EXHIBIT 394

```
 1                UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3   IN RE: NATIONAL         )    MDL No. 2804
     PRESCRIPTION OPIATE     )
 4   LITIGATION              )    Case No. 1:17-MD-2804
                             )
 5                           )    Hon. Dan A. Polster
     THIS DOCUMENT RELATES TO   )
 6   ALL CASES               )
                             )
 7
 8
 9                        __ __ __
10               Thursday, January 17, 2019
                          __ __ __
11
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                 CONFIDENTIALITY REVIEW
                          __ __ __
13
14
15
16        Videotaped Deposition of AARON BURTNER,
     held at Keller Rohrback LLP, 1201 Third
17   Avenue, Suite 3200, Seattle, Washington,
     commencing at 8:45 a.m. on the above date,
18   before Susan Perry Miller, Registered
     Diplomate Reporter, Certified Realtime
19   Reporter, Certified Realtime Captioner.
20
21
                          __ __ __
22
              GOLKOW LITIGATION SERVICES
23        877.370.DEPS | fax 917.591.5672
                   deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

1  A P P E A R A N C E S:
2
3  LEVIN PAPANTONIO THOMAS MITCHELL
   RAFFERTY PROCTOR, P.A.
   BY: WILLIAM C. BAKER, JR., ESQUIRE
4    Of Counsel
   316 South Baylen Street
5  Pensacola, Florida 32502
   (850) 435-7000
6  Counsel for Plaintiffs
7
8  WEISMAN, KENNEDY & BARRIS CO., L.P.A.
   BY: DANIEL P. GOETZ, ESQUIRE
9    dgoetz@weismanlaw.com
     BRIAN ROOF, ESQUIRE
10     broof@weismanlaw.com
       (via teleconference)
11  101 West Prospect Avenue
   Midland Building, Suite 1600
12  Cleveland, Ohio 44115
   (216) 781-1111
13  Counsel for Plaintiffs
14
15  ZUCKERMAN SPAEDER LLP
   BY: PAUL B. HYNES, JR., ESQUIRE
16     phynes@zuckerman.com
   1800 M Street, NW, Suite 1000
17  Washington, DC 20036
   (202) 778-1800
18  Counsel for CVS Indiana, LLC, CVS RX
   Services, Inc., and the Witness
19
20
21  WILLIAMS & CONNOLLY LLP
   BY: JULI ANN LUND, ESQUIRE
22     jlund@wc.com
       (via teleconference)
23  725 Twelfth Street, N.W.
   Washington, D.C. 20005
24  (202) 434-5000
   Counsel for Cardinal Health, Inc.
25

---

Page 3

1  A P P E A R A N C E S, Continued:
2
3  JONES DAY
   BY: NICOLE LANGSTON, ESQUIRE
4    nlangston@jonesday.com
       (via teleconference)
5  77 West Wacker
   Chicago, Illinois 60601
6  (312) 782-3939
   Counsel for Walmart
7
8  REED SMITH LLP
   BY: SHANA E. RUSSO, ESQUIRE
9    srusso@reedsmith.com
       (via teleconference)
10  136 Main Street, Suite 250
   Princeton Forrestal Village
11  Princeton, New Jersey 08540
   (609) 987-0050
12  Counsel for AmerisourceBergen Drug
   Corporation
13
14  COVINGTON & BURLING LLP
   BY: MICHAEL J. LANOSA, ESQUIRE
15     mlanosa@cov.com
       (via teleconference)
16  1999 Avenue of the Stars
   Los Angeles, California 90067-4643
17  (424) 332-4764
   Counsel for McKesson Corporation
18
19  BAKER HOSTETLER LLP
   BY: MELISSA D. BERTKE, ESQUIRE
20     mbertke@bakerlaw.com
       (via teleconference)
21  127 Public Square
   Key Tower, Suite 2000
22  Cleveland, Ohio 44114
   (216) 621-0200
23  Counsel for Endo Health Solutions
   Inc., Endo Pharmaceuticals Inc., Par
24  Pharmaceutical, Inc. and Par
   Pharmaceutical Companies, Inc.
25

---

Page 4

1  A P P E A R A N C E S, Continued:
2
3  TUCKER ELLIS LLP
   BY: ANDREA M. GLINKA PRZYBYSZ, ESQ.
4    andrea.przybysz@tuckerellis.com
       (via teleconference)
5  233 South Wacker Drive, Suite 6950
   Chicago, Illinois 60606
6  (312) 624-6300
   Counsel for Janssen Pharmaceuticals
7  and Johnson & Johnson
8
9  TRIAL TECHNICIAN:
10   WILLOW ASHLYNN,
   Golkow Litigation Services
11
12  VIDEOGRAPHER:
13   DAVID KIM,
   Golkow Litigation Services
14
15  ALSO PRESENT:
16   BRIAN ASQUITH, Weisman Kennedy
17   STEPHANIE HECKMAN, Paralegal
18   KAITLYN EEKHOFF, Motley Rice
   (via text streaming)
19
20
       --oOo--
21
22
23
24
25

---

Page 5

1            INDEX
2                     Page
3  APPEARANCES              2
4
5  EXAMINATION OF AARON BURTNER:
6  BY MR. BAKER.............................. 20
7  BY MR. GOETZ............................. 327
8  BY MR. BAKER............................. 506
9  BY MR. HYNES............................. 517
10  BY MR. BAKER............................. 524
11
12
13  CERTIFICATE              541
14  ACKNOWLEDGMENT OF DEPONENT          542
15  ERRATA              543
16  LAWYER'S NOTES              544
17
18
19
20       --oOo--
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 6

E X H I B I T   I N D E X

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 1 | DEA Slides: Opioid Death Chart, Opioid Deaths & Admissions 1999-2010, Opioid Top 10 Kilograms Narcotics 2014 | 137 |
| CVS-Burtner Exhibit 2 | Drug Fact Sheets for Hydrocodone, Oxycodone, Narcotics CVS-MDLT1-000055614 | 130 |
| CVS-Burtner Exhibit 3 | CVS Suspicious Order Monitoring, May 2014 CVS-MDLT1-000081680 | 126 |
| CVS-Burtner Exhibit 4 | E-mail from Buzzeo to Brown, 2/21/2008, Subject: DEA Letters - SOMs, with Attachment(s) CVS-MDLT1-000091508 | 144 |
| CVS-Burtner Exhibit 5 | E-mail from Schiavo to Burtner, 5/8/2013, with Attachment CVS-MDLT1-000055266 | 146 |
| CVS-Burtner Exhibit 6 | DEA, FDA, Osha Regulatory Update CVS-MDLT1-000061121 | 167 |
| CVS-Burtner Exhibit 7 | "SOM Program," re DEA's "Know Your Customer" policy CVS-MDLT1-000002188 | 168 |
| CVS-Burtner Exhibit 10 | E-mail Chain ending with E-mail from Mortelliti to Devlin, 2/9/2011, Subject: FW: The CVS Retirement, with Attachment(s) CVS-MDLT1-000061141 | 171 |

Page 7

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 11 | E-mail Chain ending with E-mail from Hinkle to Tulley and Burtner, 11/2/2012, Subject: FW: SOM Report Attorney Client Privilege, with Attachment(s) CVS-MDLT1-000109623 | 190 |
| CVS-Burtner Exhibit 12 | E-mail Chain ending with E-mail from Mortelliti to Williamson, June 30, 2010, Subject: SOM Update CVS-MDLT1-000088737 | 234 |
| CVS-Burtner Exhibit 13 | E-mail Chain ending with E-mail from Mortelliti to Devlin, 3/5/2010, Subject: FW: Adjustment to the CVS SOM CVS-MDLT1-000111260 | 220 |
| CVS-Burtner Exhibit 14 | E-mail Chain ending with E-mail from Santhoshraj to Mortelliti, 3/10/2012, Subject: RE: Adjustment to the CVS SOM CVS-MDLT1-000110439 | 228 |
| CVS-Burtner Exhibit 15 | Memo to Frank Devlin from John Mortelliti dated August 13, 2010, Subject: Control Drug IRR Update CVS-MDLT1-000034183 | 216 |
| CVS-Burtner Exhibit 18 | E-mail Chain ending with E-mail from Williamson to Mortelliti, February 08, 2011, Subject: RE: Update CVS-MDLT1-000061142 | 199 |

Page 8

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 22 | Suspicious Order Monitoring for PSE/Control Drugs, Summary of Key Concepts and Procedures, August 2010 CVS-MDLT1-000061191 | 202 |
| CVS-Burtner Exhibit 23 | E-mail Chain ending with E-mail from Hinkle to Devlin, 1/27/2011, Subject: FW: IRR Narratives, with Attachment(s) CVS-MDLT1-000112597 | 241 |
| CVS-Burtner Exhibit 24 | E-mail Chain ending with E-mail from Cain to Mortelliti and Hinkle, 1/27/2011, Subject: IRR Narratives, with Attachment(s) CVS-MDLT1-000010849 | 245 |
| CVS-Burtner Exhibit 25 | E-mail from Devlin to Hughes, 5/17/2011, Subject: Control Drug Suspicious Order Monitoring.doc, with Attachment(s) CVS-MDLT1-000057736 | 249 |
| CVS-Burtner Exhibit 34 | List I Chemicals (PSE, EPH) and Control Drug Policy & Procedure, Logistics IRR Analyst-Suspicious Order Monitoring (SOM) Program, Effective Date June 28, 2011 CVS-MDLT1-000009812 | 123 |
| CVS-Burtner Exhibit 37 | E-mail Chain ending with E-mail from Burtner to Lawson, 5/31/2012, Subject: RE: Control/PSE IRR dated 5/30/12 CVS-MDLT1-000019682 | 98 |

Page 9

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 38 | CVS Corporation Control Drug Top 10 Stores by DC - WN, 08-31-12 CVS-MDLT1-000019667 | 99 |
| CVS-Burtner Exhibit 39 | CVS Corporation Control Drug Top 10 Stores by DC - HI, 05-31-12 CVS-MDLT1-000019552 | 107 |
| CVS-Burtner Exhibit 40 | E-mail Chain ending with E-mail from Lawson to Burtner, 6/8/2012, Subject: FW: Top 10 Report Review CVS-MDLT1-000019491 | 109 |
| CVS-Burtner Exhibit 41 | E-mail Chain ending with E-mail from Hinkle to Andrade, 7/10/2012, Subject: FW: Attorney/Client Privileged Information CVS-MDLT1-000083855 | 258 |
| CVS-Burtner Exhibit 44 | E-mail from Burtner to Hinkle, 9/7/2012, Subject: Required Headcount to Complete IRR SOM Process.docx, with Attachment CVS-MDLT1-000008248 | 74 |
| CVS-Burtner Exhibit 46 | Pharmacy/DC Ordering Process conference call recap, AGI/CVS Discussion, 10/5/12 CVS-MDLT1-000083881 | 44 |
| CVS-Burtner Exhibit 47 | E-mail from Burtner to Hinkle, 10/10/2012, Subject: Justification CVS-MDLT1-000033573 | 25 |

**Page 10**

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 48 | E-mail from Burtner to Campbell, 10/11/2012, Subject: Loss Prevention Analyst - Job Description/Work Instruction, with Attachment(s) CVS-MDLT1-000009810 | 40 |
| CVS-Burtner Exhibit 49 | E-mail Chain ending with Tulley and Hinkle, 1/11/2012, Subject: RE: Recap progress made CVS-MDLT1-000055834 | 212 |
| CVS-Burtner Exhibit 52 | "Suggested Questions a Distributor should ask prior to shipping controlled substances," October 20, 2009 CVS-MDLT1-000100088 | 316 |
| CVS-Burtner Exhibit 53 | SOM Due Diligence Guidance Document CVS-MDLT1-000057741 | 320 |
| CVS-Burtner Exhibit 54 | "Some Due Diligence Questions" CVS-MDLT1-000014198 | 327 |
| CVS-Burtner Exhibit 55 | E-mail Chain ending with Pike and Hinkle, 10/31/2012, Subject: RE: Todays IRR CVS-MDLT1-000083056 | 72 |
| CVS-Burtner Exhibit 56 | E-mail to Hinkle from Devlin, 9/12/2012, Subject: FW: Maximum Cutoffs on IRR 9/11/12 CVS-MDLT1-000109941 | 68 |

**Page 11**

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 75 | E-mail Chain ending with Schiavo, 4/26/2013, Subject: RE: Order Flagging Reasons CVS-MDLT1-000055291 | 271 |
| CVS-Burtner Exhibit 80 | E-mail from Burtner to Pike, 6/10/2013, Subject: SOM CVS-MDLT1-000009678 | 41 |
| CVS-Burtner Exhibit 81 | E-mail from Burtner to Baker, 6/11/2012, Subject: FW: Kelly Baker CVS-MDLT1-000009683 | 508 |
| CVS-Burtner Exhibit 82 | E-mail Chain ending with Bourque and others, July 02, 2013, Subject: FW: Archer SOM CVS-MDLT1-000076116 | 509 |
| CVS-Burtner Exhibit 83 | E-mail Chain ending with Schiavo and others, July 09, 2013, Subject: RE: Archer SOM CVS-MDLT1-000076115 | 510 |
| CVS-Burtner Exhibit 84 | E-mail Chain ending with Nicastro, 7/17/2013, Subject: FW: Archer SOM CVS-MDLT1-000076114 | 512 |
| CVS-Burtner Exhibit 85 | E-mail from Burtner to Eck, 9/17/2013 CVS-MDLT1-000099708 | 513 |
| CVS-Burtner Exhibit 88 | Store Metric Sheet CVS-MDLT1-000080069 | 314 |

**Page 12**

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 97 | CVS Distribution Center, Controlled Drug - DEA Standard Operating Procedures Manual, Effective Date 12/1/07 CVS-MDLT-000008506 | 115 |
| CVS-Burtner Exhibit 400 | E-mail from Burtner to Molina, 8/11/2012, Subject: Attorney/Client Privilege - Project Plan CVS-MDLT-000114320 | 375 |
| CVS-Burtner Exhibit 401 | IRR SOM Review Project Plan Phase 1 CVS-MDLT-000114321 | 375 |
| CVS-Burtner Exhibit 402 | E-mail from Burtner to Miller and others, December 24, 2012, Subject: Control IRR dated 12/23/12 stores [redacted] CVS-MDLT-0000003166 | 387 |
| CVS-Burtner Exhibit 404 | E-mail from Helfrich to Deaton and others, February 07, 2014, Subject: Control/PSE IRR dated 2/6/14 Store 5949; Store 3992; Store 3314 IN CVS-MDLT-0000008496 | 389 |
| CVS-Burtner Exhibit 405 | List I Chemicals (PSE, EPH) and Control Drug Policy & Procedure, Logistics IRR Analyst - Suspicious Order Monitoring (SOM) Program, Effective Date June 28, 2011 CVS-MDLT-000025018 | 435 |
| CVS-Burtner Exhibit 406 | Flowchart, "Draft IRR SOM Process" CVS-MDLT-000109874 | 328 |

**Page 13**

| | Description | Page |
|---|---|---|
| CVS-Burtner Exhibit 407 | Item Review Report dated 12/20/2012 CVS-MDLT-000011359 | 331 |
| CVS-Burtner Exhibit 409 | Irregular Order - DC Communication dated 11/19/2012 CVS-MDLT-000030490 | 334 |
| CVS-Burtner Exhibit 410 | Irregular Order - Logistics Communication Submitted by Aaron Burtner, 11/9/2012 CVS-MDLT-000030489 | 335 |
| CVS-Burtner Exhibit 411 | E-mail from Burtner to Mortelliti, 6/18/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 6 15 12.xlsx, with Attachment CVS-MDLT-000112657 | 341 |
| CVS-Burtner Exhibit 412 | E-mail from Burtner to Mortelliti, 6/19/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 6 18 12.xlsx, with Attachment CVS-MDLT-000112648 | 344 |
| CVS-Burtner Exhibit 413 | E-mail Chain ending with Mortelliti, 6/21/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 6 20 12.xlsx, with Attachment CVS-MDLT-000112644 | 347 |
| CVS-Burtner Exhibit 414 | E-mail from Burtner to Mortelliti, 7/6/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 7 5 12.xlsx, with Attachment CVS-MDLT-000112676 | 353 |

**Page 14**

| Description | Page |
|---|---|
| CVS-Burtner Exhibit 415 E-mail from Burtner to Hinkle, 7/13/2012, with Attachment(s) CVS-MDLT1-000112680 | 355 |
| CVS-Burtner Exhibit 416 E-mail from Burtner to Hinkle, 7/19/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 7 18 12.xlsx, with Attachment CVS-MDLT1-000112690 | 363 |
| CVS-Burtner Exhibit 417 E-mail from Burtner to Hinkle, 8/23/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 8 22 12.xlsx, with Attachment CVS-MDLT1-000112595 | 364 |
| CVS-Burtner Exhibit 418 E-mail from Burtner to Hinkle, 9/10/2012, Subject: Attorney Client Privilege - LP Analyst Time Study 9 7 12.xlsx, with Attachment CVS-MDLT1-000112698 | 365 |
| CVS-Burtner Exhibit 422 VIPERx PDMR High Priority Report CVS-MDLT1-000074450 | 382 |
| CVS-Burtner Exhibit 424 E-mail from Schiavo to Bourque and others, 1/29/2012, Subject: Privileged and Confidential - SOM Process Documentation CVS-MDLT1-000083064 | 367 |
| CVS-Burtner Exhibit 425 "Opportunities - Current SOM Process CVS-MDLT1-000083065 | 367 |

**Page 16**

| Description | Page |
|---|---|
| CVS-Burtner Exhibit 441 December 2010 PSE IRR Recap CVS-MDLT1-000009740 | 480 |
| CVS-Burtner Exhibit 443 E-mail from Nicastro to Gillen, 11/14/2013, Subject: Closing audit CVS-MDLT1-000022284 | 495 |
| CVS-Burtner Exhibit 444 E-mail from Gillen to Nicastro and Ratcliff, 11/25/2013, Subject: CVS Store #06880 & 6757 CVS-MDLT1-000076135 | 496 |
| CVS-Burtner Exhibit 445 IRR dated 01/30/2011 CVS-MDLT1-000100925 | 463 |
| CVS-Burtner Exhibit 451 E-mail from Burtner to Vanelli and Hinkle, 12/20/2012, Subject: Attorney Client Privilege - Store Metrics Report CVS-MDLT1-000109775 | 393 |
| CVS-Burtner Exhibit 455 E-mail from Burtner to Campbell, 10/11/2012, Subject: Loss Prevention Analyst - Job Description/Work Instruction CVS-MDLT1-000009810 | 475 |
| CVS-Burtner Exhibit 462 E-mail from Burtner to Lawson and Hinkle, 3/26/2012, No Subject CVS-MDLT1-000109870 | 328 |
| CVS-Burtner Exhibit 500 Handwritten Chart Regarding Time Studies and IRRs, 3 pages, No Bates | 505 |
| CVS-Burtner Exhibit 501A First Half of Large Demonstrative Exhibit of Taped Pages | 505 |

**Page 15**

| Description | Page |
|---|---|
| CVS-Burtner Exhibit 428 CVS Logistics Loss Prevention Work Instruction, Irregular Order Review Process, Current Revision Date: 5/3/12 CVS-MDLT1-000009816 | 446 |
| CVS-Burtner Exhibit 429 E-mail from Burtner to Campbell, 10/11/2012, Subject: Loss Prevention Analyst - Job Description/Work Instruction CVS-MDLT1-000009810 | 446 |
| CVS-Burtner Exhibit 431 Columnar Report, 12/31/2012 CVS-MDLT1-000007622 | 418 |
| CVS-Burtner Exhibit 432 Item Review Report - Cont, 12/31/12 CVS-MDLT1-000011260 and 11264 | 429 |
| CVS-Burtner Exhibit 436 E-mail Chain ending with E-mail from Burtner to Pike and others, 11/9/2012, Re: Todays IRR CVS-MDLT1-000055836 | 431 |
| CVS-Burtner Exhibit 437 IRR dated 01/20/2011 CVS-MDLT1-000100925 | 462 |
| CVS-Burtner Exhibit 438 IRR dated 05/27/2011 CVS-MDLT1-000102803 | 463 |
| CVS-Burtner Exhibit 439 Track One CVS Store Information CVS-MDLT1-000007362 | 477 |
| CVS-Burtner Exhibit 440 Printout of Spreadsheet(s) CVS-MDLT1-000010268 - CVS-MDLT1-000010521 | 479 |

**Page 17**

| Description | Page |
|---|---|
| CVS-Burtner Exhibit 501B Second Half of Large Demonstrative Exhibit of Taped Pages | 505 |

--oOo--

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 (Thursday, January 17, 2019, 8:45 a.m.)
2 THE VIDEOGRAPHER: We are now
3 on the video record. My name is David
4 Kim. I'm a videographer for Golkow
5 Litigation Services. Today's date is
6 January 17th, 2019, and the time is
7 8:45 a.m.
8 This video deposition is being
9 held in Seattle, Washington in the
10 matter of National Prescription Opiate
11 Litigation, MDL 2805, for the
12 U.S. District Court, the Northern
13 District of Ohio, Eastern Division.
14 The deponent is Aaron Burtner.
15 Will counsel please identify
16 themselves for the record.
17 MR. BAKER: This is William
18 Baker for the plaintiffs.
19 MR. GOETZ: Dan Goetz on behalf
20 of the plaintiffs.
21 MR. HYNES: Paul Hynes on
22 behalf of CVS Indiana LLC,
23 CVS RX Services, Inc., and the
24 witness, Aaron Burtner.
25 THE REPORTER: Would those on

Page 19

1 the phone announce, please?
2 MS. BERTKE: Melissa Bertke
3 from -- sorry. Melissa Bertke from
4 BakerHostetler on behalf of the Endo
5 Defendants.
6 MR. ROOF: Brian Roof on behalf
7 of plaintiffs.
8 MR. LANOSA: This is Michael
9 Lanosa on behalf of McKesson.
10 MS. LANGSTON: Nicole Langston
11 from Jones Day on behalf of Walmart.
12 MS. LUND: Juli Ann Lund from
13 Williams & Connolly on behalf of
14 Cardinal Health.
15 MS. RUSSO: Shana Russo of Reed
16 Smith on behalf of AmerisourceBergen
17 Drug Corporation.
18 MS. PRZYBYSZ: Andrea Przybysz
19 from Tucker Ellis on behalf of J&J and
20 Janssen.
21 THE VIDEOGRAPHER: The court
22 reporter is Susan Miller and will now
23 swear in the witness.
24 MR. BAKER: Before we do that,
25 could everybody on the phone, please,

Page 20

1 please double-check, triple-check,
2 that you have your mute button on? I
3 appreciate it. Thank you.
4 (Witness sworn by the
5 reporter.)
6 P R O C E E D I N G S
7 AARON BURTNER,
8 having taken an oath to tell the truth, the
9 whole truth, and nothing but the truth,
10 testified as follows:
11 EXAMINATION
12 QUESTIONS BY MR. BAKER:
13 Q. Mr. Burtner, the arrangement
14 here today is you are represented by counsel
15 seated to your left, Mr. Paul Hynes, correct?
16 A. Yes.
17 Q. Okay. And Mr. Hynes has met
18 with you for the last two days to prepare you
19 for your deposition? Is that correct?
20 A. Yes.
21 Q. You're no longer employed by
22 CVS. In fact, you live in Seattle,
23 Washington, which is where we are today. Is
24 that correct?
25 A. That is correct.

Page 21

1 Q. Okay. And you worked for CVS
2 from 2000 what to 2012?
3 A. 2010 to 2012.
4 Q. Okay. When you started at CVS,
5 what was your position?
6 A. My original position was loss
7 prevention supervisor.
8 Q. And when you quit CVS, what was
9 your position?
10 A. SOM manager.
11 Q. Give me the month that you
12 started in 2010 and the month that you quit
13 in 2012.
14 MR. HYNES: Objection.
15 Compound.
16 Go ahead.
17 A. Sorry, one clarification. I
18 was there until 2013. June of 2010 until
19 June of 2013.
20 QUESTIONS BY MR. BAKER:
21 Q. Okay. What are you currently
22 doing here in Seattle?
23 A. I am currently employed by
24 Amazon.
25 Q. Okay. What have you done to

Page 22

1  prepare for your deposition?
2      A.    I have met with Paul.
3      Q.    Mr. Hynes?
4      A.    Mr. Hynes, and a few other
5  associates with his law firm, and attorneys
6  from within CVS.
7      Q.    Okay.  You know Mr. Hynes
8  represents CVS in this case, he and his law
9  firm, you know that?
10     A.    Yes.
11     Q.    Okay.  When did Mr. Hynes
12  become your personal attorney?
13     A.    My personal...
14     Q.    He's here today representing
15  you; you stated that.
16     A.    Okay.
17     Q.    When did he become your
18  personal attorney?
19     A.    I believe I first spoke with
20  Mr. Hynes in November of -- approximately
21  November of 2018.
22     Q.    Okay.  That's when you got
23  notice that you were going to have to testify
24  in this case?
25     A.    I believe so.

Page 23

1      Q.    You know what this case is
2  about?
3      A.    Yes.
4      Q.    Okay.  You know this is about
5  the national opioid crisis and distributors'
6  roles in that crisis; you understand that?
7      A.    Yes.
8      Q.    Okay.  And you've studied
9  documents in relation to that crisis in
10  preparation for your deposition, have you
11  not?
12         MR. HYNES:  Objection to the
13      form.  Instruct the witness not to
14      answer to the extent that it gets into
15      prep with counsel.
16  QUESTIONS BY MR. BAKER:
17     Q.    Okay.  You can tell me what
18  you've reviewed.  You can't tell me what your
19  conversation was with your counsel, but you
20  can certainly tell me what you've reviewed.
21         MR. HYNES:  And I disagree.  I
22      object.  He will not tell you what he
23      reviewed.  He can tell you he reviewed
24      documents.  We're not going to talk
25      about what documents he reviewed.

Page 24

1  That is protected by work product.
2         MR. BAKER:  That, I disagree
3  with.  Let's go off record for a
4  second.
5         THE VIDEOGRAPHER:  We are now
6  going off the record, and the time is
7  8:50 a.m.
8         (Recess taken, 8:50 a.m. to
9  8:51 a.m.)
10         THE VIDEOGRAPHER:  We are now
11  going back on the record, and the time
12  is 8:51 a.m.
13  QUESTIONS BY MR. BAKER:
14     Q.    When you left CVS's employment
15  and came to Amazon in Seattle, did you take
16  any CVS documents with you?
17     A.    No.
18     Q.    Okay.  So everything that
19  you've reviewed is something that has been
20  provided by CVS to you to review.  Is that
21  correct?
22         MR. HYNES:  You can answer that
23  question.
24     A.    Yes.
25           --oOo--

Page 25

1  QUESTIONS BY MR. BAKER:
2      Q.    And Mr. Hynes, the lawyer
3  sitting next to you, provided that to you.
4  Is that right?
5      A.    Yes.
6      Q.    Okay.  Do you have any problem
7  with your memory at all?
8      A.    No.
9      Q.    Okay.  Are you on any
10  medication that would cause you to have a
11  lapse of memory of any type today?
12     A.    No.
13     Q.    Okay.  Do you feel prepared for
14  your deposition today?
15         MR. HYNES:  Objection to form.
16  QUESTIONS BY MR. BAKER:
17     Q.    Do you feel prepared?
18     A.    To the best of my ability.
19     Q.    Okay.  Let's go to document
20  number 47.
21         (CVS-Burtner Exhibit 47 was
22      marked for identification.)
23         MR. BAKER:  Hand him a copy.
24         MR. HYNES:  Thank you.
25           --oOo--

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  QUESTIONS BY MR. BAKER:
2       Q.   Okay.  I've handed you document
3  No. 47.  Do you recognize this e-mail, Aaron
4  Burtner, 10/10/12?
5       A.   I don't recall sending this
6  document.
7       Q.   All right.  Let's see if we can
8  get some ground rules here.  I'm going to ask
9  you very simple questions, and, for instance,
10  this e-mail has your name on it.  It's
11  blatantly obvious that it has your e-mail
12  name on it.  And throughout this whole
13  litigation -- please look at me.
14       A.   Yes.
15       Q.   I'm getting a lot of "I don't
16  remember, I may have, I don't know."
17           Well, this is so obvious that
18  you can look at it and just obviously tell
19  the answer, yes, you wrote the e-mail.
20           So this is the question:  Did
21  you write this e-mail?
22           MR. HYNES:  Objection to the
23       colloquy.  The witness said he doesn't
24       recall sending the e-mail.
25                 --oOo--

Page 27

1  QUESTIONS BY MR. BAKER:
2       Q.   Okay.  Let me explain this to
3  you.  You told me you don't have any problem
4  with your memory, correct?
5       A.   Yes.
6       Q.   Okay.  I'm going to ask you
7  very simple questions, and I'm not going to
8  play games all day long about "I don't
9  remember."  This has gone on with every
10  single witness in this case.  It's because
11  they're meeting with counsel and they're
12  saying "I don't remember."
13           Well, let me tell you
14  something.  I'm going to show you documents.
15  I'm going to jog your memory.  And I don't
16  want to play games about the "I don't
17  remember" stuff all day long or else we'll be
18  here a long time.  Are we clear about that?
19           MR. HYNES:  Objection.
20  QUESTIONS BY MR. BAKER:
21       Q.   Are we clear?
22           MR. HYNES:  Objection.
23       A.   Yes.
24  QUESTIONS BY MR. BAKER:
25       Q.   Okay.  What name is on this

Page 28

1  e-mail?
2       A.   From this e-mail, I can see
3  that it was sent from me.
4       Q.   Okay.  And you sent it to Pam
5  Hinkle.  Who was Pam Hinkle at the time you
6  wrote this e-mail?
7       A.   At this time, Pam was a
8  dotted-line supervisor.
9       Q.   Okay.  And this says:
10  Reference the CFR and the requirements we
11  need to comply.  Correct?
12       A.   Umm.
13       Q.   That's what it says:  Reference
14  the CFR and the requirements we need to
15  comply.
16           First sentence, correct?
17           MR. HYNES:  Objection to form.
18  QUESTIONS BY MR. BAKER:
19       Q.   Is that what it says?
20           MR. HYNES:  Objection to form.
21       A.   I don't recall sending this
22  e-mail, but I can see from the document that
23  apparently that must be the reasoning.
24  QUESTIONS BY MR. BAKER:
25       Q.   Okay.  Let me see if we can get

Page 29

1  something straight.  I want to ask you very
2  specific questions.  I'm not looking for
3  editorial answers.
4           What is the date of today?
5           MR. HYNES:  Objection to form.
6       A.   January 17th, 2019.
7  QUESTIONS BY MR. BAKER:
8       Q.   Okay.  The key word in that
9  question was "date," okay?  And you answered
10  it.  What day is today?
11       A.   Thursday.
12       Q.   The key word in that question
13  was "day."  You picked up on it.  You
14  answered it.  I appreciate it.
15           What color is the pen I'm
16  handing you right now?  What is that color?
17       A.   Blue.
18       Q.   The key word in that question
19  was "color."  So you see we went day, date,
20  color.  You understand?  So I'm going to ask
21  you questions.  I'm going to ask you does the
22  document say that.  If the document says
23  that, there's one word, yes.  There's not "I
24  don't remember" and all that.  So I want to
25  get through this, okay?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  MR. HYNES: Objection to the
2  colloquy.
3  QUESTIONS BY MR. BAKER:
4  Q. So was this document sent in
5  order for you to apply for a job at CVS to be
6  the IRR SOM manager?
7  MR. HYNES: Objection to form.
8  A. I -- I don't recall the purpose
9  of sending this e-mail.
10  QUESTIONS BY MR. BAKER:
11  Q. Okay. In October 2012, what
12  was your job?
13  A. I was -- in October 2012, I was
14  the loss prevention supervisor.
15  Q. And what did you get promoted
16  to?
17  MR. HYNES: Objection to form.
18  A. SOM manager.
19  QUESTIONS BY MR. BAKER:
20  Q. Okay. When did you get
21  promoted to SOM manager?
22  A. Approximately December of 2012.
23  Q. And who was the SOM manager
24  before you took that position?
25  --oOo--

Page 31

1  MR. HYNES: Objection to form.
2  QUESTIONS BY MR. BAKER:
3  Q. Was there an SOM manager?
4  A. I don't believe there was a
5  position of SOM manager.
6  Q. Okay. Was this a position that
7  was created just for you?
8  A. I don't recall if this position
9  existed before I took it.
10  Q. Okay. Look at the second
11  bullet point there. It says: My
12  qualifications to completely fill this role
13  and complete the necessary tasks are involved
14  with the decision-making process in shaping
15  and building the IRR policies and procedures
16  since 2/24/12.
17  Is that true?
18  A. That is what the document says.
19  Q. Is that what you put in the
20  document?
21  MR. HYNES: Objection to form.
22  A. I wrote that in this document.
23  QUESTIONS BY MR. BAKER:
24  Q. Okay. Skip down to where it
25  says "This person."

Page 32

1  Do you see this bullet where it
2  says "This person will"?
3  A. Yes.
4  Q. Okay. It says: This person
5  will ensure all store reviews are completely,
6  thoroughly, proficiently, in a
7  timely manner -- are completed thoroughly,
8  proficiently and timely -- excuse me, let me
9  repeat that.
10  This says: This person will
11  ensure all store reviews are completed
12  thoroughly, proficiently, and in a timely
13  manner.
14  Is that correct?
15  A. That is what the document says.
16  Q. And that's referencing the IRR,
17  which is the daily Item Review Report,
18  correct?
19  A. I don't recall writing this
20  document, so I can't be certain as to what --
21  what exactly that is referring to.
22  Q. This also says that you would
23  audit reviews and documentation completed by
24  loss prevention analysts to ensure compliance
25  with DEA and corporate policies and

Page 33

1  procedures. Is that correct?
2  MR. HYNES: Object to form.
3  QUESTIONS BY MR. BAKER:
4  Q. Is that what it says?
5  A. Yes.
6  Q. Okay. Down below that, it
7  says: What we lose by not creating this
8  management position.
9  Isn't that what it says?
10  A. That is what the document says.
11  Q. Okay. So this was a brand-new
12  created position. Is that right?
13  MR. HYNES: Objection to form.
14  QUESTIONS BY MR. BAKER:
15  Q. Is that right?
16  MR. HYNES: Objection to form.
17  A. I don't recall if this position
18  was created before me. That is what the
19  document says.
20  QUESTIONS BY MR. BAKER:
21  Q. Okay. Your lawyer has a right
22  to say "Objection to form," and pretty much
23  every question that I ask, no matter what,
24  he's going to say those three words. That's
25  fine. He's allowed to do that.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1      That doesn't mean you don't
2  answer, unless he instructs you not to
3  answer.  So I don't want you to be thrown off
4  by that.  Fair enough?
5      A.    That's fair.
6      Q.    So if he says "Objection to
7  form," don't think that means don't answer
8  the question.  That just means he's trying to
9  reserve an objection so later on if he wants
10  to go to the judge and ask, you know, can we
11  not ask that question, not give that answer,
12  he's preserved that.
13      But as we move through this, I
14  don't want you to hear that, hesitate 10
15  seconds, wait, and then answer, unless that's
16  what you really needed to do to answer the
17  question.
18      In other words, don't hesitate
19  just because he objected.  Fair enough?
20      MR. HYNES:  He's ready.  I'll
21  instruct you not to answer if --
22  QUESTIONS BY MR. BAKER:
23      Q.    All right.  You ready?
24      A.    I am ready.
25      Q.    All right.  It says:  What we

Page 35

1  lose by not creating this management position
2  and not providing 100% supervision is
3  potential lose due to store reviews not
4  completed thoroughly, proficiently, and in a
5  timely manner.
6      Is that what the document says?
7      A.    That is what the document says.
8      Q.    All right.  Let me go back up.
9  "What we lose by not creating this management
10  position," the word "create" is in there, is
11  it not?
12      A.    The word "create" is in this
13  document, yes.
14      Q.    Okay.  Which leads you to
15  recall that this position did not exist
16  before it was actually created --
17      MR. HYNES:  Objection to form.
18  QUESTIONS BY MR. BAKER:
19      Q.    -- for you.  Is that right?
20      MR. HYNES:  Objection to form.
21  Objection to form; asked and answered.
22  QUESTIONS BY MR. BAKER:
23      Q.    Is that right?
24      MR. HYNES:  Objection to form;
25  asked and answered.

Page 36

1      A.    That would be speculation.  I
2  don't recall if this position existed before
3  my --
4  QUESTIONS BY MR. BAKER:
5      Q.    Without using speculation, what
6  does the word "create" mean in your mind when
7  you use it?
8      MR. HYNES:  Objection to form.
9      A.    To establish.
10  QUESTIONS BY MR. BAKER:
11      Q.    Okay.  So what we lose by not
12  establishing this management position, could
13  we put that word in there and make that the
14  same as what you mean by the word "create"?
15      MR. HYNES:  Objection to form.
16  QUESTIONS BY MR. BAKER:
17      Q.    Would that be fair?
18      MR. HYNES:  Objection to form.
19      A.    I don't recall if this position
20  existed before I took it.  According to this
21  document, the word "create" is in this
22  document.
23  QUESTIONS BY MR. BAKER:
24      Q.    Okay.  Which means "establish"
25  in your vernacular, correct?

Page 37

1      MR. HYNES:  Objection to form.
2  QUESTIONS BY MR. BAKER:
3      Q.    Is that right?
4      MR. HYNES:  Objection to form.
5  QUESTIONS BY MR. BAKER:
6      Q.    Sir?
7      A.    Yes.
8      Q.    Okay.  It says also:  Potential
9  lose due to documentation not completed
10  according to DEA and corporate
11  policies/procedures, correct?
12      A.    That is what the document says.
13      Q.    Who, to your knowledge, was
14  doing the store reviews thoroughly,
15  proficiently, and in a timely manner, if
16  anybody, before this position was created for
17  you?
18      MR. HYNES:  Objection to form.
19      A.    At this time, in October
20  of 2012, I was creating -- I'm sorry.  I was
21  completing the reviews on a daily basis with
22  a team of other individuals.
23  QUESTIONS BY MR. BAKER:
24      Q.    Okay.  But this was created so
25  that that could be done thoroughly,

Page 38

1 proficiently, and in a timely manner,
2 correct?
3         MR. HYNES:  Objection to form;
4     assumes facts not in evidence.
5 QUESTIONS BY MR. BAKER:
6     Q.    I'm reading from the document:
7 That was created so that store reviews could
8 be completed thoroughly, proficiently and in
9 a timely manner, correct?
10         MR. HYNES:  Objection to form;
11     mischaracterizes the document.
12 QUESTIONS BY MR. BAKER:
13     Q.    That's what the document says,
14 right?
15         MR. HYNES:  Objection to form;
16     misrepresents the document.
17     A.    That is the statement in the
18 document.
19 QUESTIONS BY MR. BAKER:
20     Q.    Okay.  Remember at all times
21 that a jury is watching you on that camera,
22 so I appreciate you answering that question
23 direct.  If you don't answer a question
24 direct, you understand the jury is going to
25 know that you're not doing that.

Page 39

1         You understand that?
2         MR. HYNES:  Objection.
3     A.    Understood.
4 QUESTIONS BY MR. BAKER:
5     Q.    Okay.  All right.  It says:
6 Potential lose due to documentation not
7 completed according to DEA and corporate
8 policies/procedures.
9         Let me ask you that.  You
10 understand that the DEA requires that
11 documentation be completed in reference to
12 the suspicious order monitoring process,
13 don't you?
14         MR. HYNES:  Objection to form;
15     calls for a legal interpretation.
16     A.    Yes.  And at this time we were
17 documenting every -- all reviews.  We were
18 completing the documentation according to the
19 DEA standard and corporate policies and
20 procedures.
21 QUESTIONS BY MR. BAKER:
22     Q.    Okay.
23         MR. BAKER:  Next document,
24     please.  Number 48.
25         (CVS-Burtner Exhibit 48 was

Page 40

1     marked for identification.)
2 QUESTIONS BY MR. BAKER:
3     Q.    All right.  This is another
4 e-mail dated 10/11/12 by you, Aaron Burtner.
5 That's what the document says, correct?
6     A.    Correct.
7     Q.    Okay.  And at the bottom of
8 that e-mail it says:  Also, I attached the
9 justification submitted to Frank Devlin to
10 create a new management position over the
11 IRR SOM process.
12         Correct?
13     A.    That is what the document says.
14     Q.    Okay.  "New" means it didn't
15 exist before, correct?
16         MR. HYNES:  Objection to form.
17 QUESTIONS BY MR. BAKER:
18     Q.    That's what new means?
19         MR. HYNES:  Objection to form.
20 QUESTIONS BY MR. BAKER:
21     Q.    Right?
22         MR. HYNES:  Objection to form.
23     A.    That would be my understanding
24 of "create a new."
25         MR. BAKER:  Okay.  Next

Page 41

1 document.  Number 80.
2         (CVS-Burtner Exhibit 80 was
3     marked for identification.)
4 QUESTIONS BY MR. BAKER:
5     Q.    All right.  This document says
6 it's Aaron Burtner to Crystal Pike.  Do you
7 remember who Crystal Pike was?
8     A.    Yes.
9     Q.    Who was she?
10     A.    She was an employee of Analysis
11 Group.
12     Q.    Okay.  And Analysis Group was
13 what in reference to your job in CVS at the
14 time?
15         MR. HYNES:  Objection to form.
16     A.    Analysis Group was, I
17 believe -- I believe a consulting firm that
18 we were working with on the SOM process.
19 QUESTIONS BY MR. BAKER:
20     Q.    Okay.  And before that your
21 company had been working with a company, CCS?
22 Is that right?
23     A.    I don't believe I was involved
24 with that.
25     Q.    Okay.  But you were involved

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  with the Analysis Group communication?
2      A.    Yes.
3      Q.    Okay.  Analysis Group rewrote
4  the whole program for CVS at one point.  Is
5  that right?
6          MR. HYNES:  Objection to form.
7      A.    I don't have -- I don't know
8  what the new product is.  I left before it
9  was finished.  I can't say if they completely
10  rewrote the program.
11  QUESTIONS BY MR. BAKER:
12      Q.    This is during the time frame
13  when the new product was in development.  Is
14  that correct?
15      A.    Yes.
16      Q.    Okay.  And the old product is
17  the one that you used while you were at CVS.
18  Is that right?
19          MR. HYNES:  Objection to form.
20      A.    Yes.
21  QUESTIONS BY MR. BAKER:
22      Q.    You never got to use the new
23  product that this company developed.  Is that
24  correct?
25          MR. HYNES:  Objection to form.

Page 43

1      A.    Correct.
2  QUESTIONS BY MR. BAKER:
3      Q.    All right.  It says:  Crystal,
4  I wanted to let you know that I put in my
5  two-weeks' notice of resignation last
6  Thursday and my last day with CVS will be
7  Wednesday, June 26.
8          That's June 26th, 2013.  Is
9  that right?
10      A.    Correct.
11      Q.    So that's the last day that you
12  worked at CVS.
13      A.    Yes.
14      Q.    So the date that the position
15  was actually created was in November of 2012?
16  Is that right?
17          MR. HYNES:  Objection to form.
18      A.    I assumed the role of SOM
19  manager in December of 2013.
20  QUESTIONS BY MR. BAKER:
21      Q.    December of --
22      A.    I'm sorry, 2012, yes.
23      Q.    2012, okay.  So the role of
24  your position as suspicious order monitoring
25  manager for CVS lasted from December 2012 to

Page 44

1  June 26 of 2013, right?
2      A.    Correct.
3      Q.    Okay.  So a total of seven
4  months.
5      A.    Yes.
6      Q.    And you've not returned to CVS
7  since then, correct?
8      A.    No.
9      Q.    You've only been in touch with
10  CVS to the extent of this litigation since
11  November of 2018, right?
12      A.    Yes, I believe that to be true.
13      Q.    And we're in January of 2019
14  right now, correct?
15      A.    Correct.
16          MR. BAKER:  Okay.  Next
17  document, No. 46.  Hand him two, he
18  can hand him one.  The process is I'll
19  hand you two and then you can hand him
20  one, all right?
21          MR. HYNES:  Yeah, that works.
22          (CVS-Burtner Exhibit 46 was
23  marked for identification.)
24  QUESTIONS BY MR. BAKER:
25      Q.    This is called an AGI/CVS

Page 45

1  discussion that's dated 10/5 of 2012.
2          Do you see that?
3      A.    Yes.
4      Q.    You see that you're one of the
5  attendees in this group discussion, Aaron
6  Burtner.
7          Do you see that?
8          MR. HYNES:  Objection to form.
9      A.    Yes.
10  QUESTIONS BY MR. BAKER:
11      Q.    This is a memorandum or recap
12  of a discussion of multiple people with that
13  new company, AGI, that was developing the new
14  SOM software program for CVS.  Is that
15  correct?
16          MR. HYNES:  Objection to form.
17  QUESTIONS BY MR. BAKER:
18      Q.    Is that correct?
19          MR. HYNES:  Objection to form.
20      A.    Correct.
21  QUESTIONS BY MR. BAKER:
22      Q.    Okay.  All right.  It says:
23  The decision has been made to not use
24  e-SupplyLink.
25          Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    A.   Oh.  Yes.  That is what the
2 document says.
3    Q.   All right.  That was another
4 company bidding for CVS's business to rewrite
5 the SOM program software.  Is that correct?
6          MR. HYNES:  Objection to form.
7    A.   I don't recall e-SupplyLink or
8 their role in this process.
9 QUESTIONS BY MR. BAKER:
10    Q.   But then the next bullet says,
11 it says:  AGI will develop an algorithm to
12 fix issues with existing algorithm used for
13 SOM program.
14        Is that right?
15    A.   That is what the document says.
16    Q.   Okay.  That means that there
17 were issues that needed to be fixed in
18 relation to the program that you were
19 actually using at CVS at that time in the SOM
20 program, correct?
21          MR. HYNES:  Objection to form.
22    A.   I don't recall specifically why
23 or what that is in reference to.  I do feel
24 that the tools that we had in place were
25 sufficient to complete the job on a daily

Page 47

1 basis.
2 QUESTIONS BY MR. BAKER:
3    Q.   Okay.  So there's an answer
4 where you kind of threw in a little editorial
5 at the end that I didn't ask you, because
6 you're trying to do something to try to
7 justify your position.  I understand that.
8        But I didn't ask you that, did
9 I?  I didn't ask you whether you felt --
10          MR. HYNES:  Objection.  Please
11   stop this.
12 QUESTIONS BY MR. BAKER:
13    Q.   I didn't ask you that, did I?
14    A.   No, you did not.
15    Q.   Okay.  I'm going to ask you not
16 to do that in the future, fair enough?  If I
17 ask you a question and you give me a direct
18 answer, it's the end of the answer.
19        So let me ask the question.
20          MR. HYNES:  And I will instruct
21   the witness to answer the question as
22   he sees fit.
23 QUESTIONS BY MR. BAKER:
24    Q.   No, you answer the question and
25 that's it, okay?  So let me ask you this.  It

Page 48

1 says:  AGI will develop an algorithm to fix
2 issues with existing algorithm used for SOM
3 program.
4        That's what it says, correct?
5    A.   That's what the document says.
6    Q.   That means that issues needed
7 to be fixed with respect to that program,
8 correct?
9          MR. HYNES:  Objection.
10   Objection, asked and answered.
11 QUESTIONS BY MR. BAKER:
12    Q.   Correct?
13          MR. HYNES:  Objection, asked
14   and answered.
15    A.   As I stated, I don't recall
16 specifically what this is in reference to,
17 but I do feel that the tools we had in place
18 at the time were sufficient to complete the
19 job on a daily basis.
20 QUESTIONS BY MR. BAKER:
21    Q.   Let me ask you this:  It says
22 that the algorithm needed to be fixed,
23 correct?
24    A.   That is what the document says.
25    Q.   Okay.  There were problems that

Page 49

1 needed to be fixed with that algorithm,
2 correct?
3          MR. HYNES:  Objection, form.
4 QUESTIONS BY MR. BAKER:
5    Q.   There were problems; yes or no?
6          MR. HYNES:  Objection to form.
7    A.   Like I said, I don't recall
8 what this is in reference to.  Also, I feel
9 the tools we had were sufficient to complete
10 the job on a daily basis.
11 QUESTIONS BY MR. BAKER:
12    Q.   I'm going to give you the
13 opportunity to answer this question with a
14 yes or no.  Yes begins with Y, has two
15 letters, E-S.  No begins with N and has one
16 letter after it, no.
17        So here's the question, and
18 it's going to be a yes or a no:  There were
19 issues that needed to be fixed with respect
20 to the algorithm in use at the time this
21 discussion took place; yes or no?
22          MR. HYNES:  Objection to form;
23   asked and answered.  He said he
24   doesn't recall.
25          --oOo--

Highly Confidential – Subject to Further Confidentiality Review

Page 50

1  QUESTIONS BY MR. BAKER:
2      Q.    Yes or no?
3      A.    I don't recall what that is in
4  reference to.
5      Q.    All right.  Skip down, please.
6      A.    Sure.
7      Q.    With respect to the algorithm
8  that was in effect at the time, all orders
9  have been reviewed by 11:30 p.m. to
10  12:00 p.m.
11          In other words, by noon every
12  day.  Is that right?
13          MR. HYNES:  Where are you?  I'm
14  sorry.
15      A.    That -- that is not in
16  reference to the algorithm.  Oh, no.  No,
17  that is not in reference to the algorithm.
18  Are you --
19          MR. HYNES:  Where are you?
20  QUESTIONS BY MR. BAKER:
21      Q.    That's a reference to the
22  Internal Review Reports.
23      A.    That is in reference to the
24  internal ordering system.
25      Q.    It then says that:  For

Page 51

1  consistency, the SOM process is reviewed at a
2  central location for all 11 RX DCs.
3          Is that right?
4      A.    Yes, that is correct.
5      Q.    All right.  The central
6  location at that time was where?
7      A.    Indianapolis.
8      Q.    And that's where you were
9  located?
10      A.    Yes.
11      Q.    Okay.  And that's where the
12  centralized system for the SOM, suspicious
13  order monitoring, process for CVS was located
14  at that time.  Is that correct?
15      A.    To clarify, you're referring to
16  the manual process that was completed?
17      Q.    Correct.
18      A.    Yes.
19      Q.    Okay.  And it's all based upon
20  a computer where the results are showing up
21  in that location where you are situated in
22  Indiana at that time.  Is that right?
23          MR. HYNES:  Objection to form.
24          --oOo--
25          --oOo--

Page 52

1      A.    I'm sorry, can you repeat that
2  question?
3  QUESTIONS BY MR. BAKER:
4      Q.    You would be seated at a
5  location inside of a distribution center in
6  Indiana reviewing software results from an
7  overnight ordering process.  Is that correct?
8          MR. HYNES:  Objection to form.
9      A.    Correct.
10  QUESTIONS BY MR. BAKER:
11      Q.    Is that correct?
12      A.    Correct.
13      Q.    Okay.  And it says:  Currently
14  we're using eight algorithms.
15          Is that correct?
16      A.    That's -- yes, according to the
17  document, that's what it says.
18      Q.    Can you tell me what those
19  eight algorithms were?
20      A.    Sitting here today --
21      Q.    Yes.
22      A.    -- no.  At the time, I had a
23  high-level understanding.
24      Q.    Okay.  You had a high level of
25  understanding of all the math behind those

Page 53

1  algorithms?
2      A.    A very high level.
3      Q.    Okay.  It says:  Any pharmacy
4  item that is out of stock is assigned to be
5  ordered from an outside vendor on a first
6  pass.
7          Does that say that in that
8  document?
9      A.    That's what the document says.
10      Q.    Okay.  So what was happening
11  here at the time is that there were 11
12  distribution centers for CVS around the
13  nation, correct?
14          MR. HYNES:  Objection to form.
15  QUESTIONS BY MR. BAKER:
16      Q.    11 pharmacy prescription --
17      A.    Yes.
18      Q.    -- distribution centers,
19  correct?
20          MR. HYNES:  Objection to form.
21      A.    Correct.
22  QUESTIONS BY MR. BAKER:
23      Q.    Okay.  And those distribution
24  centers, in relation to suspicious order
25  monitoring, carried Class III controlled

Highly Confidential – Subject to Further Confidentiality Review

Page 54

1  substances, correct?
2      MR. HYNES:  Objection to form.
3      A.    Yes.
4  QUESTIONS BY MR. BAKER:
5      Q.    And that included hydrocodone
6  combination products, correct?
7      A.    Yes.
8      Q.    Okay.  They did not carry Class
9  II products because they weren't licensed to
10 carry Class II products.  Is that correct?
11     MR. HYNES:  Objection to form.
12     A.    I don't know the reason that we
13 didn't carry Class IIs, but I know that we
14 did not.
15 QUESTIONS BY MR. BAKER:
16     Q.    And you know that these
17 Class III products are controlled substances
18 under the Controlled Substance Act of the
19 United States of America.
20         You understand that?
21     MR. HYNES:  Objection to form.
22     A.    Yes.
23 QUESTIONS BY MR. BAKER:
24     Q.    Okay.  And you were
25 understanding that controlled substances are

Page 55

1  distributed through a closed system.  You
2  understood that, right?
3      MR. HYNES:  Objection to form.
4      A.    Yes.
5  QUESTIONS BY MR. BAKER:
6      Q.    Okay.  And you understood that
7  in order to comply with what you had to do
8  with suspicious order monitoring, you had to
9  comply with the law in effect that you were
10 taught.  Is that correct?
11     MR. HYNES:  Objection to form.
12     A.    My understanding was to follow
13 the requirements that were set forth by the
14 DEA.
15 QUESTIONS BY MR. BAKER:
16     Q.    Right.  Okay.
17         Now, if it's an outside vendor
18 that's selling the item, that's not something
19 that was monitored through this process.  Is
20 that correct?
21     A.    That is correct.
22     Q.    Okay.  And outside vendors
23 would have included at that time Cardinal and
24 McKesson.  Is that right?
25     A.    That is my understanding.

Page 56

1      Q.    So the pharmacies that were all
2  over the United States that were ordering
3  from these 11 distribution centers, they were
4  getting their Class III drugs from the CVS
5  distribution center and outside vendors.  Is
6  that right?
7      MR. HYNES:  Objection to form.
8      A.    Yes.
9  QUESTIONS BY MR. BAKER:
10     Q.    Okay.  And you assumed that the
11 outside vendors were monitoring those orders
12 that were going from the outside vendors to
13 CVS.  Is that right?
14     MR. HYNES:  Objection to form.
15     A.    That is my understanding.
16 QUESTIONS BY MR. BAKER:
17     Q.    Okay.  Whether they were
18 actually doing that, you have no idea, do
19 you?
20     MR. HYNES:  Objection to form.
21     A.    I do not have -- I did not have
22 visibility to their process.
23 QUESTIONS BY MR. BAKER:
24     Q.    Okay.  And you never were
25 involved with having visibility to that

Page 57

1  process.  Is that right?
2      A.    No.
3      Q.    And you don't know what data,
4  if any, that CVS provided to those vendors to
5  enable those vendors to be able to monitor
6  what was sold to CVS and how it was
7  distributed by CVS, do you?
8      MR. HYNES:  Objection to form.
9  QUESTIONS BY MR. BAKER:
10     Q.    You have no idea.
11     MR. HYNES:  Objection to form.
12     A.    No, it's not visible -- I
13 didn't have visibility to that.
14 QUESTIONS BY MR. BAKER:
15     Q.    You had no idea if those
16 outside vendors did anything to monitor the
17 dispensing of CVS with respect to those items
18 that were sold by outside vendors to CVS.  Is
19 that correct?
20     MR. HYNES:  Objection to form.
21     A.    No, I did not have visibility
22 to their processes.
23 QUESTIONS BY MR. BAKER:
24     Q.    And you have no idea if --
25 well, strike that.

Page 58

1    Outside vendors were
2 responsible for selling all of the Class II
3 narcotics to CVS pharmacies.  Am I right?
4    MR. HYNES:  Objection to form.
5    A.   Yes.
6    Q.   Okay.
7    A.   Yes.
8    MR. HYNES:  Give me time to
9 object.
10 QUESTIONS BY MR. BAKER:
11    Q.   Okay.  And you have no idea
12 whether CVS did any monitoring of those,
13 correct?
14    A.   I'm sorry?
15    Q.   You have no idea whether CVS
16 did any suspicious order monitoring with
17 respect to those Class II products.  Am I
18 correct?
19    MR. HYNES:  Objection to form.
20    A.   I had no visibility to orders
21 of Class II products.
22 QUESTIONS BY MR. BAKER:
23    Q.   Okay.  You, as the SOM manager
24 at the time, had no visibility to monitor
25 that.  Is that correct?

Page 59

1    MR. HYNES:  Objection to form.
2 QUESTIONS BY MR. BAKER:
3    Q.   Is that what you just said?
4 Class II?
5    A.   Class II, the monitoring of
6 Class II orders was not within the scope of
7 my role.
8    Q.   Okay.  And nobody else at CVS
9 that you're aware of did that either?
10    MR. HYNES:  Objection to form.
11    A.   I have no way of knowing the
12 answer to that question.
13    MR. HYNES:  Give me time to
14 object.
15    THE WITNESS:  Sorry.
16 QUESTIONS BY MR. BAKER:
17    Q.   Okay.  No way of knowing the
18 answer.  So the answer is you're not aware of
19 anybody doing that at CVS.  Is that correct?
20    MR. HYNES:  Objection to form.
21    A.   I am not aware of anyone doing
22 that.
23 QUESTIONS BY MR. BAKER:
24    Q.   Okay.  At CVS, correct?
25    MR. HYNES:  Objection to form.

Page 60

1    A.   Correct, at CVS.
2 QUESTIONS BY MR. BAKER:
3    Q.   Okay.  It says:  Items that
4 have -- it says:  All orders generated from
5 outside vendors are not pushed through the
6 SOM process.
7    Correct?
8    A.   Correct, that is what the
9 document says.
10    Q.   All right.  And you have no
11 idea how much of a quantity of or how many
12 grams of that type of product was being
13 provided by outside vendors to CVS, correct?
14    MR. HYNES:  Objection to form.
15    A.   No.
16 QUESTIONS BY MR. BAKER:
17    Q.   Correct?
18    A.   No.  I did have visibility to
19 the volumes that the stores were receiving
20 from outside vendors.
21    Q.   But you didn't do anything in
22 reference to monitoring that, correct?
23    MR. HYNES:  Objection to form.
24    --oOo--
25    --oOo--

Page 61

1    A.   In reference to monitoring
2 individual orders, no.
3 QUESTIONS BY MR. BAKER:
4    Q.   Okay.  Items that have
5 historically only been ordered from outside
6 vendors typically do not have a CVS item
7 number.  Is that correct?
8    A.   Yes.
9    Q.   That means it doesn't get
10 pushed through the SOM process, correct?
11    MR. HYNES:  Objection to form.
12    A.   Yes.
13 QUESTIONS BY MR. BAKER:
14    Q.   Okay.  Let's go down where it
15 says, "Overview of the IRR SOM process."
16    Do you see that?
17    A.   Yes.
18    Q.   It says:  Review of all stores
19 to determine irregular orders.
20    Correct?
21    A.   Yes.
22    Q.   Go to the next page.  Could you
23 bring it out a little bit?
24    It says:  Orders identified as
25 irregular are flagged for further review.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    Correct?
2    MR. HYNES:  Objection to form.
3  QUESTIONS BY MR. BAKER:
4    Q.    That's what it says.
5    A.    Yes.
6    Q.    All right.  It says:  Fat
7  finger from store.
8    "Fat finger from store," that
9  would mean if somebody accidentally pushed
10 1,000 instead of 100, something like that.
11 Is that right?
12   A.    Correct.
13   Q.    Okay.  It says:  Common doctor,
14 patient, cash versus insurance, drug cards,
15 location of the store, i.e., near a pain
16 clinic, cocktail drugs being prescribed,
17 et cetera.
18   Correct?
19   A.    Correct.
20   Q.    "Cocktail drugs," define that
21 for me.
22   MR. HYNES:  Objection to form.
23   A.    That would be the combination
24 of two drugs being used together.
25   --oOo--

Page 63

1  QUESTIONS BY MR. BAKER:
2    Q.    Okay.  Two drugs being used
3  together that are suspicious in the context
4  of the suspicious order monitoring system,
5  correct?
6    A.    Yes.
7    Q.    Okay.  Such as alprazolam and
8  hydrocodone being prescribed or filled at the
9  same time, correct?
10   A.    Correct.
11   Q.    Okay.  And that makes it more
12 suspicious because that is indicative of
13 illegal use of narcotics.  Is that correct?
14   MR. HYNES:  Objection to form.
15 QUESTIONS BY MR. BAKER:
16   Q.    Correct?
17   MR. HYNES:  Objection to form.
18   A.    I don't feel comfortable fully
19 answering that question because it isn't --
20 it isn't necessarily an indication of abuse.
21 QUESTIONS BY MR. BAKER:
22   Q.    But that's what y'all are
23 looking for.  Y'all are looking for those
24 cocktail drugs in your SOM process, right?
25   A.    It was one of many data points

Page 64

1  that we looked at.
2    Q.    And then it says:  DC,
3  distribution center, contacted via e-mail and
4  phone to stop the order until notified if the
5  order can ship.
6    Correct?
7    MR. HYNES:  Objection to form.
8    A.    Correct.
9  QUESTIONS BY MR. BAKER:
10   Q.    Then it says:  Items not
11 shipped to the store are marked out via the
12 system and show as not shipped on the store
13 manifest.
14   Correct?
15   MR. HYNES:  Objection to form.
16   A.    Yes.
17 QUESTIONS BY MR. BAKER:
18   Q.    Okay.  Let me just ask you a
19 quick question.  During the entire time that
20 you were at CVS, did you ever notify the DEA
21 of a suspicious order?
22   A.    I don't recall notifying the
23 DEA.
24   Q.    Okay.  The DEA has no record of
25 you doing so.  That's why I asked.  So the

Page 65

1  question on the table:  Do you have any
2  recall of ever, ever, during the entire time
3  that you were at CVS, notifying the DEA that
4  there was a suspicious order from a CVS
5  distribution center to a CVS pharmacy?
6    MR. HYNES:  Objection to form,
7    including asked and answered and
8    assumes facts not in evidence.
9  QUESTIONS BY MR. BAKER:
10   Q.    All right.  Let me ask it this
11 way.
12   MR. HYNES:  Asked and answered.
13 QUESTIONS BY MR. BAKER:
14   Q.    During the entire time that you
15 were at CVS, did you report a suspicious
16 order by a CVS pharmacy to a CVS distribution
17 center?
18   MR. HYNES:  Objection to form;
19   asked and answered.
20   A.    I'm sorry.
21 QUESTIONS BY MR. BAKER:
22   Q.    During the entire time that you
23 were at CVS, did you ever report a suspicious
24 order from a CVS pharmacy to a CVS
25 distribution center?

Page 66

1    MR. HYNES: Same objection.
2    A.   The scope of my role was not to
3  notify of suspicious orders. It was --
4  QUESTIONS BY MR. BAKER:
5    Q.   Next document.
6        As a result of your work, did
7  you notify anybody at CVS to notify the DEA
8  that there was a suspicious order that needed
9  to be reported to the DEA?
10    MR. HYNES: Objection to form.
11    A.   No. My role was not to
12  identify an order as suspicious. It was to
13  identify orders of potential suspicion for
14  further escalation.
15  QUESTIONS BY MR. BAKER:
16    Q.   Let me write that down. Your
17  role was not to identify an order as
18  suspicious. Is that right?
19    A.   Correct.
20    Q.   Now, your name is Aaron
21  Burtner, correct?
22    A.   Yes.
23    Q.   Aaron Burtner's role as -- and
24  what was the name of your title at the time?
25    A.   SOM manager.

Page 67

1    Q.   -- SOM manager was not to
2  identify an order as suspicious. Is that
3  correct?
4    A.   Correct.
5    MR. HYNES: Objection. I think
6  he said more than that.
7    MR. BAKER: Today's date --
8  let's put this under the --
9    MR. HYNES: Here, do you want
10  to just finish your answer?
11    MR. BAKER: Okay. He has
12  finished his answer. So go ahead and
13  put that on --
14    MR. HYNES: You didn't write
15  down the complete answer. Do you want
16  to write down the complete answer or
17  no, Bill?
18    MR. BAKER: No, I'd like him to
19  read that.
20  QUESTIONS BY MR. BAKER:
21    Q.   Read that, please. Read that
22  back --
23    MR. HYNES: He can read that
24  and also --
25  QUESTIONS BY MR. BAKER:

Page 68

1    Q.   -- what I just wrote, read that
2  back.
3    MR. HYNES: -- and also give
4  the complete answer.
5    MR. BAKER: He did.
6  QUESTIONS BY MR. BAKER:
7    Q.   Go ahead. Read it back,
8  Mr. Burtner.
9    MR. HYNES: And give the
10  complete answer.
11    A.   Okay. "Aaron Burtner's role as
12  SOM manager was not to identify an order as
13  suspicious." It was to identify an order as
14  an order of interest and then escalate for
15  further investigation.
16  QUESTIONS BY MR. BAKER:
17    Q.   Okay. I'm going to come back
18  to this later, okay?
19    A.   Okay.
20    Q.   All right. Next document,
21  No. 56.
22        (CVS-Burtner Exhibit 56 was
23    marked for identification.)
24  QUESTIONS BY MR. BAKER:
25    Q.   A part of what you did also was

Page 69

1  to spend time reviewing orders, correct?
2    A.   Correct.
3    Q.   That you thought might be
4  suspicious, correct?
5    MR. HYNES: Objection to form.
6  QUESTIONS BY MR. BAKER:
7    Q.   Correct?
8    MR. HYNES: Objection to form.
9    A.   Orders of interest.
10  QUESTIONS BY MR. BAKER:
11    Q.   Okay. You reviewed orders of
12  interest that popped up daily on the internal
13  Item Review Report. Is that right?
14    A.   Correct.
15    Q.   IRR, is that item review,
16  internal review, what do you recall it?
17    A.   I don't recall specifically
18  today but I believe it was Item Review
19  Report.
20    Q.   Okay. And that Item Review
21  Report was a result of the computer system
22  going through its algorithm process to then
23  cause certain orders to appear on that IRR
24  report daily. Is that right?
25        --oOo--

Page 70

1    MR. HYNES:  Objection to form.
2  QUESTIONS BY MR. BAKER:
3    Q.   Is that right?
4    MR. HYNES:  Objection to form.
5    A.   That is my understanding.
6  QUESTIONS BY MR. BAKER:
7    Q.   Okay.  And how long did it take
8  you to review each one of those orders on
9  that form?
10    MR. HYNES:  Objection to form.
11    A.   It varied widely throughout the
12  month.
13  QUESTIONS BY MR. BAKER:
14    Q.   Okay.  Let me ask you to review
15  at the bottom of Exhibit 56.  This is an
16  e-mail dated 9/12/2012, correct?  Is that
17  right?
18    A.   Yes.
19    Q.   Okay.  And it says here:  My
20  concern is that these orders are taking
21  approximately 20 minutes each to review.
22    Is that right?
23    MR. HYNES:  Objection to form.
24  QUESTIONS BY MR. BAKER:
25    Q.   Is that what you wrote?

Page 71

1    MR. HYNES:  Objection to form.
2    A.   That is what the document says.
3  QUESTIONS BY MR. BAKER:
4    Q.   Okay.  Let's move to the next
5  document, please.
6    Now, how many orders would
7  appear on one of those item review reports
8  per night that you would then review the next
9  morning?
10    MR. HYNES:  Objection to form.
11    A.   It varied widely throughout the
12  month.  At the beginning of the month it was
13  very small.
14  QUESTIONS BY MR. BAKER:
15    Q.   Okay.  And as the month
16  proceeded, the Item Review Report got bigger.
17    A.   That's correct.
18    Q.   Is that right?
19    A.   Yes.
20    Q.   And when you reviewed those
21  items, how many minutes did you spend?  20 on
22  each item, like it says?
23    MR. HYNES:  Objection to form.
24    --oOo--
25    --oOo--

Page 72

1    A.   I don't recall specifically how
2  much time was spent on each report.
3  QUESTIONS BY MR. BAKER:
4    Q.   Okay.  All right.  Let me show
5  you a document that's marked Exhibit 55.
6    (CVS-Burtner Exhibit 55 was
7    marked for identification.)
8  QUESTIONS BY MR. BAKER:
9    Q.   This is at the end of the
10  month, 10/31/2012.  Do you see that at the
11  top, from Aaron Burtner?
12    A.   Which e-mail?  Ah, the top
13  e-mail?
14    Q.   Yeah.
15    A.   Yes.
16    Q.   If you look at the screen she's
17  highlighting here.  Can you see okay into the
18  screen?
19    A.   Yes.
20    Q.   Okay.  So it says here, Aaron
21  Burtner, 10/31/12:  There are 3100 orders
22  populated between the two reports.
23    Is that right?
24    MR. HYNES:  Objection to form.
25    --oOo--

Page 73

1    A.   That is what the document says.
2  QUESTIONS BY MR. BAKER:
3    Q.   And you attached the IRR, the
4  Item Review Report, for yesterday and today.
5  So that's two days' worth, correct?
6    MR. HYNES:  Objection to form.
7    A.   I don't recall what documents
8  were attached to this.
9  QUESTIONS BY MR. BAKER:
10    Q.   Let's see if we can take this
11  in context.  Crystal, Crystal Pike, she
12  worked with Analysis Group, correct?
13    A.   Yes.
14    Q.   And you're reporting to her how
15  many items are on the IRR for yesterday and
16  today, which would be 10/30/12 and 10/31/12,
17  correct?
18    A.   According to this document,
19  yes.
20    Q.   Okay.  And you're reporting
21  there are 3100 orders -- three thousand, one
22  hundred orders -- populated between the two
23  reports.  Correct?
24    A.   Yes.
25    MR. BAKER:  Okay.  Next

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  document.
2      MR. HYNES: When you get to a
3  breaking point --
4      MR. BAKER: I'm sorry?
5      MR. HYNES: When you get to a
6  breaking point, can we take a break?
7      MR. BAKER: Okay, sure.
8      The next document would be
9  No. 94.
10     MS. HECKMAN: 44.
11     MR. BAKER: Oh, 44, I'm sorry.
12     (CVS-Burtner Exhibit 44 was marked
13  for identification.)
14  QUESTIONS BY MR. BAKER:
15     Q.    So this is an e-mail from Aaron
16  Burtner to Pamela Hinkle, 9/7/12, correct?
17     A.    Yes.
18     Q.    Okay. Now, at that time, were
19  you already the SOM manager or not?
20     A.    Not at that time.
21     Q.    At this time you're working as
22  a loss prevention analyst. Is that correct?
23     A.    Loss prevention supervisor.
24     Q.    Okay. But you were reviewing
25  IRR reports every night. Is that right?

Page 75

1      A.    Every day.
2      Q.    Every day.
3      A.    Yes.
4      Q.    Okay. What time did you get to
5  work in the morning?
6      A.    It varied widely throughout the
7  month.
8      Q.    Give me an example of what
9  would be a time that you might come to work.
10     A.    In the beginning, 7:00 a.m.
11  Towards the end of the month, once the report
12  was larger, 4:00 or 5:00 a.m.
13     Q.    Okay. So go to the next page
14  of this. Okay. Could you bring that out a
15  little bit, please? All right.
16     It says this is to Pam Hinkle
17  from Aaron Burtner dated 9/7/2012: Required
18  headcount to complete IRR SOM process.
19     Correct?
20     MR. HYNES: Objection to form.
21     A.    That is what the document says.
22  QUESTIONS BY MR. BAKER:
23     Q.    What does a headcount mean?
24     A.    A person in a role.
25     Q.    Okay. The number of heads?

Page 76

1  The number of people?
2      A.    Yes.
3      Q.    Okay. It says: Current
4  required activities with two full-time
5  analysts.
6      Let's stop right there. Were
7  there two full-time analysts at that time?
8      A.    Prior to this, there were two.
9  I don't recall when the second analyst left
10  but it was right around this time.
11     Q.    Okay. So there either was one
12  or two. Is that right?
13     A.    Correct.
14     Q.    Okay. One would be you.
15     A.    Yes.
16     Q.    And the other would be who?
17     A.    Paul Lawson.
18     Q.    Okay. And he was gone about
19  this time? Is that what you're saying?
20     A.    I believe so, yes.
21     Q.    You actually went to Knoxville
22  later to review his files, did you not?
23     A.    That is correct.
24     Q.    To make sure of his
25  documentation, correct?

Page 77

1      MR. HYNES: Objection to form.
2      A.    To verify that the process he
3  was following was the same as the process I
4  was following.
5  QUESTIONS BY MR. BAKER:
6      Q.    Was Paul located -- Paul Lawson
7  located in Knoxville?
8      A.    Yes.
9      Q.    Okay. He was with Pam Hinkle?
10     A.    Yes.
11     Q.    That's where Pam Hinkle was,
12  too?
13     A.    Yes.
14     Q.    You were in Indiana, right?
15     A.    Yes.
16     Q.    So the two people that were
17  potentially reviewing these item review
18  reports were you and Paul Lawson at the time
19  this memorandum was written, 9/7 of 2012,
20  right?
21     A.    That is correct.
22     Q.    And you're telling Pam Hinkle
23  how many people you think you need to do this
24  headcount to complete the IRR SOM process,
25  correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    MR. HYNES: Objection to form.
2  QUESTIONS BY MR. BAKER:
3    Q.   Yes?
4    MR. HYNES: Objection to form.
5  QUESTIONS BY MR. BAKER:
6    Q.   If you don't remember, say you
7  don't remember and I'll go through and make
8  you remember. You ready?
9    MR. HYNES: Objection to form.
10  QUESTIONS BY MR. BAKER:
11    Q.   No, the document is going to
12  make you remember, trust me.
13    MR. HYNES: Objection to form.
14    A.   I don't recall specifically why
15  I wrote this document.
16  QUESTIONS BY MR. BAKER:
17    Q.   Okay. Let's go through the
18  document and look at me, please. Look at the
19  camera. Understand a jury is looking at you.
20    So if you say you don't recall,
21  and we've got a whole bunch of documentation
22  that should allow a young man like you to
23  recall something, it's going to sound kind of
24  silly that you say "I don't recall."
25    MR. HYNES: Objection to the

Page 79

1  colloquy. Let's take a break.
2  QUESTIONS BY MR. BAKER:
3    Q.   I want you to look --
4    MR. BAKER: No, we're going to
5  keep going.
6    MR. HYNES: No, we're going to
7  take a break.
8    MR. BAKER: We're going to
9  finish this document. No, we're not.
10  Okay.
11  QUESTIONS BY MR. BAKER:
12    Q.   So let me ask you. It says:
13  Current required activities with two
14  full-time analysts; daily review of
15  controlled IRR, correct?
16    MR. HYNES: Objection to form.
17    A.   That is what the document says.
18  QUESTIONS BY MR. BAKER:
19    Q.   Daily review of PSE IRR,
20  correct?
21    A.   That is what the document says.
22    Q.   And the Control IRR, they're
23  controlled drugs, correct?
24    A.   Correct.
25    Q.   And those include the

Page 80

1  hydrocodone combination products that are
2  being distributed out of these distribution
3  centers to the pharmacies, correct?
4    A.   Yes.
5    Q.   CVS distribution centers to CVS
6  pharmacies, right?
7    A.   Correct.
8    Q.   So a CVS distribution center is
9  monitoring another CVS entity, a CVS
10  pharmacy, correct?
11    MR. HYNES: Objection to form.
12    A.   Yes.
13  QUESTIONS BY MR. BAKER:
14    Q.   Okay. And then it says: Daily
15  review of PSE.
16    That's pseudoephedrine. Is
17  that right?
18    A.   Yes.
19    Q.   That's a separate IRR that you
20  have to review on top of reviewing the
21  controlled drug IRR, correct?
22    A.   That is correct. The PSE
23  report was typically very small.
24    Q.   Then it says: Daily review of
25  Florida and Oregon 5,000 dose report.

Page 81

1    Correct?
2    MR. HYNES: Objection to form.
3    A.   That's what the document says.
4  QUESTIONS BY MR. BAKER:
5    Q.   Okay. Because there was a
6  distribution center in Florida in Vero Beach,
7  correct?
8    A.   I don't recall specifically
9  where it was located.
10    Q.   But there was one, right?
11    A.   In Florida, yes.
12    Q.   And it distributed hydrocodone
13  combination products to CVS pharmacies,
14  correct?
15    A.   I don't recall if that was one
16  of them, the DCs that did.
17    Q.   And then the Oregon, there was
18  a DC there too, correct?
19    A.   I believe OR stands -- is
20  relating to Orlando.
21    Q.   Oh, Orlando, I'm sorry. My
22  apologies.
23    So in Florida you had two, Vero
24  Beach and Orlando, correct?
25    A.   I don't recall how many DCs

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 were in Florida.
2 Q. Okay. So this says: Daily
3 review of Florida and Orlando 5,000 dose
4 report.
5 Is that correct?
6 A. Yes.
7 Q. All right. Then it says:
8 Review of high-volume stores based on current
9 priority.
10 Correct?
11 A. Yes.
12 Q. So right now we have three
13 different reports that you're reviewing; the
14 Control IRR, the PSE IRR, the Florida and
15 Orlando 5,000 dose reports. So that's
16 actually four reports. Is that right?
17 A. Correct.
18 Q. On top of that you have a
19 review of high-volume stores based on current
20 priority, correct?
21 A. Yes.
22 Q. Okay. You weren't reviewing
23 the 5,000 dose reports for the other nine
24 distribution centers, just those two. Is
25 that right? At the time.

Page 83

1 A. My understanding is we were
2 reviewing those reports because it was a DEA
3 requirement.
4 Q. Correct. But you were only
5 reviewing two out of the 11 at the time,
6 right?
7 A. We were reviewing those two as
8 a DEA requirement, yes.
9 Q. But not the other nine,
10 correct?
11 A. No, the other nine were not a
12 DEA requirement.
13 Q. But you were not reviewing them
14 either, were you?
15 A. No, we were not.
16 Q. Okay. It says: Review -- wait
17 a minute, a DEA requirement. You're required
18 to review all orders from every distribution
19 center to every pharmacy within the CVS
20 universe at that time, correct?
21 A. I thought you were speaking
22 solely to the orders that were populated on
23 the 5,000 dose report. All orders would go
24 through the algorithm. That would populate
25 orders that were specifically over 5,000

Page 84

1 doses so they were being double reviewed.
2 Q. Okay. The DEA was paying
3 special attention to Florida at the time,
4 correct?
5 MR. HYNES: Objection to form.
6 A. I'm not an expert in that area.
7 I don't know if they're spending -- or
8 devoting more time to that area.
9 QUESTIONS BY MR. BAKER:
10 Q. It says: Review of high-volume
11 stores based on current priority, top 10
12 hydro dispensing stores from each DC, top 100
13 hydro dispensing stores from Orlando DC, top
14 25 oxy ordering stores from McKesson and
15 Cardinal.
16 Correct?
17 MR. HYNES: Objection to form.
18 A. Yes.
19 QUESTIONS BY MR. BAKER:
20 Q. So you were reviewing the top
21 25 OxyContin ordering stores from McKesson
22 and Cardinal?
23 A. Yes.
24 Q. Okay. Were you doing
25 suspicious order monitoring with respect to

Page 85

1 that?
2 MR. HYNES: Objection to form.
3 A. A form of suspicious order
4 monitoring.
5 QUESTIONS BY MR. BAKER:
6 Q. Did you ever report any of
7 those orders as being excessive?
8 A. I don't recall if we did or
9 not.
10 Q. Did you ever report any of
11 those orders as being suspicious to the DEA?
12 MR. HYNES: Objection, asked
13 and answered.
14 A. The scope of my role was not
15 reporting to the DEA. It was identifying
16 orders of interest and escalating. I don't
17 recall if we escalated any of these orders or
18 not.
19 QUESTIONS BY MR. BAKER:
20 Q. Okay. Do you ever recall
21 telling anybody at CVS above you in the chain
22 of command, "Hey, I found an order out of the
23 top 25 oxy stores in Florida or in Orlando
24 with respect to McKesson and Cardinal"?
25 Did you ever do that?

Page 86

1      MR. HYNES:  Objection to form.
2      A.   I don't recall if I escalated
3  any of these orders or not.
4  QUESTIONS BY MR. BAKER:
5      Q.   And this is 2012.  Do you know
6  what was going on in Florida in Orlando at
7  that time in those distribution centers in
8  reference to the stores they were servicing?
9      MR. HYNES:  Objection to form.
10     A.   I don't recall anything
11 specific.
12 QUESTIONS BY MR. BAKER:
13     Q.   Okay.  Now it says:  Proposed
14 required activities with a proposed headcount
15 of three full-time analysts.  Correct?
16     A.   Yes.
17     Q.   But you didn't have three
18 full-time analysts at the time, right?  You
19 had one, maybe two, you and Paul Lawson,
20 right?
21     MR. HYNES:  Objection to form.
22     A.   At that time, I believe we
23 had -- I don't recall specifically how many
24 we had.  I do recall that we had enough
25 people to complete the job or complete the

Page 87

1  reviews each day.
2  QUESTIONS BY MR. BAKER:
3      Q.   Well, we know that one of your
4  reviews was taking 20 minutes apiece from
5  that prior document, correct?
6      MR. HYNES:  Objection to form.
7  QUESTIONS BY MR. BAKER:
8      Q.   We know that, right?
9      A.   That --
10     MR. HYNES:  Objection to form.
11     A.   Those reviews are in relation
12 to the top 10, top 100s.  Those were pulled
13 based off of overall volume and not specific
14 orders.  We were reviewing specific orders
15 each day.
16 QUESTIONS BY MR. BAKER:
17     Q.   Okay.  Proposed -- it says:
18 Daily review of Control IRR, maximum/minimum
19 ratios to take effect during the week ending
20 9/8 of '12.
21     Correct?
22     MR. HYNES:  Objection to form.
23 QUESTIONS BY MR. BAKER:
24     Q.   Right?
25     A.   Yes.

Page 88

1      Q.   It says:  Expect increase based
2  on these ratios an additional 135 stores on
3  the IRR per day, up to 300 stores per day
4  during the fourth week of the month.
5      Correct?
6      A.   I don't recall if those numbers
7  are accurate, but according to the document,
8  yes.
9      Q.   It says:  During the fourth
10 week of the month, the third member of the
11 IRR SOM team would also need to review the
12 IRR to accommodate this increase.
13     Correct?
14     MR. HYNES:  Objection to form.
15     A.   According to the document, yes.
16 QUESTIONS BY MR. BAKER:
17     Q.   It says:  Daily review of PSE
18 IRR -- that's the pseudoephedrine IRR -- on
19 top of the Control IRR that needs to be
20 reviewed.
21     Correct?
22     A.   Yes.
23     Q.   It says:  Daily review of the
24 Florida and Orlando 5,000 dose report.
25 Currently only the Florida and Orlando 5,000

Page 89

1  dose reports are reviewed.
2      Is that what it says?
3      A.   That is what the document says.
4      Q.   With respect to those 5,000
5  dose reports, that's just one of the things
6  that has to be reviewed, correct, in addition
7  to the other things that are listed, right?
8      A.   Correct.
9      Q.   And it says:  The 5,000 dose
10 reports are currently available for each DC.
11     Right?
12     A.   According to the document, yes.
13     Q.   But they weren't being
14 reviewed, right?  Just the two, right?
15     MR. HYNES:  Objection to form.
16 QUESTIONS BY MR. BAKER:
17     Q.   Right?
18     MR. HYNES:  Objection to form.
19     A.   Yes.  We were reviewing those
20 two as they were DEA required.
21 QUESTIONS BY MR. BAKER:
22     Q.   Okay.  You were not reviewing
23 the other nine.  Correct?
24     A.   Correct.
25     Q.   Okay.  On the 8/29/12 report,

Page 90

1 741 stores, excluding tramadol stores, were
2 populated and each store would take five
3 minutes to review. Correct?
4         MR. HYNES: Objection to form.
5     A.    I don't recall if that's
6 accurate, but according to the document, yes.
7 QUESTIONS BY MR. BAKER:
8     Q.    Okay. You were telling me on
9 the 5,000 dose reports before that it was
10 taking 20 minutes to review each order.
11 Right?
12        MR. HYNES: Objection to form;
13 misstates his testimony.
14 QUESTIONS BY MR. BAKER:
15     Q.    Isn't that what you said on
16 that prior document?
17     A.    No. That was in relation to
18 the top 10 and top 100, which was outside of
19 the 5,000 dose reports.
20     Q.    Okay. We'll get to that. But
21 each one of those alone was taking you 20
22 minutes apiece, correct?
23        MR. HYNES: Objection to form.
24            --oOo--
25            --oOo--

Page 91

1     A.    Which report are you referring
2 to?
3 QUESTIONS BY MR. BAKER:
4     Q.    The ones that I showed you on
5 that document where it was taking you 20
6 minutes apiece.
7        MR. HYNES: Objection to form.
8     A.    I don't know which report
9 you're referring to.
10 QUESTIONS BY MR. BAKER:
11     Q.    Okay. We'll go back to the
12 document in a minute, okay?
13     A.    Okay.
14     Q.    On the 8/29/12 report: 741
15 stores where probably each store would take
16 approximately five minutes to review.
17        Is that right?
18     A.    I don't recall if that's
19 accurate or not, but according to the
20 document, yes.
21     Q.    And it would take eight
22 full-time employees 7.75 hours each to
23 complete reviews of just 741 stores, right?
24        MR. HYNES: Objection to form.
25     A.    I don't recall what that is in

Page 92

1 reference to.
2 QUESTIONS BY MR. BAKER:
3     Q.    You didn't have eight full-time
4 employees reviewing these reports at that
5 time, did you?
6     A.    No, we did not have eight
7 full-time employees at that time.
8     Q.    Then it says you have to:
9 Review high-volume stores based on priority.
10 Stores to review would be determined based
11 upon current focuses of the DEA, the Top Ten
12 reported generated on InfoPak, special
13 requests, et cetera.
14        That's what it says?
15        THE WITNESS: Thank you.
16 QUESTIONS BY MR. BAKER:
17     Q.    Is that right?
18     A.    According to the document, yes.
19     Q.    And it says: High-volume
20 stores offer the most value due to the
21 following factors: Review of all C2 and C5
22 drugs dispensed from the store in question
23 during a specific time frame, right?
24     A.    That is what the document says.
25     Q.    It requires you to review

Page 93

1 common doctor, common patients, the payment
2 method, the potential cocktails that we
3 talked about, right?
4     A.    Yes. That was the process for
5 deep diving into a store.
6     Q.    Okay. Deep diving beyond just
7 an initial cursory review, correct?
8        MR. HYNES: Objection to form.
9 QUESTIONS BY MR. BAKER:
10     Q.    Correct?
11        MR. HYNES: Objection to form.
12     A.    Beyond the initial due
13 diligence, yes.
14 QUESTIONS BY MR. BAKER:
15     Q.    Okay. Now, we'll talk about
16 due diligence. A cursory review is not due
17 diligence, is it, sir?
18        MR. HYNES: Objection to form.
19 QUESTIONS BY MR. BAKER:
20     Q.    That's not due diligence, is
21 it?
22        MR. HYNES: Objection to form.
23 QUESTIONS BY MR. BAKER:
24     Q.    Answer that question.
25            --oOo--

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    MR. HYNES: Objection.
2    QUESTIONS BY MR. BAKER:
3    Q.    A cursory review is not due
4    diligence, is it, sir?
5    MR. HYNES: Objection to form.
6    A.    I believe that's asking for my
7    opinion and my opinion is that it is due
8    diligence.
9    QUESTIONS BY MR. BAKER:
10    Q.    Let me write that down.  A
11    cursory review is due diligence.
12    MR. HYNES: Not his testimony.
13    QUESTIONS BY MR. BAKER:
14    Q.    Is that what you said?  A
15    cursory review is due diligence?
16    MR. HYNES: He said it wasn't a
17    cursory review.
18    MR. BAKER: No, I'm going to
19    ask you not to do that.
20    QUESTIONS BY MR. BAKER:
21    Q.    What did you say?  Did you say
22    a cursory review?
23    MR. HYNES: Then don't
24    misrepresent what he says.
25    --oOo--

Page 95

1    QUESTIONS BY MR. BAKER:
2    Q.    Did you say a cursory review is
3    equivalent to due diligence, yes or no?
4    A.    No.
5    MR. HYNES: Why don't we look
6    at the transcript to see what he said.
7    QUESTIONS BY MR. BAKER:
8    Q.    What did you say in response to
9    this question:  Is a cursory review of the
10    IRR report due diligence, yes or no?
11    MR. HYNES: Objection, form;
12    assumes facts not in evidence.
13    A.    I did not say it was cursory --
14    QUESTIONS BY MR. BAKER:
15    Q.    Is it due diligence to
16    cursorily review an IRR report, yes or no?
17    MR. HYNES: Objection to form.
18    A.    I didn't say it was a cursory
19    review.  I said it was the initial review of
20    the IRR and it was a form of due diligence.
21    QUESTIONS BY MR. BAKER:
22    Q.    Okay.  Is a cursory review of
23    the IRR due diligence, yes or no?
24    MR. HYNES: Objection, form.
25    A.    I don't know what -- I don't

Page 96

1    know what a cursory review would entail.
2    QUESTIONS BY MR. BAKER:
3    Q.    All right.  Let's go back to
4    that document, please.  When we're done with
5    this document we'll take a break.
6    A.    Which -- I'm sorry.
7    Q.    All right.  Down on this
8    document it says:  One full-time analyst --
9    go down further -- there you go.  All right.
10    It says:  One full-time analyst
11    would complete auditing of reviews completed
12    by 2 other analysts.
13    Correct?
14    A.    According to the document, yes.
15    Q.    It says:  Currently, a given
16    set of information is reviewed by only one
17    person so if that one person misses
18    something, it is missed.
19    Correct?
20    MR. HYNES: Objection to form.
21    A.    According to the document.
22    QUESTIONS BY MR. BAKER:
23    Q.    Okay.  That one person at the
24    time was who?  You?
25    A.    I was one of the team of

Page 97

1    people.
2    Q.    Okay.  And who was the one
3    person that was doing this review?
4    MR. HYNES: Objection to form.
5    QUESTIONS BY MR. BAKER:
6    Q.    Who was the team?  You and
7    whom?
8    A.    Myself and Paul Lawson.
9    Q.    But you don't know if Paul
10    Lawson was even doing reviews at this time,
11    do you?
12    A.    Once Paul Lawson left, we also
13    had a staff of temporary employees.  Well,
14    not temporary.  Flex employees.
15    Q.    There was a gap between the
16    time that Paul Lawson left and the time that
17    you hired some temps.  Am I correct?
18    MR. HYNES: Objection to form.
19    A.    A short gap.
20    MR. BAKER: Okay.  We'll take a
21    break.  Thank you.
22    THE VIDEOGRAPHER: We are now
23    going off the record, and the time is
24    9:42 a.m.
25    (Recess taken, 9:42 a.m. to

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    9:57 a.m.)
2        THE VIDEOGRAPHER:  We are now
3    going back on the record, and the time
4    is 9:57 a.m.
5    QUESTIONS BY MR. BAKER:
6    Q.   Okay.  We're going to
7    Exhibit 37.
8        (CVS-Burtner Exhibit 37 was
9    marked for identification.)
10   QUESTIONS BY MR. BAKER:
11   Q.   I'm showing you an e-mail
12   that's exchanged 5/31/2012, correct?
13   A.   Yes.
14   Q.   Okay.  And at the bottom it's
15   you, Aaron Burtner, May 31, 2012, and it
16   says:  Control drug PSE IRR, 5/30/12, and now
17   the nightmare that is the 5,000 dose report
18   begins.  It's been ridiculous the past couple
19   days.
20       Is that correct?  Is that what
21   it says?
22   A.   Yes, that is what the document
23   says.
24   Q.   You didn't really like
25   reviewing these reports, did you?  It's a

Page 99

1    nightmare.
2        MR. HYNES:  Objection, form.
3    QUESTIONS BY MR. BAKER:
4    Q.   Right?
5    A.   No, that is not true.  It is
6    that Paul and I had built a relationship and
7    this was friendly back-and-forth.  The
8    reports would grow throughout the month and
9    at the end of the month it was challenging,
10   and we were coming in at 4:00 or 5:00 in the
11   morning to complete.
12   Q.   Okay.  And you were doing them
13   for both the controlled drug and the PSE.  Is
14   that correct?
15   A.   I don't recall specifically how
16   the reports were split between Paul and
17   myself.
18   Q.   As well as the top 10 store
19   reports for the DCs, correct?
20   A.   Yes.
21   Q.   Okay.
22       (CVS-Burtner Exhibit 38 was
23   marked for identification.)
24   QUESTIONS BY MR. BAKER:
25   Q.   Let me show you what is

Page 100

1    Exhibit 38.  Now, this is the top 10 reports
2    for the distribution centers of CVS
3    throughout the nation, 5/31/12, correct?
4    A.   Yes.  Yes, that's what the
5    document says.
6    Q.   All right.  This is just a
7    portion of it because this one deals with a
8    distribution center YK, which is Chemung,
9    New York, correct?
10   A.   I believe so.
11   Q.   Okay.  And if you look to the
12   first page here, it has right here, item
13   hydrocodone 5 -- hydrocodone 5/500, correct?
14   A.   Yes.
15   Q.   Okay.  And that's 5 milligrams
16   of something into 500 milligrams of
17   something.  What is it?
18   A.   It is 5 mil- -- I don't
19   specifically recall, but I believe it is
20   5 milligrams of hydrocodone with
21   500 milligrams of acetaminophen.  That could
22   be the other way around.
23   Q.   Okay.  Good guess.
24   A.   Thank you.
25   Q.   All right.  So this is one of

Page 101

1    the drugs that you're monitoring, correct?
2    A.   Yes.
3    Q.   All right.  And it lists the
4    top 10 stores out of that distribution center
5    that had ordered the night prior, correct?
6    Or the night of.
7    A.   No.  This is a -- I don't
8    specifically recall but I believe this is an
9    accumulation over the month.
10   Q.   Okay.  Are you sure about that?
11   A.   I am not certain of that, no.
12   Q.   Okay.  And so it lists 10
13   stores down here at the bottom, correct?
14   Just go ahead and highlight all of this.  Out
15   of that distribution center?
16   A.   Yes.
17   Q.   Okay.  And those 10 stores,
18   each one of them had ordered 500 bottles?  Is
19   that right?
20       MR. HYNES:  Objection to form.
21   QUESTIONS BY MR. BAKER:
22   Q.   Excuse me.  They had ordered
23   like 500 pills per bottle, correct?
24   A.   Yes, that is my understanding
25   of the report.

Page 102

1  Q.   That's what size means, right?
2  A.   Correct.
3  Q.   So for the first order they had
4  ordered 11 bottles of 500, correct?
5  A.   Yes.
6  Q.   Okay.  The second store they
7  ordered 10 bottles of 500, correct?
8  A.   Yes.
9  Q.   Now, is this the total per
10  month of that particular drug?
11      MR. HYNES:  Objection.
12  QUESTIONS BY MR. BAKER:
13  Q.   Or is this just one order?
14      MR. HYNES:  Objection, form.
15  A.   I don't recall.
16  QUESTIONS BY MR. BAKER:
17  Q.   Okay.  And do some of these
18  stores appear as you go through the list on
19  other drugs that are named in the list such
20  that a store could order, say, 11 bottles of
21  500 of this drug and then order, say, another
22  several bottles of another drug that are also
23  hydrocodone combination products?
24      MR. HYNES:  Objection to form.
25          --oOo--

Page 103

1  QUESTIONS BY MR. BAKER:
2  Q.   Does that happen?
3      MR. HYNES:  Same objection.
4  A.   Yes.
5  QUESTIONS BY MR. BAKER:
6  Q.   Okay.  Go down to the next
7  drug.  The next drug is hydrocodone 7.5/500,
8  correct?
9  A.   Yes.
10  Q.   And that's the list of all the
11  10 stores that are ordering that product as
12  well, correct?
13  A.   Yes.
14  Q.   And each store has a store
15  number in the CVS system, which is how you're
16  tracking this.  Is that right?
17  A.   Yes.
18  Q.   Okay.  So if we have the
19  hydrocodone 7.5, that's 7.5 grams -- or
20  milligrams of hydrocodone and 500 milligrams
21  of acetaminophen, correct?
22  A.   Yes.
23  Q.   Separate product, correct?
24  A.   Yes.
25  Q.   Okay.  But a store could order

Page 104

1  that and order the 5.0/500s as well, correct?
2  A.   Yes.
3  Q.   Okay.  Move down to the next
4  drug.
5      MR. HYNES:  Are you on 19668?
6      MR. BAKER:  Yeah.
7  QUESTIONS BY MR. BAKER:
8  Q.   All right.  The next one is
9  7.5/750.  Is that 7.5 milligrams of
10  hydrocodone and 750 milligrams of
11  acetaminophen, correct?
12  A.   You said 750, and it's six --
13  I'm sorry.
14  Q.   7.5/750.  Is that right?
15  A.   Got it.  Yes.  Yes.
16  Q.   Okay.  Separate drug, separate
17  list of stores, correct?
18  A.   Correct.
19  Q.   Okay.  And these are the top 10
20  that are ordering out of that distribution
21  center that are CVS stores from that
22  distribution center during the time frame
23  that's being recognized on this report,
24  correct?
25          MR. HYNES:  Objection to form.

Page 105

1  A.   I don't recall the time frame
2  that was being reviewed.
3  QUESTIONS BY MR. BAKER:
4  Q.   Okay.  Move on down the list.
5  Each one of these -- go to hydrocodone
6  10/650, that's another one.  Move on down the
7  list again.  We have -- keep going --
8  hydrocodone 10/300 right here, right?
9  A.   Yes.
10  Q.   Okay.  If you go down this
11  list, we're looking at one, two, three, four,
12  five, six, seven, eight, nine, 10, 11, 12,
13  13, 14, 15, 16 pages on that list, correct?
14  Count them.
15          MR. HYNES:  Objection to form.
16          Answer if you can.
17  QUESTIONS BY MR. BAKER:
18  Q.   How many did you count?
19  A.   I believe I counted 14 pages.
20  Q.   Okay.  We'll go with your 14.
21  A.   Okay.
22  Q.   I thought I just counted 16,
23  but 14, we'll go with.  This is an example of
24  a report that you had to sit down and review,
25  correct?

Page 106

1    A.   Not every day.
2    Q.   How many minutes are you
3  spending on reviewing each one of these
4  stores?
5    A.   I don't recall how much time we
6  spent on each one of these stores.
7    Q.   Tell me how much of your
8  average time was spent on reviewing one store
9  on this report.
10      MR. HYNES:  Objection to form;
11   asked and answered.
12   A.   I don't recall how much time I
13 spent on reviewing these stores.
14 QUESTIONS BY MR. BAKER:
15   Q.   Did you call each one of these
16 stores to find out why they were ordering
17 these quantities?  Did you?
18   A.   I don't recall if each of these
19 stores -- each of these stores required being
20 called based on the investigation we were
21 completing.
22   Q.   I asked did you call each one
23 of these stores?
24   A.   I don't recall if I called each
25 one of these stores.

Page 107

1    Q.   You don't even know how much
2  time it would take you to go through this
3  list and review and do due diligence with
4  respect to that, do you?
5        MR. HYNES:  Objection to form;
6    asked and answered.
7    A.   I don't recall how much time we
8  spent on this specific list.
9  QUESTIONS BY MR. BAKER:
10   Q.   Okay.  Let's go to the next
11 list.  It would be Exhibit 38.  39, excuse
12 me.
13       (CVS-Burtner Exhibit 39 was
14   marked for identification.)
15       MR. HYNES:  Thank you.
16 QUESTIONS BY MR. BAKER:
17   Q.   This is out of a separate
18 distribution center.  This is the Indiana
19 distribution center, correct?  Skip down,
20 right here.  Indiana.
21   A.   Yes, that's the distribution --
22 distribution center listed.
23   Q.   Okay.  Highlight that, please.
24       All right.  DC-IN means
25 Distribution Center-Indiana, correct?

Page 108

1    A.   Correct.
2    Q.   Again, this is same date,
3  5/31/12, correct?
4    A.   Same date as the last report,
5  yes.
6    Q.   All right.  And this is a whole
7  separate report.  How many pages is this
8  report?
9    A.   I believe I counted 14 pages
10 again.
11   Q.   Okay.  Same thing, you have to
12 go through several different drugs and the
13 top 10 stores that ordered those several
14 different drugs that are on this report,
15 correct?
16       MR. HYNES:  Objection to form.
17   A.   I don't specific- -- I don't
18 recall what -- which stores we reviewed on
19 the report or how much time that was
20 required.
21 QUESTIONS BY MR. BAKER:
22   Q.   Okay.  You don't know if you
23 even reviewed any of the stores in this
24 report, do you?
25       --oOo--

Page 109

1        MR. HYNES:  Objection to form.
2  QUESTIONS BY MR. BAKER:
3    Q.   You don't know, do you?
4    A.   I can't say that we did not
5  review any of these stores, no.  I can't say
6  that.
7    Q.   You can't say one way or the
8  other if you reviewed any of these stores,
9  can you?
10       MR. HYNES:  Objection to form.
11   A.   No.  I cannot say today that I
12 did or did not review any of these stores.
13 QUESTIONS BY MR. BAKER:
14   Q.   Okay.  Thank you.
15       The next numbered document,
16 No. 40.
17       (CVS-Burtner Exhibit 40 was
18   marked for identification.)
19 QUESTIONS BY MR. BAKER:
20   Q.   This is in reference to the top
21 10 report.  This is your e-mail 6/8/12.
22       Do you see that?
23 A.   Yes.
24   Q.   Okay.  It says:  Whose idea was
25 it to populate this report?  I can't

Page 110

1 remember.
2         Do you see that?
3     A.    That is what the document says,
4 yes.
5     Q.    Okay.  It wasn't your idea, was
6 it?
7     A.    I don't recall.
8     Q.    Well, you're asking whose idea.
9 If it was your idea, don't you think you
10 would have remembered?
11        MR. HYNES:  Objection, form.
12     A.    This e-mail is from Paul.
13 QUESTIONS BY MR. BAKER:
14     Q.    So -- I'm sorry, I apologize
15 for that.  It's from Paul Lawson to you.
16 He's asking whose idea was it to populate
17 this report, correct?
18     A.    That is the question on the
19 document, yes.
20     Q.    Okay.  Was this part of the
21 colloquy that went back and forth between you
22 guys that y'all were aggravated at having to
23 review this report?
24        MR. HYNES:  Objection to form.
25     A.    I don't remember.  I don't know

Page 111

1 what his purpose of this e-mail was.
2 QUESTIONS BY MR. BAKER:
3     Q.    But you weren't happy about
4 having to do this.  It was a nightmare to
5 you, correct?
6        MR. HYNES:  Objection to form.
7     A.    It was not a nightmare.
8 QUESTIONS BY MR. BAKER:
9     Q.    You put that in words, that it
10 was a nightmare, right?
11     A.    That is what the e-mail said.
12     Q.    Okay.  Let's go down in this
13 e-mail.  It says:  Please review the attached
14 report file for format only.
15        And it's talking about the top
16 10 report review, correct?  Right?
17     A.    According to this document,
18 yes.
19     Q.    Okay.  And we just reviewed two
20 top 10 reports, correct?
21     A.    Yes.
22     Q.    We didn't review them.  We
23 looked at them, right?
24     A.    Yes.
25     Q.    "Review" is a whole separate

Page 112

1 thing, right?
2        MR. HYNES:  Objection.
3     A.    Absolutely.
4 QUESTIONS BY MR. BAKER:
5     Q.    All right.  So it says:  I'm
6 asking our offshore group to run data for the
7 whole month of May.
8        Correct?
9     A.    That is what the document says,
10 yes.
11     Q.    All right.  Who was the
12 offshore group for CVS?
13     A.    I have no idea.
14     Q.    What's going on with an
15 offshore group relative to the data that CVS
16 is generating?
17     A.    I was not -- I had no
18 involvement with the data that was stored.  I
19 have no idea.
20     Q.    Off whose shore?  The shore
21 what, where?
22     A.    I have no idea.
23     Q.    Did you ever ask that?
24     A.    No, I did not.
25     Q.    Okay.  Who is Ellen Demetrius?

Page 113

1     A.    She was an employee of CVS
2 corporate office.
3     Q.    So Ellen Demetrius is writing
4 this to Pam Hinkle copying you on the e-mail,
5 correct?
6     A.    That's what the document says.
7     Q.    Okay.  So tell me, did you ever
8 ask CVS what "offshore group" meant and who
9 CVS had that they considered to be their
10 offshore group?
11        MR. HYNES:  Objection to form.
12     A.    No, I did not.
13 QUESTIONS BY MR. BAKER:
14     Q.    Was CVS running data through an
15 offshore group somewhere, to your knowledge?
16     A.    I have no idea.
17     Q.    The top 10 report review, was
18 that being farmed out to the offshore group?
19     A.    I was not aware of an offshore
20 group.
21     Q.    When you got this offshore
22 group e-mail, did you ever think to ask,
23 offshore group, what in the world does that
24 mean and why is this even there and who is it
25 being sent to, any of that kind of thing?

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1   MR. HYNES:  Objection, form.
2   A.   No, I did not.
3   QUESTIONS BY MR. BAKER:
4   Q.   Did you know that there are
5   some pharmacies in Puerto Rico that CVS owns?
6   A.   I don't recall if -- I don't
7   recall.
8   Q.   Is that in any way connected to
9   the offshore group or not?
10  A.   I have no idea.
11  Q.   Do you know, were you ever
12  reviewing anything relative to stores owned
13  by CVS in Puerto Rico?
14  A.   I don't recall if we did or
15  not.
16  Q.   Okay.  I'm going to show you
17  Exhibit 97.
18       MR. BAKER:  This is from the
19  old 97?  It's old 97 because it wasn't
20  on this list, but nevertheless, this
21  is going to be marked 97.
22       MR. HYNES:  We have a previous
23  97?
24       MR. BAKER:  Yes.  This is from
25  a prior deposition, but we're

Page 115

1   re-marking it 97 here as well.
2        MR. HYNES:  Oh, I thought you
3   meant this was used earlier in this
4   deposition.  It wasn't.
5        MR. BAKER:  No.
6        MR. HYNES:  Oh, okay.  Okay.
7        (CVS-Burtner Exhibit 97 was
8   marked for identification.)
9   QUESTIONS BY MR. BAKER:
10  Q.   All right.  Look at Exhibit 97.
11  It should be tabbed for you, a page to go to.
12       Do you see that?
13  A.   Yes.
14  Q.   Okay.  All right.  Now, go to
15  the front of the document, all right?  This
16  document is dated 11/8 of 2011.  Is that
17  right?
18  A.   Yes.
19  Q.   Okay.  And the effective date
20  of this document, the original effective
21  date, was 12/1 of '07, correct?
22  A.   That is the date on the
23  document.
24  Q.   But the revision date of this
25  document, which would be the last revision

Page 116

1   date, is 11/8 of '11, correct?
2   A.   That is the date on the
3   document, yes.
4   Q.   And this would have been in
5   effect during the time that you were employed
6   at CVS, at least during that particular time
7   frame, 11/8/11, correct?
8   A.   According to the revision
9   dates, I don't have any reason to believe
10  that it wasn't.
11  Q.   Okay.  And this would be a
12  document that governed part of what you were
13  doing relative to reviewing IRRs, correct?
14       Or do you know?
15  A.   I don't recall this specific --
16  this specific document.  But, yes, if it was
17  in place, it would have, yes.
18  Q.   Okay.  Did you ever read this
19  document while you were at CVS?
20  A.   I don't recall reading this
21  document.  I don't have any reason to believe
22  that I didn't.  When I started with loss
23  prevention, I was provided all the policies
24  and I read through all of them at that time.
25  Q.   Okay.  Well, let me ask you

Page 117

1   this.  If you can't recall reading it, does
2   that mean you can, you can't?  Tell me:  Can
3   you say yes or no that you reviewed this
4   document?
5   A.   I can't say yes or no that I
6   reviewed this document.
7   Q.   Okay.  So go to the page that's
8   tabbed for you.
9   A.   Okay.
10  Q.   And it's Bates number 8545.
11       Do you see that?
12  A.   Yes, sir.
13  Q.   Okay.  Go back one page.
14  A.   Okay.
15  Q.   Back one page, it says,
16  subparagraph D:  Prevention and monitoring of
17  control drug suspicious orders.
18       Correct?
19  A.   That's what the document says.
20  Q.   That's what this portion of it
21  is related to.
22       Go to the next page.  All
23  right.  At the top it says:  General.  DEA
24  regulations require that all distributors
25  must design a system to monitor, detect and

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  report any suspicious control drug orders.
2  Suspicious orders are those involving an
3  extraordinary quantity, an uncommon method of
4  payment or delivery or any other circumstance
5  that may indicate that the Control Drug will
6  be used in violation of the law.  All CVS
7  distribution centers must follow these
8  procedures to comply with this requirement.
9      Correct?
10     A.    That's what the document says,
11 yes.
12     Q.    Now, you see where it says
13 "extraordinary quantity"?  Do you see that,
14 "extraordinary"?
15     A.    Yes.
16     Q.    Okay.  Have you ever read the
17 DEA definition of what a suspicious order is?
18     A.    Yes.
19     Q.    Okay.  It doesn't say
20 "extraordinary," does it?
21     A.    That is not the term that is
22 used.
23     Q.    Okay.  This is what CVS used in
24 its document, though, right?  It says it.
25     A.    Yes, that is the word in the

Page 119

1  document, yes.
2      Q.    All right.  The next says:
3  Items Reviewed.  CVS has established control
4  drug order thresholds which will flag on the
5  IRR, the Item Review Report, as well as field
6  loss prevention Novistor, loss prevention
7  software, reports.  These thresholds are the
8  primary tool to prevent stores from
9  purchasing excessive or potentially
10 suspicious control drugs.
11         That's what it says, right?
12     A.    Yes, that's what the document
13 says.
14     Q.    Go down to paragraph 4.  It
15 talks about the Item Review Report.  It says:
16 Currently the Item Review Report for control
17 drugs is being reviewed at a central location
18 in Knoxville, Tennessee.
19         That's where Pam Hinkle was
20 located, correct?
21     A.    That is correct.
22     Q.    Okay.  And each day the network
23 DC analyst shall review the daily Item Review
24 Report.
25         Correct?

Page 120

1      A.    That's what the document says,
2  yes.
3      Q.    That's who does the first-pass
4  review, the DC analyst, correct?
5          MR. HYNES:  Objection to form.
6      A.    Yes.
7  QUESTIONS BY MR. BAKER:
8      Q.    Okay.  So there's one person,
9  the DC analyst reviewer, doing that review at
10 this time, Pam Hinkle in Knoxville, right?
11         MR. HYNES:  Objection to form.
12     A.    I was not involved with the SOM
13 at this time.  I don't know who was
14 completing the review at that time.
15 QUESTIONS BY MR. BAKER:
16     Q.    Okay.  It says:  This report is
17 an analysis of all Control Drug orders from
18 the stores within the prior 24 hours.
19         Correct?
20     A.    Yes, that's what the document
21 says.
22     Q.    All right.  That's orders from
23 the CVS pharmacy drugstores throughout the
24 United States, correct?
25     A.    I don't know the geographical

Page 121

1  area of the stores, if they're limited to the
2  U.S. or not.
3      Q.    Okay.  Did you ever review
4  stores from anywhere other than the United
5  States?
6      A.    I do not recall reviewing
7  stores outside of the United States, no.
8      Q.    Okay.  Including Puerto Rico?
9  You never reviewed any of those stores, did
10 you?
11     A.    I don't recall if we did or did
12 not.
13     Q.    Okay.  And nobody was reviewing
14 those stores, were they?
15         MR. HYNES:  Objection to form.
16     A.    I do not know the answer to
17 that question.
18 QUESTIONS BY MR. BAKER:
19     Q.    Okay.  It says:  This report is
20 an analysis of control drug orders from the
21 stores within the prior 24 hours.
22         This refers to control drugs
23 that are supplied by CVS distribution centers
24 to CVS pharmacies, to the best of your
25 knowledge.  Is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    A.    Yes, that is correct.
2    Q.    All right.  And the report
3  identifies orders that are statistically
4  significant or that vary from historical
5  monthly trends based upon the previous six
6  months as well as the current month.
7        Correct?
8    A.    Yes.
9    Q.    Okay.  And you know what a lag
10  means, right?
11    A.    Yes.
12    Q.    Okay.  It means that a
13  comparison historically of your current
14  supply or sale from a distribution center to
15  a pharmacy compared to prior months, correct?
16    A.    Correct.
17    Q.    Okay.  A Lag 1 would be one
18  month; a Lag 1 through 6 would be six prior
19  months.  Correct?
20    A.    Yes.
21    Q.    Okay.  And that was what was in
22  place in 2011, to the best of your knowledge,
23  according to this document.  Is that right?
24    A.    According to the document, yes.
25    Q.    Okay.  Next document.

Page 123

1        All right.  Go to Exhibit 34.
2        (CVS-Burtner Exhibit 34 was
3      marked for identification.)
4      MR. HYNES:  Thank you.
5  QUESTIONS BY MR. BAKER:
6    Q.    Okay.  Now, this document also,
7  this is one that was in effect March 28 of
8  2012, correct?
9    A.    Yes, according to the document,
10  yes.
11    Q.    Actually, last review date,
12  March 28, 2012, but effective June 28, 2011,
13  correct?
14    A.    Yes.
15    Q.    Okay.  So this came in effect
16  in 2011 for the logistics IRR analyst,
17  correct?
18    A.    According to the document, yes.
19    Q.    All right.  Is logistics and
20  loss prevention in the same department or are
21  those different departments?
22    A.    I don't recall.
23    Q.    The reason I'm asking you is
24  this, because this deals with suspicious
25  order monitoring.  Was the suspicious order

Page 124

1  monitoring part of the logistics department
2  for the IRR analyst or was it part of loss
3  prevention?  I'm just asking based upon your
4  recollection.
5    A.    Right.  I -- SOM fell within --
6  I don't recall.  I don't recall where it fell
7  within.
8    Q.    What department were you in at
9  the time?
10    A.    At that time I was within loss
11  prevention.
12    Q.    Okay.  Did this document govern
13  what you were doing if it dealt with
14  suspicious order monitoring, even if it was
15  from a different department?
16    A.    Yes.  If this document governed
17  suspicious order monitoring, it would govern
18  what I was doing.
19    Q.    Okay.  Let's skip down to where
20  it defines thresholds.  It says:  List
21  chemicals control drug policy and procedure.
22        "Control drugs" includes what
23  we're talking about, the hydrocodone
24  combination products, right?
25    A.    Yes.

Page 125

1    Q.    Can we call those HCPs for
2  short so we can get through this?
3    A.    That's right, yes.
4    Q.    Okay.  All right.  It says:
5  Thresholds.  CVS has established thresholds
6  that restrict the amount of control drugs,
7  PSE and other List I chemicals that can be
8  ordered by each store within a specific time
9  frame.  These thresholds and subsequent
10  analysis of irregular activity are the
11  primary tools to stop suspicious orders of
12  control drugs.
13        Correct?
14    A.    That's what the document says,
15  yes.
16    Q.    Then it goes on to say:  Stores
17  may not order more than the threshold amount.
18        Isn't that what it says?
19    A.    That's what the document says,
20  yes.
21    Q.    And the DC may not ship amounts
22  that exceed these thresholds.
23        Correct?
24    A.    According to the document, yes.
25    Q.    Okay.  So the document that

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  governed what you were doing as a loss
2  prevention analyst in 2012, that document
3  says that stores may not order more than the
4  threshold amount, correct?
5       MR. HYNES: Objection to form.
6       A.   According to the document, yes.
7  QUESTIONS BY MR. BAKER:
8       Q.   Okay. And that the DC, the
9  distribution center, may not ship amounts
10 that exceed these thresholds, correct?
11      A.   According to the document, yes.
12      Q.   All right. Next document.
13          (CVS-Burtner Exhibit 3 was
14      marked for identification.)
15 QUESTIONS BY MR. BAKER:
16      Q.   Now, the law that you were
17 aware of is the Controlled Substances Act
18 that governed your activities as a loss
19 prevention analyst, correct?
20      MR. HYNES: Objection to form.
21      A.   I don't -- I don't recall the
22 specific law.
23 QUESTIONS BY MR. BAKER:
24      Q.   Well, let me see if we can get
25 you schooled on it.

Page 127

1       A.   Okay.
2       Q.   So we'll go to the next -- next
3  page. "Suspicious Order Monitoring." All
4  right.
5            Now, you understand this is a
6  CVS document because you saw the front page
7  of it, right? CVS Suspicious Order
8  Monitoring, right?
9       MR. HYNES: Objection. Is this
10      the complete document?
11      MR. BAKER: This is the
12      complete document called Suspicious
13      Order Monitoring that is provided to
14      me by CVS. I mean --
15      MR. HYNES: It just has one
16      page behind it?
17      MR. BAKER: Yeah, I don't know.
18      This is what's in there.
19      MR. HYNES: Okay. I'm just
20      going to object to the extent it's not
21      the complete document, but you can
22      go on.
23      MR. BAKER: Okay. That's fine.
24      MR. HYNES: Yeah. Yeah.
25      MR. BAKER: Okay.

Page 128

1       A.   The date is after I left CVS,
2  so I don't know if this specific -- I don't
3  know that I would have ever seen this
4  specific document. According to the
5  document, it is a CVS document, yes.
6  QUESTIONS BY MR. BAKER:
7       Q.   All right. In front of you is
8  21 C.F.R. 1301.74(b). Have you ever seen
9  that law before?
10      A.   Umm --
11      Q.   Before today, have you ever
12 seen that law in writing?
13      A.   I don't specifically recall the
14 number, but I do recall the paragraph, yes.
15      MR. BAKER: Okay. Go back to
16      the other document that I just was
17      reviewing.
18      THE WITNESS: 34?
19      MR. BAKER: Yeah. Strike that.
20 QUESTIONS BY MR. BAKER:
21      Q.   Go back to what we were on,
22 please. Go back to the --
23      A.   The present?
24      Q.   Yeah, the present document,
25 please.

Page 129

1            21 C.F.R. 1301.74(b) sets out
2  the requirements for SOM for a distribution
3  center for controlled substances.
4            The registrant shall design and
5  operate a system to disclose to the
6  registrant suspicious orders of controlled
7  substances. The registrant shall inform the
8  field division office of the administration
9  in his area of suspicious orders when
10 discovered by the registrant.
11           Suspicious orders include
12 orders of unusual size, orders deviating
13 substantially from a normal pattern, and
14 orders of unusual frequency.
15           Is that what that says?
16      A.   Yes.
17      Q.   Do you know that to be the
18 Controlled Substances Act?
19      MR. HYNES: Objection to form.
20 QUESTIONS BY MR. BAKER:
21      Q.   Do you, or not?
22      A.   I don't know it to be the
23 Controlled Substances Act, but I know that
24 paragraph.
25      Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1   A.   That was the paragraph that we
2  used.  That was my understanding when we were
3  operating SOM.
4   Q.   Did that paragraph govern what
5  you did in your job?
6   A.   Unusual size, unusual order
7  pattern and unusual frequency.
8   Q.   It does not say extraordinary,
9  does it?
10   A.   It does not say extraordinary.
11   Q.   Okay.  Let's move to the next
12  document.
13       (CVS-Burtner Exhibit 2 was
14       marked for identification.)
15  QUESTIONS BY MR. BAKER:
16   Q.   Now, are you familiar with the
17  drug hydrocodone?  We're going to document
18  No. 2.
19       MR. HYNES:  Hydrocodone or
20       hydrocodone combination products?
21       MR. BAKER:  Hydrocodone
22       combination products, which is
23       inclusive within this document.
24          --oOo--
25          --oOo--

Page 131

1   A.   Hydrocodone -- familiar to what
2  extent?
3  QUESTIONS BY MR. BAKER:
4   Q.   Okay.  Are you familiar with
5  the addictive nature of it?
6   A.   I mean, I wouldn't consider
7  myself to be an expert of hydrocodone, but I
8  do recognize that it is addictive.
9   Q.   Thank you.
10       All right.  Hydrocodone --
11  according to the DEA Drug Fact Sheet:
12  Hydrocodone is the most frequently prescribed
13  opioid in the United States and is associated
14  with more drug abuse and diversion than any
15  other illicit or illegal opioid.
16       Correct?  That's what the DE
17  document said -- DEA document says.  Is that
18  correct?
19   A.   That's what this document
20  states, yes.
21   Q.   And this is one of the drugs
22  that you were monitoring for CVS in terms of
23  their distribution of that particular drug
24  out of a distribution center, a hydrocodone
25  combination product that is out of a

Page 132

1  distribution center to a pharmacy, correct?
2   A.   The hydrocodone combination
3  products were our highest priority drug that
4  we were monitoring.
5   Q.   Okay.  And if you go down here
6  it says, looks like -- well, the street names
7  for that are Hydro, Norco, Vikes.  You've
8  heard of those names, right?
9       MR. HYNES:  Objection to form.
10  QUESTIONS BY MR. BAKER:
11   Q.   Norco, you've heard of that,
12  right?
13       MR. HYNES:  Objection to form.
14  QUESTIONS BY MR. BAKER:
15   Q.   Vicodin, you've heard of that,
16  have you not?
17   A.   I have heard of hydro and
18  Vicodin.
19   Q.   All right.  And then it says
20  that the effect on the mind are -- actually,
21  drugs causing similar effects.  It says
22  morphine, heroin, oxycodone, codeine,
23  poxy- -- propoxyphene, fentanyl, and
24  hydromorphone, correct?
25   A.   According to the document, yes.

Page 133

1   Q.   And you've heard of morphine,
2  you've heard of heroin, right?
3   A.   Yes.
4   Q.   You've heard of fentanyl,
5  correct?
6   A.   Yes.
7   Q.   And you're familiar that our
8  country is in a crisis?
9       MR. HYNES:  Objection to form.
10  QUESTIONS BY MR. BAKER:
11   Q.   You know that, don't you?
12  We're in an opioid crisis, are we not?
13       MR. HYNES:  Objection.
14  Objection to form.
15   A.   I'm not an expert on any of
16  that.  I don't know if --
17  QUESTIONS BY MR. BAKER:
18   Q.   Are you going to sit here and
19  tell me that you're not familiar with the
20  fact that our country is in the midst of an
21  opioid crisis?  Are you honestly going to
22  look in that camera and say that you're not
23  familiar with that?
24       MR. HYNES:  Objection to form.
25   A.   No, I understand that there's a

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  problem going on, but to the level of crisis,
2  I don't -- I've been out of this world for
3  six years and I haven't really looked back.
4  QUESTIONS BY MR. BAKER:
5      Q.   Okay.  We're going to go into
6  the level of that crisis for you.  All right?
7          Let me show you another drug
8  that's involved in that crisis called
9  oxycodone.  Are you familiar with that drug?
10     A.   Yes.
11     Q.   Okay.  Oxycodone is a
12 semisynthetic narcotic analgesic and
13 historically has been a popular drug of abuse
14 among the narcotic-abusing population.
15         Is that what the document says?
16         MR. HYNES:  Can we have a copy?
17         MR. BAKER:  Oh, I'm sorry.
18         MR. HYNES:  Oh, is it behind
19 here?
20         MR. BAKER:  Should have been.
21         MR. HYNES:  No, no, no.  Hold
22 on.  Hold on.  It's behind here.
23         MR. BAKER:  Okay.
24         MR. HYNES:  Sorry, we were
25 confused, though.  So it's the next

Page 135

1  document in the packet he gave us.
2      A.   Got it.
3          Yes, that's what the document
4  says, yes.
5  QUESTIONS BY MR. BAKER:
6      Q.   Okay.  And you knew that before
7  today too, right?  It's common knowledge to
8  you, right?
9      A.   Yes, that oxycodone is abused.
10     Q.   All right.  And it has street
11 names of Hillbilly Heroin, Kicker, OC, Ox,
12 Oxy, Perc, Roxy.
13         Did you know that?
14         MR. HYNES:  Objection to form.
15     A.   I have heard some of those but
16 definitely not most.
17 QUESTIONS BY MR. BAKER:
18     Q.   Okay.  And oxycodone is
19 marketed alone as OxyContin in 10, 20, 40,
20 and 80 milligram controlled substance release
21 tablets and other immediate-release capsules
22 like 5-milligram Oxy LR is also marketed in
23 combination products with aspirin, such as
24 Percodan, or acetaminophen, such as Roxicet.
25         Is that what the document says?

Page 136

1      A.   Yes, that's what the document
2  says.
3      Q.   All right.  Look where it says
4  what effects it has on the mind.  It says:
5  Euphoria and feelings of relaxation are the
6  most common effects of oxycodone on the
7  brain, which explains its high potential for
8  abuse.
9          Correct?
10     A.   That's what it says, yes.
11     Q.   All right.  And you knew this
12 when you were working at CVS, did you not?
13         MR. HYNES:  Objection to form.
14     A.   Yes, I knew the -- I recognized
15 the effects of oxycodone.
16 QUESTIONS BY MR. BAKER:
17     Q.   And these are the drugs that
18 you knew to be sold by CVS retail stores that
19 were not monitored by CVS's suspicious order
20 monitoring system, correct?
21         MR. HYNES:  Objection to form.
22 QUESTIONS BY MR. BAKER:
23     Q.   Am I correct?
24         MR. HYNES:  Objection to form.
25         --oOo--

Page 137

1      A.   Yes.
2  QUESTIONS BY MR. BAKER:
3      Q.   All right.  Let's go to
4  Exhibit 1, please.
5          MR. LANOSA:  This is Mike for
6  McKesson.  I'm sorry to interrupt you
7  guys.  We're having some connection
8  problems here on the phone.  We can
9  hear each other, but we can't hear
10 you.  You're cutting in and out.
11         MR. HYNES:  Let's go off the
12 record for a minute.
13         THE VIDEOGRAPHER:  We are now
14 going off the record, and the time is
15 10:28 a.m.
16         (Recess taken, 10:28 a.m. to
17 10:41 a.m.)
18         (CVS-Burtner Exhibit 1 was
19 marked for identification.)
20         THE VIDEOGRAPHER:  We are now
21 going back on the record, and the time
22 is 10:41 a.m.
23 QUESTIONS BY MR. BAKER:
24     Q.   You have in front of you
25 Exhibit 1.  Is that correct, Mr. Burtner?

Highly Confidential – Subject to Further Confidentiality Review

Page 138

1 A. Yes.
2 Q. Okay. You see on the screen
3 Exhibit 1 -- is it not coming up? Yes, there
4 it is. Okay.
5 Up here in the upper left-hand
6 corner you see this is the symbol for the
7 United States Drug Enforcement Agency,
8 correct?
9 A. I believe so, yes.
10 Q. Okay. And you see here where
11 there's a top 10 list in kilograms of
12 consumption of hydrocodone.
13 Do you see that?
14 A. Yes, I see the list.
15 Q. Okay. You see where the United
16 States consumes 99.3% of the hydrocodone in
17 the world?
18 A. Yes, I see that on the
19 document.
20 Q. Okay. You see here on the next
21 document, it says: Poison and deaths from
22 opioidal analgesics.
23 A. Yes, I see that.
24 Q. All right. This is -- the
25 source at the bottom is the National Vital

Page 139

1 Statistics System.
2 Do you see that?
3 A. Yes, I do.
4 Q. Center for Disease Control.
5 Do you see that? CDC?
6 A. Yes, I do.
7 Q. Okay. Go back to the document.
8 Do you see where it talks about this
9 poisoning death from opioid analgesics over a
10 period of 1999 through 2010 are represented
11 by those bar charts?
12 Do you see that?
13 A. Yes, I see that.
14 Q. Do you see a steady climb in
15 that from 1999 all the way up through 2013?
16 Do you see that?
17 MR. HYNES: Objection to form.
18 A. Yes. The document indicates a
19 climb.
20 QUESTIONS BY MR. BAKER:
21 Q. Okay. Do you see that as of
22 the time you were working as a manager in the
23 suspicious order monitoring program at CVS,
24 those deaths were 16,917 in 2011, 16,600 in
25 2012, and 16,200 in 2013?

Page 140

1 Do you see that?
2 MR. HYNES: Objection, form. I
3 think you got some of the numbers
4 wrong.
5 QUESTIONS BY MR. BAKER:
6 Q. Let me repeat the question,
7 then. When were you the suspicious order
8 monitoring manager?
9 A. I -- the manager, late 2012
10 through mid 2013.
11 Q. And when were you the LP
12 analyst?
13 A. I was performing functions as
14 the LP analyst from early 2012 through late
15 2012 when I became the SOM manager.
16 Q. Okay. So in 2012 alone, do you
17 see that there were 16,000 opioid analgesic
18 deaths in the United States?
19 MR. HYNES: Objection to form.
20 A. Yes. I see that on the
21 document, yes.
22 QUESTIONS BY MR. BAKER:
23 Q. Okay. Do you see that number
24 climb to 16,200 in 2013?
25 MR. HYNES: Objection, form.

Page 141

1 A. Yes, I see that.
2 QUESTIONS BY MR. BAKER:
3 Q. Have you ever seen this
4 document before today?
5 MR. HYNES: Objection to the
6 extent it calls for him to divulge the
7 documents shown to him during his
8 prep. He may answer as to whether
9 he's seen it outside of his prep with
10 counsel.
11 QUESTIONS BY MR. BAKER:
12 Q. Have you seen this document
13 outside of your prep with counsel before
14 today?
15 A. No, I do not recall seeing this
16 document, no.
17 Q. Before walking in here today,
18 were you familiar with the fact that there
19 were 16,000 deaths per year as a result of
20 opioid analgesics in the year 2012?
21 MR. HYNES: Objection to form.
22 A. No, I was not familiar with the
23 number of deaths.
24 QUESTIONS BY MR. BAKER:
25 Q. Before you walked in here

Page 142

1 today, were you familiar with the number of
2 deaths reflected on this chart?
3　　　　MR. HYNES: Objection to form.
4　　　A.　No, I was not aware of the
5 number of deaths.
6 QUESTIONS BY MR. BAKER:
7　　　Q.　Let me ask you to pull the next
8 chart up, please. This talks about the U.S.
9 rates of opioid overdose deaths, sales, and
10 treatment admissions from 1999 to 2010.
11　　　　Have you ever seen this
12 document before today?
13　　　A.　No, I do not believe I've ever
14 seen this, no.
15　　　Q.　Okay. Do you understand that
16 the green line on that document represents
17 opioid sales, the red line represents opioid
18 deaths and the blue line represents opioid
19 treatment admissions?
20　　　　Do you see that?
21　　　A.　Yes, I do see that.
22　　　Q.　Okay. The green line is the
23 top line, the red line is the middle line and
24 the blue line is the bottom line, correct?
25　　　A.　Yes.

Page 143

1　　　Q.　Okay. Do you see where those
2 lines travel in the same direction upward
3 from 1999 to 2010?
4　　　　Do you see that?
5　　　　MR. HYNES: Objection, form.
6　　　A.　Yes. Yes, I see that.
7 QUESTIONS BY MR. BAKER:
8　　　Q.　Do you see the correlation
9 between opioid sales, opioid treatment
10 admissions and opioid deaths pursuant to what
11 that chart represents, yes or no?
12　　　　MR. HYNES: Objection to form.
13　　　A.　Yes, I can see the correlation
14 based on this chart.
15 QUESTIONS BY MR. BAKER:
16　　　Q.　Okay. The more opioids that
17 are sold, the more opioid deaths and the more
18 opioid treatment admissions, according to
19 this chart, correct?
20　　　　MR. HYNES: Objection to form.
21　　　A.　According to this chart, yes.
22 QUESTIONS BY MR. BAKER:
23　　　Q.　Those things run correlating
24 hand in hand with each other on this chart,
25 correct?

Page 144

1　　　　MR. HYNES: Objection to form.
2　　　A.　According to this chart, yes.
3 QUESTIONS BY MR. BAKER:
4　　　Q.　Okay. From 1999 to 2010,
5 correct?
6　　　　MR. HYNES: Objection to form.
7　　　A.　Yes, those are the years on the
8 chart.
9 QUESTIONS BY MR. BAKER:
10　　　Q.　You understand this is all part
11 of the opioid crisis?
12　　　　MR. HYNES: Objection to form.
13 QUESTIONS BY MR. BAKER:
14　　　Q.　Do you understand that to be
15 part of the opioid crisis?
16　　　　MR. HYNES: Objection to form.
17　　　A.　Yes, I understand that this
18 would be part of the crisis.
19 QUESTIONS BY MR. BAKER:
20　　　Q.　Next document. Let's go to
21 Exhibit 4.
22　　　　(CVS-Burtner Exhibit 4 was
23　　　marked for identification.)
24 QUESTIONS BY MR. BAKER:
25　　　Q.　This is an e-mail from Mr. Ron

Page 145

1 Buzzeo to Amy Brown. Have you ever seen this
2 e-mail before?
3　　　　MR. HYNES: Objection to the
4　　　extent it calls for the witness to
5　　　divulge documents shown to him in
6　　　prep. He will answer as to any
7　　　documents he's seen outside of his
8　　　prep with counsel.
9　　　　RANDOM CALLER: Hello? Hello?
10　　　MR. BAKER: Yes.
11　　　RANDOM CALLER: Hello?
12　　　MR. BAKER: Yes.
13　　　MR. HYNES: Can you hear us?
14　　　MR. BAKER: Can you hear us?
15　　　RANDOM CALLER: Yeah, so I just
16 called in to the technical support
17 department --
18　　　MR. BAKER: Let's take a break
19 off the record. Let's take a break
20 off the record.
21　　　THE VIDEOGRAPHER: Okay. We
22 are now going off the record, and the
23 time is 10:47 a.m.
24　　　　(Recess taken, 10:47 a.m. to
25 10:49 a.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    THE VIDEOGRAPHER:  We are now
2  going back on the record, and the time
3  is 10:49 a.m.
4  QUESTIONS BY MR. BAKER:
5    Q.    I'm going to hand you
6  Exhibit 5.
7    (CVS-Burtner Exhibit 5 was
8  marked for identification.)
9  QUESTIONS BY MR. BAKER:
10    Q.    All right.  This is an e-mail
11  dated 5/8/2013 from Craig Schiavo to you,
12  Aaron Burtner, correct?
13    A.    That is correct.
14    Q.    All right.  And who was Craig
15  Schiavo in relation to you and CVS at the
16  time?
17    A.    He was an employee based in the
18  corporate office, I believe in compliance.
19    Q.    Okay.  And he sends you this
20  DEA letter as an attachment.  Do you want to
21  look at the DEA letter?  The letter is dated
22  December 27, 2007, is it not?
23    A.    Yes, it is.
24    Q.    Okay.  And the e-mail states at
25  the top, this sentence on the e-mail says:

Page 147

1  In case you haven't read the letter that
2  started all this SOM stuff and the
3  wholesalers getting fined, attached is what
4  started it all.
5    Is that what this says?
6    A.    That is what the document says.
7    Q.    Okay.  And he gave you this
8  document, it's dated December 27, 2007,
9  correct?
10    MR. HYNES:  I just want to note
11  that this is not consecutively -- you
12  skipped a document in between the
13  attachment.
14    MR. BAKER:  It's okay.  We'll
15  re-staple it.
16    MR. HYNES:  Okay.
17    THE WITNESS:  I'm sorry, will
18  you repeat the question?
19  QUESTIONS BY MR. BAKER:
20    Q.    Do you see the document
21  attached to it, December 27, 2007?
22    A.    Yes, I do.
23    Q.    All right.  Did you read that
24  document when he sent it to you?
25    A.    I don't recall if I read it or

Page 148

1  not at that time.
2    Q.    Go back to the first page where
3  it says:  In case you haven't read the letter
4  that started all this SOM stuff.  Do you see
5  that, "that started all this SOM stuff"?
6    MR. BAKER:  Highlight that,
7  please, ma'am, "started all this SOM
8  stuff."
9  QUESTIONS BY MR. BAKER:
10    Q.    Do you see that?
11    A.    Yes.
12    Q.    Okay.  Do you know whether or
13  not CVS only started to do this SOM stuff
14  when they got this letter, or not?
15    MR. HYNES:  Objection to form.
16    A.    I don't know of any of CVS's
17  practices prior to my involvement with this
18  program.
19  QUESTIONS BY MR. BAKER:
20    Q.    Okay.  But that's what
21  Mr. Schiavo is saying, that's what
22  started all this is when they got this
23  letter, right?
24    MR. HYNES:  Objection to form.
25    A.    I don't know to what extent he

Page 149

1  was referring to, the "started all this
2  stuff."
3  QUESTIONS BY MR. BAKER:
4    Q.    All right.  Now, you realize
5  that Controlled Substances Act that I showed
6  you, the 21 C.F.R., do you remember that,
7  that I just showed you?
8    A.    Yes, sir.
9    Q.    Did CVS tell you that that had
10  been in effect since 1971, or not?  Did they
11  tell you that?
12    MR. HYNES:  Objection to form.
13    A.    I don't recall if that was
14  communicated to me or not.
15  QUESTIONS BY MR. BAKER:
16    Q.    Were you ever instructed on the
17  fact that that Controlled Substances Act, the
18  21 C.F.R. that I showed you, 1307(b), that
19  that was in effect since 1971?  Did anybody
20  at CVS ever instruct you on that?
21    MR. HYNES:  Objection to form.
22    A.    I was aware of the act, but I
23  don't recall if anyone told me how long it
24  had been in place.
25    --oOo--

Page 150

1  QUESTIONS BY MR. BAKER:
2      Q.    You're aware that it -- you're
3  not aware that it had been in effect way
4  before this letter was written that's
5  attached to this e-mail?
6          MR. HYNES:  Objection to form.
7      A.    No.  I don't know if -- I don't
8  recall if anyone communicated that to me or
9  not.
10  QUESTIONS BY MR. BAKER:
11      Q.    But you were the SOM manager,
12  right?
13      A.    Yes.
14      Q.    And you weren't instructed on
15  that by anybody at CVS?
16          MR. HYNES:  Objection to form;
17  misstates his testimony.
18  QUESTIONS BY MR. BAKER:
19      Q.    Right?
20          MR. HYNES:  Same objection.
21          --oOo--
22          --oOo--
23          --oOo--
24          --oOo--
25          --oOo--

Page 151

1      A.    No, I was -- I was
2  instructed -- I was familiar and instructed
3  on the act, but I don't know if anyone
4  communicated to me how long it had
5  specifically been in --
6  QUESTIONS BY MR. BAKER:
7      Q.    Fair enough.
8      A.    -- in existence.
9      Q.    Okay.  Let's look at this
10  letter in detail.  It says:  This letter is
11  being sent to every entity in the United
12  States registered with the DEA to manufacture
13  or distribute controlled substances.
14          Correct?
15      A.    That's what the document says,
16  yes.
17      Q.    All right.  And at that time,
18  are you familiar with the fact that CVS was a
19  distributor of controlled substances, or not?
20      A.    Yes.
21      Q.    Okay.  All right.  So it says:
22  The purpose of this letter is to reiterate
23  the responsibilities of controlled substances
24  manufacturers and distributors -- of
25  manufacturers and distributors to inform DEA

Page 152

1  of suspicious orders in accordance with
2  21 C.F.R. 1301.74(b).
3          Correct?
4      A.    That's what it says, yes.
5      Q.    Okay.  And that's the law that
6  I just showed you a minute ago, right?
7      A.    Yes, I believe so.
8      Q.    All right.  And it says here
9  that:  In addition to -- in lieu of the
10  general requirement under 21 USC 823, that
11  manufacturers and distributors maintain
12  effective controls against diversion.
13          Correct?
14      A.    That's what it says, yes.
15      Q.    And you know what "diversion"
16  is, don't you?
17      A.    Yes.
18      Q.    That was the purpose of the
19  suspicious order monitoring program was to
20  avoid diversion of controlled substances,
21  correct?
22      A.    Yes.
23      Q.    Including the hydrocodone
24  combination products that were distributed
25  out of the distribution centers owned by CVS

Page 153

1  to the pharmacies owned by CVS, correct?
2          MR. HYNES:  Objection to form.
3  QUESTIONS BY MR. BAKER:
4      Q.    Correct?
5      A.    Correct.
6      Q.    All right.  It says:  DEA
7  regulations require all manufacturers and
8  distributors to report suspicious orders of
9  controlled substances.
10          Correct?
11      A.    That's what it says, yes.
12      Q.    Okay.  Under this context, in
13  your job at CVS, if a CVS distributor was to
14  report a suspicious order made by a CVS
15  pharmacist, that would be one CVS entity
16  reporting to the DEA on another CVS entity,
17  correct?
18          MR. HYNES:  Objection to form.
19      A.    I'm not familiar -- I don't
20  know.
21  QUESTIONS BY MR. BAKER:
22      Q.    Well, let's take -- let's break
23  that down.
24      A.    Okay.
25      Q.    CVS owned the distribution

Highly Confidential – Subject to Further Confidentiality Review

Page 154

1 center, correct?
2        MR. HYNES: Objection to form.
3     A.    I don't know. I viewed it as I
4 worked for CVS. We all worked for CVS. I
5 don't know.
6 QUESTIONS BY MR. BAKER:
7     Q.    Right.
8     A.    Okay.
9     Q.    The distribution center that
10 you worked for, you were paid to work there
11 by CVS, right?
12     A.    Correct.
13        MR. HYNES: Objection to form.
14 QUESTIONS BY MR. BAKER:
15     Q.    Okay. The pharmacy that you
16 were selling to as a distributor, as a
17 monitoring person for that distributor, that
18 was owned by CVS, right?
19        MR. HYNES: Objection to form.
20 QUESTIONS BY MR. BAKER:
21     Q.    Right?
22        MR. HYNES: Objection to form.
23 QUESTIONS BY MR. BAKER:
24     Q.    It had a big CVS sign, C-V-S,
25 on it, right?

Page 155

1        MR. HYNES: Same objection.
2 QUESTIONS BY MR. BAKER:
3     Q.    Right?
4     A.    I believe so, yes.
5     Q.    Okay. And so if you were to
6 tell the DEA as an SOM manager that somebody
7 that was ordering from your distribution
8 center, that being a CVS pharmacy, was
9 ordering something that was a suspicious
10 order, you in effect would be telling the
11 DEA, "Hey, I'm at CVS and another CVS entity
12 that's ordering from me is ordering a
13 suspicious order." Correct?
14        MR. HYNES: Objection to form.
15 QUESTIONS BY MR. BAKER:
16     Q.    Isn't that right?
17        MR. HYNES: Same objection.
18     A.    I'm not familiar with the term
19 "entity." I'm not sure of the definition --
20 QUESTIONS BY MR. BAKER:
21     Q.    Oh, come on.
22        MR. HYNES: Let him finish.
23        --oOo--
24        --oOo--
25        --oOo--

Page 156

1     A.    I don't know the exact
2 definition of it. To me it would be one CVS
3 employee reporting on another CVS employee.
4 QUESTIONS BY MR. BAKER:
5     Q.    Fair enough.
6     A.    Okay.
7     Q.    Okay. So it would be one CVS
8 employee reporting on the conduct of another
9 CVS employee to the DEA, right?
10     A.    Agreed.
11     Q.    Okay. And that never happened
12 while you were there. There was never one
13 instance that you're aware of while you were
14 the SOM manager at CVS, not one time was
15 there a report of misconduct under the
16 Controlled Substances Act --
17        MR. HYNES: Objection --
18 QUESTIONS BY MR. BAKER:
19     Q.    -- of a suspicious order being
20 made by a CVS pharmacy to a CVS distribution
21 center. Am I correct?
22        MR. HYNES: Objection to form.
23     A.    I wasn't involved with the
24 process of escalating it -- or of reporting
25 it to the DEA. I escalated orders of

Page 157

1 interest to my supervisor to further
2 investigate and then make the decision as to
3 report or not.
4 QUESTIONS BY MR. BAKER:
5     Q.    Are you aware of whether or not
6 your supervisor ever did that?
7        MR. HYNES: Objection to form.
8     A.    I don't know if she would have
9 communicated to me if she did or not.
10 QUESTIONS BY MR. BAKER:
11     Q.    Okay. Well, did you ever hear
12 of that happening?
13     A.    I don't recall ever hearing of
14 that happening.
15     Q.    Okay. It says here on the
16 third paragraph: The regulation also
17 requires that the registrant inform the local
18 DEA division office of suspicious orders when
19 discovered by the registrant.
20        Does it not say that?
21     A.    Yes, that's what the document
22 says.
23     Q.    Okay. Go to the second page.
24 Actually, go down to the bottom of the first
25 page. It says: The regulation specifically

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 states that suspicious orders include orders
2 of an unusual size, orders deviating
3 substantially from a normal pattern and
4 orders of an unusual frequency.
5        Correct?
6     A.    Yes, that's what the document
7 says, yes.
8     Q.    Okay.  That's the same
9 definition that you saw in 21 C.F.R. 1301.74,
10 correct?
11    A.    Yes.
12    Q.    All right.  You did not see
13 anywhere in there the word "extraordinary,"
14 did you?
15    A.    No, I did not.
16    Q.    But you saw that in the
17 document that I showed you that governed your
18 job, correct?
19        MR. HYNES:  Objection to form.
20    A.    Yes.  That word was in the CVS
21 document.
22 QUESTIONS BY MR. BAKER:
23    Q.    Okay.  So, then, it goes on to
24 the next page.  It says:  Registrants that
25 rely on rigid formulas to define whether an

Page 159

1 order is suspicious may be failing to detect
2 suspicious orders.  For example, a system
3 that identifies orders as suspicious only if
4 the total amount of a controlled substance
5 ordered during one month exceeds the amount
6 ordered the previous month by a certain
7 percentage or more is insufficient.
8        Is that what that document
9 says?
10    A.    Yes, that's what the document
11 says.
12    Q.    It says:  The system fails to
13 identify orders placed by a pharmacy if the
14 pharmacy placed unusually large orders from
15 the beginning of its relationship with the
16 distributor.
17        Correct?
18    A.    That's what it says, yes.
19    Q.    Okay.  So let me give you an
20 example.  Let's hypothetically assume that
21 there was no software-generated suspicious
22 order monitoring system in effect at CVS for
23 all of 2006, for all of 2005, for all of
24 2004, 2003, 2002.  Let's just suppose that
25 for the hypothetical.

Page 160

1        Are you with me on that
2 supposition?
3        MR. HYNES:  Objection to form.
4 QUESTIONS BY MR. BAKER:
5     Q.    Do you understand that?
6     A.    I understand what you're
7 saying, yes.
8     Q.    Okay.  And if there was no
9 program, no software program in effect to
10 monitor that in relation to the lags that we
11 talked about, historical reference lags,
12 there would be no way to measure a threshold,
13 would there?
14        MR. HYNES:  Objection to form.
15    A.    I don't know that not having an
16 algorithm or systematic process in place
17 would say that we -- that there's no way of
18 identifying a suspicious order.
19 QUESTIONS BY MR. BAKER:
20    Q.    You don't know if they were
21 monitoring at any time prior to the time of
22 the delivery of this software system, are
23 you?
24        MR. HYNES:  Objection to form.
25        --oOo--

Page 161

1     A.    No.
2 QUESTIONS BY MR. BAKER:
3     Q.    You're not familiar with that,
4 are you?
5     A.    I was not employed by CVS, so I
6 wouldn't have had any information to that,
7 and then once I started, I was not looking
8 back at the process.  I was looking at the
9 process as it was that day.
10    Q.    You don't know whether or not
11 the thresholds that you inherited when you
12 started as an LP analyst at CVS were properly
13 monitored before you came in and started
14 monitoring based upon those thresholds, do
15 you?
16        MR. HYNES:  Objection -- sorry.
17 QUESTIONS BY MR. BAKER:
18    Q.    You don't know that, do you?
19        MR. HYNES:  Objection to form.
20    A.    No, I did not have visibility
21 to that.
22 QUESTIONS BY MR. BAKER:
23    Q.    You just inherited thresholds
24 to monitor from a certain date forward,
25 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  MR. HYNES: Objection to form.
2  A.  Yes.
3  QUESTIONS BY MR. BAKER:
4  Q.  And you just assumed that the
5  thresholds that were in place had been
6  properly monitored under the Controlled
7  Substance Act by CVS before you took over
8  monitoring that system, correct?
9  MR. HYNES: Objection to form.
10  QUESTIONS BY MR. BAKER:
11  Q.  Am I right?
12  MR. HYNES: Objection to form.
13  A.  I had no visibility to how the
14  thresholds were set and I had no reason to
15  believe that they were incorrect.
16  QUESTIONS BY MR. BAKER:
17  Q.  But you didn't know if they
18  were or weren't accurately monitored before
19  you came onboard as the SOM manager.  Am I
20  right?
21  MR. HYNES: Objection to form.
22  QUESTIONS BY MR. BAKER:
23  Q.  Correct?
24  A.  I don't know how they were
25  monitored before I came onboard, no.

Page 163

1  Q.  Okay.  Now, go back to
2  Exhibit 4, please.  Go to the second page,
3  please.  These are the DEA letters that were
4  attached to this e-mail that was sent to --
5  by Mr. Buzzeo to Amy Brown of CVS 2/21 of
6  2008, correct?
7  A.  That's what it says according
8  to the document, yes.
9  Q.  Okay.  And do you know who
10  Amy Brown was when you worked there?
11  A.  I'm not familiar with that
12  name.
13  Q.  Do you know who Amy Propatier
14  was when you worked there?
15  A.  I am familiar with that name.
16  Q.  Okay.  And do you realize she
17  would be the same person, Amy Brown and Amy
18  Propatier?
19  A.  I don't -- I mean, I have no
20  reason not to believe that.
21  Q.  Okay.  You realize this is the
22  same sort of letter that was sent in 2006
23  that says: This letter is being sent to
24  every commercial entity in the United States
25  registered with the DEA to distribute

Page 164

1  controlled substances.  The purpose of this
2  letter is to reiterate the responsibilities
3  of controlled substance distributors in view
4  of the prescription drug abuse problem our
5  nation currently faces.
6  Is that what it says?
7  A.  That is what it says.
8  Q.  All right.  Does that indicate
9  that there is a prescription drug abuse
10  problem already in the nation as of 2006?  Is
11  that what that document says?
12  MR. HYNES: Objection to form.
13  QUESTIONS BY MR. BAKER:
14  Q.  Isn't that what it says?
15  A.  Yes, that's what the document
16  says.
17  Q.  Okay.  And it says here:  As
18  each of you is undoubtedly aware, the abuse
19  (nonmedical use) of controlled prescription
20  drugs is a serious and growing health problem
21  in this country.
22  Do you see that?
23  A.  I see that.
24  Q.  Do you see at the bottom it
25  says -- the middle of paragraph 3, it says:

Page 165

1  Distributors.  Distributors are of course one
2  of the key components of the distribution
3  chain.  If the closed system is to function
4  properly as Congress envisioned, distributors
5  must be vigilant in deciding whether a
6  prospective customer can be trusted to
7  deliver controlled substances only for lawful
8  purposes.
9  This responsibility is critical
10  as Congress has expressly declared that the
11  illegal distribution of controlled substances
12  has a substantial and detrimental effect on
13  the health and general welfare of the
14  American people.
15  Is that what that says?
16  A.  That is what it says, yes.
17  Q.  Okay.  And then page 4, there's
18  another letter dated February 7, 2007.
19  Do you see that?
20  MR. HYNES:  What is the Bates
21  number?  Sorry.
22  MR. BAKER:  91513.
23  MR. HYNES:  Thank you.
24  A.  Yes, I see it.
25  --oOo--

Page 166

1 QUESTIONS BY MR. BAKER:
2     Q.    Do you see that?  Another
3 letter from the DEA.  Again, Background:  As
4 each of you is undoubtedly aware, the abuse
5 (nonmedical use) of controlled prescription
6 drugs is a serious and growing health problem
7 in this country.
8         Correct?
9     A.    Yes, that's what it says.
10    Q.    All right.  And then it goes on
11 to have that same language in there, that the
12 responsibility is critical -- talking about
13 of distributors -- because Congress has
14 expressly declared that the illegal
15 distribution of controlled substances has a
16 substantial and detrimental effect on the
17 health and general welfare of the American
18 people.
19         Do you see that?
20         MR. HYNES:  Objection to form.
21 QUESTIONS BY MR. BAKER:
22    Q.    Do you see that?
23    A.    Yes, I see it in the document,
24 yes.
25    Q.    Okay.  Now, are you familiar

Page 167

1 with the fact that these letters were sent to
2 CVS that far back?
3         MR. HYNES:  Objection to form.
4     A.    I mean, according to this
5 document, yes, they were sent in 2008.
6 QUESTIONS BY MR. BAKER:
7     Q.    All right.  Next exhibit is
8 Exhibit 6.
9         (CVS-Burtner Exhibit 6 was
10 marked for identification.)
11 QUESTIONS BY MR. BAKER:
12    Q.    This is called a Regulatory
13 Update from CVS Logistics.  Pull that up,
14 please.  Go to the next page.
15         Do you see where it says, on
16 the second bullet point under the topic DEA:
17 Failure to comply with DEA regulations not
18 only creates exposure for logistics but CVS
19 as a corporation?
20         MR. HYNES:  I'm just going to
21 object to the exhibit as incomplete.
22         You may answer the question.
23 QUESTIONS BY MR. BAKER:
24    Q.    Do you see that?
25    A.    Yes, I see it on the document.

Page 168

1     Q.    Okay.  You knew that when you
2 worked there, that failure to comply with DEA
3 regulations not only creates exposure for
4 logistics, the department that you were
5 working in, but CVS as a corporation,
6 correct?
7     A.    Correct.
8     Q.    "Exposure" means liability,
9 correct?
10        MR. HYNES:  Objection to form.
11 QUESTIONS BY MR. BAKER:
12    Q.    Is that what that means?
13        MR. HYNES:  Same objection.
14    A.    That would be my understanding.
15        MR. BAKER:  Okay.  Next
16 document.
17        (CVS-Burtner Exhibit 7 was
18 marked for identification.)
19 QUESTIONS BY MR. BAKER:
20    Q.    You know that the system, one
21 of the key components of the system is the
22 Know Your Customer policy; do you know that?
23 Did you know that?
24        MR. HYNES:  Objection to form.
25    A.    I don't know that I'm familiar

Page 169

1 with the policy Know Your Customer, possibly
2 by a different name.
3 QUESTIONS BY MR. BAKER:
4     Q.    You've never heard of "Know
5 Your Customer"?
6     A.    Well, okay.  Yes.  I understand
7 Know Your Customer, but I don't recall using
8 it in my time at CVS.
9     Q.    Okay.  Let's read for you what
10 that policy states.  It says:  First, you
11 must know and understand DEA's Know Your
12 Customer policy.  This is the foundation to
13 designing the SOM program.
14        Did you know that?  Did you
15 know that was the foundation to designing the
16 SOM program?
17        MR. HYNES:  Objection to form.
18    A.    I wouldn't say that it was
19 explicitly stated to me in that way, but the
20 information that we were looking at was all
21 around getting to know our customer.
22 QUESTIONS BY MR. BAKER:
23    Q.    Okay.  The policy states:  It
24 is fundamental for sound operations that
25 handlers take reasonable measures to identify

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 their customers, understand the normal and
2 expected transactions typically conducted by
3 those customers, and, consequently, identify
4 those transactions conducted by their
5 customers that are suspicious in nature.
6        Is that what it says?
7        MR. HYNES: Hold on, objection
8 again to the incomplete exhibit.
9        You may answer the question.
10   A.   Yes, that's what the document
11 says.
12 QUESTIONS BY MR. BAKER:
13   Q.   Did I read that sentence in its
14 complete pattern?
15   A.   Me?
16   Q.   Did I?
17   A.   Yes, you did.
18   Q.   Okay. And did you know that
19 that's what that policy stated when you
20 worked at CVS in the suspicious order
21 monitoring department?
22        MR. HYNES: Objection to form.
23 QUESTIONS BY MR. BAKER:
24   Q.   Yes or no?
25   A.   No, I do not recall seeing this

Page 171

1 specific paragraph, but this is consistent
2 with the information we were looking at when
3 reviewing stores.
4   Q.   Okay. Exhibit No. 6, please.
5 All right. Go to Exhibit 10.
6        Are you familiar with the
7 history of when CVS first --
8        (Telephonic interruption.)
9        MR. BAKER: Let's go off the
10 record.
11        THE VIDEOGRAPHER: Okay. We
12 are now going off the record, and the
13 time is 11:07 a.m.
14        (Recess taken, 11:07 a.m. to
15 11:08 a.m.)
16        THE VIDEOGRAPHER: We are now
17 going back on the record, and the time
18 is 11:08 a.m.
19        (CVS-Burtner Exhibit 10 was
20 marked for identification.)
21 QUESTIONS BY MR. BAKER:
22   Q.   This is Exhibit 10. Go to
23 Exhibit 10.
24        --oOo--
25        --oOo--

Page 172

1        (Discussion off the
2 stenographic record.)
3 QUESTIONS BY MR. BAKER:
4   Q.   All right. Are you familiar
5 with the history of how CVS first purchased
6 and installed its first initial SOM software
7 program?
8        MR. HYNES: Objection to form.
9   A.   No, I'm not familiar with that.
10 QUESTIONS BY MR. BAKER:
11   Q.   Okay. What was the name of the
12 program that you were using and who delivered
13 it to CVS for your use when you were the SOM
14 manager?
15        MR. HYNES: Objection to form.
16   A.   The system we used, we called
17 it the Buzzeo system. I don't know if that's
18 the exact name of it.
19 QUESTIONS BY MR. BAKER:
20   Q.   Okay, fair enough.
21        All right. So let me show you
22 what's called the retunement document. Go to
23 the second page here.
24        All right. It talks about the
25 company C-E-G-E-D-I-M. Some people say

Page 173

1 "SEJ-dim," I say "Suh-GEE-dum." Whatever.
2 Do you know what that means?
3   A.   No.
4   Q.   Do you know how to pronounce
5 that?
6   A.   No, sir.
7   Q.   Do you know this to be the
8 Buzzeo company? I want you to assume that
9 it's the Buzzeo company for the sake of my
10 questions, okay?
11        MR. HYNES: Standing objection
12 to the assumption.
13        MR. BAKER: Is there not in
14 that the Buzzeo company, Paul?
15        MR. HYNES: I think so, but he
16 doesn't know, so --
17        MR. BAKER: Okay. All right.
18 QUESTIONS BY MR. BAKER:
19   Q.   Can you just assume that?
20   A.   Yeah.
21   Q.   I want you to assume --
22   A.   I don't know, but I have no
23 reason not to believe it, so --
24   Q.   In good faith I'm telling you
25 that's the Buzzeo company, okay?

Highly Confidential – Subject to Further Confidentiality Review

Page 174

1   A.   Perfect.
2   Q.   Okay.  So let me go through
3   this.  This is called the retunement
4   document.  Have you ever read the retunement
5   document before?
6        MR. HYNES:  Same objection as
7   to prep.  He may answer as to whether
8   he read it outside of his prep.
9   A.   No, I have never seen this
10  document before.
11  QUESTIONS BY MR. BAKER:
12  Q.   Okay.  Did CVS show you this
13  while you were working there?
14  A.   I do not recall seeing this
15  document, no.
16  Q.   All right.  Go down to the
17  bottom.
18       MR. HYNES:  The first page?
19  QUESTIONS BY MR. BAKER:
20  Q.   Yes, first page.  You see here
21  it says: The primary requirement to be
22  satisfied is 21 C.F.R. 1301.74.
23       Do you see that?
24  A.   Yes, sir.
25  Q.   Okay.  And that repeats that

Page 175

1   same couple of sentences about the obligation
2   of a distributor under 21 C.F.R. 1301.74,
3   correct?
4   A.   Yes, I see that.
5   Q.   Let me tell you the system.
6   Let's go through the system as reported by
7   Buzzeo on here, okay?
8   A.   Okay.
9   Q.   All right.  It says:  In
10  December 2008, CCS -- which is this
11  company -- delivered an initial SOM model to
12  CVS which CVS integrated into their order
13  management process.
14       Did you know that's when they
15  first took delivery of that system?
16  A.   No, I did not know that.
17  Q.   Okay.  Now, you saw those
18  letters dated back to 2006 and 2007
19  reminding --
20       (Discussion off the
21  stenographic record.)
22       MR. BAKER:  There's been an
23  interruption of people calling in.
24  This is why I'm a little agitated, so
25  we're going to go off record.

Page 176

1        THE VIDEOGRAPHER:  We are now
2   going off the record, and the time is
3   11:11 a.m.
4        (Recess taken, 11:11 a.m. to
5   11:13 a.m.)
6        THE VIDEOGRAPHER:  We are now
7   going back on the record, and the time
8   is 11:13 a.m.
9   QUESTIONS BY MR. BAKER:
10  Q.   The document goes on to state
11  that in July of 2009, CVS staff advised that
12  their current SOM model was pending a large
13  number of orders that were not suspicious on
14  their face and cleared by CVS staff.
15       Do you understand the nature of
16  the word "pending" in that sentence?
17  A.   Yes.
18  Q.   Okay.  What does that mean?
19  A.   Waiting, needing to be
20  reviewed, or -- yes.
21  Q.   Okay.  It says that:  This can
22  occur infrequently with the model.
23       Meaning, if you read that last
24  sentence, it says:  CVS staff advised that
25  the current SOM model was pending a large

Page 177

1   number of orders that were not suspicious on
2   their face and cleared by CVS staff.
3        Correct?
4   A.   That's what it says, yes.
5   Q.   Okay.  This can occur
6   infrequently.
7        Correct?  That's what it says.
8   A.   Yes, it does say that.
9   Q.   Okay.  With the model,
10  especially during the initial implementation
11  period when the model uses data from a fixed,
12  unchanged period of time prior to the model's
13  initial deployment.
14       Correct?
15  A.   Yes, I see that.
16  Q.   It says:  In light of CVS's
17  perceived number of false positives -- now,
18  do you know what the word "perceived" means?
19  A.   Yes.  Yeah.
20  Q.   What does it mean?
21  A.   What someone thinks.
22  Q.   Okay.  Whether it's true or
23  not, it's perceived, correct?
24  A.   Correct.
25  Q.   Okay.  It says:  In light of

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 CVS's perceived number of false
2 positives, CCS statisticians made a revision
3 to the CVS model through an adjustment to the
4 algorithm coefficients.
5      Now, you know what algorithm
6 coefficients are, do you not?
7     A.   I do not -- I mean, I can make
8 an assumption but I don't know exactly what
9 coefficients, what that would mean.
10     Q.   Okay.  When you earlier
11 testified that you were very familiar with
12 the algorithms at CVS, you don't know what
13 coefficients really mean, do you?
14     MR. HYNES:  Objection.  That
15     wasn't his testimony.
16     A.   I had a high-level
17 understanding of how the algorithms worked.
18 They were looking for high volume, ordering
19 frequency, you know, order patterns.  I'm not
20 familiar with the term "coefficients."
21 QUESTIONS BY MR. BAKER:
22     Q.   Okay.  But you don't know
23 mathematically what the algorithm was all
24 about, do you?
25     A.   No.  At a mathematical level, I

Page 179

1 was not super familiar with the algorithms.
2     Q.   You don't even know what a
3 coefficient is, do you?
4     A.   No.
5     Q.   Okay.  It says:  The revised
6 model was delivered to CVS on August 27,
7 2009.  Then, on July 6, 2010, CVS contracted
8 with CCS for three years of SOM maintenance
9 to include yearly full model retunements.
10     Correct?
11     A.   Yes, that's what the document
12 says.
13     Q.   Do you know if they did full
14 model retunements every year, or not?
15     A.   I have no idea.  I was not
16 involved in that process.
17     Q.   Okay.  Go down to the bottom
18 where it says:  Recap of the model design.
19     Do you see this right here,
20 "Recap"?
21     A.   Yes.
22     Q.   Okay.  It says:  The SOM model
23 that has been developed and recommended by
24 Cegedim Compliance Solution, which is CCS,
25 has been designed to pend an order which may

Page 180

1 be classified as a suspicious order for DEA
2 reporting purposes.
3     Correct?
4     A.   That's what it says, yes.
5     Q.   Okay.  And then it goes on, the
6 second paragraph says:  The SOM model that
7 has been developed and recommended by CCS is
8 thus designed to evaluate orders and
9 determine whether they are more likely to fit
10 the DEA's definition of a suspicious order or
11 less likely to fit the DEA's definition of a
12 suspicious order.
13     Correct?
14     A.   Yes.
15     Q.   In order to do this, a score is
16 given for each product line item in an order.
17 The score is based on a number of attributes
18 or order qualities which are independent
19 variables that represent characteristics of
20 the item in the order.
21     Correct?
22     A.   Yes.
23     Q.   The attributes are based on
24 markers or data calculated from a 12-month
25 historical database.  The model also includes

Page 181

1 identifiers, binary variables, that must be
2 either yes, assigned a value of 1, or no,
3 assigned a value of 0.
4     Correct?
5     A.   That is correct.
6     Q.   So the only thing it can be
7 assigned is a 1 or 0, correct?
8     A.   For some -- for some of the
9 factors that were presented.  There were
10 other factors that had numerical values other
11 than that.
12     Q.   Okay.  It says:  For each
13 order, an analysis is performed to determine
14 whether or not the order contains a number of
15 factors (attributes) that would be associated
16 with a suspicious order.  Each of these
17 factors (attributes) is assigned a numerical
18 value.
19     Correct?
20     A.   Yes.
21     Q.   Okay.  Now go to the next page
22 where the underlined portion is here.  It
23 says:  The model has been designed so that an
24 order with a score of .15 or higher is
25 identified as suspicious, pended, and should

Page 182

1  be investigated further.
2      Correct?
3      A.   That's what it says, yes.
4      Q.   "Investigated further" means
5  with due diligence, correct?
6          MR. HYNES:  Objection to form.
7  QUESTIONS BY MR. BAKER:
8      Q.   Is that correct?
9          MR. HYNES:  Objection to form.
10     A.   That would be my understanding.
11 QUESTIONS BY MR. BAKER:
12     Q.   Okay.  And then it says here,
13 down at the bottom, it says:  The attributes
14 are primarily functions of the history
15 field -- fields (markers) that are given
16 below.  Since the new model now accommodates
17 12 months of data, there are roughly twice
18 the number of entries.  Both 6- and 12-month
19 markers should be computed.
20         That's what it says, correct?
21     A.   That's what it says, yes.
22     Q.   All right.  So then let's go to
23 the next page.  This is part of the formula
24 that's explained as to how this algorithm
25 works.  Do you know what all those

Page 183

1  mathematical formulas mean?  Do you have any
2  idea what they mean?
3          MR. HYNES:  Objection to form.
4      A.   Not at a detailed level, no.
5  QUESTIONS BY MR. BAKER:
6      Q.   Okay.  Do you know what
7  n multiplied by (n+1) divided by 2 equals 6
8  multiplied by (6+1) divided by 2 means?  Do
9  you know what that even means?
10         MR. HYNES:  Objection to form.
11     A.   I mean, I understand the
12 mathematical equation, but, I mean, I don't
13 know what "n" necessarily stands for.
14 QUESTIONS BY MR. BAKER:
15     Q.   Okay.  Go ahead and come up.
16 All of these math formulas here, the marker
17 descriptions, this is something that you just
18 assumed was a correct way to compute these
19 things, correct?
20         MR. HYNES:  Objection to form.
21 QUESTIONS BY MR. BAKER:
22     Q.   Am I right?
23         MR. HYNES:  Same objection.
24         --oOo--
25         --oOo--

Page 184

1      A.   Yes.  I have no reason to
2  believe that they weren't.
3  QUESTIONS BY MR. BAKER:
4      Q.   All right.  Go to the next
5  page.  Same thing, where it talks about
6  marker descriptions, do you see all these
7  formulas here in the marker descriptions?
8      A.   Yes, I do.
9      Q.   Do you know what all those mean
10 and what they compute?
11     A.   Not at a detailed level, no.
12     Q.   Okay.  Go to the next page.
13 Same thing, the marker descriptions.  Do you
14 know what all these mean and what they
15 compute?
16         MR. HYNES:  Object to form.
17     A.   No.  Again, at a detailed
18 level, I do not.
19 QUESTIONS BY MR. BAKER:
20     Q.   Same as the next page, do you
21 know what all these mean and what they
22 compute?
23         MR. HYNES:  Objection to form.
24     A.   Not at a detailed level.
25         --oOo--

Page 185

1  QUESTIONS BY MR. BAKER:
2      Q.   Okay.  Next page, do you know
3  what all these mean and what they compute?
4          MR. HYNES:  What page, just so
5      we're clear what page we're on?
6          MR. BAKER:  We're on
7      page 114649.
8          MR. HYNES:  Thank you.
9          Objection to form.
10     A.   No, not at a detailed level, I
11 do not understand what all of these mean.
12 QUESTIONS BY MR. BAKER:
13     Q.   Okay.  And it says:  An
14 important feature -- at the bottom, where it
15 starts with the writing, right here:  An
16 important feature of the SOM model that is
17 now being recommended to CVS is that it is
18 now based on monthly totals, i.e., sums of
19 the controlled substance as measured in
20 milligrams amount of active ingredient.
21         Do you see that?
22     A.   I do see that.
23     Q.   Do you know whether or not
24 before the time this model was delivered in
25 2011, the retuned model, if CVS had been

Page 186

1 measuring orders based upon active
2 ingredient, or not?
3     A.   I don't know how they measured
4 it prior.
5     Q.   Was that an important aspect of
6 how you measured an order, by measuring it by
7 active ingredient as the SOM manager?
8         MR. HYNES:  Objection to form.
9     A.   Yes, that was a factor we
10 looked at.
11 QUESTIONS BY MR. BAKER:
12     Q.   Okay.  It says:  That is, the
13 model does not distinguish between different
14 brands, formulas and/or package sizes.  When
15 an order is placed which contains a
16 controlled substance, the total milligram
17 amount must be calculated for each of the
18 same items and then these values are added to
19 the existing quantities that have already
20 been ordered for the month.
21         Correct?
22     A.   Yes, I see that.
23     Q.   It says:  These cumulative
24 quantities are then evaluated for suspicion
25 based upon the monthly totals of each item

Page 187

1 for the previous 12 months in the CVS
2 database.
3         Correct?
4     A.   Yes, I see that.
5     Q.   And those previous 12 months
6 would be Lag 1, Lag 2, Lag 3, all the way
7 through Lag 12, correct?
8     A.   Correct.
9     Q.   Okay.  And Lag 1 would be the
10 most recent month in time prior to the order
11 that's being made in the current month,
12 correct?
13     A.   Yes, I believe so.
14     Q.   Lag 2 would be the second
15 closest month to the current month and so
16 forth, on down to Lag 12, correct?
17     A.   I believe that is correct, yes.
18     Q.   All right.  So let's go to the
19 SOM model on page 10 of this document, and
20 that would be Bates number 14651.
21         MR. HYNES:  Next page.
22 QUESTIONS BY MR. BAKER:
23     Q.   Next page, next page.  All
24 right.
25         It says, "The SOM model," and

Page 188

1 then do you see where it says "The SOM
2 Model"?
3         Given the variables previously
4 identified, the recommended SOM retuned model
5 for CVS is the following formula:  p equals e
6 to the A power over 1 plus e to the A power.
7         Do you see that?
8     A.   I do see that.
9     Q.   Do you know what that means?
10         MR. HYNES:  Objection, form.
11     A.   No, I do not.
12 QUESTIONS BY MR. BAKER:
13     Q.   Okay.  Do you know what all
14 those variables mean at the bottom where it
15 says:  A = b + b0 + b1 times FrequencyOrder6
16 times Zscore6range plus b2 times
17 FrequencyOrder12 times Zscore12range,
18 et cetera?
19         Do you know what all that
20 means?
21     A.   No, I do not.
22     Q.   Okay.  Let's go to the next
23 page.  It talks about the model coefficients.
24         Do you see that?
25     A.   Yes, sir.

Page 189

1     Q.   All right.  Again, these are
2 the coefficients that are built into this
3 program, according to this document, correct?
4     A.   According to the document, yes.
5     Q.   Do you know what a b0 model
6 coefficient of -5.9745 means in the context
7 of how this calculates things?
8     A.   No, I do not.
9     Q.   Okay.  Go to the next document.
10         First of all, do you know if
11 this program was retuned at any time between
12 the time it was delivered in 2011, this
13 retunement program, and the time that you
14 resigned in 2013?
15     A.   I do not know if it was or was
16 not.
17         MR. HYNES:  Hold on.  Objection
18 to form.
19         Go ahead.  Sorry.
20         THE WITNESS:  Sorry.
21 QUESTIONS BY MR. BAKER:
22     Q.   Do you know if it was modified
23 or changed in any way from the time it was
24 delivered in 2011 until the time that you
25 resigned in 2013?

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1     MR. HYNES: Objection to form.
2     A.    I don't know if it was or
3  wasn't.
4  QUESTIONS BY MR. BAKER:
5     Q.   Okay. All right. Go to
6  Exhibit 11, please.
7          (CVS-Burtner Exhibit 11 was
8      marked for identification.)
9          (Discussion off the
10     stenographic record.)
11  QUESTIONS BY MR. BAKER:
12     Q.   All right. This is the CVS SOM
13  Revised Coefficients. Do you remember me
14  talking to you earlier in the retunement
15  document about the initial program being
16  delivered in December of 2008?
17         Do you remember that?
18     A.   Yes, I do.
19     Q.   Okay. And do you remember that
20  document talking about that there was a
21  perception -- that there was perceived some
22  issues with CVS?
23         Do you remember that?
24     A.   Yes, I remember the document.
25     Q.   And that there was a change in

Page 191

1  the coefficients? Do you remember that?
2     A.    I don't recall it stating the
3  coefficients were changed.
4     Q.    Okay. I want you to assume
5  that's what the document said, okay?
6          MR. HYNES: Objection to the
7      hypothetical.
8  QUESTIONS BY MR. BAKER:
9     Q.    All right. Go back to the
10  document, then. Go back to the previous
11  document. What number was it? What number
12  was the --
13     A.    No. 10.
14     Q.    -- retunement? No. 10.
15     A.    Okay.
16     Q.    All right. Go to the bottom of
17  page 1.
18     A.    Yes, sir.
19     Q.    Go back to No. 10, please, the
20  first page.
21          MR. HYNES: Of the retunement
22      or the e-mail?
23          MR. BAKER: The retunement
24      document --
25          MR. HYNES: Okay.

Page 192

1     MR. BAKER: -- that has the
2  history. Go to the second page,
3  please. All right.
4  QUESTIONS BY MR. BAKER:
5     Q.    In the bottom paragraph, let's
6  read through that again. It says: In July
7  of 2009, CVS staff advised that the current
8  model was pending a large number of orders
9  that were not suspicious on their face and
10  cleared by CVS staff.
11         Do you remember that?
12     A.    Yes, I do.
13  QUESTIONS BY MR. BAKER:
14     Q.    It says: This can occur
15  infrequently.
16         Do you see that?
17     A.    Yes, I remember us reviewing
18  this, yeah.
19     Q.    Then it says: In light of
20  CVS's perceived number of false positives,
21  the bottom sentence.
22         Do you see that?
23     A.    Yes.
24     Q.    Okay. Statisticians made a
25  revision to the CVS -- keep going -- model

Page 193

1  through an adjustment to the algorithm
2  coefficients.
3          Do you see that?
4     A.    Yes, I see that.
5     Q.    Okay. Now, go to the next
6  document.
7          MR. HYNES: I didn't remember
8      that. I'm sorry.
9  QUESTIONS BY MR. BAKER:
10     Q.    Okay. Go to the next document,
11  the coefficients change. The one that we
12  were on.
13          MR. HYNES: 11?
14          MR. BAKER: 11, yes.
15  QUESTIONS BY MR. BAKER:
16     Q.    All right. Now, this one
17  starts with an e-mail, the front page. It
18  says here: Here's -- at the bottom, it says:
19  Here's the revised formula change for the SOM
20  control drug report.
21         Do you see that?
22     A.    Yes, I see that.
23     Q.    This is August of 2009,
24  correct?
25     A.    Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Q.    Okay.  And you see what's
2  attached to it is this document here called
3  CVS SOM Revised Coefficients.
4         Do you see that?
5    A.    Yes, I see the document, yes.
6    Q.    Okay.  And you see where it
7  says:  In July 2009 -- third paragraph -- CVS
8  staff advised CDCS that the current SOM model
9  was pending a large number of orders that
10  were being cleared by CVS staff and
11  determined not to be suspicious on their
12  face.  This can occur infrequently,
13  et cetera.
14         It's that same sentence, that
15  same paragraph, correct?
16    A.    Yes.
17    Q.    All right.  Then it talks
18  about -- it says that, on the next page --
19  or, actually, at the bottom of this page, it
20  says:  CVS -- CDCS recommends that CVS update
21  their order management system with the
22  revised coefficients as soon as practical.
23  Additionally, CVS may wish to consider a
24  planned, once-a-year retunement of the model
25  that Cegedim Dendrite can facilitate to

Page 195

1  ensure the model continues to run at optimum
2  efficiency as customers' ordering habits and
3  patterns gradually change over time.
4         Correct?
5    A.    I see that, yes.
6    Q.    All right.  Then it says:
7  Model Summary (with revised coefficients).
8         It says:  Given the variables
9  previously identified in the 12/24/2008 SOM
10  document, the SOM model for CVS remains the
11  following formula:  s equals e to the A power
12  over 1 plus e to the A power.
13         Do you see that?
14    A.    I see it, yes.
15    Q.    All right.  But at the bottom
16  of this right here it says, "The values," and
17  it talks about -- keep going -- it says:  The
18  values b0, b1, b2, all the way through b6, are
19  the model coefficients.
20         Do you see that?
21    A.    I see it.
22    Q.    It says:  Using the data
23  provided by CVS.
24         Do you see that?
25    A.    Yes.

Page 196

1    Q.    That means to you that CVS
2  provided the data to this company to build
3  this model.  Is that right?
4    A.    According to this document,
5  yes.
6    Q.    Okay.  These have been
7  precisely tuned and revised for high model
8  sensitivity.  The coefficients are given
9  below.
10         And then it gives those
11  coefficients, right?
12    A.    Yes.  I see the coefficients
13  there.
14    Q.    That's a new set of
15  coefficients, according to the document,
16  correct?
17         MR. HYNES:  Objection to form.
18  QUESTIONS BY MR. BAKER:
19    Q.    Take a look at that set of
20  coefficients, beginning with b0 equals
21  -3.214, b1 equals .7294.
22         Do you see that?
23    A.    Yes.
24    Q.    Okay.
25    A.    The coefficients in Exhibit 10

Page 197

1  are different from the coefficients in
2  Exhibit 11.
3    Q.    Exactly.  So what happened was,
4  when the model was delivered in 2008, CVS,
5  according to the document, said that it was
6  pending too many orders that CVS felt were
7  false positives, correct?
8         MR. HYNES:  Objection to form.
9  QUESTIONS BY MR. BAKER:
10    Q.    Isn't that what it says?
11         MR. HYNES:  Objection to form.
12    A.    According to the document, I --
13  I wasn't even part of the company at that
14  time.  I don't know.
15  QUESTIONS BY MR. BAKER:
16    Q.    I know.  I'm just trying to
17  give you the historical analysis, okay?
18    A.    Okay.  Okay.
19    Q.    That's what it said, right?
20         MR. HYNES:  Objection to form.
21    A.    According to the document, yes.
22  QUESTIONS BY MR. BAKER:
23    Q.    And then in 2009, there was a
24  delivery of revised coefficients to that 2008
25  model, at least according to the documents,

Page 198

1 correct?
2      A.   Uh.  I --
3      Q.   I just read it to you.
4      A.   No, I understand.  I don't see
5 a date on the document of when this was
6 provided to CVS.  I see that it was attached
7 to an e-mail.
8      Q.   Okay.  Attached to an e-mail
9 dated August 27, 2009.
10      A.   Yes.
11      Q.   Correct?
12      A.   Correct, yes.
13      Q.   And it says:  Ellen, here is
14 the revised formula change for the SOM
15 control drug report.
16           Correct?
17      A.   Correct, that is what the
18 e-mail says.
19      Q.   All right.  I want you to
20 assume that it was delivered in 2009.  That's
21 what it said, that in 2009, they were doing
22 this revision, correct?
23           MR. HYNES:  Objection, form.
24 QUESTIONS BY MR. BAKER:
25      Q.   Is that right?

Page 199

1           Well, let me ask you, do you
2 have any reason to doubt that the revised
3 coefficients were delivered in 2009 to CVS?
4      A.   No, I have no reason to doubt
5 that's what happened.
6      Q.   All right.  Now, historically
7 then, we move up to 2011.  We have the
8 retunement, correct?
9      A.   I was not aware of any
10 retunement in 2011.
11      Q.   But I showed you the document,
12 remember?  The retunement document in 2011?
13      A.   Exhibit 10?
14      Q.   It was retuned in 2011.
15      A.   I wasn't involved with any
16 retunement.  I have no idea if it happened or
17 not.
18      Q.   All right.  Go to Exhibit 10
19 again.  Go to Exhibit 18.
20           (CVS-Burtner Exhibit 18 was
21 marked for identification.)
22 QUESTIONS BY MR. BAKER:
23      Q.   Okay.  Exhibit 18, do you see
24 February 8, 2011?  It says --
25           MR. HYNES:  Where is 18?

Page 200

1           MR. BAKER:  I'm sorry.
2           MR. HYNES:  Oh, it's a new one.
3 Got it.
4 QUESTIONS BY MR. BAKER:
5      Q.   It says:  We are finalizing the
6 retunement document.
7           Do you see that?
8      A.   Yes, I see that.
9      Q.   That's February 8 of 2011,
10 correct?
11      A.   Correct.
12      Q.   Okay.  Go down to the bottom,
13 and it says:  February 8, 2011.  Are the new
14 tables ready?  It says:  12-month lag for IRR
15 and control drugs.
16           Do you see that?
17      A.   I see that.
18      Q.   Okay.  Control drugs reported
19 on IRR by active ingredient.
20           Do you see that?
21      A.   I see that.
22      Q.   That's what was discussed in
23 the retunement document that I just showed
24 you from 2011, correct?
25      A.   Yes.  I didn't realize that

Page 201

1 document was from 2011.
2      Q.   Okay, fair enough.  All right.
3 So historically you now understand what went
4 on with respect to when the program was
5 delivered, how the coefficients were changed
6 and how the document was retuned in 2011.
7           Do you understand that --
8           MR. HYNES:  Objection to form.
9 QUESTIONS BY MR. BAKER:
10      Q.   -- from those documents now?
11           MR. HYNES:  Objection to form.
12      A.   Based on what we reviewed, it
13 appears there were retunements.  I have no
14 reason to believe that that's not true.
15 QUESTIONS BY MR. BAKER:
16      Q.   Okay.  All right.  Next
17 document.
18           MR. HYNES:  Can we break when
19 you have a minute, though?
20           MR. BAKER:  Sure.
21           MR. HYNES:  You can do this.  I
22 mean, whenever it's a convenient time.
23           MR. BAKER:  Now is a convenient
24 time.
25           THE VIDEOGRAPHER:  Okay.  We

Page 202

1    are now going off the record, and the
2    time is 11:32 a.m.
3        (Recess taken, 11:32 a.m. to
4    11:40 a.m.)
5        THE VIDEOGRAPHER:  We are now
6    going back on the record, and the time
7    is 11:40 a.m.
8    QUESTIONS BY MR. BAKER:
9        Q.    Pull document 22, please.
10       (CVS-Burtner Exhibit 22 was
11   marked for identification.)
12   QUESTIONS BY MR. BAKER:
13       Q.    This is the Suspicious Order
14   Monitoring for PSE/Control Drugs, Summary of
15   Key Concepts and Procedures, CVS, August 27,
16   2010.
17       Have you ever reviewed this
18   document before today?
19       MR. HYNES:  Objection to --
20   QUESTIONS BY MR. BAKER:
21       Q.    While you were employed at CVS,
22   did you review this document?
23       MR. HYNES:  Thank you, Bill.
24       A.    I don't recall reviewing this
25   document but it appears to lay out the

Page 203

1    process for reviewing an order.
2    QUESTIONS BY MR. BAKER:
3        Q.    Did you know that CVS inserted
4    the suspicious order monitoring paragraph
5    into their standard operating procedures in
6    August of 2010?
7        Did you know that?
8        A.    I did not know that.
9        Q.    Okay.  Did you know that this
10   was generated at or about that time?
11       A.    Yes, it appears so.
12       Q.    Okay.  And would you look at
13   page 1 of that document.  It says:  The
14   purpose of the -- it says "Inventory Review
15   Report," but IRR, we're talking the same
16   thing, Item Review Report, correct?
17       A.    Yes, sir.
18       Q.    It may be a typo, but
19   nevertheless, it's the same thing that we
20   talked about that's in that document that I
21   showed you previously, correct?
22       A.    Yes.
23       Q.    The document that was their SOM
24   policy and procedure that I showed you from
25   2011.  You remember that?

Page 204

1        A.    Yes, I do.
2        Q.    Okay.  All right.  It says
3    that:  CVS has created an IRR for PSE/EPH and
4    for controlled drugs.
5        Correct?
6        A.    Yes, I see that.
7        Q.    So PSE/EPH is chemicals, and
8    then controlled drugs deals with what we're
9    talking about, hydrocodone combination
10   products, correct?
11       A.    Yes.
12       Q.    All right.  And it says:  CVS
13   has created to assist in detection of
14   potential suspicious orders.
15       Correct?
16       A.    Yes.
17       Q.    And to prevent diversion of
18   controlled drug products, correct?
19       A.    Yes, that's what it says.
20       Q.    Okay.  And you know what
21   diversion is, right?
22       A.    Yes.
23       Q.    All right.  And then it says
24   "Responsibilities," the next page.  It talks
25   about, at that time, on the first paragraph,

Page 205

1    it says:  The DC pharmacist reviews the IRR
2    daily and determines whether or not variances
3    are within acceptable ranges.
4        Do you see that?
5        MR. HYNES:  Objection to form.
6        A.    I do see that.
7    QUESTIONS BY MR. BAKER:
8        Q.    All right.  The DC RX, is that
9    a pharmacist?  Is that what that means?
10       A.    I don't know.
11       Q.    Okay.  Do you know who that
12   was, the DC RX at that time, or not?
13       MR. HYNES:  August 2010?
14   QUESTIONS BY MR. BAKER:
15       Q.    2010.
16       A.    No, I'm not familiar with that
17   position.
18       Q.    Okay.  In any event, it says
19   that -- at the bottom, it says if there's no
20   suspicious order, that you attach
21   documentation to the IRR report and file,
22   correct?
23       A.    Correct.
24       Q.    Documentation, would that be
25   due diligence?  Is that what that is, due

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 diligence documentation, to the best of your
2 knowledge?
3     A.   Yes.  It would include the due
4 diligence, additional due diligence that we
5 completed, in addition to just overall
6 documentation of what we reviewed that day.
7     Q.   Okay.  And do you know what
8 percentage of orders that came through that
9 were flagged on the SOM computer system that
10 showed up on the IRR report were actually
11 subjected to the process of due diligence?
12         MR. HYNES:  Objection to form.
13 QUESTIONS BY MR. BAKER:
14     Q.   Do you?
15         MR. HYNES:  Objection.
16     A.   Every order that was populated
17 on the report was subjected to a form of due
18 diligence.
19 QUESTIONS BY MR. BAKER:
20     Q.   Due diligence to the point
21 where it resulted in attached documentation
22 to show what was done, that's what I'm
23 asking.
24         MR. HYNES:  Objection to form.
25     A.   I do not recall what percentage

Page 207

1 of the orders on the report were further --
2 received further due diligence.
3 QUESTIONS BY MR. BAKER:
4     Q.   Okay.  And when they received
5 the due diligence that was put in written
6 form, that would be proof of what was done in
7 reference to review of that order from the
8 standpoint of due diligence, correct?
9         MR. HYNES:  Objection to form.
10     A.   Yes.
11 QUESTIONS BY MR. BAKER:
12     Q.   Okay.  And that would be
13 attached to the IRR report for that day,
14 right?
15         MR. HYNES:  Objection to form.
16     A.   Yes, I believe so.
17 QUESTIONS BY MR. BAKER:
18     Q.   Okay.  And do you know what
19 percentage of orders were subjected to that
20 due diligence to where it resulted in a
21 written report to show what was done for due
22 diligence?  Yes or no?
23         MR. HYNES:  Objection to form;
24     asked and answered.
25         --oOo--

Page 208

1     A.   I don't recall what percentage.
2 QUESTIONS BY MR. BAKER:
3     Q.   Okay.  Go to the next page.  It
4 says:  Why is the DC responsible to review
5 suspicious orders?  Then it says:  The DC, as
6 a separate DEA registrant, is responsible for
7 products shipped from the facility.  DEA
8 regulations require all distributors to
9 report suspicious orders.  Therefore, the DC
10 must review the orders of control drugs and
11 initiate an investigation because the DC is
12 the entity that picks and distributes the
13 product.
14         Correct?
15     A.   I see that, yes.
16     Q.   All right.  Now, when you
17 worked there, everything that was done with
18 respect to suspicious order monitoring that
19 you did was done out of one DC, one
20 distribution center, that was Indiana,
21 correct?
22         MR. HYNES:  Objection to form.
23     A.   For a certain portion.  In the
24 beginning it was out of Indianapolis and
25 Knoxville, and then at the end, once Paul had

Page 209

1 left, Paul Lawson, then it was all completed,
2 as far as I know, at the Indianapolis DC.
3 QUESTIONS BY MR. BAKER:
4     Q.   Okay.  So the period of time
5 that it was done in both Indiana and
6 Knoxville was when?
7     A.   Approximately March of 2012
8 through the beginning portion of September
9 2012, yes.
10     Q.   All right.  Was Mr. Lawson an
11 LP analyst?
12         (Telephone interruption.)
13     A.   Yes, I believe that was his
14 position.
15 QUESTIONS BY MR. BAKER:
16     Q.   All right.  We're going to go
17 back on the record and reask that same
18 question.
19         Was Mr. Lawson a loss
20 prevention analyst at that time?
21     A.   Yes, I believe that was his
22 position.
23     Q.   And were you a loss prevention
24 analyst at that time?
25     A.   Technically, loss prevention

Highly Confidential – Subject to Further Confidentiality Review

Page 210

1 supervisor but performing some tasks of a
2 loss prevention analyst.
3     Q.    Okay.  How much of your day was
4 spent as a loss prevention supervisor as
5 opposed to a loss prevention analyst during
6 that time?
7         MR. HYNES:  Objection, time
8 period, but...
9 QUESTIONS BY MR. BAKER:
10     Q.    State the time period that you
11 think I'm asking.
12     A.    Oh, oh.  From March 2012 to
13 early September 2012?
14     Q.    Yes, sir.
15     A.    It varied throughout the month.
16 At the beginning of the month when the report
17 was smaller, less time.  At the end of the
18 month when the report was larger, most of my
19 time if not all of my time was as an LP --
20 sorry.
21     Q.    And your job during that time
22 frame was other than just doing suspicious
23 order monitoring tasks, correct?
24     A.    Yes, that is correct.
25     Q.    What other tasks did you have?

Page 211

1     A.    So my primary -- at that time I
2 was still performing as a loss prevention
3 supervisor, which was the role that I was
4 hired in as, and my primary tasks were around
5 safety, safety compliance.
6     Q.    Okay.  So how much of your day
7 was spent on suspicious order monitoring
8 versus doing other tasks associated with your
9 job?
10         MR. HYNES:  Objection, asked
11 and answered.
12     A.    So it varied.  In that time
13 frame it varied throughout the month from a
14 little -- small amount, 25% of my day at the
15 beginning of the month, to much more, if not
16 all of my day, at the end of the month.
17 QUESTIONS BY MR. BAKER:
18     Q.    How about Mr. Lawson?  From
19 your knowledge of being in touch with him,
20 how much of -- was he also doing similar
21 things, like he was doing something other
22 than SOM when he was in Knoxville, or not?
23     A.    No, I do not believe he was
24 doing anything else.  I think he was a
25 full-time LPA.

Page 212

1     Q.    IRR analyst?
2     A.    Yes.
3     Q.    Okay.  Now, do you know when it
4 moved away from a distribution center to
5 distribution center program into a
6 centralized program?
7     A.    No, I'm not aware of when that
8 happened.
9     Q.    Okay.  Let's go to the next
10 document, No. 49.
11         (CVS-Burtner Exhibit 49 was
12     marked for identification.)
13 QUESTIONS BY MR. BAKER:
14     Q.    Do you know why it was moved
15 away from a distribution center to
16 distribution center program into a
17 centralized location program?
18     A.    No, I do not know why.
19     Q.    Let me ask you to look at
20 Exhibit 49 in front of you, all right?  This
21 is an e-mail from Christopher Tulley, the
22 middle here, is from Christopher Tulley to
23 Pamela Hinkle, copying you, Aaron Burtner,
24 regarding "Recap progress made," and it's
25 dated November 11, 2012.

Page 213

1         Do you see that?
2     A.    Yes, I do.
3     Q.    It says:  Hi guys.  I met with
4 John A and Ellen on Friday.  They advised
5 when this program was initially designed it
6 was meant for the review that Aaron does to
7 be done in all 11 DCs.  Do you know why and
8 when it was consolidated to just one DC doing
9 the review?
10         Do you see that?
11     A.    I do.
12     Q.    Okay.  And do you see your
13 response right above that, you responded to
14 Mr. Tulley?
15     A.    Yes, I do.
16     Q.    And you responded to him the
17 same day, and this was your response:  Chris,
18 Pam will be able to shed more light, but two
19 big reasons were review consistency with
20 having just one person completing the reviews
21 rather than 11 people.
22         Correct?
23     A.    Yes, that's what it says.
24     Q.    Okay.  With Pam in Knoxville,
25 they wanted the reviews completed so that she

Page 214

1  could manage the process, correct?
2      A.   Yes, that's what it says.
3      Q.   Let me ask you something.  As
4  an LP analyst and a suspicious order
5  monitoring manager during your period at
6  CVS -- those were the two positions that you
7  held, correct?
8      A.   Technically, loss prevention
9  supervisor and SOM manager, yes.
10     Q.   Okay.  When you were in those
11 positions, did you manage people and
12 understand that it cost money to employ them?
13         MR. HYNES:  Objection to form.
14     A.   I did not manage employees as
15 LPS but I did manage employees as an SOM
16 manager.
17 QUESTIONS BY MR. BAKER:
18     Q.   And you know that when you
19 manage employees as an SOM manager, it costs
20 money to pay those employees, right?
21     A.   Yes, I do understand that.
22     Q.   And it costs more money to
23 employ 11 people than it does to employ one
24 person, does it not?
25         MR. HYNES:  Objection to form.

Page 215

1      A.   I -- I mean, not necessarily,
2  no.
3  QUESTIONS BY MR. BAKER:
4      Q.   Unless you're paying that one
5  person what the 11 people would normally
6  earn, correct?
7      A.   Correct, yes.
8      Q.   And CVS didn't normally do that
9  in the context of that department, did they?
10     A.   No, I do not believe that CVS
11 would do that.
12     Q.   Okay.  So basically, CVS saves
13 money when they employ one person to do this
14 job as opposed to 11, correct?
15         MR. HYNES:  Objection to form.
16     A.   Speculating, theoretically,
17 yes.
18 QUESTIONS BY MR. BAKER:
19     Q.   Okay.  Without speculating,
20 theoretically, the answer is yes, correct?
21     A.   I don't know if they would
22 have -- yes.  It seems likely that if they
23 employed one person versus 11 they would save
24 money, yes.
25     Q.   Okay.  And so that's what they

Page 216

1  were doing when they had Pam Hinkle doing all
2  the reviews in Knoxville, right?
3          MR. HYNES:  Objection to form.
4      A.   I don't know.  I don't know
5  what the purpose of -- what the purpose was
6  of moving from all 11 to one.
7  QUESTIONS BY MR. BAKER:
8      Q.   And when you have one person
9  doing the reviews for consistency, that one
10 person can consistently make a finding that
11 there are no suspicious orders on that IRR
12 report, correct?
13         MR. HYNES:  Objection to form.
14     A.   Yes, I suppose so.
15 QUESTIONS BY MR. BAKER:
16     Q.   All right.  Let me go to
17 Exhibit 15.
18         (CVS-Burtner Exhibit 15 was
19     marked for identification.)
20 QUESTIONS BY MR. BAKER:
21     Q.   This is a memorandum dated
22 August 13, 2010, from Frank Devlin to John
23 Mortelliti regarding Control Drug IRR Update.
24         Now, before I go into this
25 document, do you remember when I showed you

Page 217

1  the history of the SOM computer software
2  system, when we went through that earlier
3  today?
4      A.   Yes.
5      Q.   Do you remember where, in that
6  history of the program, it talked about that
7  the program was designed to pend an order at
8  a total score of .15?
9          Do you remember that?
10     A.   I do remember seeing that, yes.
11     Q.   Okay.  And do you know how it
12 ended up getting raised to above .5, or why?
13         MR. HYNES:  .15?
14 QUESTIONS BY MR. BAKER:
15     Q.   .15?
16     A.   No, I do not know why or when.
17     Q.   Okay.  I think I may have
18 restated the -- let me restate.
19     A.   Okay.
20     Q.   Do you remember when I showed
21 you in the documents of the history of the
22 suspicious order monitoring software program
23 where the program was designed to pend an
24 order as potentially suspicious at total
25 score of .15?

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1      Do you remember that?
2     A.   Yes, I do remember seeing that.
3     Q.   Okay. And do you remember --
4 do you know how, when or why that got raised
5 to a score of .65?
6     A.   No, I do not know any of that.
7     Q.   When you worked there, did you
8 use point -- was .65 the score at which an
9 order was pended under that system?
10     A.   Yes. That was -- that was the
11 plateau of when an order was placed on the
12 IRR.
13     Q.   Okay. That was the bottom
14 number, .65, at which it would score to end
15 up on the IRR report, correct?
16     A.   Yes, correct.
17     Q.   All right. And then it says,
18 August 13, 2010, it says: The following
19 information is a breakdown of the tested
20 results for the control drug IRR as well as
21 the plan of action to incorporate the control
22 drug IRR into permanent SOP.
23     Do you see that?
24     A.   Yes, I see that.
25     Q.   All right. It says: Completed

Page 219

1 as of 8/13/2010. It says: Control drug
2 IRR .15 has been tested by John Mortelliti,
3 Lumberton Distribution Center.
4     Do you see that?
5     A.   Yes, I see that.
6     Q.   Okay. Do you know who
7 Mr. Mortelliti is?
8     A.   Yes, I do.
9     Q.   Okay. Do you know if at the
10 time he was working in the Lumberton
11 distribution center reviewing IRRs?
12     A.   I believe he was working in
13 Lumberton. I don't know if reviewing the IRR
14 was part of his responsibilities.
15     Q.   And then it says the score was
16 eventually adjusted to .65, does it not?
17     A.   Yes, he was that.
18     Q.   And you have no idea how that
19 happened or who did it, right?
20     A.   No, I do not.
21     Q.   Okay. But if the system is
22 designed to pend an order at .15, why -- are
23 you aware of why somebody would think it
24 would be okay to raise it up to .65 as a
25 pending score, or not?

Page 220

1     MR. HYNES: Objection.
2   Objection to form.
3     A.   I wasn't involved in those
4 conversations. I don't know the reasoning.
5 QUESTIONS BY MR. BAKER:
6     Q.   That's just the program you
7 inherited is one that was designed to pend an
8 order at .15 that was raised to .65 before
9 you ever got involved, right?
10     A.   Yes, that is correct.
11     (CVS-Burtner Exhibit 13 was
12 marked for identification.)
13 QUESTIONS BY MR. BAKER:
14     Q.   Let me show you Exhibit 13.
15 Now, this, if you go back -- you have to read
16 e-mails when they're printed out like this
17 backwards, so if you go to the second-to-last
18 page here.
19     A.   Okay.
20     Q.   It starts with an e-mail dated
21 February 15, 2010.
22     Do you see that?
23     A.   Yes, I do.
24     Q.   All right. And it talks about:
25 The score used for pending is currently .15.

Page 221

1     Do you see that?
2     A.   Yes, I see that.
3     Q.   All right. And this is an
4 e-mail from cegedim.com. That would be CCS.
5 Is that right? Same company?
6     A.   Yes. Yes.
7     Q.   Okay. And it's February 15,
8 2010, and this is Mr. Frank Devlin, right?
9     A.   Yes.
10     Q.   Do you know who Frank Devlin
11 was at the time?
12     A.   Yes, I do.
13     Q.   And who was he?
14     A.   I know Frank Devlin. At this
15 time I believe he was the director of loss
16 prevention, logistics, loss prevention.
17     Q.   Okay. And he was the one that
18 was your boss, basically, right?
19     A.   Several layers, but yes.
20     Q.   Okay. All right. So it says:
21 The score used for pending is currently .15.
22     Do you see that?
23     A.   Yes, I do.
24     Q.   All right. Then go to the --
25 above that where it says -- it says: This is

Page 222

1  in regards to the Item Review Report for
2  control drugs.  The report is pending far too
3  many orders.  In discussions with our
4  consultant they made the recommendation
5  below.
6        Do you see that?
7     A.   Yes, I do.
8     Q.   Okay.  And then skip up above.
9  It says: Hi Frank.  I just -- this is
10 February 16.  This is -- go above.  You have
11 to go to the next page to see who is writing
12 this, but in any event, it's to Devlin --
13 Frank Devlin, Gary Misiaszek, John Andrade, a
14 copy to John Mortelliti and Anthony -- I
15 can't say that last name, but in any event,
16 you see all those people are on it, right?
17    A.   I do see those names, yes.
18    Q.   This appears to be a pretty
19 widely distributed e-mail within CVS, does it
20 not?
21    A.   I'm sorry, I didn't hear the
22 question.
23    Q.   It appears to be a pretty
24 widely distributed e-mail within CVS, right?
25 I mean, we have seven people on the e-mail

Page 223

1  now, right?
2        COUNSEL ON PHONE:  Hello?
3  QUESTIONS BY MR. BAKER:
4     Q.   Let's skip that question and
5  move on.  It says: Hi Frank, I just spoke to
6  John and Rick about your request.  What we'd
7  like to do is have you pick a day that you
8  would like us to work on.  Then we will run
9  and rerun the different scores, .16, .17,
10 et cetera, until you're satisfied with the
11 results.
12       Correct?
13    A.   Yes, I see that.
14    Q.   All right.  So then if you move
15 forward, on the front page, it says here at
16 the bottom, February 24, at the bottom --
17    A.   Yes, sir.
18    Q.   February 24, 2010.  It says:
19 Ellen, would it be possible to do this
20 Friday?  Also, with expenses being tight
21 right now -- let me ask you about that.
22       Was CVS always giving you that
23 impression, that expenses needed to be kept
24 tight, when you worked there as a manager?
25       MR. HYNES:  Objection to form.

Page 224

1     A.   I -- I mean, I wouldn't say to
2  the extent that we weren't able to spend
3  money, but like any operations, they were
4  trying to cut costs where possible.
5  QUESTIONS BY MR. BAKER:
6     Q.   Okay.  And did you find them to
7  cut costs where they shouldn't have cut costs
8  at times?
9     A.   Not in my opinion, no.
10    Q.   Did you ever write an e-mail to
11 that effect?
12    A.   I don't believe so.
13    Q.   Okay.  It says here: Ellen,
14 would it be possible to do this Friday?
15 Also, with expenses being tight right now,
16 would we be able to turn off the control drug
17 IRR for all the DCs except Lumberton?
18       Do you see that?
19    A.   Yes, I do.
20    Q.   Okay.  So would that mean that
21 the control drug IRR would only run at
22 Lumberton?  Is that what that means?
23       MR. HYNES:  Objection to form.
24       --oOo--
25       --oOo--

Page 225

1     A.   I don't know.  I don't know
2  what he means by that exactly.
3  QUESTIONS BY MR. BAKER:
4     Q.   All right.  It says:  The
5  report is very thick and costly to run daily.
6        Do you see that?
7     A.   Yes, I do.
8     Q.   Okay.  Would that be consistent
9  with the program was pending a lot of orders
10 as potentially suspicious?
11       MR. HYNES:  Objection to form.
12 QUESTIONS BY MR. BAKER:
13    Q.   Would that be consistent with
14 that?
15       MR. HYNES:  Same objection.
16    A.   Yes.  I would -- I would say
17 so.
18 QUESTIONS BY MR. BAKER:
19    Q.   It says:  Once we get the
20 formula acceptable, we -- we, CVS, right?
21 It's from John Mortelliti.
22    A.   I don't know exactly who all
23 he's referring to with "we."  He could also
24 be referring to the consultants.
25    Q.   Once we get the formula

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 acceptable, we can turn it back on for the
2 network.
3          Do you see that?
4      A.   Yes, I do.
5      Q.   So basically what this is
6 saying is Mr. Mortelliti is going to turn the
7 program off, except for him up in Lumberton,
8 and he's going to start testing out different
9 scores to see where he thinks it's
10 acceptable, correct?
11         MR. HYNES:  Objection to form.
12 QUESTIONS BY MR. BAKER:
13     Q.   Isn't that what that says?
14         MR. HYNES:  Same objection.
15     A.   I can't be certain that that's
16 the intent of this.
17 QUESTIONS BY MR. BAKER:
18     Q.   Well, go up above that.
19 March 5 of 2010.  It says:  John, please find
20 attached Item Review Reports for control
21 drugs for New Jersey.
22         That's Lumberton, correct?
23     A.   Yes.
24     Q.   And that's where Mortelliti was
25 at the time, correct?

Page 227

1      A.   Yes.
2      Q.   Report is run with .15,
3 .16, .17, .18 and .19 score.
4          It says:  Please review and let
5 us know whether you would like to see reports
6 for more incremental scores.  We can run for
7 alternatives -- alternate too, like .17, .19,
8 .21 and so on.
9          Isn't that what it says?
10     A.   Yes, I see that.
11     Q.   All right.  And then,
12 Mortelliti writes to Frank Devlin, 3/5 of
13 2010, and says:  Frank, the report is still
14 large even for the most aggressive formula
15 attached.
16         Isn't that what that says?
17     A.   Yes, that's what it says.
18     Q.   Were you ever made aware that
19 this is what they were doing to that score,
20 the score that you inherited at .65?
21     A.   No.
22         MR. HYNES:  Objection to form.
23     A.   No, I was not aware of this.
24 QUESTIONS BY MR. BAKER:
25     Q.   All right.  Go to the next

Page 228

1 document, Exhibit 14.
2          (CVS-Burtner Exhibit 14 was
3     marked for identification.)
4 QUESTIONS BY MR. BAKER:
5     Q.   All right.  Now, if you go to
6 the front page of this document, this is just
7 a continuation of these e-mails moving
8 forward, and it says -- March 9 of 2010, it
9 says:  I did.  I believe we need to continue
10 to tweak the formula up.
11         Do you see that?
12     A.   Yes, I see that.
13     Q.   It appears that what they're
14 doing is they're tweaking the formula
15 from .15 to a higher score level.  Is that
16 what it appears to you?
17         MR. HYNES:  Objection to form.
18     A.   Yes.  According to the
19 e-mails -- to these two documents, it appears
20 that that is what they're doing.
21 QUESTIONS BY MR. BAKER:
22     Q.   All right.  They're tweaking
23 it.  Is that right?
24         MR. HYNES:  Objection to form.
25     A.   That is what this document

Page 229

1 says.
2 QUESTIONS BY MR. BAKER:
3     Q.   They're manipulating the score
4 upward, aren't they?
5         MR. HYNES:  Objection to form.
6 QUESTIONS BY MR. BAKER:
7     Q.   Isn't that what they're doing,
8 Mr. Burtner?
9         MR. HYNES:  Same objection.
10     A.   Yes.  It appears in these two
11 documents that they're testing moving the
12 score value up.
13 QUESTIONS BY MR. BAKER:
14     Q.   That's called manipulating it
15 up, isn't it?
16         MR. HYNES:  Objection to form.
17 QUESTIONS BY MR. BAKER:
18     Q.   Isn't it, Mr. Burtner?
19         MR. HYNES:  Same objection.
20     A.   Yes.
21 QUESTIONS BY MR. BAKER:
22     Q.   It says:  I'm still seeing
23 small quantities hitting the report that may
24 be due to a new patient needing a specific
25 drug.  The orders aren't heavy in most cases.

Page 230

1    Correct?
2    A.    That's what it says, yes.
3    Q.    Because they're tweaking it
4  now, right?  They're causing less to show up,
5  right?
6         MR. HYNES:  Objection to form.
7  QUESTIONS BY MR. BAKER:
8    Q.    Isn't that what's going on?
9         MR. HYNES:  Same objection.
10   A.    Yes, by moving the score up,
11 fewer -- fewer orders would populate on the
12 report.
13 QUESTIONS BY MR. BAKER:
14   Q.    By moving the score up
15 from .15, for which it was designed, to a
16 higher score, it makes the system less
17 sensitive and report less orders as
18 potentially suspicious.  Is that correct?
19        MR. HYNES:  Objection to form.
20 QUESTIONS BY MR. BAKER:
21   Q.    Isn't that what's going on
22 here?
23        MR. HYNES:  Objection to form.
24 QUESTIONS BY MR. BAKER:
25   Q.    Mr. Burtner, isn't that what's

Page 231

1  going on?
2         MR. HYNES:  Objection to form.
3  QUESTIONS BY MR. BAKER:
4    Q.    A jury is looking at you.
5  Please answer.
6         MR. HYNES:  Objection to form.
7  The jury is not looking at him.
8  QUESTIONS BY MR. BAKER:
9    Q.    Is that it?  Is that the
10 answer, yes?
11        MR. HYNES:  Objection to form.
12   A.    I don't --
13        MR. HYNES:  Let him answer the
14 question.
15   A.    Yes, by increasing the score,
16 it is causing fewer orders to populate on the
17 report.  However, the score wasn't the only
18 factor we were looking at when identifying an
19 order that was potentially suspicious.
20 QUESTIONS BY MR. BAKER:
21   Q.    But the score, the overall
22 score is what caused an order to pend under
23 that system and appear on that IRR report,
24 correct?
25   A.    Correct.

Page 232

1    Q.    And if you raise that score
2  upward from .15 and make the system less
3  sensitive, there's going to be less orders of
4  interest that appear on that report, correct?
5    A.    That's true.  The orders with
6  the lower scores, as John pointed out, a lot
7  of times would be stores that have never
8  ordered this drug or ordered a very small
9  amount and now a slightly larger amount but
10 still extremely small overall.
11   Q.    But they still have to be
12 monitored, correct?
13   A.    Correct.  They would still go
14 through the algorithm.
15   Q.    Okay.  Even a small order
16 should be monitored, correct?
17   A.    Absolutely.
18   Q.    Even a new order should be
19 monitored.
20   A.    Absolutely.
21   Q.    That would be especially if a
22 store didn't have a history on record, if
23 they were a brand-new store, correct?
24        MR. HYNES:  Objection to form.
25        --oOo--

Page 233

1    A.    Yes.
2  QUESTIONS BY MR. BAKER:
3    Q.    Or if they were ordering a new
4  drug that they hadn't been ordering before,
5  that should be monitored, correct?
6    A.    Absolutely.
7    Q.    Okay.  So basically, raising
8  the score up from .15 to a higher score makes
9  the system less sensitive, correct?
10        MR. HYNES:  Objection to form.
11 QUESTIONS BY MR. BAKER:
12   Q.    Right?
13        MR. HYNES:  Same objection.
14   A.    Yes, I suppose so.
15 QUESTIONS BY MR. BAKER:
16   Q.    All right.  Now, go upward.  It
17 says, on -- at 1:57 p.m. on March 10, 2010,
18 it says: John, I have run today with
19 scores .15, .17, .19, .21, .23, .25, .27
20 and .29.  Could you please take a look and
21 let me know whether we have to still tweak
22 the formula up or concentrate on a particular
23 range?
24        Do you see that?
25   A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    Q.   Let's go to Exhibit 12.
2         (CVS-Burtner Exhibit 12 was
3    marked for identification.)
4    QUESTIONS BY MR. BAKER:
5    Q.   This is in June of 2010, two
6    months or three months later, right?
7    A.   Yes.
8    Q.   All right.  And this is a
9    series of e-mails on the front says:
10   Bob, I will -- this is from Mortelliti again
11   to Robert Williamson.  It says:  Bob, I will
12   be reviewing the data for the next few
13   weeks --
14        (Telephonic interruption.)
15        MR. BAKER:  Let's go off the
16   record for a second.
17        THE VIDEOGRAPHER:  We are now
18   going off the record, and the time is
19   12:05 p.m.
20        MR. BAKER:  Go back on the
21   record.
22        (Recess taken, 12:05 p.m. to
23   12:05 p.m.)
24        THE VIDEOGRAPHER:  We are now
25   going back on the record, and the time

Page 235

1    is 12:05 p.m.
2    QUESTIONS BY MR. BAKER:
3    Q.   This is an e-mail dated
4    June 30, 2010, from Mortelliti, John
5    Mortelliti at CVS to Bob Williamson.  It
6    says:  Bob, I will be reviewing the data for
7    the next few weeks and testing some of the
8    pending items with field loss prevention.  I
9    am going to focus on the .15 for starters.
10   Once I determine the acceptable score, I will
11   get in touch with you and Jonathan for
12   feedback if necessary.
13        Is that what it says?
14   A.   Yes, I see that.
15   Q.   It says:  The call today was a
16   great help and has opened the door for me to
17   get at this in another direction.
18        Right?
19   A.   I see that's what it says, yes.
20   Q.   Okay.  Now, go to the next
21   page.
22   A.   Okay.
23   Q.   All right.  In the middle of
24   the page here, this is from Mortelliti, if
25   you'll highlight all of this.

Page 236

1         MR. HYNES:  Is this the same
2    e-mail chain?
3         MR. BAKER:  Yes.  This goes
4    July 26th of 2010.  This is another
5    month forward.
6         MR. HYNES:  Oh, I see.
7    QUESTIONS BY MR. BAKER:
8    Q.   Do you see it?  We were telling
9    you what's happening in June, now we're going
10   into July, right?
11   A.   Yes.
12   Q.   Okay.  And you realize they
13   were tweaking it up to incremental levels
14   higher than .15 leading up to this, correct?
15   A.   According to what we've looked
16   at, that appears to be true, yes.
17   Q.   All right.  And then it says,
18   on July 26, 2010, this is Mortelliti to
19   Mr. Williamson regarding SOM update: .65 is
20   where we are now.  .70 looks a bit more
21   realistic but I still want to view data.
22        Correct?
23   A.   Yes, that's what it says.
24   Q.   Now, you know how to do basic
25   multiplication, right?

Page 237

1    A.   Yes.
2    Q.   Okay.  You know that .15 times
3    4 is .60, correct?
4    A.   Okay.  Yes.
5    Q.   Is that right?
6    A.   I believe so.
7    Q.   Okay.  .65 is more than four
8    times .15, correct?
9    A.   Right.
10   Q.   Right?
11   A.   Yes.  Yes.  Yes.
12   Q.   Okay.  So at this point we're
13   more than four times greater than what the
14   system was designed to pend an order at
15   according to the documents that I've showed
16   you, correct?
17        MR. HYNES:  Objection to form.
18   QUESTIONS BY MR. BAKER:
19   Q.   Is that right?
20        MR. HYNES:  Same objection.
21   A.   Yes, that's what it says.
22   QUESTIONS BY MR. BAKER:
23   Q.   Okay.  And he still wants to
24   raise it above that to .70.  He wants to give
25   that a run for the money, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1  A.   Yes, that's what it says.
2  Q.   All right.  He says:  .70 looks
3  a bit more realistic but I still want to view
4  data.
5        Right?
6  A.   According to this document,
7  yes.
8  Q.   All right.  At that point, he
9  gets a response dated July 26, 2010, from
10 Robert Williamson to John Mortelliti and it
11 says:  That's quite a departure from the
12 initial threshold.
13       Do you see that?
14 A.   Yes, I do.
15 Q.   It says:  We should probably
16 have a phone call once you've completed your
17 review as a logical starting point for the
18 retunement.
19       Do you see that?
20 A.   Yes, I see that.
21 Q.   Okay.  And then I gave you the
22 history previously about how the retunement
23 occurred.  You understand all that now,
24 right?
25 A.   Yes.

Page 239

1  Q.   So you understand that the
2  company you worked for, the CVS company that
3  you worked for, took a formula that was
4  delivered to them and, instead of using it
5  for what it was designed to do, which was to
6  pend an order at .15, that company, your
7  company, worked to tweak that order -- that
8  score up to .65, more than four times the
9  score at which it was designed to pend orders
10 of interest, correct?
11       MR. HYNES:  Objection to form.
12 A.   According to these documents,
13 yes, that appears to be the case.
14 QUESTIONS BY MR. BAKER:
15 Q.   Okay.  And that made it less
16 sensitive than what it was designed to be,
17 correct?
18       MR. HYNES:  Objection.
19 Objection to form.
20 A.   Yes, I would believe so.
21 QUESTIONS BY MR. BAKER:
22 Q.   And that caused less orders of
23 interest to show up on that IRR report daily,
24 correct?
25       MR. HYNES:  Objection to form.

Page 240

1  A.   Yes.
2  QUESTIONS BY MR. BAKER:
3  Q.   Now, this -- this system of
4  suspicious order monitoring that was being
5  done by you was a nationwide suspicious order
6  monitoring system, correct?
7  A.   Yes.
8  Q.   And "nationwide" means that
9  it's monitoring all the transactions from all
10 of the pharmacy-related DCs to all of the CVS
11 pharmacy retail stores on a night-by-night
12 basis, correct?
13 A.   Yes, that was my understanding.
14       MR. BAKER:  This would probably
15 be a good place to -- is our lunch
16 here?
17       MR. GOETZ:  I don't think so.
18       MR. BAKER:  Okay.  If it's not,
19 then let me take just a 30-second
20 break.
21       MR. HYNES:  Yeah, yeah, that's
22 fine.
23       THE VIDEOGRAPHER:  We are going
24 off the record, and the time is
25 12:10 p.m.

Page 241

1        (Recess taken, 12:10 p.m. to
2  12:11 p.m.)
3        THE VIDEOGRAPHER:  We are now
4  going back on the record, and the time
5  is 12:11 p.m.
6  QUESTIONS BY MR. BAKER:
7  Q.   Please pull Exhibit 23.
8        (CVS-Burtner Exhibit 23 was
9  marked for identification.)
10 QUESTIONS BY MR. BAKER:
11 Q.   What I'm showing you is an
12 e-mail from Pam Hinkle to Frank Devlin,
13 1/27/2011.
14       Do you see that?
15 A.   Yes, I do.
16 Q.   The title of it is IRR
17 Narratives.
18       Do you see that?
19 A.   Yes, I do.
20 Q.   Okay.  Now, go to the next
21 page.  It says:  Components of the Control
22 IRR Report, and then it talks about what a
23 Control IRR report is.
24       Control IRR Report is a list of
25 controlled substances which are labeled as

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 being suspicious?
2 Correct?
3 A. No.
4 Q. That's what the document reads,
5 does it not?
6 A. The document says that, yes. I
7 would not call it suspicious.
8 Q. Okay. That's what I was asking
9 you, okay. It says: The Control IRR Report
10 is a list of controlled substances which are
11 being labeled as suspicious.
12 Correct?
13 A. That's what the document says,
14 yes.
15 Q. Okay. And you know what the
16 definition of "suspicious" is because I've
17 shown you that in the context of 21 C.F.R.
18 1307, correct?
19 A. Yes, I do.
20 Q. And you read that in those
21 letters of the DEA, what the DEA considered
22 to be a suspicious order, correct?
23 A. Yes.
24 Q. All right. And it says: The
25 components of the report include: Store

Page 243

1 number, item number, description of item in
2 question, UPC/NDC number -- you know what an
3 NDC number is, don't you?
4 A. I don't remember now but I
5 definitely knew at the time.
6 Q. Okay. That's the national drug
7 code, is it not?
8 A. Okay. Yes, that sounds
9 familiar.
10 Q. Okay. It's an identifier of a
11 particular drug, correct?
12 A. Yes.
13 Q. It identifies the labeler, the
14 manufacturer, and it also identifies the
15 product code, which is the specific strength,
16 dosage or form of the drug and the
17 formulation of the drug for a specific
18 company. Is that correct?
19 A. Yes, I believe so.
20 Q. Okay. And then it tells you
21 who -- the bill quantity and the order
22 quantity of that drug, correct?
23 A. Yes, that's what it says.
24 Q. It tells you the unit of
25 measure, the month-to-date order quantity,

Page 244

1 and then Lags 1, 2, 3 when they were using a
2 3-month lag, correct?
3 A. That's what the document says,
4 yes.
5 Q. Okay. And then it says here,
6 at the bottom of paragraph one, it says: The
7 month-to-date order quantity states the
8 amount of item -- of the item in question
9 ordering -- let me start from scratch.
10 It says: The month-to-date
11 order quantity states the amount of the item
12 in question ordered during the current month.
13 Lag 1 is the amount ordered the month before,
14 Lag 2 is the amount ordered two months
15 before, and Lag 3 is the amount ordered three
16 months before.
17 Correct?
18 A. Yes.
19 Q. Then it goes on to say: The
20 Process of Identifying Suspicious Orders. In
21 order to determine which items on the Control
22 IRR Report are suspicious, the order quantity
23 field is observed by the DC IRR analyst for a
24 quantity ordered of ten or more. The
25 month-to-date field is then observed and

Page 245

1 compared to Lags 1, 2 and 3. If the
2 month-to-date quantity is at least three
3 times greater than the quantities in Lags 1,
4 2 or 3, then the item is labeled as being
5 suspicious.
6 That's what the document says,
7 correct?
8 A. Yes, that's what the document
9 says.
10 Q. Now, when you read the
11 definition of a suspicious order in that
12 statute that I showed you, 21 C.F.R. 1307, it
13 didn't say that was the definition of a
14 suspicious order, did it?
15 MR. HYNES: Objection to form.
16 A. No, it did not. No.
17 QUESTIONS BY MR. BAKER:
18 Q. Okay. Let's go to the next
19 document, Exhibit 24.
20 (CVS-Burtner Exhibit 24 was
21 marked for identification.)
22 QUESTIONS BY MR. BAKER:
23 Q. Now, this is that same e-mail,
24 1/27/20- -- I believe it's around that same
25 time frame, but then it has another

Page 246

1 attachment to it that is the Control Drug IRR
2 report that's the subject of the e-mail.
3          Do you see that?
4     A.   Yes.
5     Q.   Okay.  Go down to where --
6 about three pages in where it talks about
7 components of the Control IRR Report.
8          Do you see that?
9     A.   Yes, I do.
10    Q.   All right.  So again, it talks
11 about, "The Control IRR Report is a list of
12 controlled substances," et cetera.  It says
13 the same thing as the prior e-mail and
14 attachment, correct?
15    A.   Yes, I see that.
16    Q.   All right.  And then it talks
17 about the identifiers -- keep going down --
18 these are the same identifiers, correct?
19    A.   Yes, I believe so.
20    Q.   All right.  And then it talks
21 about a formula on the second page.  It says:
22 Process of Identifying Suspicious Orders.  It
23 says:  The DC IRR analyst observes order
24 quantity field for a quantity ordered of ten
25 or more.

Page 247

1          The month-to-date field is then
2 observed and compared to Lags 1 through 6.
3 If the month-to-date quantity is at least
4 three times greater than the quantities in
5 Lags 1 through 6, then that item is labeled
6 as being suspicious.
7          Do you see that?
8     A.   Yes, I see where it says that.
9     Q.   Do you remember that document I
10 showed you that had 21 C.F.R. 1307 in it that
11 defined suspicious order?
12    A.   Yes, I do.
13    Q.   The DEA's definition of
14 suspicious in the letters that the DEA wrote,
15 you saw that too, right?
16    A.   Yes.
17    Q.   The 2007 Rannazzisi letters
18 that CVS received, right?
19         MR. HYNES:  Objection to form.
20 QUESTIONS BY MR. BAKER:
21    Q.   That -- the e-mail shows that
22 CVS received in 2008, correct?
23    A.   Yes.
24    Q.   And you have no doubt to
25 suspect that they received it even before

Page 248

1 then, do you?  Because it was sent to all
2 distributors, according to the document,
3 right?
4         MR. HYNES:  Objection to form.
5     A.   Yeah, I'd have no reason to
6 doubt that.
7 QUESTIONS BY MR. BAKER:
8     Q.   Okay.  And it didn't say
9 anything about you find suspicious orders
10 only if the quantity is three times greater
11 than the quantities in Lags 1 through 6; that
12 document didn't say that, did it?
13    A.   No, it did not.
14    Q.   This is just CVS coming up with
15 some definition that -- how do you -- how did
16 they come up with this?  Do you know?
17         MR. HYNES:  Objection to form.
18    A.   No, I wasn't involved with
19 that.  I have no idea.
20 QUESTIONS BY MR. BAKER:
21    Q.   Did anybody ever tell you about
22 this definition or to use this definition?
23         MR. HYNES:  Objection to form.
24    A.   No.  And when I reviewed the
25 SOM, this doesn't -- this was not part of the

Page 249

1 process.  This was not in any of the process.
2 QUESTIONS BY MR. BAKER:
3     Q.   I understand.
4          This document, CVS, I'm just
5 asking, did anybody ever tell you about this,
6 that this was what they were doing?
7     A.   No.  No, they did not.
8     Q.   All right.  Exhibit 25.
9          (CVS-Burtner Exhibit 25 was
10 marked for identification.)
11 QUESTIONS BY MR. BAKER:
12    Q.   This is yet another e-mail, May
13 of 2011.  And let me ask you to look at the
14 Bates numbers at the bottom.  Do you see
15 where these are stamped?  Look at the Bates
16 numbers.
17         MR. HYNES:  These numbers right
18 here.
19    A.   Okay.
20 QUESTIONS BY MR. BAKER:
21    Q.   All right.  This is 57736.  The
22 next one is 57737.  Do you see it?
23    A.   Yes, sir.
24    Q.   The next one is 577- --
25 actually -- yeah.

Page 250

1    MR. HYNES:  Then the next one
2 is off.
3 QUESTIONS BY MR. BAKER:
4    Q.    Wait a minute.  57736, 57737,
5 and 57738.  Do you see that?
6    A.    Yes, I do.
7    Q.    Okay.  Let's take a look at
8 this, all right?  It says from Frank Devlin
9 to Judith Hughes on the front.  Do you see
10 that?
11    A.    Yes, I do.
12    Q.    All right.  That's 5/16/2011,
13 that's May of 2011, correct?
14    A.    Yes.
15    (Telephonic interruption.)
16    MR. HYNES:  Is everyone still
17 on the line?
18    Let's go off the record.
19    THE VIDEOGRAPHER:  Okay.  We
20 are going off the record, and the time
21 is 12:19 p.m.
22    (Recess taken, 12:19 p.m. to
23 1:01 p.m.)
24    THE VIDEOGRAPHER:  We are now
25 going back on the record, and the time

Page 251

1 is 1:01 p.m.
2 QUESTIONS BY MR. BAKER:
3    Q.    You have in front of you
4 Exhibit 25.  The e-mail attached to it is
5 dated 5/16/2011 from Mr. Devlin to
6 Ms. Hughes.
7    Could you go to the next page,
8 please?
9    A.    Yes.
10    Q.    All right.  This is the
11 components of the control drug IRR, and
12 again, it lists the components that we've
13 been over in the prior exhibits.
14    Skip down, please.  Then it
15 talks about the lags.  It says Lag 1 -- come
16 up -- Lag 1 is the amount ordered the month
17 before, Lag 2 is the amount ordered two
18 months before, Lag 3 is the amount ordered
19 three months before.
20    Do you see that?
21    A.    Yes, I do.
22    Q.    All right.  And then it says
23 Process of Identifying a Suspicious Order:
24 In order to determine which items on the
25 Control IRR Report are suspicious, the order

Page 252

1 quantity field is observed by the DC IRR
2 analyst for a quantity ordered of ten or
3 more.
4    Let me ask you.  What is --
5 logically, does that mean to you, "quantity
6 ordered of ten or more"?
7    A.    I don't know.  I would guess
8 bottles of ten, I suppose.  I don't -- I
9 don't know.  This was before my time.
10    Q.    The number 5,000 has come up in
11 the 5,000 dose report, remember that?
12    A.    Yes.
13    Q.    Okay.  And you remember that if
14 there's a quantity of 10 times 500, that
15 would equal 5,000, right?
16    A.    Correct.
17    Q.    I mean, that's logic.
18    A.    Yes.
19    Q.    So if we're talking about a
20 quantity of ten or more, is this referencing
21 the 5,000 dose report, or not?
22    A.    I don't know what this is in
23 reference to.
24    Q.    Is this determining which items
25 that -- okay.  You don't even know one way or

Page 253

1 the other, right?
2    A.    No.  This ten or more had
3 nothing to do with the process once I had
4 gotten in place.
5    Q.    But what shows up in that 5,000
6 dose report are items that have been ordered
7 of 5,000 pills or more of hydrocodone
8 combination product, correct?
9    A.    Yes, that is correct.
10    Q.    All right.  And that's based
11 upon quantity, not based upon active
12 ingredient, correct?
13    MR. HYNES:  Objection to form.
14    A.    It is --
15 QUESTIONS BY MR. BAKER:
16    Q.    Let me rephrase the question.
17    A.    Okay.
18    Q.    Active ingredient is described
19 in terms of the milligrams of -- like, say,
20 you have one type of hydrocodone versus
21 another type of hydrocodone, right?  Like you
22 have 5/500 or 7.5/500 or something of that
23 nature.  We went over that, remember?
24    A.    Yes.
25    Q.    With the first number being the

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  milligrams of hydrocodone and the second
2  number being the milligrams of acetaminophen
3  or additive to it, correct?
4      A.   Correct.
5      Q.   Which makes it a combination
6  product, right?
7      A.   Yes.
8      Q.   Okay.  So tell me, does this
9  appear, when it says:  In order to determine
10  which items on the Control IRR Report are
11  suspicious, the order quantity field is
12  observed by the DC IRR analyst for a quantity
13  ordered of ten or more, is that the cutoff
14  for what's being identified under this
15  process?
16          MR. HYNES:  Objection to form.
17      A.   I don't know what that is in
18  reference to.  This was not anything to do
19  with the process when I was in place or
20  anything that had ever been communicated to
21  me.
22  QUESTIONS BY MR. BAKER:
23      Q.   But if we took it logically
24  based upon what you did as a suspicious order
25  monitoring manager while you were there, ten

Page 255

1  or more, if there were ten orders or more,
2  typically the order is of a bottle that
3  contains 500 hydrocodone combination product
4  pills, correct?
5      A.   The bottles came in several
6  different sizes.
7      Q.   But normally they were 500, at
8  least on that 5,000 dose report.  We went
9  through them.
10          MR. HYNES:  Objection, form.
11  QUESTIONS BY MR. BAKER:
12      Q.   There was a lot of them that
13  have 500 on it, right, quantity?
14          MR. HYNES:  Objection.
15  Objection to form.
16      A.   That, I didn't -- I don't know.
17  I don't recall what --
18  QUESTIONS BY MR. BAKER:
19      Q.   Okay.
20      A.   I don't recall.
21      Q.   It then says:  The
22  month-to-date field is then observed and
23  compared to Lags 1, 2 and 3.  If the
24  month-to-date quantity is at least three
25  times greater than the quantities in Lags 1,

Page 256

1  2 or 3, then the item is labeled as being
2  suspicious.
3          Correct?
4      A.   Yes, that's what it says.
5      Q.   Now, we went through the
6  definition of what a suspicious order was in
7  21 C.F.R. 1307(b), remember?
8      A.   Yes.
9      Q.   We went through what the
10  definition of a suspicious order was in the
11  Rannazzisi letters that were attached to the
12  e-mails that you saw from 2006, 2007 and
13  2008, Mr. Rannazzisi, correct?
14      A.   Yes.
15      Q.   And he's the DEA representative
16  informing distributors how to define a
17  suspicious order, right?
18          MR. HYNES:  Objection to form.
19      A.   I don't know.
20  QUESTIONS BY MR. BAKER:
21      Q.   I mean, it's in the letter.
22      A.   Okay.  Okay.  Then I don't have
23  any reason --
24      Q.   Right?
25      A.   Okay.

Page 257

1      Q.   Okay.  And nowhere in 21 C.F.R.
2  1307(b) do you see that definition, this
3  three times lag -- if the month-to-date
4  quantity is at least three times greater than
5  the quantities in Lags 1, 2 or 3, then the
6  item is labeled as being suspicious.  You
7  don't see that anywhere in the definition of
8  21 C.F.R., do you?
9      A.   No, you do not.
10      Q.   You don't see it anywhere in
11  the definition of those DEA letters that
12  Mr. Rannazzisi wrote, do you?
13      A.   No, I did not see it anywhere
14  in those letters.
15      Q.   This is just something that CVS
16  just decided to come up with according to the
17  document, correct?
18          MR. HYNES:  Objection to form.
19      A.   I don't know that I can comment
20  on that.  I don't know the reasoning for
21  coming up with that -- with this three times
22  greater than quantities Lag 1, 2 or 3.
23  QUESTIONS BY MR. BAKER:
24      Q.   And this is what CVS, in its
25  document that you're reading, is the way that

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1 they were identifying a suspicious order,
2 correct?
3        MR. HYNES: Objection to form.
4    A.   Yes, that is what the document
5 says, yes.
6        MR. BAKER: Okay. Let's move
7 on to the next one. No. 75, please.
8        Before we do, let's go to 41.
9        (CVS-Burtner Exhibit 41 was
10       marked for identification.)
11 QUESTIONS BY MR. BAKER:
12   Q.   I asked you if what you were
13 doing in the context of suspicious order
14 monitoring was a nationwide program, correct?
15       Do you recall that?
16   A.   Yes, I do.
17   Q.   All right. And so let me talk
18 about the volume of what was going on. You
19 see this e-mail that's dated July 10, 2012,
20 from John Andrade to Pam Hinkle?
21   A.   Yes, I do.
22   Q.   All right. Here's what it
23 says. It says there are 11 CVS distribution
24 centers. This would be as of July 10, 2012,
25 to the best of your knowledge; that's

Page 259

1 correct?
2    A.   Yeah, I don't have any reason
3 to not believe that.
4    Q.   And as of July 10, 2012, 11 of
5 the 18 CVS distribution centers are DEA
6 licensed to ship Controlled Substance II
7 through V, correct?
8    A.   III through V?
9    Q.   III through V. I'm sorry, let
10 me start out again. It says there are 11 CVS
11 distribution centers on this e-mail, correct?
12       MR. HYNES: Object.
13 QUESTIONS BY MR. BAKER:
14   Q.   Excuse me. Let me start over.
15 I've had lunch and I guess my blood sugar is
16 running wrong.
17   A.   I understand, I get it.
18   Q.   Okay. Let's start from
19 scratch. This e-mail dated July 10, 2012,
20 from John Andrade to Pam Hinkle says the
21 following: There are 11 CVS distribution
22 centers. 11 are DCA -- DEA licensed to ship
23 Controlled Substance III through V, correct?
24   A.   Yes.
25   Q.   All right. Controlled

Page 260

1 Substance III would be the hydrocodone
2 combination products, correct?
3    A.   Yes.
4    Q.   All right. And it says: CVS
5 does not ship Schedule II products.
6        Correct?
7    A.   Correct.
8    Q.   Schedule II products would be
9 the oxycodones, the OxyContins, that sort of
10 thing, correct?
11   A.   Yes.
12   Q.   All right. Then it says:
13 Stores place orders using CVS homegrown
14 system called AIM.
15       Correct?
16   A.   Yes.
17   Q.   That's a computer system
18 through which the pharmacy inserts its order
19 electronically to the distribution center,
20 correct?
21       MR. HYNES: Objection to form.
22   A.   Correct.
23 QUESTIONS BY MR. BAKER:
24   Q.   All right. And it says here on
25 the second page, it says, at the bottom here,

Page 261

1 it says -- keep going -- Volume of Orders.
2 Volume of Orders right here. Right here,
3 above it.
4        MR. HYNES: Up a little bit.
5 QUESTIONS BY MR. BAKER:
6    Q.   Volume of Orders. RX -- does
7 that mean drugs?
8    A.   Yes, I would believe so.
9    Q.   Okay. Control drugs or RX
10 controls, that would be Schedule III through
11 V, correct? S-III through V?
12   A.   Yes.
13   Q.   Okay. That would include the
14 hydrocodone combination products, right?
15   A.   Yes.
16   Q.   And PSE, which is the
17 pseudoephedrine, right, the chemical?
18   Q.   All right. Comprises 30,000 to
19   Q.   All right. Comprises 30,000 to
20 40,000 line items, right?
21   A.   Yes. That's what the document
22 says, yes.
23   Q.   Okay. That's a nightly order,
24 right?
25       --oOo--

Page 262

1    MR. HYNES:  Objection.
2  QUESTIONS BY MR. BAKER:
3    Q.   Read the whole e-mail.  Go
4  ahead.  Volume of orders.
5    MR. HYNES:  Objection to the
6  extent it calls for speculation.
7  QUESTIONS BY MR. BAKER:
8    Q.   Let's just go back and read the
9  whole e-mail to make sure we keep it in
10 context, okay?  There are 18 CVS distribution
11 centers.  11 are DEA licensed to ship
12 Controlled Substances III through V.  CVS
13 does not ship Schedule II products.
14    Correct?
15    A.   Yes.
16    Q.   It says:  Stores place orders
17 using CVS homegrown system called AIM.
18 Orders are polled from the stores using
19 corporate NetView DM communications tool.
20 Orders are uploaded from NetView DM into
21 mainframe flat files at approximately
22 8:40 p.m.  Orders are processed by CVS legacy
23 system "Store Order Process."
24    Let me stop.  Does this appear
25 to describe how orders are placed overnight

Page 263

1  to CVS distribution centers?
2    A.   It appears to describe the
3  ordering process but it doesn't -- it's not
4  over a time frame.  I mean, I understand what
5  you're saying, but it doesn't say that the 30
6  to 40 thousand lines are every night.
7    Q.   Okay.  It is describing the
8  process as it goes through a 24-hour cycle.
9  Am I correct?
10    A.   I mean, there's nothing here
11 that explicitly says that, but I don't have
12 any reason to not believe it.
13    Q.   Okay.  The context of it leads
14 you to believe that, does it not?
15    MR. HYNES:  Objection to form.
16    A.   Yes.
17 QUESTIONS BY MR. BAKER:
18    Q.   Okay.  So then if we take that
19 context, the volume of orders of RX controls,
20 which are controlled drugs Schedule III
21 through V, and PSE, which are chemicals,
22 comprises 30 to 40 thousand line items,
23 correct?
24    A.   Yes, that's what it says.
25    Q.   And then the front store,

Page 264

1  drugs, promotional items, et cetera, total
2  approximately 6 to 8 million records nightly.
3    Is that right?
4    A.   Yes, that's what it says.
5    Q.   Okay.  So this means, according
6  to this document, if we interpret this to
7  mean a nightly process, that the pharmacy
8  controls -- that the controlled drugs, that
9  there's 30 to 40 thousand line item orders
10 per night from the pharmacies to the
11 distribution centers, correct?
12    A.   Using those assumptions, yes.
13    Q.   Okay.  And then if we also
14 assume the next line that front store, RX --
15 RX, what is that, pharmaceutical?
16    A.   I don't know.
17    Q.   Would that be noncontrolled
18 drugs?
19    MR. HYNES:  Front store or RX?
20    MR. BAKER:  RX.
21 QUESTIONS BY MR. BAKER:
22    Q.   What is RX?
23    A.   In this context, that's what I
24 would be led to believe.
25    Q.   Okay.  Promo, promotional

Page 265

1  items?
2    A.   Uh-huh.
3    Q.   Okay.  Et cetera, total
4  approximately 6 to 8 million records nightly,
5  correct?
6    A.   Yes, that's what it says.
7    Q.   That's the volume, that's what
8  they're reporting as the volume that's going
9  on in July of 2012 at these 18 CVS
10 distribution centers, and 11 which are DEA
11 licensed to ship Controlled Substances III
12 through V, correct?
13    A.   Yes, that's what it says.
14    Q.   And this is accounting for the
15 distribution centers receiving orders from
16 all over the nation from CVS stores called
17 CVS pharmacies.  Is that right?
18    A.   Yes, I believe so.
19    Q.   And at the time, the person
20 reviewing the IRR reports at that moment, you
21 were an LP analyst?  Is that right?
22    A.   Yes, performing some of those
23 tasks, but technically, a loss prevention
24 supervisor.
25    Q.   Okay.  And how many other

Page 266

1  people were doing that task with you at that
2  time?
3      A.    In July of --
4      Q.    Of 2012.
5      A.    One other, Paul Lawson.
6      Q.    Paul Lawson?
7      A.    Yes.
8      Q.    So you and Paul Lawson were
9  responsible for 30 to 40 thousand line items
10 nightly, right?
11         MR. HYNES:  Objection to form.
12 QUESTIONS BY MR. BAKER:
13     Q.    Is that right?
14     A.    No, we were responsible for
15 reviewing the IRR.  Not all 30 to 40 thousand
16 items would be populated on the IRR.
17     Q.    All right.  Whatever was
18 populated as a result of those 30 to 40
19 thousand items nightly on the IRR is what you
20 and Paul Lawson would be reviewing, correct?
21     A.    Yes, that is correct.
22     Q.    All right.  Now, let's talk
23 about what makes an order flag.  And let's
24 talk before that about what a flag is, okay?
25         Now, when something appears on

Page 267

1  that IRR report, that is a flag, right?  That
2  means the SOM system has flagged the order,
3  right?
4      A.    Correct.
5      Q.    Okay.  And then from that
6  point, you have to decide which ones you're
7  going to conduct due diligence upon, right?
8         MR. HYNES:  Objection to form.
9      A.    Additional -- additional due
10 diligence, yes.
11 QUESTIONS BY MR. BAKER:
12     Q.    Okay.  The one that you're
13 going to run a Store Metrics Report on,
14 correct?
15     A.    Yes, that is correct.
16     Q.    The one that you're going to
17 call the pharmacy, call the pharmacist,
18 correct?
19     A.    Potentially, yes.
20     Q.    And if you do any of that
21 stuff, you're supposed to document it in the
22 AIM system, which is the computer system,
23 correct?
24         MR. HYNES:  Objection to form.
25     A.    No.  We did not document it in

Page 268

1  AIM.  We kept documentation with the IRR.
2  QUESTIONS BY MR. BAKER:
3      Q.    Okay.  In other words, you
4  attached it to the IRR?
5      A.    Yes.
6      Q.    Okay.  So if there's no such
7  notations attached to the IRR, that means you
8  did not do that type of review, correct?
9         MR. HYNES:  Objection to form.
10     A.    Yes.  I would say that is
11 probably the case.
12 QUESTIONS BY MR. BAKER:
13     Q.    And that type of review is
14 called a deep-dive review, correct?
15     A.    That's typically what we called
16 it.
17     Q.    And you didn't do a deep-dive
18 review on every one of those items that
19 appeared on the IRR report, did you?
20     A.    No, we did not.
21     Q.    Okay.  You made a decision as
22 to which ones you were going to do a deep
23 dive on, correct?
24     A.    Yes.  Once we had performed the
25 initial due diligence, we would make that

Page 269

1  decision.
2      Q.    But everything that appeared on
3  that IRR report had a score of at least .65
4  or higher, correct?
5         MR. HYNES:  Objection to form.
6      A.    Yes, that's my understanding.
7  QUESTIONS BY MR. BAKER:
8      Q.    Everything on that nightly IRR
9  report that you received, it had a score
10 of .65 or higher, .65 being four times --
11 over four times the score at which it was
12 designed to pend an order at .15, correct?
13         MR. HYNES:  Objection to form.
14     A.    Yes.
15 QUESTIONS BY MR. BAKER:
16     Q.    Okay.  And then from there,
17 even though it's already four times what the
18 pending score was designed to pend an order
19 at, meaning .15 times four was 6, and .65 was
20 the pend at which you were using, correct?
21         MR. HYNES:  Objection to form.
22     A.    Correct.
23 QUESTIONS BY MR. BAKER:
24     Q.    Even though it was already four
25 times that, you still were narrowing down

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 which ones you were going to do a deep-dive
2 review into, correct?
3          MR. HYNES:  Objection to form.
4     A.    Based off of several data
5 points in the IRR, yes, we would make that
6 decision.
7 QUESTIONS BY MR. BAKER:
8     Q.    And you alone made that
9 decision, right?
10          MR. HYNES:  Objection to form.
11     A.    Myself or Paul Lawson, whoever
12 is reviewing the IRR.
13 QUESTIONS BY MR. BAKER:
14     Q.    Right.  But you're sitting in
15 an office, you're reviewing the IRR report,
16 and you, Aaron Burtner, are making that
17 decision for CVS, correct?
18     A.    Yes.
19     Q.    Okay.  And you, Aaron Burtner,
20 do not have to have somebody looking over
21 your shoulder to tell you this is the one
22 you're going to review, this is the one
23 you're going to review, this is the one
24 you're going to review.  You make that
25 decision yourself for CVS, correct?

Page 271

1     A.    Yes, that is correct.
2     Q.    And nobody second-guesses that.
3 It's just you making that decision, correct?
4          MR. HYNES:  Objection to form.
5     A.    Yes, that is correct.
6 QUESTIONS BY MR. BAKER:
7     Q.    Okay.  Now, let's talk about
8 what makes an order pend, and let's go to
9 Exhibit 75.
10          (CVS-Burtner Exhibit 75 was
11          marked for identification.)
12          MR. HYNES:  Thanks, Bill.
13 QUESTIONS BY MR. BAKER:
14     Q.    All right.  This is an e-mail
15 that's dated April 24, 2013, from Crystal
16 Pike at Analysis Group, and she's writing to
17 Craig Schiavo at CVS, correct, at the bottom?
18     A.    Yes.
19     Q.    All right.  It's April 24,
20 2013.  Now, this is regarding order flagging
21 reasons.  Is that right?
22     A.    Yes, that's what it says.
23     Q.    All right.  Now, at the time,
24 is this -- was this consulting company
25 looking at the existing program that y'all

Page 272

1 had?
2          MR. HYNES:  Objection to form.
3 QUESTIONS BY MR. BAKER:
4     Q.    The CCS program?
5     A.    They were not looking at the
6 existing program to make improvements; they
7 were looking at the existing program to
8 determine what could be incorporated into the
9 new system they were creating.
10     Q.    Okay.  So what this is is a
11 discussion about what's making orders flag
12 under the existing system, correct?
13     A.    Yes, I believe so.
14     Q.    Okay.  It says:  Craig, there
15 were two different types of flags into the
16 SOM algorithm:  exceptions and orders of
17 interest.
18          Correct?
19     A.    Yes, that's what it says.
20     Q.    All right.  So the flags that
21 come up, those are the number -- the number
22 of stores that flag on the IRR report,
23 correct?
24     A.    Yes.
25     Q.    All right.  And again, that

Page 273

1 flag is generated by the algorithm system
2 that has a score of .65 or higher, correct?
3          MR. HYNES:  Objection to form.
4 QUESTIONS BY MR. BAKER:
5     Q.    Is that right?
6     A.    Yes.
7     Q.    All right.  And this is the
8 system that was in place when you were there
9 as the SOM manager and as the LP analyst,
10 correct?
11     A.    Yes, that is correct.
12     Q.    All right.  And this is the
13 system that you inherited, that you had no
14 idea that the score had been tweaked up
15 from .15 to .65 when you started there, did
16 you?
17          MR. HYNES:  Objection to form.
18     A.    No, I did not know the scores
19 had been changed.
20 QUESTIONS BY MR. BAKER:
21     Q.    All right.  It says that:  The
22 basic reasons why an order could be flagged
23 as either an exception or an order of
24 interest are listed below.
25          Then it says:  Please note that

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 this list assumes we treat each test under
2 the various categories independently (meaning
3 if it meets any of the a, b, c, d, et cetera,
4 under the size it would flag) and we may end
5 up exploring combinations of tests following
6 our discussion on 5/1.
7         So then it says there are
8 either exceptions, and then "or orders of
9 interest," and they go to exceptions. Are
10 you with me?
11     A.    Yes.
12     Q.    All right. So Exceptions:
13 These issues my team will be able to address
14 without involving LP or RX Sup. We will need
15 to contact RX Ops or IS to determine the root
16 cause of the issue. I see exceptions
17 occurring very rarely and more likely with
18 new items or new stores.
19         Correct?
20     A.    Yes, that's what it says.
21     Q.    All right. So under
22 "Exceptions" it says: I see exceptions
23 occurring very rarely and more likely with
24 new items or new stores.
25         Correct?

Page 275

1     A.    Yes.
2     Q.    All right. And the reasons, it
3 says: Order is missing a store number,
4 meaning each store has a store number and if
5 the store number is not there, it might
6 appear on the IRR report, correct?
7     A.    Correct.
8     Q.    All right. It says: Order
9 does not have a valid billing quantity (i.e.,
10 a discrete number greater than zero).
11         Correct?
12     A.    Yes, that's what it says.
13     Q.    Order does not have a valid
14 NDC -- which is the distributor code,
15 correct?
16     A.    Yes.
17     Q.    Then it says: GCN is not found
18 on the drug family label.
19         That's another identifier for
20 the drug. Is that right?
21     A.    Yes.
22     Q.    Information needed for
23 NDC-level dosage unit calculation is not on
24 drug family table or in the RxDrug file.
25         Correct?

Page 276

1     A.    Yes, that's what it says.
2     Q.    Or: Store did not have
3 sufficient data to run any statistical test
4 (note that this should not happen but it is
5 built in just in case).
6         Do you see that?
7     A.    Yes, I do.
8     Q.    All right. Then it goes on to
9 talk about an order of interest. And it
10 talks about: Every order of interest flag
11 could eventually lead to my team needing LP
12 and/or the RX Sup to review the store. I
13 won't put that in my note after each flag but
14 I wanted to get it out there.
15         Do you see that?
16     A.    Yes, I see that.
17     Q.    Let's repeat that.
18         Every order of interest flag
19 could eventually lead to my team needing LP.
20         Who is LP?
21     A.    That would be myself or Paul if
22 she's referring to the LP analyst.
23     Q.    Loss prevention.
24         "And/or the RX Sup," what is
25 that?

Page 277

1     A.    Pharmacy supervisor, which
2 would be the pharmacist in charge.
3     Q.    "To review the store," what
4 does that mean?
5     A.    The additional due diligence
6 that we were doing, the deep dive.
7     Q.    Okay. It says: I won't put
8 that in my note after each flag but I wanted
9 to get it out there.
10         Did you ever hear that sentence
11 uttered at CVS?
12     A.    No. I mean, that would be the
13 understanding. If it's on the IRR, then it
14 potentially would need a deep dive.
15     Q.    Correct.
16     A.    So there's no reason to put it
17 after every order. It's assumed.
18     Q.    Right. All right. 1, it says:
19 Orders by new stores (stores that have opened
20 in the last 3 months) can flag as follows:
21 It says: Store's initial stocking volumes
22 (dosage units ordered in first 7 days) are
23 extremely high compared with prior new
24 stores.
25         Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    A.    Yes, that's what it says.
2    Q.    All right.  It says:  For
3  orders in weeks 2 to 3, store's cumulative
4  volume ordered in past 7 days is unusual
5  compared to the prior new stores.
6         Correct?
7    A.    Yes.
8    Q.    All right.  Then it talks
9  about:  Orders for a new drug family (drugs
10  that contain a controlled active ingredient
11  that was newly introduced to the market) can
12  flag as follows; then it talks about the
13  reasons for that.
14         Do you see?
15    A.    Yes, I see that.
16    Q.    All right.  Then it says,
17  number 3:  Orders of established drug
18  families by new stores can flag for unusual
19  size as follows, then it talks about, you
20  know, there could be a fat finger like you
21  meant to put 100 but you put a thousand, but
22  you don't really know this until you actually
23  check into it and do a deep dive, right?
24    A.    Yes, that is correct.
25    Q.    Okay.  And it says for the last

Page 279

1  two -- it says:  Or overzealous
2  pharmacist/tech ordering too much to increase
3  safety stock.
4         Again, you wouldn't know that
5  unless you did a deep dive, right?
6    A.    Yes, that is correct.
7    Q.    All right.  And then it says:
8  For the last two, my team can address this by
9  calling the store and then reducing the
10  order.
11         What?  So is that what happens?
12  Y'all call the store if they order too much,
13  and then you tell them to reduce the order so
14  you don't have to report it as suspicious?
15  Is that what happens?
16         MR. HYNES:  Objection to form.
17    A.    No, that's not the situation.
18  That's referring to more of the fat fingers,
19  the mistakes, inadvertently ordered more than
20  what they intended to, then we had the
21  ability to reduce the order.
22  QUESTIONS BY MR. BAKER:
23    Q.    But you wouldn't know that
24  unless you made a deep dive and made that
25  call, right?

Page 280

1    A.    Correct.
2    Q.    Okay.  And that's called due
3  diligence, right?
4         MR. HYNES:  Objection to form.
5  QUESTIONS BY MR. BAKER:
6    Q.    Part of due diligence, right?
7    A.    Yes, that is part of the due
8  diligence we completed.
9    Q.    Okay.  And if you don't attach
10  a note to the IRR, then we can't assume that
11  due diligence was done on that particular
12  order, correct?
13         MR. HYNES:  Objection to form.
14    A.    We can't assume that the deep
15  dive was done.
16  QUESTIONS BY MR. BAKER:
17    Q.    Okay.  So it says:  For the
18  last two, my team can address this by calling
19  the store and then reducing the order.  For
20  the overzealous pharmacist, my team would
21  also coach -- coach on only ordering what is
22  necessary and then inform the RX Sup of the
23  situation.
24         What?  For the -- let me repeat
25  that:  For the overzealous pharmacist/tech,

Page 281

1  my team would also coach -- what does that
2  mean, "my team would coach"?
3         MR. HYNES:  Objection to form;
4  calls for speculation.
5    A.    I can't be certain as to what
6  the -- this is from Crystal.  I can't be
7  certain as to what she was referring to.
8  QUESTIONS BY MR. BAKER:
9    Q.    Okay.  Did you ever coach a
10  pharmacist on what they should order?  If
11  they order too much, then you call them up
12  and say, "Look, here, let me coach you on
13  what you should do"?  Did you ever do that?
14         MR. HYNES:  Objection to form.
15    A.    I don't recall ever coaching a
16  pharmacy supervisor.
17  QUESTIONS BY MR. BAKER:
18    Q.    Okay.  Then it talks about:  LP
19  would only be needed if diversion is
20  suspected.
21         Is that right?
22    A.    Yes, that's what it says.
23    Q.    Okay.  Were you ever contacted
24  in the context of a deep dive like this and
25  somebody told you that they suspected

Page 282

1  diversion?
2      A.    No, I was never contacted in
3  that.
4      Q.    Okay.  It says:  Dosage units
5  in DC order are unusually high for the store
6  (based upon the store's past 12 DC orders).
7          That could be a suspicious
8  order, correct?
9      A.    Yes.
10     Q.    And you wouldn't know whether
11 it was or wasn't truly a suspicious order
12 until you actually did due diligence to find
13 out one way or the other, right?
14     A.    We were doing initial due
15 diligence by looking at the IRR.
16     Q.    I understand.  But, no, that's
17 not due diligence.  Due diligence is the deep
18 dive.
19         MR. HYNES:  Objection to form.
20     That's a question?
21 QUESTIONS BY MR. BAKER:
22     Q.    How many -- let me ask you
23 something.  You wouldn't know whether or not
24 the dosage units are unusually high for the
25 store based upon 12 DC orders -- well,

Page 283

1  actually, you could look at it and tell that
2  on the IRR, right?
3      A.    Yes.
4      Q.    That's one of the reasons it
5  would flag, right?
6      A.    Right.
7      Q.    That's one of the primary
8  reasons it flags, right?
9      A.    One of the primary reasons,
10 yes.
11     Q.    Yes.  So if it's on the IRR,
12 then one of the primary reasons it's already
13 out there, that it's because they've ordered
14 too much compared to the months 1 through 12
15 prior, correct?
16         MR. HYNES:  Objection to form.
17 QUESTIONS BY MR. BAKER:
18     Q.    Right?
19         MR. HYNES:  Same objection.
20     A.    Potentially, yes.
21 QUESTIONS BY MR. BAKER:
22     Q.    Yeah.  Okay.  And it says:
23 Dosage units in OV order are unusually high
24 for the store (based upon the store's past 12
25 OV orders).

Page 284

1          Correct?
2      A.    Yes, that's what it says.
3      Q.    That's outside vendor orders,
4  correct?
5      A.    Correct.
6      Q.    So are you looking at outside
7  vendor orders on the IRR?
8      A.    No, we were not.
9      Q.    Okay.  The only way you'd know
10 that is if you called the store and asked
11 them, right?
12     A.    No.  We had access to that data
13 we could pull from a different tool.
14     Q.    Transactional data?  What's
15 that data called?
16     A.    I don't recall specifically
17 what data we had.  I know -- I do know that
18 we had access to some OV data.  Whether it
19 was transactional or total volume, I don't
20 recall.
21     Q.    But the only time you would
22 look at outside vendor data is when you were
23 doing a deep dive, right?
24     A.    Yes, that is correct.
25     Q.    So you wouldn't know whether

Page 285

1  somebody had ordered from an outside vendor
2  in addition to what shows up on your IRR
3  report as what they've ordered, unless you
4  did a deep dive, right?
5          MR. HYNES:  Objection to form.
6  QUESTIONS BY MR. BAKER:
7      Q.    Right?
8          MR. HYNES:  Same objection.
9      A.    Yes, that is correct.
10 QUESTIONS BY MR. BAKER:
11     Q.    Because the outside vendor
12 orders were not run through the SOM algorithm
13 system at CVS, right?
14     A.    No, they were not.
15     Q.    Okay.  And that included
16 outside vendor orders for Control IIIs and
17 Control IIs, right?  For hydrocodone
18 combination products and for OxyContin
19 products, correct?
20     A.    Yes, that is correct.
21     Q.    Okay.  Then it says:  Dosage
22 units ordered today from DC are unusually
23 high compared to the most recent DC orders at
24 comparable benchmarks (i.e., stores with
25 similar noncontrolled volume).

Highly Confidential – Subject to Further Confidentiality Review

Page 286

```
1        Correct?
2     A.    Yes, that's what it says.
3     Q.    And how would you know that by
4  looking at the IRR report without doing a
5  deeper dive?  Tell me, how would you know
6  that --
7        MR. HYNES:  Let him answer.
8  Let him answer.
9  QUESTIONS BY MR. BAKER:
10    Q.    -- from just looking at the IRR
11 report?
12       MR. HYNES:  He's thinking.
13    A.    The IRR lists the volume for
14 month-to-date, current order, the lag.
15 There's several data points there that we
16 could use as a form of due diligence.
17 QUESTIONS BY MR. BAKER:
18    Q.    Yeah.  But you wouldn't know
19 what the dosage units ordered from the
20 distribution center are are unusually high
21 compared to the most recent DC orders at
22 comparable benchmarks, stores with similar
23 noncontrolled volume, would you, by just
24 looking at the IRR?  Or not?
25    A.    I don't recall if like stores
```

Page 287

```
1  are listed -- if the same store was listed
2  with all controlled drugs for that store, I
3  don't recall if it was listed that way or
4  not.
5     Q.    If you did a deep dive, you
6  could find out, right?
7     A.    Yes.  I would have
8  visibility -- I would definitely have
9  visibility to that if I completed a deep
10 dive.
11    Q.    And that's called due
12 diligence, right?
13       MR. HYNES:  Objection to form.
14 QUESTIONS BY MR. BAKER:
15    Q.    Yes?
16    A.    An additional form of due
17 diligence, yes.
18    Q.    Okay.  And then it says:
19 Dosage units ordered today from the outside
20 vendor are unusually high compared to the
21 most recent outside vendor orders at
22 comparable benchmark stores (i.e., stores
23 with similar noncontrolled volume).
24       That type of thing you would
25 not know unless you did a deep dive, correct?
```

Page 288

```
1     A.    Yes, that is correct.
2     Q.    And that's called due
3  diligence, correct?
4        MR. HYNES:  Same objection.
5     A.    Additional due diligence, yes.
6  QUESTIONS BY MR. BAKER:
7     Q.    Okay.  And the cumulative --
8  next is: The cumulative dosage units ordered
9  (DC and OV combined) -- which means ordered
10 from the distribution center and the outside
11 vendor combined -- in the past 28 days is
12 unusually high compared with the store's
13 ordering over the past year.
14       Again, that's something you
15 should look at, but you're only going to find
16 that out if you do a deep dive, correct?
17    A.    Yes, that was correct.
18    Q.    And that's called due
19 diligence, correct?
20       MR. HYNES:  Objection, asked
21 and answered.
22    A.    Yes.  It's an additional form
23 of due diligence.
24 QUESTIONS BY MR. BAKER:
25    Q.    Okay.  And then the next is:
```

Page 289

```
1  The cumulative dosage units ordered (DC and
2  OV combined) in the past 28 days is unusually
3  high compared with that ordered at benchmark.
4        Right?  F.
5     A.    Yes.
6     Q.    Right here.
7     A.    Okay.
8     Q.    That's something that you
9  should look at if you're going to do a deep
10 dive, but you'd only know it if you did a
11 deep dive, correct?
12       MR. HYNES:  Objection to form.
13       (Document review by witness.)
14 QUESTIONS BY MR. BAKER:
15    Q.    Do you even know what that
16 means?  If you don't, we'll move on.  You
17 just tell me.
18       (Document review by witness.)
19    A.    Oh, no, I see.  Yes, that is
20 something we were looking at is month-to-date
21 cumulative dosage.
22 QUESTIONS BY MR. BAKER:
23    Q.    Right.  But you wouldn't know
24 it for the distribution center and the
25 outside vendor unless you did a deep dive,
```

Highly Confidential – Subject to Further Confidentiality Review

Page 290

1 correct?
2    A.    Yes.  Yes, that is correct.
3    Q.    Again, that's called due
4 diligence, right?
5         MR. HYNES:  Same objection.
6    A.    Yes, additional due diligence,
7 yes.
8 QUESTIONS BY MR. BAKER:
9    Q.    All right.  Then
10 subparagraph (g):  The store has ordered an
11 unusually high number of dosage units (DC and
12 OV combined) in the past 28 days given its
13 overall size when compared with the store's
14 ordering ratio in the past year.
15         Correct?
16    A.    Yes, that's what it says.
17    Q.    That's something you would not
18 know unless you did a deep dive, correct?
19    A.    No, I would not know the OV
20 combined.
21    Q.    Okay.  That's something you
22 would have to do a deep dive to find out
23 about, correct?
24    A.    Yes, that's correct.
25    Q.    And that's called due

Page 291

1 diligence, right?
2         MR. HYNES:  Objection, form.
3    A.    Yes, that is an additional form
4 of due diligence.
5 QUESTIONS BY MR. BAKER:
6    Q.    That's not something you are
7 going to get right off the IRR report raw; am
8 I correct?
9    A.    You are correct.
10    Q.    Okay.  Subparagraph (h):  The
11 store has ordered an unusually high number of
12 dosage units (DC and OV combined) -- meaning
13 from this distribution center from which it's
14 ordering at CVS, and an outside vendor
15 combined --
16         (Telephone interruption.)
17         MR. BAKER:  Let me go off the
18 record for just a second.
19         THE VIDEOGRAPHER:  We are now
20 going off the record, and the time is
21 1:32 p.m.
22         (Recess taken, 1:32 p.m. to
23 1:43 p.m.)
24         THE VIDEOGRAPHER:  We are now
25 going back on the record, and the time

Page 292

1 is 1:43 p.m.
2 QUESTIONS BY MR. BAKER:
3    Q.    Okay.  The next subcategory is
4 (h):  The store has ordered an unusually high
5 number of dosage units (DC and OV
6 combined) -- meaning distribution center and
7 outside vendor combined -- in the past 28
8 days given its overall size when compared
9 with benchmark stores.
10         Correct?
11    A.    Yes, that's what it says.
12    Q.    And you wouldn't know that,
13 whether that's the case or not, unless you
14 did a deep dive, correct?
15    A.    Yes, that is correct.
16    Q.    And that is due diligence,
17 correct?
18         MR. HYNES:  Same objection as
19 before.
20    A.    Yes, it is an additional form
21 of due diligence.
22 QUESTIONS BY MR. BAKER:
23    Q.    All right.  Then it goes on to
24 a fourth category:  Orders of established
25 drug families by non-new stores can flag for

Page 293

1 unusual frequency as follows.
2         Now, let's break that sentence
3 down, okay?
4         "Orders of established drug
5 families," what is an established drug
6 family?  What does that mean?
7    A.    I don't recall specifically,
8 but I believe it was hydrocodone, alprazolam,
9 et cetera.
10    Q.    Okay.  Hydrocodone combination
11 products, correct?
12    A.    Correct.
13    Q.    All right.  By "non-new
14 stores," that would be existing CVS stores,
15 correct?
16    A.    Yes, that is correct.
17    Q.    All right.  "Can flag for
18 unusual frequency as follows," and then it
19 says:  Items b through h will depend on
20 dosage quantity.
21         Below, we'll go through b
22 through h.
23         If the overall dosage quantity
24 is consistent with historical data, my team
25 will call the store to understand why the

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 store is ordering more frequently.
2       That's what it says, correct?
3       A.    Yes, that is what it says.
4       Q.    "Call the store" is part of due
5 diligence, correct?
6       A.    Yes, that is part of due
7 diligence.
8       Q.    All right.  And that's part of
9 a deep dive, correct?
10      A.    Yes, that is part of a deep
11 dive.
12      Q.    That's not something you would
13 do by just looking at the IRR report.  You'd
14 actually pick up a phone and call the
15 pharmacist, correct?
16      MR. HYNES:  Objection to form.
17      A.    No, we would not call the
18 pharmacist for every order or store on the
19 IRR.
20 QUESTIONS BY MR. BAKER:
21      Q.    I know you didn't.  What I'm
22 asking is under this context, it says that's
23 what you'd have to do, to pick up a telephone
24 and call the pharmacist, right?
25              --oOo--

Page 295

1       MR. HYNES:  Objection to form.
2 QUESTIONS BY MR. BAKER:
3       Q.    Who would you call?
4       MR. HYNES:  Objection to form.
5       A.    Yes, this would be referring to
6 calling the pharmacist.
7 QUESTIONS BY MR. BAKER:
8       Q.    Okay.  If the overall dosage
9 quantity has substantially increased or if
10 anything else of interest is identified
11 (higher percentage ordered from the outside
12 vendor, more cash sales, et cetera), my team
13 would need to include the RX Sup.
14          Correct?
15      A.    Yes, that's what it says.
16      Q.    And the RX Sup is the pharmacy
17 supervisor, correct?
18      A.    Yes, that is correct.
19      Q.    And you wouldn't know whether
20 those things existed, whether it was a higher
21 percentage order from outside vendor or more
22 cash sales, et cetera, than insurance sales,
23 et cetera, unless you did a deep dive,
24 correct?
25      MR. HYNES:  Objection to form.

Page 296

1       A.    Yes, that is correct.
2 QUESTIONS BY MR. BAKER:
3       Q.    And that's part of due
4 diligence, correct?
5       MR. HYNES:  Objection; asked
6 and answered.
7       A.    Yes.
8 QUESTIONS BY MR. BAKER:
9       Q.    Okay.  Then it says:  The store
10 ordered a rarely ordered drug (defined by a
11 minimum percentage of stores ordering the
12 drug in the past quarter) more than X times
13 in the quarter - this can be handled by my
14 team.  Most likely will be a new/rare
15 (annual/semiannual) customer or fat-finger.
16          Correct?
17      A.    Yes, that's what it says.
18      Q.    But you wouldn't know that
19 unless you did a deep dive, correct?
20      A.    Yes, that is correct.
21      Q.    All right.  And it says, b:
22 The store's DC order schedule has changed
23 recently and the store has ordered the drug
24 more times in the past 4 weeks than it did in
25 the prior month.

Page 297

1          Correct?
2       A.    Yes, that's what it says.
3       Q.    You wouldn't know that unless
4 you called the store to find out, correct?
5       MR. HYNES:  Objection to form.
6       A.    Yes.
7 QUESTIONS BY MR. BAKER:
8       Q.    Okay.  And that's part of a
9 deep dive, which is due diligence, correct?
10      MR. HYNES:  Objection to form.
11      A.    Yes.  It is additional due
12 diligence, yes.
13 QUESTIONS BY MR. BAKER:
14      Q.    All right.  Then
15 subparagraph c:  The store is ordering the
16 drug unusually frequently from the DC
17 compared with how often it ordered the drug
18 from the DC in the past year.
19          Correct?
20      A.    Yes, that's what it says.
21      Q.    How would you know that?
22      A.    By looking at the IRR, we could
23 see that information.
24      Q.    Right.  I mean, it wouldn't be
25 on the IRR unless that's what was happening,

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 correct?
2        MR. HYNES: Objection to form.
3 QUESTIONS BY MR. BAKER:
4    Q.    If it was measuring quantity,
5 right?
6    A.    Yes. It was measuring the
7 quantity, but -- yes. It is one of the
8 factors that would cause it to populate on
9 the IRR.
10    Q.    Okay. So that is something
11 that's an order of interest; it's populated
12 automatically on the IRR because of what the
13 IRR algorithm-related program does before it
14 reaches that report, correct?
15        MR. HYNES: Objection to form.
16    A.    Yes.
17 QUESTIONS BY MR. BAKER:
18    Q.    Okay. Then once it's there, as
19 to why they're ordering more, you would have
20 to do a deep dive, correct?
21        MR. HYNES: Objection to form.
22    A.    Yes, that is correct.
23 QUESTIONS BY MR. BAKER:
24    Q.    That means you would have to
25 call the pharmacist and find out what the

Page 299

1 excuse is, right?
2        MR. HYNES: Objection to form.
3    A.    Not necessarily for every
4 order. We could also look at data that we
5 had available to us.
6 QUESTIONS BY MR. BAKER:
7    Q.    Okay. But you could also go
8 into the database that has the outside vendor
9 that you can only do if you are doing a deep
10 dive, correct?
11        MR. HYNES: Objection to form.
12    A.    Yes, that is correct.
13 QUESTIONS BY MR. BAKER:
14    Q.    And you could also go into the
15 data and look at comparable store sales, but
16 only if you did a deep dive, correct?
17        MR. HYNES: Objection to form.
18    A.    Yes, that is correct.
19 QUESTIONS BY MR. BAKER:
20    Q.    Those things don't show up
21 automatically unless you stop, flag that
22 order further beyond what is already flagged
23 for further review, and then go do a deep
24 dive and make that assessment, correct?
25        MR. HYNES: Objection to form.

Page 300

1    A.    Yes, that is correct.
2 QUESTIONS BY MR. BAKER:
3    Q.    And if you don't do a deep dive
4 assessment, then you have no idea why that
5 store is ordering more than what it should,
6 correct?
7        MR. HYNES: Objection to form.
8    A.    I wouldn't say ordering more
9 than it should, but going in to understand
10 further why it had populated on the IRR.
11 QUESTIONS BY MR. BAKER:
12    Q.    You wouldn't know why that
13 store is ordering beyond its threshold unless
14 you did a deep dive, correct?
15        MR. HYNES: Objection to form.
16    A.    Yes.
17 QUESTIONS BY MR. BAKER:
18    Q.    Then the next subparagraph
19 says: The store is ordering the drug
20 unusually frequently from the outside vendor
21 compared to how often it ordered the drug
22 from the outside vendor in the past year,
23 correct?
24    A.    Yes, that's what it says, yes.
25    Q.    And you wouldn't know that

Page 301

1 unless you further flagged the order beyond
2 the way it's already flagged on the algorithm
3 system, correct?
4    A.    Correct.
5    Q.    And you wouldn't know that
6 unless you then did a deep dive and started
7 doing the due diligence investigation to find
8 that out, correct?
9    A.    We would not know that unless
10 we started deep dil- -- or deep dive, yes.
11    Q.    Then it says: The store is not
12 above the statistical threshold for its DC-
13 or outside vendor-specific order frequency
14 but on a combined basis is ordering the drug
15 unusually often compared with how often it
16 ordered the drug in the past year.
17        Correct?
18    A.    The DC-specific orders for an
19 unusual frequency would show up on the IRR.
20    Q.    Because it's showing the 12
21 lags, correct?
22    A.    No. There is a part of the
23 algorithm that monitored frequency as well,
24 order frequency.
25    Q.    Okay. But the outside

Page 302

1 vendor-specific order frequency you wouldn't
2 know unless you did a deep dive, correct?
3     A.   Yes, that is correct.
4     Q.   And that's part of what you
5 call due diligence, correct?
6        MR. HYNES:  Objection, asked
7    and answered.
8 QUESTIONS BY MR. BAKER:
9     Q.   Right?
10     A.   Yes.  Yes, that is part of the
11 additional due diligence we would complete.
12     Q.   Okay.  The store is ordering --
13 next subparagraph:  The store is ordering the
14 drug unusually frequently -- ah, let me start
15 that over.
16        Next:  The store is ordering
17 the drug unusually frequently from the DC
18 compared with how often comparable benchmark
19 stores ordered the drug from the DC in the
20 past four weeks.
21      Correct?
22     A.   Yes, that's what it says.
23     Q.   And how would you know that?
24     A.   That would be flagged.  If it
25 was ordering unusually frequently from the

Page 303

1 DC, that would be flagged on the IRR.
2     Q.   Okay.  Would that be same
3 store, same month ordering, or would that be
4 cumulative orders during the same month or
5 only one order during the month?  Tell me how
6 that would work.
7        MR. HYNES:  Objection to form.
8     A.   I don't recall the specifics.
9 QUESTIONS BY MR. BAKER:
10     Q.   Okay.  Let me see if I can
11 reask the question.  You understand it's
12 comparing the orders in the past four weeks,
13 which doesn't necessarily mean the same
14 month, correct?
15     A.   Correct.
16     Q.   All right.  So all you're
17 looking at is month to month on the IRR,
18 right?
19        MR. HYNES:  Objection to form.
20     A.   Yes, I believe so.
21 QUESTIONS BY MR. BAKER:
22     Q.   Okay.  So you'd have to do a
23 deep dive to find out this four-week
24 comparison if two of the weeks were in one
25 month and two of the weeks were in another

Page 304

1 one, correct?
2        MR. HYNES:  Objection to form.
3     A.   I don't know if the -- I'm not
4 familiar enough with the algorithm to know if
5 it was only looking at orders on a
6 month-to-month for frequency.  I know it's
7 listing orders on the IRR for data visible to
8 us from a month-to-month standpoint.
9        I'm not familiar enough with
10 the algorithm to understand -- to comment on
11 whether it was looking at week-to-week orders
12 while it was calculating to populate on the
13 IRR.
14 QUESTIONS BY MR. BAKER:
15     Q.   You just don't know one way or
16 the other?
17     A.   No, I do not.
18     Q.   And you'd have to do a deep
19 dive to find that out for sure, wouldn't you?
20        MR. HYNES:  Objection to form.
21     A.   Yes.
22 QUESTIONS BY MR. BAKER:
23     Q.   And that's part of what's
24 called due diligence, right?
25        MR. HYNES:  Objection to form.

Page 305

1     A.   Yes, the additional due
2 diligence.
3 QUESTIONS BY MR. BAKER:
4     Q.   All right.  Now, the next
5 subparagraph says:  The store is not above
6 the statistical threshold for its DC- or
7 OV-specific order frequency, but on a
8 combined basis is ordering the drug unusually
9 often compared with how often benchmark
10 stores ordered the drug in the past four
11 weeks.
12      Correct?
13     A.   I'm sorry, which point are you
14 reading?
15     Q.   Subparagraph h.
16     A.   h, okay.
17     Q.   It says:  The store is not
18 above the statistical threshold for its DC-
19 or OV-specific order frequency, but on a
20 combined basis is ordering the drug unusually
21 often compared with how often benchmark
22 stores ordered the drug in the past four
23 weeks.
24      Correct?
25     A.   Yes, that's what it says.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    Q.   All right. Would you know that
2 looking at the IRR or would that require you
3 to do a deep dive?
4    A.   That would require a deep dive.
5    Q.   Okay. And deep dive is beyond
6 what you would do by just looking at the IRR,
7 correct?
8    A.   Yes, that is correct.
9    Q.   That means you'd have to go to
10 other databases and spend more time reviewing
11 that order, correct?
12      MR. HYNES: Objection to form.
13    A.   Yes, that is correct.
14 QUESTIONS BY MR. BAKER:
15    Q.   All right. And that is
16 something that's called due diligence,
17 correct?
18    A.   Yes. It is an additional form
19 of due diligence, yes.
20    Q.   All right. The next category
21 of why orders flag for non-new stores would
22 be: Orders of established drug families by
23 non-new stores can flag for unusual pattern
24 as follows: Pattern is a little more
25 difficult because it is so vague. My initial

Page 307

1 thought is that my team will be able to
2 address most issues.
3      Subparagraph a: The store has
4 had a change in its formulation mix in this
5 quarter compared to the prior quarter that is
6 unusually high compared with other stores in
7 the chain.
8      Correct?
9    A.   Yes, that's what it says.
10    Q.   And you wouldn't know that by
11 looking at the IRR, would you?
12    A.   No, I don't believe so.
13    Q.   You would have to do a deep
14 dive to figure that out, correct?
15    A.   Yes.
16    Q.   You'd have to go to other
17 databases to figure that out, right?
18    A.   Yes.
19    Q.   What databases would you
20 access?
21    A.   I don't recall specifically,
22 but I believe it was MicroStrategy.
23    Q.   Okay. And MicroStrategy was
24 available as of when?
25    A.   It was available when I started

Page 308

1 in the position. I don't know when it became
2 available before that.
3    Q.   Was it available in 2012 when
4 you were an LP analyst?
5    A.   Yes, I believe so.
6    Q.   Are you sure about that?
7      MR. HYNES: Objection.
8    A.   Yeah. Yes, it was -- I'm
9 fairly certain it was available when I first
10 started reviewing the IRR.
11 QUESTIONS BY MR. BAKER:
12    Q.   Okay. Was it available in
13 2011?
14    A.   I don't know. I wasn't
15 reviewing the IRR at that time.
16    Q.   All right. And you would only
17 use MicroStrategy if you did a deep dive,
18 right?
19      MR. HYNES: Objection to form.
20    A.   Yes, that is correct.
21 QUESTIONS BY MR. BAKER:
22    Q.   Okay. And if you used
23 MicroStrategy and did a deep dive, you'd make
24 a note of it and attach it to the IRR,
25 correct?

Page 309

1      MR. HYNES: Objection to form.
2    A.   Yes, that's correct.
3 QUESTIONS BY MR. BAKER:
4    Q.   And if it wasn't -- there was
5 no such note attached to the IRR that said
6 you used MicroStrategy, then we can assume
7 you did not, correct?
8      MR. HYNES: Objection to form.
9    A.   Yes, that would be correct.
10 QUESTIONS BY MR. BAKER:
11    Q.   All right. So now we go to
12 subparagraph b: Relative to the proportion
13 over the past year, the store has increased
14 the proportion of the drug family that it
15 ordered from the outside vendor in this month
16 compared with other stores in the chain.
17      That's for non-new stores,
18 correct?
19    A.   Yes, that is what it says.
20    Q.   Again, that requires a deep
21 dive to figure that one out, right?
22    A.   Yes, it would.
23    Q.   You're not going to look at the
24 IRR and come up with that, right?
25    A.   No, we would not.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    Q.    But you have databases that
2  allow you to do that, inclusive of
3  MicroStrategy, correct?
4    A.    Yes, that is correct.
5    Q.    What other databases could you
6  look into?
7    A.    I don't remember specifically
8  what each tool is used for, but I know we had
9  MicroStrategy, VIPER, InfoPak, possibly a
10 couple of other tools.  I don't remember for
11 sure.
12   Q.    So the tools are there to use,
13 it's just a matter of your discretion as to
14 whether or not you use them, correct?
15       MR. HYNES:  Objection to form.
16   A.    Yes.
17 QUESTIONS BY MR. BAKER:
18   Q.    Okay.  And then subparagraph c:
19 The discrepancy between amount ordered and
20 amount dispensed this quarter is unusually
21 high compared with other stores in the chain.
22       Do you see that?
23   A.    Yes, I do.
24   Q.    That would require you to do a
25 deep dive, would it not?

Page 311

1    A.    Yes, it would.
2    Q.    In order to do that deep dive,
3  what tools do you have available?
4    A.    The tools I previously listed.
5  I don't even remember any beyond that.
6  MicroStrategy, InfoPak, VIPER.  At some
7  point, AGI created a tool called -- that we
8  called a Store Metrics Report, but I don't
9  recall exactly when that tool became
10 available.
11   Q.    Okay.  The Store Metrics
12 Report, what would you be looking at on the
13 store metrics?
14   A.    So the Store Metrics Report
15 took a lot of the information that was
16 available in the other tools and put it in
17 one place, so common doctor, common
18 patient -- or customer, rather.
19       Percentage of cash sales,
20 really all of the data points that we would
21 be looking at through the different tools,
22 but putting it in one -- another place that
23 was easier so it was all combined.
24   Q.    Okay.  All right.  So then the
25 next -- but again, to do that type of review

Page 312

1  you'd need to do a deep dive, right?
2    A.    Yes, that is correct.
3    Q.    And you'd document it in your
4  notes and attach it to the IRR if you did
5  that, right?
6       MR. HYNES:  Objection to form.
7    A.    Yes, we would.
8  QUESTIONS BY MR. BAKER:
9    Q.    And if you did not do that,
10 then we wouldn't see that in any -- in fact,
11 there wouldn't be any notes attached to the
12 IRR if you didn't do that, correct?
13       MR. HYNES:  Objection to form.
14   A.    Yes, I believe that is correct.
15 QUESTIONS BY MR. BAKER:
16   Q.    All right.  Next says,
17 subparagraph d:  The discrepancy between the
18 amount ordered and the amount dispensed over
19 the past year is unusually high compared with
20 other stores.
21       Did we go over that yet, or
22 not?
23   A.    I don't know if we did but I
24 see it in the document.
25   Q.    Okay.  You wouldn't be able to

Page 313

1  tell that unless you did a deep dive,
2  correct?
3    A.    Yes, we would not.
4    Q.    Okay.
5    A.    Or, yes, we would need to do a
6  deep dive.
7    Q.    And you had the tools available
8  to do it; it's just you wouldn't do it unless
9  you did a deep dive, right?
10   A.    Yes, that is correct.
11   Q.    And a deep dive is beyond that
12 which shows up on the IRR, right?
13   A.    Yes, that is correct.
14   Q.    And in order to do a deep dive
15 and use the tools, you document what you did
16 to use the tools, you document the results of
17 it and then you attach that to the IRR,
18 correct?
19       MR. HYNES:  Objection to form.
20   A.    Yes, I believe that's correct.
21 QUESTIONS BY MR. BAKER:
22   Q.    And if that attachment is not
23 in the IRR, we can assume you did not do that
24 deep dive, correct?
25       MR. HYNES:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  A.   Yes, I believe that is true.
2      MR. BAKER:  All right.  Let's
3  move on to Exhibit 88, please.
4      (CVS-Burtner Exhibit 88 was
5  marked for identification.)
6  QUESTIONS BY MR. BAKER:
7  Q.   This is --
8      MR. BAKER:  Could you blow that
9  up a little bit and bring that out up
10  at the top?
11  QUESTIONS BY MR. BAKER:
12  Q.   -- a store metric sheet.  Do
13  you recognize this?
14  A.   I don't recognize this.
15      MR. BAKER:  Okay.  Let's go
16  down a little bit.  Highlight that for
17  me.  Not highlight, but bring it out.
18  Increase the size.
19  QUESTIONS BY MR. BAKER:
20  Q.   Okay.  Is this an example of
21  what you're looking at in store metrics is
22  questions, Size 1, Size 2, Size 3?  Size 1:
23  Is the order unusual relative to the store's
24  past 12 months?  DC compared to OV.
25      Number 2:  Is the store unusual

Page 315

1  relative -- is the order unusual relative to
2  the most recent orders among the benchmark
3  stores?  [Separate DC/OV].
4      Is that part of what you're
5  looking at?
6  A.   Yeah.  I don't recognize this
7  document, but, yes, those would be a lot of
8  the data points and questions, I guess, that
9  we'd be trying to answer.
10  Q.   Okay.  And we can go through
11  all that, but basically, if a jury looks at
12  this, this is the kind of thing that you're
13  looking at for store metrics, correct?
14      MR. HYNES:  Objection to form.
15  A.   I mean, I'm not familiar with
16  this so I can't say that it's all-inclusive
17  of everything we would look at, but, yes,
18  this appears to be a lot of -- at least a lot
19  of what we would be looking at, yes.
20  QUESTIONS BY MR. BAKER:
21  Q.   Okay.  And in order to do a
22  store metrics comparison, you'd have to do a
23  deep dive, correct?
24  A.   Yes, that is correct.
25  Q.   And that would be part of due

Page 316

1  diligence that you'd then put in writing and
2  attach to the IRR, correct?
3      MR. HYNES:  Objection to form.
4  A.   Yes, it would be in the due
5  diligence that we attach to the IRR.
6  QUESTIONS BY MR. BAKER:
7  Q.   If you didn't do a store
8  metrics comparison, then it wouldn't be
9  attached to the IRR because it wouldn't be in
10  writing and attached, correct?
11      MR. HYNES:  Objection to form.
12  A.   Yes, I believe that to be
13  correct.
14  QUESTIONS BY MR. BAKER:
15  Q.   Okay.  So now go to 52, please.
16      (CVS-Burtner Exhibit 52 was
17  marked for identification.)
18  QUESTIONS BY MR. BAKER:
19  Q.   Was there a due diligence set
20  of questions that you were provided by CVS
21  when you worked as an LP analyst or an SOM
22  manager?
23  A.   Yes.  I don't recognize this
24  set of questions.
25      --oOo--

Page 317

1  QUESTIONS BY MR. BAKER:
2  Q.   Okay.
3  A.   Or I don't recognize it in this
4  format.
5  Q.   Okay.
6  A.   But we did have a document that
7  listed -- I believe we called it "talking
8  points" that we would use when we spoke with
9  a pharmacist.
10  Q.   Okay.
11  A.   Spoke with somebody at the
12  store, yes.
13  Q.   All right.  Go to the bottom of
14  this one.  This one is dated October 20,
15  2009.  Do you know where this one came from?
16  This is part of what was produced by CVS in
17  this case.
18      Do you know where this came
19  from?
20  A.   No, I do not.
21  Q.   Okay.  We'll look at some of
22  the questions that are highlighted here as to
23  what questions a distributor should ask a
24  pharmacy when they call a pharmacy.  That's
25  what this is, right, here?

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    A.    Yes, I would believe that's
2  what it is.
3    Q.    And this is part of due
4  diligence, correct?
5    A.    Yes, it's part of the due
6  diligence we'd complete.
7    Q.    Okay.  Some of the questions:
8  Does the pharmacy have staff or a private
9  firm that solicits practitioners to get more
10 business?
11        That's one of the questions
12 that's suggested, right?
13        MR. HYNES:  Objection to form;
14     calls for speculation.
15    A.    Yes, I see -- yes, I see that
16 in the list, yes.
17 QUESTIONS BY MR. BAKER:
18    Q.    Does the pharmacy have security
19 guards on the premises, that's something that
20 you should ask, right?
21        MR. HYNES:  Same objection.
22    A.    Yes, I see it on the list.
23 QUESTIONS BY MR. BAKER:
24    Q.    It says:  Does the pharmacy
25 order from other suppliers as well?  If so,

Page 319

1  why, and what controlled substances?
2        Correct?
3    A.    Yes, I see it on the list.
4    Q.    That's an outside vendor
5  question, correct?
6    A.    Potentially, yes.  Yes.
7    Q.    Okay.  Go to the top of this
8  document.  Go to the top of it.  Look -- it
9  says "Suggested Questions a Distributor
10 should ask prior to shipping controlled
11 substances."  Correct?
12    A.    Yes, that's what the document
13 says.
14    Q.    Okay.  It says:  This
15 questionnaire is provided to assist for the
16 distributor to formulate a better
17 understanding of who their customers are and
18 whether they should sell them controlled
19 substances.
20        Correct?
21    A.    Yes, that's what the document
22 says.
23    Q.    It says:  It is incumbent upon
24 you, the distributors, to ensure that sales
25 to your customers are for legitimate

Page 320

1  purposes.
2        Correct?
3    A.    Yes, I see that.
4    Q.    It is further incumbent upon
5  you to identify illicit or suspicious
6  activities which may result in the diversion
7  of controlled substances.
8        Correct?
9    A.    Yes, that's what it says.
10    Q.    Now, let me ask you to pull
11 Exhibit Number 50 -- the next numbered.  Hold
12 on.  It would be 53.
13        (CVS-Burtner Exhibit 53 was
14     marked for identification.)
15 QUESTIONS BY MR. BAKER:
16    Q.    Do you recognize this list of
17 questions?  Again, this is a CVS document.
18 You see where it's CVS Bated down at the
19 bottom, 57741?  Do you see that?
20        MR. HYNES:  Objection.
21    A.    Yes.
22 QUESTIONS BY MR. BAKER:
23    Q.    Okay.  This is a document that
24 was provided to us by CVS in discovery in
25 this case.

Page 321

1        Do you understand that?
2    A.    Okay.
3    Q.    Do you recognize this document?
4    A.    I do not recall seeing this
5  document, no.
6    Q.    Okay.  It's called an "SOM Due
7  Diligence Guidance Document," but you never
8  received it.  Is that right?  Never reviewed
9  it?
10        MR. HYNES:  Objection as to
11     prep.  You may answer outside of prep.
12 QUESTIONS BY MR. BAKER:
13    Q.    Did you ever see this document
14 while you were at CVS?
15    A.    No, I don't recall seeing this
16 specific document.
17    Q.    Okay.  Let's look at this list
18 of questions.  It says:  Questions to
19 consider when calling the pharmacy.  It says,
20 number 1:  What do you do to verify
21 prescriptions?
22        Do you see that?
23    A.    Yes.
24    Q.    Number 2:  Do you document
25 these conversations?

Highly Confidential – Subject to Further Confidentiality Review

Page 322

1  Do you see that?
2  A.  Yes.
3  Q.  Do you ever refuse to fill any
4  prescriptions?
5  Do you see that?
6  A.  Yes, I do.
7  Q.  Are there any patient or
8  prescriber red flags that you consistently
9  see in your area/pharmacy?
10  Do you see that?
11  A.  Yes, I do.
12  Q.  Do patients travel a long
13  distance?  Are they cash paying?  Are there
14  groups of patients from the same prescriber's
15  office?
16  Do you see that, a, b and c?
17  A.  Yes, sir.
18  Q.  Are there groups of patients
19  coming in to fill prescriptions/lines of
20  patients outside [sic] pharmacies, correct?
21  A.  Yes, I see that.
22  Q.  Are these the type of things
23  that you were instructed to ask?
24  A.  Yeah.  Yes, I haven't seen this
25  exact document, but those are consistent with

Page 323

1  a lot of the questions that I recall asking.
2  Q.  Are patients between the ages
3  of 18 to 35?  Is there doctor shopping?
4  Early refill?
5  Correct?
6  A.  Yes, I see that.
7  Q.  Are there cocktails?
8  We discussed what a cocktail
9  was.  What's a cocktail?
10  A.  Two drugs used together.
11  Q.  Like alprazolam and hydrocodone
12  combination product?
13  A.  Yes.  Yes.
14  Q.  All right.  Then it says:
15  Prescriber scope of practice.
16  In other words, is it a pain
17  management doctor, is it a general
18  practitioner?  Orthopedic?  You want to know
19  that, right?
20  A.  Yes, definitely.
21  Q.  All right.  Are there multiple
22  prescribers at one location prescribing for
23  the same drug/drug combinations?
24  You want to know that, right?
25  A.  Yes.

Page 324

1  Q.  You won't know these things
2  unless you call the pharmacist and ask,
3  correct?
4  MR. HYNES:  Objection to form.
5  QUESTIONS BY MR. BAKER:
6  Q.  Right?
7  MR. HYNES:  Objection to form.
8  A.  No.  I have access to a lot --
9  to a lot, if not all, of this information.  I
10  don't remember -- I don't specifically
11  remember if some of this was available or
12  not.
13  QUESTIONS BY MR. BAKER:
14  Q.  Some of it you have to call the
15  pharmacist; some of it you can get from your
16  databases, correct?
17  MR. HYNES:  Objection to form.
18  A.  Yes, I believe that is correct.
19  QUESTIONS BY MR. BAKER:
20  Q.  Okay.  And that's called a deep
21  dive, which is part of due diligence,
22  correct?
23  MR. HYNES:  Objection, form.
24  --oOo--
25  --oOo--

Page 325

1  A.  Yes, it is part of the
2  additional due diligence.
3  QUESTIONS BY MR. BAKER:
4  Q.  So what sort of percentage of
5  your IRRs did you do that deep dive on?
6  MR. HYNES:  Objection to form.
7  A.  I don't recall percentage.
8  QUESTIONS BY MR. BAKER:
9  Q.  Okay.  Whatever we look at in
10  IRRs, to the extent they have due diligence,
11  it's going to be attached, correct?
12  MR. HYNES:  Objection to form.
13  A.  Yes, it should be.
14  QUESTIONS BY MR. BAKER:
15  Q.  And if it's not attached, you
16  didn't do it, correct?
17  MR. HYNES:  Objection to form.
18  A.  Yes, I would believe that is
19  true.
20  QUESTIONS BY MR. BAKER:
21  Q.  Okay.  So then it asks for
22  general questions.  Who is responsible for
23  ordering controlled substances in your store?
24  Do you regularly check your AIM-generated
25  orders and adjust according to the amount you

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1 actually need based on what is on the
2 shelves?  How much product do you have on the
3 shelf?  How long has that person been
4 ordering?  What kind of area is the pharmacy
5 in?  Do you have a "do not fill list" for
6 prescribers?  If prescriber has a high share
7 of cocktails or prescribing, what do you know
8 about this prescriber?
9       Correct?  Those are general
10 questions you have to ask, correct?
11       MR. HYNES:  Objection.
12 QUESTIONS BY MR. BAKER:
13    Q.    You have to investigate as part
14 of a deep dive when you do a deep dive,
15 correct?
16       MR. HYNES:  Objection to form.
17    A.    Yes.  Those are consistent with
18 the questions we would ask when we called a
19 store.
20 QUESTIONS BY MR. BAKER:
21    Q.    Right.  And that's called due
22 diligence, correct?
23    A.    Yes, that is a form of due
24 diligence.
25    Q.    Okay.  All right.  Go to the

Page 327

1 next one, 54.
2       (CVS-Burtner Exhibit 54 was
3    marked for identification.)
4 QUESTIONS BY MR. BAKER:
5    Q.    Is this the same document, same
6 sort of things that you'd look at?
7    A.    Yes, it appears to be similar
8 to the last document.
9       MR. BAKER:  Okay.  All right.
10 I think we're going to take a break.
11 Thank you.
12       THE VIDEOGRAPHER:  Okay.  We
13 are now going off the record, and the
14 time is 2:08 p.m.
15       (Recess taken, 2:08 p.m. to
16    2:19 p.m.)
17       THE VIDEOGRAPHER:  We are now
18 going back on the record, and the time
19 is 2:19 p.m.
20            EXAMINATION
21 QUESTIONS BY MR. GOETZ:
22    Q.    Mr. Burtner, my name is Dan
23 Goetz.  We met earlier but now we're formally
24 meeting on the record.
25       I am going to hand you two

Page 328

1 exhibits.  One is marked CVS-Burtner 462 and
2 one is marked CVS-Burtner 406.
3       (CVS-Burtner Exhibit 462 was
4    marked for identification.)
5       (CVS-Burtner Exhibit 406 was
6    marked for identification.)
7 QUESTIONS BY MR. GOETZ:
8    Q.    And so that 462, I believe,
9 according to the production, is the e-mail
10 that is attached the flowchart that you see
11 in 406.
12    A.    Yes, that appears to be
13 correct.
14    Q.    Okay.  And if you go to 406, do
15 you remember putting together this flowchart?
16    A.    I don't recall if I specific --
17 if I put this together, but I do remember
18 working on it, yes.
19    Q.    And this was a flowchart to try
20 to put into boxes or words what you actually
21 were doing in the suspicious order monitoring
22 program, correct?
23    A.    Yes, that is correct.
24    Q.    Okay.  And if you look at the
25 first box, it says:  Initiate IRR SOM review

Page 329

1 process.
2       Correct?
3    A.    Yes.
4    Q.    And then it says:  Review
5 entire IRR per time zone.
6       Correct?
7    A.    Yes.  That's what it says, yes.
8    Q.    So the IRR would group into
9 two -- two separate sections, because it
10 would group into two time zones.  Is that
11 correct?
12    A.    No.  It was grouped based off
13 of distribution center and then -- I mean, at
14 the time, I was very familiar where they were
15 located and which ones were in which time
16 zone, so we would review the assessments for
17 the DCs in the east time zone and then --
18    Q.    Okay.  If you look at the
19 bottom left, it says Group 1.
20       Do you see that?
21    A.    Yes.
22    Q.    So would that be the first
23 group that you would review?
24    A.    No.  I believe this was the
25 separation of -- Group 1 would be the

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  distribution centers that Paul Lawson
2  reviewed, and then Group 2 was the
3  distribution centers that I would review.
4      Q.   Okay.  And within Group 2, you
5  would review those four distribution centers
6  shown in there based upon time zone.  Is that
7  correct?
8      A.   Yes, correct.
9      Q.   Okay.  And so you would review
10  that IRR, if you look at the third box, it
11  says:  While reviewing the IRR, identify all
12  orders that appear irregular based on the
13  previous 12 months lag.
14          Correct?
15      A.   Yes, that's what the document
16  says.
17      Q.   And so those irregular orders,
18  and we're going to get into it a little
19  deeper, those orders that were identified in
20  that third box as irregular, those are the
21  orders that you would get -- do a deep dive?
22      A.   Correct.
23      Q.   And that's what we just talked
24  about, correct, that deep dive?
25      A.   Correct.

Page 331

1          (CVS-Burtner Exhibit 407 was
2      marked for identification.)
3  QUESTIONS BY MR. GOETZ:
4      Q.   Mr. Burtner, I'm handing you
5  what's been marked as CVS-Burtner
6  Exhibit 407.
7      A.   Okay.
8      Q.   You testified a great deal
9  today about an IRR, an Item Review Report.
10  That's a copy of an IRR, correct?
11      A.   Yes, this is a copy of the IRR.
12      Q.   And this IRR, if you flip
13  through it, it -- at the top, for example, go
14  to, please, go to page 11396.
15      A.   Okay.
16      Q.   And that says:  CVS Corporation
17  Item Review Report Control Drugs-IN.
18          Correct?
19      A.   Yes.
20      Q.   And so these were the
21  potentially suspicious orders as identified
22  by the algorithm that were to be shipped out
23  of the Indiana distribution center, correct?
24          MR. HYNES:  Objection to form.
25      A.   Yes, that is correct.

Page 332

1          MR. GOETZ:  And based on what?
2          MR. HYNES:  What?
3          MR. GOETZ:  Based on what?
4          MR. HYNES:  Basis of my
5  objection?
6          MR. GOETZ:  Yeah.
7          MR. HYNES:  You said to be
8  shipped out of the Indy DC.  I'm not
9  sure all these would be shipped
10  pending a review.
11          MR. GOETZ:  Okay.
12  QUESTIONS BY MR. GOETZ:
13      Q.   Those were the potentially
14  suspicious orders as identified by the
15  algorithm that were placed to the
16  Indianapolis distribution center, correct?
17          MR. HYNES:  That's better.
18      A.   Yes.  Yes, that is correct.
19  QUESTIONS BY MR. GOETZ:
20      Q.   And all of those orders that
21  were not stopped by you would be shipped,
22  correct?
23      A.   Stopped by myself or another
24  analyst, yes.
25      Q.   Okay.  And there was some

Page 333

1  confusion last week, but if you look at the
2  earlier pages where it says:  Item Review
3  Report Control Drugs-FL, for example,
4  11374 --
5          MR. HYNES:  Give us a second.
6      A.   Yes.
7  QUESTIONS BY MR. GOETZ:
8      Q.   That is just a different
9  distribution center's IRR, correct?
10      A.   Yes, that is correct.
11      Q.   And during this time, you were
12  reviewing an IRR like this for all 11
13  distribution centers?
14      A.   At this time, we had two
15  full-time analysts and a flex associate that
16  would -- I don't recall exactly how we split
17  it, but someone would -- someone would review
18  all portions -- it would be reviewed by at
19  least one person, yes.
20      Q.   Okay.  And out of the
21  Indianapolis distribution center, 11 -- 11
22  IRRs would be reviewed, correct?
23      A.   Yes, that is correct.
24      Q.   Can you go back to this
25  flowchart, please?

Page 334

1  A.  Yes.
2  Q.  And so after you identified
3  orders that you wanted to do a deep dive on,
4  you would then inform the distribution
5  centers, correct, to not ship those orders?
6  A.  Correct.
7  Q.  And do you remember how you
8  would inform those distribution centers?
9  A.  We'd created a form.  I don't
10  remember what it was called.  But it would be
11  used to communicate the order, the drug,
12  quantity, et cetera, of what they should hold
13  until given further direction.
14  Q.  Okay.  And so to the extent --
15  MR. GOETZ:  Let me have both.
16  QUESTIONS BY MR. GOETZ:
17  Q.  To the extent that you would --
18  I'm going to hand you what's been marked as
19  CVS-Burtner Exhibit 409.
20  (CVS-Burtner Exhibit 409 was
21  marked for identification.)
22  QUESTIONS BY MR. GOETZ:
23  Q.  And I'm going to hand you
24  what's been marked as CVS-Burtner
25  Exhibit 410.

Page 335

1  (CVS-Burtner Exhibit 410 was
2  marked for identification.)
3  QUESTIONS BY MR. GOETZ:
4  Q.  Those are the forms that you
5  would use to identify the distribution
6  center?
7  MR. HYNES:  Can you repeat the
8  question again?
9  QUESTIONS BY MR. GOETZ:
10  Q.  These are the forms that you
11  would identify -- that you would use to
12  notify the distribution center --
13  MR. HYNES:  Thank you.
14  QUESTIONS BY MR. GOETZ:
15  Q.  -- to not ship until you did a
16  deep dive on those orders, correct?
17  A.  Yes, I believe so.  I don't --
18  I don't recall specifically what this form
19  was for, but this form (indicating) has the
20  more detailed information about the drug in
21  question on the store, yes.  Yes.
22  Q.  They have the same title,
23  correct?
24  A.  Oh, okay.  Okay.  Yes.
25  Q.  Okay.  And I believe what

Page 336

1  happened is at one point there was a printed
2  form and then at one point you went to an
3  Excel spreadsheet.
4  Do you remember doing that?
5  A.  I don't recall doing that, no.
6  Q.  It's the same title of the
7  form, correct?
8  MR. HYNES:  Objection to form.
9  A.  Yes.  The title is on the --
10  MR. HYNES:  It's not the same.
11  MR. GOETZ:  What's the
12  difference?
13  MR. HYNES:  DC Communication,
14  Logistics Communication.
15  MR. GOETZ:  Oh, I apologize.
16  QUESTIONS BY MR. GOETZ:
17  Q.  Is it the same format, or no?
18  A.  I believe the two forms are
19  used in conjunction.  This form was
20  communicated to say, "Hey, yes, you have
21  orders that are being held."  And then we
22  would use this to -- so for instance, this
23  has Indianapolis as a yes, everyone else as a
24  no, except for Patterson that has a yes for
25  PSE.

Page 337

1  Those two distribution centers
2  would receive this additional form that gave
3  them additional information on what orders
4  specifically needed to be held.
5  Q.  And that additional form that
6  you're talking about is Exhibit 409, correct?
7  A.  Correct.
8  Q.  Okay.  And that form that we're
9  talking about, again, to the extent that you
10  did a deep dive on a specific distribution
11  center or a specific store, we should have
12  one of these Exhibit 409s, correct?
13  MR. HYNES:  Objection to form.
14  A.  I don't recall if we saved this
15  form as part of the due diligence.  I believe
16  that we would, but I don't recall if we did
17  or not.
18  QUESTIONS BY MR. GOETZ:
19  Q.  We'll get into that.  And then
20  after you would communicate to them, correct,
21  if we keep going -- if you'd go back to 406,
22  please.
23  And if you look, it said:
24  Complete the irregular orders with logistics
25  communication indicating which distribution

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 centers have orders identified as irregular.
2          Correct?
3      A.   Yes.
4      Q.   You would send communication to
5 all distribution centers, correct?
6      A.   Yes.
7      Q.   Complete a separate irregular
8 orders DC communication for each distribution
9 center with an order identified as irregular.
10          That was Exhibit 409, correct?
11     A.   I believe so.  Yes, that was
12 409.
13     Q.   Okay.  And then if you go to
14 the third page of this, do you see -- do you
15 see the first page, it says C?
16     A.   Yeah.
17     Q.   That means go to then bubble C,
18 correct?
19     A.   Yes.
20     Q.   And bubble C then begins on the
21 third page?
22     A.   Yes.
23     Q.   And then it talks about the due
24 diligence, the deep dive you could do,
25 correct?

Page 339

1      A.   Correct.
2      Q.   And eventually, after you
3 verified this order was or was not
4 suspicious, if you go to the fourth page you
5 would document that information on the IRR
6 recap spreadsheet, correct?
7      A.   Yes, that's what the document
8 says.  I don't recall much of the recap
9 spreadsheet.
10     Q.   Okay.  But so to the extent
11 that a deep dive was done, according to this
12 flowchart that you did of the process, that
13 deep dive would be reflected on the recap
14 spreadsheet.
15     A.   Yes.  According to the flow
16 map, yes, that was the process.
17     Q.   And then again, we know that
18 the IRR, along with that deep dive, would be
19 attached and placed into a box, correct?
20     A.   Yes, that is correct.
21          MR. HYNES:  Are we done with
22 the flow map, Dan?
23          MR. GOETZ:  We might go back to
24 it.
25          MR. HYNES:  Okay.

Page 340

1 QUESTIONS BY MR. GOETZ:
2      Q.   Mr. Burtner, you were asked
3 earlier what percentage of orders you did a
4 deep dive on.
5          Do you remember that?
6      A.   I do recall the questioning.
7      Q.   And do you remember you said
8 you don't recall?
9      A.   Yes, that is correct.
10     Q.   And so as you sit here today,
11 you don't have a recollection?
12     A.   I don't recall how many orders
13 or the percentage of orders that were on the
14 IRR that we would do additional due diligence
15 on.
16     Q.   Okay.  And there was a time
17 when you did time studies, correct?
18     A.   Yes, that is correct.
19     Q.   And those time studies were
20 studies to try to gauge what was your average
21 day.  Fair?
22          MR. HYNES:  Objection to form.
23     A.   Yes.  Yes.
24 QUESTIONS BY MR. GOETZ:
25     Q.   And you filled those time

Page 341

1 studies out truthfully?
2      A.   Yes, to the best of my ability.
3      Q.   You filled them out accurately?
4      A.   Yes.
5      Q.   And so those time studies would
6 probably be the best evidence that we have as
7 to what your day consisted of when you
8 were -- strike that.
9          Those time studies would
10 probably be the best evidence we have as to
11 what percentage of orders you did a deep dive
12 on, correct?
13          MR. HYNES:  Objection to form.
14     A.   Possibly.
15 QUESTIONS BY MR. GOETZ:
16     Q.   I'm going to hand you what has
17 been marked --
18     A.   Okay.
19     Q.   -- as Exhibit 411.
20          (CVS-Burtner Exhibit 411 was
21     marked for identification.)
22 QUESTIONS BY MR. GOETZ:
23     Q.   Do you see the first page?
24     A.   Of the e-mail?
25     Q.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1   A.   Yes, I do.
2   Q.   And that is an e-mail from you
3 to John Mortelliti?
4   A.   Yes.
5   Q.   And it's attaching -- it was
6 sent on June 18th of 2012?
7   A.   Yes.
8   Q.   And then if you'd turn in to
9 the -- what is the third page, it says "LP
10 Analyst Time Study"?
11   A.   Yes.
12   Q.   Okay.  And that date is
13 6/15/12?
14   A.   Yes, it is.
15   Q.   And if you look about the
16 middle of the page, it says:  Review 6/14/12
17 Control IRR?
18   A.   Yes, I see that.
19   Q.   Okay.  And just so we do not
20 have to go back and forth through this all
21 the time, I'm going to write this down so we
22 can kind of remember, okay?  And then to the
23 extent that we have to go back, we'll look at
24 it.  Fair enough?
25   A.   Okay.

Page 343

1   Q.   So that date of the time study
2 is 6/15/12 and it's a 6/14/12 IRR and it
3 appears that it took you 25 minutes to
4 review?
5   A.   Yes.  Yes, that's what the time
6 study says.
7   Q.   Okay.  And then down below, it
8 says:  Continue reviewing 6/14/12.
9       And that took you 30 minutes,
10 correct?
11   A.   Yes.  So it appears that I
12 began reviewing and then continued reviewing,
13 a total of, what, an hour, I guess.
14   Q.   55 minutes?
15   A.   Okay.
16   Q.   Does that seem fair?
17   A.   Yes.  Yes.
18   Q.   And according to this, zero
19 orders received additional due diligence,
20 correct?
21   A.   According to the time study,
22 yes.
23   Q.   Okay.  And could you go to the
24 next page.  Actually, on this day you spent
25 an hour looking at a cigarette shortage,

Page 344

1 correct?
2   A.   Yes.
3   Q.   Okay.
4   A.   I'm sorry.
5       MR. HYNES:  What page are you
6 on, Dan?
7       MR. GOETZ:  The next page.
8 QUESTIONS BY MR. GOETZ:
9   Q.   Worked with Andy Eck on
10 cigarette shortage.
11   A.   Oh.  Yes, I did, yes.
12   Q.   All right.  So you were doing a
13 significant amount of other stuff besides
14 SOM.
15       And then it looks down below --
16 it says:  Worked with Joe Scholl on petty
17 cash, and you spent an hour and a half on
18 that day.  Correct?
19   A.   Yes.
20       (CVS-Burtner Exhibit 412 was
21       marked for identification.)
22 QUESTIONS BY MR. GOETZ:
23   Q.   I'm going to hand you what has
24 been marked as 412.  Do you see the first
25 page?

Page 345

1   A.   Yes.
2   Q.   That is an e-mail from you to
3 Mr. Mortelliti dated June 19th, 2012?
4   A.   Yes.
5   Q.   And if you open it up, that is
6 a time study from June 18th, 2012, correct?
7   A.   Yes.
8   Q.   Okay.  And if you look at the
9 6/15/12 Control IRR, it says review, it looks
10 like you spent 30 minutes?
11   A.   According to the time study,
12 yes.
13   Q.   Okay.  And you investigated, it
14 appears, zero orders.
15       MR. HYNES:  Objection to form.
16   A.   According to the time study,
17 yes.
18 QUESTIONS BY MR. GOETZ:
19   Q.   Okay.  Do you see the next
20 page, it says zero orders?
21   A.   Yes.
22   Q.   Okay.  And then if you look at
23 Review 6/17/12.
24       Do you see that?
25   A.   Yes, I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1   Q.   Okay.  And how long did that
2   take you?
3   A.   From 8:45 to 9:20, so 35
4   minutes.
5   Q.   Okay.  And how many orders, if
6   you look at the next page, did you review --
7   did you do a deep dive on?
8   A.   One.
9   Q.   One.  And that deep dive, how
10  long did it take you to do that?
11       MR. HYNES:  Objection to form.
12  A.   According to the time study, 30
13  minutes.
14  QUESTIONS BY MR. GOETZ:
15  Q.   You have no reason to suspect
16  that this time study is anything but
17  accurate, do you?
18  A.   No, I don't -- I mean, clearly
19  looking at the times I wasn't going to the
20  minute, but I was rounding to the closest
21  five-minute, I suppose.  But beyond that,
22  yes.  No, I don't have any reason to question
23  the accuracy.
24  Q.   And then if you could go to
25  112651, again, on this day, if you look at

Page 347

1   the second-to-last entry, you're working with
2   Joe Scholl for 50 minutes, again trying to
3   resolve a petty cash issue.  Correct?
4   A.   Yes.  According to that time
5   study, that is correct.
6   Q.   These first -- do you see the
7   last entry?
8   A.   Yeah, I do, I'm sorry.  I was
9   just looking to see -- I was just trying to
10  see if it was the same day.
11       (CVS-Burtner Exhibit 413 was
12       marked for identification.)
13  QUESTIONS BY MR. GOETZ:
14  Q.   Let me show you what's been
15  marked as 413.  That first e-mail is dated
16  June 21st, 2012?
17  A.   Yes.
18  Q.   And it's from you to John
19  Mortelliti, correct?
20  A.   Yes.
21  Q.   And if you open it up, it's a
22  6/20/12 time study?
23  A.   Yes.
24  Q.   And if you look at -- it says:
25  Review 6/19/12 Control IRR.

Page 348

1       Correct?
2   A.   Yes.
3   Q.   And you spent one hour,
4   correct?
5   A.   Yes.
6   Q.   And it appears that you
7   investigated three orders.
8   A.   Yes, according to that time
9   study.
10  Q.   Okay.  And how long did it take
11  you to investigate order 5408 -- store 5408?
12       MR. HYNES:  Objection to form.
13  A.   According to this, 25 minutes.
14  QUESTIONS BY MR. GOETZ:
15  Q.   And what did you do?
16  A.   That would include deep diving,
17  as we've discussed, looking at order pattern,
18  common doctor, common patient, et cetera.
19  Q.   Those are the things that
20  Mr. Baker just asked you about that are
21  things that do not show up on the IRR,
22  correct?
23  A.   Yes, that is correct.
24  Q.   If you actually want to
25  investigate an order as potentially

Page 349

1   suspicious, you have to do those things,
2   correct?
3       MR. HYNES:  Objection to form.
4   A.   Yes.  If we identify an order
5   that we feel looks irregular and we need to
6   deep dive further, yes, we would need to
7   access other systems to get that information.
8   QUESTIONS BY MR. GOETZ:
9   Q.   And could you look at
10  Store 8980?
11  A.   Yes.
12  Q.   You investigated an order,
13  correct?
14  A.   Yes.
15  Q.   How long did that take?
16  A.   Approximately 20 minutes.
17  Q.   And again, what did you do?
18  A.   Followed the same process.  It
19  was the same process for every store that we
20  would -- primarily the same process, up to
21  and including calling the pharmacy.
22  Q.   When you did call the pharmacy,
23  that would take significantly more time than
24  the 20 minutes, wouldn't it?
25       MR. HYNES:  Objection.  More --

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1 objection to form.
2     A.    Not necessarily.  The time
3 would vary depending on what I needed to ask
4 the pharmacist.
5 QUESTIONS BY MR. GOETZ:
6     Q.    Do you remember how long it
7 would take you?
8     A.    I don't recall.  It varied from
9 order to order or from store to store.
10     Q.    I did this chart, and it's too
11 difficult to put in front of the ELMO, but I
12 just want to make sure that the summary is
13 correct for this.
14         We looked at four IRR dates,
15 correct?
16     A.    Yes.
17     Q.    When you reviewed the IRRs, you
18 took between 30 minutes and an hour?
19         MR. HYNES:  Objection.  Are you
20     asking him what the document says or
21     what his recollection is?
22         MR. GOETZ:  I'm asking if this
23     is -- if I wrote this down correctly.
24 QUESTIONS BY MR. GOETZ:
25     Q.    Do you remember this?

Page 351

1         MR. HYNES:  From the document?
2         MR. GOETZ:  Yeah.  I was
3     writing as we were speaking.
4     A.    Yes, I believe so.  I believe
5 that's the information from the time study.
6 QUESTIONS BY MR. GOETZ:
7     Q.    From the time studies.
8         And twice you reviewed, of
9 these, zero orders, and one time you reviewed
10 one order, and one time you reviewed three
11 orders, correct?
12     A.    Right.  And one thing to keep
13 in mind is that the volume of the IRR would
14 vary pretty wildly, especially at the
15 beginning and the middle of the month where
16 it would be relatively small.
17     Q.    Do you -- well, these are not,
18 by the way -- do you know how long these IRRs
19 were?
20     A.    No specific days.  I have no
21 idea.
22     Q.    Well, let me ask you.  Based
23 upon the fact that you reviewed an IRR in 55
24 minutes from 6/14/12 and you flagged zero
25 orders, what would be your guess?

Page 352

1         MR. HYNES:  Objection; calls
2     for speculation.
3         MR. GOETZ:  He just testified
4     that the IRR differences -- when I
5     asked him about if he reviewed zero
6     orders he said, yes, but those are
7     from the middle -- the middle of the
8     month, as though he had some knowledge
9     as to what this would show.
10         MR. HYNES:  He just said it was
11     shorter, and you asked him then how
12     long it was, and he said he doesn't
13     know.
14     A.    I don't remember the specific
15 number of how long it would be.  I know that
16 it was drastically smaller than what it would
17 be at the end of the month.
18 QUESTIONS BY MR. GOETZ:
19     Q.    Okay.  Would it shock you if I
20 told you some of these were a couple hundred
21 pages?
22         MR. HYNES:  Objection to form.
23     A.    I don't know.  I don't know if
24 it would shock me or not.
25             --oOo--

Page 353

1 QUESTIONS BY MR. GOETZ:
2     Q.    I was just trying to understand
3 when you were telling me that these were from
4 the middle, what that meant to you.
5     A.    To what I understand.
6     Q.    Mr. Burtner, I'm going to hand
7 to you what has been marked as 414.
8         (CVS-Burtner Exhibit 414 was
9     marked for identification.)
10 QUESTIONS BY MR. GOETZ:
11     Q.    That front e-mail is an e-mail
12 from you to Pam Hinkle, correct?
13     A.    Yes.
14     Q.    Dated July 6 of 2012?
15     A.    Yes.
16     Q.    Okay.  And if you turn on the
17 second page, that is a time study from
18 July 5th of 2012, correct?
19     A.    Yes.
20     Q.    And if you look at the
21 July 3rd, '12 Control IRR, that took you 15
22 minutes, correct, to review?
23     A.    Yes.
24     Q.    And if you look at the
25 July 4th, 2012 IRR, that took you 20 minutes,

Highly Confidential – Subject to Further Confidentiality Review

Page 354

1 correct?
2     A.    Yes.
3     Q.    And again, you reviewed zero
4 orders on both days, correct?
5         MR. HYNES:  Objection to form.
6     A.    According to the time study,
7 yes.
8 QUESTIONS BY MR. GOETZ:
9     Q.    All right.  In fact, we'll use
10 your language, zero orders for additional due
11 diligence, correct?
12     A.    That is correct.
13     Q.    Okay.  And could you turn to
14 the second page?
15     A.    Yes.
16         MR. HYNES:  Of the time study?
17         MR. GOETZ:  Yes.
18 QUESTIONS BY MR. GOETZ:
19     Q.    Again, on this day, you spent
20 three hours, look at the bottom, researching
21 a cigarette shortage?
22     A.    Yes.  At this time I was still
23 working as a loss prevention supervisor, so
24 at the beginning of the month a large portion
25 of my time would be devoted to loss

Page 355

1 prevention work.
2     Q.    It would not be devoted to
3 suspicious orders, would it?
4     A.    A portion of my time, but we
5 also had Paul, who was full time at that time
6 as well.
7     Q.    You keep mentioning Paul.
8 There was a big issue about Paul's
9 performance, wasn't there?
10         MR. HYNES:  Objection to form.
11     A.    Not that I'm aware of.
12 QUESTIONS BY MR. GOETZ:
13     Q.    You don't remember those
14 e-mails?
15     A.    No.  I --
16     Q.    Okay.
17     A.    I thought Paul was doing a fine
18 job at analyzing the data.
19     Q.    Okay.  I'm going to hand you
20 what has been marked as 415.
21         (CVS-Burtner Exhibit 415 was
22         marked for identification.)
23 QUESTIONS BY MR. GOETZ:
24     Q.    That front page is an e-mail
25 from you to Pam Hinkle?

Page 356

1     A.    Correct.
2     Q.    And on the inside it attaches a
3 time study from July 9th, 2012, and then I
4 will tell you it attaches other ones as well.
5     A.    Okay.
6     Q.    Okay?  And that's kind of
7 indicative from what's shown in the e-mail.
8     A.    Uh-huh.
9     Q.    We'll start with the July 9th
10 of 2012.  On that day you reviewed an IRR
11 from July 6 of 2012?
12     A.    Yes.
13     Q.    You spent 35 minutes?
14     A.    Yes.
15     Q.    Zero orders for additional deep
16 dive, correct?
17     A.    According to the time study,
18 yes.
19     Q.    All right.  On that day you
20 also reviewed an IRR from July 8th?
21     A.    Yes.
22     Q.    You spent 40 minutes?
23     A.    Yes.
24     Q.    And again, you flagged for
25 additional due diligence zero orders.

Page 357

1     A.    Yes.
2     Q.    Could you go to the third page
3 of that where it begins "Retrieve 7/10/12 IRR
4 from Data Room"?
5         MR. HYNES:  What Bates number,
6     Dan?  Oh, we don't have it.  Sorry.
7 QUESTIONS BY MR. GOETZ:
8     Q.    Keep going.
9     A.    Okay.  I've retrieved which?
10     Q.    On the third line down, it says
11 "Retrieve 7/10/12 IRR"?
12     A.    Got it.
13     Q.    Okay.  And that took 15
14 minutes, correct?
15     A.    Yes.
16     Q.    And then it says:  Organize and
17 file IRR.
18         And that took 15 minutes?
19     A.    Yes.
20     Q.    I mean, you're spending almost
21 as time [sic] grabbing the IRR and putting it
22 in the box as you are in any form of review
23 of these orders, correct?
24         MR. HYNES:  Objection to form.
25     A.    Retrieving the IRR was on the

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 opposite side of the building so I had to
2 walk there from my office to get to it and
3 back, which would be approximately a
4 15-minute walk round trip. And then the
5 organizing of the file, I mean, I can't speak
6 to specifically what happened this day, but
7 something may have come up to cause it to
8 take a little bit longer; if I had a phone
9 call or an e-mail or something I responded to
10 in the middle, I don't know.
11 QUESTIONS BY MR. GOETZ:
12     Q.    That time, though, was a normal
13 time.  It would take you 15 to 30 minutes to
14 take the IRR and organize it.  We can go
15 through these again.
16         MR. HYNES:  Objection to form.
17     A.    I don't recall if that's a
18 normal time or not.  I don't have any reason
19 to not believe that it took me 15 minutes
20 this day.
21 QUESTIONS BY MR. GOETZ:
22     Q.    Okay.  And on some of these
23 days you took 15 minutes to review the IRR,
24 right?  You took less, sometimes, to actually
25 do the work than to actually go and have it

Page 359

1 printed and put it in the box.
2     A.    I can't speak to the quantity
3 of orders that were on the IRR for those
4 times either.
5         COUNSEL ON PHONE:  Hello?
6         MR. GOETZ:  Hello.
7 QUESTIONS BY MR. GOETZ:
8     Q.    The page numbers of the IRR,
9 the total pages, would give us a very good
10 indication of the quantity of orders on the
11 IRR, correct?
12     A.    Yes, I believe so.
13     Q.    Okay.  So, for example, I've
14 seen some IRRs from 2012 with three orders
15 per page and I've seen some from 2011 with
16 five orders per page.
17         Are you aware of that?
18         MR. HYNES:  Objection to form.
19     A.    I don't recall a time where
20 there was different orders, different
21 quantities of orders per page.
22 QUESTIONS BY MR. GOETZ:
23     Q.    Do you remember how many there
24 were in 2012?
25     A.    I'm sorry, how many of what?

Page 360

1     Q.    How many orders per page in
2 2012.
3     A.    I don't.
4     Q.    Did we look at 407?
5         MR. HYNES:  Yeah, we did.
6 QUESTIONS BY MR. GOETZ:
7     Q.    Could you go back to that.
8 Could you look at 11385, and you'll see
9 there's two -- two orders up top and then
10 what appears to be one blacked out?  Does
11 that refresh your recollection that there's
12 three pages per order?  Three orders per
13 page.
14     A.    Yes, in this IRR it does appear
15 that there would be three orders per page.
16     Q.    So, again, if we know how many
17 pages an IRR was, we have a really good
18 idea -- we can make a really good estimate
19 how many orders were on that, correct?
20         MR. HYNES:  Objection to form.
21     A.    Orders of all Schedule III, IVs
22 and Vs, yes.
23 QUESTIONS BY MR. GOETZ:
24     Q.    Everything you were supposed to
25 review, correct?

Page 361

1     A.    Yes.  Yes.
2     Q.    Right.  So everything on that
3 IRR, not just hydrocodone combination
4 products, you were supposed to review
5 everything that showed up on that IRR.
6     A.    Yes.  Every order that came
7 through on the IRR, we did the initial due
8 diligence.
9     Q.    Could you go to, within that,
10 it says:  Document produced in native format,
11 and that's 112683.
12         MR. HYNES:  Which exhibit?
13         MR. GOETZ:  We are on 415.
14         MR. HYNES:  That's the one you
15 were using -- it's the last one we
16 were using.
17         THE WITNESS:  Yes.  Which page?
18         MR. HYNES:  116283?
19         MR. GOETZ:  112683.
20 QUESTIONS BY MR. GOETZ:
21     Q.    And that is a time study from
22 7/12 of '12?
23     A.    Yes.
24     Q.    And that day you reviewed the
25 IRR dated July 11th, 2012?

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    A.    Yes.
2    Q.    You spent 35 minutes?
3    A.    According to the time study,
4  yes.
5    Q.    And you investigated one order
6  for additional due diligence, correct?
7    A.    According to this study, yes.
8    Q.    Okay.  And that was an order
9  for store 2438?
10   A.    Yes.  That does appear to be
11 2438.
12   Q.    Okay.  And again, to
13 investigate that order you took 20 minutes.
14   A.    Yes, approximately 20 minutes.
15   Q.    Again, during this time study
16 it shows a number of additional things you
17 were doing besides trying to investigate
18 suspicious orders.  Again I'm going to show
19 this to you.  This includes IRRs from
20 July 3rd, July 4th, July 6th, July 8th and
21 July 11th, five IRRs, and you investigated
22 one order for additional due diligence.
23   A.    Yes.
24   Q.    I'm handing you what's been
25 marked as 416.

Page 363

1        (CVS-Burtner Exhibit 416 was
2        marked for identification.)
3  QUESTIONS BY MR. GOETZ:
4    Q.    That is an e-mail dated
5  July 19th from you to Pam Hinkle?
6    A.    Yes.
7    Q.    And if you open it up, it says
8  "LP analyst time study"?
9    A.    Yes.
10   Q.    And the date of that study is
11 July 18th, 2012, correct?
12   A.    Yes.
13   Q.    And it has an IRR date of
14 7/17/12, correct?
15   A.    Yes, that is correct.
16   Q.    You spent 50 minutes?
17   A.    According to this, yes.
18   Q.    And you investigated zero
19 orders.
20       MR. HYNES:  Objection to form.
21   A.    According to the time study,
22 yes.
23 QUESTIONS BY MR. GOETZ:
24   Q.    You did on this day spend a
25 half hour at the second-to-last entry

Page 364

1  researching replacement pads for earmuffs,
2  didn't you?
3        Do you see the -- I go back to
4  the first page.  Right on the first page,
5  right under the SOM stuff, you research
6  replacement pads for earmuffs on this day,
7  right?
8    A.    Yes.  That's in reference to
9  safety equipment that we used in the
10 warehouse.
11   Q.    It has nothing to do with SOM,
12 does it?
13   A.    No.  At this time I was
14 splitting my effort between LP and analyst.
15   Q.    I'm going to hand you what's
16 been marked as 417.
17       (CVS-Burtner Exhibit 417 was
18       marked for identification.)
19 QUESTIONS BY MR. GOETZ:
20   Q.    That is an e-mail dated
21 August 23rd, 2012.  Do you see that?
22   A.    Yes.
23   Q.    And if you open it up it's a
24 time study from August 22nd, 2012, correct?
25   A.    Yes.

Page 365

1    Q.    And on that day you reviewed
2  the IRR from 8/21/12, correct?
3    A.    Yes.
4    Q.    You spent 30 minutes?
5    A.    According to the time study,
6  yes.
7    Q.    And you looked at zero orders
8  again, right?
9    A.    According to the time study.
10       MR. HYNES:  Objection to form.
11   A.    According to the time study.
12 QUESTIONS BY MR. GOETZ:
13   Q.    You did additional due
14 diligence on zero orders, correct?
15   A.    According to the time study on
16 this day.
17       (CVS-Burtner Exhibit 418 was
18       marked for identification.)
19 QUESTIONS BY MR. GOETZ:
20   Q.    I'm going to hand you what's
21 been marked as 418.  The front page indicates
22 that's an e-mail from you to Pam Hinkle dated
23 9/10 of '12?
24   A.    Yes.
25   Q.    And that is a time study from

Page 366

1  9 -- 9/7/12, correct?
2      A.    Correct.
3      Q.    And you reviewed the 9/6/12
4  IRR?
5      A.    Yes.
6      Q.    And it took you 15 minutes?
7      A.    According to the time study,
8  yes.
9      Q.    And on that day, you had two
10 orders for additional due diligence, correct?
11     A.    According to the time study,
12 yes.
13     Q.    And one was for order --
14 Store #3235?
15     A.    Yes.
16     Q.    And you took 10 minutes
17 investigating that, correct?
18     A.    On this day, yes.
19     Q.    And one was for order --
20 Store #828?
21     A.    Yes.
22     Q.    And you took 10 minutes, didn't
23 you?
24     A.    According to the time study,
25 yes.

Page 367

1      Q.    I'm going to show you one more.
2            No, I'm done.
3            MR. GOETZ:  Let me have 424 and
4  425.
5  QUESTIONS BY MR. GOETZ:
6      Q.    Do you have any reason to think
7  that those time studies we just looked at
8  don't accurately reflect --
9      A.    No, I do not.
10     Q.    -- your day?
11     A.    No, I do not.
12     Q.    I'm going to show you what's
13 been marked as 424 and 425.  424 is the
14 e-mail and 425 are the notes.  I apologize
15 for my reach.
16            (CVS-Burtner Exhibit 424 was
17     marked for identification.)
18            (CVS-Burtner Exhibit 425 was
19     marked for identification.)
20 QUESTIONS BY MR. GOETZ:
21     Q.    Do you see that e-mail?  That
22 is an e-mail from Craig Schiavo, and it's to
23 a number of people, including you?
24     A.    Yes, I see that.
25     Q.    And that's an e-mail dated

Page 368

1  November 29th, 2012, correct?
2      A.    Yes, that is the date.
3      Q.    And Mr. Schiavo indicates that
4  he's attaching his notes from that meeting
5  that you guys had, correct?
6      A.    Yes, I believe so.
7      Q.    It says:  List of opportunities
8  (my notes) from our meeting on 11/27?
9      A.    Yes, I see that.  Yes.
10     Q.    Okay.  And if -- could you go
11 to the notes, please?  Do you see it says:
12 Opportunities - Current SOM Process?
13     A.    Yes, I see that.
14     Q.    Could you go to paragraph 8,
15 please.
16     A.    Okay.
17     Q.    Paragraph 8 says:  100-plus
18 orders flagged by system, looked (past
19 history, algorithm, max/min).
20            That's the IRR, correct?
21            MR. HYNES:  Objection to form.
22     A.    I'm not 100% certain of what
23 he's referring to, but it would appear to be
24 the IRR.
25            --oOo--

Page 369

1  QUESTIONS BY MR. GOETZ:
2      Q.    What else flagged -- what else
3  flagged?
4      A.    Whenever we used the 5,000 dose
5  report, we had the hot list reports that we
6  were using.  But it would appear that this
7  was the IRR.
8      Q.    And then it says:  Two to three
9  were stopped by Aaron for review.
10     A.    Yes, I see that.
11     Q.    And then it says:  Deeper dive
12 review, dispensing versus ordering, reach out
13 to store.
14            That's what we were just
15 talking about on your timesheets, correct?
16     A.    Right, and those are high-level
17 steps that we would complete, yes.
18     Q.    I get it.
19            Does that -- is it fair to
20 assume that -- well, according to this IRR
21 time studies that looked at, I don't know,
22 over a dozen IRRs, you would investigate
23 anywhere from zero to three.
24            But is it fair to assume that
25 those notes are correct, you would normally

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 look at two to three orders per IRR for a
2 deeper-dive review?
3          MR. HYNES:  Objection to form.
4    A.   I don't -- I don't recall how
5 many orders I would look at.
6 QUESTIONS BY MR. GOETZ:
7    Q.   The time studies are probably
8 the best evidence of that, correct?
9          MR. HYNES:  Objection to form.
10    A.   Perhaps.  We looked at, what,
11 12 days over three months.
12 QUESTIONS BY MR. GOETZ:
13    Q.   Correct.
14    A.   So, I mean, it's a small sample
15 size, and on those specific days we can see
16 how many orders I reviewed.  I mean, I don't
17 know if that's enough information for me to
18 say that there's a percentage of orders per
19 IRR that I would review.
20    Q.   Mr. Burtner, you filled out
21 these time studies so CVS would have a
22 realistic and an accurate idea of, one, what
23 you were doing, and how many people were
24 needed in the SOM program, correct?
25          MR. HYNES:  Objection to form.

Page 371

1    A.   Yes, I believe that was part of
2 the reason.
3 QUESTIONS BY MR. GOETZ:
4    Q.   And you would fill those out
5 for typical days, correct?
6          MR. HYNES:  Objection to form.
7    A.   I believe I filled it out every
8 day, yes.
9 QUESTIONS BY MR. GOETZ:
10    Q.   Okay.  And trust me, to the
11 extent that there are IRRs in there that show
12 you're reviewing 40 or 50 or 20 orders a day,
13 your counsel will find them and point them
14 out.
15          MR. HYNES:  Is that a question?
16 QUESTIONS BY MR. GOETZ:
17    Q.   And I promise you there are
18 not, okay?
19          MR. HYNES:  Objection to the
20    question, narrative.
21 QUESTIONS BY MR. GOETZ:
22    Q.   My question is:  Based upon
23 what we've looked at, what percentage of
24 orders do you think you were reviewing?
25          MR. HYNES:  Objection, asked

Page 372

1 and answered, multiple times by
2 Mr. Baker and now by Mr. Goetz.
3          MR. GOETZ:  And now he's had a
4 chance to look at the time studies
5 that show what his day was, that shows
6 how many orders he investigated.
7          MR. HYNES:  I don't think he
8 said those have refreshed his
9 recollection.
10 QUESTIONS BY MR. GOETZ:
11    Q.   Did that refresh your
12 recollection?
13          MR. HYNES:  Listen, I objected.
14 I'll make the same objection again,
15 but I'm not telling him he can't
16 answer the question -- or try to
17 answer it again.
18    A.   I mean, it was six years ago
19 that I was reviewing orders.  I just don't
20 recall on a day-to-day basis what the
21 percentage was of the orders on the IRR that
22 I would typically flag.
23 QUESTIONS BY MR. GOETZ:
24    Q.   And you think that these notes
25 on Exhibit 425 that say two to three orders

Page 373

1 were stopped by Aaron for review, deeper
2 dive -- you think that that's not accurate?
3    A.   I also --
4          MR. HYNES:  Objection; calls
5    for speculation.
6          Go ahead.
7    A.   I also can't be certain that
8 he's absolutely referring to the IRR.  I
9 don't know why he wrote that.  I didn't write
10 it.  I don't know -- I don't know what it is
11 in reference to.
12 QUESTIONS BY MR. GOETZ:
13    Q.   Do you think that might be in
14 reference to the New Jersey 5,000 dose
15 report?
16    A.   I don't know what it's in
17 reference to.
18    Q.   Do you think it might be in
19 reference to the Florida 5,000 dose report?
20          MR. HYNES:  Objection.  He said
21 he doesn't know what it's in reference
22 to.
23          MR. GOETZ:  I'm asking.
24    A.   I don't know.
25          --oOo--

Page 374

1 QUESTIONS BY MR. GOETZ:
2    Q.   Okay.  I'm just asking why we
3 can't agree with what this says, why it's
4 such a struggle.  I just don't understand.
5        Let me ask you a question.  The
6 first paragraph of this talks about that this
7 relates to the algorithm, correct?
8    A.   Yes.
9    Q.   Right?
10   A.   Yes.
11   Q.   You guys were talking about the
12 algorithm.  In fact, the first paragraph,
13 which we know from talking to a bunch of
14 people, it says:  Lack of understanding as to
15 what characteristics make up the current
16 algorithm.
17       MR. HYNES:  Object to
18 commentary.
19 QUESTIONS BY MR. GOETZ:
20   Q.   Is that an accurate statement
21 based upon what your understanding was was
22 happening in 2012 at CVS?
23   A.   I can't speak as to the
24 understanding of others.  I had a high-level
25 understanding of the algorithm.  I don't know

Page 375

1 to whom he's referring to in this, in this
2 point.
3 QUESTIONS BY MR. GOETZ:
4    Q.   MicroStrategy was critical in
5 your deep-dive review, correct?
6        MR. HYNES:  Objection to form.
7    A.   I would say that it was a tool
8 that we used most primarily for a certain
9 time.
10 QUESTIONS BY MR. GOETZ:
11   Q.   Well, when was that time?
12   A.   When I initially reviewed the
13 IRR, when we would do a deep dive, once the
14 Store Metrics Report was created, it pulled
15 the information from MicroStrategy and the
16 other tools and displayed it in a way that
17 was easier for us to review.
18   Q.   Okay.  And I don't know if
19 you're aware of this.  I'm going to hand you
20 what's been marked as 400 and 401.
21       (CVS-Burtner Exhibit 400 was
22 marked for identification.)
23       (CVS-Burtner Exhibit 401 was
24 marked for identification.)
25            --oOo--

Page 376

1 QUESTIONS BY MR. GOETZ:
2    Q.   And 400 is an e-mail that you
3 sent to Steve Molina, correct?
4    A.   Yes.
5    Q.   On July 11th, 2012?
6    A.   Correct.
7    Q.   And who is Steve Molina?
8    A.   He was a loss prevention
9 manager at a CVS distribution center.  I
10 don't recall which -- which distribution
11 center.
12   Q.   And you sent him the template
13 for the project plan, correct?
14   A.   According to this document,
15 yes.
16   Q.   So this was a document that
17 indicated where you were on updating the SOM.
18 Is that fair?
19       MR. HYNES:  Objection to form.
20   A.   No.  I believe I sent him the
21 template of a project plan, not the SOM
22 project plan.
23 QUESTIONS BY MR. GOETZ:
24   Q.   Well, look at Exhibit 401.  Do
25 you see Exhibit 401?

Page 377

1    A.   Yes, I do.
2    Q.   That is what was attached to
3 your e-mail, according to the production made
4 by CVS?
5    A.   Okay.
6    Q.   So you actually sent him the
7 template of here's where we are, here's where
8 we've been, here's where we're going on the
9 SOM project plan, correct?
10       MR. HYNES:  Objection to form.
11 QUESTIONS BY MR. GOETZ:
12   Q.   Is that correct?
13       MR. HYNES:  Objection to form.
14   A.   I don't recall, but I don't
15 have any reason to believe that I didn't.
16 QUESTIONS BY MR. GOETZ:
17   Q.   Okay.  And if you look at 11,
18 do you see number 11, ID 11?
19   A.   Yes.
20   Q.   It says:  Ability to review
21 flagged orders in MicroStrategy (script
22 information, cash/insurance, drug summary).
23       Do you see that?
24   A.   Yes, I do.
25   Q.   And that start date was 2/27

Highly Confidential – Subject to Further Confidentiality Review

Page 378

1  of '12?
2       A.    I see that.
3       Q.    And the end date was 3/15
4  of '12, correct?
5       A.    Yes, that is correct.
6       Q.    You were one of the task owners
7  for that?
8       A.    Yes, I was.
9       Q.    And it indicates that:
10 Multiple reports are now available to review
11 top 10 project as well as IRR.
12          Correct?
13      A.    Yes.
14      Q.    And could you go to 21, please?
15          (Telephonic interruption.)
16          THE REPORTER:  Mute your
17 phones, please.
18 QUESTIONS BY MR. GOETZ:
19      Q.    Do you see 21?
20      A.    Yes, sir.
21      Q.    It says:  Begin reviewing
22 irregular store orders utilizing
23 MicroStrategy, capturing script information,
24 cash versus insurance, drug summary,
25 et cetera.

Page 379

1          And the start date of that was
2  February 29th of '12, correct?
3       A.    Yes.
4       Q.    According to this document that
5  you shipped out related to the IRR project
6  plan, MicroStrategy was not available for
7  review until sometime in February of 2012.
8       A.    Okay.
9       Q.    Do you have an understanding of
10 that?
11      A.    That is right at the beginning
12 of when I started this project, so I have no
13 reason to doubt that.
14      Q.    Okay.
15      A.    In my memory, that would
16 qual- -- that would seem as the beginning for
17 me.
18      Q.    Do you know what reports could
19 be generated by MicroStrategy?
20      A.    I'm sorry, could you repeat
21 that question?
22      Q.    Do you know what reports could
23 be generated by MicroStrategy?
24          MR. HYNES:  Objection to form.
25      A.    As in what information was

Page 380

1  there?
2  QUESTIONS BY MR. GOETZ:
3       Q.    Yes.
4       A.    Vaguely, some of the
5  information, yes.
6       Q.    What?
7       A.    I believe it was dispensing
8  history for a store and several data points
9  related to the script that was filled, such
10 as doctor, customer, payment method, how far
11 the customer had driven from their home to
12 the location, and there may have been other
13 information I'm not recalling.
14      Q.    Do you know what was used
15 before then?
16      A.    I do not know.
17      Q.    Okay.  You had also talked
18 about VIPER, correct?
19      A.    Yes.
20      Q.    And VIPER was just an inventory
21 control system, correct?
22          MR. HYNES:  Objection to form.
23      A.    I know we used several tools.
24 I don't -- MicroStrategy, I remember.
25 InfoPak, VIPER, I don't specifically remember

Page 381

1  what they were used for.
2  QUESTIONS BY MR. GOETZ:
3       Q.    Do you know what InfoPak was
4  used for?
5       A.    I don't remember.  I know those
6  were the tools that we used.  We used
7  MicroStrategy the most and then I would use
8  VIPER and InfoPak some.  I don't recall
9  specifically what for.
10      Q.    InfoPak was just where the data
11 resided, wasn't it?  I mean, I know you keep
12 talking about -- that was just where the data
13 was residing was on InfoPak?
14          MR. HYNES:  Objection to form;
15          calls for speculation.
16 QUESTIONS BY MR. GOETZ:
17      Q.    Did you work at CVS when you
18 were using InfoPak?
19      A.    Yes, I believe, yes.
20      Q.    Okay.  Did InfoPak -- was that
21 just the program where the data resided?
22      A.    I don't recall.
23      Q.    Mr. Burtner, I'm going to hand
24 you what's been marked as 420.  Actually,
25 strike that, because I think I might have one

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 that has headings you can read.
2          MR. HYNES:  Do you want to put
3    it up here?
4 QUESTIONS BY MR. GOETZ:
5    Q.    Yeah.  Mr. Burtner, I'm going
6 to hand you what's been marked as
7 Exhibit 422.
8          MR. HYNES:  So are we making
9    420 part of the record, or no?
10         MR. GOETZ:  No, you don't have
11   to.
12         MR. HYNES:  Give that back to
13   him.
14 QUESTIONS BY MR. GOETZ:
15   Q.    And that is what's been marked
16 as 422.
17        (CVS-Burtner Exhibit 422 was
18   marked for identification.)
19 QUESTIONS BY MR. GOETZ:
20   Q.    And that is a VIPERx PDMR -
21 High Priority report.
22        Do you see that?
23   A.    Yes, I do.
24   Q.    Okay.  Do you see where it says
25 store 7371?

Page 383

1    A.    Yes, I do.
2    Q.    Okay.  And tell me, what
3 information is shown on this report that
4 allows you to tell whether or not an order is
5 of unusual size?
6          MR. HYNES:  Objection to form.
7 QUESTIONS BY MR. GOETZ:
8    Q.    Strike that.
9          Is there any information on
10 this report to tell you whether or not an
11 order is of unusual size?
12   A.    I mean, I don't -- not to tell
13 me it was of an unusual size, but it is
14 information that we would have used to
15 further deep dive.
16   Q.    Is there any information on
17 this report that tells you whether or not an
18 order deviates substantially from a normal
19 pattern?
20         MR. HYNES:  Objection to form.
21   A.    No, it does not specifically
22 say that but --
23 QUESTIONS BY MR. GOETZ:
24   Q.    Sir --
25   A.    -- again, it's information that

Page 384

1 we would use to investigate that.
2    Q.    Is there any information on
3 this report that can tell you whether or not
4 an order is of unusual frequency?
5    A.    That would be the same as my
6 answer to the previous question.
7    Q.    Is there any information on
8 this report that would tell you whether or
9 not an order is likely to be diverted?
10   A.    No.  Again, same answer as
11 previously.
12   Q.    What this tells you is how much
13 was shipped to the pharmacy and how much was
14 dispensed from the pharmacy, correct?
15   A.    Correct.
16   Q.    It tells you whether or not
17 there's theft within that system, correct?
18         MR. HYNES:  Objection to form.
19   A.    Correct, but dispensed versus
20 shipped was information that we would use as
21 part of our investigation.
22 QUESTIONS BY MR. GOETZ:
23   Q.    To judge theft?
24         MR. HYNES:  Objection to form.
25   A.    No, not necessarily, because

Page 385

1 dispensed versus shipped is in a -- it's not
2 an even correlation.  It won't be one to one
3 because you will want to have some inventory
4 in stock.
5 QUESTIONS BY MR. GOETZ:
6    Q.    What else does it tell you?
7 Does it tell you whether or not a doctor is
8 prescribing an inordinate amount?
9    A.    No, it does not.
10   Q.    Does it tell you whether or not
11 patients are coming from faraway distances to
12 buy the drugs?
13   A.    No.  That's information we get
14 from MicroStrategy.
15   Q.    Does it tell you whether or not
16 there's unusually high cash purchases?
17   A.    No.  Again, that would be in
18 MicroStrategy.
19   Q.    Again, I asked you in the
20 beginning whether or not this was an
21 inventory tool.  Besides showing inventory,
22 what was shipped in and what was dispensed,
23 what else does it show?
24   A.    Like I said, when you asked me
25 that, I don't -- didn't recall what VIPER was

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1 specifically used for, and it makes sense,
2 because there isn't a ton of information here
3 that I would use, but there's some.
4 Q. For inventory, to figure out
5 whether or not there's theft, like when
6 you're investigating the cigarette shortage
7 or the theft of petty cash, correct?
8 MR. HYNES: Objection; asked
9 and answered.
10 A. That's also OV shipments here,
11 which is -- I'm not sure if that information
12 would be included in MicroStrategy.
13 QUESTIONS BY MR. GOETZ:
14 Q. Okay. I'm not asking about
15 MicroStrategy. Again, when you want to
16 figure out whether there's theft, we look at
17 outside vendor shipments, right?
18 A. Uh-huh.
19 Q. When we want to figure out
20 whether somebody is getting these drugs from
21 CVS and not paying for it, we look at outside
22 vendor orders, correct?
23 MR. HYNES: Objection. He
24 asked all about OV orders.
25 --oOo--

Page 387

1 QUESTIONS BY MR. GOETZ:
2 Q. And now we just talked about
3 this showing up here, correct?
4 A. Right. And this -- I don't
5 remember specifically, but this could have
6 been a tool that we used to see the OV
7 orders.
8 Q. Did you ever use it as a tool
9 to see the outside vendor orders?
10 A. I don't recall if I did or did
11 not.
12 Q. Okay. If you really wanted to
13 look at outside vendor orders as part of the
14 suspicious order monitoring, you could have
15 run them through your algorithm, correct?
16 MR. HYNES: Objection to form.
17 A. I don't -- sure. Yes.
18 QUESTIONS BY MR. GOETZ:
19 Q. I'm handing you what's been
20 marked as 402.
21 (CVS-Burtner Exhibit 402 was
22 marked for identification.)
23 QUESTIONS BY MR. GOETZ:
24 Q. That is an e-mail from you
25 dated December 24th, 2012, correct?

Page 388

1 A. Correct.
2 Q. And it appears that on that
3 day, you did a deep dive into four orders?
4 A. That's what it appears like,
5 yes.
6 Q. This was late in the month,
7 correct? When these would be getting big,
8 the IRRs.
9 MR. HYNES: Objection to form.
10 A. Yes. It was late in the month,
11 yes.
12 QUESTIONS BY MR. GOETZ:
13 Q. All right. And again, even
14 late in the month, we're at four orders.
15 A. Based on the people that are on
16 this e-mail, I believe this was only for the
17 Knoxville DC. The -- Shannon Miller was the
18 loss prevention manager, Janis and Jacob were
19 the pharmacy manager and supervisor at that
20 distribution center.
21 Q. We don't know because CVS has
22 blacked out the store numbers, correct?
23 A. Yes, I suppose that's one way
24 that we would have been able to verify.
25 Q. Could you go to the next page,

Page 389

1 3167?
2 A. Yes.
3 Q. And that says: SOM Daily
4 Extract Detail Report?
5 A. Okay. Yes, I see that. Yes.
6 Q. And that was some due diligence
7 you did to investigate this order?
8 A. Possibly. I don't recall this
9 form. This isn't a form that I recognize,
10 no.
11 Q. I'm going to show this to you
12 from a different order that wasn't yours --
13 A. Okay.
14 Q. -- that I believe might have
15 some more information, and hopefully you'll
16 refresh your recollection.
17 Keep that form, please.
18 (CVS-Burtner Exhibit 404 was
19 marked for identification.)
20 QUESTIONS BY MR. GOETZ:
21 Q. I'm handing you what's been
22 marked as 404. This e-mail appears that this
23 is an e-mail from Shauna Helfrich after she
24 investigated a couple of orders.
25 A. Okay.

Page 390

1    Q.    And if you look at 8498, do you
2  see that?
3    A.    Yeah.  Okay.  So I do vaguely
4  recall this form.  I don't remember where we
5  pulled it from, but it was the order
6  information for this store on that date, and
7  we would just include it as just a reference
8  document as part of the due diligence.
9    On Exhibit 404 -- oh, wait, I
10  saw -- wait, I'm sorry, apologies.
11    Q.    402?
12    A.    Yes, 402, the last page is the
13  Store Metrics Report, and this is what we
14  were using at that time as our primary.
15    Q.    I want to --
16    A.    Okay.  Apologies.  All right.
17    Q.    So this document that is 3167
18  of 402 and 8498 of 404, that was not a due
19  diligence document; that was just a document
20  that referenced the order?
21    MR. HYNES:  Objection to form.
22    A.    I don't recall what exactly we
23  were using it for, but I recall that we
24  attached it to every deep dive that we
25  completed, yes.

Page 391

1  QUESTIONS BY MR. GOETZ:
2    Q.    And it just actually, if you
3  look at the one from Shauna Helfrich, 8498,
4  it just actually references what the order
5  was, correct?
6    A.    I believe so, yes.
7    Q.    Yeah.  I mean, there's nothing
8  on there that is due diligence worthy, right?
9  There's nothing about cash, nothing about
10  doctors, nothing about patients, nothing
11  about how far they came from, nothing.
12  Correct?
13    MR. HYNES:  Object --
14  QUESTIONS BY MR. GOETZ:
15    Q.    And I understand you want to
16  talk about the store metrics, and we will.
17  I'm just asking about this document.
18    MR. HYNES:  Objection to form.
19    A.    Right.  This one piece of what
20  is attached does not reference any of that
21  information.
22  QUESTIONS BY MR. GOETZ:
23    Q.    Okay.  Now, I know you want to
24  talk about store metrics.  Correct?
25    MR. HYNES:  I'm not sure he

Page 392

1  wants to be here.
2  QUESTIONS BY MR. GOETZ:
3    Q.    And that is 3169 of
4  Exhibit 402.
5    A.    Okay.
6    Q.    Correct?
7    A.    Yes.
8    Q.    And that's what you talked
9  about with Mr. Baker and you talked about
10  here that shows all of that great
11  information, correct?
12    A.    Correct.
13    Q.    And it puts it in a usable
14  format, correct?
15    A.    Correct.
16    Q.    Puts it in a readable format?
17    MR. HYNES:  Objection, form.
18    A.    I mean, the information was
19  always -- it was always available and
20  readable.  This helped to further make our
21  reviews more efficient, yes.
22  QUESTIONS BY MR. GOETZ:
23    Q.    This report was not available
24  until really late in 2012, correct?
25    A.    I don't recall when this report

Page 393

1  became available to us.
2    Q.    I'm going to hand you what
3  we've marked as Exhibit 451.
4    Do you see that?
5    (CVS-Burtner Exhibit 451 was
6  marked for identification.)
7    A.    Yes.
8    MR. HYNES:  You need this copy.
9  Sorry.
10  QUESTIONS BY MR. GOETZ:
11    Q.    That's an e-mail from you to
12  Dean Vanelli and Pam Hinkle?
13    A.    Yes.
14    Q.    And it's about the Store
15  Metrics Report?
16    A.    Yes, according to this
17  document, we had received it and began using
18  it for the max cutoff orders on the IRR.
19    Q.    Okay.  And it says:  This
20  report has greatly reduced the amount of time
21  required to review these orders as the report
22  generates in a few seconds rather than the
23  few minutes required for MicroStrategy.
24    Correct?
25    A.    Yes, that's what it says.

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1    Q.    And so this report became your
2  go-to report?
3          MR. HYNES:  Objection to form.
4    A.    Yes, it became one of our key
5  sources for completing a deep dive.
6  QUESTIONS BY MR. GOETZ:
7    Q.    Do you see the second
8  paragraph?  Could you read that into the
9  record -- into the record.
10   A.    My concern is the dispensing
11  data populated on this report is from
12  June 2012 through August 2012 so this data is
13  already three months old and quickly
14  approaching four months old.
15   Q.    Was that ever fixed while you
16  were there?
17         MR. HYNES:  Objection to form.
18   A.    I don't recall if it was or was
19  not.
20  QUESTIONS BY MR. GOETZ:
21   Q.    And that problem with that data
22  being stale, almost the entirety of this
23  report, this Store Metrics Report, is
24  dispensing data, right?  Could you go back to
25  3169?

Page 395

1    A.    Yes, it is.
2    Q.    And CVS is not like other
3  distributors.  They could have this
4  information instantaneous, right, because
5  they're getting it from their own stores.
6          MR. HYNES:  Objection to form.
7    A.    I can't comment on the ability
8  to have the information displayed
9  instantaneously.
10  QUESTIONS BY MR. GOETZ:
11   Q.    Did anybody ever tell you,
12  "Hey, we can't -- we have to have it four
13  months old, it has to be stale data"?  Were
14  you ever told that?
15   A.    No, I was never told that it
16  needs to be stale data, no.
17   Q.    And to the extent that this was
18  a helpful report that comes about in December
19  of 2012, do you know any reason why it
20  couldn't have come about in 2011?
21         MR. HYNES:  Objection to form.
22   A.    No.  I am not aware of any
23  reasons of why it wasn't created sooner.
24  QUESTIONS BY MR. GOETZ:
25   Q.    And based upon you being SOM

Page 396

1  manager from December of '12 till June of
2  '13, do you know any reason why it couldn't
3  have come about in 2010?
4          MR. HYNES:  Objection to form.
5    A.    2010 was prior to my being on
6  the team.  I wasn't involved with any of
7  those conversations.  I don't know.  I'm not
8  aware of any reason of why it wasn't created
9  then.
10  QUESTIONS BY MR. GOETZ:
11   Q.    Do you have any idea why it
12  wasn't created in 2009?
13         MR. HYNES:  Objection to form.
14   A.    No, I do not.
15  QUESTIONS BY MR. GOETZ:
16   Q.    Okay.  What about in 2008?
17         MR. HYNES:  Same objection.
18   A.    That was prior to me being
19  employed by the company.  I have no reason to
20  know why it -- why or why not it wasn't
21  created in 2008.
22  QUESTIONS BY MR. GOETZ:
23   Q.    We talked about the due
24  diligence.  You can do due diligence that's
25  shown on the store metrics, which came about

Page 397

1  in December of 2012; you could do due
2  diligence from MicroStrategy, which gave you
3  the dispensing data, correct?  It would give
4  you a picture of the patient, it would give
5  you a picture of the pharmacy, correct, the
6  MicroStrategy?
7          MR. HYNES:  Objection to form.
8          Go ahead.
9    A.    I'm sorry, are you asking for
10  like a -- just building an overall picture of
11  the customer in the store?
12  QUESTIONS BY MR. GOETZ:
13   Q.    Yeah.
14   A.    Okay, all right.  I'm sorry, I
15  just wanted to confirm that you weren't
16  saying that this is a picture of this one.
17         Yes, that is correct.
18   Q.    Okay.  You talked with
19  Mr. Baker earlier about you could call a
20  pharmacy?
21   A.    Yes, that is correct.
22   Q.    Okay.  We just talked about you
23  could look at VIPER and see if anything is
24  being stolen, correct?
25   A.    Yes, that is correct.

Page 398

1    Q.    Is there any due diligence that
2  I'm missing?
3         MR. HYNES:  Objection to form.
4    A.    Sitting here today, I cannot
5  say definitively that you're missing
6  anything.  I don't recall anything else that
7  we were doing, no.
8  QUESTIONS BY MR. GOETZ:
9    Q.    Okay.  And Mr. Baker had gone
10 through that entire list with you, which is
11 kind of what we just talked about, correct?
12   A.    Correct.
13   Q.    Could you go back to 406?
14        MR. HYNES:  Which one was that?
15        MR. GOETZ:  That was the chart.
16        THE WITNESS:  Oh, the flow map.
17        MR. HYNES:  Oh, the flow map.
18   A.    Okay.
19 QUESTIONS BY MR. GOETZ:
20   Q.    When you had -- could you go to
21 the second page of that, please?
22   A.    Yes.
23   Q.    When you had talked with
24 Mr. Baker, you talked about top 10 reports,
25 correct?

Page 399

1    A.    Yes.
2    Q.    And you had talked about top
3  100 reports, correct?
4    A.    Yes.
5    Q.    Okay.  And this flowchart on
6  page 2, that is an encapsulation of that
7  process of reviewing those high-volume
8  stores?
9         MR. HYNES:  Objection to form.
10   A.    This is the process that we
11 would use for reviewing an order that was
12 flagged after the initial due diligence on
13 the IRR.
14 QUESTIONS BY MR. GOETZ:
15   Q.    Could you look at 2?
16   A.    Page 2?
17   Q.    Page 2.
18   A.    Starting with circle B?
19   Q.    Yeah.  It says:  Do any high
20 stores need to be reviewed?
21        Circle B --
22   A.    Oh, okay.
23   Q.    Wait, stop.  We'll go to the
24 front page.  Circle B was, I reviewed the IRR
25 and I did the deep dive on any stores and I'm

Page 400

1  done with my deep dive, correct?
2    A.    Yes.  Okay.
3    Q.    I've put it in the file, I've
4  filed it all, it's on the recap spreadsheet,
5  and now do I need to review any high-volume
6  stores, correct?
7    A.    Okay.  Yes, I see that now,
8  yes.
9    Q.    Okay.  And so that's what this
10 page 2 is, correct?
11   A.    Yes.  Yes.
12   Q.    And so this page 2, when you
13 would review high-volume stores, you would
14 look at one thing, correct?  First thing
15 you'd look at?
16        MR. HYNES:  Objection to form.
17   A.    Yes.  I believe the first thing
18 that we would look at was we would use those
19 MicroStrategy.
20 QUESTIONS BY MR. GOETZ:
21   Q.    And what would you look at?
22   A.    The same information that we'd
23 look at for a deep dive on an order from the
24 IRR, common doctor, common patient, cash
25 sales, distance traveled.

Page 401

1    Q.    That is not what this says, is
2  it?
3    A.    Going down:  Review
4  MicroStrategy report, identifying cash orders
5  with common doctor or common patient.
6    Q.    It says:  Using MicroStrategy,
7  run a report to retrieve all necessary
8  information to review all cash sales at that
9  store in the previous four weeks.
10        Correct?
11   A.    Okay.  Yes.
12   Q.    And then it says:  Review
13 MicroStrategy report, identifying cash orders
14 with common doctor and/or common patient.
15        Correct?
16   A.    We prioritized cash sales
17 over -- cash sales included drug cards, so
18 anything over -- we prioritized those over
19 insurance sales.
20   Q.    My question is:  When you
21 looked at high-volume stores, you looked at
22 cash sales, correct?
23        MR. HYNES:  Objection to form.
24   A.    Correct.
25        --oOo--

Page 402

1  QUESTIONS BY MR. GOETZ:
2      Q.   And if there was not a trend
3  identified with cash sales, then you were
4  done, correct?
5      MR. HYNES:  Objection to form.
6  QUESTIONS BY MR. GOETZ:
7      Q.   Can you read that, sir?  Is
8  that what -- can you read that spreadsheet?
9  Is that what that indicates?
10     A.   Yes.  If there was not a trend
11 of cash sales with common doctors or common
12 patients or both, at that point we would
13 document it on the recap spreadsheet and move
14 on.
15     Q.   So as long as the high-volume
16 stores had a lot of insurance people, they
17 would never, ever be investigated beyond
18 that, regardless of how high the volume
19 was --
20     MR. HYNES:  Objection to form.
21 QUESTIONS BY MR. GOETZ:
22     Q.   -- based upon the high-volume
23 store review?
24     MR. HYNES:  That's not what he
25 said earlier.  Objection to form.

Page 403

1      A.   According to this flow map,
2  although I don't remember that being the
3  process.
4  QUESTIONS BY MR. GOETZ:
5      Q.   That -- according to this,
6  that's what it was, correct?
7      A.   According to this document,
8  yes.
9      Q.   You would not have put
10 something --
11     (Telephonic interruption.)
12     THE VIDEOGRAPHER:  We are now
13 going off the record, and the time is
14 3:28 p.m.
15     (Recess taken, 3:28 p.m. to
16 3:37 p.m.)
17     THE VIDEOGRAPHER:  We are now
18 going back on the record, and the time
19 is 3:37 p.m.
20 QUESTIONS BY MR. GOETZ:
21     Q.   Mr. Burtner, could you go back
22 to page 2 of Exhibit 406?
23     A.   Okay.
24     Q.   And it's only after you
25 identified trends of cash orders that you

Page 404

1  actually used MicroStrategy to look at the
2  other types of due diligence we talked about,
3  and that's only if you identified trends of
4  cash, correct?
5      MR. HYNES:  Objection to form.
6      A.   According to this document,
7  yes.  I don't recall that being the process.
8  QUESTIONS BY MR. GOETZ:
9      Q.   Should we go back to the
10 e-mail?  You actually sent this document out,
11 correct?
12     A.   Yes, I believe I did.
13     Q.   It's 462, you actually sent it
14 to Paul Lawson and Pam Hinkle?
15     A.   Okay.
16     MR. HYNES:  It's right here.
17     THE WITNESS:  Okay, thank you.
18     A.   Yes.
19 QUESTIONS BY MR. GOETZ:
20     Q.   You didn't tell them, "Hey,
21 disregard page 2, it's wrong"?
22     A.   No, I did not in the e-mail,
23 no.
24     Q.   All right.  And in any event,
25 when you do that, then at the end, you

Page 405

1  document the review on the recap spreadsheet,
2  correct?
3      A.   Yes.  According to this flow
4  map, yes.
5      Q.   So again, if you do a review of
6  a high-volume store, that should show up on a
7  recap spreadsheet.
8      MR. HYNES:  Objection to form.
9      A.   Yes, according to the flow map,
10 yes.
11 QUESTIONS BY MR. GOETZ:
12     Q.   Could you go back to 407,
13 please?  You talked in depth with Mr. Baker
14 about the algorithm, correct?
15     A.   Yes.
16     Q.   And it's fair to say we can
17 agree that the algorithm is incredibly
18 complicated?
19     A.   I think that's a fair
20 statement.
21     Q.   All right.  How the math works,
22 you have no idea?
23     MR. HYNES:  Objection to form.
24     A.   I have a high-level
25 understanding, but no.  Mathematician, down

Highly Confidential – Subject to Further Confidentiality Review

Page 406

1 to the nitty-gritty detail, no.
2 QUESTIONS BY MR. GOETZ:
3     Q.    So that is about the fourth or
4 fifth --
5         MR. GOETZ:  No, stop.  I
6     want -- come here.  I actually want
7     that document and I don't want the
8     others.
9 QUESTIONS BY MR. GOETZ:
10    Q.    That's about the fourth time
11 you said you have a high-level understanding.
12    A.    Okay.
13    Q.    So what you mean by that is you
14 have a high level of understanding that the
15 algorithm is looking for unusual orders?
16        MR. HYNES:  Objection to form.
17 QUESTIONS BY MR. GOETZ:
18    Q.    What does that mean?
19    A.    Orders of unusual size, unusual
20 order frequency, and unusual pattern.
21    Q.    Okay.  So that's what -- you
22 understand that the algorithm is looking for
23 orders of unusual size, unusual frequency,
24 unusual pattern, correct?
25    A.    Yes.  That was my

Page 407

1 understanding.
2     Q.    I'm going to write that down.
3         What else is your high-level
4 understanding?
5     A.    Of the algorithm, that was --
6 that was it.
7     Q.    Okay.  You have no idea how
8 that algorithm calculates what is unusual
9 size, do you?  You don't know how that math
10 works?
11    A.    No, I do not.
12    Q.    You don't know what the
13 coefficients were?
14    A.    No, I did not.
15    Q.    You don't know what the inputs
16 are?
17    A.    Huh-uh.
18        MR. HYNES:  Objection to form.
19    A.    I believe the orders were the
20 inputs.  I don't know.
21 QUESTIONS BY MR. GOETZ:
22    Q.    You don't, do you?
23        Unusual frequency, do you know
24 what the math is?
25    A.    No, I do not.

Page 408

1     Q.    Do you know what the
2 coefficients are?
3     A.    No, I do not.
4     Q.    Do you know what the pattern
5 is?
6     A.    No, I do not.
7     Q.    Okay.  Could you turn to 11396,
8 please, within that document?
9     A.    Okay.
10    Q.    Do you see that?
11    A.    11396?
12    Q.    Yes, sir.
13    A.    Yes.
14    Q.    And so do you see that that
15 order is a score of 1?
16    A.    Yes.
17    Q.    That's the highest it can be,
18 correct?
19    A.    I don't recall what the highest
20 number was for a score.
21    Q.    When you started, anything
22 over .65 was what flagged on the algorithm,
23 correct?
24    A.    Yes, that is correct.
25    Q.    Okay.  And when you started --

Page 409

1 strike that.
2         That number 1, can you tell me
3 anything what that says about unusual size,
4 that number?
5     A.    The score number indicates -- I
6 don't recall today specifically what the
7 score is intended to indicate, but it was
8 something I knew at the time.
9     Q.    The score just indicates that
10 the algorithm has identified this order as
11 potentially suspicious, correct?
12    A.    According to the definitions
13 within the IRR, yes, I believe so.
14    Q.    That's what that score means.
15 And so my question is, looking at that score,
16 all you know is that the algorithm says this
17 order is potentially suspicious, correct?
18        MR. HYNES:  Objection to form.
19    A.    Yes, I believe that is correct.
20 QUESTIONS BY MR. GOETZ:
21    Q.    And what you know is that that
22 order is above .65 and is potentially
23 suspicious, correct?
24        MR. HYNES:  Objection to form.
25    A.    Yes.

Page 410

QUESTIONS BY MR. GOETZ:

Q.   Okay.  And actually, if you go back to the pages you were looking at earlier, which is 11361, if you look at Score, it says:  Higher the score, the more -- higher the score, comma, more irregular the order is.

Correct?

A.   Yes, that is what it says.

Q.   So that we know that the algorithm considers this order at 1.0 more irregular than an order at .9.

A.   Yes, that would be my understanding.

Q.   In any event, though, the algorithm considers this order as potentially suspicious.

MR. HYNES:  Objection to form.

A.   Yes, I believe that is the case.

QUESTIONS BY MR. GOETZ:

Q.   And you went through it earlier, but we don't have to rehash.  It was .15 and then it was internally manipulated to be .65.  We won't go through

Page 411

that.  But --

MR. HYNES:  Objection to the commentary.

QUESTIONS BY MR. GOETZ:

Q.   If you look at this order -- I want to try to find out what you do know from looking at this Item Review Report.  Can you go back to 11396?

A.   Okay.

Q.   Where it says Store, we can agree that's the store number?

A.   Yes.

Q.   And it says SOM key, that's hydrocodone, correct?

A.   Yes.

Q.   Okay.  We can agree to that.

Item number, do you know what that is?

A.   I believe that was the internal CVS item number for this particular item.

Q.   And Description, again, that's what you were talking about earlier with the top 10 reports, 5/500?

A.   Yes, I believe so.

Q.   And the UPC/NDC code, that's

Page 412

the national drug code, correct?

A.   Yes.

Q.   And Invoice Number, is that the order number?

A.   I don't know.  That wasn't information that I would have used.

Q.   Bill Quantity, do you know what that is?

A.   I believe that's the quantity that the store is being billed.

Q.   Okay.  Order Quantity?

A.   I believe that's the order -- the quantity that the store had ordered.

Q.   Unit of Measure?

A.   I don't -- I don't recall specifically.  I really -- I really don't recall.

Q.   Would you use that for due diligence?  Strike that.

Would you use that to review whether or not to do a deep dive?

A.   I don't recall.

Q.   What about Extended Quantity?

A.   That, I don't know what that is.

Page 413

Q.   Okay.  Binary Day, do you know what that is?

A.   Yes.  That is measuring whether or not the order is a frequent pattern and whether the order frequency is regular.

Q.   Okay.  And what about Trend Above Month?

A.   I don't recall what Trend Above Month stands for.

Q.   What about Trend Slope?

A.   Or Trend Slope.

Q.   What about where it says frequent -- or FREQRD6, 12, and do you know what those are?

A.   I don't recall.  These were things I would have known at the time.

Q.   You think you would have known what those meant?

A.   Yes.  I mean, I used them quite a -- you know, for a portion of every single day.  I just haven't looked at them in a long time, so I don't recall specifically what these were.  These -- we didn't place as much weight on these specific data points because --

Page 414

1  Q.  On which specific data points?
2  A.  The second row, because it's
3  always either a 0 or a 1, so there's not as
4  much -- there's not as much PZ data there as
5  with the second row, the PZ scores, where
6  it's obviously much more precise.
7  Q.  That second row data point,
8  that's already captured in the score, isn't
9  it?
10  A.  I don't know.
11  Q.  You don't know?
12  A.  Oh, the ones we were just
13  speaking of, Binary Day, Trend Above Month?
14  Q.  Yeah.
15  MR. HYNES:  Objection to form.
16  Go ahead.
17  A.  Oh. I don't know.
18  QUESTIONS BY MR. GOETZ:
19  Q.  You don't know, okay.
20  What about the third row data
21  points everywhere other than Score?  Do you
22  know what those mean?
23  A.  So each one had to do with the
24  standard deviation away from the average over
25  a specific time frame that this current month

Page 415

1  was, so anything that was -- the 6 Range
2  would be over the previous six months, 12
3  Range would be over the last 12 months.  The
4  PZSCORE12MAXRANGE, that is the standard
5  deviation that the current month is above the
6  largest total volume month over the last 12
7  months.
8  So for this one it would be
9  compared to Lag 11, I believe.  I don't see
10  Lag 12. Oh, yeah.  5.
11  Q.  And so would an order of 1.376
12  where it says PZSCORE12MAXRANGE, is that
13  concerning?
14  MR. HYNES:  Objection to form.
15  A.  I don't recall what we would
16  consider a concerning score versus a
17  non-concerning score.
18  QUESTIONS BY MR. GOETZ:
19  Q.  I'm just trying to figure out
20  how you get to the two to three orders that
21  you choose to investigate.  I'm just trying
22  to understand that.
23  Where it says MTD, 131.727, do
24  you know what that is?
25  A.  It's the month-to-date volume.

Page 416

1  Q.  What does that mean?
2  A.  I believe it was the
3  month-to-date doses that the store had
4  ordered.
5  Q.  And those lags, then, Lag 1
6  through Lag 11, those are the prior months'
7  orders other than this current month,
8  correct?  So Lag 1 would be orders from one
9  month ago?
10  A.  Yes, I believe so.
11  Q.  Those are actually about the
12  only thing on there that's understandable
13  besides the score?
14  MR. HYNES:  Objection to form.
15  A.  I don't entirely agree with
16  that.  We used the other information.  Like I
17  said, at the time I knew what it meant.
18  Sitting here today, it's -- sitting here
19  today, it's almost like speaking a new
20  language.  But at the time, I knew the
21  language.
22  QUESTIONS BY MR. GOETZ:
23  Q.  Does the language on there tell
24  us the current week quantity ordered?
25  A.  Possibly, but possibly not.

Page 417

1  Q.  Okay.  Does it tell me the
2  month-to-date quantity ordered?
3  A.  Yes, it does.
4  Q.  Tells me the previous 12-month
5  lag, correct?
6  A.  Yes, it does.
7  Q.  And tells me the potential for
8  abuse of the drug, correct?
9  MR. HYNES:  Objection to form.
10  QUESTIONS BY MR. GOETZ:
11  Q.  That's why it's on there,
12  correct?
13  MR. HYNES:  Objection to form.
14  A.  I mean, not necessarily.
15  QUESTIONS BY MR. GOETZ:
16  Q.  Hydrocodone we know has a high
17  potential for abuse, correct?
18  MR. HYNES:  Objection to form.
19  A.  Yes.  It is understood that
20  hydrocodone has a high --
21  QUESTIONS BY MR. GOETZ:
22  Q.  And does it tell me if that's a
23  single item or multiple items?
24  MR. HYNES:  Objection to form.
25  A.  I believe this is a single --

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1 this is a single item.
2 QUESTIONS BY MR. GOETZ:
3 　Q.　I'm going to show you what's
4 been marked as 431.
5 　　(CVS-Burtner Exhibit 431 was
6 　　marked for identification.)
7 QUESTIONS BY MR. GOETZ:
8 　Q.　Do you recognize that document?
9 　A.　Not really, no. Well, I
10 recognize that it's the data from the IRR but
11 I don't recognize it in this form.
12 QUESTIONS BY MR. GOETZ:
13 　Q.　It actually is -- if you look
14 at 7622, it's a row of columns, correct?
15 Columns and rows?
16 　A.　Yes.
17 　Q.　And 7623 is a continuation of
18 those columns?
19 　A.　Yes, it appears so.
20 　Q.　And 7624 is a continuation of
21 those columns?
22 　A.　Yes. I mean, it appears to be
23 going right to left.
24 　Q.　It goes Lag 2 and then 7625 is
25 the Lag 3 to Lag 10, correct?

Page 419

1 　A.　Yes.
2 　Q.　And then 7626 is Lag 11 and 12,
3 correct?
4 　A.　Correct.
5 　Q.　That is all of the data that's
6 captured on the IRR in a separate format. Is
7 that correct?
8 　　MR. HYNES: Objection to form.
9 　A.　I'm not sure what C1, C2 is.
10 Otherwise, yes, I believe this is the
11 information that is collected on the IRR.
12 QUESTIONS BY MR. GOETZ:
13 　Q.　Okay. And if you look on what
14 is 7624, that says Score, correct?
15 　A.　Yes.
16 　Q.　And those are all above .65,
17 correct, if you look down?
18 　A.　Yes, I believe so.
19 　Q.　All right. And if you look at
20 the date column, it says 12/31/12?
21 　A.　Yes, it does.
22 　Q.　And those are all -- these are
23 all, then, the orders as flagged by the
24 algorithm that were potentially suspicious
25 for 12/31/12, correct?

Page 420

1 　　MR. HYNES: Objection to form.
2 QUESTIONS BY MR. GOETZ:
3 　Q.　I'll tell you, I'm going to
4 make it easier for you. We have actually
5 pieced this together and it's one gigantic
6 sheet and I'll let you look at it, okay?
7 　A.　Okay. I have no reason to
8 believe that this isn't the same exact data
9 yet.
10 　　MR. GOETZ: We -- and then to
11 　the extent that Mr. Hynes disagrees
12 　with it, he can look at the different
13 　Bates numbers --
14 　　MR. HYNES: I'm just objecting
15 　because I don't think it's fair to ask
16 　him this has -- everything this has on
17 　it when it's 500 pages long sitting in
18 　a deposition.
19 　　MR. GOETZ: Look, I --
20 　　MR. HYNES: It's just an unfair
21 　question, Dan. He can't answer that.
22 　　MR. GOETZ: Mr. Hynes, it is
23 　CVS's algorithm that flagged all these
24 　orders as above .65. And I do
25 　understand the ridiculousness of the

Page 421

1 size, and that is our point, is the
2 ridiculousness of --
3 　　MR. HYNES: All I'm saying
4 　is --
5 　　MR. GOETZ: -- 1200 orders from
6 　one day that need additional due
7 　diligence.
8 　　MR. HYNES: But you're asking
9 　him whether this is the same as the
10 　IRR, and I'm just saying he can't
11 　answer that unless you want to let him
12 　sit here for a couple hours and
13 　compare each page.
14 　　MR. GOETZ: I'm not asking him
15 　if it's the same as the IRR -- stop,
16 　let me complete. That IRR is from
17 　12/28.
18 　　MR. HYNES: Okay.
19 　　MR. GOETZ: This is from 12/31.
20 　What I asked is: Does it show
21 　the same information as the IRR?
22 　　MR. HYNES: Okay. I
23 　misunderstood the question.
24 　　MR. GOETZ: Can we go off the
25 　record for a second?

Page 422

1    MR. HYNES: We shouldn't go off
2 the record.
3    MR. GOETZ: We won't go off the
4 record, that's fine.
5    (Discussion off the
6 stenographic record.)
7    THE WITNESS: Have we seen this
8 before?
9    MR. HYNES: No, this is a
10 first.
11    MR. GOETZ: Mr. Hynes, you
12 absolutely can look to make sure that
13 all of these Bates numbers that are
14 shown here show up on this chart. So
15 you can see how it was created. We
16 did not have this in a native format.
17 This is crazy.
18    Mr. Burtner, could you come
19 over here for a second, and then I'll
20 ask you some questions.
21    THE VIDEOGRAPHER: You'll have
22 to take off your mic. I'll use the
23 table mic.
24    THE REPORTER: Please speak up
25 so I can hear you, gentlemen.

Page 423

1    MR. HYNES: I'll just state
2 this standing objection. Assuming it
3 would take a half hour to confirm it,
4 I'll just will object to this document
5 as incomplete.
6    MR. GOETZ: That's fine. Do
7 you think there are more orders we
8 missed?
9    MR. HYNES: I just don't know,
10 and I'm not going to waste your time.
11 QUESTIONS BY MR. GOETZ:
12    Q.    This is actually the beginning
13 of the chart, and so right here is the score.
14    Do you see that, Mr. Burtner?
15    A.    Yes.
16    Q.    So we can do a line all the way
17 down here. See that?
18    A.    Yes.
19    Q.    As we keep going down, could
20 you look at what I highlighted and tell me --
21 or just look and put your finger down on all
22 those above .65.
23    MR. BAKER: Mr. Hynes, could
24 you step out of the camera shot?
25    A.    I don't believe I see any that

Page 424

1 are more than .65.
2 QUESTIONS BY MR. GOETZ:
3    Q.    I've looked at it a number of
4 times. I haven't, but there might be one
5 that snuck in there that you guys might have
6 done wrong.
7    And if you look over here, it
8 gives a date, correct? Do you see that over
9 there?
10    A.    Yes. Yes.
11    Q.    And that date is what date?
12    A.    12/31/2012.
13    Q.    And if we come over here, where
14 again, this is a continuation of that chart,
15 what date is on here, all of them?
16    A.    Again, 12/31/2012.
17    Q.    And again, feel free, I'll
18 count the number over for the scores so we
19 can guarantee the scores are correct. The
20 score is actually on the third page over,
21 it's one, two, three -- the fourth line of
22 numbers.
23    MR. HYNES: Where is the score,
24 Dan? We have to look close enough.
25 That's the score, right?

Page 425

1    A.    All these are below .65.
2 QUESTIONS BY MR. GOETZ:
3    Q.    Do you know why those would be
4 in there? How many of those are below .65?
5    A.    Most of them on this little
6 printout are.
7    Q.    Do you know why those are on
8 here?
9    A.    I have no idea.
10    Q.    Because of the max cutoff?
11    A.    I have no -- I have no idea.
12    Q.    Well, if you look at the C1 and
13 C2, those lines over here, that gives us a
14 cutoff, correct?
15    MR. HYNES: Objection, he said
16 he didn't know what those were. Calls
17 for speculation.
18    A.    I don't know what the C1, C2
19 is.
20 QUESTIONS BY MR. GOETZ:
21    Q.    Fair enough.
22    We know to 7712 all of these
23 orders are identified as potentially
24 suspicious, correct?
25    MR. HYNES: Objection to form.

Highly Confidential – Subject to Further Confidentiality Review

Page 426

1 QUESTIONS BY MR. GOETZ:
2    Q.    That entire chart and all the
3 way to here?
4        MR. HYNES:  Objection to form.
5    A.    According --
6 QUESTIONS BY MR. GOETZ:
7    Q.    Based upon the score.
8        MR. HYNES:  Objection to the
9 form.
10    A.    Based upon the score, yes, that
11 would be the indication from the algorithm.
12 QUESTIONS BY MR. GOETZ:
13    Q.    And at this point, you had
14 entered in the max cutoff ratio, correct?
15    A.    In December of 2012, yes, I
16 believe we had.
17    Q.    And you had entered in the max
18 volume, correct?
19    A.    Yes.
20    Q.    And oftentimes you would get a
21 max volume flag with a variable score,
22 correct?
23    A.    That, I don't -- I do not
24 recall.
25    Q.    Can you tell me, just this

Page 427

1 chart here, how would you pick three or four
2 orders to investigate?
3        MR. HYNES:  Objection to form.
4    A.    Looking at the different data
5 points in the IRR.
6 QUESTIONS BY MR. GOETZ:
7    Q.    What data points?  We can go
8 sit.
9        What data points, Mr. Burtner?
10 To look at that order, that's 600 orders,
11 Mr. Burtner, on that right chart.
12        MR. HYNES:  Objection to form.
13    A.    On 12/31, I wasn't the only
14 person reviewing.
15 QUESTIONS BY MR. GOETZ:
16    Q.    The IRR?
17    A.    I don't recall specifically
18 what I was looking at, but it was a
19 combination of the information on the IRR.
20    Q.    And just so we're clear, that
21 right chart looks overwhelming to me.  Does
22 it look overwhelming to you in that format?
23        MR. HYNES:  Objection.
24 Objection to form.
25    A.    I can't comment as to whether

Page 428

1 or not it's overwhelming.  I mean, I can't
2 say that it was overwhelming to me at the
3 time.
4 QUESTIONS BY MR. GOETZ:
5    Q.    Okay.  And that's 600 orders.
6 There were times where over 3,000 orders were
7 flagged, correct?  Mr. Baker showed that to
8 you earlier?
9    A.    What he showed to me was a
10 combination of two days.
11    Q.    Okay.  That you would have to
12 review, correct?
13        MR. HYNES:  Objection to form.
14    A.    Myself and my team.
15 QUESTIONS BY MR. GOETZ:
16    Q.    In one day?
17    A.    Yes.
18    Q.    By 10:30 or 11:00, normally,
19 correct?
20    A.    No.
21    Q.    No?
22    A.    No.  2:00 p.m., East Coast, so
23 typically by 2:00 p.m. local time, we would
24 need to communicate to the distribution
25 centers.

Page 429

1    Q.    And there were three ways an
2 order could be identified as potentially
3 suspicious, correct?
4    A.    Three ways?
5    Q.    Yes.
6    A.    Such as --
7    Q.    One is the score.
8    A.    Okay.
9    Q.    One is maximum cutoff volume.
10    A.    Yes.
11    Q.    And one was a maximum cutoff
12 ratio, correct?
13    A.    Yes, that is --
14        MR. HYNES:  Objection to form.
15    A.    Yes, that is correct.
16 QUESTIONS BY MR. GOETZ:
17    Q.    Okay.  I'm going to hand you
18 what we've marked as 432.
19        (CVS-Burtner Exhibit 432 was
20        marked for identification.)
21 QUESTIONS BY MR. GOETZ:
22    Q.    Could you go to the second
23 page, please?
24    A.    Yes.
25    Q.    And that score shown on 11264,

Highly Confidential – Subject to Further Confidentiality Review

Page 430

1 that second order flagged onto this report
2 because of score, correct?
3     A.    I would believe so.  It's
4 a .69.
5     Q.    Okay.  And can you go up to the
6 first page.  And that was put on this order
7 why?  It was put onto this form why?
8     A.    Based on the note on the form
9 it was added based -- due to the maximum
10 cutoff volume exceeded.
11     Q.    And maximum cutoff volume was
12 what?
13     A.    I don't remember the specifics.
14     Q.    Maximum cutoff volume is just a
15 limit, correct?  A threshold?
16         MR. HYNES:  Objection to form.
17     A.    Yes, but I don't recall how the
18 threshold was established.
19 QUESTIONS BY MR. GOETZ:
20     Q.    Okay.  But it is just a
21 threshold?
22         MR. HYNES:  Objection to form.
23     A.    Yes, I believe so.
24 QUESTIONS BY MR. GOETZ:
25     Q.    Okay.  Are you aware when that

Page 431

1 was put in?
2     A.    I don't recall.  Summer of
3 2012.
4     Q.    I'll show you a document, maybe
5 it will refresh your recollection.  I'm
6 handing you what's been marked as 436.  Keep
7 that document in front of you, please.
8         (CVS-Burtner Exhibit 436 was
9     marked for identification.)
10 QUESTIONS BY MR. GOETZ:
11     Q.    If you look at the bottom of
12 this document it's an e-mail from you to
13 Crystal Pike.
14     A.    Okay.
15     Q.    Do you see that?
16     A.    Yes.
17     Q.    And the second paragraph of
18 that reads:  The max cutoff field began
19 appearing on the IRR on 10/11/12.
20     A.    Okay.
21     Q.    So does that refresh your
22 recollection that was about the time that it
23 was added?
24     A.    I mean, it doesn't necessarily
25 refresh my recollection, but I don't have any

Page 432

1 reason to disagree with that.  10/11 sounds
2 accurate.
3     Q.    And this report, let's go back
4 to the maximum cutoff volume.  The
5 month-to-date is 598.144, correct?
6     A.    Yes, according to the report.
7     Q.    A large amount, correct?
8         MR. HYNES:  Objection to form.
9 QUESTIONS BY MR. GOETZ:
10     Q.    Mr. Burtner, you reviewed these
11 for over a year, correct, these types of
12 reports?
13     A.    Yes, I did.
14     Q.    Okay.  Is 598.144 of
15 hydrocodone 7.5/500 a large amount of that
16 drug?
17         MR. HYNES:  Objection to form.
18     A.    I don't recall how this would
19 compare to other benchmarks for stores.
20 QUESTIONS BY MR. GOETZ:
21     Q.    Was it a large amount of that
22 drug to flag for maximum cutoff volume
23 exceeded, meaning too much?
24         MR. HYNES:  Objection to form.
25     A.    There's too many other factors

Page 433

1 that aren't -- that I don't see right here to
2 comment on whether this was a large amount or
3 not.
4 QUESTIONS BY MR. GOETZ:
5     Q.    What are those factors?
6 That -- I mean, we see the month-to-date.
7 What are the other factors?
8     A.    Store-specific factors, where
9 it's located.
10     Q.    Again, if you want to know
11 those things, you have to do a deep dive,
12 correct?
13     A.    Correct.
14     Q.    So if you wanted to know
15 whether or not this store at 598.144 and
16 flagged for maximum cutoff volume, whether it
17 actually was a suspicious order, instead of
18 just a potentially, you'd have to look at the
19 deep-dive due diligence you just talked
20 about, correct?  Those other factors.
21     A.    Yes.  To flag it as an order of
22 interest to escalate, yes, we would look --
23 we would deep dive.
24     Q.    And so when I asked you if that
25 was large, you said you'd have to know other

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1 factors, correct?
2     A.    I really don't recall if this
3 would be -- if we would consider this a large
4 order or not.
5     Q.    Did it flag for maximum cutoff
6 volume?
7     A.    Yes, it did.
8     Q.    Okay.  Does that give you some
9 indication that it probably was large?
10         MR. HYNES:  Objection to form.
11     A.    It is one data point to point
12 in the direction that it is a large order.
13 QUESTIONS BY MR. GOETZ:
14     Q.    And what are the other data
15 points?
16     A.    I don't recall.
17     Q.    Okay.  I understand, but you
18 just told me the other data points would be I
19 would need to know the store, what that store
20 looked like relative to the neighbor stores
21 or what that store geography looked like or
22 what that store population looked like,
23 correct?
24     A.    Correct.
25     Q.    Only things I could find out by

Page 435

1 a deep dive, correct?
2     A.    Correct.
3     Q.    Nothing that's shown on this
4 form, correct?
5     A.    Correct.
6     Q.    Okay.  And this form actually
7 has a score of .03, doesn't it?
8     A.    Yes, it does.
9     Q.    Again, maybe, maybe adjusting
10 the algorithm from .15 to .65 wasn't the
11 greatest idea, because here it shows where
12 actually even .15 would have missed this
13 store, wouldn't it have?
14         MR. HYNES:  Objection to form.
15     A.    Yes, this would not have
16 flagged with a .15.
17     (CVS-Burtner Exhibit 405 was
18     marked for identification.)
19 QUESTIONS BY MR. GOETZ:
20     Q.    I'm going to hand you what's
21 been marked as 405.  Can you look at page 3
22 of that, where it says Thresholds?
23 Definitions?
24     A.    Oh, yes.
25     Q.    And it says Thresholds,

Page 436

1 definition, maximum order limit.
2     A.    Yes, I see that.
3     Q.    Okay.  And could you go back to
4 page 3 -- or page 1, letter numeral III?
5     A.    Yes.
6     Q.    It says:  These thresholds and
7 subsequent analysis of irregular activity are
8 the primary tools to stop suspicious orders
9 of control drugs.  Correct?
10     A.    That's what the document says,
11 yes.
12     Q.    We just looked at the document
13 that showed thresholds did not come about
14 until October 11th of 2012, correct?
15     A.    Maximum cutoffs for the IRR.  I
16 don't know as to what thresholds this is
17 referring to.
18     Q.    What other thresholds could
19 there be?  This says:  Thresholds, maximum
20 order limit.
21     A.    I --
22     Q.    Do you see where it -- go back
23 to the third page, Definitions.
24     A.    Yes.  Yes.
25     Q.    Thresholds, maximum order

Page 437

1 limit, correct?
2     A.    Yes.
3     Q.    Okay.  Maximum cutoffs, which
4 was a threshold, did not come about until
5 October 11th of 2012, correct?
6         MR. HYNES:  Objection to form.
7     A.    Correct.  The maximum cutoffs
8 for the IRR did not, but this doesn't -- I
9 can't confirm if this is referring to the
10 IRR.  This is just a threshold of a maximum
11 order.  I don't know what that's referring
12 to.
13 QUESTIONS BY MR. GOETZ:
14     Q.    Okay.  Mr. Burtner, you were
15 the IRR SOM manager from December of '12 to
16 June of '13, and from February of '12 until
17 December of '12 you were involved in SOM in
18 reviewing IRRs.
19         Are you aware of some other
20 threshold?
21     A.    I don't know what this is
22 referring to.  I recall vaguely that stores
23 had ordering thresholds but I don't remember
24 enough details on it to fully comment.
25     Q.    Stores did have ordering

Highly Confidential – Subject to Further Confidentiality Review

Page 438

1  thresholds?
2      A.   I believe so.
3      Q.   Where would those thresholds
4  be?
5      A.   I don't know.
6      Q.   Where would those thresholds
7  flag?
8      A.   Like I said, I don't have -- I
9  don't recall enough detail on it.  I recall
10  thresholds, but that's it.
11      Q.   Okay.  I've seen thresholds
12  tons of places in the documents.  You just
13  said stores had thresholds.  In 2011 --
14  strike that.
15      In 2012, before October 11th,
16  did stores have thresholds?
17      MR. HYNES:  Objection to form.
18      A.   I don't recall.
19  QUESTIONS BY MR. GOETZ:
20      Q.   Okay.  If CVS told the DEA
21  before October 11th of 2012 that they had
22  thresholds, that would not be true, would it?
23      MR. HYNES:  Objection,
24      hypothetical.
25      A.   I don't know if that would be

Page 439

1  true or not.
2  QUESTIONS BY MR. GOETZ:
3      Q.   Okay.  If CVS put in talking
4  points for the DEA that they had thresholds,
5  that would not be true, would it?
6      MR. HYNES:  Objection.  He said
7      he doesn't know if they had
8      thresholds.
9      A.   I don't know if it would be
10  true or not.
11  QUESTIONS BY MR. GOETZ:
12      Q.   Okay.  Do you know how that
13  maximum cutoff threshold was calculated?
14      MR. HYNES:  Objection to form.
15      A.   I believe it was created by
16  AGI, but I don't recall how it was
17  calculated.
18  QUESTIONS BY MR. GOETZ:
19      Q.   Do you know how -- other than
20  that additional due diligence that you talked
21  about, do you know how you could investigate
22  a maximum cutoff threshold flag on the IRR?
23      A.   I mean, the additional due
24  diligence that I mentioned was the only
25  method that I'm aware of that we would

Page 440

1  complete for doing a deep dive.
2      Q.   There's no information shown on
3  that IRR that would help you figure out
4  whether or not that maximum cutoff was a
5  suspicious order and not just a potentially
6  suspicious order, is there?
7      MR. HYNES:  Objection to form.
8  QUESTIONS BY MR. GOETZ:
9      Q.   Feel free to go back to the
10  IRR.
11      A.   No.  I don't recall the process
12  of how we reviewed the maximum cutoff orders.
13  I don't recall.
14      Q.   What about maximum cutoff
15  ratio, do you know what that means?
16      A.   No, I don't recall what the
17  ratio means.
18      Q.   You have no idea?
19      A.   Sitting here today, I have no
20  idea.  At the time it was something I knew.
21  Sitting here today, I have no idea what that
22  meant.
23      Q.   Okay.  If I told you that the
24  maximum cutoff ratio is a comparison of that
25  drug that shows up on the order --

Page 441

1      A.   Okay.
2      Q.   -- as compared to other orders
3  by that pharmacy, other pharmaceutical orders
4  by that pharmacy, does that refresh your
5  recollection?
6      MR. HYNES:  Objection to form.
7      A.   No.  Not necessarily, no.
8      (Discussion off the
9      stenographic record.)
10  QUESTIONS BY MR. GOETZ:
11      Q.   Do you know if the maximum
12  cutoff ratio, whether it was month-to-date or
13  based on order?
14      MR. HYNES:  Objection.  Based
15      on order of what?
16  QUESTIONS BY MR. GOETZ:
17      Q.   Do you know if the maximum
18  cutoff ratio flagged on the IRR because of a
19  month-to-date cumulative order or because of
20  that individual order?
21      MR. HYNES:  Thank you.
22      A.   I don't recall the specifics on
23  that.
24  QUESTIONS BY MR. GOETZ:
25      Q.   Mr. Burtner, you would retrieve

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1 the IRR, correct? Didn't we talk about your
2 process?
3     A.    Yes.
4     Q.    You would review that IRR,
5 which was a listing of orders that the
6 algorithm had flagged as potentially
7 suspicious, correct?
8     A.    Yes, that is correct.
9     Q.    We know that sometimes that
10 review would encompass 3,000 orders that had
11 been identified by the algorithm, correct?
12        MR. HYNES:  Objection to form;
13 lack of foundation.
14     A.    The number we saw earlier
15 was -- that was over 3,000 was a combination
16 of two days.
17 QUESTIONS BY MR. GOETZ:
18     Q.    Is that correct?  There were
19 days where you would have to review two days
20 of IRRs in one day, correct?
21     A.    Yes, that is correct.
22     Q.    And we can argue about whether
23 or not those scores that are under .65
24 flagged because of maximum cutoff or not, but
25 we can at least agree that all the stores on

Page 443

1 the right on that chart over there were
2 above .65, correct?
3     A.    Yes, that is correct.
4     Q.    Okay.  And that, I will tell
5 you, is over 600 orders.
6        MR. HYNES:  Objection to form.
7 Or to the commentary if it's a
8 question.
9 QUESTIONS BY MR. GOETZ:
10     Q.    Okay.  Do you disagree that
11 that's 600 orders?
12        MR. HYNES:  Objection to form.
13     A.    I mean I --
14        MR. HYNES:  Do you want him to
15 go count them right now?
16        MR. GOETZ:  We can go count one
17 sheet and then multiply down.  Would
18 you like to do that?
19        MR. HYNES:  No, we're not going
20 to agree to it unless you give him
21 time to count all of them.
22        MR. GOETZ:  Would you like
23 to -- so multiplication doesn't work?
24        MR. HYNES:  We're not.  If you
25 want to spend more time doing that, we

Page 444

1 can do it.  Aaron is a pretty slow
2 counter.
3 QUESTIONS BY MR. GOETZ:
4     Q.    Mr. Burtner, will you please
5 count one sheet?  Come on, we'll do it.
6        MR. HYNES:  I object to this
7 line of -- this instruction.
8        MR. GOETZ:  Paul, I'll let you
9 use your iPhone to do the math.
10        MR. HYNES:  I'm not doing the
11 math.
12     A.    I think I counted 49.
13 QUESTIONS BY MR. GOETZ:
14     Q.    I count 15 sheets.  Do you
15 agree with that?
16     A.    Yes, there are 15 sheets.
17     Q.    Let's assume it's 50.  But I'll
18 give you 40 if you want.  We can just assume
19 it's between 600 and 750 orders.
20        MR. HYNES:  I'll stand by my
21 objection.
22 QUESTIONS BY MR. GOETZ:
23     Q.    Do you agree with that math,
24 Mr. Burtner?
25     A.    I have no reason not to think

Page 445

1 it's between 600 and 750.
2     Q.    That's for the right side
3 sheet, correct?
4     A.    Correct.
5     Q.    And from there, you have to
6 decide which orders you're going to do a deep
7 dive on, correct?
8     A.    Yes.
9     Q.    Okay.  And I know you wouldn't
10 agree earlier, but the timesheets we showed
11 showed zero to three orders, an e-mail
12 suggested two to three orders, but let's
13 assume you do 5%.  Let's assume you do 35
14 orders.
15        Half hour time, that would take
16 you 17 hours in the day, but let's assume
17 that you do 35 orders.  What standard would
18 you use to pick the 35?
19        MR. HYNES:  Objection to the
20 hypothetical and the commentary that
21 preceded the question.
22     A.    Well, there would be at least
23 three people reviewing those 600 to 750
24 orders.  So if we did 35 orders it would be
25 split between those three people, and the

Highly Confidential – Subject to Further Confidentiality Review

Page 446

1  standard of selecting would be the initial
2  due diligence that we've discussed as far as
3  looking at the IRR, the data on the IRR.
4  QUESTIONS BY MR. GOETZ:
5      Q.    What data would you look at?
6          MR. HYNES:  Objection, asked
7      and answered.
8          MR. GOETZ:  He said the data on
9      the IRR.
10     A.    The data points presented for
11 each order.
12 QUESTIONS BY MR. GOETZ:
13     Q.    Which is what?  Strike that,
14 Mr. Burtner.
15         I'm going to hand you what's
16 been marked as 429 and 428.
17         (CVS-Burtner Exhibit 428 was
18     marked for identification.)
19         (CVS-Burtner Exhibit 429 was
20     marked for identification.)
21 QUESTIONS BY MR. GOETZ:
22     Q.    Exhibit 429 is an e-mail from
23 you dated 10/11/12 to Susan Campbell,
24 correct?
25     A.    Yes.

Page 447

1      Q.    And that says:  I have attached
2  a job description and work instruction for
3  the Loss Prevention Analyst, correct?
4      A.    Yes, that's what it says.
5      Q.    This was something that you
6  were -- you helped draft, correct?
7      A.    Yes, I believe so.
8      Q.    Okay.  And can you go, please,
9  to 428?
10     A.    Yes.
11     Q.    And it says:  II, Further
12 Initiative of Suspicious Order Monitoring
13 (SOM) Program (Top 10 Project).
14         Right?
15     A.    Roman numeral -- oh, I'm sorry.
16 Yes.
17     Q.    Okay.  And Roman numeral I
18 relates to the IRR, Inventory Review Report,
19 correct?
20     A.    Yes.
21     Q.    And Roman numeral II, just so
22 we're clear, down at the bottom on the next
23 page is the Top 10, how you do that, correct?
24     A.    Yes.
25     Q.    Okay.  Could you look at I(C),

Page 448

1  please.
2      A.    Okay.
3      Q.    And it says:  Review IRR to
4  identify irregular orders based on, but not
5  limited to.
6          Do you see that?
7      A.    Yes.
8      Q.    Okay. One is:  Current week
9  quantity ordered.
10         That's just the order, correct?
11     A.    Yes.
12     Q.    Okay.  That's already in the
13 IRR.
14     A.    Right.
15     Q.    That's why the IR -- that's why
16 it flagged, because of that.
17         MR. HYNES:  Objection to form.
18     A.    I believe it's one of the
19 many -- one of the -- it's one of several
20 data points that would cause it to flag.
21 QUESTIONS BY MR. GOETZ:
22     Q.    That's -- okay, perfect.
23 Month-to-date quantity ordered.
24         Again, that's in the IRR,
25 correct?

Page 449

1      A.    Yes.
2      Q.    That's why it flagged.
3          MR. HYNES:  Objection to form.
4      A.    Again, one of the factors, yes.
5  QUESTIONS BY MR. GOETZ:
6      Q.    Yeah.  That's what the computer
7  already looked at and said this is a
8  potentially suspicious order.
9          MR. HYNES:  Objection to form.
10     A.    Yes.
11 QUESTIONS BY MR. GOETZ:
12     Q.    Okay.  Previous 12-month lag.
13     A.    Yes.
14     Q.    That's in the IRR.
15     A.    Yes.
16     Q.    It's what the computer looked
17 at to decide this is a potentially suspicious
18 order.
19         MR. HYNES:  Objection to form.
20     A.    One of several factors, yes.
21 QUESTIONS BY MR. GOETZ:
22     Q.    Thank you.
23         Potential for abuse of drug in
24 question.  Again, we talked about that.
25 That's why it's part of the IRR to begin

Page 450

1  with.  It's hydrocodone, it's highly
2  addictive.  That's why you have to monitor
3  it, correct?
4      A.    There's several -- it's all
5  Schedule IIIs, IVs and Vs and there are
6  Schedule IVs and particularly Schedule Vs
7  that aren't nearly as addictive as
8  hydrocodone, if even considered addictive by
9  the DEA.
10     Q.    So can I ask a question?  Did
11  every drug that was -- that you had to
12  monitor, did every drug flag at a .65?
13         MR. HYNES:  Objection to form.
14     A.    It was every order of a
15  controlled drug that was Schedule III, IV or
16  V.  It would go through the algorithm and if
17  it had a score of over .65, it would flag on
18  the IRR.
19  QUESTIONS BY MR. GOETZ:
20     Q.    Despite the fact that, as you
21  said, there are drugs that aren't nearly as
22  addictive as hydrocodone, correct?
23     A.    Yes, that is correct.
24     Q.    But you had them have the same
25  score, correct?

Page 451

1      A.    Yes, because they required the
2  same level of due diligence.
3      Q.    They were not nearly as
4  addictive as hydrocodone, correct?
5      A.    Yes.
6      Q.    They did not have a crisis,
7  correct?
8         MR. HYNES:  Objection to form.
9      A.    I mean, I really don't know how
10  to answer that question.
11  QUESTIONS BY MR. GOETZ:
12     Q.    While we're here today, two
13  people in Ohio aren't going to die because of
14  them, are they?
15         MR. HYNES:  Objection to form.
16     A.    I can't answer that question.
17  QUESTIONS BY MR. GOETZ:
18     Q.    Okay.  Do you know of other
19  drugs you were distributing that were -- was
20  going to kill two people while we were taking
21  your deposition, in Ohio?
22         MR. HYNES:  Objection to form;
23  lack of foundation.  Hypothetical.
24     A.    If there wasn't some level of
25  danger with the drugs, they wouldn't have

Page 452

1  been classified as a Schedule V by the DEA,
2  so that's why we gave every drug and every
3  order the same level of due diligence or the
4  same level of initial review.
5  QUESTIONS BY MR. GOETZ:
6      Q.    Sir, you gave --
7         MR. HYNES:  Let him finish the
8  answer.
9  QUESTIONS BY MR. GOETZ:
10     Q.    You gave hydrocodone
11  combination products the same level of
12  diligence and concern as some Schedule V
13  drug?
14     A.    No.  No.
15         MR. HYNES:  Can you let him
16  finish.
17     A.    We had created a priority list.
18  We did -- it was 1, 2 and 3, priority 1 was
19  hydrocodone, and then other drugs that were
20  commonly cocktailed with hydrocodone and, I
21  believe, codeine, and those, we gave a higher
22  level of scrutiny to those drugs.
23  QUESTIONS BY MR. GOETZ:
24     Q.    They had the same score on the
25  algorithm, correct?

Page 453

1      A.    Yes, that is correct.
2      Q.    When they redid the
3  algorithm -- strike that.
4         And then it says:  Verification
5  of single item or multiple items.
6         Do you see that?
7      A.    Yes.
8      Q.    Does that mean they're looking
9  for a cocktail?  Is that what that is?
10     A.    I don't recall what that is in
11  reference to.
12     Q.    If you look at -- and I asked
13  you this.  If you looked at the IRR 11396 and
14  I said, does that tell you if it's a single
15  item or multiple item, there's nothing on
16  there that would indicate that to you, would
17  it?
18     A.    I don't recall how the IRR was
19  listed.  If it was listed -- so 11396 is
20  store #1415.  I don't recall if it was
21  hydrocodone and then all the other controlled
22  drugs for 1415 would be listed there
23  together.
24     Q.    Okay.  So what you're telling
25  me is that you would be looking for the

Page 454

1 cocktail, that's what that means.
2     A.    I -- I don't recall what that
3 is in reference to.
4     Q.    Let's assume that that is,
5 because you just said, it might have every
6 suspicious order for that -- every
7 potentially suspicious order for that day for
8 store 1415 listed, and so it might go
9 hydrocodone and then the next drug might be,
10 I don't know, benzodiazepine is a Schedule II
11 or a Schedule III?
12     A.    It's a Schedule III.
13     Q.    Okay.  So the next drug might
14 be benzodiazepine, correct?
15     A.    Correct.
16     Q.    So then you could see a
17 cocktail?
18     A.    Possibly.  I don't recall if
19 that's how the IRR was laid out or not, but
20 that -- it could be what this is referring
21 to.
22     Q.    Okay.  You would not see that
23 cocktail if benzodiazepine was ordered the
24 day before?
25         MR. HYNES:  Objection,

Page 455

1     hypothetical.  Calls for speculation.
2     A.    The way the stores ordered,
3 they either ordered once a week or twice a
4 week, or, rather, the way the stores were
5 picked, they're either picked once a week or
6 twice a week.  And all the orders that were
7 being picked -- so, for example, stores get
8 to order on Mondays or Thursdays or Monday
9 and Thursday, depending on the store and the
10 size of the store.  All of the orders that
11 were placed that were being picked on Monday
12 would be listed on the Monday IRR.
13     So if they -- if -- so if a
14 store had cocktail drugs, we would
15 potentially be -- we would be able to see
16 that in the IRR if they both flagged.
17 QUESTIONS BY MR. GOETZ:
18     Q.    If a store is picked on Monday
19 for hydrocodone and on Wednesday they placed
20 an order for benzodiazepine, that store gets
21 picked on Thursday, correct?
22         MR. HYNES:  Objection to the
23     hypothetical.
24     A.    It depends on the store's order
25 pattern.  If it was a once-a-week store and

Page 456

1 they ordered it on Wednesday, that order
2 wouldn't be picked until the following
3 Monday.  If their order day -- if their pick
4 day was Monday, it wouldn't be picked until
5 the following Monday.
6 QUESTIONS BY MR. GOETZ:
7     Q.    If it was a twice-a-week store,
8 you wouldn't catch it, correct?
9         MR. HYNES:  Same objection.
10 QUESTIONS BY MR. GOETZ:
11     Q.    Is that correct?
12         MR. HYNES:  Same objection.
13     A.    Yes, if the hydrocodone was
14 picked on Monday and the benzodiazepine was
15 picked on Thursday, we wouldn't necessarily
16 see that on the same IRR.
17 QUESTIONS BY MR. GOETZ:
18     Q.    Assuming that this is right,
19 you're right about that verification of
20 single item or multiple items, that's a
21 pretty random chance, right?  That you're
22 saying, "Well, boy, we hope it's a single --
23 single week store, they're only ordering once
24 a week, and we hope they're ordering their
25 benzos and hydros same week," correct?

Page 457

1         MR. HYNES:  Objection to form.
2 QUESTIONS BY MR. GOETZ:
3     Q.    That's the only way you see it
4 on the IRR.
5         MR. HYNES:  Objection to form;
6     speculation.  Hypothetical.
7     A.    I mean, I can't comment to the
8 randomness of that.  I don't know.
9 QUESTIONS BY MR. GOETZ:
10     Q.    Do you know what "random"
11 means?
12     A.    Yes, I do.
13     Q.    And you don't think that would
14 be random to be able to catch that?
15         MR. HYNES:  Same objections.
16     A.    I -- I don't know that I could
17 comment to how unlikely it would be for us to
18 catch that, but again, it's just one of many
19 data points that we were looking at.
20 QUESTIONS BY MR. GOETZ:
21     Q.    On the IRR --
22     A.    Correct.
23     Q.    And so what I'm trying to
24 figure out is, you look at the IRR, we know
25 you do a deep dive on a very small

Page 458

1  percentage, and how do we get there?
2        In this, you said: Review IRR
3  to identify irregular orders based on but not
4  limited to.
5        That is you telling, this is
6  how we look at the IRR to determine what we
7  do deep dive on, correct?
8        MR. HYNES: Objection,
9     misstates the document.
10  A.    According to the document,
11  these are some of the items that we were
12  looking at, yes.
13  QUESTIONS BY MR. GOETZ:
14  Q.    That's what you chose to put in
15  the document, correct? You helped write
16  this.
17        MR. HYNES: Objection to form.
18  A.    I mean, I can't comment. It's
19  six and a half years ago. I can't recall why
20  these specific item -- things were selected
21  to be placed in the document.
22  QUESTIONS BY MR. GOETZ:
23  Q.    Six and a half years ago, you
24  were not in the practice, were you, of
25  writing standard operating procedures or work

Page 459

1  instructions that weren't as accurate as they
2  could be?
3        MR. HYNES: Objection. He said
4     he doesn't know.
5  A.    No. I was in the process of
6  writing -- it was my practice to write
7  documents as accurately as I could. I don't
8  recall why these items were selected.
9  QUESTIONS BY MR. GOETZ:
10  Q.    I don't understand either,
11  because those items, the first three, you say
12  you looked -- to look at those, but the
13  computer has already told you that that's a
14  suspicious order or potentially suspicious
15  order, right, based on those items?
16        MR. HYNES: Objection, asked
17     and answered.
18        Go ahead.
19  A.    It's potentially suspicious,
20  and we were doing a second review to confirm
21  whether or not we thought it was potentially
22  suspicious.
23  QUESTIONS BY MR. GOETZ:
24  Q.    Based on what the computer
25  already told you. The computer said, "I

Page 460

1  looked at a, b and c, in addition to other
2  stuff, and based upon my algorithm, I think
3  it's potentially suspicious."
4        MR. HYNES: Objection to form,
5     including asked and answered.
6  QUESTIONS BY MR. GOETZ:
7  Q.    Correct?
8        MR. HYNES: Same objections.
9  A.    The information we were looking
10  at was information that the algorithm had
11  looked at.
12  QUESTIONS BY MR. GOETZ:
13  Q.    So you were double-checking the
14  algorithm.
15  A.    Yes.
16        MR. HYNES: Objection to form.
17  QUESTIONS BY MR. GOETZ:
18  Q.    You didn't know how the math
19  worked. Correct?
20  A.    Not at a detailed level, no.
21  Q.    Double-checking the algorithm
22  sounds like what the real process was was
23  incredibly random as to whether or not what 2
24  or 3 percent of orders got selected for a
25  deep dive.

Page 461

1        MR. HYNES: Objection to form.
2  A.    I'm sorry, is that a question?
3  QUESTIONS BY MR. GOETZ:
4  Q.    That is a question.
5  A.    Okay.
6        MR. HYNES: What is the
7     question?
8  QUESTIONS BY MR. GOETZ:
9  Q.    Strike that.
10        What was the point of the
11  algorithm?
12  A.    The algorithm was -- the point
13  of the algorithm was to identify potentially
14  suspicious orders as either irregular order
15  pattern, irregular size, or irregular order
16  frequency.
17  Q.    And then that algorithm would
18  identify them and then you would look at the
19  identical information and decide whether or
20  not to do a deep dive, correct?
21        MR. HYNES: Objection to form.
22  A.    Yes. We would look at that
23  information to determine if we needed to do a
24  deep dive.
25        --oOo--

Highly Confidential – Subject to Further Confidentiality Review

Page 462

1 QUESTIONS BY MR. GOETZ:
2    Q.   The information that the
3 algorithm used to indicate that they believe
4 that it's potentially suspicious.
5        MR. HYNES:  Objection to form.
6    A.   Yes.
7        MR. HYNES:  Can we take a break
8 at a convenient time?
9        MR. GOETZ:  I'll take a break
10 if you want.  It doesn't matter.
11        MR. HYNES:  Okay.
12        THE VIDEOGRAPHER:  Okay.  We
13 are now going off the record, and the
14 time is 4:33 p.m.
15        (Recess taken, 4:33 p.m. to
16 4:45 p.m.)
17        THE VIDEOGRAPHER:  We are now
18 going back on the record, and the time
19 is 4:45 p.m.
20 QUESTIONS BY MR. GOETZ:
21    Q.   Mr. Burtner, I'm going to show
22 you three exhibits.  It's 437, 438 and 445.
23        (CVS-Burtner Exhibit 437 was
24 marked for identification.)
25        (CVS-Burtner Exhibit 438 was

Page 463

1 marked for identification.)
2        (CVS-Burtner Exhibit 445 was
3 marked for identification.)
4 QUESTIONS BY MR. GOETZ:
5    Q.   I will represent to you that
6 those are IRRs from 2011 before the IRR
7 changed to 12 months of data.
8        Do you understand what I'm
9 saying when I say that?
10    A.   Yes.
11    Q.   It used to be six months of lag
12 and now -- then it went to 12 months of lag,
13 correct?
14    A.   Yes.
15    Q.   Other than that, the IRR was
16 essentially the same, except for when you get
17 to October 11 of 2012 and you add the max
18 cutoff and the max volume, correct?
19    A.   I believe so.
20    Q.   Okay.  Could you look at 437,
21 please, on the second page?
22    A.   Yes.
23    Q.   You see the one store there,
24 that 4338?
25    A.   Yes, I see --

Page 464

1        MR. HYNES:  What exhibit are we
2 on?  I'm sorry, Dan.
3        MR. GOETZ:  437.
4    A.   Yes, I see 4338.
5 QUESTIONS BY MR. GOETZ:
6    Q.   Okay.  That's a store, and that
7 showed up on the IRR because of a violation
8 of a score, correct?  .86.
9        MR. HYNES:  Objection to form.
10    A.   Yes.  That appears to be the
11 case.
12 QUESTIONS BY MR. GOETZ:
13    Q.   Okay.  Looking at this
14 information on this IRR, can you tell me
15 whether or not this order is of unusual size?
16        MR. HYNES:  Objection to form;
17 calls for speculation.  This is before
18 Mr. Burtner was doing SOM work.
19 QUESTIONS BY MR. GOETZ:
20    Q.   Mr. Burtner, was this the same
21 IRR that you were reviewing, except for the
22 lag?
23    A.   I mean, it appears to be.
24 Sitting here today, I mean, I can't comment
25 on to whether or not we would review this.

Page 465

1    Q.   Okay.  Can you tell me what
2 that data there for that order for 4338,
3 whether or not it shows that that order is of
4 unusual size?
5        MR. HYNES:  Objection to form.
6    A.   I can't comment as to -- I
7 mean, I see the quantities.  Sitting here
8 today, I don't recall -- I don't have enough
9 information to feel confident or comfortable
10 commenting on whether or not I would consider
11 this of unusual size.
12 QUESTIONS BY MR. GOETZ:
13    Q.   Because there's not enough
14 information shown?
15    A.   Because it's been six years
16 since I reviewed an order.
17    Q.   Mr. Burtner, you had a couple
18 of days of prep, correct?
19    A.   Yes.
20    Q.   You're not coming in here
21 totally blind in us asking you questions.
22 You keep saying six years ago.  That's not
23 actually fair to the plaintiffs, is it,
24 because --
25        MR. HYNES:  Objection.

Page 466

1    Objection. Don't answer the question.
2    QUESTIONS BY MR. GOETZ:
3        Q.   Mr. Burtner, did you have a
4    couple of days of prep?
5        A.   Yes. We reviewed.
6        Q.   And before that, did you have
7    preparation?
8        A.   Yes.
9        Q.   And before that, you looked at
10   documents?
11       A.   No.
12       Q.   How many days -- how much
13   preparation did you have from November
14   of 2018 until today?
15       A.   Several days.
16       Q.   Several.
17       So, again, when we keep talking
18   about six years, we need to put that in
19   perspective with how much preparation you had
20   to testify today. Correct?
21       MR. HYNES: Objection to the
22   commentary. Objection to the form.
23       A.   I don't feel comfortable
24   commenting on whether or not I would review
25   this based off of a few days of prep when I

Page 467

1    haven't looked at this information in six
2    years outside of a few days over the last
3    couple of months.
4    QUESTIONS BY MR. GOETZ:
5        Q.   Mr. Burtner, what can you tell
6    me about whether or not this order deviates
7    substantially from a normal pattern?
8        A.   I -- I don't recall how I would
9    use this document to determine if it deviated
10   from normal pattern.
11       Q.   Mr. Burtner, what can you tell
12   me about whether or not this order is of
13   unusual frequency?
14       A.   It does not appear to be of
15   unusual frequency because the binary day is
16   zero.
17       Q.   Okay, great.
18       What can the data on this form
19   tell me about the likelihood of this order
20   being diverted?
21       MR. HYNES: Objection to form.
22       A.   I do not know if this data
23   would indicate that or that it would be -- be
24   diverted.
25       --oOo--

Page 468

1    QUESTIONS BY MR. GOETZ:
2        Q.   Mr. Burtner -- I apologize for
3    interrupting. Are you finished? I'm sorry.
4        A.   Yes. Yes.
5        Q.   You actually trained -- can you
6    look at 438? You actually trained Shauna
7    Helfrich, didn't you?
8        A.   Yes, I believe so.
9        Q.   And her training was
10   on the job, correct?
11       A.   A portion of it was, yes.
12       Q.   What wasn't?
13       A.   I mean, she spent time watching
14   me complete the reviews. I wouldn't consider
15   that on the job. I would consider on the job
16   of, "Here, you do the reviews and I will
17   assist."
18       Q.   Okay. So she watched you a
19   little?
20       A.   Yes.
21       Q.   And then you watched her a
22   little?
23       A.   Yes.
24       Q.   Not much, correct?
25       A.   Hmm, I don't recall how long.

Page 469

1        Q.   And in fact, when she started
2    helping you, she was actually a picker in the
3    RX, correct?
4        A.   She was a picker in the
5    controlled cage area, yes.
6        Q.   And when you wrote a job
7    description for an IRR analyst, you actually
8    suggested they should have a four-year
9    degree?
10       A.   I don't recall if I did that or
11   not.
12       Q.   You don't recall that was one
13   of the requirements?
14       A.   I do not.
15       Q.   Those documents will speak for
16   themselves.
17       Are you aware, when you hired
18   her, that Ms. Helfrich had a high school
19   degree?
20       A.   I don't recall what her
21   education was.
22       Q.   Okay. Are you aware, when you
23   hired her, that she had zero experience in
24   regulation of controlled substances?
25       MR. HYNES: Objection to form.

Highly Confidential – Subject to Further Confidentiality Review

Page 470

1  A.   Experience with the regulation
2  and compliance, but experience in the control
3  cage and what control orders would typically
4  look like, yes.
5  QUESTIONS BY MR. GOETZ:
6      Q.   Is that your understanding, she
7  worked in a control cage?
8      A.   Yes, my understanding was she
9  was a picker in the control cage.
10     Q.   She wasn't.  She testified she
11 was an ordinary picker, not in the control
12 cage.
13          But your understanding when you
14 took her on as one of your associates in the
15 suspicious order monitoring was that she had
16 been a picker in the control cage?
17         MR. HYNES:  Objection to the
18     commentary that preceded the question.
19     A.   Yes, I believe she was a picker
20 in the control cage.
21 QUESTIONS BY MR. GOETZ:
22     Q.   Okay.  To the extent she
23 wasn't, does that concern you that they stuck
24 her with you to do suspicious order
25 monitoring?

Page 471

1          MR. HYNES:  Objection to form.
2      A.   Sitting here today, I'm not
3  comfortable commenting on whether or not it
4  concerned me at the time.  I remember that
5  she was good at what she was doing, she was
6  good at analyzing the data, and I felt
7  confident in her ability to identify orders
8  of potential interest.
9  QUESTIONS BY MR. GOETZ:
10     Q.   Would you have expected her to
11 be able to recognize what an Item Review
12 Report looks like, like what 438 is in front
13 of you?
14     A.   At the time or now?
15     Q.   Today.
16     A.   I don't know if she would be
17 able to recognize this or not.
18     Q.   Okay.  This is what -- this is
19 the primary tool.  This is what you worked
20 with, correct?  This is suspicious order
21 monitoring.  Where it starts, this is the
22 primary tool.
23         MR. HYNES:  Objection to form.
24     A.   Yes.  This is where our reviews
25 began, yes.

Page 472

1  QUESTIONS BY MR. GOETZ:
2      Q.   Are you aware that immediately
3  before coming to work for CVS as a picker and
4  not in the control cage, that she had spent
5  the last two years volunteering at an animal
6  park?
7          MR. HYNES:  Objection to form.
8      A.   No, I did not know that.
9  QUESTIONS BY MR. GOETZ:
10     Q.   Could you go to 438, please.
11     A.   Yes.
12     Q.   Could you look at that top
13 order, please?
14     A.   For store 3997?
15     Q.   Yes.
16     A.   Okay.
17     Q.   Can you tell me what that data
18 shows about whether or not this is an order
19 of unusual size?
20     A.   Looking at this data today, I'm
21 not comfortable making the speculation of
22 whether this is an order of unusual size.
23     Q.   Can you tell me whether this
24 data tells you anything about the likelihood
25 of this order being diverted?

Page 473

1      A.   No.  I cannot say whether or
2  not this data would indicate that.
3      Q.   If you really wanted to find
4  out whether or not this truly was a
5  suspicious order, you would need to do the
6  deep-dive due diligence, correct?
7          MR. HYNES:  Objection to form.
8      A.   Our process was to look at this
9  data and determine if we felt there was
10 anything here that looked potentially
11 irregular and then continue on to a deep
12 dive, which would lead to potentially -- the
13 order being potentially labeled as
14 suspicious.
15 QUESTIONS BY MR. GOETZ:
16     Q.   Does it look like there's
17 anything potentially irregular here?
18     A.   Sitting here today, I don't
19 recall enough of this information to make the
20 comment.  I just don't know.
21     Q.   Would you have done a deep dive
22 on that order we just talked about?
23     A.   I have no idea.
24     Q.   I'm going to show you what's
25 been marked as 445.  And if you look at store

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1  4054, do you see that?
2      A.    Yes, I do.
3      Q.    Is there anything on here that
4  shows me whether this is an order of unusual
5  size?
6      A.    Again, sitting here today, I'm
7  not comfortable enough with this data at this
8  time to make a judgment call on whether this
9  is of unusual size.
10     Q.    Sitting here today, after
11 you've had multiple days of prep, is this an
12 order that you would have done a deep dive
13 on?
14         MR. HYNES:  Objection to form.
15     A.    I have no way of answering that
16 question.
17 QUESTIONS BY MR. GOETZ:
18     Q.    Who would know that?
19     A.    I don't know.
20         THE VIDEOGRAPHER:  You have 37
21 minutes.
22 QUESTIONS BY MR. GOETZ:
23     Q.    We had earlier, when we looked
24 at your spreadsheet -- okay.  When we looked
25 at your spreadsheet earlier, 406, that

Page 475

1  flowchart; do you remember?
2      A.    Yes.
3      Q.    That indicates everything that
4  you do a deep dive on is put on the IRR
5  recap, correct?
6          MR. HYNES:  Objection to form.
7      A.    Yes.  The flowchart indicates
8  that that was the process.
9  QUESTIONS BY MR. GOETZ:
10     Q.    I'm going to hand you what's
11 been marked as 455.
12         (CVS-Burtner Exhibit 455 was
13         marked for identification.)
14         THE VIDEOGRAPHER:  Your mic
15         just fell off.
16 QUESTIONS BY MR. GOETZ:
17     Q.    That's an e-mail from you to
18 Susan Campbell?
19     A.    Yes.
20     Q.    Okay.  And could you go to the
21 second page, please.  And that indicates a
22 position justification to create a management
23 position, correct?
24     A.    Yes.  That is what the document
25 appears to be.

Page 476

1      Q.    And it also is recommending you
2  as the manager, correct?
3      A.    Yes, according to the document,
4  yes.
5      Q.    Okay.  And if you look at 9811,
6  it says:  Benefits of management position.
7          Do you see that?
8      A.    Yes, I see that.
9      Q.    And then the fourth bullet up
10 from the bottom, it says:  Submit necessary
11 monthly reporting to include recap of flagged
12 stores reviewed.
13         MR. HYNES:  Objection.  We
14 talked just a minute ago about
15 cumulative questioning.  Mr. Baker
16 used the same document with him this
17 morning.
18         MR. GOETZ:  Did he talk about
19 the IRR recap?
20         MR. HYNES:  He used the same
21 document.
22         MR. BAKER:  I didn't talk about
23 the IRR recap.
24         MR. GOETZ:  He didn't talk --
25         MR. HYNES:  Well, anyways, I

Page 477

1  object to the line of questioning.
2  QUESTIONS BY MR. GOETZ:
3      Q.    Recap -- Mr. Burtner, did
4  anyone actually talk to you today, do you
5  remember, about one of the jobs, your jobs,
6  would be recap of flagged stores reviewed,
7  that you would submit that reporting?
8      A.    I do not recall discussing the
9  recap of flagged stores.
10     Q.    And that actually was your job,
11 correct?  One of the jobs?
12     A.    I don't recall this, this
13 function.
14     Q.    You submitted this, correct?
15     A.    Yes.  It appears from the
16 e-mail that, yes, I did.
17     Q.    I'm handing you what's been
18 marked as Burtner 439.
19         (CVS-Burtner Exhibit 439 was
20         marked for identification.)
21 QUESTIONS BY MR. GOETZ:
22     Q.    Those are the CT-1 stores.
23         Do you know what CT-1 means?
24     A.    No.
25     Q.    Have you learned that in your

Page 478

1  prep?
2          MR. HYNES:  Objection.  Don't
3  answer.
4  QUESTIONS BY MR. GOETZ:
5      Q.    Strike that.
6          MR. HYNES:  Come on, Dan.
7  QUESTIONS BY MR. GOETZ:
8      Q.    And I apologize.  Strike that.
9          MR. GOETZ:  I apologize.
10  QUESTIONS BY MR. GOETZ:
11      Q.    Mr. Burtner, the first lawsuit
12  to be tried relates to what we call CT-1,
13  Case Track 1, and that involves CVS
14  pharmacies or the distribution to CVS
15  pharmacies in Cuyahoga and Summit County,
16  okay?
17      A.    Okay.
18      Q.    And so this listing I will
19  represent to you is our understanding, as
20  produced by CVS, of the Case Track 1 stores.
21      A.    Okay.
22      Q.    So --
23      A.    So the stores in those two
24  counties.
25      Q.    Yes, sir.

Page 479

1      A.    Okay.
2          MR. GOETZ:  And I apologize,
3  Paul.
4  QUESTIONS BY MR. GOETZ:
5      Q.    So when I say CT-1 stores, I'm
6  talking about these stores in Cuyahoga and
7  Summit County, okay?
8      A.    Understood.
9          (CVS-Burtner Exhibit 440 was
10  marked for identification.)
11  QUESTIONS BY MR. GOETZ:
12      Q.    Mr. Burtner, I'm handing you
13  what's been marked as 440, and they are
14  paper-clipped separately or clipped
15  separately because of the size.
16          Could you look at that, please?
17      A.    Yes.
18      Q.    Do you recognize that document
19  as an IRR recap?
20          MR. HYNES:  Objection; calls
21  for speculation.
22      A.    I don't recall feeling --
23  completing this document.  I don't recall
24  using this document.
25              --oOo--

Page 480

1  QUESTIONS BY MR. GOETZ:
2      Q.    Okay.  Let's look at this.  I'm
3  going to hand to you what's been marked as
4  441.
5          (CVS-Burtner Exhibit 441 was
6  marked for identification.)
7  QUESTIONS BY MR. GOETZ:
8      Q.    Do you recognize that document
9  as an IRR recap?
10          MR. HYNES:  Same objection.
11      A.    I -- I don't recognize this
12  document either.
13  QUESTIONS BY MR. GOETZ:
14      Q.    Can you turn to page 9790,
15  please.
16      A.    Yes.  Okay.
17      Q.    Does that top say April '12
18  Control IRR Recap?
19      A.    Yes, it does.
20      Q.    Okay.  Was there some other --
21  when you talk there on your spreadsheet about
22  putting it on the recap spreadsheet, was
23  there some other recap spreadsheet?
24      A.    Not that I recall.  I don't
25  recall -- I don't recall recapping

Page 481

1  investigations on a spreadsheet, or deep
2  dives.
3      Q.    Go back to 406.  I mean, we
4  have gone through this, that you... here, go
5  back to 406.  Look at 109877.  Look at the --
6  every one of those ends with:  Document the
7  review on recap spreadsheet.
8          Correct?
9      A.    Yes, it does.  According --
10      Q.    Document the review on recap
11  spreadsheet, correct?
12      A.    On this document, yes.
13      Q.    You're --
14          MR. HYNES:  Let him finish.
15      A.    Yes.  On this document, yes.
16  QUESTIONS BY MR. GOETZ:
17      Q.    I apologize, Mr. Burtner.
18          MR. GOETZ:  I'm sorry, Paul.
19  QUESTIONS BY MR. GOETZ:
20      Q.    Your justification for your
21  position talked about reviewing the recap
22  spreadsheet, correct?
23      A.    Yes.  The justification
24  attached to the e-mail, yes.
25      Q.    But you, as the SOM manager,

Page 482

1  never reviewed this?
2       MR. HYNES: Objection.
3       Misstates his testimony.
4       A.   I don't recall if I reviewed
5  this or not. I don't recall this document.
6  QUESTIONS BY MR. GOETZ:
7       Q.   Okay. You, as the SOM manager,
8  never made sure that this information on here
9  was documented?
10      MR. HYNES: Objection to form.
11      A.   I can't state to whether -- as
12 to whether I did or not.
13 QUESTIONS BY MR. GOETZ:
14      Q.   If you were doing your job
15 appropriately and following your flowchart,
16 you would have made sure that the reviews
17 were documented on here, wouldn't you have?
18      MR. HYNES: Objection to form.
19      A.   According to the flow map and
20 according to the job justification, yes, that
21 would have been the process.
22 QUESTIONS BY MR. GOETZ:
23      Q.   If you were doing your jobs
24 appropriately, correct?
25      MR. HYNES: Objection to form.

Page 483

1  QUESTIONS BY MR. GOETZ:
2       Q.   441 indicates on page 9741,
3  it's -- I apologize, 9742, that first date is
4  a January 2011 Control IRR Recap. And if you
5  follow it through, it appears to me that the
6  last date is June 2012 Control IRR Recap.
7       A.   Yes, that appears to be the
8  last table.
9       Q.   And if you can go back to 9790,
10 since you weren't sure about whether or not
11 this actually was a recap, could you look at
12 the bottom order?
13      A.   Yes. On 9790?
14      Q.   Yeah. Do you see the remarks?
15      A.   I spoke to the PIC?
16      Q.   Yeah.
17      A.   Yes, thank you. Yes.
18      Q.   That's a deep-dive review,
19 correct?
20      MR. HYNES: Objection to form.
21      A.   Yes. I would say this is
22 indicative of a recap of a deep-dive review.
23 QUESTIONS BY MR. GOETZ:
24      Q.   And could you go back to 440,
25 please?

Page 484

1       A.   Yes.
2       Q.   When did you leave -- you quit
3  being the IRR manager in June of 2013?
4       A.   Correct.
5       Q.   Okay. Could you go to 10292,
6  please.
7       A.   10292. Okay.
8       Q.   Do you see that?
9       A.   Yes.
10      Q.   Do you see that hydrocodone
11 order for Indiana?
12      A.   Yes.
13      Q.   It's a 5/500?
14      A.   Yes.
15      Q.   And do you see where it says on
16 the right: Reviewed store metrics for
17 hydrocodone 5/500, reviewed dispense versus
18 order quantities, no concerns identified.
19 Based on this information, the order was
20 approved.
21      That's a deep-dive review,
22 correct?
23      MR. HYNES: Objection to form.
24      A.   Yes. I -- I would believe this
25 indicates a deep-dive review.

Page 485

1  QUESTIONS BY MR. GOETZ:
2       Q.   This IRR recap goes from
3  February 6th, 2013 to December 30th of 2013.
4  Okay? And I'll tell you the page numbers
5  that indicate, just so we're clear. That
6  page number starts on 10269 and it ends on
7  10516, and the reason it doesn't end on the
8  end is because of the PSE recap.
9       Do you see? Can you go to
10 10516?
11      A.   Got it.
12      Q.   And there's an order there from
13 FRR, 12/30/2013. Do you see that in the
14 middle?
15      A.   For 12/24/13?
16      Q.   No, there's one from 12/30/13.
17      A.   Oh, I see.
18      Q.   Do you see that?
19      A.   Yes. Yes, I see.
20      Q.   Okay. I make the assumption
21 that this is a document, a control recap from
22 February 6 of '13 to 12/30 of '13. A
23 significant period of this you were the
24 IRR -- the SOM manager.
25      Would you be surprised if I

Page 486

1 told you that during that period, one order
2 in the CT-1 stores received a deep dive?
3      MR. HYNES: Objection to form.
4     A. I can't comment as to whether
5 or not I'd be surprised. We weren't
6 necessarily looking at specific regions or
7 states to indicate whether or not we would --
8 we would further deep-dive a store. When we
9 were going through the IRR, I mean, as you
10 can see, we know where the origin DC is, but
11 we don't know where the store is.
12 QUESTIONS BY MR. GOETZ:
13     Q. I understand. One order. One
14 order in two of the largest counties in a
15 state that is decimated by the opioid crisis
16 got additional due diligence.
17     Does that surprise you?
18     MR. HYNES: Objection to form;
19     lack of foundation, asked and
20     answered.
21     A. Again, I can't comment as to
22 whether or not it surprises me. All I can
23 say is we were not looking at the state that
24 the store was in to determine -- as any part
25 of the determining factor as to whether or

Page 487

1 not we would complete a deep dive.
2 QUESTIONS BY MR. GOETZ:
3     Q. Except for Florida and
4 New Jersey, correct? Correct?
5     MR. HYNES: Objection to form;
6     misstates the record.
7     A. Yes. We were looking -- well,
8 no. We were looking at the Florida 5,000 and
9 the OR 5,000 -- or Florida 5,000, NJ 5,000,
10 but not necessarily determining whether or
11 not we would complete a deep dive based on
12 those stores -- based on the fact that those
13 stores were in Florida. We were still
14 looking at the data that was on the IRR.
15 QUESTIONS BY MR. GOETZ:
16     Q. But Florida and New Jersey,
17 they got special treatment.
18     MR. HYNES: Objection to form.
19 QUESTIONS BY MR. GOETZ:
20     Q. Correct?
21     MR. HYNES: Objection to form.
22     A. We were completing the
23 additional reports as a requirement of the
24 DEA.
25     --oOo--

Page 488

1 QUESTIONS BY MR. GOETZ:
2     Q. And you actually had a report
3 called the Florida Review Report.
4     A. Yes, I believe that's in
5 reference to the Florida 5,000.
6     Q. What if I told you that the
7 other IRR, Exhibit 441, went from
8 January 11th to June of 2012?
9     A. This is a recap from December
10 '10 to November -- or June 2012.
11     Q. To June of 2012. What if I
12 told you that one order got additional due
13 diligence --
14     MR. HYNES: Objection to form.
15 QUESTIONS BY MR. GOETZ:
16     Q. -- for the CT-1 stores. Would
17 that surprise you, over 18 months?
18     MR. HYNES: Objection to form;
19     lack of foundation.
20     A. Again, I can't comment as to
21 whether or not I'd be surprised. Again, we
22 weren't looking at states as part of our due
23 diligence -- or part of our review of the
24 IRR.
25     --oOo--

Page 489

1 QUESTIONS BY MR. GOETZ:
2     Q. Over an 18-month period in the
3 CT-1 stores, Cuyahoga and Summit County,
4 okay, during that period, you looked at one
5 order where you might have looked at the
6 store metrics or you might have looked at the
7 pharmacies, you might have looked at the
8 patients, you might have looked at the cash
9 trend, you might have looked at how far the
10 patients were coming, you might have looked
11 at whether it was pill mills; one time over
12 18 months, correct?
13     MR. HYNES: Objection. Calls
14     for speculation.
15     A. I don't know. I don't know if
16 that -- if that's true or not.
17 QUESTIONS BY MR. GOETZ:
18     Q. Do you have any reason to
19 believe these IRRs are not accurate?
20     MR. HYNES: Objection to the
21     form.
22 QUESTIONS BY MR. GOETZ:
23     Q. The IRR recaps, I apologize.
24     MR. HYNES: He said he didn't
25     recall them.

Highly Confidential – Subject to Further Confidentiality Review

Page 490

1  A.   I mean, sitting here today, I
2  have no reason to believe that they're
3  inaccurate, but I don't -- that doesn't
4  indicate that they are.
5  (Discussion off the
6  stenographic record.)
7  MR. HYNES:  How much time?  20
8  minutes?
9  MR. GOETZ:  40.
10 QUESTIONS BY MR. GOETZ:
11 Q.   You could have the greatest due
12 diligence in the world, the greatest Store
13 Metrics Report, the greatest inventory
14 reports, the greatest VIPER reports, the
15 greatest of everything; but if you roll it
16 out once every 18 months, it's pretty
17 useless.  Do you agree?
18 MR. HYNES:  Objection to form.
19 A.   Yes.  I guess if you have the
20 data and you're not using it, then it doesn't
21 help.  But at the same time, I feel confident
22 today as I did then that every review that we
23 completed, we flagged the orders as we felt
24 necessary.
25 --oOo--

Page 491

1  QUESTIONS BY MR. GOETZ:
2  Q.   One.  I just want to make sure
3  we're right.  One order over 18 months was
4  flagged as necessary.
5  MR. HYNES:  Objection, lack of
6  foundation.  He has not said that.
7  QUESTIONS BY MR. GOETZ:
8  Q.   Do you disagree with that IRR
9  recap?
10 A.   I don't know.  I --
11 MR. HYNES:  Objection.
12 QUESTIONS BY MR. GOETZ:
13 Q.   I'm going to read you a
14 statement and you can tell me if it's true,
15 based on your testimony today.
16 Any order that is flagged by
17 our SOM model or questioned by our DC team is
18 initially identified as an order of interest
19 and has additional due diligence conducted by
20 the SOM team.
21 MR. HYNES:  Hold on.  Is there
22 a question?
23 MR. GOETZ:  Yeah, I'm asking if
24 that's accurate based upon your
25 testimony.

Page 492

1  MR. HYNES:  Objection to form.
2  A.   Yes, I believe that to be
3  accurate.
4  QUESTIONS BY MR. GOETZ:
5  Q.   So any order that is flagged by
6  our SOM model is initially identified as an
7  order of interest and has additional due
8  diligence conducted by our SOM team.
9  MR. HYNES:  Objection to form.
10 A.   Yes, and the additional due
11 diligence would be the review of the IRR.
12 QUESTIONS BY MR. GOETZ:
13 Q.   Go back to 406.  We already
14 know what the IRR doesn't show, but go back
15 to 406.
16 MR. HYNES:  What is 406?
17 A.   Okay.
18 QUESTIONS BY MR. GOETZ:
19 Q.   Strike that.  I'll withdraw
20 that.
21 The additional due diligence is
22 the IRR review that we've talked about today?
23 A.   That is the first layer of the
24 additional -- or of the due diligence, yes.
25 Q.   And that IRR is reviewing 750

Page 493

1  orders, and based upon our chart, in anywhere
2  from 15 minutes to an hour.
3  MR. HYNES:  Objection, form;
4  misstates the record.
5  QUESTIONS BY MR. GOETZ:
6  Q.   Correct?
7  A.   Are you asking if that's how
8  long I took to review the IRR?
9  Q.   Yeah.
10 A.   I mean, it varied widely
11 throughout the month.  Based on the time
12 slides we looked at, it appears to be the
13 case.
14 Q.   Okay.  And that is
15 investigating something that, as you sit here
16 today, and we looked at an IRR, you can't
17 tell us if it says anything about whether the
18 order is of unusual size?
19 A.   Sitting here today --
20 MR. HYNES:  Objection to form.
21 QUESTIONS BY MR. GOETZ:
22 Q.   Correct?
23 A.   Sitting here today, no.  At the
24 time, I had more -- I was more comfortable in
25 the reviews at the time.

Highly Confidential – Subject to Further Confidentiality Review

Page 494

1   Q.   Sitting here today, you can't
2   tell us, from anything on the IRR, whether
3   that order is -- the likelihood of it being
4   diverted, can you?
5   A.   Sitting here today, no.
6   Q.   And there's actually nothing on
7   the IRR that would tell you about the
8   likelihood of being diverted, is there?
9           MR. HYNES:  Objection to form.
10  A.   Sitting here today, I don't
11  know that there is.
12  QUESTIONS BY MR. GOETZ:
13  Q.   You would have to actually have
14  the store metrics, wouldn't you?
15          MR. HYNES:  Objection to form.
16  A.   I don't know if that's true or
17  not.
18  QUESTIONS BY MR. GOETZ:
19  Q.   You're aware that the DEA
20  investigated CVS's Indiana distribution
21  center in 2013?
22          MR. HYNES:  Objection to form.
23  A.   No, I was not aware of a DEA
24  investigation in 2013.
25              --oOo--

Page 495

1   QUESTIONS BY MR. GOETZ:
2   Q.   Nobody ever told you?
3           MR. HYNES:  Objection to form
4   to the extent -- objection, work
5   product, to the extent you're asking
6   what he was told in prep.
7   QUESTIONS BY MR. GOETZ:
8   Q.   I'm not asking -- Kelly Baker
9   never wrote you an e-mail?
10  A.   Not that I recall.
11          (CVS-Burtner Exhibit 443 was
12  marked for identification.)
13  QUESTIONS BY MR. GOETZ:
14  Q.   That is an e-mail from Mark
15  Nicastro.  Who's Mark Nicastro?
16  A.   He's the director of
17  Indianapolis DC.
18  Q.   To Daniel Gillen.  Do you know
19  who he is?
20  A.   I do.
21  Q.   It's dated 11/14/13 and its
22  subject is "Closing Audit," correct?
23  A.   Yes.
24  Q.   And it says: Dan, I am writing
25  to request a time frame that we can complete

Page 496

1   our closing meeting.  Do you think we can
2   complete the closing audit in November?
3   Q.   Did I read that correctly?
4   A.   Yes, that's what it says.
5   Q.   Regarding our call today, I am
6   disappointed to hear you do not believe we
7   have a suspicious order monitoring program in
8   place, but I can assure you that we do.
9           You don't know who Dan Gillen
10  is, do you?
11  A.   No, I do not.
12          (CVS-Burtner Exhibit 444 was
13  marked for identification.)
14  QUESTIONS BY MR. GOETZ:
15  Q.   I'm handing you what's been
16  marked as 444.  That's an e-mail from Daniel
17  Gillen to Mark Nicastro?
18  A.   Yes.
19  Q.   It's dated 11/25/2013?
20  A.   Yes.
21  Q.   And if you look down below, it
22  says:  Daniel Gillen, Group Supervisor,
23  Diversion Group 53, Drug Enforcement
24  Administration.
25          When you were the SOM manager,

Page 497

1   were you at all familiar with anybody at the
2   DEA?
3   A.   I was not.  It was not within
4   my scope to contact the DEA so I was not
5   familiar with any of the personnel there.
6   Q.   Okay.  This is an e-mail, and
7   it says: Mark, CVS Store #06880/DEA
8   #AH9157137 ordered 1,888,600 dosage units of
9   hydrocodone (drug code 9193) between January
10  1 of 2012 through October 2013.  Of which
11  1,766 -- 1,766,000 tablets of hydrocodone
12  were shipped from your facility.  This
13  pharmacy is located in --
14          Do you know how to pronounce
15  that?
16  A.   "VIN-senz."
17  Q.   -- Vincennes, Indiana with a
18  population of approximately 18,000.
19          Did I read that correctly?
20  A.   Yes.
21  Q.   And you were the DEA manager
22  from December of '12 to June of 2013,
23  correct?
24  A.   SOM manager.
25  Q.   SOM manager.

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1  A.   Yes.
2  Q.   And so you were the SOM manager
3  right in the heart of when these shipments
4  went.
5  A.   Yes.
6  Q.   Okay.  The second paragraph
7  talks about another problem with a store in
8  Columbus, Indiana.  I'm going to read to you.
9  It says:  Additionally, CVS Store #6757/DEA
10 #AH2693376 located in Columbus, Indiana,
11 ordered a total of 2,012,400 tablets of which
12 your facility provided 1,756,300 tablets from
13 January 1, 2012 through October of 2013.  The
14 population of Columbus, Indiana is
15 approximately 45,000.
16      Do you see that?
17 A.   Yes, I do.
18 Q.   And it says:  Both stores have
19 purchased a large quantity of hydrocodone
20 given their population.
21      You were the DEA -- strike
22 that.
23      You were the SOM manager in the
24 middle of this time period, right?
25 A.   Yes.

Page 499

1  Q.   Okay.  These orders went out,
2  many of them, under your watch, correct?
3       MR. HYNES:  Objection to form.
4  A.   Yes, they would have gone out
5  while I was part of the SOM team.
6  QUESTIONS BY MR. GOETZ:
7  Q.   CVS never cared about figuring
8  out what happened.  They never contacted you
9  to see what happened, did they?
10      MR. HYNES:  Objection to form.
11 A.   No.  As a former employee, I'm
12 not sure why they would reach out to me.
13 QUESTIONS BY MR. GOETZ:
14 Q.   Well, you were the SOM manager.
15 A.   Yes.
16 Q.   These drugs were shipped under
17 your watch.
18      MR. HYNES:  Objection to form.
19 QUESTIONS BY MR. GOETZ:
20 Q.   Correct?
21 A.   Correct.
22 Q.   And CVS never contacted you to
23 find out what happened, correct?
24 A.   No, CVS never contacted me.
25 Q.   And, in fact, CVS was issued a

Page 500

1  letter of admonishment.  Are you aware of
2  that?
3       A.   No, I'm -- I was not.
4       Q.   Were you aware that -- the
5  review, as you said, does not discriminate
6  based upon geography, does it?  A store --
7       A.   I'm sorry.  To the extent of
8  when we were reviewing the IRR, once we do
9  the deep dive, we do account for that to an
10 extent.
11      Q.   A store in Indiana receives the
12 same level of scrutiny on the IRR as a store
13 in Ohio.
14      A.   Correct.
15      Q.   And the IRR is the primary
16 process.
17      MR. HYNES:  Objection to form.
18      A.   It's the initial -- it's the
19 initial review, yes.
20 QUESTIONS BY MR. GOETZ:
21      Q.   It's the primary process.
22      MR. HYNES:  Objection to form;
23 asked and answered.  Asked and
24 answered.
25      A.   I mean -- it's the initial

Page 501

1  review.
2  QUESTIONS BY MR. GOETZ:
3       Q.   The IRR was the same for
4  Indiana stores, it was the same for Ohio
5  stores?
6       A.   Yes, that is correct.
7       Q.   And so to the extent that the
8  DEA found a failure to design and maintain a
9  system to detect suspicious orders for
10 hydrocodone for Indiana, it applies equally
11 to Ohio.
12      MR. HYNES:  Objection to form.
13      A.   I disagree that looking at only
14 the total volume versus the population is an
15 indication that it is a suspicious order.
16 QUESTIONS BY MR. GOETZ:
17      Q.   And I appreciate that, and
18 that's based on your training at CVS,
19 correct?
20      MR. HYNES:  Objection to form.
21      A.   Yes.
22 QUESTIONS BY MR. GOETZ:
23      Q.   And that's based -- that's what
24 you trained people, correct?
25      MR. HYNES:  Objection to form.

Page 502

1    A.   Yes.  I trained people not to
2  only look at volume and look at other factors
3  as well.
4  QUESTIONS BY MR. GOETZ:
5    Q.   And I appreciate you saying
6  that.  But the DEA found differently,
7  correct?
8    MR. HYNES:  Objection to form.
9    A.   I'm not familiar enough with
10 this to fully comment if they -- I don't know
11 if there is anything -- I'm not sure what a
12 letter of admonishment means.  I don't know
13 what that means.
14 QUESTIONS BY MR. GOETZ:
15   Q.   Okay.  You don't --
16   A.   No, I don't.
17   Q.   -- as the SOM manager?  You --
18 you don't know as the SOM manager what that
19 means?
20   A.   No.  Again, I had -- my scope
21 had nothing to do with reporting to the DEA.
22 Pam was the DEA compliance person.
23   Q.   Do you -- I appreciate you
24 saying that it's not all about volume to a
25 population.  I appreciate that's your

Page 503

1  opinion, and I appreciate that's your opinion
2  as the former CVS SOM manager.
3    But my question is:  To the
4  extent that the DEA found that there was a
5  failure to design and implement a system to
6  detect suspicious and report suspicious
7  orders for hydrocodone for Indiana stores,
8  that applies equally to the Ohio stores.
9    MR. HYNES:  Objection to form.
10   A.   I don't know how I could answer
11 that question.
12 QUESTIONS BY MR. GOETZ:
13   Q.   They had the same IRR.
14 Correct?
15   A.   Yes.
16   Q.   They had the same score that
17 had been manipulated up to .65.
18   MR. HYNES:  Objection to form.
19   A.   Oh.  Yes.
20 QUESTIONS BY MR. GOETZ:
21   Q.   Yes?
22   A.   Yes.
23   Q.   They had the same due
24 diligence?
25   A.   Yes.

Page 504

1    Q.   They had the same suspicious
2  order monitoring program?
3    A.   Yes.
4    Q.   They had the same people
5  reviewing the IRR?
6    A.   Yes.
7    Q.   They had the same people doing
8  the due diligence.
9    A.   Yes.
10   Q.   What was different?
11   A.   There was nothing.  But again,
12 I -- I don't agree with them saying that we
13 didn't have an SOM process.
14   Q.   I understand you don't agree
15 with what the DEA said and what the DEA found
16 in the letter of admonishment, and that was
17 based upon what you were trained to do at CVS
18 and how you trained people.
19   A.   Correct.
20   MR. GOETZ:  I'm done.
21   THE VIDEOGRAPHER:  Going off?
22 Should we go off the record?
23   MR. GOETZ:  Yeah.
24   THE VIDEOGRAPHER:  We are now
25 going off the record, and the time is

Page 505

1  5:27 p.m.
2    (Recess taken, 5:27 p.m. to
3  5:27 p.m.)
4    THE VIDEOGRAPHER:  We're going
5  back on the record and the time is
6  5:27 p.m.
7    MR. GOETZ:  Mr. Burtner, I have
8  marked and I'm going to put into the
9  record that chart we made about the
10 time studies, okay?  And I've marked
11 that as Exhibit 500.
12   And I am actually going to mark
13 that chart as Exhibit 501A and 501B.
14 Okay?
15   Now we're done.
16   (CVS-Burtner Exhibit 500 was
17 marked for identification.)
18   (CVS-Burtner Exhibit 501A was
19 marked for identification.)
20   (CVS-Burtner Exhibit 501B was
21 marked for identification.)
22   THE VIDEOGRAPHER:  We're going
23 off the record and the time is
24 5:28 p.m.
25   (Recess taken, 5:28 p.m. to

Highly Confidential – Subject to Further Confidentiality Review

Page 506

1  5:30 p.m.)
2      THE VIDEOGRAPHER: We are now
3  going back on the record, and the time
4  is 5:30 p.m.
5      FURTHER EXAMINATION
6  QUESTIONS BY MR. BAKER:
7    Q.  Mr. Burtner, we're going to go
8  back to Exhibit 4. This is the letter from
9  the DEA dated September 27, 2006, that was
10  attached to the e-mail that Ron Buzzeo sent
11  to Amy Brown on 2/21/2008.
12      Do you recall that document?
13  A.  Yes, I do.
14      MR. HYNES: I'm just, again,
15  objecting. This is a document we've
16  already worked through before.
17      MR. BAKER: Correct.
18      MR. HYNES: And it's a
19  discovery ruling.
20      MR. BAKER: I didn't go through
21  this particular --
22      MR. HYNES: It's in the
23  deposition protocol. It's fine.
24  QUESTIONS BY MR. BAKER:
25    Q.  So in that document, in

Page 507

1  addition to everything else, it says:
2  Thus -- in that document, in addition to
3  everything else, it says: Thus, in addition
4  to reporting all suspicious orders, a
5  distributor has a statutory responsibility to
6  exercise due diligence to avoid filling
7  suspicious orders that might be diverted into
8  other than legitimate medical, scientific,
9  and industrial channels. Failure to exercise
10  such due diligence could, as circumstances
11  warrant, provide a statutory basis for
12  revocation or suspension of a distributor's
13  registration.
14      Now, did CVS ever provide this
15  letter to you?
16      MR. HYNES: Objection. I think
17  it's been asked before.
18    A.  I don't recall if this letter
19  was provided to me or not.
20  QUESTIONS BY MR. BAKER:
21    Q.  Were you aware that the DEA
22  required due diligence to be done on
23  potentially suspicious orders?
24    A.  Yes.
25    Q.  When you resigned, did you

Page 508

1  recommend Kelly Baker to take your position
2  as suspicious order monitoring manager?
3    A.  I don't recall if I did or not.
4      MR. BAKER: Could you pull up
5  Exhibit 81, please?
6      (CVS-Burtner Exhibit 81 was
7  marked for identification.)
8  QUESTIONS BY MR. BAKER:
9    Q.  This is an e-mail from you,
10  Aaron Burtner, to Kelly Baker dated 6/1/2013,
11  correct?
12    A.  6/11.
13    Q.  Okay, 6/11/2013.
14    A.  Yes.
15    Q.  This was right about the time
16  you resigned, correct?
17    A.  Yes. I think this was right
18  around the time that I put in my two-week
19  notice.
20    Q.  Okay. And you said: Just an
21  FYI, Susan asked if I have a copy of your
22  résumé from when you were hired. I don't
23  know this as fact, but I would guess they are
24  beginning the process of looking at you as
25  the SOM manager.

Page 509

1    Correct?
2    A.  Yes, that's what it says.
3    Q.  You in fact recommended him to
4  be the SOM manager, correct?
5      MR. HYNES: Objection to form.
6    A.  I don't recall if I did or not.
7  QUESTIONS BY MR. BAKER:
8    Q.  Okay. Go to Exhibit 82,
9  please.
10      (CVS-Burtner Exhibit 82 was
11  marked for identification.)
12  QUESTIONS BY MR. BAKER:
13    Q.  This is an e-mail dated Monday,
14  July 1, 2013, from Shawna Luehring to Craig
15  Schiavo. Do you know those people?
16    A.  I vaguely recall Shawna, but I
17  definitely remember Craig.
18    Q.  This is different than Shauna
19  Helfrich. It's Shawna Luehring, a
20  contractor.
21    A.  Yes.
22    Q.  And she was a contractor that
23  worked for the company that was going to
24  revamp the SOM software system. Is that
25  right?

Highly Confidential – Subject to Further Confidentiality Review

Page 510

1    A.    I don't recall what her role
2  was.
3    Q.    And in here, it says:  Craig
4  and Team.  And then on paragraph 1 it says:
5  It also need to get requirements for Access
6  Control.  Who will be entering in the SOM
7  cases?
8        And it says:  Kelly Baker and
9  his team (yet to be hired).
10        Correct?
11    A.    Yes, that's what it says.
12    Q.    All right.  And then at Exhibit
13  83.
14        (CVS-Burtner Exhibit 83 was
15      marked for identification.)
16  QUESTIONS BY MR. BAKER:
17    Q.    There is an e-mail dated
18  July 9, 2013, from Kelly Baker to Craig
19  Schiavo and Dean Vanelli, and you know who
20  those people are, right?
21    A.    Yes.
22    Q.    Okay.  Mr. Vanelli was whom?
23    A.    Mr. Vanelli was a vice
24  president, I believe, within CVS.
25    Q.    And Mr. Schiavo was whom?

Page 511

1    A.    A program manager, I believe on
2  the compliance team.
3    Q.    He was Kelly's boss?  Is that
4  right?
5    A.    I don't know that to be true.
6    Q.    And it says:  Craig, not really
7  pertaining to your question, but I did want
8  to highlight to the group that you note that
9  I do not have a backup.  Even our hourly
10  assistant has limited access.  If something
11  happens to me via act of nature or likeness,
12  the current daily SOM process would come to a
13  complete halt.
14        Is that what that says?
15    A.    Yes, that's what that says.
16    Q.    Were you made aware of that
17  e-mail at some point?
18        MR. HYNES:  Objection to form.
19    A.    No, I do not believe I've ever
20  seen this e-mail.
21  QUESTIONS BY MR. BAKER:
22    Q.    Okay.  I'll ask you to go to
23  Exhibit 84.
24          --oOo--
25          --oOo--

Page 512

1        (CVS-Burtner Exhibit 84 was
2      marked for identification.)
3  QUESTIONS BY MR. BAKER:
4    Q.    This is an e-mail from Kelly
5  Baker to Mark Nicastro and -- actually, to
6  Craig Schiavo, Kelly Baker to Craig Schiavo,
7  dated July 11, 2013, and it says:  Craig,
8  another concern I have is the Store Metric
9  Report I use to analyze the BVRs on the IRR.
10        BVR is by volume and ratio,
11  correct?
12    A.    That's a term I don't think I
13  ever saw.
14    Q.    Okay.  The data snapshot is a
15  3-month window that is a year old.  Any
16  analysis that I make from the data is, for
17  the most part, irrelevant and pointless.
18        Is that what that says?
19    A.    That is what it says.
20    Q.    But you never used the BVR
21  metric or that tool to measure anything, did
22  you?
23    A.    Yeah, I'm not familiar with the
24  BVR title.
25    Q.    All right.  Go to Exhibit 85,

Page 513

1  please.
2        (CVS-Burtner Exhibit 85 was
3      marked for identification.)
4  QUESTIONS BY MR. BAKER:
5    Q.    Actually, I'll give you a
6  highlighted one if you'd like.  To get
7  straight --
8        MR. HYNES:  Do you want this
9      one to put into the record, though?
10        MR. BAKER:  It doesn't matter.
11      The non-highlighted can go in.
12        MR. HYNES:  All right.
13  QUESTIONS BY MR. BAKER:
14    Q.    So this is an e-mail from you,
15  Mr. Burtner, to Andy Eck.  And let's follow
16  up what led to this, okay?  You received an
17  e-mail from Andy Eck -- go back down here --
18  September 17, 2013, and the subject is about
19  Mr. Burtner.  And it says:  He is not
20  stable --
21        MR. HYNES:  You mean Mr. Baker?
22  QUESTIONS BY MR. BAKER:
23    Q.    Mr. Baker, I'm sorry.  This is
24  Andy Eck to Aaron Burtner, correct?
25    A.    Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 514

1  Q.   And who was Andy Eck?
2  A.   Andy Eck was also a loss
3  prevention supervisor at the Indy DC.
4  Q.   Okay.  And at the time you were
5  receiving these e-mails and responding to
6  them, you were already at Amazon doing your
7  current job, correct?
8  A.   Yes, that is correct.
9  Q.   All right.  And so it says:  He
10 is not stable.  Shauna is worried about him
11 and tells me that he is much over the SOM.
12       Now, this is discussing the
13 person that we're talking about, Kelly Baker.
14 Is that correct?
15 A.   Yes, I believe so.
16 Q.   Okay.  And it says:  This then
17 he leaves her reports that she still is not
18 familiar with.
19       Who is she?  Shauna who?
20 A.   That would be Shauna Helfrich.
21 Q.   Okay.  And she was the lady
22 that took over to be the helper?  Is that
23 right?
24       MR. HYNES:  Objection to form.
25 A.   She was initially a flex

Page 515

1  associate in mid -- I'm sorry, late 2012, and
2  then by the time I left she was essentially
3  working as a full-time analyst on the SOM
4  team.
5  QUESTIONS BY MR. BAKER:
6  Q.   Okay.  You know that for a fact
7  or you just suspect that?
8  A.   No, I recall that she was up in
9  our area most of the time.
10 Q.   Okay.  And it says:  We have a
11 DEA consultant who is telling Kelly he needs
12 to leave and that CVS is treating him like
13 crap.  The DEA is also trying to get into
14 Shauna's head.
15       Were you made aware of that
16 e-mail?  Because this was Andy Eck to you.
17 Did you read that e-mail?
18 A.   I mean, I don't recall
19 receiving this e-mail, but, I mean, it's
20 clear that I did.
21 Q.   Let me ask you if this was your
22 response.  See at the top, Aaron Burtner to
23 Andy Eck, 9/17/2013.  Please tell me you
24 remembered writing this, okay?  Because it
25 says:  Yes, he's completely over it, he's

Page 516

1  doing his job and my old job, but only being
2  paid for one.  Then, he finds out they are
3  moving the SOM to Woonsocket so he really has
4  no motivation at this point.  Also, the DEA
5  consultant told him his salary is about half
6  that of most SOM managers.  Seems like CVS is
7  in the business of screwing people over until
8  they've had enough and move on.
9        Did you write that?  Yes or no?
10 A.   I don't recall writing it, but
11 it's clear from the e-mail that I did.  Or
12 clear from the document that I did.
13 Q.   You wrote that CVS is in the
14 business of screwing people over until
15 they've had enough and move on.  Is that
16 correct?
17       MR. HYNES:  Objection.
18 A.   That is what I said in the
19 document.
20       MR. BAKER:  That's all I have.
21 Thank you.
22       MR. HYNES:  I have just a few
23 minutes of follow-ups, so can we just
24 break for a minute?
25       THE VIDEOGRAPHER:  We are now

Page 517

1  going off the record, and the time is
2  5:40 p.m.
3        (Recess taken, 5:40 p.m. to
4  5:45 p.m.)
5        THE VIDEOGRAPHER:  We are now
6  going back on the record, and the time
7  is 5:45 p.m.
8            EXAMINATION
9  QUESTIONS BY MR. HYNES:
10 Q.   Good evening, Mr. Burtner.  As
11 you know, my name is Paul Hynes.  I just have
12 a few follow-up questions for you real quick.
13       Have you ever, before today,
14 been deposed?
15 A.   No, I have not.
16 Q.   Okay.  And counsel for the
17 plaintiffs, both Mr. Baker and Mr. Goetz,
18 asked you a lot of questions today, didn't
19 they?
20 A.   Yes, that is true.
21 Q.   And did you find some of those
22 questions to be confusing?
23       MR. BAKER:  Object to form.
24 A.   Yes.  At times I wasn't certain
25 what question was being answered or if a

Page 518

1  question was being answered at all -- or
2  asked at all.
3  QUESTIONS BY MR. HYNES:
4      Q.    Okay.  And you worked at CVS in
5  SOM for a total of approximately one and a
6  half years, correct?
7      A.    Approximately, yes.
8      Q.    Okay.  And you were the SOM
9  manager for about six months of that time,
10  right?
11     A.    Yes.
12     Q.    Okay.  And you were in that
13  position until June of 2013 when you left
14  CVS.
15     A.    Yes.
16     Q.    And you've worked at Amazon
17  here in Seattle ever since then?
18     A.    Yes, that is correct.
19     Q.    Okay.  And you've had nothing
20  to do with SOM since you left CVS?
21         MR. BAKER:  Object to form.
22     A.    No, I have not.
23  QUESTIONS BY MR. HYNES:
24     Q.    And you've had nothing to do
25  with the pharmaceutical industry since you

Page 519

1  left CVS?
2      A.    No, I have not.
3      Q.    And you don't recall everything
4  that you did six years ago when you were
5  working in SOM at CVS, do you?
6         MR. BAKER:  Object to form.
7      A.    No, definitely not.
8  QUESTIONS BY MR. HYNES:
9      Q.    Okay.  And you were shown a lot
10  of documents today, weren't you?
11     A.    Yes, I was.
12     Q.    Okay.  And you don't recall
13  seeing a lot of those documents before you
14  saw them today during your deposition, do
15  you?
16         MR. BAKER:  Object to form.
17         Also you're opening the door for me to
18         ask him about your discussions with
19         him, if you want to get into that.
20         MR. HYNES:  What's that?
21         MR. BAKER:  You're opening the
22         door for me to ask him about your
23         discussions with him by asking that
24         question, just to let you know.
25  QUESTIONS BY MR. HYNES:

Page 520

1      Q.    Let me rephrase the question.
2          You don't recall seeing the
3  documents during your time at CVS, do you?
4  Many of those documents?
5         MR. BAKER:  Object to form.
6      A.    No.  Many of the forms I did
7  not recall seeing.
8  QUESTIONS BY MR. HYNES:
9      Q.    Okay.  And one document you
10  were shown was Exhibit 406, the Draft IRR SOM
11  Process flow map, right?
12     A.    Yes.
13     Q.    Is that a draft?
14         MR. BAKER:  Object to form.
15     A.    Yes, the title says Draft IRR
16  SOM Process.
17  QUESTIONS BY MR. HYNES:
18     Q.    To the best of your knowledge,
19  is it the final process flow map?
20         MR. BAKER:  Object to form.
21     A.    To the best of my knowledge,
22  no, I do not know if that's the final.
23  QUESTIONS BY MR. HYNES:
24     Q.    And it's dated March 21st,
25  2012, correct?

Page 521

1      A.    Yes, that is correct.
2      Q.    I believe you testified that
3  you started working in SOM around March
4  of 2012.  Is that right?
5         MR. BAKER:  Object to form.
6      A.    Late February.
7  QUESTIONS BY MR. HYNES:
8      Q.    Late February, okay.
9          So this document, the date of
10  this document is pretty close in time, within
11  a month, to when you first started working in
12  SOM.
13     A.    Yes, I believe so.
14     Q.    Okay.  And you didn't recognize
15  this document, did you?
16         MR. BAKER:  Object to form.
17     A.    No, I did not recognize it from
18  my time at CVS.
19  QUESTIONS BY MR. HYNES:
20     Q.    To the best of your knowledge,
21  did you and the SOM team, when you worked in
22  SOM, review all of the orders flagged on an
23  IRR --
24         MR. BAKER:  Object to form.
25  QUESTIONS BY MR. HYNES:

Page 522

1     Q.    -- on a daily basis?
2     A.    Yes. We reviewed every order
3 on the IRR on a daily basis.
4     Q.    And did you conduct all of the
5 due diligence that you thought was necessary
6 to evaluate the orders on the IRR?
7        MR. BAKER: Object to form.
8     A.    Yes. I felt at the time, and
9 still do, that I completed the due diligence
10 as necessary.
11 QUESTIONS BY MR. HYNES:
12     Q.    And did you have access to all
13 of the data and information that you thought
14 was necessary to evaluate those orders?
15        MR. BAKER: Object to form.
16     A.    Yes, I believe so.
17 QUESTIONS BY MR. HYNES:
18     Q.    And during that same -- at that
19 time, you also understood the information
20 presented in the IRR?
21        MR. BAKER: Object to form.
22     A.    Yes, at that time I understood
23 the IRR.
24 QUESTIONS BY MR. HYNES:
25     Q.    Including all the scores that

Page 523

1 appeared for each drug in the IRR?
2        MR. BAKER: Object to form.
3     A.    Yes. I had a much better
4 understanding of all of the data on the IRR
5 at that time.
6 QUESTIONS BY MR. HYNES:
7     Q.    And sitting here today, are you
8 aware of any order for a controlled
9 substance -- strike that.
10        Sitting here today, are you
11 aware of a suspicious order for a controlled
12 substance that shipped during your time that
13 you were doing SOM at CVS?
14        MR. BAKER: Object to form.
15     A.    I'm not aware of any suspicious
16 orders. I wouldn't have been part of the
17 final decision of determining it as
18 suspicious or not.
19 QUESTIONS BY MR. HYNES:
20     Q.    Okay. But you're not aware of
21 any suspicious order that CVS shipped during
22 your time working in SOM for CVS?
23        MR. BAKER: Object to form.
24     A.    No, I am not.
25        MR. HYNES: I have no further

Page 524

1 questions.
2        MR. BAKER: I have a few.
3        FURTHER EXAMINATION
4 QUESTIONS BY MR. BAKER:
5     Q.    You said you've had nothing to
6 do with the pharmaceutical industry since you
7 left CVS, correct?
8     A.    Yes, that is correct.
9     Q.    Well, you've met with their
10 lawyer, who is also your lawyer, who is
11 sitting right next to you. That's the
12 pharmaceutical industry, isn't it?
13        MR. HYNES: Objection to form.
14 QUESTIONS BY MR. BAKER:
15     Q.    Right?
16     A.    Yes.
17     Q.    So you have had something to
18 do. You've met with the lawyer that
19 represents CVS who's sitting right next to
20 you, asking you questions, and you've also
21 had that lawyer agree to be your lawyer
22 personally here today in Seattle where you
23 work where we're taking your deposition,
24 correct?
25        MR. HYNES: Objection to form.

Page 525

1     A.    I was never under the
2 understanding that he was my lawyer. I was
3 under the understanding that I was here on
4 behalf of CVS, answering questions as a
5 former employee.
6 QUESTIONS BY MR. BAKER:
7     Q.    At the beginning of this
8 deposition, you heard the lawyer sitting next
9 to you identify himself as representing CVS
10 and representing Aaron Burtner.
11        You heard that, didn't you?
12     A.    Yes, I believe that was the
13 statement.
14     Q.    That is your lawyer sitting
15 right next to you, within three feet of you
16 the whole time of this deposition, correct?
17        MR. HYNES: Objection to form.
18 QUESTIONS BY MR. BAKER:
19     Q.    Right?
20     A.    Again --
21     Q.    That's your lawyer?
22     A.    I was never under the
23 understanding he was my lawyer.
24     Q.    Well, he says he is. Is he
25 your lawyer or not?

Highly Confidential – Subject to Further Confidentiality Review

Page 526

1    MR. HYNES: Objection, asked
2  and answered.
3    A.   I don't know. I don't know if
4  he's classified as my lawyer or not. I don't
5  know.
6  QUESTIONS BY MR. BAKER:
7    Q.   So the things that you say you
8  can't remember, the things that you're
9  talking about on this IRR, this is something
10 that you say you did every single day from
11 the time that you started into the SOM
12 program until the time you left at CVS; every
13 day that you showed up for work, this is what
14 you did, for months.
15   MR. HYNES: Objection to the
16 form.
17 QUESTIONS BY MR. BAKER:
18   Q.   Right?
19   A.   Yes.
20   Q.   And now you're telling us that
21 you can't remember it just because it was a
22 certain time period ago. Right? You can't
23 remember the details of it, even though you
24 did it every stinking day for about a year.
25 Am I right?

Page 527

1    MR. HYNES: Objection to form.
2    A.   I recall the form. I don't
3  recall the specifics of the metrics that are
4  on the form, no.
5  QUESTIONS BY MR. BAKER:
6    Q.   Well, he just asked you, were
7  you familiar with every number on the form
8  and what it represented in relation to your
9  review. Do you remember that line of
10 questioning?
11   MR. HYNES: Objection to form.
12 QUESTIONS BY MR. BAKER:
13   Q.   Do you remember that?
14   A.   I recall him asking me if I
15 recall all of the documents that we've
16 reviewed today.
17   Q.   No, he asked you were you
18 familiar with all the numbers and what they
19 identified on the IRR. Do you remember that?
20 Remember that line of questioning?
21   A.   Not specifically, no.
22   Q.   Okay. The truth is, you don't
23 remember everything on that IRR because you
24 didn't know what it represented even when you
25 worked at CVS, correct?

Page 528

1    MR. HYNES: Objection, form.
2    A.   No, I don't agree with that.
3  QUESTIONS BY MR. BAKER:
4    Q.   Well, you certainly had an
5  opportunity to go through this with
6  Mr. Goetz. When he put that IRR form in
7  front of you and went through every stinking
8  number on that IRR form, many of them you did
9  not know what they represented, correct?
10   MR. HYNES: Objection to form.
11   A.   Sitting here today, I don't
12 know exactly what those numbers mean. At the
13 time, I had a much better understanding.
14 QUESTIONS BY MR. BAKER:
15   Q.   Right. And you actually
16 have -- you've seen IRRs before you came in
17 here today. You've seen IRRs within the last
18 two days, have you not?
19   MR. HYNES: Objection. Don't
20   answer the question. I'm objecting on
21   work product. Don't answer the
22   question.
23 QUESTIONS BY MR. BAKER:
24   Q.   Well, he wasn't your lawyer
25 when you reviewed them. Is that right?

Page 529

1    MR. HYNES: Bill, I went for
2  four minutes. You're at five now.
3  QUESTIONS BY MR. BAKER:
4    Q.   Was he your lawyer when you met
5  with him to review for this deposition, or
6  not?
7    A.   I don't know.
8    Q.   Okay. If you don't know, then
9  he wasn't. So did you review IRRs with this
10 gentleman when he met with you?
11   MR. HYNES: Objection to form.
12   Objection --
13 QUESTIONS BY MR. BAKER:
14   Q.   Yes or no?
15   MR. HYNES: Objection on work
16   product. He's not going to answer the
17   question.
18 QUESTIONS BY MR. BAKER:
19   Q.   He wasn't your lawyer.
20   MR. BAKER: You weren't his
21   lawyer. He says you weren't his
22   lawyer.
23   MR. HYNES: And you're out of
24   time --
25           --oOo--

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1  QUESTIONS BY MR. BAKER:
2      Q.    Was he your lawyer or not?  Was
3  he your lawyer or not?
4      A.    You're out of time.
5          MR. HYNES:  He's not answering
6  the question.
7          MR. GOETZ:  I don't think
8  necessarily we're out of time.  How
9  much time was preserved from our
10  initial -- and we can look at the
11  protocol.  We actually have that time
12  available.
13          MR. HYNES:  Okay.  Forget about
14  the time.
15          THE VIDEOGRAPHER:  24 minutes.
16          MR. HYNES:  I made the
17  objection.  He's not answering the
18  question.
19  QUESTIONS BY MR. BAKER:
20      Q.    Was he your lawyer or not when
21  you met to prepare for this deposition?
22          MR. HYNES:  Objection, asked
23  and answered.
24  QUESTIONS BY MR. BAKER:
25      Q.    No.  Answer the question.  Was

Page 531

1  he your lawyer or not?
2          MR. HYNES:  Objection, asked
3  and answered.
4      A.    I don't know.
5  QUESTIONS BY MR. BAKER:
6      Q.    You don't know.
7      A.    I don't know.
8      Q.    Did you pay him money to
9  represent you?
10          MR. HYNES:  Objection.
11      A.    No, I have not.
12  QUESTIONS BY MR. BAKER:
13      Q.    Okay.  Has CVS paid you any
14  money for the time that you're missing from
15  work?
16      A.    No.
17      Q.    Okay.  How many hours have you
18  met with this gentleman sitting next to you?
19      A.    Approximately 40.  I don't
20  know.
21      Q.    40 hours?  40 hours you
22  prepared for this deposition.  Is that right?
23      A.    I believe so.
24      Q.    And you're going to tell me
25  that during that 40 hours, you didn't review

Page 532

1  one IRR?
2          MR. HYNES:  Objection, work
3  product.  He's not answering that
4  question.
5  QUESTIONS BY MR. BAKER:
6      Q.    After 40 hours --
7          MR. HYNES:  Your witnesses
8  don't answer that question.
9  QUESTIONS BY MR. BAKER:
10      Q.    After 40 hours of review,
11  you're going to sit here, look into this
12  camera and tell this jury that you don't
13  remember whether or not you can interpret
14  something on that IRR number by number.  Is
15  that what you're saying?
16      A.    Yes, sitting here today, I
17  cannot sit -- I cannot sit here and interpret
18  every single number on that IRR.
19      Q.    And you're going to tell us
20  that you could six years ago, but you can't
21  today, even though you've reviewed for 40
22  hours for this deposition.  Is that what
23  you're saying?
24          MR. HYNES:  Objection to form.
25                --oOo--

Page 533

1      A.    Yes.
2  QUESTIONS BY MR. BAKER:
3      Q.    In spite of what you think you
4  could or couldn't do for due diligence, the
5  truth is that you conducted deep dives on
6  very few orders of interest that showed up on
7  that IRR form.  Am I right?  In comparison to
8  the number that showed up, you did very few
9  deep dives.
10          MR. HYNES:  Objection to form.
11  QUESTIONS BY MR. BAKER:
12      Q.    Am I right?
13          MR. HYNES:  Objection to form.
14      A.    I don't recall how many deep
15  dives we completed.
16  QUESTIONS BY MR. BAKER:
17      Q.    Well, we looked at how many you
18  did today on the ones that CVS provided to
19  us.  We went through those.  And the truth is
20  that amounts to less than 2% of all the
21  orders on that form.
22          Am I right or wrong?
23          MR. HYNES:  Objection to form;
24  lack of foundation.
25                --oOo--

Highly Confidential – Subject to Further Confidentiality Review

Page 534

1 QUESTIONS BY MR. BAKER:
2    Q.   Am I right or wrong?
3        MR. HYNES:  Objection to form;
4 lack of foundation.
5 QUESTIONS BY MR. BAKER:
6    Q.   Am I right?
7    A.   I don't know.
8        MR. HYNES:  Objection to form;
9 lack of foundation.
10 QUESTIONS BY MR. BAKER:
11    Q.   You have no basis --
12    A.   I don't know how many orders
13 are on the IRRs on those days so I have no
14 way of saying whether or not it was 2% or
15 less.
16    Q.   On any given day you never did
17 more than two to five deep-dive reviews.  Am
18 I correct?
19        MR. HYNES:  Objection to form.
20    A.   Looking at the time studies
21 that were presented today, no.
22 QUESTIONS BY MR. BAKER:
23    Q.   Okay.  And on some of those IRR
24 forms, there were thousands.  We just looked
25 at one where there was over a thousand,

Page 535

1 right?
2        MR. HYNES:  Objection.
3 Misstates the record.
4 QUESTIONS BY MR. BAKER:
5    Q.   We just did.
6    A.   I thought we said 600 to 750.
7    Q.   On each side of the form.  When
8 you add it up, it's double that.  Right?
9        MR. HYNES:  Objection to form.
10    A.   Approximately.
11 QUESTIONS BY MR. BAKER:
12    Q.   Okay.  And you remember the
13 document that I presented you that said there
14 were 3100 orders that showed up on the IRR
15 over a two-day period?  Do you remember that
16 document?
17    A.   I remember seeing that
18 document.
19    Q.   Okay.  And out of those days,
20 you did no more than two to five deep-dive
21 reviews, correct?
22    A.   I have no --
23        MR. HYNES:  Objection, lack of
24 foundation.
25        --oOo--

Page 536

1 QUESTIONS BY MR. BAKER:
2    Q.   Is that correct?
3        MR. HYNES:  Objection, lack of
4 foundation.
5    A.   I have no way of knowing if
6 that's true.
7 QUESTIONS BY MR. BAKER:
8    Q.   Okay.  The truth is that you
9 used a very random method to decide what
10 you're going to do a deep-dive review on.
11 True?
12        MR. HYNES:  Objection to form.
13    A.   No.
14 QUESTIONS BY MR. BAKER:
15    Q.   The truth is that nobody
16 selected for you what you were to review.
17 You just selected it on your own, correct?
18        MR. HYNES:  Objection to form.
19    A.   Based off of the information we
20 were reviewing, yes.
21 QUESTIONS BY MR. BAKER:
22    Q.   And nobody determined whether
23 or not what you picked was appropriate or
24 inappropriate to review.  You just picked it
25 and if you reviewed it, you reviewed it and

Page 537

1 if you didn't, you didn't, and nobody
2 questioned that at CVS, correct?
3        MR. HYNES:  Objection to form.
4 QUESTIONS BY MR. BAKER:
5    Q.   Am I correct?
6        MR. HYNES:  Objection to form.
7    A.   I don't recall if anyone
8 reviewed what I -- what I -- I don't recall
9 if anyone went back and looked at the stores
10 that I reviewed, no.
11 QUESTIONS BY MR. BAKER:
12    Q.   Nobody ever came to you and
13 said, "Mr. Burtner, you're not reviewing
14 enough, you need to review more," did they,
15 at CVS?  Nobody did that?
16        MR. HYNES:  Objection to form.
17    A.   I don't recall that statement
18 being made.
19 QUESTIONS BY MR. BAKER:
20    Q.   Regardless of what you did or
21 failed to do, you never, ever, reported
22 anything to CVS that caused CVS to then
23 report a suspicious order to the DEA,
24 correct?
25        MR. HYNES:  Objection to form.

Page 538

1    A.    I don't know if that's true or
2 not.
3 QUESTIONS BY MR. BAKER:
4    Q.    Were you ever made aware of any
5 suspicious orders that were reported as a
6 result of any due diligence that you did on
7 any IRR?
8         MR. HYNES:  Objection, asked
9 and answered probably 10 times.
10   A.    I was not made aware of any.
11 QUESTIONS BY MR. BAKER:
12   Q.    As you sit here today, what --
13 you've got Exhibit 406 in front of you,
14 correct?
15   A.    I'm sure it's one of the --
16 actually, here it is.  Got it.
17        MR. HYNES:  You can put it up
18   on the screen?
19        MR. GOETZ:  We've got it up on
20   the screen.
21   A.    Found it.
22 QUESTIONS BY MR. BAKER:
23   Q.    As you sit here today, you
24 agree that you did one deep dive over an
25 18-month period in the jurisdiction that is

Page 539

1 the subject of the Ohio case, which is
2 Cuyahoga and Summit County, correct?
3        MR. HYNES:  Objection, asked
4 and answered --
5 QUESTIONS BY MR. BAKER:
6    Q.    One.
7        MR. HYNES:  -- probably five
8   times by Mr. Goetz.
9 QUESTIONS BY MR. BAKER:
10   Q.    Right?
11        MR. HYNES:  Same objection.  He
12   said he didn't know.
13 QUESTIONS BY MR. BAKER:
14   Q.    Am I right?
15   A.    That is the information that
16 was presented.  I don't know if it's right or
17 not.
18   Q.    Okay.  As you sit here today,
19 what is on Exhibit 406 that is not accurate?
20   A.    Sitting here today, I don't
21 know what's accurate or not.
22   Q.    Sitting here today, you've
23 chosen to remember things that you think
24 might be helpful for you, and you've chosen
25 to not remember things that you know are not

Page 540

1 helpful for you in the nature of your
2 testimony.
3         Am I correct or incorrect about
4 that?
5         MR. HYNES:  Objection.  Come
6   on, Bill.
7    A.    Absolutely incorrect.
8         MR. BAKER:  Those are all my
9   questions.  Thank you.
10        MR. GOETZ:  Do you have
11   anything?
12        MR. HYNES:  No, I don't.
13        THE VIDEOGRAPHER:  Okay.  We're
14   concluded.  This concludes the
15   deposition of Aaron Burtner.  We are
16   now going off the record, and the time
17   is 6:00 p.m.
18        (Deposition recessed at
19   6:00 p.m.)
20        (Signature was reserved.)
21             --oOo--
22
23
24
25

Page 541

1         CERTIFICATE
2
3         I, SUSAN PERRY MILLER, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter, Certified Court Reporter and Notary
   Public, do hereby certify that prior to the
5  commencement of the examination, AARON
   BURTNER was duly sworn by me to testify to
6  the truth, the whole truth and nothing but
   the truth;
7         That pursuant to Rule 30 of the
   Federal Rules of Civil Procedure, signature
8  of the witness was reserved by the witness or
   other party before the conclusion of the
9  deposition;
10        That the foregoing is a verbatim
   transcript of the testimony as taken
11 stenographically by and before me at the
   time, place and on the date hereinbefore set
12 forth, to the best of my ability.
13        I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15 employee of such attorney or counsel, and
   that I am not financially interested in the
16 action.
17
18
19
   Susan Perry Miller
20 CSR-TX, CCR-LA, CSR-CA-13648
   Registered Diplomate Reporter
21 Certified Realtime Reporter
   Certified Realtime Captioner
22 NCRA Realtime Systems Administrator
   Notary Public, State of Texas
23 My Commission Expires 03/30/2020
24
25 Dated: 22nd of January, 2019

Highly Confidential – Subject to Further Confidentiality Review

Page 542

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4    I, AARON BURTNER, do hereby
certify that I have read the foregoing pages
5    and that the same is a correct transcription
of the answers given by me to the questions
6    therein propounded, except for the
corrections or changes in form or substance,
7    if any, noted in the attached
Errata Sheet.
8
9
10
11
12    _____
AARON BURTNER              DATE
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 543

1    _ _ _ _ _ _ _
2        ERRATA
        _ _ _ _ _ _ _
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6    REASON: _____
7    ____  ____  _____
8    REASON: _____
9    ____  ____  _____
10   REASON: _____
11   ____  ____  _____
12   REASON: _____
13   ____  ____  _____
14   REASON: _____
15   ____  ____  _____
16   REASON: _____
17   ____  ____  _____
18   REASON: _____
19   ____  ____  _____
20   REASON: _____
21   ____  ____  _____
22   REASON: _____
23   ____  ____  _____
24   REASON: _____
25

Page 544

1    _ _ _ _ _ _ _
2        LAWYER'S NOTES
        _ _ _ _ _ _ _
3
4    PAGE   LINE
5    ____  ____   _____
6    ____  ____   _____
7    ____  ____   _____
8    ____  ____   _____
9    ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   ____  ____   _____
25