EXHIBIT 395

Highly Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5    ----------------------------) MDL No. 2804

6    IN RE:  NATIONAL PRESCRIPTION )

7    OPIATE LITIGATION            )

8    ----------------------------  ) Case No. 17-md-2804

9    THIS DOCUMENT RELATES TO:     )

10   ALL CASES                     )

11   ----------------------------) Hon. Dan A. Polster

12

13                 HIGHLY CONFIDENTIAL

14       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16             VIDEOTAPED DEPOSITION OF

17                 TERRENCE DUGGER

18

19                 January 23, 2019

20

21             Indianapolis, Indiana

22

23

24

**Page 2**

```
 1
 2
 3
 4
 5        The videotaped deposition of TERRENCE
 6   DUGGER, called by the Plaintiffs for examination,
 7   taken pursuant to the Federal Rules of Civil Procedure
 8   of the United States District Courts pertaining to the
 9   taking of depositions, taken before JULIANA F.
10   ZAJICEK, a Registered Professional Reporter and a
11   Certified Shorthand Reporter, at the Indianapolis
12   Marriott Downtown, Texas Room, 350 West Maryland
13   Street, Indianapolis, Indiana, on January 23, 2019, at
14   9:16 a.m.
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS:
 3      WEISMAN KENNEDY & BERRIS CO LPA
            1600 Midland Building
 4         101 W. Prospect Avenue
            Cleveland, Ohio 44115
 5         216-781-1111
            BY:  DANIEL P. GOETZ, ESQ.
 6            dgoetz@weismanlaw.com
 7
      ON BEHALF OF THE PLAINTIFFS:
 8
         MOTLEY RICE LLC
 9         28 Bridgeside Boulevard
            Mt. Pleasant, South Carolina 29464
10         843-216-9250
            BY:  MICHAEL E. ELSNER, ESQ.
11            melsner@motleyrice.com
12
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
13   AMERISOURCEBERGEN DRUG CORPORATION:
14
         REED SMITH LLP
15         Three Logan Square
            1717 Arch Street, Suite 3100
16         Philadelphia, Pennsylvania 19103
            215-851-8100
17         BY:  JACLYN M. SETILI WOOD, ESQ.
               (telephonically)
18            jsetiliwood@reedsmith.com
19
      ON BEHALF OF CARDINAL HEALTH, INC. AND THE DEPONENT:
20
         WILLIAMS & CONNOLLY LLP
21         725 Twelfth Street, N.W.
            Washington, D.C. 20005
22         202-434-5000
            BY:  MATTHEW C. MONAHAN, ESQ.
23            mmonahan@wc.com
24
```

**Page 4**

```
 1
 2   ON BEHALF OF CARDINAL HEALTH, INC.:
 3      ARMSTRONG TEASDALE LLP
            7700 Forsyth Boulevard, Suite 1800
 3         St. Louis, Missouri 63105
            314-621-5070
 4         BY:  SARAH E. HARMON, ESQ.
 5            sharmon@ArmstrongTeasdale.com
 6
      ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
 7   INC. AND THE WITNESS IN HIS CAPACITY AS A FORMER
      EMPLOYEE OF CVS:
 8
         ZUCKERMAN SPAEDER LLP
 9         1800 M Street, NW, Suite 1000
            Washington, D.C. 20036
10         202-778-1800
            BY:  R. MILES CLARK, ESQ.
11            mclark@zuckerman.com
12
      ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
13   PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
      INC.:
14
         ARNOLD & PORTER KAYE SCHOLER LLP
15         601 Massachusetts Avenue, NW
            Washington, D.C. 20001
16         202-942-5000
            BY:  DAVID KOUBA, ESQ. (Telephonically)
17            david.kouba@arnoldporter.com
18
      ON BEHALF OF WALMART INC.:
19
         JONES DAY
20         77 West Wacker Drive
            Chicago, Illinois 60601-1692
21         312-269-4164
            BY:  PATRICK L. DUBOIS, ESQ. (Telephonically)
22            pdubois@jonesday.com
23
24
```

**Page 5**

```
 1   ALSO PRESENT:
 2      BRIAN ASQUITH, Law Clerk
            Weisman Kennedy & Berris Co LPA
 3
         KAITLYN EEKHOFF, Law Clerk
 4         Motley Rice LLC
 5      JOHN KNOWLES, Trial Technician
 6
 7   THE VIDEOGRAPHER:
 8      MR. ANTHONY MICHELETTO,
            Golkow Litigation Services
 9
10
```

Page 6

I N D E X

WITNESS:                           PAGE:
TERRENCE DUGGER
    EXAM BY MR. GOETZ..................    9
    EXAM BY MR. MONAHAN................   149

                    *****

            E X H I B I T S
CVS - DUGGER EXHIBIT          MARKED FOR ID
No. 1   Terrence Dugger - LinkedIn        31
No. 2   US DOJ DEA Diversion Control      38
        Division, Title 21 Code of Federal
        Regulations
No. 3   2/21/2008 E-mail with attachment;  40
        CVS-MDLT1-000091508 - 518

No. 4   IRR Report;                       54
        CVS-MDLT1-000100925 - 983
No. 5   8/27/2010 E-mail chain;           63
        CVS-MDLT1-000010223 - 224

No. 6   8/26/2010 E-mail with attachment; 105
        CVS-MDLT1-000088956 - 9025
No. 7   PowerPoint titled: Suspicious     69
        Order Monitoring for PSE/Control
        Drugs, Summary of Key Concepts and
        Procedures, August 27, 2010;
        CVS-MDLT1-000064115 - 127
No. 8   9/1/2010 E-mail chain;            69
        CVS-MDLT1-000064114

Page 7

    E X H I B I T S (Continued)
CVS - DUGGER EXHIBIT          MARKED FOR ID
No. 9   10/12/2010 E-mail;                84
        CVS-MDLT1-000104883

No. 15  Fronts of various IRRs from       55
        various dates;
        CVS-MDLT1-000100722, -681, -775,
        -763, -1022, -851, -1125, -1227,
        -2659

No. 21  Excerpt of a document titled:    102
        VIPERx PDMR, Tuesday, June 12,
        2007; CVS-MDLT1-000068372 - 376

No. 31  9/24/2009 E-mail with attachment; 123
        CVS-MDLT1-000083340 - 343
No. 32  9/24/09 E-mail chain;            127
        CVS-MDLT1-000120422

No. 34  4/9/2010 E-mail with attachment;  129
        CVS-MDLT1-000118291 - 295
No. 35  Document titled: Transactional   137
        Analysis - DEA Review;
        CVS-MDLT1-000105714 - 721
No. 39  Document titled: January 2011 PSE  95
        IRR Recap;
        CVS-MDLT1-000009740 - 749

Page 8

1       THE VIDEOGRAPHER: We are now on the record. My

2  name is Anthony Micheletto. I am the videographer for

3  Golkow Litigation Services.

4       Today's date is January 23rd, 2019. The

5  time is 9:16 a.m., as indicated on the video screen.

6       This video deposition is being held in

7  Indianapolis, Indiana, in the matter of In Re:

8  National Prescription Opiate Litigation in the

9  United States District Court for the Northern District

10  of Ohio, Eastern Division.

11       Our deponent is Terrence Dugger.

12       Will counsel please identify themselves

13  for the video record?

14       MR. GOETZ: Dan Goetz on behalf of the

15  Plaintiffs.

16       MR. ELSNER: Michael Elsner on behalf of the

17  Plaintiffs.

18       MS. HARMON: Sarah Harmon, Armstrong Teasdale,

19  on behalf of Cardinal Health.

20       MR. MONAHAN: Matthew Monahan, Williams &

21  Connolly, on behalf of Cardinal Health and the

22  witness.

23       MR. CLARK: Miles Clark from Zuckerman Spaeder

24  on behalf of CVS Indiana, LLC, CVS Rx Services, Inc.,

Page 9

1  and the witness in his capacity as a former employee

2  of CVS.

3       THE VIDEOGRAPHER: Counsel on the phone?

4       MR. KOUBA: Good morning. This is David Kouba

5  of Arnold & Porter on behalf of the Endo and Par

6  Pharmaceutical Defendants.

7       MR. DUBOIS: This is Patrick Dubois from Jones

8  Day on behalf of Walmart.

9       MS. SETILI WOOD: And Jaclyn Setili Wood on

10  behalf of AmerisourceBergen.

11       THE VIDEOGRAPHER: Our court reporter today is

12  Juliana Zajicek.

13       Please swear in the witness.

14       (WHEREUPON, the witness was duly

15       sworn.)

16       TERRENCE DUGGER,

17  called as a witness herein, having been first duly

18  sworn, was examined and testified as follows:

19       EXAMINATION

20  BY MR. GOETZ:

21   Q.   Mr. Dugger, my name is Dan Goetz. We met

22  earlier before we started.

23       If I ask you a question that you don't

24  understand, please tell me and I'll clarify it. By

Highly Confidential – Subject to Further Confidentiality Review

Page 10

1  the same token, if you answer a question, I'll assume
2  you understood it.
3       Fair enough?
4  A.   That's fair.
5  Q.   Okay.  What did you do to prepare for
6  today's testimony?
7  A.   I met with the attorneys.
8  Q.   Which attorneys, when you say "the
9  attorneys"?
10 A.   Miles Clark and Matthew -- sorry,
11 Matthew -- Monahan is the last name.
12 Q.   And -- and when did you meet with Miles
13 Clark?
14 A.   Yesterday evening, maybe two days prior to
15 that, probably a total of maybe nine hours or so.
16 Q.   And when did you meet with Mr. Monahan?
17 A.   Yesterday.
18 Q.   When?
19 A.   Yesterday around three o'clock or so.
20 Q.   For how long?
21 A.   Three o'clock p.m.
22 Q.   For how long?
23 A.   Maybe an hour-and-a-half.
24 Q.   Was Mr. Clark present?

Page 11

1  A.   No.
2  Q.   Was anybody else present?
3  A.   No.
4  Q.   Are you currently employed by Cardinal?
5  A.   I am.
6  Q.   And is that your understanding why
7  Cardinal has provided you with an -- an attorney
8  today?
9  A.   Because I'm employed there?
10 Q.   Yes.
11 A.   That's not my understanding.  I'm just --
12 I was told that I needed to be here, so I'm here.
13 Q.   Okay.  Do you understand that Mr. Monahan
14 represents Cardinal?
15 A.   He explained that.
16 Q.   Okay.  And do you understand that when he
17 went on the record, he said that he represented you?
18 A.   I understand that.
19 Q.   Okay.  Are you aware that he represented
20 you before you heard that today?
21 A.   I am now.  It may have been said prior to
22 that, but I'm aware of it now.
23 Q.   You don't have a memory of that?
24 A.   No, I don't.

Page 12

1  Q.   Okay.  And so Mr. Monahan, who represents
2  Cardinal and said that he represents you, is it your
3  understanding the reason for that arrangement is
4  because you currently work at Cardinal?
5       MR. MONAHAN:  Counsel, I can confirm I am
6  representing him because he is a current Cardinal
7  Health employee.
8  BY MR. GOETZ:
9  Q.   Where did you go to college?
10 A.   Georgia State -- well, I went to several.
11 So there was West Georgia College in Carrollton,
12 Georgia; there was Atlanta Metropolitan College in
13 Atlanta; there is Georgia State University in downtown
14 Atlanta; and University of Cincinnati Distance
15 Learning.
16 Q.   Okay.  What degree did you receive from
17 Georgia State?
18 A.   Bachelor's of science in criminal justice.
19 Q.   And what degree did you receive from
20 University of Cincinnati?
21 A.   A master's of science in criminal justice.
22 Q.   And when was that degree from the
23 University of Cincinnati?
24 A.   2007, August of 2007, commencement was

Page 13

1  December of '07.
2  Q.   That degree that you earned from
3  University of Cincinnati was while you were working
4  for CVS?
5  A.   It was.
6  Q.   Okay.  And so you worked for CVS from June
7  of 2005 to November of 2011?
8  A.   That is correct.
9  Q.   What -- who was your actual employer?
10 A.   CVS.
11 Q.   CVS what?
12 A.   CVS Pharmacy.
13 Q.   Okay.  Is that where your paycheck came
14 from, CVS Pharmacy?
15 A.   It said it on the paycheck.  I'm not sure
16 where it came from.
17 Q.   Do you have any other degrees other than
18 those two we just spoke about?
19 A.   An associate degree from Atlanta
20 Metropolitan, also in criminal justice.
21 Q.   And do you have any other certificates
22 other than those two we've just spoke about?
23 A.   What do you mean by certificates?
24 Q.   Any other training, any other certificates

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 of training?
2     A.   Several.  There is Wicklander's and
3 Zulawski's.
4     Q.   Sorry?
5     A.   Wicklander and Zulawski, interviewing and
6 interrogation techniques, I've had that twice.  RCRA
7 training which is a part -- RCRA.
8     Q.   Can you spell that?
9     A.   It's an acronym, R-C-R-A.  It is basically
10 EPA training as it relates to, I think it's a reser --
11 conservation act.  I can't exactly -- remember exactly
12 what the acronym stands for, but it relates to how you
13 handle -- handle -- how you handle hazardous waste,
14 DOT training as it relates to hazardous materials
15 training, probably OSHA 10-hour training, OSHA 30-hour
16 training.  That's all I can remember at this point.
17     Q.   What was the OSHA training about?
18     A.   Really just hazard communication, how you
19 educate your employees, training your employees, just
20 being educated on certain aspects of 29 CFR.
21     Q.   I -- I don't -- you need to be a little
22 bit --
23     A.   29 Code of Federal Regulations.
24     Q.   Okay.  Related to what, though?  Was it

Page 15

1 workplace safety?
2     A.   Yes, workplace safety.
3     Q.   Okay.  Anything other than workplace
4 safety related to the OSHA training?
5     A.   Not that I can recall.
6     Q.   Okay.  And the -- the first one you
7 mentioned, Wickland and Zulawski?
8     A.   Wicklander.
9     Q.   Wicklander and Zulawski?
10     A.   And Zulawski, yeah.
11     Q.   And you -- you said that was
12 investigation?
13     A.   It's the -- the name of the course is
14 Interviewing and Interrogation Techniques.
15     Q.   Does that relate to theft, is that what
16 that was about?
17     A.   It -- it is about just how you conduct
18 interviews for theft related or whether it is
19 employees or -- whether it is internal or external
20 type of theft, just how you sit down across from an
21 employee and -- or person to elicit information.
22     Q.   It was about theft investigations, though,
23 correct?
24     MR. CLARK:  Object to the form.

Page 16

1 BY THE WITNESS:
2     A.   It could be about any investigation.
3 BY MR. GOETZ:
4     Q.   Okay.  What other types of investigations
5 did you cover?
6     A.   Did they cover in the training or did I
7 cover?
8     Q.   Did they cover in the training?
9     A.   It was really -- they didn't really
10 cover -- I don't recall them covering any types of
11 investigation.  It was more so because the training is
12 supposed to -- sorry.
13     So the training -- the training is
14 supposed to cover any types of investigation that may
15 take place.  So if it's one where a person has taken
16 money from a register, then you would know how to go
17 about getting the information from them.
18     Q.   When did you have that training?
19     A.   I've had it twice.  Once in the '90s, and
20 I can't remember when, and again probably 2012.
21     Q.   The training in 2012 was when you had
22 already left CVS, correct?
23     A.   That is correct.
24     Q.   And the training in the '90s was many

Page 17

1 years before you came to CVS, correct?
2     A.   That is right.
3     Q.   Okay.  And so that -- none of that
4 training was while you were at CVS, just so we're
5 clear?
6     A.   The training for the Zulawski --
7     Q.   Yes.
8     A.   -- and Wicklander?
9     No, that training did not occur when I was
10 at CVS.
11     Q.   After you graduated, can you give me your
12 job history?
13     A.   After I graduated when?
14     Q.   From Georgia State.
15     A.   At the time I was currently employed with
16 Rich's Department Store.  It was -- actually the name
17 of the company was Rich's Lazarus Goldsmith, or RLG.
18 They were a part of Federated Department Stores.  And
19 I was there from '90 -- from '93 to '98.  So, that's
20 where I worked at the time I graduated from Georgia
21 State.
22     Q.   What did you do there?
23     A.   Loss prevention -- well, several roles.
24 It was in loss prevention.  I started out as a store

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 detective where my job was to perform audits on the
2 floor to ensure that sensormatic tags and things along
3 those lines were on product, to catch shoplifters. I
4 moved from store detective to a senior store detective
5 where the concentration was more on employee theft.
6 And then -- and I forget the year, it could have been
7 '96, I was promoted to a loss prevention manager at
8 one of the department stores there in Atlanta.
9    Q.   When I mention "controlled substances," do
10 you know what that refers to?
11    A.   I do.
12    Q.   Okay.  And so that Rich's Department
13 Store, none of that work was related to the monitoring
14 of controlled substances?
15    A.   It did not have any controlled substances.
16    Q.   What did you do after Rich's?
17    A.   After Rich's, I worked -- I went to --
18 moved to Ohio, still with RLG, which is Rich's Lazarus
19 Goldsmiths again, and they have the Lazarus stores up
20 there, nameplate, and that was in Miamisburg, Ohio, it
21 is right outside of Dayton, Ohio.  Don't go there.
22        But -- so I was there for a bit.  And I
23 left there and started working for Sears here in
24 Indianapolis, and that was in the fall of '98.

Page 19

1    Q.   At Lazarus did you do the same thing as
2 you did at Rich's?
3    A.   I did.  I just had more FHEs, or full-hire
4 employees.
5    Q.   And you came to Sears in '98.
6        How long were you there?
7    A.   The fall of '98 until May of 2000.
8    Q.   And what -- what did you do there?
9    A.   Some of the same things I did with Rich's.
10 The store -- the -- the product base is a little
11 different, but it was an -- as an asset protection
12 manager.  My job really revolves around safety, safety
13 and general liability as well as workmen's comp, which
14 I never really handled at the Rich's Department Store,
15 so it was my first time really, you know, going into
16 that area, but that's what I did until May of 2000.
17    Q.   And, again, that job had nothing to do
18 with the monitoring of controlled substances, correct?
19    A.   It did not.
20    Q.   What did you do after Sears?
21    A.   After Sears I went -- I started working
22 for Airborne Express in Chicago as a corporate
23 investigator.  I started there in June of -- of 2000.
24 And, again, I was there.  My job was to conduct

Page 20

1 investigations as it related to freight being taken or
2 packages being stolen and handling other
3 security-related events there within the -- within the
4 company.
5    Q.   How long were you there?
6    A.   I was with -- well, the company was bought
7 out by DHL, and I can't remember the year.  I
8 apologize.  It may have been 2002, 2003.  But I was
9 there with Airborne Express/DHL Express USA until
10 June -- May or June of 2005.
11    Q.   Again, that job had nothing to do with the
12 monitoring of controlled substances?
13    A.   I did not monitor any controlled
14 substances there.
15    Q.   In June of 2005 you came to work for CVS?
16    A.   That's correct.
17    Q.   And you were here until November of '11?
18    A.   That's correct.
19    Q.   What was your job when you were hired at
20 CVS?
21    A.   Logistics, loss prevention manager.
22    Q.   How long did you hold that job?
23    A.   During my duration there.
24    Q.   When you were hired, did your job have

Page 21

1 anything to do with monitoring of controlled
2 substances?
3        MR. CLARK:  Object to form.
4 BY MR. GOETZ:
5    Q.   You can answer.
6    A.   Oh.  I did never monitored any type of
7 controlled substances while there.
8    Q.   Never in -- in your six years?
9    A.   Well, you asked me when I was hired there
10 was that my job.  And I'm saying that was not my job
11 when I first started working there.
12    Q.   Okay.  What -- what did you do when you
13 first started working there?
14    A.   It was to -- really safety, the -- the
15 welfare of the employees there, to perform audits,
16 whether it was safety, a slew of training to ensure
17 that employees were kept abreast as to, you know,
18 certain OSHA-related trainings, regulatory trainings,
19 that of hazardous materials as well, security,
20 ensuring that -- that the facility, you know, was
21 secure.
22        And I supervised three salaried employees
23 and depending on exactly how -- what time of the year
24 it was and whether or not CVS had made an acquisition,

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  anywhere between six to ten indirect reports or hourly
2  employees.
3      Q.   And how long did you have those
4  responsibilities?
5      MR. CLARK:  Object to the form.
6  BY THE WITNESS:
7      A.   From really the time I started there until
8  November of 2011.
9  BY MR. GOETZ:
10      Q.   At some point you started monitoring
11  controlled substances?
12      MR. CLARK:  Object to the form.
13  BY THE WITNESS:
14      A.   I never monitored any controlled
15  substances.
16  BY MR. GOETZ:
17      Q.   Do you know what this litigation is about?
18      A.   I have an idea.
19      Q.   What's your understanding?
20      A.   That a -- towns in Ohio is suing, I would
21  I think at that point, several companies because of
22  opioids.
23      Q.   What is your understanding as to why CVS
24  was being sued?

Page 23

1      MR. CLARK:  I would just like to caution and
2  remind you not to disclose in answering these
3  questions conversations you and I have had, privileged
4  conversations you and I have had.
5      THE WITNESS:  Okay.
6  BY THE WITNESS:
7      Q.   What was your question again?  I'm sorry.
8  BY MR. GOETZ:
9      Q.   Other than what you've discussed with
10  counsel, what you've learned from counsel, what is
11  your understanding as to why CVS is being sued?
12      A.   I don't have an understanding, no.
13      Q.   Okay.  Other than discussing with Cardinal
14  counsel, do you have an understanding as to why
15  Cardinal is being sued?
16      A.   No idea at all.
17      Q.   I will tell you, I will represent to you,
18  and if I'm wrong, they can correct me, that the
19  current lawsuits --
20      MR. CLARK:  Object to the form.
21  BY MR. GOETZ:
22      Q.   -- the current lawsuits relate to the
23  distribution of opioids into Cuyahoga and Summit
24  County as well as many other states, municipalities

Page 24

1  that have filed lawsuits, okay?
2      A.   Uh-huh.
3      Q.   The claims against CVS and Cardinal relate
4  to their failure to monitor when they distributed
5  opioids, okay.
6          Do you understand that?  Can -- can we
7  have that understanding about what this litigation is
8  about?
9      A.   Yes.
10      MR. CLARK:  Object to the form.
11  BY MR. GOETZ:
12      Q.   CVS distributed, are you aware during your
13  time period there, they distributed hydrocodone
14  combination products?
15      MR. CLARK:  Object to the form.
16  BY THE WITNESS:
17      A.   I don't -- well, I don't -- I never recall
18  CVS distributing anything.  I know they did transfers
19  to their stores, you know, the pharmacies.  You know,
20  you have a distribution center and you transfer
21  product to the stores.  I never knew they distributed
22  anything.
23  BY MR. GOETZ:
24      Q.   Are -- are you aware that CVS was a --

Page 25

1  strike that.
2          Are you aware that CVS, the CVS Indiana
3  distribution center where you worked was a licensed
4  DEA distributor for controlled substances?
5      A.   Yes.
6      Q.   Okay.  And so they were a distributor, can
7  we agree with that?
8      MR. CLARK:  Object to the form.
9  BY THE WITNESS:
10      A.   From a DEA perspective in terms of giving
11  them a DEA registrant number, yes.
12  BY MR. GOETZ:
13      Q.   And so when you said that they just
14  transfer --
15      A.   Yeah.
16      Q.   -- what did you mean by that?
17      A.   Well, because it is all CVS and you are
18  sending it to a CVS store.  There is not an outside
19  entity that you're giving product to.  You are sending
20  it to your own store.  So in my mind it is, like a,
21  just a transfer, it goes to other CVS stores.
22      Q.   Okay.  Did -- in -- in your mind do you
23  think that they had any less obligation because they
24  were just transferring, so they are just taking it

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  from the manufacturer and giving it to the pharmacy,
2  did the distributor -- did the CVS Indiana have any
3  obligation in your mind?
4      A.   Obligation --
5      MR. CLARK:  Object to the form.
6  BY THE WITNESS:
7      A.   Obligation to do what?
8  BY MR. GOETZ:
9      Q.   To monitor those controlled substances.
10     MR. CLARK:  Object to the form.
11 BY THE WITNESS:
12     A.   I guess when you mean monitor, there -- so
13 inside the facility itself there at the distribution
14 center, you have DEA regulations that require you to
15 keep the drugs within, you know, certain -- make sure
16 they are secured.  But other than that, I'm un -- I'm
17 unsure.
18 BY MR. GOETZ:
19     Q.   It's your understanding that when you talk
20 about DEA regulations, make sure they are secured, are
21 we talking about the controlled substances cage?
22     A.   We are talking about does DEA -- anything
23 that's a drug that is deemed by DEA to be secured
24 within that particular facility, it was secured.  So

Page 27

1  whether there were Schedule Vs, Schedule IV,
2  Schedule III or pseudoephedrine, which I don't think
3  there is any regulations specifically for that.  At
4  that time I don't think there were.  Those were kept
5  behind cage that was specified by the DEA, the local
6  DEA.
7      Q.   What I'm confused about is you said that
8  the DEA regulations required you to keep certain
9  substances secured, correct?
10     A.   Yes.
11     MR. CLARK:  Object to the form.
12 BY MR. GOETZ:
13     Q.   And you -- we just talked about Schedule
14 III, Schedule IV, Schedule V, correct?
15     A.   Yes.
16     Q.   And you talked about pseudoephedrine --
17     A.   Yes.
18     Q.   -- correct?
19     A.   Yeah.
20     Q.   Okay.  How did you keep them secured,
21 if -- if that's your understanding that was your
22 obligation?
23     MR. CLARK:  Object to the form.
24 BY THE WITNESS:

Page 28

1      A.   Oh, they were kept secured behind -- I
2  think the name of the -- the -- the name of the
3  company that manufactured the wire is WireCrafters, I
4  believe.  And that could be, you know, it is hard to
5  remember that, but I remember that the DEA actually coming
6  in and approving the cage, actually giving their idea
7  as to how the cage needed to be.
8          And based on what they said, that is what
9  you did in terms of building the cage and ensuring
10 that whatever controls are in place were in place
11 based on what the DEA told you to do.
12 BY MR. GOETZ:
13     Q.   So the cage I understand.  And then you
14 just said "whatever controls are in place."
15          What controls are you speaking about?
16     A.   Just securing the drugs in terms of who
17 can go inside and who can't.
18     Q.   So what -- what -- when you talk about
19 that DEA obligation, it's to make sure that there
20 isn't theft, correct?
21     A.   It's to ensure that the regulations are
22 followed.
23     Q.   Okay.  And what regulations are there
24 that's your understanding?

Page 29

1      A.   As it relates to the security of them,
2  ensuring that they are within the cage.
3      Q.   Any other DEA regulation you are aware of?
4      MR. CLARK:  Object to the form.
5  BY THE WITNESS:
6      A.   As it relates to what?
7  BY MR. GOETZ:
8      Q.   As it relates to the Schedule III drugs
9  that CVS was distributing.
10     A.   No, not that I recall, I mean.  It's
11 been -- it's -- it's been a while since I worked at
12 CVS.
13     Q.   I -- I -- I appreciate that, but you did
14 spend time with your lawyers, correct, a lawyer from
15 CVS and a lawyer from Cardinal?
16     A.   I did.
17     MR. CLARK:  Object to the form.
18 BY MR. GOETZ:
19     Q.   And you did spend a number of years after
20 you left CVS working in controlled substances,
21 correct?
22     A.   Correct.
23     MR. CLARK:  Object to the form.
24 BY MR. GOETZ:

Page 30

1    Q.   Okay.  So, when we talk about a number of
2  years, that's not really fair to the Plaintiffs to say
3  it's been a number of years because, one, you've had a
4  chance to meet with two sets of lawyers and you did
5  this after you left CVS in 2011?
6    A.   Well, you are asking me about CVS.  You
7  are not asking me about anything that happened after
8  CVS.  So I was really -- my point was making that it's
9  been a while since I worked at CVS.
10    MR. CLARK:  I'm sorry.  I object to the form of
11  that.  And just -- sorry.  I didn't want to interrupt.
12    THE WITNESS:  No, don't apologize.
13  BY MR. GOETZ:
14    Q.   So after you left CVS, what was your
15  understanding about DEA regulations?
16    A.   I didn't have any --
17    Q.   Okay.
18    A.   -- understanding at that point in time
19  because when I left CVS, the job I went to had no
20  dealings with DEA regulations at the time.
21    Q.   Do you have a LinkedIn page?
22    A.   I do.
23    Q.   Do you maintain that LinkedIn page?
24    A.   I try to.

Page 31

1    Q.   Okay.  You try to put honest information
2  on that LinkedIn page?
3    A.   Absolutely.
4    MR. CLARK:  Object to the form.
5  BY THE WITNESS:
6    A.   Absolutely.
7         (WHEREUPON, a certain document was
8         marked CVS - Dugger Deposition
9         Exhibit No. 1, for identification, as
10        of 01/23/2019.)
11  BY MR. GOETZ:
12    Q.   Okay.  I'm handing you what's been marked
13  as Exhibit 1.
14        Do you recognize that?
15    A.   It appears to be a copy, a printout of my
16  LinkedIn page.
17    Q.   And after you left CVS, you worked for The
18  Harvard Drug Group?
19    A.   Well, when I left CVS, I worked for the
20  Stage Stores.
21    Q.   And then after that you went to work for
22  The Harvard Drug Group?
23    A.   That is correct.
24    Q.   And what is The Harvard Drug Group?

Page 32

1    A.   I believe they are now defunct.  It was a
2  company that had several other companies underneath
3  its umbrella.
4    Q.   Was it affiliated with Cardinal?
5    A.   At the time that I started working there,
6  no.
7    Q.   Okay.  Did it eventually become affiliated
8  with Cardinal?
9    A.   Yes.
10    Q.   Okay.  And so after you left The Harvard
11  Drug Group, you then went to Cardinal, correct, they
12  were affiliated and you moved to Cardinal --
13    MR. MONAHAN:  Object to form.
14  BY MR. GOETZ:
15    Q.   -- as your employer?
16    A.   Well --
17    MR. MONAHAN:  Object to form.
18  BY THE WITNESS:
19    A.   Well, it was just an acquisition, so I
20  don't -- I didn't really leave.  It was just merged
21  together.
22  BY MR. GOETZ:
23    Q.   And -- and can you look at the Cardinal --
24  or The Harvard Drug Group, and tell me if I'm reading

Page 33

1  this correctly.  This is the first sentence you put on
2  your job.
3    A.   Okay.
4    Q.   "Responsible for, but not limited to:
5  Overseeing, monitoring, and coordinating all aspects
6  of network's distribution center's compliance
7  including DEA," and then you list a few other
8  government entities, correct?
9    A.   Yes.
10    Q.   Okay.
11        Is that -- is that wrong?  Did -- did you
12  not ensure compliance with DEA regulations while at
13  The Harvard Drug Group?
14    MR. MONAHAN:  Object to the form.
15    MR. CLARK:  Object to the form.
16  BY THE WITNESS:
17    A.   Well, I wrote here that it was all aspects
18  of the network's distribution center's compliance, so
19  that was specifically what The Harvard Drug Group had
20  to comply with.
21  BY MR. GOETZ:
22    Q.   Which was what?
23    A.   Ensuring that the drugs were secure there
24  in that particular location.

Page 34

1    Q.   And -- and that's my question.  That's
2  your only understanding of DEA regulations?
3    A.   That's not my only understanding, but
4  that's the job what I was doing at that particular
5  time was to secure the drugs.
6    Q.   What are the other understanding?  What --
7  what -- what do you understand the distributor's other
8  obligations are?
9    MR. MONAHAN:  Object to the form.
10   MR. CLARK:  Object to the form.
11 BY THE WITNESS:
12   A.   To, one, ensure that the 222 forms are
13 completed, to file 601s if there is a loss or a theft
14 regarding controlled substances, and to reconcile
15 your -- your numbers, your drugs to ensure that
16 they're reported.
17 BY MR. GOETZ:
18   Q.   You said the 222 form?
19   A.   Yes.
20   Q.   What's your understanding of what that is?
21   A.   I didn't start doing that right away when
22 I got to The Harvard Drug Group, but it is a job I
23 took on maybe in the last eight to -- six to eight
24 months that I was there, but it is a form that is used

Page 35

1  by companies to order controlled substances from at
2  this point The Harvard Drug Group.  It was actually
3  Major Pharmaceuticals, which is under that Harvard
4  Drug Group umbrella.
5    Q.   What type of controlled substances?
6    A.   I can't remember, but they were just
7  Schedule V, IV and III drugs at the time, but I can't
8  remember exactly between.
9    Q.   And what about a Form 601?
10   MR. MONAHAN:  Object to the form.
11 BY THE WITNESS:
12   A.   601s were filed if there were any type of
13 losses occur -- that may have occurred there at the
14 facility, then it was on the -- the onus was on the
15 facility to file the 601.
16 BY MR. GOETZ:
17   Q.   And what about you said rec -- reconciling
18 drugs to make sure reported, what does that mean?
19   A.   Just to ensure that, you know, the drugs
20 that you received and the drugs that you send out and
21 whatever your balance is, that they match, that you
22 don't have any kind of losses there at the -- at the
23 facility.
24   Q.   Essentially your understanding of the DEA

Page 36

1  obligations relate to theft and shrinkage, to make
2  sure that the -- the inventory you received matches
3  the inventory you think you -- the inventory you have
4  matches what you think the inventory you received is?
5    MR. CLARK:  Object to the form.
6  BY THE WITNESS:
7    A.   Well, that was my role, to ensure the
8  safety and to ensure the welfare and the security of
9  product there at the -- at those facilities.
10 BY MR. GOETZ:
11   Q.   Can you read -- go to -- back to your
12 LinkedIn?
13   A.   Yep.
14   Q.   Do you see the second paragraph?
15   A.   Where?
16   Q.   The second sentence, it says --
17   MR. CLARK:  I'm sorry.  Are we --
18 BY THE WITNESS:
19   A.   There are a number of jobs there.
20 BY MR. GOETZ:
21   Q.   The LinkedIn.
22   MR. CLARK:  I'm sorry.  The Harvard?
23 BY MR. GOETZ:
24   Q.   I'm -- I'm --

Page 37

1    MR. CLARK:  Sorry.
2  BY MR. GOETZ:
3    Q.   -- sorry.  The CVS.
4    A.   Okay.
5    Q.   And -- and tell me if this is how you
6  described your job:
7       "Through auditing and report reviews,
8  ensured regulatory compliance with OSHA, DEA, FDA,
9  USDA and Hazardous Materials regulations."
10       Correct?
11   A.   That's correct.
12   Q.   Okay.  You -- the only obligation -- the
13 only DEA obligation that you ensured compliance with
14 was related to theft and inventory control?
15   MR. CLARK:  Object to the form.
16 BY THE WITNESS:
17   A.   For my job there as a logistics loss
18 prevention manager, that is what my main objective
19 was, to ensure that the drugs were not sent out
20 anywhere, that they were -- that they were kept there,
21 we didn't have any losses or thefts.
22 BY MR. GOETZ:
23   Q.   Theft and inventory control, that was what
24 your understanding was ensuring DEA compliance at CVS?

Page 38

1    MR. CLARK: Object to the form.
2  BY THE WITNESS:
3    A.  That's what I recall, yeah. That's what I
4  recall at this point in time.
5         (WHEREUPON, a certain document was
6          marked CVS - Dugger Deposition
7          Exhibit No. 2, for identification, as
8          of 01/23/2019.)
9  BY MR. GOETZ:
10   Q.  I'm handing you what has been marked
11 CVS-Dugger 2.
12       Have you ever seen that document?
13   A.  I don't recall seeing it.
14   Q.  Have you -- I'd like to -- to point your
15 attention to (b), where it says "1301.74(b)"?
16   A.  Um-hum.
17   Q.  Could you read that, please?
18   A.  "The registrant shall design and operate a
19 system to disclose to the registrant suspicious orders
20 of controlled substances. The registrant shall inform
21 the Field Division Office of the Administration in his
22 area of suspicious orders when discovered by the
23 registrant. Suspicious orders include orders of
24 unusual size, orders deviating substantially from a

Page 39

1  normal pattern, and orders of unusual frequency."
2    Q.  When you were at CVS, were you aware of
3  that DEA requirement?
4    A.  No, not from this particular form.
5    Q.  I -- I'm not asking from this form. I'm
6  asking: Were you aware of that requirement for a
7  registrant to design and operate a system to disclose
8  to the registrant suspicious orders of controlled
9  substances?
10   MR. CLARK: Object to the form.
11 BY THE WITNESS:
12   A.  No. I mean --
13 BY MR. GOETZ:
14   Q.  You were --
15   A.  Well, what I'm saying is that I don't
16 recall having to design or operate any system at all
17 being that falling under my area of responsibility.
18 So I don't -- and I may have seen this before, but I
19 don't remember having that as a responsibility to
20 design and operate any system as it relates to the
21 registrant suspicious orders of controlled substances.
22   Q.  A -- according to you, you had no role in
23 CVS's monitoring of suspicious orders of controlled
24 substances, other than preventing theft?

Page 40

1    MR. CLARK: Object to the form.
2  BY THE WITNESS:
3    A.  It was -- I don't recall it ever being
4  explained to me that I had a responsibility of
5  monitoring suspicious orders.
6         (WHEREUPON, a certain document was
7          marked CVS - Dugger Deposition
8          Exhibit No. 3, for identification, as
9          of 01/23/2019.)
10 BY MR. GOETZ:
11   Q.  I'm showing you what's been marked as
12 Exhibit 3.
13       Do you know who Ron Buzzeo is?
14   A.  I know of him.
15   Q.  And -- and what do you know of him?
16   A.  That he was, I think, a former DEA agent
17 and that he may have done some consulting -- or had a
18 consulting business, and I know his name came up
19 during times when I was at CVS.
20   Q.  Do you know who Amy Lynn Brown is?
21   A.  I do not.
22   Q.  Do you know Amy Propatier?
23   A.  I've heard she is a CVS person, I believe.
24   Q.  Amy Lynn Brown and Amy Propatier are the

Page 41

1  same person. She changed her name.
2    A.  Okay.
3    Q.  I'll represent that to you.
4        This e-mail from Ron Buzzeo attached three
5  letters. And I'd like to ask really briefly if you've
6  ever seen them.
7        The first letter is a letter dated
8  September 27th, 2006. It is from the DEA and its
9  Bates number begins 91509.
10       Have you ever seen that letter?
11   MR. CLARK: Just take a moment to look at it.
12 BY MR. GOETZ:
13   Q.  And I'm not asking you -- let me -- let me
14 be clear. I'm not asking you if you saw it during
15 your prep. I'm asking you other than your prep, so I
16 don't want to...
17   A.  I don't recall seeing this before.
18   Q.  You were at CVS at this point, correct?
19   A.  Yeah, I was employed there during that
20 date that's listed on this.
21   Q.  You were in logistics and loss prevention
22 at this point, correct?
23   A.  That is correct.
24   Q.  Could you turn to the first sentence?

Page 42

1 It says:
2 "This letter is being sent to every
3 commercial entity in the United States registered with
4 the Drug Enforcement Administration to distribute
5 controlled substances."
6 Is it your understanding that CVS Indiana
7 would qualify under that sentence?
8 MR. CLARK: Object to the form.
9 BY THE WITNESS:
10 A. I would think so.
11 BY MR. GOETZ:
12 Q. Okay. And then it says "Background."
13 Could we go to the first sentence.
14 It says:
15 "As each of you is undoubtedly aware, the
16 abuse (non-medical use) of controlled prescription
17 drugs is a serious and growing health problem in this
18 country."
19 Let me ask you a question: Did anyone
20 ever inform you of that while you were at CVS?
21 MR. CLARK: Object to the form.
22 BY THE WITNESS:
23 A. That the abuse of -- that -- this sentence
24 here?

Page 43

1 BY MR. GOETZ:
2 Q. That -- about the abuse of opioids, did --
3 did anybody ever inform you of that?
4 A. I don't recall ever being told about it,
5 about it being a -- an issue at all.
6 Q. Were you aware when you were there that it
7 was an issue?
8 MR. CLARK: Object to the form.
9 BY MR. GOETZ:
10 Q. Strike that.
11 In -- while you were employed at CVS from
12 2005 to 2011, were you aware that -- that opioid abuse
13 was a serious and growing health problem in the
14 country?
15 A. I did not.
16 Q. Okay. Do you think, had -- are you aware
17 of it today?
18 A. In terms of what, it being a problem?
19 Q. Yeah.
20 A. Well, I hear things on the news about
21 there being issues with it, but there are issues with
22 crack cocaine in inner cities that are much bigger
23 than what people are saying here, so, I'm not here
24 because of that.

Page 44

1 Q. Is -- is -- is it your understanding as
2 you sit here today that the issues of crack cocaine
3 are more significant than the opioid crisis?
4 MR. CLARK: Object to the form.
5 BY THE WITNESS:
6 A. Me personally, absolutely. I think issues
7 in the inner city are never dealt with and I'm not
8 being deposed about those particular things. I'm here
9 because of some sentence here that says it's a serious
10 and growing problem.
11 BY MR. GOETZ:
12 Q. This sentence is from 2006, correct?
13 A. That's what it says on the paper.
14 Q. Do you -- do you know if anybody at CVS
15 Indiana distribution center was ever informed about
16 the opioid crisis?
17 MR. CLARK: Object to the form.
18 BY THE WITNESS:
19 A. During my time there or just in general?
20 BY MR. GOETZ:
21 Q. Yeah, during your time.
22 A. I have no idea.
23 Q. You were never -- you never saw a poster
24 about it, did you?

Page 45

1 A. I don't recall seeing a poster about it
2 being a -- an issue at all.
3 Q. Nothing in the break room, nothing in
4 the -- the -- the kitchen?
5 A. I -- I don't recall seeing anything. I
6 mean, if -- if I did, I would say I saw it. I just
7 don't recall seeing any kind of posters or any kind
8 of --
9 Q. The --
10 A. -- memos about it.
11 Q. There is lots of other posters in the
12 break room at CVS Indiana distribution center, aren't
13 there?
14 MR. CLARK: Object to the form.
15 BY THE WITNESS:
16 A. I don't know. I posted several things
17 there from a loss prevention standpoint or safety.
18 BY MR. GOETZ:
19 Q. Tons of posters about safety, right,
20 about -- about making sure that --
21 A. I didn't put up a ton. I mean, I'm just
22 saying I --
23 Q. Many --
24 A. -- I put posters up there.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  Q.  -- many --
2  A.  Okay.
3  Q.  -- is -- is that true about -- about
4  safety and about theft in that break room?
5  MR. CLARK: Object to the form.
6  BY THE WITNESS:
7  A.  I guess I put up maybe -- I put a
8  newsletter up.  There were a few things about injuries
9  at the facility, but that's pretty much all that we
10  put up there in -- in the -- the break room.
11  BY MR. GOETZ:
12  Q.  Can you go to the third paragraph, I -- I
13  want to ask you about this.  It says:
14      "Distributors are, of course, one of the
15  key components of the distribution chain.  If the
16  closed system is to function properly as Congress
17  envisioned, distributors must be vigilant in deciding
18  whether a prospective customer can be trus" --
19  "trusted to deliver controlled substances only for
20  lawful purposes."
21      Were you aware of that when you were at
22  CVS?
23  MR. CLARK: Object to the form.
24  BY THE WITNESS:

Page 47

1  A.  That -- I've never seen that sentence
2  before.  I don't recall seeing it, but, you know, the
3  latter part of my time there, the facility -- I know
4  the company itself were looking into the way drugs are
5  sent out from the DCs and how they go to, you know,
6  the facilities.
7      So from that perspective, yeah, we -- you
8  transfer it to the stores, you want to make sure that
9  they get what they are supposed to get and that they
10  get exactly what they are supposed to have, ensuring
11  that there is no, you know, alterated [sic] drugs,
12  there is no, you know, illegal contraband is -- if you
13  will, on our trucks.  So from that perspective, then,
14  yeah, I mean.
15  BY MR. GOETZ:
16  Q.  Again, we are talking about shrinkage
17  within the distribution chain, that -- that's what CVS
18  was focusing on, correct?
19  MR. CLARK: Object to the form.
20  BY THE WITNESS:
21  A.  That's what I was focusing on.
22  BY MR. GOETZ:
23  Q.  And -- and that's what you just described,
24  you said you want to make sure that -- that when we

Page 48

1  ship the drugs it gets to the store and they got --
2  they got what they ordered, correct?
3  MR. CLARK: Object to the form.
4  BY THE WITNESS:
5  A.  Yes, that is correct.
6  BY MR. GOETZ:
7  Q.  Again, do you know what shrink is when we
8  talk about shrink?
9  A.  Absolutely.
10  Q.  Okay.  What -- what is it?
11  A.  Well, it is basically if you -- put it if
12  you order ten -- ten items and you sell five, you are
13  doing inventory and you only have three, something
14  happened to your two, you've got a shrinkage of, you
15  know, 20 percent.
16  Q.  And that -- and if you have shrinkage,
17  that leads to lost profits, correct?
18  A.  It can, depending on what type of
19  shrinkage there is.
20  Q.  And -- and -- and that's what you just
21  described that CVS was -- was looking at, shrinkage
22  within that distribution chain?
23  A.  Well, according to the --
24  MR. CLARK: Object to the form.

Page 49

1  THE WITNESS: Sorry.
2  BY THE WITNESS:
3  A.  According to this particular sentence here
4  and that's what -- how I understood it.
5  BY MR. GOETZ:
6  Q.  I'm asking you what CVS was doing to your
7  knowledge within the distribution chain and to your
8  knowledge and you said they started looking later,
9  they were looking at issues related to shrinkage?
10  MR. CLARK: Object to the form.
11  BY THE WITNESS:
12  A.  My role there as it was explained to me
13  would be to look at shortages as it relates to how
14  stores would claim that they didn't receive items that
15  they were supposed to receive.  So it was my
16  responsibility if it came out of the Indianapolis DC
17  to really look to determine whether or not they
18  actually received what they were supposed to receive.
19  We would work in concert with the regional loss
20  prevention people who were the counterparts here at
21  the store as well as the pharmacies there and some of
22  the clerks or the technicians, if you will, to ensure
23  that they received what they were supposed to receive.
24  Q.  Again, shorthand, shrinkage, can we not

Page 50

1 agree to that?

2     A.  Well, it is not shrinkage because --

3     MR. CLARK: Object --

4 BY THE WITNESS:

5     A.  -- a lot of --

6     MR. CLARK: Sorry.

7        Object to the form.

8 BY THE WITNESS:

9     A.  For me it's -- you are investigating the

10 possible loss because people are saying that they are

11 missing it. There at the facility we would look to

12 determine whether or not those particular items went

13 out, and video wise and everything else, so we could

14 determine if you ordered, you know, ten items and you

15 received -- and it shows ten going inside the totes,

16 the totes being sealed and they went out on the truck,

17 we see them going inside the truck, then you

18 received -- you should have received what you ordered.

19 That's how we look at it.

20 BY MR. GOETZ:

21     Q.  And if they didn't, what do you call that?

22     A.  They need to call it, I don't call it

23 anything. I call it they sent it out there.

24     Q.  Maybe a better term is inventory control,

Page 51

1 is that kind of what you described?

2     A.  For us --

3     MR. CLARK: Object to the -- sorry. Object to

4 the form.

5 BY THE WITNESS:

6     A.  For there at the facility, it is a form of

7 inventory control to ensure that, again, those

8 particular items, specifically the controlled

9 substances, are monitored and sent out in the -- in

10 the proper manner.

11 BY MR. GOETZ:

12     Q.  Nobody ever explained to you at CVS that

13 one of your jobs was to monitor orders for unusual

14 size, did they?

15     A.  I don't recall ever -- anyone ever telling

16 me that was my job to do that at CVS.

17     Q.  And -- and you never monitored orders for

18 unusual size, did you?

19     MR. CLARK: Object to the form.

20 BY THE WITNESS:

21     A.  I -- I don't recall ever having to monitor

22 anything for any orders that went out in terms of the

23 amount that was ordered.

24        Again, it was based on if there were a

Page 52

1 number of orders that need to be shipped out from the

2 facility, the Rx department shipped those out. And if

3 there were claims made by the store that they didn't

4 receive anything, then my team would look into whether

5 or not those particular items were, in fact, put

6 inside the tote.

7 BY MR. GOETZ:

8     Q.  Nobody told you that one part of your job

9 was to determine or investigate whether orders

10 deviated substantially from a normal pattern, did

11 they?

12     MR. CLARK: Object to the form.

13 BY THE WITNESS:

14     A.  I don't recall that ever happening. I

15 know there were, you know, reports. Like I said, the

16 latter part of me being there is the period of time

17 that there were reports as it relates to the size of

18 product that was being sent to the stores, but,

19 frankly, they kind of just piled up in my office

20 because I was never given any direction as to what to

21 do with them.

22 BY MR. GOETZ:

23     Q.  Okay.

24        And -- and nobody ever told you that one

Page 53

1 of your jobs was to monitor or try to detect orders of

2 unusual frequency?

3     MR. CLARK: Object to the form.

4 BY THE WITNESS:

5     A.  I don't recall ever being told that. It

6 just -- it wasn't -- it wasn't my job. I didn't do

7 that.

8 BY MR. GOETZ:

9     Q.  Again, the orders that we're talking about

10 are those orders of controlled substances?

11     A.  That's understood, yeah.

12     Q.  Okay. And are -- we kind of started into

13 this.

14        Are you aware that -- of the opioids that

15 CVS distributed?

16     MR. CLARK: Object to the form.

17 BY THE WITNESS:

18     A.  Well, what do you mean, am I aware? I

19 mean, I know they had scheduled drugs there at CVS.

20 BY MR. GOETZ:

21     Q.  Okay. Are you aware that they distributed

22 hydrocodone combination products?

23     A.  Yes.

24     Q.  Are you aware that those are

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  Schedule III -- or were Schedule III until 2014?
2      A.   That's correct.
3      Q.   Okay.  Are you aware of CVS distributing
4  any other opioids?
5      MR. CLARK:  Object to the form.
6  BY THE WITNESS:
7      A.   Well, I don't think -- I don't know what
8  all opioids are.  I mean, I know they had hydrocodone
9  products.  I don't recall them ever having any
10  Schedule II drugs, so I would assume that the only
11  thing from an opioid standpoint, just my understanding
12  of it, would be the hydrocodone.
13      MR. GOETZ:  Five minutes?
14      THE VIDEOGRAPHER:  We are off the record at
15  10:02 a.m.
16          (WHEREUPON, a recess was had
17           from 10:02 to 10:15 a.m.)
18      THE VIDEOGRAPHER:  We are back on the record at
19  10:15 a.m.
20          (WHEREUPON, a certain document was
21           marked CVS - Dugger Deposition
22           Exhibit No. 4, for identification, as
23           of 01/23/2019.)
24  BY MR. GOETZ:

Page 55

1      Q.   Mr. Dugger, I'm handing you what's been
2  marked as Exhibit 4.
3      MR. CLARK:  Oh, yeah, this is multiple copies.
4      THE WITNESS:  Oh.
5  BY MR. GOETZ:
6      Q.   Do you recognize that document?
7      A.   Yes, it appears to be a -- an IRR report.
8      Q.   And when you said earlier that you were
9  receiving documents that were piling up, this is
10  the -- the report that you were speaking about,
11  correct?
12      A.   Yes, this is the IRR report I was
13  referring to.  I think there were -- there was some --
14  there was some before and there was some after a
15  certain date, so I don't --
16      Q.   I don't know what you mean by some before
17  and some after.
18      A.   Like so, looking at this one here, it just
19  has a -- a January 2011 date and...
20          (WHEREUPON, a certain document was
21           marked CVS - Dugger Deposition
22           Exhibit No. 15, for identification,
23           as of 01/23/2019.)
24  BY MR. GOETZ:

Page 56

1      Q.   Okay.  So let me show you what I've marked
2  as Exhibit 15.
3      THE WITNESS:  Multiple copies again.
4  BY MR. GOETZ:
5      Q.   And -- and let me represent to you what
6  that is.  That is just the front of various IRRs from
7  various dates, and if -- if we go to the first page of
8  that exhibit, it says "Terrence Dugger," correct?
9      A.   It does.
10      Q.   And so you are the recipient of this IRR,
11  correct?
12      A.   Not all of the time.  I mean, it's -- my
13  name is on here, but there are many times I didn't get
14  the forms.  There were things that were -- that may
15  have been sent to you but you may not have had the
16  responsibility of going through them.
17      Q.   I -- I get it.
18          According to this document, you are the
19  recipient, correct?
20      A.   Yes, it was sent to me, yeah.
21      Q.   And this -- this one is dated 9/28/2010?
22  Look at the first page, sir.
23          Do you see where it says right down on
24  the --

Page 57

1      A.   Yep.
2      Q.   Okay.  And then if you go to the next
3  page, I just pulled some out so we could show the
4  different dates you were getting it.
5          "Terrence Dugger," 10/19/2010?
6      A.   Yes.
7      Q.   Again, you are the recipient, and -- and
8  this was sent to you on October 19th, 2010, according
9  to this?
10      A.   Yes.
11      Q.   And then if you look at the third page,
12  again, "Recipient:  Terrence Dugger"?
13      A.   Yes.
14      Q.   And 11/30/2010?
15      A.   That is correct.
16      Q.   And then the next page, it says,
17  "Recipient:  Terrence Dugger"?
18      A.   The fourth page -- fourth page, yes.
19      Q.   And the -- the date is 12/14/10, correct?
20      A.   Correct.
21      Q.   And then the next page, again, you're
22  still the recipient?
23      A.   Yes.
24      Q.   And it is January 23rd of 2011?

Page 58

1  A.   Yes.
2  Q.   And then the next page you are the
3 recipient and it's February 20th of 2011, correct?
4  A.   That is correct.
5  Q.   And we keep going, 3/20/11 is the next
6 page?
7  A.   Yes.
8  Q.   And then 5/8/11?
9  A.   Yes.
10  Q.   And then 6/28/11?
11  A.   Correct.
12  Q.   Okay.
13       So when you -- if we go back to Exhibit 4,
14 you had said there were multiple dates.  I wanted to
15 show you, I believe this IRR was a report that was
16 printed five days a week.
17       Are you aware of that?
18  MR. CLARK:  Object to the form.
19       And just before -- I apologize, Dan,
20 before we move back to Exhibit 4, I just want to -- I
21 object to Exhibit 15 to the extent I think as
22 represented it purports to be just cover pages of
23 multiple --
24  MR. GOETZ:  That's all it is.

Page 59

1  MR. CLARK:  -- individual documents.
2       So there's -- you know, so it is not --
3 they're not complete documents that we are looking at.
4 We are just looking at cover pages, correct?
5  MR. GOETZ:  We were just looking -- absolutely,
6 that's correct.
7  MR. CLARK:  And I also just wanted the record to
8 be clear.
9  MR. GOETZ:  We are looking at cover pages where
10 Mr. Dugger was the recipient of -- of those IRRs, and
11 I just want to get a -- to show a smattering of dates
12 so that we had the beginning and an end when he was
13 receiving them.
14  MR. CLARK:  Understood.
15 BY MR. GOETZ:
16  Q.   Mr. Dugger, can you go back to Exhibit 4?
17  A.   Yes.
18  Q.   Are you aware of how often this was
19 printed?
20  A.   You said five days a week.  It -- I don't
21 recall what it was.  It may have been weekly, it may
22 have been daily.  The one I'm looking at here says
23 1/30 of 2011.  I don't know if this represented a
24 day's orders or if it represented a week.  I'm not

Page 60

1 sure.
2  Q.   Okay.  I -- I will tell you there has been
3 testimony in this case that this report was printed
4 five days a week.  This is a daily report, I believe,
5 except for Saturdays and Sundays.
6  A.   Okay.
7  MR. CLARK:  Object to the form.
8 BY MR. GOETZ:
9  Q.   Do you disagree with that?  Do you have
10 any reason to disagree with that?
11  A.   I have no reason to disagree with that.
12  Q.   Did you ever review this IRR?
13  A.   This one in particular?
14  MR. CLARK:  Objection to form.
15 BY MR. GOETZ:
16  Q.   Did you ever review an item review report?
17  A.   I've looked at them.
18  Q.   Okay.  And why -- why would you look at
19 them?
20  A.   Because it had my name on it.
21  Q.   All right.  And so you would review it for
22 what?
23  A.   Because it had --
24  MR. CLARK:  Object to the form.  Sorry.

Page 61

1 BY THE WITNESS:
2  A.   Because it had -- had my name on it, so.
3 BY MR. GOETZ:
4  Q.   And what were you trying to determine when
5 you would review it?
6  A.   Well, I would review the first page, and
7 it was probably put into Gary Lamberth's box to go
8 over it.
9  Q.   But you don't know what you did with it?
10 Is that speculation?
11  A.   Well, I don't -- there -- I -- I was
12 saying earlier there were a number that piled up in my
13 office for a period of time and they sat there and --
14 and nothing was done, to my knowledge, with them.  I
15 didn't do anything with them.  And then these started
16 appearing at a certain date, and I can't recall the
17 date, and they were put into the Rx department's box
18 because someone in that department went through it.
19  Q.   Do you know who?
20  A.   I don't know, but looking at this one here
21 for your Exhibit 15, Gary Lamberth has signed a number
22 of those, but I didn't give it to anyone in
23 particular.  It was a slot, I believe, a mail slot
24 that we all had things in.  It may have been put into

Page 62

his box.

2    Q.   When do you think you first started
3  receiving them?
4    A.   When did I or he?
5    Q.   You.
6    A.   I can't recall.
7    Q.   And when were they piling up in your
8  office?
9    A.   Probably -- I just can't recall.  I don't
10  want to speculate and give a date that's incorrect.  I
11  just don't -- I just remember them piling up.  I
12  don't -- I don't know.
13    Q.   Do you remember that there was a DEA
14  audit?
15    A.   We've had several DEA audits there.
16    Q.   Do you remember there was a DEA audit in
17  August of 2010?
18    A.   If that was the last one, yes, yes.
19    Q.   Okay.  And during a DEA audit, what was
20  your role while you were at CVS as it related to that
21  audit?
22    A.   As a loss prevention manager there,
23  logistics for the facility, and to answer -- to be a
24  representative of that facility as relates to loss

Page 63

prevention.

2    Q.   If somebody were to go over forms or
3  documents, you would try to find the most qualified
4  person to do that with the DEA auditor?
5    MR. CLARK:  Object to the form.
6  BY THE WITNESS:
7    A.   Would I try to find the most qualified
8  person?
9  BY MR. GOETZ:
10    Q.   Yeah.
11    A.   Absolutely.
12    Q.   Right.
13        You -- you wouldn't have somebody that
14  wasn't -- if there is somebody that is more familiar
15  with a document, whatever those documents are, you
16  would have that person review it with the auditor,
17  correct?
18    MR. CLARK:  Object to the form.
19  BY THE WITNESS:
20    A.   I would try to do that.  That would be my
21  goal.
22        (WHEREUPON, a certain document was
23        marked CVS - Dugger Deposition
24        Exhibit No. 5, for identification, as

Page 64

of 01/23/2019.)

2  BY MR. GOETZ:
3    Q.   I'm going to show you what's been marked
4  as Exhibit 5.
5        Do you see that second e-mail?
6    A.   There -- yeah, there is -- yeah.  So it is
7  the top from Pamela Hink -- Hinkle and there is a
8  second one from Frank Devlin.
9    Q.   Okay.  There -- there is actually a third
10  one, correct, from you to Frank Devlin?
11    A.   There is a third one, correct.
12    Q.   Okay.  And that is -- what's the subject
13  of that?
14    A.   It says "DEA Day 3."
15    Q.   And if you look at that e-mail, that is a
16  recap of the Day 3 of the DEA audit?
17    A.   Correct.
18    Q.   Do you see the last bullet on that first
19  page?
20    A.   Yes.
21    Q.   And it -- it says:
22        "I shared with her the suspicious order
23  monitoring report (IRR) and she asked how often I
24  received it."

Page 65

Do you see that?

2    A.   I do.
3    Q.   Okay.  And then the second bullet, if you
4  go down, we'll look at that, it said:
5        "I explained to her what the Lag 1, Lag 2,
6  et cetera indicated."
7    A.   Are you referring to the next page?  I'm
8  sorry.
9    Q.   Yes.
10    A.   Okay.
11    Q.   Do you see that:  "I explained to her what
12  the Lag 1, Lag 2" --
13    A.   I do.
14    Q.   -- "indicated"?
15        That Lag 1, Lag 2, that is what is shown
16  on Exhibit 4, correct, that is the IRR?
17    MR. CLARK:  Object to the form.
18  BY THE WITNESS:
19    A.   On what page?  Oh, just the same page?
20  BY MR. GOETZ:
21    Q.   Well, we can go to any page you want, but,
22  here, let's go to Page 100929.
23    A.   Okay.  All right.
24    Q.   Do you see that?

Page 66

1　　　　And if you look at, let's say,
2　Store 00788.
3　　　A.　Okay.
4　　　Q.　There is a month-to-date, correct?
5　　　A.　There is.
6　　　Q.　There is a Lag 1, Lag 2 all of the way up
7　to Lag 6?
8　　　A.　Yes.
9　　　Q.　And so you explained to her what that
10　meant, correct?
11　　　A.　Yeah, I did.  I mean, I wrote it here, so
12　I explained something to her.
13　　　Q.　So, a reasonable assumption is in -- in
14　August of 2010 you were the person with the most
15　knowledge about what that item review report
16　indicated, correct?
17　　　MR. CLARK:  Object to the form.
18　BY THE WITNESS:
19　　　A.　I don't know if I would have been the most
20　knowledgeable person at that facility or within CVS,
21　but apparently the memo that I sent to Frank Devlin, I
22　explained something to Madeline --
23　BY MR. GOETZ:
24　　　Q.　Okay.

Page 67

1　　　A.　-- about regarding Lag 1 and Lag 2.
2　　　Q.　What are those lags?
3　　　A.　I have no idea.
4　　　Q.　Did you know then?
5　　　A.　I must have known for me to talk to her
6　and -- and write it as a memo.  I got -- I just don't
7　recall.  I really don't recall what the Lag 1 and
8　Lag 2's are.  But here it says they are previous
9　month's ordering quantities.  So I guess that's what
10　they are.
11　　　Q.　If -- if -- if you look at this store, it
12　says score of .67.
13　　　　　Do you see that, above the -- the Lag 6?
14　　　A.　You are still looking at Store 788?
15　　　Q.　Yes.
16　　　A.　Okay.
17　　　Q.　Do you see that, .67?
18　　　A.　Under Lag --
19　　　Q.　Above Lag 6.
20　　　A.　Okay.  Above Lag -- okay.  Scores, yeah,
21　0.67.
22　　　Q.　Do you know what that means?
23　　　A.　I do not.
24　　　Q.　Did anybody ever tell you what that meant?

Page 68

1　　　A.　I don't --
2　　　MR. CLARK:  Object to the form.
3　BY THE WITNESS:
4　　　A.　-- I don't -- I don't recall anyone
5　telling me that.
6　BY MR. GOETZ:
7　　　Q.　You -- you never ever told Gary Lamberth
8　how to review these, did you?
9　　　MR. CLARK:  Object to the form.
10　BY THE WITNESS:
11　　　A.　I don't recall ever telling Gary Lamberth
12　how to review them.  I don't recall ever telling him
13　that.
14　BY MR. GOETZ:
15　　　Q.　I --
16　　　A.　That doesn't mean I didn't, but I just
17　don't recall.  I've had many conversations with Gary
18　about a number of things, and I don't remember having
19　conversations about this.
20　　　Q.　You -- you as you sit here today have no
21　idea if you ever had an understanding of the item
22　review report, correct?
23　　　MR. CLARK:  Object to the form.
24　BY THE WITNESS:

Page 69

1　　　A.　I had to have had some understanding of it
2　to explain to Madeline Kuzma about the Lag 1 and Lag 2
3　and what it -- what it meant.  But other than that, I
4　don't -- this is not anything that I did when I was
5　there.  I didn't -- you know, I didn't go through
6　these particular reports.  Like I said, they kind of
7　piled up and...
8　　　　　So I may have had an understanding to
9　explain to Madeline Kuzma, but I just don't recall
10　having a conversation with Gary Lamberth.  He didn't
11　work for me.  He actually worked for either Gary
12　Mil -- Gary Milikan or Andy Koropoulis.
13　　　　　(WHEREUPON, certain document were
14　　　　　marked CVS - Dugger Deposition
15　　　　　Exhibit No. 7 and No. 8, for
16　　　　　identification, as of 01/23/2019.)
17　BY MR. GOETZ:
18　　　Q.　I'm going to show you Exhibit 7 and
19　Exhibit 8 together.
20　　　　　Do you see Exhibit 7?
21　　　A.　I do.
22　　　Q.　Okay.  That -- the bottom e-mail is an
23　e-mail from John Mortelliti to you?
24　　　A.　Yes.

Page 70

1   Q.   Dated September 1st, 2010?
2   A.   10:46 a.m., yes.
3   MR. CLARK:  You know, I hate to do this, 7 -- I
4   think you have 7 and 8 reversed.  Just make sure the
5   record is clear.
6   BY MR. GOETZ:
7   Q.   That is 8 we are looking at right now.
8   The e-mail is 8.
9   A.   Yes, I see that, yeah.
10  Q.   I apologize if I misspoke.
11  MR. CLARK:  No, I'm just -- I didn't --
12  MR. GOETZ:  I appreciate it.
13  BY MR. GOETZ:
14  Q.   Looking at Exhibit 8, that is John
15  Mortelliti, correct?
16       Who is John Mortelliti?
17  A.   He is a regional loss prevention manager
18  of logistics.
19  Q.   Was he your boss?
20  A.   At this point he was, at this point in
21  time he was.  Well, he was my supervisor.  I don't
22  have a boss.
23  Q.   And -- and what does he say?  What does --
24  A.   "Terrence, this is for the DEA.  The

Page 71

1   corrections listed below have been updated.  It is
2   okay to review this with the agents."
3   Q.   And the subject of this is what?
4   A.   "DEA Speaking Points."
5   Q.   Could you go to Exhibit 7?
6   A.   Yep.
7   Q.   Who is Sean Humphries, by the way?
8   A.   Sean Humphries was John Mortelliti's
9   counterpart and he was my previous supervisor.
10  Q.   And -- and he was your supervisor where,
11  meaning where -- where did Sean Humphries sit?
12  A.   Where he was out of?
13  Q.   Yes.
14  A.   He was out of Woonsocket, Rhode Island at
15  the Woonsocket distribution center.
16  Q.   And -- and so where was Mr. Mortelliti?
17  A.   I think John Mortelliti was out of the
18  Lumberton, New Jersey facility, if I recall.
19  Q.   And can you explain to me why when you
20  testified earlier you had no role in the suspicious
21  order monitoring of controlled substances other than
22  theft, why you would be sent this DEA speaking points?
23  MR. CLARK:  Object to the form.
24  BY THE WITNESS:

Page 72

1   A.   Well, he said it was -- it was -- they
2   were speaking points, so it was something I needed to
3   review with the agents if they had a question about
4   it.
5   BY MR. GOETZ:
6   Q.   You were the person with the most
7   knowledge, correct?
8   MR. CLARK:  Object to the form.
9   BY THE WITNESS:
10  A.   The most knowledge for that site or --
11  BY MR. GOETZ:
12  Q.   Suspicious order monitoring at that point
13  at the CVS Indiana distribution center?
14  MR. CLARK:  Object to the form.
15  BY THE WITNESS:
16  A.   That would probably have been Gary Milikan
17  and then Lamberth, because Gary Milikan had a
18  pharmacist degree and I think he had a license to --
19  to -- to act as a pharmacist there and then it would
20  have been Gary Lamberth and then probably me.
21  Q.   Well, do you know why this was not sent to
22  Gary Lamberth?
23  MR. CLARK:  Object to the form.
24  BY THE WITNESS:

Page 73

1   A.   I don't know if it wasn't sent to him.  I
2   know it was -- this particular one was sent to me.
3   BY MR. GOETZ:
4   Q.   Did you forward this to Gary Lamberth?
5   A.   I don't recall sending it to Gary
6   Lamberth.
7   Q.   And -- and I can tell you we deposed
8   Mr. Milikan.
9   A.   Uh-huh.
10  Q.   You -- you think Mr. Milikan would have
11  had the most knowledge about suspicious order
12  monitoring in August of 2010 --
13  MR. CLARK:  Object to the form.
14  BY MR. GOETZ:
15  Q.   -- for the CVS Indiana distribution
16  center?
17  A.   Because he is a pharmacist by trade, I
18  think he would probably have knowledge about it.
19  Q.   What -- what would being a pharmacist do?
20  A.   He has to fill scripts and he has to -- he
21  falls under the regulations of the DEA.  I mean, that
22  would be -- he -- he's went to school for it.  He has
23  gone to school for it.  So I would expect him to have
24  more knowledge about it than me at that point in time.

Page 74

1 Q. What -- what about a -- since we are
2 talking about knowledge, what about a -- do you know
3 what a picker is, a picker and a packer?
4 A. Yes.
5 Q. Okay. And what about a picker and a
6 packer in the control cage, would you expect them to
7 have any knowledge about suspicious order monitoring?
8 A. I wouldn't expect them to have any at all.
9 Their job is to pick and pack.
10 Q. Could you go to 64116?
11 A. Of what exhibit, I don't...
12 Q. Of that --
13 A. Oh, 7?
14 Q. -- Exhibit 7.
15 A. I'm sorry. 6411?
16 Q. Yes.
17 A. 116, all right.
18 Q. Did -- did you ever share these with the
19 DEA?
20 MR. CLARK: Object to the form.
21 BY THE WITNESS:
22 A. I don't recall. It wasn't during the
23 audit. I may -- I think I shared an IRR report, but I
24 don't recall sharing this document here with anyone.

Page 75

1 BY MR. GOETZ:
2 Q. These were speaking points for, at a
3 minimum, for you to talk to the DEA about, right, to
4 give you an idea and then talk to the DEA about what
5 is shown in these?
6 A. That's what Mortelliti stated.
7 Q. And that's what you would understand that
8 e-mail to be?
9 MR. CLARK: Object to the form.
10 BY THE WITNESS:
11 A. Yep, yes.
12 BY MR. GOETZ:
13 Q. And if you look at 64116, it says: "CVS
14 Suspicious Order Monitoring." And I want -- I want to
15 read this to you.
16 A. Okay.
17 Q. "CVS has implemented several policies and
18 procedures to identify and investigate potential
19 suspicious orders."
20 Did I read that correctly?
21 A. Correct.
22 Q. The next bullet, which is under, which to
23 me would indicate that's one of the policies and
24 procedures, it says:

Page 76

1 "Stores are limited in how much
2 PSE/EPH/Control Drugs may be ordered."
3 MR. CLARK: Object --
4 BY MR. GOETZ:
5 Q. Did I read that correctly?
6 MR. CLARK: Object to the form.
7 BY THE WITNESS:
8 A. That's right, you read it correctly.
9 BY MR. GOETZ:
10 Q. In 2010 when this was sent to you, did you
11 have an understanding that stores were limited in how
12 much hydrocodone combination products they could
13 order?
14 MR. CLARK: Object to the form.
15 BY THE WITNESS:
16 A. I mean, I can't recall. I -- I may have.
17 I just can't recall ever having a conversation
18 specifically about suspicious order monitoring and it
19 being my responsibility. I just don't recall having
20 that conversation.
21 I mean, I had a lot of conversations about
22 that audit, you know, as it relates to the balancing
23 of, you know, the books and things of that sort, but I
24 just don't recall having one. It doesn't mean I

Page 77

1 didn't have it. I just don't recall having one with
2 anyone about suspicious order monitoring as it relates
3 to stores and with it being my responsibility.
4 BY MR. GOETZ:
5 Q. I will tell you that there was no max
6 cutoff line entered until October 11th, 2012, and
7 there was no hard threshold that was entered until the
8 new system came about on March 14th.
9 Would it bother you if -- if I told you
10 that wasn't a true statement?
11 MR. CLARK: Object to the form.
12 BY THE WITNESS:
13 A. If -- would it bother me if what you just
14 said, the second bullet point?
15 BY MR. GOETZ:
16 Q. If I told you that limit, the limit on how
17 much control drugs a store could order, that's
18 actually not a -- a true statement?
19 MR. CLARK: Object to the form.
20 BY THE WITNESS:
21 A. You are asking me would it bother me?
22 BY MR. GOETZ:
23 Q. Yes.
24 A. It wouldn't bother me at all.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q.   It doesn't?  If -- if they gave you
2 something to say, Hey, tell the DEA we are limiting
3 how much control drugs stores can order, that wouldn't
4 bother you if it wasn't true?
5    A.   Well, anything that's not true, that's
6 untrue would -- would raise a flag, but if you are
7 asking me personally does it bother me, it doesn't
8 bother me at all.
9    Q.   Okay.  The next bullet says:
10        "An inventory review report has been
11 developed to identify potential excessive orders."
12        That's the IRR we spoke about earlier,
13 correct, Exhibit 4?
14   A.   I would make that inference, yeah.
15   Q.   Yeah.  And that actually was the primary
16 process for identifying suspicious orders, correct?
17   MR. CLARK:  Object.  Object to the form.
18 BY THE WITNESS:
19   A.   It was?  I -- I don't know, I mean...
20 BY MR. GOETZ:
21   Q.   You have no knowledge of that?
22   A.   Well, it had to come from someone, someone
23 had to generate the report, so when you say it was the
24 only way, I don't -- that's why I don't want to say

Page 79

1 yes and if there are other ways, because someone
2 generated it, the report, and had it sent to the
3 facility there.
4    Q.   I said it was the primary process.
5    A.   But I don't know if it's the primary
6 process or not because it is generated by someone and
7 they sent it there to the facility.
8    Q.   And then it says down below:
9        'DC Rx and loss prevention have been
10 tasked with review and investigation of potential
11 suspicious orders from the DC to the stores."
12        Did I read that correctly?
13   A.   It was read correctly.
14   Q.   And -- and you were in loss prevention,
15 correct?
16   A.   I was a part of loss prevention.
17   Q.   And so -- and -- and you actually had
18 three reports to you, correct?
19   A.   I had three direct reports and then some
20 odd number of indirect reports.
21   Q.   You were the highest up in loss prevention
22 at CVS Indiana distribution center?
23   A.   At that facility I was the top ranking
24 person.

Page 80

1    Q.   So, what did you do to review and
2 investigate potential suspicious orders from the
3 Indiana distribution center to stores?
4    MR. CLARK:  Object to the form.
5 BY THE WITNESS:
6    A.   I don't recall.
7    MR. GOETZ:  I don't understand the -- the basis
8 of that.  I -- I -- Miles, we -- I -- I -- you've
9 objected every time.  I -- I don't understand the
10 basis of that objection.  There has been so many, but
11 now I'm finally asking.
12   MR. CLARK:  The basis of the objection to that
13 particular question?
14   MR. GOETZ:  Do you want me to ask him if he did
15 do anything?  Do you want me to ask him first if he
16 did do anything, is that -- you are -- you are
17 suggesting that he didn't do anything so it's
18 inappropriate to ask what he did?
19   MR. CLARK:  I am not suggesting anything.  I'm
20 just...
21   MR. GOETZ:  But I -- I'm -- I'm curious as to
22 why, why -- why that's a proper objection?
23   MR. CLARK:  Well, there -- you haven't
24 established the foundation that he did anything.

Page 81

1    MR. GOETZ:  That's what I'm saying.  So you're
2 objecting because we don't know that he did anything?
3 BY MR. GOETZ:
4    Q.   As the No. 1 person in loss prevention at
5 the CVS Indiana distribution center, did you ever do
6 anything to investigate potential suspicious orders
7 from that distribution center to stores?
8    A.   I don't recall doing anything.  I mean, it
9 was a -- it was an Rx -- it was an Rx responsibility.
10 That's why you see the forms with Gary Lamberth
11 signing them.  I don't recall doing anything.
12        Like I mentioned earlier, sir, they kind
13 of piled up for a bit, and then there was a time when
14 they were given to the Rx department, they were put in
15 their slot.
16        And the only thing that I recall doing,
17 anything with these particular loss prevention-wise
18 was to investigate the shortages that stores were
19 claiming that they didn't receive their product, or if
20 we got something from McKesson or Cardinal Health that
21 there may have been shortages there, we would, you
22 know, reach out to their people and hopefully they
23 will do an investigation there.  Again, we don't want
24 to file the 601s if we didn't have to.

Page 82

1    Q.   Did you ever inform anybody at CVS that
2  this slide, this talking point that was for the DEA
3  that you were not investigating stores but are
4  investigating potential suspicious orders from that
5  DC?
6    A.   I got confused on --
7    MR. CLARK:  Object to form.
8  BY THE WITNESS:
9    A.   I got confused on the question.  Can you
10 repeat it again?
11 BY MR. GOETZ:
12   Q.   I asked you if you ever investigated any
13 potential suspicious orders from the Indiana --
14 Indiana distribution center to the stores, correct?
15 And you said no?
16   A.   Right, if I -- yeah, I don't recall ever
17 having to investigate a suspicious order.  There were
18 shortages that we investigated, overages that
19 sometimes were investigated, but never a suspicious
20 order.  It just wasn't something that I did there or
21 anyone -- really, anyone in my department at that
22 point in time.  It was an Rx function that I recall.
23   Q.   This document says:
24       "Loss prevention," that's you, you were

Page 83

1  the top guy there, "have been tasked with review and
2  investigation of potential suspicious orders from the
3  DC to the stores."
4       Did you ever tell anybody at CVS loss
5  prevention is not doing that?
6    A.   I don't recall ever telling anyone that.
7    Q.   Did you ever tell anybody, Hey, these
8  speaking points you want me to talk to the -- to the
9  DEA about, that's not true because we're not doing it
10 in Indianapolis?
11   A.   I don't ever --
12   MR. CLARK:  Object to the form.
13 BY THE WITNESS:
14   A.   I don't ever recall saying that.
15 Mr. Mortelliti sent it.  If I shared it with agents, I
16 did.  I just don't recall sharing that.  I don't -- I
17 don't -- you know, I don't recall them coming back out
18 there after a certain time for anything relate --
19 related to an audit.
20       There may have been subsequent visits as
21 it relates to some changes to the DEA cage, because we
22 were kind of moving it around, I remember, to expand
23 it for pseudoephedrine.
24       (WHEREUPON, a certain document was

Page 84

1       marked CVS - Dugger Deposition
2       Exhibit No. 9, for identification, as
3       of 01/23/2019.)
4  BY MR. GOETZ:
5    Q.   I'm showing you what's been marked as
6  Dugger Exhibit 9.
7       Who -- who -- before we do this, who --
8  Gary Lamberth was the DC Rx, is that correct, at -- at
9  this time?
10   A.   He was --
11   MR. CLARK:  I'm sorry.
12       Object to the form.
13 BY THE WITNESS:
14   A.   Gary --
15 BY MR. GOETZ:
16   Q.   Who was the DC Rx in 2010 for the Indiana
17 distribution center?
18   MR. CLARK:  Object to the form.
19 BY THE WITNESS:
20   A.   DC Rx what?
21 BY MR. GOETZ:
22   Q.   Well, we just looked at a spreadsheet,
23 correct?  Or we looked at a PowerPoint that talks
24 about DC Rx?

Page 85

1    A.   Yes.
2    Q.   Who was in that department in 2010?
3    A.   I can't recall everyone that was --
4    MR. CLARK:  Object to form.
5  BY THE WITNESS:
6    A.   I can't recall everyone that was in the
7  DC Rx department.  They had a number of picker and
8  packers, there was a supervisor there, there was a
9  manager there, they had office personnel.
10 BY MR. GOETZ:
11   Q.   When we talked about that slide shown in
12 Exhibit 7, you had said Gary Lamberth might have been
13 investigating suspicious orders.
14       Do you remember that testimony?
15   A.   I did because he was the manager back
16 there, so it more than likely would have fell under
17 his responsibility, but you were asking about who was
18 DC Rx, there were just a number of people.
19   Q.   So it would be your understanding when
20 these DEA speaking points came to you that Gary
21 Lamberth or somebody in his department would have been
22 investigating the suspicious orders, correct?
23   A.   At this point in time, I have no idea who
24 would have been doing it.  Like I said, it was a -- a

Page 86

1 point in time when the IRR forms were placed in the
2 D -- the -- the Rx mail slot and he would look into
3 them.
4     But this particular -- I can't recall
5 exactly when based on this particular date of
6 October 12th of 2000. I just know I -- I wasn't doing
7 anything with them. Was Gary doing something at
8 that -- with them at that point in time, possibly. I
9 just don't remember.
10    Q.   Can we go to Exhibit 9?
11        That's an e-mail from John Mortelliti?
12    A.   Yes.
13    Q.   To a -- and it is dated October 12th,
14 2010, correct?
15    A.   It is.
16    Q.   Are any of those people shown on that
17 e-mail, the "to", are any -- were any of them at the
18 Indiana distribution center?
19    A.   There is myself, Terrence Dugger. It
20 looks as though it is just me on this particular
21 e-mail.
22    Q.   And this e-mail, the importance is high,
23 correct?
24    A.   It says "High."

Page 87

1    Q.   Right.
2        Could you read the first paragraph?
3    A.   The first sentence:
4        "I sent several control drug flagged items
5 out this morning. If your DC had a suspicious order
6 you would have received an e-mail from me by now."
7    Q.   Okay. Do you know what that means?
8    A.   It means that if the DC had a suspicious
9 order, he would have sent an e-mail out prior to this
10 particular e-mail.
11    Q.   And you would get those e-mails, correct?
12    A.   I don't know --
13    MR. CLARK:  Object to the form.
14 BY THE WITNESS:
15    A.   I'm not sure who he would have sent them
16 to. It just says "you would have," so I have to infer
17 that based on the people to, but I don't know what he
18 meant by it at that point in time. I didn't type it.
19 BY MR. GOETZ:
20    Q.   And -- and can you read the second
21 paragraph?
22    A.   "I would like to remind everyone that due
23 to the amount of suspicious orders flagged, I do not
24 have the time to follow up on each item I send out.

Page 88

1 It is the DC's responsibility to monitor the
2 suspicious order process until the flagged item is
3 declared not suspicious or there is an investigation.
4 Either way, you should have the results attached to
5 your files as per policy."
6        Should I continue?
7    Q.   No, sir.
8    A.   Okay.
9    Q.   When he talks about attaching the results,
10 he is talking about attaching the results of the
11 investigation, correct?
12    MR. CLARK:  Object to the form.
13 BY THE WITNESS:
14    A.   (Reading to self.)
15        I'm -- yeah, whatever investigation he may
16 have done, those are -- "Either way, you should have
17 the results attached," so the results of the
18 investigation that he would have done.
19 BY MR. GOETZ:
20    Q.   Do you -- do you read this that he would
21 have done it or do you read it that he doesn't have
22 time and he is expecting the DCs to do it?
23    A.   I read it as he doesn't have time, he is
24 expecting the DCs to look at those reports that he

Page 89

1 sent out, but either way you should have results
2 attached to your files as per policy.
3    Q.   He is looking to the distribution centers
4 to do some investigation of suspicious orders,
5 correct?
6    A.   Yes, it says it is the DC's
7 responsibility.
8    Q.   And the only person this was sent to at
9 the Indiana distribution center was you, correct?
10    A.   This e-mail, correct.
11    Q.   Or the e-mail.
12        And you were not doing any investigation,
13 correct?
14    A.   I was not doing any investigations on
15 suspicious order monitoring.
16    Q.   Do you know how this could have gotten to
17 somebody that might have been doing it?
18    A.   How this e-mail could have gotten to
19 somebody?
20    Q.   Yeah. Did -- did you forward it?
21    A.   I don't recall forwarding it, but he said
22 he sent out several drug flagged items. Maybe he sent
23 those to other people in the facility.
24    Q.   So you -- I apologize. I cut you off.

Page 90

1   A.  No.  Because it says the DC's
2 responsibility, so he may have sent it to someone else
3 in the DC.
4   Q.  He -- how many people are copied on this
5 e-mail when you say he -- you think that he sent this
6 e-mail to -- how many people are -- one, two, three
7 four, five, six, seven --
8   A.  Well, sir, to help you, when he says he
9 sent several control drugs flagged by them that
10 morning, it would -- if there was an e-mail where it
11 shows they were sent to me, then I would be able to
12 say, Yes, they were sent to me.  He just say he sent
13 them out, but I don't - and there is no attachment to
14 it, so I -- I can't -- I don't want to assume
15 anything.  I just don't recall having it and him
16 saying that he sent it to the -- it was the DC's
17 responsibility.  He may have sent it to somebody else.
18 That's all I'm saying.
19   Q.  You -- you think he sent this to 16 people
20 and then sent a separate one to somebody else saying,
21 Oh, I have to make sure Indiana distribution center
22 actually has somebody looking at it so I'm going to
23 send it to somebody else?
24   MR. CLARK:  Object to form.

Page 91

1 BY MR. GOETZ:
2   Q.  Is that what I understood?
3   MR. CLARK:  Object to form.
4 BY THE WITNESS:
5   A.  I don't know what he was inferring at this
6 point in time.  He sent it out and said he sent out
7 several earlier in that morning.
8   Like I said, it would help if there was an
9 e-mail that showed him sending it to me.  I don't
10 know -- I don't what he sent out that morning is all
11 I'm saying.
12 BY MR. GOETZ:
13   Q.  Mr. Dugger --
14   A.  Yes.
15   Q.  -- I -- I -- I will represent to you that
16 the way discovery is done in this case, and Mr. Clark
17 can object if I am wrong, is that we only get
18 suspicious orders if there was a store contained
19 within Cuyahoga or Summit County that was identified
20 on that day's report.
21   A.  Okay.
22   Q.  So unless by chance this day had a -- an
23 order of Cuyahoga and Summit, we would not get the
24 follow-up E -- we would not get that order.

Page 92

1   MR. CLARK:  I object to the testimony from
2 counsel and the --
3   MR. GOETZ:  Am I wrong --
4   MR. CLARK:  -- form of the question to the
5 extent it is a question.
6   MR. GOETZ:  Am I wrong about -- about how
7 discovery works?  Am I wrong about what's being
8 produced?
9   MR. CLARK:  I'm not being deposed.
10   MR. GOETZ:  Am I -- I'm -- I'm asking if I'm
11 wrong?  I'm -- I'm trying to -- he says he needs the
12 other documents.
13 BY THE WITNESS:
14   A.  What I'm say -- what I'm try -- what I'm
15 saying is that you just said -- you were asking me
16 this particular thing as though I'm responsible for
17 it, and I'm just pointing out it says the DC's
18 responsibility, he said he sent it out earlier, I'm
19 saying that maybe he sent it to someone else in the
20 DC.
21   If there was an e-mail that shows it -- it
22 was sent to me that particular morning, then I would
23 be able to say, yes, sir, it was in fact sent to me.
24 I'm just saying it says the DC's responsibility.

Page 93

1   And going back to your other exhibit where
2 it says Rx to DC Rx and loss prevention and really
3 going back to the other exhibits that has Gary
4 Lamberth signing them, maybe he sent them to Gary
5 Lamberth.  I don't know.  I just don't recall ever
6 re -- receiving anything.
7 BY MR. GOETZ:
8   Q.  Gary Lamberth is not on this e-mail marked
9 "high," is he?
10   A.  He is not.
11   Q.  Mr. Dugger, the reality is in -- in the --
12 is CVS never told you you were doing suspicious
13 monitoring, did they?
14   MR. CLARK:  Object to the form.
15 BY THE WITNESS:
16   A.  I don't recall them telling me that I had
17 to do suspicious order monitoring, no.
18 BY MR. GOETZ:
19   Q.  And -- and -- and yet they kept sending
20 you, the only person in the Indiana distribution
21 center, documents related to suspicious order
22 monitoring, didn't they?
23   MR. CLARK:  Object to the form.
24 BY THE WITNESS:

Page 94

1    A.   There were documents with my name attached
2  to it, yeah.
3  BY MR. GOETZ:
4    Q.   Because nobody was doing it at the Indiana
5  distribution center, were they?
6    A.   Mr. Gary Lamberth --
7    MR. CLARK:  Object to form.
8  BY THE WITNESS:
9    A.   -- was signing them, so he must have been
10  looking over them at that point in time.
11  BY MR. GOETZ:
12    Q.   I -- I'm asking about whether there was an
13  investigation.  I'm not asking about review of that
14  IRR for those few dates.  I'm asking if there was an
15  investigation.
16    A.   I did not conduct any investigations at
17  all.  I don't even know what an investigation would
18  con -- consist of as relates to suspicious order
19  monitoring.
20       I mean, your Exhibit 15 has a date of
21  September 28th of '10, this e-mail here has
22  October 12th of '10, so Gary may have been receiving
23  them at that point in time.
24    Q.   You -- you understand that we talked about

Page 95

1  Exhibit 15.  Those are reports that come day -- five
2  days a week, which is why they have different dates,
3  correct?
4    A.   Yes.
5    Q.   Do you know what a controlled recap is,
6  controlled drug recap?
7    A.   I do not.  I can't recall what that is.
8  I'd probably need to see it.
9    MR. GOETZ:  Would you mark this, please, as 39.
10       Thank you.
11       (WHEREUPON, a certain document was
12       marked CVS - Dugger Deposition
13       Exhibit No. 39, for identification,
14       as of 01/23/2019.)
15  BY MR. GOETZ:
16    Q.   Could you turn to Page 9742.
17    A.   Yes.
18    Q.   I will represent for the record this is
19  not a complete document.  This is only the first few
20  pages of a significantly longer document that has many
21  other dates, okay, just for the record.  But I just
22  wanted to ask you about something.
23       Do you see it says "January 2011 Control
24  IRR Recap"?

Page 96

1    A.   On 9742?
2    Q.   Yes, sir.
3    A.   Yes.
4    Q.   And do you know what this document is?
5    A.   A control IRR recap from January of 2011.
6    Q.   Do you -- is it your understanding that
7  this document is a -- stop.  Strike that.
8       What is your understanding of what this
9  document is?
10    A.   I have no idea about -- it says "recap," I
11  see my name along with Gary Milikan's.  I don't ever
12  recall seeing this, so, but it says it is a control
13  IRR recap and it has my name and Gary Milikan's name
14  on here on this first page twice.  I don't -- I'm
15  sorry.  I don't know what it is, I don't -- other than
16  it's what it says, it is a recap.
17    Q.   If you look at -- at the left-hand column,
18  it says, "Distrib" -- "DC," correct, distribution
19  center?
20    A.   Yes.
21    Q.   And then it has "Store," correct?
22    A.   That's correct.
23    Q.   And then it has "IRR date," correct?
24    A.   That's correct.

Page 97

1    Q.   And that IRR is the same thing we looked
2  at earlier in Exhibit 4, not the same document, but
3  the same format, correct?
4    A.   Yes.
5    Q.   Okay.  And so that IRR, and those are the
6  potentially suspicious orders that show up on that
7  report.
8       Do you understand that?
9    A.   Yes.
10    Q.   And then it says "Item in Question,"
11  correct?
12    A.   It does.
13    Q.   And it then says "Item Number"?
14    A.   For Column 6, yeah.
15    Q.   Yes.
16       And then nash -- "NDC," which is national
17  drug codes, correct?
18    A.   Yes.
19    Q.   And then "Quantity Ordered," do you see
20  that?
21    A.   Yep.
22    Q.   "Order Mistake"?
23    A.   Yes.
24    Q.   "Field LP Contacted."

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    Do you see that?
2    A.   I do.
3    Q.   It says "Date File Started," "Date File
4  Completed," "Investigation Needed," "File of Case
5  Attached to IRR."
6        Did I read those columns correctly?
7    A.   You did.
8    Q.   This is actually, sir, a recap of those
9  items that showed up on the IRR that received
10  additional due diligence.
11        Does that refresh your recollection?
12    MR. CLARK:  Object to the form.
13  BY THE WITNESS:
14    A.   When you are saying additional due
15  diligence, that means someone else looked into it.
16  BY MR. GOETZ:
17    Q.   Right.  Fair?
18    A.   If that's the recap, that's the recap.
19    Q.   And -- and this says you did it?
20    MR. CLARK:  Object to the form.
21  BY MR. GOETZ:
22    Q.   Does it say "field LP contacted"?
23    A.   It just says the person contacted.  It
24  doesn't say I conducted an investigation.  It just

Page 99

1  says -- and it also misses -- lists Gary Milikan's
2  name there as well.
3    Q.   Gary Milikan assumed that you must have
4  been the one to do it because he did not do any due
5  diligence on any orders at this time.
6    A.   I didn't do any due diligence --
7    MR. CLARK:  Object to the form.
8  BY THE WITNESS:
9    A.   I don't do either -- any either.  I don't
10  recall ever doing any type of investigation for
11  suspicious order monitoring.
12        Again, my crew was there for the security
13  of the -- the drugs while they were there inside the
14  facility and to investigate any shortages that were
15  presented.  I just don't recall doing this at all.
16  I -- I don't remember -- I don't even remember seeing
17  this report here.
18  BY MR. GOETZ:
19    Q.   And that was your understanding what your,
20  as you put on your LinkedIn, compliance with DEA
21  regulations was, correct?
22    A.   As it --
23    MR. CLARK:  Object to the form.
24  BY THE WITNESS:

Page 100

1    A.   As it relates to what my understanding of
2  my role there at CVS was, yes.
3  BY MR. GOETZ:
4    Q.   And you don't know anybody that was
5  investigating any orders that were potentially
6  suspicious, do you?
7    MR. CLARK:  Object to the form.
8  BY THE WITNESS:
9    A.   I -- I thought John Mortelliti said he was
10  investigating them here and he would send it over to
11  us when -- if there were some issues or he would
12  e-mail them.
13  BY MR. GOETZ:
14    Q.   He'd e-mail those that needed
15  investigation, correct?
16    A.   According to that Exhibit 9, if they were
17  declared "not suspicious or there is an
18  investigation," it is the DC's responsibility.  It
19  would have been the DC Rx.  I mean, it -- it wasn't
20  anyone in loss prevention.  We didn't do anything with
21  suspicious order monitoring.
22    MR. GOETZ:  Let's take five minutes.
23  BY THE WITNESS:
24    A.   I don't -- I just don't recall doing

Page 101

1  anything with suspicious order monitoring at all.
2  BY MR. GOETZ:
3    Q.   I'm sorry.  I didn't mean to cut you off.
4    A.   Well, I'm just saying I don't re -- I just
5  don't recall doing anything with suspicious order
6  monitoring.  I just don't recall doing anything with
7  it.
8    THE VIDEOGRAPHER:  We are off the record at
9  10:59 a.m.
10        (WHEREUPON, a recess was had
11         from 10:59 to 11:14 a.m.)
12    THE VIDEOGRAPHER:  We are back on the record at
13  11:14 a.m.
14  BY MR. GOETZ:
15    Q.   Mr. Dugger, do you know what a Viper
16  analyst is?
17    A.   Yeah, I have an idea as to what a Viper
18  analyst is.
19    Q.   What do you think it is?
20    A.   I'm trying to recollect.  So, CVS has --
21  or had when I was there individuals who are
22  responsible for generating reports, just in retail
23  investigations.  They are basically exception-based
24  reporting.  And they would -- you would print out

Page 102

1 things like shortages under $10 followed by an under
2 ring, normally for the stores from a retail
3 standpoint. And it was just a way for the store
4 investigators or loss prevention managers to kind of
5 quickly rule out a number of just returns that were
6 made and they can look at certain things that indicate
7 whether or not a theft may have occurred involving an
8 employee.
9     So the Viper analysts that I recall, they
10 were individuals who kind of printed out those
11 reports, so they were responsible for kind of going
12 through them and giving it to the field guys.
13     I never dealt with the Viper analysts, but
14 we just had a -- a regional business office there at
15 the Indianapolis DC, so I kind of knew some of those
16 individuals there, but that's my understanding of what
17 their roles are.
18     MR. GOETZ: Can you mark this, please, 21.
19     (WHEREUPON, a certain document was
20         marked CVS - Dugger Deposition
21         Exhibit No. 21, for identification,
22         as of 01/23/2019.)
23 BY MR. GOETZ:
24     Q.  I've put in front of you what's been

Page 103

1 marked as Exhibit 21, and it is, again, a part of a
2 document that begins on page -- Bates No. 68372 and
3 ends on 68376. I do not believe that's the full
4 document. I didn't think it was necessary to print
5 the full report.
6     Have you seen this Viper report before?
7     A.  I don't ever recall seeing it.
8     Q.  If -- if you look right under the title,
9 it says "fiscal March through May."
10     Do you see that?
11     MR. CLARK: I'll take your word for it. My copy
12 is hard to read.
13     MR. GOETZ: So is ours.
14 BY MR. GOETZ:
15     Q.  And do you see it says "high theft drug"?
16     A.  Yes, I can kind of make it out.
17     Q.  Okay. And then it says "by GCN."
18     Do you see that?
19     A.  Yes.
20     Q.  And GCN is the -- the number assigned by
21 CVS, is that correct?
22     A.  I have no idea what GCN stands for.
23     Q.  Okay. Could you go to 68373.
24     Do you see where it says "Don Dugger"?

Page 104

1     A.  I do.
2     Q.  Is that you?
3     A.  It is not.
4     Q.  Who is Don Dugger?
5     A.  It looks like he is a regional loss
6 prevention manager somewhere.
7     Q.  Do you know him?
8     A.  I do not, no relation.
9     Q.  I -- I figured it was you under -- and I
10 apologize -- under some other name. I -- I -- I
11 apologize.
12     This is kind of what you were talking
13 about, these are the theft reports, correct, these
14 are -- are reports to help determine whether or not
15 there was theft?
16     A.  That's my understanding of what a Viper
17 analyst did, but I -- I don't -- I don't recall seeing
18 this report before.
19     Q.  This is a Viper Rx report, correct?
20     MR. CLARK: Object to the form.
21 BY THE WITNESS:
22     A.  It says "Viper Rx PDMR," correct.
23     (WHEREUPON, a certain document was
24         marked CVS - Dugger Deposition

Page 105

1         Exhibit No. 6, for identification, as
2         of 01/23/2019.)
3 BY MR. GOETZ:
4     Q.  I'm going to show you what's been marked
5 as Exhibit 6.
6     That is an e-mail from Amy Propatier to
7 Annette Lamoureux?
8     A.  Yes.
9     Q.  Do you know who Annette Lamoureux is?
10     A.  Yes.
11     Q.  Who is Annette Lamoureux?
12     A.  She was a supervisor at -- under Sean
13 Humphries at the Woonsocket distribution center there
14 in Woonsocket, Rhode Island.
15     Q.  And the -- the title or subject of this is
16 "DEA SOP 8-25-10"?
17     A.  Document, yes.
18     Q.  Could you turn to the next page, please.
19     Do you recognize that document?
20     A.  I see it's the CVS Distribution Center
21 Controlled Drug - DEA Standard Operating Procedures
22 Manual. It's the manual. I don't recall it, but I'm
23 pretty sure we had it there. It says it's the
24 operating manual.

Page 106

1 Q. Did you ever review it?
2 A. I don't recall reviewing it, but, again,
3 as a part of my job, I may have looked at it, certain
4 aspects of it, you know, specifically how to handle a
5 DEA inspection, but I don't have any kind of
6 recollection of actually reading all of it. I
7 just don't -- I don't remember.
8 Q. Could -- could you go to Page 88996,
9 please. And if you look at the bottom of that.
10 Are you there?
11 A. Yes, 88996.
12 Q. Yeah. And it says: "Prevention and
13 Monitoring of Controlled Drug and PSE Suspicious
14 Orders"?
15 A. Yes.
16 Q. And then under that it says: "Prevention
17 and Monitoring of Controlled Drugs Suspicious Orders."
18 Do you see that?
19 A. I do.
20 Q. And it says: "1. General." And I'm
21 going to read to you and you tell me if I read it
22 in -- in a -- incorrectly.
23 "DEA regulations require that all
24 distributors must design a system to monitor, detect

Page 107

1 and report any suspicious control drug orders.
2 Suspicious orders are those involving an extraordinary
3 quantity, an uncommon method of payment or delivery or
4 any other circumstance that may indicate the control
5 drug will be used in violation of the law."
6 Did I read that correctly?
7 A. You read it correctly.
8 Q. And according to your testimony today,
9 one, you're not aware of that DEA requirement while
10 you were at CVS?
11 MR. CLARK: Object to form.
12 BY THE WITNESS:
13 A. I just don't recall. It just wasn't
14 something that I did on a daily basis here. It
15 wasn't -- this wasn't my scope of work.
16 BY MR. GOETZ:
17 Q. And you had nothing to do with suspicious
18 order monitoring as it relates to orders involving an
19 extraordinary quantity?
20 A. No, sir, I don't -- I don't recall ever
21 having to do any investigations regarding
22 suspicious -- orders of large amounts.
23 Q. Or uncommon method of payment?
24 A. Yeah, I wouldn't even know how they were

Page 108

1 paid for.
2 Q. Okay.
3 Or delivery or anything related to that,
4 correct?
5 A. No, I -- large orders, no. Delivery,
6 there was responsibility, again, from the standpoint
7 of ensuring that orders that -- product that was being
8 ordered were being sent correctly because, again, we
9 moved them from our warehouse to the store. So from a
10 delivery standpoint, ensuring that they got from A to
11 B, from that aspect. But in terms of large quantities
12 or suspicious orders, I don't recall having that as a
13 scope of my work.
14 Q. Standard operating procedures are
15 critical.
16 Do you agree with that?
17 A. I agree.
18 Q. Important that you follow them to the
19 letter.
20 Do you agree with that?
21 A. If they are written in such that they
22 should be followed to the letter, yes.
23 Q. Could you go back to Exhibit 2, please.
24 Do you see Exhibit 2?

Page 109

1 A. I have it here.
2 Q. And then if we go back to 1301.74(b), the
3 last sentence reads:
4 "Suspicious orders include orders of
5 unusual size."
6 Did I read that correctly?
7 A. That's correct.
8 Q. If we go back to the SOM SOP that CVS
9 wrote, they actually said "extraordinary quantity."
10 Do you interpret those as the same thing?
11 A. No, because they are using two different
12 words.
13 Q. And you --
14 A. I don't know what the DEA meant -- means
15 by "unusual" and what CVS meant by, you said,
16 "extraordinary." I don't --
17 Q. Ex -- extraordinary quantity seems like it
18 is -- it's a larger amount, correct?
19 A. Yeah, I understand extraordinary, I
20 understand what that means, but whether or not they
21 mean the same thing, unusual and extraordinary, I see
22 a lot of unusual things, very seldom do I see anything
23 extraordinary.
24 Q. I agree. Right. Extraordinary quantity

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 is an order that is -- is -- is of extreme size.
2 Can we agree with that?
3 A. Yes.
4 Q. Okay. That is not the same as unusual
5 size?
6 MR. CLARK: Object to the form.
7 BY THE WITNESS:
8 A. I would say it -- I don't know what the
9 DEA meant by "unusual," but to me, my own personal
10 definition, unusual is something odd. Extraordinary,
11 is -- it would be something that's beyond being odd.
12 BY MR. GOETZ:
13 Q. And these -- this is a -- a -- something
14 that has to be followed to the letter?
15 A. Most SOPs should be followed to the
16 letter, like I said, unless they are written in such a
17 way where, you know, there is wiggle room to not
18 follow them by the letter.
19 Q. Do you see any wiggle room here in -- in
20 this SOP?
21 A. I would have to read through it.
22 Q. Do you see any wiggle room where it says:
23 "Suspicious orders are those involving an
24 extraordinary quantity, an uncommon method of payment

Page 111

1 or delivery, or any other circumstance that may
2 indicate the controlled drug will be used in violation
3 of the law"?
4 MR. CLARK: Object to the form.
5 BY THE WITNESS:
6 A. I didn't write it. I would need to
7 read -- read it in its entirety. Again, I'm not --
8 you know, I'm -- I'm not a lawyer, so I -- you know,
9 so I can't -- I would need to read it in its entirety
10 to see whether or not there are some ambiguities with
11 it, but that's what they wrote there, that's what they
12 wrote.
13 BY MR. GOETZ:
14 Q. And -- and -- and it's up to you to follow
15 it?
16 MR. CLARK: Object to the form.
17 BY THE WITNESS:
18 A. Well, in this particular case it wasn't up
19 to me to follow it. Again, I didn't have anything to
20 do with drug suspicious orders. My job there was to
21 ensure that the product was -- that our employees were
22 safe first and foremost, and that the -- the drugs
23 were -- stayed within the cage and they were sent to
24 where they needed to go and we didn't have any losses.

Page 112

1 BY MR. GOETZ:
2 Q. You don't find that ambiguous, do you,
3 "extraordinary quantity"?
4 A. Not necessarily. But, again, I don't -- I
5 didn't write extraordinary, so I don't know if -- I --
6 I can assume what they meant by it, but I don't want
7 to assume anything because I didn't write it.
8 Q. Mr. Dugger --
9 A. Yes.
10 Q. -- your job was -- was relying on the SOPs
11 and working through the SOPs on a daily basis. I
12 mean, that was part of what you did, right, follow the
13 standard operating procedures to the letter?
14 A. My job was to do what was asked of me, and
15 I can't recall everything that was in an SOP. If I
16 needed to relate back to it, it was there, but I don't
17 think you could find anyone that can recite verbatim
18 an SOP that they read at the time they were hired or
19 any particular time. You refer back to it if you
20 needed to, and I would have referred back to it if I
21 needed to. If there was something within my scope of
22 work for me to refer back to it, I would have done
23 that, but --
24 Q. So --

Page 113

1 A. -- I couldn't recite what I read at this
2 point in time or even then.
3 Q. So you -- because you had to follow it to
4 the letter, you -- you wrote that in e-mails and you
5 sent it out to a ton of people, didn't you?
6 A. I -- I wrote what?
7 Q. That you need to follow the SOPs to the
8 letter?
9 A. I'm pretty sure I would have said people
10 need to follow it to the letter, but, again, we are
11 talking about your scope of work. Everything within
12 the SOP may not apply to everyone.
13 So if it applied to an individual, they
14 are looking at it, there are things that says security
15 or things that says recordkeeping and accountability.
16 So if it fell with under your scope of work, then you
17 should follow it to the letter. Unless, again, like I
18 said, there is areas where it allows you not to.
19 Q. Could -- could you go to the next page,
20 please, of that, 88997?
21 Do you see down below it says "Escalation
22 of Review"?
23 A. Yes.
24 Q. And it says:

Page 114

1    "The DC pharmacy supervisor shall verify
2  specific ordered items and notify the field Viper
3  analyst and the DC's loss prevention manager by e-mail
4  or fax of any orders that appear to be ex" --
5  "excessive or potentially suspicious as soon as
6  possible."
7        You were the DC loss prevention manager,
8  correct?
9    A.   I was.
10    Q.   Did you ever get an e-mail about a
11  potentially suspicious order?
12    A.   I can't say if -- if I -- I can't say I've
13  never received an e-mail or if I have received one.  I
14  just don't recall ever receiving an e-mail regarding
15  anything about excessive orders.  I received a
16  plethora of e-mails regarding shortages.  I just don't
17  recall ever receiving an e-mail from, at this point it
18  would have been Robert Richardson, I believe, he was
19  the pharmacy supervisor, I think, but I don't -- I
20  don't recall receiving anything, but it --
21    Q.   Do you have a --
22    A.   -- doesn't mean that I didn't.
23    Q.   I understand.
24        You -- you have no independent memory of

Page 115

1  ever receiving an e-mail about excessive or
2  potentially suspicious orders?
3    A.   I can't recall.  It just -- it just wasn't
4  something that I did on a -- that my team was
5  responsible for, so I -- even if you told me about a
6  loss, I would be like, well, losses we investigated,
7  but I couldn't tell you about a specific one unless,
8  you know, I saw it, but I just don't recall -- I don't
9  recall seeing it.  I apologize.
10    Q.   That's fine.
11        I -- I'm just asking if you have any
12  independent memory --
13    A.   No, I don't.
14    Q.   -- of ever -- okay.
15    MR. CLARK:  Object to form.
16  BY MR. GOETZ:
17    Q.   And do you have any independent memory of
18  ever receiving a fax about an order that appeared
19  excessive or potentially suspicious?
20    A.   No, I don't recall receiving any --
21  anything about any excessive or potentially suspicious
22  orders.
23    Q.   You received, you said, regular
24  communication about losses, correct, you just said

Page 116

1  that?
2    A.   I received a lot of e-mails about losses
3  from the stores about their shipments.
4    Q.   And -- and the reason that was important
5  was because that was product for which CVS didn't get
6  paid, right?
7    MR. CLARK:  Object to the form.
8  BY THE WITNESS:
9    A.   I don't know whether or not that CVS
10  didn't get paid for it.  I'm talking about the DC
11  sending product to the stores.  Very seldom, if at
12  all, do I recall getting involved in the delivery from
13  McKesson, ABC, Cardinal Health coming to the facility.
14  That was something that someone else handled.
15  BY MR. GOETZ:
16    Q.   Mr. Dugger, if -- if -- if the
17  distribution center --
18    A.   I'm sorry if I misunderstand.
19    Q.   -- thinks they shipped 100 doses of a drug
20  and the -- the pharmacy says they only received 90 --
21    A.   Okay.
22    Q.   -- there are -- that's a loss of ten,
23  correct?
24    A.   It may not be a loss of ten.  It may

Page 117

1  only --
2    Q.   It's a -- it's a -- it's a reported loss
3  of ten that you have to investigate?
4    A.   Correct.
5    Q.   And the reason you investigate it is
6  because that ten should be sold and if it's not found,
7  then CVS didn't receive revenue for that ten, correct?
8    MR. CLARK:  Object to the form.
9  BY THE WITNESS:
10    A.   I mean, it doesn't mean -- we didn't
11  receive it from a sales standpoint, but it could still
12  be left in the DC, it could have been mis-picked there
13  at -- or from the store level.  A number of things can
14  happen with it.
15  BY MR. GOETZ:
16    Q.   I -- I -- I get it.
17    A.   Right.
18    Q.   But if -- if there is actually a loss, the
19  truck driver stole it out of the tote or the -- the
20  pharmacy tech stole it at the pharmacy, CVS is not
21  getting paid then for that ten, correct?
22    A.   They are not getting paid from a purchase
23  standpoint.  I don't know what they have from -- in
24  terms of insurance or...

Page 118

1  Q.  Do you know if they have insurance?
2  A.  I don't know.
3  MR. CLARK:  Object to the form.
4  BY THE WITNESS:
5  A.  I have -- don't have no idea.
6  BY MR. GOETZ:
7  Q.  All right.  They monitor something that
8  can result in a loss of revenue closely?
9  MR. CLARK:  Object to the form.
10  BY THE WITNESS:
11  A.  Was that a question?  I'm sorry.
12  BY MR. GOETZ:
13  Q.  Yeah.
14  A.  Can you repeat it?  I'm sorry.
15  Q.  Do they monitor something that could
16  result in a close -- a loss of revenue closely?
17  MR. CLARK:  Object to the form.
18  BY THE WITNESS:
19  A.  I don't know what they do.  It has been a
20  number of years since I've worked there.
21  BY MR. GOETZ:
22  Q.  Could we go back to your LinkedIn page,
23  please.
24  A.  Was that the very first thing?

Page 119

1  MR. CLARK:  Exhibit 1.
2  BY MR. GOETZ:
3  Q.  Yes.
4  Do you see the -- the paragraph we had
5  read earlier about CVS, and it says:
6  "Through auditing and report reviews
7  ensured regulatory compliance with DEA regulations."
8  And I -- I shortened some of the other stuff, but
9  that's what you wrote, correct?
10  A.  That's what I wrote.
11  Q.  While you were at CVS, was there ever a
12  mon -- any auditing of the suspicious order monitoring
13  program?
14  MR. CLARK:  Object to the form.
15  BY THE WITNESS:
16  A.  By -- by me?
17  BY MR. GOETZ:
18  Q.  By -- are you aware of anybody ever doing
19  it?
20  A.  That's auditing the program?  I don't --
21  no, I don't recall anyone there at the DC auditing the
22  program.  Like I said, the IRR reports were there and
23  Gary Lamberth signed off on them.
24  Q.  Who -- who -- did anybody ever audit Gary

Page 120

1  Lamberth's work on the IRR?
2  A.  I'm not aware.
3  MR. CLARK:  Object to the form.
4  BY THE WITNESS:
5  A.  I'm not aware.
6  BY MR. GOETZ:
7  Q.  You were the recipient of the item review
8  report, correct?
9  A.  They came to -- they had my name on there,
10  but like I said, they went to the Rx department's box.
11  Q.  And after they would be printed, they
12  would be put into a Bankers Box, correct?
13  A.  Yes, something like that, yeah.
14  Q.  Yeah.  They -- right.
15  And did you ever see anybody audit them
16  from the Bankers Box?
17  A.  I don't -- no, I don't recall anyone
18  conducting audits there at the mail slots, no.
19  Q.  Are -- are you aware that they were not
20  saved electronically?
21  MR. CLARK:  Object to the form.
22  BY THE WITNESS:
23  A.  I was not aware, but if they are printed
24  out electronically, I think someone would have them

Page 121

1  somewhere.  There has to be a program that generated
2  the report, so you'd think they would have it, but I
3  don't -- I'm not aware of that.
4  BY MR. GOETZ:
5  Q.  I would have thought that as well, but are
6  you aware that they were not saved electronically,
7  that was --
8  A.  I -- I'm not aware.  I don't know.
9  Q.  And so if they are only in a hard copy,
10  somebody to audit it actually has to go dig through
11  the boxes, correct?
12  A.  Yeah, that's the problem with being an
13  investigator, sometimes you have to do legwork.  You
14  have to dig through things.  I've been there, done
15  that.  But sometimes you have to investigate, you have
16  to look through it.
17  Q.  Did you ever do it for anything related to
18  suspicious order monitoring?
19  A.  No, sir.  I --
20  Q.  Where --
21  A.  -- I don't recall -- I don't recall ever
22  doing any investigations or anything for suspicious
23  order monitoring.  I -- I just don't recall doing
24  that, no.

Page 122

1    Q.   Where were the item review reports
2  maintained?  We talked about they are in a -- in a
3  Bankers Box.
4        Where was that Bankers Box kept?
5    A.   Well, when you say "Bankers Box," I was
6  referring to a slot, the mail slot that they went
7  into.  I don't know where they -- actually when they
8  were done, I don't know what they did with them after
9  that.  That's what I -- when you said auditing, I was
10 referring to the -- the bankers slot where you put
11 them inside the slot, the mail slot, that's what I was
12 referring to when you said "Bankers Box."  I know what
13 you mean by it now, but -- but if they were put in
14 Bankers Boxes, I have no idea where they put them or
15 what they did with them at that point in time.
16   Q.   You -- you had no idea what was to happen
17 with them after they were printed other than you --
18 you put them in a slot?
19   A.   Correct.  After a certain time, like I
20 said, before they kind of -- they were in my office
21 for a while and then a period of time passed and they
22 were given to the Rx department's mail slot.
23   Q.   Did you ever see a box full of -- did you
24 ever see a box full of item review reports?

Page 123

1    A.   That I boxed -- like I said, there were a
2  number of them in my office that just didn't get
3  looked at and they have -- may have been put into a
4  box, but I don't recall seeing anything just in a box
5  and stored anywhere.  I don't recall seeing that at
6  all.
7    Q.   I might have asked you this, but would you
8  agree that the ability to audit a system or a process
9  is critical?
10   A.   I would agree.
11        (WHEREUPON, a certain document was
12        marked CVS - Dugger Deposition
13        Exhibit No. 31, for identification,
14        as of 01/23/2019.)
15 BY MR. GOETZ:
16   Q.   I'm showing you what's been marked as
17 Exhibit 31.
18        Do you see that?
19   A.   The exhibit you just gave, yes.
20   Q.   Yes, sir.
21        That is an e-mail from Pam Hinkle?
22   A.   Yes.
23   Q.   And it's to a number of people?
24   A.   Yes.

Page 124

1    Q.   Are -- are there any people on there that
2  are at the Indiana distribution center?
3    A.   Other than myself, at this time, no.
4    Q.   Okay.
5    A.   I don't know who is there now.
6    Q.   And so you were the -- the one, according
7  to this e-mail, responsible for DEA compliance and
8  completing this review, correct?
9    A.   I was responsible for completing this
10 attachment.
11   Q.   And -- and what is this attachment?
12   A.   It says it is the -- I don't know what the
13 attachment is.  There is no name for it.  It just has
14 a number of listings here, "Policy Review," "Purchase
15 Order Review."
16   Q.   And it says "Subject:  DEA Compliance,"
17 the attachment?
18   A.   It does.
19   Q.   And it -- it says:
20        "Based on request upon review of DEA SOP,
21 Title 21 CFR and other related materials, below is a
22 list of questions.  Questions are to be" -- "are
23 separated into specific areas."
24        Do you see that?

Page 125

1    A.   Yes.
2    Q.   And do you see it says "Policy Review" in
3  Paragraph 7?
4    A.   Yep.
5    Q.   And it says:
6        "Is the DEA compliance coordinator
7  contacting stores per, and complying with the
8  suspicious order monitoring SOP?"
9        Do you see that?
10   A.   I do.
11   Q.   You never did that audit, did you?
12   MR. CLARK:  Object to the form.
13 BY THE WITNESS:
14   A.   You mean complete this and turn it in you
15 mean?  When you said audit?
16 BY MR. GOETZ:
17   Q.   Yes.  Did you ever -- did you ever confirm
18 that that was happening?
19   A.   I can't recall doing that because the DEA
20 compliance coordinator would have been someone in Rx
21 department.  That's the person who would have had that
22 role.  I just don't recall doing it.
23   Q.   Mr. Dugger, you were the only person at
24 the Indiana distribution center this DEA compliance

Page 126

1 checklist was sent to, correct?
2    MR. CLARK:  Object to the form.
3 BY THE WITNESS:
4    A.   At the Indianapolis DC, correct.
5 BY MR. GOETZ:
6    Q.   Yes.
7        It was your responsibility to complete
8 this form and return it, correct?
9    A.   Yeah, that's correct.
10    Q.   Okay.  And --
11    A.   But I would have had to go through several
12 people to get a number of the answers, so I would have
13 had to go to people -- to the Rx department, ARCOS
14 reporting, a number of things on here that I would
15 have had to go through other members of the -- of
16 the -- of the facility to get the answers to complete
17 it and send it in.
18    Q.   And do you think you did that?
19    A.   If it was asked of me to do it -- I just
20 don't recall doing it, you know, but if it was asked
21 of me to do it, I'm pretty sure I did it, but I --
22 again, I don't want to assume anything.  I just don't
23 recall doing it.  I don't re -- even remember seeing
24 this.

Page 127

1        (WHEREUPON, a certain document was
2         marked CVS - Dugger Deposition
3         Exhibit No. 32, for identification,
4         as of 01/23/2019.)
5 BY MR. GOETZ:
6    Q.   Mr. Dugger, I'm going to show you what's
7 been marked as Exhibit 32.
8    A.   That's almost ten years ago.
9    Q.   Again, I appreciate it is ten years ago.
10    A.   No, I'm just saying --
11    Q.   You just met with counsel, two sets of
12 counsel representing CVS and Cardinal within the last
13 few days, correct?
14    A.   Yes.
15    Q.   Okay.  I'm showing you what's been marked
16 as Exhibit 32.
17        Do you see that?
18    A.   Yes.
19    Q.   And that appears to be a follow-up e-mail
20 related to Question 7?
21    A.   I'll infer that, yeah.
22    Q.   Yeah.
23        And -- and that says, Hey, don't worry
24 about monitoring or auditing the suspicious order

Page 128

1 monitoring because the suspicious order report is
2 still in the testing stages, correct?
3    A.   It doesn't say don't monitor.  It says
4 just disregard the question.  So that was a question
5 as to whether or not people are complying with it.
6 Basically it's in the testing stages.
7    Q.   So the suspicious order monitoring program
8 in September of 2009, according to this, is still in
9 the testing stages?
10    MR. CLARK:  Object to form.
11 BY THE WITNESS:
12    A.   According to what Pam Hinkle wrote.
13 BY MR. GOETZ:
14    Q.   Do you know when it -- it came out of the
15 testing stages?
16    A.   Yeah, I have no idea it was in the testing
17 stage, so I don't, no.  I'm not --
18    Q.   I mean, do you -- do you know if -- if --
19 if it's in the testing stage how they are monitoring
20 for suspicious orders?
21    A.   At this point in time?
22    Q.   Yeah.
23    A.   I do not.
24    Q.   What about in 2008?

Page 129

1    A.   I don't know.
2    Q.   What about in 2007?
3    A.   I don't know.
4    Q.   What about in 2006?
5    A.   I don't know.
6    MR. GOETZ:  Can I have 33 to 35.
7        (WHEREUPON, a certain document was
8         marked CVS - Dugger Deposition
9         Exhibit No. 34, for identification,
10         as of 01/23/2019.)
11 BY MR. GOETZ:
12    Q.   Mr. Dugger, I'm going to hand you what's
13 been marked as Exhibit 34.
14        Do you see that?
15    A.   Yes.
16    Q.   That is an e-mail sent from Wendy Foor?
17    A.   Yes.
18    Q.   And that is sent -- you are one of the
19 recipients, correct?
20    A.   That is correct.
21    Q.   And the subject of that is "DEA SOP
22 compliance."
23        Do you see that?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1   Q.   Could you turn to the next page, please?
2        (WHEREUPON, discussion was had
3        off the stenographic record.)
4   MR. GOETZ:  Let's take a break.
5   THE VIDEOGRAPHER:  We are off the record at
6   11:46 a.m.
7        (WHEREUPON, a recess was had
8        from 11:46 to 12:07 p.m.)
9   THE VIDEOGRAPHER:  We are back on the record at
10  12:07 p.m.
11       (WHEREUPON, a certain document was
12       marked CVS - Dugger Deposition
13       Exhibit No. 34, for identification,
14       as of 01/23/2019.)
15  BY MR. GOETZ:
16  Q.   Mr. Dugger, I think what's been put in
17  front of you is Exhibit 34, is that correct?
18  A.   Yes.
19  Q.   I apologize for the confusion and I
20  appreciate you taking the break.
21       That is an e-mail from Wendy Foor?
22  A.   Yes.
23  Q.   Who is Wendy?  Did I pronounce it
24  correctly?  Who is Wendy Foor?

Page 131

1   A.   I can't recall who Wendy Foor is.  I think
2   the last name is pronounced correctly, but I can't
3   remember what Wendy did or who she worked for.
4   Q.   And -- and that is to many people, that
5   e-mail?
6   A.   It is to a number of people, correct.
7   Q.   And -- and you are one of those
8   recipients?
9   A.   I am.
10  Q.   And the subject of that is "DEA SOP
11  compliance"?
12  A.   Yes.
13  Q.   And, again, it -- the attachment, if you
14  open it up, it is, again, a survey to be completed,
15  correct, an audit to be completed by people related to
16  DEA compliance?
17  A.   Yes.
18  Q.   And the -- the subject of it says:  "DEA
19  compliance" and then under that it reads:
20       "In efforts to ensure compliance, below is
21  a listing of questions derived from the DEA SOP titled
22  21 CFR and other related materials.  These questions
23  are separated into spe" -- "specified areas containing
24  policy, purchase order, damage, operational, facility

Page 132

1   review.  Please complete and provide the information
2   by 4/15/10."
3        Did I read that correctly?
4   A.   You did.
5   Q.   And if you go down to 7, again, that --
6   that paragraph, it says:
7        "Is the DEA compliance coordinator
8   contacting stores per, and complying with the
9   suspicious order monitoring SOP?"
10       Do you see that?
11  A.   I do.
12  Q.   And then in bold, it says:
13       "Currently process is not being completed.
14  Disregard until further notice!"
15       Did I read that correctly?
16  A.   You did.
17  Q.   That was your understanding that in April
18  of 2010 the suspicious order monitoring SOP process
19  was not being completed?
20  A.   According to this e-mail, that would have
21  been my understanding.
22  Q.   You have no reason to think that that
23  e-mail is wrong, correct?
24  A.   I have no reason to believe that, no.

Page 133

1   Q.   And -- and you were one of the recipients
2   of this e-mail?
3   A.   I was one of them, correct.
4   Q.   Right.
5        Were there -- is there anybody else on
6   here, I know there is a -- lot of people, is there
7   anybody else on here related to the Indiana
8   distribution center?
9   A.   Yes.
10  Q.   Who?
11  A.   There is Victoria Pierce, who follows my
12  name, there is Andy Linville, who follows Victoria.
13  Q.   Is that Michael A. Linville?
14  A.   It is.
15  Q.   Okay.
16  A.   Theresa Hanchett was there as well.  And I
17  think that's it.
18  Q.   What did Victoria Pierce do?
19  A.   She was responsible for environmental
20  health and safety issues, an EHS specialist or
21  supervisor there.
22  Q.   She had nothing re -- to do related to
23  suspicious order monitoring of controlled substances?
24  A.   Yeah, no one in loss prevention did, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q.   Okay.  What did Michael Linville do?

2    A.   He was responsible for investigating the

3 shortages.  He was the main person that would

4 investigate the shortages there.  He was responsible

5 also for kind of supervising the uniform --

6 supervising the supervisor of the uniform security

7 they had there at site.  Camera maintenance, he had

8 a -- a maintenance tech that was assigned to him.  So,

9 you know, he had 200 plus cameras in that facility.

10 He was responsible for ensuring those particular

11 things from a -- he -- he was more the -- the -- the

12 security person as opposed to the safety aspect of it.

13    Q.   And what about Theresa Hanchett?

14    A.   Theresa was a second shift person.  I

15 don't know how long she had been there at this point.

16 We were given the opportunity to hire a second shift

17 person because we had taken on -- CVS had taken on

18 some acquisitions of some Longs stores at this time

19 and I believe we were given the opportunity to hire a

20 supervisor for second shift to have some oversight

21 from a security standpoint, loss prevention, and

22 that's the role that she served.

23    Q.   Did -- did those three people we just

24 discussed, did they report to you?

Page 135

1    A.   They did.

2    Q.   Okay.  So you're the top person on this

3 e-mail as it relates to the Indiana distribution

4 center, correct?

5    A.   Yes.

6    Q.   And -- and you are the person that

7 corporate is informing that they are not doing any

8 suspicious order monitoring, correct?

9    A.   Well, me and this -- everyone else on

10 here, yes.

11    Q.   Yes.  But you are the top person at the

12 Indiana distribution center that's being informed of

13 that?

14    MR. CLARK:  Object to the form.

15 BY THE WITNESS:

16    A.   As it relates to loss prevention, yes.

17 BY MR. GOETZ:

18    Q.   Is -- is there anybody else on here

19 related to the Indiana distribution center other than

20 those three people we just spoke about that report to

21 you?

22    A.   John Mortelliti would have been the

23 regional manager over the site, but he was not there

24 at that particular site, but he had oversight of it.

Page 136

1 He was my immediate supervisor.

2    Q.   John Mortelliti was in Lumberton,

3 New Jersey, correct?

4    A.   That's correct.

5    Q.   Okay.  He was not at the Indiana

6 distribution center overseeing suspicious order

7 monitoring as of April of 2010, was he?

8    A.   He was not there at the facility, no.

9    Q.   Are -- you are aware of a number of

10 different audits that occurred at CVS while you were

11 there?

12    A.   There are audits that were conducted.

13    Q.   Yeah.  There were internal audits and

14 external audits by the DEA, correct?

15    A.   When you say internal audits by the DEA, I

16 don't know what you are referring to.

17    Q.   I apologize.  There are internal audits

18 that CVS did like these forms we were just looking at,

19 correct?

20    A.   There was a quarterly mock DEA audit.  I

21 don't -- I can't remember exactly what it was referred

22 to or called, but there was a quarterly audit that the

23 DCs were responsible for performing really just from

24 a -- to ensure that, you know, that the drugs there

Page 137

1 reconciled, that, you know, the product was safe, you

2 know, that the people who had access actually accessed

3 it and things of that sort.

4    Q.   And -- and while you were there, you don't

5 have ever -- any memory of any of those audits ever

6 covering suspicious order monitoring, do you?

7    A.   I can't recall whether or not that was a

8 question on the audit or not.  I...

9    Q.   Do you have any memory of whether or not

10 those audit -- do you have -- strike that.

11    Do you have any memory of those audits

12 covering suspicious order monitoring?

13    A.   I don't recall that at all.

14    Q.   You have no memory?

15    A.   I -- I don't recall, no.

16        (WHEREUPON, a certain document was

17        marked CVS - Dugger Deposition

18        Exhibit No. 35, for identification,

19        as of 01/23/2019.)

20 BY MR. GOETZ:

21    Q.   I'm handing you what's been marked as

22 Exhibit 35.

23    Do you know what that is?

24    A.   This would have been the aforemen --

Page 138

1     MR. CLARK: I'm sorry. Just take a moment to
2  look at it.
3  BY THE WITNESS:
4     A.   The form would have been the
5  aforementioned DEA mock review or audit quarterly.
6  BY MR. GOETZ:
7     Q.   Do you see anything related to suspicious
8  order monitoring on this sheet?
9     A.   On the first sheet or just --
10    Q.   On anywhere.
11    A.   Oh.
12    Q.   Take your time.
13    A.   I don't see anything on here from a
14  suspicious order monitoring perspective, no.
15    Q.   Every quarter you do this audit, right?
16    A.   I don't know if I did it every quarter,
17  but it was required to conduct it every quarter.
18    Q.   CVS created the form?
19    A.   I'm not sure who created it.  It was a
20  form that we used here.  I don't know who it was
21  created by.
22    Q.   You didn't create it?
23    A.   I did not create this form.
24    Q.   Somebody at CVS gave it to you?

Page 139

1     A.   Yes.
2     Q.   And not one question on here relates to
3  suspicious order monitoring, does it?
4     A.   I don't see anything about -- regarding
5  that.
6     Q.   Not one question on here relates to are
7  you doing anything to find orders of unusual size?
8     MR. CLARK: Object to the form.
9  BY THE WITNESS:
10    A.   I don't see that on here at all.
11  BY MR. GOETZ:
12    Q.   Not -- not one question on here relates to
13  are you doing anything to find orders that are of
14  extraordinary quantity?
15    MR. CLARK: Object to the form.
16  BY MR. GOETZ:
17    Q.   Does it?
18    A.   I don't re -- recall seeing that on here.
19    Q.   Not one question relates to are you doing
20  anything to find orders of unusual frequency?
21    MR. CLARK: Object to the form.
22  BY THE WITNESS:
23    A.   Nope, I don't see that on here.
24  BY MR. GOETZ:

Page 140

1     Q.   There -- there is not one question on here
2  as to whether or not you are doing anything as it
3  relates to whether or not an order is likely to be
4  diverted?
5     MR. CLARK: Object to the form.
6  BY THE WITNESS:
7     A.   I don't see that on here.
8  BY MR. GOETZ:
9     Q.   I'm handing you what's been marked as
10  Exhibit 36.
11         Do you recognize that doctor -- document,
12  Mr. Dugger?
13    A.   I see what it says, but I -- I don't
14  recall ever seeing it.
15    Q.   Could you go to the last page, please.
16         Is that your signature?
17    A.   Where it says "associate signature," yes.
18    Q.   And -- and that's the date, 6/3/15?
19    A.   Yes.
20    Q.   This document is a summary of your job
21  responsibilities at The Harvard Drug Group?
22    A.   Yeah, someone typed this up.  I don't
23  know.
24    Q.   Let -- let's go back to the last

Page 141

1  page again.
2     A.   Okay.
3     Q.   It -- it says -- why don't you read in the
4  acknowledgment?
5     A.   "I have read, fully understand and agree
6  to the responsibilities outlined in this job
7  description.  I also assert that my background and
8  experience satisfy the minimum requirements of the
9  position.  I have discussed what needs to be
10  accomplished with my manager and intend to fully" --
11  I'm sorry -- "to fulfill my commitment to the Harvard
12  Drug Group to the best of my abilities.  The Harvard
13  Drug Group reserves the right to change and/or modify
14  the duties and essential functions of this position at
15  any time."
16    Q.   And you signed it?
17    A.   I did.
18    Q.   Okay.  Can you go back to the first page,
19  please.
20         Before we -- I ask you that, and I'm --
21    MR. GOETZ: Man -- Manahan is your last name?
22    MR. MONAHAN: Monahan.
23  BY MR. GOETZ:
24    Q.   When you spoke with Mr. Monahan, did you

Page 142

1  speak at all about what you did at CVS?
2      MR. MONAHAN: Objection.
3          You can answer that question yes or no.
4  BY THE WITNESS:
5      A.  Yes.
6  BY MR. GOETZ:
7      Q.  You -- you spoke about what your job was
8  at CVS?
9      A.  Yes.
10     Q.  How long did you speak about what your job
11 was at CVS?
12     A.  How long was the duration of the
13 conversation or the time that I was there?
14     Q.  That portion.
15     A.  Probably, I don't know, five minutes.
16 Less than that.
17     Q.  Okay.  And how long did you speak
18 generally?
19     A.  I don't know.  From 3 o'clock to 4:30.
20     Q.  Was the rest of the conversation about
21 what your duties and roles were at the Harvard Drug or
22 at Cardinal?
23     MR. MONAHAN: Objection.
24         You can answer that yes or no.

Page 143

1  BY THE WITNESS:
2      A.  The majority.
3          No, it was not.
4  BY MR. GOETZ:
5      Q.  What was the -- the rest of that
6  conversation about?
7      MR. MONAHAN: Objection; calls for
8  attorney/client privilege.
9          Instruct him not to --
10     MR. GOETZ: Mr. Monahan, I -- I don't understand
11 how it is attorney/client privilege when you speak to
12 him about what he did while he was at CVS.  That I --
13 I don't fully understand because it's related to --
14 that is -- is CVS's privilege and it relates to that.
15         So you can talk to him all you want about
16 what he does at the Harvard Drug Group and what he
17 does at Cardinal, but I don't understand how you have
18 a privilege as to what he did at CVS or any of those
19 conversations.
20     MR. MONAHAN: The conversation between myself
21 and the witness was privileged in its entirety.  You
22 are not -- I am not going to permit this witness to
23 testify about what he talked to me about in that room
24 with all counsel.

Page 144

1  BY MR. GOETZ:
2      Q.  Are you going to listen to your counsel?
3      A.  I am.
4      Q.  Could you go back to the position summary.
5      Do you see that?  It says:
6          "Under general supervision of the vice
7  president, quality assurance and regulatory affairs,
8  the distribution center compliance supervisor is the
9  main point of contact for the oversight of regulatory
10 compliance, safety, and security for the distribution
11 center."
12         Did I read that correctly?
13     A.  You did.
14     Q.  And were you the distribution center
15 compliance supervisor?
16     A.  I served that role there, yes.
17     Q.  And the -- the next paragraph says:
18         "The pish" -- "position is responsible
19 for, but not limited to:  Overseeing, monitoring and
20 coordinating all aspects of the distribution center
21 compliance including DEA," and then it lists some
22 other things.
23         Did I read that correctly?
24     A.  You did.

Page 145

1      Q.  Okay.  And then down below under 36, it
2  says:
3          "Remains current with emerging/revised DEA
4  and FDA regulations."
5          Do you see that?
6      A.  What line, what number was this?
7      Q.  Down in Paragraph 2,
8  "regulatory/compliance"?
9      A.  I see that.
10     Q.  Okay.  And do you see Paragraph 7, it
11 says:
12         "Ensures compliance with all appropriate
13 policies, procedures, safety rules and" -- "and state
14 and federal regulations with relation to
15 pharmaceutical diversion, regulatory compliance and
16 profit protection."
17     A.  I see that.
18     Q.  I read that correctly?
19         And you signed that, that this was your
20 job, correct?
21     MR. MONAHAN: Objection to form.
22 BY THE WITNESS:
23     A.  I signed it.
24 BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    Q.   Okay.  That -- and you signed it that
2  these were your responsibilities, you understood them
3  and you could comply with them?
4    MR. MONAHAN:  Objection to form.
5  BY THE WITNESS:
6    A.   I signed it, but a lot of these weren't my
7  full responsibilities there during my time at the
8  Harvard Drug Group.
9  BY MR. GOETZ:
10   Q.   Mr. Dugger, can you go back to the
11 acknowledgment?
12   A.   Yeah, I can go back to the acknowledgment.
13 And I'm not -- I'm not disputing that I didn't sign
14 it.  What I'm telling you, sir, is that everything in
15 here, just because I signed it doesn't mean that I was
16 responsible for everything here.  There were other
17 responsibilities.
18        Now, if they gave me that responsibility,
19 if you look at the last sentence under the
20 Acknowledgments, things could be modified and, you
21 know, as relates to some of these things, I may not
22 have been a part of that.  It may have been someone
23 else's responsibility, so.  Yes, I signed the
24 acknowledgment.

Page 147

1    Q.   And -- and it says:
2        "I have read, fully understand, and agree
3  to the responsibilities outlined in this job
4  description"?
5    A.   It says that.
6    Q.   When you signed that, you understood these
7  responsibilities and you agreed to perform them,
8  correct?
9    A.   If -- if those responsibilities were given
10 to me, absolutely.
11   Q.   Okay.  This says they were given to you.
12 Am I wrong?
13   A.   It says that, but that doesn't mean that
14 they were.
15   Q.   Okay.  So you didn't do this for -- for
16 the Harvard Drug Group either?
17   A.   I had nothing to do -- I had nothing to do
18 with pharmaceutical diversion unless it involved
19 the -- a theft, that's the only diversion that I would
20 have been involved with there at the -- at the site.
21   Q.   Did you have anything at the Harvard Drug
22 Group, anything to do with suspicious order
23 monitoring?
24   A.   Absolutely not.

Page 148

1    Q.   Nothing?
2    A.   Zero.
3    Q.   These responsibilities that you agreed to
4  are false?
5    MR. MONAHAN:  Objection; mischaracterizes the
6  document.
7        You can answer.
8  BY THE WITNESS:
9    A.   I don't know if they are false or not, but
10 in terms of what I was responsible for, there are a
11 number of things on here, I would need to read it in
12 its entirety to tell you what I was fully responsible
13 for or wholly responsible for, things that I may have
14 done, but I didn't do anything with any type of
15 pharmaceutical diversion there at the site.
16   MR. GOETZ:  I think we might be done.  Give me
17 five minutes.
18   THE WITNESS:  Okay.
19   THE VIDEOGRAPHER:  We are off the record at
20 12:27 p.m.
21        (WHEREUPON, a recess was had
22        from 12:27 to 12:35 p.m.)
23   THE VIDEOGRAPHER:  We are back on the record at
24 12:35 p.m.

Page 149

1        EXAMINATION
2  BY MR. MONAHAN:
3    Q.   Good afternoon, Mr. Dugger.  My name is
4  Matthew Monahan.  I represent Cardinal Health.  I just
5  have a few of questions for you.
6        Do you mind bringing out Exhibit 36 that
7  you discussed with Plaintiffs' counsel, please.
8        And do you remember you were asked some
9  questions about this document?
10   A.   I do.
11   Q.   And you were directed to review Nos. 2 and
12 7 under the Primary Duties and Responsibilities,
13 correct, sir?
14   A.   Yes.
15   Q.   You were not directed to No. 5, were you?
16   A.   I was not.
17   Q.   Could you read No. 5 out loud, please?
18   A.   "With assistance from corporate,
19 regulatory and compliance personnel, hosts and
20 supports all distribution center-specific DEA, state
21 boards of pharmacy, FDA and other government agency
22 audits and inquiries."
23   Q.   Do you have an understanding of what this
24 document mean -- means when it refers to corporate,

Page 150

1  regulatory and compliance personnel?
2      A.   Yes.
3      Q.   Can you tell me what that means?
4      A.   It's referring to the individuals that
5  were in Livonia, Michigan that were corporate office.
6      Q.   And -- sorry.  I didn't mean to interrupt.
7      A.   I'm sorry.  Headquarters.
8      Q.   And that was Harvard Drug's corporate
9  headquarters, correct?
10     A.   That's correct.
11     Q.   And those individuals, to your knowledge,
12  did they have any responsibility for complying with
13  DEA regulations?
14     A.   They did.
15     Q.   Okay.  You can set this document aside,
16  sir.
17          You were asked some questions earlier
18  about individuals named "pickers" and "packers."
19          Do you remember that testimony?
20     A.   I do.
21     Q.   Do you know what a picker or a packer is?
22     A.   As relates to CVS, pickers were
23  individuals that picked product and the packers were
24  those individuals that packed the totes.

Page 151

1      Q.   Did -- did Harvard Drug have pickers and
2  packers, to your knowledge?
3      A.   There were -- they had pickers, yes.
4      Q.   Were you ever a picker, sir?
5      A.   I was -- I was never a picker.
6      Q.   Did you ever supervise pickers?
7      A.   I never supervised pickers.
8      MR. MONAHAN:  No more questions.
9      MR. GOETZ:  I don't have anything further.
10     MR. CLARK:  We are done.
11     THE VIDEOGRAPHER:  We are off the record at
12  12:37 p.m.  This concludes the videotaped deposition
13  of Terrence Dugger.
14          (Time Noted:  12:37 p.m.)
15          FURTHER DEPONENT SAITH NOT.
16
17
18
19
20
21
22
23
24

Page 152

1          REPORTER'S CERTIFICATE
2
3      I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4  a Certified Shorthand Reporter, do hereby certify:
5      That previous to the commencement of the
6  examination of the witness herein, the witness was
7  duly sworn to testify the whole truth concerning the
8  matters herein;
9      That the foregoing deposition transcript
10  was reported stenographically by me, was thereafter
11  reduced to typewriting under my personal direction and
12  constitutes a true record of the testimony given and
13  the proceedings had;
14     That the said deposition was taken before
15  me at the time and place specified;
16     That I am not a relative or employee or
17  attorney or counsel, nor a relative or employee of
18  such attorney or counsel for any of the parties
19  hereto, nor interested directly or indirectly in the
20  outcome of this action.
21     IN WITNESS WHEREOF, I do hereunto set my
22  hand on this 27th day of January, 2019.
23
24     JULIANA F. ZAJICEK, Certified Reporter

Page 153

1          DEPOSITION ERRATA SHEET
2
3
4  Case Caption:  In Re:  National Prescription
5          Opiate Litigation
6
7      DECLARATION UNDER PENALTY OF PERJURY
8
9      I declare under penalty of perjury that I
10  have read the entire transcript of my Deposition taken
11  in the captioned matter or the same has been read to
12  me, and the same is true and accurate, save and except
13  for changes and/or corrections, if any, as indicated
14  by me on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18          TERRENCE DUGGER
19
20  SUBSCRIBED AND SWORN TO
21  before me this      day
22  of        , A.D. 20__.
23
24      Notary Public

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1       DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24       TERRENCE DUGGER

Page 155

1       DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24       TERRENCE DUGGER