EXHIBIT 400

```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3

 4    In re:  NATIONAL PRESCRIPTION    )   CASE NO.

      OPIATE LITIGATION               )   1:17-MD-2804

 5                                     )   Judge

      APPLIES TO ALL CASES            )   Dan Aaron Polster

 6

 7        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 8                 CONFIDENTIALITY REVIEW

 9

      DEPOSITION FOR PLAINTIFF

10

11

12                  ***   ***   ***

13    DEPONENT:        GARY MILLIKAN

14    DATE:            JANUARY 11, 2019

15                  ***   ***   ***

16

17

18

19

20

21

22

23

24

25
```

Page 2

EXAMINATION INDEX

Examination by Mr. Goetz........................ 10
Examination by Mr. Hynes........................ 251
Re-examination by Mr. Goetz..................... 256
Reporter's Certificate........................... 262

EXHIBIT INDEX

CVS-Millikan-2..................................... 171
IRR, 8-30-13          CVS-MDLT1-10672-757
          Highly Confidential
CVS-Millikan-3..................................... 196
Email chain          CVS-MDLT1-83064
          Confidential
CVS-Millikan-4..................................... 196
SOM Process          CVS-MDLT1-83065
          Confidential
CVS-Millikan-5..................................... 199
Time study          CVS-MDLT1-112702
          Confidential
CVS-Millikan-6..................................... 205
LP Analyst Time Study          CVS-MDLT1-112686
          Confidential
CVS-Millikan-7..................................... 208
LP Analyst Time Study          CVS-MDLT1-112690
          Confidential
CVS-Millikan-9..................................... 113
Controlled Drug-DEA SOP Manual          CVS-MDLT1-8506
          Confidential
CVS-Millikan-11.................................... 198
Email chain          CVS-MDLT1-55836
          Confidential
CVS-Millikan-13.................................... 159
CVS-MDLT-110268          Highly Confidential

Page 3

EXHIBIT INDEX - Continued
CVS-Millikan-15.................................... 155
December 2010 PSE IRR Recap          CVS-MDLT1-9740
          Highly Confidential
CVS-Millikan-18.................................... 35
Personnel file
CVS-Millikan-22.................................... 156
January 2011 Control IRR Recap  CVS-MDLT1-8258
          Highly Confidential
CVS-Millikan-33.................................... 239
Track One CVS Store Information CVS-MDLT1-7362
          Confidential
CVS-Millikan-36.................................... 173
List 1 Chemicals, Policies & Procedures
          CVS-MDLT1-25018
          Confidential
CVS-Millikan-37.................................... 233
Irregular Order Logistics Communication
          CVS-MDLT1-3348
          Highly Confidential
CVS-Millikan-38.................................... 233
Email chain          CVS-MDLT1-8483
    Highly Confidential - Public Health Information
CVS-Millikan-45.................................... 153
Viper PDMR Supplemental          CVS-MDLT1-67863
          Highly Confidential
CVS-Millikan-46.................................... 153
Viper PDMR          CVS-MDLT1-68377
          Highly Confidential
CVS-Millikan-47.................................... 153
Viper PDMR - High Priority          CVS-MDLT1-74450
          Highly Confidential
CVS-Millikan-48.................................... 137
IRR, 11-30-10          CVS-MDLT1-775
          Highly Confidential

Page 4

EXHIBIT INDEX - Continued
CVS-Millikan-100.................................. 48
Email          CVS-MDLT1-17100
          Highly Confidential
CVS-Millikan-101.................................. 53
McKesson document          CVS-MDLT1-15502
CVS-Millikan-102.................................. 60
Bar Graph, Opioid Analgesics Poisoning Death
CVS-Millikan-103.................................. 62
Bar Graph: U.S. Rates of Opioid Overdoses Deaths,
Sales and Treatment Admissions, 1999-2010
CVS-Millikan-104.................................. 64
2012 Ohio Drug Overdose Deaths
CVS-Millikan-105.................................. 66
International Narcotics Control Board,
Comments on Reported Statistics, 2012
CVS-Millikan-106.................................. 69
Email chain,          CVS-MDLT1-91508
          Confidential
CVS-Millikan-107.................................. 89
CVS DEA SOP Manual          CVS-MDLT1-34234
          Confidential
CVS-Millikan-108.................................. 94
Controlled Drug - DEA SOP Manual    CVS-MDLT1-66380
CVS-Millikan-109.................................. 100
CVS Indiana, LLC Controlled Drug, DEA SOP Manual
          CVS-MDLT1-89315  Confidential
CVS-Millikan-111.................................. 106
Email          CVS-MDLT1-61132
          Confidential
CVS-Millikan-112.................................. 107
Email          CVS-MDLT1-88956
          Confidential

Page 5

EXHIBIT INDEX - Continued
CVS-Millikan-113................................. 109
CVS Distribution Center, DEA SOP Manual
          CVS-MDLT1-88957
          Confidential

CVS-Millikan-115................................. 21
Transcript [excerpt] Nicastro

CVS-Millikan-117................................. 29
Transcript [excerpt] Nicastro

CVS-Millikan-119................................. 39
Transcript [excerpt] Nicastro

| | Page 6 |
|---|---|

```
 1        A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:    DANIEL P. GOETZ, Esquire
              BRIAN ROOF, Esquire
              Weisman Kennedy & Berris CO LPA
 4            1600 Midland Building
              101 West Prospect Street
 5            Cleveland, Ohio  44115
              216-781-1111
 6            dgoetz@weismanlaw.com
              broof@weismanlaw.com
 7
 8  Via Speakerphone:   MICHAEL ELSNER, Esquire
              KAITLYN EEKHOFF, Esquire
 9            Motley Rice
              28 Bridgeside Boulevard
10            Mount Pleasant South Carolina
              29464
11            843-216-9250
              melsner@motleyrice.com
12
13  FOR THE DEFENDANT:   PAUL B. HYNES, Jr. Esquire
14  CVS entities    R. MILES CLARK, Esquire
              Zuckerman Spaeder
15            Suite 1000
              1800 M Street
16            Washington, DC  20036
              202-778-1800
17            phynes@zuckerman.com
              mclark@zuckerman.com
18
19  FOR THE DEFENDANT:   SARAH E. HAMON, Esquire
    Cardinal Health     Armstrong Teasdale
20            Suite 1800
              7700 Forsyth Boulevard
21            St. Louis, Missouri  63105
              314-552-6672
22            sharmon@ArmstrongTeasdale.com
23
24
25
```

| | Page 7 |
|---|---|

```
 1        APPEARANCES - Continued
 2
 3  FOR THE DEFENDANT:   SCOTT D. QUELLHORST, Esquire
    Walmart         Jones Day
 4  via speakerphone    77 West Wacker Street
              Chicago, Illinois
 5            312-269-4251
              squellhorst@jonesday.com
 6
 7  FOR THE DEFENDANT:   CHRISTIAN W. SAUCEDO, Esquire
    AmerisourceBergen   Reed Smith
 8  via speakerphone    Three Logan Square
              Suite 3100
 9            1717 Arch Street
              Philadelphia, PA  19103
10            215-851-8204
              csaucedo@reedsmith.com
11
12  FOR THE DEFENDANT:   EMILY DILLINGHAM, Esquire
    Endo entities    Arnold & Porter
13  Par entities     250 West 55th Street
    via speakerphone    New York, New York  10019
14            212-836-7408
              emily.dillingham@arnoldporter.com
15
16
17
    ALSO PRESENT:   Ben Stanson, videographer
18            Jon Knowles, trial technologist
19
20
21
22
23
24
25
```

| | Page 8 |
|---|---|

```
 1        The deposition of GARY MILLIKAN, taken on
 2  discovery, pursuant to Notice heretofore filed, in the
 3  Latitude Room, 2nd Floor, of Le Meridien Indianapolis,
 4  123 South Illinois Street, Indianapolis, Indiana, on
 5  January 11, 2019, at approximately 8:59 a.m.; upon
 6  oral examination, and to be used in accordance with
 7  the Federal Rules of Civil Procedures.
 8
 9              *   *   *
10
11        THE VIDEOGRAPHER:  We are now on the record.
12  My name is Ben Stanson.  I'm the videographer for
13  Golkow Litigation Services.  Today's date is
14  January 11, 2019, and the time is 8:59 a.m.
15        This video deposition is being held in
16  Indianapolis, Indiana, in the matter of National
17  Prescription Opiate Litigation, MDL Number 2804,
18  pending in the U.S. District Court, Northern District
19  of Ohio, Eastern Division.
20        The deponent is Gary Millikan.
21        Will counsel please identify yourselves for
22  the record?
23        MR. ROOF:  Brian Roof, for Plaintiff, law
24  firm of Weisman Kennedy and Berris.
25        MR. GOETZ:  Dan Goetz, on behalf of
```

| | Page 9 |
|---|---|

```
 1  Plaintiff.
 2        MS. HARMON:  Sarah Harmon for Cardinal
 3  Health.
 4        MR. CLARK:  Miles Clark, Zuckerman and
 5  Spaeder, on behalf of CVS Indiana, LLC; CVS Rx
 6  Services, Inc., and the witness.
 7        MR. HYNES:  Paul Hynes, Zuckerman and
 8  Spaeder, on behalf of the same parties.
 9        THE VIDEOGRAPHER:  Would counsel on the phone
10  please identify yourselves for the record?
11        MS. DILLINGHAM:  Hi.  Emily -- go ahead.
12        MR. ELSNER:  Michael Elser, from Motley Rice,
13  on behalf of the Plaintiffs.
14        MS. DILLINGHAM:  Emily Dillingham, Arnold
15  Porter, on behalf of the Endo and Par Defendants.
16        MR. SAUCEDO:  Christian Saucedo, from Reed
17  Smith, on behalf of AmerisourceBergen.
18        THE VIDEOGRAPHER:  Thank you.  Our court
19  reporter is Kim Keene.
20        Will you please swear in the witness?
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1             *   *   *
2         GARY MILLIKAN, after having first been duly
3  administered an oath, testified as follows:
4         THE WITNESS:  I do.
5         THE REPORTER:  Thank you.
6             *   *   *
7
8             EXAMINATION
9  BY MR. ROOF:
10     Q.  Good morning, Mr. Millikan.
11     A.  Good morning.
12     Q.  We met off the record.  My name is Brian
13 Roof, and as I said earlier, I represent the
14 Plaintiffs.
15         Can you state your full name for the record
16 and spell it?
17     A.  My name is Gary Lee Millikan.  G-A-R-Y,
18 L-E-E, M-I-L-L-I-K-A-N.
19     Q.  And where do you currently live?
20     A.  I live at Indianapolis, Indiana.
21     Q.  What's the address?
22     A.  10944 Echo Trail, 46236.
23     Q.  And what's your highest level of education
24 that you've achieved?
25     A.  I have a bachelor of science.

Page 11

1      Q.  And what was that in?
2      A.  It was in pharmacy.
3      Q.  Pharmacy?
4          And from what institute did you get that
5  degree from?
6      A.  I graduated from Purdue University.
7      Q.  Do you have any post degrees?  Graduate
8  degrees?
9      A.  No, sir.
10     Q.  Are you a pharmacist?
11     A.  Yes, I am a pharmacist.
12     Q.  Do you have any other certifications or
13 anything like that, besides your degree from Purdue
14 University?
15     A.  No, I don't believe so.
16     Q.  No certifications in DEA regulations or
17 anything like that?
18         MR. HYNES:  Objection to form.
19         THE WITNESS:  No, I don't believe so.
20     Q.  When were you first hired by the Indianapolis
21 distribution center?
22         MR. HYNES:  Objection to form.
23         THE WITNESS:  The -- I was first hired into
24 the distribution center in 1995.
25     Q.  And were you hired by CVS Indiana LLC or CVS

Page 12

1  Pharmacy, Inc?
2      A.  This is prior to CVS.  I began my career with
3  Hook drugs, which was purchased by Revco, and in 1995,
4  I went into the distribution center.
5      Q.  And in 1995, who was your employer?
6      A.  Revco.
7      Q.  And then when did you work for Hook?
8      A.  I worked for Hook's from 1977 until the Revco
9  acquisition.
10     Q.  Do you know when that occurred?
11     A.  In 1995.
12     Q.  And then in 1995, when you worked for Revco,
13 you went to the Indianapolis distribution center?
14     A.  Yes, I did.
15     Q.  And where were you before that?
16     A.  I was in the Hook corporate office.
17     Q.  And what did -- was your position in 1995
18 with Revco?
19     A.  I was a pharmacy manager for distribution.
20     Q.  And how long did you hold that role for?
21     A.  Until 1998.
22     Q.  And what happened in 1998?
23     A.  After CVS purchased Revco, I was promoted
24 from pharmacy manager to operations manager for the
25 entire facility.

Page 13

1      Q.  So when CVS purchased Revco in 1998, you were
2  promoted to operations manager?
3      A.  Shortly after the purchase.  I don't remember
4  the exact time frame, but it wasn't long.  It was a
5  few months.
6      Q.  So, the year was 1998?
7      A.  Yes.
8      Q.  And then what was your next position after
9  operations manager?
10     A.  I held the position of operations manager
11 until probably 2009 or '10, and they changed my title
12 to production manager because a decision had been made
13 that each facility would only have one operations
14 manager.
15     Q.  And so, was that a demotion?
16         MR. HYNES:  Objection to form.
17         THE WITNESS:  I don't -- my role did not
18 change.  My title changed.
19     Q.  And there was another operations manager,
20 though?
21     A.  Before that, there was a senior operations
22 manager, and his title was changed to operations
23 manager.
24     Q.  And who was that?
25     A.  Andy Koropoulis.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q. And then your title was changed from
2  operations manager to production manager?
3    A. Yes, it was.
4    Q. But your role did not change?
5    A. No, it did not.
6    Q. Your duties did not change?
7    A. No, they did not.
8    Q. And then from 2009/2010, how long did you
9  hold the production manager?
10   A. Until June of 2012, when I retired from the
11  company.
12   Q. Going back to your operations manager
13  position from 1998 to 2009 or 2010, what were your
14  duties?
15   A. The facility is 1 million square feet,
16  approximately 6- to 900 employees, five days a week,
17  three shift operation. I had various duties over that
18  time period, over different departments, whether it be
19  shipping, order filling, inventory control,
20  receiving.
21   Q. Anything else?
22   A. And pharmacy at times. I -- I believe I had
23  responsibilities for everything in the facility at
24  some time during that time period.
25   Q. When you say you had responsibilities for

Page 15

1  everything at some point, was that on a continuous
2  basis or is that at separate points?
3    A. At separate points. Throughout that time
4  period, CVS was acquiring other companies. There were
5  many times when the director, the senior ops manager,
6  and the HR manager were out of the building for a
7  significant period of time and I was the senior person
8  in the building.
9    Q. As operations manager, did you report
10  directly to Mark Nicastro?
11       MR. HYNES: Objection. Time period.
12       MR. ROOF: As operations manager.
13       THE WITNESS: I -- as operations manager
14  during that period --
15   Q. Yes.
16   A. -- '98 to '09, he was only there for the
17  period of '08 and '09, and I believe I reported
18  directly to him during that time, although it is
19  possible that I reported to the senior ops manager
20  part of that time. There's a few different org
21  charts.
22   Q. I noticed that.
23       And who's the senior ops manager again?
24   A. Andy Koropoulis.
25   Q. Okay. So, it's your testimony that Mark

Page 16

1  Nicastro was only director from '08 to '09?
2    A. No. He came in the building in '08. I
3  thought we were talking about the time period up to
4  '09. He is still the director of the facility.
5    Q. And prior to his -- well, strike that.
6       When did he arrive at the Indianapolis DC?
7    A. He arrived in July of 2008.
8    Q. So from the -- the period that you were
9  operations manager, from '08 to approximately 2010,
10  Mark Nicastro was the director of the Indianapolis DC?
11       MR. HYNES: Objection. Mischaracterizes the
12  testimony.
13       THE WITNESS: Yes, he was.
14   Q. And who was the director of the Indianapolis
15  DC prior to that?
16   A. Prior to Mark Nicastro, it was Dana Lilly.
17   Q. And how long did Dana Lilly have the position
18  of director?
19   A. I don't remember when he came in. Early
20  2000s until 2008, when he was promoted.
21   Q. And who was the director prior to Dana
22  Lilly?
23   A. That was Gary Kanapka.
24   Q. And when was he the director of the
25  Indianapolis DC?

Page 17

1    A. I don't remember exactly, but it would be '98
2  or '99 until early 2000s.
3    Q. And when you were production manager from
4  1998 through 2009, 2010, who did you report to?
5    A. I was not production manager during that time
6  period. I was pharmacy manager and then operations
7  manager.
8    Q. You were pharmacy manager when?
9    A. 1995 to 1998.
10   Q. And then from 1998 through 2010, you were --
11   A. From 1998 until about 2009 or '10, I was the
12  operations manager.
13   Q. Okay. And then from about 2009 or 2010
14  through June of 2012, when you retired, you were the
15  production manager?
16   A. Yes, I was.
17   Q. Okay. Who did you report to as the
18  production manager?
19   A. It was probably Mark Nicastro, the director,
20  for that entire time. It's possible that it was
21  through Andy Koropoulis, the operations manager.
22   Q. Why do you say it's possible?
23   A. I -- I don't remember the organization charts
24  as -- during that period.
25   Q. Who did your reviews during the time you were

Page 18

1 production manager?
2    A.  Again, I -- I'm not completely sure.  I
3 believe it's the director, Mark Nicastro.  It is
4 possible that it was the operations manager, Andy
5 Koropoulis.
6    Q.  And that same is true when you were
7 operations manager, correct?
8    A.  Yes, it is.
9    Q.  Okay.  And when you were operations manager,
10 were you employed by CVS Pharmacy, Inc., or CVS
11 Indiana, LLC?
12    A.  My W2 says:  CVS Indiana, LLC.
13    Q.  And that was the entire time you were
14 employed by a CVS entity?
15    A.  I'm not -- I'm not sure.
16    Q.  But the time you were operations manager and
17 production manager, you were employed by CVS Indiana,
18 LLC?
19       MR. HYNES:  Objection.  Mischaracterizes his
20 testimony.
21       THE WITNESS:  I'm not sure how long that
22 title -- that company was in place without going back
23 and looking at all of those W2s.
24    Q.  So when you were an operations manager,
25 though, you were a CVS Indiana, LLC employee?

Page 19

1       MR. HYNES:  Same objection.
2       THE WITNESS:  I believe that CVS Indiana, LLC
3 was specifically my company.
4    Q.  We're going to talk about suspicious order
5 monitoring and diversion, and I just want to make sure
6 we're on the same page as to what those terms mean.
7       And the way I define suspicious order
8 monitoring is the monitoring of orders that are
9 unusual size, orders that deviate substantially from a
10 normal pattern, and orders that are of unusual
11 frequency.
12       Do you understand that?
13    A.  The suspicious orders that we had to
14 determine would meet that criteria.
15    Q.  Okay.  And diversion would be diverting
16 controlled substances to an illegitimate channel
17 rather than distributing it to medical, scientific, or
18 industrial channels?
19       MR. HYNES:  Objection to form.
20       THE WITNESS:  The -- my role in diversion
21 when I was directly -- part of it was to ensure that
22 the drugs that we shipped went to legitimate
23 pharmacies for legitimate concerns.
24    Q.  So, can we have an understanding, though,
25 that diversion means diverting of controlled

Page 20

1 substances to illegitimate channels?
2       MR. HYNES:  Objection to form.
3       THE WITNESS:  I have -- my role, when I was
4 directly involved with the suspicious ordering, was to
5 make sure that what we shipped was legitimate, to a
6 legitimate store for a legitimate reason.
7    Q.  We'll use that as you -- the definition of
8 diversion then, okay?
9    A.  Okay.
10    Q.  And hydrocodone is a controlled substance?
11    A.  Yes, it is.
12    Q.  And hydrocodone combination products are a
13 controlled substance?
14    A.  Yes, they are.
15    Q.  And another name for hydrocodone combination
16 products is HCPs?
17    A.  I'm not sure that I'm aware of that --
18    Q.  You never --
19    A.  -- term.
20    Q.  You never heard of the term "HCPs" before?
21    A.  HCP?
22    Q.  Yes.
23    A.  No, I don't believe I have.
24    Q.  Okay.  As operations manager and production
25 manager, did you oversee the pharmacy?

Page 21

1    A.  There were times when I did oversee the
2 pharmacy.  There were some parts of the time when I
3 did not.
4    Q.  Can you tell me those dates?
5    A.  I don't know for sure, but I believe from
6 about 2009 till my retirement in June of 2012, I did
7 not have direct responsibility for pharmacy.
8       Prior to that, from '98 to '08, while I'm not
9 completely sure that I always had it, I feel like I
10 probably did.
11    Q.  Why do you say "probably"?
12    A.  I feel pretty certain that I did.  I just
13 don't remember.
14    Q.  And why from 2009 through 2012 did you not
15 have direct oversight of the pharmacy?
16    A.  The director of the facility redid the
17 responsibilities for Andy Koropoulis and myself, and
18 he gave him the direct responsibility for pharmacy.
19    Q.  And that was Mark Nicastro?
20    A.  Yes, it was.
21       (CVS-Millikan-115 was marked for
22 identification.)
23    Q.  And I want to hand you what is marked as
24 Exhibit 115.
25       MS. DILLINGHAM:  Could you read the Bates

Page 22

1  number for that document?
2      MR. ROOF: It's deposition testimony of Mark
3  Nicastro.
4      Q. Like I said, Exhibit 115, his deposition
5  transcript -- partial deposition transcript of Mark
6  Nicastro. The first page is the cover page for the
7  deposition transcript of the video deposition of Mark
8  Nicastro dated December 6, 2018 in Indianapolis,
9  Indiana.
10      Do you see that on the first page,
11  Mr. Millikan?
12      A. I'm sorry. Repeat the question.
13      Q. First page is a cover page for the video
14  deposition of Mark Nicastro dated December 6, 2018 in
15  Indianapolis, Indiana.
16      Do you see that?
17      A. Yes.
18      Q. Okay. And then the second page is page 23?
19      A. Yes. Yes.
20      Q. And the question on line 15 says:
21      "When you joined in 2008, who was responsible
22  for pharmacy related aspects of the business in
23  Indianapolis?
24      Answer: "Gary Millikan was my operations
25  manager and he oversaw the pharmacy."

Page 23

1      Did I read that correctly?
2      A. Yes.
3      Q. Is that a correct statement?
4      A. I -- I was indirectly responsible. There was
5  a pharmacy manager, I believe.
6      Q. So, Mark Nicastro is not directly correct in
7  his testimony here?
8      MR. HYNES: Object to the form.
9  Mischaracterizes the document.
10      THE WITNESS: I'm not sure how he meant that
11  on "responsible."
12      Q. But you're saying you're now indirectly
13  responsible for the pharmacy, correct?
14      A. In 2008, I -- in 2008, pharmacy fell under
15  me, but there were other people that I managed that
16  directly were involved with pharmacy.
17      Q. And who were those people?
18      A. While I -- I'm not sure on that date. It was
19  either Steve Campbell or Gary Lamberth as the pharmacy
20  manager, and there would have been a pharmacy
21  supervisor or two.
22      Q. So there was a pharmacy manager under you,
23  correct?
24      A. Yes.
25      Q. And then the pharmacy supervisor under you?

Page 24

1      A. Yes. And then there would have been another
2  pharmacy supervisor on the other shift.
3      Q. So two pharmacy supervisors under you?
4      A. Yes. Well, the second shift one did not
5  directly report to me. They reported through a second
6  shift manager.
7      Q. So the only two direct reports was the
8  pharmacy manager and the pharmacy supervisor,
9  correct?
10      A. My -- one of my direct reports would have
11  been the pharmacy manager. The pharmacy supervisor
12  would have reported to the pharmacy manager.
13      Q. And then under the pharmacy supervisor were
14  the pickers and packers?
15      A. They would have had all of the warehouse
16  associates: receiving, picking orders, shipping
17  orders, returns.
18      Q. And that's what is called the pickers and
19  packers?
20      MR. HYNES: Objection to form.
21      THE WITNESS: That's a term that is used. I
22  prefer warehouse associates.
23      Q. Okay. We can use warehouse associates.
24      So indirectly, the warehouse associates
25  reported through you, correct?

Page 25

1      A. Yes, they did.
2      Q. What were your duties regarding suspicious
3  order monitoring of controlled substances and
4  diversion?
5      MR. HYNES: Objection. Time period.
6      Q. While you were operations manager.
7      A. While I was operations manager from 1998 till
8  2009 or '10, I had indirect knowledge and oversight
9  over the Suspicious Order Monitoring program.
10      Q. When you said you had indirect oversight over
11  the SOM, what do you mean?
12      A. I mean that the pharmacy manager, supervisor,
13  admin. personnel, and the warehouse associates in the
14  controlled substance area were actually doing the
15  program.
16      Q. And so what was your role as indirect
17  oversight over SOM?
18      A. Just the fact that that reported up through
19  me. Again, it was a million square feet, the number
20  of associates. It was one of my responsibilities.
21      Q. So the people that reported to you, or up
22  through you actually did the work for SOM, and -- but
23  since you were over them or managed them, you had
24  indirect oversight of SOM; is that correct?
25      A. Yes.

Page 26

1  Q. Anything else you did regarding suspicious
2  order monitoring or diversion?
3     MR. HYNES: Objection. Time period.
4  Q. Same time period.
5  A. The same time period?
6     No.
7  Q. And what about your duties regarding
8  suspicious order monitoring of controlled substances
9  and diversion when you were production manager?
10    MR. HYNES: Objection. Compound.
11    Go ahead.
12 A. When I was production manager, Andy
13 Koropoulis had responsibility of pharmacy, but because
14 of my background in pharmacy, I had -- some knowledge
15 of the process and I continued to work with the DEA on
16 the audits and --
17 Q. Besides working with the DEA and audits,
18 anything else?
19 A. I don't believe so.
20 Q. Did you work with the DEA on audits when you
21 were operations manager?
22 A. Yes, I did.
23 Q. And what do you mean by you worked with the
24 DEA on audits?
25 A. When the DEA came to the facility to do their

Page 27

1  annual -- not annual, but do an audit, I was one of
2  the persons who was with them.
3  Q. And what do you mean by one of the persons
4  with them?
5  A. They had my name, I believe, on the document
6  when they came to the facility.
7  Q. On what document?
8  A. I don't remember what that's called.
9  Q. And so what did you do during these audits?
10 A. Oh, the information that they requested,
11 balancing of the inventory, answering any questions.
12 Q. So you provided the information requested,
13 you balanced the inventory, and you answered
14 questions.
15    Anything else during the audit?
16 A. No, not that I recall.
17 Q. Do you recall how many DEA audits you were
18 involved in?
19    MR. HYNES: Objection. Same time period,
20 Brian?
21    MR. ROOF: Yes.
22 Q. As operations manager and production manager.
23 A. So we are going from '98 to 2012, Oh, I
24 believe it would have been four.
25 Q. Do you recall the years?

Page 28

1  A. '98, '6 and -- 2006, 2010, and then there
2  will be one between '98 and 2006.
3  Q. You don't recall that?
4  A. No, I do not.
5  Q. But somewhere in between those two years?
6  A. I'm -- I'm sure it is.
7  Q. Okay. Who else was involved in the DEA
8  audits?
9  A. Normally, it was two inspectors.
10 Q. And those two inspectors were from the DEA,
11 correct?
12 A. Yes.
13 Q. And who was involved from CVS Indiana?
14 A. The loss -- someone from loss prevention.
15 And then if they wanted to talk to someone, warehouse
16 associate or --
17 Q. So it was just you and the loss prevention
18 person handling the DEA audits?
19 A. As best I can remember.
20 Q. And who took the lead on the DEA audits, you
21 or the loss prevention?
22    MR. HYNES: Object to the form.
23 A. I believe we had shared responsibility.
24 Q. And again, your responsibility was providing
25 the information requested, balancing, and then

Page 29

1  answering questions?
2  A. Yes.
3  Q. And that was balancing what again?
4  A. The inventory of a selected controlled
5  substances.
6  Q. And you had no other responsibilities during
7  the DEA audit?
8  A. Not that I can recall at this time. I'm --
9  Q. As either operations manager or production
10 manager, were you responsible for implementing the
11 standard operating procedure for controlled drugs?
12    MR. HYNES: Objection to form.
13 A. Could you repeat that?
14 Q. As either -- well, let's start with as
15 operations manager. Were you responsible for
16 implementing the standard operating procedures for
17 controlled drugs?
18    MR. HYNES: Objection to form.
19 A. The -- no, I was not.
20    (CVS-Millikan-117 was marked for
21 identification.)
22 Q. I'm going to go to Exhibit 117, which is
23 another partial deposition transcript.
24    MR. HYNES: Thanks, Brian.
25 Q. Again, first page of Exhibit 117 is the cover

Highly Confidential - Subject to Further Confidentiality Review

| Page 30 |
|---|

1  page for the video deposition of Mark Nicastro on
2  December 6, 2018, correct?
3      A.  Yes.
4      Q.  And then the next page is page 46 of
5  Mr. Nicastro's deposition, correct?
6      A.  Yes.
7      Q.  And it says, on line 17:
8          "When you arrived at CVS Indiana, was there a
9  specific staff member who was designated to implement
10  the standard operating procedures for controlled
11  drugs?
12          Answer:  Yes.
13          Question:  Who was that?
14          Answer:  Gary Millikan."
15          Did I read that correctly?
16      A.  Yes.
17      Q.  Is that a correct statement?
18      A.  I don't know how -- I don't know the
19  substance of what he meant by that.
20      Q.  But it is your testimony that you were not in
21  charge of implementing the standard operating
22  procedures for controlled drugs?
23      MR. HYNES:  Objection to form.
24      A.  I can't read into what that meant and how he
25  answered it compared to my testimony.

| Page 31 |
|---|

1      Q.  But my question was:  It's your testimony
2  that you were not in charge of implementing the
3  standard operating procedure for controlled
4  substances, correct?
5      A.  I -- I had a pharmacy manager, loss
6  prevention manager, that I would have said were doing
7  that, not necessarily me.
8      Q.  And Mark Nicastro contradicts that,
9  correct?
10      A.  Mark Nicastro is saying -- is answering the
11  question -- I can't -- I'm not sure how he interpreted
12  the question to answer it.
13      Q.  Well, he says -- the question is:  Who is
14  designated to implement the standard operating
15  procedure for controlled drugs?  And he says, Gary
16  Millikan; correct?
17      A.  Yes.
18      Q.  Okay.  Were you the DEA compliance person for
19  the Indianapolis DC?
20      A.  Yes, I was.
21      Q.  For what period of time?
22      A.  I don't remember.  I don't remember when the
23  program started and when I had that position.
24      Q.  You said "program."
25          What program?

| Page 32 |
|---|

1      A.  The CVS Controlled Substance SOP.
2      Q.  So CVS implemented a CVS Controlled Substance
3  SOP at some point?
4      A.  Yes, they did.
5      Q.  And what was that?
6      A.  It was a written document from corporate that
7  used that title of designee as one of the parts.
8      Q.  I'm a little confused.  Can you explain
9  that?
10      A.  Corporately, they issued a written policy and
11  in there it mentions having a -- I don't remember the
12  exact words of the title, but representative or
13  designee for the facility.
14      Q.  Did -- the document talks about a
15  representative or designee for DEA purposes?
16      A.  I don't remember exactly what it called for,
17  but I know that title was there.
18      Q.  The title of representative or designee?
19      A.  Yes.
20      Q.  And that was for the DEA compliance,
21  correct?
22      A.  Yes, it was.
23      Q.  And that's the title that you had for
24  Indianapolis DC?
25      A.  Yes.

| Page 33 |
|---|

1      Q.  And do you know when that -- whether that
2  occurred when you were operations manager?
3      A.  I don't remember.  I believe so.
4      Q.  For the entire time you were operations
5  manager?
6      A.  No.  This is sometime in the middle of 2000s,
7  maybe, 2007 or '8, I believe.
8      Q.  And then for how long did you have that title
9  of DEA compliance representative?
10      A.  I don't remember, but my guess would be I had
11  it until I retired in 2012.
12      Q.  And what were your duties as DEA compliance
13  representative?
14      A.  Those duties would be to main -- make sure
15  that we were compliant with the CVS SOP as it related
16  to controlled substances.
17      Q.  What else did you do as the Indianapolis DC
18  DEA compliance coordinator?
19      A.  Indianapolis.
20      MR. HYNES:  Object to the form.
21      A.  I don't remember.
22      Q.  So all you recall is that you were in charge
23  of making sure that Indianapolis DC was compliant with
24  the CVS SOP as it related to control substance?
25      A.  Yes.

Page 34

1 Q. And what did that entail?

2 A. CVS was responsible for shipping controlled

3 substances to stores so we ensured that we were --

4 receiving, storing, recordkeeping was appropriate.

5 Q. So you were responsible for storing and

6 recordkeeping of controlled substances?

7 MR. HYNES: Objection to form.

8 A. Yes.

9 Q. Anything else?

10 A. Not that I recall.

11 Q. Were you in charge of preventing diversion?

12 MR. HYNES: Objection to form.

13 A. As part of the --

14 Q. As part of being the --

15 A. -- legitimate.

16 Q. -- DC DEA compliance coordinator?

17 MR. HYNES: Same objection.

18 A. As part -- as part of the legitimate shipment

19 of product to stores.

20 Q. Anything else?

21 MR. HYNES: Objection to form.

22 A. Not that I recall.

23 Q. And it's your testimony, when you were

24 production manager, that Andy had control, or oversaw,

25 the pharmacy?

Page 35

1 MR. HYNES: Objection.

2 A. While I don't remember the exact dates in

3 that whole time period, there was a time period when

4 he had responsibility for pharmacy.

5 Q. So sometime when you were production manager,

6 he had responsibility for pharmacy?

7 A. I believe so.

8 Q. And did you have responsibility for pharmacy

9 at any time when you were production manager?

10 A. I don't remember.

11 Q. Then in January of 2002, you started as a

12 part-time employee with CVS Indiana, LLC?

13 MR. HYNES: Did you say 2002?

14 A. No.

15 MR. GOETZ: 2013. January of 2013.

16 MR. HYNES: Could you repeat the question.

17 2002.

18 MR. ROOF: Yeah, sure.

19 BY MR. ROOF:

20 Q. Then in January of 2013, you started as a

21 part-time employee for CVS Indiana, LLC?

22 A. I believe it was actually in November of

23 2012.

24 (CVS-Millikan-18 was marked for

25 identification.)

Page 36

1 Q. I want to hand you what has been marked as

2 Exhibit 18. Maybe we can just refresh your

3 recollection here.

4 A. Okay.

5 Q. This is your personnel file.

6 For the people on the phone, this document

7 was produced by CVS in the past couple of days.

8 There's no Bates number on it, and --

9 MR. HYNES: We can do a Bates number if you

10 want.

11 MR. GOETZ: It doesn't matter.

12 MR. HYNES: Okay.

13 BY MR. ROOF:

14 Q. If you would turn to -- we kind of self Bates

15 stamped it 119, and then .1.

16 If you can turn to 119.34.

17 Do you see that in the upper right-hand

18 corner?

19 And then you see there that on January 25,

20 2013, you have four hours earning $72.

21 Do you see that?

22 A. Yes, I do.

23 Q. To me, that appears to be the first time

24 where you have an hourly rate.

25 If you can look through to see if that's

Page 37

1 correct.

2 MR. HYNES: Can you see the type?

3 THE WITNESS: Kind of.

4 A. I agree that's the first time I see the

5 hourly rate. However, I don't -- I don't understand

6 the payroll part of it and how or why it is what it

7 is.

8 But in October or November of 2012, Mark

9 Nicastro called me and asked me if I would work on a

10 special project, which was SOM monitoring, and I

11 came -- I said I would. And I came into the facility

12 in November, and I worked for three or four weeks in

13 2012.

14 Q. For those three or four -- I mean, I'm sorry.

15 Are you finished?

16 A. Let me -- let me ask: If we go up on 119.33

17 and the pay period ending 12-14, that one shows me as

18 having 79 hours, and I believe that's when I helped

19 out on the SOM. If we do the -- if we do the math,

20 that's probably about right. Seventy-nine times $18

21 is --

22 Q. You were making $18 an hour?

23 A. When I came back, that's what he offered

24 me.

25 Q. And so -- all right.

Page 38

1  The first time you came back as a part-time
2  employee was in November of 2012?
3  A. Yes, it was.
4  Q. And it was for SOM monitoring?
5  A. Yes, it was.
6  Q. What did you do?
7  A. I came in to help Aaron Burtner, who I
8  believe was the SOM analyst, and that is more than six
9  years ago. It was a short period of time, and I
10 really cannot remember what I did to help him during
11 that process.
12 Q. And this is just for the three to four weeks,
13 correct?
14 A. I thought it was about three or four weeks.
15 There's 79 hours, I think. I'm not sure if there's --
16 later it says 80 with vacation. I don't know if
17 there's an error, if -- if that's how it gets up to
18 that.
19 But my recollection is that for a short
20 period of time, November, December, I came in and I
21 helped him some way, and I -- I just don't remember
22 what I did to help him.
23 Q. Would it have been reviewing Item Review
24 Reports?
25 A. I -- I've -- I've thought about this for a

Page 39

1  long time. I -- I just -- during that -- I -- I just
2  don't know. I can -- I can picture where he sat. I
3  can somewhat picture where I might have been. I just
4  do not remember what I did during that time period.
5  Q. And so, you don't remember reviewing Item
6  Review Reports?
7  A. I --
8  MR. HYNES: Objection. Asked and answered.
9  A. Yes, I don't remember. I -- I may have.
10 I -- I just don't remember.
11 Q. Who else was in the SOM department at that
12 time?
13 MR. HYNES: Objection to form.
14 A. The only person that I'm aware of was, Aaron
15 Burtner was who I was there to assist.
16 (CVS-Millikan-119 was marked for
17 identification.)
18 Q. And then it looks like, based on Exhibit 119,
19 you came back in January of 2013, correct?
20 A. I believe what's happening from now on, in
21 2013, for a period of time, he kept -- the director,
22 Mark Nicastro, kept me on the payroll as a part-time
23 associate, and I did some special projects for him.
24 Q. What were those special projects?
25 A. While I don't remember everything, there was

Page 40

1  a monthly store audit that needed to be done that I
2  did. I don't remember other things, but it's a small
3  amount of hours until we get to about August of 2013.
4  So, it's a few little things that he asked me to do.
5  Q. And the only thing you can remember is
6  monthly store audit?
7  A. I definitely remember monthly store audit.
8  Q. So between January 2013 and August 2013, the
9  only thing you can remember is monthly store audit?
10 A. Yes.
11 Q. I want to go back to when you were helping
12 Aaron Burtner out as -- in the SOM department.
13 How many hours a day did you work?
14 A. I don't remember. It appears this document
15 is going to reference 79 hours in one two-week period,
16 so that would appear to me to be nearly full-time.
17 Q. And then you said that you had short hours in
18 January '13 to August 2013.
19 What happened in August of 2013?
20 A. I don't recall what happened, but it appears
21 that in August of '13, for a period of time, I came in
22 and I -- I helped in SOM.
23 Q. And what did you help in SOM?
24 A. I don't remember. Shauna Helfrich, Kelly
25 Baker -- there were -- were the two individuals.

Page 41

1  Q. Were the two individuals that were --
2  A. Oh, that were doing SOM at that time.
3  Q. Aaron Burtner had left the company?
4  A. I believe so.
5  Q. And so, you came in to help Shauna Helfrich
6  and Kelly Baker?
7  MR. HYNES: Objection to form.
8  A. Yes, I did.
9  Q. And that was in August of 2013?
10 A. Yes.
11 Q. And what did you do to help them?
12 A. I don't remember all of the details or
13 exactly what I did, but I'm sure I helped review some
14 of the reporting connected with orders of concern.
15 Q. You reviewed some of the reporting of orders
16 of concern.
17 What do you mean by that?
18 A. There were orders that were flagged as
19 potentially they needed to be looked at.
20 Q. And do you recall whether this was -- report
21 was called the Item Review Report?
22 A. That was -- one component of it was the IRR.
23 Q. And what were the other components?
24 A. And which was the inventory report.
25 There was another report. Slips my mind what

Page 42

1   that's called, but we would move some of the data into
2   that report to look at other criteria, and we also had
3   a loss prevention tool.
4       Q.  What was the loss prevention tool?
5       A.  I believe at one point in time, it was called
6   Viper.  I don't remember if it was called that
7   throughout this time frame or not.
8       Q.  And what was the other tool that you said
9   that you used to put information into?
10      A.  I know -- I don't remember the name of
11  that.
12      Q.  And what was the information you put into
13  that?
14      A.  We put in a store and a drug.
15      MR. ROOF:  Can we go off the record?
16      MR. HYNES:  Yeah.  Yeah, that would be good
17  for me, too.
18      THE VIDEOGRAPHER:  We're off the record at
19  9:54 a.m.
20      (There was a brief recess.)
21      THE VIDEOGRAPHER:  We are back on record at
22  10:07 a.m.
23  BY MR. ROOF:
24      Q.  Mr. Millikan, we were talking about your time
25  and working part-time in SOM when we left.

Page 43

1       And you said that you reviewed IRR reports,
2   Viper, and then some document in which you put in the
3   store and the drug, correct?
4       A.  Yes.
5       Q.  Is there anything else that you reviewed when
6   you worked for SOM?
7       A.  Not that I recall.
8       Q.  And this started in August of 2013?
9       A.  I believe so.
10      Q.  And how long did it last?
11      A.  A few weeks or months, with not a lot of
12  hours.
13      Q.  You're not sure whether it was weeks or
14  months as to how long it lasted?
15      A.  No, I'm not.
16      Q.  And how many hours a day did you work?
17      A.  I don't remember.
18      Q.  If we go to --
19      A.  Yep.
20      Q.  -- 119 and go to 119.36.
21      And then it says at the bottom, it is
22  8 August of 2013 the pay period.  Correct
23      MR. HYNES:  Very bottom?
24      A.  Mine -- you said 119.36?
25      Q.  Yes.

Page 44

1       MR. HYNES:  I thought you said 8-13.
2       MR. GOETZ:  I -- what I believe is talking
3   about is the upper right-hand Bates number.
4       MR. HYNES:  Oh.
5       MR. GOETZ:  So 119.36.
6       A.  Mine looks like it says 8-8, maybe.
7       Q.  Correct.  It is August of 2013.
8       A.  Oh.  I'm sorry.
9       Q.  Yeah.  Correct?
10      A.  Oh, I was -- I was doing the date.  That's
11  August '13.
12      Q.  Right.
13      A.  August of 2013.
14      Q.  Right.  And has listed two hours there,
15  correct?
16      A.  Yes.
17      Q.  And then if you turn to the next page, 119.37
18  for 8-20 -- it looks like 8-22 or 23, 2013, it has
19  hours of 13, correct?
20      A.  Yes.
21      Q.  And then the next pay period of 9 -- it looks
22  like 9-30-2013, has hours of 4.42, correct?
23      A.  Yes.
24      Q.  And then the next entry, again of like 9-20,
25  it has 2.6?

Page 45

1       A.  Yes.
2       Q.  And then the next entry, pay period of
3   10-4-2013, it has two hours?
4       A.  Yes.
5       Q.  And October of 2013, it has -- looks
6   like a little over 15 hours?
7       A.  Yes.
8       Q.  And then in 11 of 2013, it has 3.13 hours?
9       A.  Yes.
10      Q.  And then 11-15 of 2013, it has 16 hours?
11      A.  Yes.
12      Q.  So those are the hours you worked for those
13  two-week pay periods, correct?
14      A.  Yes.
15      Q.  That refreshes your recollection as to how
16  long you worked each day, about?
17      A.  Each two-week time period.  What it doesn't
18  do is tell me if I was working in SOM or not during
19  those time periods.
20      For example, if you take two hours, I doubt
21  if I went into SOM for two hours.  I can't imagine
22  that I accomplished anything during those two hours,
23  so --
24      Q.  What would you have done?
25      A.  Whatever project -- maybe I did a store

Page 46

1  audit.  Maybe I did something in pharmacy.  I don't
2  remember, but I doubt if most of those weeks I went to
3  SOM.  My --
4      Q.  Do you know what weeks you went to SOM?
5      A.  No.
6      Q.  Can you tell?
7      A.  I don't, and I can't.
8      Q.  That's fine.  But you don't -- your
9  recollection, it wasn't many hours with SOM?
10     MR. HYNES:  Objection to form.
11     A.  Correct.  My -- my recollection -- and -- is
12  that it was a small amount of hours and it was
13  probably far less than what is on that pay period.
14     Q.  On which was reflected in Exhibit 119?
15     A.  Yes.
16     Q.  So you had other projects that you were doing
17  between August 2013 and the couple of weeks, couple of
18  months that you were doing the SOM, correct?
19     A.  I'm not sure of that.  I don't remember.  I'm
20  just saying I imagine that I did something else.
21     Q.  That's kind of what 119 is telling you?
22     MR. HYNES:  Objection to form.
23     A.  119 is reinforcing what I thought I already
24  knew.
25     Q.  And that's you worked a very few hours in

Page 47

1  SOM?
2      A.  Yes.
3      Q.  Were you trained in reviewing IRRs?
4      A.  Yes.
5      Q.  Who trained you?
6      A.  Shauna Helfrich and Kelly Baker.
7      Q.  And describe that training for me.
8      A.  It was an on-the-job training.  I know there
9  was a three- or four-page document of the steps to go
10  through.  And also during this time, we had some
11  former DEA agents who were in the facility, so I spent
12  some time with them.
13     Q.  So, Shauna Helfrich and Kelly Baker trained
14  you basically on the job, correct?
15     A.  Yes.
16     Q.  And then there was a document that told you
17  how to review an IRR?
18     A.  Yes.
19     Q.  And then you used the former DEA agents for
20  questions?
21     A.  Yes.
22     Q.  Any other type of training?
23     A.  No, I don't believe so.
24     Q.  And how long did that training last?
25     MR. HYNES:  Objection to form.

Page 48

1      A.  I don't recall.  It would have been ongoing
2  because there were multiple things that they were
3  doing.  I probably wasn't -- I know I wasn't trained
4  in everything, so I would have only been doing one
5  part that they trained me to do.
6      (CVS-Millikan-100 was marked for
7  identification.)
8      Q.  I'm going to hand you what has been marked as
9  Exhibit 100.  Exhibit 100 is Bates 17100 through
10 17101.
11     And Exhibit 100, the first page of 17100 is
12 an email, correct?
13     A.  Yes, it is.
14     Q.  And it is dated July 18, 2011?
15     A.  Yes, it is.
16     Q.  And it is from Eufemia Bryden, correct?
17     A.  Yes.
18     Q.  To Patricia Paul, correct?
19     A.  Yes.
20     Q.  And you're copied on it?
21     A.  Yes, I am.
22     Q.  So you received a copy of Exhibit 100?
23     A.  Yes.
24     Q.  And it says, "Good afternoon.  Here is a copy
25 of your DEA license-hard copy on way-thank you."

Page 49

1      Did I read that correctly?
2      A.  Yes.
3      Q.  So, you turn to the next page, 17101.  That
4  is the DEA certificate, correct?
5      A.  Yes, it is.
6      Q.  And it is actually called the Controlled
7  Substance Registration Certificate, correct?
8      A.  Yes.
9      Q.  And it is issued by the Drug Enforcement
10 Administration?
11     A.  Yes.
12     Q.  And it's -- the business activity is
13 distributor, correct?
14     A.  Yes.
15     Q.  And it's for Schedules 3, 3N, 4 and 5,
16 correct?
17     A.  Yes, it is.
18     Q.  And that's the schedules of controlled
19 substances?
20     A.  Yes.
21     Q.  And the issue date is July 12, 2011?
22     A.  That looks like July 12, 2011.
23     Q.  That's the issue date, correct?
24     A.  Yes.
25     Q.  And then it is issued to CVS Indiana, LLC?

Page 50

1     A. Yes.
2     Q. And so, this is the license that gives CVS
3 Indiana, LLC the ability to distribute controlled
4 substances?
5     A. Yes.
6     Q. And for the years that you were the DC DEA
7 compliance coordinator, you received one of these
8 licenses every year?
9     A. I believe so.
10     Q. The Indianapolis DC distributed controlled
11 substances to all CVS stores in Cuyahoga and Summit
12 Counties in Ohio, correct?
13     MR. HYNES: Objection. Time period.
14     A. Yes.
15     Q. And for what time period did that occur?
16     A. I don't know when we would have started, but
17 it would have been through -- I guess I don't know
18 when we started, and right now I'm not familiar if we
19 are shipping to them or not. So I don't know if or
20 when we ended shipping there.
21     Q. Did you distribute to Cuyahoga County and
22 Summit County when you were operations manager?
23     A. I don't know for sure.
24     Q. What about when you were production manager?
25     A. Again, I don't know for sure.

Page 51

1     Q. But do you know the Indianapolis DC
2 distributed controlled substances to all CVS stores in
3 Cuyahoga County and Summit County of Ohio?
4     A. No. I know that CVS Indiana, LLC, we did
5 distribute into Ohio. I'm just not sure of the
6 geography of where we did or didn't ship.
7     Q. So you're not -- you're not sure of the
8 geography, whether it was Cuyahoga County or Summit
9 County now?
10     A. Not for sure.
11     Q. Okay. And you're not sure of the dates,
12 correct?
13     A. Right.
14     Q. But those controlled substances included
15 hydrocodone and hydrocodone combination products,
16 correct?
17     MR. HYNES: Objection to form.
18     A. If -- if we shipped in the controlled
19 substances, they could have included hydrocodone.
20     Q. Did you know that there was an opioid crisis
21 sweeping the nation in 2006?
22     MR. HYNES: Objection to form.
23     A. I'm aware of opioids and the chance for
24 abuse.
25     Q. But you're not aware of any national epidemic

Page 52

1 or crisis?
2     MR. HYNES: Same objection.
3     A. I'm aware that various things are reported.
4 I'm not privy to all of the facts of it.
5     Q. What about in 2007? Were you aware about the
6 opioid crisis in 2007?
7     MR. HYNES: Same objection.
8     A. I don't recall.
9     Q. And what about between 2008 and 2012?
10     MR. HYNES: Same objection.
11     A. I don't recall.
12     Q. Did you know that hydrocodone and hydrocodone
13 combination products were at the center of the opioid
14 crisis?
15     MR. HYNES: Same objection.
16     A. No.
17     Q. Did you know that the Indianapolis DC had a
18 role to play in preventing this epidemic?
19     MR. HYNES: Same objection.
20     A. CVS distribution center has a role to ship
21 legitimate prescription needs to our legitimate stores
22 for legitimate patients.
23     Q. And to prevent diversion, correct?
24     MR. HYNES: Same objection.
25     A. We want to make sure that those products go

Page 53

1 in the correct channels.
2     (CVS-Millikan-101 was marked for
3 identification.)
4     Q. Handing you what has been marked as Exhibit
5 101.
6     Exhibit 101 is Bates stamped 15502 through
7 15526.
8     Do you see that in the lower right-hand
9 corner?
10     A. Yes.
11     Q. Exhibit 101 is a PowerPoint presentation,
12 correct? That's what it appears to be?
13     A. I'm not sure.
14     Q. It is a document from McKesson, correct? In
15 the upper --
16     A. Yes.
17     Q. -- right-hand corner, it says McKesson,
18 correct?
19     A. Yes.
20     Q. In the lower right-hand corner, it says,
21 "Copyright 2014, McKesson Corporation. All rights
22 reserved"?
23     A. Yes.
24     Q. Have you seen Exhibit 101 before?
25     MR. HYNES: I'm just going to object and

|  | Page 54 |
| --- | --- |

1  instruct the witness not to divulge anything that
2  happened during preparation for the deposition.
3      Do you -- do you need some time to look at
4  it?  Did you need time to look at the document?
5      MR. ROOF:  Yeah, I'm not rushing him.
6      MR. HYNES:  Yeah, take your time and look at
7  the document.
8      A.  There are a couple of pages that look vaguely
9  familiar, but the majority of this I've never seen.
10     Q.  And what do you mean they look vaguely
11  familiar?
12     A.  The one ending 15507, I believe I've seen
13  either that or something to that effect.
14     Q.  And 15507 is titled "U.S. Rates of Opioid
15  Overdose Deaths, Sales and Treatment Admissions 1999
16  to 2010"?
17     A.  Yes.
18     Q.  We'll take a look at that document in a
19  better form in a little bit.  Okay?
20     A.  Okay.
21     Q.  And any other documents that look familiar on
22  in Exhibit 101?
23     A.  15513.
24     Q.  And that's titled, "The Florida Pill Mills
25  2009 and 2010," correct?

|  | Page 55 |
| --- | --- |

1      A.  Yes.  15516.
2      Q.  And that's titled, "Drug Diversion Migration
3  Out of Florida," correct?
4      A.  Yes.
5      I believe those are the only pages that I
6  potentially have seen before.
7      Q.  And where would you have potentially seen
8  them?
9      A.  I believe in the preparation for this day.
10     Q.  And when was that?
11     A.  In one of the last couple of days.
12     Q.  And that was preparation with your counsel?
13     A.  Yes.
14     Q.  Turn to 15503.  Second line says, "The
15  Centers for Disease Control and Prevention, CDC -- or
16  (CDC), has declared prescription drug abuse to be an
17  epidemic."
18      Did I read that correctly?
19     A.  Yes.
20     Q.  And "epidemic" is underlined and in bold,
21  correct?
22     A.  Yes.
23     Q.  Did you know this?
24      MR. HYNES:  Objection.  Asked and answered.
25     A.  I don't recall.

|  | Page 56 |
| --- | --- |

1      Q.  You don't recall knowing whether the Centers
2  for Disease Control and Prevention has declared a
3  prescription drug abuse to be an epidemic?
4      A.  That's correct.
5      Q.  And do you recall anybody from CVS telling
6  you this?
7      A.  I don't recall using that language.
8      Q.  Turn to the next page, 15504.
9      Second line says, "Every component of the
10  distribution chain has been breached."
11      Did I read that correctly?  15504.
12     A.  Yes.
13     Q.  I read that correctly?
14     A.  Yes.
15     Q.  Did you know this?
16      MR. HYNES:  Objection to form.
17     A.  I don't know for sure.
18     Q.  Do you recall anybody from CVS telling you
19  about this?
20      MR. HYNES:  Same objection.
21     A.  I don't know.
22     Q.  Turning to 15505, the next page, the first
23  line, McKesson is basically admitting that there is a
24  prescription drug abuse epidemic in the U.S.,
25  correct?

|  | Page 57 |
| --- | --- |

1      MR. HYNES:  Objection to form.
2      A.  I can read what they say, but...
3      Q.  And they say, "Prescription drug abuse is an
4  epidemic in the U.S.," correct?
5      A.  Yes, they do.
6      Q.  So that's basically admitting that there is a
7  prescription drug abuse epidemic in the U.S.,
8  correct?
9      MR. HYNES:  Objection to form.
10     A.  I didn't put this together.  I can't speak to
11  it.
12     Q.  The next bullet point says, "Prescription
13  drugs cause more deaths than heroin and cocaine
14  combined."
15      Do you see that?
16     A.  Yes.
17     Q.  Did I read that correctly?
18     A.  Yes.
19     Q.  And did you know this fact?
20     A.  I don't know where they got that data.
21     Q.  But if you see the asterisk next to
22  "combined" and then at the bottom it says "source."
23  If you read closely, "Centers for Disease Control."
24      Do you see that?
25     A.  Yes.

Page 58

1  Q. So, did you know this fact?
2  MR. HYNES: Objection. Asked and answered.
3  A. Again, I -- I don't know where they got
4 everything and I haven't done the analysis on this.
5  Q. So you don't know one way or the other?
6  A. Not unless I get a chance to look into it.
7  Q. And nobody from CVS told you about this
8 fact?
9  MR. HYNES: Objection to form.
10  A. I don't -- I don't recall.
11  Q. Turn to 15511.
12  15511 is titled, "Current Prescription Drug
13 Diversion Trends, States with Highest Pharmacy
14 Dispensing in 2012."
15  Correct?
16  A. Yes.
17  Q. And then it has a column for -- called
18 "Rank," and then you see one for "Hydrocodone,"
19 correct?
20  A. Yes.
21  Q. And No. 7, for rank for hydrocodone is
22 Ohio?
23  A. Yes.
24  Q. And so, Ohio is the seventh largest dispenser
25 of hydrocodone?

Page 59

1  MR. HYNES: Objection to form.
2  A. That's what it says here. Again, I didn't
3 put this together, so --
4  Q. Yeah. And it says the "Source of the data."
5 If you look at asterisk, it says "DEA, Distributors'
6 Conference, October, 2013," correct?
7  A. Yes.
8  Q. Do you have any reason to doubt this
9 information?
10  A. I just -- I haven't had a chance to look into
11 it to know if that's a true fact or not.
12  Q. But you don't -- as you sit here today, you
13 have no reason to doubt it one way or the other?
14  A. I always have a reason to doubt unless I can
15 prove it to myself, I think.
16  Q. Were you aware that CVS Indiana was the
17 largest distributor of hydrocodone to Ohio?
18  MR. HYNES: Objection to form. Lack of
19 foundation.
20  A. No.
21  Q. Did you know that from 2006 to 2014, CVS
22 Indiana distributed 287 million dosage units into
23 Ohio?
24  MR. HYNES: Objection to form. Dosages of
25 what?

Page 60

1  MR. ROOF: Of hydrocodone and HCPs.
2  MR. HYNES: Objection. Lack of foundation.
3  THE WITNESS: No.
4  MR. HYNES: Mischaracterizes the evidence.
5  Q. Pardon me?
6  A. No.
7  (CVS-Millikan-102 was marked for
8 identification.)
9  Q. I'm going to hand you what has been marked as
10 Exhibit 102.
11  102 is not Bates stamped. Exhibit 102 is
12 called, "Poisoning Deaths, Opioid Analgesics,"
13 correct?
14  A. Yes.
15  Q. And it is a bar graph, correct?
16  A. Yes.
17  Q. And it is a bar graph showing poisoning
18 deaths from opioid analgesics, correct?
19  MR. HYNES: Objection to form.
20  A. That's what is says.
21  Q. Okay. And it is from 1999 through 2013?
22  A. Yes.
23  Q. And there is a steady increase in deaths from
24 1999 to 2013, correct?
25  MR. HYNES: Objection to form.

Page 61

1  A. That's what it shows.
2  Q. And in 1999 there was 4,041 deaths from
3 opioid analgesics, correct?
4  MR. HYNES: Objection to form.
5  A. That is what it alleges.
6  Q. And then it peaks out in 2011 at 16,917,
7 correct?
8  MR. HYNES: Same objection.
9  A. Again, that's what it alleges.
10  Q. And then it tapers off at -- in 2013 at
11 16,200, correct?
12  MR. HYNES: Same objection.
13  A. Again, that is what it alleges.
14  Q. Yeah. And the source of this is the
15 CDC/NCHS, National Vital Statistics System --
16  MR. HYNES: Same objection.
17  Q. -- correct?
18  A. Yes.
19  Q. And the U.S. Drug Enforcement Administration,
20 Office of Diversion Control published this document?
21  MR. HYNES: Same objection.
22  A. I'm not sure.
23  Q. It says --
24  A. I see where it says that, but I don't see
25 where it says it published it, but...

Page 62

1    Q. But do you see where it says U.S Drug
2  Enforcement Administration, Office of Diversion
3  Control in the lower right-hand corner?
4    A. Yes.
5    Q. Did you know about the information conveyed
6  in Exhibit 102?
7        MR. HYNES: Objection to form.
8    A. I don't believe so.
9        (CVS-Millikan-103 was marked for
10  identification.)
11   Q. Handing you what has been marked as Exhibit
12  103.
13       And this is the document that you referred to
14  earlier and said you reviewed with your attorneys in
15  preparation for this deposition, correct?
16       MR. HYNES: Objection. Don't answer the
17  question.
18   Q. He already answered the question. Go ahead
19  and answer it.
20       MR. HYNES: Don't answer it.
21   Q. Have you seen this document before?
22       MR. HYNES: Objection. Instruct the witness
23  not to divulge anything that happened during prep
24  session.
25   Q. Have you seen this document before?

Page 63

1    A. I guess I can't answer.
2    Q. So, that's a yes?
3        MR. HYNES: Objection. Asked and answered.
4    Q. We are relying on your earlier testimony
5  then.
6        Exhibit 103 is titled, "U.S. Rates of Opioid
7  Overdose Deaths, Sales and Treatment Admissions, 1999
8  to 2010," correct?
9    A. Yes.
10   Q. And it is a line graph?
11   A. Yes.
12   Q. And it is showing that as opioid sales
13  increase, opioid deaths increase as well?
14       MR. HYNES: Objection to form.
15   A. Again, I didn't put this together. I can't
16  really speak to what it is saying without looking at
17  it.
18   Q. But that's what it shows, though, doesn't it?
19  You can read a line graph, can't you?
20       MR. HYNES: Objection to form. Compound.
21   A. Yes.
22   Q. And so, this line graph is showing opioid
23  sales growth then the -- the same -- at the same time
24  opioid deaths increased, correct?
25       MR. HYNES: Objection to form.

Page 64

1    A. That's what it appears to be showing.
2    Q. And it also shows that as opioid sales
3  increase, opioid treatment admissions increase,
4  correct?
5        MR. HYNES: Same objection.
6    A. Yes.
7        (CVS-Millikan-104 was marked for
8  identification.)
9    Q. Handing you what has been marked as Exhibit
10  104. Again, this document is not Bates stamped.
11       Exhibit 104 is dated 2012, Ohio Drug Overdose
12  Deaths, correct?
13   A. Yes.
14   Q. Have you seen this document before?
15       MR. HYNES: Objection, to the extent this
16  calls for the witness to divulge what he reviewed
17  during prep.
18   Q. Have you seen this document before?
19   A. I don't believe so.
20   Q. The first sentence says, "Drug overdose
21  deaths continue to be a public health crisis in Ohio
22  with 366 percent increase in the number of deaths from
23  2000 to 2012."
24       And then it cites to see Figure 1, correct?
25   A. Yes.

Page 65

1    Q. I read that correctly?
2    A. Yes.
3    Q. And the source for that is the Ohio
4  Department of Health, correct?
5        MR. HYNES: Objection to form.
6    A. Yes.
7    Q. The first bullet point says, "Unintentional
8  drug overdoses caused 1,914 deaths to Ohio residents
9  based on data in 2012. This is the highest number of
10  deaths on record for drug overdose, and surpasses the
11  previous highest number (1,765) in 2011, by 8.4
12  percent."
13       Did I read that correctly?
14   A. Yes.
15   Q. And then the next bullet point says, "In
16  2012, five Ohioans died every day from unintentional
17  drug overdose, or one every five hours," correct?
18       MR. HYNES: Objection to form.
19   A. That's what it says.
20   Q. And the next bullet point says,
21  "Unintentional drug overdose continues to be the
22  leading cause of injury related deaths in Ohio, ahead
23  of motor vehicle traffic crashes, suicide and falls.
24  This trend began in 2007 and continues through 2012."
25       Did I read that correctly?

Page 66

1     A.  Yes.

2     Q.  And then the next sentence says, "Opioids
3  (prescription or heroin) remain the driving factor
4  behind the unintentional drug overdose epidemic in
5  Ohio.  Approximately two-thirds (1,272; 66.5 percent)
6  of the drug overdoses involved any opioid in 2012,
7  similar to 2011 (1,154; 65 percent)."

8     Did I read that correctly?

9     A.  Yes.

10     Q.  Did you know about the information conveyed
11  in Exhibit 104?

12     MR. HYNES:  Objection.  Time period.

13  Before today.

14     A.  I'm not sure.

15     Q.  You have no idea?

16     A.  I'm not sure if I knew or not.

17     Q.  Did anybody from CVS tell you about the
18  information conveyed in Exhibit 104?

19     A.  I'm not sure if they have or not.

20     (CVS-Millikan-105 was marked for
21  identification.)

22     Q.  Handing you what has been marked as
23  Exhibit 105.  This is also not Bates stamped.

24     Exhibit 105 is titled, International
25  Narcotics Control Board Comments on Reported

Page 67

1  Statistics on Narcotic Drugs-2012, correct?

2     A.  Yes.

3     Q.  Have you seen Exhibit 105 before?

4     MR. HYNES:  Objection and instruct the client
5  not to answer with respect to what he reviewed during
6  prep.

7     He can answer with respect to whether he's
8  reviewed this document outside of his prep session.

9     Go ahead.

10     A.  I don't believe so.

11     Q.  The first entry says:  U.S. was the country
12  with the highest consumption of hydrocodone
13  (approximately 45.5 tons, or 99 percent, of global
14  consumption).

15     Did I read that correctly?

16     A.  Yes.

17     Q.  Were you aware of this?

18     A.  No.

19     Q.  After reviewing Exhibits 101 through 105,
20  does this change your opinion that there was an opioid
21  epidemic between 2006 and 2013 in the United States?

22     MR. HYNES:  Objection to form.

23     A.  No, I can't comment on that wording based on
24  these documents without looking into it more.

25     Q.  If you had known the information in

Page 68

1  Exhibits 101 through 105, and that there was an opioid
2  crisis in the U.S., would you have done your job
3  differently?

4     MR. HYNES:  Objection to form.  Lack of
5  foundation.

6     A.  No.  We had a duty to make sure that
7  legitimate prescriptions went to legitimate stores for
8  legitimate patients.  So despite anything, we would
9  make sure that we were following the correct.

10     Q.  And how did you do that?  How did you make
11  sure that it was going to legitimate stores, to
12  legitimate patients?

13     A.  We were provided with a monitoring system,
14  and between ourselves and loss prevention, we could
15  look at stores and their prescription use.

16     Q.  What was the monitoring system?

17     A.  What time frame are we talking about?

18     Q.  In -- when you were operations manager.

19     A.  Okay.  So between 1998 and 2009 or '10, part
20  of that time we had a process where the warehouse
21  associate in the controlled substance area, if they
22  had a concern with the size of the order, they could
23  bring it to someone's attention, and we would then do
24  the due diligence to confirm that it was a legitimate
25  order or not.

Page 69

1     Q.  And so, they were only looking at size,
2  correct?

3     A.  They had the ability to look at size or
4  frequency based on the store's ordering pattern.

5     Q.  They didn't have any computer system with
6  them when they are doing this, correct?

7     A.  No, they did not.

8     Q.  And so, this was all from memory, correct?

9     MR. HYNES:  Objection to form.

10     A.  Yes.

11     Q.  And what was the other -- and that was the
12  only SOM process at the time, was the -- what I call
13  the pickers and packers?

14     A.  Yes.

15     Q.  And those dates were from when?

16     A.  I don't know when it started.  Probably back
17  in the '70s, up until about 2008.

18     Q.  Not 2009?

19     A.  Or nine, I --

20     Q.  You believe 2009?

21     A.  No, I believe 2008.  It could be 2007 to
22  2009.

23     (CVS-Millikan-106 was marked for
24  identification.)

25     Q.  I'm going to hand you what has been marked as

Page 70

1  Exhibit 106.
2      106 is Bates stamped 91508 through 91518,
3  correct?
4      A. Yes.
5      Q. Have you seen Exhibit 106 before?
6      MR. HYNES: Objection to the extent it calls
7  for the client, the witness, to divulge documents
8  reviewed during prep. I instruct the witness to only
9  answer as to what he's reviewed outside of his prep
10 session.
11     MR. GOETZ: What is the grounds for that? I
12 mean, is -- is there a -- are you referencing a case
13 management order? I'm curious.
14     MR. HYNES: No, no. I just -- I don't
15 think -- what we discussed during his prep session, I
16 think that's privileged.
17     MR. GOETZ: You're not asking what you
18 discussed. You're asking if he saw that document.
19     MR. HYNES: But I think documents I choose to
20 show him, I think that's privileged.
21     MR. GOETZ: We're not asking him: What
22 documents did the lawyer choose to show you?
23     MR. HYNES: He's asking --
24     MR. GOETZ: Asking: Did you see this
25 document? It's a different question than,

Page 71

1  Mr. Millikan, what documents did Mr. Hynes choose to
2  show you during the prep?
3      MR. HYNES: But -- but if the answer is, I
4  saw this during prep --
5      MR. GOETZ: Totally different question.
6      MR. HYNES: But if his answer is, I saw this
7  during prep, that's, to me, privileged.
8      Do you agree?
9      MR. GOETZ: Those are the documents -- no, I
10 don't because those are the documents we chose to use.
11     It's a different question than, what
12 documents did Mr. Hynes show you?
13     If we have a document that we choose to use,
14 we have a right to know if he saw them before he
15 walked in here.
16     MR. ROOF: And Eric allowed that yesterday.
17     MR. GOETZ: I mean, it just -- and I'm just
18 curious. I -- I -- I wanted to know if you're looking
19 at a CMO because there was --
20     MR. HYNES: It's not a CMO.
21     MR. GOETZ: -- as to what -- as to whether
22 you had to identify everything you showed to your
23 witnesses. There was that issue. And what it was
24 resolved at, no, but everything he used for prep has
25 to have been produced.

Page 72

1      MR. HYNES: That was for 30(b).
2      MR. GOETZ: Okay. I -- I --
3      MR. HYNES: And that's for 30(b), not
4  everything -- but, listen, I'll -- I'll give it some
5  thought. This is what I've always done in
6  depositions, and I've never had a problem with it.
7      Miles and I will talk about it at the
8  break.
9      MR. GOETZ: Okay. Fair enough.
10     MR. HYNES: Okay.
11     MR. ROOF: Okay. So, my question --
12     MR. HYNES: Do you want to ask the question
13 again and I'll just say --
14     MR. ROOF: Yeah.
15     MR. HYNES: -- "same objection"?
16 BY MR. ROOF:
17     Q. Can you -- or strike that.
18     Have you seen Exhibit 106 before?
19     MR. HYNES: Same objection.
20     A. So at this point in time, your question is
21 referring to this email?
22     Q. The email and the attachments.
23     A. Okay. May I have a moment?
24     Q. Sure. And I'll let you know the attachments
25 are three DEA letters.

Page 73

1      A. Okay.
2      I have seen the letter dated September 27,
3  2006.
4      Q. What about the letter dated February 7,
5  2007?
6      MR. HYNES: Bates number?
7      MR. ROOF: Bates number 91513 through
8  91516.
9      MR. HYNES: Okay.
10     A. I -- I don't remember if I've seen that one
11 or not.
12     Q. You could have seen it?
13     A. I could have.
14     Q. And then the December 27, 2007 letter, 91517
15 through 91518, do you recall seeing that document
16 before?
17     A. I don't recall seeing that one, but, again, I
18 might have.
19     Q. When did you see the September 27, 2006
20 letter?
21     MR. HYNES: Same objection as it goes to
22 prep.
23     You may answer.
24     A. I -- I don't remember when I saw it, but it
25 was somewhere back in this time frame. I would --

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.  You saw it around September of 2007?
2    A.  Actually, it says September of --
3    Q.  2006.
4    A.  -- 2006.
5    Q.  I'm sorry.
6    A.  I don't recall when I saw it, but I would
7  think I saw it around that time frame.
8    Q.  And do you know who showed you this
9  document?
10    A.  I do not know, but the pharmacy manager at
11  the time I feel comfortable would have shared that
12  with me.
13    Q.  Would this letter have gone to the pharmacy
14  manager?
15    A.  It would have went to the DE registrant
16  address.
17    Q.  And what address is that?
18    A.  If you go back on the license, it'll say "CVS
19  Indiana, LLC," with a street address.
20    Q.  And that would have gone to that address?
21    A.  Correct.
22    Q.  All three of these letters would have gone to
23  that address?
24      MR. HYNES:  Objection to form.
25    A.  I can't speak to where -- where they --

Page 75

1  without reading through all of this, to know where
2  they sent it, but this one I see right in the first
3  sentence where they say they sent it.
4    Q.  Okay.  And that would have been to the
5  address on the DEA license?
6    A.  Yes.
7    Q.  And then the CVS pharmacy, it would have been
8  directed to the pharmacy director?
9      MR. HYNES:  Objection.
10      Go ahead.
11    A.  It would have went to that address.  From
12  there, I don't know how the mail got sorted.
13    Q.  But you believe you got it from the pharmacy
14  director?
15    A.  I'm sure I saw it from the pharmacy
16  manager.
17    Q.  Manager.
18      And what did you do with this letter?
19    A.  We kept it in a file with the DEA
20  correspondence.
21    Q.  All right.  Let's take a look at the
22  September 7, 2006 letter, which is Bates stamped 91509
23  through 91512.
24      And it's -- like we said, it's a letter dated
25  September 27, 2006, correct?

Page 76

1    A.  Yes.
2    Q.  It's from the U.S. Department of Justice,
3  Drug Enforcement Administration, correct?
4    A.  Yes.
5    Q.  And it's specifically from Joe Rannazzisi,
6  deputy assistant administrator, office of diversion
7  control?
8    A.  Yes.
9    Q.  You reference the first sentence of the first
10  paragraph of the letter.  That sentence says:  This
11  letter is being sent to every commercial entity in the
12  United States registered with the Drug Enforcement
13  Administration (DEA) to distribute controlled
14  substances, correct?
15    A.  Yes.
16    Q.  And so, that's what you're basing that it
17  would have been sent to CVS Indiana, LLC?
18    A.  Yes.
19    Q.  The next sentence says:  The purpose of this
20  letter is to reiterate the responsibilities of
21  controlled substance distributors in view of
22  prescription drug abuse problem our nation currently
23  faces.
24      And then the first sentence of the next
25  paragraph says:  As each of you is undoubtedly aware,

Page 77

1  the abuse (nonmedical use) of controlled prescription
2  drugs is a serious and growing health problem in this
3  country.
4      Did I read that correctly?
5    A.  Yes.
6    Q.  And so, this is reiterating the opioid
7  epidemic that is ongoing in 2006, correct?
8      MR. HYNES:  Objection.
9    A.  I don't see the word "epidemic," and I can't
10  speak to what he was referring to.
11    Q.  The source of this footnote 1 is the National
12  Institute on Drug Abuse Research Report, Prescription
13  Drug Abuse and Addiction, revised August -- August
14  2005.
15    A.  Yes.
16    Q.  Go down to the last paragraph of the first
17  page, please.
18      And it says:  The CSA uses the concept of
19  registration as the primary means by which
20  manufacturers, distributors, and practitioners are
21  given legal authority to handle controlled substances.
22  Registration also serves as the primary incentive for
23  compliance with regulatory requirements of the CSA and
24  DEA regulations, as Congress gave DEA authority under
25  the Act to revoke and suspend registration for failure

Page 78

1  to comply with these requirements.
2       Did I read that correctly?
3    A.  Yes.
4    Q.  And did you know this?
5    A.  Yes.
6    Q.  And what is the CSA?
7    A.  Controlled Substance Act.
8    Q.  If you can turn to the next page, 91510,
9  second paragraph beginning with "Nonetheless..."
10      Do you see that?  Second paragraph?
11      MR. HYNES:  91510?
12      MR. ROOF:  91510.
13   A.  Mine says:  DEA recognizes...
14   Q.  Yeah.
15      MR. HYNES:  Oh, in the middle of the
16 paragraph.
17   Q.  Yeah.
18      MR. HYNES:  I'm sorry.  Right there.
19   Q.  "Nonetheless..."  Second sentence.
20   A.  Oh, okay.  Okay.
21   Q.  It says:  Nonetheless, given the extent of
22 prescription drug abuse in the United States, along
23 with the dangerous and potentially lethal consequences
24 of such abuse, even just one distributor that uses the
25 DEA registration to facilitate diversion can cause

Page 79

1  enormous harm.
2       Do you see that?
3    A.  I didn't see the quote.
4    Q.  I quoted it.
5       MR. HYNES:  No, he -- he puts that quote.
6    A.  Oh.  Oh, okay.
7       Yes, I saw it.
8    Q.  And I read that correctly?
9    A.  Yes.
10   Q.  Do you agree with this statement?
11   A.  Again, I didn't put this document together,
12 and I can't really state.
13   Q.  As you -- as you sit here today, after
14 reading it, do you agree with that statement?
15      MR. HYNES:  Objection.  Asked and answered.
16   A.  Again, I can't comment to what he wrote
17 here.
18   Q.  I'm not asking you to comment as to what he
19 wrote.
20      I'm asking you to say whether you agree or
21 not with that statement.
22      MR. HYNES:  Same objection.
23   A.  In the realm of what we did, we lawfully did
24 what we needed to do to make sure legitimate
25 prescriptions went to legitimate stores.

Page 80

1    Q.  Next paragraph, first sentence, says:  The --
2  the statutory factors DEA must consider in deciding
3  whether to revoke a distributor's registration are set
4  forth in 21 USC 823(e).
5       Did I read that correctly?
6    A.  Yes.
7    Q.  Did you know this?
8    A.  I -- I know they can revoke a license -- a
9  registration.  I don't know the complete sentence.
10   Q.  And you're the DEA --
11   A.  I don't --
12   Q.  -- compliance coordinator?
13   A.  -- I don't know the -- the regulation number
14 there.
15   Q.  You've never seen or read 21 USC 823(e)?
16   A.  I don't know that.  This is 12 years ago.
17 I've basically been retired for six years.  I can't
18 quote that code.
19   Q.  My question is:  Have you seen that code
20 before?
21   A.  I believe so.
22   Q.  Okay.  As part of your job?
23   A.  Or as a student.
24   Q.  You can't recall which one?
25   A.  No.

Page 81

1    Q.  The next sentence says:  Listed first among
2  those factors is the duty of distributors to maintain
3  effective control against diversion of controlled
4  substances into other than legitimate medical,
5  scientific, and industrial channels.
6       Did you know this?
7    A.  Yes.
8    Q.  And did CVS Indiana, LLC abide by it?
9    A.  Yes, we did.
10   Q.  The next paragraph says:  The DEA regulations
11 require all distributors to report suspicious orders
12 of controlled substances.
13      Did I read that correctly?
14   A.  Yes.
15   Q.  And is that a true statement?
16   A.  Yes.
17   Q.  And then it says:  Specifically, the
18 regulation states in 21 CFR 1301.74(b):  The
19 registrant shall design and operate a system to
20 disclose to the registrant suspicious orders of
21 controlled substances.  The registrant shall inform
22 the field division office of the administration in
23 this area of suspicious orders when discovered by the
24 registrant.  Suspicious orders include orders of
25 unusual size, orders deviating substantially from a

Page 82

1 normal pattern, and orders of unusual frequency.
2 　　Did I read that correctly?
3 　A. Yes.
4 　Q. And that's a true statement?
5 　A. Yes.
6 　Q. Have you seen CFR 1301.74(b) before?
7 　A. Yes.
8 　Q. Is that part of your job?
9 　A. Yes.
10 　Q. And did CVS abide by this?
11 　A. Yes.
12 　Q. Skip a paragraph and go to the next one that
13 begins with "Thus..." It says: Thus, in addition to
14 reporting all suspicious orders, a distributor has a
15 statutory responsibility to exercise due diligence to
16 avoid filling suspicious orders that might be diverted
17 into other than legitimate medical, scientific, and
18 industrial channels.
19 　　Did I read that correctly?
20 　A. Yes.
21 　Q. And is that a true statement?
22 　A. Yes.
23 　Q. Then it says: Failure to exercise such due
24 diligence could, if the circumstances warrant, provide
25 a statutory basis for revocation or suspension of a

Page 83

1 distributor's registration.
2 　　Did I read that correctly?
3 　A. Yes.
4 　Q. Is that a true statement?
5 　A. Yes.
6 　Q. Next paragraph: In a similar vein, given the
7 requirement under section 823(e) that a distributor
8 maintain effective controls against diversion, a
9 distributor may not simply rely on the fact that the
10 person placing the suspicious order is a DEA
11 registrant and turn a blind eye to the suspicious
12 circumstances.
13 　　Did I read that correctly?
14 　A. Yes.
15 　Q. Is that a true statement?
16 　A. Yes.
17 　Q. I want to turn to the next February 7, 2007
18 letter. And that's Bates stamp 91513 through 91516.
19 　A. Yes.
20 　Q. And the first sentence says: This letter is
21 being sent to every commercial entity in the United
22 States registered with the Drug Enforcement
23 Administration (DEA) to distribute controlled
24 substances, correct?
25 　A. Yes.

Page 84

1 　Q. And so, this would have gone to CVS Indiana,
2 LLC?
3 　A. Yes.
4 　Q. This February 7, 2007 letter would have gone
5 to CVS Indiana, LLC, correct?
6 　A. That's what they say they did. That's the
7 address they would have mailed it to.
8 　Q. Okay. This February 7, 2007 letter is
9 basically a duplicate of the September 27, 2006
10 letter, correct?
11 　　MR. HYNES: Objection to form. Lack of
12 foundation.
13 　　Go ahead.
14 　A. I believe so.
15 　Q. All right. And as an example, it says -- the
16 second sentence says: The purpose of this letter is
17 to reiterate the responsibilities of controlled
18 substance distributors in view of the prescription
19 drug abuse problem our nation currently faces,
20 correct?
21 　A. Yes.
22 　Q. And that was in the September 27, 2006
23 letter?
24 　A. Yes.
25 　Q. And if you turn to page 2 of the letter, the

Page 85

1 third paragraph cites to 21 USC 823(e) again,
2 correct?
3 　A. Yes.
4 　Q. Just like the September 27, 2006 letter?
5 　A. Yes.
6 　Q. And then it quotes and cites to 21 CFR
7 1301.73(b) again?
8 　A. Yes.
9 　Q. Just like the September 27, 2006 letter?
10 　A. Yes.
11 　Q. Turn to the December 27th, 2007 letter.
12 That's Bates number 91517 through 91518.
13 　　In the first letter -- the first sentence of
14 the letter says: This letter is being sent to every
15 entity in the United States registered with the Drug
16 Enforcement Administration (DEA) to manufacture or
17 distribute controlled substances.
18 　　Did I read that correctly?
19 　A. Yes.
20 　Q. Again, based on this sentence -- this letter
21 of December 27, 2007 from the DEA would have gone to
22 CVS Indiana, LLC?
23 　A. That's where they say they sent it.
24 　Q. And this letter is from the U.S. Department
25 of Justice Drug Enforcement Administration?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  A.  Yes.

2  Q.  And it is from Joe Rannazzisi again?

3  A.  Yes.

4  Q.  The next sentence in the first paragraph

5  says:  The purpose of this letter is to reiterate the

6  responsibilities of controlled substance manufacturers

7  and distributors to inform DEA of suspicious orders

8  according to the 21 CFR 1301.74(b), correct?

9  A.  Yes.

10  Q.  That's what the letter says?

11  A.  Yes.

12  Q.  That's a true statement?

13  A.  Yes.

14  Q.  And if you can go to the third paragraph,

15  second or third sentence, beginning with

16  "registrants."

17  A.  Okay.

18  Q.  It says:  Registrants are reminded that the

19  responsibility does not end merely with filing of a

20  suspicious order report.  Registrants must conduct an

21  independent analysis of suspicious orders prior to

22  completing a sale to determine whether the controlled

23  substances are likely to be diverted from legitimate

24  channels.  Reporting an order as suspicious will not

25  absolve the registrant of responsibility if the

Page 87

1  registrant knew or should have known that the

2  controlled substances were being diverted.

3      Did I read that correctly?

4  A.  Yes.

5  Q.  That's a true statement?

6  A.  I can't comment to that.  This is his

7  letter.

8  Q.  As the DEA compliant coordinator for the

9  distribution center, you can't comment one way or the

10  other that's a true statement?

11  A.  I know what he's -- I read what he's saying

12  we need to do.

13  Q.  And so that's a true statement, then?

14      MR. HYNES:  Objection.  Asked and answered.

15  A.  I know I can't comment on what he's saying

16  here.  I just know that we had systems to make sure

17  that we shipped legitimate drugs to legitimate

18  stores.

19  Q.  Turn to the second page of the letter, 91518.

20  First paragraph.

21      First sentence says:  Registrants that rely

22  on rigid formulas to define whether an order is

23  suspicious may be failing to detect suspicious orders.

24      Do you see that?

25  A.  Yes.

Page 88

1  Q.  Did I read that correctly?

2  A.  Yes.

3  Q.  Is that a true statement?

4      MR. HYNES:  Objection to form.

5  A.  I don't know since he wrote it, the entire

6  intent of that.

7  Q.  Says:  For example, a system that identifies

8  orders as suspicious only if the total amount of

9  controlled substance ordered during one month exceeds

10  the amount ordered the previous month by a certain

11  percentage or more is insufficient.

12      Did I read that correctly?

13  A.  Yes.

14  Q.  Is that a true statement?

15  A.  That's a statement from him.  I -- I can't

16  validate.

17  Q.  And both of those are statements from the DEA

18  regarding their requirements?

19  A.  Yes.

20  Q.  Okay.  In your time with CVS Indiana, LLC,

21  has the Indianapolis DC ever reported a suspicious

22  order to the DEA?

23  A.  I'm not sure.

24  Q.  As the director -- or as the DC DEA

25  compliance coordinator, you're not sure?

Page 89

1  A.  No, I'm not.

2  Q.  I want to talk about the suspicious order

3  monitoring standard operating procedure next.

4      MR. HYNES:  We're okay.

5      (CVS-Millikan-107 was marked for

6  identification.)

7  Q.  Handing you what has been marked as Exhibit

8  107.  Exhibit 107 is Bates stamped 34234 through

9  34300.

10      Do you see that?

11  A.  Yes.

12  Q.  Have you seen Exhibit 107 before?

13      MR. HYNES:  Same objection as to privileged

14  over prepped sessions.  He may answer as to whether

15  he's seen the document outside of his prep session.

16  A.  Yes, I have.

17  Q.  And the bottom email on 34234 of Exhibit 107

18  is dated April 3, 2009, correct?

19  A.  Yes.

20  Q.  It is from Amy Propatier, correct?

21  A.  Yes.

22  Q.  Who is Amy Propatier?

23  A.  She is a corporate associate in logistics.

24  Q.  And you received this email, correct?

25  A.  Yes, I did.

Page 90

1    Q.  You're in the "to" line as Millikan, Gary L.?

2    A.  Yes.

3    Q.  And the subject is "Updating DEA SOP,"

4  correct?

5    A.  Yes.

6    Q.  And it says:  Good morning -- Attached is the

7  DEA SOP which was implemented in December of 2007.

8      Did I read that correctly?

9    A.  Yes.

10    Q.  And so, attached to this email is the

11  December, 2007 DEA SOP?

12    A.  Yes.

13    Q.  Skip a sentence, and then go with the one

14  that begins with "also."

15      It says:  Also, the SOM section is still not

16  included in the SOP.  In the event of an audit and the

17  question comes up, please direct them to corporate

18  (Frank or myself) for the explanation of the program,

19  correct?

20    A.  Yes.

21    Q.  That's what it says?

22    A.  Yes.

23    Q.  And so, this is saying that the SOM SOP, in

24  April of 2000 -- or in December of 2007 hadn't been

25  written, correct?

Page 91

1      MR. HYNES:  Objection.  Mischaracterizes the

2  document.

3    A.  It -- it is saying that it is not in this

4  document.

5    Q.  Correct.  Which is the December 2007 DEA SOP,

6  correct?

7    A.  Yes.

8    Q.  And so, it is also saying that the SOM SOP is

9  not in existence in April of 2009, correct?

10      MR. HYNES:  Objection.  Mischaracterizes the

11  document.

12    A.  I don't know what she was -- referenced

13  that way.  I know that we had a procedure in place to

14  monitor suspicious orders, and this is a policy that

15  came out that would include more than just suspicious

16  order monitoring.

17    Q.  What was the policy for suspicious order

18  monitoring?

19    A.  We had a -- warehouse associates who reviewed

20  orders and reported any concern to pharmacy

21  management.

22    Q.  And that's it?

23    A.  We also had loss prevention people in

24  stores.

25    Q.  I'm talking at the compliance -- at the

Page 92

1  distribution center, not at the stores.

2    A.  Yes.

3    Q.  So the only SOM policy you had was the

4  pickers and packers, correct?

5      MR. HYNES:  Objection.  Time period.

6    Q.  In 2007?

7    A.  Yes.

8    Q.  And in 2009?

9    A.  At some point in time, whether it 2008 or '9,

10  we implemented an IRR program that supplemented the

11  warehouse associate program.

12    Q.  All right.  Let's take a look at first 34236,

13  and that's titled:  CVS Distribution Centers

14  Controlled Drug-DEA Standard Operating Procedures SOPs

15  Manual, correct?

16    A.  Yes.

17    Q.  And that's the D -- the December 7 DEA SOP,

18  correct?

19    A.  Yes.

20    Q.  And if you turn to 34274, and look at Section

21  7 -- or Section D.  I'm sorry.  Section D says,

22  Suspicious order monitoring (SOM)

23    A.  Yes.

24    Q.  And Section D1 says:  Prior to distribution,

25  all controlled substance orders are screened and

Page 93

1  reviewed by the host system prior to being transmitted

2  to warehouse operating system.  This process is

3  performed through the application of (by item and by

4  store type) ordering quantity parameters.

5      Did I read that correctly?

6    A.  Yes.

7    Q.  And then when we talk about the quantity --

8  the per order quantity parameters, we go to Section

9  D1B, correct?

10      And it says there:  These parameters are

11  documented in SOP, blank underline, 'order quantity

12  parameters for controlled drugs' being developed and

13  written.

14      Did I read that correctly?

15    A.  Yes.

16    Q.  So, the SOM SOP is being developed and

17  written in December of 2007, correct?

18    A.  I -- I can't comment on what she is writing

19  or referring.  We had an SOM program in place.

20    Q.  But this document says it is being developed

21  and written, correct?

22    A.  Yes, it does.

23    Q.  So that means there is no SOM written policy

24  or procedures, correct?

25    A.  I don't know that.

Page 94

1    Q.  You're the DEA compliance coordinator and you
2  don't know that?
3    A.  She says this one is being developed and
4  written.  Our previous policy, I'm not sure if that
5  was written or not.
6    Q.  And that's the pickers and packers?
7    A.  Yes.
8       (CVS-Millikan-108 was marked for
9  identification.)
10   Q.  Handing what has been marked as Exhibit 108.
11      Have you seen Exhibit 108 before?
12      MR. HYNES:  Same objection as to prep.
13      He may answer as to what he's reviewed
14  outside of prep.
15   A.  Yes, I have.
16   Q.  And when did you see it?
17   A.  I don't recall.
18   Q.  Do you recall what title you had when you saw
19  it?
20   A.  I'm not sure.  I would think I was an
21  operations manager.
22   Q.  The document is titled, Controlled Drug DEA
23  Standard Operating Procedures, correct?
24   A.  Yes.
25   Q.  And the revision date is December 8, 2009,

Page 95

1  correct?
2    A.  Yes.
3    Q.  Do you believe that you saw it around the
4  revision date?
5    A.  Yes.
6    Q.  And who showed this to you?
7    A.  I don't recall.  I'm sure it came out on an
8  email.
9    Q.  You don't recall the person?
10   A.  I don't know for sure.  I would think it was
11  Amy Propatier.
12   Q.  Why do you think it was Amy Propatier?
13   A.  I feel pretty comfortable that she was in the
14  position of -- that would have -- that this would have
15  came under.
16   Q.  And that was logistics?
17   A.  Yes.
18   Q.  Let's turn to the last page, 66444.  And it
19  says, Designated Representative, correct?
20   A.  Yes.
21   Q.  And underneath is -- that's your name,
22  correct?
23   A.  Yes.
24   Q.  And you're the designated representative for
25  the DEA SOP?

Page 96

1    A.  Designated representative for the Indiana,
2  LLC.
3    Q.  Correct.
4    Q.  Okay.  Yes.
5    Q.  Did you know that your name was going to be
6  put on this document?
7    A.  I believe I would have signed the
8  acknowledgement that I received this document.
9    Q.  I guess my question is:  Do you know that you
10  were going to be designated as the designated
11  representative for this DEA SOP of 2009?
12   A.  I don't remember.
13   Q.  So is it common for you to have somebody put
14  your name on a document that you are not aware of?
15      MR. HYNES:  Objection.  Mischaracterizes his
16  testimony.
17   A.  No.  I'm saying I put my name on that
18  document.
19   Q.  Oh, that's your testimony, is you put your
20  name and that's your electronic signature that you
21  agreed to put on Exhibit 108, which is on 664444,
22  correct?
23   A.  While I cannot remember doing that, I cannot
24  imagine somebody else putting my name and my
25  electronic signature there.

Page 97

1    Q.  Unless you knew about it and agreed to it?
2    A.  I don't believe, no.  I believe that to put
3  that signature there, I would have done that.
4    Q.  You would have done that.  Okay.
5       Let's start --
6    A.  I don't recall doing it, but I -- I don't
7  imagine any other way it got there.
8    Q.  Okay.  And is this what you refer to -- were
9  referring to earlier as the document that designated
10  you as the DEA compliance coordinator?
11   A.  I'm -- not this document.  There is an email
12  or something at some point in time saying that each DC
13  would have that person.
14   Q.  And then that email designated you?
15   A.  No.  It requested that we submit the name of
16  the person that was designated.
17   Q.  And Mr. Nicastro submitted your name?
18   A.  I don't remember.
19   Q.  But somebody submitted your name, correct?
20   A.  I don't remember.
21   Q.  Let's turn to 66419.  Again, to Section D.
22      And D is titled, Suspicious Order Monitoring
23  (SOM), correct?
24   A.  Yes.
25   Q.  And it says -- Section D(1) says:  Prior to

Page 98

1  distribution, all controlled substance orders are
2  screened and reviewed by the host system prior to
3  being transmitted to the warehouse operating system.
4  This process is performed through the application of
5  (by item and by store type) order quantity parameters.
6      Did I read that correctly?
7  A.  Yes.
8  Q.  And then section D(1)(b) says:  These
9  parameters are documented in SOP_blank, 'order
10 quantity parameters for controlled drugs' being
11 developed and written, correct?
12 A.  Yes.
13 Q.  And "being developed and written" is in bold
14 and in capitalization?
15 A.  Yes.
16 Q.  And so, this means that the SOM SOP is still
17 not -- being written, correct?
18    MR. HYNES:  Objection to form.
19 A.  I can't speak to who put this together.
20 Q.  Your name is on this document, correct?
21 A.  My name on that document is acknowledging
22 that I received it document.
23 Q.  And when you received it, did you ask anybody
24 whether it was still being developed and written, the
25 SOM SOP?

Page 99

1  A.  I don't remember.
2  Q.  But the language does say "being developed
3  and written," so that means there is no SOM SOP in
4  December of 2009, correct?
5      MR. HYNES:  Objection to form, including
6  asked and answered.
7  A.  Again, I can't speak to what she is putting
8  in this document.  The SOM procedures that we did have
9  in place were there.
10 Q.  But it wasn't written down?
11 A.  I don't know that it wasn't written down.
12 Q.  Well, that's what it says, correct?
13 A.  This is -- I can't say what she is referring
14 to here.
15 Q.  But you can't interpret "being developed and
16 written"?
17    MR. HYNES:  Objection.  Asked and answered.
18 A.  Again, I don't know what she was -- what she
19 is referencing here.
20 Q.  She is referencing the SOM SOP.
21 A.  A SOM SOP.
22 Q.  Correct.
23 A.  I don't know which one she is referencing.
24 Q.  And she is referencing that it is being
25 developed and written, correct?

Page 100

1      MR. HYNES:  Objection.  Asked and answered.
2  A.  Which ever one she's referencing, yes, that's
3  what she is saying.
4  Q.  And it is the one regarding ordered quantity
5  parameters for controlled drugs, correct?
6  A.  Again, I -- I don't know what she was
7  thinking or what -- I don't know what she's doing when
8  she's preparing this document.
9  Q.  And the SOM SOP that is in place in 2009 is
10 just the pickers and packers?
11    MR. HYNES:  Objection.  Mischaracterizes
12 testimony.
13 A.  I don't remember.
14 Q.  What does it mean to be the designated
15 representative?
16 A.  I don't remember the job description when
17 that went out.
18    (CVS-Millikan-109 was marked for
19 identification.)
20 Q.  I'm handing you what has been marked as
21 Exhibit 109.
22      Exhibit 109 is Bates stamped 89315 through
23 89379, correct?
24 A.  Yes.
25 Q.  Have you seen Exhibit 109 before?

Page 101

1      MR. HYNES:  Same objection as to documents
2  reviewed during prep.
3  A.  Yes, I have.
4  Q.  And when did you see it?
5  A.  I don't recall.
6  Q.  Would you have received it at the revision
7  date of January 28, 2010?
8  A.  I would think sometime around then.
9  Q.  And this Exhibit 109 is titled, Controlled
10 Drug-DEA Standard Operating Procedures Manual,
11 correct?
12 A.  Yes.
13 Q.  And again, we talked about the revision date
14 is January 28, 2010?
15 A.  Yes.
16 Q.  Again, if you look at the last page, 89379,
17 you're listed as the designated representative,
18 correct?
19 A.  Yes.
20 Q.  And that's your signature?
21 A.  Yes.
22 Q.  And you don't know what the designated
23 representative does?
24 A.  I don't recall what the job description of
25 that title was.

Page 102

1   Q. Does it have anything to do with writing
2   Exhibit 109?
3       MR. HYNES: The SOP?
4       MR. ROOF: Yes.
5   A. I don't believe so. It's possible that Amy
6   and I talked on the phone throughout this.
7   Q. But you don't recall?
8   A. I recall talking to Amy throughout this
9   process. I'm just -- I don't recall when and what was
10  our substance of talking.
11  Q. And when you say "throughout this process,"
12  what do you mean, "throughout this process"?
13  A. I believe you started back -- I forget what
14  that first one -- well, 12-1-07. So, even before
15  that.
16  Q. So through the process of writing these DEA
17  SOPs, you've talked with Amy Propatier?
18  A. Yes.
19  Q. And you don't recall when or the subject
20  matter of --
21  A. No.
22  Q. -- those discussions, correct?
23  A. Correct.
24  Q. Do you recall actually ever writing a section
25  of either Exhibit 107, 108, or 109?

Page 103

1   A. I did not write a section.
2   Q. Of any of those exhibits?
3   A. No, I did not.
4   Q. Anything besides talking with Ms. Propatier
5   did you do regarding Exhibits 107 through 109?
6   A. No.
7   Q. Turn to 89354, again focusing on section D.
8       Again, section D is titled, Suspicious Order
9   Monitoring (SOM)?
10  A. Yes.
11  Q. And section D(1), again, states: Prior to
12  distribution, all controlled substance orders are
13  screened and reviewed by the host system prior to
14  being transmitted to the warehouse operating system.
15  This process is performed through the application of
16  (by item and by store type) order quantity parameters.
17      Did I read that correctly?
18  A. Yes.
19  Q. Then we go to section D(1)(b), and it says:
20  These parameters are documented in SOP_blank, (order
21  quantity parameters for controlled drugs). Being
22  developed and written, correct?
23  A. Yes.
24  Q. "Being developed and written" is bold and in
25  caps?

Page 104

1   A. Yes.
2   Q. So, this is saying that the SOM SOP is still
3   being developed and written, correct?
4       MR. HYNES: Objection to form.
5   A. Again, what she's referring to, I can't say
6   what she's thinking or what she's actually talking
7   about.
8   Q. Are you saying that Ms. Propatier wrote
9   Exhibits 107 through 109?
10  A. I don't know that.
11  Q. Okay. Because you're saying "she," you don't
12  know what --
13  A. I'm -- I'm --
14  Q. -- "she's" referring to?
15  A. Correct. I'm sorry.
16  Q. I just wanted to make sure.
17  A. I don't know who was writing it. You are
18  correct.
19  Q. But again, the simple language, English
20  language, is that "being developed and written" means
21  that the SOM SOP is being developed and written and
22  isn't in final form yet, correct?
23      MR. HYNES: Objection to form.
24  A. Again, whichever one she's referring to is
25  the one that's not there and not in effect.

Page 105

1   Q. And you don't know which one that is?
2   A. No, I do not.
3   Q. And in 2010, the IRR was in place, correct?
4   A. Yes.
5   Q. And so, this could be referring to the IRR
6   SOM SOP?
7       MR. HYNES: Objection. Calls for
8   speculation.
9   A. Again, I don't know what her intent or what
10  she's referring to.
11  Q. I want to talk about the 2010 DEA audit.
12      MR. HYNES: Can we could take a two-minute
13  break? We've just been going for a while.
14      MR. ROOF: Sure. Absolutely.
15      THE VIDEOGRAPHER: Off the record at
16  11:35 a.m.
17      (There was a brief recess.)
18      THE VIDEOGRAPHER: We are back on the record
19  at 11:52 a.m.
20  BY MR. ROOF:
21  Q. Mr. Millikan, when we broke, we were going to
22  talk -- start talking about the 2010 DEA audit.
23      There was a DEA audit of the Indianapolis DC
24  in late August of 2010, correct?
25  A. Yes.

Page 106

1    Q. And you were involved in that DEA audit?
2    A. Yes, I was.
3       (CVS-Millikan-111 was marked for
4  identification.)
5    Q. I'm handing you what has been marked as
6  Exhibit 11 -- 111.
7       It's Bates stamped 61132 through 61134.
8       And the first page is 61132, and the bottom
9  email is dated September 2nd, 2010, correct?
10   A. Yes.
11   Q. It's from Terrence Dugger, correct?
12   A. Yes.
13   Q. To Sean Humphries?
14   A. Yes.
15   Q. And then you're copied on it?
16   A. Yes.
17   Q. So, you received it?
18   A. Yes, I did.
19   Q. And the attachment appears to be a memo,
20  correct?
21   A. Yes.
22   Q. And it's a memo from Terrence Dugger to Frank
23  Devlin, correct?
24   A. Yes.
25   Q. And the subject is: DEA Visits (8/24 through

Page 107

1  8/26, and 8/31 through 9/1/2010), correct?
2    A. Yes.
3    Q. And so, that's when the DEA visits occurred?
4  Those dates?
5    A. Based on this memo, those were those
6  visits.
7    Q. Okay. And then this memo has the title
8  called, Requested Information?
9    A. Yes.
10   Q. And the requested information is information
11  requested by the DEA to CVS Indiana, LLC, correct?
12   A. Yes.
13   Q. And midway down, there is a bullet point that
14  says, "SOM SOP," correct?
15   A. Yes.
16   Q. And so, the DEA is requesting a SOM SOP,
17  correct?
18   A. Yes, according to his recollection of that
19  visit.
20   Q. And do you recall DEA asking for a SOM SOP?
21   A. Yes.
22       (CVS-Millikan-112 was marked for
23  identification.)
24   Q. Handing you what has been marked as
25  Exhibit 112.

Page 108

1       Back up.
2       Have you seen Exhibit 111 before?
3       MR. HYNES: Same objection as to documents
4  reviewed during prep session.
5    A. Yes.
6    Q. And you saw it around the time that the memo
7  was written?
8    A. Yes.
9    Q. And the memo was written sometime during the
10  audit?
11   A. Sometime either during or after the audit. I
12  believe he sent it the morning after 9-1.
13   Q. Right.
14   A. I don't know if he wrote it that morning.
15   Q. During the audit, they had requested the SOM
16  SOP, correct?
17   A. Yes.
18   Q. All right. The Exhibit 112 is an email dated
19  August 26, 2010, correct?
20   A. Yes.
21   Q. And it's from Amy Propatier to Annette
22  Lamoureux?
23   A. Yes.
24   Q. And it says: Can you please post? We added
25  the suspicious order monitoring.

Page 109

1       Did I read that correctly?
2    A. Yes.
3    Q. And so, this email is saying that there's a
4  new DEA August 25th, 2010 with suspicious order
5  monitoring in it, correct?
6    A. I -- I don't know what she meant when she's
7  referring to this.
8    Q. Okay. You don't understand we added
9  suspicious order monitoring to mean they added a
10  suspicious order monitoring section to the 8-25-2010
11  DEA SOP?
12   A. I don't know for sure. I -- I wasn't on
13  this.
14       (CVS-Millikan-113 was marked for
15  identification.)
16   Q. Handing you what has been marked as
17  Exhibit 113.
18       Exhibit 113 is Bates stamped 88957 through
19  89025, correct?
20   A. Yes.
21   Q. And it's titled, Controlled Drug DEA Standard
22  Operating Procedures Manual, correct?
23   A. Yes.
24   Q. And the revision date is August 25th, 2010,
25  correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  A. Yes.

2  Q. And then if you flip to section D on 88996?

3  A. Okay.

4  Q. And this section D is different than the
5  section D in the Exhibits 107 through 109, correct?

6  A. Yes.

7  Q. It doesn't have that SOM blank language being
8  written and developed, correct?

9  A. Correct.

10  Q. So, the SOM section is now written and
11  developed in this August 25th, 2010 DEA SOP,
12  correct?

13  MR. HYNES: Objection to form.

14  A. A SOM. And I -- I can't comment on what
15  she's referring to, but there is now a SOM program
16  mentioned.

17  Q. And section D is, Prevention and Monitoring
18  of Controlled Drug PSE Suspicious Orders, correct?

19  A. I'm sorry. Where are you at now?

20  Q. Section D.

21  A. Oh, on -- we're still on 996, correct?

22  Q. Yes.

23  A. Yes.

24  Q. And so, this section D was written and
25  included and then posted because of the DEA audit that

Page 111

1  was going on in August of 2010, correct?

2  MR. HYNES: Objection. Lack of foundation.

3  A. I don't know when it was written.

4  Q. Well, it's dated August 25th, 2010,
5  correct?

6  A. Yes.

7  Q. And the audit was going on during that time,
8  correct?

9  A. Yes.

10  Q. And we know that DEA asked for the SOM SOP
11  during the DEA audit, correct?

12  A. Yes.

13  Q. And so, this is CVS Indiana, LLC's attempt to
14  put together a SOM SOP to give to the DEA -- DEA
15  during the audit, correct?

16  MR. HYNES: Objection to form.

17  A. No.

18  Q. It's not?

19  A. No.

20  Q. Section -- or item 4 on 88997 says: During
21  the month September 2010, the report will be
22  transitioned to each pharmacy DC, and the following
23  procedures will occur.

24  Did I read that correctly?

25  A. Yes.

Page 112

1  Q. Did that transfer occur in September of
2  2010?

3  A. I don't recall. I don't believe so.

4  Q. When do you believe it was -- the IRR review
5  was transferred to the individual DCs?

6  A. I don't believe it ever went -- I do not
7  believe -- I do not believe the IRR ever transitioned
8  to individual DCs. I don't recall that happening.

9  Q. Well, it was happening in Lumberton,
10  New Jersey, correct? That's what the first sentence
11  says, correct?

12  A. It says it was being done at a central
13  location --

14  Q. In New Jersey?

15  A. -- being New Jersey.

16  Q. Yeah. And the central location would have to
17  be Lumberton, New Jersey, correct?

18  A. Yes.

19  Q. And it was being done by John Mortelliti?

20  A. Yes.

21  Q. And so, after it was being done in Lumberton,
22  New Jersey, where did it go to?

23  A. I don't know the trail. I believe that it
24  went to -- I believe it went from New Jersey to
25  Knoxville, Tennessee.

Page 113

1  Q. And when did that occur?

2  A. I don't recall.

3  Q. Did it?

4  A. I -- I really don't -- I'm not going to be
5  able to tell you. It's going to be somewhere between
6  this date and 2012, but I don't remember when.

7  And again, this -- the IRR was already in
8  place. This just got added to this document, because
9  I -- I think I stated early, I think the IRR was in
10  place in 2007 and eight, somewhere there.

11  Q. Or nine?

12  A. Or nine, but...

13  MR. GOETZ: Do you want to break for lunch
14  now?

15  MR. HYNES: We might as well.

16  THE VIDEOGRAPHER: We are off the record at
17  12:03 p.m.

18  (There was a luncheon break.)

19  THE VIDEOGRAPHER: We are back on record at
20  12:55 p.m.

21  BY MR. GOETZ:

22  Q. Mr. Millikan, my name is Dan Goetz. We met
23  earlier.

24  (CVS-Millikan-9 was marked for
25  identification.)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    I'm going to hand you what has been marked as
2 Millikan Exhibit 9.
3    Do you recognize that document, sir?
4    A. Yes.
5    Q. Could you turn to page 8510, please, of that
6 document?
7    And do you see where it is paragraph 13(A)?
8    A. Yes.
9    It says, DC DEA compliance coordinator?
10   A. Yes.
11   Q. And -- and that was your role from 2006 until
12 2012?
13   A. It was one of my roles. I don't remember
14 when it started, but it would have ended in 2012.
15   Q. And you're correct. I apologize, because
16 this document we looked at the front page, I don't
17 believe this document was written until December of
18 2007.
19   So, that was one of your roles according --
20 under this document from December of '07 until June of
21 2012?
22   A. It -- I just don't remember when I was named
23 into that position.
24   Q. Okay. It was sometime around 2007 that you
25 became that?

Page 115

1    A. I'm sure.
2    Q. And you held that position until?
3    A. June of 2012.
4    Q. Could you read what -- what -- read into the
5 record what your responsibilities were?
6    A. The DC, DEA compliance coordinator means the
7 individual designated as responsible for assuring
8 compliance with applicable CSA requirements at each
9 CVS distribution center.
10   This person will have the responsibility to
11 implement the required systems and procedures for
12 controlled substances in coordination with the CVS
13 DEA compliance coordinator, the senior manager,
14 logistics planning and the director of logistics loss
15 prevention.
16   Q. That was one of your -- that language is
17 consistent with one of your roles until you retired in
18 June of 2012?
19   A. Yes.
20   Q. And do you know who the CVS DEA compliance
21 coordinator was?
22   A. I believe it was Amy Propatier.
23   Q. Did you work in compliance with her in
24 assuring that the CVS Indiana distribution center
25 abided by all of the DEA regulations?

Page 116

1    A. She sent out policies such as this that we
2 would comply with.
3    Q. Did -- to your knowledge, did that CVS DEA
4 compliance coordinator do anything other than send out
5 policies?
6    A. I know that she was involved with ARCOS for a
7 time, I'm not sure how long was involved with that,
8 and other DEA activities.
9    Q. What other DEA activities?
10   A. Maybe I misspoke there. I mean, I know she
11 was involved with ARCOS. I don't know her other --
12   Q. Okay. What else did she do to monitor the
13 required systems and procedures implemented at Indiana
14 -- Indianapolis distribution center?
15   A. I'm not -- I'm not sure.
16   Q. Okay. At -- as the Indianapolis DC DEA
17 compliance coordinator, you're not aware of her doing
18 anything to help monitor that, other than she did some
19 ARCOS and she sent out some forms, sent out some
20 policies?
21   A. I'm not sure what -- what her total job --
22 jobs are or job responsibilities were.
23   Q. And I appreciate that. I'm asking if you are
24 aware of anything.
25   A. No, I'm not.

Page 117

1    Q. Okay. Thank you.
2    You had testified earlier that from 2006
3 until the implementation of the IRR, that CVS used a
4 pickers and packers system for suspicious order
5 monitoring?
6    A. Yes.
7    Q. Okay. Did they use any other system from
8 2006 until the implementation of the IRR for a pickers
9 and packers system?
10   A. No.
11   Q. Okay. I believe that the -- the evidence in
12 this case is that the implementation of the IRR came
13 about in mid to -- early to mid 2009; is that -- does
14 that --
15   A. I don't remember. I -- I know it came into
16 play sometime between '7 and '9.
17   Q. Okay. In 2006, how many pharmacies were
18 served by the Indianapolis distribution center?
19   A. Probably about 1,500 per week.
20   Q. How many pharmacies total?
21   A. For who?
22   Q. In 2006, how many pharmacies total were
23 served by the Indianapolis distribution center?
24   A. 1,500 per week.
25   Q. Okay. All right. There were 1,500

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  pharmacies that submitted an order per week in 2006
2  to the Indianapolis distribution center.
3      Is that what you're saying?
4      A. Yes.
5      Q. Were there other pharmacies that didn't
6  submit an order?
7      A. No.
8      Q. Okay. So it served a total of 1,500
9  pharmacies?
10     A. Approximately 1,500.
11     Q. What about in 2007?
12     A. I would -- I would speculate that the number
13 was about the same.
14     Q. 2008?
15     A. Yes.
16     Q. 2009?
17     A. Yes.
18     Q. 2010?
19     A. Yes.
20     Q. 2011?
21     A. Yes.
22     Q. 2012?
23     A. Yes.
24     Q. CVS had pretty substantial growth nationwide
25 from 2006 to 2012.

Page 119

1      Do you agree with that?
2      A. Yes.
3      Q. Is it -- there some reason why the pharmacies
4  serves by the Indianapolis distribution center didn't
5  increase?
6      A. I'm not for sure why it didn't increase or
7  not. We were pretty much at capacity, so I would
8  think we would have been not the first choice to take
9  on added volume.
10     Now, during some of those purchases, there
11 were times where we had to shift stores for a period
12 of time.
13     Q. Okay. Would the distribution center
14 predominately be decided where you would distribute to
15 based on geography?
16     MR. HYNES: Objection, form. Go ahead.
17     A. That would be the -- it would be one of the
18 factors. The transportation costs possibly more than
19 geography, but there would be other criteria and also
20 distribution center volume.
21     Q. Transportation cost is not dependent upon
22 geography?
23     A. Not always.
24     Q. Okay. In 2006 when we talk about pickers and
25 packers, tell me if I'm wrong, what we are talking

Page 120

1  about are people that -- that are inside a controlled
2  substances cage, correct?
3      A. Yes.
4      Q. That cage is locked?
5      A. It is locked after hours. It has card swipe
6  during business hours.
7      Q. And from 2006 to 2012, just so we can maybe
8  shortcut this, did the cage change?
9      A. I believe it did, and I don't remember the
10 time frame when it did change.
11     Q. How did it change?
12     A. We asked the DEA if we would be permitted to
13 put PSE Chemical 1 items into that cage so that we
14 could better monitor the distribution of those
15 products.
16     Q. Do you know when that happened?
17     A. I don't. It had to be before 2012, and it
18 had to have been after 2008.
19     Q. Other than that change, were there other
20 changes to the cage?
21     A. We also needed to expand the pallet storage
22 to be able to handle that amount of product.
23     Q. Are you telling me to handle the PSE?
24     A. Yes.
25     Q. Any other changes?

Page 121

1      A. I -- I think it would be during this same
2  time frame, when we added that, we had a card swipe
3  outside the forklift door that we kept bumping into,
4  and I requested to the DEA that we cut into the cage,
5  recess that in so that it didn't get hit.
6      Q. Okay. Anything else you remember?
7      A. No.
8      Q. For ease, I'm going to refer to the cage from
9  2006 to whenever the PSE was added as cage 1, and then
10 the subsequent as cage 2.
11     Is that fair?
12     A. And subsequent --
13     Q. Subsequent meaning after you added the PSE
14 and you expanded it.
15     A. Okay. So in reality -- No. 1 is pre-PSE?
16     Q. Yes.
17     A. Okay.
18     Q. Cage 1, how big was that?
19     A. 5,000 square feet.
20     Q. How big was cage 2?
21     A. 10,000 square feet.
22     Q. Cage 1, how many people would work in there
23 on a typical day?
24     A. Two to three.
25     Q. Would they work an eight-hour shift?

Page 122

1    A. Yes.
2    Q. Did you have -- was it run multiple shifts?
3    A. No. The controlled substances was done on
4 the day shift.
5    Q. And what about cage 2?
6    A. Cage 2, you now would have taken it up to
7 five to seven.
8    Q. Again, only the day shift?
9    A. Yes.
10    Q. In cage 1, how many products were in there?
11    A. I don't recall. My guess would be around a
12 hundred.
13    Q. When I speak about products, did do you
14 consider hydrocodone combination products to be one
15 product?
16    A. No, I do not. I consider a product to be an
17 individual UPC code.
18    Q. Okay. So hydrocodone combination products
19 might have been three of those products?
20    A. Or more.
21    Q. What about in cage 2, how many products were
22 there?
23    A. So we would have continued with the same
24 amount of controlled substances, and you would have
25 added PSE items. That probably would have been about

Page 123

1 60.
2    Q. How many in cage -- in cage 1 and cage 2, did
3 the volume of -- strike that.
4    Did the volume change as to what an
5 individual picker could pick per day between cage 1
6 and cage 2?
7    MR. HYNES: Objection. Form. You can
8 answer.
9    A. No, it wouldn't have. They would have been
10 picking the same amount.
11    Q. And how many orders would a picker pick in a
12 day?
13    A. Based on 1,500 stores a day -- or a week, and
14 based on if five days were equal, that would be about
15 300 stores a day. And based on two to four people on
16 each side, that would be 75 to 150.
17    Q. So each picker would pick 75 to 150 orders
18 per day?
19    A. Yes.
20    Q. When we earlier said 1,500 pharmacies, I'm
21 talking about the physical number of buildings.
22    Do you understand that?
23    A. Yes.
24    Q. When -- the math that you just did assumes
25 that a pharmacy only gets one order per week?

Page 124

1    A. Yes.
2    Q. That's really unusual, isn't it?
3    A. Not for us.
4    Q. Not for controlled substances?
5    A. Not for CVS. Our stores that we had got one
6 order per week.
7    Q. Where -- where would that information -- how
8 could I validate that information?
9    A. Through store operations. Anybody in
10 logistics. I mean, I could get that for you.
11    Q. That, I would like. I would like to know
12 where that database is and -- it is contrary to some
13 emails that I've seen, which is why I'm asking.
14    A. They would -- they would have the ability to
15 order from the McKesson on a daily basis, depending on
16 -- or the wholesaler that they use, but their
17 warehouse order was once per week, which included
18 their pharmacy order.
19    Q. That one per week would be reflected in the
20 transactional data?
21    A. Yes.
22    Q. Okay. So, for a particular pharmacy, we
23 should see an order -- if it is January 1st, we should
24 not see an order until January 8th?
25    A. Correct.

Page 125

1    Q. Would it also be reflected in the ARCOS
2 data?
3    A. Yes.
4    Q. When you talked about outside vendors,
5 McKesson or Cardinal, a store could order from them as
6 well, correct?
7    A. Yes.
8    Q. And the Indianapolis distribution center
9 would have nothing to do with that?
10    MR. HYNES: Objection to form.
11    A. I don't know the present setup or I don't
12 know what the setup was or how that would have worked
13 for a store during this time period.
14    Q. As a DC DEA compliance coordinator, were you
15 aware of the outside orders placed by CVS pharmacies
16 to other distributors?
17    A. To CVS stores, no.
18    Q. Okay. And you did not track that as the DEA
19 compliance coordinator, did you?
20    A. No.
21    Q. And your pickers and packers weren't aware of
22 that, were they?
23    A. No.
24    Q. How does a picker and packer -- did it change
25 -- from 2006 to 2012, did the technology change or can

Page 126

1 you take me through how they actually complete an
2 order?
3     A. The technology may have changed during that,
4 but the basics of it are that they scan an order, they
5 go through and pick the number of bottles that each of
6 those -- that it is calling for and they place it in a
7 tote.
8         They take the tote to a checking area. The
9 person that is at the checking area would then scan
10 the bar code and on the screen in front of them, it
11 would tell them what was supposed to be in that tote.
12         They would then scan each bottle that was in
13 there, and it would decrement from the screen until
14 you got a clean screen, meaning what was supposed to
15 be in the tote is in the tote. If you had an error,
16 it would beep at you. You would then correct the
17 error.
18     Q. You used a word I don't know.
19     A. Okay. How do we do it that -- here -- here
20 is what is in the tote. And you just took this item
21 off. So let's go like that (indicating). And each
22 time you take an item off or a bottle, it goes like
23 that (indicating), until it gets down to everything
24 was in that tote.
25     Q. Was that word decrement?

Page 127

1     A. Yes.
2     Q. Okay.
3     A. Did I invent that?
4     Q. I've never heard of it. I'll blame my
5 Florida education on that.
6         So, there would be a person that would pick
7 the order and there would be a person that would scan
8 the order, kind of quantity control?
9     A. Correct.
10     Q. When I asked you how many people were in a
11 cage and you said two to three, was that quality
12 person -- quality control person in that two to
13 three?
14     A. Yes.
15     Q. Okay. So that person, always a QC person,
16 was not actually picking orders?
17     A. Unless there was a -- not a backload of
18 things to check, they could pick another order.
19     Q. Okay. And so, while -- while we are
20 validating that the picker picked the order correctly,
21 and they put it in the tote and they bring it to
22 the -- to the -- I'll call them quality control, is
23 that fair? What do you call them?
24     A. That's fair.
25     Q. Does the picker stand and wait?

Page 128

1     A. No.
2     Q. Okay. And then what do they do?
3     A. They got another order and continue to do
4 that --
5     Q. Okay.
6     A. -- that process.
7     Q. And they would do that eight hours a day?
8     A. Or until they were done.
9     Q. And they were judged on accuracy?
10     A. Yes.
11     Q. And they were judged on speed?
12     A. Actually, I don't believe we had rate -- a
13 speed on them throughout that time period.
14     Q. When did you add speed?
15     A. I don't think we did add speed. I'm not
16 aware of us adding speed.
17     Q. What were they judged on?
18     A. Quality, for sure. Interactions among
19 employees. Attendance.
20     Q. I've seen some reference to a current pick
21 rate.
22         Do you know what that is?
23     A. Yes, I do.
24     Q. What is a current pick rate?
25     A. That is rate in which you can pick a store

Page 129

1 order.
2     Q. And so if they're not -- if we are not
3 judging these people on a speed, why do we have a
4 current pick rate?
5     A. That was for front store and pharmaceuticals,
6 not controlled substances.
7     Q. Okay. So, controlled substances, there
8 should be nothing in any of the discovery that talks
9 about a --
10     A. I don't believe.
11     Q. -- current pick rate?
12     A. I don't believe it's there. I am -- I wasn't
13 directly involved in it, so I'm not completely sure,
14 but I do not believe it's there.
15     Q. As the DC DEA compliance coordinator, it
16 would be concerning to you if you were at all judging
17 or evaluating an employee based upon speed with which
18 they picked a controlled substance?
19         MR. HYNES: Objection to form.
20     A. Actually not. The people who pick with speed
21 mean that they're -- for the most part, means that
22 they're actually concentrating on what they're doing
23 and they are actually more accurate than those who are
24 not picking at the correct rate.
25     Q. When you talk about "accurate," you're saying

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 they actually get the right number of products into
2 the tote?
3    A. The right quantities of the right products
4 into the tote.
5    Q. And that is what you're looking for,
6 correct?
7    A. Yes.
8    Q. And that is what you evaluate employees on?
9    A. Yes.
10    Q. Did you ever do any audits to see if the
11 pickers and packers were actually monitoring
12 suspicious orders appropriately?
13    A. I --
14    MR. HYNES: Objection to form.
15    Go ahead.
16    A. I don't know.
17    Q. You were the DC DEA compliance coordinator?
18    Do you remember any audits?
19    A. I had pharmacy manager/supervisor that were
20 managing the process.
21    Q. Do you know if they ever did an audit?
22    A. I'm not aware.
23    Q. Okay. Who was that pharmacy
24 manager/supervisor from '06 to '09?
25    A. There was more than one. The manager would

Page 131

1 have been Steve Campbell and Gary Lamberth, and
2 there's a various number of supervisors.
3    Q. There was no written policy surrounding the
4 pickers and packers as it relates to suspicious order
5 monitoring from 2006 to 2009, was there?
6    A. There was actually no written policy from the
7 '70s until 2009.
8    Q. All right. Is it your understanding that one
9 came about in 2009?
10    A. I have seen a document that references that
11 in that -- in the policy.
12    Q. Do you know the date of that document?
13    A. No, I do not.
14    Q. Do you know the name of that document?
15    A. No.
16    Q. Have you ever heard the term DC Huddle
17 Guide?
18    A. Yes.
19    Q. Is that the document we are talking about?
20    A. I think there is another one, but --
21    Q. I'm just curious what you think.
22    You think it came about in 2009?
23    A. I don't know if it's 2009, but there's
24 somewhere, I'm -- I'm guessing, that it's in the SOP,
25 and it uses the language of -- of that.

Page 132

1    Q. Of the pickers and packers?
2    A. Yeah.
3    Q. You know, though, it wasn't -- it didn't
4 exist from '06 to '09? You think sometime after that?
5    A. That the written policy --
6    Q. Yes.
7    A. -- was there? Yes.
8    Q. How were the pickers and packers trained on
9 suspicious order monitoring?
10    A. It was on-the-job training by the management
11 and by the existing people that were in that
12 controlled substance area.
13    So, the people that worked in that area were
14 previously trained somewhere in picking. Now, they
15 had to learn about controlled substances, the
16 importance of that, and the additional responsibility
17 to report any concerns.
18    Q. And what would you tell them about the
19 controlled substances?
20    A. That it had potential for abuse. That we
21 were required to make sure that we shipped legitimate
22 quantities of legitimate drugs to legitimate stores.
23    Q. How do they know what a legitimate quantity
24 was?
25    A. When you're there and you're doing it,

Page 133

1 something just doesn't feel right sometimes. For
2 example, you go to this one section and you -- in that
3 number of stores you're picking today, you pick one
4 and one and one and one, and you get an eight. Does
5 eight concern you? Bring it up to us. Let's look
6 into it.
7    And --
8    Q. Do you know what the term "fat finger" is?
9    A. Yes.
10    Q. What is the term "fat finger"?
11    A. That the store, at least in the '90s, I don't
12 know when the machine changed, but there was a Telxon
13 ordering system where a store would enter an item
14 number, and then they would enter -- press quantity
15 and then enter. So, you had a six-digit number, how
16 many do you want, and then hit enter.
17    The -- the actual tabs of the keys aren't the
18 easiest to use. They sometimes stick, so you could
19 enter your six-digit number, go to press one, which
20 actually, in your word, fat fingered, it stuttered, it
21 made it an 11, they pressed enter, and it accepted
22 it.
23    Q. "Fat finger" is a term that -- that lived at
24 least through 2006 and 2009, correct?
25    A. I don't know how long it was there.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 Q. Okay.
2 A. It -- it probably is still there today
3 because in -- what I know of today's system, and
4 again, I've been retired and things could have
5 changed, but the store is on an automated inventory
6 management system, but they still have the ability to
7 override or to change an order.
8 So, they would still, in my mind, have the
9 potential to fat finger something.
10 Q. And -- and that's what the pickers and
11 packers were looking for.
12 Do you agree?
13 A. No, because that's probably an -- an 11 and a
14 22. It's -- it would be difficult to fat finger a
15 43.
16 Q. Okay. So, they were looking for other large
17 volume differences, other than fat finger? You're
18 testifying they could -- they could see other large
19 volume differences?
20 A. Potentially they would see something that
21 didn't seem right to them, and it was a concern.
22 Q. How many orders per day or per week or per
23 month would they raise a concern about from 2006 to
24 2009?
25 MR. HYNES: Objection.

Page 135

1 Q. And if it changed, let me know.
2 MR. HYNES: Objection. Compound.
3 A. I wasn't directly there. I was more of the
4 operations manager and production manager, and I -- I
5 don't know what the day-to-day activity would have
6 been.
7 Q. As the DEA compliance coordinator, you never
8 knew?
9 A. I don't recall. That was one of my titles
10 that I had during that.
11 Q. Who would be able to tell us?
12 A. The order fillers themselves. That warehouse
13 associate could probably come up with a guess of
14 people that are in the cage, and management or admin
15 that --
16 Q. And from 2006 to 2009, who would they tell?
17 A. Either the pharmacy manager, supervisor, or
18 an admin person.
19 Q. And then there would be investigation done?
20 A. Yes.
21 Q. It was less than five orders per day.
22 Do you agree?
23 MR. HYNES: Objection to form.
24 A. I don't know.
25 Q. Would it -- if it was more than five, would

Page 136

1 that surprise you?
2 A. I don't -- I -- I don't know.
3 Q. Okay. Are you aware -- and we'll get into
4 this -- that when you went to the IRR system, that the
5 IRR actually flagged hundreds of orders per day that
6 it considered potentially suspicious from the Indiana
7 distribution center?
8 Are you aware of that?
9 MR. HYNES: Objection to form. Lack of
10 foundation.
11 A. No, I'm not.
12 Q. Okay. Can you explain to me why they're
13 picking 150 orders per day of controlled drugs from
14 2006 to 2009? We have approximately the same number
15 of pharmacies from 2006 to 2012, and we have some IRRs
16 that flag 4- to 500 drugs for one -- 4- to 500 orders
17 for one day from the Indiana distribution center?
18 MR. HYNES: Objection. Lack of foundation.
19 Q. Can you explain that?
20 A. I didn't have anything to do with writing the
21 IRR or the algorithm or how that --
22 Q. I'm asking how -- how that math works out.
23 We go from 150 orders to hundreds and
24 hundreds being identified as potentially suspicious,
25 not total orders.

Page 137

1 MR. HYNES: Objection. Asked and answered.
2 MR. GOETZ: Off the record.
3 THE VIDEOGRAPHER: We're off the record at
4 1:27 p.m.
5 (There was a brief recess.)
6 THE VIDEOGRAPHER: We're back on the record
7 at 1:28 p.m.
8 (CVS-Millikan-48 was marked for
9 identification.)
10 BY MR. GOETZ:
11 Q. Mr. Millikan, I am handing you what has been
12 marked as CVS Millikan Exhibit 48.
13 Do you know what that is, sir?
14 A. This is the Item Review Report for controlled
15 drugs.
16 Q. And the -- the way the Item Review Report --
17 you tell me if I'm wrong -- orders from pharmacies are
18 run through an algorithm computer model, that
19 algorithm computer model does some sort of
20 calculations, and then it populates an Item Review
21 Report of all orders from the prior day that it finds
22 to be potentially suspicious?
23 MR. HYNES: Objection to form.
24 A. I believe that to be.
25 Q. That's accurate?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  A. Yes.
2  Q. Okay. And so, this is an Item Review Report
3  from 11-30-2010, correct?
4     Look at the front page.
5  A. I saw that's his handwriting, and, yes, it is
6  11-30.
7  Q. Okay. And what this Item Review Report, if
8  you look at 100777, this Item Review Report, at the
9  bottom, populates with all orders that are considered
10 potentially suspicious, and -- and those orders are
11 those that exceed a score of .65?
12 A. Yes.
13 Q. Could you please go to 100780?
14 A. Okay.
15 Q. And where it says "nonresponsive" on that
16 document, I will tell you what that is, is that was a
17 drug that is a controlled substance, a controlled
18 drug, but it's something other than hydrocodone
19 combination products.
20    It's some other drug that's not subject to
21 this litigation, so they black that out, but they did
22 give us a hydrocodone order.
23 A. Okay.
24 Q. Do you see that?
25 A. Yes.

Page 139

1  Q. And so, this page actually contains five
2  pages of orders, correct? Five orders on this page?
3  A. Five items.
4  Q. Five items?
5  A. Yes.
6  Q. Five orders?
7  A. I -- I would have considered an order to be a
8  summation of all the items and quantity.
9  Q. Oh. So when you say you're packing 150 -- or
10 75 orders --
11 A. One order, one store.
12 Q. So, what you're actually -- that one order
13 might be 40 items or 50 items?
14 A. Yes.
15 Q. Okay. I still don't understand something.
16 A. Okay.
17 Q. You -- you told us that there are 75 orders
18 per day, which could have up to a hundred items or 150
19 items per day, correct? Per order?
20    MR. HYNES: Objection to form.
21 A. They could.
22 Q. If you look at page 100849 -- I'm sorry.
23 100850. It's the last page.
24 A. Okay.
25 Q. It indicates that this report is 600 pages,

Page 140

1  correct -- or 122 pages, correct?
2  A. Yes.
3  Q. If my math is correct, that means that this
4  report contains approximately 600 items that were
5  identified as potentially suspicious by the computer
6  algorithm on 11-30-2010 for the Indianapolis
7  distribution center alone?
8     MR. HYNES: Objection to form. Lack of
9  foundation.
10 A. Yes.
11 Q. Okay. Sir, your -- Mr. Hynes objected.
12 I'm -- did you understand my question?
13 A. I think I did.
14 Q. Can you tell me, based upon some simple math,
15 how many orders you think are in this sheet?
16    MR. HYNES: Same objection.
17 A. Well, while I didn't put this together and
18 how it generates, it would appear 122 times five.
19    MR. HYNES: I would agree.
20 Q. So on this day, November 30th of 2010, we
21 know that the CVS computer algorithm identified 600
22 potentially suspicious orders, correct?
23    MR. HYNES: Can you repeat that?
24 Q. Items?
25    MR. HYNES: Can you repeat that? I'm sorry.

Page 141

1  Q. We know that on this day, November 30th,
2  2010, the CVS computer algorithm identified 600 orders
3  from the prior day that were potentially suspicious?
4  A. That were orders that came in from stores on
5  that day.
6  Q. One day?
7  A. Yes.
8  Q. Considered by the computer algorithm to be
9  potentially suspicious?
10 A. Yes.
11 Q. Okay. And we established earlier that the
12 number of pharmacies didn't change, right? The number
13 of pharmacies being served by the distribution center
14 didn't change, correct?
15 A. But what -- what you're potentially missing
16 is, I don't know when those orders were then picked.
17 Q. I --
18 A. I don't -- I don't know that all of those
19 items, all of those stores were picked the following
20 day.
21 Q. It's highly unusual for an item not to be
22 picked the following day of controlled substances,
23 isn't it?
24 A. I need to look at this date for one thing,
25 and to know, based on weekends and everything else,

Page 142

1 when the store sent in their order for picking.
2    Q. So, you think this might be a -- a Monday?
3    I do know, since this is dated 11-30-2010,
4 that these are actually the orders received on
5 November 29th, 2010.
6    Do you agree with that?
7    A. Yes.
8    Q. But you think that there might have been a
9 backlog and that some of these orders weren't picked
10 on November 30th?
11    A. I -- I wasn't saying that. I just don't know
12 that because they show up here as being flagged, I
13 don't know that we're going to pick all of those
14 orders on what we're assuming is the next day.
15    Q. Okay. Because they're flagged, you might
16 need some investigation?
17    A. No. I'm talking about the -- the order
18 itself. I don't know when the store ordered compared
19 to when we're going to actually pick that order.
20    Q. And that was my question: Isn't it highly
21 unusual to not pick a controlled substance order the
22 next day?
23    A. It has to do with the pulling schedule, the
24 routing schedule, the picking schedule.
25    Q. So, what you're telling me is that this might

Page 143

1 actually kind of cascade, and you might have orders
2 from a day earlier or two days earlier, correct?
3    A. Or just the opposite, so...
4    Q. But -- but that -- that assumes that this --
5 you only get orders on one day.
6    From November 29, 2010, I have an IRR --
7 isn't there? There's an IRR from that prior day?
8    A. If -- if that's -- if that's one of the five
9 days that we got an order.
10    Q. Yeah. You have an IRR for Monday, Tuesday,
11 Wednesday, Thursday, Friday, correct?
12    A. We have it for five days. I don't know what
13 those five days are.
14    Q. And so, even if it cascades, there are
15 hundreds and hundreds of orders that have been
16 identified as potentially suspicious by the computer
17 algorithm, at least around this date, of November 30th
18 of 2010, that are being picked by the pickers,
19 correct?
20    MR. HYNES: Objection to form.
21    A. That are eligible to be reviewed by the
22 person doing the IRR.
23    Q. And when they're eligible to be reviewed,
24 they're eligible because the computer algorithm model
25 identified them as potentially suspicious?

Page 144

1    A. Yes. And we looked at that as a potential
2 concern that needed to be looked at to determine if it
3 was, indeed, suspicious.
4    Q. And we'll get into that.
5    So going back, when you said 75 orders,
6 and -- and each order contained multiple products for
7 a store, and they had between a hundred and 140
8 products, I believe you said they were picking,
9 correct?
10    A. The potential. And --
11    Q. Potential?
12    A. And those were my best guesstimates.
13    Q. So, one picker could be picking 7,500
14 products a day?
15    MR. HYNES: Objection to form. Calls for
16 speculation.
17    A. I would -- I would rather that we actually
18 got that data to -- to come up with that answer rather
19 than --
20    Q. How would we know?
21    A. We would know how many orders and how many
22 picks and items that there were per day.
23    Q. Do you do -- does CVS still have the data
24 that they could tell me, that in 2007, on March 2nd of
25 2007, there were 5,000 or 10,000 controlled substances

Page 145

1 and PSE picked on that day?
2    A. I don't know for sure.
3    Q. If they did, it would be highly relevant,
4 correct?
5    MR. HYNES: Objection to form.
6    A. I -- I don't know that part of it.
7    Q. All right. Would you want to know -- if you
8 wanted to know how -- how many actual picks a picker
9 was -- was making, that would -- that would have to at
10 least tell me. I could look at that.
11    I could look at time records, see who was in
12 the cage, and I could say: Ms. Wilson, you picked
13 9,000 items that day, correct?
14    MR. HYNES: Objection to form.
15    A. Yes.
16    Q. And there were days they were picking 9,000
17 items, correct?
18    A. I don't know that.
19    Q. The pickers and packers, when they are
20 picking an order in 2006 -- strike that.
21    Did when the IRR came in, did the role of the
22 pickers and packers change?
23    A. I'm not aware of it changing.
24    Q. Okay. And so, you believe they played the
25 same role from 2006 until you were no longer the DEA

Page 146

1  compliance coordinator in June of 2012?
2      A.  I believe that the process began in the '70s,
3  and I know that it exists in -- as of the summer of
4  2018.
5      Q.  Okay.  When the pickers and packers were
6  picking an order, did they know anything about the age
7  of the customers of that pharmacy that had placed that
8  order?
9      A.  No.  The only thing they knew was that they
10 had a concern.
11     Q.  Based upon a gut feeling?  That's what we had
12 talked about, right, a gut feeling?
13     A.  Yes.
14     Q.  They didn't know the age.  They didn't know
15 the distance that those customers were going to travel
16 to purchase those drugs, did they?
17     A.  No.
18     MR. HYNES:  Objection to form.
19     Q.  They did not -- I'll try to slow down.  They
20 did not know how those drugs would be paid for or how
21 they had been pay for in the past, did they?
22     MR. HYNES:  Objection to form.  Calls for
23 speculation.
24     You may answer.
25     A.  No.

Page 147

1      Q.  These objections, speculation.
2      You were the DEA compliance coordinator.
3  This was your job to make sure that your complied with
4  DEA regulations, correct?
5      A.  Yes.
6      Q.  And so, you would have known or should have
7  known had they known these things, correct?
8      MR. HYNES:  Objection to form.
9      A.  I don't know that.  I was in a position of
10 many responsibilities, one of them was the DC
11 coordinator, and we monitor and did the best that we
12 could to assure the safety.
13     Q.  Based upon a gut feeling of the pickers and
14 packers?
15     A.  Yes.
16     Q.  Okay.  These pickers and packers, they have
17 no idea about the combination of drugs that whomever
18 is going to purchase those opioids are having, do
19 they?
20     MR. HYNES:  Objection to form.
21     A.  I don't know.
22     Q.  Well, have you ever heard of the Trinity?
23     A.  Of what?
24     Q.  The Trinity.  And not the Trinity we spoke
25 about this morning, but have you ever heard of the

Page 148

1  Trinity in -- when you talked about drug abuse?
2      A.  Not -- no.
3      Q.  Okay.  As a DEA compliance coordinator from
4  '06 to June of '12, I -- I'm surprised you never heard
5  of it, but the Trinity is a hydrocodone combination
6  product, a benzodiazepine, which is an antianxiety
7  medication and a muscle relaxant.
8      A.  I was familiar with the term "cocktail."
9      Q.  Okay.  Cocktail.
10     A.  We never -- I never heard the term "Trinity."
11     Q.  So, we'll use the term "cocktail."
12     The  pickers and packers had no idea whether
13 or not those customers that were going to be buying
14 these drugs or had bought them in the past bought them
15 in combination with other drugs that made up what is
16 considered the cocktail?
17     MR. HYNES:  Objection to form.
18     A.  Yes.
19     Q.  And that cocktail is a tell-tale sign of
20 diversion and that there is a problem at the pharmacy,
21 correct?
22     A.  I don't know that.
23     Q.  You don't know that?
24     They know nothing about the doctors that
25 prescribe the drugs, do they?

Page 149

1      MR. HYNES:  Objection to form.
2      A.  No.
3      Q.  They don't know anything about the
4  specialty?
5      MR. HYNES:  Same objection.
6      Q.  Of those physicians?
7      MR. HYNES:  Same objection.
8      A.  No.
9      Q.  They don't know whether or not those drugs
10 are making -- or came from a pill mill?
11     MR. HYNES:  Same objection.
12     A.  They just know that they have a CVS store
13 that has been validated to fill legitimate
14 prescriptions.
15     Q.  And that's my question:  They have no idea
16 whether or not that prescription is legitimate,
17 proper, improper, appropriate, or inappropriate?
18     All they know is that they are picking a -- a
19 drug and putting it in a tote, correct?
20     MR. HYNES:  Objection.
21     A.  Unless they saw a concern that they raised to
22 someone.
23     Q.  And that concern was a gut feeling?
24     MR. HYNES:  Objection to form.
25     A.  That concern was something that stood out to

Page 150

1 them in the line of their day.

2 Q. A gut feeling was not based on any of those

3 things we just spoke about, correct?

4 MR. HYNES: Objection to form.

5 A. You had just have to be there, I guess.

6 Q. And maybe we'll get to videotape it.

7 Has it changed? Has the cage changed?

8 A. No.

9 Q. You're no longer distributing hydrocodone

10 combination products, correct?

11 A. That's correct.

12 Q. Okay. And a lot of people were actually

13 thrilled to be out of that distribution business.

14 Are you aware of that?

15 A. I'm not aware of that. It was -- part -- you

16 know, part of our business.

17 MR. GOETZ: Do you want to take a break or

18 keep going?

19 Mr. Millikan, would you like a short break or

20 would you like to keep going?

21 THE WITNESS: Whatever you want to do is fine

22 with me.

23 THE VIDEOGRAPHER: We are off record at

24 1:46 p.m.

25 (There was a brief recess.)

Page 151

1 THE VIDEOGRAPHER: We are back on record at

2 2:00 p.m.

3 BY MR. GOETZ:

4 Q. Mr. Millikan, we -- you had previously talked

5 about some loss prevention tools.

6 Do you remember that?

7 A. Yes.

8 Q. And those are Viper reports?

9 A. At one time the things called Viper. I'm not

10 sure what it is today.

11 Q. And loss prevention means theft?

12 A. Prevention of loss, whether it be -- theft

13 would be one of the components, I'm sure.

14 Q. What else would it be?

15 A. Paper loss, so you've got a bookkeeping

16 error.

17 Q. What else?

18 A. Maintaining of the assets of the building.

19 Protection of the people.

20 Q. I'm talking about the loss prevention tool of

21 Viper. What else -- it looked for theft.

22 What else did it do?

23 A. I thought you were talking about loss

24 prevention. Sorry.

25 Q. No. Viper looked for theft?

Page 152

1 A. Viper was a tool by the loss prevention store

2 personnel that could look at orders and distributions

3 of prescriptions of medicines, I believe.

4 Q. To gauge theft, correct?

5 A. I never worked with that part of it, so I --

6 Q. As the DC DEA compliance coordinator, is it

7 your understanding that Viper could not tell whether

8 or not an individual order was of unusual size, could

9 it?

10 A. I am not sure.

11 Q. Okay. Viper couldn't tell whether or not a

12 order deviated substantially from prior orders, could

13 it?

14 A. Like I said, I never worked with Viper so I

15 don't really know the inner workings of it.

16 Q. As a DC DEA compliance coordinator, you

17 didn't think it was necessary as part of your SOM,

18 suspicious order monitoring, to work with Viper, did

19 you?

20 MR. HYNES: Objection to form.

21 A. No. I utilized the loss -- I allowed the

22 loss prevention people from the stores to use that

23 tool.

24 Q. Okay. And what would they do relative to

25 that, with suspicious order monitoring?

Page 153

1 A. It was a tool for them to monitor the usage

2 in a store.

3 Q. Meaning -- that's what I'm -- meaning what?

4 They would look at the amount that came in and the

5 amount dispensed, correct?

6 A. Again, I don't know the specifics in between

7 to be able to tell you what they could or could not

8 see.

9 Q. Did they ever inform you as in charge of DC

10 DEA compliance of any issues related to Viper that

11 they found out from Viper?

12 MR. HYNES: Objection to form.

13 MR. GOETZ: I butchered that question.

14 MR. HYNES: That's why I objected.

15 A. I don't recall.

16 (CVS-Millikan-45 was marked for

17 identification.)

18 Q. I'm handing you Exhibit 45. I'm going to do

19 all of these together. If I may indulge you, Exhibit

20 46 and Exhibit 47.

21 (CVS-Millikan-46 was marked for

22 identification.)

23 (CVS-Millikan-47 was marked for

24 identification.)

25 Mr. Millikan, if you look at Exhibit 45, that

Page 154

1 says "Viper Rx PDMR Supplemental," correct?
2    A. Yes.
3    Q. And I will tell you this is just a portion of
4 the Viper Report. If you look down below, it
5 indicates that it is 59 pages.
6    A. Okay.
7    Q. And we only printed the first three.
8    A. All right.
9    Q. Okay. If you could turn to the third page --
10 actually, strike that.
11       If you look at Exhibit 46, that is a Viper Rx
12 PDMR.
13    A. Yes.
14    Q. What is the difference between that and
15 supplemental?
16    A. I do not know. I've never seen these and
17 I've never worked with them.
18    Q. If you look at 47, it says "Viper Rx PDMR
19 high priority"?
20    A. Again, I've never seen these or worked with
21 any of them.
22    Q. All right. Do you know the difference
23 between those three reports?
24    A. No, I do not.
25    Q. And so as part of your job as the DC DEA

Page 155

1 compliance coordinator and -- and suspicious order
2 monitoring, you never personally used these reports?
3    A. No, I did not.
4    Q. You never felt it was necessary?
5    A. I was never given these reports to use.
6    Q. Do you know what the term IRR recap means?
7    A. I don't remember.
8    Q. Who is at Terrence Dugger?
9    A. Terrence was the loss prevention manager in
10 Indianapolis for a period of time.
11    Q. And did he review IRRs?
12    A. I don't know.
13       (CVS-Millikan-15 was marked for
14 identification.)
15    Q. I'm going to show you what we have marked as
16 CVS Millikan 15.
17       Have you seen a document like that before?
18    A. I don't --
19       MR. HYNES: Same objection as pertaining to
20 review of documents. You may answer as to other
21 review besides prep session.
22    A. I don't believe so.
23    Q. As your role -- in your role as DC DEA
24 compliance coordinator, you never saw a document like
25 this?

Page 156

1    A. I don't believe so.
2    Q. I'm going to hand you what we have -- what?
3 That's fine.
4       (CVS-Millikan-22 was marked for
5 identification.)
6       I'm going to hand you what we have marked --
7 I'm going to come back to that -- CVS exhibit, yes,
8 Exhibit 22.
9       That is actually a copy of some IRR control
10 recap, and we printed it from the native format,
11 meaning we were able to print it directly from the
12 Excel spreadsheet.
13       Have you seen a document that looks like
14 that?
15    A. I don't believe so.
16    Q. Okay. Was there ever a document that
17 actually captured all of the due diligence that was
18 done or the orders that were reviewed for additional
19 due diligence? Was there ever a synopsis document?
20    A. I don't know.
21    Q. And as the DC DEA compliance coordinator,
22 that was not something that you would look at?
23    A. That was not something that I was given, I
24 believe, but, again, I don't remember that.
25       Terrence Dugger and the pharmacy manager

Page 157

1 worked on these.
2    Q. Can you go back to 15, please? Do you see
3 where can you go to 9742, please?
4    A. Yes.
5    Q. And do you see on the fourth entry down it
6 says, it's DC is Indiana distribution center?
7    A. Yes.
8    Q. The store is 1923?
9    A. Yes.
10    Q. The IRR date is 1-12-11?
11    A. Yes.
12    Q. It says, "Hydrocodone seven and a half 325."
13       Do you see that?
14    A. Yes.
15    Q. And then over it says, "Quantity order 10"?
16    A. Yes.
17    Q. "Order mistake, yes. Field LP contacted
18 Terrence Dugger, Gary Millikan."
19       Is that you?
20    A. It says it is.
21    Q. Do you know what that means when it says it
22 contacted you?
23    A. No. I don't believe that is what it is
24 saying.
25    Q. Okay. What is it saying?

Page 158

1    A. I don't recall, but I was not Field LP and
2 Terrence was not Field LP. So, I -- I'm -- I would
3 have to think that we contacted the Field LP.
4    Q. Okay. So that's -- that's what you think
5 that that means? This is the person that actually
6 made the contact?
7    A. I don't remember this, but that's how I would
8 have read it.
9    Q. Who was the Field LP for the Indianapolis
10 distribution center in January of '11?
11    A. I don't remember and I don't know what level
12 of Field LP was contacted.
13    Q. There are other entries in here that have
14 your name.
15       Would you give me the same explanation?
16    A. I'm sure I would. Like I say, I've never
17 seen this and I'm not aware of that one. And it's --
18 I don't believe any of them are going to trigger any
19 different memory.
20    Q. Was Paul Lawson a loss prevention analyst?
21    A. I don't know that name.
22    Q. Have you ever heard of something called a Max
23 Tracker?
24    A. Yes.
25    Q. What is a Max Tracker?

Page 159

1    A. Max Tracker was a tool from the IRR report
2 that you could enter the store and the drug family
3 into as part of your due diligence.
4    Q. Okay. Did the Max Tracker report look like
5 the report that we just saw in Exhibit 15?
6    A. No, I don't believe so.
7       (CVS-Millikan-13 was marked for
8 identification.)
9    Q. I'm going to hand to you CVS Exhibit 13.
10 Apologize for my reach.
11       Could you go back to Exhibit 15, and go to
12 page 9793.
13       Do you see that?
14    A. Yes.
15    Q. And the title of that is May 12th -- May 2012
16 Control IRR Recap?
17    A. Yes.
18    Q. And could you go look at CVS Exhibit 13, and
19 go to 10269, just to the next page.
20    A. Okay.
21    Q. Those are the identical headings, aren't
22 they?
23    A. Yes.
24    Q. They capture the identical information?
25    A. Yes.

Page 160

1    Q. And there was testimony yesterday that this
2 CVS Exhibit 13 was the Max Tracker.
3       That's false, correct?
4    MR. HYNES: Object to the form.
5    A. Unless I'm wrong.
6    Q. Well, if you go back to the prior exhibit, it
7 actually gives us a title, May of 2012 Control IRR
8 Recap.
9    A. Okay.
10    Q. Correct? I mean, we actually have a title on
11 the prior exhibit, correct?
12    A. Yes.
13    Q. Do you think the title on that exhibit is
14 wrong, on 9 -- that is shown on page 9793?
15    A. No.
16    Q. Okay. This Max -- this document that we see,
17 Exhibit 13, there was no due diligence done from this
18 document, was there?
19    MR. HYNES: Object to form.
20    A. This is after the due diligence. I believe
21 this is the recap of that.
22    Q. That's what it looks like, right?
23       That looks like the recap of the orders for
24 May of 2012 that had due diligence done from the
25 control IRR?

Page 161

1    A. Yes.
2    Q. And so, assuming that you are right, and
3 assuming that these documents say or mean what they
4 say, that control recap, which I believe runs from --
5 if you go to the first page, I think January of 2011,
6 through June of 2012 -- that would show me what
7 orders, what controlled drug orders, had additional
8 due diligence done apart from the, what was reviewed
9 on the Item Review Report, correct?
10    MR. HYNES: Objection to form.
11    A. I don't know. I didn't work directly with
12 this stuff to know that.
13    Q. Would that be your assumption after reading
14 the document?
15    MR. HYNES: Objection to form. Calls for
16 speculation.
17    A. I don't know without -- I'm --
18    Q. I'm not sure how it calls for speculation.
19       During this period, you are the DC DEA
20 compliance coordinator, correct?
21    MR. HYNES: Objection. The question asked
22 for an assumption.
23    Q. Is that a -- during this period --
24    MR. HYNES: Prior question.
25    Q. During this period, you were the -- that

Page 162

1 these documents reflect, assuming that CVS dated them
2 correctly, December of 2010 or -- through June of
3 2012, you were the DC DEA compliance coordinator?
4 A. Yes.
5 Q. And this document, if you look at either this
6 one, and we have other ones, has dates. It says -- if
7 you go to the next page, 9742, January of 2011, it
8 says, January 2011, Control IRR Recap.
9 It has a list of the IRR dates, correct?
10 A. Yes.
11 Q. And then it has the items in question.
12 Again, we only see the hydrocodone items. And then it
13 talks about the other information.
14 And it says, "Investigation needed," and then
15 it says "File of Case Attached to IRR," correct?
16 A. Correct.
17 Q. The reason why we don't have the
18 investigation section is simply because of how this
19 prints out, it becomes a separate printout.
20 But we can go back to Exhibit 22. If you
21 want to go back to Exhibit 22, and that actually
22 has -- I apologize, that does not have it either
23 because of how it printed.
24 But if you look at Exhibit 22 and look at
25 April of 2012, the Control IRR Recap, this page? It's

Page 163

1 unBates numbered.
2 MR. HYNES: Is there a question?
3 Q. Are you -- do you have that in front --
4 A. Yes.
5 Q. April, please, of 2012.
6 A. Oh.
7 The first page of April?
8 Q. The next page.
9 A. Next one. Okay.
10 Q. Or this one.
11 A. Yes.
12 MR. HYNES: What's the store number?
13 9219?
14 Q. 9219.
15 So, that gives me a store -- a DC number. A
16 DC, correct? Distribution center?
17 A. Yes.
18 Q. Gives me a store number, an IRR date. Again,
19 we only have the hydrocodone. The quantity order,
20 whether the order was a mistake or not, the Field LP,
21 the date the file started, date it completed, whether
22 investigation is needed, whether the file is attached
23 to the IRR. We'll get to that.
24 And then it gives us remarks, all of the due
25 diligence that that person did to investigate that

Page 164

1 order, correct?
2 MR. HYNES: Objection to form.
3 A. Yes.
4 Q. Yes. And then it talks about order stop,
5 cut, common doctor, cash, insurance.
6 Those are all things that would be done as
7 part of due diligence?
8 MR. HYNES: Objection to form.
9 A. I don't see the last part.
10 Q. Do you see where it says "order stop"?
11 A. Yes. Oh, it's folded back.
12 Q. Common doctor?
13 A. Okay. Yes.
14 Q. Cash?
15 That's all due diligence that -- that could
16 have been done in April of 2012 to determine whether
17 or not an order that had been identified by the
18 computer algorithm as potentially suspicious was
19 actually a suspicious order, correct?
20 MR. HYNES: Objection to form.
21 A. Yes.
22 Q. I understand that you do not know or won't
23 agree that this is a recap of all orders that were
24 investigated for that month of April because you never
25 seen it.

Page 165

1 But if I told you -- and we -- if we have
2 time, we'll go through the documents -- that we have
3 an IRR recap, Exhibit 13, it shows one order that was
4 investigated by -- in a Cuyahoga or Summit County
5 pharmacy and we actually -- it's the only due
6 diligence we have.
7 Would that lead you to believe that, yes,
8 that actually recaps every store that had due
9 diligence for that month?
10 MR. HYNES: Object -- objection to form,
11 including lack of foundation.
12 Go ahead.
13 A. I wasn't actively involved at that time.
14 I -- I can't talk to what they were doing or not
15 doing.
16 Q. Exhibit 13 is the exact same form of document
17 as Exhibit 15, correct?
18 MR. HYNES: Objection to form.
19 A. Yes.
20 Q. It's exact same information, correct?
21 MR. HYNES: Objection to form.
22 Q. Same column? Same everything?
23 MR. HYNES: Same objection.
24 A. And again, I didn't put this together, so I
25 can't really comment to the -- the use of it.

Page 166

1    Q.  Could you -- in that situation, could you
2  turn to page 10482 of Exhibit 13?
3    A.  104?
4    Q.  82?
5    A.  82.
6       Okay.
7    Q.  Do you see that page?
8    A.  Yes.
9    Q.  And there is a store.
10      Do you see the highlighted store?
11   A.  Yes.
12   Q.  And I will tell you that that is a store in
13  the CT-1 jurisdiction, meaning that is a store in
14  either Cuyahoga or Summit County.
15   A.  Okay.
16   Q.  This IRR, I will represent to you -- and you
17  can look through the pages -- this IRR recap runs from
18  February 6, 2013, to December 30th, 2013.
19      During a break, you can dig through it, and
20  I'll show you the page numbers.
21      That order right there, 41401, from
22  December 9th of 2013, which shows up on this recap,
23  also happens to be the only order for that time period
24  for which we have due diligence done, okay?
25      Understanding that, would you agree with me

Page 167

1  that this is a recap showing those stores from the --
2  that had additional due diligence done separate and
3  apart of whatever showed up on the IRR?
4       MR. HYNES:  Objection to the colloquy.
5       Objection to form.
6       Go ahead.
7    A.  I wasn't there to put it together or work
8  with it, so I don't know if they've included
9  everything that they did.
10   Q.  So, you're -- you're thinking there might be
11  due diligence --
12   A.  I don't have any --
13   Q.  -- that's not captured in there?
14   A.  I don't have any way of knowing.
15   Q.  I'm not sure I understand.
16   A.  I don't have any way of knowing what they put
17  on here or -- or didn't.
18   Q.  So, am I correct?  You think there might be
19  due diligence that you're not seeing that's captured
20  on there?
21      MR. HYNES:  Objection.  Mischaracterizes his
22  testimony.
23      Go ahead.
24   A.  Yeah, I'm not seeing anything that way.  I --
25  I just don't know what -- what's here or what -- I --

Page 168

1  I wasn't there to see them do it.
2    Q.  Okay.  Well, as the -- as the DC DEA
3  compliance coordinator until June of 2012, who could
4  tell me what the controlled drug recap means for all
5  of the dates leading up to June of 2012?
6       Who could tell me what that means?
7    A.  I would -- I would think the people that were
8  putting together, being Shauna Helfrich and Kelly
9  Baker.
10   Q.  Shauna Helfrich yesterday testified that that
11  was a max tracker.
12      We know that that's not correct.
13   A.  Okay.
14      MR. HYNES:  Objection to form.
15   Q.  Who else could tell me?
16      MR. HYNES:  Objection.  Asked and answered.
17   A.  I -- I don't know at this time.
18   Q.  Who -- do you know who put that together?
19   A.  I don't know.
20   Q.  You worked with Shauna Helfrich, correct?
21   A.  Yes.
22   Q.  And you worked with her in 2013?
23   A.  And '14 for a very few hours.
24   Q.  And you worked with her when -- when that
25  document, which we were just looking at, Exhibit 13,

Page 169

1  that time period for which it covers, correct?
2       MR. HYNES:  13?
3    Q.  It covers from --
4       MR. HYNES:  Exhibit 13?
5       MR. GOETZ:  Yes.
6    A.  Yes.
7    Q.  As the former DC DEA compliance coordinator,
8  does it concern you that she would testify that that
9  was a max tracker and that was actually what the IRR
10  was populated into?
11      MR. HYNES:  Objection to form.
12   A.  I don't know.  Maybe she did call it max
13  tracker.  Maybe there was another name for it.
14   Q.  Mr. Millikan, could you go back to
15  Exhibit 48, please?
16   A.  Yes.
17   Q.  That's an Item Review Report?
18   A.  Yes.
19   Q.  And you had, I know, testified you reviewed
20  them in 2013.
21      Had you reviewed them prior to that?
22   A.  I don't believe so.
23   Q.  Had you seen them prior to that?
24      MR. HYNES:  Just one second.
25      THE WITNESS:  What?

Page 170

1    MR. HYNES: Sorry.
2    A. I'm sorry.
3        You -- I -- I heard you say that I reviewed
4  them prior -- at this time?
5    Q. No, sir.
6    A. Oh.
7    Q. You -- you -- and I might have butchered it.
8  I apologize.
9    A. That's fine.
10   Q. In 2013, you reviewed Item Review Reports,
11 correct?
12   A. Yes, I did.
13   Q. Had you reviewed them prior to 2013?
14   A. I do not believe I ever did.
15   Q. So as part of your job as the DC DEA
16 compliance coordinator, you never looked at the
17 review -- Item Review Reports?
18   A. The Item Review Reports were being done, I
19 believe, by Terrence Dugger and Gary Lamberth --
20   Q. Okay.
21   A. -- during part of this time period.
22   Q. You -- you had never looked at them, though,
23 as part of your job as the -- the distribution center
24 DEA compliance coordinator?
25   A. I don't remember looking at them. We would

Page 171

1  have had a monthly or a daily meeting. I'm -- they
2  may have showed them to me at some time during that.
3    Q. I'm going to hand you CVS Exhibit 2.
4        (CVS-Millikan-2 was marked for
5  identification.)
6    Q. Okay. So, that is an Item Review Report from
7  August 30th of 2013?
8    A. Yes.
9    Q. And you reviewed Item Review Reports during
10 this period, correct?
11   A. Probably.
12   Q. And what would your practice be?
13   A. There were a few times where I came in, in
14 the latter part of 2013, Kelly Baker, Shauna Helfrich
15 were there. We had some former DEA agents that were
16 there, and I came in for -- I don't remember why, and
17 I helped them a few times.
18   Q. You were trained on how to do it?
19   A. Yes, I was.
20   Q. That's important, right? So you don't miss
21 orders?
22   A. Yes.
23   Q. You were shown a -- I think you said, a -- a
24 three or four-page document?
25   A. Yes.

Page 172

1    Q. That showed -- do you know what that document
2  looked like?
3    A. They were a couple of typed instructions on
4  how to use the -- use the report. It was on -- you're
5  going to be online instead of paper.
6    Q. So, you would not look at this report in
7  paper?
8    A. I don't remember looking at it on paper.
9    Q. When you looked at the report online, would
10 it -- would it -- let's go to page 10693.
11   A. Okay.
12   Q. When you looked at that report online, would
13 it look like this? Have this information?
14   A. Very similar.
15   Q. Very similar?
16       And so, you would look at this report online,
17 you were trained how to do it appropriately, and then
18 what would you do?
19   A. The -- the few times that I did it, I
20 actually had to use the instructions to move the data
21 around to be able to look at it.
22   Q. Is -- is that what the instructions you were
23 talking about as you would move that data around?
24   A. Yes.
25   Q. All right.

Page 173

1    A. That's one of them, yes.
2        (CVS-Millikan-36 was marked for
3  identification.)
4    Q. I'm going to hand you Exhibit 36.
5        I just want to find out if these are the
6  instructions you're speaking about.
7    A. Oh, sorry.
8        These are not the instructions I'm referring
9  to.
10   Q. Oh. Have you -- and you can object -- have
11 you seen the instructions during your prep?
12       MR. HYNES: Let me -- I'm going to object and
13 tell him not to answer.
14       We've produced the instructions if that's
15 what you're getting at.
16       MR. GOETZ: I -- I would like for you to
17 identify. We --
18       MR. HYNES: Okay.
19       MR. GOETZ: I have no idea where they --
20       MR. HYNES: Yeah, I can identify. It's not a
21 problem. I can't do it, like, right now, but...
22 BY MR. GOETZ:
23   Q. So, you have instructions about how to
24 manipulate this model?
25       Can we go back to 10693, please?

Page 174

1    A. 10693?
2    Q. Yes.
3    A. Okay.
4    Q. And you would review this IRR, correct?
5    A. Yes.
6    Q. These are orders that have been identified by
7  the computer algorithm model as potentially
8  suspicious?
9    A. Yes.
10   Q. And after you reviewed the IRR, would you
11 print it?
12   A. I don't remember.  I don't believe so.
13   Q. Are you aware, when you were the DEA
14 compliance coordinator, that it was required to be
15 printed, signed, and saved?
16   A. I wasn't directly involved with it, so that
17 was being done by others.
18   Q. I understand.
19      Are you aware --
20   A. Oh.
21   Q. -- when you were the DEA compliance
22 coordinator, that there was a requirement that the IRR
23 be printed every day and -- and stored in a box,
24 signed and stored in a box?
25      MR. HYNES:  Objection to form.

Page 175

1    A. I don't remember.  I do know that it was
2  being done.
3    Q. So when you were the DEA compliance
4  coordinator, the IRR would -- you know it was -- it
5  was being printed, signed, and put into a box?
6      MR. HYNES:  Objection to form.
7    A. Yes.
8    Q. And additional -- additionally to that, there
9  was a requirement, when you were the DEA compliance
10 coordinator, to print all of the due diligence done
11 for any orders that had additional due diligence, and
12 those were also to be attached to the file and put in
13 the box?
14      Are you aware of that?
15      MR. HYNES:  Same objection.
16   A. I don't remember.
17   Q. Are you aware that it was being done?
18   A. I'm not aware.
19   Q. All right.  So, you never told anybody: Hey,
20 put your due diligence -- make sure you save your due
21 diligence in the files?
22   A. No, I did not.
23   Q. If you don't save due diligence, there's no
24 way to audit whether or not they're actually being
25 investigated, is there?

Page 176

1      MR. HYNES:  Objection to form.
2    A. I don't know what they were doing with it.  I
3  did not tell them anything to do with the actual
4  report.  They were doing it themselves.
5    Q. I understand.  You were the DEA compliance
6  coordinator.
7      If you don't save due diligence, there's no
8  way to audit as to whether or not it was actually
9  being done or whether it was being done
10 appropriately?
11     MR. HYNES:  Objection to form.
12   A. Again, I wasn't directly involved with it, so
13 I can't speak to what was being done or not.
14   Q. Mr. Millikan, you spent 35 years in a
15 distribution center distributing controlled drugs,
16 correct?
17   A. No.
18   Q. How long?
19   A. '95 to 2012.
20   Q. Seventeen years?
21   A. Yes.
22   Q. Okay.  You spent 17 years in a distribution
23 center distributing controlled substances.
24      Can you not agree that if you don't save the
25 due diligence, you can't audit whether it was done and

Page 177

1  you can't audit whether it was done appropriately?
2      MR. HYNES:  Objection to form.
3    A. You wouldn't be able to audit that it had
4  been done, yes.
5    Q. And you wouldn't be able to audit whether it
6  was done appropriately?
7    A. Yes.
8    Q. And the ability to audit a suspicious order
9  monitoring system, or any type of system like that, is
10 critical?
11     MR. HYNES:  Objection to form.
12   A. It is part of the compliance to make sure
13 that legitimate drugs go to legitimate places.
14   Q. All right.  And yet, we have no idea whether
15 or not this was ever saved, we have no idea whether or
16 not it was ever audited, whether that was saved,
17 correct?
18     MR. HYNES:  Objection to form.
19   A. I'm not aware.
20   Q. And you were the DEA compliance
21 coordinator?
22   A. As one of my jobs.
23   Q. Did you ever look inside the boxes?
24     MR. HYNES:  Objection to form.
25   A. I don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  Q. I did.
2     I can promise you nobody ever looked through
3  them.
4     Where were the boxes saved?
5     MR. HYNES: Object to the colloquy.
6     A. There were some in the analyst area, some in
7  the pharmacy.
8     Q. Why were they saved in two different spots?
9     A. I believe the requirement was that the
10 pharmacy department maintained a copy and the analyst
11 maintained a copy.
12    Q. So, there were -- there were two sets of IRRs
13 maintained?
14    A. I believe.
15    Q. All right. And where -- where was the due
16 diligence to be maintained?
17    A. I believe from the analyst.
18    Q. And where is the analyst -- did you say the
19 analyst office?
20    A. Yes.
21    Q. Where was that at the Indianapolis
22 distribution center?
23    A. Near the southeast end of the building.
24    Q. Where was the pharmacy office?
25    A. Near the northeast end of the building.

Page 179

1     Q. And would they be put in the same type of
2  boxes, or did they use different types of boxes?
3     A. I don't know.
4     Q. Do you remember what the boxes looked like?
5     A. Either a paper ream -- paper box that you buy
6  at Staples or a Banker's box, I think they're
7  called.
8     Q. So when you were reviewing IRRs in 2013, you
9  would get the IRR on a computer screen, it would look
10 similar to what we see up there on 10693?
11    A. Yes.
12    Q. And then you said you would move the data
13 around?
14    A. Yes.
15    Q. And then what else would you do?
16    A. From there, an item that was of concern, you
17 could take that to another report, I don't remember
18 the name of that.
19    But from there, you could see things about
20 the store and the drug family, such as patient, top
21 patients, age, distance traveled, physicians
22 prescribing, store prescriptions, percent controls,
23 and I'm sure some other things that I'm --
24    Q. So, that other screen are all of those things
25 that could not be done by the pickers and packers from

Page 180

1  2006 to 2009, correct?
2     MR. HYNES: Objection to form.
3     A. Yes.
4     Q. Okay. And that other screen, when you would
5  go to it, you would print that due diligence and
6  attach it to a file, correct?
7     A. I don't remember that.
8     Q. Okay. What do you remember doing with it?
9     A. I remember looking at it, sometimes calling
10 stores. Talking to them. Trying to figure out if the
11 order was legitimate or not.
12    Q. Can you go back to 13, please? Could you go
13 to 10474, please?
14    A. Okay.
15    Q. This is an order that references Shauna
16 Helfrich.
17    Do you see that?
18    A. Yes.
19    Q. And it's an order from 11-30-2013 that
20 appears to be investigated on 12-2 of 2013. Probably
21 a weekend.
22    A. Yes.
23    Q. And to the right, it talks about what she did
24 to investigate that order, correct?
25    A. Yes.

Page 181

1     Q. And that's what you just told us about, those
2  are the other things that could you do?
3     A. Yes.
4     Q. All right. Do you have any idea why it would
5  show up on this report -- strike that.
6     If it was done, there would be a note that it
7  was done, correct, so somebody would know that that
8  due diligence was done?
9     MR. HYNES: Objection to form.
10    A. I don't remember how they checked off that it
11 was done.
12    Q. But somebody checked off that it was done?
13    A. I don't know that.
14    Q. Okay. Under a good system, somebody should
15 check off that it is done, correct?
16    MR. HYNES: Objection.
17    Q. Under an appropriate system, somebody should
18 check to make sure that somebody is actually doing due
19 diligence on orders of concern, that you called
20 them?
21    MR. HYNES: Objection to form.
22    A. Yeah, I just don't know how they did that. I
23 don't remember.
24    Q. But you would agree that somebody should do
25 it?

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1     MR. HYNES: Objection to form.
2     A. Yes, there has to be a way to know that you
3 reviewed the order.
4     Q. Okay. And so, you would then, you said, go
5 to another screen, if you needed to, you would call a
6 pharmacist, and you would review the entire IRR for a
7 distribution center?
8     MR. HYNES: Objection to form.
9     A. It is possible. Probably -- and some of
10 them, I'm sure -- well, they would have done multiple
11 distribution centers.
12     Q. In Indianapolis -- at this time, in 2013,
13 Indianapolis was reviewing IRRs for 11 distribution
14 centers, correct?
15     A. I don't remember the exact number, but,
16 yes.
17     Q. Okay. And this IRR that we are looking at
18 from August 30th of 2013, is -- if you look at the
19 end, and I will tell you the end is not the end
20 because it starts with a control PSE.
21     A. Okay.
22     Q. Exhibit 2.
23     MR. HYNES: Two?
24     MR. GOETZ: Two. Okay.
25     Q. This IRR -- if you look at 10747, up in the

Page 183

1 top right corner, it indicates that the controlled
2 drug section of this IRR -- do you see it said, Item
3 Review Report Controlled Drugs IN.
4     That's Indiana, correct?
5     A. Yes.
6     Q. Gives date of 8-29-13. That's the order
7 date, correct?
8     A. I don't remember if that's order date or
9 review date.
10     Q. Well, look at front page.
11     A. Yeah.
12     Q. The front page says 8-30 of '13?
13     A. Yes.
14     Q. And then it says page 144.
15     A. Okay.
16     Q. So this IRR controlled drug section was 144
17 pages.
18     Do you agree?
19     A. Yes.
20     Q. And although yesterday we had a dispute about
21 it, this IRR in this format generally contains three
22 orders per page.
23     A. Okay.
24     Q. This IRR for Indiana contains approximately
25 400 orders from one day that were identified as

Page 184

1 potentially suspicious by the computer algorithm
2 model.
3     MR. HYNES: Objection, form.
4     Q. Is that correct?
5     A. That's what it appears.
6     Q. That's what it appears.
7     And in Indiana, at the Indianapolis
8 distribution center, there would be ten other of these
9 Item Review Reports for ten other distribution centers
10 that would be reviewed every day?
11     MR. HYNES: Objection.
12     A. I don't know if that -- I don't know if that
13 IN represents the Indianapolis distribution center and
14 their -- or if that's just where the report got sent.
15     I don't know if this is Indiana distributions
16 or everybody's distributions.
17     Q. You think that this might be everybody's
18 distributions?
19     A. I just don't know. I can see that it's at
20 the month end, so you are getting the maximum cutoff
21 amounts on a lot of these.
22     And I can also see that it's August. It is
23 July, June -- August, it is a five-week month. Your
24 lag three is May. It was probably a five-week month.
25 So, your -- so your average would be higher in a --

Page 185

1 our distributions would be higher in a five-week
2 months than in a four-week month.
3     Q. That is an order from one day, do you
4 agree?
5     A. Yes.
6     Q. Okay. So when we talk about averages from --
7 from five -- that's orders from one day.
8     That is not orders from the previous four
9 weeks?
10     A. It is saying that it -- the one -- the one
11 I'm looking at on 10712, it's just saying that the
12 maximum cutoff volume ratio was exceeded, which is a
13 monthly calculation.
14     Q. Is -- is -- when you were reviewing the IRR,
15 was the maximum cutoff volume important?
16     MR. HYNES: Objection to form.
17     A. Yes. It is included. It is something we had
18 to look at.
19     Q. Did you find it helpful?
20     A. I'm finding it pretty helpful on this one.
21 If I'm right, that that is a five-week month and
22 that's May and that's a five-week month, but --
23     Q. So that is helpful. It was important.
24     And the maximum cutoff ratio is another
25 element that relates to maximum cutoffs, right? Are

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 you aware of that?

2    A. Yes.

3    Q. And was that helpful?

4      MR. HYNES: Objection to form.

5    A. I don't remember.

6    Q. Okay. How important was the maximum cutoff

7 volume when you were reviewing the IRR?

8      MR. HYNES: Objection to form.

9    Q. How important to your review was the maximum

10 cutoff volume when you were reviewing the Item Review

11 Report?

12      MR. HYNES: Objection to form.

13    A. It would be one component of the review, so

14 depending on what the order was, it would have a

15 varying degree of importance.

16    Q. It could be critical?

17      MR. HYNES: Objection to form.

18    A. I don't know. I think we would have to -- we

19 would have to -- I don't know.

20    Q. So, an order can be identified by the

21 computer algorithm model as potentially suspicious for

22 one of three reasons.

23    Do you agree with that?

24    A. Yes.

25    Q. It can be identified because it violates an

Page 187

1 algorithm score, correct?

2    A. Yes.

3    Q. It can be identified because it violates a

4 maximum cutoff ratio?

5    A. Yes.

6    Q. And it can be identified because it violates

7 a maximum cutoff volume?

8    A. Yes.

9    Q. And those are the three reasons that

10 potentially suspicious orders are populated on the

11 daily Item Review Report?

12    A. Yes.

13    Q. My question is: In reviewing that Item

14 Review Report, how important was the maximum cutoff

15 volume?

16    Was it -- did you find that more important to

17 look at than an algorithm violative score? Less

18 important?

19    A. I don't know that I thought of it that way.

20 I just thought of reviewing the total package as it

21 was, not by those pieces of the --

22    Q. You may note that an awful lot of orders

23 flagged on this report, August 30th of 2013, because

24 it was a long month, this was the end of the month,

25 and so multiple orders flagged because they violated

Page 188

1 the maximum cutoff volume?

2    A. I believe so.

3    Q. Okay. Do you have any idea why this was not

4 inserted into the IRR, the maximum cutoff volume

5 October 11, 2012?

6    A. Ask that again.

7    Q. Do you know why the maximum cutoff volume was

8 not put into the Item Review Report as a reason why an

9 order could be identified as potentially suspicious

10 until October 11th, 2012?

11      MR. HYNES: Objection. Lack of foundation.

12    A. No, I do not.

13    Q. Does that concern you that while you were the

14 DC DEA compliance coordinator, that that was not a

15 reason an order could flag because it violated the

16 maximum cutoff ratio?

17      MR. HYNES: Objection to form.

18    A. If your date is correct, that would be after

19 my time as the DC coordinator, but I'm -- I don't know

20 how they put the program together and I wasn't

21 directly involved with the program.

22    Q. I understand.

23    My question is: The fact that when you were

24 the DC DEA compliance coordinator, the IRR algorithm

25 would not flag because an order exceeded a maximum

Page 189

1 cutoff.

2    Does that worry you?

3      MR. HYNES: Objection. Lack of foundation.

4    A. I don't know.

5    Q. You don't know if it worries you?

6    (CVS-Millikan-11 was marked for

7 identification.)

8    Q. Can I -- can you look, please -- I've handed

9 you Plaintiff's Exhibit 11.

10    A. Okay.

11    Q. And if you look at 55836, at the bottom, it

12 is Aaron Burtner responding to Crystal Pike in an

13 email dated November 2nd, 2012.

14    Do you know who Crystal Pike is?

15    A. No, I don't.

16    Q. I will tell you that Crystal Pike worked in

17 the Analysis Group, which is one of the companies that

18 CVS hired to help build and modify the computer

19 algorithm model that identified potentially

20 suspicious orders.

21    A. Okay.

22    Q. If you look at the second sentence of that

23 email, it says, "The max cutoff field began appearing

24 on the IRR on the 10-11-12 IRR."

25    Do you have any reason to think that is

Page 190

1  inaccurate?
2  A. No.
3  Q. You never saw a max cutoff field on any IRR
4  before then, did you?
5  A. I was not involved with the IRR before that
6  date.
7  Q. You were, though, the DC DEA compliance
8  coordinator?
9  A. Yes.
10  Q. Can we go back to 10693, please, of Exhibit
11  2.
12  That is an order that flagged because of a
13  violative score, correct?
14  A. Yes.
15  Q. If an order flags because of a violative
16  score or because it exceeds the maximum cutoff volume
17  or because it exceeds the maximum cutoff ratio, the
18  Item Review Report will still contain the same general
19  data fields, correct?
20  A. Yes.
21  Q. Okay. Can you tell me what -- what these
22  data fields mean where it says "Store, and it says
23  "3355"?
24  That's the store number?
25  A. That is the store number.

Page 191

1  Q. And where it says "SOM Key," do you know what
2  that means?
3  A. Hydrocodone family.
4  Q. Okay. And where it says "Item," do you know
5  what that means?
6  A. That is the store -- well, it's the item
7  number attached to that UPC.
8  Q. Okay. And the description?
9  A. Is the name of the product.
10  Q. What about where it says "UPC NDC"?
11  A. That's the National Drug Code.
12  Q. And invoice number?
13  A. I don't know that for sure. I don't know if
14  that's the -- I don't know what that is.
15  Q. Okay. "Bill Quantity"?
16  A. The -- the order sent to the Item Review
17  Report was three bottles -- or we billed three
18  bottles, the store ordered three bottles.
19  Q. The bottle contains how many doses?
20  A. It could vary.
21  Q. Can you tell from this order?
22  A. I would have to look up the item number.
23  I -- I don't know just from looking at this.
24  When you -- when you work with it day in and
25  day out, you would know.

Page 192

1  Q. "Unit of Measure"?
2  A. I don't remember that. I --
3  Q. Okay. "Extended Quantity."
4  A. I don't know how they got that.
5  Q. And what about "Binary Day"?
6  A. I don't know that.
7  Q. What about "Trend Above Month"?
8  A. All of those across there where it is ones
9  and zeros, that has something to do with this -- this
10  front page of all of this.
11  Q. The magic?
12  A. The magic. Forty something years ago, I
13  think I was pretty good at that stuff.
14  Q. Do you ever understand -- when you were
15  reviewing orders, did you understand the magic? Did
16  you need to know the magic?
17  A. I hope not. I -- I remember trying to read
18  this sometimes just to realized that, "Oh, that's
19  that."
20  Q. But you didn't -- I've tried to read it as
21  well. You did not understand what it meant when you
22  were reviewing orders, the Item Review Report?
23  MR. HYNES: Objection to the form. Objection
24  to form. Go ahead.
25  A. Correct.

Page 193

1  Q. What about where it says "PZSCORE6RANGE"?
2  A. That is defined up here.
3  Q. When you say "up here," you're speaking --
4  A. On the front page, 10674.
5  Q. And so what does that mean?
6  A. To me, it is a math thing, something about
7  standard deviations and --
8  Q. Is that -- that tells you the standard
9  deviations of this order or the month-to-date or --
10  A. I -- I can't interpret it.
11  Q. Did you know then what it meant?
12  A. Then?
13  Q. When you were reviewing these, did you
14  know?
15  A. I -- I don't remember. I -- I don't think
16  so.
17  Q. Okay. What about where it says
18  "PZSCORE12RANGE," was that the same as your answer for
19  "PZSCORE6RANGE"?
20  A. Yes.
21  Q. What about where it says
22  "PZSCORE12MAXRANGE"?
23  A. Yes.
24  Q. And, again, all of those are --
25  A. I believe that is the calculation or the

Page 194

1 algorithm that is going to --
2    Q. That's what's going to spit out a number,
3 right, the .85?
4    A. Yes.
5    Q. What about down below where it says "MTD"?
6    A. MTD is month-to-date.
7    Q. And what about "LAG"?
8    A. That's last month.
9    Q. That's the last month's order?
10    A. Last month.
11    Q. Right.
12    A. So right now, we are -- this is August, so
13 that is month-to-date, LAG1 would be July, LAG2 June,
14 LAG3, May.
15    Q. Okay. And then all the way down?
16    A. Yes.
17    Q. So you would look at these numbers,
18 correct --
19    A. Yes.
20    Q. -- on an Item Review Report and decide
21 whether or not that order needed additional due
22 diligence?
23    A. Yes.
24    Q. How would you decide that?
25    A. Multiple factors of either looking up that

Page 195

1 store, looking at these order quantities, looking at
2 month-to-date, looking at history.
3    Q. My question is this: You did not do due
4 diligence -- extra due diligence on every store that
5 -- that populated the Item Review Report, did you?
6    MR. HYNES: Objection to form.
7    A. I believe we did due diligence on every --
8    Q. Every store?
9    So for every store that populated this, you
10 would actually for -- on this day, we have 400 orders
11 for one distribution center.
12    You would do additional due diligence on 400
13 orders?
14    A. We would look through each of those that was
15 on a screen, we would look at that to see what jumped
16 out at us.
17    Q. What would you look at?
18    A. Where we are at on the month, how big this
19 order is, who is that store.
20    Q. What I'm asking is: I'm asking apart from
21 what is shown on the Item Review Report, would you do
22 additional due diligence on every order that populates
23 on the Item Review Report?
24    MR. HYNES: Objection to form.
25    A. Additional?

Page 196

1    Q. You would review the Item Review Report,
2 correct?
3    A. Yes.
4    Q. And there are some orders on the Item Review
5 Report that you would look at and go, "Oh, I'm okay
6 with that," and go to the next one, correct?
7    A. I believe so.
8    Q. And there are some -- can I have 3 and 4?
9    (CVS-Millikan-3 was marked for
10 identification.)
11    (CVS-Millikan-4 was marked for
12 identification.)
13    Mr. Millikan, I'm going to hand you what has
14 been marked as Exhibit 3 and Exhibit 4.
15    Exhibit 4 is an attachment that is referenced
16 in the Exhibit 3 email.
17    MR. HYNES: So, you're getting these.
18    Q. Do you know who Craig Schiavo is?
19    A. No, I do not.
20    Q. This -- the Exhibit 4 appears to be his
21 notes. If you look at the top email, it says: Team,
22 as discussed on our call earlier today, please find
23 the attached document, list of opportunities, my notes
24 for our meeting on 11-27.
25    Do you see that?

Page 197

1    A. Yes.
2    Q. And this was an email sent to what was he
3 considering his team.
4    Tom Bork, do you know who that is?
5    A. No.
6    Q. Okay. What about Dean Panelli?
7    A. He's in logistics at CVS corporate.
8    Q. What about Christopher Tolley?
9    A. He is also -- when I say "he's in logistics,"
10 that's when -- where I remember him. I'm not sure if
11 there -- there --
12    Q. Fair enough.
13    A. Okay.
14    Q. I -- I totally appreciate that.
15    A. Okay. Chris Tolley was in logistics at CVS
16 corporate.
17    Q. Pam Hinkle?
18    A. Pam Hinkle is based out of Knoxville. I
19 don't remember her title.
20    Q. Okay. Aaron Burtner?
21    A. Aaron would have been the analyst based out
22 of Indianapolis.
23    Q. Could you go to the notes, please?
24    And up top on the notes, on Exhibit 4, it
25 says: Opportunities. Current SOM process.

Page 198

1    Do you see that?
2    A. Yes.
3    Q. The first note says: Lack of understanding
4 as to what characteristics make up the current
5 algorithm.
6    That was consistent with your understanding
7 in 2013, too, correct? We kind of went through it?
8 You didn't --
9    A. Yes.
10    MR. HYNES: Objection to form.
11    Q. And then if you look at paragraph 8, it says:
12 A hundred plus orders flagged by system. Looked (past
13 history, algorithm, max min).
14    Did I read that correctly?
15    A. Yes.
16    Q. Two to three were stopped by Aaron for
17 review.
18    So, he did a deeper dive review, dispensing,
19 ordering, and reach out to store.
20    How do you interpret that document?
21    MR. HYNES: Objection to form. Calls for
22 speculation.
23    Go ahead.
24    A. Yeah, I -- I didn't put this together. I
25 wasn't part of it. So, I'm not sure what all they're

Page 199

1 referencing.
2    Q. Okay. Does it appear to you that Aaron
3 Burtner, of every hundred plus orders, he would do
4 additional due diligence that was not shown on the IRR
5 for two to three orders?
6    MR. HYNES: Objection to form.
7    A. It is possible. I'm just not sure when they
8 put this together, if the notes correctly reflect or
9 if that's truly what happened.
10    Q. Okay. Have you ever looked at the time
11 studies?
12    A. Time studies?
13    Q. Are you aware that CVS did time studies?
14    Are you aware that CVS actually undertook
15 time studies?
16    A. Time studies on what?
17    Q. On the computer -- on the -- on the
18 suspicious order monitoring?
19    A. No, I'm not.
20    (CVS-Millikan-5 was marked for
21 identification.)
22    Q. I'm going to hand you Exhibit 5.
23    The first page of this document, and then the
24 time study was an attachment, is an email from Aaron
25 Burtner to Pam Hinkle dated September 25th, 2012.

Page 200

1    Do you see that?
2    A. Yes.
3    Q. And if you could turn inside into the
4 interior page, it would say, Date, 9-24-12?
5    A. Yes.
6    Q. Next page, and it says, LP Analyst Time
7 Study.
8    Do you see that?
9    A. Yes.
10    Q. And could you go down and look. 9-24, I will
11 tell you, was actually a Monday.
12    A. Okay.
13    Q. So as we talked earlier, those Mondays
14 would -- would actually capture multiple days of IRRs,
15 because it would capture Friday's orders and then the
16 orders from Saturday and Sunday.
17    MR. HYNES: Objection to form.
18    A. I don't know that. I -- and I don't think I
19 agree with that, but --
20    Q. Why -- why -- what do you not agree with?
21    A. I believe stores ordered on a -- our store
22 orders came in on a five-day cycle, not a seven-day
23 cycle.
24    Q. Well, I will -- I will represent to you that
25 September 24th, 2012, was a -- was a Monday.

Page 201

1    A. Okay.
2    Q. And we'll look at the document.
3    A. Yes.
4    Q. If you look, it says: Review 9-21-12 and
5 9-23-12 IRRs for stores populated based on max
6 cutoffs, okay?
7    I believe because the max cutoff yet was not
8 part of the regular IRR, the reason they were doing
9 this was to try to get some idea as to how long it was
10 going to take. But that's neither here nor there, but
11 that's my guess as to why that says that when the date
12 doesn't coincide with the other email we saw, okay?
13    Then it says --
14    MR. HYNES: Objection.
15    MR. GOETZ: No. Then it says -- I just did
16 not because I showed him earlier a document that
17 showed that the max cutoff was not added till October
18 11th.
19    MR. HYNES: Okay.
20 BY MR. GOETZ:
21    Q. It says down below, Review 9-21-12 control
22 IRR.
23    Do you see that?
24    A. Yes.
25    Q. And it says that he spent 15 minutes

Page 202

1 reviewing that?
2    A. Yes.
3    Q. Is that correct?
4       And no orders flagged?
5    A. Yes.
6    Q. And then if you look at the -- at the last
7 entry, it says: Review 9-23-12 Control IRR.
8       And he spent 50 minutes doing that,
9 correct?
10   A. Yes.
11   Q. And it says, Three orders flagged.
12      Do you see that?
13   A. Yes.
14   Q. And then if you turn to the next page, he
15 actually gives us a time study as to how long it took
16 him to investigate those flagged orders.
17      Do you see that?
18   A. Yes.
19   Q. Those three orders actually happened to --
20 the -- the store orders you see of 7561, 9646, and
21 9705 actually happen to coincide with his next three
22 time entries, correct?
23   A. Yes.
24   Q. And so, to review store 7561, he took 20
25 minutes?

Page 203

1    A. Yes.
2    Q. And to do that, he says -- could you read
3 what it says he did?
4    A. Time frame of 6-17-12 to 9-24-12, dispense
5 versus order was 3,900 versus 3,500. Reviewed common
6 doctor pat, patient, and payment method. No
7 significant irregular patterns identified.
8    Q. And then down below, it says, Review store
9 9646, and that took him 40 minutes, correct?
10   A. Yes.
11   Q. And what did he find there? What did he say
12 he did there?
13   A. Time frame was 4-1-12 through 9-24-12. The
14 dispense versus order was 180 versus 1,400. Called
15 store based on large discrepancy in dispense versus
16 order quantities. Spoke to pharmacist. Order should
17 have been four bottles. Pharmacy tech placed order.
18 Communicated to LADC to reduce the order.
19   Q. And what about the next entry?
20   A. 9705. Time frame, 6-17-12 to 9-24-12.
21 Dispense versus order. 5580 versus 6400. Review
22 common doctor/pat, patient and payment method. No
23 significant irregular patterns identified.
24   Q. According to this time study, it appears that
25 Mr. Burtner reviewed the IRR from one day, did not do

Page 204

1 any additional due diligence, and then the next day,
2 he picked three stores to do additional due diligence?
3       MR. HYNES: Objection to form.
4    Q. Do you disagree with that interpretation?
5       MR. HYNES: Objection to form.
6    A. Again, I -- I don't know who put this
7 together. I really can't comment.
8    Q. When he did those things that you had talked
9 about, looking at dispense versus order, common doctor
10 relationships, looking at cash transactions, correct?
11      And you -- you -- he made specific note of
12 it, didn't he, in his time sheets --
13      MR. HYNES: Objection.
14   Q. -- his time studies?
15      MR. HYNES: Objection to form.
16   Q. Correct?
17   A. Yes.
18   Q. And it took significant time.
19      One of these took 40 minutes for him to do
20 that for one store, didn't it?
21      MR. HYNES: Objection to form.
22   A. I don't understand that part, why that took
23 that long, but --
24   Q. Well, I believe it's probably because he
25 called the pharmacy, but I might be wrong, but that's

Page 205

1 the one thing that makes -- I've looked at enough of
2 these. That's the one thing. But we'll look at a few
3 more.
4       (CVS-Millikan-6 was marked for
5 identification.)
6    Q. I'm handing you CVS Exhibit 6.
7    A. Okay.
8    Q. That front page, again, indicates it's an
9 email from Aaron Burtner to Pam Hinkle, and it's dated
10 July 16th, 2012; is that correct?
11   A. Yes.
12   Q. And if you go to the next page, it says: LP
13 Analyst Time Study, dated July 13th, 2012, correct?
14   A. Yes.
15   Q. And if you go down four entries, it says,
16 Review 7-12-12 Control IRR --
17   A. Yes.
18   Q. -- correct?
19      And it -- it's 7:35 to 8:15, correct?
20   A. Yes.
21   Q. And so, that -- he spent 40 minutes reviewing
22 the control drug IRR, which is what we've kind of been
23 looking at before we started this?
24   A. Yes.
25   Q. And it says, One store flagged, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    A. Yes.

2    Q. And then down below, it says: Review

3  store 1780. That's the store that he flagged.

4    And it took him 15 minutes to review that one

5  store, and what did he do?

6    MR. HYNES: Objection to form.

7    A. His time frame, 4-1-12 to 7-7-12, dispense

8  versus order, 1350, versus 1,000. Reviewed common

9  doctor patient. No patterns identified. Store will

10  not be contacted.

11    Q. Again, we know that this IRR was long enough

12  that it took him 40 minutes to review, and then he

13  picked one order for additional due diligence that he

14  marked on his time study, correct?

15    MR. HYNES: Objection to form. Calls for

16  speculation.

17    A. I -- again, I don't know.

18    Q. Do you -- do you --

19    A. Well --

20    Q. I apologize.

21    A. I'm -- I don't know when they put this

22  together or not. I don't really know the whole

23  process that they did.

24    Q. Do you know Aaron Burtner?

25    A. I do.

Page 207

1    Q. Do you know him to be honest?

2    A. I believe so.

3    Q. He -- you --

4    A. I actually don't know him that well, but,

5  yes, I do know him.

6    Q. Do you think he would -- would put in false

7  entries on his --

8    A. I --

9    MR. HYNES: Objection.

10    Q. -- time study?

11    MR. HYNES: Objection to form.

12    A. I don't know who put the -- I don't know who

13  did this.

14    Q. Okay. Well, it -- it -- it says he sent the

15  email, correct?

16    A. Yes.

17    Q. And then if you look at the name, it has his

18  name?

19    A. Yes. So, did he do his own time study, or

20  did someone else do the time study?

21    Q. Is there someone at -- at the Indiana

22  distribution center that you think would be less than

23  truthful in doing a time study?

24    MR. HYNES: Objection to form.

25    A. Again, I -- I don't know.

Page 208

1    Q. Okay. I'm going to show you 7.

2    MR. HYNES: This one has writing on it.

3    MR. GOETZ: I apologize. That's mine that I

4  handed you.

5    THE WITNESS: Okay. I'm sorry.

6    (CVS-Millikan-7 was marked for

7  identification.)

8  BY MR. GOETZ:

9    Q. Do you see the front of 7?

10    A. Yes.

11    Q. That's an email, correct?

12    A. Yes.

13    Q. From Aaron Burtner to Pam Hinkle?

14    A. Yes.

15    Q. Dated July 19th, 2012?

16    A. Yes.

17    Q. It actually says: Attorney-client privilege

18  LP Analyst Time Study.

19    Do you -- do you know why that would say

20  that?

21    A. I thought the other one did also.

22    Q. They do.

23    A. Oh.

24    Q. Do you know why they would say that?

25    A. No.

Page 209

1    Q. Are you aware that in 2012, CVS hired lawyers

2  to try to redo its suspicious order monitoring

3  program?

4    A. Lawyers?

5    Q. Yes.

6    A. I'm not aware of that.

7    Q. Are you aware that in 2012, CVS had experts

8  working to try to redo its suspicious order monitoring

9  system?

10    A. I don't know for sure. I -- I believe I

11  did.

12    Q. Did you ever meet with them?

13    A. I don't -- during that time frame? Do not

14  remember.

15    Q. Do you know if it was the practice at the CVS

16  Indiana distribution center to mark stuff as

17  attorney-client privilege?

18    MR. HYNES: Objection to form.

19    A. I don't remember. I -- I -- I -- I just

20  don't remember.

21    Q. Did you do it?

22    A. No.

23    Q. Okay. Did you see that come through where

24  people would mark it as attorney-client privilege?

25    A. I don't know if I would have noticed.

Page 210

1    Q.  Okay.  If we go to, then, the next page, it
2  says, LP Analyst Time Study, correct?
3    A.  Yes.
4    Q.  And that is an LP analyst time study,
5  according to the date, from July 18, 2012?
6    A.  Yes.
7    Q.  The name on there is Aaron Burtner?
8    A.  Yes.
9    Q.  And if you look at the third entry, it says,
10  Review 7-17-12 Control IRR?
11    A.  Yes.
12    Q.  7:50 to 8:40 a.m., no orders flagged,
13  correct?
14    A.  Correct.
15    Q.  So, he spent 50 minutes reviewing the IRR,
16  and he did not, in this instance, list any other due
17  diligence that he did outside the IRR, did he?
18      MR. HYNES:  Objection to form.
19    A.  Not that I'm aware of.
20    Q.  And he actually said no orders flagged, but
21  in the other ones, when he did due diligence, he
22  actually listed it, the store, and gave the time --
23      MR. HYNES:  Objection to form.
24    Q.  -- correct?
25    A.  Yes.

Page 211

1    Q.  He actually -- if you stay there and -- and
2  if you look down below, he did review something called
3  a 7-17-12 New Jersey 5,000 dose report.
4      Do you see that at the bottom entry,
5  Mr. Millikan?
6    A.  Yes.
7    Q.  Do you know what that is?
8    A.  I'm not familiar with a New Jersey 5,000 dose
9  report.
10    Q.  Was there a Florida 5,000 dose report?
11    A.  I am familiar with a Florida 5,000 dose
12  report.
13    Q.  And what is the Florida 5,000 dose report?
14    A.  I never worked with it.  I was in there so
15  seldom, it was -- it -- it was -- would have been one
16  more thing that I had to learn, so I never had to
17  learn that.  Shauna and Kelly were able to do that.
18    Q.  If you look at the next page, nonetheless,
19  where he -- he shows, actually, the additional due
20  diligence that he did on those orders that were of
21  concern from the New Jersey 5,000 dose report, doesn't
22  he?
23    A.  Yes.
24    Q.  And again, that due diligence, dispense
25  versus order, that's what you said that you had done

Page 212

1  for every order that was populated on the Item Review
2  Report.
3      You thought you did that?
4      MR. HYNES:  Objection to form.
5    A.  No.
6    Q.  Okay.  I misunderstood you.
7      An order populates on the Item Review Report,
8  correct?
9    A.  Yes.
10    Q.  And when you look at that order, which has
11  been identified by the computer algorithm model as
12  potentially suspicious, I asked you if you would look
13  at the Item Review Report, and there were some orders
14  that would you not do additional due diligence on
15  beyond what's shown on the IRR.
16      Do you remember that?
17    A.  No, but go ahead.
18    Q.  Okay.  When -- we'll go back.  I'll ask you a
19  simple question.
20    A.  Okay.
21    Q.  You would look -- pull the Item Review
22  Report, correct?
23    A.  Yes.
24    Q.  You would look at it online.
25      There would be an order populated on the Item

Page 213

1  Review Report as potentially suspicious as identified
2  by the computer algorithm model?
3    A.  Yes.
4    Q.  When that order was on there, would you
5  automatically look at additional information that was
6  not shown on that Item Review Report?
7    A.  No.
8    Q.  No.
9      So, there were oftentimes, and that's where
10  we started, and I apologize.
11    A.  Oh, yes.
12    Q.  So when I said to you, Mr. Burtner, according
13  to those notes, looks at additional information not
14  shown on the Item Review Report two to three times,
15  per hundred orders -- and we have been going through
16  those control studies to show you when he looks at an
17  IRR, how often he would look at additional due
18  diligence.
19      How often would you do additional due
20  diligence that was not reflected on the Item Review
21  Report for an order that was flagged?  What
22  percentage?
23      MR. HYNES:  Object to form.
24      Go ahead.
25    A.  I don't remember the percent, but it would

Page 214

1 not be a large percent.
2    Q. And so, under five?
3       MR. HYNES: Objection to form.
4    Go ahead.
5       Under 5 percent or under five --
6    MR. GOETZ: Under 5 percent.
7    THE WITNESS: Five percent.
8    MR. GOETZ: Under 5 percent.
9    MR. HYNES: Objection to form.
10 BY MR. GOETZ:
11    Q. Under 5 percent?
12    A. I don't know, but, yes, probably.
13    Q. Consistent with what we've seen from these
14 time studies from Mr. Burtner and from that -- those
15 notes I showed you?
16    A. Yes.
17    Q. So, the other orders, the other 95 percent of
18 orders, you would evaluate based upon what information
19 was shown on the Item Review Report?
20    A. Yes.
21    Q. That's my question.
22       How do we get from an order that's identified
23 as potentially suspicious by the computer algorithm
24 model to deciding, I do need to do additional due
25 diligence or I don't?

Page 215

1       Does that make sense?
2    A. Yes.
3    Q. Could you go back to 10693, please?
4       It's Exhibit 2. If we look at this order,
5 hypothetically, this IRR, Item Review Report, totaling
6 400 orders shows up on your computer and you need to
7 review it, and we look at this order, what are you
8 going to look at to tell me whether or not that order
9 needs additional due diligence?
10    A. I don't see anything that needs further due
11 diligence.
12    Q. Why?
13    A. There is only three bottles ordered. The
14 month-to-date, the previous months, they all seem to
15 be about the same range.
16    Q. So because it has -- the month-to-date is the
17 same as the prior months, you assume that this is --
18 this order is okay?
19    A. I didn't assume that. But in this instance,
20 there is nothing jumping out at me that would say
21 there's a concern.
22    Q. You don't know how the algorithm calculates a
23 score, do you?
24    A. No.
25    Q. Okay. And this algorithm actually has a

Page 216

1 score of .85, correct?
2    A. Yes.
3    Q. .99 is the highest; is that correct?
4    A. I believe so.
5    Q. And .65, the computer algorithm says this is
6 potentially suspicious?
7    A. Yes.
8    Q. And how is it -- what are you looking at
9 there that you can ignore the algorithm, that you
10 don't know how it calculates it?
11       MR. HYNES: Objection to form.
12    A. What was produced by the report, as I look at
13 it, I just didn't see anything that made it seem like
14 it was a concern.
15    Q. I appreciate that.
16       My question is: Without knowing how the
17 algorithm calculates the score, without knowing what
18 it puts into it, how can you ignore the algorithm?
19       What -- what is on there that says "I can
20 ignore this algorithm"? Do you know if the algorithm
21 took into account the order quantity?
22       MR. HYNES: Objection to form.
23    A. I don't know how the algorithm calculated
24 that score. And the tools that I was given to do the
25 analysis, I did that to the best of my ability to

Page 217

1 determine.
2    Q. Do you know if the algorithm looked at the
3 month-to-date in the lags as the prior average, the
4 prior month-to-dates?
5    A. I don't know. At this time, I don't know. I
6 don't remember.
7    Q. Did you know at the time?
8    A. I don't know.
9    Q. So, all we know is that you start with a
10 hundred orders and five or less we choose to do
11 additional due diligence on, correct?
12       MR. HYNES: Objection to form.
13    A. I made a guesstimate early that it was
14 probably about 5 percent of the orders.
15    Q. And -- and those 95 orders have been
16 identified as potentially suspicious, and the extent
17 of review they get -- and it is not just you,
18 Mr. Millikan.
19       Shauna Helfrich yesterday could not identify
20 one item in here, one item on this.
21       But the extent of review that they get is,
22 Okay. It looks okay and I'm going to ignore the
23 score.
24       I just don't see how we get to that point.
25       MR. HYNES: Objection to form, if it is a

Page 218

1  question.
2      MR. GOETZ:  It is a question.
3      MR. HYNES:  What is the question?
4  BY MR. GOETZ:
5      Q.  Did you understand my question?
6      A.  How did we get to this point?
7      MR. HYNES:  Well, object to the form.
8      You can answer if you understand it.
9      A.  I don't know if I understand your question,
10  but if you were to go to 10696, and I just bring that
11  up because of what you said about Shauna.
12     Q.  Yes.  10696?
13     A.  Yes.
14     Q.  Okay.
15     A.  One bottle ordered, one bottle billed.  There
16  is nothing I can do with that in reality.  I can't
17  call a store and say, "Hey, I've got a potentially
18  excessive order.  How many?  One."
19     Q.  Okay.
20     A.  So, there was nothing else for me to do on
21  that order.  I looked at it, I saw it was one bottle.
22  I looked -- actually, I don't even think I got to go
23  any farther in looking, but, actually the
24  month-to-date, the other months, they all make
25  sense.

Page 219

1      Q.  Let me ask you a question:  You understand
2  that the maximum cutoff ratio is the ratio of that
3  drugs to other controlled substances?
4      A.  I don't remember that.  I don't know that at
5  this point in time.
6      Q.  Well, we will go into it.  Do you see the
7  score of this order?
8      A.  Yes.
9      Q.  The maximum cutoff ratio is a lot easier to
10  understand than the score, correct?
11     Do you agree?
12     A.  Yes.
13     Q.  If we are looking at percentages of this drug
14  to that drug, correct?
15     A.  Yes.
16     Q.  And the score of this is actually .06?
17     A.  Correct.
18     Q.  So before this maximum cutoff ratio was
19  added, this doesn't even flag, does it?
20     A.  Correct.
21     Q.  This is not an order that gets ignored before
22  it is added because it is not something that flags?
23     A.  Yes.
24     Q.  I would like to ask you, if you could go to
25  10717.

Page 220

1      A.  Okay.
2      Q.  Do you see that order?
3      A.  Yes.
4      Q.  That is a month-to-date of 632.32?
5      A.  Yes.
6      Q.  What -- what -- what does that represent?
7      A.  That's how much for the month of August.
8      Q.  Does that represent a lot?
9      MR. HYNES:  Objection to form.
10     A.  I don't know.  I would have to look at the
11  item number, size of the bottle to know that.
12     Q.  This flagged for maximum cutoff volume, and
13  yet the score was .01.
14     Can you explain that?
15     A.  That it exceeded the maximum cutoff.
16     Q.  No.  No.
17     Can you tell me why the score is .01?  Can
18  you explain the algorithm why this would flag and have
19  such a large volume in an algorithm score of .01?
20     A.  No, I cannot.
21     Q.  Are you aware that when the algorithm was
22  originally written by the experts, they set the score
23  of .15?
24     A.  No, I'm not aware of that.
25     Q.  Are you -- do you know who John Mortelliti

Page 221

1  is?
2      A.  I know who he is.
3      Q.  Who is he?
4      A.  I believe he's -- when I knew, him he was a
5  regional loss prevention person in New Jersey.
6      Q.  Are you aware when you were at the DC DEA
7  compliance coordinator, that John Mortelliti decided
8  to reset the model score from .15 to .65?
9      A.  No, I'm not.
10     Q.  Are you aware that that was not recommend by
11  the experts?
12     MR. HYNES:  Objection to form.
13     A.  No, I'm not.
14     Q.  Are you aware that the experts that actually
15  designed the model suggested that after he did that,
16  it was, quote, a substantial departure, that the model
17  should be retuned?
18     MR. HYNES:  Objection to form.
19     A.  No, I'm not.
20     Q.  Are you aware of whether the model was ever
21  retuned?
22     MR. HYNES:  Objection to form.
23     A.  No, I'm not.
24     Q.  Okay.
25     MR. GOETZ:  Can we take a break?

Page 222

1    MR. HYNES:  Yeah.
2    THE VIDEOGRAPHER:  We are off the record at
3  3:38 p.m.
4    (There was a brief recess.)
5    THE VIDEOGRAPHER:  We are back on record at
6  3:54 p.m.
7  BY MR. GOETZ:
8    Q.  Mr. Millikan, in 2013, when an order was
9  identified as potentially suspicious, what additional
10  due diligence could be done other than looking at the
11  Item Review Report?
12    A.  There was another report.  I can't remember
13  what it's called.  I described it earlier.
14    Q.  I don't -- I don't mean to cut you off.  I
15  obviously, wasn't clear.  I'm not asking about
16  reports.
17    I'm asking about other things you could do.
18  Call a pharmacist, those sorts of things.  I'm not
19  asking about the reports, just other things that could
20  be done.
21    A.  We could call a store loss prevention, the
22  store itself, corporate.
23    MR. HYNES:  Dan, the other report is
24  responsive to your question, if you'll let him
25  finish.

Page 223

1    MR. GOETZ:  Okay.
2    MR. HYNES:  Find out what the other report
3  has, I think is where he was going was the right
4  way.
5  BY MR. GOETZ:
6    Q.  Okay.  Go ahead.
7    A.  So the other report did top three patients,
8  age, distance traveled, method of payment, the top
9  prescribers, percent of business, percent controlled
10  substance.  And it compared itself to a like store,
11  among other things.
12    Q.  And can you think of any other due diligence
13  that could possibly be done when a store -- when an
14  order was identified as potentially suspicious?
15    A.  And then we could call store loss prevention,
16  corporate loss prevention.  I drew a blank here a
17  second.  I'm drawing a blank on something, but --
18    Q.  And that report that you are talking about,
19  is that report called a Store Metrics Report?
20    A.  Yes.  Thank you.
21    Q.  Was there another report besides the Store
22  Metrics Report?
23    A.  Not anything that I used or that I
24  remember.
25    Q.  And so, approximately 5 percent of the time

Page 224

1  you would then would go the Store Metrics Report and
2  kind of look at that extensive list of due diligence
3  that we just talked about?
4    A.  Yes.
5    Q.  Okay.  And -- and those are all really
6  important things to do if you want to find out if a --
7  if an order actually is suspicious?
8    MR. HYNES:  Object to the form.
9    A.  That was the tool that we had to use that had
10  been recreated by some outside people, I believe DEA
11  consultants that had come up with that.
12    Q.  Since we are talking about DEA.
13    You had said that there were some ex-DEA
14  agents around 2013?
15    A.  Yes.
16    Q.  Who were they?
17    A.  I don't -- I don't remember names.  Four or
18  five individuals over a few months.
19    Q.  Were there four or five there at once?
20    A.  There were times when there were two, but
21  most generally when I was there, there was only one.
22    Q.  And what were they doing?
23    A.  They were helping out with the analysis.
24  They were talking to us about the use of the matrix,
25  the program, the IRR, the usage of it.  Many times

Page 225

1  told us, Wow, this is good stuff.
2    Q.  Talking about those Store Metrics Reports,
3  they said that's good stuff?
4    A.  Yes.
5    Q.  Did you tell them you did it 5 percent or
6  less at the time --
7    MR. HYNES:  Objection.
8    Q.  -- on those orders identified as potentially
9  suspicious?
10    MR. HYNES:  Objection.  Form.
11    A.  I wouldn't have specifically mentioned that,
12  but they were working there side-by-side.  And as we
13  identified something on an IRR, I don't ever remember
14  them saying, Oh, we need to -- why didn't do you this
15  one?
16    Q.  Who were they employed by?
17    A.  I don't know.
18    Q.  I think -- have you ever heard of the Pharma
19  Group, or some name like that?
20    A.  Yeah, I don't know.  I don't know.
21    Q.  They were there for a couple of months?
22    A.  It seems like about that amount of time,
23  maybe three.
24    Q.  Am I right, they were there after Aaron
25  Burtner left, kind of in -- and then -- or was it

Page 226

1  after Kelly Baker left?
2      A. I believe it's after Aaron Burtner left.
3      Q. And so they were a stopgap to kind of fill
4  his position?
5          MR. HYNES: Object to the form.
6      A. I -- I actually don't know why they were
7  there and --
8      Q. When we talked about additional due
9  diligence, you said that you could call a store?
10     A. Yes.
11     Q. What would you get from that?
12     A. You could call and talk to the pharmacist,
13  point out the size of the order, and find out why they
14  were ordering that drug, that quantity.
15     Q. Okay. And you could call loss prevention?
16     A. Yes.
17     Q. And what would you get from that?
18     A. Oh, I would have loss prevention look into it
19  to see what they had from their end.
20     Q. And inventory?
21     A. They could do an inventory. They could also
22  interview the pharmacist or technician.
23     Q. And so what -- what would they find out? I'm
24  just curious.
25         Other than what you are looking at, I'm

Page 227

1  curious what you would be looking for from them.
2      A. To MORE legitimate that definitely what we're
3  shipping out is then going to go legitimate
4  patients.
5      Q. Loss prevention would -- and I've seen some
6  documents -- they would be investigating potential
7  theft?
8      A. I would say, among other things.
9      Q. And so what are the other things that they
10  would be investigating?
11     A. Oh, wouldn't they also be looking at
12  potential false prescriptions?
13     Q. You tell me. Are they?
14     A. I don't know that. I don't know exactly, but
15  I'm saying that I believe theft would be one of the
16  things that they would be looking at.
17     Q. Okay. You think they also were looking for
18  false prescriptions?
19     A. I don't know that.
20     Q. What else do you think they might have been
21  doing?
22     A. I didn't work directly with them to know
23  exactly what they do.
24     Q. One of the -- since you talk about false
25  prescriptions.

Page 228

1      One of the reasons that CVS claims it did
2  report any suspicious orders from the CVS Indiana
3  distribution center was because of how robust its
4  pharmacy operations were.
5      Are you aware of that?
6      A. I'm not aware of that.
7      Q. Do you agree with that?
8      A. I wasn't actively working with them to know
9  that.
10     Q. Okay. So you have no opinion?
11     A. No.
12     Q. I just want to summarize: You could call a
13  store. And from there, you would find out, you know,
14  is this -- Do you really need this order? Is this a
15  mistake, essentially, correct?
16     A. Yes.
17     Q. You could call loss prevention, and what we
18  know they would be looking for is theft, correct?
19         MR. HYNES: Objection.
20     A. I believe so.
21     Q. Okay. And you don't know anything else for
22  sure that they would be looking for?
23     A. No, I do not.
24     Q. All right. You could call -- you could look
25  at the report that gave you the top three patients?

Page 229

1      A. Yes.
2      Q. And that would give you the age, the distance
3  traveled and the method of payment for them?
4      A. Yes.
5      Q. You could look at percent of controlled
6  substances to that order to -- as a percent of a
7  controlled substances.
8      Maybe it was hydrocodone to the other
9  controlled substance orders? I butchered that.
10     You could look at hydrocodone as a percentage
11  of controlled substances, the other controlled
12  substances that were ordered by CVS, by that --
13         MR. HYNES: Objection.
14     Q. -- pharmacy?
15     A. I don't remember that. I don't recall how
16  that worked. I do remember there was some percent
17  thing, but I don't know what filled that field.
18     Q. Okay. But it is something that you would
19  look at?
20     A. Yes.
21     Q. You could look at comparison to like
22  stores?
23     A. Yes.
24     Q. And I'm sorry, you said two other things
25  and -- top five. What would the top five be? Would

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1　that also be the top five patients?
2　　　A. No. It was the top three patients, top three
3　doctors.
4　　　Q. Okay. And the top three doctors, you would
5　be looking at their percent of prescriptions of that
6　drug that flagged on the IRR as potentially
7　suspicious, correct?
8　　　　MR. HYNES: Objection, form.
9　　　A. Again, I don't remember what you saw on that
10　top physician. I do remember there is a percent over
11　to the right, but I don't remember what that was.
12　　　Q. And if you wanted to investigate an order
13　that had been identified as potentially suspicious by
14　the computer algorithm and you wanted to really get
15　comfortable with that order, these are the things that
16　you could do?
17　　　　MR. HYNES: Objection to form.
18　　　A. That's what I used.
19　　　Q. Okay. Can you go back to Exhibit 2, 10693,
20　please?
21　　　A. 1 --
22　　　　MR. HYNES: 0693. Right there.
23　　　A. Okay.
24　　　Q. Looking at this Item Review Report, again,
25　which is from August 30th of 2013, which is a listing

Page 231

1　of those orders that were identified by the computer
2　algorithm model as potentially suspicious.
3　　　　And we're looking at this order for 3355.
4　From this, the information shown on this Item Review
5　Report, can you tell me anything about whether this
6　order was a mistake?
7　　　A. I cannot.
8　　　Q. Can you tell me anything about whether there
9　was theft at this store?
10　　　A. I cannot.
11　　　Q. Can you tell me anything about the age of the
12　patients that were purchasing this drug in the past?
13　　　A. No.
14　　　Q. Can you tell me anything about the distance
15　that the patients would travel to purchase this
16　drug?
17　　　A. No.
18　　　Q. Can you tell me anything about the method of
19　payment?
20　　　A. No.
21　　　Q. What about the prescribers?
22　　　A. No.
23　　　Q. What about the percent of controlled
24　substances?
25　　　A. No.

Page 232

1　　　Q. You can't tell me whether or not this order
2　is part of a cocktail, the Trinity, such that it
3　should be a concern, correct?
4　　　A. Just from looking here, no.
5　　　Q. You can't tell me anything about the
6　comparison of this store to like stores?
7　　　A. No.
8　　　Q. And yet, that is a due diligence that can be
9　done on an order, none of it is shown, but we, CVS,
10　only looks at 5 percent of the orders that were
11　identified as potentially suspicious?
12　　　　MR. HYNES: Objection to form.
13　　　A. In my time of working with it, that was my
14　estimate.
15　　　Q. Do you know what it means for a false
16　positive? Do you know what that terms means?
17　　　A. I assume we are referring to a drug test?
18　　　Q. Do you know what it means when a model has
19　false positives?
20　　　A. No.
21　　　Q. Can you go back to Exhibit 13, please? That
22　is the very large exhibit.
23　　　　Could you go to 10482, please?
24　　　　Do you see the last order that's not blacked
25　out? It says, IRR Indiana -- IRR IN. I apologize.

Page 233

1　　　A. Yes.
2　　　Q. And that's an order dated 12-9 of '13?
3　　　A. Yes.
4　　　Q. And again, that due diligence that's done
5　should be printed and put into a file?
6　　　　MR. HYNES: Objection to form.
7　　　Q. Do you agree with that?
8　　　A. I don't know. I don't remember that. I
9　didn't work that often to remember all of that --
10　those steps.
11　　　　(CVS-Millikan-37 was marked for
12　identification.)
13　　　　(CVS-Millikan-38 was marked for
14　identification.)
15　　　Q. I'm going to show you what has been marked as
16　Plaintiff's Exhibit 37 and Plaintiff's Exhibit 38.
17　　　　Here's 37 and 38.
18　　　　MR. HYNES: We're short a copy on 38.
19　　　　MR. GOETZ: I -- I apologize.
20　　　　Do you have a 38 for you?
21　　　　MR. HYNES: I do.
22　　　　MR. GOETZ: And does the witness have a 38?
23　　　　THE WITNESS: Yes.
24　　　　MR. GOETZ: Okay.
25　BY MR. GOETZ:

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 Q. Exhibit 37, do you see that?

2 A. Yes.

3 Q. Can you tell me what that is?

4 A. It was a communication so that distribution

5 centers and the analysts knew that they had looked at

6 the IRR.

7 Q. And could you look at the next page of

8 that?

9 A. Okay.

10 Q. And that's an email from Shauna Helfrich?

11 A. Yes.

12 Q. And it's to Dan Deaton.

13 Who's Dan Deaton?

14 A. He would have been a pharmacy supervisor

15 probably at that time.

16 Q. And who's Gary Lamberth?

17 A. The pharmacy manager at that time.

18 Q. And who's Joseph Shohll?

19 A. Was probably the logistics manager -- or I'm

20 sorry -- the loss prevention manager.

21 Q. When you would review an Item Review Report,

22 okay, you would look at, let's say, a hundred orders.

23 We know that 95 orders you would not do any

24 due diligence other than what is shown on the Item

25 Review Report, correct?

Page 235

1 MR. HYNES: Objection to form.

2 A. We looked at the Item Review Report. My

3 guesstimate was 5 percent.

4 Q. You would do additional due diligence?

5 A. Yes.

6 Q. Those 5 percent that you wanted to do

7 additional due diligence on, you would do a hold on

8 that order?

9 A. Yes.

10 Q. And you would do a hold on that order until

11 you had done your due diligence and it was released?

12 A. Yes.

13 Q. And this is an email releasing an order from

14 December 9th, 2013, from the IRR date of December 9th,

15 2013, if you looked at the front page, correct?

16 A. I'm not familiar with that.

17 Q. That's not your understanding where she sends

18 this to the pharmacy people who would -- who -- their

19 people would be in charge of packing the orders.

20 And it says: Based on information reviewed,

21 these orders have been approved.

22 Do you see that at the -- at the bottom?

23 A. Oh, I see that. Yes.

24 Q. And so --

25 A. Okay.

Page 236

1 Q. -- that's what this communication is,

2 correct?

3 I did -- I did due diligence, that order that

4 I previously held is now released, you can -- it's

5 good to go, you can ship it?

6 A. That's what it appears, yes.

7 Q. Could you look at Exhibit 38, please?

8 Do you see that email?

9 A. Yes.

10 Q. Okay. That is actually the -- that cover

11 email is actually the same cover email as Exhibit 37,

12 correct?

13 A. Yes.

14 Q. And if you look at the pages that follow, if

15 you look at 8484, that's an inventory inquiry?

16 A. Yes.

17 Q. And so, that will -- will give us information

18 about what?

19 A. While I can't speak to this -- these

20 documents, it appears this is the pharmacy copy, is

21 number 37, and number 38 appears to be what stayed

22 back with SOM.

23 Q. Okay. And so, that 8484, if you look at 38

24 and go to page 8484, that RX inventory inquiry, is

25 that telling us the amount of ordered versus

Page 237

1 dispensed?

2 A. I'm not familiar with that. I'm not sure.

3 Q. So, you don't know what that's -- what that

4 is describing, that document?

5 A. No.

6 Q. What about the next page, 8485? Do you know

7 what that document is?

8 A. No, I do not.

9 Q. What about the last page, 8487?

10 A. I'm not familiar with that either.

11 Q. Is -- that is different than a Store Metrics

12 Report?

13 A. Yes.

14 Q. Okay. If you look at 37 -- pardon me -- if

15 you look at Exhibit 38, in that order and that due

16 diligence, that happens to coincide and be the same

17 order, right, that's shown on page 10482 of

18 Exhibit 13?

19 A. On 10482, I'm not seeing the quantity.

20 Q. The -- the store that's 4101.

21 A. I -- I do see 4101. I'm not seeing a

22 quantity.

23 Q. It's the same store, correct?

24 A. Yes.

25 Q. It's the same order date?

Page 238

1  A.  Yes.  I'm just not seeing the -- the
2 quantity.
3  Q.  Do you see that 1.41?
4  A.  Yes.
5  Q.  Is that the quantity?
6  A.  I -- it doesn't match.  I -- I'm just not
7 familiar enough with it to definitely confirm that --
8  Q.  That's the same order?
9  A.  Yes.
10  Q.  I will represent to you that from a period of
11 2-6 of 2013 to December 30th of 2013 -- strike that.
12    Mr. Millikan, I'm handing you what has been
13 marked as Exhibit 13.  You're going to want to keep
14 that.  It doesn't matter.
15  A.  Oh.
16  Q.  That is a list of what says, Track One CVS
17 Store Information.
18    Do you see that?
19  A.  Yes.
20  Q.  All right.  Do you understand that the first
21 opioid litigation case involves the County of
22 Cuyahoga?
23  A.  I don't know that it's the first.
24  Q.  Okay.  Do you understand that the County of
25 Cuyahoga, the City of Cleveland, the County of Summit,

Page 239

1 and the City of Akron are joined together in one
2 lawsuit to be tried together?
3  A.  Yes, I believe so.
4  Q.  Okay.  I will represent to you they are the
5 first case that are scheduled to be tried.
6  A.  Okay.
7    (CVS-Millikan-33 was marked for
8 identification.)
9  Q.  These stores that you see on Exhibit 33,
10 they, according to what has been produced by CVS,
11 represent those stores that are part of what we're
12 calling track one, because that's the first case to be
13 tried.
14    Do you see up top:  Track One CVS Store
15 Information?
16  A.  Yes.
17  Q.  That Exhibit 13 that we just looked at was
18 a -- an IRR recap.
19    We -- we established that earlier, correct?
20  A.  Yes.
21  Q.  You're not sure exactly what it is, but I
22 will tell you that on that IRR recap, from a period of
23 February 6, 2013, to December 30th of 2013, that that
24 order we just looked at is the only order that shows
25 up for a track one store?

Page 240

1    MR. HYNES:  Objection to form.
2  Q.  Do you understand that?
3    MR. HYNES:  Objection to form.
4  A.  While I was there part of the time, I'm -- I
5 don't know that I have enough knowledge to comment on
6 that.
7  Q.  That is the only order that shows up during
8 that time period as receiving any due diligence
9 outside of what is shown on the Item Review Report.
10    Do you understand that?
11    MR. HYNES:  Objection.  Asked and answered.
12 Lack of foundation.
13  A.  I understand what you're saying.  I'm just --
14 I'm not aware of that personally.
15  Q.  Does it surprise you, that one order, in
16 two of the largest counties in a state that has been
17 decimated by the opioid crisis, would get additional
18 due diligence outside of what's flagged by the IRR --
19    MR. HYNES:  Objection.
20  Q.  -- over an 11-month period?
21    MR. HYNES:  Objection.  Lack of foundation.
22 Calls for speculation.
23  A.  I mean, again, I wasn't actively working in
24 that, and I haven't reviewed the documents to --
25  Q.  Does it surprise you?

Page 241

1    MR. HYNES:  Objection.  Asked and answered.
2  A.  I don't know what to base that against.
3  Q.  I'm asking you to assume that's true.
4    Does it surprise you?
5    MR. HYNES:  Objection.  Hypothetical.
6  A.  There's so many other factors.  I don't
7 know.
8  Q.  What are the other factors?
9  A.  Store market share.  Prescription volume.  I
10 don't --
11  Q.  All right.  But what we know is that every
12 time a CT-1 store was put on the IRR as a potentially
13 suspicious order, over an 11-month period, of all the
14 times that happened, one time there was a store
15 investigated for additional due diligence.
16    And we established -- do you understand that?
17 Assume that.
18    And we established earlier that the Item
19 Review Report tells nothing about market share, does
20 it?
21    MR. HYNES:  Objection.  Compound.
22  Q.  When you review the Item Review Report, does
23 it tell you anything about market share?
24  A.  No.
25  Q.  Does it tell you anything about patient

Page 242

1  data?

2     A.  No.

3     Q.  Tell you anything about the patient age?

4     A.  No.

5     Q.  Does it tell you anything about how far the

6  patient has traveled?

7     A.  No.

8     Q.  Does it tell you anything about how the

9  patients pay for the prescriptions?

10     A.  No.

11     Q.  Does it tell you anything about the

12  prescribers?

13     A.  No.

14     Q.  Does it tell you anything about whether those

15  patients are ordering a drug cocktail?

16     A.  No.

17     Q.  And one time that information was reviewed

18  over an 11-month period for Cuyahoga and Summit County

19  for one order.

20     All I'm asking:  If that surprises you.

21     MR. HYNES:  Objection.  Lack of foundation.

22  Calls for speculation.  Asked and answered.

23     Q.  You can go ahead.

24     A.  According to that report.  I don't know the

25  validity of that report, and I did not work in that

Page 243

1  area throughout most of the time.

2     Q.  You were the CVS DEA compliance coordinator

3  from '06 to when you retired in June of '12.

4     Having held that position, does it surprise

5  you that one order received additional due diligence

6  over an 11-month period in a -- in those two

7  counties?

8     MR. HYNES:  Objection.  Lack of foundation.

9  Calls for speculation.  Asked and answered.  And

10  general objection to the form.

11     Go ahead.

12     A.  Again, I don't know what is in that report

13  because I didn't put it together, I didn't directly

14  work with them, and I don't know where that -- where

15  that information is or came from.

16     Q.  I'm asking you to assume that that report is

17  accurate, and I'm asking you to assume that the

18  interpretation that one order was investigated in an

19  11-month period in 2013, as shown on this report, is

20  accurate, and I'm asking you if it surprises you.

21     MR. HYNES:  Objection.  Hypothetical.  Lack

22  of foundation.

23     A.  And again, I think I can only speak to the

24  facts that I know.

25     Q.  And what are those?

Page 244

1     A.  On the times when I worked in that area, I --

2  I don't have the knowledge of what rolled up into that

3  report over that time period.

4     Q.  I'm not asking you to have the knowledge.

5  Forget the report.  Forget all of that.

6     What if I said to you, I said:  Mr. Millikan,

7  over a one -- over an 11-month period, in the State of

8  Ohio, two of the largest counties, a state that's

9  struggling with an opioid crisis, what if I asked you:

10  Mr. Millikan, over an 11-month period, if there was

11  one order in Cuyahoga or Summit County that had due

12  diligence of, called the pharmacy maybe, looked at

13  cash -- cash purchases, looked at dispensing versus

14  ordering, looked at how far the geographic dispersion

15  was of the patient, looked at all of those things we

16  talked about with due diligence, and if I said there

17  was one order in an 11-month period that had that due

18  diligence done, would that surprise you?

19     MR. HYNES:  Objection to form, including

20  hypothetical.  Calls for speculation.  Asked and

21  answered.

22     A.  And again, not necessarily.

23     Q.  Okay.  Why?

24     A.  CVS distributes legitimate drugs for

25  legitimate patients to our legitimate stores, and

Page 245

1  that's what I was involved in.

2     Q.  How do you know that if you don't

3  investigate?

4     MR. HYNES:  Objection to form.

5     A.  In what -- I can only speak to what I was

6  involved with, and that was to try to ensure that.

7     Q.  I'm asking you how you knew -- you said CVS

8  distributes legitimate drugs to legitimate stores for

9  legitimate patients.

10     How do you know if you don't do the due

11  diligence?

12     A.  I don't know beyond that.

13     Q.  CVS paid $132 million of fines, didn't they,

14  to the DEA related to their dispensing operations?

15     Are you aware of that?

16     MR. HYNES:  Objection.  Lack of foundation.

17     A.  No, I'm not.

18     Q.  Okay.  You had no idea of that?

19     A.  I don't believe so.

20     Q.  Are you aware that CVS had a show cause order

21  because of how much oxycodone was going out their

22  doors in Florida?

23     Are you aware of that?

24     A.  Yes.

25     Q.  And what -- what's your knowledge of that?

Page 246

1    A. That a wholesaler and a couple of stores were
2  involved in oxycodone.
3    Q. What else?
4    A. That's about it.
5    Q. Those were clearly not legitimate stores.
6      Do you agree?
7      MR. HYNES: Objection to form.
8    A. I don't know anything more than what I just
9  told you.
10   Q. They were not legitimate orders.
11     Do you know how much hydrocodone was going to
12 those stores?
13   A. No, I do not.
14   Q. Could you go back to Exhibit 15, please?
15     MR. HYNES: Dan, which one is that? Okay.
16   Q. This is a -- do you have it in front of you,
17 sir?
18   A. Yes.
19   Q. This is a controlled IRR recap, and the
20 controlled drug section appears to run from January
21 11th to June of 2012; is that correct?
22   A. Yes.
23   Q. Okay. This is when you were in -- the DEA
24 compliance coordinator, right?
25   A. The end date again?

Page 247

1    Q. June of 2012.
2    A. Yes.
3    Q. This is when you were responsible -- and I
4  want to get the exact language, so I'm going to go to
5  Exhibit 9, if I can.
6      You were responsible at this point to
7  assuring that the Indiana distribution center complied
8  with all DEA regulations?
9    A. Yes.
10   Q. Your responsibility during the time period
11 that this control IRR recap, as shown on page 8510,
12 means:
13     The individual designated as responsible for
14 assuring compliance with applicable CSA requirements
15 at each CVS distribution center. This person will
16 have the responsibility to implement the required
17 systems and procedures for controlled substances in
18 coordination with CVS DEA compliance coordinator, the
19 senior manager, logistics planning, and the director
20 of logistics loss prevention, correct?
21   A. Yes.
22   Q. As part of that, you are responsible for
23 suspicious order monitoring?
24   A. Yes.
25   Q. This control IRR recap indicates that from

Page 248

1  January of 2011 until June of 2012, one order in the
2  CT-1 jurisdictions had additional due diligence done
3  on it outside of whatever is shown on the Item Review
4  Report?
5      MR. HYNES: Objection to form. Lack of
6  foundation.
7    Q. Does that surprise you?
8      MR. HYNES: Same objection.
9    A. Again, I -- I didn't see this report. I'm
10 just not aware of it.
11   Q. Forget the report.
12     What if I told you that over an 18-month
13 period, of the orders that were flagged on the Item
14 Review Report as potentially suspicious by the
15 computer algorithm model for the counties of Cuyahoga
16 and Summit, one order was investigated, would that
17 surprise you?
18     MR. HYNES: Objection. Hypothetical, calls
19 for speculation.
20   A. I just don't how many might have popped up or
21 -- without seeing it, I just don't know.
22   Q. You think maybe only one popped up onto this
23 IRR as potentially suspicious?
24   A. I don't know. I wasn't directly working with
25 them.

Page 249

1    Q. We -- we looked at controlled drug IRRs
2  today, just a couple of them, one had 600 entries,
3  right, of potentially suspicious orders for the
4  Indianapolis distribution center?
5    A. Yes.
6    Q. Okay.
7      MR. HYNES: Objection.
8    Q. One of those had 400 entries as potentially
9  suspicious drugs as identified by the IRR for --
10 strike that.
11     One had 400 orders as potentially suspicious
12 as identified by the controlled drug IRR?
13     MR. HYNES: Objection.
14   Q. Correct?
15     MR. HYNES: Lack of foundation.
16   A. Yes.
17   Q. And those were daily reports, correct?
18   A. Yes.
19   Q. And knowing those numbers, you think only
20 maybe one -- one order showed up relative to Cuyahoga
21 and Summit County for investigation?
22     MR. HYNES: Objection. Mischaracterizes the
23 testimony.
24   A. I don't know.
25   Q. You can have the greatest due diligence in

Page 250

1 the world, but if you don't actually do the due
2 diligence on orders it is pretty meaningless, do you
3 agree?
4     MR. HYNES:  Objection, lack of foundation.
5     Object to the form.
6     A.  When I worked directly with suspicious order
7 monitoring, I thought we were doing the best with what
8 we -- with what we had to do that due diligence.
9     Q.  I understand.
10     And you did that due diligence on 5 percent
11 or less of the orders that were identified as
12 potentially suspicious, correct?
13     A.  That was my estimate.
14     Q.  Okay.
15     MR. GOETZ:  Let's take a break.
16     THE VIDEOGRAPHER:  We are off record at
17 4:36 p.m.
18     (There was a brief recess.)
19     THE VIDEOGRAPHER:  We are back on the record
20 at 4:49 p.m.
21     MR. GOETZ:  Mr. Millikin, I don't have any
22 further questions for you, pending what Mr. Hynes asks
23 you.
24     THE WITNESS:  Okay.  Thank you.
25     MR. GOETZ:  And thank you for your time

Page 251

1 today.
2     THE WITNESS:  Thank you.
3         EXAMINATION
4 BY MR. HYNES:
5     Q.  As you know, my name is Paul Hynes.  I have a
6 few follow-up questions for you.
7     A.  Okay.
8     Q.  Mr. Millikin, you testified that during 2006
9 through 2009 you were the operations manager at the
10 CVS distribution center; is that correct?
11     A.  Yes.
12     Q.  And during that time, did you have any direct
13 involvement in SOM?
14     A.  No, I did not.
15     Q.  Did you supervise anyone who had direct
16 involvement in SOM?
17     MR. GOETZ:  Objection.
18     A.  Probably during most of that time, it would
19 have been the pharmacy manager.
20     Q.  And pharmacy manager is the one who
21 supervised the warehouse associates; is that
22 correct?
23     A.  Yes.
24     Q.  So you did not directly supervise the
25 warehouse associates during that time period, did

Page 252

1 you?
2     A.  No, I did not.
3     Q.  And you testified that from 2000 --
4 approximately 2010 to 2012, you were the production
5 manager of the CVS Indianapolis distribution center;
6 is that correct?
7     A.  Yes.
8     Q.  And during that time, did you have
9 responsibility for the pharmacy department?
10     A.  No, I did not.
11     Q.  Okay.  Mr. Goetz showed you some Item Review
12 Reports from the 2011 to 2012 time period.
13         Do you remember that?
14     A.  What kind of reports?
15     Q.  IRRs.  Item Review Reports.
16     A.  Yes.
17     Q.  Did you, during that period of time, ever
18 review IRRs?
19     A.  No, I did not.
20     Q.  Did you ever review potentially suspicious
21 orders during that time period?
22     A.  No, I did not.
23     Q.  Did you have any direct involvement in the --
24 in the SOM program during that time period?
25     A.  No.

Page 253

1     Q.  But there did come a time when you had some
2 involvement in SOM; is that correct?
3     MR. GOETZ:  Objection.
4     A.  Yes.
5     Q.  You testified that you came back, that you
6 assisted with the SOM in December of 2012 and then for
7 a period in 2013 and 2014; is that correct?
8     A.  Yes.
9     Q.  And I believe you said it was just few weeks
10 in December of 2012?
11     A.  Yes.
12     Q.  And then beginning in August of 2013, a few
13 days or weeks, on or off; is that correct?
14     A.  I believe so.
15     Q.  And it was less than full-time?
16     A.  Definitely.
17     Q.  Okay.  And it was fairly irregular?
18     A.  I don't recall.
19     Q.  Would you characterize the amount of time you
20 spent reviewing IRRs during that period, August 2013
21 through early to mid 2014, as insignificant?
22     MR. GOETZ:  Objection.
23     A.  My guess is it's less than 200 hours.
24     Q.  And Mr. Goetz showed you some time studies
25 that were done for Aaron Burtner in the summer of

Page 254

1 2013.
2      Do you recall those?
3      A. I recall him showing me those, yes.
4      Q. Did you have any involvement in preparing
5 those time studies?
6      A. No, I did not.
7      Q. Did you work with Mr. Burtner during that
8 period of time, the summer of 2013?
9          MR. GOETZ: Objection.
10     A. 2013?
11     Q. Summer of 2000 -- July of 2013.
12         MR. GOETZ: Objection.
13     A. I don't believe so.
14     Q. So, do you have any familiarity with how
15 Mr. Burtner performed his SOM work in July of 2013?
16         MR. GOETZ: Objection.
17     A. No, I do not.
18     Q. So, do you have any understanding whether
19 those time studies reflected accurately the work that
20 Mr. Burtner did in July of 2013?
21         MR. GOETZ: Objection.
22         Paul, I think you should look at the time
23 studies. You have the year wrong, I believe.
24     Q. Oh, July 2012. You're right. Let me step
25 back.

Page 255

1      It's the same question.
2          MR. GOETZ: I understand.
3      Q. Did you work with -- did you work with
4 Mr. Burtner in July of 2012 on SOM?
5      A. No, I did not.
6      Q. And do you have any familiarity with the SOM
7 work he was doing in July of 2012?
8      A. No.
9      Q. Mr. Goetz showed you some IRR recap reports.
10 Do you recall those?
11     A. Yes.
12     Q. Did you have any involvement in preparing
13 those IRR recap reports?
14     A. No, I did not.
15     Q. Sitting here today, can you say whether those
16 IRR recap reports reflect all of the orders on which,
17 quote unquote, additional due diligence was done?
18     A. No.
19     Q. Mr. Goetz elicited an estimate from you or a
20 guess that you did additional due diligence on about 5
21 percent of orders that you reviewed.
22     Do you remember that?
23         MR. GOETZ: Objection.
24     A. Yes.
25     Q. Was that a guess?

Page 256

1      A. Yes, it was.
2      Q. And did that guess apply to the percentage of
3 orders that you did additional due diligence on or
4 that all SOM analysts did additional due diligence
5 on?
6      A. I can only comment on mine, what I thought I
7 was guessing.
8      Q. Okay. And you don't know what percentage of
9 orders others did additional due diligence on?
10     A. No, I do not.
11     Q. Okay.
12         MR. HYNES: No further questions.
13         RE-EXAMINATION
14 BY MR. GOETZ:
15     Q. Mr. Millikan, you were just questioned about
16 whether or not you were responsible for SOM during a
17 certain time periods.
18     They -- those people reported to you,
19 correct? We established that earlier.
20     A. You're talking prior to 2000 --
21     Q. '12.
22     A. Okay.
23     Q. Those people that were responsible for SOM
24 ultimately reported up to you, correct?
25     A. The pharmacy manager reported to me. The

Page 257

1 times when SOM was being done by loss prevention,
2 whether it be Terrence Dugger, John Mortelliti, that
3 -- they did not report to me.
4      Q. Okay. There was a time period when the IRR
5 was not being reviewed in Indianapolis? That's what
6 you're telling me?
7      A. Well, both. There was a time when the IRR
8 was not being reviewed in Indianapolis and there was a
9 time it was being reviewed in Indianapolis, I believe,
10 and that involved -- outside of Indianapolis was John
11 Mortelliti, inside of Indianapolis was Terrence
12 Dugger.
13     Q. And during that time period, you were the DC
14 DEA compliance coordinator, correct?
15     A. Yes.
16     Q. You were responsible for assuring that that
17 CVS distribution center complied with DEA regulations
18 as it related to controlled substances, correct?
19     A. Yes.
20     Q. You are responsible to ensure that they
21 followed the CVS practices as it related to controlled
22 substances, correct?
23     A. Yes.
24     Q. You were responsible to make sure that CVS
25 followed the appropriate policies so that they could

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  comply with all of the DEA regulations, correct?
2      A.  Yes.
3      Q.  Okay.  You said that IRRs at 5 percent was
4  your best guess -- or your guess.  That was your best
5  guess, right?
6      MR. HYNES:  Objection to form.
7      A.  I don't have another guess.
8      Q.  That was your estimate?
9      A.  Yes.
10     Q.  Okay.  And we talked about what percentage of
11 orders that would be identified by the algorithm as
12 potentially suspicious received additional due
13 diligence, and that percent was -- your estimate or
14 guess was 5 percent of those orders you -- you looked
15 at on the IRR, correct?
16     MR. HYNES:  Objection to form.
17     A.  That was the number that you presented, and I
18 agreed to.
19     Q.  Fair enough.  The IRRs we looked at today
20 contained between 400 and 600 orders that had been
21 flagged as potentially suspicious by the computer
22 algorithm model.
23     Do you agree with that?
24     MR. HYNES:  Objection to form.
25     A.  Yes.

Page 259

1      Q.  And Indianapolis DC would be looking at not
2  just the Indianapolis orders, which is what was
3  reflected on those IRRs, but they also would be
4  looking at the orders for 10 other distribution
5  centers?
6      A.  I don't know that for that time frame.
7      Q.  They were looking at -- they were the only
8  facility in 2013 reviewing the Item Review Reports?
9      You don't know that?
10     A.  I believe that's correct.
11     Q.  Okay.  Do you have a question as to whether
12 there was 11 distribution centers?
13     A.  No.  Our time frame -- there was some times
14 when we were doing less than 11.
15     Q.  All right.  In 2013, when you were reviewing
16 Item Review Reports, you were reviewing, that group
17 was reviewing for every distribution center?
18     A.  I believe so.
19     Q.  And we had looked at earlier time studies
20 about the requirement of due diligence and how long it
21 took, and then we looked at some due diligence and we
22 talked about due diligence, how extensive it could be.
23     When you did additional due diligence on a
24 store, how long would it take you?
25     A.  One to six minutes, maybe.  It was -- I don't

Page 260

1  remember it taking as long as that time study
2  showed.
3      Q.  Okay.  Would you print that due diligence?
4      A.  I don't remember myself having that ability,
5  so I believe it was either Shauna or Kelly.
6      Q.  Do you know how long Shauna Helfrich took to
7  do additional due diligence?
8      MR. HYNES:  Objection.
9      A.  No, I do not.
10     Q.  Do you know how long Aaron Burtner took to do
11 additional due diligence?
12     MR. HYNES:  Same objection.
13     A.  No, I do not.
14     Q.  Okay.  You were not working when you were
15 doing this full-time or even eight hours a day
16 formerly, were you, when you were reviewing the
17 IRRs?
18     A.  The only time I'm -- there was two times when
19 I was working eight hours, by my recollection.  The
20 first would be November and December of 2012.
21 However, I've worked with Aaron Burtner.  I have no
22 memory of what I did.
23     The second time would be in 2014 as it's
24 transitioning to CVS corporate.  I may have worked
25 eight hours then; however, since the number of DCs had

Page 261

1  dropped to -- I want to say it was three and then
2  less, I don't think I worked eight hours then.
3      Q.  When you say the number of DCs, you're saying
4  the number of distribution centers that were being --
5  the Item Review Report was being reviewed out of
6  Indianapolis?
7      A.  Yes.
8      MR. GOETZ:  That's all I have.  Thank you,
9  sir.
10     THE WITNESS:  Okay.  Thank you.
11     THE VIDEOGRAPHER:  We are off the record at
12 5:02 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 262

1  STATE OF KENTUCKY    )
                        ) SS
2  COUNTY OF JEFFERSON  )
3     I, Kimberley Ann Keene, a notary public, within
4  and for the State at Large, do hereby certify that the
5  foregoing deposition of
6          GARY MILLIKAN
7  was taken before me at the time and place and for the
8  purpose in the caption stated; that the witness was
9  first duly sworn to tell the truth, the whole truth
10 and nothing but the truth; that the deposition was
11 taken before me stenographically and transcribed by
12 me; that the foregoing is a full, true and complete
13 transcript of the said deposition so given; that there
14 was a request that the witness read and sign the
15 transcript; that the appearances were as stated in the
16 caption.
17    I further certify that I am neither counsel or of
18 kin to any of the parties to this action, and am in no
19 way interested in the outcome of said action.
20    Witness my signature this 14th day of January,
21 2018.  My Commission Expires on September 16, 2020.
22
23 _____
24 Kimberley Ann Keene
   Registered Professional Reporter
25

Page 263

1       - - - - - -
        E R R A T A
2       - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5    REASON:  _____
6  ____  ____  _____
7    REASON:  _____
8  ____  ____  _____
9    REASON:  _____
10 ____  ____  _____
11   REASON:  _____
12 ____  ____  _____
13   REASON:  _____
14 ____  ____  _____
15   REASON:  _____
16 ____  ____  _____
17   REASON:  _____
18 ____  ____  _____
19   REASON:  _____
20 ____  ____  _____
21   REASON:  _____
22 ____  ____  _____
23   REASON:  _____
24 ____  ____  _____
25   REASON:  _____

Page 264

1  ACKNOWLEDGMENT OF DEPONENT
2
3     I,_____, do
   hereby certify that I have read the
4  foregoing pages, and that the same
   is a correct transcription of the answers
   given by me to the questions therein
5  propounded, except for the corrections or
   changes in form or substance, if any,
6  noted in the attached Errata Sheet.
7
   _____
8  GARY MILLIKAN          DATE
9
10
11
12
13
14
15 Subscribed and sworn
   to before me this
16 _____ day of _____, 20____.
17 My commission expires:_____
18
   _____
19 Notary Public
20
21
22
23
24
25