# EXHIBIT 415

```
  1              IN THE UNITED STATES DISTRICT COURT
  2              FOR THE NORTHERN DISTRICT OF OHIO
  3                       EASTERN DIVISION
  4                           -  -  -
  5
     IN RE:  NATIONAL                :    MDL NO. 2804
  6  PRESCRIPTION OPIATE             :
     LITIGATION                      :
  7                                  :
     ---------------------------------------------------
  8  THIS DOCUMENT RELATES TO        :    CASE NO.
     ALL CASES                       :    1:17-MD-2804
  9                                  :
                                     :    Hon. Dan A.
 10                                  :    Polster
 11                           -  -  -
 12                      January 30, 2019
 13                           -  -  -
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 14               CONFIDENTIALITY REVIEW
 15
 16             Videotaped deposition of JANET
     GETZEY HART taken pursuant to notice, was held at
 17  the law offices of Morgan, Lewis & Bockius LLP,
     1701 Market Street, Philadelphia, Pennsylvania,
 18  beginning at 9:34 a.m., on the above date, before
     Ann Marie Mitchell, a Federally Approved
 19  Certified Realtime Reporter, Registered Diplomate
     Reporter, Registered Merit Reporter and Notary
 20  Public.
 21                           -  -  -
 22              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
 23                    deps@golkow.com
 24
```

```
 1   distribution center from our corporate office,
 2   based on an individual store's movement.
 3          Q.    The ordering process you're
 4   talking about there, is that the auto
 5   replenishment system?
 6          A.    It is.
 7          Q.    So the auto replenishment system
 8   is part of your suspicious order monitoring
 9   program?
10          A.    It is.
11          Q.    How long has the auto
12   replenishment system been in place for?
13          A.    As far back as I know, as I can
14   recall.
15          Q.    Even as your time as a
16   pharmacist?
17          A.    I don't know that.
18          Q.    But --
19          A.    Definitely since 1995.
20          Q.    How is the auto replenishment
21   system used in the Rite Aid suspicious order
22   monitoring system?
23                MS. McENROE:  Objection to form.
24                THE WITNESS:  It is utilized to
```

1  that a red flag of diversion?

2      A.    It could be.

3      Q.    Does the auto replenishment

4  system look at any of the red flags of diversion

5  you just discussed in your previous answer?

6          MS. McENROE:  Objection to form.

7          THE WITNESS:  It does not.

8  BY MR. POWERS:

9      Q.    So if those red flags of

10  diversion that we just talked about were

11  occurring, forged prescriptions, paying in cash,

12  things like that, the auto replenishment system

13  would not have any way of detecting that.  Right?

14          MS. McENROE:  Objection to form.

15          THE WITNESS:  It would not.

16  BY MR. POWERS:

17      Q.    You also talked about the auto

18  replenishment system relying on [redacted] of data.

19         Is that just the dispensing data?

20      A.    Yes.

21      Q.    And that's just purely the volume

22  of product dispensed.  Right?

23          MS. McENROE:  Objection to form.

24          THE WITNESS:  Yes.  Dispensed to

```
 1    or procedures about how the distribution center
 2    was supposed to determine whether an order was
 3    suspicious?
 4                MS. McENROE:  Objection to form.
 5                THE WITNESS:  There are policies
 6         and procedures to determine a suspicious
 7         order, yes.
 8    BY MR. POWERS:
 9         Q.    You were talking about the
10    distribution center looking at the history of the
11    order.
12         A.    Uh-huh.
13         Q.    Was there any guidance given to
14    the distribution centers to determine what would
15    be used to determine, regarding order history,
16    what was suspicious?
17                MS. McENROE:  Objection, form.
18                THE WITNESS:  Can you repeat the
19         question?
20    BY MR. POWERS:
21         Q.    Sure.
22                You said the distribution center
23    employees knew the stores they were picking for.
24    Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Correct.
 2              Q.      And they gained that knowledge
 3    through picking for those stores periodically
 4    during their jobs.  Right?
 5                      MS. McENROE:  Objection to form.
 6                      THE WITNESS:  Correct.  They pick
 7         a store once a week.
 8    BY MR. POWERS:
 9              Q.      So besides just being the one who
10    picks that store every week, was there any way --
11    any other way that the distribution center
12    employees were supposed to determine whether or
13    not an order was suspicious?
14                      MS. McENROE:  Objection to form.
15                      THE WITNESS:  To the best of my
16         knowledge, no.
17    BY MR. POWERS:
18              Q.      And in paragraph 4 here, it says,
19    "Any order which is determined to be suspicious
20    will be immediately reported to the corporate
21    office."
22                      Who at the corporate office would
23    the suspicious orders be reported to?
24              A.      That would be me.
```

```
 1          Q.    Were any suspicious orders ever
 2   reported to you at the corporate office?
 3          A.    There were none reported to me.
 4          Q.    And to be clear, you never
 5   received a report of a suspicious order your
 6   entire time working in the corporate office from
 7   1995 through 2018.  Correct?
 8          A.    I did not.
 9          Q.    Going down to paragraph 5, it
10   says, if a suspicious order is reported to
11   corporate, the corporate government affairs will
12   determine whether to "ship" or "do not ship."
13                Do you see that?
14          A.    I do.
15          Q.    And this is the same corporate
16   office that we just referred to, the government
17   affairs office.  Right?
18          A.    That is correct.
19          Q.    So that would be you?
20          A.    That would be me.
21          Q.    How would you make the
22   determination of whether to ship or not ship?
23          A.    There would be a number of
24   factors that would come into play.  The very
```

Highly Confidential - Subject to Further Confidentiality Review

1    first factor that I would look at is if it was an
2    auto ship order, that it came through the
3    algorithm and that was what the algorithm
4    provided.  That would be a key one.
5                A second one would be to look at
6    the size of the order, to determine if the
7    unusual size of it was due to something at the
8    pharmacy that was placing the order, if there was
9    something unusual happening at that pharmacy.
10         Q.    Anything else you would look at?
11         A.    That would be it.
12         Q.    Was there any written policy or
13   procedure about how to make that decision about
14   whether to ship or not ship?
15         A.    To the best of my knowledge, no.
16         Q.    So the factors you just testified
17   about that you would use to determine whether to
18   ship or not ship, those were just ones that you
19   yourself personally came up with.  Right?
20         A.    Yes.
21               MS. McENROE:  Objection to form.
22               THE WITNESS:  Sorry.
23   BY MR. POWERS:
24         Q.    What were those based on, those

Highly Confidential - Subject to Further Confidentiality Review

```
 1   factors based on?
 2        A.    Based on my knowledge of the
 3   industry, based on my years of experience having
 4   dealt with the DEA for a period of -- for a long
 5   period of time, and knowing how to review a store
 6   as far as its book of business, going way back to
 7   even my days as the pharmacy district manager in
 8   the Baltimore market.
 9        Q.    But to be clear, you never had to
10   make the decision whether to ship or not ship
11   because you never received any report of a
12   suspicious order.  Right?
13        A.    That is correct.
14        Q.    And going down to paragraph 6, it
15   says, "All discussions, investigations and
16   reports will be maintained in the file designated
17   'Suspicious Orders.'"
18              Do you see that?
19        A.    I do.
20        Q.    Am I correct to assume that there
21   was no file designated suspicious orders because
22   there were no suspicious orders?
23        A.    You are correct.
24        Q.    Who would keep that file, if
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   pharmacy district manager as a result of the
 2   threshold log, do you specifically recall any
 3   instances where you contacted the pharmacy
 4   district manager as a result of hydrocodone
 5   orders?
 6          A.    I don't remember specific to
 7   hydrocodone.
 8          Q.    How about specific to any opioid
 9   product that Rite Aid distributed?
10                MS. McENROE:  Objection to form.
11                THE WITNESS:  I do not.
12   BY MR. POWERS:
13          Q.    Did you use these threshold logs
14   that you were reviewing quarterly to determine
15   whether particular orders were suspicious orders?
16          A.    I did not.
17          Q.    Do you know if Chris Belli and
18   Kevin Mitchell used these logs to determine if
19   orders were suspicious orders?
20                MS. McENROE:  Objection to form.
21                THE WITNESS:  I do not.
22   BY MR. POWERS:
23          Q.    To be clear, when you got these
24   threshold logs, these orders reflected in the
```

```
 1   threshold logs had already been shipped.
 2   Correct?
 3        A.    Yes.
 4        Q.    I'm going to hand you what's been
 5   marked as Rite Aid Exhibit Number -- or Rite
 6   Aid_Hart Exhibit Number 6.  It's a multi-page
 7   document with the Bates number
 8   Rite_Aid_OMDL_46227 through 46319.  It's a pretty
 9   long document.  I'm just going to ask you
10   questions about the first page.
11              MS. McENROE:  And, Will, do
12         you -- can you reference this is a
13         complete document?
14              MR. POWERS:  I believe, once
15         again, it's the range that was identified
16         in the interrogatory responses.
17                     -  -  -
18              (Deposition Exhibit No. Rite
19         Aid-Hart-6, Rite Aid Controlled Drug
20         Reporting Above Average Controlled Drug
21         Purchases Report, Bates stamped
22         Rite_Aid_OMDL_0046227 through
23         Rite_Aid_OMDL_0046319, was marked for
24         identification.)
```

```
 1   Mitchell.
 2             Who was Andrew Palmer?
 3        A.   Andrew Palmer was a director in
 4   asset protection at the time, I believe.
 5        Q.   Why did you invite him to this
 6   meeting about suspicious order monitoring?
 7        A.   Because he was also key as part
 8   of it as well.  Him and his team were involved
 9   with the analytics related to asset protection
10   and the analytics related to the key performance
11   indicators that were looked at from the asset
12   protection side.
13        Q.   How did you use the -- let me
14   back up.
15             Did you use the asset protection
16   analytics to determine whether orders were
17   suspicious or not?
18             MS. McENROE:  Objection to form.
19             THE WITNESS:  We used the asset
20        protection analytics to review orders and
21        look for abnormalities.  We did not use
22        the analytics from asset protection prior
23        to an order being shipped.
24   BY MR. POWERS:
```

```
 1    things that we talked about in the daily column
 2    here on the "Specialist, Regulatory Compliance"
 3    page, you said those were being done at the
 4    distribution center.  Right?
 5         A.    Yes.
 6         Q.    What's your basis for saying
 7    that?
 8         A.    The distribution center was
 9    responsible for the picking, reviewing the
10    orders, determining if it was suspicious or not,
11    making the phone call to the pharmacist.  And at
12    the same time, if there was a suspicious order,
13    the distribution center was responsible to report
14    that in to corporate.  That was part of their
15    standard operating procedures.
16         Q.    I just want to be clear.  You
17    just said that the distribution center was
18    responsible for determining whether a particular
19    order was suspicious or not; is that right?
20         A.    The distribution center was
21    responsible for identifying orders and
22    determining if they were suspicious, yes.
23         Q.    Moving on to the next page, the
24    one entitled "Senior Analyst, Controlled
```