# EXHIBIT 418

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       -  -  -
 5

      IN RE:  NATIONAL          :   MDL NO. 2804
 6    PRESCRIPTION OPIATE        :
      LITIGATION                 :
 7                               :
      ------------------------------------------------
 8    THIS DOCUMENT RELATES TO   :   CASE NO.
      ALL CASES                  :   1:17-MD-2804
 9                               :
                                 :   Hon. Dan A.
10                               :   Polster
11                       -  -  -
12                  January 31, 2019
13                       -  -  -
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW
15
16            Videotaped deposition of JANET
      GETZEY HART taken pursuant to notice, was held at
17    the law offices of Morgan, Lewis & Bockius LLP,
      1701 Market Street, Philadelphia, Pennsylvania,
18    beginning at 9:38 a.m., on the above date, before
      Ann Marie Mitchell, a Federally Approved
19    Certified Realtime Reporter, Registered Diplomate
      Reporter, Registered Merit Reporter and Notary
20    Public.
21                       -  -  -
22            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: MARK PIFKO, ESQUIRE
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333
mpifko@baronbudd.com
Representing the Plaintiffs

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
wpowers@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: ELISA P. McENROE, ESQUIRE
BY: MATTHEW R. LADD, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
elisa.mcenroe@morganlewis.com
matthew.ladd@morganlewis.com
Representing Rite Aid

MORGAN, LEWIS & BOCKIUS LLP
BY: KELLY A. MOORE, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6000
kelly.moore@morganlewis.com
Representing Rite Aid

Page 3

APPEARANCES (cont.'d):

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ELISEO R. PUIG, ESQUIRE
370 Seventeenth Street
Denver, Colorado 80202
(303) 863-1000
eliseo.puig@apks.com
Representing Endo Health Solutions Inc.,
Endo Pharmaceuticals Inc., Par
Pharmaceutical, Inc. and Par Pharmaceutical
Companies, Inc.

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: ALEXANDER M. OWENS, ESQUIRE
1818 Market Street
Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
amo@pietragallo.com
Representing Cardinal Health

COVINGTON & BURLING, LLP
BY: KEVIN KELLY, ESQUIRE
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5272
kkelly@cov.com
Representing McKesson

Page 4

APPEARANCES VIA TELEPHONE AND STREAM:

BARON & BUDD, P.C.
BY: GRETCHEN KEARNEY, ESQUIRE
BY: JAY LICHTER, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
gkearney@baronbudd.com
jlichter@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN M. MALOY, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
john.maloy@morganlewis.com
Representing Rite Aid

BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
Suite 320
Athens, Georgia 30601
(706) 744-4135
ahughes@bbga.com

Page 5

APPEARANCES VIA TELEPHONE AND STREAM (cont.'d):

JACKSON KELLY PLLC
BY: SYLVIA WINSTON NICHOLS, ESQUIRE
150 Clay Street
Morgantown, West Virginia 26501
(304) 284-4105
sylvia.winston@jacksonkelly.com
Representing AmeriSource Bergen Drug
Corporation

JONES DAY
BY: MIRIAM LIABO, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
mliabo@jonesday.com
Representing Walmart

BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
500 Virginia Street East
Suite 600
Charleston, West Virginia 25301
(304) 345-4222
hcyrus@baileywyant.com

VIDEOGRAPHER:
DAVID LANE

ALSO PRESENT:
DAVID SAYRES
Precision Trial Solutions

EMMA KABOLI
Baron & Budd, P.C.
(via stream)
- - -

Page 6

- - -

INDEX

- - -

Testimony of: JANET GETZEY HART
By Mr. Pifko                    11, 285
By Ms. McEnroe                  274

- - -

EXHIBITS

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hart- 30(b)(6)- 1 | Second Notice of Deposition Pursuant to Rule 30(B)(6) and Document Request Pursuant to Rule 30(B)(2) and Rule 34 to Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid and Mid-Atlantic Customer Support Center, Inc. | 14 |
| Hart- 30(b)(6)- 2 | First Notice of Deposition Pursuant to Rule 30(B)(6) and Document Request Pursuant to Rule 30(B)(2) and Rule 34 to Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid and Mid-Atlantic Customer Support Center, Inc. | 18 |
| Hart- 30(b)(6)- 3 | Email chain, top one dated 2010-11-24, Bates stamped Rite_Aid_OMDL_0046695 | 41 |

Page 7

| Hart- 30(b)(6)- 4 | Index of Binder | 113 |
| Hart- 30(b)(6)- 5 | Email chain, top one dated 16 Sep 2011, Bates stamped MCKMDL00632923 through MCKMDL00632925 | 135 |
| Hart- 30(b)(6)- 6 | Email dated 2011-02-01, Bates stamped Rite_Aid_OMDL_0013134 through Rite_Aid_OMDL_0013136 | 175 |
| Hart- 30(b)(6)- 7 | Press Release entitled "Akron Doctor Pleads Guilty to Illegally Prescribing Painkillers, Indictment, Case No.: 5:14CR096 | 179 |
| Hart- 30(b)(6)- 8 | Press Release, "Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act," 2 pages | 188 |
| Hart- 30(b)(6)- 9 | Order of the State Board of Pharmacy, Docket Number D-110127-163 | 197 |
| Hart- 30(b)(6)- 10 | Order of the State Board of Pharmacy Docket Number D-100621-134 | 214 |
| Hart- 30(b)(6)- 11 | Project Initiation for Suspicious Order Monitoring, Bates stamped Rite_Aid_OMDL_0040184 through Rite_Aid_OMDL_0040198 | 221 |

Page 8

| Hart- 30(b)(6)- 13 | Email chain, top one dated 2013-08-07, Bates stamped Rite_Aid_OMDL_0024599 and Rite_Aid_OMDL_0024600 | 224 |
| Hart- 30(b)(6)- 14 | Handwritten notes, 11/23/10, Bates stamped Rite_Aid_OMDL_0046066 | 277 |
| Hart- 30(b)(6)- 15 | PowerPoint slides, Bates stamped Rite_Aid_OMDL_0046067 through Rite_Aid_OMDL_0046072 | 278 |
| Hart- 30(b)(6)- 16 | Email dated 2010-12-10, Bates stamped Rite_Aid_OMDL_0020381 and Rite_Aid_OMDL_0020381 | 279 |
| Hart- 30(b)(6)- 17 | Handwritten notes, 12/14/10, Bates stamped Rite_Aid_OMDL_0046065 | 280 |
| Hart- 30(b)(6)- 18 | Email dated 2011-01-21, Bates stamped Rite_Aid_OMDL_0020541 and Rite_Aid_OMDL_0020542 | 282 |

- - -

PREVIOUSLY MARKED EXHIBITS USED

- - -

Rite Aid-Hart-15

Page 9

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line

132  19

Request for Production of Documents

Page Line

Stipulations

Page Line

Question Marked

Page Line

Page 10

1      THE VIDEOGRAPHER:  We're now on
2  the record.  My name is David Lane,
3  videographer from Golkow Litigation
4  Services.  Today's date is January 31,
5  2019.  Our time is 9:38 a.m.  This
6  deposition is taking place in
7  Philadelphia, Pennsylvania in the matter
8  of National Opiate Litigation, MDL.
9      Our deponent today is Janet
10  Getzey Hart.  Counsel will be noted on
11  the stenographic record.  Our court
12  reporter is Ann Marie Mitchell.
13      Ms. Hart, I just want to remind
14  you, you're still under oath.
15      MR. PIFKO:  Can we get people on
16  the phone to just state their name and
17  firm and who they represent real quick?
18      MS. LIABO:  Hi, this is Miriam
19  Liabo from Jones Day on behalf of
20  Walmart.
21      MS. McENROE:  Anybody else?
22      MS. WATSON:  This is Sylvia
23  Watson from Jackson Kelly on behalf of
24  AmeriSource Bergen.

Page 11

1      MR. PIFKO:  Anyone else?
2      MR. MALOY:  This is John Maloy
3  from Morgan Lewis on behalf of Rite Aid.
4      MR. PIFKO:  Anyone else?
5          - - -
6      JANET GETZEY HART, after having
7  been previously duly sworn, continued to
8  be examined and testified as follows:
9          - - -
10          EXAMINATION
11          - - -
12  BY MR. PIFKO:
13      Q.   All right.  Now that we got that
14  out of the way.
15      My name is Mark Pifko.  We kind
16  of met yesterday a little bit.  I'm going to be
17  asking you some questions today.  I represent the
18  plaintiffs in the litigation.
19      MR. PIFKO:  So -- was she
20  administered the oath?
21      THE REPORTER:  She's still under
22  oath from yesterday.
23      MR. PIFKO:  Okay.
24  BY MR. PIFKO:

Page 12

1      Q.   So you understand that you're
2  still under oath?  Do you understand that?
3      A.   Yes.
4      Q.   Okay.  Yes?  Sorry, I spoke over
5  you.
6      A.   Yes, yes.
7      Q.   And we'll fast forward through a
8  bunch of the ground rules.  I know we covered
9  that yesterday and had your deposition taken.
10      So you understand that your
11  testimony here today is under penalty of perjury.
12  Correct?
13      MS. McENROE:  Objection to form.
14      THE WITNESS:  I do.
15  BY MR. PIFKO:
16      Q.   And you understand that if you're
17  untruthful or intentionally dishonest in some
18  way, that you could be subject to criminal
19  penalties or civil penalties or some other sort
20  of punishment from the court.
21      Do you understand that?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  I do.
24  BY MR. PIFKO:

Page 13

1      Q.   Is there any reason why you can't
2  provide truthful and accurate testimony today?
3      A.   There is not.
4      Q.   Do you have any medical
5  condition, are you taking any medication or
6  undergoing any sort of treatment that would
7  impact your ability to tell the truth?
8      A.   No.
9      Q.   Are you taking any medication or
10  suffering from any condition that would impact
11  your memory?
12      A.   No.
13      Q.   From time to time, I'm obviously
14  going to be asking you, as you know from
15  yesterday, about past events.  Okay?  And I don't
16  want you to guess, but I do -- I am entitled to
17  your best recollection of events.  Okay?
18      A.   Yes.
19      Q.   Okay.  You intend to provide that
20  today?
21      A.   I do.
22      Q.   All right.  So one other thing
23  that's different today, we'll get into it in just
24  a moment, as opposed to yesterday, is that

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 today's deposition, you are providing testimony
2 on behalf of the company.
3         Do you understand that?
4     A.   I do.
5     Q.   Okay.  So when I ask you
6 questions -- I'm going to hand you a notice in a
7 minute and there's some topics.
8         When I ask you questions within
9 those topics, you're going to be providing
10 testimony on behalf of the company, not just you.
11        Do you understand that?
12    A.   I do.
13    Q.   All right.  Let's start by
14 handing you that document.  I'm sure that you saw
15 it in preparing for today's deposition.
16              - - -
17        (Deposition Exhibit No.
18    Hart-30(b)(6)-1, Second Notice of
19    Deposition Pursuant to Rule 30(B)(6) and
20    Document Request Pursuant to Rule
21    30(B)(2) and Rule 34 to Defendant Rite
22    Aid of Maryland, Inc., d/b/a Rite Aid and
23    Mid-Atlantic Customer Support Center,
24    Inc., was marked for identification.)

Page 15

1              - - -
2 BY MR. PIFKO:
3     Q.   I'm handing you what's marked as
4 Hart-30(b)(6) Exhibit 1, which is a copy of a
5 deposition notice.
6         Have you seen this before?  Take
7 a minute to look at it.
8         MS. McENROE:  Mark, if it would
9     help, I'm happy to stipulate to which
10    topics from the second notice --
11        MR. PIFKO:  Yeah, I'm going to
12    ask her.  I have got your letter in front
13    of me.
14        MS. McENROE:  Great.  Thank you.
15        THE WITNESS:  I'm fine.
16 BY MR. PIFKO:
17    Q.   All right.  Have you seen this
18 before?
19    A.   I have.
20    Q.   When was the last time you saw
21 this?
22    A.   Within the past few days.
23    Q.   Okay.  When was the first time
24 you recall seeing this?

Page 16

1     A.   Months ago.
2     Q.   Sometime in the third quarter of
3 last year?
4     A.   Seems familiar, yes.
5     Q.   So you see if you -- there's
6 numbered pages on the bottom.
7         If you turn to the page that's
8 numbered 6, it's got "Subject Matters for
9 Testimony," letters A through O.
10        Do you see that?
11        MS. McENROE:  I think you may be
12    looking at notice 1 and you may have
13    handed us notice 2.  That may be what's
14    going on.
15        The second notice is the one that
16    you handed us.
17        MR. PIFKO:  That's Will's fault.
18    We can hand her both of them.
19 I'll ask you some questions about that.
20    I'll hand you notice 1 in just a
21    minute.  Thanks for clarifying.
22 BY MR. PIFKO:
23    Q.   So with respect to notice 2, you
24 see that there's topics that start on -- well,

Page 17

1 they do the same thing.  They start on page 6
2 here.
3         Do you see that?
4     A.   I do.
5     Q.   Okay.  And they go through page
6 11.
7         Do you see that?
8     A.   I do.
9     Q.   So looking at this -- this is
10 called the second notice.
11        Do you understand yourself to be
12 designated for topics 6, 12, 17, 18, 20, 21 and
13 22?
14    A.   6, 12 -- what were the other
15 numbers?
16    Q.   17, 18, 20, 21 and 22.
17        MS. McENROE:  Just preserving for
18    the record that 20, 21 and 22 are as
19    modified by a ruling from Special Master
20    Cohen.
21        THE WITNESS:  I do.
22 BY MR. PIFKO:
23    Q.   Is there any reason why you can't
24 provide testimony on those topics today?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  A.  There is not.

2  Q.  Let's look at the first notice.

3  - - -

4  (Deposition Exhibit No.

5  Hart-30(b)(6)-2, First Notice of

6  Deposition Pursuant to Rule 30(B)(6) and

7  Document Request Pursuant to Rule

8  30(B)(2) and Rule 34 to Defendant Rite

9  Aid of Maryland, Inc., d/b/a Rite Aid and

10  Mid-Atlantic Customer Support Center,

11  Inc., was marked for identification.)

12  - - -

13 BY MR. PIFKO:

14  Q.  Which is marked as Exhibit 2.

15  Take a moment to review that and

16 let me know when you're done.

17  A.  (Reviewing document.)

18  Okay.  Have you seen Exhibit 2 before?

19  Q.  Have you seen Exhibit 2 before?

20  A.  I have.

21  Q.  When was the last time you saw

22 Exhibit 2?

23  A.  Within the past few days.

24  Q.  When was the first time you

Page 19

1 believe you saw Exhibit 2?

2  A.  I don't remember when I first saw

3 it.

4  Q.  Do you believe it would have been

5 on or around the same time you saw Exhibit 1?

6  A.  A little after.  Oh, this one

7 here is Exhibit 1 that we're talking about now?

8  Q.  I'm asking about Exhibit 2.

9  A.  Okay.  Exhibit 2 is the first

10 notice, though.  Right?

11  Q.  Right.

12  A.  So I would have saw the first

13 notice before the second notice.

14  Q.  Okay.  That's your recollection,

15 is that you saw the first one before you saw the

16 second one?

17  A.  I believe so.

18  Q.  Just so you know, they're dated

19 the same day.

20  Does that refresh your

21 recollection at all about when you saw them?

22  A.  It does not.

23  Q.  Okay.  All right.  Well, you see

24 on page 6 -- well, so you believe, though, it

Page 20

1 would have been around a few months ago, like the

2 other notice, roughly?

3  A.  Yes.

4  Q.  Okay.  If you turn to page 6 of

5 Exhibit 2, you see there's a bunch of letter

6 topics that goes from page 6 to page 7.

7  Are you there?

8  A.  I am.

9  Q.  Do you understand yourself to be

10 designated to speak on behalf of the company with

11 respect to topics A through N?

12  Take a minute to look at them.

13  A.  I do.

14  Q.  Is there any reason why you can't

15 provide testimony on behalf of the company with

16 respect to topics A through N in Exhibit 2?

17  A.  There is not.

18  Q.  Do you know what diversion is?

19  MS. McENROE:  Objection to form.

20  THE WITNESS:  I do.

21 BY MR. PIFKO:

22  Q.  What's your understanding of what

23 diversion is?

24  A.  Diversion is any time that a

Page 21

1 controlled substance gets out of the normal

2 channel of controlled substance delivery to a

3 patient, not to the patient based upon a valid

4 medical intent.

5  Q.  Do you understand that Rite Aid

6 has a duty to prevent diversion?

7  MS. McENROE:  Objection, calls

8  for a legal conclusion.

9  THE WITNESS:  I do.

10 BY MR. PIFKO:

11  Q.  Do you understand that during

12 certain relevant time periods to this case, Rite

13 Aid was a, what's called a distributor under the

14 Controlled Substances Act?

15  A.  I do.

16  Q.  What's your understanding of how

17 Rite Aid fit into a definition of a distributor

18 under the Controlled Substances Act?

19  MS. McENROE:  Objection to form.

20  THE WITNESS:  Rite Aid

21  distributed its Schedule III, IV and V

22  controlled substances to our various Rite

23  Aid locations.

24 BY MR. PIFKO:

Page 22

1    Q.    And Rite Aid purchased those
2  products directly from manufacturers?
3    A.    I believe so, yes.
4    Q.    And then warehoused them and
5  ultimately shipped them to its stores?
6    A.    That is correct.
7    Q.    And so you understand as a
8  distributor that Rite Aid had a duty to prevent
9  diversion.  Correct?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  I do.
12  BY MR. PIFKO:
13    Q.    And do you also have an
14  understanding that Rite Aid had a duty to
15  identify, report and halt the shipment of
16  suspicious orders?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I do.
19  BY MR. PIFKO:
20    Q.    Okay.  And do you know what a
21  suspicious order is?
22    A.    I do.
23    Q.    What is a suspicious order?
24    A.    A suspicious order is an unusual

Page 23

1  frequency, an unusual pattern, orders of that
2  nature.
3    Q.    Bear with me a second here.
4        Do you understand the purpose for
5  which Rite Aid, as a registrant under the
6  Controlled Substances Act, has a duty to prevent
7  diversion?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  I do.
10  BY MR. PIFKO:
11    Q.    What's your understanding of what
12  that purpose is?
13    A.    Our purpose is to make sure the
14  controlled substances are kept in the normal
15  channel of distribution and dispensing to the end
16  patient, make sure that it does not end in the
17  hands of any other one that's not in that
18  distribution channel.
19    Q.    Do you understand that one of the
20  purposes of preventing diversion is to protect
21  the public health?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I do.
24  BY MR. PIFKO:

Page 24

1    Q.    And is that consistent with Rite
2  Aid's understanding of why we want to prevent
3  diversion?
4    A.    It is.
5    Q.    I believe -- I was just looking
6  for it, but I couldn't find it, but I believe
7  that's in one of Rite Aid's policy documents.
8        Do you recall seeing that?
9    A.    I do.
10    Q.    So you agree that that's a stated
11  policy of Rite Aid, is that they want to prevent
12  diversion because they want to protect the public
13  health.  Correct?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  I'm not sure if
16    it's part of a policy or a statement or
17    whatever, but yes.
18  BY MR. PIFKO:
19    Q.    All right.  You understand that
20  Rite Aid has a duty to -- we talked earlier, to
21  identify, report and halt the shipment of any
22  suspicious orders that it may find in its system.
23  Correct?
24        MS. McENROE:  Objection to form.

Page 25

1        THE WITNESS:  I do.
2  BY MR. PIFKO:
3    Q.    And did you also understand that
4  Rite Aid has a duty to design a system to
5  identify suspicious orders.  Correct?
6        MS. McENROE:  Objection to form.
7    And Mark, this is pretty heavily on the
8    legal interpretation end, from which
9    Special Master Cohen specifically ruled
10    the topics do not cover, despite how
11    they're drafted.  So I just wanted to
12    make sure that we don't go too far down
13    that road.
14        THE WITNESS:  Could you repeat
15    the question?
16  BY MR. PIFKO:
17    Q.    Yeah.
18        I was just asking, you understand
19  that Rite Aid has a duty to design and maintain a
20  system to identify and report suspicious orders.
21  Correct?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I do.
24  BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.   Did Rite Aid have such a system?
2    A.   We did.
3    Q.   When did Rite Aid first design a
4  system to identify and report and halt the
5  shipment of suspicious orders?
6    A.   I came into the Rite Aid
7  corporate office in 1995. And at that point
8  there was a program to report suspicious orders.
9    Q.   How about a program to identify
10 suspicious orders?
11   A.   I think same time.
12   Q.   Do you know anything about who
13 designed the system that you're describing to
14 identify and report suspicious orders?
15   A.   I do not.
16   Q.   Okay. But it's your testimony
17 that that system was in place in 1995?
18   A.   Yes.
19   Q.   Were there any changes to that
20 system? You've been employed by, we discussed
21 yesterday, by Rite Aid since the '80s; is that
22 correct?
23      MS. McENROE: Objection to form.
24      THE WITNESS: Yes.

Page 27

1      MS. McENROE: It's okay. Give me
2   time to get my objections in.
3  BY MR. PIFKO:
4    Q.   So you're familiar with Rite
5  Aid's policies and procedures with respect to
6  suspicious orders and preventing diversion.
7  Correct?
8    A.   Yes.
9    Q.   And are you familiar with whether
10 there are any changes to Rite Aid's system to
11 identify and report suspicious orders from 1995
12 to present?
13   A.   I believe that the system itself
14 has been in place. There has been minor changes
15 or tweaks along the way, but the basics of the
16 system have remained the same.
17   Q.   To your knowledge, has Rite Aid
18 ever identified a suspicious order?
19   A.   We have not.
20   Q.   Do you believe that there's never
21 been a suspicious order that's occurred within
22 Rite Aid's distribution system?
23      MS. McENROE: Objection to form.
24      THE WITNESS: Could you repeat

Page 28

1   the question?
2  BY MR. PIFKO:
3    Q.   Yeah.
4      Do you believe that there's never
5  been a suspicious order that has occurred within
6  Rite Aid's distribution center -- system?
7      MS. McENROE: Objection to form.
8      THE WITNESS: I do.
9  BY MR. PIFKO:
10   Q.   So it's your testimony that
11 there's never been a suspicious order that's
12 occurred within Rite Aid's distribution of
13 Schedule III controlled substances?
14      MS. McENROE: Objection to form.
15      THE WITNESS: I do.
16 BY MR. PIFKO:
17   Q.   Are you familiar with the
18 scheduling of controlled substances?
19   A.   I am.
20   Q.   Are you aware of -- that there's
21 Schedule I through VI?
22   A.   Schedule I through V.
23   Q.   I'm sorry, I through V, yes.
24   A.   Yes.

Page 29

1    Q.   Okay. Keeping you on your toes.
2      Do you have an understanding
3  about what the differences are as you move along
4  the schedules?
5    A.   I do.
6      MS. McENROE: Objection to form.
7  BY MR. PIFKO:
8    Q.   From I to V?
9      MS. McENROE: Objection to form.
10      THE WITNESS: I do.
11 BY MR. PIFKO:
12   Q.   What is your understanding of the
13 difference between a Schedule I controlled
14 substance and a Schedule V controlled substance?
15      MS. McENROE: Just real quick, I
16 want to make sure I understand.
17      Which topic is this part of?
18      MR. PIFKO: I'm asking the
19 questions. I don't need to identify the
20 topics.
21      MS. McENROE: I understand. So
22 you're asking topics from a 30(b)(6)
23 witness designated for specific
24 testimony.

Page 30

1    MR. PIFKO: You can object to
2 scope, but I'm going to ask the
3 questions.
4    MS. McENROE: I can object to
5 scope. I'm just trying to understand
6 where you're going with this, so --
7    MR. PIFKO: I'm asking her
8 questions.
9    MS. McENROE: -- if you're just
10 laying the basis for something in scope,
11 then that's fine, Mark. But I just want
12 to make sure that we're not going to
13 spend all day, she's a talented
14 pharmacist with a lot of experience,
15 getting every dot of the Controlled
16 Substances Act, make sure that we're
17 staying within the nature of the topics.
18    So that all being said, I will
19 say objection to scope.
20 BY MR. PIFKO:
21    Q.   All right. So let's go back to
22 my question.
23    Do you understand the difference
24 between a Schedule I substance and a Schedule V

Page 31

1 substance?
2    MS. McENROE: Objection to form.
3    THE WITNESS: I do.
4 BY MR. PIFKO:
5    Q.   What is your understanding of the
6 difference between those substances, as you move
7 through the scale?
8    A.   Schedule I has an abusive -- has
9 the most abusive properties. They are typically
10 the illicit drugs. Schedule V is the least
11 addictive, and they are the products that may be
12 able to be sold over the counter.
13    Q.   And so as you moved down the
14 scale, there's -- all these substances have been
15 identified by the government as having a
16 potential for abuse. Correct?
17    MS. McENROE: Objection to form.
18    THE WITNESS: Abuse, addiction,
19 yes.
20 BY MR. PIFKO:
21    Q.   And as you move down the scale,
22 there's a lower potential for abuse and
23 addiction; is that correct?
24    A.   As you go to Schedule V, there is

Page 32

1 less potential for that, yes.
2    Q.   And Rite Aid was a distributor of
3 Schedule III controlled substances. Correct?
4    MS. McENROE: Objection to form.
5    THE WITNESS: We were.
6 BY MR. PIFKO:
7    Q.   But you also sold Schedule II
8 controlled substances. Correct?
9    MS. McENROE: Objection to form.
10    I just want to make sure we are
11 clear in which "you" we are using here.
12 So she is here testifying as a 30(b)(6)
13 witness for Rite Aid Maryland, Inc.,
14 doing business as Mid-Atlantic Customer
15 Support Center, which is the Perryman
16 Distribution Center. So I just want to
17 make sure the witness is not going to be
18 getting confused or misled that it's her
19 personally or the Rite Aid family of
20 companies.
21 BY MR. PIFKO:
22    Q.   You understand that Rite Aid
23 Corporation operates pharmacies, correct, through
24 its various subsidiaries?

Page 33

1    A.   I do.
2    Q.   And those pharmacies sell
3 Schedule II substances. Correct?
4    A.   Those pharmacies dispense
5 Schedule II controlled substances.
6    Q.   And they also sell Schedule III
7 substances. Correct?
8    A.   Yes.
9    Q.   So we talked about the system for
10 identifying, reporting and halting the shipments
11 of suspicious orders.
12    You said that there was a system
13 in place in 1995. Correct?
14    A.   Yes.
15    Q.   And then I asked you if there
16 were changes over the years. And you said there
17 might have been some little changes, but the
18 basic functions of the system have been the same;
19 is that correct?
20    A.   That is correct.
21    Q.   All right. So can you tell me
22 what are the basic functions or features of the
23 Rite Aid system to identify, report and halt the
24 shipment of suspicious orders?

Page 34

1    MS. McENROE: Objection to form.
2    THE WITNESS: I can.
3  BY MR. PIFKO:
4    Q.   All right. Let's start with the
5  first element of Rite Aid's system.
6        And let's talk about what was in
7  place in 1995, and then we'll move through and
8  talk about any potential changes. Okay?
9        MS. McENROE: Objection in terms
10   of scope of the time period. Discovery
11   starts in this case in 2006 for the
12   relevant purposes. So I know the witness
13   said that she started in this role in
14   1995, but I just want to make sure we
15   don't end up spending all day on portions
16   of discovery that are not even within
17   scope.
18  BY MR. PIFKO:
19   Q.   Do you recall my question?
20   A.   Please repeat it.
21   Q.   All right.
22       MR. PIFKO: Do you recall Special
23  Master Cohen ordered objections to stay
24  under 10 seconds, so let's try to

Page 35

1  remember that rule.
2        MS. McENROE: I talk real fast.
3  I think it was under 10 seconds.
4        MR. PIFKO: All right.
5  BY MR. PIFKO:
6    Q.   What I asked you was to identify
7  the features of Rite Aid's system to identify,
8  report and halt the shipment of suspicious
9  orders. Okay?
10   A.   Okay.
11   Q.   And what we talked about is you
12  said you're familiar with the system that was in
13  place from 1995 until present. Correct?
14   A.   Correct.
15   Q.   Okay. And so what I want you to
16  do is start with the features of the system that
17  you're familiar with from the earliest time frame
18  from which you're familiar, which you said was
19  1995. Correct?
20   A.   Correct.
21   Q.   And then we'll go through various
22  changes that may have occurred over the years.
23       So let's start in 1995, what's
24  the first step in Rite Aid's system to identify,

Page 36

1  report and halt the shipment of suspicious
2  orders?
3        MS. McENROE: Objection to form.
4        Yeah. We're here giving 30(b)(6)
5  testimony on behalf of the distribution
6  center that I mentioned earlier. You
7  know, in terms of -- that distribution
8  center wasn't even in existence in 1997,
9  Mark. So I'm worried that we're really
10   going far afield here on a number of
11   different avenues.
12  BY MR. PIFKO:
13   Q.   Can you answer the question?
14       MS. McENROE: Objection on
15   multiple grounds.
16       THE WITNESS: I can.
17  BY MR. PIFKO:
18   Q.   Okay. So let's start.
19       What was the first feature of the
20  system?
21   A.   The Rite Aid suspicious order
22  monitoring program had various features to it.
23  One of the features was a threshold quantity of
24  5,000 dosage units for any single NDC, National

Page 37

1  Drug Code, product per order.
2    Q.   Do you know how that threshold
3  was calculated?
4    A.   As far as how was it established?
5    Q.   Right.
6    A.   I do not know.
7    Q.   Do you know why 5,000 was picked?
8    A.   I do not know.
9    Q.   Throughout the entirety of your
10  knowledge, that threshold was the same. Correct?
11   A.   That threshold remained the same
12  until we stopped distributing controlled
13  substances in 2014.
14   Q.   So from 1995 to 2014, the
15  threshold was always 5,000 dosage units per NDC?
16       MS. McENROE: Objection to form.
17  BY MR. PIFKO:
18   Q.   Per week? Per order? Sorry.
19   A.   That is correct.
20   Q.   And what was the same threshold
21  at all stores, with a handful of exceptions.
22  Correct?
23       MS. McENROE: Objection to form.
24       THE WITNESS: That is correct.

Page 38

BY MR. PIFKO:

Q. Do you know approximately how many stores had exceptions to that threshold?

A. My guess would be less than a dozen.

Q. Can you name them?

A. I can name a few. Rite Aid 777. I believe Rite Aid number 408. Those are the two that I remember.

Q. Do you know where those are located? How about 777, where is that located?

A. It was located in New Jersey.

Q. How about 408?

A. I don't know where that one is located.

Q. You can't recall any others?

A. There were others with exceptions. I believe yesterday we discussed 3151.

Q. Do you know where that store is located?

A. Ohio.

Q. Do you know where in Ohio?

A. I believe Akron.

Page 39

Q. Any others?

A. Those are the ones that I remember.

Q. So that's a feature of Rite Aid's suspicious order monitoring system. And that feature has been the same over the entirety of your knowledge up to and including 2014, when you stopped distributing Schedule III controlled substances. Correct?

MS. McENROE: Objection to the form.

THE WITNESS: To the best of my knowledge, yes.

BY MR. PIFKO:

Q. Were there ever any discussions about changing that number?

MS. McENROE: Objection to form.

THE WITNESS: I don't recall any discussions. There may have been discussions within the logistics team to change the number.

BY MR. PIFKO:

Q. Were you part of any of those discussions?

Page 40

A. I don't recall being a part of those discussions.

Q. Do you know what the nature of those discussions were with the logistics team to change those numbers?

MS. McENROE: Objection to form.

THE WITNESS: I do not.

BY MR. PIFKO:

Q. Do you know why they were having such discussions?

MS. McENROE: Objection to form.

THE WITNESS: I think part of it always to look at the program and determine if it's adequate or not.

BY MR. PIFKO:

Q. And was at some point someone was concerned that it wasn't adequate?

MS. McENROE: Objection to form.

THE WITNESS: No. I did not say that. I said they were looking at it to continue to make sure that it was adequate.

- - -

(Deposition Exhibit No.

Page 41

Hart-30(b)(6)-3, Email chain, top one dated 2010-11-24, Bates stamped Rite_Aid_OMDL_0046695, was marked for identification.)

- - -

BY MR. PIFKO:

Q. I'm handing you what's marked as Exhibit 3.

For the record, Exhibit 3 is a single page document Bates labeled Rite_Aid_OMDL_0046695.

Let me know -- take a minute to review that and let me know when you're done.

A. (Reviewing document.)

Q. Are you ready?

A. I'm ready.

Q. Have you seen this before?

A. I have.

Q. When was the last time you saw this?

A. Within the past few days.

Q. Is this something you reviewed in preparing for your 30(b)(6) deposition?

A. Yes.

Page 42

1    Q.   In preparing for the 30(b)(6)
2 deposition, did you discuss this document with
3 anyone from the company?
4    A.   From Rite Aid?
5    Q.   Yes.
6    A.   I did not.
7    Q.   Who is Owen McMahon?
8    A.   Owen, at this time, was our
9 senior director of generic purchasing and
10 specialty programs.
11    Q.   Is he still with the company?
12    A.   He is.
13    Q.   What's his current role?
14    A.   Vice president of pharmacy
15 purchasing in some capacity.
16    Q.   So he writes you on November 24,
17 2010 and says, "It is my understanding that due
18 to DEA regulation we are looking at limiting
19 stores purchases from our DCs on controls."
20       Do you see that?
21    A.   I do.
22    Q.   Other than this email, did you
23 have a discussion with him about thresholds or
24 limiting stores' purchases of controls?

Page 43

1    A.   I did not, to the best of my
2 knowledge, no.
3    Q.   Okay.  You write back to him and
4 you say, "At present we are not looking at any
5 additional controls or thresholds on shipments
6 from the distribution centers."
7       Do you see that?
8    A.   I do.
9    Q.   Did I read that correctly?
10    A.   You did.
11    Q.   You say, "Our current thresholds
12 are in place.  They have been for the past 10
13 years."
14       Do you see that?
15    A.   I do.
16    Q.   You say, "We are looking to
17 provide the distribution center a better
18 understanding of our replenishment parameters so
19 they can utilize that as part of their response
20 to the DEA should there be an inspection and
21 questions about suspicious orders."
22       Do you see that?
23    A.   I do.
24    Q.   What did you mean by that?

Page 44

1       MS. McENROE:  Objection to form.
2       THE WITNESS:  I meant at that
3 particular time back in 2010, we at the
4 Rite Aid office were looking to put
5 together a document to provide to our
6 distribution centers on our suspicious
7 order monitoring program, so that they
8 would have a united one document to hand
9 to a DEA inspector should they come into
10 the pharmacy.
11       I was looking to determine what
12 the algorithm was and what the parameters
13 were to be able to put into that
14 document.
15 BY MR. PIFKO:
16    Q.   At that time, did you not know
17 what the algorithm was?
18       MS. McENROE:  Objection to form.
19       THE WITNESS:  I did know what the
20 algorithm was, but I wanted a more
21 IT-techie type of an algorithm document
22 than I myself could put together.
23 BY MR. PIFKO:
24    Q.   And then you said that you wanted

Page 45

1 to understand what the parameters were so you
2 could put that in a document; is that correct?
3       MS. McENROE:  Objection to form.
4       THE WITNESS:  Yes.
5 BY MR. PIFKO:
6    Q.   Did you have an understanding at
7 that time of what the parameters were?
8    A.   I had an idea of the parameters,
9 yes.  I wasn't sure if my understanding was
10 complete or not, so I wanted to make sure
11 everything was complete when we sent the document
12 to the distribution centers.
13    Q.   Is there any reason why you were
14 having this discussion at this particular time?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  I believe, based on
17 documents that I have looked at, that
18 there were some meetings to put together
19 around this time concerning suspicious
20 order monitoring.
21 BY MR. PIFKO:
22    Q.   Why were there such meetings?
23    A.   At that particular time, some
24 individuals from our company had attended a

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  conference, and there was discussion about
2  suspicious orders at the conference. And we were
3  trying to have a discussion with all the
4  different segments of the company that were
5  involved.
6      Q.    Was that one of the Buzzeo
7  conferences?
8      A.    Yes.
9      Q.    Who specifically attended that
10 conference that led to that discussion, do you
11 recall?
12     A.    This one I believe was Kevin
13 Mitchell, our logistics person. I think at this
14 time it was Kevin Mitchell.
15     Q.    We looked at an email yesterday,
16 I believe, where Kevin Mitchell comes back from
17 one of those conferences and says he had some
18 concerns about the company's suspicious order
19 monitoring.
20         Do you recall that?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  I do.
23 BY MR. PIFKO:
24     Q.    Is that the discussion that

Page 47

1  initiated this discussion?
2      A.    It very well could be, yes.
3      Q.    Do you recall Mr. Mitchell
4  providing any specific explanation about what his
5  concerns were after attending that conference?
6         MS. McENROE:  Objection to form.
7         THE WITNESS:  I believe his
8      concerns were that our suspicious order
9      monitoring program was not robust.
10 BY MR. PIFKO:
11     Q.    Did he articulate why he felt
12 your suspicious order monitoring program was not
13 robust?
14     A.    I don't remember why he -- what
15 he said, no.
16     Q.    Was anyone else part of that
17 discussion?
18     A.    We had a meeting on it with
19 myself, Kevin Mitchell, Maggie Perritt and Andy
20 Palmer.
21     Q.    What did you discuss at that
22 meeting?
23     A.    Our suspicious order monitoring
24 program.

Page 48

1      Q.    Do you recall any specifics
2  beyond that you discussed the suspicious order
3  monitoring program?
4      A.    I do.
5      Q.    Okay. What do you recall
6  specifically?
7      A.    The individual people that were
8  invited to that meeting each had an area of
9  specialties to bring to the suspicious order
10 monitoring program. They were from logistics,
11 obviously, that were the owner. There was Maggie
12 Perritt, who was from operations -- pharmacy
13 operations. And there was Andy Palmer, who was
14 from asset protection.
15     Q.    Who was there from logistics?
16     A.    I believe it was Kevin Mitchell.
17     Q.    Did you call that meeting
18 together?
19     A.    I don't know -- I don't remember
20 if I did or if Kevin did. Kevin may have called
21 the meeting and I may have invited the other
22 individuals.
23     Q.    So that's where I was going to go
24 with my question was, what was the reason for

Page 49

1  inviting Andy Palmer?
2      A.    Andy Palmer at that time was in
3  asset protection. And they had a piece of the
4  suspicious order monitoring program. They had
5  KPIs and a tool that they used to monitor for
6  diversion, used to monitor for cycle counts up,
7  cycle counts down. He was the asset protection
8  portion of the suspicious order monitoring
9  program.
10     Q.    I believe you testified yesterday
11 that the asset protection portion of the program
12 did not have any connection to identifying or
13 reporting suspicious orders; is that correct?
14         MS. McENROE:  Objection to form.
15         THE WITNESS:  That asset
16     protection did not identify a suspicious
17     order prior to it being shipped. Asset
18     protection did, from a diversion
19     standpoint, from an opening
20     investigations, have some impact on the
21     diversion of controlled substances.
22 BY MR. PIFKO:
23     Q.    How did it have an impact on
24 diversion of controlled substances?

Page 50

1    A.   They would look at historical
2 data based on certain key performance indicators
3 that would identify that a store had ordered,
4 let's say, above what their traditional order
5 was. And if there was some deviation, then they
6 would begin an investigation into that particular
7 store.
8    Q.   Did the investigations ever --
9 when -- scratch that.
10    When they conducted an
11 investigation, did they document that anywhere?
12    A.   They did.
13    Q.   Is there a specific format or
14 name for the document they would create?
15    A.   At that particular time, it would
16 have been NaviCase or NaviScript.
17    Q.   But NaviScript was never used to
18 report a suspicious order. Correct?
19    MS. McENROE: Objection to form.
20    THE WITNESS: It was not.
21 BY MR. PIFKO:
22    Q.   To your knowledge, were any
23 orders identified as suspicious as a result of
24 that type of investigation?

Page 51

1    A.   They were not.
2    Q.   So every time that Andy
3 Palmer's -- he was the head of that team?
4    MS. McENROE: Objection to form.
5    THE WITNESS: Yes.
6 BY MR. PIFKO:
7    Q.   Every time that his team
8 conducted an investigation, they never found any
9 suspicious activity to have occurred?
10    MS. McENROE: Objection to form.
11    THE WITNESS: Suspicious activity
12    is different from a suspicious order. I
13    am sure that their investigations led to
14    drug losses that were reported to the
15    Drug Enforcement Administration from
16    individual stores.
17    Did they report a suspicious
18    order versus a suspicious -- what -- the
19    terminology that you used, they were
20    reported to the DEA on a Form 106. They
21    were not reported as a suspicious order,
22    per se.
23 BY MR. PIFKO:
24    Q.   If an order is placed in order to

Page 52

1 fill quantities of prescriptions that have been
2 stolen, do you believe that order could be
3 suspicious?
4    MS. McENROE: Objection to form.
5    THE WITNESS: Can you repeat the
6    question?
7 BY MR. PIFKO:
8    Q.   Yeah.
9    If a store has a certain amount
10 of inventory of controlled substances, and for
11 purposes of this discussion let's keep it
12 Schedule III controlled substances. Okay?
13    So if a store has a material
14 volume of Schedule III controlled substances
15 stolen and it needs to place an order to
16 replenish that inventory as a result of the
17 theft, do you believe that that could be a
18 suspicious order?
19    MS. McENROE: Objection to form.
20    THE WITNESS: I do not believe
21    it's a suspicious order. If you are --
22    theft and diversion in a store does not
23    impact a suspicious order, per se.
24 BY MR. PIFKO:

Page 53

1    Q.   Do you believe that if the
2 quantities of Schedule III controlled substances
3 that are ordered are increased because theft is
4 occurring at the store, that that could be a
5 suspicious order?
6    MS. McENROE: Objection, form.
7    THE WITNESS: It could not be --
8    excuse me -- a suspicious order to the
9    distribution center in simply ordering
10    the product. The distribution center
11    does not know the nature of what is going
12    to happen to those drugs.
13 BY MR. PIFKO:
14    Q.   Do you believe that the
15 distribution center and the company has a duty to
16 know that the theft is occurring and factor that
17 into their shipping of orders?
18    MS. McENROE: Objection to form.
19    THE WITNESS: Can you repeat the
20    question? I'm sorry.
21 BY MR. PIFKO:
22    Q.   Yeah.
23    Do you believe that the
24 distribution center and Rite Aid in general have

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  a duty to know that the theft is occurring and
2  factor that into their evaluation of whether
3  they're shipping orders to a specific store?
4         MS. McENROE: Objection to form.
5         THE WITNESS: I believe Rite Aid
6     has a duty, from a pharmacy registrant
7     perspective, to identify theft and
8     diversion and to follow DEA protocol and
9     report it.
10        From the distribution side,
11    there -- just because simply a store has
12    diversion of an associate does not mean
13    that an order would be suspicious.
14 BY MR. PIFKO:
15    Q.   Have you heard the term "know
16 your customer"?
17    A.   I have.
18    Q.   What's your understanding of what
19 that teams?
20        MS. McENROE: Objection, form.
21        THE WITNESS: Know your customer
22    is that you identify everyone that you
23    ship to. In the course of Rite Aid, our
24    customers are ourselves. To know your

Page 55

1     customer, you should make sure that their
2     licenses are correct. You should make
3     sure that they have a physical building
4     that is licensed by the Board of
5     Pharmacy. You should make sure that they
6     have a DEA registration. Knowing your
7     customer is making sure that they are
8     registered, that they are a pharmacy, and
9     they are entitled to be able to receive
10    and dispense controlled substances.
11        In Rite Aid's case, our customer
12    is ourselves. So from a licensing
13    perspective, the licensing coordinator is
14    in our corporate office. And so we know
15    the stores are licensed. We know the
16    whole process.
17 BY MR. PIFKO:
18    Q.   This question came up yesterday,
19 so I know you know the answer, but I'll ask you
20 for purposes of the 30(b)(6).
21        Do you know what red flags of
22 diversion are?
23        MS. McENROE: Objection to form.
24        THE WITNESS: I know what red

Page 56

1  flags are, yes.
2  BY MR. PIFKO:
3     Q.   What's your understanding of what
4  red flags of diversion are?
5         MS. McENROE: Objection to form.
6         THE WITNESS: Red flags are
7     identified by the Drug Enforcement
8     Administration for a pharmacist when
9     dispensing a controlled substance
10    prescription. There are numerous red
11    flags. They include, does the pharmacist
12    know the patient, is it a known patient.
13    They include, does the pharmacist know
14    the prescriber, is it a known prescriber.
15    They include a valid patient relationship
16    between the prescriber and the patient.
17    It also requires you to check to
18    determine, from a red flag standpoint, is
19    it in the geographic area. They
20    require -- a red flag can be to look at a
21    prescription to determine if it was a
22    forged prescription or not, to determine
23    if perhaps another pharmacy had declined
24    to fill and had noted on the

Page 57

1     prescription. Red flag would be to make
2     sure that the prescription was issued for
3     a valid medical reason by a prescriber in
4     the course of their due diligence and
5     their specialty.
6  BY MR. PIFKO:
7     Q.   Did Rite Aid ever consider any
8  red flags of diversion with respect to whether it
9  was going to fill an order placed by any of its
10 pharmacies for a Schedule III controlled
11 substance?
12        MS. McENROE: Objection to form.
13        THE WITNESS: Rite Aid and all of
14    our pharmacies identify red flags. If a
15    red flag is identified, the prescription
16    is not filled at that particular time and
17    declined and provided back to the
18    patient. Should that be -- should there
19    be a red flag that meets our criteria, it
20    would not be dispensed.
21 BY MR. PIFKO:
22    Q.   Do you believe that theft is one
23 of the red flags of diversion?
24        MS. McENROE: Objection to form.

Page 58

1    THE WITNESS: Theft is not a red
2  flag of the prescription processing.
3  Part of theft is diversion, yes, but
4  involved in the red flag process, it's
5  not diversion as such in a red flag
6  process.
7  BY MR. PIFKO:
8    Q.   When I asked you about "know your
9  customer," do you believe that the
10  know-your-customer requirement includes a
11  requirement to know about whether the red flags
12  of diversion are occurring at your customer's
13  location?
14    MS. McENROE: Objection to form.
15    THE WITNESS: I believe know your
16  customer, yes, would include if the
17  pharmacies are following the red flags
18  process.
19  BY MR. PIFKO:
20    Q.   Okay.  And so with respect to
21  Rite Aid's duty to prevent diversion and to
22  identify suspicious orders, did Rite Aid have any
23  system in place to consider red flags of
24  diversion when an order was placed at any of its

Page 59

1  pharmacies?
2    MS. McENROE: Objection to form.
3    THE WITNESS: If red flags were
4  identified when a prescription was being
5  dispensed, the prescription would not be
6  dispensed.  So that would not result in
7  an order to the distribution center.
8  BY MR. PIFKO:
9    Q.   So it's your testimony that in
10  every instance throughout the relevant time
11  period, if a red flag occurred, it was always
12  caught and observed at the pharmacy and never
13  resulted in a prescription being dispensed?
14    MS. McENROE: Objection to form.
15    THE WITNESS: Can you repeat
16  that, please?
17  BY MR. PIFKO:
18    Q.   Yes.
19    So my question is, it's your
20  testimony that is it -- are you saying that in
21  every instance throughout the relevant time
22  period, if a red flag occurred, it was always
23  caught and observed at the pharmacy, and that
24  prescription was never dispensed?

Page 60

1    MS. McENROE: Objection to form.
2    THE WITNESS: I would never say
3  in every instance.
4  BY MR. PIFKO:
5    Q.   Okay.  In most instances?
6    A.   In the majority, yes.
7    MS. McENROE: Objection to form.
8  Mark, we've been going about an
9  hour.
10    Are you looking for a break, too?
11    THE WITNESS: (Witness nods
12  head.)
13    MS. McENROE: Okay.  The witness
14  is asking for a break, too.
15    MR. PIFKO: Okay.
16    THE VIDEOGRAPHER: Going off the
17  record at 10:27 a.m.
18    -  -  -
19    (A recess was taken from
20  10:27 a.m. to 10:41 a.m.)
21    -  -  -
22    THE VIDEOGRAPHER: We're back on
23  the record at 10:41 a.m.
24  BY MR. PIFKO:

Page 61

1    Q.   Welcome back.
2    Okay.  Before we took a break, we
3  were talking about red flags of diversion and
4  knowing your customer.  Okay?
5    A.   Yes.
6    Q.   Do you remember that?
7    So I was asking you if there was
8  a way that Rite Aid factors in the red flags of
9  diversion into a suspicious order that could be
10  placed -- or, sorry, an order that could be
11  placed.
12    MS. McENROE: Objection to form.
13  BY MR. PIFKO:
14    Q.   Do you recall that discussion?
15    A.   Yes.
16    Q.   Okay.  And am I correct that your
17  testimony was that Rite Aid factors in red flags
18  of diversion into its order system because the
19  pharmacist would identify that and that
20  prescription would never be filled; is that
21  correct?
22    MS. McENROE: Objection to form.
23    THE WITNESS: Could you do that
24  again, please?

Page 62

BY MR. PIFKO:

Q. Yep.

My question is -- well, why don't you just tell me. How does Rite Aid factor red flags of diversion into an order for a Schedule III controlled substance?

MS. McENROE: Objection to form.

THE WITNESS: If there was a red flag that was identified for a prescription in a pharmacy, the pharmacist has the ability to assess that prescription and determine if their prescription should be filled or not. Simply because there's one red flag doesn't mean that the prescription should not be filled.

That being said, if there's a red flag and the prescription is not filled, and the pharmacist refuses to fill it, there's no way that that's ever going to get to be an order to go to the distribution center, because at that point, there's no dispensing of the drug. There's no need for replenishment from

Page 63

the distribution center.

BY MR. PIFKO:

Q. Is it your testimony that red flags of diversion are always caught and stopped by pharmacists before a prescription is filled?

MS. McENROE: Objection to form.

THE WITNESS: Not all red flags are caught before diversion occurs or before they're filled.

BY MR. PIFKO:

Q. So there are occasions when an order is placed from a pharmacy where a prescription has been filled even though there were red flags; is that correct?

MS. McENROE: Objection to form.

THE WITNESS: Can you repeat, please?

BY MR. PIFKO:

Q. You agree that there are instances where a prescription is placed to be filled at a Rite Aid pharmacy that may have indicia of red flags. Correct?

MS. McENROE: Objection to form.

THE WITNESS: There could be a

Page 64

prescription presented with red flags, yes.

BY MR. PIFKO:

Q. And you agree that that's not always caught by a pharmacist. Correct?

MS. McENROE: Objection to form.

THE WITNESS: The majority of the time it would be caught. But, yes, there are instances where a red flag is not caught or red flags are not caught.

BY MR. PIFKO:

Q. So my question is, in these instances where red flags are not caught, is there any system in place where Rite Aid takes those red flags into account when considering whether to ship an order to one of its pharmacies?

MS. McENROE: Objection to form.

THE WITNESS: There is not.

BY MR. PIFKO:

Q. Does Rite Aid have any system in place to evaluate whether prescriptions are being placed without legitimate medical need at its pharmacies when it's filling an order of Schedule

Page 65

III controlled substances for that pharmacy?

MS. McENROE: Objection to form.

THE WITNESS: The red flags process is in place in Rite Aid pharmacies to identify fraudulent activity or activity related to a prescription to identify the red flags on a prescription for controlled substances.

BY MR. PIFKO:

Q. The only process in place is at the pharmacy through the pharmacist; is that correct?

MS. McENROE: Objection to form.

THE WITNESS: When dispensing a prescription, the pharmacist is the front line. And yes, they're a licensed individual that's trained and schooled to be able to identify red flags. So yes, the red flags and the prescription is identified by the pharmacist. It has nothing to do with the distribution center.

BY MR. PIFKO:

Q. All I'm trying to understand, is

Page 66

1 there any way that that kind of information is
2 passed on to the distribution center.
3          So is your testimony that
4 potential red flag activity at a store location
5 is never passed on to the distribution center?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  To the best of my
8      knowledge, the red flag activity is not
9      passed on to the distribution center back
10      when we distributed controlled substances
11      up till 2014.
12 BY MR. PIFKO:
13      Q.   And there's no -- that means that
14 there was no system in place to consider red
15 flags of diversion at the distribution center
16 when an order was being shipped.  Correct?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  That is correct.
19      The red flags are determined by the
20      pharmacist that is in the pharmacy in
21      whether or not to dispense the
22      prescription.
23 BY MR. PIFKO:
24      Q.   Let's go back to the thresholds.

Page 67

1          Remember we were talking about
2 attributes of Rite Aid's system to identify,
3 report and halt suspicious orders.
4          MS. McENROE:  Objection to form.
5 BY MR. PIFKO:
6      Q.   You recall us discussing that?
7      A.   I do.
8      Q.   Okay.  So it was your testimony
9 that thresholds are one attribute of the system.
10 Correct?
11      A.   That is correct.
12      Q.   And other than a -- less than a
13 dozen, all store locations had a threshold of
14 5,000 dosage units per NDC per order.  Correct?
15          MS. McENROE:  Objection.
16          THE WITNESS:  Correct.
17 BY MR. PIFKO:
18      Q.   And that was a threshold that was
19 in place for multiple decades.  Correct?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  Yes.  Keep in mind
22      for this, the Perryman Distribution
23      Center did not open until I believe 1998
24      or somewhere in that time frame.

Page 68

1 BY MR. PIFKO:
2      Q.   So from the entirety of its
3 operation, that was the threshold when Rite Aid
4 was shipping Schedule III controlled substances
5 as a distributor.  Correct?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  Correct.
8 BY MR. PIFKO:
9      Q.   And we talked about a meeting,
10 when I showed you Exhibit 3, discussing the
11 thresholds.  Correct?
12      A.   We discussed a meeting.
13      Q.   So you -- we talked about the
14 people who are present at the meeting, and you
15 said that Andy Palmer was there because he had
16 the asset protection program.  Correct?
17      A.   That is correct.
18      Q.   And you clarified that NaviScript
19 is never used to identify or report a suspicious
20 order.  Correct?
21          MS. McENROE:  Objection to form.
22          THE WITNESS:  That is correct.
23 BY MR. PIFKO:
24      Q.   All right.  And so Maggie Perritt

Page 69

1 was another person who was there from operations.
2 Correct?
3      A.   Yes.
4      Q.   And you invited her to that
5 meeting?
6      A.   I don't remember who invited
7 whom, but yes, she was at the meeting.
8      Q.   Why was she invited to the
9 meeting?
10      A.   Maggie was the pharmacy
11 operations person at the meeting that knew
12 algorithms, and also was the operator there that
13 would be impacted by thresholds.
14      Q.   When you say she would be
15 impacted by thresholds, what do you mean?
16      A.   The service to the stores and the
17 pharmacies obtaining their drugs.  Pharmacy
18 operations obviously is in charge of who -- the
19 pharmacists that are dispensing the drugs and the
20 operating of the pharmacies.
21      Q.   So if there was a change in the
22 threshold, it would impact the pharmacy
23 operations?
24          MS. McENROE:  Objection to form.

Page 70

1      THE WITNESS:  It could.  It
2   could.
3  BY MR. PIFKO:
4      Q.   How would it impact the pharmacy
5  operations?
6      A.   It may impact their ordering.  It
7  may impact the amount of product that they would
8  have on their shelves.  There could be any number
9  of ways that it could be impacted.
10     Q.   Was that part of the discussion
11  at this meeting?
12     A.   At this meeting -- I don't
13  recall.
14     Q.   Do you recall discussing -- you
15  said Maggie had some knowledge about algorithms;
16  is that correct?
17     A.   That is correct.
18     Q.   Do you recall a specific
19  discussion with Maggie about algorithms and
20  suspicious order monitoring at this meeting?
21     A.   I recall what occurred at the
22  meeting was that we were trying to put down in
23  detail the algorithms that were used in our
24  suspicious order monitoring program so that we

Page 71

1  could communicate it effectively to our
2  distribution centers on a one-page document so
3  that the DC would have something to present to
4  government agency, the Drug Enforcement
5  Administration, that would visit and do an
6  inspection.
7      Q.   So prior -- and this meeting
8  occurred, if we look back at Exhibit 3, the email
9  is at the end of 2010.  Agree?
10     A.   Yes.
11     Q.   Do you have a recollection about
12  when this meeting occurred after that email?
13     A.   Maybe early 2011.  I don't
14  recall.
15     Q.   That's your best estimate, is
16  early 2011 when this meeting occurred?
17     A.   Best estimate, yes.  I don't -- I
18  don't recall truly.
19     Q.   You said that you wanted to put
20  detail down concerning the algorithms so that you
21  could communicate them to the distribution
22  centers.
23          Prior to this discussion, did the
24  distribution centers have any document to present

Page 72

1  to a government agency, such as the DEA,
2  concerning the algorithms that may have been
3  used?
4      MS. McENROE:  Objection to form.
5      THE WITNESS:  I believe the
6   distribution centers had information as
7   far as obtaining the orders and the
8   thresholds and part of their suspicious
9   order program, but they did not know the
10  detail of the algorithms to the effect of
11  what was included and how the algorithms
12  work.  There's numerous algorithms that
13  come together.  And they did not have all
14  of that, no.
15          They had a document to provide to
16  the DEA.  They really did provide -- that
17  was sufficient for DEA inspections 2005,
18  2009, prior to this meeting.  So the
19  documentation on suspicious order
20  monitoring was at the distribution center
21  and adequate for the DEA.
22  BY MR. PIFKO:
23     Q.   There's a document that was
24  created in 2005?

Page 73

1      A.   There was a DEA inspection in
2  2005 at the distribution center.  And as part of
3  their standard operating procedures in suspicious
4  order monitoring program, the distribution center
5  at that time had passed inspection.
6      Q.   There was another inspection in
7  2009?
8      A.   There was another inspection in
9  2009.
10     Q.   Which specific facility are we
11  talking about with respect to the 2005 and 2009
12  inspections?
13     A.   We are speaking of the Perryman
14  Distribution Center.
15     Q.   You're opening a binder.
16          Can you tell me what that is?
17     A.   Sure.  It's a binder of documents
18  that I asked counsel to prepare for me to review
19  for the deposition.
20     Q.   And you're looking for something
21  specific in there right now?
22     A.   I was looking for a memo on the
23  DEA audit summary for 2005 and 2009.
24     Q.   It's your understanding that

Page 74

1 there was some documentation concerning
2 algorithms that may have been provided during
3 those inspections?
4     MS. McENROE:  Objection to form.
5     THE WITNESS:  I was not at the
6     inspections.  I do not know.  I know that
7     there was an inspection and what was
8     provided to the DEA through their normal
9     routine audit, which is looking for
10    suspicious order monitoring.  The
11    distribution centers had no violations at
12    those times.
13 BY MR. PIFKO:
14    Q.    You don't know what was provided
15 to the DEA in connection with those inspections,
16 though?
17    MS. McENROE:  Objection to form.
18    THE WITNESS:  I do not.
19 BY MR. PIFKO:
20    Q.    Did the DEA provide any written
21 documentation after those inspections?
22    A.    I will check.
23    Q.    If you can narrate for me what
24 you're checking, I would appreciate it.

Page 75

1     A.    Sure.
2         I am narrating a communication
3 from Kevin Mitchell, who was our senior manager
4 of regulatory compliance, for the distribution
5 centers as an update of the inspection.
6         Typically when you have a DEA
7 inspection, they will leave you -- if there are
8 deficiencies, they typically do not leave you any
9 documentation.  If you have passed a DEA
10 inspection, you can receive a letter of
11 admonition.
12         And in this particular
13 correspondence, the words were -- the closing
14 comments specifically mentioned that they have no
15 words of advice for the staff for improvement.
16 It was a flawless audit.
17    Q.    Can you read the -- you are
18 looking at a document that was produced in the
19 case.  Correct?
20    A.    Yes.
21    Q.    What's the Bates number for that
22 document?  Do you know what that -- on the bottom
23 right-hand corner, there's a number.
24    A.    0047171.

Page 76

1     MS. McENROE:  And that was a Rite
2     Aid produced document.
3 BY MR. PIFKO:
4     Q.    There's some words before the
5 number.
6         Can you read those words, too?
7     A.    Yes.  Rite_Aid_OMDL_.
8     Q.    Thanks.
9         So there was no DEA documentation
10 provided after that audit.  Correct?
11    MS. McENROE:  Objection to form.
12    THE WITNESS:  Correct.
13 BY MR. PIFKO:
14    Q.    The only documentation that you
15 have is a summary written by Kevin Mitchell?
16    MS. McENROE:  Objection to form.
17    THE WITNESS:  Yes.
18 BY MR. PIFKO:
19    Q.    Let's talk about these algorithms
20 that you've been referring to.
21        So is it your testimony that
22 these algorithms are part of Rite Aid's
23 suspicious order monitoring system?
24    A.    They are.

Page 77

1     Q.    You've made it sound like there's
2 more than one?
3     A.    Yes.
4     Q.    Is that correct?
5         So what are the algorithms that
6 you contend are part of Rite Aid's suspicious
7 order monitoring system?
8     MS. McENROE:  Objection to form.
9     THE WITNESS:  In an overall
10 perspective, what happens is Rite Aid's
11 system, in order to place an order,
12 reviews a store's order history for the
13 ████████████████████████████████
14 ████████████████████████████████
15 █████████
16     At that particular point, it
17 places an order based on that individual
18 ████████████████████████████████
19 history.  And it allows the store to
20 ████████████████████████████████
21 ████████████████
22     There are other factors that come
23 into play, such as a weighted moving
24 average, depending on what time the order

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 is placed. There's calculate regular
2 movement averages, perform checks on
3 weeks with no movement.
4 So there's a series of
5 algorithms, but the general overall one
6 is looking at that specific store's data,
7 analyzing it, looking at what's on hand
8 in the store, and analyzing to determine
9 what order should be placed for that
10 store.
11 BY MR. PIFKO:
12 Q. Can orders be placed manually?
13 MS. McENROE: Object to the form.
14 THE WITNESS: Once the order gets
15 to the store, there is the ability for
16 the pharmacist to override the order,
17 yes.
18 BY MR. PIFKO:
19 Q. How does that process work, the
20 manual process?
21 A. If the algorithm says to order
22 60, and the pharmacist has an order for 90
23 tablets, then at that point the pharmacist can
24 override to get the additional tablets that they

Page 79

1 need in the order.
2 Q. So when an order is going to be
3 placed, the pharmacist has access to see what
4 that order is?
5 MS. McENROE: Objection.
6 THE WITNESS: Yes. The
7 pharmacist has to have access to see that
8 order.
9 BY MR. PIFKO:
10 Q. So it's in this automated system,
11 but then there's some screen where the pharmacist
12 can see what the automated system is calculating
13 for the order?
14 A. Yes.
15 Q. Is there a name for that screen?
16 A. I don't know what the name is.
17 Q. Is the pharmacist required to
18 check the order before it's placed every time?
19 A. Typically they do. I don't know
20 if it's required.
21 Q. And so orders are placed by Rite
22 Aid stores with a regular frequency. Correct?
23 A. Orders are placed once a week,
24 once every other week in a limited number of

Page 80

1 stores, and twice a week in a very limited number
2 of stores.
3 Q. So let me break that down.
4 So most -- what most -- what's
5 the ordering pattern for most stores?
6 A. Most stores, Rite Aid places an
7 order once a week.
8 Q. Some stores place two orders a
9 week?
10 A. Some stores place two orders a
11 week, yes.
12 Q. Some stores place orders every
13 two weeks?
14 A. Yes.
15 Q. Is there any other ordering
16 pattern that we haven't discussed?
17 A. No. The stores are -- once a
18 store is programmed in, they can't place
19 additional orders.
20 Q. Well, I'm just trying to
21 understand. So there's three categories here.
22 There's stores that order once a
23 week, which is most of the stores.
24 Then there's another category of

Page 81

1 stores that can order two orders in a week.
2 Correct?
3 A. Correct.
4 Q. And then there's another category
5 of stores that place one order every two weeks.
6 Correct?
7 A. Correct.
8 Q. And there's no other pattern
9 within Rite Aid for ordering. Correct?
10 MS. McENROE: Objection to form.
11 THE WITNESS: From the
12 distribution center, no.
13 BY MR. PIFKO:
14 Q. When you say most stores are on
15 this one order every week pattern, do you have an
16 understanding about the percentage of stores that
17 are in that pattern?
18 A. Best guess estimate is 90 percent
19 are on that pattern.
20 Q. How about stores that place two
21 orders a week, do you have a sense of the
22 percentage of stores that fit in that category?
23 A. Let's reduce the first one to
24 80 percent. Sorry.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  Q.   Okay.  So 80 percent of the
2  stores place one order every week.  Correct?
3  A.   Correct.
4  Q.   What percentage of stores place
5  two orders a week?
6  A.   To the best of my knowledge,
7  about 15 percent.
8  Q.   What percentage of stores place
9  one order every two weeks?
10  A.   5 percent.
11  Q.   The stores that place two orders
12  a week, are they located in specific areas?
13  MS. McENROE:  Objection.
14  THE WITNESS:  The stores that
15  order twice a week typically are in urban
16  areas such as Center City Philadelphia,
17  Center City New York City, where to get
18  one order once a week, there's not enough
19  room in the store itself to hold the
20  front end merchandise.
21  So an order needs to be shipped
22  twice a week in order to keep the
23  merchandise in the store to be sold.
24  That's typically when a store gets two

Page 83

1  orders a week.
2  BY MR. PIFKO:
3  Q.   So those stores are -- the square
4  footage of the stores is somewhat smaller and
5  they don't have room for inventory.
6  Is that what you're saying?
7  A.   Typically, yes.
8  Q.   Are there other occasions where a
9  store would have two orders a week?
10  A.   No.  That's primarily it.
11  Q.   What about stores that order once
12  every two weeks, is there some sort of
13  characteristic about those stores?
14  A.   Those may be the lower volume
15  stores that dispense less prescriptions or have
16  less movement of front end merchandise.  A lower,
17  slower front end selling front end merchandise
18  may get it every two weeks.
19  Q.   And just for clarity, when you
20  talk about "front end," that's everything that's
21  not in the pharmacy.  Correct?
22  A.   That is correct.
23  Q.   Is that an internal term that
24  Rite Aid uses, front end versus pharmacy

Page 84

1  operations?
2  A.   I think a lot of people in the
3  industry use the term "front end" versus
4  pharmacy.
5  Q.   But that's also a term that Rite
6  Aid uses?
7  A.   Yes.
8  Q.   Let's go back to the algorithms
9  of ordering.
10  So a pharmacist can see the order
11  that's about to be placed in advance of it being
12  placed.  Correct?
13  A.   Yes.
14  Q.   How far in advance of it being
15  placed can a pharmacist see it?
16  A.   I believe a day.  And then they
17  have time to review it and then make changes,
18  should they decide to.
19  Q.   And then when a pharmacist sees
20  the order that's about to be placed, they can
21  manually increase the volumes that are on the
22  order; is that correct?
23  MS. McENROE:  Objection to form.
24  THE WITNESS:  They can manually

Page 85

1  increase the volumes or they can manually
2  decrease the volumes.
3  BY MR. PIFKO:
4  Q.   So you talked about the highest
5  ██████████████████████████████████
6  █ ████
7  █ ████████████████████████████████
8  █ █████████████████████████
9  A.   Yes.
10  Q.   Okay.  But then the pharmacist
11  could manually increase that.  Correct?
12  MS. McENROE:  Objection to form.
13  THE WITNESS:  They have the
14  ability to do that.
15  BY MR. PIFKO:
16  Q.   Are there any other algorithms
17  that are in place?
18  A.   There are other algorithms or
19  there are other pieces of the program which
20  allows no greater than 99 bottles to be
21  distributed in -- of any given product at any
22  given time as well.
23  Q.   Can a pharmacist manually
24  override that?

Page 86

1    A.    The pharmacist has the ability
2  to -- no.  Pardon me.  Step back.
3         The pharmacist cannot override
4  the 99 bottles.
5    Q.    Are there any other algorithms in
6  place?
7         And you're looking at a document.
8  Can you read the Bates number of the document?
9    A.    I can.  004 -- oh.
10  Rite_Aid_OMDL_0045426.
11    Q.    Is there a name for that
12  document?
13    A.    It is called pharmacy
14  replenishment algorithm.  Okay.
15         There are other parts to the
16  algorithm that come into play as well, one of
17  them being making an account for what we call
18  90-day fills at the pharmacy.
19         So what that means is a patient
20  comes in and has a 30 -- a prescription for 30
21  days of like their blood pressure medication.
22  The patient chooses to get a 90-day supply or
23  three months at a time.
24         So instead of having the

Page 87

1  replenishment algorithm ship that product to the
2  store for the 30 days, 30 days and 30 days, the
3  algorithm takes into effect that that patient's
4  not coming back until 90 days.  So you have to
5  have that product in 90 days instead of two 30
6  days.  So that's part of the algorithm as well.
7         And that's the gist of the
8  algorithms.  The rest of it can be found in the
9  document.
10    Q.    Were there any changes to the
11  algorithms?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  To the best of my
14  knowledge, no.
15  BY MR. PIFKO:
16    Q.    Then going back to this meeting,
17  Kevin Mitchell was another person who was
18  invited.  Correct?
19    A.    Correct.
20    Q.    Why was he invited?
21    A.    Kevin has responsibility for
22  the controlled -- had responsibility for the
23  controlled substance cages at the distribution
24  centers and was working with the DEA coordinators

Page 88

1  in each of the facilities.
2    Q.    And why did that make him someone
3  that was invited to this meeting?
4    A.    He owned the process of the
5  distribution of the controlled substances and the
6  pickers, was involved with -- directly involved
7  with the individual pickers that picked, the
8  operations of the controlled substance cages.
9         So because of that and impacting
10  thresholds, he was invited to the meeting.  And
11  also he was the one that attended the Buzzeo
12  conference that wanted to have some discussion
13  around it.
14    Q.    Were there any -- you talked
15  about putting together a document.
16         That was something that was
17  discussed at this meeting.  Correct?
18    A.    It was.
19    Q.    Did this meeting ultimately
20  result in a document being created?
21    A.    It did not.
22    Q.    Why was that?
23    A.    Several -- an individual at the
24  meeting left the company.

Page 89

1    Q.    Who is that?
2    A.    Maggie Perritt.
3    Q.    And she was going to be
4  responsible for putting this documentation
5  together?
6    A.    Yes.
7    Q.    Do you know why she left?
8    A.    To take a job elsewhere.  She
9  moved to Florida.
10    Q.    Did she make any comments on the
11  perceived sufficiency of Rite Aid's suspicious
12  order monitoring processes?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  After we had the
15  meetings -- the meeting, and everybody
16  came together, everyone was overly
17  confident that our suspicious order
18  monitoring program was adequate and met
19  DEA rule and regulation.  The idea was
20  again to put everything together in one
21  space and in one document to be able to
22  provide for the DEA.  There were no --
23  from Kevin to Andy to Maggie to myself,
24  there were no changes at that time that

Page 90

1  were noted to be made to the suspicious
2  order monitoring program, just to put it
3  into a format that could be provided to
4  governmental agencies when needed.
5  BY MR. PIFKO:
6      Q.   Did anyone write down anything
7  after that meeting stating that they were
8  satisfied with Rite Aid's procedures?
9          MS. McENROE:  Objection to form.
10         THE WITNESS:  I don't know that
11     anyone said that they were satisfied with
12     it.  There were communications from Kevin
13     asking to -- for Maggie to put it in so
14     that they could get it to distribution
15     centers, but I don't know that there was
16     anything that said everybody signed off
17     at the meeting.
18 BY MR. PIFKO:
19     Q.   Are there any other features of
20 Rite Aid's procedures with respect to identifying
21 suspicious orders?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  Sure.  There is an
24     asset protection side of our suspicious

Page 91

1  order monitoring program which has a
2  number of KPIs which look at cycle counts
3  down, which look at ordering
4  abnormalities.  So there are part of the
5  asset protection, part of the suspicious
6  order monitoring.  And that can lead to
7  investigations into stores, into theft,
8  diversion, whatever it may be.
9  BY MR. PIFKO:
10     Q.   But you testified earlier that
11 that system was never used to identify and report
12 a suspicious order.  Correct?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  I did.
15 BY MR. PIFKO:
16     Q.   Any other systems in place that
17 Rite Aid had to identify, report and halt the
18 shipment of suspicious orders?
19         MS. McENROE:  Objection to form.
20         THE WITNESS:  Those were the
21     major three components.
22 BY MR. PIFKO:
23     Q.   So to be clear, we talked about
24 the thresholds, the algorithm and then you

Page 92

1  mentioned the asset protection aspects?
2      A.   Correct.
3      Q.   When you say those are the three
4  components, that's what you were referring to?
5      A.   Yes.
6      Q.   Let's talk about the thresholds
7  for a moment.
8          So I want to talk about how they
9  work.
10         So every store, except for the
11 less than a dozen that you mentioned, has a limit
12 of 5,000 dosage units per NDC per order.
13 Correct?
14     A.   Correct.
15     Q.   And how is that limitation
16 implemented?
17     A.   It is implemented by the pickers
18 in the distribution centers.
19     Q.   How specifically does that occur?
20     A.   In the distribution center, when
21 an item is lit up to be picked, there's a device
22 called the pick -- Pick-to-Light and it lights up
23 and there's a quantity of the item to be picked.
24 When it lights up, it will say the number of

Page 93

1  packages to be picked.
2          If the picker sees, say, it's a
3  bottle of 100, 53 packages to be picked, they
4  will set -- they won't pick the item and they
5  will immediately report it to their supervisor.
6      Q.   So an order is placed that
7  exceeds the threshold, the picker sees that on
8  the lighting system?
9      A.   Pick-to-Light, yes.
10     Q.   So the lighting system identifies
11 that it exceeds the threshold or the picker does?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  The picker does.
14 BY MR. PIFKO:
15     Q.   So the pickers know that there's
16 this 5,000 dosage unit per NDC per order
17 requirement?
18     A.   The pickers are very well versed
19 in the threshold, yes.
20     Q.   Is there documentation that
21 they're provided with that tells them about that
22 threshold?
23     A.   Each of the pickers has an
24 attestation that they understand the 5,000 dosage

Page 94

1 unit limit.

2 Q. What do you mean by dosage unit?

3 A. A tablet, a capsule, any
4 individual dose.

5 Q. Okay. So the picker has to look
6 and see if it's 10 bottles of 50, they have to
7 make that calculation?

8 A. Yes. They make that calculation.
9 Pharmacy packages are typically bottles of 100 or
10 bottles of 500 or bottles of 1,000. So it's a
11 simple calculation. There's not half bottles or
12 anything along those lines. It's typically 100,
13 500 and 1,000.

14 Q. Is there any automation that
15 makes that calculation for them?

16 MS. McENROE: Objection to form.

17 THE WITNESS: From the
18 Pick-to-Light, there's not.

19 BY MR. PIFKO:

20 Q. So an order comes in and they --
21 if it says six bottles of 1,000, that exceeds the
22 threshold. Correct?

23 MS. McENROE: Objection to form.

24 THE WITNESS: Correct.

Page 95

1 BY MR. PIFKO:

2 Q. And then if it exceeds the
3 threshold, they have to call their supervisor?

4 A. They do.

5 Q. What do they do when they call
6 their supervisor?

7 A. The supervisor comes over, stops
8 the pick and then investigates the order to
9 determine, was it an auto ship order, what was
10 the nature of the order.

11 And at that particular time, they
12 would short the order to the 5,000 threshold and
13 then inquire from the store, if it wasn't an auto
14 replenishment order, why they ordered the
15 additional bottle.

16 Q. So let's break that process out a
17 little bit.

18 You said the supervisor comes
19 over and looks at the order.

20 How do they tell if it's an auto
21 ship order?

22 A. There is -- once they realize the
23 drug in that, there is a terminal in the
24 distribution center in the cage. They can go to

Page 96

1 a computer and determine if the order was on a
2 replenishment and an auto ship or not.

3 Q. And we talked earlier about
4 manually overriding by the pharmacist.

5 Do you recall that?

6 A. I do.

7 Q. Is that what you're
8 distinguishing between a manual override and an
9 order that's not -- that has no manual overrides?

10 A. Yes.

11 Q. How does the supervisor see that
12 on a computer screen?

13 A. You can identify the particular
14 drug. And it would say what your projected order
15 was.

16 So let's say that we took those
17 6,000 dosage units that you were discussing, they
18 would be able to see that the auto generated
19 order was six bottles to know that that was the
20 case.

21 Q. And if the pharmacist manually
22 overrides it, then there's something they can see
23 on there that shows that the amount is different
24 than what the auto replenishment system would

Page 97

1 have placed?

2 A. That is correct. I believe
3 some -- one of the exhibits that we discussed
4 yesterday had a screenshot of a suggested order
5 and where you could see what the suggested order
6 was, when we were discussing 3151.

7 Q. And so where it says suggested
8 order, that's what the auto replenishment system
9 would order?

10 A. That is correct.

11 Q. And so if it's an auto
12 replenishment system order, what is the
13 supervisor supposed to do?

14 A. The supervisor -- the order is
15 still cut to the normal -- to the 5,000
16 threshold. And at that point, the supervisor
17 would reach out and contact the pharmacy to
18 determine, did they need the 6,000 dosage units
19 and if they did, what was the reason. And if
20 they -- if it continued to go above what the
21 threshold was, how they could get an increase to
22 their threshold.

23 Q. Is the order filled before that
24 conversation occurs?

Page 98

1       MS. McENROE: Objection to form.
2       THE WITNESS: The order is
3   reduced to the 5,000, yes. And the
4   conversation can occur after the order is
5   reduced.
6   BY MR. PIFKO:
7       Q.    Is there any documentation of
8   this conversation that occurs?
9       A.    There is documentation in the
10  controlled drug cage.
11      Q.    Is there a name of a form or a
12  logbook or something where they write down
13  anything about the conversation?
14      A.    There is a log, yes.
15      Q.    What's it called?
16      A.    Let me look.
17      Q.    And when you get to what you're
18  looking at, please identify the Bates number.
19      A.    I'm going to flip through,
20  because I'm not finding what I wanted to see.
21      Q.    What specifically are you looking
22  for?
23      A.    There is a threshold log that is
24  created at the distribution centers that would

Page 99

1   identify who was called on what date and what
2   their response was.
3       Q.    And when you're looking through
4   that binder -- I assume you've looked at all the
5   materials in the binder. Correct?
6       A.    I have.
7       Q.    Are you looking for an example of
8   a threshold log, or are you looking for a policy
9   that discusses it?
10      A.    I'm looking for an example of a
11  threshold log. And it is called the Controlled
12  Drug Above Average Order Monitoring Log.
13      Q.    And that's the document that --
14  where the supervisor notates any conversation
15  they may have had with the pharmacist?
16      A.    That is correct.
17      Q.    Is there any other place where
18  they would note their discussion?
19      A.    This is the primary document
20  where they would note their discussion.
21      Q.    You said primary.
22          Is there a secondary document?
23      A.    They may have an Excel
24  spreadsheet that they would create a log as well,

Page 100

1   but this is the hands-on log in the cage.
2       Q.    So any notes of any discussion
3   would be contained in that log?
4       A.    Yes.
5       Q.    What happens to that log after
6   it's -- where do they keep their log?
7       MS. McENROE: Objection to form.
8       THE WITNESS: They keep the log
9   in the controlled drug cage with the
10  other DEA records.
11  BY MR. PIFKO:
12      Q.    Do they send it to anyone with
13  some frequency?
14      A.    This log, they may send it to
15  myself or Kevin Mitchell or Chris Belli for
16  review as well.
17      Q.    They may, but they're not
18  required to do so?
19      MS. McENROE: Objection to form.
20      THE WITNESS: They're not
21  required to do so.
22  BY MR. PIFKO:
23      Q.    So they would call the pharmacist
24  to ask if they -- in a situation where the order

Page 101

1   exceeds the threshold, they would call the
2   pharmacist and ask if that was -- they intended
3   to place that order. Correct?
4       A.    That is correct.
5       Q.    But regardless of what the
6   pharmacist says, the order is cut to threshold?
7       MS. McENROE: Objection to form.
8       THE WITNESS: That is correct.
9   BY MR. PIFKO:
10      Q.    And that may be shipped before
11  that conversation occurs. Correct?
12      A.    That is also correct.
13          The number on the log that I'm
14  looking at, do you want that?
15      Q.    Oh, yes. Thank you.
16      A.    Okay. Rite_Aid_OMDL_0024039.
17      Q.    Is there any other discussion
18  that occurs in the situation where an order
19  exceeds the threshold?
20      MS. McENROE: Objection to form.
21      THE WITNESS: The discussion is
22  at the distribution center when the order
23  is -- to the best of my knowledge, no.
24  BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  Q.  So other than calling the
2  pharmacist to ask if they intended to place that
3  order, there is no other discussion.  Correct?
4  A.  If they're -- part of the policy
5  is if there was an order that there was deemed to
6  be suspicious, part of the policy then is to
7  contact government affairs, myself, to
8  investigate and determine if there was any
9  suspicion or diversion or anything.
10  Q.  But that's never happened.
11  Correct?
12  A.  It has not.
13  Q.  No one has ever called you and
14  said an order is potentially suspicious?
15  MS. McENROE:  Objection to form.
16  THE WITNESS:  They have not.
17  BY MR. PIFKO:
18  Q.  So other than this conversation
19  with the pharmacist, is there anything else that
20  happens?
21  MS. McENROE:  Objection to form.
22  THE WITNESS:  After the
23  conversation with the pharmacist, and if
24  the pharmacist deems that it's necessary,

Page 103

1  that they need the additional product to
2  service their patients and meet their
3  patients' healthcare needs, then they can
4  reach out to their pharmacy district
5  manager who, at that term will determine,
6  yes, there is a valid need to increase
7  the threshold.  And then ask me to
8  complete a threshold override so that
9  they can go above the 5,000 dosage units
10  based on valid patient need.
11  BY MR. PIFKO:
12  Q.  Let's hold on to that for a
13  second.
14  Other than making a request to
15  increase the threshold, is there any other
16  discussion that occurs?
17  MS. McENROE:  Objection to form.
18  THE WITNESS:  There is not.
19  BY MR. PIFKO:
20  Q.  And there's -- other than writing
21  down this log, there is no other documentation
22  that's made.  Correct?
23  MS. McENROE:  Objection to form.
24  THE WITNESS:  The log is the

Page 104

1  documentation of the call.
2  BY MR. PIFKO:
3  Q.  That's the only documentation of
4  any investigation that may be conducted.
5  Correct?
6  MS. McENROE:  Objection to form.
7  THE WITNESS:  Yes.  The log is
8  the documentation.
9  BY MR. PIFKO:
10  Q.  So let's talk about the override
11  or threshold increase.
12  Can the -- is it possible to make
13  a one-time override?
14  MS. McENROE:  Objection to form.
15  THE WITNESS:  I don't know that
16  it's ever been done, but it could be
17  possible for someone to call me and ask
18  for a one-time override.  And yes, it
19  could be done.
20  BY MR. PIFKO:
21  Q.  But to your knowledge, that's
22  never happened?
23  A.  No.
24  Q.  So when you mentioned that

Page 105

1  someone could ask for a threshold increase, that
2  would be a permanent increase for that location.
3  Correct?
4  MS. McENROE:  Objection to form.
5  THE WITNESS:  That would be an
6  increase that would be put in place and
7  then monitored routinely to make sure
8  that the usage and the reason for the
9  override would occur.
10  I would foresee a one-time
11  threshold override if there was a store
12  that had a night burglary and all of the
13  products were stolen from the store.  So
14  obviously you would need to get product
15  into that store.  So there may be the
16  potential for an override in situations
17  like that.
18  BY MR. PIFKO:
19  Q.  Do you recall that ever
20  occurring?
21  A.  There are night break-ins, yes.
22  I don't recall ever doing a threshold override,
23  but we do have night break-ins and armed
24  robberies, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.    In situations where an order is
2 placed to fill product that's been stolen in an
3 overnight robbery, is there any -- other than
4 reporting theft to the DEA, is there any
5 reporting of that order being potentially
6 suspicious?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  There is not.
9 BY MR. PIFKO:
10    Q.    So then when we're talking about
11 this override of the threshold, the store can
12 then request that their threshold be increased?
13    A.    If it was a one-time threshold,
14 typically the pharmacy district manager would
15 make a call and ask for it because of the
16 extenuating circumstance.
17    Q.    But we talked this, there's never
18 been to your knowledge a one-time increase?
19    A.    To the best of my knowledge, no.
20    Q.    So if after this call -- so you
21 said that on the call, the supervisor asked the
22 pharmacist if they intended to place that order.
23 Correct?
24         MS. McENROE:  Objection to form.

Page 107

1         THE WITNESS:  Correct.
2 BY MR. PIFKO:
3    Q.    And then if they say yes, the
4 next thing that the supervisor tells them is
5 how -- the process that they can go through to
6 get their threshold increased.  Correct?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  That is correct.
9 BY MR. PIFKO:
10    Q.    And so what is the process then
11 that a store would undertake to get a threshold
12 increase?
13    A.    At that particular time, the
14 store would reach out to their pharmacy district
15 manager or immediate supervisor and say, my order
16 has been cut back.  I can't service my patients.
17 Please seek a threshold increase on hydrocodone
18 for my particular store.  And then the pharmacy
19 district manager would send that increase request
20 to myself or a member of my team.
21    Q.    Is there a name for that team?
22    A.    Regulatory compliance, government
23 affairs.  It's both one and the same.
24    Q.    So you talked yesterday about the

Page 108

1 organizational structure of your department.
2 Correct?
3    A.    I did.
4    Q.    Is there any sort of
5 suborganizational structure of people who would
6 just deal with threshold increases?
7    A.    From the distribution center,
8 when we distributed, there was myself and Andrea
9 Bucher.
10    Q.    So only the two of you would have
11 been the only people who would deal with
12 threshold increases?
13    A.    I'm thinking of the time frame of
14 when individuals entered the department.  There
15 is the possibility that another member of my
16 team, Amy Knisely, may have looked at thresholds
17 as well.
18    Q.    Anyone else?
19    A.    No.
20    Q.    So you, Andrea Bucher or Amy
21 Knisely would be the only people that would have
22 evaluated a threshold increase request?
23    A.    Yes.
24    Q.    Is there a document that has to

Page 109

1 be created to get requests to threshold increase?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  There is no
4    document, just an email with the reason
5    why the increase is needed and -- on an
6    email.
7 BY MR. PIFKO:
8    Q.    So the district manager sends an
9 email to you or one of the members of your team?
10    A.    They do.
11    Q.    Can the pharmacist go directly to
12 you?
13    A.    If the pharmacists come directly
14 to us, we reroute it to the pharmacy district
15 manager in order to make sure that they're aware
16 that there's a request in for them to say, yes,
17 please look at the request.
18         MS. McENROE:  Mark, we've been
19    going for about an hour, so whenever is a
20    good time for a break.
21         MR. PIFKO:  Okay.
22 BY MR. PIFKO:
23    Q.    The district manager has to
24 approve sending the request to you and your team?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1   A.   Yes.
2       Q.   And even if a pharmacist makes it
3  directly, you then back route it to the district
4  manager to make sure that they would approve it
5  first?
6       A.   Sure.  I would -- I could make a
7  phone call to the pharmacy district manager and
8  say, hey, we have a request that came in from
9  your store 1234, you know, do you want us to work
10 on it or look at it.  And they would say yes or
11 no once they determined if it was needed or not.
12 But yes.
13      Q.   We'll take a break in just a
14 moment, but I want to ask you, are there any
15 criteria or attributes of the pharmacy that you
16 look for when you're evaluating a threshold
17 increase?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  For a threshold
20     increase, we look at usage from the
21     store, the order history, the suggested
22     order and an average of the monthly
23     dispensings of that particular drug for
24     the store.

Page 111

1  BY MR. PIFKO:
2       Q.   When they make the request to
3  you, though, do they have to provide any specific
4  type of information in the email request?
5       A.   Sometimes they do and sometimes
6  they don't.  Sometimes they would say, a new
7  clinic opened down the street, depending on the
8  request that came in.
9       Q.   But my question was different.
10          Are they required to provide
11 certain types of information in the email making
12 the request to you?
13      A.   They are not required to put it
14 in the email, but that does not mean that we
15 don't follow up and get the extenuating
16 circumstance of why they're asking for the
17 increase.
18      Q.   So the only thing that's required
19 is that they tell you that they want the
20 increase?
21          MS. McENROE:  Objection to form.
22          THE WITNESS:  In the email, yes.
23      But there would be follow-up with them.
24 BY MR. PIFKO:

Page 112

1       Q.   Okay.  And so then upon receiving
2  that, you would then look at the data for that
3  pharmacy as you just testified a few minutes ago?
4       A.   We would.  Similar to what we
5  looked at yesterday for 3151.
6          MR. PIFKO:  Okay.  We can take a
7  break.
8          MS. McENROE:  Okay.
9          THE VIDEOGRAPHER:  Going off the
10 record at 11:35 a.m.
11          - - -
12      (A recess was taken from
13 11:35 a.m. to 11:53 a.m.)
14          - - -
15          THE VIDEOGRAPHER:  We're back on
16 the record at 11:53 a.m.
17 BY MR. PIFKO:
18      Q.   I want to ask you some questions.
19          You brought a binder with you
20 today.  Correct?
21      A.   I did.
22      Q.   Can you describe for the record
23 what that binder is?
24      A.   Sure.  It was documents that I

Page 113

1  asked counsel to put together and make copies of
2  for me as part of my testimony, or depositions so
3  that I could refer to them.
4       Q.   I'm handing you what's marked as
5  Exhibit 4.
6          - - -
7          (Deposition Exhibit No.
8      Hart-30(b)(6)-4, Index of Binder, was
9      marked for identification.)
10          - - -
11 BY MR. PIFKO:
12      Q.   For the record, it's a copy of a
13 first page in the binder; is that correct?
14      A.   That is correct.
15      Q.   And this is -- it appears to be
16 some kind of index, would you agree?
17      A.   Yes.
18      Q.   Who created the index?
19      A.   Counsel did, at my direction.
20      Q.   The descriptive language here, is
21 that your language or is that counsel's language?
22      A.   It's my language.
23      Q.   So I want to go through the --
24 and identify for the record the first Bates

Page 114

1 number of each of these exhibits -- or tabs in
2 the -- so these correspond, I assume, the numbers
3 1 through 27 correspond to a tab in the binder
4 with a document. Correct?
5    A.    They do.
6    Q.    So let's go through and read the
7 Bates number for the first page of each of the
8 tabs.
9    A.    Tab number 1 is
10 Rite_Aid_OMDL_0046082.
11    Q.    Keep doing it.
12    A.    You want me to keep going? Oh,
13 okay. I wasn't sure.
14        The second, number 2, is
15 Rite_Aid_OMDL_0045625.
16        Tab 3 is Rite_Aid_OMDL_0015079.
17        Tab 4 is Rite_Aid_OMDL_0032594.
18        Tab 5 is Rite Aid_OMDL_0024039.
19        Tab 6 is Rite_Aid_OMDL_0015876.
20        Tab 7 is Rite_Aid_OMDL_0046321.
21        Tab 8 is Rite_Aid_OMDL_0046064.
22        Tab 9 is Rite_Aid_OMDL_0045426.
23        Tab 10 is Rite_Aid_OMDL_0046598.
24        Tab 11 is Rite_Aid_OMDL_0032575.

Page 115

1        Tab 12 is Rite_Aid_OMDL_0046228.
2        Tab 13 is Rite_Aid_OMDL_0044402.
3        Excuse me a minute.
4        Tab 14, Rite_Aid_OMDL_0014338.
5        Tab 15, OM --
6 Rite_Aid_OMDL_0044791.
7        Tab 16, Rite_Aid_OMDL_0024382.
8        Tab 17, Rite_Aid_OMDL_0023939.
9        Tab 18, Rite_Aid_OMDL_0047171.
10        Tab 19, Rite_Aid_OMDL_0046552.
11        Tab 20, Rite_Aid_OMDL_0046772.
12        Tab 21, Rite_Aid_OMDL_0032622.
13        Tab 22, Rite_Aid_OMDL_0032621.
14        Excuse me.
15        Tab 23, Rite_Aid_OMDL_0012547.
16        Tab 24, Rite_Aid_OMDL_0046700.
17        Tab 25, Rite_Aid_OMDL_0036784.
18        Tab 26, Rite_Aid_OMDL_0012415.
19        Tab 27 is -- doesn't have a --
20    Q.    Okay, right. That's the
21 interrogatory responses.
22    A.    Yes.
23    Q.    So during the break, I looked
24 through the notebook a little bit.

Page 116

1        There's a few highlights in
2 there.
3        Whose highlighting is that?
4    A.    It's mine.
5    Q.    Okay. And there are some tabs in
6 there as well, little -- like the green little
7 Post-it tabs.
8    A.    Yes.
9    Q.    Did you put those in there?
10    A.    I asked counsel to put them
11 there.
12    Q.    Okay. You asked counsel.
13        What was the reason why you asked
14 counsel to put certain tabs on certain things?
15    A.    There were certain areas that if
16 I wanted to refer to them, they would be readily
17 available. And certain places to review
18 documents.
19    Q.    Did you make any notes on any of
20 those documents other than highlighting?
21    A.    I think I only made one note,
22 which was on the interrogatories.
23    Q.    What was the note that you made?
24    A.    It was just that number 21 was

Page 117

1 the interrogatory that was still on the first
2 response.
3    Q.    Any other --
4    A.    I don't believe there were any
5 other notes I made, no.
6    Q.    Did you review all these
7 documents prior to today's deposition?
8    A.    I did.
9    Q.    Did you review any other
10 documents prior to today's deposition, beyond
11 what's in this -- that binder?
12    A.    I did.
13    Q.    What was the basis for reviewing
14 the other documents that you reviewed other than
15 the ones that are in the binder?
16        MS. McENROE: Objection. I just
17    want to caution the witness in terms of
18    not revealing substance discussed with
19    counsel, to avoid divulging any verbally,
20    of course, privileged information.
21        Can you restate the question?
22    Just so I make sure I understand how it's
23    not asking for privileged information.
24 BY MR. PIFKO:

Page 118

1     Q.   Yeah.

2        So you reviewed the documents in

3 the binder to prepare for the deposition.

4 Correct?

5     A.   Correct.

6     Q.   And you reviewed other documents

7 that aren't in the binder to prepare for the

8 deposition; is that correct?

9     A.   Correct.

10     Q.   Okay.  When did you review the

11 other documents that weren't in the binder?

12     A.   When I met with counsel to

13 prepare.

14     Q.   Okay.  It's like a two-inch

15 binder that you have in front of you.

16        It's basically full.  Agreed?

17     A.   Yes.

18     Q.   And is it double-sided?

19     A.   Yes.

20     Q.   The volume of documents that you

21 reviewed that's not in the binder, how does that

22 compare to the volume of documents that's in the

23 binder?

24        MS. McENROE:  Objection to form.

Page 119

1        THE WITNESS:  Many more documents

2    were reviewed aside from this -- these

3    27.

4 BY MR. PIFKO:

5     Q.   So you would say there's a lot

6 more documents that you reviewed to prepare for

7 the deposition that aren't in the binder.

8 Correct?

9     A.   There were.

10     Q.   You just went through the

11 exercise of reading all those numbers.  As we

12 discussed, those are Bates numbers.

13        Do you believe that all the

14 documents that you reviewed to prepare for the

15 deposition had those kinds of numbers on them?

16     A.   I believe so, yes.

17     Q.   Do you know if there's any

18 documents that you reviewed to prepare for the

19 deposition that were not provided to the

20 plaintiffs in the litigation?

21        MS. McENROE:  What he means by

22    that is, if it has a Bates number, that

23    it would be provided to plaintiffs in the

24    litigation.

Page 120

1        THE WITNESS:  I believe all the

2    documents that I reviewed were provided.

3 BY MR. PIFKO:

4     Q.   How did you decide what documents

5 that you wanted to review?

6     A.   I looked at the importance of the

7 documents and what I might make part of my

8 deposition.  And picked some of the positives or

9 like in the analytics part of it, the algorithms.

10 I'm not an algorithm person, so I wanted to have

11 something in front of me to be able to review.

12     Q.   Did you speak to anyone other

13 than counsel to prepare for the deposition?

14     A.   Today or previously?

15     Q.   At any time.

16     A.   I have.

17     Q.   Okay.  Who did you speak with?

18     A.   I spoke with Marcia Brumbaugh,

19 who is in our IT department.  Charlie Miller,

20 Andy Palmer, Ron Chima.

21        I'm trying to think.

22        Those are the people within the

23 corporation that I spoke to, or with or former.

24     Q.   How long did you speak to Marcia?

Page 121

1     A.   I believe it was about an

2 hour-and-a-half.

3     Q.   Did you have more than one

4 conversation with her?

5     A.   I had one conversation with her.

6     Q.   What did you discuss with her to

7 prepare for the deposition?

8        MS. McENROE:  Objection.  I just

9    want to interject.  To the extent counsel

10    was involved, that you shouldn't discuss

11    the substance as privileged.

12    THE WITNESS:  Okay.

13    MR. PIFKO:  Well, preparations

14    for a 30(b)(6) are not -- if she's trying

15    to inform herself, they're not

16    privileged.

17    MS. McENROE:  On the underlying

18    facts, I agree with you.  I just want to

19    make sure that any of the substance that

20    could have been discussed at the

21    direction of counsel or with input from

22    counsel is not divulged inadvertently.

23    THE WITNESS:  Can you repeat the

24    question?



Page 122

BY MR. PIFKO:

1  BY MR. PIFKO:
2    Q.    Yeah.
3          I just want to know -- okay.
4          So you had one conversation with
5  Marcia to prepare for the deposition.  Correct?
6    A.    I did.
7    Q.    Okay.  And my question is, and
8  you said that you spoke to her for about an
9  hour-and-a-half.  Correct?
10   A.    That is correct.
11   Q.    Sorry.  You need to give an
12 audible response.
13         Did you speak to her in person or
14 on the phone?
15   A.    In person.
16   Q.    Who else was present at that
17 meeting?
18   A.    Counsel.
19   Q.    Anyone else?
20   A.    That was it.
21   Q.    Okay.  And for purposes of
22 preparing of the deposition, what did you discuss
23 with her?
24   A.    We discussed the algorithm.

Page 123

1    Q.    Anything else?
2    A.    That was primarily it.
3    Q.    What's Marcia's background?
4    A.    She is in our information -- IT
5  department.
6    Q.    Does she have knowledge about the
7  algorithm?
8    A.    She does.
9    Q.    Did she have any role in
10 designing it?
11   A.    I don't know that.
12   Q.    Do you know how long she's been
13 with the company?
14   A.    I'm going to say at least 15
15 years.
16   Q.    Do you know if Marcia had any
17 role in modifying the algorithm at any time?
18   A.    I don't know that.
19   Q.    Okay.  For purposes of preparing
20 for the deposition, what did Marcia tell you
21 about the algorithm?
22   A.    We went over the document on the
23 algorithm that was involved in here, just to give
24 an overview of the algorithm.

Page 124

1    Q.    And which tab was that?
2    A.    Let me look.
3          That would be 7 and 8.
4    Q.    What else did you discuss with
5  her to prepare for the deposition?
6    A.    Primarily the algorithm.
7    Q.    What did she tell you about how
8  it functions?
9  ▮      ▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮   ▮▮▮▮▮▮▮▮▮▮▮▮.  Then there was the
14 ability to override the order up to ▮▮▮▮▮.
15   Q.    You also spoke to Charlie Miller?
16   A.    I did.
17   Q.    Who is Charlie Miller?
18   A.    Charlie Miller is a pharmacist
19 for Rite Aid at present.
20   Q.    Where is he based?
21   A.    He is in Pennsylvania.
22   Q.    Does he work for a specific
23 store?
24   A.    Yes, he's a pharmacist in a

Page 125

1  store.  I don't know the location.
2    Q.    Somewhere in Pennsylvania?
3    A.    Yes.
4    Q.    In Philadelphia, or you don't
5  know that?
6    A.    I think closer to York.
7    Q.    And what did you speak with Mr.
8  Miller to prepare for the deposition about?
9          MS. McENROE:  Same objection,
10 same instruction, in terms of any
11 involvement of counsel, stay away from
12 any of that sort of privileged
13 discussion.  But for the underlying
14 facts, so long as you're not divulging
15 privileged information, you may answer.
16         THE WITNESS:  Mr. Miller used to
17 be in the corporate office at one point,
18 and he was responsible for replenishment
19 at that time.  And so I had a discussion
20 with him as far as replenishment system
21 as well.
22 BY MR. PIFKO:
23   Q.    What did he tell you about the
24 replenishment system?

Page 126

1  A.    It was a brief discussion.  I
2  don't know -- I don't remember exactly what he
3  told me, because he was actually working in a
4  store at the time and didn't have a lot of time
5  to talk to me.
6      Q.    So you spoke to him on the phone?
7      A.    Yes.
8      Q.    Less than 20 minutes?
9      A.    Yes.
10      Q.    Less than five minutes?
11      A.    Yes.
12      Q.    Andy Palmer, you spoke to him to
13  prepare for the deposition?
14      A.    I did.
15      Q.    How many times did you speak with
16  him?
17      A.    Twice.
18      Q.    Were those in person or on the
19  phone?
20      A.    They were in person.
21      Q.    When was the first time that you
22  spoke to Andy?
23      A.    Two to three weeks ago.
24      Q.    When was the second time you

Page 127

1  spoke to him?
2      A.    Within the last week or two.
3      Q.    The first conversation that you
4  had with him, how long was that?
5      A.    A few hours.
6      Q.    What did you discuss during that
7  conversation?
8          MS. McENROE:  And again, same
9      objection for the record in terms of
10      protecting any privileged information
11      that may have come from or discussed
12      specifically with counsel.  In terms of
13      underlying facts that you gained from Mr.
14      Palmer, if any, you're allowed to discuss
15      those, but please be careful not to
16      divulge privileged information.
17          THE WITNESS:  Okay.  We discussed
18      the asset protection part of KPIs that we
19      have discussed.
20  BY MR. PIFKO:
21      Q.    Anything else?
22      A.    That was primarily that.
23      Q.    Did you review any documents with
24  him to have that discussion?

Page 128

1      A.    We did review some documents.
2      Q.    What documents did you review?
3      A.    Some Above Average logs.
4      Q.    Anything else?
5      A.    That was primarily it.
6      Q.    Are you aware that Andy Palmer
7  was deposed in this case?
8      A.    I am.
9      Q.    Did you review his deposition
10  transcripts to prepare for this deposition?
11      A.    I did not review Andy's
12  transcripts.
13      Q.    Did you review any deposition
14  transcripts to prepare for this deposition?
15      A.    I reviewed Chris Belli's
16  transcript, Rick Chapman's transcript and part of
17  Andrea Bucher's transcript.
18      Q.    Only part of Andrea's transcript?
19      A.    Yes.
20      Q.    What part of her transcript did
21  you review?
22      A.    I briefly read through
23  approximately the first half of it and then that
24  was it.

Page 129

1      Q.    Why was is it that you only
2  looked at the first half?
3      A.    I simply didn't have enough time.
4      Q.    What did you learn from reviewing
5  her transcript?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  When she was --
8          MS. McENROE:  You can answer.
9          THE WITNESS:  What she was asked
10      questions about, similar to what I was
11      asked questions about.
12  BY MR. PIFKO:
13      Q.    So then you said you met with
14  Andy Palmer again in the last week or so?
15      A.    Yes.
16      Q.    How long was that meeting?
17      A.    An hour, an hour-and-a-half.
18      Q.    What did you discuss during that
19  meeting?
20          MS. McENROE:  Same objection and
21      same instruction with respect to not
22      divulging privileged communications.  But
23      to the extent that you learned facts that
24      you're testifying about here today, you

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    may testify.
2          THE WITNESS:  I learned
3    additional information about the KPIs.
4    BY MR. PIFKO:
5        Q.    Anything else?
6        A.    That was primarily it.
7        Q.    Did you learn new information
8    that you hadn't learned in the previous meeting?
9        A.    It was a review of some and then
10   gaining a better knowledge of them.
11       Q.    Why did you want to learn about
12   the KPIs to prepare for the deposition?
13       A.    That was -- that's really an
14   asset protection tool that I wasn't thoroughly
15   involved in, and I wanted to get an idea of some
16   of the different KPIs, such as the trifecta or
17   other pieces of what asset protection was doing.
18       Q.    When you say "trifecta," what do
19   you mean by that?
20       A.    That is one of the tools that
21   Andy uses to identify like cycle counts down.
22   There's three parts of the tool that he uses to
23   identify outlying stores.
24       Q.    What is a cycle count?

Page 131

1        A.    A cycle count is when a
2    pharmacist is in a store and they go to the shelf
3    and they pick a bottle off and the bottle has 90
4    pills in it and they go to dispense in the
5    dispensing system and instead of 90 pills, the
6    dispensing system says that they should have 100.
7    And at that point then they cycle count down from
8    100 to 90 pills, so that the system is correct
9    with what the on-hand quantity is.
10       Q.    Why is that something that the
11   asset protection department measures?
12         MS. McENROE:  Objection to form.
13         You may answer.
14         THE WITNESS:  Asset protection
15       looks at cycle counts down for potential
16       diversion.
17   BY MR. PIFKO:
18       Q.    Because theoretically if the
19   system says there's a higher number of pills than
20   there actually are, they might have been stolen
21   by somebody?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  That is correct.
24   BY MR. PIFKO:

Page 132

1        Q.    So you mentioned cycle counts.
2          What else is in the trifecta that
3    you mentioned?
4        A.    I don't remember.
5        Q.    Did you discuss anything else
6    with Mr. Palmer in the second meeting?
7          MS. McENROE:  Same instruction
8       with respect to privilege.
9          You may answer.
10         THE WITNESS:  Not that I
11      remember, no.
12   BY MR. PIFKO:
13       Q.    How about Ron Chima, what did
14   you --
15         MS. McENROE:  Go ahead.
16   BY MR. PIFKO:
17       Q.    What did you discuss with Mr.
18   Chima?
19         MS. McENROE:  I'm going to object
20      and instruct the witness not to answer.
21      Mr. Chima is in-house counsel for Rite
22      Aid, and so I -- I have given you some
23      leeway with respect to the underlying
24      fact witnesses, but I'm sorry that I

Page 133

1    can't do the same with respect to Mr.
2    Chima.
3    BY MR. PIFKO:
4        Q.    Did you discuss any facts that
5    you needed to know to serve as the 30(b)(6)
6    witness with Mr. Chima?
7          MS. McENROE:  That's just a yes
8       or no.
9          THE WITNESS:  I did not discuss
10      any facts.
11   BY MR. PIFKO:
12       Q.    How long did you meet with Mr.
13   Chima?
14       A.    Not long at all.  I would -- you
15   know, a short meeting.  Not even a meeting, a
16   conversation.
17         MS. McENROE:  Okay.
18   BY MR. PIFKO:
19       Q.    Was that in person?
20         MS. McENROE:  You may answer that
21      question.
22         THE WITNESS:  Yes.
23   BY MR. PIFKO:
24       Q.    When was that?

Page 134

1    A.    Way back when the whole process
2  started.
3    Q.    So a few months ago?
4    A.    Yes.
5    Q.    On or around the time that you
6  first saw the notices?
7    A.    Yes.
8        MR. PIFKO:  Why don't take a --
9  it looks like it's 12:20, we'll take a
10  lunch break.
11       MS. McENROE:  Sure.
12       THE VIDEOGRAPHER:  Going off the
13  record at 12:16 p.m.
14        -  -  -
15       (A recess was taken from
16  12:16 p.m. to 1:10 p.m.)
17        -  -  -
18       THE VIDEOGRAPHER:  Back on the
19  record at 1:10 p.m.
20  BY MR. PIFKO:
21    Q.    Welcome back.
22    A.    You too.
23    Q.    Before the break, we were talking
24  about threshold increases.

Page 135

1        Do you recall that?
2    A.    I do.
3         -  -  -
4        (Deposition Exhibit No.
5  Hart-30(b)(6)-5, Email chain, top one
6  dated 16 Sep 2011, Bates stamped
7  MCKMDL00632923 through MCKMDL00632925,
8  was marked for identification.)
9         -  -  -
10  BY MR. PIFKO:
11    Q.    I'm handing you a document that
12  was previously admitted with Ms. Novack's
13  deposition, but I'm also going to remark it for
14  this deposition.  It's marked as Novack-6, but
15  I'm going to mark it here as Hart-30(b)(6)-5.
16    A.    Thank you.
17    Q.    Take a minute to review that.
18        For the record, it's document
19  Bates labeled MCKMDL00632923 through 25.
20       MS. McENROE:  Just for the
21  record, I'm going to object as to scope.
22  I know that we have topic 18, which is,
23  "Each application for, and/or change of,
24  any threshold to prescription" opioids --

Page 136

1  "opiates," sorry, in a CT1 jurisdiction."
2        Looking at this document just
3  briefly --
4        MR. PIFKO:  Well, I haven't asked
5  a question yet, so --
6        MS. McENROE:  I know.  I'm just
7  objecting to the line of questioning that
8  would come off of this document that you
9  just put in as one to go with her
10  30(b)(6), because I don't believe this
11  actually has to do with Rite Aid of
12  Maryland's thresholds.
13       MR. KELLY:  I'm going to object.
14  This is a McKesson-produced document,
15  based on the Bates stamp.
16       MR. PIFKO:  It's already been
17  admitted in other depositions, so --
18       MR. KELLY:  But -- that may be
19  the case with a different deponent, but
20  we haven't had this pre-cleared for this
21  particular witness.  I don't know if we
22  have taken a look at it yet to see if
23  there's any --
24       MR. PIFKO:  It's also not --

Page 137

1  permission isn't required, because it's
2  only information that the Rite Aid
3  company had already had awareness of.
4  There's nothing just McKesson on here.
5        MR. KELLY:  Okay.
6        MS. MOORE:  I think -- wasn't the
7  agreement that if the witness isn't on
8  the document -- isn't the --
9        MR. PIFKO:  Well, she's Rite Aid.
10  She's -- the witness is Rite Aid.  Rite
11  Aid is on it.
12       MR. KELLY:  Just to be clear,
13  we're lodging an objection on the record,
14  we're not withdrawing it, but I
15  understand the point that you're making.
16  Looking through this briefly, it doesn't
17  appear that this witness is on this
18  document.
19       MR. PIFKO:  The witness is Rite
20  Aid, and Rite Aid is all over the
21  document.
22       MS. McENROE:  The witness is
23  testifying on behalf of Rite Aid of
24  Maryland, Inc., doing business as the

Page 138

1    Mid-Atlantic Customer Support Center,
2    which is the Perryman Distribution
3    Center, for clarification.
4         I don't think you've established
5    that that equals Rite Aid or Ms. Lai in
6    any way, but you may proceed.
7    BY MR. PIFKO:
8         Q.    Are you done reviewing the
9    document?
10        A.    I'm reading.
11        Q.    Huh?
12        A.    I'm reading.
13        Q.    Okay.
14        A.    Okay.
15        Q.    Have you seen this document
16   before?
17        A.    I don't believe so.
18        Q.    Do you understand what's being
19   discussed in this document?
20        A.    I do.
21        Q.    What's your understanding of the
22   discussion here?
23        A.    A Rite Aid store location is
24   requesting an increase from McKesson in the

Page 139

1    threshold for oxycodone.
2         Q.    So as a structural matter, we
3    talked about Rite Aid thresholds.
4         You recall discussing that
5    earlier.  Correct?
6         A.    Yes.
7         Q.    Okay.  If a pharmacy exceeds a
8    Rite Aid threshold, that pharmacy can order
9    directly from McKesson.  Correct?
10        A.    They can order from McKesson,
11   yes.
12        Q.    Do they need anyone's permission
13   to place an order from McKesson?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  They do not.
16   BY MR. PIFKO:
17        Q.    And the pharmacist just does that
18   directly on their own?
19        A.    They can, yes.
20        MR. KELLY:  Objection to form.
21   BY MR. PIFKO:
22        Q.    They just call McKesson, some
23   account executive, and place the order.
24        Is that how it works?

Page 140

1         MS. McENROE:  Objection to form
2    and again scope.  I don't see how this
3    falls within the 30(b)(6) topics in any
4    way.
5         THE WITNESS:  There's an
6    automated system.  They can log on to a
7    computer and generate an order from
8    McKesson.  They don't have to make a
9    phone call.
10   BY MR. PIFKO:
11        Q.    Is there a policy that when Rite
12   Aid was self-distributing Schedule III controlled
13   substances that it should only place an order for
14   those substances from McKesson if it exceeded its
15   own threshold?
16        MS. McENROE:  Objection to form.
17        THE WITNESS:  There was no policy
18   that stated that if a store reached the
19   Rite Aid threshold that they were to
20   order that product from McKesson.
21   BY MR. PIFKO:
22        Q.    Was there a policy, though, that
23   said they couldn't order from McKesson unless
24   they had exceeded their threshold?

Page 141

1         MS. McENROE:  Objection to form.
2         THE WITNESS:  They could order
3    from McKesson and -- even if they didn't
4    reach their threshold.
5    BY MR. PIFKO:
6         Q.    Okay.  So there was no
7    limitations on how a pharmacy could place an
8    order with McKesson?
9         MS. McENROE:  Objection to form.
10        THE WITNESS:  There were McKesson
11   thresholds in place as well as Rite Aid
12   thresholds.
13   BY MR. PIFKO:
14        Q.    We'll get to that.
15        But my question just is, other
16   than speaking about thresholds, just as a general
17   matter, there was no limitation on the
18   circumstances when a Rite Aid pharmacy could
19   place a direct order with McKesson with respect
20   to Schedule III substances during the time period
21   when Rite Aid self-distributed those substances?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  There was not.
24   BY MR. PIFKO:

Page 142

1    Q.   So getting into that, with
2  respect to thresholds, it's your understanding
3  that in addition to the Rite Aid thresholds, if a
4  Rite Aid store ordered from McKesson, McKesson
5  had its own threshold system.  Correct?
6         MS. McENROE:  Objection to form.
7     And again this whole line of questioning
8     is way beyond the scope of the 30(b)(6).
9         THE WITNESS:  They did.
10 BY MR. PIFKO:
11    Q.   Did Rite Aid consider the
12 thresholds established by McKesson to be part of
13 its suspicious order monitoring program?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  We did not.
16 BY MR. PIFKO:
17    Q.   So this document that you've been
18 handed, it discusses a request that's first
19 internally being discussed at Rite Aid about
20 requesting an increase and then ultimately
21 there's a request to McKesson.
22        Do you agree?
23        MS. McENROE:  Objection to form.
24     Again, the witness is not on the

Page 143

1     document.
2         THE WITNESS:  I do.
3  BY MR. PIFKO:
4     Q.   Was there a procedure in place
5  where, if a Rite Aid store wanted to exceed a
6  McKesson threshold, they had to get permission
7  from you first?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  The McKesson
10    thresholds at this time were not under my
11    jurisdiction.
12 BY MR. PIFKO:
13    Q.   At some later time they were?
14    A.   At some later time they were,
15 yes.
16        MR. KELLY:  Objection.
17 BY MR. PIFKO:
18    Q.   When did McKesson thresholds move
19 under your jurisdiction?
20    A.   Once Ms. Lai left her position at
21 the corporate office.
22        MR. KELLY:  Objection to form.
23 BY MR. PIFKO:
24    Q.   When was that?

Page 144

1    A.   I don't remember.  I don't
2  remember the exact time.
3     Q.   Was that during a time when Rite
4  Aid still self-distributed Schedule III
5  substances?
6     A.   I don't believe so, but I'm not
7  sure.
8     Q.   So prior to you having
9  jurisdiction over McKesson thresholds, Sophia
10 Lai, or she changed her name to Novack, she had
11 authority over McKesson thresholds --
12        MS. McENROE:  Objection.
13 BY MR. PIFKO:
14    Q.   -- with respect to the extent
15 there was anyone at Rite Aid who had authority
16 over it?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  Yes.  The McKesson
19    thresholds rested with Sophia in asset
20    protection.
21 BY MR. PIFKO:
22    Q.   So if a pharmacy wanted to make a
23 request to exceed a McKesson threshold, they had
24 to first go through Ms. Lai; is that correct?

Page 145

1         MS. McENROE:  Objection to form.
2         THE WITNESS:  That is correct.
3  BY MR. PIFKO:
4     Q.   Are you familiar with any
5  criteria that Ms. Lai would use to evaluate
6  whether a pharmacy was allowed to make such a
7  request to McKesson?
8         MS. McENROE:  Objection to form.
9     And again, you already elicited the
10    testimony that Rite Aid did not consider
11    the McKesson thresholds to be part of the
12    suspicious order monitoring.
13        MR. PIFKO:  You're giving a
14    speaking objection.  You can't do that.
15    You've got to stop --
16        MS. McENROE:  You said I could
17    have 10 seconds.  And you're going far
18    beyond --
19        MR. PIFKO:  No, no.  I didn't say
20    you could have 10 seconds.  You can
21    object to scope and that's it.  You're
22    coaching the witness.  You need to stop.
23        MS. McENROE:  I'm not coaching
24    the witness.  I'm trying to speak to you.

Page 146

1    MR. PIFKO: You're speaking here,
2  you're giving testimony.
3    MS. McENROE: Do you want to go
4  off the record --
5    MR. PIFKO: No.
6    MS. McENROE: -- and you and I
7  can go talk in the hallway?
8    MR. PIFKO: No, I don't.
9    MS. McENROE: Then that's fine.
10    MR. PIFKO: I want you to object
11  properly.
12    MS. McENROE: I'm objecting just
13  fine. You are all over the place.
14    MR. PIFKO: Okay.
15    MS. McENROE: Can you tell me
16  which 30(b)(6) topic --
17    MR. PIFKO: No. I'm asking the
18  questions here. Okay?
19    MS. McENROE: -- you are talking
20  about?
21    MR. PIFKO: If you want to --
22    MS. McENROE: I understand you're
23  asking questions, but you're way beyond
24  the scope. She already gave you

Page 147

1  testimony, this isn't part of our
2  suspicious order monitoring program.
3  Where is your basis for asking the
4  question?
5    MR. PIFKO: Are you done
6  speaking? Are you done speaking?
7    MS. McENROE: Are you just not
8  going to tell me?
9    MR. PIFKO: You're interrupting
10  the deposition. Okay?
11    MS. McENROE: Are you not going
12  to tell me?
13    MR. PIFKO: You can object to
14  form. You can object to scope. Other
15  than that, you need to be quiet.
16    MS. McENROE: Well, I'm going to
17  take that as a concession that you don't
18  have a 30(b)(6) topic, so a full --
19    MR. PIFKO: I'm not conceding
20  anything.
21    MS. McENROE: -- line of
22  questioning is improper.
23    MR. PIFKO: I'm asking my
24  questions. Okay? We can fight about the

Page 148

1  scope of it after the deposition is over.
2    MS. McENROE: Objection as to
3  scope.
4  BY MR. PIFKO:
5    Q.  Okay. So my question for you
6  was, do you know if Ms. Lai had any criteria that
7  she would evaluate as far as whether a pharmacy
8  was allowed to make a request to McKesson to
9  exceed the McKesson threshold?
10    MS. McENROE: Objection to form,
11  objection to scope.
12    THE WITNESS: I'm sure she had
13  criteria. I don't -- I'm not familiar
14  with what her criteria were.
15  BY MR. PIFKO:
16    Q.  Did you ever discuss her
17  reviewing of McKesson thresholds with her?
18    MS. McENROE: Objection to form,
19  objection to scope.
20    THE WITNESS: We did discuss,
21  yes.
22  BY MR. PIFKO:
23    Q.  What was the nature of your
24  discussion?

Page 149

1    A.  Looking at various doctors as
2  related to the thresholds. And she would ask if
3  a particular store who was the top prescriber and
4  we could run a prescriber activity report for her
5  to review, things along those lines.
6    Q.  And that's something that she
7  would do in the course of evaluating a threshold
8  request?
9    MS. McENROE: Objection.
10  Objection to form, objection to scope.
11    THE WITNESS: To the best of my
12  knowledge, yes.
13  BY MR. PIFKO:
14    Q.  She reported to you during this
15  time?
16    A.  She did not.
17    Q.  Okay. Oh, you said she was in
18  asset protection; is that correct?
19    A.  Yes.
20    Q.  Who did she report to?
21    A.  Bob Oberosler.
22    Q.  So yesterday you recall
23  discussing this store. Correct? If you go --
24  it's on the second page, 3151.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.   Yes.
2    Q.   You just explained that when a
3  threshold request was made, there would be
4  occasions when you would run a top prescriber
5  report?
6         MS. McENROE:  Again, objection to
7     form, objection to scope.
8         THE WITNESS:  Yes.
9  BY MR. PIFKO:
10   Q.   Was that a policy of the company,
11 that if there was going to be a threshold
12 increase, you have to run a prescriber report?
13        MS. McENROE:  Objection to form,
14    objection to scope.
15        THE WITNESS:  I don't know what
16    Sophia's policy was or what asset
17    protection policy was as far as approving
18    McKesson thresholds.
19 BY MR. PIFKO:
20   Q.   How about for a Rite Aid
21 threshold?  If you were going to approve an
22 increase of a Rite Aid threshold, did you run a
23 prescriber report?
24   A.   Typically, no.

Page 151

1    Q.   Do you have any understanding as
2  to why one would run a prescriber report when you
3  were going to exceed a McKesson threshold but not
4  for Rite Aid?
5         MS. McENROE:  Objection to form,
6     objection to scope.
7         THE WITNESS:  That was just the
8     policy from the Rite Aid perspective.
9  BY MR. PIFKO:
10   Q.   You said from time to time Ms.
11 Lai discussed prescribers with you in connection
12 with these types of requests.  Correct?
13   A.   True, yes.
14   Q.   Do you recall this particular
15 request and this particular physician?
16        MS. McENROE:  Objection to form,
17    objection to scope.
18        THE WITNESS:  I don't recall
19    discussing a Dr. Adolph Harper with
20    Sophia.
21 BY MR. PIFKO:
22   Q.    It says here on the second page
23 of the document, at the -- towards the top, Mary
24 Menegay -- am I saying that right?

Page 152

1    A.   Menegay.
2    Q.   Okay, Menegay.
3         Writes to, it looks like, Ms.
4  Lai.
5         Who is Mary?
6    A.   She would be the pharmacy
7  district manager.
8    Q.   So is this consistent with what
9  you said before about a store maybe would need to
10 talk to the district manager first?
11        MS. McENROE:  Objection to form.
12        THE WITNESS:  Correct.
13 BY MR. PIFKO:
14   Q.   Okay.  So that's your
15 understanding of why Mary's involved in this
16 discussion?
17   A.   Yes.  She's the pharmacy district
18 manager.  It's on -- it's on the paper.
19   Q.   Okay.  And you see her, it says,
20 "The orders are needed" -- Mary writes, "The
21 orders are needed.  There is increased activity
22 from a local pain management doctor.  Cx who were
23 previously filling at store 3151 are now coming
24 to 3182.  Can the threshold be increased?"

Page 153

1         Do you see that?
2    A.   I do.
3    Q.    What does Cx mean in the context
4  of this sentence, do you know?
5    A.   Customer.
6    Q.   Okay.  So it's saying there's
7  increased volume at store 3151 and 3182 because
8  of customers from this doctor.
9         You agree?
10        MS. McENROE:  Objection to form,
11    misstates the record.
12        THE WITNESS:  I believe it's
13    stating that the customers are moving
14    from store 3151 to store 3182.
15 BY MR. PIFKO:
16   Q.   Okay.  But that -- you also agree
17 that it's increased activity apparently from this
18 particular doctor.  Correct?
19        MS. McENROE:  Objection to form.
20        THE WITNESS:  Yes.
21 BY MR. PIFKO:
22   Q.   On occasions when Ms. Lai would
23 discuss prescribers with you, what would be the
24 nature of those discussions?

Page 154

1    MS. McENROE:  Objection to form.
2    THE WITNESS:  We may do a
3  prescriber analysis.  We would look at an
4  individual prescriber and determine their
5  book of business.  We would at times run
6  a prescriber activity report from the
7  Rite Aid system to look at the types of
8  prescriptions that we were filling for
9  that prescriber.  It all depends.
10    Back in 2011, we would have had
11  access to Rite Aid data to look at as far
12  as what prescriptions were being
13  dispensed.
14  BY MR. PIFKO:
15    Q.  So when you say -- I want to ask
16  a couple details on some of those things you
17  said.
18    When you say you would look at an
19  individual prescriber and determine their book of
20  business, what did you mean by that?
21    A.  I mean we would look at the types
22  of prescriptions that they were writing for,
23  break them out if they were a Schedule II, III,
24  IV or V, or a noncontrolled prescription.  We

Page 155

1  would look at the percentage of the controlled
2  substance versus the non-controlled substance
3  that the doctor was prescribing for.  We would
4  look at the prescriber's specialty to determine
5  if there was -- if it was a pain management
6  doctor, obviously there would be additional
7  perhaps opioids that would be needed.  So we
8  would look at various items like that.
9    Q.  What would the purpose of that
10  inquiry be?  Why would you be looking at those
11  things?
12    MS. McENROE:  Objection to form,
13    objection to scope.
14    THE WITNESS:  We would look at
15    those things to determine if the
16    prescriber had a valid -- had a -- if the
17    prescriber was prescribing within their
18    scope of practice and within normal
19    range.
20  BY MR. PIFKO:
21    Q.  So you would look at the types of
22  prescriptions and the nature of the doctor's
23  practice to see if the prescriptions being
24  written are consistent with what one would expect

Page 156

1  to see from that type of doctor?
2    MS. McENROE:  Objection to form,
3    objection to scope.
4    THE WITNESS:  Yes.
5  BY MR. PIFKO:
6    Q.  And the purpose of doing that is
7  to identify a potential red flag?
8    MS. McENROE:  Objection to form,
9    objection to scope.
10    THE WITNESS:  It would be to
11    identify, yes, a suspicious prescriber.
12  BY MR. PIFKO:
13    Q.  So if you saw a doctor writing
14  high volumes of prescriptions of concern, that
15  could be a red flag?
16    MS. McENROE:  Objection to form,
17    objection to scope.
18    THE WITNESS:  Just simply writing
19    high volumes of controlled substances is
20    not a red flag based on their specialty.
21    Like you will see orthopedic doctors are
22    going to have a high amount of controlled
23    substances after surgeries.  So just
24    because there's a high amount of

Page 157

1    controlled substances doesn't necessarily
2    mean that there's a red flag.
3  BY MR. PIFKO:
4    Q.  Have you heard of the concept
5  "the holy trinity"?
6    MS. McENROE:  Objection to form,
7    objection to scope.
8    THE WITNESS:  I have.
9  BY MR. PIFKO:
10    Q.  What does that mean to you?
11    A.  The holy trinity is an opioid, a
12  benzodiazepam -- benzodiazepine and a muscle
13  relaxant prescribed for a person at one time.
14    Q.  Is that a red flag?
15    MS. McENROE:  Objection to form,
16    objection to scope.
17    THE WITNESS:  The trinity is a
18    red flag, yes.
19  BY MR. PIFKO:
20    Q.  And why is that a red flag?
21    MS. McENROE:  Objection to form,
22    objection to scope.
23    THE WITNESS:  The DEA has come
24    out and stated that there should be no

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  reason why a prescriber should prescribe
2  those three medications for one patient
3  at one time.
4  BY MR. PIFKO:
5      Q.    Would you also look at the nature
6  of the patients when you ran some of this
7  prescriber level analysis?
8          MS. McENROE:  Objection to form,
9      objection to scope.
10         THE WITNESS:  We would look at
11     patients if one -- when we ran our
12     analysis, if one patient stood out, we
13     would look at a particular patient, yes.
14 BY MR. PIFKO:
15     Q.    Would you look at the actual
16 scripts that were written?
17         MS. McENROE:  Objection to form,
18     objection to scope.
19         THE WITNESS:  We would look at
20     original scripts as well.
21 BY MR. PIFKO:
22     Q.    Would you look at the conditions
23 for which the prescription was being written?
24         MS. McENROE:  Objection to form,

Page 159

1      objection to scope.
2          THE WITNESS:  We would look if
3      there was a description.
4  BY MR. PIFKO:
5      Q.    Okay.  But you wouldn't -- what
6  would you do -- if there was a description, what
7  would you do with that information?
8          MS. McENROE:  Objection to form,
9      objection to scope.
10         THE WITNESS:  It would remain on
11     the prescription.
12 BY MR. PIFKO:
13     Q.    But would you look if there
14 was -- a prescription was being written for a
15 medication that the reason on the prescription
16 seemed unusual to you?
17         MS. McENROE:  Objection to form,
18     objection to scope.
19         THE WITNESS:  Yes.
20 BY MR. PIFKO:
21     Q.    And what would you do with that
22 information?
23         MS. McENROE:  Objection to form,
24     objection to scope.

Page 160

1          THE WITNESS:  We would look at
2      the patient profile and look at the type
3      of the prescriber and review it.
4  BY MR. PIFKO:
5      Q.    Would you look at the physical
6  location of the prescriber in relationship to the
7  patient?
8          MS. McENROE:  Objection to form,
9      objection to scope.
10         THE WITNESS:  We could look at
11     that, yes.
12 BY MR. PIFKO:
13     Q.    You would agree that one red flag
14 is if you have patients from out of the area
15 filling a prescription, that could be a red flag?
16         MS. McENROE:  Objection to form,
17     objection to scope.
18         THE WITNESS:  Patients traveling
19     distance to get a prescription filled
20     could be a red flag or it may not be a
21     red flag.
22 BY MR. PIFKO:
23     Q.    Would you agree that -- in what
24 situation would it be a red flag?

Page 161

1          MS. McENROE:  Objection to form,
2      objection to scope.
3          THE WITNESS:  It could possibly
4      be a red flag if a patient lived two
5      hours away from a pharmacy and drove by
6      two other pharmacies to get to the
7      pharmacy where they were filling it.
8  BY MR. PIFKO:
9      Q.    What about if a doctor is from
10 out of the area and the patient is bringing a
11 script from a far away doctor?  Is that a red
12 flag?
13         MS. McENROE:  Objection to form,
14     objection to scope.
15         THE WITNESS:  Again, it all
16     depends on the type of doctor, where the
17     patient and the pharmacy is located.
18     There are things to consider if it's,
19     say, Johns Hopkins -- if the doctor is
20     from Johns Hopkins and the patient is
21     filling it on the Eastern Shore of
22     Maryland, I wouldn't -- that may not be a
23     red flag as obviously Johns Hopkins is a
24     medical hub type thing.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 BY MR. PIFKO:
2     Q.    On these occasions when you would
3 run these prescriber analyses, would you document
4 your findings?
5         MS. McENROE:  Objection to form,
6     objection to scope.
7         THE WITNESS:  We would maintain a
8     file on the doctor.
9         Again, this was Sophia, but -- in
10     this instance, but if we were reviewing
11     doctors, yes, we would maintain a file on
12     that doctor.
13 BY MR. PIFKO:
14     Q.    What would that file be called?
15         MS. McENROE:  Objection to form,
16     objection to scope.
17         THE WITNESS:  The file would be
18     the DEA number of the doctor and their
19     name.
20 BY MR. PIFKO:
21     Q.    Is there some sort of specific
22 use that you would do with that file?
23         MS. McENROE:  Objection to form,
24     objection to scope.

Page 163

1         THE WITNESS:  We just store it on
2     our drives.
3 BY MR. PIFKO:
4     Q.    Would there be occasions if you
5 found -- I believe you said on certain occasions
6 there can be a suspicious prescriber; is that
7 correct?
8         MS. McENROE:  Objection to form,
9     objection to scope.
10         THE WITNESS:  That is correct.
11 BY MR. PIFKO:
12     Q.    If you found a prescriber to be a
13 suspicious prescriber, what would you do?
14         MS. McENROE:  Objection to form,
15     objection to scope.
16         THE WITNESS:  If we found a
17     suspicious prescriber, we would then look
18     at the profile, verify the profile and
19     send out a clinic protocol to the field
20     teams, the asset protection district
21     manager and the pharmacy district
22     manager, to go and visit the prescriber's
23     office.
24 BY MR. PIFKO:

Page 164

1     Q.    And what would the nature of the
2 visit to the prescriber's office be?
3         MS. McENROE:  Objection to form,
4     objection to scope.
5         THE WITNESS:  We have all of the
6     data in front of us, but we don't know
7     what the office looks like, if it's a
8     functioning office, if it's in an office
9     building that would look like a
10     physician's office.  And so the PDM and
11     the APDM are responsible for sending back
12     pictures of the doctor's office if
13     possible, looking at the doctor's office
14     to determine if there are people walking
15     in and out and getting prescriptions
16     every five minutes and not what would be
17     a normal doctor visit.
18         So they would be the eyes and
19     ears looking for things like that.
20 BY MR. PIFKO:
21     Q.    When you said PDM, you meant
22 pharmacy district manager?
23     A.    Yes.
24     Q.    And APM is assistant pharmacy

Page 165

1 manager?
2     A.    Asset protection.
3     Q.    Okay.  Thank you.
4         In connection with those visits,
5 would they speak to the doctor?
6         MS. McENROE:  Objection to form,
7     objection to scope.
8         THE WITNESS:  They would ask to
9     speak with office staff or to speak with
10     the doctor.  They would provide
11     information on Rite Aid, such as the
12     ability to get a flu shot at Rite Aid,
13     things along those lines.
14 BY MR. PIFKO:
15     Q.    Would they tell the doctor that
16 they were investigating that doctor as a
17 potentially suspicious prescriber?
18         MS. McENROE:  Objection to form,
19     objection to scope.
20         THE WITNESS:  They would not.
21 BY MR. PIFKO:
22     Q.    So then at some point this
23 inquiry into the suspicious prescriber reaches
24 some resolution.  Agreed?

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1          MS. McENROE: Objection to form,
2   objection to scope.
3          THE WITNESS: Yes.
4   BY MR. PIFKO:
5      Q.    If Rite Aid finds that a
6   prescriber is a suspicious prescriber after
7   finishing that investigation, what does it do?
8          MS. McENROE: Objection to form,
9   objection to scope.
10         THE WITNESS: We have the
11     pictures come back and we have a file of
12     all the data that we've run. And at that
13     point, if there's -- if we believe that
14     it is a suspicious prescriber, we have a
15     committee of three pharmacists at our
16     corporate office that will sit down and
17     look at the data, look at the pictures,
18     and make a determination if that
19     prescriber is a book of business that we
20     wanted or not.
21  BY MR. PIFKO:
22     Q.    So ultimately a decision could be
23  made not to service prescriptions from that
24  doctor; is that correct?

Page 167

1          MS. McENROE: Objection to form,
2   objection to scope.
3          THE WITNESS: Controlled
4     substance prescriptions, yes.
5   BY MR. PIFKO:
6      Q.    To your knowledge, has that
7   happened on occasion?
8          MS. McENROE: Objection to form,
9   objection to scope.
10         THE WITNESS: It has.
11  BY MR. PIFKO:
12     Q.    And when Rite Aid makes a
13  determination that they're not going to service a
14  prescriber anymore because they deem that
15  prescriber's practice to be sufficiently
16  suspicious, what would they do to implement that
17  decision?
18         MS. McENROE: Objection to form,
19     objection to scope.
20         THE WITNESS: Once the three
21     pharmacists at the corporate office sign
22     off that it's a book of business that we
23     don't want for the controlled substance,
24     then I notify the prescriber in a letter

Page 168

1   that states that because of the
2   prescription of oxycodone, or whatever
3   the drug may be, that effective at a
4   certain date, Rite Aid will no longer
5   dispense controlled substance
6   prescriptions under their DEA number.
7   BY MR. PIFKO:
8      Q.    Do they have an appeal process or
9   anything or is that decision final once it's
10  made?
11         MS. McENROE: Objection to form,
12     objection to scope.
13         THE WITNESS: Typically when we
14     get to that point, they may call and ask
15     for an appeal, but when we reach that
16     decision, that's a very serious decision
17     that we don't take lightly. So typically
18     there is no appeal.
19  BY MR. PIFKO:
20     Q.    To your knowledge, has that
21  happened ever?
22         MS. McENROE: Objection to form,
23     objection to scope.
24         THE WITNESS: Has what happened?

Page 169

1   BY MR. PIFKO:
2      Q.    You've made a determine to stop
3   servicing business from a particular prescriber?
4          MS. McENROE: Objection to form,
5     objection to scope.
6          THE WITNESS: Yes, we have.
7   BY MR. PIFKO:
8      Q.    Do you have a rough estimate
9   about how many times it's happened in your
10  career?
11         MS. McENROE: Objection to form,
12     objection to scope.
13         THE WITNESS: Over 150 times.
14  BY MR. PIFKO:
15     Q.    That number came rather quickly.
16         You feel like that's a --
17     A.    Very close, yes.
18         MS. McENROE: Objection to form,
19     objection to scope.
20  BY MR. PIFKO:
21     Q.    Okay. Do you keep statistics on
22  that somewhere?
23         MS. McENROE: Objection to form,
24     objection to scope.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    THE WITNESS: We do.
2  BY MR. PIFKO:
3    Q.    That's a statistic that you have
4  reviewed in the recent past?
5        MS. McENROE: Objection to form,
6    objection to scope.
7        THE WITNESS: I'm familiar with
8    it on a daily basis.
9  BY MR. PIFKO:
10    Q.    That's something you check every
11  day?
12        MS. McENROE: Objection to form,
13    objection to scope.
14        THE WITNESS: Not every day, but
15    at least monthly.
16  BY MR. PIFKO:
17    Q.    Can a doctor get reinstated after
18  they've been terminated?
19        MS. McENROE: Objection to form,
20    objection to scope.
21        THE WITNESS: Yes. A doctor can
22    get reinstated.
23  BY MR. PIFKO:
24    Q.    Is there a formal process that

Page 171

1  they have to follow?
2        MS. McENROE: Objection to form,
3    objection to scope.
4        THE WITNESS: The doctor makes a
5    request of -- from myself that they would
6    like to be reinstated. And then I go in
7    and look at the prescriber's history.
8        So let's say it's been a year
9    since we shut the doctor off. What then
10    happens is he requests to be reinstated a
11    year later. I would look at that
12    doctor's history for the year, his
13    prescribing pattern for that year, to
14    determine if it has changed from when we
15    shut the person off.
16  BY MR. PIFKO:
17    Q.    But you wouldn't have a history
18  on the substances, the controlled substances that
19  you shut off because you weren't servicing that.
20  Correct?
21        MS. McENROE: Objection to form,
22    objection to scope.
23        THE WITNESS: That is not
24    correct. We have a tool -- from 2013 on,

Page 172

1  we had a tool that was through IQVIA that
2    would provide industry data deidentified
3    for about 87 percent of retail
4    pharmacists.
5  BY MR. PIFKO:
6    Q.    Okay. When you found that a
7  store has been servicing a suspicious prescriber,
8  have you ever undertaken anything to flag the
9  orders from that pharmacy as suspicious?
10        MS. McENROE: Objection to form,
11    objection to scope.
12        THE WITNESS: Could you repeat
13    the question, please?
14  BY MR. PIFKO:
15    Q.    So if a store is filling
16  prescriptions from a physician who's been
17  determined to be a suspicious prescriber, does
18  Rite Aid undertake any effort to identify orders
19  from that store as suspicious as a result of them
20  being from the suspicious prescriber?
21        MS. McENROE: Objection to form.
22        THE WITNESS: One more time, I'm
23    sorry.
24  BY MR. PIFKO:

Page 173

1    Q.    If a store is filling
2  prescriptions from a prescriber who's been
3  determined to be a suspicious prescriber, does
4  Rite Aid undertake any efforts to identify the
5  orders that come from that store -- during the
6  time when that suspicious prescriber was sending
7  patients to that store, does Rite Aid undertake
8  any effort to identify those orders as
9  suspicious?
10        MS. McENROE: Objection to form.
11        THE WITNESS: We do not.
12  BY MR. PIFKO:
13    Q.    So Rite Aid does not use any of
14  the suspicious prescriber information that it may
15  have collected in determining whether an order
16  from any location is suspicious. Correct?
17        MS. McENROE: Objection to form.
18        THE WITNESS: The order has
19    already been shipped to the store, so
20    there's -- that's not incorporated --
21    suspicious prescriber isn't incorporated
22    in.
23  BY MR. PIFKO:
24    Q.    What about when an investigation

Page 174

1  is going on, does Rite Aid undertake any effort
2  to look at the orders that are continuing to come
3  in as a result of prescriptions being placed
4  through that doctor?
5       MS. McENROE:  Objection to form.
6       THE WITNESS:  We continue to
7       monitor the prescriptions that would be
8       coming in, but we do not consider that a
9       suspicious order to place.
10 BY MR. PIFKO:
11      Q.    So I believe we -- I asked you a
12 little bit earlier, do you remember discussing
13 this doctor, Dr. Harper?
14      MS. McENROE:  Objection to form,
15      objection to scope.
16      THE WITNESS:  I don't remember
17      discussing the doctor with Sophia.
18 BY MR. PIFKO:
19      Q.    This is a -- this Exhibit 5, as
20 you see from the first page of the document, is a
21 request to increase the threshold through
22 McKesson for oxycodone.
23      Do you see that?
24      MS. McENROE:  Objection to form,

Page 175

1      objection to scope.
2       THE WITNESS:  Where is it
3       highlighted?
4  BY MR. PIFKO:
5       Q.    On the first page there.
6       A.    On the --
7       Q.    If you look on the screen in
8  front of you.
9       A.    It wasn't highlighted on my
10 screen.
11      Q.    Oh.
12      A.    Yes, I see the request.
13      Q.    That's not a substance that Rite
14 Aid self-distributed.  Correct?
15      A.    Correct.
16                 - - -
17      (Deposition Exhibit No.
18      Hart-30(b)(6)-6, Email dated 2011-02-01,
19      Bates stamped Rite_Aid_OMDL_0013134
20      through Rite_Aid_OMDL_0013136, was marked
21      for identification.)
22                 - - -
23 BY MR. PIFKO:
24      Q.    I'm handing you what's marked as

Page 176

1  Exhibit 6.
2       For the record, Exhibit 6 is a
3  three-page document Bates labeled
4  Rite_Aid_OMDL_0013134 through 36.
5       Please take a moment to look at
6  that and let me know when you're done.
7       A.    (Reviewing document.)
8       Q.    Have you seen this document
9  before?
10      A.    I don't believe so, no.
11      Q.    In reviewing this, do you know
12 what this document is?
13      A.    The document is a email from
14 Andrea Bucher to Marian and Kevin Mitchell about
15 a hydrocodone threshold at Rite Aid 3151.
16      Q.    If you go to the second page of
17 the document, it's a screenshot of an email.
18      Do you see that?
19      A.    I do.
20      Q.    It's making a request to increase
21 the hydrocodone threshold at store 3151.
22      Do you see that?
23      A.    I do.
24      Q.    And the email is -- has a date on

Page 177

1  the top of having been replied to December 7,
2  2010.
3       Do you see that?
4       A.    I do.
5       Q.    Do you know what this discussion
6  is that's reflected on the second page of
7  Exhibit 6?
8       MS. McENROE:  Objection to form.
9       THE WITNESS:  It -- that Andrea
10      is sending an email to Marian and
11      Kimberly to increase the threshold for
12      hydrocodone at 3151.
13 BY MR. PIFKO:
14      Q.    And this is a Rite Aid threshold
15 request, as opposed to a McKesson threshold
16 request.
17      Do you agree?
18      A.    I agree.
19      Q.    Do you recall, this is something
20 that would have required your approval.  Correct?
21      MS. McENROE:  Objection to form.
22      THE WITNESS:  I'm not sure if at
23      one point I gave authorization to Andrea
24      to be able to do it, but I will say that

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1　　　　McKesson -- that Rite Aid thresholds were
2　　my responsibility.
3　BY MR. PIFKO:
4　　　Q.　So you would have had
5　responsibility for approving this threshold
6　increase.  Right?
7　　　　　MS. McENROE:  Objection to form.
8　　　　　THE WITNESS:  Correct.
9　BY MR. PIFKO:
10　　　Q.　At some point, if you go to the
11　first page of Exhibit 6, the second page is --
12　just discusses that it appears that the Liverpool
13　Distribution Center was servicing that pharmacy.
14　　　　Do you agree?
15　　　A.　I do.
16　　　Q.　And then if you look on the first
17　page, it looks like the Perryman facility is then
18　going to be taking over responsibility for
19　distributing to that store.
20　　　　Do you agree?
21　　　A.　I do.
22　　　Q.　DC 10 is Perryman?
23　　　A.　Yes.
24　　　Q.　What do you understand the

Page 179

1　discussion on page -- the first page of Exhibit 6
2　to be reflecting?
3　　　　　MS. McENROE:  Objection, form.
4　　　　　THE WITNESS:  That the override
5　　　threshold that was in place for 3151 from
6　　　Liverpool was being transferred, since
7　　　the store was now being picked from
8　　　Perryman.
9　BY MR. PIFKO:
10　　　Q.　This is one of the same stores
11　that's reflected in Exhibit 5.  Agreed?
12　　　　　MS. McENROE:  Objection to form.
13　　　　　THE WITNESS:  Yes.
14　BY MR. PIFKO:
15　　　Q.　This store that they're noting
16　had an increase in activity from this pain
17　management doctor.  Agreed?
18　　　　　MS. McENROE:  Objection to form,
19　　　objection to scope.
20　　　　　THE WITNESS:  Yes.
21　　　　　　- - -
22　　　　　(Deposition Exhibit No.
23　　　Hart-30(b)(6)-7, Press Release entitled
24　　　"Akron Doctor Pleads Guilty to Illegally

Page 180

1　　　Prescribing Painkillers," was marked for
2　　　identification.)
3　　　　　　- - -
4　BY MR. PIFKO:
5　　　Q.　I'm handing you what was
6　previously marked as Novack Exhibit 8 and I'm
7　marking here as Hart-30(b)(6) Exhibit 7.
8　　　　Please take a moment to review
9　this.  Note it's double sided.
10　　　　Let me know when you're done.
11　　　　　MS. McENROE:  I'm also going to
12　　　make another scope objection for the
13　　　record.
14　　　　　THE WITNESS:  (Reviewing
15　　　document.)
16　　　　I'm done.
17　BY MR. PIFKO:
18　　　Q.　Have you seen this before?
19　　　A.　Yes.
20　　　Q.　When was the last time you saw
21　this?
22　　　A.　Within the past several days.
23　　　Q.　This is something you reviewed in
24　preparing for this deposition?

Page 181

1　　　A.　Yes.
2　　　Q.　Do you see the first sentence
3　here above the -- the headline reads, "Akron
4　Doctor Pleads Guilty to Illegally Prescribing
5　Painkillers."
6　　　　Do you see that?
7　　　A.　I do.
8　　　Q.　It's dated October 20, 2014.
9　　　　Do you see that?
10　　　A.　I do.
11　　　Q.　Do you see the first sentence
12　here, it says, "An Akron physician pleaded guilty
13　to illegally prescribing hundreds of thousands of
14　doses of painkillers and other pills to customers
15　for no legitimate medical purpose, even after he
16　learned some customers had died from
17　overdose-related deaths, law enforcement
18　officials said."
19　　　　Do you see that?
20　　　A.　I do.
21　　　Q.　Did Rite Aid institute efforts to
22　shut this particular doctor down from its --
23　serving his customers?
24　　　　　MS. McENROE:  Objection to form,

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    objection to scope.
2         THE WITNESS: I don't remember.
3         - - -
4         (Deposition Exhibit No.
5    Hart-30(b)(6)-8, Indictment, Case No.:
6    5:14CR096, was marked for
7    identification.)
8         - - -
9    BY MR. PIFKO:
10        Q.    I'm handing you what was
11   previously marked as Novack Exhibit 7 and I've
12   also marked here as Hart-30(b)(6) Exhibit 8.  For
13   the record, it's an indictment of Dr. Harper.
14        MS. McENROE:  For the record,
15        again, objection as to scope.  And can
16        you tie this to any of the 30(b)(6)
17        topics?  Because the witness already
18        said --
19   BY MR. PIFKO:
20        Q.    It's dated March 25, 2014.
21        Please take a moment to review
22   this document and let me know when you're done.
23        MS. McENROE:  I'm going to take
24        that as a no for purposes of the record.

Page 183

1         MR. PIFKO:  I'm disagreeing with
2    your characterization.  You can object to
3    scope.  And I'm not going to answer
4    questions from you.
5         THE WITNESS:  (Reviewing
6    document.)
7    BY MR. PIFKO:
8         Q.    As an initial matter, have you
9    seen this document before?
10        A.    I have.
11        Q.    When did you see this?
12        A.    The past several days.
13        Q.    Is this something you reviewed in
14   connection with preparing for this 30(b)(6)
15   deposition?
16        A.    It is.
17        Q.    You can feel free to look at it
18   as much as you want to, but I want to just ask
19   you, on the second page here, it notes that Dr.
20   Harper had issues with Schedule III substances.
21        Do you see that?  At the top of
22   the second page.
23        MS. McENROE:  Objection to form.
24        Where are you looking, Mark?  I'm sorry,

Page 184

1         I don't see what paragraph.
2         MR. PIFKO:  It's paragraph 1.  It
3    continues from the bottom of the first
4    page to the top of the second page.
5         MS. McENROE:  And objection to
6    the scope as well.
7         THE WITNESS:  I see hydrocodone.
8    BY MR. PIFKO:
9         Q.    And specifically it says that Dr.
10   Harper and some of his colleagues, who they refer
11   to as the Harper Drug Trafficking Organization,
12   it says, starting on the first page that they
13   "agreed to illegally distribute hundreds of
14   thousands of doses of prescription painkillers to
15   customers located in the Northern District of
16   Ohio and elsewhere.  They did so using ADOLPH
17   HARPER, JR.'S 'medical' offices located in Akron,
18   Ohio, by issuing drug orders purporting to be
19   'prescriptions' for Schedule II controlled
20   substances, primarily oxycodone, oxymorphone,
21   methadone, and amphetamines, Schedule III
22   controlled substances, primarily buprenorphine
23   and hydrocodone, and Schedule IV controlled
24   substances."  It continues on.

Page 185

1         Do you see that?
2         MS. McENROE:  Objection to form,
3         objection to scope.
4         THE WITNESS:  I do.
5    BY MR. PIFKO:
6         Q.    So you agree that part of this
7    indictment concerns Schedule III substances?
8         MS. McENROE:  Objection to form,
9         objection to scope.
10        THE WITNESS:  I do.
11   BY MR. PIFKO:
12        Q.    And those were substances that
13   Rite Aid self-distributed during this time
14   period.  Agree?
15        MS. McENROE:  Objection to scope.
16        THE WITNESS:  The hydrocodone was
17        distributed by Rite Aid.
18   BY MR. PIFKO:
19        Q.    Did Rite Aid ever identify any
20   orders from the pharmacies that serviced Dr.
21   Harper's customers as suspicious?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  Could you repeat
24        the question?  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

BY MR. PIFKO:

Q. Yeah.

Did Rite Aid ever identify any orders from the pharmacies that serviced Dr. Harper's customers as suspicious?

MS. McENROE: Objection to form.

THE WITNESS: To the best of my knowledge, no.

BY MR. PIFKO:

Q. Do you know if Rite Aid was aware of this indictment on or around the time that it occurred?

MS. McENROE: Object to the form, objection to scope.

THE WITNESS: I do not know.

BY MR. PIFKO:

Q. Does Rite Aid track whether any prescribers and -- who have customers that come to Rite Aid stores are indicted?

MS. McENROE: Objection to form, objection to scope.

THE WITNESS: We do not.

BY MR. PIFKO:

Q. Does Rite Aid track whether

Page 187

prescribers have lost their licenses?

MS. McENROE: Objection to form, objection to scope.

THE WITNESS: We have a database in our NextGen system that updates the prescriber file on a daily basis. Once a DEA license becomes invalid, that license becomes invalid in our system and no prescriptions can be dispensed under that prescriber's DEA number. It's a national database that's out there.

BY MR. PIFKO:

Q. How long has that been in place?

MS. McENROE: Objection to scope.

THE WITNESS: I'm going to say 2000 -- late 2000s, early 2000 -- late 2000s, like '9, '10, '11. That's just speculation. It could have been there before that, but...

BY MR. PIFKO:

Q. I'm handing you what's marked as Hart-30(b)(6) Exhibit 9.

- - -

(Deposition Exhibit No.

Page 188

Hart-30(b)(6)-9, Press Release, "Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act," 2 pages, was marked for identification.)

- - -

BY MR. PIFKO:

Q. Take a moment to review that.

If you recall, there was a brief discussion of this yesterday.

MS. McENROE: Again, for the record, objection as to scope as to the line of questioning pertaining to this exhibit as outside the scope of the 30(b)(6) topics.

THE WITNESS: (Reviewing document.)

BY MR. PIFKO:

Q. Have you seen this document before?

A. I have.

Q. When was the last time you saw this?

Page 189

A. Within the last several days.

Q. This is a document that you reviewed in preparing for your 30(b)(6) deposition?

A. Yes.

Q. Can you tell me what this is?

MS. McENROE: Objection to form, objection to scope.

THE WITNESS: It's an announcement of a settlement agreement between Rite Aid and the Drug Enforcement Administration from 2009.

BY MR. PIFKO:

Q. Does this refresh your recollection about when Rite Aid instituted the system that it uses to check whether prescribers' DEA licenses are invalid?

MS. McENROE: Objection to form, objection to scope.

THE WITNESS: I don't know that that coincides. I couldn't say that for sure.

BY MR. PIFKO:

Q. You agree this happened in 2009?

Page 190

1 It says here -- it's dated -- this press release
2 is dated January 12, 2009. Do you agree?
3          MS. McENROE: Objection to form,
4     objection to scope.
5          THE WITNESS: I do.
6 BY MR. PIFKO:
7     Q.    And you testified that you
8 believe that Rite Aid instituted its efforts to
9 check prescriber licenses sometime in 2009, '10
10 or '11; is that correct?
11          MS. McENROE: Objection to form.
12          THE WITNESS: I said that was --
13     I will correct the record then.
14          There was a system in place to
15     check licenses prior to that. There was
16     enhancement to the system as well.
17 BY MR. PIFKO:
18     Q.    The enhancement was sometime in
19 2009, '10 or '11?
20          MS. McENROE: Objection to form.
21          THE WITNESS: Again, I don't know
22     the date line of that. I don't have that
23     knowledge.
24 BY MR. PIFKO:

Page 191

1     Q.    Was that made as a result of this
2 settlement?
3          MS. McENROE: Objection to form,
4     objection to scope.
5          THE WITNESS: It was not.
6 BY MR. PIFKO:
7     Q.    There are some bullet points here
8 about halfway down the page.
9          Do you see those?
10     A.    I do.
11     Q.    It talks about some of the
12 alleged violations that occurred in connection
13 with this settlement.
14          Do you see that?
15     A.    I do.
16          MS. McENROE: Objection.
17 BY MR. PIFKO:
18     Q.    One of them is that "Rite Aid
19 knowingly filled prescriptions for controlled
20 substances that were not issued for a legitimate
21 medical purpose pursuant to a valid
22 physician-patient relationship."
23          Do you see that?
24          MS. McENROE: Objection to scope.

Page 192

1          THE WITNESS: I see that.
2 BY MR. PIFKO:
3     Q.    Do you agree that that was part
4 of the scope of the settlement agreement?
5          MS. McENROE: Objection to form,
6     objection to scope.
7          THE WITNESS: I do.
8 BY MR. PIFKO:
9     Q.    It also says that, "Rite Aid
10 failed to notify the DEA in a timely manner of
11 significant thefts and losses of controlled
12 substances, thus permitting the diversion of
13 controlled substances to continue and undermining
14 DEA's ability to investigate such thefts...or
15 losses."
16          Do you see that?
17          MS. McENROE: Objection to form,
18     objection to scope.
19          THE WITNESS: I do.
20 BY MR. PIFKO:
21     Q.    Do you agree that that was part
22 of the 2009 settlement?
23          MS. McENROE: Objection to form,
24     objection to scope.

Page 193

1          THE WITNESS: I do.
2 BY MR. PIFKO:
3     Q.    It also says, "Rite Aid failed to
4 properly execute DEA forms used to ensure that
5 the amount of Schedule II drugs ordered by Rite
6 Aid were actually received."
7          Do you see that?
8          MS. McENROE: Objection to form,
9     objection to scope.
10          THE WITNESS: I do.
11 BY MR. PIFKO:
12     Q.    Was that part of the settlement
13 as well?
14          MS. McENROE: Objection to form,
15     objection to scope.
16          THE WITNESS: That was part of
17     the settlement.
18          It should be noted that the Rite
19     Aid distribution center in Perryman was
20     not included or mentioned in the
21     settlement agreement.
22 BY MR. PIFKO:
23     Q.    It says here in the paragraph
24 after those bullet points, part of the last

Page 194

1 sentence, that accountability audits reflected "a
2 pattern of non-compliance with the requirements
3 of the Controlled Substances Act and federal
4 regulations that lead to the diversion of
5 controlled substances."
6          Do you see that?
7          MS. McENROE:  Objection to form,
8     objection to scope.
9          THE WITNESS:  You lost me on that
10    one.
11 BY MR. PIFKO:
12    Q.    It's highlighted on the screen
13 for you.
14    A.    Oh, okay.  Sorry.
15          I do.
16    Q.    Do you agree that that was part
17 of the settlement?
18          MS. McENROE:  Objection to form,
19     objection to scope.
20          THE WITNESS:  It was.
21 BY MR. PIFKO:
22    Q.    There's a quote here from the DEA
23 acting administrator, two paragraphs down, second
24 to last paragraph on the first page there.

Page 195

1          It says, at the bottom of that
2 paragraph, "Our nation's pharmacies must play a
3 major role in the fight against drug abuse, so
4 that together we can protect public health and
5 keep our communities safe."
6          Do you see that?
7          MS. McENROE:  Objection to form,
8     objection to scope.
9          THE WITNESS:  I do.
10 BY MR. PIFKO:
11    Q.    Do you agree with that statement?
12          MS. McENROE:  Objection to form,
13     objection to scope.
14          THE WITNESS:  I do.
15          MS. McENROE:  Mark, when you get
16     a chance, we've been going about an hour
17     for a break.
18          MR. PIFKO:  Yeah.
19 BY MR. PIFKO:
20    Q.    Did Rite Aid identify any
21 suspicious orders as a result of any of the
22 allegations in connection with the settlement?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  Can you repeat the

Page 196

1     question?
2 BY MR. PIFKO:
3    Q.    Yeah.
4          Like, for example, the settlement
5 concerned Rite Aid knowingly filling
6 prescriptions for controlled substances that were
7 not issued for a legitimate medical purpose
8 pursuant to a valid physician-patient
9 relationship.
10          Do you see that?
11          MS. McENROE:  Objection to form,
12     objection to scope.
13          THE WITNESS:  I do.
14 BY MR. PIFKO:
15    Q.    Did Rite Aid identify any
16 suspicious orders as a result of prescriptions
17 that were filled that were not issued for a
18 legitimate medical purpose?
19          MS. McENROE:  Objection to form.
20          THE WITNESS:  We did not.
21          MR. PIFKO:  All right.  We can
22     take a break.
23          THE WITNESS:  Wait.
24          THE VIDEOGRAPHER:  Going off the

Page 197

1 record at 2 --
2          THE WITNESS:  Wait, wait.  May I
3 make a comment also, though?
4          As part of the press release, it
5 does state that "The settlement agreement
6 is neither an admission of liability by
7 Rite Aid nor a concession by the United
8 States that its claims" were not founded.
9          Thank you.
10          THE VIDEOGRAPHER:  Going off the
11 record at 2:08 p.m.
12          - - -
13          (A recess was taken from
14 2:08 p.m. to 2:23 p.m.)
15          - - -
16          THE VIDEOGRAPHER:  Going back on
17 the record at 2:23 p.m.
18          - - -
19          (Deposition Exhibit No.
20 Hart-30(b)(6)-10, Order of the State
21 Board of Pharmacy, Docket Number
22 D-110127-163, was marked for
23 identification.)
24          - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 198

BY MR. PIFKO:

Q.   I'm handing you what's marked as Exhibit 10.

For the record, this is an order from the Ohio State Board of Pharmacy.  The document itself is four pages.  Take a moment to review it.  Let me know when you're ready.

The part I consider to be the document, just so you can understand, is this docket number D-110127-163, concerning Marcus -- or Brian Marcus Kins.

MS. McENROE:  Starting in the middle of the first page?

MR. PIFKO:  Yeah.

MS. McENROE:  And then going until where, Mark?

MR. PIFKO:  It continues onto the last page, but only the top quarter of the last page.

MS. McENROE:  Where it says 11:30 a.m.?

MR. PIFKO:  Yes.

MS. McENROE:  For the record, I'm going to object to this document and the

Page 199

line of questioning that will be related to it as beyond the scope and not being tied to one of the topics.

MR. PIFKO:  You haven't heard the questions yet.

MS. McENROE:  I know.  Just in terms of the document.

THE WITNESS:  (Reviewing document.)

Okay.

BY MR. PIFKO:

Q.   Have you seen this before?

A.   I have not.

Q.   It mentions here, as an aside, Kevin Mitchell here as being a member of the board of the Ohio Board of Pharmacy.

I assume that's not the same Kevin Mitchell who works at Rite Aid?

A.   Okay.

Q.   Is it?

A.   This Kevin Mitchell is a pharmacist for Rite Aid in Ohio, not the Kevin Mitchell that's involved in this case.

Q.   Okay.  So this Kevin Mitchell

Page 200

does work for Rite Aid?

A.   Yes.

Q.   When one serves on the Board of Pharmacy, is that concurrent with him working for Rite Aid?

A.   Yes.

Q.   So he still holds that -- does this Kevin Mitchell still work for Rite Aid?

A.   Yes.  This Kevin Mitchell left from Rite Aid, went to work for the board, and came back to Rite Aid.

Q.   Okay.

A.   So he is currently a pharmacist for Rite Aid.

Q.   But he doesn't currently serve on the Board of Pharmacy?

A.   No.  His term was up.

Q.   At the time that he was sitting on the Board of Pharmacy here, did he still work for Rite Aid?

A.   I don't -- I'm going to say yes, but again, my recollection could be wrong.  But it looks around the time frame, yes.

Q.   Does anyone else who is a member

Page 201

of the board reflected here in that section under introduction work for Rite Aid?

MS. McENROE:  Objection, scope.

THE WITNESS:  No.

BY MR. PIFKO:

Q.   Do you know who Michael Mone is?

A.   Yes.

Q.   Who is he?

A.   Michael Mone works for Cardinal.

Q.   Do you know what he does for Cardinal?

A.   He is an attorney and a pharmacist and does regulatory affairs.

Q.   Do you know if he was employed by Cardinal at the time that he sat on the Board of Pharmacy here?

MS. McENROE:  Objection to scope.

THE WITNESS:  I don't know his employment.

BY MR. PIFKO:

Q.   How do you know who Mr. Mone is?

A.   I am on the Pennsylvania State Board of Pharmacy here in the state, and I interact with Mr. Mone on a routine basis at NABP

Page 202

1 meetings, National Association of Boards of
2 Pharmacy meetings, or district -- NABP district
3 meetings and occasionally at NACDS meetings.
4     Q.    In connection with those kind of
5 meetings, do you meet with any other distributors
6 of pharmaceutical products?
7         MS. McENROE:  Objection to form,
8     objection to scope.
9         THE WITNESS:  Not really.  And
10     Michael and I are there as members of the
11     Board of Pharmacy.  We are not meeting on
12     behalf of our jobs.
13 BY MR. PIFKO:
14     Q.    So, to your knowledge, you don't
15 meet with, for example, anyone who works for
16 AmeriSource Bergen at those meetings?
17         MS. McENROE:  Objection, form,
18     objection to scope.
19         THE WITNESS:  There could be
20     someone at one of those meetings.  I
21     don't know a lot of people from
22     AmeriSource Bergen since we don't -- Rite
23     Aid doesn't do business with them.
24 BY MR. PIFKO:

Page 203

1     Q.    How about McKesson, is anyone
2 from McKesson at those meeting?
3         MS. McENROE:  Objection to form,
4     objection to scope.
5         THE WITNESS:  Occasionally, yes.
6 BY MR. PIFKO:
7     Q.    Who from McKesson attends those
8 meetings?
9         MS. McENROE:  Objection to form,
10     objection to scope.
11         THE WITNESS:  I don't remember
12     who from McKesson.  I apologize.
13 BY MR. PIFKO:
14     Q.    How about from any of the
15 manufacturers, do you know if there are people at
16 those meetings who work for drug manufacturers?
17         MS. McENROE:  Objection to form,
18     objection to scope.
19         THE WITNESS:  At the NACDS
20     meetings?  There are drug manufacturers
21     that are members of NACDS, yes.
22 BY MR. PIFKO:
23     Q.    Do you know which ones?
24         MS. McENROE:  Objection to form,

Page 204

1     objection to scope.
2         THE WITNESS:  Not off the top of
3     my head, no.
4 BY MR. PIFKO:
5     Q.    Do you know if any of the
6 defendants in this litigation are members of the
7 NACDS?
8         MS. McENROE:  Objection to form,
9     objection to scope.
10         THE WITNESS:  I would say yes.
11 BY MR. PIFKO:
12     Q.    What's the basis for saying that?
13         MS. McENROE:  Objection to scope.
14         THE WITNESS:  Reading the
15     documentation as far as the case and
16     industry newsletters and things like
17     that.
18 BY MR. PIFKO:
19     Q.    When you say documentation for
20 the case, you've seen documents that have a list
21 of defendants on it, like the interrogatory
22 responses, things like that?
23     A.    Yeah.  Or there could be
24 something published in like a Pharmacy Times or

Page 205

1 something like that.
2     Q.    So you're talking about -- to the
3 extent there's been media coverage of the case
4 and you see who's involved, that's what you're
5 talking about?
6         MS. McENROE:  Objection to form,
7     objection to scope.
8         THE WITNESS:  Yes.
9 BY MR. PIFKO:
10     Q.    Okay.  Turning back to this
11 particular Exhibit 10, this incident here, are
12 you familiar with this pharmacist, Mr. Kins?
13         MS. McENROE:  Objection to form.
14     Objection to form, objection to scope.
15         THE WITNESS:  I am not.
16 BY MR. PIFKO:
17     Q.    If you turn to the second page,
18 there's a heading "Findings of Fact."
19         Do you see that?
20     A.    I do.
21     Q.    There's numbered paragraphs there
22 with parentheses.
23         Do you see that?  Like 1, 2?
24     A.    Yes.

Page 206

1    Q.   Paragraph 1, towards the bottom,
2  it says that Mr. Kins was the Responsible
3  Pharmacist at Rite Aid Pharmacy #4764 in
4  Broadview Heights, Ohio.
5         Do you see that?
6         MS. McENROE:  Objection to scope.
7         THE WITNESS:  I do.
8  BY MR. PIFKO:
9    Q.   Do you know what the term
10 "responsible pharmacist" means?
11        MS. McENROE:  Objection to scope.
12        THE WITNESS:  I do.
13 BY MR. PIFKO:
14   Q.   What does that mean?
15   A.   It means that is the pharmacist
16 in charge, the head pharmacist for the store.
17   Q.   Okay.  And that's what I was
18 going to ask you, is -- so there's a hierarchy of
19 the pharmacists who work at any particular store?
20        MS. McENROE:  Objection to form,
21     objection to scope.
22        THE WITNESS:  In -- there is a
23     pharmacist that's in charge or the
24     pharmacist that's responsible for the

Page 207

1      recordkeeping.  And then there could be a
2      staff pharmacist or a floater pharmacist
3      that may work in the store.
4  BY MR. PIFKO:
5    Q.   And so you just alluded to some
6  of it, but the responsibilities of the pharmacist
7  in charge include recordkeeping and what else?
8         MS. McENROE:  Objection to form,
9      objection to scope.
10        THE WITNESS:  Typically the
11     pharmacist in charge is of staffing and
12     maintenance of prescriptions and that.
13 BY MR. PIFKO:
14   Q.   I believe in Sophia Lai's
15 deposition it was discussed that she had profit
16 and loss responsibility for the pharmacy
17 operations at her pharmacy at one point.
18        Does the pharmacist in charge
19 have that kind of responsibility as well?
20        MS. McENROE:  Objection to form,
21     objection to scope.
22        THE WITNESS:  Can you repeat the
23     question?
24 BY MR. PIFKO:

Page 208

1    Q.   We talked about -- I forget the
2  term you used now -- the front of the store?
3    A.   Front end?
4    Q.   Front end and the pharmacy.
5  Right?
6    A.   Right.
7    Q.   So those operations -- there's
8  some degree of separation between those
9  operations at a store.  Correct?
10        MS. McENROE:  Objection to form,
11     objection to scope.
12        THE WITNESS:  That is correct.
13 BY MR. PIFKO:
14   Q.   Okay.  And somebody at the
15 pharmacy is responsible for the profit and loss
16 operations of the pharmacy.  Correct?
17        MS. McENROE:  Objection to form,
18     objection to scope.
19        THE WITNESS:  That is correct.
20 BY MR. PIFKO:
21   Q.   And is that the pharmacist in
22 charge?
23        MS. McENROE:  Objection to scope.
24        THE WITNESS:  That is correct.

Page 209

1  BY MR. PIFKO:
2    Q.   So in this particular case, Mr.
3  Kins was in charge of the profit and loss of this
4  particular Rite Aid, 4764; is that correct?
5         MS. McENROE:  Objection to form,
6      objection to scope.
7         THE WITNESS:  That is correct.
8  BY MR. PIFKO:
9    Q.   It says here under the second
10 paragraph of "Findings of Fact" that Mr. Kins "is
11 addicted to or abusing drugs."
12        Do you see that?
13   A.   I do.
14   Q.   Do you have any reason to dispute
15 that finding?
16        MS. McENROE:  Objection to form,
17     objection to scope.
18        THE WITNESS:  I do not.
19 BY MR. PIFKO:
20   Q.   If you go to the next page, well,
21 starting at the bottom of the second page and
22 continuing to the third page, it says, "Brian
23 Marcus Kins has admitted to Board agents that he
24 is addicted to controlled substances; that Brian

Page 210

1 Marcus Kins has stolen controlled substances from
2 his employer for personal abuse;" and "that Brian
3 Marcus Kins altered prescriptions to obtain
4 controlled substances for his abuse and to sell."
5          Do you see that?
6     A.   I do.
7     Q.   Do you have any reason to dispute
8 those findings of fact in here?
9          MS. McENROE: Objection to form,
10 objection to scope.
11          THE WITNESS: I do not.
12 BY MR. PIFKO:
13    Q.   Did Rite Aid ever report any
14 suspicious orders from store Rite Aid 4764 while
15 Mr. Kins was the responsible pharmacist?
16          MS. McENROE: Objection to form.
17          THE WITNESS: We did not report
18    any suspicious orders.
19 BY MR. PIFKO:
20    Q.   Does Rite Aid have a process of
21 disciplining an employee or terminating them when
22 they have a Board of Pharmacy action brought
23 against them?
24          MS. McENROE: Objection to form,

Page 211

1     objection to scope.
2          THE WITNESS: Any time an
3     employee diverts controlled substances,
4     they would be terminated and Rite Aid
5     would turn that individual into the state
6     Board of Pharmacy.
7 BY MR. PIFKO:
8     Q.   Other than terminating them, is
9 there any other investigation with respect to the
10 order history at that store that would occur in
11 connection with a finding that a pharmacist in
12 charge or any other pharmacist diverted
13 controlled substances?
14          MS. McENROE: Objection to form,
15 objection to scope.
16          THE WITNESS: Rite Aid would
17    conduct an accountability of all of the
18    drugs that entered into the pharmacy
19    in -- or dispensed to determine if there
20    was a loss of controlled substances.
21 BY MR. PIFKO:
22    Q.   By loss, you mean theft?
23    A.   Theft.
24    Q.   What if a pharmacist doesn't

Page 212

1 steal the prescriptions but fills them for
2 illegitimate medical purposes, does Rite Aid make
3 any evaluation of that?
4          MS. McENROE: Objection to form,
5 objection to scope.
6          THE WITNESS: Can you repeat
7     that?
8 BY MR. PIFKO:
9     Q.   Yeah.
10          You've said that Rite Aid would
11 conduct an accountability of all drugs that
12 entered into the pharmacy or dispensed to
13 determine if there was a loss of controlled
14 substances.
15          And you define loss as theft.
16 Correct?
17    A.   That is correct.
18    Q.   So my question is, if you have a
19 problem pharmacist who isn't necessarily stealing
20 the pills but is knowingly filling them for
21 illegitimate purposes, would Rite Aid conduct any
22 sort of investigation into that type of conduct?
23          MS. McENROE: Objection to form,
24    objection to scope.

Page 213

1          THE WITNESS: That would be part
2     of the asset protection's investigation
3     into the theft.
4 BY MR. PIFKO:
5     Q.   And what would be the outcome if
6 they found that there was theft?
7          MS. McENROE: Objection to form,
8     objection to scope.
9          THE WITNESS: If there was theft
10    and the loss of drugs, the loss would be
11    reported to the Ohio Board of Pharmacy
12    and to the Drug Enforcement
13    Administration.
14 BY MR. PIFKO:
15    Q.   But Rite Aid wouldn't make any
16 reports concerning suspicious orders. Correct?
17          MS. McENROE: Objection to form,
18    objection to scope.
19          THE WITNESS: We would not make a
20    report of a suspicious order.
21 BY MR. PIFKO:
22    Q.   Would Rite Aid make any
23 adjustments to its auto replenishment system if
24 it knew that, for example, in this case, that the

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 pharmacist was stealing prescriptions for
2 personal use or selling them to others?
3          MS. McENROE:  Objection to form.
4          THE WITNESS:  We would not adjust
5     the auto replenishment.
6 BY MR. PIFKO:
7     Q.   So when it's conducting its
8 analysis of ▓▓▓▓▓▓▓▓ and the like, it's
9 including that conduct as well, potentially.
10 Correct?
11          MS. McENROE:  Objection to form.
12          THE WITNESS:  It would be
13     including the prescriptions that were
14     fraudulently dispensed, because they
15     would be through the system.  So yes.
16 BY MR. PIFKO:
17     Q.   I'm handing you what's been
18 marked as Hart-30(b)(6) Exhibit 11.
19          - - -
20     (Deposition Exhibit No.
21     Hart-30(b)(6)-11, Order of the State
22     Board of Pharmacy Docket Number
23     D-100621-134, was marked for
24     identification.)

Page 215

1          - - -
2 BY MR. PIFKO:
3     Q.   It's another order of the state
4 Board of Pharmacy.  This one's five pages.
5     Direct your attention to the bottom
6 that begins on the bottom of the first page
7 concerning Henry Kozik, docket number
8 D-100621-134.
9          Take a moment to review that and
10 let me know when you're done.
11          MS. McENROE:  For the record, I'm
12     going to object to the use of this
13     document as being outside the scope of
14     the 30(b)(6) for this deposition.
15          THE WITNESS:  I have a question.
16     Here it makes note under the
17     State's Exhibit Number 3, "Rite Aid
18     Corporation Letter of Explanation."
19          Is that available to review?
20 BY MR. PIFKO:
21     Q.   I don't have a copy of that with
22 me.  Maybe Kevin Mitchell can get it for us.
23          Are you ready?
24     A.   I am ready.

Page 216

1     Q.   Have you seen this before?
2     A.   I have not.
3     Q.   Do you know who Henry Kozik is?
4     A.   A pharmacist, yes.
5     Q.   Someone who was employed by Rite
6 Aid?
7          MS. McENROE:  Objection to scope.
8          THE WITNESS:  Based on the order,
9     yes.
10 BY MR. PIFKO:
11     Q.   The order has a number of
12 findings of fact concerning thefts committed by
13 Mr. Kozik on various dates, specifically
14 identifying various thefts of product that he
15 made.
16          Do you see that?
17          MS. McENROE:  Objection to form,
18     objection to scope.
19          THE WITNESS:  I do.
20 BY MR. PIFKO:
21     Q.   Paragraph 5 also says -- it's on
22 the third page.
23          Are you there?
24     A.   I'm fine.

Page 217

1     Q.   It says, "Henry F. Kozik did, on
2 or about June 2, 2007, knowingly sell a
3 controlled substance when the conduct was not in
4 accordance with Chapters 3719., 4729., and 4731.
5 of the Ohio Revised Code, to wit:  Henry F. Kozik
6 gave a female at least 33 hydrocodone/APAP 5/500
7 tablets and at least 43 tablets of
8 hydrocodone/APAP 7.5/750 without a valid
9 prescription from a prescriber and not for a
10 legitimate medical purpose."
11          Do you see that?
12          MS. McENROE:  Objection to scope.
13          THE WITNESS:  I do.
14 BY MR. PIFKO:
15     Q.   To your knowledge, did Rite Aid
16 report any suspicious orders from the pharmacies
17 where Mr. Kozik worked --
18          MS. McENROE:  Objection to form.
19 BY MR. PIFKO:
20     Q.   -- as a result of these
21 incidents?
22          MS. McENROE:  Objection to form.
23          THE WITNESS:  We did not.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 Q. Do you know if Rite Aid conducted
2 an investigation into this conduct?
3 MS. McENROE: Objection to scope,
4 objection to form.
5 THE WITNESS: An investigation
6 would have been completed by our asset
7 protection team.
8 BY MR. PIFKO:
9 Q. What's the basis for you
10 believing that such an investigation would have
11 occurred?
12 MS. McENROE: Objection to scope.
13 THE WITNESS: Any theft of
14 controlled substances results in an asset
15 protection investigation.
16 BY MR. PIFKO:
17 Q. And if Mr. Kozik was disciplined
18 by the Board of Pharmacy, Rite Aid would know
19 about that?
20 MS. McENROE: Objection to form,
21 objection to scope.
22 THE WITNESS: Yes, we would know.
23 We have a system that we use to verify
24 our associates and their licenses to make

Page 219

1 sure that they remain valid.
2 BY MR. PIFKO:
3 Q. As we discussed with respect to
4 the prior Board of Pharmacy order, with respect
5 to paragraph 5 here, there would not have been
6 any adjustments to Rite Aid's auto replenishment
7 system as a result of this sale to a female of
8 certain hydrocodone tablets without a valid
9 prescription.
10 Do you agree?
11 MS. McENROE: Objection to form,
12 objection to scope.
13 THE WITNESS: There would be no
14 revision.
15 BY MR. PIFKO:
16 Q. If a pharmacist conducts any due
17 diligence of any suspected red flags, does -- at
18 the time when Rite Aid was self-distributing
19 Schedule III controlled substances, did the
20 distribution center who would sell to that
21 pharmacy have any visibility into the
22 investigation being conducted by the pharmacist?
23 MS. McENROE: Objection.
24 Objection to form.

Page 220

1 THE WITNESS: They did not.
2 BY MR. PIFKO:
3 Q. Did Rite Aid have any policy
4 whereby if a pharmacist conducted such an
5 investigation, they needed to report that back up
6 to the distribution center?
7 MS. McENROE: Objection to form.
8 THE WITNESS: The pharmacist, if
9 they did an investigation, would report
10 that to their pharmacy district manager
11 or their asset protection district
12 manager, not to the distribution center.
13 BY MR. PIFKO:
14 Q. Would anybody in that chain
15 ultimately provide information that there was a
16 potential red flag to the distribution center?
17 MS. McENROE: Objection to form.
18 THE WITNESS: Typically, no.
19 BY MR. PIFKO:
20 Q. I'm handing you a document that
21 was previously marked in Mr. Belli's deposition
22 as Exhibit 15. And I have marked it as
23 Exhibit 12 to Rite Aid's 30(b)(6) deposition.
24 - - -

Page 221

1 (Deposition Exhibit No.
2 Hart-30(b)(6)-12, Project Initiation for
3 504 Suspicious Order Monitoring, Bates
4 stamped Rite_Aid_OMDL_0040184 through
5 Rite_Aid_OMDL_0040198, was marked for
6 identification.)
7 - - -
8 BY MR. PIFKO:
9 Q. It's a project initiation form
10 dated October 2, 2013.
11 Take a moment to review that and
12 let me know when you're done.
13 And it's Bates labeled
14 Rite_Aid_OMDL_0040184 through 40198.
15 THE WITNESS: (Reviewing
16 document.)
17 MS. McENROE: The witness looks
18 done.
19 BY MR. PIFKO:
20 Q. Are you ready?
21 A. Sure.
22 Q. We're trying to be efficient for
23 later.
24 Have you seen this document

Page 222

1 before?
2    A.    I have.
3    Q.    When was the last time you saw
4 it?
5    A.    Within the past few days.
6    Q.    This is something that you
7 reviewed in preparing for your 30(b)(6)
8 deposition?
9    A.    I did.
10    Q.    When was the first time you saw
11 this?
12    A.    Back when it was prepared, when
13 it was first initiated.
14    Q.    So this particular update is
15 dated October 2, 2013.
16        Do you see that?
17    A.    I see that.
18    Q.    So you would have seen it on or
19 around that time?
20    A.    I would have, yes.
21    Q.    It's got a business
22 representative signature name there, and it's got
23 your name on it.
24        Do you see that?

Page 223

1    A.    I do.
2    Q.    Can you tell me what this project
3 initiation is?  It says on the first page,
4 "Project Initiation for 5046 Suspicious Order
5 Monitoring."
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  Sure.  This was a
8    project that we put together to take all
9    of the manual processes of our suspicious
10    order monitoring program and tie them
11    together into one portal application that
12    could house all of the information so
13    that there would be somewhere where the
14    distribution centers could easily
15    retrieve it, corporate could easily
16    retrieve the information from the current
17    suspicious order monitoring program.
18 BY MR. PIFKO:
19    Q.    You had testified earlier that
20 you read Mr. Belli's deposition.  Correct?
21    A.    I did.
22    Q.    He was questioned about this
23 document.  It was admitted as Exhibit 15 in his
24 deposition.

Page 224

1        Do you see that?
2    A.    I do.
3    Q.    Do you recall reading the
4 discussion about this project initiation project
5 when you read his deposition?
6    A.    I don't recall.
7        - - -
8        (Deposition Exhibit No.
9    Hart-30(b)(6)-13, Email chain, top one
10    dated 2013-08-07, Bates stamped
11    Rite_Aid_OMDL_0024599 and
12    Rite_Aid_OMDL_0024600, was marked for
13    identification.)
14        - - -
15 BY MR. PIFKO:
16    Q.    I'm handing you another exhibit
17 concerning this project.  You can keep that one
18 with you as well.
19        It's marked as Exhibit
20 Hart-30(b)(6)-13.
21        For the record, Exhibit 13 is
22 Bates labeled Rite_Aid_OMDL_0024599, and it has
23 an attachment which is a spreadsheet, which is
24 Bates labeled Rite_Aid_OMDL_0024600.

Page 225

1        Let me know when you're done
2 reading Exhibit 13.
3    A.    I'm done reading number 13.
4    Q.    Have you seen Exhibit 13 before?
5    A.    I have.
6    Q.    When was the last time you saw
7 that?
8    A.    Within the past few days.
9    Q.    This is a document that you
10 reviewed in preparing for your 30(b)(6)
11 deposition?
12    A.    It is.
13    Q.    When do you believe was the first
14 time you saw this document?
15    A.    Back around July of 2013.
16    Q.    Karyn Kunzig writes to Rick
17 Chapman and you on Exhibit 13.
18        Do you see that?
19    A.    I do.
20    Q.    Who is Karyn?
21    A.    Karyn is in our IT department.
22    Q.    Who is Rick Chapman?
23    A.    Rick Chapman was our VP of
24 logistics at the time.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    Q.    Do you know why Karyn is writing
2  to you and Rick at this time?
3    A.    So that we can move the project
4  along.
5    Q.    Did you have a discussion about
6  this project before Karyn sent you this email?
7    A.    We did.
8    Q.    When do you believe was the first
9  time you discussed this project?
10   A.    Late 2012, early 2013, initial
11 discussions.
12   Q.    How did it first come about?
13   A.    I believe part of it was based on
14 a review of the suspicious order monitoring.  And
15 we were looking to start to streamline the
16 process and started having discussions about it,
17 to the best of my knowledge.
18   Q.    Who was reviewing the suspicious
19 order monitoring?
20   A.    Sophia --
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  Sophia, Chris Belli
23 and myself.
24 BY MR. PIFKO:

Page 227

1    Q.    Why were you reviewing the
2  suspicious order monitoring?
3    A.    The suspicious monitoring had
4  various pieces in various -- as we've discussed,
5  various pieces with various departments.  And we
6  were looking to streamline it to make sure that
7  everything was in one place.
8    Q.    What led you to have a discussion
9  about streamlining it?
10   A.    Part of the discussion was just
11 how manual the process was and all the different
12 aspects were all manual and we wanted to
13 streamline it.
14   Q.    But what I'm trying to get at is,
15 why have the discussion at that time?
16        MS. McENROE:  Objection to form.
17        THE WITNESS:  I don't remember.
18 BY MR. PIFKO:
19   Q.    Was there some sort of event or
20 incident that led you to want to modify the
21 program?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  Not that I
24 remember.

Page 228

1  BY MR. PIFKO:
2    Q.    Do you remember who initiated the
3  discussion?
4    A.    I believe it was Chris Belli.
5    Q.    So do you remember anyone else
6  who was part of the discussion?
7    A.    Sophia, Chris and myself.  IT
8  would have to be part of the discussion, Karyn or
9  someone from her team.  Those are the individuals
10 that I would believe would be involved.
11   Q.    Do you know if there was any
12 other documentation prior to this August 7, 2013
13 email?
14        MS. McENROE:  Objection to form.
15 BY MR. PIFKO:
16   Q.    Concerning this project?
17   A.    I'm sure there had to be other
18 documentation or emails setting up for it, but I
19 don't know where they would be.
20   Q.    When Karyn writes to you and
21 Rick, she says she wants to present this to Frank
22 at the August 21st meeting.
23        Do you see that?
24   A.    I do.

Page 229

1    Q.    Who's Frank?
2    A.    Frank was our chief financial
3  officer.
4    Q.    And do you have an understanding
5  about why you would need to present to him?
6    A.    I do.  Any capital expense needed
7  to be approved by the chief financial officer.
8    Q.    Have you gone before Frank on
9  other occasions to request approval for capital
10 expenditures?
11        MS. McENROE:  Objection to form,
12        objection to scope.
13        THE WITNESS:  I have not.
14 BY MR. PIFKO:
15   Q.    Okay.  But you're familiar with
16 the process of getting approval for a capital
17 expenditure?
18        MS. McENROE:  Objection to form.
19        THE WITNESS:  I am.
20 BY MR. PIFKO:
21   Q.    And so it says, present this to
22 him at the August 21st meeting.
23        To your knowledge, is there some
24 regularity with which Frank holds capital

Page 230

1 expenditure approval meetings?
2     A.   I believe so.
3     Q.   What's the regularity of which
4 these meetings are held?
5     A.   I do not know.
6     Q.   Do you know if they're held
7 monthly?
8          MS. McENROE: Objection to form.
9          THE WITNESS: I do not know.
10 BY MR. PIFKO:
11     Q.   According to this email, there
12 was going to be a meeting on August 21st.
13          And you were preparing to be able
14 to present at that meeting?
15     A.   That is correct.
16     Q.   Karyn says, "This is a new form
17 used to request the use of" resources --
18 "resource to gather requirements and perform
19 enough analysis to determine a realistic cost of
20 the project. It's sort of a pre-PI."
21          Do you see that?
22     A.   I do.
23     Q.   So the PI is this project
24 initiation form that is marked as Exhibit 12 that

Page 231

1 I just handed you a moment earlier. Correct?
2     A.   Correct.
3     Q.   And she's talking about this form
4 that's attached to the email. Correct?
5          MS. McENROE: You mean in
6     Exhibit 13?
7          MR. PIFKO: Yeah, sorry. The
8     heading on it is "Proposed Project
9     Request."
10          THE WITNESS: Yes.
11 BY MR. PIFKO:
12     Q.   Did you provide Karyn with the
13 information that she put in this proposed project
14 request?
15          MS. McENROE: Objection to form.
16          THE WITNESS: I would have
17     provided input.
18 BY MR. PIFKO:
19     Q.   When you say "input," what do you
20 mean?
21     A.   The description would have been
22 drafted. I'm not sure if I did the drafting, but
23 I most certainly would have had some input into
24 it.

Page 232

1     Q.   Who would have done the drafting
2 if it wasn't you?
3     A.   It may have been done by Chris
4 Belli or Sophia.
5     Q.   Okay. So any one of them, it
6 would have been done by Sophia, Chris or you?
7          MS. McENROE: Objection to form.
8          THE WITNESS: To the best of my
9     knowledge, yes.
10 BY MR. PIFKO:
11     Q.   Okay. So it has a detailed
12 research description.
13          Do you see that section?
14     A.   I do.
15     Q.   And it says, "Develop effective
16 controls against the diversion of controlled
17 substances and conduct adequate due diligence to
18 ensure that controlled substances distributed
19 from the Distribution Centers are for legitimate"
20 medical "needs."
21          Did I read that correctly?
22          MS. McENROE: Objection to form.
23     It's "legitimate patient needs," not
24     "legitimate medical needs."

Page 233

1 BY MR. PIFKO:
2     Q.   Did I read that correctly, with
3 the addition of "patient"?
4     A.   I do see that.
5     Q.   Let me just start over to make a
6 clear record.
7          It says, under "Detailed Research
8 Description," "Develop effective controls against
9 the diversion of controlled substances and
10 conduct adequate due diligence to ensure that
11 controlled substances" are "distributed from the
12 Distribution Centers are for legitimate patient
13 needs."
14          Did I read that correctly?
15     A.   You did.
16     Q.   Then it says, "Create a portal
17 application that will use the Rx Replenishment
18 and Billing system information to create a
19 reporting platform for suspicious order
20 monitoring."
21          Did I read that correctly?
22     A.   You did.
23     Q.   It also says, "Today blanket
24 thresholds are manually enforced at 5,000 dosage

Page 234

1 units per individual ndc per week per store,
2 regardless of dispensing volume or trends."
3          Did I read that correctly?
4      A.    You did.
5      Q.    And then it says, "A process to
6 systematically control based on store volume must
7 be developed."
8          Did I read that correctly?
9      A.    You did.
10     Q.    "Allow for distribution center to
11 add comments/approvals on shipments to stores.
12 This information needs to be available to show
13 DEA if requested."
14          Did I read that correctly?
15     A.    You did.
16     Q.    Okay.  Is that an accurate
17 description of this project?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  The project itself,
20     as it alludes to, was to bring the entire
21     suspicious order monitoring program into
22     the portal so that we could get at the
23     program and have easy access to it.  You
24     will make note that it references what we

Page 235

1     have been speaking about as far as
2     replenishment and billing in our current
3     system.  And this would enhance the
4     system.
5 BY MR. PIFKO:
6      Q.    It says that -- where it says,
7 "Today blanket thresholds are manually enforced
8 at 5,000 dosage units per individual ndc per week
9 per store regardless of dispensing volume or
10 trends."
11          Do you see that?
12     A.    Yes.
13     Q.    Is that an accurate statement
14 about the system as of when this was written, in
15 August 7, 2013?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  Yes.  Blanket
18     controls were in place of 5,000 dosage
19     units per store.
20 BY MR. PIFKO:
21     Q.    Regardless of dispensing volume
22 or trends.  Correct?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  Correct.

Page 236

1 BY MR. PIFKO:
2      Q.    And then it says, "A process to
3 systematically control based on store volume must
4 be developed."
5          Do you see that?
6      A.    I do.
7      Q.    There was no process for
8 systematically controlling based on store volume
9 at that time.  Correct?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  That is not true.
12     That ties back to the replenishment
13     system and the algorithms that were used
14     with the replenishment system with a
15     maximum billing capacity or ship on
16     billing capacity.
17 BY MR. PIFKO:
18     Q.    Did you ever write to anyone and
19 say that this statement about a process to
20 systematically control based on store volume
21 needed to be developed was inaccurate?
22          MS. McENROE:  Objection to form.
23          THE WITNESS:  I did not.
24 BY MR. PIFKO:

Page 237

1      Q.    Do you recall ever telling anyone
2 that that was inaccurate?
3          MS. McENROE:  Objection to form.
4          THE WITNESS:  I don't recall.
5 BY MR. PIFKO:
6      Q.    Halfway down the page, it says,
7 "Additional Information on this Request."
8          Do you see that section?
9      A.    I do.
10     Q.    And then it's got enumerated
11 items there.
12          Do you see that?
13     A.    I do.
14     Q.    Item number 2, "How does this
15 request support the RiteAid's Corporate Strategic
16 Plan?"
17          Do you see that?
18     A.    I do.
19     Q.    And it says, "Reduce risk of
20 fines and automate manual distribution center
21 processes."
22          Do you see that?
23     A.    I do.
24     Q.    Is that accurate?

Page 238

1    MS. McENROE: Objection to form.
2    THE WITNESS: It is. It
3  identifies what I have previously said as
4  far as automate the manual DC processes.
5  BY MR. PIFKO:
6    Q.   What about reducing the risk of
7  fines.
8        Do you see that?
9    A.   It could reduce the risk of fines
10 as well.
11   Q.   How would this reduce the risk of
12 fines?
13   A.   Having -- we would have all of
14 the documentation in one particular place to be
15 able to provide to the DEA when they came in for
16 an inspection.
17   Q.   At this time, there was no --
18 there was a risk of fines because there wasn't
19 adequate documentation for the DEA if they came
20 for an inspection.
21       Is that true?
22       MS. McENROE: Objection to form.
23       THE WITNESS: That is not true.
24 There was adequate documentation at the

Page 239

1  DCs, but again, it was in a paper format.
2  And so we were trying to streamline the
3  process and eliminate anything of the
4  manual such.
5  BY MR. PIFKO:
6    Q.   Do you agree that there were some
7  risk of fines that you were trying to reduce?
8  Why make this statement here?
9        MS. McENROE: Objection to form.
10       THE WITNESS: There's always risk
11 of fines.
12 BY MR. PIFKO:
13   Q.   Why do you say that?
14   A.   Because there's always risk that
15 there's going to be an error that's going to be
16 made that could result in a fine.
17   Q.   If you're compliant with the law,
18 you wouldn't get a fine.
19       You agree with that?
20       MS. McENROE: Objection to form.
21       THE WITNESS: That is correct.
22 BY MR. PIFKO:
23   Q.   Turning back to the email, it
24 says, "Please review and let me know if you have

Page 240

1  any questions."
2        Do you see that?
3    A.   I do.
4    Q.   Did you ever tell anyone that you
5  had questions about this form?
6    A.   I don't remember.
7    Q.   It says, "Also, do you have
8  additional benefits that can be added, particular
9  a dollar figure associated with the potential
10 fines or what you've seen as recent fines with
11 other chains."
12       Do you see that?
13   A.   I do.
14   Q.   Did you ever provide that type of
15 information?
16   A.   I believe I did.
17   Q.   Where did you get that
18 information?
19   A.   Any information that I had would
20 have been my knowledge.
21   Q.   It says, "Have actual numbers
22 really makes a difference and will make it easier
23 when you are answering Frank's questions during
24 the meeting."

Page 241

1        Do you see that?
2    A.   I do.
3    Q.   Do you have an understanding
4  about why she said that?
5        MS. McENROE: Objection to form.
6        THE WITNESS: Having actual
7    numbers or having some -- putting some
8    substance between a request and providing
9    it to Frank for consideration raises the
10   level that the project would be approved
11   and could move forward.
12 BY MR. PIFKO:
13   Q.   So let's go back to Exhibit 12.
14       If you turn in to page using --
15 you can use the page 9 at the bottom or you can
16 use the Bates number, which is 0040192.
17       Let me know when you're there.
18   A.   I'm there.
19   Q.   Okay. In response to the
20 question about, did you have additional benefits
21 that could be added, a particular dollar figure
22 associated with the potential fines that you have
23 seen in other chains that we just talked about in
24 Exhibit 13, it's got some numbers here.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    Do you see that?
2    A.    I do.
3    Q.    Are those the numbers that you
4 obtained in response to that question?
5    A.    I believe so, yes.
6    Q.    How did you come to obtain those
7 numbers?
8    A.    They were industry announcements
9 from industry publications and articles.
10    Q.    Those were settlements and fines
11 that you were aware of?
12    A.    Yes.
13    Q.    It says here, "Recent DEA fines
14 for controlled substances distributors have been
15 tied to shipping suspicious orders to registrants
16 (pharmacies)."
17    Do you see that?
18    A.    I do.
19    Q.    Do you know who wrote that
20 language?
21    A.    I believe I did.
22    Q.    What did you mean by that?
23    A.    I meant that there was a
24 heightened awareness that -- from a distribution

Page 243

1 standpoint, that wholesalers were getting fines
2 for suspicious orders.
3    Q.    So then there's three different
4 companies and fines that you list there.
5    Do you see that?
6    A.    I do.
7    Q.    Walgreens, $80 million; is that
8 correct?
9    A.    Yes.
10    Q.    Do you know what that concerned?
11    A.    I believe suspicious orders.
12    Q.    Cardinal Health, $34 million.
13    Do you know what that concerned?
14    A.    I believe suspicious orders.
15    Q.    Do you know when the Walgreens
16 fine was issued?
17    A.    I do not.
18    Q.    Do you know when the Cardinal
19 Health fine was issued?
20    A.    I do not.
21    Q.    McKesson, $13 million.
22    Do you see that?
23    A.    I do.
24    Q.    Do you have an understanding

Page 244

1 about what that was about?
2    A.    My understanding was it was about
3 suspicious orders.
4    Q.    Do you know when that fine was
5 issued?
6    A.    I do not.
7    Q.    Turn to the next page, page 10.
8    Well, starting at the bottom of
9 page 9 and continuing through page 10, it talks
10 about a West Virginia case that had been filed
11 which included allegations against three Rite Aid
12 pharmacy locations.
13    Do you see that?
14    A.    I do.
15    Q.    And then it says, "Included in
16 the suit was language" -- if you go to page 10.
17    "Included in the suit was
18 language concerning suspicious orders to the
19 three Rite Aid pharmacies, how identified, how
20 resolved and end outcome."
21    Do you see that?
22    A.    I do.
23    Q.    Did you write that language?
24    A.    I believe I did.

Page 245

1    Q.    What did you mean by that?
2    A.    I believe I was trying to put
3 forth the impact of the distribution of
4 controlled substances to make it aware as part of
5 the project.
6    Q.    The next paragraph here, it says,
7 on page 10, "DEA has stated numerous times
8 controlled substance distributors must have a
9 protocol to identify and report suspicious orders
10 based on individual pharmacy volume not generic
11 limits for all registrants."
12    Do you see that?
13    A.    I do.
14    Q.    Did you write that?
15    A.    I did.
16    Q.    How did you come to that
17 knowledge?
18    MS. McENROE:  Objection to form.
19    THE WITNESS:  Through my
20    knowledge base and my interaction with
21    various entities, trade groups, reading
22    articles from the DEA.
23 BY MR. PIFKO:
24    Q.    Why put that in this document?

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1     A.    At this particular time when we
2  were tying all of the documents together, this
3  would be part of our algorithms, and I wanted to
4  make sure that that was included in as part of
5  our process.
6     Q.    What do you mean by that, this
7  would have been part of our algorithms?  I don't
8  know what you mean by that part.
9     A.    What I'm trying to say is, I
10  wanted to make sure we weren't just
11  accounting for the 5,000 dosage units, that we
12  were tying in the rest of our suspicious order
13  monitoring program related to replenishment.
14        MS. McENROE:  Mark, we've been
15     going about an hour.  Whenever you're
16     ready for a break would be great.
17  BY MR. PIFKO:
18     Q.    How does this paragraph pertain
19  to the algorithms?
20     A.    The algorithms are not the
21  generic limits for all registrations.  The
22  algorithms for us identify individual pharmacy
23  volume, not generic limits for registrations.  So
24  that's what I wanted to put in there.

Page 247

1     Q.    Going back to page 9, it's got a
2  cost estimate.
3        Do you see that?
4     A.    I do.
5     Q.    $435,000 -- $435,600.
6        Do you see that?
7     A.    I do.
8     Q.    Is that a large amount in the
9  context of Rite Aid's costs?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  If you look at this
12     form, it would be an extra large cost.
13        MS. McENROE:  For the record, the
14     witness was looking at the attachment to
15     Exhibit 13.
16  BY MR. PIFKO:
17     Q.    That's in the section "Size
18  Guesstimates" of the Proposed Project Request
19  on Exhibit 13.  Correct?
20     A.    Yes.
21        MR. PIFKO:  We can take a break.
22        MS. McENROE:  Thank you.
23        THE VIDEOGRAPHER:  Going off the
24     record at 3:23 p.m.

Page 248

1              - - -
2        (A recess was taken from
3     3:23 p.m. to 3:46 p.m.)
4              - - -
5        THE VIDEOGRAPHER:  Back on the
6     record.  The time is 3:46 p.m.
7  BY MR. PIFKO:
8     Q.    Let's go back to Exhibit 12.
9        Do you have it in front of you?
10     A.    I've got it.  Thank you.
11     Q.    Go to page 3.
12        It says, "Background/Summary of
13  the Project."
14        Do you see that?
15     A.    I do.
16     Q.    It says, "The purpose of this
17  project is to develop effective controls against
18  the diversion of controlled substances and
19  conduct adequate due diligence to ensure that
20  controlled substances distributed from the
21  Distribution Centers are for legitimate patient
22  needs.  Rite Aid must ensure compliance with 21
23  U.S.C. Section 823 and/or C.F.R. 1307.74(b) to
24  detect and report suspicious orders of controlled

Page 249

1  substances through the Distribution Centers."
2        Do you see that?
3     A.    I do.
4     Q.    Did I read that correctly?
5     A.    You did.
6     Q.    Is that an accurate description
7  of the background/summary of the project?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  It is.
10  BY MR. PIFKO:
11     Q.    Go to page 5.
12        So on page 5 and 6, page 5 has
13  some parameters that it says -- well, I'm jumping
14  ahead myself.
15        Let's start over here.
16     A.    Okay.
17     Q.    Top of page 5.
18        "Suspicious Order Review.  Today
19  blanket thresholds are manually enforced at 5,000
20  dosage units per individual NDC per week per
21  store regardless of dispensing volumes and
22  trends."
23        We read that in Exhibit 13 as
24  well.  Correct?

Page 250

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  Yes.
3   BY MR. PIFKO:
4        Q.    Did I read that correctly?
5        A.    You did.
6        Q.    It says, "This is a labor
7   intensive process with opportunity for order
8   lines to be missed."
9             Do you see that?
10       A.    I do.
11       Q.    Did I read that correctly?
12       A.    You did.
13       Q.    Did you write this portion of the
14  document?
15       A.    I don't remember.
16       Q.    What does it mean when it says,
17  "This is a labor intensive process with
18  opportunity for order lines to be missed"?
19       A.    I believe that means when the
20  picker is picking the order and the system comes
21  up for 51 bottles instead of 50 bottles, the
22  manual process of reducing it has the ability to
23  be missed.
24       Q.    And that can happen sometimes?

Page 251

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  Very rarely, but
3        they're human beings, so it's possible.
4   BY MR. PIFKO:
5        Q.    It says, "In addition, stores
6   which truly need this quantity must order it from
7   McKesson."
8             Do you see that?
9        A.    I do.
10       Q.    What does that mean?
11       A.    It means that if there is an
12  order that is cut back and the store did not
13  receive the order from the distribution center,
14  they can pick up the additional quantity from
15  McKesson up to McKesson's threshold if need be.
16       Q.    Did anyone ever tell Rite Aid
17  that it was compliant for it to cut orders to
18  threshold?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  Can you repeat the
21       question?
22  BY MR. PIFKO:
23       Q.    So you understand, as we were
24  just discussing, when an order comes in and

Page 252

1   exceeds threshold, Rite Aid cuts the order down
2   to the thresholds and then ships it.  Correct?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  Correct.
5   BY MR. PIFKO:
6        Q.    Did anyone ever advise Rite Aid
7   that that was a procedure that was compliant with
8   the Controlled Substances Act?
9        MS. McENROE:  Objection.
10       THE WITNESS:  Well, I would state
11       that the three DEA audits of the
12       distribution center from the DEA and
13       looking at the suspicious order
14       monitoring program in the process that
15       the 5,000 dosage units was the max was
16       reviewed by DEA agents at those three
17       inspections in 2005, 2009 and 2012.
18  BY MR. PIFKO:
19       Q.    Do you know if they were provided
20  documentation that explained that Rite Aid cut
21  its orders down to threshold?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  They were provided
24       documentation in that they reviewed all

Page 253

1        the logs in the distribution center that
2        documented the threshold cutbacks.
3   BY MR. PIFKO:
4        Q.    How do you know that they review
5   those logs?
6        A.    Through the write-up from the
7   distribution center managers and individuals that
8   were at the distribution center.
9        Q.    We spoke yesterday, you know Don
10  Tush from having been involved in this industry
11  for many decades?
12       MS. McENROE:  Objection to form.
13       THE WITNESS:  I do know Don, yes.
14  BY MR. PIFKO:
15       Q.    Did you ever talk to him about
16  Rite Aid's procedure of cutting orders to
17  threshold?
18       MS. McENROE:  Objection to form.
19       THE WITNESS:  Not that I
20       remember, no.
21  BY MR. PIFKO:
22       Q.    Did you ever talk to any other
23  DEA agents who inspected Rite Aid about that
24  procedure?

Page 254

1    MS. McENROE:  Objection to form.
2       THE WITNESS:  Not that I
3    remember, no.
4  BY MR. PIFKO:
5    Q.   Has any DEA agent ever provided
6  anything in writing to Rite Aid saying that that
7  procedure is acceptable under the Controlled
8  Substances Act?
9       MS. McENROE:  Objection to form
10   and objection to scope.
11      THE WITNESS:  Not that I'm aware
12   of.
13  BY MR. PIFKO:
14   Q.   So the only basis of your
15  knowledge that you believe that DEA said it was
16  okay was from Rite Aid's internal write-ups of
17  those inspections; is that correct?
18      MS. McENROE:  Objection to form.
19      THE WITNESS:  That and the fact
20   that the DEA has never said it was not
21   effective.
22  BY MR. PIFKO:
23   Q.   I want to hand you -- or refer
24  you back to an exhibit that was introduced

Page 255

1  yesterday as Exhibit 15.
2       MS. McENROE:  Why don't we make a
3    pile of today's separate a little bit, so
4    that we -- is that okay, Mark?  I just
5    don't want to --
6       MR. PIFKO:  Well, I'm still
7    looking at those.
8       MS. McENROE:  Oh, you're still
9    looking at these?  Okay.
10      MR. PIFKO:  Yes.
11      MS. McENROE:  Okay.  Then don't
12   put those away.
13      MR. PIFKO:  I just -- I want to
14   direct you to what was marked yesterday
15   as Exhibit 15.
16      MS. McENROE:  1-5?
17      MR. PIFKO:  Yeah.
18  BY MR. PIFKO:
19   Q.   Have you got that in front of
20  you?
21   A.   I do.
22   Q.   Okay.  Do you recall this
23  document?
24   A.   I do.

Page 256

1    Q.   Let's turn to the second and
2  third page.  It's a letter from the Department of
3  Justice dated December 27, 2007.
4       Do you see that?
5    A.   I do.
6    Q.   Did Rite Aid ever receive this
7  letter?
8    A.   I cannot confirm that Rite Aid
9  ever received the letter.
10   Q.   There was a similar letter sent
11  in 2006.
12      Do you know if Rite Aid ever
13  received that letter?
14   A.   I cannot confirm that Rite Aid
15  received the letter.
16   Q.   How about a similar letter dated
17  2012, did Rite Aid ever receive that letter?
18   A.   I cannot locate a 2012 letter
19  that Rite Aid received it.
20   Q.   You see in the second paragraph
21  on page 2 of the letter, it says, "The regulation
22  clearly indicates that it is the sole
23  responsibility of the registrant to design and
24  operate such a system."  And it's talking about a

Page 257

1  system to report suspicious orders.
2       It says, "Accordingly, DEA does
3  not approve or otherwise endorse any specific
4  system for reporting suspicious orders."
5       MS. McENROE:  Are you on the
6    second page of the letter, Mark?
7       MR. PIFKO:  The first page of the
8    letter.
9       MS. McENROE:  Oh, the first page
10   of the letter?
11      Can you start from the beginning?
12   I'm so sorry, I just couldn't find it.
13  BY MR. PIFKO:
14   Q.   And then it says, "Past
15  communications with DEA, whether implicit or
16  explicit, that could be construed as approval of
17  a particular system for reporting suspicious
18  orders, should no longer be taken to mean that
19  DEA approves a specific system."
20      Do you see all that?
21   A.   I do.
22   Q.   Okay.  Are you aware that that's
23  DEA's position?
24      MS. McENROE:  Objection to form.

Page 258

1    THE WITNESS: I am aware that the
2    DEA does not approve or otherwise endorse
3    a specific system.
4 BY MR. PIFKO:
5    Q.    The second page of the letter,
6 which is the third page of Exhibit 15 from
7 yesterday's deposition, which is Bates labeled
8 Rite_Aid_OMDL_0046650, it says, "Registrants that
9 rely on rigid formulas to define whether an order
10 is suspicious may be failing to detect suspicious
11 orders."
12    Do you see that?
13    A.    I see that.
14    Q.    Do you understand that's DEA's
15 position?
16    MS. McENROE: Objection to form.
17    THE WITNESS: I do.
18 BY MR. PIFKO:
19    Q.    It says, "For example, a system
20 that identifies orders as suspicious only if the
21 total amount of a controlled substance order
22 during one month exceeds the amount ordered the
23 previous month by a certain percentage or more is
24 insufficient."

Page 259

1    Do you see this? Do you see
2 that?
3    A.    I do.
4    Q.    Do you understand that that's
5 DEA's position?
6    MS. McENROE: Objection to form.
7    THE WITNESS: I do.
8 BY MR. PIFKO:
9    Q.    Going back to the first page of
10 the letter, which is Rite_Aid_OMDL_0046649, the
11 last paragraph there says, "The regulation
12 specifically states that suspicious orders
13 include orders of an unusual size, orders
14 deviating substantially from a normal pattern,
15 and orders of an unusual frequency."
16    Do you see that?
17    A.    I do.
18    Q.    "These criteria are disjunctive
19 and not all inclusive."
20    Do you see that?
21    A.    I do.
22    Q.    Do you understand that that's
23 DEA's position?
24    MS. McENROE: Objection to form.

Page 260

1    THE WITNESS: Yes.
2 BY MR. PIFKO:
3    Q.    Then it says at the bottom of
4 that same paragraph, "The size of an order alone,
5 whether or not it deviates from a normal pattern,
6 is enough to trigger the registrant's
7 responsibility to report the order as
8 suspicious."
9    Do you see that?
10    A.    I see that.
11    Q.    Do you understand that that's the
12 DEA's position?
13    MS. McENROE: Objection to form.
14    THE WITNESS: I do.
15 BY MR. PIFKO:
16    Q.    Let's go back to Exhibit 12 from
17 the 30(b)(6).
18    MR. PIFKO: And keep that letter,
19    we might still look at --
20    MS. McENROE: Yeah. I was just
21    going to do it like this, so we don't get
22    them mixed up.
23 BY MR. PIFKO:
24    Q.    So we're looking at this heading,

Page 261

1 "Suspicious Order Review" on page 5 of
2 Exhibit 13 -- or, sorry, Exhibit 12 to the
3 30(b)(6). It says, "A new Billing application
4 will be developed which will," and then it's got
5 all these bullet points.
6    Do you see that?
7    A.    I do, yes.
8    Q.    And it refers to Appendix A and
9 Appendix B for details.
10    Do you see that?
11    A.    Yes.
12    Q.    Were any of these calculations
13 referred to in Exhibit A and Exhibit B already
14 being performed by Rite Aid?
15    MS. McENROE: Objection to form.
16    MR. PIFKO: For the record,
17    Exhibit A can be found on page 12 of the
18    document, Rite_Aid_OMDL_0040195 through
19    0040197.
20    THE WITNESS: Yes. Some of the
21    items in Appendix A were being done at
22    present.
23 BY MR. PIFKO:
24    Q.    At the time of this document?

Highly Confidential - Subject to Further Confidentiality Review



Page 262

1    A.    At the time of this document.

2    Q.    Okay.  Let's go through them.

3          So starting with the beginning of

4  Appendix A.

5          The first row, do you see that?

6    A.    I do.

7    Q.    "Control Drug Max Movement,

8  Weekly Store."

9    A.    Yes.

10   Q.    So when it says "weekly store" or

11 "bi-weekly store," that is referring back to the

12 thing we discussed earlier, right, whether a

13 store gets a shipment once a week or once every

14 two weeks; is that correct?

15         MS. McENROE:  Objection to form.

16         THE WITNESS:  That is correct.

17 BY MR. PIFKO:

18   Q.    When it says "bi-weekly," is

19 that -- we also talked about certain stores that

20 get two orders a week.

21   A.    This would be every other week.

22   Q.    Okay.  That's what I thought.  I

23 just wanted to confirm that.  All right.

24         So this max movement calculation

Page 263

1  referred to in the first two rows, is that

2  something that was already being performed?

3    A.    Yes.

10 BY MR. PIFKO:

11   Q.    Was it possible for an order to

12 be placed which exceeded that calculation?

13         MS. McENROE:  Objection to form.

14         THE WITNESS:  An order could be

15 placed in excess of that

17 BY MR. PIFKO:

18   Q.    To be clear, no orders that

19 exceeded that calculation were ever reported as

20 suspicious.  Correct?

21         MS. McENROE:  Objection to form.

22         THE WITNESS:  They were not.

23 BY MR. PIFKO:

24   Q.    You pulled out the binder.

Page 264

1    A.    I did.

2    Q.    What are you --

3    A.    I'm looking for the Rx

4  replenishment suggested order screens.

5    Q.    Which tab are you at?  Tell me

6  when you get there.

7    A.    Tab 8.

8    Q.    That's the document you have

9  identified here as DC ordering limitations?

10   A.    Yes.

11   Q.    0046064?

12   A.    Yes.

13         And tab 9.

14   Q.    Which is pharmacy replenishment

15 algorithms 2007, 0045426; is that correct?

16   A.    Yes.

17   Q.    What specifically are you looking

18 for there?

19   A.    A lot of the items that are here

20 would be in this particular document, such as the

21 first two.  Or when we're going to go to the back

22 part of it, where we're talking number of

23 suggested orders, deliveries, that's all in here

24 as far as the sensitivity ▮▮▮▮ and all of

Page 265

1  the information.

2    Q.    Okay.  So when -- okay.

3          So the max movement, where is

4  that referred to in the documents you're looking

5  through in your binder, if you can just read the

6  Bates number?

7    A.    Sure.  Let me find it.

8          I'm looking.

9          I can't find it in the documents.

10   Q.    So you don't know for sure if

11 that was a calculation that's already being

12 performed?

13         MS. McENROE:  Object to form.

17 BY MR. PIFKO:

18   Q.    Okay.  But you can't find it in

19 the documentation that you have?

20   A.    I cannot.

21   Q.    So you can't say with certainty

22 that that was being performed sitting here today.

23 Correct?

24         MS. McENROE:  Objection to form.

Page 266

1    THE WITNESS: I cannot.
2  BY MR. PIFKO:
3    Q.   How about "Control Drug Slow
4  Mover Limit"? It's the third and fourth rows.
5    Was that a calculation that was
6  being performed already as of the date of this
7  document, October 2, 2013?
8    Let the record reflect you're
9  reviewing the same exhibits. Correct?
10    A.   Correct.
11    Q.   Not exhibits, the tabs in your
12  binder.
13    A.   It appears that number 3 is on
14  Rite_Aid_OMDL_0045431, maximum quantity check.
15    Q.   Okay. Let's look at the fifth
16  and sixth calculation, or calculation in rows
17  five and six, which is, "Control Drug Store
18  Unblock Limit."
19    Can you tell me if that was a
20  calculation that was already being performed as
21  of October 2, 2013?
22    And let the record reflect that
23  you're looking at the same tabs in your binder.
24  Correct?

Page 267

1    A.   That is correct.
2    I cannot locate that.
3    Q.   So sitting here today, you don't
4  know if those calculations were already being
5  performed as of October 2, 2013. Correct?
6    MS. McENROE: Objection to form.
7    THE WITNESS: I do not.
8  BY MR. PIFKO:
9    Q.   How about moving to page 13, the
10  calculation called "Suspicious Order Percent."
11    Do you see that?
12    It's on the second and third
13  column -- or, sorry, second and third row on page
14  13.
15    Do you know if that was a
16  calculation that was being performed on or before
17  October 2, 2013?
18    A.   Which one are you on? I got page
19  13, but what's --
20    Q.   "Suspicious Order Percent."
21    A.   "Weekly Store"?
22    Q.   Yeah. Can you tell me if it's
23  being calculated for weekly store or bi-weekly
24  store?

Page 268

1    A.   To the best of my knowledge, that
2  was not being done.
3    Q.   How about "Suspicious Order
4  Quantity," which is the fourth row on page 13 and
5  the fifth row on page 13?
6    A.   I do not know that that was being
7  done.
8    Q.   How about "Percent Over Average,"
9  the sixth row on page 13?
10    A.   I do not know if that was current
11  or not.
12    Q.   How about "Percent Over Max
13  Month," the seventh row on page 13, was that
14  calculation being performed already as of October
15  2, 2013?
16    A.   I do not know.
17    Q.   And let's go to page 14.
18    The calculation in the first row
19  on page 14, "Number of Repeated Upward
20  Overrides," do you know if that calculation was
21  being performed on or before October 2, 2013?

Page 269

5  familiar with all of the KPIs.
6    Q.   To be clear, the asset protection
7  KPIs were never used to identify, report or stop
8  the shipment of a suspicious order. Correct?
9    MS. McENROE: Objection to form.
10    THE WITNESS: The asset
11  protection KPIs were utilized to review
12  orders and then lead to diversion cases
13  if there were some issues with it. But
14  they were not used to report suspicious
15  orders.
16  BY MR. PIFKO:
17    Q.   Or to identify them. Correct?
18    MS. McENROE: Objection to form.
19    THE WITNESS: They could identify
20  a suspicious order or an order. But if
21  it was out of the norm, they would
22  identify it after it was shipped.
23  BY MR. PIFKO:
24    Q.   And no data from the asset

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 protection program was ever used to report a
2 suspicious order. Correct?
3          MS. McENROE: Objection to form.
4          THE WITNESS: No.
5 BY MR. PIFKO:
6     Q.    Your testimony that you just
7 gave, was that for the entirety of the
8 calculations on page 14?
9     A.    Yes.
10    Q.    Going back to page 6,
11 Rite_Aid_OMDL_0040189.
12         Are you there?
13    A.    I am.
14    Q.    Okay. The first bullet point
15 refers to Appendix A, but the remaining bullet
16 points do not refer to the appendix.
17         Do you know if any of the
18 calculations in the second through sixth bullet
19 point were being calculated on or before October
20 2, 2013?
21         MS. McENROE: Objection to form.
22         THE WITNESS: I believe some of
23     these were, again, part of the asset
24     protection KPIs, such as the trend

Page 271

1     percent, repeated downward cycle counts
2     were monitored by our asset protection
3     department.
4 BY MR. PIFKO:
5     Q.    So you said from time to time the
6 asset protection department did identify certain
7 orders that it deemed to be suspicious?
8          MS. McENROE: Objection to form.
9          THE WITNESS: They identified
10     orders that were related to a theft or a
11     loss that occurred in a store.
12 BY MR. PIFKO:
13    Q.    And those could be suspicious?
14         MS. McENROE: Objection to form.
15         THE WITNESS: They could be.
16     They couldn't be.
17 BY MR. PIFKO:
18    Q.    Did they document those anywhere?
19         MS. McENROE: Objection to form.
20         THE WITNESS: They do. There's a
21     case file for each theft or loss that
22     asset protection maintains.
23 BY MR. PIFKO:
24    Q.    And do they have a specific name?

Page 272

1     A.    It was called NaviScript/Navi --
2 NaviScript/NaviCase.
3     Q.    Okay. And it's all in that
4 database?
5     A.    It is. And now it is moved to
6 LPMS.
7     Q.    This project that's reflected in
8 Exhibit 12, 5046 suspicious order monitoring,
9 this was never actually implemented. Correct?
10    A.    Correct.
11    Q.    Why was not -- why wasn't it
12 implemented?
13    A.    By the time the roll-out of the
14 project, by the time the roll-out of the project
15 would have been complete, Rite Aid would not have
16 been distributing controlled substances anymore.
17    Q.    Are you familiar with Rite Aid's
18 decision to stop distributing Schedule III
19 controlled substances?
20         MS. McENROE: Objection to form.
21         THE WITNESS: I was familiar -- I
22     was provided information that Rite Aid
23     would stop distributing all drugs from
24     our distribution centers.

Page 273

1 BY MR. PIFKO:
2     Q.    Were you part of the discussions
3 about the strategy for making that change?
4          MS. McENROE: Objection to form.
5          THE WITNESS: I was not.
6 BY MR. PIFKO:
7     Q.    Do you know who was?
8     A.    I would imagine our pharmacy
9 purchasing that owns the McKesson contract was.
10    Q.    Do you know why Rite Aid made the
11 decision not to distribute controlled substances
12 on its own anymore?
13         MS. McENROE: Objection to form.
14         THE WITNESS: I do not. I was
15     not in the meeting.
16 BY MR. PIFKO:
17    Q.    No one ever told you why Rite Aid
18 decided to stop distributing controlled
19 substances?
20         MS. McENROE: Objection to form.
21         THE WITNESS: I never had a
22     discussion, a formal discussion about why
23     Rite Aid stopped distributing controlled
24     substances.

Page 274

1      MR. PIFKO: All right. Subject
2  to any direct examination your counsel
3  may have, I don't have any other
4  questions at this time.
5      MS. McENROE: Thanks. Let's take
6  a quick break and then we'll be back.
7      MR. PIFKO: Going off the record
8  at 4:17 p.m.
9           - - -
10     (A recess was taken from
11  4:17 p.m. to 4:42 p.m.)
12          - - -
13     THE VIDEOGRAPHER: We're back on
14  the record at 4:42 p.m.
15          - - -
16     EXAMINATION
17          - - -
18  BY MS. McENROE:
19     Q.    Good afternoon, Ms. Hart. You
20  understand my name is Elisa McEnroe. I'm counsel
21  for Rite Aid in this matter?
22     A.    I do.
23     Q.    I have a couple questions for
24  you.

Page 275

1      Do you remember earlier today you
2  were asked some questions about the auto
3  replenishment system?
4      A.    I do.
5      Q.    And you were asked some questions
6  specifically about the concept of a manual
7  override to that system?
8      A.    Yes.
9      Q.    And you testified that there was
10  a 99-bottle block to manual overrides in that
11  system.
12     Do you remember that?
13     A.    I do.
14     MR. PIFKO: Objection, leading.
15  BY MS. McENROE:
16     Q.    Are there any other blocks in the
17  manual override process of the auto replenishment
18  system?
19     A.    There are -- there is a block.
20  The algorithm takes the on-hand quantity, looks
21  ███████████████████████████████████
22  ███████████████  The pharmacist has the ability
23  to increase that suggested order ██████████
24  ████████████████████████

Page 276

1  quantity.
2      Q.    I'd like to direct your attention
3  to Exhibit 3 from today's deposition.
4      Do you have that in front of you?
5      A.    I do.
6      Q.    Do you remember being asked about
7  this document earlier today?
8      A.    I do.
9      Q.    And you mentioned in the middle
10  email on this document that "We are looking to
11  provide the DC a better understanding of our
12  replenishment parameters so they can utilize that
13  as part of their response," et cetera.
14     Do you see that?
15     A.    I do.
16     Q.    And then you were asked some
17  questions about a meeting you had with others at
18  Rite Aid regarding Rite Aid's suspicious order
19  monitoring program.
20     Do you remember those questions?
21     A.    Yes.
22     Q.    I'm going to mark Exhibit 14.
23          - - -
24     (Deposition Exhibit No.

Page 277

1      Hart-30(b)(6)-14, Handwritten notes,
2      11/23/10, Bates stamped
3      Rite_Aid_OMDL_0046066, was marked for
4      identification.)
5          - - -
6  BY MS. McENROE:
7      Q.    Do you recognize this document?
8      A.    I do.
9      Q.    What is this document?
10     A.    It is an outline of a meeting
11  that was held on 11/23/10 on suspicious order
12  monitoring.
13     Q.    Is this the meeting you were
14  referencing in your testimony earlier today
15  regarding suspicious order monitoring?
16     A.    It was.
17     Q.    And what you have listed here,
18  you have at the bottom some names.
19     A.    Those were attendees, Maggie
20  Perritt, Kevin Mitchell, Andy Palmer and myself.
21     Q.    And is that your handwriting?
22     A.    This is, yes.
23          - - -
24     (Deposition Exhibit No.

Page 278

1    Hart-30(b)(6)-15, PowerPoint slides,
2    Bates stamped Rite_Aid_OMDL_0046067
3    through Rite_Aid_OMDL_0046072, was marked
4    for identification.)
5         - - -
6  BY MS. McENROE:
7    Q.    I hand you what I've marked as
8  Exhibit 15.
9         Do you recognize this document?
10   A.    I do.
11   Q.    What is it?
12   A.    It was a document that was
13 brought back from a Buzzeo meeting on suspicious
14 order monitoring that was discussed by the group.
15   Q.    And when you say "discussed by
16 the group," are you talking about the meeting
17 that was referenced in Exhibit 14?
18   A.    Yes.
19   Q.    And you say it was brought back
20 from a Buzzeo conference.
21        Who brought it back?
22   A.    I believe Kevin Mitchell.
23   Q.    Do you remember whether the
24 group, as you called it, discussed the entirety

Page 279

1  of this presentation during the meeting?
2    A.    We did.
3         - - -
4         (Deposition Exhibit No.
5    Hart-30(b)(6)-16, Email dated 2010-12-10,
6    Bates stamped Rite_Aid_OMDL_0020381 and
7    Rite_Aid_OMDL_0020381, was marked for
8    identification.)
9         - - -
10 BY MS. McENROE:
11   Q.    I'm going to hand you what I'm
12 marking as Exhibit 16.  And in particular, I'd
13 like to direct your attention to the attachment,
14 which at the top says "Supply Chain Update --
15 Mitchell December 10, 2010."
16        Do you see that?
17   A.    I do.
18   Q.    The second bullet point there
19 says, "Met with RX Corporate team discussing
20 Suspicious Order Monitoring and how to better our
21 program."
22        Did I read that correctly?
23   A.    You did.
24   Q.    Do you know what that's referring

Page 280

1  to?
2    A.    That was referring to the meeting
3  that Andy Palmer, Kevin Mitchell, Maggie Perritt
4  and myself had originally to start discussing
5  suspicious order monitoring.
6    Q.    And is that the meeting reflected
7  as Exhibit 14 we were just discussing?
8    A.    Yes.
9    Q.    It then goes on to say, "We will
10 meet again 12/14 to follow-up on initial action
11 plans."
12        Do you see that?
13   A.    I do.
14   Q.    Did that group in fact meet again
15 in December to discuss suspicious order
16 monitoring?
17        MR. PIFKO:  Objection to form.
18        THE WITNESS:  We did.
19 BY MS. McENROE:
20   Q.    You can answer.
21   A.    We did.
22        - - -
23        (Deposition Exhibit No.
24   Hart-30(b)(6)-17, Handwritten notes,

Page 281

1    12/14/10, Bates stamped
2    Rite_Aid_OMDL_0046065, was marked for
3    identification.)
4         - - -
5         (Phone interruption.)
6         - - -
7  BY MS. McENROE:
8    Q.    Wait until the phone stops
9  ringing.  Hold on one second.
10        Ms. Hart, I handed you what's
11 been marked as Exhibit Number 17.
12   A.    Yes.
13   Q.    Do you recognize this document?
14   A.    Yes.
15   Q.    Is this your handwriting?
16   A.    This is my handwriting, yes.
17   Q.    And it's dated December 14, 2010
18 at the top.  Correct?
19   A.    Correct.
20   Q.    What does this document reflect?
21   A.    It is my notes on the meeting on
22 suspicious monitoring that occurred on the 14th.
23   Q.    Do you remember the conclusion
24 from that meeting?

Page 282

1  A.   The conclusion from the meeting
2  was that at this particular time we were going to
3  make no changes to our suspicious order
4  monitoring program.
5         - - -
6        (Deposition Exhibit No.
7        Hart-30(b)(6)-18, Email dated 2011-01-21,
8        Bates stamped Rite_Aid_OMDL_0020541 and
9        Rite_Aid_OMDL_0020542, was marked for
10       identification.)
11       - - -
12 BY MS. McENROE:
13     Q.   I'm going to hand you what I have
14 marked as Exhibit 18.  And again, as with
15 Exhibit 16, I'm going to direct you to the
16 attachment here, which is a supply chain update
17 document dated January 21, 2011.
18       Do you see that?
19     A.   I do.
20     Q.   And the very first bullet point
21 says, "Met with RX Corporate team discussing
22 Suspicious Order Monitoring and how to better our
23 program."
24       Do you see that?

Page 283

1      A.   I do.
2      Q.   Do you know what that's in
3  reference to?
4      A.   The meeting from the 10th -- the
5  14th that we had discussion about suspicious
6  order monitoring.
7      Q.   And the document goes on to say,
8  "Tested current process and everything works as
9  described."
10        Do you recall that being
11 consistent with your takeaway from the meeting on
12 December 14th?
13        MR. PIFKO:  Objection to form,
14 leading.
15 BY MS. McENROE:
16     Q.   You may answer.
17     A.   I do.
18     Q.   And you were asked questions
19 earlier today about a Maggie in reference to
20 these meetings.
21        And who was that?
22     A.   Maggie was an individual in
23 pharmacy operations.
24     Q.   And it says, "Maggie to put

Page 284

1  process in writing so that DC's can explain if
2  ever questioned by DEA."
3        Did I read that correctly?
4      A.   You did.
5      Q.   And why was it that Maggie never
6  did that?
7      A.   She had left the company.
8        MS. McENROE:  I have no further
9  questions.  Thank you.
10        MR. PIFKO:  I don't think we have
11 questions, but let me just look at the
12 documents real quick.
13        MS. McENROE:  Let's go off the
14 record real quick.
15        THE VIDEOGRAPHER:  Going off the
16 record, 4:50 p.m.
17        - - -
18        (A recess was taken from 4:50
19 p.m. to 4:51 p.m.)
20        - - -
21        THE VIDEOGRAPHER:  Back on the
22 record at 4:51 p.m.
23
24

Page 285

1        - - -
2        EXAMINATION
3        - - -
4  BY MR. PIFKO:
5      Q.   I want to direct your attention
6  to Exhibit 15 that your counsel just introduced
7  to you.
8        For the record, it's a multi-page
9  document, Bates labeled Rite_Aid_OMDL_004607
10 through 46072.
11        Can you tell me what this is?
12     A.   This was a PowerPoint
13 presentation that was brought back to Rite Aid
14 from Kevin Mitchell when he attended the
15 suspicious order monitoring Buzzeo in November of
16 2010.
17     Q.   You testified yesterday that
18 Cegedim is an industry leader on suspicious order
19 monitoring; is that correct?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  They are one of the
22 industry leaders, yes.
23 BY MR. PIFKO:
24     Q.   And you relied on their guidance

Page 286

1  in evaluating your suspicious order monitoring
2  system. Correct?
3         MS. McENROE: Objection to form.
4         THE WITNESS: We reviewed the
5      PowerPoint and then determined that our
6      suspicious order monitoring program had
7      all of the pieces to continue as we had
8      it.
9  BY MR. PIFKO:
10     Q.    And so Mr. Mitchell was at this
11 particular conference?
12     A.    Yes.
13     Q.    And then he came back and brought
14 the slides to you, and you had a discussion about
15 it?
16     A.    Yes.
17     Q.    I'm going to direct you to the
18 page Bates labeled Rite_Aid_OMDL_0046070. Tell
19 me when you're there.
20     A.    I am there.
21     Q.    There's a slide here, the top
22 slide, the top heading on it is "Common SOM
23 Pitfalls," suspicious order monitoring pitfalls.
24         Do you see that?

Page 287

1      A.    I do.
2      Q.    It says, "'Threshold' based
3  systems are not sufficient."
4         Do you see that?
5      A.    Yes.
6      Q.    And then it says underneath,
7  "'Cutting' orders to a volume that puts the order
8  under a threshold is not acceptable."
9         Do you see that?
10     A.    I do.
11     Q.    "DEA has previously stated on
12 this topic, 'that's like saying a little bit of
13 diversion is okay.'"
14         Do you see that?
15     A.    I do.
16     Q.    But you never made any changes to
17 the system after seeing that?
18         MS. McENROE: Objection to form.
19         THE WITNESS: We did not make any
20     changes simply because cutting an order
21     to 5,000 dosage units was only one part
22     of our suspicious order monitoring
23     program, and along with the algorithms
24     and the asset protection part, we decided

Page 288

1      to remain as it was.
2  BY MR. PIFKO:
3      Q.    Did you specifically discuss the
4  Cegedim's guidance on cutting orders when you had
5  this meeting with Mr. Mitchell?
6      A.    I don't recall if it was
7  discussed in detail. The PowerPoint was
8  discussed, yes.
9      Q.    Okay. But do you recall if that
10 slide was discussed?
11     A.    I don't recall.
12     Q.    Who else was in this meeting
13 again?
14     A.    This meeting was Maggie Perritt,
15 Andy Palmer, Kevin Mitchell and myself.
16     Q.    And you decided not to make any
17 changes after having this meeting and discussing
18 these slides. Correct?
19     A.    We did.
20         MR. PIFKO: Okay. No further
21     questions.
22         MS. McENROE: Thank you. That
23     concludes the 30(b)(6) deposition of Ms.
24     Hart.

Page 289

1         THE VIDEOGRAPHER: Going off the
2      record. The time is 4:55 p.m.
3         (Witness excused.)
4         (Deposition concluded at
5      approximately 4:55 p.m.)

Page 290

```
 1
 2              CERTIFICATE
 3
 4
 5       I HEREBY CERTIFY that the witness
    was duly sworn by me and that the deposition is a
 6  true record of the testimony given by the
    witness.
 7
              It was requested before
 8  completion of the deposition that the witness,
    JANET GETZEY HART, have the opportunity to read
 9  and sign the deposition transcript.
10
11
12
13
    _____
14       ANN MARIE MITCHELL, a Federally
         Approved Certified Realtime
15       Reporter, Registered Diplomate
         Reporter, Registered Merit Reporter and
16       Notary Public
17
18
19       (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24
```

Page 291

```
 1         INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over
 4  carefully and make any necessary corrections.
 5  You should state the reason in the appropriate
 6  space on the errata sheet for any corrections
 7  that are made.
 8          After doing so, please sign the
 9  errata sheet and date it.
10          You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13          It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed to
18  be accurate and may be used in court.
19
20
21
22
23
24
```

Page 292

```
 1          - - - - - -
              E R R A T A
 2          - - - - - -
 3
 4  PAGE  LINE  CHANGE
 5  ____  ____  _____
 6      REASON: _____
 7  ____  ____  _____
 8      REASON: _____
 9  ____  ____  _____
10      REASON: _____
11  ____  ____  _____
12      REASON: _____
13  ____  ____  _____
14      REASON: _____
15  ____  ____  _____
16      REASON: _____
17  ____  ____  _____
18      REASON: _____
19  ____  ____  _____
20      REASON: _____
21  ____  ____  _____
22      REASON: _____
23  ____  ____  _____
24      REASON: _____
```

Page 293

```
 1
 2      ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5  hereby certify that I have read the foregoing
 6  pages, 1 - 293, and that the same is a correct
 7  transcription of the answers given by me to the
 8  questions therein propounded, except for the
 9  corrections or changes in form or substance, if
10  any, noted in the attached Errata Sheet.
11
12
13  _____
14  JANET GETZEY HART              DATE
15
16
17  Subscribed and sworn
    to before me this
18  _____ day of _____, 20_____.
19  My commission expires:_____
20
    _____
21  Notary Public
22
23
24
```