UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT**

October 7, 2019

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ...................................................................................................... VII

INTRODUCTION ..........................................................................................................................1

LEGAL STANDARD ......................................................................................................................2

ARGUMENT .................................................................................................................................4

    A.     PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL
           TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTION IN LIMINE (DKT. #2661).
           ............................................................................................................................4

           1.     Defendants' Omnibus MIL No. 1: The Court should not permit
                Plaintiffs to present evidence or argument to the jury concerning "future
                damages." ...................................................................................................4

                i.     *Plaintiffs long ago disclosed that they are seeking future damages.* ......................4

                ii.     *Defendants offer no argument to support the exclusion of future damages
                         evidence other than the McGuire and Liebman Supplemental Tables.* ...............6

                iii.     *Plaintiffs properly supplemented the expert reports of Profs. Liebman and
                         McGuire to separate future damages from abatement costs.* ...............................8

           2.     Defendants' Omnibus MIL No. 2: The Court should preclude Plaintiffs
                from offering individualized evidence concerning prescriptions,
                shipments, and other matters on which they successfully avoided
                discovery by claiming it was "irrelevant." ...........................................................12

           3.     Defendants' Omnibus MIL No. 3: The Court should preclude testimony
                 from witnesses about personal stories of opioid abuse or related harms
                to themselves or others. .........................................................................................15

           4.     Defendants' Omnibus MIL No. 4: The Court should exclude lay and
                 hearsay testimony about prescription opioids being a "gateway" to illicit
                opioid use. ............................................................................................................17

           5.     Defendants' Omnibus MIL No. 5: The Court should preclude evidence
                 concerning lobbying and other protected petitioning activity..........................21

            6.     Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from
                 introducing evidence of alleged wrongful shipments to places outside
                Track One jurisdictions. ........................................................................................31

7.      Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations.............................................................................34

8.      Defendants' Omnibus MIL No. 8: The Court should require plaintiffs to establish the necessary foundation for their experts' testimony. .....................41

9.      Defendants' Omnibus MIL No. 9: The Court should not allow use of certain charts presenting misleading and irrelevant data.................................43

10.     Defendants' Omnibus MIL No. 10: The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.............................................................................................44

11.     Defendants' Omnibus MIL No. 11: The Court should exclude evidence and argument concerning Defendants' financial condition, revenues, or profitability.............................................................................................47

12.     Defendants' Omnibus MIL No. 12: The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.........48

13.     Defendants' Omnibus MIL No. 13: The Court should bar Plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers. ...............................................................................51

14.     Defendants' Omnibus MIL No. 14: The Court should preclude any comment regarding the absence of a corporate representative at trial. ..........51

B.      PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE (DKT. #2666).............................53

1.      Distributors' MIL No. D-1: The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia. .......................................................................53

2.      Distributors' MIL No. D-2: The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge. ...................................................................................59

3.      Distributors' MIL No. D-3: The Court should exclude any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction. .........................................................................62

4.      Distributors' MIL No. D-4: The Court should prohibit Plaintiffs from stating expressly or suggesting that the jury may infer that an older document never existed just because it cannot be found. ...............................63

5.      Distributors' MIL No. D-5: The Court should prohibit Plaintiffs from
        presenting evidence or making arguments suggesting Distributors
        committed a "fraud on the DEA." ....................................................................65

6.      Distributors' MIL No. D-6:  The Court should prohibit counsel and
        witnesses from making references broadly and generally to
        "Defendants" when the statement, argument, or testimony relates only
        to certain specific Defendants or groups of Defendants. ..............................67

7.      Distributors' MIL No. D-7: The Court should preclude Plaintiffs from
        offering evidence of, and arguments about RICO predicates that
        Plaintiffs did not identify in their discovery responses. ...................................68

8.      Distributors' MIL No. D-8: The Court should issue an order excluding
        any evidence of, or reference to, Distributor-run programs that allowed
        Manufacturers to communicate product information to Pharmacies or
        other parties. ...................................................................................................70

C.  PLAINTIFFS' RESPONSE TO HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE
    (DKT. #2645). .............................................................................................................72

1.      Henry Schein MIL No. HS-1: References to the Henry Schein
        Defendants having engaged in any alleged activities with respect to
        Cuyahoga County. ..........................................................................................72

2.      Henry Schein MIL No. HS-2: References to Henry Schein Medical
        Systems, Inc. as having distributed any opioid medications into Summit
        County or otherwise caused or contributed to any alleged opioid
        epidemic. ........................................................................................................73

3.      Henry Schein MIL No. HS-3: References to sales or distribution of
        opioid medications to retail, chain, Internet pharmacies, or "pill mills." .......74

4.      Henry Schein MIL No. HS-4: References to opioid medications
        distributed by Henry Schein, Inc. to Dr. Brian Heim........................................74

5.      Henry Schein MIL No. HS-5: References that Henry Schein, Inc. should
        not have shipped opioid medications following Dr. Heim's May 2012
        indictment. ......................................................................................................75

6.      Henry Schein MIL No. HS-6: References to opioid medications
        distributed by Henry Schein, Inc. to Dr. Adolph Harper. ...............................77

7.      Henry Schein MIL No. HS-7: References to purported inadequacies
        regarding Henry Schein, Inc.'s Suspicious Order Monitoring System

without first identifying whether any orders that HIS sold into Summit County were diverted. ..........................................................................77

8.    Henry Schein MIL No. HS-8: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.........78

9.    Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County. ...............................................79

10.    Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc. ..............................................................................................79

11.    Henry Schein MIL No. HS-11: References to alleged conduct supportive of Plaintiff's conspiracy claim, which took place, if at all, prior to May 18, 2014. ...................................................................................................80

12.    Henry Schein MIL No. HS-12: References to Henry Schein Animal Health, which is not a named party to Plaintiff's lawsuit................................81

D.    PLAINTIFFS' RESPONSE TO WALGREENS' MOTIONS *IN LIMINE* (DKT. #2648)...........82

1.    Walgreens' MIL No. W-1: To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen......................................82

2.    Walgreens' MIL No. W-2: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement.............84

3.    Walgreens' MIL No. W-3: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man."..........86

E.    PLAINTIFFS' RESPONSE TO CARDINAL HEALTH INC'S MOTIONS *IN LIMINE* (DKT. #2653). .........................................................................................87

1.    Cardinal MIL No. 1: 14,000 Orders Not Shipped. ............................................87

2.    Cardinal MIL No. 2: "Interesting Gossip" Email.............................................90

3.    Cardinal MIL No. 3: Misleading Data Comparisons (McCann Data Analysis). ...........................................................................................91

F.    PLAINTIFFS' RESPONSE TO MCKESSON CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT (DKT. #2663)................................92

1.    McKesson MIL No. MCK-1: The Court should prohibit any reference to baseless accusations. ..............................................................................92

2.      McKesson MIL No. MCK-2: The Court should prohibit evidence or argument about the U.S. House of Representatives Energy and Commerce Committee's Investigation. ..........................................93

        *i.      The House Report is admissible under Rule 803(8) because it is factual findings from a legally authorized investigation and there are no indications of untrustworthiness.* ..........................................93

        *ii.     The findings of the House Report are probative into the issues at the core of the claims in this case and its inclusion is unlikely to unfairly prejudice the jury.* ..........................................95

        *iii.    Testimony Provided to the Committee is Also Admissible.* ..............................96

        *iv.    Letters from members of Congress to McKesson Are Admissible.* ....................96

3.      McKesson MIL No. MCK-3: The Court should prohibit the introduction of nationwide trends in drug deaths.............................................97

4.      McKesson MIL No. MCK-4: The Court should prohibit Plaintiffs from introducing evidence or argument about allegations contained in letters from the DEA or DOJ. ..........................................98

5.      McKesson MIL No. MCK-5: The Court should prohibit introduction of testimony from McKesson witness Nathan Hartle because of Plaintiffs' badgering and abusive conduct. ..........................................98

6.      McKesson MIL No. MCK-6: The Court should prohibit introduction of documents related to McKesson's relationship with CVA and Rite Aid in light of severance. ..........................................102

G.    PLAINTIFFS' RESPONSE TO TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE (DKT. #2668). ....................................104

    1.      Teva MIL No. TAD-1: The Court should exclude reference to the Cephalon misdemeanor plea. ..........................................104

    2.      Teva MIL No. TAD-2: The Court should exclude reference to "off-label" promotion. ..........................................105

    3.      Teva MIL No. TAD-3: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government. .....106

    4.      Teva MIL No. TAD-4: The Court should exclude evidence of opioid-related harm that occurred outside of the counties. ......................................106

5.      Teva MIL No. TAD-5: The Court should exclude evidence of marketing-related statements or opioid shipments outside of the counties..................................................................................................... 108

6.      Teva MIL No. TAD-6: The Court should exclude evidence regarding Teva Defendants' financial support of third-party groups. ........................... 109

7.      Teva MIL No. TAD-7: The Court should exclude testimony from Russell Portenoy about any improper conduct by Moving Defendants...... 112

8.      Teva MIL No. TAD-8: Plaintiffs should be precluded from arguing that the Actavis Generic Defendants should have made additional warnings regarding their generic medicines or should have stopped selling them. .... 114

9.      Teva MIL No. TAD-9: The Court should exclude reference to the purchase price paid by Teva Pharmaceutical Industries Ltd. for the Actavis Generic Defendants............................................................................... 115

10.     Teva MIL No. TAD-10: The Court should exclude reference to the settlement agreement between Teva Ltd. and Allergan. ................................ 116

CONCLUSION .................................................................................................................. 117

# TABLE OF AUTHORITIES

*Page*

CASES

*Adams v. U.S.,*
    03-0049-E-BLW, 2009 WL 1259019 (D. Idaho May 3, 2009) ........................................24, 25, 67

*Alexander v. Natl. Farmers Org.,*
    687 F.2d 1173 (8th Cir. 1982) ................................................................................23

*Almanza v. United Airlines, Inc.,*
    851 F.3d 1060 (11th Cir. 2017) ...........................................................................113

*Anderson v. Westinghouse Savannah River Co.,*
    406 F.3d 248 (4th Cir. 2005) ................................................................................95

*Andler v. Clear Channel Broadcasting, Inc.,*
    670 F.3d 717 (6th Cir. 2012) ..........................................................................42, 43

*Anthony v. DeWitt,*
    295 F.3d 554 (6th Cir. 2002) ................................................................................97

*Antioch Co. Litig. Tr. v. Morgan,*
    No. 3:10CV156, 2014 WL 2117450 (S.D. Ohio May 21, 2014) .................................................68

*Atanus v. S&C Elec. Co.,*
    454 F. Supp. 2d 753 (N.D. Ill. 2006) ........................................................................40

*Baker v. Elcona Homes Corp.,*
    588 F.2d 551 (6th Cir. 1978), *cert. denied*, 441 U.S. 933 (1979) ................................................94

*Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.,*
    959 F.2d 606 (6th Cir. 1992) ................................................................................94

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988) .................................................................................6

*Beech Aircraft Corp. v. Rainey,*
    488 U.S. 153 (1988) ........................................................................................94

*Bell v. Consol. Rail Corp.,*
    299 F. Supp. 2d 795 (N.D. Ohio 2004) ......................................................................57

*Brazos River Auth. v. GE Ionics, Inc.,*
    469 F.3d 416 (5th Cir. 2006) ..........................................................................60, 61

*Bridgeport Music, Inc. v. WM Music Corp.,*
    508 F.3d 394 (6th Cir. 2007)................................................................................70

*Brooks v. Caterpillar Glob. Mining Am. LLC,*
    No. 4:14-cv-00022-JHM, 2017 WL 3401476 (W.D. Ky. Aug. 8, 2017)............................116, 117

*Buckman Co. v. Plaintiffs' Leg. Comm.,*
    531 U.S. 341 (2001) ................................................................................66, 67

*Cadence Educ., LLC v. Vore,*
    No. 17-CV-2092-JTM-TJJ, 2018 WL 690993 (D. Kan. Feb. 2, 2018) .......................................84

*Cal. Motor Transport Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ................................................................................22

*Campbell v. PMI Food Equip. Group, Inc.,*
    509 F.3d 776 (6th Cir. 2007)................................................................................22

*Chambers v. St. Mary's Sch.,*
    697 N.E.2d 198 (Ohio 1998) ................................................................................40

*Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.,*
    No. 10-CV-02349-WJM-KMT, 2014 WL 1583993 (D. Colo. Apr. 21, 2014) ...........................62

*Chism v. CNH Am., LLC,*
    638 F.3d 637 (8th Cir. 2011)................................................................................104

*Christopher Seri v. Crosscountry Mortg., Inc.,*
    No. 1:16-CV-01214-DAP, 2016 WL 5405257 (N.D. Ohio Sept. 28, 2016) ...............................68

*Cincinnati Ins. Co. v. Omega Flex, Inc.,*
    No. 3:10-CV-00670-H, 2013 WL 1403493 (W.D. Ky. Apr. 5, 2013) ........................................45

*Cincinnati v. Beretta U.S.A. Corp.,*
    768 N.E.2d 1136 (Ohio 2002) ................................................................................39

*Cipollone v. Liggett Group, Inc.,*
    668 F. Supp. 408 (D.N.J. 1987) ................................................................................23, 24

*City of Cleveland v. Cleveland Elec. Illuminating Co.,*
    538 F. Supp. 1257 (N.D. Ohio 1980)................................................................26, 27, 28, 29

*City of Cleveland v. Cleveland Elec. Illuminating Co.,*
    734 F.2d 1157 (6th Cir. 1984) ................................................................26, 27, 28, 29

*City of Cleveland v. Peter Kiewit Sons' Co.,*
    624 F.2d 749 (6th Cir. 1980)................................................................................117

*Community Action League v. City of Palmdale,*
  CV 11-4817 ODW VBKX, 2012 WL 10647285 (C.D. Cal. Feb. 1, 2012) ....................................24

*Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.,*
  CV 00-1693-PA, 2003 WL 24901381 (D. Or. July 5, 2003) ........................................................24

*Cooley v. Lincoln Elec. Co.,*
  693 F.Supp.2d 767 (N.D. Ohio 2010) ........................................................................................63

*Croskey v. BMW of North America, Inc.,*
  532 F.3d 511 (6th Cir. 2008) .....................................................................................................56

*CSX Transp., Inc. v. Exxon/Mobil Oil Corp.,*
  401 F. Supp. 2d 813 (N.D. Ohio 2005) ...............................................................................56, 57

*Daniels v. Northcoast Anesthesia Providers, Inc.,*
  2018-Ohio-3562 (Ct. App. 2018) ...........................................................................................6, 8

*Davis v. Clark Cty. Bd. of Commrs.,*
  994 N.E.2d 905 (Ohio App. 2d Dist. 2013) ...............................................................................40

*DeLoach v. Philip Morris Companies, Inc.,*
  1:00CV01235, 2001 WL 1301221 (M.D.N.C. July 24, 2001) .....................................................22

*DIRECTV, Inc. v. Cavanaugh,*
  321 F. Supp. 2d 825 (E.D. Mich. 2003) .....................................................................................22

*Doe v. United States,*
  253 F.3d 256 (6th Cir. 2001) .....................................................................................................48

*Dortch v. Fowler,*
  588 F.3d 396 (6th Cir. 2009) ................................................................................................2, 35

*Feinstein v. Resolution Tr. Corp.,*
  942 F.2d 34 (1st Cir. 1991) ........................................................................................................70

*Feminist Women's Health Ctr., Inc. v. Mohammad,*
  586 F.2d 530 (5th Cir. 1978) ...............................................................................................30, 31

*Flir Sys., Inc. v. Fluke Corp.,*
  No. 3:10-CV-00971-HU, 2012 WL 13054267 (D. Or. Nov. 29, 2012) ........................................69

*Galayda v. Lake Hosp. Sys., Inc.,*
  1994-Ohio-64, 71 Ohio St. 3d 421 ..............................................................................................6

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
  458 U.S. 375 (1982) .........................................................................................................111, 112

*Gillis v. Murphy-Brown, LLC,*
    7:14-CV-185-BR, 2018 WL 5928010 (E.D.N.C. Nov. 13, 2018) ...............................................23

*Gjokaj v. United States Steel Corp.,*
    700 F. App'x 494 (6th Cir. 2017) ...........................................................................................55

*Globetti v. Sandoz Pharm. Corp.,*
    CV98-TMP-2649-S, 2001 WL 419160 (N.D. Ala. Mar. 5, 2001) .............................................67

*Goldman v. Healthcare Mgmt. Sys., Inc.,*
    559 F. Supp. 2d 853 (W.D. Mich. 2008) ...........................................................................45, 93

*Gomez v. Rivera,*
    344 F.3d 103 (1st Cir. 2003) ............................................................................................19, 20

*Gonzalez Prod. Sys. Inc. v. Martinrea Int'l Inc.,*
    No. 13-cv-11544, 2015 WL 4934628 (E.D. Mich. Aug. 18, 2015) ........................................117

*Harris v. Goins,*
    No. 6: 15-151-DCR, 2017 WL 4080692 (E.D. Ky. Sep. 14, 2017)..........................................102

*Hilton Hotels Corp. v. Dunnet,*
    No. 00–2852–GV, 2002 WL 1482543 (W.D.Tenn. Mar. 15, 2002) .........................................101

*Hobson v. Wilson,*
    556 F. Supp. 1157 (D.D.C. 1982), *aff'd in part, rev'd in part,* 757 F.2d 1 (D.C. Cir. 1985) .............95

*Hochstein v. Microsoft Corp.,*
    04-73071, 2009 WL 2022815 (E.D. Mich. July 7, 2009) .......................................................83

*Homoki v. Rivers Edge Tree Stands,*
    No. 1:12-CV-2926, 2012 WL 6631043 (N.D. Ohio Dec. 19, 2012)..........................................55

*Howe v. City of Akron,*
    801 F.3d 718 (6th Cir. 2015) ................................................................................................11

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,*
    538 U.S. 600 (2003) ...........................................................................................................22

*In re Air Crash at Lexington, KY,*
    No. 5:06-CV-316-KSF, 2008 WL 2782827 (E.D. Ky. July 8, 2008)........................................91

*In re Air Crash Disaster,*
    86 F.3d 498 (6th Cir. 1996)............................................................................................91, 92

*In re Asbestos Sch. Litig.,*
    46 F.3d 1284 (3d Cir. 1994) ...............................................................................................113

*In re Cathode Ray Tube Antitrust Litig.*,
    MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891 (N.D. Cal. 2016) ..............................82

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*,
    295 F. Supp. 3d 927, 973 ...............................................................................................24

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
    888 F.3d 753 (5th Cir. 2018).....................................................................................46, 47

*In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*,
    14 C 1748, 2018 WL 305503 (N.D. Ill. Jan. 6, 2018)..........................................23, 24

*In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*,
    181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) ....................................................24, 66, 67

*In re Vioxx Products Liab. Litig.*,
    MDL 1657, 2005 WL 3164254 (E.D. La. Nov. 21, 2005) .........................................67

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
    MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) .................23, 24

*In re Welding Fume Products Liab. Litig.*,
    1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) .............................23, 24

*In re Welding Fume Products Liab. Litig.*,
    526 F. Supp. 2d 775 (N.D. Ohio 2007)..........................................................110, 112

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*,
    No. 3:09-CV-10012-DRH, 2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ..........................passim

*In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*,
    No. 2:13-CV-170, 2016 WL 659112 (S.D. Ohio Feb. 17, 2016) ..........................55, 56

*In re: Gen. Motors LLC Ignition Switch Litig.*,
    14-MD-2543 (JMF), 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015)........................24, 25

*Indiana Ins. Co. v. Gen. Elec. Co.*,
    326 F. Supp. 2d 844 (N.D. Ohio 2004)...........................................................passim

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ...................................................................................................8

*Jackson v. O'Reilly Auto. Stores, Inc.*,
    131 F. Supp. 3d 756, 760, 761 (M.D. Tenn. 2015) ...................................................49

*Jacobs v. Tricam Industries, Inc.*,
    10-11469, 2013 WL 950969 (E.D. Mich. Mar. 12, 2013)....................................16, 17

*Jones v. Pramstaller,*
No. 1:09-CV-392, 2013 WL 12249827 (W.D. Mich. Jan. 14, 2013) ............................................19

*Jordan v. John Soliday Fin. Group, LLC,*
1:09CV0707, 2010 WL 4281807 (N.D. Ohio Oct. 20, 2010)........................................2, 3, 4, 32

*KCH Services, Inc. v. Vanaire, Inc.,*
CIV.A. 05-777-C, 2010 WL 3245243 (W.D. Ky. June 2, 2010) ...........................................16, 17

*King v. Pratt & Whitney, a Div. of United Technologies Corp.,*
161 F.R.D. 475 (S.D. Fla. 1995) ........................................................................................102

*Koloda v. General Motors Parts Div., General Motors Corp.,*
716 F.2d 373 (6th Cir. 1983) .................................................................................................91

*Kottle v. N.W. Kidney Centers,*
146 F.3d 1056 (9th Cir. 1998) ...............................................................................................22

*Lloyd v. Midland Funding, LLC,*
No. 15-5132, 639 Fed. Appx. 301 (6th Cir. Jan. 22, 2016) ............................................60, 61

*Louzon v. Ford Motor Co.,*
718 F.3d 556 (6th Cir. 2013)..........................................................................................3, 35

*Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.,*
835 F. Supp. 2d 299 (W.D. Ky. 2011) .............................................................................66, 67

*Marcilis v. Twp. of Redford,*
693 F.3d 589 (6th Cir. 2012).................................................................................................68

*Martin v. Thrifty Rent A Car,*
145 F.3d 1332 (6th Cir. 1998) ...............................................................................................57

*Mascarenas v. Cooper Tire & Rubber Co.,*
CV208-009, 2010 WL 11534359 (S.D. Ga. Jan. 11, 2010) ..........................................................52

*McAuliffe v. United States,*
514 F. App'x 542 (6th Cir. 2013) ....................................................................................55, 56

*McConnell v. Fed. Election Commn.,*
540 U.S. 93 (2003), *overruled by Citizens United v. Fed. Election Commn.*, 558 U.S. 310 (2010)........110

*McFarlane v. Ben–Menashe,*
No. 93–1304, 1995 WL 129073 (D.D.C. March 16, 1995), *reconsideration granted,* 1995 WL
799503 (D.D.C. June 13, 1995) ...........................................................................................95

*McLean v. 988011 Ontario,*
224 F.3d 797 (6th Cir. 2000)................................................................................................42

*McWilliams v. S.E., Inc.*,
    581 F. Supp. 2d 885 (N.D. Ohio 2008) ..................................................................112

*Miles v. Scutt*,
    No. 07-15068, 2008 WL 2949240 (E.D. Mich. July 29, 2008) .................................21

*Mitchell v. City of Tukwila*,
    C12-238RSL, 2013 WL 6631791 (W.D. Wash. Dec. 17, 2013) ...............................52

*Morningstar v. Circleville Fire & EMS Dept.*,
    2:15-CV-3077, 2018 WL 3721077 (S.D. Ohio Aug. 6, 2018) ..........................2, 3, 35

*Nat.-Immunogenics Corp. v. Newport Tr. Group*,
    SACV1502034JVSJCGX, 2018 WL 6137597 (C.D. Cal. May 16, 2018) ...................24

*Natl. Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ...............................................................................................112

*O'Dell v. Hercules, Inc.*,
    904 F. 2d 1194 (8th Cir. 1990) ...............................................................................94

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) .................................................................................................25

*Okuda v. Wyeth*,
    1:04-CV-80 DN, 2012 WL 12337860 (D. Utah July 24, 2012) ...............................52

*Pearce v. E.F. Hutton Group, Inc.*,
    653 F. Supp. 810 (D.D.C. 1987) .............................................................................95

*Pfahler v. Nat'l Latex Prod. Co.*,
    517 F.3d 816 (6th Cir. 2007) .....................................................................................7

*Potters Med. Ctr. v. City Hosp. Ass'n*,
    800 F.2d 568 (6th Cir. 1986) ...................................................................................22

*PPM Finance, Inc. v. Norandal USA, Inc.*,
    392 F.3d 889 (7th Cir. 2004) ...................................................................................61

*Pugh v. City of Attica, Ind.*,
    259 F.3d 619 (7th Cir. 2001) ..............................................................................61, 62

*Quillen v. Safety-Kleen Sys., Inc.*,
    No. CIV.A. 07-67-EBA, 2010 WL 8357353 (E.D. Ky. May 27, 2010) ....................45

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*,
    2:13-CV-213-JRG-RSP, 2015 WL 627430 (E.D. Tex. Jan. 31, 2015) .......................52

*Reo v. Caribbean Cruise Line, Inc.*,
  No. 1:14 CV 1374, 2016 WL 1109042 (N.D. Ohio Mar. 18, 2016) ...........................................68

*Rheinfrank v. Abbott Labs., Inc.*,
  No. 1:13-cv-144, 2015 WL 5258858 (S.D. Ohio Sept. 10, 2015) ...............................................115

*Robinson v. Runyon*,
  149 F.3d 507 (6th Cir. 1998) ...................................................................................................2

*Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*,
  2017 WL 4748054 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018)..........108

*Rui He v. Rom*,
  No. 1:15-CV-1869, 2017 WL 1054814 (N.D. Ohio Mar. 21, 2017)............................................68

*Sara Lee Corp. v. Kraft Foods, Inc.*,
  276 F.R.D. 500 (N.D. Ill. 2011) ....................................................................................61, 62, 63

*Securities and Exch. Commn. v. Jacobs*,
  1:13 CV 1289, 2014 WL 12597832 (N.D. Ohio Feb. 25, 2014) ..................................................3

*Shahid v. City of Detroit*,
  889 F.2d 1543 (6th Cir. 1989) .................................................................................................43

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ..........................................................................................................25, 26

*Sperberg v. Goodyear Tire & Rubber Co.*,
  519 F.2d 708 (6th Cir. 1975)................................................................................................2, 49

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
  537 U.S. 51 (2002).............................................................................................................38, 39

*St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*,
  1:06CV2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009)................................................2, 3

*Stanton v. Vashinder*,
  No. 06-10432, 2009 WL 996955 (E.D. Mich. Apr. 13, 2009) ...................................................21

*State ex rel. Morrison v. Wiener*,
  83 N.E.3d 292, 295-99 (Ohio App. 9th Dist. 2017) ...............................................................40

*State v. Craig*,
  110 Ohio St. 3d 306, 853 N.E.2d 621 (2006) ........................................................................21

*State v. Toudle*,
  2013-Ohio-1548...................................................................................................................21

*Stewart v. Hooters of Am., Inc.*,
   No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873 (M.D. Fla. June 18, 2007)................................69

*Stringer v. N.F.L.*,
   749 F. Supp. 2d 680 (S.D. Ohio 2010) ........................................................................17, 73, 83

*Taylor v. AirCo, Inc.*,
   CV 02-30014-MAP, 2003 WL 27382684 (D. Mass. Aug. 4, 2003), *report and recommendation
   adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003)..................26, 110, 111

*Taylor v. Checkrite, Ltd.*,
   627 F. Supp. 415 (S.D. Ohio 1986) ........................................................................... 112, 113

*Taylor v. City of Cincinnati*,
   55 N.E.2d 724 (Ohio 1944) ...................................................................................................39

*Telecor Commun., Inc. v. S.W. Bell Tel. Co.*,
   305 F.3d 1124 (10th Cir. 2002) ...........................................................................................23

*TJX Companies, Inc. v. Hall*,
   2009-Ohio-3372, 183 Ohio App. 3d 236 ...........................................................................7, 8

*Tovey v. Nike, Inc.*,
   1:12CV446, 2014 WL 3510636 (N.D. Ohio 2014) ...............................................................43

*Tucker v. Union of Needletrades, Indus., & Textile Emps.*,
   407 F.3d 784 (6th Cir. 2005)................................................................................................70

*U.S. Football League v. Natl. Football League*,
   634 F. Supp. 1155 (S.D.N.Y. 1986) ........................................................................29, 30, 31

*U.S. Football League v. Natl. Football League*,
   842 F.2d 1335 (2d Cir. 1988) .............................................................................................30

*U.S. v. Alghazouli*,
   517 F.3d 1179 (9th Cir. 2008) ............................................................................................37

*U.S. v. Boyd*,
   640 F.3d 657 (6th Cir. 2011)...............................................................................................97

*U.S. v. Daniel*,
   329 F.3d 480 (6th Cir. 2003)...............................................................................................37

*U.S. v. Kerley*,
   784 F.3d 327 (6th Cir. 2015)...............................................................................................50

*U.S. v. Lopez-Ortiz*,
   736 F. Supp. 2d 469 (D.P.R. 2010) .....................................................................................88

*U.S. v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011), *aff'd in part sub nom.*, *Smith v. U.S.*, 568 U.S. 106 (2013) ................53

*U.S. v. Nixon*,
    694 F.3d 623 (6th Cir. 2012) ........................................................................................53

*U.S. v. Pits*,
    85 F.3d 629, 1996 WL 254655 (6th Cir. 1996) .........................................................53

*U.S. v. Signer*,
    482 F.2d 394 (6th Cir. 1973) ........................................................................................53

*U.S. v. Smith*,
    70 Fed. Appx. 804 (6th Cir. 2003) .......................................................................41, 42

*U.S. v. Turning Bear*,
    357 F.3d 730 (8th Cir. 2004) ........................................................................................88

*Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*,
    111 F.3d 1284 (6th Cir. 1997) ......................................................................................54

*Union Pump Co. v. Centrifugal Tech. Inc.*,
    Nos. 10–30040, 10–30072, 2010 WL 5186616 (5th Cir. Dec. 16, 2010) ...................63

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) .......................................................................................23, 26, 29

*United States v. Amr*,
    132 F. Appx. 632 (6th Cir. 2005) ................................................................................48

*United States v. Asher*,
    910 F.3d 854 (6th Cir. 2018) ........................................................................................59

*United States v. Fleming*,
    902 F.2d 1570 (6th Cir. 1990) ...............................................................................72, 73

*United States v. Foster*,
    376 F.3d 577 (6th Cir. 2004) ...............................................................................113, 114

*United States v. Fowler*,
    932 F.2d 306 (4th Cir. 1991) ........................................................................................51

*United States v. Gupta*,
    747 F.3d 111 (2d Cir. 2014) ........................................................................................84

*United States v. Midwest Fireworks Mfg. Co.*,
    248 F. 3d 563 (6th Cir. 2001) ......................................................................................94

*United States v. Mohammad,*
 No. 1:10CR389, 2012 WL 4483544 (N.D. Ohio, Sept. 27, 2012) ..............................73

*United States v. Rea,*
 958 F.2d 1206 (2d Cir. 1992) ................................................................................51

*United States v. Robinson,*
 763 F.2d 778 (6th Cir. 1985).................................................................................84

*United States v. Schrock,*
 855 F.2d 327 (6th Cir. 1988).................................................................................59

*United States v. Smith,*
 550 F.2d 277 (5th Cir. 1977).................................................................................51

*United States v. Valdez-Reyes,*
 No. 03-3737, 2006 WL 126733 (6th Cir. Jan. 18, 2006) ...........................................50

*Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.,*
 68 F. Supp. 3d 917 (N.D. Ill. 2014) .......................................................................61

*Vystrcil v. Mercy Health,*
 No. 17CV781, 2019 WL 2076035 (N.D. Ohio May 10, 2019) .....................................70

*Watson Carpet & Floor v. Mohawk Indus.,*
 648 F. 3d 452 (6th Cir. 2011)................................................................................82

*Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago,*
 641 F.2d 457 (7th Cir. 1981).................................................................................31

*Widmer v. Warden, Corr. Reception Ctr.,*
 2017 WL 447237 (S.D. Ohio Feb. 2, 2017)............................................................104

*William F. Shea, LLC v. Bonutti Research, Inc.,*
 No. 2:10-CV-615, 2012 WL 5077701 (S.D. Ohio Oct. 18, 2012) ................................55

*Wise v. Zwicker & Associates, P.C.,*
 780 F.3d 710 (6th Cir. 2015).................................................................................22

*Wolfe v. McNeil-PPC, Inc.,*
 CIV.A. 07-348, 2012 WL 38694 (E.D. Pa. Jan. 9, 2012).....................................24, 25

## STATUTES

5 U.S.C. § 551 .....................................................................................................22

5 U.S.C. § 552 .....................................................................................................22

5 U.S.C. § 553 ...........................................................................................22

5 U.S.C. § 554 ...........................................................................................22

5 U.S.C. § 555 ...........................................................................................22

5 U.S.C. § 556 ...........................................................................................22

5 U.S.C. § 557 ...........................................................................................22

5 U.S.C. § 558 ...........................................................................................22

5 U.S.C. § 559 ...........................................................................................22

18 U.S.C. § 545 .........................................................................................37

18 U.S.C. § 1343 ........................................................................................37

18 U.S.C. § 1961 ........................................................................................36

21 U.S.C. § 801 ....................................................................................39, 40

21 U.S.C. § 821 .........................................................................................38

21 U.S.C. § 826 .........................................................................................22

21 U.S.C. § 843 ..............................................................................36, 37, 39

21 U.S.C. § 871 .........................................................................................38

21 U.S.C. § 877 .........................................................................................22

OHIO REV. CODE § 313.10 .........................................................................21

OHIO REV. CODE § 4729.35 ...................................................................37, 38

## OTHER AUTHORITIES

1 CV Ohio Jury Instructions 443.01 .............................................................40

1 CV Ohio Jury Instructions 621.05 .............................................................39

21 C.F.R. § 1303.11 ....................................................................................22

21 C.F.R. § 1303.12 ....................................................................................22

21 C.F.R. § 1303.13 ....................................................................................22

21 C.F.R. § 1303.31 ....................................................................................22

21 C.F.R. § 1303.32 .................................................................................................................22

21 C.F.R. § 1303.33 .................................................................................................................22

21 C.F.R. § 1303.34 .................................................................................................................22

21 C.F.R. § 1303.35 .................................................................................................................22

21 C.F.R. § 1303.36 .................................................................................................................22

21 C.F.R. § 1303.37 .................................................................................................................22

21 C.F.R. § 1316.41 .................................................................................................................22

21 C.F.R. § 1316.42 .................................................................................................................22

21 C.F.R. § 1316.43 .................................................................................................................22

21 C.F.R. § 1316.44 .................................................................................................................22

21 C.F.R. § 1316.45 .................................................................................................................22

21 C.F.R. § 1316.46 .................................................................................................................22

21 C.F.R. § 1316.47 .................................................................................................................22

21 C.F.R. § 1316.48 .................................................................................................................22

21 C.F.R. § 1316.49 .................................................................................................................22

21 C.F.R. § 1316.50 .................................................................................................................22

21 C.F.R. § 1316.51 .................................................................................................................22

21 C.F.R. § 1316.52 .................................................................................................................22

21 C.F.R. § 1316.53 .................................................................................................................22

21 C.F.R. § 1316.54 .................................................................................................................22

21 C.F.R. § 1316.55 .................................................................................................................22

21 C.F.R. § 1316.56 .................................................................................................................22

21 C.F.R. § 1316.57 .................................................................................................................22

21 C.F.R. § 1316.58 .................................................................................................................22

21 C.F.R. § 1316.59 .................................................................................................................20

21 C.F.R. § 1316.60 .................................................................................................22

21 C.F.R. § 1316.61 .................................................................................................22

21 C.F.R. § 1316.62 .................................................................................................22

21 C.F.R. § 1316.63 .................................................................................................22

21 C.F.R. § 1316.64 .................................................................................................22

21 C.F.R. § 1316.65 .................................................................................................22

21 C.F.R. § 1316.66 .................................................................................................22

21 C.F.R. § 1316.67 .................................................................................................22

21 C.F.R. § 1316.68 .................................................................................................22

2 MCCORMICK ON EVIDENCE § 214 (7th ed.) .........................................................46

FED. R. CIV. P. 1 ......................................................................................................42

FED. R. CIV. P. 26 ...............................................................................10, 11, 19, 20

FED. R. CIV. P. 30 ........................................................................................... passim

FED. R. CIV. P. 37 ....................................................................................................11

FED. R. CIV. P. 56 ....................................................................................................61

FED. R. EVID. 401 ..................................................................................................2, 58

FED. R. EVID. 402 ........................................................................................... passim

FED. R. EVID. 403 ........................................................................................... passim

FED. R. EVID. 404 ..................................................................................................106

FED. R. EVID. 406 .........................................................................................56, 57, 58

FED. R. EVID. 408 ........................................................................................... passim

FED. R. EVID. 602 .........................................................................................60, 61, 75, 79

FED. R. EVID. 613 ..................................................................................................113

FED. R. EVID. 701 .........................................................................................50, 51

FED. R. EVID. 702 ..................................................................................................50

FED. R. EVID. 704 .................................................................................................................51

FED. R. EVID. 801 .................................................................................................................97

FED. R. EVID. 803 ................................................................................................... 21, 62, 93, 94

https://www.washingtonpost.com/health/feds-probe-manager-of-mckesson-narcotics-
    distribution-warehouse-in-ohio/2019/09/18/0878fd26-d644-11e9-9610-
    fb56c5522e1c_story.html ...................................................................................... 63, 64

https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-
    federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-
    d7f0e60391e9_story.html .............................................................................................85

*In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation,*
    N.D. Tex., No. 3:11-md-02244-K, Dkt. No. 1031 (Order Granting Motion for Final
    Assessment, pp. 7-8) .......................................................................................................47

RESTATEMENT (SECOND) OF TORTS § 821B(2)(b) ...........................................................39

## INTRODUCTION

Plaintiffs submit this omnibus response to the following motions *in limine* filed by Defendants: Omnibus Memorandum of Law in Support of All Track One Bellwether Trial Defendants' Motion in Limine (Dkt. #2661); Omnibus Memorandum of Law in Support of Distributor Defendants' Motions in Limine (Dkt. #2666); Henry Schein Defendants' Motions in Limine (Dkt. #2645); Walgreens' Motions *in Limine* (Dkt. #2648); Cardinal Health Inc.'s Motions *in Limine* (Dkt. #2653); McKesson Corporation's Motion in Limine to Exclude Certain Evidence and Argument (Dkt. #2663); and Teva Defendants' and Actavis Generic Defendants' Omnibus Motion in Limine (Dkt. #2668).[1]  This omnibus response is designed to reduce the documents on this Court's docket and promote brevity.

The MILs proposed by Defendants should be denied.[2]  As a preliminary matter, Plaintiffs are unclear if Defendants have not read this Court's summary judgment rulings, or have simply chosen to ignore them, but many of their MILs seek to re-litigate issues on which they have already lost.  This is not an appropriate use of a motion *in limine*.  Additionally, Defendants' legal and factual arguments in support of exclusion are without merit.  Many of the cases Defendants cite do not even address motions *in limine* or evidentiary issues, and those that do are easily distinguishable.  Defendants do not come close to satisfying their burden to demonstrate that the evidence sought to be excluded is clearly inadmissible on all grounds.  And most of their MILs are overly broad and vague.  Accordingly, Defendants' MILs should be denied and any evidentiary ruling should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context.

---

[1]  All Exhibits referenced herein as are attached to the Appendix in Support of Plaintiffs' Omnibus Response to Defendants' Motions *in Limine*, filed contemporaneously herewith.

[2]  There are two exceptions.  Plaintiffs will agree to the Teva/Actavis Defendants' MIL No. TAD-10.  *Infra* at § G.10.  Additionally, the parties have agreed to stipulate to a modified version of Defendants' Omnibus MIL No. 13 (*infra* at § A.13) and informed Special Master Cohen of this agreement by e-mail on September 30, 2019.

## LEGAL STANDARD

The Sixth Circuit states: "Orders in limine which exclude broad categories of evidence should rarely be employed.  A better practice is to deal with questions of admissibility of evidence as they arise."  *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).[3]  Thus, the Court "has the power to exclude evidence in limine only when evidence is *clearly inadmissible* on all potential grounds."  *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (emphasis added).[4]  Relevant evidence is generally admissible.  FED. R. EVID. 402.  "Evidence is relevant if: (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  FED. R. EVID. 401 (emphasis added).  This is an " 'extremely liberal' " standard.  *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009)(citation omitted).  Courts may exclude relevant evidence, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.  To be excluded on prejudice grounds, the evidence cannot just be prejudicial; it must be *unfairly* prejudicial.  *Robinson v. Runyon*, 149 F.3d 507, 514 (6th Cir. 1998).  " 'Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis.' "  *Id.* at 515 (citation omitted).  Even when the evidence is "shaky," " 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking' such evidence, not exclusion."  *Id.* (citation omitted).

The moving party bears the burden of demonstrating that the evidence sought to be excluded is clearly inadmissible.  *See Jordan*, 2010 WL 4281807, at *1 (" 'A court will generally not grant a motion in limine unless the moving party meets its burden of showing that the evidence in

---

[3]    *See also Morningstar v. Circleville Fire & EMS Dept.*, 2:15-CV-3077, 2018 WL 3721077, at *1 (S.D. Ohio Aug. 6, 2018) (same).

[4]    *See also Jordan v. John Soliday Fin. Group, LLC*, 1:09CV0707, 2010 WL 4281807, at *1 (N.D. Ohio Oct. 20, 2010) (same); *St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*, 1:06CV2781, 2009 WL 10689369, at *1 (N.D. Ohio Oct. 23, 2009).

question is clearly inadmissible.' ") (citation omitted).  "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Indiana Ins.*, 326 F. Supp. 2d at 846.[5]  The Court has broad discretion in determining whether to grant or deny a motion *in limine*.  *St.-Gobain*, 2009 WL 10689369, at *1 ("Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court.").

Moreover, motions *in limine* are meant to address evidentiary issues; they should not be used to resolve non-evidentiary factual or legal disputes.  As the Sixth Circuit explained:

> [A] mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial—the summary-judgment motion.  Allowing a party to litigate matters that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment.

*Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013).  Thus, when a motion *in limine* "is no more than a rephrased summary-judgment motion, the motion should not be considered.  *Id.* at 563.  *See also Morningstar*, 2018 WL 3721077, at *7 (same).

The fact that the Court denies a motion *in limine* "does not necessarily mean that all evidence contemplated by the motion will be admitted at trial."  *Indiana Ins.*, 326 F. Supp. 2d at 846.[6]  It simply means that "without the context of trial, the [C]ourt is unable to determine whether the evidence in question should be excluded."  *Indiana Ins.*, 326 F. Supp. 2d at 846.[7]  The movant may still raise objections to the introduction of the evidence during the trial.[8]

---

[5]  *See also Jordan*, 2010 WL 4281807, at *1 ("If this burden is not met, evidentiary rulings should be deferred and resolved in the context of the trial."); *St.-Gobain*, 2009 WL 10689369, at *1 ("If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in the proper context.").

[6]  *See also Securities and Exch. Commn. v. Jacobs*, 1:13 CV 1289, 2014 WL 12597832, at *2 (N.D. Ohio Feb. 25, 2014); *Jordan*, 2010 WL 4281807, at *1.

[7]  *See also Securities*, 2014 WL 12597832, at *2 ("Where a court denies a motion *in limine*, it is, in essence, a finding that the court cannot determine whether it can exclude the evidence without the context of trial."); *Jordan*, 2010 WL 4281807, at *1.

[8]  *Indiana Ins.*, 326 F. Supp. 2d at 846 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine."); *Jordan*, 2010

# ARGUMENT

A.  **PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTION IN LIMINE (DKT. #2661).**

1.  <u>**Defendants' Omnibus MIL No. 1**</u>: The Court should not permit Plaintiffs to present evidence or argument to the jury concerning "future damages."

Defendants seek to exclude evidence of Plaintiffs' future damages on the ground that Plaintiffs failed timely to disclose that they were seeking these damages.  The record shows otherwise:  Plaintiffs specifically identified future damages in their interrogatory responses as a category of damages they were seeking and specifically noted the overlap between their claims for future damages and their claim for abatement.  When Plaintiffs learned that the two remedies would not be tried together, they promptly provided supplemental tables from their previously-disclosed experts, Prof. Jeffrey Liebman and Prof. Thomas McGuire, to separate the two forms of relief, and offered the experts who provided the supplemental tables for additional deposition time.  Under these circumstances, Defendants cannot fairly claim surprise or prejudice to justify exclusion of this evidence.

*i.  Plaintiffs long ago disclosed that they are seeking future damages.*

On November 30, 2018, Plaintiffs served their Second Supplemental Response and Objections to Distributor Defendants' Interrogatory No. 18.  In those responses, Summit County and Cuyahoga County each stated:  "Plaintiff seeks, *inter alia*, damages in the amounts as set forth below, which reflect both past damages from at least 2006 to present, *and future damages for at least 10 years.*  Plaintiff's investigation of both its past and future costs, expenditures, damages, losses or harms caused by Defendants is ongoing. . . ."  *See* **Ex. 1** [Summit Rog Resp.] at p. 6; **Ex. 2** [Cuyahoga Rog Resp]. at p. 7 (emphasis added).  Each response further disclosed:

> To the extent Plaintiff is seeking future damages as set forth above, various components and subparts may either overlap, be a component part of, or be incidental to the equitable remedy sought as part of a comprehensive abatement plan

---

WL 4281807, at *1 (same).

should the Court enter such a plan, including the provision of funds necessary to implement the abatement plan.

**Ex. 1** [Summit Rog Resp.] at p. 8; **Ex. 2** [Cuyahoga Rog Resp]. at p. 9.  Finally, each response identified by name "the following persons with knowledge of such damages. . . ." *Id.*  Thus, Defendants were informed 11 months before the start of the trial both that Plaintiffs were seeking future damages and that the components of future damages would overlap with the components of any comprehensive abatement plan.  They were also provided with the names of fact witnesses concerning Plaintiffs' damages.

Plaintiffs also timely disclosed expert witnesses concerning damages.  In March 2019, Plaintiffs disclosed their expert reports, including reports from Prof. Jeffrey Liebman and Prof. Thomas McGuire.  Prof. Liebman's report set forth a detailed abatement plan to address the opioid crisis in Summit and Cuyahoga Counties over the period 2020-2034.  Prof. Liebman quantified the cost of the abatement plan, offering the opinion that

> In Cuyahoga, the 15-year costs for the elements of the Abatement Plan evaluated to date range from $3.5 billion to $4.5 billion. In Summit, the 15-year costs range from $1.5 billion to $2.0 billion.

Dkt. #2000-11 (Liebman Expert Rep.) at p. 30.  There was, of course, no doubt that all of this money would be expended in the future.  In the meantime, Prof. Thomas McGuire quantified the past costs of the opioid epidemic, offering the opinion that "[i]n total for both Bellwether governments, damages from 2006 through 2018 range from to $194.4 - $223.4 million." Dkt. #2000-17 (McGuire Expert Report) at p. 7.  Prof. McGuire noted, as well that, "[t]o the extent any Bellwether government seeks damages at trial beyond 2018 attributable to defendants' misconduct, the same methodology set forth herein would be extended to those future years, subject to the assumption that there would be no material changes in the scope and extent of harms." *Id.* at p. 7 n.12.

Although Defendants focus on the McGuire and Liebman supplemental tables, their motion sweeps more broadly and asks the Court to exclude *all* evidence of future damages.  To the extent that Plaintiffs rely on previously disclosed material, including previously disclosed fact witnesses and

previously disclosed expert testimony, to prove their future damages, there can be no possible claim of surprise or prejudice and no basis to complain about a "trial by ambush."  None of this evidence of future damages should be excluded.

    ii. *Defendants offer no argument to support the exclusion of future damages evidence other than the McGuire and Liebman Supplemental Tables.*

   Defendants' entire argument for the exclusion of all evidence pertaining to future damages is based on the purported untimeliness of the McGuire and Liebman supplemental tables.  But Plaintiffs have other evidence of future damages, including testimony of fact witnesses and testimony of expert witnesses as disclosed in March 2019.  Defendants offer no basis to exclude any of that evidence.

   Under Ohio state law (applicable to Plaintiffs' conspiracy and OCPA claims) or federal law (applicable to Plaintiffs' RICO claims), "a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future."  *Galayda v. Lake Hosp. Sys., Inc.*, 1994-Ohio-64, 71 Ohio St. 3d 421, 425; *see also Daniels v. Northcoast Anesthesia Providers, Inc.*, 2018-Ohio-3562, ¶ 57 (Ct. App. 2018); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (future damages recoverable under RICO unless the fact of their accrual is speculative or their amount and nature unprovable).  Significantly, however, expert testimony is not required to prove future damages.  *See Daniels*, 2018-Ohio-3562, ¶ 56 (*citing Sahrbacker v. Lucerne Prods., Inc.*, 52 Ohio St.3d 179, 179 (1990)).  The authorities cited by Defendants do not show otherwise, under Ohio law or federal law; they merely provide illustrations of the potential use of expert testimony to establish the certainty of future damages in particular cases.  So long as a jury can find and quantify future damages with the requisite level of certainty, there is no specific requirement of expert testimony.

   In this case, Plaintiffs have sufficient evidence, besides the supplemental tables, so that the existence of future damages cannot be found, as a matter of law, to be speculative, nor the amounts unprovable.  The testimony of Plaintiffs' addiction experts and of fact witnesses regarding the opioid epidemic in Ohio will sufficiently establish that, in the absence of treatment, opioid abuse problems persist.  In light of this testimony, it hardly requires speculation to conclude that the Counties will

continue to incur losses in the future arising from the opioid epidemic.  (Indeed, the entire predicate of Plaintiffs' abatement claim is that the nuisance will continue to inflict harm until it is abated.)  As for the amount of future damages, that information, too, may be provided by fact witnesses from the Counties with knowledge of how much it costs to provide the services needed address the opioid abuse problem in the Counties.  This is especially true because Plaintiffs' claims for future damages are in the alternative, not in addition, to their claim for an abatement remedy.[9]  For this reason, the premise of this claim is that there is no abatement plan in place, so the amount of future damages need not account for the kinds of improvements one would expect an abatement plan to produce.  And even without their supplemental charts, the expert testimony of Profs. Liebman and McGuire provides sufficient information about the services required to address the opioid crisis, the ongoing need for such services, and the cost of providing them that a jury could with reasonable certainty award future damages based on this information.[10]  The McGuire report provides sufficient information for the jury to determine the ongoing damages to be incurred in the future, and the Liebman report provides sufficient information for the jury to identify the overlap between Plaintiffs' future damages and their abatement plan.  No more is required.  *See Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) ("Damages cannot be speculative, but this only means that the fact of damages, not their amount, cannot be uncertain."); *TJX Companies, Inc. v. Hall*, 2009-Ohio-3372, ¶ 32, 183 Ohio App. 3d 236, 245 ("Damages are not rendered uncertain because they cannot be calculated with absolute exactness.  It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.").  Indeed, "[a] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as

---

[9]   To the extent they are awarded both, Plaintiffs have already recognized a set-off will be necessary to avoid double recovery.  *See* Dkt. #2660 (Plaintiffs' Trial Brief) at p. 4.

[10]  The Court has already found that the testimony of Profs. Liebman and McGuire is reliable and admissible.  *See* Dkt. #2577 (denying motion to exclude testimony of Prof. McGuire); Dkt. #2519 (denying motion to exclude expert testimony regarding abatement costs).

would otherwise be possible." *TJX Companies*, 2009-Ohio-3372, ¶ 33, 183 Ohio App. 3d at 245; *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (citation and internal quotation marks omitted).

In *Daniels*, the Ohio Court of Appeals held that, although the plaintiff's future damages had to be reduced to present value, the plaintiff was not required to offer expert testimony on that issue. 2018-Ohio-3562, ¶ 57.  If a jury can make its own present value computation without expert guidance, so, too, a jury can determine the Counties' future damages from the testimony of the County's employees, the evidence of the ongoing nature of addiction and opioid misuse, the evidence of the costs of addressing the crisis in the past, and the evidence of what it would take to abate the problem going forward.  Defendants cannot show that no jury could find the fact of future damages to be reasonably certain or make a reasonable estimate of what those damages will be.

In any event, the issue on this motion is not the sufficiency of Plaintiffs' future damages evidence, but its admissibility. As discussed above, no arguments of prejudice or surprise apply to evidence of future damages as presented by Plaintiffs' fact witnesses or as presented in expert reports that were disclosed in March 2019.  Not only were Defendants informed that Plaintiffs would be seeking future damages, they were provided the names of Plaintiffs' fact witnesses with respect to damages and they were provided with the original Liebman and McGuire reports, which included, as noted above, the methodology that would be used to calculate future damages. Plaintiffs may properly rely on this evidence to prove their future damages at trial.

        iii.    *Plaintiffs properly supplemented the expert reports of Profs. Liebman and McGuire to separate future damages from abatement costs.*

Although Plaintiffs believe their fact and original expert evidence is sufficient to establish their future damages, the Counties should also be permitted to present testimony based on the supplemental tables prepared by Profs. Liebman and McGuire.  Because Plaintiffs expected to try their legal claims together with their equitable abatement claim, Plaintiffs did not separately quantify their future damages. Rather, Plaintiffs believed that the jury would hear all of the evidence

concerning past damages and abatement, and could then determine all elements of damages based on that evidence.  On September 16, 2019, however, the Court suggested that it might bifurcate the trial and hear evidence pertaining to nuisance abatement in a separate proceeding from the trial in which Plaintiffs will present their damages evidence.  On September 24, 2019, the Court ordered such bifurcation. *See* Dkt. #2629.  Prior to September 16, Plaintiffs had no notice that the Court intended to hear evidence pertaining to legal remedies separately from evidence pertaining to equitable abatement and had not planned to separate the evidence pertaining to those remedies.

At the September 16 conference the Court explained its concerns about allowing Plaintiffs to present their nuisance abatement evidence in same proceeding with the rest of their evidence:

> It seems to me what I am proposing is that a jury decide whether or not any of the Defendants are liable for public nuisance. And that's all the jury will decide with respect to public nuisance. There is not going to be any evidence or testimony about what any relief or abatement would be in the event there is nuisance, how much it would cost, who would do what, whatever.

> We are not going to take the time in the trial for that because the jury isn't going to decide it, and my concern is, it may confuse them, and they may jumble things up and conflate that with past damages.

**Ex. 3** [9/16/19 transcript].  Thus, the Court made clear that the jury could not use the abatement plan to compute future damages or to offset future damages from abatement, because, in order to prevent confusion and prejudice to the Defendants, the full abatement plan would not be presented to the jury.

This change in the trial plan required Plaintiffs to adapt the presentation of their evidence.[11] In order to present their legal damages in a separate proceeding from their equitable abatement plan,

---

[11]  Defendants' suggestion that Plaintiffs sought to introduce evidence of future damages only when they learned that the Court, rather than the jury, would be the fact-finder with respect to the amount of the abatement remedy, *see* Dkt. #2661 at pp. 2-3, is entirely unfounded and contradicted by the record.  First, as discussed above, Plaintiffs had identified future damages as a component of their damages on their legal claims in November, 2018.  Second, Plaintiffs had always assumed that the Court would be the fact-finder with respect to the cost of the abatement remedy.  Indeed, in Plaintiffs' Position Statement Regarding a Jury Trial on the Public Nuisance Claim (Dkt. #2598) (a well as in the corrected version of that document, *see* Dkt. #2601), Plaintiffs took the position that "there is no right to a jury trial on a public nuisance claim for abatement."  Dkt. #2601 at p. 1.  Plaintiffs also stated that they "take no position and defer to the Court's decision as to whether to use an advisory jury regarding that claim." *Id.* Thus, Plaintiffs neither expected nor sought a jury with respect to their nuisance abatement claim.  What

on September 30, Plaintiffs provided three supplemental tables to Prof. Liebman's expert report and one supplemental table to the Prof. McGuire's report. *See* **Ex. 4** [supplemental tables]. The supplemental table to the McGuire report presents a computation of damages since the time of his original report as well as future damages,[12] while the supplemental tables to the Liebman report assess the overlap between future damages and abatement. Plaintiffs have offered to provide Profs. Liebman and McGuire for deposition to answer questions about the computations in these tables. Plaintiffs do not seek to introduce new experts or new reports – rather, their "new" evidence consists solely of a single table that projects Plaintiffs' past damages into the future (as Prof. McGuire explained in his March, 2019 report could be done) and three tables that show how future damages can be subtracted from the amount needed for abatement. These tables simply extend the methodologies already found by this Court to be reliable.

Defendants seek specifically to exclude testimony based on these supplemental tables, but their arguments are unpersuasive and should be rejected. Plaintiffs had no advance knowledge that the trial would be bifurcated and thus had no reason to separate their future damages from their abatement plan. Once they learned of the bifurcation plan, they promptly supplemented their experts' reports. Rule 26(e) requires that a party supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . . ." FED. R. CIV. P. 26. Here, Plaintiffs learned that their disclosures were incomplete when they learned that, because of the bifurcated structure of the trial, Prof. Liebman's abatement plan could not be presented to the jury for its consideration in assessing future damages. They provided the supplemental tables less than one week after the Court ruled that it would, in fact, bifurcate the trial. This constitutes a timely supplement.

Even if the Court concludes that the supplemental tables were not timely under Rule 26(e), the tables should still not be struck or excluded because any delay was both "substantially justified"

---

Plaintiffs did expect was that all of their damages evidence would be submitted in a single proceeding.

[12] The computations in Prof. McGuire's supplemental table are based on the corrected numbers from his errata, rather than the numbers in his original report.

and also is harmless. *See* FED. R. CIV. P. 37(c)(1). Untimely disclosure does not automatically warrant preclusion. Rather, Rule 37 provides that a party may be precluded from using material that was not timely disclosed "unless the failure was substantially justified or is harmless." Either ground is sufficient, under Rule 37, to preclude the sanction of exclusion Defendants seek, but in this instance, both factors are present.

In assessing whether a late disclosure is substantially justified or harmless, the Sixth Circuit uses a five-factor test: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). All of these factors weigh in favor of admitting the supplemental tables.

First, as discussed above, the surprise to the Defendants is limited because Defendants have known for eleven months that Plaintiffs are seeking future damages and have had other disclosures, including the testimony of fact witnesses and the original disclosures of Profs. Liebman and McGuire on that subject. Second, to the extent Defendants were surprised by the supplemental tables, that surprise can be readily cured by brief pretrial examination of each of the witnesses, limited to questioning about the supplemental tables. Third, the evidence will not disrupt the trial because Prof. McGuire, who provides the future damages information, will testify to the Counties' past damages in any event. The only question is whether he will also be permitted to explain how his past damage numbers may be extrapolated to calculate future damages. Moreover, the supplemental tables do not alter Defendants' overall exposure at trial. The future damages shown on Prof. McGuire's supplemental table are less than the cost of the abatement plan covering the same period and there would be an offset to prevent double recovery. Thus, although the supplemental table permits a jury to identify future damages separate and apart from the cost of abatement, it does not affect the total amount Plaintiffs are seeking to recover. Fourth, the evidence is important because with information from the Liebman abatement plan, the jury may lack sufficient guidance about the nature of future expenditures. Finally, as discussed above, Plaintiffs

have explained the reason for the late disclosure of these supplemental tables.  For these reasons, the disclosure of the supplemental tables on September 30 was both substantially justified and, in light of Plaintiffs' offer to provide the witnesses for additional deposition, harmless.  Defendants' motion to exclude them should be denied.

>    **2.**      **Defendants' Omnibus MIL No. 2**: **The Court should preclude Plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

Defendants' Omnibus MIL No. 2 is an improper attempt to sanitize the record of all evidence of individual prescriptions, shipments, or use of prescription opioids.  This request sweeps far too broadly by conflating the disputed relevancy of individual prescriptions or shipments to *causation* with the relevancy of the very existence of these prescriptions or shipments.  The Court's rulings only limited the former, while also *requiring* Plaintiffs, at Defendants' demand, to either identify individual prescriptions and individuals or to forego presentation of evidence at trial.  Plaintiffs identified the prescriptions and produced associated claims data, and this Court confirmed the propriety of Plaintiffs' responses in Discovery Rulings 13 and 18.  Defendants cannot now categorically exclude this evidence that they demanded be produced.

The Court's discovery rulings that Defendants rely upon for this request did not prohibit all use of individualized evidence or declare it *per se* irrelevant.  Just the opposite, in what Defendants call the "seminal" ruling on this subject, *see* Dkt. #2661 at p. 6, the Special Master ruled that:

> Plaintiffs must now produce all available statistical and aggregate evidence, *and enough supporting particulars* to allow the Court and Defendants and the parties' experts to understand the fundamental bases for those statistics and aggregated data; but Plaintiffs need not produce *all* discovery regarding *every* patient or *every* opioid prescription.

> ***

> Plaintiffs . . . must produce to defendants all relevant aggregated data and statistics.  Plaintiffs must also undertake a good faith effort to produce sufficient supporting particularized evidence to allow Defendants and their experts to understand the fundamental bases for these statistics and aggregated data.  . . .  When Plaintiffs later

> seek *to prove causation or damages at trial . . . Plaintiffs may not rely affirmatively or defensively on any evidence or data they did not produce during discovery.*

Dkt. #606 (Discovery Ruling No. 1) at pp. 4-5 (first and last emphases added; middle emphases in original).  This discovery ruling thus both required Plaintiffs to produce some (though not all) individual prescription and shipment evidence and then limited their use of individualized evidence at trial only by holding that they cannot prove causation or damages with evidence not produced during discovery.  This ruling is far narrower than the blanket exclusion of individual prescription or shipment evidence Defendants now seek.

And Defendants' request seemingly ignores Plaintiffs' interrogatory responses served during discovery, which were presented to the Special Master at least three times for rulings.  In the first ruling, the Special Master ordered Plaintiffs to identify certain medically unnecessary prescriptions and individuals harmed by prescriptions, ruling:

> The plaintiffs' objections are upheld in part, to the extent that plaintiffs do not have to identify **all** prescriptions and **every** person, as requested in the Interrogatories.  Rather, the Special Master rules that plaintiffs must respond to the five Interrogatories at issue **as rewritten below**.

Dkt. #1027 (Discovery Ruling No. 5) at pp. 1-2 (emphasis in original).  The ruling rewrote the interrogatories to replace the phrase "all prescriptions" with "500 prescriptions," and included other criteria (*e.g.*, 10 prescriptions per manufacturer, etc.).  *Id.* at pp. 2-3.  Plaintiffs objected to this ruling, and the Court modified it as follows:

> Instead of answering the disputed interrogatories as required by the Discovery Ruling, Plaintiffs may instead elect not to answer them **on the condition** that Plaintiffs instead categorically and affirmatively respond to the disputed interrogatories by stating that: (1) they will not assert, either in expert opinions or factual presentations at trial, that any specific prescriptions 'were unauthorized, medically unnecessary, ineffective, or harmful' or that 'the filling of [any specific prescriptions] caused or led to harm for which [Plaintiffs] seek to recover,' and (2) Plaintiffs instead will rely, at trial and in expert opinions, solely on a theory of aggregate proof.

Dkt. #1047 at pp. 1-2 (emphasis in original) (internal footnote omitted).

Plaintiffs in fact did produce individual prescription evidence pursuant to the Court's Orders and at Defendants' demand, as follows:

- Manufacturer Interrogatory No. 6 (*identify 500 prescriptions written in reliance on alleged wrongdoing*):  Plaintiffs answered that *all* prescriptions in their respective jurisdictions were influenced by Defendants' deceptive marketing, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Manufacturer Interrogatory No. 7 (*identify 300 persons who became addicted or were harmed as a result of any opioid prescription*):  Plaintiffs identified 300 such persons, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Manufacturer Interrogatory No. 10 (*identify 500 prescriptions that were unauthorized, medically unnecessary, ineffective, or harmful*):  Plaintiffs identified more than 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Pharmacy Interrogatory No. 2 (*identify 500 prescriptions alleged to support claims*):  Plaintiffs identified more than 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Pharmacy Interrogatory No. 3 (*identify 500 prescriptions which caused or led to harm*):  Plaintiffs identified 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms.

Dkt. #1058 (Bellwether Plaintiffs' Submission in Response to Discovery Ruling No. 5) at pp. 2-6.[13]

Defendants, having demanded and obtained individual-level prescription evidence from Plaintiffs, cannot now turn tail and preclude all use of such evidence at trial.[14]  Nor may Defendants preclude Plaintiffs' use of this evidence on the ground that it is "cherry-picked."  Dkt. #2661 at

---

[13]  In late October and mid-November of 2018, Plaintiffs served interrogatory responses that identified prescriptions in response to some, but not all of the interrogatories.  Defendants challenged Plaintiffs' responses.  On December 22, 2018, the Special Master ordered Plaintiffs to choose between answering all five of the interrogatories fully, or electing not to answer them at all.  Dkt. #1215 (Discovery Ruling No. 13) at p. 6.  In that same ruling, the Special Master rejected Defendants' complaint that Plaintiffs had not sufficiently identified the alleged misstatements that led to the prescription.  *Id.* at p. 7.  On December 31, 2018, Plaintiffs amended their responses to identify prescriptions and individuals in response to *all five* interrogatories, in compliance with the Special Master's order.  Defendants once again challenged Plaintiffs' response, and the Special Master rejected their challenge in his Discovery Ruling No. 18.  Dkt. #1476.

[14]  Plaintiffs also have produced millions of lines of information associated with individual prescriptions.  For example, pursuant to the Order Regarding Production of Medical and Pharmacy Claims Data in Track One Cases (Dkt. #1421), Plaintiffs produced claims data for: (i) all individuals who received prescriptions Plaintiffs' identified as "medically unnecessary" in response to the interrogatories; and (ii) all individuals insured through the bellwethers who received an opioid prescription.

pp. 8-9 ("This bar should apply to *all* individualized evidence plaintiffs might offer in these categories, including the limited samples they cherry-picked for disclosure in discovery . . . .") (emphasis in original).  The Court specifically ruled in Discovery Ruling No. 5 that Plaintiffs did *not* have to produce *all* prescriptions and identify *every* person in response to Defendants' interrogatories.  Moreover, Defendants have subpoenaed insurers seeking production of claims data for all residents of Summit and Cuyahoga counties.  Defendants thus already have the information they need.

Similarly, Plaintiffs identified suspicious orders or shipments throughout discovery.  Discovery Ruling No. 7 directed Plaintiffs to identify suspicious orders, and Plaintiffs did so.  In Discovery Ruling No. 12, the Court rejected Defendants' attempt to compel further answers, but directed Plaintiffs to identify additional suspicious orders, which Plaintiffs did.  Further, the expert reports of James Rafalski, Craig McCann, and Lacey Keller all identified suspicious orders and the methodology used to identify the orders.  The Court denied Defendants' motions to exclude these expert opinions, and those decisions are dispositive of this issue.  Dkt. #2492; Dkt. #2494.

In sum, the Court limited but did not prohibit use of individual-level opioid prescription, shipment, and use evidence and since Plaintiffs produced substantial amounts of this evidence at Defendants' demand, Defendants' Omnibus MIL No. 2 for a categorical exclusion of this type of evidence at trial should be rejected.

3.     **Defendants' Omnibus MIL No. 3: The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.**

Defendants' Omnibus MIL No. 3 is another improper attempt to sanitize the record of evidence of individual-level harms from opioid abuse.  Defendants repeat through incorporation their incorrect arguments from MIL No. 2 for exclusion of all individual-level opioid prescription, shipment, and use evidence.  Dkt. #2661 at p. 9.  The Court should reject these arguments for the same reasons set forth above (*supra* at § A.2), *i.e.*, that the Court's prior rulings did not prohibit all use of individual level opioid prescription, shipment, and use evidence and that Plaintiffs produced

substantial amounts of this evidence at Defendants' demand, thus making categorical exclusion at trial impermissible.

The Court also should reject Defendants' argument that Plaintiffs' attempts to prohibit questioning on certain deponents' or their family members' private medical treatment information prohibits *all* testimony about opioid abuse.  Dkt. #2661 at p. 9.  The examples Defendants cite where Plaintiffs' counsel instructed witnesses not to answer involved questions about the witnesses' own medical treatment.  Dkt. #2661-4 at 260:1-9; Dkt. #2661-5 at 346:24-347:1-2; Dkt. #2661-6 at 181:7-182:5.  Defendants acknowledge, however, that they also obtained testimony about some individuals' use of opioids.  Dkt. #2661 at p. 9 n.7.  Defendants again therefore cannot categorically preclude all use of this type of evidence at trial.

Nor may Defendants obtain a blanket preclusion on "foundational and hearsay grounds." Dkt. #2661 at p. 10.  These are context-specific objections that should be raised and ruled upon not in a vacuum, but with respect to particular evidence if and when it is introduced.  *See*, *e.g.*, *Jacobs v. Tricam Industries, Inc.*, 10-11469, 2013 WL 950969, at *2 (E.D. Mich. Mar. 12, 2013) ("[I]t is premature to rule on Plaintiffs' motion prior to Plaintiffs establishing their proofs at trial and before the Court can consider and resolve any evidentiary issues regarding foundation, relevancy, jury confusion, and potential prejudice."); *KCH Services, Inc. v. Vanaire, Inc.*, CIV.A. 05-777-C, 2010 WL 3245243, at *1 (W.D. Ky. June 2, 2010) ("[T]he defendants' motion in limine to exclude documents or require authentication and foundation prior to admission (R. 340) is DENIED as premature.").

Finally, the Court also should reject Defendants' argument that this testimony should be categorically excluded because the witnesses are not parties.  Dkt. #2661 at p. 10.  A non-party witness may be a source of relevant evidence.  *See*, *e.g.*, *Stringer v. N.F.L.*, 749 F. Supp. 2d 680, 704 (S.D. Ohio 2010) ("[W]here an employee is injured while using a product at work, Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim.").  Whether a particular non-party witness's testimony is founded, relevant, and/or fairly or unfairly prejudicial should, again, be raised and decided not in a vacuum, but with

respect to particular evidence if and when it is introduced at trial. *See, e.g., Jacobs*, 2013 WL 950969, at *2; *KCH Services*, 2010 WL 3245243, at *1.[15]

For all of these reasons, the Court should deny Defendants' Omnibus MIL No. 3 as both substantively incorrect and procedurally premature.

**4.    Defendants' Omnibus MIL No. 4: The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.**

Defendants, having failed in their attempt to exclude expert testimony about the Gateway Effect, now attempt to exclude the particularly important testimony on that subject from Thomas Gilson, the Cuyahoga County Medical Examiner.[16]  However, Defendants' MIL No. 4 completely omits reference to Dr. Gilson's extensive and ground-breaking demonstration of the Gateway Effect with actual data that he reviewed in his official capacity as Medical Examiner.  Defendants' arguments, which do not address this important factual evidence, are insufficient to exclude it.

The Gateway Effect, which refers to the transition from prescription opioids to illicit drugs such as heroin/fentanyl, is a widely acknowledged phenomenon in both scientific literature and common understanding.  *See, e.g.,* Dkt. #2197 (Plaintiffs' Opp. to Defendants' Gateway *Daubert* Motion).  While the Gateway Effect has been a proper subject of scientific literature and may be addressed by expert testimony, as the Court found in denying the Defendants' *Daubert* motion (Dkt. #2518), the admissibility of expert testimony does not render factual testimony on the issue

---

[15]  Notably, during discovery, Plaintiffs argued that individual prescription records should not be produced because those individuals were not parties and had not put their treatment at issue or consented to disclosure.  Defendants vehemently opposed Plaintiffs' position, and each Defendant sought interrogatory responses, for example, on individuals harmed by opioid prescriptions, which Plaintiffs provided.  *Supra* at § A.2.  Defendants cannot have it both ways by now seeking to categorically preclude as irrelevant evidence they previously and successfully argued was relevant.

[16]  Plaintiffs do not plan to call Jerry Craig, Executive Director of Summit County's Alcohol and Mental Health Board, or Keith Martin, Assistant Special-Agent-in-Charge of the DEA's Cleveland Field Office, to testify in the upcoming trial.  Accordingly, Defendants' Omnibus MIL No. 4 is moot as to these witnesses.  Plaintiffs note, however, that both of these witnesses appear on Defendants' witness lists.  To the extent Defendants call them at trial, these witnesses are certainly permitted to testify as to their factual knowledge arising from their personal experiences and any objections should be assessed in the context of their overall testimony.

irrelevant or inadmissible.  Instead, Dr. Gilson's testimony complements and reinforces the opinions of Plaintiffs' experts concerning the pathway from prescription opioids to heroin/fentanyl and provides direct and specific experience of this effect in Cuyahoga County.

On January 14, 2019, Dr. Gilson testified at a deposition in this case. His testimony established that, in his capacity as Medical Examiner, he reviewed Cuyahoga County records that identified heroin/fentanyl as cause of death, and then investigated the Ohio Automated Rx Reporting System (OARRS), a State-wide prescription monitoring database, to determine which of these heroin/fentanyl decedents had prior opioid pain reliever prescriptions.  Dr. Gilson "cross-check[ed] our heroin overdoses against the OARRS database," due to a "spike in heroin mortality, and the function of going back to look at that was to firm up, to our satisfaction, that this was in fact, the relationship." Dkt. #2163-2 (1/14/19 Gilson Dep.) at 176:7-177:10.  Dr. Gilson testified: "We identified, through our Poison Death Review Committee, through our task forces, that there was a role for the prescription opiates in the subsequent evolution into heroin and fentanyl addiction…" *Id.* at 163:9-164:18.  Dr. Gilson and his staff "collected good data to make that association," and, as a result, "We were one of the first counties to recognize is [sic] that *people are going from OPRs [opioid pain relievers] to heroin.*" *Id.* at 170:1-171:12; 173:2-174:3 (emphasis added).  At Dr. Gilson's second deposition session on January 22, 2019, defense counsel inquired at length about the OARRS program, and Dr. Gilson reiterated that the OARRS data was used to verify the sequence of prior prescription opioids and subsequent fatal overdoses on heroin or fentanyl.[17] These facts are relevant, admissible, and supportive of the opinions of Plaintiffs' experts, previously found to meet *Daubert* standards by this Court.

Defendants raise a red herring as to whether Dr. Gilson's testimony constitutes "expert" opinion, and further misrepresent his qualifications.  Plaintiffs maintain that the testimony referenced above constitutes reliable, relevant *factual* evidence of the transition from OPRs to

---

[17]  Dkt. #1977-16 (1/22/19 Gilson Dep.) at 127:5 – 146:8; *see especially*, 132:8-133:4 and 135:1-15 which affirm the use of OARRS data to confirm the factual sequence of opioid pain relievers followed by heroin/fentanyl overdose.

heroin/fentanyl in Cuyahoga County. However, to the extent that qualifications are at issue, Dr. Gilson testified in response to a direct question at his deposition that he is an expert on "the opioid crisis."[18] The fact that he is an expert on this subject in no way impairs the admissibility of his testimony regarding the facts regarding the prior use of opioid prescriptions by heroin/fentanyl decedents. Under Federal Rule of Civil Procedure 26, "[t]he relevant inquiry is the nature of the testimony rather than the status of the witness." FED. R. CIV. P. 26, Commentary; *Jones v. Pramstaller*, No. 1:09-CV-392, 2013 WL 12249827, at *1 (W.D. Mich. Jan. 14, 2013) (holding that where witnesses had both factual and expert knowledge, expert disclosure rules would not apply if the witness would "present eyewitness testimony" rather than expert testimony). Accordingly, "[t]he fact that an individual has expertise does not require him to be disclosed as an expert so long as his testimony is going to be limited to that of a fact witness." *Id.*; *see also Gomez v. Rivera*, 344 F.3d 103 (1st Cir. 2003) (overturning exclusion of testimony of "fact witness" with specialized knowledge, finding the definition of an expert under Rule 26 "does not encompass a percipient witness who happens to be an expert"). There was no need for an expert report to testify as to factual evidence regarding heroin/fentanyl deaths among OPR users in Cuyahoga County. Nor can Defendants claim unfair surprise, since their own counsel asked whether Dr. Gilson held himself out as an expert on opioids and inquired at length on the very topic they now seek to exclude.

Defendants' changing position as to Dr. Gilson's testimony is particularly ironic. As the Court may recall, Defendants affirmatively cited and relied on an outdated version of Dr. Gilson's views on the Gateway Effect in their misleading reference to his 2014 article stating that "there is a dearth of firm evidence establishing the role of OPR [opioid pain relievers] as a gateway to heroin."

---

[18] Dkt. #2163-2 (1/14/19 Gilson Dep.) at 103:12-20. Defendants' reference to Dr. Gilson's testimony at his January 22, 2019 deposition is misleading, in that Dr. Gilson was asked only about opioids and their pharmacologic properties, rather than about the "opioid crisis." As to the latter, Dr. Gilson has published articles in scientific journals, and his employment on the opioid crisis would qualify him as an expert. Such expertise is not necessary to admissibility of the factual testimony about the OARRS database/death certificate evidence of prescription opioid use before heroin/fentanyl overdose; nevertheless, it is worth noting that Defendants' motion misstates Dr. Gilson's qualifications and testimony.

Dkt. #1857-1, at pp. 5-6.  However, as pointed out in Plaintiffs' Opposition to the *Daubert* motion, Defendants had failed to inform the Court that Dr. Gilson published a follow-up article in 2017, which stated: "While this crisis appears to have its *roots in the overprescribing of opioid pain relievers (OPR)*, more recent years have seen *a transition to illicit drugs*, primarily heroin and fentanyl."[19]  Having cited Dr. Gilson's statements on the Gateway Effect when they believed them to support their position, Defendants are in a poor position to seek to exclude his testimony when it turns out that their earlier reliance was misplaced.

Dr. Gilson's 2017 article also states, "The Cuyahoga County Medical Examiner's Office (CCMEO) has a *statutory responsibility* to investigate all deaths that are unnatural, suspicious, or involve the sudden, unexpected death of a person in apparent good health."[20]  Dr. Gilson's review pursuant to statute confers the status of public records upon the work product of his office. Dr. Gilson also reviewed the official records found in the OARRS, and those records provided data summarized in his article (*id.*), as well as those described in his deposition testimony, above.  These reports are official records, and testimony about them is admissible under FED. R. EVID. 803(6) (Records of Regularly Conducted Activity) and/or 803(8) (Official Records).[21]  Dr. Gilson may

---

[19]  Dkt. #2197-29 (T. Gilson, *et al. The Evolution of the Opiate/Opioid Crisis in Cuyahoga County.* Acad. Forensic Pathology) 7:41-49, at p. 42 (2017) (emphasis added); Dkt. #2197 (Plaintiffs' Gateway *Daubert* Opposition Brief) at pp. 20-21.

[20]  Dkt. #2197-29 at p. 42 (emphasis added). "All DRD in our jurisdiction underwent intensive case review and from 2011 through the third quarter of 2016 (with full-year projections where appropriate), cases were analyzed for basic demographic information (i.e., age, gender, race) and residency status (i.e., urban vs. suburban).  More recent years (2015 and 2016) were also analyzed for education level and occupation based on death certificate entries for these variables.  The more recent DRD were further stratified by lethal intoxicant represented by heroin, fentanyl, cocaine, OPR, and all others.  In our earlier study, we used oxycodone data as a surrogate for OPR, as this has been the major driver of OPR trends in our region [citation omitted].  *Id.*

[21]  *See State v. Toudle*, 2013-Ohio-1548, ¶ 20 ("[W]e find that an OARRS report is an official record of the state pharmacy board and is admissible under Evid.R. 803(8)."); OHIO REV. CODE ANN. § 313.10 (designating records of coroners, including medical examiners, as public records, with some exceptions); *Stanton v. Vasbinder*, No. 06-10432, 2009 WL 996955, at *10 (E.D. Mich. Apr. 13, 2009) ("[T]he factual observations in a medical examiner's autopsy report have sufficient 'indicia of reliability' to be admitted as a business record regardless of whether or not the examining pathologist testifies at trial."); *Miles v. Scutt*, No. 07-15068, 2008 WL 2949240, at *4 (E.D. Mich. July 29, 2008) (noting that "autopsy reports are business records" and are therefore admissible); *State v. Craig*, 110 Ohio St. 3d 306, 322, 853 N.E.2d 621, 639 (2006) (same).

testify to the evolution of these reports during the course of his tenure, showing the transition from prescription opioids to illicit heroin/fentanyl, as stated in the records kept pursuant to statute. Supplementing his deposition testimony, Dr. Gilson's article shows that prescription opioid mortality peaked in 2011, and that there was an inflection point from that year forward, in which heroin deaths rose and surpassed the declining numbers of prescription opioid deaths in Cuyahoga County, followed by a fentanyl spike beginning in 2014.  Dkt. #2197-29 at p. 43, Figure 1.  Dr. Gilson's article cites a trend toward lower numbers of death cases of patients with an opioid prescription within the preceding year, suggesting the possibility that "addicts may be circumventing the previously *well-established progression route from OPR to illicit drugs like heroin and fentanyl*."  *Id.* at p. 48 (emphasis added).  This progression was "well-established" by the factual data evaluated by Dr. Gilson, as summarized above.

For these reasons, Defendants' Omnibus MIL No. 4 should be denied as to Dr. Gilson, and denied as moot as to Mr. Craig and Mr. Martin.

5. **<u>Defendants' Omnibus MIL No. 5</u>: The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

As a preliminary matter, Plaintiffs dispute the underlying premise of Defendants' argument in support of this MIL (*i.e.*, that the lobbying and petitioning activities at issue in this case are constitutionally protected).  It is well-established that neither the First Amendment nor the *Noerr-Pennington* doctrine immunizes fraud.[22]  Regardless, Plaintiffs have clearly stated that they are not

---

[22] *See, e.g., Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 606, 612 (2003); *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513-15 (1972); *Wise v. Zwicker & Associates, P.C.*, 780 F.3d 710, 719 n.5 (6th Cir. 2015); *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986). Defendants claim the fraud exception to *Noerr-Pennington* applies only in the context of an adjudicatory proceeding (Dkt. #2661 at p. 14 n.13).  But at least some of Defendants' fraudulent communications with the government were made in an adjudicatory context, such as during enforcement-related proceedings or rulemakings.  Additionally, the DEA's quota-setting process is unquestionably adjudicatory in nature, as it conducts public hearings, accepts evidence and argument from interested parties, makes findings of fact and conclusions of law, and its actions are guided by enforceable standards subject to review (21 C.F.R. §§ 1303.11 – 1303.13, 1303.31 – 1303.37, 1316.41 – 1316.68; 5 U.S.C. §§ 551-559; 21 U.S.C. §§ 826, 877).  *Cf. Kottle v. N.W. Kidney Centers*, 146 F.3d 1056, 1062 (9th Cir. 1998) ("The CON determination by the Department [of Health] bears many indicia of a true adjudicatory proceeding.  The Department conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses.  The Department must

attempting "to impose liability upon the Defendants for their lobbying or petitioning activities, nor do [they] argue that these activities were unlawful conduct." Dkt. #2090-1 at p. 3; Dkt. #2562 at p. 6 n.7. Thus, the question of whether or not these activities are constitutionally protected need not be decided here.[23]

Even assuming, *arguendo*, that Defendants' lobbying and petitioning conduct is constitutionally protected such that those activities could not directly give rise to liability, this does not mean evidence of that conduct is inadmissible at trial. Far from it. Rather, the United States Supreme Court, and courts throughout the country, have recognized that such evidence is still relevant and admissible to show the purpose and character of Defendants' wrongful activities. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."); *In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010) ("*Welding Fume II*") (noting that it previously declined to

---

issue written findings after its hearing. Its decision is appealable, and that appeal is governed by APA procedures and statutory standards. In all, we believe that this combination of facts makes the application of the judicial sham exception appropriate in this case."); *DeLoach v. Philip Morris Companies, Inc.*, 1:00CV01235, 2001 WL 1301221, at *12 (M.D.N.C. July 24, 2001) (no *Noerr-Pennington* immunity for defendants who intentionally submitted false purchase intentions to the USDA that resulted in lower annual tobacco quotas).

[23] Although Plaintiffs are not seeking to impose liability on Defendants for their petitioning conduct, Plaintiffs do not waive any argument they may have at trial that certain petitioning conduct of Defendants is not constitutionally protected under the First Amendment or the *Noerr-Pennington* doctrine. Plaintiffs also do not concede that the *Noerr-Pennington* doctrine applies outside the antitrust context. Although the Sixth Circuit recognizes that other federal courts have applied the doctrine to common law claims, it has not yet definitively resolved the issue. *See Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (acknowledging other federal courts have applied *Noerr-Pennington* to common law claims, but stating that it "need not decide that issue here because the Workers failed to state such a claim"); *see also DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 840 (E.D. Mich. 2003) ("Since the current dispute is not regulated by the Sherman Act, the Court is reluctant to apply the *Noerr–Pennington* doctrine.").

issue a pretrial, blanket ruling excluding all evidence of the defendants' lobbying activities, and in fact had "admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contain[ed] statements directly relevant to issues central to every *Welding Fume* case").[24]  For example, such evidence demonstrates

---

[24]  *See also Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136-39 (10th Cir. 2002) (district court did not abuse its discretion admitting evidence of defendant's misleading statements to Oklahoma Corporation Commission where offered "for the proper purpose of supporting the claim that [the defendant] acted for an improper monopolistic purpose"); *Alexander v. Natl. Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982) ("Exempt conduct may be considered, however, to the extent it tends to show the 'purpose or character' of other, nonexempt activity.  Here, the district court's findings are noteworthy because they show CMPC, AMPI and Mid-Am acting in concert with the specific intent to block NFO from competing as a qualified cooperative.  While not illegal because of the exemption, this conduct does have evidentiary value as to the purpose and concerted character of these co-ops' contemporaneous nonexempt activities.") (internal citations omitted); *Cipollone v. Liggett Group, Inc.*, 668 F. Supp. 408, 410-11 (D.N.J. 1987); *Gillis v. Murphy-Brown, LLC*, 7:14-CV-185-BR, 2018 WL 5928010, at *1 (E.D.N.C. Nov. 13, 2018) (noting that the *Noerr-Pennington* doctrine does not operate "in the manner in which defendant seeks to do here—[to] bar otherwise admissible evidence in a state law private nuisance lawsuit"); *In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*, 14 C 1748, 2018 WL 305503, at *10 (N.D. Ill. Jan. 6, 2018) ("The Court disagrees that the *Noerr–Pennington* doctrine is applicable.  Nolte does not seek to hold AbbVie *liable* for its alleged petitioning activity; he intends to offer evidence of that activity to demonstrate AbbVie's motive or intent.  There is no general rule that evidence of activity that is protected by the First Amendment—speech, for example—is inadmissible.") (internal citation omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *15 n.4 (N.D. Cal. Oct. 30, 2017) ("The *Noerr-Pennington* doctrine does not bar consideration of Bosch's lobbying activities. . . .  Here, the Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful.  Instead, they contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud."); *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2015 WL 8130449, at *1-2 (S.D.N.Y. Dec. 3, 2015) ("Under the *Noerr-Pennington* doctrine, a defendant may not be held liable based solely on conduct that is protected by the First Amendment, but that does not mean that such conduct is altogether inadmissible or necessarily lacking in evidentiary value."); *Community Action League v. City of Palmdale*, CV 11-4817 ODW VBKX, 2012 WL 10647285, at *8 (C.D. Cal. Feb. 1, 2012); *Wolfe v. McNeil-PPC, Inc.*, CIV.A. 07-348, 2012 WL 38694, at *6 (E.D. Pa. Jan. 9, 2012) (rejecting defendants' argument that the *Noerr-Pennington* doctrine compelled the exclusion of evidence of two citizen's petitions one defendant submitted to the FDA and noting that the petitions were "relevant to defendants' knowledge regarding the safety of ibuprofen and the adequacy of its labeling"); *Adams v. U.S.*, 03-0049-E-BLW, 2009 WL 1259019, at *2 (D. Idaho May 3, 2009) (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington* because, among other things, such evidence was "relevant to plaintiffs' claims of misbranding and failure to warn, and shows the state of [the defendant's] knowledge which is relevant to many claims"); *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, CV 00-1693-PA, 2003 WL 24901381, at *7 (D. Or. July 5, 2003) ("[E]ven if the state lands transaction could not itself have been a basis for liability [under *Noerr-Pennington*], evidence regarding that transaction would likely have been admissible for other purposes, such as showing market share, the extent of any log sources available to competitors, the scope of the relevant market or markets, the manner in which Weyerhaeuser allegedly obtained and maintained its monopoly, the company's motives and intent, and to impeach credibility").

Defendants' knowledge and intent to participate in a RICO enterprise.[25]  For these reasons, courts regularly deny motions *in limine* seeking to preclude evidence of lobbying and petitioning activities.[26]

Moreover, evidence of Defendants' lobbying activities will be particularly probative in this case since Defendants, as they have already indicated, plan to argue that the DEA did not do enough to enforce the law.  Plaintiffs are entitled to rebut this argument with evidence that, for example, Defendants and their trade association (i) lobbied to limit the DEA's enforcement authority, and (ii) influenced their Congressional allies to criticize the DEA in order to undermine the agency's authority and effectiveness.

Defendants' cases do not support granting their *limine* request.  First, they cite *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), for the proposition that "[a]llowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right."  Dkt. #2661 at p. 13.  In *Octane*, which involved the appropriateness of an attorney's fee

---

[25] *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) ("Plaintiffs are not asserting that the Bosch Defendants' lobbying activity was unlawful.  Instead, they assert that the lobbying activity helps prove knowledge and intent to participate in the RICO enterprise.  Use of the Bosch Defendants' lobbying activity in this manner is not barred by *Noerr-Pennington*."); *Nat.-Immunogenics Corp. v. Newport Tr. Group*, SACV1502034JVSJCGX, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) ("While the evidence may ultimately be inadmissible under the Noerr-Pennington doctrine as a basis for liability, it may be admissible for some other purpose such as to show intent to participate in a RICO enterprise, in which case Noerr-Pennington would not be a bar to admissibility.").

[26] *See, e.g., Welding Fume II*, 2010 WL 7699456, at *93; *In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (denying defendants' motion *in limine* to exclude lobbying evidence; "[T]he plaintiff seeks to offer evidence about how the defendants attempted to influence, petition, or communicate with Congress and/or the FDA to show their knowledge, state of mind, or intent.  It would be a stretch to say that Noerr-Pennington bars any use of any evidence of the defendants' petitioning of the government, and its agencies, or evidence of any communications with the FDA."); *Cipollone*, 668 F. Supp. at 410-11 (denying defendants' motion *in limine* to exclude evidence that defendants provided false and misleading information to Congress; court deferred decision of "whether the specific evidence to be offered is probative of a continuing course of conduct that corroborates plaintiff's direct allegations" until trial so that it could be "decided in context"); *Testosterone*, 2018 WL 305503, at *10 (denying defendant's motion *in limine* to exclude all evidence of defendant's lobbying efforts with the FDA); *Gen. Motors*, 2015 WL 8130449, at *1-2 (denying defendants' motion *in limine* to exclude evidence that it intentionally misled or concealed information from, or tried to influence, NHTSA); *Wolfe*, 2012 WL 38694, at *6 (denying defendants' motion *in limine* to exclude citizen's petitions submitted to the FDA); *Adams*, 2009 WL 1259019, at *2 (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington*).

award in a patent litigation case, the Supreme Court briefly discussed the *Noerr-Pennington* doctrine because the plaintiff had attempted (unsuccessfully) to analogize the standard for baseless litigation under that doctrine with the standard applicable under the Patent Act.  572 U.S. at 548, 555-56.  The Court noted that it had "crafted the *Noerr-Pennington* doctrine . . . to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances."  *Id.* at 556.  The case has absolutely nothing to do with the admissibility of petitioning-related evidence.

Defendants then cite *Snyder v. Phelps*, 562 U.S. 443 (2011), to support their argument that "plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy."  Dkt. #2661 at pp. 14-15.  But *Snyder* is entirely distinguishable.  In that case, the plaintiff asserted various tort claims, including civil conspiracy, against the Westboro Baptist Church and some of its members based on their picketing of a military funeral.  562 U.S. at 447.  At trial, the jury found in favor of the plaintiff.  *Id.*  The Supreme Court affirmed the reversal of the jury's verdict, holding that "the First Amendment shield[ed] the church members from tort liability for their speech in th[at] case."  *Id.* at 447, 451-60.[27]  Significantly, the defendants' picketing formed the *entire basis* for the plaintiff's tort claims in that case.  *Id.* at 447.[28]  Because the underlying torts upon which the alleged conspiracy was based failed, the civil conspiracy claim also failed.  *Id.* at 460.  This case does not address the admissibility of lobbying or petitioning evidence.[29]

---

[27]  Notably, the Supreme Court noted that none of the defendants' statements were "provably false[.]"  *Id.* at 451.  And it also emphasized that its holding was "narrow."  *Id.* at 460 ("We are required in First Amendment cases to carefully review the record, and *the reach of our opinion here is limited by the particular facts before us*.") (emphasis added).

[28]  In the present case, to the contrary, Plaintiffs' claims are based on Defendants' (i) unlawful marketing and distribution of opioids through fraud and misrepresentation, and (ii) unlawful failure to prevent diversion and failure to monitor for, report, and prevent shipment of suspicious orders of opioids.  It is the entirety of that wrongful conduct that forms the basis of Plaintiffs' civil conspiracy claims.  *See, e.g., Taylor v. AirCo, Inc.*, CV 02-30014-MAP, 2003 WL 27382684, at *16 n.8 (D. Mass. Aug. 4, 2003) (rejecting defendants' argument that they were immune from liability based on their lobbying efforts under *Noerr-Pennington*; "Plaintiffs do not seek to have liability imposed solely on the basis of lobbying efforts.  Rather, Plaintiffs allege 'a continuing course of deceptive conduct of which this activity was just one small part.' "), *report and recommendation adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003).

[29]  Nor does this case address the *Noerr-Pennington* doctrine at all.

Defendants also claim "the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct[,]" citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157 (6th Cir. 1984) ("*Cleveland II*") and *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257 (N.D. Ohio 1980) ("*Cleveland I*").  Dkt. #2661 at p. 15.  Of course neither of these opinions, which arise from the same *antitrust* case,[30] addresses the admissibility of petitioning evidence in cases involving nuisance, RICO, OPCA, or common-law conspiracy claims.  Moreover, neither case even stands for the proposition that such evidence is *per se* inadmissible in antitrust cases.

In *Cleveland I*, the City of Cleveland brought an antitrust suit against an electric utility. 538 F. Supp. 1257.  There were two trials, the first of which ended in a hung jury.  *Cleveland II*, 734 F.2d at 1160.  Prior to the second trial, the defendant sought to preclude the plaintiff from "enter[ing] upon a [specific] course of inquiry" in its examination of the "defendant's general attorney, the *sole purpose* of which [wa]s to elicit testimony" that would trigger the introduction of certain *Noerr-Pennington*-protected evidence that the court had *already determined* should be excluded based on the first trial. *Cleveland I*, 538 F. Supp. at 1278 (emphasis added).  After noting that the protected conduct of which the plaintiff was seeking to introduce evidence was not relevant to the plaintiff's claims,[31] the court precluded the plaintiff from initiating that course of inquiry unless the defendant opened the door.[32] In other words, the court analyzed specific pieces of evidence of the defendant's *Noerr-Pennington*

---

[30] It is well established that, subject to certain exceptions, petitioning conduct, even if undertaken for anti-competitive purposes, is not sanctionable *under the Sherman Act.  See Pennington*, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate antitrust laws even though intended to eliminate competition.  Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

[31] *Id.* at 1279 ("In light of the fact the only instance of protected conduct sought to be introduced herein relates to a lawsuit *which, the City concedes, did not actually affect the construction of the 69KV intertie*, the plaintiff may not inquire as to activity undertaken by CEI which was merely 'designed' to delay, impede, or make more costly the construction of the 69KV temporary emergency interconnection.") (emphasis added).

[32] *Id.* at 1279 ("Although plaintiff may not, at this juncture, initiate inquiry designed solely to trigger admission of Noerr-Pennington conduct, the Court recognizes, of course, that the evolution of the defendant's evidence may 'open the door' for the introduction of such conduct, as occurred during the first trial.").

protected conduct, determined that this evidence should be excluded, and then prohibited the plaintiff from questioning a witness in its case-in-chief with the sole purpose of triggering the introduction of the previously-excluded evidence. Contrary to Defendants' assertions otherwise, *Cleveland I* does not support granting Defendants' overly-broad MIL No. 5. In fact, that court explicitly stated that determinations as to the admissibility of petitioning-related evidence *should be deferred until trial*:

> [T]he weighing process embodied in Rule 403, and the similar balancing analysis which governs the admissibility of evidence relating to activities protected by the Noerr-Pennington doctrine, are more appropriately undertaken in the context of the evidence theretofore adduced. To exclude broad categories of evidence in this action, prior to the presentation of any proof, might appear in a controversy of this nature to risk depriving the plaintiff of what may ultimately be demonstrated to be the "legitimate moral force" of its evidence. The Court is thus constrained to conclude that the extent to which the litigants may properly adduce evidence which pertains to the substance of the tendered admission is a matter which must await the actual presentation of proof in this case.

*Id.* at 1265 (internal citations omitted).[33]

Defendants cite *Cleveland II* as affirming the *Cleveland I* decision (Dkt. #2661 at p. 15), but in actuality *Cleveland II* affirmed the district court's judgment on the jury's defense verdict from the second trial. 734 F.2d at 1160, 1169.[34] The plaintiff appealed, arguing, among other things, that the trial judge erred by refusing to admit into evidence information regarding the defendant's secret sponsorship of a lawsuit challenging an order by the Federal Power Commission requiring the defendant to interconnect with the plaintiff's utility company. *Id.* at 1161-62. The plaintiff claimed the evidence demonstrated the defendant's "anticompetitive intent to exclude [the plaintiff's utility

---

[33] The court also recognized that courts are "vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the Noerr-Pennington doctrine." *Id.* at 1277.

[34] Defendants also purport to quote certain language from *Cleveland II* in their motion, implying that this was a direct quote by the Sixth Circuit's majority opinion. Dkt. #2661 at p. 15 ("Allowing such questioning would 'gut the constitutional protection afforded under the Noerr-Pennington doctrine and have a 'chilling effect' upon the exercise of First Amendment rights.' *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171."). In fact, this is a direct quote from the district court in *Cleveland I* (538 F. Supp. at 1279), which is then re-quoted in a parenthetical to a citation to *Cleveland I* in the *dissent* to *Cleveland II*. 734 F.2d at 1171.

company] from the retail electric power market." *Id.* at 1161.  The district court ruled that the evidence was "inadmissible on the basis of the *Noerr-Pennington* Doctrine." *Id.* at 1161-62.  The Sixth Circuit held that the district court had not abused its discretion in excluding the evidence because the conduct was "not the kind of antitrust activity that is admissible to prove a Sherman Act violation" and the plaintiff's purpose in introducing the evidence "was to show the anticompetitive character and nature of [the defendant's] conduct in this episode as a part of the alleged broader pattern of conduct condemned by the Sherman Act, and to cast appellee and its counsel in the role of deceivers[,]" which was "not an admissible basis for its introduction[.]" *Id.* at 1162-63.  The court further noted that the evidence was cumulative because the defendant had already admitted at trial that its objective was "to reduce and *eliminate* competition with its competitor" and the plaintiff had introduced considerable other evidence of the defendant's anti-competitive conduct.  *Id.* at 1164. Thus, *Cleveland II,* similar to *Cleveland I*, simply reiterates that the balancing test for whether a particular piece of petitioning-related evidence is admissible requires a fact-specific inquiry that should be deferred until trial.

Defendants' Rule 403 arguments are also without merit.  They claim that "evidence of lobbying activity is considered presumptively prejudicial." Dkt. #2661 at p. 15.  But the cases they cite for this proposition—all of which, not surprisingly, arise in the antitrust context—are entirely distinguishable.  In *U.S. Football League v. Natl. Football League*, 634 F. Supp. 1155 (S.D.N.Y. 1986) ("*U.S. Football I*"), the plaintiffs brought various antitrust claims against the NFL.  *Id.* at 1158.  The NFL sought summary judgment on certain of these claims that related to the NFL's actions "directed at preventing existing and potential USFL clubs from gaining adequate access to suitable stadium facilities."  *Id.* at 1176.  The NFL argued that the stadium-related claims were barred under the *Noerr-Pennington* doctrine because the conduct at issue almost entirely consisted of the NFL's lobbying of state and local governments on issues related to stadium lease approvals.  *Id.* at 1177-78. The court held that such conduct could not "give rise to liability under the federal antitrust laws." *Id.* at 1180.  It recognized, however, that evidence of stadium-related conduct could potentially be "probative of the 'purpose and character' of the transactions" that formed the basis of some of the

plaintiffs' other claims. *Id.* at 1180 (quoting *Pennington*, 381 U.S. at 670 n.3). And it expressly acknowledged that the admissibility of this evidence should be determined *during the trial*: "Since the admissibility or exclusion of such 'purpose or character' evidence will be within this Court's discretion at trial, *it would be premature to rule on such matters at this time*." *Id.* (internal citation omitted) (emphasis added). Despite this acknowledgement, the court proceeded *in dicta* to make some "preliminary observations" regarding the potential admissibility of such evidence at trial. *Id.* The court emphasized the need to weigh the probative value of the evidence against the risk of undue prejudice. *Id.* at 1180-81. The court noted that the evidence was largely irrelevant to the plaintiffs' remaining claims and had significant evidentiary problems, including that most of it was hearsay. *Id.* at 1181 & n.13. It was during this *dicta* analysis that the court stated: "Given such risks, the exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception *in an antitrust case*." *Id.* at 1181 (emphasis added).[35] But even if the present case was an antitrust case (which it is not), and even if the 33-year-old *dicta* of a district court outside this circuit was binding on this Court (which it is not), *U.S. Football I* does not support granting Defendants' *limine* request. To the contrary, it *reaffirms* Plaintiffs' argument that such determinations should be deferred until trial, where the Court will have the benefit of a developed record in order to analyze whether a specific piece of lobbying-related evidence is admissible. 634 F. Supp. at 1180.

---

[35]  In their motion, Defendants cite *U.S. Football League v. Natl. Football League*, 842 F.2d 1335 (2d Cir. 1988) ("*U.S. Football II*") as affirming the district court's *U.S. Football I* opinion. Dkt. #2661 at p. 15. In actuality, the Second Circuit's opinion affirmed the district court's denial of the plaintiffs' *post-trial* motions which dealt with issues that arose *during* the trial. *Id.* at 1340-41. In fact, the appellate court noted that the district court's summary judgment ruling "in favor of the NFL on the USFL's stadium-related claims on *Noerr-Pennington* grounds" had "not been appealed." *Id.* at 1350 n.13. The Second Circuit acknowledged that the district judge actually admitted some lobbying evidence at trial, but also held that he had not abused his discretion in excluding certain other lobbying evidence during the trial based on the specific circumstances of that case. *Id.* at 1373-75. Notably, the appellate court did not state that such evidence was "presumptively prejudicial"; rather, it acknowledged that lobbying evidence "may be admitted . . . 'if it tends reasonably to show the purpose and character of the particular transactions under scrutiny,' and that evidence is more probative than prejudicial." *Id.* at 1374 (internal citation omitted); *see also id.* ("Evidence of lobbying may, as we have already stated, nevertheless be admitted as purpose or character evidence.").

In *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978), which is also an antitrust case, the court never said lobbying/petitioning evidence is "presumptively prejudicial." Rather, in determining whether the district court properly granted summary judgment on one of the plaintiff's antitrust claims, the Fifth Circuit acknowledged that "[e]vidence of activity that is protected by the Noerr doctrine may be admitted to show the purpose and character of other activity if doing so is not overly prejudicial to the defendants." *Id.* at 543 n.7.  The court determined that a specific piece of petitioning evidence was inadmissible in that case because "[i]ts evidentiary value to the plaintiff [wa]s far outweighed by the defendants' first amendment interests."  *Id.* Specifically, the court found that "the probative value of this evidence [wa]s low" because "[a]s evidence of the alleged conspiracy it [wa]s cumulative" and "[a]s evidence of [the defendant's] state of mind it [wa]s exceedingly weak[.]"  *Id.*  As with *U.S. Football I*, this case does not support the granting of Defendants' broad *limine* request; rather, it reaffirms that the admissibility of lobbying evidence is a fact-specific inquiry that is best reserved for trial.

Finally, *Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981) is yet another antitrust case in which the appellate court analyzed whether the district court erroneously declined to consider evidence of the defendants' lobbying activities when deciding whether to grant the defendants' summary judgment motion.  *Id.* at 458, 466-67.  In *Weit*, the plaintiffs alleged that the defendant banks "conspired to fix the interest rate paid by consumer credit cardholders on extended payments[.]"  *Id.* at 548.  After *eight years* of discovery, the plaintiffs "failed to produce any significant probative evidence to support the[ir] complaint[,]" leading the district court to grant summary judgment in favor of the defendants.  *Id.*  On appeal, the plaintiffs argued, among other things, that the district court erred by not considering evidence of the defendants' lobbying efforts to influence the passage of a bill in the legislature that would allow the banks to charge an increased interest rate.  *Id.* at 461, 466-67.  The district court did not exclude that evidence because the conduct was immunized from antitrust liability under *Noerr-Pennington*, but rather because "the prejudicial quality of this evidence outweighed its probative value."  *Id.* at 466.  The Seventh Circuit held that the district court "correctly excluded this evidence from consideration on

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added).  It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case.  *Id.  See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation.  A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims.  Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds.  *Jordan*, 2010 WL 4281807, at *1.  Defendants' Omnibus MIL No. 5 should be denied.

6. **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36]  They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial.  Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

In fact, there is abundant evidence in the record that the opioids Defendants shipped migrated beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon.[37]  The Ohio Department of Mental Health and Addiction Services was aware of the migration of opioids into Ohio.[38] Defendants were regularly alerted to the migration phenomenon by the DEA,[39] and their personnel acknowledged the reality of diversion and migration in their depositions.[40]  With respect to Walgreens, Plaintiffs' expert James Rafalski opined that Walgreens was familiar with the Florida phenomenon in part because its pharmacy managers alerted their supervisors to the high volume of prescriptions coming from out of state:

> Walgreens's also knew opioids it distributed in Florida were migrating into Ohio. Because Walgreens failed to maintain many pre-2012 documents outside of those produced to the DEA during the Jupiter DC investigation, many of the pre-2012 documents Walgreens produced relate to Walgreens distribution in Florida. This information is highly relevant to CT1, however, because not only does the evidence show that Walgreens's distribution failures were "systemic", as noted by the DEA in the 2013 MOA, but the evidence further shows that Walgreens knew and/or should have known that the high-volume Florida prescriptions were traveling out of state, including to Ohio. For example, Pharmacy managers in Florida alerted their supervisors and the distribution center that they were ordering 55+ bottles a week (where 30 bottles was an admitted red flag) and that many of the prescriptions were coming from out of state. Walgreens was well familiar with the "Florida migration"

---

[37]  *See, e.g.,* **Ex. 5** [CAH_MDL_2804_031944472] at p. 118 (vast majority of Florida pain clinic patients came from out-of-state, including Ohio); **Ex. 6** [FTIMDL00039536] (most drug customers travel to Florida from Ohio and elsewhere); **Ex. 7** [HDS_MDL_00455124] (travelers seeking opioids come "by the thousands" to Florida from Ohio and elsewhere); **Ex. 8** [ABDCMDL00360134] at Slide 7(2009 AmerisourceBergen presentation describing distribution from Florida pain clinics to Ohio and other states); **Ex. 9** [MCKMDL00407451] at 465(McKesson presentation depicting "Drug Diversion Migration Out of Florida" to Ohio and elsewhere); **Ex. 10** [WAGMDL00441398—1431] (describing case studies of diverted opioids migrating to Ohio); **Ex. 11** [WAGMDL00049752] at 759 ("this is not just a Florida problem").

[38]  *See* **Ex. 12** [*Ohio Substance Abuse Monitoring Network Surveillance of Drug Abuse Trends in the State of Ohio*, CUYAH_001656831] at 834, 840, 913, 924 (Cleveland region law enforcement and others note influx of prescription opioids from outside Ohio).

[39]  *See, e.g.,* **Ex. 13** [CAH_MDL_02448227] at 378—80; **Ex. 14** [US-DEA 00000001 – 141]; **Ex. 15** [WAGMDL00289068] at 153.

[40]  *See, e.g.,* Dkt. #1962-24 (8/1/18 Hartle Dep.) at 318:24 – 321:2.

phenomenon, in which prescription opioids were being dispensed in Florida and transported north to states include Ohio, and knew that "Interstate 95 has been renamed the Oxycodone Express because of the brisk travel of people from Kentucky, Tennessee, [and] Ohio to South Florida to obtain medications." When the DEA issued Orders to Show Cause to Walgreens's Jupiter Distribution Center and six Florida Walgreens pharmacies, the DEA specifically noted likely migration to Ohio."

Dkt. #1895-19 (Rafalski Expert Rep.) at p. 121; *see also* Dkt. #1969-19 (5/14/19 Rafalski Dep.) at 552:13-554:6 (testifying as to the basis for his opinion and observing that "by this time period, everybody knew there was a problem in Florida").

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Defendants' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow.  Defendants shipped tens of millions of opioid pills to resellers throughout the U.S.  They knew that those resellers could, and often did, sell those opioids to individuals who had come from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home.  That every pill that was diverted posed a risk to localities throughout the nation was not only foreseeable to Defendants, it was observed by them.  Each shipment Defendants made in disregard of the potential for diversion is evidence of damages caused by Defendants to localities throughout the nation.

In addition, because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a suspicious order monitoring ("SOM") program.  Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants.  Dkt. #1895-19 (Rafalski Expert Rep.) at pp. 46-186.  Each Defendant's SOM program was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere.  *See id.* at p. 62 (noting that DEA enforcement actions against Cardinal in Maryland and Florida involved increasing thresholds despite evidence indicating potential diversion, and that these actions identified a systematic problem in Cardinal's nationwide distribution operations); *id.* at p. 79 (observing that the DOJ recognized that there was a "nationwide" and "systemic" failure of McKesson to report suspicious orders and otherwise maintain effective

controls against diversion); *id.* at p. 85 (ABDC's settlement with the DOJ arose from failures in its SOM program, which were systematic because ABDC maintained national SOM policies and procedures); *see also, e.g.,* Dkt. #1971-2 (10/16/18 Stahmann Dep.) at 94-96.  Because the SOM programs were implemented nationally, not regionally, each suspicious order filled by Defendants is also evidence of the flaws in Defendants' SOM programs, wherever it shipped to.  For this reason, as well, Defendants' efforts to exclude this highly probative evidence must be denied.

7.     **Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations.**

In their Omnibus MIL No. 7, Defendants argue that evidence of their CSA violations is irrelevant because it does not establish certain elements of Plaintiffs' claims.  First, that is not true, as discussed in greater detail below.[41]  Moreover, Defendants are attempting to use this MIL to re-litigate issues decided on summary judgment, which the Sixth Circuit has held is improper.  *See Louzon*, 718 F.3d at 558, 563 (defendant moved *in limine* to exclude plaintiff's "evidence of comparable employees on the basis that none were similarly situated as a matter of law[,]" arguing this evidence was irrelevant to plaintiff's discrimination claims; court held this was an improper motion *in limine*: "[T]his argument rests entirely on the presumption that Louzon would not be able to make out a prima facie case of discrimination, which if true would render null the need for any evidentiary rulings.  Additionally, if these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant.  Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered.").

This Court has determined that whether Defendants violated their duties under the CSA or its implementing regulations must be resolved by the jury in the upcoming trial:

---

[41]     And, regardless, "a piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball."  *Dortch*, 588 F.3d at 401.  *See also Morningstar*, 2018 WL 3721077, at *1 (same).

> The Court . . . finds the record is replete with disputes of material fact as to whether each Defendant complied with its obligations under the CSA, which preclude summary judgment.  In these circumstances, it is a jury that must determine the credibility of the evidence, the weight to be given to the evidence, and any inferences to be drawn from the facts presented.  Put simply, while the Defendants had a duty not to ship suspicious orders, there are disputes of fact as to whether, and when, each Defendant's SOMS was adequate, whether orders were suspicious, and whether each Defendant did actually ship suspicious orders (or instead, identified it as suspicious but then, through due diligence, dispelled that suspicion.

Dkt. #2483 at pp. 20-21 (internal citations omitted).  *See also id.* at p. 32 ("[T]he Court finds the record is replete with material factual disputes regarding whether Defendants furnished false information or omitted material information, and, if so, whether they did so knowingly or intentionally.").  By arguing that Plaintiffs cannot submit evidence of Defendants' CSA violations at trial, Defendants are effectively seeking to invalidate this Court's summary judgment rulings.  This they cannot do.

Additionally, Defendants are simply wrong when they argue that their CSA violations are not relevant to Plaintiffs' claims.  They largely reiterate the same erroneous arguments they made on summary judgment.  These arguments were refuted in Plaintiffs' summary judgment briefing, which is incorporated by reference as if fully set forth herein.  Dkt. #2545 at pp. 68-81; Dkt. #1924 at pp. 20-25.  However, a number of their arguments bear some additional discussion here.

For example, Defendants claim that a violation of 21 U.S.C. § 843(a)(4)(A) "based on failure to comply with 'suspicious' order duties" cannot serve as a racketeering predicate act in this case. Dkt. #2661 at pp. 18-19.  The Court has rejected this argument numerous times.  Dkt. #2580 at p. 3 ("[T]he Court reaffirms its legal conclusion that a violation of 21 U.S.C. § 843(A)(4)(a) can constitute a predicate act under 18 U.S.C. § 1961(1)(D); and the Court further concludes that, at a minimum, Distributors have failed to demonstrate there is no genuine dispute of material fact regarding whether they violated § 842, § 843."); Dkt. #1025 at pp. 45-47; Dkt. 1203.[42]

---

[42]   Additionally, Defendants' CSA violations are clearly felonious pursuant to § 841(a) and § 843(a)(4)(A). *See, e.g,* Dkt. #2545 at pp. 73-76.

Defendants also, yet again, argue that a violation of CSA *regulations* is not a violation of law punishable as a crime for purposes of 18 U.S.C. § 1961(1)(D).[43] But this Court has flatly rejected the argument that the relevant CSA regulations do not have force of law. Dkt. #2483 at p. 15 ("As a regulation promulgated pursuant to Congressional authority, Section 1301.74 is legislative in nature and has the full force and effect of law.") (citing cases). Defendants cite *U.S. v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), in support of their argument, but that case is distinguishable. In *Alghazouli*, which did not involve RICO at all, the court decided whether a regulatory violation satisfied the "contrary to law" requirement in 18 U.S.C. § 545, a statute prohibiting the fraudulent or knowing importation of merchandise "contrary to law[.]" *Id.* at 1182-83. After analyzing the statutory history, the court determined "that Congress intended 'law', *as used in § 545*, to include a regulation only if a statute specifies that the violation of that regulation is a crime." *Id.* at 1187 (emphasis added). Unlike the statutes at issue in *Alghazouli*, CSA §§ 841 and 843 do not criminalize conduct that is "contrary to law," but rather conduct that violates "this subchapter" (*i.e.*, Subchapter I of the CSA and regulations promulgated thereunder).

Next, Defendants claim that evidence of their CSA violations "does not establish intent to defraud a victim of money or property, as required for mail and wire fraud[,]" citing *U.S. v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). The cited portion of *Daniel* simply provides the elements of a wire fraud claim; that case does not involve or discuss violations of the CSA. 329 F.3d at 485. Defendants' CSA violations are certainly relevant to the issue of intent to defraud. Defendants intended to induce the medical community and individual patients to purchase more opioids than they otherwise would have purchased "by means of false or fraudulent pretenses, representations, or promises[.]" 18 U.S.C. § 1343; *Daniel*, 329 F.3d at 488 ("It is sufficient that the defendant by material misrepresentations intend the victim to accept a substantial risk that otherwise would not have been taken"). In order to serve that purpose, Defendants violated the CSA and made

---

[43]    They further argue that because these violations are not relevant to establishing RICO predicates, they are not relevant to establishing "corrupt activities" for purposes of OCPA. Because the violations *are* relevant to establishing RICO predicates, Defendants' OCPA-related arguments also fail.

misrepresentations regarding same.   Thus, evidence of Defendants' violations is relevant to Plaintiffs' wire and mail fraud allegations.   Of course, even if Defendants' CSA violations were not relevant to their intent to defraud, they are relevant to various elements of Plaintiffs' other claims, as described herein.

Moving on to Plaintiffs' statutory public nuisance claim, Defendants reiterate their argument that CSA regulations do not constitute "laws . . . of the United States of America . . . controlling the distribution of a drug of abuse" for purposes of OHIO REV. CODE § 4729.35.  Dkt. #2661 at p. 20. Again, this argument has already been rejected by this Court.  *See* Dkt. #2483 at p. 15; Dkt. #2578 at p. 8 ("[T]he Court recently determined that the record demonstrates material issues of fact as to whether each Defendant complied with CSA obligations, and that conclusion applies here. Manufacturers' contention that no violation supporting the statutory nuisance claim has been identified in this litigation is without merit and does not warrant summary judgment.") (internal citation omitted).  Defendants now try to argue that the fact that § 4729.35 separately lists "any rule of the board of pharmacy controlling the distribution of a drug of abuse" means that its reference to "laws" cannot be interpreted to include regulations.   But "rules" are not the same thing as "regulations."   Even the Controlled Substances Act differentiates between the two.  *See, e.g.,* 21 U.S.C. § 821 ("The Attorney General is authorized to promulgate rules *and* regulations . . . relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances . . .") (emphasis added); 21 U.S.C. § 871(b) ("The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his function under this subchapter.").   Under Defendants' interpretation, violating a "rule of the board of pharmacy controlling the distribution of a drug of abuse" is sufficiently "inimical, harmful, and adverse to the public welfare of the citizens of Ohio . . . to constitute a public nuisance[,]" but violating federal regulations controlling the distribution of a drug of abuse is not.[44]  This makes no sense and is not consistent with the purpose of the statute, which is

---

[44]   Presumably, if the Ohio legislature intended this interpretation, it could have easily used the word "statutes" instead of "laws."

to penalize "unlawful" distribution of "drug[s] of abuse," such as opioids.  OHIO REV. CODE § 4729.35.

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51 (2002), is inapposite.  In that case, the Supreme Court was determining whether an express preemption clause in the Federal Boat Safety Act of 1971, which states that it applies to "a [state or local] law or regulation[,]" encompassed common-law claims.  *Id.* at 63.  The Court determined it did not, reasoning:

> [B]ecause "a word is known by the company it keeps," the terms "law" and "regulation" *used together* in the pre-emption clause indicate that Congress pre-empted only positive enactments.  If "law" were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render *the express reference to "regulation" in the pre-emption clause* superfluous.

*Id.* (internal citation omitted) (emphasis added).

Defendants next claim that their CSA violations are irrelevant to Plaintiffs' common law absolute public nuisance claims because Plaintiffs are required to prove that Defendants "violated a 'safety statute' " in order to recover on those claims.  To begin with, that is not true.  Defendants may also be held liable for intentional and unreasonable conduct causing the public nuisance. *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143 n.4 (Ohio 2002) ("With an absolute nuisance, the wrongful act is either intentional *or* unlawful . . .") (emphasis added); CV 621.05 Absolute nuisance–intentional acts [Rev. 3-18-02], 1 CV Ohio Jury Instructions 621.05 ("Ohio has recognized that an intentional act can form the basis for an absolute nuisance.").[45]  Moreover, the Ohio Supreme Court has clearly stated that violations of statutes *or regulations* involving public health or safety can establish a public nuisance: "[A] 'public nuisance' is 'an unreasonable interference with a right common to the general public.'  'Unreasonable interference' includes . . . conduct that is contrary to a statute, *ordinance or regulation* . . ."  *Beretta*, 768 N.E.2d at 1142 (internal citations omitted) (emphasis added); *see also id.* (noting it has "often applied public nuisance laws to actions

---

[45]  In *Taylor v. City of Cincinnati*, 55 N.E.2d 724 (Ohio 1944), the Ohio Supreme Court merely stated that the violation of a safety statute is one way to establish an absolute nuisance.  *Id.* at 728.  But the court also noted that an absolute nuisance can be established when "the actor commits and intentional act involving a culpable wrong."  *Id.* at 727.

connected . . . to statutory *or regulatory* violations involving public health or safety") (emphasis added)).[46]  Regardless, Plaintiffs have alleged violations of the CSA itself (*e.g.*, § 841, § 843) in Defendants' failure to maintain effective controls against diversion.  The CSA is clearly a statute setting forth specific legal requirements for the protection of others.  *See* 21 U.S.C. § 801 (in the introductory provisions to the CSA, Congress finds and declares that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people").  Finally, *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198 (Ohio 1998), is entirely inapposite as it addressed negligence *per se* claims, not nuisance claims.  *Id.* at 200-03 (holding "the violation of an administrative rule does not constitute negligence *per se*").

Defendants' CSA violations also are relevant to Plaintiffs' civil conspiracy claims.  In its order denying Defendants' summary judgment motion as to those claims, this Court explained that the "unlawful act" element of civil conspiracy "requires existence of an underlying unlawful act that is actionable in the absence of a conspiracy"[47] and that the unlawful act of any one member of the conspiracy is sufficient to satisfy this element.  Dkt. #2562 at p. 4.  The Court noted that Plaintiffs had alleged "unlawful acts of fraudulent marketing and Defendants' 'near uniform CSA noncompliance[,]' " and held that these issues "present[ed] factual disputes that must be evaluated by a jury."  *Id.*  Defendants' CSA violations are some of the unlawful activities on which Plaintiffs' underlying tort claims are based.  Specifically, these violations form the basis of Plaintiffs' nuisance, RICO, and OPCA claims, all of which are torts separate from the conspiracy itself that Plaintiffs are pursuing against each Defendant.  For that reason, Defendants' cases are inapposite.[48]

---

[46]  *See also* RESTATEMENT (SECOND) OF TORTS § 821B(2)(b) (unreasonable interference with a public right may be shown by "conduct [that] is proscribed by a statute, ordinance, *or administrative regulation*") (emphasis added).

[47]  *See also* CV 443.01 Civil conspiracy [Rev. 12-1-07], 1 CV Ohio Jury Instructions 443.01 ("The unlawful act must be an unlawful act 'independent' of the existence of the conspiracy.  In other words, there must be an underlying unlawful act actionable in the absence of the conspiracy.").

[48]  *See State ex rel. Morrison v. Wiener*, 83 N.E.3d 292, 295-99 (Ohio App. 9th Dist. 2017) (granting summary judgment on plaintiffs' civil conspiracy claim because plaintiffs failed to allege any underlying torts

As Defendants' CSA violations are relevant to all of Plaintiffs' claims, Defendants' request for an instruction to the jury as to the limited relevance of this evidence to particular causes of action should be denied.  Dkt. #2661 at p. 22.  Plaintiffs have no objection to the jury being instructed as to the definition of "suspicious orders" under CSA regulations.  *Id.*  However there is no basis, and Defendants fail to offer any justification, for "instructing the jury that 'suspicious' orders are not evidence of diversion or likely diversion."  *Id.*  The very purpose of monitoring for suspicious orders is to prevent diversion.  Certainly evidence of an order that was, or should have been, flagged as suspicious is *some* evidence of likely diversion.  If Defendants have proof that a particular suspicious order was not diverted, they are certainly able to make such an argument at trial.  Defendants' requested instruction seeks to prevent the jury from weighing such evidence and is therefore improper and unwarranted.

Finally, Defendants ask the Court to preclude any testimony "that purports to set out, or opine on, the content of the law, whether on 'suspicious' order duties or any other subject."  Dkt. #2661 at p. 22.  Presumably, since Defendants request this relief, they will have no objection to Plaintiffs' *limine* request #13, which seeks to preclude "[a]ny argument or suggestion that the [CSA] and its implementing regulations do not impose, or have not always imposed, on registrants an identification duty, reporting duty, and no-shipping duty with respect to suspicious orders[,]" since such argument or suggestion would not only address the content of the law but directly contradict this Court's prior summary judgment rulings.  Dkt. #2652 at pp. 10-11.  Of course, Plaintiffs' *limine* request identified specific statements regarding the law that should be excluded because they would conflict with the Court's prior rulings.  Defendants' request, on the other hand,

---

supporting the conspiracy claim in their complaint and noting that even if the plaintiffs had pled the underlying torts they raised for the first time in their summary judgment response, they failed to meet their burden of pointing to any triable issues of material fact with respect to civil conspiracy based on those underlying torts); *Davis v. Clark Cty. Bd. of Commrs.*, 994 N.E.2d 905, 909-11 (Ohio App. 2d Dist. 2013) (dismissing plaintiff's civil conspiracy claim because the underlying torts on which he based that claim were barred by the statute of limitations); *Atanus v. S&C Elec. Co.*, 454 F. Supp. 2d 753, 756 (N.D. Ill. 2006) (noting that, in that case, the "success of [the plaintiff's tort] claims d[id] not depend upon a determination of whether defendants violated the regulation").

is overly broad, vague, and would encompass all legal conclusions (regardless of whether they conflicted with the law as determined by the Court). Dkt. #2661 at p. 22 ("The Court should therefore exclude any evidence on the meaning of law."). Whether certain testimony or evidence offers an inadmissible legal conclusion depends on the content of such testimony or evidence, and the context in which it is offered. As the Sixth Circuit noted in *U.S. v. Smith*, 70 Fed. Appx. 804 (6th Cir. 2003) (unpublished), when deciding whether testimony containing a legal conclusion should be allowed, " '[t]he best resolution . . . is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.' " *Id.* at 809 (citation omitted).[49]  Thus, Defendants' blanket *limine* request should be denied.

8. **Defendants' Omnibus MIL No. 8: The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.**

Defendants' request for a hearing prior to the presentation of any expert's testimony should be denied. While a party must establish the necessary foundation for their experts' testimony, pre-testimony hearings are neither required by the Federal Rules of Evidence nor necessary in this case, particularly given the significant resources this Court has already expended ruling on dozens of *Daubert* and summary judgment motions. *Cf.* FED. R. CIV. P. 1 (mandating that the parties and Court refrain from wasting resources).[50]  Defendants' proposal would serve only to interrupt the trial and allow Defendants to re-litigate issues which they previously lost.

---

[49]    In that case, for example, the court held that a witness's opinion that the firearm at issue "belonged" to the defendant based on its location was admissible in an unlawful possession case. *Id.* ("Though Kurowski twice stated that he believed that the gun belonged to Smith, the term 'belong' does not have a meaning identical to the legal term 'possession' contained in the statute. Moreover, even if Kurowski had used the term "possession," in the present context, there is no distinction between the legal term of art and the common vernacular usage that would render the testimony inadmissible under [Federal] Rule [of Evidence] 704.").

[50]    Plaintiffs proposed to stipulate to Defendants' language that: "The Parties shall be required to establish the necessary foundation for their experts' testimony." Defendants declined, instead indicating that for their motion to be mooted, an additional sentence would be required: "Before any expert is called to testify, the opposing side may request a hearing outside the presence of the jury to address whether the requirement has been satisfied." Such an additional mechanism not contemplated by the Federal Rules is not necessary to address Defendants' concerns in this case.

Defendants' cases do not support a different conclusion.  Most instead emphasize that expert testimony is liberally admitted before a jury.  *See McLean v. 988011 Ontario*, 224 F.3d 797, 806 (6th Cir. 2000) (reviewing a grant of summary judgment finding that the lower court had erred by prohibiting the expert testimony which was "sufficiently rooted in the available evidence to make out a reasonable theory . . . and [] plaintiffs should have been allowed to take their negligence theory to a jury"); *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (applying the *Daubert* standards to the "district court's initial decision to exclude [Plaintiffs expert's] testimony was an abuse of discretion"); *Tovey v. Nike, Inc.*, 1:12CV446, 2014 WL 3510636, at *14 (N.D. Ohio 2014) (applying the *Daubert* standards to expert testimony).  Given that this Court has already evaluated these experts' qualifications and opinions under the *Daubert* standard, there is no need to predetermine there is a need for a hearing in each case.  To the extent such a need arises, if it arises, the Court is more than capable of making that determination during trial.

Another of Defendants' cases, *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989), also supports permitting the court to make this determination at trial and discusses the proper method for objections to testimony based on assumptions not in evidence.  The Sixth Circuit found that the district court did not err in excluding prior expert testimony via *videotape* "based on assumptions not in evidence, but rather assumptions based on plaintiff's version of events." *Id.*  In doing so, the district court reasoned: "If you were asking these questions at this time there would be objections in terms of foundation or assumes a fact not in evidence, and I would have to sustain that objection, so we have a problem with this testimony." *Id.*  Here, Plaintiff's experts will be testifying live and Defendants will have every opportunity to make such objections should Plaintiffs not lay the proper foundation for their expert's testimony.

Defendants also assert a variety of hypothetical arguments that Plaintiffs will ultimately be unable to demonstrate at trial that certain of their expert's assumptions are valid.  Setting aside that Defendants are incorrect, what matters for present purposes is the point made above: Plaintiffs either will or will not lay a proper foundation for their experts, just as Defendants either will or will not lay a proper foundation for theirs.  Additional hearings are wasteful.  Indeed, the Court has

already ruled that any purported assumptions will be properly tested at trial, not that another *Daubert* hearing be held before the expert can testify.  *See, e.g.*, Dkt. #2558 at p. 14 (Op. & Order Granting in Part and Denying in Part Mot. to Exclude Kessler and Perri) ("If this is a faulty assumption, as Defendants allege, they will have the opportunity for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to attack Perri's opinions." (citing *Burgett v. Troy–Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014)); Dkt. #2492, at p. 18 (Op. & Order Denying Mot. to Exclude Keller) ("If the party positing the hypothetical fails to independently prove the facts assumed, the jury is free to disregard the conclusion of the witness." (citing *United States v. McCafferty*, 801 F. Supp.2d 605, 621 (N.D. Ohio 2011)); Dkt. #2495, at p. 13 (Op. & Order Denying Mot. to Exclude Rosenthal) ("Of course, Defendants are free to challenge Rosenthal's assumption – and Defendants may well convince a jury it is not true that all of defendants' detailing was fraudulent and tainted by misrepresentations – but her central assumption does not render her opinion inadmissible." (citing *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002)).

As noted, in the event Defendants later continue to disagree with a particular expert's testimony, they are able to address it by *inter alia* (i) cross-examination, (ii) their own case-in-chief, (iii) a Rule 50 motion, or (iv) another motion made at trial.  The Court is perfectly capable of addressing any issues that may arise at trial without the need for further evidentiary hearings to ensure proper foundation.  Defendants' Omnibus MIL No. 8 should be denied.

9.  **Defendants' Omnibus MIL No. 9**: The Court should not allow use of certain charts presenting misleading and irrelevant data.

Defendants seek to exclude certain charts that are attached to Plaintiffs' expert Dr. Craig McCann's report[51] on the basis that they are potentially misleading.  But Defendants identify nothing that is actually or inherently misleading about these charts.  Each of the points raised by Defendants, that the charts include data relating to shipments outside the CT-1 jurisdictions and/or by non-

---

[51]  Dkt. #2661 at p. 25 n. 19 (listing the charts Defendants seek to exclude).

defendants, and that charts do not identify specific pharmacies or specific diverted orders, is a matter that Defendants can readily address through objections to any direct examination of Dr. McCann that they believe is misleading and through their own cross-examination. Indeed, Defendants' challenges regarding the purported methodological flaws regarding Dr. McCann's processing of the ARCOS data and Defendants' own transactional data have already been rejected at the *Daubert* phase, with the Court specifically recognizing that Dr. McCann's methodological choices go to weight rather than admissibility, and permitting Defendants to cross-examine Dr. McCann on the choices he made. Dkt. #2494 at pp. 15-21.

The subject charts provide valuable background information in support of Dr. McCann's opinions, including information that Plaintiffs will use to show what orders – based on non-controversial data from ARCOS and Defendants' own production – should have been flagged as suspicious and therefore ultimately caused the harm Defendants are responsible for. Defendants' generalized concerns regarding how this data was analyzed or whether they are an appropriate methodological fit do not warrant their exclusion. *See, e.g., Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 871 (W.D. Mich. 2008) ("Factual questions should not be resolved through motions in limine."); *Cincinnati Ins. Co. v. Omega Flex, Inc.*, No. 3:10-CV-00670-H, 2013 WL 1403493, at *1 (W.D. Ky. Apr. 5, 2013) (denying motion *in limine* where cross examination would be sufficient to address deficiencies in expert testimony or opinions); *Quillen v. Safety-Kleen Sys., Inc.*, No. CIV.A. 07-67-EBA, 2010 WL 8357353, at *1 (E.D. Ky. May 27, 2010) (denying motion *in limine* where alleged errors in expert opinion could be the subject of cross examination).

10. **Defendants' Omnibus MIL No. 10**: The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.

As the Court has repeatedly noted, the parties in this litigation are represented by some of the most experienced and accomplished trial attorneys in the country. They all know how to try cases. Defendants' Omnibus MIL No. 10 is an attempt to improperly curtail proper, and long-standing, trial advocacy. Defendants' MIL seeks to preclude, among other things, "ad hoc drawings

or other visual aids during examination of witnesses," alleging that such tactics "belittle" witnesses or "mischaracterize" testimony.  This assertion is wrong, and the MIL should be denied.

In the first place, the motion is overly broad and vague, making it practically unenforceable. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, No. 3:09-CV-10012-DRH, 2011 WL 6740391, at *12 (S.D. Ill. Dec. 22, 2011) ("The Court finds that the request is too broad and will handle any individual objections at trial.").  In *Yasmin*, the court denied two requested motions *in limine* because they were overly broad – one seeking to exclude "all evidence regarding unrelated corporate controversies," and one seeking to exclude "media reports."  The court correctly concluded that those matters were better addressed during trial, when the relevance and admissibility of particular items could be more appropriately evaluated.

The same is true here.  Lawyers have used visual aids in trial for decades – flip charts, white boards, and presumably chalk boards before those.  The "ELMO" document projector is merely the latest iteration of the chalk board.  There is nothing inappropriate or unusual about using such visual aids during witness examination.  In fact, such aids are very useful in assisting the jury who are trying to follow complex testimony covering subject areas about which they likely have no prior experience.  As one authoritative evidence treatise notes,

> It is today increasingly common to encounter the use of demonstrative aids throughout a trial. These aids are offered to illustrate or explain the testimony of witnesses, including experts, or to present a summary or chronology of complex or voluminous documents.  Counsel also rely on such aids during opening and closing statements.  Demonstrative aids take many forms; the types discussed in this Section are duplicates, models, hand drawn maps, charts, drawings, diagrams, and computer-generated pedagogic aids.  *Unlike real evidence, the availability of which will frequently depend upon circumstances beyond counsel's control, opportunities for the use of demonstrative aids are limited only by counsel's ingenuity and ability to generate them.  The potential of these aids for giving clarity and adding interest to spoken statements has brought about their widespread use, which will undoubtedly continue in the future.*

§ 214.Demonstrative aids, 2 McCormick On Evidence § 214 (7th ed.).  Defendants should be required to make specific and timely objections during trial, where the Court can rule on them in context rather than based on non-specific hypotheticals.

This MIL also attempts to impugn Mr. Lanier regarding evidence that a long-serving and well-regarded federal district judge determined was admissible to rebut misleading evidence adduced by the defendants in the trial.  The court of appeals disagreed with the district court's evidentiary rulings, but that is no reflection on Mr. Lanier.  The opinion omits the fact that the challenged evidence was only introduced after a series of lengthy sidebar discussions with the district court about whether the evidence should be admitted.  As the court of appeals' opinion observes, "[t]he *district court* admitted several pieces of inflammatory character evidence against defendants— including claims of race discrimination and bribes to Saddam Hussein's Iraqi 'regime'—reasoning the defendants had 'opened the door' by repeatedly presenting themselves as 'wonderful people doing wonderful things.'"  *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 764 (5th Cir. 2018) (emphasis added).

This portion of Defendants' Omnibus MIL is also too vague to be enforced.  Every trial is unique.  Even in the Pinnacle Hip Implant MDL, where the MDL court tried four lengthy bellwether trials (and started a fifth), each trial was different and the evidence that was admitted varied depending on the circumstances.  Significantly, that court also explicitly recognized the high caliber of the plaintiffs' counsel's legal representation in that MDL.  *See In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*, N.D. Tex., No. 3:11-md-02244-K, Dkt. No. 1031 (Order Granting Motion for Final Assessment, pp. 7-8) ("The skill requisite to perform the legal services properly was exceptional.  Defendants were ably represented by multi-national law firms. At one point, Defendants asserted they had 50 lawyers working on this case.  To fight Defendants to a draw—or, in reality, better—Plaintiffs' legal skill was readily apparent to even a casual observer."). Defendants' Omnibus MIL effectively could be read as requesting that Plaintiffs be precluded from doing anything at trial that could constitute reversible error.  That is not the purpose of a motion *in limine*.

Next, the portion of this MIL regarding "references to unrelated bad acts" should be denied for the same reasons expressed by the court in *Yasmin*:

> Bayer asks that the Court prohibit any and all evidence regarding unrelated corporate controversies.  Plaintiff counters, arguing that while most of the disputed controversies are likely irrelevant, the request is overbroad, vague, and not capable of enforcement.
>
> The Court could just as easily grant this motion because the request incorporates the language "unrelated."  Thus, it would presume that the Court is only precluding that which is irrelevant.  However, relevance is in the eye of the beholder.  So while the Eli Lily example provided by the plaintiff in her response is in her view relevant, Bayer undoubtedly would disagree.  The Court finds that the request is too broad and will handle any individual objections at trial.

*Yasmin*, 2011 WL 6740391, at *12.

With regard to "Golden Rule" arguments, Plaintiffs have no intention of making such arguments, and in fact agreed to a more specifically worded MIL proposed by Defendants that precludes "[a]ny reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers."  *See infra* at § A.13.

In sum, Defendants' Omnibus MIL No. 10 should be denied because it is overly broad and vague, and the items which it seeks to exclude can only be properly considered in the context of the trial.

11.      **Defendants' Omnibus MIL No. 11: The Court should exclude evidence and argument concerning Defendants' financial condition, revenues, or profitability.**

Defendants seek to exclude evidence about "defendants' overall financial condition, assets, revenues, or profitability."  This motion is overbroad.  Plaintiffs agree that they will not seek to introduce evidence of Defendants' overall financial condition or assets, as they are not seeking punitive damages, and neither RICO trebling nor OCPA trebling, which Plaintiffs do seek, depends on the defendant's ability to pay.  But the request to exclude evidence of revenues and profitability stands on a different footing.  Plaintiffs should be permitted to introduce and refer to evidence of the revenues and profits Defendants earned *from their opioid sales*.  Evidence of profits earned from the conduct at issue is admissible to show the defendants' motive for engaging in that conduct.  *See United States v. Amr*, 132 F. App'x 632, 635 (6th Cir. 2005); *Doe v. United States*, 253 F.3d 256, 269 (6th Cir. 2001). The evidence is probative of Defendants' willingness to engage in illegal conduct, and

thus of the likelihood that they did.  Neither the jury nor the Court can properly assess whether, or understand how, Defendants could engage in the callous conduct at issue, involving indiscriminate dissemination of addictive drugs, without understanding the profits that were at stake.  This evidence also shows the extent to which Defendants had the resources from their opioid business to design and maintain appropriate suspicious order monitoring and due diligence systems.  It is thus probative of the extent to which their failure to do so was a deliberate choice, rather than reflecting, for example, a lack of resources.  Because evidence of Defendants' opioid profits is highly relevant to both motive and intent, it should be not excluded.

12.  **Defendants' Omnibus MIL No. 12**: The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.

Defendants seek to preclude witness testimony concerning "personal feelings of personal responsibility or guilt relating to the opioid epidemic or their opinions about whether they or their employers violated legal requirements."  Dkt. #2661 at p. 34.  This request should be denied because it is vague, overbroad, and devoid of any specific context.

Defendants complain that "counsel for plaintiffs often asked" witnesses about their personal beliefs in depositions, yet fail to identify any examples of testimony they claim should be excluded. In the absence of specifically identified testimony, the Court cannot properly assess the potential relevance or prejudice of the evidence.  *See Jackson v. O'Reilly Auto. Stores, Inc.*, 131 F. Supp. 3d 756, 760, 761 (M.D. Tenn. 2015) ("[W]e are unable to resolve Plaintiff's motion because he has not identified any particular piece of evidence that should be excluded.  As a result, we cannot assess the likely relevancy or prejudice of the challenged evidence.").

Defendants' motion is also vague and overbroad.  Terms such as "personal feelings" and "responsibility" could conceivably encompass a vast array of testimony, and Defendants' broad reference to those terms does little to provide the Court with any specific context upon which to base its rulings.  *See Sperberg*, 519 F.2d at 712 ("Orders in limine which exclude broad categories of evidence should rarely be employed.").  Without providing some minimal context for their motion

to exclude this broad category of testimony, Defendants are asking this Court to blindly exclude such evidence.

Further, the Court "has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.* Defendants cannot satisfy that standard here.

To the extent Plaintiffs can offer a response to Defendants' motion as it is presented, "testimony from individual witnesses affiliated with defendants" concerning their personal perception of their own or their employers' "responsibilities" is not inherently irrelevant or prejudicial. Such testimony would certainly be probative and relevant to central issues in this case, such as notice, standard of care, and causation. Defendants cite no case law supporting exclusion of the testimony under Rule 403, and they have not met their burden of demonstrating that the probative value of such testimony would be substantially outweighed by a risk of unfair prejudice.

Additionally, Defendants cannot show that such testimony is "clearly inadmissible" under Rule 701. *See Indiana Ins.*, 326 F. Supp. 2d at 846. Rule 701 permits lay witness testimony if it is rationally based on the witness's perception, helps the factfinder to understand the witness's testimony or to determine a fact in issue, and does not depend on scientific, technical, or other specialized knowledge within the scope of Rule 702. FED. R. EVID. 701. In applying Rule 701, "the modern trend among courts favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *United States v. Valdez-Reyes*, No. 03-3737, 2006 WL 126733, *4 (6th Cir. Jan. 18, 2006) (internal quotation marks and citation omitted). The Sixth Circuit has established that lay opinion testimony is proper where it is drawn from the witness's personal knowledge and experience gained through employment. *See U.S. v. Kerley*, 784 F.3d 327, 337-39 (6th Cir. 2015). Such testimony includes a witness's personal knowledge of his or her employer's policies and procedures, as well as the witness's experience in applying those procedures. *See id.* at 338.

Here, there can be no doubt that testimony regarding "personal feelings" is susceptible of firsthand knowledge.  Witnesses affiliated with Defendants possess particularized knowledge about their own or their employers' policies and procedures by virtue of their employment.  *See* FED. R. EVID. 701 adv. comm. note ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.").  Because those procedures and policies are a central issue in this case, such testimony would facilitate understanding of a factual issue.  Indeed, lay opinion testimony is particularly helpful "when the inference of knowledge is based on . . . such factors as the defendant's history or job experience."  *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992).  *See also, e.g.*, *United States v. Fowler*, 932 F.2d 306, 312 (4th Cir. 1991) (permitting Department of Defense officials to opine that a person with defendant's experience in the department would know rules forbidding giving certain documents to contractors); *United States v. Smith*, 550 F.2d 277, 281 (5th Cir. 1977) (allowing witness to testify to her belief that defendant who ran federally funded program understood certain federal regulations).

Finally, Defendants argue that such testimony impermissibly amounts to a legal conclusion and addresses an ultimate issue.  Again, the absence of specifically identified testimony precludes a proper assessment of the testimony.  Nevertheless, lay witnesses may testify as to their personal perception about certain responsibilities and procedures.  Rather than constituting a legal conclusion, such testimony will provide factual information that will aid the factfinder in determining the ultimate legal issues in this case.  Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704.[52]

In sum, determinations regarding the admissibility of particular testimony are best left for trial, once such testimony has been identified and the purpose for which it is offered has been explained.  If Defendants have an objection to specific deposition testimony that Plaintiffs have

---

[52]   Defendants cite several cases for the general proposition that lay opinion on an ultimate issue must be helpful to the trier of fact. As explained above, the testimony Defendants challenge would facilitate understanding of a factual issue and is admissible under Rule 701.

designated for trial, it is appropriate for Defendants to object to that testimony in accordance with the Court's instructions.  That would provide the appropriate context for the Court to make a specific evidentiary ruling.

**13.    Defendants' Omnibus MIL No. 13: The Court should bar Plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.**

The parties conferred regarding this MIL and agreed to stipulate to a modified version. Specifically, both sides have agreed not to make "[a]ny reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers" in the presence of the jury.

**14.    Defendants' Omnibus MIL No. 14: The Court should preclude any comment regarding the absence of a corporate representative at trial.**

Defendants' Omnibus MIL No. 14 should be denied because it is overbroad and premature. Whether or not a particular witness's absence is relevant depends on who the witness is and the relevant circumstances.  This analysis should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context.  For this reason, courts regularly deny similar motions *in limine*.  *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 2:13-CV-213-JRG-RSP, 2015 WL 627430, at *5 (E.D. Tex. Jan. 31, 2015) (denying defendant's motion to exclude reference to the absence of any its witnesses at trial); *Yasmin*, 2011 WL 6740391, at *11 ("The Court concludes, if no corporate representative is present at counsel table, said absence is fodder for comment by plaintiff since it is customary for such a person to be present.  Certainly, if plaintiff was never present in the court room Bayer would feel compelled to comment.  There are circumstances when a missing witness instruction is appropriate and that will not be precluded prior to trial.").[53]

---

[53]    *See also Mitchell v. City of Tukwila*, C12-238RSL, 2013 WL 6631791, at *4 (W.D. Wash. Dec. 17, 2013) (denying plaintiff's motion *in limine* to preclude arguments "regarding the absence of specific witness testimony"; "[T]he parties will be allowed to present arguments regarding the absence of evidence. Whether the parties will be permitted to argue why certain witnesses have not testified cannot be determined in the absence of information regarding particular witnesses and the evidence presented at trial."); *Okuda v. Wyeth*, 1:04-CV-80 DN, 2012 WL 12337860, at *3 (D. Utah July 24, 2012) (denying defendants' motion *in limine* to preclude plaintiff "from making any reference to the absence of a corporate representative for [d]efendants at trial";  "The  presence  or absence of a corporate representative (or a fact witness) is not evidence but is a fact of the procedure of trial.  It may

Significantly, not one of the cases cited by Defendants involved references to the absence of corporate representatives, or even motions *in limine*.  *See U.S. v. Nixon*, 694 F.3d 623, 635-36 (6th Cir. 2012) (district court did not err in excluding the testimony of a witness in a criminal trial because that testimony was irrelevant); *U.S. v. Signer*, 482 F.2d 394, 398-400 (6th Cir. 1973) (in criminal trial for attempted income tax evasion and for making and signing false income tax returns, prosecutor's opening and closing arguments suggesting defendant committed a crime for which he was not on trial constituted reversible error); *U.S. v. Pits*, 85 F.3d 629, 1996 WL 254655, at *1 (6th Cir. 1996) (district court did not abuse its discretion in sustaining objections to statements made by defense counsel in his opening statement about the defendant regarding irrelevant matters, including that she is the mother of two small children, lived with her mother, had never before been arrested, and only recently learned the identity of her father); *U.S. v. Moore*, 651 F.3d 30, 51-55 (D.C. Cir. 2011) (addressing whether prosecutor committed prosecutorial misconduct during his opening and closing arguments in a criminal trial; although prosecutor crossed the line on several occasions, "the misconduct did not impermissibly and prejudicially interfere with the jury's ability to assess the evidence"), *aff'd in part sub nom. on other grounds*, *Smith v. U.S.*, 568 U.S. 106 (2013).

Because the factual circumstances of the absence of the specific witness should be considered, this category is not appropriate for a motion *in limine* and should be handled by individual objections during trial.[54]  Defendants' Omnibus MIL No. 14 should be denied.

---

be argued, and counter-argument may be made."); *Mascarenas v. Cooper Tire & Rubber Co.*, CV208-009, 2010 WL 11534359, at *10 (S.D. Ga. Jan. 11, 2010) (denying defendant's motion to exclude "any reference to the fact that it may not have a representative at trial at any particular time or to [the defendant's] choice of its corporate representative not being the appropriate person to respond to Plaintiffs' allegations").

[54]  The risk of unfair prejudice is particularly low with respect to any such references made by Plaintiffs' counsel.  What an attorney says is not evidence and the jury will be instructed accordingly.  *Moore*, 651 F.3d at 54.  If Defendants believe any additional instruction is necessary with respect to a particular reference made at trial, they should request it at that time, so the Court will have the full context necessary to decide their request.

**B.** PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE (DKT. #2666).

> **1.** __Distributors' MIL No. D-1__: **The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia.**

Defendants have filed several motions *in limine* that seek to exclude evidence regarding their resolution of various enforcement actions taken by federal and state governments.  The arguments asserted by Defendants in these MILs are very similar, so rather than repeat them in response to each MIL, Plaintiffs will address the legal standards and argument regarding these topics once, and will refer back to this argument on the specific points.  If any specific additional information is necessary in response to a particular MIL, that will be addressed separately.

The argument and legal standards addressed here are applicable to the following MILs:

- Dkt. #2666 –Distributors' MIL No. D-1:  Distributor settlements with the DEA and West Virginia.

- Dkt. #2645 – Henry Schein MIL Nos. HS-9 and HS-10:  DEA fines, investigations, and Ohio Board of Pharmacy cease and desist letter (*infra* at § C.9-10).

- Dkt. #2648 – Walgreens' MIL No. W-2:  DEA enforcement action and related settlement with Walgreens (*infra* at § D.2).

- Dkt. #2663-1 – McKesson MIL No. MCK-4:  Allegations contained in letters from the DEA and DOJ to McKesson (*infra* at § F.4).

- Dkt. #2668-1 – Teva MIL No. TAD-1:  Cephalon misdemeanor off-label promotion plea agreement (*infra* at § G.1).

- Dkt. #2668-1 – Teva MIL No. TAD-3:  Cephalon settlement with DOJ (*infra* at § G.3).

__The agreements are not precluded by Rule 408.__  Federal Rule of Evidence 408 generally prohibits the use of evidence of statements or conduct to compromise a claim "to prove or disprove the validity or amount of a disputed claim."  However, "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, *not some other claim*."  *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (citing Wright, et al., FEDERAL PRACTICE & PROCEDURE:  EVIDENCE § 5314, 5308 (1st ed. 1980)

(internal citations omitted, emphasis added); *see also Gjokaj v. United States Steel Corp.*, 700 F. App'x 494, 501 (6th Cir. 2017).  So Rule 408 does not even apply to the evidence Defendants seek to exclude, since that evidence does not involve the specific claims asserted by Cuyahoga and Summit Counties in this case.[55]

Moreover, even when Rule 408 applies, evidence of settlements *is* admissible where it is offered for "another purpose," such as "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  FED. R. EVID. 408(b).  The burden of establishing the application of Rule 408 is on the party invoking its protection.  *William F. Shea, LLC v. Bonutti Research, Inc.*, No. 2:10-CV-615, 2012 WL 5077701, at *5 (S.D. Ohio Oct. 18, 2012).

Rule 408 is therefore "not a blanket rule that wholly precludes the consideration of settlement discussions."  *Homoki v. Rivers Edge Tree Stands*, No. 1:12-CV-2926, 2012 WL 6631043, at *2 (N.D. Ohio Dec. 19, 2012).  Instead, "evidence of such discussions may be admitted for any purpose not specifically excluded by the Rule."  *Id.*  As the rule makes clear, a settlement may be admissible where "it is offered for a purpose other than to prove liability or disprove a claim."  *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *54 (S.D. Ohio Feb. 17, 2016).  Accordingly, "the principal inquiry that determines whether Rule 408 bars introduction of evidence of [this evidence] must be toward the purpose for which the evidence is being offered."  *McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013).

The Sixth Circuit and Ohio district courts have recognized several purposes allowing for the admission of settlement evidence.  One such purpose is establishing a party's knowledge or notice of potential harm.  *See E.I Du Pont*, 2016 WL 659112, at *54 (consent decree was properly admitted when it was offered "as evidence of [Defendant] DuPont's knowledge and/or notice of C-8's

---

[55]  This is also plain from the language of the rule, which repeatedly references "prov[ing] or disprov[ing] the validity or amount of **a** disputed claim" by offering evidence of conduct that occurred while attempting to resolve "**the** claim."  *See* FED. R. EVID. 408(a)(1) and (2) (emphasis added).

potential for harm, not as evidence that DuPont acted negligently"). In this case, the multitude of enforcement actions and settlements establish a pattern of conduct demonstrating knowledge by Defendants that their SOM systems were inadequate and were likely to cause harm – not just in the specific locations where the enforcement actions focused, but throughout the country. That is particularly true in this case, where Defendants have claimed that they lacked understanding of their legal duties.

Another permissible purpose is to prove a party's state of mind. *See Croskey v. BMW of North America, Inc.*, 532 F.3d 511, 519 (6th Cir. 2008) ("settlement evidence was not offered as a defense to plaintiff's negligence claims against BMW, but instead was offered to show the state of mind of the witnesses"); *McAuliffe*, 514 F. App'x at 549-50 ("It is plain from the record that the contents of the conversation were not offered in McAuliffe's criminal trial to prove the liability of either one in the civil dispute or the amount of those claims. Instead, the evidence was offered for the other purpose of showing McAuliffe's knowledge of and participation in illegal acts—in other words, his state of mind, which Rule 408 allows.").

With regard to Plaintiffs' nuisance claims, the Court identified as disputed issues of fact for trial in its rulings on the parties' motions for summary judgment: (1) whether a public nuisance exists (Dkt. #2572 at p. 4); (2) whether the opioid epidemic interferes with public health and public safety rights (Dkt. #2578 at p. 4); (3) whether Defendants' conduct substantially contributed to Plaintiffs' injuries (*id.* at p. 5); and (4) whether Defendants' conduct was intentional or unlawful (*id.* at pp. 5-7). The enforcement actions demonstrate that Defendants' conduct was intentional and persisted over a lengthy period of time, which goes to the heart of Plaintiffs' claims.

**The agreements are admissible under Rule 406.** Evidence of "an organization's routine practice . . . to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice" is admissible. FED. R. EVID. 406; *CSX Transp., Inc. v. Exxon/Mobil Oil Corp.*, 401 F. Supp. 2d 813, 818 (N.D. Ohio 2005) (finding the evidence of performing inspections and "observations made during the inspections, [are] admissible under Fed. R. Evid. 406 as proof of habit or routine practice"). "Rule 406 evidence must rest on an analysis of instances numerous

enough to support an inference of systematic conduct and to establish one's regular response to a repeated specific situation." *Bell v. Consol. Rail Corp.*, 299 F. Supp. 2d 795, 800 (N.D. Ohio 2004) (internal citations and quotations omitted). Courts may consider three elements to determine whether the organization's routine practice is admissible under Rule 406: (1) whether "it is unlikely that the individual instance can be recalled or the person who performed it can be located," (2) whether the "specific conduct … is engaged in frequently by the group," and (3) whether "the number of instances of such behavior [is] large enough that doubt about a single instance does not destroy the inference that the practice existed." *Martin v. Thrifty Rent A Car*, 145 F.3d 1332 (6th Cir. 1998).

Defendants' conduct that forms the bases of the DEA/DOJ agreements occurred "with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances." *Bell*, 299 F. Supp. 2d at 800. The agreements and related documents establish that Defendants engaged in "systematic, particularized, and repetitive conduct" by selling prescription opioids without proper, effective controls to prevent diversion and to identify, report, and stop shipment of suspicious orders. As the agreements describe, the temporal and geographic scope of this systematic conduct (covering millions of transactions) was so extensive that it cannot be evaluated by a singular instance, nor can a single instance destroy the inference that this was a routine practice.

Both Cardinal Health and McKesson agreed to pay significant fines in 2008 relating to their failure to comply with their obligations under the Controlled Substances Act. Despite agreeing to comply with those obligations, both companies continued to ignore them and were the subject of later enforcement actions by the federal government roughly a decade later, reflecting their persistent failure to conform their conduct to the law. In connection with those later enforcement actions, Cardinal and McKesson acknowledged that they had not lived up to their prior agreements. This history of repeated violations of their legal duties shows that Defendants' violations were not the result of mere oversight, but reflected Defendants' intentional and ongoing business practices.

As a result, the agreements are admissible under Rule 406 because they prove Defendants acted in accordance with their routine practice.

**The agreements are relevant.**  Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  FED. R. EVID. 401.  Generally, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible."  FED. R. EVID. 402.

Defendants' meritless relevance arguments are wholly divorced from an analysis of the substantive law governing the claims and defenses at issue.  The DEA/DOJ agreements are relevant evidence for several claims at issue.  For instance, as part of Plaintiffs' RICO and Ohio Corrupt Practices Act (OCPA) claims against McKesson, Cardinal, and AmerisourceBergen, Plaintiffs seek to establish that these Defendants formed and operated an opioid supply chain to expand their sales of prescription opioids through repeated violations of the CSA.  Defendants failed to maintain effective controls to prevent diversion and filled suspicious orders for opioids.  The DEA/DOJ agreements describe investigations and findings by the DEA and the DOJ concerning the same violations alleged here.  The agreements also describe the multiple suspension orders and ISOs which provided notice to Defendants that their suspicious order systems were ineffective and were being abused.

Evidence regarding Defendants' repeated violations of their duties under the CSA demonstrates that Defendants continued the conduct in the face of confirmed proof that such conduct was contributing to the opioid epidemic.  These agreements are therefore relevant to establish Defendants' RICO and OCPA violations.

Distributor Defendants argue that the settlement agreements are not relevant because some of them "disclaim any admission or concession of liability," and even those that contain "narrow admissions" do not implicate the distribution of opioids into Summit and Cuyahoga Counties. Dkt. # 2666 at p. 5.  Defendants therefore attempt to cabin the relevance of the agreements to the distribution centers at issue there.  Yet, the agreements make it clear that they apply to all (or at least most) distribution centers.  The McKesson 2017 Agreement, for example, expressly states that

"[t]his Agreement shall be applicable to McKesson and any facility owned or operated by McKesson US Pharmaceutical registered, or who may become registered, with DEA to distribute, or otherwise handle controlled substances." Dkt. #2212-29; Dkt. #2557-3. AmerisourceBergen's obligations are similarly not limited to any particular Distribution Centers.

These arguments also fail to acknowledge that the conduct about which Plaintiffs complain is not limited to conduct that occurred in Cuyahoga and Summit Counties. Instead, Plaintiffs' allege that the harm they suffered was caused by conduct that occurred all across the nation, over many years, which was a substantial factor in causing the nuisance condition that persists in those counties and also gives rise to Plaintiffs' other claims. This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

**The agreements are not unfairly prejudicial.** Although relevant evidence is generally admissible, "Rule 403 carves out a narrow exception to this broad rule of admissibility." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*; FED. R. EVID. 403. As the permissive language of the rule makes clear, a court may admit evidence even where there is potential prejudice, and "[this] decision to admit relevant, but potentially prejudicial, evidence is committed to the sound discretion of the trial court." *Id.* "When the district court admits evidence over a party's undue-prejudice objection, [the 6th Circuit] review[s] the admitted evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (citation omitted).

Here, any danger of unfair prejudice or confusion is quite limited because the practices described in the DEA/DOJ agreements pertain directly to Defendants' controls to prevent diversion and the filling of suspicious orders for opioids. Thus, this evidence will not confuse the

issue nor inject extraneous factual matters into the trial.  Nor would a jury be likely to take this evidence as a concession of liability – although the evidence is factually on point, the *legal* context of the agreements is so distinct that a jury is not likely to believe that an agreement with the government to settle what are in effect charges for CSA violations amount to an admission of liability to the alleged RICO, OCPA, and public nuisance claims.  And, to the extent that the jury credits the factual statements in the agreements, this does not constitute "unfair" prejudice.  Even if that were the case, the Court can ensure, through trial rulings and jury instructions, that the context in which the facts were developed does not overwhelm the import of the evidence itself.

For these reasons, Distributor Defendants' arguments that their distributor settlements with the DEA and West Virginia are irrelevant, prejudicial, or inadmissible under Rule 408, are without merit.  Distributor Defendants' MIL No. D-1 should be denied.

2.   **Distributors' MIL No. D-2**: **The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge.**

Distributor Defendants broadly seek to preclude the admission of non-party 30(b)(6) witness testimony "on matters outside the witness' personal knowledge," arguing such evidence is inadmissible hearsay and lacks foundation.  For the following reasons, Distributor Defendants' MIL No. D-2 should be denied.

Contrary to Distributor Defendants' assertion, Rule 602's personal knowledge requirement does not preclude the introduction of 30(b)(6) testimony at trial that is beyond the witness' direct personal knowledge.  It is well established that a corporate designee testifying pursuant to Rule 30(b)(6) "does not testify as to his personal knowledge or perceptions [but rather] testifies 'vicariously,' for the corporation, as to its knowledge and perceptions."  *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006).  *See also Lloyd v. Midland Funding, LLC*, No. 15-5132, 639 Fed. Appx. 301, 305 (6th Cir. Jan. 22, 2016) (citing *Brazos*).  As such, Rule 30(b)(6) provides a recognized exception to the personal knowledge requirement set forth in Rule 602.

Although Rule 30(b)(6) refers by its terms to depositions, courts have recognized that a 30(b)(6) witness may testify at trial despite a lack of personal knowledge about the matters described.

*See Brazos*, 469 F.3d at 434 (permitting 30(b)(6) trial testimony concerning "the collective knowledge or subjective belief of [the corporation] . . . even if it is not within his direct personal knowledge"); *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) ("[A] Rule 30(b)(6) witness may testify both in a deposition and at trial to matters as to which she lacks personal knowledge, notwithstanding the requirements of Federal Rule of Evidence 602."). Relatedly, numerous courts, including the Sixth Circuit, have permitted 30(b)(6) witness testimony addressing corporate matters outside of the witness' personal knowledge in summary judgment proceedings.  *See, e.g.*, *Lloyd*, 639 F. App'x at 305 (finding corporate representative's testimony based on his review of corporate records satisfied personal knowledge requirement under Federal Rule of Civil Procedure 56); *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894 (7th Cir. 2004) (holding non-party 30(b)(6) witness "was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric").

With respect to *non-party* 30(b)(6) witness testimony, the court in *Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500 (N.D. Ill. 2011) specifically rejected the argument that a non-party 30(b)(6) witness could not testify at trial regarding matters outside his or her personal knowledge.  *See id.* at 503 ("This Court . . . will not limit . . . testimony strictly to matters within [his] personal knowledge").  The court reasoned that to rule otherwise "would only recreate the problems that Rule 30(b)(6) was created to solve."  *Id.*  "For example, a party might force a corporation to 'take a position' on multiple issues through a Rule 30(b)(6) deposition, only to be left with the daunting task of identifying which individual employees and former employees will have to be called at trial to establish the same facts."  *Id.*  The court concluded that proper areas of testimony for non-party Rule 30(b)(6) witnesses include "topics . . . about which the corporation's official position is relevant . . . ."  *Id.* at 503.

Second, 30(b)(6) testimony that is beyond personal knowledge is not inherently inadmissible hearsay.  *See, e.g.*, *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 627 n.7 (7th Cir. 2001) (finding, in the summary judgment context, that City Attorney O'Conner's "answers to the interrogatories were not hearsay because the City had designated O'Connor to testify to matters known or reasonably

available to the City."). While the *Sara Lee* court acknowledged the risks of admitting non-party 30(b)(6) testimony based on hearsay, it reasoned that limiting such testimony to matters "particularly suitable for Rule 30(b)(6) testimony" sufficiently mitigated the risk. 276 F.R.D. at 503.

Here, Distributor Defendants' motion is overbroad and completely devoid of context. They seek a blanket evidentiary ruling based on hearsay and lack of foundation and mistakenly assume that if Plaintiffs offer non-party 30(b)(6) testimony beyond a witness' direct personal knowledge, then such evidence must be offered for the truth of the matter. Determinations regarding the admissibility of a particular third-party statement are best left for trial, once such statement has been identified and the purpose for which it is offered has been explained. *See Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-CV-02349-WJM-KMT, 2014 WL 1583993, at *3 (D. Colo. Apr. 21, 2014) ("Defendant's Motion identifies no specific evidence it seeks to exclude from Plaintiffs' Rule 30(b)(6) designees. Instead, Defendant makes general reference to evidence that may be inadmissible hearsay, and asks the Court to restrict the testimony of Plaintiffs' witnesses without any indication of what such evidence will show, or for what purpose it will be offered. The Court will not issue such a blanket evidentiary ruling, particularly where a fact-intensive evaluation of hearsay exceptions may be necessary.") (internal citation omitted).

Distributor Defendants offer two examples of testimony they claim should be excluded from the 30(b)(6) deposition of DEA employee, Thomas Prevoznik, in which he identified a DEA report and DEA presentation.[56] However, such testimony addresses "matters about which the corporation's official position is relevant" and therefore falls squarely within the realm of permissible trial testimony for non-party 30(b)(6) witnesses. *See Sara Lee*, 276 F.R.D. at 503.

---

[56] These DEA documents could be admitted for a number of non-hearsay reasons, such as to prove (i) that the statement was made, (ii) the falsity of the matter asserted, (iii) the knowledge of the declarant, (iv) notice to, or knowledge of, the recipient of the statement, (v) motive, intent, bias, or state of mind, or (vi) association among persons or entities. And *if* Plaintiffs offered the evidence for the truth of the matter, the documents could fall within a hearsay exception in Rule 803, such as: a record of regularly conducted activity under Rule 803(6); a public record or report under Rule 803(8); or, a statement in an ancient document under Rule 803(16).

Further, the official DEA report and presentation Mr. Prevoznik identified sharply contrast with the type of evidence excluded in the cases Distributor Defendants cite.  For instance, in *Cooley v. Lincoln Elec. Co.*, 693 F.Supp.2d 767, 791 (N.D. Ohio 2010), the defendant's 30(b)(6) witness sought to explain the company's position at trial using a recent conversation he had with the CEO. The court barred the proposed explanatory testimony on the basis of hearsay.  *Id.* at 791-92. Significantly, the hearsay at issue in *Cooley* was of questionable reliability.  Stephen J. O'Neil, *Rule 30(b)(6) Witnesses at Trial*, 60 Fed. Law. 70, 73 (September 2013) ("[T]he result in *Cooley* might be different if the Rule 30(b)(6) witness had learned of additional information in the discovery record as opposed to the undiscoverable water-cooler conversation with the CEO, or if the Rule 30(b)(6) witness had learned of new information at trial that was not in the discovery record but was verifiable and reliable.").  Similarly, the testimony found to be improper in *Union Pump Co. v. Centrifugal Tech. Inc.*, Nos. 10–30040, 10–30072, 2010 WL 5186616, at *6-7 (5th Cir. Dec. 16, 2010) involved facts the 30(b)(6) witness learned "solely through conversations with others" and of which there were no written reports.  *Cf. Sara Lee*, 276 F.R.D. at 503-04 (considering "whether the underlying corporate knowledge is *sufficiently reliable* to substitute for personal knowledge") (emphasis added).

For all these reasons, the Court should deny Distributor Defendants' MIL No. D-2 in its entirety and defer ruling on issues regarding the foundation for admitting Mr. Prevoznik's and other 30(b)(6) witness' testimony until trial.

3. **Distributors' MIL No. D-3**: The Court should exclude any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction.

In March of 2019, David Gustin, the former compliance officer for McKesson's warehouse in southern central Ohio, was indicted on one count of conspiracy for allegedly violating the Controlled Substances Act.[57]  Mr. Gustin's lawyer described the charge as follows:  "The United

---

[57]  *See* "Feds probe manager of McKesson narcotics distribution warehouse in Ohio," *The Washington Post*, Sept. 18, 2019, available at https://www.washingtonpost.com/health/feds-probe-manager-of-mckesson-narcotics-distribution-warehouse-in-ohio/2019/09/18/0878fd26-d644-11e9-9610-

States' theory seems to be that Mr. Gustin was so woefully negligent in overseeing his compliance responsibilities that his conduct was criminal."  The article reports that McKesson has received subpoenas from the federal government and is cooperating with the government's investigation, and that "documents [filed in the criminal case] also show that Gustin and McKesson have an agreement to work together on the legal case."  So McKesson is obviously fully aware of the circumstances and conduct giving rise to Mr. Gustin's indictment.

Although the indictment and related documents are included on Plaintiffs' exhibit list, Plaintiffs do not intend to introduce these documents unless necessary for some other purpose, such as impeachment.  However, Plaintiffs are not precluded from inquiring about the *conduct* at issue in the indictments.  Whether the former director of regulatory affairs for McKesson's warehouse in Ohio engaged in conduct that violated the Controlled Substances Act involving the distribution of prescription opiates is certainly relevant to Plaintiffs' claims.

> 4. **Distributors' MIL No. D-4: The Court should prohibit Plaintiffs from stating expressly or suggesting that the jury may infer that an older document never existed just because it cannot be found.**

Distributor Defendants' MIL No. D-4 seeks to preclude Plaintiffs, or any of their experts, from "suggesting" that the "fact that suspicious order reports and due diligence files from five, ten, or twenty years ago cannot be located today does not mean they never existed."  Dkt. #2666 at p. 13.  Their purported basis is that there is no "requirement to maintain such records for any period of time," and Plaintiffs have failed to satisfy the Sixth Circuit's adverse inference test.  *Id.*

This argument is virtually identical to the argument Defendants raised in their *Daubert* motion against Mr. Rafalski, which has already been rejected by this Court:

> Defendants reply that, if the law does not require them to maintain due diligence records, Rafalski has no basis to conclude they did not conduct due diligence based on the absence of those records.  Based on his experience as a DEA Diversion Investigator, however, Rafalski may opine as to what the absence of due diligence records indicates to him.  *Moreover, it is notable that Defendants do not contradict Rafalski by explaining they did conduct due diligence but don't have any documents to support it.*

---

fb56c5522e1c_story.html (accessed on 10/6/19).

Dkt. #2494 (Opinion and Order Regarding Defendants' Motion to Exclude Opinions of James Rafalski and Craig McCann) at p. 13 (emphasis added).

Moreover, in bringing this motion, Distributor Defendants once again incorrectly argue that the absence of documents is the "sole" basis for Mr. Rafalski's conclusion that they failed to perform due diligence.  But as pointed out in Plaintiffs' *Daubert* opposition brief (Dkt. #2253 at pp. 13-14), the bases for Mr. Rafalski's conclusions are his detailed review of Defendants' SOM program, Defendants identification of an absurdly trivial number of suspicious orders, and policies and practices that allowed certain Defendants to ship orders before any due diligence could be carried out.  In light of this evidence, it falls to Defendants to establish that their purported due diligence nonetheless took place.  As Mr. Rafalski found, Defendants' files are devoid of any such evidence, and as the Court itself emphasized, "it is notable that Defendants do not contradict Rafalski by explaining they did conduct due diligence but don't have any documents to support it." Dkt. #2494 at p. 13.

Distributor Defendants' reliance on the Sixth Circuit's adverse inference test is also inapposite.  There is a difference between asking the fact-finder to draw inferences adverse to a party from the evidence presented (which presumably both parties intend to do at trial) and asking the Court to issue an adverse inference instruction.  Distributor Defendants' test applies in the latter case, and at this time, Plaintiffs are not seeking such an instruction.  In fact, Plaintiffs are not arguing that documents were necessarily destroyed, as opposed to never existing in the first place because Defendants failed to perform any due diligence.  One can infer from the absence of due diligence materials that no due diligence was performed, or that if due diligence was performed, but not documented, this is an indication of an inadequate due diligence program.  There is nothing improper about Plaintiffs, or their experts, advocating for such an inference.  In rejecting Defendants' *Daubert* argument, the Court has already ruled that Mr. Rafalski can offer this as an expert opinion:

> As a former Diversion Investigator, Rafalski clearly has experience and expertise regarding the components and characteristics he would expect to be included in an

effective SOMS and due diligence program.  Indeed, Defendants do not challenge his credentials in this regard . . .

Defendants ask the Court to preclude Rafalski from stating that the law requires registrants to document and retain forever suspicious order reports and due diligence records.  It is Rafalski's position that, while the regulations do not require a registrant to retain these documents for any specific length of time, in his opinion, permanent retention is important to maintaining effective control and preventing diversion.  See Rafalski Depo. at 125:11 to 126:3.  *For the reasons stated above, Rafalski may opine as to the need for documentation to maintain effective control; however he may not state what the law requires in this regard.*

Dkt. #2494 at pp. 8, 10 (emphasis added).

For these reasons, Distributor Defendants' MIL No. D-4 should be denied.

**5.** **Distributors' MIL No. D-5**: The Court should prohibit Plaintiffs from presenting evidence or making arguments suggesting Distributors committed a "fraud on the DEA."

Through their MIL No. D-5, Distributor Defendants attempt to re-litigate their preemption argument in the guise of a motion *in limine*.  Indeed, the vast majority of their argument is that Plaintiffs' due-diligence based claims are preempted under *Buckman Co. v. Plaintiffs' Leg. Comm.*, 531 U.S. 341 (2001).  But as this Court has held several times, Plaintiffs are not asserting claims for fraud on the DEA (or FDA), and thus, their claims are not preempted under *Buckman*.  Dkt. #2565 at pp. 9-10, 22; Dkt. #1025 at pp. 50-51; Dkt. #1203 at p. 2.

However, this does not render evidence regarding their interactions with the DEA irrelevant or inadmissible.[58]  To the contrary, this evidence is highly relevant to a wide range of issues, including Defendants' knowledge, motive, intent, and state of mind, as well as their violations of the CSA, fraudulent misstatements to the public and the medical community, and their conspiratorial conduct and objectives.  *See, e.g., Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 318 (W.D. Ky. 2011) ("[T]he fact that Plaintiff intends to introduce evidence that NPC violated FDA regulations does not automatically implicate the holdings of *Buckman* and *Kemp*.  State-law

---

[58]  *See Tylenol*, 181 F. Supp. 3d at 289 n.9 (noting that "whether the evidence related to the defendants' interactions with the FDA is admissible for purposes other than establishing liability or breach of duty" is "a different inquiry than whether the plaintiff's claims are preempted").

causes of action that track federal regulatory regimes have not been preempted by these decisions . . . . Evidence of violations of the FDA's regulations that are introduced to support the state-law torts is admissible."), *order vacated in part on other grounds on reconsideration sub nom. Mahaney on behalf of estate of Kyle v. Novartis Pharm. Corp.*, 1:06-CV-00035-R, 2012 WL 12996015 (W.D. Ky. Jan. 4, 2012); *Tylenol*, 181 F. Supp. 3d at 289–90 (denying defendants' motion *in limine* to exclude evidence or argument relating to fraud on the FDA because "evidence that the defendants attempted to manipulate the regulatory process, failed to comply with regulatory duties, or adhere to guidance provided by the FDA can be used to show other elements of the plaintiff's claims[,]" including "the defendants' state of mind, motive, or knowledge of a defect"; "It also would be relevant to the plaintiff's fraud claims if the information the defendants sent to or received from the FDA was different from what the defendants were communicating to consumers[.]").[59] Moreover, as Defendants have indicated that they intend to argue that the DEA failed to vigorously enforce the law, their misstatements regarding their SOMS programs, reporting of suspicious orders, and efforts to prevent diversion are directly relevant to facts that Defendants themselves are putting at issue.

Distributor Defendants' sole argument against the admissibility of this evidence is their conclusory statement, citing nothing but Rule 402 and 403, that "testimony, evidence, or argument that Distributor Defendants have misled the DEA by failing to report suspicious orders, or

---

[59] *See also Yasmin*, 2011 WL 6740391, at *2 (denying similar motion *in limine* implicating fraud-on-the-FDA; "In a case such as this, the jury must be fully informed of any information withheld from the FDA that could have effected decisions regarding the label."); *Adams*, 2009 WL 1259019, at *1 ("The Court has ruled in a prior decision . . . that evidence of communications between DuPont and the agencies is not excludable simply because the Court dismissed the fraud-on-the-agency claim. The evidence of such communications is relevant for other purposes, such as proving the claims of misbranding or failure to warn."); *In re Vioxx Products Liab. Litig.*, MDL 1657, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (denying defendant's motion *in limine* to exclude evidence or argument preempted by federal regulations, including that the defendant "committed 'fraud' on the FDA, misled the FDA, did not cooperate with the FDA, or otherwise violated the Food, Drug, and Cosmetic Act and its implementing regulations[,]" noting that "[t]his is an issue of proof and will have to be dealt with at time of trial"); *Globetti v. Sandoz Pharm. Corp.*, CV98-TMP-2649-S, 2001 WL 419160, at *3 (N.D. Ala. Mar. 5, 2001) (denying defendant's motion *in limine* based on *Buckman*; "While plaintiff may not offer evidence simply to show misrepresentations to or concealment from the FDA, such evidence may be relevant to showing the defendant's knowledge relating to the adequacy of the warning or the truth of information represented to or concealed from plaintiff or her physician.").

otherwise failing to submit the required information" is "irrelevant, prejudicial, and would risk confusing the jury." Dkt. #2666 at p. 15. This does not come close to satisfying their high burden of demonstrating such evidence is clearly inadmissible on all potential grounds. *Supra* at pp. 2-3. Distributor Defendants' MIL No. D-5 should be denied.

6. **Distributors' MIL No. D-6**: The Court should prohibit counsel and witnesses from making references broadly and generally to "Defendants" when the statement, argument, or testimony relates only to certain specific Defendants or groups of Defendants.

Distributor Defendants seek to prohibit Plaintiffs' counsel and witnesses from referring to "defendants" generally at trial, contending it will violate Federal Rule of Evidence 403. Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury. FED. R. EVID. 403. "Exclusion under Rule 403 is an extraordinary measure that should be exercised sparingly." *Antioch Co. Litig. Tr. v. Morgan*, No. 3:10CV156, 2014 WL 2117450, at *1 (S.D. Ohio May 21, 2014) (citing *United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996)).

None of the cases Defendants cite demonstrate that categorical references to defendants are improper in the context of a motion *in limine* or under Rule 403. Instead, they discuss concerns related to "lumping" defendants in a jury charge or complaint.[60] Of course, those concerns are not implicated at this stage of the litigation, and Plaintiffs have no intention of "lumping" Defendants together in the jury charge.

Distributor Defendants' motion is also overbroad and highly impractical, and its enforcement would unduly police the speech of Plaintiffs' counsel and witnesses at trial. Requiring

---

[60] *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (noting damage claims against government officials arising from constitutional rights violations must allege particular facts against each defendant); *Rui He v. Rom*, No. 1:15-CV-1869, 2017 WL 1054814, at *4-5 (N.D. Ohio Mar. 21, 2017) (finding lumping of defendants on jury form was proper); *Christopher Seri v. Crosscountry Mortg., Inc.*, No. 1:16-CV-01214-DAP, 2016 WL 5405257, at *4 (N.D. Ohio Sept. 28, 2016) (dismissing complaint); *Reo v. Caribbean Cruise Line, Inc.*, No. 1:14 CV 1374, 2016 WL 1109042, at *1 (N.D. Ohio Mar. 18, 2016) (holding that lumping defendants in complaint did not require dismissal).

Plaintiffs' counsel to approach the bench before using the word "defendants" would inevitably impede the flow of trial and interfere with the presentation of evidence. And given the breadth of the restriction, it would necessitate numerous side bars addressing whether various statements, arguments, or testimony relate to certain Defendants. Plaintiffs' counsel and witnesses should be permitted in their discretion to reference certain subsets of defendants or defendants generally at trial. *See Flir Sys., Inc. v. Fluke Corp.*, No. 3:10-CV-00971-HU, 2012 WL 13054267, at *5 (D. Or. Nov. 29, 2012) ("It would be highly impractical to enforce this motion at trial. Absent a legitimate basis to preclude the use of a particular term . . . it is for counsel to choose the words they prefer to describe it.").

Further, any potential prejudice or confusion will be minimized through cross-examination and clarifying jury instructions. Distributor Defendants have not met their burden of demonstrating that the probative value of such testimony would be substantially outweighed by a risk of unfair prejudice. Distributor Defendants' MIL is an inappropriate method of addressing the word choice of Plaintiffs' counsel and witnesses, and should be handled by individual objections at trial. *See Stewart v. Hooters of Am., Inc.*, No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007) ("Motions In Limine are disfavored; admissibility questions should be ruled upon as they arise at trial.").

7.   **Distributors' MIL No. D-7: The Court should preclude Plaintiffs from offering evidence of, and arguments about RICO predicates that Plaintiffs did not identify in their discovery responses.**

Distributor Defendants' MIL No. D-7 must be denied because it rests on a misapplication of the law and misstatements of the facts. Specifically, Distributor Defendants argue that the Court should exclude evidence of any racketeering activities not disclosed in Plaintiffs' discovery responses. But their cited authority does not support exclusion. Instead of addressing exclusion of evidence at trial after a purported failure to identify racketeering activities, Distributor Defendants' cases involve exclusion of evidence about legal claims alleged in a complaint or amended

complaint.[61]  *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("Bridgeport's first amended complaint alleges liability on the part of Universal based solely on the inclusion of *Change Gone Come* in 'Well Connected' and 'Dead Man Walkin.'  To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal"); *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787 (6th Cir. 2005) ("Tucker contends that the district court erred when it refused to consider her promissory estoppel claim.  The court took this action after determining that she had neglected to include such a claim in her complaint"); *Vystcil v. Mercy Health*, No. 17CV781, 2019 WL 2076035, at *4 (N.D. Ohio May 10, 2019) ("Plaintiffs argue that the April 7, 2017 telephone calls also violated 15 U.S.C. § 1692c(a)(2).  Plaintiffs did not allege any violations of that subsection in the Amended Complaint.  Plaintiffs may not expand the scope of their claims in an opposition to a summary judgment motion").

Here, setting aside the lack of authority regarding Distributor Defendants' position, their request for exclusion also fails because Plaintiffs identified the racketeering activities (and corrupt activities)[62] upon which they intend to rely at trial in their Complaints including:  (1) mail fraud, (2) wire fraud; and  (3) the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance.  *See, e.g.,* Dkt. #1466 (Summit Third Amended Complaint) at ¶ 914.  Indeed, Defendants made this same argument in the motion to dismiss phase of the case and the Court rejected it, confirming that each of the racketeering activities was sufficiently alleged.  Dkt. #1025 at pp. 39-48; Dkt. #1203 at pp. 38-39.  Plaintiffs did not identify any new racketeering activities in their opposition to Defendants' summary judgment motions.

---

[61]  *Feinstein v. Resolution Tr. Corp.*, is different than the above cases and even further afield because in *Feinstein*, the plaintiff failed to adequately plead the details of mail and wire fraud to overcome a Rule 9(b) argument.  942 F.2d 34, 42 (1st Cir. 1991) ("It is well settled in this circuit that Fed. R. Civ. P 9(b) . . . extends to pleading predicate acts of mail and wire fraud under RICO. . . . Neither in this part of the complaint nor in count 1 proper did the plaintiffs supply any additional details as to when the communications occurred, where they took place, or what they contained").

[62]  Plaintiffs also identified telecommunications fraud as a corrupt activity in support of their OCPA claim.  As this claim is not addressed in Distributor Defendants' motion, any ruling arising from it should not be applied to that aspect of Plaintiffs' OCPA claims.

Finally, Distributor Defendants' motion also fails because they mischaracterize Plaintiffs responses to their discovery requests.  When asked to identify the racketeering activity at issue, Plaintiffs not only identified mail and wire fraud and violations of the CSA, including a broad range of misrepresentations and omissions that form the basis of those violations, they cited to documents supporting their claims.  *See* **Ex. 16** [Plaintiffs' 12/14/18 Supplemental Objections and Responses to Distributor Defendants' Interrogatory Nos. 24, 25, 26, and 27].  In sum, Plaintiffs provided ample information to Defendants regarding the racketeering activity at issue and Defendants fail to provide any authority showing that more is required.

> 8.  **Distributors' MIL No. D-8: The Court should issue an order excluding any evidence of, or reference to, Distributor-run programs that allowed Manufacturers to communicate product information to Pharmacies or other parties.**

Distributor Defendants seek to exclude evidence that Manufacturers use Distributors as a conduit to convey marketing information based on a misplaced argument under Rules 402 and 403. Dkt. #2666 at pp. 18-20.  The evidence that Manufacturers used Distributors to market opioids is *not* being offered to support marketing-based claims against Distributors, but rather to demonstrate their overall motive and knowledge.  Distributors profited from these marketing services and were aware of Manufacturers' marketing efforts and claims.  This evidence is particularly relevant given Distributors' intent to blame Manufacturers, doctors, and patients as potentially superseding causes of Plaintiffs' injuries.  The evidence further supports Plaintiffs' marketing RICO and conspiracy claims *against the Manufacturers*, as it is relevant to show how Manufacturers used their relationships with Distributors in order to further disseminate the Manufacturers' marketing messages.

In support of their erroneous arguments, Distributors misrepresent both statements made by Plaintiffs and the testimony of Plaintiffs' expert, Dr. Perri.[63]  First, though Plaintiffs' conspiracy claims "*against the Pharmacy and Distributor Defendants* are not based on opioid marketing," Plaintiffs'

---

[63]  Plaintiffs have not listed Dr. Perri as a testifying witness on their witness list, but mention him herein simply to correct Distributor Defendants' mischaracterization of his testimony in their motion.

RICO and Conspiracy claims against Manufacturers expressly *are*.[64]  As discussed in Plaintiffs' summary judgment briefing, different coconspirators may have different roles in the conspiracy. Dkt. #2182 at p. 114-115.  The evidence of Manufacturers' agreements with Distributors to use the Distributors to facilitate distribution of the Manufacturers' advertisements and marketing materials are directly relevant to Plaintiffs' claims *against the Manufacturers* who created the advertisements and who were well versed in the flaws in the marketing materials.  Second, the testimony of Plaintiffs' expert Dr. Perri confirms that the Manufacturers' use of Distributors to convey the Manufacturers' marketing messages is an important fact in support of Plaintiffs' marketing claims, contrary to Defendants' inaccurate summary of Dr. Perri's testimony.[65]

Not only are these facts relevant to Distributors' motive and knowledge, as well as Plaintiffs' marketing claims against Manufacturers, such that exclusion under Rule 402 is not warranted, but they are hardly so prejudicial that they warrant exclusion under Rule 403.  Any purported "spill over prejudice" may be resolved through jury instructions and does not warrant exclusion of this evidence.  *See United States v. Fleming*, 902 F.2d 1570 (6th Cir. 1990) (evidence properly admitted where alleged "jury confusion and spill over prejudice were made less likely by the trial court's jury instructions."); *United States v. Mohammad*, No. 1:10CR389, 2012 WL 4483544, at *5 (N.D. Ohio, Sept. 27, 2012) (rejecting defendant's "spill-over prejudice argument" where "instructions to the jury directing them to consider the evidence and charges against each defendant separately" could "eliminate any possible prejudice").  Distributor Defendants' ill-founded MIL to exclude this evidence is due to be denied.

---

[64]  Dkt. #2182 (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Plaintiffs' Civil Conspiracy, RICO, and OCPA Claims) at p. 114 (emphasis added).  *See also id.* at p. 114 ("the conspiracy began with the Manufacturer Defendants' false marketing efforts . . . ), and pp. 7-27 (discussing the Manufacturers' marketing conspiracy).

[65]  Dkt. #1969-7/#1983-4 (4/23/19 Perri Dep.) at 217-222 (testifying that distributors were "integral" to manufacturers' functioning in the supply chain, that, in addition to conveying information on "price and availability" for the manufacturers, the distributors also conveyed marketing messages "beyond that" including "unbranded marketing messages," that "marketing behaviors … are interrelated" such that "the overall marketing and all the things [the defendants] did contributed to the marketing success," and that "the marketing of opioids was inappropriate" with the distributors being "part of that process").

C.  **PLAINTIFFS' RESPONSE TO HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE (DKT. #2645).**

1.  **Henry Schein MIL No. HS-1: References to the Henry Schein Defendants having engaged in any alleged activities with respect to Cuyahoga County.**

Through MIL No. HS-1, the Henry Schein Defendants ("Henry Schein") seek a blanket prohibition of references to any Henry Schein entities or to "Defendants" or "Distributor Defendants" when referencing Plaintiff Cuyahoga County's claims because Cuyahoga did not sue the Henry Schein companies.  Dkt. #2645 at p. 2.  The Court should reject this request as both unwarranted and unworkable.

It is unwarranted because the mere fact that Cuyahoga did not sue Henry Schein does not mean *either* that Henry Schein's conduct in neighboring Cuyahoga County cannot be relevant to Plaintiff Summit County's claims against it *or* that Henry Schein's conduct as a non-party is irrelevant to Cuyahoga's claims.  *See*, *e.g.*, *Stringer*, 749 F. Supp. 2d at 704 ("Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim.").  For example, there is evidence that Henry Schein engaged in the "alleged activities" in Cuyahoga County since as early at 2010.  A November 12, 2012 letter from HSI to the Ohio State Board of Pharmacy informs the Board that, with the exception of products containing two non-opioid substances, HSI failed to report sales of controlled substances as required by the state's Prescription Monitoring Program since as early as 2010.  *See* Dkt. #2302-31/#2307-2 (Ex. 32 to Plaintiffs' Opp. to Non-Rico Small Distributors' MSJ).  Defendants explain in the letter that HSI "operates six (6) distribution centers licensed to sell prescription drugs in Ohio.  The primary customers for [their] distribution services are office based dental and medical practitioners."  *Id.*  Based on this language a reasonable juror could conclude that Henry Schein did distribute and fail to report the distribution of opioid products throughout the entire state of Ohio including Cuyahoga County from at least 2010-2012.

This MIL is also unworkable because this blanket requirement that any party not refer to "Defendants" or "Distributor Defendants" when discussing Cuyahoga's claims could not be enforced without an endless series of objections raised every time these words are spoken and

ensuing colloquies over whether the claims of Cuyahoga-only, Summit-only, or both were being discussed when the verboten word or words were spoken.  Finally, a party's reference to "Defendants" or "Distributor Defendants" would not be prejudicial to Henry Schein under FED. R. EVID. 403 in any event because the jury may be instructed that Cuyahoga has no claims against Henry Schein and therefore it could not find Henry Schein liable to Cuyahoga.  Henry Schein's MIL No. HS-1 therefore should be denied.

2. **Henry Schein MIL No. HS-2: References to Henry Schein Medical Systems, Inc. as having distributed any opioid medications into Summit County or otherwise caused or contributed to any alleged opioid epidemic.**

Henry Schein's MIL No. HS-2 addresses Defendant Henry Schein Medical Systems, Inc. ("HSMS") and seeks to prohibit Plaintiffs "from referencing HSMS as having distributed opioids generally or to Summit County specifically causing or contributing to any alleged opioid epidemic." Dkt. #2645 at p. 2.  This request is contrary to Plaintiff Summit County's claims, *see* Dkt. #513 (Corrected 2d Am. Compl.) at ¶ 117 (HSMS's "symbiotic" arrangement with Defendant Cardinal Health generated hundreds of millions of dollars in sales), and to the Court's Order denying summary judgment for HSMS.  Dkt. #2559 (Order Denying Small Distr. MSJ) at p. 5 ("[T]he Court is unable to conclude that no reasonable jury could find that Schein's market activities were *de minimus*.").  Since sufficient evidence supports Summit's claims against HSMS, the Court should deny Henry Schein's MIL No. H-2 to preclude Plaintiffs from referencing Defendant HSMS as having caused harms to Summit County.

3.  **Henry Schein MIL No. HS-3**: References to sales or distribution of opioid medications to retail, chain, Internet pharmacies, or "pill mills."

Neither Plaintiffs nor their counsel have any intention of making or eliciting factual misrepresentations at trial.  Thus, if Defendant Henry Schein, Inc. ("HSI") truly did not distribute opioids to chain, retail, or internet pharmacies,[66] Plaintiffs and their counsel will not claim they did.  To the extent Henry Schein believes that Plaintiffs have offered at trial specific evidence or argument on this issue that is factually inaccurate or lacks foundation, they should raise their objections at that time so that the Court can resolve the matter in context.  A blanket motion *in limine* is not appropriate.

Henry Schein also inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that the "probative value of such references is contrary to the evidence, lacks foundation, and would otherwise confuse the jury and unfairly prejudice Henry Schein, Inc."  Dkt. #2645 at p. 3.  Rule 602 states:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony.  This rule does not apply to a witness's expert testimony under Rule 703.

FED. R. EVID. 602.  It is not clear how this rule is relevant to MIL No. H-3, and Henry Schein provides no explanation.  If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-3 should be denied.

4.  **Henry Schein MIL No. HS-4**: References to opioid medications distributed by Henry Schein, Inc. to Dr. Brian Heim.

Henry Schein's MIL No. H-4 seeks to prohibit Plaintiffs from referencing HSI's distribution of prescription opioids to Dr. Brian Heim after he pled guilty and lost his medical license for felony

---

[66]  Although Henry Schein claims that the "undisputed evidence shows that [HSI's] distribution of opioids in Summit County was limited to individual prescribers (*i.e.*, doctor and dentists)[,]" they failed to cite to, or attach, any such evidence to their motion *in limine*.

drug theft and again after he was indicted for drug trafficking, unless Plaintiffs show that the drugs sold were diverted.  Dkt. #2645 at pp. 3-4.

The Court should reject this request as contrary to its recent Order denying summary judgment on causation.  In that ruling, the Court rejected Defendants' argument that Plaintiffs must show whether each suspicious order shipped was in fact diverted, holding instead that:

> [G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs.

Dkt. #2561 (Order re MSJs on Causation) at p. 9.  So it is here.  Plaintiffs may introduce evidence of Henry Schein's sales to Dr. Heim after his guilty plea, loss of licensure, and later drug trafficking indictment as evidence of its complete failure to maintain effective controls *whether or not* those sales are shown to have been diverted.  Henry Schein's MIL No. H-4 concerning Dr. Heim therefore should be denied.

5.  **Henry Schein MIL No. HS-5: References that Henry Schein, Inc. should not have shipped opioid medications following Dr. Heim's May 2012 indictment.**

Henry Schein also seeks to exclude evidence regarding HSI's continued shipments of opioid medications to Dr. Heim after he was indicted in May 2012 for destroying business records and trafficking in the stimulant drug Adderall.  Henry Schein argues that such evidence is inadmissible unless Plaintiffs can show HSI knew or should have known of the indictment.

As a distributor of dangerous drugs with a known risk of diversion, HSI had a duty to know and monitor their customers.  For new customers seeking to purchase opioids, HSI should have exercised due diligence to determine whether there were any potential "red flags" with that new customer.  HSI failed to adequately inquire about Dr. Heim's background when it approved him to purchase opioid medications.  A simple verification of Dr. Heim's medical license in Ohio would have revealed that in 1998, Dr. Heim entered a guilty plea to twenty-four felony counts of theft of drugs and twenty-one felony counts of illegal processing of drug documents, which resulted in his

license being revoked.  A reasonable distributor, knowing this information, would have realized that any sales to Dr. Heim would result in a likelihood of diversion and would have not sold opioid medications to him.  From January 2010 to December 2011, Dr. Heim was listed as the 11th top prescriber of Oxycodone/APAP in the Akron, Ohio area, yet HSI's due diligence file for Dr. Heim does not reflect a single visit to his office.

Henry Schein designed and operated a grossly inadequate screening system for customers that allowed customers, including Dr. Heim, to place and receive large orders of opioids despite warning signs.  HSI's witnesses repeatedly testified that their due diligence inquiry for opioid customers has never included either criminal background checks or medical license disciplinary checks.  In this particular case, based on a license check HSI conducted in June of 2011, Henry Schein knew Dr. Heim had previously faced disciplinary actions.  **Ex. 17** [HSI-MDL-00001198-HSI-MDL-00001210] at 1210.  Despite this red flag, HSI made no additional effort beyond the license check and a simple questionnaire to determine whether Dr. Heim should be allowed to order and receive large quantities of opioids.  In addition, Dr. Heim identified his areas of medical practice as Family Practice and Obstetrics & Gynecology.  This should have been another red flag.

Instead, HSI shipped approximately 11,500 hydrocodone pills to Dr. Heim over fourteen transactions between August 17, 2011, and June 5, 2012.  *See* Dkt. #2200 (Plaintiffs' Opp. to Non-RICO Small Distributors' De Minimis MSJ) at p. 10.  Two thousand of those pills were shipped on May 21, 2012 and June 5, 2012, after Dr. Heim was indicted on May 18, 2012 for drug trafficking.  Whether Henry Schein knew about the indictment at the time of the May and June shipments is irrelevant - they already had plenty of warning signs about Dr. Heim by that time.  In addition, the orders Henry Schein filled for Dr. Heim were during the timeframe and of materials that were not reported to the Ohio Prescription Monitoring Program as previously discussed in above (*supra* at § C.1).  Dkt. #2200 at p. 10.  All of this information is relevant the question of Henry Schein's liability.

Had HSI performed the due diligence the law requires, it would have known about Dr. Heim's history of criminal activity.  Consequently, HSI cannot claim ignorance of his indictment when minimal effort would have disclosed it.  Henry Schein's MIL No. H-5 should be denied.

6. **Henry Schein MIL No. HS-6**: References to opioid medications distributed by Henry Schein, Inc. to Dr. Adolph Harper.

Henry Schein's MIL No. H-6 seeks to prohibit Plaintiffs from referencing HSI's distribution of opioids to Dr. Adolph Harper—who was convicted of drug trafficking, health care fraud, and conspiracy to distribute oxycodone, in effect operating a pill mill, and eight of whose patients died of overdose-related deaths—unless Plaintiffs show that the pills HSI sold to Dr. Harper were diverted.  Dkt. #2645 at pp. 4-5.

The Court should reject this request, too, as contrary to its recent Order denying summary judgment on causation.  In that ruling, the Court rejected Defendants' argument that Plaintiffs must show whether each suspicious order shipped was in fact diverted, holding instead that:

> [G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs.

Dkt. #2561 (Order re MSJs on Causation) at p. 9.  So it is here.  Plaintiffs may introduce evidence of HSI's sales to Dr. Harper as evidence of its complete failure to maintain effective controls.  Although these sales pre-dated Dr. Harper's criminal conviction, the frequency and strength of the opioid prescriptions he wrote support Summit County's claim that Schein should have flagged his orders as suspicious.  Dkt. #1999-7/#2000-7 (Keller Rep.) at ¶¶ 104-105.  Henry Schein's MIL No. H-6 concerning Dr. Harper therefore should be denied.

7. **Henry Schein MIL No. HS-7**: References to purported inadequacies regarding Henry Schein, Inc.'s Suspicious Order Monitoring System without first identifying whether any orders that HIS sold into Summit County were diverted.

It is not entirely clear whether Henry Schein is arguing that evidence of HSI's insufficient

SOMS is itself irrelevant and unfairly prejudicial, or whether it is only irrelevant and unfairly prejudicial if Plaintiffs do not first demonstrate "that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County."  Regardless, both arguments are without merit.  First, evidence of HSI's insufficient SOMS is highly probative to Plaintiffs' claims and is not unfairly prejudicial for the reasons discussed above as to Defendants' Omnibus MIL No. 7.  *Supra* at § A.7.  Additionally, Plaintiffs have already made an initial showing that Henry Schein's conduct substantially contributed to the public nuisance, which the Court considered sufficient to withstand summary judgment.  Dkt. #2561 at p. 9 ("As with the SOMS claims against the Manufacturers, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs."); Dkt. #2559 (order denying small distributors' summary judgment motion).  Plaintiffs understand that they will have to establish causation at trial, and fully intend to do so.  Whether Plaintiffs have laid an adequate foundation for a particular piece of evidence or testimony is a determination that should be made at trial so that it can be resolved in context.  *See Indiana Ins.*, 326 F. Supp. 2d at 846.

Finally, Henry Schein again inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that this evidence "lacks foundation and is otherwise irrelevant and unfairly prejudicial."  Dkt. #2645 at p. 5.  It is not clear how this rule, which requires witnesses to have personal knowledge of matters on which they testify (FED. R. EVID. 602), is relevant to MIL No. H-7, and Henry Schein provides no explanation.  If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-7 should be denied.

8. **Henry Schein MIL No. HS-8**: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.

Henry Schein's MIL No. HS-8 should be denied for the same reasons discussed above with

respect to Defendants' Omnibus MIL No. 6.  *Supra* at § A.6.

9.    **Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.**

Henry Schein argues that evidence regarding fines imposed by other states is not relevant in this case because those fines did not involve HSI's distribution of opioids in Ohio.  As discussed in § A.6, *supra*, however, Henry Schein's argument improperly seeks to limit the scope of Plaintiffs' proof.  The opioid crisis and harm experienced by Cuyahoga and Summit Counties did not result solely from conduct by Defendants that specifically occurred in those counties or in Ohio.  Rather, the problem caused in these counties by Defendants' oversupply, inadequate monitoring, and diversion resulted from conduct by Defendants that occurred all over the country.  This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

10.   **Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.**

Henry Schein seeks to exclude evidence regarding a "purported" letter "supposedly" sent in 1998 from the Ohio Board of Pharmacy to HSI.  The MIL specifically references meeting minutes of the Ohio Board of Pharmacy from November 1998 that reference the letter.  Henry Schein argues "[a]s an initial matter, there is no evidence that any such letter was actually sent to or received by HSI."  Dkt. #2645 at p. 6.

Henry Schein is wrong.  Its own documents reflect receipt of the very same letter referenced in the meeting minutes.  In a PowerPoint presentation discussing HSI's due diligence requirements, there is a slide summarizing various "penalties" imposed by governmental entities on distributors, including HSI.  The first item on the slide references a "Warning Letter" sent by the "Ohio State BOP" in 1998 to HSI regarding the "Sale of dangerous drugs to persons/entities not

licensed/authorized to possess them."  **Ex. 18** [HSI-MDL-00176719] at p. 4.  This could not be clearer.  As has been discussed previously, this evidence is relevant and admissible to show that Henry Schein was aware that there were deficiencies in its oversight of sales of dangerous opioid medications, which is probative of its intent in causing the nuisance condition in Cuyahoga and Summit Counties.

11.  <u>Henry Schein MIL No. HS-11</u>: References to alleged conduct supportive of Plaintiff's conspiracy claim, which took place, if at all, prior to May 18, 2014.

Henry Schein requests that Plaintiffs be prohibited from referencing, or introducing evidence of, Henry Schein's pre-May 18, 2014 conduct to support their conspiracy claim.  In support, Defendants argue "Plaintiff has acknowledged that its conspiracy claim against the Henry Schein Defendants...is governed by a four (4) year statute of limitations." Dkt. #2645 at p. 7.  This argument is not only unsupported in the motion, it is simply not true.  Henry Schein's MIL No. HS-11 should be denied for multiple reasons.

First, as Plaintiffs argued and the Court has held, there is no statute of limitations for Plaintiffs' RICO claims for equitable relief and they "are exempt from the operations of a limitations period."  Dkt. #2568 at p. 11.  Second, to the extent Defendants contend that a four year statute of limitations is applicable to Plaintiffs' public nuisance claim, Plaintiffs have consistently argued there is no limitations period applicable to public nuisance claims.  More importantly, this Court also held there is no limitations period for absolute nuisance claims. *Id.* at p. 5.  Third, since "the applicable statute of limitations for filing a civil conspiracy cause of action is the relevant limitations statues for the underlying cause of action," *id.* at p. 12 (citation omitted), and the underlying cause of action is public nuisance there is likewise no conspiracy statute of limitations at issue here.  Fourth, as set forth in Plaintiffs' prior arguments submitted in opposition to the Defendants' motion for partial summary judgment on statute of limitations grounds, pre-May 18, 2014 conduct remains relevant and admissible as it relates to post-May 18, 2014 damages and liability.  Dkt. #2212 at pp. 55-56.  Indeed, unless Henry Schein demonstrates that it has *affirmatively withdrawn* from a conspiracy, it remains exposed to liability for post-May 18, 2014 damages for the acts of its co-conspirators.  To

the extent Henry Schein seek to temporally limit the scope of its participation in the conspiracy, it has not pointed to any action taken to affirmatively withdraw from the conspiracy.[67]

Finally, this Court held that there are "material fact questions concerning the claim's accrual dates, whether Plaintiffs exercised reasonable diligence to discover facts necessary to bring suit, and the applicability of tolling doctrines." Dkt. #2568 at p. 1; *see also* Dkt. #2212.  The Court further ruled that questions about "the dates these [civil conspiracy] claims accrued or the periods they were tolled," can only be answered after a presentation of all the evidence at trial. Dkt. #2568 at p. 3.

There are multiple factual disputes involving Henry Schein the jury will need to consider. For example there is evidence that, despite recommendations to the contrary, Henry Schein willfully failed to design a system that would detect suspicious orders until at least October 2009.[68]  In addition, there is evidence that Henry Schein failed to report suspicious orders to the DEA when discovered until at least 2017 and that, in the meantime, Henry Schein was aware it lacked due diligence files for 27,000 customers.[69]  Whether and the extent to which these actions impact the statute of limitations and/or the date(s) Plaintiffs' claims accrued must be determined at trial.[70]

Henry Schein's MIL No. HS-11 should be denied for these reasons.

**12.**     **Henry Schein MIL No. HS-12: References to Henry Schein Animal Health, which is not a named party to Plaintiff's lawsuit.**

Henry Schein's MIL No. HS-12 seeks to prohibit any reference to or evidence concerning Henry Schein Animal Health ("HSAH"), which is not a named defendant.  Dkt. #2645 at pp. 7-8.

---

[67] "[O]nce a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." *Watson Carpet & Floor v. Mohawk Indus.*, 648 F. 3d 452 (6th Cir. 2011). "At a minimum, 'affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment." *In re Cathode Ray Tube Antitrust Litig.*, MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891, *3 (N.D. Cal. 2016) (citing *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 464-5 (1978)).

[68] *See* Dkt. #1956-2 (12/13/18 Abreu Dep.) at 237:21-239:1, 259:17-261:19, 454:12-456:24.

[69] *Id.* at 261:9-19, 294:21-295:7, 308:10-310:24.

[70] Dkt. #2568 at p. 3.

Henry Schein asserts that any reference or evidence about HSAH "is irrelevant as to whether HSI or HSMS substantially caused or contributed to the alleged public nuisance in Summit County.  *Id.* at p. 7.  This is incorrect.  An entity's status as a non-party is not determinative of whether its conduct is relevant to a claim.  *See*, *e.g.*, *Stringer*, 749 F. Supp. 2d at 704 ("Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim.").

Here, Plaintiffs allege that HSAH was investigated for distribution of wholesale dangerous drugs to an unlicensed entity in Ohio in 2014.  Dkt. #513 (Corrected 2d Am. Compl.) at ¶ 590.  Although Defendant HSI asserts that it "no longer holds an interest" in HSAH, Dkt. #2645 at p. 7, it does not dispute that it did when the conduct at issue took place.  Henry Schein's request concerning HSAH therefore is either baseless or else premature.  *See*, *e.g.*, *Hochstein v. Microsoft Corp.*, 04-73071, 2009 WL 2022815, at *6 (E.D. Mich. July 7, 2009) (denying motion *in limine* to exclude "any reference to third party games for which discovery was not sought" as "premature," to which the parties agreed).  In either event, Henry Schein's MIL No. H-12 should be denied.

D.     **PLAINTIFFS' RESPONSE TO WALGREENS' MOTIONS *IN LIMINE* (DKT. #2648).**

1.     **Walgreens' MIL No. W-1**: **To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen.**

Walgreens's argument that evidence of its ownership interest in AmerisourceBergen should be excluded under Rules 402 and 403 is based on a misconstruction of the purpose for which Plaintiffs propose to rely on the evidence.  Plaintiffs do not seek to hold Walgreens liable for the actions of AmerisourceBergen as a legal control person or parent entity.  Rather, Plaintiffs seek to enter evidence of Walgreens' ownership interest in AmerisourceBergen as being relevant to Plaintiffs' conspiracy claims.

The financial relationships between Defendants, including Walgreens's ownership interest in AmerisourceBergen, are relevant to show the continuing conspiracy among the Defendants and should not be excluded under Rule 402.  Plaintiffs' summary judgment briefing concerning Plaintiffs' RICO and conspiracy claims set out the significant financial interests implicit in the

relationships among and between the Defendant coconspirators.  *See, e.g.,* Dkt. #2182 at pp. 63-68.
This evidence of Defendants' financial interests and connections is relevant to Plaintiffs' conspiracy
claims.  *See United States v. Robinson*, 763 F.2d 778, 783 n.8 (6th Cir. 1985) ("evidence tending to
establish. . . . an ownership interest . . . would be relevant as tending to show . . . a motive for
entering into the conspiracy"); *United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014) (evidence
establishing ownership were relevant to establish "financial stake in the profitability" of an entity in
context of alleged conspiracy); *Cadence Educ., LLC v. Vore*, No. 17-CV-2092-JTM-TJJ, 2018 WL
690993, at *7 (D. Kan. Feb. 2, 2018) (defendants ordered to produce documents concerning
ownership interest in corporate entities and relationships between corporate entities as being
relevant to conspiracy claims).

Walgreens has repeatedly taken the position that its liability ended when it ceased self-
distribution.  However, as set out in Plaintiffs' summary judgment briefing regarding Plaintiffs'
conspiracy claims, Walgreens did not withdraw from the Conspiracy at that time – or ever – and has
continued to work with other Defendants, including AmerisourceBergen, to continue to support the
conspiracy's objectives.  Dkt. #2182 at pp. 116-117.  Walgreens remains liable for the actions of its
coconspirators in furtherance of the conspiracy, regardless of its cessation of distribution.  The jury
should be permitted to consider Walgreens' near simultaneous decision to stop self-distribution,
entry of an exclusive distribution relationship with coconspirator AmerisourceBergen, its corporate
involvement in the AmerisourceBergen SOM review of Walgreens orders, and the beginning of
Walgreens acquisition of significant amounts of AmerisourceBergen stock, which also provided
Walgreens with a seat on AmerisourceBergen's Board.

Walgreens's continued participation in the conspiracy and financial relationships to
conspirators are relevant to show Walgreens's continued corporate involvement in and support of
the conspiracy, including Walgreens's involvement in the SOM procedures applied by
AmerisourceBergen to orders for prescription opioids placed by Walgreens's pharmacies, and do not
transform Plaintiffs distribution and conspiracy based claims into claims based on Walgreens
pharmacy level dispensing.  Walgreens' MIL No. W-1 should be denied.

2.  **Walgreens' MIL No. W-2**: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement.

The arguments asserted by Walgreens regarding admissibility under Rule 408 and 403 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

With regard to Walgreens' argument that evidence concerning the Florida DEA enforcement action should be excluded because it occurred in Florida, rather than Ohio, this argument ignores the well-known problem of opioid "migration" from one location to another. As the Washington Post recently reported,

> During the past two decades, *Florida became ground zero for pill mills* — pain management clinics that served as fronts for corrupt doctors and drug dealers. They became so brazen that some clinics set up storefronts along I-75 and I-95, advertising their products on billboards by interstate exit ramps. So many people traveled to Florida to stock up on oxycodone and hydrocodone, they were sometimes referred to as "prescription tourists."

> *The route from Florida to Georgia, Kentucky, West Virginia and Ohio became known as the "Blue Highway."* It was named after the color of one of the most popular pills on the street — 30 mg oxycodone tablets made by Mallinckrodt, which shipped more than 500 million of the pills to Florida between 2008 and 2012.

> When state troopers began pulling over and arresting out-of-state drivers for transporting narcotics, drug dealers took to the air. *One airline offered nonstop flights to Florida from Ohio and other Appalachian states, and the route became known as the Oxy Express.*

"76 billion opioid pills: Newly released federal data unmasks the epidemic," The Washington Post, July 16, 2019 (emphasis added).[71]

There is abundant evidence in the record – including in Walgreens' own internal documents – that the opioids the Defendants shipped migrated far beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon. *Supra* at fn.37. Defendants were regularly alerted to the migration phenomenon

---

[71] *Available at* https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html (accessed on 10/3/19).

by the DEA, and their personnel acknowledged the reality of diversion and migration in their depositions. *Supra* at fns.39-40.

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Walgreens' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped hundreds of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come long distances from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every diverted pill posed a risk to localities throughout the nation was not only foreseeable to Walgreens, it was observed and known by them. Each shipment Walgreens made in disregard of the potential for diversion is evidence of damages caused by Walgreens to localities throughout the nation, including Cuyahoga and Summit Counties.

Because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a SOM program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Each Defendant's SOM was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. Because of the uniform national character of Defendants' SOMs, each wrongful order filled by Defendants is further evidence of the flaws in Defendants' SOMs, and of the consequences of those flaws. Defendants' efforts to exclude this highly probative evidence, including by Walgreens' MIL No. W-2, should be denied.

**3.**     **Walgreens' MIL No. W-3**: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man."

Walgreens' motion to preclude evidence or argument that former DEA Deputy Administrator Joseph Rannazzisi's credibility is bolstered by his appearance on "60 Minutes," or by reporting by other news outlets, has no merit.  Walgreens specifically seeks to preclude such references – and in particular, reference to Mr. Rannazzisi as the "60 Minute Man" – on the grounds that such references would invade the jury's role as factfinder, as well as mislead and confuse the jury.  These purported concerns cannot be taken seriously.

First, Walgreens' objection to the specific phrase "60 Minute Man" – to reference a man who appeared on "60 Minutes" – has no legal basis.  The parties have listed hundreds of names to appear as potential witnesses at trial, and each witness called by the parties will testify in varying levels of detail as to their backgrounds, educational history, employment history, as well as their involvement and interactions with the opioid epidemic.  Brief, accurate references to a relevant and undisputed part of a witness's history are thus necessary at trial.  Instead of reciting a witness's full name, full job title, and dates of employment, counsel routinely instead refers to "the Walgreens' CEO," "the ABDC Consultant," or "the Mallinckrodt Investigator."  "The 60 Minute Man" is no different, and this phrase includes no commentary or argument as to Mr. Rannazzisi's credibility.  It simply references a critical part of one witness's relevant history in a neutral, shorthand phrase. Forbidding such references at trial would result in bizarre affirmative rules mandating the use of each witness's full name and title each time counsel references that witness.  Walgreens' request here is unreasonable and untenable, and must be denied.

Second, actual references to Mr. Rannazzisi's credibility in connection with either his "60 Minutes" interview, or other news reports, do nothing to invade the jury's role as a factfinder to weigh the strength of the evidence.  In fact, such references affirmatively provide additional evidence for the jury to weigh.  With this evidence – and any admissible impeachment evidence offered by Defendants – the jury is free to determine whether it finds Mr. Rannazzisi to be a

credible witness.[72]  Indeed, a reputable news outlet's use and reliance on Mr. Rannazzisi's comments in a national broadcast or publication constitutes valid and admissible evidence of his credibility. And Walgreens cites no authority that such evidence is typically excluded.

Finally, references to Mr. Rannazzisi's credibility in connection with either his "60 Minutes" interview, or other news reports, also do nothing to mislead or confuse the jury.  The decision of various news outlets to broadcast and publish Mr. Rannazzisi's statements is useful information the jury should consider in weighing the strength of his testimony.  This inference does not mislead the jury as to any facts (and Walgreens identifies none), nor does it confuse the jury as to any facts (and Walgreens identifies none).  Walgreens' MIL No. W-3 should accordingly be denied.

## E. PLAINTIFFS' RESPONSE TO CARDINAL HEALTH INC'S MOTIONS *IN LIMINE* (DKT. #2653).

### 1. Cardinal MIL No. 1: 14,000 Orders Not Shipped.

Cardinal erroneously seeks to exclude evidence that it failed to report more than 14,000 suspicious orders nationwide under Rule 402 and pursuant to a misplaced and repeatedly rejected preemption argument.  Dkt. #2653-1 at pp. 1-4.  Cardinal's MIL is due to be denied on both grounds.

Cardinal's admitted failure to report suspicious orders is relevant to Plaintiffs' claims that Cardinal failed to maintain effective controls against the diversion of opioids.  This evidence presents another example of Cardinal's failures both in CT1 counties specifically and nationally. Even after the DEA took action against Cardinal in 2008 and 2012, Cardinal continued to fail to establish an effective SOM program.  Over at least six years[73] Cardinal was failing to report

---

[72]  *See U.S. v. Turning Bear*, 357 F.3d 730 (8th Cir. 2004) (admitting evidence of witness's character for truthfulness over Rule 403 objection, that was neither substantially outweighed by unfair prejudice nor needlessly cumulative, where credibility of the testimony was at issue); *U.S. v. Lopez-Ortiz*, 736 F. Supp. 2d 469, 471 (D.P.R. 2010) ("Allowing defense counsel to introduce admissible testimony or other evidence bearing on the government witnesses's character would not result in unfair prejudice to the government's case or unfairly influence the jury.").

[73]  Cardinal told the DEA that the "vast majority" of the unreported suspicious orders were placed during the time period of 2012-2015, but that 23 have occurred since January 1, 2017. **Ex. 19** [CAH_MDL2804_02101803].

suspicious orders of the most highly abused opioids and only disclosed their failures in 2018 because of pending litigation with an attorney general.

The seriousness of Cardinal's failure to report these suspicious orders is underscored by the fact that, according to Cardinal, the "vast majority" of the suspicious orders were for formulations of opioids most likely to be diverted and abused.[74]  Cardinal sets sub-base code thresholds only for the most highly abused strengths of certain opioids.  These formulations, according to Cardinal, "are more susceptible to diversion and abuse," including in particular 15 and 30 milligram doses of oxycodone and 10 milligram doses of hydrocodone.[75]  If it was not egregious enough that Cardinal failed to report thousands of suspicious orders over the course of at least six years, the fact that most of those orders were for the most dangerous versions of opioids is astounding given the company's history with DEA administrative actions.  The unreported suspicious orders are directly relevant to whether Cardinal was able to maintain effective controls against diversion after 2012.

While Cardinal contends that four of the more than 14,000 unreported suspicious orders originated from Summit and/or Cuyahoga Counties, Cardinal advised the DEA that 887 of the orders were placed by customers in the Wheeling, West Virginia Distribution Center's service area, which includes Summit and Cuyahoga Counties.[76]  Even if the orders were not shipped, it is undisputed that pharmacies in this region placed nearly 900 suspicious orders, the vast majority of which were for the most abused and diverted opioids.[77]  Cardinal's failure to report allows these bad pharmacies to continue to operate without further investigation.

Cardinal attempts to downplay the number of suspicious orders it failed to report by stating that it was reporting "tens of thousands of orders a year" from 2012 to 2015.  However, in his 2012 Annual Quality and Regulatory Report to the Cardinal Board of Directors' Audit Committee, Chief

---

[74]  *Id.*

[75]  **Ex. 20** [CAH_MDL2804_00069435] at 48.

[76]  **Ex. 19** [CAH_MDL2804_02101803] at 4.

[77]  Dkt. #1959-14 (9/26/18 Cameron Dep.) at 269:12-270:13 (produced at CAH_MDL2804_02953369); **Ex. 20** [CAH_MDL2804_00069435] at 48.

Legal and Compliance Office Craig Morford reported that Cardinal had reported only 3,020 suspicious orders to the DEA nationwide in fiscal year 2012.[78]  The ratio of unreported suspicious orders versus reported suspicious orders is much larger than Cardinal presents.

Finally, Cardinal recycles again here the preemption arguments this Court has repeatedly rejected.[79]  Those arguments are made no more persuasive in their third iteration.  Cardinal's MIL No. 1 should be denied.

---

[78]  **Ex. 21** [CAH_MDL2804_03262274] at 438.

[79]  Dkt. #1025 (Report and Recommendation) at pp. 48-54 (rejecting preemption arguments); Dkt. #1203 (Opinion and Order) at p. 2 (adopting R&R decision on preemption); Dkt. # 2565 (Opinion and Order re: Preemption) (rejecting all preemption arguments).

2.      **Cardinal MIL No. 2**: "Interesting Gossip" Email.[80]

Cardinal bases its argument that MCKMDL00545341 should be excluded under Rules 402 and 403 (Dkt. #2653-1 at p. 4) on a misconstruction of the purpose for which Plaintiffs propose to use the email at trial.  The email, and the notes attached thereto, contain the report from Cardinal's Director of Regulatory Affairs of a "Huddle" meeting among Cardinal, McKesson, AmerisourceBergen, and HD Smith (the self-styled "Big Four") and the issues discussed therein, including those related to CSA compliance.  Plaintiffs do not intend to cite the email as evidence that Cardinal failed to report suspicious orders, but rather as evidence of the nature of the relationships between these Defendants and the types of CSA compliance related issues they discussed and coordinated together.[81]

The evidence is relevant and should not be excluded under Rule 402.  The email Cardinal moves to exclude contains notes from a Big Four "Huddle" meeting that occurred during and after an HDA conference.  During this Huddle, these Defendants all discussed CSA compliance issues, including intentional failure to comply.  This document (among others) shows that Big Four Huddles in conjunction with HDA conferences occurred and further shows the kinds of discussions that occurred at the meetings.  This evidence is particularly relevant to Plaintiffs' RICO and conspiracy claims because it shows, as Plaintiffs' alleged in their TAC,[82] that Defendants used the HDA as a forum in which to form agreements, to discuss issues related to suspicious order compliance, and to coordinate their activities.  The document is also relevant to show Defendants' knowledge of – and failure to report - the noncompliance of direct competitors.  Moreover, the

---

[80]   Though Cardinal's motion refers to MCKMDL0054341, based on the first page of the email, which Cardinal attaches to the motion, and the context of the argument, Plaintiffs believe Cardinal made a typographical error and respond regarding MCKMDL00545341.  Further, Cardinal only includes the cover page of MCKMDL00545341 as an exhibit to its motion, depriving the Court of the full context of the document.  Plaintiffs attach the complete document – including the attached notes – here.  *See* **Ex. 22** [MCKMDL00545341-347].

[81]   The purpose for which Plaintiffs intend to offer the email is confirmed in Plaintiffs' omnibus summary judgment opposition briefing regarding Plaintiffs' Conspiracy, RICO, and OCPA claims (Dkt. #2182 at pp. 37 and Exhibit 291).

[82]   *See* Dkt. #1466 (Summit Third Amended Complaint) at ¶¶ 540-546, 763-767, 854, 910.

"interesting gossip" section of the Huddle notes is also relevant to show that the relationships between these Defendants were so secure that Cardinal felt comfortable disclosing intentional regulatory violations.

Rule 403 does not justify exclusion of the Big Four Huddle document.  While all evidence is prejudicial, Rule 403 requires that the probative value of the document be outweighed by the prejudice.  *See Koloda v. General Motors Parts Div., General Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983) ("Virtually all evidence is prejudicial or it isn't material.  The prejudice must be 'unfair.'"). Exclusion under Rule 403 is an "extraordinary remedy and carries a strong presumption in favor of admissibility."  *In re Air Crash at Lexington, KY*, No. 5:06-CV-316-KSF, 2008 WL 2782827, at *1 (E.D. Ky. July 8, 2008) (citing *U.S. v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). *See also In re Air Crash Disaster*, 86 F.3d 498, 538 (6th Cir. 1996) ("Rule 403 does not exclude evidence because it is strongly persuasive or compellingly relevant—the rule only applies when it is likely that the jury will be moved by a piece of evidence in a manner that is somehow unfair or inappropriate. The truth may hurt, but Rule 403 does not make it inadmissible on that account.").  Here, there are multiple reasons why this Big Four Huddle document has probative value regarding the defenses and claims at issue in this case, as discussed above.  Cardinal's only argument about prejudice is their presumption (without supporting evidence) that the document contains an allegedly inaccurate statement that would require rebuttal and take time. Cardinal's position is simply not enough to overcome the significant probative value of the Big Four Huddle document.  Cardinal's MIL No. 2 should be denied.

### 3.  <u>Cardinal MIL No. 3</u>: Misleading Data Comparisons (McCann Data Analysis).

Cardinal seeks to prohibit Plaintiffs' expert Dr. Craig McCann from testifying based upon data produced by Cardinal for the years 1996-2005.  Cardinal argues that because it retained and produced data for several years prior to the period covered by other Distributor Defendants' productions, the jury may be confused when comparing Dr. McCann's opinions regarding Cardinal to his opinions regarding the other Distributor Defendants.  Plaintiffs dispute Cardinal's contentions

regarding the potential for juror confusion and do not believe any limiting instruction is necessary. Should the need arise for any clarification, Defendants can make a request for a properly worded instruction at the time the evidence is offered and a determination as to the appropriateness of said instruction can be made at that time.

**F.     PLAINTIFFS' RESPONSE TO MCKESSON CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT (DKT. #2663).**

> **1.     McKesson MIL No. MCK-1: The Court should prohibit any reference to baseless accusations.**

McKesson asks the Court to prohibit Plaintiffs from making "baseless accusations." Dkt. #2663-1 at p. 1. This request is one part specific, and one part general. As to the general, of course, Plaintiffs do not believe their allegations of McKesson's widespread and rampant misconduct are baseless, and indeed, the parties' disagreement on this score is the reason for the trial. Thus, McKesson's vague request that Plaintiffs be precluded from referencing "unfounded accusations" in "opening, closing, or during examination of witnesses" should be rejected. Dkt. #2663-1 at p. 2.

As to the specific, McKesson complains about certain deposition questions regarding former Attorney General Eric Holder. Plaintiffs dispute that the questions were baseless, but this testimony was not designated by Plaintiffs for trial, and so the request to strike reference to them is now moot. McKesson also complains about deposition questions pertaining to whether McKesson Chief Executive Officer John Hammergren knowingly provided false information during Congressional testimony when he stated that McKesson did not market opioids to, among others, pharmacists. *Id.* This is an entirely appropriate area of inquiry in light of McKesson's marketing agreements with other Defendants, including Teva, Purdue, and Actavis. *See, e.g.,* Dkt. #2169-32/#2173-50 (7/19/18 Oriente Dep.) at 278-287, 305-313. McKesson has every right to argue that Hammergen's testimony was the whole truth, but Plaintiffs have the equal right to present witnesses with evidence that suggests otherwise and question the bases of McKesson's public statements. *See, e.g., Goldman,* 559 F. Supp. 2d at 871 ("Factual questions should not be resolved through motions in limine.").

For these reasons, McKesson's MIL No. MCK-1 should be denied.

2. **McKesson MIL No. MCK-2: The Court should prohibit evidence or argument about the U.S. House of Representatives Energy and Commerce Committee's Investigation.**

McKesson's MIL No. MCK-2 seeks to preclude Plaintiffs from offering evidence or argument regarding the U.S. House of Representatives Energy and Commerce Committee's Investigation. Dkt. #2663-1 at p. 2. This MIL should be denied for the following reasons.

> i. *The House Report is admissible under Rule 803(8) because it is factual findings from a legally authorized investigation and there are no indications of untrustworthiness.*

The U.S. House of Representatives, Committee on Energy and Commerce Report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia* (the "House Report") (**Ex. 23**) clearly is admissible under Rule 803(8) of the Federal Rules of Evidence. Rule 803(8) provides, in relevant part:

> A record or statement of a public office [is not excluded by the rule against hearsay] if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation[,] and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FED. R. EVID. 803(8). Rule 803(8) is intended to encompass investigative or "evaluative reports" generated in the course of a public agency's duties. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 166 (1988). Examples of the types of agency investigative reports admissible under Rule 803(8) include accident reports prepared by specialized agencies, consumer safety studies, and diagnostic studies relating to issues of public health.[83] Conclusions and opinions, as well as facts, are admissible under Rule 803(8) as long as they are based on a factual investigation and satisfy the Rule's trustworthiness requirement. *Beech Aircraft*, 488 U.S. at 170.

---

[83] *See, e.g., id.* at 170 (Air Force accident report on cause of plane crash in training exercise); *United States v. Midwest Fireworks Mfg. Co.*, 248 F. 3d 563, 566-67 (6th Cir. 2001) (reports of Consumer Product Safety Commission); *O'Dell v. Hercules, Inc.*, 904 F. 2d 1194, 1204-06 (8th Cir. 1990) (CDC report on health risks from environmental exposure to dioxin).

In light of this presumption of admissibility, the party opposing the admission of the report must prove that the report is not trustworthy. *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir. 1978), *cert. denied*, 441 U.S. 933 (1979). To determine whether a report is trustworthy, courts consider the following four factors: (1) the timeliness of the investigation upon which the report is based, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems. *Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.*, 959 F.2d 606, 616–17 (6th Cir. 1992). McKesson has failed to show that the House Report lacks trustworthiness under any of these factors.

The House Report was the result of an in-depth, bipartisan investigation into the distribution of prescription opioids by wholesale distributors, which was undertaken as part of the Committee's legislative responsibilities. The report itself contains factual findings. The Subcommittee on Oversight and Investigations held hearings and received sworn testimony from, and posed questions to, representatives of each of the wholesale drug distributors involved in the investigation. The Subcommittee examined the role that each company may have played in contributing to the opioid epidemic. In addition, the five distributors (Cardinal Health, AmerisourceBergen, McKesson, Miami-Luken and H.D. Smith) provided thousands of pages of documents to the Committee, including due diligence files, suspicious order reports and policy manuals. **Ex. 23** [House Report] at p. 40. In all, the Committee, through its members and staff, sent twelve letters requesting documents and information, reviewed more than 20,000 pages of material obtained from the DEA and wholesale distributors, participated in numerous briefings with the DEA and wholesale distributors, and held two hearings. *Id.* at pp. 43-44.

McKesson bases its challenge on possible motivational problems, arguing that the investigation was "highly charged" and involved matters already a subject of litigation (and thus subject to influence by the litigants). Dkt. #2663-1 at p. 2. The cases McKesson cites for its proposition mostly involve draft reports and partisan investigations.[84] In contrast, here the House

---

[84]  *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264 (4th Cir. 2005) (affirming exclusion on the grounds that "the Department of Energy's assessment was only a draft report"); *Pearce v. E.F. Hutton*

Report is a final report which resulted from a bipartisan investigation. Where, as here, members of both parties joined in the report, courts have been more likely to reject challenges to the admissibility of Congressional reports.[85] McKesson has not pointed to anything in either the House Report or the hearings that would indicate that the report was prepared primarily or even partially to assist in ongoing opioid-related litigation. McKesson alleges that Plaintiffs' counsel in this litigation played an active role in the investigation process, including by briefing congressional staff and providing them with "factsheets" about the opioid epidemic. Dkt. #2663-1 at p. 2 n.4. McKesson fails to state that Defendants also had input into the investigation, including briefing congressional staff and providing documents and testimony. **Ex. 24** [MCKMDL00373829]; **Ex. 25** [ABDCMDL00320377]; **Ex. 26** [CAH_MDL_PRIORPROD_HOUSE_0004057]; **Ex. 27** [CAH_MDL_PRIORPROD_HOUSE_0004068]; **Ex. 28** [ABDCMDL00321879]; **Ex. 29** [MCKMDL00373814].

> ii.  *The findings of the House Report are probative into the issues at the core of the claims in this case and its inclusion is unlikely to unfairly prejudice the jury.*

The investigation that led to the House Report sought to "evaluate the extent that distributors implemented controls to prevent diversion of opioids." **Ex. 23** [House Report] at p. 4. Further, while the House Report "focused on a narrow part of West Virginia, the report raises grave concerns about practices by the distributors and the DEA nationwide." *Id.* at p. 9. The House Report notes that its findings "raise questions about the effectiveness of distributors' anti-diversion efforts outside West Virginia, as the same policies were implemented across the country." *Id.* at p. 105. Thus, the House Report's probative value is not limited to conduct that occurred in West

---

*Group, Inc.*, 653 F. Supp. 810, 813–15 (D.D.C. 1987) (excluding House committee report that was "dissented to directly along party lines" and that failed "to isolate or distinguish any factual findings from its subjective criticisms and conclusions").

[85]  *See McFarlane v. Ben–Menashe,* No. 93–1304, 1995 WL 129073, at *4–*5 (D.D.C. March 16, 1995) (admitting the report of a joint Congressional task force in which members of both parties joined), *reconsideration granted on other grounds,* 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson,* 556 F. Supp. 1157, 1181 (D.D.C. 1982) (admitting committee report that "reflected adherence to appropriate standards of scholarly responsibility, investigative integrity, and trustworthiness"), *aff'd in part, rev'd in part on other grounds,* 757 F.2d 1 (D.C. Cir. 1985).

Virginia.  The House Report is directly relevant to the litigation, going to Defendants' due diligence, suspicious order monitoring and reporting practices.  Further, Defendants' own experts relied on the House Report and it was included on at least one Defendant exhibit list.[86]

Thus, there is no doubt that this evidence is highly probative on a number of issues and Defendants have not met their burden to demonstrate a risk of prejudice, much less a risk that is so substantial that outweighs their probative value.

### iii.   Testimony Provided to the Committee is Also Admissible.

McKesson also challenges the admissibility of testimony given by McKesson Chairman, President and CEO John Hammergren to the Subcommittee on Oversight and Investigations Committee on Energy and Commerce United States House of Representatives.  The statements made by Mr. Hammergren were made while he was the McKesson Chairman, President and CEO of McKesson and related to McKesson's role in the supply chain and its SOM system, unquestionably matters within the scope of his employment.   These statements are therefore admissible as party admissions under Rule 801(d)(2)(D) of the Federal Rules of Evidence. Additionally, to the extent that Defendants' experts relied on this testimony it is relevant to challenge their opinions.[87]

### iv.   Letters from members of Congress to McKesson Are Admissible.

McKesson argues that the February 15, 2018 letter sent from members of Congress to McKesson is inadmissible hearsay.  However, the letter to McKesson is not offered to prove the truth of the matters asserted in the letter, but rather as background for the House investigation and to show McKesson's awareness of the investigation and that the statements in the letter were

---

[86]   *See* Dkt. #2174-2/#2172-2 (Bell Expert Rep.) at p. 70 and n.329; Dkt. #2544-1/#2546-1 (Cantor Expert Rep.) at pp. 95-96 and Attachment 3 – Materials Considered at p. 8; **Ex. 30** [Purdue Exhibit list of September 10, 2019].

[87]   John Dombrowski, MD, and expert for distributor defendants McKesson Corporation, AmerisourceBergen Drug Corporation, and Cardinal Health included Mr. Hammergren's testimony in his report as material he considered in forming his opinions.  *See* **Ex. 31** [Expert Report of John Dombrowski, MD, Exhibit C P. 3].

made. Evidence is not hearsay when it is not offered to prove the truth of the matter asserted. *See Anthony v. DeWitt,* 295 F.3d 554, 563 (6th Cir. 2002). "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." FED. R. EVID. 801, Advisory Committee Note to Subdivision (c), 1972 Proposed Rules. Further, "[s]tatements to prove the listener's knowledge are not hearsay." *U.S. v. Boyd,* 640 F.3d 657, 664 (6th Cir. 2011).

3. **McKesson MIL No. MCK-3**: The Court should prohibit the introduction of nationwide trends in drug deaths.

McKesson seeks to exclude certain Centers for Disease Control ("CDC") maps on the basis that Plaintiffs may inaccurately characterize the data depicted on the maps. But McKesson's expressed concerns do not warrant the remedy of exclusion of this evidence. If in fact McKesson believes that an inaccurate or misleading suggestion is made by Plaintiffs at trial regarding these maps, McKesson can object at the time and/or address the matter through cross-examination.

No more availing is McKesson's argument that the maps should be excluded as irrelevant because, in McKesson's view, Plaintiffs lack evidence that McKesson caused any death, and Plaintiffs may not "seek damages beyond their borders." Dkt. #2663-1 at p. 4. But these maps are relevant to numerous other issues, including by providing useful background with respect to the scope and nature of the opioid crisis, and showing (with appropriate qualification) the relationship between increased prescription opioid shipment and harms, including mortality—a subject of extensive expert testimony. As Plaintiffs' causation and damage experts make clear, increased shipments led to increased harms, and Plaintiffs' experts use mortality as the primary proxy for these harms – an analysis this Court has already blessed in rejecting Defendants prior complaints about the purported irrelevance of mortality in their *Daubert* motions. Indeed, as explained in Prof. Cutler's expert report, the field of health economics routinely studies how the use of substances—including addictive ones such as tobacco, alcohol, and more recently, opioids—are related to personal harms such as mortality. Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶ 14. The use of mortality trends and statistics is hardly controversial, and in fact is of fundamental

relevance in measuring the magnitude of the harms caused by defendants' misconduct.  Information of this type will greatly assist the jury in understanding the issues presented at trial.

Accordingly, McKesson's MIL No. MCK-3 should be denied.

4.  **McKesson MIL No. MCK-4**: **The Court should prohibit Plaintiffs from introducing evidence or argument about allegations contained in letters from the DEA or DOJ.**

McKesson argues that allegations contained in enforcement letters from the DEA and DOJ should be excluded "[f]or substantially the same reasons that the Court should exclude settlement agreements."  Dkt. #2663-1 at pp. 4-5.  For the same reasons discussed in § B.1, *supra*, that evidence is not precluded by Rule 408 or any other rule of evidence.  That evidence is relevant, among other reasons, to prove that McKesson engaged in intentional conduct, over many years and across the country, that was a substantial factor in causing the harm to Plaintiffs, and that they were on notice of the ways in which its conduct violated the law.

5.  **McKesson MIL No. MCK-5**: **The Court should prohibit introduction of testimony from McKesson witness Nathan Hartle because of Plaintiffs' badgering and abusive conduct.**

McKesson improperly seeks to exclude the entirety of the 30(b)(6) testimony[88] from its designated witness Nathan Hartle based only on a couple of areas of questioning undertaken by Plaintiffs, which covered a small portion of a day long deposition that spanned nearly 400 pages of testimony.  Dkt. #2663-1 at pp. 6-7.  In reality, Plaintiffs' questioning of Mr. Hartle in his capacity as a 30(b)(6) witness was reasonable and tailored to the broad range of topics Mr. Hartle was designated to discuss.   Mr. Hartle directly answered these questions and McKesson's belated

---

[88]  Mr. Hartle was deposed in two different capacities in this case.  On July 31, 2018, he testified as a 30(b)(6) designee.  On August 1, 2018, he provided fact witness testimony as well.  Given that McKesson's arguments in its motion *in limine* focus solely on Mr. Hartle's 30(b)(6) testimony, Plaintiffs respond only to the baseless accusations made as to that testimony.  While there is equally no basis to exclude Mr. Hartle's fact testimony, Plaintiffs reserve the right to separately oppose exclusion of that testimony should that remedy be sought by McKesson in the future.

attempts to unpack that credible and admissible testimony should not be rewarded. Thus, McKesson's MIL should be denied in its entirety.[89]

First, McKesson's complete failure to seek assistance from the Special Master or the Court at or following Mr. Hartle's deposition demonstrates that Plaintiffs did not act in a "wasteful" and "abusive" manner as McKesson now contends. Dkt. #2663-1 at p. 6. Rather, McKesson's motion is nothing more than an improper attempt to exclude admissible testimony that is simply contrary to the liability picture it now intends to portray to the Court and the jury. Routinely throughout the discovery phase of this case Special Master Cohen was heavily involved in the conduct of depositions, and in fact, actually attending some of the depositions that were taken. Despite the Special Master's active involvement in the deposition process, McKesson never once asked for relief from the Special Master related to Mr. Hartle's deposition. This is telling, given that Mr. Hartle's 30(b)(6) deposition was only the third of twenty depositions taken of current or former McKesson employees during the discovery phase. If McKesson truly believed Plaintiffs acted in an abusive and wasteful fashion during Mr. Hartle's 30(b)(6) deposition it surely would have sought relief from the Special Master and/or the Court before Plaintiffs continued with seventeen additional depositions of McKesson witnesses, including the fact witness deposition of Mr. Hartle himself.

Second, the questioning addressed by McKesson was completely legitimate and consistent with the subject matter areas for which McKesson designated Mr. Hartle. McKesson designated Mr. Hartle on ten different topics that spanned broad areas concerning McKesson's duties under the CSA, the company's efforts to comply with the CSA, data concerning opioid orders supplied to CT1 pharmacies, and information concerning suspicious orders identified for CT1 pharmacies.[90]

---

[89]  Although its criticisms of Mr. Hartle's deposition have no merit, McKesson could easily avoid having his deposition played at trial by simply making him available to testify live.

[90]  Specifically, Mr. Hartle was designated to cover the entirety of Plaintiffs' first 30(b)(6) notice and topics 9, 14, and 16-22 of Plaintiffs' second 30(b)(6) notice. *See* Dkt. #2663-4 (Amended First Notice of Deposition); Dkt. #2663-5 (Amended Second Notice of Deposition).

The testimony cited by McKesson concerning opioids being a gateway to heroin use certainly relates to McKesson's duties under the CSA and why those duties are important. McKesson concedes the relatedness of this inquiry, but instead complains that answering this question requires "specialized medical and public health knowledge." Dkt. #2663-1 at p. 6. As an expert in controlled substances generally, and opioids specifically, McKesson should have such specialized knowledge to be able to answer questions on this topic. Thus, McKesson alone had the ability and responsibility to select the appropriate person to address this inquiry. Moreover, Mr. Hartle had no problem answering the question posed of him on this subject because, in fact, he does possess such specialized knowledge himself.[91] Mr. Hartle has presented data on opioids being a gateway to heroin use to various McKesson pharmacy customers and to McKesson employees in his capacity as Senior Regulatory Affairs Director at McKesson.[92] The fact that McKesson trusted Mr. Hartle's expertise to discuss opioids being a gateway to heroin use in presentations to its own customers and its own employees alone completely undercuts the validity of McKesson's argument that Mr. Hartle lacks the requisite knowledge on this subject now.

Similarly, Mr. Hartle readily acknowledged, as the company's 30(b)(6) designee, McKesson's role in contributing to the opioid epidemic.[93] Given that Mr. Hartle was designated by McKesson to broadly speak to the company's compliance, or lack thereof, with its regulatory and societal responsibilities concerning opioid distribution, this testimony is well within the scope of topics Mr. Hartle could reasonably be expected to discuss. Moreover, McKesson is undoubtedly in an excellent position to judge its own culpability in contributing to the opioid epidemic, and as the company's designated spokesperson on those topics, Mr. Hartle is precisely the person that should be expected to answer this central question. *See* e.g., *Hilton Hotels Corp. v. Dunnet,* No. 00–2852–GV, 2002 WL 1482543, *2 (W.D.Tenn. Mar. 15, 2002) (30(b)(6) deponents are expected to speak as to

---

91   Dkt. #1962-23/#1978-3 (7/31/18 Hartle Dep.) at 320:14-321:13.

92   *See* **Ex. 32** [MCKMDL00430424] at 425; **Ex. 33** [MCKMDL00448596] at 611; Dkt. #1962-24/#1978-4 (8/1/18 Hartle Dep.) at 34:16 – 40:3.

93   Dkt. #1962-23/#1978-3 (7/31/18 Hartle Dep.) at 285:6-286:15.

"the knowledge of the corporation and the corporation's subjective beliefs and opinions and interpretation of documents and events"). While McKesson no doubt dislikes the testimony Mr. Hartle offered on this point, that distaste does not justify the exclusion of this vitally important testimony.

Third, despite the fact that Plaintiffs' examination was tailored to the confines of the 30(b)(6) notices, Plaintiffs were not necessarily limited to questioning Mr. Hartle on matters specifically included in those notices. As outlined in *King v. Pratt & Whitney, a Div. of United Technologies Corp.,* 161 F.R.D. 475, 476 (S.D. Fla. 1995):

> Rule 30(b)(6) should not be read to confer some special privilege on a corporate deponent responding to this type of notice. … Rather, the Rule is best read as follows:
>
> 1) Rule 30(b)(6) obligates the responding corporation to provide a witness who can answer questions regarding the subject matter listed in the notice.
>
> 2) If the designated deponent cannot answer those questions, then the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions, etc. The corporation has an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are "known or reasonably available" to the corporation. Rule 30(b)(6) delineates this affirmative duty.
>
> 3) If the examining party asks questions outside the scope of the matters described in the notice, the general deposition rules govern (i.e. Fed.R.Civ.P. 26(b)(1)), so that relevant questions may be asked and no special protection is conferred on a deponent by virtue of the fact that the deposition was noticed under 30(b)(6).
>
> 4) However, if the deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem.

This interpretation of the scope of examinations under Rule 30(b)(6) has been explicitly followed by courts in the Sixth Circuit. *See e.g., Harris v. Goins*, No. 6: 15-151-DCR, 2017 WL 4080692, *2 (E.D. Ky. Sep. 14, 2017) (citing *King*, 161 F.R.D. 475) ("Rule 30(b)(6) does not limit what can be asked at a deposition"). Thus, McKesson's contention that Plaintiffs somehow strayed from the 30(b)(6) topics is immaterial, as the notices themselves did not serve to limit the topical areas that could be addressed with Mr. Hartle.

Finally, even assuming the portions of the examination pinpointed by McKesson were improper – which they were not – McKesson has offered no justification or authority for excluding the entirety of Mr. Hartle's 30(b)(6) testimony based on the narrow set of issues it has identified. The glaring lack of authoritative support for this remedy speaks volumes to the futility of the motion itself.   In fact, the more appropriate approach would be to deal with these issues through the process already in place to deal with objections to deposition designations.  Wholesale exclusion of the entirety of Mr. Hartle's 30(b)(6) testimony is simply not the appropriate answer under any circumstances.  McKesson's MIL No. MCK-5 should be denied.

6.    **McKesson MIL No. MCK-6**: The Court should prohibit introduction of documents related to McKesson's relationship with CVA and Rite Aid in light of severance.

McKesson asks the Court to prohibit introduction of documents related to McKesson's relationship with CVS and Rite Aid because CVS and Rite Aid were severed from the Track I Trial. The Court should deny this MIL because:  (1) evidence about McKesson's "relationship" with CVS and Rite Aid is central to Plaintiffs' civil conspiracy claim, so that evidence poses no danger of a "trial within a trial" – it is the trial itself; and (2) severance of defendants is not a basis for excluding any evidence about those defendants in a conspiracy case.

A critical component of Plaintiffs' conspiracy claim is the many actions and inactions by Distributor Defendants, including McKesson, to ensure that they and their pharmacy customers, including CVS and Rite Aid, could avoid having to report suspicious orders.[94]  Far from creating a "trial within a trial," evidence about McKesson's relationship with CVS (McKesson's largest customer from 2008-2018) and Rite Aid goes directly to Plaintiffs' allegations that Distributor and Pharmacy Defendants conspired to protect and grow the opioids market by, inter alia, avoiding their reporting obligations to the DEA.  One of the key provisions of McKesson's Controlled Substance Monitoring Program was creation of appropriate thresholds for opioid sales to pharmacy

---

[94]   *See, e.g.*, Dkt. #2182 (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment of Plaintiffs' Civil Conspiracy, RICO and OCPA Claims) at pp. 68-70.

customers.[95]  Yet, McKesson repeatedly and automatically increased thresholds for both CVS and Rite Aid, without adequate due diligence, and failed to investigate or report suspicious orders by these chain pharmacies in order to advance their common purpose to avoid suspicious order reporting.[96]  Such evidence does not pose any risk of a "trial within a trial" – it is evidence that will support Plaintiffs' conspiracy claim.[97]  This evidence will not cause McKesson to defend CVS and Rite Aid's internal SOM processes, but its role in abdicating its own duties,[98] which again is evidence going directly to Plaintiffs' claims.

Second, McKesson cites no authority for the proposition that a defendant's severance precludes introduction of evidence regarding the relationship between that defendant and a non-severed defendant.  Even assuming such a rule exists (which it does not), its application here would improperly hamstring Plaintiffs in presenting their conspiracy claim.  Granting this motion would unduly prejudice Plaintiffs by preventing them from presenting direct evidence of McKesson's role in the conspiracy.  Indeed, McKesson acknowledged that evidence regarding the relationship between Distributor Defendants and Pharmacy Defendants would be central to Plaintiffs' conspiracy claims when opposing severance.  Dkt. #2143 at pp. 6-7.  Under these circumstances McKesson's MIL No. MCK-6 should be denied.

---

[95]  Dkt. #1959-4 (1/17/19 Boggs Dep.) at 88:19–89:18.

[96]  *See, e.g.*, Dkt. #1971-19 (1/10/19 D. Walker Dep.) at 279:4-24, 288:6–291:1; Dkt. #2261-10 (MCKMDL00632825); Dkt. #2261-26 (MCKMDL00627723); Dkt. #2261-25 (MCKMDL00629858); Dkt. #2261-28/#2371-86 (MCKMDL00632923); Dkt. #2261-27 (MCKMDL00646634).

[97]  The cases McKesson cites do not support exclusion of evidence in this trial of McKesson's involvement with other actors as part of a conspiracy.  *Chism v. CNH Am., LLC*, 638 F.3d 637, 642 (8th Cir. 2011) (in personal injury case against manufacturer of hay baler, excluding evidence of other accidents involving hay balers because of lack of substantial similarity); *Widmer v. Warden, Corr. Reception Ctr.*, 2017 WL 447237, at *49 (S.D. Ohio Feb. 2, 2017) (in habeas corpus action seeking relief from murder conviction, refusing to allow inmate to cross-examine investigator based on alleged prior instance of untruthful conduct where authenticity of document on which request was based was questionable).  In both instances, evidence was excluded for other reasons besides the "trial within a trial" rationale.  More importantly, in neither instance was the evidence sought to be excluded directly relevant to the plaintiff's claim, like the evidence McKesson seeks to exclude here.

[98]  Dkt. #2169-32/#2713-50 (7/19/18 Oriente Dep.) at 548:22-550:1.

G.  **PLAINTIFFS' RESPONSE TO TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS'
OMNIBUS MOTION IN LIMINE (DKT. #2668).**

1.  **Teva MIL No. TAD-1**: The Court should exclude reference to the Cephalon
misdemeanor plea.

Moving Defendants[99] seek to exclude evidence regarding a criminal plea agreement entered
into by one of their related companies, Cephalon.  The motion attempts to minimize the severity of
the criminal activity, describing it as "a single misdemeanor count of off-label promotion of three
medicines, only one of which was an opioid) limited to an eight-month period in 2001."
Dkt. #2668-1 at p. 1.  The reality is far more serious.  The opioid drug in question was Actiq, which
was approved by the FDA in 1998 solely for the management of "breakthrough pain" in opioid-
tolerant cancer patients.  The FDA restricted its use because Actiq was a powerful narcotic –
fentanyl – in the form of a fast-dissolving lollipop, also known as a Transmucosal Immediate-
Release Fentanyl product (TIRF).

In 2000, Actiq generated a relatively modest $16 million in revenue for its then-owner
Anesta.  That same year Cephalon purchased Anesta.  Cephalon set extremely high sales goals for
Actiq, pressuring employees to generate volume sales. The pressure tactics worked spectacularly
well. By 2006, Cephalon's Actiq sales were $590.7 million, more than 36 times the amount sold in
2000.  The massive increase in sales was driven largely by fraudulent marketing – criminal acts that
were later admitted by Cephalon.  The "single misdemeanor count of off-label promotion" resulted
in $425 million in fines and settlements.  Cephalon and its successors were also required to adhere to
a five-year "Corporate Integrity Agreement" governing marketing practices.   The evidence
supporting these facts was included in Plaintiffs' Opposition to Teva/Actavis' Motion for Summary
Judgment. Dkt. #2220 at pp. 5-6.

For the same reasons discussed in § B.1, *supra*, this evidence is relevant and admissible, and
not properly excluded under Rule 403.  It is relevant, among other reasons, to prove that Moving

---

[99]  "Moving Defendants" are the Teva Defendants and the Actavis Generic Defendants, as defined in their
motion *in limine*. Dkt. #2668-1 at p. 1 & n.1.

Defendants engaged in intentional conduct, over many years and across the country, that was a substantial factor in causing the harm to Plaintiffs.

Moving Defendants argue the Cephalon plea is inadmissible character evidence, but they are wrong.  If they were being prosecuted for off-label promotion of a different drug, or at a later time, and the government sought to prove their guilt by introducing evidence of this prior conviction, that evidence would likely be barred by Rule 404.  But that is not the purpose for which the evidence will be offered here.  Rather, as Rule 404(b) notes, character evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  FED. R. EVID. 404(b)(2).  In this case, these Defendants' intent is an element of Plaintiffs' claims, and their ongoing and repetitive conduct improperly and falsely promoting the use of dangerous opioid medications is central to those claims.  Accordingly, Moving Defendants MIL No. TAD-1 should be denied.

### 2.    Teva MIL No. TAD-2: The Court should exclude reference to "off-label" promotion.

Moving Defendants' MIL No. TAD-2 seeks to preclude Plaintiffs from offering any testimony, evidence, or argument that Cephalon, Teva USA, or any other Moving Defendant's conduct constituted off-label promotion.  Dkt. #2668-1 at pp. 4-6.  Moving Defendants assert that any reference to off-label promotion is irrelevant and would confuse the jury.  Both of these arguments should be rejected as red herrings.

Moving Defendants argue that evidence and testimony about off-label promotion is irrelevant be-cause promoting the off-label use of drugs is not inherently false or misleading.  *Id.* at p. 4. But even if misleading messaging were not part of Moving Defendants' off-label promotion, false marketing is not the only basis for Plaintiffs' claims.  Evidence regarding off-label promotion is relevant to Plaintiffs' argument that the massive overpromotion of opioid use led to the creation of the public health crisis confronting their communities.  Evidence or testimony that Actiq and Fentora, for example, were promoted for noncancer pain caused by migraines and injuries when they were only approved for cancer pain in opioid-tolerant patients is relevant to the argument that

excessive promotion of opioids created a public health crisis.  Aggressive overpromotion of dangerous drugs need not be fraudulent to be unlawful.  Evidence regarding Moving Defendants' promotion of their opioids for a multitude of uses beyond those approved is fundamentally relevant to Plaintiffs' claims in this case.  *See* Dkt. #2000-8 (Kessler Expert Rep.).

Moving Defendants also argue that FDA regulations are "arcane," *id.* at p. 5, and "risk sucking the jury down an irrelevant rabbit hole of confusion and side issues." *Id.* at p. 4.  But the jury is not tasked with determining whether Moving Defendants' conduct violated FDA regulations surrounding off-label promotion or whether certain communications were protected speech, and it need not do so in order to determine whether Defendants' conduct substantially contributed to the opioid epidemic.  Moving Defendants raise the specter of "an irrelevant, confusing and highly prejudicial mini-trial," but the jury need not "assess[] whether Defendants' conduct constituted off-label activity[.]" *Id.* at pp. 5-6.  The question is whether Moving Defendants' conduct in aggressively over-promoting their opioid products (whether for approved or off-label uses) was a substantial factor in causing the harms caused by overprescribing alleged by Plaintiffs.  Answering this question does not require determining whether Defendants' off-label promotion complied with FDA regulations.  Evidence, testimony, and argument regarding Moving Defendants' promotion of drugs for uses beyond the approved indications are relevant and should not be excluded.

      **3.**    **Teva MIL No. TAD-3**: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government.

The arguments asserted by Moving Defendants in their MIL No. TAD-3 are addressed in § B.1, *supra*.  Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

      **4.**    **Teva MIL No. TAD-4**: The Court should exclude evidence of opioid-related harm that occurred outside of the counties.

Moving Defendants seek to prohibit any evidence regarding harm that occurred outside of Ohio, on the theory that the Plaintiffs can only recover for harm that they incurred.  As initial matter, it is unclear what Moving Defendants mean by "evidence of harm," and hence exactly what

evidence Moving Defendants are seeking to exclude. To the degree that Moving Defendants have specific evidence in mind, and that they are simply choosing not to identify it at this time, the appropriate course is for them to object when that evidence is offered at trial, as opposed to seeking an unspecified adjudication in a vacuum.

But more importantly, the fact that Plaintiffs cannot recover for harm incurred outside Ohio does not mean that the impact of Defendants misconduct outside of Ohio is irrelevant or should be ignored. Moving Defendants reference, by way of example, national studies on opioid abuse relied on by Plaintiffs' experts. Dkt. #2668-1 at p. 9. These studies are relevant to numerous issues, including providing the context and background with respect to the scope and nature of the opioid crisis. This is a crisis which many Defendants are disputing actually exists. Further, evidence of the national scope and nature of the crisis will be pertinent to any attempt by Defendants to blame the Plaintiffs for the harms by suggesting bellwether-specific failures are the cause of the harms. Indeed, the Court has already rejected Defendants' arguments seeking to exclude Plaintiffs' causation and damage experts who analyze national and aggregate trends to create their models. As Plaintiffs' expert reports make clear, and explained by Plaintiffs in their opposition briefs to Defendants' *Daubert* motions, national trends and statistics make Plaintiffs' analyses more reliable and relevant, and strengthen the reliability of the relationship between increased shipments of prescription opioids and increased harms. *See, e.g.,* Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶¶ 81-100 (explaining the most appropriate way to assess the relationship between shipments and mortality is based on regression-based comparisons across a robust sample of counties across the nation, not just one or two counties viewed in isolation); *see also* Dkt. #2000-6/#1999-6 (Gruber Expert Rep.) at ¶ 84, Fig. 1.18 (showing that in counties with the highest per capita shipments between 1997 and 2010, the prescription opioid mortality rate increased over 3.75 times more than it did in the counties with the lowest per capita shipments); *see also Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2017 WL 4748054, at *3 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018) ("[I]t seems axiomatic that the more data points that are available, the more reliable the ultimate damage calculation"). As such, information on the opioid crisis and its national scope is directly relevant to

both claims and defenses at issue in the litigation, and will greatly assist the jury in understanding the issues presented at trial.  *See also supra* at § A.6.

**5.    Teva MIL No. TAD-5: The Court should exclude evidence of marketing-related statements or opioid shipments outside of the counties.**

Moving Defendants also seek to exclude "evidence of marketing activity" where there is no showing that the marketing materials were distributed, published, or read in either County, as well as any evidence of shipments of opioids manufactured by Defendants that have no connection to Ohio.   Moving Defendants' arguments regarding shipments outside of Ohio are addressed in Plaintiffs' response to Defendants' Omnibus MIL No. 6.  *Supra* at § A.6.  With respect to Moving Defendants' marketing arguments, the factual premise underpinning these arguments is false.  The evidence in the record demonstrates that both Teva and Actavis engaged in nationwide marketing. There was no state-specific marketing, including state-specific marketing in Ohio, and any national marketing would have been used in all 50 states.  *See, e.g.,* Dkt. #1962-26/#1978-06 (11/16/18 Hassler Dep.) at 275:12 – 276:17 (confirming that for Teva, Cephalon and Actavis, marketing, sales and advertising pieces were national in scope, in that "they are able to be used all over America," and that these materials were not tracked, such that defendants have no way showing that such materials were not used in Ohio); **Ex. 34** [Hassler Dep. Vol II] at 621:10-19 (testifying that Teva and Cephalon did not release materials that were specific to geographic areas for their marketing or educational messages, and that "[t]he messages were approved nationwide, and they would have been available and used in Ohio, just as they would have been in any other state in the country."); Dkt. #2177-5 (11/2/18 Snyder Dep.) at 271:5 – 272:3 (testifying that Kadian marketing materials were national in that the same marketing materials were provided and used by sales reps across the country).

Finally, Moving Defendants' constitutional argument—that it is unconstitutional to "project Ohio's regulatory regime into another state"—is simply misplaced.  Dkt. #2668-1 at pp. 10-11. Plaintiffs are not seeking to project Ohio's regulatory regime into another state, nor are they seeking to "penalize" Moving Defendants for conduct outside of Ohio.  Defendants' misconduct violated

not only Ohio law, but also federal law and the local laws of any non-Ohio jurisdiction within which the conduct occurred.  As Plaintiffs will demonstrate at trial, the evidence in the record establishes that Moving Defendants have engaged in misconduct, and caused significant injury, within Plaintiffs' jurisdictions.  But Plaintiffs are also entitled to introduce evidence showing the systemic nature of Moving Defendants' misconduct, and the degree to which this conduct caused a national opioid crisis that impacted the bellwether jurisdictions.

6. **Teva MIL No. TAD-6**: The Court should exclude evidence regarding Teva Defendants' financial support of third-party groups.

Moving Defendants claim Plaintiffs should be precluded from offering evidence or argument of their funding of third-party trade groups because such conduct is protected by the First Amendment's right to freedom of association.[100]  Not so.  Plaintiffs are not arguing that Moving Defendants' mere participation in, and funding of, various trade and advocacy organizations, in and of themselves, subject them to liability.  Rather, Plaintiffs allege, and will demonstrate at trial, that Moving Defendants worked together, through their trade associations and otherwise, (i) to unlawfully deceive and mislead the public, the medical community, and the government regarding the risks of their opioids and their purported efforts to prevent diversion, and (ii) to unlawfully avoid their legal duties to monitor for, report, and prevent shipment of suspicious orders of opioids.  Evidence of Moving Defendants' participation and funding of these trade associations is relevant to demonstrate that they participated in this conspiracy with the intention of furthering this wrongful conduct.  *See In re Welding Fume Products Liab. Litig.*, 526 F. Supp. 2d 775, 803 (N.D. Ohio 2007)

---

[100]  In their motion, Moving Defendants quote the following language from the Supreme Court: " 'The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial resources for expressive purposes—is part of the freedom of speech.' " Dkt. #2668-1 at pp. 11-12 (quoting *McConnell v. Fed. Election Comm.*, 540 U.S. 93, 255 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm.*, 558 U.S. 310 (2010)).  They fail to mention this language was taken from Justice Scalia's *dissent* in that case.  *McConnell*, 540 U.S. at 247-48, 255.  (In *McConnell*, Justice Scalia concurred in part and dissented in part, but the quoted language is in a section of his opinion in which he is criticizing the majority opinion.  *Id.* at 250, 255-56.).

("*Welding Fume I*") (recognizing that there are circumstances in which "joint activity undertaken through a trade association" can be "evidence of a conspiracy").[101]

Moving Defendants also claim that Plaintiffs should be precluded from arguing that they are responsible for statements made by these third-party groups because Plaintiffs have not and cannot demonstrate that any third-party group was acting as their agent.  Dkt. #2668-1 at p. 12.  This Court already rejected this argument in its opinion denying the Teva Defendants' summary judgment motion:

> The Court rejects the Teva Defendants' argument that Plaintiffs cannot show an agency relationship existed between the Teva Defendants and the third parties they "partially" funded.  In the "Pain Matters" presentation, Gudin told the audience: "this program was developed by Teva Pharmaceuticals, . . . the three of us are presenting on behalf of Teva, and . . . we've been compensated by Teva to give this presentation."  Clearly, material fact issues exist in this regard.

Dkt. #2564 at pp. 3-4 n.5 (internal citations omitted).  *See also* Dkt. #2565 at p. 19 ("Whether groups like APF were truly independent third parties or merely front groups, remains an issue of fact for the jury.  Though Teva contends that funding to these third-party organizations was conditional on their independence, it is the jury's province to decide whether third-party agreements requiring independent were actually followed; and this, to large extent, may depend on the credibility of the witnesses called. . . .  A reasonable finder of fact could conclude . . . that the Teva entities directly, as well as through front groups and CME programs, falsely represented the risk of opioid addiction, and that these representations were not tied to specific brand names, but applied to opioids generally.") (internal citation omitted).[102]

---

[101]  *See also AirCo, Inc.*, 2003 WL 27382684, at *16 (rejecting defendants' argument that dismissal of plaintiff's civil conspiracy claim was warranted because members of a trade association cannot be held liable "for simply exercising their first amendment rights by attending meetings[,]" because the complaint did "not seek to hold Defendants responsible merely for attending trade association or scientific meetings[,]" but rather "allege[d], beyond mere membership, that they  . . . took specific affirmative acts at meetings in which specifically-named entities agreed to perpetrate a series of frauds").

[102]  Thus, Plaintiffs have already made an evidentiary proffer that the Court considered sufficient to withstand summary judgment.

The cases cited by Moving Defendants, none of which involved motions *in limine*, are factually inapposite. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 395 (1982) (in a § 1981 racial discrimination action, defendants could not be held vicariously liable, under *respondeat superior*, for the discriminatory conduct of third party where there was no evidence in the record that the third party was acting as the defendants' agent; "That the employers fund the activities of the JATC does not render the JATC the employers' servant or agent any more than an independent contractor is rendered an agent simply because he is compensated by the principal for his services. The employers must also enjoy a right to control the activities of the JATC, and there is no record basis for believing that to be the case."); *Natl. Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451 (1958) (addressing whether the state of Alabama could compel the NAACP "to reveal to the State's Attorney General the names and addresses of all its Alabama members and agents, without regard to their positions or functions in the Association"); *McWilliams v. S.E., Inc.*, 581 F. Supp. 2d 885, 893 (N.D. Ohio 2008) (plaintiff failed to allege "any agency relationship between the pilot and the aircraft owner[,]" and therefore could "not impute [the pilot's] alleged negligence to [the owner]"; bare allegation in complaint that "[a]ll acts of [the aircraft owner] were done by its agents" was "insufficient to establish agency");[103] *Welding Fume I*, 526 F. Supp. 2d at 803 ("There is no evidence that would allow a jury to conclude that Caterpillar actually joined any conspiracy by agreeing to cooperate with other defendants, intending to help them achieve the objective of hiding the hazards of manganese in welding fume.  This is so because, from the beginning, Caterpillar's actions and statements reveal that, in most regards, it was actually working at cross-purposes from the supposed objectives of the conspiracy."); *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416-18 (S.D. Ohio 1986) (holding franchisor had sufficient right of control over

---

[103]  In their motion, Moving Defendants describe *McWilliams* as holding a "defendant not liable for third-party statements because [there was] no evidence that [the] third party acted as defendant's agent with respect to the challenged statements[.]"  Dkt. #2668-1 at p. 13 n.11.  But that case does not address liability for third-party statements.  Rather, the issue was whether the owner of a skydiving plane owed a duty to the skydiver "to inspect the harness or ensure its safety" based on the owner's relationship with the pilot.  581 F. Supp.2d at 893.  The court held that the pilot's negligence could not be imputed to the owner because the plaintiff had failed to allege an agency relationship between the two.  *Id.*

franchisee check collection company under their contract to make franchisee its "agent" in regard to franchisee's acts giving rise to check drawer's action against franchisor for liability under the Fair Credit Reporting Act and the Fair Debt Collection Practices Act); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1072 (11th Cir. 2017) ("Of course, *alone*, membership in a trade organization like CANAERO does not make Defendants part of an enterprise.") (emphasis added); *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1290-94 (3d Cir. 1994) (former manufacturer of asbestos products could not be held civilly liable for any wrongful conduct committed by [the trade association] SBA or its members in the years after SBA's formation unless it can be shown that [the manufacturer's] actions taken in relation to the SBA were specifically intended to further such wrongful conduct" and "[h]ere, there is simply no evidence that [the manufacturer] had such an intent"; critically, the court noted that there was no evidence that the manufacturer "had 'tacitly or overtly agreed' with the other defendants to continue selling its product without warnings or had been a party to 'written agreements, meetings, and other communications among asbestos defendants to conceal their knowledge of the dangers of asbestos from the public' ").

For these reasons, Moving Defendants' MIL No. TAD-6 should be denied.

7. **Teva MIL No. TAD-7: The Court should exclude testimony from Russell Portenoy about any improper conduct by Moving Defendants.**

Moving Defendants' MIL No. TAD-7 is an improper attempt to evade possibly adverse relevant testimony by a witness whom the Court expressly permitted Teva to depose, but Teva declined to do so. Moving Defendants argue that Plaintiffs should be precluded from eliciting testimony from witness Dr. Russell Portenoy about any improper conduct by Teva because he allegedly testified in the State of Oklahoma prescription opioid litigation that he was unaware of any such conduct. Dkt. #2668-1 at 13-14. The Court should reject this argument as procedurally improper.

Moving Defendants have not demonstrated that Dr. Portenoy's trial testimony here would contradict his prior testimony in the Oklahoma case. Even assuming it did, the remedy would not be exclusion under FED. R. EVID. 402, as Moving Defendants aver, *see* Dkt. #2668-1, but

impeachment under FED. R. EVID. 613(b). *See*, *e.g.*, *United States v. Foster*, 376 F.3d 577, 591 (6th Cir. 2004) ("Glover's prior inconsistent statement is admissible under Federal Rule of Evidence 613(b), which permits the impeachment of a witness . . . ."). Since Moving Defendants may try to impeach Dr. Portenoy using any allegedly contrary prior testimony, the Court should reject this motion to preemptively limit his trial testimony here.

An *in limine* ruling would be particularly inappropriate here because the Court issued an Order expressly permitting Teva and all Defendants to depose Dr. Portenoy. Dkt. #1577 (Order re Discovery Order No. 19) at p. 8 ("[T]he Court concludes that a more appropriate sanction is to allow Defendants to take Dr. Portenoy's deposition at Plaintiffs' counsel's expense. Further, should Defendants deem it necessary, the Court will consider, on a motion by Defendants, allowing a small amount of supplemental discovery and deposition testimony from additional fact witnesses that Defendants sincerely believe could 'challenge Dr. Portenoy's specific claims about Defendants' supposedly misleading marketing. . . ."). The Court placed no substantive limits on Defendants' deposition of Dr. Portenoy, thus permitting Moving Defendants to probe the full range of his factual knowledge and also to obtain additional rebuttal evidence as needed.

Moving Defendants chose not to do so. At one point, Defendants expressed an intent to exercise their right to depose Dr. Portenoy. A dispute then arose concerning the scope of his deposition, particularly over whether questioning would or would not be limited to the scope of his Oklahoma testimony and over whether Plaintiffs, too, would be permitted to question him. Special Master Cohen ruled in a telephonic hearing that questioning of Dr. Portenoy *would not* be limited to the scope of his Oklahoma testimony, which he found to be "incomplete," and that *all parties* including Plaintiffs would be permitted to question him. *See* **Ex. 35** [Transcript of July 18, 2019 Teleconference with Special Master Cohen re Dr. Portenoy Deposition]. After the Special Master so ruled, Teva and its co-Defendants backpedaled and chose to decline the Court's invitation to depose Dr. Portenoy. Having done so, Moving Defendants may not now obtain an order precluding allegedly inconsistent testimony that they could have fully probed and rebutted through discovery and may still try to impeach at trial.

For all of these reasons, the Court should deny Moving Defendants' MIL No. TAD-7 concerning Dr. Portenoy.

8. **Teva MIL No. TAD-8: Plaintiffs should be precluded from arguing that the Actavis Generic Defendants should have made additional warnings regarding their generic medicines or should have stopped selling them.**

Moving Defendants' joint motion to preclude argument that the Actavis Generic Defendants should have made additional warnings regarding generic opioids is an improper attempt to re-litigate the preemption theory Defendants already lost. Dkt. #2565 (Opinion and Order Re: Preemption) ("Preemption Order"). In the Preemption Order, the Court summarized Plaintiffs' theory that "*all* manufacturers engaged in the false marketing of opioids generally, frequently through unbranded promotion." Dkt. #2565 at p. 12 (emphasis in original). "[A]ny distinction . . . between those defendants who manufactured brand name opioids, those who manufactured generic opioids, or, as appears to be most common, those who manufactured both, would be rendered largely immaterial." *Id.* As the Court found, because "Plaintiffs' state law claims are *not* predicated upon violations of the FDA or CSA, nor are they accurately characterized as 'fraud on the FDA' or 'fraud on the DEA' claims," preemption simply does not apply. Dkt. #2565 at p. 10 (emphasis in original).

Moving Defendants' reliance on *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5258858 (S.D. Ohio Sept. 10, 2015), is inapt. Dkt. #2668-1 at p. 15. In *Rheinfrank*, the Court granted a motion *in limine* on plaintiff's failure to warn claim because the FDA had affirmatively found the warning at issue "'should not be incorporated'" into defendant's drug label. 2015 WL 5258858 at *2 (citation omitted). No parallel exists here.

Moving Defendants also argue they had no duty to "correct[] alleged impressions *by others* about opioids." Dkt. #2668-1 at p. 15 (emphasis added). But that straw man does not address Plaintiffs' claim; Plaintiffs allege that Teva/Actavis engaged in affirmative misrepresentations in their branded and unbranded marketing, and failed to correct their *own* representations, not others'.

Second, Actavis Generic Defendants' employees, including some that designated to testify at trial here, were active participants on the boards that conducted non-branded marketing.[104]  As such, Plaintiffs have put forward evidence sufficient to show that the Actavis Generic Defendants themselves "engaged in the false marketing of opioids generally, frequently through unbranded promotion." Dkt. #2565 at p. 12.  Such promotional activities are not preempted.  *Id.* at p. 10; *see also* Dkt. #1499, *The Muscogee (Creek) Nation v. Purdue Pharma L.P.*, Report and Recommendation re: Motion to Dismiss, at p. 35 n.29 (denying motion to dismiss marketing claims because "some of the Generic Manufacturers or their corporate affiliates are also alleged to sell name-brand prescription opioids").  Plaintiffs have never advanced any argument that Moving Defendants needed to "stop selling" opioids (Dkt. #2668-1 at p. 15), just that they could not do so with false and misleading marketing.

For these reasons, Moving Defendants' MIL No. TAD-8 should be denied.

9. **Teva MIL No. TAD-9: The Court should exclude reference to the purchase price paid by Teva Pharmaceutical Industries Ltd. for the Actavis Generic Defendants.**

Moving Defendants move to exclude reference to the purchase price Teva Pharmaceutical Industries Ltd. paid for the Actavis Generic Defendants in 2016 on grounds that the price is irrelevant and unduly prejudicial.  It is neither.  The purchase price is relevant because it indicates that, as of 2016, the acquisition of the Actavis Generic Defendants and their portfolio of generic opioids was worth approximately $40.5 billion.  Opioids were massively profitable for Defendants, due in substantial part to extensive marketing based on misrepresentations and the failure to comply with the CSA's SOM requirements.  Teva's willingness to pay tens of billions dollars in order to acquire the rights to sell a large number of generic opioids, including oxycodone, oxymorphone, morphine sulfate, and fentanyl, is relevant to the jury's understanding of the value of and expectations for sales of generic opioids.

---

[104]  Dkt. #2383-1/#2290-1 at 391:22-393:5 (Michael Perfetto on NACDS planning board); Dkt. #2380-20/#2287-20 at 431:3-14 (Douglas Boothe on GPhRMA board).

Moving Defendants' reliance on *Brooks v. Caterpillar Glob. Mining Am. LLC*, No. 4:14-cv-00022-JHM, 2017 WL 3401476 (W.D. Ky. Aug. 8, 2017), is inapt. Dkt. #2668-1 at p. 16. The claim in that case concerned a design defect claim concerning a single accident sustained by a coal miner; as such, defendant's financial condition was properly found irrelevant. 2017 WL 3401476, at *1. This case, concerning decades of misrepresentations and failures to meet regulatory requirements, could not be more different. *Gonzalez Prod. Sys. Inc. v. Martinrea Int'l Inc.*, No. 13-cv-11544, 2015 WL 4934628 (E.D. Mich. Aug. 18, 2015), is more informative. There, the court denied in part defendant's motion *in limine* to exclude the financial condition of defendant because it determined that such evidence "pertain[ed] to [defendant's] knowledge and potential motives for [defendant's] actions." *Id.* at *11. Similarly, the amount paid by Teva to acquire the Actavis Generic Defendants is relevant and probative of how valuable generic opioids were viewed by a pharmaceutical company.

Nor is the purchase price unduly prejudicial. Moving Defendants posit a strawman fallacy, contending that Plaintiffs will use the purchase price to communicate Teva's "current financial health" to the jury. Dkt. #2668-1 at p. 17. Not so. In fact, the Teva entity that purchased the Actavis Generic Defendants – Teva Pharmaceutical Industries Ltd. – is not a defendant at the trial for which Moving Defendants seek exclusion of the sale price. Dkt. #2673. Contrary to *City of Cleveland v. Peter Kiewit Sons' Co.*, on which Moving Defendants rely (Dkt. #2668-1 at p.), references to the purchase price will *not* be "'clearly calculated to direct the jury's attention to . . . compensation rather than the real issues in the case.'" 624 F.2d 749, 756-57 (6th Cir. 1980). Rather, as set forth above, the purchase price is probative of the market value of a portfolio including generic opioids in 2016 – even after the role of prescription opioids in creating the opioid crisis was a matter of national discussion. The purchase price is, therefore, indicative of "the real issues in the case." It is not unduly prejudicial.

### 10.     Teva MIL No. TAD-10: The Court should exclude reference to the settlement agreement between Teva Ltd. and Allergan.

Plaintiffs have no objection to Moving Defendants' MIL No. TAD-10.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny each of Defendants' joint and individual MILs, except as otherwise indicated above.

Dated:  October 7, 2019

Respectfully submitted,

/s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232

(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
6810 FM 1960 Rd W
Houston, TX  77069-3804
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Lead Trial Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY  10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

**CERTIFICATE OF SERVICE**

I certify that the foregoing instrument was served via email to defense counsel and to Special

Master Cohen on October 7, 2019.

s/Peter H. Weinberger
Peter H. Weinberger