Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4   IN RE: NATIONAL           *

 5   PRESCRIPTION              *    MDL No. 2804

 6   OPIATE LITIGATION         *      Case No.

 7   _____      *    1:17-MD-2804

 8   THIS DOCUMENT RELATES     *     Hon. Dan A.

 9   TO ALL CASES              *       Polster

10

11              THURSDAY, DECEMBER 13, 2018

12

13        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14               CONFIDENTIALITY REVIEW

15                     - - -

16   Videotaped deposition of DEANNA STACY AYERS

17   CHICK, held at the Law Offices of Robbins

18   Geller Rudman & Dowd, 3424 Peachtree Road, NE,

19   Suite 1650, Atlanta, Georgia, commencing

20   at 9:11 a.m., on the above date, before

21   Lois A. Robinson, Registered Diplomate

22   Reporter and Certified Realtime Reporter.

23

24

25
```

Page 2

```
1           A P P E A R A N C E S
2   COUNSEL FOR PLAINTIFFS:
3        LIEFF CABRASER HEIMANN & BERNSTEIN
         222 2nd Avenue South, Suite 1640
         Nashville, Tennessee 37201-2379
4        BY: MARK P. CHALOS, ESQUIRE
           Mchalos@lchb.com
5
6        LIEFF CABRASER HEIMANN & BERNSTEIN
         275 Battery Street, 29th Floor
         San Francisco, California 94111
7        BY: PETER ROOS, ESQUIRE
           Proos@lchb.com
8
9   COUNSEL FOR THE TENNESSEE ACTION:
    BRANSTETTER, STRANCH & JENNINGS, PLLC
         The Freedom Center
10       223 Rosa L. Parks Avenue, Suite 200
         Nashville, Tennessee 37203
11       BY: TRICIA HERZFELD, ESQUIRE
           Triciah@bsjfirm.com
12
    COUNSEL FOR MALLINCKRODT:
13       ROPES & GRAY
         Prudential Tower
14       800 Boylston Street
         Boston, Massachusetts 02199
15       BY: WILLIAM T. DAVISON, ESQUIRE
           William.davison@ropesgray.com
16       MAX R. MAEROWITZ, ESQUIRE
           Max.maerowitz@ropesgray.com
17
    COUNSEL FOR WALMART:
18       JONES DAY
         51 Louisiana Avenue, N.W.
19       Washington, D.C. 20001-2113
         BY: SHIRLETHIA V. FRANKLIN, ESQUIRE
20         Sfranklin@jonesday.com
21  COUNSEL FOR CARDINAL HEALTH, INC.:
    BAKER HOSTETLER
22       1170 Peachtree Street, NW, Suite 2400
         Atlanta, Georgia 30309-9814
23       BY: CHRISTOPHER A. WIECH, ESQUIRE
           Cwiech@bakerlaw.com
24
25       (Continued on next page)
```

Page 3

```
1        A P P E A R A N C E S - (continue)
2   (Appearing via teleconference)
3   COUNSEL FOR AMERISOURCEBERGEN:
         JACKSON KELLY
4        500 Lee Street East, Suite 1600
         Charleston, West Virginia 25322
5        BY: Jon L. Anderson, ESQUIRE
           Jlanderson@jacksonkelly.com
6
7   COUNSEL FOR ENDO HEALTH SOLUTIONS, INC., ENDO PHARMACEUTICALS,
    INC., PAR PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES,
    INC. (F/k/a PAR PHARMACEUTICAL HOLDINGS, INC.):
8        BAKER HOSTETLER
9        127 Public Square, Suite 2000
         Cleveland, Ohio 44114-1214
10       BY: DOUG L. SHIVELY, ESQUIRE
           Dshively@bakerlaw.com
11
12  COUNSEL FOR VALIDUS PHARMACEUTICALS:
         FOX ROTHSCHILD, LLP
13       1301 Atlantic Avenue
         Midtown Building, Suite 400
14       Atlantic City, New Jersey 08401-7212
         BY: EILEEN OAKES MUSKETT, ESQUIRE
15         Emuskett@foxrothschild.com
16  COUNSEL FOR McKESSON:
         COVINGTON & BURLING LLP
17       One City Center
         850 Tenth Street, NW
18       Washington, DC 20001-4956
         BY: WEISS NUSRATY, ESQUIRE
19         Wnusraty@cov.com
20
    ALSO PRESENT:      JASON TILLY
21
22  VIDEOGRAPHER:      JOSH COLEMAN
23
    REPORTER:      LOIS ANNE ROBINSON, RPR, RDR, CRR, CRC
24
25
```

Page 4

```
1                 I N D E X
2   EXHIBITS                        PAGE
3   Mallinckrodt Chick 1             18
4    Notice of Deposition
5   Mallinckrodt Chick 2             26
6    LinkedIn Profile of Stacy Chick
7   Mallinckrodt Chick 3             52
8    Offer Letter - MNK-T1_0007147310 - MNK-T1_0007147317
9   Mallinckrodt Chick 4             67
10   Separation of Employment Agreement and General Release -
11   MNK-T1_0007147236 - MNK-T1_0007147259
12  Mallinckrodt Chick 5             80
13   Organizational announcement - MNK-T1_0000944549
14  Mallinckrodt Chick 6             90
15   Organizational announcement - MNK-T1_0000546859 - 0000546862
16  Mallinckrodt Chick 7             96
17   Organizational Structure of Specialty Pharmaceuticals
18   Business - MNK-T1_00023333495
19  Mallinckrodt Chick 8             111
20   Noncompete agreement - MNK-T1_0007147292
21  Mallinckrodt Chick 9             115
22   Separation agreement for Payroll Purposes Only -
23   MNK-T1_0007147320 - 0007147321
24
25       (Continued on next page)
```

Page 5

```
1                 I N D E X - (continued)
2   Mallinckrodt Chick 10            117
3    U.S. Specialties Pharmaceuticals Town Hall - MNK-T1_0000546174
4    - MNK-T1_0000546204
5   Mallinckrodt Chick 11            130
6    Email from Rhonda Sciarra - 1/15/15 - MNK-T1_0000543744
7   Mallinckrodt Chick 12            134
8    Email from D. Hasse re MNK-795 Launch plan -
9    MNK-T1_0000540835 - MNK-T1_0000540842
10  Mallinckrodt Chick 13            142
11   May 20, 2014, communication - MNK-T1_0000136035 -
12   MNK-T1_0000136037
13  Mallinckrodt Chick 14            162
14   MNK-T1_0000135662 - MNK-T1_0000135664
15  Mallinckrodt Chick 15            163
16   Email from S. Chick - 7/23/14 - MNK-T1_0000545292 -
17   MNK-T1_0000545294
18  Mallinckrodt Chick 16            169
19   Email from S. Chick re "Important Information" -
20   MNK-T1_0000537717 - MNK-T1_0000537718
21  Mallinckrodt Chick 17            173
22   Letter of recognition - MNK-T1_0001024933
23  Mallinckrodt Chick 18            178
24   Emails - MNK-T1_0002235394 - MNK-T1_0002235397
25       (Continued on next page)
```

Page 6

1        I N D E X - (continued)
2    Mallinckrodt Chick 19              184
3    Email from S. Chick - 4/16/14 re XXR Performance to Date -
4    MNK-T1_0000173752 - MNK-T1_0000173753
5    Mallinckrodt Chick 20              188
6    District Analysis of Xartemis XR Performance -
7    MNK-T1_0000740311 - MNK-T1_0000740327
8    Mallinckrodt Chick 21              226
9    Push report - MNK-TNSTA00224454
10   Mallinckrodt Chick 22              230
11   Midyear Performance Discussion Guide - MNK-TNSTA013717
12   Mallinckrodt Chick 23              235
13   Email 5/13/14 - MNK-TNSTA00222642
14   Mallinckrodt Chick 24              237
15   Email from J. Meyer - MNK-TNSTA02582409
16
17
18
19
20
21
22
23
24
25

Page 7

1    VIDEOGRAPHER:
2         We are now on the video record. My
3    name is Josh Coleman. I'm the videographer for
4    Golkow Litigation Services.
5         Today's date is December 13th, 2018.
6    The time is approximately 9:11 a.m.
7         This video deposition is being held in
8    Atlanta, Georgia, in the matter of National
9    Prescription Opiate Litigation, Number 2804, for
10   the United States District Court for the Northern
11   District of Ohio, Eastern Division.
12        The deponent is Stacy Chick.
13        Counsel will be noted on the
14   stenographic record.
15        The court reporter is Lois Robinson,
16   who will now swear in the witness.
17        DEANNA STACY AYERS CHICK,
18   the witness, after having first been
19   duly sworn to tell the truth, the whole truth,
20   and nothing but the truth, was examined and
21   testified as follows:
22             EXAMINATION
23   BY MR. CHALOS:
24   Q    Thank you, Miss Chick, for being here
25   today.

Page 8

1         Before we went on the record, you
2    spelled and said your full name. Can you please
3    do that again.
4    A    Yes. Deanna Stacy Ayers Chick. D-E --
5    Q    Okay. I'm sorry. Yeah. Perfect.
6    A    Spell it?
7    Q    Yes, please.
8    A    D-E-A-N-N-A, S-T-A-C-Y, A-Y-E-R-S,
9    C-H-I-C-K.
10   Q    Okay. Have you ever been known by any
11   other names?
12   A    No.
13   Q    Is Ayers your maiden name?
14   A    My maiden name, yes.
15   Q    So at some point you were known as
16   Deanna Stacy Ayers?
17   A    Deanna Stacy Ayers, yes.
18   Q    Gotcha.
19        Have you ever given a deposition
20   before?
21   A    Yes.
22   Q    On how many occasions?
23   A    Two in particular I can recall.
24   Q    What was the subject matter of those
25   depositions?

Page 9

1    A    One was involving an action with
2    Mallinckrodt in an HR-related matter that
3    preceded my being with the company, and another
4    was when I was employed with Bristol-Myers
5    Squibb.
6    Q    And what was the nature of that
7    lawsuit?
8    A    That was an action by the Department of
9    Justice on the PBM litigation that was before a
10   number of pharmaceutical companies at the time.
11   Q    What drugs were at issue there?
12   A    In particular, Pravachol.
13   Q    What was your role in that situation?
14   A    So I was a customer marketing manager
15   and director at the time.
16   Q    What does that mean?
17   A    So it was my role to help create
18   promotional strategy for products in the payer
19   space.
20   Q    Were you responsible for Pravachol
21   solely or were you also responsible for other
22   drugs?
23   A    The -- the entire portfolio.
24   Q    Okay. Did you testify at a trial in
25   that case?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 A    No.
2 Q    Going back to the Mallinckrodt
3 deposition that you gave on the HR matter, who
4 was the -- the claimant there, the person making
5 the claims?
6 A    I don't recall the individual's name.
7 Again, this -- this action preceded my employment
8 with the company. I was there to provide some
9 subject matter expertise on the current
10 situation.
11 Q    Was this a district manager who made
12 the claim?
13 A    I don't recall the specific person's
14 name or title. I did not interact with them.
15 Q    Was it a salesperson, somebody in the
16 sales division?
17 A    I believe it was a sales-related
18 individual. I don't know their name or -- or
19 title.
20 Q    Where did you give that deposition?
21 A    I believe --
22 Q    Where were you physically --
23 A    I believe that was in St. Louis.
24 Q    Where were you physically in the
25 Bristol-Myers Squibb deposition?

Page 11

1 A    That was in Plainsboro, New Jersey.
2 That's -- that's where my employment was. The
3 deposition was taken, I believe, in Philadelphia.
4 Q    And were you represented in both of
5 those depositions by lawyers for the company?
6 A    Yes.
7 Q    Did you have your own lawyers as well?
8 A    In the case of Bristol-Myers Squibb,
9 the company did retain counsel individually for
10 me as well.
11 Q    Do you recall who that was?
12 A    I believe his name was Wick Sollers.
13 Q    Can you spell that?
14 A    Does that sound right? I'm trying to
15 recall his name. I'd have to go back and look.
16 But I believe it was Wick Sollers, W-I-C-K,
17 S-O-L-L-E-R-S.
18 Q    Do you recall what firm Mr. Sollers was
19 with?
20 A    I don't. I'm sorry. It was quite some
21 time ago.
22 Q    When was that?
23 A    2001, 2002 time frame.
24 Q    And when was the Mallinckrodt
25 deposition?

Page 12

1 A    It would have been sometime in the
2 period of my employment there, which would have
3 been between 20- --
4 I have to go back and -- and look at
5 time frames.
6 Q    I believe your --
7 A    So between --
8 Q    I'm sorry.
9 A    -- August of 2013 and June of 2015 was
10 my employment. I can't recall specifically
11 the -- the time of that event.
12 Q    Do you recall what lawyers you worked
13 with there?
14 A    I don't.
15 Q    Those were lawyers hired my
16 Mallinckrodt to represent you?
17 A    I don't know, but I would assume so,
18 yes. I just simply don't recall.
19 Q    Did you hire your own lawyers in
20 connection with the Mallinckrodt --
21 A    No.
22 Q    -- matter?
23 Okay. Were they the same lawyers who
24 represent you here today?
25 A    No.

Page 13

1 Q    Was it the same law firm?
2 A    I don't believe so.
3 Q    And do you have lawyers representing
4 you here today?
5 A    No -- yes. I beg your pardon. Yes.
6 Mallinckrodt, yes.
7 Q    Do you believe they're representing you
8 individually?
9 A    Yes.
10 Q    Have you hired those lawyers?
11 A    So I have agreed to an engagement,
12 signed an engagement letter with Ropes & Gray.
13 Q    Have you paid them any money?
14 A    No.
15 Q    Do you expect to pay them any money?
16 A    No.
17 Q    Do you know who's paying them?
18 A    Mallinckrodt.
19 Q    When did you sign the agreement with
20 Ropes & Gray?
21 A    I'm trying to recall the specific date.
22 It would have been sometime within the last six
23 to nine months, when I was contacted about this.
24 Q    Okay. Who contacted you about this?
25 A    So I was contacted, I believe -- I

Highly Confidential - Subject to Further Confidentiality Review

---

1 believe by Ropes & Gray.

2 Q You believe that was within the last

3 six to nine months?

4 A Yes.

5 Q Do you recall who contacted you?

6 A I believe Bill contacted me.

7 Q Who is Bill? The man sitting next to

8 you?

9 A Bill, the man sitting next to me.

10 Thank you.

11 Q And how long after that contact did you

12 enter into an agreement with Ropes & Gray?

13 A So I would say approximately two weeks.

14 Q Are you being paid by anyone in

15 connection with today?

16 A No.

17 Q Did you prepare for the deposition

18 today?

19 A Yes.

20 Q How did you do that?

21 A So I met with counsel.

22 Q What else?

23 A Met with counsel.

24 Q Okay. Is that --

25 On how many occasions did you meet with

---

1 counsel?

2 A We've actually met twice, once

3 yesterday, once sometime ago, I believe in

4 August, when the time frame was more imminent for

5 this deposition, and then, subsequently, it was

6 rescheduled.

7 Q Okay. So you've met two times with

8 counsel?

9 A Yes.

10 Q Have you talked on the phone other than

11 those two meetings?

12 A Yes.

13 Q Substantive -- did you have substantive

14 conversations on the phone?

15 A No.

16 Q Have you ever communicated by video

17 conference with counsel?

18 A No.

19 Q How long -- let's talk about the first

20 meeting in August. How long did that last?

21 A Less than a full day.

22 Q How much less than a full day?

23 A I don't recall the specific time. I

24 believe we met at 9 o'clock in the morning and

25 concluded some -- somewhere around maybe

---

1 3 o'clock in the afternoon.

2 Q Where was that meeting?

3 A At the J. W. Marriott in Buckhead.

4 Q Do you recall who was there?

5 A Bill, counsel here with Ropes & Gray,

6 and one of his associates.

7 Q Anyone else?

8 A Cassie --

9 And I'm sorry. I don't recall Cassie's

10 last name.

11 Q Okay. So two people? Two lawyers?

12 A Yes.

13 Q Okay. Is Cassie a lawyer?

14 A I believe so.

15 Q Okay. And how about yesterday? How

16 long did that meeting last?

17 A We began at 9 a.m. and concluded about

18 4:30.

19 Q And who was there?

20 A Counsel as represented here, Bill and

21 Max, with Ropes & Gray.

22 Q Two lawyers?

23 A Yes.

24 Q Where was that meeting?

25 A Also at the J. W. Marriott in Buckhead.

---

1 Q Okay. Somebody's got some Marriott

2 points, I guess.

3 Did you look at documents during the

4 first meeting in August?

5 A Yes.

6 Q Did you look at documents yesterday?

7 A Yes.

8 Q Did those documents help refresh your

9 memory for either of the meetings?

10 A In some instances, yes.

11 Q Okay. What do you do now?

12 A So I'm employed by a privately --

13 privately held company, a molecular diagnostics

14 company called Inivata. I'm the chief commercial

15 officer.

16 Q What do they do at that company?

17 A The company produces proprietary

18 technology-based assay specific for patients with

19 advanced non-small cell lung cancer.

20 Q Is it a test for cancer?

21 A It's a molecular diagnostics test, yes.

22 Q What is -- what does that mean?

23 A It means it sequences circulating tumor

24 DNA to stratify patients' DNA for certain genetic

25 markers associated with advanced non-small cell

---

Page 18

1  lung cancer.
2  Q      Is that to direct the type of treatment
3  that the patient receives?
4  A      It is.
5  Q      How long have you had that job?
6  A      So I became the chief commercial
7  officer in September of 2018. That was preceded
8  by a consulting arrangement, exclusive consulting
9  arrangement with the company since February of
10  2018.
11  Q      Are you still based in Atlanta?
12  A      I live in Atlanta. The company is
13  based in the U.S. in Raleigh, North Carolina, so
14  I travel there quite a bit.
15  Q      You can fly there; right?
16  A      Yes.
17  Q      Okay. What's that weird -- it's -- the
18  airport's not right there, though; right? Is it?
19  Where --
20  A      Yes. It's in -- in Raleigh.
21  Q      Oh, yeah. RVU. That's right. That's
22  right.
23      (MALLINCKRODT CHICK EXHIBIT NUMBER 1
24      WAS MARKED FOR IDENTIFICATION.)
25  MR. CHALOS:

Page 19

1  Q      Let me show you what we'll mark as
2  Exhibit Number 1, which is the notice for your
3  deposition here today. We'll put that up on the
4  screen as well.
5  MR. DAVISON:
6      Counsel, do you have copies?
7  MR. CHALOS:
8      No.
9  MR. DAVISON:
10      Do you have copies for other --
11      I'm fine with this one, but I would
12  assume there are copies for other exhibits?
13  MR. CHALOS:
14      Yeah. We -- I mean, we have some
15  copies.
16  MR. DAVISON:
17      Okay.
18  MR. CHALOS:
19      Well, we've got two copies.
20  MR. DAVISON:
21      All right. This one -- I just want to
22  make sure for other exhibits down the --
23  MR. CHALOS:
24      Yeah. We have --
25  MR. DAVISON:

Page 20

1      -- down the line that I'm gonna have a
2  copy.
3  MR. CHALOS:
4      We have copies. We got all the
5  documents from you guys, so that --
6  MR. DAVISON:
7      Okay. And I understand that --
8  MR. CHALOS:
9      We --
10  MR. DAVISON:
11      -- but the protocol does require copies
12  for attorneys who are here. So...
13  MR. CHALOS:
14      We both have copies, and we'll put them
15  up on the big screen so everybody can see them
16  who doesn't have a copy. But -- and we'll make
17  sure everybody sees what we are talking about.
18  Q      So, while we focus this contraption
19  over here, what I'm gonna ask you about in
20  particular, Miss Chick, is the Requests For
21  Production, which are on pages 4 and 5 of Exhibit
22  Number 1.
23      I'll hand out a few copies for
24  Mr. Bill. Thank you.
25      That might be focused. I can't -- I

Page 21

1  can't tell.
2  MR. ROOS:
3      It is.
4  MR. CHALOS:
5      It is?
6  Q      Okay. With the notice that we sent --
7      Well, let me start here. Have you seen
8  this notice before today?
9  A      Yes.
10  Q      Okay. When did you see it?
11  A      I believe within the last week I was
12  forwarded a copy from Bill.
13  Q      Okay. And, in this notice, we asked
14  for production of some documents, as you'll see
15  on pages 4 and 5.
16      Do you see that?
17  A      Yes.
18  Q      Page 4 has got a doc- -- request for a
19  copy of your current résumé or curriculum vitae.
20      Do you see that?
21  A      Yes.
22  Q      Do you have a current résumé?
23  A      I have a résumé. I have not updated it
24  over the course of the last year. I simply have
25  not. With my engagement, I've been quite busy.

Highly Confidential – Subject to Further Confidentiality Review

Page 22

1 Q      Right.  So it's current as of 2017,
2 would you say?
3 A      I believe so.  I -- I haven't looked at
4 it in quite some time.
5 Q      Do you have that on a computer?
6 A      I do.
7 Q      Would you be able to email that to
8 counsel?
9 A      Yes.
10 Q      Is that possible to do?
11 A      Yes.
12 Q      Okay.  And then we'll make
13 a request -- I mean, we've requested that, and
14 I'm asking --
15 MR. DAVISON:
16      We can provide that within --
17 MR. CHALOS:
18      You would forward that to us?
19 MR. DAVISON:
20      -- the 30 days as provided for in the
21 30(b)(2).
22 MR. CHALOS:
23      I'm sorry.  I didn't hear you.
24 MR. DAVISON:
25      We can provide that within the 30 days

Page 23

1 as provided for in the 30(b)(2), and we will work
2 with Miss Chick on that.
3 MR. CHALOS:
4      Oh, I see.  So you have it but you
5 didn't provide it?
6 MR. DAVISON:
7      Oh, no.  We do not have it yet.  I'm
8 saying we'll -- we'll make sure to get it to you
9 when we get it from Miss Chick.
10 MR. CHALOS:
11      Okay.  So maybe we should clear this
12 up.  So I had an email exchange with Rocky Tsai
13 out of --
14      I think I'm saying it right.
15 MR. DAVISON.
16      That's correct.
17 MR. CHALOS:
18      -- from Ropes & Gray, and he said that
19 they were -- that your company was not
20 withholding any documents based on any objections
21 that it interposed.
22 MR. DAVISON:
23      That's correct.
24 MR. CHALOS:
25      And one of the objections was we're not

Page 24

1 going to have to produce anything until 30 days.
2 MR. DAVISON:
3      We're not withholding the document
4 because we do not have --
5 MR. CHALOS:
6      Okay.
7 MR. DAVISON:
8      -- Miss Chick's résumé.
9 MR. CHALOS:
10      Okay.  I see.
11 Q      Let's look at Request For Production
12 Number 2, if you would.  We asked for all
13 documents, including electronic data and email,
14 in your possession related in any way to
15 defendant's manufacture, marketing, sale,
16 distribution, suspicious order monitoring and
17 lobbying efforts in connection with its opioids
18 business.
19      Do you see that?
20 A      Yes.
21 Q      Do you have any such documents in your
22 possession?
23 A      No.  When I ended my employment with
24 the company, all of that material was returned to
25 the company.

Page 25

1 Q      Did you have a -- phone that was
2 given to you from Mallinckrodt?
3 A      I believe so, yes.
4 Q      Was it a smartphone?
5 A      Yes.
6 Q      Did you give that back to the company
7 as well?
8 A      Yes.
9 Q      Did you use that phone for other things
10 other than telephone calls?  In other words, did
11 you text or email from that phone?
12 A      Yes.
13 Q      Did you send emails to other employees
14 of Mallinckrodt through that phone?
15 A      Yes.
16 Q      Did you send text messages to other
17 employees of Mallinckrodt through that phone?
18 A      Yes.
19 Q      Did you receive text messages from
20 other employees of Mallinckrodt through that
21 phone?
22 A      Yes.
23 Q      Did Mallinckrodt pay for the phone
24 service?
25 A      Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1  Q      Let's look at Number 3 Request For
2  Production. All documents that you've consulted
3  or reviewed or plan to consult in preparation for
4  your deposition and have relied upon or will rely
5  upon for your testimony for your deposition.
6          Do you see that?
7  A      Yes.
8  Q      Do you have any such documents in your
9  possession?
10  A      I do not.
11  Q      Okay. We can put Exhibit 1 aside for
12  now.
13          Did Mallinckrodt also provide phones
14  for the sales staff, to your knowledge, while you
15  were there?
16  A      Yes. I believe so.
17  Q      And sales staff also used that to send
18  its text messages?
19  A      Yes.
20  MR. DAVISON:
21          Object to the form.
22  A      Yes.
23          (MALLINCKRODT CHICK EXHIBIT NUMBER 2
24          WAS MARKED FOR IDENTIFICATION.)
25  MR. CHALOS:

Page 27

1  Q      I'm going to hand you what we'll mark
2  as Exhibit Number 2.
3          I do have copies of this as well.
4          Okay. Here's -- there we go. Thank
5  you. You have the copy with the exhibit number
6  on it.
7          And I will represent to you that this
8  is a printout from LinkedIn that my number one
9  man, Peter Roos, printed. And what he did for
10  page 3, I believe, was sort of blew up the
11  experience section that was otherwise interrupted
12  by a page break.
13          Does that sound right?
14  MR. ROOS:
15          Uh-huh. Yeah.
16  MR. CHALOS:
17          You're not under oath, so that's okay.
18  Q      So the question for you, is the
19  information on Exhibit Number 2 accurate?
20  A      Yes.
21  Q      Is this information that you input into
22  the LinkedIn system?
23  A      Yes.
24  Q      So let's -- let's walk through some of
25  this, if we can. Let's start with your time at

Page 28

1  Bristol-Myers Squibb. So you were there from
2  1988 through 2000. Is that right?
3  A      Yes.
4  Q      What did you do before that?
5  A      I was region sales manager for a small
6  consumer products company which is no longer in
7  business. And that was 1984 through 1988.
8  Q      So you started there in fifth grade?
9  A      I -- I started there after I graduated
10  from the University of Georgia in 1984.
11  Q      Okay. Oh, yeah. Right.
12          Can you -- do you have a -- I gave out
13  all our copies.
14          Okay. What type of products did you
15  sell there?
16  A      They were consumer products, health and
17  beauty aids, personal hygiene products,
18  contraceptive products, all over the counter.
19  Q      What was the company called?
20  A      Julius Schmid, S-C-H-M-I-D.
21  Q      Did you have a sales territory with
22  them?
23  A      I did.
24  Q      Then you moved to Bristol-Myers Squibb
25  in 1988? Is that right?

Page 29

1  A      Yes. I held two positions at -- three
2  positions at -- at Schmid and then was recruited
3  by Bristol-Myers Squibb.
4  Q      So did you --
5          Let's go back to Schmid. You started
6  as a sales rep?
7  A      Yes.
8  Q      And then moved up to regional sales
9  manager?
10  A      Yes.
11  Q      What was the third position?
12  A      So the in-between position was a
13  management trainee in the home office in Little
14  Falls, New Jersey.
15  Q      Who did you sell to with them?
16  A      Primarily retail pharmacies, and also
17  wholesale pharmacies as well.
18  Q      Bristol-Myers Squibb then recruited you
19  to come work for them?
20  A      Yes.
21  Q      Did you start -- what did -- what was
22  your position when you started with Bristol-Myers
23  Squibb?
24  A      So I began as a region sales manager
25  based in the Southeast here in Atlanta. I

Page 30

1 covered a number of states. I was with
2 their -- what was originally at the time their
3 Squibb Mark division, which is their generics and
4 multisource division at the time.
5 Q     Were opioids among the products that
6 you were responsible for in that position?
7 A     No.
8 Q     What -- what was your -- the first
9 position that you held for any of the
10 companies --
11      We're fast-forwarding a little bit, but
12 we'll come back.
13      What was the first -- when was the
14 first time that you were responsible in any way
15 for sales of opioids?
16 A     So when I joined Archimedes in 2011, I
17 had responsibility for building and operating the
18 market access function for that firm. The single
19 product that they developed and gained FDA
20 approval for was a nasally administered fentanyl
21 product indicated for breakthrough pain in
22 cancer.
23 Q     What does that mean, market access?
24 A     So the primary responsibility is
25 engaging with private payers and with CMS to gain

Page 31

1 reimbursement to allow for patient access to the
2 medication.
3 Q     Okay. It's important that these drugs
4 are paid for by private payers or CMS in order
5 for patients to ultimately get the drug; right?
6 MR. DAVISON:
7      Objection to form.
8 MR. CHALOS:
9 Q     He may object from time to time. So
10 unless he tells you not to answer, you can just
11 answer and disregard what he says --
12 A     Okay.
13 Q     -- unless he tells you to not answer,
14 in which case don't answer.
15 A     So in the US healthcare system, it is
16 customary to gain formulary access -- in this
17 case, for therapeutic products -- for -- for
18 patients to be able to access them through their
19 drug benefit.
20 Q     So in the US healthcare market, at
21 least in some instances, some -- an insurance
22 company or the Federal Government or State
23 Government pays for the drugs that are ultimately
24 taken by a patient? Is that right?
25 A     Not in all cases.

Page 32

1 Q     Uh-huh. Not in enough cases, perhaps;
2 right? But, in any event, in some cases.
3 MR. DAVISON:
4      Objection. That's the situation.
5 MR. CHALOS:
6 Q     Sorry. That was my political
7 commentary.
8      Let's start that question again.
9      For some patients, there is another
10 entity, either an insurance company or the
11 Federal Government or the State Government, that
12 pays for certain medications. Is that fair to
13 say?
14 A     Yes. And a patient typically is paying
15 a premium to access -- to access that type of
16 benefit. Yes.
17 Q     That's sometimes known as health
18 insurance; right?
19 A     We actually call it -- yes, it's health
20 insurance but a pharmacy benefit, specifically.
21 Yes.
22 Q     So, going back to your time with
23 Bristol-Myers Squibb, so initially in 1988 you
24 were hired as a regional sales manager for
25 Squibb -- Squibb Mart, did you say?

Page 33

1 A     Squibb Mark. It was a division of
2 E. R. Squibb & Sons.
3 Q     And what products were you responsible
4 for there?
5 A     So they're multisource products, so
6 those were primarily injectable products used in
7 hospitals, anti-infective type of products in
8 that particular therapeutic class. So we -- we
9 sold via hospital contracts and to wholesalers as
10 well.
11 Q     What would be an example of the type of
12 drug you're talking about?
13 A     A product called Tobramycin.
14 Q     What is that?
15 A     It's an antibiotic.
16 Q     What do you mean when you say
17 multisource?
18 A     Means the products have exhausted their
19 patent life and there are multiple generic
20 offerings from a number of manufacturers and
21 distributors.
22 Q     Is multisource another way of saying
23 generic?
24 A     Yes.
25 Q     Did you eventually get a different job

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 with Bristol-Myers Squibb?

2 A      Yes.  I was promoted throughout the

3 eleven years I was there.

4 Q      Okay.  What was the job you held when

5 you left Bristol-Myers Squibb?

6 A      Was the Director of Customer Marketing,

7 which meant that I led a team of home

8 office-based professionals focused on the

9 reimbursement market, focused on the needs of

10 insurers and pharmacy benefit managers, as well

11 as hospital systems, and developed strategies for

12 our products and offerings in way of promotional

13 resources and contract offerings that were used

14 by our account executives in their engagement

15 with those payers.

16 Q      Was that for a specific line of drugs

17 or was that for --

18 A      The entire portfolio.  And I just want

19 to mention it was the pharmaceutical portfolio,

20 so I was not involved in the oncology or the

21 virology business or the dermatology business at

22 that time.

23 Q      Okay.  What was the second one you said

24 after oncology?

25 A      Virology, V-I-R-O-L-O-G-Y.

Page 35

1 MR. CHALOS:

2       That was for you, Lois.

3 Q      What is -- what is virology?

4 A      So it's now part of the oncology

5 business.  I wasn't familiar with it.  I just

6 wanted to distinguish that I was focused on the

7 pharmaceutical business.

8 Q      How many jobs did you hold between your

9 initial job at Bristol-Myers Squibb and the

10 Director of Customer Marketing job?

11 A      So I'll have to count back and reflect.

12 Q      Okay.

13 A      Four.

14 Q      Were they all marketing or

15 sales-related?

16 A      Yes.

17 Q      Were you ever, in any of your jobs,

18 after the Schmid job, your initial job, were you

19 ever a field sales representative?

20 A      No.

21 Q      In 2000 you moved to Sanofi; is that

22 right?

23 A      Aventis.

24 Q      It was called Aventis then?

25 A      It was Aventis until Aven- -- Sanofi

Page 36

1 acquired the company in 2004.

2 Q      What did you do for them when you

3 initially joined up?

4 A      I was recruited to head up their

5 national account management team.

6 Q      What does that mean?

7 A      So I led a team of ten national account

8 executives who represented the Aventis portfolio

9 to US payers.

10 Q      Also focused on the third-party payer

11 market?

12 A      Yes.

13 Q      Did you hold that job throughout your

14 time with --

15       What do you think of it as?  Sanofi?

16 A      Yes.

17 Q      So when I say "Sanofi," I mean the

18 entire time that you worked for that company from

19 2000 to 2011.  Is that fair?

20 A      Yes.

21 Q      What other jobs did you hold with them?

22 A      So I was also the senior director of

23 cardiovascular channel marketing.  Then I was

24 promoted to an area vice president.

25 Q      Is that sales?

Page 37

1 A      I beg your pardon.  I just -- I

2 neglected to add a role there.  Sorry.

3       Senior Director of Channel Marketing.

4 I then returned to the market access group as the

5 vice president of their specialty account

6 management team.  And from that role I was

7 promoted to area vice president.

8 Q      Was the area vice president for sales?

9 A      Yes.

10 Q      In that capacity, did you oversee --

11       Well, I guess at that level you're

12 overseeing other managers?  Is that fair?

13 A      Yes.  And other directors, yes.

14 Q      And they, in turn, oversaw field --

15 field sales representatives?

16 A      Yes.

17 Q      What types of products were you

18 responsible for there?

19 A      So I had responsibility for Plavix,

20 also a product called Multaq.

21 Q      What was that?

22 A      So it was a product indicated for

23 atrial fibrillation.

24 Q      Okay.

25 A      Also was responsible for a product

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 called Avapro and Avalide.
2 Q Which is --
3 A So these are angiotensin inhibitors;
4 Avapro and Avalide in particular.
5 Q Those were -- so were all the drugs
6 cardiovascular-related?
7 A Yes. And also -- I beg your
8 pardon -- in the metabolism side of the business,
9 I had responsibility for Lantus.
10 Q What was that?
11 A A basal insulin.
12 MR. CHALOS:
13 These are American problems, Peter.
14 Peter's Dutch. We are in America.
15 Q Okay. And, then, what else -- what did
16 you do after that?
17 A So I returned to the market access team
18 as vice president of account management.
19 Q Was that for the entire portfolio?
20 A Yes.
21 Q And then what?
22 A And then I was recruited to Archimedes.
23 And, so, I left Sanofi and joined Archimedes.
24 Q Did Sanofi make an opioid product while
25 you were with the company?

Page 39

1 A I don't believe so.
2 Q Okay. So what did -- when you joined
3 Archimedes, you were involved in the market
4 access function? Is that right?
5 A Yes.
6 Q Was that nasal fentanyl, was that their
7 sole product at that point?
8 A Yes.
9 Q That was your first experience with
10 opioids?
11 A Yes.
12 Q Did you receive any training when you
13 joined Archimedes specific to opioids?
14 A Not specific to opioids. I recall
15 being educated around the product itself.
16 Q Did you learn about the risks
17 associated with fentanyl at that point?
18 A So I learned about the risks associated
19 with the product in particular that we were
20 marketing. Yes.
21 Q What were the risks associated with the
22 Archimedes product that you recall?
23 A So I would have to go back and look at
24 the package insert to recall all of the risks.
25 Q Okay. Do you recall any of them?

Page 40

1 A Well, the product delivery system had
2 a -- a measured dosage approach which was in
3 place really to allow for a metered dose, to --
4 Q Uh-huh.
5 A -- not allow, you know, more product to
6 be dispensed than intended, to prevent any -- any
7 type of -- or at least to deter any type of
8 attempted abuse or --
9 And the way in which the product was
10 distributed, not only through the mechanism but
11 also through the -- a gel formulation that was
12 administered to the nasal cavity, also inhibited
13 absorption and metered that approach.
14 Q Do you recall any of the risks
15 associated with the Archimedes product?
16 MR. DAVISON:
17 Objection.
18 A Risks to -- with the Archimedes
19 product?
20 MR. CHALOS:
21 Q Yes, ma'am.
22 A Certainly, it, as a fentanyl product,
23 there were certain risks that would -- would
24 travel with the product. So because the product
25 could be abused in other forms, Archimedes took

Page 41

1 special attention to the mechanism by which the
2 product was dispensed to -- to deter that kind of
3 abuse.
4 Q Was there a risk of addiction with that
5 product?
6 A Yes.
7 Q Did you, when you worked for
8 Archimedes, discuss the risks of the product with
9 the customers that you dealt with?
10 MR. DAVISON:
11 Objection to form.
12 A So I did not personally -- was not
13 personally responsible for customers. But in
14 engaging with account executives in their
15 customer interactions, yes, there were -- the
16 risks of the product were discussed, yes.
17 MR. CHALOS:
18 Q You, in your capacity at Archimedes,
19 dealt with -- did you deal with -- directly with
20 people from other entities, or were you solely
21 focused internally?
22 A So I dealt with people in other
23 entities.
24 Q Okay. And those -- and these other
25 entities were third-party payers, such as

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  insurance companies and people at CMS?
2  A      Yes.
3  Q      Right?
4  A      Yes.
5  Q      I'm sorry. I cut you off, I feel like.
6  A      I wanted to mention that while I was
7  hired to lead the market access function, in the
8  course of my first year of employment there, I
9  was also asked to take on the sales
10 responsibility as well.
11 Q      Okay. And to whom did you sell?
12 A      So the sales representatives based in
13 the field sold to medical oncologists, radiation
14 oncologists, and -- and those practices, and --
15 and hospital systems.
16 Q      What was your job? Were you the
17 manager of the sales representatives?
18 A      Vice president of sales and market
19 access, yes.
20 Q      Did the sales representatives report
21 directly to you?
22 A      They reported to region managers, who
23 reported in to me.
24 Q      Is there a problem in the United States
25 today with opioid abuse?

Page 43

1  MR. DAVISON:
2        Objection to form.
3  A      So I'm aware of issues associated with
4  opioid abuse in the US through the news.
5  MR. CHALOS:
6  Q      What type of issues are you aware of?
7  A      I'm aware of addiction issues.
8  Q      Any others?
9  A      No.
10 Q      Do you know anyone addicted to opioids?
11 MR. DAVISON:
12       Objection to form.
13 A      I do not.
14 MR. CHALOS:
15 Q      Have you ever met anyone addicted to
16 opioids?
17 MR. DAVISON:
18       Object to the form.
19 A      Yes.
20 MR. CHALOS:
21 Q      Do you have any --
22       Well, let's go back to your education.
23 You were -- you received a bachelor of business
24 administration from the University of Georgia; is
25 that right?

Page 44

1  A      Yes.
2  Q      And then you received an MBA from
3  Rutgers in Newark, New Jersey? Sorry. In
4  Newark, New Jersey?
5  A      Yes.
6  Q      Did you -- do you have any education
7  specific to any medical field?
8  A      No.
9  Q      Did you take any courses regarding
10 pharmacology when you were in college or in
11 business school?
12 A      No.
13 Q      Was there a focus of your MBA?
14 A      Yes.
15 Q      What was that?
16 A      Finance.
17 Q      Since you finished your formal
18 schooling, have you taken any courses related to
19 any medical subject?
20 A      No, outside of professional training
21 provided by the companies I was employed by.
22 Q      And that professional training relates
23 to the company's products? Is that right?
24 A      Yes.
25 Q      What professional training have you had

Page 45

1  related to opioids? We -- we already talked
2  about the Archimedes training that you had
3  specific to their product. Is that --
4        Let me back up.
5        What professional training have you had
6  related to opioids specifically?
7  A      Product-specific training provided by
8  my employer.
9  Q      One example of that is the Archimedes
10 nasal fentanyl product?
11 A      Yes.
12 Q      Did you receive, when you worked at
13 Mallinckrodt, any training related to opioids?
14 A      Yes. Product training specifically.
15 Q      Okay. On which product?
16 A      Xartemis XR in particular.
17 Q      We're gonna talk about that one a lot.
18 It's X-A-R-T-E-M-I-S.
19       Oh. You already had it.
20       XR.
21       Any other products, opioid products,
22 that you received training in connection with?
23 A      I did have some training on Exalgo as
24 well.
25 Q      Any others?

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 A    Not that I recall.

2 Q    Since you left Mallinckrodt, have you

3 had any professional responsibility for any

4 opioids products?

5 A    No.

6 Q    So how did you come to leave

7 Archimedes?

8 A    So the company single asset was

9 acquired by another company.  At that same time,

10 I was being recruited by Mallinckrodt.  So when

11 the company, Archimedes, dissolved its US

12 operation, I joined Mallinckrodt.

13 Q    Where was Archimedes based?

14 A    Bedminster, New Jersey.

15 Q    Was it affiliated with an international

16 company?

17 A    Yes.

18 Q    Where was that?

19 A    Company was based in Reading, England.

20 Q    Were you recruited by Mallinckrodt for

21 a specific position?

22 A    I was.

23 Q    What is that position?

24 A    I was recruited for the vice president

25 of market access and interviewed for that role

Page 47

1 throughout.  When I was interviewed by the CEO,

2 he asked me to consider the vice president of

3 specialty sales role.  And that's the position I

4 assumed with Mallinckrodt.

5 Q    Who was the CEO at that point?

6 A    Mark Trudeau.

7 Q    Where did you interview with him?

8 A    In the company's headquarters in

9 Hazelwood, Missouri.

10 Q    Did you ever learn why they thought you

11 were appropriate for specialty sales rather than

12 market access?

13 A    In my discussion -- discussions with

14 executives, there was an appreciation for the

15 breadth of my experience in both market access

16 and in sales.  It was at the time a bit unusual

17 to have someone who had the depth and breadth of

18 market access experience as well as sales

19 experience in -- at that level.

20 Q    Did your job with Mallinckrodt as vice

21 president of specialty sales, did that include a

22 market access component?

23 A    It did not.

24 Q    When did you interview with

25 Mr. Trudeau?

Page 48

1 A    That would have been in the summer of

2 2013.  I joined the company in August of 2013, so

3 it would have been sometime in the preceding

4 months, June, July, in that time frame.

5 Q    Did you, during the course of the

6 discussion with Mr. Trudeau or at any point

7 before you actually began working for

8 Mallinckrodt, did you learn that there was

9 somebody already in the position of vice

10 president of specialty sales?

11 A    I didn't learn that until I arrived at

12 the company.

13 Q    That was Mr. Wickline?

14 A    Yes.

15 Q    Are you in touch with anyone with

16 Mallinckrodt -- I mean, other than the lawyers --

17 have you been in touch with anyone at

18 Mallinckrodt since you left?

19 A    Since I left the company, I may have

20 had conversations.  I don't recall specifically.

21 Q    Do you -- do you keep up with anyone

22 that you -- that works for Mallinckrodt?

23 A    Currently, no.

24 Q    What conversations do you think you had

25 after you left?

Page 49

1 MR. DAVISON:

2     Objection to form.

3 A    So the division that I was part of was

4 dissolved, and, so, I was asked for things like

5 recommendations, job leads.  So I engaged in some

6 of that -- that type of discussion.

7 MR. CHALOS:

8 Q    Did you have any friend- --

9 friendship-type relationships with anyone at

10 Mallinckrodt?

11 MR. DAVISON:

12     Objection to form.

13 A    Yes.

14 MR. CHALOS:

15 Q    And -- and none of them continued after

16 you left?

17 A    They did, though I -- I have not been

18 engaged recently with -- with anyone who's

19 currently employed by the company.

20 Q    Do you keep up with anyone who is a

21 former Mallinckrodt employee?

22 A    Yes.

23 Q    Who -- who do you keep up with?

24 A    Mark Sabella.

25 Q    How do you spell that one?

Page 50

1 A    S-A-B-E-L-L-A.

2 Q    Okay. Who is Mr. Sabella?

3 A    Mark was the head of customer

4 operation -- excuse me. Commercial Excellence

5 was the department name. It was an operations

6 function that supported the sales and marketing

7 effort.

8 Q    What -- what type of work does the

9 Commercial Excellence department do?

10 A    They do things like develop physician

11 target lists, territory alignments, incentive

12 compensation plan design and approval process,

13 managing a CRM system. They also manage the

14 training function, forecasting, analytics, things

15 of that nature.

16 Q    Were they involved in setting sales

17 goals for sales reps?

18 A    Yes.

19 Q    Were they also called the analytics

20 department?

21 A    That group evolved over time. So they

22 did analytics, but the expanse of that function

23 was -- was greater than just analytics.

24 Q    Was there also an analytics department

25 when you were there?

Page 51

1 A    The analytics function reported in to

2 the customer excellence function.

3 Q    I see. Okay.

4    Okay. Who else of former Mallinckrodt

5 employees do you keep up with?

6 A    I on occasion may get an email from

7 Ellen McCune.

8 Q    Who was that?

9 A    She was the vice president of

10 commercial excellence.

11 Q    Okay. Anyone else?

12 A    I have -- since leaving Mallinckrodt, I

13 have seen former account -- or people who were

14 account executives at Mallinckrodt. For example,

15 at PCMA in 2016 I saw some Mallinckrodt account

16 executives at that industry function.

17 Q    When you say "account executives," are

18 you talking about field sales representatives?

19 A    No.

20 Q    Or you're talking about the managed

21 care side?

22 A    The managed care side.

23 Q    Okay. Do you remember who you ran into

24 there?

25 A    I saw Rick Telder --

Page 52

1 Q    How do you spell that one?

2 A    T-E-L-D-E-R.

3 Q    Okay.

4 A    -- and Ann van Bevern.

5 Q    Have you talked with anyone other than

6 the lawyers about your deposition here today?

7 A    I disclosed to my current employer that

8 I would be deposed in an action involving a

9 former employer.

10 Q    Anyone else?

11 A    No. I beg your pardon. My husband.

12 Q    What does he do?

13 A    He's a schoolteacher.

14 Q    Okay. So let's go back to

15 Mallinckrodt. So you got hired on as a vice

16 president of specialty sales? Is that right?

17 A    Yes.

18 Q    Okay.

19    (MALLINCKRODT CHICK EXHIBIT NUMBER 3

20    WAS MARKED FOR IDENTIFICATION.)

21 MR. CHALOS:

22 Q    We're gonna mark as the next numbered

23 exhibit your offer letter from Mallinckrodt. It

24 runs Bates numbers MNK-T1_0007147310 through

25 MNK-T1_0007147317.

Page 53

1 MR. ROOS:

2    Here you are.

3 MR. CHALOS:

4    Thank you. I was just stalling while

5 Peter went and got that.

6    Okay. We'll mark that as Exhibit

7 Number 3. There you are. Thank you very much.

8 MR. DAVISON:

9    Thank you.

10 MR. CHALOS:

11 Q    If you would, take a moment and look at

12 Exhibit Number 3, Miss Chick. And I'm gonna ask

13 you first if you recognize this document.

14 A    Yes.

15 Q    And what is this?

16 A    This is the offer letter extending an

17 offer of employment to me by Mallinckrodt.

18 Q    And, on the last page of this,

19 second-to-last page, one that ends in 316, that's

20 your signature there?

21 A    Yes.

22 Q    And it says, in the beginning of this

23 letter, that you're being offered -- I'm

24 paraphrasing -- the Vice-President of Sales,

25 Specialty Pharmaceuticals for Mallinckrodt

Highly Confidential – Subject to Further Confidentiality Review

Page 54

1 Pharmaceuticals.  Is that right?
2 A      Yes.
3 Q      It says the position is field-based.
4 What does that mean?
5 A      The position is considered not home
6 office-based but field-based.
7 Q      Where -- where did you live at that
8 time?
9 A      So I maintained my primary residence in
10 Montgomery, New Jersey, Skillman.
11 Q      Uh-huh.
12 A      And I also had an apartment in
13 St. Louis.
14 Q      Did you split your time between the two
15 locations?
16 A      I didn't split my time.  I spent
17 primary time in St. Louis.
18 Q      It says you will report to the
19 Vice-President and General Manager, Brands.
20      Do you see that?
21 A      Yes.
22 Q      Who was that at that time?
23 A      Steve Carchedi.
24 Q      Your initial salary was ███████.  Is
25 that right?

Page 55

1 A      Yes.
2 Q      And you received a signing bonus of
3 ███████ at that time?
4 A      Yes.
5 Q      It -- in this letter, I'm looking at
6 the one, two, three, four -- fifth paragraph that
7 refers to the company's long-term incentive
8 program.
9      Do you see that?
10 A      Yes.
11 Q      And it involves annual equity grants.
12      Do you see that?
13 A      Yes.
14 Q      What is that?
15 A      It's a -- a stock award for equity in
16 the company.
17 Q      So they give you shares of stock in the
18 company?
19 A      Yes.
20 Q      Did you, in fact, receive shares of
21 stock in Mallinckrodt?
22 A      Yes.
23 Q      Did -- do you presently hold those
24 shares?
25 A      ████████████████████

Page 56

1 ████████████████
2 Q      How many shares do you currently hold?
3 A      ████████████████████
4 ██████
5 Q      What do you -- can you give me a
6 ballpark?  ████████████████████,
7 ████████████████.
8 MR. DAVISON:
9      Objection to form.
10 A      I simply don't recall the -- the number
11 of shares at this point.
12 MR. CHALOS:
13 Q      Do you have an approximation of the
14 value?
15 MR. DAVISON:
16      Objection.
17 A      Less than -- I believe the current
18 valuation of the stock, less than ████████.
19 MR. CHALOS:
20 Q      Do you presently hold any stock options
21 in Mallinckrodt stock?
22 A      No.
23 Q      Did you at some point?
24 A      Yes.
25 Q      When did you last exercise a stock

Page 57

1 option?
2 A      I don't recall specifically, but I
3 believe it was in conjunction with my exit from
4 the company.
5 Q      When did you last sell any of your
6 Mallinckrodt stock?
7 A      I would have to go back and look to be
8 accurate.  I don't recall a specific date or time
9 more generally.
10 Q      Was it after -- after you left the
11 company at some point?
12 A      I don't recall if it was before or
13 after.  I would have to go back and look at -- at
14 records.
15 Q      What are your intentions with respect
16 to your current stock holdings?
17 MR. DAVISON:
18      Object to the form.
19 A      I don't have any intentions at this
20 point in time.
21 MR. CHALOS:
22 Q      So you plan to hold them?
23 A      Yes.
24 Q      Do you presently have a retirement plan
25 through Mallinckrodt?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  A    No.
2  Q    Did you roll your whatever retirement
3  plan you had with them into your new company?
4  A    Yes.  Actually, I believe I rolled it
5  into my brokerage account with Merrill Lynch.
6  Q    Did you, while you were with
7  Mallinckrodt, in fact, receive equity grants from
8  them?
9  A    I believe so, yes.
10 Q    It says here in Exhibit Number 3 that
11 the current annualized equity grant value for
12 positions comparable -- comparable to yours is
13 █████████
14    Do you see that?  I'm in the fifth
15 paragraph still.
16 A    Yes.
17 Q    Exhibit 3, first page.
18 A    Yes.
19 Q    Did you, in fact, receive something on
20 the order of ████████ in equity grants, while you
21 were at Mallinckrodt, per year?
22 A    This grant that was detailed here
23 was -- was provided.
24 Q    So --
25 A    I -- I simply can't recall if -- if the

Page 59

1  valuation was exactly ████████ at the time.
2  Q    Was it in that ballpark?
3  A    Yes.
4  Q    Did you receive it for three years?
5  A    I don't recall the specific term.
6  Q    Okay.  So you worked for
7  Mallinckrodt --
8     Actually, let's go back.
9     You worked for Mallinckrodt for two --
10 two -- about two years; right?
11 A    Less than two years, yes.
12 Q    Okay.  It was -- you started in August
13 of 2013; right?
14 A    Yes.
15 Q    And you left in June of 2015?
16 A    June.  So I started in August of 2013.
17 Q    Right.
18 A    And exited in June of 2015.
19 Q    So just short of two years.
20 A    Yes.
21 Q    And do you recall how many equity
22 grants you received?  Meaning did you receive one
23 in 2013, one in 2014, one in 2015, or something
24 else?
25 A    I'd have to go back and look at records

Page 60

1  to be accurate.
2  Q    Do you have any recollection of that at
3  all?
4  A    I believe I received an additional
5  grant.  I don't know when, and I don't recall the
6  amount.
7  Q    An additional beyond the annual grant?
8  A    Beyond this -- this annual grant, yes.
9  Q    Was that in connection with your
10 severance from the company?
11 A    No.  This would have been a
12 performance-related grant.
13 Q    So you think you received at least
14 three grants, maybe four --
15 MR. DAVISON:
16    Objection to form.
17 MR. CHALOS:
18 Q    -- of equity?
19 MR. DAVISON:
20    Objection to form.
21 A    I don't recall the number.  I'm sorry.
22 MR. CHALOS:
23 Q    You did, in fact, receive the signing
24 bonus of ████████; is that right?
25 A    Yes.

Page 61

1  Q    If you look at the next paragraph, it
2  says -- of Exhibit 3, on the front
3  page -- between your start date and end of
4  calendar year 2013, you will be issued a prorated
5  annual equity grant for fiscal year 2013 with a
6  value of ████████.
7     Do you see that?
8  A    Yes.
9  Q    Did you receive that?
10 A    Yes.
11 Q    You also received a company vehicle; is
12 that right?
13 A    Yes.
14 Q    What kind of vehicle did they provide
15 for you?
16 A    Was a Ford Escape.
17 Q    Did you have the same vehicle for the
18 entire time you worked at Mallinckrodt?
19 A    Yes.
20 Q    Did they pay for your apartment in
21 St. Louis?
22 A    No.  I paid for that.
23 Q    Did they give you any kind of housing
24 stipend or something like that?
25 A    To be clear --

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 Q     Yeah.
2 A     -- the signing bonus was what I used
3 for -- for that arrangement.
4 Q     In other words, you used your signing
5 bonus to pay for housing in St. Louis?
6 A     Yes.
7 Q     Did you buy a place there?
8 A     No.
9 MR. DAVISON:
10     Mark, we've been going about an hour.
11 MR. CHALOS:
12     Oh, have we?  Goodness.
13 MR. DAVISON:
14     Is now a good time --
15 MR. CHALOS:
16     We can take a break.
17 VIDEOGRAPHER:
18     We are now going off the video record.
19 The time is currently 10:10 a.m.  This is the end
20 of media number 1.
21     (OFF THE RECORD.)
22 VIDEOGRAPHER:
23     We are now back on the video record
24 with the beginning of media number 2.  The time
25 is currently 10:26 a.m.

Page 63

1 MR. CHALOS:
2 Q     Miss Chick, I should have mentioned
3 this earlier.  If you need a break at any time,
4 please let me know.  We'll do that.
5 A     Thank you.
6 Q     If there are any questions that I ask
7 you that you don't understand, will you please
8 let me know that?  And I'll do my best to
9 rephrase the question.
10 A     Yes.
11 Q     And you're doing a very good job of
12 waiting till I finish to answer my question.  I'm
13 not doing such a good job of waiting until you
14 finish your answer.  But if you just keep that in
15 your mind that -- wait until I finish before you
16 respond, and I'll try to reciprocate.  Okay?
17 A     Yes.
18 Q     And if there's any question that I ask
19 that you don't understand, let me know.  And if
20 you answer it, I'm gonna assume that you did
21 understand it.  Is that fair?
22 A     Yes.
23     Excuse me.
24 Q     Sure.
25 A     I'm gonna get rid of this LifeSaver.

Page 64

1 Thank you.
2 Q     You -- you mention -- I'm
3 paraphrasing -- that after you left Mallinckrodt,
4 that they dissolved the division or something
5 like that.  Do you recall that?
6 A     Yes, I recall saying that.
7 Q     Yeah.  What -- what -- what do you know
8 about that?
9 A     I don't -- I don't have a lot of
10 information about the ongoing operations of
11 Mallinckrodt.
12 Q     Uh-huh.  What do you know about what
13 happened to the division after you left?
14 MR. DAVISON:
15     Objection to form.
16 A     I believe the ongoing operations
17 continued with the hospital-based sales force
18 that was marketing Ofirmev.
19     At some point -- and I don't know
20 when -- I'm aware Mallinckrodt discontinued the
21 marketing of Xartemis XR.  I don't know when that
22 was or why that was.
23 MR. CHALOS:
24 Q     When you left Mallinckrodt, was
25 Mallinckrodt still marketing Xarte- --

Page 65

1 Xartemis XR?
2 A     When I left the company, that had
3 remained a promotional product, yes.
4 Q     Okay.  What was the drug that you
5 mentioned that they were continuing to market
6 after you left the company?
7 A     The product?
8 Q     The product, yeah.
9 A     Ofirmev.
10 Q     What was that?
11 A     It was a product indicated for pre-,
12 peri-, and postoperative surgical pain.
13 Q     Was it an opioid?
14 A     No.
15 Q     Do you recall how that was spelled?
16 A     O-F, as in Frank, I-R-M, as in Mary,
17 E-V, as in Victor.  Ofirmev.
18 Q     Why did you leave Mallinckrodt?
19 A     So I had a discussion with the general
20 manager of the division, Mike Matthews, who
21 informed me that it would be a decision taken to
22 discontinue the specialty sales division, and I
23 was offered an exit package.
24 Q     Were you offered another position
25 within Mallinckrodt?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  A       I had been in previous discussion with
2  Hugh O'Neill, who was head of the specialty
3  pharmaceutical business, about alternative
4  positions. I self-selected out of those
5  discussions for personal reasons and understood
6  the decision the company had made about the
7  specialty sales division. So...
8  Q       So could you have stayed with
9  Mallinckrodt if you wanted to?
10 MR. DAVISON:
11        Objection to form.
12 A       I was not offered a specific position
13 as an alternative, and I intentionally chose not
14 to pursue one.
15 MR. CHALOS:
16 Q       And I'm not trying to pry, and if
17 there's something personal about it, don't tell
18 me that, but was there any professional reason
19 why you didn't pursue a specific position within
20 Mallinckrodt after you were told that the
21 specialty sales division was going to be
22 dissolved?
23 MR. DAVISON:
24        Object to form.
25 A       Not a --

Page 67

1  MR. DAVISON:
2        Sorry.
3  A       Not a professional reason, no.
4  MR. CHALOS:
5  Q       Do you think if you had chosen to
6  continue to work for Mallinckrodt, Mallinckrodt
7  would have allowed that?
8  MR. DAVISON:
9        Objection.
10 A       I don't know.
11 MR. CHALOS:
12        Do I have those? Oh.
13 MR. ROOS:
14        Sorry. Here.
15 MR. CHALOS:
16        Always a struggle to stay organized.
17        (MALLINCKRODT CHICK EXHIBIT NUMBER 4
18        WAS MARKED FOR IDENTIFICATION.)
19 MR. CHALOS:
20 Q       So we're marking as Exhibit Number 4
21 a --
22        This one?
23 MR. ROOS:
24        No.
25 MR. CHALOS:

Page 68

1        Okay. Take one.
2  Q       We're marking as Exhibit Number 4
3  MNK-T1_0007147236 through MNK-T1_0007147259.
4  It's Exhibit Number 4. The title of the document
5  is "Separation of Employment Agreement and
6  General Release."
7        My first question will be "Do you
8  recognize this document?" Take as much time as
9  you need to review it.
10 A       Yes, I recognize the document.
11 Q       Okay. And what is this document?
12 A       Was the separation agreement executed
13 between myself and Mallinckrodt.
14 Q       Did you have a lawyer in connection
15 with executing this document?
16 A       Yes.
17 Q       Was it somebody that you hired
18 personally?
19 A       Yes.
20 Q       Who was the lawyer?
21 A       Ben Haftel. H-A-F, as in Frank, T-E-L.
22 Q       And where is Mr. Haftel located?
23 A       In Montgomery, New Jersey.
24 Q       Is this a personal acquaintance?
25 A       He was a personal acquaintance and also

Page 69

1  personal attorney.
2  Q       So if you flip over to the third page
3  of Exhibit Number 4, looking at paragraph 2(a),
4  it says, "Executive will begin receiving 12
5  months of salary continuation payments at a
6  biweekly gross rate of ██████, with total
7  payments equalling ██████."
8        Do you see that?
9  A       Yes.
10 Q       Minus some deductions and withholdings.
11 Do you see that paragraph there?
12 A       Yes.
13 Q       When you left Mallinckrodt, did you
14 receive total payments of salary continuation
15 equalling ██████?
16 A       Yes.
17 Q       And if you look at the next paragraph,
18 paragraph 2(b), which is on the third page of
19 Exhibit 4, it says "Severance Period Bonus."
20        Do you see that?
21 A       Yes.
22 Q       It says that "During the severance
23 period, Executive will receive Executive's annual
24 bonus at a biweekly gross rate of ██████ with
25 total payments equalling ██████."

Highly Confidential - Subject to Further Confidentiality Review



Page 70

1    Do you see that?
2  A    Yes.
3  Q    Okay. Did you, in fact, receive that
4  bonus as well?
5  A    Yes.
6  Q    So when you left Mallinckrodt, you
7  received just over ████. Is that right?
8  MR. DAVISON:
9    Objection.
10 MR. CHALOS:
11 Q    I'm adding ██████████.
12 A    Yes.
13 Q    Did you receive any other money from
14 Mallinckrodt when you left the company?
15 A    I don't recall when I would have filed
16 my last expense report, but that -- that would
17 have been receipts justifying business expenses
18 and any remuneration with respect to cash out of
19 pocket, which would have been very small.
20 Q    That would be a reimbursement of your
21 expenses that you advanced?
22 A    Correct.
23 Q    Okay. If you'd flip over to the next
24 page, it's labeled "4 of 11" but it ends in the
25 Bates number 7147242. Paragraph (e), Fiscal Year

Page 71

1  2015 Annual Incentive Bonus, do you see that?
2  A    Yes.
3  Q    It says: Payment will be paid in a
4  lump sum in the gross amount of ██████, minus
5  any applicable deductions or withholdings, et
6  cetera.
7    Do you see that?
8  A    Yes.
9  Q    Did you receive that payment as well?
10 A    Yes.
11 Q    That was on top of the ████ that we
12 just talked about?
13 A    Yes.
14 Q    So when you left Mallinckrodt, leaving
15 aside your expense reimbursement, when you left
16 Mallinckrodt you received approximately ████
17 in cash; is that right?
18 MR. DAVISON:
19    Objection to form.
20 A    Yes.
21 MR. CHALOS:
22 Q    Did you receive, when you left
23 Mallinckrodt, any additional stock options?
24 A    Could you clarify "additional"?
25 Q    Okay. In addition to what you already

Page 72

1  had been granted at that point.
2  A    I don't believe so.
3  Q    Did you -- when you left Mallinckrodt,
4  in connection with your leaving, so in connection
5  with your severance package, did you receive any
6  additional shares of Mallinckrodt stock?
7  A    No.
8  Q    When I say "additional," I mean in
9  addition to what you had already held at the
10 point at which you severed from the company.
11 A    Thank you for clarifying.
12    No.
13 Q    Okay. To your recollection, did any of
14 your stock options vest after you left the
15 company?
16 A    I don't know.
17 Q    How would you find that out?
18 A    Records with the administrator of the
19 benefit.
20 Q    Somebody at Mallinckrodt, you mean?
21 A    No.
22 Q    Who -- who administered that benefit?
23 A    UBS, I believe.
24 Q    So, in connection with your employment
25 at Mallinckrodt, if I'm doing this right, you

Page 73

1  received a salary of ████ per year. Is that
2  right?
3  A    My first year of employment, yes.
4  Q    Did you receive a raise for your second
5  year?
6  A    Yes.
7  Q    What was your second-year salary?
8  A    I don't recall.
9  Q    More than ████
10 A    Yes.
11 Q    Was it a substantial raise between the
12 two years?
13 MR. DAVISON:
14    Objection to form.
15 A    I don't know how you would define
16 substantial.
17 MR. CHALOS:
18 Q    Was it more than ████?
19 A    No. I don't -- I don't believe so.
20 Q    And did you receive --
21    Okay. So let's -- let's see. So your
22 first year you received ████ in salary. Your
23 second year you received something more than 310
24 but not substantially more? Is that fair?
25 A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 Q      So less than ████ in salary, base
2 salary?
3 A      I don't recall the specific number.
4 Q      Okay. And you received stocks as well
5 during that time period?
6 A      Yes.
7 Q      Did you receive a cash bonus as well?
8 A      I received a prorated annual bonus.
9 Q      In cash, though?
10 A      Yes.
11 Q      I'm not talking about your first year.
12 I'm talking about in all the time you were at
13 Mallinckrodt.
14 A      Yes.
15 Q      So let me clarify what I mean by that.
16 You had mentioned earlier that you received some
17 stocks as a bonus at one point; right?
18 A      Yes.
19 Q      Did you also receive cash as a bonus at
20 some point?
21 A      Yes.
22 Q      So did you receive that each year you
23 were there, a cash bonus?
24 A      Yes.
25 Q      Okay. Then you received a one-time

Page 75

1 stock bonus as well?
2 A      Yes.
3 Q      Do you recall the approximate value of
4 the stock bonus?
5 A      No.
6 Q      You received a ████ signing bonus;
7 is that right?
8 A      Yes.
9 Q      And do you recall how much in, let's
10 say, 2014, your first full year at Mallinckrodt,
11 do you recall how much your cash bonus was?
12 A      No.
13 Q      Was it about a ████████████
14 ████?
15 A      I don't recall.
16 Q      Do you have any ballpark on how much
17 that was?
18 MR. DAVISON:
19      Objection to form.
20 A      May I take a look at this offer letter?
21 MR. CHALOS:
22 Q      Oh, of course. Of course. You can
23 look at any of the exhibits.
24 A      So, according to the offer letter, the
25 incentive plan offers a target bonus of 40

Page 76

1 percent of base salary for a hundred percent of
2 achievement objectives. I didn't recall the
3 specific percentage, but that would be the
4 guidance for 2014 bonus.
5 Q      Okay. Did you achieve 100 percent of
6 the objectives in 2014?
7 A      No.
8 Q      So your bonus was something less than
9 40 percent? Is that your recollection?
10 A      I don't -- I don't have a recollection
11 of the amount of the bonus nor the percentage.
12 Q      You did get a bonus, though, in 2014?
13 A      Yes.
14 Q      Did you get a bonus in 2015 as well?
15 A      The bonus I received for 2015 was in
16 accordance with the separation agreement that
17 you've referenced.
18 Q      So you received cash bonuses in 2013
19 prorated and then 2014; right?
20 A      Yes.
21 Q      Then you received an equity bonus
22 in -- was that in 2014? Meaning stocks as a
23 bonus?
24 A      Yes.
25 Q      And that was in 2014?

Page 77

1 A      Yes.
2 Q      Then, in connection with your
3 severance, you received a salary continuation for
4 one year of ████; right? This is from
5 Exhibit 4.
6 MR. DAVISON:
7      Objection.
8 A      Yes.
9 MR. CHALOS:
10 Q      And you also received a severance bonus
11 of ████ at your severance; right?
12 MR. DAVISON:
13      Objection.
14 A      Yes.
15 MR. CHALOS:
16 Q      And then you received an incentive
17 bonus of ████ in connection with your
18 severance; right?
19 MR. DAVISON:
20      Objection to form.
21 A      Yes.
22 MR. CHALOS:
23 Q      Did you have to do any work for
24 Mallinckrodt in the 12 months after you left the
25 company?

Page 78

1  A     No.
2  Q     So would you agree with my math that
3  Mallinckrodt has paid you somewhere ████
4  ████████ over the time of your
5  relationship with them?
6  MR. DAVISON:
7       Objection to form.
8  A     I haven't done the math myself over
9  that period of time.
10 MR. CHALOS:
11 Q     Okay.  Well, if we added up your salary
12 for the two years you were with the company,
13 we're at about ████ plus; right?
14 A     Yes.
15 Q     Add █████████████ signing
16 bonus, that's about ████?
17 A     Yes.
18 Q     Add your severance of ████, that
19 gets you to about ████; right?
20 A     Yes.
21 Q     Add ██████████ bonus at the
22 severance, you're about ████ -- I'm sorry.
23 ████.  Is that right?
24 A     Yes.
25 Q     You add ████ of the incentive bonus

Page 79

1  in connection with your severance and you're just
2  short of ████; right?
3  A     Yes.
4  Q     Then you've got your cash bonuses from
5  2013, 2014.  We don't know how much those are,
6  or, at least, you don't remember.  Right?
7  A     Yes.
8  Q     And then you've got a stock bonus in
9  2014 as well on top of that; right?
10 A     Yes.
11 Q     So would you say it's probably in the
12 ballpark of about ████ that you received
13 from Mallinckrodt in the course of your
14 relationship with them?
15 MR. DAVISON:
16      Objection to form.
17 A     I haven't -- I haven't done the math,
18 but ████████ would be accurate,
19 yes.
20 MR. CHALOS:
21 Q     All right.  Let's go back in time a
22 little bit to --
23 MR. ROOS:
24      Next exhibit?
25 MR. CHALOS:

Page 80

1       Yeah.
2  Q     -- to 2013, when you signed on with
3  Mallinckrodt.  We'll mark as Exhibit Number 5 to
4  your deposition MNK-T1- -- I'm sorry --
5  _0000944549.
6       (MALLINCKRODT CHICK EXHIBIT NUMBER 5
7       WAS MARKED FOR IDENTIFICATION.)
8  MR. CHALOS:
9       Oh, did you already --
10      No.  Sorry.  Here you go.  That's for
11 you.  Do you have copies?
12 MR. ROOS:
13      I already gave them.
14 MR. CHALOS:
15      Oh, you did?  Okay.  Good.  Thank you.
16 Q     Do you recognize the document we marked
17 as Exhibit Number 5?
18 A     Yes.
19 Q     What is this?
20 A     This was an organizational announcement
21 issued by Steve Carchedi at my joining the
22 company and informing on Ron Wickline's
23 retirement.
24 Q     Do you recall whether Ron Wickline
25 leaving Mallinckrodt was his decision or their

Page 81

1  decision?
2  MR. DAVISON:
3       Objection to form.
4  A     I don't.
5  MR. CHALOS:
6  Q     Did you ever know the answer to that?
7  MR. DAVISON:
8       Objection to form.
9  A     No.
10 MR. CHALOS:
11 Q     If you look at the one, two, three,
12 fourth paragraph, it says, "With the pending
13 launches of MNK-795 and MNK-395, it is critical
14 that we have a seamless sales leadership
15 transition."
16      Do you see that?
17 A     Yes.
18 Q     What is MNK-395?
19 A     I'm trying to recall, and I don't.
20 Q     Do you recall whether the product
21 designated as MNK-395 ever made it to market?
22 MR. DAVISON:
23      Objection.
24 A     I -- I don't.
25 MR. CHALOS:

Page 82

1  Q       MNK-795, is that "X-artemis" XR?
2  A       "Xar-temis" XR, yes.
3  Q       "Xar-temis."
4  A       Yes.
5  Q       "Xar-temis."  "Xar-temis."  Got it.
6  Well, I've been saying that wrong all this time.
7  So Xartemis.
8         Okay.  And if you go down here to the
9  bullet points where it says Gavin McGowan, do you
10 see that?
11 A       Yes.
12 Q       And it lists the three people who will
13 be reporting to you:  Gavin McGowan, Bill Nichols
14 and Jay Meyer.  Do you see that?
15 A       Yes.
16 Q       Those were the regional sales directors
17 at the time you joined Mallinckrodt?
18 A       Yes.
19 Q       Did that change at some point during
20 your tenure at Mallinckrodt?
21 A       Did what change?
22 Q       That there were three regional managers
23 reporting to you?  Did it ever become four?
24 A       Yes.
25 Q       Did the -- did any of the three people

Page 83

1  listed in Exhibit 5, did they leave the company
2  during the time you were there?
3  A       Yes.
4  Q       Which -- who left?
5  A       Gavin McGowan and Jay Meyer.
6  Q       When did they leave?  Do you recall?
7  A       I don't.
8  Q       And then there was a fourth regional
9  manager eventually added?
10 A       Yes.
11 Q       Do you recall in which region Ohio was?
12 A       When I joined the company, Ohio was led
13 by Jay Meyer, who lived in Ohio and managed a
14 very large geography west.
15 Q       Okay.  Did that change during the time
16 you were --
17 A       Yes.
18 Q       -- at Mallinckrodt?
19         Okay.  What did it change to?
20 A       So we implemented four regions.  The
21 change primarily involved dividing that very
22 large geography into two regions, one in the west
23 with a region sales director based in California,
24 one in the midwest with a region sales director
25 based in St. Louis, and the northeast region and

Page 84

1  the southeast region remained, though I don't
2  recall if the regional boundaries changed at that
3  time.
4  Q       Did the person responsible for Ohio
5  change at that time?
6  A       Yes.
7  Q       Who took over then?
8  A       Kim Gawart, I believe, had
9  responsibility for Ohio.
10 Q       Did Mr. Meyer leave the company at that
11 point?
12 A       He -- he left the company and,
13 subsequently, Miss Gawart was hired.
14 Q       Do you know why Mr. Meyer left?
15 MR. DAVISON:
16         Objection.
17 A       I recall he accepted a position with
18 another firm.
19 MR. CHALOS:
20 Q       Do you know whether it was his choice
21 to leave or whether he was told to leave?
22 A       That was his choice.
23 Q       And, then, is it Kim Gawart?
24 A       Yes.
25 Q       Did Miss Gawart retain her position

Page 85

1  with -- regional sales position with
2  responsibility for Ohio for the remaining time
3  that you were at Mallinckrodt?
4  A       Yes.
5  Q       What did you do when you left
6  Mallinckrodt?
7  MR. DAVISON:
8         Objection to form.
9  MR. CHALOS:
10 Q       Professionally, I mean.
11 A       ████████████████████████████
12 ████████████████████████████████
13 ████████████████████████████████
14 ████████████████████████████
15 Q       Did you eventually go back to work?
16 A       I did.
17 Q       When was that?
18 A       In late 2015 I decided to initiate a
19 consulting practice and, very shortly thereafter,
20 became engaged full-time with an entrepreneur who
21 was building a business that I had had some
22 experience with.
23 Q       What was that business?
24 A       A concierge health navigation service
25 for seniors.

Page 86

1 Q    Where was that located, that position?
2 A    Princeton, New Jersey.
3 Q    Can you explain what that -- what that
4 is?
5 A    So the vision for the business was to
6 provide navigation services to families who had
7 aging parents who might live remote from their
8 adult children who could benefit from assistance
9 in navigating their -- their health benefits.
10 Q   Sounds like a good idea.
11      What did you -- what did you do for
12 them?
13 A    So I did a good deal of research, also
14 leveraged my own personal experience as not only
15 a healthcare executive but also a full-time adult
16 caregiver, and provided insight into service
17 offerings for the business.
18 Q    Uh-huh.  Is that UCB?
19 A    No.
20 Q    What is the name of that company, the
21 concierge --
22      Oh, is that the name of it, Concierge
23 Health Navigation Services?
24 A    No.
25 Q    What is the name of that company?

Page 87

1 A    Theia, T-H-E-I-A.
2 Q    And who was the person, the
3 entrepreneur you mentioned?
4 A    Joanna Gordon Martin.
5 Q    And how long did you have that
6 professional affiliation?
7 A    We worked together for about four
8 months.
9 Q    And what happened to end that
10 relationship?
11 A    I made the determination myself that,
12 based on the business model as I saw it
13 developing and discussions with Joanna about a
14 potential for partnership, we did not see things
15 similarly.
16 Q    Uh-huh.
17 A    And I chose not to extend my engagement
18 with her.  She had asked me to -- to do so, and I
19 declined.
20 Q    What did you do after that?
21 A    I was exploring professional
22 opportunities, a number of professional
23 opportunities through recruiters.
24 Q    And did you eventually find one that
25 was suitable?

Page 88

1 A    I did.
2 Q    What was that?
3 A    UCB.
4 Q    What is UCB?
5 A    UCB is a pharmaceutical company with US
6 headquarters in Atlanta, global headquarters in
7 Brussels, Belgium.
8 Q    What -- what do you do -- what did you
9 do for them?
10 A    So I was recruited as their US head of
11 market access.
12 Q    What type of products did they have?
13 A    Two therapeutic areas:  One primarily
14 rheumatology/psoriasis with a product called
15 Cimzia, and also neurology, epilepsy in
16 particular.
17 Q    Did they market any opioids when you
18 worked for them?
19 A    No.
20 Q    Did you have the same position the
21 entire time you worked there?
22 A    Yes.
23 Q    Was there a title?
24 A    Vice President of U.S. Market Access.
25 Q    And you left there in 2018?  Is that

Page 89

1 right?
2 A    Yes.
20 Q    When in 2018 did that happen?
21 A    February of 2018.
22 Q    That's when you began your consulting
23 arrangement with Inivata?
24 A    Yes.
25 Q    How did you get hooked up with Inivata?

Page 90

1  A      The chairman of the board contacted me,
2  knowing my experience.  The chairman of the board
3  was the chief executive officer at Archimedes.
4  Q      Oh.  Okay.  Who is that?  What's that
5  person's name?
6  A      Jeff Buckhalter.
7  Q      Where is he physically located?
8  A      I believe he is now based out of
9  Jupiter, Florida.
10        (MALLINCKRODT CHICK EXHIBIT NUMBER 6
11        WAS MARKED FOR IDENTIFICATION.)
12 MR. CHALOS:
13 Q      I hand you what we're marking as
14 Exhibit Number 6.  It is Bates-stamped
15 MNK-TI_0000546859 through MNK-T1_0000548862
16 [sic].  My question to you will be, first, do you
17 recognize this document?
18 A      Yes.
19 Q      Okay.  What is this?
20 A      This is an organizational announcement
21 issued by Hugh O'Neill.
22 Q      Okay.  Who was Hugh O'Neill?  Or who is
23 Hugh O'Neill?
24 A      So Hugh, at the time at which I was
25 with the organization, headed the specialty

Page 91

1  pharmaceuticals business.
2  Q      Was he in that role the entire time you
3  were with Mallinckrodt?
4  A      No.  I actually preceded Hugh to
5  Mallinckrodt.  He joined not long after I joined
6  the company.
7  Q      Did he stay in that role for the
8  remaining time you were at Mallinckrodt?
9  A      He did remain in a leadership role of
10 the specialty business.  I believe his role
11 evolved over time.
12 Q      Did he take on a different title at
13 some point?
14 A      I -- I don't recall.
15 Q      Okay.
16        Okay.  So if you look at the
17 first -- well, it's the second page, I guess, of
18 Exhibit 6.  Yeah.  That's the one on the board.
19 The second paragraph --
20        Well, let me back up.
21        So this -- this is a document that is
22 from Hugh O'Neill; right?  Signed by him?  Or at
23 least it's got his -- not his handwritten
24 signature but it's -- it purports to be from him.
25        Do you see that on the next page?

Page 92

1  A      Yes.
2  Q      Okay.  The second paragraph, he says,
3  "To prepare the organization for this growth
4  while continuing to build our commercial
5  capabilities, including product launch for
6  Xartemis XR, formerly known as MNK-795, and
7  MNK-155, I'd like to share some important
8  information regarding changes to the specialty
9  pharmaceutical -- pharmaceuticals organization."
10        Do you see that?
11 A      Yes.
12 Q      What was MNK-155?
13 A      I don't recall.
14 Q      Do you recall whether that drug ever
15 made it to market?
16 MR. DAVISON:
17        Objection to form.
18 A      I don't recall.
19 MR. CHALOS:
20 Q      If you go down here to the
21 second-to-last paragraph, it says, "Finally, I
22 would like to announce that Terry Terifay has
23 chosen to leave the organization effective
24 immediately."
25        Do you see that?

Page 93

1  A      Yes.
2  Q      Do you know why Mr. Terifay elected to
3  leave the organization?
4  A      I do not.
5  Q      Do you know whether it was
6  Mr. Terifay's decision to leave the organization?
7  MR. DAVISON:
8         Objection to form.
9  A      I don't.
10 MR. CHALOS:
11 Q      Have you heard anything about that one
12 way or the other?
13 A      No.
14 Q      Did you ever ask anybody about that?
15 MR. DAVISON:
16        Objection to the form.
17 A      I don't recall.
18 MR. CHALOS:
19 Q      If you'll flip on to the next page, it
20 says, "The opioids franchise will be led by
21 Melissa Falcone, Director of Product Management."
22        Do you see that?
23 A      Yes.
24 Q      And she was, at that time, Melissa
25 Falcone, in charge of marketing for the opioids

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  franchise?  Is that right?
2  A      At the time of this announcement,
3  Melissa was a member of the opioid marketing
4  team.
5  Q      Uh-huh.
6  A      Yes.
7  Q      Okay.  I'm -- so her new position would
8  be Director of Product Management?  That is
9  essentially the marketing manager; is that right?
10  Or is it something else?
11  A      She led the marketing team for the
12  opioid franchise.  So she had other marketers, as
13  listed here, reporting in to her.
14  Q      Okay.
15  A      Yes.
16  Q      So if you flip to the next page,
17  there's a diagram.  It's a black and white, so
18  it's not as easy to see.  But --
19          Can we zoom on that?
20          So this depicts an organizational
21  structure that has a group of people reporting to
22  Mr. O'Neill, including you.
23          Is this an accurate depiction of the
24  organizational structure from October of 2013
25  through the end of your tenure with Mallinckrodt,

Page 95

1  with respect to you and your position and the
2  reporting that your position did?
3  A      So with respect to me, there was a
4  general manager brought in that reported directly
5  to Hugh and to whom I directly reported.
6  Q      Who was that?
7  A      Mike Matthews.
8  Q      Who else report- --
9          First of all, when was that when
10  Mr. Matthews --
11  A      I don't recall the specific time.
12  Some -- somewhere likely 20-- late 2014, early
13  2015.
14  Q      Who else at that time reported to
15  Mr. Matthews?
16  A      Melissa Falcone.  Also, the market
17  access function, which was filled by Todd
18  Killian.
19  Q      Okay.  This is the person all the
20  way -- that was vacant at the time this was
21  created, I guess?
22  A      Yes.
23  Q      Anyone else?
24  A      Also the Vice-President of Sales for
25  the Hospital Division and the Vice-President of

Page 96

1  Marketing for the Hospital Division.  Those were
2  acquisitions that had not yet been made at this
3  time.
4  Q      Okay.  Did Melissa Falcone remain in
5  her position through the time that you worked at
6  Mallinckrodt, meaning the position depicted in
7  Exhibit 6?
8  A      I am aware that she accepted another
9  role within the company.  I just don't recall
10  when specifically that was.
11  Q      It was during the time you were at
12  Mallinckrodt?
13  A      I -- I don't recall specifically the
14  time.  I believe so.
15  MR. CHALOS:
16          495.  Oh, I have it here.  Peter, I
17  have it here.  Sorry about that.
18          (MALLINCKRODT CHICK EXHIBIT NUMBER 7
19          WAS MARKED FOR IDENTIFICATION.)
20  MR. CHALOS:
21  Q      We're gonna mark as Exhibit Number 7
22  MNK-T1_00023333495 through -- that's it.  It's a
23  native format document.  It's stapled a little
24  bit funny, so sorry about that.  And you can take
25  as much time as you need to review that.

Page 97

1          My question would be "Do you recognize
2  this document?"  The next question will be "What
3  is it?"
4  A      So I -- I don't recall specifically
5  this document nor its use, but it appears to be
6  the organizational structure of the specialty
7  pharmaceuticals business, both field-based and
8  home office-based.
9  Q      Okay.  If you look at the -- I guess
10  it's the third page of the exhibit that looks
11  like what's on the board here --
12          Yeah, slide number 2.  Thank you.
13          It's got -- sort of cut off, but I
14  assume that's you on the left there?
15  A      Yes.
16  Q      It's got you -- and it says, I should
17  say, at the top, "Fiscal year '13 through fiscal
18  year '14, Brands Specialty Pharmaceuticals
19  Commercial Leadership Team and Structure."
20          Do you see that?
21  A      Yes.
22  Q      Okay.  So the top box here, President
23  and General Manager -- I'm assuming it's just
24  president.  It's got a -- it's blocked out.  But
25  is that the role Mr. Matthews eventually filled?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 A    Yes. However, that was some period of
2 time after this organizational structure was in
3 place.
4 Q    Do you recall what the fiscal year at
5 Mallinckrodt was?
6 A    Yes. The fiscal year began October
7 1st.
8 Q    Okay. And it lists --
9 A    I --
10 Q    Oh, I'm sorry. Go ahead.
11 A    I beg your pardon. I may be confusing
12 that with UCB.
13 Q    Okay.
14 A    I may be confusing that with UCB,
15 just...
16 Q    Okay. Do you have any recollection of
17 what the Mallinckrodt fiscal year was? I mean,
18 don't expend too much brain power. It's not that
19 hard to --
20 A    I'm sorry. I may -- I may have
21 interchanged those two.
22 Q    Okay. Well, we'll leave that aside for
23 now.
24    It's got you listed on slide number 2,
25 which is the third page of Exhibit Number 7 --

Page 99

1    Is that right? Seven? Yeah.
2    It shows that -- under your photograph
3 there, it says, "Fiscal year '13." It shows you
4 having responsibility for three regional
5 directors, 20 district managers and 211 field --
6 field sales reps.
7    Do you see that?
8 A    Yes.
9 Q    Is that consistent with your memory?
10 A    Yes.
11 Q    Okay. And then, "Planned for fiscal
12 year '14," they have four regional directors, 36
13 district managers, and 350 to 380 field sales
14 reps.
15    Do you see that?
16 A    Yes.
17 Q    Okay. Did that actually happen?
18 A    No.
19 Q    What -- what actually happened in '14
20 in terms of numbers of people?
21 A    I don't recall numbers of people.
22 Q    What do you recall that was different
23 about what happened versus what's depicted in
24 Exhibit 7?
25 A    I don't believe that we scaled the

Page 100

1 sales force to this degree, to these numbers.
2 Q    Did the four regional directors happen?
3 A    Yes.
4 Q    And did the 36 district managers
5 happen?
6 A    I don't recall the specific number.
7 Q    But more -- it increased from 20 at
8 some point?
9 A    I believe so.
10 Q    And the field sales representative
11 number increased from 211?
12 A    I believe so.
13 Q    Then it says, in parentheses,
14 "Approximately 50/50 MNK/CSO split."
15    Do you see that?
16 A    Yes.
17 Q    What does that mean?
18 A    CSO refers to contract sales
19 organization.
20 Q    At some point in fiscal year '14, did
21 Mallinckrodt engage a contract sales association?
22 A    Yes.
23 Q    Was that inVentiv?
24 A    Yes.
25 Q    I-N, capital V, E-N-T-I-V. Is that

Page 101

1 right?
2 A    Yes.
3 Q    And what was the role of inVentiv?
4 A    So the inVentiv sales force was
5 contracted to provide promotional support,
6 field-based field support for Xartemis XR.
7 Q    So they provided field sales
8 representatives?
9 A    Yes.
10 Q    Did they, the inVentiv sales
11 representatives, report to the district managers
12 similar to the Mallinckrodt employed sales
13 representatives?
14 A    They reported in to their own
15 management structure that worked in partnership
16 with our field management structure.
17 Q    Would a physician being called upon by
18 a sales representative know whether the
19 representative worked for inVentiv or worked for
20 Mallinckrodt? Do you understand what I mean?
21 Would they be able to tell the difference?
22 A    No.
23 MR. DAVISON:
24    Objection to form.
25 MR. CHALOS:

Page 102

1 Q        In terms -- from the physician's
2 standpoint or whoever the person being called
3 upon's standpoint, the sales representative was
4 being held out as a Mallinckrodt sales
5 representative?
6 MR. DAVISON:
7          Objection to form.
8 A        I don't recall what was shown on the
9 business card of those individuals.  But they
10 clearly represented Mallinckrodt.
11 MR. CHALOS:
12 Q        And they were speaking on behalf of
13 Mallinckrodt?
14 A        Yes.
15 Q        Did the -- was there a regional
16 director structure for the contract sales
17 organization as well?
18 A        They weren't referred to as region
19 directors.  They were employee relations managers
20 and a national sales director.
21 Q        So the national sales director was the
22 person that was at your level in their
23 organization, essentially?
24 A        No.  They -- he was at the level of the
25 region sales directors.

Page 103

1 Q        Oh, I see.
2          Was there a person analogous to you in
3 the contract sales organization?
4 A        No.
5 Q        Did their national sales director
6 report to you?
7 A        No.
8 Q        How did you -- how did you -- how did
9 Mallinckrodt manage the field sales
10 representatives who were employed by inVentiv?
11 MR. DAVISON:
12          Objection to form.
13 A        The field representatives were within
14 the district structure of district managers and
15 also within the regional sales structure.  So
16 they worked as part of that district team or part
17 of that regional team.
18 MR. CHALOS:
19 Q        Uh-huh.
20 A        And that's -- that was the -- that was
21 the structure.
22 Q        Their messaging, meaning the messaging
23 that the inVentiv sales reps delivered, was the
24 same messaging as the Mallinckrodt sales
25 representatives?

Page 104

1 A        Yes.
2 Q        Did you ever do ride-alongs while you
3 worked for Mallinckrodt?
4 A        Yes.
5 Q        Okay.  What is a ride-along?
6 A        When one accompanies a field sales
7 representative calling on customers.
8 Q        How many times did you do a ride-along
9 with Mallinckrodt?
10 A        I don't recall.
11 Q        Was it a lot?  I mean, was it something
12 you did frequently?
13 A        No.
14 Q        How did you decide where to do your
15 ride-alongs?
16 A        If there was a particular appointment
17 with a particular practice or event, I might
18 consider accompanying a representative.
19 Q        Geographically, where did you do your
20 ride-alongs?
21 A        I don't recall.
22 Q        Did you ever travel to do your
23 ride-along?
24 A        Yes.
25 Q        Did you ever do any ride-alongs in

Page 105

1 Tennessee?
2 MR. DAVISON:
3          Objection to form.
4 A        Not with -- not while with
5 Mallinckrodt.
6 MR. CHALOS:
7 Q        You did with some other company?
8 A        Yes.
9 Q        Which one?
10 A        With Bristol-Myers Squibb.
11 Q        Any others?
12 A        No.
13 Q        Did you do any ride-alongs in Ohio when
14 you were with Mallinckrodt?
15 A        Not a ride-along, but I visited there
16 for a business review.
17 Q        What's a business review?
18 A        I met with the region sales director
19 and reviewed their business.
20 Q        Was it Mr. Meyer at the time?
21 A        Yes.
22 Q        Did you review it favorably?
23 MR. DAVISON:
24          Objection to form.
25 A        I was simply absorbing information.  It

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 was not long after my joining the company.
2 MR. CHALOS:
3 Q      Uh-huh.
4 A      So it was simply introductory
5 assimilation meeting into the business.
6 Q      Did you do that with all the regional
7 sales directors?
8 A      Yes.
9 Q      Where in Ohio was that?
10 A      I don't recall if it was Columbus or
11 Cincinnati.
12 Q      It was one of the two?
13 A      Yes.
14 Q      We've been going a little while.  Let
15 me just finish with this document, and then we'll
16 take a break and make a plan for the rest of the
17 day.
18      If you look at --
19 MR. ROOS:
20      Three?
21 MR. CHALOS:
22      Yeah.  Yeah.  Well, let's look at slide
23 3.  Exhibit 7, slide 3.  It's the fourth page of
24 the exhibit.
25 Q      So if you look at this, it looks to

Page 107

1 me -- and tell me if this is correct -- that the
2 title of the position that you reported directly
3 to was Vice-President/General Manager, Brands.
4 Was that -- is that right?
5 A      Yes.  When I joined the company, this
6 position was vacant.  It remained vacant for a
7 period of time until Mike Matthews joined the
8 company.
9 Q      I see.  Okay.
10      Was this -- how did you refer to this?
11 Was this a reorganization or realignment?  How
12 did you internally refer to what happened going
13 into the fiscal year of 2014?
14 A      I recall there was anticipation of
15 growing the organization in anticipation of
16 Xartemis XR's approval.
17 Q      Right.  I mean, I just -- I want to
18 make sure we're talking about the same -- we're
19 talking the same language.
20      Did you -- was this referred to in some
21 way, a reorganization, realignment --
22 A      I don't --
23 Q      -- revision or something?
24 A      I don't recall.
25 Q      Okay.  Well, whatever you called what

Page 108

1 happened in fiscal year '14, did Mallinckrodt
2 also hire additional field sales representatives?
3 A      In the Specialty Pharmaceuticals
4 Division?
5 Q      Yes, ma'am.
6 A      We continued to -- to hire individuals,
7 yes.
8 Q      And that was in anticipation of the
9 Xartemis launch?
10 A      Yes.
11 Q      When did Xartemis actually launch?
12 A      I recall a national launch meeting in
13 October of 2014.
14 Q      If you look at slide 7 of Exhibit 7, it
15 says, "The proposed alignment has 86 districts
16 with 377 territories."
17 A      Yes.
18 Q      And it's got a map there.
19      First of all, did this -- did this
20 actually come to fruition?  In other words, did
21 this alignment actually happen?
22 A      There was additional promotional effort
23 placed in the field.  I don't know if this
24 particular alignment is what ultimately was
25 implemented.

Page 109

1 Q      If you look at the label for Cleveland,
2 Ohio --
3      Do you see that?
4 A      Yes.
5 Q      It says, "Cleveland, Ohio, 11."
6      Do you have any idea what that means?
7 A      So, as I read the legend on the bottom,
8 the label shows the district name in brackets
9 followed by "Span of Control" in brackets.  I
10 would recall that would mean 11 representatives
11 in the district that was entitled "Cleveland."
12 Q      Okay.  Is that consistent with your
13 memory?
14 A      I don't recall specific numbers of
15 representatives in -- in specific districts.
16 Q      And does that sound about right, 11
17 sales reps for the Cleveland district?
18 MR. DAVISON:
19      Objection to form.
20 A      I don't recall what the number would
21 have been or was.
22 MR. CHALOS:
23 Q      Did you make the slides that
24 are -- that come immediately after the --
25      Well, let's back up.

Page 110

1 So if you turn back a few pages, after
2 slide 3, there's a cover sheet that says,
3 "Mallinckrodt Pharmaceuticals, Stacy Chick,
4 Fiscal Year '14, Brands Sales Organization
5 Structure."
6 Do you see that?
7 A Yes.
8 Q And then there are some slides that
9 come after that, three slides that come after
10 that, including the map we just looked at.
11 Do you see that?
12 A Yes, I see that.
13 Q Did you -- did you make these slides?
14 A I don't recall specifically making
15 these slides.
16 Q Did you approve these slides before
17 they were put into this presentation?
18 A I don't recall specifically.
19 MR. CHALOS:
20 Why don't we take a break.
21 VIDEOGRAPHER:
22 We are now going off the video record.
23 The time is currently 11:28 a.m. This is the end
24 of media 2.
25 (OFF THE RECORD.)

Page 111

1 VIDEOGRAPHER:
2 We are now back on the video record
3 with the beginning of media number 3. The time
4 is currently 11:45 a.m.
5 MR. CHALOS:
6 Q Okay. Let's mark as the next numbered
7 exhibit Exhibit 8, document MNK-T1_0007147292.
8 (MALLINCKRODT CHICK EXHIBIT NUMBER 8
9 WAS MARKED FOR IDENTIFICATION.)
10 MR. CHALOS:
11 Q And my first question to you will be
12 "Do you recognize this document?"
13 A Yes.
14 Q What is it?
15 A This is a noncompete agreement.
16 Q This is a document that you signed when
17 you first started working for Mallinckrodt; is
18 that right?
19 A Yes.
20 Q If you look at -- let me see here.
21 It's toward the end. It says page 7 of 8. It
22 ends in 7147304. There's a signature. Is that
23 your signature there?
24 A Yes.
25 Q It's dated 8-12 of 2013. Is that

Page 112

1 right?
2 A Yes.
3 Q Was that your start date at
4 Mallinckrodt?
5 A I believe that was around my start
6 date.
7 Q Yeah. I mean, that's the date that
8 I'll represent to you on Exhibit 3, that's the
9 date of your offer letter, and that's also the
10 date of --
11 A Yes.
12 Q -- Exhibit 5, the announcement that
13 went out.
14 A Yes.
15 Q So is that the date you actually
16 started working at Mallinckrodt?
17 A I believe so.
18 Q Did you -- did you have an office at
19 Mallinckrodt?
20 A Yes.
21 Q Where was your office?
22 A I was located off the main campus,
23 along with all of the specialty pharmaceuticals
24 colleagues.
25 Q That was in Missouri?

Page 113

1 A Yes.
2 Q Was it Hazelwood, Missouri? Was that
3 the name?
4 A Yes.
5 Q Did you, when you left Mallinckrodt,
6 have any specific discussions with Mallinckrodt
7 about whether you would be bound by a noncompete
8 agreement? You know what I mean when I say
9 "noncompete agreement"?
10 A Yes.
11 I'm sorry. Could you ask the question
12 again?
13 Q Sure.
14 When you left Mallinckrodt, did you
15 have any discussions with anyone at Mallinckrodt
16 about whether you would be bound by a noncompete
17 agreement?
18 A I don't recall a discussion on that
19 matter.
20 Q Did you feel like you were bound by a
21 noncompete agreement when you left Mallinckrodt?
22 A Yes.
23 Q Did you make your professional
24 decisions based in -- based on your belief that
25 you were bound by a noncompete agreement?

Page 114

1 MR. DAVISON:
2      Objection to form.
3 A     This was certainly a consideration that
4 I kept in mind to uphold my obligation as a
5 result of the noncompete.
6 MR. CHALOS:
7 Q     Could you pick up Exhibit Number 4? It
8 should be in that stack over there. It's the
9 separation agreement you had with Mallinckrodt.
10 And, specifically, I'd like to turn to page 5 of
11 11. It says "5 of 11" at the bottom. I don't
12 know that it's the fifth page of the exhibit, but
13 it ends in 7147244, the paragraph that says
14 "Release of All Claims."
15     Do you see that?
16 A     Yes.
17 Q     It says here: Executive -- which I
18 believe is defined -- that's the way they refer
19 to you in this agreement.
20     Executive -- bunch of legalese -- does
21 remise -- whatever that means -- release and
22 forever discharge the company, its affiliates,
23 subsidiaries and parents, et cetera, from any
24 causes of action.
25     I'm paraphrasing, but -- or I'm

Page 115

1 selectively quoting. But what is -- this -- did
2 you understand that this document, Exhibit 4,
3 included a release of all claims?
4 MR. DAVISON:
5     Objection to form.
6 A     That's what it says in the document.
7 MR. CHALOS:
8 Q     Okay. Were you contemplating bringing
9 claims against Mallinckrodt at the time you left
10 the company?
11 A     No.
12 Q     Did you believe you had any basis --
13     God bless you.
14     Did you believe you had any basis to
15 bring any legal claims against Mallinckrodt in
16 connection with your employment?
17 A     No.
18     (MALLINCKRODT CHICK EXHIBIT NUMBER 9
19     WAS MARKED FOR IDENTIFICATION.)
20 MR. CHALOS:
21 Q     Okay. We've marked as Exhibit Number 9
22 a two-page document, MNK-T1_007147320 through
23 MNK-T1_007147321. Do you recognize this
24 document, ma'am?
25 A     No.

Page 116

1 Q     Okay. It says on the top "Separation
2 Agreement Summary For Payroll Purposes Only."
3 May be an internal document. It may be you've
4 never seen it. But do you recognize how -- do
5 you -- do you think you've ever seen this
6 document before?
7 MR. DAVISON:
8     Objection to form.
9 A     I don't recall this particular
10 document.
11 MR. CHALOS:
12 Q     Okay. It lists here your base salary
13 as being ████████ as of your termination from
14 Mallinckrodt. Do you see that?
15 A     Yes.
16 Q     Is that consistent with your memory for
17 what your base salary was in 2015?
18 A     Yes.
19 Q     Was your salary adjusted at the end of
20 a calendar year or at the end of a fiscal year?
21 A     I don't recall.
22 Q     All right.
23     I hope everybody's got their readers.
24 We're going to mark as Exhibit Number 10 a
25 document with the Bates number MNK-T1_0000546174,

Page 117

1 and it runs through MNK-T1_0000546204.
2     Here's your copy.
3     (MALLINCKRODT CHICK EXHIBIT NUMBER 10
4     WAS MARKED FOR IDENTIFICATION.)
5 MR. CHALOS:
6 Q     The Bates number is printed very, very
7 small on the document for some reason. I don't
8 know why.
9     You can take as much time as you need
10 to review this document. I'm going to direct you
11 to the couple pages that I want to ask you about,
12 and those are the pages that end in 546184 --
13 A     All right.
14 Q     -- and 185.
15 A     Okay.
16 Q     But you can look at the rest of the
17 document if it's helpful.
18 MR. ROOS:
19     "Culture, Our Foundation"?
20 MR. CHALOS:
21     Yeah. There it is.
22 Q     So the front page of the document says
23 "US Specialty Pharmaceuticals Town Hall," dated
24 June 24th of 2014. Do you see that?
25 A     June 26th --

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 Q    Sorry.
2 A    -- 2014.
3 Q    June 26th, 2014.
4 A    Yes.
5 Q    Looking at those small numbers has
6 scrambled my brain.
7        June 26, 2014.  US Specialty
8 Pharmaceuticals Town Hall; right?
9 A    Yes.
10 Q    Was that a physical meeting where
11 people were present?
12 A    Yes.
13 Q    Do you remember -- do you remember the
14 meeting?
15 A    I don't recall this specific meeting.
16 Q    If you look at the --
17 A    I beg your pardon.
18 Q    Yes.
19 A    May I -- just -- may I just go through
20 the rest of the document?
21 Q    Take as much time as you need.
22 A    Thank you.  That will help me.
23 Q    And I might suggest if you look at the
24 second page, it says -- it has video
25 instructions.

Page 119

1 A    Yes.  Yes.
2 Q    Okay.  So --
3 A    Can I go through the rest of the
4 document first?
5 Q    Absolutely.  Tell me when you're ready.
6 A    Thank you.
7        It actually does help to go through
8 the document.
9 Q    Uh-huh.
10 A    I -- I do recall this town hall.  It
11 was -- the date was -- was helpful.
12 Q    Okay.  So this was a -- an in-person
13 meeting?
14 A    Yes.
15 Q    Were some people participating by
16 video?
17 A    Yes.
18 Q    Were you in person at the meeting?
19 A    Yes.
20 Q    Where was it?
21 A    At the company's headquarters in
22 Hazelwood, New Jersey -- excuse me -- Hazelwood,
23 Missouri.
24 Q    Was it the entire --
25        Who -- who was present?  I don't mean

Page 120

1 each person but in categories.
2 A    Home office-based employees would be
3 present, field-based employees via video
4 conference.
5 Q    And you were present even though you
6 were technically a field-based employee?
7 A    Yes.
8 Q    Mr. O'Neill was present?
9 A    Yes.
10 Q    Was -- were all the members of the
11 commercial -- the Brand Specialty Pharmaceutical
12 Commercial Leadership Team present?
13 A    I don't know.
14 Q    Okay.  So if you turn to the page that
15 is on the board here, which is -- ends in 6184,
16 it says "Culture, Our Foundation."
17        Do you see that?
18 A    Yes.
19 Q    Okay.  Before this meeting, had you had
20 any exposure to the "Culture, Our Foundation"
21 concepts within Mallinckrodt?
22 MR. DAVISON:
23        Objection to form.
24 A    I don't recall specifically when this
25 concept was introduced.

Page 121

1 MR. CHALOS:
2 Q    There is a mission statement here,
3 "Reveal and relieve disease for a healthier
4 world."
5        Do you see that?
6 A    Yes.
7 Q    Was that the mission of this -- the
8 specialty pharmaceuticals group while you were at
9 Mallinckrodt?
10 A    This -- this cultural foundation
11 applied throughout the entire company.
12 Q    Okay.  And is that true for all of the
13 statements on this page of Exhibit Number 10?
14 A    So this -- this approach applied to all
15 divisions of the company.
16 Q    Yes.  Okay.  Yeah, that's what I'm
17 asking.
18 A    Yes.
19 Q    That's true?  Okay.
20 A    Yes.
21 Q    Okay.  And is that -- were these the --
22 the approach that was in place during the entire
23 time you were at Mallinckrodt?
24 A    No.
25 Q    These came into being while you were at

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 Mallinckrodt?
2 A     Yes.
3 Q     And did they persist through the end of
4 the time that you were at Mallinckrodt?
5 A     Yes.
6 Q     If you look at the core values listed
7 on this page, do you see that?
8 A     Yes.
9 Q     It says, "Quality, an unwavering
10 commitment to quality."
11       Do you see that?
12 A     Yes.
13 Q     While you were at Mallinckrodt, was it
14 a core value of the company that it had an
15 unwavering commitment to quality?
16 A     Based on my experience, yes.
17 Q     Okay. And was it a core value of
18 Mallinckrodt that the company had integrity in
19 everything the company does?
20 A     Yes.
21 Q     Did you agree that that was a good core
22 value for the company to have?
23 A     Yes.
24 Q     Why is that?
25 A     Why do I believe integrity is a good

Page 123

1 core value?
2 Q     Uh-huh.
3 A     Dealing with the healthcare industry
4 with the trust of patients, working in a complex
5 environment, having the -- the trust of
6 healthcare professionals and -- and patients and
7 a high standard in operating I believe is
8 important.
9 Q     If you look at the bottom right of this
10 page, it says, "Trustworthy. We consistently
11 model our values."
12       Do you see that?
13 A     Yes.
14 Q     And if you flip over to the next page,
15 which is -- ends in 546185, it says
16 "Trustworthy."
17       Do you see that?
18 A     Yes.
19 Q     It says, "We do the right thing,
20 without compromise."
21       Do you see that?
22 A     Yes.
23 Q     Was that a core value of Mallinckrodt
24 while you were there?
25 A     Based on my experience, yes.

Page 124

1 Q     Okay. Do you personally agree with
2 that as being a good core value to have?
3 A     Yes.
4 Q     With --
5       You have been in marketing or sales in
6 the pharmaceutical world for about 20 years; is
7 that right?
8 A     More than 20 years. Yes.
9 Q     Woo. You're right. 30 years. All
10 right. I'll stop saying that.
11       You've been in the pharmaceutical
12 marketing and sales role for a number of years;
13 right?
14 A     Yes.
15 Q     And, in the course of that, have you
16 developed an understanding of what are best
17 practices for pharmaceutical marketing?
18 MR. DAVISON:
19       Objection to form.
20 A     I've had experience over the years in
21 different therapeutic categories to -- to
22 understand and to evaluate practices.
23 MR. CHALOS:
24 Q     Are there standards in the marketing
25 field that apply to pharmaceutical marketing?

Page 125

1 MR. DAVISON:
2       Objection to form.
3 A     Could you elaborate on what you mean by
4 "standards"?
5 MR. CHALOS:
6 Q     Yeah. Are there general principles
7 that are accepted in the marketing world, in the
8 pharmaceutical marketing world, that apply
9 to -- to pharmaceutical marketing?
10 MR. DAVISON:
11       Objection to form.
12 A     I'm sorry. I'm not -- I'm not
13 following what specifically you're asking for.
14 MR. CHALOS:
15 Q     Okay. For example, we just talked
16 about a phrase, "Do the right thing, without
17 compromise." Right?
18 A     Yes.
19 Q     Is that something that is a general
20 principle that would apply to pharmaceutical
21 marketing, in your view, and based on your
22 experience?
23 A     Yes. In addition to the regulatory
24 environment in which the pharmaceutical industry
25 operates in the United States.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 Q      So a pharmaceutical marketer should be
2 committed to meeting regulatory standards and
3 obligations?
4 MR. DAVISON:
5          Objection to form.
6 A      The company should be committed to
7 following regulatory standards.
8 MR. CHALOS:
9 Q      Okay.
10 A      Yes.
11 Q      And a company should speak with candor
12 about the performance of its products?
13 MR. DAVISON:
14          Objection to form.
15 A      Yes.  Yes.
16 MR. CHALOS:
17 Q      And a company should show unwavering
18 commitment to patient safety and the integrity of
19 its products?
20 A      Yes.
21 Q      And a company engaged in pharmaceutical
22 marketing should act responsibly in its
23 communities?  Do you agree with that?
24 A      Yes.
25 Q      Do you agree that pharmaceutical

Page 127

1 companies must never make a false or misleading
2 statement to the medical community?
3 MR. DAVISON:
4          Objection to form.
5 A      I believe that it's a pharmaceutical
6 company's obligation to be truthful and to
7 provide balanced information, as required by the
8 regulations.
9 MR. CHALOS:
10 Q      Why is it a pharmaceutical company's
11 obligation to be truthful?
12 MR. DAVISON:
13          Objection to form.
14 A      The information that a pharmaceutical
15 company provides to healthcare professionals is
16 essential to the practice of medicine, and it is
17 important for healthcare professionals to have
18 accurate information.
19 MR. CHALOS:
20 Q      Do you agree that a pharmaceutical
21 company must always accurately disclose
22 information about the risks of the product, in
23 addition to the benefits of the product?
24 MR. DAVISON:
25          Objection to form.

Page 128

1 A      Yes.  That is required in the
2 regulation.
3 MR. CHALOS:
4 Q      Do you believe that pharmaceutical
5 companies should be transparent about who or what
6 they financially support and who is paid to
7 endorse their products?
8 MR. DAVISON:
9          Objection to form.
10 A      Yes.
11 MR. CHALOS:
12 Q      Do you agree that a pharmaceutical
13 company must never put patients at risk by
14 putting profits over patient safety when
15 marketing a product?
16 MR. DAVISON:
17          Objection to form.
18 A      Yes.
19 MR. CHALOS:
20 Q      Do you agree that a pharmaceutical
21 company must never make a false or misleading
22 statement to the public?
23 MR. DAVISON:
24          Objection to form.
25 A      Yes.

Page 129

1 MR. CHALOS:
2 Q      Should scientific and educational
3 activities be used for purposes of promoting a
4 pharmaceutical product?
5 MR. DAVISON:
6          Objection to form.
7 A      I believe you said scientific and
8 medical education?
9 MR. CHALOS:
10 Q      I said scientific and education --
11          I'll re-ask the question.
12 A      Okay.
13 Q      Should scientific and educational
14 activities be used for the purpose of promoting a
15 pharmaceutical product?
16 MR. DAVISON:
17          Objection to form.
18 A      As I consider scientific and medical
19 education and reflecting on my experience, those
20 are scientific and medical education exchange
21 opportunities and not suitable for use in
22 promotion.
23 MR. CHALOS:
24 Q      Are there ethics rules that govern
25 pharmaceutical marketing that you're aware of?

Page 130

1 MR. DAVISON:
2      Objection to form.
3 A    Yes.
4 MR. CHALOS:
5 Q    Okay. What are those? I mean -- I
6 don't mean what are all the rules, but what is
7 that called?
8 A    So I believe the -- the agency's
9 division has -- has changed its name over time.
10 But there is an office within the FDA that
11 governs pharmaceutical marketing.
12 Q    Okay. Are there any industry rules or
13 principles that you're aware of? Meaning, is
14 there an industry body that puts out ethics rules
15 for marketing that you're aware of?
16 MR. DAVISON:
17      Objection. Objection to form.
18 A    I'm -- I'm not aware of that entity.
19 MR. CHALOS:
20      I did it again. Put the sticker on the
21 wrong document.
22      (MALLINCKRODT CHICK EXHIBIT NUMBER 11
23      WAS MARKED FOR IDENTIFICATION.)
24 MR. CHALOS:
25 Q    We're gonna mark as Exhibit Number 11

Page 131

1 MNK-T1_0000543744. I'm gonna ask you about this
2 document, particularly the section update
3 regarding MNK-155. But you can read the rest of
4 it at your convenience.
5      Have you had a chance to review that
6 document?
7 A    Yes.
8 Q    Okay. So it says this is an email from
9 a person named Rhonda Sciarra, S-C-I-A-R-R-A.
10      Do you see that?
11 A    Yes.
12 Q    Do you -- who is Miss Sciarra?
13 A    Rhonda was part of the non- --
14 communications department.
15 Q    She, in this email dated January 15th
16 of 2015, at 6:31 p.m., it was an email to you and
17 somebody named Neil McDaniel.
18      Do you see that?
19 A    Yes.
20 Q    Who was Neil McDaniel?
21 A    Neil was our field operations manager.
22 Q    What does that mean?
23 A    He reported to me and was part of our
24 operational day-to-day interactions with the
25 field team.

Page 132

1 Q    The field sales team?
2 A    Yes.
3 Q    Okay. The re line says, "Talking
4 points re MNK-155 update."
5      Do you see that?
6 A    Yes.
7 Q    Do you -- I know I had asked you
8 earlier, but --
9 MR. DAVISON:
10      Objection to form.
11 MR. CHALOS:
12      Whatever.
13 Q    -- do you have any recollection as to
14 what MNK-155 was?
15 MR. DAVISON:
16      Objection to form.
17 A    I don't.
18 MR. CHALOS:
19 Q    Okay.
20      Did you -- I think he objected. Did
21 you get that?
22 THE COURT REPORTER:
23      I will.
24 MR. CHALOS:
25      Okay. It was quiet, so...

Page 133

1 MR. DAVISON:
2      I'll be a little louder.
3 MR. CHALOS:
4      Yes, please. Make your objections
5 louder, would you?
6 Q    It says, "I wanted to share" --
7      I'm sorry. Let me -- let me back up.
8 Yeah.
9      Miss Sciarra says in this email, "With
10 the field call tomorrow, we had talked with
11 Melissa and Kate about a few quick talking
12 points" -- sorry -- "talking point resources for
13 you regarding the update with MNK155."
14      Do you see that?
15 A    Yes.
16 Q    Okay. And then she lists some bullet
17 points here. The second one says, "The US Food
18 and Drug Administration (FDA) has extended the
19 review action date of the new drug application
20 (NDA) for MNK-155 in response to Mallinckrodt's
21 submission of additional abuse deterrence data."
22      Do you see that?
23 A    Yes.
24 Q    Okay. Does that jog your memory at all
25 about MNK-155?

Page 134

1  A      No.
2  Q      The next bullet point says, "The
3  updated action is expected in mid-April 2015, and
4  the product is expected to launch in the first
5  half of 2015."
6          Do you see that?
7  A      Yes.
8  Q      Does that jog your memory at all as to
9  whether MNK-155 made it to market during the time
10 that you were at Mallinckrodt?
11 A      I don't believe that it did in the time
12 that I was there.
13 Q      Were you involved in preparing for a
14 launch of MNK-155 in any way?
15 MR. DAVISON:
16         Objection to form.
17 A      I don't recall.
18 MR. CHALOS:
19 Q      And do you recall being involved in
20 preparing for a launch of a new product other
21 than Xartemis while you were at MNK?
22 A      No.
23 Q      Okay.  You can put that aside.
24         (MALLINCKRODT CHICK EXHIBIT NUMBER 12
25         WAS MARKED FOR IDENTIFICATION.)

Page 135

1  MR. CHALOS:
2  Q      We're gonna mark as the next numbered
3  exhibit, Exhibit 12, document MNK-T1_0000540835.
4  It ends with MNK-T1_0000540842.  That's Exhibit
5  12.  Take as much time as you need to look at
6  that.
7          Okay.  Have you had a chance to review
8  that?
9  A      Yes.
10 Q      Okay.  The transmittal email here on
11 the first page of Exhibit 12 is from a person
12 named Deborah Hass (phonetic) or Hasse,
13 H-A-S-S-E.
14         Do you see that?
15 A      Yes.
16 Q      And Miss Hasse is the director of
17 strategic marketing?  Is that how you remember
18 it?
19 A      Yes.
20 Q      What does that mean?
21 A      Deborah was one of our marketers in the
22 specialty pharmaceutical brands.
23 Q      Okay.  She, in her email, the subject
24 line is, "MNK-795 launch plan, BOD, November
25 13.pptx."

Page 136

1          Do you see that?
2  A      Yes.
3  Q      MNK-795 was Xartemis; right?
4  A      Yes.
5  Q      She says, "Per our discussion, attached
6  are current examples (draft) of BOD slides being
7  created."
8          Is BOD Board of Directors?
9  A      Yes.
10 Q      She says, "If you can take the content
11 you sent me for the sales launch preparedness and
12 format into two -- 2-3 slides, would greatly
13 appreciate it."
14         Do you see that?
15 A      Yes.
16 Q      Okay.  And then she has some slides
17 here that are attached.  I guess these are the
18 example slides.
19         Do you see those?
20 A      Yes.
21 Q      Okay.  And did you periodically prepare
22 slides for Mallinckrodt to be presented to the
23 Board of Directors?
24 A      I periodically presented -- or
25 developed slides.  How they were used -- I don't

Page 137

1  know if they were used in Board of Director
2  meetings.
3  Q      How frequently --
4          I mean, this seems to be a specific
5  request for slides for Board of Directors.  Did
6  that occur any other time other than this, that
7  you recall?
8  A      Not that I recall.
9  Q      Did you, in fact, prepare slides as
10 requested by Miss Hasse?
11 A      I don't recall.
12 Q      Did you ever make any presentations to
13 the Board of Directors?
14 A      No.
15 Q      Did you have any discussions about
16 presentations that were being made to the Board
17 of Directors?
18 A      I don't recall.
19 Q      Was that something that just happened
20 at a different level within the organization?
21 MR. DAVISON:
22         Objection to form.
23 A      When -- preparations or presentations
24 to the board?
25 MR. CHALOS:

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  Q      Presentations I'm talking about.
2  A      So I -- I don't know who would be
3  presenting to the board, but I was not part of
4  that.
5  Q      Okay.  You -- what company did you work
6  for --
7  MR. DAVISON:
8       Objection to form.
9  MR. CHALOS:
10  Q      -- when you were at --
11       Sorry.
12       When you were at Mallinckrodt, what
13  company did you work for?
14  A      What division did I work for?
15  Q      No.  Let me --
16  A      I'm sorry.
17  Q      Let me -- let me give it some more
18  context.
19  A      I'm sorry.  Okay.
20  Q      If you look at Exhibit 4, Exhibit 8,
21  these are the separation agreement and the
22  noncompete agreement that you signed.  The party
23  listed is Mallinckrodt Enterprises, LLC --
24       I'm looking at the first paragraph of
25  both of those documents, Exhibit 4 and 8.

Page 139

1  A      Okay.  Thank you.  Yes.
2  Q      Okay.  And if you look at Exhibit 3,
3  which is your offer letter --
4  A      Yes.
5  Q      -- it says -- well, it's coming from
6  somebody named Ian Watkins, Senior Vice-President
7  and Chief Human Resources Officer.  I'm just
8  reading from the last page of Exhibit 3.
9       It says, "I'm pleased to offer you the
10  position of Vice-President, Sales, Specialty
11  Pharmaceuticals for Mallinckrodt
12  pharmaceuticals."
13       Do you see that?
14  A      Yes.
15  Q      So it looks like Mallinckrodt
16  Pharmaceuticals' letterhead.
17       Do you see that?
18  A      Yes.
19  Q      So what -- who did you consider that
20  you worked for when you were at Mallinckrodt?
21  MR. DAVISON:
22       Objection to form.
23  A      I worked -- I considered myself working
24  for Mallinckrodt in the pharmaceutical division.
25  Mallinckrodt had several divisions.

Page 140

1  MR. CHALOS:
2  Q      Okay.  And had you ever heard of
3  a -- something called Mallinckrodt PLC?
4  A      I don't recall specifically.
5  Q      Okay.
6  MR. CHALOS:
7       Why don't we leave it there and we'll
8  go eat lunch?
9  MR. DAVISON:
10       Sounds good.
11  VIDEOGRAPHER:
12       We are now going off the video record.
13  The time is currently 12:23 p.m.
14            (LUNCH RECESS.)
15  VIDEOGRAPHER:
16       We are now back on the video record.
17  The time is currently 1:16 p.m.
18  MR. CHALOS:
19  Q      Miss Chick, did you have any role in
20  marketing or selling Exalgo at any time?
21  A      Yes.
22  MR. DAVISON:
23       Objection to form.
24  MR. CHALOS:
25  Q      What was your role?

Page 141

1  A      So, as the head of specialty sales,
2  Exalgo was one of the promoted products by the
3  sales force at the time.
4  Q      And, at some point, that -- the company
5  stopped marketing Exalgo; is that right?
6  A      Yes.
7  Q      Do you recall when that was?
8  A      I don't.
9  Q      It was while you were with
10  Mallinckrodt, though?
11  A      I believe so, yes.
12  MR. CHALOS:
13       Do we need to do anything with that?
14  THE COURT REPORTER:
15       It says "mute" here.
16  MR. CHALOS:
17       Yeah.
18  THE COURT REPORTER:
19       I hope everybody can hear.
20  MR. CHALOS:
21       All right.  Here goes nothing.
22       Can you hear us on the phone?
23  MS. MUSKETT:
24       Yeah.
25  MR. CHALOS:

Page 142

```
1        Okay.
2   Q    Was Exalgo --
3        Let's just mark this.
4        (MALLINCKRODT CHICK EXHIBIT NUMBER 13
5        WAS MARKED FOR IDENTIFICATION.)
6   MR. CHALOS:
7   Q    We'll mark as Exhibit 13
8   MNK-T1_0000136035. It's a two-page document. It
9   ends at MNK-T1_0000136036.
10       Okay. So let me revise that. It's a
11  three-page document, even though the third page
12  is blank. So it goes from -- Exhibit 13 goes
13  from MNK-T1_0000136035 through MNK-T1_0000136037.
14       You can take as much time as you need
15  to review that document. In a moment I'm going
16  to ask you if you recognize it and then what is
17  it, if you do.
18  A    Okay.
19  Q    Okay. Do you recognize that document?
20  A    I -- I've read the document. I don't
21  recall the document specifically.
22  Q    Okay. If you flip over to the second
23  page, it says, "Best regards, Stacy Chick,
24  Melissa Falcone and Mike Wessler."
25       Do you see that?
```

Page 143

```
1   A    Yes.
2   Q    This was a communication that was sent
3   out to the specialty pharmaceutical sales teams.
4   Is that right?
5   A    I can't tell --
6   MR. DAVISON:
7        Objection to form.
8   A    -- from the document if it -- if this
9   was a draft or if it was actually sent.
10  MR. CHALOS:
11  Q    I see.
12       Okay. Would -- how were documents like
13  this communicated to the sales teams? Were they
14  emailed?
15  A    So anything of a communication nature
16  like this would have been emailed.
17  Q    Does it -- when you were at
18  Mallinckrodt, if something was a draft, was there
19  some marker on it that said "draft" or something
20  like that?
21  A    I don't recall specifically.
22  Q    Okay. But do you see anything about
23  the document that suggests to you it's a draft?
24  A    No.
25  Q    It's dated May the 20th of 2014,
```

Page 144

```
1   according to the front -- first page of Exhibit
2   13. I want to direct your attention to the
3   Exalgo section there. It says -- it's the second
4   paragraph on the front page. It says, "As you
5   know, we are no longer promoting Exalgo as a
6   consequence of generic entry."
7        Do you see that?
8   A    Yes.
9   Q    Does that refresh your memory about
10  when the company stopped promoting Exalgo?
11  A    I would just accept it as -- as it's
12  written here, that it was around that time.
13  Q    Okay. It -- and I should maybe back
14  up. The first paragraph says "given the recent
15  changes with Exalgo." So does that -- is that
16  consistent with your memory, at least, that it
17  was sometime in -- in around May of 2014 that
18  Mallinckrodt stopped promoting Exalgo?
19  A    Yes.
20  Q    So it was about, what, six months or so
21  after you were at the company?
22  A    Yes.
23  Q    Did you play any role in crafting the
24  sales messages for Exalgo?
25  A    No.
```

Page 145

```
1   Q    Did you play any role in determining
2   the sales strategies for Exalgo in terms of which
3   customers to call on?
4   A    May I ask counsel a question?
5   Q    Sure.
6   VIDEOGRAPHER:
7        We'll go off the video record.
8        We are now going off the video record.
9   The time is currently 1:23 p.m.
10       (OFF THE RECORD.)
11  VIDEOGRAPHER:
12       We are now back on the video record.
13  The time is currently 1:25 p.m.
14  MR. CHALOS:
15  Q    So what's the answer?
16  A    Could you re-ask the question for me,
17  please?
18  Q    Sure.
19       Did you play any role in determining
20  the sales strategies for Exalgo in terms of which
21  customers to call on?
22  A    So I was a participant in discussions
23  around target lists, which would include which
24  customers to call on, which types of physician
25  specialties to call on. I was part of that
```

Page 146

1 process, yes.
2 Q      Okay.  What was your concern about
3 answering that question?
4 A      I wanted to make sure that I understood
5 the question when you said sales strategy --
6 Q      Uh-huh.
7 A      -- for an established product.  I
8 wanted to just have clarity that, you know, for
9 the time that I was there, my role in Exalgo was
10 somewhat limited in shaping or crafting or
11 evolving the strategy.
12 Q      And you felt like you needed to ask
13 your Mallinckrodt lawyer that question?
14 MR. DAVISON:
15      I'm going to object to questions
16 relating to why she would ask a question as to
17 read my mind.
18 MR. CHALOS:
19      I'm not sure it's attorney-client
20 privileged.
21 MR. DAVISON:
22      I'm gonna instruct the witness not to
23 answer.
24 MR. CHALOS:
25 Q      Okay.  So your concern was --

Page 147

1      First of all, there was a question
2 pending when she got up to ask you a question,
3 which is --
4 MR. DAVISON:
5      I understand.
6 MR. CHALOS:
7      -- in itself probably violates
8 protocol, but I was wanting to be accommodating
9 for that.  But I don't know that there's an
10 expectation that that'd be a privileged
11 conversation during the pendency of a question
12 pending.
13      But let me see if I can get the
14 information without impeding on the
15 attorney-client relationship, which I certainly
16 don't want to do.
17 Q      So you said you -- you were -- you
18 wanted to make sure you understood the question
19 when I said sales strategy.
20 A      Yes.
21 Q      What is ambiguous about sales strategy,
22 if anything?  Or what is unclear about sales
23 strategy?
24 A      I didn't characterize it as unclear.
25 It's a lot of elements into -- that go into how

Page 148

1 to promote a product, everything from physician
2 targeting to messaging to resources.  So sales
3 strategy could -- could mean a lot of things,
4 so...
5 Q      So, as we go forward, if you have a
6 question about what I mean by my question --
7 A      Uh-huh.
8 Q      -- I'd prefer if you ask me that rather
9 than ask Mallinckrodt's lawyer what I mean by my
10 question.  Is that fair?
11 A      Okay.  Thank you.
12 Q      Is there some element of sales strategy
13 that you feel like you're not at liberty to
14 disclose in this deposition today?
15 A      Not at all.
16 Q      Did you have conversations with lawyers
17 at Mallinckrodt -- not this team representing you
18 here today but while you were at Mallinckrodt --
19 at any time about any product that you were
20 responsible for?
21 A      I didn't have individual conversations.
22 If I did, they would have been part of materials
23 review preparing for review committee.
24 Q      I'm trying to understand what's -- what
25 we've been going back and forth in questions and

Page 149

1 answers for three hours today, and I asked you a
2 question and for some reason you decided you
3 needed to ask your lawyer about it.  I'm trying
4 to understand why that was.  I'm not asking for
5 what you said to your lawyer, but if you can help
6 explain what is it about asking about the sales
7 strategy for Exalgo triggered a concern that you
8 needed to ask your lawyers about.
9 A      I beg your pardon.  I should have asked
10 you that question.  I just wanted to get clarity
11 on sales strategy -- not clarity.  I wanted to
12 express that sales strategy is quite broad.  And
13 so I wasn't -- I wasn't sure about how -- how to
14 think about that, but it -- my answer here hasn't
15 changed at all.
16      Sales strategy or marketing strategy's
17 a complex process, and it's not something that
18 one -- one person alone does.  So I wanted to
19 make sure that I represented that it was a
20 process with multiple stakeholders.
21 Q      Did you consider your question to your
22 lawyer to be confidential in some way?
23 A      No.
24 Q      Okay.  So why don't you tell me the
25 question you asked your lawyer?

Page 150

MR. DAVIS:

I'm gonna object to the form of that. I'm gonna instruct her not to answer. Object to it as privileged.

MR. CHALOS:

Hmm. Let me think about that.

All right. Well, let's -- we'll leave that there for now and we'll think about what we want to do about that.

Q    Did you play any role with respect to the sales strategy for Xartemis in terms of who to call on?

A    I was a participant in that process, yes.

Q    What was your role with respect to Xartemis?

A    With respect to Xartemis, I was the sales leader, so I had participated in discussions concerning customer targeting, position targeting, messaging, resources to be used in that approach.

Q    Did you participate in the process of deciding which types of patients the sales team would convey to physicians would be appropriate for prescribing Xartemis to?

Page 151

MR. DAVISON:

Objection to form.

A    I would characterize my role in that more of a recipient of information, of understanding market research findings, clinical information about where patient benefit would be observed. But I didn't make a determination about the specific patient type. That -- that is -- that was not my role.

MR. CHALOS:

Q    What patient type was targeted by the Xartemis sales team while you were at Mallinckrodt?

MR. DAVISON:

Objection to form.

A    The patient profile for Xartemis XR was an acute pain patient.

MR. CHALOS:

Q    What does that mean?

A    So patients that would experience acute pain as a result of something on the order of surgical experience, perhaps a fracture, an injury, some sort of trauma event like that.

Q    So the patient profile for Xartemis was -- or included opioid-naive patients? Is

Page 152

that right?

A    Yes.

Q    What does it mean to be opioid-naive?

A    To not have had exposure to an opioid previously nor have blood levels that would indicate use of opioids.

Q    Let's look back at Exhibit 13, if you would. Under the target -- under -- or on page 1, "Xartemis XR," do you see where that paragraph is?

A    Yes.

Q    Then there's a paragraph number 1 there says "Targeting."

Do you see that?

A    Yes.

Q    It says -- let me see -- third sentence, "It is vital to present Xartemis XR to all targets, not just hyper and super targets."

Do you see that?

A    Yes.

Q    That is in reference to the prescribers; right?

A    Yes.

Q    Okay. So prescribers were put into categories that included hyper target, super

Page 153

target, target, and opportunistic target? Is that right?

A    Yes.

Q    What does each of those determinations mean, in general terms? Let's start with hyper target. What does that mean?

A    So I don't recall the specific definition. As I read this, this would mean to me targets that would have more likely patient population within their practice than others.

Q    So in -- in terms of -- of gradations, hyper targets would be physicians who, for whatever reason, were most likely to be prescribing or most likely to prescribe Xartemis or at least be -- potentially prescribe Xartemis? Am I saying that right?

Let me scratch that. Let's start again.

In terms of gradations, hyper target was the top category, I guess?

A    Yes.

Q    And what -- what is that evaluating? Is it the likelihood that this physician would be a prescriber of Xartemis?

A    So a lot of ingredients go into a

Page 154

1 targeting approach --
2 Q      Uh-huh.
3 A      -- considering physician specialty,
4 practice location, prescribing history, a number
5 of elements.
6 Q      Okay.  But here, the directive to the
7 sales reps is don't just focus on your hyper and
8 super targets but focus on all your targets.  Is
9 that right?
10 A      That's how I read this, yes.
11 Q      Okay.  Oh, I see.  I guess I should
12 have read the last sentence here.
13        "Please keep in mind the targets were
14 created to provide you with the best
15 opportunities for success --"
16        "You" being the sales representative
17 there; is that right?
18 A      Yes.
19 Q      "-- taking into account acute pain
20 patient volume, market access, brand usage and
21 volume."
22        Is that right?
23 A      Yes.
24 Q      So are those the ingredients that went
25 into this categorization?

Page 155

1 A      They're some of the ingredients.
2 Q      There are others as well?
3 A      Yes.
4 Q      What others do you think that are not
5 listed there?
6 A      One that comes to mind would be
7 physician specialty.
8 Q      Okay.  Any others come to mind?
9 A      That's probably the most significant.
10 Q      And the next paragraph there, on the
11 back side -- there we go -- page -- paragraph 2,
12 "Message," third line down, it says, "To increase
13 your impact, remember to add logic and emotion to
14 your conversations to appeal to HCPs on an -- on
15 an emotional level."
16        Do you see that?
17 A      Yes.
18 Q      What is HCP there?
19 A      Healthcare practitioner or healthcare
20 professional.
21 Q      And, so, the instructions to the sales
22 representatives was to add logic and emotion to
23 the conversations to appeal to healthcare
24 practitioners on an emotional level.  Is that
25 right?

Page 156

1 MR. DAVISON:
2        Objection to form.
3 A      That's -- that's what the sentence
4 says, yes.
5 MR. CHALOS:
6 Q      Okay.  Do you recall giving that
7 instruction?
8 A      I don't recall the specific instance,
9 but this term, "logic and emotion," was used as a
10 training approach.
11 Q      At Mallinckrodt?
12 A      Yes.
13 Q      The number one focus of the
14 pharmaceutical -- specialty pharmaceutical sales
15 team at Mallinckrodt in May of 2014 was in
16 generating Xartemis XR prescriptions.  Is that
17 right?
18 A      I'm sorry.  Could you ask the question
19 again?
20 Q      Sure.
21        The number one focus of the
22 Mallinckrodt specialty pharmaceutical sales team
23 in 2014 was to generate Xartemis XR
24 prescriptions; is that correct?
25 MR. DAVISON:

Page 157

1        Objection to form.
2 A      Yes.
3 MR. CHALOS:
4 Q      And in August of 2014, a number one
5 priority of the Mallinckrodt specialty
6 pharmaceutical sales team was to increase the
7 number of high-value prescribers and overall
8 prescriptions of Xartemis.  Is that correct?
9 A      So -- I'm sorry.  I don't have the
10 benefit of what you're reading from.
11 Q      Yeah.  I'm asking your memory.
12 A      Based on -- based on what I recall from
13 those time periods, yes.
14 Q      At some point, there was a concern with
15 respect to Xartemis that pharmacies were not
16 stocking Xartemis such that it would be available
17 if a patient were prescribed it.  Is that right?
18 A      Yes.
19 Q      The sales representatives were
20 instructed to include pharmacies among the
21 customers that they called on; is that right?
22 A      Yes.
23 Q      And the Mallinckrodt sales
24 representatives were also instructed to ask
25 physician practice groups or physician offices to

Page 158

1 call pharmacies to tell them that they intended
2 to prescribe Xartemis so that the pharmacy would
3 then order Xartemis? Is that right?
4 A      Yes.
5 Q      And at some point the -- Mallinckrodt
6 had a -- an app that the sales representatives
7 would bring with them into the pharmacies, and
8 they would attempt to persuade the pharmacy to
9 make an order right there for Xartemis. Is that
10 right?
11 MR. DAVISON:
12        Objection to form.
13 A      May I clarify --
14 MR. CHALOS:
15 Q      Sure, absolutely.
16 A      -- what you just said?
17 Q      Yes.
18 A      The app was a pharmacy locator for
19 pharmacists that -- or pharmacies that stocked
20 Xartemis XR to check and was primarily used not
21 within the pharmacy but primarily within a
22 physician's office to be able to check the
23 nearest location of a pharmacy stocking Xartemis
24 XR.
25 Q      Was there ever a -- maybe I'm

Page 159

1 not -- maybe app is not the right word. Maybe
2 it's some kind of other computer program. But
3 was there ever some sort of system where the
4 sales reps would go into the pharmacies and would
5 ask the pharmacy to make an order of Xartemis on
6 the spot --
7 A      Yes.
8 Q      -- through the -- through the sales
9 representative?
10 A      Yes.
11 Q      Okay. How -- explain that. How did --
12 how did that process work? Please.
13 A      So with the launch of a new product,
14 without a historical demand upon which to
15 anticipate future orders and, therefore, guide
16 inventory management at the pharmacy level,
17 oftentimes it's difficult to get a pharmacy to
18 stock a new product without that demand, that
19 demonstrated demand.
20        And, so, in this case, having
21 physicians write a prescription for an acute pain
22 product, which was needed, you know, in -- in
23 fairly short course, physicians and patients
24 needed information about which pharmacists or
25 which pharmacies stocked Xartemis XR. This was

Page 160

1 not a product that retail pharmacies took on
2 without having known demand.
3 Q      Okay. And how -- what was the physical
4 process for a sales representative to have an
5 order made by the pharmacy?
6 A      Most often it's when a prescription is
7 presented by a patient or through an electronic
8 media from the physician to the pharmacy.
9 Q      Okay. Was there ever a program
10 where -- I don't know if program's the right
11 word. Do you recall, while you were at
12 Mallinckrodt, that the sales representatives were
13 encouraged to ask the pharmacy that they were
14 calling on to make an order of Xartemis at the
15 time the pharm-- the sales representative was
16 in the pharmacy, irrespective of whether a
17 prescription was headed their way?
18 A      Yes.
19 Q      And how -- how physically --
20        Well, I'm going to ask how physically
21 did that happen? Was there a computer program or
22 did somebody pick up a phone and call to make an
23 order?
24 A      No. More -- most often a sales
25 professional would present themselves within the

Page 161

1 pharmacy, ask to speak to a pharmacist, ask if
2 the product was on the shelf. If not, sales
3 professional would detail the pharmacist on the
4 product and share with them that the product was
5 being actively promoted to physicians in the area
6 and ask for a bottle to be ordered from the
7 wholesaler or from the warehouse to be placed on
8 the pharmacy shelf, thereby having a -- an
9 inventory ready when a prescription was
10 presented.
11 Q      I see. And did this sales
12 representative have any way to facilitate that
13 order, or would the pharmacy have to order it
14 through some other channel?
15 A      So a pharmacist or a pharmacy tech
16 would order the product. A sales professional
17 was not -- is not part of that equation.
18 Q      Okay. So they would -- the sales
19 professional would say to the pharmacist, after
20 their interaction, "Would you please now order
21 this from your wholesaler, whoever you choose?"
22 Is that how it worked?
23 A      Yes.
24 Q      Okay. In other words, they wouldn't
25 actually make the order through the sales rep.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  A      No.
2  Q      I asked that the wrong way.
3         Would they actually make the order
4  through the sales rep?
5  A      No.
6  Q      At some point --
7         Well, let's mark this as the next
8  numbered exhibit.
9         (MALLINCKRODT CHICK EXHIBIT NUMBER 14
10        WAS MARKED FOR IDENTIFICATION.)
11 MR. CHALOS:
12 Q      So we're marking as Exhibit Number 14
13 MNK-T1_0000135662 through MNK-T1_0000135664.
14 It's Exhibit 14.
15        Oh.  You ready?
16 A      Uh-huh.
17 Q      Okay.  So at some point Mallinckrodt
18 had a program they called the PPI program.  Is
19 that right?
20 A      Yes.
21 Q      Okay.  What was that?
22 A      This was a patient copay program
23 delivered by a card that would assist with
24 patient out-of-pocket costs associated with a
25 prescription.

Page 163

1  Q      And the intention of the PPI program
2  was that the patient would not have to pay any
3  out-of-pocket money for one prescription of
4  Xartemis; is that right?
5  A      Yes.
6  Q      Was there a limit as to what number of
7  pills was in the prescription in terms of whether
8  the PPI card would be available?
9  A      I don't recall.
10 Q      It was -- the PPI card was a
11 one-time-use only up to $450.00; right?
12 A      Yes.
13 Q      You can put that aside.
14        (MALLINCKRODT CHICK EXHIBIT NUMBER 15
15        WAS MARKED FOR IDENTIFICATION.)
16 MR. CHALOS:
17 Q      So we'll mark as Exhibit Number 15,
18 it's a three-page document, MNK-T1_0000545292
19 through MNK-T1_0000545294.  Will be Exhibit 15.
20        Have you had a chance to review that
21 document?
22 A      Yes.
23 Q      Okay.  The first, in terms of how it
24 appears on the page, the beginning of Exhibit 15
25 is an email from you dated July 23rd of 2014, at

Page 164

1  1:09 a.m., to a group of people that looks to
2  me -- I'm gonna guess here -- the regional sales
3  directors?
4  A      Yes.
5  Q      And who is Thomas Bonk?
6  A      So Thomas was the national sales
7  director for inVentiv Health associated with the
8  contract sales organization.
9  Q      And, in -- in general terms, you were
10 forwarding an email that Christian Kampfl had
11 sent to his west region sales team?  Is that
12 right?
13 A      Yes.
14 Q      Christian Kampfl at that time was the
15 regional director for the west region?
16 A      Yes.
17 Q      Kimberly Gawart was at the time the
18 regional sales director responsible for a region
19 that included Ohio; is that right?
20 A      Yes.
21 Q      Did Miss Gawart's region at that time
22 include Tennessee as well?
23 A      I don't recall.
24 Q      You, in your email, said -- this is to
25 Christian, Bill, Kim and Jay.  "As successful and

Page 165

1  accomplished senior field leaders, I know each of
2  you send inspirational and motivating messages to
3  your teams.  Please cc me on these.  It's so very
4  important that we motivate and encourage our
5  teams to reach their potential."
6         Is that right?  That's what you said.
7  A      Yes.
8  Q      "I'll continue to share these messages
9  with your colleagues and home office so all know
10 how invested each of you are in our success."
11        Right?  That's what you said there?
12 A      Yes.
13 Q      You then go on to reference a goal of
14 10 TRx's per territory per week by September.
15        Do you see that?
16 A      Yes.
17 Q      What does that mean?
18 A      This was a general goal for every
19 territory to achieve by the end of September.
20 Q      And what does ten TRx's mean?
21 A      Ten prescriptions.
22 Q      This was, in this context, ten
23 prescriptions of Xartemis?
24 A      Yes.
25 Q      You go on here to say, "It is so

## Page 166

1 important that each of you take time to reflect
2 on what you and your teams have accomplished
3 since launch."
4     And the first bullet point here is,
5 "Courageous entry into new customer
6 types -- surgical specialty practices -- moving
7 from chronic pain expertise and into acute pain
8 expertise."
9     Do you see that?
10 A    Yes.
11 Q    What did you mean by that?
12 A    We learned through the launch of
13 Xartemis XR that ambulatory surgical centers were
14 new but also approp- -- appropriate, meaning
15 patient types -- practice setting that the sales
16 force of Mallinckrodt that had previously been
17 very focused in chronic pain with the promotion
18 of Exalgo, this was a -- new practice setting
19 for the sales force that lent itself to volumes
20 of patients with acute pain.
21 Q    When you say they were new, the
22 ambulatory surgery centers were new, you mean new
23 to the Mallinckrodt sales force?
24 A    Yes.
25 Q    Okay.  And this -- Xartemis was, in

## Page 167

1 terms of sales messaging, was being promoted as a
2 drug that is both -- both fast-acting and
3 long-lasting; is that right?
4 A    Yes.
5 Q    Whereas, Exalgo was more focused on
6 people with chronic pain who needed long-lasting,
7 steady state opioids?
8 A    Yes.
9 Q    With respect to --
10     Well, let's look at the fourth bullet
11 point here. Sorry. The third. "Convincing
12 retail pharmacists to stock XXR" --
13     XXR is Xartemis XR; right?
14 A    Yes.
15 Q    -- "in the most challenging C-II
16 environment and moving inventory to demonstrate
17 demand."
18     Do you see that?
19 A    Yes.
20 Q    What does C-II mean there?
21 A    That's a narcotic schedule
22 classification.
23 Q    So, in other words, a Schedule II drug
24 is what -- what Xartemis was?
25 A    Yes.

## Page 168

1 Q    One of the challenges with Xartemis was
2 that physicians had a -- had ingrained
3 prescribing habits in terms of what they
4 prescribed for their acute pain patients; is that
5 right?
6 MR. DAVISON:
7     Objection to form.
8 A    Yes.
9 MR. CHALOS:
10 Q    And one of the goals of the
11 Mallinckrodt sales force at that time was to
12 change ingrained prescribing habits to include
13 the Xartemis product; right?
14 A    Yes.
15 MR. CHALOS:
16     Let's take a break here so we can
17 change the tape.
18 VIDEOGRAPHER:
19     We are now going off the video record.
20 The time is currently 2 p.m.  This is the end of
21 media number 3.
22     (OFF THE RECORD.)
23 VIDEOGRAPHER:
24     We are now back on the video record
25 with the beginning of media number 4.  The time

## Page 169

1 is currently 2:09 p.m.
2 MR. CHALOS:
3 Q    We're gonna mark as Exhibit 16 a
4 document that's MNK-T1_0000537717 through
5 MNK-T1_0000537718.
6     (MALLINCKRODT CHICK EXHIBIT NUMBER 16
7     WAS MARKED FOR IDENTIFICATION.)
8 MR. CHALOS:
9 Q    And you can read the entire document.
10 I'm gonna direct you to a couple of places, but
11 you can read it.
12 A    Okay.
13 Q    Ready?
14     Okay.  So Exhibit -- sorry -- 16, have
15 you seen this document before?
16 A    I'm reading it now, and I see my name
17 attached to it, an email that I sent, so I would
18 have to say yes.
19 Q    And it's entitled "Important
20 Information," the --
21     Sorry.  I'm looking at the text of the
22 communication here.  "Important Information.
23 Please read entire communication."
24     And it's directed to the specialty
25 pharmaceutical sales team.  Do you see that?

Page 170

1  A      Yes.
2  Q      Okay.  The second paragraph of the
3  communication says, "As a consequence of generic
4  entry, we will stop all Exalgo field promotion on
5  Monday, May 19."
6        Do you see that?
7  A      Yes.
8  Q      Okay.  So is that consistent with your
9  memory of when the field promotion for Exalgo was
10 stopped?
11 A      Yes.
12 Q      I knew I'd seen a date somewhere.  I
13 just couldn't remember where I'd seen it.
14        And, as a result of stopping the Exalgo
15 field promotion, Mallinckrodt had to then adjust
16 the formula for calculating sales representative
17 incentive compensation; right?
18 A      Yes.
19 Q      And let's back up one step and talk
20 about that concept.
21        The sales representatives at
22 Mallinckrodt were paid a base salary, and then
23 they were given bonuses based on performance;
24 right?
25 A      They are base salary as the primary

Page 171

1  means of their compensation, and then there was a
2  variable incentive performance-based component of
3  their compensation.
4  Q      Okay.  And the incentive
5  performance-based component of their compensation
6  was based in part on the number of prescriptions
7  written in their territory for
8  Mallinckrodt-promoted drugs?
9  A      Yes.  It was based on achievement to a
10 territory-specific goal for those -- for each
11 product in their territory.
12 Q      And there was some formula that
13 factored in variables such as the number of
14 targets in their -- in their territory as well as
15 the number of prescriptions written for
16 Mallinckrodt products; right?
17 A      Actually, the incentive compensation
18 formula is based upon a number of factors,
19 including market potential based on prescribing
20 history of similar products and, yes, numbers of
21 physicians in a territory and -- and other
22 factors.
23 Q      And, as a general principle, the more
24 prescriptions that were written in a given
25 territory, the more bonus pay a sales

Page 172

1  representative could earn?
2  MR. DAVISON:
3        Objection.
4  A      As long as the representative was
5  meeting the -- the goal.  So, yes, it's about
6  numbers of prescriptions, but it's also versus
7  potential in the territory.
8  MR. CHALOS:
9  Q      And that was, in part, to control for
10 the variance among territories in terms of
11 potential?
12 A      Yes.
13 Q      So sales representatives had a
14 financial incentive to encourage physicians to
15 write prescriptions for Mallinckrodt products in
16 their territories; right?
17 MR. DAVISON:
18        Objection to form.
19 A      The primary responsibility of the sales
20 representative was to educate physicians about
21 Xartemis XR and the properties of the product.  I
22 don't know that I would use the word "encourage."
23 I think we -- we consider it more of educating
24 and informing.
25 MR. CHALOS:

Page 173

1  Q      Okay.  The purpose of educating
2  physicians about Mallinckrodt products was to
3  generate prescriptions for Mallinckrodt products;
4  right?
5  A      Yes.
6  Q      When --
7        And let's -- I guess we can put aside
8  Exhibit 16 for now.  Let's go to this document.
9        (MALLINCKRODT CHICK EXHIBIT NUMBER 17
10       WAS MARKED FOR IDENTIFICATION.)
11 MR. CHALOS:
12        So we'll mark as Exhibit 17
13 MNK-T1_0001024933.  Exhibit 17.
14        See, Lois, we're eating into those
15 zeros over there on the left.
16 Q      Have you had a chance to review the
17 document?
18 A      Yes.
19 Q      This -- do you recognize the document,
20 number 17?
21 A      I do.
22 Q      Okay.  What is that?
23 A      This was a letter of recognition that
24 went to a number of sales professionals who were
25 performing at a higher level amongst their peers

Page 174

1 in Xartemis XR.
2 Q       Okay.  And is this the type
3 communication that --
4       Well, first of all, this was something
5 that came from you?
6 A       Yes.
7 Q       Okay.
8 A       Myself and Hugh O'Neill.
9 Q       This went to sales representatives,
10 other than Jean-Paul Lemerand; is that right?
11 A       Yes.
12 Q       I mean, you selected a group of high
13 performers and sent them this letter; is that
14 right?
15 A       Yes.  I don't recall how many or what
16 the threshold was, but yes.
17 Q       Was there any --
18       Let me back up.  At the end of each
19 year, the highest performers in terms of sales
20 representatives would get, in addition to their
21 bonus pay, they'd get some sort of recognition.
22 I believe in some years it's called the
23 President's Club?  Is that right?
24 A       Yes.
25 Q       And that would include, at least in

Page 175

1 some years, a trip somewhere for some period of
2 time?  Is that right?
3 A       Yes.
4 Q       A vacation trip; right?  In other
5 words, it wasn't a "you get to go do more work."
6 You get to go and hang out with your family and
7 stuff.
8 A       There was a guest included on an
9 incentive trip with other winners and their
10 guests.
11 Q       I think one year it was in Maui.  Is
12 that right?
13 A       Yes.
14 Q       And at some point --
15       Well, by the way, did that happen at
16 the two year-ends that you were at Mallinckrodt?
17 MR. DAVISON:
18       Objection to form.
19 A       So I attended a President's Club trip
20 in Hawaii as part of the 2014 award.
21 MR. CHALOS:
22 Q       Was there one in 2013 as well?
23 A       I believe so.
24 Q       You didn't go to it?
25 A       I don't recall.  I -- I may have.  I

Page 176

1 just don't recall at this time.
2 Q       Are they at the end of a calendar year,
3 typically, the 2013 trip -- sorry -- 2014 trip?
4 A       The trip would have been in the spring
5 of the following year.
6 Q       Did you go on one in 2015?
7 A       Yes, I believe so.  I'm sorry.  I
8 recall one trip, and I just don't recall if it
9 was 2014 or 2015.
10 Q       Okay.  The district managers were also
11 given a bonus based on their performance of the
12 sales representatives in their districts; is that
13 right?
14 A       Yes.
15 Q       And were the regional managers also
16 given a bonus based on the performance of the
17 sales representatives in their region?
18 A       Yes.
19 Q       Was that based on the same formulas
20 that applied to the sales representatives?
21 A       The formulas applied for managers and
22 directors were different from those for
23 individual sales representatives.
24 Q       What else went into the district and
25 regional managers' formulas, if you know?

Page 177

1 A       I -- I don't recall the specifics.
2 But, as you described, it was based on the
3 collective achievement of their respective teams.
4 That's how it differed from an individual sales
5 representative.
6 Q       Okay.  Same -- same variables but
7 averaged out over their sales force?
8 A       Yes.
9 Q       In 2014, was there an additional
10 incentive put in place for sales representatives
11 related to Xartemis?
12 A       Additional to their variable
13 compensation?
14 Q       Yes, ma'am.
15 A       There may have been a sales contest.  I
16 don't -- I don't recall specifics.
17 Q       Do you recall there being a, quote,
18 surge in 2014 with respect to Xartemis?
19 A       Yes.
20 Q       And --
21 A       Thank you.
22 Q       And do you recall that there was a -- a
23 weekend trip that was being offered as part of a
24 sales contest for sales representatives?  I think
25 it was in the fourth quarter of 2014.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 A    I believe -- I believe that's correct.
2 Q    Did you go on that trip as well?
3 A    No.
4 Q    At some point, Mallinckrodt concluded
5 that Xartemis promotion was not successful. Is
6 that right?
7 MR. DAVISON:
8       Objection to form.
9 A    Yes.
10 MR. CHALOS:
11 Q    Let's look at --
12       (MALLINCKRODT CHICK EXHIBIT NUMBER 18
13       WAS MARKED FOR IDENTIFICATION.)
14 MR. CHALOS:
15 Q    Let's mark as Exhibit 18
16 MNK-T1_000223534 [sic] through MNK-T1_0002235397.
17       You can read the entire thing. I'm
18 gonna ask you questions about probably
19 Mr. O'Neill's portion of this email.
20       Okay. Have you had a chance to review
21 Exhibit Number 18?
22 A    Yes.
23 Q    So this is in -- let me focus on the
24 email from Mr. O'Neill to you, Ellen McCune, Todd
25 Killian dated May 19th, 2014, at 8:52 p.m.,

Page 179

1 subject line: Critical, Immediate Attention
2 Required.
3       Do you see that?
4 A    Yes.
5 Q    This is -- Hugh O'Neill is the, at this
6 point, the boss over -- over your group; right?
7 A    Yes.
8 Q    And Mr. O'Neill at this point was
9 characterizing the Xartemis launch as a failure;
10 right?
11 A    Yes.
12 Q    That's his word?
13 A    Yes.
14 Q    He, Mr. O'Neill, requested an immediate
15 plan of action to be shared with the entire
16 commercial leadership. Is that right?
17 A    Yes.
18 Q    Do you remember getting this email, by
19 the way?
20 A    Yes.
21 Q    Nothing good happens Monday night at
22 8:52 p.m., I guess. I'm sure that was a fun
23 email to get, huh? I say that sarcastically.
24 This is a, I assume, a difficult email to
25 receive; right?

Page 180

1 A    Yes.
2 Q    He says he wants the plan of action to
3 include a back-to-basics approach to generate RXs
4 immediately.
5       Do you see that?
6 A    Yes.
7 Q    RXs are prescriptions?
8 A    Yes.
9 Q    He encourages -- encouraged the brand
10 team to put forth a guarantee program around
11 Xartemis that says if the physician and the
12 patient are not satisfied with Xartemis, we,
13 Mallinckrodt, will reimburse their cost of the
14 copay not only for that patient but for the next
15 patient that the physician puts on the drug. Is
16 that right?
17 A    Yes. That's what it says there.
18 Q    Did that ever happen? Did that program
19 ever get implemented?
20 A    I don't recall that program being
21 implemented.
22 Q    He also -- Mr. O'Neill says that he
23 would like to take our highest performing 10
24 percent of reps and bring them together on a
25 weekend to turn them loose on the organization

Page 181

1 and the non-prescribing physicians.
2       Do you see that?
3 A    Yes.
4 Q    Do you have any idea what it means to
5 turn them loose on the organization?
6 MR. DAVISON:
7       Object to form.
8 A    I don't know what he meant by that.
9 MR. CHALOS:
10 Q    Did that ever happen? Was there ever a
11 gathering of the highest 10 percent -- highest
12 performing 10 percent of reps brought together on
13 a weekend?
14 A    I -- I don't recall.
15 Q    Mr. O'Neill went on to say, "The bottom
16 line is one have one common goal, generate
17 prescriptions."
18       Do you see that?
19 A    Yes.
20 Q    He said, "Everything else that is not
21 generating prescriptions should become a
22 secondary priority."
23       Do you see where he said that?
24 A    Yes.
25 Q    Did -- well, what happened -- well, let

Page 182

1  me rephrase that.
2        What, if anything, occurred as a result
3  of Mr. O'Neill's May 19th, 2014, email? Let's
4  talk about the short term.
5  A     Sure. While I don't recall specifics,
6  I do recall this point in the product's life
7  cycle. And the use of analytical insights, which
8  are mentioned throughout here, continued to
9  inform the organization where the opportunities
10 existed and where -- where representatives had
11 been successful in educating physicians on
12 Xartemis XR. That's my -- my recollection at
13 that point in time.
14 Q     Okay. Is Mallinckrodt currently
15 promoting Xartemis XR?
16 MR. DAVISON:
17        Objection to form.
18 A     I don't know. I don't believe so.
19 MR. CHALOS:
20 Q     Is it still on the market?
21 A     I don't believe so.
22 Q     Was it on the -- on the market when you
23 were --
24        Is that -- is "on the market" not the
25 right --

Page 183

1        You seem to be --
2        All right. Let me ask a question, and
3  then you can --
4        Okay. Is -- was Mal- -- was
5  Mallinckrodt promoting Xartemis XR when you left
6  the company?
7  A     It had been up until that point. After
8  that point, I -- I don't know.
9  Q     Was it -- it your understanding that
10 you being asked to leave the company corresponded
11 with a decision about the future of Xartemis XR
12 as a product?
13 MR. DAVISON:
14        Objection to form.
15 A     I can't speculate about what the
16 organization's intention was with respect to the
17 product. But with respect to the specialty sales
18 force that had primary responsibility for
19 Xartemis XR, I believe the entire division was
20 dissolved.
21 MR. CHALOS:
22 Q     At the time or near the time that you
23 left the company?
24 A     Yes.
25 Q     Let's mark as the next numbered

Page 184

1  exhibit, 19 -- let's mark as Exhibit 19
2  MNK-T1_0000173752 through MNK-T1_0000173753.
3        (MALLINCKRODT CHICK EXHIBIT NUMBER 19
4        WAS MARKED FOR IDENTIFICATION.)
5  MR. CHALOS:
6  Q     Okay. Have you had a chance to review
7  that?
8  A     Yes.
9  Q     Okay. Before we talk about Exhibit 19,
10 I want to ask you one more question about Exhibit
11 18.
12        Do you recall sending response to
13 Mr. O'Neill's May 19th, 2014, email?
14 A     I don't recall specifically doing so.
15 Q     Okay. Let's go back to Exhibit Number
16 19. This is an email from you dated April the
17 16th of 2014 at 12:02 p.m. Subject line, "XXR
18 performance to date."
19        Do you see that?
20 A     Yes.
21 Q     Okay. This was to the field leadership
22 team? Is that right?
23 A     Yes.
24 Q     Is that the district managers,
25 essentially?

Page 185

1  A     And the region sales directors.
2  Q     Okay. Let me go down to the second
3  paragraph. This is Exhibit 19. You got it?
4  Yeah.
5        Second paragraph --
6        And you can read as much of that as you
7  a need to. I'm gonna ask you about this XXR map
8  tool that's referenced in the last sentence.
9  A     Yes.
10 Q     See that? What was the XXR map tool?
11 A     It referred to the payer penetration
12 for a specific physician and the coverage of
13 certain payers in that prescriber's practice.
14 Prescription coverage, I should say.
15 Q     Okay. And that was based on data from
16 some vendor that could tell you which insurance
17 company or federal or state program covered
18 particular physicians' patients in terms of drug
19 benefit?
20 MR. DAVISON:
21        Objection to form.
22 A     The tool actually --
23 MR. CHALOS:
24 Q     Let me ask it this way. What was that?
25 A     Sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  Q      What does that mean?
2  A      The tool actually provided insight into
3  which payers provided what degree of
4  reimbursement and coverage for Xartemis XR.
5  Q      And how did that correlate with the
6  particular physician's patients?
7  A      So, using third-party data, one can see
8  the -- we -- it's referred to as payer
9  penetration within a physician's practice. How
10 many claims by a particular insurer or a pharmacy
11 benefit manager were adjudicated based on that
12 physician's prescription.
13 Q      I see. So that would be data from
14 something like IMS or IQVIA?
15 A      Yes.
16 Q      And, from that data, you could also see
17 what percentage of prescriptions written by a
18 particular prescriber were paid for with cash;
19 right?
20 A      I don't know if that was included in
21 this particular tool. But through IMS data, we
22 could see proportion of cash patients or cash
23 paid prescriptions to a physician's total pay RX.
24 Q      Would the PPI program or some other
25 program cover prescriptions that were paid for

Page 187

1  with cash?
2  A      I don't recall the specifics on that
3  particular card. I -- I don't know what -- I
4  don't recall what the application of that card to
5  a cash-paying patient would be.
6  Q      Were there any programs, whether it was
7  the PPI program or some other program, at
8  Mallinckrodt during the time you were there that
9  would provide payment for prescriptions for
10 cash-paying customers -- cash-paying patients?
11 A      I don't recall anything being
12 specifically targeted to cash-paying patients.
13 Q      Was -- were there any programs that
14 were available to be used by cash-paying
15 patients?
16 A      I don't recall any.
17 Q      Back to Exhibit Number 19 on -- in the
18 first paragraph, third page -- sentence, you
19 said, "Thank you for your leadership" -- sorry.
20 "Thank you for the leadership you're
21 demonstrating day in and day out. I see the
22 early morning, all day and late night
23 communications to your teams. I'm sure the texts
24 are far more frequent to and from your team,
25 sharing their progress with you."

Page 188

1      The texts there, you're talking about
2  text messages on the phone?
3  A      Yes.
4  Q      And the progress that you're
5  referencing there means -- or refers to the
6  progress of detailing physicians about Xartemis?
7  A      Yes.
8  Q      We'll put this aside, 19.
9      You know, I may be about done, so why
10 don't we take a break and let me talk to my
11 lawyer here and see where we are.
12 VIDEOGRAPHER:
13      We are now going off the video record.
14 The time is currently 2:39 p.m.
15      (OFF THE RECORD.)
16 VIDEOGRAPHER:
17      We are now back on the video record.
18 The time is currently 2:53 p.m.
19 MR. CHALOS:
20 Q      Okay.
21      (MALLINCKRODT CHICK EXHIBIT NUMBER 20
22      WAS MARKED FOR IDENTIFICATION.)
23 MR. CHALOS:
24 Q      Miss Chick, we've marked as Exhibit 20
25 document MNK-T1_0000740311 through

Page 189

1  MNK-T1_0000740327.
2      Have you had a chance to review this
3  document?
4  A      Yes.
5  Q      What's this document?
6  A      This appears to be a district analysis
7  of Xartemis XR performance.
8  Q      Is district analysis something that was
9  done on -- at some regular intervals when you
10 were at Mallinckrodt?
11 A      Not with this approach. Not -- not
12 regularly with this approach.
13 Q      What do you mean by "this approach"?
14 A      This is an in-depth analysis of every
15 territory looking at a number of metrics.
16 Q      Uh-huh. So is this more in depth in
17 detail than the typical district analysis?
18 A      Yes.
19 Q      Do you recall how many times
20 Mallinckrodt did a district-level analysis
21 similar to the one set forth in Exhibit 20 with
22 respect to Xartemis while you were with the
23 company?
24 A      I don't recall how frequently.
25 Q      And was it more than once, you think?

Page 190

1 A     I don't recall.
2 Q     Okay.  Was this document presented at
3 some meeting?
4 A     I don't know.
5 Q     Okay.  Let's flip, if you would, to
6 slide number 6, which is Bates number
7 MNK-T1_0000740316.  And the top of it says "North
8 Central Districts Performance and Potential to
9 Prescribe."
10     Do you see that?
11 A     Yes.
12 Q     Okay.  And if you look at the left
13 axis --
14     And I never can remember if that's the
15 X or the Y axis, but let's just call it the left
16 vertical axis -- axis.
17     -- it says, "Potential score in
18 thousands."  It's got a list of values.
19     Do you see that?
20 A     Yes.
21 Q     Do you know what that means?
22 A     I don't.  I was actually going to look
23 in the document to see if the potential score was
24 defined.
25 Q     Yes.  Oh.

Page 191

1 A     Okay.  Yes.
2 Q     Look at that.  And it even says --
3 A     Yes.
4 Q     -- it's the -- it's the Y axis.
5 A     Yes.
6 Q     How about that.  Hey.  Yes.
7     Okay.  So if we turn back to slide
8 number 4, which is -- ends in Bates number
9 740314, the center of the page, that column says
10 "Y axis" -- "Y axis potential score."  Then it
11 lists five factors that went into that.
12     Do you see that?
13 A     Yes.
14 Q     So is that -- those are factors that
15 went into calculating the vertical, or Y axis, on
16 slide 6?
17 A     That's how I would interpret it.
18 Q     Okay.  And that's some --
19     Okay.  And, then, those -- those
20 variables or those steps to calculate the Y axis
21 include "Identify continuous target prescribers,"
22 right, as number 1?
23 A     Yes.
24 Q     Number 2 is "Eliminate one-time
25 prescribers who have written only once and not

Page 192

1 written since last six weeks."
2 A     Yes.
3 Q     And number 3 is "Replace outliers
4 greater than 100 total prescriptions with average
5 of high prescriptions to eliminate biasness."
6     Do you see that?
7 A     Yes.
8 Q     I'm not sure biasness is a word, but I
9 think I understand what it means.
10     Four, "Estimated total TRx" -- so total
11 prescriptions -- "of oxycodone, plus OxyContin,
12 plus oxy/APA volume times acute share of their
13 practice times percent of commercial lives."
14     Do you see that?
15 A     Yes.
16 Q     Acute share of their practice means
17 what percentage of a particular prescriber's
18 practice is for acute pain?  Is that right?
19 A     What products are prescribed for acute
20 pain.
21 Q     I see.  Okay.  "Times num-" -- sorry.
22 "Percent of commercial lives."
23     What does that mean?
24 A     Percent of commercial lives would refer
25 to a privately insured benefit.  So we spoke

Page 193

1 earlier about percentage of a physician's
2 practice by payer --
3 Q     Uh-huh.
4 A     -- or payer penetration.  This
5 particular phrase, "commercial lives," would
6 refer to privately insured or nongovernmental
7 insured lives.
8 Q     Okay.  Number five is "Roll-up for
9 respective territory/districts for total
10 potential score of prescribers."  Is that right?
11 A     Yes.
12 Q     What does that mean, "roll-up"?
13 A     I read this as a summary or a total for
14 either the territory or the district for a total
15 prescriber potential.
16 Q     I see.
17     Okay.  And, then, the X axis on slide 6
18 is the total prescriptions divided by the
19 potential of prescribers?
20 A     Yes.
21 Q     And what is the potential of
22 prescribers?  Is that what we just talked about,
23 all that?
24 A     That's how I would interpret it, yes.
25 Q     Okay.  Okay.  So let's see if we can

Page 194

1 put this into English terms. So if we look at
2 slide 6, let's take Cleveland, Ohio, as an
3 example, which is on sort of the left upper
4 quadrant there. Well, no. It's on the left
5 upper part of the page.
6 A Yes.
7 Q Do you see it there?
8 A Yes.
9 Q And it's -- it's a -- it spans about
10 12,000 to 14,000 on the potential score. I guess
11 that's in thousands, so I guess that's 12 million
12 to 14 million. Does that sound right?
13 A That's -- that's how it's portrayed.
14 Q Okay.
15 A Yes.
16 Q And then it, on the X axis, falls
17 somewhere between -- well, closer to .025 on the
18 prescriptions per potential of prescriber; right?
19 A Yes.
20 Q So what -- how would you translate, you
21 know, in English terms, the positioning of
22 Cleveland in slide 6 of Exhibit 20?
23 MR. DAVISON:
24     Objection to form.
25 A And could I ask you to clarify --

Page 195

1 MR. CHALOS:
2 Q Sure.
3 A How would I interpret the -- the status
4 of Cleveland versus what?
5 Q Just in general. I mean, is
6 it -- is --
7     I'll give you a for instance, and tell
8 me if I'm getting this right.
9 A Okay.
10 Q So it's Cleveland is an area that has
11 high potential for prescriptions of Xartemis, but
12 not, in actuality, a lot of prescriptions for
13 Xartemis, at least at this point?
14 A I want -- I just wanted to go back and
15 look --
16 Q Sure.
17 A -- look for something.
18 Q Okay.
19 A As a means --
20     I don't know that -- one of the
21 other --
22     Okay. Here it is. I was looking for
23 the definitions of the labels on each one of
24 those cohorts.
25 Q Okay.

Page 196

1 A So "Go Deep, Get New," just to make
2 sure that I was recalling this correctly.
3 Q Okay. And they're defined somewhere in
4 this document?
5 A Yes. So, for example, on one of the
6 next pages, North Central St. Louis --
7 Q Yes.
8 A Okay. So down at the bottom, I
9 believe, of each --
10 Q This is the page that ends --
11 A -- territory --
12 Q Sorry. This is -- this ends in --
13 A Yes.
14 Q -- 40317?
15 A Yes.
16 Q Okay. Got it.
17 A Yes.
18 Q Okay.
19 A So I was just looking for that
20 definition to clarify how that was being
21 interpreted.
22 Q Okay. Does that help you understand?
23 A Well, as I -- as I read, I don't recall
24 specifically how -- how to think about Cleveland
25 in this example, so I'm just trying to refresh my

Page 197

1 memory.
2 Q Okay. Yeah. Take whatever time you
3 need.
4 A So as I look at the --
5     And I actually went to
6 MNK-T1_0000740320, which is the territory
7 analysis for Cleveland --
8 Q Got it.
9 A -- to -- to look at that versus other
10 territories.
11     And looking at the box on the bottom,
12 in terms of those definitions, it appears that,
13 relatively speaking, the opportunity within that
14 territory is to focus, as it says, on increased
15 focus on orthopedic surgery, pain management, and
16 podiatrist. And then the --
17     I anticipate the size of the bubble is
18 relative, as we talked about, in terms of the
19 market potential.
20 Q So is it accurate to say, as you get
21 into where Cleveland is, which is the top left of
22 that graph, those are areas that have high
23 potential, but Xartemis is not reaching the
24 potential in terms of numbers of prescriptions;
25 whereas, if you look at St. Louis, for example,

Page 198

1  where it says "get new prescribers," it looks
2  like they have more prescriptions per prescriber
3  but haven't -- but have a lower potential?  Am
4  I -- is that reading that right?
5  A      Yes.
6  Q      Okay.
7  A      That's how I would read that.
8  Q      So Go -- the Go Deep bunch on the top
9  left there would suggest that the sales
10 representatives translate this -- this into
11 practice, which the sales representatives would
12 have to focus on the -- would have to --
13        I'll start that again.
14        The Go Deep folks have -- territories
15 have a lot of potential but just haven't yet
16 realized the potential and translated into
17 numbers of prescriptions?
18 A      That's how I would interpret that.
19 Q      Okay.  The Nashville, Tennessee,
20 district there, do you know whether that includes
21 the entire state of Tennessee?
22 A      I -- I don't recall.
23 Q      Okay.  Those are all the questions I
24 have for you at this time.  So I guess we'll go
25 off the record and swap seats.

Page 199

1  VIDEOGRAPHER:
2        We are now going off the video record.
3  The time is currently 3:07 p.m.
4        (OFF THE RECORD.)
5  VIDEOGRAPHER:
6        We are now back on the video record.
7  The time is currently 3:10 p.m.
8        EXAMINATION
9  BY MS. HERZFELD:
10 Q      Good afternoon, Miss Chick.  How are
11 you?
12 A      I'm well.  Thank you.
13 Q      My name is Tricia Herzfeld, and I'm one
14 of the attorneys representing the plaintiffs in
15 the Tennessee state litigation.
16        Are you familiar with the Tennessee
17 state litigation?
18 A      I'm not.
19 MS. HERZFELD:
20        Okay.  Before we start, I just want to
21 renew the objections that we have in this case
22 for the document production being insufficient,
23 not on time, and incomplete, in addition to the
24 other objections that we've laid out in our
25 previous depositions, which I think counsel is

Page 200

1  aware.
2        So, before we start, we just wanted to
3  reserve our rights to redepose this witness in
4  future litigation if it becomes necessary due to
5  later-disclosed documents.
6  MR. DAVISON:
7        And Mallinckrodt disagrees with your
8  position.  We have complied with the deposition
9  protocols.  No further depositions of this
10 witness will be necessary, and we will object to
11 any further deposition of this witness.
12 MS. HERZFELD:
13        Okay.  Very good.
14 Q      Moving along, so as vice-president of
15 specialty sales for Mallinckrodt, were you
16 responsible at all for sales of Mallinckrodt
17 opioids in the state of Tennessee?
18 A      I was responsible for US sales of
19 Mallinckrodt opioid products, inclusive of
20 Tennessee.
21 Q      Okay.  And do you remember anyone that
22 worked for you or under you or with you during
23 your time at Mallinckrodt with Tennessee-specific
24 responsibilities?
25 A      I'm sorry.  I don't recall specific

Page 201

1  names at this point in time.
2  Q      Okay.  What about Jay Meyer?  Do you
3  remember Jay Meyer?
4  A      Jay Meyer, yes.
5  Q      And what were Jay Meyer's
6  responsibilities?
7  A      When I arrived at the company,
8  Jay Meyer was the region sales director for the
9  west region, which was quite expansive.
10 Q      Okay.  Do you think that might have
11 included Tennessee?
12 A      I don't know if it was in that
13 district -- that region or the southeast
14 region --
15 Q      Okay.
16 A      -- just off the top of my head.
17 Q      Okay.  And do you recall who was in
18 charge of the southeast region?
19 A      Bill Nichols.
20 Q      Bill Nichols.
21        Okay.  And Bill Nichols, do you know if
22 he's still employed at Mallinckrodt?
23 A      I believe he's retired.
24 Q      Okay.  And do you know what year he
25 retired?

Page 202

1 MR. DAVISON:
2      Objection to form.
3 A      I don't recall. Although I was aware
4 of his intention to retire, I don't recall
5 specifically when that may have occurred.
6 MS. HERZFELD:
7 Q      Okay. And do you believe that you
8 became aware of his intention to retire while you
9 were employed at Mallinckrodt or after you left?
10 A      While I was employed.
11 Q      Okay.
12      Okay. And who was Dan Polesovsky?
13 A      Polesovsky.
14 Q      Okay. Very good. Thank you.
15 A      Yes. Dan was a district manager.
16 Q      And do you know what district Dan was a
17 district manager for?
18 A      I'm trying to recall geography. I'm
19 sorry. It's been some years.
20 Q      Okay. Do you think it might have had
21 anything to do with Tennessee, Dan's district?
22 MR. DAVISON:
23      Objection to form.
24 A      I -- I just don't recall.
25 MS. HERZFELD:

Page 203

1 Q      Okay. What about Brad Newberry? Do
2 you recall who Brad Newberry is?
3 A      That name's not familiar. I don't
4 recall specifically that individual.
5 Q      Okay. What about Todd Druen?
6 A      Todd Druen was a district manager.
7 Q      Do you know what district he managed?
8 A      I -- I recall that he was associated
9 somewhere in the southeast US, but I don't know
10 which -- I don't recall which region he was
11 affiliated with.
12 Q      Okay. And what about Christopher
13 Clark?
14 A      The name is familiar, but I don't
15 recall, again, the specific geography.
16 Q      Okay. And Susan Young?
17 A      Sorry. I don't recall a specific
18 geography.
19 Q      Okay. But do you recall Susan Young's
20 position?
21 A      I don't.
22 Q      Okay. But do you recall the name Susan
23 Young?
24 A      I don't recall it specific to
25 Mallinckrodt.

Page 204

1 Q      Okay. Do you know if Tennessee was a
2 high-performing area for your specialty sales
3 team?
4 A      I don't recall it as being an outlier
5 necessarily.
6 Q      Okay. Do you recall it being an
7 outlier in any circumstance?
8 A      No.
9 Q      Okay. Do you know if there were any
10 Tennessee-specific bonuses or initiatives?
11 A      I'm sorry. Could you define
12 Tennessee-specific bonuses or initiatives?
13 Q      Do you know of any specific programs or
14 some sort of incentive to someone in Tennessee?
15 A      Versus other states?
16 Q      Yes, ma'am.
17 A      I don't know of any that would be
18 exclusive or limited to Tennessee versus other
19 states.
20 Q      Okay. Do you recall any sales
21 incentives or specific programs targeted towards
22 the southeast?
23 MR. DAVISON:
24      Objection to form.
25 A      I don't recall anything specific to the

Page 205

1 southeast.
2 MS. HERZFELD:
3 Q      Okay. At any point in your tenure, did
4 Tennessee itself have a specific sales tactic?
5 Did you --
6      I'm gonna start over.
7      At any point in your tenure, was there
8 any sort of different message that was given to
9 physicians or pharmacies in Tennessee versus
10 other states?
11 A      It was not our practice to distinguish
12 sales messages by state or geography,
13 necessarily. I don't recall anything similar to
14 that.
15 Q      Okay. Can you recall any time that a
16 message would have deviated for geography
17 purposes?
18 A      The only specificity would be with
19 respect to payer coverage in a geography. That
20 would, in my mind, be the only reason for it to
21 be different.
22 Q      Okay. And, so, when you're talking
23 about payer coverage, that would be who's paying
24 for the product; is that correct?
25 A      It would be the insurance coverage

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  either through an insurer or pharmacy benefit
2  manager, yeah.
3  Q      And, so, could that also be some sort
4  of a state-run program, like TennCare, for
5  example?
6  A      Yes.
7  Q      Do you recall ever hearing anything
8  about any issues with the products being on the
9  formulary for TennCare?
10  A      I don't recall.
11  Q      Okay.  Were you aware specifically of
12  any opioid abuse problems in Tennessee?
13  MR. DAVISON:
14      Objection to form.
15  A      At the time of my employment with
16  Mallinckrodt?
17  MS. HERZFELD:
18  Q      Yes, ma'am.
19  A      Not necessarily, no.
20  Q      Okay.  And what about since you have
21  left employment with Mallinckrodt?
22  MR. DAVISON:
23      Objection to form.
24  A      I'm not aware of Tennessee specific,
25  but I'm generally aware of issues.

Page 207

1  MS. HERZFELD:
2  Q      Of opioid abuse issues?
3  A      Yes.
4  Q      Okay.  And have you heard at all of
5  those being particularly pronounced in the
6  Appalachian region of the country?
7  A      Yes.
8  Q      Okay.  And do you consider Tennessee to
9  be part of Appalachia, in your opinion?
10  A      Yes -- yes.  I've -- and -- and I've
11  learned this through actually being in
12  Appalachia, yes.
13  Q      Okay.  When did you go to Appalachia?
14  A      So I was in that area of the country
15  with our church mission team --
16  Q      Okay.
17  A      -- affiliated with the Appalachian
18  Service Project, which is based out of Johnson
19  City, Tennessee.
20  Q      Oh.  Very good.
21      Okay.  So now I'm going to back up,
22  because very few people have been to Johnson
23  City, Tennessee, so you've piqued my interest a
24  little bit.
25      When did you go to Appalachia with your

Page 208

1  church mission trip?
2  A      So, as an aside, I've actually not been
3  in Johnson City, Tennessee, but working on
4  projects with ASP --
5  Q      Okay.
6  A      -- in other areas of Appalachia.
7      So in the time frames of around 2008 or
8  so for several years, and then again 2011, '12
9  time frames, the summers of those years.
10  Q      Okay.  And when --
11      I just want to make sure I understand.
12  So it was with a church or an organization that
13  was based out of Johnson City?
14  A      So it was with our church, sponsored by
15  ASP, Appalachian Service Project, which is based
16  in Johnson City, Tennessee.
17  Q      Okay.  And where did you go in
18  Appalachia?
19  A      We went several locations over those
20  years, primarily in West Virginia.
21  Q      Okay.  And during those times when you
22  were on those --
23      I don't really want to call them
24  mission trips.  Service projects?
25  A      Yes.

Page 209

1  Q      Is that a fair statement?
2  A      That's a fair statement.
3  Q      Okay.  When you were on those service
4  projects in Appalachia, did you become aware of
5  the opioid issues in Appalachia at that time?
6  A      Yes.
7  MR. DAVISON:
8      Objection to form.
9  MS. HERZFELD:
10  Q      And to what is it that you became
11  aware?
12  MR. DAVISON:
13      Objection to form.
14  A      In those project assignments, we were
15  based in the community and learned about the
16  community, the issues in the community, and
17  worked on homes for individual families, some of
18  whom had been affected by opioid abuse and -- and
19  other economic factors.
20  MS. HERZFELD:
21  Q      And, so, was it part of your
22  understanding that the service projects that you
23  went on, the places your service projects took
24  you in Appalachia, that those areas were hard hit
25  by -- by opioid addiction?

MR. DAVISON:
Objection to form.
A So I don't have an appreciation for the areas. What I experienced were in communities, in specific communities in which we were involved, and in some cases with specific families.
MS. HERZFELD:
Q And tell me the types of things you were doing with -- with those families.
MR. DAVISON:
Objection to form.
A So our project teams were assigned to work on homes to improve their -- their function. Could range anywhere from insulating to repairing to even external drainage.
MS. HERZFELD:
Q So kind of like Habitat For Humanity projects where you're, like, physically nailing stuff and helping out?
A So the difference is Habitat builds new homes. ASP works on existing homes.
Q Okay. And I'm assuming there was some sort of a financial component on how people were selected to have their homes helped by the



organization?
A I don't know the --
MR. DAVISON:
Objection to form.
A I don't know the criteria with which ASP selected families. ASP performed that function and assigned our groups upon arrival.
MS. HERZFELD:
Q Okay. And was your opinion that the folks seemed to be pretty poor?
MR. DAVISON:
Objection to form.
A Relative to what our youth experienced and grew up in, there was a significant difference in economic means.
MS. HERZFELD:
Q And it would have been a lower economic means?
A Yes.
Q Okay. And how -- so how is it in that project that you'd become aware of opioid abuse issues? How -- how did that come about?
A Simply being in the community for a week's period of time, being aware of what was going on in -- in -- in a neighborhood or if



a -- if a family member, you show, shared their experience.
Q Okay. And can you give me some examples?
MR. DAVISON:
Objection to form.
A I recall in one town there seemed to be very little industry, very little retail. It appeared quite bleak. We had heard -- I don't have firsthand accounts, but we had heard that opioid abuse had been an issue in the community.
MS. HERZFELD:
Q Okay. And do you know who you-all heard that from?
A The members in the community who were involved with ASP oftentimes spent the entire summer there, and, so, became familiar with the circumstances in the town.
Q Okay. And was that story pretty much consistent for the -- the various locations that you went to with ASP?
MR. DAVISON:
Objection to form.
A Not every -- not every location.
MS. HERZFELD:



Q Okay. Do you remember specifically which locations seemed to have opioid abuse problems in their community versus which ones did not?
MR. DAVISON:
Objection to form.
A I don't. I don't necessarily.
MS. HERZFELD:
Q Do you remember any of the names of any of the towns that you went to?
A I'd have to go back and look. It was quite some time ago.
Q That's okay.
Did you ever go to Welch, West Virginia?
A No.
Q Do you recall if you were ever in Mingo County, West Virginia?
A No.
Q Okay. But you believe they were all in West Virginia?
A Not all of them.
Q Okay. So I'm glad I asked that.
Okay. Where were the other ones?
A I believe we also went to Kentucky at

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 one point.
2 Q      Okay.  Do you recall where in Kentucky?
3 A      I don't.
4 Q      And what about any towns in Tennessee?
5 A      I don't believe I ever was on an ASP
6 trip to Tennessee.
7 Q      Okay.  So the affiliation there would
8 be with the ASP which is in Johnson City?
9 A      Headquartered, yes.
10 Q      Okay.  Have you ever been to the
11 tri-cities area, upper east Tennessee?
12 A      No.
13 Q      Okay.  On -- and I think you'd said
14 before that you had been to Tennessee with your
15 job at Bristol-Myers Squibb.  Is that correct?
16 A      Yes.
17 Q      Okay.  And is that the only other time
18 you'd been to Tennessee?
19 A      No.
20 Q      Okay.  When else -- when else have you
21 been?
22 A      Most recently, my son was married in
23 ▇▇▇▇▇▇.
24 Q      Oh.  When was that?
25 A      In 2015.

Page 215

1 Q      Okay.  And does he live there?
2 A      No.
3 Q      Why ▇▇▇▇▇▇?
4 MR. DAVISON:
5      Objection.
6 MS. HERZFELD:
7 Q      You can answer.
8 A      Okay.
9 MR. DAVISON:
10      Let's focus on what's at issue here.
11 No sense wasting time.
12 MS. HERZFELD:
13      I'm asking why ▇▇▇▇▇▇.  I can ask
14 the question.
15 A      My daughter-in-law and her family live
16 in Tennessee.
17 MS. HERZFELD:
18 Q      Oh, okay.
19 A      Not necessarily in ▇▇▇▇▇▇.  There
20 is some family there.
21 Q      Okay.  And do you know where your
22 daughter-in-law and her family live in Tennessee?
23 MR. DAVISON:
24      Objection.
25 A      So my daughter-in-law and her husband,

Page 216

1 my son, live in ▇▇▇▇▇▇.
2 MS. HERZFELD:
3 Q      Okay.
4 A      Her family, she has grandparents in
5 ▇▇▇▇▇▇, and her parents are in ▇▇▇▇▇▇.
6 Q      Okay.  So other than going for the
7 wedding and the time at Bristol-Myers Squibb,
8 what other times have you been in Tennessee?
9 A      Even prior to Bristol-Myers Squibb,
10 when I was with Schmid, I would travel to Memphis
11 to call on accounts with my sales representative.
12 Q      Have you ever been to Knoxville?
13 A      No.
14 Q      Okay.  And in your position at
15 Mallinckrodt, did that ever take you to
16 Tennessee?
17 A      I don't recall traveling on business
18 to -- to Tennessee while at Mallinckrodt.
19 Q      Okay.  Have you ever heard of the
20 acronym AHIDTA?
21 A      No.
22 Q      A-H-I-D-T-A.
23 A      No.
24 Q      Have you ever heard of the Appalachian
25 High Intensity Drug Trafficking Area?

Page 217

1 A      Not until now.
2 Q      When I just said it?
3 A      Yes.
4 Q      Okay.  Yes, ma'am.
5      Do you know what neonatal abstinence
6 syndrome is?
7 A      No.
8 Q      It's not something you've heard of?
9 A      No.
10 Q      Okay.  Have you heard of a condition
11 where newborns are born dependent upon opioids?
12 A      Yes.  I've -- I'm familiar with reading
13 stories about that.
14 Q      Okay.  And do you believe that you were
15 familiar with that condition at the time that you
16 worked at Mallinckrodt?
17 A      I don't know that I could reliably say
18 that.
19 Q      Okay.  Do you know how you became
20 familiar with the condition?
21 A      I don't.
22 Q      Okay.
23 A      Most --
24      I don't.
25 Q      Okay.  Did anybody at Mallinckrodt ever

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 give you any training or instruction on neonatal
2 abstinence syndrome?
3 MR. DAVISON:
4     Objection to form.
5 A    No.
6 MS. HERZFELD:
7 Q    Okay. Have you ever heard that
8 Appalachia has elevated rates of neonatal
9 abstinence syndrome?
10 MR. DAVISON:
11     Objection to form.
12 A    I wasn't aware of that.
13 MS. HERZFELD:
14 Q    Okay. Were you involved at all in the
15 creation or maintenance of the no-call lists for
16 prescribers?
17 A    I was involved in informing and
18 communicating on those lists.
19 Q    Okay. And what does "informing and
20 communicating" mean?
21 A    So I believe you're referring to the
22 order monitoring function within Mallinckrodt.
23 Q    Yes, ma'am.
24 A    A separate group monitored various
25 information sources and would bring to our

Page 219

1 attention any issues associated with physicians
2 who were found to be on our call list who were
3 called into question about their prescribing
4 activity.
5 Q    Okay. And, so, when you say "informing
6 and communicating," what was your role?
7 A    So my role was as a recipient of
8 information from that department, understanding
9 what their findings and recommendations were.
10 Q    Okay. And when you say "findings and
11 recommendations," you mean whether somebody is on
12 the call list or not on the no-call list?
13 MR. DAVISON:
14     Objection.
15 A    Yes. And if there were any
16 recommendations about changing the status of a
17 physician on that list.
18 MS. HERZFELD:
19 Q    Okay. And do you know if the no-call
20 list was kept by state or by -- sorry about
21 that -- by state or by ZIP code, like locale in
22 any way?
23 MR. DAVISON:
24     Objection to form.
25 A    So because it was physician-specific,

Page 220

1 there would be geographic information associated
2 with that physician included.
3 MS. HERZFELD:
4 Q    Okay. But you don't know that there
5 was, like, a specific list for Tennessee or by
6 state?
7 A    I don't.
8 Q    Okay. And when you would get
9 information from the other group that told you
10 why someone was to be put on the no-call list,
11 would they tell you why?
12 A    Yes.
13 Q    Okay. And how often would you
14 communicate with that separate group?
15 A    So at their initiation.
16 Q    And do you know how they would get
17 their information?
18 A    I don't.
19 Q    Okay. And you said that they had
20 different information sources. Various
21 information sources I think is what you said. Do
22 you know what those were?
23 A    I don't know all of them.
24 Q    Okay. Could you tell me the ones you
25 know?

Page 221

1 A    If a state medical board took action on
2 a physician license, I don't know how they
3 obtained that information, necessarily, but that
4 would be an information source, as well as the --
5 the news, electronic media.
6 Q    Okay. So, to your knowledge, someone
7 in that suspicious order monitoring group would
8 be monitoring the news?
9 MR. DAVISON:
10     Objection to form.
11 A    I don't know how exactly they did it,
12 but I recall that when physicians -- if -- if a
13 physician appeared in the news on prescribing
14 activity issues, that would be one source of
15 information that they would -- they would have
16 access to.
17 MS. HERZFELD:
18 Q    Can you think of any other sources of
19 information?
20 A    I -- I don't definitively know exactly
21 other sources of information.
22 Q    Okay. Those are the only ones you can
23 think of for now?
24 A    Yes.
25 MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    Objection to form.
2  MS. HERZFELD:
3  Q    Okay.  Okay.  Do you recall any
4  specific communication about any Tennessee
5  physicians being on that list or not on that
6  list?
7  A    I don't recall any Tennessee
8  physicians.
9  Q    Okay.  I'm gonna go through a series of
10 names with you, and if you could let me know if
11 you recall any communication about those
12 physicians.
13 A    Okay.
14 Q    Okay.  First one is Abdelrahman
15 Mohamed.
16 A    I don't recall.
17 Q    Okay.  What about Timothy Gowder?  Have
18 you ever heard of him?
19 A    I don't recall.
20 Q    Okay.  Gary Arlan Moore?
21 A    I don't recall.
22 Q    Okay.  What about a doctor by the name
23 of David Florence?
24 A    I don't recall.
25 Q    He also had a reality show, very

Page 223

1  short-lived, called DocStar.  Does that ring a
2  bell to you at all?
3  A    No.
4  Q    Mark Murphy?  Have you heard of that
5  prescriber?
6  A    I don't recall.
7  Q    Okay.  What about Ed White?
8  A    I don't recall.
9  Q    Okay.  Or a physician's assistant named
10 Pam White?
11 A    I don't recall.
12 Q    Okay.  What about some specific
13 Tennessee clinics?  I'm wondering if they had
14 your product promoted at those particular
15 clinics.  Just let me know if you remember any
16 communications about them.  Okay?
17 A    Okay.
18 Q    Okay.  So the first one would be
19 The Center For Advanced Medicine in Manchester,
20 Tennessee.  Do you recall any communications
21 about them?
22 A    I don't.
23 Q    Okay.  What about Center Pointe Clinic
24 in Kingsport, Tennessee?
25 A    I don't.

Page 224

1  Q    Okay.  What about Specialty Associates,
2  also known as Montclair Health and Wellness, in
3  Lewisburg, Tennessee?
4  A    I don't recall.
5  Q    Okay.  What about Hamblen Neuroscience
6  Center in Hamblen, Tennessee?
7  A    I don't remember.
8  Q    Okay.  What about the Pain -- Tennessee
9  Pain Institute in Hixson, Tennessee?
10 A    I don't recall.
11 Q    Okay.  What about the Lynnville Family
12 Medical Clinic in Lewisburg, Tennessee?
13 A    I don't recall.
14 Q    Okay.  Or North Alabama Pain Services
15 in Lewisburg, Tennessee, or in Alabama?
16 A    I don't recall.
17 Q    Okay.  Do generic sales of Mallinckrodt
18 products impact the specialty sales force
19 alignment?  Did they when you were there?
20 MR. DAVISON:
21     Objection to form.
22 A    I'm sorry.  I -- could you further
23 elaborate on your question?
24 MS. HERZFELD:
25 Q    Sure.

Page 225

1    So I'm trying to figure out what role,
2  if any, generic sales of Mallinckrodt products
3  played a role in making determinations for which
4  physicians were targeted.
5  A    So, in my experience at Mallinckrodt,
6  generic sales of any product, Mallinckrodt or
7  otherwise, did not factor into -- into our
8  approach, other than looking at prescribing
9  history for physicians.  So for physicians who
10 would treat, in this case, with Xartemis XR,
11 acute pain, generic products would have been
12 included in the -- the market basket of
13 physicians' prescribing habits.
14 Q    And when you say "market basket," can
15 you tell me what you mean by that?
16 A    When looking at physicians who might be
17 appropriate recipients of medical information
18 from Mallinckrodt, one -- we looked at what their
19 prescribing history had been.  We also looked at
20 things like specialty and other things as well.
21 So when I say "market basket," it's really
22 looking at what is their prescribing history in,
23 in this case, acute pain.
24 Q    Okay.  And when talking about the
25 various pharmacies that were selected by you-all,

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 I think you talked a little bit with Mr. Chalos
2 about some -- some different factors that went
3 into selecting those -- those pharmacies. And
4 I'm curious if selling a high level of
5 Mallinckrodt generic opioids at those pharmacies
6 would factor at all into your determination of
7 who to target from a pharmacy basis.
8 MR. DAVISON:
9      Objection.
10 A     I'm not aware of any criteria that was
11 applied that would be similar to what you just
12 described.
13 MS. HERZFELD:
14 Q     Okay.
15      Okay. I've got a couple documents I
16 want to go through with you, if that's okay.
17      Do you know what a push report is?
18 A     A push report. It's not ringing a
19 bell.
20 Q     Okay. I'm gonna hand you what we will
21 mark as Exhibit 21.
22      (MALLINCKRODT CHICK EXHIBIT NUMBER 21
23      WAS MARKED FOR IDENTIFICATION.)
24 MS. HERZFELD:
25 Q     If you could take a look at that, then

Page 227

1 let me know.
2 A     Yes. Thank you.
3 Q     Okay. Does that refresh your memory
4 now?
5 A     It does.
6 Q     Okay. Great. And, so, looking at
7 Exhibit 21, what does it appear to be to you?
8 A     I'm sorry. I was just trying to review
9 and recall.
10 Q     That's okay. You can take your time.
11 A     So it appears that the push reports
12 were performance reports that went out on a -- a
13 weekly basis, I believe.
14 Q     Okay. And your memory has been
15 refreshed by this exhibit, I take it?
16 A     To some degree.
17 Q     Okay. And what is Exhibit 21 that
18 you're looking at here?
19 A     So could I take a moment and read?
20 Q     Sure. Sure.
21 A     Thank you.
22      So this is recalling for me that I
23 didn't receive all of these, I stated in this
24 email, because the reports were individually
25 generated and distributed. So that's refreshing

Page 228

1 my memory. So thank you.
2 Q     Sure.
3      Okay. And, so, this is -- it's a
4 Tennessee Bates number, so it may be a little
5 different than what the rest of you-all have.
6 But it's Mallinckrodt_TNSTA00224454. And I think
7 that's only a Tennessee Bates number. I don't
8 have another one. My apologies.
9      And does this appear to be an email
10 that was sent to your email account, ma'am?
11 A     Yes.
12 Q     Okay. From Travis Moore. Who is
13 Travis Moore?
14 A     Travis was the director of sales
15 operations.
16 Q     Okay. And what is a push report?
17 A     The report essentially provided
18 performance feedback on an individual physician
19 level to each territory for the products that
20 were promoted at the time.
21 Q     Okay. And how often would the push
22 reports be generated?
23 A     I don't recall the frequency of those
24 reports.
25 Q     Do you think they were quarterly,

Page 229

1 weekly, monthly? Do you have no idea at all?
2 MR. DAVISON:
3      Objection to form.
4 A     I -- I -- I simply do not recall the
5 frequency because I didn't receive them
6 personally.
7 MS. HERZFELD:
8 Q     Okay.
9 A     I just simply don't recall.
10 Q     Who received them?
11 A     The sales professionals and the
12 district managers.
13 Q     Okay. And when you say the performance
14 for each physician, it'd be like a targeted
15 physician and maybe how many times they're
16 visited and how many prescriptions they wrote?
17 What types of factors?
18 MR. DAVISON:
19      Objection.
20 A     So it, I don't believe, included call
21 information but did include, by physician,
22 product prescription information --
23 MS. HERZFELD:
24 Q     Okay.
25 A     -- over time.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 Q    Okay. I don't think I have any more
2 questions on this exhibit, so you can set that
3 aside.
4        My understanding is we need to change
5 the tape, so we'll take a break. Okay?
6 A    Okay.
7 VIDEOGRAPHER:
8        We are now going off the video record.
9 The time is currently 3:40 p.m. This is the end
10 of media number 4.
11       (OFF THE RECORD.)
12 VIDEOGRAPHER:
13       We are now back on the video record
14 with the beginning of media number 5. The time
15 is currently 3:49 p.m.
16 MS. HERZFELD:
17 Q    Okay. Miss Chick, we're back from a
18 short break. I'm going to hand you what is
19 marked as Mallinckrodt Chick Exhibit 22. And,
20 again, this is a Tennessee Bates number. It's
21 MNK_TNSTA01372717. Take a look at that for me.
22       (MALLINCKRODT CHICK EXHIBIT NUMBER 22
23       WAS MARKED FOR IDENTIFICATION.)
24 MS. HERZFELD:
25 Q    Okay. Do you recognize this document?

Page 231

1 A    Yes.
2 Q    Okay. What is it?
3 A    This is a midyear performance
4 discussion guide.
5 Q    Okay. And who would have been the
6 person who created this document?
7 A    So this document reflects input from
8 Todd Druen.
9 Q    Okay. And does it reflect input from
10 you as well?
11 A    This -- this document does not.
12 Q    Okay. So it says on the top of this
13 document that it's the 2014 Midyear Performance
14 Discussion Guide. Is that right?
15 A    Yes.
16 Q    Okay. And the employee name is
17 Todd Druen. Who was he?
18 A    Todd was a district sales manager.
19 Q    Okay. And do you remember what
20 district he was in?
21 A    I don't recall the district he was in.
22 However, reading the document recalls to me the
23 Nashville district.
24 Q    Okay.
25 A    And seeing the list of payers also

Page 232

1 recalls to me the -- the Tennessee responsibility
2 he had.
3 Q    Okay. And did you supervise Todd
4 Druen?
5 A    I did for a period of time after Jay
6 Meyer's departure.
7 Q    Okay. And, so, you would have been
8 Todd Druen's supervisor in, looks like, mid-2014?
9 A    Yes.
10 Q    Okay. I guess my question is, if
11 you'll flip with me to the second page, it says
12 "Cultural Hallmarks, Manager Completes Prior to
13 Discussion" in that dark bar. Do you see where
14 I'm at?
15 A    Oh, yes.
16 Q    Okay. And did I read that correctly?
17 A    Yes.
18 Q    Okay. And then it says "Leader's
19 Assessment of Employee Demonstrating Mallinckrodt
20 Cultural Hallmarks."
21       Do you see where it says that?
22 A    Yes.
23 Q    And, so, maybe I'm just incorrect. It
24 would appear to me that it says "Manager
25 Completes Prior to Discussion." So did you

Page 233

1 complete this section?
2 A    I did not.
3 Q    Okay. Do you know who would have?
4 A    Reading this, it appears that Todd
5 completed this himself.
6 Q    Okay. And, so, looking down where it
7 says "competitive" --
8 A    Yes.
9 Q    "I have delivered timely feedback to
10 representatives both via the FCR and verbal
11 coaching during field rides."
12       Do you know what that means?
13 A    The statement?
14 Q    Yes, ma'am.
15 A    As a district manager, Todd represents
16 that he provided feedback to his representatives
17 by way of the FCR, or field coaching report, and
18 also verbal coaching as he rode along with his
19 sales representatives.
20 Q    Okay. So I think I understand.
21 A    Uh-huh.
22 Q    So where it says "Manager Completes
23 Prior to Discussion," that would be the district
24 manager, not the manager that's written on -- on
25 the top of the form on page 1.

Highly Confidential - Subject to Further Confidentiality Review

| Page 234 |
| --- |

1 A      So reading the form in the way it was
2 intended to be completed, yes.  The manager would
3 have completed cultural hallmarks commentary
4 prior to discussion.  In this instance, this
5 individual completed this part himself.
6 Q      Okay.  That clears it up for me.
7 A      Okay.
8 Q      Thank you very much.
9 A      Uh-huh.
10 Q      Okay.  You can set that aside.
11 A      Okay.
12 Q      And I believe, before, you were
13 speaking to Mr. Chalos about the copay and PPI
14 report.
15 A      The card, yes.
16 Q      Okay.  And did you receive reports on
17 copays and PPIs, to your knowledge?
18 A      I -- I don't recall specific reports,
19 although I would imagine --
20        Let me -- let me restate that.
21        I don't recall how frequently I would
22 have seen that information, but I recall
23 generally redemptions of those reports.
24 Q      Okay.
25 A      Or of those cards.

| Page 235 |
| --- |

1 Q      Okay.  And do you recall them
2 being -- those redemptions being put together in
3 a report?
4 A      Yes.
5 Q      Okay.
6        (MALLINCKRODT CHICK EXHIBIT NUMBER 23
7        WAS MARKED FOR IDENTIFICATION.)
8 MS. HERZFELD:
9 Q      I'm gonna hand you -- or it has been
10 marked as Mallinckrodt Chick Exhibit 23.  And,
11 again, it's a state case Bates number,
12 MNK_TNSTA00222642.
13        Okay.  Does this email look familiar to
14 you?
15 A      It isn't familiar, but I see the
16 recipients, so...
17 Q      Okay.  And it's dated May 13th, 2014;
18 is that correct?
19 A      Yes.
20 Q      Okay.  And does this refresh your
21 recollection at all as to how often you would
22 have received the reports?
23 A      Yes.
24 Q      Okay.  And how often would that have
25 been?

| Page 236 |
| --- |

1 A      This email states every Tuesday and
2 Friday.
3 Q      Okay.  And do you recall a time when
4 that stopped, when you stopped receiving reports
5 every Tuesday and Friday?
6 A      I don't recall at all.
7 Q      Okay.  And what would you do with the
8 reports when you received them?
9 A      These reports would be useful to use
10 along with TRx information just to have an
11 overall assessment of resource utilization when
12 it came to this particular resource.
13 Q      Okay.  And you would monitor the copay
14 and PPIs from physicians all over the country; is
15 that correct?
16 MR. DAVISON:
17        Objection to form.
18 A      The report included redemptions from
19 across the country.
20 MS. HERZFELD:
21 Q      Okay.  And across the country would
22 also include redemptions from Tennessee?
23 A      Yes.
24 Q      Okay.  Thank you, ma'am.  You can set
25 that aside.

| Page 237 |
| --- |

1        (MALLINCKRODT CHICK EXHIBIT NUMBER 24
2        WAS MARKED FOR IDENTIFICATION.)
3 MS. HERZFELD:
4 Q      Okay.  And then my last one here we're
5 gonna mark as Mallinckrodt Chick Exhibit 24.
6 That Bates number is MNK_TNSTA02582409.
7        Wow.  Thank you.
8        Okay.  Do you recognize this document,
9 ma'am?
10 A      Yes.
11 Q      Okay.  What does it appear to be to
12 you?
13 A      This appears to be an email forwarded
14 to me from Jay Meyer, the region director, not
15 long after I began at Mallinckrodt, from one of
16 his district managers.
17 Q      Okay.  And did you know that district
18 manager, Christian Paranjothi?
19 A      Yes.
20 Q      And how did you know Christian
21 Paranjothi?
22 A      We called him Kitcha.
23 Q      Okay.
24 A      Kitcha was a district manager with
25 Mallinckrodt.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 Q    Okay.  And did -- was Kitcha employed,
2 the entire time you were at Mallinckrodt, with
3 Mallinckrodt?
4 A    Kitcha left the organization at some
5 point while I was employed at Mallinckrodt.  I
6 don't recall specifically when.
7 Q    Okay.  And do you know if Kitcha
8 left --
9      Is it a -- I'm sorry.  Is it a male or
10 female?
11 A    Male.
12 Q    Okay.  Do you know if Kitcha left on
13 his own volition or if he was terminated?
14 A    Kitcha left on his own volition.
15 Q    Okay.  And was the performance of
16 Kitcha satisfactory during his employment?
17 A    Yes.
18 Q    Okay.  And, so, when you received this
19 email, did you respond to it in any way?  Do you
20 recall?
21 A    I don't recall responding to the email.
22 I may have, but I don't recall specifically.
23 Q    Okay.  And do you know if any
24 information in this email was incorrect?
25 MR. DAVISON:

Page 239

1      Objection to form.
2 MS. HERZFELD:
3 Q    Let me back up.
4 A    Okay.
5 Q    I'll ask you a more specific question.
6 A    Okay.
7 Q    Looks like some people might have heard
8 that there was a car allowance.  Do you know what
9 that was about?
10 MR. DAVISON:
11      Objection to form.
12 A    I had only recently joined the
13 organization.  When I did so, there had been -- I
14 learned that there had been recently internal
15 discussion of moving from leased company cars to
16 a car allowance or a lease management program
17 managed by Runzheimer.
18 Q    Okay.  It looks like that didn't
19 happen?
20 A    It did not.
21 Q    At least during your tenure.
22 A    While I was there.
23 Q    Sorry.  I didn't mean to talk over you.
24 That's my fault.  My apologies.
25      Okay.  And then it says, number 2,

Page 240

1 "Bonus payouts are next Friday."
2      Did you know anything about the bonus
3 payouts?
4 MR. DAVISON:
5      Objection to form.
6 A    Not at this time.  I had only recently
7 joined the company within days of this email, so
8 I did not know anything about the bonus payouts
9 by that point.
10 MS. HERZFELD:
11 Q    Okay.  And then number 3, it looks like
12 there's some introduction of you to the -- to the
13 group.
14 A    Yes.
15 Q    Okay.  And then, below that, it says,
16 "Folks, stay focused on Exalgo, Sumavel and
17 Pennsaid."
18      What is Sumavel?
19 A    Sumavel was a very small product in
20 comparison, and I don't -- I don't recall a whole
21 lot about Sumavel.
22 Q    Okay.  Do you know if it was an opioid
23 product?
24 A    I don't recall.
25 Q    Okay.  And Pennsaid, was that an opioid

Page 241

1 product?
2 A    No.
3 Q    Okay.  And but had "HQ" --
4      And I'm assuming that means
5 headquarters?
6 A    Yes.
7 Q    -- "worry about our launch plans."
8      Do you know what they're referring to
9 there with launch plans?
10 MR. DAVISON:
11      Objection to form.
12 A    I -- I can't speculate about what
13 Kitcha was speaking or was thinking about with
14 that statement.
15 MS. HERZFELD:
16 Q    Okay.  And then the next statement is,
17 "You only have one responsibility, sell baby
18 sell."
19      Did I read that correctly?
20 A    Yes.
21 Q    Okay.  And was that kind of the mantra
22 of the sales department?
23 MR. DAVISON:
24      Objection to form.
25 A    I'm not aware of a mantra.

Page 242

1  MS. HERZFELD:
2  Q      Was Kitcha incorrect when he said "You
3  only have one responsibility, sell baby sell"?
4  MR. DAVISON:
5       Objection to form.
6  A      I'm sorry.  You asked was he incorrect?
7  MS. HERZFELD:
8  Q      Was he -- I mean, was he correct?  Was
9  that right?  You have one responsibility, sell
10 baby sell?
11 MR. DAVISON:
12      Objection to form.
13 A      That's -- that's Kitcha's statement.
14 That was not a Mallinckrodt statement.  So I -- I
15 don't quite know how to answer your question.
16 MS. HERZFELD:
17 Q      Okay.  Did you respond at all to this
18 email?
19 MR. DAVISON:
20      Objection to form.
21 A      I don't recall having responded to it.
22 I may have.
23 MS. HERZFELD:
24 Q      Okay.  Do you recall having any
25 conversations about this email?

Page 243

1  A      I don't -- I don't recall.
2  Q      Okay.  If you'll just give me two
3  minutes to take a break.
4  VIDEOGRAPHER:
5       We are now going off the video record.
6  The time is currently 4:03 p.m.
7       (OFF THE RECORD.)
8  VIDEOGRAPHER:
9       We are now back on the video record.
10 The time is currently 4:07 p.m.
11 MS. HERZFELD:
12      Okay.  Miss Chick, we're back on the
13 record after a short break, and I don't have any
14 further questions for you.  Thank you for your
15 time today.
16 MR. DAVISON:
17      We have no questions.  Thanks.
18 VIDEOGRAPHER:
19      We are now going off the video record.
20 The time is currently 4:07 p.m.  This is the end
21 of media number 5 and the end of the deposition.
22      (Deposition concluded at 4:07 p.m.)
23
24
25

Page 244

1       C E R T I F I C A T E
2
3       I do hereby certify that the above and
4  foregoing transcript of proceedings in the matter
5  aforementioned was taken down by me in machine
6  shorthand, and the questions and answers thereto
7  were reduced to writing under my personal
8  supervision, and that the foregoing represents a
9  true and correct transcript of the proceedings
10 given by said witness upon said hearing.
11      I further certify that I am neither of
12 counsel nor of kin to the parties to the action,
13 nor am I in anywise interested in the result of
14 said cause.
15
16
17
18
       LOIS ANNE ROBINSON, RPR, RMR
19     REGISTERED DIPLOMATE REPORTER
       CERTIFIED REALTIME REPORTER
20
21
22
23
24
25

Page 245

1       E R R A T A   P A G E
2
3       I, STACY CHICK, the witness herein, have
   read the transcript of my testimony, and the same
4  is true and correct, to the best of my knowledge,
   with the exceptions of the following changes noted
5  below, if any:
6  Page/Line  Word/Words to be changed  Correct Word
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21
         _____
22       DEANNA STACY AYERS CHICK
23
24
25

Page 246

1          DECLARATION OF WITNESS

2

3          I, the undersigned, declare under penalty

4   of perjury that I have read the foregoing

5   transcript, and I have made any corrections,

6   additions, or deletions that I was desirous of

7   making; that the foregoing is a true and correct

8   transcript of my testimony contained herein.

9          EXECUTED this _____ day of _____,

10  2019, at _____, _____.
        (City)            (State)

11

12

13

14

15

        _____

16      DEANNA STACY AYERS CHICK

17

18

19

20

21

22

23

24

25