```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5   ------------------------------) MDL No. 2804

 6   IN RE:  NATIONAL PRESCRIPTION )

 7   OPIATE LITIGATION             )

 8   ------------------------------) Case No. 17-md-2804

 9   THIS DOCUMENT RELATES TO:     )

10   ALL CASES                     )

11   ------------------------------) Hon. Dan A. Polster

12

13                 HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16              VIDEOTAPED DEPOSITION OF

17                 KELLY JAMES BAKER

18

19                  January 24, 2019

20

21              Indianapolis, Indiana

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

**Page 2**

```
 1
 2
 3
 4
 5          The videotaped deposition of KELLY JAMES
 6   BAKER, called by the Plaintiffs for examination, taken
 7   pursuant to the Federal Rules of Civil Procedure of
 8   the United States District Courts pertaining to the
 9   taking of depositions, taken before JULIANA F.
10   ZAJICEK, a Registered Professional Reporter and a
11   Certified Shorthand Reporter, at the Indianapolis
12   Marriott Downtown, Texas Room, 350 West Maryland
13   Street, Indianapolis, Indiana, on January 24, 2019, at
14   9:03 a.m.
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS:
 3       MOTLEY RICE LLC
         28 Bridgeside Boulevard
 4       Mt. Pleasant, South Carolina 29464
         843-216-9250
 5       BY:  MICHAEL E. ELSNER, ESQ.
             melsner@motleyrice.com
 6
 7   ON BEHALF OF THE PLAINTIFFS:
 8       WEISMAN KENNEDY & BERRIS CO LPA
         1600 Midland Building
 9       101 Prospect Avenue
         Cleveland, Ohio 44115
10       216-781-1111
         BY:  DANIEL P. GOETZ, ESQ.
11           dgoetz@weismanlaw.com
12
     ON BEHALF OF CARDINAL HEALTH, INC.:
13
         ARMSTRONG TEASDALE LLP
14       7700 Forsyth Boulevard, Suite 1800
         St. Louis, Missouri 63105
15       314-621-5070
         BY:  SARAH E. HARMON, ESQ.
16           sharmon@ArmstrongTeasdale.com
17
     ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
18   INC.:
19       ZUCKERMAN SPAEDER LLP
         1800 M Street, NW, Suite 1000
20       Washington, D.C. 20036
         202-778-1800
21       BY:  R. MILES CLARK, ESQ.
             mclark@zuckerman.com
22
23
24
```

**Page 4**

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
     PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
 3   INC.:
 4       ARNOLD & PORTER KAYE SCHOLER LLP
         777 South Figueroa Street, 44th Floor
 5       Los Angeles, California 90017-5844
         213-243-4238
 6       BY:  JAKE R. MILLER, ESQ. (Telephonically)
             jake.miller@arnoldporter.com
 7
 8   ON BEHALF OF HBC SERVICES:
 9       MARCUS & SHAPIRA LLP
         One Oxford Centre, 35th Floor
10       Pittsburgh, Pennsylvania 15219
         412-471-3490
11       BY:  PAUL M. MANNIX, ESQ. (Telephonically)
             pmannix@marcus-shapira.com
12
13   ON BEHALF OF McKESSON CORPORATION:
14       COVINGTON & BURLING, LLP
         One City Center
15       850 Tenth Street, NW
         Washington, D.C. 20001
16       202-662-5531
         BY:  KEVIN KELLY, ESQ. (Telephonically)
17           kkelly@cov.com
18
     ON BEHALF OF WALMART INC.:
19
         JONES DAY
20       77 West Wacker Drive
         Chicago, Illinois 60601-1692
21       312-269-4164
         BY:  PATRICK J. BEISELL, ESQ. (Telephonically)
22           pbeisell@jonesday.com
23
24
```

**Page 5**

```
 1   ALSO PRESENT:
 2       KAITLYN EEKHOFF, Law Clerk,
         Motley Rice LLC
 3
         JOHN KNOWLES, Trial Technician
 4
 5   THE VIDEOGRAPHER:
 6       MR. ANTHONY MICHELETTO,
         Golkow Litigation Services.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

I N D E X
WITNESS:                               PAGE:
KELLY JAMES BAKER
      EXAM BY MR. ELSNER.................. 11
      EXAM BY MR. CLARK.................. 366

                   *****

           E X H I B I T S
CVS- BAKER EXHIBIT              MARKED FOR ID
No. 1    Kelly Baker | LinkedIn          13
No. 2    7/17/13 E-mail chain with       21
         attachment; CVS-MDLT1-000118931 -
         934
No. 3    9/27/06 DEA letter sent to CVS  55
         Indiana; CVS-MDLT1-000010552 - 555

No. 4    12/27/07 DEA letter sent to Dear 56
         Registrant; CVS-MDLT1-000013535 -
         536

No. 5    8/29/13 E-mail with attachment; 58
         CVS-MDLT1-000009821 - 847
No. 6    1/4/13 E-mail with attachment;  68
         CVS-MDLT1-000081372 - 373

No. 7    8/30/13 Item Review Report -    76
         Control Drugs; CVS-MDLT1-000010672
         - 757

No. 8    Controlled Drug - DEA Standard  92
         Operating Procedures Manual, last
         Revision date 4/18/13;
         CVS-MDLT1-000008572 - 635

Page 7

           E X H I B I T S (Continued)
CVS- BAKER EXHIBIT              MARKED FOR ID
No. 9    1/27/11 E-mail chain with       108
         attachments; CVS-MDLT1-000112597 -
         635
No. 10   3/26/12 E-mail with attachment; 117
         CVS-MDLT1-000109870 - 878

No. 11   Report titled VIPERx PDMR - High 133
         Priority; CVS-MDLT1-000074450 -
         454

No. 12   Store metric sheet;             141
         CVS-MDLT1-000080069
No. 13   CVS-MDLT1-000010302 - 363       155
No. 14   11/29/12 E-mail chain with      167
         attachments; CVS-MDLT1-000083064 -
         069
No. 15   7/16/12 E-mail with attachment; 171
         CVS-MDLT1-000112686 - 687

No. 16   9/7/12 E-mail; CVS-MDLT1-000008249 184

No. 17   3/13/13 E-mail with attachment; 198
         CVS-MDLT1-000009848 - 855
No. 18   4/4/13 E-mail chain with        202
         attachment; CVS-MDLT1-000111877 -
         879
No. 19   6/10/13 E-mail;                 208
         CVS-MDLT1-000009678

No. 20   6/11/13 E-mail chain;           211
         CVS-MDLT1-000009683
No. 21   Kelly Baker - Mid-Year Review - 214
         2013 (Finalized);
         CVS-MDLT1-000121559 - 560
No. 22   6/10/13 E-mail;                 222
         CVS-MDLT1-000014750

Page 8

           E X H I B I T S (Continued)
CVS- BAKER EXHIBIT              MARKED FOR ID
No. 23   6/10/13 E-mail chain;           223
         CVS-MDLT1-000030472 - 473

No. 24   6/10/13 E-mail;                 226
         CVS-MDLT1-000119953
No. 25   7/9/13 E-mail chain;            229
         CVS-MDLT1-000077946 - 948

No. 26   7/9/13 E-mail chain;            239
         CVS-MDLT1-000051586 - 588
No. 27   7/16/13 E-mail chain;           247
         CVS-MDLT1-000078116 - 119

No. 28   7/17/13 E-mail chain;           251
         CVS-MDLT1-000076114 - 117
No. 29   12/20/12 E-mail;                257
         CVS-MDLT1-000109775

No. 30   7/16/13 E-mail chain;           263
         CVS-MDLT1-000077910 - 911
No. 31   7/16/13 E-mail chain;           269
         CVS-MDLT1-000028615 - 617

No. 32   7/18/13 E-mail chain;           271
         CVS-MDLT1-000029478 - 479
No. 33   7/23/13 E-mail chain;           276
         CVS-MDLT1-000077953 - 954

No. 34   11/13/13 E-mail chain;          278
         CVS-MDLT1-000017255 - 258
No. 35   7/17/13 E-mail chain;           284
         CVS-MDLT1-000077973 - 974

No. 36   7/18/13 E-mail chain;           288
         CVS-MDLT1-000118897 - 898
No. 37   9/27/13 E-mail chain;           292
         CVS-MDLT1-000017250

Page 9

           E X H I B I T S (Continued)
CVS- BAKER EXHIBIT              MARKED FOR ID
No. 38   8/12/13 E-mail chain;           298
         CVS-MDLT1-000076095 - 096

No. 39   9/12/13 E-mail chain;           301
         CVS-MDLT1-000119704 - 705
No. 40   9/16/13 E-mail chain;           305
         CVS-MDLT1-000102845 - 846

No. 41   9/13/13 E-mail chain;           309
         CVS-MDLT1-000103068
No. 42   9/17/13 E-mail chain;           311
         CVS-MDLT1-000099708 - 709

No. 43   7/23/13 E-mail chain;           318
         CVS-MDLT1-000057777
No. 44   9/17/13 E-mail chain;           320
         CVS-MDLT1-000119935

No. 45   10/11/13 E-mail chain;          325
         CVS-MDLT1-000119938
No. 46   11/21/13 E-mail with attachments; 334
         CVS-MDLT1-000000409 - 420

No. 47   CVS Indianapolis, IN DC DEA Visit 337
         8/5 - 8/8/2013, Audit Report;
         CVS-MDLT1-000008389 - 395

No. 48   11/15/13 E-mail chain;          352
         CVS-MDLT1-000092932
No. 49   11/25/13 E-mail;                355
         CVS-MDLT1-000076135

No. 50   Closing letter from the DEA to CVS
         Indiana, signed 12/31/15;       363
         CVS-MDLT1-000008014 - 015

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    THE VIDEOGRAPHER: We are now on the record. My
2   name is Anthony Micheletto. I am the videographer for
3   Golkow Litigation Services.
4       Today's date is January 24th, 2019. The
5   time is 9:03 a.m. as indicated on the video screen.
6       This video deposition is being held in
7   Indianapolis, Indiana, in the matter of In Re National
8   Prescription Opiate Litigation for the United States
9   District Court for the Northern District of Ohio,
10  Eastern Division.
11      The deponent is Kelly Baker.
12      Will counsel please identify themselves
13  for the video record.
14      MR. ELSNER: My name is Michael Elsner from the
15  law firm of Motley Rice on behalf of Plaintiffs.
16      MR. GOETZ: Dan Goetz on behalf of the
17  Plaintiffs.
18      MS. HARMON: Sarah Harmon of Armstrong &
19  Teasdale on behalf of Cardinal Health.
20      MR. CLARK: Miles Clark from Zuckerman Spaeder
21  on behalf of CVS Indiana, LLC, CVS RX Services, Inc.
22  and the witness.
23      THE VIDEOGRAPHER: Counsel on the phone.
24      MR. MILLER: Hi. This is Jake Miller from

Page 11

1   Arnold & Porter on behalf of the Endo and Par
2   Defendants.
3       MR. MANNIX: Paul --
4       MR. KELLY: Kevin Kelly from Coving -- Kevin
5   Kelly from Covington & Burling on behalf of McKesson.
6       MR. MANNIX: Paul Mannix with Marcus & Shapira
7   on behalf of HBC Services.
8       THE VIDEOGRAPHER: Okay. Our court reporter
9   today is Juliana Zajicek.
10      Please swear in the witness.
11      (WHEREUPON, the witness was duly
12      sworn.)
13      KELLY JAMES BAKER,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as follows:
16      EXAMINATION
17  BY MR. ELSNER:
18      Q. Good morning. My name is Michael Elsner
19  and I represent the Plaintiffs in the action. I'm
20  going to be asking you some questions this morning.
21      A. Okay.
22      Q. Could you tell us your full name, please?
23      A. I am Kelly James Baker.
24      Q. And how old are you?

Page 12

1       A. I am 51.
2       Q. And where do you live?
3       A. I live in Frankfort, Indiana.
4       Q. Okay. How far is that from Indianapolis?
5       A. It's about an hour.
6       Q. Okay. And did you attend Ivy Tech
7   Community College?
8       A. Uh, yeah, so, yeah. Yeah.
9       Q. Okay. And what did you study when you
10  were there?
11      A. Computer infor -- I think they called it
12  computer information technology.
13      Q. Okay. Did you obtain a degree?
14      A. Yeah, I got an associate's, but I already
15  had a degree, so I never actually went through
16  graduation.
17      Q. Okay. And what year did you attend Ivy
18  Tech Community College?
19      A. It had to be about seven years ago. I
20  can't remember the exact date because it was -- it was
21  while I was home with my daughter.
22      Q. Okay.
23      A. I -- I -- I attended some classes, some
24  extra computer classes --

Page 13

1       Q. Okay.
2       A. -- to supplement what I already had.
3       Q. Was this before or after you started
4   working with CVS?
5       A. I think it was before.
6       (WHEREUPON, a certain document was
7       marked CVS - Elsner Deposition
8       Exhibit No. 1, for identification, as
9       of 01/24/2019.)
10  BY MR. ELSNER:
11      Q. I am going to just mark for you as the
12  first exhibit in the -- in the deposition, this is a
13  copy of your -- of your LinkedIn page. It may just
14  help us get through some of your background a little
15  bit, make it easier.
16      A. Oh, okay. Yeah.
17      Q. Do you recognize that?
18      A. Yeah, that looks like me. Yeah, that's a
19  terrible picture, but yeah.
20      Q. I don't think it is so bad. It is better
21  in -- in color. On the screen you can see that.
22      A. Oh, I -- I was actually holding the
23  camera, so...
24      Q. Okay. And did you write -- did you write

Page 14

1  this, your LinkedIn page?
2      A.   Yeah, I think so.
3      Q.   Okay.
4      A.   I don't look at it a lot, you know, but...
5      Q.   Okay.  I'm also -- you said you also --
6  you already had an associate degree.
7           You attended Purdue University as an
8  undergraduate, right?
9      A.   Yep, undergraduate and a graduate.
10     Q.   And a graduate, right.
11          And you -- what was your degree in as an
12  undergraduate?
13     A.   An undergraduate, it was considered
14  aeronautical engineering technology, AOT.
15     Q.   Okay.  And -- and then you got a master's
16  degree, is that right?
17     A.   Correct.
18     Q.   And what was your master's in?
19     A.   At the time they called it a master's of
20  science in business.  It is basically an MBA.  They've
21  changed the name now to an MBA, but then, Purdue being
22  a technical school, they wanted to give it a technical
23  connotation.
24     Q.   Okay.  And are you an engineer?

Page 15

1      A.   I am a quality engineer.
2      Q.   Okay.  And you got your master's degree
3  from Purdue between 1998 and 2001, does that sound
4  about right?
5      A.   No.  I graduated in '98.
6      Q.   You graduated in '98 --
7      A.   Right.
8      Q.   -- with the degree?
9      A.   Correct.
10     Q.   The master's degree?
11     A.   Correct.
12     Q.   Okay.  When did you graduate for your
13  undergrad?  And did you work in between or --
14     A.   I graduated in '94.
15     Q.   Okay.
16     A.   I went to work for a while, then -- only
17  about a year or so, then I decided to go back to
18  school.
19     Q.   Okay.  What did you do in that year?
20     A.   I worked for a local airport, started out
21  at a local airport in Frankfort --
22     Q.   Okay.
23     A.   -- as their mechanic, and then I went to
24  work for -- which is now a Rolls Royce but at the time

Page 16

1  it was owned by Allison Engine Company here in
2  Indianapolis, technical writer.
3      Q.   What -- what did you do when you finished
4  your MBA from Purdue, what was your first job?
5      A.   I went to work for Ford Motor Company.
6      Q.   Okay.  And what year was that?
7      A.   That was in '98.
8      Q.   And how long did you work for Ford Motor
9  Company?
10     A.   Well, ten years, but somewhere along the
11  line I became a Visteon employee because they die --
12  they divested their plant.  It just happened to be
13  where you were at at the time.  It wasn't -- real
14  similar to, like, Delphi and Delco situation.  I don't
15  remember where that delineation happened, just one day
16  your check said Ford, the next day it said Visteon.
17  But it was technically, it's the same people, same
18  place, everything, so...
19     Q.   And -- and they were -- what were they --
20  what were they doing, is this building automobile
21  plants?
22     A.   Yeah, automotive.
23     Q.   Okay.  And -- what were you doing for
24  them?

Page 17

1      A.   I did several different roles.  I went in
2  a college rotation program.  I did, like, logistics,
3  I -- I was an auditor for a while, traveled around
4  doing audits.  And then I came back to Indianapolis
5  plant, because I am from Indiana, and then I worked as
6  a quality engineer at that plant.
7      Q.   Is this all -- and -- and when you say "at
8  that plant," you mean -- is that Visteon?
9      A.   That -- it was an Visteon plant at the
10  time.
11     Q.   Okay.
12     A.   It -- it -- it is weird because it was all
13  staffed by Ford hourly people, Ford the union, and all
14  of that, and I was in the salary.  It got kind of
15  muddied.  It is hard to keep track of, but...
16     Q.   And is it fair to say you were -- you were
17  working sort of as a -- as a quality engineer and in
18  quality assurance, is that accurate?
19     A.   Correct.
20     Q.   Okay.  And then -- and then at some point
21  in -- and tell me if I'm wrong -- maybe July of 2007,
22  you started working for, is it Aerodyne Engineering?
23     A.   Aerodyne Engineering.
24     Q.   Okay.

Highly Confidential – Subject to Further Confidentiality Review

Page 18

1    A.   After --

2    Q.   And what did they do?

3    A.   They make components for aerospace

4 applications and gas turbines, some even energy.

5    Q.   Okay.

6    A.   It's a high -- kind of a high-end

7 engineering firm, pretty small.

8    Q.   And -- and were you again a quality

9 assurance --

10    A.   I was a --

11    Q.   -- manager?

12    A.   -- quality assurance manager.  I don't

13 know if you are familiar with ISO 9001.

14    Q.   I am not, but I see it indicated.

15    A.   You'll see it in places and you'll see it,

16 like, on the water company.  Anyway, it is quality

17 management system to be certified as a third-party

18 registrar.  I installed their system for them because

19 the -- their customer base was leaning on them to be

20 certified.

21    Q.   Okay.

22    A.   They are common in manufacturing.

23    Q.   And I saw that you worked there until

24 about March of 2009, does that --

Page 19

1    A.   Correct.

2    Q.   -- sound about right?

3       Okay.  And -- and then why did you leave

4 Aerodyne?

5    A.   They had a round of layoffs.  It was --

6 you know, like I say, it was kind of funny because --

7 well, not funny.  Being a small company, coming from

8 Ford, nothing moves on a dime, but when I got there in

9 March we were having a pizza party to celebrate their

10 previous year's record sales.  By the next month,

11 well, they were laying everybody off.

12       Yeah, so -- and so I got laid off.  And

13 I'll answer your next question.  I became a

14 stay-at-home dad at that time.

15    Q.   Okay.

16    A.   My wife was a pharmacist, she was

17 pregnant, and our baby was born maybe almost like

18 three weeks after I got laid off, so...

19    Q.   Okay.  And you said you're --

20    MR. CLARK:  And I'm sorry.  You can wait until

21 he asks the question before you answer it, but...

22 BY THE WITNESS:

23    A.   Well, I knew it.

24 BY MR. ELSNER:

Page 20

1    Q.   Well, in this -- in this background

2 questions it's pretty --

3    A.   It is like being on a job interview.

4    Q.   It is a different job, but yes.

5       You said your wife worked as a pharmacist.

6 For whom did she work?

7    A.   It's called Eskenazi Health.  It is the

8 state -- or not really state, but the city hospital.

9    Q.   Okay.

10    A.   It was -- it was called Wishard at the

11 time, but they got a grant, I think, of something and

12 they've changed the name.  It is downtown

13 Indianapolis.

14    Q.   Okay.  And how -- is she still working as

15 a pharmacist?

16    A.   Correct.

17    Q.   Where does she work now?

18    A.   I do not know.  She works in that system,

19 but I don't know where.  We are no longer married,

20 so...

21    Q.   Okay.  And so at some point in time in

22 around 2011 you started to do some work at the VA

23 hospital, is that right?

24    A.   Yeah, I -- I was part -- that was part of

Page 21

1 the Ivy Tech curriculum, you know, you do some

2 volunteer work.  I did some volunteer work for the VA

3 hospital in their IT department.

4    Q.   Okay.  And you did that through, what,

5 almost a year, is that right?

6    A.   I think so.

7    Q.   You know, I've -- I've got also -- why

8 don't we mark this as Exhibit 2.  This may be a little

9 bit easier.

10       (WHEREUPON, a certain document was

11       marked CVS - Elsner Deposition

12       Exhibit No. 2, for identification, as

13       of 01/24/2019.)

14 BY MR. ELSNER:

15    Q.   Mr. Kelly, this is a -- the front page is

16 an e-mail, but it is forwarding your resume back in

17 2013.  And if you turn to the second page, it's a copy

18 of the resume that you --

19    A.   Yeah --

20    Q.   -- gave CVS.

21    A.   Yeah.

22    Q.   Is that it?  Does that look about right?

23    A.   Yeah.

24    Q.   Okay.

Page 22

1    And it -- it lists, it says your current
2  work experience, the very first thing, Indianapolis
3  Veterans VA Hospital, is that right?
4    A.  Yeah.
5    Q.  Okay.
6    A.  And I wasn't being paid.  That was a
7  volunteer position.
8    Q.  That was a volunteer work.
9    A.  Yeah.
10   Q.  Okay.
11      And -- and then, how is it that you came
12 to be hired by CVS?
13   A.  I decided to return to the workforce and I
14 applied for a posting on LinkedIn, actually.
15   Q.  Okay.  What was the post for?
16   A.  I don't remember what it was called, it
17 has been so long ago.  It was for a type of analyst
18 position and, I think, talked about numbers and trend
19 analysis and my quality background.  It seemed like a
20 pretty logical fit, so I applied.
21   Q.  Okay.  Who did you interview with when you
22 were hired?
23   A.  When I was -- I interviewed with Aaron
24 Burtner and, oh, I can't remember the name, you'll

Page 23

1  bring her up, when you -- when you bring her name up
2  I'll -- I'll remember it, which was -- I think she was
3  his boss at the time.
4    Q.  His boss?  Pam Hinkle?
5    A.  Pam Hinkle, that was it.
6    Q.  That --
7    A.  That was, yeah, Pam Hinkle.
8    Q.  Okay.
9    A.  I think that was the only time I ever met
10 Pam.
11   Q.  And do you -- Aaron Burtner was your --
12 was he your immediate supervisor --
13   A.  Correct.
14   Q.  -- when you joined CVS?
15   A.  Yeah.
16   Q.  And was he a -- a suspicious order
17 monitoring analyst, do you recall?
18   A.  I don't know.
19   Q.  Or manager?
20   A.  I don't -- I didn't -- he was the manager.
21 I knew he had a manager role, I believe, and -- and
22 that's all I can remember.  I can't even --
23   Q.  Do you remember what Pam Hinkle's role
24 was?

Page 24

1    A.  No.  I -- like I say, she interviewed me
2  and I never saw her again after that.
3    Q.  Okay.  Did you interview with anybody
4  else, did you interview with Mark Nicastro or anybody
5  else?
6    A.  Not that I can remember, you know.  I --
7  not that I can remember.  All I remember, the one
8  interview, because I -- the only reason I re --
9  remember that is because I brought in all of my
10 statistical analysis slides from automotive and I was
11 showing him all of these little graphs and they're
12 like, Oh, wow, you know.
13   Q.  And at that point in time did you have any
14 experience working in -- with pharmaceuticals?
15   A.  With pharmaceuticals, no.
16   Q.  Okay.  And did you have any experience
17 with controlled substances, controlled drugs?
18   MR. CLARK:  Object to -- object to the form.
19   THE WITNESS:  What did you say?
20   MR. CLARK:  I -- sorry.  I objected to the form
21 of the question.
22   THE WITNESS:  Oh.  Oh.
23   MR. CLARK:  You can still answer.
24 BY THE WITNESS:

Page 25

1    A.  No.  You mean in a professional format?
2  BY MR. ELSNER:
3    Q.  I -- I don't mean did you take them
4  yourself.
5    A.  No, I didn't say -- that could be --
6    Q.  I mean in a professional sense, did you --
7    A.  No, no, no, no, really.
8    Q.  -- did you -- did you work at all with
9  controlled substances in any of your prior work?
10   A.  No, no.
11   Q.  All of your prior work was -- it's sort of
12 in engineering, wasn't it?
13   A.  Manufacturing, yes.
14   Q.  Okay.  All right.
15      And you worked at CVS from December
16 of 2012 through November of 2013, is that right?
17   A.  Apparently.  I don't remember.  I thought
18 it was something like six months.  It's such a flash
19 in the past, but I don't...
20   Q.  If -- if you look back to Exhibit 1, which
21 is your LinkedIn page, you put some -- you put some
22 dates here?
23   A.  Yeah.
24   Q.  And if you look at the CVS Health section,

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 which is on the second page.
2 MR. ELSNER: John, this is Exhibit 1.
3 BY THE WITNESS:
4 A. Yeah, that's what it says.
5 BY MR. ELSNER:
6 Q. You -- you -- you wrote here on your
7 LinkedIn page that it was between December 2012 and
8 November of 2013.
9 Does that -- is that accurate?
10 A. I think so.
11 Q. Okay. I mean, you -- you -- you did your
12 best to make your LinkedIn page as accurate as you
13 could?
14 A. Yeah, I did at that time, you know.
15 MR. CLARK: Mike, I just wanted to note for the
16 record I see here on this version that's printed out
17 of the LinkedIn page under the CVS, at the end there
18 is a -- it says "see more." I assume that the actual
19 LinkedIn page has further description.
20 MR. ELSNER: What we may try to do on a break is
21 we'll see if we can pull that out. I -- I thought it
22 was more complete, but I -- I don't think there is
23 much else there, but we'll get it printed out.
24 MR. CLARK: No, I just wanted to note it for the

Page 27

1 record.
2 MR. ELSNER: I understand.
3 BY MR. ELSNER:
4 Q. After you left CVS you started work as a
5 quality engineer -- engineer at Voestalpine, is
6 that --
7 A. Yeah.
8 Q. I'm sure I butchered that. How do you say
9 it?
10 A. Well, that's a European firm. It's
11 Voestalpine, I think. Well, we never knew. Somebody
12 said Voestalpine, who knows, you know, but -- but,
13 yeah, it's here in Lafayette.
14 Q. Okay. And what type of work did you do
15 for them?
16 A. Quality engineering.
17 Q. Okay. And -- and you were there for about
18 two years, is that right, 2012 to '14?
19 A. No, no, it wasn't very long. Because the
20 only reason I can remember -- true --
21 Q. Oh, you had --
22 A. -- the reason I left, they got hit by a
23 tornado.
24 Q. Oh.

Page 28

1 A. And it was even in the news. And it took
2 out half of the building, so our capacity went back
3 overseas, so I really had nothing to do.
4 Q. All right.
5 A. And then I went up to Peru.
6 Q. Okay. So on your ap -- on your LinkedIn
7 page just above CVS, it -- it lists that company and
8 it says November 2013 through May of 2014, so about
9 seven months, is that right?
10 A. Yeah, seven months, yeah, because I wasn't
11 there very long, I knew that.
12 Q. And then -- and then you started working
13 for -- on the first page, what is this company on the
14 bottom there?
15 A. That is Heraeus Miller. It's another
16 firm -- European firm. So it's Heraeus Electro Nite.
17 Q. I learned my lesson not to try to
18 pronounce it.
19 A. Yeah.
20 Q. I'm going to let you do that.
21 And you worked there from July 2014 to
22 November 2015?
23 A. Yeah. That's up in Peru, Indiana.
24 Q. Okay. And also as a quality engineer?

Page 29

1 A. Correct.
2 Q. All right. And why did you leave that
3 position?
4 A. Another -- they had a big round of
5 layoffs. Quality is typically overhead for most of
6 the companies, so there were years -- you get used to
7 be being on the chopping block. We are a cost center,
8 so. They closed a plant up in Pennsylvania. They
9 supported the steel industry, and so lacking in
10 economics, so, yeah, everybody was crunching at that
11 time, so. Which is probably more than you wanted to
12 know, but...
13 Q. How -- how many people got laid off
14 roughly?
15 A. Oh, I don't know. I know me and two other
16 engineers, and they closed the whole plant in
17 Pennsylvania and brought some of them down. But once
18 you're out, you're out. They -- you're out the door.
19 They don't let you come back in.
20 Q. Okay. And then -- and then it looks -- at
21 least according to your LinkedIn page there, the next
22 position here is as another quality assurance
23 consultant for Sommer Met -- Metalcraft, is that
24 right, on the --

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 　A.　Sommer Metalcraft.　Well, no, because,
2 see, I did some other jobs --
3 　Q.　Okay.
4 　A.　-- in that time.　Now, I --
5 　Q.　What -- what did you do between Heraeus
6 Electro or the company called --
7 　A.　I had some -- some contract hourly jobs,
8 you know, just to pay the bills.　I worked for the gas
9 company for a while, and a --
10 　Q.　Okay.
11 　A.　-- and that.　Now --
12 　Q.　And who else?
13 　A.　And I don't even remember all of them.
14 　　I also -- all of this time, and probably
15 for the last 15 years, maybe, I have been a motorcycle
16 safety instructor.
17 　Q.　Yes, I see that here.
18 　A.　I do that on weekends and the summer.
19 　Q.　Okay.
20 　A.　And so I kind of picked that -- you know,
21 I keep doing that during this time and...
22 　Q.　Is that a paid position?
23 　A.　Yes.
24 　Q.　Okay.　So you had -- you had a series

Page 31

1 of -- of contract jobs --
2 　A.　Yeah.
3 　Q.　-- from about November 2015 to
4 January 2018, does that -- or I guess May of 2008 --
5 or, no, January of 2018.
6 　　Does that seem right?
7 　A.　Well, nah -- yeah -- well, there were some
8 other -- yes, some quality jobs that didn't last very
9 long and, you know, contract like that.
10 　Q.　Okay.
11 　A.　Engineering.　Nothing to really --
12 suitable for the resume.
13 　Q.　All right.　And then -- and it has here
14 that you worked for this Sommer Metalcraft as a
15 qual -- this --
16 　A.　Yeah.
17 　Q.　-- again, as a quality assurance?
18 　A.　That's what -- that's my last role before
19 this role now.
20 　Q.　Okay.　And how long did you work there?
21 　A.　Three months.
22 　Q.　Three months.
23 　A.　Just --
24 　Q.　What happened there?

Page 32

1 　A.　They closed the plant.
2 　Q.　All right.
3 　A.　They were like, Hey, sorry, we thought it
4 was going to work out, but we are closing the plant,
5 so...
6 　Q.　Okay.
7 　A.　It was a family-owned business.
8 　Q.　All right.　And then -- then who do you
9 work with today?
10 　A.　FLIR.
11 　Q.　Okay.　And you started there in May
12 of 2018?
13 　A.　No.　I think it was closer to June.
14 　Q.　Okay.
15 　A.　June.
16 　　Yeah, there was a little bit of time off
17 in between.
18 　Q.　All right.　And -- and -- and what do you
19 do for them?
20 　A.　Quality engineer.
21 　Q.　Okay.　So all of your positions, except
22 for the one position at CVS, have generally been in
23 quality assurance or quality engineer, is that...?
24 　　MR. CLARK:　Object to the form.

Page 33

1 BY THE WITNESS:
2 　A.　I wouldn't say that specifically because
3 at Ford I did a little bit of everything.
4 BY MR. ELSNER:
5 　Q.　Okay.
6 　A.　I only -- I ended up in quality at the
7 tail end of my tenure at Ford.　You know, I did -- I
8 came in at quality rotation, I did some -- I did some
9 finance, some statistics -- or I -- I had an stint in
10 the finance department, I did some logistics, shipping
11 and receiving, I was supervisor of metrology.
12 　Q.　But -- but most of your jobs were as an
13 engineer?
14 　A.　Yeah --
15 　Q.　Is that fair?
16 　A.　-- that's what I recall.
17 　Q.　Okay.　And -- and you have a degree in
18 that, right?
19 　A.　Well, I have a general degree.
20 　Q.　But a master's degree?
21 　A.　Yes.
22 　Q.　Okay.　Let's go back to -- well, let me
23 say this:　What did you do to prepare for today's
24 deposition?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  You are not currently employed at CVS, is
2  that right?
3  A. No, no.
4  Q. Okay. And who contacted you to let you
5  know that you were going to be deposed in this case?
6  A. I believe it was Eric, initially --
7  Q. Okay.
8  A. -- through you.
9  Q. And -- and he is one of the lawyers that
10  represents CVS?
11  A. Correct.
12  Q. Is that right? Okay.
13  A. Via phone call.
14  Q. And what did he tell you that we were
15  going to -- the reason for your deposition?
16  Did you ask him?
17  A. Well, yeah. He just told me that I wasn't
18  being, and he said that we -- you need to be at --
19  deposed.
20  Q. Okay. Did --
21  MR. CLARK: And I'm --
22  MR. ELSNER: I'll try to be careful.
23  MR. CLARK: -- just going to object to -- yeah.
24  BY MR. ELSNER:

Page 35

1  Q. Did you --
2  MR. CLARK: And I just want to -- sorry, before
3  it's -- I'm just going to caution you not to testify
4  about the substance of the conversations you've had
5  with --
6  THE WITNESS: Yeah, yeah, yeah, yeah, exactly.
7  MR. CLARK: -- Mr. Delinsky or me.
8  BY MR. ELSNER:
9  Q. After you decided to use them, did -- did
10  they tell you that you could hire your own counsel if
11  you want or that you could come without a lawyer?
12  A. Did --
13  MR. CLARK: Object to the form.
14  And, again, I'm going to instruct you not
15  to testify about the substance of your conversation.
16  BY THE WITNESS:
17  A. Yeah, yeah, that's -- to my understanding,
18  that's privileged.
19  BY MR. ELSNER:
20  Q. Are you being compensated in any way to
21  appear here today?
22  A. Nope.
23  Q. Okay. Did -- did you talk with anyone
24  other than the lawyers for CVS about your deposition

Page 36

1  today?
2  A. No.
3  Q. Okay. No other former employees of CVS,
4  have you had any communication with them?
5  A. Uhn-uhn.
6  Q. No?
7  A. No, I mean, other than -- I -- Andy Eck is
8  a friend on Facebook, but we don't converse. I see
9  pictures of his kids, but that's...
10  Q. Okay. But did you talk to Andy Eck about
11  your deposition?
12  A. Nah.
13  Q. Did you talk to Andy Eck about the lawsuit
14  at all?
15  A. I don't think I talked -- I don't -- like
16  I say, I don't actually talk to him. I just put a
17  "like."
18  Q. Okay. You've just seen his -- you've just
19  seen his Facebook posts?
20  A. Yeah.
21  Q. Okay. Do you -- do you have any documents
22  at your house from the time you worked at CVS? Did
23  you keep any materials there?
24  A. No documents. I'm -- I may have a key

Page 37

1  chain, but that's it.
2  Q. A key chain?
3  A. Yeah.
4  Q. Okay.
5  All right. To prepare for your
6  deposition, did you speak with anyone other than
7  lawyers for CVS about the deposition?
8  A. I mean, I -- I told work I had to go do
9  this --
10  Q. Oh, sure.
11  A. -- you know, and that I won't be here
12  today, you know.
13  Q. Okay.
14  A. Other than that, I mean...
15  Q. And you met with counsel to prepare for
16  your deposition, is that right?
17  A. Correct.
18  Q. Okay. And who did you meet with?
19  A. Miles.
20  Q. And how -- how long -- how long did you
21  meet with Miles, how many days and how much time each
22  day?
23  MR. CLARK: Object to the form.
24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    A.  I don't know how long.  I just -- I know
2  by number of meals we had, which was four, so.
3  BY MR. ELSNER:
4    Q.  Four meals, okay.
5        So did you meet with him on multiple days?
6  You didn't eat four meals in one day, right?
7    A.  Yeah, yeah, yeah, it was usually a little
8  bit of time after work at the local LaQuinta Inn there
9  in Frankfort we'd sit down and...
10    Q.  Okay.  And so you'd have a meal and how
11  long would you talk, roughly?
12    A.  An hour or two.
13    Q.  An hour or two.
14        Did he show you documents, just yes or no?
15    A.  Yes.
16    Q.  Okay.  And did you review those documents?
17    A.  Yes.
18    Q.  Okay.  Did you meet with any other lawyers
19  representing CVS?
20    A.  Uhn-uhn.
21    Q.  Do you have any e-mails, text messages
22  with any -- anyone you worked with at CVS?
23  MR. CLARK:  Object to the form.
24  BY THE WITNESS:

Page 39

1    A.  Did I?
2  BY MR. ELSNER:
3    Q.  Do you?
4    A.  Do I.  Not normally.  I haven't talked to
5  anybody in a long time.  Now, I have -- I did get a --
6  a text from Andy, just one saying, Baker, is this
7  still your number?  I'm like, Uh, I'm like, Hey, you
8  know, and that was it.
9    Q.  Okay.
10    A.  Because I -- I really haven't talked to
11  anybody in a long time.
12    Q.  Okay.  You've never worked in a pharmacy
13  before, have you?
14    A.  No.
15    Q.  Okay.  And prior to joining CVS, you --
16  you didn't have any prior work experience with
17  controlled substances, did you?
18    A.  No, other than --
19    Q.  Okay.
20    A.  -- than being married, my ex-wife being a
21  pharmacist.
22    Q.  That is your only exposure, right?
23    A.  Yeah.
24    Q.  What -- did you -- did you understand that

Page 40

1  the position that you were going to be doing for CVS
2  was working as an analyst reviewing orders of
3  controlled substances?
4  MR. CLARK:  Object to the form.
5  BY THE WITNESS:
6    A.  I -- I don't remember actually doing it.
7  I mean, it's been so long ago.  The only thing I
8  remember of the job was being attracted to it because
9  it -- because it talked about, the description, as far
10  as trends and numbers and statistical or other, that's
11  a lot what -- a lot of that is apropos with quality
12  engineering.
13        We do a lot of statistical control, trend
14  analysis, X-Bar and R-Charts, you know, looking for
15  anomalies, special cause, common cause, and that's all
16  I remember, what drew me to the job.  I'm like, Oh,
17  that's something I could do.
18  BY MR. ELSNER:
19    Q.  Okay.  What -- what is your understanding
20  of what your position was when you joined CVS, not
21  when you were being interviewed, but once you were --
22  once you were hired?
23    A.  Well, what I can remember, and this is how
24  I describe it to everybody when I've interviewed since

Page 41

1  then, because coming from manufacturing, it sticks
2  out.
3    Q.  Right.
4    A.  And I said, I was analyzing drug orders,
5  looking for basically two things, if a store was
6  ordering more than they were dispensing, that means,
7  you know, somebody was stealing probably out the back
8  door, or for doctors who were overprescribing, you
9  know, then.
10        There was -- and this is the only other
11  thing that stuck out because I tell the story to
12  every -- in every interview.  One thing that drew my
13  attention, this is why I remember it, I was like, Wow,
14  this one patient was getting 900-milligrams a week for
15  something that should be 400-milligrams -- or
16  40-milligrams a month, like, What's going on.  And
17  when I called the pharmacist to investigate, it turned
18  out it was a -- the doctor was a vet, the patient was
19  a horse.  But that illustrates the anomalies of things
20  that would flag out of the normal.  And that's the
21  stuff that I was looking for.
22    Q.  Okay.  You -- you wrote in your LinkedIn
23  page that you were -- that you were -- you -- you
24  analyze -- if we go back to the LinkedIn page, this --

Page 42

1 the first bullet:
2      "Analyze trend and transaction data for
3 controlled substance transactions..."
4      We had it and now we just lost it.
5      MR. ELSNER: It is down under CVS, John.
6 BY THE WITNESS:
7      A. Yeah, yeah.
8 BY MR. ELSNER:
9      Q. Sorry. I'm just going to get it up on the
10 screen so that everyone can follow us.
11      "Analyze trend and transaction data for
12 controlled substance transactions for over 10,000
13 stores."
14      Is that -- is that what you wrote?
15      A. Well, yeah, I obviously wrote it, so...
16      Q. Okay.
17      And so what you were doing is you were
18 reviewing orders of controlled substances across all
19 CVS pharmacies around the country, is that right?
20      A. I believe so.
21      Q. Okay. And -- and you estimated here
22 that -- that they had about roughly 10,000 stores?
23      A. I thought it was 5,000, but I may be -- I
24 may -- at the time. I may have inflated it.

Page 43

1      Q. Well, regardless, but it was all the --
2      A. Yeah.
3      Q. -- it was all of the CVS pharmacies around
4 the country?
5      A. Yeah, right.
6      Q. Okay. You also wrote that you: "Target
7 shrinkage and illegal activities" and "Report findings
8 to the FDA."
9      What does that mean?
10      A. I don't know. I can't remember, to tell
11 you the truth.
12      I remember at the time trying to make this
13 sound -- make it understandable for non-people, you
14 know, because --
15      Q. So --
16      A. -- somebody from the factory would say,
17 what were you doing. I don't remember what that
18 meant, shrinkage. And like I say, I haven't did this
19 job for six years, so I don't know.
20      Q. No. I'm -- I'm just trying to understand
21 what you wrote.
22      So, were -- did you have any involvement
23 with -- with investigating illegal activities at CVS,
24 like thefts of controlled substances or anything like

Page 44

1 that?
2      MR. CLARK: Object to the form.
3 BY THE WITNESS:
4      A. No, I didn't.
5 BY MR. ELSNER:
6      Q. Okay.
7      You next write that you: "Developed
8 metrics and algorithms for the development of a
9 tracking system" with a budget of $650,000?
10      A. Yeah.
11      Q. What are you referring to here?
12      A. I -- I don't know where the numbers came
13 from. The only thing I can remember is I know at the
14 time, at the time I left, they were developing a newer
15 system for -- for SOM, you know, and so it was a nice
16 number to put in there, because otherwise, hey, this
17 is a -- it is not going to help me get a job anywhere
18 else, but yeah.
19      Q. Right. I mean, and you were -- you're
20 mainly focused on trying here in your LinkedIn page to
21 create something that would explain what you were
22 doing --
23      A. Yeah.
24      Q. -- for people who work in engineering

Page 45

1 and --
2      A. Yeah.
3      Q. -- in manufacturing, right?
4      The -- you -- you mentioned that you
5 developed metrics and algorithms for this new SOM
6 system, so just to put it in context --
7      A. No, not --
8      Q. Well, I thought you -- I thought in your
9 answer that's what you said. But regardless of what's
10 written, let me strike that.
11      When you started work at CVS, they had a
12 suspicious order monitoring system in place that you
13 worked on, is that right?
14      A. Um-hum.
15      Q. And they were developing a new suspicious
16 order monitoring system?
17      A. Yeah.
18      Q. And you also provided some consulting to
19 that?
20      A. I don't know if I consulted to it. I --
21 all I know is that was going on and they kept saying,
22 Hey, they are going to probably put a new system
23 together.
24      Q. Okay.

Page 46

1    A.    And all I did -- worked with is what Aaron
2  and I had.
3    Q.    Okay.  So let's focus on that part first.
4         When you first joined CVS, Aaron Burtner
5  was your boss.  He was your -- the manager.  And what
6  were you doing at that point in time?
7    A.    What I can remember doing is, all I can
8  tell you, is we'd come in and I'd do my -- my data
9  mining, my data dump -- dumps off of several
10 different databases, pulling transactional
11 information, and then we'd put it in there.  And when
12 I say "algorithms," what specifically we mined was one
13 of the reports Aaron had put -- developed or -- and I
14 tweaked a little, you know, you tweak a little bit, to
15 flag certain orders based on by red, yellow and green
16 to give you which ways to look at, you know.  The --
17 the bigger the discrep -- I --
18   Q.    I'm going to show you some of those and --
19   A.    Yeah.
20   Q.    -- we'll get into that so that it will
21 help refresh your memory.
22   A.    And I don't remember -- and some of this
23 was my professional background.  I know we like -- I
24 think what we like -- well, this is the order, this.

Page 47

1  What did they sell?  If there is a big disparity, it
2  would pop up red or something to help us kind of
3  visually get in there and maneuver the data.
4    Q.    So -- so you were -- you were trying to
5  work through a system that would identify orders of
6  controlled substances that -- that were suspicious?
7    A.    Suspicious.
8    Q.    Okay.
9         And -- and you were trying to develop
10 and -- and review printouts of all of the orders that
11 would be triggered as potentially suspicious by an
12 algorithm?
13   A.    I -- as printouts, the only thing I
14 remember as a printout, we got one printout, and the
15 only reason I remembered it, it came from a different
16 printer.  It was like a different type of computer
17 screen, you know, the old, and I had to walk a couple
18 of -- a few yards to a different area to pick it up.
19 But what I did with it, I don't remember.
20   Q.    This is -- this is the IRR report, is that
21 what you are talking about?
22   MR. CLARK:  Object to the form.
23 BY THE WITNESS:
24   A.    I guess.  I don't -- I don't remember.  I

Page 48

1  just know I picked that up, you know.  And I hadn't
2  uttered the word "IRR" in six years until we started
3  doing this.  And I remember it now because it rolls
4  off the tongue a little bit, you know what I'm...  But
5  what I did with it and what we did, I just cannot tell
6  you.
7  BY MR. ELSNER:
8    Q.    Okay.  But this is the report that -- that
9  it was kind of -- it had those holes on the side?
10   A.    Yeah, that was it --
11   Q.    It was big, giant paper?
12   A.    -- because it came from a separate
13 printer, I want to say Fortran, but it was an old Unix
14 system, it looked like.  It wasn't a Windows-based.
15 It rrr, rrr.
16   Q.    Right.
17        And -- and it -- and it was a -- it was
18 a -- it was a sort of a daily report, is that right?
19   A.    Yeah, I think.  I know I looked at
20 something daily, but -- because I had to go down and
21 get it, you know --
22   Q.    Okay.
23   A.    -- but somebody had to, anyway.  But the
24 only thing I basically remember is looking at my

Page 49

1  spreadsheets and -- and -- because I know I pulled
2  data in from the different -- more than one
3  database --
4    Q.    Sure.
5    A.    -- and put this in there and then we -- we
6  analyzed with the colors and there was stuff that
7  looked -- that really stuck out, looked suspicious,
8  then I would do my investigation.  You know, that's --
9  the reason is, that's how I detected the horse.
10   Q.    Okay.  Let's talk a little bit about the
11 training that you got when you first joined CVS.
12        Did -- who provided you training?  Was it
13 Aaron Burtner?
14   A.    Aaron trained me, if you will, on the job.
15   Q.    Okay.  And was there any other kind of
16 training, any kind of videos, computer programs,
17 manuals you reviewed?
18   MR. CLARK:  Objection to form.
19 BY THE WITNESS:
20   A.    I -- I know there was some -- the standard
21 safety.  I don't remember what training I had.  I
22 watched a lot of videos in the beginning, but so many
23 times, many different jobs, I'd -- I watch videos
24 about a job everywhere I go, you know, but yeah, there

Page 50

1 was.
2 BY MR. ELSNER:
3    Q.   Was -- was there a specific video on how
4 to handle controlled substances at CVS?
5    MR. CLARK:  Object to the form of the question.
6 BY THE WITNESS:
7    A.   I don't know.
8 BY MR. ELSNER:
9    Q.   You don't know?  Okay.
10    A.   I don't remember.
11    Q.   What was it that Aaron Burtner actually
12 trained you to do?
13    A.   Well, I don't think he had to train me how
14 to do the job because I came in there -- like I say,
15 the spreadsheets, the database, and I also have a
16 computer background, that was kind of my area anyway,
17 just kind of what we are trying to do, you know, how
18 we do it and explain some of his systems and how to
19 get into some of the databases, but as far as the data
20 analysis, I was already capable of that.
21    Q.   Did -- did he ever tell you that you were
22 working with controlled substances which are a special
23 kind of drug and that -- that there needed to be
24 certain protections concerning the distribution or

Page 51

1 sale of those drugs?
2    A.   Well, I mean --
3    MR. CLARK:  Object to the form.  I'm sorry.
4 BY THE WITNESS:
5    A.   -- that's kind of what we were there for,
6 I mean, were these drugs -- this was just -- this --
7 we were looking at these types.  But that's all I
8 knew, I mean, looking at this.  I didn't pick up on
9 controlled substance, you know.  I mean, I wasn't
10 there.  We were --
11 BY MR. ELSNER:
12    Q.   No, but I understand.  But -- but you knew
13 in this position --
14    A.   I knew they were a con -- a controlled
15 substance.  It says right at the top, but that --
16 that's what I knew.  It was controlled.
17    Q.   Okay.  Did you know that the -- that the
18 Federal Government had put in regulations on how -- on
19 the -- on the manufacturing and the distributing and
20 the sale of controlled substances?
21    MR. CLARK:  Object to the form.
22 BY THE WITNESS:
23    A.   No.  What I knew was that we had to be
24 doing what we were doing because the FDA mandated it.

Page 52

1 There was an FDA -- because there was -- I think the
2 FDA was coming in to do an audit at sometime along the
3 line.
4 BY MR. ELSNER:
5    Q.   Okay.  And did anyone ever share with you
6 any letters that the U.S. Government gave to CVS that
7 described the responsibilities of a distributor of a
8 controlled substance?
9    A.   Not that I recall.
10    Q.   Okay.
11    A.   I don't...
12    Q.   Did Aaron ever tell you that there was
13 a -- a crisis in the United States or a public health
14 concern in the United States about the misuse of
15 prescription drugs?
16    A.   At that time probably the only experience
17 I had was the Rush Limbaugh.
18    Q.   Tell me about that.
19    A.   Remember Rush Limbaugh got busted for
20 doing --
21    Q.   For --
22    A.   -- because he was addicted to prescription
23 something.
24    Q.   Oh, that's right.

Page 53

1    A.   Yeah.
2    Q.   And so you followed that?
3    A.   I knew -- well, I don't follow that.
4    Q.   But you heard it?
5    A.   I don't watch a lot of news, but, no, I
6 remembered it, you know.
7    Q.   Okay.  Did -- did -- did Aaron ever,
8 though, show you any manuals or information about --
9 about the purpose behind what you were doing and
10 the -- and the fact that there was a public health
11 crisis in the United States?
12    MR. CLARK:  Object to the form.
13 BY THE WITNESS:
14    A.   I don't know what Aaron showed me, no, I
15 mean, at that time, you know.
16 BY MR. ELSNER:
17    Q.   Okay.  Are you aware of whether there is
18 an opioid crisis in the United States?
19    A.   I'm -- I don't pay attention to it.  I
20 don't watch a lot of news.  No, I'm kind of a hermit,
21 you know.  I just -- until you guys come knocking on
22 my door, I was kind of blissfully ignorant, you know.
23    Q.   Okay.  What about when you were working at
24 CVS?

Page 54

1    A.   Well --

2    Q.   Did -- did anyone ever tell you that there

3 was an opioid crisis in the US?

4    MR. CLARK:  Object to form.

5 BY THE WITNESS:

6    A.   I don't know remember a world crisis.  I

7 know it was -- it was a controlled substance and we

8 were trying to control it.  You know, and that's -- I

9 was doing my job.  I was a numbers cruncher man.

10 I don't -- the politics are for other people.

11 BY MR. ELSNER:

12   Q.   No, I understand.  I'm not trying to ask

13 you about the politics.  I'm just trying to -- I'm

14 just trying to ask, did anyone explain to you what's

15 the purpose behind what we are doing, you know --

16   A.   Well --

17   Q.   -- what's the purpose to prevent people

18 from --

19   A.   -- I -- I don't remember.  It could have

20 been in the training.  I wouldn't want to say yes or

21 no because I just don't remember all of the stuff I

22 had.

23        I mean, obviously we are controlling it

24 for a reason, but I don't know how much of that is

Page 55

1 just me making, you know, intuition versus what I was

2 actually told, you know.

3        (WHEREUPON, a certain document was

4        marked CVS - Elsner Deposition

5        Exhibit No. 3, for identification, as

6        of 01/24/2019.)

7 BY MR. ELSNER:

8    Q.   I'm going to show you a letter that was

9 sent -- this is Exhibit 3.

10        This is a letter that was sent to CVS

11 Indiana.

12        Do you see that on the top left?

13   A.   Yeah.

14   Q.   And this was a letter sent by the

15 U.S. Government, the DEA in particular, and it was

16 sent to C -- to your employer CVS Indiana.  And I'd

17 like you to look at the first paragraph.

18        It says:

19        "This letter is being sent to every

20 commercial entity in the United States registered with

21 the Drug Enforcement Administration to distribute

22 controlled substances.  The purpose of this letter is

23 to reiterate the responsibilities of controlled

24 substance distributors in view of the prescription

Page 56

1 drug abuse problem our nation currently faces."

2        Did anyone at CVS ever show you this

3 letter or -- or --

4    A.   I don't know.

5    Q.   -- relay this information to you?

6    A.   I don't know.  I don't recognize this, so

7 I don't know.  I don't remember this.

8    Q.   Okay.

9        Did you understand that -- that under the

10 DEA regulations that CVS had an obligation as a

11 distributor to develop a system to detect suspicious

12 orders of controlled substances?

13   A.   I -- yeah, I think I said that earlier,

14 that that's why -- I knew that's why we were doing it,

15 the FDA required us to monitor.

16   Q.   Okay.

17   MR. ELSNER:  And can we see the second letter.

18        (WHEREUPON, a certain document was

19        marked CVS - Elsner Deposition

20        Exhibit No. 4, for identification, as

21        of 01/24/2019.)

22 BY MR. ELSNER:

23   Q.   Mr. Kelly, this is Exhibit 4.  This is

24 a -- another letter from the DEA a year later,

Page 57

1 December of 2007.

2        And if you look in the middle of the

3 second paragraph.

4    A.   Okay.

5    Q.   They cite to a code section.  And then

6 they say it:

7        "Specifically requires that a registrant

8 design..." -- and on the screen they are going to

9 highlight that for you.

10   A.   Yeah.

11   Q.   -- "...and operate a system to disclose to

12 the registrant suspicious orders of controlled

13 substances."

14        And then if you go down to the next

15 paragraph.  Or, sorry, the -- the one on the bottom of

16 the page.  It says:

17        "The regulation specifically states that a

18 suspicious order includes orders of an unusual size,

19 orders deviating substantially from a normal pattern,

20 and orders of an unusual frequency."

21        Did you understand that while you were

22 working at CVS that you were -- that a -- that the DEA

23 was requiring those who distribute controlled

24 substances to develop a system to detect suspicious

Page 58

1  orders --
2      A.   That --
3      Q.   -- orders of unusual size, deviating
4  substantially from a normal pattern and orders of
5  unusual frequency?
6      MR. CLARK:  Object to the form.
7  BY THE WITNESS:
8      A.   I don't know how to answer your question
9  specifically.  I know that's what I was doing.
10         I mean, just like the horse, you know, I
11 mean, that was an unusual size or frequency.  And I
12 knew we had to do -- what we were doing was part of
13 the FDA mandate, but whether I had seen this document,
14 I don't know.
15 BY MR. ELSNER:
16     Q.   Okay.
17     A.   I looked -- a lot of my other jobs I look
18 a lot of ITAR stuff, so.
19     MR. ELSNER:  Okay.  Let's look at Exhibit 299.
20         (WHEREUPON, a certain document was
21         marked CVS - Elsner Deposition
22         Exhibit No. 5, for identification, as
23         of 01/24/2019.)
24 BY MR. ELSNER:

Page 59

1      Q.   Mr. Kelly, this is Exhibit 5.
2      A.   A lot of dead trees.
3      Q.   This is an e-mail to you from Matt Murphy?
4      A.   Matthew, yep.
5      Q.   It is actually to Shauna Helfrich.
6          Who is she?
7      A.   Shauna was the other analyst that worked
8  under Aaron.
9      Q.   Okay.  And you're cc'd on this e-mail --
10     DEFENSE COUNSEL:  Is there a Bates number for
11 Exhibit 5?
12     MR. ELSNER:  Yes.  98 -- it is CVS-MDLT1 9821
13 through 9847.
14 BY MR. ELSNER:
15     Q.   And who is Matt Murphy?
16     A.   Well, he is vice president of Pharma --
17 Pharma Compliance Group.
18     Q.   And who is -- and who is that?
19     A.   Well, he was the consultant that came in
20 for -- for -- for he was a -- former FDA
21 investigator, I believe?  Or something.  He was an
22 agent for the F --
23     Q.   Okay.  And he -- was he --
24     A.   -- or DEA, one of the two, yeah.

Page 60

1      Q.   And so did he have his own company and --
2  and did CVS hire that company?
3          He wasn't an employee of CVS, right?
4      A.   No, no.
5      MR. CLARK:  Object to form.
6  BY THE WITNESS:
7      A.   He came in to consult for us.  I think
8  that -- that was, like, for -- when Aaron left the
9  company.
10 BY MR. ELSNER:
11     Q.   After Aaron left, he was one of the people
12 they brought in to help out?
13     A.   Yeah, that's right.
14     Q.   Okay.
15         I want you to -- he -- he -- the
16 attachment is:  "Behind the Prescription, Know Your
17 Prescriber," and they talk about pharmacy diversion,
18 and then it -- it has -- it has an attachment.
19         Do you see that?
20     A.   Okay.  Wait.  The a -- this is the
21 attachment, right, or --
22     Q.   Yeah, the next page is the first page of
23 the --
24     A.   Okay, yeah, I see the Pharma Diversion,

Page 61

1  yeah.
2      Q.   Okay.  And if -- if you go to the second
3  page there.
4      A.   Yeah.
5      Q.   Under the Introduction, it says, "Abuse of
6  pre-" --
7      A.   Oh, yeah.
8      Q.   Do you see where I'm at?
9      A.   Yeah.
10     Q.   It reads:
11         "Abuse of prescription drugs is an
12 epidemic facing this country and the world."
13         And then in the last sentence of that
14 paragraph, it says:
15         "But it's not just pill mills where
16 diversion of controlled substances occurs.  It happens
17 everywhere."
18         And it says:  "Even in the pharmacy
19 located in your local grocery chain."
20     A.   Um-hum.
21     Q.   Were you aware when you were working at
22 CVS that -- that there was an epidemic facing the
23 country and that -- and that pharmacies could be a
24 part of that epidemic in distributing controlled drugs

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  to people who shouldn't have them?
2      MR. CLARK: Object to the form.
3  BY THE WITNESS:
4      A.  I don't know anything about an epidemic.
5  I don't know what the cause of that or -- or what the
6  problem was. I knew it was a problem, but, I think,
7  yeah.
8  BY MR. ELSNER:
9      Q.  Okay.
10     A.  But as far as an epidemic, I don't. I
11 can't quantify that.
12     Q.  And if -- if you turn to Page 5 of the
13 document, which is on 9826.
14     A.  Oh, what's in front of me, you guys
15 couldn't -- couldn't just give me Pages 1, 2 and 3
16 or...
17     Q.  I wish. It would make life so much
18 easier, especially for Kaitlyn.
19         If you look at Page 5 of the document, it
20 starts "Due Diligence" on -- it's CVS-MDLT1 9826.
21     A.  Yeah, I've got it, yeah, "Due Diligence,"
22 yeah.
23     Q.  "Due Diligence," okay.
24         And then it reads:

Page 63

1         "Your pharmacists are your line of defense
2  against possible suspicious prescriptions."
3         Do you agree with that statement?
4      MR. CLARK: Object to the form.
5  BY THE WITNESS:
6      A.  I don't know if I agree with that because
7  one of the things -- where it kind of muddies me a
8  little bit is I was also married to a pharmacist at
9  the time and so I kept hearing a lot of stuff that she
10 was dealing with as well. I know they did a lot to
11 mitigate that. And here -- not relevant to here, but
12 that's kind of -- I got a lot of different stuff
13 floating around out there.
14 BY MR. ELSNER:
15     Q.  Well, one of the things that you were --
16 you were looking for in your job for suspicious orders
17 potentially was looking at whether there was a
18 physician prescribing the same narcotic pattern to a
19 group of people, right?
20     A.  Yes.
21     Q.  And -- and you were also looking at -- to
22 determine whether there were com -- dangerous
23 combinations of drugs prescribed together, right?
24     A.  Correct.

Page 64

1      Q.  That's referred to as -- have you ever
2  heard the phrase the -- the -- a cocktail drug?
3      A.  Cocktail, something like that.
4      Q.  Okay.
5      A.  Yeah, yeah, I'm sure we did that. I don't
6  remember that part, now that you mentioned it, but...
7      Q.  Okay. And you understand that there was
8  an obligation for distributors to know who their
9  customers were?
10     MR. CLARK: Object to the form.
11 BY THE WITNESS:
12     A.  I don't know if there was an obligation.
13 I -- like I say, I don't know about an obligation. I
14 know that the pharmacist that I knew, I was married
15 to, did that.
16 BY MR. ELSNER:
17     Q.  Well, I -- I'm asking a little bit
18 different question.
19         So, if you -- if you look at Page 6 of the
20 document, which is the next page, it says "Know Your
21 Customer" on top.
22         Do you see that?
23     A.  Um-hum.
24     Q.  Okay. And then -- and then it says in the

Page 65

1  second paragraph:
2         "The DEA is spearheading their 'Know Your
3  Customer' policy at all levels of the controlled
4  substance supply chain."
5         Were you -- were you aware that there
6  was -- that there were "know your customer"
7  responsibilities as a distributor of a controlled
8  substance to the pharmacy that you were distributing
9  to?
10     A.  I don't remember if it was specific --
11 whether or not it was a specific responsibility, or if
12 it was called out or -- but I knew -- I just remember
13 it being done, you know.
14     Q.  What do you -- when you say "being done,"
15 what do you mean?
16     A.  Like, I could call the pharmacist, that
17 was my first thing, I'd call the pharmacist: What do
18 you know about this doctor? And they'd go, Oh, yeah,
19 yeah. Or, No, no, no, we -- we don't prescribe to him
20 and that's why.
21     Q.  Okay. So you had the authority in your
22 job that if you saw something suspicious --
23     A.  Yeah.
24     Q.  -- that you could call a pharmacist --

Page 66

1    A.    Yeah.

2    Q.    -- and find out why?

3    A.    Yeah, I got right through, you know,
4 because...

5    Q.    And -- and this document was sent to you,
6 correct?

7    A.    Um-hum.  Oh -- oh, this one?

8    Q.    Yes.

9    A.    I don't know.  Well -- well, I guess,
10 yeah, I'm assuming it was, yeah.

11    Q.    Okay.

12    A.    I don't -- I don't recognize it.  I don't
13 remember ever seeing it, so.

14    Q.    But you -- your name is listed in the
15 e-mail, right?

16    A.    Yeah, so probably, but whether or not I
17 opened it, you know, I'd assume, but like I'm just
18 telling you, I can't remember.  I don't remember
19 hardly any of this stuff.

20    Q.    Well, usually when somebody would to
21 you -- send you something, you would read it, right?

22    A.    Yeah, well --

23    Q.    Maybe not.  Do you not?

24    A.    Well, not always, but, yeah, I would

Page 67

1 assume so.

2    Q.    When -- how soon after you joined CVS did
3 you begin to review IRR reports on your own?

4    MR. CLARK:  Object to the form.

5 BY THE WITNESS:

6    A.    I don't remember.  I -- maybe -- maybe
7 immediately, maybe weeks.  I don't remember.  I
8 just...

9 BY MR. ELSNER:

10    Q.    Well, there was some period you said that
11 Aaron trained you on the job, right?

12    A.    Yeah, he trained me, but I don't re --
13 what that training was, really, where do you get your
14 information, you know, how to log in and stuff.  The
15 analysis, I -- I -- I'm comfortable saying I can do
16 the analysis right off the bat, you know.

17    Q.    Right off the bat without any training?

18    A.    Yeah, well, I -- yeah, that's my training.
19 I mean, I've got a master's in that.

20    Q.    Okay.

21    A.    I mean, if you ordered ten but you only
22 solid five...

23    Q.    Okay.  So you -- you felt pretty much
24 without much training at all that you were capable of

Page 68

1 doing the job at CVS?

2    A.    Well, yeah, that was kind of my --

3    MR. CLARK:  Object to the form.

4 BY THE WITNESS:

5    A.    -- my background, you know.

6 BY MR. ELSNER:

7    A.    Okay.

8    MR. ELSNER:  I want to -- I want to take a look
9 at MR 318.

10         (WHEREUPON, a certain document was
11          marked CVS - Elsner Deposition
12          Exhibit No. 6, for identification, as
13          of 01/24/2019.)

14 BY MR. ELSNER:

15    Q.    This is Exhibit 6.  And this is an e-mail
16 from you to a large group of people dated January 4th,
17 2013, and the subject is "Control/PSE IRR dated
18 1/3/13."

19         Did I read that right on this front page?

20    A.    1/3/13.

21    Q.    Okay.  And if you go to the next page.

22    DEFENSE COUNSEL:  What was the exhibit?

23    MR. ELSNER:  81372 and 73.

24 BY MR. ELSNER:

Page 69

1    Q.    If you go to the next page, it's an --
2 it -- it says on the top, "Irregular Order - Logistics
3 Communication.  Submitted by:  Kelly Baker."

4         Did I read that right?

5    A.    Yep.

6    Q.    Okay.  What was this form?

7    A.    You know what, I don't re -- all I know is
8 it was kind of a sum -- I think it was a summary form,
9 but I can't remember.  I remember it was in a -- all I
10 can remember it was an Excel spreadsheet but we had to
11 send it as a PDF.  That's all I remember doing.  You
12 know, what...

13    Q.    Let -- let's take a -- let's -- let's go
14 through it -- a few more questions about it.  Maybe it
15 will help jog your memory a little bit.

16         If you see on the left-hand side of the
17 page, there is a whole list of -- of different cities.

18         Do you see that?

19    A.    Yeah.

20    Q.    Okay.  Are these the cities where CVS had
21 a distribution center that -- that was distributing
22 controlled substances?

23    A.    I would venture to say yes, I think so --
24 so, because, I know Indianapolis is on there, and the

Page 70

1 one that -- the only one I ever remember was
2 Woonsocket, because I wasn't going to go there, and
3 LaHabra, because it sounded funny.
4    Q.    Okay.
5    A.    So, yeah, I would say from there.
6    Q.    All right.  And so, do you see there is
7 like a checkmarks, it says:  "Control Yes"?
8    A.    Yeah, but the --
9    Q.    And then there is an "X" there next to
10 Indianapolis?
11    A.    -- the functionality behind that, what we
12 were doing, I don't remember.
13    Q.    Okay.  But you worked out of the
14 Indianapolis distribution center, right?
15    A.    Correct.
16    Q.    Okay.  And when -- as part of your job,
17 you weren't just reviewing orders of controlled
18 substances from Indianapolis, you were looking at
19 the -- the orders from all of the CVS pharmacies to
20 each of the distribution --
21    A.    Correct.
22    Q.    -- centers, right?
23    A.    My position was not physically tied --
24 well, maybe it was physically -- to the Indianapolis

Page 71

1 DCS.  It was not governed by that.  That just happened
2 to be where I was sitting.  And I could have been
3 sitting in Woonsocket.  I probably could have been
4 sitting in my house, you know, I mean.  That -- that's
5 just where it happened to be.
6    Q.    Okay.
7    A.    Does that make sense?
8    Q.    It does.
9         And so when you say it wasn't part of the
10 Indiana center, who -- who -- what -- what was the
11 chain of command?
12         So there was Aaron Burtner and then who
13 was above Aaron?
14    A.    I think --
15    MR. CLARK:  Object to the form.
16 BY THE WITNESS:
17    A.    I'm wanting to say Pam Hinkle was
18 Aaron's -- who Aaron reported to, I believe, and --
19 like I say.
20         And I know, like, Mark Nicastro was the
21 plant manager, but for the plant.  Now, we lived in
22 his house, so to speak.  So we -- you know, as far as
23 resources and -- and what we were doing and, yeah, and
24 he was a manager, but what he -- his day-to-day

Page 72

1 operations and our day-to-day operations weren't
2 really connected.
3    Q.    Okay.
4    A.    I mean, I think if I reported that
5 Indianapolis was doing something, I would handle it
6 with him the same way I was handling it for Woonsocket
7 except, you know, I could talk to him face-to-face.  I
8 couldn't anybody else, but...
9    Q.    All right.  So were you part of loss
10 prevention at CVS?
11    A.    No.
12    Q.    What -- what -- what part of CVS were you
13 part of?
14    MR. CLARK:  Object to the form.
15 BY THE WITNESS:
16    A.    I don't know, other than SOM.  You know, I
17 mean, really, we were --
18 BY MR. ELSNER:
19    Q.    You were kind of your own entity, right?
20    A.    Yeah, we were at the corporate level.  We
21 were like corporate finance or something.  We are at
22 the corporate level.  We affected everything that CVS
23 did, not just Indianapolis.
24    Q.    And -- and then at this time in January

Page 73

1 of 2013, it was you and Aaron Burtner doing this work,
2 is that right?
3    A.    At what time?
4    Q.    In January of 2013 when you started.
5    A.    Yeah, it sounds like when I first started,
6 yeah, it was me and Aaron.
7    Q.    Okay.
8    A.    I think.
9    Q.    Do you know whether you actually -- so, it
10 says here, this is on the top, it says:  "Irregular
11 Order - Logistics Communication."
12         Do you see that?
13    A.    Yeah.
14    Q.    Okay.  And then it says underneath that
15 the:
16         "Distribution Centers marked YES on the
17 Controlled" -- "on Control YES," and then it says
18 something about PSE, "or both will receive follow-up
19 communication with the specific store numbers related
20 to the irregular orders.  Distribution Centers marked
21 NONE indicates no orders were flagged."
22         So, was this a form that would be sent to
23 all of the distribution -- to the distribution
24 centers?

Page 74

1    A.   I -- I believe so.  That's was probably
2  who was in here in the -- because I know -- I remember
3  doing -- this is the form letter that we did every
4  day, you know.  We changed it what you did, so.  So --
5  so whoever was on here, it was just -- you just
6  re-sent that same group of people.  There is a few
7  people on here whose names I recognize, but most of
8  them I don't.
9    Q.   Right.  And so you would send this out
10  every day and you'd indicate whether or not that there
11  was an irregular order that you identified?
12    A.   Yeah, I think we might -- I followed up on
13  the store, made a call or something to someone.
14    Q.   Okay.  And we'll get to -- we'll get to
15  what you did with that, but I just want to understand
16  what the form is.
17      And then it says on the top:
18      "Two copies of this form must be printed
19  each day.  A teach" -- "Attach one copy to the control
20  IRR and one copy to the PSE IRR."
21      So, is it true that this form would --
22  then would be attached to the IRR if you completed it
23  as is noted on the top of the page?
24    MR. CLARK:  Object to the form.

Page 75

1  BY THE WITNESS:
2    A.   Yeah, I would think so.
3  BY MR. ELSNER:
4    Q.   Okay.
5    A.   And that's -- that's kind of where I
6  struggled with trying to answer this, like, well,
7  yeah, logic would induce me to say yes, but I don't
8  actually remember doing it, you know.
9      Does that make sense?
10    Q.   Well, it does, but do you have any reason
11  to believe that that's not what was done?
12    A.   See, that's what I'm saying, no, I don't
13  have any reason not to believe.
14    Q.   Okay.
15    A.   I just -- I just don't want you to
16  think -- you know, I just want to make sure I'm being
17  truthful.
18    Q.   Let me --
19    MR. CLARK:  I'm sorry, if you are moving on,
20  Mike, and is now a good time?  We've been on for
21  almost an hour.
22    MR. ELSNER:  Okay.  We can a break.
23    MR. CLARK:  Is that okay?
24    MR. ELSNER:  Yeah, that's fine.

Page 76

1    THE WITNESS:  Yeah, I've kind of got -- my hot
2  chocolate is going through me.
3    THE VIDEOGRAPHER:  We are off the record at
4  9:58 a.m.
5      (WHEREUPON, a recess was had
6      from 9:58 to 10:09 a.m.)
7    THE VIDEOGRAPHER:  We are back on the record at
8  10:09 a.m.
9      (WHEREUPON, a certain document was
10      marked CVS - Elsner Deposition
11      Exhibit No. 7, for identification, as
12      of 01/24/2019.)
13  BY MR. ELSNER:
14    Q.   Mr. Baker, I've marked this next document
15  as Exhibit 7.  It's 10672 is the first page of the
16  Bates number.
17      And this is a -- you were -- you were
18  talking about this printout --
19    A.   Yes.
20    Q.   -- that would come with these lines down
21  the slide.
22      Is -- is this a copy of what you kind of
23  recall is an -- is the report that you'd have to walk
24  over and grab from the printer?

Page 77

1    A.   It looks like it.
2    Q.   Okay.
3    A.   It looks like it.
4    Q.   And you see the date on the front of that
5  is August 30th, 2013?
6      Do you see that?
7    A.   Up -- yeah, yeah, 8/30, yeah.
8    Q.   Okay.  And that's -- you were working at
9  CVS then, right?  You were employed at CVS?
10    A.   Was I?
11    Q.   You were, yes.
12    A.   Okay.  Because I -- I'm -- dates, nah, I
13  don't get.
14    Q.   Okay.  That's fine.
15      If you turn to the next page, it -- it
16  says "Item Review Report - Control Drugs."
17      Do you see that?
18    A.   Yeah.
19    Q.   Okay.  So this is a copy of the -- of the
20  IRR for control drugs dated August 30th, 2013, right?
21    A.   Um-hum.
22    Q.   Okay.  And if you go to the third page,
23  there is a chart there.
24      Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  A.  Yeah.

2  Q.  Okay.  And -- and it has a number of
3  different items, right?  So there is a -- you know,
4  just by way of example, the first one there is a
5  "Zscore6range."

6  Do you see that?

7  A.  Yep.

8  Q.  And then it says, it:  "Gives the number
9  of standard deviations" --

10  A.  Yeah.

11  Q.  -- "the current monthly total lies from
12  the (prior) six month."

13  Do you see that?

14  A.  Um-hum.

15  Q.  Okay.  And then it -- and then it provides
16  a -- a model weight in the very last column.

17  Do you see that?

18  A.  Model weight, correct.

19  Q.  Okay.  And so the weight that we are going
20  to give to this six-month, whether there has been a
21  deviation in orders over the past six months, is a
22  1.045, right?

23  All right.

24  This first box, that's measuring the

Page 79

1  number -- the -- how the current order compares with
2  the last six-month order, correct?

3  A.  The -- wait.  You said this first box?

4  Q.  Yeah, the one we just read.  If you look
5  on your screen they are highlighted for you.

6  A.  Oh.  Oh, okay.  Yeah.

7  I'll have to stop you there because I
8  don't remember.  I don't know what this was meant --
9  was measuring or whatever.  I know -- I recognize Z.
10  That's a statistical term, you know, of standard
11  deviations, but other than that, I don't remember what
12  we did with this.

13  Q.  Okay.

14  Did you understand that -- that there was
15  a computer system in place at CVS and that computer
16  system was looking at all of the orders for controlled
17  substances and it was applying those orders through an
18  algorithm based on a number of different factors and
19  then it was scoring each order of a controlled
20  substance to give it a particular score?

21  Do you gen -- generally understand that?

22  A.  I know what you are talking about.  I --

23  MR. CLARK:  Object to the form.  Sorry.

24  BY THE WITNESS:

Page 80

1  A.  That sounds like what I was telling you I
2  did.

3  BY MR. ELSNER:

4  Q.  Okay.

5  A.  I mean -- I mean, yeah, basically, but as
6  far as what this did, I guess that makes logical
7  sense, but I don't remember.  I remember having to go
8  get this report, but that's all I remember with it.

9  Q.  Okay.  And if you look at the very bottom
10  of this chart after this long ris -- list of things,
11  it says, "Score."

12  Do you see that?

13  A.  Yeah.

14  Q.  And then it says the:

15  "Score decides if an order is irregular or
16  not."  And it says:  "If it's greater than a threshold
17  value," and then in parentheses it says, "(currently
18  .65) the order is flagged as irregular."

19  Do you see that?

20  A.  Um-hum.

21  Q.  And -- and then the model weight at the
22  end lists it again, ".65."

23  Do you see that?

24  A.  Yeah.

Page 81

1  Q.  So, is it correct that what was happening
2  was this algorithm would look at all of these orders
3  and it would give it a weight and if the threshold was
4  .65 or above, then it would be flagged as potentially
5  irregular?

6  MR. CLARK:  Object to the form.

7  BY THE WITNESS:

8  A.  I cannot comment if it was correct.  I
9  just don't remember what we were doing with this.  I
10  could read into that and, you know, do a statistical
11  analysis and find out what you are trying to do with
12  this, whether it was correct.  I -- I -- I hate to be
13  so difficult, but I just don't remember.

14  BY MR. ELSNER:

15  Q.  Okay.

16  A.  I just --

17  Q.  But --

18  MR. CLARK:  You are not -- you are not being
19  difficult.

20  BY MR. ELSNER:

21  Q.  You are not being --

22  So -- so what -- but that's what the
23  document says here at the bottom, right?  That --
24  that -- in the second column that the -- that the

Page 82

1 score decides if an order is irregular or not and if
2 it's greater than a threshold value of .65, the order
3 is flagged as irregular.
4         That's what it says, right?
5     A.   That's what that says.
6     Q.   Okay.  So you understand that when you
7 were doing your job, you weren't looking at every
8 single order for a controlled substance that came in.
9     A.   Oh --
10    Q.   The computer decided which ones --
11    A.   Well --
12    Q.   -- were potentially irregular that should
13 be looked at first?
14    A.   -- I don't know about what the computer
15 was doing.
16    Q.   Okay.
17    A.   You know, I'll decide it.  I don't
18 remember that part.  That's what I was doing when I
19 talked about that red, green, yellow.
20    Q.   Okay.
21        So -- so how did you use this report?
22    A.   I don't remember.  I just -- I just
23 don't -- I've had some serious head issues.  I have
24 traumatic brain injuries from a car wreck.  And so

Page 83

1 that's one of the reasons a lot of this stuff is just
2 gone, you know.
3     Q.   Okay.  When was that car accident?
4     A.   That was when I was in high school.
5     Q.   Okay.  So before you joined CVS?
6     A.   Yes, correct.
7     Q.   Okay.
8     A.   And I have -- like I said, I have
9 medical records, so I have a traumatic brain injury,
10 you know.
11    Q.   Okay.  I want to -- this particular
12 report --
13    A.   Yeah.
14    Q.   -- is broken up into two parts.  One is
15 the controlled substances and the other is the PSEs,
16 right?
17    A.   You are asking me to answer "right"?
18    Q.   Do you -- I mean, do you remember that
19 that -- do you know?
20    A.   No, I don't.  I -- the only reason I
21 remember this form is because of the --
22    Q.   Of the lines on there?
23    A.   -- of the type of printing it was.  And I
24 just remembered now, that, yeah, Joe used to bring it

Page 84

1 down, he would go get it, a lot of times.  And so then
2 until I read his name -- yeah, that's right, I had to
3 go get it when he wasn't in the house.
4     Q.   When he wasn't there, you had to walk and
5 get it?
6     A.   Yeah, that's what --
7     Q.   Okay.
8     A.   -- that's why -- I remember it.
9     Q.   Okay.
10        But do you understand that -- that at --
11 that at CVS that -- that -- that your job as a
12 suspicious order monitoring analyst and later as the
13 acting manager --
14    A.   I was never acting manager.
15    Q.   Okay.  Well, we'll get there and I'll ask
16 about that.
17        But as the -- as the analyst of the
18 suspicious order monitoring program, you understand
19 that you were not looking at every single order for a
20 controlled substance?
21    A.   Oh, like I say, I -- in the role that I
22 remember, I wasn't.  I was using my algorithm to put
23 them for color to target the ones that were most
24 suspicious to look at.

Page 85

1     Q.   Okay.
2     A.   So yes.
3     Q.   Okay.  So when you would get this report,
4 this report would identify --
5     A.   Okay.
6     Q.   -- which of the orders for controlled
7 substance met the algorithm for you to look at?
8     MR. CLARK:  Object to the form.
9 BY THE WITNESS:
10    A.   I don't -- I don't know.  I mean, as far
11 as -- I know what -- we got this form, but this --
12 this report is not what I remember doing.  I pulled my
13 own information out of the databases and ran a
14 spreadsheet based on that.
15 BY MR. ELSNER:
16    Q.   How did you decide -- before you -- before
17 you get to telling me what you did to investigate
18 whether it -- whether it was suspicious or not, how
19 did you decide which of the orders you would pull to
20 complete that deeper dive?
21    A.   Well, like I say, we had the algorithm
22 to -- well, we call it an algorithm -- to potentially
23 formatted the spreadsheet on color based on, I guess,
24 the three threshold values maybe.  So if there was a

Page 86

1 difference -- the deviation was more than this to
2 this, then it would be red. If it was this, it was
3 yellow.
4 I don't remember what the specific numbers
5 were. I think Aaron gave me those values over what he
6 was -- we were considering the threshold or whatever,
7 but that's, yeah, we pulled in and -- and sorted them
8 accordingly.
9 Q. Okay. Let's -- this report I'll represent
10 to you is -- is roughly about 200 orders of controlled
11 substances and is -- and sometimes these reports would
12 be larger and sometimes they'd be smaller depending
13 on -- on that day's orders, right?
14 A. Yeah, that would make sense.
15 Q. Okay. And so some days they would be
16 significantly larger, particularly at the end of the
17 month, than they would be at the beginning of the
18 month, is that true?
19 A. Yeah, that would --
20 MR. CLARK: Object to the form.
21 BY THE WITNESS:
22 A. I don't know if that's true, and it makes
23 logical sense. You know, I just don't want to -- I
24 want to be perfectly honest and I can't perfectly

Page 87

1 honestly say that's true.
2 BY MR. ELSNER:
3 Q. Did --
4 MR. CLARK: And I just -- for clarification,
5 Mike, when you said this report is 20 orders -- or
6 2 -- 200 orders --
7 MR. ELSNER: 200.
8 MR. CLARK: -- were you referring to the
9 particular exhibit or just --
10 MR. ELSNER: Yes, the controlled substance
11 component of the exhibit.
12 MR. CLARK: Thank you. And I object to the
13 characterization.
14 MR. ELSNER: Eric -- Eric -- Eric said he'd
15 stipulate to the fact that it was 200 orders or more,
16 so I was -- I was conservatively using your counsel's
17 stipulation here.
18 BY MR. ELSNER:
19 Q. I want to just pull one out. If you -- if
20 you look at the Page 10675.
21 MR. ELSNER: John, it is MR 278-4.
22 BY MR. ELSNER:
23 Q. And I'm going to have you look at the --
24 at the order at the bottom.

Page 88

1 Do you see that, Mr. Baker?
2 A. Yeah.
3 Q. On the screen we can kind of --
4 A. There is only one on there, isn't there?
5 I mean...
6 Q. Yeah. So the way -- so the way this
7 worked, just so you know, is that in the discovery we
8 weren't entitled to every order. We are only entitled
9 to the orders of controlled substance to look at for
10 the CVS stores in the jurisdiction that this case
11 involves.
12 Okay?
13 A. Okay. I understand.
14 Q. So the reason that's blacked out is
15 because that relates --
16 A. Got it.
17 Q. -- to a different store and a different
18 order, okay.
19 But I want -- I want to take a look at the
20 information that's contained here.
21 Do you see that the first column, it says
22 "Store Number"?
23 A. Um-hum.
24 Q. Okay. And you understand that every CVS

Page 89

1 had their own --
2 A. Yeah.
3 Q. -- specific store number, is it?
4 A. Yes, unique identifier.
5 Q. Okay. And then next it says
6 "Hydrocodone."
7 Do you understand that to be one of the
8 controlled substances --
9 A. Yes, that's the drug.
10 Q. -- that CVS distributed?
11 Okay. And, in fact, that's the drug that
12 you were most concerned about from a suspicious order
13 monitoring system, is that right?
14 MR. CLARK: Object to the form.
15 BY THE WITNESS:
16 A. I don't know. I don't remember. I -- I
17 was looking at drugs and...
18 BY MR. ELSNER:
19 Q. Did you know -- did you know that there
20 were some that had a higher priority than others?
21 A. I can't --
22 MR. CLARK: Object to form.
23 BY THE WITNESS:
24 A. I can't recall. I don't...

Page 90

BY MR. ELSNER:

Q.   Okay.  If you look next, it says "Item" and then there is a number there.

A.   Yeah.

Q.   Every drug has its -- has its own item number, is that right?

A.   Okay.

Q.   Yes?

A.   I see the number.  I don't know what that's for, I mean.

Q.   Okay.  And then there is a "Description" and it says: "Hydrocod 5/325 tablet"?

A.   Yeah, 5 -- obviously, I mean, that's a milligram or something...

Q.   And that -- that refers to the -- to the -- to the number of tablets and this -- and the dosage, right?

A.   Yeah.

Q.   Milligrams?

A.   Oh, okay, yeah, yeah, yeah, yeah.

Q.   Okay.  And then the next one is a "UPC/NDC" number.

That's a unique code for each drug, is that...?

Page 91

A.   Product code, yeah.

Q.   Okay.  And then there is a "Bill Quantity" and an "Order Quantity," in this case it was both six.

And then if you go down beneath, there is a -- what they call sort of a six-month lag score and a 12-month lag score.

Do you see that?

MR. CLARK:  Object to the form.

BY THE WITNESS:

A.   A Lag 6 and a Lag 12, is that what you are asking?

BY MR. ELSNER:

Q.   Yes.

A.   Okay.

Q.   And -- and -- and these were the -- these -- this was the information you were looking at to determine whether you should do a deeper dive on a particular order, is that right?

A.   I don't remember.

Q.   And you see there is a score there at the end, and it says ".97."

Do you see that, at the end of that line we were looking at?

A.   Oh, there.  Oh, okay.  It's not -- yeah,

Page 92

it's up there, okay.  Yeah.

Q.   And -- and -- and because that score is over .65, it got identified in this report, right?

MR. CLARK:  Object to the form.

BY THE WITNESS:

A.   You keep saying "right" and I don't -- I can't say "right" because I can't remember.  You are telling me and I'm learning from you.  If that's what you say, I'll --

BY MR. ELSNER:

Q.   Well, I'm trying to learn from you because this is your job.

A.   Well, then we are not going to get anywhere because I -- I'm sorry.  I just do not remember any of this.

Q.   When you were -- when you were looking at this report -- well, let me -- let me -- let me do something else.

MR. ELSNER:  Could we see MR 336.

(WHEREUPON, a certain document was marked CVS - Elsner Deposition Exhibit No. 8, for identification, as of 01/24/2019.)

BY MR. ELSNER:

Page 93

Q.   This is Exhibit 8.  The first page is the "Controlled Drug - DEA Standard Operating Procedures Manual" for the CVS distribution center.

Do you see that --

A.   Okay.

Q.   -- in the first column at the top?

A.   Yeah, this is a -- this is a CVS SOP basically, right?

Q.   Right.

A.   Okay.

Q.   And if you look at -- within the document at Page 8609?

A.   Way back there.

Q.   It is Roman Numeral VIII-5.

Do you see where I'm at?

A.   I don't see a Roman numeral -- oh -- oh, down here at the bottom of it.

Q.   Yep.

A.   Yeah, yeah.

Q.   Uh-huh.

And do you see there is a -- there is a paragraph there that says "Items Reviewed"?

A.   Oh, "Items Reviewed," okay.  Yeah.

Q.   Okay.  And it reads:

Highly Confidential – Subject to Further Confidentiality Review

Page 94

1    "CVS has established control drug order
2  thresh" -- "thresholds which flag on the IRR (item
3  review report) as well as the field loss prevention
4  Novistor (loss prevention software) reports. These
5  thresholds are the primary tool to prevent stores from
6  purchasing excessive or potentially suspicious control
7  drug orders. These thresholds are based on historical
8  trends of sales."
9        Did I read that correctly?
10   A.  You read it.
11   Q.  Okay.
12   A.  What I read, yeah.
13   Q.  It says here that this -- that these
14 thresholds to select orders for the IRR are the
15 primary tool used for suspicious order monitoring.
16       Do you agree with that?
17   MR. CLARK:  Object to the form.
18 BY THE WITNESS:
19   A.  I'm not --
20   MR. CLARK:  It slightly misreads the document.
21 BY THE WITNESS:
22   A.  I cannot agree -- I cannot agree or
23 disagree.
24 BY MR. ELSNER:

Page 95

1    Q.  Okay.
2        But this is the -- what the standard
3  operating procedures manual says for CVS, right?
4    A.  I will say that is what it says right
5  here.
6    Q.  Okay. And did you follow the standard
7  operating procedures at CVS while you worked there?
8    A.  I can't remember what we did then, no.
9  I -- I -- I've told you what I did and that's all I
10 can remember.
11   Q.  Well, did you do your best to try to
12 follow the procedures at CVS?
13   A.  I absolutely did. I felt like we did our
14 due diligence and we pursued.
15   Q.  And you tried to follow the policies that
16 they set at CVS, right?
17   A.  I tried to do what I was told to do.
18   Q.  Okay.
19   A.  I mean, I can't...
20   Q.  Okay. Did you know that -- that this is
21 the primary tool to review orders of controlled drugs
22 at CVS?
23   MR. CLARK:  Object to the form.
24 BY THE WITNESS:

Page 96

1    A.  I don't know what I did back then.
2  BY MR. ELSNER:
3    Q.  Okay.
4        If you turn to the next page, on Page 4 --
5  I'm sorry -- under --
6    A.  80 --
7    Q.  -- Paragraph 4.
8    A.  8610?
9    Q.  Yeah.
10       On the third line there, it begins:
11       "Each day, the network DC analyst shall
12 review the daily item review report."
13       And then it says:  "This report is an
14 analysis of all control drug order" -- "drug orders
15 within the prior 24 hours."
16       And -- and I think you testified that,
17 yes, that the IRR report would be a daily run of
18 all --
19   A.  Yeah.
20   Q.  -- the control drugs for the -- for a
21 particular day, is that right?
22   A.  I believe so.
23   Q.  Okay. And then it says:
24       "The report identifies orders that are

Page 97

1  statis" -- "statistically significant or that vary
2  from historical monthly trends based on the previous
3  six months as well as the current month."
4        Did I read that right?
5    A.  That sounds like what you -- what I saw.
6    Q.  Okay. And then it says:
7        "The network DC analyst has primary
8  responsibility for reviewing the report and
9  investigating all orders that may be excessive or
10 unusual."
11       Is that right?
12   A.  That's what it says.
13   Q.  Okay. And so is it true that that was a
14 component of your job, was to review this IRR report
15 to look for orders that were stat -- statistically
16 significant or would vary from historical monthly
17 trends based on the previous six months as well as the
18 current month?
19   A.  Obviously --
20   MR. CLARK:  Object to the form.
21 BY THE WITNESS:
22   A.  -- I was looking at this report.
23 BY MR. ELSNER:
24   Q.  Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    A.   Now, was I -- I'm not going to say I was
2  looking at statistical differences because that sounds
3  like what the -- the report was doing.
4    Q.   Right.
5    A.   And -- and obviously I was looking at it,
6  but what I did with it, I can't -- I'm not going to
7  com --
8    Q.   Okay.
9    A.   -- comment.
10   Q.   So -- so -- but what I'm trying to get at
11 is, is that you were -- you are looking at this report
12 and you are trying to identify which of these orders
13 you are going to do a further investigation, right?
14      You didn't -- every drug order you didn't
15 call a pharmacy and say, Hey, why did you order that
16 drug, right?
17   MR. CLARK:  Objection to the form.
18 BY THE WITNESS:
19   A.   No, I did not.  Now, I don't know if it
20 was based on this.  I'm not going to say it was
21 based off this because I don't remember what I did
22 with this.
23 BY MR. ELSNER:
24   Q.   Okay.

Page 99

1    A.   But what I did do, we -- we looked at the
2  troublesome and that's when we made our call.
3    Q.   Okay.
4       When you said you "looked at the
5  troublesome," how did you determine which -- which
6  order was troublesome and which one was not?
7    A.   Well, like I say, we used the -- all I
8  remember is I used the red, yellow, green, that we had
9  set it up to sort through the data to pick out what
10 was, you know, what was deviating and --
11   Q.   Okay.  Let's -- let's go through that
12 process.
13      So you'd get -- tell me -- tell me what
14 would happen.  You'd get -- would it be an electronic
15 spreadsheet or would you download data into an Excel?
16   A.   No, we -- we data mined it.  You do a data
17 dump.  I don't remember the -- I know it was more than
18 one database.  We'd pull transactional data in, a
19 couple of places, mix it together in -- in Excel
20 spreadsheet, and use the -- the -- the algorithms.
21      Really it was the situation -- or our
22 conditional formatting for the cells through
23 highlighting if the -- you know, if this value
24 deviated from the checked value -- or these

Page 100

1  transactional data difference from the checked or
2  whatever, whatever it was, then it would highlight it
3  in a color to be how much it was deviated.
4       And that's what I would look at.  Because,
5  like I say, to me what sticks out in my mind is the
6  colors, not what I -- you know, not the information
7  that I was doing.
8    Q.   Okay.  Did -- did -- was there a program
9  set up in place that would automatically color code
10 those items --
11   A.   We had --
12   Q.   -- or did you --
13   A.   -- we had an al --
14   Q.   -- physically have to do it?
15   A.   We had an algorithm set up and you could
16 just dump that information into that same -- you know,
17 paste it and the formatting would -- would -- would
18 stay for the cells.  So you'd copy that -- the
19 template over and you'd dump your data into that
20 template.
21   Q.   And then you'd sort it, right?
22   A.   Well, yeah, it would sort for you,
23 basically.
24   Q.   Okay.

Page 101

1    A.   And show you this is what was different
2  and...
3    Q.   And what -- and -- and then how would
4  it -- what -- what would be -- how would it sort?
5  Would all of the red ones be on top and then the green
6  ones and the yellow ones or the yellow ones in the
7  middle?  How did -- how did it do that?
8    A.   You would -- you can sort it however you
9  want.  It is a spreadsheet, you know.
10   Q.   How did you sort it?
11   A.   I don't remember.  I mean, I -- I don't --
12 I don't remember.  I just know -- I remember looking
13 at colors and saying, Hey, there is red, we looked at
14 that.
15   Q.   I understand it has been some years.
16   A.   I probably sorted it many different ways
17 to, you know, see what popped out, you know --
18   Q.   Okay.
19   A.   -- what would help.
20   Q.   Okay.  Through this sorting process that
21 you were engaged in, you would -- based on -- based on
22 how it was sorted and the color coding that it gave --
23 now, did you give it the color code or did the
24 computer already automatically make the color?

Page 102

1     A.   Well, like, see, that was built into
2  the -- the formatting.  It was just a spreadsheet.
3  And it would -- so it was already built into the --
4  like I say, the -- the algorithm was built in there.
5  And it was almost, like, you could sort and you
6  filtered based off of that.
7     Q.   Okay.
8     A.   What you are trying to look at.
9     Q.   And then from the orders that were in that
10 spreadsheet, would you use all of the ones that you --
11 that were color coded as red as the ones you'd do the
12 deeper dive, would you do the yellows, and how many a
13 day would you --
14    A.   I --
15    Q.   -- do a deeper dive on?
16    MR. CLARK:  Object to the --
17 BY THE WITNESS:
18    A.   Honestly, all I remember --
19    MR. CLARK:  Object to the form.  Sorry.
20    THE WITNESS:  Huh?
21    MR. CLARK:  I'm sorry.
22 BY THE WITNESS:
23    A.   All I remember is the horse story.  That
24 kind of ex -- because I've told that several times.

Page 103

1  That's an -- it illustrated what I was doing.  That
2  stuck out.
3        How it stuck out, why it stuck out, I
4  don't remember.  What color it was, I don't remember,
5  but I called and that illustrated what I would do on a
6  daily basis.
7  BY MR. ELSNER:
8     Q.   Because it was an excessive size of an
9  order?
10    A.   It was an anomaly.
11    Q.   Right.
12        And that -- and that's essentially what
13 you were trying to do was to pull out --
14    A.   Yes, it was the outliers, anomaly.
15    Q.   -- the anom -- the outliers and anomalies
16 and then when you identified -- what -- what criteria
17 were you looking at to identify the anomaly?
18        How did you pick that one?
19    MR. CLARK:  Object to the form.
20 BY THE WITNESS:
21    A.   I don't remember what we were using.  I --
22 you were comparing some -- one value to another value
23 and I can -- I don't want to guess because I could be
24 wrong, you know, but I -- yeah, obviously I was

Page 104

1  comparing something to something.
2  BY MR. ELSNER:
3     Q.   Well, what I want you to do is to do
4  your -- the very best job you can to remember the
5  criteria that you were using.
6        Did you consider the size of the order
7  compared to prior orders from that store over six
8  months and 12 months?
9     MR. CLARK:  Object to the form.
10 BY THE WITNESS:
11    A.   I don't remember the -- like I say, the
12 only thing I remember is because, I explain it to
13 people, you are looking for if a store ordered more
14 than it was giving out, where was it going.  And
15 that's about the only thing I can remember.
16        I mean, what you are saying is making
17 sense, it sounds like something you should probably
18 do, but I can't say that I did or did not do it, you
19 know.  I just can't remember.
20 BY MR. ELSNER:
21    Q.   I do -- I do try to make sense.  I'm
22 rarely successful --
23    A.   Yeah, no, and I --
24    Q.   -- but I do -- I do try.

Page 105

1     A.   -- I understand what you are trying to get
2  at here and I -- I understand.
3     Q.   Well --
4     A.   I'm not trying to be difficult.  I just
5  don't want to say something I don't remember.
6     Q.   All I want you to do today is let's work
7  together to try to extract the things that you can
8  remember and I'll try to do my best to show you some
9  things to help you to try to remember and then -- and
10 then you'll do your best to try to tell me what you
11 remember.
12        If we went back to this IRR report that we
13 looked at, the -- the -- the document with all of
14 the -- the lines down the side, right?
15    MR. CLARK:  Which exhibit is it, Mike?  Seven?
16    THE WITNESS:  Seven.
17    MR. ELSNER:  Seven.
18    THE WITNESS:  See, you'll have to look at me
19 pretty soon.
20 BY MR. ELSNER:
21    Q.   And if you look at -- if you look at
22 Page 10744.
23    A.   10 -- ooh, okay.
24    Q.   It is near the very back of the document.

Page 106

1   A.  Yeah.

2   Q.  On the very top there are also some

3 numbers, MR 278-73.

4   A.  MR.

5     Okay. Where are you at?

6   Q.  Are you with me?

7   MR. ELSNER: If you go to the bottom of that

8 page, John.

9 BY THE WITNESS:

10   A.  Yes, I see.

11   MR. ELSNER: If you go -- if you can -- yeah.

12 BY MR. ELSNER:

13   Q.  So this is a -- this is a particular

14 order --

15   A.  Yeah.

16   Q.  -- for a -- for Store 8740 and there was

17 an order of hydrocodone --

18   A.  Uh-huh.

19   Q.  -- that was flagged, okay.

20     And if you -- and you see that it has this

21 score in the third line and it's "1"?

22     Do you see that?

23   A.  Um-hum.

24   Q.  Okay. And then if -- and then you see

Page 107

1 that it has underneath that these various lags, Lag 1,

2 Lag 2, Lag 3, Lag 4?

3   A.  Yeah.

4   Q.  All right. And -- and there is 12 of

5 them. And -- and these lags relate to the prior

6 12 months orders of that drug from this store.

7     Now, the system flagged this as

8 "potentially suspicious." And part of your job was to

9 look at this and say, Okay. Am I going to do

10 something more or not with respect to this order.

11     And so one of the things that I want to

12 ask you if you looked at is: Did you look at these

13 various monthly lags to see if this order was

14 particularly suspicious that I should do a deeper

15 dive?

16   MR. CLARK: Object to the form.

17 BY THE WITNESS:

18   A.  I don't remember. Like I say, really, I

19 don't -- hopefully something pops up, but I don't

20 remember what we were doing. I can kind of vaguely

21 now remember circling something, but, you know, that's

22 it. That's all I remember.

23 BY MR. ELSNER:

24   Q.  When -- okay. So, tell me what that

Page 108

1 memory is. So when you would go through this, you

2 would circle certain ones?

3   A.  Well, I don't know. I just remembered I

4 did something with this, but -- we looked at it, but

5 what we did with it, I don't remember.

6   Q.  Okay.

7   MR. ELSNER: Can I see MR 333.

8   THE WITNESS: I'm going to take my sweater off.

9   MR. ELSNER: Why don't we go off the record for

10 a second.

11   MR. CLARK: Yeah, let's just go off for a

12 second.

13   THE VIDEOGRAPHER: We are off the record at

14 10:36 a.m.

15     (WHEREUPON, a recess was had

16      from 10:36 to 10:38 a.m.)

17   THE VIDEOGRAPHER: We are back on the record at

18 10:37 a.m.

19     (WHEREUPON, a certain document was

20      marked CVS - Elsner Deposition

21      Exhibit No. 9, for identification, as

22      of 01/24/2019.)

23 BY MR. ELSNER:

24   Q.  Okay. Mr. Baker, I'm going to show you

Page 109

1 Exhibit 9.

2   A.  Okay.

3   Q.  All right. And this is an e-mail from

4 Pam Hinkle, who we mentioned earlier in the

5 deposition --

6   A.  Okay.

7   Q.  -- to Frank Devlin. And this is before

8 you joined CVS. This is in January of 2011.

9   A.  Okay.

10   Q.  And the subject is: "IRR Narratives."

11 And then the -- there is an attachment and on the

12 front it says: "Reviewing Suspicious Orders on the

13 Control IRR Report."

14     Do you see that in the -- in the

15 attachment?

16   A.  Yep.

17   Q.  Okay. And then -- and then in the

18 attachment, if you go to the third page of the

19 document.

20   A.  Yeah. Components of the IRR report.

21   Q.  Okay. "Components of the Control IRR

22 Report." And then it reads:

23     "The Control IRR Report is the list of

24 controlled substances which are labeled as being

Page 110

suspicious."
Did I read that right?
A. Um-hum.
Q. Okay. And then it says:
"The components of the report include: The store number, the item number, description of the item in question, UPC/NDC Number," and we -- we saw some of those in the report?
A. Yeah.
Q. "The unit of measure, the month-to-date order quantity, and the Lag 1, 2 and 3."
Do you see that?
A. Um-hum.
Q. Okay. And then if you look at the bottom of that first -- of that pare -- of that paragraph, it is sort of the last sentence, it says: "The month-to-date order quantity."
Do you see that?
That -- that states the amount of the item in question ordered during the current month, right?
And then Lag 1 is the amount ordered the month before. Lag 2 is the amount ordered two months before, and Lag 3 is the amount three months before, right?

Page 111

A. Okay.
Q. And we saw 12 of those lags when you were doing this review, correct?
A. Correct.
Q. Okay. And then underneath that it says the: "Process of Identifying Suspicious Orders." And it reads:
"In order to determine which items on the control IRR report are suspicious, the order quantity field is observed by the DC IRR analyst for a quantity ordered of ten or more. The month-to-date field is then observed and compared to Lags 1, 2, and 3. If the month-to-date quantity is at least three times greater than the quantities in Lag 1, 2, or 3, then the item is labeled as being suspicious."
Did I read that right?
A. Um-hum.
Q. Okay. Is it true that you were comparing the particular order in question, as this memo states, to determine whether the quantity ordered is of ten or more in the first line?
Do you recall doing that?
A. I can't tell you if that was true. I don't remember doing it. Plus this document is before

Page 112

I was there. I'm not on it. I don't know. I mean, I -- I can't -- I'm not going to say this document was linked to anything I was doing. I wasn't -- this document is before I was there.
Q. Okay. But we saw that some of those fields are the same --
A. Yes, the fields are the same.
Q. -- and the IRR report is the same. And I -- and I acknowledged to you upfront that this was a document before you arrived. I'm just trying to see if this jogs your memory as to --
A. No, it doesn't really jog my memory.
Q. -- whether the order was --
A. I can look at this and start to understand what the trends say and what they are -- you know, how they are developing their algorithm, but that's kind of my background, but as to what I -- what I did with this, I don't know.
Q. Okay. So, were -- were you looking at the -- this -- this -- this memo says that for a quantity ordered ten or more, ten times more, that it would highlight a certain way. And then it says:
"The month-to-date field is then observed and compared to Lags 1, 2 and 3. And if the

Page 113

month-to-date quantity is at least three times greater than the quantities in Lags 1, 2, or 3," then that was being labeled as suspicious.
Do you recall whether that's the system you were using when you were --
A. No.
Q. -- doing suspicious order monitoring?
A. I mean, I don't know. If that's -- was still in place, is that the most current document? I mean, that's what I would ask, just being that -- is that the version that was in place when this was going on? I don't -- I don't know, you know, I mean.
Q. Well, that's what I'm trying to ask you is -- is what those -- what that criteria was?
A. I can't -- I don't think I even got into really analyze the lags that much. That was more -- I think that was built into the program or...
Q. Well, certainly the -- the -- those factors were built into the program to determine whether it met a threshold that it would appear on the IRR report, but my question is, is, would you look at those to determine which of the orders in the IRR report you'd do a deeper dive on?
A. I really don't -- can't tell you what I

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 did with this report.
2     Q.   Okay.
3     A.   This report just doesn't -- I mean, other
4 than the holes on the side, doesn't really bring much
5 about.  More -- more to me it makes -- I can get a
6 handle on what I did with my spreadsheet.
7     Q.   Wait.  What you did with your spreadsheet?
8     A.   The spreadsheet I was -- you know, we were
9 up there doing the colors, I call that my -- that was
10 the stuff that I was actually inserting things.
11     Q.   And -- and what fields were on the
12 spreadsheet you were looking at?
13     A.   I don't remember now.  I don't know.  I
14 real don't.  I mean, that's -- that was six years ago.
15 All I know is it was red, yellow, green or not at all.
16     Q.   And -- and -- and the system predetermined
17 what was red, yellow and green or did you determine
18 what was red, yellow or green?
19     A.   Oh --
20     MR. CLARK:  Object to form, asked and answered.
21 BY THE WITNESS:
22     A.    -- the algorithm we put into it
23 determined.
24 BY MR. ELSNER:

Page 115

1     Q.   Okay.  So --
2     A.   It wasn't a program.  It was just an Excel
3 spreadsheet that we configured to -- to flag certain
4 conditions.
5     Q.   Okay.
6     A.   Additional formatting.  Anybody can do it.
7     Q.   Okay.  Let me see if I've got this right
8 as I understand it.
9          The IRR information would come to you as
10 the SOM analyst and you would get that data in an
11 electronic form and there would also be a printout and
12 then you would sort that in some way and the system
13 would identify from those orders what was red, yellow
14 and green based on the algorithm you created?
15     A.   No, no, no.
16     MR. CLARK:  Object to form.
17 BY THE WITNESS:
18     A.   No.  What -- what happened with this, I
19 can't remember.  That wasn't -- because this was
20 already in a paper format.
21 BY MR. ELSNER:
22     Q.   Okay.
23     A.   This was already said and done.  I can
24 look at this and tell you this was -- this is a

Page 116

1 report.
2          What I did, what I can remember doing was
3 I did data mining, if you will, pulled data out of a
4 couple of different databases.  I can't even remember
5 the names.  And -- and you pull that raw data, which
6 would be numbers in the field, you know, and then you
7 put those into the spreadsheet that Aaron and I used
8 that was already set up for con -- formatting,
9 conditional formatting.
10          We would take whatever -- you know, I can
11 sit there and say -- I can dump any of those numbers
12 in there, but I put that number in there and it
13 would -- and it was set up to -- as long as you put
14 the right day and the right information, you know,
15 say, Hey, okay, this is different than this, but this
16 marks, Oh, well, we'll flag that yellow, we'll flag it
17 green.
18     Q.   Okay.  So you -- so you predetermined with
19 Aaron if -- if there is a certain value that triggers
20 this way, then it will be red, and if there is a
21 certain --
22     A.   I think -- I think Aaron already had that
23 set up.
24     Q.   Okay.

Page 117

1     A.   And I just kind of worked with it.
2     Q.   Okay.
3     A.   He understood what I was trying to do.
4     Q.   Okay.  So -- and you would do this every
5 day, is that right?
6     A.   I believe so.
7     Q.   Okay.  And -- and then from those things
8 that were flagged, you would then select -- you would
9 look at those --
10     A.   Yeah.
11     Q.   -- based on they're red, yellow, green,
12 right?  And then you would decide from those which you
13 were going to do a deeper dive on, right?
14     A.   Correct.
15     Q.   Okay.  I want to show you a flowchart
16 which we've marked as Exhibit 10.
17          (WHEREUPON, a certain document was
18          marked CVS - Elsner Deposition
19          Exhibit No. 10, for identification,
20          as of 01/24/2019.)
21 BY MR. ELSNER:
22     Q.   Okay.  This is a document that Aaron
23 Burtner put together.  This is your boss until June
24 of 2013.  And he put this together, again, before you

Page 118

1 got there. And it is something he is sending to
2 Pam Hinkle and he -- and he has an attachment here and
3 it says "IRR SOM Process Flow."
4       Do you see that? It's in the -- it's in
5 the e-mail attachment.
6    A.   Oh, do you mean --
7    Q.   Description.
8    A.   Oh, okay. The -- yeah.
9    Q.   Attachment.
10   A.   The attachment.
11   Q.   Okay.
12       And then if we -- if we go to -- it
13 attaches a memo and then it has a flowchart on the
14 back, the last three pages. Well, it is actually more
15 than three. It is about five pages. And if you look
16 at this screen, that may help you.
17   A.   Yeah.
18   Q.   It has -- it has a first field here and it
19 says: "Initiate the IRR SOM review process."
20       Do you see that?
21   A.   Correct, yes.
22   Q.   Then it says: "Review the entire IRR per
23 time zone." And then it says after that: "While" --
24 in the third box there.

Page 119

1    A.   Yeah.
2    Q.   "While reviewing the IRR, identify all
3 orders that appear irregular based on the previous
4 12 months lag."
5       Do you see that?
6    A.   Correct.
7    Q.   Okay.
8       Is -- is this what -- what was happening
9 when you were reviewing the IRR report? Did -- did
10 the -- did this system that you created flag if there
11 was an order that was irregular based on the 12-month
12 lag that you and Aaron created?
13   A.   We were -- I don't think that spread --
14 that spreadsheet used lags, so to speak. Or maybe it
15 did. I don't remember that. I don't remember enough
16 about it to do lag. We --
17   Q.   Whether it used lags, were there any other
18 criteria that -- that it used?
19   A.   I don't remember the criteria. I just
20 knew we had -- like I said, really, all I can remember
21 is red, yellow, green.
22   Q.   Okay. Any reason to -- that would
23 indicate in your mind that the box is wrong?
24   A.   No. I just think that maybe it's pointing

Page 120

1 towards the IRR hard copy and not what we were doing,
2 you know.
3    Q.   Well, I -- I think there -- I think you
4 were getting data of the --
5    A.   I think I --
6    Q.   -- of the orders in an electronic way so
7 you could sort them?
8    A.   Yeah, yeah.
9    Q.   Okay. And -- and I think you were also
10 getting a -- a printout?
11   A.   I think, yeah, maybe what we were doing
12 was in addition to this, you know, an extra step.
13 Maybe. I don't know.
14   Q.   It then says: "Are any more orders
15 identified as irregular?"
16       Do you see that after the "A" in a
17 triangle?
18   A.   Yeah, yeah.
19   Q.   Okay. And -- if the answer is no you
20 go up.
21       Do you see that?
22   A.   Yep.
23   Q.   And it says: "Complete the irregular
24 orders, logistics communication form indicating no

Page 121

1 irregular orders."
2       That's the form we were looking at before,
3 right?
4    A.   Um-hum.
5    Q.   And then you send -- and then there is a
6 box: "Send it all to the distribution centers."
7       Do you see that?
8    A.   Um-hum.
9    Q.   And that's that form you sent, right?
10   A.   Yeah, I think so.
11   Q.   To all those people?
12   A.   I think so.
13   Q.   Okay. And then if you follow B, go to the
14 next page.
15       Do you see that?
16   A.   B, okay.
17   Q.   Okay. And it says: "Do any high stores
18 need to be reviewed?"
19       Do you see that diamond?
20   A.   Yeah, I see the diamond.
21   Q.   Okay. How are high stores reviewed?
22   A.   I don't -- I can't even remember what --
23 what does a high store mean? I don't understand.
24   Q.   That's what -- you -- you don't know what

Page 122

1 that means? Does it mean high volume store, perhaps?
2    A.   It could mean anything high. I don't
3 remember. I don't know. That's why I'm asking you.
4 I don't -- is it defined on the document or...
5    Q.   It's not. That was one of my questions
6 for you. That's why you are here.
7    A.   Like I said, this was -- I think this is
8 something that he put together as an ISO requirement.
9 I do -- I do ISO and I -- but that's basically ISO is
10 do what you say, say what you do type thing, you know.
11    Q.   So you -- you try to create a flowchart
12 that's accurate that describes your process so you can
13 see it?
14    A.   Yeah, you are supposed to map out your
15 process and then when you get audited, what I would do
16 is say, Are you doing what your process says you are
17 doing?
18    Q.   Right.
19         And -- and did you do your best to try to
20 file the -- follow the process that was set up for the
21 SOM program?
22    A.   That was given to me --
23    Q.   Yeah.
24    A.   -- by Aaron.

Page 123

1    Q.   By Aaron?
2    A.   Yeah.
3    Q.   And you did your best to try to follow
4 that, right?
5    A.   Yeah.
6    Q.   Okay. Now, it says here that if there are
7 no high stores need to be reviewed then the answer is
8 no and then there is an end.
9         And then, but if there is, do you see
10 that, if it's yes, then down below there is a box and
11 it says:
12         "Using MicroStrategy, run a report to
13 retrieve all necessary information to review all cash
14 sales at that store in the previous four weeks"?
15    A.   That could be what I'm talking about,
16 quite possibly, because I know MicroStrategy, and I
17 think that was one of the databases we pulled out of,
18 or, you know. And that sounds -- that sounds like
19 what I was doing, you know.
20    Q.   Okay.
21    A.   On top of it. Like I say, I didn't --
22 from what I can remember, what I was -- what I was
23 doing was on top of this, and that's what that sounds
24 like.

Page 124

1    Q.   Okay.
2    A.   That's what I would say.
3    Q.   Now, that MicroStrategy run, that was a
4 computer system where you could set in certain
5 criteria and run a report, say give me this store's --
6    A.   I think it was just a -- a typical
7 database which is -- you know, a database is just
8 tables that you pull. I want to see this for this
9 type of -- you know, you just put in your criteria in
10 here, what you...
11    Q.   So if we follow the boxes, and it says
12 there is a high store that needs to be reviewed, and
13 then it says using MicroStrategy you run a report to
14 retrieve all of the necessary information to review
15 cash sales at that store in the previous four weeks.
16         And that's one of the things you were
17 looking at, right, for high stores?
18    A.   Yeah, this is starting to -- this --
19    Q.   This is starting to sound familiar, this
20 part?
21    A.   Yeah, that's -- I think this is what I was
22 talking about.
23    Q.   Okay.
24    A.   The recap spreadsheet or whatever.

Page 125

1    Q.   And -- and one of the things you were
2 looking at be -- is because prescriptions for a
3 controlled substance paid for in cash could be an
4 indication that -- that there is diversion?
5    A.   Yeah, I think so.
6    MR. CLARK:  Object to the form.
7 BY MR. ELSNER:
8    Q.   And -- and so -- and -- and then if you go
9 to the next box, if you've looked at those cash sales
10 over the prior four weeks, you are also going to look
11 at whether there is a common doctor or a common
12 patient, right?
13    A.   Yeah, I think so. That's what we are
14 looking for, just pill mills and...
15    Q.   Yeah.
16         So -- well, you are looking to see, okay,
17 over the last month, the last four weeks, are we doing
18 a lot of cash sales in the high volume stores and are
19 those patients coming in paying in cash, are they all
20 coming in from the same doctor, right?
21         And -- and all -- and all the --
22    A.   It could be.
23    Q.   -- patients paying in cash, that's one of
24 the things you were looking at?

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    A.   It could be.  Yeah, I -- like I say, I
2  don't remember the specifics.  I won't say this is
3  what I'm looking at.  But that -- that could be.  That
4  sounds probable.
5    Q.   Okay.
6         You remember, though, that you were doing
7  some looking at cash stores and common doctors for
8  cash, is that right?
9    A.   Well, you know, I remember looking at
10 something.  I don't remember -- by going over this, it
11 leads me to believe this is what I was doing.  But I
12 don't remember what I was getting.  I know I was
13 pulling it out of the database.
14   Q.   It -- it seems more right than wrong,
15 right?
16   MR. CLARK:  Object to form.
17 BY MR. ELSNER:
18   Q.   I mean, you don't have any --
19   A.   A high degree likely.
20   Q.   Likely.
21   A.   I'm not going to say...
22   Q.   Okay.  And then it says:  "Were there any
23 trends identified?"
24        Do you know what that means, in the next

Page 127

1  diamond there?  So when you are looking at --
2    A.   Well, I know what a trend is, but I don't
3  know what they are -- what we are talking there.  I
4  mean, I can -- I would guess based on my information.
5  And, honestly, I don't know what they are asking for.
6    Q.   Well, it -- it -- I mean, you can look at
7  trends in a variety of different ways --
8    A.   Yeah, that's true.
9    Q.   -- and everyone probably had their own way
10 of looking at them, right?
11   A.   Like I said, if you've seen more from one
12 doctor than another, that would be a trend or, you
13 know.
14   Q.   Okay.  And -- and then if -- if you don't
15 see that kind of trend, if you are not looking -- if
16 you are not seeing that there is one whole group of
17 patients are all at the same doctor paying in cash,
18 then -- then you see the answer would be "no" above
19 trend, and then it says:  "Document review on the
20 recap spreadsheet."
21        Do you see that?
22   A.   Yeah, document the review on the recap
23 spreadsheet.
24   Q.   And -- and -- and it's important, right,

Page 128

1  when you were doing your work to document everything
2  you did, you know --
3    A.   Yeah, I would think so, probably.
4    Q.   Okay.  And -- and you'd -- and -- and we
5  saw that that one form you'd attach to the IRO and
6  this says that you are going to put the information
7  that you compiled in the recap spreadsheet?
8    A.   Yeah, the spreadsheet PDF or...
9    Q.   Does that sound right?
10   A.   Yeah.
11   Q.   Okay.
12        But if it says if there is a trend that
13 you identify, you have seen some cash sales from those
14 doctors, then you would use the MicroStrategy and
15 you'd run a report to retrieve, and it says this in
16 that bottom box:  "All information to perform an
17 in-depth review of the doctor and patient."
18        Do you see that in the box?
19   A.   Yeah, I -- I see it in the box.
20   Q.   What types of -- what types of information
21 would you be looking for through MicroStrategy's --
22   A.   I don't remember what we got out of
23 MicroStrategy.  That was just numbers.  I know if --
24 what I would look for with the trend is just

Page 129

1  situational effects, you know.
2         It might be okay, a doctor has a high
3  prescription for this one store, if his clinic is
4  right across the street from the store, because most
5  people are going to go there.  So you can look at that
6  or, you know, that kind of stuff or...
7    Q.   Okay.  And MicroStrategy's could tell you
8  a whole bunch of things about -- about the -- the
9  prescription, right, it can tell you how far the
10 patient -- or how far the doctor's office was from the
11 CVS store, is that true?
12   A.   I don't know what if would tell me.
13 Offhand I can't remember.  I --
14   MR. ELSNER:  Do you have that MicroStrategy
15 sheet?
16 BY THE WITNESS:
17   A.   I don't know what -- actually what data I
18 got out of MicroStrategy.  It was just -- it was a
19 database, which is tables and fields, you know, and
20 what -- what information was in there, I don't
21 remember where I got it because I know I got it from
22 more than one.
23   MR. ELSNER:  Why don't we take a quick break and
24 I'll find that document.

Page 130

1    THE VIDEOGRAPHER: We are off the record at
2  10:56 a.m.
3        (WHEREUPON, a recess was had
4        from 10:56 to 11:09 a.m.)
5    THE VIDEOGRAPHER: We are back on the record at
6  11:09 a.m.
7  BY MR. ELSNER:
8    Q.  Mr. Burtner, before we broke -- sorry.
9        Mr. Kelly, before we broke, we were just
10 following through this flowchart --
11   A.  Okay. Yeah.
12   Q.  -- and we were talking about using
13 "MicroStrategy's to run a report to retrieve all
14 information to perform an in-depth review of the
15 doctor and patient."
16       Were there times at CVS that you performed
17 an in-depth review of particular orders --
18   A.  One --
19   Q.  -- for controlled substances?
20   A.  One -- the horse was an in-depth review.
21   Q.  Okay.
22   A.  The horse analysis that came up.
23   Q.  That was one?
24   A.  Yeah. That's the one I can remember.

Page 131

1    Q.  Okay. All right.
2        Let's go to the beginning of the flowchart
3  again, which is the page before.
4    A.  Yeah, the page before.
5    Q.  And remember when --
6    MR. CLARK: I'm sorry. I forget which page.
7    MR. ELSNER: 74.
8    MR. CLARK: Oh, I see it. I see it.
9    MR. ELSNER: 109874.
10 BY MR. ELSNER:
11   Q.  And if you look -- we went to the second
12 page because we follow the top going up.
13   A.  Yeah.
14   Q.  "Are there any more orders identified as
15 irregular?" that -- that -- that diamond in the
16 middle --
17   A.  Yeah.
18   Q.  -- here after the A, right?
19   A.  Correct.
20   Q.  Now what I want to do is follow if the
21 answer is yes.
22   A.  Yes.
23   Q.  Okay?
24       So if there are more orders identified as

Page 132

1  irregular, underneath it says:
2        "Complete the irregular orders, logistics
3  communication indicating which distribution centers
4  have orders identified as irregular."
5    Q.  That's the form we started with, right,
6  where'd you put a little X in the box on that one in
7  Indianapolis where there was an irregular order?
8    A.  Yeah, I believe so.
9    Q.  Okay. And then you'd send that
10 communication to all of the distribution centers,
11 which is the e-mail that you sent with that form,
12 correct?
13   A.  I don't know beyond that form what I sent.
14   Q.  Okay. But -- but it -- it at least
15 included that form?
16   A.  Yeah, it included that form.
17   Q.  Okay. And then -- and then it -- and then
18 it says, if you look at C, do you see where I am at?
19   A.  Yep.
20   Q.  If you can go to C.
21       So then if we turn two pages in.
22   A.  Two pages.
23   Q.  We'll see what happens if you follow the
24 flowchart for C.

Page 133

1        All right. And then it says:
2        "Send a communication to each specific
3  distribution center." And then the next -- the next
4  box says: "Using Viper, MicroStrategy, InfoPak, et
5  cetera, begin initial inquiry of irregular order."
6        Do you see that box?
7    A.  Um-hum.
8    Q.  Okay. Now, I want to show you a Viper
9  report which we'll mark as Exhibit 11. I've changed
10 my mind and screwed up the exhibits.
11       (WHEREUPON, a certain document was
12       marked CVS - Elsner Deposition
13       Exhibit No. 11, for identification,
14       as of 01/24/2019.)
15 BY MR. ELSNER:
16   Q.  And if you go to the box underneath that
17 one, you see that squiggly line that goes down, and
18 then it -- and then it's got this -- yeah.
19   A.  Yeah.
20   Q.  It is kind of highlighted there?
21   A.  The big box up there, yeah.
22   Q.  Okay. It says:
23       "During initial inquiry the following
24 items, but not limited to these items, will be

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 reviewed." And then the first one, it says: "Store
2 ordering versus dispensing."
3     A. Yeah, I've said that, remember.
4     Q. Right.
5     And so that's the Viper report, right, you
6 would compare how much the store bought to how much
7 they dispensed, right?
8     A. I don't remember which report it came out
9 of. I mean, to say it was Viper, I don't know. But,
10 yeah, that is one of the things I remember looking at.
11     Q. Okay. And you see above, it says: "Using
12 Viper, MicroStrategy" --
13     A. This says -- this says -- this also says
14 MicroStrategy --
15     Q. Right.
16     A. -- InfoPak, et cetera, so it could have
17 come from that.
18     Q. Okay. We'll go through -- we'll go
19 through the Viper one first.
20     I'm going to show you Exhibit 11. And it
21 says on the top, "VIPERx PDMR - High Priority."
22     Do you see that?
23     A. Yep.
24     Q. Okay. And do you recall this is one of

Page 135

1 the items that you would look at at CVS?
2     A. No, to tell you the truth, I --
3     Q. You don't recall?
4     A. I remember the name Viper now because it
5 kind of sounds cool, but, you know, but -- but what we
6 actually did with it, I don't remember that.
7     Q. Okay. If you -- if you see that it has a
8 list of drugs on the first page of the -- of the
9 report.
10     Do you see that?
11     A. Yeah, I see the hydrocodone,
12 acetaminophen.
13     Q. Hydrocodone, okay.
14     And then if you -- if you go across, it
15 has -- there is a line that says "Total Ship."
16     Do you see that?
17     A. Yep.
18     Q. And it's 6200 in that -- in that one in
19 the middle for Store 7371?
20     A. Oh, okay. It was up one. Yeah, 6200,
21 yeah.
22     Q. Okay. And then a look -- and then a few
23 things back it says -- well, it says "Disp."
24     Do you see that? Follow along the line

Page 136

1 from the 6200 to the 3884.
2     A. Oh, there it is, dispensed, yeah. Okay.
3 Dispensed, yeah.
4     Q. Okay. So this report lets you compare how
5 many was shipped versus how many was dispensed, right?
6     A. Correct.
7     Q. Does that sound right?
8     A. Yeah.
9     Q. And whether it is called Viper or
10 whatever --
11     A. Yeah.
12     Q. -- that's one of the things that you were
13 looking at, right?
14     A. Yeah, yeah.
15     Q. And that's what's in the flowchart and you
16 remember that, right?
17     A. Yeah.
18     Q. Okay. Now, let's -- is there anything
19 else about this report that -- that you recall using
20 it for other than that?
21     A. I -- you know, no, I don't recall -- maybe
22 I -- I don't -- I don't even know if we actually used
23 a paper report. It was probably something that I
24 pulled through electronically. Maybe that's why it

Page 137

1 doesn't look familiar to me.
2     Q. Well, I can assure -- I'm sure that you
3 didn't deal with it in paper. I'm sure -- I'm sure --
4     A. Okay. Then, yeah, that's probably why it
5 didn't look -- because when I looked, I'm like, I
6 don't know, you know.
7     Q. But yeah --
8     A. So that's probably where we got the
9 dispensing versus ordering information.
10     Q. Okay. And that's one of the things you'd
11 look at as -- as part of your deep dive, right?
12     A. Yeah.
13     Q. Okay. Because now we've identified some
14 unusual orders and -- and one of the things in the
15 deep dive you are going to do is you are going to look
16 for, Okay, well, how much did they buy versus how much
17 they dispensed, right?
18     A. Um-hum.
19     MR. CLARK: Object to form.
20 BY MR. ELSNER:
21     Q. Yes?
22     A. (Nodding head.)
23     Q. Okay.
24     Now, the next thing it says is it says:

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 "Significant quantity of orders with" and then it has
2 some dashes, "common doctor, common patient, cash
3 payment method."
4        Do you see that?
5    A.   Okay. I don't know what page -- I'm
6 sorry.
7    Q.   I'm sorry. We are going back --
8    MR. CLARK: Now we are on the flowchart.
9 BY MR. ELSNER:
10   Q.   -- to the flowchart.
11   A.   Oh, back to the flowchart. Oh, okay.
12   Q.   I'm sorry.
13   A.   Common doctor, common patient, yeah.
14   MR. CLARK: Exhibit 10.
15 BY MR. ELSNER:
16   Q.   Okay. And then above, above that box on
17 the bottom, we talked about Viper. It says: "Using
18 Viper."
19   A.   Uh-huh.
20   Q.   And then the next one, it says: "Using
21 MicroStrategy," right?
22   A.   Um-hum.
23   Q.   And then -- and then it says in that
24 bottom box: "Significant quantity of orders with

Page 139

1 common doctor, common patient, cash method."
2        Now, this is another thing that you would
3 look at in terms of your deep dive, right, whether
4 there were payments for the prescriptions in cash,
5 whether there was a common doctor?
6    A.   I -- I believe so.
7    Q.   Okay.
8        And -- and then significant quantity of
9 orders with a common doctor, that's another thing that
10 you were looking at?
11   A.   It might have been.
12   Q.   Okay. And were these things that you
13 could -- or you could run a report in a database
14 and -- and say, Hey, I want to know cash, doctor,
15 whatever, and then -- and then you would electrically
16 get it?
17   A.   That would be on the field, you would just
18 say give it. And then, like I say, this, it would
19 show -- this is not going to flag it, right, this is
20 just a database.
21   Q.   No, it just tells you.
22   A.   And that's why we put it into the
23 spreadsheet, set up the formatting, say, Okay, these
24 two are different, here is your color.

Page 140

1    Q.   Okay. So MicroStrategy had a -- a lot of
2 different things you could run a report for. You
3 could run a report, Hey, are there prescriptions in
4 cash, can -- are there common doctors, are -- there
5 was a whole host of things that --
6    A.   Uh-huh.
7    Q.   -- you could program that thing to run
8 for, right?
9    MR. CLARK: Object to the form.
10 BY THE WITNESS:
11   A.   You could query.
12 BY MR. ELSNER:
13   Q.   Query, right.
14       And so -- and did you run the same query
15 every time, any time you had an unusual order you
16 wanted to look at or did you --
17   A.   I --
18   Q.   -- pick and choose how to do it?
19   A.   -- I don't remember. I would be
20 comfortable doing that because databases were my kind
21 of thing, but -- an area that I'm pretty competent in,
22 but I -- what I did now, I don't know if I -- because
23 I don't think we had to use SQL to pull the
24 information out, so it was just pulled out...

Page 141

1    Q.   Let me mark this as Exhibit 12.
2        (WHEREUPON, a certain document was
3            marked CVS - Elsner Deposition
4            Exhibit No. 12, for identification,
5            as of 01/24/2019.)
6 BY MR. ELSNER:
7    Q.   And -- and -- and you see that it says
8 "Store Metric Sheet" and there is "Drug Family" and
9 "Classification" and then --
10   A.   Yeah.
11   Q.   -- "Order Details."
12       And then underneath that it says:
13 "Results of tests."
14       Do you see that?
15   A.   Yeah.
16   Q.   Is this the type of queries that you could
17 run through MicroStrategy's?
18   A.   I don't know. This doesn't look like
19 anything I've ever seen. This looks like some kind of
20 a, like a test plan for a program or something.
21   Q.   You've never seen anything like this
22 before?
23   A.   No, nothing like this. This is -- I'd
24 have to look at it.

Page 142

1    Q.   What about some of the questions in here,
2    so --
3    A.   Like, say this is -- yeah, this is -- this
4    is -- no, this is test -- like a -- this is a test
5    plan for a program of some sort. I'm going by my
6    background. This is not what you get out of a
7    database. This is what you are expect -- you test to
8    get your results for the database. Like, say, Hey,
9    test description, is the order unusual, that database
10   didn't make that decision. They gave you the
11   information. You had to make that decision.
12   Q.   The -- you don't -- you don't think that
13   the database --
14   A.   I don't know. I mean, I'm just looking at
15   this. You know what, I don't -- this -- this doesn't
16   make any --
17   Q.   Okay.
18   A.   -- sense to me.
19   Q.   Okay.
20   A.   I'm just -- I'm just going by experiences.
21   Q.   All right. Well --
22   A.   I don't think --
23   Q.   -- but you don't have any memory of
24   this --

Page 143

1    A.   -- I think this is not really part of
2    this. I think it is something else.
3    Q.   Okay. All right.
4         Let's go back to the flowchart then.
5    MR. CLARK:   Exhibit 10.
6    THE WITNESS:   Yep.
7    BY MR. ELSNER:
8    Q.   So you -- if you see that box in the
9    middle, it says:
10        "Using all of these entities, begin the
11   initial inquiry of the" -- "of the irregular order."
12        And then in the diamond next to it, it
13   says: "Did the inquiry validate the order?"
14        Do you see that?
15   A.   Yeah.
16   Q.   So if you did these -- if you did this
17   dive and it -- -- and you were satisfied that you
18   didn't need to go any further --
19   A.   Yeah, like the horse. Or with the horse,
20   no --
21   Q.   No, no.
22   A.   -- that's no big deal.
23   Q.   That's different, but -- but all the --
24   everything that wasn't a horse, right?

Page 144

1    A.   Yeah, anything we looked up, yeah.
2    Q.   Anything that you -- anything that after
3    doing this initial dive into the order, if you were
4    satisfied, then you would communicate to the DC to
5    release the order, right?
6    MR. CLARK:   Object to the form.
7    BY THE WITNESS:
8    A.   I want to -- I want to say yes, but I
9    can't remember exactly how they worked, if they were
10   all on hold until we released them. I don't remember.
11   Or we just -- they weren't on hold, but I -- but yeah.
12   BY MR. ELSNER:
13   Q.   Do you -- do you know, did the -- do you
14   know whether the drug orders were held until after you
15   finished your whole deep dive or did they go and then
16   you --
17   A.   See, I want to think, because --
18   MR. CLARK:   Sorry. Objection to form.
19        Sorry. Go ahead.
20   BY THE WITNESS:
21   A.   I was wanting to think that we needed to
22   get the re -- the analysis done in time so we could
23   stop them if we had to.
24   BY MR. ELSNER:

Page 145

1    Q.   Okay. So you made an effort to try to do
2    this every day, right?
3    A.   Yeah. Oh, we did do it every day.
4    Q.   That you are sure of?
5    A.   Yeah.
6    Q.   Okay. And this says that if -- that if --
7    if you've determined that it's okay to release that
8    order after this deep dive, then you document that
9    inquiry on the recap spreadsheet, right?
10   A.   That's what it says, yeah.
11   Q.   Okay. Do you remember -- do you remember
12   recording the things that you did?
13   A.   No.
14   Q.   Would it have been your practice to do
15   that?
16   A.   Yeah, I think we have a -- something was
17   expected every day, you know.
18   Q.   Yeah, you'd have to -- you'd have to say
19   what did I do.
20   A.   Yeah, what did I do, what did we look at
21   and why and --
22   Q.   So that if ever anyone wanted to go back
23   and look at it --
24   A.   Yeah.

Page 146

1    Q.  -- they could say, Okay, well, this is
2  what I did and this is why I said --
3    A.   A paper trail, for an audit you need to
4  have a paper trail.
5    Q.  Right.  And that's important no matter
6  what you are doing, including this, right?
7      That's important, right?
8    A.   Yeah.
9    Q.  Okay.  Now, this says if the inquiry --
10  if -- if after that inquiry you weren't satisfied, do
11  you see that, where it says "no"?
12    A.   Um-hum.
13    Q.  Then you would contact the store PIC via
14  phone and gather more information.
15      Can you explain to me what you would do
16  when you'd contact the store?
17    A.   Once again, I don't think it's that.  The
18  only example that really comes to mind is like when I
19  researched to find out, I called the pharmacist to
20  say, Hey, I've got this doctor who prescribed this one
21  patient way too much.  Oh, that's a vet, you know.
22  That was the kind of stuff, okay, this guy is this.
23    Q.  How -- and would the -- and how -- tell me
24  how those conversations went?  I mean, I'm sure there

Page 147

1  are times when you called the pharmacy and you
2  couldn't get the pharmacist on the line immediately?
3    A.   Ah --
4    Q.  Could you talk to an --
5    A.   -- until they found out who you were.
6    Q.  Until -- because once they knew who you
7  were, you weren't going to get their drug until --
8    A.   Yeah, that's it, you know...
9    Q.  Until you approved it, right?
10    A.   Potentially, I guess, you could shut
11  the -- the store down.  You know, so they -- I never
12  had -- other than the initial pause hold.  I said,
13  Well, no, you may want to get them on right now.
14  Because normally it was a tech who would answer --
15    Q.  Right.
16    A.   -- you know, and as soon as they found out
17  who you were, you'd go right to them.
18    Q.  Now -- now, there are a lot of different
19  positions in a pharmacy.  Would you speak to the
20  pharmacist in charge or would you speak to any
21  pharmacist or a tech?
22      Who would you -- who would you talk to?
23    MR. CLARK:  Objection to the form.
24  BY THE WITNESS:

Page 148

1    A.   Well, if the tech answered the phone, but
2  most of the time then they would pass it over to the
3  pharmacist in charge.
4  BY MR. ELSNER:
5    Q.  Okay.  Do you ever recall doing an
6  interview with the tech instead of the pharmacist when
7  you did your deep dives?
8    A.   Not specific, but I suppose it is
9  possible.  Like, if a tech knew that that's a
10  veterinarian, then you don't have to to be a doctor of
11  pharmacy to answer.
12    Q.  So it could be -- it didn't necessarily --
13  it didn't necessarily have to be the pharmacist in
14  charge?
15    A.   Probably not, but almost always.  That's
16  who you want -- usually went to.
17    Q.  Okay.  Now --
18    A.   And there was always a pharmacist's number
19  in the room somewhere.
20    Q.  Right.  And so was there some kind of
21  talking points or some document you used or some
22  formula you used of like what questions I'm going to
23  ask or did you just kind of ask whatever you thought
24  you needed to?

Page 149

1    A.   I'm wanting to say, I kind of remember
2  something about a dialogue that they said, Here, that
3  Aaron had developed, but I can't remember much more
4  than that.  Like, Hey, in this one, make sure this is
5  the stuff you want to cover when you are talking to
6  them, tell them who you are.  There was something like
7  that, but...
8    Q.  So you -- you were given some guidance,
9  but was there a form that said, Okay, the question you
10  ask is Question 1 and then next to Question 1 you had
11  to write down what the answer was?
12    A.   I can't remember exactly what it was.
13  There was -- I -- I -- there was some guidance on how
14  to talk to them, you know, talk to them on the phone,
15  make sure you had your ask -- it may have even been a
16  sheet or something that says, you know, ask this,
17  this, this, these are the things, the relevant
18  information you've got to get down from them.
19    Q.  And -- and would the pharmacist know that
20  information off the top of their head or would they
21  need to look for it?
22    A.   Yeah, it was surprising that most of
23  the --
24    MR. CLARK:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 BY THE WITNESS:
2    A.  -- most of the time -- and with -- and
3 with dealing with my wife, you'd be surprised, the
4 pharmacists, they usually have a pretty good intuition
5 of who it is. Oh, yeah, I know that guy. You know, I
6 know this doctor, and they know --
7 BY MR. ELSNER:
8    Q.  Because the pharmacist interacts with the
9 patient and is familiar generally with the doctors,
10 right?
11    A.  Yeah, they -- they usually have a pretty
12 good beat on what was going on. I was always kind of
13 surprised by it. Even with my wife, she would say,
14 Yeah, I know this guy. They -- and they -- they
15 pretty quickly know who -- what doctors do what in the
16 area and what ones they -- because I remember talking
17 to my wife, there'd be times where they wouldn't
18 prescribe -- Well, we are not going to fill this
19 doctor's prescription anymore. They would push it on.
20    Q.  And then after that review, you would
21 document that, whatever the outcome of that was,
22 correct?
23    A.  Yeah, I think so. I believe so.
24    Q.  Okay. All right.

Page 151

1       And that's -- that's what the flowchart
2 indicates?
3    A.  Yeah.
4    Q.  At the very end you document the
5 conversation, right?
6    A.  Yeah, send it on.
7    MR. CLARK: Object to the form.
8 BY MR. ELSNER:
9    Q.  Okay. And then if you go to -- to the
10 next page, which follows the -- the kind of "D"
11 marker?
12    A.  Oh, okay.
13    Q.  This kind of just indicates, okay, well,
14 if you -- if there is -- you know, you decide whether
15 the order is going to be shipped or frozen. And, but
16 at the end of each of these, no matter what it was,
17 it -- in each box at the very end, on the top it says:
18 "Document the review on recap spreadsheet."
19       Do you see that?
20    A.  Um-hum.
21    Q.  And then underneath that, for that outcome
22 you document the review in the recap spreadsheet,
23 right?
24    A.  Yep.

Page 152

1    Q.  And on the bottom you do the same thing?
2    A.  Yes.
3    Q.  You document the investigation on the
4 recap spreadsheet.
5       So in each case you'd -- you would
6 document what you did --
7    A.  I -- that's what the procedure says.
8    MR. CLARK: Objection to the form.
9 BY MR. ELSNER:
10    Q.  And you tried to follow the procedure?
11    MR. CLARK: Object to the form.
12 BY THE WITNESS:
13    A.  I'm -- I -- I did what I was told.
14 BY MR. ELSNER:
15    Q.  And -- but you were told to follow the
16 procedure?
17    A.  Yeah, I -- I'm assuming. I don't -- I
18 just don't remember what exactly, if this was it or we
19 did more or less, you know, I mean, but, yeah, that
20 sounds -- that sounds plausible.
21    Q.  Now, Aaron Burtner testified when -- last
22 week that whenever there would be a deep dive done on
23 a particular order that you would document that order
24 and attach it to the IRR.

Page 153

1       Do you have any reason to disagree with
2 his statement?
3    MR. CLARK: Object to the form.
4 BY THE WITNESS:
5    A.  I don't have any reason to disagree with
6 Aaron. I mean, he never did anything --
7 BY MR. ELSNER:
8    Q.  Okay.
9    A.  -- I don't -- you know, I can't agree nor
10 disagree.
11    Q.  And the form that we looked at that you
12 sent to each of the distribution centers which was one
13 of the first exhibits --
14    A.  That was that check spreadsheet.
15    Q.  That check -- exactly, the one with the X?
16    A.  Yeah.
17    Q.  And on the top of that, this one, this
18 is -- this is 81373. It is Exhibit 6.
19    A.  Yeah, there it is.
20    Q.  It is the one that looks like this?
21    A.  Yep.
22    Q.  Have you got that one?
23       And do you see that, the note on the top:
24 "Two copies of this form must be printed each day,

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 attach one copy to the control IRR."
2　A.　Yeah.
3　Q.　Right?
4　A.　Yeah.
5　Q.　Okay.  And -- and that -- and -- and you
6 have no reason to -- to disagree --
7　A.　To doubt that we did that.
8　Q.　-- that that's the procedure?
9　　　Did -- did you say you have no doubt we
10 did that or you --
11　A.　Oh, no, I have no reason to doubt that.
12　Q.　You have no reason to doubt.
13　A.　I'm agreeing with you.
14　Q.　Okay.  That that's what the procedure was,
15 consistent with what Aaron testified to, right?
16　A.　Yeah.
17　MR. CLARK:  Object to form.
18 BY MR. ELSNER:
19　Q.　And we talked about in the spreadsheet
20 documenting things on the recap spreadsheet.
21　　　Is there any other method of documentation
22 that you did when you were reviewing orders of
23 controlled substances?
24　A.　Wait.  Not that I -- I don't know.  I

Page 155

1 don't remember.  I -- is this -- is this what we are
2 calling the recap?
3　Q.　No, that's -- that's not.  That -- this is
4 the -- this is the -- this is the order -- this is the
5 note that you --
6　A.　Like a summary.
7　Q.　-- summary that you sent to each of the
8 distribution centers.
9　A.　Yeah, I'm not -- I don't even remember the
10 recap.  I wouldn't know it unless it -- you know, I
11 don't know what it was, I mean.  I don't remember it,
12 so I -- we haven't -- have we seen it since -- in
13 the -- so far?
14　Q.　No.  Let's look at it.
15　MR. ELSNER:  343.
16　THE WITNESS:  That's a lot of ink, man.  You
17 guys are killing trees and printer cartridges.
18　MR. ELSNER:  I know.  If we could do it all
19 electronic, believe me, I'd prefer it.
20　　　(WHEREUPON, a certain document was
21　　　marked CVS - Elsner Deposition
22　　　Exhibit No. 13, for identification,
23　　　as of 01/24/2019.)
24 BY MR. ELSNER:

Page 156

1　Q.　This is Exhibit 13.
2　A.　So obviously the first page doesn't count.
3　Q.　Well, the only reason the first page is
4 there is so we could --
5　A.　It is all redacted, I know.
6　Q.　No, I know, but do you see the titles on
7 the top?
8　A.　Yeah, that's the header.
9　Q.　The title columns.
10　A.　Yeah.
11　Q.　It says "Report," "DC," "Store Number,"
12 "Report Date," "Item in Question."
13　　　In fact, it might just be easier if you
14 rip off the first page?
15　A.　Yeah, that's what I was thinking.  Yeah.
16　Q.　And then let's just line it up on the next
17 page.  And so if we do that and then look at
18 Page 10303.
19　A.　10303.
20　Q.　Which is the next page of the document.
21　A.　Yeah, I've got it.
22　Q.　And then -- and then it says "Report" and
23 then it says "FRR."
24　　　Do you see where I am at?

Page 157

1　A.　Report.
2　Q.　He is going to pull it over for us if he
3 can.
4　A.　Oh, I see, yeah, "IRR," "FRR," "doses,"
5 "grams."
6　Q.　Okay.  And then next to that it says "DC"
7 and it says "OR."
8　　　That's one of the distribution centers,
9 right?
10　A.　Yeah.
11　Q.　Okay.  And then next it says "Store
12 Number."  We talked about that.  Each store -- each
13 CVS store has their -- its own unique store number,
14 right?
15　A.　Yeah.
16　Q.　And then "Report Date," this one is
17 April 15th, 2013?
18　A.　Oh, okay, yeah.
19　Q.　And then it says:  "Item in Question,
20 Hydro," that's -- that's the -- the drug that you were
21 doing the deep dive on, right?
22　　　And then it says, "Quantity Ordered," in
23 this case they -- they had ordered 6,300.
24　　　And then you look here at "Dispense Versus

Page 158

1 Order," that was that one thing we were looking at,
2 right, how much did they order versus how much they
3 dispensed, is that right?
4    A.   Correct.
5    Q.   Okay.  And here it was 18,705 dispensed
6 versus order and the order was 20,300, right?
7    A.   Um-hum.
8    Q.   And then it says:  "Order mistake, yes or
9 no."
10        So what's that, like a -- like if somebody
11 mistyped it in or...?
12    A.   Um, I -- yeah, I remember it like nothing
13 you'd ask the pharmacist.  Hey, usually you dispense
14 ten a month and all of a sudden you ordered a hundred.
15 Why?  Oh, whoops, we -- we meant to order ten.
16    Q.   Right.
17    A.   It's a -- it's a -- fat fingered it and
18 then we could correct that --
19    Q.   Okay.
20    A.   -- shipment, so.
21    Q.   And "fat finger" is an expression for kind
22 of mistyping in, like, an extra zero?
23    A.   An extra zero or, you know...
24    Q.   Okay.  So that's one of the things that

Page 159

1 you would document, was there an order mistake, yes or
2 no?
3    A.   Yeah.  And if I remember right, if that
4 was the case, we would actually go in and correct the
5 order for them on the spot.
6    Q.   You would correct it for them?
7    A.   Yeah.
8    Q.   Just based on the pharmacy saying, Yeah,
9 that's it, then you would correct it?
10    A.   Yeah, that's not what we needed.  Can you
11 correct it?  Yeah, yeah, yeah.
12    Q.   Okay.  And then -- and then the next, it
13 says:  "Field LP Contacted."  And then your name is
14 listed there, "Kelly Baker SOMA," right?
15    A.   Yeah.
16    Q.   Is that right?
17    A.   That's me.
18    Q.   Okay.
19    A.   That's the devil.
20    Q.   And -- and by "Field LP Contacted," does
21 that -- what does that refer to that you --
22    MR. CLARK:  Object to the form.
23 BY THE WITNESS:
24    A.   I don't know.  I don't know.  LP is loss

Page 160

1 prevention.  I don't under -- I'm not sure what that
2 means, because I don't -- was I contacted or did I do
3 the contacting?  I'm assuming I was doing the
4 contacting, but I don't -- but maybe --
5 BY MR. ELSNER:
6    Q.   Okay.  But then it --
7    A.   But maybe they just -- LP maybe just
8 happens to be their field.  I don't know what it
9 means.  Yeah.  That's the person who was -- probably
10 did the contacting, the re --
11    Q.   Okay.
12    A.   -- research, because I'm on all of these,
13 so, yeah.
14    Q.   All right.  And then the next field is the
15 "Date File Started" on this, and so that would be when
16 you started the investigation, right?
17    A.   Yes.
18    MR. CLARK:  Object to the form.
19 BY MR. ELSNER:
20    Q.   And then the next one is the:  "Date the
21 File is Completed," that's when you'd finish the --
22    A.   Correct.
23    Q.   -- investigation, right?
24    MR. CLARK:  Object to form.

Page 161

1 BY MR. ELSNER:
2    Q.   And then it says:  "Investigated needed,
3 yes or no," and you'd indicate whether you needed to
4 do anything more, correct --
5    A.   Correct.
6    Q.   -- yes or no?
7    MR. CLARK:  Object to form.
8 BY THE WITNESS:
9    A.   I think so.
10 BY MR. ELSNER:
11    Q.   Here you said no.
12        And then it says:  "File of Case Attached
13 to the IRR, Yes or No."
14        Do you see that?
15    A.   Um-hum.
16    Q.   Indicating did you attach a copy of your
17 research to the IRR, "File of case attached to the
18 IRR" --
19    A.   Well, I don't know what file of case is,
20 if that's my research or if it's a case, I don't know.
21 Is it a case?  I don't know what that means.  I mean,
22 that's -- that's kind of confusing to me.  I don't
23 know.
24    Q.   Okay.  And then there are remarks.  And in

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 this one it says:

2      "Reviewed store metrics for hydro 10/325.

3 Reviewed dispensed versus order quantities, common

4 doctor/patient and payment method. No concerns

5 identified. Based on this information the order was

6 approved."

7      The -- that's the outcome of your

8 research, correct?

9    A. Yes, that's what it sounds like, yes.

10    MR. CLARK: Object to form.

11 BY THE WITNESS:

12    A. The remarks is what I can relate to.

13 BY MR. ELSNER:

14    Q. Okay. And -- and these are the kind of

15 remarks that you would put in this -- in this

16 database, this recap database?

17    A. Now, it seems so --

18    MR. CLARK: Object to form.

19 BY THE WITNESS:

20    A. I don't remember doing any of this. I

21 mean, obviously I did. I just don't remember. It --

22 it makes sense, I can see doing that, but, like I

23 said, so much of that job is just all cloud from here.

24 You know, I just don't remember a whole lot of it.

Page 163

1 BY MR. ELSNER:

2    Q. Well, you have no reason to believe that

3 this is not the recap report and this is not the data

4 that you provided?

5    A. I have no reason to believe that I didn't

6 put this in here, I mean, what it is, I mean, I'm --

7 yeah, I guess.

8    Q. But you have no reason to dispute that

9 that's what it is, right?

10    A. No.

11    Q. Okay. All right. So we've looked at the

12 recap sheet.

13    It -- just is there any other way at CVS

14 that you recall storing information about the

15 investigations you did? Did you -- did you have a

16 notebook that you can -- had or calendar or anything

17 else that you used?

18    A. I don't remember how. I think that

19 most -- all I remember was electronically, you know,

20 and any paper that you would have, like I say, notes

21 during a phone call, you would transpose into the

22 computer anyway.

23    Q. To put into this?

24    A. Yeah, in the system.

Page 164

1    So I don't remember what we did other than

2 electronically.

3    Q. Well, then, Aaron Burtner also

4 testified --

5    MR. ELSNER: And why don't we show him that

6 testimony just so that --

7 BY MR. ELSNER:

8    Q. Well, he testified that he would -- that

9 they would attach the notes of the investigation to

10 the IRR report.

11    Do you have any reason to dispute that?

12    A. I don't have any reason to dispute that.

13    Q. Okay. You know, a big part of the job of

14 being the SOM analyst was to say, Hey, look, we've got

15 200 orders in a day for controlled substances that

16 have been identified for us or some days it may be

17 more, 400, and we've seen some days it was up to 1500

18 in a day. And a big part of that job was to say,

19 Okay, which one of these am I going to do a deep dive

20 investigation on, right?

21    MR. CLARK: Object to the form.

22 BY THE WITNESS:

23    A. I think I looked at all of them that

24 bothered me, you know.

Page 165

1 BY MR. ELSNER:

2    Q. Right.

3    And then you -- and the ones that bothered

4 you, those were the ones that you did the deep dive

5 on, those were the ones where you ran the

6 MicroStrategy's report?

7    A. Yeah.

8    Q. Those were the ones you did Viper on,

9 those were the ones that you called the pharmacy if

10 you needed to, right?

11    A. Um-hum.

12    MR. CLARK: Object to form.

13 BY MR. ELSNER:

14    Q. You didn't do that for every single

15 controlled drug order, right?

16    A. I can't say. That would be putting words

17 in my mouth. I don't remember doing it, so. Maybe I

18 did. I'm pretty good, you know.

19    Q. Okay. Well, why don't we -- why don't

20 we -- well, how long would it -- well, let -- let me

21 strike that.

22    Do you know who Gary Milikan is?

23    A. I recognize the name but I don't know him.

24 I know the name. I'm not even sure if I ever met him.

Page 166

1    Q.   Did he ever do some part-time work on
2  reviewing IRR reports and suspicious orders for CVS?
3    A.   I don't remember who he is.  I know the
4  name.  I don't know what he was.  Did he?  I can --
5  I -- I --
6    Q.   He -- he testified earlier in the case
7  and -- and he worked at CVS and he did do some
8  suspicious order monitoring review.  And he said that
9  of all of the control drug orders that he'd look at in
10 a day, you know, he'd select his best estimate was
11 about 5 percent of which he would then do this sort of
12 deeper dive review.
13         And so my question to you is, does that
14 sound consistent with what you did?
15    MR. CLARK:  Object to the form.
16 BY THE WITNESS:
17    A.   I can't say.  I mean, what percentage.
18 It's just --
19 BY MR. ELSNER:
20    Q.   Do you have a reason to dispute what Gary
21 Milikan said?
22    A.   I don't have a reason to dispute.
23    MR. CLARK:  Object to the form.
24 BY THE WITNESS:

Page 167

1    A.   I can't confirm nor deny.  You know, I
2  just -- because I don't even -- I never worked with
3  Gary Milikan --
4  BY MR. ELSNER:
5    Q.   Okay.
6    A.   -- in that role because it was -- the
7  people I worked with, Shauna, Aaron and the one
8  consultant.
9         He is not the consultant, is he?
10    Q.   No.
11    A.   Okay.  Then no.
12    Q.   I want to show you this document which
13 we'll mark as Exhibit 14.
14         (WHEREUPON, a certain document was
15         marked CVS - Elsner Deposition
16         Exhibit No. 14, for identification,
17         as of 01/24/2019.)
18 BY MR. ELSNER:
19    Q.   This is a -- this is a -- an e-mail from
20 Craig Schiavo.
21         And who -- do you -- do you remember
22 working with Craig Schiavo?
23    A.   Nope.
24         See, a lot of this, like I say, we didn't

Page 168

1  work for the DC.  We worked for corporate.  We
2  happened to be located -- so most of the people, most
3  of the -- the names were -- were only e-mail
4  correspondence or phone calls, you know.
5    Q.   Right.
6    A.   We didn't see most of these people.
7    Q.   Right.  So Craig Schiavo was at corporate.
8  He was in Rhode Island.
9    A.   Yeah, see, his name sounded fam -- it
10 sounds familiar, but I never personally met him.
11    Q.   Okay.  And this e-mail he sends to
12 Pam Hinkle and to Aaron Burtner, right?
13    A.   I don't see Aaron's name on there, do I?
14    Q.   It's the very last one on the "to" -- the
15 first "to" line.
16    A.   Oh, yeah, yeah.  I'm -- but there.  I --
17    Q.   Okay.
18    A.   -- I'm somewhere on here, right, so.
19    Q.   No, you are not.  This is before you got
20 there.
21    A.   Okay.
22    Q.   This is November of 2012.  And -- and
23 it -- and it says:
24         "As discussed on our call earlier today,

Page 169

1  please find the attached documents."  And it says:
2  "List of opportunities (my notes) from our meeting
3  11/27."  And then he has got some other things there.
4  "Updated SOM process flowchart and SOM project plan."
5         And I want you to go to the next document.
6  And this -- these are notes of the meeting from 11/27.
7  And it says:  "Opportunities" and then it says:
8  "- Current SOM Process."
9         And it goes -- and under No. 8, it says:
10 "100 plus orders flagged by the system," and then
11 it's -- and then it reads "looked (past history,
12 algorithm, max/min)."  And then it says:  "2 to 3 were
13 stopped by Aaron for review."
14         Do you see that?
15    A.   Um-hum.
16    Q.   And then it says:  "Deeper dive review,
17 dis" -- "dispensing versus ordering," we talked about
18 that, right, how much did they order, how much did
19 they dispense, and "reaching out to the store,"
20 calling the pharmacist?
21    A.   Correct.
22    Q.   So, according to these notes, Aaron was
23 selecting two to three out of a hundred plus flagged
24 orders to do this deeper dive review, the comparison

Highly Confidential – Subject to Further Confidentiality Review

Page 170

1 of dispensing versus ordering, and reaching out to the
2 store.
3         Is that consistent with what you were
4 doing with the information you were getting?
5     A.   I do not remember.  I thought we stopped
6 more than that, but I don't -- I can't tell you.  I --
7 I -- I felt like I did more than that, but that sounds
8 like, more like a question for Aaron and Craig
9 because --
10    Q.   Well, we've asked -- we've asked them
11 both.
12    A.   Yeah.
13    Q.   And -- and now I'm trying to get your best
14 memory of how many you did this deeper dive on.
15 Because you didn't do the deep dive -- you didn't call
16 the pharmacy on every single control order?
17    A.   No, not on every single one, but we did
18 it.
19    Q.   You did, but you didn't do it on every
20 single one.  So --
21    A.   No, no.
22    Q.   -- let me see -- let me show you 337.
23    A.   Do they have phone records back then
24 perhaps or...?

Page 171

1     Q.   So I don't know.  We -- I have -- I have
2 something that might be a little better than a phone
3 record I'm going to show you and see if that kind of
4 helps jog your memory.
5         (WHEREUPON, a certain document was
6         marked CVS - Elsner Deposition
7         Exhibit No. 15, for identification,
8         as of 01/24/2019.)
9 BY MR. ELSNER:
10    Q.   This is Exhibit 15.
11        And this is -- was put together in July
12 of 2012, so before you got there.  It's an e-mail from
13 Aaron Burtner to Pam Hinkle.
14    A.   Ah, yeah, okay.
15    Q.   And then it says:  "LP analyst time
16 study," all right.
17        And then it looks like Aaron put together
18 a little time study of how long it took him to do
19 certain things.
20        Do you see that?
21    A.   Um-hum.
22    Q.   And if we look at the -- let's see which
23 one I was going to look at here.  Maybe we don't need
24 to go through all of them.

Page 172

1         If you look at the first page, this was
2 his time study for July 13th, 2012.  All right.  And
3 he gets to work around 7:20 a.m.  And then if you go
4 down to the box there, it says:  "Review July 12th,
5 2012 Control IRR."
6         Do you see that?
7     A.   Oh, yeah, yeah.
8     Q.   Okay.  And it looks like he started
9 reviewing that IRR report at 7:35 a.m.?
10    A.   Yeah.
11    Q.   And he did it until about 8:15.  So it
12 took him roughly, what, 40 minutes, according to the
13 timesheet, to go through it?
14    A.   Yeah.
15    Q.   And then from that he flagged one of those
16 stores that he was going to do a deeper review.
17        Do you see that?
18    A.   Yeah.
19    Q.   Okay.  So at least on this day it took
20 Aaron, you know, about 40 minutes to do the review of
21 the IRR report.
22        Is that consistent more or less with the
23 amount of time it took you to do that review?
24    A.   I --

Page 173

1     MR. CLARK:  Object to the form.
2 BY THE WITNESS:
3     A.   I don't remember.  I know -- how much
4 longer we did it.  Some days took longer than others.
5 It was -- some day you could be pretty much set --
6 secure, say 2:30, you know, Ah, we are done, you know,
7 for the most part, and then you work on the reports
8 and stuff.  Other days you spent a lot more time, you
9 know.  I don't --
10    Q.   Okay.
11    A.   So typical is a good word, but I don't
12 think there is an exact set time.
13    Q.   Oh, I appreciate that.  I know some days
14 it took longer and some days it took less.  That's
15 true of everything.
16        But -- but he writes on this day it took
17 him about 40 minutes to review the IRR report.  And
18 then he is -- and then you see that he flagged one of
19 the -- of the IRR report from that day, he -- he
20 picked one that he was going to do the review of.
21        And then do you see underneath it says:
22 "Review Store 1780"?
23    A.   Yes.
24    Q.   And that's the one he flagged, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1     And it says that he started that review
2  about 8:15 and he finished it about 8:30 and then this
3  is what he looked at. He looked at the timeframe from
4  4/1/2012 to 7/7/2012, he looked at that dispense
5  versus ordering, how much did the store order versus
6  how much they dispensed, we talked about that, right,
7  and then he writes those numbers that they, you know,
8  they ordered 1350 and dispensed a thousand. Then he
9  reviewed common doctor/patient.
10     And we talked about that criteria,
11  correct?
12     Yes?
13     A.  Um-hum.
14     MR. CLARK:  Object to the form.
15  BY MR. ELSNER:
16     Q.  And then it says: "No patterns
17  identified, store will not be contacted."
18     So it took him about 15 minutes to do that
19  review, run -- run that report on dispense versus
20  order and look at the data on whether there was a
21  common doctor/patient --
22     A.  Yeah.
23     Q.  -- and look at the patterns, correct?
24     MR. CLARK:  Object to the form.

Page 175

1  BY MR. ELSNER:
2     Q.  If you didn't have to call the pharmacy,
3  is that about the amount of time it would take you to
4  take a look at that order?
5     A.  I don't -- because I know each in -- each
6  investigation was discrete, you just -- it just --
7  sometimes you are on the internet looking to see where
8  the hospital is located, you know, call stuff up that
9  way. Sometimes it is more, you know,
10  mouth-to-mouth/face-to-face with the pharmacy, we were
11  talking to them, so.
12     And the one thing I know is this -- I --
13  when you -- when you brought this up, I remember
14  hearing Aaron talking about it briefly, but this was
15  made back I think when he first started the role with
16  the -- and he took it over from another guy and it was
17  very initial and I don't -- and I know the process
18  evolved as we got into it, we made it better and we
19  brought in more people, you know, brought in another
20  person, Shauna, and I know the guy that he was working
21  with or took it over from, they let him go, and I'm --
22     Q.  Was that person fired, do you think?
23     MR. CLARK:  Object to the form.
24  BY THE WITNESS:

Page 176

1     A.  I don't remember. Maybe if he was -- if
2  he was, I think part -- this was part of it because
3  Aaron say -- you know, I don't remember, but that
4  was -- yeah, he worked in another state.
5  BY MR. ELSNER:
6     Q.  Right.
7     A.  And that was all before I got in because
8  that was how Aaron got involved in it.
9     Q.  Was that a person by the name of
10  Mortelliti?
11     A.  I don't remember his name. That one
12  doesn't sound familiar. It --
13     Q.  Okay.
14     A.  -- it'd -- would make sense because he was
15  gone before I got there so I would have never seen his
16  name in an e-mail.
17     Q.  Okay. But do you think that Aaron Burtner
18  told you that -- that the person who performed the
19  role before him was let go by CVS?
20     A.  I don't remember. I know he didn't -- he
21  is not doing the job anymore. That's why Aaron took
22  it over.
23     Q.  What -- what exactly was it that -- that
24  Aaron told you, was it -- was it Paul Lawson?

Page 177

1     A.  I -- I don't remember.
2     Q.  So there was --
3     A.  Because it probably -- he maybe never
4  mentioned the name.
5     Q.  Okay.
6     A.  I just know he -- he learned it from
7  somebody else down there, maybe was it Tennessee or
8  something?
9     Q.  Yeah, Knoxville maybe?
10     A.  Knoxville, with -- and with Pam and --
11     Q.  So -- so there was -- there was Paul
12  Lawson and Aaron Burtner were doing reviews together
13  of the suspicious order monitoring in Knoxville,
14  Tennessee and then Aaron moved to Indianapolis, right?
15     A.  Back up to Indianapolis, okay. Yeah.
16     Q.  And -- and -- and what did -- and what did
17  Aaron tell you about why he took that role over?
18     A.  I don't remember.
19     Q.  Okay.
20     A.  The only thing I remember -- the only
21  thing I can remember, Aaron, he started out at Mike's
22  Car Wash --
23     Q.  Oh, yeah?
24     A.  -- as a safety manager.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.   Okay.
2    A.   So he made a jump, too, you know.  And --
3  and other than that, I don't remember why he got
4  involved with the job.
5    Q.   Okay.
6       Do you remember anything else about the
7  person who -- because you said that --
8    A.   I -- no, I just kind of just talked --
9  that's how Aaron told me he got involved.  I don't --
10  I don't remember.  I never met -- I don't know the
11  guy's name because it was all before I came along.
12    Q.   Okay.  But at the time that you joined
13  CVS, doing these reviews starting in 2013, the
14  beginning of 2013, it was you and Aaron, right?
15    A.   Yeah, correct.
16    Q.   Okay.  Okay.
17       All right.  So if we go back to the -- to
18  the time study, we -- we -- it took him about
19  40 minutes to review the IRR, it took him about
20  15 minutes to do this review of Store 1780, which
21  included what we discussed, the dispense --
22    A.   Yeah.
23    Q.   -- how much drug dispensed --
24    A.   Yeah.

Page 179

1    Q.   -- versus ordered, review the common
2  doctor/patient information, and then he decided the
3  store will not be contacted.
4       So that's a situation where in that one it
5  only took about 15 minutes, right?
6    A.   Yeah.
7    Q.   And sometimes that happened, you could go
8  through that information and --
9    A.   Yeah.
10    Q.   -- in about 15 minutes you could determine
11  it was not --
12    A.   Yeah, yeah, it could be something -- or,
13  you know, you called that store, Oh, yeah, we
14  mis-ordered that, boom.
15    Q.   What -- so -- so that's another situation,
16  but let's -- let's look at the second page after
17  lunch.  Toward the bottom around 2:00 p.m. he said he
18  completed a review of Store 2775.
19       Do you see that?
20    MR. CLARK:  Object to the form.
21  BY THE WITNESS:
22    A.   Oh.  Oh, okay.  Complete reviews.
23  BY MR. ELSNER:
24    Q.   Okay.  And he started that at 2:00 p.m.

Page 180

1  and he finished that one at 3:50 p.m.  And then he
2  writes what he did.  He flagged five sets of scripts.
3    A.   Yeah.  Okay.
4    Q.   And then -- and then he -- he lists what
5  those are, correct?
6    A.   Yeah, the patient/doctor combos, I see
7  here.
8    Q.   Okay.  And -- and in order to do -- do
9  you -- do you know what kind of review this would have
10  included when you are looking at scripts?  He is
11  looking at patient versus doctor information.
12       Do you see there is the consistent
13  patient/doctor?
14    A.   You know, the only thing I can say is this
15  would have been what drew me to the horse, you know,
16  something to do with patient versus doctor, and when I
17  got into it I found out what was going on.  But how he
18  went about it and how long it took, I don't remember.
19    Q.   Well, he said in this situation it took
20  him about one hour and 50 minutes.  That's what's
21  written on the sheet, right?
22    A.   Yeah, that's a -- that's about --
23    Q.   And -- and the only --
24    A.   -- two hours, you know.

Page 181

1    Q.   And the only thing I'm trying to get at is
2  sometimes that review could be done in 15 minutes?
3    A.   Yeah, it just depends, yeah.
4    Q.   But -- but there were times it could
5  take --
6    A.   Yeah.
7    Q.   -- up to an hour and a half, an hour --
8    A.   I concur.
9    Q.   -- sometimes even two hours, is that
10  right?
11    A.   Yeah.
12    Q.   Now, if the computer program is
13  identifying every day hundreds of orders, you can't
14  spend two hours or even 15 minutes doing this kind of
15  deep dive review and finish that job before 5 or
16  6 o'clock at night, right?
17    MR. CLARK:  Object to the form.
18  BY MR. ELSNER:
19    Q.   You had to pick which ones you were going
20  to decide to do that deeper dive review on even if
21  it -- even if it preprogrammed in the system as red or
22  green or yellow?
23    A.   I think you were there to do the job.  If
24  you had to look at a hundred of them, you know, deal

Page 182

1  it to the next day, well, you just wouldn't ship until
2  the next day, you know.
3      Q.   Well, I agree with that, but you -- but
4  my -- my question to you is on -- on this review of
5  the IRR report he picked one, right?
6      A.   He did, yeah.
7      Q.   He didn't -- he didn't -- he didn't select
8  any others except for one that he was going to do that
9  deeper dive on.
10         So some days you'd -- you'd --
11     A.   I -- I can't extrapolate what he did to
12  what we were doing.  I won't do it because I don't
13  know what this was -- this was early on and I don't
14  remember enough about what we were doing that I
15  wouldn't say that this is -- I wouldn't -- I can't
16  confidently say that this document has any relevance
17  to what I was doing.
18     Q.   Well, there were -- you were doing these
19  kinds of reviews, right?
20     A.   Yeah, I was doing this kind of stuff, but
21  as far as time study, this is a time study.  Is it
22  relevant to what my time?  I can't answer that.
23     Q.   Well, what would happen in a given day,
24  like if you needed to work over eight hours, were you

Page 183

1  salary or did you -- were you paid hourly?
2         Did you get overtime?
3      A.   I think I was salary.  I can't remember.
4  I'm pretty sure I was salary.  Like I say, this -- it
5  ebbed and flowed.  You know, some days you -- some
6  days it was a relaxing day, you know, you didn't have
7  to, and then some days you were there pulling out your
8  hair, you know, all day long, you know.  It is just
9  like as the time study shows, it just -- it would
10  depend.
11     Q.   And there were times where it could take
12  an hour to two hours to do a -- a review if you needed
13  to?
14     A.   Oh, sure.  I'm sure there were.
15     Q.   Okay.
16     A.   Do you -- can you -- do you remember, does
17  it say if I was salary or hourly?  I can't remember.
18     Q.   I asked you the question.  I don't know
19  the answer.
20     A.   I can't remember.  I was just curious.  I
21  think I was salary, but...
22         I thought you guys were only supposed to
23  ask questions you already knew the answers to?
24     Q.   Well, that's the difference between a good

Page 184

1  lawyer and me.
2      MR. CLARK:  No objection.
3      MR. ELSNER:  Oh, I'm going to ask that that be
4  stricken from the record.
5      MR. CLARK:  Move to strike.  And I apologize.
6      MR. ELSNER:  I'm just teasing.
7         Can we see 338.
8      THE WITNESS:  So who is running this, is it you
9  or...?  Ah, you're pretty good.  I thought you were
10  pretty good for being handing me documents and still
11  running that.
12     MR. ELSNER:  That would not be me, my friend.
13         (WHEREUPON, a certain document was
14         marked CVS - Elsner Deposition
15         Exhibit No. 16, for identification,
16         as of 01/24/2019.)
17  BY MR. ELSNER:
18     Q.   Exhibit 16.
19         This is a memo that Aaron wrote to
20  Pam Hinkle, also before you arrived in September
21  of 2012, and the subject here is "Required Headcount
22  to Complete the IRR SOM Process."
23         Did I read that right?
24     A.   That's what it looks like.

Page 185

1      Q.   Okay.  And he -- he has a -- a chart here,
2  "The Current Required Activities With Two Full-Time
3  Analysts."
4         Do you see that, the very first heading?
5      A.   Yeah.
6      Q.   And when -- and -- and you'd review the
7  daily --
8      A.   Okay.
9      Q.   -- there would be a daily review of the
10  control IRR report listed first, correct?
11     A.   Yeah.
12     Q.   And then you'd -- there would be a daily
13  review of the PSE IRR report.
14         Usually that didn't take very long to
15  review, right, the PSE one?
16     A.   Don't put "right" on there.  I can't agree
17  or disagree.
18     Q.   You don't know?
19     A.   I don't remember.
20     Q.   You don't know which one took longer than
21  the other?
22     A.   I don't -- I don't remember one from the
23  other, you know.
24     Q.   Then it says:  "Daily review of the FL or

Page 186

1  5000 Dose Report."

2       Do you see that?

3       A.   Yeah, I see it.

4       Q.   Okay.  Were you doing a review of the

5  Florida, which they referred to as the "5000 Dose

6  Report"?

7       A.   That -- that sounds familiar.  This is the

8  first time I -- now that I read it, but what I -- we

9  did with it, I can't remember.

10      Q.   Well, let's look -- let's look --

11  underneath it that says:  "Review of high volume

12  stores based on current priority."

13      Do you see that, underneath?

14      A.   Yeah.

15      Q.   And then it says:

16      "Type" -- "Top ten hydro dispensing stores

17  for each distribution center, top hundred hydro

18  dispensing stores Form OR DC," and then "The top 25

19  oxy ordering stores from McKesson and Cardinal."

20      Those are all under the review of high

21  volume stores based on current priority?

22      A.   Yeah, okay.

23      Q.   Is that right?  That's what the document

24  shows?

Page 187

1       A.   That's what it shows, yeah.

2       Q.   Okay.

3       And then underneath that, it says the --

4  he is proposing required activities with a proposed

5  headcount of three time analysts, meaning we have to

6  do what's above with two, but here is the proposal of

7  what we could do with three?

8       A.   Oh, okay.

9       Q.   Do you see that?

10      A.   Yeah, yeah.

11      Q.   Okay.

12      And so he says:  With two full-time

13  analysts this is what we'd be able to complete.  And

14  it is the daily review of the control IRR, right?

15      A.   Um-hum.

16      Q.   And then underneath it:  "Max/minimum

17  ratios to take effect for a particular week," and then

18  he goes through these various items.

19      Then he says:  "A daily review of the

20  Florida or 5000 Dose Report"?

21      A.   I think, if I want to remember, because

22  it -- it was with my wife as well, I think Florida had

23  a different set of laws.  I think that's why we had to

24  do something different, because I remember that my

Page 188

1  wife's pharmacy license was good everywhere else but

2  Florida.  If she wanted to go practice in Florida, she

3  had to take the exam again.  So I think, now -- now

4  that I see this, we did something -- we had to do

5  something additional --

6       Q.   For Florida.

7       A.   -- for the Florida laws.

8       Q.   Were you aware that -- that CVS had been

9  investigated by the DEA in Florida relating to its

10  pharmacies' dispensing of controlled substances?

11      A.   No, I don't remember anything like that,

12  no.

13      Q.   No one ever told you that the Florida's

14  CVS stores had been investigated by the DEA?

15      A.   Not -- no, I don't remember.  I knew -- I

16  knew Florida, a lot of crazy stuff happens there, but

17  I don't know.  I didn't -- I don't know about it being

18  CVS related.

19      Q.   Okay.  You didn't -- nobody told you that

20  the CVS pharmacies there had gotten into trouble?

21      A.   Not specific to CVS, no.

22      Q.   Okay.  It says --

23      A.   Not that I remember, I mean.

24      Q.   It says that currently only the Florida

Page 189

1  and OR 5000 Dose Reports are reviewed, okay.  So only

2  the Florida 5000 Dose Reports are reviewed.

3       Underneath that it says:  "5000 Dose

4  Reports are currently available for each of the

5  distribution centers."  Okay?

6       And so on this particular day in August,

7  underneath that, on Aug -- August 29th, 2012, there

8  were 741 stores that would have been populated in the

9  5,000 dose review.

10      So 5,000 doses means 5,000 doses of a

11  con -- of a particular controlled substance.

12      A.   Okay.

13      Q.   Is that right?

14  MR. CLARK:  Objection to form.

15  BY THE WITNESS:

16      A.   I don't know.

17  BY MR. ELSNER:

18      Q.   You don't know?

19      A.   No, I -- I -- I looked and I thought -- I

20  thought maybe it was 500 level on -- on the SKU or

21  something.

22      Q.   But you weren't doing a review of every

23  CVS store that hit the 5,000 dose mark, correct?

24      A.   I don't remember what the 5000 Dose Report

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  was.  I don't know.  I mean, I -- we looked at all of
2  our stores for something, so...
3      Q.    But underneath it says it would take eight
4  full-time employees --
5      A.    Yeah, so.
6      Q.    -- that would need to spend 7.75 hours
7  each to complete reviews of all 741 stores, right?
8      A.    Well, that's what Aaron -- that's Aaron's
9  analysis.
10      Q.    And that -- do you think that would be
11  about right, that they -- that's how long it would
12  take?
13      A.    I can't tell you what I think because I
14  don't remember working with that.  And this was
15  something that I wasn't a part of, this analysis.
16      Q.    And -- and -- and and that's based on a review
17  of each of those stores for five minutes, that's what
18  he wrote, right?  But we saw that one of the reviews
19  that he needed to do on the timesheet took him
20  15 minutes without even calling the pharmacist?
21      A.    Well, was that a 500 -- or a 5000 Dose
22  Report, is that -- is -- are we doing apples to apples
23  here or...?
24      Q.    I -- I don't know that it came from that

Page 191

1  report.
2          Would there have been a different --
3      A.    I don't --
4      Q.    -- review done for the 5,000 dose than --
5      A.    I don't -- if this was -- when -- when he
6  looked at these stores on this time study, was he
7  going off this report or was he going off the IRR?
8      Q.    I think he was going off the IRR.
9      A.    Oh, okay, so.
10      Q.    Was there a different review done on the
11  5,000 dose review?
12      A.    I -- I don't remember.  That's why I'm
13  trying to ask.
14      Q.    But if you needed to call the pharmacy and
15  document that and do all of the computer searching, it
16  would take more than five minutes for a store, right?
17      A.    Probably.  I mean, sometimes, yeah, real
18  quick, sometimes maybe -- it might go that quick.  If
19  you get them in the morning, and they answer, pick
20  right up, oh, yeah, you know.
21      Q.    But even if it went that quick, in order
22  to do 741 stores, it -- you --
23      A.    Well --
24      Q.    -- according to his calculations, you need

Page 192

1  eight full-time employees working 7.75 hours each?
2      A.    According to his calculations.
3      Q.    And there were never -- there were never
4  eight em --
5      A.    Well, I don't -- I mean --
6      Q.    -- full-time employees working on the SOM
7  program while were you there, right?
8      A.    Isn't that what your report is for, to
9  separate out the anomalies so you are looking at what
10  was different?  I mean, if somebody is ordering ten
11  and they are distributing ten and they did that for
12  12 months, why would you look at them, for example,
13  based on order versus dispensing.
14      Q.    Did you -- did -- were there ever eight
15  full-time employees in the suspicious order monitoring
16  group that you were involved in --
17      A.    Not in my office.
18      Q.    Okay.
19      A.    I don't know what happened elsewhere.
20      Q.    In fact, there weren't even three
21  full-time analysts when you started at CVS.  It was
22  you and Aaron Burtner?
23      A.    It was me and Aaron.
24      Q.    So that was two?

Page 193

1      A.    Aaron and I, yeah.
2      Q.    So this is what his proposal of what could
3  be accomplished with three?
4      A.    Yeah, I think this was like his --
5      Q.    And the --
6      A.    -- growth.
7      Q.    -- and the -- and the other thing that I
8  wanted to -- wanted to just direct your attention to
9  is that under the -- the one full-time analyst would
10  complete, so if we had three, if you go down a little
11  bit further --
12      A.    Yeah, three full time.
13      Q.    -- it -- it -- it says in the -- under --
14  in the second -- in the first square bullet there:
15          "Currently, a given set of information is
16  reviewed by only one person, so if that one person
17  misses something, it's missed."
18          Do you agree with that statement?
19      MR. CLARK:  And do you know where we are on the
20  document?
21      THE WITNESS:  Yeah, we are right here.
22  BY THE WITNESS:
23      A.    At that time, perhaps.  I don't know.  I
24  can't --

Page 194

BY MR. ELSNER:

1 Q. Well, when you did your reviews, did Aaron
2 go behind you and do the same work and see if what you
3 did was right?
4 A. I don't believe so.
5 Q. Okay. And what he is saying here is if,
6 Boy, if I had three full-time people, then I would
7 have someone to make sure something doesn't get
8 missed. Because under the next square, it says:
9 "Consistent auditing of the reviews by the
10 other two analysts would eliminate the liability of
11 any potentially irregular orders, doctors, patients,
12 et cetera, getting missed."
13 That's what he writes, right?
14 A. Okay. Yeah, I think -- I think what you
15 are saying is -- is he is recommending proofing, you
16 know, we checking each other's work, you know.
17 Q. Well, I think what he is saying is if we
18 had three people, one person could review the other
19 two analysts' work --
20 A. Yeah, you know.
21 Q. -- to make sure nothing gets missed,
22 right?
23 A. I think that's --

Page 195

1 MR. CLARK: Objection to form.
2 BY THE WITNESS:
3 A. -- yeah, like the man -- I think -- did I
4 miss -- I think that was what -- as a manager that's
5 what he -- when they brought Shauna on, that's what he
6 was trying to do, he was going to go over the --
7 BY MR. ELSNER:
8 Q. He want -- he wanted three people so that
9 someone could audit --
10 A. Yes.
11 Q. -- all of the reviews?
12 A. Yeah, he was auditing us there. Yeah, he
13 was auditing us.
14 Q. I mean, that's what he wanted to do --
15 A. Yeah.
16 Q. -- if there was three people, right?
17 MR. CLARK: Object to the form.
18 BY MR. ELSNER:
19 Q. Was there anyone doing auditing of your
20 reviews while you and Aaron were doing the reviews and
21 then after Aaron left?
22 MR. CLARK: Object to the form.
23 BY THE WITNESS:
24 A. I think that's what Aaron was doing for

Page 196

1 me. I can't remember exactly. And then we brought --
2 before Aaron left, we brought Shauna up. So then,
3 yeah, that's kind of what he was doing. And when he
4 left, it wasn't very long until they brought in the
5 consultant, not Matthew, but one of his...
6 BY MR. ELSNER:
7 Q. Did -- another DEA consultant?
8 A. Yeah, he -- he took over the management
9 role. He was a former retired DEA agent.
10 Q. Did -- did you perform any audits of the
11 reviews of the suspicious order monitoring?
12 A. Did I audit?
13 Q. Yes.
14 A. No. I was doing the --
15 Q. You were doing the work?
16 A. I was doing the work.
17 Q. You didn't have time to do the work and
18 audit the work, correct?
19 A. No, no.
20 Q. And you would have been auditing your own
21 work because --
22 A. That was the manager who did it.
23 Q. -- at the time you were --
24 A. Yeah, I don't remember. I mean, I just --

Page 197

1 I did the job. That's all I can remember.
2 Q. Now, you sort of testified in the
3 beginning that there was a current suspicious order
4 monitoring system in place and -- and they were
5 developing a new SOM program, correct?
6 A. I knew that they had something in
7 development. When I said current system in place,
8 that's just what --
9 Q. What you were using?
10 A. Well -- well, using or doing. I don't
11 know if I was using it. I was -- not a system. The
12 system is what we had -- were doing. We put it
13 together. You know, we pulled from this report and
14 those reports. There was nothing -- nothing was doing
15 that. We were the system.
16 And if it was my understanding -- or my
17 recollection is that -- that the system they were
18 developing was going to go ahead and pull in a lot of
19 that stuff, the data mining, the -- the non-analytical
20 part, put a lot of that in for one system so there is
21 a...
22 Q. Do you know what -- what information or
23 what program was being done in the new SOM to fix
24 situations in the old SOM?

Page 198

1    MR. CLARK: Object to form.
2  BY THE WITNESS:
3    A.  I do not know because I think before any
4  of that ever got to me, that's about the time I left.
5  I do remember them telling me it was going to be a
6  web-based application, not a mainframe. You know,
7  that's what I'm looking for.
8        This -- the report with the -- with the
9  holes down the side, that's a mainframe, an old
10 school, mainframe application.
11 BY MR. ELSNER:
12   Q.  Okay.
13   THE WITNESS: Did I hit something?
14   MR. CLARK: No. I think he is switching
15 documents.
16   THE WITNESS: Oh, okay.
17 BY MR. ELSNER:
18   Q.  Let me show you this document.
19       (WHEREUPON, a certain document was
20       marked CVS - Elsner Deposition
21       Exhibit No. 17, for identification,
22       as of 01/24/2019.)
23 BY MR. ELSNER:
24   Q.  This is Exhibit 17.

Page 199

1       This is training for Archer. And this is
2  an e-mail sent to you and to Aaron Burtner and Shauna
3  Helfrich from Cassandra Castro. And this is a
4  training guide on using Archer, SOM training guide for
5  Archer tool.
6        Do you see that?
7    A.  Yeah, I see that.
8    Q.  Okay.
9    A.  Who is Cassandra? Is she a -- was she a
10 CVS employee?
11   Q.  I don't know. I -- I'm not sure. I
12 believe she is because it says CVS Caremark Exchange
13 Administrative Group.
14   A.  Okay. Yeah, okay.
15   Q.  But do you understand that Archer was part
16 of the new program that was going to be --
17   A.  Is it?
18   Q.  -- put into place?
19   A.  I -- I knew something, but I didn't know
20 what it was called. I can't remember what it was
21 called. This, it looks like something that might be
22 it, because I knew it was going to be Windows based
23 where you didn't have to go in and pull up a specific
24 program. You could do it all in Windows, but --

Page 200

1    Q.  Okay.
2    A.  -- that's all I remember. I never really
3  got involved with it that I recall.
4    Q.  And it -- and -- and --
5    A.  It was going to make our job easier
6  supposedly, but never -- I never got exposed to it.
7    Q.  Okay. And -- and it never actually went
8  into effect while you were at CVS?
9    A.  I do -- I do not think so. I don't -- I
10 never -- I never -- I don't think I ever actually used
11 it.
12   Q.  Right.
13       But you were -- you were consulted or at
14 least some of these elements were brought to your
15 attention to take a look at?
16   A.  I think, yeah, the minutes will say, Hey,
17 you know, we have some issues that, you know, we are
18 looking at. The specifics behind it, I can't recall,
19 but I know we probably tried to give our two cents for
20 what, you know, as a user of the environment, you
21 know, it's like if I was going to design a program on
22 how to do law, you'd -- I'd have to ask you what I'm
23 supposed to do, you know.
24   Q.  Right. And -- and if I was trying to

Page 201

1  design a SOM system for you to use --
2    A.  Yeah.
3    Q.  -- I'd want to make sure you had a look at
4  it before it went into service to make sure it was
5  workable for you, right?
6    A.  Yeah, and -- and I don't --
7    Q.  And to take advantage of your experience
8  with the program, right?
9    A.  I don't -- I don't -- I can't remember if
10 we got involved, if we ever opened it up or it was
11 ever a -- a beta version was ever functional enough to
12 try it out. I don't remember if it was just screen
13 shots. I don't remember.
14   Q.  Do you -- do you --
15   MR. ELSNER: Let me see Exhibit 285.
16 BY THE WITNESS:
17   A.  You know, when we used to have an auditor
18 to come into our plant, we'd turn the heat up
19 sometimes to make them -- so they would quit the audit
20 early.
21 BY MR. ELSNER:
22   Q.  I can promise you that's not the intent,
23 because as difficult it is for you, it also is for me.
24   A.  I know, I was going to say, you can take

Page 202

1  your coat off, you know, I won't be offended.
2      Q.   I probably could, but I'm not going to.
3          (WHEREUPON, a certain document was
4          marked CVS - Elsner Deposition
5          Exhibit No. 18, for identification,
6          as of 01/24/2019.)
7  BY MR. ELSNER:
8      Q.   This is Exhibit 18. I'm sorry. I did
9  that backwards.
10     MR. CLARK: And just for the record, that
11 comment referred to the temperature in the room.
12     MR. ELSNER: Yeah.
13     MR. CLARK: The literal temperature in the room.
14     MR. ELSNER: I don't think -- I don't think
15 anyone would be confused by that.
16 BY MR. ELSNER:
17     Q.   This is an e-mail from Craig Schiavo to
18 Ken Weinstein and -- and Crystal Pike. And it says in
19 the e-mail, it says:
20         "Hi Ken, We recently had one for" -- and
21 apparently it relates to a -- to a -- either a drug or
22 an item that's not included in this case.
23         "Attached is a sheet Aaron had sent over
24 to me and his e-mail regarding the order below. Maybe

Page 203

1  you'll provide a better example, but this is one that
2  I was recently involved in."
3          And if you look down beneath, it says: "I
4  reviewed the IRR for the day this order was placed and
5  it did flag."
6          Do you see where I'm at right beneath the
7  line?
8      A.   Yeah. Yeah, it did flag, yep.
9      Q.   Okay.
10         And then it says: "On the screen shot
11 below, you can see Store 1007 as the first entry and
12 it is listed as" -- "as a max cutoff order."
13         Do you see that?
14     A.   Um-hum.
15     Q.   And that's one of the other criteria that
16 the system was looking at, right, max cutoff orders?
17     A.   Yeah, I think so.
18     Q.   Okay.
19     A.   I don't remember what a max cutoff order
20 is, so I'm just nodding my head.
21     Q.   But do you think that that's one of the
22 criteria that -- that you were looking at?
23     A.   I don't know. I don't -- I don't
24 recognize max cutoff. I don't know what this is

Page 204

1  about, you know. Although I think I kind of -- I'm
2  starting to remember Craig Schiavo. Was he IT or
3  something?
4      Q.   No.
5      A.   He sounds a little familiar. Maybe not.
6      Q.   Well, we'll look at some other things
7  later. Maybe it will refresh your memory.
8          And he says: "I also reviewed the
9  ship/dispense history of the previous three months for
10 this GCN and they receive on average 185 to
11 200 bottles per month," which is 55 -- it is over
12 5,000 to 6,000 doses, "and dispenses approximately
13 50" -- "5,000 doses per month. All of this
14 information would give my team reason to approve this
15 order as non-suspicious."
16         Do you see that?
17     A.   Yeah.
18     Q.   "For my team to catch this issue, we would
19 need to review the entire invoice for each store which
20 is not part of the current process. That" -- "This is
21 a scenario that is a gap in our current process,
22 however, it will be addressed with the new process
23 because each item ordered in the drug family in
24 question will be listed on the algorithm output report

Page 205

1  with the quantity ordered."
2          Do you see that?
3      A.   Um-hum.
4      Q.   Okay. So this is an example where --
5  where Aaron Burtner was identifying a gap in the
6  current SOM system, correct?
7      A.   So this down here is from Aaron?
8      Q.   From Aaron, yes.
9      A.   Okay. Good, because I didn't see his
10 name.
11     Q.   Well, the e-mail above says that --
12 that --
13     A.   Oh, okay.
14     Q.   -- it attaches to this e-mail?
15     A.   Oh, oh, from Aaron. Okay. All right.
16         But I'm not on this e-mail and this is --
17 I think realistically, this is -- this is, like,
18 management talk, developmental talk, this is not
19 really --
20     Q.   Well -- well, did you understand that
21 there was a gap in the current suspicious order
22 monitoring process?
23     A.   I don't -- I don't know any more than
24 there is a gap in anything. That wasn't something

Page 206

1 that was on my plate. I was doing the job. This is
2 stuff that, you know, was above my pay grade.
3    Q. Okay. Well, this is April 4th, 2013?
4    A. Yeah.
5    Q. It is two months before Aaron -- before
6 Aaron Burtner leaves and you take over, right?
7    MR. CLARK: Object to the form.
8 BY THE WITNESS:
9    A. I didn't take over. I never took over.
10 BY MR. ELSNER:
11    Q. It is two months before Aaron Burtner
12 leaves, right?
13    A. Right.
14    Q. Okay.
15    And at this point in time you weren't
16 involved in analyzing what gaps existed in the --
17    A. No, the system, yeah.
18    Q. -- current process versus -- and you
19 weren't aware of any --
20    A. I was just a --
21    Q. -- you do know about the gaps?
22    A. -- I was an analyst just analyzing the
23 job. I wasn't doing any planning of strategy,
24 nothing. That wasn't -- that was -- like I say, a

Page 207

1 man -- if somebody says I was managing, somebody owes
2 me some money then, because I was never paid as a
3 man -- as a manager.
4    Q. Well, you may be right about that.
5    If you go to the next -- the -- the second
6 page, you -- I just want to just clarify it a little
7 bit.
8    The original e-mail is:
9    "Do you have an example from the past year
10 in mind of a generic launch that would have had a
11 significant impact on ordering? It may be worthwhile
12 for us to take a look at the data for that drug family
13 to pressure-test how things would have worked out."
14    A. One, I don't know what he means by a
15 "launch," generic or otherwise, and I don't know if
16 this is -- Ken is obviously a manager of the analysis
17 group, but -- and the consulting, I think, company
18 that developed it, but this sounds just like he is
19 looking for test scenarios.
20    Q. Well --
21    A. That's what it sounds like to me. But I
22 don't know. I mean, I -- I wasn't -- I wasn't
23 involved in any of this. This is out -- like I say,
24 it is outside of my pay grade at the time.

Page 208

1    MR. ELSNER: Okay. Why don't we take a quick
2 break.
3    THE VIDEOGRAPHER: We are off the record at
4 12:14 p.m.
5    (WHEREUPON, a recess was had
6    from 12:14 to 1:13 p.m.)
7    THE VIDEOGRAPHER: We are back on the record at
8 1:13 p.m.
9 BY MR. ELSNER:
10    Q. Mr. Baker, six months after you joined
11 CVS, Aaron Burtner resigned from CVS, is that right?
12    A. Correct.
13    Q. Okay.
14    A. I think -- well, I know -- yeah, he did,
15 yeah.
16    Q. Okay. Do you know, did he resign or --
17    A. Well, he -- yeah, because he went
18 through -- he got a job offer from -- somebody he knew
19 before got him a job by Amazon.
20    Q. Okay. I'm going to show you Exhibit 19.
21    (WHEREUPON, a certain document was
22    marked CVS - Elsner Deposition
23    Exhibit No. 19, for identification,
24    as of 01/24/2019.)

Page 209

1 BY MR. ELSNER:
2    Q. And this is just to kind of remind you of
3 the date.
4    This is an e-mail from Aaron Burtner to
5 Crystal Pike. The subject is the "SOM." And Aaron
6 writes:
7    "I wanted to let you know that I put in my
8 two-week notice last Thursday and my last day with CVS
9 will be June 26th, 2013."
10    Do you see that?
11    A. Yep.
12    Q. Okay. So when Aaron resigned in June
13 of 2013, you sort of as -- assumed the role you were
14 doing and then you also were taking over some of
15 Aaron's responsibilities, is that right?
16    A. I don't believe so. I don't think I
17 ever -- I think that was his original summation. I
18 didn't do anything different, I don't believe, that I
19 remember.
20    Q. Okay.
21    A. There was some talk of me -- Mark
22 Nicastro, but they never did put me in that role.
23    Q. Okay. Well, let me -- let me go through
24 the document here. It says in the fourth paragraph:

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    "I would guess that Kelly Baker will be
2  acting as the SOM manager until a permanent
3  replacement is found."
4    A.   Yeah.
5    Q.   That's what he wrote to -- to Crystal
6  Pike --
7    A.   Okay.
8    Q.   -- in this e-mail?
9    A.   And who was Crystal Pike, anyway?
10   Q.   Well, I take it from the second paragraph
11 here, it says:
12   "I really want to thank you for all your
13 help over the last year.  It has been a pleasure
14 working with you and the AGI team."
15   A.   Okay.  So it's some kind of --
16   Q.   You know the analysis group AGI --
17   A.   Yeah, I think.
18   Q.   -- was the consultants working on the SOM?
19   A.   Wasn't the consultants working on the
20 new --
21   Q.   SOM program, that's right.
22   A.   Yeah, okay.
23   Q.   Okay.  And so anyway, he -- he had --
24   MR. MILLER:  This is Jake Miller on the phone.

Page 211

1  It appears that the phone was just un-muted.
2    Was the deposition started with the phone
3  still muted after the lunch break?
4    MR. ELSNER:  It was for about two questions.
5  We've established that his boss resigned in June 26th,
6  2013.  I'm going to --
7    MR. MILLER:  Do you -- do you have a rough idea
8  of how long the phone was on mute during the actual
9  deposition?
10   MR. CLARK:  Two minutes.
11   MR. ELSNER:  Maybe a minute, two minutes.
12   MR. MILLER:  Okay.  Thank you.
13   MR. ELSNER:  Your objections will be preserved.
14   (WHEREUPON, a certain document was
15   marked CVS - Elsner Deposition
16   Exhibit No. 20, for identification,
17   as of 01/24/2019.)
18 BY MR. ELSNER:
19   Q.   I'm going to show you Exhibit 20.
20   This is an e-mail that Aaron Burtner sends
21 to you dated June 11th, 2013, and he writes:
22   "Just an FYI, Susan asked if I have a copy
23 of your resume from when you were hired.  I don't know
24 this is a fact, but I would guess they are beginning

Page 212

1  the process of looking at you as the SOM manager."
2    Is that what Aaron wrote to you?
3    A.   Probably, yeah.  I think, yeah, I remember
4  they said they -- you know -- you know, it would be
5  logical that I would be the consideration because I
6  was there, but I had no interest in it, so...
7    Q.   You had no interest in the position?
8    A.   Nah, not being manager.
9    Q.   Okay.  So did Aaron -- did Aaron Burtner
10 ever discuss with you why he left CVS?
11   A.   I'm sure he did.  Because we went out --
12 the four of us went out for lunch every day.  I think
13 he just had a better role, a better job.
14   Q.   Did -- did he tell you he was leaving CVS
15 before he told CVS?
16   A.   I don't remember.
17   Q.   Did he ever express to you during any of
18 those lunches any issues he was having with CVS
19 related to staffing or finances or anything?
20   A.   No, no, no.  I just think a nice -- a
21 really much better deal came up and he -- he went
22 there.
23   Q.   I know you said that there were some
24 discussions.  Tell me about the discussions you had

Page 213

1  with Mark Nicastro about potentially assuming some of
2  the responsibilities that -- that Aaron Burtner was
3  taking over?
4    MR. CLARK:  Objection to form.
5  BY THE WITNESS:
6    A.   I don't remember what -- I'm sorry.  Maybe
7  I -- ask your question again.  I'm sorry.
8  BY MR. ELSNER:
9    Q.   Well, you had mentioned that you had some
10 discussions with Mark Nicastro, and I wanted to ask:
11 Did you discuss with Mark Nicastro the possibility of
12 you assuming or taking responsibility for some of
13 Aaron's roles at CVS?
14   A.   I -- I know we briefly had some
15 discussions and because -- and -- and then I think CVS
16 corporate decided to go a different direction, which
17 was okay with me, and they decided to get somebody,
18 because they had found a candidate that was, seemed
19 like a pretty good fit.
20   Q.   Okay.  And -- and how -- how far after
21 that June date were those discussions?
22   A.   I -- I really don't know.  Like I say, my
23 memory, I thought I only worked there six months, but
24 it turns out I worked there for a year.  That's how

Page 214

1 bad, you know.
2 BY MR. ELSNER:
3 Q. Okay. I want to show you your annual
4 review, which is Exhibit 21.
5 (WHEREUPON, a certain document was
6 marked CVS - Elsner Deposition
7 Exhibit No. 21, for identification,
8 as of 01/24/2019.)
9 BY MR. ELSNER:
10 Q. And this is -- this your annual review.
11 That's your name, Kelly Baker. And your reviewing
12 manager at the time was Mark Nicastro.
13 A. Correct.
14 Q. Okay. And on the right-hand side under
15 Self Progress and Results, it -- it says in the second
16 set of paragraphs, in the first line, it says:
17 "I did double duty functioning as the
18 temporary SOM manager in Aaron's absence and continued
19 to fully conduct SOM daily operations ensuring CVS's
20 regulatory compliance as well as attending all
21 implementation conferences."
22 A. Um-hum.
23 Q. Is that what you wrote in your review?
24 A. I -- I don't know. I don't remember

Page 215

1 writing it. I -- I -- I thought that looked like
2 something Mark would write, but...
3 Q. Well, it says that you "did double duty
4 functioning as the temp SOM manager in Aaron's absence
5 and continued to conduct fully SOM daily operations."
6 This is your annual review.
7 A. I -- I continued to do my job. I don't
8 know what I would be doing as a manager. I guess.
9 But I -- but I think -- what I did, it wasn't very
10 long, it was, like, only a few days. Of course you
11 want to -- you know, you want to make the review look
12 good, but I think it wasn't long after Aaron left that
13 they brought in the consultants. I'm -- it wasn't
14 very -- and we had a consultant that came in there
15 that was our manager until -- basically until I left.
16 Q. All right. Well, we'll -- we'll get to
17 that.
18 Let's go to the second page of the review.
19 There is an -- there is an opportunity for the manager
20 to offer a comment.
21 And if you see under the -- the second
22 comment in the -- it reads: "Kelly has done a great
23 job of adapting to his role."
24 Do you see that?

Page 216

1 A. Yeah.
2 Q. This is the part that your manager fills
3 in, Mark Nicastro?
4 A. Oh, okay.
5 Q. It says:
6 "Several months into his" -- "into his
7 position, the manager decided to leave. The
8 department of two quickly became the department of
9 one, and he has done a great job of holding it all
10 together."
11 Do you see that?
12 A. Um-hum.
13 Q. It then says:
14 "He has trained another analyst while he
15 completes his work and assumes duties as" -- "duties
16 of the manager."
17 So Mark Nicastro wrote that you assumed
18 the duties of the manager?
19 A. Yeah. Well, yeah, and I think Matt --
20 Mark originally had me planned for that, but you've
21 got to remember, Mark wasn't really director result --
22 related to this position. He was only filling this
23 out because Aaron was gone and there was nobody left
24 to do my review.

Page 217

1 Q. Right.
2 And there was no one left to do Aaron's
3 job, right?
4 A. No.
5 Q. Because Aaron left?
6 A. Yeah, so...
7 Q. And so you had to do both roles, you had
8 to do your role and some of his role?
9 A. Well, I had -- I also had Shauna. We
10 still had -- Aaron trained Shauna before he left.
11 Q. Okay.
12 A. So I had Shauna.
13 Q. And -- and -- and she was there?
14 A. Yeah.
15 Q. And when -- and she -- when did she start?
16 MR. CLARK: Objection to form.
17 BY THE WITNESS:
18 A. I don't remember, I mean.
19 BY MR. ELSNER:
20 Q. But she was working part-time, right?
21 A. No, I think what it was, she was working
22 full time just as a contractor. She wasn't -- you
23 know, like in a Manpower position. She wasn't on
24 CVS's payroll yet, if that...

Highly Confidential – Subject to Further Confidentiality Review

Page 218

1    Q.   Were you involved in the hiring of Shauna
2  Helfrich?
3    A.   I had nothing to do with that.
4    Q.   You didn't review her or anything?
5    A.   Nah, uhn-uhn.
6    Q.   This says in that -- well, Mark Nicastro
7  writes here that you assumed the duties of the
8  manager?
9    A.   Yeah, he assumed that I was assuming to do
10 it.  I mean, he didn't really -- I don't think he
11 really knew what we were doing per se.  I wasn't --
12   Q.   He just assumed you were doing Aaron's
13 job, right?
14   A.   Well, we --
15   MR. CLARK:  Objection to form.
16 BY THE WITNESS:
17   A.    -- we just happened to be in his house.
18 What we were doing wasn't directly related.  He was in
19 operations.  We were SOM, you know.  Our -- our
20 structure was really reporting to corporate.  We just
21 happened to be in his -- his house, his plant.  We
22 could have been in any other plant as well, you know.
23 BY MR. ELSNER:
24   Q.   Did you have a supervisor at corporate

Page 219

1  when Aaron Burtner left?
2    A.   I -- like I say, I think it was Pam Hinkle
3  was Aaron's boss, and I think that's who we reported
4  to.  And I don't -- I know I re -- we sent -- sent
5  stuff out to names, all right, and voices, but I never
6  met people, really.
7    Q.   I just want to make sure the record is
8  clear.
9        So you wrote that you did a double duty
10 functioning as the temporary SOM manager in Aaron's
11 absence on the first page?
12   A.   Yeah, I guess.
13   Q.   That's what you wrote, right?
14   A.   I -- I don't remember writing it, but I --
15   Q.   That's what's on your review?
16   A.   It is not beyond management to be lazy,
17 Here, fill out your, you know --
18   Q.   Well, this is actually your -- there --
19 this is divided in two parts.  You write the first
20 part.
21   A.   Oh, okay.  Oh, okay.  Yeah, it's possible.
22   Q.   And then the manager writes the second.
23   A.   I just don't remember doing it.
24   Q.   Okay.

Page 220

1    A.   But it may have been.
2    Q.   And when you filled it out, you tried to
3  be accurate, right?
4    A.   Well, yeah, you want -- you want to make
5  it look good, sound good, but you are not going to
6  lie.  No, I mean, I was doing --
7    Q.   Okay.  You wanted to make it sound good,
8  but you -- but in all fairness, you were doing both
9  jobs, there wasn't -- there wasn't anyone else doing
10 his role other than you, right?
11   A.   I believe so.
12   Q.   Okay.  And -- and Mark Nicastro thought
13 so.  He says, am I right, that:
14       "The department of two quickly became the
15 department of one" and that you "did a great job
16 holding it together."
17       He says you've trained another analyst?
18   A.   I helped train.  It was --
19   Q.   Okay.
20   A.    -- it was Shauna.
21   Q.   "And assumes the duty of manager."
22       So Mark Nicastro thought you were acting
23 as the manager?
24   A.   Yeah.

Page 221

1    Q.   And you wrote that, is that right?
2    MR. CLARK:  Objection to form.
3  BY THE WITNESS:
4    A.   I -- yeah, I -- I don't remember actually
5  doing any manager role, but...
6  BY MR. ELSNER:
7    Q.   But that's what's written in the review?
8    A.   Yeah.
9    Q.   Okay.  One of the things that you
10 reference is the -- the new SOM program, and we saw an
11 e-mail right before lunch where --
12   A.   Uh-huh.
13   Q.    -- they were talking about some gaps in
14 the current system and Aaron Burtner was given some
15 information about those gaps to the consultants so
16 they could build the SOM system.
17       And when Aaron left, you -- you started to
18 participate in some of those calls related to the new
19 SOM system, is that right?
20   A.   I don't know if I was on any calls.  I
21 think I maybe gave some e-mail feedback.  I don't know
22 if I was on any calls.
23       (WHEREUPON, a certain document was
24       marked CVS - Elsner Deposition

Page 222

1    Exhibit No. 22, for identification,
2    as of 01/24/2019.)
3 BY MR. ELSNER:
4    Q.   Let me show you Exhibit 22.
5    A.   I may have.  You know, I don't...
6    Q.   This is dated June 10th, 2013.
7    A.   Well...
8    Q.   And it is from Aaron Burtner to
9 Christopher Tulley and he cc's you, right?
10   A.   Yeah.
11   Q.   And it says: "Subject:  SOM Team."  And
12 he writes:
13        "Kelly Baker will be attending the SOM
14 calls and will be a key figure on the SOM team moving
15 forward, so please add him to the distribution list
16 for this team."
17        Is that what the e-mail says?
18   A.   Yeah, that's what the e-mail says.
19   Q.   Okay.
20        Now, before this date in June be -- 10th,
21 2013, had you ever been on any SOM calls before
22 related to the new system?
23   A.   I don't think so.
24   Q.   Did you participate on any SOM calls after

Page 223

1 Aaron sent this e-mail?
2    A.   I don't -- I don't -- I can't remember.  I
3 don't think I did because I don't know how long -- I
4 don't know how many days I was acting as the manager
5 because as soon as -- because pretty soon they brought
6 in --
7    Q.   Well --
8    A.   -- the consultant guy.
9    Q.   Well, let me show you Exhibit 23.
10        (WHEREUPON, a certain document was
11        marked CVS - Elsner Deposition
12        Exhibit No. 23, for identification,
13        as of 01/24/2019.)
14 BY THE WITNESS:
15   A.   You know, it's pos -- it's still possible,
16 I mean.
17 BY MR. ELSNER:
18   Q.   Now, this is the same day, June 10th,
19 2013.  This is an e-mail from Aaron Burtner to you,
20 correct?
21        Yes?
22   A.   Yeah.
23   Q.   Sorry.  I've just got to get a verbal
24 response for the court reporter.

Page 224

1    And he writes: "FYI.  Below are estimated
2 timelines for building, testing, and rolling out the
3 new system."
4    Do you see that?
5    A.   Yeah.
6    Q.   Okay.  And so Aaron is sending you
7 information to participate in the development of the
8 new SOM system, correct?
9    A.   Yeah, it looks like he is sending me
10 information all right.
11   Q.   Okay.
12        Now, aside from this e-mail, did he give
13 you any notes or any information on what the new
14 system was going to be like and how it was going to be
15 built?
16   A.   I -- you know, I don't know -- I can't
17 remember where we got the information.  Like I say, I
18 knew it was web based and, you know, something like we
19 looked at earlier, but I don't know what came from
20 Aaron or what we were exposed to.
21        And I know Shauna was in some of that
22 stuff too.  And I remember making some cra -- you
23 know, critiquing it a little bit, but I don't know
24 what information was disseminated.  And I -- how did

Page 225

1 I -- I can't remember actually being on any phone
2 calls about it.
3    Q.   Can we go back to your annual review a
4 second?
5    A.   Yeah.
6    Q.   That same first paragraph that we were
7 focused on, the part that you wrote.  It says there
8 that in Aaron's absence you: "Continued to fully
9 conduct SOM daily operations, including CVS's
10 regulatory compliance," and then it says: "As well as
11 attending all implementation conferences."
12        Do you see that?
13   A.   Is this on the front page?
14   Q.   It is on the front page.  This is the part
15 that you wrote, at the end of that first paragraph.
16        Do you see that, it says: "Attending all
17 implementation conferences, revised implementation
18 timing is now late October."
19        Do you see that?
20   A.   Okay.  Yeah, I think so.  Okay.  Yeah.
21   Q.   So, these implementation conferences, are
22 these the conference calls related to the development
23 of the new SOM and the implementation of that?
24   A.   I don't know.  I don't remember having any

Highly Confidential – Subject to Further Confidentiality Review

Page 226

1 conversations. I -- because it was all kind of done
2 in -- in Woonsocket, you know, and that was all -- and
3 then I think it was -- once we decided it wasn't going
4 to be -- I wasn't going to be a part of it, once they
5 decided they weren't going to do the -- they were
6 going to move the job to Woonsocket that I knew I
7 wasn't going to be a part because I wasn't going to
8 relocate to Woonsocket.
9     Q. Well, at this point in June, I don't think
10 there had been any discussions of Woonsocket.
11     A. Yeah.
12     Q. Because I'll show you Exhibit 24.
13         (WHEREUPON, a certain document was
14         marked CVS - Elsner Deposition
15         Exhibit No. 24, for identification,
16         as of 01/24/2019.)
17 BY MR. ELSNER:
18     Q. Mr. Baker, if you'll look at Exhibit 24,
19 this is an e-mail from Aaron Burtner and he cc's it --
20 you on the e-mail. This is also on June 10th.
21         Apparently, this is transition day for
22 Aaron Burtner, right?
23     A. Oh, okay. Yeah. All right.
24     Q. And he says:

Page 227

1         "As of June 27th, I will no longer be
2 employed by CVS. Therefore, please change the owner
3 of the IRR report to Kelly Baker."
4         Do you see that?
5     A. Yeah.
6     Q. And from that point on, you were going to
7 be responsible for the IRR report, correct?
8 MR. CLARK: Object to the form.
9 BY THE WITNESS:
10     A. Yeah, because this is a -- a monthly
11 report, so it must have been a different report that I
12 did monthly.
13 BY MR. ELSNER:
14     Q. And then he -- well, then he -- then he
15 says: "Kelly will need access to the PSE tab on
16 Archer and he will need to be added to the
17 distribution list for this group."
18         And then he says: "I will train him on
19 completing the monthly report moving forward."
20         Do you know where that monthly report was?
21     A. No, I don't. I thought we covered all of
22 the reports for the month.
23     Q. Well, we -- we talked about them all,
24 but --

Page 228

1     A. Yeah.
2     Q. -- at this point in time there is -- so
3 there's a -- some reporting in June that you didn't --
4 that you had not yet received any training on that he
5 is going to train you on, correct?
6     A. Yes, and --
7 MR. CLARK: Object to the form.
8 BY THE WITNESS:
9     A. I guess where I'm drawing a blank, do you
10 remember how long after Aaron left did they bring in
11 the consultant that took over as a manager role?
12 BY MR. ELSNER:
13     Q. Well, we may find -- I don't know the
14 answer to that right now, but we may find some
15 documents that helps us answer that.
16     A. Yeah, because I'm want -- I'm wanting to
17 say that it was such a quick transition that I
18 really -- none of that stuff ever became relevant,
19 but...
20     Q. Well, I am going to move to strike that.
21 We'll get to the question and --
22     A. Okay.
23     Q. -- and we'll get there.
24         Can we look at 290, please.

Page 229

1     A. 290?
2     Q. Oh, I'm -- I'm going to show you another
3 exhibit.
4     A. Oh.
5     Q. We are done with that one.
6         (WHEREUPON, a certain document was
7         marked CVS - Elsner Deposition
8         Exhibit No. 25, for identification,
9         as of 01/24/2019.)
10 BY MR. ELSNER:
11     Q. This is Exhibit 25, Mr. Kelly.
12         Wait. I may have -- yep, okay.
13         This is a collection of e-mails, and what
14 I want to focus on is the earliest of the e-mails. So
15 if you turn to Page 77947, that's the --
16     A. Yep.
17     Q. -- second-to-the-last page.
18     A. Yeah.
19     Q. This is an e-mail from Shawna Luehring?
20     A. Yes.
21     Q. And it says after her "contractor."
22         Do you see that?
23     A. Yes. That's -- that's a different Shawna
24 than my Shauna.

Page 230

1    Q.   Than was working for CVS, right.  This is
2 the wor -- Shawna working with AGI on the new SOM.
3         Do you see that the e-mail -- you are cc'd
4 on the e-mail, is that right?
5    MR. CLARK:  Object to the form.
6 BY MR. ELSNER:
7    Q.   Are -- are you listed on the cc's in the
8 e-mail from Craig Schiavo dated July --
9    A.   To Shawna?
10   Q.   I'm sorry.  No.  We are --
11   MR. ELSNER:  John, we are -- we are at the
12 e-mail beneath that.
13 BY THE WITNESS:
14   A.   Oh, Craig.
15   MR. ELSNER:  The one beneath that e-mail.
16 BY THE WITNESS:
17   A.   Okay.
18 BY MR. ELSNER:
19   Q.   Shawna Luehring --
20   A.   Yeah, there --
21   Q.   -- to Craig Schiavo?
22   A.   -- there "to."  Yeah, I'm "to" there.  I'm
23 not cc'd on -- on there at the "to."
24   Q.   On this one you are cc'd, correct, this --

Page 231

1 let me -- let me just orient you, make sure we are all
2 on the same place.
3         I am looking at Page 77947.
4    A.   Correct.
5    Q.   The very last e-mail on that page.
6    A.   Oh, okay.  Down there.  Okay.  Yeah, I am
7 cc'd.
8    Q.   All of the way down at the bottom, it says
9 Shawna Luehring is the -- is the "from" person, and we
10 talked about her being the contractor, and it is to
11 Craig Schiavo and cc's you, correct, among others?
12   A.   Yeah.
13   Q.   And the subject is "Archer SOM"?
14   A.   Correct.
15   Q.   Okay.  And then it says:
16        "I have updated the Archer SOM prototype
17 with the prescriber changes by removing the letter and
18 call fields from the review tab," and she goes on
19 there.  And then -- and then it says:  "I'll also need
20 to get requirements for access control."
21        And under No. 1 is a question of:  "Who
22 will be entering in" -- "in the SOM cases?"
23        Do you see that?
24   A.   Yeah.

Page 232

1    Q.   Okay.  Now, what I want to do is have you
2 go back to Page 2 to the e-mail above the one from
3 Shawna.
4    A.   Yeah, the -- the -- from Craig.
5    Q.   That's right, from Craig.
6         And now this one is to you, among other
7 people, dated July 2nd, 2013.  And he says:
8         "Team," and this is Craig Schiavo writing,
9 right, and it says here that he is the senior
10 compliance manager, regulatory compliance for CVS.
11        Do you see that as his title there?
12   A.   Yeah, yes, yep.
13   Q.   Does that sound familiar?
14   A.   Craig Schiavo.
15   Q.   Okay.  And then he writes:
16        "My comments are in red.  Please review
17 and make any additions, changes necessary."
18        Do you see that?
19   A.   Yeah.
20   Q.   Okay.  Now, if we flip back to the e-mail,
21 the first e-mail on this --
22   A.   Okay.  Let me see the bold.
23   Q.   -- on the last page, so we've got the
24 question:

Page 233

1         "Who will be entering in the SOM cases?"
2 And then in bold it says:  "Case Owner" and this is
3 Craig Schiavo writing in, "Kelly Baker and his team."
4 And then it says "(yet to be hired?)"
5         Do you see that?
6    A.   Yeah.
7    Q.   Okay.  So Craig Schiavo is entering --
8 is -- is -- for access control in response to the
9 question of who is going to enter in the SOM cases,
10 the answer is you and your team and it says that you
11 haven't hired -- that they haven't hired you a team
12 yet, correct?
13   MR. CLARK:  Objection to form.
14 BY THE WITNESS:
15   A.   That's what it looks like, yeah.
16 BY MR. ELSNER:
17   Q.   Okay.  And then if we go down a little bit
18 further to Question No. 4, it says:  "Who will be
19 approving the SOM cases?  The approver."
20        And then you are listed there again,
21 correct, it says "Kelly Baker or" --
22   A.   Manager.
23   Q.   -- "or Kelly Baker's manager or both,"
24 correct?

Page 234

1 Is that what it says?
2 A. Yep, yep.
3 Q. Okay. So that -- so you are going to be
4 responsible for that.
5 And then it says under No. 5: "Who will
6 be the business Archer SOM administrator?" And then
7 that also lists you and your backup, yet to be
8 determined.
9 Is that what it says?
10 A. Yeah, yet to be determined.
11 Q. Okay.
12 A. Okay.
13 Q. So you get this document from Craig
14 Schiavo dated July 2nd, 2013.
15 Had anyone told you you were going to be
16 responsible for all of these things?
17 A. I don't know that -- to me that just
18 sounds a lot about what I was doing just now doing it
19 in a different system. I mean, I -- I approved --
20 Q. Did --
21 A. -- shipments before, you know.
22 Q. Did anyone tell you that you are now going
23 to be the person in charge of the IRR, that you now
24 were going to be the person entering the SOM cases,

Page 235

1 that you --
2 A. Well, I --
3 Q. -- now were going to be approving the SOM
4 cases?
5 A. I think that was kind of the --
6 MR. CLARK: Object to form.
7 BY THE WITNESS:
8 A. -- inferred once Jay -- Aaron left.
9 BY MR. ELSNER:
10 Q. Okay.
11 A. It was down to me to do the job, you know.
12 Q. Right, because there -- there -- and there
13 isn't anyone else listed here, everyone else is a team
14 yet to be hired, a -- or the manager -- or a manager
15 yet to be hired or a backup yet to be determined,
16 right?
17 A. Yeah, this is all for the new system,
18 yeah, right.
19 Q. Okay. Well, you were doing the new -- the
20 new system and you were doing the current system,
21 correct?
22 A. The new system --
23 MR. CLARK: Objection to form.
24 BY THE WITNESS:

Page 236

1 A. -- I don't think we ever had -- the new
2 system ever came online.
3 BY MR. ELSNER:
4 Q. No, agreed, it -- it did not. But -- but
5 you were --
6 A. They were just -- they were --
7 Q. -- you were in --
8 A. It was in development.
9 Q. You were the person who was going to be
10 selected for that?
11 A. It was going to be, yeah.
12 Q. Okay.
13 A. I didn't actually do anything with it.
14 Q. All right. Now what I want you to do is I
15 want you to turn to the first page of the e-mail
16 chain.
17 And Craig -- this is about a week later,
18 this is now July 9th, on the very last e-mail of the
19 page.
20 A. Okay.
21 Q. An e-mail from Craig Schiavo, and this is
22 an e-mail to you and to Dean Vanelli.
23 Do you know who Dean Vanelli is?
24 A. Once again, he -- that's another guy that

Page 237

1 I never met. I -- I recognize the name, I've heard
2 the name, but it was so long ago.
3 Q. Okay. And -- and -- and this is still the
4 Archer SOM system.
5 So a week later he writes: "Dean and
6 Kelly," so that's Kelly you, correct?
7 A. Me, I assume, yeah.
8 Q. "Please review the attached and comments
9 below I made in red and let me know if everything
10 looks correct or if" -- "or if anyone needs to be
11 added or removed."
12 That's what he writes, correct?
13 Okay.
14 And now, you then respond to the group
15 about an hour later on the same day, July 9th, 2013,
16 correct? And you write:
17 "Craig, not really pertaining to your
18 question, but I did want to highlight to the group
19 that you note that I do NOT," and "not" is all in
20 caps, "have a backup."
21 Is that what you wrote?
22 A. Yes.
23 Q. Okay. "And even an hourly assistant has
24 limited access"?

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    A.   "Our hourly assistant" would have been --
2    Q.   "Even our hourly assistant has limited
3 access."  Thank you for correcting me.
4        And then you write:  "If something happens
5 to me, via act of nature or illness, the current daily
6 SOM process would come to a complete halt."
7        Is that what you wrote?
8    A.   Correct.
9    Q.   Okay.  And then you wrote:
10       "I am not aware of a risk assessment or
11 action plans in place to address."
12   A.   Yeah, I just --
13   Q.   Is that what you wrote?
14   A.   Yes.
15   Q.   Okay.  Now, Craig Schiavo responds to you,
16 does he not, if you look at the very top e-mail?
17   A.   Yeah.
18   Q.   And he responds about a half hour, maybe
19 40 minutes later, and this is just to you, correct?
20   A.   Um-hum, I think.
21   Q.   And it says:
22       "Kelly, Thanks for the heads up.  This is
23 something that we'll need to discuss."
24   MR. ELSNER:  If we could look at 291.

Page 239

1        (WHEREUPON, a certain document was
2        marked CVS - Elsner Deposition
3        Exhibit No. 26, for identification,
4        as of 01/24/2019.)
5 BY MR. ELSNER:
6    Q.   This is Exhibit 26.
7        This is -- if you look in the middle of
8 the first page, this is 51586.  That's the e-mail that
9 you sent to Craig Schiavo and Dean Vanelli that we
10 just discussed.
11       Do you see that?
12   A.   Yeah.
13   Q.   Okay.  Now, this is a response that comes
14 to you and to Kelly Baker from -- from Dean Vanelli,
15 and that's dated July 9th, 2013 --
16   A.   Yep.
17   Q.   -- around 5:00 p.m.
18       Do you see that?
19   A.   Yeah.
20   Q.   Okay.  And he agrees with you, does he
21 not?  At the end of the very first paragraph, he says:
22 "Kelly and Craig," at the end of that first paragraph
23 he says:  "I agree there is a short-term risk if
24 something were to happen with Kelly, especially until

Page 240

1 we backfill Aaron's role and onboard the planned
2 staffing increase on the Indy SOM team."
3        Is that what he writes?
4    A.   Okay.  Short-term risk -- I -- to let you
5 know, I've got double vision from my damage to my eyes
6 a long time, that's why sometimes I'm a little slow
7 catching up with the reading.
8    Q.   That's fine.  We can go -- we -- we can
9 always slow down if you need to.
10       He agreed with you, right, that there is a
11 short-term risk --
12   A.   Yeah, it looks like --
13   Q.   -- if something happens to you --
14   A.   -- yeah, there's a short-term risk.
15   Q.   -- there is no one to fill it?
16       And -- and that was true, right, if
17 something were to happen --
18   A.   Yeah.
19   Q.   -- to you at that time there wasn't any
20 backup because you were the only one.
21       Now, I want to -- I want to look -- he
22 responds also -- he says in the second -- if you see
23 in that same e-mail that Dean Vanelli sends --
24   A.   Yeah.

Page 241

1    Q.   -- he -- he -- he writes something to
2 Craig there, the third paragraph says -- to Craig,
3 that's right, he -- he -- and this is in reference to
4 the names that are being added to this system in the
5 back, right?
6        And he says:  "I agree with your additions
7 below."  And then at the second sentence -- or the
8 third sentence is there, he says:  "Over and above, I
9 would like to add the following individuals to the
10 read only list:  Mark Nicastro and Amy Propatier."
11       Do you see that?
12   A.   Um-hum.
13   Q.   Now, prior to this point, had Mark
14 Nicastro played any role with respect to the SOM
15 program?
16   A.   I don't know.  Not that -- not in my
17 awareness, but I -- like I said, I was just -- I was a
18 grub.  Whatever was going on in the background, I
19 didn't know about.
20   Q.   Well, you may have been, but you are --
21 you are moving up.
22   A.   Yeah, it seems like it.  I'm not getting
23 paid for it.
24   Q.   But my question to you, though, is, is

Page 242

1 did -- did -- in all of the time that you were doing
2 your SOM review, did -- did -- did -- did Mark
3 Nicastro --
4     A.   I would say --
5     Q.   -- do any SOM reviews with you?
6     A.   Like I say, I -- from my -- I don't think
7 he was directly related initially because it was just
8 not the operation of the DC, what we were doing. We
9 were doing something different.
10     Q.   Right.
11     A.   We just happened to be...
12     Q.   And Mark Nicastro told me he didn't even
13 know how to read an IRR?
14     A.   Yeah, no, no, no.
15     MR. CLARK: Object to form.
16 BY THE WITNESS:
17     A.   I'm sure he didn't, you know, I mean, at
18 least not at the time.
19 BY THE WITNESS:
20     Q.   So do you have any -- any -- do you have
21 any understanding of why he would be included now on
22 the read-only list?
23     A.   Well, I would guess only as going forward
24 making sure somebody else is a backup, isn't that what

Page 243

1 they are talking about, you know.
2     Q.   So the -- so if -- if there is going to be
3 some sort of -- someone to fill in, it will end up
4 being Mark?
5     A.   Yeah, and it looked like -- it said read
6 only, so that means he couldn't make changes. He
7 could just have access to the information.
8     Q.   Because he didn't know what to do with the
9 information, right?
10     MR. CLARK: Object to the form.
11 BY THE WITNESS:
12     A.   Well, I don't know what Mark knew. All I
13 can say, I really didn't -- I didn't have any
14 interaction with Mark hardly, nobody else. There
15 really -- Aaron was the only person who was related to
16 what I was doing.
17 BY MR. ELSNER:
18     Q.   Because he was just the guy managing the
19 house, right?
20     A.   Yeah, he was like our landlord, you know.
21     Q.   Right. He didn't play any role with the
22 SOM process --
23     A.   Not that --
24     Q.   -- that you were aware of?

Page 244

1     A.   -- I don't -- yeah, what -- what went on
2 between him and Aaron or whatever, I don't -- yeah,
3 and I know he was brought in -- he was working, they
4 brought in the consultants, he was part of that, but I
5 don't know, you know, any more about it.
6     MR. CLARK: I just want to remind you for the
7 court reporter, sometimes you are speaking before he
8 finishes.
9     THE WITNESS: Yeah.
10     MR. CLARK: To make her life easier.
11 BY MR. ELSNER:
12     Q.   If you go to 51588, end of the -- well,
13 let's -- let -- we'll just leave that.
14     There is a mention of an hourly assistant
15 here. Is that referring to Shauna Helfrich?
16     A.   And -- and what line did you say?
17     Q.   Let's see if I can find it here.
18     In -- in your -- in your e-mail to Craig
19 Schiavo and Dean Vanelli, you re -- you say: "Even
20 our hourly assistant has limited access"?
21     A.   Yeah, that would have been Shauna.
22     Q.   Okay.
23     A.   That's what I was talking about.
24     Q.   So even in July -- by July 9th, 2013, she

Page 245

1 didn't have access to all of the databases to be able
2 to do the SOM?
3     A.   Not by herself.
4     MR. CLARK: Object to form.
5 BY MR. ELSNER:
6     Q.   Right.
7     And she hadn't been trained fully on all
8 of those programs?
9     A.   I think she had been trained. It was just
10 the IT access kind of lagged behind and I think --
11 because it was -- there was a lot of confidential
12 information, patient information stuff on there, so, I
13 mean, there -- I think --
14     Q.   Do you know, do you know whether she had
15 been fully trained or are just assuming?
16     A.   Oh, yeah, she knew what she was doing.
17 She could do the job. She was really good at it. She
18 was actually a natural. She was -- she was good at
19 the job. She just couldn't -- she had to get in just
20 to the database under, like, say, maybe Aaron's
21 password until she got hers.
22     Q.   Okay.
23     A.   You know, but as far as doing it, she was
24 fully trained and quite good at it.

Page 246

1    Q.   So other than you at this point in time in
2  July of 2013, the only other person that knew the
3  process as well as you would be Shauna Helfrich?
4    A.   Yeah, if -- if Aaron is gone by this time.
5    Q.   Right.
6    A.   Then, yeah, it would be Shauna and I,
7  yeah.
8    Q.   So it was you and -- and -- and it says
9  here your part -- hourly assistant?
10   A.   Yes.
11   Q.   Okay.
12   A.   Now, at -- at the DC.  I don't know about
13  the corporate people, what Pam Hinkle knew or other, I
14  don't know.  At the DC we were the only two that kind
15  of knew what was going on.
16   MR. ELSNER:  Can we go off the record for a
17  quick, just a minute.
18   MR. CLARK:  Yeah, absolutely.
19   THE VIDEOGRAPHER:  We are off the record at
20  1:46 p.m.
21        (WHEREUPON, a recess was had
22          from 1:46 to 1:50 p.m.)
23   THE VIDEOGRAPHER:  We are back on the record at
24  1:50 p.m.

Page 247

1        (WHEREUPON, a certain document was
2          marked CVS - Elsner Deposition
3          Exhibit No. 27, for identification,
4          as of 01/24/2019.)
5  BY MR. ELSNER:
6    Q.   I'm going to show you what we've marked as
7  Exhibit 27.
8        And I'm going to have you turn to the
9  second page of this e-mail exchange.  And if you look
10  at the very bottom of the page, this is the e-mail
11  that you sent about not having any backup that we just
12  saw that you sent on July 9th, correct?
13   A.   Correct.
14   Q.   Okay.  And then -- and then we looked at
15  the response from Craig Schiavo saying:  "Thanks for
16  the heads up, this is something we need to discuss,"
17  right?
18   A.   Correct, yes.
19   Q.   Okay.  And then you -- then you write
20  to him separately, just to Craig Schiavo, on
21  July 11th, 2013.
22   A.   Okay.
23   Q.   And you write:
24        "Craig, another concern I have is the

Page 248

1  store metric report I use to analyze the BVRs on the
2  IRR."
3        Do you see that?
4    A.   Um-hum.
5    Q.   You write:
6        "The data snapshot is a three-month window
7  that is a year old.  Any analysis that I make from the
8  data is, for the most part, irrelevant and pointless."
9        That's what you wrote, correct?
10   A.   Correct.
11   Q.   Okay.  And then at the end, you write:
12        "In any event, the big issue is of false
13  negatives and the risks associated with something
14  slipping by."
15        That's what you wrote, correct?
16   A.   Yes.
17   Q.   So you -- you were worried that by using
18  outdated data that there could be a controlled
19  substance that slips through the program because you
20  don't have the full up-to-date data, correct?
21   MR. CLARK:  Objection to the form.
22  BY THE WITNESS:
23   A.   Honestly, I don't know what this is
24  pertaining to now without being there.  It's been so

Page 249

1  long since I wrote it, I don't remember what it was
2  about.  Something I was doing was to that effect.
3  BY MR. ELSNER:
4    Q.   Well, you are -- you are writing that the
5  data snapshot you are using for your reviews is old
6  data, and -- and -- and in your --
7    A.   It could be the point.  I just don't
8  remember what I was talking about during this, you
9  know, I mean.
10   Q.   Okay.  Well, other than controlled
11  substances, what else would have been slipping by?
12   A.   I don't know.
13   Q.   There is really nothing, right?
14   A.   Probably.
15   Q.   Okay.  And so there is an exchange from
16  Craig Schiavo.  He is not really sure what BVR is.
17  And then he says -- he then forwards your e-mail, if
18  you look at the top.
19   A.   Oh.
20   Q.   Craig Schiavo forwards your e-mail to Tom
21  Bourque, and he writes:
22        "Kelly brings up another concern about the
23  current process and the data he is looking at.  Seems
24  that some of the information he is using is very old

Page 250

1  and not helpful."
2  Did I read that correctly?
3  A.  Correct.
4  Q.  And he attaches your -- your e-mail below,
5  correct.
6  Okay.  I want to have you take a look at
7  the next exhibit.
8  MR. ELSNER:  No, I don't think so.  Hold on a
9  second.  Can I see Exhibit 91.
10  Can we go off the record real quick.
11  THE VIDEOGRAPHER:  We are off the record at
12  1:54 p.m.
13  (WHEREUPON, a recess was had
14  from 1:54 to 1:57 p.m.)
15  THE VIDEOGRAPHER:  We are back on the record at
16  1:57 p.m.
17  BY MR. ELSNER:
18  Q.  Mr. Baker, why were you sending these
19  e-mail exchanges to Craig Schiavo?
20  A.  I -- you know, I don't remember sending
21  them, but I would say I'm just doing my
22  responsibility, what I -- to help develop a good
23  system, finding out what deficiencies that I saw in
24  the current system.

Page 251

1  Q.  And -- and also, you also were pointing
2  out to him the problems you were having without having
3  a backup?
4  A.  Potential risks, potential risks.
5  Q.  Potential risks.
6  (WHEREUPON, a certain document was
7  marked CVS - Elsner Deposition
8  Exhibit No. 28, for identification,
9  as of 01/24/2019.)
10  BY MR. ELSNER:
11  Q.  I want to show you Exhibit 28.  And just
12  to orient you, this is a -- this is the -- the same
13  e-mail exchange that we've been looking at originally.
14  This is the -- the original e-mail from Shauna way in
15  the back, Craig Schiavo adding your name to who's
16  responsible in the chart, and then on the top of
17  Page 2 is your e-mail about not having backup.
18  Do you see that on the top of Page 2, the
19  e-mail you sent to Craig Schiavo and Dean Vanelli
20  about not having backup?
21  A.  Do not have -- yep.
22  Q.  And -- and you are worried about a risk
23  assessment of action plans.
24  And then -- and then Craig Schiavo's

Page 252

1  response to you:  "Thanks for the heads up, this is
2  something we are going to need to discuss."
3  And then you -- and then the e-mail that
4  you sent to Craig Schiavo about the store metric
5  report --
6  A.  Report, yeah.
7  Q.  -- being outdated, correct?  Okay.
8  Then you forward this whole e-mail
9  exchange to Mark Nicastro.
10  Now, Mark Nicastro was the person who
11  filled out your annual review?
12  A.  Yeah.
13  Q.  And he is the guy managing the house that
14  you are working in?
15  A.  He is the -- the -- the plant manager.
16  Q.  The plant manager.
17  And you write on the 17th of July, you
18  write:  "Mark, I didn't include you on this original
19  because of your full mailbox."
20  Do you see that?
21  A.  Yeah, because I think he was on vacation
22  at the time and so it was --
23  Q.  Okay.
24  A.  Yeah.

Page 253

1  Q.  Was he?
2  A.  I -- I think so.  I think -- maybe that's
3  because I saw it here somewhere else, but his mailbox
4  was full --
5  Q.  Okay.
6  A.  -- because he wasn't there to answer his
7  e-mail.
8  Q.  Is that why you sent it to Craig Schiavo
9  originally?
10  A.  No.  I think that's -- like I say here,
11  that's why I didn't cc him, because I knew it would
12  have got bounced back anyway.  I just went ahead and
13  sent it to him when he got back in the office.
14  Q.  When you say "mailbox," are you talking
15  about e-mail box or are you talking about his
16  voicemail?
17  A.  E-mail, e-mail.  E -- I think e-mail.  I
18  would assume e-mail.
19  Q.  I didn't know e-mails bounced back.  I
20  didn't think you could get -- is there --
21  A.  Oh, yeah.
22  Q.  -- is there a limit on e-mails --
23  A.  Yeah.
24  Q.  -- at CVS?

Page 254

1    A.   Yeah, you have -- all of our stuff, you
2  only have so much in your Outlook file, if it fills
3  up, it just -- it won't let you take any more.
4    Q.   Okay.  And was that for the whole time you
5  worked at CVS?
6    A.   Well, that's anywhere I've ever worked
7  it's been that way.  And I think that's what was going
8  on here.
9    Q.   Okay.
10   A.   If somebody is out, you'll know.
11   Q.   Okay.
12   A.   Same way a voice, you know, your answering
13 machine fills up, it won't take any more.
14   Q.   Okay.  And then you write to him:
15 "Really, just a CYA for me."
16      Do you see that?
17   A.   Yeah.
18   Q.   "I'm pretty sure Aaron mentioned this to
19 the SOM development team, but I don't want them to use
20 me as the sacrificial lamb when or if it hits the fan
21 because something slipped through."
22      Is that what you wrote?
23   A.   Yeah, I wrote that.  It looks --
24   Q.   Okay.

Page 255

1    A.   -- like I did, yeah.
2    Q.   And if we look back at the prior exhibit,
3  Exhibit 27, you're exactly right, because when Craig
4  Schiavo writes to Tom Bourque on the top of this
5  e-mail, forwarding your concerns about up -- outdated
6  data, Craig writes:
7       "FYI.  Kelly brings up another concern
8  about the current process and the data he is looking
9  at... seems that some of the information he is using
10 is very old and not helpful."
11      Then he writes:  "Don't think there is
12 anything we can do about it now, but just wanted you
13 to know."
14      Meaning that it didn't get fixed, right?
15   MR. CLARK:  Objection to form.
16 BY THE WITNESS:
17   A.   I don't know what that means.  I just --
18 it was -- that second that meant, I'm not going to
19 say, you know.  And I see what you are asking, but I
20 can't answer that.  I mean, that -- that wasn't --
21 BY MR. ELSNER:
22   Q.   Let me show you Exhibit --
23   A.   I wasn't part of that conversation.
24   Q.   Let me show you Exhibit 29.

Page 256

1       Well, you were concerned -- you -- you
2  were concerned that they were -- they weren't going to
3  be able to do anything about it anyways?
4    A.   I was concerned --
5    Q.   And, in fact, they wrote they did?
6    A.   -- something would happen and I would get
7  blamed for it.
8    Q.   Right.
9    A.   I wanted to make sure everybody knows,
10 Hey, I did my due diligence, I notified you of the
11 problem.
12   Q.   Exactly.
13   A.   If it happened, it wasn't my fault.
14   Q.   Not -- not your fault.
15      And, in fact, you made it known to them
16 that this isn't the first time we brought this problem
17 up to your attention.  You thought Aaron brought this
18 up long before, right?
19   A.   I know I said Aaron may.  I'm pretty sure
20 Aaron mentioned this.  This was why I was including
21 Mark.  I just -- because Mark is a local guy and let
22 him know what was going on.  I just tried to keep
23 him...
24   Q.   Up-to-date?

Page 257

1    A.   Especially as we moved forward, once Aaron
2  was gone, I interacted with him more -- more, on a
3  more regular basis.
4    Q.   You didn't have any other direct
5  supervisor you could talk to day-to-day?
6    A.   Yeah, well, and also since there was
7  nobody to take direction from the local, Mark had to
8  talk to me at least for a short time.
9    Q.   Okay.  And you -- and you mentioned to
10 Mark that:  "I'm pretty sure that Aaron mentioned this
11 to the SOM development team," meaning that I -- he
12 mentioned it before, right?
13   MR. CLARK:  Objection to form.
14 BY MR. ELSNER:
15   Q.   Is that what you wrote --
16   A.   That's what I wrote.
17   Q.   -- to Mark Nicastro?
18      (WHEREUPON, a certain document was
19      marked CVS - Elsner Deposition
20      Exhibit No. 29, for identification,
21      as of 01/24/2019.)
22 BY MR. ELSNER:
23   Q.   All right.  Let me show you Exhibit 29.
24 Once again, you were right.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1   A.   I like being right.
2   Q.   Good.  I'll show you another time.
3        This is an e-mail from Aaron Burtner to
4  Dean Vanelli and Pam Hinkle.  It is dated 12/20/2012.
5  So this is right about the time you are starting --
6  maybe a few, maybe a week before or so you started at
7  CVS.
8   A.   Okay.  Yeah.
9   Q.   And it reads in the very first sentence:
10       "We recently received the store metrics
11 report from AGI and began using it to review the max
12 cutoff orders on the IR" -- "IRR."  And then he talks
13 about how:  "It has greatly reduced the amount of time
14 required to review these orders."
15       And then he writes:  "My concern," this is
16 in the second paragraph, "is the dispensing data
17 populated on this report is from June to August 2012.
18 So this data is already three months old and quickly
19 approaching four months old."
20       So, this issue had been raised with Dean
21 Vanelli and Pam Hinkle related to the store metrics
22 report in December of 2012 and the problem still
23 existed in July of 2013, right?
24       MR. CLARK:  Objection to the form.

Page 259

1  BY THE WITNESS:
2   A.   I don't -- I don't -- all right.  Walk me
3  through something.
4        Are we sure what this -- is 29 directly
5  related to Exhibit 28?
6  BY MR. ELSNER:
7   Q.   Yeah, let's look back at your e-mail.
8   A.   Oh, okay.
9   Q.   This is Exhibit 27.
10  A.   I mean, I know we are talking about the
11 same type of problem.  But, I mean, I want to see
12 something that says --
13  Q.   Okay.
14  A.   -- I'm talking about this and this and
15 this.
16  Q.   Let's -- let's -- let's look at
17 Exhibit 27, the second page.  Your e-mail to Craig
18 Schiavo on July 11th, 2013.  This is 78117.
19  A.   Hang on.
20  Q.   You write:
21       "Craig, another concern I have is the
22 store metric report."  That's what we are talking
23 about.
24  A.   Yep.

Page 260

1   Q.   And then you write:
2        "The data snapshot is a three-month window
3  that is a year old."
4   A.   Yeah, okay, you're right.
5   Q.   So the issue related to the store metric
6  report was first raised in -- in December of 2012 and
7  it still hadn't been fixed in July of 2013 and you
8  brought it again to the attention of corporate because
9  you didn't want to get blamed if something slipped
10 through, right?
11  A.   Well --
12       MR. CLARK:  Objection to the form.
13 BY THE WITNESS:
14  A.   -- I'm going to --
15 BY MR. ELSNER:
16  Q.   Yes or no, is that what was written?
17  A.   I'm going to say that I brought it to
18 their attention.  What happened before that, I'm --
19 that's for you to decide.  I'm not --
20  Q.   Well, that will --
21  A.   -- I'm going to let you know --
22  Q.   -- be for the jury to decide.
23  A.   Yeah.
24  Q.   But that's what the e-mail says, right?

Page 261

1   A.   That's what this e-mail says here.  It
2  said what you said it said.  And what -- I brought it
3  up when I said -- when I brought it up.
4   Q.   Okay.  And you said that the -- that the
5  three-month window you are looking at now is a year
6  old.
7        That's what you wrote, right?
8   A.   Yeah, okay.
9   Q.   "The data snapshot is a three-month window
10 that is a year old."
11       That's what you wrote, right?
12  A.   Yeah, I -- that's what I write.  And it
13 sounds --
14  Q.   And then -- and then you write --
15  A.   Probably.
16  Q.   -- "And any analysis that I make from the
17 data is for the most part irrelevant and pointless."
18       That's what you wrote, right?
19  A.   Yeah, if the data would be a year old,
20 then it wouldn't make --
21  Q.   It -- it would be irrelevant and
22 pointless?
23  A.   Well, from a -- to me in my mind it was
24 irrelevant if it's not current, you know.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    Q.   And there is a risk that if you don't use
2  the right data that something could slip through,
3  right?
4    MR. CLARK:  Objection to form, asked and
5  answered.
6  BY MR. ELSNER:
7    Q.   That's what you wrote?
8    A.   Yeah.  Yeah, I think so.  I think that's
9  what I wrote.
10   Q.   And that makes sense, right?
11   A.   Yeah.
12   Q.   If you don't use the right data, then you
13 are not going to be able to check the system, right?
14   A.   I don't even -- even "right."  Just it may
15 be the right data, just not current.
16   Q.   Not current?
17   A.   Yeah.
18   Q.   It needs to be current data, right?
19   A.   Correct.
20   Q.   All right.  So at this point in time, just
21 to orient you, this is July 2013.
22   A.   Okay.
23   Q.   You're doing your job, you're encountering
24 some problems with -- with some of the metric reports,

Page 263

1  and they are also asking you at the very same time to
2  be testing this new SOM system at the same time,
3  correct?
4    A.   I don't know.  I don't think they ever
5  actually tested.  I don't think it ever got developed
6  to the point to test.  I think they were just asking
7  for perceptual input.
8    Q.   Okay.  Well, let's look at Exhibit 30.
9         (WHEREUPON, a certain document was
10        marked CVS - Elsner Deposition
11        Exhibit No. 30, for identification,
12        as of 01/24/2019.)
13 BY THE WITNESS:
14   A.   It could be.  I don't know.
15        Yeah, see, this is -- I've seen this
16 before.  It was a web-based application.
17 BY MR. ELSNER:
18   Q.   You were right about that, it is a
19 web-based application.
20        All right.  So if you look at the very
21 last page of this e-mail exchange, this is, again,
22 Shawna, the contractor, writing to you and to Craig
23 Schiavo and to Cassandra Castro, and the subject is:
24 "Archer SOM User Acceptance Testing."

Page 264

1         Do you see that?
2    A.   Oh, yep.
3    Q.   Okay.  And the first sentence in this
4  e-mail to you, it says:
5         "The new Archer SOM solution has been
6  moved to the UAT environment and is ready for you to
7  test."
8         Do you see that?
9    A.   Yep.
10   Q.   Okay.  And then -- and then about, I guess
11 it's on the same day, at the end of the day around
12 6:00 p.m. Craig Schiavo writes an e-mail just to you
13 and cc's Cassandra Castro, and he writes to you:
14        "If you have any questions with Archer and
15 this testing, please feel free to reach out to
16 Cassandra or myself."
17        Is that what it says?
18   MR. CLARK:  It is the e-mail on the bottom that
19 rolls over to the next page.
20 BY THE WITNESS:
21   A.   Oh, good.
22        Oh, okay.  I see that, yeah.
23 BY MR. ELSNER:
24   Q.   Do you see that, okay.

Page 265

1         And then you write back to him the next
2  morning around 11:00 a.m. on July 16th.  And you
3  write:
4         "Thanks, Craig.  Right now the volume is
5  up enough that I really don't have time to get into it
6  right now, and it will be like this for the rest of
7  the month."
8    A.   Yeah.
9    Q.   Is that what you wrote?
10   A.   Yes.
11   Q.   Okay.  And then you say:
12        "Also, I'm having problems with
13 MicroStrategy's response time this week and it's
14 affecting my ability to complete all of the reviews
15 for each day."
16        Is that what you wrote?
17   A.   Um-hum.
18   Q.   Okay.  And -- what was I going to...
19        And so Craig Schiavo is asking you to
20 assist with the testing on the system, but what you
21 tell him is that the real -- the volume is really too
22 high for the --
23   A.   Yeah.
24   Q.   -- review you are doing, you didn't have

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 time to do that whole review, which you were
2 previously doing, you and Aaron, you couldn't do all
3 of that and also test the new system at the same time.
4         Is that what you wrote?
5     A.   That's what it looks like.
6     MR. CLARK:  Objection to form.
7 BY MR. ELSNER:
8     Q.   Okay.  And -- and you anticipated that
9 that problem was going to exist for the rest of the
10 month, right?
11     A.   That's what it says, yeah.
12     Q.   And so -- hold on a second.
13         If you look, then, Craig Schiavo then
14 responds to you about your schedule and the -- and
15 your timing.  And he says on the same day at about
16 8:00 p.m. that night, in the second paragraph, he --
17 he -- he writes in the second sentence:
18         "I understand" -- he says:  "As for the
19 testing" -- sorry.  The first sentence of the second
20 paragraph:
21         "As for the testing, we need to have you
22 or your team complete the testing in the next couple
23 of days to move forward and stay on track on the
24 action plan."

Page 267

1         Correct?
2     A.   Um-hum.
3     Q.   So he is basically saying, Look, I know
4 you don't got a lot of time, but we need to get this
5 done if we are going to stay on track, right?
6     MR. CLARK:  Objection to form.
7 BY MR. ELSNER:
8     Q.   Correct?
9     A.   Yes.
10     Q.   Okay.
11     A.   Correct.
12     Q.   And you are feeling pressure because it's
13 a lot to do all of the reviews of all of the
14 suspicious order monitoring and test this at the same
15 time and you really didn't have time, right?
16     MR. CLARK:  Objection to form.
17 BY THE WITNESS:
18     A.   I don't think I felt pressure.  There was
19 never any time where this job felt like pressure.  It
20 just needed more time involved doing this stuff.  No
21 one was ever leaning on you that you had to do this or
22 you had to do that.
23 BY MR. ELSNER:
24     Q.   Well, I -- I -- I didn't mean to suggest

Page 268

1 that.
2     A.   Yeah.
3     Q.   But -- but you told him in your e-mail:
4 "I don't really have time to get into it right now and
5 it's going to be like this to the rest of the month
6 because the volume is really high," right?
7         That's what you wrote, right?
8     A.   Correct.
9     Q.   Okay.  And then he says:
10         "I understand that you have a heavy
11 workload and previously expressed concerns about you
12 not having a backup," that's the prior e-mail we
13 looked at, "so I think this is a good example to bring
14 to Dean as well that we are in need of more resources.
15 If you are able to get to this testing, please let me
16 know.  I'm going to reach out to Dean to see if there
17 is any progress on expanding resources."
18     A.   Okay.
19     Q.   Is that what he wrote to you?
20     A.   Yeah.
21     Q.   Do you know whether Kelly raised it --
22 whether this was raised with Dean Vanelli?
23     A.   I don't know what happened with Dean, but
24 he was...

Page 269

1     Q.   Do you know why the volume was up in the
2 middle of July 2013?
3     A.   I just think sometimes it went up and
4 sometimes it -- it would go down.  It could be
5 seasonal or -- I don't remember exactly why with
6 drugs, but I would guess, you know, it is summer,
7 people are more active, they get more active.
8     Q.   Did -- did Mark Nicastro throw anyone on
9 the SOM system to review at this point in time in 2 --
10 July of 2013?
11     MR. CLARK:  Objection to form.
12 BY THE WITNESS:
13     A.   What do you mean by "throw"?
14 BY MR. ELSNER:
15     Q.   I'll show you a document and ask you.
16     A.   I'm not sure what...
17         (WHEREUPON, a certain document was
18          marked CVS - Elsner Deposition
19          Exhibit No. 31, for identification,
20          as of 01/24/2019.)
21 BY MR. ELSNER:
22     Q.   This is Exhibit 31.
23         And if you look on the second page of the
24 e-mail exchanges.

Page 270

1    A.  Okay.  I see it, yeah.
2    Q.  That kind of is in the bottom of the first
3  page and then the top of the second page, the e-mail
4  from you to Craig Schiavo is there about the volume
5  being up and not having time to review it?
6    A.  Yeah, that's the -- that's the one we just
7  read, yeah.
8    Q.  That's the one we just read.
9        And then there is an e-mail from Craig
10  Schiavo and he forwards this e-mail to -- to Dean
11  Vanelli and Tom Bourque.  And then on the very top
12  there is an e-mail from Dean Vanelli to Mark Nicastro.
13      Do you see that?
14    A.  Um-hum.
15    Q.  And it says:
16      "Mark, please review the e-mail trail,
17  particularly the yellow highlighted sections," which
18  unfortunately I don't have the benefit of what all of
19  that is.  But then he writes:
20      "Are there additional trained resources
21  that can be thrown at the SOM work so Kelly can
22  support the testing?"
23      Were you aware that Dean Vanelli was
24  asking Mark Nicastro if he could throw additional

Page 271

1  trained resources at the SOM program?
2    A.  No, I don't know what was going on between
3  Mark or Dean.  I was never privy to that stuff.
4    Q.  Well, Dean Vanelli then started relying on
5  you to discuss with Mark Nicastro whether you could
6  spend more time on the system.
7      Do you remember that?
8    A.  Yeah, uh --
9    MR. CLARK:  Objection to form.
10  BY THE WITNESS:
11    A.  -- I don't remember, you know, if we could
12  get...
13  BY MR. ELSNER:
14    Q.  Let's look at the next -- this next
15  exhibit.
16      (WHEREUPON, a certain document was
17      marked CVS - Elsner Deposition
18      Exhibit No. 32, for identification,
19      as of 01/24/2019.)
20  BY MR. ELSNER:
21    Q.  This is Exhibit 32.
22      This is a -- this is a -- if you look at
23  the second page, there is -- there is an e-mail from
24  Dean Vanelli to you dated July 18th, 2013.

Page 272

1      Do you see that?
2    A.  From Dean to me?
3    Q.  Yes.
4    A.  Yeah.  "Kelly, are you satisfied."
5    Q.  Okay.  He writes:
6      "Kelly, are you satisfied with the design
7  and user acceptance testing results?"
8      And the -- and the "re" line here is the
9  "Archer SOM."
10      Do you see that?
11    A.  Yeah.
12    Q.  And you write on the bottom of the -- of
13  that page, you respond:
14      "As much as I can be.  Since we're
15  entering the busy part of the month, I have been too
16  busy keeping up with daily SOM activities to spend as
17  much time as I would like with it.  But I liked what I
18  saw."
19      Is that what you said?
20    A.  Yes.
21    Q.  Okay.  Then Dean Vanelli separately
22  responds to you and asks:
23      "Have you talked to Mark about additional
24  resources to support daily functions so you can spend

Page 273

1  more of your time on the new SOM project?"
2    A.  Yeah, and I see up there I said, "Yes."
3    Q.  Okay.  So at this point in time Dean
4  Vanelli is relying on you to raise these issues with
5  Mark Nicastro to find out?
6    A.  Yeah, it -- it -- yeah, it looks like it.
7  I don't think -- I mean, I'm face-to-face with Mark
8  and that's who is going to -- that's where I would get
9  it, like I say, he is the landlord, so.
10    Q.  Okay.
11    MR. ELSNER:  Why don't we take a quick break.
12  We've been going about an hour.
13    THE VIDEOGRAPHER:  We are off the record at
14  2:16 p.m.
15      (WHEREUPON, a recess was had
16      from 2:16 to 2:31 p.m.)
17    THE VIDEOGRAPHER:  We are back on the record at
18  2:31 p.m.
19  BY MR. ELSNER:
20    Q.  Mr. Baker, one of the other things that
21  you raised as a concern to Craig Schiavo and
22  management with CVS was conductivity issues with the
23  computer system?
24    A.  Oh, yeah.

Page 274

1    Q.   And it was -- and it was slow, right?
2    A.   Yeah, it was -- it wasn't connectivity
3  like the internet or the -- well, not the internet,
4  but the -- the connection between the databases and
5  everything, what's that called, yeah.
6    Q.   And it was slow and it restrained your
7  ability to do things promptly, right?
8    A.   Well, not properly.
9    Q.   I didn't say -- I meant -- I said
10 "promptly." I didn't --
11   A.   Oh, promptly, promptly, that's a better
12 word, exactly.
13   Q.   Okay. And so this is what you wrote to --
14 to Craig Schiavo. In the second paragraph of your
15 e-mail to him on the 16th, July 16th, 2013:
16        "That's a good segue for one of my other
17 concerns. Connectivity is already a big restraint
18 when a system acts up."
19        That's what you wrote, correct?
20   A.   Um-hum.
21   Q.   Okay. And then you write in the last
22 sentence: "Even on good days, my DSL at home is
23 faster."
24   A.   And that's why I was laughing, I re-read

Page 275

1  it. I kind of now remember saying it. Yeah, it
2  was -- it was -- it was slow.
3    Q.   Okay. And then you said:
4        "With the volume of flagged orders that we
5  may see, this situation won't work." And then you
6  say: "Doesn't work that well now," right?
7        Is that what you wrote?
8    A.   Correct.
9    Q.   All right. And it was expected that the
10 new system was going to flag more orders, is that
11 what -- because in the last paragraph you write:
12        "With the volume of flagged orders we may
13 see," do you see that?
14   A.   Um-hum.
15   Q.   That means that the new system is going to
16 detect more orders, right?
17   A.   I don't know if I'm saying that. It's
18 saying it could.
19   Q.   Yeah.
20   A.   Yeah.
21   Q.   The volume of orders that we may see, this
22 situation is not going to work with the current
23 connection we have right now, right? That's what you
24 are saying?

Page 276

1    A.   Um-hum.
2    MR. CLARK: Objection to form.
3  BY MR. ELSNER:
4    Q.   Okay. And so the new system, you are --
5  you are projecting that it may actually flag more
6  suspicious orders than the current system?
7    MR. CLARK: Objection to form.
8  BY THE WITNESS:
9    A.   It may. I'm thinking it may.
10 BY MR. ELSNER:
11   Q.   And one of the other issues that you were
12 having is sort of timely technical assistance at CVS.
13        Do you remember that?
14   A.   Correct, yeah, I do remember that.
15   Q.   Some -- you need a password, you'd be
16 asking for a password, and sometimes it would take
17 forever to get the new password?
18   A.   Well, not forever, but it could take
19 longer, and I remember that issue. I thought the --
20 we could be faster.
21   Q.   You could be faster, yeah.
22        (WHEREUPON, a certain document was
23        marked CVS - Elsner Deposition
24        Exhibit No. 33, for identification,

Page 277

1        as of 01/24/2019.)
2  BY MR. ELSNER:
3    Q.   Let me show you Exhibit 33.
4        This is on July 23rd, you write to Craig
5  Schiavo there in the middle. You say:
6        "I just encountered another issue. I have
7  been waiting almost a day to have my Navistor (Viper)
8  password reset."
9        Do you see that?
10   A.   Um-hum.
11   Q.   "When technical issues like this arise,
12 the SOM process comes to a halt."
13        Did I read that right?
14   A.   Correct.
15   Q.   And that's what you wrote, is that right?
16   A.   Correct.
17   Q.   Okay. And so that's one of the technic --
18 that's one of the technical issues that we -- that you
19 were referring to, right, you are trying to get a
20 password, it takes a whole day to get a new
21 password --
22   A.   Well --
23   Q.   -- and then you can't do your work?
24   A.   -- if -- if it did, any time it takes

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 time, it takes time away from what you are doing.

2    Q.   Right, because you can't finish what you

3 are doing until you can have access to the right

4 databases, right?

5    A.   Possibly.

6    Q.   Well, the Viper is one of those

7 databases --

8    A.   Yeah.

9    Q.   -- that we looked at, right?

10     And you wrote that a -- you were concerned

11 that when these technical issues arise, the SOM

12 process comes to a halt, that's what you said, right?

13     Okay.

14    MR. ELSNER: If we could -- 306.

15 BY MR. ELSNER:

16    Q.   And you weren't the only person that had

17 problems with these issues at CVS, right?

18    A.   No. It was fairly common.

19    Q.   Yeah. Let me show you Exhibit 34.

20     (WHEREUPON, a certain document was

21     marked CVS - Elsner Deposition

22     Exhibit No. 34, for identification,

23     as of 01/24/2019.)

24 BY MR. ELSNER:

Page 279

1    Q.   If you go all of the way to the back of

2 this, there is an e-mail from William Klenotic.

3     Do you see that?

4    A.   Okay. William Klenotic, yeah.

5    Q.   Okay. And he was an IT guy at CVS in

6 Indiana, is that right?

7    A.   I don't know, wherever he is from.

8    Q.   You don't remember?

9    A.   I don't recognize the name.

10    Q.   Okay. And he writes to a group of people,

11 and -- John Mortelliti and Pam Hinkle, and cc's Mark

12 Nicastro and Shauna Helfrich, and he writes:

13     "To All: Shauna Helfrich has" -- and she

14 was on the SOM project -- "has been looking for this

15 access for months. Upon review it looks like someone

16 rejected the request. How do we find out who and

17 why?"

18     Did I read that right?

19    A.   Yeah.

20    Q.   Okay.

21    A.   You read it right.

22    Q.   And then Pam Hinkle responds that:

23     "Navistor is Viper that no longer" --

24 "that is no longer functional and is probably why it

Page 280

1 was denied."

2     Did you know that Shauna Hinkle was trying

3 to get access to the wrong database?

4    MR. CLARK: Objection to form.

5 BY THE WITNESS:

6    A.   No, I don't know what was going on with

7 this, you know, let's see. Viper was no longer

8 functional doesn't make any sense to me.

9 BY MR. ELSNER:

10    Q.   Okay.

11    A.   This is all between -- well, yeah, I'm not

12 even on this e-mail, so this is between Shauna and

13 Mark and --

14    Q.   Okay. And --

15    A.   Was I -- was I even still there? That

16 says November 6, 2013.

17    Q.   I think in your -- I'm not sure. I think

18 you did leave CVS in November or December.

19    A.   Okay.

20    Q.   I --

21    A.   Yeah, it could be. I mean, I don't know.

22 It just seems like this is also -- this is right --

23 this is pretty close to the end of my reign, in any

24 event.

Page 281

1    Q.   And so even by the time you are leaving,

2 she doesn't even have full access to all of the

3 databases, she is trying to get access to this

4 database, right?

5    MR. CLARK: Objection to form.

6 BY THE WITNESS:

7    A.   That would be leading me -- at this time

8 she didn't have -- according to this, she didn't have

9 something she didn't need or --

10 BY MR. ELSNER:

11    Q.   Right.

12    A.   -- something was -- oh, it looks like

13 maybe she needed -- she tried to get access to

14 something that didn't exist anyway anymore, maybe

15 that's why.

16 BY MR. ELSNER:

17    Q.   So if you look at the first page, there is

18 an e-mail from Mark -- Mark Nicastro, he is the --

19 what did you call him -- the boss of the house?

20    A.   I call him the landlord.

21    Q.   The landlord, all right. That's it.

22 Sorry.

23    A.   Yeah. He was the director.

24    Q.   And so -- so he was the director of the

Page 282

1  Indiana distribution center and he writes to this
2  group of people, and he says:
3      "She needs this access immediately. The
4  work she is doing is a critical compliance component
5  that cannot be delayed."
6      And -- and all I'm asking, is this the
7  kind of -- this is an example of some of the situation
8  that sometimes you encountered at CVS about trying to
9  get passwords and access to databases?
10  MR. CLARK: Objection to form.
11  BY THE WITNESS:
12      A.  Well, I don't think sometimes. I think
13  this might -- this is kind of an isolated case --
14  BY MR. ELSNER:
15      Q.  Well, you --
16      A.  -- simply the fact that she was the only
17  new hire that came in. I don't think I had that --
18  any kind of problems getting it, but...
19  BY MR. ELSNER:
20      Q.  Well, you -- you had a -- it didn't take
21  you as long.
22      A.  No.
23      Q.  But you had a -- you had a problem getting
24  access to the Viper --

Page 283

1      A.  Yeah.
2      Q.  -- database a few months before, right, if
3  you look back at the last exhibit?
4      A.  I know it took a little bit -- it took
5  some wrangling to finally get in there, but...
6      Q.  Well, for you it only took a day. For her
7  it took about -- it took about six months. If you
8  look at the last page of the e-mail request, the
9  master request, the date is July 29th, 2013, correct?
10      A.  Yeah, that would have been about what
11  time.
12      Q.  The second-to-last page.
13      A.  Yeah.
14      Q.  Do you see that master request and then
15  the number 7/29/2013?
16      A.  Yep, there you go, yeah.
17      Q.  And Mark Nicastro's e-mail is dated
18  November 13th, 2013?
19      A.  Yeah, so.
20      Q.  So not quite six months, five months?
21      A.  Pretty close, so.
22      Q.  Right?
23      A.  (Nodding head.)
24      Q.  Okay.

Page 284

1      You did manage to do a little testing on
2  the Archer system for the new SOM program.
3      Is that right?
4      A.  Well, that's what it sounds like I did,
5  you know.
6  MR. ELSNER: Okay. Can we see 295.
7      (WHEREUPON, a certain document was
8      marked CVS - Elsner Deposition
9      Exhibit No. 35, for identification,
10      as of 01/24/2019.)
11  BY MR. ELSNER:
12      Q.  This is Exhibit 35.
13      And we saw a portion of this e-mail
14  before, but we are going to look at a -- a different
15  e-mail chain stretched off of it.
16      If you look at the very last page, there
17  is an e-mail from Shawna to Craig Schiavo and to you
18  and to Cassandra Castro.
19      Do you see that?
20      A.  Yeah.
21      Q.  And this is the e-mail that we looked at
22  that --
23      A.  Yeah, it was.
24      Q.  -- about the testing, do you remember

Page 285

1  that?
2      And then Craig responded if you have any
3  questions to do that.
4      And then you -- you respond to Kelly
5  Baker -- sorry, you write to Craig Schiavo on
6  Wednesday, July 17th, which is on the first page of
7  the e-mail all of the way at the bottom.
8      You write: "Craig, I tried to set up a
9  few orders of interest, a flag and a milestone.
10  Either they won't save or the search/display
11  functionality is inactive."
12      Do you see that?
13      A.  Yeah.
14      Q.  And then Craig -- Craig Schiavo responds
15  to you. He said: "I found the same thing."
16      And then you write: "I won't be able to
17  get back to this today but I can try again tomorrow."
18      Do you see that?
19      A.  Yeah.
20      Q.  So this is an -- this is an example of you
21  trying to make some time to test the new system?
22      A.  Yeah, it looks like I was getting in there
23  trying to, you know --
24      Q.  To --

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  A.  -- shake the system a little bit.

2  Q.  Yeah.

3  And then -- but then Craig Schiavo
4  responds to you, to your e-mail about how you are not
5  going to have time to get back into it today.

6  He says: "Testing ends today." And then
7  he writes: "However, it is important that you're
8  comfortable with everything since you are the one who
9  will be approving and using this on a daily basis."

10  Do you see where he wrote that to you?

11  A.  Um-hum.

12  Q.  "If we don't find everything now, it's
13  going to make your job of documenting each case much
14  more difficult once this goes live because
15  changes/fixes/addition may take awhile so now is the
16  time to change everything."

17  That's what he wrote to you, right?

18  A.  Um-hum.

19  Q.  But you didn't have the time to spend any
20  more time on this program, did you?

21  A.  Not that particular day.

22  Q.  But the deadline was that day, right?

23  A.  That's what it sounds like.

24  Q.  And so this is another example of Craig

Page 287

1  trying to get you to make more time to test the
2  system, but every time you are testing the system,
3  it's time you can't spend on reviewing the suspicious
4  orders every day, right?

5  A.  Yeah.

6  MR. CLARK: Objection to form.

7  BY THE WITNESS:

8  A.  Well, this looks like it's also time when
9  Shauna was up there as well, so. I mean, between her
10  and I is what we were doing, yeah.

11  BY MR. ELSNER:

12  Q.  Well, Shauna was hired full time at CVS in
13  August of 2013, so this is July of 2013.

14  A.  Did she come up there before --

15  MR. CLARK: Objection to form.

16  BY THE WITNESS:

17  A.  She came up there before, though, because
18  I said that -- was that -- didn't she? Because I know
19  that one she was getting access from back in July.
20  Because I know she wasn't -- the reason it is probably
21  confusing is because in the beginning she was -- she
22  was not a full time -- she worked full time but she
23  was not a -- she was a contract employee, like
24  Manpower or whatever, and then -- and I think that

Page 288

1  might have had something to do with some of her
2  access, it was tricky, and then they brought her on as
3  a full-time employee.

4  But, yeah, yeah, we can go ahead. I
5  don't...

6  BY MR. ELSNER:

7  Q.  No. That's fine. I want to make sure
8  that we are all on the same page.

9  A.  Yeah.

10  (WHEREUPON, a certain document was
11  marked CVS - Elsner Deposition
12  Exhibit No. 36, for identification,
13  as of 01/24/2019.)

14  BY MR. ELSNER:

15  Q.  This is Exhibit 36.

16  So if you look on the back page of the
17  e-mail, the last one, there is an e-mail from Mark
18  Nicastro to Dean Vanelli and the subject line is:
19  "Resume - Kelly Baker."

20  Do you see that?

21  A.  I -- yeah, right here.

22  Q.  Okay. He says:

23  "Dean, I don't know if you have this from
24  Kelly. Since Craig Schiavo did this kind of work

Page 289

1  in" -- oh, sorry. Strike that. Hold that sentence.
2  I'm reading from the wrong part.

3  Can we go to the -- the first page of the
4  document. At the bottom, there is an e-mail from Dean
5  Vanelli to Craig Schiavo and Tom Bourque, and the
6  subject is, again, your resume: "Resume - Kelly
7  Baker." And it says:

8  "Attached is Kelly Baker's resume.
9  According to the e-mail below and voicemail from the
10  DC director, he is considering promoting Kelly into
11  Aaron's old position and Shauna," it says, "(an
12  existing SOM team member) into Kelly's role."

13  Do you see that?

14  A.  Yeah, yep.

15  Q.  Okay. And then --

16  A.  It says --

17  Q.  -- and then up above, Dean Vanelli writes
18  an e-mail to Tom Bourque and Craig Schiavo, and at the
19  very last -- in the -- in the -- in the middle
20  paragraph, it says:

21  "We also discussed Shauna to begin the
22  interview process to make her full time."

23  Do you see that?

24  A.  Yeah.

Page 290

1   Q.   Okay.  And this is July 18th.
2        "I think we have flexibility as it relates
3   to the role we put her in.  She is the daughter of one
4   of the key managers in the building."
5        Do you know whose daughter she was?
6   A.   I met him a couple of times, but just like
7   one time he gave me a ride on the back of one of
8   the -- but, you know, I didn't work with him or for
9   him or anything, like, yeah.
10  Q.   Okay.  Do you know his name?
11  A.   Not -- no, not offhand.  It is Helfrich,
12  right, last name, but I just know -- I know a --
13  Q.   Well, I think -- I think that may be her
14  married name.  She may have had a --
15  A.   I don't -- I don't know -- I don't know if
16  she was married.  Maybe she was.  I don't know.
17  Q.   It doesn't matter.
18       Then he writes:  "I am also considering a
19  trip to Indy in the coming weeks, reevaluate the
20  current as-is state, and to meet/evaluate/interview
21  both Kelly and Shauna, as well are" -- "as other
22  members of the team."
23       Did you ever -- did Dean Vanelli ever make
24  this trip, did he ever interview you for the position

Page 291

1   of SOM manager?
2   A.   I -- I do not know.  He never interviewed
3   me.  Like I say, I don't think I ever met him.  And --
4   and the reason I was kind of bringing this up is her
5   full time --
6   Q.   Yes.
7   A.   -- she still worked there full time.
8   Me -- from my point of view, she was there all of the
9   time.  Her checks not -- didn't always come from CVS.
10  They come from the contractor, like Manpower.
11  Q.   Okay.
12  A.   So my --
13  Q.   So she was hemp -- hired through a
14  temporary agency?
15  A.   Yeah, I think initially on.  Like a lot of
16  places do that.  I think that's why they keep saying
17  not full time.  She was there all of the time.  She is
18  just not a CVS employee.
19  MR. ELSNER:  Okay.  Can I see MR 37.
20  BY THE WITNESS:
21  A.   And I think they -- I think she was
22  working as a packer and they did that a lot.
23  BY MR. ELSNER:
24  Q.   She was working as a packer?

Page 292

1   A.   A picker, packer --
2   Q.   A picker?
3   A.   -- whatever it is, initially before she
4   came up with us, and they always -- it was very common
5   to start people out as a contract employee with no
6   benefits until they do their 90 days or whatever.
7        (WHEREUPON, a certain document was
8         marked CVS - Elsner Deposition
9         Exhibit No. 37, for identification,
10        as of 01/24/2019.)
11  BY MR. ELSNER:
12  Q.   Okay.  Here is Exhibit 37.
13       So this is an e-mail from Mark Nicastro to
14  Dean Vanelli.
15  A.   Uh-huh.
16  Q.   And in the second sentence he says:
17       "We were talking about Kelly and Shauna
18  and he told me Kelly had a phone interview this week.
19  No surprise."
20  A.   Nah, 'cause...
21  Q.   Did you -- did you have a phone interview
22  for the position of the SOM manager that you recall
23  or no?
24  A.   Oh, no.  I think what this is talking

Page 293

1   about is I had a phone interview for another position.
2   Q.   Another position.  So it wasn't related to
3   this?
4   A.   So once -- one it was decided -- I liked
5   the job.  I didn't particularly want to leave, but I
6   knew that once it was decided that it was going to
7   Woonsocket, I began looking elsewhere, and Mark knew
8   that.  You know, it was no surprise, because I
9   couldn't do it.  My daughter was in Indiana, so.
10  Q.   So you needed to be here to be with her?
11  A.   Yeah.
12  Q.   Okay.  And --
13  A.   I almost brought the picture of the Easter
14  bunny.  It is on my refrigerator at home.  I forgot
15  to.
16  Q.   Oh, it's in your annual review?
17  A.   Yeah, I did that.  It was my daughter
18  sitting on my lap.
19  Q.   Do you have a picture?
20  A.   Yeah.
21  Q.   Okay.
22  A.   It's on my refrigerator.  I was going to
23  bring it for -- for laughs.  But --
24  Q.   Okay.

Page 294

1    A.   -- she still hated it.  She knew -- she
2  could hear my voice but she screamed the whole time.
3    Q.   I want to -- I want to switch gears a
4  second and -- and go to Exhibit 298.  Or sorry.
5  MR 298.
6        You know what, while she is looking for
7  that, let's -- let's look at your annual review.
8    A.   Ah, here it is.
9    Q.   Now, the date of this, this last update is
10  August 30th, 2013, and this is last updated by Mark
11  Nicastro --
12    A.   Yeah.
13    Q.   -- on the top.  And this is your annual
14  review.
15        And I want to look at the portion you
16  wrote in the middle.
17    MR. ELSNER:  This is Motley Rice 2323.  If you
18  go up just a little bit.
19  BY MR. ELSNER:
20    Q.   Do you see at the last bullet there in the
21  middle of the page, it says:  "Shauna is almost fully
22  integrated?"
23        Do you see that?
24    A.   Are you talking about on the left or right

Page 295

1  side?
2    Q.   Right-hand side.
3    A.   Right.
4    MR. ELSNER:  The page before, John.
5  BY THE WITNESS:
6    A.   Oh, there it is.  Yeah, almost fully...
7    THE TRIAL TECH:  Go back to the --
8    MR. ELSNER:  Back to the first page.
9    THE WITNESS:  Yep.
10    MR. ELSNER:  Right in the middle, John, on the
11  right-hand side, last bullet in the middle.
12  BY MR. ELSNER:
13    Q.   "Shauna is almost fully integrated into
14  the SOM team..."
15        Do you see that?
16    A.   Yeah.
17    Q.   "...and process and became a full-time SOM
18  team member in the beginning of August 2013."
19        And then it says -- so -- so it looks like
20  that -- this is Shauna Helfrich, right?
21    A.   Yeah.
22    Q.   Okay.  So she became a full-time SOM team
23  member -- member in the -- in the beginning of
24  August 2013?

Page 296

1    A.   I think what that means is full time as an
2  actual CVS employee.  She was there long before that
3  because remember Aaron trained her.
4    Q.   Right.
5    A.   So she was there overlapping Aaron.
6    Q.   I -- I actually don't remember that he
7  did, but I --
8    A.   Well, what --
9    Q.   -- I remember that you said that.  But --
10    A.   Yeah.
11    Q.   I'm just teasing you.
12        But she -- it says:  "Shauna is almost
13  fully integrated into the SOM team."
14        That's what you wrote, right?
15    A.   Yeah.
16    Q.   So she was still doing some training to
17  get as -- completely up to speed?
18    A.   It -- it might have been -- that was
19  probably talking about, like, access.  As far as doing
20  the job, she was remarkable.  She was very good at it
21  and almost a natural.  So anything like that, I would
22  say as far as being integrated, getting the proper
23  access and getting able to, you know, move around in
24  the systems.

Page 297

1    Q.   Okay.  So, but just so that I understand
2  it, at this point in time, Shauna is almost fully
3  integrated and -- and at this point in time,
4  August 2013, it's basically you and Shauna doing the
5  work?
6    A.   Correct.
7    Q.   Is that right?
8        Then there is a line here that says:
9  "Gary is almost up to speed as an emergency backup."
10        Who is Gary?
11    A.   I don't know.  I was looking at that.  I
12  don't remember Gary.
13        That's not that consultant guy, is it?
14    Q.   I don't think so.
15    A.   Gary, Gary, Gary.  Who is Gary?  I don't
16  know.  Man, can you maybe -- I don't remember Gary.
17  I'm sorry.
18    Q.   Was it maybe Gary Milikan?
19    A.   No, it wasn't -- he was, like, a manager
20  or something before I got there or something.
21    Q.   Well, there is a Gary Lamberth, that --
22  that's not who it was, right?
23    A.   No.  He was the operational side.  I mean,
24  I saw him smoking cigarettes, but, you know, it wasn't

Page 298

1 anything to do with me.

2 Q. Okay. All right. So we are not sure who

3 the Gary was?

4 A. Nah, I can't -- that's kind of...

5 (WHEREUPON, a certain document was

6 marked CVS - Elsner Deposition

7 Exhibit No. 38, for identification,

8 as of 01/24/2019.)

9 BY MR. ELSNER:

10 Q. All right. Can I have -- can I have you

11 take a look at this next exhibit. This is 38. This

12 is an e-mail from Pam Hinkle.

13 A. Oh, okay. Pam, yes.

14 Q. And I -- what I want to do is have you

15 look at your e-mail on the very, very bottom of the

16 page, the first page, dated August 12th, 2013.

17 Do you see that? At the very bottom of

18 the page.

19 A. Yeah.

20 Q. And then it kind of goes on the top of the

21 next page?

22 A. Okay. Hold on.

23 Q. And the subject is "Irregular Order - DC

24 Communication Knoxville IRR Dated 8-11-13 Store 4376."

Page 299

1 Do you see that?

2 A. Yeah, I see that.

3 Q. And you write:

4 "Until we get a grip on this, be on the

5 lookout for any orders by this store for this drug

6 that doesn't hit my normal report."

7 Do you see that's what you wrote?

8 "Until we get a grip on this, be on the

9 lookout for any orders by this store for this drug

10 that doesn't hit my normal report."

11 Do you see that?

12 MR. CLARK: Actually, it is the next page.

13 BY THE WITNESS:

14 A. Oh, okay. Here we go. I'm sorry. I

15 was...

16 Yeah, I see it, right.

17 BY MR. ELSNER:

18 Q. And I -- and what I'm going to ask you is

19 if -- if you look above to the very first page.

20 A. Yeah.

21 Q. It says -- it's in the e-mail from

22 Pam Hinkle to you dated 8/12/2013.

23 A. Yeah.

24 Q. It says:

Page 300

1 "Kelly, Going forward, when

2 stopping/holding an order at the" -- "at a DC, please

3 use the below format to communicate adding privileged

4 and confidential in the subject line."

5 A. Oh, yeah, that was -- that's that blind

6 footage.

7 Q. Do you know why that was there?

8 A. I think because -- I -- wait. Where --

9 where --

10 Q. And then she gives you an example of how

11 she wants the format to be.

12 Do you see?

13 A. Okay.

14 Q. "Please place a hold on the hydrocodone

15 items for the following stores. I will add further

16 update instructions as soon as possible."

17 And then she gives you an example of how

18 she wants you to report stopping or holding an order.

19 Do you see that?

20 A. Yeah, okay. Yeah.

21 Q. Okay. So, was this the first one you ever

22 did?

23 A. I don't -- I don't know. I mean,

24 obviously the first I gave to her.

Page 301

1 Q. And -- and --

2 A. Maybe I probably would have gave it to

3 Aaron beforehand or something.

4 Q. So -- so before this you would have given

5 them to Aaron but this one you are now forwarding on

6 and -- and Pam Hinkle is telling you what format she

7 wants these stop orders to be in?

8 A. That's what it looks like to me.

9 Q. Okay.

10 A. I was...

11 MR. ELSNER: Can we -- we can we see 281.

12 (WHEREUPON, a certain document was

13 marked CVS - Elsner Deposition

14 Exhibit No. 39, for identification,

15 as of 01/24/2019.)

16 BY MR. ELSNER:

17 Q. This is Exhibit 39, Mr. Baker, and I'm

18 going to ask you to go to the second page.

19 This is now September 11th, 2013. And

20 this is -- it looks like at the very bottom,

21 September 11th, 2013, you -- the subject is an

22 "Irregular Order - Logistics Communication."

23 Do you see that?

24 A. Yeah, okay.

Page 302

1    Q.   And then it attaches some kind of Excel
2  spreadsheet with the logistics communication?
3    A.   Yeah.
4    Q.   Okay.  Now, above that, in response to
5  that, there is an e-mail from Sandro Sciarra, I'm not
6  sure if I've pronounced that right, and she sends this
7  e-mail to you and she says:
8        "I do not have any IRR reports dated
9  September 8th, 2013."
10       Do you see that?
11   A.   Yes.
12   Q.   Okay.  And then you respond that -- it's
13 kind of the bottom of the first page and top of the
14 next page, you said:
15       "Team, for the first time ever, a Saturday
16 IRR data dump was put out last weekend and it messed
17 with the automated portions of our process.  I will
18 resend the IRRs," I -- I think there is maybe a typo,
19 "this afternoon."
20       Do you see that?
21   A.   Yeah.
22   Q.   Okay.  And then she writes back again at
23 the end of the day and she says:
24       "I apologize for contacting you again for

Page 303

1  this, but I have not received your reports for the
2  green bar IRR reports dated 9/10/13.  I did receive
3  your reports from 9/8/13.  However, I did not have the
4  green bar IRR reports to support them here at the DC
5  level.  Again, I apologize for the tenacity, but if
6  the DC will be required to intervene with an order,
7  time is of the essence."
8        Do you see that?
9    A.   Yeah, yeah.
10   Q.   Okay.  And then you reply to her:
11       "I don't mind the tenacity, but I wish you
12 wouldn't sound the alarm to the entire group
13 needlessly."
14       Right?
15       "Now I'm going to have to respond to many
16 more needless e-mails."
17       Do you see that?
18   A.   Yeah, yeah, yeah.
19   Q.   Okay.  And then you say:  "I'm not aware
20 of the green bar report."
21   A.   Yeah, other than -- I didn't know what
22 the -- what was the green bar.  I don't -- I still
23 don't know.  I never heard of that, I think.
24   Q.   Okay.  And then it appears that -- that

Page 304

1  Sandro Sciarra then sent an e-mail to Pam Hinkle and
2  says:
3        "FYI...Kelly re-sent the report from
4  9/10/2013 and it is still not correct."
5        Did you know that -- did she ever follow
6  up with you to get the correct information?
7    A.   I don't know whatever this is about.
8  Obviously she annoyed me down here, but -- but I don't
9  know, you know.
10   Q.   So fair to say that -- that as of
11 September 2013 there is some requests for some
12 reporting and -- and -- and you're not exactly sure
13 what the -- what the --
14   A.   Yeah, it's --
15   Q.   -- reporting is that they are requesting,
16 right?
17   MR. CLARK:  Object to the form.
18 BY THE WITNESS:
19   A.   Yeah, I didn't know what a -- I -- I
20 still -- obviously I didn't know what a green bar
21 report was, but -- I mean, maybe it was something --
22 you know.
23       (WHEREUPON, a certain document was
24       marked CVS - Elsner Deposition

Page 305

1        Exhibit No. 40, for identification,
2        as of 01/24/2019.)
3  BY MR. ELSNER:
4    Q.   Let me show you Exhibit 40.
5        Now, this is a -- a little bit later.
6  This is September 16th, 2013, around that time.  And
7  if you go to the second page, there is now an e-mail
8  from Nancy Price dated September 16th, 2013.
9        Do you see that?
10   A.   Nancy Price, yeah.  "Kelly."
11   Q.   And the subject line is "Control and PSE
12 IRR Reports."
13       Do you see that?
14   A.   Yep.
15   Q.   And she says:
16       "Kelly, I have not received any of the IRR
17 reports that you sent to Patty Wagner to attach to the
18 green bar item review report.  September 2nd was the
19 last I received."
20       So the last one she got was September 2nd
21 and now it's September 16th, right?
22   A.   Yeah.
23   Q.   And then again you respond:  "I'm not
24 familiar with the green bar report," right?

Page 306

1 A. Yeah.

2 Q. So, did Aaron Burtner give you any

3 training on the green bar report and the other

4 reporting that needed to be done?

5 A. Obviously --

6 MR. CLARK: Objection to form.

7 BY THE WITNESS:

8 A. -- I hadn't heard what a green bar report

9 is and -- and it could have been they had a different

10 term for what we were calling something else, you

11 know.

12 BY MR. ELSNER:

13 Q. Okay. Now, one of the problems that was

14 happening, and you mentioned it in the first e-mail,

15 is that they changed the report -- they changed the

16 reporting system and now they were going to do it on a

17 seven-day basis and before Saturdays were left out.

18 Do you remember that?

19 MR. CLARK: Objection to form.

20 BY THE WITNESS:

21 A. No.

22 BY MR. ELSNER:

23 Q. If you look at the e-mail that then you

24 sent on the 16th of September, which is on the first

Page 307

1 page, at 8:46 a.m.?

2 A. Um-hum.

3 Q. In the second paragraph, it says:

4 "But yes, there seems to be a change in

5 the system as I've started to get IRR data dumps on

6 Monday for the previous Friday, Saturday and Sunday

7 where in the past I only got it for Friday and

8 Sunday."

9 Do you see that?

10 A. Yeah.

11 Q. And then you've said: "I've inquired into

12 the cause for this but have yet to receive an answer,"

13 right?

14 A. Um-hum.

15 Q. It is kind of messing you up, right,

16 like --

17 A. And I -- yeah, I kind of have a little

18 memory something changed on the report and we got it

19 on Sunday.

20 Q. And the formatting was all off because now

21 you had three days to look at instead of two?

22 A. Yeah, something. I don't remember

23 exactly, but I knew something had changed, a process

24 shift or something.

Page 308

1 Q. Okay. And then you respond, I guess, to

2 your own e-mail, but to the group, a little bit later

3 in the day, about an hour later, and you say:

4 "I imagine it's related to the seven-day

5 order processing change that was implemented a couple

6 of weeks ago."

7 Do you see that?

8 A. Yeah.

9 Q. Okay. So -- so CVS changed the system

10 from going to reporting from six days to seven days a

11 week and you now are getting an IRR report that had

12 Friday, Saturday and Sunday and not just Friday and

13 Sunday, correct?

14 MR. CLARK: Objection to form.

15 BY THE WITNESS:

16 A. That's what it says, yeah.

17 BY MR. ELSNER:

18 Q. Okay. So they changed the whole reporting

19 a couple of weeks ago but no one bothered to tell you,

20 is that right?

21 MR. CLARK: Objection to form.

22 BY THE WITNESS:

23 A. Well, I wouldn't say -- I wouldn't say

24 they changed the whole reporting. It looks like they

Page 309

1 just added a day.

2 BY MR. ELSNER:

3 Q. They added -- okay. Well, they added a

4 day, but no one bothered to tell you, right?

5 MR. CLARK: Objection to form.

6 BY THE WITNESS:

7 A. That's what I would interpret.

8 BY MR. ELSNER:

9 Q. Okay.

10 MR. ELSNER: Can I see 301. 301.

11 BY MR. ELSNER:

12 Q. And around this time, sir, the 16th, 17th

13 of September 2013, you had some kind of personal

14 issues that were --

15 A. Um-hum.

16 Q. -- going on, right?

17 And you sent this e-mail to Mark Nicastro,

18 and I'll just mark this Exhibit 41.

19 (WHEREUPON, a certain document was

20 marked CVS - Elsner Deposition

21 Exhibit No. 41, for identification,

22 as of 01/24/2019.)

23 BY MR. ELSNER:

24 Q. And -- and you wrote to him:

Page 310

1 "I've had some pretty catastrophic news
2 today so I may not be at my best and I may be cashing
3 in some sick time or vacation time in the next few
4 days. I'm cutting out a little early today."
5     Is that what you wrote to him?
6  A.  Correct.
7  Q.  Okay. What was going on?
8  A.  I was -- I was going through divorce
9 proceedings --
10  Q.  Okay.
11  A.  -- with my ex-wife, my pharmacist ex-wife.
12  Q.  Yeah.
13     And was there anything particularly
14 catastrophic with the news that day?
15  A.  It had to do with my -- custody of my
16 daughter.
17  Q.  Okay.
18  A.  I was a -- until I went back to work at
19 CVS, I was a stay-at-home dad for a while, so that was
20 particularly --
21  Q.  Okay.
22  A.  -- rough on me.
23  Q.  Okay. And you reference here taking some
24 time off.

Page 311

1     Did you end up taking any time off?
2  A.  I don't think I had to. I maybe had to
3 take a -- a couple of hours here or there to go to a
4 couple of court dates. They were, you know, spread
5 out, you know, I mean, months in between, but no,
6 nothing, no full days. I never -- I never missed any
7 of my -- my -- as it said in my review, I never had to
8 miss the job.
9  Q.  Okay. The -- and did you talk to Aaron
10 Burtner about what was going on at work?
11  A.  Some.
12  Q.  And Andy Eck?
13  A.  Yeah, and not really as -- on a
14 professional level, but they were friends that we
15 were -- we went to lunch most times of the -- you
16 know, usually three or four days a week, yeah.
17     (WHEREUPON, a certain document was
18     marked CVS - Elsner Deposition
19     Exhibit No. 42, for identification,
20     as of 01/24/2019.)
21 BY MR. ELSNER:
22  Q.  Okay. I want to show you Exhibit 42. And
23 if we go to the second page, this is that e-mail we
24 just read, the one that you sent to Mark Nicastro on

Page 312

1 September 17th.
2     Do you see that?
3  A.  Okay. Is it on the back?
4  Q.  On the second page. On the back, yeah.
5  A.  Okay. He is asking to Andy: "Did Kelly
6 tell you anything today?"
7  Q.  No. I'm -- I'm asking the bottom one is
8 your e-mail that you --
9  A.  Oh.
10  Q.  -- sent to Mark Nicastro, right?
11  A.  Yeah, that's -- oh, yeah, I just laf -- I
12 just left it in the subject line.
13  Q.  Right.
14     And -- and then Mark Nicastro then
15 forwarded that to Andy Eck asking if you had talked to
16 Kelly about that?
17  A.  Yes, I told him about it.
18  Q.  And -- and did you talk to Andy about
19 that?
20  A.  Yeah, telling him what was going on, yeah.
21  Q.  Okay. I mean Andy.
22  A.  Andy.
23  Q.  Kelly knew too, right?
24  A.  And I did eventually get where I could

Page 313

1 talk to Mark, but he is a very nice -- he was a very
2 nice, personable guy.
3  Q.  Okay. You know, Andy responds -- Andy
4 then takes this e-mail that he got from Mark and he
5 forwards it to Aaron Burtner.
6     Now, Aaron was your former boss, right?
7  A.  Yeah, and -- and by this time he is gone.
8 He is in -- yeah, because he's at Amazon.
9  Q.  He's at Amazon, right.
10     And -- and it's clear here that Andy is --
11 he's -- he is concerned about you?
12  A.  Well, he is a good friend. He was a nice
13 guy, and Aaron was, too.
14  Q.  And -- and he writes here that -- that you
15 are off your rocker.
16     And -- and I take that to mean that --
17 that he was -- he was worried about everything that
18 you had going on in your personal life and in work?
19  A.  Yeah, yeah, I had a lot -- I had a big
20 personal -- personal conflict going on at the time.
21  Q.  Okay.
22  A.  It was a rough time.
23  Q.  And there was also a lot of pressure at
24 work, too?

Page 314

1    MR. CLARK: Objection to form.
2  BY THE WITNESS:
3    A.  Nah, I wouldn't -- work was never what I
4  would say pressure.  There was just a lot going on.
5  BY MR. ELSNER:
6    Q.  Well --
7    A.  Work was nothing compared to -- you know,
8  it was -- it was just work, you know, you've got to
9  get the job done.
10   Q.  Well, one of -- one of the pressures that
11 you were facing, though, was that there was a
12 discussion at CVS about moving the whole operation
13 from Indianapolis to Rhode Island, right?
14   A.  Well, yeah, I mean...
15   Q.  And if they did that, then you weren't
16 going to be able to do that job?
17   A.  I wasn't going to go with the job.
18   Q.  Because you had a daughter to take care of
19 and -- and you otherwise wouldn't be able to see her,
20 right?
21   A.  Correct.
22   Q.  Okay.  And so one of the pressures you
23 faced is if they did move those operations --
24   A.  I wouldn't call that a pressure.  That --

Page 315

1  I think that's overemphasizing it.  I just -- I knew I
2  didn't want to go over to Woonsocket and I wasn't
3  going to go.  No big deal.  I mean, I'm -- I worked in
4  quality.  I moved jobs a lot.  It was time to get a
5  different job.  And it was easy to get a different
6  job.
7    Q.  But it meant you were going to lose your
8  job, right?
9    A.  No, no, they were going -- they wanted
10 me -- they would have let me go on to Woonsocket.  I
11 was invited to go.
12   Q.  But if they moved that operation, you made
13 the decision that you weren't going to go?
14   A.  I just wasn't going to go.  As soon as I
15 found that out, I decided to look somewhere else, I
16 mean.
17   Q.  Okay.  Aaron responds to -- to Andy Eck
18 that he was worried about your mental stability at
19 this point, too.  "I know this really is taking a toll
20 on him."
21       Did I read that right?
22   A.  Yeah.
23   Q.  Okay.  And -- and then Andy responds to
24 Aaron Burtner that Shauna was worried about you, and:

Page 316

1  "Tells me that he is pretty much over the SOM."
2       Is that what he wrote?
3    A.  That's what it says.
4    Q.  And then he writes:  "This then leaves her
5  reports that she isn't fully familiar with."
6       That's what he writes, correct?  Did
7  that -- is that what he wrote?
8    A.  Where is it?  This leaves her reports and
9  that she is not familiar with, yeah.
10   Q.  And then there was some --
11   A.  Well --
12   Q.  -- discussion about conversations you had
13 with the DEA consultant about -- about salary,
14 correct?
15       MR. CLARK:  Objection to form.
16 BY THE WITNESS:
17   A.  Well, and I've got to stop you right here,
18 because, one, this is Andy telling Aaron.  Aaron
19 hadn't been there for a while.  Andy didn't work with
20 us.  He -- he is not -- he didn't have firsthand
21 experience in any of this.
22 BY MR. ELSNER:
23   Q.  Well --
24   A.  The only time he interacted with me was at

Page 317

1  lunch.
2    Q.  Well, and that's fair, but -- but he was
3  your friend --
4    A.  Yeah.
5    Q.  -- and -- and he knew this was talking a
6  toll on you and Aaron was your friend and he knew it
7  was taking a toll on you and you worked with Shauna
8  every day --
9    A.  Yeah.
10   Q.  -- and she was worried about you too,
11 right?
12   A.  Yeah, she was great.
13   Q.  Okay.  And then -- and then Aaron Burtner
14 writes back to Andy Eck and he says:
15       "Yeah, he is completely over it.  He is
16 doing his job, my old job, but he is only getting paid
17 for one of those jobs.  Then he finds out that they
18 are moving the SOM to Woonsocket," that's Rhode
19 Island, "so he really has no motivation at this point.
20 Also, the DEA consultant told him his salary is about
21 half that of other SOM managers."
22       And then he writes:  "It seems like CVS is
23 in the business of screwing people over until they've
24 had enough and move on."

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  Is that what he wrote?
2  A.  That's what Aaron wrote.
3  Q.  Okay.  How did you first learn that the
4  SOM program was going to be moved to Rhode Island?
5  A.  I don't remember, because it kind of -- I
6  think it was part of the developing with the new
7  pross -- process and the new program and I heard some
8  stuff.  And I do know the first time I asked Mark he
9  was told, No, it wasn't going to go, because I
10  remember asking him about that, and then they did --
11  they did a 180 again, so.  And it was even later when
12  he finally said, Nope, they changed their mind.  They
13  are definitely coming.
14  Q.  Exactly.  That's -- your memory is good.
15  Exhibit 43.
16  A.  Yeah, see, yeah, I remember, he told me.
17  (WHEREUPON, a certain document was
18  marked CVS - Elsner Deposition
19  Exhibit No. 43, for identification,
20  as of 01/24/2019.)
21  BY MR. ELSNER:
22  Q.  You -- you wrote -- you wrote to -- to
23  Mark on July 23rd, this is right about the same time,
24  about a week after these other e-mails that we had,

Page 319

1  right?
2  A.  Yeah.
3  Q.  And you said:
4  "Let me know if you hear any more about
5  moving SOM to corporate out east.  My four-year-old
6  daughter is in Indy and relocation is not an option
7  for me at that time."
8  And Mark Nicastro told you it won't be
9  moving out east, right?
10  A.  Yeah, because, yeah, because he told me to
11  the best of his knowledge at that time it wasn't going
12  to happen.
13  Q.  But there were these rumors that were
14  circulating?
15  A.  It was rumors that it could, and -- and
16  then, but they told him, no, it wasn't going to
17  happen.
18  Q.  Do you know who suggested that the system
19  be moved to Woonsocket?
20  MR. CLARK:  Objection to the form.
21  BY THE WITNESS:
22  A.  I don't know.  Yeah, I don't remember any
23  of that.  It was just -- it was just grapevine stuff,
24  and who -- you know.  I don't remember when it -- it

Page 320

1  came out.  And I guess it was a -- it might have
2  always been a potential they could move it because it
3  didn't have to be located anywhere, you know.
4  MR. ELSNER:  Can I see 329.
5  MR. CLARK:  Are you good?  Do you need a break?
6  THE WITNESS:  Hmm?
7  MR. CLARK:  Are you good?
8  THE WITNESS:  I'm fine.  Do you need a break?
9  MR. CLARK:  Yeah, I'm fine, but thank you.
10  (WHEREUPON, a certain document was
11  marked CVS - Elsner Deposition
12  Exhibit No. 44, for identification,
13  as of 01/24/2019.)
14  BY MR. ELSNER:
15  Q.  Let me -- let me show you Exhibit 44.
16  This is an e-mail that you wrote to
17  Pam Hinkle and this is in September of 2013.  And
18  you -- you tell Pam Hinkle:  "I'm dealing with
19  catastrophic personal issue on several fronts."
20  A.  Yeah.
21  Q.  "And I found out that they are moving the
22  SOM process to Rhode Island and I'll be unemployed
23  soon."
24  That's what you wrote, correct?

Page 321

1  A.  Yeah.
2  Q.  And then you write:
3  "Maybe my emotions venting, but it's been
4  very disheartening to learn that all of the extra work
5  I've been" -- "I've put in to cover Aaron's role and
6  train Shauna while covering my own duties and without
7  additional compensation has all been for naught."
8  That's what you wrote, correct?
9  A.  Yeah, because they are moving the, you
10  know, the job.
11  Q.  So you are doing all of this work, you are
12  doing your job, you are doing Aaron's job, you are
13  trying to train Shauna and all along they are planning
14  to move this whole system to Rhode Island?
15  A.  Well, not all along.  All along they
16  weren't and then they did --
17  Q.  And then they did?
18  A.  -- and they decided they were, yeah.
19  Q.  And -- and -- and it was disheartening to
20  you, right?
21  A.  Yeah.
22  Q.  Because you worked hard?
23  A.  Yeah, I think that's a fair assessment.
24  Q.  And once you learned that CVS was moving

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 their operation to Woonsocket, then you started to
2 look for other work, right?
3    A.   That's when I started looking.
4    Q.   Okay.
5    A.   Let's say I -- on -- not until, you know.
6    Q.   Did they offer you a position in
7 Woonsocket?
8    A.   I don't know if they actually offered me
9 or -- a formal offer was never made because no reason
10 to.  I already told them I wasn't going to go, you
11 know, as to whether expenses or anything like that.
12    Q.   Right.
13    A.   I know that I was welcome to come.  I just
14 didn't want to go, you know.
15    Q.   Okay.  You -- you knew that if -- if -- if
16 circumstances were different and you wanted to go to
17 Rhode Island that there was a position for you there?
18    A.   Yeah.
19    Q.   Is that right?
20    A.   Yeah, exactly.
21    Q.   Okay.
22    A.   They wanted -- and they wanted Shauna to
23 go, too, but, you know.
24    Q.   Okay.  And -- and let's go back to the

Page 323

1 document I showed you earlier, Exhibit 37.
2         And you were right, I had mixed up the
3 dates here.  This is -- this is the e-mail that Mark
4 Nicastro sends on September 27th, 2013, is that right?
5    A.   Yeah.
6    Q.   Okay.  And this is the part that I read to
7 you and you correct -- you -- you rightly corrected me
8 that the -- that he was talking about Kelly and Shauna
9 and he told me that Kelly had a phone interview.
10        Now, this is you having an interview for
11 another position because -- because CVS was moving --
12    A.   Yeah, yeah.
13    Q.   -- the SOM process to Rhode Island, right?
14    A.   Yeah.
15    Q.   Okay.  And he writes:  "No surprise."  And
16 then he -- and then he says:
17        "However, Shauna has been offered a
18 position with the law firm she used to work with and
19 it is more money."
20        And he says:  "I'll talk with her today."
21    A.   Oh, yeah.  Yeah, that's right, yeah.
22    Q.   "But we could be in trouble fast."
23        And then it says:  "I know Deb wasn't a
24 fan of guaranteeing Kelly a certain employment date or

Page 324

1 throwing money at him, but we may need to get creative
2 to keep his going."
3         Do you see how he said that there?
4    A.   Yeah.
5    Q.   But they never threw any money at you, did
6 they?
7    A.   No, they never did anything.
8    Q.   Okay.  And -- and it's true, is it not,
9 that if you left and Shauna left, then they wouldn't
10 have anyone to do the SOM program at that time?
11    A.   As far as I know.
12    MR. CLARK:  Objection to form.
13 BY THE WITNESS:
14    A.   I don't know what they had -- who they had
15 to do the job, other locations, corporate level.  I
16 saw something about some guy who used to do that, but
17 at the -- at the Indianapolis DC, Shauna and I were
18 it.
19 BY MR. ELSNER:
20    Q.   And so if something were to happen, they
21 could be in trouble fast?
22    A.   Right.
23    Q.   And that's what Mark Nicastro wrote?
24    A.   Yeah.

Page 325

1    MR. ELSNER:  Can I see 330.
2    THE WITNESS:  Okay.  Steve Churchill, that's the
3 name.  That's -- that's the consultant that worked.
4         (WHEREUPON, a certain document was
5         marked CVS - Elsner Deposition
6         Exhibit No. 45, for identification,
7         as of 01/24/2019.)
8 BY MR. ELSNER:
9    Q.   This is Exhibit 45.
10    MR. CLARK:  Oh, actually, don't write on that
11 one.
12 BY MR. ELSNER:
13    Q.   This is Exhibit 45.
14        This is an e-mail on the bottom from Mark
15 Nicastro and he -- he writes:
16        "Dean, Kelly Baker will probably be
17 putting in his notice tomorrow.  I received a call
18 this afternoon from a company for a reference."
19        Did you end up resigning from CVS?
20    A.   Yeah, yeah.
21    Q.   Okay.
22    A.   Of course.
23    Q.   And do you know when your last day was at
24 CVS?

Page 326

1    A.  Not right offhand, no.
2    Q.  Okay.
3       I think your LinkedIn page said it was
4 November?
5    A.  Yeah, that was just something that I --
6 yeah, that's the, you know, I -- the LinkedIn page may
7 not be accurate down to the day.
8    Q.  Completely acc -- down to the day?
9    A.  No, it was just an approximation.
10    Q.  Okay.  So it could have been sometime in
11 October or November of 2013, is that right?
12    A.  Yeah, I just know my last week Mark took
13 me out for a lunch, you know, as a going away, and
14 that's -- but I don't even remember what day that was,
15 so...
16    Q.  You know, you've mentioned a couple of
17 times these -- this DEA consultant --
18    A.  Yes.
19    Q.  -- that they hired.
20       And how many -- was that person full time
21 or part time?
22    A.  What do you mean by full time, in the
23 office full time?
24    Q.  Yes.

Page 327

1    A.  Yeah, he was in there the whole time.
2    Q.  Now, is this Gary Milikan or is this
3 someone else?
4    A.  No, no.  I know you said Gary, and I -- I
5 can't remember who Gary Milikan was.  His was Steve
6 Churchill, that's why I just saw him on the -- I
7 can't --
8    Q.  Is this the guy who was there working
9 in --
10    A.  Yeah.  He was --
11    Q.  -- in the distribution center?
12    A.  He worked for Matt Murphy, Matt Murphy's
13 company, and he was the guy kind of doing the manager
14 role or oversight because he was a former F -- F --
15    Q.  DEA?
16    A.  -- FDA or DEA agent, yeah.
17    Q.  Okay.
18    A.  And that was a consultant.
19    Q.  And was he -- but he wasn't an employee of
20 CVS, is that right?
21    A.  No.  He was a consultant.  He worked --
22    Q.  He was a consultant.
23    A.  -- for Matt Murphy's company.
24    Q.  Now, did he sit down and review IRR

Page 328

1 reports --
2    A.  I don't know what he did.  He was in
3 Aaron's office doing whatever Aaron did or whatever.
4 I don't know.  I was never in there, so...
5    Q.  Well, when Aaron left, did -- was -- was
6 he still working there?
7    A.  He kind of took in -- he kind of came in
8 because Aaron was gone.
9    Q.  Okay.  Was he reviewing suspicious orders
10 for controlled substances like you were?
11    A.  I don't know.  I don't know what he was
12 doing, to tell you -- to be honest, I don't know what
13 he was doing.
14    Q.  Did he interact -- did he oversee your
15 work?
16    MR. CLARK:  Objection to form.
17 BY THE WITNESS:
18    A.  Sometimes he would come in there and look
19 at what we did and stuff.  And I -- I -- I remember
20 very little about what he actually did, just he was
21 kind of a character and I remember him that way.
22 BY MR. ELSNER:
23    Q.  Do you -- do you know whether he worked
24 40 hours a week?

Page 329

1    A.  I -- I didn't do his time cards.  I
2 assume.  He was there all of the time I was there,
3 so...
4    Q.  Okay.
5       If you look above in the e-mail we were
6 just looking at, there is an e-mail from Dean Vanelli
7 to Mark Nicastro and to Pam Hinkle.
8    A.  This is on 45 again or --
9    Q.  Yeah.
10    A.  Okay.  This is some --
11    Q.  And he asks:
12       "Do you have staff cross-trained to
13 support Shauna?  We need to have coverage for the next
14 few months as the existing SOM will most likely run
15 through the end of the year as we will transition to
16 the new solution slowly.  Too much risk to move too
17 fast."
18       Do you see that?
19    A.  Uh-huh.
20    Q.  Okay.  So he is concerned about whether
21 there is support and coverage for when you leave,
22 correct?
23    MR. CLARK:  Object to form.
24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

---

Page 330

1    A.  I don't know if this is -- well, it says
2 me, but I don't know if that's exactly what he is
3 talking about. Here it just says that he is not going
4 to put the new program in fast because it's too risky.
5 BY MR. ELSNER:
6    Q.  Right.
7       And then he says we need -- "Do you" --
8 "Do you have staff cross-trained to support Shauna?"
9       That's Shauna Helfrich, right?
10    A.  Yeah.
11    Q.  Okay. So then underneath he says:
12       "The next option will be to talk to Matt
13 Murphy?"
14       Do you see that?
15    A.  Yes, that's Matt Murphy --
16    Q.  Okay.
17    A.  -- he was the owner of --
18    Q.  So what he is saying is is that we are
19 going to first see if we can cross-train any people to
20 support Shauna.
21       Now, this is October 10th, 2013, right?
22    A.  Okay. Okay.
23    Q.  And then he says: "The next option will
24 be to talk to Matt Murphy."

---

Page 331

1       Right?
2    A.  Um-hum.
3    Q.  And that's the consultant you were
4 referring to, that they might have somebody that could
5 be trained, right?
6    A.  Correct. I don't -- well, talking
7 about -- are we just --
8    Q.  And then he writes --
9    A.  -- they don't know --
10    Q.  Sorry.
11    A.  -- they don't know if they are going to
12 train.
13    Q.  Right.
14    A.  I don't know if they are training anybody.
15 They are just getting a consultant in.
16    Q.  Right. He is saying the next option will
17 be to talk to Matt Murphy if they can't get people
18 cross-trained. And then he writes:
19       "I would need to level set with Betsy
20 first as she dealt with Matt and I don't have a clear
21 understanding on the agreed level of involvement,"
22 meaning how much involvement Matt Murphy and his
23 company would have, right?
24    A.  Yeah, I don't --

---

Page 332

1    MR. CLARK: Object to form.
2 BY THE WITNESS:
3    A.  Yeah, that's -- that -- I don't know what
4 that means. That -- to me that's contractual with
5 the -- with what you deal with consultants. I don't
6 know, I mean, you know, I...
7 BY MR. ELSNER:
8    Q.  Okay.
9       So at this time it's -- it's really --
10 it's you and Shauna Helfrich?
11    A.  At this time, yeah.
12    Q.  Okay.
13       And -- and it's true that the new SOM
14 system that you had done a little testing on and
15 looked at was not operational --
16    A.  Yeah.
17    Q.  -- the whole time you were at CVS,
18 correct?
19    A.  It never actually operated when I was
20 there, I used it, you know --
21    Q.  Okay.
22    A.  -- in live capacity.
23    MR. ELSNER: Why don't we take a quick break.
24    THE VIDEOGRAPHER: We are off the record at

---

Page 333

1 3:23 p.m.
2       (WHEREUPON, a recess was had
3       from 3:23 to 3:39 p.m.)
4    THE VIDEOGRAPHER: We are back on the record at
5 3:39 p.m.
6 BY MR. ELSNER:
7    Q.  Mr. Baker --
8    A.  You can call me Kelly, if you don't mind.
9    Q.  Okay. Okay. Thanks.
10       Did you -- were you aware of how many --
11 oh. Why don't we get it settled.
12    A.  Okay. I got it.
13    Q.  Were you aware that there was an
14 obligation if a suspicious order was detected that CVS
15 had to report that to the DEA?
16    MR. CLARK: Object to form.
17 BY THE WITNESS:
18    A.  I can't -- I'm not sure. I -- I would
19 think so, but I can't remember. I'm not -- I'm not
20 sure if they were -- if we had to re -- report it or
21 if I remember having to report it. I think I just
22 reported to the higher-ups and they did that, you
23 know.
24 BY MR. ELSNER:

---

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    Q.   Okay.  And do you recall whether there
2  were any suspicious orders reported for any controlled
3  drugs from the Indiana distribution center?
4    A.   Not specifically from the Indiana, not
5  from a specific site, you know.
6    Q.   Do you remember there being suspicious
7  orders reported to the DEA related to other
8  distribution centers?
9    A.   Not by distribution centers.  I remember
10  like an instance when we did do that, but I don't know
11  which distribution center it came from.
12    Q.   Okay.  Let me -- let me show you a
13  document.  This is Exhibit 46.
14       (WHEREUPON, a certain document was
15        marked CVS - Elsner Deposition
16        Exhibit No. 46, for identification,
17        as of 01/24/2019.)
18  BY MR. ELSNER:
19    Q.   This is an e-mail from Mark Nicastro, the
20  landlord of the Indiana distribution center, and he
21  sends this e-mail to -- to Dan Gillen.
22       Do you know who Daniel Gillen is?
23    A.   No.  I'm assuming you are going to tell me
24  he is DEA?

Page 335

1    Q.   You are exactly right.
2       And -- and -- and this is in response to
3  an audit that the DEA was conducting of the
4  Indianapolis distribution center.
5       Were you aware that the DEA was conducting
6  an audit of the Indianapolis distribution center --
7    A.   Yes, I do remember that we were going to
8  have an audit.
9    Q.   Okay.  Tell me what you remember.
10    A.   Well, the only thing I remember is that
11  they were going to go to my house.
12    Q.   To your house?
13    A.   Yeah, but to verify everybody, but they
14  never did, but they acc -- I think they contacted my
15  neighbors or something.  Anybody that had access,
16  because while I was there, I did have access -- I
17  didn't really do it -- to go into the control cage
18  where they picked controlled substance.  I went with
19  Andy a few times --
20    Q.   Okay.
21    A.   -- doing some of the -- the ISO stuff, but
22  anybody that was involved, though, could have been
23  exposed to that, they did background checks on and
24  that's the only thing I remember.  I was like, Ooh,

Page 336

1  wow, they could actually go to my house.  That's
2  creepy, you know.
3    Q.   Right.  Okay.
4       But there was a -- there was a DEA audit
5  of the Indianapolis distribution center in August
6  of 2013.
7    A.   Okay.
8    Q.   And they were looking at the suspicious
9  order monitoring system.
10    A.   Okay.
11    Q.   Were you aware that the DEA was doing an
12  audit of the dis -- of the Indianapolis distribution
13  center looking specifically at the issues related --
14    A.   I just remember there was a DEA --
15       MR. CLARK:  Objection to form.
16  BY THE WITNESS:
17    A.   -- audit of our side, you know, because
18  actually, audit is what I used to do for quality.  So
19  I was like, Oh, they are going to do an audit, you
20  know.  I didn't know if it was specific to SOM or --
21  or just our -- our site, because I know now every DC
22  had controlled substance.  So only the ones who did
23  were the ones that we were looking at.
24  BY MR. ELSNER:

Page 337

1    Q.   Right.
2       But -- but Mark Nicastro or no one at CVS
3  brought to your attention that the DEA audit of the
4  Indianapolis distribution center related to the
5  suspicious order monitoring --
6    A.   I don't -- I -- I'm sure it had -- I would
7  have expected it to have something to do with it
8  because that's what we were doing, but, you know, the
9  DEA is controlled -- about controlled substance, so
10  that's why they were there, not because we were
11  selling toilet paper, you know.
12    Q.   Right.
13    A.   But I don't remember exactly, you know
14  what I mean.  I kind of didn't really pay a lot of
15  attention to, you know, management stuff.
16    Q.   Let me -- let me mark this as the next
17  exhibit.  Sorry.  We are going to jump around just a
18  little bit.
19       (WHEREUPON, a certain document was
20        marked CVS - Elsner Deposition
21        Exhibit No. 47, for identification,
22        as of 01/24/2019.)
23  BY MR. ELSNER:
24    Q.   This is Exhibit 47.  And this is a report

Page 338

1 that was written --
2    A.   Okay.
3    Q.   -- related to the DEA visit August 5th
4 through August 8th, 2013.
5        Do you see that?
6    A.   Yeah, it's an audit report.
7    Q.   Okay.  And -- and then it says in the
8 third bullet that:
9        "The visit began with an opening
10 conference attended by Mark Nicastro, Gary Lamberth,
11 Joe Scholl and Andy Eck."
12       Do you see that?
13   A.   Yes.
14   Q.   Okay.
15       Did you attend any meetings related to the
16 DEA investigation of the Indianapolis distribution
17 center --
18   A.   I don't remember.  I don't remember to --
19   MR. CLARK:  Object to form.  Sorry.
20 BY THE WITNESS:
21   A.   I just don't remember, you know, I don't
22 know.  I mean, I recognize those names and Joe and
23 Andy was my lunch buds, but...
24 BY MR. ELSNER:

Page 339

1    Q.   Okay.  Did they ever tell you that there
2 was a DEA audit in August?
3    A.   I knew there was an audit.  I do remember
4 there being an audit.
5    Q.   You remember there being an audit, okay.
6        Do you see under the next bullet, it says:
7        "During the opening conference, Mr. Gillen
8 described the visit as threefold:  Regulatory audit"
9 and then second is:  "Discuss suspicious order
10 monitoring."
11       Do you see that?
12   A.   Yeah, I see that.
13   Q.   Okay.  And then down below there is a list
14 of documents that was needed for the audit.
15       And the second bullet from the bottom is:
16 "A copy of the SOM SOP," a copy of the suspicious
17 order monitoring program.
18   A.   Yeah.
19   Q.   Do you see that?
20   A.   Um-hum.  Yeah, then see actually down
21 there my name and address.  Never mind.
22   Q.   What's that?  Where -- where were you
23 referring?
24   A.   I just said at the bottom of the -- yeah,

Page 340

1 they -- they asked for name, date of birth, addresses
2 of anybody.  I -- that's probably what keeps my memory
3 knowing they could go to my house.  They didn't but
4 they could have --
5    Q.   Okay.
6    A.   -- because they had my address.
7    Q.   So on the bottom is that they needed a
8 name, the date of birth, and the address of anyone
9 that had access to --
10   A.   Yeah.
11   Q.   -- the controlled substance room?
12   A.   And -- and I was part of that because I
13 could go into the cage and --
14   Q.   Okay.  But -- but that's your extent of
15 your -- of the involvement with the DEA audit?
16   A.   That's -- that's the extent of what I
17 remember.
18   Q.   Okay.  If you turn to Page 8394, the
19 notes, which is the second-to-last page.
20       Do you see the title on the top is "SOM"?
21   A.   Um-hum.
22   Q.   Then it says:
23       "The DC director Mark Nicastro explained
24 the process and provided the SOP."

Page 341

1        So Mark Nicastro explained the suspicious
2 order monitoring process to the DEA, is that right?
3    MR. CLARK:  Object to form.
4 BY MR. ELSNER:
5    Q.   According to the notes?
6    A.   According to this.  I don't know what he
7 did, to tell you the truth, I mean...
8    Q.   And --
9    A.   But --
10   Q.   -- Mark Nic -- and then it says:
11       "Director Nicastro explained some
12 statistics surrounding CVS customers of controlled
13 prescriptions."
14       Do you see that?
15   A.   Um-hum.
16   Q.   Did Mark Nicastro ask you for any
17 statistics about the cus -- the dis -- the pharmacies
18 that CVS was distributing controlled substances to?
19   A.   I don't remember.  I don't -- I don't know
20 why he would, because he can get that same information
21 from the same reports that I did, I would think, but,
22 no, I don't -- I --
23   Q.   Do you know whether Mark Nicastro knew how
24 to --

Page 342

1    A.   I don't remember.  I -- I don't --
2    Q.   -- do a full review?
3    A.   I don't know what he knew.  You know, like
4 I say, I just really didn't -- I didn't hardly get to
5 know him until the end when I was about ready to
6 leave.  Then I kind of found out what --
7    Q.   Well, this is about that time, this is
8 August --
9    A.   Yeah.
10    Q.   -- 2013.
11    A.   And so I -- I just -- but what he got
12 involved with, as far as SOM and running his
13 operations, I don't know.
14    Q.   Then it says:
15        "The DEA questioned whether the SOM
16 process had stopped any orders."
17        And then it rud -- and then it reads:
18        "Director Nicastro said, No, the process
19 has identified several orders that required additional
20 research and upon validating them they were released
21 and sent."
22        Do you see that?
23    A.   Um-hum.
24    Q.   Do you know why Mark Nicastro was in this

Page 343

1 meeting and you were not included since you were doing
2 the day-to-day work on the suspicious order monitoring
3 system?
4    A.   I don't know.  Is this a meeting or is
5 this just a...?
6    Q.   This is the notes of the meeting that they
7 had with the DEA.
8    A.   I thought this was just a summary of the
9 stuff we talked about.
10    Q.   If you see on the front page, it says:
11 "DEA visit"?
12    A.   Oh, okay.  Yeah, I don't know.  No, I
13 don't...
14    Q.   Do you know why no one from CVS asked you
15 to attend the meeting related to the suspicious --
16    A.   I would assume --
17    Q.   -- order monitoring system?
18    MR. CLARK:  Object to form.
19 BY THE WITNESS:
20    A.   I would assume because I'm not management.
21 I mean, that's -- in my company, too, when we are
22 getting audited, we don't let -- you don't want the
23 auditors to talk to anybody below who they should be
24 talking to.

Page 344

1 BY MR. ELSNER:
2    Q.   Only management level?
3    A.   Yeah, usually.
4    Q.   Even though you knew the most about the
5 SOM program that was operating at this time, right?
6    MR. CLARK:  Objection --
7 BY MR. ELSNER:
8    Q.   You were doing it every day, right?
9    MR. CLARK:  -- to form.
10 BY THE WITNESS:
11    A.   I was doing the an -- analysis.
12 BY MR. ELSNER:
13    Q.   Do you see three -- three bullets down?
14    A.   Um-hum.
15    Q.   It says:
16        "DEA stated statistics like Indiana leads
17 the nation in pharmacy armed robberies."
18        Do you see that?
19        "And several CVS stores have been among
20 those robbed."
21        Do you see where I'm at?
22    A.   The third one down or --
23    Q.   It's -- no.  It's -- it's three down from
24 the last one we read.

Page 345

1    A.   Oh, okay.
2    Q.   It begins:  "DEA stated statistics."
3    A.   Oh, let's see --
4    Q.   It is also on the screen here if that
5 makes it easier.
6    A.   "DEA stated statistics," yeah, okay.  I
7 didn't know that.  Maybe I don't want to go into a CVS
8 store anymore.
9    Q.   And then it reads:
10        "The DEA questioned what CVS was doing or
11 can do to prevent pharmacy robberies.  They questioned
12 maybe some of our stores carrying too much
13 hydrocodone, which is a major target for robberies,
14 and that CVS continues to pump hydro into these
15 stores, some of which have been robbed repeatedly."
16        Did anyone make you aware that that was
17 the DEA's concern, among others, in August of 2013?
18    MR. CLARK:  Objection to form.
19 BY THE WITNESS:
20    A.   Oh, I don't remember.  Like -- like I
21 said, that's -- that -- but this is a lengthy report
22 from years ago.  I don't remember it.  I don't
23 remember this report.  I don't remember any specifics
24 about the actual audit other than I knew we had one.

Page 346

BY MR. ELSNER:

2  Q.  Right.

3      And -- and -- and -- and they didn't ask

4  you to attend?

5  A.  I don't know if they did or not.  I

6  just -- I don't know.  Maybe they did and maybe I

7  didn't listen or maybe I just don't remember.

8  Q.  Well, you weren't in the meetings, right?

9  A.  Okay, yeah, yeah, no, no, I wasn't in the

10  meeting, but...

11  Q.  Okay.

12  A.  That doesn't mean he couldn't have told me

13  outside of the meeting if that's what you are asking,

14  but...

15  Q.  No.  I'm asking you if you were in the

16  meeting?

17  A.  Oh, no, I don't think I was in any

18  meetings.

19  Q.  Okay.  And then did anyone tell you

20  outside of the meetings that the -- what the DEA's

21  concerns were?

22  A.  I don't know.  I don't remember.  I

23  don't -- I just don't remember anything about it.

24  Q.  If we go back to Exhibit 46, which is the

Page 347

1  first e-mail I showed.

2  A.  Yeah, there you go.

3  Q.  If you see in the opening e-mail, there is

4  some dashes and there is one that's "the fourth file."

5      Do you see that?

6  A.  "The fourth file is a list of stores where

7  we have stopped orders."

8  Q.  That's the one I'm looking at.  "The

9  fourth file is a list of stores where we have stopped

10  orders."

11      I'm going to ask you to turn to that file,

12  okay?

13  A.  Is that -- is that on 46?

14  Q.  It is a few pages in.  If you -- it's a

15  chart.

16  A.  Oh, okay.

17  Q.  With some store numbers and on the top it

18  says MR 55-11.

19      Do you see where I am at?

20  MR. CLARK:  This is it.

21  BY THE WITNESS:

22  A.  Yeah, I think so, yeah, okay.

23  BY MR. ELSNER:

24  Q.  And this is -- this is the chart of the

Page 348

1  stopped orders that were reported to the DEA.

2  A.  Okay.

3  Q.  Okay.

4  MR. CLARK:  Objection to the form.

5  BY MR. ELSNER:

6  Q.  Were you aware that CVS had only stopped

7  orders and reported them to the DEA on these seven

8  occasions?

9  MR. CLARK:  Objection to form.

10  BY THE WITNESS:

11  A.  Well, anything other than when I got

12  there, I wouldn't have any awareness of, so --

13  BY MR. ELSNER:

14  Q.  Okay.

15  A.  -- anything dates 2012...

16  Q.  So bef -- so when you started at CVS, did

17  anyone tell you that there had only been four orders

18  reported and stopped and orders reported to the DEA

19  for controlled substances?

20  MR. CLARK:  Objection to form.

21  BY THE WITNESS:

22  A.  I don't remember what was reported to me.

23  I don't -- I don't know.

24  BY MR. ELSNER:

Page 349

1  Q.  Okay.  And then while you were at CVS,

2  there were three orders that were reported to the DEA

3  and stopped in October of 2013.

4      Do you see that?

5  A.  That's the Hawaii.  I was waiting for you

6  to get to this.

7  Q.  Okay.  So are you familiar with these

8  stopped orders?

9  A.  I remember the one -- like I say, there is

10  only a few things that stick out.  The last -- one of

11  the last things I remember before I left was a

12  situation with a Hawaii store or obviously maybe

13  stores that was taken up to -- way -- way up the chain

14  of command at CVS that we had some con --

15  teleconferences talking about this issue.  With -- I

16  was in there, Shauna was in there, Mark, Pam was in

17  there, the teleconference were higher-ups, even the

18  consultant was in there, and it was about that.

19      And I think that was probably about --

20  pretty close to when -- maybe it was when I was

21  leaving, I don't know, maybe it was, but...

22  Q.  Well, it is October of 2013, so it's --

23  A.  That --

24  Q.  -- it's about a month before you left --

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    A.   Yeah.
2    Q.   -- or it was right around, a few weeks
3 before you left?
4    A.   Yeah, and --
5    Q.   What was the issue?
6    A.   I don't -- I don't remember what the issue
7 was.  It was something, but it got flagged.  And then
8 once it got -- went to high enough up it came out of
9 our hands and then management ran -- you know,
10 corporate ran off with it and they did what they
11 needed to do.
12       I don't -- you know, once -- once it
13 flagged it and kind of ran it up the chain, and people
14 knew it was --
15   Q.   Did you flag it or did Shauna flag it?
16   A.   It was -- it was Shauna or I.  I don't
17 remember which one of us.
18   Q.   You don't remember?
19   A.   No.
20   Q.   Do you remember discussing it with her?
21   A.   I'm sure we discussed it, I mean.
22   Q.   Do you remember anything about it?
23   A.   Not really, other -- I just re -- I
24 remember having -- sitting in a big conference room,

Page 351

1 Aloha, it's getting real, you know, I mean, and I knew
2 it was Hawaii.
3    Q.   And was that in Indianapolis where that
4 conversation took place?
5    A.   Yeah, that was where we -- initially we
6 started out, in Indianapolis.
7    Q.   Did anyone from corporate come to that
8 meeting?
9    A.   There was a lot of people.  I don't
10 remember who all was there.  I know it was -- the only
11 thing I can remember is me, Shauna, the -- the -- the
12 consultant, Mark was there, and then a lot of people
13 we had on teleconference as well, you know, and, like
14 I say, a lot of these -- a lot of these names, I never
15 actually saw the face, I either heard their voice or
16 read the names off.
17   Q.   Okay.  So aside from these three orders,
18 and -- and the total is seven here, these are all of
19 the orders that were stopped and reported to the DEA.
20       Are you aware of any others?
21   A.   No.  I'm -- I'm aware of -- I am not --
22   Q.   You are only aware of these three, right?
23   A.   That's the only thing that sticks out in
24 my mind because I was there.

Page 352

1    Q.   You never reported any suspicious orders
2 and recommended that any orders be stopped into Ohio?
3    A.   I don't know.  I can't -- I don't --
4 situationally based on -- I really didn't do it based
5 on states.  I did -- you know, it was like, Hey, this
6 is going out, this is going out, you know, boom, boom,
7 boom.
8    Q.   Was it based on stores or distribution --
9    A.   I looked at --
10   Q.   -- centers or --
11   A.   -- I just looked at the data and
12 investigated it.  I didn't, Oh, I wouldn't do it
13 because it was a state or not.  I mean, I don't think
14 where it was going was relevant to me.  It was just
15 a...
16       (WHEREUPON, a certain document was
17       marked CVS - Elsner Deposition
18       Exhibit No. 48, for identification,
19       as of 01/24/2019.)
20 BY MR. ELSNER:
21   Q.   This is Exhibit 48.  This is an e-mail
22 exchange between Tom Bourque and Craig Schiavo.  And
23 Tom Bourque writes to Craig Schiavo:
24       "Also, the DEA situation in Indy."  And he

Page 353

1 asks: "Is the DEA looking at one CVS store or
2 multiple?"
3       And then Craig Schiavo responds:  "No one
4 knows" -- and this is in the second paragraph -- "No
5 one knows what the DEA is looking at but I am hearing
6 it did not go well.  Dan Gillen told Mark, I don't
7 believe you have an SOM process, and do you want to
8 lose your DEA licenses" -- or "license.  Dean is
9 waiting for Mark's notes from his call yesterday."
10       Did anyone ever tell you, operating the
11 suspicious order monit -- monitoring system, that the
12 DEA was concerned about the SOM program at CVS?
13   MR. CLARK:  Objection to form.
14 BY THE WITNESS:
15   A.   This -- I'm not on this e-mail.  When was
16 my last date?  Because this is November 15th.  This is
17 almost end of the year.
18 BY MR. ELSNER:
19   Q.   That's true.
20   A.   So how could they of?
21   Q.   Well, the -- the audit began in August of
22 that year.
23       Did anyone bring to your attention that
24 the DEA was concerned about CVS's suspicious order

Page 354

1  monitoring system?
2      A.  I don't recall.  I don't remember.
3      Q.  Well, that would have been a big deal,
4  right, if the DEA thought that you didn't have a good
5  SOM system, you would expect that somebody would have
6  at least told you, right?
7      MR. CLARK:  Objection to form.
8  BY THE WITNESS:
9      A.  I don't know.  I mean, I was -- like I
10 say, I was a peon, so...
11 BY MR. ELSNER:
12     Q.  But you were running the program, right?
13     MR. CLARK:  Objection to form.
14 BY THE WITNESS:
15     A.  No, I don't think I was running the --
16 I -- I never felt like I was running the program.  I
17 was doing the analysis every day, making sure --
18 BY MR. ELSNER:
19     Q.  You were the guy checking all the orders
20 every day?
21     A.  Yeah.
22     Q.  You and Shauna, right?
23     A.  Yeah.  So whether or not we lose our --
24 our license or whatever, is kind of irrelevant, I'm

Page 355

1  still going to have to check orders.  I -- I would
2  guess.  I don't know.
3      Q.  Except not for the centers that lost their
4  license, right?
5      A.  Yeah, yeah, it make -- make it easier,
6  yeah, that's a good point, you know.
7      MR. ELSNER:  Can I see Motley Rice 57.  Well,
8  let me see 49, but I'm probably going to jump to 57.
9          (WHEREUPON, a certain document was
10         marked CVS - Elsner Deposition
11         Exhibit No. 49, for identification,
12         as of 01/24/2019.)
13 BY MR. ELSNER:
14     Q.  Let me show you what we've marked as
15 Exhibit 49.
16         This is an e-mail that -- that Dan Gillen
17 sends from the DEA to Mark Nicastro, the landlord, and
18 he -- he is writing about two stores in particular,
19 and he writes that this one CVS store ordered over
20 1.8 million dosage units of hydrocodone between
21 January 1st, 2012, through October 2013.  And -- and
22 that the pharmacy is located in a city with a
23 population of only about 18,000 people.
24         So 18,000 people in this town and there

Page 356

1  are 1 point -- over 1.8 million dosage units of hydro
2  going into that town and 1 point -- over 1.7 million
3  tablets of hydrocodone were being shipped from the
4  Indianapolis distribution center.
5          Did the system you have in place, did you
6  ever take a look at what the size of the town or
7  community was in relation to the number of pills being
8  shipped into that?
9      A.  I know that was something you kind of look
10 into -- if a pharmacy popped up and then you looked on
11 the map and it turned out to be the only pharmacy for
12 50 miles because it was a really barren location,
13 well, yeah, you'd get a little more for that, or if it
14 was located next to a hospital, so we did kind of look
15 at stuff like that.
16         Vincennes is actually a college town for a
17 little -- a small private college, I don't know if
18 that helps.  I don't know.
19     Q.  Okay.
20     A.  I recognize that, but...
21     Q.  And -- and would those be things that you
22 would consider in your analysis --
23     A.  Yeah, like I --
24     Q.  -- for suspicious order monitoring?

Page 357

1      A.  -- like I say, part of it was getting on
2  Mapquest at the time, you know, I don't know if we use
3  it anymore, but looking at -- at the surroundings,
4  that was all part of the analysis was looking at
5  the -- is there a reason why, you know, there is an
6  anomaly.
7      Q.  And would you agree with me that that's a
8  large number of dosage units of hydrocodone for a town
9  of only 18,000 people?
10     MR. CLARK:  Objection to form.
11 BY THE WITNESS:
12     A.  I can't make that assessment.  I don't
13 know what the normal dosage.  I mean, how many doses
14 of hydrocodone do you need to have for every person?
15 I don't know.  I mean, maybe that's -- I don't know.
16 I -- I can't make that assessment.  I don't know
17 enough about dosage and the drug.
18 BY MR. ELSNER:
19     Q.  Okay.  Did you ever -- did you ever look
20 at how many dosage units of that drug were being de --
21 sold or dispensed from other pharmacies in the same
22 area and compare those pharmacies to CVS's?
23     MR. CLARK:  Objection to form.
24 BY THE WITNESS:

Page 358

1    A.  I don't -- I don't know.  I don't think we
2  had access to other pharmacy -- ceuti -- pharmacies.
3  We don't have -- we didn't have the data, did we?  I
4  don't think we did.
5  BY MR. ELSNER:
6    Q.  Did you -- did anyone ever provide you
7  data to be able to do that, either through --
8    A.  Not that I remember.  I don't recall.
9    Q.  Wasn't a database search that you recall
10  being able to do so?
11    A.  I don't think so, no.
12    Q.  Would that -- you'd agree that would be an
13  important thing to know, right, if -- if one CVS --
14  if, like, the average for all of the CVS stores and
15  that -- I'm sorry -- if the average for all of the
16  pharmacies in that town, they were dispensing, you
17  know, 200 tablets of hydro and -- and the CVS store
18  was at 1.8 million, that would be -- that would be --
19    A.  Well --
20    Q.  -- something you'd want to look at, right?
21    A.  -- I guess, like, that's also kind of a --
22    MR. CLARK:  Objection to form.
23      Sorry, Kelly.
24  BY THE WITNESS:

Page 359

1    A.  -- a blanket -- I don't think that's an
2  applicable or -- sort of applicable, blanket response,
3  because I know we looked at one thing we saw, if it
4  happened to be the pharmacy right across the street
5  from a legitimate pain clinic, well, they are going to
6  get all of the people because you are going leave your
7  clinic and go get your prescription right there,
8  nowhere else, you know.
9    So I would elevate it for right there, so.
10  You know, so you can't just say because of the
11  average.  Do you -- do you know what I'm saying?
12  That's a -- that's just not a fair...
13  BY MR. ELSNER:
14    Q.  Did anyone tell you that the DEA had any
15  concerns about CVS shipping hydrocodone in -- in kind
16  of large amounts to small towns?
17    A.  I don't remember, like, anything else
18  about the DEA other than I -- we were going to be
19  audited and I had to give them my address.
20    Q.  Do you recall --
21    MR. ELSNER:  Why don't we go off the record real
22  quick.
23    THE VIDEOGRAPHER:  We are off the record at
24  4:03 p.m.

Page 360

1    (WHEREUPON, a recess was had
2    from 4:03 to 4:14 p.m.)
3    THE VIDEOGRAPHER:  We are back on the record at
4  4:14 p.m.
5  BY MR. ELSNER:
6    Q.  Mr. Baker, I want you to take a look again
7  at Exhibit 47, and these are the notes of the DEA's
8  visit on August 5th through the 8th, 2013.
9    A.  Okay.
10    Q.  We looked at this before, do you recall?
11    A.  Yeah.
12    Q.  Okay.  If you go to the second-to-last
13  page or third-to-last page, I'm going to direct you to
14  the notes of the third day of the DEA visit.
15    A.  Okay.  That would be Page 5, then, I
16  guess.
17    Q.  Yeah.  It starts with:  "Day 3" --
18    A.  Yeah.
19    Q.  -- "Thursday, August 8, 2013."
20    Do you see that?
21    A.  Um-hum.
22    Q.  And it says:
23    "The same two DEA agents arrived at the
24  D" -- "distribution center."

Page 361

1    Do you see that?
2    A.  Yep.
3    Q.  And then if we go to the -- to the next
4  page, and we -- we looked at this briefly before, it
5  says "SOM" on the top?
6    A.  Yeah.
7    Q.  48-06.
8    And after -- so -- so during this audit,
9  in the first two days of the audit, no one mentioned
10  to you that the DEA was concerned about the suspicious
11  order monitoring program and that they were going to
12  have a meeting with the DEA about that program on the
13  8th of August, correct?
14    A.  I can't remember.  I just don't remember
15  anything about the audit.
16    Q.  Well, and you didn't attend the meeting
17  on -- on the 8th, right?
18    A.  I don't believe so because I don't recall
19  meeting any of the DEA agents.
20    Q.  Okay.  And on the 8th, there -- according
21  to these notes, there was a discussion of the
22  suspicious order monitoring process and -- and the
23  concern that the DEA had about the suspicious order
24  monitoring process.

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 After this meeting on the 8th of August,
2 did Mark Nicastro ever sit down with you and Shauna
3 and -- and say, Hey, look, the DEA is really concerned
4 about the suspicious order monitoring program we are
5 using?
6 A. He could have. I don't remember, I mean.
7 I don't -- I don't remember. I just -- I'm sorry, I
8 just do not remember anything about it.
9 Q. Well, you know if the DEA is doing an
10 audit and they find that the system you've got in
11 place isn't working, one of the tools that the DEA
12 could do would be to shut down that operation and
13 remove the license, right?
14 MR. CLARK: Object to the form.
15 BY THE WITNESS:
16 A. I'm assuming. I don't...
17 BY MR. ELSNER:
18 Q. And -- and the DEA audit is kind of a big
19 event, I mean, they are coming in and looking at
20 everything and it's a -- it's a memorable event, is it
21 not?
22 A. I don't know. From my point of view an
23 audit is just a part of doing business. I -- I've
24 been in tons of audits, I've done tons of audits, so

Page 363

1 maybe I have a different perspective. It just didn't
2 seem like a --
3 Q. Okay.
4 A. -- it didn't seem -- yeah.
5 (WHEREUPON, a certain document was
6 marked CVS - Elsner Deposition
7 Exhibit No. 50, for identification,
8 as of 01/24/2019.)
9 BY MR. ELSNER:
10 Q. Let me show you the next exhibit. It is
11 Exhibit 50.
12 This is the closing letter from the DEA --
13 A. Oh, yeah.
14 Q. -- to the CVS Indiana distribution center.
15 And do you see at the end of the first paragraph it
16 reads:
17 "As a result of this investigation, the
18 following violation of the Controlled Substance Act
19 was identified"?
20 A. Wait, wait, wait.
21 Q. Do you see where I'm at, at the end of the
22 first paragraph: "As a result of this investigation"?
23 A. Oh, there it is. Oh, it is in the -- oh,
24 part of the paragraph, okay.

Page 364

1 Q. And you see in the beginning it says: "In
2 July, 2013," the very first sentence?
3 A. Yeah, I see -- I see it now. I thought --
4 I was looking down at No. 1.
5 MR. ELSNER: John, if you highlight that.
6 BY MR. ELSNER:
7 Q. "In July 2013" --
8 A. Yeah, "As a result of this investigation."
9 Q. -- "investigators from the Drug
10 Enforcement Administration Indianapolis district
11 office initiated a regulatory investigation of CVS
12 Indiana."
13 And that's the distribution center you
14 were working out of, correct?
15 A. Correct, yes.
16 Q. Okay. And -- and it states in this
17 letter:
18 "As a result of this investigation, the
19 following violation of the Controlled Substances Act
20 was identified."
21 Do you see that?
22 A. Um-hum.
23 Q. And under No. 1, it reads:
24 "Failure to design and maintain a system

Page 365

1 to detect suspicious and report suspicious orders for
2 Schedule III through V controlled substances as
3 required by these code sections."
4 Do you see that?
5 A. Yes.
6 Q. Okay.
7 Were you aware that the DEA had made a
8 determination that CVS had failed to maintain a system
9 to detect suspicious and report suspicious orders
10 based on its audit in 2013?
11 A. I --
12 MR. CLARK: Objection to form.
13 BY THE WITNESS:
14 A. I can't -- I just wouldn't feel
15 comfortable commenting on it because I just don't
16 recall what happened back then that much. I mean, I
17 know they were there and -- and they looked at our
18 system and, you know, but what became of it, what
19 happened, I -- I -- I don't remember.
20 BY MR. ELSNER:
21 Q. But you did your best, didn't you, to --
22 to --
23 A. Oh, I always did my best at my job, but...
24 Q. And you did your best with the -- with the

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1  staff you had and the system that you were given,
2  right?
3      A.   Correct.
4      MR. ELSNER:  Okay.  I -- I don't think I have
5  any other questions.  I pass the witness.
6              EXAMINATION
7  BY MR. CLARK:
8      Q.   Mr. Baker, I just have a couple of very
9  brief clarification questions.
10         Is that all right?
11     A.   Sure.  Sure, sure.
12     Q.   Do you remember today being shown a number
13 of e-mails where you identified for more senior
14 officials at CVS certain areas of improvement that you
15 had identified in the SOM practices and procedures?
16     A.   Yes.
17     Q.   I gather you understood it was an open
18 environment where you could readily raise such issues,
19 correct?
20     MR. ELSNER:  Objection.
21 BY THE WITNESS:
22     A.   Oh, yeah, yeah.
23 BY MR. CLARK:
24     Q.   Was there ever a time when you felt you

Page 367

1  did not have the resources or time to complete your
2  job?
3      A.   That's kind of -- I think we had the
4  resources I needed to do my job.  Time, that's --
5  that's hard to answer that because I -- you know,
6  sometimes I could get done early, sometimes I could
7  get done later.  If the reports -- the internet were
8  slow, your report would come in, say, 15 minutes
9  instead of two minutes, that kind of stuff, so.
10         I wouldn't say I didn't have enough time.
11 It just took time.  You know, sometimes it was longer
12 than others a bit.
13     Q.   You were always able to perform your job
14 then?
15     A.   Correct, yeah, I always left the day able
16 to sleep at night.
17     Q.   And I think, moving to another topic,
18 there were a number of times today when you were
19 testifying about the staffing of the SOM team after
20 Mr. Burtner's leaving CVS.
21         Do you remember that?
22     A.   Correct.
23     Q.   And I think a couple of times you
24 testified that it was you and Shauna Helfrich who were

Page 368

1  the individuals performing those functions after Aaron
2  Burtner left?
3      A.   Correct.
4      Q.   And then a number of times you've also
5  testified about DEA consultants that were brought
6  in --
7      A.   Yes.
8      Q.   -- after Mr. Burtner's leaving CVS?
9      A.   Um-hum.
10     Q.   Were they also assisting in the SOM?
11     A.   I believe so.
12     MR. ELSNER:  Objection.  Foundation.
13 BY MR. CLARK:
14     Q.   Is it your understanding that the DEA
15 consultants that were brought in after Mr. Burtner's
16 leaving CVS were assisting the SOM?
17     A.   Yes.
18     MR. ELSNER:  Objection.
19 BY THE WITNESS:
20     A.   That's my understanding.
21     MR. ELSNER:  Same -- same objection.
22 BY MR. CLARK:
23     Q.   Mr. Baker, during your time at CVS, were
24 you aware of any time when a CVS distribution center

Page 369

1  shipped a suspicious order to a CVS Pharmacy?
2      A.   Am I aware that it happened?  Not that I
3  recall.
4      MR. CLARK:  Thank you.  I have no further
5  questions.
6      MR. ELSNER:  I think we are done.  Thank you.
7      THE VIDEOGRAPHER:  We are off the record at
8  4:22 p.m.  This concludes the videotaped deposition of
9  Kelly Baker.
10         (Time Noted:  4:22 p.m.)
11         FURTHER DEPONENT SAITH NOT.
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1         REPORTER'S CERTIFICATE

2

3     I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

4 a Certified Shorthand Reporter, do hereby certify:

5     That previous to the commencement of the

6 examination of the witness herein, the witness was

7 duly sworn to testify the whole truth concerning the

8 matters herein;

9     That the foregoing deposition transcript

10 was reported stenographically by me, was thereafter

11 reduced to typewriting under my personal direction and

12 constitutes a true record of the testimony given and

13 the proceedings had;

14     That the said deposition was taken before

15 me at the time and place specified;

16     That I am not a relative or employee or

17 attorney or counsel, nor a relative or employee of

18 such attorney or counsel for any of the parties

19 hereto, nor interested directly or indirectly in the

20 outcome of this action.

21     IN WITNESS WHEREOF, I do hereunto set my

22 hand on this 28th day of January, 2019.

23

24     JULIANA F. ZAJICEK, Certified Reporter

---

Page 371

1     DEPOSITION ERRATA SHEET

2

3

4 Case Caption:  In Re: National Prescription

5     Opiate Litigation

6

7     DECLARATION UNDER PENALTY OF PERJURY

8

9     I declare under penalty of perjury that I

10 have read the entire transcript of my Deposition taken

11 in the captioned matter or the same has been read to

12 me, and the same is true and accurate, save and except

13 for changes and/or corrections, if any, as indicated

14 by me on the DEPOSITION ERRATA SHEET hereof, with the

15 understanding that I offer these changes as if still

16 under oath.

17

18     KELLY JAMES BAKER

19

20 SUBSCRIBED AND SWORN TO

21 before me this     day

22 of     , A.D. 20__.

23

24     Notary Public

---

Page 372

1     DEPOSITION ERRATA SHEET

2 Page No._____Line No._____Change to:_____

3 _____

4 Reason for change:_____

5 Page No._____Line No._____Change to:_____

6 _____

7 Reason for change:_____

8 Page No._____Line No._____Change to:_____

9 _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24     KELLY JAMES BAKER

---

Page 373

1     DEPOSITION ERRATA SHEET

2 Page No._____Line No._____Change to:_____

3 _____

4 Reason for change:_____

5 Page No._____Line No._____Change to:_____

6 _____

7 Reason for change:_____

8 Page No._____Line No._____Change to:_____

9 _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24     KELLY JAMES BAKER