```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION               )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES               )   Polster
                               )
 7
 8
 9                     __ __ __
10             Thursday, June 6, 2019
                       __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                       __ __ __
13
14
15
16        Videotaped Deposition of LAURENCE C.
      BAKER, Ph.D., held at JONES DAY, 1755
17    Embarcadero Road, Palo Alto, California,
      commencing at 9:18 a.m., on the above date,
18    before Debra A. Dibble, Registered Diplomate
      Reporter, Certified Realtime Reporter,
19    Certified Realtime Captioner, and Notary
      Public.
20
21
                       __ __ __
22
            GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
24
```

Page 2

1  A P P E A R A N C E S:
2     KELLER ROHRBACK LLC
      BY: GARY A. GOTTO, ESQUIRE
3        ggotto@kellerrohrback.com
         ERIKA EMERSON, ESQUIRE
4        eemerson@kellerrohrback.com
      3101 North Central Avenue
5     Suite 1400
      Phoenix, Arizona 85012-2643
6     (602) 2480088
      Counsel for MDL Plaintiffs
7
8
9     BARTLIT BECK LLP
      BY: MATTHEW BREWER, ESQUIRE
10       Matthew.Brewer@BartlitBeck.com
      54 West Hubbard Street
      Suite 300
11    Chicago, Illinois 60654
      (312) 494-4432
12    Counsel for Walgreens Company
13
14    O'MELVENY & MYERS LLP
      BY: TRISHA PARIKH, ESQUIRE
15       tparikh@omm.com
      Two Embarcadero Center
16    28th Floor
      San Francisco, California 94111-3823
17    (415) 984-8700
      Counsel for Janssen Pharmaceuticals
18    Inc.
19
20    JONES DAY
      BY: CHRISTOPHER J. LOVRIEN, ESQUIRE
21       cjlovrien@jonesday.com
      555 South Flower Street
22    Fiftieth Floor
      Los Angeles, California 90071-2300
23    (213) 489-3939
      Counsel for Walmart
24

Page 3

1     DECHERT LLP
2     BY: MARY KIM, ESQUIRE
         mary.kim@dechert.com
3     One Bush Street
      Suite 1600
4     San Francisco, California 94104
      (415) 262-4500
5     Counsel for Purdue Pharma
6
7     COVINGTON & BURLING LLP
      BY: LAENA ST.-JULES, ESQUIRE
8        lstjules@cov.com
      New York Times Building
9     620 Eighth Avenue
      New York, New York 10018-1405
10    (212) 841-1201
11    Counsel for McKesson Corporation
12    CAVITCH FAMILO DURKIN CO. LPA
      BY: ERIC WEISS, ESQUIRE
13       EWeiss@cavitch.com
      1300 East 9th Street
14    Twentieth Floor
      Cleveland, Ohio 44114
15    216-472-4657
      Counsel for Discount Drug Mart
16
17
18    ROPES & GRAY LLP
      BY: KAITLIN BERGIN, ESQUIRE
19       kaitlin.bergin@ropesgray.com
      800 Boylston Street
20    Boston, Massachusetts 02199-3600
      (617) 951-7000
21    Counsel for Mallinckrodt
      Pharmaceuticals
22    ATTENDING VIA VIDEOCONFERENCE:
23    Harrison Cyrus
         hcyrus@baileywyant.com
24

Page 4

1     VIDEOGRAPHER:
2        Jim Lopez,
         Golkow Litigation Services
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1              INDEX
2
      APPEARANCES                    2
3
      PROCEEDINGS                    7
4
5
      EXAMINATION OF LAURENCE C. BAKER, Ph.D.:
6
         DIRECT EXAMINATION BY MR. GOTTO      8
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

DEPOSITION EXHIBITS
LAURENCE C. BAKER, Ph.D.
June 6, 2019

NUMBER            DESCRIPTION            PAGE
Exhibit 1   Plaintiffs' Notice of Oral            9
            Videotaped Expert
            Deposition of Lawrence
            Baker

Exhibit 2   The Effects of Medicare            10
            Advantage on Opioid Use,
            Baker, et al.

Exhibit 3   6-5-19 invoices for            10
            Professor Laurence Baker
Exhibit 4   6-5-19 invoices for            11
            Analysis Group

Exhibit 5   5-10-19 Expert Report of            12
            Laurence C. Baker
Exhibit 6   Corrections to Expert            12
            Report of Laurence C. Baker

Page 7

PROCEEDINGS

(June 6, 2019 at 9:18 a.m.)

THE VIDEOGRAPHER:  We are now on the record.  My name is Jim Lopez.  I'm a videographer for Golkow Litigation Services.  Today's date is June 6, 2019, and the time is approximately 9:18 a.m.  This video deposition is being held in Palo Alto, California, in the matter of In Re: National Prescription Opiate Litigation, Case No. 1:17-MD-2804, for the United States District Court for the Northern District of Ohio, Eastern Division.  The deponent is Laurence Baker.  Counsel will be noted on the stenographic record.

The court reporter is Debbie Dibble, and she will now swear in the witness.

LAURENCE C. BAKER, Ph.D., having first been duly sworn, was examined and testified as follows:

* * *

Page 8

DIRECT EXAMINATION

BY MR. GOTTO:

Q.  Good morning, Professor Baker.

A.  Good morning.

Q.  How are you today?

A.  Fine.  Thanks.

Q.  Great.  My name is Gary Gotto, and with me is my colleague Erika Emerson.  We're with the law firm Keller Rohrback, and we're one of the firms representing the plaintiffs in the opioid litigation.

We've never met before today; correct?

A.  I think that's correct.

Q.  I realize you've given depositions previously, so I won't belabor the deposition ground rules and that sort of thing.  I will tell you if any of my questions are unclear to you in any way, please let me know and I'll do my best to clarify them.  Okay?

A.  Okay.

Q.  I'm going to begin by handing you what we've marked as Exhibit 1, which is

Page 9

the notice of today's deposition.

(Baker Deposition Exhibit 1, Plaintiffs' Notice of Oral Videotaped Expert Deposition of Lawrence Baker, was marked for identification.)

Q.  (BY MR. GOTTO)  Why don't you take a look at that document and tell me if you've seen it before.

A.  Yes, I have seen this before.

Q.  And Exhibit A to the notice requests certain documents be produced.  I understand from counsel you do have some responsive documents for me; is that correct?

A.  Yes.

Q.  Perhaps we could share those at this time.

MR. BREWER:  So for the record, this is a document entitled The Effects of Medicare Advantage on Opioid Use.  It's an NBER working paper authored by Professor Baker.

MR. GOTTO:  Okay.

Let's go ahead and mark that -- we'll mark that as Exhibit 2, please.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 (Baker Deposition Exhibit 2,
2 The Effects of Medicare Advantage on
3 Opioid Use, Baker, et al., was marked
4 for identification)
5 MR. GOTTO: Is there anything
6 else that's responsive?
7 MR. BREWER: Not to that -- not
8 to item No. 1.
9 MR. GOTTO: Okay. How about to
10 item No. 2?
11 MR. BREWER: In response to
12 item No. 2, I have two sets of
13 invoices. One from Professor Baker
14 and then one from the support staff
15 that he used at the Analysis Group.
16 MR. GOTTO: Okay. Great.
17 MR. BREWER: I'll hand you
18 those. There are six copies of each.
19 MR. GOTTO: Okay. So let's
20 mark, as Exhibit 3, Professor Baker's
21 invoice.
22 (Baker Deposition Exhibit 3,
23 6-5-19 invoices for Professor Laurence
24 Baker, was marked for identification.)

Page 11

1 MR. GOTTO: And as Exhibit 4,
2 the Analysis Group invoice.
3 (Baker Deposition Exhibit 4,
4 6-5-19 invoices for Analysis Group,
5 was marked for identification.)
6 MR. GOTTO: I take it that's
7 all that's responsive to point 2?
8 MR. BREWER: Yes.
9 MR. GOTTO: And anything
10 responsive to point 3?
11 MR. BREWER: No.
12 MR. GOTTO: Okay.
13 MR. BREWER: Meaning that the
14 CV he attached is up-to-date.
15 MR. GOTTO: Right.
16 And then were there some
17 corrections to -- or a supplement to
18 the report?
19 MR. BREWER: Yes. This
20 document is titled Corrections to
21 Expert Report of Laurence C. Baker,
22 and it contains a few corrections to
23 his expert report.
24 MR. GOTTO: Okay. So why don't

Page 12

1 we just, for logic, we'll mark the
2 report first and then the corrections.
3 Let's mark that as 5, please.
4 (Baker Deposition Exhibit 5,
5 5-10-19 Expert Report of Laurence C.
6 Baker, was marked for identification.)
7 MR. GOTTO: And then that will
8 be 6.
9 (Baker Deposition Exhibit 6,
10 Corrections to Expert Report of
11 Laurence C. Baker, was marked for
12 identification.)
13 Q. (BY MR. GOTTO) Okay. Now that
14 we have the documents marked, I have just a
15 few questions for you on them.
16 If you would turn to Exhibit 2,
17 the working paper.
18 A. Yes.
19 Q. And at the same time, if you'll
20 look at Exhibit A to Exhibit 1. Item one on
21 Exhibit A asks for all documents or other
22 materials you reviewed since the date of your
23 report that you have not specifically
24 identified in your report in preparation for

Page 13

1 your expected testimony.
2 And I understand that Exhibit 2
3 is -- was produced in response to that
4 request; correct?
5 A. Yes. That's correct.
6 Q. Okay. So that is a document
7 you reviewed in anticipation of today's
8 testimony?
9 A. Yes.
10 Q. And apart from Exhibit 2 and
11 apart from the materials that are identified
12 in your expert report, have you reviewed any
13 other materials in preparing -- in
14 preparation for today's testimony?
15 MR. BREWER: Objection, form.
16 THE WITNESS: No, I don't
17 believe I have.
18 MR. GOTTO: Okay. Great.
19 Q. (BY MR. GOTTO) Exhibit 3
20 appears to be an invoice for your services
21 for the periods April 1 through May 31 of
22 2019; correct?
23 A. Yes.
24 Q. And is that the only invoice

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  you've issued for services performed in
2  connection with this litigation?
3       A.    Well, I would clarify that it's
4  an invoice that was issued by Analysis Group.
5       Q.    Okay.  The invoices for your
6  services, though?
7            So let me ask the question a
8  different way.  To your knowledge, have there
9  been any other invoices issued for your
10  services in connection with the opioid
11  litigation other than Exhibit 3?
12       A.    Not to my knowledge.
13       Q.    Okay.
14            And Exhibit 3 indicates an
15  amount of $65,000 and change for expert
16  professional services.  I believe in your
17  report you indicate an hourly rate of $875 an
18  hour?  Am I remembering that correctly?
19       A.    Yes.  That's correct.
20       Q.    Okay.  And so would -- if I
21  divided 65,537.50 by 875, would that give me
22  the number of hours you spent on this
23  engagement in the months of April and May of
24  2019?

Page 15

1       A.    I would hope that it would,
2  yes.
3       Q.    Okay.  To your knowledge, it
4  does; correct?
5       A.    To my knowledge, it does.
6       Q.    Okay.
7            Do you know if the Exhibit 3
8  invoice has been paid?
9       A.    I don't believe it's been paid.
10       Q.    Okay.  Is there -- are there
11  payment terms that you're aware of?
12            MR. BREWER:  Objection, form.
13            THE WITNESS:  I imagine there
14       are in the retention letter, but I
15       can't recall them at the moment.
16       Q.    (BY MR. GOTTO)  Okay.  Do you
17  recall any particular agreement regarding
18  deferral of payment for a period of time, or
19  anything along those lines?
20       A.    No, I don't recall any
21  agreement like that.
22       Q.    So would you generally expect
23  this invoice to be paid in the ordinary
24  course of business?

Page 16

1       A.    Yes.
2       Q.    Okay.
3            And Exhibit 3, it seems like it
4  had two pages stapled together, but they look
5  to just be copies of one another.  Is that --
6  I guess the second page has remittance
7  instructions.
8            Is that the only difference?
9       A.    I'm looking at this with you,
10  in some sense.  I didn't issue this.  It
11  looks to me like that's correct.  I don't
12  know if there's another reason to be two
13  pages on this.
14       Q.    Okay.  Would you have reviewed
15  Exhibit 3 before it was sent out?
16       A.    No, not specifically.
17       Q.    Okay.  Let's look at Exhibit 4
18  for a moment.  And Exhibit 4 is the
19  analysis -- the invoice for services in
20  support of you in connection with preparation
21  of your expert report.
22            So services by Analysis Group
23  in support of you; correct?
24       A.    Yes, that's what it looks like

Page 17

1  to me.
2       Q.    Okay.  Can you tell me who at
3  Analysis Group provided support to you in
4  your work here?
5       A.    So I worked specifically with a
6  fellow named Steve Cacciola, who was my point
7  of contact.  I understand that he supervised
8  a larger team of people.
9       Q.    And I'm sorry, the spelling on
10  his name?  Do you recall?
11       A.    C-A-C-C-I-O-L-A is his last
12  name.  First name is Stephen.  And that would
13  be S-T-E-P-H-E-N, if I have it correct.
14       Q.    And he supervised a group of
15  other folks at Analysis Group?
16       A.    Yes.
17       Q.    And do you know the names of
18  any of those other people?
19       A.    A couple of them come to mind.
20  One is Federico Mantovanelli.
21            And the second was Lucia Antos,
22  I believe.  Goodness.  I hope I have
23  everybody's name correct.
24       Q.    And Ms. Antos, the spelling on

Page 18

1  that last name? Or approximation?
2      A.    I'm going to say A-N-T-O-S,
3  with my apologies to her if I have misspelled
4  her name.
5      Q.    Okay.
6          And I understand you indicated
7  that Mr. Cacciola was your principal point of
8  contact.
9          Did you also have direct
10  contact with either Mr. Mantovanelli or
11  Ms. Antos?
12     A.    Not that I recall.
13     Q.    Okay. Any other direct contact
14  with Analysis Group personnel that you can
15  recall?
16     A.    No.
17     Q.    Do you know what Mr. Cacciola's
18  background is?
19     A.    I believe he has training in
20  economics, but I'm not sure, no.
21     Q.    Okay. So you're not familiar
22  with -- does he hold a Ph.D., for example, do
23  you know?
24     A.    I believe, yes.

Page 19

1      Q.    Okay. And is there any
2  particular area of economics that he has
3  expertise in, to your knowledge?
4      A.    I did not investigate that.
5      Q.    Have you worked with
6  Mr. Cacciola other than this engagement?
7      A.    No, I don't believe so.
8      Q.    Okay. How about
9  Mr. Mantovanelli, do you know what his area
10  of expertise is?
11     A.    Again, he's a -- he works in
12  economics. He has training in economics.
13     Q.    Okay. Does he have a Ph.D., do
14  you know?
15     A.    I believe, yes.
16     Q.    Have you worked with him in any
17  other engagement?
18     A.    Yes. One previous engagement.
19     Q.    What was that?
20     A.    That was a matter involving --
21  it's listed in my --
22     Q.    One of the ones listed?
23     A.    Yes.
24     Q.    We'll turn to those a little

Page 20

1  later on, so maybe you can identify that for
2  us when we're actually looking at your CV and
3  your prior testimony.
4          So apart from that one other
5  engagement, any other background with
6  Mr. Mantovanelli?
7      A.    I don't believe so.
8      Q.    How about Ms. Antos? What's
9  her area of expertise?
10     A.    I believe also economics.
11     Q.    Does she hold a Ph.D.?
12     A.    That, I don't know.
13     Q.    Have you worked with her in any
14  other engagement?
15     A.    No.
16     Q.    I believe you indicated that
17  those three individuals are the ones whose
18  names you can recall from Analysis Group at
19  this point.
20         Were there other people that
21  you understood to be working on this support
22  engagement?
23     A.    It would only be in the general
24  sense. I worked with Steve, and I understood

Page 21

1  that he had a team of people working on this.
2  So I might infer that there were, but I don't
3  know any specifics.
4      Q.    Okay. So, let me just back up
5  for one second.
6          The Exhibit 4 invoice indicates
7  495.9 professional hours and $251,741 of
8  billing.
9          Do you know what hourly rates
10  or rate or rates were employed in deriving
11  the dollar billing from those number of
12  hours?
13     A.    No, I don't.
14     Q.    Do you know if there were
15  different rates applied for different
16  Analysis Group personnel?
17     A.    No.
18     Q.    Do you know if this -- if the
19  Exhibit 4 invoice has been paid?
20     A.    No. This invoice is not
21  something that I have any real awareness of
22  other than I'm just seeing it really today.
23     Q.    Okay. Any reason to think the
24  terms of payment are other than the ordinary

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 course of business?
2     A.    No reason to think that, or no
3 knowledge of any aspects of that.
4     Q.    The Exhibit 4 invoice appears
5 to be for services performed during the month
6 of April.  Do you know if there is an
7 additional Analysis Group invoice for
8 services performed in the month of May?
9     A.    I don't know.
10     Q.    Did Analysis Group, to your
11 knowledge, perform support services in
12 connection with your work during the month of
13 May?
14     A.    Yes, they did.
15     Q.    Do you have -- in terms of the
16 magnitude of the amount of work that they
17 did, Do you have a sense of whether it was
18 greater or lesser than the amount of work
19 they did in the month of April?
20     A.    That would be hard for me to
21 make an estimate of.  I gave them
22 instructions and asked for their support in
23 April and in May.  I couldn't tell you if
24 they were doing more or less work off the top

Page 23

1 of my head right now.
2     Q.    Okay.  Your report is dated
3 May 10th.
4     A.    Yes.
5     Q.    So do you know if they did any
6 work after May 10th?
7     A.    You know, I spoke with Steve
8 after May 10th to review a couple of aspects
9 of my work.  So there may be bits, but I
10 don't know.
11     Q.    Okay.  Fair to say that you
12 would expect that the substance of their --
13 the bulk of their work was done prior to --
14 on or before May 10th?
15     A.    If I had to make an estimate,
16 that would be my estimate, but I don't know
17 their -- their -- I'm retained separately
18 from them, and they provide services to me to
19 help me; but I don't really keep track of or
20 know anything about the timing or specifics
21 of their activity.
22     Q.    Okay.  Any services that they
23 performed at your request in preparation for
24 today's deposition?

Page 24

1     A.    Other than answering questions
2 that I had to familiarize myself -- or to
3 refamiliarize myself with aspects of the
4 work, I don't believe so.
5     Q.    And what areas did you ask --
6 did you speak with them about to
7 refamiliarize yourself with --
8         MR. BREWER:  And I'm going to
9     let you answer the question, but just
10     give you the caution that to the
11     extent your response would disclose
12     any substance of conversation with
13     counsel, I'd ask you not to include
14     that in your response.
15     Q.    (BY MR. GOTTO) Let me see if I
16 can ask the question a little bit differently
17 and maybe address counsel's concern.
18         Just in terms of the subject
19 matter, you indicated there were some areas
20 you had some discussions to refamiliarize
21 yourself with matters in the report.  Just in
22 terms -- at the level of just subject matter,
23 do you recall what those were?
24         MR. BREWER:  Same instruction.

Page 25

1         THE WITNESS:  So as I was
2     reviewing the report, I wanted to just
3     go back over some of the analyses that
4     I conducted and the empirical work and
5     walk through the specific conduct of
6     those and make sure I was completely
7     familiar and recalling everything
8     correctly.  So that was the main
9     issue.
10     Q.    (BY MR. GOTTO) Okay.
11         When were you first contacted
12 regarding potential expert work in connection
13 with the opioids litigation?
14     A.    It would be late March, I
15 believe.  Maybe middle of March this year.
16 It's hard for me to recall the date
17 specifically.
18     Q.    And by whom were you contacted?
19     A.    The first contact was from
20 Analysis Group indicating that the counsel
21 was looking for an expert.  And subsequent to
22 that, the substantive discussions were
23 between me and counsel.
24     Q.    Okay.  So that first Analysis

Page 26

1 Group contact, was that from Mr. Cacciola?
2     A.    I don't recall.  It may have
3 been.  That would make sense to me.
4 Sometimes the initial contacts come from
5 other people there, so I -- I don't recall at
6 the moment.
7     Q.    Okay.  In any event, it was
8 someone in the Analysis Group that you had
9 had prior contact with?
10    A.    Yes.  Well, it was someone from
11 Analysis Group.  If it was Steve, I wouldn't
12 have had prior contact with him at that
13 point.  But it would have been someone from
14 Analysis Group.
15    Q.    Okay.  And so when you were
16 initially contacted, what was your
17 understanding of the nature of the potential
18 engagement?
19    A.    That there was counsel here for
20 one of the defendants in this matter that was
21 interested in talking with potential Experts.
22 And I believe I was informed of the general
23 matter, but it's also a matter that I had
24 noted in the press, for example.

Page 27

1       So I had the general
2 understanding from that and then the
3 understanding that counsel was interested in
4 talking to potential Experts.
5     Q.    Did you have any understanding
6 as to who any of the plaintiffs' experts were
7 at that point of the initial conversation?
8     A.    No.
9     Q.    Did you have any understanding
10 as to any particular aspect of the opioids
11 litigation where your testimony could be
12 used?
13    A.    No.
14    Q.    Did you have an understanding
15 as to why the person at Analysis Group had
16 contacted you about this potential
17 engagement?
18    A.    I do work at health economics,
19 and I understood that they were looking --
20 that there was an interest in talking to
21 people who had expertise in health economics.
22    Q.    Okay.  Any particular item in
23 your background that you understood to be of
24 particular significance?

Page 28

1     A.    I was not made aware of
2 anything like that.
3     Q.    In your own mind, is there any
4 particular item in your professional
5 experience that was particularly germane to
6 what you understood to be the engagement?
7       MR. BREWER:  Objection, vague.
8       MR. GOTTO:  Let me break it
9    down a little bit.
10      THE WITNESS:  Okay.
11    Q.    (BY MR. GOTTO)  In your CV you
12 list many publications, for example, that
13 you've authored or coauthored in your career.
14 Were any of those publications -- did you
15 have an understanding as to whether any of
16 those publications were of particular
17 pertinence to any aspect of the litigation as
18 to which your testimony would be of interest?
19    A.    So if we're talking about at
20 the time of the initial contact.
21    Q.    Yes.
22    A.    I was not made aware of
23 anything in particular.  It was simply a
24 matter of reaching out to me, informing me

Page 29

1 that counsel was interested in talking to
2 people that -- who might be willing to be
3 expert -- offer expert opinions in this
4 matter and would I be interested in talking
5 to counsel.
6       So no specifics about my
7 background were indicated to me at that time.
8 It was a fairly general inquiry.
9     Q.    Okay.  And in terms of in your
10 own mind, though -- understanding that
11 nothing was necessarily communicated to you,
12 but in terms of your own mind, was there
13 anything in your background that you felt
14 would be of particular pertinence to what you
15 understood to be the nature of the testimony
16 that would be sought from you?
17    A.    Well, I would have to be using
18 my imagination at this time to go back.  I'm
19 a health economist.  You can see in my CV
20 some work related to opioids.  Perhaps that
21 had something to do with it.  I didn't spend
22 a lot of time thinking about that at the
23 time.
24    Q.    Okay.  So, for example,

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 Exhibit 2, I think we marked it as it's a
2 working paper that you are a coauthor that
3 relates to opioids; correct?
4     A.    Yes.  I believe that's correct.
5     Q.    And I guess what I'm getting
6 at, in terms of whether there was a
7 communication or just in your own mind, this
8 isn't a situation where there -- for example,
9 there is a paper you published in 2015 that
10 addresses a specific issue that we're
11 anticipating needing or wanting your
12 testimony on.  There's no kind of
13 conversation or thought process along those
14 lines; is that fair?
15     A.    That was my sense at the time,
16 I believe.
17     Q.    Okay.  So more your general
18 background and professional experience was
19 what was of interest in terms of contacting
20 you about this particular engagement?  At
21 least that was your understanding?
22     A.    Yes.  The last part was
23 important.  To the extent I had any
24 understanding or even thought about it, which

Page 31

1 I'm not sure I did at the time, that would be
2 the kind of thing that I would perhaps now in
3 retrospect think would have been it.  But I
4 don't remember reflecting on that at the time
5 at all.
6     Q.    Okay.  When you were originally
7 contacted, were you given any information in
8 order to assess whether there would be a
9 conflict or some other circumstance that
10 would make it inappropriate for you to be
11 retained in this matter?
12         MR. BREWER:  Objection to form.
13         THE WITNESS:  So, yes, early
14     on.  And I can't recall if that was in
15     the transition to the conversation
16     with the counsel or as an initial step
17     in that conversation, but yes, I did
18     assess whether there were any
19     conflicts that could be an issue.
20     Q.    (BY MR. GOTTO)  Okay.  And I
21 take it there were none?
22     A.    I -- no, I don't think there
23 are any.
24     Q.    Okay.

Page 32

1     A.    Were any or are any.
2     Q.    And did you understand from the
3 initial conversation that the client of the
4 counsel that was interested in potentially
5 retaining you was representing Walgreens?
6         MR. BREWER:  I'm going to give
7     you just the same caution about
8     responding about the substance of any
9     conversation with counsel.
10         You can answer.
11         THE WITNESS:  So that would
12     have come out pretty early on.  I
13     can't recall if that was in the
14     initial contact or if that was pretty
15     immediate in the initial conversation
16     with counsel.
17     Q.    (BY MR. GOTTO)  Okay.  And have
18 you ever in your career been retained by
19 Walgreens for any purpose?
20     A.    No.
21     Q.    And my understanding from
22 reading your report, and ask you to confirm
23 if this is accurate, is that the client of
24 counsel that has retained you in this matter

Page 33

1 is Walgreens; correct?
2     A.    That's my understanding.
3     Q.    Okay.  And so is it your
4 understanding that your opinions in this
5 matter are being offered on behalf of any
6 defendant other than Walgreens?
7     A.    So I've been retained by
8 Walgreens -- or by counsel associated with
9 Walgreens.  That was the focus of my report.
10 You would see one part of my report I do say
11 that I have been informed that my testimony
12 could be offered -- at trial could be offered
13 by Walgreens or by other defendants.  So I do
14 understand that to be the case.
15     Q.    Okay.  In preparing your
16 report, have you reviewed any documents
17 produced by defendants other than Walgreens?
18         MR. BREWER:  Objection, form.
19         THE WITNESS:  I don't believe
20     so.  We could go back and look through
21     my materials if we wanted to make an
22     itemized list of that, but I don't
23     believe so.
24     Q.    (BY MR. GOTTO)  So after the

Highly Confidential - Subject to Further Confidentiality Review

---

Page 34

1 initial contact with the Analysis Group, you
2 indicated then there was a contact with
3 counsel.
4          With whom did you have that
5 conversation with counsel?
6     A.    That was with Mr. Brewer.
7     Q.    Okay.  And I don't want you to
8 divulge the substance of any of the
9 communications you've had with Mr. Brewer or
10 anyone else at his firm.  Apart from
11 Mr. Brewer and his colleagues at his firm,
12 have you had conversations with any other
13 persons other than at Analysis Group in
14 connection with the preparation of your
15 report?
16     A.    No.
17     Q.    Have you had occasion to speak
18 with any other person who has submitted an
19 expert report in this litigation with respect
20 to the litigation or any of the issues in the
21 litigation?
22     A.    No.
23     Q.    Are you aware that Daniel
24 Kessler has submitted an expert report?

---

Page 35

1     A.    Yes.
2     Q.    And you know Professor Kessler?
3     A.    Yes.
4     Q.    And you've coauthored several
5 papers with him; correct?
6     A.    That's correct.
7     Q.    Okay.  But you've had no
8 conversations with him with respect to any
9 aspect of this litigation, is that fair?
10     A.    Yes.
11     Q.    Okay.  Have you previously been
12 retained by Mr. Brewer or anyone at his firm?
13     A.    No.
14     Q.    And I know you indicated
15 already that you have not previously been
16 retained by Walgreens.
17          Have you previously been
18 retained for any purpose by any of the other
19 defendants in this litigation?
20     A.    No.  I don't believe so.
21     Q.    In your report, you describe
22 the scope of your assignment.  And did -- did
23 the scope of your assignment as reported in
24 your report, was that in any way different

---

Page 36

1 from what you understood to be the potential
2 scope of the assignment from your initial
3 contact by Analysis Group?
4          MR. BREWER:  Objection to form.
5          THE WITNESS:  I don't think it
6     was different.  I think the -- my
7     initial understanding was fairly
8     broad, that this -- there were defense
9     counsel in this matter that were
10     looking for health economists or a
11     health economist to opine on matters
12     related -- health economic matters
13     related to the issues.  So I did not
14     have a specific sense at the initial
15     contact of what it was, and so I'd say
16     it falls within what I might have
17     thought at the time would be the scope
18     of the engagement.
19     Q.    (BY MR. GOTTO)  Okay.  So fair
20 to say that there -- there wasn't a point at
21 which there was a subject matter that had
22 been identified to you as a potential area
23 for your testimony that was then taken off
24 the table?

---

Page 37

1     A.    No.  Certainly not.
2     Q.    And did you understand from the
3 initial contact that it was anticipated that
4 there would be one or more expert reports
5 submitted by plaintiffs that you would be
6 requested to review and comment on?
7          MR. BREWER:  I'm going to just
8     lodge an objection.  Because the
9     questions are increasingly getting
10     closer to substance of discussions
11     with counsel.  So you can answer this,
12     but that is my objection.
13          MR. GOTTO:  Okay.  And again,
14     this is the Analysis Group initial
15     contact that I'm asking you about.
16          THE WITNESS:  Oh, the Analysis
17     Group initial contact, I don't recall
18     whether there was -- there were
19     specifics about responding to expert
20     reports.  There could have been.
21     Q.    (BY MR. GOTTO)  Okay.  In your
22 own mind, did you anticipate that as being
23 one of the potential aspects of the
24 assignment?

---

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1   A.   I'm used to that being part of
2 these matters.  So to the extent that I would
3 have thought about it, I suppose I would have
4 imagined that.
5   Q.   Have you had occasion to review
6 any of the complaints filed by any of the
7 plaintiffs in the opioid litigation?
8   A.   Yes.  There are two complaints.
9 Second amended complaint from Cuyahoga County
10 and the second amended complaint from Summit
11 County, if I recall correctly.
12       If we want to get specific, I
13 should probably refer to the list to make
14 sure I caption those or quote those
15 correctly.
16   Q.   Let's turn to Exhibit 6 for a
17 moment, which is the corrections page.  And
18 perhaps the best way to -- well, just give me
19 a moment.  I'm just looking at this for the
20 first time myself.
21       The correction on paragraph 45,
22 is it simply striking the words "one court or
23 two"?
24   A.   Yes.

Page 39

1   Q.   Okay.  And the correction in
2 paragraph 122 simply inserting the word "two"
3 in the first line?
4   A.   Yes.
5   Q.   And then the correction in
6 paragraph 18 is simply including the
7 underlined sentence at the end?
8   A.   Yes.
9   Q.   Okay.  Great.  Then perhaps we
10 can get back into that then when we're
11 actually going through your report.
12       Are you aware that there's
13 trial dates scheduled in this matter in
14 October of this year?
15   A.   Yes.  I think I'm aware of
16 that.
17   Q.   Do you anticipate performing
18 any additional services in connection with
19 testimony in this matter prior to the trial
20 other than reviewing the report to refresh
21 yourself on what you said in the report?
22   A.   Oh, I suppose it depends on the
23 circumstances.  It may be appropriate to
24 prepare other exhibits or prepare ways of

Page 40

1 presenting my testimony that I would want to
2 undertake.  I also would say that in my
3 report I note that if additional material
4 becomes available or additional opinions are
5 offered or new information relevant to my
6 report becomes available, that I would want
7 to reserve the opportunity to take a look at
8 that and possibly do additional work or
9 extend or revise my opinions.  So it's
10 possible that that would come along, and I
11 want to have the ability to do that.
12   Q.   Okay.  But in terms of as we
13 sit here today and additional work that
14 you're actually anticipating performing as we
15 sit here today, other than reviewing the
16 report you've already submitted so that it
17 would be fresh in your mind when you testify
18 at trial, is there any other work, again, as
19 we sit here today, that you have in mind that
20 you would do before trial?
21       MR. BREWER:  Asked and
22 answered.
23       THE WITNESS:  So as we sit here
24 today, the things that I can imagine

Page 41

1 were, as I said before, possibly
2 preparing additional exhibits or
3 demonstratives or working on ways to
4 effectively or suitably present my
5 opinions at trial, so that that could
6 be additional work.
7       And then I suppose your
8 question asked me to avoid this, but
9 to the extent other material becomes
10 available, I would revise or extend my
11 opinion.
12   Q.   (BY MR. GOTTO)  Are there any
13 particular demonstratives you have in mind
14 that you are anticipating putting together
15 for trial?
16   A.   I have not given thought to
17 that at this point.
18   Q.   Fair to say, though, that
19 there's no additional analysis or research
20 that you, at least as we sit here today, have
21 in mind to perform prior to testifying at
22 trial?
23       MR. BREWER:  Asked and
24 answered.

Page 42

1    THE WITNESS:  As we sit here
2    today, the kinds of things that would
3    lead me to do additional analyses
4    would be the arrival of new
5    information or other opinions in this
6    matter that would be relevant to mine.
7    So I haven't anticipated it right now,
8    but it could happen.
9    Q.    (BY MR. GOTTO)  Okay.
10    As you sit here today, are you
11  anticipating testifying at trial?
12    A.    If I'm asked to.
13    Q.    Your $875-an-hour rate, do you
14  have any different billing rate for
15  deposition or trial testimony?
16    A.    No.
17    Q.    And how did you arrive at the
18  $875 rate?
19    A.    That's my rate.  That's the
20  rate I decided to charge.
21    Q.    How long have you used that
22  rate?
23    A.    That rate has -- I've used that
24  rate for material -- I've used that rate for

Page 43

1  matters that began this year.
2    Q.    Okay.  And I think you indicate
3  in your report that you received some
4  compensation for -- with respect to amounts
5  that are paid by Analysis Group; is that
6  correct?
7    MR. BREWER:  Objection, form.
8    THE WITNESS:  So what I
9    indicate in my report is that I
10    received some compensation that is
11    based on billings, Analysis Group
12    billings or receipts in matters in
13    which they support me.
14    Q.    (BY MR. GOTTO)  Okay.  And so
15  what is -- what are the details of your
16  arrangement with Analysis Group on that?
17    A.    I believe that I get eventually
18  seven and a half percent of some measure of
19  their receipts from matters in which they
20  support me.
21    Q.    Okay.  So, for example,
22  Exhibit 4, the April invoice, which shows a
23  251,000-and-change amount, would you expect
24  to receive seven and a half percent of that

Page 44

1  amount?
2    A.    So there I have to be a little
3  bit careful because in their internal
4  accounting they may or may not count all of
5  that.  And I don't know what all of those
6  details are and how they arrive at the base
7  number.  But my understanding is I would be
8  generally associated with that number.
9    Q.    Okay.  Is that an arrangement
10  you negotiated with Analysis Group?
11    A.    It was arrived at in
12  conversation with them.  I don't know how
13  you'd characterize negotiation particularly,
14  but they offered that arrangement to me.
15    Q.    Okay.  So not a situation where
16  they offered less and you asked for more and
17  people arrived at a middle ground?
18    A.    Not really, no.
19    Q.    And has that arrangement been
20  in place in the prior engagements you had
21  where Analysis Group provided support?
22    A.    Oh, that is a recent
23  arrangement.
24    Q.    And so has that arrangement

Page 45

1  been in place for any engagement prior to
2  this one?
3    A.    No.
4    Q.    Did you have any arrangement
5  for prior engagements where Analysis Group
6  was involved?  Did you have any arrangement
7  in place where you received any compensation
8  with respect to their receipts?
9    A.    So I've worked with Analysis
10  Group for a long time, and a number of years
11  ago there was an arrangement like that in
12  place and then it lapsed.  And I didn't say
13  anything about it.  And then fairly recently
14  they noticed that it had lapsed, and they
15  called that to my attention and they
16  reinstated it.  So, yes, but it would go back
17  a few years.
18    Q.    Okay.  So what is Analysis
19  Group?
20    A.    They're a litigation support
21  consulting firm.
22    Q.    Do they have particular areas
23  of expertise, to your knowledge?
24    A.    I know they have people who

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  work on health economics, and I work with
2  them in that area.
3        If I look at their website, I
4  can recall they list other areas as well.
5  They do a lot of different kinds of economic
6  work, as I understand it.
7     Q.   Okay.  Your experience with
8  them, though, has that been limited to health
9  economics?
10    A.   Yes.
11    Q.   And when did you first work
12  with them?
13    A.   That would go back quite a
14  while, to the 1990s.
15    Q.   And what were the
16  circumstances?  Did they contact you?  Did
17  you contact them?
18        How did that come to be?
19    A.   That was a long time ago.  I --
20  as I recall now in the fuzzy way of 20- or
21  30-year-old conversations, they must have
22  contacted me with a matter and asked if I was
23  interested.  And that would have started the
24  conversation with them.

Page 47

1     Q.   Okay.  So for this engagement,
2  if we look at Exhibits 3 and 4, you have
3  approximately 75 professional hours through
4  the end of May and the Analysis Group has
5  just slightly under 500 professional hours
6  for the month of April.
7        How is the work divided between
8  yourself and Analysis Group that is reflected
9  in those professional hours?
10    A.   So the way that I wrote the
11  report was that I came up with a plan, a game
12  plan, if you will.  And I sat down with Steve
13  or talked to Steve on the phone and informed
14  him or let him know the areas in which I was
15  hoping to get support from Analysis Group.
16  And we came up with a plan of attack and
17  worked through it.
18        So as I was writing the report,
19  they were providing me with materials at my
20  request.  And, you know, we went through the
21  report in that way.  So that is what led to
22  these hours.
23    Q.   Okay.  And so what were the
24  areas in which you were hoping to get support

Page 48

1  from Analysis Group?
2     A.   Oh, in a number of areas as I
3  was working on the report:  gathering
4  relevant materials, conducting analyses,
5  preparing exhibits, collecting information to
6  make the points that I wanted to make.
7        I asked for support in numerous
8  areas.  It was a big job.
9     Q.   Are there any particular
10  analyses you can recall requesting Analysis
11  Group to perform?
12        MR. BREWER:  I'm going to just
13  object on the lines that these
14  questions are starting to get into
15  drafting of his expert report, which
16  is protected under the federal rules.
17        I'll allow him to answer
18  because I understand -- I'll allow him
19  to answer to a point because I
20  understand in this case we've gotten
21  rulings that have permitted some
22  questioning, but I am going to lodge
23  the objection.
24        MR. GOTTO:  Okay.  And let me

Page 49

1  just clarify what I'm interested in,
2  and perhaps this addresses some of
3  counsel's concern.
4     Q.   (BY MR. GOTTO)  I just want to
5  know the individuals who actually performed
6  the work that ultimately is reflected in your
7  report.
8        So if there's -- if there's a
9  piece of analysis that you thought, I'd like
10  to -- I'd like this analysis done, but I'm
11  not going to do it myself.  I'd like someone
12  at Analysis Group to do this analysis and
13  then report back to me the results.  That's
14  what I'm asking about, if there's things that
15  are in that category.
16    A.   So my interaction with them was
17  nearly always that I would communicate with
18  Steve and I would indicate areas in which I
19  wanted their support.  And that might have --
20  that would have included, for example, the --
21  a statistical analysis.
22        And then he would work with the
23  team to conduct that, and then I would get
24  results back through him.

Page 50

1    So, you know, throughout the
2 report there was that sort of interaction,
3 where I would ask for support in the area.
4 He would see to it that it was conducted.  I
5 would review the materials coming back.
6    But I was not aware of or
7 directing the specific personnel who would
8 have worked on a particular piece of
9 analysis.
10   Q.   Okay.  Yeah, and I -- I wasn't
11 necessarily asking for individuals' names.  I
12 was just trying to get an understanding of
13 aspects of your report that reflect analysis
14 that you personally conducted as compared to
15 analysis that you requested someone at
16 Analysis Group conduct.
17   A.   Oh, I would say these are my
18 analyses.  I gave instructions for how I
19 wanted them done.  I saw the results along
20 the way.  And I view them as my work.
21   I asked for support to get the
22 specifics taken care of, but they're analyses
23 that I directed and then I received and
24 reviewed.

Page 51

1    Q.   Okay.  You comment in your
2 report, in some detail, on a number of the
3 reports submitted by plaintiffs' experts;
4 correct?
5    A.   Yes.
6    Q.   And fair to say you personally
7 reviewed each one of those reports that you
8 comment on?
9    A.   Yes.
10   Well, yes.  The ones I comment
11 on, I would say there are -- there was a
12 report that I refer only in a footnote to,
13 for example, and those I reviewed parts of
14 but would have reviewed more quickly and in
15 less depth than the reports that I comment
16 on.
17   Q.   Okay.  But for example, the
18 McCann report, you've reviewed personally?
19   A.   Yes.
20   Q.   And the McGuire report?
21   A.   There are two, but yes.
22   Q.   And -- thank you.
23   And the Gruber report?
24   A.   Yes.

Page 52

1    Q.   And the Cutler report?
2    A.   Yes.
3    Q.   Now, you indicated that you had
4 a conversation with Mr. Cacciola about -- I
5 think your term was plan of attack for the
6 engagement.  You had not previously worked
7 with him; correct?
8    A.   That's correct.
9    Q.   Okay.  So when you make
10 reference to plan of attack, what did you
11 communicate to Mr. Cacciola?
12   A.   So as we were getting started,
13 I had looked at some of the reports and some
14 of the -- well, I looked at the complaints
15 and -- I'm trying to recall the specific
16 timing.  I think we had done some looking at
17 pieces before the plaintiffs' reports were
18 filed.  So in that space, some initial
19 conversations about things I was interested
20 in, but then once the plaintiffs' experts
21 were filed and I had reviewed them, a much
22 more specific set of points that I wanted to
23 make, a set of analyses that I wanted to
24 investigate.  And we worked through, looked

Page 53

1 at those steps.  And I asked him to help with
2 those.  And then he would have worked out a
3 plan to conduct the work that I had asked
4 for.
5    Q.   In the course of your
6 engagement, have you been provided with any
7 assumptions that you were to make in forming
8 any of your opinions?
9    A.   It is a little hard for me to
10 know what you mean by assumptions, but I
11 would say no.  I wasn't given anything called
12 an assumption, or really an assumption by
13 counsel, and I can't recall at this point
14 making assumptions that would be important
15 factors in the analysis or in the results.
16   Q.   Okay.  Were there any summaries
17 of facts that you were provided and
18 instructed to assume to be true for purposes
19 of your report?
20   A.   No.
21   Q.   As your work on the engagement
22 progressed -- well, strike that.
23   I had asked you early on about
24 when you were first contacted, if there were

Page 54

1 aspects of your background or experience that
2 you thought to be particularly germane.  As
3 your work on the engagement progressed, did
4 you come to view any aspects of your
5 background or experience as particularly
6 germane to the opinions that you were
7 formulating?
8     A.    I would say I felt somewhat
9 informed by having worked on some papers
10 related to opioids in the past.  And so that
11 made me feel familiar with many of the
12 aspects of -- in general that were coming up
13 in this matter.  I can recall that.
14     Q.    Okay.  And is one of those
15 papers Exhibit 2?
16     A.    Yes.  That's -- that's correct.
17     Q.    Okay.  And are there others
18 that are listed on your CV?
19     A.    Yes.
20     Q.    Okay.  Well, we'll -- and we'll
21 turn to those in a little bit.
22          Did you maintain a file with
23 respect to this engagement?
24     A.    No.  I mean, I looked at the

Page 55

1 plaintiffs' expert reports and so -- but I
2 didn't maintain a file of their materials.
3     Q.    Okay.  Anywhere where you
4 maintained any record of notes that you made
5 in the course of formulating your opinions,
6 or outlines, anything of that nature?
7     A.    No.
8     Q.    Okay.  Let's turn to your
9 report, which we've marked as Exhibit 5.
10          First, would you just look at
11 it and confirm for me that that is the report
12 you've prepared and submitted in this matter?
13          [Document review.]
14     A.    Flipping through it a moment,
15 it does look like my report.
16     Q.    Okay.  And does the report
17 contain all of the opinions that you have
18 formulated in connection with this
19 litigation?
20     A.    Up to this point, it contains
21 the opinions that I've formulated.
22     Q.    Okay.  And apart from
23 Exhibit 6, which had those corrections, are
24 there any corrections or updates to the

Page 56

1 report that you would provide today if you
2 were -- if you were reissuing this report as
3 of June 6th rather than May 10th?
4     A.    I don't think so, no.  I will
5 note, as we talked about before, I would like
6 to reserve my ability to respond to other
7 material that may come forth in the future.
8 So I'll leave that out there.  But as of
9 today, this expresses the opinions that I
10 have in the matter.
11     Q.    Okay.  Let's just look at
12 Exhibit 6 for a moment and paragraph 18,
13 footnote 16 of your report so that we have
14 the context for that change.
15          Okay.  So in Exhibit 6, you add
16 to the end of footnote 16 a sentence that
17 states:  However, in my own work, I have
18 found that a small share of physicians do
19 account for a significant share of opioid
20 prescriptions.
21          Did I read that correctly?
22     A.    Yes.
23     Q.    And just so we have the full
24 context, in paragraph 18, the first sentence

Page 57

1 in the text states:  Over time, prescription
2 opioid use, both medically appropriate and
3 nonmedical, increased, and many patients
4 became dependent on opioids.
5          Did I read that correctly?
6     A.    Yes.
7     Q.    And then in the footnote, in
8 the citation to footnote 16 and in the
9 footnote, the footnote in the -- in Exhibit 5
10 in your report states:  Note that according
11 to Plaintiffs' expert Dr. Alexander, only a
12 small proportion of the prescription opioids
13 that entered the general circulation are the
14 result of, quote, bad actors, closed quote,
15 such as, quote, rogue physicians, closed
16 quote, and, quote, Doctor Shoppers, closed
17 quote, and a citation to Dr. Alexander's
18 report; correct?
19     A.    Yes.
20     Q.    And so the addition reflected
21 in Exhibit 6 provides some commentary on
22 that -- the existing sentencing in footnote
23 16 of Exhibit 5, referencing your own work
24 and in which you found that a small share of

Page 58

1 physicians do account for a significant share
2 of opioid prescriptions.  So what is that --
3 your own work that you're referring to in
4 that added sentence?
5      A.    That would be principally be
6 the NBER working paper and the analysis
7 contained and the literature review contained
8 in that.
9      Q.    Okay.  And what's your reason
10 for including the added sentence in
11 Exhibit 6, including that in footnote 16?
12      A.    Oh, I had meant to include that
13 reference and to call out the importance of
14 physician prescribing behavior in
15 understanding the changes in prescription
16 opioid use over time.
17           I could have sworn I had
18 written that into the report.  But when I
19 went back to look at this in the last few
20 days, I found it wasn't there.
21      Q.    Okay.  So just an oversight on
22 your part when you were preparing the initial
23 report?
24      A.    Yes.

Page 59

1      Q.    Okay.  Is Dr. Alexander's
2 report noted in footnote 16 the plaintiff
3 expert report that you were referring to
4 earlier that you mentioned in a footnote?
5      A.    Yes, that's a report that I
6 mentioned once, I believe, in a footnote.  So
7 it's one that I would say I took a look at
8 but I did not review at the level of depth as
9 the other reports that I'm talking about in
10 this report here.
11      Q.    And you don't comment on it
12 other than what's in footnote 16; correct?
13      A.    I don't believe so.  That's
14 correct.
15      Q.    Okay.  Let's turn to some of
16 your background information that's in your
17 CV, Appendix A to your report.
18           Do you maintain any other CV
19 other than the CV included in Appendix A?
20      A.    No.
21      Q.    Under employment history, you
22 list academic appointments starting in August
23 of 1994 to present, and then you list other
24 appointments, various appointments with dates

Page 60

1 from 1994 to the present.
2           The appointment -- the other
3 appointment entries, are you compensated or
4 have you been compensated for any of those
5 appointments?
6      A.    Not other than as part of my
7 normal compensation from, say, Stanford
8 University, which is primarily associated
9 with my faculty appointment.
10      Q.    Okay.
11           Is any of your research funded
12 in whole or in part by any grants?
13      A.    Yes.
14      Q.    And can you describe for me any
15 of your current research that's funded in
16 whole or in part by any grants?
17      A.    So I have been working on a
18 project related to insurance type and the use
19 of medical services that's funded by a grant
20 from AHRQ, the Agency For Healthcare Research
21 and Quality, a federal government agency.
22           I've been working on a project
23 related to medical group practices that is
24 funded by a grant from the National Institute

Page 61

1 For Healthcare Management.
2           I'm associated with other
3 grant-funded projects, also generally
4 federally funded grants.
5      Q.    What is the National Institute
6 For Healthcare Management?  Is that a
7 governmental agency or private agency?
8      A.    It's a private entity.
9      Q.    And do you know what the source
10 of its funding is?
11      A.    I'm given a grant from them,
12 and so I don't particularly pay attention to
13 that.
14           I have a general understanding
15 that they receive some of their support from
16 healthcare plans, large insurance companies.
17      Q.    So you indicate -- you
18 identified the National Institute For
19 Healthcare Management.  Are there any other
20 nongovernment agencies that provide grants
21 that fund any portion of your current
22 research?
23      A.    I don't think so, no.
24      Q.    How about in the last five

Page 62

years? Have there -- is there any research
that you've conducted in the last five years
funded in whole or in part by grants from
agencies other than governmental agencies?

A. I would have to look at the
time periods precisely. I've had a grant
from the Robert Wood Johnson Foundation in
the not-too-distant past, and I've had a
grant from the California Health Care
Foundation in the not-too-distant past. I'm
not sure whether those are within five years.

Q. Okay.

A. But then those are
nongovernmental foundations.

Q. And so the Robert Wood Johnson
Foundation grant, what was the nature of the
research that that's related to?

A. Usually it's healthcare markets
and the performance of healthcare markets.

Q. And how about the California
Health Care Foundation grant? What was the
research that that's related to?

A. Ambulatory surgical centers.

Q. What's the nature of the

Page 63

California Health Care Foundation?

A. Oh, they're a philanthropy that
makes grants.

Q. Do you understand if they're
funded in whole or in part by private
industry?

A. I understand that they have a
large endowment that is the source of their
funds, the grants they make, but I don't know
the past history. If there is an interesting
one in that, I don't know of it.

Q. Okay. How about the Robert
Wood Johnson Foundation? Do you know if that
foundation is funded in whole or in part by
funds from private industry?

A. Again, I understand that they
have a large endowment that they use to make
grants, so I don't believe they're funded at
the moment by that. I don't know where their
endowment might in history have come from.

Q. On your CV, you -- well, you
have a heading Nonacademic Employment,
Research Economist. Well, that's back in
'93, '94. So I take it that was before your

Page 64

position at Stanford; correct?

A. Yes.

Q. Okay. You then list a number
of public and professional service
engagements or positions.

Are you compensated or have you
been compensated for any of those positions?

A. Let me take a look.

Q. Sure.

[Document review.]

A. So a couple of these I can
recall receiving honoraria associated with
the role. Most of these, no.

Q. Okay. Can you identify the
ones where you can recall receiving
honoraria?

A. Yes. So, for example, on
page A-3, toward the bottom there's a
notation as a member of the Research Awards
Selection Committee, and then it says for the
National Institute of Health Care Management.

And then it says Chair, 2009 to
the present.

As the chair I have received an

Page 65

honorarium for that work.

And then next to that, when I
was senior associate editor of Health
Services Research, the journal, there was an
annual honorarium associated with that
position.

Those are the two that come to
mind.

I'll tell you, I can't recall
at the moment -- for example, when you do
study sections. So the special member of the
HSOD study section, that could have been an
honorarium associated with that, but I can't
recall at the moment if there was.

So those are the two that I
know that there was some honorarium
associated with it.

Q. Okay. Do you have a
recollection of the approximate amount?

A. I believe the honorarium for
the research awards selection committee
chair, it has certainly varied over time.
Lately it's been $4,000 a year.

And then as senior associate

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 editor, I -- that may also have varied over
2 time. But most recently when I was last a
3 senior associate editor, that would have been
4 $5,000 per year.
5     Q.    Okay. Let's turn to your prior
6 testimony, which is Appendix B to your
7 report.
8     A.    Okay.
9     Q.    And fair to say Appendix B
10 lists all of the expert testimony you've
11 provided since 2015?
12     A.    Yes.
13     Q.    Okay. And are there any
14 matters in which you -- since 2015 in which
15 you have prepared an expert report that, to
16 your knowledge, was provided to the other
17 side of the litigation, as to which you did
18 not provide testimony?
19     A.    There are other matters in
20 which I know I prepared an expert report. I
21 don't know whether it was always provided to
22 the other side in the litigation.
23     Q.    Okay. So since 2015, you have
24 had expert engagements, litigation-related

Page 67

1 expert engagements other than those listed on
2 Appendix B.
3         Is that fair?
4     A.    Yes.
5     Q.    Okay. Do you have any estimate
6 as to the approximate number of such
7 engagements?
8     A.    As I sit here today, I would
9 have to think it over. Five would be an
10 estimate.
11     Q.    Okay. Okay. Let's go through
12 the ones that are listed on Appendix B for a
13 few moments.
14         The first item, the
15 Kimberly-Clark litigation, you indicate there
16 you gave trial testimony.
17     A.    Correct.
18     Q.    What was the nature of the
19 opinions that you expressed in that
20 litigation?
21     A.    That litigation concerned in my
22 involvement, prices for its purchase by
23 hospitals. And so my opinion was related to
24 those prices and factors affecting those

Page 68

1 prices and trends and prices over time.
2     Q.    Okay. And do you recall the
3 law firm that retained you in that matter?
4     A.    Oh, I am terrible at recalling
5 all of the law firms. So I don't right now.
6 I -- no.
7     Q.    Okay.
8     A.    I shouldn't try to guess at it.
9     Q.    Do you recall the names of any
10 of the lawyers that were at the firm that
11 retained you?
12     A.    I wish I were better at
13 remembering those names, but no,
14 unfortunately.
15     Q.    In addition to the trial
16 testimony, did you also give a deposition in
17 that matter?
18     A.    No. There was no deposition in
19 that matter.
20     Q.    Did you prepare a report?
21     A.    Yes.
22     Q.    Were you cross-examined at
23 trial?
24     A.    Yes.

Page 69

1     Q.    Do you recall the lawyer who
2 cross-examined you?
3     A.    Oh, what's his name?
4     Q.    I'm sure you recall. I guess
5 the fair question is whether you recall his
6 name?
7     A.    That's my thought exactly. I
8 can picture him. He's been in the news. But
9 as I say, I'm -- in this moment, I'm sorry,
10 I -- in five seconds I'll recall it, but --
11     Q.    Okay.
12     A.    -- you asked me and I...
13         I'm embarrassed that I can't
14 remember it right now.
15     Q.    Now that you mention it, I seem
16 to recall seeing Mr. Avenatti's name
17 associated with that litigation in some news
18 reports.
19     A.    That sounds familiar.
20     Q.    Okay. I'm sure if you're
21 following recent news accounts, you're
22 probably feeling pretty good about what
23 you're reading about him these days, after
24 your cross-examine experience. But that's

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 another matter.
2    A.    I shouldn't comment, I suppose.
3    Q.    Okay.  The next matter, the
4 appraisal of Towers Watson & Co. matter, what
5 was the nature of the opinions you expressed
6 in that litigation?
7    A.    That matter involved the
8 valuation of a business that was involved in
9 selling health insurance of a particular
10 type.  And so my opinions were related to the
11 market for health insurance and how that
12 might be performing.
13    Q.    Okay.  It indicates it was in
14 chancery court in Delaware.  Was it some sort
15 of corporate dispute?
16       Do you recall the nature of the
17 litigation?
18    A.    The dispute was over the
19 valuation of a company that had been involved
20 in a transaction.
21    Q.    Okay.  How about the next
22 matter, the Duke University matter?  What was
23 the nature of the opinions you gave in that
24 matter?

Page 71

1    A.    That was a matter involving
2 allegations about pay for academic
3 physicians.  And so I gave opinions about the
4 market for academic physicians and how
5 compensation might be affected by different
6 environmental issues or contextual issues.
7    Q.    Do you remember the law firm
8 that retained you in that matter?
9    A.    Again, I have worked with a
10 number of law firms, and so I'd be guessing
11 to try to associate particular law firms with
12 these.
13    Q.    Okay.
14    A.    So no, not specifically, no.
15    Q.    Any individual lawyer you
16 recall in connection with that matter?
17    A.    It's very hard for me to recall
18 the names in this particular setting right
19 here.  So no.  I can picture a face, but I --
20 no.
21    Q.    Okay.
22       MR. BREWER:  He'll forget my
23 name in a few weeks.
24       THE WITNESS:  I'm sorry to say.

Page 72

1    Q.    (BY MR. GOTTO)  I should have
2 asked you those same questions regarding the
3 Delaware matter.
4       Do you recall the -- either the
5 law firm that retained you or any of the --
6 any of the lawyers at that firm?
7    A.    No, I'm sorry.
8    Q.    Okay.  Do you recall either the
9 law firm or name of the lawyer who took your
10 deposition in the Delaware matter?
11    A.    No.
12    Q.    How about in the Duke matter?
13    A.    Again, I can picture a face in
14 the matter, but no, there are just too many
15 names and jumbles going on for me to try to
16 associate them all.
17       MR. GOTTO:  Okay.  Why don't we
18 take a short break.  We'll reconvene
19 in a few minutes.
20       THE VIDEOGRAPHER:  Approval of
21 all counsel, going off the record.
22 Time is approximately 10:32 a.m.  This
23 marks the end of recording Media
24 No. 1.

Page 73

1       (Recess taken, 10:32 a.m. to
2 10:47 a.m.)
3       THE VIDEOGRAPHER:  With the
4 approval of counsel, back on the
5 record.  The time is approximately
6 10:47 a.m.  This marks the recording
7 Media No. 2.
8    Q.    (BY MR. GOTTO)  Professor
9 Baker, let's continue to go through the
10 litigation matters that are listed on
11 Appendix B to your report.  We talked about
12 the first three.
13       Item No. 4, the Blue Shield of
14 California matter.  What was the nature of
15 the opinions you expressed in that
16 litigation?
17    A.    That matter had to do with
18 insurance products and the characteristics of
19 insurance products of -- my opinions were
20 about the normal market for insurance
21 products and their characteristics.
22    Q.    And the normal market meaning
23 what?
24    A.    Meaning the kinds of

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 identifiers of insurance products that are
2 found commonly offered to the public.
3     Q.    Do you recall the law firm that
4 hired you in that matter, the names of any
5 the individual lawyers you worked with?
6     A.    The law firms, no.
7         I believe one of the attorneys
8 was John Fogerty.
9     Q.    Do you recall the lawyer who
10 took your deposition in that matter, or that
11 person's law firm?
12     A.    No, I'm afraid I don't.
13     Q.    Item 5, the Evident, Inc.
14 matter, what's the nature of the opinions you
15 rendered or formed in that opinion -- in that
16 case?
17     A.    That was a matter involving
18 electronic medical records software, and my
19 opinions were about the common uses of
20 electronic medical records software in
21 hospitals and other parts of the healthcare
22 system, that -- the normal ways in which
23 those are used by hospitals.
24     Q.    And do you -- what's the nature

Page 75

1 of Evident, Inc's business?
2     A.    Evident, Inc. offers a medical
3 records software product for primarily dental
4 laboratories.
5     Q.    Do you recall the law firm that
6 retained you in that matter or any of the
7 names of the individual lawyers?
8     A.    No, I'm afraid I don't.
9     Q.    How about the lawyer that took
10 your deposition or cross-examined you at
11 trial, and or that person's firm?
12     A.    I'm afraid I can picture the
13 face again, but I can't come up with a name
14 for you.
15     Q.    You indicated in that matter
16 you gave trial testimony April of last year.
17         Do you know what the outcome of
18 that case was?
19     A.    I have a general understanding
20 that the outcome of the case was against the
21 client that I had worked for. I don't recall
22 the specific issues in the judgment.
23     Q.    Was that also true as to item
24 No. 1, the Kimberly-Clark case, in terms of

Page 76

1 the outcome of the case?
2     A.    That's my understanding, yes.
3     Q.    Item No. 6, the Mylan versus
4 Sanofi-Aventis matter, what was the nature of
5 the opinions you gave in that matter?
6     A.    That's a matter related to
7 the -- my involvement is related to the
8 commercial success of a pharmaceutical
9 product, and so my opinions were related to
10 the assessment of commercial success for that
11 product.
12     Q.    What was the nature of the
13 product?
14     A.    It's a diabetes drug, insulin
15 product.
16     Q.    Do you recall the name of the
17 firm that retained you or any lawyers?
18     A.    Weil might come to mind more
19 specifically than it has for other cases
20 here, but again, I'm not completely sure I
21 have all of these right.
22     Q.    Did you mean Weil as a name, or
23 were you using the word "while" as an adverb?
24     A.    Oh, I'm sorry, Weil as a name.

Page 77

1     Q.    So it was Weil Gotshal? Is
2 that the firm?
3     A.    I would say that's familiar,
4 yeah.
5     Q.    And do you remember the name of
6 the lawyer who took your deposition or that
7 person's firm?
8     A.    No.
9     Q.    And item 7, Blue Cross Blue
10 Shield of Florida matter, what's the nature
11 of the opinions you formed in that case?
12     A.    It's a matter involving
13 competition in insurance markets. And so my
14 opinions were related to how the market for
15 insurance was functioning, whether there was
16 evidence of problems with that market.
17     Q.    And do you recall the name of
18 the firm that retained you or any of the
19 lawyers at that firm that you worked with?
20     A.    Cravath, I believe, and Lauren
21 Kennedy is one of the lawyers.
22     Q.    And you indicate that you gave
23 hearing testimony.
24         Was that in a courtroom or an

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 administrative hearing?  What was the nature
2 of that proceeding?
3      A.    It was in a courtroom.
4      Q.    Do you recall the name of the
5 lawyer who cross-examined you or that
6 person's firm?
7      A.    I'm sorry, I don't.
8      Q.    You indicate hearing.  Are you
9 distinguishing a hearing from a trial?
10      A.    I wrote down hearing because I
11 understand it was a hearing preliminary to
12 the trial.
13      Q.    Okay.
14           Do you know if that matter is
15 still currently pending?
16      A.    Yes, I believe there are
17 ongoing aspects to that matter.
18      Q.    Of the seven matters pending on
19 Exhibit B, can you tell me which ones, if
20 any, you've worked with with Analysis Group?
21      A.    Yes.  Let me take a look.
22           That would be No. 2, No. 3,
23 No. 4.
24      Q.    And can you remember any of the

Page 79

1 names that you worked with at Analysis Group
2 on those matters?
3      A.    So Federico Mantovanelli was
4 one of the people that I worked with on
5 No. 3.
6           Mark Gustafson on No. 4 comes
7 to mind.
8           Goodness.  I'm trying to
9 recall, again, with lots of different people
10 over time.  So those are the ones that I can
11 come up with for you.
12      Q.    Now, you indicated before the
13 break that since 2015, you've also provided
14 some expert work on I think you indicated
15 five matters other than those listed on
16 Appendix B; correct?
17      A.    That would be my estimate.
18      Q.    Sure.  Did you work with
19 Analysis Group in any of those matters?
20      A.    I would have to estimate yes,
21 but I'm having a hard time coming up with the
22 specifics for that for you.
23      Q.    Okay.  Okay.  And I think you
24 indicated before the break that you weren't

Page 80

1 sure whether or not your -- your involvement
2 in those other five matters had been
3 disclosed to the other side; is that correct?
4      A.    That's correct.
5      Q.    Okay.  I would request, if
6 after today if you can -- if, in fact, there
7 are -- if, in fact, in any of those matters
8 you did prepare a report that's been provided
9 to the other side, or if your involvement has
10 otherwise been disclosed to the other side in
11 that litigation, if you could supplement
12 Appendix B to identify those matters as well,
13 please.
14           MR. BREWER:  And I'm going to
15      object to the question just in that
16      he's only required to provide
17      testimony and not expert reports.
18           MR. GOTTO:  Okay.  Fair enough.
19      Well, I understand your objection.  I
20      reiterate my request, and we can just
21      move on from there.
22      Q.    (BY MR. GOTTO)  I think you
23 indicated before the break that your first
24 involvement with Analysis Group goes back to

Page 81

1 the 1990s; correct?
2      A.    Yes.
3      Q.    Is that when you first
4 performed any sort of litigation-related
5 expert work?
6      A.    That's probably fair to say.
7      Q.    Okay.  And so what were the
8 circumstances under which you were -- the
9 first time you took on a litigation expert
10 assignment?
11      A.    It's a little fuzzy, but I can
12 remember a matter involving hospital
13 competition in California.
14      Q.    Looking at Appendix B, since
15 2015 you list seven matters on Appendix B.
16 You've indicated there were about five
17 others.  That's 12.  And then there's the
18 opioids matter.  So that's about 13
19 litigation-related engagements since 2015.
20           Prior to 2015, was sort of the
21 level of your activity as an expert witness
22 comparable?
23           MR. BREWER:  I object to the
24      question to the extent the question

Page 82

1  mischaracterizes the witness's
2  previous testimony.
3      THE WITNESS:  I'd say it was
4  less before the last five years.
5  Q.  (BY MR. GOTTO)  Okay.
6      So starting with the first
7  engagement back in the '90s, were there
8  periods of time -- say from the period from
9  whenever that first engagement was in the
10 '90s to 2015, were there periods of time when
11 you did not have any ongoing expert
12 engagements?
13     A.  I'm going to have a hard time
14 recalling the specifics of it.  You know, the
15 last few years I've done more than I did
16 before.  It used to come up from time to
17 time.
18         And it may have been that there
19 was reasonably steady streams, but there may
20 have been some times in there where there was
21 no case at a particular time that I was
22 working on.
23     Q.  Okay.
24     A.  Hard to recall the specifics.

Page 83

1      Q.  Any particular reason that the
2  level has increased in the last few years?
3      A.  I felt able to take on more
4  opportunities in my life.
5      Q.  Did you do any -- do you take
6  any steps to try to -- to try to solicit
7  business as an expert witness?
8      A.  No.
9      Q.  Don't do any advertising,
10 anything like that?
11     A.  Nothing that I do, no.
12     Q.  Does your -- are there any
13 restrictions or limitations imposed by
14 Stanford in terms of the amount of litigation
15 consulting work you're able to do?
16     A.  Yes.  I'm able to do work up to
17 a day a week.
18     Q.  And is it just for the academic
19 year or is that calendar year?
20     A.  Oh, I suppose that would
21 probably go for 11 months of the year and
22 average out at a day a week.
23     Q.  Okay.  And then for the 12th
24 month, you can do your -- you're a free

Page 84

1  agent?
2      A.  You know, there are vagaries
3  about how they determine or think about
4  vacation time that I would be at my
5  discretion.  And so my general understanding
6  is that my appointment is for 11 months of
7  the year, but there are different
8  interpretations of the details of that,
9  depending on how exactly you look at it.
10     Q.  Okay.  So for those 11 months,
11 you can -- just round numbers, you can do
12 about 50 days of -- slightly under 50 days of
13 expert work.  Is that fair?
14     A.  Yes.
15     Q.  That day-a-week limitation,
16 does that apply only to litigation-related
17 work or is that any outside professional
18 employment that you have?
19     A.  I think that would extend to
20 outside employment that's not part of my
21 assignment at Stanford.
22     Q.  Okay.
23         Have there been any times in
24 which your litigation expert work has

Page 85

1  exhausted your day-a-week allotment?
2      A.  No.  My understanding is that's
3  averaged over, you know, multiple weeks or
4  multiple months to make the calculation.  And
5  so I believe it's -- I've kept it within the
6  allotment.
7      Q.  Okay.  Do you report to
8  Stanford -- anything formal -- with respect
9  to your outside activities?
10     A.  There are required disclosures
11 for NIH grants.  To the extent that I would
12 have conflicts that might be viewed as a
13 conflict by the NIH, I have to report that.
14 But otherwise, no.
15     Q.  Okay.
16     A.  I certify that I'm in
17 compliance.
18     Q.  You provide a certification
19 that you are in compliance with this
20 day-a-week limitation?
21     A.  Yes.
22     Q.  Is that day-a-week limitation a
23 formal policy at Stanford?
24     A.  Yes.

Page 86

1    Q.    And so if I wanted to review
2  that policy, where would I look in the
3  Stanford, you know, library of materials?
4    A.    I have no idea.
5    Q.    Okay.  But your understanding
6  is it's written down somewhere and is
7  applicable to faculty at Stanford?
8    A.    Yes.
9    Q.    If we looked at the periods
10  2015 through 2018, on average over that
11  period, what percentage of your compensation
12  have you derived from expert witness work?
13  Approximately.
14    A.    Well, that's a calculation I
15  have not made.  A quarter?  As a guess or an
16  estimate.
17    Q.    Okay.  Have there been any
18  particular years when the amount was
19  significantly different from approximately
20  25 percent?
21    A.    Oh, I'd have to go think that
22  through.  I'm sure it goes up and down from
23  year to year.  May have been a little higher
24  in some and a little lower in others.

Page 87

1    Q.    Apart from your expert witness
2  work, since 2015 -- and I realize you
3  mentioned the honoraria earlier, and so we
4  can exclude those as well -- are there any
5  other items of recurring income -- and I
6  don't want -- I'm not referring here to
7  passive investments, but income for services
8  that you have received other than your
9  employment at Stanford, expert witness work,
10  and the honoraria you've identified?
11    A.    If there is, it's a minimal
12  amount.  I can't think of anything in that
13  time period that would be relevant.
14    Q.    And your compensation at
15  Stanford, is that a fixed amount?
16    A.    It's a salary, yes.
17    Q.    And what's the amount
18  currently?
19    A.    It's 350,000.
20    Q.    Okay.
21    A.    Maybe a little higher than
22  that.
23    Q.    Okay.  And so estimates since
24  2015, approximate annual amount of expert

Page 88

1  witness earnings be in the, would it be fair
2  to say, 70 to $100,000 range?
3    A.    Yeah.  I'm following the
4  calculation that you're making.  I'd have to
5  go back and look at the averages over that
6  time period to get it right.  It's possible
7  that it's a little higher than that, as I
8  think about it.
9        Right.  Something -- right,
10  something like that.  So as you put that
11  calculation, maybe it's 30 percent, but...
12    Q.    Okay.
13    A.    That's the right ballpark.
14    Q.    Okay.  So it sounds like maybe
15  if we use 75 to 125,000 for the expert
16  witness compensation, we'd be approximately
17  right?
18    A.    Probably, yes.
19    Q.    In the last five years, have
20  you received any compensation for speaking
21  engagements of any sort?
22    A.    I don't think so in the last
23  five years.
24    Q.    Okay.  Prior to that time have

Page 89

1  you?
2    A.    I can recall an engagement of a
3  few years back that I got a speaking fee.
4    Q.    Okay.  And do you recall the
5  nature of the engagement?
6    A.    It was to speak to a group
7  associated with an insurance company about
8  variations in healthcare use across different
9  areas, different geographic areas.
10    Q.    And do you recall the amount of
11  the fee that you received?
12    A.    I think it was $5,000.
13    Q.    In the last five years, have
14  you received any compensation for
15  participation in any conferences, any
16  professional conferences?
17    A.    No.
18    Q.    Have you -- in the last five
19  years, have you received any compensation for
20  publicly expressing any opinions with respect
21  to pharmaceutical -- the pharmaceutical
22  industry?
23    A.    No.
24    Q.    How about any opinions with

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 respect to any aspect of the medical
2 industry?
3         MR. BREWER:  Objection, form.
4         THE WITNESS:  Not that I can
5 think of.
6     Q.    (BY MR. GOTTO)  Same questions
7 prior to the last five years:  Any
8 compensation you can recall receiving for
9 publicly expressing any opinions related to
10 the pharmaceutical industry?
11        MR. BREWER:  Same objection.
12        THE WITNESS:  No.
13     Q.    (BY MR. GOTTO)  Or the medical
14 industry?
15        MR. BREWER:  Same objection.
16        THE WITNESS:  No.
17     Q.    (BY MR. GOTTO)  Do you have any
18 equity ownership in any business, public or
19 private, related -- that's engaged in any
20 aspect of the pharmaceutical industry?
21     A.    No.  Other than maybe through a
22 mutual fund that I don't know of the direct
23 investment in.
24     Q.    And same question with respect

Page 91

1 to any company, public or private, that's
2 engaged in any aspect of the medical
3 industry.
4     A.    No.
5     Q.    Are you the holder of any
6 patents?
7     A.    No.
8     Q.    Or any applications for any
9 patents?
10     A.    No.
11     Q.    Ever been listed as an inventor
12 on a patent?
13     A.    No.
14     Q.    In the last five years, apart
15 from litigation-related consulting, have you
16 had any other consulting engagements for
17 which you were compensated?
18     A.    I can recall one small one with
19 a company that had a product that we were
20 helping them think about how to evaluate.
21     Q.    What was the nature of the
22 product?
23     A.    Product designed to encourage
24 or help people get better sleep.

Page 92

1     Q.    Do you remember the approximate
2 time frame on that?
3     A.    Oh, it's been going on for the
4 last year or so, and it's still going on.
5     Q.    And approximate magnitude of
6 the compensation you've received?
7     A.    So far, maybe $2,000.
8     Q.    With respect to the
9 approximately five litigation engagements
10 since 2015 which are not included on
11 Appendix B, do any of them relate in any way
12 to the opioid crisis?
13     A.    No.
14     Q.    Have you ever testified in any
15 litigation prior to 2015 that related in any
16 way to the opioid crisis?
17     A.    No.
18     Q.    Have you ever testified before
19 Congress?
20     A.    No.
21     Q.    How about any state
22 legislature?
23     A.    Yes.
24     Q.    On what occasion?

Page 93

1     A.    The California state
2 legislature on an occasion or two in which
3 they were holding hearings related to aspects
4 of the healthcare system in California.
5     Q.    Do you remember the approximate
6 time -- time frame?
7     A.    The one that I can remember was
8 in the last few years.  They were considering
9 reforms one could make to the California
10 healthcare system, and they held a hearing to
11 hear from some academics about that.
12     Q.    And what was the particular
13 subject matter of your testimony?
14     A.    It was related to competition
15 in California.  Competition for healthcare
16 providers in California.
17     Q.    And how did you come to do that
18 testimony?  Were you approached, or did you
19 approach someone?
20     A.    Oh, I was approached by someone
21 from the committee that was holding the
22 hearing.
23     Q.    Have you ever provided any
24 testimony either oral or written to the DEA?

Page 94

1    A.    No.
2    Q.    How about the FDA?
3    A.    No. I'm trying to -- I don't
4 believe so, no.
5    Q.    You were hesitating as if there
6 was something that you thought might fall
7 into that category.
8    A.    Oh, I just took a look at No. 6
9 here.
10    Q.    Okay.
11    A.    To make sure that that did not
12 list the FDA, and it listed the Patent and
13 Trademark Office.
14    Q.    How about the CDC?
15    A.    No.
16    Q.    And any grand jury?
17    A.    No.
18    Q.    Do you know if there's a
19 transcript of the testimony you gave to the
20 California legislature?
21    A.    I'm not aware if there is.
22    Q.    Apart from grants issued by
23 governmental agencies in connection with
24 research you've done, have you ever had --

Page 95

1 received compensation from the federal
2 government for any services?
3    A.    No. The most I -- I don't
4 believe so. The most I can think of would be
5 an honorarium associated with, say, grant
6 review, if, in fact, I got an honorarium
7 associated with grant review. So those would
8 be smaller amounts. That would have been the
9 kind of thing we reviewed earlier.
10    Q.    Okay. How about any state
11 government? Any compensated employment apart
12 from a grant for research?
13    A.    I don't believe so, no.
14    Q.    On Appendix A to your report,
15 the first page to your CV, you indicate under
16 Other Appointments, you indicate from 1994 to
17 2002, you were a faculty research fellow at
18 the National Bureau of Economic Research.
19         What is the National Bureau of
20 Economic Research?
21    A.    That is an organization that
22 facilitates and encourages economic research.
23 Brings people together for meetings and helps
24 encourage research projects.

Page 96

1    Q.    And do you have continuing
2 involvement with that organization?
3    A.    Yes.
4    Q.    And what is your continuing
5 involvement?
6    A.    Oh, I continue to be affiliated
7 with them as a research associate.
8    Q.    Okay. How does one become
9 affiliated with the National Bureau of
10 Economic Research?
11    A.    There's a nomination process,
12 and so one is nominated and then accepted, I
13 suppose, as a member.
14    Q.    Is it generally viewed as a
15 prestigious retention?
16    A.    I don't know how to attach
17 meaning to that. It's positively viewed in
18 the field.
19    Q.    What does your ongoing
20 involvement as a fellow, a research fellow
21 for the NBER entail?
22    A.    So it's as a research
23 associate.
24    Q.    I'm sorry.

Page 97

1    A.    And I attend meetings from time
2 to time, and work on projects associated with
3 NBER. They have some data that I use, for
4 example.
5    Q.    And they maintain data that you
6 sometimes use in your research?
7    A.    Yes.
8    Q.    I think you indicated earlier
9 that there were, in addition to Exhibit 2,
10 there were perhaps some other of your
11 publications that related to opioids.
12         Could you identify those for
13 me, please?
14    A.    Yes. Let me flip through here.
15         [Document review.]
16    A.    So on the list of publications
17 by the number, it would be No. 125.
18         No. 130.
19         No. 132.
20         No. 133.
21    Q.    Is that it?
22    A.    Yes. I'm sorry.
23    Q.    Okay. So if we look at
24 No. 125, Incidence of and Risk Factors for

Page 98

1 Chronic Opioid Abuse Among Opioid-Naive
2 Patients in the Postoperative Period, from
3 September of 2016, can you tell me what your
4 contributions to that paper were?
5     A.   Yes. So you can see that there
6 are four authors listed. So I worked with
7 others to write that paper.
8     My particular expertise as
9 relates to that paper was in the use of the
10 database that the analyses were derived from.
11     So I had arranged for some
12 access to that database, and I have some
13 expertise to its use, and so I contributed
14 that to the team.
15     Q.   Okay.
16     A.   I also worked on drafting the
17 manuscript and different aspects of doing the
18 research.
19     Q.   What were the circumstances
20 under which you got involved in that
21 particular project?
22     A.   Oh, Professor Sun, who is the
23 lead author, is a colleague of mine at
24 Stanford, and we cross paths from time to

Page 99

1 time. And we had a conversation about his
2 interest in working on this question and the
3 fact that I had a database that might allow
4 one to look at it. And we -- with, of
5 course, other conversations that he or I were
6 having as well, came up with the idea of
7 doing the research project.
8     Q.   How about item 130, the 2017
9 paper on Association Between Concurrent Use
10 of Prescription Opioids and Benzodiazapines?
11     Do I have that right?
12     A.   Pretty close.
13     Q.   And Overdose: Retrospective
14 Analysis.
15     What was your contribution to
16 that paper?
17     A.   It was similar. You can see,
18 again, there are several coauthors to that
19 paper, so I participated as a member of a
20 group in writing this paper. This uses the
21 same database that I had arranged for access
22 to and was expert in using, and so I
23 contributed my expertise in how to use the
24 database to address the questions that the

Page 100

1 paper was aiming to study.
2     Q.   What's the nature of the
3 database that you're referring to?
4     A.   Oh, it's -- it's a large claims
5 database that contains insurance claims for a
6 large group of people.
7     Q.   Is it one of the NBER databases
8 that you referred to earlier?
9     A.   Yes.
10     Q.   And your involvement in the
11 paper under 130, did that come about with
12 your same interactions with Professor Sun?
13     A.   Yes. I would say principally
14 so.
15     Q.   How about item 132, which is a
16 September of 2000 -- am I reading it right?
17 Looks like it's September 2017, published
18 paper, with a long title that I won't read.
19     What was your contribution to
20 that paper?
21     A.   Again, that will be similar.
22 That also uses that database of insurance
23 claims, and so I was participating with the
24 group of people helping them do analyses and

Page 101

1 think about the way to use the database to
2 conduct analyses of the questions that were
3 of interest to the paper.
4     And I'll just be clear, I also
5 participated in the writing of the paper and
6 other aspects of authoring the paper.
7     Q.   And item 133, which is also a
8 2017 publication, what was your involvement
9 in that paper?
10     A.   I would give a similar answer
11 to the one I just gave. I can give it again
12 if you --
13     Q.   No, that's fine. That's fine.
14 Thank you.
15     And I see that paper, Professor
16 Sun's not listed on that one. What were the
17 circumstances under which you became involved
18 in that project?
19     A.   Professor Sun is listed on that
20 one.
21     Q.   Oh, I'm sorry.
22     A.   As the last author.
23     Q.   I see. I'm sorry. So then it
24 would be similar circumstances to your

Page 102

1  interaction with him as what --
2      A.    Yes.
3      Q.    -- brought that about?
4      A.    Yes.
5      Q.    The four papers that you've
6  just identified, 125, 130, 132, and 133, did
7  you perform any research or analysis in
8  connection with those papers with respect to
9  the economic consequences of the opioid
10  crisis?
11          MR. BREWER:  Objection, vague.
12          THE WITNESS:  You can see the
13      titles of the work that we were doing.
14      So we were interested in the incidence
15      and risk factors of opioid use.  So we
16      were interested in concurrent use of
17      benzodiazapines.  We were interested
18      in nerve blocks.
19          I would not characterize those
20      as directly related to the economic
21      consequences of the opioid crisis.
22      These papers all involved opioids.
23      Q.    (BY MR. GOTTO)  Fair to say
24  that none of them involve any costs incurred

Page 103

1  by governmental agencies as a result of the
2  opioid crisis?
3      A.    Yes, that's correct.
4      Q.    Apart from your report in this
5  case, have you performed any research with
6  respect to the costs incurred by any
7  governmental agencies as a result of the
8  opioid crisis?
9          MR. BREWER:  Objection, form.
10          THE WITNESS:  I don't believe
11      so, no.
12      Q.    (BY MR. GOTTO)  You've
13  coauthored a number of papers with Professor
14  Kessler; correct?
15      A.    Yes.
16      Q.    And when did you first
17  collaborate with him on a project?
18      A.    It would be years ago.  I -- we
19  could search through here to find some
20  specifics about that, but a number of years
21  ago.
22      Q.    Okay.  What were the
23  circumstances under which you first began
24  working with Professor Kessler?

Page 104

1      A.    Oh, we've been colleagues at
2  Stanford for many years, going back to when I
3  first came there when he did, around the same
4  time.
5          I think at one point we crossed
6  paths and started talking about research
7  ideas and came to write some -- write what
8  would be our first paper.  I'd have to go
9  look back at it, but it's just in the normal
10  course of interacting with my colleagues.
11      Q.    Okay.  Do you view Professor
12  Kessler's area of expertise as similar to
13  yours?
14      A.    I don't know how he would
15  characterize his area of expertise.  I see
16  him as an economist and interested in
17  healthcare.
18      Q.    And you're an economist that's
19  interested in healthcare too, right?
20      A.    Yes.
21      Q.    Are there any particular
22  focuses of your academic or research work
23  that you associate with Professor Kessler as
24  being in any way different from your own

Page 105

1  focuses?
2      A.    Oh, I've seen him do
3  interesting work on lots of issues in
4  healthcare.  I think we're both interested in
5  a broad set of issues in healthcare and
6  health economics.
7      Q.    So when the two of you
8  collaborate on a paper, is there a particular
9  division of responsibilities that you employ?
10      A.    No.  I think it's specific to
11  the individual matter, the individual paper
12  that we'd be working on.
13      Q.    So Exhibit 2, I believe we
14  labeled it, is the working paper that you and
15  Professor Kessler and Professor Bundorf are
16  working on; correct?
17      A.    Yes.
18      Q.    What were the circumstances
19  under which you commenced work on this
20  project?
21      A.    This would be similar to other
22  projects.  We cross paths, Professor Kessler
23  and I and Professor Bundorf, from time to
24  time.  And I think we had taken note of the

Page 106

1  fact that we had some data that would allow
2  us to take a look at an aspect of the issue
3  here with insurance coverage and opioid use
4  that hadn't been looked at to our knowledge
5  before.  And so we identified that in a
6  conversation and decided to go look into it.
7      Q.    Have you worked with Professor
8  Bundorf on other projects?
9      A.    Yes.
10     Q.    Was there a division of
11 responsibilities among the three of you in
12 the preparation of the paper that we've
13 marked as Exhibit 2?
14     A.    Oh, I'd say we all made
15 contributions to the writing of the paper.  I
16 think Professor Kessler carried out most of
17 the specific analyses, and then we would meet
18 to discuss and work on the ideas and the
19 writing of the paper.
20     Q.    The current status of this
21 paper is -- it has not been peer-reviewed at
22 this point; is that correct?
23     A.    It's submitted to a peer-review
24 journal, so that peer review may be ongoing.

Page 107

1  I can't speak to that.  But this is a working
2  paper, and it's not yet finished the
3  peer-review process.
4      Q.    Your anticipation at the
5  conclusion of the peer-review process, it
6  would be published in an academic journal?
7      A.    I hope it's successful.
8      Q.    Okay.
9          If you'd turn to the Materials
10 Reviewed list that I believe is Appendix C --
11 your Materials Reviewed list, Appendix C to
12 your report.
13     A.    Yes.
14     Q.    Fair to say that the materials
15 listed on Appendix C are all of the materials
16 you considered in formulating your opinions
17 here?
18     A.    I believe that's correct, yes.
19     Q.    Okay.  You list under Court
20 Documents:  plaintiff expert reports,
21 depositions, and court filings.
22          Did you receive all of those
23 from counsel?
24     A.    Yes.

Page 108

1          Yes.  Some by way of Analysis
2  Group, but from counsel I understand
3  originally.
4      Q.    Was there anything listed under
5  Court Documents you received by way of a
6  request by you, or were these matters simply
7  provided to you by counsel or by Analysis
8  Group?
9      A.    So in my work on the report, I
10 had asked the -- the support team to make me
11 aware of materials that might be relevant to
12 the points I was making -- the points I was
13 trying to make.
14          And so in response to that
15 request, for example, you know, I'd say
16 that's how I became aware of the Alexander
17 report they identified that has something the
18 support team knew about and thought maybe I'd
19 want to take a glance at.
20          I'd say the same thing about
21 the Rafalski report.  Others of these I think
22 I was provided as part of my assignment.
23          Thinking about the depositions,
24 again I -- that came from Analysis Group and

Page 109

1  from the support team as part of my request
2  that they help me identify things that I
3  should be looking at, and they were aware of
4  what I wanted to do.
5          So I thought it was quite
6  natural for them to provide that.  And if I
7  hadn't heard from them, I probably would have
8  asked for the chance to look at some of that
9  material if I had known about it.
10          So I -- so there's, you know, a
11 bit of back and forth in this.
12     Q.    Focusing on the plaintiff
13 expert reports, you've already testified
14 regarding Dr. Alexander's report, so we can
15 exclude that one.
16          The Rafalski report -- correct
17 me if I'm wrong.  I don't think you commented
18 on that report in your report; is that
19 correct?
20     A.    No.  I think that appears in a
21 footnote or two, but there's no specific
22 comment on that, no.
23     Q.    And the Rafalski report, did
24 you personally review it?

Page 110

1    A.    I would say it was brought to
2  my attention that there might be something in
3  there that I should look at.  So I took a
4  glance through the whole thing, but I
5  specifically looked at a very small part of
6  it that would have been relevant to my
7  footnote.
8    Q.    And what was that part that you
9  looked at?
10   A.    Oh, I'd have to go back in my
11 report.  But it --
12   Q.    Is it identified in your
13 report?
14   A.    Yeah.  It's a footnote in my
15 report to the relevant piece of material.
16   Q.    That's fine.
17         The remaining reports that are
18 listed on Appendix C, I believe, are all
19 reports that you comment on in varying
20 degrees of detail in your report.
21         Did you review each of them
22 personally?
23   A.    Yes.
24   Q.    And the deposition transcripts

Page 111

1  that you list on Appendix C, did you review
2  those personally as well?
3    A.    So those, I would say I
4  reviewed sections, in some cases significant
5  sections of, but I would not say I've
6  reviewed the entirety of those in detail.
7    Q.    Okay.  How did you know which
8  sections to review?
9    A.    Oh, this was a result of,
10 again, a request to the support team to, with
11 the points I was making in mind, help me
12 identify parts of those that I should be
13 looking at.  So they would call that to my
14 attention; I would read sections.
15         It's my custom to read a few
16 pages before and a few pages after any
17 section they identified, so that would lead
18 to me reviewing chunks of these depositions.
19   Q.    Do you know Dr. McCann apart
20 from this engagement?  Any familiarity with
21 him?
22   A.    No.
23   Q.    How about Professor Cutler?
24   A.    Yes.

Page 112

1    Q.    And in what context do you know
2  Professor Cutler?
3    A.    We both work in the same area.
4  So cross paths from time to time at
5  professional meetings or in other contexts
6  related to our work.
7    Q.    For about how long have you
8  known him and crossed paths with him?
9    A.    Oh, going back to the 1990s
10 again.
11   Q.    Apart from this matter, have
12 you had occasion in any of your expert
13 litigation engagements to comment on any of
14 Professor Cutler's work?
15   A.    Not that I can recall
16 specifically.  I can -- I've been in
17 conferences where he's presented his work
18 and, although I can't recall it specifically,
19 I sometimes ask questions at those meetings.
20 And so it may be that you would construe that
21 as a comment of sorts, but not in a formal
22 way like we're talking about here.
23   Q.    And I think I was asking
24 initially in a way of an actual litigation

Page 113

1  setting, where it's similar to what we've got
2  here, where there's an expert report that
3  you've commented on.  That hasn't occurred
4  previously; correct?
5    A.    That's correct.
6    Q.    Have you ever participated in
7  the peer review of any paper that Professor
8  Cutler was an author on?
9    A.    I peer review a lot of papers.
10 And it is quite possible, but I couldn't
11 recall a specific instance in this -- as I
12 sit here right now.
13   Q.    And obviously you express in
14 your report here various commentary and
15 criticisms on Professor Cutler's report.
16         As a general matter, do you
17 have an opinion on Professor Cutler's
18 academic rigor?
19         MR. BREWER:  Objection to form.
20         THE WITNESS:  I have seen
21 Professor Cutler do some nice work
22 over the years, and I have a generally
23 positive view of research that he
24 does.  I'd be careful to say that I

Page 114

1 would never extend a general view like
2 that to anything and everything
3 someone does or says.
4 Q. (BY MR. GOTTO) Apart from
5 Professor Cutler's report in this matter, can
6 you recall any other work of Professor Cutler
7 as to which you've ever expressed any
8 meaningful criticism?
9 A. I can't recall a specific
10 instance, no.
11 Q. How about Professor Gruber? Do
12 you know him apart from this litigation?
13 A. Yes.
14 Q. And in what context do you know
15 him?
16 A. In a similar way. We both work
17 in the same general area and so cross paths
18 from time to time, even with some regularity
19 lately, at meetings and conferences and other
20 settings.
21 Q. And for about how --
22 A. And --
23 Q. I'm sorry, I didn't mean to
24 interrupt.

Page 115

1 A. And all related to work.
2 Q. And for about how long have you
3 had that sort of relationship with Professor
4 Gruber?
5 A. Oh, I probably first
6 encountered him back in the 1990s also.
7 Q. Have you ever participated in
8 the peer review of any paper that he was an
9 author on?
10 A. In the same way I regularly do
11 peer review and have reviewed a large number
12 of manuscripts. So it is not unlikely at all
13 that there is something from him in that, but
14 I can't recall a specific instance.
15 I'll also just note that in
16 many cases the authors are -- of papers that
17 one is peer reviewing are not revealed to the
18 peer reviewer. So it's possible that I did
19 and wouldn't have been able to know.
20 Q. Okay. In a litigation setting,
21 apart from this case, have you had occasion
22 to comment on any report or testimony
23 provided by Professor Gruber?
24 A. No.

Page 116

1 Q. And again, apart from this
2 case, have there been any indications on
3 which you can recall expressing any material
4 criticism of any work done by Professor
5 Gruber?
6 A. Not in any formal sense, no.
7 Q. And do you have a general
8 opinion of the quality of the work of
9 Professor Gruber that you've seen apart from
10 work in this litigation?
11 A. Oh, I would give a similar
12 answer to the one I gave before. I've
13 observed Professor Gruber do some good work
14 over time, and I -- my general impression is
15 positive of the work that he does. But
16 again, I would never extend that as a blanket
17 statement to anything that -- or everything
18 that he's ever done.
19 Q. How about Professor Rosenthal?
20 Are you -- do you have -- are you familiar
21 with her apart from this litigation?
22 A. Yes.
23 Q. And in what context?
24 A. In a similar context. We cross

Page 117

1 paths -- or have crossed paths from time to
2 time.
3 Q. And approximate time frame?
4 A. That's less clear to me. It's
5 not as far back as Professors Cutler and
6 Gruber, but it would go back a number of
7 years that I've seen her around.
8 Q. Okay. And to your knowledge,
9 have you ever participated in a peer review
10 of a paper in which she was an author?
11 A. It's the same answer. It's
12 likely at some point that it happened. I
13 couldn't recall specifics.
14 Q. And in a litigation setting
15 apart from this case, have you had occasion
16 to comment on any expert report or testimony
17 that she's provided?
18 A. No.
19 Q. And in any setting, have you
20 had -- can you recall a situation in which
21 you expressed any material disagreement with
22 any work of Professor Rosenthal?
23 A. No.
24 Q. And do you have a general

Page 118

1 opinion as to the quality of Professor
2 Rosenthal's academic work?
3     A.    My answer would, again, be
4 similar to the one I gave before for the
5 other two.
6     Q.    And how about Professor
7 McGuire?  Do you have familiarity with him
8 apart from this litigation?
9     A.    Yes.
10     Q.    In what context?
11     A.    In the same way.  We worked in
12 the same area and have crossed paths from
13 time to time.
14     Q.    Any approximate time frame?
15     A.    Back to the 1990s again.
16     Q.    Okay.  And have you, to your
17 knowledge, participated in peer review of any
18 papers that Professor McGuire is an author
19 on?
20     A.    The same answer that I gave
21 before.
22     Q.    And I apologize for the
23 repetition of questions.  I think you can
24 discern the pattern that is emerging here.

Page 119

1           But in the litigation setting,
2 apart from this case, have you had occasion
3 to comment on any expert report or testimony
4 provided by Professor McGuire?
5     A.    No.
6     Q.    And in any setting can you
7 recall, apart from this case, expressing any
8 material disagreement with any work done by
9 Professor McGuire?
10     A.    No.
11     Q.    And do you have an overall
12 general view as to the academic quality of
13 the work done by Professor McGuire?
14     A.    It would be the same kind of
15 answer that I've given in the previous
16 questions.
17     Q.    Apart from the expert reports
18 that are listed on Appendix C, are you aware
19 of the identity of any other plaintiff
20 experts who have submitted reports in this
21 litigation?
22     A.    No, I don't believe I am.
23     Q.    And have you reviewed any
24 reports submitted by any other expert

Page 120

1 retained by counsel for any of the defendants
2 in this matter?
3     A.    No.
4     Q.    Have you reviewed any
5 transcripts of testimony given in this
6 litigation other than the four deposition
7 transcripts that you list on Appendix C?
8     A.    No.
9     Q.    Were the -- strike that.
10           You list a number of
11 publications under Academic Literature and
12 Publicly Available Documents.
13           How did you compile that list?
14     A.    There were multiple parts of
15 the work to compile that list.  Some of this
16 is literature that I knew of or had taken
17 note of over the last few years as I've been
18 entrusted in this area and have followed
19 along.
20           So I've actually tried to keep
21 up myself with some of the literature and so
22 knew a number of these papers from that.
23           I've worked on these other
24 papers and so had some idea of where to look

Page 121

1 for materials from that.  And then in
2 addition, I asked the support team to do
3 their own look at the literature and inform
4 me of things that they identified that they
5 thought could be relevant to my work, and so
6 then I would take a look at things that they
7 suggested.
8     Q.    Were any of the materials
9 listed under Academic Literature or Publicly
10 Available Documents brought to your attention
11 by the support team other than after -- than
12 following up on a request by you?
13     A.    No.  It was part of the plan
14 that they would go look into these -- look
15 into the literature and help me identify
16 things of interest.  And that was part of the
17 plan from the outset.
18     Q.    Okay.  And in terms of the plan
19 from the outset, was there subject matter or
20 subject matters as to which they were going
21 to review the literature and report back to
22 you?
23     A.    So they were aware of the kinds
24 of points that I was interested in making,

Page 122

1 and so the request was actually related to
2 those points. And so it's across the
3 spectrum of things that I was looking at in
4 my report.
5    Q.    Can you articulate for me what
6 some -- what all of those points were?
7    A.    For example, the kinds of
8 factors that are associated with use of
9 opioids.
10    Q.    Okay. Any others you can think
11 of?
12    A.    We would have to start going
13 through the report. The report deals with
14 the multiple different areas and so it would
15 essentially be any area in my report.
16    Q.    Were the matters or the items
17 that are listed on Appendix C provided to you
18 in hard copy or electronically or a
19 combination. Do you recall?
20    A.    They were generally posted on a
21 website that I could use to go look, and I
22 could look at them on the website.
23    Q.    And I realize you indicated
24 that you had an existing familiarity with

Page 123

1 some of the academic literature that you list
2 on Appendix C. Did you personally perform
3 any literature review other than identifying
4 literature you were already familiar with?
5    A.    Over the last few years, I've
6 tried to keep up on the literature, and so
7 I'm not sure whether you'd call that a
8 systematic literature review. But even
9 preceding this -- predating this matter, I
10 was trying to pay attention to things coming
11 through.
12    Q.    Okay. But after you were
13 retained in this matter, understanding you
14 were already familiar with much of the
15 literature in this area -- and I understand
16 from your earlier answer that there was a
17 literature review performed by Analysis Group
18 at your request -- did you personally perform
19 any literature review after you were retained
20 in this matter?
21    A.    Not a systematic one. It would
22 be working from things that I knew. Some of
23 them have citations that I could go follow up
24 on and then receiving things from Analysis

Page 124

1 Group that would have filled out my
2 understanding.
3         So it was not that I was
4 conducting a specific literature review for
5 this matter other than the kinds of things
6 that I just talked about: Trying to make
7 sure that I had a sense of what was out in
8 the literature from my own experience, from
9 following that up where it led me, and then
10 from Analysis Group.
11    Q.    So is there -- apart from your
12 work in this litigation, do you maintain a
13 file or some other compilation of
14 opioid-related academic literature as a
15 result of your efforts to stay current in
16 this area?
17    A.    No. It's more that I paid
18 attention to things that were coming along
19 and would try to read them.
20    Q.    Okay.
21         MR. GOTTO: Why don't we take a
22 few minutes.
23         THE VIDEOGRAPHER: With
24 approval of counsel, going off the

Page 125

1 record. The time is approximately
2 11:54 a.m. This ends recording Media
3 No. 2.
4         (Recess taken, 11:55 a.m. to
5 12:07 p.m.)
6         THE VIDEOGRAPHER: With the
7 approval of counsel, back on the
8 record. Time is approximately
9 12:06 p.m. This marks the beginning
10 of recording Media No. 3.
11    Q.    (BY MR. GOTTO) Professor
12 Baker, you list in your report at appendix --
13 the testimony you've given, expert testimony
14 since 2015, and I -- I asked you a little
15 earlier regarding when you first gave expert
16 testimony, which I think you indicated went
17 back to the 1990s at some point.
18         Can you recall the names of any
19 of the cases in which you were engaged in
20 which you provided expert testimony prior to
21 2015?
22    A.    The names of the cases. No.
23 No.
24    Q.    Okay. Can you recall the names

Page 126

1  of any of the law firms or lawyers who
2  retained you in matters in which you provided
3  testimony prior to 2015?
4      A.    No, I'm afraid not.
5      Q.    Did you provide trial testimony
6  in any matter prior to 2015?
7      A.    No.
8      Q.    So just deposition testimony
9  would be the limit?
10     A.    Yes.
11     Q.    In any of the matters, whether
12 before or after 2015, in which you provided
13 testimony, to your knowledge has there ever
14 been a motion made to a court seeking to
15 eliminate or exclude your testimony?
16     A.    I'm aware of one time a motion
17 like that was made.  It was not granted.
18     Q.    So there's never been an order
19 entered limiting or excluding testimony
20 you've proposed to give in any matter, to
21 your knowledge?
22     A.    No.
23     Q.    I'm sorry.  I asked the
24 question with a negative answer, which is

Page 127

1  going to be confusing when you read the
2  transcript.
3          Is it correct that you have
4  never -- there's never been an order entered
5  limiting or excluding testimony you proposed
6  to give in a matter?
7      A.    Yes, it's correct that there
8  has never been such an order.
9      Q.    Okay.  You were good enough to
10 provide Exhibit 6, which has correction or
11 supplement -- I guess corrections to your
12 report.
13         I would ask that if you become
14 aware of any other inaccuracies or errors in
15 your report that you would like to correct
16 before trial, if you would supplement
17 Exhibit 6 rather than wait for trial to make
18 those corrections, that would be helpful.
19         Let's turn to your -- the
20 substance of the opinions that you express in
21 your report.  On pages 4 to 5 of your report,
22 you have your summary of conclusions.  Fair
23 to say that -- that's Section 2 -- paragraphs
24 11 through 15 summarize the opinions that

Page 128

1  you've reached in this matter?
2      A.    That's my intent with this
3  section.  Of course the full set of opinions
4  is expressed in the full set of the report,
5  but this was intended to be a summary.
6      Q.    Sure.  And fair to say that the
7  opinions you express in your report and were
8  summarized in paragraphs 11 to 15 are all in
9  the nature of criticisms or critiques of the
10 opinions expressed by plaintiffs' experts?
11     A.    Yes.  That was my assignment,
12 to review and respond to that set of expert
13 reports.  And so the report is focused on
14 that, yes.
15     Q.    So you haven't formulated any
16 opinions that are independent of the opinions
17 expressed by plaintiffs' experts that you
18 comment on in your report; is that fair?
19         MR. BREWER:  Objection to form.
20         THE WITNESS:  I believe my
21     report was, yes, responsive to the
22     request that I look at those expert
23     reports and comment on them.  So I
24     believe that's correct, yes.

Page 129

1      Q.    (BY MR. GOTTO)  In the
2  preparation of your report, were there any
3  documents or testimony that you requested
4  that you did not receive?
5      A.    No.
6      Q.    To your knowledge, are you
7  aware of any information that has not been
8  available to you that could either strengthen
9  or weaken any of the opinions you've
10 expressed in this matter?
11     A.    I can't think of any right now.
12     Q.    Are there any facts that could
13 influence or change any of the opinions
14 you've expressed in this matter?
15         MR. BREWER:  Objection to form.
16         THE WITNESS:  My opinions are
17     responding to these expert reports,
18     and I feel like I was able to consider
19     them and I had adequate information to
20     do that.  So, no, I don't have
21     anything in mind to -- that would
22     allow me a different answer than no to
23     your question.
24     Q.    (BY MR. GOTTO)  How would you

Page 130

1  characterize the degree of certainty to which
2  you hold the opinions you've expressed in
3  this matter?
4      A.    I'm very confident about these
5  opinions.
6      Q.    In paragraph 11 on page 4 of
7  your report, you state that:  Plaintiffs'
8  experts' methodology does not establish that
9  Walgreens' alleged failure to appropriately
10  monitor the prescription opioid shipments
11  that it distributed caused any harm to the
12  Bellwether counties.
13          Did I read that correctly?
14      A.    Yes, I think so.
15      Q.    And then you go on to elaborate
16  on that in the balance of that paragraph.
17          I want to be sure I understand
18  the basis for the opinion that you summarize
19  in paragraph 11.  Can you point out to me in
20  your report where you describe the basis for
21  that opinion?
22      A.    That in some sense is
23  throughout the report.  So we could look at
24  different sections, but the -- that would

Page 131

1  encompass the failure of the structure of the
2  several reports to create a causal chain, if
3  you will, that would link some action of
4  Walgreens to the harms.
5          It would go to the validity of
6  the analyses that were conducted by Professor
7  Rosenthal, by Professor Cutler, by Professor
8  Gruber, and ultimately by Professor McGuire
9  using those inputs, and the lack of proof of
10  a causal connection in the methodologies and
11  the analyses used in those reports.
12          And so in some sense this
13  summarizes the entire -- this summarizes work
14  in the entirety of my report.
15      Q.    If we turn to pages 16 and 17
16  of your report, you have Figures 2 and 3
17  that -- where you graphically depict what you
18  referred to as Causal Links Alleged By
19  Plaintiffs Between Walgreens' Alleged
20  Misconduct and Prescription Opioid Mortality,
21  in the case of Figure 2; and in the case of
22  Figure 3, Causal Links Alleged By Plaintiffs
23  Between Walgreens' Alleged Misconduct and
24  Illicit Opioid Mortality; correct?

Page 132

1      A.    Yes.  Those are the titles of
2  those figures.
3      Q.    And are those the causal links
4  that you're -- that you're referring -- that
5  you referred to in your answer a moment ago
6  in terms of the -- what you view as
7  inadequacies in the plaintiffs' expert
8  reports?
9      A.    I would say my opinion is
10  possibly even more general than these two
11  figures.  My opinion generally is that there
12  has not been shown to be a link between any
13  alleged activity or lack of activity by
14  Walgreens and the harms that are at issue in
15  this matter.
16          These are illustrations of what
17  I took to be possible causal chains as
18  alleged in the matter, and so I work through
19  these to discuss the failure to create a
20  causal chain.  I would say that my opinion
21  about the lack of causality or lack of a
22  causal link would extend possibly beyond
23  these if other people were to say, Well, I
24  had a different causal chain in mind.  I

Page 133

1  think I would still say I don't see a causal
2  chain overall.
3      Q.    If we look at paragraph 33 of
4  your report.  Starting in the second
5  sentence, you say:  To show that Walgreens'
6  alleged misconduct caused an increase in
7  prescription opioid mortality and harms to
8  the Bellwether counties, one would need to
9  demonstrate that, and then you list three
10  circumstances; correct?
11      A.    Yes, I see that sentence.
12      Q.    Okay.  So is that statement in
13  paragraph 33, including circumstances one,
14  two, and three, that I didn't take the time
15  to read, is that your description of what
16  would, if established, constitute a causal
17  link between misconduct and prescription
18  opioid mortality?
19      A.    So I identify this as a causal
20  chain that I inferred to be alleged from the
21  materials that I read, and so I characterize
22  it in this way.
23          One would need to demonstrate
24  those steps, and then the entirety of the

Page 134

1 linkage between all of those steps being
2 accurate in the data or in the analyses to
3 establish a causal chain.
4　　Q.　Okay. And what I'm trying to
5 be sure I understand is, in paragraph 33,
6 whether you're describing -- whether you're
7 characterizing what you understand to be the
8 plaintiffs' allegation of the causal chain,
9 or are you describing what you believe would
10 be a causal chain if, in fact, those
11 circumstances were demonstrated?
12　　A.　So what I'm trying to make --
13 the larger point I'm trying to make here is
14 that there is no causal chain established.
15 So in order to walk through some steps in
16 that discussion, I outlined what I thought to
17 be a causal chain that was in the background
18 of the plaintiffs' reports that I was
19 reviewing.
20　　　And so I characterized it this
21 way in order to set up my broader discussion,
22 which leads me to the conclusion that there
23 isn't a causal chain established here.
24　　Q.　So in paragraph 33, though,

Page 135

1 you -- when you say: To show that Walgreens'
2 alleged misconduct caused an increase in
3 prescription opioid mortality and harms to
4 the Bellwether counties, one would need to
5 demonstrate that, and then you list
6 circumstances one, two, and three, are you
7 saying that that's the only way that a causal
8 link between the alleged misconduct and
9 increase in prescription opioid mortality
10 could be demonstrated?
11　　　MR. BREWER: Objection, asked
12　　and answered.
13　　　THE WITNESS: So I believe we
14　　just walked through this. I set this
15　　up because my larger point is that a
16　　causal chain has not been established.
17　　And so in order to organize a
18　　discussion relevant to what was in the
19　　plaintiffs' -- or expert reports, I
20　　characterized a causal chain that I
21　　believed they were reasoning with, in
22　　this way, and then I walked through
23　　the ways in which I believe the causal
24　　chain is established here. And so

Page 136

1 that's the context in which I'm
2 setting this up.
3　　Q.　(BY MR. GOTTO) And when you
4 used the phrase in paragraph 33, "One would
5 need to demonstrate," are you opining that
6 the circumstances listed under causes one,
7 two, and three, as a legal matter, are
8 elements of a claim asserted by the
9 plaintiffs?
10　　　MR. BREWER: Objection, form.
11　　And to the extent it calls for a legal
12　　conclusion.
13　　　THE WITNESS: Yes. So let me
14　　be careful just to say that I am not
15　　going to make a legal judgment. I'm
16　　not a lawyer.
17　　　This is to write down what I
18　　think is in the -- what I thought when
19　　I was writing this report, and still
20　　think, is in the background of
21　　plaintiffs' reasoning, or would have
22　　to be in some way for them to be
23　　thinking about the causal chain that
24　　they allege exists. And so by putting

Page 137

1 this down, I can use it to organize my
2 writing about why a causal chain
3 doesn't exist in this case, is not
4 proven. And that's what I mean by
5 that part of the report.
6　　Q.　(BY MR. GOTTO) Okay. And
7 so -- just so I understand, you're not
8 opining in your report or in paragraph 3 or
9 elsewhere in your report as to the legal
10 elements of any claim that the plaintiffs
11 need to establish in order to prevail.
12　　　Is that fair?
13　　　MR. BREWER: Same objection.
14　　　THE WITNESS: I'm opining as an
15　　economist looking at the issues here
16　　and the analyses in these reports.
17　　I'm not here with a legal conclusion
18　　or a legal opinion.
19　　　MR. GOTTO: Okay.
20　　Q.　(BY MR. GOTTO) Okay. And if
21 we turn to paragraph 34, on page 16, you
22 state: To show that Walgreens' alleged
23 misconduct caused an increase in illicit
24 opioid mortality, one would need to

Page 138

1 demonstrate that, and then you list four
2 circumstances; correct?
3     A.    Yes, I see that.
4     Q.    When you use the word "illicit"
5 in paragraph 34, what do you mean by that?
6     A.    I'm generally referring to the
7 illegal use of opioids, for instance, heroin.
8     Q.    Okay.  So if someone obtained a
9 prescription for opioids by lying to their
10 doctor, for example, about their tolerance of
11 ibuprofen, would their use of those opioids
12 be illicit in your -- as you use the term?
13     A.    So some of this --
14         MR. BREWER:  I'm just going to
15     object to the extent it's an
16     incomplete hypothetical.
17         THE WITNESS:  So again, what's
18     happening here is I'm trying to set up
19     causal chains or alleged causal chains
20     that I think are relevant to an
21     analysis of whether there is a causal
22     chain established here.  So I think
23     these are expressions of things that
24     were in the -- or I can infer were in

Page 139

1     the background of the plaintiffs'
2     experts' reasoning.
3         Whether one would characterize
4     that particular scenario in the
5     hypothetical as illicit or as
6     prescription, something of a function
7     of the kind of analysis or thinking
8     one would be doing at the time, how
9     it's characterized in the data, other
10     things.
11         So I don't know that I need to
12     put it in one of these categories.  I
13     would tend to think of that as
14     illicit, but I don't know that that
15     needs to be the case.  I'm not sure
16     how I would change that if I were
17     doing different kinds of analyses.
18         So these are meant to
19     characterize a set of links that allow
20     me to structure a discussion that --
21     in which I express my conclusion or
22     come to my conclusion that there is no
23     causal link here.
24     Q.    (BY MR. GOTTO)  Okay.  But I

Page 140

1 just want to be sure I understand what you're
2 saying in paragraph 34 and when you use the
3 word "illicit."  I'm understanding from your
4 last answer that you're not necessarily
5 limiting illicit to -- to being drugs
6 obtained other than from a registered DEA
7 registrant.
8         MR. BREWER:  Objection -- well,
9     is that a question -- is that the
10     question?
11         MR. GOTTO:  Yes.  I want to
12     know if that's a fair understanding of
13     how he's using the word "illicit."
14         THE WITNESS:  Yes, I don't
15     know -- I don't need -- I don't think
16     it matters particularly to my analysis
17     which way that goes.
18         So in certain contexts, I might
19     say that, yes, maybe that there are
20     data or other things in which one
21     would confine illicit to be heroin or
22     other things, it wouldn't matter to my
23     conclusion.
24         MR. GOTTO:  Okay.

Page 141

1     Q.    (BY MR. GOTTO)  Look at
2 paragraph 38 of your report.  The concluding
3 sentence states:  As I will discuss in more
4 detail below, Plaintiffs' experts have not
5 provided a method that would allow them to
6 isolate the effect of Walgreens' alleged
7 misconduct from the impact of these other
8 factors on prescription opioid use.
9         Did I read that correctly?
10     A.    Yes.
11     Q.    What are the other factors that
12 you're referring to in that sentence?
13     A.    So the literature includes
14 numerous factors that can be involved in
15 opioid use, and they include a wide range of
16 individual and contextual characteristics.
17 And the plaintiffs' experts here have not
18 produced a method that would allow them to
19 identify Walgreens' -- the effect of
20 Walgreens' alleged misconduct separate from
21 other factors -- individual characteristics,
22 economic characteristics, insurance
23 characteristics -- other characteristics that
24 could also be affecting opioid use here.

Page 142

1  Q.   Would the other factors that
2  you are referring to in that sentence include
3  misconduct by other defendants in this
4  litigation?
5       MR. BREWER:  Objection, form.
6       THE WITNESS:  The report refers
7    to a number of different pieces of
8    evidence that were the things that I
9    had in mind.
10      So I hadn't even considered
11   that particularly.
12   Q.   (BY MR. GOTTO)  Well, the
13  language that you use in 38, you talk about
14  the -- to isolate the effect of Walgreens'
15  alleged misconduct from the impact of these
16  other factors.  So I'm just trying to
17  understand.  When you said that, are you --
18  did you mean to refer to isolating Walgreens'
19  alleged misconduct from, among other things,
20  misconduct alleged by the other -- any other
21  defendants in the litigation?
22   A.   Oh, I mean what I say in the
23  overall report here.  So the report
24  identifies other factors as I've said.

Page 143

1  Individual, contextual, insurance
2  characteristics are the things that I have in
3  mind.
4       I make the point in other parts
5  of the report that the methods would not
6  distinguish manufacturers from distributors
7  in other things -- in other -- make other
8  distinctions.  The methods simply don't do
9  that.  And so the points that I make with
10  respect to the question you're asking are
11  expressed in the report, and they're the
12  things I just summarized.
13   Q.   So you end that answer by
14  saying:  I mean what I say in the overall
15  report here.  And I'm -- I'm trying to get at
16  that same concept, what you mean in the
17  overall report, because you've -- in
18  paragraph 38 you make reference to these
19  other factors, which earlier in paragraph 38
20  are only very generally alluded to.
21       And I'm just trying to
22  understand what those other factors are, or
23  if you can direct me where in the report you
24  identify those other factors.

Page 144

1  A.   Yes.  So the -- what I'm
2  specifically thinking about in the sentence
3  that precedes this in paragraph 38, where I
4  say a number of other independent factors
5  identified in medical studies contributed to
6  the observed increases, those are referred to
7  later in the report.  They'll be things like
8  changes in the prevalence of diabetes or
9  cancer survivorship, changes in treatments of
10  pain, things like that.  And so that's what's
11  meant by that.
12       And as I discuss those in more
13  detail, that's what I'm referring to in the
14  last sentence.  And I conclude that those --
15  that the plaintiffs' experts have not
16  provided a method that identifies the effect
17  or any effect of Walgreens' alleged
18  misconduct separate from those other factors.
19   Q.   Thank you.
20       If you'd turn to paragraph 50
21  of your report and pages 22, 23.
22   A.   Yes.
23   Q.   In this paragraph you lead in
24  by saying, Plaintiffs' experts contribute not

Page 145

1  only prescription opioid mortality, but also
2  almost all of the opioid mortality after 2010
3  to Walgreens' and other Defendants' alleged
4  misconduct.
5       And then in the last two
6  sentences of that paragraph, you state:  In
7  order for Plaintiffs' experts to establish
8  this claim, they must make the same
9  assumptions regarding an alleged causal link
10  between alleged insufficient monitoring and
11  prescription opioid abuse described above and
12  shown in Steps 1 and 2 of Figure 3.  And
13  Figure 3 we looked at a few moments ago.
14       You then go on to say:
15  Further, they must also assume the
16  prescription opioid addiction was the primary
17  driver of increased abuse of illicit opioids
18  and associated mortality.
19       And my question for you is,
20  what do you mean by the phrase "primary
21  driver" in that sentence?
22   A.   Oh, I'm referring back to
23  Figure 3.  And this is, again, an
24  illustration of a potential causal chain that

Page 146

1 seems to me to be relevant to the plaintiffs'
2 allegations. And so I'm beginning here in
3 Section B to walk through the reasons that
4 that is not established.
5 And so what I'm simply doing in
6 this paragraph is summarizing what I think is
7 the -- is the background structure here.
8 So you asked about primary
9 driver. I -- what I'm trying to say is, in
10 order for this to go through, you have to
11 have all of those steps. That's the context,
12 and that's the intention of this paragraph.
13 Q. Okay. And maybe I'm
14 misunderstanding the last sentence, though,
15 because it starts off by saying: Further --
16 Which suggests to me that
17 it's -- this is something beyond what's
18 covered in Figure 3.
19 -- they must also assume that
20 the prescription opioid addiction was the
21 primary driver of increased abuse of illicit
22 opioids and associated mortality.
23 And I -- I didn't think this
24 constituted the primary driver was included

Page 147

1 in Figure 3. So I'm just trying to
2 understand what you mean by that.
3 A. Oh. So what that is capturing
4 is really the third step, that there has to
5 be a causal piece in that third step where
6 the people become addicted to prescription
7 opioids and then transition to using illicit
8 opioids because of the addiction.
9 So that has to be established
10 after you go through Steps 1 and Step 2, as
11 I've illustrated it in that figure.
12 Q. And is that -- do you reach
13 that conclusion sort of purely as a logical
14 matter, or do you base it on something else?
15 A. So this -- this is as we've
16 discussed before. What I try to do is
17 illustrate what could have been the causal
18 chain in the background of the plaintiffs'
19 expert analyses. And then I walk through --
20 I use that as a structure to walk through the
21 reasons that I don't believe it's
22 established.
23 So that's all that this
24 paragraph is doing, also, is referring to

Page 148

1 paragraph -- or Figure 3 and walking through
2 the pieces there.
3 Q. If you look back at
4 paragraph 15 on page 5 of your report.
5 A. Yes.
6 Q. You state that: The
7 methodologies employed by Professor
8 Rosenthal, Dr. McCann, Professor Cutler,
9 Professor McGuire, Professor Gruber also
10 suffer from flaws that render them each
11 unreliable for their respective purposes.
12 These flaws include errors in statistical
13 modeling, reliance on unsupported
14 assumptions, and inappropriate inferences of
15 causation in the estimated relationships of
16 interest.
17 Can you point out to me where
18 in your report you identify the various flaws
19 that you're summarizing in paragraph 15?
20 A. Yes. So we'd have to go to
21 specific sections of the report, but there
22 are specific comments on the methodologies
23 used by Professor Rosenthal, Dr. McCann,
24 Professor Cutler, Professor McGuire, and

Page 149

1 Professor Gruber in the report. And so there
2 are specific sections for each, and that
3 would contain the particular -- particular
4 points I'm trying to make.
5 Q. Okay. So fair to say that all
6 of the flaws that you're referring to in
7 paragraph 15 are identified elsewhere in your
8 report?
9 A. Yes. I -- so I believe this is
10 a summary of the report and the points in the
11 report.
12 MR. GOTTO: Okay. Why don't we
13 take just a couple of minutes for me
14 to review my notes.
15 THE VIDEOGRAPHER: With the
16 approval of counsel, going off the
17 record. The time is approximately
18 12:40 p.m. This marks the end of
19 Recording No. 3.
20 (Recess taken, 12:41 p.m. to
21 12:45 p.m.)
22 THE VIDEOGRAPHER: With
23 approval of counsel, back on the
24 record. The time is approximately

Page 150

1   12:44 p.m.  This marks the beginning
2   of recording Media No. 4.
3         MR. GOTTO:  Professor Baker, I
4   have no further questions.  Thank you
5   for your time.
6         MR. BREWER:  And I have no
7   questions.
8         THE WITNESS:  Okay.
9         MR. GOTTO:  Great.
10        THE VIDEOGRAPHER:  This
11  concludes today's video deposition.
12  The time is approximately 12:45 p.m.
13  We are now off the record.
14        (Proceedings recessed at
15  12:45 p.m.)
16        --o0o--
17
18
19
20
21
22
23
24

Page 152

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8         After doing so, please sign the
9   errata sheet and date it.
10        You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14        It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24

Page 151

1               CERTIFICATE
2         I, DEBRA A. DIBBLE, Registered
    Diplomate Reporter, Certified Realtime
3   Reporter, Certified Realtime Captioner,
    Certified Court Reporter and Notary Public,
4   do hereby certify that prior to the
    commencement of the examination, LAURENCE C.
5   BAKER, Ph.D. was duly sworn by me to testify
    to the whole truth, the whole truth and nothing but
6   the truth.
7         I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
8   testimony as taken stenographically by and
    before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
    ability.
10
          I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
    not requested by the witness or other party
12  before the conclusion of the deposition.
13        I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
    that I am not financially interested in the
16  action.
17
18
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 6-6-19
23
24

Page 153

1               ERRATA
2   PAGE LINE CHANGE
3   ____ ____ _____
4       REASON: _____
5   ____ ____ _____
6       REASON: _____
7   ____ ____ _____
8       REASON: _____
9   ____ ____ _____
10      REASON: _____
11  ____ ____ _____
12      REASON: _____
13  ____ ____ _____
14      REASON: _____
15  ____ ____ _____
16      REASON: _____
17  ____ ____ _____
18      REASON: _____
19  ____ ____ _____
20      REASON: _____
21  ____ ____ _____
22      REASON: _____
23  ____ ____ _____
24      REASON: _____

Page 154

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4          I, LAURENCE C. BAKER, Ph.D., do
        hereby certify that I have read the foregoing
 5      pages and that the same is a correct
        transcription of the answers given by me to
 6      the questions therein propounded, except for
        the corrections or changes in form or
 7      substance, if any, noted in the attached
        Errata Sheet.
 8
 9
10
11
12      _____
        LAURENCE C. BAKER, Ph.D.          DATE
13
14
15      Subscribed and sworn to before me this
16      _____ day of _____, 20 _____.
17      My commission expires: _____
18
19      _____
20      Notary Public
21
22
23
24
```

Page 155

```
 1          LAWYER'S NOTES
 2
 3      PAGE   LINE
 4      ____   ____   _____
 5      ____   ____   _____
 6      ____   ____   _____
 7      ____   ____   _____
 8      ____   ____   _____
 9      ____   ____   _____
10      ____   ____   _____
11      ____   ____   _____
12      ____   ____   _____
13      ____   ____   _____
14      ____   ____   _____
15      ____   ____   _____
16      ____   ____   _____
17      ____   ____   _____
18      ____   ____   _____
19      ____   ____   _____
20      ____   ____   _____
21      ____   ____   _____
22      ____   ____   _____
23      ____   ____   _____
24      ____   ____   _____
```