```
 1              IN THE UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF OHIO

 2                        EASTERN DIVISION

 3

      ------------------------    )

 4    IN RE: NATIONAL             ) MDL No. 2804

      PRESCRIPTION OPIATE         )

 5    LITIGATION                  ) Case No.

      ------------------------    ) 1:17-MD-2804

 6                                )

      THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

 7    ALL CASES                   )

      ------------------------    )

 8

 9

10                 HIGHLY CONFIDENTIAL

11      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

13              VIDEOTAPED DEPOSITION OF

14               WAYNE EUGENE BANCROFT

15                 January 10, 2019

16

17                 Chicago, Illinois

18

19

20

21

22

23           GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24                deps@golkow.com
```

## Page 2

```
 1
 2
 3
 4
 5          The videotaped deposition of
 6   WAYNE EUGENE BANCROFT, called by the Plaintiffs for
 7   examination, taken pursuant to the Federal Rules of
 8   Civil Procedure of the United States District
 9   Courts pertaining to the taking of depositions,
10   taken before CORINNE T. MARUT, C.S.R. No. 84-1968,
11   Registered Professional Reporter and a Certified
12   Shorthand Reporter of the State of Illinois, at the
13   offices of Bartlit Beck LLP, Suite 600, 54 West
14   Hubbard Street, Chicago, Illinois, on
15   January 10, 2019, commencing at 9:11 a.m.
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1   APPEARANCES:
 2     ON BEHALF OF THE PLAINTIFFS:
 3       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR P.A.
 4       316 South Baylen Street, Suite 600
         Pensacola, Florida 32502
 5       205-396-3982
         BY: PETER J. MOUGEY, ESQ.
 6         pmougey@levinlaw.com
           -and-
 7         PAGE A. POERSCHKE, ESQ.
           ppoerschke@levinlaw.com
 8           (via livestream)
           LAURA DUNNING, ESQ.
 9           (via livestream)
10
11     BLASIGAME BURCH GARRARD & ASHLEY P.C.
       440 College Avenue, Suite 320
12     Athens, Georgia 30601
       706-707-3497
13     BY: SARA SCHRAMM, ESQ.
         sschramm@bbga.com
14         (via livestream)
15
16   ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
     aka WALGREEN CO.:
17
       BARTLIT BECK LLP
18     54 West Hubbard Street, Suite 300
       Chicago, Illinois 60654
19     312-494-4475
       BY: KATHERINE M. SWIFT, ESQ.
20       kswift@bartlit-beck.com
21
       BARTLIT BECK LLP
22     1801 Wewatta Street, Suite 1200
       Denver, Colorado 80202
23     303-592-3177
       BY: LESTER C. HOUTZ, ESQ.
24       Lester.Houtz@bartlitbeck.com
```

## Page 4

```
 1   APPEARANCES (Continued):
 2    ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
      ENDO PHARMACEUTICALS, INC.,
 3    PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
      COMPANIES, INC. (f/k/a Par Pharmaceutical
 4    Holdings, Inc.):
 5      ARNOLD & PORTER KAYE SCHOLER LLP
        601 Massachusetts Avenue, NW
 6      Washington, DC 20001-3743
        202-942-5000
 7      BY: ERICA I. GUTHRIE, ESQ.
          erica.guthrie@arnoldporter.com
 8          (via telephone/livestream)
 9   ON BEHALF OF McKESSON CORPORATION:
10      TABET DIVITO & ROTHSTEIN LLC
        209 South LaSalle Street, 7th Floor
11      Chicago, Illinois 60604
        312-762-9461
12      BY: DANIEL L. STANNER, ESQ.
          dstanner@tdrlawfirm.com
13
14   ON BEHALF OF CARDINAL HEALTH, INC.:
15      ARMSTRONG TEASDALE LLP
        7700 Forsyth Boulevard, Suite 1800
16      St. Louis, Missouri 63105
        314-621-5070
17      BY: JULIE FIX MEYER, ESQ.
          jfixmeyer@ArmstrongTeasdale.com
18
19   ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
20      JASZCZUK, P.C.
        311 South Wacker Drive, Suite 3200
21      Chicago, Illinois 60606
        312-442-0509
22      BY: MARGARET M. SCHUCHARDT, ESQ.
          mschuchardt@jaszczuk.com
23
24
```

## Page 5

```
 1   APPEARANCES (Continued):
 2    ON BEHALF OF WALMART:
 3      JONES DAY
        77 West Wacker Drive
 4      Chicago, Illinois 60601-1692
        312-782-3939
 5      BY: MARK W. DeMONTE, ESQ.
          mdemonte@jonesday.com
 6
 7    ON BEHALF OF HBC COMPANY:
 8      MARCUS & SHAPIRA LLP
        One Oxford Centre, 35th Floor
 9      Pittsburgh, Pennsylvania 15219
        412-338-4383
10      BY: ZACHARY FENSTEMAKER, ESQ.
          fenstemaker@marcus-shapira.com
11          (via telephone/livestream)
12
13   ALSO PRESENT:
14      ALEXANDRA M. GARLOCK, Paralegal
        agarlock@levinlaw.com
15      MADISON SHELQUIST, Legal Assistant,
        mshelquist@levinlaw.com
16      Levin Papantonio Thomas Mitchell
        Rafferty & Proctor P.A.
17
18      CHRIS GRIMM, Trial Technician
19
20   VIDEOTAPED BY: ANTHONY MICHELETTO
21
22   REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
23
24
```

Highly Confidential – Subject to Further Confidentiality Review

| Page 6 | Page 8 |
|---|---|

**Page 6**

1　THE VIDEOGRAPHER: We are now on the record.
2　　My name is Anthony Michelletto. I'm a
3　legal videographer for Golkow Litigation Services.
4　　Today's date is January 10, 2019. The
5　time is 9:11 a.m., as indicated on the video
6　screen.
7　　This video deposition is being held in
8　Chicago, Illinois, in the matter of In Re National
9　Prescription Opiate Litigation, in the
10　United States District Court for the Northern
11　District of Ohio, Eastern Division.
12　　The deponent is Wayne Bancroft.
13　　Will counsel please identify yourselves
14　for the video record.
15　　MR. MOUGEY: Peter Mougey on behalf of the
16　Plaintiffs.
17　　MS. SHELQUIST: Madison Shelquist on behalf of
18　the Plaintiffs.
19　　MS. GARLOCK: Alexandra Garlock on behalf of
20　the Plaintiffs.
21　　MS. MEYER: Julie Fix Meyer, Armstrong
22　Teasdale, on behalf of Cardinal Health.
23　　MS. SCHUCHARDT: Margaret Schuchardt,
24　Jaszczuk P.C., on behalf of AmerisourceBergen Drug

**Page 8**

1　MS. SWIFT: Thanks very much. Appreciate it.
2　THE WITNESS: Can I say something?
3　MR. MOUGEY: I think Kate would like the names
4　of the people on the phone.
5　MS. SWIFT: Thanks, Peter.
6　THE REPORTER: I have on the phone Erica
7　Guthrie from Arnold & Porter and also Zach
8　Fenstemaker from Marcus & Shapira for HBC.
9　MS. SWIFT: Thank you.
10　THE WITNESS: For the record I'd like to let
11　everybody know that I have Parkinson's, and I don't
12　know if it's going to interfere with the testimony
13　at all. But I just want you to be aware of it.
14　Sometimes my voice goes soft and -- but I will try
15　to do the best I can to not let it interfere.
16　　And I've also had a little bit of a head
17　cold lately. So, those things are working against
18　me. But I think I will get through them fine. But
19　I just wanted to let you know. Thank you.
20　MR. MOUGEY: Thank you.
21
22
23
24

| Page 7 | Page 9 |
|---|---|

**Page 7**

1　Corporation.
2　MR. STANNER: Dan Stanner for McKesson.
3　MR. DeMONTE: Mark DeMonte on behalf of
4　Walmart.
5　MR. HOUTZ: Les Houtz from Bartlit Beck for
6　Walgreens.
7　MS. SWIFT: Kate Swift for Walgreens.
8　THE VIDEOGRAPHER: Our Court Reporter today is
9　Corinne Marut. Please swear in the witness.
10　　(WHEREUPON, the witness was duly
11　　sworn.)
12　THE REPORTER: Folks on the phone, can you
13　identify yourselves for the record.
14　　I have two names.
15　MS. SWIFT: The Court Reporter has noted that
16　she has two names for folks who are on the phone
17　but have not identified themselves. So, I would
18　appreciate it if you go ahead and note those names
19　on the record. Thanks, Corinne.
20　　There is also another gentleman in the
21　room who didn't identify himself.
22　MR. GRIMM: Chris Grimm.
23　MS. SWIFT: Are you with the Plaintiffs?
24　MR. GRIMM: I am with the videographer.

**Page 9**

1　　WAYNE EUGENE BANCROFT,
2　called as a witness herein, having been first duly
3　sworn, was examined and testified as follows:
4　　EXAMINATION
5　BY MR. MOUGEY:
6　Q.　Good morning, Mr. Bancroft.
7　A.　Good morning.
8　Q.　My name is Peter Mougey. I represent
9　the Plaintiffs in this case.
10　　You are an employee of Walgreens,
11　correct, sir?
12　A.　That's correct.
13　Q.　And you have been an employee of
14　Walgreens since 2004, correct?
15　A.　That's correct.
16　Q.　And your title from 2004 to today has
17　remained the same?
18　A.　Basically, yes.
19　Q.　And senior quantitative analyst at
20　Walgreens from 2004 up and to the current time,
21　correct?
22　A.　That's correct.
23　Q.　And you said "basically." Has your --
24　A.　Business analyst. The titles change

Page 10

1  slightly.
2       MS. SWIFT:  Let him finish his questions --
3       THE WITNESS:  Sorry.
4       MS. SWIFT:  -- before you start to answer.
5  BY MR. MOUGEY:
6       Q.   And it's hard.  In the course of
7  conversation, typically I will, I am 100 percent
8  positive, will interrupt you at some point today
9  before you're finished.  So, if you take a breath,
10 I think you're done, Mr. Bancroft.  I don't mean to
11 be disrespectful or rude.
12      A.   Yes.
13      Q.   So, just tell me, "I'm not finished
14 answering," and I'll stop.  Okay?
15      A.   Okay.  Thank you.
16      Q.   And, of course, at any point in time
17 today if you want to take a break or you want to
18 stop a few minutes, let me know as well.  Okay?
19      A.   Thank you, Peter.
20      Q.   Have you already -- have you been
21 deposed at any point in time or provided testimony?
22      A.   No.
23      Q.   Okay.  And I'm going to hand you what I
24 have I believe is your resume.  Okay, sir?

Page 11

1            (WHEREUPON, a certain document was
2              marked as Walgreens-Bancroft
3              Exhibit No. 1:  Resume, Wayne
4              Bancroft, P-WAG-02258.)
5  BY MR. MOUGEY:
6       Q.   All right, Mr. Bancroft.  I believe this
7  is your resume.  Is that -- you have this in front
8  of you?
9       A.   It looks right.
10      Q.   Yes, sir.  Do you recognize this as a
11 document that you put together?
12      A.   I believe so, yes.
13      Q.   All right.  And if you could, sir, I'd
14 like to turn to the second page of this document,
15 Bancroft 1, and just start with your education.
16           Sir, you have an undergraduate degree, a
17 graduate degree and then also your Ph.D., correct,
18 sir?
19      A.   That's correct.
20      Q.   And your undergrad is in chemistry,
21 correct?
22      A.   Yes.
23      Q.   And your Master's Degree, similar to
24 your Ph.D., is in management sciences/operations

Page 12

1  research, correct, sir?
2       A.   That's correct.
3       Q.   And those are both, both your Master's
4  and your Ph.D., are from the Institute of
5  Technology here in Chicago, correct, sir?
6       A.   Illinois Institute of Technology.
7       Q.   Yes, sir.  Thank you.
8            And, sir, when did you finish your
9  Ph.D., late '80s?
10      A.   '87.
11      Q.   '87.  And I see that your first job
12 experience on your resume is from 1990.  What did
13 you do after your Ph.D. from '87 until '90?
14      A.   From '87 to '90?  Let's see.
15      Q.   If you're -- do you see how your
16 education doesn't have a date on it?
17      A.   Oh, yes.
18      Q.   So, did you graduate somewhere around
19 1987?
20      A.   Yes.
21      Q.   Okay.  And your first entry on your
22 resume is Motorola in 1990.
23           Do you see that?
24      A.   Yes.

Page 13

1       Q.   Did you have --
2       A.   Before -- before Motorola I worked for
3  Lucent Technologies.
4       Q.   For Lucent Technologies?
5       A.   Yes.
6       Q.   What did you do for Lucent?
7       A.   Quantitative analyst.
8       Q.   Okay.  So, your very broad, macro, your
9  employment starting with Lucent all the way to
10 today at Walgreens involved some component of
11 quantitative analysis, correct, sir?
12      A.   Some component.
13      Q.   And just to kind of put that in layman's
14 terms, that involves statistics, modeling, kind of
15 a math-based background.  Is that fair?
16      A.   Yes.
17      Q.   And, now, if you would, sir, turn to the
18 first page of your resume.  And you have a number
19 of bullets here listed under Walgreens Co. from
20 2004 and the resume says till '14, but you've
21 continue to work at Walgreens up until today,
22 correct?
23      A.   Yes.
24      Q.   And what we're here today to talk to you

Page 14

1 about, sir, is Walgreens' suspicious order
2 monitoring policies. You understand that?
3     A. That's correct.
4     Q. And, sir, you had a role in Walgreens'
5 suspicious order monitoring algorithm or formula
6 used, correct, sir?
7     A. That's right.
8     Q. And that algorithm or formula was
9 designed by you, correct?
10     MS. SWIFT: Object to form.
11 BY THE WITNESS:
12     A. Not entirely.
13     MS. SWIFT: Vague.
14         Give me a chance to object before you
15 answer.
16     THE WITNESS: I'm sorry.
17     MR. MOUGEY: Are you done, Kate?
18     MS. SWIFT: Yes.
19 BY MR. MOUGEY:
20     Q. So, I understand it wasn't written
21 entirely by you. But that's something that you
22 worked on at Walgreens, correct?
23     A. Yes, that's correct.
24     MS. SWIFT: Same objection.

Page 15

1 BY MR. MOUGEY:
2     Q. And when I say "something that you
3 worked on," the suspicious order monitoring
4 algorithm was a part of your employment while you
5 were at Walgreens, correct?
6     MS. SWIFT: Same objection.
7 BY THE WITNESS:
8     A. Yes.
9 BY MR. MOUGEY:
10     Q. So, do you have a recollection of when
11 you began to work on the suspicious order
12 monitoring policies at Walgreens?
13     MS. SWIFT: Object to the form, vague.
14 BY THE WITNESS:
15     A. Yes.
16 BY MR. MOUGEY:
17     Q. What time period do you recall that you
18 began to work on the -- I'm going to call it SOM,
19 suspicious order monitoring. Okay?
20     A. The recollection, yeah, I think it was
21 around 2008.
22     Q. Around 2008. And do you have a
23 recollection, sir, of who brought to your attention
24 or asked you to work on the suspicious order

Page 16

1 monitoring at Walgreens?
2     A. I don't know for certain.
3     Q. And who do you believe it is?
4     A. I would believe my manager, Joe
5 Tiemeyer.
6     Q. I'm sorry?
7     A. My manager at the time, Joseph Tiemeyer,
8 Joseph Tiemeyer.
9     Q. Joseph Tiemeyer. Okay. And do you have
10 a recollection of the conversation about what you
11 were asked to do, what the scope of work was?
12     A. No.
13     Q. Do you have a recollection, was there a
14 team or a group that was formed to help assist you
15 or participate in drafting Walgreens' SOM?
16     MS. SWIFT: Object to the form.
17 BY THE WITNESS:
18     A. Yes.
19 BY MR. MOUGEY:
20     Q. And was there a name for that team or
21 task force?
22     A. I --
23     MS. SWIFT: Object to the form.
24 BY THE WITNESS:

Page 17

1     A. I don't know. I don't recall.
2 BY MR. MOUGEY:
3     Q. Do you recall who was on the team with
4 you helping put together Walgreens' SOM policies?
5     MS. SWIFT: Object to the form.
6 BY THE WITNESS:
7     A. A few people.
8 BY MR. MOUGEY:
9     Q. And who were those few people?
10     A. Tracy Morris was one.
11     Q. Tracy Morris.
12     A. Barb Martin. Joanne, I don't remember
13 her last name.
14     Q. Okay.
15     A. I know there were some people from loss
16 prevention. I don't remember -- I don't know any
17 names. That's -- that's who I can recall.
18     Q. All right. So, five or so, less than
19 ten people on a group with you helping put
20 together --
21     A. I wouldn't say that.
22     Q. You wouldn't say that?
23     A. I don't know if it was less than ten
24 people.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.   Okay.
2    A.   I think there -- at least ten people.
3    Q.   At least ten people.
4        All right.  So we have three names
5    including yourself.  So, there is four people.  We
6    have Joanne, Barb Martin and Tracy Morris, and some
7    folks from loss prevention.  Don't remember who?
8    A.   Don't remember.
9    Q.   Okay.  Any other groups within Walgreens
10   that were on the team?
11   A.   I don't recall.
12   Q.   All right.  And kind of walk me through
13   the genesis of how this project started and, you
14   know, how you met, who you met, how often, just
15   kind of walk me through how this started.
16   A.   Well --
17   MS. SWIFT:  Object to the form.
18   BY THE WITNESS:
19   A.   It was in 2008.  My memory is not
20   crystal clear.  I remember the objective was to --
21   that we had requirements from the DEA to put -- to
22   control our -- to monitor our stores for suspicious
23   ordering in terms of order size and order frequency
24   is what I recall.

Page 19

1    BY MR. MOUGEY:
2    Q.   Why do you believe you were asked to be
3    on this team?
4    MS. SWIFT:  Object to the form, foundation.
5    BY THE WITNESS:
6    A.   I think any kind of quantitative issue
7    that they usually involved me.
8    BY MR. MOUGEY:
9    Q.   All right.  So, would you help me
10   understand and help this jury understand when you
11   say "quantitative issue," what do you mean?
12   A.   I think that would -- statistical
13   modeling.  Anything that might involve that.
14   Q.   So, if we go back to your resume,
15   Bancroft 1, and we look at your education under
16   "Management Sciences/Operations Research," is
17   that -- is your educational background kind of math
18   or statistics-heavy?
19   A.   I would say it's -- yes.
20   Q.   Yes.  And would you consider yourself to
21   have a significant educational background in
22   statistical modeling?
23   A.   I have an educational background in
24   modeling in general.

Page 20

1    Q.   Modeling in general.  Now, how many
2    years were you, in both your Master's Degree and
3    Ph.D., your graduate programs, how many years were
4    you in school working on your management
5    sciences/operations research Ph.D.?
6    A.   At least eight.
7    Q.   Eight years.  In addition to your
8    undergrad?
9    A.   Yes.
10   Q.   And your undergrad was in chemistry?
11   A.   Yes.
12   Q.   So, you have 12 years in total, maybe a
13   little more, eight years based in management
14   sciences and operations research, correct?
15   A.   Some of those years were part time.
16   Q.   Some of those years were part time.  But
17   a significant amount of time in the educational
18   process, kind of understanding operations,
19   management science, correct?
20   A.   That's correct.
21   Q.   And did you have a focus or an area
22   that -- that you specialized in during your
23   graduate work?
24   A.   Graduate work, there was a general array

Page 21

1    of courses that you were required to take.  So, I
2    would say I was not specialized at that point.
3    Q.   When you finished your -- when you
4    finished your Ph.D., had you focused or specialized
5    in any area?
6    A.   Forecasting and inventory.
7    Q.   Forecasting and inventory.  Okay.
8        So, your career, starting with Lucent,
9    going to Motorola, your -- has all been
10   forecasting, inventory, modeling, kind of
11   math-based work experience, correct?
12   A.   Not totally.
13   Q.   And when you say "not totally," what
14   other kind of work have you specialized in?
15   A.   Well, at Motorola I did some strategic
16   planning and operational plan for -- help plan for
17   operations.
18   Q.   Would you agree with me that a
19   significant part of your work experience after your
20   graduate work at -- did you say it was Illinois
21   Institute of Technology?
22   A.   Illinois Institute of Technology, IIT.
23   Q.   Okay.  Oh, I see.  It's -- all right.
24       Would you agree with me that after your

Page 22

1 eight or so years of graduate work at Illinois
2 Institute of Technology in management sciences and
3 operations research that the bulk of your work
4 experience has been building upon your academic
5 background?
6    A.   I would say so.
7    Q.   And as a matter of fact, on your resume
8 on the second page, your -- one of the titles of
9 the grouping of Motorola and the issues below were
10 all forecasting and inventory consultants, correct?
11    A.   Yes.
12    Q.   And, now, you began at Walgreens in '04
13 and within a few years you had been asked to serve
14 on this -- on this team with suspicious order
15 monitoring policies, correct?
16    A.   That's correct.
17    MS. SWIFT:  Object to the form.
18    THE WITNESS:  Sorry.
19 BY MR. MOUGEY:
20    Q.   So, did you -- when you started as part
21 of this team, did you and the team start from
22 scratch or was there any work product that had
23 already been developed when you started?
24    MS. SWIFT:  Object to the form, foundation.

Page 23

1 BY THE WITNESS:
2    A.   We gave it a clean slate and took it
3 from scratch.
4 BY MR. MOUGEY:
5    Q.   All right.  So, when you say you gave it
6 a clean slate, was there a body of work that you
7 started with as part of the team to develop a
8 suspicious order monitoring algorithm or was there
9 already some work done?
10    MS. SWIFT:  Object to the form.
11 BY THE WITNESS:
12    A.   Could you repeat the question.
13 BY MR. MOUGEY:
14    Q.   Yes, sir.  When I asked you if -- what
15 would you call it?  Would you call it a team, this
16 group of people?  Would you call it a committee?
17 What would you refer to it as?
18    A.   Initially I'd refer to it as a
19 committee.
20    Q.   A committee.  All right.  So, did
21 that -- you said "initially."  Did that change over
22 some period of time?
23    A.   Well, we started to put together a
24 solution and we worked as a team then.

Page 24

1    Q.   Okay.  So, it started as a committee and
2 then worked and developed into a team?
3    A.   Yes.
4    Q.   Because you continued to work on this
5 committee, which ultimately became a team, to
6 develop and implement the suspicious order
7 monitoring policy for several years after it was
8 brought to your attention in 2008, correct?
9    MS. SWIFT:  Object to the form, compound.
10 BY THE WITNESS:
11    A.   There was two phases.  So, the first
12 phase was -- it was in 2008; and then we had a
13 second phase where we enhanced the model, and that
14 was around 2012.
15 BY MR. MOUGEY:
16    Q.   So, there was the initial phase in '08
17 and then a second phase in around 2012?
18    A.   Yes.
19    Q.   Okay.  So, let's start with the 2008.
20 Okay?
21    A.   Okay.
22    Q.   Beginning of 2008, somewhere in 2008,
23 your boss brought to your attention, you think, we
24 need to develop an algorithm for suspicious order

Page 25

1 monitoring, correct?
2    MS. SWIFT:  Object to the form.
3 BY THE WITNESS:
4    A.   I was asked to attend the meeting and at
5 the meeting that was where it was brought to my
6 attention.
7 BY MR. MOUGEY:
8    Q.   All right.  And do you recall where the
9 meeting was?
10    A.   It was in Deerfield.
11    Q.   Deerfield.  And did the committee
12 continue to meet after the initial meeting?
13    A.   Yes.
14    Q.   And do you have a recollection of how
15 often the committee met?
16    A.   No.
17    Q.   Would it meet once a quarter?  Were you
18 all meeting weekly?  Were you meeting once a day?
19    A.   I don't recall.
20    Q.   You don't recall at all?
21    A.   No.
22    Q.   You don't recall if you met once and
23 never met again or you don't --
24    A.   No, I recall meeting more than once.

Page 26

1   Q.   More than once.  Do you recall meeting
2   two or three times or how did -- how did the --
3   A.   I'm sure we met several times.
4   Q.   All right.  So, did everyone on this
5   committee have a different area of expertise and
6   did you all -- or were you assigned specific tasks
7   within the committee?
8   A.   Everybody had their -- brought their own
9   talents, yes, they had different talents.
10   Q.   So, what do you -- do you have an
11   understanding of what Ms. Tracy Morris' talents
12   were on that, on the committee?
13   A.   She worked in the same capacity I did.
14   Q.   All right.  And if you had just a
15   couple-of-word description about you and
16   Ms. Morris' area, would you call it a statistical
17   modeling?  What would you call your area?
18   A.   I never thought about giving it.  I
19   never had a name that I --
20   Q.   I want to use something you're
21   comfortable with today.
22         Were you the -- were you the -- you and
23   Tracy the modeling folks?
24   A.   Yes.

Page 27

1   Q.   Okay.  So, you and Ms. Morris were kind
2   of in charge of putting together the model,
3   correct?
4   A.   I don't know if we were in charge.  We
5   certainly took lead.
6   Q.   All right.  You took lead in --
7   A.   Yes.
8   Q.   -- in developing the model.
9         But you needed input from other folks
10   within Walgreens to develop the model, correct?
11   A.   Yes.
12   Q.   So, for example, Ms. Martin, what would
13   you -- what would you explain her area of --
14   A.   She's a pharmacist, so she's familiar
15   with the store ordering process.  She's familiar
16   with how things, operations are in the stores.
17   Q.   All right.  And how about Joan who you
18   couldn't --
19   A.   Same.  She was a pharmacist.
20   Q.   Same.  Pharmacist.
21   A.   Yeah.
22   Q.   And was familiar with, you said SOR,
23   S-O-R, suspicious order reporting, correct?
24   A.   She was familiar with dispensing in the

Page 28

1   stores.  She is familiar with store operations.
2   Q.   Okay.  Did you not use the word "SOR" --
3   MR. MOUGEY:  Kate, I'd appreciate it if I
4   don't have shaking of the head yes or no from you.
5   I'm asking the witness.  Okay?
6   MS. SWIFT:  Peter, I'm sorry.  I did not
7   intend to shake my head at you.  Ignore me.
8   MR. MOUGEY:  You are and that's been a
9   continuing issue for --
10   MS. SWIFT:  Just ignore me.
11   MR. MOUGEY:  I appreciate it, but you're
12   leaning up in front of the witness shaking your
13   head yes and no, which has been a continued issue
14   for months on end.  If you could please refrain --
15   MS. SWIFT:  For the record I'm not at all in
16   front of the witness, which I'm sure is clear from
17   the video.  But for the transcript I am not in
18   front of the witness.
19   MR. MOUGEY:  You're in the witness' line of
20   sight.  I've asked repeatedly that you stop shaking
21   your head yes and no during testimony when the
22   witness can see you in the peripheral vision.  So,
23   I'd appreciate that.
24   BY MR. MOUGEY:

Page 29

1   Q.   Mr. Bancroft, did you -- and I might
2   have misunderstood.  I thought you said "SOR,"
3   which to me would be suspicious order reporting.
4   Did you say "store"?
5   A.   Store.
6   Q.   Okay.  Thank you.
7   A.   Yes.  I'm sorry.  It's part of --
8   Q.   No.
9   A.   Yeah.
10   Q.   And I'm also -- we are just making sure.
11   A.   I am glad you clarified that.  Thank
12   you.
13   Q.   So, we were talking about Barb Martin
14   and I wrote down SOR.  But let me go back and clean
15   that up.
16         So, Ms. Martin is a pharmacist?
17   A.   Yes.
18   Q.   And she brought together to the
19   committee store operations?
20   A.   Operational, yes.
21   Q.   Gotcha.  And Joanne, sounds like the
22   same thing, she was a pharmacist and brought store
23   operations kind of expertise to the committee,
24   right?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.   Yes.  They are also, they both worked
2  for Rx purchasing.
3    Q.   And Rx purchasing.  Okay.
4         So, now, loss prevention, what was their
5  area of expertise or what skill set did they bring
6  to the table?
7    MS. SWIFT:  Object to the form, foundation.
8  BY THE WITNESS:
9    A.   I wasn't as familiar with them as much,
10  but they brought the skill set they brought, they
11  looked for theft.  Loss prevention.
12  BY MR. MOUGEY:
13    Q.   Thefts and loss prevention.  Okay.
14         Now, safe to assume you ultimately came
15  up with a product or a model to -- that was used at
16  Walgreens, correct?
17    MS. SWIFT:  Objection; form.
18  BY THE WITNESS:
19    A.   Did we come up with a way of monitoring?
20  BY MR. MOUGEY:
21    Q.   Yes, sir.
22    A.   Yes, we did.
23    Q.   All right.  Now, was there some code or
24  computer language written that was deployed at

Page 31

1  Walgreens?
2    MS. SWIFT:  Object to the form.
3  BY THE WITNESS:
4    A.   Yes.
5  BY MR. MOUGEY:
6    Q.   And were there any people in this
7  committee that had more programming backgrounds?
8    A.   I don't remember.
9    Q.   Do you have a computer -- do you have a
10  programming background?
11    A.   I could -- I'm a good hack.
12    Q.   Okay.  But you wouldn't -- for a company
13  the size of Walgreens, your area of expertise
14  wasn't writing code to implement the model,
15  correct?
16    A.   I use code to help develop the model and
17  test data, but I do not write any code that gets --
18  none of the code I write is implemented on
19  Walgreens' systems.  It gets written by a
20  professional.
21    Q.   So, let's go back to kind of where I
22  started, which is when this committee was formed in
23  '08, did you start from a base of work that was
24  already developed at Walgreens?

Page 32

1    MS. SWIFT:  Object to the form.
2  BY THE WITNESS:
3    A.   No.
4  BY MR. MOUGEY:
5    Q.   Did you ask what was currently being
6  used at Walgreens?
7    MS. SWIFT:  Object to the form.
8  BY THE WITNESS:
9    A.   I don't recall.
10  BY MR. MOUGEY:
11    Q.   Do you recall that there was any system
12  in place at Walgreens prior to the 2008 committee
13  meeting?
14    MS. SWIFT:  Object to the form, foundation.
15  BY THE WITNESS:
16    A.   I remember there was some general
17  discussions of what was -- what was done, but I
18  don't remember details.
19  BY MR. MOUGEY:
20    Q.   Why don't you give me the general
21  discussions about what was done?
22    A.   What loss prevention, what involvement
23  they had, but we -- we went with a -- we started
24  from scratch.  So, I don't remember any details.

Page 33

1    Q.   Okay.  Now, I get that you started from
2  scratch and I get that loss prevention was
3  involved.
4         But you -- you have no understanding of
5  anything that was in place prior to the 2008
6  committee meeting at Walgreens?
7    A.   That would be accurate.
8    MS. SWIFT:  Object to the form.
9  BY THE WITNESS:
10    A.   That would be accurate.
11  BY MR. MOUGEY:
12    Q.   Now, you have -- the resume we still
13  have in front of us, Bancroft 1, is filled with
14  different projects that you've done at a number of
15  very large companies, correct?
16    A.   Yes.
17    Q.   And I would imagine that a lot of these
18  projects were developed from a -- just a blank
19  slate, as you called it, correct?
20    A.   I would say so.
21    Q.   And I would say a number of these
22  projects you've worked on were enhancing or
23  improving what had already been built, correct?
24    A.   Most of the projects I work on, I tend

Page 34

1 to like to start from scratch and not be influenced
2 by -- most of the projects I try to get on the
3 ground floor and so I don't have influence by
4 other -- outside, something that's already in
5 place.
6    Q.  Help me because I'm hearing a couple
7 different things, and I want to make sure I
8 understand you.
9      You say you want to get in on the ground
10 floor and you want to start from scratch?
11    A.  Yes.
12    Q.  Okay. But if you come in in a system
13 that's already been developed, isn't it important
14 for you to understand what's being employed at the
15 point in time when you start?
16    A.  Of course, yes.
17    Q.  Okay.
18    A.  And I stand corrected. Yes, I have to
19 work with any systems that's in place for the
20 company. I have to be able to work within that.
21    Q.  Yes, sir. And as part of the committee
22 in the beginning of 2008, it was important that you
23 understood what was currently being used so you
24 could understand how to fit into that system,

Page 35

1 correct?
2    MS. SWIFT: Object to the form.
3 BY THE WITNESS:
4    A.  I would not say that's correct. No, I
5 would disagree with that.
6 BY MR. MOUGEY:
7    Q.  Was there any system that was in place
8 at Walgreens when you began on this committee in
9 2008?
10    A.  I can't answer that question.
11    Q.  Why not?
12    A.  Because I wasn't involved with what was
13 there prior to.
14    Q.  I understand that you weren't involved.
15 All right. And I understand you didn't write it.
16 But you're coming in in 2008 and being asked to
17 serve on a committee to develop an algorithm for
18 suspicious order monitoring, correct?
19    A.  We were asked to develop an algorithm,
20 not to -- not to fix an algorithm. That's correct.
21    Q.  So, do you have an understanding of
22 whether or not a system was in place in 2008 that
23 was already deployed within Walgreens?
24    A.  No, I didn't.

Page 36

1    MS. SWIFT: Object to the form.
2 BY THE WITNESS:
3    A.  No.
4 BY MR. MOUGEY:
5    Q.  No, there wasn't a system or --
6    A.  No, I don't have an understanding.
7    Q.  So, you didn't ask anyone at Walgreens
8 what system's already being used?
9    A.  I don't recall.
10    Q.  You don't recall -- you don't recall
11 at any -- saying, "Well, what is -- what's being
12 used at Walgreens? Do we have a system? How is it
13 being deployed"? Never asked?
14    A.  I remember we had general discussions
15 and -- but the details of those discussions I don't
16 remember.
17    Q.  All right. Well, give me some general
18 parts of those discussions that you remember.
19    A.  I just told you I don't remember.
20    Q.  So, you don't remember anything about
21 what system was in place at Walgreens prior to
22 2008?
23    A.  That would be correct.
24    Q.  You don't even know -- you don't have an

Page 37

1 independent recollection of whether a system was in
2 place prior to 2008?
3    MS. SWIFT: Objection; mischaracterizes the
4 testimony.
5 BY THE WITNESS:
6    A.  Yes, that's correct.
7 BY MR. MOUGEY:
8    Q.  All right. Now, when you write and sit
9 down to put together an algorithm, a -- it's
10 important that you gather information from others,
11 kind of end users, so to speak, so you have all the
12 information you need to put together an accurate
13 model, correct?
14    A.  I would say in general speaking that
15 would be a true statement.
16    Q.  That you and Ms. Morris writing an
17 algorithm in a vacuum without understanding the
18 business side probably wouldn't come up with a very
19 good product, correct?
20    A.  That sounds right.
21    Q.  So, the part -- point of this committee
22 was to help you and Ms. Morris gather information
23 to put together a model that would have the highest
24 likelihood of success, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1   A.   I would say that's correct.
2   Q.   So, do you have an understanding of how
3   long you and Ms. Morris worked on this model to
4   where you had a proof of concept?
5   A.   That was a long time ago.  I -- to ask
6   me exactly how long I worked on it, I couldn't tell
7   you.
8   Q.   And I'm not asking you exactly, like did
9   it take ten days or eight months and three days.
10  Just a general understanding of how long it would
11  take to put together a model that was ultimately a
12  proof of concept at Walgreens.  Was it six months?
13  Was it, you know, a year and a half?  Any general
14  understanding.
15  A.   It was -- it was -- it was less than six
16  months.
17  Q.   Less than six months.
18  A.   To put together the initial.  But the
19  work that everybody else did extended beyond the
20  six months.  So, it depends on how you define the
21  work scope, scope of work.
22  Q.   And the initial scope of work I asked
23  was a proof of concept.  Something that you came
24  up, that was in place, that was a proposal that

Page 39

1   was -- that was tested.
2   A.   It would be less than six months.
3   Q.   Less than six months.
4        And, now, did you walk away after that
5   first six months, seven, eight months, however it
6   took to get a model in place, and then you were
7   never brought back in again?
8   A.   No.
9   Q.   Until 2012?
10  A.   No.
11  Q.   So, you continued your involvement with
12  any tweaks or modifications from the initial
13  committee work in '06 all the way through your
14  tenure at Walgreens?
15  MS. SWIFT:  Object to the form.  You said '06.
16  BY THE WITNESS:
17  A.   2006, no, that's not correct.
18  BY MR. MOUGEY:
19  Q.   Thank you.  Sounds like what Ms. Swift
20  said.
21       So, 2008.  Okay.  So, from 2008.  Okay.
22  Did you stay involved in the suspicious order
23  monitoring model project or committee for several
24  years?

Page 40

1   A.   I got involved as needed.
2   Q.   So, at some points in time after '08 and
3   after the model was put in place, you were brought
4   back in with either questions or concerns or any
5   input, correct?
6   A.   As needed.
7   Q.   Now, will you describe to me in 2008
8   what was your scope of work, as you called it?
9   What were you charged with doing?
10  A.   I was charged to help identify a method
11  for monitoring the orders for size and frequency.
12  Q.   For size and frequency.  Did anyone tell
13  you why?
14  A.   Those were the requirements from the
15  DEA.
16  Q.   Did anyone -- were you given materials
17  or descriptions or any documents to help you
18  determine what -- what you should be looking for
19  for size and frequency?
20  A.   No.
21  Q.   Were any consultants brought in from the
22  outside to help you determine what you should be
23  looking for with size and frequency?
24  A.   Not to my recollection.

Page 41

1   Q.   Are you familiar with a company -- I'm
2   going to probably mispronounce it -- but Tata,
3   T-A-T-A, Consulting?
4   A.   Yes.
5   Q.   Who was Tata Consulting?
6   A.   They're a consulting firm that -- that
7   we hire a lot of consultants from them, mostly
8   programmers.
9   Q.   Mostly for what, sir?  Mostly
10  programmers?
11  A.   Yes.
12  Q.   Okay.  Do you have a recollection of
13  what time period Walgreens hired programmers from
14  Tata?
15  MS. SWIFT:  Object to the form, foundation.
16  BY THE WITNESS:
17  A.   No, I don't have any, hiring practices
18  and staff, no.
19  BY MR. MOUGEY:
20  Q.   I'm not asking you if you were -- about
21  hiring practices.  Okay.
22       What I'm asking is:  Do you have a
23  recollection of when folks from Tata were brought
24  in to Walgreens?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    MS. SWIFT: Objection; foundation.
2    BY THE WITNESS:
3    A.   Walgreens is a big company. Tata is a
4    big company. And what their relationships are is
5    way out of my scope of expertise.
6    BY MR. MOUGEY:
7    Q.   Was anyone from Tata brought in on the
8    project that you worked on, on this committee, to
9    develop an algorithm to -- for suspicious order
10   monitoring for size and frequency?
11   MS. SWIFT: Objection; foundation.
12   BY THE WITNESS:
13   A.   I don't recall.
14   BY MR. MOUGEY:
15   Q.   You don't recall?
16   A.   I don't recall.
17   Q.   Do you have -- broaden that question up.
18       Do you have any recollection from Tata
19   ever coming in to Walgreens to assist in the
20   suspicious order monitoring policies and
21   procedures?
22   MS. SWIFT: Objection; foundation.
23   BY THE WITNESS:
24   A.   I don't recall.

Page 43

1    BY MR. MOUGEY:
2    Q.   So, let's go back to the scope of work.
3        What information did you need and
4    Ms. Morris need to put together the algorithm to
5    monitor orders for size and frequency?
6    A.   We would need order history. Order.
7    Q.   Order history from where?
8    A.   From the -- from the stores.
9    Q.   Okay. How long?
10   A.   We probably asked for a year worth of
11   data.
12   Q.   All right. And what -- what types of
13   information or fields would you ask for within that
14   order history category?
15   A.   We were looking for order size, so the
16   order quantity and the time, when, the date it was
17   placed and the size of the orders for the different
18   drugs.
19   Q.   So, we have order, we have time, we have
20   size. What else would you have needed?
21   A.   That would be the main part of the data
22   that we need and the stores -- obviously, every
23   store has their unique set of data. That would be
24   what I recall.

Page 44

1    Q.   Okay. So, just if I use the word
2    "fields," does that make sense to you in a database
3    or a data pool concept?
4    A.   Yes.
5    Q.   Okay. What's your -- the word "fields"
6    in kind of a database concept do you understand
7    that to mean?
8    MS. SWIFT: Object to the form.
9    BY THE WITNESS:
10   A.   It means an attribute of a record.
11   BY MR. MOUGEY:
12   Q.   Okay. So, what different fields would
13   you have pulled or needed to write the algorithm
14   with Ms. Morris?
15   A.   To test the algorithm, we would need the
16   store, the order size, the date of the order, the
17   item itself, a description of the item.
18   Q.   And help me understand. Do you
19   understand if I use the word "parameter values"?
20   Does that -- is that a --
21   A.   Sure.
22   Q.   -- a term of art that you would use --
23   A.   Yes.
24   Q.   -- in kind of statistical modeling?

Page 45

1    A.   Yes, yes.
2    Q.   All right. So, what do you understand
3    the parameter values means?
4    A.   Can you be more specific?
5    Q.   Just your general definition of what you
6    believe parameter values means.
7    A.   A parameter is something that controls
8    an output of a calculation.
9    Q.   And do you have an understanding of what
10   data you needed to determine the parameter values
11   of the algorithm?
12   MS. SWIFT: Object to the form.
13   BY THE WITNESS:
14   A.   Can you tell me what parameters you're
15   referring to.
16   BY MR. MOUGEY:
17   Q.   You tell me. Whatever parameters you
18   used in the model. I want -- you've worked on this
19   model for years. Help me understand what parameter
20   values you needed to put together this algorithm.
21   A.   The parameter values for which
22   algorithm?
23   Q.   For the algorithm to identify orders of
24   outliers for size.

Page 46

1    MS. SWIFT: Object to the form.
2    A.    One of the parameters would be a
3 statistical, a k-value.
4 BY MR. MOUGEY:
5    Q.    Okay.  And what's your definition of
6 k-value?
7    A.    Based on -- it's how many standard
8 errors that we're going to allow above the mean.
9    Q.    All right.  And who gave you the
10 information to fill in the k-values?
11    A.    The k-values used in production?
12    Q.    Yes, sir.
13    A.    That was done by another group.  I
14 didn't get involved with the production.  I came up
15 with the -- we came up with the model.  We showed
16 how it could be used.  But how it was actually used
17 in operations, I was not involved in that.
18    Q.    Okay.  So, what group came up with the
19 k-values?
20    A.    I don't know.
21    Q.    You don't know.  You have no idea?
22    A.    Initially, no, I don't.
23    Q.    How about just --
24    A.    Eventually there was an integrity group

Page 47

1 that got involved that was formed.
2    Q.    And that was late '12, 2013, correct?
3    A.    I would -- it sounds about right.  I
4 can't say exactly.
5    Q.    So, do you have any understanding of who
6 the individuals were that helped identify what the
7 k-values were?
8    A.    I can't say for certain.
9    Q.    I'll tell you what.  Why don't we put --
10 I'm going to mark as Bancroft 2.
11           (WHEREUPON, a certain document was
12           marked as Walgreens-Bancroft
13           Exhibit No. 2:  6/23/08 Walgreens
14           memo; WAGMDL00624503 - 00624509.)
15 BY MR. MOUGEY:
16    Q.    Do you recognize what's been marked as
17 Bancroft 2 in front of you, Mr. Bancroft?
18    A.    Yes.
19    Q.    And is this a document that you and
20 Ms. Morris drafted?
21    A.    That's correct.
22    Q.    And is this one of the first memos that
23 were generated regarding the algorithm or the
24 modeling that you had been working on?

Page 48

1    A.    Yes.
2    Q.    Was this the very first?
3    A.    Could be.
4    Q.    And did you have a working set of this
5 document that you were making changes to over a
6 period of time?
7    A.    I'm sure we made changes to it as we
8 were writing it, but no.
9    Q.    And you see the date is June 23, 2008,
10 correct?
11    A.    Yes.
12    Q.    And "DEA Suspicious Order Reporting" is
13 under the "Re" line, correct, sir?
14    A.    Yes.
15    Q.    And the deliverable that you were
16 working on was a proposal for defining suspicious
17 orders in the Walgreens distribution system,
18 correct, sir?
19    A.    That's correct.
20    Q.    And that's what you and Ms. Morris were
21 charged with doing was delivering a model to
22 identify suspicious orders, correct, sir?
23    A.    Yes.
24    Q.    And will you take a second and look

Page 49

1 through this document and make sure we've got the
2 whole thing and this looks like the -- an accurate
3 copy of the memo put together for this team.
4    A.    Yes, it looks complete.
5    Q.    Now, the memo has a "To" section.  Do
6 you see at the very top, Steve Bamberg,
7 Ed Choroski?
8    A.    Yes.
9    Q.    Now, is this -- are these individuals
10 the same people that were on the committee?
11    A.    Like I said, I don't remember.  I don't
12 recall all the names.  So, most likely it would
13 have been.  And my boss, Joe Tiemeyer, he was not
14 on the committee but he -- I included him.
15    Q.    Okay.  So, your recollection is these
16 are -- these are folks that may have been on the
17 committee?
18    A.    Yes.
19    Q.    Okay.  And do you have any recollection
20 of how many hours, just kind of ballpark, it took
21 you from one of the first meetings to put together
22 this algorithm?
23    A.    I --
24    MS. SWIFT:  Objection; asked and answered.

Page 50

1 BY THE WITNESS:
2    A.   I'm not good with concepts of time.  I
3 work on something and I get involved in it and time
4 flies and I'm done.  And, no, I don't have really a
5 good concept of time.  Hours.
6 BY MR. MOUGEY:
7    Q.   Help me --
8    A.   And that was back in 2008.
9    Q.   No, sure, I understand.  I guess what
10 I'm trying to get a handle on, is this something
11 that took you, just with all your experience, is
12 this algorithm something that would take you 50,
13 100 hours or is this something that would take
14 several hundred hours to put together?
15    MS. SWIFT:  Object to the form, asked and
16 answered.
17 BY THE WITNESS:
18    A.   I'm not good with concept of time.  So,
19 I couldn't answer that.
20 BY MR. MOUGEY:
21    Q.   Well, there is a lot of people that
22 aren't good with concept of time.  I have a wife
23 that's not real good with concept of time.  I mean,
24 I get that.  But I probably...

Page 51

1       Did this take months for you to put
2 together?  Is this something that you could -- turn
3 to page 2.  You see the algorithm right there,
4 right?
5    A.   Yeah.  The concept --
6    MS. SWIFT:  Object to the form of the
7 question.
8 BY THE WITNESS:
9    A.   The -- come up with a concept, it
10 probably didn't take months, you know.  It took a
11 little time.
12 BY MR. MOUGEY:
13    Q.   Sure.
14    A.   Then to develop and to code, do some
15 testing, pass it by everybody, that involves time.
16 But, you know, putting it all together, how many
17 hours was involved, I couldn't -- I couldn't tell
18 you.
19    Q.   But it certainly didn't take you several
20 months to put together?
21    A.   Oh, no.
22    MS. SWIFT:  Object to the form.
23 BY MR. MOUGEY:
24    Q.   Okay.  And, now, you don't have any

Page 52

1 specific educational background in suspicious order
2 monitoring for controlled substances, right?
3    A.   That's correct.  No formal training, no.
4    Q.   And you don't have any even work
5 experience prior to this project or this committee
6 with suspicious order monitoring for controlled
7 substances, correct?
8    A.   That's correct.
9    Q.   You were brought in to this committee
10 because of your modeling background, right?
11    A.   I would say that's accurate.
12    Q.   And -- I mean, I hope this comes across
13 as a compliment.  But you're brought in as the guy
14 with the Ph.D. to help with the model because
15 you're a smart guy that can take complex problems
16 and create solutions, correct?
17    MS. SWIFT:  Object to the form.
18 BY THE WITNESS:
19    A.   I would say that's correct, but
20 everybody on the team is smart.
21 BY MR. MOUGEY:
22    Q.   Sure, and I recognize.  But smart in
23 different areas, right?
24    A.   We work as a team, yes.

Page 53

1    Q.   Right.  That's a very good political
2 answer.
3       So, the folks that you worked with all
4 had different areas of specialty, right?
5    MS. SWIFT:  Object to the form.
6 BY THE WITNESS:
7    A.   That's right.  They all had their own
8 specialties, yes.
9 BY MR. MOUGEY:
10    Q.   And you're the smart math guy?
11    MS. SWIFT:  Object.
12 BY MR. MOUGEY:
13    Q.   You and Ms. Morris, right?
14    MS. SWIFT:  Object to the form.
15 BY THE WITNESS:
16    A.   We -- we're competent in math.
17 BY MR. MOUGEY:
18    Q.   Yes, sir.  We'll see how -- what you
19 define as competent versus the rest of us.  All
20 right.
21       So, if we -- if we get into page 2, this
22 is -- starts to lay out what your proof of concept
23 is, correct?
24    MS. SWIFT:  Object to the form.

Page 54

1 BY THE WITNESS:
2    A.   I believe that's correct.
3 BY MR. MOUGEY:
4    Q.   So, I'm going to go back to the first
5 page. But the broad tests you have, tolerance
6 limits and order frequency, correct?
7    A.   Yes.
8    Q.   And the tolerance limits has to do with
9 the size, correct?
10   A.   That's correct.
11   Q.   And order frequency has to do with how
12 often orders are entered, correct?
13   A.   That's correct.
14   Q.   And the order frequency was changed a
15 few years down the road to have more of a ceiling,
16 correct?
17   A.   That's correct.
18   Q.   Were you involved in the ceiling?
19   A.   Yes.
20   Q.   So, when you said earlier "I'm brought
21 back in as needed," one of the tweaks along the way
22 was changing order frequency to order ceiling
23 threshold, correct?
24   A.   Yes, we constantly tried to improve our

Page 55

1 system --
2    Q.   So, let's go back to --
3    A.   -- for that concept.
4    Q.   -- to the first page.
5        But as needed, as you said. Okay?
6    A.   Yes.
7    Q.   So, the overview is, "The DEA's
8 requiring Walgreens to monitor the orders, for
9 control substances, that our stores place on our
10 distribution centers for suspicious activity.
11 Suspicious orders are defined in terms of order
12 size and order frequency."
13       Did I read that right?
14   A.   That's correct.
15   Q.   That's kind of the very broad scope of
16 work, correct?
17   A.   That's right.
18   Q.   And this document proposes a methodology
19 for identifying suspicious orders in terms of order
20 size and order frequency. Did I read that right?
21   A.   That's correct that you read it right.
22   Q.   Okay. So, those first few sentences
23 that I just read, are those an accurate kind of job
24 description of what this committee was charged with

Page 56

1 doing?
2    A.   It is with exception that when we say
3 "suspicious," we say order of interest.
4    Q.   An order of interest. But it doesn't
5 say "order of interest" here, right?
6    A.   No, but that's how we used the term.
7    Q.   So, suspicious orders here doesn't
8 really mean suspicious orders?
9    A.   It doesn't mean that there is -- the
10 order is not valid. It means it's an order that
11 was worth looking into.
12   Q.   So, now, this is January 23, 2008. The
13 deliverable includes the word "suspicious order,"
14 right?
15   A.   Yes.
16   MS. SWIFT: Object to the form of the
17 question.
18 BY MR. MOUGEY:
19   Q.   So, under "Deliverable," it's "Proposal
20 for defining 'suspicious orders.'" Correct?
21   A.   Can you repeat that?
22   Q.   The deliverable is "Proposal for
23 defining 'suspicious orders.'" Correct?
24   A.   That's what -- that's what it says.

Page 57

1    Q.   Okay. And this is something you drafted
2 based on your work with this committee, right?
3    A.   That's correct.
4    Q.   And you believe at the time you drafted
5 this memo, you and Ms. Morris drafted the memo, you
6 had been working with this committee for a matter
7 of several months, correct?
8    MS. SWIFT: Object to the form.
9 BY THE WITNESS:
10   A.   I can't say it's months. I don't know.
11 Like I said, I don't have a good sense of -- sense
12 of time.
13 BY MR. MOUGEY:
14   Q.   Yes, sir. But you believe it was
15 beginning of 2008 when you generally started
16 working with this committee, right?
17   MS. SWIFT: Object to the form.
18 BY THE WITNESS:
19   A.   I would say that's correct.
20 BY MR. MOUGEY:
21   Q.   So, you'd agree with me that this memo
22 culminated in at least a few months' worth of work
23 in meeting with these committee members, right?
24   MS. SWIFT: Object to the form.

Page 58

BY THE WITNESS:
    A.    I would say that's correct.
BY MR. MOUGEY:
    Q.    So, the words "suspicious orders," like, for example, in the second sentence, "Suspicious orders are defined in terms of order size and order frequency," was that -- was that something you just misunderstood of what your deliverable was?
    A.    The way I used "suspicious orders" was to identify orders that were worth -- were of interest, out of the norm, and worth looking into.
    Q.    All right.  So, these -- all of these people that this memo is to, those are some pretty sophisticated people, right, in their own right?
    A.    That's correct.
    Q.    I mean, like, for example, Dwayne Piñon, he's counsel, isn't he?
    A.    I believe yes, he is.
    Q.    There is some pretty smart folks here on the "To" line of this memo, right?
    A.    Yes.
    Q.    So, after this memo went out and you used the word "suspicious orders," did anyone correct you and say, "Mr. Bancroft, you

Page 59

misunderstood our first few months of meetings.  That suspicious orders you're using incorrectly"?  Did anybody say that to you?
    A.    I don't recall.
    MS. SWIFT:  Object to the form.
BY MR. MOUGEY:
    Q.    You don't recall that?
    A.    No.
    Q.    So, do you recall that in the documents generated after this initial memo in June of 2008 that you didn't use the word "suspicious orders" anymore, that it was more, I think you said, orders of interest?
    A.    No.
    MS. SWIFT:  Object to the form.
BY MR. MOUGEY:
    Q.    No.  So, actually, you continued to use the word "suspicious orders" for months after this, correct?
    A.    That's correct.
    Q.    And, actually, you continued to use the word "suspicious orders" in the context of this deliverable for years afterwards, correct?
    MS. SWIFT:  Object to the form.

Page 60

BY THE WITNESS:
    A.    I think --
    MS. SWIFT:  Foundation.
BY THE WITNESS:
    A.    I think that's correct.
BY MR. MOUGEY:
    Q.    Yes, sir.  I mean, 2008, 2009, 2010, 2011, 2012, no one ever said, "Mr. Bancroft, you didn't understand our deliverable that the algorithm was designed to detect suspicious orders"?  Anybody ever say that to you?
    MS. SWIFT:  Object to the form.
BY THE WITNESS:
    A.    In the -- we -- as a supplement of this algorithm?
BY MR. MOUGEY:
    Q.    Yes, sir.
    A.    We had a -- they would -- this was used so that we would not generate orders of suspicion.  So, I think the answer to your question is nobody corrected my language.
    Q.    Okay.  Thank you.  Let's keep going on this June 23, 2008 memo.  It's Bancroft 2.
          And the next sentence says, "First the

Page 61

reasoning behind the method is described.  Followed by the steps needed to perform the analysis."
          And, so, this memo was a culmination of committee work that was a proposal for identifying suspicious orders, correct?
    MS. SWIFT:  Object to the form.
BY THE WITNESS:
    A.    I think that's correct.
BY MR. MOUGEY:
    Q.    Let me -- maybe even just another big, broad kind of question.
          So, the algorithm was designed to flag orders, correct, sir?
    MS. SWIFT:  Object to the form.
BY THE WITNESS:
    A.    Yes.
BY MR. MOUGEY:
    Q.    And those orders that were flagged are what you are referring to in Bancroft 2 in June of 2008 as suspicious, correct, sir?
    MS. SWIFT:  Object to the form.
BY THE WITNESS:
    A.    Yes.
BY MR. MOUGEY:

Page 62

1    Q.   All right.  Now, the next two paragraphs
2  is where you identify the order size and the order
3  frequency, correct, sir?
4    A.   Yes.
5    Q.   And the last paragraph on this page, "In
6  either case, if the order quantity does not exceed
7  the SIMS suggested order quantity."
8        And I swear Walgreens is worse than the
9  military with the acronyms.  So, help me out here.
10  SIMS, S-I-M-S, is?
11   A.   That's our replenishment system.
12   Q.   Okay.  And when you say "replenishment,"
13  would the words "inventory management" be okay?
14   A.   Yes.  In this case, the word SIMS was
15  referring to our replenishment logic.  SIMS is a
16  bigger system.  So, that's a small component of it.
17   Q.   All right.  So, to read that sentence
18  again.
19       "In either case, if the order quantity
20  does not exceed the SIMS," and that was the
21  replenishment system, "suggested order quantity,
22  then the order should no longer be considered
23  suspicious."
24       Correct?

Page 63

1    A.   That's what I wrote at the time.
2    Q.   Yes, sir.  And "If the order is
3  identified as suspicious, a detailed report should
4  be created to aid the analysis that has to make a
5  quick decision to allow or stop the order."
6        Correct?
7    A.   That was what I wrote.
8    Q.   And your understanding at this point in
9  time based on these meetings with the folks in the
10  "To" line up here was that if an order was flagged
11  as suspicious, there had to be a detailed report
12  created to aid the analysis of whether or not the
13  order could be shipped, correct?
14       MS. SWIFT:  Objection; foundation.
15  BY THE WITNESS:
16   A.   I'm -- I'm not sure I understood the
17  question.  Could you repeat it.
18  BY MR. MOUGEY:
19   Q.   You understand based on your meetings
20  with this group by June of 2008 that before an
21  order that's flagged by the algorithm could be
22  shipped, that there had to be some analysis on that
23  order, correct?
24       MS. SWIFT:  Object to the form, foundation.

Page 64

1  BY THE WITNESS:
2    A.   I'm not sure that's correct.
3  BY MR. MOUGEY:
4    Q.   Well, let's look at this exact language
5  of your statement.
6    A.   That's what I -- that's what I said.
7    Q.   There you go.  That's what I -- I'm
8  asking about your understanding, based on the
9  committee meetings in June of 2008, you understood
10  that an order flagged by the algorithm, A, was
11  suspicious, correct?
12       MS. SWIFT:  Object to the form.
13  BY THE WITNESS:
14   A.   No.  It identified as what I was
15  referring to as suspicious as an order of interest.
16  BY MR. MOUGEY:
17   Q.   Yes, sir.  And I understand that's your
18  testimony of what it is now.  I'm saying at the
19  time you drafted this memo.  Let's just make sure.
20  I want to have this snapshot in time of June 2008.
21       As of June 2008 based on your meetings,
22  committee meetings, up until this point, you
23  understood that an order flagged by the model you
24  and Ms. Morris were creating was suspicious,

Page 65

1  correct?
2        MS. SWIFT:  Object to the form.
3  BY THE WITNESS:
4    A.   At the time of this memorandum we were
5  making a proposal.
6  BY MR. MOUGEY:
7    Q.   Yes, sir.
8    A.   And this was a proposal.
9    Q.   And I understand.  And that's what I'm
10  asking about.  This proposal, June of 2008, your
11  understanding when drafting this order was that an
12  order flagged -- I'm sorry.  Let me do that
13  question again.
14       Your understanding in June of 2008, when
15  you drafted this memo, was that an order flagged by
16  your algorithm was identified, it was considered
17  suspicious, correct?
18       MS. SWIFT:  Object to the form.
19  BY THE WITNESS:
20   A.   The definition of suspicious that we
21  used in this -- this memorandum was an order of
22  interest.
23  BY MR. MOUGEY:
24   Q.   Yes, sir.  I understand that's what

Page 66

1  you're saying.  But I don't see the words -- I
2  mean, take your time and look through this.
3      A.   No.
4      Q.   I don't see the words "order of
5  interest" -- 1, 2, 3, 4, 5, 6 -- six pages.  I
6  don't see the word "order of interest" in here.
7      A.   No, you won't see the word "order of
8  interest."  What I'm trying to convey is the fact
9  that when I used the term "suspicious," I meant an
10 order of interest.  I -- if I miswrote, that could
11 be true.  But what I -- the intent was order of
12 interest.
13     Q.   What I'm asking is what you said in this
14 memo.  What you say in this memo is that an order
15 flagged by your algorithm is suspicious.  Does your
16 memo say that?
17     MS. SWIFT:  Object to the form.
18 BY THE WITNESS:
19     A.   What I intended, what I -- when I wrote
20 those words, I wrote those words with the
21 suspicious as -- as order of interest.
22 BY MR. MOUGEY:
23     Q.   Yes, sir.
24     A.   That's the definition that I had in

Page 67

1  mind.
2      Q.   I understand.  That's not what it says
3  in this memo.  So, what I'm asking you is based on
4  what you say in this memo.
5          So, is what you say in this memo is that
6  an order flagged by your algorithm, that order is
7  suspicious, that's what it says in this memo,
8  correct, sir?
9      MS. SWIFT:  Object to the form.
10 BY MR. MOUGEY:
11     Q.   That's the language you used here,
12 right?
13     MS. SWIFT:  Objection.
14 BY THE WITNESS:
15     A.   That's the language.
16 BY MR. MOUGEY:
17     Q.   Yes, sir.  Now, the language in your
18 memo in June of 2008, based on input from this
19 committee, is once that order is flagged as
20 suspicious, that there had to be analysis on that
21 order before it was shipped.  That's what you say
22 in your memo, right?
23     A.   That was --
24     MS. SWIFT:  Object to the form.

Page 68

1  BY THE WITNESS:
2      A.   That was the proposal.
3  BY MR. MOUGEY:
4      Q.   Yes, sir.  And that's what you say in
5  your memo, correct, sir?
6      MS. SWIFT:  Object to the form.
7  BY THE WITNESS:
8      A.   That's what I propose in the memo, yes.
9  BY MR. MOUGEY:
10     Q.   Yes, sir.  I want to make sure we have a
11 clear record.
12         The language in your memo is that once
13 an order is flagged as suspicious, there had to be
14 analysis on that order before it shipped.  That's
15 the language in the memo, correct, sir?
16     A.   That's --
17     MS. SWIFT:  Object to the form;
18 mischaracterizes the document.
19 BY THE WITNESS:
20     A.   That's what I was proposing in the
21 document.
22 BY MR. MOUGEY:
23     Q.   Yes, sir.  When you say that's what you
24 were proposing in the document, the language in the

Page 69

1  document, based on your committee meetings, was
2  once an order is flagged by the algorithm, it's
3  considered suspicious and analysis had to be
4  performed before it was shipped, correct, sir?
5      A.   That was my --
6      MS. SWIFT:  Objection; asked and answered
7  several times.
8  BY THE WITNESS:
9      A.   That was my proposal to the committee.
10 BY MR. MOUGEY:
11     Q.   So, the answer is yes, that's what's in
12 the memorandum, correct?
13     MS. SWIFT:  Same objection.
14 BY MR. MOUGEY:
15     Q.   Just a yes or no would be -- would be
16 plenty sufficient.
17     MS. SWIFT:  Same objection.
18 BY THE WITNESS:
19     A.   I --
20 BY MR. MOUGEY:
21     Q.   I know it's hard to answer and you keep
22 looking at Ms. Swift, and I know just try to tune
23 it out and --
24     A.   No, I just wanted -- I didn't want to

Page 70

1 interrupt her.
2 　　MS. SWIFT: Object to the argument.
3 BY MR. MOUGEY:
4 　　Q. I'm sorry. I couldn't hear what you
5 said over Ms. Swift.
6 　　A. I wanted to wait until she was finished.
7 That's why I was looking at her.
8 　　Q. We're both trying to. It's hard.
9 　　So --
10 　　MS. SWIFT: Object to the argument. Is there
11 a question?
12 BY THE WITNESS:
13 　　A. I don't know the question.
14 　　MS. SWIFT: Is there a question?
15 BY THE WITNESS:
16 　　A. The question is lost. You have to
17 repeat it.
18 BY MR. MOUGEY:
19 　　Q. It's hard when you're trying to get the
20 back-and-forth. So, let's do it again. Okay?
21 　　Your memo explains to this committee
22 that when an order is flagged, it's considered
23 suspicious? Yes or no.
24 　　MS. SWIFT: Objection; asked and answered a

Page 71

1 dozen times. Mischaracterizes the document.
2 BY THE WITNESS:
3 　　A. I -- the -- what I was proposing to the
4 committee was of what method for identifying a
5 potentially suspicious orders, and I was suggesting
6 that we do, we -- an analysis or report on that
7 item, that order, be put together for further
8 investigation.
9 BY MR. MOUGEY:
10 　　Q. And I appreciate that explanation. I
11 think my question is capable of just a clear yes or
12 no answer. And so what I would appreciate is if
13 you would give me a yes or a no and if you want to
14 explain, explain, but I would like a yes or no.
15 　　Sir, your memorandum explains to this
16 committee that an order that's flagged by your
17 algorithm was considered suspicious? Yes or no.
18 　　A. I --
19 　　MS. SWIFT: Objection. If it's not a yes or
20 no answer, you can answer it the way it requires to
21 be answered. It's been asked more than a dozen
22 times. You can answer again.
23 BY THE WITNESS:
24 　　A. I -- I would say you're

Page 72

1 mischaracterizing the statement, and the answer --
2 BY MR. MOUGEY:
3 　　Q. Sounds like what Ms. Swift just said.
4 　　A. And the answer is no.
5 　　Q. Well, let's go through the exact
6 language again. Okay?
7 　　A. Okay.
8 　　Q. Second sentence, the sentence that
9 begins with "If," the second sentence.
10 　　Do you see that?
11 　　A. Second paragraph?
12 　　Q. Yes, sir.
13 　　A. It begins with "To." What document?
14 　　Q. Let's focus on the whole second
15 paragraph. You ready? To make it easy. Begins
16 with "To." You ready?
17 　　A. Okay. Oh, okay.
18 　　Q. "To monitor the orders size." Do you
19 see that?
20 　　A. Yes.
21 　　Q. "To monitor the orders size, tolerance
22 limits will be established for each store/item
23 combination."
24 　　Do you see that, sir?

Page 73

1 　　A. That's correct.
2 　　Q. So, the tolerance limits were part of
3 the algorithm, correct?
4 　　A. Yes.
5 　　Q. And if an order is placed on the DC, and
6 that's distribution center, right?
7 　　A. Yes.
8 　　Q. That exceeds its tolerance limit, the
9 order is flagged as suspicious, correct? That's
10 what you told this committee in 2008, correct?
11 　　A. That's what the words say.
12 　　Q. Yes, sir. That's what the words say.
13 　　Now, if you would go down to the fourth
14 paragraph, second sentence of the fourth paragraph
15 that begins with "If."
16 　　"If the order is identified as
17 suspicious, a detailed report should be created to
18 aid the analysis that has to make a quick decision
19 to allow or stop the order."
20 　　Correct, sir?
21 　　A. That would be because there is two types
22 of errors you can make in identifying an item as
23 suspicious. You can identify an item as suspicious
24 that's not or you can -- or you could, you know, or

Page 74

1  it could be true.
2      So, there is more than one error when
3  you identify, you draw a line, you have the
4  tolerance limit, if you could be on one side of the
5  limit and you could be suspicious and you could be
6  on the other side of the limit and not be
7  suspicious or vice versa.
8      Q.   None of the explanation you gave is in
9  that -- in that paragraph discussing that an
10  analysis has to be done on a suspicious order
11  before it's shipped, correct?
12      A.   Could you repeat that.
13      Q.   Step 1, flagged on your algorithm,
14  suspicious, right?
15      MS. SWIFT:  Object to the form.
16  BY THE WITNESS:
17      A.   Suspicious as I was defining at the
18  time, yes.
19  BY MR. MOUGEY:
20      Q.   Yes, sir.  Step 2, analysis has to be
21  made before it's shipped.  Plain language of the
22  document.  That's what you're referring to in
23  June of 2008, correct?
24      A.   That's what I --

Page 75

1      MS. SWIFT:  Object to the form.
2  BY THE WITNESS:
3      A.   That's what I proposed.
4  BY MR. MOUGEY:
5      Q.   Yes, sir.
6      MS. SWIFT:  I'm just going to note it's 10:10.
7  Do you need to stop for a break?
8      THE WITNESS:  Yeah, I probably should.
9      MS. SWIFT:  He's got medication he needs to
10  take.
11      Can we go off the record, please.
12      THE VIDEOGRAPHER:  We are off the record at
13  10:12 a.m.
14      (WHEREUPON, a recess was had
15       from 10:12 to 10:26 a.m.)
16      THE VIDEOGRAPHER:  We are back on the record
17  at 10:26 a.m.
18  BY MR. MOUGEY:
19      Q.   Mr. Bancroft, was the algorithm that you
20  and Ms. Morris were working on, that was ultimately
21  a finished product, correct, sir?
22      MS. SWIFT:  Object to the form.
23  BY THE WITNESS:
24      A.   The -- it was implemented, yes.

Page 76

1  BY MR. MOUGEY:
2      Q.   Yes, sir.  And do you have a
3  recollection of when it was implemented?
4      A.   No.
5      Q.   Generally do you have an understanding
6  of when the proof of concept was implemented?
7      MS. SWIFT:  Object to the form.
8  BY THE WITNESS:
9      A.   This was -- the proposal -- this was a
10  proposal.  I don't know what you mean by proof of
11  concept.
12  BY MR. MOUGEY:
13      Q.   When was the algorithm you and
14  Ms. Morris worked on with the committee implemented
15  in any shape, form or fashion?
16      A.   I don't know.  I don't know how long it
17  took to program.  I don't know.
18      Q.   I'm sorry, sir?
19      A.   I don't know is my answer.
20      Q.   And you said you don't know how long it
21  took to program?
22      A.   It had to have been programmed.
23      Q.   And, sir, you have an understanding that
24  the algorithm you used was implemented to detect or

Page 77

1  flag orders, right?
2      MS. SWIFT:  Objection to form.
3  BY THE WITNESS:
4      A.   It was used to identify orders.
5  BY MR. MOUGEY:
6      Q.   Yes, sir.  And the mechanism for
7  identifying orders, you understand that there was a
8  report generated?
9      MS. SWIFT:  Objection to form.
10  BY THE WITNESS:
11      A.   I did not get involved with the report
12  generated.
13  BY MR. MOUGEY:
14      Q.   Did you understand that there was -- how
15  did you think that the orders were identified that
16  were flagged as a result of your algorithm?
17      MS. SWIFT:  Object to the form.
18  BY THE WITNESS:
19      A.   That -- that was done by other people.
20  I don't have knowledge.
21  BY MR. MOUGEY:
22      Q.   You don't -- I'm not asking who it was
23  done by.  I'm saying how were the orders
24  identified.  You have no idea?

Page 78

1    A.   Well, they were identified by the
2  tolerance and the frequency.
3    Q.   And then those orders would be
4  communicated to other people at Walgreens.  Is that
5  fair?
6    A.   I believe that's correct.
7    Q.   Okay.  And are you aware -- well, let me
8  just hand you -- do you believe that the language
9  we just went through in Bancroft 2, meaning if an
10 order exceeds the tolerance limit, that order is
11 flagged as suspicious, was your language in the
12 June '08 proposal corrected or fixed shortly after
13 this memo?
14   A.   I don't have any knowledge.  What -- I
15 think everybody understood what the spirit of
16 the -- the language was.
17   Q.   Everybody understood that suspicious
18 really didn't mean suspicious?
19   A.   The -- the system was designed to
20 prevent orders that might be suspicious from even
21 being placed on the DC.
22   Q.   But you don't see that language anywhere
23 in your June of '08 memorandum, correct?
24   A.   No, we already came to that.

Page 79

1    Q.   Well, let me hand you what I will mark
2  as Bancroft 3.
3           (WHEREUPON, a certain document was
4           marked as Walgreens-Bancroft
5           Exhibit No. 3:  Document, 8/5/09,
6           Order Item Detail; WAGMDL00674553.)
7  BY MR. MOUGEY:
8    Q.   I want you, sir, to look at the bottom
9  of this document.  On the left-hand side it says
10 "Suspicious Reason Code:"  Do you see that?
11   A.   I see it.
12   Q.   And it says, "T - Exceeds Tolerance
13 Limits."  Correct, sir?
14   A.   That's what it says.
15   Q.   And the date of this document in the
16 upper right-hand corner is August 25, 2009,
17 correct, sir?
18   A.   That's what it says.
19   Q.   And, sir, have you seen a document
20 similar to this before?
21   A.   No.
22   Q.   And, sir, do you have an understanding
23 of whether or not this document is -- was generated
24 as a result of an order being flagged by your

Page 80

1  algorithm?
2    A.   I would only be speculating.
3    Q.   Do you know of any other parallel system
4  being run at Walgreens detecting orders flagged for
5  tolerance limits?
6    A.   No, I would suspect that this is based
7  on my algorithm, but I'm not familiar with the
8  screen.
9    Q.   Because that's what your algorithm, one
10 of the thresholds was the exceeding the tolerance
11 limit, correct?
12   A.   Yes.
13   Q.   That's language out of your model,
14 correct?
15   A.   I would think that's correct.
16   Q.   Yes, sir.  And you see here in the
17 bottom left-hand side of Bancroft 3 as of August 25
18 of 2009 that Walgreens considers this order flagged
19 by the -- by your algorithm as suspicious, correct?
20   A.   I --
21   MS. SWIFT:  Object to the form.
22 BY THE WITNESS:
23   A.   I just can go by what it says on the
24 memo.

Page 81

1  BY MR. MOUGEY:
2    Q.   Yes, sir.
3    A.   Or on the screen.
4    Q.   Yes, sir.  And it uses the word
5  "suspicious" in the bottom left-hand corner,
6  correct?
7    A.   Yes, it does.
8    Q.   And the upper right-hand corner also
9  uses the language "Suspicious Order," correct?
10   A.   Yes.
11   Q.   So, this is approximately 14 months
12 after your proposal to the committee for the
13 algorithm, correct?
14   A.   That seems right, yes.
15   Q.   And based on your recollection, sir, was
16 your model implemented within a year after the
17 June of '08 proposal?
18   MS. SWIFT:  Objection; foundation.
19 BY THE WITNESS:
20   A.   That would -- I don't know exactly when
21 it was implemented.
22 BY MR. MOUGEY:
23   Q.   I didn't ask you exactly on June 23 of
24 2009.  What I said, within a year, is it your

Page 82

1 understanding that your model was -- your algorithm
2 was implemented at Walgreens?
3    A.   I --
4    MS. SWIFT:  Objection; foundation.
5 BY THE WITNESS:
6    A.   I was tasked with coming up with the
7 algorithm.  I wasn't tasked with delivering it.
8 BY MR. MOUGEY:
9    Q.   And I understand that, and I didn't ask
10 you if you were tasked with implementing.  I didn't
11 ask if you were tasked with programming.  I didn't
12 ask if you were responsible for doing any of the
13 analysis on the due diligence.
14       What I simply asked is:  Do you have an
15 understanding of generally, within the year, was
16 your algorithm to detect suspicious orders as you
17 elaborated in June of '08 implemented at Walgreens?
18    MS. SWIFT:  Objection; foundation, asked and
19 answered.
20 BY THE WITNESS:
21    A.   I would say that yes.
22 BY MR. MOUGEY:
23    Q.   Okay.  I hand you what I have marked as
24 Bancroft 4, sir.

Page 83

1       (WHEREUPON, a certain document was
2       marked as Walgreens-Bancroft
3       Exhibit No. 4:  Document, 9/23/09
4       Threshold Violations-Monthly;
5       WAGMDL00674619.)
6 BY MR. MOUGEY:
7    Q.   The very top of this document,
8 "Threshold Violation-Monthly."
9       Do you see that, sir?
10    A.   Yes.
11    Q.   That's language from your algorithm,
12 correct, sir?
13    A.   "Threshold Violation-Monthly"?
14 Threshold was -- sounds like it came from my...
15    Q.   Yes, sir.  And if you look in the middle
16 of this page, you see the OxyContin identified in
17 three separate orders.  Do you see that, sir?
18    A.   Yes, I do.
19    Q.   And you see in the -- after the
20 OxyContin, with the tab and the strength, you see
21 "PUR," correct, sir?
22    A.   Yes.
23    Q.   And do you have an understanding that
24 would be Purdue?

Page 84

1    A.   I'm not familiar with that.
2    Q.   Upper right-hand corner, sir, with this
3 list of orders, you see the title "Suspicious
4 Order" as of September 23, 2009, correct, sir?
5    A.   That's correct.
6    Q.   I hand you what I will mark as Bancroft
7 5.
8       (WHEREUPON, a certain document was
9       marked as Walgreens-Bancroft
10       Exhibit No. 5:  Document, 9/23/09,
11       Threshold Violations-Monthly;
12       WAGMDL00674620.)
13 BY MR. MOUGEY:
14    Q.   This is another example of OxyContin,
15 amongst other controlled substances, being
16 identified in a report titled "Suspicious Order,"
17 correct, sir?
18    MS. SWIFT:  Object to the form.
19 BY THE WITNESS:
20    A.   This is a report that I haven't created,
21 but that's what it looks like.
22 BY MR. MOUGEY:
23    Q.   Hand you what we're going to mark as
24 Bancroft 6.

Page 85

1       (WHEREUPON, a certain document was
2       marked as Walgreens-Bancroft
3       Exhibit No. 6:  Various Documents,
4       first document, 2/17/10, Threshold
5       Violations-Weekly; WAGMDL00674576 -
6       00674594.)
7 BY MR. MOUGEY:
8    Q.   Do you see the upper right-hand side,
9 the date is February 17, 2010?
10    A.   Yes.
11    Q.   So, your memo was June of 2008, correct,
12 sir?
13    A.   Yes.
14    Q.   And you'll see again that the
15 "suspicious order" was still being used on internal
16 reports at Walgreens, correct?
17    A.   That's what it looks like.
18    Q.   And you see below, sir, you understand
19 that the first entry on this list, hydrocodone, is
20 a controlled substance, an opiate, correct, sir?
21    A.   Yes, I think that's correct.
22    Q.   And you'll see here a list of controlled
23 substances that were being monitored from your
24 algorithm, correct, sir?

Page 86

1    MS. SWIFT: Object to the form, foundation.
2    BY THE WITNESS:
3        A.   I would assume so.
4    BY MR. MOUGEY:
5        Q.   And February 17, 2010, orders that were
6    flagged by your system appeared to still be
7    referred to as suspicious, correct, sir?
8        MS. SWIFT: Object to the form, foundation.
9    BY THE WITNESS:
10       A.   I -- I didn't write this. So, I don't
11   know.
12   BY MR. MOUGEY:
13       Q.   I hand you what I'm going to mark as
14   Bancroft 7.
15           (WHEREUPON, a certain document was
16           marked as Walgreens-Bancroft
17           Exhibit No. 7: Various document,
18           first page, 8/18/10 Order Item
19           Detail; WAGMDL00674562 - 00574575.)
20   BY MR. MOUGEY:
21       Q.   Upper right-hand corner, the date is
22   8/18/10. Do you see that, sir?
23       A.   Yes, I do.
24       Q.   And do you see in the middle of the

Page 87

1    page, hydromorphone.
2            Do you see that?
3        A.   Yes.
4        Q.   And, sir, you have an understanding that
5    hydromorphone is also an opiate controlled
6    substance, correct?
7        MS. SWIFT: Objection.
8    BY THE WITNESS:
9        A.   I never heard of that specific drug, but
10   it sounds like it is.
11   BY MR. MOUGEY:
12       Q.   And you see in the upper right-hand
13   corner that this order is identified as suspicious,
14   correct?
15       A.   Yes. No, no, I wouldn't say. It says
16   "Suspicious Orders," yes, that's what it says.
17       Q.   So, sir, this is almost two years after
18   your memo that internal documents at Walgreens are
19   referring to orders flagged by the model as
20   suspicious, correct, sir?
21       MS. SWIFT: Objection; foundation.
22   BY THE WITNESS:
23       A.   That's what it says on the report.
24   BY MR. MOUGEY:

Page 88

1        Q.   Sir, based on the work you did on the
2    committee, you understand that suspicious orders
3    are required to be reported to the DEA, correct?
4        MS. SWIFT: Objection; calls for a legal
5    conclusion, foundation.
6    BY THE WITNESS:
7        A.   I don't know that these were ever orders
8    that got through. I wouldn't know that.
9    BY MR. MOUGEY:
10       Q.   I didn't ask you if those were orders.
11   I'm not asking about any specific orders. What I'm
12   asking you, sir, is you understand what an order
13   is, right?
14       A.   Yes.
15       Q.   A pharmacist places an order to the
16   system at Walgreens, correct?
17       A.   The pharmacist, the system -- there is a
18   lot of ways orders are created. Pharmacists
19   placing an order is one avenue. The system could
20   place an order.
21       Q.   And when you say "The system could place
22   an order," it could be a standing order, correct?
23       MS. SWIFT: Object to the form.
24   BY THE WITNESS:

Page 89

1        A.   Define standing, please.
2    BY MR. MOUGEY:
3        Q.   An order comes in from the pharmacy to
4    the Walgreens system, correct?
5        A.   The pharmacy is part of the Walgreens
6    system.
7        Q.   Yes, sir. But they're two separate
8    stand-alone operations typically, correct,
9    buildings, brick and mortar, two separate places,
10   right?
11       A.   Yes.
12       Q.   This is simple. All right?
13       A.   Yes.
14       Q.   All I'm asking --
15       A.   Yes.
16       Q.   -- sir, is --
17       A.   Yes.
18       Q.   There are orders that come in to keep
19   pharmaceuticals in the pharmacies, correct?
20       A.   We want to keep our -- the business
21   going, yes.
22       Q.   Yes, sir. And you understand that
23   opiates, under the Controlled Substance Act, if the
24   orders are suspicious, those should be reported to

Page 90

1  the DEA, correct?
2      MS. SWIFT: Objection; foundation, calls for a
3  legal conclusion.
4  BY THE WITNESS:
5      A.  I'm not a lawyer.  So -- so, I don't
6  know if I can answer that.
7  BY MR. MOUGEY:
8      Q.  But you were on the committee, right?
9  You were on the committee for months and months and
10 months, correct?
11     A.  That's correct.
12     Q.  And you have to have an understanding in
13 order to generate the algorithm of what your goals
14 were, correct?
15     A.  That's --
16     MS. SWIFT: Object to the form.
17 BY THE WITNESS:
18     A.  Yes.
19 BY MR. MOUGEY:
20     Q.  And you understand when I say what your
21 charge was on that committee, right?
22     A.  Yes.
23     Q.  And you have to gather information to
24 implement the charge on that committee, right?

Page 91

1      A.  I would say that's correct.
2      Q.  And you have to have an understanding
3  generally about what the information surrounding
4  your charge is, correct?
5      MS. SWIFT: Object to the form.
6  BY THE WITNESS:
7      A.  I'd say that's correct.
8  BY MR. MOUGEY:
9      Q.  And, sir, you understood as part of your
10 information-gathering process that one of the goals
11 of your algorithm was to prevent suspicious orders,
12 correct?
13     MS. SWIFT: Object to the form.
14 BY THE WITNESS:
15     A.  Yes.
16 BY MR. MOUGEY:
17     Q.  And it was -- one of the goals was to
18 detect suspicious orders, correct?
19     MS. SWIFT: Object to the form.
20 BY THE WITNESS:
21     A.  Define order.  I mean, is an order if it
22 gets placed?  If it doesn't get placed, is it an
23 order?
24 BY MR. MOUGEY:

Page 92

1      Q.  There are orders that are suspicious
2  that need to be sent to the DEA, correct, sir?
3      MS. SWIFT: Object to the form, calls for a
4  legal conclusion, foundation.
5  BY THE WITNESS:
6      A.  Define what you're referring to as an
7  order.  I don't know how to answer that question.
8  BY MR. MOUGEY:
9      Q.  Do you have any general understanding
10 that an order flagged as suspicious needs to be
11 reported to the DEA?
12     MS. SWIFT: Objection; foundation, calls for a
13 legal conclusion.
14 BY THE WITNESS:
15     A.  I -- I would be assuming.  But I --
16 BY MR. MOUGEY:
17     Q.  I don't want you to assume.
18         You sat on a committee, sir, for years
19 that worked on designing a system to identify
20 suspicious orders.  As part of your committee work,
21 do you have an understanding that an order flagged
22 as suspicious needs to be reported to the DEA?
23     A.  I never --
24     MS. SWIFT: Object to the form of the

Page 93

1  question, calls for a legal conclusion, foundation.
2  BY THE WITNESS:
3      A.  I never worked on the legal aspects of
4  it.  So, I can't say for certainty.
5  BY MR. MOUGEY:
6      Q.  I didn't ask you whether you were a
7  lawyer.  You've given me, "I'm not a lawyer.  I
8  didn't work on the legal aspects."
9          I'm asking Mr. Wayne Bancroft, Ph.D.,
10 eight years of graduate work, undergrad in
11 chemistry, charged with designing a system to
12 detect suspicious orders.
13         As part of that committee do you have an
14 understanding that orders flagged as suspicious
15 need to be reported to the DEA?
16     MS. SWIFT: Object to the form of the
17 question, foundation, calls for a legal conclusion.
18 BY THE WITNESS:
19     A.  I would say no.  From a legal aspect, I
20 can't give you a yes answer.
21 BY MR. MOUGEY:
22     Q.  I'm not asking for a legal aspect.
23     A.  Then the --
24     Q.  I understand that's what your lawyer --

Page 94

1   A.   Then the answer is no, then.

2   Q.   I've asked -- I'm asking from what your

3 understanding was, not as a lawyer, not as a legal

4 aspect, not if you were asked to work on the legal

5 side of it.  I haven't asked you anything.

6       I'm asking Mr. Wayne Bancroft, eight

7 years of graduate work, four years of undergrad,

8 charged with designing an algorithm.

9       Did you have an understanding that

10 orders identified as suspicious needed to be

11 reported to the DEA?

12   MS. SWIFT:  Object to the form of the

13 question, calls for a legal conclusion, foundation,

14 asked and answered.  And I will also object to the

15 abusive nature of the questioning.

16 BY THE WITNESS:

17   A.   The -- we had groups that were in charge

18 of monitoring and we formed an integrity group.

19 Those were -- those were the people that you should

20 ask that question to.  That was not my charter.

21 BY MR. MOUGEY:

22   Q.   I appreciate.  But today you're sitting

23 in the chair and I get to ask you questions and I'm

24 asking what your understanding was sitting on that

Page 95

1 committee.  Okay.

2       And you generated a memo in June of 2008

3 addressed to several important folks at Walgreens,

4 correct, sir?

5   MS. SWIFT:  Object to the form of the

6 question.

7 BY THE WITNESS:

8   A.   Yes.

9 BY MR. MOUGEY:

10   Q.   And when you drafted that memo, did you

11 have an understanding that orders identified as

12 suspicious for controlled substances had to be

13 reported to the DEA?

14   MS. SWIFT:  Object to the form of the

15 question, foundation, calls for a legal conclusion,

16 asked and answered, and I'll object to the abusive

17 nature of the questioning.

18 BY THE WITNESS:

19   A.   My answers from previous stand.

20 BY MR. MOUGEY:

21   Q.   I'm sorry.  I get to get an answer to my

22 question.  I'd like an answer to my question.

23   MR. MOUGEY:  You have a standing objection on

24 this line of questions for the 18 different

Page 96

1 objections you had.

2 BY MR. MOUGEY:

3   Q.   What I'm asking you, sir, not as a

4 lawyer, not did you implement from the legal

5 component.

6       Sitting on this committee, when you

7 drafted this memorandum, did you have an

8 understanding that orders identified as suspicious

9 had to be reported to the DEA?

10   MS. SWIFT:  Object to the form of the

11 question, calls for a legal --

12   MR. MOUGEY:  I already agreed you have a

13 standing.

14   MS. SWIFT:  Calls for -- I didn't agree to

15 that, Peter.

16 BY MR. MOUGEY:

17   Q.   Answer my question, sir.

18   MS. SWIFT:  It calls for a legal conclusion.

19 He lacks foundation.  You've asked it multiple

20 times and the questioning has become abusive.

21 BY MR. MOUGEY:

22   Q.   Please answer my question.

23   A.   When my -- what my understanding was in

24 2008 I don't recall.

Page 97

1   Q.   I hand you what I've marked as Bancroft

2 8.

3       (WHEREUPON, a certain document was

4       marked as Walgreens-Bancroft

5       Exhibit No. 8:  3/27/09 e-mail

6       string with attachments;

7       WAGMDL00325368 - 00325378.)

8 BY MR. MOUGEY:

9   Q.   March 27, 2009.  Do you see that, sir?

10   A.   Yes.

11   Q.   And do you see your name as a copy on

12 this e-mail, sir?

13   A.   Yes, I do.

14   Q.   And do you see under the subject line,

15 "Revised Suspicious Order Document," correct?

16   A.   Yes.  That's correct.

17   Q.   If you'd turn to the second page, and

18 just flip through the next few pages.

19       Do you have an understanding of who

20 drafted this document?

21   A.   Tracy Morris.

22   Q.   And that was your kind of equal on that

23 committee charged with designing an algorithm to

24 identify suspicious orders, right?

Page 98

1    MS. SWIFT: Object to the form.
2  BY THE WITNESS:
3    A.  She was my equal on the committee, yes.
4  BY MR. MOUGEY:
5    Q.  And, sir, if you would -- now, did you
6  read -- do you recall reading this memo before it
7  went out?
8    A.  I -- I've seen this memorandum, yes.
9    Q.  Okay.  But that was a little different
10 than what I asked.  What I asked was have you -- do
11 you recall seeing it before it went out?
12   A.  What I recall on this -- this -- in
13 committee, there was different scenarios that
14 were -- were different conditions and the group got
15 together and decided what should be considered to
16 be flagged and what shouldn't be flagged.
17   Q.  Okay.
18   A.  And it was done in committee.
19   Q.  What I asked you was a little different.
20 What I asked you was do you recall reviewing this
21 memo before it was sent out?
22   A.  I remember -- I recall going through
23 these spreadsheets.
24   Q.  Do you recall you and Ms. Morris working

Page 99

1  on this memorandum together before it was sent to
2  your peers on the committee?
3    A.  I know this is something that Tracy
4  worked on and I probably looked at it.
5    Q.  Does Tracy have similar academic
6  background that you have?
7    A.  I don't know Tracy's credentials.
8    Q.  And from your experience working with
9  Tracy, Ms. Morris, is she pretty sharp?
10   A.  She was very sharp.
11   Q.  Do you trust her analysis and her work?
12   A.  I -- yes, she was good.
13   Q.  She does a good job?
14   A.  She does a good job, yes.
15   Q.  Did she have a firm command of what the
16 charge was at Walgreens to design an algorithm to
17 detect suspicious orders?
18   A.  You'd have to --
19   MS. SWIFT: Object to the form.
20 BY THE WITNESS:
21   A.  You'd have to ask Tracy.
22 BY MR. MOUGEY:
23   Q.  I'm asking you from your perception of
24 dealing with her on this committee for now,

Page 100

1  March 27, 2009, for a little over a year, did
2  Ms. Morris have a firm command on the charge of the
3  committee to design an algorithm to detect
4  suspicious orders?
5    MS. SWIFT: Object to the form.
6  BY THE WITNESS:
7    A.  You'd have to ask Tracy.  That specific
8  knowledge, I don't know specific.
9  BY MR. MOUGEY:
10   Q.  I'm asking you your understanding.
11 Okay.  Do you see I'm not saying did she?  I'm
12 saying: Is your perception that Ms. Morris had a
13 firm command on the material needed to develop an
14 algorithm to detect suspicious orders?
15   MS. SWIFT: Object to the form of the
16 question, foundation.
17 BY THE WITNESS:
18   A.  I know she had a firm command of what
19 was in this document and she went over it very
20 thoroughly.
21 BY MR. MOUGEY:
22   Q.  Because you interacted with Ms. Morris
23 on a regular basis during this time period
24 developing the algorithm, correct, sir?

Page 101

1    A.  During what time period?
2    Q.  From the time when you started, 2009, to
3  the time -- I'm sorry -- 2008, to the time of this
4  document, March 27, 2009.
5    A.  In between then, we did other things.
6  So, yes.  But, yes, I -- we worked together.
7    Q.  Yes.  If you'd flip to the second page,
8  Bates numbered 69, "Compliance Status of Controlled
9  Substances by Order Size."
10       Do you see that, sir?
11   A.  Let me see.  Where is that on the
12 screen?
13   Q.  Very top of the page.
14   A.  Oh, the page 1.  It's marked page 1 on
15 the bottom.
16   Q.  Yes, sir.  Page 1 on the bottom.
17   A.  Yes.
18   Q.  Do you see the section titled
19 "Compliance Status of Controlled Substances by
20 Order Size," correct?
21   A.  Yes.
22   Q.  "Orders of controlled substances will be
23 monitored and evaluated based on its order size
24 when compared to upper tolerance limits established

Page 102

1  for each item."
2      Correct, sir?
3      A.   That's what it says.
4      Q.   And that's the algorithm that you and
5  Ms. Morris were working on, correct?
6      A.   Yes.
7      Q.   Now, let's go to the second paragraph.
8      "Orders that are flagged as suspicious
9  will be intercepted and the order quantity will be
10 reduced to a level which is not considered to be an
11 outlier when compared to other orders within its
12 history."
13     Do you see that, sir?
14     A.   Yes.
15     Q.   So, as of the date of this memo that
16 Ms. Morris drafted, she too thought that orders
17 flagged by the system were suspicious, correct?
18     MS. SWIFT:  Objection; foundation.
19 BY THE WITNESS:
20     A.   If you read this, the sentence, it
21 refers to an order before it is an order.  The
22 order was intercepted and not gone out.  So, I
23 don't think it's -- "order" is not a correct term
24 maybe either.  Potential order.

Page 103

1  BY MR. MOUGEY:
2      Q.   So now we've got Ms. Morris doesn't
3  understand what order is.  Is that accurate?
4      A.   No.
5      MS. SWIFT:  Object to the form.
6  BY MR. MOUGEY:
7      Q.   And she's -- and the word "suspicious"
8  doesn't really mean suspicious, is that accurate?
9      MS. SWIFT:  Object to the form.
10 BY THE WITNESS:
11     A.   I -- the term "order" in this document
12 meant potential order and suspicious meant
13 something, an item of interest.
14 BY MR. MOUGEY:
15     Q.   So, let me make sure I understand.
16     The word -- the sentence "Orders that
17 are flagged as suspicious will be intercepted and
18 the order quantity will be reduced which is not
19 considered to be an outlier when compared to other
20 orders within its history."
21     Did I read that right?
22     A.   You read it right, yes.
23     Q.   So the first word, "Orders that are
24 flagged as suspicious," is it your testimony to

Page 104

1  this jury that that really doesn't mean order?
2      A.   It means --
3      MS. SWIFT:  Object to the form.
4  BY THE WITNESS:
5      A.   It means it was -- it was a potential
6  order.  We had -- we intercepted it.  Apparently we
7  intercepted the order and changed it.
8  BY MR. MOUGEY:
9      Q.   So, "order" means -- doesn't really mean
10 order.  It means potential order is what your
11 testimony is?
12     A.   In this -- in this example, yes.
13     Q.   And "suspicious" doesn't really mean
14 suspicious.  It means orders of interest?
15     A.   Yes.
16     Q.   So, Ms. Morris also, similar to you,
17 didn't understand the word "suspicious"; that it
18 really meant orders of interest, correct?
19     MS. SWIFT:  Objection; foundation.
20 BY THE WITNESS:
21     A.   That's -- that's how we used the term.
22 BY MR. MOUGEY:
23     Q.   So, both of you had similar confusions,
24 correct?

Page 105

1      MS. SWIFT:  Object to the form of the
2  question.
3  BY THE WITNESS:
4      A.   I -- that's -- I didn't know the legal
5  definition of suspicious.  This is how I used
6  suspicious.  It was order -- it was order of
7  interest.
8  BY MR. MOUGEY:
9      Q.   Now, this memo has now -- March 27,
10 2009.  You're the math guy.  That's approximately
11 nine months after your initial memo with
12 Ms. Morris, correct?
13     A.   Yeah, I'm the math guy.
14     Q.   Yes.  But your -- this memo, March 27 of
15 2009, is approximately nine months after your
16 initial memo that we looked at from June of '08,
17 right?
18     A.   Yes, you're correct.
19     Q.   Okay.  And no one on the committee had
20 corrected you or Ms. Morris that an order that was
21 flagged by the system was really not a suspicious
22 order, right?
23     MS. SWIFT:  Object to the form.
24 BY THE WITNESS:

Page 106

1   A.  They -- I would say that's -- I don't
2 remember being corrected.
3 BY MR. MOUGEY:
4   Q.  Sure.  Because if you had been
5 corrected, you or Ms. Morris, by some of the pretty
6 sharp people on this, that received this, you would
7 have incorporated that into your work, right?  You
8 wouldn't have kept writing the same thing over and
9 over again that was wrong?
10   A.  I would have added a word or two, yes.
11   Q.  Yes.  So, if "suspicious" really didn't
12 mean suspicious and someone had corrected you, your
13 work would have reflected that, correct?
14   A.  Yes.  In a statistical model, there's
15 always -- there's no absolute.
16   Q.  We're not talking about a statistical
17 model right now.  All I'm talking about is the
18 plain language that "Orders that are flagged
19 suspicious will be intercepted," right?
20       That's just -- that just phrase right
21 there.
22       If someone had told you that "order"
23 really meant potential order and "suspicious"
24 really didn't mean suspicious, you would have

Page 107

1 incorporated that corrected language into your
2 memo, correct, sir?
3   A.  I would think so.
4   Q.  Yes, sir.  You wouldn't keep writing the
5 same thing with a mistake in it, correct?
6   A.  I like to say I correct my mistakes.
7   Q.  And you don't have any independent
8 recollection of anybody within Walgreens coming and
9 telling you that these memos are incorrect.
10 "Order" really doesn't mean order.  It means
11 potential order.  Right?
12   A.  I don't remember.
13   Q.  Sir, let me hand you what I'm going to
14 mark as Bancroft 9.
15       (WHEREUPON, a certain document was
16       marked as Walgreens-Bancroft
17       Exhibit No. 9:  Document,
18       "Controlled Substance Threshold";
19       WAGMDL00491896 - 00491912.)
20 BY MR. MOUGEY:
21   Q.  Sir, if you would just flip through this
22 document.  This is a -- you recognize this format,
23 correct, sir?
24   A.  It's a requirements document.

Page 108

1   Q.  Yes, sir.  And this type of document was
2 used to manage projects within Walgreens, correct?
3   A.  Yes.
4   Q.  And this kind of format was used
5 frequently, correct?
6   A.  Yes.
7   Q.  And it was a way of keeping track of --
8 keeping track of the project and communicating with
9 different individuals within Walgreens, right?
10   A.  Correct.
11   Q.  And if you see here on the "Store
12 Ordering Team" on the first page, right underneath
13 that is a date February 2009, correct?
14   A.  Correct.
15   Q.  So, this is a group identified in
16 Walgreens as the ordering team, Store Ordering
17 Team, correct?
18   A.  Yes.
19   Q.  And explain to the jury what -- what
20 Store Ordering Team is.
21   A.  Store Ordering Team is part of inventory
22 systems, which was Joe Tiemeyer's organization, and
23 they would be -- they wrote the code for
24 implementing store orders in general, front end,

Page 109

1 back end, replenishment, forecasting and so on.
2   Q.  And if you look at the top of this
3 document, under "Walgreens," it's titled
4 "Controlled Substance Threshold," correct?
5   A.  Yes.
6   Q.  And, sir, if you would -- if you want to
7 refresh your memory by looking through this
8 document, this document is an overview of the
9 algorithm you and Ms. Morris worked on, correct?
10   A.  That's correct.
11   Q.  And -- I apologize.  I lost my place
12 here, Mr. Bancroft.  If you would give me a minute.
13   A.  Take two.
14   Q.  Thank you.
15       Sir, let's turn to, if you would, it
16 says page 3 of 17.  It's Bates No. 98.  The top of
17 the document is "Systems Training & Consulting
18 Impact" and then it has "Overview" underneath of
19 that.  Are you on the same place I am?
20   A.  Yes.
21   Q.  All right.  And, sir, you recognize the
22 language in the first paragraph under "Overview."
23 That language was used in a number of different
24 memorandums within Walgreens to communicate what

Page 110

1  the primary objective was of this project, correct?
2      MS. SWIFT:  Object to the form, foundation.
3  BY MR. MOUGEY:
4      Q.   I'm sorry?
5      A.   Give me time to read it.
6      Q.   Certainly.
7      A.   This paragraph?
8      Q.   Yes, sir.
9      A.   I may have seen it before.  I never --
10  if it was used over and over again, I don't know.
11      Q.   Okay.  The gentleman that prepared it is
12  on the first page, Rakesh?
13      A.   Rakesh.
14      Q.   I'm sorry?
15      A.   Rakesh.
16      Q.   Yeah.  Rakesh Khanna?
17      A.   Yes.
18      Q.   Did you have interactions with
19  Mr. Khanna about the algorithm?
20      A.   I had interactions with Rakesh, but I
21  don't recall if it was specifically regarding this
22  algorithm.
23      Q.   Okay.  The second paragraph identifies
24  "The purpose of this project is to create a process

Page 111

1  to systematically" -- I'm sorry -- "to systemic" --
2  no, I got it right the first time -- "to
3  systematically identify and prevent suspicious
4  orders based on a formula used to determine
5  inconsistent," just in case anyone was confused,
6  open and closed parens, "(suspicious) ordering
7  patterns for controlled drugs."
8      Do you see that?
9      A.   Yes.
10      Q.   And is it your understanding that the
11  Store Ordering Team also believed that orders
12  flagged by your algorithm were suspicious?
13      MS. SWIFT:  Objection; foundation.
14  BY THE WITNESS:
15      A.   The term "inconsistent" is -- was what
16  comes -- doesn't sound like that's a true
17  understanding.  Inconsistent means inconsistent.
18  Suspicious was the word I -- I was using.
19  BY MR. MOUGEY:
20      Q.   Yes, sir.
21      A.   Why one is in parentheses and the other
22  isn't, I don't know.  But I would say inconsistent.
23      Q.   So, the first sentence, end of the
24  second paragraph, "The purpose of this project is

Page 112

1  to create a process to systematically identify and
2  prevent suspicious orders based on a formula used
3  to determine inconsistent or suspicious ordering
4  patterns."
5      Do you agree with that sentence?
6      MS. SWIFT:  Object to the form.
7  BY THE WITNESS:
8      A.   There's no "or."  You said "or."  There
9  was no "or" in there.
10  BY MR. MOUGEY:
11      Q.   Let's do it again.  Thank you.
12      "The purpose of this project is to
13  create a process to systematically identify and
14  prevent suspicious orders based on a formula used
15  to determine inconsistent (suspicious) ordering
16  patterns for controlled drugs."
17      Do you agree with that sentence?
18      MS. SWIFT:  Object to the form.
19  BY THE WITNESS:
20      A.   I agree that's what it says.
21  BY MR. MOUGEY:
22      Q.   Do you agree that that is the purpose of
23  the project?
24      A.   The wording here is sort of convoluted.

Page 113

1  So...
2      The purpose of the project was to -- to
3  control our stores from ordering suspicious on the
4  DC.  This is -- it says, this sort of explains
5  how based on a formula.
6      Q.   So, you do agree or you don't agree with
7  that sentence?
8      MS. SWIFT:  Object to the form.
9  BY MR. MOUGEY:
10      Q.   That it's accurate?
11      A.   I don't think I agree with the way you
12  characterize the sentence.
13      Q.   I'm simply asking you, sir, do you agree
14  that the purpose of the project as defined in that
15  first sentence on Bates No. 98 of the second
16  paragraph is accurate?
17      MS. SWIFT:  Object to the form.
18  BY THE WITNESS:
19      A.   It's more than just create a process.
20  The purpose of the process -- the project was
21  bigger than just create a process.  Than
22  identifying.  We did -- the system does more than
23  just identifying.
24  BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Q.   Sir, let me hand you what I'll mark as
2   Bancroft 10.
3          (WHEREUPON, a certain document was
4          marked as Walgreens-Bancroft
5          Exhibit No. 10:  Document, 10/1/09
6          Project Request Estimate;
7          WAGMDL00492070 - 00492072.)
8   BY MR. MOUGEY:
9    Q.   Sir, this is dated -- Bancroft 10 is
10  dated 10/1 of 2009.
11       Do you see that, sir?
12   A.   Yes.
13   Q.   And under "Project Name:  DEA Suspicious
14  Order Part II - Phase II"?
15   A.   Yes.
16   Q.   And the -- Rakesh is the programmer
17  analyst, the same gentleman that was on the last
18  document that we looked at, correct, sir?
19   A.   Yes.
20   Q.   And you see under the list of 1 through
21  7, No. 5, "Create a process to purge DEA Suspicious
22  items on a regular basis."
23   A.   Yes.
24   Q.   Do you have any understanding of what

Page 115

1   that means?
2    MS. SWIFT:  Object to the form, foundation.
3   BY THE WITNESS:
4    A.   I would have to speculate.
5   BY MR. MOUGEY:
6    Q.   Sir, I'm asking you do you have an
7   understanding of what is meant by No. 5, "Create a
8   process to purge DEA Suspicious items on a regular
9   basis"?
10   MS. SWIFT:  Objection; foundation.
11  BY THE WITNESS:
12   A.   I would -- again, it gets to the
13  definition of suspicious.  So, it's...
14  BY MR. MOUGEY:
15   Q.   So, this sentence is confusing to you
16  because you're not sure what the word "suspicious"
17  means?
18   A.   I'm not sure how -- I -- how it's -- let
19  me read it.
20       So, what -- I'm sorry.  Could you repeat
21  the question.
22   Q.   Sure.  Do you have any individual
23  understanding of what is meant on Bancroft 10,
24  No. 5, "Create a process to purge DEA Suspicious

Page 116

1   items on a regular basis"?
2    MS. SWIFT:  Objection; foundation.
3   BY THE WITNESS:
4    A.   I have an idea what it -- what the
5   intent of that statement is, yes.
6   BY MR. MOUGEY:
7    Q.   Okay.  What is your idea of what the
8   intent of "create a process to purge DEA Suspicious
9   items on a regular basis"?
10   A.   To not let orders of suspicious nature
11  get through to our distribution centers so there
12  would be no suspicious orders ever placed on them.
13  We wanted to be proactive and stop suspicious
14  orders from happening, period.
15   Q.   So, now, when you say "stop suspicious
16  orders," is that the definition of an order as it
17  comes into the distribution center that's flagged
18  by your system or some other definition?
19   MS. SWIFT:  Objection; foundation.
20  BY THE WITNESS:
21   A.   Defined by the distribution center?
22  BY MR. MOUGEY:
23   Q.   Um-hmm.
24   A.   No, we were defining it at corporate.

Page 117

1    Q.   So, under "Description," second
2   sentence, "An order quantity will be deemed
3   suspicious based on a formula used to determine
4   inconsistent ordering patterns."
5        Do you see that sentence?
6    A.   Yes.
7    Q.   Did I read it correctly?
8    A.   Yeah, I think you did, yes.
9    Q.   And do you agree with that sentence that
10  an order quantity will be deemed suspicious based
11  on a formula?
12   MS. SWIFT:  Objection; foundation.
13  BY THE WITNESS:
14   A.   We use tolerance limits to identify
15  orders that have potential -- are potentially
16  suspicious.
17  BY MR. MOUGEY:
18   Q.   Yes, sir.
19   A.   So, if that's what they are referring
20  to, yes.
21   Q.   And that's the only formula that you're
22  aware of that was in play identifying or flagging
23  orders, correct, sir?
24   MS. SWIFT:  Object to the form, vague.

Page 118

1  BY THE WITNESS:
2      A.  There was frequency, too, in 2009.
3  BY MR. MOUGEY:
4      Q.  The threshold and the frequency are two
5  of the algorithms or formulas that you used, that
6  you implemented, correct?
7      MS. SWIFT:  Object to the form.
8  BY THE WITNESS:
9      A.  I was part of the committee that
10  implemented them, yes.
11  BY MR. MOUGEY:
12      Q.  Yes, sir.  So, this second sentence, "An
13  order quantity will be deemed suspicious based on a
14  formula used to determine inconsistent ordering
15  patterns."  Do you agree with that sentence?
16      MS. SWIFT:  Object to the form.
17  BY THE WITNESS:
18      A.  In general sense, I would -- let me see.
19  I'm sorry.  I lost my place.
20  BY MR. MOUGEY:
21      Q.  That's okay.  Second sentence.
22          "An order quantity will be deemed
23  suspicious based on a formula."  Do you agree with
24  that, sir?

Page 119

1      A.  Let's see.
2      MS. SWIFT:  Object to the form.
3  BY THE WITNESS:
4      A.  I'm -- could you highlight it.
5  BY MR. MOUGEY:
6      Q.  Yes, sir.  It is.  Take your time.
7      A.  Oh, okay.  I went too far down.
8      Q.  "An order quantity will be deemed
9  suspicious based on a formula."  Do you agree with
10  that, sir?
11      MS. SWIFT:  Object to the form of the
12  question.
13  BY THE WITNESS:
14      A.  A formula was used to identify -- to set
15  tolerance limits, and that was what we were using,
16  yes.
17  BY MR. MOUGEY:
18      Q.  Yes, sir.  And that formula used to
19  identify or set tolerance limits, if an order was
20  flagged, do you agree with Rakesh that it was
21  deemed suspicious?
22      MS. SWIFT:  Object to the form, foundation.
23  BY THE WITNESS:
24      A.  The term "suspicious" is -- the

Page 120

1  tolerance limits was used to identify orders that
2  were suspicious -- worth looking into, an order
3  of interest.
4          So, the term "suspicious" was, if he was
5  using it the same way I was using it, then I would
6  say yes.  But if he -- but "suspicious" under the
7  legal definition, I can't answer that.
8  BY MR. MOUGEY:
9      Q.  Okay.  So, as of October of 2009, Rakesh
10  is similarly confused as you and Ms. Morris about
11  order of interest versus suspicious?
12      MS. SWIFT:  Objection; mischaracterizes the
13  testimony, foundation.
14  BY THE WITNESS:
15      A.  I don't know that he was confused.  He
16  was using it the same way that I was using it.
17  BY MR. MOUGEY:
18      Q.  Sure.  He was using --
19      A.  He is not a lawyer either.
20      Q.  -- the language that you used in your
21  June of 2008 memo that an order flagged by your
22  algorithm was suspicious, correct, sir?
23      MS. SWIFT:  Object to the form of the
24  question.

Page 121

1  BY MR. MOUGEY:
2      Q.  This language is almost identical to the
3  June of '08 memo, correct, sir?
4      MS. SWIFT:  Object to the form.
5  BY THE WITNESS:
6      A.  The introduct- -- the use of
7  "suspicious" meant order of interest, and it was
8  used consistently that way and it's being used here
9  it looks like.
10  BY MR. MOUGEY:
11      Q.  The language that you used in your '08
12  memo that an order flagged by your algorithm is
13  deemed suspicious is almost identical to the
14  language used by Rakesh in 2009, correct?
15      A.  He was using it in the same vein that I
16  was using it.
17      Q.  Yes, sir.  So, the answer to my question
18  is yes, correct?
19      A.  I -- I'm sorry.  I lost the question.
20  But the -- so, I don't want to say yes.
21      Q.  The language that you used in your '08
22  memo.
23      A.  Yes.
24      Q.  That an order flagged by your algorithm

Page 122

1 was suspicious is almost identical to the language
2 Mr. Rakesh uses -- I'm sorry -- Rakesh uses in
3 February of '09 in his memorandum, correct?
4    A.   We both mischaracterized the term
5 "suspicious," yes.
6    Q.   And the language you used in your
7 January -- June 2008 memo about an order being
8 flagged by the system is deemed suspicious is
9 almost identical to the language Mr. or Rakesh uses
10 in October of 2009 in Bancroft 10, correct?
11    A.   We both mischaracterized the use of
12 "suspicious," yes.
13    Q.   Yes, sir.
14    MR. MOUGEY:  Mark the next exhibit as Bancroft
15 11.
16        (WHEREUPON, a certain document was
17         marked as Walgreens-Bancroft
18         Exhibit No. 11:  10/27/11 e-mail
19         with attachment; WAGMDL00119542 -
20         00119548.)
21 BY MR. MOUGEY:
22    Q.   Sir, Bancroft 11 is dated 10/27/2011.
23        Do you see that, sir?
24    A.   Yes.

Page 123

1    Q.   And this is now over three years after
2 your June of 2008 memorandum, correct?
3    A.   That's right.
4    Q.   And walk me through who these folks are
5 in this e-mail.  Kristie Provost.  Do you see that?
6 What's her title, if you know?
7    A.   No.  She -- no, I don't know her title.
8    Q.   What department?
9    A.   She was a manager.
10    Q.   Manager of what?
11    A.   I don't know the department.
12    Q.   Okay.  How about Ferdinand Dungca?
13    A.   I would think he works for Kristie.
14    Q.   But you're not sure what department?
15    A.   No, I'm not.
16    Q.   Okay.  How about Edward -- I can't
17 pronounce the last name.  On the cc line.
18    A.   I don't recall Edward.
19    Q.   How about Marcella Ranick?
20    A.   Marcella.  I'm -- no, I don't recall.
21    Q.   Okay.  And then Barbara Martin?
22    A.   She worked for Rx purchasing.
23    Q.   Okay.  And Barbara Martin was one of the
24 folks that was involved in this committee

Page 124

1 developing the algorithm to identify suspicious
2 orders from inception, correct?
3    A.   That's correct.
4    Q.   So, this is -- Ms. Martin is copied on
5 this e-mail and a memorandum from Rakesh almost a
6 little over three years after your initial memo,
7 correct?
8    A.   Yes.
9    Q.   And if we go back to your initial memo
10 in June of '08, do you recall that Ms. Martin's
11 copied on that --
12    A.   Yes.
13    Q.   -- as well?
14    A.   Yes, I do recall that.
15    Q.   Okay.  And if you'd turn, sir, to
16 page 1, 543, I want you to go to the second
17 paragraph, and take your time if you want to read
18 through it to get the context, but you'll see the
19 language is very similar to other documents.
20        And I want to direct your attention to
21 the middle of the second paragraph that begins
22 with, "The order that is flagged as suspicious."
23        Do you see that, sir?
24    A.   I see that.

Page 125

1    Q.   Okay.  That's the language I want you to
2 focus on.
3        Sir, this language, "The order that is
4 flagged as suspicious on the store side will be
5 intercepted and the order quantity will be reduced
6 to a non-suspicious (order limits) level."
7        Do you see that, sir?
8    A.   Yes.
9    Q.   All right.  The initial part of this
10 sentence, "The order that is flagged as
11 suspicious," that language in October of 2011 is
12 almost identical to the language you used in your
13 June 2008 memorandum, correct, sir?
14    A.   That language would be incorrect.
15    Q.   Yes, sir.  But that's almost the exact
16 language that you used in your memo more than three
17 years earlier, correct?
18    A.   I don't remember saying that the
19 order -- that it would be flagged.  I -- orders
20 would be identified -- let's see.  This says the
21 orders will be reduced, right?
22    Q.   First part of that sentence is what I
23 want you to focus on, "The order that is flagged as
24 suspicious on the store side."

Page 126

1   Do you see that, sir?
2   A.   Yes.
3   Q.   That concept is --
4   A.   Yes.
5   Q.   -- almost identical to the memo that you
6   wrote in June of 2008, correct?
7   MS. SWIFT:  Object to the form, foundation.
8   BY THE WITNESS:
9   A.   I -- I apologize.  Yes.  That would --
10  that in general is correct.  There is a lot of
11  other things going on in the sentence so it's, you
12  know.
13  BY MR. MOUGEY:
14  Q.   Yes, sir.
15  A.   I want to make sure I got it correct.
16  Q.   Yes, sir.  But an order flagged by the
17  algorithm was deemed suspicious, that concept
18  that's in this October of 2011 memo is almost
19  identical to your June 2008 memorandum, correct?
20  A.   The language is correct --
21  MS. SWIFT:  Objection; foundation.
22  BY THE WITNESS:
23  A.   The language is correct.  The orders
24  were not actually orders at that point.  They are

Page 127

1   potential.
2   BY MR. MOUGEY:
3   Q.   But the question I asked you was that
4   the language, meaning that the order that's flagged
5   as part of your algorithm is deemed suspicious,
6   that language in October of 2011 in Bancroft 11 is
7   almost identical to your June 2008 memorandum,
8   correct?
9   A.   They're similar.
10  Q.   Yes, sir.  I hand you what I'm going to
11  mark as Bancroft 12.
12      (WHEREUPON, a certain document was
13       marked as Walgreens-Bancroft
14       Exhibit No. 12: Document,
15       "Functional Requirements & (Macro)
16       Design"; WAGMDL00400342 -
17       00400356.)
18  BY MR. MOUGEY:
19  Q.   Sir, you see that this document is
20  titled -- I'm sorry -- is dated right in the middle
21  of the page.  The last date entry is 4/6/2012.
22      Do you see that?
23  A.   Yes.
24  Q.   And so now we are going on almost four

Page 128

1   years after your memorandum, correct, sir?
2   A.   That would be correct.
3   Q.   And you can see from the top box of this
4   document that this document involves the suspicious
5   order monitoring at Walgreens, correct?
6   A.   Yes.
7   Q.   And you can see in the bottom right-hand
8   side, the business owner Barb Martin's name is in
9   there, correct, sir?
10  A.   Yes.
11  Q.   And you see the project manager is
12  Rakesh again, the same gentleman we just went
13  through the last couple memorandums, correct?
14  A.   And Steve Bamberg.
15  Q.   And Steve Bamberg, correct.
16      And do you recall what department Steve
17  Bamberg is in at this point?
18  A.   Yes.  He -- well, he was part of
19  inventory systems.
20  Q.   Yes, sir.  And ultimately ended up being
21  in Pharmaceutical Integrity?
22  A.   No.
23  Q.   No.  Okay.  So, again, Ms. Martin,
24  pretty knowledgeable, been in the process from --

Page 129

1   from inception on developing this algorithm,
2   correct?
3   MS. SWIFT:  Objection; foundation.
4   BY THE WITNESS:
5   A.   Barb is very knowledgeable.
6   BY MR. MOUGEY:
7   Q.   Yes, sir.  And if you turn to the second
8   page of this document, under "Phase I Overview."
9   Do you see that, sir?
10  A.   Yes.
11  Q.   "In this Phase, DEA suspicious orders
12  were not reduced.  System was implemented as a
13  'Proof of Concept.'"
14      Do you see that, sir?
15  A.   Yes.  I see that's what it says.
16  Q.   Do you have any understanding of what
17  Phase I was?
18  MS. SWIFT:  Objection; foundation.
19  BY THE WITNESS:
20  A.   I think Phase I was the tolerance and
21  frequency.
22  BY MR. MOUGEY:
23  Q.   That you drafted?
24  A.   Yes.

Page 130

1    Q.    And did you have an understanding of how
2  long Phase I lasted?
3    A.    Until about 2012.
4    Q.    Does your algorithm or your work have
5  anything to do with how the orders were reduced?
6    MS. SWIFT:  Objection; foundation.
7  BY THE WITNESS:
8    A.    The -- by committee, it was decided
9  whether an order was -- under certain conditions,
10 what orders would be considered suspicious and the
11 orders -- it was my understanding that orders were
12 reduced to bring it under tolerance.
13 BY MR. MOUGEY:
14   Q.    All right.  And was it your algorithm
15 that identified what an acceptable tolerance level
16 was?
17   A.    Acceptable tolerance level?
18   Q.    Yes, sir.
19   A.    I'm not familiar with that terminology.
20   Q.    All right.  The threshold.  How is that?
21 Is that easier?
22   A.    Determined a threshold?
23   Q.    Yes, sir.
24   A.    Yes.

Page 131

1    Q.    And the threshold that you helped draft
2  was used as a ceiling for what -- when an order was
3  acceptable, correct?
4    MS. SWIFT:  Object to the form.
5  BY THE WITNESS:
6    A.    That would be an order that was -- yes.
7  BY MR. MOUGEY:
8    Q.    Okay.  So, as of April 6, 2012, in
9  Bancroft Exhibit 12, under Phase I, the orders
10 flagged by your algorithm, Walgreens still was
11 referring to as suspicious orders, correct, sir?
12   A.    I wouldn't -- whoever wrote the
13 memorandum was referring to it that way.
14   Q.    Yes, sir.  And --
15   A.    I can't say Walgreens in general, you
16 know.  I can't say what legal was.  I could just
17 say if that's what the -- how it was being used in
18 a memorandum, in a memo.
19   Q.    Orders flagged by your system were
20 deemed suspicious, correct?
21   MS. SWIFT:  Object to the form.
22 BY THE WITNESS:
23   A.    They were deemed an item of interest.
24 BY MR. MOUGEY:

Page 132

1    Q.    But it doesn't -- the words "item of
2  interest" here --
3    A.    No, that's correct.
4    Q.    -- almost a little over four years later
5  isn't being used, correct?
6    A.    The terminology that was used as item of
7  interest, that's what we -- how it was used
8  initially and it stuck.
9    Q.    As of April 6, 2012 in Bancroft
10 Exhibit 12, the language that you used in your
11 initial memo in June of 2008, orders flagged by
12 your algorithm were suspicious, were still being
13 used at Walgreens, correct, sir?
14   A.    I would -- sounds like it, yes.
15   Q.    Now, at what point in time -- do it
16 another way.
17        Did you change your language at any
18 point in time from "suspicious orders" to "orders
19 of interest" like you're referring to today?
20   A.    I don't think so.
21   Q.    Okay.  And did Walgreens formally change
22 their language, intentionally change their language
23 about suspicious orders?
24   A.    I can't speak for the larger, the larger

Page 133

1  audience.
2    Q.    Were you aware of anyone at Walgreens
3  that analyzed that the language "suspicious orders"
4  should be changed to "orders of interest"?
5    A.    I didn't know anybody that analyzed the
6  language.
7    Q.    Do you think that everyone at Walgreens
8  when they were saying -- using the word
9  "suspicious" in this year after year really didn't
10 mean suspicious?
11   A.    You'd have to ask them.
12   Q.    But you really didn't mean suspicious
13 when you were using it.  You meant something else,
14 right?
15   A.    I meant there were outliers and they
16 were worth looking into.
17   Q.    I'm going to hand you what --
18   MS. SWIFT:  Peter, before you mark another
19 document, can we take a five-minute break?  We have
20 been going more than an hour.
21   MR. MOUGEY:  Yeah, I'm really trying to get
22 through today, and the last break took 15 minutes.
23 So, I think we've been --
24   MS. SWIFT:  I --

Page 134

1    MR. MOUGEY: I understand. We have been on
2 the record for about two hours and I just don't
3 want another 15-minute break.
4    MS. SWIFT: Understood. That's fine.
5    MR. MOUGEY: If we can take a five-minute
6 break --
7    MS. SWIFT: Sounds great.
8    MR. MOUGEY: -- I am more than fine with that,
9 but I'd like it to be five minutes.
10    THE VIDEOGRAPHER: We are off the record at
11 11:23 a.m.
12        (WHEREUPON, a recess was had
13        from 11:23 to 11:31 a.m.)
14    THE VIDEOGRAPHER: We are back on the record
15 at 11:31 a.m.
16 BY MR. MOUGEY:
17    Q.   Mr. Bancroft, I believe it was your
18 testimony that you were called upon at different
19 periods in time to analyze the algorithm you
20 initially put together in 2008, correct?
21    A.   To analyze the algorithm?
22    Q.   Just to look at it for enhancements or
23 updates or tweaks or modifications, right?
24    MS. SWIFT: Object to the form, compound.

Page 135

1 BY THE WITNESS:
2    A.   We -- the algorithm we put in from the
3 beginning, it was what was -- what was used.
4 BY MR. MOUGEY:
5    Q.   Yes, sir. That was a little different
6 than what I asked.
7        There were -- you were called in to look
8 at potential modifications to the algorithm after
9 the initial proposal in 2008, correct?
10    A.   I was called in to verify that the
11 algorithms were working as designed during the
12 programming phase. I would check -- I'd verify the
13 data was right and the algorithms were right. It's
14 not until 2012 that we made any changes that I'm
15 aware of.
16    Q.   So, talk to me a little bit about
17 your -- I'm going to call it -- is "sensitivity
18 testing" the right math term?
19    A.   Sensitivity? No.
20    Q.   No.
21    A.   No.
22    Q.   What would you call it? Confidence
23 testing? What would you call the right math term?
24    MS. SWIFT: Objection; vague.

Page 136

1 BY THE WITNESS:
2    A.   Testing of what?
3 BY MR. MOUGEY:
4    Q.   The algorithm. You just talked about
5 testing --
6    A.   Testing --
7    Q.   -- the algorithm to make sure it was
8 working as planned, right?
9    A.   Yes.
10    Q.   Okay.
11    A.   There is no sensitivity there. It's
12 either right or wrong. Calculations came out of
13 the computer were what the -- equal to the
14 calculations that we would do on paper, you know,
15 or in another system. We verified that the
16 calculations were being done correctly.
17    Q.   And --
18    A.   It's not sensitivity.
19    Q.   What was your -- so, there was no
20 sensitivity testing on the algorithm?
21    A.   Sensitivity testing is a total different
22 concept.
23    Q.   So, the answer is no?
24    A.   No.

Page 137

1    Q.   And what testing -- tell me what testing
2 was done to make sure it was working --
3    MS. SWIFT: Objection; vague.
4 BY MR. MOUGEY:
5    Q.   -- as intended.
6    A.   That was in 2008. I don't recall.
7    Q.   You don't recall?
8    A.   I don't recall the details of the tests,
9 no.
10    Q.   You don't even recall generally what was
11 done to make it -- make sure that it was working as
12 intended?
13    A.   I know we -- we did our due diligence.
14 But, no, I don't have any recollection exactly what
15 that entailed at this point.
16    Q.   Yeah.
17    A.   I don't recall.
18    Q.   Are there any documents that memorialize
19 the testing of the algorithm?
20    A.   That was -- would have been done by the
21 inventory system, people that programmed it. That
22 wouldn't be my responsibility.
23    Q.   So, I didn't -- but I didn't ask if it
24 was your responsibility or not.

Page 138

1    What I asked you was there any documents
2 memorializing it that you were aware of?
3    A.   You would have to ask inventory systems
4 group.  Steve Bamberg.
5    Q.   I'm asking you, sir.  I'm asking you
6 sitting in this chair today, are you aware of any
7 documents memorializing any testing on the
8 algorithm that you drafted?
9    MS. SWIFT:  Objection; argumentative.
10 BY THE WITNESS:
11    A.   I don't have any -- I don't know of any
12 other documents.
13 BY MR. MOUGEY:
14    Q.   You don't know?
15    A.   I don't know.
16    Q.   Do you agree based on your academic and
17 your decades in this space, drafting complex
18 statistical solutions, that it's important that the
19 algorithms are tested to ensure they're working
20 accurately?
21    A.   Yes.
22    Q.   And would you agree with me, sir, that
23 it's important that any testing that's done is
24 memorialized?

Page 139

1    A.   I think that would be a good thing, yes.
2    Q.   And after you drafted this, you didn't
3 ask anyone to -- to review any memorandum or
4 testing or anything to make sure that the algorithm
5 was working?
6    A.   Did I ask?
7    Q.   Yes.
8    A.   I'm sure I was involved in testing it.
9 Exactly the details, I don't recall.
10    Q.   Now, you mentioned earlier that in 2012
11 you were called in to help make some modifications,
12 correct?
13    A.   That's correct.
14    Q.   Yes, sir.  And you, when you drafted --
15 you drafted a memorandum documenting your
16 additional proposals, correct?
17    A.   I'd have to see the document.  I don't
18 recall exactly.  If I saw the document, I would
19 recall.
20    Q.   When you draft a memorandum, do you --
21 do you take good care in ensuring that it's
22 accurate?
23    A.   I would think I do.
24    Q.   Do you take time to make sure and

Page 140

1 perform due diligence to ensure that the document
2 contents are correct and complete?
3    A.   To the best of my ability.
4    Q.   Do you even share the memorandum with
5 your colleagues to get another set of eyes on it to
6 make sure it's accurate?
7    A.   I would say yes, that would be the
8 standard practice.
9    Q.   You understood that your job within
10 Walgreens, for example, this algorithm on
11 suspicious order monitoring policies, were
12 important, correct?
13    A.   Yes.
14    Q.   Did you have an understanding by the
15 time you got to 2012 of the opiate epidemic that
16 was occurring in the United States?
17    A.   I know that we took the controlled
18 substance very seriously and we wanted to make sure
19 that we didn't ship orders that were in violation
20 and we wanted -- we continued -- and in 2008 to
21 2012, we continued -- we enhanced our system.
22    Q.   Yes, sir.  And what I was asking was a
23 little different.  What I asked was:  Were you
24 aware that there was an opiate epidemic as of 2012

Page 141

1 in the United States?
2    A.   I was aware that they were concerned
3 that some of the -- that the -- our algorithms
4 needed to be enhanced.
5    Q.   Yes, sir.  And that there were concerns
6 about the algorithm because overdoses were quickly
7 becoming the leading cause of death in certain age
8 groups, correct, sir?
9    A.   I can't say --
10    MS. SWIFT:  Objection; foundation.
11 BY THE WITNESS:
12    A.   I can't make that parallelism.
13 BY MR. MOUGEY:
14    Q.   Did you have any understanding as you
15 got into 2012 that there had been Congressional
16 investigations into the opiate crisis dating back
17 over ten years?
18    A.   That was not an area of interest for me.
19    Q.   Did you have any -- did anybody from
20 Walgreens ever provide a sense of urgency to you
21 about the importance that people were dying from
22 overdoses?
23    A.   There was a sense of importance that we
24 needed to become -- needed to have further controls

Page 142

1 on our orders. But the genesis of that concern, I
2 don't know.
3    Q.   You don't know.
4        I'll hand you what we'll mark as
5 Bancroft 14 -- is it 13? I'm sorry. Bancroft 13.
6        (WHEREUPON, a certain document was
7        marked as Walgreens-Bancroft
8        Exhibit No. 13: 4/27/12 e-mai with
9        attachment; WAGMDL00119539 -
10       0019541.)
11 BY MR. MOUGEY:
12    Q.   You'll see on Bancroft 13 that this is
13 an e-mail generated from you, correct, sir?
14    A.   Yes.
15    Q.   And you see the date of 4/27/2012 --
16    A.   Yes.
17    Q.   -- correct, sir?
18    A.   That's correct.
19    Q.   This is coming up almost, what is that,
20 four years after your initial proposal, correct?
21    A.   That would be four, yes.
22    Q.   And the subject line is "DEA Suspicious
23 Store Ordering." Do you see that?
24    A.   Yes.

Page 143

1    Q.   And had you been asked to look at
2 enhancing the algorithm?
3    A.   I know in 2012 we made an enhancement to
4 the algorithm, yes.
5    Q.   And my question I asked, though, was had
6 you been asked to enhance it. Is this something
7 you came up with on your own or did someone ask
8 you?
9    A.   It came up in committee, the -- John
10 Merritello came up with the paradigm, what he
11 wanted in the new -- added to the logic, and it was
12 my task to do the math.
13    Q.   And what was that logic that
14 Mr. Merritello came up with?
15    A.   He wanted to have a limit -- the
16 tolerance limit and the frequency were individual
17 orders that we were -- we were monitoring.
18        What John came up with is look at the
19 orders in term of the corporate in total, how
20 this -- every store sells in relationship to the --
21 to the corporate sales, to all the -- all the 8,000
22 or how many other -- how many stores there was at
23 the time.
24        So, we would look at -- we'd look at the

Page 144

1 system in total, and then we'd focus on down on to
2 the store and how did that store fit into the
3 bigger picture, was it higher than normal range for
4 that store.
5        And, so, it took a more -- it added
6 another dimension to the -- to the monitoring. It
7 took -- it made -- it took -- made a corporate
8 direction. So, we looked at it as how is each
9 store and each item performing against all the
10 other stores in the corporation.
11    Q.   You mentioned a committee?
12    A.   Yes.
13    Q.   Was this the same committee, with
14 obviously some people being replaced, that had been
15 in place since 2008?
16    A.   John was new to the committee.
17    Q.   Right. But it was the same?
18    A.   Denny Morris was new to the committee.
19    Q.   The charge of the committee, which
20 meaning the algorithm from suspicious order
21 monitoring policy, was similar to what was put
22 together in 2008?
23    A.   What was similar?
24    Q.   The charge of the committee.

Page 145

1    A.   The charge of the committee was
2 continuation of the same.
3    Q.   Thank you. And this e-mail is directed
4 to Barb Martin who had been in the -- in the mix
5 since 2008, correct?
6    A.   Yes, that's correct.
7    Q.   The DE -- "The enclosed offers two
8 possible enhancements to the DEA Suspicious" -- it
9 says DES, but I'm assuming you meant DEA?
10    A.   Where does it say DES? What page are we
11 on?
12    Q.   We're on the very first page.
13    A.   Yes, DEA, yes.
14    Q.   Okay. "DEA Suspicious Order" -- I'm
15 sorry -- "Suspicious Store Ordering application for
16 your consideration." Correct?
17    A.   Yes.
18    Q.   And that was the tolerance versus the
19 frequency, correct?
20    A.   That was the initial.
21    Q.   Yes, sir. And the -- I believe you
22 didn't use these words, but I think what you're
23 referring to is the subsequent linear regression
24 model that was in place, right?

Page 146

1   A.   Yes.
2   Q.   And that was comparing stores of similar
3   sizes, correct?
4   A.   It was -- it was comparing stores, the
5   whole corporation.  So, it wasn't just stores of
6   similar sizes.  It took all the corporate data into
7   consideration.
8   Q.   Yes, sir.  And sorry for my maybe
9   amateur terms here.  But it put stores into buckets
10  based on size, correct?
11  A.   No.
12  Q.   Categories?
13  A.   No.
14  Q.   All right.  What do you think it did?
15  A.   It based -- to took the stores based on
16  Rx frequency, the number of scripts that store
17  would sell in total.  It's not a bucket.  Each
18  store had their unique number.  And that was part
19  of the --
20  Q.   That store that had a unique number was
21  compared to other stores within its same parameters
22  of prescriptions, correct?
23  A.   It was -- all corporate data went into
24  the calculation.  So, one store -- it wasn't

Page 147

1   isolated from the stores that were down here on the
2   lower end because it was done with regression and
3   all data was considered.
4        So, you can't isolate one store.  It was
5   based on corporate data in total.
6   Q.   The linear regression model creates a
7   line with a slope on an axis, correct?
8   A.   Yes.
9   Q.   And then the -- and then if we look at
10  some of these models, the slope of the line has
11  dots below the line and dots above the line,
12  correct?
13  A.   It -- yes.
14  Q.   And that slope of the line is used to
15  identify outlier stores, correct?
16  A.   That plus -- that's one of the
17  components of identifying.
18  Q.   Thank you.  And the slope of the line
19  is, on that axis, is created in part by the stores
20  with similar prescription size within that store,
21  correct?
22  A.   No.
23  Q.   How is that slope of the line?
24  A.   The slope, linear regression considers

Page 148

1   all the data.  It doesn't isolate the data.
2   Q.   Does the slope of the line change when
3   comparing one store to another or is it the same
4   slope every time?
5   A.   Same slope.  Not -- same slope when the
6   line is generated, same slope for all stores.
7   Q.   The store -- the dots above the line and
8   below the line that represent individual order
9   sizes from individual stores, does the grouping of
10  those stores change?
11  MS. SWIFT:  Object to the form.
12  BY THE WITNESS:
13  A.   There is no grouping.
14  BY MR. MOUGEY:
15  Q.   The stores represented are compared
16  against the slope of the line.  Does that change?
17  MS. SWIFT:  Object to the form.
18  BY THE WITNESS:
19  A.   Could you repeat the question.
20  BY MR. MOUGEY:
21  Q.   Yes, sir.  The stores -- the slope of
22  the line is used to identify outliers, correct?
23  A.   It's part of the component, yes.
24  Q.   All right.  And the dots that are

Page 149

1   groupings of stores, how are those -- how are
2   those --
3   A.   Groupings of stores, we don't -- I'm
4   not -- you're using groupings.  There is no
5   grouping.
6   Q.   There is no grouping in the algorithm?
7   A.   We use all the data for the corporation,
8   all the stores go into the calculation of that
9   line.
10  Q.   I'll get to one of the --
11  A.   So, I don't know what you mean by
12  grouping.
13  Q.   Let's just go back to your memo here
14  dated 4/27/2012, Bancroft 13.
15  A.   We --
16  Q.   Same memo we got.  Right?
17  A.   Okay.
18  Q.   April 27, 2012, you're asked to create
19  some enhancements, correct?
20  A.   Yes.
21  Q.   And I'm assuming you spent some time
22  working on these enhancements to make a
23  recommendation, correct?
24  A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    Q.   And this was something you consider
2 fairly serious at this point in time?
3    A.   We -- all along we considered it
4 serious.
5    Q.   Of course.  So, as we get into our first
6 paragraph titled "DEA Suspicious Store Ordering
7 Application Proposed Enhancement."  Did I read that
8 right?
9    A.   What paragraph?
10   Q.   Very first, very top of the page, Bates
11 No. 40.  Page 1.
12   A.   Where is "Proposed"?  Highlight it.
13   Q.   "DEA Suspicious" --
14   A.   Oh, at the title.  I'm sorry.  The
15 title.
16   Q.   -- "Store Ordering Application."
17   A.   I was looking at the paragraph, not the
18 title.
19   Q.   Okay.
20   A.   Sorry.
21   Q.   Are we on the same page?
22   A.   Yes.
23   Q.   Are you there?
24   A.   Yes.

Page 151

1    Q.   And the title is "DEA Suspicious Store
2 Ordering Application Proposed Enhancement," right?
3    A.   That's the title.
4    Q.   Okay.  And the language directly under
5 the title is, "The DEA Suspicious Store Ordering
6 application was developed based on DEA requirements
7 for our DCs to monitor for suspicious orders of
8 control substances."  Correct?
9    A.   Yes.
10   Q.   Now, how did you have an understanding
11 of what the DEA requirements?  Who told you what
12 the DEA requirements were?
13   A.   In the initial committee?
14   Q.   Yes, sir.
15   A.   There was -- we were told the
16 requirements is for us to monitor in terms of order
17 size and frequency, and there was no -- they gave
18 no definition.  It was our obligation to define
19 what that meant.
20   Q.   Order size and frequency was the only
21 parameters you were given on this algorithm?
22   A.   That was the -- that was the gist of it,
23 yes.
24   Q.   Okay.  That was the gist of it or was

Page 152

1 that it?
2    A.   That's -- in 2008, I don't -- I think
3 that was -- that was primarily it.
4    Q.   The second paragraph, "This process
5 allows for any single order to be compared to the
6 last 26 weeks of order history."
7         Did I get that right?
8    A.   Yes.
9    Q.   I'm sorry.  I skipped the first
10 paragraph.
11        The last sentence of the first
12 paragraph, "Orders placed on the DC," and that's
13 distribution center, right?
14   A.   Yes.
15   Q.   "That exceed its tolerance limit are
16 flagged as suspicious."  Correct?
17   A.   That's what it says.
18   Q.   Yes, sir.  And that language is almost
19 identical to the language that you used four years
20 earlier in your June of 2008 memorandum, correct?
21   A.   That -- the language is similar, yes.
22 "Suspicious" was being used in the same -- same
23 definition.
24   Q.   And that would be that orders that were

Page 153

1 flagged by your algorithm were suspicious, correct?
2    A.   Were --
3    Q.   That's the plain language of this
4 document, right?
5    A.   The language as potentially suspicious
6 would be the correct terminology.
7    Q.   Yes, sir.  But that's not what I'm
8 asking.  The language that's in this memo in
9 April of '12, four years after your initial memo,
10 is almost identical to the language in your
11 June 2008, meaning that orders flagged by the
12 algorithm are suspicious, right?
13   A.   "Potentially suspicious" should have
14 been used, but yes.
15   Q.   Yes, sir.  But that -- what I want to
16 make sure that you and I are on the same page.
17        The language that you're using in
18 April of 2012, that orders flagged by your
19 algorithm are suspicious, is almost identical to
20 the language you used in June of 2008, correct?
21   A.   The languages are similar.
22   Q.   Not similar.  It's almost identical,
23 correct?
24   MS. SWIFT:  Object to form.

Page 154

1  BY THE WITNESS:
2     A.  Almost identical is similar.
3  BY MR. MOUGEY:
4     Q.  Yes, sir.  Now, were you aware at the
5  time of this memorandum that with the enhancements
6  that Walgreens was under investigation by the DEA?
7     A.  No.
8     Q.  Let's turn to the next page.
9       "DEA Suspicious Store Ordering
10 Application Proposed Enhancement," "Comparing the
11 average order size across time."
12      Do you see that?  Page 2 of the
13 document.
14    A.  Yes.
15    Q.  "The DEA is conducting crackdown on
16 Florida pharmacies where the market is notorious
17 for illicit prescription painkillers."
18      Do you see that, sir?
19    A.  Yes.
20    Q.  Was that your language?
21    A.  That's -- I put this document together.
22    Q.  Yes, sir.  You drafted that, right?
23    A.  Yes.
24    Q.  So, you knew as of the date of this

Page 155

1  document that the Florida market was notorious for
2  illicit prescription painkillers, correct?
3     A.  I -- I knew that this was a problem in
4  Florida and the DEA was looking at it.  I didn't --
5  yes.
6     Q.  The DEA wasn't looking at it.  They were
7  conducting a crackdown, correct, sir?
8     A.  That's what the language says, yes.
9     Q.  And the next language in quotes says,
10 "Walgreen pharmacies now account for 53 of the top
11 100 retail sellers of oxycodone in the state."
12      Correct, sir?
13    A.  That's what it says, yes.
14    Q.  "According to an affidavit filed by the
15 DEA."
16      So, you knew that there was at least
17 affidavits being filed by the DEA, correct, sir?
18    A.  I -- that's what it says.  So, that
19 would be correct.
20    Q.  And at the bottom of this paragraph you
21 cite to the Miami Herald, April 6, 2012, correct,
22 sir?
23    A.  At the bottom of the paragraph?
24    Q.  Yes, sir.

Page 156

1     A.  Yes.
2     Q.  And, sir, how were you aware about -- of
3  the Miami Herald article?
4     A.  I -- I'm not sure.
5     Q.  You're not sure?
6     A.  I may have Googled it.  I may have --
7     Q.  You live in Chicago, right?
8     A.  Yes.
9     Q.  You don't read the Miami Herald on a
10 regular basis, correct?
11    A.  No.
12    Q.  And the next sentence says, "Three years
13 ago, when Walgreens pharmacies were among the top
14 100 sellers of the drug."  Correct?
15    A.  Where does it say that?
16    Q.  In the middle of the paragraph.
17    A.  Oh, yes.
18    Q.  Sir --
19    A.  That's what it says.
20    Q.  -- you were aware that oxycodone was one
21 of the most abused controlled substances in the
22 opiate space, correct, sir?
23    MS. SWIFT:  Objection; foundation.
24 BY THE WITNESS:

Page 157

1     A.  I don't know that it was the most abused
2  or where it was -- stood in the space.
3  BY MR. MOUGEY:
4     Q.  You continue, "One Walgreen pharmacy in
5  Fort Myers now under investigation."
6       Do you see that, sir?
7     A.  Yes.
8     Q.  So, you were aware at the time you
9  drafted --
10    A.  At this --
11    Q.  -- this memorandum that Walgreens was
12 under investigation at least in Fort Myers,
13 correct?
14    A.  That would be correct, yes.
15    Q.  And that one pharmacy "sold more than
16 2.1 million oxycodone pills in 2011."
17      Do you see that, sir?
18    A.  That's what it says, yes.
19    Q.  "More than 22 times the oxycodone sales
20 at the same pharmacy two years earlier," according
21 to the DEA.  Did I read that right?
22    A.  That's -- you read it right.
23    Q.  Yes, sir.  So, at the time that you were
24 brought back in to look at this enhancement,

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  Walgreens was under a crackdown by the DEA,
2  correct, sir?
3      MS. SWIFT:  Object to the form.
4  BY THE WITNESS:
5      A.    I -- there was problems in Florida.
6  That's what I was -- that's what it says in my
7  mind.
8          I -- what the DEA was cracking down on,
9  this is what -- it looks -- yeah, there was --
10 could you rephrase the question.
11 BY MR. MOUGEY:
12     Q.    Sir, you understand what difference
13 testing is, correct?
14     A.    Yes, I do.
15     Q.    And what is difference testing?
16     A.    When you compare two stores -- you --
17 the way I would do difference testing is I would
18 take -- depends what you're testing.
19         If you're testing like sales to see if
20 there is a change in sales because you implemented
21 a program, you would -- you take a set of stores
22 and you find two stores that have -- that are very
23 well correlated, they have similar sales over a
24 whole year or two years of time, and you find

Page 159

1  several pairs like that.  You have a control group
2  and pilot group.
3          You introduce your change and see if the
4  difference -- the differences between these two
5  pilot and control groups should be, on average,
6  should be close to zero, statistically zero.
7          And then you measure it after the change
8  takes place and you monitor for a number of weeks
9  or months or even a year and you see if there's a
10 statistically difference in -- if there is a gap
11 between the two, the control group and pilot group.
12         If the pilot, what you're -- whatever
13 you're testing is -- had a significant influence on
14 the sales, for example.  That was --
15     Q.    You see the chart in the middle of the
16 page, correct, sir?
17     A.    Chart in the middle of the page, yes.
18     Q.    And that chart, sir, is depicting the
19 growth of oxycodone 30 milligram tabs from April of
20 '11 to 12 of '11, correct, sir?
21     A.    That's what it says.
22     Q.    And you're tracking the order quantity
23 from -- from October -- I'm sorry -- from April '11
24 to December of '11, correct, sir?

Page 160

1      A.    Yes.
2      Q.    And, sir, what you were suggesting based
3  on your analysis was that adding a time dimension
4  to the application would enhance the tool's
5  capability for identifying suspicious activity as
6  required by the DEA, correct?
7      A.    That's what it says.
8      Q.    And, sir, were you aware from the
9  time -- let me do it another way.
10         Do you believe that your algorithm that
11 you and Ms. Morris put together in '08 was a good
12 algorithm?
13     A.    Yes, I do.
14     Q.    Do you believe that it achieved the
15 purpose that your committee was charged to do?
16     A.    I believe that there was some -- it
17 could -- extra algorithms were needed to make it
18 even stronger.
19     Q.    Was it good work?
20     A.    It was -- the work was good.
21     Q.    Yes, sir.  Was the result what you
22 intended it to be when you and Ms. Morris put it
23 together?
24     A.    It did -- it did its function.  So, in

Page 161

1  isolation, yes.
2      Q.    And when you say "it did its function,"
3  its function was to identify suspicious orders and
4  report those to the DEA, correct?
5      A.    It was -- no, it was more than that.  It
6  was -- the algorithm kept the store from growing
7  because it didn't allow for orders to be placed.
8  It was allowed to place one order a week and it
9  didn't allow for those orders to be increasing in
10 size.  So, it kept the order, it kept -- the
11 tolerance kept the orders in bay.
12     Q.    Let me go back to the paragraph on
13 Bancroft 13.
14         "One Walgreen pharmacy in Fort Myers now
15 under investigation sold more than 2.1 million
16 oxycodone pills in 2011 - more than 22 times the
17 oxycodone sales at the same pharmacy two years
18 earlier."
19         Your algorithm, if used as deployed,
20 would never have allowed that to occur, correct,
21 sir?
22     MS. SWIFT:  Objection; foundation.
23 BY THE WITNESS:
24     A.    No, I can't -- I wouldn't say that's

Page 162

1 correct.
2 BY MR. MOUGEY:
3     Q.   Sir, in order for a pharmacy's oxycodone
4 sales to increase 22 times, there had to be some
5 subjective human intervention into your algorithm,
6 correct?
7     MS. SWIFT:  Objection; foundation.
8 BY THE WITNESS:
9     A.   No, that's not correct.
10 BY MR. MOUGEY:
11     Q.   There was a decision made by Walgreens
12 personnel to allow this pharmacy's sales of
13 oxycodone to increase 22 times in a year, correct,
14 sir?
15     MS. SWIFT:  Objection; foundation.
16 BY THE WITNESS:
17     A.   I can't --
18 BY MR. MOUGEY:
19     Q.   Your algorithm would have flagged
20 that --
21     MS. SWIFT:  Are you going to let him answer
22 the question?
23 BY MR. MOUGEY:
24     Q.   Your algorithm -- are you finished, sir?

Page 163

1     A.   Could you repeat.  Between the
2 objections, I'm -- I lost the question.
3     Q.   There was a decision made by Walgreens
4 personnel to allow this pharmacy's sales of
5 oxycodone to increase 22 times in a year, correct?
6     MS. SWIFT:  Objection; foundation.
7 BY THE WITNESS:
8     A.   No.  By a person?  To allow it?
9 BY MR. MOUGEY:
10     Q.   I said there's a Walgreens personnel.
11 Listen to the question.
12         There is a Walgreens personnel allowed
13 this pharmacy in Fort Myers to increase its
14 oxycodone sales by 22 times, correct?
15     MS. SWIFT:  Objection; foundation.
16 BY THE WITNESS:
17     A.   I would -- I don't know of any person
18 that allowed this to happen.
19 BY MR. MOUGEY:
20     Q.   Personnel.  Walgreens.  Your algorithm
21 would have flagged this as suspicious and cut the
22 sale down to the threshold amount, correct?
23     MS. SWIFT:  Objection; foundation.
24 BY THE WITNESS:

Page 164

1     A.   If my algorithm was used exclusively,
2 this would not have happened.
3 BY MR. MOUGEY:
4     Q.   Exactly.  If your algorithm would have
5 been used exclusively, this pharmacy, as an
6 example, in Fort Myers would never have increased
7 its oxy sales by 22 times, correct, sir?
8     MS. SWIFT:  Objection; foundation.
9 BY THE WITNESS:
10     A.   I believe it wouldn't.
11 BY MR. MOUGEY:
12     Q.   Yes, sir.  You believe.  You drafted the
13 algorithm.  You know that your algorithm would not
14 have allowed this to occur, correct, sir?
15     MS. SWIFT:  Objection; foundation.
16 BY MR. MOUGEY:
17     Q.   As drafted.  Your algorithm would not
18 have allowed a 22-time increase in oxycodone sales
19 in this pharmacy, correct, sir?
20     A.   I believe --
21     MS. SWIFT:  Objection; foundation.
22 BY THE WITNESS:
23     A.   I believe the algorithm was designed to
24 keep the stores in check.

Page 165

1 BY MR. MOUGEY:
2     Q.   Yes, sir.
3     A.   Not from growing.
4     Q.   And the question I've asked three or
5 four times now is your algorithm would not have
6 allowed this pharmacy, as an example, oxycodone
7 sales to increase by 22 times in one year, correct,
8 sir?
9     MS. SWIFT:  Objection; foundation.
10 BY THE WITNESS:
11     A.   I believe that's correct.
12 BY MR. MOUGEY:
13     Q.   And in order for this pharmacy to
14 increase its oxycodone sales in one year by 22
15 times, Walgreens personnel had to override your
16 algorithm, correct, sir?
17     A.   I don't have knowledge.
18     MS. SWIFT:  Objection; foundation.
19 BY MR. MOUGEY:
20     Q.   I didn't ask whether you had knowledge.
21 An order --
22     A.   If I don't have knowledge, how could I
23 answer the question?  The answer is no.
24     Q.   If your algorithm would have been used

Page 166

1  as intended, this would never have happened,
2  meaning that this --
3      A.  That's correct.
4      Q.  -- pharmacy --
5      MS. SWIFT: Objection; foundation.
6      MR. MOUGEY: I'm not finished with my
7  question.
8      MS. SWIFT: It's abusive, Peter.
9      MR. MOUGEY: This isn't abusive.
10     MS. SWIFT: It's absolutely abusive. In every
11 one of these depositions you do the same thing.
12 You've asked the question 12 different times trying
13 to get the answer you want.
14         Objection; foundation, asked and
15 answered, and the questioning is abusive.
16 BY MR. MOUGEY:
17     Q.  This result if someone at Walgreens
18 wouldn't have intervened would never have occurred
19 with just your algorithm, meaning 22 times increase
20 of oxycodone sales in one year?
21     A.  You said --
22     MS. SWIFT: Objection; foundation, asked and
23 answered, and the questioning has become abusive.
24 BY THE WITNESS:

Page 167

1      A.  You said if somebody wouldn't have
2  intervened.
3  BY MR. MOUGEY:
4      Q.  Yes.
5      MS. SWIFT: Objection.
6  BY THE WITNESS:
7      A.  Who intervened?  I don't know of anybody
8  that intervened.
9  BY MR. MOUGEY:
10     Q.  I'm not asking you if you know of anyone
11 that intervened.  Okay?  Listen to my question.
12         Without intervention from Walgreens
13 personnel, your algorithm would have prevented an
14 increase in oxycodone sales of 22 times in one
15 calendar year, correct?
16     MS. SWIFT: Objection; foundation, asked and
17 answered, as you said yourself, many times.
18 BY THE WITNESS:
19     A.  I'm -- my algorithm would have -- would
20 curtail the orders from growing substantially.
21 What -- how this happened, what the mechanism was,
22 I don't know.  I can't answer about personnel.
23 BY MR. MOUGEY:
24     Q.  Do you have an understanding of whether

Page 168

1  or not there were exceptions to your algorithm
2  allowed at Walgreens?
3      MS. SWIFT: Objection; foundation.
4  BY THE WITNESS:
5      A.  Exceptions to the algorithm?
6  BY MR. MOUGEY:
7      Q.  Yes, sir.
8      A.  No.  Define exceptions.  I don't know
9  what you mean by exceptions.
10     Q.  Do you have an understanding if a store
11 could be turned off from the algorithm, meaning
12 they just -- the algorithm didn't apply to that
13 store?
14     A.  I have no understanding of that.
15     Q.  Do you -- would that have defeated the
16 purpose of what the algorithm --
17     A.  Well --
18     MS. SWIFT: Objection; foundation.
19 BY THE WITNESS:
20     A.  The store could be turned off?
21 BY MR. MOUGEY:
22     Q.  Yes.
23     A.  If the algorithm wasn't used, it wasn't
24 used.

Page 169

1      Q.  Thank you.
2      A.  But if it was used, you know -- I don't
3  have any knowledge of a store being turned off.
4      Q.  Do you have any understanding of whether
5  or not a store could fulfill an order from a
6  third-party vendor that had been cut by your
7  algorithm?
8      A.  I've never worked in the stores.  I've
9  never had firsthand experience.  So, I don't have
10 that firsthand experience.  I don't know.
11     Q.  Okay.  So, would -- if a store had the
12 ability to order the amount that had been cut by
13 your algorithm, would that fulfill the intended
14 purpose of your algorithm?
15     MS. SWIFT: Objection; foundation.
16 BY THE WITNESS:
17     A.  If a store had the ability --
18 BY MR. MOUGEY:
19     Q.  If the store had the ability --
20     A.  Yes.
21     Q.  -- to order the amount that had been cut
22 from a third-party vendor, would that have
23 fulfilled the obligation -- I'm sorry.  Let me do
24 that over.

Page 170

1    A.   It's very confusing.
2    Q.   Yeah, it is a little confusing.  Bad
3 question.
4        Do you have any understanding of whether
5 or not a store could fill an order that had been
6 cut by your algorithm by a third-party vendor?
7    MS. SWIFT:  Object to the form of the
8 question.
9 BY THE WITNESS:
10   A.   I -- I didn't work in operations.  So, I
11 don't know.  I never worked -- I don't have any
12 experience at the store.
13 BY MR. MOUGEY:
14   Q.   So you don't know?
15   A.   No, I don't know.
16   Q.   Did you account for the ability of a
17 store to order from a third-party vendor in your
18 algorithm?
19   A.   Did I account?
20   Q.   Yes, sir.
21   A.   I don't have control of how the --
22 how -- the different mechanisms for the store to
23 order.  I know that if the store was ordered, went
24 through the algorithm, it would be cut.

Page 171

1    Q.   Yes, sir.  But what I asked was a little
2 different.
3        In your algorithm, did you account for
4 the fact that a store could order from a
5 third-party vendor?
6    A.   The algorithm has nothing to do how a
7 store could order.  It has to do with the order.
8    Q.   Do you have an understanding of whether
9 or not only stores that were ordering from
10 Walgreens were run through your algorithm?
11   A.   It was a Walgreens system.  We didn't do
12 CVS.
13   Q.   Just answer the questions I got.  That's
14 exactly right.
15       Your algorithm.  Did you have an
16 understanding of whether or not it was run or
17 applied to stores that were ordering from
18 third-party vendors like Cardinal?
19   A.   I wouldn't have -- if --
20   MS. FIX MEYER:  Objection; foundation.
21 BY THE WITNESS:
22   A.   The algorithm looked at the order in
23 relationship to other orders and it wouldn't -- it
24 had a tolerance limit and if it exceeded the

Page 172

1 tolerance limit, it flagged it as potentially
2 suspicious.
3        How the orders got into the algorithm,
4 what the -- what orders got in and what orders
5 didn't get out, I have no knowledge of that.
6 BY MR. MOUGEY:
7    Q.   Do you have an understanding sitting
8 here or a belief that all Walgreens orders were run
9 through your algorithm?
10   MS. SWIFT:  Object to the form of the
11 question.
12 BY THE WITNESS:
13   A.   I don't have firsthand knowledge.
14 BY MR. MOUGEY:
15   Q.   Did you design the algorithm --
16   A.   Yes.
17   Q.   -- that all Walgreen orders would be run
18 through your algorithm?
19   MS. SWIFT:  Object to the form.
20 BY THE WITNESS:
21   A.   The -- I designed the algorithm to look
22 at -- to look at orders and -- for all orders to go
23 through the algorithm?  Whether there is
24 exceptions, I'm sure -- I don't know.

Page 173

1 BY MR. MOUGEY:
2    Q.   You don't know.
3    A.   I don't know.
4    Q.   But you designed the algorithm that you
5 proposed in 2008 to apply to all Walgreens pharmacy
6 orders, correct?
7    MS. SWIFT:  Object to the form, foundation.
8 BY THE WITNESS:
9    A.   I didn't control what orders got pushed
10 through the system.  If they -- if they got pushed
11 through the system, they were a part of the
12 process.
13   Q.   But what I asked -- I understand you're
14 not in ordering.  I understand you're not a lawyer.
15 I understand.  That's not what I'm asking.
16       What I'm asking you -- just focus on
17 just what I'm asking.
18   A.   Yes.
19   Q.   Your algorithm that you and Ms. Morris
20 put together in 2008, was it designed to review all
21 Walgreens orders for controlled substances and
22 specifically opiates?
23   A.   It was --
24   MS. SWIFT:  Object to the form.

Page 174

1 BY THE WITNESS:
2    A.   It was designed to control all orders
3 that went through the system.  I have no control of
4 what orders go which way or how they get processed.
5 BY MR. MOUGEY:
6    Q.   We get that.  Okay.  I'm talking about
7 your algorithm.  What I want to know -- you defined
8 it as "the system."
9         So, was your algorithm designed to be
10 applied to all Walgreens orders?
11    A.   In spirit?  I -- it was designed to
12 measure orders that went through the system.  What
13 orders, where it went through the system, which
14 orders didn't go through the system, I didn't -- I
15 have no knowledge of that.
16    Q.   No one -- no one is asking you right
17 now, I'm not asking you what orders went through
18 the system or not.  Okay.
19         What I'm simply asking is:  When you put
20 together this algorithm with Ms. Morris designed to
21 identify suspicious orders, did you intend it to
22 apply to all Walgreens orders for controlled
23 substances?
24    A.   My -- I was charged with the task of

Page 175

1 coming up with an algorithm to identify suspicious
2 orders and if they went through the system, they
3 would be identified.  If they didn't go through, I
4 wasn't tasked to determine what path the orders
5 take.  Just -- so I don't have any firsthand
6 knowledge of that.
7    Q.   I'm sorry if we're speaking past each
8 other.  All I'm asking you is what you intended
9 your algorithm to do.
10    A.   I intended my algorithm to identify
11 orders that went through the -- through my
12 algorithm as suspicious orders, potentially
13 suspicious or not suspicious.
14    Q.   And was it your understanding when you
15 put together the algorithm at Walgreens that all
16 orders for controlled substances were being run
17 through your system?
18    A.   I -- I wasn't in control of all orders.
19    Q.   I didn't ask you if you were in -- sir,
20 I'm asking a really simple question.  Okay?
21         What I'm asking is:  When you designed
22 your algorithm, Mr. Bancroft -- hold on -- did you
23 have an understanding that all Walgreens orders for
24 controlled substances were going to be run through

Page 176

1 your algorithm?
2    MS. SWIFT:  Objection; asked and answered.
3 BY THE WITNESS:
4    A.   I had -- definitively, I can't answer
5 that.  I have no knowledge if all orders would go
6 through or not.
7 BY MR. MOUGEY:
8    Q.   So, you didn't have an understanding
9 when you drafted it whether it was going to be run
10 through 1%, 5%, 50%, 90, you never asked?
11    A.   No.  I don't have any percentage.
12    Q.   You don't have any idea, you never asked
13 when you put together this algorithm, what pieces
14 of orders were going to be run through your system?
15    A.   I think it was intended for -- for
16 orders to go through the system.  If there's other
17 ways, mechanisms for store ordering, I -- that
18 was -- that was out of my realm.
19         So, I -- there may have been other
20 mechanisms for the store to order to circumvent the
21 system, but I have no knowledge of that and I --
22 and that was not part of the design of the system.
23         The design of the system was to identify
24 orders as suspicious or potentially suspicious that

Page 177

1 went through the algorithm.
2    Q.   So no one ever came to you and asked
3 you --
4    A.   Why would they?
5    Q.   -- will you please design --
6    MS. SWIFT:  Just let him ask the question,
7 Wayne.
8    THE WITNESS:  Sorry.
9 BY MR. MOUGEY:
10    Q.   -- will you please design a system to
11 flag stores that were trying to circumvent your
12 algorithm?
13    A.   No.
14    Q.   Do you believe or do you have any
15 individual knowledge that Walgreens allowed stores
16 to circumvent your system?
17    A.   I have no firsthand knowledge.
18    Q.   If there were stores that Walgreens
19 allowed to circumvent your system, that would
20 minimize the impact of your algorithm, correct,
21 sir?
22    A.   That would be correct.
23    MS. SWIFT:  Objection; foundation.
24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    A.   Yes.
2    BY MR. MOUGEY:
3    Q.   I'm sorry.  Yes?
4    A.   That would -- yes.
5    Q.   Sir, outside of your algorithm that
6    we've been talking about for the last couple of
7    hours, are you -- were you involved in any other
8    component of Walgreens' suspicious order monitoring
9    systems?
10   A.   I believe not.
11   Q.   Okay.  So, you didn't write any
12   algorithm or formula for any other of Walgreens'
13   suspicious order monitoring systems other than the
14   ones we have been talking about today?
15   A.   Including the ceiling?
16   Q.   Yes, sir.
17   A.   Yes.
18   Q.   Yes, sir.  That's the universe of what
19   you were involved in?
20   A.   I think so, yes.
21   Q.   Okay.  Are you familiar with the orders
22   that Walgreens was sending to the DEA from 2006
23   until the beginning of 2012 being identified as
24   suspicious?

Page 179

1    A.   I wasn't, no.
2    Q.   No knowledge at all?
3    A.   No.
4    Q.   Do you have any -- do you have any
5    knowledge of what formula or algorithm was used to
6    detect the orders that were sent to the DEA from
7    2006 to 2012?
8    A.   I would assume it's the algorithms I
9    designed, I worked on.
10   Q.   So, you don't -- would you be surprised
11   to hear that the orders sent to the DEA as
12   suspicious were based on another formula, something
13   different than you drafted?
14   A.   I'd be surprised to hear that.
15   Q.   Why would you be surprised?
16   A.   I'm not aware of any.
17   Q.   Are you proud of the work that you did,
18   the model you put together?
19   A.   I think it was good work.
20   Q.   You think it was good work.  And so
21   you're proud of what you did?
22   A.   I'm proud of everything I've done at
23   Walgreens.
24   Q.   And you would think that the algorithm

Page 180

1    you put together was used to identify suspicious
2    orders to the DEA?
3        MS. SWIFT:  Objection; foundation.
4    BY MR. MOUGEY:
5    Q.   You believed that Walgreens was using
6    your algorithm to identify suspicious orders that
7    it was reporting to the DEA?
8    A.   It was --
9        MS. SWIFT:  Objection; mischaracterizes the
10   testimony.
11   BY THE WITNESS:
12   A.   I was aware -- I believe that the
13   algorithms were used to prevent suspicious orders
14   from occurring.
15   BY MR. MOUGEY:
16   Q.   The question I asked was a little
17   different.  I asked you did you believe that
18   Walgreens was using your algorithm to identify
19   suspicious orders that were reported to the DEA?
20       MS. SWIFT:  Objection; asked and answered.
21   BY THE WITNESS:
22   A.   The system -- what I believed is that
23   the algorithms were used to cut orders from being
24   suspicious so there would be no need to report

Page 181

1    them.  They'd be -- they would not allow suspicious
2    orders to even be generated.
3        So, if what was reported, I'm not sure
4    how -- what the reporting system was or what other
5    mechanisms there were for stores to order.  I am
6    unaware of that.
7    BY MR. MOUGEY:
8    Q.   Mr. Bancroft, I'm going to hand you what
9    I'm going to mark as Bancroft 14.
10       (WHEREUPON, a certain document was
11        marked as Walgreens-Bancroft
12        Exhibit No. 14:  7/2/12 e-mail with
13        attachment; WAGMDL00077015 -
14        00077023.)
15   BY MR. MOUGEY:
16   Q.   This is an e-mail that you're copied on,
17   July 2, 2012.  Do you see that, sir?
18   A.   Yes.
19   Q.   And you see your name under the "To"
20   section?
21   A.   Yes.
22   Q.   Wayne Bancroft?
23   A.   Yes.
24   Q.   All right.  And the subject, "Discussion

Page 182

1  of ceiling limits - updated with PowerPoint for
2  review"?
3      A.   Yes.
4      Q.   And "Attachments:  CSR talking points
5  6-22-12," and it's a meeting invite, correct?
6      A.   Yes.
7      Q.   All right.  And you were invited to this
8  meeting.  And, in fact, the e-mail below, "Hi John
9  and Wayne, We've done some additional
10  analysis/simulation on the ceiling limits issue and
11  wanted to walk through a few results with you to
12  gather your perspective and make sure we're on the
13  same page.  I'll be able to get you the slides for
14  review on Monday morning in advance of the
15  meeting."
16          Do you see that?
17     A.   Yes.
18     Q.   And, so, there was a meeting discussing
19  the enhancements to the algorithm that we went
20  through on Exhibit 13, correct, sir?
21     A.   Exhibit 13?  This is 19.
22     Q.   Yes, sir.  The Exhibit 13 that we just
23  went through, citing to the store in Fort Myers
24  where the oxycodone --

Page 183

1      A.   Yes.
2      Q.   -- increased by 22 --
3      A.   Yes.
4      Q.   -- times, that was a memo where you were
5  discussing enhancements, correct?
6      A.   Yes.
7      Q.   And that memo was dated 4/27/2012,
8  Exhibit 13.  Do you see that?
9      A.   Yes.
10     Q.   And now we're, Exhibit 14, we're in
11  July of 2012, just a few months later, right?
12     A.   This is 14?
13     Q.   Yes, sir.
14     A.   Oh, I thought it was 19.  The year 19.
15  Okay.
16     Q.   14.
17     A.   Yes.  So, this was dated -- what was
18  your question about the date?
19     Q.   The ceiling limits in Exhibit 14 --
20     A.   Yes.
21     Q.   -- dated 7/2 of 2012 --
22     A.   Yes.
23     Q.   -- are referencing the enhancements from
24  Exhibit 13, correct?

Page 184

1      A.   I'm not sure.
2      Q.   Do you want to check?
3      A.   Yes.
4      Q.   Do you see in the e-mail on 14 where it
5  says "ceiling limits"?
6      A.   On 14.  14, but I'm looking at what's on
7  13.
8      Q.   Okay.
9      A.   Is there ceiling limits on 13, tolerance
10  limits?  I don't see ceiling limits, do I?  I don't
11  see ceiling limits on 13.
12     Q.   So, these are a different, a different
13  enhancement that's being discussed in 13 -- I'm
14  sorry -- in Exhibit 14?
15          MS. SWIFT:  Object to the form.
16  BY THE WITNESS:
17     A.   I -- I don't see ceiling limits in 13.
18  BY MR. MOUGEY:
19     Q.   Why don't you explain to me what you
20  think the difference of the enhancements were in 13
21  from what's being discussed in 14?
22          Let's do it this way.  We can make it
23  quick.
24          In Exhibit 13 the enhancements were

Page 185

1  discussing adding a time dimension to the
2  application, correct?
3      A.   I think that's correct.
4      Q.   All right.  And Exhibit 14 is discussing
5  adding a ceiling limits tool as an enhancement to
6  the system, correct?
7      A.   Yes.
8      Q.   So, there were discussions in early '12
9  making enhancements to the system, correct?
10     A.   Enhancements, yes.
11     Q.   So, it's not just one enhancement.
12  There were different things that were being
13  discussed.  Is that accurate?
14     A.   Yeah, that would be accurate.
15     Q.   Okay.  So, let's stick with Exhibit 14
16  on the ceiling limits.  Okay, sir?
17     A.   Yes.
18     Q.   I'd like to walk through the PowerPoint
19  that's attached.
20     A.   Okay.
21     Q.   Very first page, Bates No. 16,
22  "Controlled Substance Order Review, Business
23  Logic."
24          Do you see that, sir?

Page 186

1   A.   Yes.
2   Q.   And A, under the wheel, is "Ongoing
3 controlled substance order review logic includes
4 PSE," right?
5   A.   Yes.
6   Q.   B is "Manual line limits for select
7 drugs."
8       Do you see that, sir?
9   A.   Yes.
10  Q.   C, "Automated ceilings."
11      Do you see that?
12  A.   Yes.
13  Q.   And "Automated ceilings," next to it has
14 "Phase 5: In design, ceilings trump step A below
15 if/when necessary."
16      Do you see that?
17  A.   Yes.
18  Q.   So, let's go to the second page, Bates
19 No. 17, "Ongoing Controlled Drug Order Review
20 Logic." Okay?
21  A.   Sorry.  17, got it.
22  Q.   Yes, sir.  And you see at the bottom of
23 Bates No. 17, along with the other pages, where it
24 says, "Privileged & confidential prepared in

Page 187

1 anticipation of litigation by or at the direction
2 of litigation & regulatory law."
3       Do you see that, sir?
4   A.   Yes.
5   Q.   Do you have any understanding of whether
6 or not this was created in anticipation of meeting
7 with the DEA?
8   A.   I don't have -- I didn't create this
9 document.  I don't know what the anticipation was.
10  Q.   I didn't ask if you created it.  I just
11 asked do you have any understanding?
12  A.   I --
13      MS. SWIFT:  Objection; asked and answered.
14 BY THE WITNESS:
15  A.   I'm not -- I don't know.  I'm not -- I
16 didn't create this document.  I don't know the
17 intent of the author.
18 BY MR. MOUGEY:
19  Q.   Okay.  So, if we look at Bates No. 17,
20 you see that there is a table with 1, 2, 3 and 4.
21      Do you see that, sir?
22  A.   Yes.
23  Q.   And it has -- the titles of the column
24 are "Phase" and then "Key Points."

Page 188

1       Do you see that?
2   A.   Yes.
3   Q.   So, sir, the order review logic that's
4 at the top of the page, do you have an
5 understanding that this was referencing in part the
6 algorithm that you drafted?
7       MS. SWIFT:  Objection; foundation.
8 BY THE WITNESS:
9   A.   I -- again, I don't know the intent of
10 this document.  I'm not -- I'm not familiar with
11 this document.
12 BY MR. MOUGEY:
13  Q.   Sir, this was e-mailed to you on July 2
14 of 2012, right?
15  A.   That was, yes.
16  Q.   You were brought into a meeting to
17 discuss the ceiling limits, correct?
18  A.   Yes, I guess.
19  Q.   And --
20  A.   That's what it says.
21  Q.   And do you know any other order review
22 logic other than your algorithm?
23  A.   No.
24  Q.   So, what I want to direct your attention

Page 189

1 to, under 1 you say, "August of 2009 to
2 September of 2009" (sic)?
3   A.   Yes.
4   Q.   And under "Key points," "Reviews WAG DC
5 orders only."
6       Do you see that, sir?
7   A.   Yes.
8   Q.   And "WAG DC orders only" would mean
9 Walgreens distribution centers only, correct?
10      MS. SWIFT:  Objection; foundation.
11 BY THE WITNESS:
12  A.   That would be an assumption.
13 BY MR. MOUGEY:
14  Q.   You don't know that?
15  A.   I didn't write the document.
16  Q.   So, that would be -- I'm not asking if
17 you've read the document.  What I'm asking you:  Is
18 it news to you that the order review logic was only
19 applied to Walgreens distribution centers only?
20      MS. SWIFT:  Object to the form.
21 BY THE WITNESS:
22  A.   I'm not sure what -- if it was
23 restricted to Walgreens distribution centers only
24 or not.  I don't have any knowledge.

Page 190

BY MR. MOUGEY:

Q. And if you go across to the last column under "Phase I Key Points," "No order reductions in Phase I."

Do you see that?

A. Yes.

Q. Were you aware that there were no order reductions at least to September of 2010?

A. I know it takes time to build a system. So, initially -- we design an algorithm, it takes time to program it, so it makes sense.

Q. You started on this algorithm in the beginning of 2008, correct?

A. Yes.

Q. And you've pointed to several times today that one of the benefits of the algorithm was it reduced the orders that were flagged as a result of the algorithm, right?

A. That was the intent. That was one of the intents of what the committee put together, yes.

Q. Were you aware that more than two years later it was still not reducing the orders?

MS. SWIFT: Object to the form, foundation.

Page 191

BY THE WITNESS:

A. No, I was not aware if it was or was not.

BY MR. MOUGEY:

Q. So, until we looked at this document, September 2010, "No order reductions in Phase I," sitting here today you didn't know that it wasn't until September of 2010 that orders were being reduced?

MS. SWIFT: Objection; asked and answered.

BY THE WITNESS:

A. I don't know when the orders were started to be reduced.

BY MR. MOUGEY:

Q. Line No. 2, September 2010 to current. Do you see "Reviews WAG DC orders only"?

A. Yes.

Q. And in the third -- I'm sorry -- fourth column under "Key Points," "Reductions begin in Phase 2 - only applies to WAG DC orders." Correct?

A. That's what it says.

Q. That would be a hole in your algorithm, correct, sir?

MS. SWIFT: Object to the form.

Page 192

BY THE WITNESS:

A. No.

BY MR. MOUGEY:

Q. So, if a pharmacy could go around the algorithm and order from a vendor like Cardinal or McKesson, that would be a hole in your algorithm, correct, sir?

MS. FIX MEYER: Object to the form, foundation.

MS. SWIFT: Object to the form, foundation.

BY THE WITNESS:

A. The -- it wouldn't be a hole in my algorithm. It might be -- I -- the -- the algorithm is the algorithm.

BY MR. MOUGEY:

Q. Fair enough. And you're right. It's not a hole in the algorithm.

A. Thank you.

Q. It's a hole in Walgreens' system that your algorithm was only applied to orders that were entered at Walgreens, correct, sir?

MS. SWIFT: Object to the form, foundation.

BY THE WITNESS:

A. That would go beyond my -- my scope.

Page 193

BY MR. MOUGEY:

Q. Under 3, estimated June of 2012 to 7 of 2012, "Reviews only WAG distribution center orders plus checks to see if vendor order placed within 48 hours for the same drug."

Do you see that, sir?

A. Yes.

Q. Were you aware until sitting here today that a pharmacy could place an order with a vendor like Cardinal or McKesson or AmerisourceBergen within 48 hours --

MS. FIX MEYER: Objection to form and foundation.

MS. SCHUCHARDT: Objection to form and foundation.

BY THE WITNESS:

A. I didn't work in the stores. I don't know how the order systems got, you know. I don't know all the mechanisms of the store operations. I know the algorithms. I worked on the algorithms, and that was my responsibility. And when I wasn't working on these algorithms, I was working on some other algorithms most likely.

BY MR. MOUGEY:

Page 194

1  Q.   Last, No. 4, July 2012.

2  A.   Yes.

3  Q.   "Reviews WAG DC," distribution center,

4  "orders plus applies same logic to vendor orders

5  making them eligible for flagging and order

6  reduction."

7       Do you see that, sir?

8  A.   Yes.

9  Q.   That was just months after your memo

10 citing to the Miami Herald article citing the DEA

11 crackdown and investigation into Walgreens,

12 correct, sir?

13 A.   I don't remember the date, but I believe

14 that's correct.  I believe you.

15 Q.   So, July of 2012, '9, '10, '11, '12,

16 four months -- I'm sorry -- four years after your

17 proposed algorithm, Walgreens, according to this

18 document, has now rolled out your algorithm to both

19 Walgreens distribution centers and vendor orders,

20 correct?

21 MS. SWIFT:  Object to the form,

22 mischaracterizes the document.

23 BY THE WITNESS:

24 A.   I wasn't in charge of how -- what

Page 195

1  systems were in place at what time.  Like I said, I

2  designed the algorithms and when I wasn't designing

3  those algorithms, I was designing some other

4  algorithms.

5  BY MR. MOUGEY:

6  Q.   So, sitting here -- until sitting here

7  today, you weren't aware that your algorithm was

8  not being applied to third-party vendor orders like

9  Cardinal and AmerisourceBergen and McKesson until

10 July of 2012?

11 MS. SCHUCHARDT:  Objection.

12 MS. FIX MEYER:  Objection; form, foundation.

13 MR. STANNER:  Also assumes facts not in

14 evidence.

15 MS. FIX MEYER:  Also calls for speculation.

16 BY THE WITNESS:

17 A.   I was not -- no, I was not aware.  I

18 don't know if it was or wasn't.  Goes beyond my

19 knowledge.

20 BY MR. MOUGEY:

21 Q.   Phase 4, very last column under "Key

22 Points," "Both WAG DC and vendor orders reduced if

23 thresholds exceeded."

24      Do you see that, sir?

Page 196

1  A.   Yes.

2  Q.   Do you have any understanding of why in

3  July of 2012 Walgreens decided to apply your

4  algorithm to reduce orders to third-party vendors?

5  MS. SWIFT:  Object to the form, foundation.

6  BY THE WITNESS:

7  A.   I have no knowledge.

8  MS. SWIFT:  It is about 12:30.  Can we stop

9  for a lunch, please?

10 MR. MOUGEY:  Actually, I'm going to make your

11 day I think.  I've got a couple more docs and if

12 you'll give me a few more minutes, I think I might

13 be done.

14 MS. SWIFT:  I'm actually going to have

15 probably a few questions as well.  So, keep that in

16 mind --

17 MR. MOUGEY:  When you say --

18 MS. SWIFT:  -- when you're thinking about how

19 hungry you are.

20 MR. MOUGEY:  How much time do you have?

21 MS. SWIFT:  I won't know until you're done,

22 Peter.

23 MR. MOUGEY:  I just have a few --

24 MS. SWIFT:  I actually probably won't know --

Page 197

1  MR. MOUGEY:  If I were to stop right now, how

2  much longer do you have?

3  MS. SWIFT:  I don't know.  I honestly don't

4  know.

5  MR. MOUGEY:  Five minutes?  It sounds like.

6  MS. SWIFT:  Probably more than five minutes.

7  MR. MOUGEY:  Ten minutes, a half hour?  It

8  depends -- I am going to gauge my answer by how

9  much longer I have to what you tell me.

10 MS. SWIFT:  I am going to answer the question

11 the same way no matter how many times you ask it.

12 I don't know.  Five minutes, 15 minutes.

13 MR. MOUGEY:  I can continue to go until 4,

14 5 o'clock and I'm open to knocking off here in the

15 next few minutes if you can tell me if you've got

16 15, 20 minutes' worth of questions if I were to

17 stop.

18 MS. SWIFT:  It might be 15 to 20 questions.  I

19 don't know.

20 MR. MOUGEY:  15, 20 minutes is what I was --

21 is that fair?  Is that the same answer?

22 MS. SWIFT:  It might be 15 or 20 minutes.  I

23 don't know.  I am trying to be honest.

24 THE WITNESS:  I'm flexible either way.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 MS. SWIFT: Thank you, sir.

2 MR. MOUGEY: Thank you.

3 MS. SWIFT: I will say, Peter, either way,

4 we're going to want to stop. I want a little bit

5 of a break before asking questions, just FYI.

6 MR. MOUGEY: If we -- I am willing to tell you

7 I'm done right now. If we can take a couple-minute

8 break, organize what you need to do, and then if

9 you have got 15 or 20 minutes, I'm willing to knock

10 off the rest of what I have to do.

11 MS. SWIFT: I'm going to need to eat a

12 sandwich is what I'm telling you.

13 MR. MOUGEY: You're going to need to eat a

14 sandwich to ask 15 minutes' worth of questions?

15 MS. SWIFT: Yes, sir.

16 MR. MOUGEY: Then I'll keep going for the rest

17 of the day, then.

18 MS. SWIFT: Okay. That's your choice.

19 MR. MOUGEY: I mean, you got to be kidding me.

20 I'm just asking can we just take a five-minute

21 break, you get organized --

22 MS. SWIFT: I will go get -- here's what I'll

23 do for you.

24 MR. MOUGEY: You've got to be kidding me.

Page 199

1 MS. SWIFT: I'll go get the sandwich right now

2 and I'll bring it in here, you can do your

3 remainder questions.

4 MR. MOUGEY: I am not asking you to bring it

5 in here. I'm telling you --

6 MS. SWIFT: I know you're not. I'll telling

7 you I'll do that to speed things along.

8 MR. MOUGEY: I'm telling you I'm done if we

9 can take a five-minute break and you organize your

10 stuff and if you've got 15, 20 minutes, great.

11 Organize your things.

12 If you're telling me you want to take an

13 hour lunch break, I am going to miss the reason why

14 I want to get out of here and then I'm going to

15 keep going.

16 So, if you would like to get done, let

17 Mr. Bancroft off, take five minutes, get your stuff

18 organized and eat a sandwich in 20 minutes versus

19 now, that would be great. I think everybody would

20 appreciate it. If you want to take an hour lunch

21 break, I am going to miss the reason why I want to

22 get going.

23 MS. SWIFT: We're wasting time now. I don't

24 need an hour to eat a sandwich. If you've got 5,

Page 200

1 10 minutes of questions, I'll run outside and get a

2 protein bar. I don't care what it is. And then

3 I'll take 15 minutes and we'll come back.

4 MR. MOUGEY: Let's do that. We'll take a

5 five-minute break. You go eat a protein bar and

6 then I'll be done.

7 THE VIDEOGRAPHER: We are off the record at

8 12:28 p.m.

9 (WHEREUPON, a recess was had

10 from 12:28 to 12:38 p.m.)

11 THE VIDEOGRAPHER: We are back on the record

12 at 12:38 p.m.

13 MR. MOUGEY: I'm done. I don't have any more

14 questions.

15 THE WITNESS: Thank you.

16 EXAMINATION

17 BY MS. SWIFT:

18 Q. Mr. Bancroft, now that I know once we've

19 gone back on the record that Mr. Mougey doesn't

20 have any more questions, I do actually have a few

21 for you. Are you ready for those questions right

22 now?

23 A. I'm ready.

24 Q. Great. I think you testified earlier

Page 201

1 today that you received all of your education here

2 in Chicago. Is that right, sir?

3 A. My Master's, yes. Well, most of my

4 education. I spent a little time at SIU as an

5 undergrad.

6 Q. Was that SUI in Carbondale, Illinois?

7 A. Yes, it is.

8 Q. Did you grow up in the Chicago area?

9 A. Yes, I did.

10 Q. When did you get your Ph.D.? And I

11 apologize if you already testified about that

12 earlier today.

13 A. In May of '87.

14 Q. Your -- what was your Ph.D. in?

15 A. Management sciences.

16 Q. Does that involve statistical modeling?

17 A. It does.

18 Q. Does it involve other things?

19 A. Yes.

20 Q. What else does it involve?

21 A. It was part of the business school. My

22 Master's was with the engineering school. It

23 was -- the program got moved from the engineering

24 school to the business school. So, there were some

Page 202

1  finance with the business school.  There was linear
2  programming.  There was simulation.  There was an
3  array of disciplines that would fit under
4  management sciences that we -- we were responsible
5  for.
6      Q.    You received both your Master's and your
7  Ph.D. in management sciences.  Were both of those
8  degrees from the Illinois Institute of Technology
9  in Chicago?
10     A.    Yes, they were.
11     Q.    And your undergraduate degree was from
12 Loyola here in Chicago, is that right?
13     A.    Yes, it was.
14     Q.    I understand you had a variety of jobs
15 after receiving your Ph.D.  Were all of those,
16 before you came to Walgreens, were those all in the
17 Chicago area as well?
18     A.    Yes.
19     Q.    All performing quantitative analysis
20 along the lines of what you have been discussing
21 today?
22     A.    Either all or part of my work, yes.
23     Q.    Am I right that you came to Walgreens in
24 2004?

Page 203

1      A.    Yes.
2      Q.    Prior to your involvement in developing
3  the algorithms that you discussed today for
4  identifying orders that were potentially
5  suspicious, did you have any involvement at all in
6  anything called suspicious order monitoring or
7  reporting at Walgreens?
8      A.    No.
9      Q.    You talked today about I think a number
10 of algorithms that you developed for Walgreens
11 related to identifying potentially suspicious
12 orders.  Is that correct?
13     A.    Yes.
14     Q.    Was the first of those algorithms that
15 you developed for Walgreens relating to identifying
16 potentially suspicious orders, was that developed
17 in around the 2008 time frame?
18     A.    Yes.
19     Q.    And was it just one algorithm that you
20 developed in 2008 or was there more than one at
21 that point in time?
22     A.    There was two at that time.
23     Q.    Please describe to me those two
24 algorithms that you developed in the 2008 time

Page 204

1  frame.
2      A.    In the 2008 time frame first we
3  developed -- one of the algorithms was tolerance,
4  the other was frequency.
5          The objective of tolerance is to find
6  anything that lied above the norm, the orders that
7  the store placed in its history.  So, it didn't
8  want -- it was allowed to place an order once a
9  week through the system and it didn't want those
10 orders to grow very much, but you had -- there is
11 some dispersion around the means.
12         So, we would calculate the mean, and we
13 calculate so many standard errors about that mean;
14 and if it went above that, we would -- we would
15 flag it as potentially suspicious.
16         Now, in developing the mean and the
17 standard error, we'd go through the data and we
18 took care to filter out anything that looked --
19 that was outlier in the history.
20         So, we only used -- we -- our goal was
21 to only use orders that were -- conform to the
22 normal pattern for that store.  So, if there was
23 orders that were high, they got thrown out and they
24 did not go into the calculations of the mean or to

Page 205

1  the tolerance limit.
2          And that should -- itself every store
3  has to go -- every order -- every item goes through
4  this for every store, and that should keep the
5  stores from being able to grow at a very high rate.
6  It would put like a governor on their ability to
7  increase their amount of sales that they had.
8  So -- so, historically that kept the -- each
9  individual store in check.
10         The order frequency --
11     Q.    Before you go on -- I'm sorry to
12 interrupt you.  Before you go on to order
13 frequency, can I ask you a follow-up question about
14 tolerance limits?
15     A.    Yes.
16     Q.    Was the tolerance limit algorithm that
17 you developed designed to place limits on
18 individual orders?
19     A.    Placed -- it placed limits on individual
20 items and those individual orders for that item,
21 yes, it would place a limit on that.
22     Q.    But it wasn't like the tolerance limit
23 was looking at a limit over an entire store, like a
24 group of orders, individual --

Page 206

1    A.  No.  Every item had its own -- own
2    calculation, yes.
3    Q.  Do you have an understanding whether the
4    algorithm that you developed for tolerance limits
5    is still in place at Walgreens today, do you know?
6    A.  I believe it's still in place.
7    Q.  All right.  You said there was another
8    algorithm that you developed in the 2008 time frame
9    related to order frequency, is that right?
10    A.  Yeah.  One of the requirements from the
11    DEA was order size and order frequency.
12        Frequency I had -- I scratched my head
13    as to what does it mean, and we talked about it.
14    What we came up with is if orders were placed too
15    close together, you placed an order today and you
16    placed an order tomorrow and that's not a normal
17    pattern, that's what the frequency.  Used a
18    geometric distribution.
19        And if -- so, if it was a slow-moving
20    item and two orders showed up back to back, it
21    could be a little bit suspicious or were
22    potentially suspicious.
23    Q.  And you say a little bit suspicious,
24    potentially suspicious.  There was a lot of

Page 207

1    questioning today about what you meant in your memo
2    from June of 2008 when you said suspicious orders.
3        Your -- I understand that you're not a
4    lawyer, is that right, sir?
5    A.  Yes.  And I'm not a linguist either.
6    Q.  You are also not somebody who is in the
7    store on the Store Ordering Team, is that right,
8    sir?
9    A.  That's right.
10    Q.  Am I also correct that you're not in the
11    Rx purchasing department?
12    A.  That's correct.
13    Q.  Am I also correct that you are not in
14    the Rx Integrity department?
15    A.  That's right.
16    Q.  Do you have an understanding of whether
17    folks on each of those different departments may
18    or -- do you know whether -- how they use the words
19    "suspicious orders" over time?
20    A.  I can't -- that would be speculation.  I
21    don't know how other people intended.  I know when
22    I heard the term "suspicious," how I interpret it
23    and how I intended it.
24    Q.  All right.  So, we talked about the two

Page 208

1    algorithms that you developed in the 2008 time
2    frame.
3        Once you were done writing your
4    algorithms, did you -- did you maintain an ongoing
5    constant presence on the project to develop
6    Walgreens' suspicious order monitoring policies and
7    how those were implemented?
8    A.  Constant, no.  I would -- when asked to
9    participate, I'd participate.
10    Q.  Did that happen frequently,
11    infrequently, something else?
12    A.  I -- I would say something else.  You
13    know, I would say when needed.  I was needed more
14    upfront and then for a while I wasn't -- I was
15    doing other things, and then in 2012 I was -- I had
16    a more active role again.
17    Q.  Do you have an understanding of whether
18    the Store Ordering Team, Rakesh Khanna and Steve
19    Bamberg and folks like that, whether they took what
20    you did in 2008 and developed it further and
21    implemented it at the store -- at the company?
22    A.  That was their -- their job, yes.
23    Q.  Did they, in doing that, in that
24    development process, did they do that in large part

Page 209

1    without your involvement?
2    A.  In large part but, you know, I
3    participated where needed.
4    Q.  You said that at a certain point you got
5    back involved for making enhancements to the
6    system, is that correct?
7    A.  That would be correct.
8    Q.  In 2012, did you develop an additional
9    algorithm for use in identifying suspicious orders?
10    A.  In 2012 we -- we -- it was a group of us
11    called together, and we -- there was a -- they
12    wanted to tighten the or enhance the system, put
13    more controls on it, and so John Merritello, he
14    went to the whiteboard and he says, he said, "I
15    want to put an upper line and they can't cross it."
16        And I took that as a, you know -- so, he
17    told me what his intent was, the model, what the
18    spirit of the model, to not only look at them as
19    isolated orders but to look at from a corporate
20    viewpoint how all the stores were ordering and how
21    do these -- this store -- how was it relative to
22    the other stores in general in an overall aspect.
23    Q.  Is what you just described the
24    development of what we've talked about here today

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 as ceiling limits?
2    A.   Yes.
3    Q.   When you talked about tolerance limits
4 earlier today, I asked you are those limits on an
5 individual order.  Do you remember that question?
6    A.   Yes.
7    Q.   Do ceiling limits apply to individual
8 orders?
9    A.   No.
10    Q.   What do ceiling limits apply to?
11    A.   Ceiling limits look at orders over a
12 period of time, and it's my understanding that they
13 have used six weeks for that period of time.
14    Q.   Do you know that for sure?
15    A.   I know it's a variable.  So, no, I don't
16 know that for sure.
17    Q.   Do you have an understanding of whether
18 Walgreens uses the ceiling limit algorithm that you
19 developed today?
20    A.   That's my understanding that it's being
21 used, yes.
22    Q.   You talked a bit about the fact that
23 there are standard deviations that are used in
24 conjunction with your algorithms.  Is that right?

Page 211

1    A.   Yes.
2    Q.   Is it up to you to set the standard
3 deviations that are used?
4    A.   No.
5    Q.   Do you know who is responsible for that?
6    A.   The integrity group is my understanding.
7    Q.   Is it your understanding that that's who
8 is responsible for setting the standard deviations
9 today?
10    A.   Yes.
11    Q.   Prior to the time when the Rx Integrity
12 group was in place, do you have an understanding of
13 who was responsible for the standard deviations
14 that would have applied to the algorithms that you
15 developed?
16    A.   Prior to today, no.  Yeah, prior to
17 today, no.  I got a hint from today but...
18    Q.   You were asked a lot of questions about
19 what might happen to an order after it was flagged
20 on one of your algorithms.
21         Do you have any understanding of what
22 other folks in other departments at Walgreens may
23 have done once an order was flagged on one of your
24 algorithms?

Page 212

1    A.   The system, my understanding was the
2 system would -- would adjust the order size.  And
3 exactly how, what that logic was, I wasn't too
4 involved in that.
5    Q.   There were other folks at Walgreens --
6    A.   Yes.
7    Q.   -- who were involved in that?
8    A.   Yes.
9    Q.   You were asked questions about the
10 timeline of development of Walgreens' suspicious
11 order monitoring policies and procedures over time.
12         Do you actually know when the tolerance
13 limit and frequency algorithms that you developed
14 were implemented at Walgreens?
15    A.   Time frame, no.  Timeline, I don't know.
16    Q.   Same question with respect to the
17 ceiling limits.  Do you actually know when the
18 ceiling limits were implemented at Walgreens?
19    A.   No, timeline, I'm not aware of.
20    Q.   Take a look, if you would, please, sir,
21 at Exhibit 12 just as an example.  This is the
22 "Functional Requirements & (Macro) Design" document
23 from -- the latest date on it is April 6, 2012.
24         Do you see that?

Page 213

1    A.   Yes.
2    Q.   Your name isn't actually on this
3 document.  Did you have responsibility and
4 involvement in documents like this that were
5 developed by folks like Steve Bamberg and Rakesh
6 Khanna?
7    A.   The functional requirements, no, I was
8 not involved in that.  They probably used some of
9 the stuff I worked on, but creating this document,
10 no.
11    Q.   You were asked a question -- well, I
12 will look at Exhibit 12 for this purpose as well.
13         If you turn to page 2, you were asked
14 questions about the Phase I Overview and Phase II
15 Overview, and I believe you testified that Phase I
16 as used in Exhibit 12, the functional requirements
17 document, lasted until 2012.
18         Do you have any understanding of whether
19 other groups may have had different timelines using
20 different phases than what's in your mind?
21    A.   No, I -- no.  No knowledge.
22    MS. SWIFT:  I don't have any other questions.
23    MR. MOUGEY:  I don't have anything else.
24         Thank you, Mr. Bancroft.

Page 214

1    THE WITNESS: Thank you.

2    MR. MOUGEY: Thanks, everybody. Appreciate

3 it.

4    MS. SWIFT: Ten to 1:00.

5    THE VIDEOGRAPHER: We are off the record at

6 12:52 p.m. This concludes the video deposition of

7 Wayne Bancroft.

8         (Time Noted: 12:52 p.m.)

9         FURTHER DEPONENT SAITH NAUGHT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 215

1         I, CORINNE T. MARUT, C.S.R. No. 84-1968,
2    Registered Professional Reporter and Certified
     Shorthand Reporter, do hereby certify:
3         That previous to the commencement of the
     examination of the witness, the witness was duly
4    sworn to testify the whole truth concerning the
     matters herein;
5         That the foregoing deposition transcript
     was reported stenographically by me, was thereafter
6    reduced to typewriting under my personal direction
     and constitutes a true record of the testimony
7    given and the proceedings had;
          That the said deposition was taken
8    before me at the time and place specified;
          That the reading and signing by the
9    witness of the deposition transcript was agreed
     upon as stated herein;
10        That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
11   such attorney or counsel for any of the parties
     hereto, nor interested directly or indirectly in
12   the outcome of this action.
13
     _____
14        CORINNE T. MARUT, Certified Reporter
15
          (The foregoing certification of this
16   transcript does not apply to any
     reproduction of the same by any means, unless under
17   the direct control and/or supervision of the
     certifying reporter.)
18
19
20
21
22
23
24

Page 216

1         INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over

4 carefully and make any necessary corrections. You

5 should state the reason in the appropriate space on

6 the errata sheet for any corrections that are made.

7         After doing so, please sign the errata

8 sheet and date it.

9         You are signing same subject to the

10 changes you have noted on the errata sheet, which

11 will be attached to your deposition.

12         It is imperative that you return the

13 original errata sheet to the deposing attorney

14 within thirty (30) days of receipt of the

15 deposition transcript by you. If you fail to do

16 so, the deposition transcript may be deemed to be

17 accurate and may be used in court.

18

19

20

21

22

23

24

Page 217

1         - - - - - -
          E R R A T A
2         - - - - - -
3
4 PAGE LINE CHANGE
5 ____ ____ _____
6         REASON: _____
7 ____ ____ _____
8         REASON: _____
9 ____ ____ _____
10        REASON: _____
11 ____ ____ _____
12        REASON: _____
13 ____ ____ _____
14        REASON: _____
15 ____ ____ _____
16        REASON: _____
17 ____ ____ _____
18        REASON: _____
19 ____ ____ _____
20        REASON: _____
21 ____ ____ _____
22        REASON: _____
23 ____ ____ _____
24        REASON: _____

Page 218

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4          I, WAYNE EUGENE BANCROFT, do hereby
5   certify under oath that I have read the foregoing
6   pages, and that the same is a correct transcription
7   of the answers given by me to the questions therein
8   propounded, except for the corrections or changes
9   in form or substance, if any, noted in the attached
10  Errata Sheet.
11
12
13  _____
14  WAYNE EUGENE BANCROFT          DATE
15
16
17  Subscribed and sworn
    to before me this
18  _____ day of _____, 20____.
19  My commission expires:_____
20
    _____ Notary Public
21
22
23
24

Page 219

1            LAWYER'S NOTES
2   PAGE  LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____