Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3

      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____  )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES     )  Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                 MONDAY, OCTOBER 22, 2018
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                      - - -
12           Videotaped deposition of Sean
13    Barnes, held at the offices of BARTLIT BECK
14    HERMAN PALENCHAR & SCOTT LLP, 54 West
15    Hubbard, Suite 300, Chicago, Illinois,
16    commencing at 9:03 a.m., on the above date,
17    before Carrie A. Campbell, Registered
18    Diplomate Reporter, Certified Realtime
19    Reporter, Illinois, California & Texas
20    Certified Shorthand Reporter, Missouri &
21    Kansas Certified Court Reporter.
22                      - - -
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
25
```

Page 2

APPEARANCES:

LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY PROCTOR, P.A.
BY: JEFF GADDY, ESQUIRE
jgaddy@levinlaw.com
LAURA DUNNING, ESQUIRE
ldunning@levinlaw.com
316 South Baylen Street
Pensacola, Florida 32502
(850) 435-7000

NAPOLI SHKOLNIK, PLLC
BY: JODI KLOCKENGA, ESQUIRE
JKlockenga@NapoliLaw.com
(VIA TELECONFERENCE)
360 Lexington Avenue, 11th Floor
New York, New York 10017
(212) 397-1000
Counsel for Plaintiffs

BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
BY: KATHERINE M. SWIFT, ESQUIRE
kate.swift@bartlit-beck.com
SHARON DESH, ESQUIRE
sharon.desh@bartlit-beck.com
54 West Hubbard, Suite 300
Chicago, Illinois 60654
(312) 494-4400
Counsel for Walgreens

WILLIAMS & CONNOLLY LLP
BY: JOSEPH S. BUSHUR, ESQUIRE
spyser@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5331
Counsel for Cardinal Health, Inc.

Page 3

REED SMITH LLP
BY: STEVEN BORANIAN, ESQUIRE
sboranian@reedsmith.com
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Counsel for AmerisourceBergen

JONES DAY
BY: PATRICK BEISELL, ESQUIRE
pbeisell@jonesday.com
77 West Wacker
Chicago, Illinois 60601-1692
(312) 782-3939
Counsel for Walmart

PELINI CAMPBELL & WILLIAMS LLC
BY: ERIC WILLIAMS, ESQUIRE
ewilliams@pelini-law.com
(VIA TELECONFERENCE)
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Counsel for Prescription Supply,
Inc.

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: JUSTIN MCCARTHY, ESQUIRE
justin.mccarthy@arnoldporter.com
(VIA TELECONFERENCE)
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
(213) 243-4000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

Page 4

MORGAN, LEWIS & BOCKIUS LLP
BY: JAMES A. NORTEY, ESQUIRE
james.nortey@morganlewis.com
(VIA TELECONFERENCE)
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006
(713) 890-5000
Counsel for Rite Aid

VIDEOGRAPHER:
MICHAEL NEWELL,
Golkow Litigation Services

TRIAL TECHNICIAN:
COREY SMITH,
Golkow Litigation Services

– – –

Page 5

INDEX

PAGE

APPEARANCES.................................  2
EXAMINATIONS
  BY MR. GADDY...............................  10
  BY MS. SWIFT............................... 329

EXHIBITS

| Walgreens-Barnes | Description | Page No. |
| --- | --- | --- |
| 1 | Sean Barnes LinkedIn profile printout | 11 |
| 2 | ARCOS Registrant Handbook, Office of Diversion Control, WAGMDL00282651 - WAGMDL00282841 | 28 |
| 3 | E-mail(s), WAGMDL00363767 - WAGMDL00363770 | 44 |
| 4 | E-mail(s), WAGMDL00282342 - WAGMDL00282345 | 57 |
| 5 | E-mail(s), WAGMDL00363749 - WAGMDL00363750 | 69 |
| 6 | E-mail(s), WAGMDL00364632 - WAGMDL00364633 | 75 |
| 7 | E-mail(s), WAGMDL00282973 - WAGMDL00282981 | 98 |
| 8 | Merchandising, Supply Chain & Logistics, WAGMDL00254645 - WAGMDL00254648 | 111 |
| 9 | GAO Report to Congressional Requesters, Prescription Drugs, OxyContin Abuse and Diversion and Efforts to Address the Problem, December 2003 | 120 |

Highly Confidential - Subject to Further Confidentiality Review

Page 6

10    US Department of Justice June 12,    135
      2012 letter to registrant,
      ABDCMDL00269683 - ABDCMDL00269694

11    McKesson Corporation Agrees to Pay    136
      More than $13 Million to Settle
      Claims that it Failed to Report
      Suspicious Sales of Prescription
      Medications

12    E-mail(s),    144
      WAGMDL00363134 - WAGMDL00363144

13    E-mail(s),    162
      WAGMDL00282353 - WAGMDL00282354

14    Settlement and Memorandum of    168
      Agreement between DEA and Walgreens

15    Walgreen Co Form 10-Q Filed 3/25/13    201
      for the period ending 2/28/13

16    Walgreens Business Requirements,    207
      WAGMDL00314370 - WAGMDL0031488

17    Rx Quick Order: Add Items by Item    220
      Description,
      WAG00000293

18    CII Process and CSOS Training    226
      Document,
      WAGMDL00237415 - WAGMDL00237422

19    E-mail(s),    232
      WAGMDL00363660 - WAGMDL00363662

20    United States Attorney's Office    242
      Colorado Archive, Cardinal Health,
      Inc., Agrees to Pay $34 Million to
      Settle Claims that it Failed to
      Report Suspicious Sales of
      Widely-Abused Controlled Substances

21    E-mail(s),    247
      WAGMDL00085856 - WAGMDL00085858

Page 7

22    Second Notice of Deposition Pursuant    261
      to Rule 30(b)(6) and Document
      Request Pursuant to rule 30(b)(6)(2)
      and rule 34 to Defendant Walgreens
      Boots Alliance, Inc., a/k/a Walgreen
      Co.

23    Sean Barnes October 22, 2018 binder    264
      of documents

24    E-mail 9/27/18 from David R. Cohen,    270
      Subject: Rulings 5a & 5b

25    E-mail(s),    308
      WAGMDL00358746 - WAGMDL00358750

26    CII-CV Controlled Substances Mini    312
      Audit for Jupiter DC, Audit Period
      June 10-August 10,
      WAG00001803 - WAG00001822

27    E-mail(s),    317
      WAGMDL00079943 - WAGMDL00079946

(Exhibits attached to the deposition.)

Page 8

VIDEOGRAPHER: We are now on the record.

My name is Michael Newell. I'm a videographer for Golkow Litigation Services.

Today's date is October 22, 2018. The time is 9:03 a.m.

This video deposition is being held in Chicago, Illinois, in the matter of In Re: National Litigation -- National Prescription Opiate Litigation for the Northern District of Ohio, Eastern Division.

The deponent today is Sean Barnes.

Will counsel please identify themselves for the record?

MR. GADDY: Jeff Gaddy for the plaintiffs.

MS. DUNNING: Laura Dunning for the plaintiffs.

MR. BUSHUR: Joseph Bushur on behalf of Cardinal Health.

MR. BORANIAN: Steven Boranian for defendant AmerisourceBergen.

Page 9

MR. BEISELL: Patrick Beisell for defendant Walmart.

MS. DESH: Sharon Desh for Walgreens.

MS. SWIFT: Kate Swift for Walgreens.

VIDEOGRAPHER: The court reporter today is Carrie Campbell and will now swear in the witness.

MR. GADDY: If anybody on the phone could go ahead and introduce themselves also, please.

MR. MCCARTHY: Sorry, can folks hear me through the dial-in?

MS. SWIFT: Yes, we can hear you.

MR. MCCARTHY: Okay, great. This is Justin McCarthy for Endo.

MS. SWIFT: Anybody else on the phone?

SEAN BARNES, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Plaintiffs, as follows:

Highly Confidential - Subject to Further Confidentiality Review

Page 10

DIRECT EXAMINATION

QUESTIONS BY MR. GADDY:

Q. State your name, please.

A. Sean Barnes.

Q. Mr. Barnes, do you understand that today you're going to be giving essentially two separate depositions: One in your personal capacity, a fact witness deposition, and a second where you'll be testifying on behalf of Walgreens as a company?

Do you understand that?

A. I do.

Q. Okay. I expect that we'll spend the majority of our day in your fact deposition, and that's what I will start with this morning.

Okay?

A. Okay.

Q. Anything that I ask you until I tell you otherwise will be in your personal capacity based on your personal understanding, based on your experience with Walgreens.

Do you understand that?

Page 11

A. I do.

Q. Okay. And if you have any questions about whether I'm asking you a question in your personal capacity or on behalf of Walgreens as a company, feel free to let me know, but I assure you that I'll make it clear that I'm transitioning into the 30(b)(6) portion of the deposition.

Understood?

A. Uh-huh.

(Walgreens-Barnes Exhibit 1 marked for identification.)

QUESTIONS BY MR. GADDY:

Q. Okay. I'm going to show you what we're going to mark as Barnes 1.

Do you recognize this?

A. I think this is my LinkedIn portfolio or profile.

Q. Okay. You drafted this?

A. I did.

Q. You posted it online?

A. I did.

Q. Did you make an effort to ensure that it was complete and accurate?

A. Honestly, I -- though I need

Page 12

another revision, I believe it's fairly complete and accurate. But kind of rushed the first two versions, and I've realized since I need to brush up some. But if you mention anything that I feel needs clarification, I'll let you know, if that works.

Q. But you have updated this over time?

A. I have.

Q. On the first page there under experience, it says you've been with Walgreens for approximately 12 years?

A. Actually, that's incorrect, and the reason for that is there's been multiple promotions and stuff through the years. I've actually been there -- it will be 15 years on January 26, 2019.

I just -- the promotions, I don't know if anyone else knows what I'm talking about, the LinkedIn promotion, when you change jobs, it sets the time clock oddly.

Q. Okay. So in January it'll be 15 years with Walgreens?

Page 13

A. Yes.

Q. Okay. If you turn to the second page, it looks like you first started with Walgreens in January 2004?

A. Correct.

Q. Okay. And what was your position then?

A. I was a senior programmer analyst and developer in logistic systems.

Q. What were the scope of your duties in that role?

A. A lot of your first year in a company as large as Walgreens with as many IT employees, you're just getting your feet wet, honestly, even within a suborganization like logistics information systems, which is what we'd be called nowadays. So I was on a team called the PROF team. It standed for pick, replenishment and order fill. Because we deal a lot with warehouses and transportation, and a lot of it was learning how the systems work at a high level because back then we were all on support, on a support rotation as well, and often when you were on that rotation, it could be hours a

Highly Confidential – Subject to Further Confidentiality Review

Page 14

1 night for the week.  You know, every -- every
2 night for the whole week you're on support.
3        Other duties -- I believe your
4 question was initial duties -- besides
5 learning was -- were to travel the US to most
6 of our distribution centers to learn how to
7 make our -- the way we do resets, revisions
8 and promo handling better, which is basically
9 ads, coupons, rolling out new seasonal stock,
10 making Christmas, Thanksgiving, Hanukkah, all
11 that happen.
12        Q.    In the first bullet point of
13 your -- under that original job title, in the
14 last line you list compliance, SOX,
15 Pedigree --
16        A.    That's correct.
17        Q.    -- and replenishment areas,
18 correct?
19        A.    Yes.  So --
20        MS. SWIFT:  Wait until he asks
21 a question.
22        THE WITNESS:  I'm sorry.
23 QUESTIONS BY MR. GADDY:
24        Q.    So what is SOX referring to?
25        A.    Sarbanes-Oxley.

Page 15

1        Q.    And what is Pedigree referring
2 to?
3        A.    Pedigree, the way I understand
4 it, the nonlegal definition, is chain of
5 custody.  Can you prove that the drug goes
6 all the way back to the manufacturer and then
7 through the supply chain to -- all the way
8 through till you and then the last stop to
9 the customer.
10        Q.    In your role as it relates to
11 compliance in that first position that you
12 held with Walgreens, did you have any duties
13 that related to controlled substances?
14        A.    In this first role, no.
15        Q.    As it related to your duties
16 with compliance with Sarbanes-Oxley, did your
17 duties have anything to do with document
18 retention or the prevention of document
19 destruction?
20        A.    Sar -- my role with relation to
21 SOX, or Sarbanes-Oxley, if you step back,
22 that was -- at least my understanding was
23 that it was a very new law in 2004, and
24 Walgreens had developed a custom system to do
25 all the document tracking and also make sure

Page 16

1 the right person was -- you know, you got
2 assigned roles, and the right person was
3 doing the right job as far as document
4 approval and retention.
5        So my role was really
6 understanding it, implementing the Walgreens
7 solution for our department and training
8 people.
9        Q.    In your role with compliance
10 with Sarbanes-Oxley, you weren't signing off
11 on document retention policies or document
12 destruction or anything like that?
13        A.    I was not.
14        Q.    Go ahead to the first page.  It
15 looks like the bulk of your time at Walgreens
16 was spent as an IT team manager, correct?
17        A.    Correct.
18        Q.    And you did that job for over
19 nine years?
20        A.    Yeah, correct.
21        Q.    And you list some of the duties that you
22 had in that area, correct?
23        A.    I do.
24        Q.    Okay.  And about three bullet

Page 17

1 points down you write, "Compliance, including
2 RX Pedigree, C-II and CSOS," correct?
3        A.    Correct.
4        Q.    Are those two separate areas?
5        A.    They're three separate
6 application areas under Walgreens, and I -- I
7 believe at least two different sets of walls,
8 but I'm not aware.
9        Q.    Okay.  Let's first talk about
10 the RX Pedigree.
11        What were your duties as it
12 related to RX Pedigree?
13        A.    I -- it's kind of odd in the
14 job -- or in the IT world to know a lot of
15 different languages, and in short, I -- older
16 languages that Walgreens owned that I also --
17 or not owned, used, and I also owned Java,
18 newer languages that were newer back then.
19        Q.    By "languages" are you talking
20 software?
21        A.    Software languages like --
22 yeah.  Like RPG and Java are two examples.
23        The reason it's applicable
24 here, to bring it back to non-IT speak, is I
25 was asked to write the first Pedigree

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 solution. And back then the DEA would
2 allow -- or not -- it wasn't the DEA; I
3 believe it was the state of Florida. All you
4 had to do was retain that -- we were told by
5 the business that all we had to do was retain
6 paper documents and do some checking of those
7 documents upon receipt.
8      And so we put in a scanning
9 solution. It's just as simple as, you know,
10 you have a copier and you scan it digitally
11 and link that to the orders by working with
12 another team on their systems to provide that
13 linkage.
14   Q.   Okay. And that was
15 instructions that you got from Walgreens?
16   A.   Anytime we act in IT, we've
17 gotten instructions from the business
18 specialist -- SME, subject matter expert. We
19 don't just go, of course, and make up rules.
20   Q.   But when you -- when you refer
21 to the -- the business specialist, you're
22 talking about Walgreens corporate, correct?
23   A.   I would be talking someone at
24 Walgreens corporate that has the role of the
25 specialist in that area; in this case, the

Page 19

1 Pedigree roles.
2   Q.   Okay. In your role as an IT
3 team manager, were you designing programs or
4 were you implementing programs that had been
5 designed by somebody else?
6   A.   Since I'm -- it was a little
7 bit of both as I first became team manager,
8 because I was transitioning out of a role as
9 a programmer into more of a management role.
10 So depending on the time period within the
11 team manager years, sometimes early on I
12 might have still been programming. Later on,
13 no, but it would be -- you know, so it would
14 either be I'd implement it myself at the
15 direction of business -- you know, the
16 business or I'd have team members that get
17 the requirements, program it, and with the
18 business sign-off and my sign-off, go ahead
19 and implement.
20   Q.   What were your duties as it
21 related to C-II and COS?
22   A.   During that time period I --
23 really, to me, they're one and the same as
24 far as my experience. So early on,
25 Walgreens, as soon as the DEA allowed for

Page 20

1 C -- we usually call it CSOS, so if I say
2 that instead of C-S-O-S, that's why --
3 controlled substance ordering system,
4 sometimes called e222. And we -- as a
5 company, I was told we were interested in it
6 because electronic -- you know, if you can
7 make things electronically, it's usually a
8 much easier, cleaner, paper you don't have to
9 handle it and stuff like that.
10      So my role in there was first
11 helping give an IT input to the business as
12 they were negotiating a contract for the
13 software that we were going to choose because
14 we did an RFP around that, and then later
15 gave IT input to negotiating the contract
16 with what is currently Axway Corp., which is
17 the provider of our core CSOS solution.
18      Then later on we implemented
19 for -- and during this time period, we
20 implemented it for DC replenishment --
21      MR. NORTEY:  Court Reporter,
22   can you hear me?
23      MS. SWIFT:  We can hear you.
24      MR. GADDY:  We can hear you.
25      MS. SWIFT:  You're dialing into

Page 21

1 the deposition. Is that what you
2   meant to do? Hello?
3 QUESTIONS BY MR. GADDY:
4   Q.   So let me ask a new question.
5      So you -- your original
6 function as it related to the CSOS, or
7 C-S-O-S, was to assist with securing the
8 contract through an RFP process, correct?
9   A.   Yeah. To assist, yes.
10   Q.   Okay. Once the system was
11 established, what was your role as it related
12 to C-IIs and CSOS?
13   A.   The role we've had, it's varied
14 depending on the part of the solution. So as
15 I said, once the contract was secured, we
16 implemented it. We used it for -- I think
17 that's when the gentleman cut in, was we were
18 ending.
19      We implemented for DC
20 replenishment orders. That's actually
21 ordering it from a third party like Cardinal
22 or ABC or any of the wholesalers and bringing
23 into our warehouses for later sale to our
24 stores.
25      During this time period we

Highly Confidential – Subject to Further Confidentiality Review

Page 22

1 didn't have CSOS for store ordering from
2 either ourselves as a wholesaler or any other
3 wholesaler.
4     Q.    Was CSOS the program that you
5 used to make Walgreens ARCOS reports?
6     A.    No.
7     Q.    What was used to make ARCOS
8 reports?
9     A.    I don't know if it's during
10 this time period, if it matters, but since --
11 I have owned that since, the program that's
12 actually used to create the reports is a
13 program that we received, I was told, free of
14 charge with another program we bought that
15 handled our RX returns.  And that was built
16 by a company called Stericycle, who's also a
17 third-party return vendor, but they no longer
18 are in the software business.  But it was
19 built by them.
20     Q.    What was your -- here in this
21 bullet point you write that you were involved
22 in compliance, including C-II and CSOS.
23         What was your duties as it
24 related to compliance with C-IIs?
25     A.    My duties in relation to

Page 23

1 compliance are getting the compliance -- like
2 most of our IT functions, it's getting any
3 changes that are requested on any of our
4 compliance applications, whether it was CSOS
5 or ARCOS or Pedigree, but during this time we
6 gave Pedigree to another team.  But it's
7 going to always be to get their -- you know,
8 working for a business.  Either they'll
9 schedule meetings, we'll schedule meetings.
10 We capture the requirements, make sure that
11 we are aligned to what they want to do.
12         Sometimes they include multiple
13 teams, but whoever they are at the time,
14 document them, get them to sign off,
15 implement them, get them to test and make
16 sure it's right and put it in because at the
17 end of the day, the business is the one that
18 has the expertise, and they are really the
19 ones that need to make sure it's working
20 correctly and that we have done our job
21 right, because sometimes humans don't always
22 understand each other until you see what's in
23 your face.
24     Q.    When you say "compliance,"
25 compliance with what?

Page 24

1     A.    Again, it's just a general term
2 to describe -- me, as an IT person, we had a
3 few compliance applications under us.  I was
4 not in charge of actual compliance.  I was in
5 charge of helping support and modify
6 compliance applications.
7     Q.    When you say "compliance," do
8 you mean compliance with any federal
9 statutes, federal regulations or DEA
10 guidance?
11         MS. SWIFT:  Object to the form.
12         THE WITNESS:  These
13     applications were designed with
14     business input to comply with some
15     federal regulations, is my
16     understanding.
17 QUESTIONS BY MR. GADDY:
18     Q.    Okay.  In your role working in
19 C-II compliance, did Walgreens provide you
20 with any training in Schedule II or III
21 narcotics?
22         MS. SWIFT:  Object to the form.
23         THE WITNESS:  Again, my role
24     wasn't to actually do the compliance;
25     it was to enable compliance as told to

Page 25

1     us by various business SMEs and legal,
2     who I don't -- I'm not aware of their
3     training.
4 QUESTIONS BY MR. GADDY:
5     Q.    Okay.  Did Walgreens provide
6 you any training as it relates to C-II or III
7 narcotics?
8         MS. SWIFT:  Object to the form.
9         THE WITNESS:  No, they did not,
10     because we worked with the
11     professionals who had the background.
12     I can't say that they had the
13     background, but we worked with those
14     subject matter experts.
15 QUESTIONS BY MR. GADDY:
16     Q.    You were not provided any
17 training in Schedule II or III narcotics by
18 Walgreens?
19         MS. SWIFT:  Object to the form.
20     Asked and answered.
21         THE WITNESS:  No direct
22     training, no.
23 QUESTIONS BY MR. GADDY:
24     Q.    Did Walgreens provide you with
25 any training on ARCOS reporting?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A.    Can you specify?  Do you mean
2  the software side or the law, or what do you
3  mean?
4    Q.    The law and the requirements to
5  make ARCOS reports to the DEA.
6    A.    Again, the business gave us the
7  requirements.  They're subject matter
8  experts.  They also referred us sometimes to
9  the direct DEA website to reference how to
10 format some items.  But that would only be if
11 we made changes.
12          Again, the ARCOS applications
13 were provided by a third-party company with
14 presumed expertise in this area.  The only
15 thing we had to do was keep it running for
16 the most part.
17   Q.    Who were the Walgreens subject
18 matter experts who provided you information
19 on Schedule II or III narcotics?
20   A.    Instead of ARCOS, you're going
21 more general?
22          We have a basic group of
23 experts that stayed pretty consistent
24 throughout the years who would give us
25 guidelines on these requirements, such as

Page 27

1  Barb Martin, Tasha Polster, their management.
2    Q.    Who was their management?
3    A.    Denny Murray, or Denman Murray
4  is officially his name, is Barb Martin's
5  director.  Tasha is actually the VP, so at
6  times we'll actually work with Steve -- I
7  can't remember his last name, but Tasha will
8  usually assign people.  She has what we call
9  RX integrity.
10   Q.    What is ARCOS?
11   A.    My personal definition?  I'm
12 not --
13   Q.    As per your understanding.
14   A.    Okay.  Let's say DEA reporting
15 requirement that monthly we need to report
16 transactions in or out between registrants,
17 between DEA-registered entities.
18   Q.    Okay.  And when you were
19 filling this role as an IT team manager from
20 2006 to 2015, did your duties sometime
21 encompass assisting with troubleshooting as
22 it related to ARCOS reporting?
23          MS. SWIFT:  Object to the form.
24          THE WITNESS:  I can't remember
25 any specific incidents in which it

Page 28

1  had.
2          In general, as a team manager,
3  you -- or in management you help your
4  team get through any issues, but
5  nothing specific comes to mind on this
6  for me personally.
7          (Walgreens-Barnes Exhibit 2
8  marked for identification.)
9  QUESTIONS BY MR. GADDY:
10   Q.    I want to show you a document
11 that we're going to mark as Barnes Exhibit
12 Number 2.
13          Mr. Barnes, while we're pulling
14 this out, you named several -- you named
15 several individuals you considered subject
16 matter experts and referenced the
17 pharmaceutical integrity team, correct?
18   A.    Not all the same team, but
19 experts who are at Walgreens.
20   Q.    Okay.  Do you have an
21 understanding that the pharmaceutical
22 integrity team was created in approximately
23 2013?
24          MS. SWIFT:  Object to the form.
25 Foundation.

Page 29

1          THE WITNESS:  Excuse me.  I
2  don't remember the exact year.  I know
3  it was not there from the beginning.
4  Roughly about that time, I would
5  guess.
6  QUESTIONS BY MR. GADDY:
7    Q.    Prior to the creation of the
8  pharmaceutical integrity team, who were the
9  subject matter experts that you would talk to
10 regarding Schedule II and III narcotics?
11   A.    It would have been more Denny
12 Murray's team and Mike -- Mike Blazer is the
13 VP over that whole area.  So that team has
14 been called multiple things over the years,
15 but they've always had -- they've always had
16 RX under them.
17   Q.    Okay.  Showing you what we've
18 marked as Barnes 2.
19          Do you recognize that document?
20   A.    I recognize -- I recognize the
21 cover.  I certainly never had cause to read
22 the entire document.
23   Q.    Okay.  Have you reviewed that
24 document before?
25   A.    It's available on -- I've never

Page 30

1 read the entire document. It's available on
2 the web, searchable, so that if we needed
3 specific information, it's been there.
4     Q.    And is this something that
5 you've had to utilize from time to time?
6         MS. SWIFT: Object to the form.
7         THE WITNESS: I've looked at it
8     time to time if I wanted to make sure
9     I understood a request, and then maybe
10     sometimes -- because IT, we act as
11     partners and we say, "Is this what you
12     mean by reference" and -- in that
13     format. So, again, I've read
14     partially as needed.
15 QUESTIONS BY MR. GADDY:
16     Q.    If you'd turn for me, please,
17 to -- it's about 10 or so pages in, 1-1.
18     A.    You said 1-1?
19     Q.    Correct.
20         Actually, before I go
21 there, let me use the ELMO for just a minute.
22         You should have a screen in
23 front of you, and then there's also one up
24 here if you want to look at what I'm showing
25 you here.

Page 31

1         MS. SWIFT: You're putting
2     something different on the screen,
3     Jeff?
4         MR. GADDY: Yeah, there was an
5     attachment e-mail that somehow didn't
6     get on the other copies, so we'll just
7     use the ELMO for that.
8         MS. SWIFT: An attachment
9     e-mail --
10         MR. GADDY: There was an
11     e-mail --
12         MS. SWIFT: -- to this giant
13     document?
14         MR. GADDY: Correct.
15         MS. SWIFT: When you say "an
16     attachment e-mail," you mean that as
17     it was produced, the e-mail attached
18     the ARCOS registrant handbook that you
19     marked as Exhibit 2?
20         MR. GADDY: Correct. Correct.
21 QUESTIONS BY MR. GADDY:
22     Q.    Do you see up on the screen
23 that we're looking at an e-mail from Brian
24 Amend?
25     A.    Correct.

Page 32

1     Q.    And who is Mr. Amend?
2     A.    He currently is my senior
3 director, so two levels above me. At that
4 time he could have been my manager or my
5 director. I do not remember.
6     Q.    Okay. And you see that this is
7 an e-mail from January of 2013 and that you
8 were copied on this e-mail?
9     A.    I do.
10     Q.    And the subject of the e-mail
11 is "government compliance open items."
12         Do you see that?
13     A.    I do.
14     Q.    And you see there that it lists
15 an attachment, and it's the ARCOS doc?
16     A.    I'm sorry, what was your
17 question?
18     Q.    That it lists an attachment and
19 that's the ARCOS doc?
20     A.    Yeah, that's the name of the
21 attachment.
22     Q.    Okay. You see the e-mail
23 reads, "Attached is the ARCOS handbook, which
24 has information on how we would need to
25 correct the transaction submitted for

Page 33

1 Store 11577 with the wrong DEA number"?
2         Do you see that?
3         MS. SWIFT: I'm going to
4     object. He doesn't have the document
5     in front of him. It looks like, from
6     the one you're looking at, it's a
7     half-inch thick, and you're just
8     reading the first paragraph from it.
9         If you want to ask him about a
10     document, he should have the
11     opportunity to look at the document.
12         MR. GADDY: This is the extent
13     of the document. The rest of it is
14     the document that he has.
15         MS. SWIFT: This is a totally
16     different-sized document. I'm
17     confused.
18         MR. GADDY: One's double-sided;
19     one's not.
20         MS. SWIFT: Okay. So your
21     representation, Jeff, is that what you
22     have in front of you is the e-mail,
23     and then it attaches this whole
24     document that you marked as Exhibit 2?
25         MR. GADDY: Correct.

Highly Confidential – Subject to Further Confidentiality Review

Page 34

1    MS. SWIFT:  Okay.
2    THE WITNESS:  This one's
3 double-sided?
4    MS. SWIFT:  My objection stands
5 with respect to the e-mail.  He should
6 have an opportunity to look at it if
7 he wants to look at it.
8    MR. GADDY:  Okay.
9 QUESTIONS BY MR. GADDY:
10   Q.   Well, the whole e-mail is up
11 there on the screen.
12      Do you see that, Mr. Barnes?
13      MR. NORTEY:  Good morning.  Is
14 there a court reporter available?
15      MS. SWIFT:  There is.
16      Who's on the line?
17      If you can hear us, we're in
18 the middle of a deposition.
19 QUESTIONS BY MR. GADDY:
20   Q.   Mr. Barnes --
21      MR. NORTEY:  Hello.  Is one
22 available?
23      MS. SWIFT:  If you can hear me,
24 we're in a middle of a deposition.  We
25 can hear you.  I don't know if you can

Page 35

1 hear us.  You're not on mute.
2    Can you hear me on the phone?
3    MR. NORTEY:  Now, I can hear
4 you.
5    I wanted to get a sense of when
6 we might get started.
7    MS. SWIFT:  We've been going
8 for a good 20, 25 minutes.  We're in
9 the middle of a deposition right now.
10   MR. NORTEY:  The microphone
11 isn't working well, so we're unable to
12 hear on the phone.
13   MS. SWIFT:  I don't know what
14 to tell you.
15   MR. NORTEY:  It's very faint.
16 It's a very faint connection.
17   MS. SWIFT:  Well, we're doing
18 the best we can.  I don't know what to
19 tell you.
20   (Discussion off the record.)
21 QUESTIONS BY MR. GADDY:
22   Q.   All right.  Mr. Barnes, do you
23 see the e-mail that we have on the screen?
24   A.   I do.
25   Q.   Okay.  And I think we read the

Page 36

1 text of the e-mail, but you see that it says,
2 "Attached is the ARCOS handbook which has
3 information on how we would need to correct
4 the transactions submitted for this
5 particular store with the wrong DEA number."
6    Do you see that?
7    A.   I do.
8    Q.   Okay.  And was that something
9 in your role that you were involved in from
10 time to time would be correcting issues as it
11 related to ARCOS reports?
12   A.   My team does both development
13 and support work, so if there are items that
14 the business or someone acting for the
15 business can't correct with a tool, they
16 submit a ticket or an e-mail, some type of
17 documentation for my team to correct.  You'll
18 notice that it was -- I was actually copied,
19 not the "to" person.  So -- but I don't
20 remember this specific e-mail.
21   Q.   Okay.  Earlier we were going to
22 page 1-1.  It's about ten pages in.
23   A.   Okay.
24   Q.   You see there it says -- in
25 Section 1.1.1 it says, "ARCOS defined."

Page 37

1    Do you see that?
2    A.   Correct.
3    Q.   And it reads, "The Automation
4 of Reports and Consolidated Order System,
5 ARCOS, is the automated system developed by
6 DEA to monitor selected controlled
7 substances.  ARCOS software enables the
8 government to maintain a current historical
9 record of selected controlled substance
10 inventories and transactions from point of
11 manufacture to the point of sale,
12 distribution, or other disposition."
13      Do you see that?
14   A.   I do.
15   Q.   Is that your understanding of
16 what ARCOS was?
17   A.   That's my understanding of,
18 yeah, the DEA's definition of how their
19 software works.
20   Q.   In this next section it says,
21 "Manufacturers and distributors must
22 periodically report to DEA their inventories
23 of selected controlled substances and
24 increases and decreases to the inventories of
25 these substances."

Page 38

1        Do you see that?
2    A.   I do.
3    Q.   And how often would Walgreens
4 report their ARCOS information to the DEA?
5    A.   I was not the actual reporter.
6 Again, we support the system.
7        If you want my recollection on
8 that, I believe they reported monthly, was
9 the due date, or it had to be done monthly.
10   Q.   Okay.  If you go to the next
11 page under Section 1.2, you see there's a
12 heading "ARCOS Relationship to Drug Inventory
13 Audit."
14        Do you see that?
15   A.   Yes.
16   Q.   And there it says, "DEA has the
17 capability to perform analyses on filled
18 order form data since ARCOS captures and
19 stores this information."
20        It says, "This increases the
21 federal government's ability to detect
22 potential diversion situations."
23        Do you see that?
24   A.   I do.
25   Q.   Okay.  And you agree that

Page 39

1 that's important, that the DEA that has the
2 ability to detect potential diversion?
3        MS. SWIFT:  Object to the form.
4        THE WITNESS:  To me, that's an
5    opinion.  I just see that it's true as
6    listed here.
7 QUESTIONS BY MR. GADDY:
8    Q.   Okay.  But do you agree that
9 it's important for the DEA to have this
10 information to be able to protect potential
11 diversion?
12        MS. SWIFT:  Object to the form.
13        THE WITNESS:  As a personal
14    person outside of Walgreens, that I
15    think it's important that someone has
16    the ability to detect diversion.
17 QUESTIONS BY MR. GADDY:
18   Q.   And so it's important that the
19 DEA have the information that must be
20 reported under ARCOS, correct?
21        MS. SWIFT:  Object to the form.
22        THE WITNESS:  I agree the DEA
23    has, as you've outlined here, a
24    reporting scheme that Walgreens needs
25    to follow.

Page 40

1 QUESTIONS BY MR. GADDY:
2    Q.   Okay.  And you agree it would
3 be important for them to receive accurate
4 information?
5        MS. SWIFT:  Object to the form.
6        THE WITNESS:  I -- the word
7    "important" to me is -- I agree that
8    under this that we're asked to report
9    accurate information.
10 QUESTIONS BY MR. GADDY:
11   Q.   Okay.  Do you agree that it
12 would be important for the DEA to do their
13 job, to detect potential diversion, that the
14 information that they receive from a
15 distributor such as Walgreens be accurate?
16        MS. SWIFT:  Object to the form.
17        THE WITNESS:  Could you please
18    repeat?
19 QUESTIONS BY MR. GADDY:
20   Q.   Sure.
21        You've indicated that you
22 agreed that it's important that somebody have
23 the ability to detect potential diversion.
24        Is that what you said earlier?
25        MS. SWIFT:  Object to the

Page 41

1    extent it mischaracterizes the
2    testimony.
3        THE WITNESS:  I said earlier
4    something more along the lines of the
5    DEA has these regulations, and
6    important for us to report accurately
7    as you've outlined these in the
8    regulations or rules read before.
9 QUESTIONS BY MR. GADDY:
10   Q.   Do you agree that it's
11 important that the DEA has the ability to
12 detect potential diversion?
13        MS. SWIFT:  Object to the form.
14    Asked and answered several times.
15        THE WITNESS:  Again, I believe
16    that it's important for us to comply
17    with the DEA regulations as we've gone
18    through so far.
19 QUESTIONS BY MR. GADDY:
20   Q.   And the DEA regulations require
21 accurate reporting, correct?
22        MS. SWIFT:  Object to the form.
23    Foundation.
24        THE WITNESS:  Going back
25    to as -- what we've read so far, I

Page 42

1　agree that the DEA's requested
2　accurate information and that -- in
3　that context is important.
4　QUESTIONS BY MR. GADDY:
5　　　Q.　Okay.  And would you agree that
6　it would be important to provide the
7　information timely?
8　　　　　MS. SWIFT:  Object to the form
9　and to the extent it calls for a legal
10　conclusion.
11　　　　　THE WITNESS:  Yeah, I have no
12　real opinion on the timeliness other
13　than as a general -- but we've not
14　read anything about the timing yet, so
15　I have no reference point.
16　QUESTIONS BY MR. GADDY:
17　　　Q.　Okay.  Well, you agree that DEA
18　cannot act on any information until they
19　receive it, correct?
20　　　　　MS. SWIFT:  Object to the form.
21　Foundation.
22　　　　　THE WITNESS:  Again, I don't
23　know -- it's a general -- I'm sorry,
24　it's a serious situation.  I didn't
25　mean to laugh; just kind of nervous

Page 43

1　laugh.  I haven't done this before.
2　　　　　Act -- can you repeat your
3　question, please?
4　QUESTIONS BY MR. GADDY:
5　　　Q.　Sure.
6　　　　　So what I've asked is, is it
7　important that the DEA receive the ARCOS
8　reporting information that they use to detect
9　potential diversion timely?
10　　　　　MS. SWIFT:  Object to the form.
11　　　　　THE WITNESS:  I agree that
12　whatever the regulation is under the
13　DEA for timeliness would be in
14　Walgreens' or anyone's best interest
15　to comply with.
16　QUESTIONS BY MR. GADDY:
17　　　Q.　And it would assist the DEA in
18　doing their job too, correct?
19　　　　　MS. SWIFT:  Object to the form.
20　　　　　THE WITNESS:  I would have to
21　speculate on how the DEA can do their
22　job better.  I have no personnel
23　knowledge there.
24　QUESTIONS BY MR. GADDY:
25　　　Q.　Okay.  Well, you would agree

Page 44

1　that if the DEA doesn't get the information,
2　they can't act on it?
3　　　　　MS. SWIFT:  Object to the form.
4　　　　　THE WITNESS:  I don't know if
5　you're referring to the specific.
6　　　　　In my personal opinion, my
7　Walgreens' opinion, yeah, I would
8　think everyone needs to be data driven
9　to be able to act on things in
10　general.  It's...
11　　　　　(Walgreens-Barnes Exhibit 3
12　marked for identification.)
13　QUESTIONS BY MR. GADDY:
14　　　Q.　I'm going to show you what
15　we're going to mark as Barnes number 3.
16　　　　　You see at the top of the first
17　page this is another e-mail?
18　　　A.　Uh-huh.
19　　　Q.　And you see the very -- in the
20　"from" line, this is from an individual named
21　Tim Schmelzer.
22　　　　　Did I say that correctly?
23　　　A.　Correct.
24　　　Q.　Okay.  Who is Mr. Schmelzer?
25　　　A.　Tim Schmelzer is a -- I believe

Page 45

1　his title is computer manager for the Windsor
2　distribution center in Wisconsin.  And I
3　forgot the -- because I'm not the ARCOS
4　business expert, but I think he's the group
5　reporter.
6　　　　　It's basically you can tell the
7　DEA that we're going to report as one entity
8　in the -- in one big report instead of 13 or
9　however many distribution centers we may have
10　had back when we were acting as a wholesaler.
11　　　　　But he submits it on behalf of
12　Walgreens.
13　　　Q.　Okay.
14　　　A.　Or at least he used to.
15　　　Q.　And you see in this original
16　e-mail you were -- or ultimately what will be
17　the last e-mail in the chain that you were
18　copied?
19　　　A.　Uh-huh.
20　　　Q.　And let's go back to the last
21　page and -- to read these in order.
22　　　A.　Okay.
23　　　Q.　Do you see we have an e-mail --
24　it starts with an e-mail also from
25　Mr. Schmelzer to Alan Drumheller.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1      Do you see that?
2      A.   I do.
3      Q.   And do you know who
4  Mr. Drumheller is?
5      A.   I haven't heard that name in a
6  while.  I believe Mr. Drumheller was with the
7  DEA.
8      Q.   Okay.  And the subject of this
9  e-mail was "January 2013 ARCOS report
10 transmission issue."
11     Do you see that?
12     A.   The subject?
13     Q.   Correct.
14     A.   Yeah, I see that.
15     Q.   Okay.  And he says, "Alan, here
16 are the associate registrant numbers that
17 were included in the January 2013 reports for
18 Walgreens distribution centers.  These
19 accounts received letters from the DEA
20 indicating that the reports had not been
21 received."
22     Do you see that?
23     A.   I do.
24     Q.   And he's referring to ARCOS
25 reports, correct?

Page 47

1      MS. SWIFT:  Object to the form.
2  Foundation.
3      THE WITNESS:  Since I'm not the
4  one writing the letter, I would have
5  to make the assumption that, yes,
6  based on the subject.
7  QUESTIONS BY MR. GADDY:
8      Q.   Okay.  The subject says "ARCOS
9  report transmission issue," right?
10     A.   Yes.
11     Q.   Okay.  And if the DEA was not
12 receiving ARCOS reports from Walgreens, that
13 would be a problem, correct?
14     MS. SWIFT:  Object to the form.
15 Foundation.
16     THE WITNESS:  I would need more
17 information to know if that was a
18 problem -- there could be multiple
19 things going on -- if I was in the
20 detail.
21 QUESTIONS BY MR. GADDY:
22     Q.   Well, can we agree that it
23 would be an issue that needs to be addressed?
24     MS. SWIFT:  Object to the form.
25 Foundation.

Page 48

1      THE WITNESS:  Again, I would
2  need to know the specifics because
3  it's not automatically an issue.
4  QUESTIONS BY MR. GADDY:
5      Q.   It's not an issue for the DEA
6  to not receive ARCOS reports from Walgreens?
7      MS. SWIFT:  Object to the form.
8  Mischaracterizes his testimony.
9      THE WITNESS:  Again, I'm not
10 the expert on ARCOS reporting;
11 however, I -- again, there's always
12 multiple possible causes.  Unless
13 you're deep in the issue, you don't
14 know.
15     One example I can think of is
16 if they didn't have any transactions
17 that month for whatever reason.
18 QUESTIONS BY MR. GADDY:
19     Q.   Well, let's look down below it
20 at facilities for which they did not receive
21 reports.
22     Do you see the chart listed
23 below?
24     A.   Below the -- the one for "to"
25 Alan Drumheller?

Page 49

1      Q.   Correct.  The only chart on the
2  page.
3      A.   Okay.  Just making sure we're
4  seeing the same thing.  Oh, the one up here.
5  Okay.
6      Q.   Okay.  You see there are
7  approximately 15 distribution centers for
8  which no reports were received by the DEA?
9      MS. SWIFT:  Object to the form.
10 Mischaracterizes the document.
11     THE WITNESS:  I don't believe
12 that that's what the letter was
13 saying.  I believe -- but again, I'd
14 have to be in the situation.  To me, I
15 thought the original e-mail said
16 stores instead of distribution centers
17 completely.
18 QUESTIONS BY MR. GADDY:
19     Q.   Okay.  Well, let's read the
20 e-mail again just to make sure we're on...
21     Mr. Schmelzer's original
22 e-mail, Friday, March 15 at 4:37 p.m.
23     Do you see where I am?
24     A.   Yes.
25     Q.   Okay.  It says, "Here are the

Page 50

1 associate registrant numbers that were
2 included in the January 2013 reports for the
3 Walgreen distribution centers."
4         Do you see that?
5     A.    Uh-huh.
6     Q.    It says, "These accounts
7 received letters from the DEA indicating that
8 the reports had not been received," right?
9     A.    Okay.
10     Q.    And we've already discussed
11 that reports, tracking with the subject of
12 the e-mail line, is likely referring to ARCOS
13 reports?
14         MS. SWIFT:  Object to the form.
15 QUESTIONS BY MR. GADDY:
16     Q.    Do you see that?
17     A.    I would assume that's true,
18 yes.
19     Q.    Okay.  And do you see in the
20 chart, the right-hand column -- the far
21 right-hand column is DC name?
22     A.    I do.
23     Q.    Okay.  And DC within Walgreens
24 stands for what?
25     A.    Distribution center.

Page 51

1     Q.    Okay.  And do you recognize the
2 below, approximately, list of 15 locations as
3 being distribution centers of Walgreens?
4     A.    I do.
5     Q.    Okay.  And you see there that
6 about five down Mount Vernon is listed?
7     A.    I do.
8     Q.    Okay.  And a couple below
9 there, do you see Woodland C2?
10     A.    I do.
11     Q.    And right below there there's
12 also Woodland?
13     A.    I do.
14     Q.    Okay.  A couple more down
15 there's Perrysburg C2 and then Perrysburg?
16     A.    I do.
17     Q.    Okay.  What's the difference
18 between Woodland and Woodland C2 and
19 Perrysburg and Perrysburg C2?
20     A.    The -- as I understand it, it's
21 related to the type of license they have.
22 One type of license is for C-II drug --
23 related-drugs, and the other type of license
24 is for more -- other types of drugs except
25 for C-II, is what I believe I've been told by

Page 52

1 experts, which I'm not one.
2     Q.    Okay.  All right.  If you flip
3 to the response to that, you see a response
4 to Tim's e-mail from Alan Drumheller,
5 correct?
6     A.    Uh-huh.
7     Q.    And you see he does have a
8 USDOJ.gov e-mail address, correct?
9     A.    Yeah, I do.
10     Q.    Okay.  And so you understand
11 that Mr. Drumheller is with the DEA?
12         MS. SWIFT:  Object to the form.
13         THE WITNESS:  Well, I would
14     agree that he says he's with the
15     Department of Justice.  I'm not sure,
16     but I'll go with the assumption.
17 QUESTIONS BY MR. GADDY:
18     Q.    Okay.  He says, "Hello Tim.  I
19 checked all of these DEA numbers and came up
20 empty for the January 2013 reports.  None are
21 in the system."
22         Do you see that?
23     A.    I do.
24     Q.    Okay.  Do you agree that this
25 is an issue that would require attention from

Page 53

1 Walgreens?
2         MS. SWIFT:  Object to the form.
3         THE WITNESS:  I agree that
4     whenever we work with the DEA and when
5     they bring issues to our attention
6     through our SMEs or directly to us, we
7     work with them on researching issues.
8     So it's going -- working with them to
9     find out issues, whether it's on their
10     side or ours, is nothing new, so I
11     agree it's important to work with
12     them.
13 QUESTIONS BY MR. GADDY:
14     Q.    Okay.  And in your role, with
15 your training and experience as it relates to
16 compliance with Schedule II narcotics as it
17 relates to compliance with CSOS, do you have
18 an -- is it important to address an issue of
19 ARCOS reports not being sent from
20 distribution centers to the DEA?
21         MS. SWIFT:  Object to the form
22     and the question.
23         If you understand it, you can
24     answer.
25         THE WITNESS:  Yeah, actually, I

Page 54

1  was kind of -- would you mind
2  rephrasing, please?
3  QUESTIONS BY MR. GADDY:
4      Q.    Sure.
5          Based on your training and
6  experience in the 15 almost years that you've
7  been with Walgreens and in your experience as
8  it relates to compliance with C-IIs, is it
9  important to address an issue of ARCOS
10 reports not being submitted to the DEA for
11 approximately 15 distribution centers?
12         MS. SWIFT:  And I'm going to
13 object that you're mischaracterizing
14 the document as well.
15         And you should feel free to
16 read the document to whatever extent
17 you want to answer his questions.
18         THE WITNESS:  You're -- is
19 the -- is it fair to say the basis of
20 your question is, is it important
21 to -- that not submitting reports for
22 a number of distribution centers is
23 important?  Is that a fair
24 summarization?
25 QUESTIONS BY MR. GADDY:

Page 55

1      Q.    As far as I'm --
2      A.    Or it seems like you're --
3  maybe you can restate, please.
4      Q.    Mr. Barnes, I'm just trying to
5  ask whether or not ARCOS reports not being
6  submitted for approximately 15 distribution
7  centers is an issue that Walgreens would want
8  to address.  That's all that I'm asking.
9          MS. SWIFT:  Objection.  And it
10 mischaracterizes the document.
11         MR. GADDY:  Kate, if you would
12 please just limit your objections to
13 form, that'd be appreciated.
14         MS. SWIFT:  If you would not
15 mischaracterize the document, I would
16 appreciate that.
17         MR. GADDY:  Okay.
18         THE WITNESS:  Okay.  And as you
19 two went back and forth, I'll ask you
20 one more time to please repeat because
21 I got lost in that.
22 QUESTIONS BY MR. GADDY:
23     Q.    Okay.
24         Is it important for Walgreens
25 to address the issue of ARCOS reports not

Page 56

1  being submitted to the DEA for approximately
2  15 distribution centers?
3          MS. SWIFT:  Object to the form
4  of the question.
5          THE WITNESS:  To me, that's
6  asking for an opinion.  I don't know
7  that I'm seeing that in this document.
8  I don't remember this specific
9  incident.
10         As a general concept, I think
11 this seems to show that we were
12 taking, as a company, this very
13 seriously, working directly with the
14 DEA and making sure that any issue
15 that may or may not have existed gets
16 corrected.
17 QUESTIONS BY MR. GADDY:
18     Q.    Okay.  Ultimately, this was an
19 issue that Walgreens was able to correct; is
20 that true?
21         MS. SWIFT:  Object to the form.
22 Foundation.
23         THE WITNESS:  I don't see any
24 supporting information here.  We -- if
25 it's not still an issue years later,

Page 57

1  it would have been corrected in normal
2  process of business.
3          So if you want me to make an
4  assumption or draw a conclusion, I
5  would say so, but I would need more
6  information to give a true or false.
7          (Walgreens-Barnes Exhibit 4
8  marked for identification.)
9  QUESTIONS BY MR. GADDY:
10     Q.    Okay.  I want to move on to
11 Barnes 4.
12         You see this document starts on
13 the front page at the top.  It's another
14 e-mail originating from Mr. Schmelzer?
15     A.    Uh-huh.
16     Q.    And you see this was sent to
17 you?
18     A.    I do, though it looks like the
19 last e-mail in the chain.
20     Q.    And the subject is "ARCOS error
21 reports that need correction."
22         Do you see that?
23     A.    I do.
24     Q.    Would you agree that it was not
25 unusual in your time in compliance as it

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  related to ARCOS reporting to have to correct
2  errors that Walgreens had with ARCOS
3  submissions?
4      A.    That would be asking for a
5  general characterization, it sounds like, and
6  I would need more information to make that
7  general statement.
8          I can make a statement that
9  often the DEA's website did not provide
10 consistent information, which caused problems
11 with our system.
12     Q.    As far as my question to you
13 was whether or not it was unusual -- was
14 whether or not it was -- let me strike and
15 rephrase.
16         It was not unusual, was it not,
17 for Walgreens to have to make corrections to
18 ARCOS submissions?
19         MS. SWIFT:  Object to the form.
20         THE WITNESS:  Again, I would
21     need a definition of "unusual" to
22     characterize that.  There were
23     times --
24 QUESTIONS BY MR. GADDY:
25     Q.    You don't know what unusual

Page 59

1  means?
2          MS. SWIFT:  Let him finish his
3      answer.
4          THE WITNESS:  There were times
5      when we got a data feed into ARCOS of
6      whether it was ARCOS reportable.  If
7      that was not up to date, which
8      sometimes happened, then any numerous
9      things could happen to cause a
10     correction.  It does not mean that one
11     party or the other was the root cause
12     of that issue.
13         And "unusual," I would need
14     your definition.
15 QUESTIONS BY MR. GADDY:
16     Q.    Okay.  Well, would it be fair
17 to say that part of your duties in your role
18 of compliance involved correcting reports to
19 ARCOS?
20     A.    The -- our IT team supports the
21 ARCOS application.  Our business partner,
22 which is often Tim Schmelzer, and if he has
23 questions, goes back to other people, directs
24 us on exactly the changes they want.
25         So, yes, we will make

Page 60

1  corrections when asked to make specific
2  corrections by the business.
3      Q.    And that was something that you
4  did from time to time?
5      A.    It did happen time to time.
6  Again, definition, yeah.
7      Q.    Okay.  If we go to the original
8  e-mail in this chain, go to the first e-mail
9  in this chain on the next page, see it's from
10 Kathy Federico to Rob Varno?
11     A.    Okay.
12     Q.    Do you see that?
13     A.    I do.
14     Q.    Do you know who Rob Varno is?
15     A.    I believe I do.
16     Q.    Okay.  Who is he?
17     A.    I believe he was the general
18 manager of the Windsor distribution center at
19 one point in his career.
20     Q.    Has he been over any other
21 distribution centers?
22     A.    I -- this is a vague memory.  I
23 believe he has, but, again, that's
24 speculation on my part because sometimes
25 people move around in a large company.

Page 61

1      Q.    Subject is "ARCOS error reports
2  that needs correction."
3          Do you see that?
4      A.    I do.
5      Q.    Okay.  Before I go forward, do
6  you know who Kathy Federico is?
7      A.    I do not.
8      Q.    Let's read the e-mail.  She
9  says, "Mr. Varno, enclosed you will find an
10 ARCOS report as submitted by Walgreens" -- it
11 gives their registrant number -- "a reverse
12 distributor located in the Milwaukee DO AOR
13 in which Walgreen reported 238 sales to
14 retail registrants.  A reverse distributor by
15 the nature of its registration cannot under
16 any circumstances sell to retail-level
17 registrants.  A reverse distributor can sell
18 to another reverse distributor or to a
19 distributor or a manufacturer."
20         Do you see that?
21     A.    I do.
22     Q.    Okay.  And do you understand
23 what she's saying there?
24         MS. SWIFT:  Object to the form.
25         THE WITNESS:  There's a lot of

Page 62

1   acronyms I don't recognize.
2   QUESTIONS BY MR. GADDY:
3       Q.   Okay.  Let's read the next
4   paragraph.  It says, "In accordance with the
5   particular statute, the enclosed report is a
6   complete and accurate reflection of this
7   registrant's activities.  Since this is a
8   factual report as submitted by this
9   registrant in accordance with 21 USC 823 B1
10  in which this registrant is required to have
11  in place effective controls to detect
12  diversion, the reporting of these sales is in
13  violation of a particular statute as these
14  sales are not authorized."
15      Do you see that?
16      A.   I do.
17      Q.   Okay.  Do you understand her to
18  be indicating to Mr. Varno that if the
19  reports that were made by Walgreens as it
20  relates to these 238 sales were accurate,
21  that it would have been a violation of the
22  law?
23      MS. SWIFT:  Object to the form.
24      THE WITNESS:  I -- the way I'm
25  reading it is if like -- if this is

Page 63

1   true, this may have been the case, but
2   there's an "if" there.
3   QUESTIONS BY MR. GADDY:
4       Q.   Sure.
5       And so then she goes on to say,
6   "If through your investigation it's
7   determined that Walgreens misreported these
8   transactions, then Walgreens has five
9   business days to correct them."
10      Do you see that?
11      A.   I do.
12      Q.   Okay.  So this is another issue
13  where there were potentially some reporting
14  errors as it relates to ARCOS by Walgreens,
15  correct?
16      MS. SWIFT:  Object to the form.
17      THE WITNESS:  That's how it's
18  been represented so far.
19  QUESTIONS BY MR. GADDY:
20      Q.   Okay.  The next slide says,
21  "Also enclosed is Walgreens uncorrected error
22  report.  Walgreens has 258 uncorrected errors
23  primarily consisting of DNC numbers not in
24  the ARCOS dictionary."
25      Do you see that?

Page 64

1       A.   I do.
2       Q.   Okay.  So in addition to the
3   first issue as it relates to the 238 sales,
4   there's also an uncorrected error report with
5   258 entries.
6       Do you see that?
7       A.   I do.
8       Q.   Okay.  And these are the types
9   of issues as it relates to ARCOS reporting
10  that you and your team would have to address
11  from time to time?
12      A.   From time to time we'd be asked
13  to research various questions that Tim or
14  others in the business side would ask us to
15  look into.
16      Q.   Okay.  And from time to time
17  you'd have to look into issues such as this
18  related to Walgreens' reporting of ARCOS
19  information to the DEA?
20      A.   Yes.
21      Q.   Okay.  And you'd have to fix or
22  help them fix some of the errors as it
23  related to the reporting of ARCOS
24  information?
25      A.   Actually, I believe the term

Page 65

1   we've used is "resolve" because, again, there
2   can be many root causes when something comes
3   up on one of these DEA flag reports.
4       From time to time, for
5   instance, they were missing NDCs that they
6   needed to add to the system, so I can't make
7   blanket statements.
8       Q.   The only question I'm asking is
9   whether or not from time to time you had to
10  help Tim Schmelzer and other individuals who
11  were charged with making ARCOS reports with
12  errors that had resulted from those reports
13  that they'd attempted to make to the DEA.
14      MS. SWIFT:  Objection.  Asked
15  and answered.
16      THE WITNESS:  From time to time
17  we had to help them make corrections
18  or do research.
19  QUESTIONS BY MR. GADDY:
20      Q.   Okay.  And we've looked at
21  several different situations now of separate
22  incidents where your team has had to come in
23  and assist with errors in the ARCOS
24  reporting, correct?
25      MS. SWIFT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  Mischaracterizes the documents.
2       THE WITNESS:  You presented
3  several e-mail document chains which,
4  you know, before we had our incident
5  ticketing system at Walgreens, are
6  people reaching out for help or
7  research, which is a typical IT
8  function.  So, yeah, we support our
9  business as they request.
10 QUESTIONS BY MR. GADDY:
11      Q.   If we go back up to the very
12 top e-mail where this was sent to you, the
13 top of the first page.
14      Do you see that?
15      A.   Okay.  Yeah.
16      Q.   It says, "Sean, Rajib" --
17      Who is Rajib?
18      A.   Rajib was a member of my team
19 back then.
20      Q.   It says, "We received this
21 communication from the DEA today regarding
22 errors from RX returns reporting, some dating
23 back to 2008" --
24      A.   Uh-huh.
25      Q.   -- "that need to be corrected

Page 67

1  and transmitted in the next five business
2  days."
3       Do you see that?
4       A.   I do.
5       Q.   Okay.  And this e-mail was sent
6  in what day?
7       A.   It says it was sent on May 6,
8  2013.
9       Q.   Okay.  So some of these errors
10 as it relates to DEA ARCOS reporting were
11 five years old?
12      A.   I'm reading the e-mail, and
13 he -- per Tim, it appears that the report he
14 got had transactions dating back to that
15 time.
16      Personally, I didn't see the
17 report.  I don't remember this incident.
18      Q.   Okay.  And again, we've already
19 talked about how DEA uses the ARCOS
20 information to help it spot potential
21 diversion.
22      Do you remember that?
23      A.   I remember you telling me that.
24      Q.   Well, do you remember reading
25 it in the ARCOS handbook?

Page 68

1       A.   I also remember reading that,
2  yes.
3       Q.   And you had access to the ARCOS
4  handbook to help you do your job here,
5  correct?
6       MS. SWIFT:  Object to the form.
7       THE WITNESS:  Well, we likely
8  would not have needed the ARCOS
9  handbook to do this, but, yeah, if we
10 were directed to look something up by
11 the business, we could have done so,
12 of course.
13      MS. SWIFT:  We've been going
14 about an hour.  You want to take a
15 break in a minute and get something to
16 drink?
17      MR. GADDY:  Yeah, that's fine.
18      MS. SWIFT:  Okay.
19      THE WITNESS:  Okay.
20      VIDEOGRAPHER:  We're going off
21 the record at 9:57.
22      (Off the record at 9:57 a.m.)
23      MR. NORTEY:  This is James
24 Nortey with Morgan Lewis.
25      MR. WILLIAMS:  This is Eric

Page 69

1  Williams for Prescription Supply, Inc.
2       MS. KLOCKENGA:  And Jodi
3  Klockenga with Napoli for the
4  plaintiffs.
5       VIDEOGRAPHER:  We're back on
6  the record at 10:09.
7       (Walgreens-Barnes Exhibit 5
8  marked for identification.)
9  QUESTIONS BY MR. GADDY:
10      Q.   Mr. Barnes, I want to show you
11 what's been marked as Barnes 5.
12      Do you recognize this as being
13 another e-mail?
14      A.   Yeah, I -- yes.
15      Q.   And it's an e-mail from
16 Jaspreet Kamal in June of 2013, and you were
17 on the "to" line, correct?
18      A.   I am, yes.
19      Q.   Okay.  And the subject of this
20 e-mail is "compliance issues," and it shows
21 that there's an attachment, correct?
22      A.   It does.
23      Q.   Okay.  And if you flip the
24 page, you see the attachment to that
25 spreadsheet entitled at the top is

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 "Compliance Issues."
2       Correct?
3       A.    The spreadsheet title is
4 "Compliance Issues," yes.
5       Q.    Okay.  And this spreadsheet was
6 sent to you?
7       A.    Based on the attachment title,
8 it appears so.
9       Q.    Okay.  Do you recall receiving
10 this e-mail?
11      A.    I do not.
12      Q.    Okay.  But this was something
13 in your role in compliance that you did from
14 time to time was address compliance issues as
15 it related to reporting or other issues,
16 correct?
17      A.    When compliance issues were
18 brought to our attention or -- yeah, we aided
19 and assisted in those issues.
20      Q.    And when you were asked to
21 correct or resolve those issues or errors as
22 it related to government reporting, including
23 ARCOS reporting, your normal course of action
24 would be to correct or resolve those issues,
25 correct?

Page 71

1       A.    Our normal course of action is
2 to take the action requested by the business,
3 so --
4       Q.    And if the business asks you to
5 resolve or correct the problems, that's what
6 you do?
7       A.    Yeah.  Based on their
8 directions on how to do so, yes.
9       Q.    But we see here on this
10 spreadsheet another list of issues that
11 Walgreens needed to resolve as it related to
12 compliance, correct?
13      A.    I see a list of items, yes.
14      Q.    Okay.  So the top one listed is
15 there were issues with the store having the
16 wrong DEA number, correct?
17      A.    That is what it says.
18      Q.    The next had to do with
19 November reporting issues?
20      A.    That's what it says, yes.
21      Q.    And the next had to do with
22 Florida back-reporting issues?
23      A.    Again, what it says, yes.
24      Q.    The next one down was December
25 errors?

Page 72

1       A.    Yes.
2       Q.    Okay.  A couple down, there's
3 an entry for 257 transactions having the
4 wrong DEA number, correct?
5       A.    Number 12?
6       Q.    Correct.
7       A.    That is what it says, yeah.
8       Q.    And you see in the status box
9 there in the middle that some of these were
10 compliance issues that you and your team was
11 working on, and down at the bottom you see
12 some of the issues that you and your team had
13 actually resolved, correct?
14          MS. SWIFT:  Object to the form.
15      Object to the form.  I don't know that
16      you've established that he actually
17      was working on any of these.
18          MR. GADDY:  Okay.  You've made
19      your objection.
20          THE WITNESS:  It appears that
21      based on that status that someone had
22      made resolutions and no longer
23      considered them to be active, I guess,
24      is what I would take from this.
25

Page 73

1 QUESTIONS BY MR. GADDY:
2       Q.    Okay.  And that's the point,
3 Mr. Barnes, is that while there would be
4 issues or errors that would come up as it
5 related to DEA reporting from time to time,
6 that you or other members of your team or
7 other members at Walgreens would have to
8 correct or resolve those issues?
9       A.    We would have to keep track of
10 the issues reported to us, or whatever items
11 the business was asking about, and then get
12 their feedback on how to make such changes or
13 corrections.
14      Q.    Mr. Barnes, if Walgreens is
15 having issues or errors with its reporting
16 system, do you agree that that would be
17 something that would be important for
18 Walgreens to let the DEA know about?
19          MS. SWIFT:  Object to the form.
20          THE WITNESS:  That was a lot of
21      speculation I'd have to make there.
22      If there was actual problems with the
23      system.  Important is, you know, a
24      judgment term, so...
25

Page 74

1  QUESTIONS BY MR. GADDY:
2     Q.    Sure.
3           Well, I'm asking for your
4  judgment.  From your perspective as a member
5  of the compliance team at Walgreens, would it
6  be important to you to let the DEA know if
7  there were issues or errors within Walgreens'
8  reporting?
9           MS. SWIFT:  Object to the form.
10    Calls for speculation.
11          THE WITNESS:  Again, if I make
12    all these assumptions, then, yes, I
13    agree it's important.
14 QUESTIONS BY MR. GADDY:
15    Q.    Okay.  You wouldn't want to
16 hide information?
17          MS. SWIFT:  Are you done with
18    your answer?
19          THE WITNESS:  I am done, yes.
20 QUESTIONS BY MR. GADDY:
21    Q.    You wouldn't want to hide
22 information from the DEA, would you?
23    A.    Me personally or -- well, you
24 know, me personally, of course not.  We've
25 been very open about working with the DEA in

Page 75

1  the past.  I believe you showed an e-mail
2  that also showed that.
3           (Walgreens-Barnes Exhibit 6
4     marked for identification.)
5  QUESTIONS BY MR. GADDY:
6     Q.    I'm going to show you what
7  we're going to mark as Walgreens 6.
8           If you look at the top of the
9  page, you see this ultimately is going to be
10 an e-mail from you.
11          Do you see that?
12    A.    Yes.
13    Q.    Okay.  And you see the date of
14 this e-mail is August of 2013?
15    A.    Yes.
16    Q.    Okay.  We've been looking at
17 several e-mails, Mr. Barnes, from the 2013
18 time frame, several different months from
19 2013.
20          Do you have an understanding of
21 what happened in June of 2013 between
22 Walgreens and the DEA as it related to
23 allegations by the DEA that Walgreens had
24 violated some aspects of the Controlled
25 Substance Act?

Page 76

1           MS. SWIFT:  Object to the form.
2           THE WITNESS:  Could you be more
3     specific, please?
4  QUESTIONS BY MR. GADDY:
5     Q.    Do you have an understanding of
6  what happened in the summer of 2013 between
7  Walgreens and the DEA as it relates to
8  allegations that Walgreens violated some
9  aspects of the Controlled Substance Act?
10          MS. SWIFT:  Same objection.
11          THE WITNESS:  I don't know -- I
12    don't know of anything in a specific
13    date, time period.
14 QUESTIONS BY MR. GADDY:
15    Q.    Okay.  You don't know of
16 anything about Walgreens paying an
17 $80 million settlement to the DEA?
18    A.    Yeah, I've heard of that
19 internally at Walgreens.
20    Q.    Okay.  How did you hear of that
21 internally at Walgreens?
22    A.    It's been a -- well, if you
23 say -- if I accept your term of 2013, you
24 said?  It's been five-plus years, so this is
25 kind of a foggy memory here, but I believe

Page 77

1  there was an internal all-employees release
2  or maybe even a press release, and vaguely
3  remember it was a -- well, internally I heard
4  of it.  And, you know, of course, anytime
5  there's something like that, you know, your
6  coworkers will talk about it.
7     Q.    Okay.  Did you receive any
8  communication from your supervisors about
9  that?
10    A.    Not directly in an official
11 capacity.
12    Q.    Okay.  But at the time that
13 that settlement occurred, you certainly knew
14 about it?
15    A.    Yeah, we did hear about it.
16    Q.    Okay.  You certainly were aware
17 of it?
18    A.    As I've said, we -- I did hear
19 about it at least through that press release
20 and conversations.
21    Q.    Okay.  And you had an awareness
22 that Walgreens paid an $80 million settlement
23 to the DEA?
24    A.    As reported in the
25 communication that I've mentioned already,

Page 78

1  yes.
2      Q.    Okay.  So again, we looked up
3  at the top.  This e-mail in August of 2013
4  would have been approximately two months
5  after that DEA settlement?
6          MS. SWIFT:  Object to the form.
7  Foundation.
8          THE WITNESS:  If you're saying
9  that it was in May 2013, yeah, it
10  would appear to be a couple months
11  after.
12  QUESTIONS BY MR. GADDY:
13      Q.    Okay.  I think I said June, but
14  same general time frame, correct?
15      A.    General, yeah, correct.
16      Q.    If you turn to the last page
17  for me, and let's see the first e-mail that
18  started this chain.
19          You see that's an e-mail from
20  an individual named Jaspreet, and you are one
21  of the individuals listed in the "to" line,
22  correct?
23      A.    Correct.
24      Q.    And it's -- the subject is
25  "ARCOS 7 type for this month."

Page 79

1          Do you see that?
2      A.    I do.
3      Q.    Okay.  And the first thing that
4  he writes there, he says, "Hi, I checked, and
5  we do not have any transaction for Jupiter,
6  Jupiter C2, and Perrysburg, Perrysburg C2
7  this month," meaning July, "so I've added 7
8  type entries for both DCs."
9          Do you see that?
10      A.    I do.
11      Q.    And the 7 type entry, that's an
12  entry that Walgreens would make if there were
13  no transactions, correct?
14      A.    I do not know.  I would have to
15  refer to documentation or ask someone.
16      Q.    Okay.  And the Jupiter C2 and
17  Perrysburg C2, those are two distribution
18  centers that distribute controlled
19  substances, correct?
20      A.    That's my understanding of what
21  they were at the time.
22      Q.    Okay.  And we see here just a
23  couple months after the settlement with the
24  DEA regarding allegations of violations of
25  the Controlled Substance Act, that Walgreens

Page 80

1  is no longer reporting transactions from
2  those distribution centers, correct?
3          MS. SWIFT:  Object to the form.
4  Foundation.
5          THE WITNESS:  I don't see that
6  spelled out specifically.
7  QUESTIONS BY MR. GADDY:
8      Q.    Well --
9      A.    He -- he says in the e-mail,
10  "We do not have any transactions."
11      Q.    Okay.  Well, that's pretty
12  specific, isn't it?
13      A.    Then later he says, "We've
14  added the entries."
15      Q.    Sure.
16          The 7 type entries, correct?
17      A.    Yeah.
18      Q.    Okay.  So back to my original
19  question.  You agree that according to
20  Jaspreet's e-mail here, a couple months after
21  the settlement with the DEA, Walgreens is not
22  reporting any transactions out of the Jupiter
23  C2 or Perrysburg C2 distribution center,
24  correct?
25          MS. SWIFT:  Object to the form.

Page 81

1  Asked and answered.
2          THE WITNESS:  Well, again, I --
3  there's a lot of information I need to
4  know that's not in here.  Not
5  remembering this specific e-mail, I
6  can't --
7  QUESTIONS BY MR. GADDY:
8      Q.    I'm just asking if that's what
9  Jaspreet says.
10      A.    Jaspreet says he does not have
11  any transactions.  I don't see any more
12  background e-mails about what happened
13  afterwards.  So in this isolated occurrence,
14  he's simply saying we didn't find any.
15          Often we would error check if
16  asked, so there could have been something
17  like that.  But that's speculation, as you've
18  asked me to do on here.
19      Q.    He says there were no
20  transactions, correct?
21      A.    He does at this point in this
22  e-mail.
23      Q.    Okay.  In the second paragraph
24  he goes on to say, "Actually, I want to
25  discuss one more issue with you this month.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 We have" -- there's a term there and it says,
2 "error for two transactions in Florida
3 reporting, and Tim is not aware of this
4 error."
5         Do you see that?
6     A.    I do.
7     Q.    Okay.  If you go up to the next
8 e-mail, you see that Jaspreet -- looks like
9 he replies all to the same group of people
10 and says, "Please provide the suggestion for
11 the problem below, as we are very close to
12 reporting."
13         Do you see that?
14     A.    I see that he's saying please
15 provide a suggestion, again, because Tim
16 Schmelzer's on there and -- as well as my
17 management, so we -- again, we work with our
18 business for instructions, and he lists an
19 issue, gives a proposed solution from the IT
20 side, which I don't know if Tim took it or
21 not.  That's what I see.
22     Q.    His proposed solution was to
23 mark these two errors, delete it and not
24 report anything with zero quantity.
25         Do you see that?

Page 83

1     A.    Yes.  As I just stated, I do
2 see that.
3     Q.    Okay.  If you go to the first
4 page, you see the next e-mail in the chain is
5 from -- is it Shailesh Patel?  Did I say that
6 correct?
7     A.    He went -- yeah.
8     Q.    Okay.  Who is that individual?
9     A.    He's another team member under
10 me.
11     Q.    Okay.  What was his role?
12     A.    He would have been support and
13 also -- I don't remember our titles over the
14 time.  They've changed over time.  He's no
15 longer with the company, but he would have
16 been like an analyst.
17     Q.    Okay.
18     A.    And a support person.
19     Q.    He says, "My suggestion is to
20 exclude these two transactions from the
21 report that are generated for this month."
22         Do you see that?
23     A.    I do.
24     Q.    Okay.  It says, "This is a new
25 issue.  I don't think we've encountered this

Page 84

1 before."
2         He goes on to say, "I don't
3 know how the DEA will respond to transactions
4 with zero quantity.  Will they respond with
5 error, warning, put RX returns on a list for
6 audit?"
7         Do you see that?
8     A.    I do.
9     Q.    It says, "If we include these
10 two transactions, we don't know how DEA will
11 respond."
12         Do you see that?
13     A.    I do.
14     Q.    One of the factors that
15 Mr. Patel was considering in determining
16 whether or not to report these transactions
17 to the DEA was how the DEA would respond to
18 these errors?
19     A.    Those are his words.
20     Q.    Okay.  And one of the concerns
21 that he raises is that there would be a
22 potential audit?
23     A.    Give me a second to find that
24 area again.  It says, "Put on a list for an
25 audit," yes.

Page 85

1     Q.    Okay.  And that's something
2 that he's wanting to avoid?
3         MS. SWIFT:  Object to the form.
4     Calls for speculation.
5         THE WITNESS:  I would have to
6     speculate on what he really meant by
7     that.
8 QUESTIONS BY MR. GADDY:
9     Q.    Okay.  Well, does he look like
10 he's wanting to have an audit or not wanting
11 to have an audit from this e-mail?
12         MS. SWIFT:  Object to the form.
13         THE WITNESS:  Again, you're
14     asking me to read his mind and state
15     here, which I can't do.
16 QUESTIONS BY MR. GADDY:
17     Q.    You don't know whether or not
18 his e-mail indicates that he is in favor of
19 an audit or does not want an audit to occur?
20     A.    I don't -- he does not indicate
21 this option is bad, this option is worse, or
22 characterize it in any such way.  To me he's
23 just listing possible outcomes.
24     Q.    Okay.  Well, he lists a
25 possible outcome on if you report the error

Page 86

1  that it might result in an audit, and then he
2  recommends not reporting the error, correct?
3      A.    I'm finding that space again.
4  I thought I remembered reading that,
5  something similar.
6          Can you point that out again?
7  I'm sorry.
8      Q.    Sure.
9          The very first sentence of the
10 e-mail is, "My suggestion is to exclude these
11 two transactions."
12         Do you see that?
13     A.    Yeah, I do see that.
14     Q.    Okay.  And then in the second
15 paragraph, in the middle sentence he says, "I
16 don't know how DEA will respond to the
17 transactions if they're reported.  Will
18 they -- will RX returns be put on a list for
19 audit?"
20         Do you see that?
21         MS. SWIFT:  Objection.  You
22 misread the document.
23         THE WITNESS:  Well, I see that,
24 but I see before that, "This is a new
25 issue I don't think we've encountered

Page 87

1  before."
2          Again, I can't read Mr. Patel's
3  mind; however, to me he's just
4  exploring options here, how to handle
5  it.  A quantity equals zero, you know,
6  I don't know what that meant at the
7  time.  It -- you're trying to take an
8  inventory with ARCOS, is what we've
9  been told by our professionals.  But
10 again, I don't want to get too far
11 down into the speculation rabbit hole.
12 QUESTIONS BY MR. GADDY:
13     Q.    Mr. Barnes, does he recommend
14 the option that puts RX returns at risk for
15 audit or not?
16     A.    That would really be asking me
17 to read the DEA's mind and his mind as well.
18 I -- he -- where was that line?
19         Oh, my recommendation...
20         He suggests that they be
21 excluded --
22     Q.    Okay.
23     A.    -- in the first sentence and
24 then mentions, I believe later, that it can
25 roll into the next reporting period if

Page 88

1  needed, I believe I saw as well.
2      Q.    Okay.  He recommends that they
3  be excluded, and he says if they are
4  reported, RX returns may be put on a list for
5  an audit, correct?
6      A.    I believe he asked the
7  question.  He asked -- says, "Put RX
8  return on list for audit, question mark?"  He
9  doesn't know, apparently, if I read his
10 wording.
11     Q.    Okay.  And this is about two
12 months after Walgreens had paid an
13 $80 million settlement to the DEA?
14         MS. SWIFT:  Object to the form.
15 Lack of foundation.
16         THE WITNESS:  If I use your
17 date of June, I believe, 2013, that
18 appears to be when this e-mail is.
19 QUESTIONS BY MR. GADDY:
20     Q.    And in the top e-mail you
21 respond, and you concur with Mr. Patel's
22 decision to not report the errors, correct?
23     A.    Not remembering specifically
24 but looking at my wording, I'm saying we
25 should report it, but maybe not this exact

Page 89

1  month because we want to report correctly.
2  So it still gets reported.
3      Q.    Okay.  So you had the option of
4  telling the DEA about potential errors within
5  the reporting system or not telling them, and
6  your recommendation was to not tell them?
7      A.    That was not the options
8  discussed here.  The options were, are we
9  going to put in this month's reporting cycle
10 or next reporting cycle.  And we always
11 provide options to the business, so...
12     Q.    Okay.  Well, when was it
13 supposed to be reported?
14     A.    You're supposed to report -- I
15 would need to ask my business, but I believe
16 within 30 days.
17     Q.    Okay.  Is there an option
18 within the ARCOS handbook that we looked at
19 earlier that allows you to not report
20 information if there are errors?
21         MS. SWIFT:  Object to the form.
22         THE WITNESS:  I don't have the
23 whole handbook memorized.  I'm not --
24 I do know in our system there's an
25 option of reporting in a subsequent

Page 90

1 month for past months if you find or
2 determine that you need to make
3 corrections.
4 QUESTIONS BY MR. GADDY:
5     Q.   Okay.  Well, you didn't need to
6 make a correction.  You were putting off to
7 another month a report that should have been
8 made earlier, correct?
9     MS. SWIFT:  Object to the form.
10     THE WITNESS:  I cannot draw
11 that conclusion.  Again, the quantity
12 is zero.  The quantity zero means we
13 don't have product, so I -- there's
14 likely another chain of e-mails or
15 discussions or something that were
16 around this, too.
17     But again, with it being this
18 long ago, we're making a lot of
19 speculation, a lot of -- we're -- I
20 don't remember the specifics, in other
21 words, so...
22 QUESTIONS BY MR. GADDY:
23     Q.   Okay.  Well, Mr. Barnes, you
24 can see that in this document the two
25 concerns that were raised were, A, we don't

Page 91

1 know how the DEA will respond, and B, will RX
2 returns be on a list for an audit.
3     Those were the two concerns
4 that were raised if this information was
5 reported to the DEA, correct?
6     A.   That was by Silas Patel, yes.
7     Q.   Okay.  And his recommendation
8 of not reporting that information to the DEA
9 is what you followed?
10     A.   That's mischaracterizing, I
11 believe, what I've said.  I've said --
12     Q.   Did you report it, or did you
13 not report it?
14     MS. SWIFT:  Let him finish his
15 answer.
16     You can finish your answer.
17     THE WITNESS:  As I said --
18     As I said, we -- one option we
19 gave the business instead of not
20 reporting was, okay, we can put it in
21 next report -- month's reporting.
22 QUESTIONS BY MR. GADDY:
23     Q.   Okay.  So you didn't report it
24 that month?
25     MS. SWIFT:  Object to the form.

Page 92

1 Foundation.
2     THE WITNESS:  I have no way of
3 drawing that conclusion from the
4 e-mail.
5 QUESTIONS BY MR. GADDY:
6     Q.   Your recommendation was to not
7 report that month?
8     A.   I did offer that option.
9     Q.   Well, you didn't offer that
10 option; you offered that recommendation.
11     A.   Option, recommendation, yeah,
12 that's what I offered.
13     Again, our role is to work with
14 the business to provide the most accurate
15 reporting possible.  If we didn't know what
16 that zero meant, I think we would have been
17 negligent to report inaccurate data.
18     Q.   But you also agree that it's
19 important that the DEA be aware of any
20 potential issues with your reporting,
21 correct?
22     A.   As a general personal opinion,
23 I agree we do work with the DEA and have on
24 questions we've had about how to report
25 things.

Page 93

1     Q.   Okay.  And you agree that it
2 would be important to -- that the DEA know if
3 there's issues or discrepancies in your
4 reporting that could impact the accuracy of
5 the information that they're receiving?
6     A.   Repeat, please.
7     Q.   Sure.
8     You agree that it would be
9 important for the DEA to know if there were
10 issues or discrepancies within Walgreens
11 reporting that could impact the accuracy of
12 the information they're receiving?
13     A.   As a general statement on my
14 personal belief, because I don't stand for
15 the SMEs, or the subject matter experts, I
16 think if there was a question that we had on
17 the DEA's formatting on how to proceed so
18 that it's best represented, then we
19 definitely need to let the DEA know or ask
20 the question.  In this case, it's not clear
21 that if it's on something that falls into
22 that category.
23     Q.   Okay.  I'm not asking about the
24 DEA's formatting.  I'm asking generally from
25 Walgreens' perspective and from your

Page 94

1 perspective.
2         Do you agree that it's
3 important to let the DEA know if there's
4 issues or discrepancies within Walgreens'
5 reporting that could impact the accuracy of
6 the information that you're providing to the
7 DEA?
8         MS. SWIFT: Object to the form
9 of the question. You said you're
10 asking for Walgreens' perspective
11 or --
12         MR. GADDY: I said from his
13 perspective.
14         THE WITNESS: From my personal
15 perspective, there's things on the
16 Walgreens side that we would need to
17 research in this example scenario to
18 see how do we -- what is the truth,
19 because we're always aiming for the
20 truth, as we take our compliance
21 duties very seriously.
22         The DEA in their formatting, I
23 believe, gives us the option to report
24 backwards -- and this is really
25 stretching my memory -- I think for up

Page 95

1 to two years to make corrections or
2 additions.
3         So the key important thing is
4 accuracy. So if we didn't feel like
5 we knew how to report it, after we did
6 our systems, then traditionally
7 someone would have reached out to the
8 DEA.
9 QUESTIONS BY MR. GADDY:
10     Q.    Okay. And maybe, Mr. Barnes, I
11 should have been clear. I've moved on from
12 that last document. So the question I'm
13 asking you has nothing to do with the last
14 document we were looking at. Okay?
15         And what I'm asking you is if
16 it's important from your perspective to let
17 the DEA know if there are issues or
18 discrepancies within the information that
19 Walgreens is reporting to the DEA that could
20 impact its accuracy.
21     A.    If there was a case that we
22 felt like we had -- in the making of a
23 general, personal statement, if there was a
24 case where we felt like we had possibly
25 reported discrepancies, then, yes, I would

Page 96

1 say it's important.
2     Q.    Okay. And you agree it would
3 be important to be transparent with the DEA
4 so that they could know about any issues or
5 transparencies in Walgreens' reporting?
6     A.    As a general statement, yes, I
7 agree that it's important to be transparent,
8 I believe was your word, for my personal
9 opinion.
10     Q.    Okay. And, I mean, we -- one
11 of the first things we did was look at the
12 ARCOS handbook that talked about how -- how
13 the DEA uses information reported to it by
14 distributors such as Walgreens to assist them
15 in detecting potential diversion, correct?
16         MS. SWIFT: Are you going back
17 to the document?
18         THE WITNESS: Huh?
19         MR. GADDY: He didn't say he
20 needed it.
21         MS. SWIFT: If you understand
22 the question, you can answer it.
23         THE WITNESS: That's my general
24 memory of -- I believe it's one of the
25 first things you presented from

Page 97

1 memory, yes.
2 QUESTIONS BY MR. GADDY:
3     Q.    Okay. And Walgreens has an
4 interest in preventing diversion as well,
5 correct?
6         MS. SWIFT: Object to the form.
7         THE WITNESS: I can't answer
8 for all of Walgreens. From my, Sean
9 Barnes', opinion, yes, I think any
10 company that wants to do business has
11 an interest in being fair, open and
12 honest. And in my personal opinion, I
13 definitely see that at Walgreens.
14 QUESTIONS BY MR. GADDY:
15     Q.    Okay. And the one way to do
16 that would be to be transparent with the DEA?
17         MS. SWIFT: Object to the form.
18         THE WITNESS: One way to do
19 what? To be open and transparent?
20 Could you please --
21 QUESTIONS BY MR. GADDY:
22     Q.    One way to assist with
23 preventing potential diversion would be to be
24 open and honest and transparent with the DEA?
25         MS. SWIFT: Object to the form

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  of the question.
2       THE WITNESS:  On a personal
3  level, I could see that.
4       (Walgreens-Barnes Exhibit 7
5  marked for identification.)
6  QUESTIONS BY MR. GADDY:
7       Q.   I'm going to show you what
8  we're going to mark as Barnes 7.
9       And you see at the very top
10 page, this would be the last e-mail in the
11 chain.
12      A.   Uh-huh.
13      Q.   You see it's an e-mail from
14 Lynn Guyot --
15      Did I say that right?
16      A.   Guyot.
17      Q.   Guyot.  Thank you.
18      -- from January 2017, and you
19 are in the "to" line there, correct?
20      A.   Yes, I am.
21      Q.   Okay.  And the subject of
22 this -- of this e-mail here is CS -- is I
23 guess what you refer to as CSOS?
24      A.   Uh-huh.
25      Q.   Lock and load.

Page 99

1       And CSOS is the mechanism in
2  which Walgreens would order controlled
3  substances?
4       A.   It's where they sign -- yeah,
5  technically.  They sign the electronic
6  orders.
7       Q.   And some of the orders that get
8  signed and some of the paperworks within
9  there are the DEA 222 forms, correct?
10      A.   Yeah, the electronic 222 forms.
11      Q.   And that is the information
12 that we saw in the first -- in the earlier
13 document, the ARCOS handbook, that DEA can
14 analyze to detect potential diversion?
15      MS. SWIFT:  Object to the form.
16      THE WITNESS:  I would need you
17 to show me that document again.  I may
18 have a vague memory of that.
19 QUESTIONS BY MR. GADDY:
20      Q.   It should be right there next
21 to you.
22      A.   Which exhibit?
23      Q.   The thick one.
24      A.   Can you restate your question
25 and provide me a page number, please?

Page 100

1       Q.   Sure, 1-1.
2       A.   Exhibit 2?
3       Q.   Correct.
4       A.   What subsection?
5       Q.   It's going to be on the top of
6  page 1-2 under 1.2, ARCOS relationship to
7  drug inventory audit.
8       A.   Okay.
9       Q.   You see there it says, "The DEA
10 has the capability to perform analysis on
11 filled order form data, DEA Form 222."
12      Do you see that?
13      A.   I do.
14      Q.   Okay.  And the next sentence
15 says, "This increases the federal
16 government's ability to detect potential
17 diversion."
18      Correct?
19      A.   "In this sense, ARCOS captures
20 and stores this information.  This increases
21 the federal" -- is it before that line?
22      I do see it.  The only -- I
23 already have a question about it.  DEA
24 Form 222 usually specifically talks about
25 paper forms, not electronic, so I don't know

Page 101

1  whether or not -- it raises a question in my
2  head, so...
3       Q.   The ARCOS handbook states that
4  the DEA uses that information to detect
5  potential diversion; yes or no?
6       A.   It says for -- they state,
7  "This increases the federal government's
8  ability to detect potential diversion
9  situations for Form 222," which, again, I
10 believe may be different than the electronic
11 form that you started asking about.
12      Q.   Okay.  Well, let's go back to
13 the e-mail chain.  I think it's Barnes 7.
14      Do you have that in front of
15 you?
16      A.   Yes, sir.
17      Q.   Okay.  If we go back to the
18 back, last page, you see the first e-mail in
19 the chain?  It's an e-mail to -- from
20 Ms. Guyot?  Guyot?
21      A.   That's right.
22      Q.   To Barb Martin.
23      Do you see that?
24      A.   Uh-huh.
25      Q.   And the subject is "CSOS

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 question."
2        Do you see that?
3    A.   Yes.
4    Q.   And you're copied on this
5 e-mail, correct?
6    A.   Yes, I am.
7    Q.   Okay.  And Ms. Guyot writes,
8 "Hi, Barb.  If there are issues with the CSOS
9 data, are we subject to any fines if DEA
10 finds them?  If yes, what do the fines cost?"
11       Do you see that?
12   A.   Uh-huh.  I do.
13   Q.   Okay.  Do you agree that
14 Ms. Guyot does not ask, "What happens when we
15 tell the DEA about them?"  She doesn't say
16 that, does she?
17   A.   No, she does not.
18   Q.   She asked, "What happens if the
19 DEA finds them?" correct?
20   A.   Yes, being taken out of context
21 as I skim through the rest of the e-mail.
22   Q.   Okay.  Let's go to the next
23 e-mail in the chain.
24       You see the next one is from
25 Barb Martin back to Ms. Guyot?

Page 103

1    A.   I do.
2    Q.   Do you see that?
3        And again, you're copied.
4        Do you see that?
5    A.   I am.
6    Q.   Okay.  And Ms. Martin writes,
7 "Hi, Lynn.  The DEA can fine up to $10,000
8 per occurrence for improper recordkeeping."
9        Do you see that?
10   A.   I do.
11   Q.   That's a significant fine,
12 isn't it?
13   A.   To me personally, out of my
14 checkbook, yes.  I believe that's a judgment
15 statement.
16   Q.   Okay.  Will you agree that
17 $10,000 is a lot of money?
18   A.   To me personally, yeah, I'd
19 like to have 10,000.
20   Q.   Okay.  You agree that one of
21 the reasons the DEA would charge a
22 significant fine for this type of violation
23 is because it needs accurate information to
24 be reported by companies such as Walgreens?
25       MS. SWIFT:  Object to the form.

Page 104

1    Lacks foundation.  Calls for a legal
2    conclusion.
3        THE WITNESS:  Could you repeat
4    your question, please?
5 QUESTIONS BY MR. GADDY:
6    Q.   Would you agree with the
7 contention that one of the reasons the DEA
8 would impose a significant fine for this type
9 of violation is because it's important for
10 the DEA to receive accurate information, for
11 accurate information to be provided to the
12 DEA as a -- as a result -- or as it relates
13 to controlled substance ordering?
14       MS. SWIFT:  Same objections.
15       THE WITNESS:  I don't
16    personally or professionally have any
17    basis to characterize that conclusion.
18 QUESTIONS BY MR. GADDY:
19   Q.   You see Ms. Guyot then takes
20 Mrs. Martin's e-mail, forwards it on to some
21 other individuals, one of which is you,
22 correct?
23   A.   I do.
24   Q.   She says, "Hi all, the CSOS
25 fixes will be taken to the EIC tomorrow, and

Page 105

1 below are the fines per occurrence if we are
2 fined by the DEA."
3        Do you see that?
4    A.   I do.
5    Q.   She says, "Currently we have
6 35,000 discrepancies per year unless we fix
7 this."
8        Do you see that?
9    A.   I do.
10   Q.   Okay.  At $10,000 per fine, per
11 violation, and 35,000 discrepancies, what
12 does that add up to?
13   A.   I am not a human calculator.
14 Can you tell me?
15   Q.   Does $350 million sound right?
16   A.   I'll take your word for it.
17   Q.   Okay.  Do you agree that that
18 would be a significant penalty?
19   A.   How many million?
20   Q.   350.
21   A.   Again, it's -- it's really all
22 relative depending on the situation.  To me
23 it's a huge amount of money, but...
24   Q.   Well, $350 million would be a
25 huge amount of money to pretty much anybody;

Page 106

1  would you agree?
2      A.   I would hope so.
3      Q.   Okay.
4      A.   But again, it's a value and
5  judgment statement.  I -- but, yeah,
6  personally, I certainly agree.
7      Q.   Okay.  And at this time,
8  Ms. Guyot is reporting that Walgreens is --
9  has discrepancies that could potentially cost
10  the company $350 million?
11      MS. SWIFT:  Object to the form.
12      THE WITNESS:  That's what she's
13      stating; however, Ms. Guyot is not a
14      lawyer.  So I don't know that she was
15      qualified, but she does state that.
16  QUESTIONS BY MR. GADDY:
17      Q.   Okay.  At any point in this
18  e-mail chain do you see Ms. Guyot, Ms. Martin
19  or anybody else say that you should inform
20  the DEA, that you should be transparent with
21  the DEA and let them know about the
22  discrepancies within your ordering system?
23      MS. SWIFT:  He's asking you to
24      read the whole document.
25      THE WITNESS:  I will.

Page 107

1      Your question was, does anyone
2      say they -- or should report this to
3      the DEA?  Was that correct?
4  QUESTIONS BY MR. GADDY:
5      Q.   I think what I asked you is
6  anywhere in this e-mail chain did you see
7  Ms. Guyot, Ms. Martin or anybody else say
8  that you should report these 35,000
9  discrepancies to the DEA?
10      A.   What I do see is that this is a
11  document requesting funding and the backing
12  for funding.
13      Any communication with the DEA
14  or suggestion of that would be through our
15  legal department or our RX integrity
16  departments.
17      This document is simply asking
18  for information on how to justify funding a
19  compliance project and -- because compliance
20  projects at Walgreens always get pushed to
21  the top because we take compliance very
22  seriously.
23      Q.   Okay.  Well, the first thing
24  this document does is raise the issue of a
25  potential $350 million fine from the DEA,

Page 108

1  correct?
2      MS. SWIFT:  Object to the form.
3      THE WITNESS:  No.  The first
4      thing the document mentioned was a
5      number of what Lynn apparently
6      perceived as violations to justify a
7      funding request.
8      Any characterization on how
9      much that would cost may be talked
10      about in this e-mail again, but it
11      wasn't from our legal or compliance
12      team, so it would be me speculating on
13      top of them speculating.
14  QUESTIONS BY MR. GADDY:
15      Q.   Okay.  Well, Mr. Barnes,
16  anywhere in this e-mail where Ms. Guyot asked
17  about DEA finding issues with CSOS data,
18  where Barbara Martin tells her it's $10,000
19  per occurrence, wherein Ms. Guyot mentions
20  there are 35,000 discrepancies that could be
21  subject to these issues, anywhere in that
22  e-mail chain does anybody say, "let's notify
23  the DEA of these issues"?
24      A.   Again, no -- in this e-mail
25  chain, that would not be their

Page 109

1  responsibility.  This would have been brought
2  to us by legal --
3      Q.   Anywhere in this e-mail
4  chain --
5      MS. SWIFT:  Let him finish his
6      answer.
7      Finish your answer.
8      THE WITNESS:  This would have
9      been brought to us by legal in order
10      to -- legal gets their issues, or the
11      things that they ask us to do, often
12      in conversations with the DEA from
13      field agents, is what I've been told.
14      So normally, course of
15      business, they would have come to Lynn
16      or someone and said, "We need to get
17      funding.  We need -- we've got a
18      change we need in the application."
19      So this entire chain, they're
20      showing the importance of compliance
21      and why we need the money.
22  QUESTIONS BY MR. GADDY:
23      Q.   Okay.  But the answer is no,
24  nobody in this e-mail chain says we should
25  tell the DEA about these discrepancies with

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 our reporting?

2     MS. SWIFT: Objection. Asked

3 and answered.

4     THE WITNESS: It's asking for a

5 yes or no in a more complicated issue.

6 The -- would not be appropriate in

7 this type of communication.

8 QUESTIONS BY MR. GADDY:

9     Q.   At anywhere in here does this

10 e-mail chain that you're copied on, do you

11 reply and say, "We should let the DEA know

12 about this issue"?

13     A.   Again, with a corporation as

14 large as Walgreens, we have specialties. My

15 specialty is not DEA communication. That

16 would be with other people that more than

17 likely -- I'm making an assumption here

18 because I don't remember the specifics --

19 came to us about the IT side of this.

20     Q.   Okay. You agree the letter,

21 the language in Ms. Guyot's e-mail, is what

22 happens if DEA fines them?

23     A.   I agree that that is what her

24 and, I believe it was, Barb Martin believe.

25 I can't say if that's true.

Page 111

1     Q.   What's your current job title

2 at Walgreens?

3     A.   IT manager.

4     (Walgreens-Barnes Exhibit 8

5 marked for identification.)

6 QUESTIONS BY MR. GADDY:

7     Q.   Showing you what I'm going to

8 mark as Barnes 8.

9     I believe this is a 2018

10 organizational chart. You tell me if I'm

11 wrong on that.

12     Is this your current

13 organizational situation?

14     A.   Just a second.

15     Are you asking about the whole

16 document or just the top page or...

17     Q.   Just the top page for now.

18     A.   Okay. I can't say if it's

19 2018. There's actually been -- a few remain

20 current. I believe there's been some changes

21 that I don't know the details of where more

22 people report in to Mr. Amend, but under

23 Andrew Meyer, in my area, it is correct.

24     Q.   Okay. And if you turn to the

25 second page, it looks like it's actually a

Page 112

1 breakdown of Mr. Meyer's reports.

2     Do you see that?

3     A.   I do.

4     Q.   What, if anything, would need

5 to be changed about this diagram to make it

6 accurate?

7     A.   It partly depends on what level

8 and depth of detail you'd like. For

9 instance, we now have someone in the

10 architecture position, actually two people

11 trying out in that role, in contract to hire.

12     I currently have a contract to

13 hire my open BSA II role, even though that --

14 well, currently I do.

15     And I'm not familiar with

16 Thomas Schiffner's organization.

17     Rajib, yeah, it looks like he's

18 coming from Andrew. He kind of reports to

19 Andrew and all three managers, so...

20     Q.   So you took over this role in

21 approximately 2015?

22     A.   Sounds roughly right.

23     Q.   Okay. And in 2015, Walgreens

24 was no longer distributing controlled

25 substances, correct? Or C-IIs, I should say.

Page 113

1     A.   I -- yeah, I don't know the

2 exact date we stopped doing it, but --

3     Q.   You know in 2015 you were not?

4     A.   I don't remember specifically

5 the date. I do know it's been at least two

6 to three years. I just -- it was a process,

7 so I don't remember -- I don't even know that

8 there was one exact date, to be honest.

9     Q.   Do you serve in any compliance

10 function now?

11     A.   I've never really served in a

12 compliance function. When I put it on, like,

13 LinkedIn or on, you know, other areas, it's

14 part of my team name. What it really refers

15 to is we support these applications. We keep

16 them up and running. We make sure they have

17 disc space. If there's errors, we try to

18 help you correct them, or if you need it

19 changed, we'll take directions from you on

20 how to do it. So that's my involvement with

21 compliance.

22     Q.   Okay. Do you support

23 compliance functions now?

24     A.   I do for specific applications.

25     Q.   Okay. Do you support any

Page 114

¹ compliance functions currently as it relates
² to Schedule II narcotics?
³     A.     Related to the CSOS e222
⁴ ordering only, not to the paper.
⁵     Q.     Okay.  In what way do you
⁶ support Schedule II narcotics compliance
⁷ currently?
⁸     A.     The controlled substance
⁹ ordering system is -- we bought a package
¹⁰ from a company called Axway, Incorporated.
¹¹ That package enables people who are
¹² authorized to sign for specific stores to
¹³ apply their electronic signature to a drug
¹⁴ order and -- for C-II products, and once
¹⁵ their signature is applied, then it
¹⁶ eventually gets sent to our distributor or
¹⁷ wholesaler, which is currently ABC.
¹⁸         There's a lot of interactions,
¹⁹ lots of systems involved, about seven, but
²⁰ that's the core of the system right there, is
²¹ the signing.
²²     Q.     Who is on -- looking at this
²³ document on the organizational chart, who is
²⁴ Caroline Rawa?
²⁵     A.     Caroline Rawa is an Analyst II,

Page 115

¹ or BSA II, under me.
²     Q.     Okay.  What are her duties?
³     A.     Any team member on my team,
⁴ except for one, is going to be on what we
⁵ call application development.  BSA means
⁶ business systems analyst, so these are the
⁷ people that go out and they talk to our
⁸ business and they say, basically, "Hey, you
⁹ said you wanted a change in this.  Tell us
¹⁰ what you want."
¹¹         They document it, we get it
¹² signed off for, and then she would monitor
¹³ that through the process, constantly checking
¹⁴ back the deliverable to the business, "Is
¹⁵ this what you want, is this what you want,"
¹⁶ until it's done.
¹⁷         So it's kind of a general role,
¹⁸ but it's limited unless our team happened to
¹⁹ have worked only the applications our team
²⁰ supports.
²¹     Q.     When you began, Mr. Barnes, at
²² Walgreens in 2006, did you have an
²³ understanding that there was an opioid
²⁴ epidemic within the US?
²⁵     A.     Actually, I started in 2004.

Page 116

¹ But, no, I don't remember being aware.
²     Q.     Okay.  Do you acknowledge that
³ there's currently an opioid epidemic in the
⁴ US?
⁵         MS. SWIFT:  Object to the form.
⁶         THE WITNESS:  I don't have any
⁷     personal knowledge.  I read news
⁸     articles.  It's kind of hard to miss,
⁹     so I assume that they're correct.
¹⁰     Yeah, I would agree.
¹¹ QUESTIONS BY MR. GADDY:
¹²     Q.     When did you first become aware
¹³ that there was an opioid epidemic in the
¹⁴ country?
¹⁵         MS. SWIFT:  Object to the form.
¹⁶         THE WITNESS:  I'd really be
¹⁷     guessing, honestly, on when I first
¹⁸     became aware personally.  It really
¹⁹     seems like -- well, I'd just really be
²⁰     guessing.
²¹ QUESTIONS BY MR. GADDY:
²²     Q.     Did anybody from Walgreens ever
²³ provide you with any education or training
²⁴ regarding the opioid epidemic within the
²⁵ country?

Page 117

¹     A.     I don't recall any training
² specific to opioids themselves.
³     Q.     Okay.  In your role supporting
⁴ compliance for Schedule II and III narcotics,
⁵ did you ever receive any training or
⁶ education on the scope of prescription drugs
⁷ being abused?
⁸         MS. SWIFT:  Object to the form.
⁹         THE WITNESS:  No.  In IT,
¹⁰     again, we're not the experts.  We
¹¹     gather the data from the experts.
¹² QUESTIONS BY MR. GADDY:
¹³     Q.     Okay.  But did anybody at
¹⁴ Walgreens provide any training or education
¹⁵ on prescription drugs being abused within the
¹⁶ country?
¹⁷         MS. SWIFT:  Object to the form.
¹⁸         THE WITNESS:  No, no direct
¹⁹     education was provided to me as an IT
²⁰     person.
²¹ QUESTIONS BY MR. GADDY:
²²     Q.     Okay.  Did Walgreens provide
²³ you any education or training on the scope of
²⁴ individuals within the US overdosing and
²⁵ dying from prescription medication?

Page 118

1    A.    Again, as my personal role in
2  IT, no specific education.
3         Internally, there's newsletters
4  making people aware about the epidemic,
5  steps, according to those letters, that were
6  directly -- steps the company was taking and
7  generally asking people to be alert, but in
8  my role as IT, no direct training.
9    Q.    When did you begin getting
10  newsletters within Walgreens?
11    A.    Various newsletters have
12  been -- different types have been published
13  since I started.
14    Q.    Okay.  Did you get a newsletter
15  within Walgreens regarding the $80 million
16  settlement that Walgreens paid to the DEA?
17    A.    There was a communication about
18  it.  I don't know how I would characterize
19  the content, whether it was a newsletter or a
20  web article or whatever, again, because
21  there's multiple types.  And I don't remember
22  how you categorized it, but just that there
23  was an agreement with the DEA on that issue.
24    Q.    When do you believe you began
25  getting newsletters from Walgreens related to

Page 119

1  the abuse of prescription narcotics within
2  the US?
3         MS. SWIFT:  Objection to the
4         extent it mischaracterizes the
5         testimony.
6         THE WITNESS:  I don't believe
7         that the -- that would be the way it
8         was worded.  It was more -- you know,
9         a lot of these newsletters are general
10         for all employees to say here's -- it
11         tries to bring people together in
12         Walgreens so you know a little bit
13         about other job functions that were --
14         what we're doing as a company, so
15         responsible.
16         So it was more -- you might
17         hear how I characterized it earlier.
18         You might hear about on the news all
19         this opioid epidemic and here's what
20         we're doing as a company, is how I'd
21         characterize it.
22  QUESTIONS BY MR. GADDY:
23    Q.    But you didn't receive any
24  training or education from Walgreens on those
25  issues?

Page 120

1    A.    No.
2         (Walgreens-Barnes Exhibit 9
3         marked for identification.)
4  QUESTIONS BY MR. GADDY:
5    Q.    I'll show what you we'll mark
6  as Barnes 9.  You see on the first page at
7  the top that says this is from the United
8  States General Accounting Office?
9         It's a report to Congressional
10  requesters.
11         You see that?
12    A.    I do.
13    Q.    Do you see it's dated on the
14  left-hand side there December 2003?
15    A.    I do.
16    Q.    The title of the document is,
17  "Prescription drugs:  OxyContin abuse and
18  diversion and efforts to address the
19  problem."
20         Do you see that?
21    A.    I do.
22    Q.    And this document that has a
23  December 2003 date, that would have been just
24  before you started at Walgreens, correct?
25    A.    Yeah, December -- given that I

Page 121

1  started in January of 2004, yes.
2    Q.    Okay.  When you started with
3  Walgreens in 2004, you agree that Walgreens
4  was a distributor of Schedule II narcotics?
5    A.    To my knowledge, yes, that was
6  the case.  I didn't know that at the time,
7  but later on as I was asked to help out with
8  some compliance apps, yes.
9    Q.    Okay.  As you sit here today,
10  you know that in 2004 Walgreens was a
11  distributor of Schedule II narcotics?
12    A.    Can I swear that that was
13  occurring?  No.  I was led to believe that
14  these systems had existed for a while since I
15  support systems and had data.  So I could
16  deduce that that was likely the case, but I
17  have no personal knowledge.
18    Q.    And do you also have an
19  understanding that one of the drugs, one of
20  the Schedule II drugs, that Walgreens
21  distributed and dispensed in their pharmacies
22  was OxyContin?
23    A.    Now or then?
24    Q.    As you sit here today, do you
25  have an understanding that OxyContin is a

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 drug that Walgreens has distributed from its
2 distribution centers and dispensed from its
3 pharmacies?
4     A.    I don't have any personal
5 knowledge on that dispensing from either the
6 pharmacy or from the distribution center, but
7 it's my general, again, secondhand knowledge.
8     Q.    Is that yes?
9     A.    That Walgreens has distributed
10 from both, no longer from our DCs, and
11 continues to do so from our pharmacies.
12     Q.    Okay.  Walgreens used to
13 distribute OxyContin, no longer does.
14        Has always dispensed OxyContin,
15 correct?
16        MS. SWIFT:  Object to the form
17 of the question.
18        THE WITNESS:  Yeah, the
19 specific drug -- I was speaking as
20 secondhand knowledge of a general drug
21 class and type.  I don't know
22 OxyContin -- I don't know if that's
23 the name brand or the generic form,
24 but in general.
25        At a high level, I believe

Page 123

1     we've dispensed and continue to
2     dispense from the stores and no longer
3     from the warehouse or DCs.
4 QUESTIONS BY MR. GADDY:
5     Q.    Okay.  And if you turn a couple
6 pages in, on the bottom of page you'll see it
7 says page 1.
8     A.    I do.
9        MS. SWIFT:  I think that's
10     page I.
11        THE WITNESS:  Oh.
12 QUESTIONS BY MR. GADDY:
13     Q.    Sorry, yeah, not roman
14 numerals, but...
15     A.    Okay.  Thank you.
16     Q.    You see at the top of the page
17 there's a date, December 23, 2003?
18     A.    I do.
19     Q.    And you see that this is
20 addressed to three members of Congress -
21 Honorable Frank Wolf, James Greenwood and
22 Harold Rogers - all identified as being
23 within the House of Representatives?
24     A.    I do.
25     Q.    If you'd turn to the next page

Page 124

1 for me, please.
2     A.    Okay.
3     Q.    In the paragraph that starts in
4 the middle of the page, it says, "In early
5 2000, media reports began to surface in
6 several states that OxyContin was being
7 abused, that is, used for nontherapeutic
8 purposes or for purposes other than those for
9 which it was prescribed, and illegally
10 diverted."
11        Do you see that?
12     A.    I do.
13     Q.    And after the word "diverted,"
14 you see there's a footnote there, correct?
15     A.    I do.
16     Q.    If we go down to the bottom of
17 page and look at that footnote 4, it says,
18 "Prescription drug diversion can involve such
19 activities as doctor shopping by individuals
20 who visited" -- excuse me, "who visit
21 numerous physicians to obtain multiple
22 prescriptions, prescription forgery and
23 pharmacy theft."
24        Do you see that?
25     A.    I do.

Page 125

1     Q.    Do you agree those are all
2 issues that Walgreens has dealt with over
3 time as it relates to Schedule II narcotics?
4        MS. SWIFT:  Object to the form.
5        THE WITNESS:  I can't agree.  I
6     have no personal knowledge of that.
7 QUESTIONS BY MR. GADDY:
8     Q.    Going back up to the main
9 paragraph, it says, "According to FDA and the
10 Drug Enforcement Administration, DEA, the
11 abuse of OxyContin is associated with serious
12 consequences, including addiction, overdose
13 and death."
14        Do you see that?
15     A.    I do.
16     Q.    It says, "When OxyContin was
17 approved, the federal government classified
18 it as a Schedule II controlled substance
19 under the Controlled Substance Act because it
20 has a high potential for abuse and may lead
21 to severe psychological or physical
22 dependence."
23        Do you see that?
24     A.    Yes.
25     Q.    Did anybody at Walgreens ever

Page 126

1  provide you with any information, education
2  or training when you started in 2004 that
3  these types of reports were being made to
4  Congress a year earlier?
5      A.    No, not in my role as an IT
6  person.
7      Q.    Okay.  Who supported the
8  compliance division of Walgreens, correct?
9      A.    You asked in 2004, and I did
10  not at that time.
11      Q.    Okay.  In 2006 you did?
12      A.    I would say roughly.
13      Q.    Okay.  It goes on to say, "DEA
14  has characterized the pharmacological effects
15  of OxyContin and its active ingredient,
16  oxycodone, as similar to those of heroin."
17          Do you see that?
18      A.    Yes.
19      Q.    Did anybody at Walgreens, at
20  any time while you were serving in a support
21  to a compliance role from 2006 to 2015,
22  provide you any education or training on how
23  the DEA equivalized oxycodone and heroin?
24      MS. SWIFT:  Object to the form.
25      THE WITNESS:  Can you please

Page 127

1      restate that -- I didn't follow that
2      question.
3  QUESTIONS BY MR. GADDY:
4      Q.    Sure.
5          Did anybody at Walgreens ever
6  provide you with any training or education on
7  this statement that was provided to Congress
8  in 2003, that the DEA was equating the
9  impacts of oxycodone with heroin?
10      A.    Not to my knowledge.  Not in
11  IT.
12      Q.    It says, "Media reports
13  indicated that abusers were crushing
14  OxyContin tablets and snorting the powder or
15  dissolving it in water and injecting it to
16  defeat the intended controlled release effect
17  of the drug and obtain a rush or high through
18  the body's rapid absorption of oxycodone."
19          Do you see that?
20      A.    Yes.
21      Q.    Okay.  And did anybody at
22  Walgreens provide you any education or
23  training on those issues as it related to
24  your support of the compliance division
25  within Walgreens?

Page 128

1      MS. SWIFT:  Object to the form.
2      THE WITNESS:  I'm not in the
3  compliance division at Walgreens to --
4  brief correction there.  We support
5  applications in IT.  We're --
6  thousands of IT people, thousands of
7  business people.  We specialize.  So
8  we get information from the
9  specialists in order to support.
10          We don't -- you know, we take
11  compliance very seriously.  That's why
12  we provide so many people on it.  But
13  we give training to the people -- my
14  experience is the training I've been
15  given is specific to my individual
16  needs.
17  QUESTIONS BY MR. GADDY:
18      Q.    Okay.  Prior to today, have you
19  ever seen the statement that DEA has
20  characterized pharmacological effects of
21  OxyContin and its active ingredient,
22  oxycodone, as similar to those of heroin?
23          Have you ever heard of that
24  concept before today?
25      A.    I have not heard it in my

Page 129

1  professional capacity.  I think I've read it
2  in various news organizations.
3      Q.    Okay.  Nobody at Walgreens has
4  ever made you aware of that?
5      A.    I don't -- honestly, I'm trying
6  to think of a specific time.  There's general
7  conversations that will go along on a
8  project, and, you know, you might discuss in
9  general but not specifically.
10      Q.    In your role of supporting
11  compliance, you talked a little bit about how
12  you supported some of the ARCOS reporting
13  that was done.
14          Did you have any involvement in
15  supporting divisions within Walgreens that
16  were charged with making suspicious order
17  reports?
18      A.    No.
19      Q.    Okay.  Ever?
20      A.    Repeat your question just so I
21  can be sure.
22      Q.    Sure.
23          Did you have any involvement in
24  supporting divisions within Walgreens that
25  were charged with making suspicious order

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 reports?
2     A.    Have I had any encounters or
3 dealings with any group that was in charge of
4 making suspicious order reports; is that your
5 question?
6     Q.    I'm asking if that was ever
7 within the scope of your duties.
8     A.    I might need you to repeat it
9 again because I think you're asking have I
10 worked with groups that might do that, and
11 that answer would be yes, but my duties do
12 not include supporting those applications.
13     Q.    Okay.  Well, let me ask it one
14 more time just to make sure.
15     A.    Okay.
16     Q.    At any time in your employment
17 with Walgreens, did your duties ever include
18 supporting divisions within Walgreens that
19 were charged with making suspicious order
20 reports?
21         MS. SWIFT:  Object to the form.
22         THE WITNESS:  The question -- I
23     would support the groups that do that,
24     but there's another IT team that
25     supports the suspicious drug reporting

Page 131

1     applications, I believe.  We do not do
2     that, but -- we do also have
3     involvement with that group, but not
4     for that purpose.
5 QUESTIONS BY MR. GADDY:
6     Q.    Okay.
7     A.    That business group, to
8 clarify.
9     Q.    Okay.  So who's in that
10 business group?
11     A.    I'm sorry?
12     Q.    Who's in that business group?
13         MS. SWIFT:  Object to the form.
14         THE WITNESS:  Currently that
15     would be Tasha Polster and her
16     reports, Patricia Daugherty.
17 QUESTIONS BY MR. GADDY:
18     Q.    You're talking about the
19 pharmaceutical integrity team?
20     A.    RX integrity, yes.
21     Q.    Okay.  Prior to --
22     A.    I believe, again, it's not
23 my -- that's the team I work with.  I've
24 heard they support that, but since I don't
25 support that application, I'm making somewhat

Page 132

1 of an assumption.
2     Q.    I understand.
3         Prior to the formation of the
4 RX integrity team, what -- who was in the
5 business group that was charged with
6 reporting suspicious orders?
7     A.    I do not know.
8     Q.    What is -- who was in charge of
9 the IT team that supports the suspicious
10 order monitoring program now?
11     A.    That supports it currently?
12         I believe -- no direct
13 knowledge, but I believe that's Steve Bamberg
14 is the IT manager, my peer.
15     Q.    And Steve's the head of the IT
16 unit that supports the suspicious order
17 reporting currently?
18         MS. SWIFT:  Object to the form.
19         THE WITNESS:  Again, that's my
20     understanding.  It's, you know,
21     third -- you know, secondhand
22     knowledge.
23 QUESTIONS BY MR. GADDY:
24     Q.    Okay.  Who else works with
25 Steve on that team?

Page 133

1     A.    I actually don't know any of
2 his reports, anyone that reports to him
3 offhand.  No.
4     Q.    So prior to Tasha Polster and
5 her RX integrity group being in charge of
6 reporting suspicious orders, when that team
7 was formed, you don't know who was in charge
8 of reporting suspicious orders prior to that?
9     A.    No, there's no reason for me to
10 have known since we didn't support that
11 application.
12     Q.    Okay.  Do you offer any support
13 to any of the loss prevention divisions or
14 departments?
15     A.    Not directly.  The -- I mean,
16 support's a funny thing because people can
17 come and ask you a question in a large
18 organization and just ask for input, but
19 directly it's not one of our day-to-day
20 functions.
21         MR. GADDY:  Okay.  Do you want
22     to take a break?
23         THE WITNESS:  Yeah.
24         MR. GADDY:  I saw you
25     stretching.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 134

1 THE WITNESS: Thank you.
2 VIDEOGRAPHER: We're going off
3 the record at 11:13.
4 (Off the record at 11:13 a.m.)
5 VIDEOGRAPHER: We're back on
6 the record at 11:28.
7 QUESTIONS BY MR. GADDY:
8 Q. Mr. Barnes, I think just before
9 the break you testified that you did not
10 support any of the divisions that were
11 charged with suspicious order monitoring at
12 Walgreens, correct?
13 A. I was trying to make a
14 distinction between we do support them but
15 not for suspicious drug monitoring.
16 Q. Okay.
17 A. Ordering.
18 Q. What do you support them for?
19 A. They would be the SMEs or the
20 teams we go to for CSOS ordering, ARCOS,
21 things like that, but there's another IT team
22 that I'm told that supports the suspicious
23 monitoring.
24 Q. Okay. Do you have any
25 understanding of Walgreens' suspicious order

---

Page 135

1 monitoring or reporting obligations under the
2 CSA?
3 A. I don't know what CSA is, so,
4 no, I do not.
5 Q. Okay. That's fair.
6 Are you familiar with the
7 Controlled Substance Act?
8 A. I've heard it mentioned, but
9 I -- no, I would have to say familiar, no.
10 Q. Okay. So are you familiar with
11 Walgreens' suspicious order reporting
12 obligations under the Controlled Substance
13 Act?
14 A. Am I familiar with Walgreens'
15 reporting obligations under the suspicious --
16 Q. Under the Controlled Substance
17 Act?
18 A. Controlled Substance Act.
19 Not -- no, I -- directly or
20 indirectly, no.
21 (Walgreens-Barnes Exhibit 10
22 marked for identification.)
23 QUESTIONS BY MR. GADDY:
24 Q. Okay. I'm going to show you
25 what we'll mark as Barnes Exhibit Number 10.

---

Page 136

1 Do you recognize this document?
2 A. Not offhand.
3 Q. Okay. Have you ever seen this
4 before?
5 A. Are you asking for a general
6 opinion or for me to read it? Because I
7 don't believe --
8 MS. SWIFT: He's just asking if
9 you've seen it.
10 THE WITNESS: I don't believe
11 so.
12 QUESTIONS BY MR. GADDY:
13 Q. Okay. And I'll represent to
14 you that this document relates to suspicious
15 order monitoring, and you're telling me that
16 that's not part of the scope of your duties
17 or nor has it ever been while you were at
18 Walgreens, correct?
19 A. Correct.
20 (Walgreens-Barnes Exhibit 11
21 marked for identification.)
22 QUESTIONS BY MR. GADDY:
23 Q. I'll show you what I'm going to
24 mark as Exhibit Number 11.
25 Do you see at the top left of

---

Page 137

1 this, this is a Department of Justice
2 document?
3 A. Okay. Yes.
4 Q. And that just below the seal
5 there's a date, Friday, May 2, 2008.
6 Do you see that?
7 A. I do.
8 Q. Okay. And the title of this
9 document is "McKesson Corporation agrees to
10 pay more than 13 million to pay claims that
11 it failed to report suspicious sales of
12 prescription medications."
13 Do you see that?
14 A. I do.
15 Q. Okay. Are you familiar with
16 the fact that McKesson paid a settlement to
17 the DEA in 2008 related to violations of the
18 Controlled Substance Act?
19 A. I was not.
20 Q. Okay. Did anyone within
21 McKesson -- excuse me. Did anybody within
22 Walgreens make you aware that this occurred
23 back in 2008?
24 A. Not to my memory.
25 2008?

---

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  Q.   Correct.
2  A.   Well, I mean, any -- for any
3  year, no.
4  Q.   Okay.  Were you ever asked to
5  make any changes or any modifications to any
6  of the systems or teams that you supported
7  within Walgreens as a result of this issue
8  with McKesson and the DEA back in 2008?
9       MS. SWIFT:  If you need to take
10      time to read the document, that's
11      fine, too.
12      THE WITNESS:  Okay.  I mean, I
13      can read the document.  I was never
14      made aware of this as a whole, so...
15 QUESTIONS BY MR. GADDY:
16  Q.   Okay.  Well, let's go through
17 some of it.
18      First paragraph, it says,
19 "McKesson Corporation, one of the nation's
20 largest distributors of pharmaceutical drugs,
21 has agreed to settle allegations that it
22 violated federal reporting provisions
23 relating to its handling of certain
24 prescription medications regulated by the
25 Drug Enforcement Administration."

Page 139

1       Do you see that?
2  A.   I do.
3  Q.   Are you familiar with who
4 McKesson is?
5  A.   I believe it's one of the
6 distributors or wholesalers.
7  Q.   Okay.  It says, "Under the
8 agreement between the company and six
9 US Attorneys' offices, McKesson has agreed to
10 pay $13,250,000 in civil penalties for
11 alleged violations of its obligations under
12 the Controlled Substance Act."
13      Do you see that?
14  A.   I do.
15  Q.   Now that we've read that first
16 paragraph, does that jog any memory of you
17 being made aware of this settlement between
18 McKesson and the DEA related to violations of
19 the Controlled Substance Act back in 2008?
20  A.   I don't remember this being
21 made aware to me directly at work anytime.  I
22 have a fuzzy memory.  I subscribe to a couple
23 of, like, online newsletters related to the
24 drug industry and -- or to the drug -- I
25 think it's Chain Age, drugstore.com type of

Page 140

1  thing, and I vaguely remember reading about
2  this.
3  Q.   Okay.  Was that something that
4  Walgreens had you do, or was that something
5  you did on your own?
6  A.   On my own.
7  Q.   Next paragraph says, "McKesson
8  Corporation, which operates 30 DEA-registered
9  distribution facilities, failed to report to
10 DEA suspicious sales of controlled substance
11 pharmaceuticals it made to pharmacies that
12 filled orders from illegal Internet
13 pharmacies that sell drugs online to
14 customers who do not have a legal
15 prescription."
16      Do you see that?
17  A.   I do.
18  Q.   It goes on to say, "McKesson
19 also failed to report suspicious orders of
20 controlled substances that it received from
21 other pharmacies and clinics, even though the
22 orders were unusually large."
23      Do you see that?
24  A.   I do.
25  Q.   It goes on to say, "Every DEA

Page 141

1  registrant is required to report to DEA any
2  suspicious orders or the theft or significant
3  loss of controlled substances."
4       Do you see that?
5  A.   I do.
6  Q.   Okay.  Do you agree that it's
7  your understanding that in 2008 Walgreens was
8  a DEA registrant?
9  A.   As a -- well --
10  Q.   Let me --
11  A.   -- specifically related to
12 which facility type or which, you know --
13  Q.   Let me ask a simpler question.
14  A.   Okay.
15  Q.   Do you agree that in 2008
16 Walgreens was distributing controlled
17 substances?
18      MS. SWIFT:  Object to the form.
19      THE WITNESS:  I'm not sure,
20      given the fact that eventually we
21      stopped distributing drugs altogether,
22      what year that took place.
23      I agree that, to my knowledge,
24      I was made aware that we used to do
25      so, but I don't know when the cutoff

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    is, is what I'm trying to say. I
2    don't know about 2008.
3    QUESTIONS BY MR. GADDY:
4        Q.    Okay. You know that at one
5    point in time Walgreens distributed
6    controlled substances?
7        A.    That is my understanding.
8        Q.    Okay. In the next paragraph,
9    this document goes on to say, "The abuse of
10   prescription medication is a significant and
11   growing problem."
12         Do you see that?
13       A.    I do.
14       Q.    Do you recall back in May
15   of 2008 anybody at Walgreens making you aware
16   of the abuse of prescription medication being
17   a significant and growing problem?
18       A.    I do not.
19       Q.    Now that you've had an
20   opportunity to read some of the document and
21   some of the gist of the allegations that were
22   made against this other distributor of
23   controlled substances, does that jog your
24   memory about any changes or amendments that
25   you were asked to make to any of the

Page 143

1    compliance-related teams that you supported
2    at Walgreens?
3        A.    I do not have any recollection
4    of any such event.
5        Q.    Seeing the information in this
6    press release from the Department of Justice
7    regarding the abuse of prescription
8    medication being a significant and growing
9    problem, does that jog your memory about
10   anything, training or education-wise, that
11   you were provided by Walgreens in this time
12   frame on that topic?
13       A.    Nothing specific.
14           At an earlier question you
15   asked before the break, I had indicated that
16   in general Walgreens has various newsletters
17   where they -- my personal opinion of the
18   point is, is just to make us better corporate
19   citizens, to kind of keep everyone on the
20   lookout for anything suspicious, but beyond
21   that, no.
22       Q.    Are you saying that you got
23   those types of updates from Walgreens in
24   2008?
25       A.    I don't remember a year. Just

Page 144

1    generally, you know, Walgreens has had a
2    general communication policy that I can
3    tell -- and this is my opinion, not
4    Walgreens' opinion or anything -- that they
5    try to keep everyone generally aware of
6    bigger trends in the industry and just, you
7    know, ask everyone to look -- if anything
8    sounds suspicious, report it. So that's what
9    we do.
10           But there was no specific
11   training for us as our role in IT.
12       Q.    So, Mr. Barnes, I think what I
13   had asked was, did you get updates regarding
14   the abuse of prescription drugs in 2008, and
15   the answer is you don't remember?
16       A.    Not to my knowledge. Not to my
17   memory.
18       Q.    Now, one of the items at
19   Walgreens that you did support was the CSOS
20   program, C-S-O-S?
21       A.    We -- there -- to be clear, I
22   support the core function. There's seven IT
23   teams involved in the total solution, but if
24   we need to clarify, I will as we go.
25           (Walgreens-Barnes Exhibit 12

Page 145

1    marked for identification.)
2    QUESTIONS BY MR. GADDY:
3        Q.    Okay. I'm going to show you
4    what we're going to mark as Barnes 12.
5            You see this is another e-mail?
6        A.    Correct.
7        Q.    And this is e-mails from Brian
8    Amend, and you're one of the individuals that
9    it's to, correct?
10       A.    Correct.
11       Q.    And the subject is, "340 B
12   discussion."
13           Do you see that?
14       A.    I do.
15       Q.    What is 340 B?
16       A.    It's not my specialty, but I
17   can give you my understanding of it.
18           So my understanding is it's a
19   government insurance program that people
20   with -- I'm guessing, honestly -- financial
21   needs that can't afford their medications can
22   use this program to obtain their medications.
23   And unlike insurance where Walgreens -- and
24   this is going outside of my wheelhouse
25   again -- would get reimbursed for the drug

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 and for our service, we get a service, but a
2 wholesaler that's picked by the government to
3 send us a replacement for the medication that
4 was dispensed.
5 That's not my team. That's
6 knowledge I was given to put estimates
7 together on how to make that electronic
8 versus paper.
9 Q. Okay. And you see this e-mail
10 has several attachments to it, correct?
11 A. I do.
12 Q. Okay. And the first attachment
13 looks like it's the CSOS Phase II IT group
14 kickoff meeting.
15 Do you see that?
16 A. The second --
17 Q. You can flip the page.
18 A. Oh, you mean in the order here.
19 Okay, yeah.
20 Q. Okay.
21 And that's dated March 10,
22 2009?
23 A. Yes.
24 MS. SWIFT: Is there an
25 attachment missing?

Page 147

1 THE WITNESS: Yeah, because
2 that's what -- when he said "first," I
3 thought he was talking about this
4 Visio business process.
5 MR. GADDY: This is how it was
6 produced to us.
7 THE WITNESS: Okay.
8 QUESTIONS BY MR. GADDY:
9 Q. This is a program you would
10 have been involved in, correct?
11 A. I believe I would have been,
12 yes.
13 Q. Okay. And if you flip through
14 a couple of pages, it's going to be page 4 in
15 that PowerPoint?
16 A. Correct.
17 Q. The title is "CSOS Phase II
18 process overview."
19 Do you see that?
20 A. Correct.
21 Q. Okay. And what are we looking
22 at here?
23 A. Give me a second to make sure.
24 I think we're looking at a
25 rough presentation of the steps, both

Page 148

1 physically that business users take as well
2 as system interfacing, in other words, moving
3 data from one place to the other, that all
4 work together for us to be able to order C-II
5 through CSOS electronically.
6 Q. Okay. And when you're talking
7 about ordering through CSOS, you're talking
8 about ordering controlled substances,
9 correct?
10 A. Yeah, that's what the acronym
11 stands for, controlled substance ordering
12 system.
13 Q. Okay. That would include
14 Schedule II and Schedule III narcotics?
15 A. My understanding, not my
16 specialty, is that this is how they're
17 classified, yeah.
18 Q. Okay. And I promise we're not
19 going to go through every step individually,
20 but if you'd look at -- it looks like if you
21 start at the store, the top middle, there's
22 an arrow going down and it says "BR 1."
23 Do you see where I'm looking
24 at?
25 A. Yes. Transmit C-II orders?

Page 149

1 Q. Correct.
2 I'm sorry. If you look sort of
3 at the store, you look at the arrow to the
4 right, it's transmit C-II orders?
5 A. Yes.
6 Q. Do you see where I am?
7 A. Yeah.
8 Q. Okay. And that's the first
9 step in the process of ordering controlled
10 substances, correct?
11 A. I believe so.
12 Now, just to be clear, some of
13 these -- a lot of this information, because
14 there are seven different IT -- roughly five
15 to seven IT teams that support us, we're
16 secondhand knowledge. But that was our
17 understanding when we put this together is
18 that is what happens.
19 Q. Okay. Well, this is the
20 overview that made it into the presentation
21 that was going to be the rollout for the
22 webinar, correct?
23 MS. SWIFT: Object to the form.
24 THE WITNESS: The rollout of
25 what? Because to -- what was your

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  question again?
2  QUESTIONS BY MR. GADDY:
3      Q.   This is the CSOS Phase II
4  process overview that was included in this
5  presentation, correct?
6          MS. SWIFT:  Object to the form.
7          THE WITNESS:  Yeah, assuming
8      that, you know, it was printed as is.
9      I can -- yes.
10 QUESTIONS BY MR. GADDY:
11     Q.   Okay.  And you mentioned that
12 there were several different IT supporting
13 groups that worked on this process?
14     A.   Did and do, yes.
15     Q.   Okay.  And would one of those
16 IT support groups that work on this process
17 be the group that you referenced earlier that
18 supported suspicious order monitoring?
19     A.   Not today.  The -- again,
20 Walgreens IT has at least 1,500, to my
21 knowledge, if not thousands of people, so we
22 get very specialized.  But to my knowledge,
23 that is another group that is related to a
24 group that's in here, what's called currently
25 the store SIMS group, which is our ordering

Page 151

1  system, but that -- another group supports
2  SIMS that I believe supports that document,
3  you were told, but --
4      Q.   Okay.
5      A.   -- they're not represented on
6  here.
7      Q.   Okay.  So what I'm asking is
8  back in March of 2009, which was the date of
9  this document --
10     A.   Uh-huh.
11     Q.   -- was one of the IT support
12 teams that worked on this with you one of the
13 teams that supports the suspicious order
14 monitoring group?
15         MS. SWIFT:  Object to the form.
16         THE WITNESS:  In the detailed
17     sense, no.  In the larger sense
18     they're related, so I -- normal IT
19     practice is they would inform of the
20     change so that they can make sure
21     their system still works together.
22 QUESTIONS BY MR. GADDY:
23     Q.   Okay.  Is there anywhere in
24 this diagram of the controlled substance
25 ordering system, Phase II process overview,

Page 152

1  anywhere within this process that it accounts
2  for monitoring for suspicious orders?
3          MS. SWIFT:  Object to the form.
4          THE WITNESS:  No, it would not
5      need to because that's not the point
6      of this project or this diagram.  It
7      was specifically related to CSOS.
8          You would need to ask the
9      person who supports that system how
10     they get that information from the box
11     that you identified as stores.
12 QUESTIONS BY MR. GADDY:
13     Q.   Okay.  This process deals with
14 how stores order and ultimately receive
15 controlled substances, correct?
16     A.   This process deals with how
17 stores can order controlled substances
18 electronically.  You can also do it via paper
19 and, therefore, I would be speculating about
20 how the team gets their controlled reporting
21 or monitoring.  I don't know.  The answer is
22 that, again, it's not my area.
23     Q.   But you can agree with me that
24 nowhere on this diagram does it call for
25 monitoring of orders for whether or not they

Page 153

1  are suspicious?
2      A.   I can agree with that because
3  it wouldn't be appropriate to diagram an
4  unrelated system.
5      Q.   So from your point of view,
6  monitoring for suspicious orders is separate
7  and apart from ordering controlled
8  substances?
9          MS. SWIFT:  Object to the form.
10         THE WITNESS:  From my point of
11     view, you have separate systems that
12     have separate purposes and functions,
13     and you can monitor in general, not
14     just suspicious drugs, you can monitor
15     for something and not have to change
16     it when you're changing the underlying
17     database or technology.
18         So you'd be wasting your
19     stockholders' time and making things
20     more confusing and potentially less
21     accurate if you made them too
22     complicated, so...
23 QUESTIONS BY MR. GADDY:
24     Q.   What system within Walgreens
25 would diagram the suspicious order monitoring

Page 154

1 program?
2          MS. SWIFT:  Object to the form.
3          THE WITNESS:  The suspicious --
4 sorry.
5          MS. SWIFT:  It's okay.
6          THE WITNESS:  It would be the
7 application that does suspicious drug
8 order monitoring.
9 QUESTIONS BY MR. GADDY:
10    Q.    Okay.  And at this time, March
11 of 2009, who was doing that?
12          MS. SWIFT:  Object to the form.
13          THE WITNESS:  I don't know
14 specifically.  I believe through
15 second-party knowledge, again, it was
16 that Steve Bamberg gentleman.
17 QUESTIONS BY MR. GADDY:
18    Q.    Okay.  How does your group with
19 the controlled substance ordering system
20 interface with Steve's group, assuming that's
21 the right person, who was doing the
22 suspicious order monitoring back in 2009?
23          MS. SWIFT:  Object to the form.
24          THE WITNESS:  We may have had
25 multiple slight reorgs since then, so

Page 155

1 I'm assuming it was similar back then.
2          If I make that assumption,
3 there are two teams that support store
4 systems.  The team -- my understanding
5 is it's -- the team that does ordering
6 is the one we're working with here.
7 There's another team that does
8 reporting that we didn't need to work
9 with directly, but it would be the
10 responsibility of that person that we
11 do work with to interface with Steve's
12 group and make sure that that's
13 happening.  Again, we're very
14 specialized.
15 QUESTIONS BY MR. GADDY:
16    Q.    Okay.  Who was that person that
17 would interface with Steve --
18    A.    Lynn Guyot.
19    Q.    I'm sorry?
20    A.    Lynn Guyot.
21    Q.    Okay.  What is her title?
22    A.    IT manager.
23    Q.    And other than being a liaison
24 between two groups, does she have any other
25 role --

Page 156

1    A.    Her --
2    Q.    -- as it relates to these
3 issues?
4    A.    I'm sorry to interrupt you.
5 Could you repeat, please?
6    Q.    Sure.
7          Other than being a liaison
8 between the two groups, does she have any
9 other roles as it relates to the controlled
10 substance ordering system or the suspicious
11 ordering monitoring program?
12    A.    I cannot speak to the -- to the
13 suspicious drug monitoring.  I can speak to
14 what she does with -- relates to CSOS.  And
15 as you can see the diagram says, they create
16 the orders, they're transmitted to -- that
17 start the transmission of the orders.  The
18 various types, including Controlled II.
19    Q.    Do you know where within this
20 process and diagram there was any monitoring
21 for whether or not orders were suspicious?
22          MS. SWIFT:  Object to the form.
23          THE WITNESS:  I do not know.
24 QUESTIONS BY MR. GADDY:
25    Q.    Did you ever have any meetings

Page 157

1 or conversations or correspondence with Steve
2 Bamberg and his group about when and where
3 that would take place?
4          MS. SWIFT:  Object to the form.
5          THE WITNESS:  Not with Steve
6 Bamberg, no.
7 QUESTIONS BY MR. GADDY:
8    Q.    Anybody with his group?
9    A.    Not with his group.
10    Q.    Have you ever had any
11 conversations with anybody during your time
12 at Walgreens about suspicious order
13 monitoring and when and where that takes
14 place?
15    A.    Yeah, at one point I -- the
16 gentleman, Brian Amend, who used to be my
17 direct manager and now is two levels above
18 me -- was kind of like a water cooler
19 conversation.  And I was kind of curious
20 about a couple things related to the process
21 because he implemented the current store
22 ordering process, and I was taking it over
23 for various reasons.  I wasn't able to do a
24 direct implementation myself.
25          But anyway, he told me that it

Page 158

1 was Steve Bamberg that had this, and it was
2 done at the store level before we implemented
3 ABC. And so that's what I was told by a
4 second party.
5    Q.   Okay. So Mr. Amend told you
6 that before ABC became the distributor of
7 C-IIs, that any suspicious order monitoring
8 was handled by the stores?
9       MS. SWIFT: Object to the form.
10      THE WITNESS: He told me it
11   was -- I'm trying to remember, just to
12   make sure I get it as accurate as
13   possible for my memory.
14      I don't think -- he may have
15   said it was done by the stores, but I
16   believe he did say that it was done by
17   Steve Bamberg's group. And I probably
18   made the assumption because Steve was
19   running eventually the store systems.
20 QUESTIONS BY MR. GADDY:
21    Q.   When did that conversation
22 occur?
23    A.   I want to say roughly -- I
24 think we put in store ordering CSOS roughly
25 five years ago. So I would say roughly

Page 159

1 five -- four to six years ago, sometime in
2 that time period.
3    Q.   And I guess it would have been
4 after ABC came on board, correct?
5       MS. SWIFT: Object to the form.
6       THE WITNESS: It could have
7   been during. It was a staged process,
8   so I -- again, it's such a vague
9   memory, I would not say yes or no. It
10   really didn't have any -- at the time
11   it didn't strike me as relevant.
12      I do at least know that ABC was
13   in the -- starting to come into the
14   picture because I do remember asking
15   if we would still do that. And I
16   guess the thing was we would do
17   monitoring, not reporting, because ABC
18   would eventually do the reporting, I
19   guess, as the distributor.
20      But some of that's mixed in
21   with knowledge I may have learned over
22   the other years. Again, with just
23   various conversations you sometimes
24   learn more.
25      And again, it's not my

Page 160

1 expertise area.
2 QUESTIONS BY MR. GADDY:
3    Q.   If you look at the document
4 after the -- what looks to be a PowerPoint
5 presentation, it's labeled .002 at the top
6 right. Says "Walgreens controlled substance
7 ordering system Phase II A."
8       Do you see that?
9    A.   Is it just --
10    Q.   It's up there on the screen if
11 you want to look at it for reference --
12    A.   Oh, okay.
13    Q.   -- and then find it in the
14 document. Or you can use the screen.
15      MS. SWIFT: I'm sorry, is it in
16   the document?
17      MR. GADDY: Uh-huh.
18      MS. SWIFT: Where is it in the
19   document?
20      MR. GADDY: It's after that.
21      THE WITNESS: Yeah, it's like
22   three pages from the back or so.
23 QUESTIONS BY MR. GADDY:
24    Q.   And --
25    A.   Okay. I do see it.

Page 161

1    Q.   Do you recognize this document?
2    A.   Not specifically.
3    Q.   Okay. Well, do you recognize
4 it to be a diagram of the paper business
5 procedures for ordering controlled
6 substances?
7       MS. SWIFT: Take your time and
8   look at it. See if you do.
9       THE WITNESS: I believe it's a
10   high-level prep -- I believe it's a
11   high-level presentation of paper at
12   the time, and I think even still today
13   it's not -- it's not a lot of detail,
14   but, you know, high level.
15 QUESTIONS BY MR. GADDY:
16    Q.   Okay. Do you agree this
17 diagram does not have any steps in it for
18 monitoring orders to determine whether or not
19 they are suspicious?
20    A.   I agree that that system is not
21 documented here, as again it's a different
22 system.
23    Q.   Okay. And in the third box
24 down from the top, there's a notation that
25 says "DC." That refers to distribution

Page 162

1 center, correct?
2    A.    DC does.
3          You said third box down?
4    Q.    Correct.
5    A.    Okay.
6    Q.    It says, "Distribution center
7 signs all," in all caps, "paper 222s."
8          Do you see that?
9    A.    I do.
10         (Walgreens-Barnes Exhibit 13
11         marked for identification.)
12 QUESTIONS BY MR. GADDY:
13   Q.    Okay.  I'll show you what I'll
14 mark as Barnes 13.
15         You see at the top this is an
16 e-mail that was sent to you by Caroline Rawa?
17   A.    Uh-huh.
18   Q.    Sent in November of 2012,
19 correct?
20   A.    Correct.
21   Q.    The subject of the e-mail is
22 "DEA serves order to show cause to three
23 Walgreens pharmacies."
24         Do you see that?
25   A.    I do.

Page 163

1    Q.    And Ms. Rawa said, "I thought
2 you-all might find this interesting."
3          Do you see that?
4    A.    I do.
5    Q.    Okay.  And in the e-mail below,
6 it looks like it's just a copy and paste, or
7 I guess it's a forwarded e-mail of a press
8 release, correct?
9    A.    Yeah, I couldn't verify the
10 authenticity, but that appears to be in the
11 format I've seen press releases in before.
12   Q.    Okay.  I'm just asking, is this
13 an e-mail you got from Ms. Rawa?
14   A.    I'm sorry.
15   Q.    Is this an e-mail you got from
16 Ms. Rawa?
17   A.    I don't remember it
18 specifically, but it appears -- as presented,
19 it appears so.
20   Q.    Okay.  You see it says, "DEA
21 serves order to show cause to three Walgreens
22 pharmacies."
23         Do you see that?
24   A.    I do.
25   Q.    Okay.  And about halfway

Page 164

1 through that first paragraph it says, "In
2 order to show cause, this served as a notice
3 to a DEA registrant to provide an opportunity
4 to show cause as to why the DEA should not
5 revoke its DEA registration because its
6 registration is deemed inconsistent with the
7 public interest."
8          Do you see that?
9    A.    Took a minute to find you
10 there, so I'm rereading it.
11   Q.    Sure.
12   A.    I do see it.
13   Q.    Okay.  Now, Ms. Rawa, who sent
14 this to you, she actually reports to you,
15 correct?
16   A.    She does.
17   Q.    Okay.  So she's not your
18 superior, correct?
19   A.    No, she's not.
20   Q.    Okay.  Were you made aware of
21 this, to your knowledge, by any of your
22 superiors at Walgreens?
23   A.    I don't recall being so.
24   Q.    If you look at the next
25 paragraph it says, "The diversion of

Page 165

1 pharmaceutical controlled substances
2 continues to be a great concern for the DEA.
3          It says, "A DEA registration is
4 a privilege and not a license for bad
5 behavior.  These registrants have a
6 responsibility to their customers as well as
7 to the community to be an advocate against
8 prescription drug abuse that has plagued
9 Florida since 2009 and not contribute to the
10 epidemic."
11         Do you see that?
12   A.    I do see that written.
13   Q.    Okay.  Seeing this here, does
14 it jog your memory at all about whether or
15 not Walgreens provided you with any training
16 or education as it related to prescription
17 diversion back in 2012?
18   A.    To my memory, we were never
19 provided any training.  Training is geared
20 generally towards the subject matter experts
21 needing that knowledge.
22   Q.    You see in the next paragraph
23 it says, "On April 14, 2012, DEA Miami
24 diversion office served an administrative
25 inspection warrant on the registrants as well

Page 166

1 as on three other Walgreens pharmacies in
2 Florida and its Walgreens distribution center
3 in Jupiter."
4        Do you see that?
5     A.   I do.
6     Q.   Okay.  And we've seen that
7 Jupiter is one of the facilities that
8 distribute -- distributed Schedule II
9 narcotics, correct?
10    A.   Repeat, please.
11    Q.   We've seen previously, and
12 you're aware that Jupiter is one of the
13 distribution centers that distributed
14 Schedule II narcotics?
15    A.   That is my understanding.
16    Q.   It says, "The administrative
17 investigative warrant at the Walgreens
18 distribution center was served to determine
19 if the distribution center maintained a
20 system in place that detects and reports
21 suspicious orders to the DEA and to prevent
22 the diversion of controlled substances as
23 governed by federal laws."
24        Do you see that?
25    A.   I do.

Page 167

1     Q.   It says, "And the Controlled
2 Substance Act related to the proper
3 distribution of controlled substances."
4        Do you see that?
5     A.   I do.
6     Q.   In response to the warrants
7 that were served in April of 2012 or the
8 orders to show cause that were served in
9 November of 2012, were you asked by anyone at
10 Walgreens to make any changes or
11 modifications to any of the systems that you
12 supported as it related to compliance?
13       MS. SWIFT:  Object to the form.
14 Foundation.
15       THE WITNESS:  Not to my
16 knowledge.
17 QUESTIONS BY MR. GADDY:
18    Q.   You see in the second to last
19 paragraph, the last sentence?
20    A.   Second to last paragraph, last
21 sentence?
22    Q.   Correct.
23    A.   Okay.
24    Q.   You see it says, "The DEA has
25 utilized numerous resources to educate and

Page 168

1 work with its registrants and the public to
2 battle this epidemic."
3        Do you see that?
4     A.   I do.
5     Q.   Were you made aware of any of
6 those efforts by anybody at Walgreens?
7        Were you made aware of any of
8 the efforts the DEA had made to work with
9 Walgreens on these issues?
10    A.   I was not made aware of their
11 claimed work that they've done.
12    Q.   Did you take any action as a
13 result of being informed of this?
14    A.   I would -- I don't recall
15 taking any action.
16       (Walgreens-Barnes Exhibit 14
17    marked for identification.)
18 QUESTIONS BY MR. GADDY:
19    Q.   Show you what we'll mark as
20 Exhibit Number 14.
21       I've given you the first page
22 of which is titled "Settlement Memorandum of
23 Agreement."  It goes for approximately 13
24 pages.
25       Then the next document that's

Page 169

1 attached to that is a -- an exhibit --
2 Appendix A, which is another administrative
3 memorandum of agreement.
4     A.   I don't know if it matters.
5 Mine says page 1 of 343.  I thought you said
6 13.
7     Q.   Next thing you should have is
8 an Appendix B, which is an order to show
9 cause, and that takes you through the end of
10 the materials that you have.
11       Do you see that?
12    A.   Oh, I see what -- three's two
13 paginations.  Never mind, I got them mixed
14 up.
15       What was the title of the
16 second one, please?
17    Q.   Sure.  You should have an
18 Appendix A and then Appendix B.
19    A.   Oh, okay.  I got confused
20 because I didn't have all 13 pages.
21       Yeah, I see Appendix A.
22    Q.   We're having the same problem.
23    A.   Huh?  And I have Appendix B.
24 Okay.
25    Q.   If you go back to the very

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 first page, you see it's entitled "Settlement
2 Memorandum of Agreement."
3        Do you see that?
4    A.   I do.
5    Q.   Have you ever seen this
6 document before?
7    A.   No.
8    Q.   It says here in the first
9 paragraph, "This memorandum of agreement is
10 entered into by and between the United States
11 Department of Justice, the United States Drug
12 Enforcement Administration and Walgreen
13 Company and its wholly-owned subsidiaries."
14        Do you see that?
15    A.   I do.
16    Q.   I think you told me earlier
17 that you were aware that there was a
18 settlement between DEA and Walgreens,
19 correct?
20    A.   Yeah. I was made aware of it
21 or I became aware of it in a couple different
22 ways.
23    Q.   Okay. But you've never seen
24 this document before?
25    A.   I have not.

Page 171

1    Q.   Nobody at Walgreens ever sent
2 you this document?
3    A.   Not to my memory.
4    Q.   Okay. Did anybody at Walgreens
5 ever explain to you the reasons for the
6 settlement?
7    A.   I don't think I've had
8 conversations I would characterize as an
9 explanation. I think it was, again, more
10 like water cooler, side conversations about,
11 you know, the nature of it and, wow, because
12 we weren't aware of the investigation
13 because -- you know, that type of discussion,
14 not an official, you know, here's details,
15 here's the terms, if that's what you're
16 asking.
17    Q.   Okay. Did anybody at Walgreens
18 ever make you aware of any of the allegations
19 that the DEA made against Walgreens?
20    A.   No. Not at Walgreens.
21    Q.   Has anybody ever made you aware
22 of any of the allegations?
23    A.   No person. Again, I think I,
24 at the time, read it a little bit, maybe some
25 online news site or something. I'm not...

Page 172

1    Q.   But nobody at Walgreens ever
2 asked you to take any actions or make any
3 amendments or modifications to any of the
4 programs that you supported as a result of
5 this?
6        MS. SWIFT:  Object to the form.
7 Foundation.
8        THE WITNESS:  If any changes
9        were related to the settlement, they
10        were not stated as such to me.
11 QUESTIONS BY MR. GADDY:
12    Q.   Okay. If you turn to the
13 bottom right, it's going to say page 23.
14    A.   In the appendix?
15    Q.   The first page.
16    A.   In the matter of...
17    Q.   You see at the top right this
18 is a US Department of Justice document?
19    A.   Yes.
20    Q.   And below that, you see it's
21 dated September 13, 2012?
22    A.   I do.
23    Q.   And it says, "In the matter of
24 Walgreens Company"?
25    A.   I do.

Page 173

1    Q.   Okay. Have you ever seen this
2 document before?
3    A.   I have not.
4    Q.   Okay. You see that it says,
5 "Order to show cause, an immediate suspension
6 of registration"?
7        Do you see that?
8    A.   I do.
9    Q.   Okay. And do you see that it
10 says in the body of the second paragraph, it
11 says, "Notice is hereby given to inform
12 Walgreens Corporation of the immediate
13 suspension of Drug Enforcement Administration
14 certification of registration," and it gives
15 a number, pursuant to a certain statute,
16 "because such registration constitutes an
17 imminent danger to the public health and
18 safety"?
19        Do you see that?
20    A.   I do.
21    Q.   But prior to just now, had
22 anybody ever made you aware that the DEA
23 considered Walgreens and their continued
24 activity under the registration to be an
25 imminent danger to the public health and

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 safety?
2　　A.　No one has stated that opinion,
3 no.
4　　Q.　Until today, you never were
5 aware that the DEA had that opinion of
6 Walgreens?
7　　A.　No.
8　　Q.　If you go down to the
9 paragraph 1 at the bottom of the page, the
10 last sentence on the page says, "The Jupiter
11 distribution center is one of 12 distribution
12 centers owned and operated by the Walgreens
13 Corporation."
14　　　Do you see that?
15　　A.　I do.
16　　Q.　Okay. It says -- if you
17 continue on the next page, it says,
18 "Walgreens is headquartered in Deerfield,
19 Illinois. Walgreens also operates more than
20 7,800 Walgreens retail pharmacies in the
21 United States."
22　　　Do you see that?
23　　A.　I do.
24　　Q.　Do you know what the accurate
25 number is today?

Page 175

1　　A.　The number of stores?
2　　Q.　Correct.
3　　A.　I think it -- approximately
4 8,500, but I'm not 100 percent sure.
5　　Q.　If you skip down to
6 paragraph 3, do you see -- do you see where I
7 am?
8　　A.　Yes.
9　　Q.　It says, "Oxycodone is a
10 dangerously addictive Schedule II controlled
11 substance which is known to be highly abused
12 and diverted in the state of Florida."
13　　　Do you see that?
14　　A.　I do.
15　　Q.　It says, "According to the 2010
16 Florida Medical Examiner's commission drug
17 report, the drug that caused the most deaths
18 in the state of Florida in 2010 was oxycodone
19 followed by benzodiazapines."
20　　　Do you see that?
21　　A.　I do.
22　　Q.　Okay. Prior to reading that in
23 this document here today, did you have an
24 understanding that oxycodone and
25 benzodiazapines were responsible for that

Page 176

1 many deaths and overdoses in the state of
2 Florida?
3　　A.　I had never heard that before.
4　　Q.　If you go on to the next
5 paragraph, paragraph number 4, it says,
6 "Since 2009, Walgreens Jupiter, Florida,
7 distribution center has been the single
8 largest distributor of oxycodone products in
9 Florida."
10　　　Do you see that?
11　　A.　I do.
12　　Q.　Did you know that?
13　　A.　I did not.
14　　Q.　"At about the same time as the
15 abuse of prescription drugs became an
16 epidemic in Florida, Florida's Wal --
17 Walgreens Florida retail pharmacies supplied
18 by Respondent commanded an increasingly large
19 percentage of the state's growing oxycodone
20 business. In 2010, only three Walgreens
21 retail pharmacies were in the top 100
22 purchasers of oxycodone within Florida. In
23 2011, 38 Walgreens pharmacies made up the top
24 100, and six were in the top ten."
25　　　Do you see that?

Page 177

1　　A.　I do see that.
2　　Q.　Okay. Prior to today, were you
3 aware of that?
4　　A.　No, I was not.
5　　Q.　It says, "Through May 2012, 44
6 Walgreens pharmacies are in the top 100
7 oxycodone purchasers, all of them supplied by
8 Respondent."
9　　　Do you see that?
10　　A.　I do.
11　　Q.　During this time frame -- this
12 document was September 2012, and it's talking
13 about activity that occurred in 2009 and
14 2010 -- you were in an IT role, and you
15 supported the controlled substance ordering
16 system program, correct?
17　　A.　And to do some math here. So I
18 believe we would have been supporting the
19 controlled substance ordering system but
20 not -- in a different capacity than it is
21 today. Used in a different capacity, to be
22 clear.
23　　Q.　So, yes, you were supporting
24 the controlled substance ordering system
25 program during that time frame?

Page 178

1    MS. SWIFT: Object to the form.
2    THE WITNESS: Yes, as it was
3    used at the time, which was different.
4  QUESTIONS BY MR. GADDY:
5    Q.  Okay.  Different from today,
6  not different from the time frame of the
7  documents that we're looking at, correct?
8    A.  Yeah --
9    MS. SWIFT: Object to the form.
10   THE WITNESS: Correct.  Back
11   then we did not -- we did not sign
12   store orders in the system.
13  QUESTIONS BY MR. GADDY:
14   Q.  Mr. Barnes, my only question
15  was: In 2009, 2010 through 2012, you worked
16  in a capacity where you supported the
17  controlled substance ordering system,
18  correct?
19   MS. SWIFT: Object to the form.
20   THE WITNESS: I did support the
21   controlled substance ordering systems
22   for ordering drugs into the DCs
23   themselves.
24  QUESTIONS BY MR. GADDY:
25   Q.  Okay.  If you go on to

Page 179

1  paragraph 6 -- first, let's look at the above
2  paragraphs.  Let's look at the chart on that
3  same page.
4    Do you see where I'm looking?
5    A.  I do.
6    Q.  And do you see that it lists on
7  the left-hand column stores and the numbers
8  of those stores and location of those stores,
9  and then to the right it lists the order, the
10  number of oxycodone purchases by dosage unit?
11   Do you see that?
12   A.  I do.
13   Q.  And do you see that for the
14  first store listed, Hudson, Florida, in 2009,
15  it ordered 388,100 dosage units?
16   A.  I do.
17   MS. SWIFT: Object to the form.
18  QUESTIONS BY MR. GADDY:
19   Q.  And you see that in 2011, that
20  had increased from 388,000 to 2.2 million
21  dosage units?
22   A.  I do.
23   Q.  If you go to the next store
24  down, the Fort Myers location, do you see
25  that in 2009 it ordered only 95,000 dosage

Page 180

1  units?
2    MS. SWIFT: Object to the form.
3  QUESTIONS BY MR. GADDY:
4    Q.  Do you see that?
5    A.  I do.
6    Q.  And if you go two columns over
7  to 2011, just two years later, do you see
8  that its orders went up to 2.1 million dosage
9  units?
10   MS. SWIFT: Object to the form.
11   THE WITNESS: I do.
12  QUESTIONS BY MR. GADDY:
13   Q.  If you go to the next one down,
14  the Oviedo, Florida, location, do you see
15  that according to this chart, in 2009 it
16  ordered 80,000 dosage units of oxycodone?
17   A.  I do see that.
18   Q.  And if you look two columns
19  over to two years later, do you see that its
20  orders have increased from 80,000 dosage
21  units of oxycodone to 1.6 million dosage
22  units?
23   MS. SWIFT: Object to the form.
24   THE WITNESS: I do see that
25   represented.

Page 181

1  QUESTIONS BY MR. GADDY:
2    Q.  Okay.  Do you know what
3  percentage increase that is?
4    A.  I do not.
5    Q.  Okay.  Do you agree it's a lot?
6    A.  If I just talk about general
7  numbers on a personal opinion, it sounds like
8  a lot.
9    Q.  If you go to paragraph 6, about
10  four lines -- let's just start at the
11  beginning.  It says, "An ongoing DEA
12  investigation of Respondent's distribution
13  practices and policies, combined with both a
14  general examination of dispensing at
15  Walgreens Florida pharmacies as well as a
16  detailed investigation of the dispensing
17  practices, the six pharmacies identified
18  above demonstrates that Respondent has failed
19  to maintain effective controls against the
20  diversion of controlled substances into other
21  than legitimate medical, scientific and
22  industrial channels, in violation of 21 USC
23  823 B1 and E1."
24   Do you see that?
25   A.  I do.

Page 182

1    Q.    Did anybody at Walgreens ever
2  make you aware that the DEA had the position
3  that Walgreens failed to maintain effective
4  controls against diversion as it related to
5  this matter?
6    A.    Are you talking about once this
7  was -- the press release and everything from
8  around the situation occurred?
9    Q.    I'm talking about when this
10  order to show cause was received by Walgreens
11  in September of 2012 or anytime immediately
12  thereafter.
13    A.    As I've stated in previous
14  questions, I've never seen this specific
15  document.  But given that, could you please
16  repeat the question?
17    Q.    Sure.
18          Has anybody at Walgreens ever
19  informed you that the DEA took the position
20  that Walgreens had failed to maintain
21  effective controls against diversion of
22  controlled substances?
23    A.    No, they have not.
24    Q.    Okay.  Has anybody at Walgreens
25  ever asked you or your team to make any

Page 183

1  changes or modifications or implementations
2  to the controlled substance ordering system
3  to correct or modify or amend any procedures
4  related to the ordering of controlled
5  substances?
6          MS. SWIFT:  Object to the form.
7  Foundation.
8          THE WITNESS:  Repeat your
9  question.  It was very -- from an IT
10  perspective, I'm sorry, it was very
11  vague.
12          Can you repeat?  And I'll try
13  to do my best to answer.
14  QUESTIONS BY MR. GADDY:
15    Q.    Sure.
16          In response to the position of
17  the DEA that Walgreens failed to maintain
18  effective controls against the diversion of
19  controlled substances, has anybody at
20  Walgreens asked you or your IT team to make
21  any changes, amendments, modifications to the
22  controlled substance ordering system to
23  account for these deficiencies within
24  Walgreens' process?
25          MS. SWIFT:  Object to the form.

Page 184

1  Foundation.
2          THE WITNESS:  I have no way to
3  respond to whether deficiencies truly
4  existed or not; however, for my
5  systems that I support, we've -- we
6  continuously try to improve; however,
7  none of those improvements over the
8  years have been specifically called
9  out against this stipulation.
10  QUESTIONS BY MR. GADDY:
11    Q.    Okay.  It goes on to say in
12  that paragraph, "Respondent failed to conduct
13  adequate due diligence of its retail stores,
14  including but not limited to the six stores
15  identified above, and continued to distribute
16  large amounts of controlled substances to
17  pharmacies that it knew or should have known
18  were dispensing these controlled substances
19  pursuant to prescriptions written for other
20  than a legitimate purpose by practitioners
21  acting outside the usual course of their
22  professional practice."
23          Do you see that?
24    A.    I do.
25    Q.    And did Walgreens make you

Page 185

1  aware of that allegation?
2    A.    No, they did not.
3          MS. SWIFT:  Jeff, are you
4  getting close to a break?
5          MR. GADDY:  Not particularly,
6  but if you want to stop, we can.
7          MS. SWIFT:  I'm just noting
8  that it's 12:20.
9          MR. GADDY:  Sure.
10          MS. SWIFT:  We should probably
11  stop for lunch at some point.
12          MR. GADDY:  Yes, that's fine.
13          MS. SWIFT:  Okay.
14          THE WITNESS:  We're going off
15  the record at 12:20 p.m.
16    (Off the record at 12:20 p.m.)
17          VIDEOGRAPHER:  We're back on
18  the record at 1:06 p.m.
19          MR. GADDY:  Okay.  Mr. Barnes
20  actually jogged my memory when he made
21  a comment about the page number.
22          Have you had an opportunity to
23  track down the full version of this
24  document with the signature page?
25          MS. SWIFT:  I think we did.

Page 186

1      MR. GADDY: Do you have that
2 now?
3      MS. SWIFT: I don't, no, but
4 we'll produce it to you --
5      MR. GADDY: Okay.
6      MS. SWIFT: -- as we said we
7 would.
8      MR. GADDY: Do you know when?
9      MS. SWIFT: I don't.
10      MR. GADDY: Okay. But you
11 think you have found and do have it?
12      MS. SWIFT: That is my
13 understanding. I haven't actually
14 seen it. I'm talking thirdhand.
15      MR. GADDY: Okay. Thanks.
16 QUESTIONS BY MR. GADDY:
17   Q.  Mr. Barnes, when we broke for
18 lunch, I believe we were looking at Barnes
19 14, the order to show cause that was issued
20 to Walgreens in September of 2012.
21     Do you recall that?
22   A.  Appendix B is it?
23   Q.  Correct.
24   A.  Yes.
25   Q.  I think we were on page 25, if

Page 187

1 you were to look at the bottom right-hand
2 corner of the page.
3   A.  Okay. I'm with you.
4   Q.  Okay. We were in paragraph 6.
5 Let's actually flip the page and go to
6 paragraph 8.
7     You see there it says,
8 "Notwithstanding the ample guidance
9 available, Walgreens has failed to maintain
10 an adequate suspicious order reporting system
11 and as a result has ignored readily
12 identifiable orders and ordering patterns
13 that based on the information available
14 throughout the Walgreens Corporation should
15 have been obvious signs of diversions
16 occurring at Respondent's customers'
17 pharmacies."
18     Do you see that?
19   A.  I do.
20   Q.  Okay. At the time that this
21 report or this order to show cause was issued
22 in September of 2012, did anybody from
23 Walgreens make you aware of that allegation?
24   A.  No one's ever made me aware of
25 the allegation. I'm trying to remember what

Page 188

1 the date is, but no one's ever made me aware.
2   Q.  Okay. Did anybody from
3 Walgreens, in light of this allegation, ask
4 you as it relates to your role supporting the
5 controlled substance ordering system to make
6 any tweaks, amendments or modifications to
7 that program?
8      MS. SWIFT: Object to the form.
9 Foundation.
10      THE WITNESS: And I'm sorry,
11 there was a lot there. Could you
12 please repeat it?
13 QUESTIONS BY MR. GADDY:
14   Q.  Sure.
15     In light of this allegation
16 that we just read in paragraph 8 that
17 Walgreens failed to maintain an adequate
18 suspicious order reporting system and ignored
19 readily identifiable orders and patterns that
20 should have been obvious signs of diversion,
21 did anybody from Walgreens ask you to make
22 any changes, amendments, modifications or
23 supplements to the controlled substance
24 ordering system that you supported?
25      MS. SWIFT: Object to the form.

Page 189

1 Foundation.
2      THE WITNESS: If they -- there
3 have been changes throughout the
4 years, but if they were made in
5 reference to this, I was not made
6 aware.
7 QUESTIONS BY MR. GADDY:
8   Q.  If you go to the next page, top
9 paragraph, number 11, it says, "A review of
10 the documents Respondent provided as evidence
11 of its, quote, due diligence on the
12 above-listed six pharmacies demonstrates that
13 Respondent failed to conduct any meaningful
14 investigation or analysis to ensure the
15 massive amounts of commonly abused, highly
16 addictive controlled substances being ordered
17 by these pharmacies were not being diverted
18 into other than legitimate channels."
19     Do you see that?
20   A.  I do.
21   Q.  Do you, as you sit here today,
22 have any understanding of Walgreens' due
23 diligence requirements under the Controlled
24 Substance Act?
25      MS. SWIFT: Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1   Foundation.  Calls for a legal
2   conclusion.
3       THE WITNESS:  I'm not
4   specifically aware, no.  I mean,
5   again, being in IT, we pretty much
6   kind of are the order-takers, if you
7   compare us to a restaurant.
8       So the actual experts in this,
9   whether it be legal or other teams,
10  say, here's what to do, and we do it.
11  And they have processes in place to
12  make sure we did understand and
13  implement what they've asked for.
14  QUESTIONS BY MR. GADDY:
15      Q.    Okay.  Does that concept of
16  being an order-taker apply to all the roles
17  and duties that you perform in your function?
18      A.    I would say, yes, in general.
19  If we can think of a different way to do it
20  that would have a better outcome from an IT
21  perspective, meaning faster, less expensive,
22  et cetera, then it's a collaboration.  But as
23  far as the output, that would be correct.
24      Q.    So you rely on information and
25  directions given to you by your superiors to

Page 191

1   generate your work product?
2       A.    In part superiors.  My actual
3   superiors would be in IT.  These would -- we
4   would usually refer to these as our customers
5   or our clients internally who are asking for
6   this -- theoretical changes.
7       Q.    Okay.  But those would be
8   Walgreens employees?
9       A.    They would be.  Just not
10  necessarily a superior.  It could be at any
11  level in any other department, but...
12      Q.    The next paragraph down it
13  says, "Respondent's employee with overall
14  responsibility for Schedule II drug
15  operations, the C-II function manager, raised
16  questions with the corporation about what she
17  correctly identified as unusually large
18  orders for Schedule II narcotics placed
19  regularly by several customer pharmacies."
20      Do you see that?
21      A.    I do.
22      Q.    In your role, do you ever
23  interact with the individual who would have
24  been the C-II function manager?
25      MS. SWIFT:  Object to the form.

Page 192

1       THE WITNESS:  I don't --
2   theoretically, I could have interacted
3   with someone in this role in the past,
4   but that sounds like there's not a
5   specific person in conjecture.
6       But, yeah, the -- role --
7   roles throughout the DC is depending
8   on the project, the nature of the
9   project, what we're asked to -- we
10  could be getting requirements from
11  them.
12  QUESTIONS BY MR. GADDY:
13      Q.    Is that a position that you're
14  familiar with, that you've heard of before?
15      A.    You're referring to the
16  parentheses, the C-II function manager?
17      Q.    Correct.
18      A.    I don't believe the role exists
19  anymore, but when it did, when we were a
20  distributor, I was very high-level familiar
21  with its existence.
22      Q.    Okay.  You see it says here,
23  "The C-II function manager had raised
24  questions within the corporation about what
25  she correctly identified as unusually large

Page 193

1   orders for Schedule II narcotics."
2       Do you see that?
3       A.    I did see that before it
4   scrolled up.
5       Q.    Okay.  And were any of those
6   questions raised with you or any members of
7   your team as it related to the controlled
8   substance ordering system?
9       A.    No, that would not be a normal
10  or appropriate chain of command to go
11  through.
12      Q.    Okay.  Did any of the concerns
13  raised by this C-II function manager ever
14  make its way to you in your role supporting
15  the controlled substance ordering system?
16      A.    No, they did not.
17      Q.    Okay.  It says, "Based on the
18  evidence available to the DEA, none of these
19  orders were reported to the DEA as suspicious
20  and all appear to have been shipped without
21  any further due diligence to verify their
22  legitimacy."
23      Do you see that?
24      A.    I see that.
25      Q.    Just below that in paragraph 12

Page 194

1 A, indicates that "In January 2011, the
2 Jupiter C2 function manager expressed concern
3 about the enormous volume of 30-milligram
4 oxycodone being ordered by three stores," and
5 it lists them there.
6        Do you see that?
7    A.   I do.
8    Q.   It says, "Including in an
9 e-mail to the manager of RX inventory
10 drugstores at Walgreens corporate
11 headquarters in Deerfield, Illinois."
12        Do you see that?
13    A.   I do.
14    Q.   It indicates here that "the C2
15 function manager felt the stores needed to
16 justify the large quantity."
17        Do you see that?
18    A.   I do.
19    Q.   Did anybody at Walgreens ever
20 make you aware that there were individual
21 function managers seeking to have stores
22 justify the quantity of oxycodone that they
23 were ordering for their stores?
24        MS. SWIFT:  Object to the form.
25        THE WITNESS:  No, they didn't.

Page 195

1    And again, it wouldn't be the wisest
2    course of action.  They would go to
3    someone with the power to have some
4    impact if that actually happened.
5 QUESTIONS BY MR. GADDY:
6    Q.   Okay.  Well, somebody in your
7 position who supported the compliance arm of
8 the controlled substance ordering system, did
9 those concerns ever make their way to you or
10 your department?
11        MS. SWIFT:  Object to the form.
12        THE WITNESS:  We, again,
13    support the application or the IT
14    systems, so these did not come to me,
15    or I'm -- if they came to my
16    department, I'm not aware of it.
17 QUESTIONS BY MR. GADDY:
18    Q.   Okay.  She says, "With regard
19 to one particular store, she noted that
20 Respondent had shipped this store
21 3,271 bottles of 100 count, 30-milligram
22 oxycodone, which is 327,100 dosage units, in
23 the 40-day period from 12/1/10 to 1/10/11,
24 causing her to question how they can even
25 house this many bottles.  She then inquired

Page 196

1 of the same corporate manager, how do we go
2 about checking the validity of these orders."
3        Do you see that?
4    A.   I see that.
5    Q.   Did anybody in your -- at
6 Walgreens ask you, in your role as an
7 individual who supported the controlled
8 substance ordering system, to make any
9 amendments, modifications or supplements to
10 that program to allow for the checking of
11 validity of orders that were placed?
12        MS. SWIFT:  Object to the form
13    of the question.
14        THE WITNESS:  No.  And again,
15    to be clear, at the time these e-mails
16    were taking place, we were not
17    supporting store ordering of
18    controlled substances but --
19    controlled CSOS ordering into the DC,
20    not out to the stores.
21        So two reasons why it wouldn't
22    have come to our group, besides this
23    not being an IT question.
24 QUESTIONS BY MR. GADDY:
25    Q.   Did anybody ever ask you or

Page 197

1 your group to pull data from the controlled
2 substance ordering system regarding orders
3 that had been placed either from the stores
4 or into the distribution centers to assist
5 with determining the validity of orders?
6    A.   During this time period, again,
7 there would not have been any orders in the
8 CSOS system because it was only ordering into
9 the DC for stock purposes, not out to the
10 stores.  It was paper.
11        Secondly, I'm not aware of ever
12 being asked to pull any such reports,
13 regardless of the time period.
14    Q.   Did anybody at Walgreens ever
15 make you aware of these concerns that were
16 being raised by C-II function manager as it
17 relates to the volume of pills going into any
18 particular store?
19    A.   No, they did not.
20    Q.   If you turn to -- I'm looking
21 at the bottom.  It would be page 34.
22    A.   Okay.
23    Q.   See up in the top first full
24 paragraph it says, "In view of the foregoing
25 and based on information before the agency,

Page 198

1 as of the issuance of this notice is my
2 preliminary finding pursuant to 21 USC 823 F
3 and 824 A4, that Walgreens continued
4 registration is inconsistent with the public
5 interests."
6          Do you see that?
7     A.   I do see that.
8     Q.   It says, "Under the summarized
9 facts and circumstances described herein, it
10 is also my preliminary finding, significantly
11 in light of the rampant and deadly problem
12 prescription controlled substance abuse in
13 Florida, that Respondent's continued
14 registration while these proceedings are
15 pending constitutes an imminent danger to the
16 public health and safety."
17          Do you see that?
18     A.   I do see that written.
19     Q.   And nobody at Walgreens in
20 September of 2012 ever informed you of that
21 opinion of the DEA?
22     A.   No, they did not.  They
23 wouldn't come to let IT know that there was a
24 legal issue.
25     Q.   And that's how you see this, is

Page 199

1 as a legal issue?
2     A.   I see it partly as a legal
3 issue, partly as a compliance.  They come to
4 us when we can actually provide some benefit
5 or help, which we're happy to do.
6     Q.   Okay.
7     A.   In this case, I don't see how
8 we could have helped, personally.
9     Q.   Next paragraph it says,
10 "Pursuant to certain statutes, special agents
11 and diversion investigators of the DEA who
12 served this order to show cause and immediate
13 suspension of registration are authorized to
14 place under seal or remove for safekeeping
15 all controlled substances that Walgreens
16 possess pursuant the registration which I
17 have herein suspended."
18          Do you see that?
19     A.   I'm catching up with you,
20 honestly.
21          I do.
22     Q.   Were you aware that the DEA
23 locked up the controlled substances at the
24 Jupiter controlled substance center?
25     A.   I believe I was made aware of

Page 200

1 this at this time or roughly around the time,
2 because not my team but other teams that
3 support other parts of our warehouse
4 management system likely had to take some
5 actions to make sure that orders flowed
6 through properly.
7     Q.   Okay.  Because the Jupiter
8 distribution center was no longer allowed to
9 fill controlled substance orders, correct?
10          MS. SWIFT:  Object to the form.
11 Foundation.
12          THE WITNESS:  I don't know --
13     have that information directly, but
14     that's the impression I was under.
15 QUESTIONS BY MR. GADDY:
16     Q.   I'm gonna to flip for just a
17 moment back to the first document, which was
18 the settlement memorandum of agreement.
19          If you go to -- if you're
20 looking at the bottom right-hand corner, it's
21 going to be page 7.
22     A.   Okay.
23     Q.   Do you see that?
24     A.   Uh-huh.
25     Q.   And under paragraph 3, do you

Page 201

1 see that it delineates Walgreens general
2 obligations under the settlement?
3     A.   I do.
4     Q.   Okay.  And in paragraphs 3C,
5 you see that Walgreens agrees to pay the
6 United States $80 million?
7     A.   I do.  A settlement amount.
8     Q.   And did anybody at Walgreens
9 made you aware of this in June of 2013 when
10 this occurred?
11     A.   I don't believe that any
12 particular individual made me aware of it.  I
13 believe, again, it was some type of internal
14 web-based news announcement.
15     Q.   Where did you see that
16 web-based news announcement?
17     A.   Again, it's a vague memory, but
18 if -- it would have likely been on something
19 we called WalNet, which is an intranet site
20 for corporate store -- or corporate
21 employees.
22          (Walgreens-Barnes Exhibit 15
23     marked for identification.)
24 QUESTIONS BY MR. GADDY:
25     Q.   I'm going to hand you what

Page 202

1  we'll mark as Barnes 15.
2        Do you recognize this document
3  as a Walgreen Company Form 10-Q?
4     A.    That's what it says.  I've
5  never heard of or seen such a form to my
6  memory.
7     Q.    Okay.  So you've never reviewed
8  this before?
9     A.    I don't believe so.
10    Q.    Okay.  Do you have any
11 understanding this is a form that is required
12 be followed by the SEC for any publicly
13 traded company?
14    A.    I'm not a stockbroker, so, no,
15 I'm not -- first I've ever heard of
16 a Form 10-Q.
17    Q.    Okay.  Well, you see on the
18 first page this was filed in -- March 25,
19 2013?
20    A.    Yes.
21    Q.    Okay.  And turn, if you
22 would -- unfortunately, this is not numbered.
23        This is going to be the 13th
24 page in.  It should be note 10 in the middle
25 of the page.

Page 203

1        And do you see the note 10
2  where it says "Commitments and
3  Contingencies"?
4     A.    Yes.
5     Q.    And we're going to go down to
6  the very bottom of that page with the
7  paragraph that starts "On April 4, 2012."
8        Do you see where I am?
9     A.    I do.
10    Q.    It says, "On April 4, 2012, the
11 United States DEA served administrative
12 inspection warrants on six Walgreen retail
13 pharmacies in Florida and removed certain
14 controlled substance prescription records and
15 other related documents.  On that same date,
16 DEA also served an inspection warrant and an
17 administrative subpoena for records on the
18 company's distribution center in Jupiter,
19 Florida."
20        Do you recognize that to be the
21 issue that we were just talking about a
22 moment ago in the previous documents?
23        MS. SWIFT:  Object to the form.
24        THE WITNESS:  As presented it
25    sounds similar, if not the same.

Page 204

1  QUESTIONS BY MR. GADDY:
2     Q.    Then says, "DEA issued a
3  separate administrative subpoena for records
4  from the company's mail service in central
5  fill facility in Orlando, Florida, on
6  August 8, 2012."
7        Do you see that?
8     A.    I do.
9     Q.    In your role at Walgreens, did
10 you ever have any -- did the scope of your
11 duties ever encompass Walgreens' mail service
12 and central fill facility in Orlando,
13 Florida?
14    A.    In what capacity?  I worked --
15 what capacity?
16    Q.    In any capacity.
17    A.    When they -- when they started
18 calling it central fill, we installed a way
19 to present the orders on what we call pick to
20 lights that would tell you -- you would scan
21 the order, it would say, put it in this bin
22 so that it was mailed to the right pharmacy
23 or taken to the right pharmacy.  That's about
24 all I had.
25        It may or may not be reported

Page 205

1  through our ARCOS system.  I'm not aware of
2  it because we have 7 to 8,000 locations.  But
3  other than that, I've not had any direct
4  role.
5     Q.    Okay.  Next sentence says, "On
6  November 9th" -- or sorry, excuse me,
7  "November 29, 2012, DEA issued a separate
8  administrative subpoena for records from the
9  company's mail service and central fill
10 facility in Tempe, Arizona."
11        Do you see that?
12    A.    I do.
13    Q.    At any time while you've been
14 with Walgreens, have the scope of your duties
15 included the mail service and central fill
16 facility in Tempe, Arizona?
17    A.    It's the same answer, but just
18 to repeat, I have only supported an initial
19 system that was put in to help sort out
20 orders to the proper postal area code.  It
21 may or may not report through ARCOS systems.
22 I'm not directly aware because of our large
23 number of stores.  Other than that, I don't
24 recall being involved with them.
25    Q.    Next sentence says, "On

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1   February 5, 2013, DEA served an
2   administrative inspection warrant and
3   administrative subpoenas for records on the
4   company's distribution center in Perrysburg,
5   Ohio."
6           Do you see that?
7       A.   I do.
8       Q.   And you agree, that's another
9   Walgreens distribution center that at one
10  time distributed Schedule II narcotics?
11      A.   Yeah, for Walgreens' purposes
12  we consider it two different distribution
13  centers, one C-II, I was told, and the other
14  one non -- it's -- and short-canned, yes.
15      Q.   Prior to reading this
16  information here today, were you aware that
17  investigative warrants and subpoenas had been
18  served on Walgreens locations in Orlando,
19  Florida; Tempe, Arizona; and Perrysburg,
20  Ohio?
21      A.   That warrants were served?
22  I -- for Orlando, I guess maybe I thought
23  after I'd heard of the settlement that
24  something had happened. For the other two,
25  not at all.

Page 207

1           But no direct personal
2   knowledge.
3       Q.   As it relates to any of these
4   subpoenas and administrative warrants that
5   were served in Orlando, Tempe, Arizona,
6   Perrysburg, Ohio, were you or your team asked
7   to gather any documents, respond to subpoenas
8   or anything of that sort?
9       A.   Not to my knowledge, and let me
10  be clear about what that means. It's
11  possible, because as we've grown we've had to
12  get more efficient in how we answer support
13  tickets. So now it's possible the tickets
14  get entered. In fact, it's more common the
15  tickets get entered that I'm not aware of.
16          The only time I ask it to be
17  brought to me is if it's something new that
18  could be system-impacting or of concern.
19          (Walgreens-Barnes Exhibit 16
20      marked for identification.)
21  QUESTIONS BY MR. GADDY:
22      Q.   I'm going to show you what I'm
23  going to mark as Barnes 16.
24          Do you recognize this document?
25      A.   No.

Page 208

1       Q.   At the top this says that the
2   programming was controlled substance
3   monitoring. Below there, there's a section
4   that says the date for the initial
5   requirements was 2/12/13.
6           Do you see all that?
7       A.   I do.
8       Q.   This document related to
9   controlled substance monitoring, does it fall
10  within the scope of your duties at Walgreens?
11      A.   Controlled substance monitoring
12  is not involved in the scope of my duties at
13  Walgreens.
14      Q.   Okay. Has it ever been?
15      A.   No, it has never been.
16      Q.   Okay. Have you ever interfaced
17  with the unit that does have the scope of
18  duties that include controlled substance
19  monitoring about these issues?
20          MS. SWIFT: Object to the form.
21          THE WITNESS: Yeah, we may have
22      interacted with like Ora Yelvington,
23      the program manager. I know her.
24      We've worked on some reporting
25      issue -- not issues but reporting

Page 209

1   duties, but not to my recollection
2   ever related to anything about
3   controlled substances, whether
4   monitoring or reporting.
5   QUESTIONS BY MR. GADDY:
6       Q.   Okay. And that's -- you said
7   the name Ora Yelvington, Y-e-l-v-i-n-g-t-o-n?
8       A.   Yeah, it's on the top right
9   under program manager on the document cover
10  page.
11      Q.   And this document, you can flip
12  through and see this for yourself, but it
13  talks about flagging orders for tolerance or
14  flagging orders for ceilings.
15          Do those terms mean anything to
16  you?
17      A.   General --
18          MS. SWIFT: Object to the form.
19      Sorry.
20          THE WITNESS: Not in -- not in
21      this context. In more English
22      definitions of the words, not specific
23      related to drug ordering.
24  QUESTIONS BY MR. GADDY:
25      Q.   You don't know what those words

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 mean in the context of Walgreens' controlled
2 substance monitoring program?
3      A.    I do not.
4      Q.    How does the controlled
5 substance ordering system relate to the
6 controlled substance monitoring program?
7           MS. SWIFT:  Object to the form.
8           THE WITNESS:  You mean CSOS?
9 QUESTIONS BY MR. GADDY:
10     Q.    Yes.
11     A.    I do not know.  I -- in another
12 question you were asking, you were presenting
13 a -- on Visio that show how the systems
14 relate.  Again, I -- dozens of IT people,
15 thousands of I -- or teams, thousands of IT
16 people, it would be up to the manager related
17 to that area, working with those people, not
18 to me, to identify this.  So I don't know the
19 exact nature of how they're involved.
20     Q.    Okay.  Who would know how they
21 interact?
22     A.    In today's world, I -- I would
23 start with, because I don't know everyone's
24 duties, but I would probably start with Lynn
25 Guyot and Steve Bamberg.

Page 211

1      Q.    Okay.  How far back would Lynn
2 Guyot's involvement in knowing how these
3 programs interact go?
4      A.    We reorganized multiple times
5 over the last ten years, so I don't -- I
6 haven't kept track of people's own duties.
7 Sometimes it's hard to keep track of mine.
8           My -- just, you know,
9 especially when something new changes.  But I
10 really don't know.  I think Lynn -- the
11 reason I'm bringing that up -- and, I mean,
12 obviously you'll ask someone else, I would
13 think, but I -- Lynn had -- co-owned store
14 systems with Steve as far as inventory
15 management, and then for a while they changed
16 their model of support, then later on she
17 came back into it.
18           So I couldn't speak to when her
19 knowledge started or ended or that she even
20 really knew anything about ordering because,
21 to my knowledge, again, that's usually been
22 Steve.  So I'm surprised to see Ora on this
23 one.  So obviously you really need to talk to
24 those people.
25     Q.    Okay.  So if we are wanting to

Page 212

1 know more about the interaction between CSOS
2 and suspicious order monitoring, you
3 recommend we talk to Steve and Lynn?
4      A.    Yeah, and I would believe that
5 it -- well, you need to talk to them.
6           A reminder that CSOS is a --
7 our solution is over seven systems.  There's
8 a key component that I own that brings all of
9 the order data in, but not -- there's no
10 suspicious ordering that we take care of,
11 suspicious drug monitoring.
12     Q.    We've seen Brian Amend on a
13 couple of documents today.
14           Can you tell me what his
15 generally duties are currently?
16     A.    Currently, he is a senior
17 director of -- I apologize, they just
18 changed.  This is another example.  I mean,
19 they just changed the name of all of these
20 teams again, so...
21           But he is a senior director.
22 He's a third in line to the CIO of Walgreens
23 in the US.  He owns, through directors under
24 him and managers, probably hundreds of
25 applications, including my director, who is

Page 213

1 in charge of logistic supply chain and
2 transportation systems.
3           So it's a very high-level
4 answer, because there's so much there that he
5 does have report up to him.
6      Q.    Okay.  How long has he been in
7 that senior of a role?
8      A.    I believe approximately three
9 years.
10     Q.    What was he doing before then?
11     A.    He was a director instead of a
12 senior director, so he was actually my direct
13 manager.
14     Q.    Okay.  As far as you know, did
15 Brian Amend ever have any duties over
16 suspicious order monitoring?
17     A.    To my knowledge, if we assume
18 that it's Steve Bamberg that currently owns
19 it, then if that's true, then Steve is two
20 levels under Brian.  So directly, no, but
21 indirectly as a report of a reportee --
22     Q.    Okay.
23     A.    -- likely.
24     Q.    Sorry if I got confused, but is
25 that that Brian would currently be over

Page 214

1 suspicious order monitoring?
2         MS. SWIFT:  Object to the form.
3         THE WITNESS:  That would be my
4 guess.  Again, that's a guess.
5 QUESTIONS BY MR. GADDY:
6     Q.    Okay.  How long has Brian had
7 suspicious order monitoring folks reporting
8 to him?
9         MS. SWIFT:  Object to the form.
10        THE WITNESS:  If we take my
11        assumption that Brian is -- the last
12        three years has been in that role
13        where other directors report to him,
14        and we take my assumption that it's
15        Steve Bamberg, then approximately
16        three years would be my guess based on
17        two assumptions.
18 QUESTIONS BY MR. GADDY:
19     Q.    What is your understanding of
20 how long Steven Bamberg has had
21 responsibilities over the suspicious order
22 monitoring program?
23     A.    I really have no even guess
24 or -- educated or otherwise on that.  I'm
25 sorry.  I apologize.

Page 215

1     Q.    Okay.  Tell me if I'm wrong,
2 but my memory is that earlier I'd asked you
3 who you would go to now about suspicious
4 order monitoring, and you mentioned the RX
5 integrity team, or people on that team like
6 Tasha Polster, correct?
7     A.    Yes, I would try to go to the
8 business first, yes, because they're on --
9 yeah.
10     Q.    Okay.  And then --
11     A.    Or legal, I believe I said as
12 well.
13     Q.    Okay.  Who in legal would you
14 go to?
15     A.    I'd probably would start with
16 Mike Simko.
17     Q.    All right.  Anybody else?
18     A.    I can't remember her name, but
19 I would start with Mike.  He's usually our --
20 he's actually one of our business SMEs
21 because legal is part of the business side.
22 So since we work with him fairly frequently,
23 I'd start with Mike.
24     Q.    Okay.  How long have you been
25 working with Mike?

Page 216

1     A.    I think from -- at least from
2 memory, I think at least the last five years,
3 maybe infrequently before then.  But once
4 Brian helped designed -- helped basically
5 roll out the change in CSOS's purpose from
6 replenishing our DCs to the current sign-in
7 for store orders, I became more familiar with
8 Mike as we were, you know, making the system
9 more stable as far as keeping his speed up.
10     Q.    Are you familiar Wayne
11 Bancroft?
12     A.    I think I've heard the name,
13 but, no.
14     Q.    Are you familiar with Kathy
15 Emory?
16     A.    Yes.
17     Q.    Tell me what Kathy's role is
18 with Walgreens.
19     A.    She would be my direct peer at
20 the same level under Andrew Meyer, who is our
21 current director.
22     Q.    Okay.  So does she have
23 essentially the same duties that you do?
24     A.    We have different specialties
25 and -- you know, or what I called

Page 217

1 applications, so she has pick, replenishment
2 order fill, whereas I have others.  Yeah.
3     Q.    How long has she been your
4 direct peer?
5     A.    In one way or the other, as a
6 team manager or as a manager, we pretty much
7 followed each other.  So I would say
8 13 years, roughly.
9     Q.    Has Kathy ever had any
10 obligations over suspicious order monitoring
11 that you're aware of?
12     A.    Suspicious order monitoring?
13 Not to my knowledge.
14     Q.    Has she had duties involving
15 ARCOS reporting to the DEA?
16     A.    Part of our -- under compliance
17 or reporting analytics, which are part of my
18 team, I've said before, we were not the
19 newsmaker or the reporters.  So it's -- hers
20 is one of the systems that feeds us the
21 transactional data that we then put in a
22 format for the DEA for Tim Schmelzer to
23 report.  So, yeah, she provides the original
24 data for ordering.
25     Q.    Familiar with an IT employee at

Highly Confidential – Subject to Further Confidentiality Review

Page 218

1  Walgreens named Doug Peterson?
2      A.    Correct.
3      Q.    What is Mr. Peterson's role?
4      A.    He's my other direct peer under
5  Andrew for a different area specialties.
6      Q.    And how long has he been your
7  direct peer?
8      A.    I would say the same as Kathy,
9  roughly 13, 14 years, something like that.
10      Q.    As far as you know, has Doug
11  Peterson ever had any involvement with the --
12  any suspicious order monitoring program at
13  Walgreens?
14          MS. SWIFT:  Object to the form.
15      Foundation.
16          THE WITNESS:  Not for
17      suspicious ordering, to my knowledge.
18  QUESTIONS BY MR. GADDY:
19      Q.    Okay.  Same answer as it
20  relates to ARCOS that you gave for --
21      A.    Yeah, so Kathy system
22  reports -- because we break down -- yeah, so
23  hers reports ordering, his reports receipts.
24      Q.    Outside of anything related to
25  ARCOS or DEA reports, are there any duties

Page 219

1  that you, Kathy or Doug have that relate to
2  Schedule II or III narcotics?
3          MS. SWIFT:  Object to the form.
4          THE WITNESS:  Kathy's -- you
5      already know about me and CSOS, having
6      that responsibility.  Kathy's system,
7      from memory -- and again, I'm not
8      their experts, but I know that they
9      both do report in ARCOS transactions,
10      A; B, they also have suspicious -- or
11      not suspicious, excuse me, they have
12      controlled drug reports, which are
13      separate from ARCOS.  I don't know a
14      great deal about those.  I just know
15      that the same system feeds me that.
16          And -- oh, Kathy's system,
17      if -- if a paper -- if a paper order
18      is going to be produced and not an
19      electronic order, none of that comes
20      through any of my systems at all.
21      That's all in Kathy's system to
22      produce, generate the paper and to do
23      the other interfaces.
24  QUESTIONS BY MR. GADDY:
25      Q.    What is a controlled drug

Page 220

1  report?
2      A.    I -- I believe that the title
3  says what it is, but I don't know
4  specifically.  I just know that there is such
5  a thing.
6      Q.    Okay.  Walgreens uses an
7  acronym in its ordering system of PDQ.
8          Are you familiar with that?
9      A.    Yes, I've heard it.
10      Q.    Okay.  What does PDQ stand for?
11      A.    I don't know if it really does
12  have a meaning besides pretty darn quick, but
13  I think it's an acronym to -- this is my
14  assumption, personally; I don't have direct
15  knowledge -- that it means expedite an order.
16          (Walgreens-Barnes Exhibit 17
17      marked for identification.)
18  QUESTIONS BY MR. GADDY:
19      Q.    Okay.  Show you what I'll mark
20  as Barnes 17.
21          Do you recognize this document?
22      A.    No, I don't.
23      Q.    Well, let me first ask you:  Do
24  you recognize the -- the link or the site at
25  the bottom of the page?  It says,

Page 221

1  "walnet.walgreens.com"?
2      A.    WalNet is our -- in another
3  question I had mentioned information on the
4  intranet, which means an internal network.
5  WalNet is Walgreens' corporate intranet site.
6      Q.    Okay.  And on Walgreens'
7  intranet site, you're familiar with the fact
8  that they'll post policies and procedures on
9  that intranet?
10      A.    Yes.
11      Q.    Okay.  And do you recognize
12  this as being in the form of a policy or
13  procedure that would have been posted on
14  WalNet at some point in time?
15      A.    If you mean --
16          MS. SWIFT:  Object to the form.
17          THE WITNESS:  If you mean the
18      formatting representing a specific way
19      of -- no, I do not.
20  QUESTIONS BY MR. GADDY:
21      Q.    Okay.  The bottom right-hand
22  corner you see the date, and it looks like
23  this document was printed as 5/3/12.
24          Do you see that?
25      A.    I do.

Page 222

1    Q.   Okay.  And the top of the page,
2  the title of this document is "RX quick
3  order, add items by item description."
4       Do you see that?
5    A.   I do.
6    Q.   And in the second paragraph,
7  you see that it says, "Pharmacies cannot
8  order C-II drugs via EDI from Cardinal or
9  Blanco in Puerto Rico."
10      What does that mean?
11      MS. SWIFT:  Object to the form.
12  Foundation.
13      THE WITNESS:  I honestly don't
14  know.
15  QUESTIONS BY MR. GADDY:
16   Q.   Okay.  It says, "C-II drugs can
17  only be ordered using the weekly C-II
18  suggested order or PDQ for emergency orders."
19      Do you see that?
20   A.   Yes.
21   Q.   Okay.  And the PDQ for
22  emergency orders is what you were telling us
23  where you need an order quickly?
24      MS. SWIFT:  Object to the form.
25  Foundation.

Page 223

1       THE WITNESS:  As I said before,
2   that's my assumption of what that's
3   used for based on almost hearsay
4   discussion, you know, what's this mean
5   type of thing.  No formal knowledge of
6   the meaning.
7  QUESTIONS BY MR. GADDY:
8    Q.   Okay.  So it also says there
9  that generally controlled sub -- C-II
10  controlled substances are ordered weekly.
11      Do you see that?
12   A.   Yes.
13   Q.   And then the rest of this
14  document kind of walks you through how to
15  order some of these drugs.
16      Do you see that?
17   A.   That's what it appears to be at
18  a quick scan.
19   Q.   Are you aware if in this
20  document there's any requirements when
21  ordering a PDQ, or a pretty darn quick, order
22  for C-IIs, if there's any requirements in
23  these steps to explain or justify the need
24  for a PDQ order?
25      MS. SWIFT:  Object to the form.

Page 224

1  Foundation.
2       THE WITNESS:  It's not my
3  system to support.  I would not be
4  aware of -- of anything related to
5  that except for just general hearsay
6  that right now anything that doesn't
7  go through normal processes goes to
8  Tasha's RX integrity team.
9  QUESTIONS BY MR. GADDY:
10   Q.   And you're aware that Tasha's
11  RX integrity team was established after the
12  settlement that Walgreens entered with the
13  DEA --
14      MS. SWIFT:  Object to the --
15  QUESTIONS BY MR. GADDY:
16   Q.   -- correct?
17      MS. SWIFT:  Object to the form.
18  Foundation.
19      THE WITNESS:  I was told that
20   that was told or heard.  I would say
21   it's been a while at this point, but,
22   yeah, I believe I've heard that.
23  QUESTIONS BY MR. GADDY:
24   Q.   Okay.  So prior to the
25  settlement between Walgreens and the DEA,

Page 225

1  there was no RX integrity team that was doing
2  any review of PDQ orders?
3       MS. SWIFT:  Object to the form.
4  Foundation.
5       THE WITNESS:  Again, I've heard
6   that that team was formed afterwards
7   and that the functions were performed
8   by other individuals in Walgreens, but
9   I have no direct knowledge.
10  QUESTIONS BY MR. GADDY:
11   Q.   Okay.  Do you know -- can you
12  tell me of anybody who was doing any analysis
13  of PDQ orders prior to the settlement between
14  Walgreens and DEA?
15      MS. SWIFT:  Object to the form.
16  Foundation.
17      THE WITNESS:  I have no direct
18   knowledge.  It's outside of my area of
19   specialty in IT, so I would have no
20   real reason to know that.
21  QUESTIONS BY MR. GADDY:
22   Q.   Okay.  But you don't know of
23  anybody that did any evaluation of any PDQ
24  orders before the settlement, do you?
25      MS. SWIFT:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    THE WITNESS: With thousands of
2 systems, it's hard to know exactly. I
3 do not know anyone specifically.
4    (Walgreens-Barnes Exhibit 18
5 marked for identification.)
6 QUESTIONS BY MR. GADDY:
7    Q.   I'm going to show you what
8 we'll mark as Barnes 18.
9        Do you recognize this document?
10    A.   I do not.
11    Q.   I don't think it has a date on
12 it. I'll represent to you it's from the
13 metadata that a company's production
14 indicated it was -- it originated on
15 August 5, 2013.
16    A.   Okay.
17    Q.   You see the title is "CII
18 Process and CSOS Training Document"?
19    A.   Yes.
20    Q.   Is this -- is this a time
21 period in which you had some responsibilities
22 for CSOS?
23    MS. SWIFT: Object to the form.
24 QUESTIONS BY MR. GADDY:
25    Q.   August of 2013?

Page 227

1    A.   Repeat your question, please.
2    Q.   Is this a time period in which
3 you had some obligations related to CSOS?
4    A.   I would have had some
5 responsibilities related to CSOS. The real
6 question in my mind would be is did I have --
7 was any of the store ordering piece
8 transitioned over to me yet.
9        And I don't -- I'm not aware
10 what that date was off the top of my head.
11    Q.   Okay. And first entry there --
12 it looks like this is probably a draft
13 document. The first entry is, is "What is
14 CSOS?" and there's an entry that says "Insert
15 fluff."
16        Do you see that?
17    A.   Yeah.
18    Q.   Okay. If you were to insert
19 what should actually go in there, what would
20 you suggest?
21    MS. SWIFT: Object to the form.
22    THE WITNESS: You're asking me
23 to define CSOS?
24 QUESTIONS BY MR. GADDY:
25    Q.   Yes.

Page 228

1    A.   In my words it's -- the
2 controlled substance ordering system is a way
3 to ensure that electronically the only way to
4 order controlled -- actually, specifically, I
5 believe it is Controlled II drugs as to use a
6 system certified by the Drummond Group that
7 enables the use of DEA-supplied encryption
8 certificates and also to check to make sure
9 those have not been revoked.
10        And if all that's true, then a
11 user can sign an order that's been imported,
12 assuming that the -- they type in their
13 password, which is basically their signature.
14    Q.   What is President's Plaza?
15    MS. SWIFT: Object to the form.
16    THE WITNESS: President's
17 Plaza, I'm not extremely aware of it,
18 but I think at one time I was told
19 this. It used to be the only C-II
20 distribution center at Walgreens, and
21 it's just kept that name instead of
22 having to pay whatever the cost would
23 be to replace that name elsewhere in
24 our systems.
25

Page 229

1 QUESTIONS BY MR. GADDY:
2    Q.   Where is that located?
3    A.   It's not actually a physical
4 location anymore. It's -- again, it was just
5 the original name of C-II, so it -- in my
6 mind it almost equals C-II now as a general
7 term.
8        For instance, our catalog is
9 the -- there's a catalog of drugs, and any
10 C-IIs would be entered into that catalog as
11 available for ordering, is my belief of
12 another system.
13        But you need to talk to the
14 expert on that system to get whatever
15 information you may need.
16    Q.   Okay. Who would that be?
17    A.   I'm actually not 100 percent
18 sure. Two or three people I can think to
19 find -- that's the thing with questions in a
20 very large IT organization. A lot of times
21 you have to ask someone to ask someone to ask
22 someone. So I can send you three or four
23 names to start with.
24    Q.   If you turn the page, you'll
25 see in the middle there's a bullet point,

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  PDQ, and that's the pretty darn quick order
2  system again?
3      A.   I do.
4          MS. SWIFT:  Objection.
5  Mischaracterizes the previous
6  testimony.
7  QUESTIONS BY MR. GADDY:
8      Q.   You see that?
9      A.   I do see the PDQ, yes.
10     Q.   Okay.  And in the first bullet
11 point below there it says, "An emergency PDQ
12 order can be placed outside of your normal
13 weekly order day."
14         Do you see that?
15     A.   I do.
16     Q.   Do you have any idea what's
17 meant by emergency?
18     A.   Yeah, if we give it a
19 high-level understanding in just previous
20 projects, an emergency, as it's been
21 presented to me by Tasha's group and Barb
22 Martin's group, has been basically customers
23 waiting.  The local pharmacy is out of drugs,
24 someone's shown up and needs the order.
25         But in the same kind of side

Page 231

1  discussion that was brought up, and I do
2  remember that those orders are -- I don't
3  understand the systems, but are reviewed with
4  extra diligence, as was described to me.
5          But again, this was, you know,
6  a third-party conversation.
7      Q.   Okay.  Prior to the settlement
8  between Walgreens and the DEA, who reviewed
9  these orders with any diligence whatsoever?
10         MS. SWIFT:  Object to the form.
11 Foundation.
12         THE WITNESS:  Again, being in
13 IT, that would be a business function.
14 I've heard that it was reviewed.  We
15 don't bill -- because I heard a system
16 existed, and we don't build systems to
17 not use.  But the specific person, I
18 would not be aware of.
19 QUESTIONS BY MR. GADDY:
20     Q.   Okay.  Do you know that it was
21 reviewed before the settlement between DEA
22 and Walgreens?
23     A.   There's no way for me to know
24 that.
25         (Walgreens-Barnes Exhibit 19

Page 232

1  marked for identification.)
2  QUESTIONS BY MR. GADDY:
3      Q.   I'll show you what I'll mark as
4  Barnes 19.
5          Do you recognize the top of
6  this document as being an e-mail from
7  Caroline Rawa to you?
8      A.   That's what it says.
9      Q.   Okay.  And if you go to the --
10 just turn one page.  You'll find the first
11 e-mail in the chain, which is an e-mail from
12 Patrick Sullivan.
13         Do you see that?
14     A.   I do.
15     Q.   And this is a November 2013
16 e-mail, and you were copied on it, correct?
17     A.   I am.
18     Q.   Okay.  And in the first line he
19 says, "I'm working on CSOS for Perrysburg,"
20 and a question came up that you had been --
21 that he had been discussing with Caroline and
22 you and Brian.
23         Do you see that?
24     A.   I do.
25     Q.   And in the next paragraph he

Page 233

1  goes in to explain why he's going to ask the
2  question he does, but there in the bottom
3  paragraph do you see he says, "So the
4  question came up, 'What percentage of C-II
5  orders are PDQ?'"
6          Do you see that?
7      A.   I am, but please give me time
8  to read the rest of the e-mail.
9          Okay.  I'm caught up.
10     Q.   Okay.  Do you see where that's
11 the question that he's asking?
12     A.   I do.
13     Q.   Okay.  And you see that it
14 mentions Deb Bish.
15         And do you know who Deb Bish
16 is?
17     A.   I do.
18     Q.   Who she is?
19     A.   She would have been the FM,
20 function manager, of the CSOS signing process
21 that was being established at this time.
22         This was the same time that I'm
23 being brought into this for the first time.
24 So I'm glad you showed it to me because it
25 reminded me of that time period.

Page 234

1    Q.    Okay.  It says that "Deb Bish
2  estimated off the top of her head that it was
3  approximately 25 percent of C-II orders were
4  PDQ."
5        Do you see that?
6    A.    I do see that guesstimate.
7    Q.    Okay.  Does it surprise you
8  that the emergency orders would be that high,
9  as 25 percent?
10        MS. SWIFT:  Object to the form.
11  Foundation.
12        THE WITNESS:  I think it's
13  obvious that she was guessing.  I
14  personally have no idea either, so --
15  and I have no way of judging if that's
16  high or not, even if it was the truth.
17  QUESTIONS BY MR. GADDY:
18    Q.    Okay.  That's fair.
19        You see in the next e-mail up,
20  Ann sends an e-mail to some other folks
21  saying, "Please create a query in Perrysburg
22  C2 facility to determine the percentage of
23  PDQ orders on any given day."
24        Do you see that?
25    A.    Yeah, I do.

Page 235

1    Q.    And then on the next page you
2  see that Patrick e-mails that he received
3  something from OPSB, and ultimately it looks
4  like Caroline forwards it to you, correct?
5    A.    I'm still reading the e-mail
6  below that just so I can give you the best
7  answer possible.
8        Okay.  I'm caught up.
9    Q.    Okay.  And Caroline responds to
10  Patrick that PDQ is going to be a significant
11  wildcard.
12        Do you see that?
13    A.    I do.
14    Q.    And then ultimately this is
15  forwarded to you, correct?
16    A.    Yeah, it appears -- yes, it
17  appears so.
18    Q.    And if you look at the last
19  page of this document, you should see the
20  attachment which has the percentages of the
21  PDQ orders.
22    A.    I don't have that.
23    Q.    Okay.  So you see here, you
24  have the ability to see this on the screen in
25  front of you or the screen up top?

Page 236

1    A.    Uh-huh.
2    Q.    Okay.  Do you see how it's
3  giving a date range and it's showing the
4  regular orders that were received, and then
5  to the side it's showing the number of PDQ
6  orders that were received?
7        MS. SWIFT:  Object to the form.
8  Foundation.
9        THE WITNESS:  I do see that
10  apparently is the representation.
11  QUESTIONS BY MR. GADDY:
12    Q.    And then you see in the
13  right-hand column there's an indication of
14  the percentage of the orders that were
15  received that were PDQ?
16        MS. SWIFT:  Object to the form.
17  Foundation.
18        THE WITNESS:  Yeah, I see
19  decimals that are supposed to be
20  percentages, I guess -- I would guess.
21  QUESTIONS BY MR. GADDY:
22    Q.    Well, do you recall receiving
23  this e-mail?
24    A.    No, I do not.
25    Q.    Do you recall reviewing this

Page 237

1  document?
2    A.    No, I don't.  I remember
3  roughly the time period and what it would
4  relate to, though.  It's...
5    Q.    While would Caroline have sent
6  you the data on percentage of orders that are
7  PDQ?
8        MS. SWIFT:  Object to the form.
9  Foundation.
10        THE WITNESS:  Sorry, I got to
11  move a little bit because of the sun
12  there.
13        Repeat your question, please.
14  QUESTIONS BY MR. GADDY:
15    Q.    Sure.
16        Why would it have been of
17  interest -- strike that.
18        Do you have an understanding as
19  to why Caroline would have forwarded this
20  information to you?
21    A.    I believe I know why she did,
22  because if you look at the whole e-mail
23  topic, it goes back to talking about
24  balancing people's workloads.
25        So what -- one of the early

Page 238

1 things we had to do because of some of the
2 limitations in the software, which if you
3 remember another question, I explained that
4 CSOS enables us to apply the electronic
5 signature. It has no way of -- we only have
6 six to ten people signing all these orders
7 for the corporation, and you need to be able
8 to balance the number of orders each person
9 has.
10        So this is simply an exercise
11 in determining how many orders are out there
12 so that they can create some type of que'ing
13 system or methodology that would give us the
14 most even way to divide them up.
15     Q.    Okay.  You see here on the
16 attachment that Caroline provided to you that
17 it indicates that there were PDQ percentages
18 on the first day of 26 percent, the next day
19 39 percent.  Then from it went to 54 percent,
20 54 percent, 46 percent.
21        Do you see those numbers?
22     A.    I see those representations,
23 yes.
24     Q.    It looks like on Friday and
25 Saturday they -- they kind of overwhelmed the

Page 239

1 system because I guess those are not regular
2 ordering days?
3        MS. SWIFT:  Object to the form.
4 QUESTIONS BY MR. GADDY:
5     Q.    Is that correct?
6     A.    No, they're regular ordering
7 days.
8     Q.    Okay.
9     A.    Well, except for Friday is not.
10    Q.    Okay.
11    A.    Friday nor Saturday, yeah.
12    Q.    Okay.  You agree Friday and
13 Saturday are not normal ordering days?
14    A.    No, they're not.  They lead
15 into Sunday.
16    Q.    Okay.  Is it surprising to you
17 that the percentage of emergency orders is
18 often over 50 percent of all the orders
19 received?
20        MS. SWIFT:  Object to the form.
21        THE WITNESS:  I really have no
22    history of reviewing orders,
23    percentages, coming in the regular way
24    or the PDQ way, so I don't have
25    anything to base my -- an opinion on.

Page 240

1 QUESTIONS BY MR. GADDY:
2     Q.    Are you familiar with the
3 function of -- as it relates to ordering of
4 controlled substances of controlled substance
5 override?
6        MS. SWIFT:  Object to the form.
7        THE WITNESS:  I've never heard
8    of that before.
9 QUESTIONS BY MR. GADDY:
10    Q.    Mr. Barnes, we've talked some
11 earlier today about OxyContin and its primary
12 ingredient, oxycodone.
13        Do you recall those general
14 conversations?
15        MS. SWIFT:  Object to the form.
16        THE WITNESS:  I don't remember
17    talking about specific ingredients.  I
18    remember vaguely some OxyContin
19    discussions.  So if there's anything
20    that I should -- that is relevant, I'd
21    appreciate it if you'd refresh my
22    memory.
23 QUESTIONS BY MR. GADDY:
24    Q.    Well, are you familiar with the
25 fact that oxycodone is a Schedule II

Page 241

1 narcotic?
2     A.    I believe, I don't remember
3 how, that someone told me that all the oxys
4 are Schedule II.
5     Q.    Okay.  Are you familiar with
6 the controlled substance hydrocodone?
7     A.    Familiar -- I don't -- define
8 familiar.  I'm sorry.
9        I mean, I've heard of it.  I
10 think it's related to the other ones.  Not
11 form any specific direct professional
12 knowledge.  I just kind of -- an assumption.
13 You hear them mentioned like in the news
14 together, so that type of thing.
15    Q.    So you have an understanding
16 that hydrocodone is a substance that is
17 abused?
18        MS. SWIFT:  Object to the form.
19        THE WITNESS:  I have no direct
20    knowledge of that, other than news
21    reports and hearsay.
22 QUESTIONS BY MR. GADDY:
23    Q.    Okay.  Well, that's what I'm
24 asking about.
25        Do you have an understanding

Page 242

1 personally that hydrocodone is a substance
2 that's abused?
3          MS. SWIFT: Objection. Form.
4          THE WITNESS: I've heard that.
5 QUESTIONS BY MR. GADDY:
6     Q.   Do you have the same
7 understanding as it relates to oxycodone?
8          MS. SWIFT: Object to the form.
9          THE WITNESS: Again, I've heard
10 that.
11          (Walgreens-Barnes Exhibit 20
12 marked for identification.)
13 QUESTIONS BY MR. GADDY:
14    Q.   I'll show you what I'll mark as
15 Barnes 20.
16          You see up in the top left of
17 this document that it indicates it comes from
18 the United States Attorney's Office in
19 Colorado?
20    A.   Yes.
21    Q.   And that below there a little
22 bit it's dated October 2, 2008.
23          Do you see that?
24    A.   I do.
25    Q.   Do you see that it's entitled

Page 243

1 "Cardinal Health, Inc., agrees to pay 34
2 million to settle claims that it failed to
3 report suspicious sales of widely abused
4 controlled substances"?
5          Do you see that?
6    A.   I do.
7    Q.   Do you recall whether or not
8 anybody at Walgreens made you aware of this
9 settlement between Cardinal Health and the
10 DEA as it related to these violations?
11    A.   Not to my memory.
12    Q.   If we go down to the second
13 paragraph, you see it says, "Cardinal Health,
14 which operates 27 DEA-registered distribution
15 facilities, failed to report to DEA
16 suspicious orders of hydrocodone that it then
17 distributed to pharmacies that filled
18 illegitimate prescriptions originating from
19 rogue Internet pharmacy websites."
20          Do you see that?
21    A.   I do.
22    Q.   And if you skip a sentence, do
23 you see that it says, "Cardinal's conduct
24 allowed the diversion of millions of dosage
25 units of hydrocodone from legitimate to

Page 244

1 non-legitimate channels"?
2          Do you see that?
3    A.   I do.
4    Q.   It says, "DEA regulations
5 require all manufacturers and distributors to
6 report suspicious orders of controlled
7 substances and more specifically to design
8 and operate a system to disclose to the
9 registrant suspicious orders of controlled
10 substances. Registrants are required to
11 inform DEA of suspicious orders upon
12 discovery."
13          Do you see that?
14    A.   I do.
15    Q.   And do you recall anybody at
16 Walgreens ever talking to you about these
17 issues that are raised here as it relates to
18 Cardinal Health?
19    A.   I do not.
20          Again, it's not necessarily
21 role-specific.
22    Q.   You see in the next paragraph
23 it says that "despite DEA's repeated attempts
24 to educate Cardinal Health in diversion
25 awareness and prevention, Cardinal engaged in

Page 245

1 a pattern of failing to report blatantly
2 suspicious orders for controlled substances
3 filled by its distribution facilities located
4 throughout the United States."
5          Do you see that?
6    A.   I do.
7    Q.   The next sentence says,
8 "Cardinal's negligent conduct contributed to
9 our nation's serious pharmaceutical abuse
10 problem. The substantial civil penalty
11 underscores DEA's determination to prevent
12 pharmaceutical diversion and protect the
13 public health and safety by continuing to
14 hold companies responsible if they fail to
15 fulfill their obligations under the
16 Controlled Substance Act."
17          Do you see that?
18    A.   I do.
19    Q.   And again, did anybody at
20 Walgreens have any conversations with you or
21 provide you any training or education in your
22 role as serving a compliance function as it
23 relates to the controlled substance ordering
24 system at Walgreens?
25          MS. SWIFT: Object to the form.

Page 246

1  THE WITNESS:  No, they would
2  not come to me with news such as this.
3  We fulfill the IT functionality and we
4  specialize.  It would be like me going
5  to them with the latest RAM technology
6  or memory technology.
7  It's -- while it's serious news
8  and -- they just would come to us with
9  what they want changed.  They try to
10  be efficient.
11 QUESTIONS BY MR. GADDY:
12  Q.   You see the very bottom line on
13 that page says, "Hydrocodone is the most
14 commonly diverted and abused controlled
15 pharmaceutical in the United States."
16  Do you see that?
17  A.   I do.
18  Q.   Did you have an understanding
19 of that back in 2008?
20  A.   I did not.  Assuming, you know,
21 that that's the truth.
22  Q.   Has anybody at Walgreens ever
23 made it clear to you that hydrocodone is the
24 most commonly abused controlled
25 pharmaceutical in the US?

Page 247

1  A.   Not to my knowledge, offhand.
2  (Walgreens-Barnes Exhibit 21
3  marked for identification.)
4  QUESTIONS BY MR. GADDY:
5  Q.   Let me show you what I'm going
6 to mark as Barnes Exhibit 21.
7  And do you see at the bottom
8 that this is another e-mail that gets
9 forwarded to you by Caroline Rawa?
10  A.   I do.
11  Q.   And if you start down there,
12 you see that it's another press release from
13 DEA that says, "DEA publishes proposal to
14 reschedule hydrocodone"?
15  A.   I do.
16  Q.   And the next page it says,
17 "Today, the US DEA published in the Federal
18 Register a notice of proposed rulemaking to
19 move hydrocodone combination products, HCPs,
20 from Schedule III to Schedule II."
21  Do you see that?
22  A.   I do.
23  Q.   The next paragraph it says,
24 "The Controlled Substance Act places
25 substances with accepted medical uses into

Page 248

1 one of four schedules, with the most
2 potentially harmful and abusable medications
3 being placed in Schedule II."
4  Do you see that?
5  A.   I do.
6  Q.   Is that consistent with your
7 understanding of how the DEA classifies
8 controlled substances?
9  MS. SWIFT:  Object to the form.
10 Foundation.
11  THE WITNESS:  I don't really
12  have any basis of understanding how
13  they go about it except for in
14  general, the more controls are placed,
15  the lower the number is.
16 QUESTIONS BY MR. GADDY:
17  Q.   If you go to the next
18 paragraph, start at the second sentence, it
19 says, "The analysis by HHS and the DEA shows
20 HCPs have a high potential for abuse, and
21 abuse may lead to severe psychological or
22 physical dependence."
23  Do you see that?
24  A.   I do.
25  What is HCPs?

Page 249

1  Q.   Hydrocodone combination
2 products.
3  A.   Okay.
4  Q.   Is that sentence there
5 consistent with your understanding that
6 hydrocodone has a high potential for abuse
7 and may lead to psychological or physical
8 dependence, i.e., addiction?
9  MS. SWIFT:  Object to the form.
10 Foundation.
11  THE WITNESS:  That's definitely
12  what I've heard on the news.
13 QUESTIONS BY MR. GADDY:
14  Q.   If you skip a sentence it says,
15 "Data and surveys from multiple federal and
16 nonfederal agencies show the extent of abuse
17 of HCPs" -- that's again hydrocodone
18 combination products.
19  A.   Uh-huh.
20  Q.   It says, "For example,
21 monitoring the future, surveys of 8th, 10th
22 and 12th graders from 2002 to 2011 found that
23 twice as many high school seniors used
24 Vicodin, an HCP, nonmedically, as used
25 OxyContin, a Schedule II substance, which is

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 more tightly controlled."
2        Do you see that?
3    A.    I do.
4    Q.    Do you recall reading this
5 press release when it was sent to you by
6 Caroline?
7    A.    No, I don't.
8    Q.    Do you recall receiving it?
9    A.    No, I actually don't recall
10 receiving it.
11    Q.    When Caroline sends to you --
12 and I'm looking in the middle of the page
13 there.
14    A.    Uh-huh.
15    Q.    She forwards it to you, and her
16 comment to you is, "FYI.  Potential for lots
17 of CSOS orders here," with a smiley face.
18    A.    Uh-huh.
19    Q.    Do you see that?
20    A.    I do.
21    Q.    What did that mean to you?
22        MS. SWIFT:  Object to the form.
23        THE WITNESS:  Again, I'm not
24 remembering specifically, but seeing
25 the timeline, as I've explained in

Page 251

1 other questions, is roughly around the
2 time where we changed the CSOS system
3 to fulfill signing for store orders
4 and not for -- not for bringing orders
5 into our warehouses for wholesale to
6 our stores.
7        We had a lot of problems with
8 getting the system stable to perform,
9 and we were trying to hold back the
10 number of orders and advising the
11 business to stay paper as long as
12 possible.
13        My belief is that, you know,
14 this was like a -- anytime you're
15 going through struggles together as a
16 team, you know, oh, gosh, here's going
17 to be another 10,000 orders or
18 whatever type of feeling, is my best
19 surmise of what I would think was
20 going on here.
21 QUESTIONS BY MR. GADDY:
22    Q.    Okay.  And Walgreens sold
23 hydrocodone in the stores at this time,
24 correct?
25    A.    I don't know specifically about

Page 252

1 hydrocodone.
2        Knowing -- Caroline is one of
3 my most detailed people.  Knowing her, she
4 was just probably trying to make sure we're
5 aware of it and that they could hit it.  And
6 I trust her to read the details on things
7 like this and call my attention to anything
8 specific, so I probably sped-read the
9 high-level topic.
10        So I don't know -- but
11 specifically back to your question, you
12 asked:  Did Walgreens carry it?
13        I would assume so because I
14 think we try to carry legal drugs to
15 prescribe, but I don't have any personal,
16 direct knowledge that that was the case
17 either.
18    Q.    As you sit here today, you're
19 telling me that you don't have an
20 understanding as to whether or not Walgreens
21 sold hydrocodone?
22    A.    Like I said, I would assume so,
23 but as my -- it's not my specialty.  It's not
24 what I do day to day.  I would think we do
25 because I would think people would go to

Page 253

1 other pharmacies if we didn't.
2    Q.    And you respond up top, and the
3 first comment that you make is, "and lots of
4 suspicious drug orders," correct?
5    A.    Correct.
6    Q.    Okay.  And do your job duties
7 have anything to do with suspicious drugs
8 orders?
9    A.    No, they do not.
10    Q.    Okay.  Well, what did you mean
11 by your comment that because hydrocodone was
12 now going to be scheduled as II instead of
13 III, that you would now have lots of
14 suspicious drug orders?
15    A.    Again, trying to put this in
16 context, I think this is roughly around the
17 time I probably learned a little bit about
18 suspicious drug ordering being in effect.
19        Like I said before, when I'd
20 heard of the settlement -- you have water
21 cooler conversations.  I talked to people and
22 I heard that there was such a thing, so I'm
23 assuming that with that and with the
24 knowledge -- like I said, I heard that
25 Tasha's group was formed.  It was just kind

Page 254

1 of a -- and we were working with them closely
2 to roll out this. We were hit -- I'm kind of
3 just guessing here that that's where that
4 comment came.
5     Q.    Well, I'm a little confused
6 because just a minute ago you told me that
7 you didn't know whether or not y'all sold
8 hydrocodone, but now you're making a comment
9 that because it's getting rescheduled, you're
10 going to now have a lot of suspicious drug
11 orders.
12     So can you help me understand
13 that?
14     A.    Well, I think I also said I'm
15 making a lot of assumptions based on the
16 e-mail. I don't directly remember.
17     So given that, all I can do is
18 make what I don't prefer to do, is
19 assumptions, based on the evidence in front
20 of me. And that's what I can conclude, is
21 that, A, I would assume that we sold them as
22 a company that tries to provide the best
23 service and most products to our customers;
24 and B, likely having just recently learned
25 there was such a thing as suspicious drug

Page 255

1 ordering, that it might apply in this case.
2     Q.    Well, why would you think that
3 it might apply to hydrocodone?
4     A.    Because it's a Schedule II
5 drug, and according to that article, it's
6 being moved over.
7     Q.    Okay. It was not a secret to
8 you that people were abusing hydrocodone, was
9 it?
10     MS. SWIFT: Object to the form.
11     THE WITNESS: I think it's fair
12 to say that between starting to see
13 articles back then and hearing about
14 the settlement, that regardless of the
15 truth of the settlement or anything
16 around it, that there was -- you were
17 starting to see hints.
18 QUESTIONS BY MR. GADDY:
19     Q.    What is the next comment that
20 you make related to the e-mail that Caroline
21 sent you?
22     A.    Personal medical issues.
23     Q.    Okay.
24     A.    It's related to my co-pay.
25     Q.    Okay. So at the time that you

Page 256

1 sent this e-mail, you were filling, regularly
2 filling, 90-day supplies for the medication?
3     MS. SWIFT: Object to the form
4 of the question.
5     THE WITNESS: I don't remember
6 if they were 90-day supplies. In
7 fact, now I don't even know that you
8 can get them, but I don't remember. I
9 just know that I've had -- I had need
10 of pain medications due to a personal
11 illness that's ongoing.
12     MS. SWIFT: We've been going
13 for a more than an hour. Can we --
14 you want to take a break?
15     MR. GADDY: Yeah, now is a good
16 time.
17     VIDEOGRAPHER: We're going off
18 the record at 2:17.
19   (Off the record at 2:17 p.m.)
20     VIDEOGRAPHER: We're back on
21 the record at 2:38.
22 QUESTIONS BY MR. GADDY:
23     Q.    Mr. Barnes, the last document
24 we were looking at was the -- we'd marked as
25 Barnes number 21.

Page 257

1     Do you have that in front of
2 you?
3     A.    I do.
4     Q.    Okay. Prior to just before the
5 break, when was the last time you'd seen that
6 document?
7     A.    Prior to the break, just before
8 the break, you had given it to us.
9     Q.    Sure.
10     Prior to that, when was the
11 last time you'd seen it?
12     A.    It was reviewed in some of
13 my -- some documents that were shown to me
14 preparing for this.
15     Q.    Okay. You reviewed it in
16 preparation for the deposition?
17     MS. SWIFT: You can answer that
18 yes or no.
19     THE WITNESS: Yes.
20 QUESTIONS BY MR. GADDY:
21     Q.    Okay. How much time did you
22 spend preparing for the deposition today?
23     A.    For both parts of my deposition
24 or just the personal or --
25     Q.    Just the personal right now.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    A.    I'd say maybe just a few hours
2 in preparation for that.  More was spent on
3 the -- on 30(b)(6), I think it's called.
4    Q.    Okay.  When did you have the
5 opportunity to prepare for your individual
6 deposition?
7    A.    Last week on a couple of days,
8 a couple hours on those days, and then
9 previously.
10    Q.    Okay.  How many separate
11 meetings did you have?
12    A.    Three.
13    Q.    I wouldn't normally have asked
14 this question, but I'm going to based on the
15 e-mail and based on the response that you
16 gave, but are you still currently taking
17 opioid medication?
18        MS. SWIFT:  And I'll let him
19    answer that question, Jeff, but I'm
20    not going to let him go to -- in too
21    much detail here.  Your co-counsel had
22    repeatedly instructed witnesses not to
23    answer those exact same questions.
24        THE WITNESS:  I still have a
25    prescription, and I take it as needed.

Page 259

1 QUESTIONS BY MR. GADDY:
2    Q.    Okay.  Did you take a dose
3 today?
4    A.    No, I did not.
5    Q.    Have you felt at any time today
6 that you were under the influence of any
7 opioid medication that you're prescribed?
8        MS. SWIFT:  I'm going to object
9    to the form of the question.
10        THE WITNESS:  No, I have not.
11 QUESTIONS BY MR. GADDY:
12    Q.    Have you felt during the course
13 of the deposition that you needed to take a
14 dose of your prescribed medication?
15        MS. SWIFT:  Object to the form
16    of the question.
17        THE WITNESS:  You know, I've
18    had some pain and I've -- just because
19    of the serious nature of this, I want
20    to make sure I give the best answer.
21    Not that I even normally have any
22    impact.  But, no.  I felt pain, but
23    not of any -- like needing or anything
24    like that.
25

Page 260

1 QUESTIONS BY MR. GADDY:
2    Q.    Okay.  It hasn't impacted any
3 answers that you've given today?
4    A.    No, absolutely not.
5        MR. GADDY:  Mr. Barnes, at this
6    time I'm going to suspend the taking
7    of your individual deposition and
8    transition into your deposition in
9    your 30(b)(6) capacity.
10        Understand?
11        THE WITNESS:  Okay.
12    Understood.
13        MS. SWIFT:  How much time do we
14    have on the record?
15        VIDEOGRAPHER:  4 hours,
16    4 minutes.
17 QUESTIONS BY MR. GADDY:
18    Q.    Mr. Barnes, do you understand
19 that when you're giving testimony here in the
20 30(b)(6) capacity, that you will be
21 testifying on behalf of Walgreens?
22    A.    I do.
23    Q.    And that's been explained to
24 you?
25    A.    It has been.

Page 261

1        (Walgreens-Barnes Exhibit 22
2    marked for identification.)
3 QUESTIONS BY MR. GADDY:
4    Q.    I want to show you what I will
5 mark as Barnes Exhibit Number 22 and ask if
6 you'd turn to page 5 of that document.
7        This is plaintiff's second
8 notice of 30(b)(6) deposition, and on page 5
9 we see topics 1 A through G.
10        Do you see that?
11    A.    I do.
12    Q.    Okay.
13    A.    Section 3?
14    Q.    Correct.
15        Have you had the opportunity to
16 review this before, or have you seen this
17 before?
18    A.    I believe it was presented at a
19 high level to me, but not in the detail.
20    Q.    Okay.  Reading number 1, it
21 says that you're going to provide testimony
22 on defendant's document retention policy for
23 hard copy and electronic documents, and then
24 it includes a list of what followed under
25 that.

Page 262

1    Do you see that?
2    A.    I do.
3    Q.    Okay.  Is that your
4 understanding of what you're going to provide
5 testimony on?
6        MS. SWIFT:  And I'll just lodge
7    an objection to the extent that your
8    questioning goes beyond the objections
9    that we served on you guys on August
10   31st, and Special Master Cohen's
11   ruling as well.
12       THE WITNESS:  Could you repeat
13   your question?  I'm sorry.
14 QUESTIONS BY MR. GADDY:
15   Q.    Sure.
16       Is that your understanding of
17 what you're going to provide 30(b)(6) testimony on
18 here today?
19       MS. SWIFT:  Same objection.
20       THE WITNESS:  It is.  However,
21   she did explain that there were some
22   that were -- objections to?  Okay.
23 QUESTIONS BY MR. GADDY:
24   Q.    Okay.  Are you the person at
25 Walgreens most knowledgeable on the topic of

Page 263

1 document retention policies?
2    A.    I am not.
3    Q.    Who would be?
4        MS. SWIFT:  Object to the form.
5        THE WITNESS:  I believe that
6    would have -- I'm trying to remember
7    who gave me the retention policy.
8        I was presented with three
9    different people who had different
10   specialties, and I believe it was -- I
11   think it was Caitlin that was -- no...
12       MS. SWIFT:  If you don't
13   remember, you don't remember.
14       THE WITNESS:  I just don't
15   remember.  I know I was given -- I
16   believe you have the same cheat sheet
17   list of document -- relevant document
18   retention policies.
19       MR. GADDY:  Kate, do you have a
20   copy of this to mark for the record?
21       MS. SWIFT:  Yeah.  You can mark
22   that one if you want.  You can mark
23   the one he's got in front of you.
24   It's up to you.  They're all the same.
25       MR. GADDY:  Okay.

Page 264

1        (Walgreens-Barnes Exhibit 23
2    marked for identification.)
3        MR. GADDY:  Mr. Barnes, do you
4    mind slapping a sticker on that one
5    you've got in front of you?
6        THE WITNESS:  Sure.
7        MR. GADDY:  I'm going to mark
8    that as Barnes 23.
9 QUESTIONS BY MR. GADDY:
10   Q.    And is this -- this binder with
11 a couple of documents and some loose leaf
12 handouts in it, is that what you were
13 referring to when you were talking about
14 material that's been provided?
15   A.    Yes.
16   Q.    Okay.  Does this have within it
17 the names of the individuals who you met with
18 regarding document retention?
19   A.    I don't believe it has their
20 names on it.  I wrote the three -- well, I
21 wrote down the three people for my own
22 information --
23   Q.    Okay.
24   A.    -- because names have always
25 been something for decades that I've

Page 265

1 struggled with.  So I just wanted to make
2 sure I was able to provide the right info.
3    Q.    Their names are?
4    A.    Chris Kopeck, Caitlin and Adam
5 Rouse.  I'm trying to remember Caitlin's last
6 name.
7        MS. SWIFT:  Layton.
8        THE WITNESS:  Lay -- Lay -- I
9    thought, yeah.
10       MR. GADDY:  Layton?
11       MS. SWIFT:  Layton.
12       THE WITNESS:  Layton.
13 QUESTIONS BY MR. GADDY:
14   Q.    And what was Adam's last name?
15   A.    Rouse, R-o-u-s-e.
16   Q.    You said you spent a couple
17 hours preparing for your individual
18 testimony.
19       How long did you spend
20 preparing for your 30(b)(6) testimony on the
21 topic of document retention?
22   A.    I don't think we timed it
23 exactly, but I'll say maybe eight to ten.
24 Total I think we spent was about 14 hours
25 between the two topics, so...

Page 266

1    Q.    Okay.  First thing I want to
2  ask you about as it relates to document
3  retention is the topic of litigation holds.
4        Are you familiar with that?
5    A.    Yes.
6    Q.    Okay.  And what is the first
7  litigation hold that Walgreens was subject to
8  related to opioids, opioid products or
9  controlled substance distribution?
10        MS. SWIFT:  Objection.  Outside
11    the scope.
12        THE WITNESS:  Yeah, I was told
13    that there -- of the legal holds they
14    were able to put on people, that
15    there's two time periods for which
16    we're able to find data and that the
17    first one was another case.  I don't
18    believe I was -- I think it may or may
19    not have been related to an opioid
20    case.  But that's why there are
21    sometimes two time periods listed.
22  QUESTIONS BY MR. GADDY:
23    Q.    What's the earliest time
24  period?
25    A.    What type of data are you

Page 267

1  referring to?
2        Are you talking about --
3    Q.    The litigation hold.
4    A.    Are you talking --
5    Q.    Are you prepared to testify on
6  this today, Mr. Barnes?
7    A.    I am prepared to testify;
8  however, I did say I'm not the expert in all
9  three topics.  I've been prepped, so that's
10  why I have this cheat sheet.
11        We have documentation,
12  depending on if you're talking about
13  transactional data or custodial data,
14  sometimes dating back to 2003.
15        MS. SWIFT:  He's talking about
16    the litigation holds.
17  QUESTIONS BY MR. GADDY:
18    Q.    Mr. Barnes, I asked you
19  about -- do you know what a litigation hold
20  is?
21    A.    Do I know what a litigation
22  hold is?  It's a hold -- it was explained to
23  me.
24    Q.    What is it?
25    A.    The way it was explained to me

Page 268

1  is a notice given to an individual or a
2  company that says any relevant documents, do
3  not destroy, hold them, as they may be needed
4  to be collected.
5    Q.    Okay.  What is the earliest
6  litigation hold that Walgreens has been
7  subject to related to distribution of
8  opioids?
9    A.    And I'm going through all the
10  range of people who refer to legal holds.
11  The earliest I see so far is 2010.
12    Q.    Okay.  What was that for?
13        MS. SWIFT:  Objection.  Outside
14    the scope.
15        THE WITNESS:  That was outside
16    the scope I was given.
17  QUESTIONS BY MR. GADDY:
18    Q.    You don't know what that
19  litigation hold was for?
20    A.    No.
21        MS. SWIFT:  Objection.  Outside
22    the scope.
23  QUESTIONS BY MR. GADDY:
24    Q.    What was the next one after
25  2010?

Page 269

1    A.    The earliest?  Next earliest?
2    Q.    Uh-huh.
3    A.    It looks like 2013.
4    Q.    Okay.  And what was that for?
5    A.    Again, I was -- this -- I was
6  given two time periods for people.  I was
7  told that the earlier time period was for
8  other litigation not directly related to this
9  case.
10    Q.    The -- are you talking about
11  the 2010?
12    A.    I was told when you had two
13  time periods, there might be a gap in the
14  middle.  The reason that they were able to
15  find a hold during that period was -- in data
16  was because there was material dating back to
17  then.
18    Q.    Okay.  Do you know what the
19  2010 litigation hold was for?
20        MS. SWIFT:  Objection.  Outside
21    the scope.
22        Jeff, this goes beyond what
23    Special Master Cohen ordered us to
24    provide a witness on.
25        MR. GADDY:  I'm reading from

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 his order, and it says "a history of
2 litigation holds."
3         MS. SWIFT:  And he specifically
4 excepted the contents of any of those
5 litigation holds.
6         He ordered us to provide
7 information about the names of people
8 who were on hold and the dates they
9 were on hold.
10        (Walgreens-Barnes Exhibit 24
11 marked for identification.)
12 QUESTIONS BY MR. GADDY:
13     Q.    Mr. Barnes, I'm going to show
14 you what's been marked as Exhibit Number 24.
15        Have you ever seen this
16 document before?
17     A.    I don't believe so.
18     Q.    Okay.
19        MS. SWIFT:  Is this his
20 original ruling, or is this after he
21 modified it later?
22        MR. GADDY:  It's the final
23 ruling.
24 QUESTIONS BY MR. GADDY:
25     Q.    You see in the bottom paragraph

Page 271

1 that's highlighting it says, "Questioning may
2 include, A, a history of litigation holds; B,
3 actions of document preservation and discard
4 taken in accord with litigation holds and
5 document retention policies."
6         Do you see that?
7     A.    I do.
8     Q.    Okay.  And then if you go to
9 the very last paragraph on the next page, you
10 see that it indicates in that first sentence,
11 it says, "I clarify the highlighted portion
12 of my ruling as follows:  Walgreens is not
13 required to produce actual litigation hold
14 directives."
15        Do you see that?
16     A.    I do.
17     Q.    "Or other documents that may
18 contain attorney-client privilege."
19        Do you see that?
20     A.    I do.
21     Q.    Okay.  "As required to explain
22 when these holds were initiated and
23 discontinued."
24        Do you see that?
25     A.    I do.

Page 272

1     Q.    Okay.  Can you tell me when --
2 what the 2010 litigation hold pertained to?
3         MS. SWIFT:  Objection.  Beyond
4 the scope of this ruling.
5 QUESTIONS BY MR. GADDY:
6     Q.    Yes or no?
7     A.    No.
8     Q.    Okay.  Can you tell me what the
9 2013 litigation hold pertained to?
10        MS. SWIFT:  Objection.  Beyond
11 the scope of the special master's
12 ruling.
13        THE WITNESS:  No, I was told it
14 was outside the scope.
15 QUESTIONS BY MR. GADDY:
16     Q.    What did the March 2017
17 litigation hold pertain to?
18        MS. SWIFT:  Objection.  Outside
19 the scope of the ruling.
20        The ruling provides that we
21 should give the names of the people
22 and the dates they were on litigation
23 hold.  That is what he is prepared to
24 testify about.
25        THE WITNESS:  I can repeat the

Page 273

1 same thing.  I was told I would only
2 have to present this information, and
3 it was so much information, that's why
4 we were able to give a copy for me and
5 to you as well.
6 QUESTIONS BY MR. GADDY:
7     Q.    Was there a litigation hold
8 implemented in April of 2012 when the DEA,
9 excuse me, served Walgreens with an
10 investigative subpoena and --
11        MS. SWIFT:  Objection.  Outside
12 the scope of the notice.
13        THE WITNESS:  That's outside my
14 knowledge base.  And I was told as far
15 as this 340 B -- or 30(b)(6) that I
16 would only be giving the information
17 that was in scope.
18 QUESTIONS BY MR. GADDY:
19     Q.    Okay.  You don't know whether
20 or not there was a litigation hold issued
21 when the DEA served a subpoena and a
22 warrant --
23     A.    I do not.
24        MS. SWIFT:  Objection.
25 Mischaracterizes his testimony.

Page 274

1 If you want to ask him about
2 the timing of the litigation holds,
3 that is what we designated him to
4 testify on, what Special Master Cohen
5 instructed us to designate him on.
6 QUESTIONS BY MR. GADDY:
7 Q. You don't know whether or not
8 there was a litigation hold implemented then?
9 MS. SWIFT: Objection for the
10 same reasons.
11 THE WITNESS: I do not.
12 QUESTIONS BY MR. GADDY:
13 Q. Who makes the decision to
14 implement a hold, a litigation hold?
15 MS. SWIFT: Objection. Outside
16 the scope.
17 MR. GADDY: Kate, are you
18 taking the position that what is in
19 this order is the only topics on which
20 he can provide testimony on on the
21 30(b)(6)?
22 MS. SWIFT: You've had our
23 objections on your 30(b)(6) topics for
24 months, Jeff.
25 MR. GADDY: Sure, and we

Page 275

1 responded them to.
2 MS. SWIFT: We agreed -- you
3 didn't respond on this one. We told
4 you what we were going to prepare him
5 on. That was litigated with Special
6 Master Cohen. We prepared him on what
7 we were instructed to prepare him on.
8 MR. GADDY: Okay. Is he not
9 going to respond to any of the other
10 topics?
11 MS. SWIFT: No, he's going
12 to -- we're going to -- he's prepared
13 to testify on everything we said he
14 was prepared to testify on in our
15 objections.
16 QUESTIONS BY MR. GADDY:
17 Q. Mr. Barnes, who decides to
18 implement the litigation hold?
19 A. I am not aware of who decides
20 to implement it. I'm only aware of who
21 begins informing people they're under hold.
22 Q. Okay. Who does that?
23 A. Caitlin Layton.
24 Q. Okay. And what's her position?
25 A. She's a paralegal, I believe,

Page 276

1 at Walgreens.
2 Q. Okay. She works with the
3 in-house counsel?
4 A. That wasn't directly said, yes,
5 but I just know that that's her position.
6 Q. Okay. The litigation hold that
7 was issued in 2010, what was the scope of
8 that hold?
9 MS. SWIFT: Objection. Beyond
10 the scope of the notice.
11 THE WITNESS: Again, I was told
12 very specifically that there was two
13 time periods. It related to other
14 legal matters for which people were
15 put on hold, but I was not provided
16 details of what that matter was.
17 QUESTIONS BY MR. GADDY:
18 Q. Okay. But are you referring to
19 the 2010 issue then?
20 A. I was not specifically told
21 what the legal matter was and that I didn't
22 need to have that information, again, because
23 I was told it was objected to.
24 Q. Okay. And what is your
25 understanding of the scope of material that

Page 277

1 was retained or put on hold by the 2010
2 litigation hold?
3 MS. SWIFT: Objection. Outside
4 the scope of the notice.
5 THE WITNESS: I wasn't given
6 specific information on -- can you
7 rephrase the question? I want to make
8 sure I understood it.
9 QUESTIONS BY MR. GADDY:
10 Q. Sure.
11 What was the scope of material
12 that was placed on hold by way of the 2010
13 litigation hold?
14 MS. SWIFT: Objection. Beyond
15 the scope of the notice.
16 THE WITNESS: For the original
17 2010 is your question?
18 It doesn't tell me what type of
19 information except for it mentions
20 individuals, which I believe I was
21 told that they were custodial files
22 found in some cases via e-mail, in
23 some cases in different methods like
24 CDs, discs, printed out, et cetera.
25 MS. SWIFT: You're talking past

Page 278

1   each other.
2        If you want to ask him about
3   what documents were retained or
4   searched for, where we found things,
5   that's fine.
6        To the extent you're asking him
7   about the contents of litigation hold
8   notices, that's privileged.  Special
9   Master Cohen clearly ruled we don't
10  have to provide privileged
11  information, nor would we in any
12  event.
13       THE WITNESS:  Yeah, if you're
14  asking content, no.  I know general
15  classifications.
16       MS. SWIFT:  Wait till he asks
17  you another question.
18       THE WITNESS:  Okay.
19  QUESTIONS BY MR. GADDY:
20       Q.    Mr. Barnes, I thought that's
21  what I was asking, and maybe we just weren't
22  understanding each other.
23       But what types of information
24  were covered by the 2010 litigation hold?
25       MS. SWIFT:  Same instruction,

Page 279

1   and I'm going to instruct the witness
2   not to provide privileged information.
3        You're going beyond the scope
4   of the notice and beyond the special
5   master's ruling.
6   QUESTIONS BY MR. GADDY:
7        Q.    Mr. Barnes, what type of
8   documents were searched and maintained
9   pursuant to that 2010 litigation hold?
10       MS. SWIFT:  Same objection.
11  That calls for privileged information
12  subject to a litigation hold notice
13  that we -- we were specifically
14  instructed we did not have to divulge,
15  nor would we in any event.
16       Why don't you ask him what
17  information we retained in the course
18  of -- why don't you get beyond the
19  litigation hold piece of this.
20  QUESTIONS BY MR. GADDY:
21       Q.    Mr. Barnes, let me ask you this
22  way.  There's a list on this information that
23  you provided --
24       A.    Uh-huh.
25       Q.    -- a list of individuals for

Page 280

1   which it details litigation holds.
2        Do you see where I'm talking
3   about?
4        A.    Section E?
5        Q.    Correct.
6        A.    Yes.
7        Q.    Who -- is this a list that
8   was -- that was provided to you of these
9   individuals?
10       A.    It was.
11       Q.    Okay.  Do you know whether or
12  not the litigation holds are -- exclusively
13  apply to these other people or if there's
14  other people that are encompassed by them, or
15  do you not know?
16       MS. SWIFT:  Beyond the scope.
17       If you know the answer, you can
18  answer it in your personal capacity.
19       THE WITNESS:  I believe I was
20  told this is all that there was, but
21  honestly, I don't remember the details
22  of that piece.
23  QUESTIONS BY MR. GADDY:
24       Q.    Okay.  From the litigation
25  holds that were issued, what documents were

Page 281

1   maintained by Walgreens?
2        MS. SWIFT:  Objection.  Beyond
3   the scope of the notice and calls for
4   privileged information.
5   QUESTIONS BY MR. GADDY:
6        Q.    Mr. Barnes, can you tell me
7   what areas and what types of documents were
8   searched within Walgreens?
9        A.    For the specific section E
10  legal holds against individuals --
11       Q.    Correct.
12       A.    -- I was told that --
13       MS. SWIFT:  Same objection.
14       It's beyond the scope.
15  QUESTIONS BY MR. GADDY:
16       Q.    Mr. Barnes, what's the process
17  that Walgreens puts in place after a
18  litigation hold is initiated?
19       A.    As described to me by the
20  experts in these fields, the people who are
21  subject to the hold are informed of that,
22  told not to delete anything, whether it's
23  e-mail or any type of document.
24       On the e-mail side, a hold is
25  somehow put in the system so that no

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 deletions can occur, and this data is put
2 on -- they also search hard drives, network
3 drives, wherever their investigation takes
4 them.
5        Eventually this is sent to a
6 third-party company, and metadata is
7 collected from that after a while that
8 categorizes it, such as these date range that
9 you can see for data retention, et cetera.
10       And eventually that is provided
11 to, I believe, in-house and whatever counsel
12 is present, is the understanding I was given.
13    Q.   Okay.  Who is the third-party
14 company?
15    A.   I was actually not provided
16 that data.
17    Q.   So based on the process that
18 Walgreens puts in place, the individual
19 subject to the hold does not have the ability
20 to destroy or get rid of any of their
21 documents?
22    A.   That was my understanding.
23    Q.   Are backup documents created?
24       MS. SWIFT:  Object to the form.
25       THE WITNESS:  I did ask

Page 283

1 specifically and was told that there
2 are.
3 QUESTIONS BY MR. GADDY:
4    Q.   Okay.  Where are they housed?
5       MS. SWIFT:  Object to the form.
6       THE WITNESS:  We didn't get to
7    that level of detail, but as I stated
8    before, at least some of it is
9    extracted and looked through by the
10   third party, but housing permanently,
11   outside my knowledge.
12 QUESTIONS BY MR. GADDY:
13    Q.   What happens after a litigation
14 hold is lifted?
15    A.   Actually, that was not covered
16 either.  Yeah, I don't believe that was
17 covered either.
18    Q.   You don't know what happens
19 after a litigation hold is lifted?
20    A.   The only -- I'm trying to think
21 of all the types of records.  The -- Chris
22 Kopeck, which they brought in for --
23 specifically as a subject matter expert on
24 Outlook, did say that they -- it's like a
25 flag that they turn off, basically.  And once

Page 284

1 that's done, then, you know, it that's -- it
2 he said.  I could draw assumptions from that,
3 but it would not be really relevant because
4 I'm not an expert in Outlook.
5       But if you --
6    Q.   Well, why don't you just
7 explain to me what Chris told you as it
8 related to the Outlook system.
9    A.   Chris says after Caitlin lets
10 someone know is on hold, they put this hold
11 notice or block in the Outlook e-mail system.
12 And we learned later after talking to Adam
13 Rouse, who provided additional layer of
14 information, that Outlook actually does this
15 backup that -- hard backup that even if the
16 users thought they could delete something, it
17 would not be deleted.  We have a permanent
18 record of it at Walgreens.
19       Then once they've collected,
20 the legal hold's done, this flag is switched
21 back, which it was not told to me what
22 happens with this backup data, but they could
23 use their e-mail mailbox as normal.
24    Q.   Is it Walgreens that keeps the
25 backup data or this third-party company?

Page 285

1       MS. SWIFT:  Object to the form.
2       THE WITNESS:  That was not
3    provided.
4       MS. SWIFT:  Outside the scope.
5 QUESTIONS BY MR. GADDY:
6    Q.   Who makes the determination
7 about who would be -- who will be subject
8 within Walgreens to a litigation hold?
9       MS. SWIFT:  Object to the form.
10   Outside the scope and calls for
11   privileged information.
12      I'll instruct the witness not
13   to answer the question.
14 QUESTIONS BY MR. GADDY:
15    Q.   Do you still have that
16 deposition notice in front of you?
17    A.   Is that Exhibit 22?
18       MS. SWIFT:  It's this one.
19   Yeah.
20 QUESTIONS BY MR. GADDY:
21    Q.   You see bullet -- do you see
22 bullet point C where it says, "The
23 identification and description of all files
24 identified and/or searched for purposes of
25 responding to plaintiff's request for

Page 286

1  production"?
2      A.   I do.
3      Q.   Okay.  Are you able to tell me
4  what -- what locations were searched?
5      A.   I'm reading this.  It doesn't
6  say locations.
7           I was more generally given
8  categories of data, where that -- categories
9  were found and that high-level type of
10 information.
11     Q.   Okay.  Can you tell me that?
12     A.   Which part?
13     Q.   Can you identify the files
14 identified and searched for responding to
15 plaintiff's discovery requests?
16          MS. SWIFT:  Object to the form.
17          THE WITNESS:  Are you talking
18     about -- well, can you give me an
19     example of what you're looking for?
20 QUESTIONS BY MR. GADDY:
21     Q.   Mr. Barnes, I'm wanting to know
22 anywhere that Walgreens looked or searched to
23 respond to plaintiff's document requests.
24          MS. SWIFT:  Object to the form.
25          THE WITNESS:  I don't know what

Page 287

1      your document requests were, honestly.
2  QUESTIONS BY MR. GADDY:
3      Q.   Okay.  Nobody showed you the
4  request for production?
5          MS. SWIFT:  Object to the form.
6  QUESTIONS BY MR. GADDY:
7      Q.   That were made by plaintiffs in
8  this case?
9      A.   This was reviewed, like I said,
10 briefly, and then three people were brought
11 in to provide me a general sense of where
12 various types of information was found.
13     Q.   And that's what I'm asking you.
14 Where did you look to find that information?
15     A.   Okay.  Transactional data, for
16 instance?  Is that --
17     Q.   That'd be one, sure.
18     A.   Okay.  Transactional data was
19 obtained by submitting requests to actually
20 my support team offshore and -- by Caitlin.
21 I didn't want to be in the middle of it
22 because I just wanted to make sure she was
23 getting exactly what she wanted.
24          And they provided whatever data
25 that fell within the criteria that she'd

Page 288

1  asked for on -- for the specific states
2  involved and the specific NDCs.
3      Q.   Okay.  What about suspicious
4  order reports?
5      A.   Suspicious order reports, I was
6  informed, was a mixture of different fines.
7  So there apparently used to be a central
8  repository that exists that could not be
9  identified called Mobius; however, talking to
10 two of the DCs, Perrysburg and Woodland, they
11 were able to locate some paper, some CD-ROMs,
12 other ad hoc types of data to be able to
13 produce for this purpose.
14     Q.   What about anything from
15 Jupiter?
16     A.   Oh, for Jupiter.  They said
17 they weren't able to find anything from
18 Jupiter as they were with the other two DCs.
19     Q.   Okay.  What about custodial
20 files?  How were those searched and
21 identified?
22     A.   Custodial files, similar.
23 E-mails, especially, is the process we just
24 went through.  But again, they put the lock
25 on it.  That creates a backup copy.  That's

Page 289

1  for e-mails.
2          Sometimes they found things on
3  shared drives, network drives, identified by
4  the custodians, as well as some papers and
5  apparently even CD-ROMs.
6          Again, that was all provided to
7  the third party to do meta-analysis on, which
8  was provided back to Walgreens and, I
9  believe, reviewed by counsel after that.
10     Q.   Okay.  What was the third party
11 that did that analysis?
12     A.   As I stated in the previous
13 question, I'm not aware of the third party's
14 name.
15     Q.   Okay.  So the third party
16 that's doing the analysis for the litigation
17 is the same third party that backs up the
18 e-mails for litigation holds?
19          MS. SWIFT:  Object to the form
20     and to the extent it mischaracterizes
21     the testimony.
22          THE WITNESS:  I don't believe I
23     characterized there being a third
24     party that made the extract for
25     custodial e-mails, so that was not --

Page 290

1  the impression I was given, it was two
2  different companies.
3         Walgreens itself takes the
4  backup of the e-mails, provides it to
5  the third party, if I've understand
6  your question of being who does the
7  backup of those e-mails.
8  QUESTIONS BY MR. GADDY:
9      Q.    What were some of the shared or
10 network drives that were searched for
11 custodial files?
12     A.    What do you mean --
13         MS. SWIFT: Object to the form.
14         THE WITNESS:  -- "some of"
15 them?  Like what type of information
16 did they have on them or --
17 QUESTIONS BY MR. GADDY:
18     Q.    Well, a minute ago I asked you
19 what was done to collect custodial files, and
20 you referenced the e-mail boxes and then you
21 also said that there were shared and network
22 drives that were searched that would have
23 been -- Walgreens would have been informed
24 by -- about by the custodian.
25     A.    Uh-huh.

Page 291

1      Q.    And I'm asking you for some
2  examples of those shared or network drives.
3      A.    I was given very high-level
4  information, more that "here's a variety of
5  places where data was found."  I was told
6  some of it was found on CDs, some was found
7  on -- we're talking custodial files.  Some
8  was found in rare paper formats.
9         It was not -- examples weren't
10 given on specifically this was found here and
11 this was found there.
12     Q.    Is there a shared or network
13 drive as it relates to RX integrity?
14     A.    I have no specific knowledge
15 about what they do -- what they would have.
16 I have more general knowledge of what I've
17 seen at the company.
18     Q.    Okay.  Any shared or network
19 drives for RX integrity that you're aware of
20 through your time at the company?
21     A.    Not directly aware of, no.
22     Q.    Indirectly aware of?
23     A.    We generally have, like most
24 departments, usually have a subsection on
25 what we call the I drive.  It's more of a

Page 292

1  department -- companywide preference road
2  than any specific knowledge, though, of what
3  that group may have.
4      Q.    Okay.  What types of data or
5  documents are stored on the I drive?
6      A.    I can only answer as a general
7  in my experience.  I can't answer for a
8  specific team.
9      Q.    Sure.
10     A.    It's almost like your personal
11 drive on your computer.  People -- different
12 departments, is my experience, use them for
13 different things.  Anything you can pretty
14 much share -- save on your desktop you can
15 share -- you can save on the I drive.  It's
16 simply a LAN network drive.
17     Q.    Are there any other -- any
18 other drives such as that that were -- would
19 have been searched for relevant custodial
20 documents?
21         MS. SWIFT: Object to the form.
22         THE WITNESS:  No other specific
23 drives, as I mentioned in a previous
24 question.  I was told that some
25 CD-ROMs were found at the DCs.

Page 293

1  QUESTIONS BY MR. GADDY:
2      Q.    Okay.  What about policy and
3  procedure-type documents, where would those
4  have been located?
5      A.    Specifically I was given the
6  location of the retention policies and
7  procedures.  Those -- the current ones are on
8  our logistic -- or sorry, I'm thinking my
9  department.  They were on WalNet, which is
10 our corporate intranet site.  Or you may
11 sometimes hear StoreNet, which is the store
12 intranet site.  And that's the current
13 procedures.
14     Q.    Are there any other drives or
15 networks that you're aware of within
16 Walgreens that may have contained documents
17 that should have been -- become a part of
18 custodial files, other than the I drive?
19         MS. SWIFT: Object to the form.
20         THE WITNESS:  The only other
21 place where people -- again, being
22 very general, not specific to any
23 department, SharePoint has become a
24 fairly common place.  Many companies,
25 including Walgreens, I did ask -- I

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1　did ask Caitlin if that was searched,
2　and she -- it sounded like it was
3　searched but nothing was found.
4　QUESTIONS BY MR. GADDY:
5　　Q.　You're talking about
6　SharePoint?
7　　A.　Yes.
8　　Q.　You mentioned Mobius earlier.
9　Was that searched?
10　　A.　It was searched for their
11　report, and they could not find it.
12　　Q.　Okay.
13　　A.　Any history in there.
14　　Q.　Does Walgreens still utilize
15　Mobius?
16　　A.　I do not know for certain.　It
17　sounds like it's still used for some
18　purposes, but it sounds like it's being
19　retired.
20　　　Again, it's not my personal --
21　or was not part of my Walgreens testimony
22　data provided to me.
23　　Q.　Is the data from Mobius backed
24　up anywhere?
25　　　MS. SWIFT:　Objection.　Outside

Page 295

1　the scope.
2　　　THE WITNESS:　I have no
3　knowledge.
4　QUESTIONS BY MR. GADDY:
5　　Q.　Is there any loss prevention
6　shared site?
7　　　MS. SWIFT:　Objection.　Outside
8　the scope.
9　　　THE WITNESS:　Define -- I'm not
10　aware of any.
11　QUESTIONS BY MR. GADDY:
12　　Q.　Is there any RX integrity
13　shared site that was searched for documents?
14　　A.　I'm not aware of any, and I
15　would have defined that more along the lines
16　of a SharePoint on both these questions.
17　　Q.　As far as the suspicious order
18　reports, you indicated that you found some
19　paper and CD-ROMs from, I think you said,
20　Woodland and Perrysburg, correct?
21　　A.　Correct.
22　　Q.　Okay.　Do you have an
23　understanding as to how complete those
24　records are?
25　　A.　I have -- not for each DC at

Page 296

1　the detail level, but I show here the
2　information you have as well, they found
3　records from 2007 to 2012.
4　　Q.　Okay.　Do you know if all the
5　records within that date range have been
6　located?
7　　　MS. SWIFT:　Object to the form.
8　　　THE WITNESS:　I do not.
9　QUESTIONS BY MR. GADDY:
10　　Q.　Was it's APIS, A-P-I-S, drive
11　searched?
12　　　MS. SWIFT:　Object to the form.
13　　　THE WITNESS:　I have never
14　heard of such a drive.
15　QUESTIONS BY MR. GADDY:
16　　Q.　Are you familiar with the CMAT
17　tool, C-M-A-T?
18　　A.　I am, though it was not --
19　that's through my personal knowledge, not
20　through my Walgreens knowledge.
21　　Q.　Okay.　What is the CMAT?
22　　A.　It was Walgreens -- acting on
23　my personal -- okay.　It was when SOX first
24　came out, it was a legacy or a home-built
25　tool by Walgreens IT that was a workflow

Page 297

1　tool.　And what I mean by workflow is it
2　takes you from step to step required to
3　fulfill a function, in this case SOX
4　compliance, and lets you upload docs for
5　approvals by -- like your business because,
6　again, IT has to make sure the business is
7　signed off and that we understood the
8　requirements.
9　　　So it takes you through all the
10　steps of this STLC, which stands for software
11　development lifecycle, and ensures that you
12　fill in the correct people to be signing off
13　for each phase that you're in with the net
14　lifecycle.
15　　Q.　As it relates to custodial
16　files, were any hardcopy documents searched
17　or produced?
18　　A.　Just -- we're not going back to
19　the previous question specifically back to
20　custodial?
21　　　I was told some paper was
22　found, not the specific nature of any of the
23　paper or what it contained.
24　　Q.　Okay.　Where would the paper
25　files have been found?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    A.    I was not provided that
2 information.
3    Q.    Does Walgreens maintain its own
4 document retention system or does it utilize
5 a third party?
6    A.    Document retention system or
7 policy? I'm not aware of any actual system.
8    Q.    Okay.  As far as a filing or
9 storage system, does Walgreens maintain its
10 documents in-house or does it utilize a third
11 party?
12    A.    Again, I was not educated as to
13 that as part of the -- I keep forgetting the
14 name -- the Walgreens portion of this;
15 however, I do have personal information, very
16 high level.
17    It really had -- it -- well,
18 please repeat your question before I go to
19 the wrong direction.
20    Q.    As far as filing or storing
21 documents, does Walgreens maintain those
22 documents in-house or utilize a third party?
23    A.    Storing, maintaining, I can't
24 speak for the whole company; I can only speak
25 for my department, IT.  And within that, we

Page 299

1 have utilized -- it's actually required now
2 that we use SharePoint now.
3    Q.    How long has that been the
4 case?
5    A.    About three years.
6    Q.    Okay.  Who at Walgreens is
7 responsible for administering Walgreens'
8 electronic mail system?
9    MS. SWIFT:  Objection.  Outside
10    the scope.
11    THE WITNESS:  That was outside
12    the information I was given.  I
13    mean...
14 QUESTIONS BY MR. GADDY:
15    Q.    What electronic mail server
16 does Walgreens currently use?
17    A.    This wasn't part of my
18 education, but we use Outlook in the cloud.
19 So Microsoft would be maintaining that.
20    Q.    How long have you used Outlook?
21    A.    I believe it's roughly 2011 and
22 '12.  It was phased in over a number of
23 months to a year as people migrated away from
24 the previous system.
25    Q.    Okay.  And the previous system

Page 300

1 was what?
2    A.    Lotus Notes.
3    Q.    What is the document retention
4 schedule for e-mail files?
5    A.    Let me refer to the schedule.
6    Which time period are you
7 referring to, please?
8    Q.    Currently.
9    A.    There would be really multiple
10 potential retention schedules depending on
11 what the e-mail was regarding, so I can give
12 you the default.
13    Q.    Sure.
14    A.    So -- so the default is covered
15 under one of our retention schedules.  It
16 says, for records documented, department
17 administration planning, management as well
18 as general correspondence, just so you get
19 the flavor, and the retention is a max of
20 three years.
21    Q.    Do you agree that if a document
22 could fall under multiple retention
23 schedules, that defaults to the longer
24 period?
25    A.    You're asking me for an opinion

Page 301

1 that I don't feel like I'm an expert to
2 provide officially, personally.
3    Q.    No, I'm asking for your
4 testimony on behalf of Walgreens as the
5 person designated to testify on document
6 retention, that if a document falls under two
7 separate retention schedules, does it default
8 to the longer schedule?
9    A.    I was not specifically trained
10 to act -- to speak on behalf of Walgreens to
11 that specific question.
12    Q.    Okay.
13    A.    It's my personal experience
14 that we're told to follow that, the longer --
15 the longer schedule.
16    Q.    Does Walgreens utilize a backup
17 software for its e-mail?
18    A.    I was not trained in that, and
19 since it's in the cloud and it's not my
20 specialty area, I'm not aware.
21    Q.    Okay.  Do you know how
22 frequently e-mail backups are performed?
23    A.    That would be the same answer:
24 Since it's not my specialty, since I wasn't
25 trained, I'm not aware.

Page 302

1  Q.   In the 2011, 2012 time period
2 when Walgreens transitioned from Lotus to
3 Outlook, was that transition handled in-house
4 by Walgreens or did a third party do that?
5       MS. SWIFT:  Object to the form.
6   Outside the scope.
7       If you know.
8       THE WITNESS:  Yeah, I was not
9   provided that detail as part of the
10   30(b)(6) -- one of these days -- but
11   the people that we worked with as
12   employees were employees.  But I also
13   got the impression Microsoft was
14   helping as well, as a personal
15   observation.
16 QUESTIONS BY MR. GADDY:
17   Q.   Okay.  Prior to the transition,
18 were backups created of the Lotus e-mail
19 files?
20   A.   That was an individual basis.
21 I don't know how corporate IT, if they backed
22 up anything.  The way it was described to us
23 on the personal level was you should maintain
24 any files that you need to according to
25 retention or your business needs.

Page 303

1   Q.   Did Walgreens utilize any third
2 party to retain any backup files from Lotus
3 e-mails?
4   A.   Not to my knowledge.
5   Q.   Was it an employee-by-employee
6 decision to determine whether or not to save
7 any e-mail files when the transition was made
8 from Lotus to Outlook?
9   A.   As personally speaking, that
10 was my experience.
11   Q.   Okay.  Were those e-mails --
12 were those e-mails a -- subject to a document
13 retention policy at the time?
14   A.   There was a document retention
15 policy at the time, so it was up to users to
16 make sure that happened.
17   Q.   Okay.  Do you have this
18 document here that I gave you a few minutes
19 ago with the highlighting on it?
20       Sorry, I didn't write the
21 number on it.  I'm sorry.
22   A.   This one?
23   Q.   Yes.  Number 24.
24   A.   Yes.
25   Q.   Do you see the -- the last line

Page 304

1 of the highlighted section where it starts,
2 "But Ps are entitled"?
3       Do you see that?
4   A.   I do.
5   Q.   It says, "Where Ps are entitled
6 to what happened to documents and whether at
7 any -- whether any that were discarded are
8 still available somehow."
9       Do you see that?
10   A.   I do.  Ps being plaintiffs?
11   Q.   Correct.
12   A.   Okay.
13   Q.   Were -- did you speak with
14 somebody and get prepared to testify about
15 that issue?
16   A.   When we discussed the --
17 because I was able to ask questions that
18 occurred to me, and I was told that they
19 weren't able to find any documents that were
20 covered by the scope of the search in
21 anyone's notes.
22   Q.   There was no third party that
23 had any backup documents or backup data or
24 anything of that nature?
25   A.   That subject was not covered in

Page 305

1 the information given to me.
2   Q.   Okay.  Did you ask about that?
3   A.   No.
4   Q.   Did you ask about whether or
5 not any of those documents that would have
6 been discarded are still available now?
7   A.   I didn't feel the need to ask
8 that, given that I was told that what
9 searches were done, they could not locate any
10 data in Notes that was within the scope.
11   Q.   Okay.  Let me ask you this:
12 What happened to those documents?
13       MS. SWIFT:  Object to the form.
14       THE WITNESS:  I -- I do not
15   know.  Again, I gave my personal
16   experience, but I was not provided an
17   official Walgreens, you know, "this is
18   what happened" explanation or
19   background there.
20 QUESTIONS BY MR. GADDY:
21   Q.   Okay.  Specifically I'm asking
22 about e-mail documents that would have been
23 on the Lotus system when you transitioned to
24 the Outlook system.
25       You understand what I'm asking

Page 306

1 about?
2     A.    I do.
3     Q.    Okay.  So my question to you
4 is:  What happened to those documents from
5 Lotus?
6     A.    I do not know, as I said the
7 previous question.
8     Q.    Okay.  Did anybody -- any of
9 these subject matter experts that you talked
10 to to help prepare you for today tell you
11 what happened to those documents?
12     A.    No, they did not.
13     Q.    Okay.  Did they tell you
14 that -- whether or not any of those documents
15 that were discarded are still available
16 somehow today?
17     A.    No, they did not, except for
18 they -- they actually did -- we did talk a
19 little bit about the personal ability to
20 decide what you should keep according to
21 retention.  But, no, I did not ask if there's
22 any external copies or anything like that.
23 Just the reassurance from the people training
24 me that what was available was searched for
25 anything that was in scope.

Page 307

1     Q.    Okay.  Did you -- did you ask
2 or were you told whether or not there were
3 any other sources that could be searched for
4 the same information?
5     A.    Again, since I was told that
6 whatever could be searched was searched for
7 what was in scope, I took that as a general
8 "we've done all we can."
9     Q.    Okay.  Did you ask or were you
10 told whether or not there were any third
11 parties, whether it's representatives of the
12 Lotus software, the Outlook software or a
13 separate third party, that would have had
14 access or had possession of any of those
15 materials?
16     A.    I'll fall back again on I was
17 told that all that could be searched was
18 searched, since they were the experts, and
19 what those possibilities are.  I did not ask
20 any additional questions.
21     MR. GADDY:  Can we take a short
22 break and see if we have much more to
23 cover?
24     MS. SWIFT:  Okay.
25     VIDEOGRAPHER:  Going off the

Page 308

1 record at 3:28.
2     (Off the record at 3:28 p.m.)
3     VIDEOGRAPHER:  We're back on
4 the record at 4:01 p.m.
5     (Walgreens-Barnes Exhibit 25
6 marked for identification.)
7 QUESTIONS BY MR. GADDY:
8     Q.    Mr. Barnes, I'm going to show
9 you what I've marked as Barnes 25.
10     Do you see this is an e-mail
11 message from Caroline Rawa and that you are
12 included in the second line of the "to" line
13 there?
14     A.    Okay.
15     Are we still on the 30(b)(6)
16 section or --
17     Q.    Yes.
18     A.    -- is that personal?
19     Okay.
20     VIDEOGRAPHER:  Can you put your
21 microphone on, please, sir?
22     THE WITNESS:  Oh, sorry.
23     Yes, I do have an e-mail.
24 QUESTIONS BY MR. GADDY:
25     Q.    Okay.  And if you flip to the

Page 309

1 very next page, do you see that it's meeting
2 agenda and minutes for quarterly DEA meeting?
3     A.    Correct.
4     Q.    Okay.  And down there in the
5 meeting notes, the one, two, third bullet
6 point down, do you see the notation that
7 states, "Jonathan confirmed that documents
8 listed under multiple retention schedules
9 should follow the longer retention period"?
10     Do you see that?
11     A.    I do.
12     Q.    And is that your understanding?
13     A.    It is my understanding.
14     Q.    And does Walgreens follow that
15 policy?
16     A.    To my knowledge, they do.
17     Q.    The next couple of pages on
18 this document, or should say the next
19 attachment on this document, relate to -- if
20 you see in the columns farther out to the
21 right, it indicates individuals who would be
22 signing letters of destruction.
23     Do you see that?
24     A.    I do.
25     Q.    Okay.  Are you aware of any

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 document destruction certificates that have
2 been issued?
3      A.   I don't -- I don't even know
4 what a document -- letter document
5 destruction is, honestly.
6           Could you repeat your question,
7 please?
8           Am I aware was the question?
9      Q.   Sure.
10          Are you aware of any letters of
11 destruction related to documents that
12 Walgreens attempted to search for in relation
13 to this case?
14     A.   No, I am not.
15     Q.   And as far as -- what number
16 did you slap on your binder?
17          So did --
18     A.   But you're wanting out of the
19 binder, correct?
20     Q.   Correct.  I'm talking about the
21 information that you brought with you
22 today --
23     A.   Okay.
24     Q.   -- that was marked as Barnes
25 23.

Page 311

1      A.   All right.
2           MS. SWIFT:  I think that what
3      Carrie just said is the binder was not
4      marked as Exhibit 23.
5           MR. GADDY:  Yeah, I think we
6      can fix that --
7           THE WITNESS:  Okay.
8           MR. GADDY:  -- when we're done.
9 QUESTIONS BY MR. GADDY:
10     Q.   It has within it two separate
11 document retention policies, correct?
12     A.   Correct.
13     Q.   Okay.  And are there any other
14 document retention policies that would apply
15 to this case?
16     A.   Not to my knowledge.
17     Q.   Okay.  Has all the documents
18 and material been retained in accordance with
19 these document retention policies as it
20 relates to this case?
21     A.   To my knowledge, actually, it's
22 been overretained in relationship to this
23 case.
24     Q.   Are you aware of any documents
25 or materials or data that was not retained as

Page 312

1 it was supposed to have been under these
2 schedules?
3      A.   No.
4           (Walgreens-Barnes Exhibit 26
5      marked for identification.)
6 QUESTIONS BY MR. GADDY:
7      Q.   I'm going to show you what I'll
8 mark as Barnes 26.
9           Do you know if you've ever seen
10 this document before?
11     A.   I have not.
12     Q.   Okay.  You see at the top of
13 the first page it says, "C-II to C-V
14 controlled substance mini-audit for Jupiter
15 distribution center"?
16     A.   I do.
17     Q.   If you could turn to the --
18 it's the third page.  At the bottom it'll say
19 "page 3 of 5," so it might be your second
20 page.
21     A.   All right.  Yes.
22     Q.   Okay.  And if you look all the
23 way down at the bottom of the page under
24 Section H, it's asking the question, it says:
25 "Are the following primary controlled

Page 313

1 substance records kept for at least
2 11 years?"
3           Do you see that?
4      A.   Yes.
5      Q.   And then it lists the SIMS
6 receiving reports.
7           Do you see that?
8      A.   Correct.
9      Q.   And if you go to the next page,
10 it indicates shipments to the stores.
11          Do you see that?
12     A.   I do.
13     Q.   DEA Form 106, DEA Form 41,
14 monthly suspicious controlled drug order
15 reports, and DEA Form 222.
16          Do you see that?
17     A.   I do.
18     Q.   And is it your understanding
19 that the retention period for those documents
20 is 11 years?
21          MS. SWIFT:  Objection to the
22     extent it's outside the scope.
23          THE WITNESS:  You mean
24     according to our -- the document
25     retention that applied at the time?

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    QUESTIONS BY MR. GADDY:
2        Q.    Correct.
3        A.    I'd have to go through each
4    instance and look it up to --
5        Q.    Okay.
6        A.    There were no instances of not
7    being retained that were brought to my
8    attention.
9        Q.    Okay.  But you understand that
10   this document in 2010 indicates that
11   suspicious controlled drug order reports
12   should be retained for 11 years?
13       A.    I understand it says that on
14   this form; however, I'd have to look up to
15   refresh my mind on what the actual official
16   retention policy was.
17       Q.    Okay.  Do you have that handy?
18       A.    It's 2010.
19             And it's the monthly suspicious
20   drug order reports that you're asking about?
21       Q.    Uh-huh.
22       A.    If you look at that -- I forgot
23   what number it was officially, but the binder
24   that we provided to you, there's a -- in the
25   section marked 2008 to 2013, AUD 120, that we

Page 315

1    would retain it for six years, actually, was
2    the official policy.
3        Q.    Okay.  Do you have any
4    understanding for why the audit form
5    indicates a requirement to keep it for at
6    least 11 years?
7        A.    I don't have any direct
8    knowledge.  It would only be speculation.
9        Q.    Okay.  You agree that if there
10   was another retention policy which called for
11   a longer period of time that also applied,
12   that it would default to the longer period of
13   time?
14       A.    It was made clear to me that if
15   there was a longer policy, that it would be
16   retained.
17       Q.    Okay.  Do you have any
18   understanding for why the -- let me strike
19   that.  Let me ask you this.
20             Have all suspicious order
21   reports going back in this period that is
22   indicated on Exhibit 23, 2007 to 2012, have
23   all of those been retained?
24       A.    I was not made aware of any
25   gaps, so this is -- to my knowledge, this

Page 316

1    entire period was present.
2        Q.    Okay.  Did you ask if there
3    were any gaps?
4        A.    No, I did not.
5        Q.    Did anybody specifically tell
6    you the entire period was present?
7        A.    No, they did not.
8        Q.    Okay.  The last litigation hold
9    that I'm looking at on this same document
10   began in March of 2017.  11 years prior would
11   be 2006.
12             Do you have any understanding
13   as to why there are not suspicious order
14   reports from 2006?
15             MS. SWIFT:  Object to the form
16       of the question.
17             THE WITNESS:  I think I got it,
18       but I need you to repeat that one more
19       time, please.
20   QUESTIONS BY MR. GADDY:
21       Q.    Sure.
22             So do you have any
23   understanding as to why there are not
24   suspicious order reports to the DEA dating
25   back to 2006?

Page 317

1        A.    Do I have any understanding why
2    that is?
3        Q.    Uh-huh.
4        A.    No, I do not.
5             (Walgreens-Barnes Exhibit 27
6        marked for identification.)
7    QUESTIONS BY MR. GADDY:
8        Q.    Okay.  I'm going to show you
9    what's been marked as Barnes 27.
10            Do you see again that this is
11   an e-mail, and the top e-mail is actually
12   from you?
13       A.    Correct.
14       Q.    Okay.  And if you go back to
15   the -- I'm gonna go to the second page.
16   Towards the bottom there's an e-mail from, it
17   looks like, Pritpal Kaur.
18            Do you see that?
19       A.    Yes.
20       Q.    Okay.  And you are on this
21   e-mail, correct?
22       A.    Yes.
23       Q.    Okay.  Do you recall this
24   e-mail chain or this issue?
25       A.    I'm going to need to -- it's

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1   not ringing a bell or looking familiar
2   immediately, but I would need a little extra
3   time to look at the whole chain.
4       Q.   Okay. Well, let me just ask
5   you about your specific e-mails. Go to the
6   first page and start at the bottom.
7       A.   Okay.
8           MS. SWIFT: And if you need to
9       read the rest of the document to get
10      the context --
11          THE WITNESS: I would -- yeah,
12      just give me a moment to put this in
13      context at older before newer.
14          Okay. I'm sorry. Can you
15      repeat your question?
16  QUESTIONS BY MR. GADDY:
17      Q.   Sure.
18          So now that you've read the
19  entire e-mail, do you see that there, excuse
20  me, was an issue in which somebody was trying
21  to evaluate some order information from about
22  three months prior and wasn't able to locate
23  the data that he was looking for?
24      A.   That's not how I characterized
25  the e-mail.

Page 319

1           Which specific e-mail, from
2   whom to whom, are you saying that that was
3   the analysis? Because to me, this is a
4   follow up on a project, you know.
5       Q.   Well, if you look at the second
6   e-mail in the chain --
7       A.   Okay.
8       Q.   -- you see that it starts at
9   the bottom of page 2?
10      A.   Uh-huh.
11      Q.   It's Chris Miller sending an
12  e-mail to a group of individuals that
13  includes you.
14          Do you see that?
15      A.   Yeah.
16      Q.   And he says, "FYI, here is an
17  order that has duplicates DNCs from 8/9."
18          Do you see that?
19      A.   Correct, I do.
20      Q.   Okay. And that e-mail was sent
21  in November.
22          8/9 would have been a few
23  months earlier, correct?
24          MS. SWIFT: Object to the form.
25          THE WITNESS: It was sent late

Page 320

1       November, yeah.
2   QUESTIONS BY MR. GADDY:
3       Q.   Okay. And he indicates that he
4   sends information from an order from 8/9.
5           Do you see that?
6       A.   Uh-huh.
7       Q.   So that would have been an
8   order from a few months earlier?
9       A.   Yeah. The key there was the
10  duplicate part.
11      Q.   Sure. Okay.
12          The response to that e-mail is,
13  "Hello, Chris. We are trying to analyze this
14  but do not have all the information as it is
15  an old order. Can you send me something
16  new?"
17          Do you see that?
18      A.   I do.
19      Q.   And the old order that he's
20  referring to is one that was three months
21  old?
22      A.   Yeah.
23      Q.   Okay?
24          In the next e-mail in the
25  chain, Chris then sends him an e-mail from

Page 321

1   the previous day, 11/23, right?
2       A.   He does.
3       Q.   You then take a bunch of people
4   off the e-mail chain and send an e-mail --
5   forward this e-mail string to a Yi Feng.
6           Do you see that?
7       A.   I do.
8       Q.   Who is that?
9       A.   Yi, she's moved around. She's
10  an IT business analyst. She's reported to
11  multiple teams. I'm not extremely familiar
12  with her, but I believe she was probably
13  working with either the EDI and the storage
14  team at this point, but that would be
15  speculation given the -- how long ago it was.
16      Q.   Okay. And you wrote to her.
17  You said, "Sorry, but I have to ask: If this
18  is a requirement from a previous CSOS
19  project, we should be keeping C-II receipt
20  data for 11 years, including transfers or
21  migrations to the store incubator for closed
22  stores or DEA number changes."
23      A.   Yeah.
24      Q.   Do you see that?
25      A.   I do.

Page 322

1    Q.    You then ask, "Is that not the
2  case?" correct?
3    A.    I don't see the words, "Is that
4  not the case?" but --
5    Q.    "Is that not the case?"  It's
6  the last words that are highlighted.
7    A.    Oh, yeah.
8    Q.    Okay.  And if you go up to her
9  response, she said she'll have to check with
10 the DSD support team?
11   A.    Agreed.
12   Q.    And you then took everybody off
13 the chain and forwarded this e-mail chain to
14 your supervisor, Brian Amend, correct?
15   A.    Yes.
16   Q.    And you said, "FYI, will
17 continue researching, but some concern
18 whether orders really being maintained for
19 11 years."
20         Do you see that?
21   A.    Correct.
22   Q.    You say, "May be an anomaly,
23 may be just data needed to research the
24 details, but not what we need maintained for
25 11 years."

Page 323

1          Do you see that?
2    A.    I do.
3    Q.    Do you continue to have a
4  concern over whether or not material is being
5  maintained for 11 years as it's supposed to
6  be?
7    A.    No, I remember this at a high
8  level at this point.  What this e-mail chain
9  was really about is that we had continuously
10 improved our systems, and one of the parts of
11 CSOS that this related to, I was just kind of
12 saying -- checking all types of data with
13 random data.
14         And I'm not the expert on the
15 storage systems, but the short version is, is
16 now I don't have any more concerns.
17 They since then, the experts in the systems,
18 which is not me, have assured me that this
19 data is maintained.
20   Q.    Okay.  Even though the
21 employees weren't able to locate it at the
22 time?
23   A.    Yeah, I can't -- because I
24 don't know the design of their systems, but
25 their manager, Lynn Guyot, has made me --

Page 324

1  assured me that it is being kept.
2    Q.    As it relates to the --
3    A.    And by the way, I don't know if
4  it matters, this is a lot of personal versus
5  what I was 30(b)(6)'ed about, so...
6    Q.    Going back to the topic of
7  legal or litigation holds and the loose leaf
8  piece of paper that is in a binder that was
9  marked Barnes 23, under subsection E there's
10 a listing of 21 individuals as well as a date
11 range for legal holds that would have applied
12 to those people, correct?
13   A.    Correct.
14   Q.    Are you prepared to provide any
15 additional information about legal holds
16 other than what is reflected there in
17 subsection E?
18         MS. SWIFT:  Object to the form.
19 Do you have a specific question?
20         THE WITNESS:  Do you have --
21 yeah.  Do you have -- do you have an
22 example of what you're really asking?
23         I -- other than that, I just
24 mostly have the date range.
25

Page 325

1  QUESTIONS BY MR. GADDY:
2    Q.    Well, that's what I'm asking,
3  is if you have anything other than the names
4  of the individuals and the date ranges.
5         MS. SWIFT:  Same objection.
6  He's already provided more than just
7  that in response to your other
8  questions.
9         THE WITNESS:  I have the date
10 ranges and -- yeah, that's what I
11 have.
12 QUESTIONS BY MR. GADDY:
13   Q.    That's all that you have is the
14 date ranges for these individuals?
15         MS. SWIFT:  Same objection.
16 Mischaracterizes the previous
17 testimony.
18         THE WITNESS:  What would you
19 like in addition or -- I'm trying to
20 figure out how to answer you better --
21 or with more detail.
22 QUESTIONS BY MR. GADDY:
23   Q.    I'm trying to figure out if you
24 know anything else or are prepared to testify
25 about anything other than the names of the

Page 326

1  individuals and the date ranges of the
2  litigation holds that apply to them.
3          MS. SWIFT:  Same objection.
4  He's already answered all kinds of
5  questions about the people he talked
6  to and the process that is put in
7  place for litigation holds.
8          If you have a specific
9  additional question, you should ask
10  it.
11          THE WITNESS:  I know the date
12  ranges.  I know the gap exists because
13  a previous legal hold was taken off,
14  and that's pretty much it.
15  QUESTIONS BY MR. GADDY:
16      Q.    Okay.  Do you know legal or
17  litigation holds as they apply to any of the
18  other non-custodians that Walgreens has
19  agreed to produce in this litigation?
20          MS. SWIFT:  Objection.  Outside
21  the scope.
22          THE WITNESS:  Non-custodian
23  meaning any of these other types of
24  data?
25

Page 327

1  QUESTIONS BY MR. GADDY:
2      Q.    No.
3          MS. SWIFT:  I think he
4  misunderstood what you asked.
5  QUESTIONS BY MR. GADDY:
6      Q.    Sure.
7          So there's 21 people listed
8  here, right?
9      A.    Correct.
10      Q.    And I'm representing to you
11  that Walgreens has agreed to include at least
12  nine other individuals as custodians in this
13  matter.
14          I'm asking whether or not you
15  know whether or not litigation or legal holds
16  apply to any persons other than these 21.
17      A.    No, that knowledge has not been
18  provided to me.
19          MS. SWIFT:  And, Jeff, I'll
20  represent to you we'd be happy to
21  provide the same information for any
22  additional custodians that are agreed
23  to.  We are still negotiating the
24  scope of the additional custodians, as
25  you know.

Page 328

1          MR. GADDY:  Okay.  Kate, at
2  this time we're going to suspend the
3  taking of the 30(b)(6) deposition.  We
4  object to and disagree with your
5  narrow interpretation of Special
6  Master Cohen's order, and we reserve
7  the right to come back and reopen this
8  deposition once that matter is
9  clarified.
10          At this time I have no more
11  questions for Mr. Barnes.
12          MS. SWIFT:  Let's take a short
13  break.  I have a few questions to
14  follow up on.
15          And just for the record, I
16  think Special Master Cohen's ruling is
17  pretty clear on what we were required
18  to offer testimony on with respect to
19  the litigation holds, and we fully
20  prepared Mr. Barnes in line with that
21  order.  But I understand your
22  position.
23          Let's just take like a
24  three-minute break, five-minute break,
25  something like that.

Page 329

1          VIDEOGRAPHER:  Going off the
2  record at 4:21.
3      (Off the record at 4:21 p.m.)
4          VIDEOGRAPHER:  We're back on
5  the record at 4:33.
6          CROSS-EXAMINATION
7  QUESTIONS BY MS. SWIFT:
8      Q.    Good afternoon, Mr. Barnes.
9  Just a few follow-up questions for you.
10          Okay?
11      A.    All right.
12      Q.    Tell me a little bit about your
13  education.  Where did you go to college?
14      A.    I went to college at Northern
15  Kentucky University.
16      Q.    When did you graduate?
17      A.    Approximately 1994-ish.
18      Q.    What did you get your degree
19  in?
20      A.    Biology and psychology.
21      Q.    Where do you currently live?
22      A.    In Edgewater, Chicago.
23      Q.    Is that a neighborhood in the
24  City of Chicago?
25      A.    It is.

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    Q.    When did you start working at
2  Walgreens?
3    A.    January 26, 2004.
4    Q.    What did you do when you
5  started working at Walgreens?
6    A.    Worked for a team in the
7  logistics/IT section called pick,
8  replenishment, order fill.
9    Q.    And then what did you do after
10  that?
11    A.    Within a year and a half or so,
12  I was moved to a new team that was formed
13  called the special business unit, and that
14  team -- so worked on that team.
15    Q.    How long did you work in the
16  special business unit?
17    A.    Until our last major reorg
18  approximately three or four years ago when
19  that was somewhat renamed, and components
20  changed of what was supported to the current
21  team, which is called the CRRAIT team, which
22  is compliance, reverse logistics, reporting
23  analytics and infrastructure.
24    Q.    And just very briefly, what are
25  your responsibilities today?

Page 331

1    A.    I'm an IT manager.  It's to
2  oversee direct consulting and actual direct
3  employees and the support of -- and provide
4  support, IT advice and help and assistance to
5  our business customers internally.
6    Q.    What were you doing before you
7  went to work for Walgreens?
8    A.    I worked at a consulting firm
9  for several years.  The longest was for
10  Chaquita Brands International as a consultant
11  in their accounting and inventory systems.
12    Q.    What was your first job in IT?
13    A.    I -- I consider it to be a
14  business I started when I was 11.  Before
15  there was AOL, before there was CompuServe or
16  the Internet, there were something called the
17  bulletin board systems.  And my dad gave me a
18  computer.  I started to program and started
19  charging people to basically dial in, e-mail
20  each other, chat and stuff like that.
21    Q.    How long did you do that?
22    A.    About six years.
23    Q.    How many people work in IT at
24  Walgreens?
25    A.    I don't know the exact number.

Page 332

1  There's thousands.  We're a large
2  organization.
3    Q.    How many departments are there
4  within IT at Walgreens?
5    A.    Dozens, at least.
6    Q.    You are designated today as
7  something called a 30(b)(6) witness, correct?
8    A.    Yes.
9    Q.    Were you designated to testify
10  on a particular topic?
11    A.    Yes.  Some policies as well as
12  retention periods.
13    Q.    Were you also designated to
14  testify with respect to litigation holds?
15    A.    Yes.
16    Q.    Did you prepare for your
17  30(b)(6) deposition?
18    A.    Yes, I did.
19    Q.    How did you prepare for your
20  30(b)(6) deposition?
21    A.    Multiple people, specialists,
22  from three different related areas were given
23  to me to ask whatever questions I'd like or
24  that occurred to me after they gave a brief
25  presentation.  And that was the majority of

Page 333

1  it, as well as I was provided documents to
2  review in my own time, which I did so.
3    Q.    What documents were you
4  prepared to review -- strike that.
5        What documents were you
6  provided to review as part of your 30(b)(6)
7  preparation?
8    A.    I was given a big binder with
9  retention policies.  We were lucky enough to
10  determine that there were, you know, specific
11  ones that were most applicable, or only
12  applicable, as well as a, you know, a sheet
13  summarizing retention holds and retention
14  periods and other information around those
15  subjects.
16    Q.    Did you have an opportunity to
17  talk to people at Walgreens about where
18  particular types of documents were found for
19  purposes of this litigation?
20    A.    Yes.  For documents related to
21  this litigation, yes.
22    Q.    Were you also provided
23  information about the time frames covered by
24  various types of documents that were
25  collected for this litigation?

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1     A.    Yes.
2     Q.    Did you review the documents
3 that you were provided in preparation for
4 your 30(b)(6) deposition?
5     A.    Yes, I did.
6     Q.    Did you get all of your
7 questions answered?
8     A.    I did at that time.
9     Q.    I apologize if you testified
10 about this earlier, but how long did you
11 spend preparing for your 30(b)(6) deposition?
12     A.    It's a rough estimate. I would
13 say about 15, 16 hours between -- you know,
14 all said and done. Our 30(b)(6) part,
15 actually more like ten hours. I mean, it's
16 hard to split up the personal and the
17 private. But, yeah, I would say around the
18 ten-hour range.
19     Q.    Earlier today you were asked
20 questions about what happens at Walgreens
21 once a litigation hold is lifted.
22     Do you remember those
23 questions?
24     A.    Fairly well.
25     Q.    After a litigation hold is

Page 335

1 lifted, what happens to a person's documents?
2     A.    After the hold is lifted,
3 someone, if needed, flips a switch to allow
4 them to proceed as normal. They're told to
5 apply the actual -- the hold -- the retention
6 policies to those documents and proceed as
7 normal.
8     Q.    You were asked questions -- a
9 number of questions about locations where
10 documents were searched for and found.
11     Do you remember those
12 questions?
13     A.    I do remember some of them,
14 yes.
15     Q.    Do you remember questions about
16 the location of policies and procedures
17 relevant to this case?
18     A.    I do.
19     Q.    Were you also provided -- in
20 your preparation for your 30(b)(6)
21 questioning, were you provided information
22 about the location of Walgreens' current and
23 past good faith dispensing policies?
24     A.    Yes, I was.
25     Q.    And where are those documents

Page 336

1 found at Walgreens?
2     A.    On the current StoreNet.
3     Q.    Were you also provided
4 information about the location at Walgreens
5 of historic suspicious order monitoring
6 policies?
7     A.    On the policy?
8     Q.    Yes.
9     A.    Yeah, I was told that that
10 was -- I wasn't familiar with the term at the
11 time, but the production of another case, and
12 that case happened to be a case that was
13 related to the Florida case discussed
14 previously.
15     Q.    It's your understanding that
16 Walgreens' historic suspicious order
17 monitoring policies and procedures were
18 located in its prior production from the
19 Florida case; is that right?
20     A.    That's what I was told.
21     Q.    You were asked questions about
22 whether Walgreens stores its documents
23 in-house or with a third party.
24     Do you remember those
25 questions?

Page 337

1     A.    I do.
2     Q.    Is it your understanding that
3 the documents that you were educated on with
4 respect to this case, that they were all
5 found at Walgreens?
6     A.    Yes, it is.
7     Q.    You were asked questions about
8 Walgreens' transition from Lotus Notes to
9 Outlook.
10     Do you remember those
11 questions?
12     A.    I do.
13     Q.    Do you have an understanding of
14 what happened during that transition from
15 Lotus Notes to Outlook to a person's
16 documents if they were subject to a legal
17 hold?
18     A.    Yes.
19     Q.    What is your understanding?
20     A.    If they were on legal hold, I
21 was told that that data was retained and/or
22 migrated for them automatically.
23     Q.    So if somebody was on legal
24 hold when their e-mail was transitioned from
25 Lotus Notes to Outlook, it didn't disappear;

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 is that your understanding?
2    A.    They didn't get a choice.  It
3 didn't disappear; it was kept and moved.
4    Q.    Setting aside the question
5 about legal holds, what is your understanding
6 of what happened to a person's documents when
7 they were migrated from Lotus Notes to
8 Outlook?
9    A.    My understanding is that they
10 were told to apply the current retention
11 policy as it applied to the documents in
12 Lotus Notes and migrate accordingly to
13 Outlook.
14    Q.    You were asked a number of
15 questions in the context of a Lotus Notes
16 migration and also in the context of this --
17 do you remember this document?
18        I apologize, I don't remember
19 what the -- what exhibit number it was
20 marked.
21    A.    I remember it, but I -- the
22 visual but not the contents.
23    Q.    It's an e-mail --
24    A.    There it is.
25    Q.    -- an e-mail from David Cohen

Page 339

1 dated September 27, 2018.
2        What's the exhibit number on
3 it, Sean?
4    A.    24.
5    Q.    Do you remember questions about
6 the end of the highlighted portion on the
7 first page of Exhibit 24 where it says, "Ps
8 are entitled to learn what happened to
9 documents and whether any that were discarded
10 are still available somehow"?
11    A.    I do remember that.
12    Q.    What is your understanding of
13 whether Walgreens retained any documents from
14 Lotus Notes after those documents were no
15 longer subject to a legal hold?
16    A.    Once those documents were not
17 subject to -- you're talking about the
18 documents from the previous question that
19 would have been migrated because they were on
20 hold?
21    Q.    Correct.
22    A.    So once they're off the legal
23 hold, they are told to apply the current
24 retention policy to those documents.
25    Q.    Do you have an understanding of

Page 340

1 whether Walgreens retains any Lotus Notes
2 documents or any other documents that have
3 been discarded?
4    A.    No, I was told they were not
5 unless they happened to be migrated
6 automatically because they were currently on
7 hold, or whether they migrated individually
8 because they were following instructions.
9 Everything else, the servers were
10 decommissioned and no longer exist.
11    Q.    You were asked some questions
12 about whether the retention policy for
13 suspicious order reports was actually
14 11 years.
15        Do you remember those
16 questions?
17    A.    I do.
18    Q.    Do you have an understanding of
19 how far back Walgreens' retention of
20 suspicious order reports goes?
21    A.    Yes, I was told back to 2007,
22 which is -- happens to be 11 years.
23    Q.    Do you have an understanding of
24 how far back Walgreens' retention of
25 transactional data goes?

Page 341

1    A.    Yes, back to 2003.
2        MS. SWIFT:  I don't have any
3 other questions.
4        MR. GADDY:  No follow-up.
5        VIDEOGRAPHER:  Okay.  We're
6 going off the record at 4:44 p.m.
7 (Deposition concluded at 4:44 p.m.)
8        - - - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 342

CERTIFICATE

1
2
3         I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5  of the examination, Sean Barnes was duly
sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7         I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
11        I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
12 nor counsel of any of the parties to this
action, and that I am neither a relative nor
13 employee of such attorney or counsel, and
that I am not financially interested in the
14 action.
15
16
17 _____
CARRIE A. CAMPBELL,
18 NCRA Registered Diplomate Reporter
Certified Realtime Reporter
19 California Certified Shorthand
Reporter #13921
20 Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
21 #084-004229
Texas Certified Shorthand Reporter #9328
22 Kansas Certified Court Reporter #1715
Notary Public
23 Dated: October 25, 2018
24
25

Page 343

INSTRUCTIONS TO WITNESS

1
2
3         Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8         After doing so, please sign the
9  errata sheet and date it.  You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13        It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you.  If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25

Page 344

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4         I,_____, do
hereby certify that I have read the foregoing
5  pages and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12 _____
13 Sean Barnes              DATE
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 Notary Public
20
21
22
23
24
25

Page 345

1          _ _ _ _ _ _ _
ERRATA
2          _ _ _ _ _ _ _
3  PAGE  LINE  CHANGE/REASON
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____
25

Highly Confidential - Subject to Further Confidentiality Review

Page 346

_ _ _ _ _ _ _
LAWYER'S NOTES
_ _ _ _ _ _ _
PAGE  LINE