```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL        )   MDL No. 2804
     PRESCRIPTION OPIATE    )
 4   LITIGATION,            )   Case No.
                            )   1:17-MD-2804
 5                          )
     THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6   ALL CASES             )   Polster
                            )
 7

 8                     __ __ __
 9            Tuesday, January 15, 2019
                      __ __ __
10

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                      __ __ __
12

13

14

15       Videotaped Deposition of GREGORY BEAM,
     held at 4206 South J.B. Hunt Drive, Rogers,
16   Arkansas, commencing at 8:36 a.m., on the
     above date, before Debra A. Dibble, Certified
17   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Captioner,
18   Certified Realtime Reporter and Notary
     Public.
19

20

21

                      __ __ __
22

             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
24

25
```

```
 1     A P P E A R A N C E S:
 2        CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
          AGNELLO, P.C.
 3        BY:  DONALD ECKLUND, ESQUIRE
                decklund@carellabyrne.com
 4              JAMES E. CECCHI, ESQUIRE
                jcecchi@carellabryne.com
 5              DAVID G. GILFILLAN
                dgilfillan@carellabyrne.com
 6              MICHAEL INNES, ESQUIRE
                minnes@carellabyrne.com
 7              (appearing telephonically)
                ZACHARY BOWER, ESQUIRE
 8              zbower@carellabyrne.com
                (appearing telephonically)
 9        5 Becker Farm Road
          Roseland, New Jersey 07068-1739
10        (973) 994-1700
          Counsel for Plaintiffs
11
12        JONES DAY
          BY:  JASON VARNADO, ESQUIRE
13              jvarnado@jonesday.com
                GREGORY MITCHELL, ESQUIRE
14              gmitchell@jonesday.com
          717 Texas, Suite 3300
15        Houston, Texas  77002- 2712
          832-239-3939
16        Counsel for Walmart
17
          MARCUS & SHAPIRA, LLP
18        (appearing telephonically)
          BY:  RICHARD HALPERN, ESQUIRE
19              rhalpern@marcus-shapira.com
          301 Grant Street
20        35th Floor
          Pittsburgh, Pennsylvania 15219-6401
21        (412) 338-4690
          Counsel for HBC
22
23
24
25
```

```
 1        WRIGHT, LINDSEY & JENNINGS, LLP
          BY:  CALEY B. VO, ESQUIRE
 2            cvo@wlj.com
          3333 Pinnacle Hills Parkway
 3        Suite 510
          Rogers, Arkansas 72758-8498
 4        (479) 986-0888
          Counsel for McKesson
 5
 6        O'MELVENY & MYERS LLP
          (appearing telephonically)
 7        BY:  Ryan J. Snyder, ESQUIRE
              rsnyder@omm.com
 8        1999 Ave of The Stars, 8FL
          Los Angeles, CA 90067
 9        (310) 246-6705
          Counsel for Janssen and Johnson & Johnson
10
11        JACKSON KELLY, PLLC
          (appearing telephonically)
12        BY:  JON ANDERSON, ESQUIRE
              janderson@jacksonkelly.com
13        500 Lee Street East
          Suite 1600
14        Charleston, WV 25301-3202
          (304) 340-1288
15        Counsel for AmerisourceBergen
16
          ARNOLD & PORTER KAYE SCHOLER, LLP
17        (appearing telephonically)
          BY:  HEATHER A. HOSMER, ESQUIRE
18            hhosmer@arnoldporter.com
          601 Massachusetts Ave, NW
19        Washington, DC 20001-3743
          (202) 942-5000
20
          Counsel for Endo Health Solutions Inc.;
21        Endo Pharmaceuticals Inc.; Par
          Pharmaceuticals, Inc.; Par
22        Pharmaceutical Companies, Inc. formerly
          known as Par Pharmaceutical Holdings,
23        Inc.
24
25
```

```
 1        BARBER LAW FIRM, LLP
          BY:  M. EVAN STALLINGS, ESQUIRE
 2             estallings@barberlawfirm.com
          425 West Capitol Avenue
 3        Suite 3400
          Little Rock, Arkansas 72201
 4        (501) 707-6182
          Counsel for Cardinal Health, Inc.
 5
 6        TUCKER ELLIS, LLP
          (appearing telephonically)
 7        BY:  CHRISTINA MARINO, ESQUIRE
               christina.marino@tuckerellis.com
 8        950 Main Avenue, Suite 1100
          Cleveland, Ohio 44113-7213
 9        216-696-3675
          Counsel for Janssen and Johnson &
10        Johnson
11
12    ALSO PRESENT:
13        Paul D. Morris
          Senior Associate Counsel
14        Walmart, Inc.
15
          THE VIDEOGRAPHER:
16
          Chris Ritona
17        GOLKOW LITIGATION SERVICES
18                  — — —
19
20
21
22
23
24
25
```

                            INDEX

   APPEARANCES                                   2

   PROCEEDINGS                                   8



   EXAMINATION OF GREGORY BEAM:

        DIRECT EXAMINATION                      10
        BY MR. ECKLUND



   CERTIFICATE                                 384

   ERRATA                                      386

   ACKNOWLEDGMENT OF DEPONENT                  387

   LAWYER'S NOTES                              388

```
 1                      DEPOSITION EXHIBITS
                          GREGORY BEAM
 2                      JANUARY 15, 2019
 3       NUMBER                DESCRIPTION              PAGE
 4       WALMART-      ANNUAL PERFORMANCE REVIEWS         15
         BEAM          FOR GREGORY BEAM.
 5       EXHIBIT 1     WMT_MDL_000057274-57362
 6       WALMART-      SEPTEMBER 2010 EMAIL.              88
         BEAM          SUBJ: RE: DEA AUDIT AT DC
 7       EXHIBIT 2     6013.
                       WMT_MDL_000057259-57260
 8
         WALMART-      MARCH 2012 EMAIL CHAIN.           109
 9       BEAM          WMT_MDL_000054729-54731
         EXHIBIT 3
10
         WALMART-      7-25-12 EMAIL FROM SUSANNE        125
11       BEAM          HILAND.  SUBJ: CS POA.
         EXHIBIT 4     WMT_MDL_000009427-9428
12
         WALMART-      SEPTEMBER 2012 EMAIL CHAIN.       203
13       BEAM          SUBJ: RE: CII UTILIZATION
         EXHIBIT 5     REVIEW
14                     WMT_MDL_000008089-8090,
15       WALMART-      5/10/13 EMAIL FROM SHIRLEY        222
         BEAM          RECTOR.  SUBJ: CSMP
16       EXHIBIT 6     QUESTIONNAIRE.
                       MCKMDL00514052-514057
17
         WALMART-      JULY 2013 EMAIL CHAIN.            233
18       BEAM          SUBJ: JUNE 405-1 REPORT.
         EXHIBIT 7     WMT_MDL_000042794-42795
19                     WITH ATTACHMENT
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | WALMART-<br>BEAM | 10-16-14 EMAIL FROM JEFF<br>ABERNATHY.  SUBJ: OVER | 260 |
| 2 | EXHIBIT 8 | 20/50 REPORT.<br>WMT_MDL_000018858-18859 | |
| 3 | | WITH ATTACHMENT | |
| 4 | WALMART-<br>BEAM | 10-16-14 EMAIL FROM JEFF<br>ABERNATHY.  SUBJ: OVER | 260 |
| 5 | EXHIBIT 9 | 20/50 REPORT.<br>WMT_MDL_000018862-18863 | |
| 6 | | | |
| 7 | WALMART-<br>BEAM | JUNE 2014 SUBJ: RE: CUT<br>REPORT FROM D.C. | 319 |
| | EXHIBIT 10 | WMT_MDL_000008419 | |
| 8 | | | |
| 9 | WALMART-<br>BEAM | SEPTEMBER 2017 EMAIL CHAIN.<br>SUBJ:  RE: ARCHER QUESTION. | 327 |
| | EXHIBIT 11 | WMT_MDL_0000073917394 | |
| 10 | | | |
| 11 | WALMART-<br>BEAM | 9/28/17 EMAIL FROM BRANDI<br>WILLIAMSON. | 336 |
| | EXHIBIT 12 | WMT_MDL_000030095-30114 | |
| 12 | | | |
| 13 | WALMART-<br>BEAM | SEPTEMBER 2015 EMAIL CHAIN.<br>SUBJ: RE: SOM EVALUATION | 342 |
| | EXHIBIT 13 | NOTIFICATIONS. | |
| 14 | | WMT_MDL_000016816 | |
| 15 | WALMART-<br>BEAM | SEPTEMBER 25 EMAIL CHAIN.<br>SUBJ: SIGNIFICANT | 350 |
| 16 | EXHIBIT 14 | COMPLIANCE ISSUES.<br>WMT_MDL_000047185-47187 | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

```
 1                    PROCEEDINGS

 2              (January 15, 2019 at 8:36 a.m.)

 3              THE VIDEOGRAPHER:  We are now

 4        on the record.  My name is

 5        Chris Ritona.  I am the videographer

 6        for Golkow Litigation Services.

 7        Today's date is January 15th, 2019.

 8        The time is approximately 8:36 a.m.

 9        This video deposition is being held in

10        Rogers, Arkansas, at Mitchell

11        Williams, 4206 South J.B. Hunt Drive,

12        Suite 200 in the matter of National

13        Prescription Opioid Litigation MDL

14        No. 2084, Case No. 17-MD-2084 in the

15        United States District Court, Northern

16        District of Ohio, Eastern Division.

17              The deponent today is Greg

18        Beam.  Will all counsel please

19        identify themselves for the record?

20              MR. ECKLUND:  Good morning.

21        Don Ecklund from Carella Byrne on

22        behalf of plaintiffs in the MDL.

23              MR. GILFILLAN:  David Gilfillan

24        from Carella Byrne on behalf of

25        plaintiffs.
```

```
 1                  MR. CECCHI:  Jim Cecchi at
 2       Carella Byrne on behalf of plaintiffs.
 3                  MR. VO:  Caley Vo from Wright,
 4       Lindsey & Jennings on behalf of
 5       McKesson.
 6                  MR. STALLINGS:  Evan Stallings
 7       with Barber Law Firm on behalf of
 8       Cardinal Health.
 9                  MR. MORRIS:  Paul Morris from
10       Walmart legal.
11                  MR. MITCHELL:  Greg Mitchell,
12       Jones Day on behalf of Walmart.
13                  MR. VARNADO:  Jason Varnado
14       with Jones Day on behalf of Walmart
15       and the witness.
16                  THE VIDEOGRAPHER:  Will all
17       counsel --
18                  MR. HALPERN:  Rick Halpern,
19       Marcus & Shapira on behalf of HBC.
20                  MS. HOSMER:  Heather Hosmer of
21       Arnold & Porter on behalf of Endo and
22       Par defendants.
23                  MS. MARINO:  Christina Marino
24       of Tucker and Ellis appearing on
25       behalf of Johnson & Johnson and
```

Highly Confidential - Subject to Further Confidentiality Review

1      Janssen.

2          MR. ANDERSON:  Jon Anderson,

3      Jackson Kelly on behalf of

4      AmerisourceBergen.

5          VIDEOGRAPHER:  The court

6      reporter today, Debbie Dibble, will

7      please swear in the witness.

8          GREGORY BEAM,

9  having first been duly sworn, was examined

10 and testified as follows:

11          DIRECT EXAMINATION

12 BY MR. ECKLUND:

13     Q.     Good morning, Mr. Beam.

14 Moments ago the court reporter asked you to

15 take an oath.  What does that oath mean to

16 you today?

17     A.     That means under perjury of

18 law, I am bound to tell the truth.

19     Q.     And the whole truth?

20     A.     The whole truth.

21     Q.     Everything that you can recall,

22 your entire recollection?

23     A.     Yes, sir.

24     Q.     So throughout the day, that's

25 the expectation.

1           Full disclosure, whatever you

2   can remember.  Fair?

3        A.    Fair.

4        Q.    Okay.  Have you ever been

5   deposed before?

6        A.    Sir?

7        Q.    Have you ever been deposed

8   before?  First deposition?

9        A.    I have.

10       Q.    How many times?

11       A.    Multiple times.  I can't recall

12  an exact.

13       Q.    More than ten?

14       A.    In criminal and civil, yes.

15       Q.    More than 20?

16       A.    No.

17       Q.    Okay.  So you're fairly

18  familiar with the process?

19       A.    Yes, sir.

20       Q.    Throughout the day I'll be

21  asking you questions.  Your attorney may at

22  points in time interject an objection.  If we

23  could both try to give breaks in between when

24  we're speaking it will help the court

25  reporter take a record.  If you don't

1    understand a question, just let me know.

2    I'll try to rephrase it.  If you answer the

3    question, I'll assume you understood what I

4    was asking you about.  Is that fair?

5         A.    That's fair.

6         Q.    During the day if you want to

7    take a break, you need to stretch your legs,

8    you can stand up.  I'm not concerned about

9    that.  Any pending questions, we can answer

10   it and we'll try to get you that break.  Or I

11   might try to finish up a line of examination.

12             Is that fair?

13        A.    Yes, sir.

14        Q.    Any reason today why you --

15             MS. HOSMER:  I'm sorry to

16   interrupt.  There is about a 90-second lag

17   time with the online video.  Is there any way

18   to fix that?

19             (Discussion off the record.)

20        Q.    (BY MR. ECKLUND)  Okay.  So, if

21   at any point during the deposition you think

22   you may need to review a document when you're

23   going to answer a question that I'm going to

24   ask you, there's a chance that I might have

25   the document in the box that we brought here

 1    today.  There's also a chance that your

 2    lawyers may be able to locate that document

 3    if you describe it.  So if you need

 4    something, say something about the document

 5    you need.  Describe it.  What was it?  Is it

 6    an Excel?  Is it a PowerPoint?  Is it an

 7    email?  Okay?

 8           A.     Yes, sir.

 9           Q.     Policies.  Whatever it may be.

10    And we'll try to get that for you.  Okay?

11    This isn't intended to be a memory

12    examination.  It's intended to be a

13    fact-finding examination.

14                  So if there's a document that's

15    going to help you answer questions for us

16    today, we want you to have those documents.

17    But it's on you to tell us what that document

18    looks like and that you need it.

19                  Is that fair?

20           A.     Yes, sir.

21           Q.     What did you do to prepare for

22    your deposition today?

23           A.     I met with counsel.

24           Q.     How many times?

25           A.     Over a period of three days.

1    Q.    In person?  Telephone?

2    A.    In person.

3    Q.    Video trainings?

4    A.    Video trainings?

5    Q.    Did you watch any videos about

6  how to sit for a deposition?

7    A.    No.

8    Q.    Read any manuals about how to

9  answer questions?

10   A.    No.

11   Q.    Review any of your documents

12 within your files to prepare for today?

13   A.    We did.

14   Q.    Approximately how long did you

15 spend reviewing documents to get ready for

16 today's deposition?

17   A.    Total time?

18   Q.    Total time?

19   A.    Approximately 15, 16 hours.

20   Q.    When did you start that

21 process?

22   A.    Last Thursday.

23   Q.    Did you meet the attorneys

24 before or after you started that process?

25   A.    That was during those meetings

Highly Confidential - Subject to Further Confidentiality Review

1    with the attorneys.

2          Q.    Okay.  What's your current

3    title within Walmart?

4          A.    I'm -- current title is

5    director of global investigations.

6          Q.    And when did you get that

7    title?

8          A.    Approximately 2011.

9          Q.    Let me hand you a document

10   that's going to be marked as Exhibit 1.

11              You may have seen these, or at

12   least portions of them.  These are

13   performance evaluations from within Walmart.

14              (Walmart-Beam Deposition

15         Exhibit 1, Annual Performance Reviews

16         for Gregory Beam, WMT_MDL_000057274-

17         57362, was marked for identification.)

18              MR. CECCHI:  We'll refer to

19         them as Beam 1 and then seriatim after

20         that.

21         Q.    (BY MR. ECKLUND)  So why don't

22   you take a moment to peruse them quickly.

23   You don't need to review the whole thing

24   closely.

25              MS. HOSMER:  Will you read the

1        Bates number into the record, please?

2               MR. ECKLUND:  57274.  And it

3        ends at 57362.

4               MS. HOSMER:  Thank you.

5               MR. ECKLUND:  You're welcome.

6               Mr. Beam, why don't you just

7        skip to the end, the last page or two,

8        and just verify this is a complete

9        collection of all of your evaluation

10       forms.

11              MR. VARNADO:  Object to the

12       form.

13              THE WITNESS:  I see fiscal

14       years '12 through '18.

15       Q.     (BY MR. ECKLUND) Are any

16  missing?

17       A.     None between those years, no,

18  sir.

19       Q.     Does it seem incomplete in any

20  way?

21       A.     I do not detect anything

22  incomplete at this time.

23       Q.     Great.

24              Okay.  Let's start on the first

25  page.

1          February 1st, 2011.  Is that

2    when you started at Walmart?

3          A.      No, sir.

4          Q.      When did you start at Walmart?

5          A.      I started October of 2006.

6          Q.      And what was your title in

7    October 2006?

8          A.      In October 2006, I hired as a

9    drug diversion coordinator.

10          Q.      And was that your first

11    occasion as a drug diversion coordinator, or

12    did you come from another company with that

13    experience?

14          A.      I came from another company as

15    a district loss prevention supervisor.

16          Q.      Which company?

17          A.      Walgreens.

18          Q.      And within Walgreens, were you

19    responsible for drug diversion?

20          A.      Among other things, yes.

21          Q.      What other responsibilities did

22    you have within Walgreens?

23          A.      We had theft.  Shrink.  As well

24    as HR and employees relations matter.

25          Q.      When you talk about theft, are

1    you talking specifically about theft of

2    controlled substances or theft generally?

3         A.     Theft in general.

4         Q.     And what do you mean by

5    "shrink"?

6         A.     "Shrink" meaning stores that

7    are losing product without sales.

8         Q.     And that's a variation of

9    theft?

10        A.     It's also a variation of a

11   combination of other things.  It could be

12   shrinkage.  It could be customer theft.  And

13   it could also be reduction in price,

14   blowouts, sale blow costs.  There's a lot of

15   different things that contribute to shrink.

16        Q.     Okay.

17               And what was your role

18   concerning HR?

19        A.     These were HR investigations

20   that were telephoned in to corporate

21   headquarters.  Corporate headquarters would

22   in turn reassign those to an HR as well as

23   loss prevention supervisor for that location.

24        Q.     And just so that the record is

25   clear on all of this, because I haven't asked

1    you and I probably should have, can I have

2    the benefit of your full educational history

3    after high school?

4         A.    Sure.  I graduated bachelor of

5    science, criminal justice and security

6    management, Capella University.

7         Q.    Any certifications following

8    college?

9         A.    No, sir.

10         Q.    Additional graduate school?

11         A.    No, sir.

12         Q.    Military service?

13         A.    Military service, yes.

14         Q.    When did you serve?

15         A.    From 1979 to 1999.

16         Q.    When did you graduate from

17    college?

18         A.    I graduated from college 2014,

19    finally.

20         Q.    When did you start college?

21         A.    Gosh, 2006.

22         Q.    Okay.  So you left high school,

23    went into the armed services, and which

24    branch?

25         A.    Air Force.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Air Force.  And you were in the

2   Air Force for approximately 20 years?

3      A.      Correct.

4      Q.      And when you left, what was

5   your -- what was your title and what were you

6   doing within the Air Force?

7      A.      I was a special agent,

8   Air Force Office of Special Investigations.

9      Q.      And what type of investigations

10  were you doing within the Air Force?

11     A.      A variety of investigations.

12  Criminal investigations ranging from rape,

13  homicides, theft.

14     Q.      Did you receive any training

15  within the Air Force to conduct those

16  investigations?

17     A.      I did.

18     Q.      What type of training did you

19  receive?

20     A.      It was 12-week investigations,

21  basic investigations academia course.

22     Q.      Any continuing education

23  following the 12-week program you started

24  with?

25     A.      Yes.  We had advanced

1    investigation school.  Also went to fire bomb

2    and arson school.  Also had completed

3    protective services operations school.

4         Q.     What was your rank when you

5    left the Air Force?

6         A.     I was an E7.

7         Q.     E7?

8         A.     E7, master sergeant.

9         Q.     Master sergeant.  Thank you.

10               MS. HOSMER:  I'm sorry to

11          interrupt.  I can't hear the witness

12          at all.

13               MS. MARINO:  I'm also having

14          difficulty hearing.

15         Q.     (BY MR. ECKLUND)  So let's talk

16    a little bit about the training you received

17    more than 20 years ago concerning an

18    investigation in advanced investigation

19    school.

20               At that time, what were you

21    told are some of the core principles of a

22    thorough investigation?

23               MR. VARNADO:  Object to the

24          form.

25               THE WITNESS:  First we go

Highly Confidential - Subject to Further Confidentiality Review

1    through, and you'd want to identify

2    the crime scene.  And at that

3    particular point, you take meticulous

4    notes and you photograph the scene or

5    draft it out.

6        Q.    (BY MR. ECKLUND)  Do you share

7    the meticulous notes with other people?

8        A.    As lead investigator, you would

9    share that information with others arriving

10   on the scene and make assignments as

11   necessary.

12       Q.    So documentation is important

13   to a thorough investigation?

14       A.    Documentation is important to a

15   criminal investigation, yes.

16       Q.    I didn't ask whether it was

17   important to a criminal investigation,

18   particularly.  I'm just talking just broadly,

19   is documentation important to a thorough

20   investigation?

21           MR. VARNADO:  Object to the

22       form.

23           THE WITNESS:  Documentation

24       is -- can be very important to an

25       investigation depending on where we

1        see the outcome.

2        Q.      (BY MR. ECKLUND)   How would

3    documentation not be important to an

4    investigation?

5        A.      There are some things that are

6    not going to be material to an investigation.

7        Q.      When you left the Air Force in

8    1999, what did you do at that point?

9        A.      At that time I took a 90-day

10   break and was hired with Walgreens.

11       Q.      So from 1999, you took a short

12   vacation for about three months, and then

13   found your footing at Walgreens, and you

14   stayed there until 2006?

15       A.      Yes, sir.

16       Q.      And when you started in 1999 --

17   it was 1999 when you started Walgreens?

18       A.      Approximately 2000.

19       Q.      Approximately 2000.

20               When you started at Walgreens

21   in approximately 2000, what was your title

22   when you began?

23       A.      Loss prevention supervisor.

24       Q.      And when you left in 2006 --

25       A.      It was loss prevention

Highly Confidential - Subject to Further Confidentiality Review

1    supervisor.

2         Q.    And throughout your period at

3    Walgreens, were you responsible for oversight

4    or supervision of any other employees?

5         A.    No.

6         Q.    And did you have a direct-line

7    person to whom you reported?

8         A.    I did.

9         Q.    And who was that?

10        A.    That was Jim Odom.

11        Q.    And what was Jim Odom's title?

12        A.    He was a regional loss

13   prevention supervisor.

14        Q.    Were you responsible for just a

15   particular region within the country?

16        A.    I was responsible for a

17   particular market.

18        Q.    Which market?

19        A.    Initially, I had started in

20   Minneapolis-St. Paul.  So I managed that --

21   or worked with the manage -- the district

22   management staff in that area for

23   approximately two years.  And then moved to

24   Atlanta.  And that market was emerging, so I

25   was responsible for that area up until the

```
 1    time I came on with Walmart.

 2         Q.    And in 2006, you transitioned

 3    from Walgreens to Walmart?

 4         A.    Correct.

 5         Q.    Okay.  And where did you begin

 6    working within Walmart?  What part of the

 7    country?

 8         A.    Here.

 9         Q.    In Bentonville or Rogers?

10         A.    In Rogers.

11               I'm sorry, Bentonville.  Home

12    office.

13         Q.    Okay.  So you start in

14    Bentonville, home office, and at that point

15    you had a somewhat different job

16    responsibility than what you had at

17    Walgreens; correct?

18         A.    Correct.

19         Q.    Okay.  How did you become

20    trained in your new role and responsibility

21    within Walmart?

22         A.    That was -- came from both

23    personal knowledge as well as experience in

24    some of the drug investigations that were

25    completed as special agent with OSI, as well
```

1    as conducting similar pharmacy-related

2    investigations within Walgreens.

3         Q.    Okay.  And when you began at

4    Walmart, were you focused on one category of

5    pharmacy products, all categories of pharmacy

6    products?

7         A.    We were focused on pharmacy

8    operations in total, which means all

9    categories of pharmacy products and process.

10        Q.    And did you have interactions

11   with the office of the inspector general in

12   your role within Walmart when you began?

13             MR. VARNADO:  Object to the

14        form.

15             THE WITNESS:  Not that I

16        recall.

17             (Phone interruption.)

18             VIDEOGRAPHER:  8:54.  We are

19        off the video record.

20             (Recess taken, 8:57 a.m. to

21        8:58 a.m.)

22             THE VIDEOGRAPHER:  8:58.  We

23        are on the video record.

24        Q.    (BY MR. ECKLUND)  Mr. Beam,

25   before the break, which was caused by hold

1    music, we were talking about the office of

2    the inspector general, and you didn't have

3    any specific recollection of any interactions

4    with the OIG concerning any pharmaceutical

5    products sold within Walmart.  Do you recall?

6                   MR. VARNADO:  Object to the

7         form.

8                   THE WITNESS:  And I'm -- can

9         you help me understand what you mean?

10        Q.    (BY MR. ECKLUND)  Right before

11   the break, I was asking you whether you had

12   any interactions with the office of the

13   inspector general.  Are you familiar with the

14   office of the inspector general?

15        A.    Yes.

16        Q.    What is your understanding of

17   what the office of the inspector general does

18   as concerns pharmaceutical fraud prevention?

19        A.    The office of the inspector

20   general generally sets policy on what the

21   national opioid and national drug control

22   policy will be.

23        Q.    Do you have an understanding of

24   what that policy is today?

25                  MR. VARNADO:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  I have vague -- I

3          have a working understanding.

4          Q.    (BY MR. ECKLUND)  Can you share

5     with us your working understanding of what

6     the policies of the OIG are?

7          A.    To reduce opioid consumption

8     across the United States, as well as to

9     reduce the prescribing of such drugs.

10         Q.    And how does that differ with

11    the policy goals of the DEA?  As concerns

12    opioid consumption across the United States?

13                   MR. VARNADO:  Object to the

14         form.

15                   THE WITNESS:  As of that, I'm

16         not prepared to answer.  I don't work

17         with the DEA.

18         Q.    (BY MR. ECKLUND)  Okay.  Have

19    you ever had any other occasion to work with

20    the DEA in your roles within Walmart?

21         A.    I had worked with DEA on a

22    limited basis.

23         Q.    In what ways have you worked

24    with the DEA?

25         A.    In conversations, in reporting,

1   and also in fulfilling subpoenas and

2   requests.

3        Q.    Okay.  Let's turn first to

4   conversations.  Have those conversations

5   occurred in-person?  Or over the phone?

6        A.    Mainly over phone.

7        Q.    Do you recall any of the names

8   of the individuals you've spoken with from

9   DEA?

10       A.    Off the top of my head, no.

11  Because it was in multiple areas.

12       Q.    Okay.  What are the areas in

13  which you've spoken with DEA representatives?

14       A.    In recollection, Minnesota,

15  Arizona.

16       Q.    Oh, I see.  I see.  You're

17  talking about multiple geographical areas.

18       A.    Correct.

19       Q.    Okay.  What about topical

20  areas?  What were the topics that you

21  discussed with DEA?

22       A.    In these, these were business

23  calls, so these were calls where I'm

24  outlining these -- these are facts of what we

25  have discovered in an investigation up to

1    this point.  And getting -- attempting to get

2    DEA to participate in investigations on

3    certain matters.

4         Q.    Okay.  And you also mentioned

5    reporting.  Your conversations with them

6    concerning reporting.  What types of reports

7    were you discussing with the DEA?

8         A.    If they -- there were questions

9    around, for example, a DEA Form 106, and

10   there are administrative reviews that DEA

11   conducts inside of our pharmacies, which are

12   all licensed by the DEA.  Then sometimes they

13   have questions regarding records,

14   recordkeeping, also inventory.  So quite

15   often those agents, through our practice

16   compliance group, will contact us for a

17   fulfillment report.

18        Q.    Okay.  And just so the record

19   is clear, the Form 106 that you're

20   describing, that's the DEA's form concerning

21   theft loss for controlled substances?

22        A.    That is correct.

23        Q.    Are you personally responsible

24   for completion of the Form 106?

25        A.    No, sir.

1    Q.    Who is responsible for the

2  completion of Form 106 within Walmart?

3              MR. VARNADO:  Object to form.

4              THE WITNESS:  That would be our

5        compliance department.

6    Q.    (BY MR. ECKLUND)  Do you work

7  with individuals within the compliance

8  department?

9    A.    We work with them, but we are

10  separately housed from them.  We collaborate.

11    Q.    Okay.  So there's open channels

12  of communication between your department.

13  And what department would that be considered?

14    A.    Global investigations.

15    Q.    So there's open channels of

16  communications between global investigations

17  and compliance?

18    A.    On those business-related

19  matters, yes, sir.

20    Q.    And are there open

21  communications between your department and

22  legal?

23    A.    Yes, sir.

24    Q.    And same answer for regulatory?

25              MR. VARNADO:  Object to the

1          form.

2                    THE WITNESS:  Well, in our

3          world, the compliance is a part of the

4          regulatory.

5          Q.     (BY MR. ECKLUND)  Okay.  So

6     compliance is a subpart of regulatory?

7          A.     Compliance in a regulatory arm

8     would be a separate coordination.  We look to

9     them for regulatory guidance.

10         Q.     Okay.  And do you also interact

11    with the individuals required to address

12    shipping of product to the stores?  And which

13    department would that be?  Is that

14    warehousing?  Is it supply?  What's the

15    title?

16         A.     That is -- that would be

17    logistics.

18         Q.     Okay.  So logistics.

19                Beyond coordination with

20    compliance and regulatory and legal and

21    logistics, does your department collaborate

22    or communicate with other groups within

23    Walmart?

24                    MR. VARNADO:  Object to the

25         form.

1    THE WITNESS:  We coordinate

2    with compliance, legal, and to some

3    degree logistics.

4    And I am assuming you're

5    putting compliance and regulatory in

6    the same boat?

7    Q.    (BY MR. ECKLUND)  You told me I

8    should, so yes.

9    A.    Okay.

10    Q.    So those are all of the

11    departments that you would communicate with?

12    MR. VARNADO:  Object to form.

13    THE WITNESS:  We coordinate

14    with compliance, legal, and logistics.

15    I'm not obligating myself to

16    regulatory.  That is a part of

17    compliance function from our

18    perspective.

19    Q.    (BY MR. ECKLUND)  All right.

20    Just going through your evaluation, I had a

21    couple of questions about some of the terms

22    within it.

23    So on the first page, 57274,

24    for the benefit of the record, in the

25    Quarter 1 update it says, "All analysts were

1    provided Teradata data access."

2            What's Teradata data access?

3       A.    Can you point to the specific.

4       Q.    It's the first page.

5       A.    First page.

6       Q.    Q1 update.

7       A.    Got ya.

8       Q.    "Teradata access."  What is

9    Teradata access?

10      A.    Teradata is a database, secure

11   database, in which is housed pharmacy-related

12   data and information.

13      Q.    Does it house data and

14   information concerning controlled substances?

15      A.    It does.

16      Q.    Are you responsible for adding

17   data to that database?

18      A.    I am not.

19      Q.    Who is responsible for putting

20   the data into that database?

21            MR. VARNADO:  Object to the

22       form.

23            THE WITNESS:  There are

24       multiple, of which I am not

25       knowledgeable.  But that would

1          ultimately be within our ISD division.

2          Q.     (BY MR. ECKLUND)  What is the

3     ISD division?

4          A.     Information systems

5     development.

6          Q.     And where are the ISD division

7     employees located?

8          A.     Around the country.

9                 There are multiple here.

10         Q.     Okay.

11         A.     In Bentonville.

12         Q.     So they're not all operating

13    out of the home office within Arkansas.

14    They're located across the country, but there

15    are found within this area?

16         A.     Correct.

17         Q.     Arkansas?  Okay.  And what is

18    the Query-Man tool?

19         A.     Query-Man tool is an interface

20    tool that allows to write SQL language, to

21    pull larger amounts of data.

22         Q.     And are you trained in using

23    SQL?

24         A.     I am not.  The analysts are.

25         Q.     Okay.  Do you rely on any SQL

1    databases?

2         A.    We rely on several SQL

3    databases.

4         Q.    Do you know the names of any of

5    the SQL databases that you rely on?

6         A.    A lot of those are -- in

7    addition to Teradata, we also pull some

8    through for pharmacy alarm reports.

9         Q.    What is pharmacy alarm report?

10        A.    That shows a pharmacy is opened

11   or closed and armed, meaning as soon as the

12   pharmacy is vacated or closed, the pharmacy

13   has secured that pharmacy area per regulation

14   and law, and ensure that the pharmacy alarm

15   is activated.

16        Q.    So it's actually just an --

17   it's not an alarm as in there's some alarming

18   event, it's the actual existence of security

19   alarms?

20        A.    Security alarm.

21        Q.    Okay.

22        A.    That is correct.

23        Q.    All right.

24              Next line talks about "Receive

25   download of Tableau to evaluate with

Highly Confidential - Subject to Further Confidentiality Review

1    Teradata."

2              What's your understanding of

3    what "Tableau" is?

4         A.    Tableau is a visualization tool

5    that is very similar to Query-Man in the fact

6    that it allows you to bring data into a

7    system to be able to analyze that data and to

8    produce an output that hopefully is usable

9    information.

10        Q.    So my interpretation -- tell me

11   if you disagree with it -- is Tableau is a

12   visual analytical tool that allows you to see

13   a situation more clearly than an Excel chart

14   might allow you to understand it.  It gives

15   you a picture, and a picture could be worth a

16   lot more than those numbers and words on a

17   screen.

18        A.    Tableau does provide you with a

19   visual depiction of the data.  And the issue

20   is going to be defined by the circumstances

21   at the time.

22        Q.    Does it aid in understanding?

23        A.    It does aid in understanding.

24        Q.    Do you also use Alteryx?

25        A.    We do use Alteryx.

1      Q.    Okay.  So, now, Tableau, as I

2    understand it, there's the visual portion of

3    it, and there's also the underlying data that

4    provides the information that allows the

5    picture to form.  Is that a fair

6    interpretation of how it works?

7      A.    It has to pull data, yes.

8      Q.    It's got to load a file with

9    data, and then there's a visual piece of it.

10   Right?

11     A.    Correct.

12     Q.    Where does the data come from?

13          MR. VARNADO:  Object to the

14        form.

15          THE WITNESS:  Those data are

16        going to be coming from the same

17        processes that we use to pull the

18        manual data, that produce the

19        spreadsheets.

20     Q.    (BY MR. ECKLUND)  And does

21   pharmacy information for sales, for products,

22   for what's being dispensed from any one of

23   the regions, that information get into a

24   Tableau file?

25     A.    In the recent time frame, yes.

1    Q.    What time frame is that?

2    A.    Beginning -- we gained access

3  to Alteryx and Tableau in approximately 2014?

4    Q.    2014.

5    A.    2015.

6    Q.    For both programs?  But in 2011

7  you had Tableau?

8    A.    Alteryx came on the heels of

9  Tableau.

10    Q.    Okay.  But what about Tableau

11  specifically?  You had access to that prior

12  to 2014?

13    A.    In limited scope.

14    Q.    What does that mean?  How is it

15  limited?

16    A.    Meaning that you could get

17  trial versions, because licensing fee on

18  those were, at that particular point in time,

19  not necessarily available.  They have since

20  become there.

21    Q.    When did you purchase the

22  licenses?

23    A.    I don't recall.

24    Q.    And why would they be

25  unavailable to Walmart?

1      A.      It's not that they weren't

2   unavailable to Walmart.  They were

3   unavailable to the team at that particular

4   point in time, simply because that was a new

5   discovery in analytics.

6      Q.      Do you have an understanding of

7   what the licenses for Tableau cost in 2011?

8      A.      I do not.

9      Q.      Do you have an understanding of

10  what a Tableau license costs today?

11     A.      I do not.

12     Q.      Do you know whether they would

13  be considered expensive to a company with the

14  market value of Walmart?

15              MR. VARNADO:  Object to form.

16              THE WITNESS:  I do not.

17     Q.      (BY MR. ECKLUND)  Do you think

18  that Tableau was developed by a company with

19  the hopes that they would only be able to

20  sell to companies in the top Fortune 50?

21              MR. VARNADO:  Object to form.

22              THE WITNESS:  That -- I could

23          not answer that question.  I don't

24          know what their motivation would be.

25     Q.      (BY MR. ECKLUND)  Okay.  But

1    it's not your expectation that they would

2    have wanted to sell only 100 licenses for

3    Tableau.  They would want to sell it broadly

4    across the country; correct?

5                    MR. VARNADO:  Object to form.

6                    THE WITNESS:  That wouldn't be

7            my understanding.  I do not understand

8            their business model.

9            Q.    (BY MR. ECKLUND)  But certainly

10   Walmart would have had the resources

11   available to it if it had wanted to purchase

12   a license for Tableau?

13                   MR. VARNADO:  Object to the

14           form.

15                   THE WITNESS:  That is not a

16           decision that's made in our

17           department.

18           Q.    (BY MR. ECKLUND)  I'm not

19   asking whether it's a decision that would

20   have been made within your department.  I'm

21   asking whether they had the resources

22   available to purchase a license for Tableau.

23           A.    I'm not aware of what resources

24   would have been available at that particular

25   point in time.  I don't sit on the finance

Highly Confidential - Subject to Further Confidentiality Review

1    board.

2           Q.     What's Archer?

3           A.     Archer is -- it is a

4    commercially procured program, and it is a

5    place to house data.

6                  You can manually input

7    information into Archer for tracking

8    purposes, and for historical purposes.

9           Q.     Who puts the data into Archer

10   within Walmart?

11                 MR. VARNADO:  Object to the

12           form.

13                 THE WITNESS:  Archer is a

14           widely used program, so -- you'd have

15           to be more specific.

16          Q.     (BY MR. ECKLUND)  Within audit

17   and compliance for controlled substances, who

18   is responsible for putting data into Archer?

19                 MR. VARNADO:  Object to form.

20                 THE WITNESS:  That would be the

21           compliance department.

22          Q.     (BY MR. ECKLUND)  Do you know

23   who within compliance would be entering that

24   data?

25          A.     I don't know specifically.

1      Q.     Okay.  And just shifting back

2    to Alteryx, is Alteryx different from

3    Tableau?

4      A.     My understanding?  I'm not an

5    expert on either program, but my

6    understanding is Alteryx gives an opportunity

7    to provide or to pull larger data sets, and

8    at a higher level.

9      Q.     And you received access to

10   Alteryx and Tableau somewhere in the

11   neighborhood of 2014?

12     A.     That would be my estimate.

13     Q.     Okay.  And what were you --

14   what were you using Alteryx and Tableau for

15   in 2014?

16     A.     At that time we were continuing

17   to evolve and trying to improve our

18   processes.

19     Q.     What processes?

20     A.     Our audit processes and the

21   processes we used to monitor the inventory to

22   detect potential theft of controlled

23   substances.

24     Q.     All right.  Let's --

25     A.     As well as others.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Let's focus on audit processes.

2     How would you use Tableau or Alteryx to

3     improve your audit processes?

4     A.     By automating those.

5     Q.     And how were they automated?

6     What does that mean?

7     A.     Up until this -- forgive me.

8     Up until this time, we were -- we were, in as

9     far as 2006, pulling the data, reviewing the

10    data, determining where there might be

11    outliers.  And determining where there needs

12    to be further research and further

13    investigative effort applied.

14              At the store, and market level.

15              Those were multiple individual

16    reports pulled from those various data

17    systems.

18              What Alteryx does is pull from

19    those, for a specified time frame, in a most

20    broader scope, pulls them all at one time and

21    assembles that data in a more automated

22    fashion, making the process much more

23    efficient.

24    Q.     Okay.  And was Tableau or

25    Alteryx used in the same way to improve the

1   processes for detection of potential theft of

2   controlled substances?

3        A.    Theft of all substances

4   including controlled.

5             And that was a continuing

6   evolution of our continuous improvement

7   efforts.

8        Q.    Were Tableau and Alteryx also

9   used to improve processes for the detection

10  of potential diversion of controlled

11  substances?

12            MR. VARNADO:  Object to form.

13            THE WITNESS:  Define what

14       you're describing as "diversion."

15       Q.    (BY MR. ECKLUND)  Do you have

16  an understanding of what "diversion" means?

17       A.    I have an understanding of how

18  it is used in these documents.

19       Q.    And what is your understanding

20  of what diversion is?

21       A.    Diversion as it was known and

22  as it was applied in the documents that are

23  set before you is the theft of merchandising

24  and controlled substances from our

25  pharmacies, either through forged

Highly Confidential - Subject to Further Confidentiality Review

1    prescriptions or through shelf theft or

2    in-transit losses.

3            Q.    And what about abuse of

4    prescription drugs?  Does that fall within

5    diversion?

6            A.    As it is applied in these

7    documents, it was not a factor that was

8    applied in this understanding.

9            Q.    What about unintended use of

10   prescription drugs?  Does that fall within

11   diversion?

12               MR. VARNADO:  Object to form.

13               THE WITNESS:  Unintended use

14        would be -- could you give me a

15        broader explanation of that?

16               MR. ECKLUND:  Sure.

17           Q.    (BY MR. ECKLUND)  A parent is

18   prescribed medication by their doctor.  They

19   fill the prescription at a Walmart pharmacy.

20   They leave the pharmacy with the prescription

21   drug.  They go home.  They use the pills.

22   They don't use all of the pills because they

23   didn't feel they needed all.  It could be a

24   pain reliever, whatever you may want to use

25   in this hypothetical.  And the children come

1    home and they take the pills.  They're not

2    prescribed the pills by the doctor.  That

3    would be an unintended use of those pills.

4              Does that fall within your

5    understanding of diversion?

6        A.    As it is applied during this

7    time frame, no, sir.

8        Q.    Okay.  What about illicit

9    purposes?  And we could use Xanax or Soma or

10   Valium as examples.  Those are Schedule IV

11   controlled substances.  Right?

12       A.    Yes.

13       Q.    The same example.  The parent

14   gets prescribed Xanax.  And do you have an

15   understanding what Xanax is?

16       A.    I do.

17       Q.    What's Xanax?

18       A.    It's a tranquilizer.

19       Q.    And do you have an

20   understanding of what would happen if an

21   individual was to take crushed Xanax and also

22   drink alcohol?

23       A.    I personally do not have

24   knowledge of that.

25       Q.    I'm not asking you within your

1    personal experience, but do you understand

2    generally what may happen to an individual

3    that would do that?

4                 MR. VARNADO:  Object to form.

5                 THE WITNESS:  I have an

6            understanding what it can -- the

7            impact it can have on certain

8            individuals or some individuals, and

9            that is information that I've gleaned

10           through open source media.

11       Q.    (BY MR. ECKLUND)  What's your

12   understanding, based on your independent

13   investigation of open source media?

14       A.     That these particular drugs

15   are -- there are situations of probably drug

16   use, meaning that individuals are combining

17   prescription medications with other

18   substances for a variety of reasons.

19       Q.     Okay.  And what might those

20   reasons include?

21       A.     Those reasons could be either

22   ignorance of the interaction, or potential

23   interaction, and it could also be that

24   persons are involved in this type of activity

25   and -- from peer group pressure, and they

1    also could be involved in this activity as

2    social gatherings.

3         Q.     Okay.  And you talked about

4    some combinations of prescription

5    medications.  Are you familiar with what's

6    often referred to as the "trinity"?

7         A.     That is something that I

8    personally -- my personal knowledge of that

9    is it also comes through open source media,

10   yes.

11        Q.     Okay.  What's is your

12   understanding of what the "trinity" is?

13        A.     It is typically an opioid and

14   one of the anti-depressants or tranquilizers,

15   along with a muscle relaxer of some

16   nomenclature.

17        Q.     And what about the "holy

18   trinity"?  Are you familiar with the "holy

19   trinity"?

20             MR. VARNADO:  Object to form.

21             THE WITNESS:  Only what I've

22        read.

23        Q.     (BY MR. ECKLUND)  Okay.  And

24   again, what have you read about the holy

25   trinity as concerns combinations of

1    prescription medications?

2         A.    I have read that there have

3    been certain persons, in certain

4    circumstances, where that was a -- that that

5    was considered potentially problematic.  And

6    that that was a popular combination that was

7    being seen more and more prescribed from

8    medical doctors.

9         Q.    And you mentioned earlier that

10   you thought that people -- the reasons people

11   might use these particular medications could

12   include ignorance of the interaction, or the

13   potential interaction, peer group pressure,

14   and also could be involved in this activity

15   as social gatherings.

16              Why would people be combining

17   these medications during social gatherings?

18              MR. VARNADO:  Object to form.

19         Q.    (BY MR. ECKLUND)  Based on your

20   understanding of the social media.  I mean,

21   there's an opioid crisis.  Can we agree that

22   there's an opioid crisis?

23         A.    There is an opioid crisis.

24         Q.    When did you become familiar

25   with the opioid crisis?

1        A.      My recollection goes back

2    personally, approximately 2006.

3        Q.      2006.  And in 2006, you were

4    already at Walmart?  You were joining

5    Walmart?

6        A.      I was.

7        Q.      Okay.  So you arrived on the

8    scene and you were aware that there's a

9    crisis of opioids at that point?

10       A.      I was aware personally that

11   there was communications in media of an

12   opioid crisis.

13       Q.      Did you disagree with the media

14   coverage concerning the opioid crisis?

15       A.      At that particular point in

16   time, I didn't have evidence to agree or

17   disagree.

18               I am looking -- I am looking at

19   and focusing on the potential for that.

20       Q.      All right.  Since 2006, have

21   you come to a point where you now would agree

22   that there is in fact an opioid crisis or

23   epidemic in the United States?

24               MR. VARNADO:  Object to form.

25               THE WITNESS:  I would agree

1           that there is a crisis of opioids.

2           Opioids being a very general term in a

3           very broad class of substances.

4           Q.    (BY MR. ECKLUND)  Would you

5      agree that there is a prescription opioid

6      crisis in the United States today?

7           A.    I do not have the evidence or

8      the factors in front of me to agree or

9      disagree with that, Counsel.

10          Q.    Okay.  Are you aware that

11     between 2000 and 2014, unintentional drug

12     overdoses in the United States increased over

13     137 percent?

14          A.    I am familiar with numbers that

15     come from a multiple of different open

16     sources such as CDC, such as the DEA.  But

17     I'm not aware that -- whether -- what the

18     root cause of those overdose deaths were,

19     other than a broad class of opioids.

20          Q.    Okay.  Were you aware that

21     there was a 200 percent increase in overdose

22     deaths involving opioids?

23               MR. VARNADO:  Object to form.

24               THE WITNESS:  Again, opioids is

25          a broad class, both illicit and

1          prescription.

2          Q.    (BY MR. ECKLUND)  Were you

3     aware that more than half a million deaths

4     were due to prescription overdoses?

5          A.    I'm not familiar with that

6     particular number related to specifically

7     prescription overdoses.

8          Q.    Okay.

9               In 2015, there were 47,000

10    overdose deaths.  And there were more than

11    28,000 deaths involving opioids including

12    heroin.  But within that same year there were

13    19,000 involving prescription opioids.

14               Were you aware of that?

15               MR. VARNADO:  Object to form.

16               THE WITNESS:  I don't recall

17        reading that.

18          Q.    (BY MR. ECKLUND)  Okay.

19          A.    Specifically.

20          Q.    In your investigations online,

21    have you ever taken the time to read the CDC,

22    National Center for Health Statistics and

23    Morbidities Mortality Report from

24    January 1st, 2016?

25          A.    I did.

1    Q.    You did?  That's where these

2    numbers are coming from.

3    A.    (Witness nods.)

4    Q.    Do you have any reason to

5    dispute any of the CDC's statistics?

6    A.    I'm not in a position to

7    dispute or support CDC's outcome or

8    statistics.

9    Q.    So you're not willing to accept

10   them, but you're also not in a position to

11   dispute them?

12        MR. VARNADO:  Object to form.

13        THE WITNESS:  I didn't say I

14        didn't accept them.  I said I have no

15        basis to accept or reject.

16   Q.    (BY MR. ECKLUND)  Okay.

17        Looking at your evaluations at

18   57276, there's a description in the bottom

19   third of page -- "Initiate and direct drug

20   diversion education and training, enhancing

21   engagement and interaction between

22   investigative team and field associates."

23        MR. VARNADO:  Can you

24        show where on the page you are?

25        MR. ECKLUND:  Sure.

1          It's 57276.

2          Q.     (BY MR. ECKLUND)  Mr. Beam,

3     when you look on the bottom left-hand page --

4     I'm sorry, right-hand side.  Yeah, it's my

5     left, your right.

6          A.     Ahh.

7          Q.     My apologies.

8          A.     Yes, sir.

9          Q.     So throughout the deposition, I

10    may reference those numbers.  I'm not going

11    to read Walmart MDL or the zeros that come

12    before --

13         A.     Got ya.

14         Q.     -- the numbers.

15               So you'll see at bottom in

16    Section 2.1, there's a description.

17               Do you see the description?

18         A.     Yes, sir.

19         Q.     Okay.  And "Initiate and direct

20    drug diversion, education and training,

21    enhancing engagement and interaction between

22    the investigative team and field associates."

23    I'd like to talk a little bit about this.

24               So at this point, initiate,

25    you're beginning a program?

 1                    MR. VARNADO:  Object to form.

 2                    THE WITNESS:  No, sir.

 3          Q.      (BY MR. ECKLUND)  What were you

 4     doing, "initiating"?

 5          A.      That is -- each year, as we

 6     roll from one evaluation period to another,

 7     then those goals and objectives are set.

 8     Meaning this is what we plan to do for this

 9     particular given year.

10                    This one is an ongoing effort,

11     and was part of a program that's ongoing when

12     I came onboard in 2006, to educate new

13     associates and existing associates within the

14     health and wellness division in the field

15     areas in the market teams on, "Here are the

16     things that we're seeing inside of Walmart,

17     and we need your help as leadership, number

18     one, to identify it, and number two, to help

19     train your associates better, and number

20     three, to report this information if you see

21     these activities occurring within your

22     space."

23          Q.      Okay.  Who was -- who was

24     running that portion of the program in 2006

25     when you came onboard?

```
 1              A.      Each investigator's

 2      responsible --

 3              Q.      What were the names of

 4      the investigators?

 5              A.      -- for covering their area.

 6              MR. VARNADO:  Let him finish

 7          his answer.

 8              MR. ECKLUND:  That's fine.

 9              THE WITNESS:  Each of the

10          investigators are responsible for

11          doing that activity in their areas.

12              Q.      (BY MR. ECKLUND)  I'm asking

13      for names, specifically names.  Do you recall

14      any of the names of the investigators that

15      were responsible, when you came onboard in

16      2006, for educating and training, enhancing,

17      management interaction between investigative

18      teams and field associates?

19              A.      When I came onboard in 2006,

20      that would have been Terry Crabb.

21              Q.      Anyone besides Terry Crabb?

22              A.      Jamie Newell, who was the

23      senior manager of the group at that time.

24              Q.      Anyone else?

25              A.      Glenn Webster.
```

1      Q.      Anyone else?

2      A.      Latonya Foster was onboard at

3    that time, in 2006.

4      Q.      Anyone else?

5      A.      And Rob Price.

6      Q.      That's very helpful.

7              So these five individuals you

8    just identified, were they -- did they

9    continue to be responsible for the initiation

10   and direction and education and training as

11   described on this page beyond 2006?

12             Did they continue in that role

13   with that same responsibility from 2006

14   beyond into 2007?  '8?

15     A.      I don't recall specifically the

16   exact times that they took positions and

17   promotions on the other teams and did other

18   things, but they were responsible up until

19   the time they left the teams.

20     Q.      And when did -- do you remember

21   when they left the teams?

22     A.      I don't, sir.

23     Q.      Do you --

24     A.      Because it has been -- the

25   teams have migrated and morphed over the

1   years.

2         Q.    Do you recall any additional

3   individuals who were responsible for this

4   initiative as described on this page in 2007?

5         A.    I can't distinguish.  But if

6   all of those individuals were still there in

7   2007, like I say, I don't know exactly when

8   the rotation of one person vacated the

9   position and it was backfilled with another

10  investigator.

11        Q.    All right.  I'm asking it

12  slightly differently.  So in 2006, you're

13  fairly confident that these individuals --

14              (Interruption with hold music.)

15              MR. ECKLUND:  So for the

16        benefit of the record, we've lowered

17        the volume on the speakerphone

18        because, once again, we've been placed

19        on hold and we'll just note for the

20        record that it's the same hold music,

21        so we suspect it's more than likely

22        the same individual or law firm.

23        Q.    (BY MR. ECKLUND)  So, Mr. Beam,

24  what I'm asking -- and trying to understand

25  whether, in 2007, you recall any other people

1   that might have had the same responsibility.

2           So I'm not asking you

3   necessarily a hard stop for Terry Crabb or

4   for Webster, or any of these other

5   individuals, that they started in '06 or '05

6   or '04, and they continued until June of '08

7   or '09.  Just generally, who are the other

8   people that might have been involved?

9           So the people you can recall

10  that had responsibility for this initiative

11  which is described on your evaluation in

12  2011, right?  But we want to understand who

13  fills in prior to that.  All right?

14          So 2007, do you recall any

15  other individuals that were responsible for

16  this initiative?

17              MR. VARNADO:  Object to form.

18              THE WITNESS:  I don't recall in

19      2007.

20      Q.   (BY MR. ECKLUND)  Okay.  Same

21  for 2008.  Do you recall any additional

22  individuals who would have been responsible

23  for this initiative in 2008?

24      A.   2008, potentially.  There could

25  have been the change out of some of those

1   positions.  And at some point in there, a

2   Richard Ivy would have come onboard.

3          Q.      Anyone else?

4          A.      Jarred Crabtree at some point

5   was on the team.

6          Q.      Possibly 2008, but it might

7   have been later on?

8          A.      Could have been.

9          Q.      Anyone else?

10         A.      Kathy Stowe.

11                 Kelly Cox.

12         Q.      Anyone else?

13         A.      Travis Fought.

14         Q.      Anyone else?

15         A.      John Oldfather.

16         Q.      Any other names come to mind?

17         A.      And currently, and just

18   recently, Brandon Rogers.

19         Q.      Okay.  You said something very

20   important just now.  You said "and just

21   recently."  So these additional individuals,

22   Mr. Oldfather, Travis, Ms. Cox, these are

23   individuals that may have been doing the same

24   initiation, direction, education, and

25   training, since 2006 through to today?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yeah.  They --

2      Q.      Okay.

3      A.      They weren't doing direction.

4  They were doing interaction.

5      Q.      Okay.  All right.  Let's talk a

6  little bit about what you would do in order

7  to become educated and also insistent in how

8  you would educate the investigative teams and

9  the field associates.  All right?

10           You've given a fair number of

11  names.  Is it important that the training

12  that they receive and provide to others would

13  be consistent across Walmart?

14           MR. VARNADO:  Object to form.

15           THE WITNESS:  Across what, sir?

16      Q.      (BY MR. ECKLUND)  The field

17  associates, they're located across the

18  country; right?

19      A.      They're located here in

20  Bentonville --

21      Q.      Just Bentonville --

22      A.      -- and they cover geographic

23  areas.  Yes.

24      Q.      Is it important they are

25  provided consistent training?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. VARNADO:  Object to form.
 2              THE WITNESS:  It is important
 3         that they remain abreast of the
 4         current trends and knowledgeable of
 5         what the focal points are at that
 6         time.
 7         Q.    (BY MR. ECKLUND)  That's a fair
 8    point.  I understand what you're saying.  I'm
 9    also wondering about how these individuals
10    would have been trained on the subject matter
11    that they needed to then retrain others on,
12    or teach others about.
13         A.    The vast majority of the people
14    that are named there are former law
15    enforcement officers, with great experience.
16    And as they come in, they come in with a
17    great deal of that knowledge in their
18    position already.  And as they are oriented
19    into Walmart's environment, they do meet and
20    talk with the compliance division.  They do
21    meet and talk with operations division.  They
22    get an understanding of the environment that
23    they're responsible for, and then they look
24    at the information and data to determine
25    where there may be opportunities or there may
```

1    be some things that they can do in order to

2    help improve that area.

3         Q.    Okay.  Let's talk a little bit

4    about that.

5              You said that they're former

6    law enforcement officers.

7              From which law enforcement

8    groups are they coming from?

9         A.    Yeah.  Most were law

10   enforcement officers.

11        Q.    But I mean police officers?

12   Local enforcement?  State enforcement?

13   Federal enforcement?

14        A.    Across all of those boundaries?

15        Q.    Combination?

16        A.    Yeah.

17        Q.    Okay.

18              What is N-A-D-D-I?

19        A.    It's National Association of

20   Drug Diversion Investigators.

21        Q.    Okay.  And are you actively

22   involved in that association?

23        A.    Currently not.  We were -- I

24   have not been actively involved over the past

25   two years.  Mainly due to time.

1    Q.    Prior to 2017, were you

2    involved since your arrival at Walmart?

3    A.    Yes.  We would -- we would talk

4    with the state and the national level of

5    leadership in that organization, and we would

6    also attend conferences.

7    Q.    Do you participate in those

8    conferences annually?

9    A.    We would have members of the

10   team that would attend those conferences.

11   Not every team member was able to go.

12   Q.    Okay.

13   MR. ECKLUND:  You going to ask

14        them to take attendance?

15   MR. CECCHI:  Yeah.

16        Should we take an attendance of

17        all the attendees on the phone while

18        the hold music is playing and then

19        we'll do our own little diversion

20        investigation here and see who's on

21        hold?

22        Everyone on the phone, please

23        put your name on the record again.

24        You're going to have to speak up

25        because it's hard to hear you.

```
 1              MR. INNES:  This is

 2       Michael Innes for plaintiffs.

 3              MR. ANDERSON:  Jon Anderson,

 4       AmerisourceBergen.

 5              MS. HOSMER:  Heather Hosmer,

 6       Arnold & Porter.

 7              MS. MARINO:  Christina Marino,

 8       Tucker Ellis.

 9              MR. BOWER:  Zach Bower, Carella

10       Byrne.

11              MR. CECCHI:  And, Zach, stop.

12       Who was the name before you?  That was

13       hard to hear.

14              MS. MARINO:  Christina Marino,

15       tucker Ellis.

16              MR. CECCHI:  Anyone else?

17              MR. HALPERN:  Rick Halpern,

18       Marcus & Shapira.

19              MR. SNYDER:  Ryan Snyder,

20       O'Melveny & Myers.

21              MR. ECKLUND:  Jon Anderson?

22              MR. ANDERSON:  I'm on there.

23       I've already announced myself.

24              MR. VARNADO:  All right.  Thank

25       you, everybody.  We're going to try to
```

1        press on here.

2        Q.      (BY MR. ECKLUND)  It's always

3    unique, every deposition.

4        A.      The modern wonders of

5    technology.

6        Q.      That's right.

7                All right.  So, Mr. Beam, if I

8    could direct your attention to page 57289.

9                This is for your fiscal year

10   2013 annual performance review.

11       A.      FY13?  On the 289?

12       Q.      Okay.  Top right side of the

13   page, "Diversion mitigation response.  Year

14   to date, the team completed 1,065 pharmacy

15   investigations through December 2012, 800 of

16   which were resolved as confirmed diversion

17   integrity or cleared with no losses through

18   research."

19               Were you involved in those

20   efforts to investigate those 1,065 pharmacy

21   investigations?

22       A.      My responsibility at that time

23   was to manage the team who were directly

24   involved with those investigations.

25       Q.      Did you provide oversight to

1    the team that was responsible for those

2    individualized investigations?

3              MR. VARNADO:  Object to form.

4              THE WITNESS:  I reviewed

5         reports and provided direction as the

6         team members needed assistance in

7         making decisions.

8         Q.    (BY MR. ECKLUND)  Do you recall

9    approximately how many times you needed to

10   review the reports and provide direction for

11   these 1065 pharmacy investigations?

12        A.    I don't recall the numbers.  I

13   mean, it is a daily interaction with my

14   investigators.

15        Q.    More than half of the 1,065?

16             MR. VARNADO:  Object to form.

17             THE WITNESS:  I would not say

18        that there needed direction or any

19        type of direct -- any type of

20        instruction over half, I wouldn't

21        agree to that.

22        Q.    (BY MR. ECKLUND)  More than

23   10 percent?

24        A.    There was more.

25             MR. VARNADO:  Counsel, could

1          you please let him finish his answer.

2                THE WITNESS:  There was a lot

3          of conversation that occurred, and as

4          those conversations occurred, it is

5          more of a sounding board and just

6          bouncing things off.

7          Q.    (BY MR. ECKLUND)  All right.  I

8     will apologize for interrupting you, but I

9     also want to remind you again, I'm asking

10    questions and I'm hopeful that the answers

11    will be responsive to the question that I'm

12    asking.  The question that was asked was more

13    than half.  And you went on a bit of a

14    tangent on to other things.

15                So I can read it back to you,

16    or you can look at the iPad and see the

17    question, but I want to try to keep on focus.

18    We want seven hours.  We want to get through

19    this.  It's a lot easier if we can keep on

20    track.

21                MR. VARNADO:  And I would just

22          say, for the record, that the witness

23          responded.  I would not say that there

24          needed direction or that type of

25          instruction on over half.  I wouldn't

1    agree to that.

2              MR. ECKLUND:  And then he

3    continued.

4              MR. VARNADO:  No.  Then you

5    asked him, "More than 10 percent?"

6    And he answered.

7         Q.   (BY MR. ECKLUND)  And the

8    answer to the question "More than

9    10 percent," there was more -- "There was a

10   lot of conversation that occurred and as

11   those conversations occurred, I was more of a

12   sounding board and just bouncing things off."

13             So the answer is more than

14   10 percent, more than 10 percent, yes?

15        A.   No.

16        Q.   Less than 10 percent?

17        A.   It would be a guess --

18             MR. VARNADO:  If you know.  --

19             THE WITNESS:  Guesstimate on my

20        part.  I can't give you a specific

21        percentage.

22        Q.   (BY MR. ECKLUND)  Less than

23   5 percent?

24        A.   I can't give you --

25             MR. VARNADO:  Object to form --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  -- specific

 2         percentage, Counselor.

 3         Q.    (BY MR. ECKLUND) Do you know

 4    whether you looked at more than 20 of those

 5    investigations in that year?

 6              MR. VARNADO:  Object to form.

 7              THE WITNESS:  I would say

 8         the -- over -- over the year I looked

 9         at just about all of those.  But that

10         was more from keeping up with what was

11         going on, rather than managing and

12         directing.

13         Q.    (BY MR. ECKLUND)  Okay.  And

14    then specifically in managing and directing,

15    more than 20?  Where you directed the

16    outcome?

17         A.    I didn't direct the outcome of

18    hardly any of these.  That's the

19    responsibility of our investigators working

20    in coordination with our compliance division.

21         Q.    It's the "hardly any" that I'm

22    trying to understand.

23         A.    I don't direct the outcome of

24    an investigation.

25         Q.    Okay.
```

1          A.      The investigation will go where

2     the facts lead.

3          Q.      Do you keep records of the

4     investigations in which you became involved?

5          A.      There's a record of

6     investigations, period.

7                  And if I was involved in it,

8     that would be indicated in the report.

9          Q.      Okay.  Okay.  In the 800 of

10    which were resolved as confirmed diversion

11    integrity or cleared with no losses through

12    research, do you recall how many of the 800

13    were confirmed diversion?

14         A.      I couldn't sit here and give

15    you a clear answer on that today, from that

16    time frame.

17         Q.      Are there records within

18    Walmart that would give us that answer?

19         A.      Investigative reports, I

20    presume.

21         Q.      So within the 800 investigative

22    reports, you presume they would indicate

23    whether they were resolved as confirmed

24    diversion, or integrity, or cleared with no

25    loss?

1        A.       Na that would be an accurate

2    reflection.

3        Q.       Towards the bottom of the page

4    you see a bolded section.  "Diversion,

5    training, outside agency engagement."

6             Do you see that?

7        A.       Yes, sir.

8        Q.       And it reads, "Diversion team

9    has completed 16 diversion training and

10   awareness seminars educating over 600

11   pharmacy and asset protection associates on

12   diversion trends and methodologies."

13            Were you involved in the

14   training and awareness seminars?

15       A.       Those were not.  Those were the

16   ones that the investigators were completing.

17       Q.       Did you attend the training and

18   awareness programs?

19       A.       Not each of those.  I have

20   attended a handful of those.

21       Q.       Were there written materials

22   handed out at the trainings that you did

23   attend?

24       A.       No.

25       Q.       Were there slide decks shown?

1          A.       There were.

2          Q.       Okay.  PowerPoint slide decks

3     on a large screen?

4          A.       Yes, PowerPoints.

5          Q.       Okay.  Do you recall any of the

6     outside agencies that were brought in?

7          A.       I -- I can't answer that

8     specifically, or exactly.  I know there were

9     occasions where outside agencies would

10    attend.  Particularly board to pharmacy, or

11    diversion investigators, but to say which

12    department in which states in which training

13    session, I -- I don't recall.

14         Q.       Turn your attention to 57302.

15    It's fiscal year 2015.

16              Toward the bottom of the page

17    reads, "Diversion team has ran six

18    significant cases during the first quarter,

19    one of which was one of the largest losses

20    discovered in recent memory.  Complicated

21    cases have been uncovered."

22              Do you see that?

23         A.       I do.

24         Q.       Do you remember anything about

25    the largest loss discovered in recent memory

Highly Confidential - Subject to Further Confidentiality Review

1    investigation?  Do you remember what product

2    it involved?  What part of the country it

3    concerned?

4              Anything at all?

5              MR. ECKLUND:  I'll just note

6         for the record that the witness is

7         perusing through what has been marked

8         as Exhibit 1, and I suppose in an

9         effort to refresh his recollection.

10             THE WITNESS:  That is correct.

11   Q.    (BY MR. ECKLUND)  Okay.

12   A.    I do not see anything in the

13   record that would assist me in recalling

14   that.  I don't recall the specifics of that

15   particular investigation.

16   Q.    But for that investigation

17   along with the other six or five, depending

18   on how they were tabulated, there would be

19   records within Walmart that would document

20   those investigations; correct?

21   A.    There would be a case file.

22   Q.    There would be a case file.

23             And would you have reviewed

24   that case file?

25   A.    I would have reviewed that case

1    file.

2         Q.    Okay.

3               Direct your attention to Bates

4    page 57310.  And while you get there, I'll

5    just read this into the record.

6               It's in the right-hand side in

7    Section 1.1, bottom half.

8               "Through November 2014, the

9    team successfully initiated 555 diversion

10   investigations, closed 543 investigations,

11   20 percent of which were confirmed active

12   diversion.

13              "The team's investigative

14   efforts resulted in the identification of

15   more than ███████ dosage units of various

16   controlled substances missing or stolen from

17   inventory with a street value of more than

18   ██████████, almost double the volume of

19   missing inventory over" -- and I believe that

20   was last year to date?

21        A.    That is correct.

22        Q.    Okay.

███                        ████████████████████

███    ████████████████████████████████████████

███    █████████████████████████████████████████



5          So I'd like to just understand

6     some of the terms in this paragraph.

25          A.    Those are unknown.  Those would

1    be -- and could be generated from a multitude

2    of areas.

3              As we've seen and experienced

4    today, technology is a wonderful thing until

5    it doesn't work.  So occasionally there will

6    be some gaps that will occur.  And as we

7    track those down, we can find absolutely no

8    evidence of diversion, theft, or the loss.

9         Q.    Okay.

10    ███████████████████████████

11    that were missing or stolen from inventory,

12    do you have any insights or records that

13    would show from which parts of the country

14    those missing units were taken?

15         A.    Those would be in the

16    investigative files.  I mean, that would --

17    did we -- did we plot those?  No.

18         Q.    ███████████████████████

19    acceptable amount of theft or loss within

20    Walmart?

21              MR. VARNADO:  Object to form.

22              THE WITNESS:  The loss or theft

23         of any is going to be considered.

24              Walmart has a compliant

25         culture, and the theft and loss of

1       those are not something that Walmart

2       was ascribed to.

3               There are things that are going

4       to happen, and we talk about these

5       theft and losses.  You also have to

6       keep in mind that these are all

7       substances that were scheduled to be

8       delivered to a pharmacy, so these

9       include not only ranges from a single

10      person, self-medicating, taking an

11      aspirin from inventory, which we had

12      to go to determine that that was in

13      fact an aspirin, through in-transit

14      losses that were lost in shipment and

15      never arrived at the pharmacy.

16      Q.    (BY MR. ECKLUND) Okay.  I'm

        ███  ██████████  ████████████████████████

        ███  ████████████████████████████████████

19      include aspirin?

20      A.    Controlled substances would

21      not.  But we -- the -- just to give you a

22      broad brush, we look at any of those

23      anomalies inside of the pharmacy

24      environments.

25      Q.    Okay.  I'm only concerned with

1      the controlled substances right now.

2           A.     Understood.

13                 Do you have any understanding

14     of how many of those were C-IIs?

15          A.     I do not.

16          Q.     And would the records reflect

17     how many of those were C-IIs?

18          A.     In these losses, the 106 files,

19     perhaps.

20          Q.     Would it be reflected in the

21     Tableau?

22          A.     No.

23          Q.     What about in the Alteryx?

24          A.     No.

25          Q.     SQL database?

1        A.      No.

2        Q.      Archer?

3        A.      No.

4        Q.      Only the 106 forms?

5        A.      106 forms and case files.

6        Q.      Were you using Tableau at this

7    point?  November 2014?

8        A.      We -- we were using Tableau as

9    a company and as a division, but it was not

10   used to track or to load health and wellness

11   information.

12              From our -- we did not have

13   those ability to Archer during this time

14   frame.

15              MR. VARNADO:  Counsel, we've

16   been going close to an hour and a half.

17              MR. ECKLUND:  That's fine.

18              MR. VARNADO:  Take a little

19       break?  Doesn't have to be long.

20              VIDEOGRAPHER:  9:54.  We are

21       off the video record.

22              (Recess taken, 9:54 a.m. to

23       10:07 a.m.)

24              THE VIDEOGRAPHER:  10:07.  We

25       are on the video record.

1    Q.    (BY MR. ECKLUND)  Welcome back,

2    Mr. Beam.  You understand you're still under

3    oath?

4    A.    I do.

5    Q.    Okay.  So we were talking a

6    ██████████████████████████████████████████

7    and I'm wondering, at that point in time,

8    would there have been a way for you to

9    understand where the holes were that would

10   have allowed so many pills to go missing or

11   to have been stolen?

12            MR. VARNADO:  Object to form.

13            THE WITNESS:  There are endless

14       ways that persons can take substances

15       out of a pharmacy, any given pharmacy,

16       not just Walmart pharmacy.  It is a

17       company with associates.  Those

18       associates are human beings, and good

19       people are going to make bad

20       decisions.

21            That's why the company has our

22       team in place, in order to identify

23       and mitigate that as quickly as

24       possible.

25            There are -- in order to look

1            at trends, yes, we looked at trends.

2            And that was a part of the continuing

3            feedback loop to the field in these

4            training sessions.

5        Q.    (BY MR. ECKLUND) You mentioned

6  that sometimes good people make bad

7  decisions.  Did you report any of those good

8  people who made these bad decisions to local

9  law enforcement?

10       A.    We did.

11       Q.    How many?

12       A.    In fact, every investigation

13  where diversion is proven, we have the

14  evidence, that information is referred for

15  prosecution and police are notified in each

16  individual case.

17       Q.    Okay.  So in every instance

18  where you have sufficient information, where,

19  using your term, where diversion is proven,

20  and where you have the evidence, that

21  information is referred to prosecution and

22  police are notified in each individual case.

23        Did you -- when you had

24  occasions to suspect diversion, did you refer

25  that information, whether it was proven or

1    not proven, just suspected, to DEA?

2                 MR. VARNADO:  Object to form.

3                 THE WITNESS:  That information

4         was reported if there were losses

5         connected.  But in terms of referring

6         for local law enforcement, we did not

7         refer to local law enforcement unless

8         there is prosecutable evidence there.

9         Q.    (BY MR. ECKLUND)  I was

10   specifically asking about DEA.  So it would

11   have been reported to DEA.  And then as far

12   as referral for prosecution asks you

13   employees who were involved, that was only

14   when you felt that the evidence was clear?

15   That there was prosecutable evidence?

16        A.    Yes.

17        Q.    Okay.

18        A.    And the -- in reporting to the

19   DEA, each one of these investigations are

20   coordinated through compliance, who completes

21   the 106s, per their guidelines.  And per

22   their instructions.

23                What we do is submit the facts

24   to local law enforcement, our state law

25   enforcement, for additional action to include

1    prosecution.

2          Q.    Okay.  Okay.  We were talking

3    earlier about the definition of diversion.

4    You gave me your definition.  I'm wondering

5    whether the intended purposes and

6    unaccountable losses were factors as well.

7                So we talked about theft.  Do

8    you recall that?

9          A.    (Witness nods.)

10          Q.    And we talked about illicit

11    use, the child taking the product from a

12    parent.  What about any other deviation from

13    what the intended path for that pill was?  Is

14    that considered within Walmart as part of

15    diversion?

16                MR. VARNADO:  Object to form.

17                THE WITNESS:  Once the

18          prescription is -- a legitimate

19          medical prescription is received and

20          filled, there is not necessarily a

21          feedback loop that comes back to the

22          company that would reflect that.

23                So I'm -- I can't sit here and

24          answer the end consumption of a

25          legitimate prescription that left our

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy, sir.

2    Q.    (BY MR. ECKLUND)  I'm not

3    asking you to answer who ultimately consumed

4    the pill.  I'm asking whether the deviation

5    from the intended path for the pill is

6    considered as part of diversion within

7    Walmart.

8         So beyond just theft or loss or

9    the bad employee -- good person you described

10   as doing a bad thing, I would call them bad

11   employee, who is stealing or selling or

12   taking prescription drugs that they shouldn't

13   be taking.  Is that fair to say?  If

14   someone's taking this stuff, they shouldn't

15   be taking it?

16        MR. VARNADO:  Object to form.

17        THE WITNESS:  I wouldn't

18   necessarily call any person a bad

19   person.  I'm not going to judge

20   another person's heart, motive or

21   intent.

22        MR. ECKLUND:  Okay.

23        THE WITNESS:  But what I will

24   say is that we have had people who

25   have been long-term associates, and

```
 1              have been stellar performers, but make

 2              bad decisions.

 3         Q.     (BY MR. ECKLUND)  Okay.  So a

 4    long-term associate who was a stellar

 5    performer who took a bottle of oxy 30s and

 6    sold them to kids at a playground, not a bad

 7    person?

 8                   MR. VARNADO:  Object to form.

 9                   THE WITNESS:  That is a

10              hypothetical, and I could only give

11              you a hypothetical answer.

12                   MR. ECKLUND:  Okay.  All right.

13                   We'll mark this as Exhibit 2.

14         Q.     (BY MR. ECKLUND)  The whole

15    purpose behind the Controlled Substances Act

16    is to control potentially dangerous drugs;

17    correct?

18                   MR. VARNADO:  Objection, form.

19                   THE WITNESS:  That is -- that

20              is my understanding.  That they are

21              scheduled for a reason.

22         Q.     (BY MR. ECKLUND)  And the

23    reason why, as I understand it, the DEA

24    concerns itself with diversion is because

25    they're concerned about where those pills may
```

1    be used or consumed.

2              MR. VARNADO:  Object to form.

3              THE WITNESS:  I do not have

4         insight into the -- all the decisions

5         and factors used by the federal

6         government to make those decisions.

7         Q.   (BY MR. ECKLUND) Well, you've

8    attended for many, many years meetings where

9    members of law enforcement, DEA included,

10   would be present providing presentations,

11   providing information, correct?

12        A.    I have attended several.

13        Q.    And throughout any of those

14   conferences or meetings, did they ever share

15   with you their views on the importance of

16   preventing diversion?

17        A.    Both diversion and consumption.

18        Q.    Okay.

19              (Walmart-Beam Deposition

20         Exhibit 2, September 2010 email,

21         Subj: RE: DEA Audit at DC 6013.

22         WMT_MDL_000057259-57260, was marked

23         for identification.)

24        Q.    (BY MR. ECKLUND)  And one

25   reason that they're concerned about

Highly Confidential - Subject to Further Confidentiality Review

1    prevention and diversion is because diversion

2    can cause harm to people; correct?

3              MR. VARNADO:  Object to form.

4              THE WITNESS:  It potentially

5         can.  It doesn't always result in

6         harm.

7         Q.    (BY MR. ECKLUND)  Not always,

8    but can?  Correct?

9         A.    It can.

10        Q.    Okay.  And when you're talking

11   about Schedule IIs, where the risk of abuse

12   and addiction is most significant, the

13   concerns are even more heightened than, for

14   example, substances in controlled Category

15   IV; correct?

16             MR. VARNADO:  Object to form.

17             THE WITNESS:  The

18        classification is more restrictive.

19        Q.    (BY MR. ECKLUND)  The

20   restrictions for those classifications are

21   based upon perceived concerns about risk and

22   abuse; correct?

23        A.    As that -- that is the language

24   of the CSA Act, yes.

25        Q.    Okay.  Now, I've handed you

1    what's been marked as Exhibit 2.

2              And you'll see it's an email,

3    and at the top it was sent by James Greer,

4    and this bears Bates stamp 57259.

5              Tim Harris and Susanne Hiland

6    are also recipients of this email.

7              Do you see that?

8         A.    I do.

9         Q.    Who are James Greer,

10   Tim Harris, and Susanne Hiland, within

11   Walmart?

12        A.    James Greer is senior manager

13   asset protection within logistics.

14        Q.    Okay.

15        A.    Tim Harris was a senior

16   director of health and wellness logistics.

17             Susanne Hiland, at this time,

18   was the director of health and wellness

19   compliance.

20        Q.    And within Walmart's hierarchy,

21   are Mr. Greer and Mr. Harris above or below

22   Ms. Hiland?  She has a different title so I'm

23   just wondering within the hierarchy.

24        A.    Within hierarchy, they are

25   equals.  But because each of those are --

1    each of those three right there are separate

2    entities, that work collaboratively.

3         Q.    Okay.  So director of health

4    and wellness is within the same tranche

5    within the hierarchy in Walmart as the senior

6    director of logistics?

7         A.    Senior director.

8         Q.    Senior director.  Sorry.  I

9    thought that Mr. Greer was the senior

10   manager.

11        A.    Senior manager.  Yes.

12   Mr. Greer is senior manager.

13        Q.    Is he higher or lower than --

14   I'm trying to understand who is -- who is in

15   which role.

16        A.    Yeah.

17        Q.    So is Mr. Greer a person that

18   would delegate or be able to provide

19   assignments to Mr. Harris?

20        A.    No.

21        Q.    Okay.  Other way?

22        A.    Other way.

23        Q.    Okay.  So Mr. Harris can

24   provide assignments to Mr. Greer.  So the

25   director, senior director of health and

Highly Confidential - Subject to Further Confidentiality Review

1    wellness and logistics, Mr. Harris, would

2    supervise or be able to broken line or direct

3    line provide assignments to Mr. Greer?

4         A.    Correct.

5         Q.    And what about Ms. Hiland?

6    That's a different group, but she's a

7    director.  Could she also provide assignments

8    to Mr. Greer?

9         A.    She does not have oversight of

10   Mr. Greer.  But in a matrix or organization,

11   we work jointly across, so whatever

12   Ms. Hiland would ask of Mr. Greer that was

13   within his job scope, I'm sure he would have

14   worked with her on.

15        Q.    So I refer to that as like a

16   broken line reporting structure, where she's

17   not always directly providing him

18   responsibilities or task, but on occasion

19   can.

20        A.    Correct.

21        Q.    Okay.  Now, looking at this

22   email, it concerns a specific DC.  Do you see

23   that, DC 6013?

24        A.    Yes, sir.

25        Q.    And there's an audit, DEA

Highly Confidential - Subject to Further Confidentiality Review

1    audit.  Do you recall that audit?

2         A.     Off the top of my head, I do

3    not.

4         Q.     How often does DEA audit

5    Walmart distribution centers?

6         A.     That, sir, you would have to

7    get from logistics.

8         Q.     It's not something that would

9    often include you?

10        A.     Correct.

11        Q.     Now, second line up -- I'll

12   just start from the top.  They are looking

13   for our due diligence in dealing with

14   excessive or suspicious orders.

15             Currently we rely on the

16   diversion team to run audits and flag

17   excessive purchases.

18             Do you see that?

19        A.     I do.

20        Q.     Okay.  Who -- who is on the

21   diversion team at this point?  In 2010?

22        A.     Because of the fluid nature of

23   the diversion team, with answers that I

24   provided previously, I would -- I cannot

25   specifically tell you who would have been on

1    the team at that particular time of this

2    email.

3              I can -- I can only guess at

4    that point.

5         Q.    Were you part of the diversion

6    team?

7         A.    I was the senior manager of the

8    diversion team at that time.

9         Q.    Okay.  Were you responsible for

10   running the audits?

11        A.    I was not responsible for

12   running the audits, but our analyst team

13   were.

14        Q.    Were you responsible for

15   reviewing the work of your analyst team?

16        A.    I do review the analyst work of

17   the audit team in that any -- any product

18   they would have produced would have been

19   shared with compliance along with logistics

20   before it would have been shared elsewhere.

21        Q.    So would you have reviewed the

22   work of the analyst team prior to sharing it

23   with the other groups within the diversion

24   team?  For example, compliance?

25              MR. VARNADO:  Object to form.

```
 1                    THE WITNESS:  Yes.
 2         Q.    (BY MR. ECKLUND)  Okay.  So you
 3    would review the analyst's work, and then
 4    once you were comfortable that it was quality
 5    work, you would share it with others on the
 6    diversion team?
 7                    MR. VARNADO:  Object to form.
 8                    THE WITNESS:  Once I felt that
 9         the ask was complete, then, yes, that
10         would have been shared with
11         compliance.
12         Q.    (BY MR. ECKLUND)  Okay.
13              Were you also involved in
14    flagging excessive purchases?
15         A.    I was not.
16         Q.    Do you know who was?
17         A.    That, I do not know.
18         Q.    Do you know how Walmart was
19    complying at that point --
20                    MR. VARNADO:  Object to form.
21         Q.    (BY MR. ECKLUND)  -- with
22    flagging excessive purchases?
23                    MR. VARNADO:  Sorry.  Object to
24         form.
25                    THE WITNESS:  I do not know the
```

1          decisions or the processes by which

2          one was determined to be flagged or

3          not.

4          Q.    (BY MR. ECKLUND)  That wasn't

5    something that was --

6          A.    At that time.

7          Q.    Was that something that was

8    discussed within the diversion team, or was

9    that something that was discussed

10   specifically within compliance?

11         A.    That was something that was

12   discussed outside of diversion team.  I don't

13   know who were parties to those discussions.

14         Q.    Okay.

15               Who -- do you know anyone at

16   Walmart that would know who was party to

17   those discussions?

18               MR. VARNADO:  Object to form.

19               THE WITNESS:  I do not.

20         Q.    (BY MR. ECKLUND)  Okay.  Line

21   continues, "However, the DEA had indicated

22   more than once that they want the DC to be

23   able to show due diligence."

24               Do you have an understanding of

25   what DEA was particularly concerned about as

1    far as due diligence?

2          A.     I don't know what Jim Greer's

3    intent was behind that terminology.  I can't

4    speak for him, sir.

5          Q.     Okay.  Did you do anything in

6    response to this request for being able to

7    show due diligence?

8                 MR. VARNADO:  Object to form.

9          Q.     (BY MR. ECKLUND)  As part of

10   audit?

11         A.     That was -- that information,

12   and that particular process, was handled

13   within logistics, with others that were

14   providing advice and recommendations.

15                I don't know what processes

16   were put in place at that particular time as

17   a result of this communication.

18         Q.     Okay.  What's an excessive

19   purchase report?

20         A.     Those are reports we would

21   complete that were, in our vernacular, called

22   purchase and dispense reports.

23                So if a -- if an area or a

24   location was ordering substances, any C-III

25   through V -- or C-II through V, rather --

1    that appeared to be growing, then that would

2    be a signal for us, number one, potentially

3    we'd want to take a further look at that.

4    But we also want to look at dispenses to

5    determine are the dispenses consistent with

6    what the systems or the associated store are

7    ordering.

8         Q.    In that same sentence it

9    continues, about flagging amount.

10             It said, "You did not have a

11   flag amount."  What is a "flag amount"?

12             MR. VARNADO:  Object to form.

13             THE WITNESS:  I do not know

14        what Mr. Greer intended by this flag

15        amount as it is related in this

16        communication.

17        Q.    (BY MR. ECKLUND)  At the bottom

18   of the email it continues, "Greg and I spoke

19   and are in agreement that we do not want to

20   make the flag so high that it does not

21   trigger, but we do not want to make it so low

22   that it's flagging all the time."

23             Do you recall that conversation

24   with Jim?

25        A.    I don't recall that specific

Highly Confidential - Subject to Further Confidentiality Review

1    conversation, but I -- I do have a general

2    understanding of what that sentence is

3    intending.

4         Q.    What is your general

5    understanding of what this sentence is

6    intending?

7         A.    The general understanding would

8    be that there are -- that the company would

9    identify particular orders that would require

10   further research.

11             But no one had specified and no

12   one had ascribed a particular or specific

13   number at that particular point on what would

14   be flagged or not flagged.

15        Q.    It sounds --

16        A.    That was a general

17   conversation.

18        Q.    Subsequent to this email in

19   September of 2010, did someone ultimately

20   provide you a flag amount?

21             MR. VARNADO:  Object to form.

22             THE WITNESS:  They did not

23        provide me a flag amount.  That was

24        part of the larger process that was

25        continuing through development within

Highly Confidential - Subject to Further Confidentiality Review

1          logistics.

2          Q.     (BY MR. ECKLUND)  And do you

3     recall at what point in time they provided

4     what would be flagged or not flagged?

5          A.     I do not.  I was not part of

6     that conversation.

7          Q.     Were you still on the diversion

8     team at that time?

9          A.     I was.

10         Q.     Do you have a recollection of

11    what the flag amounts were?

12                MR. VARNADO:  Object to form.

13         Q.     (BY MR. ECKLUND)  When they

14    were established?

15                MR. VARNADO:  Object to form.

16                THE WITNESS:  At the time they

17         were established, I do not.

18         Q.     (BY MR. ECKLUND)  Do you recall

19    what they were in 2016?

20                MR. VARNADO:  Object to form.

21                THE WITNESS:  I do not.

22         Q.     (BY MR. ECKLUND) Do you recall

23    whether they varied based upon the

24    particularity of the specific controlled

25    substances?

1          A.      The process of reviewing those

2     records was a continuing evolving process.

3               I do not, and was not a part of

4     any decisions related to establishing what

5     those processes were, establishing or setting

6     any amounts, or how that would be handled and

7     who it was reported through and to.

8          Q.      At the time of this DEA audit,

9     was it your understanding within the

10    diversion team that the DEA was particularly

11    concerned with any specific controlled

12    substance, or controlled substances

13    generally?

14         A.      My understanding, that was a

15    part of the regulatory requirement for

16    establishing a distribution center.  And that

17    the DEA were going to be looking at a myriad

18    of factors, to include things such as

19    reporting, to include the security features,

20    to include all of the things that are

21    required to operate a distribution center.

22               So it was inventory plus all of

23    the factors that accompanied that

24    requirement.

25         Q.      And at that time, the myriad

1    factors and all of the factors they were

2    considering as you were beginning to operate

3    this new distribution center was not focused

4    on the availability of one particular family

5    of drugs or one particular type of controlled

6    substance; correct?

7              MR. VARNADO:  Object to form.

8              THE WITNESS:  I don't know.  I

9         was not a part of this inspection or

10        visit.

11        Q.    (BY MR. ECKLUND)  If it was --

12   would it be custom within Walmart if there

13   were a specific concern that the DEA had

14   expressed about a particular product or

15   family of drugs that it would have been

16   mentioned in the email?

17             MR. VARNADO:  Object to form.

18             THE WITNESS:  I can't answer

19        that.  I don't know.

20             MR. ECKLUND:  Okay.

21        Q.    (BY MR. ECKLUND)  Who's Carlos

22   Aquino?

23        A.    Could you spell that last name,

24   please?

25        Q.    A-Q-U-I-N-O.

```
 1           A.      Off the top of my head, I have

 2      no recollection of that name.

 3           Q.      Have you ever worked with any

 4      compliance consultants?

 5           A.      No, sir.

 6           Q.      Have you ever worked with a

 7      company named Farmer Diversion, LLC?

 8           A.      I do not recall that.

 9           Q.      Okay.  Do you recall attending

10      a conference in or around June of 2011, in

11      New England, with the NADDI?

12           A.      I do.

13           Q.      Do you recall having any

14      conversations with law enforcement while you

15      were at that conference?

16           A.      There was an HHS investigator

17      there.

18           Q.      What did you guys talk about?

19           A.      It was very general in term --

20      and his specific focus was on healthcare

21      providers and fraud.

22           Q.      As concerns all healthcare

23      potential products, not specific recollection

24      about controlled substances?

25           A.      Correct.
```

```
 1              Q.      And did you speak with anyone

 2      from the pharmaceutical industry while you

 3      were there?

 4                      MR. VARNADO:  Object to form.

 5                      THE WITNESS:  Pharmaceutical

 6              industry.  Can you define what you're

 7              referring to there?  Like manufacturer

 8              or what -- what ...

 9              Q.      (BY MR. ECKLUND) Manufacturers.

10              A.      I do not recall a manufacturer

11      being present at this meeting.

12              Q.      What about wholesale

13      distributors?

14              A.      I do not recall wholesale

15      distributors.

16              Q.      Do you recall any presentations

17      that were provided by compliance consultants

18      from Farmer Diversion, LLC concerning due

19      diligence as it concerned controlled

20      substances?

21              A.      At the New England meeting?

22              Q.      Yes.

23              A.      I do not have a recollection of

24      that.

25              Q.      Do you recall any presentations
```

1  that were provided by a compliance consultant

2  as it concerns controlled substances at any

3  other meeting besides New England?

4             MR. VARNADO:  Object to form.

5             THE WITNESS:  I do not have a

6      recollection of that at any of those

7      meetings.

8      Q.    (BY MR. ECKLUND)  Do you have

9  any recollection of sitting through a

10  conference presentation that was

11  approximately 90 minutes titled "Controlled

12  Substances and the Pharmacist" while in

13  New England?

14      A.    I do not.  I'm not exactly

15  certain how long that particular New England

16  meeting was, but I was not necessarily

17  present for every presentation.

18      Q.    Do you recall any changes in

19  Walmart's internal due diligence policies

20  following the New England meeting?

21             MR. VARNADO:  Object to form.

22      Q.    (BY MR. ECKLUND)  I'll ask it a

23  different way.

24      A.    Was it --

25      Q.    I'll ask it a different way.

1          A.      I'm sorry.

2          Q.      You attended the meetings.  You

3     may not recall certain presentations, maybe

4     you recall others.

5               Do you recall any changes that

6     you or the diversion team made within Walmart

7     in response to any of the information or

8     presentations that you had an opportunity to

9     see or listen to at the New England meeting?

10               MR. VARNADO:  Object to form.

11               THE WITNESS:  And we're simply

12          talking New England meeting?

13               MR. ECKLUND:  Yes.

14               THE WITNESS:  I do not recall

15          any changes connected from -- to

16          information coming from that.

17          Q.      (BY MR. ECKLUND)  Now, more

18     broadly, do you recall any changes that you

19     or the diversion team made within Walmart in

20     response to any information or presentations

21     that you had the opportunity to see or listen

22     to at any other NADDI meeting?

23               MR. VARNADO:  Object to form.

24               THE WITNESS:  Not specifically

25          tied to the meetings, no, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. ECKLUND)  What about

2    specifically tied to the presentations?

3    A.    I do not recall any.

4    Q.    Okay.  Was it your habit to

5    attend these conferences and to take home

6    copies of the presentations if they're handed

7    out?

8    A.    In some cases, I have.

9    In some cases, that was not

10   information that I had done -- I had room for

11   to bring home.

12   Q.    So it depended on whether you

13   felt it was worth carrying home, and the

14   information would be useful enough to put

15   into your office?

16   MR. VARNADO:  Object to form.

17   THE WITNESS:  It would depend

18   on a lot of factors, but I -- it would

19   have to -- certainly have to be useful

20   or I would feel that it would be

21   useful.

22   Q.    (BY MR. ECKLUND)  What other

23   factors would it depend on?

24   A.    Distance.  Plans after this

25   particular conference.  Did I have any

1    vacation plans subsequent to that.  Was it

2    available electronically.  There are a lot of

3    variables that would determine a physical

4    copy.

5          Q.    So if your plans were to travel

6    home from the conference to go on a vacation,

7    the information was not available

8    electronically, would you take a physical

9    copy with you if you found the information

10   useful?

11         A.    I'm not going to say I did that

12   each and every time.

13         Q.    Okay.  If you did take home a

14   physical copy with you, would you have

15   brought it to your home -- or withdraw the

16   question.

17               If you did take a physical copy

18   home from a meeting, would you bring that

19   physical copy to your home or to your office?

20         A.    If I was flying back in from a

21   conference, it would travel -- depending on

22   time of arrival or return home, it would

23   determine whether I went to the office before

24   I went home.  So it could end up at both.

25   But I would ultimately take it to the office.

1      Q.     Okay.  Thank you.  That's what
2  I was going for.
3      A.     Okay.
4      Q.     And those files would be kept
5  in your custodial file?
6      A.     Those files would be kept as
7  a -- through their end use purpose.
8            (Walmart-Beam Deposition
9            Exhibit 3, March 2012 email chain,
10           WMT_MDL_000054729-54731, was marked
11           for identification.)
12     Q.     (BY MR. ECKLUND)  I'm going to
13  hand you what has been marked as Exhibit 3.
14           MR. ECKLUND:  And for the
15           benefit of those listening, it's Bates
16           stamped 54729.
17     Q.     (BY MR. ECKLUND)  Mr. Beam, at
18  the top you'll see this is an email that you
19  sent, so I suspect that the language within
20  the email, you'll be able to provide us some
21  insights on what you mean, because you wrote
22  it.
23           The email was sent by you to
24  Mr. Harris, to Mr. Greer, and to a new person
25  for us, Donna Auldridge.

```
 1                    Who is Donna Auldridge?

 2        A.     Donna Auldridge is -- was

 3   Jim Greer's replacement, then logistics AP

 4   when Jim Greer was promoted to a DC manager.

 5        Q.     Okay.

 6        A.     And distribution center

 7   manager.

 8        Q.     At the top of your email you

 9   wrote, "I will be meeting with

10   Phyllis today."

11                    Who is Phyllis?

12        A.     I don't recall, because there

13   are several Phyllises that worked in the home

14   office, both in compliance and legal.

15        Q.     So this Phyllis may have been

16   someone involved in compliance or legal?

17        A.     Yes.

18        Q.     So there's two Phyllises you

19   have in mind.  What are the names of those

20   two women?  Full names.

21        A.     Phyllis Harris.

22        Q.     Okay.  Please pause right

23   there.

24                    Phyllis Harris.  Is she the one

25   you think works in legal or compliance?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      At that time she worked in

2    compliance.

3        Q.      Okay.  And the second Phyllis?

4        A.      She worked in -- and I cannot

5    recall her last name, but she worked in

6    environmental.

7        Q.      And environmental is part of

8    legal?

9        A.      No.  Environmental is in

10   environmental programs across the company.

11       Q.      Is there a third Phyllis?  In

12   your earlier answer, you mentioned that you

13   didn't recall the Phyllis -- there were

14   several Phyllises that worked in the home

15   office, both in compliance and legal.

16              So you've identified

17   Phyllis Harris as someone that worked in

18   compliance, and you've just identified this

19   other Phyllis, but she works in

20   environmental.  Do you recall one that works

21   specifically in legal?

22       A.      Well, no.  Between this time

23   and now, Phyllis Harris has moved from

24   compliance to legal.

25       Q.      Okay.  All right.

1        All right.  So then looking at

2   the remainder of your first sentence, the

3   Phyllis that works in environmental is more

4   than likely not the one you're referring to

5   here, because you're talking about diversion

6   and store operations.

7        Do you see that?

8        A.     I do.

9        Q.     Does this help you narrow down

10  which Phyllis you were meeting with?

11       A.     Around this time we were also

12  setting up -- and I say "We," the company was

13  setting up reverse distribution through GENCO

14  for return of outdated controlled substances.

15       But we were also setting up

16  waste programs and disposal.  So each of

17  those would have -- that would have been a

18  factor, or something to consider, as a part

19  of the ordering process.

20       So it could have been either

21  one of those.

22       Q.     Okay.  You continue in your

23  email, you indicate that Jim was one of the

24  individuals working within the logistics

25  group, that they set thresholds, reviews, and

Highly Confidential - Subject to Further Confidentiality Review

1    decisions to ship based on the reviews.

2              Do you see that?

3         A.    I do.

4         Q.    Okay.

5              Who within Walmart would set

6    the thresholds?

7              MR. VARNADO:  Object to form.

8              THE WITNESS:  I don't know who

9         would have set these exact thresholds.

10        Q.    (BY MR. ECKLUND)  What is a

11   threshold?

12        A.    A threshold, in my -- from my

13   experience?  A threshold is an upper end

14   limit.  Or lower end limit.

15        Q.    Were those thresholds set

16   within Walmart or did those thresholds get

17   set by DEA?

18        A.    I don't know, sir.

19        Q.    Was asset protection involved

20   in assisting and setting those thresholds?

21        A.    No.

22        Q.    Okay.  Was a decision to set a

23   threshold made exclusively by the logistics

24   group?

25              MR. VARNADO:  Object to form.

1              THE WITNESS:  I don't know who

2       it was made by.

3              Q.    (BY MR. ECKLUND) Well, in your

4       email you wrote that Jim, who was working

5       with the logistics group, that they set the

6       thresholds.

7              A.    They would have executed the

8       decision.  And during this time, that

9       decision would have been more of a decision

10      of committee.  Meaning there would have been

11      more than just logistics making that

12      determination.

13             I don't know who else would

14      have been involved in those or what those

15      variable factors were.

16             Q.    Is there a name for this

17      committee you're thinking of?

18             A.    No, I mean committee as in --

19      there would have been more than one person or

20      one group making this decision.  There would

21      have been input from other areas, such as

22      I'm -- I'm sure, compliance.  But again, I

23      was not a part of those meetings, so I don't

24      know that for sure.

25             Q.    You continue, you wrote that

"Logistics group was also working on reviews."

Which reviews were you referring to in your email?

A. Those would have been reviews of orders being processed, per whatever those thresholds were.

Q. And then you continued, "decisions to ship based on the reviews."

Who would be making the decisions to ship?

A. Again, that would have been not made by a single person or entity. So I -- but I don't know everyone who would have been involved in making that decision.

Q. Can you share any of the names?

A. I can't. I don't know.

Q. You don't recall sitting here today any of the individuals who might have been responsible for making the decision to ship based on the reviews?

A. During this time frame, I could not.

Q. Are there records within Walmart that could help you understand that?

1                    MR. VARNADO:  Object to form.

2         Q.    (BY MR. ECKLUND)  Or identify

3    those individuals?

4                    MR. VARNADO:  Same objection.

5                    THE WITNESS:  I cannot think of

6         any.

7         Q.    (BY MR. ECKLUND)  You

8    continued, "But our team used to get reports

9    of denials when a store's order was rejected

10   for a controlled substance or a store was

11   repeatedly rejected for all other drugs."

12                   Do you see where you wrote

13   that?

14        A.    I do.

15        Q.    What type of reports were you

16   referring to here?

17        A.    Those would have been stores

18   that were being -- that were sent to us for

19   review as a result of whatever reviews were

20   taking place within logistics.  These would

21   have been those stores that were highlighted

22   and sent to our team to look at.

23        Q.    Is there a name for those

24   reports?

25        A.    Those would have been, at that

1    time, I believe 405 reports.

2         Q.      And what does a 405 report

3    depict?

4         A.      It is my recollection, it

5    depicts controlled substances that are above

6    a particular percentage of total order.

7         Q.      Are there any other reports

8    that this could be referring to besides 405

9    reports?

10        A.      None that I can think of.

11        Q.      Do 405 reports concern

12   controlled substances and all other drugs?

13        A.      To the best of my knowledge,

14   the focus was on controlled substances.

15        Q.      So I'm trying to understand

16   your language in the email.  It says, "But

17   our team used to get reports of denials when

18   a store's order was rejected."

19               First, it talks about for a

20   controlled substance or repeatedly rejected

21   for all other drugs.  Were there reports that

22   showed those rejections for all other drugs?

23        A.      "All other drugs" meaning all

24   classifications, C-II through V.

25        Q.      So this -- you're talking

1    specifically about only controlled substances

2    in this sentence?

3         A.    That was my intent.

4         Q.    You're not talking about any

5    other products sold by the pharmacy?  Just

6    controlled substances?

7         A.    Yes.

8         Q.    And you continued in the next

9    paragraph, "Would it be possible for me to

10   get up to speed on what the thresholds are,

11   and how they were determined?"

12              Did anyone help you get up to

13   speed on the thresholds after you sent this

14   email?

15        A.    They did not.

16        Q.    No one helped?

17        A.    At this particular point in

18   time, there was a larger effort that was

19   taking place in order to consolidate and

20   automate a lot of the reports.  And again,

21   continuing to evolve this specific program.

22        Q.    Okay.  Did anyone help you get

23   up to speed on how these thresholds were

24   determined?

25        A.    No, sir.  That was the

Highly Confidential - Subject to Further Confidentiality Review

1    responsibility of the person or persons

2    specifically designated for that purpose.

3         Q.    Did anyone help you get up to

4    speed on understanding the rejection rate?

5              MR. VARNADO:  Object to form.

6         Q.    (BY MR. ECKLUND)  Did they tell

7    you why they weren't going to help you get up

8    to speed on these things?

9              MR. VARNADO:  Object to form.

10             THE WITNESS:  Because it was

11        outside of our lane of traffic in

12        conducting investigations of theft and

13        loss.

14             We obtained the results.  And

15        that was what our investigators were

16        responsible for, helping them gather

17        the facts around.

18        Q.    (BY MR. ECKLUND)  Do you see

19   below, the email from you to Ron Lance,

20   Susanne Hiland and George Chapman.

21             Who is Ron Lance?

22        A.    Ron Lance, at this particular

23   point in time, was my boss.  He was senior

24   director of asset protection.

25        Q.    And George Chapman?

1      A.      George Chapman, at this time,

2    was -- he was on the compliance team, but I

3    can't remember if at this time he had been

4    promoted to senior director and controlled

5    that team, or managed that team or not.  But

6    both Susanne and George were part of the

7    compliance apparatus.

8      Q.      You wrote to your boss,

9    Ron Lance, "Below are a few more of the

10   details from the hearing and ruling

11   yesterday."

12          Did Mr. Lance request details

13   about the CVS and Cardinal hearing that are

14   described in the newspaper article that

15   follow your email?

16     A.      He did not request that

17   specifically.  That was something because it

18   is my area of responsibility and what he has

19   asked me to manage, that is something that I

20   felt my boss needed to know.

21     Q.      Was it important within asset

22   protection to understand what was being

23   evaluated by the U.S. District Court in the

24   Cardinal Health case described in the article

25   below?

1           MR. VARNADO:  Object to form.

2           THE WITNESS:  From my personal

3       perspective?  I think it is valuable.

4       Q.     (BY MR. ECKLUND)  Did Mr. Lance

5   respond to your email?

6       A.     I do not recall.

7       Q.     Do you recall any conversations

8   with Mr. Lance concerning this email?  Or the

9   outcome of the Cardinal Health case described

10  in the article that you forwarded to him?

11      A.     I'm sure we had numerous

12  conversations.  But to recall those specifics

13  right now, I can't off the top of my head.

14      Q.     Do you recall whether Walmart

15  made any changes in its own audit procedures

16  or within the diversion team in response to

17  the events concerning Cardinal Health

18  described in the article?

19      A.     Procedures as in?

20      Q.     How you would do what you were

21  doing concerning controlled substances.

22      A.     We reviewed, along with

23  compliance, our audit list, the drugs that

24  were being added to the audit list, and

25  making sure that what our audit list was

1    capturing was consistent with the things that

2    were highlighted in the articles, that maybe

3    we need to place stronger due diligence on as

4    an investigations team.

5         Q.    Do you recall any specific

6    changes you made within the due diligence

7    team?

8              MR. VARNADO:  Object to form.

9              THE WITNESS:  I don't recall

10        that far back in a specific.

11        Q.    (BY MR. ECKLUND)  You wrote in

12   your email, "Ron, below are a few more

13   details of the hearing from yesterday.

14   Initially there were signs that Cardinal and

15   CVS might get a reprieve as the burden of

16   proof was on the government to prove a high

17   bar of public threat."

18             Do you see that?

19        A.    I do.

20        Q.    What do you mean by "reprieve"?

21        A.    As these things were beginning

22   to populate on social media and on the

23   electronic media, there was literally a fear.

24   And "fear" meaning the government is looking

25   in these areas, and they're looking very

1    strongly.  But as the immediate suspension

2    orders were being reviewed -- or applied for

3    and being reviewed, the outcome of a few of

4    those hearings were different than what a lot

5    of people thought the outcome would be.

6         Q.     You said a lot of people

7    thought they might be.  Which people are you

8    thinking of when you say that?

9         A.     I'm thinking myself.

10        Q.     Anyone else?

11        A.     Thinking members of the team

12   that were still there.

13             And there were some

14   discussions, I'm certain with Ron Lance,

15   around "This may be problematic.  Maybe we

16   need to go back and take a deeper dive and

17   look at -- and make sure we're not hitting

18   some of these same trip wires."

19        Q.     So the people you had in mind

20   in your prior answer were all the people

21   within Walmart?

22        A.     Correct.  Yeah.

23        Q.     Okay.  Do you recall any

24   changes in how the thresholds were set or

25   what the thresholds would be being made after

Highly Confidential - Subject to Further Confidentiality Review

1    this article was released?  This case?

2       A.    I do not.  I was not a part of

3    those conversations.

4       Q.    Okay.  If you'd turn to the

5    second page of this exhibit, second paragraph

6    describes what the focus of the DEA's

7    investigations were.

8             "An investigation by the DEA

9    found the company's Lakeland" -- and that's

10   in Florida -- facilities shipped a

11   'staggering' amount of oxycodone to four

12   retail customers in the state between October

13   of 2008 and December of 2011."

14            Do you recall whether Walmart

15   made any changes in how it monitored or

16   tracked shipments or distribution of

17   oxycodone in response to this Cardinal

18   decision?

19      A.    It was around this time frame

20   that the company did self-impose some

21   additional limits.  And that self-imposition

22   resulted in a specific focus on oxycodone,

23   and that oxycodone was limited by a company

24   standard.  And each one that was above that

25   was cut and submitted to our team for

1    additional due diligence and review.

2             And that continued to evolve

3    from there, and that was where the focus and

4    effort sprang from.

5             (Walmart-Beam Deposition

6        Exhibit 4, 7-25-12 email from Susanne

7        Hiland.  Subj: CS POA, WMT_MDL_

8        000009427-9428, was marked for

9        identification.)

10       Q.    (BY MR. ECKLUND)  I'm going to

11   hand to you what's been marked as Exhibit 4.

12   It bears Bates stamp 9427.  And you'll note

13   that it was sent several months after the

14   email that we just went through.  Again, the

15   prior email was sent in March 2012.  This is

16   from July 25th of 2012.

17            And it was sent by Ms. Hiland

18   to a number of individuals: Bryan Richard,

19   Matthew Lunde, George Chapman, Tim Harris,

20   you, Mr. Beam, and then Brandon Worth was

21   copied.  Do you see that?

22       A.    I do.

23       Q.    Okay.  Matthew Lunde.  Who is

24   he?

25       A.    Matthew Lunde.

1          At this time was a regional

2    health and wellness director.  Meaning he was

3    field-based.

4          Q.    So there's nothing unique about

5    these employees, the Walmart employees.  The

6    reason I ask is that dash with the MW Lunde

7    next to it is unique to his name and only his

8    name.

9          Do you see that?

10         A.    I do.

11         Q.    So he's a Walmart employee?

12         A.    He is.

13         Q.    Okay.  Everyone on here is a

14   Walmart employee.

15         A.    Mr. Worth is also a Walmart

16   employee.

17         Q.    And what was he doing at that

18   point?

19         A.    2012?  I believe at that time

20   Brandon had moved from his field-based

21   position to health and wellness innovations

22   at home office.

23         Q.    And that was for a promotion?

24         A.    At that time it would have been

25   a lateral.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Lateral?

2       A.      Mm-hmm.

3       Q.      Okay.  And Bryan Richard, what

4    does he do?  At this time?

5       A.      He was a senior director --

6    during this time, if I remember correctly,

7    Bryan Richard was a senior director of health

8    and wellness operations.  Meaning he would

9    review operational standards, policies.  He

10   was a coordinator of multiple things relative

11   to health and wellness.

12      Q.      Ms. Hiland wrote, and I -- I

13   suspect that she mistyped it, so I'm going to

14   read it as I think she intended it.  But if

15   you think I'm inaccurate, you just tell me.

16              She wrote, "For sake of our

17   discussion this afternoon, here is an outline

18   of the" -- I suspect she meant "processes and

19   changes we have made in the controlled

20   substance program," because "proceeds" would

21   make little to no sense; correct?

22      A.      I agree.

23      Q.      Okay.

24              "Implement controlled substance

25   order exception review.  See attached

1    flowchart.  MD will have exception review

2    process to follow."

3              What does that mean, "MD will

4    have"?

5        A.    That is the market director.

6        Q.    And what is an exception

7    review?

8        A.    Exception review is, as it

9    relates to this particular program, in the

10   over 20 report, if there was an over 20

11   report, there was a list of questions that

12   would come to -- that we would send out,

13   meaning our investigative team -- to the

14   market directors.  And these were points of

15   clarity around that specific order for the

16   drugs in question, to determine if there was

17   a legitimate reason that could be gleaned or

18   if there was a reason for concern for that

19   volume of order.

20       Q.    Okay.  So the exception review

21   was part of the investigative process?

22       A.    Not the investigative process,

23   the assessment process.

24       Q.    And that would precede the

25   investigation?

1        A.      Correct.

2        Q.      Okay.  Were you involved in

3    that process?

4        A.      We were involved in the

5    assessment process.

6        Q.      Okay.

7        A.      And if anything came of that

8    that rose to the level of investigation, then

9    yes.

10        Q.      Because you were involved in

11    assessment and, if anything, required an

12    investigation of the assessed order?

13        A.      Correct.

14        Q.      And at that point, would those

15    orders be considered orders of interest?

16            MR. VARNADO:  Object to form.

17            THE WITNESS:  Orders of

18        interest in what manner?

19        Q.      (BY MR. ECKLUND)  Are you

20    familiar with the term "order of interest" as

21    it concerns controlled substances?

22        A.      Excuse me?

23        Q.      Are you familiar with the term

24    "orders of interest" as it concerns

25    controlled substances?

1          A.      I would need your definition of

2    what your intent is -- or what your

3    understanding of that is.

4          Q.      We'll go through some Walmart

5    documents.

6          A.      Okay.

7          Q.      It's --

8                  Turn to the next page.

9    "Controlled substances order exception

10   response."

11                 Do you see that?

12         A.      I do, sir.

13         Q.      All right.  So "Daily,

14   DC 45" -- and that's DC 6045; correct?

15         A.      That is correct.

16         Q.      Okay.  Reviews C-II -- that's

17   controlled substances -- C-IIs, IIIs are not

18   included, C-IVs are not included and C-Vs are

19   not included?

20         A.      Correct.

21         Q.      For single item quantity

22   greater than 20.  Right?

23                 Let's talk about the item

24   quantity.  That is specific to an NDC code?

25         A.      That is specific to a drug

1    name, and milligram level.

2          Q.      Well, let me ask it slightly

3    differently.

4                  If you had two suppliers of the

5    same drug name and same strength, dosage

6    size, would those be the same code or a

7    different code?

8                  MR. VARNADO:  Object to form.

9                  THE WITNESS:  NDC code is going

10          to be unique to each manufacturer.

11          Q.    (BY MR. ECKLUND)  Okay.

12          A.      Even if it is the same drug.

13          Q.      So if you had -- in the next

14    box or diamond, you have oxy 30 milligrams.

15    If you were receiving oxy 30 milligrams from

16    two suppliers, and you got ten from each, is

17    that going to trigger item quantity greater

18    than 20?

19                  MR. VARNADO:  Object to form.

20          Q.    (BY MR. ECKLUND)  You have two

21    NDC codes, both for oxy 30, ten orders.

22                  Is it going to trigger?

23                  MR. VARNADO:  Same objection.

24                  THE WITNESS:  I don't know -- I

25          can't sit here and tell you that that

Highly Confidential - Subject to Further Confidentiality Review

1           would have triggered an objection -- a

2           rejection.  That would have been -- I

3           don't know how that program was set

4           up, and how it was managed.

5           Q.     (BY MR. ECKLUND)  Okay.  Let me

6     ask a different question.

7                  If you look at this flowchart,

8     it seems to suggest, based on the prior email

9     and the chart itself, that the focus is

10    specifically on oxy 30 milligrams.

11                 Do you see that?

12          A.     I do.

13          Q.     Do you agree with my

14    interpretation of this flowchart?

15          A.     I do.

16          Q.     So if, for example, there were

17    50 bottles or 49 bottles of oxy 20

18    milligrams, that would not trigger?

19                 MR. VARNADO:  Object to form.

20                 THE WITNESS:  Could you repeat

21          that one more time?

22                 MR. ECKLUND:  If you changed

23          the dosage strength to something lower

24          than 30 milligrams, it's not going to

25          trigger this exception response?

```
 1              MR. VARNADO:  Object to form.
 2              THE WITNESS:  It would not have
 3         met the criteria of this particular
 4         rejection, but it is one of those
 5         things that a lot -- as logistics
 6         fills orders, there is a -- you get to
 7         understand and know, based on date of
 8         order and which locations within the
 9         country are ordering.
10              So we have had, as a result of
11         this process and as we continued to
12         migrate through this process,
13         clarification from store level, did
14         you mean to order 70 bottles?  No, I
15         meant seven.  So fat-fingering in
16         technology have occurred and other
17         things that have influenced the order
18         process had been identified throughout
19         the system.  So a lot of those orders
20         were manually reduced at the warehouse
21         level, just based on that contact and
22         clarification.
23         Q.    (BY MR. ECKLUND)  Okay.  And I
24    appreciate that.  So what you just described,
25    you called it fat-finger ordering.  And that
```

Highly Confidential - Subject to Further Confidentiality Review

1    could be somebody hit the extra 0.  Someone

2    hit 4 instead of 2.

3        A.    (Witness nods.)

4        Q.    I can appreciate that.  On the

5    information for that, that would have

6    triggered a flag, if you will, where

7    there's -- something raises a concern.  And

8    someone within the warehouse looks and says,

9    "Well, do you know what?  This is -- this is

10    something we need to understand better."

11        A.    Mm-hmm.  (Witness nods.)

12        Q.    And they would get that

13    information about what was intended by

14    calling the stores?

15        A.    By calling the stores or the

16    pharmacist who placed the order.

17        Q.    So the pharmacist in -- within

18    Walmart who placed the order, to restock or

19    get more product; correct?

20        A.    Correct.  And a lot of these

21    were set up on our replenishment.  So

22    sometimes the system would order and the

23    pharmacist would have no input into that.

24        Q.    But a fat-finger order couldn't

25    happen on auto?

1         A.      Correct.

2         Q.      So I'm only talking about that

3    right now.

4         A.      Okay.

5         Q.      Auto replenishment is not going

6    to happen with fat-fingering.  You're not

7    going to be able to hit 70 and mean 7 and

8    have it automatically happening all along;

9    right?  That's going to get caught quickly;

10   right?

11        A.      Should as soon as the process

12   goes through.

13        Q.      And as soon as the process goes

14   through and there's a concern about what

15   might have been a fat-finger order, you're

16   going to -- the warehouse is going to reach

17   out to the pharmacy or the pharmacist who

18   placed the order to ask them questions about

19   that specific replenishment order; correct?

20        A.      Correct.

21        Q.      Were you ever involved in any

22   conversations with a pharmacist about a

23   replenishment order?

24        A.      Not involved with the

25   conversation itself.  We were often briefed

Highly Confidential - Subject to Further Confidentiality Review

1      of the fact.

2            Q.      Do you recall any of those

3      briefings, what they discussed?

4            A.      Only if it did not make sense

5      to the pharmacy warehouse.  We had this

6      conversation, "We think you may want to take

7      a look into this particular location."

8            Q.      Well, a fat-finger order would

9      have been pretty simple; right?  You call up.

10     The warehouse calls, reaches out to the

11     pharmacist, asks, "Did you intend to order 70

12     bottles?"  And they say, "No, I meant seven."

13     That's the end; right?  That's fairly simple.

14                   Yes?

15           A.      Not so simple.

16           Q.      What else would you have asked?

17           A.      There's a lot of other factors

18     that may have contributed to that.  The

19     reach-out to them, and then the reach-out to

20     us.  If they're -- if the response is not

21     consistent with what they're looking at, then

22     there had to be other factors.  It could be

23     technology factors.  It could be human

24     interference factors.

25                   So those would have been some

1    of the cases we would have looked into or

2    scoped a little more closely.

3              But there's more factors than a

4    cut-and-dried decision.

5         Q.    Even in your hypothetical about

6    fat-finger orders?

7         A.    Yes.  I -- depends on the

8    responses that they -- that was received by

9    the logistics associates.

10        Q.    All right.  Let's continue

11   through.  So the exception response, Oxy 20

12   would not have followed this exception

13   response flow?

14             MR. VARNADO:  Object to form.

15             THE WITNESS:  At the time this

16        was created, I do not know if oxy 20s

17        would have triggered because I was not

18        involved in setting up the trigger

19        alerts or the volume amount.

20        Q.    (BY MR. ECKLUND)  Do you recall

21   at the time whether there was any other

22   exception response that provided for cutting

23   of orders down to 20?

24             So the way the flowchart reads

25   to me is, if the item requested was oxy 30,

```
 1    and it was in excess of 20 bottles ordered,

 2    that if it was greater than that, yes, then

 3    the order would be cut to the max of

 4    20 pieces.  Do you see that?

 5         A.    I do.

 6         Q.    Do you know where cutting was

 7    implemented at this time for other dosage

 8    strengths of oxycodone?

 9              MR. VARNADO:  Object to form.

10              THE WITNESS:  I don't have

11         personal knowledge that there were

12         other factors in -- at this time, that

13         would have mitigated other orders, no.

14         Q.    (BY MR. ECKLUND)  And aside

15    from different dosage strengths of oxy, this

16    would also not have applied to a drug, say,

17    for example, at this time, hydrocodone?

18              MR. VARNADO:  Object to form.

19         Q.    (BY MR. ECKLUND)  Hydrocodone

20    is a different drug than oxycodone; correct?

21         A.    Is a different formulation.

22         Q.    And this wouldn't have

23    concerned fentanyl?

24              MR. VARNADO:  Object to form.

25              THE WITNESS:  As a name brand,
```

```
 1              I don't -- I don't recall -- I've

 2         never gotten one on a fentanyl order.

 3              Q.    (BY MR. ECKLUND)  Okay.  Is it

 4    your understanding that fentanyl is a name

 5    brand or is that just a drug?

 6              A.    My understanding fentanyl is a

 7    drug that is produced under a couple of

 8    different name brands.

 9              Q.    And this same controlled

10    substances order exception response wouldn't

11    apply to anything that wasn't a C-II; right?

12    In the first box, it limits to just C-II.

13              A.    As I look at this and recall

14    this, this was specifically targeted as

15    oxycodone.

16              Q.    How did Walmart determine that

17    cuts to 20 were the sensible approach to

18    take?

19              A.    I do not know.

20              Q.    Do you recall any conversations

21    about how Walmart determined that 20 was the

22    right number?

23              A.    I was not a part of those

24    discussions.

25              Q.    Do you recall whether there was
```

1    ever any discussion about reducing it down

2    further, perhaps to 15, as the epidemic

3    became more obvious?

4                    MR. VARNADO:  Object to form.

5                    THE WITNESS:  Those would not

6            have been discussions I would have

7            been a part of at that time.

8        Q.    (BY MR. ECKLUND)  Do you recall

9    any conversation at all about reducing from

10   20 to a lower number?

11       A.    I do not.  I don't have

12   personal knowledge of any such discussion.

13       Q.    If there had been a change from

14   20 to a lower number, would you have been a

15   part of the team responsible for implementing

16   the exception review process for it?

17       A.    I'm sure our team would have

18   been notified and would have had a scoping

19   responsibility at the least.

20       Q.    Okay.  But sitting here today,

21   you don't have any recollection specifically

22   about a reduction -- further reduction from

23   an order over 20 down to a lower number, say,

24   for example, orders over ten bottles?

25       A.    As --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. VARNADO:  Objection, asked

2      and answered.

3          THE WITNESS:  As this program

4      continued to improve or continued to

5      be automated in the continual

6      evolution of the overall program, this

7      was driven by a lot of different other

8      factors, and from people in other

9      teams.

10          And there was -- there were

11      specific individuals that were trying

12      to stand up processes in order to get

13      a much better understanding of the

14      data and its sets.  And that had been

15      ongoing since before this occurred and

16      has continued after this occurred.

17      Q.    (BY MR. ECKLUND)  Who were

18  those specific individuals that were trying

19  to stand up processes in order to get a

20  better understanding?

21      A.    Specifically that would have

22  been one of the reasons for Miranda Johnson's

23  position.

24      Q.    When did Miranda Johnson take

25  that position?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     It was right around this
2    general time frame.  I don't know
3    specifically.
4          Q.     So your understanding is that
5    Ms. Johnson took on that role somewhere in
6    the neighborhood of July of 2012?
7                 MR. VARNADO:  Object to form.
8                 THE WITNESS:  To the best of my
9          recollection, that would be about
10         approximately the same time.
11         Q.     (BY MR. ECKLUND)  Do you know
12   whether anyone else was serving in that
13   similar role or same role prior to
14   Ms. Johnson in June of 2012, or January of
15   2012?
16         A.     I don't recall the specific
17   dates, but there was a predecessor to
18   Ms. Johnson for a period of time named
19   Kristy Spruell.
20         Q.     Is it your understanding that
21   Ms. Spruell and Ms. Johnson had the same job
22   or same title?
23         A.     I don't know about same title.
24   They did have at a high level the same
25   responsibilities.
```

1    Q.    What is your understanding of

2    what the responsibilities of Ms. Johnson and

3    Ms. Spruell were at the time?

4    A.    Their responsibilities at that

5    time was to develop a program and implement a

6    program to examine the movement of controlled

7    substances through Walmart.

8    Q.    Did you work directly with

9    Ms. Spruell or Ms. Johnson in the development

10   of that program?

11   A.    Not in the development of the

12   program.  I worked with Ms. Spruell and

13   Ms. Johnson, helping them understand what we

14   see in the Walmart environment related to

15   those particular drugs.  Being controlled

16   substances.

17   Q.    Okay.  So you weren't involved

18   in the development of the program.  Were you

19   involved in the implementation of the

20   program?

21   A.    Correct.

22   Q.    And the way in which you were

23   involved in the implementation of the program

24   was you shared data with Ms. Johnson and

25   Ms. Spruell about what Walmart could see

```
 1    concerning particular drugs in the

 2    marketplace generally?

 3              MR. VARNADO:  Object to form.

 4              THE WITNESS:  Not necessarily

 5         shared data.  Shared observations and

 6         trends.

 7         Q.   (BY MR. ECKLUND)  What

 8    observations and trends did you share with

 9    Ms. Johnson and Ms. Spruell?

10         A.    This was in advance of or

11    approximately the same time of the discussion

12    around hydrocodone.

13              So, you know, within our

14    environment, we were able to point them in a

15    direction of here's -- here are the things

16    that we are seeing that are involved in a lot

17    of the investigations that we complete.

18              And within that, some of the

19    methodologies that are being used to remove

20    that drug from our pharmacies, if it is

21    internal.

22              We also discussed the

23    in-transit losses.

24         Q.    Now, in your role that touched

25    upon investigations, did -- were you involved
```

1    in the flow below where you see

2    oxy 30 milligrams and then it goes?

3              "Order filled, notification

4    sent to AP."

5              Do you see that?

6              And then AP runs -- is that --

7    that's your group, AP?

8         A.    AP, yes, sir.

9         Q.    Okay.  So you were getting

10   notification at that point?

11        A.    Mm-hmm.  (Witness nods.)

12        Q.    Okay.  And you were getting

13   notification that, for example, there's a

14   daily DC 6045 review of a controlled

15   substance.  The orders for a single item

16   greater than 20 bottles.  It's oxy 30, no.

17   The order gets filled.  If it's not oxy 30,

18   would notification be sent to you at that

19   point?

20        A.    From -- after the decision is

21   made to fill or not fill, order -- item No. 1

22   and 2 underneath "No," then that is our

23   process, to run the purchase and dispense.

24        Q.    Okay.

25        A.    And at this point we also are

1    looking to determine do we have an active

2    investigation at this location already?  And

3    if so, is it related to this particular drug

4    in question?

5              If we have run the P&D, and we

6    have no concerns -- or we do not have an open

7    investigation at that particular point, and

8    we can't find -- or we don't see anything of

9    diversion concern, then we send out, our

10   group would send out the review.  To be

11   completed by the market director.

12        Q.    Okay.  And again, this is

13   specific just to oxy 30s, based upon this

14   workflow?

15              MR. VARNADO:  Object to form.

16              THE WITNESS:  Based upon this

17        workload -- or based upon this form,

18        that was the particular drug of focus.

19        Q.    (BY MR. ECKLUND)  Okay.

20   Because I'm just trying to understand what

21   this thing was.  Right?

22        A.    Sure.

23        Q.    It says oxy 30 milligrams.  If

24   it says no, it's not oxy 30 milligrams, why

25   wouldn't it have concerned hydrocodone or

1    fentanyl or any other product?  The answer is

2    now no.  It's a controlled substance.  It's

3    ordered.  The item quantity is greater than

4    20.  It's not oxy 30.

5         A.    If the -- the way this was --

6    the way I read this, if the order's for

7    oxy 30, and it exceeds the 20, yes, then it's

8    cut, and then it's notified to us.

9              If it is not above 20, and then

10   it is no, then the order is filled.

11        Q.    (BY MR. ECKLUND)  And what if

12   it's -- it's not oxy at all?  If this does

13   not -- this doesn't happen?

14              That's what I'm asking.

15              So if it's greater than 20, I

16   understand you're saying it gets cut to the

17   max, which is 20.

18        A.    Right.

19        Q.    If it's oxy, and it's under 20,

20   right, then it gets filled, and there's a

21   notification sent to you and your department.

22        A.    Mm-hmm.  (Witness nods.)

23        Q.    What I'm asking is, if it's not

24   oxy, do you still find out that there is --

25   if there's a notification, is a notification

1    still sent to you that -- for example,

2    fentanyl, 20 bottles, filled.  It's not oxy.

3    Do you get notifications at that point?

4         A.    Not under this particular

5    procedure and process.  We would have

6    potentially gotten that information from

7    replenishment as a result of their store

8    level contact with the order itself.

9         Q.    Okay.  So possibly but not

10   always?

11        A.    Agreed.

12        Q.    Okay.  And for oxy, it was

13   always?

14        A.    Correct.

15        Q.    Every single time somebody

16   ordered oxy 30 milligrams, you received

17   notification, or your department received

18   notification that the order had been placed,

19   if it was greater than 20, it got cut.  If it

20   was under 20, or at 20, it was filled and you

21   got a notification?

22              And for other controlled

23   substances, you may or may not have gotten

24   notification.  It depended upon the

25   particular circumstances; correct?

```
 1                    MR. VARNADO:  Object to form.

 2                    THE WITNESS:  At this time --

 3                    MR. ECKLUND:  Yes.

 4                    THE WITNESS:  -- that would be

 5         correct.

 6         Q.     (BY MR. ECKLUND)  Now --

 7                    MR. VARNADO:  Do you guys want

 8         to take a little break?

 9                    MR. ECKLUND:  Let's just finish

10         this one real fast.

11         Q.     (BY MR. ECKLUND)  Okay.  So

12    let's talk about AP runs P&D.  What is P&D?

13         A.     That is a purchase and dispense

14    report.

15         Q.     Are those automated reports?

16         A.     During this time frame, they

17    were not.

18         Q.     Okay.  Who would physically

19    create the purchase and dispense reports?

20         A.     That would be a member of our

21    analyst group.

22         Q.     And would you review the

23    analyst group's work on the purchase and

24    dispense reports?

25         A.     Either I reviewed it or the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    investigator for that given geographic area

2    would review it.

3          Q.    Okay.  And those are all

4    documented?

5          A.    Mm-hmm.  (Witness nods.)

6          Q.    And then it follows, diversion

7    concerns.  Yes, at this point if there was a

8    diversion concern, you would investigate.

9          A.    Correct.

10         Q.    Okay.  And all the

11   investigations would have been documented?

12         A.    The investigations would have,

13   if it rose to the level of investigations.

14   There is a difference between scoping and

15   investigations.

16         Q.    Okay.  So --

17         A.    But if -- if it would have

18   had -- if there had been reasons for a

19   diversion concern, yes, there would have been

20   an investigation and it would have been

21   documented.

22         Q.    So actually there should be

23   another box here, then; right?  It shouldn't

24   be initiation of investigation, it should

25   have been scoping for the potential need to
```

1    investigate, and then, if yes, then initiate

2    investigation?

3                    MR. VARNADO:  Object to form.

4                    THE WITNESS:  This was not --

5            this form and diagram was not

6            completed by our division.  It was

7            completed by compliance, who has a

8            different interpretation of what the

9            term "investigation" means.

10           Q.     (BY MR. ECKLUND)  Okay.  So

11   just so we're clear, if there was a diversion

12   concern, the answer is yes, it wouldn't

13   always trigger the initiation of

14   investigation?

15           A.     If there was a diversion

16   concern, then it would trigger an

17   investigation.

18                  It would go through the same

19   review process and sometimes those diversion

20   concerns, as just going through that

21   diversion process and scoping would be

22   satisfied, and there would not be any reason

23   for a diversion investigation.

24                  For example, if there were an

25   in-transit loss that triggered the store to

```
 1   have to order replenishment more heavily

 2   because they didn't get the shipment that was

 3   ordered and sent the two previous days,

 4   because those were diverted through -- from

 5   our third-party contractor, then the store

 6   has to get the medications in order to serve

 7   the patients.

 8        Q.    Okay.  I'm just trying to

 9   understand, when you -- I asked you earlier

10   when we were going through this flowchart if,

11   yes, there would have been investigations,

12   would they have been documented?  You said,

13   "The investigations would have if it rose to

14   the level of investigations.  There's a

15   difference between scoping and

16   investigations."

17             And that's what I'm trying to

18   understand.  Okay?

19             If it's an investigation, it's

20   an investigation, or is there something less

21   than an investigation, which is scoping?

22        A.    There is something less than

23   investigation.

24        Q.    So there's a possibility here

25   that AP would not initiate an investigation.
```

1   They could initiate scoping.  And then if

2   they felt that was sufficient, that would be

3   the end.

4        A.    If it answered the questions

5   and removed the concern for diversion, yes,

6   that would have been the end.

7        Q.    Okay.  So -- and if, as part of

8   scoping or based upon the circumstances, you

9   felt or your team felt or the analysts felt

10  that it warranted a full investigation, or

11  investigation as I understand the term, then

12  an investigation would have been completed?

13       A.    That is correct.

14       Q.    And it would have been

15  documented?

16       A.    That is correct.

17       Q.    Would it also -- would those

18  documents concerning the investigation also

19  have been shared with DEA?

20       A.    The results would have been

21  shared with the DEA at the discretion of

22  compliance.  They were the ones that had the

23  communication with the DEA during this time.

24       Q.    Okay.  Now, as you go to the

25  bottom -- through the bottom of the

```
1    flowchart, so if there were no diversion

2    concerns, you would send a controlled

3    substances exception notification to the

4    managing director?

5         A.     Market director.

6         Q.     Market director?  Sorry.

7                And you would copy --

8         A.     The regional director.

9         Q.     Okay.

10        A.     And that regional director also

11   has a divisional director.

12        Q.     Okay.

13        A.     And PC is the senior director

14   of practice compliance.

15        Q.     And at the time, who was the

16   senior director of practice compliance?

17        A.     At that time, that would have

18   been Susanne.

19               MR. ECKLUND:  Why don't we take

20        that break.

21               MR. VARNADO:  Sure.

22               VIDEOGRAPHER:  11:26.  We are

23        off the video record.

24               (Recess taken, 11:26 a.m. to

25        11:38 a.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  11:38.  We
 2          are on the video record.
 3                    THE WITNESS:  In reflecting,
 4          I'm looking at the email and the line
 5          of questioning we just had gone
 6          through.
 7                    MR. ECKLUND:  Sure.
 8                    THE WITNESS:  And in that line
 9          of questioning, there's that vertical
10          process of whether that would have
11          applied to anything outside of
12          oxycodone 30 milligrams.
13                    And there have been a lot of
14          nights that have passed since all of
15          this have been implemented and a lot
16          of progress made since then.  But this
17          would have applied to controlled
18          substance orders, period.  The cutting
19          would have been at the Oxycodone
20          30-milligram.  Because I can tell you
21          precisely that we have reviewed orders
22          on methadone.  We have reviewed orders
23          on hydromorphone.
24                    So the focus on it was there,
25          but the cuts themselves were focused
```

Highly Confidential - Subject to Further Confidentiality Review

1          on oxy 30.

2          Q.      (BY MR. ECKLUND)  Okay.  So I

3    appreciate you trying to help us all get a

4    clear transcript and clear understanding.  So

5    just help me understand this again, then.

6               So that -- earlier you said

7    that the notifications would be sent, and AP

8    would run; right?  You would do what you

9    needed to, diversion.  Are you now saying

10   that the entire flowchart below

11   oxy 30 milligrams would have been employed in

12   the same way for all of the other controlled

13   substances?

14        A.      Agreed.  Yes.

15        Q.      So that includes C-IIIs?

16        A.      C-IIs.

17        Q.      So C-IIs?

18        A.      Correct.

19        Q.      And it's for everything.  And

20   you would have filled the orders.  There

21   would have been notification sent to you.

22   You would have done what you needed to do.

23   You would have assessed diversion concerns.

24   There would have been scoping or an

25   investigation.  You're not --

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Correct.

2       Q.      You're still confident that was

3   a scoping process and sometimes there was no

4   investigation, and other times there were

5   investigations?

6       A.      Yes.

7       Q.      And for every one of those

8   C-IIs, whether it was oxy or any of the

9   others, there would be documentation

10  reflecting all the investigations?

11      A.      There would be investigation

12  documentation, yes.

13      Q.      And all of those investigations

14  would have been provided to DEA?

15              MR. VARNADO:  Object to form.

16              THE WITNESS:  I'm not the one

17          that would have followed that.  It

18          would have been followed through

19          compliance.  If there was a loss

20          associated with that or there was

21          notification, then that would have

22          been compliance's lane of traffic.

23      Q.      (BY MR. ECKLUND)  Do you know

24  if you've seen this document before?  It's a

25  response to a discovery request.  You may

Highly Confidential - Subject to Further Confidentiality Review

1    have seen it and you may not have.

2         A.    Sure.

3         Q.    It might have been something

4    you reviewed in connection with your

5    operations.  I'm not asking specifically

6    about operations, but it was formerly marked

7    as a composite exhibit in the deposition of

8    Ms. Johnson, who you mentioned earlier.

9              And you're looking at the

10   screen.

11        A.    I'm waiting.  My apologies.

12        Q.    Now, let's just check off a few

13   boxes here.

14             So, Mr. Beam, do you see this

15   time period here, 2010 to 2014?

16        A.    Yes.

17        Q.    This policy.  You were there

18   during that period of time; correct?

19             MR. VARNADO:  Object to form.

20        Q.    (BY MR. ECKLUND)  You were a

21   Walmart employee within the 2010 to 2014 time

22   period?

23        A.    I was.

24        Q.    Okay.

25             And you were a Walmart employee

1    in the 2015 time period; correct?

2         A.    I was.

3         Q.    Okay.  And 2016 and '17?

4         A.    Correct.

5         Q.    And we already established all

6    of these other time periods.

7              So each one of the documents

8    described here, you were a Walmart employee

9    during each time period?  Do you see that?

10        A.    I do.

11             MR. VARNADO:  He can see it.

12        Q.    (BY MR. ECKLUND)  Mr. Beam, if

13   you can't see it, just raise your hand, clap,

14   make a sound.  I'll do something else.  Okay?

15        A.    I saw your pen strokes.

16        Q.    Okay.  All right.

17             Now I want to go through this.

18             Now, this is the response from

19   Walmart.  This is what they've told us.  So

20   if you disagree with any of this, I want you

21   to holler.  And tell me what you disagree

22   with.  Okay?

23             We're going to go through it.

24             "From as early as 1994 until

25   2010, employees in Walmart's pharmacy

1    distribution centers reviewed controlled

2    stock drug exception reports.  Followed up on

3    orders by speaking with pharmacists and

4    escalated issues to market and/or region

5    leadership as needed to investigate and/or

6    resolve concerns."

7                Do you see that?

8        A.     I do.

9        Q.     Were you involved in the

10   assessment investigation of those orders?

11       A.     From 2006 forward and during

12   that time frame.  I can't speak to anything

13   prior to 2006.

14       Q.     Right.  I understand that.

15       A.     But as the term "investigate"

16   here refers, we were not a part of that

17   particular process.

18       Q.     Okay.

19               So you were not involved, if I

20   change it now, 2006 until 2010?

21       A.     2006-2010, we were getting --

22   we were -- that's when some of those reports

23   began rolling out and incorporating as a part

24   of our team.  Because now we were -- at that

25   particular point, we were taking a look

1    through the exception reports.

2         Q.    Okay.

3              Do you see the next bullet,

4    "From approximately 2004 until at least

5    August 2010, consistent with direction from

6    DEA, employees in Walmart Schedule II

7    distribution center, Distribution Center 6045

8    faxed monthly reports to Little Rock DEA

9    office based on their review of controlled

10   drug stock exception reports."

11             Now, let's just talk through.

12   Now, it is my understanding that the

13   Little Rock DEA would be the field office

14   closest to DC 6045.

15             Is that consistent with your

16   understanding?

17        A.    That is my understanding.

18        Q.    And the regulations require you

19   to notify the field office for DEA; correct?

20             MR. VARNADO:  Object to form.

21        Q.    (BY MR. ECKLUND)  Do you have

22   an understanding of that or no?

23        A.    That is -- that is within the

24   DC area and distribution.  I'm not familiar

25   with DC -- all the DC requirements.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall receiving any

2    direction from DEA?

3    A.    No.  Not me particularly.

4    Q.    Okay.  Do you recall receiving

5    any information from other employees within

6    Walmart about direction that was provided by

7    DEA?

8    A.    I do not recall anything

9    specific.

10    Q.    Do you know whether it

11    happened?

12    MR. VARNADO:  Object to form.

13    THE WITNESS:  I don't -- I was

14    not a part of those conversations with

15    the distribution centers.

16    Q.    (BY MR. ECKLUND)  Okay.

17    It continues, "From

18    approximately 2010 until approximately 2015,

19    employees in Walmart's pharmacy distribution

20    centers reviewed controlled drug stock

21    exception reports and internally circulated

22    listing all stores' items above 4 percent for

23    further review and follow-up if needed."

24    Do you see that?

25    A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know whether that policy

2    was limited to just controlled substances?

3    A.    I recall controlled substances

4    being the majority of what we reviewed, but I

5    don't have a specific recollection of every

6    drug that may have been on that 4 percent

7    report.

8    Q.    Okay.  Now, it continues, that

9    there was follow-up as needed.

10    Were you involved in the

11    follow-up described in that bullet?

12    A.    We were.

13    Q.    How would you be involved in

14    the follow-up?

15    A.    By going through a similar

16    process.  That's where the purchase and

17    dispense reports would have been reviewed to

18    determine when the last time we were in that

19    particular store, when is the last time we

20    looked at the inventory there.  And also, if

21    there was additional investigative necessary.

22    Q.    Okay.  And those investigations

23    would have been documented?

24    A.    If there was an investigation.

25    Q.    For controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    For all products or just

3    controlled substances?

4    A.    If it involved anything outside

5    of controlled substances, and there was an

6    investigation, it would have been documented.

7    Q.    Okay.  Thank you.

8    All right.  The next bullet,

9    "From approximately 2011 until approximately

10    2015, Walmart implemented order alerts in

11    Reddwerks."

12    What's Reddwerks?

13    A.    It is a system within

14    logistics' ordering process for health and

15    wellness.  That's the extent of my knowledge

16    of it.

17    Q.    Have you ever looked at

18    Reddwerks?

19    A.    I have not.

20    Q.    Have you ever used Reddwerks?

21    A.    No.

22    Q.    Okay.  Do you know whether

23    Reddwerks is a warehouse execution software

24    or is it a diversion compliance software?

25    MR. VARNADO:  Object to form.

```
 1                THE WITNESS:  I don't know how
 2        many different ways it could be used.
 3        Q.      (BY MR. ECKLUND)  Are you
 4   familiar with a company called Dematic?
 5        A.      I'm not.
 6        Q.      D-E-M-A-T-I-C.
 7        A.      No.
 8        Q.      Okay.  Are you aware that
 9   Reddwerks was acquired by Dematic and it was
10   Dematic Reddwerks.  Now it's just Dematic?
11        A.      I was not aware of it.
12        Q.      Do you know whether Walmart
13   uses any Dematic software in its warehouse
14   execution software groups?
15        A.      I can't speak to that.
16        Q.      Okay.  All right.  So it talks
17   about Walmart's order fulfillment system.
18   And that would be part of warehouse
19   execution; correct?  Fulfilling shipments and
20   systems?
21        A.      That would be my understanding.
22        Q.      Okay.  So this is -- this is to
23   make sure that the DC 6045 or any other DC
24   that's shipping, that they know what's been
25   shipped to which other parts of the country;
```

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2               MR. VARNADO:  Object to form.

3               THE WITNESS:  I don't know what

4        it would reveal within those systems.

5          Q.    (BY MR. ECKLUND)  Okay.  And

6    then it says that "Flagged orders for

7    controlled substances of 50 bottles or more

8    and orders for amounts 30 percent higher than

9    a rolling four-week average for that item."

10              Do you see that?

11         A.    Yes, sir.

12         Q.    Okay.  So earlier we were

13   talking about the over 20 cut.  This one is

14   flagging at 50.  Do you know whether over 50

15   was for just controlled substances, or any

16   product within the pharmacy group?

17         A.    I don't recall specifically all

18   of the drugs that it had applied to.  But I

19   do recall the over 50 report.

20              I do know that it did include

21   controlled substances.

22         Q.    But sitting here today you

23   don't know whether it also included other

24   prescription drugs?

25         A.    Off the top of my head, I

Highly Confidential - Subject to Further Confidentiality Review

1    cannot recall that specifically.

2         Q.     And if it did include other

3    prescription drugs, it would be fair to say

4    it wasn't focused on limiting controlled

5    substances exclusively?

6              MR. VARNADO:  Object to form.

7              THE WITNESS:  I don't know what

8         it would have been -- I don't know

9         what the purpose was other than to

10        alert.  And we were to respond from

11        those alerts and do our due diligence.

12        Q.     (BY MR. ECKLUND)  Right.  But

13   I'm asking you a fairly discrete question.

14             So if the over 50 reports

15   applied to birth control, by way of example,

16   and antibiotics, and controlled substances,

17   those are all prescription drugs?

18        A.     Those are -- correct.

19        Q.     And if the over 50 limitations

20   described here were to apply to birth control

21   medications, because of concerns about

22   stock-keeping and warehouse concerns, it

23   would be a fair assumption that this over 50

24   program was not intended to address

25   specifically controlled substances.  It was a

Highly Confidential - Subject to Further Confidentiality Review

1    broader purpose.

2              MR. VARNADO:  Object to form.

3              THE WITNESS:  I can't -- I

4         can't answer that, because I was not a

5         part of establishing this.

6         Q.    (BY MR. ECKLUND)  Well, how --

7    how could it be specific to controlled

8    substances if it included products that were

9    not controlled substances?

10             MR. VARNADO:  Object to form.

11             THE WITNESS:  The only results

12        that I've seen coming out of this tool

13        were controlled substances.  There may

14        have been others from time to time,

15        but I do not recall any birth control

16        or antibiotics being a part of the

17        exception report.

18        Q.    (BY MR. ECKLUND) Do you know

19   how they arrived at the 30 percent or higher

20   threshold?

21        A.    No, sir.

22        Q.    Do you recall any discussions

23   regarding whether 30 percent was the right

24   number?

25        A.    I was not part of, no.

1      Q.    Do you recall any

2  correspondence that suggested that 40 percent

3  should have been the number?

4      A.    I have never seen

5  correspondence to that effect.

6      Q.    20 percent?

7      A.    No.

8      Q.    Anything different than 30?

9      A.    I was not involved in any of

10  the percentages or any of the thresholds or

11  establishing those goals.

12      Q.    Okay.  If you'd go to the next

13  bullet.  From approximately July of 2012

14  until approximately 2015 -- and you recall

15  the workflow we were working through earlier,

16  that's from July 2012; correct?

17      A.    That is.

18      Q.    Okay.  So that's probably what

19  we're talking about here.  Fair?

20      A.    Mm-hmm.  (Witness nods.)

21      Q.    Okay.  Let's talk about there

22  now.

23          It says, "Employees in

24  Walmart's DC 6045 implemented a hard limit of

25  20 bottles for shipments of oxycodone

Highly Confidential - Subject to Further Confidentiality Review

1    30 milligrams."

2              What's a hard limit?

3         A.    That was -- they were going to

4    ship no more than that.  That's why those

5    orders were cut.

6         Q.    Okay.  So automatically cut,

7    you couldn't get 21 bottles, even if the

8    pharmacy called up and said to someone in

9    your group, "We have legitimate reason for

10   all of these pills."

11        A.     Our group would not have made

12   that decision.  But 20 was the limit, and

13   that was a -- that was a hard ceiling at that

14   time.

15        Q.     And there were no exceptions,

16   workarounds or other ways to get more than

17   20?

18        A.     None that I am aware of.

19             MR. VARNADO:  Object to form.

20        Q.     (BY MR. ECKLUND)  And is there

21   anyone else in the company that would be

22   aware if there were any exceptions to the

23   hard limit of 20?

24        A.     I don't know, sir.

25        Q.     Let's continue.

1          So it talks about the hard

2   limit of 20 for shipments of oxycodone, and

3   then internal circulation of a report listing

4   orders for Schedule II controlled substances

5   of more than 20 bottles for further review

6   and follow-up as needed.

7          So again, the hard limit for

8   oxycodone was 20 bottles, and for other

9   controlled substances, if it was an order of

10  19 or less, it would not have been included

11  in the report described in this bullet point;

12  correct?

13      A.    That is -- that is my

14  understanding, yes.

15      Q.    On -- this is the response from

16  the company, so if it's incorrect, you need

17  to tell us that.

18          MR. VARNADO:  Object to form.

19          THE WITNESS:  I can't respond

20      on behalf of the company, because I'm

21      not aware of all of the programs that

22      would -- that this would have impacted

23      or decisions points that would have

24      gone into this.

25          I can respond to what our group

1    did.

2              MR. ECKLUND:  Okay.

3         Q.    (BY MR. ECKLUND)  So sitting

4    here today, you're not aware of any

5    exceptions to the hard cap of 20 for

6    oxycodone, and you're not aware of any

7    circulations of a report listing orders for

8    Schedule II controlled substances of less

9    than 20 bottles?

10             MR. VARNADO:  Object to form.

11             THE WITNESS:  I'm not aware of

12        them being identified as exceptions,

13        but there were multiple reports.  And

14        we can pull purchase and dispense

15        reports for any time frame, going

16        across the spectrum.  But I'm not

17        aware of any exception reports where

18        that would be flagged.

19        Q.    (BY MR. ECKLUND)  Where does it

20   say it's an exception report?  It says

21   "internally circulated report, listing orders

22   for Schedule II."

23        A.    At the top it leads out with

24   "exception reports," but you are correct.

25   That paragraph does not list the exception.

1        Q.        So I'm asking, are there

2    reports that tracked orders of 19 bottles of

3    other controlled substances, C-IIs, C-IIIs,

4    C-IVs, C-Vs?  Within that window of time,

5    between July 2012 and approximately 2015,

6    we've got a specific parameter for oxycodone

7    30 milligrams, and it's only oxycodone

8    30 milligrams.  And then -- and that's a hard

9    limit of 20 bottles.  Which meant if you

10   ordered 40, it got cut to 20.  The order

11   would get filled at 20, and then there would

12   be an investigation potentially.

13       A.        Mm-hmm.

14       Q.        Maybe just scoping.

15                 And for other Schedule IIs,

16   there was an internally circulated report

17   listing orders for other controlled

18   substances, C-IIs, of more than 20 bottles.

19                 Do you see that?

20       A.        I do.

21       Q.        Okay.  So a couple of questions

22   on that.

23                 First is, "internally

24   circulated report," which means it wasn't

25   externally circulated to, say, for example,

1    the DEA.

2         A.    I don't know what has been

3    shared with the DEA.

4         Q.    Well, it's an internally

5    circulated.  Would it be custom within

6    Walmart to circulate an internally circulated

7    report outside of the company?

8              MR. VARNADO:  Object to form.

9              THE WITNESS:  I was not -- I

10             have never seen these responses prior

11             to now and I don't know what would be

12             communicated outside of the company or

13             by whom.

14        Q.    (BY MR. ECKLUND)  Okay.

15             For orders of 19 bottles or

16   lower, there would be no report, according to

17   this bullet point; correct?

18        A.    I do not recall receiving

19   reports for less than 20 bottles on here.

20        Q.    And if you didn't receive a

21   report, you would also not have conducted any

22   assessment, scoping, or investigation;

23   correct?

24             MR. VARNADO:  Object to form.

25             THE WITNESS:  Relative to this

1          program, correct.

2          Q.    (BY MR. ECKLUND)  And the only

3     exception to that would be if the pharmacy or

4     someone else notified you of a concern

5     specific to that order; correct?

6               MR. VARNADO:  Object to form.

7               THE WITNESS:  Relative to this

8          program, correct.

9          Q.    (BY MR. ECKLUND)  And would

10    these bottle limits that are described here,

11    would these have been concerned with NDC

12    codes or would these be based on family?

13    Does it tell you?

14         A.    This does not tell me.

15         Q.    From your experience reviewing

16    those reports, the over 20 reports, and these

17    internal circulations concerning Schedule II

18    controlled substances, more than 20 bottles

19    for further review and follow-up as needed,

20    do you recall whether those were broken down

21    by NDC code, by family, or by particular drug

22    type and dosage?

23         A.    From my personal experience in

24    what I have reviewed, those would come in by

25    NDC code.

1    Q.    Okay.  So then you could have

2    an NDC code for, by way of example, one

3    supplier, supplier A, and they're providing

4    you 19 bottles of a controlled substance,

5    C-II, and you could have the same drug and

6    the same dosage provided -- because it's a

7    multisource generic in this hypothetical,

8    okay?  It's a multisource generic.  Supplier

9    A, supplier B, they both give you 19 bottles.

10   There would be no report based on this

11   bullet.

12            MR. VARNADO:  Object to form.

13            THE WITNESS:  That would be

14       incorrect.

15   Q.    (BY MR. ECKLUND)  How would

16   it --

17   A.    Because it -- if this was

18   coming from the DC, the DC would have

19   controlled how many and what bottles went to

20   a particular location, regardless of NDC.

21            So if it is oxy 30, regardless

22   of the NDC, that total number is taken into

23   account when the order is placed.  And the

24   shipment documents, if there were four

25   bottles, two were of this NDC and two were of

1    another NDC, the total would have been

2    listed.  And that was -- would be what the

3    trigger amount, or what the exception would

4    have been triggered off of.

5         Q.    So it's not triggered by the

6    NDC total because the NDCs are unique to each

7    product.  It's triggered by the bottles and

8    the drug type and milligram?

9         A.    Yes.

10        Q.    So the dosage strength and the

11   drug type?

12        A.    Dosage strength, drug type.

13        Q.    What about combination

14   products?

15             So by way of example, an opioid

16   mixed with a dosage of acetaminophen?

17        A.    There was a -- there was a

18   period when the federal government reduced,

19   mandated the reduction of acetaminophen

20   combinations.  As I recall, whenever that

21   occurred, the distribution center took steps

22   to eliminate those NDCs that exceeded that

23   federally mandated amount of acetaminophen

24   from the inventory, and also send all of the

25   existing stock either back to the

1    warehouse -- or back to the -- through

2    reverse distribution or back to the

3    warehouse.

4              But I do not recall the

5    specific dates.

6    Q.    Okay.  Turning to the next

7    bullet, "From approximately 2015" --

8              MR. VARNADO:  Can you pull it

9         up a little bit?  It's just a little

10        sideways.

11             That's much better.  Thank you.

12        Q.    (BY MR. ECKLUND)  So "From

13   approximately 2015 through November of 2017,

14   Walmart implemented enhanced thresholds in

15   Reddwerks and a tiered review process

16   involving teams from Walmart's health and

17   wellness logistics and practice compliance

18   divisions for orders placed by its

19   pharmacies."

20             Do you see that?

21        A.    I do.

22        Q.    Was that a supplement to the

23   processes described above, or was this a new

24   approach?

25        A.    This was an evolution that

1    included a part of the above described

2    approach.

3        Q.    So the hard limits for

4    Oxy 20 -- or sorry, oxy 30, 20 bottles, those

5    continued through November 17th?

6        A.    The hard limits on the

7    20 bottles was -- that evolved.  And that was

8    a little bit relaxed based on some of the

9    things that were occurring here.

10            And as this program continued

11    to evolve, it evolved based on not only

12    additional information, but also feedback

13    that was coming back on what areas and --

14    what would make it an exception.  Because it

15    was -- at the time we started, we started

16    with a hard limit.

17            And as it progressed forward,

18    does that hard limit make sense for all

19    orders everywhere?

20            That's when it got specific to

21    the team.

22        Q.    Okay.  So help me understand

23    what you just described.

24            The evolution of this hard

25    limit, would it have enabled the DC 6045 to

1    ship more than 20 bottles?

2              MR. VARNADO:  Object to form.

3              THE WITNESS:  That, I don't

4         know.  Because as these things were

5         being incorporated, that was between

6         compliance and logistics.

7         Q.    (BY MR. ECKLUND)  Okay.  So

8    when you -- when you testified "And as it

9    progressed forward, does that hard limit make

10   sense for all orders everywhere?"  That's

11   what I'm trying to understand.  If it's

12   either still a hard limit, where you couldn't

13   get more than 20, or it's not.

14             So why would it matter if it

15   made sense?

16        A.    The thing that I can tell you

17   is that the over 20 and over 50 report lasted

18   for a period of time.  And after that period

19   of time, we did not receive any more of those

20   exception reports.

21             That was because the

22   exceptions -- or not the exceptions -- that's

23   because the monitoring of that was then

24   incorporated as a part of this larger system.

25        Q.    And is it your understanding at

1   that time that they still had hard limits at

2   20?

3          A.     I did not know what the limits

4   were at that time.  I was not a part of that

5   conversation, or evolution of this.

6          Q.     Were you part of the team

7   described in this bullet?  The team involving

8   Walmart's health and wellness, logistics and

9   practice compliance divisions?

10         A.     No, sir.

11         Q.     Okay.  And the following

12  bullet, "From November 2017 until the end of

13  the relevant time period, when Walmart ceased

14  all distributions of controlled

15  substances" -- and I just want to ask a

16  couple of questions about that.

17                First, did Walmart seek -- is

18  it your understanding that Walmart ceased

19  distribution of all controlled substances or

20  just prescription opioids?

21         A.     My understanding is they have

22  ceased operations of all controlled drugs or

23  all substances from the warehouse that were

24  controlled.

25         Q.     Okay.

1      Do you know whether Walmart

2  still dispenses prescription opioids?

3      A.    I can say we do.

4      Q.    Do you know from whom those

5  prescription opioids are supplied to Walmart,

6  which entity provides them to the Walmart

7  stores for dispensing to patients?

8      A.    The controlled substances now

9  come from McKesson.

10      Q.    Okay.  And in your role within

11  auditing and asset protection, do you have

12  any involvement with the McKesson

13  distribution?

14          MR. VARNADO:  Object to form.

15          THE WITNESS:  I don't have any

16      involvement with the distribution.  We

17      receive data.

18      Q.    (BY MR. ECKLUND)  Okay.  What

19  data do you see from McKesson?

20      A.    What their shipment information

21  is.

22      Q.    And do you know whether

23  McKesson or Walmart is primarily responsible

24  for this suspicious order monitoring or

25  attempts to understand potential diversion?

1           MR. VARNADO:  Object to form.

2           THE WITNESS:  That is between

3      compliance and McKesson.  We're not

4      part of that discussion.

5      Q.    (BY MR. ECKLUND)  And if there

6  was a concern raised by compliance about a

7  potential diversion concern, would Walmart

8  and your group analyze and investigate and

9  assess it or would it be something that would

10  be handled by McKesson?

11           MR. VARNADO:  Object to form.

12           THE WITNESS:  If there was a

13      reason for theft of pre-exist -- is

14      that what you're --

15      Q.    (BY MR. ECKLUND)  Not that,

16  diversion.

17      A.    Okay.  If it is theft or

18  diversion, then there's a lot of variables

19  that would go into that, that it would -- it

20  may include our group, it may not.  Depends

21  on what the variables are.

22      Q.    What variables might trigger

23  your involvement?

24      A.    If there were strong suspicion

25  of that.  If there was in-transit losses.  If

1    there were things that stopped the order

2    from -- that we ordered from McKesson to

3    actually making it to the store.  And then

4    after it got to the store, what happened to

5    the drugs thereafter.

6         Q.    So you would be principally

7    involved in investigations where there was a

8    concern that one of the employees within

9    Walmart may have been involved in a theft or

10    potential loss?

11         A.    Correct.

12         Q.    Okay.  And if there were

13    something involving the shipping, from

14    McKesson, McKesson ships on its own trucks to

15    Walmart?  Or do they use Walmart trucks to

16    deliver product to Walmart?

17         A.    They ship through their own

18    mechanisms.  I don't know all of the

19    mechanisms they use, but they do not use

20    Walmart distribution.

21         Q.    All right.  So your involvement

22    would most likely be triggered by events that

23    occurred after delivery by McKesson to

24    Walmart?

25         A.    Yes.  If there was a shortage,

Highly Confidential - Subject to Further Confidentiality Review

1    that then we would be notified at that time,

2    and then we would start looking back and

3    moving forward.

4         Q.    Okay.

5              Then it continues, "Walmart

6    used the Buzzeo system to analyze orders from

7    Walmart's pharmacies and flag orders of

8    interest which were reviewed by Walmart's

9    health and wellness practice compliance

10   personnel?"

11             Do you see that?

12        A.    Yes, sir.

13        Q.    Do you know what Buzzeo is?

14        A.    I do not.

15        Q.    Have you ever had any occasion

16   to use any systems that were provided by

17   Buzzeo?

18        A.    None that I'm aware of.

19        Q.    Okay.  We talked earlier about

20   orders of interest.

21             That's a term that you used in

22   your role within asset protection?

23        A.    No.  I mean, it's not common

24   terminology within asset protection or global

25   investigations.

1      Q.      And you would not have been

2   involved in the review described here because

3   you're not within the health and wellness

4   practice compliance group?

5      A.      Correct.

6      Q.      Okay.

7              And you would also not have

8   been involved in the reporting of any orders

9   of interest identified using the Buzzeo

10   system; correct?

11      A.      Correct.

12      Q.      Because you've not used the

13   Buzzeo system?

14      A.      (Witness nods.)

15      Q.      For purposes of completion,

16   there is a last bullet point.  "For the

17   entire relevant time period, employees in

18   Walmart's pharmacy distribution centers

19   monitored orders."

20              Were you involved in the

21   monitoring of any orders?

22              MR. VARNADO:  Object to form.

23              THE WITNESS:  Not in the

24      ordering, no.

25      Q.      (BY MR. ECKLUND)  Well, I want

1    to turn back to the prior flowchart.  I

2    wanted to talk a little bit more about the

3    cutting.

4                    So this document generated on

5    or about July 2012.  And we talked a little

6    bit about this document.  It was the fifth

7    bullet down in what I had shown you

8    previously.

9                    MR. VARNADO:  The fifth bullet?

10                   MR. ECKLUND:  On this document,

11        the fifth bullet.  Right here.  I

12        could keep that up there if you want.

13        Q.    (BY MR. ECKLUND)  So this is

14   describing that flowchart, and the flowchart

15   talks about cutting.

16                   And this was all done in or

17   around July of 2012.

18                   What I'm curious about is, how

19   did you determine that it was appropriate to

20   cut the orders?

21                   Was there discussions within

22   Walmart?

23                   MR. VARNADO:  Object to form.

24                   THE WITNESS:  I don't know in

25        total.  There were no discussions with

1     our team.

2          Q.     (BY MR. ECKLUND)  Okay.  Are

3     you familiar with a case involving a company

4     named Masters?  Masters Pharmaceuticals,

5     Inc.?

6          A.     Off the top of my head,

7     that's --

8               Can you outline for me what the

9     case was about?  Maybe that will help me

10    recall.

11         Q.     It involved concerns about

12    diversion.  It involved the DEA.  It involved

13    enforcement actions brought by the Department

14    of Justice.  It involved a number of

15    different locations that were being supplied

16    by this defendant.

17              I don't want to summarize the

18    entire decision for you, but if you want to

19    read it.

20         A.     It's not ringing a bell.

21         Q.     Okay.  So I'm curious about, in

22    the prior document you circulated to your

23    direct supervisor, correspond -- or I'm

24    sorry, an article concerning Cardinal and CVS

25    and oxycodone.  Do you remember that?

1        A.      Yes, sir.

2        Q.      And it was not your habit or

3    custom to routinely search online and try and

4    find out what's going on as far as DEA,

5    controlled substances, diversion.  This was

6    just happenstance that you found the Cardinal

7    article, or did you routinely look for stuff

8    like that on the internet?

9        A.      As a part of my job, I try to

10   keep current on the environment, and where

11   the pressure points are.

12       Q.      Okay.  And as part of your job,

13   would you have also considered administrative

14   law judge decisions?

15           So decisions that come from the

16   enforcement actions brought by the DEA?

17       A.      If those were recent.  I'm not

18   going -- I did not research each and every

19   decision that was ever rendered in a

20   controlled substance action, but I tried to

21   keep current on what the -- what was relevant

22   in the social media at that particular time,

23   and what the major focus was.

24       Q.      Okay.

25           So within the Federal Register

1    at Volume 80, No. 178 dated Tuesday -- I

2    haven't put it up yet -- September 15, 2015,

3    there was notice of an administrative law

4    judge's decision.  And it's a -- I would

5    characterize it as a fairly robust decision.

6    It's fairly lengthy for an administrative law

7    judge.  It's dozens of pages long.  And

8    within the judge's decision, which ultimately

9    was appealed to the circuit court, the judge

10   wrote about cutting of orders.  And what the

11   judge wrote was, "As explained above, because

12   the purpose of the -- this law, effectively,

13   was to determine whether a customer's orders

14   were of unusual size and thus suspicious,

15   Respondent's practice of editing or deleting

16   those orders which placed a customer over its

17   controlled substance limit subverted the

18   SOMs, the suspicious order monitoring that

19   they had in place.

20           Whether Respondent's employees

21   edited or deleted orders with the intent to

22   divert its obligation to report suspicious

23   orders is irrelevant because the regulation

24   does not require proof of any level of

25   scienter."

Highly Confidential - Subject to Further Confidentiality Review

```
1                    And the judge continues and
2       talks how the cutting could effectively do
3       just that.  That in the testimony in that
4       case, a gentleman, Mr. Corona, had testified
5       that it was common practice for the
6       compliance department to either edit or
7       delete orders for controlled substances if
8       the order was above the customer's threshold
9       and there was not a reason to increase the
10      threshold.
11                   So effectively a hard limit.
12                   And though this was not
13      intentionally done to subvert respondent's
14      responsibility to report suspicious orders,
15      it in effect did just that.  Okay?
16                   What I'm wondering is, this
17      decision came out in 2015, from the
18      administrative law judge.  You're not aware
19      if that decision animated any changes?
20           A.     I'm not --
21                   MR. VARNADO:  Object to form of
22           the question.
23                   THE WITNESS:  I'm not aware.
24           Q.     (BY MR. ECKLUND)  Okay.  So it
25      wasn't something that you considered, and it
```

1    wasn't something that you are aware of being

2    considered as part of this program?

3        A.     It's not something that came up

4    as a discussion point.  So I don't know what

5    was considered.

6        Q.     If the compliance department

7    had brought this decision to your attention

8    and said, "This decision just came out

9    against Masters.  We'd like you to consider

10   it as part of your asset protection and the

11   investigations that you're completing," is

12   that something you would have done?

13           MR. VARNADO:  Object to form.

14           THE WITNESS:  That is outside

15       our scope in terms of determining what

16       is suspicious and what is not from a

17       cutting perspective.  That is going to

18       be between compliance and the other

19       remaining groups.  We would execute

20       based on their decisions.

21       Q.     (BY MR. ECKLUND)  What role did

22   asset protection have vis-à-vis distribution?

23   What was your role?  How did you guys fit

24   within distribution?

25           MR. VARNADO:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  We didn't fit

2          within distribution.  We fit on the

3          back end, after distribution, while

4          distribution is in process or after

5          the fact.

6      Q.    (BY MR. ECKLUND)  Okay.  So you

7   were not involved on the front end, and you

8   would only be brought in if the circumstances

9   warranted it, because of a hard limit being

10  exceeded, or specific circumstances being

11  raised that would have triggered an

12  investigation or scoping.

13         MR. VARNADO:  Object to form.

14         THE WITNESS:  And as well as

15         theft, in-transit losses, those types

16         of events, yes.

17     Q.    (BY MR. ECKLUND)  Do you

18  remember a C-II utilization review?

19     A.    I remember the term, but I do

20  not recall exactly what it was referencing.

21     Q.    Do you remember participating

22  in any webinars to learn more about how asset

23  protection could assist in its role within

24  C-II utilization?  A webinar?  Would have

25  been in around July of 2012?

```
 1                    MR. VARNADO:  Object to form.

 2                    THE WITNESS:  I don't recall.

 3           Q.       (BY MR. ECKLUND)  Do you know

 4    whether George Chapman, Susanne Hiland,

 5    Brandon Worth, Tim Harris and you were all on

 6    the diversion team in or around September of

 7    2012.

 8                    I'll give you the names again.

 9    Chapman, Hiland, Worth, and Harris.

10           A.       Worth was not on the compliance

11    team.  But the remainder, to my recollection,

12    were a part of the compliance component.

13           Q.       I meant the diversion team.

14           A.       Oh, I'm sorry.

15           Q.       Yeah, the diversion.

16           A.       Were they part of the

17    diversion?  No.

18           Q.       Okay.

19                    So we were talking about the

20    flowchart earlier with the hard limits for

21    20, and the reporting.  In your role within

22    asset protection, as you got these reports,

23    these daily reports, orders over 20, what

24    would your analysis entail at that point?

25                    You get the report.  It shows
```

1    orders over 20.  What would you then do?

2         A.    We would, first thing, look to

3    determine whether or not we have any open

4    investigations at that location at that time.

5              If -- and the -- whether we did

6    or whether we didn't, we were looking at the

7    last time that particular store or that

8    inventory was audited, and when the

9    particular drug in question was audited.

10             And then we would base our

11   decision on whether to send out the checklist

12   to the market directors on whether or not we

13   had an open investigation, or we needed to do

14   additional scoping.

15             But in that process, we'd also

16   run a purchase and dispense report.

17        Q.    Now, if there was no active

18   investigation, and you determined that there

19   was no need to conduct a full asset

20   protection investigation, would that be the

21   end of the analysis?  Or would you

22   communicate with the market director?

23        A.    If we ended its scoping, we

24   would communicate both to compliance and the

25   market director.

1      Q.     Okay.

2      A.     They -- they needed to complete

3   the review report.  We didn't communicate

4   with them that we found no reason for

5   diversion.

6      Q.     And was that report an online

7   submission, a web-based form or was it a

8   paper form?

9      A.     It was a paper form.  Email.

10      Q.     Did your -- okay.  So it was a

11   paper form that was sent by an email?

12      A.     It was -- yes, during that

13   time, it would have been sent by email.

14      Q.     So it would have been scanned

15   into a PDF or a TIF document and attached to

16   an email and sent?

17      A.     No.

18      Q.     Okay.  Help me understand the

19   email form, then.

20      A.     It was an online -- or not an

21   online form.  It was a list of questions in

22   an email that was sent that the market

23   director would respond to the questions in

24   the email and send it back to compliance.

25      Q.     Okay.  So the questions would

1    be sent by one person, copied, pasted to the

2    reply, and then the answers would be filled

3    in next to the questions that were presented

4    in the original email?

5         A.    They would answer those

6    questions from that email.

7         Q.    Who would review the answers to

8    those questions?

9         A.    That would be compliance.

10        Q.    Who had responsibility for

11   reviewing these exception reports?  We talked

12   about those earlier.  That was -- is that

13   compliance?  Was that you?  Was it the

14   diversion team?  Who was responsible for

15   review of the controlled substance exception

16   reports?

17             MR. VARNADO:  Object to form.

18             THE WITNESS:  The over 20?

19        Q.    (BY MR. ECKLUND)  Yeah.

20        A.    Yeah.  That was a joint.

21             I mean, they would review.  And

22   the exceptions would come to us for

23   additional review.

24        Q.    Okay.  So exception reports

25   would come to your department?

```
1         A.      Those daily ones, yes.

2         Q.      Okay.

3                 And the responses to the

4    web-based form that you described, would

5    those also come to your department?  Or just

6    compliance?

7                 MR. VARNADO:  Object to form.

8                 THE WITNESS:  They always went

9         to compliance.  And sometimes we were

10        cop -- sometimes the investigator who

11        sent it out was copied.  But that was

12        not a requirement.

13        Q.      (BY MR. ECKLUND) Okay.  So on

14   occasion, you received them, but it was not

15   part of a standard operating procedure --

16        A.      Correct.

17        Q.      -- that you would be copied or

18   your group would be copied?

19        A.      (Witness nods.)

20        Q.      It was a standard operating

21   procedure for it to be sent to compliance?

22        A.      That is correct.

23        Q.      Okay.  Was it a standard

24   operating procedure to send it to any other

25   departments aside from compliance?
```

1        A.      None that I'm aware of.

2        Q.      Okay.

3                MR. VARNADO:  We're getting

4        close to 12:30.  Whenever you are

5        ready for a break.  No rush.

6                MR. ECKLUND:  When you're

7        hungry or want to take a break, just

8        let me know.

9                THE WITNESS:  Certainly.

10               Are you ready?

11               MR. VARNADO:  Are you ready

12       now?

13               THE WITNESS:  Are we starting

14       with a new document?  Then I think

15       that would be a perfect time.

16               MR. VARNADO:  Sounds good.

17       That's fine.

18               VIDEOGRAPHER:  12:26.  We are

19       off the video record.

20               (Recess taken, 12:26 p.m. to

21       1:02 p.m.)

22               VIDEOGRAPHER:  1:02.  We are on

23       the video record.

24       Q.      (BY MR. ECKLUND)  Welcome back,

25   Mr. Beam.

```
 1          A.      Thank you.

 2          Q.      I hope you enjoyed your lunch.

 3                  So, I just wanted to turn your

 4     attention back to this composite exhibit.  If

 5     you recall, this is what we had talked about

 6     earlier.  This was what was marked as

 7     Exhibit 1 in Miranda Johnson's deposition.

 8                  And do you recall we went

 9     through these time periods.  We assembled

10     each of the Bates range documents that were

11     identified in Walmart responses in this

12     document.  And I had a couple of questions

13     about this particular document for you.

14                  It bears Bates stamp 11106.

15                  Do you see this document?

16     There we go.  Okay.  Here's the question I

17     have for you.

18                  "Upon the receipt of the Excel

19     document indicating those stores and items

20     above, the 3.99 percent threshold, the senior

21     AP pharmacy manager will forward the reports

22     to the appropriate drug diversion

23     coordinator."

24                  Were you a drug diversion

25     coordinator?
```

Highly Confidential - Subject to Further Confidentiality Review

1         A.      And what was the time frame on

2    this?

3         Q.      This is for 2010-2014.

4         A.      At that time I would have been

5    promoted to a manager role.

6         Q.      So you were not a drug

7    diversion coordinator.  You were manager of

8    the drug diversion coordinators?

9         A.      Correct.

10        Q.      Who were the drug diversion

11   coordinators within that window of time?

12        A.      And that would have been the

13   people on the -- that we covered earlier.  So

14   Terry Crabb -- I know for sure.

15        Q.      Terry Crabb, Glenn Webster,

16   Latonya, Rob Prince, Richard Ivy, Jarred

17   Crabhouse [sic]?

18        A.      Crabtree.

19        Q.      Crabtree?

20        A.      Yeah.

21        Q.      John Oldfather.

22        A.      Oldfather.

23        Q.      Oldfather?  Okay.

24               All of those individuals that

25   you identified earlier?

1    A.    John would have been there.

2  Terry would have been there.  Richard.  And

3  Jarred.

4    Q.    What about Kelly Cox?  Would

5  she have been a drug diversion coordinator?

6    A.    I don't remember the time frame

7  specifically when she came on.

8    Q.    Okay.  Kathy Stowe?

9    A.    I don't think she would have

10  been there at the time.

11    Q.    What about Travis?

12    A.    Travis would not have been

13  there at that time.

14    Q.    And do you have an

15  understanding, since you were the manager of

16  the drug diversion coordinators, of what

17  their responsibilities would have been upon

18  the receipt of the Excel document indicating

19  those stores and items above the 3.99 percent

20  threshold?

21    A.    Yes, that -- it would have been

22  what was outlined here.  That would have been

23  looking at those things we did in that

24  decision.

25    Q.    So what we're going to be

1    turning to now, which is Exhibit 9.

2              (Walmart-Beam Deposition

3         Exhibit 5, September 2012 email chain.

4         Subj: RE: CII utilization review,

5         WMT_MDL_000008089-8090, was marked for

6         identification.)

7              MR. VARNADO:  Exhibit 5?

8         Q.    (BY MR. ECKLUND)  Sorry,

9    Exhibit 5.  I apologize.

10             The four-step process

11   delineated at the bottom, that carries on to

12   the next page.

13             MR. VARNADO:  Object to form.

14             MS. HOSMER:  What are the Bates

15        stamps?

16             MR. ECKLUND:  11106.

17        Q.    (BY MR. ECKLUND)  Have you gone

18   through it?

19        A.    I've gone through it.

20        Q.    Okay.  And you said before,

21   "Yes, that would have been what was outlined

22   here.  That would have been looking at those

23   things we did in that decision."  And you

24   were placing your hands on what's been marked

25   as Exhibit 5.

1              And we've now looked at the

2    four-step process described at the bottom

3    that carries on to the top of the next page.

4    That's the process that the drug diversion

5    coordinators would have been considering?

6              MR. VARNADO:  Object to form.

7              THE WITNESS:  This was the

8         whole process through logistics.

9         Where asset protection's role is lined

10        out is in 3.

11             MR. ECKLUND:  In 3?  Okay.

12        Q.    (BY MR. ECKLUND)  What is the

13   purpose of asset protection concerning

14   controlled substances?

15             What is the overarching purpose

16   of asset protection concerning controlled

17   substances?

18        A.    Our overall function in that

19   space is to identify where and how to keep

20   the pharmacy physically and operationally

21   secure.  We have robberies, burglaries, and

22   we also have both internal as well as

23   forgeries that show up.

24             So there's a lot of dynamics in

25   terms of interface and interaction with the

1    public that asset protection is trying to

2    help the company manage.

3          Q.    Okay.  So I want to go through

4    these.

5                So, when you talk about

6    physical and operational security, you're

7    talking about security in the vault, locked,

8    stored safely, secure, sort of like we talked

9    about the alarm before?  You talked about how

10   there was a physical alarm that would be

11   tested at the pharmacies to make sure it

12   actually locks the doors and the alarm goes

13   off when it should.  We're talking about

14   physical and operational security.  Correct?

15   At a pharmacy.

16         A.    At a pharmacy.

17         Q.    Okay.

18         A.    And we're talking about the

19   major hardware implementation around that.

20   The doors.

21         Q.    As concerns security for the

22   pharmacy.  Sort of to prevent robbery -- you

23   talk about robberies and burglaries.  And is

24   there a difference in your mind between a

25   robbery and a burglary?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Yes.
 2            Q.     What's the difference between a
 3    robbery and a burglary?
 4            A.     A robbery is going to be a use
 5    of force or a threat of force.  Burglary is
 6    going to be a break-in of a facility while
 7    the facility is closed.
 8            Q.     Okay.  And then, you also
 9    continue that there have been both internal
10    as well as forgeries that show up.
11                   What did you mean by "internal
12    as well as forgeries that show up"?
13            A.     Well, you're going to have
14    internal theft.  And that is a part of
15    running the operational aspect of it.
16                   Forgeries, when they're
17    recognized, are typically brought to our
18    attention.  And then we start looking at
19    those to determine if there -- if we can
20    detect any pattern in or any other similar
21    behavior.
22            Q.     So is the goal of asset
23    protection to protect the physical pharmacy
24    and also the products within the pharmacy
25    from theft or loss?
```

1          A.      We are a part of that process,

2     yes.

3          Q.      All right.  No, I understand

4     you're a part of the process.  I'm trying to

5     understand, with a finer point.

6              Is the primary purpose or goal

7     of asset protection to protect the pharmacies

8     themselves, both operational security and

9     physical security, to prevent robberies,

10     burglaries, theft, to prevent forgeries, or

11     detect forgeries.  As I hear you explaining

12     this, it seems the primary purpose is to

13     protect the physical assets, the pharmacies

14     of Walmart, and within the Walmart stores,

15     and also the products within those

16     pharmacies.

17          A.      That and investigate, yes.

18          Q.      Is there a difference between

19     the purpose and goals of asset protection

20     outside of the pharmacies?  And I'm thinking

21     more broadly.  Do you recall that Walmart was

22     at -- for a large period, the relevant time

23     period of this case, a distributor unto

24     itself?  It would self-distribute?  You're

25     familiar with that?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I am.
2              Q.    Did you in asset protection and
3     others within your group also concern
4     themselves with asset protection for Walmart
5     as a distributor?
6                    MR. VARNADO:  Object to form.
7                    THE WITNESS:  No.
8              Q.    (BY MR. ECKLUND)  No.  Okay.
9     So you were not involved in the operational
10    security or physical security of Walmart as a
11    distributor?
12             A.    Not as a distributor.
13             Q.    And you were not involved in
14    the investigations of Walmart as a
15    distributor?
16                   MR. VARNADO:  Object to form.
17                   THE WITNESS:  Not as a
18         distributor.
19             Q.    (BY MR. ECKLUND)  So if asset
20    protection and your group were not involved
21    in the distribution side of Walmart, who was?
22                   Who, within Walmart, would have
23    been responsible for ensuring that there was
24    no theft or loss or diversion within the
25    wholesale side?
```

1      A.      There was an asset protection

2  in logistics.  That was separate from our

3  group.

4      Q.      Who was the person within

5  logistics that had an asset protection

6  responsibility?

7      A.      That would have been Jim Greer.

8      Q.      Mr. Greer is in a different

9  silo, if you will, within Walmart.  There's

10  compliance, there's logistics, there's asset

11  protection.  Mr. Greer has not been in the

12  asset protection silo; correct?

13      A.      There is an asset protection

14  division inside of logistics, and they have

15  multiple functions as it relates to logistics

16  in total.

17      Q.      Okay.

18      A.      There is one, Jim Greer, that

19  was responsible for pharmacy or health and

20  wellness.

21      Q.      Would he have reported to the

22  same manager that you did?

23      A.      No.

24      Q.      Who would he have reported to?

25      A.      He would have reported to -- he

1    would have reported to a divisional director

2    within asset protection within logistics.

3    Off the top of my head, I can't recall who

4    that would have been.

5         Q.    And the divisional director

6    that you reported to within asset protection

7    was?

8         A.    Ron Lance.

9         Q.    And would Mr. Lance also be

10   within logistics?

11        A.    No.

12        Q.    And which group is he in?

13        A.    He's in AP operations.

14        Q.    So he's in AP operations.  And

15   Mr. Greer, his portion of asset protection

16   was in logistics?

17        A.    Correct.

18        Q.    So those are different

19   departments?

20        A.    Those are separate entities of

21   a larger overall department.

22        Q.    And how would you collaborate

23   or communicate with the other asset

24   protection department?

25        A.    With Mr. Greer?

1    Q.    With the department just

2    broadly.

3    A.    Oh.

4          We are -- we're free to make

5    those phone calls and collaborate where we

6    feel business necessity requires.

7    Q.    Are those departments housed in

8    the same building?

9    A.    Logistics and operations?

10   Q.    Yeah.  The two asset protection

11   groups.  The one for logistics and the other

12   for operations, are they housed within the

13   same building?

14   A.    No.

15   Q.    Did they share servers?

16   A.    No.

17   Q.    Network drives?

18   A.    No.

19   Q.    There's asset protection

20   logistics and asset protections operations.

21   So the operations asset protection, which is

22   your department, your group, those are really

23   concerned, as I'm understanding your

24   testimony, and correct me if I'm

25   misunderstanding it, you're concerned with

Highly Confidential - Subject to Further Confidentiality Review

1    the operations of the pharmacies and the

2    stores ensuring that the stores are secure,

3    that they are not going to be prone to theft,

4    loss, robberies, burglaries, that you're

5    taking steps to protect the stores from a

6    loss of product or from a theft or a crime?

7           A.    Mm-hmm.  (Witness nods.)

8           Q.    You said "mm-hmm," but you need

9    to say "yes."

10          A.    Oh, I'm sorry.  Yes.

11          Q.    And do you have an

12   understanding of what logistics asset

13   protection would have been concerned with?

14   It's separate from what you're looking at.

15   There's not overlap for the sake of overlap.

16   They have a different focus.

17          A.    Right.

18          Q.    Okay.

19                MR. VARNADO:  Object to form.

20          Q.    (BY MR. ECKLUND)  Do you have

21   an understanding of what the focus of

22   logistics asset protection is?

23          A.    I don't have a broad

24   understanding of what their total focus was,

25   no.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Aside from a broad one, do you

2  have just a general?

3    A.    They were focused --

4         I don't know what their primary

5  focus was.

6         I just know, in my

7  communication with Jim Greer, we talked about

8  health and wellness matters and health and

9  wellness products.

10   Q.    Okay.  So what I'm wondering

11 is, sitting here today, you're not aware or

12 certain if logistics asset protection would

13 have been concerned with theft or loss prior

14 to delivery at the pharmacy.

15   A.    I don't know that answer.  I

16 know there's -- they have processes and

17 procedures like the operations I do.

18   Q.    Okay.  Do you review reports or

19 investigations conducted by the logistics

20 asset protection group?

21   A.    No.

22   Q.    Do you know whether they

23 prepare reports?

24   A.    I don't know what kind of

25 reports they would have prepared.

1    Q.    Is the logistics asset

2    protection group part of the diversion team?

3    A.    No.

4    Q.    Do you know whether they're

5    involved in any of your suspicious order

6    monitoring programs within Walmart?

7         MR. VARNADO:  Object to form.

8    Q.    (BY MR. ECKLUND) Yeah,

9    logistics asset protection, whether they're

10   involved in SOMs.

11   A.    In terms of -- in terms of the

12   exception reports that we were getting early,

13   the over 30, over 20, those were the persons

14   we were receiving those reports from.

15   Q.    Okay.  So the reports that you

16   were getting, the cut -- the cut orders,

17   those are coming from the logistics asset

18   protection and they're being provided to

19   operations asset protection?

20   A.    To our team in particular.

21   Q.    To your team.

22   A.    Yeah.

23   Q.    Okay.

24   A.    Through compliance and other

25   folks.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Now, within one of the

2    prior exhibits, and we don't have to go back

3    to it.  You can if you want.  We were talking

4    about it earlier.  It's from James Greer.  He

5    just mentions -- in the logistics asset

6    protection group, he sends an email to you

7    and others, and he mentions, "The DEA has

8    indicated that our electronic communication

9    notifications are our proof of due

10   diligence."

11                MR. VARNADO:  What page number?

12                MR. ECKLUND:  It's --

13                MR. VARNADO:  Are you reading

14        from Exhibit 5?

15                MR. ECKLUND:  No, no.  It's one

16        of the prior exhibits.  You can go

17        back.

18                MR. CECCHI:  Could you read the

19        Bates ranges of Exhibit 5 that's

20        been -- that we're talking about?  I'm

21        just confused what exhibit we're

22        looking at.

23                Read the Bates ranges into the

24        record.  I just want to make sure.

25                MR. ECKLUND:  8089.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. CECCHI:  8089.  It's

 2          Deposition Exhibit 5.

 3                    MR. ECKLUND:  Correct.

 4                    And what I was curious about

 5          was one of the prior exhibits, which

 6          is Bates stamp 57259.

 7                    It's the one with the big

 8          redacted privilege block.

 9                    Okay.  All right.

10                    Now --

11                    MR. VARNADO:  Exhibit 2, for

12          the record.

13                    MR. ECKLUND:  Exhibit 2, for

14          the record.  Thank you.

15          Q.    (BY MR. ECKLUND)  "The DEA has

16    indicated that our electronic communication

17    notifications are our proof of due

18    diligence."

19                    The electronic communication

20    notifications that Mr. Greer is talking

21    about, those are electronic communications

22    coming from his group, logistics asset

23    protection, not your group, operations asset

24    protection; correct?

25          A.    I can't answer that.  I don't
```

1    know what his intent was there.

2            We did not have any discussion

3    on that.

4        Q.    Do you provide any electronic

5    communications or notifications to the DEA?

6        A.    I do not.

7        Q.    And are you involved in proving

8    up any due diligence concerning controlled

9    substances and suspicious orders?

10           MR. VARNADO:  Object to form.

11           THE WITNESS:  No.

12       Q.    (BY MR. ECKLUND)  You're not

13   involved in due diligence for suspicious

14   orders?

15           MR. VARNADO:  Object to form.

16           THE WITNESS:  Our group was to

17        do the outline the processes -- or do

18        the processes as outlined earlier, in

19        terms of doing the P&Ds, scoping and

20        doing the work necessary.

21       Q.    (BY MR. ECKLUND) The workflow

22   we went through before?

23       A.    Correct.

24       Q.    And I'm just trying to make

25   sure we have a clear picture of where your

Highly Confidential - Subject to Further Confidentiality Review

1    role and responsibility starts and ends, and

2    where another team's would be picked up.

3              So when we're talking about

4    your role within operations asset protection,

5    you're principally if not exclusively

6    concerned with theft or loss of product

7    within the pharmacies owned and operated by

8    Walmart; correct?

9         A.    That and in transit, yes.

10        Q.    That and in transit.  And the

11   in transit would be once a box or -- is it

12   boxes or pallets?  How do you guys load the

13   trucks?

14             MR. VARNADO:  Object to form.

15             THE WITNESS:  Those are done by

16        individual store shipment.

17             MR. ECKLUND:  But I'm just --

18             THE WITNESS:  In a box.

19             MR. ECKLUND:  I want to have a

20        proper question for you so I just want

21        to make sure I understand.

22        Q.    (BY MR. ECKLUND)  So DC 6045 is

23   going to deliver, let's just say for sake of

24   example, Oro Valley, Arizona, okay?  They're

25   going to load product onto a truck and it's

Highly Confidential - Subject to Further Confidentiality Review

1    going to get shipped.  Right?  Because you're

2    not shipping by planes, are you?

3         A.    We ship through third party.

4         Q.    What third party do you use to

5    ship?

6         A.    That, I -- there were multiple,

7    depending on where the shipment was headed

8    to.

9               But then that part, Jim Greer

10   would have been the person who had a list of

11   who those third parties were.

12        Q.    Okay.  Well, let's tick off a

13   few names and see if you can clear it up for

14   us.

15              FedEx?

16        A.    Yes.

17        Q.    UPS?

18        A.    Yes.

19        Q.    The United States Postal

20   Service?

21        A.    No.

22        Q.    DHL?

23        A.    No.

24        Q.    J.B. Hunt?

25        A.    Not that I recall.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Any other shipping entities
 2    that you can recall sitting here today?
 3          A.     Only subcontractors that were
 4    contracted through the logistics department.
 5          Q.     And what names, do you
 6    remember?
 7          A.     I don't, but they did all of
 8    the contracting on that.
 9          Q.     Okay.  So you've identified the
10    ones that you recall.  You're confident or
11    aware that there were subcontractors that
12    were contracted directly through the
13    logistics department; correct?
14                 MR. VARNADO:  Object to form.
15                 THE WITNESS:  Yes.
16          Q.     (BY MR. ECKLUND)  Does Walmart
17    have its own trucks to ship controlled
18    substances?
19          A.     We have our own trucks, but we
20    do not ship controlled drugs on those trucks.
21          Q.     Have you ever delivered
22    controlled drugs on those trucks?
23                 MR. VARNADO:  Object to form.
24                 THE WITNESS:  I'm not aware of
25          that occurring.
```

1      Q.     (BY MR. ECKLUND) It wasn't

2  something that would have been part of the

3  standard operating procedures, whereby they

4  would take the controlled substances that

5  they've received from the various

6  manufacturers or wholesalers, or to the

7  extent that Walmart was wholesaling to

8  itself, taking that product and then putting

9  it onto a truck to deliver it to one of the

10  various distribution centers for supply to a

11  pharmacy?  It's not something that would have

12  been expected?

13      A.     I'm not aware of that occurring

14  in our environment.

15      Q.     Okay.  Are there records that

16  reflect which trucks were used to ship which

17  pills?

18      A.     I'm not familiar with that.

19      Q.     Okay.

20      A.     I couldn't answer it.

21      Q.     Okay.  Mr. Beam, do you

22  remember a gentleman named Dan Jefferies?

23          It's our understanding he

24  worked at McKesson.

25      A.     The name doesn't ring a bell.

1      Q.    Does the operations asset

2    protection group use base code reports in its

3    performance of its job?

4              MR. VARNADO:  Object to form.

5              THE WITNESS:  We had received

6         and reviewed those base codes.  They

7         were -- they were less useful than

8         looking at NDCs.

9      Q.    (BY MR. ECKLUND)  Okay.  Now,

10   the document I'm looking at, it suggests that

11   base code reports were being used for

12   phentermine, hydrocodone, oxycodone,

13   methadone, and alprazolam.

14             MR. ECKLUND:  And this is

15        McKesson MDL 00514053.  And again, it

16        was sent to Mr. Beam directly.

17             MR. VARNADO:  Have you

18        provided --

19             MR. ECKLUND:  I can.

20             MR. VARNADO:  Have you shown us

21        that?  Thank you.

22             (Walmart-Beam Deposition

23        Exhibit 6, 5/10/13 email from Shirley

24        Rector.  Subj: CSMP Questionnaire.

25        MCKMDL00514052-514057, was marked for

```
 1              identification.)

 2              MR. ECKLUND:  So, for the

 3       benefit of everyone listening, this

 4       letter was associated with an email

 5       that bears Bates stamp McKesson MDL

 6       00514052.  It was sent by

 7       Shirley Rector, who appears to have

 8       been an employee of McKesson within

 9       North America.

10              It was sent to Mr. Beam.  It

11       was copied to Mr. Chapman and a

12       gentleman named Dave Gustin, who is

13       also a McKesson employee.

14              MR. VARNADO:  There's a Bates

15       page missing in here.  I don't know if

16       that ...

17              MR. ECKLUND:  This is --

18       according to our tech group, these are

19       the parents and children.  This is how

20       it was produced to us.  If there was

21       something missing, that's something

22       that you'd have to put up with

23       McKesson's counsel.  I don't want to

24       speculate as to why that is.

25              MR. VARNADO:  Just note that
```

Highly Confidential - Subject to Further Confidentiality Review

1              it's a compendium exhibit, and it

2              looks like Bates No. 514053 -- I'm

3              sorry, 054 is not included, but ...

4                      MR. ECKLUND:  That's fine.

5                      Certainly not our intention to

6              omit a page.

7                      [Document review.]

8              Q.      (BY MR. ECKLUND)  And,

9    Mr. Beam, as you review this letter, does

10   your review of the letter refresh your

11   recollection about your receipt of it back in

12   May of 2013?

13             A.      I recall it vaguely.  But as I

14   sit here now, I don't recall what led up to

15   it or after -- actions after this.

16             Q.      And in May of 2013, was Walmart

17   cutting orders for phentermine?  Orders over

18   20 bottles?

19                     MR. VARNADO:  Object to form.

20                     THE WITNESS:  I don't know that

21             answer.

22             Q.      (BY MR. ECKLUND)  It's in -- so

23   we have these interrogatory responses.  We

24   can go back to those.

25                     So May 1st, 2013, that bullet

Highly Confidential - Subject to Further Confidentiality Review

1    we went over earlier, "From approximately

2    July 2012 until approximately 2015, employees

3    in Walmart's DC 6045 implemented a hard limit

4    of 20 bottles for shipments of oxycodone

5    30 milligrams."

6              But it didn't mention

7    phentermine, it didn't mention hydrocodone,

8    it didn't mention methadone, and it didn't

9    mention alprazolam.

10             So is it -- do you know

11   whether, in May of 2013, there was a hard

12   limit of 20 bottles for shipments of

13   Phentermine, hydrocodone, methadone or

14   alprazolam?

15        A.    I don't know.

16        Q.    Are there records within

17   Walmart that would reflect whether there were

18   in fact hard limits --

19             MR. VARNADO:  Object to form.

20        Q.    (BY MR. ECKLUND)  -- of those

21   drugs?

22        A.    I don't know that either.

23        Q.    In response to receipt of this

24   letter, did you do anything differently as

25   concerns asset protection for phentermine,

Highly Confidential - Subject to Further Confidentiality Review

1    hydrocodone, methadone or alprazolam in your

2    role within asset protection?  I'm just

3    talking about that.

4            So were there additional steps

5    taken to prevent theft or loss, burglaries,

6    robberies, to ensure that those four products

7    were also stored securely within the

8    pharmacies?

9            MR. VARNADO:  Object to form.

10           THE WITNESS:  There were no

11      additional steps beyond what we were

12      already doing.

13      Q.    (BY MR. ECKLUND)  It continues,

14    "Our regulatory team has reviewed the

15    purchase patterns for these locations,

16    identified several locations that require

17    additional supporting information, and have

18    provided a questionnaire for you to answer

19    out based on their findings."

20            Did you provide a response to

21    McKesson?  Were you the one that filled out

22    the questionnaire?  Or answers?  Do you see

23    that?  It says, "and have provided a

24    questionnaire for you to answer out based on

25    their findings?"

1          Do you recall filling out a

2    questionnaire?

3          A.    I do not recall filling out or

4    sending back anything on this questionnaire.

5          Q.    Okay.  If you had completed the

6    questionnaire, would that have been something

7    that would have been maintained within your

8    records or files?

9              MR. VARNADO:  Object to form.

10             THE WITNESS:  If it had been,

11        it would have been something that

12        would have been -- I would have

13        definitely kept, but I've never seen

14        this form.

15             I mean, I don't recall seeing

16        this form.

17         Q.    (BY MR. ECKLUND)  Well, you

18    don't -- you don't -- okay.  So let's just be

19    clear for the record.

20             You testified that you've never

21    seen this form.  What you meant is you don't

22    recall seeing that form?

23         A.    Correct.

24         Q.    You have no reason to dispute

25    that you received this letter from McKesson

Highly Confidential - Subject to Further Confidentiality Review

1    or that you did receive the attachments to

2    the email.

3         A.    I don't remember.

4         Q.    The email was sent by Shirley

5    Rector, and it says, "Please find the

6    following documents attached for your review

7    and response."  And it's got this CSMP

8    letter, currently -- current pharmacy

9    listing, three-month purchase history and

10   purchasing pattern for base codes and the

11   questionnaire.  Do you see that?

12        A.    I do.

13        Q.    And you have no reason to

14   dispute that you received the questionnaire

15   from Shirley Rector on May 10th, 2013?

16        A.    I have no reason to dispute --

17        Q.    You just have no recollection?

18        A.    I have no recollection.

19        Q.    In your role, if you did not

20   feel it was appropriate for you to complete

21   this questionnaire, would you have provided

22   this questionnaire to someone else within

23   Walmart for completion or would you have just

24   left it alone?  Ignored it?

25              MR. VARNADO:  Object to form.

```
 1              THE WITNESS:  This would have
 2         been something that, if -- if it had
 3         been completed, I don't know who would
 4         have completed it.  I'm sure there
 5         would have been wider coordination
 6         than just one person.
 7         Q.    (BY MR. ECKLUND)  Do you --
 8         A.    I did not complete it, that I
 9    recall.
10         Q.    Do you believe George Chapman
11    may have completed it?  He's copied on the
12    email?
13         A.    I can't say.
14         Q.    Sitting here today, you don't
15    know whether Mr. Chapman completed it, but
16    you're fairly confident that you did not?
17         A.    Correct.  I do not know if
18    Mr. Chapman completed it.  I do not recall
19    completing nor sending this form.
20         Q.    Now, do you see at the top of
21    this letter, the author from McKesson wrote,
22    "As we unfortunately are all aware, the abuse
23    of prescription drugs, particularly
24    controlled substances, continues to be a
25    serious problem among millions of Americans.
```

```
 1                    "Consequently, the federal

 2      government committed to combat this abuse by

 3      implementing monitoring programs and taking

 4      enforcement action to keep controlled

 5      substances out of the hands of those who

 6      intend to misuse them.  Since then, the DEA's

 7      expectations have been that McKesson and all

 8      wholesale distributors continue to increase

 9      their role in monitoring the order and

10      distribution of controlled substances."

11                    Do you see that?

12            A.      I do.

13            Q.      Okay.  At this time, in May of

14      2013, was Walmart a wholesale distributor to

15      itself?

16            A.      Walmart self-distributed, yes.

17            Q.      And at this point in time,

18      Walmart was also receiving some amount of

19      controlled substances from McKesson.

20            A.      Some degree, yes.

21            Q.      Okay.  Are you familiar with

22      any efforts taken within Walmart to further

23      combat abuse by implementing monitoring

24      programs?

25                    MR. VARNADO:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  In what fashion?

2      In distribution?  In ...

3          Q.    (BY MR. ECKLUND)  In your role

4      within asset protection.  So in May of 2013,

5      you get this letter from one of your

6      distributors, McKesson.  And advising you, in

7      their view, that there's an unfortunate abuse

8      of prescription drugs, particularly

9      controlled substances, that it's a serious

10     problem among millions of Americans.  That

11     the federal government has committed to

12     combat the issue by implementing monitoring

13     programs, taking enforcement actions, to keep

14     controlled substances out of the hands of

15     those who intend to misuse them.

16          And since that time, the DEA's

17     expectations have been that McKesson, all

18     wholesale distributors, including Walmart,

19     would continue to increase their role in

20     monitoring the order and distribution of

21     controlled substances.

22          What I'm asking is, do you

23     recall any increases in the monitoring or

24     distribution of controlled substances that

25     you took within Walmart?  Any steps that you

1    took to increase your oversight or your

2    efforts?

3              MR. VARNADO:  Object to form.

4              THE WITNESS:  The processes and

5         steps we took are those that are

6         outlined in a broader scope within the

7         over 30 report, over 20 report,

8         rather, and the follow-up processes

9         from those.

10        Q.    (BY MR. ECKLUND)  Okay.  But

11   those processes would have been the same in

12   April of 2013, and it sounds like June of

13   2013.

14        A.    Mm-hmm.  (Witness nods.)

15        Q.    There were no differences since

16   this letter was received?

17        A.    I'm sure there were

18   differences, because that program continued

19   to evolve.

20        Q.    How did it evolve?

21        A.    There were processes and

22   discussions that I was not a part of, that we

23   had discussed earlier.  That continued to

24   evolve, the review and look at those

25   controlled drug orders as time progressed.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And you're talking about the

2    bullet points that we've just went through

3    earlier today in the interrogatory response?

4      A.      Correct.

5      Q.      So the evolution delineated by

6    Walmart in its interrogatory response?  Okay.

7          MR. ECKLUND:  I'm going to hand

8        you what's going to be the next

9        exhibit.  For the benefit of those

10       listening, it's Walmart 42794.

11          (Walmart-Beam Deposition

12       Exhibit 7, July 2013 email chain.

13       Subj: June 405-1 report.

14       WMT_MDL_000042794-42795 with

15       attachment, was marked for

16       identification.)

17      Q.      (BY MR. ECKLUND)  Mr. Beam,

18    what I've handed you is an email sent by

19    Donna Auldridge to you, Terry Crabb,

20    George Chapman, and Kristy Spruell, sent on

21    July 8, 2013.  And it's forwarding an email

22    sent from Jeremy Hanna to Donna Auldridge.

23          Do you see that?

24      A.      I do.

25      Q.      Do you know who what Jeremy

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Hanna is?
 2          A.     I do not.
 3          Q.     In the title below it says,
 4    "Mr. Hanna was an asset protection area
 5    manager."
 6                 At that time, would Mr. Hanna
 7    have reported to you as an asset protection
 8    area manager?
 9          A.     No.
10          Q.     To whom would Mr. Hanna have
11    reported?
12          A.     From this email address, he
13    would have reported to Donna Auldridge.
14          Q.     Okay.  And within the body of
15    the email above from Ms. Auldridge, she
16    wrote, "Store 4206, Oro Valley," which I
17    understand from some internet searches is
18    more than likely the Oro Valley Walmart
19    located in Arizona, that it had a significant
20    increase in the oxy 15s.
21                 Also, the distribution center
22    has had to cut their oxy 30 orders a few
23    times in the last month or so.  And this
24    percent is comparing all prescription sales
25    from 6032 and 6045 against this one item.
```

1    Year-to-date orders from 6045 were about

2    54,000, with 39,000 of those oxy items.

3    Okay?  So 39,000 of those being oxy items.

4              Do you see that?

5         A.    I do.

6         Q.    So let's just go through this.

7              Now, we talked earlier about

8    the flowchart.  Oxy 15, that's not going to

9    trigger bottle limit cuts to 20, because it's

10   not 30 milligrams; correct?

11        A.    On the over 20?  That would

12   have been -- that would have kicked a review.

13        Q.    Potentially a review, but it

14   would not have been a bottle cut.

15        A.    That would be correct.

16        Q.    Okay.  But not in every

17   instance a review.

18              MR. VARNADO:  Object to form.

19        Q.    (BY MR. ECKLUND)  Potentially a

20   review.

21              MR. VARNADO:  Object to the

22        form.

23              THE WITNESS:  In terms of

24        review, it would have been looked at.

25        Q.    (BY MR. ECKLUND)  Looked at,

Highly Confidential - Subject to Further Confidentiality Review

1    but not necessarily investigated.

2              MR. VARNADO:  Object to form.

3              THE WITNESS:  It would have

4         been looked at to determine if an

5         investigation was necessary.  Or

6         indicators if an investigation were

7         necessary.

8         Q.    (BY MR. ECKLUND)  How long

9    would it take to conduct that limited review

10   that you've just described, the look -- to

11   look at it to determine whether an

12   investigation is necessary?  How long would

13   it take?

14        A.    On average, about a day and a

15   half.

16        Q.    For every oxy 15 order?

17        A.    For a complete review, we could

18   have pulled a P&D in about an hour.  Two

19   hours.

20        Q.    I'm just trying to understand

21   the degrees of time invested.

22              So you said for a complete

23   review, you could have pulled a P&D in about

24   an hour.  What would a P&D encompass for an

25   oxy 15 order?

1    A.    It's a purchase and dispense.

2    Q.    So what would you be looking

3    at?

4    A.    Are the purchases -- are the

5    dispenses consistent with the purchases.

6    Q.    Is that based on an algorithm?

7    A program?  Or human review?

8    A.    It's based on data pull and

9    human review.

10    Q.    Okay.  So the data is pulled

11    into a visual program, and a person looks at

12    what gets flagged and then they can determine

13    whether they think more investigation or a

14    more thorough review is required?

15    A.    It was not pulled into a visual

16    program.  It was pulled into a spreadsheet

17    for a side-by-side comparison.

18    Q.    Okay.  So -- and if you look,

19    there's a placeholder directly behind the

20    email.  It says "produced in native format."

21    And we pulled the native format and we just

22    gave you a snapshot that shows you rows and

23    columns.  But you can also see there are tabs

24    below for multiple months.

25         Do you see that?

1      A.    I do.

2      Q.    Okay.  So is this what somebody

3  would have looked at in determining whether a

4  more thorough day-and-a-half review would

5  have been necessary?

6      A.    This would have been -- this

7  would have started or initiated a process to

8  look.

9      Q.    Okay.  So walk me through the

10  process, then.

11           So 4264, Store 4264.  Do you

12  see that?  And we know that that's the

13  Oro Valley store, and that's the same store

14  referenced in the email.

15           And it's got the item number,

16  which is a code specific to that version of

17  oxycodone 15 milligrams.

18           Do you see that?

19      A.    I do not know that that number

20  is specific to oxycodone 15 milligrams.  I

21  don't work in logistics, so I don't --

22      Q.    Okay.

23      A.    -- design those item numbers.

24      Q.    Okay.  But we can agree that if

25  you look at the numbers, and then you look at

Highly Confidential - Subject to Further Confidentiality Review

1    the item descriptions, they are consistent in

2    how they refer to specific products.  For

3    example, if you look at each of the item

4    numbers 3880887, do you see those?  They're

5    in the middle.

6         A.    I do.

7         Q.    Okay.  Oxycodone and

8    acetaminophen, 5/325?

9              Do you see that?  The same

10   dosage?

11        A.    I do.

12        Q.    And then, if you look at the

13   bottom, 3880901 that's oxycodone/

14   acetaminophen 10/325.  So it's a different

15   drug.

16             I had a question about the last

17   one.  We were talking earlier about how

18   bottles would get caught.  Right?  The 20,

19   over 20.  3880910.  Oxycodone, acetaminophen,

20   5 and 325.

21             So that appears to be the same

22   combination, and the same strengths, but it's

23   a different item number.  Do you see that?

24             So the first three are 3880887,

25   and the last one is 3880910.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?
 2         A.    I do.
 3         Q.    All right.  Is it your
 4    understanding that if you had orders of 20,
 5    or 19 bottles of oxycodone for the first
 6    three variants, right?  The 3880887.  And
 7    then you had additionals under 3880910, that
 8    they would be totaled to determine the bottle
 9    limit ordered or are they considered
10    separately?
11                    MR. VARNADO:  Object to form.
12                    THE WITNESS:  I'm not an expert
13         on the logistics system, but you would
14         have to -- you would have to get the
15         particulars that you are seeking there
16         from someone who is.
17         Q.    (BY MR. ECKLUND) Okay.  And
18    you're also not certain whether the
19    percentages would be totaled as well.
20                    For example, if the same store
21    ordered the 3880910 -- and let's just use the
22    4.18 percent.  Do you see that?
23         A.    Yes, sir.
24         Q.    And then you see above, let's
25    use the eighth row, 3880887, oxycodone,
```

1   acetaminophen, right?  And it's 5.35 percent,

2   those two percentages, you don't know whether

3   those would be totaled as well.  So if the

4   same store ordered both using different item

5   numbers --

6        A.     Mm-hmm.

7        Q.     -- right?  So the pharmacy has

8   two orders placed.  And they use different

9   item numbers.  So whatever reason the

10  pharmacy decided to do that, you don't know

11  whether those percentages would be totaled as

12  well.

13             MR. VARNADO:  Object to form.

14             THE WITNESS:  Yeah, I don't

15        know the details around the technical

16        aspect behind this form.

17        Q.     (BY MR. ECKLUND)  So do you

18  have an understanding of what the analysts

19  would have been looking at in determining

20  whether or not to conduct a more thorough

21  day-and-a-half investigation or review of the

22  order?

23             So they get these four

24  columns -- five columns, I apologize --

25  report number, store number, item number,

1    item description, and percentage.

2              So the report number, that's

3    the same throughout.  So that's the monthly

4    controlled drug exception report?

5         A.    Correct.

6         Q.    So that's everything.  And one

7    individual or multiple individuals are going

8    to look at that report for the month of June?

9         A.    There's going to be multiple

10   individuals.  I know they come to our team.

11        Q.    Okay.  And within your team, do

12   you have an understanding of how they would

13   determine how thorough a review that's

14   warranted based upon this spreadsheet?

15        A.    This would have been only one

16   factor in determining that review.  Each of

17   the investigators would have the experience

18   in their area, and also would have known

19   where certain areas would warrant further

20   review in what areas they had of a major

21   concern.

22              There would be a lot of

23   factors.

24        Q.    Can you identify those other

25   factors?

1      A.      They're varied, and a lot of

2    those factors would determine the -- they

3    would be based on results of the initial pass

4    and what those reviews disclosed.

5      Q.      Do you know whether one of the

6    factors was looking back to February, March,

7    April, and May reports, to see what was being

8    ordered at those stores in the past?

9      A.      I don't know that for sure, but

10   I am certain that would have been a part of

11   the review.

12     Q.      Well, it can't be both.  It's

13   you don't know that for sure or you're

14   certain.  Or are you certain that it was part

15   of the review or you are not sure if it was

16   part of the review?

17     A.      I'm not sure.

18     Q.      Okay.  And you understand why I

19   clarify that?

20     A.      I agree.

21     Q.      Okay.  When the analyst made a

22   decision not to conduct a more thorough

23   review, is there documentation about that

24   decision?

25              MR. VARNADO:  Object to form.

1            THE WITNESS:  The analyst would

2        not have made that decision.  It would

3        have been the investigators.

4        Q.    (BY MR. ECKLUND) I'm sorry.

5    Apologies.  When the investigator made the

6    decision not to make a more thorough review,

7    would there be documentation created by the

8    investigator?

9        A.    Not in every case.

10        Q.    On what occasions would they

11    document the decision not to conduct a more

12    thorough review?

13        A.    Can you restate that for me,

14    please?

15        Q.    Sure.  So I asked you when the

16    analyst made a decision not to conduct a more

17    thorough review, was there documentation

18    about that decision.  So I looked at this

19    report, and I determined, based on my

20    investigation, that we do not need to take

21    any additional action.  There is no further

22    reviews necessary.  This doesn't rise to the

23    level of a day-and-a-half review and it

24    doesn't rise to the level of a formal

25    investigation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    What I'm trying to understand
 2      is -- and you said that there would be, but
 3      not always.  There would be documentation,
 4      just not always.
 5                    And what I'm trying to
 6      understand is, when would they document that
 7      decision to conduct a more thorough review?
 8      Were there circumstances or standard
 9      operating procedures that the investigators
10      would follow if they made a determination,
11      say, for example, "I'm not going to conduct
12      additional investigation or review,
13      notwithstanding the fact that there was an
14      8 percent -- that the oxycodone 15 milligrams
15      represented 8. -- 8 percent or higher of
16      total sales."  Right?
17                    Is there some standard
18      operating procedure or guidelines that the
19      investigators would follow that would help
20      them decide, this is one where I have to do
21      the documentation, or this time I don't have
22      to?
23                    MR. VARNADO: Object to form.
24                    THE WITNESS:  Short answer, no.
25           Q.    (BY MR. ECKLUND) So it was a
```

Highly Confidential - Subject to Further Confidentiality Review

1    discretion to the investigator?

2         A.    Discretion is to the

3    investigator.

4         Q.    And you mentioned trends were

5    one of the concerns that they would consider.

6               Do you recall that?

7         A.    Mm-hmm.  (Witness nods.)

8               MR. VARNADO:  Object to form.

9         Q.    (BY MR. ECKLUND)  What was the

10   importance of analyzing trends in connection

11   with these reports?

12        A.    Trends on that would have been

13   looking for other indicators that would be

14   indicative of something that we need to look

15   at and research further.  Were there

16   substantial in-transit losses?  Have there

17   been burglaries or robberies in this store or

18   within this immediate area?  Have there been

19   previous internal investigations relative to

20   the theft of controlled drugs?

21               So there's a lot of different

22   variables that would go into that.

23        Q.    Okay.  So, again, the focus

24   would be on in-transit losses, theft,

25   burglaries, robberies, instances that would

Highly Confidential - Subject to Further Confidentiality Review

1    have impacted operational security or

2    physical security of the pills?

3          A.    Right.  And from that

4    perspective.

5          Q.    Were the trends that the

6    investigators were looking at regional,

7    localized, or national trends?

8                MR. VARNADO:  Object to form.

9                THE WITNESS:  In --

10         Q.    (BY MR. ECKLUND)  Let me ask it

11   a different way.

12         A.    Please.

13         Q.    If the investigator is looking

14   for, or evaluating and reviewing the

15   Oro Valley purchases, are they looking at

16   sales only near the Oro Valley?  Are they

17   considering trends within the state of

18   Arizona?  Are they considering trends within

19   the southwestern United States?  Are they

20   considering trends within the entire Pacific

21   Time zone?  Are they considering trends

22   within the western half of the United States?

23   Or are they considering trends within the

24   entire country?

25                That's what I'm trying to

1    understand.  How are they looking at?  What

2    trends are they looking at?

3           A.     I think that -- strike that.

4                  They would start at the market

5    level, meaning in the immediate vicinity.

6    But that is done in the backdrop of the

7    larger picture, which would have been

8    national trends as well.

9                  They're familiar with what,

10   where, and what those trends are.

11          Q.     So they're concerned with the

12   local market and the national trends?

13          A.     (Witness nods.)

14          Q.     The regional only to the extent

15   that it's part of the national?

16          A.     Correct.

17          Q.     Okay.

18                 Did anyone have access to their

19   analysis?  The analysis of these

20   investigations?  The documentation that they

21   did provide?

22                 MR. VARNADO:  Object to form.

23                 THE WITNESS: That the

24          investigators provided?

25          Q.     (BY MR. ECKLUND) Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1       A.      It was available or accessible

2  among our group.  And this information was

3  also shared with compliance.

4       Q.      Was it also shared with

5  logistics more broadly?

6       A.      That would have been a

7  conversation that would have occurred.  We

8  would not have been a part of that. They

9  would have gotten that from another party.

10      Q.      Possibly compliance?

11      A.      Possibly.

12      Q.      Okay.  So asset protection

13  would have potentially shared the analysis

14  with the compliance group.  Are there any

15  other groups that asset protection might have

16  shared the analysis with?  Beyond compliance?

17      A.      The market director.

18      Q.      The market director.

19              Anyone else?

20      A.      None that I can recall.

21      Q.      And the market director

22  oversees the distribution centers within that

23  market?

24              MR. VARNADO:  Object to form.

25      Q.      (BY MR. ECKLUND)  What is the

1    market director doing with that information?

2         A.     The market directors are

3    responsible for the stores.  Pharmacy is

4    within the stores.

5         Q.     Right.  And I'm just trying to

6    understand.  So the market director -- for

7    the Oro Valley example, the market director

8    would be the market director responsible for

9    stores located in the Oro Valley and

10   potentially other pharmacies in the state of

11   Arizona?

12        A.     Correct.

13        Q.     But not -- I'll pick any other

14   state.  It doesn't really matter.  Arkansas,

15   Missouri.  They're not going to be the same

16   people?

17        A.     No, the market director in

18   Missouri and the market director in Arizona

19   would be different people.

20        Q.     Right.  How many market

21   directors are there?

22        A.     Currently?

23        Q.     Yes.

24        A.     I do not know of an exact

25   number.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      More than 100?

2      A.      I don't know.

3      Q.      Under 50?

4      A.      I can't give you an exact

5   number.

6      Q.      I'm not looking for an exact

7   number, but just a range.  I'm trying to

8   understand, is this a group of a dozen

9   people?  Less than five people?  More than

10  100 people?

11     A.      I would have to look at that

12  and give you an answer back.

13     Q.      So sitting here today, you

14  don't know whether there's less than five

15  market directors or more than 100?

16     A.      There's more than five.

17     Q.      Okay.  Are you confident

18  there's more than 20?

19     A.      I don't know an exact number,

20  but yeah.

21     Q.      I'm not asking for an exact

22  number.  I'm just asking are there more than

23  20 market directors?

24     A.      To my knowledge, there is more

25  than 20.

1      Q.     Do you think there are more

2  than 40?

3      A.     To my knowledge, there's more

4  than 40.

5      Q.     More than 50?

6      A.     Yes.

7      Q.     More than 60?

8      A.     Yes.

9      Q.     More than 100?

10     A.     That, I -- I don't know.

11     Q.     So somewhere in the 60 to 100

12  range?

13     A.     (Witness nods.)

14     Q.     You'd be comfortable with?

15     A.     I'd be comfortable at the

16  moment.

17     Q.     Okay.  And at the conclusion of

18  your deposition, you'll have opportunities to

19  correct any of the testimony, so, you know,

20  if you feel like you're not comfortable

21  afterwards, you can change that around a

22  little bit.  But for purposes today we're

23  going to assume that there's more than 60 and

24  less than 100 market directors.

25           So these 60 to 100 market

1   directors who are responsible for individual

2   pharmacies, did they share information about

3   these analyses with other market directors?

4   Was it part of their process?

5          A.    I don't know.

6          Q.    Does it seem like something

7   that would have made sense for them to do?

8                MR. VARNADO:  Object to form.

9                THE WITNESS:  That, I don't

10       know.

11         Q.    (BY MR. ECKLUND)  I mean, for

12   example, if you had a market director

13   responsible for the state of Texas and a

14   market director responsible for the state of

15   Arkansas and they share a border, at least a

16   small one, would it have made sense for the

17   two to share information, insights and

18   analyses?

19               MR. VARNADO:  Object to form.

20               THE WITNESS:  No, we do not

21       provide direction to field operations.

22       That's outside of our scope.

23         Q.    (BY MR. ECKLUND)  No, I'm not

24   asking whether you provided direction to

25   them.  I'm asking you whether it would make

1    sense for them to share that information.  As

2    you understand the investigations and what

3    would be reflected in that, is that the type

4    of information that would have been helpful

5    or useful to a market director in another

6    market?

7         A.     I'm really not in the position

8    to comment on that.

9         Q.     Have you reviewed any of the

10   investigations?

11            MR. VARNADO:  Object to form.

12            THE WITNESS:  Investigations as

13        in.

14        Q.     (BY MR. ECKLUND)  The ones

15   we're talking about, these -- the reports for

16   the Oro Valley and others, where there was a

17   determination as to whether or not there

18   should be a formal review or not.  And

19   there's documentation sometimes, not always.

20   In that written documentation concerning the

21   review analysis potential investigation of

22   that order, have you ever seen any of those

23   documents?

24        A.     These reports?  Or the review

25   of it?

1        Q.      The review of.

2        A.      I've seen reviews.

3        Q.      Okay.

4                How long are the reviews?

5        A.      It depends.

6                I mean, it depends on what is

7    found as the review progresses.

8        Q.      Couple pages?  50 pages?

9        A.      It depends.

10       Q.      Okay.  You're familiar with

11   mean, mode, averages, and the like?

12       A.      Mm-hmm.  (Witness nods.)

13       Q.      Do you think more than half of

14   them are under five pages?

15       A.      I would not be able to answer

16   that.

17       Q.      Okay.  Are they forms that have

18   check boxes?  Or are they written out like

19   letters?  Paragraphs?  Sentences?

20       A.      The reviews themselves are

21   not -- they are going to be spreadsheets.

22   They're going to be other data pulls that

23   make sense in terms of process.

24       Q.      Okay.

25               We talked earlier about NADDI

1    as a group that you've attended conferences

2    for a number of years and have been a

3    participant in for a number of years.  Are

4    you familiar with the National Association of

5    Chain Drug Stores?

6         A.    NACDS, I believe?

7         Q.    Yes.

8         A.    Yes.

9         Q.    And are you actively involved

10   in the NACDS?

11        A.    I am not.

12        Q.    Are you involved at all in the

13   NACDS?

14        A.    No.

15        Q.    Okay.  Do you remember

16   participating in a -- I suppose it was a

17   training in or around November of 2013,

18   concerning pharmacy loss prevention with

19   Ed Shavira from Walgreens, Nate Hartle from

20   Target, Sophia Lay from Rite Aid, and

21   John Robinson from CVS Caremark?

22        A.    What was the title?

23        Q.    It was NACDS pharmacy loss

24   prevention, and it concerned the transition

25   of hydrocodone from C-III to C-II on new

Highly Confidential - Subject to Further Confidentiality Review

1    businesses.

2              Do you recall that?

3         A.     I recall that group, and I

4    recall collaborating with them on theft and

5    shrink and the things that we are discussing

6    here as far as impacting our pharmacy

7    physical structure.

8              If we're having robberies in

9    Houston, Texas, is that impacting more

10   broadly?  Are you guys experiencing the same

11   thing?  But in terms of relative to NACDS, as

12   I sit here today, that -- I don't recall the

13   specifics of that.

14        Q.     So the discussions that you

15   would have had concerning the rescheduling of

16   hydrocodone from C-III to C-II would have

17   been focused on concerns about robberies,

18   burglaries, security, both operational and

19   physical of the pharmacy's prevention of

20   theft and loss of the pills in transit?

21        A.     And what is the unintended

22   outcome of this move.

23        Q.     Do you recall any discussions

24   about what the intentions of that move was?

25              The unintended outcome of this

Highly Confidential - Subject to Further Confidentiality Review

1 move.  So they're escalating it from C-III to

2 C-II.  Do you have an understanding of why

3 the DEA would have wanted to move hydrocodone

4 from C-III to C-II?

5      A.    I can't speak for the DEA, but

6 I know that that was -- at that time, that

7 was our primary focus, is are there going to

8 be any unintended outcomes as a result of

9 those moves?

10      Q.    Do you recall whether Walmart

11 or anyone else in the NACDS lobbied against

12 the elevation from C-III to C-II for

13 hydrocodone?

14      A.    I do not.

15      Q.    So the unintended consequences

16 that you're thinking about for Class III

17 escalation for hydrocodone to Class II, those

18 focused on theft and loss?

19      A.    And robberies, correct, and

20 loss.

21      Q.    Is that because in your

22 collective experience, the individuals I

23 mentioned earlier who were involved in this

24 NACDS pharmacy loss prevention, that there

25 was a belief that a Class II product would be

1    a larger target for theft than a Class III?

2         A.     There was -- the discussions

3    were more around if this -- if this -- once

4    this rolls through, what is good -- is there

5    going to be any impact at all.  There may be

6    no impact.

7              But if there are, what are we

8    doing to get ahead of it from a facility

9    security standpoint?

10        Q.     Do you recall any other changes

11   in asset protection that you or others in

12   your group were responsible for implementing

13   upon the escalation of hydrocodone from C-III

14   to C-II?

15             MR. VARNADO:  Object to form.

16             THE WITNESS:  No.

17        Q.     (BY MR. ECKLUND)  And you had

18   some discussions about how this may impact

19   loss.  There might be some unintended

20   consequence based upon the escalation,

21   because it could potentially prompt theft or

22   loss of the products and potentially create

23   some additional security concerns from an

24   operational or a physical pharmacy security

25   standpoint.

Highly Confidential - Subject to Further Confidentiality Review

1           Beyond that, are there any

2     other ways in which the escalation from

3     Category 3 or Class III, Category 2 or

4     Class II, impacted your responsibilities or

5     your role within Walmart?

6           A.     I don't recall any -- or not

7     necessarily, but I don't recall any changes

8     that were prompted as a result of that

9     rescheduling.

10          Q.     Do you recall whether

11    hydrocodone was soon added to the over 20 or

12    over 50 reports?

13          A.     It would have been.

14          Q.     Again, we're going to hand you

15    two emails and the attachments now.

16                 (Walmart-Beam Deposition

17          Exhibit 8, 10-16-14 email from Jeff

18          Abernathy.  Subj: Over 20/50 Report.

19          WMT_MDL_000018858-18859 with

20          attachment, was marked for

21          identification.)

22                 (Walmart-Beam Deposition

23          Exhibit 9, 10-16-14 email from Jeff

24          Abernathy.  Subj: Over 20/50 Report.

25          WMT_MDL_000018862-18863, was marked

Highly Confidential - Subject to Further Confidentiality Review

1           for identification.)

2      Q.     (BY MR. ECKLUND) The reason
3    we're giving you both, the one included the
4    attachment.  The other's a reply that didn't,
5    but we want you to have both conversations.

6           It's a continuation.  So no
7    need to read it twice.  The attachment is
8    only included once.

9      A.     I see.

10     Q.     Do you see what I'm talking
11   about?

12     A.     Yes, sir.

13     Q.     Okay.

14          MR. VARNADO:  Take your time
15       and read it.

16          MS. HOSMER:  What's the Bates
17       number?

18          MR. ECKLUND:  It's 18858.  And
19       18862.

20          And the attachment, which was
21       produced in native format, is 18859.

22          MS. HOSMER:  Thank you.

23     Q.     (BY MR. ECKLUND)  So there's
24   another new name on this email chain.  It's
25   Scott Peacock.  Who is Scott Peacock?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Scott Peacock is an analyst

 2     within global investigations.

 3              Q.      Did he report to you?

 4              A.      He does not.

 5              Q.      Did he report to Mr. Abernathy?

 6              A.      He does not.

 7              Q.      Do you know to whom he

 8     reported?

 9              A.      During this time frame, he

10     would have reported to -- he would have

11     report --

12              Let's see.  2014.  I think he

13     would have reported to -- I don't know

14     exactly who he would have reported to, at

15     that -- it was -- that was during a

16     transition from asset protection to global

17     investigation.  He was within our group,

18     meaning GI.

19              Q.      And Brooke Leverett?

20              A.      Brooke Leverett replaced

21     James Greer in that position.  She was the

22     senior manager of logistics asset protection.

23              Q.      Okay.  So the email sent by

24     Mr. Abernathy, "Let's talk about hydro."  And

25     he's referring to hydrocodone.
```

 1                    "As with everything at

 2      Distribution Center 6045 over the last week

 3      and a half, hydro has affected the Over 20

 4      Report as well.  I talked to Kristy" -- based

 5      on the email it's Kristy Spruell -- "about it

 6      on Monday and I want to provide a report that

 7      is as complete as possible with the volume

 8      increase we are experiencing.  Before hydro

 9      an Over 20 report on a heavy day would have

10      been about 50 lines (item/store combo),

11      Monday the report was over 600 lines."

12                    It continues on, "The report is

13      generated from CSOS."  C-S-O-S.

14                    Are you familiar with, as I

15      understand it, you guys refer to it as

16      "CSOS"?

17           A.    I've heard the term "CSOS."

18      I'm not familiar with that particular

19      software.

20           Q.    It's not something you use in

21      your role?

22           A.    No, sir.

23           Q.    So it talks about "A four-week

24      total on averages have been -- to be

25      researched and calculated.  To add to that,

1    the database that runs production in the

2    vault is the same database.

3              "I have to access to research

4    the line items.  It can and has slowed

5    production in the vault when I try to

6    research these items."  And there's a

7    parenthetical "(depends on the amount of data

8    I'm pulling).  And due to the resources using

9    the database, it doesn't retrieve the

10   information quickly.  It takes about one

11   minute without any interruptions to complete

12   one line on the report.  50 lines on a heavy

13   day is at least an hour.  That's if I'm not

14   pulled away to do other things.  600 lines,

15   that's ten-hour day without a break."

16             Do you see that?

17   A.    I do.

18   Q.    Was anyone else performing the

19   same role, pulling data, reviewing data, that

20   would have been on these daily reports,

21   beyond Jeff Abernathy?

22             MR. VARNADO:  Object to form.

23             THE WITNESS:  I don't know.

24        That was within DC.

25   Q.    (BY MR. ECKLUND)  Okay.  So

1     this is after the DEA had escalated

2     hydrocodone from Class III to Class II;

3     correct?

4                  This is October of 2014.

5          A.     That would have been

6     afterwards, yes.

7          Q.     And it's now part of the over

8     20 report.  It's added to the reporting

9     structure along with oxycodone, and it flags

10    over 600 lines.

11                 Is there any reason to question

12    whether those 600 lines should have been

13    evaluated based upon the existing programs

14    and processes that were in place for

15    oxycodone, instead of what seems to be the

16    approach that was taken, which is lowering

17    the threshold to make it easier to get those

18    oxycodone -- the hydrocodones shipped?

19    Getting it reduced down to 100 lines.

20                 Do you see that?

21                 MR. VARNADO:  Object to form.

22                 THE WITNESS:  I don't know the

23          intent in that email, in what

24          Mr. Abernathy meant.

25          Q.     (BY MR. ECKLUND)  It's fairly

1    clear, though, that at this point he wasn't

2    reviewing all 600 lines.

3              MR. VARNADO:  Object to form.

4         Q.    (BY MR. ECKLUND) "It's a

5    ten-hour break without a break."

6              And Mr. Abernathy was not going

7    to work ten hours a day without a break.

8    Correct?

9         A.    I can't speak for what

10   Mr. Abernathy did or did not do.

11        Q.    Does it sound like something

12   that Mr. Abernathy would do, work five days a

13   week, 50 hours, just reviewing these lines,

14   pulling them?  Doing little else, without

15   breaks?

16        A.    I've never managed or monitored

17   Mr. Abernathy's activity.  I can't speak to

18   that.

19        Q.    Does it sound reasonable for

20   somebody to do that, to sit there and view

21   600 lines, pulling each one, doing the data

22   all by themselves, with no breaks?

23              MR. VARNADO:  Object to form.

24              THE WITNESS:  I don't know.

25         Within that facility, I don't know

1    what's normal, what's not normal.

2    Because I don't work in that facility.

3    Q.    (BY MR. ECKLUND)  And then if

4    you had to do anything to understand any of

5    the entries on the over 20 report, that would

6    take additional time, beyond just the

7    pulling; correct?  If you had to then

8    evaluate it, investigate it, analyze it,

9    assess it, consider it in any way beyond just

10   pulling it, it would be additional time,

11   correct?

12   A.    Are you speaking --

13   Q.    Yes, Mr. Abernathy?

14   A.    -- for Mr. Abernathy?  I don't

15   know what Mr. Abernathy's processes were.

16   Q.    And if he had to review it and

17   then tell somebody else what he had seen,

18   that would be something in addition to just

19   pulling it?

20   A.    I'm -- can you rephrase?

21   Q.    Sure.

22   A.    I'm not quite sure --

23   Q.    What I'm reading here in

24   Mr. Abernathy's email is a cry for help.

25   Because he can't do this.  If he's saying, "I

1  can't do this.  600 lines, that's a ten-hour

2  day without a break," that's him saying, "I'm

3  not doing this.  I can't do this.  This is

4  not going to happen.  I'm going to take a

5  lunch break.  I'm going to have to use the

6  bathroom.  I'm going to have to do something

7  else.  I may have to take a phone call.  I

8  have other responsibilities.  This isn't

9  going to work."

10                 That's how I'm reading this.

11                 I don't think it's reasonable

12  for anybody to read it any other way, as if

13  Mr. Abernathy was going to do this

14  continuously, that he was going to sit there,

15  in a room, and review and pull lines all day,

16  every day, from the sunup until sundown, ten

17  hours a day, and if, God forbid, the

18  following week it pulls 1,000 lines, he's

19  there for 24 hours.  Right?  I don't think

20  that happens.

21                 So what I'm trying to

22  understand is, this occurs; right?  He's

23  saying, "I can't do this."  Anything else

24  that you would want to do with the over 20

25  reports.  Recall, we talked about that

1    process, the flow.  It's an over 20.  And

2    then what do you do?  You have to investigate

3    it.  Other people have to investigate it.

4    There's possibility of an analysis.  There's

5    an assessment.  There's a flow.  That flow

6    can't happen if nothing's moving because

7    Mr. Abernathy can't get through all 600

8    lines.  Correct?

9              MR. VARNADO:  Object to form of

10         the question.

11              THE WITNESS:  We were

12         responding to the information and data

13         that was flowed to us.  If it did not

14         flow to us, we didn't know that there

15         was an exception pending.

16         Q.    (BY MR. ECKLUND)  Okay.  So if

17    Mr. Abernathy couldn't get through the

18    dailies, if, say, for example, he could only

19    get through 200 out of the 600, and then the

20    next day there's another fresh set of 600 or

21    another 400 or 300, and he still can't get

22    through them all, he's not clearing what's on

23    his desk, so you're not going to see them,

24    was it your understanding that those orders

25    would have been held and not filled, or would

1    they have been cleared?

2        A.    I have no knowledge of what the

3    processes there were completed within the DC

4    or who else may have been involved in those

5    processes.

6        Q.    Okay.  Now, Mr. Abernathy

7    continues in the next paragraph.  It says,

8    "The last two days the report seems to be

9    manageable at about 100 lines."

10            So he -- right there he's

11   telling you that 600 lines is not manageable.

12   100 seems to be a threshold.  Or close.

13            Do you see that?

14       A.    I do.

15       Q.    "But it may vary based on daily

16   volume which we're trying to figure out.  As

17   I said before, I want to give everyone the

18   most complete report possible without taxing

19   the system more than necessary.  I'm open to

20   suggestions you may have.  Here are mine.

21            "I will still run the report to

22   list all items, store combinations over

23   20 bottles.  I will continue to research and

24   cut all oxycodone 30-milligram bottles over

25   20 bottles.  I will research all orders over

1    50 bottles, and/or unusual orders.  I will

2    highlight all the orders which were cut."

3              Is Mr. Abernathy suggesting

4    here that he's going to be dealing with

5    hydrocodone as well?

6              The suggestion that he's

7    providing to everyone is that he's going to

8    do over 20s for oxycodone 30, but he doesn't

9    want to do anything additional for

10   hydrocodone, based on his four bullets.

11             MR. VARNADO:  Object to form.

12             THE WITNESS:  I'm --

13        Q.    (BY MR. ECKLUND)  Do you see

14   the word "hydrocodone" in the four bullets?

15        A.    I don't see the word

16   "hydrocodone."

17        Q.    Is there any possible way you

18   can interpret this to suggest that

19   Mr. Abernathy at that time was open to

20   continuing to research and cut all

21   hydrocodone orders over 20 bottles?

22             MR. VARNADO:  Object to form.

23             THE WITNESS:  As I sit here

24        today, I do not recall seeing this

25        particular email from Mr. Abernathy,

1       so I do not know what his intent was

2       or what -- or who else was involved in

3       discussions around that.

4           Q.      (BY MR. ECKLUND)  Do you know

5   whether, in October of 2014, Mr. Abernathy or

6   anyone else was taking any steps to review

7   and understand all of the hydrocodone orders

8   that were flagging in the reports prior to

9   shipping?

10          A.      I don't know that.

11          Q.      Let's go to the next page.  Or

12  the next exhibit.  The email, the follow-up

13  from James Greer.

14          "Jeff, I think this makes it

15  more manageable.  If I'm not mistaken, the

16  over 20 report was first started due to oxy.

17  We have over 20, but we do not cut anything

18  except the oxy 30.  Prior to going C-II,

19  hydro was always at 50" bottles -- "and will

20  continue" -- and I added "bottles" --  "and

21  will continue to be until the SOM system is

22  in place.

23          "Since we are not doing

24  anything at this level with anything other

25  than the oxy 30 and hydro, I do not see any

1    reason why we should research anything but

2    those items at this time.

3              "Just my thoughts.  Jim."

4              So a few questions.

5              At this point it appears that

6    the only drug, according to Mr. Greer, that

7    was being cut was oxy 30, nothing else, at

8    20.  And hydro was being cut at orders of 50.

9              Do you see that?

10    A.    I see those orders on the

11    paper, yes.

12    Q.    And are you aware whether other

13    prescription drugs -- I can't recall from

14    your testimony earlier.  Are you aware

15    whether other prescription drugs,

16    noncontrolled substances, not C-IIs, were

17    being cut at orders above 50, if, say, for

18    example, a pharmacy wanted to order 70

19    bottles of birth control medications?

20    A.    I've never seen those on a

21    report.

22    Q.    Well, not on a report, but I'm

23    asking whether you have a general awareness

24    about whether cutting would be done for

25    warehouse management concerns as well as

1    controlled substances.

2        A.    I'm not aware of it.  Of any of

3    those policies or primers or anything of that

4    nature taking place.

5        Q.    Okay.  Now, here it says that

6    "Hydro has always been cut at 50 and will

7    continue to be until the SOM system is in

8    place."

9            Do you see that?

10       A.    I do.

11       Q.    Okay.  So as I read this, it

12    seems as if Mr. Abernathy was convincing

13    enough to Mr. Greer that they weren't going

14    to do cuts at 20 for hydrocodone because of

15    the number of rows it would flag, and that it

16    would not be a manageable report for him to

17    get through.

18            So instead, Mr. Greer suggests,

19    "We'll just continue to cut it at

20    50 bottles."

21            Is my interpretation consistent

22    with your interpretation of this email from

23    Mr. Greer?

24            MR. VARNADO:  Object to form.

25            THE WITNESS:  You would have to

1          speak with Mr. Greer about that.

2          I'm -- that seems like a conversation

3          between Mr. Greer and Mr. Abernathy.

4          Q.     (BY MR. ECKLUND)  Well, you're

5     copied on the email, so ...

6          A.     I agree, I -- I mean, I see

7     that I am copied on it.  I do not recall

8     responding to this email or having further

9     input on that.

10         Q.     Did you -- you don't recall

11    doing anything in response to it either?

12         A.     I have no recollection of this

13    email during this time frame.

14         Q.     Okay.  Do you have any

15    recollection about why only hydrocodone and

16    oxycodone were considered in this email, the

17    20 and 50 reports?

18         A.     I don't.

19         Q.     So you have no understanding

20    about why other drugs weren't considered?

21              MR. VARNADO:  Object to form.

22              THE WITNESS:  I don't see

23         anywhere in there where other drugs

24         were excluded, but I don't see

25         anywhere in there where that is

1    addressed.

2        Q.    (BY MR. ECKLUND)  Well, if

3    they're not included in the email and they're

4    not included in Mr. Abernathy's charge to

5    complete tasks, he's not going to do it.

6    He's already said -- and I'm paraphrasing.

7    He's fully committed, just on oxy and

8    hydrocodone.  He has no additional bandwidth.

9    He has no additional time.  600 rows was not

10    manageable.  He needed to cut it down.

11        So he gave his bullets and

12    said, "Folks, let's cut this to a manageable

13    level.  Here's a suggestion."  And Mr. Greer

14    says, "That makes it more manageable."

15    Right?  He agrees with Mr. Abernathy.  He

16    says, "I think this makes it more

17    manageable."

18        So he's agreeing to these four

19    bullets delineated in Mr. Abernathy's prior

20    email, that he would still run the report for

21    bottles over 20, that he would continue to

22    research and cut all oxycodone 30-milligram

23    bottles.  He would research all orders over

24    50 bottles and/or unusual orders, and he

25    would highlight all orders which were cut.

1            But he would only be cutting

2    hydrocodone orders over 50 bottles?

3            MR. VARNADO:  Objection, form.

4            THE WITNESS:  And could you

5        repeat the question, please?

6        Q.    (BY MR. ECKLUND)  Is there any

7    indication in here that Mr. Abernathy was

8    going to be cutting hydrocodone bottles at

9    orders below 50?

10       A.    I do not -- I can't interpret

11   this particular email because I don't recall

12   what that was.  But I don't want to read

13   anything into it either.

14       Q.    If he were cutting them at

15   other numbers, or at other levels, would it

16   make any sense as a monitoring process?

17            If he, for example, said, "I'm

18   not going to cut hydro at 50.  Instead I'm

19   going to cut it at 60 bottles," or

20   alternatively, "I'm not going to cut it at

21   50.  I'm going to cut it down to 40,"

22   Mr. Abernathy is not suggesting that he's

23   going to take some wide discretion to make

24   his own judgment calls on what to cut and to

25   which number?

1       A.      Mm-hmm.

2       Q.      Or that he was exercising any

3   judgment on the level to which it should be

4   cut.  Instead, he had hard limits, 20 and 50.

5           Do you see anything in this

6   email, or recall any occasion where hard

7   limits were flexible, squishy?  Could be

8   adjusted, based on the fly?

9           MR. VARNADO:  Object to form.

10          THE WITNESS:  I don't recall

11      that being a discussion point, no,

12      sir.

13      Q.      (BY MR. ECKLUND)  Would that

14  make sense to you as part of a process that

15  would be repeatable, defensible, due

16  diligence, one where it's wide discretion to

17  Mr. Abernathy to decide how many pills to

18  ship, "20, I could give more than 20.  I

19  could give you less.  50, if I feel like 50,

20  that makes sense.  I'll do it, but otherwise

21  I can give more"?

22          MR. VARNADO:  Object to form.

23          THE WITNESS:  I can't comment

24      on that one way or the other in terms

25      of an opinion.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. ECKLUND)  Are you

2    familiar with any other processes within

3    Walmart concerning controlled substances

4    where hard limits are not followed?

5              MR. VARNADO:  Object to form.

6              THE WITNESS:  I'm not

7         familiar -- I'm not -- as a part of

8         that review, we're not a part of it,

9         so I'm not aware of any of it.

10   Q.    (BY MR. ECKLUND) In your role

11   in your department, are there any hard limits

12   or guidelines provided to you that you're

13   asked to follow?

14   A.    With respect to this?

15   Q.    No.  At all.

16   A.    Global investigations has

17   instructions.  Corporately we have

18   instructions.

19   Q.    And do you follow the

20   instructions that you receive from global

21   investigations?

22   A.    Yes.  As closely as possible?

23   Q.    And if you were told that you

24   couldn't ship more than 20, that there was a

25   hard limit and you had to cut it down to 20,

```
 1    for example, in the logistics -- in the

 2    shipping, distribution phase, if you became

 3    aware in your role in operations asset

 4    protection, that trucks carrying in excess of

 5    100 bottles were more likely to be the

 6    victims of theft, that they were targets, and

 7    policy was do not put more than 100 bottles

 8    on a truck, would you follow that process?

 9              MR. VARNADO:  Object to form.

10              THE WITNESS:  I can't speculate

11         on that particular scenario, because

12         I've never faced that particular

13         scenario specifically.

14              MR. ECKLUND:  Okay.

15              MR. VARNADO:  We've been going

16         about an hour and 20 minutes.

17              MR. ECKLUND:  We can take a

18         break.

19              MR. VARNADO:  Yeah.

20              VIDEOGRAPHER:  2:28.  We're off

21         the video record.

22              (Recess taken, 2:29 p.m. to

23         2:41 p.m.)

24              VIDEOGRAPHER:  2:41.  We are on

25         the video record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.      (BY MR. ECKLUND)  Mr. Beam, we
2    just took another short break, and I wanted
3    to turn back to one of the earlier documents
4    we marked.  Actually, the first document,
5    Exhibit 1.  Do you recall we had that
6    paragraph that we flagged talking about the
7    ███████████████████████████████████████████
8              Do you recall that?
9              MR. VARNADO:  Do you have the
10       page number, Counsel?
11        Q.      (BY MR. ECKLUND)  I can get
12   that for you, yes.
13             We can go with page 57289.
14             We can use the same questions.
15   57289.
16             And this is from one of your
17   evaluations, diversion, mitigation, and
```

■ ▬▬▬▬▬

2          First, do you have an

3   understanding of how many of those lost

4   dosage units were taken through a robbery?

5      A.    Off the top my head, I do not.

6   But there were a substantial number that were

7   in-transit loss, and robbery.

8      Q.    Okay.

9          So I want to try to break it

10  down.

11         So in-transit loss, robbery,

12  and burglaries.

13         So robbery, person is armed.

14  Other people see them.  Right?

15         Burglary, more than likely

16  video cameras are catching them but maybe not

17  individuals.  Thinking of somebody coming in

18  after hours.  In-transit loss -- I'm

19  imagining, but you can help me understand

20  it -- a truck being shipped, and then someone

21  figures out that there may be prescription

22  opioids or something else that they want on

23  the truck and they stop the truck and rob the

24  truck.

25         Is that what you're thinking of

1    here?

2         A.    In terms of in-transit loss?

3         Q.    Yes.

4         A.    No.

5         Q.    What are you thinking of an

6    in-transit loss?

7         A.    In-transit loss are that, that

8    it is released from the warehouse, and it is

9    shipped through one of those third parties,

10   and somewhere in that process it goes awry.

11        Q.    Poof?

12        A.    (Witness nods.)

13        Q.    Okay.

14              What percentage, relatively,

███  ████████████████████████████████████

███  ████████████████████████████████████

17   were taken through burglaries of Walmart

18   pharmacies?

19        A.    The breakdown, that number, I

20   couldn't.  Because these catch everything

21   from the one person taking one tablet all the

22   way through every one of those that we've

23   discussed, the theft, the robberies, the

24   burglaries.  This is a summation.

25        Q.    Do you know whether the loss

Highly Confidential - Subject to Further Confidentiality Review

██   ████████████████████████████████

██   ██████████████

3         A.     I can't answer that.

4         Q.     So do you think it's possible

5 that more than half of them could have been

6 the result of armed robberies --

7         A.     I can't speak --

8         Q.     Of Walmart pharmacies?

9         A.     -- to that either.

10         Q.     You're the one that's

██   ████████████████████████████████

██   ██████████████████████████

13               MR. VARNADO: Object to form.

14         Q.   (BY MR. ECKLUND) Ultimately

15 your team is responsible?

16         A.     Mm-hmm. (Witness nods.)

17         Q.     So ultimately your team would

18 know what the outcome of your investigations

19 and your analyses were. Correct?

20               MR. VARNADO: Object to form.

21               THE WITNESS: We do know.

22         Q.   (BY MR. ECKLUND) And within

██   ████████████████████████████████

██   ████████████████████████████████

██   ████████████████████████████████



■ ████████ .

2              Do you see that?

3       A.      I do.

13              So just a couple of questions

14    about this paragraph and the process within

15    asset protection.

16              Significant investigations, why

17    were they significant?  What was -- what made

18    them significant?

19       A.      In our experience at that time,

20    that was -- those were ones that were not

21    normal.  That would have been a heavy loss.

Highly Confidential - Subject to Further Confidentiality Review



10          A.      Successful resolution is we had

11   an understanding, or we had successfully

12   investigated to determine the reason for the

13   loss.

14          Q.      Based upon what?

15          A.      Based upon investigative

16   process.

19          A.      I don't.

22          A.      As I sit here today, I can't

23   state that.

24          Q.      Do you know whether any of them

25   involved burglaries?

1          A.      I don't.

2          Q.      Do you know whether any of them

3    involved in-transit loss?

4          A.      I don't.

5          Q.      Are there records within your

6    department or your group that would reflect

▮    ████████████████████████████████████

▮    ██████████████████████

9          A.      Only the case files.

10         Q.      And where are those case files

11   kept?

12         A.      Those case files are kept in

13   the case management system.

14         Q.      Is that an electronic system?

15         A.      It is.

16         Q.      What's it look like?  Is it in

17   Excel?  Is it a Word document?  Is it a

18   database?  What does it look like?  Describe

19   it for us.

20         A.      It is -- it's -- it is an input

21   system.  I mean, it's very hard to describe.

22                 You input the information, in

23   the specific fields, and then it saves it.

24   It preserves those documents.

25         Q.      Do you recall whether it's a

Highly Confidential - Subject to Further Confidentiality Review

1    SQL database?

2         A.    I'm not a technical person.

3    I -- it's not a SQL database as I know it.

4         Q.    If I could direct your

5    attention to Bates page 57310.

6              So the one we just went over

7    was fiscal year 2013 annual evaluation.  I

8    want to direct your attention back to fiscal

9    year 2015.

10             In the evaluation, it reads,

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

15   those would also be included within the case

16   management system?

17        A.    In here.  Right here.

18              Those would be.

19        Q.    And within those case files, it

████████████████████████████████████████

21   robberies?  Closed investigations, how many

████████████████████████████████████

23        A.    Of the total investigations, I

24   don't know.

25        Q.    No, no.  I'm saying the case

Highly Confidential - Subject to Further Confidentiality Review

```
 1    files themselves would reflect.

 2         A.    Yes.

 ■       ■                    ■

 ■       ■

 ■       ■

 6    involved loss during shipping, how many

 7    involved a burglary, how many involved a

 8    robbery, how many were significant,

 ■       ■

10    Right?  I would be able to see that in the

11    case files?

12              MR. VARNADO:  Object to form.

13              THE WITNESS:  I don't know

14         exactly how that is stored on the back

15         end, but I know what was put in on the

16         front end.

17         Q.    (BY MR. ECKLUND)  Is it your

18    understanding that some of the information

19    that's put in on the front end might not be

20    stored?

21         A.    No, it's -- it would have been

22    stored.  But I cannot attest to, at this

23    time, any records that will go back to 2015.

24         Q.    Do you recall any

25    investigations concerning illicit use?
```

```
 1                    MR. VARNADO:  Object to form.

 2                    THE WITNESS:  And --

 3                    MR. ECKLUND:  Illicit use of

 4          controlled substances?

 5                    MR. VARNADO:  Same objection.

 6          Q.    (BY MR. ECKLUND)  Recall the

 7   sample I gave you earlier.  The parent gets

 8   the prescription from the doctor.  Mom or Dad

 9   puts the medication in the medicine cabinet.

10   Children come home, high school age.  They

11   see the pill bottle.  They open the pill

12   bottle.  They take some pills.  They leave.

13          A.    I'm not aware of any

14   investigations internally relative to that

15   matter.

16          Q.    That's not something you've

17   ever investigated personally?

18          A.    Correct.

19          Q.    And it's not something that

20   you've ever reviewed for any of your

21   analysts; correct?

22                    MR. VARNADO:  Object to form.

23                    THE WITNESS:  I don't recall

24          seeing anything of that nature.

25          Q.    (BY MR. ECKLUND)  Do you recall
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    any meetings during fiscal year 2016 that
2    appeared to have continued beyond that fiscal
3    year, with PricewaterhouseCoopers, KPMG, or
4    Deloitte, that were focused on providing you
5    and your team a better understanding of
6    existing systems and processes that could
7    help you make better progress in your
8    analysis?
9              MR. VARNADO:  Object to form.
10             THE WITNESS:  Health and
11        wellness data.
12        Q.    (BY MR. ECKLUND)  Yeah.  If you
```

██  ██████████    ███████████████████████

██  ████████████████████████████████████

██  ██████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████

██  █████████████

██  ████████████████████████

██  █████████████████  █████████████████████

██  ██████████████████████████████████

```
22             Do you recall --
23             MR. VARNADO:  Maybe give him
24        just a moment to review the document.
25             THE WITNESS:  Yes, I recall
```

Highly Confidential - Subject to Further Confidentiality Review

1     those.

2          Q.     (BY MR. ECKLUND) What were you

3     guys talking about?

4          A.     Those were non-health and

5     wellness-related matters.

6          Q.     Did they have anything to do

7     with diversion, theft, loss, and

8     investigations?

9          A.     No.  Not within the pharmacy or

10    health and wellness.

11         Q.     It had nothing to do with

12    controlled substances?

13         A.     Correct.

14    ████      █████      █████    ████████████

15    ████  ███████████████████████████████████

16    had nothing to do with controlled substances,

17    theft and loss, diversion?

18         A.     Correct.

19         Q.     Okay.  Direct your attention to

20    page 57326.

21               Again, 57326.

22               Top third of the page, it's

23    next to the redacted privilege box.

24    ████             ██████████████████████████

25    ████  ██████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

1    redacted.

2              Who's on the controlled

3    substances advisory panel?

4         A.    During this time, there would

5    have been members of compliance, and legal.

6    And I participated in that for a period of

7    time.

8         Q.    Do you still participate?

9         A.    I do not.

10        Q.    At this point in time, were

11   there voting and non-voting members of the

12   controlled substances advisory panel?

13        A.    There were.

14        Q.    Were you a voting member?

15        A.    I was at that time.

16        Q.    Why were you a voting member of

17   the controlled substances advisory panel?

18              MR. VARNADO:  Object to form.

19              THE WITNESS:  During the time

20        that I was involved, then it was going

21        through looking at operational

22        processes and policies.  And those are

23        defined as being things like --

24              MR. VARNADO:  Let me -- just

25        let me introduce an objection here, in

1           terms of discussing what the advisory

2           panel discussed, as being privileged.

3           Happy to talk about the mechanics and

4           members.

5                    THE WITNESS:  Understood.

6                    MR. VARNADO:  But directing you

7           not to answer questions or reveal what

8           was discussed in panel meetings that

9           were conducted at the direction of

10          counsel.

11          Q.    (BY MR. ECKLUND)  Do you

12    understand what he just said to you?

13          A.    I do.

14          Q.    Okay.  So don't disclose

15    privileged information that the attorneys

16    within Walmart or outside counsel were

17    investigating, evaluating at the time.  But

18    topics that did not concern privileged

19    information, those are fair.

20                 Do you understand?

21          A.    I do.

22          Q.    I want to know all of those

23    other topics.

24                    MR. VARNADO:  If any.

25                    THE WITNESS:  I cannot recall

1          any that would not have been covered

2          by privilege under these meetings.

3          Q.    (BY MR. ECKLUND)  How many

4    times did you meet?

5          A.    I don't recall.

6          Q.    What was the general purpose of

7    the controlled substances advisory panel?

8          A.    We were looking at enhancing

9    processes in that environment.

10          Q.    At this time were you concerned

11    with fines, penalties, and legal actions

12    brought against your competitors?

13          A.    That was not a discussion

14    point.

15          Q.    Who asked you to be on the

16    panel?

17          A.    Compliance at that time.

18          Q.    Who in compliance asked you to

19    be on the panel?

20          A.    Jim Greer.  Or not Jim Greer.

21    Just a minute -- Langman.

22          Q.    Who else was on the panel

23    besides Jim Langman -- is it?

24          A.    Correct.

25          Q.    Was Jim Greer also on the

```
 1    panel?

 2          A.      He was not.

 3          Q.      So Jim Langman, yourself, and

 4    who else?

 5          A.      Karen Davila.

 6          Q.      Who is Karen Davila?

 7          A.      She was legal counsel for

 8    health and wellness.

 9          Q.      Who else?

10          A.      George Chapman.

11          Q.      And George Chapman.  And anyone

12    else?

13          A.      Chad Ducote.

14          Q.      Chad Ducote?  Okay.

15          A.      Those are all I remember.

16          Q.      Are there people you're

17    forgetting right now?  Is it a bigger group?

18    Ten people?  Bigger?  You just don't remember

19    the names?

20          A.      I don't remember, and I don't

21    remember the total number of people who would

22    have been on this panel.

23          Q.      Where did you guys meet?

24          A.      Various locations.  But in the

25    home -- in Walmart offices.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      In the home office area?

2      A.      Home office area, various

3  meeting rooms.

4      Q.      So always in Bentonville,

5  Rogers areas, not outside of Arkansas?

6      A.      Correct.

7      Q.      Did you ever meet at any of

8  your outside counsels' offices?

9      A.      No.

10      Q.      Okay.

11      A.      I did not.

12      Q.      Well, you were on the

13  controlled substances advisory panel and you

14  would have gone for the meetings; right?

15      A.      I would have gone to meetings,

16  but I've never gone to a meeting outside of

17  the Walmart home office campus.

18      Q.      So if you went to all of the

19  meetings and you didn't go to any outside,

20  then it's fair to say that they didn't happen

21  outside.

22            MR. VARNADO:  That you are

23  aware of.

24            THE WITNESS:  That I'm aware

25      of.  I don't recall any meetings

Highly Confidential - Subject to Further Confidentiality Review

1     outside of the ones I discussed with

2     you.

3        Q.    (BY MR. ECKLUND)  Did you

4     consider it to be an achievement being asked

5     to participate on this controlled substances

6     advisory panel?  Something reflected in your

7     evaluation.  It seemed like you were fairly

8     proud of that.

9              MR. VARNADO:  Object to form.

10             THE WITNESS:  I didn't consider

11        it an achievement.  I considered it as

12        outlining my performance for that year

13        and the things I was involved with.

14       Q.    (BY MR. ECKLUND) How many

15    people on the substance advisory committee

16    were voting members and how many were not?

17             MR. VARNADO:  Object to form.

18             THE WITNESS:  I don't recall.

19       Q.    (BY MR. ECKLUND) Were most of

20    you voting members?

21       A.    I don't recall.

22       Q.    Was there -- were there minutes

23    kept for these meetings?

24       A.    There were.

25       Q.    And would the votes have been

1    reflected in the minutes?

2         A.    I don't recall what would have

3    been documented in the minutes, because those

4    minutes were never shared outside of -- well,

5    the meeting minutes were never shared.

6         Q.    They were never shared to the

7    other panel members, including yourself?

8         A.    They were reviewed.

9         Q.    Reviewed and then signed?

10   Reviewed and approved?

11        A.    No, those were reviewed at the

12   beginning of each meeting, what was covered

13   in the previous meeting.  And then minutes

14   were kept of that meeting.

15        Q.    Who did the controlled

16   substance advisory committee members report

17   up to?

18             MR. VARNADO:  Object to form.

19             THE WITNESS:  I'm not aware.

20        Q.    (BY MR. ECKLUND)  It's not

21   something that came up in any of the

22   meetings?

23        A.    It was -- it was not anything

24   that I was personally aware of, where the

25   information discussed went.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     I want to direct your attention

2   back to interrogatory responses.

3             And just had a couple of

4   questions concerning the drug diversion

5   coordinators.  You don't need the document to

6   answer these, just general questions.

7             Do you recall the time period

8   during which you oversaw the drug diversion

9   coordinators?

10     A.     It would have been from -- I

11  don't recall specific, but as I sit here now,

12  it was somewhere between 2009 and '10.

13            And all the way through the --

14  in 2010, those positions were restructured.

15     Q.     Restructured how?

16     A.     I mean, these went through a

17  review process, and those positions were

18  converted from coordinators to investigator

19  positions.

20     Q.     In one of the other manuals --

21  and this is also within your time period.  It

22  bears Bates range 11107.

23            Throughout the day we've been

24  talking about orders of interest, suspicious

25  orders.  The DEA defines orders of interest

Highly Confidential - Subject to Further Confidentiality Review

1    as an order that warrants follow-up

2    evaluation to determine whether it's a

3    suspicious order, at least Walmart did at

4    this time.

5              Do you see that?

6              MR. VARNADO:  Object to form.

7              THE WITNESS:  I do see that.

8        Q.    (BY MR. ECKLUND)  Okay.  When

9    you were evaluating -- sorry, strike that.

10             Were you ever involved in the

11   evaluation of an order of interest to

12   determine whether it was suspicious?

13       A.    That was outside our lane.

14       Q.    Okay.  And the same with

15   follow-up for evaluation of a suspicious

16   order?

17             Those are orders of interest

18   which had been evaluated.  So you wouldn't

19   take the baton from someone else who had

20   evaluated an order of interest and then ...

21       A.    Right.  No.  We would not have

22   been involved.

23       Q.    And you also wouldn't be

24   involved in determining that an order of

25   interest which had been evaluated and

1    determined not to be suspicious was in fact

2    not suspicious?

3           A.    Once the determination was

4    made, we would not have been involved.

5           Q.    Okay.  Thank you.

6                 Now, the drug diversion

7    coordinators, they would have received two

8    reports.  They would have gotten the oxy 30

9    cuts, based upon some of the documents we've

10   gone through today, and they also would have

11   gotten information concerning other

12   controlled C-IIs.  Right?

13                MR. VARNADO:  Object to form.

14          Q.    (BY MR. ECKLUND)  And we've

15   talked about those, and the workflow, and the

16   process flow; right?  So there's C-IIs

17   oxy 30, then there's everything else.  We

18   talked a little about hydrocodone and how

19   that changed once hydrocodone went up.

20                Were there any other reports

21   that would have been evaluated by the drug

22   diversion coordinators for the investigators

23   concerning the requests for additional pills,

24   particularly the controlled substances?

25                So we have the oxy 30 report.

1    We've got the 50 report.  We've got --

2              Anything else?

3              MR. VARNADO:  Object to form.

4         Q.    (BY MR. ECKLUND) You're nodding

5    no, but I need you to say --

6         A.    Not that I'm aware of, no.

7         Q.    Okay.  Now, the percent of

8    total column reflected in this pharmacy

9    manual -- I'm just going to pop it up real

10   quick so you can see it again.  You can see

11   it says 3.99 percent.

12             Do you see that?

13        A.    I do.

14        Q.    Percent of total column must be

15   reviewed for any entry above 3.99 percent.

16   Why don't you go back to the Oro Valley chart

17   where it had the oxycodone order and the

18   hydrocodone mix.  We talked about those

19   earlier.

20             That's not it.  It's the other

21   one.

22             Yes.

23             MR. VARNADO:  Exhibit 7.

24             MR. ECKLUND:  That's the one.

25        The one about Arizona.

1     Q.    (BY MR. ECKLUND)  So if you

2   look on that document, how many of those

3   would have had to have been investigated that

4   are over 4 percent?

5     A.    I can't make a determination on

6   what would have had to have been investigated

7   just based on this limited data set.

8     Q.    But the policy was, at least

9   according to -- and that time period again,

10   what's the year on the email?

11     A.    This one was 7-8 of 2013.

12     Q.    Right.  And the effective date

13   for this policy that I just showed you was

14   November of 2010 through October of 2014.  So

15   that's within this time frame, the

16   3.9 percent.  3.99 percent is within that

17   time period of that report.

18             So based upon the policy, every

19   one of those would have been investigated

20   over 4 percent.  Correct?

21     A.    Every one of these would have

22   been reviewed.  That policy is a logistics

23   policy.

24     Q.    Okay.  So you don't know --

25             Okay.  You don't know then?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I don't.

2        Q.      All right.

3                And those reports were provided

4     on a monthly basis.  If you look at the

5     bottom of the tabs, it shows you that?

6        A.      Yes.

7        Q.      Is that correct?

8        A.      That is my recollection.

9        Q.      Okay.  They weren't provided on

10    a weekly basis.  They were provided on a

11    monthly basis?

12       A.      Mm-hmm.

13       Q.      So if there was an

14    extraordinarily high order that came in, it

15    wouldn't necessarily immediately go to the

16    team to be evaluated.  It would be in the

17    following month's report?

18               MR. VARNADO:  Object to form.

19       Q.      (BY MR. ECKLUND) Let's use your

20    fat-finger example from earlier today, the

21    70.  Remember?

22       A.      Mm-hmm.

23       Q.      So if there was an order for 70

24    of oxycodone -- that's a big order of

25    oxycodone relative to the 20-bottle limit --

1    would that have been reflected on the monthly

2    report or would that have been sent

3    immediately to logistics?

4         A.    Sent to logistics.

5         Q.    I'm wondering to whom.  You say

6    this goes to Walmart logistics and not to

7    you.

8         A.    This came out of Walmart

9    logistics.

10        Q.    Right.

11        A.    And Walmart logistics is one

12   who does -- and manages all of the ordering.

13        Q.    That part I understand.  So

14   they get the data.  They create the report

15   you're looking at.  So they get this order of

16   70.  Is that so high that they're going to

17   get it faster, act on it more quickly?

18        A.    Their processes, I'm not -- I

19   can't speak to.

20        Q.    And you wouldn't have -- you

21   wouldn't have gotten anything sooner than the

22   monthly report, though?

23             MR. VARNADO:  Object to form.

24             THE WITNESS:  I can't speak to

25        that completely.

```
 1          Q.      (BY MR. ECKLUND)  Do you know
 2    how the files were forwarded to the
 3    appropriate drug diversion coordinator?  Do
 4    you recall we were talking about there were a
 5    number of them?
 6          A.      Mm-hmm.
 7          Q.      Do you know how they were
 8    channelled?  Routed?
 9          A.      Those would have been email
10    distribution.
11          Q.      Okay.  But how would you decide
12    which one of the drug diversion coordinators
13    would take the responsibility for the
14    evaluation of a given report?
15          A.      I didn't necessarily make that
16    determination.  That would have come because
17    Jim Greer knew what the -- who the division
18    coordinators were.  And he would send those
19    to the coordinator responsible for the
20    geographic area.
21          Q.      So you managed the drug
22    diversion coordinators.  Jim Greer managed
23    the process for channelling the work to them.
24    You would oversee that the work was being
25    completed, and if there were questions or
```

1    concerns raised by one of the drug diversion

2    coordinators, they might reach out to you,

3    ask you questions, get you involved, but you

4    weren't actively involved in who -- in the

5    determination of which one of the drug

6    diversion coordinators would handle which

7    reports?

8         A.    Correct.

9         Q.    Do you recall receiving weekly

10   health and wellness reports?

11              MR. VARNADO:  Object to form.

12              THE WITNESS:  You'd have to be

13        more specific.

14              MR. ECKLUND:  Sure.

15        Q.    (BY MR. ECKLUND)  I'll just

16   pass you one.  We don't need to talk about

17   all of them, because there's too many to talk

18   about in one day.

19              They look a lot like this.

20              So health and wellness

21   compliance focus areas steering meeting.

22              And this one's from July 16th

23   of 2015, but there are numerous reports that

24   look a lot like this with just the dates

25   changed on the front page and then the body

Highly Confidential - Subject to Further Confidentiality Review

1    of the changes thereafter.

2              Do you recall receiving these

3    steering meeting ...

4         A.    I do.

5         Q.    What was the purpose of

6    circulating these health and wellness

7    compliance focus areas steering meeting

8    minutes, or slide -- do you call them

9    minutes?  Slide decks?  What do you refer to

10   them as?  Reports?

11        A.    I call them slide decks.

12        Q.    What was the purpose for

13   circulating these weekly slide decks?

14              MR. VARNADO:  Object to form.

15              THE WITNESS:  To update on all

16        ongoing projects.

17        Q.    (BY MR. ECKLUND)  Updating?

18        A.    All of the other key

19   stakeholders that were involved in those

20   projects.

21        Q.    So you were updating each

22   other?

23        A.    We were keeping the group

24   informed of where certain projects were on a

25   continuum.

```
 1              Q.    Did this group meet in person,
 2     or just circulate these slide decks?
 3              A.    We met in person.
 4              Q.    How often?
 5              A.    Once a week.
 6              Q.    Where did you meet?
 7              A.    In home office campus.  In the
 8     home office building.
 9              Q.    Were there votes held within
10     this group?
11              A.    No.
12              Q.    And no voting members?
13              A.    No.
14              Q.    Okay.  How many people were in
15     this group?
16              A.    It varied, depending on which
17     project was being discussed.
18              Q.    I'll show you this.  Now, I'll
19     represent that this is 24368.
20                    Now, there are color versions
21     of this, but the text doesn't change.  In the
22     color versions, the Gs are green, and the Y
23     is yellow.  Okay?
24                    Towards the bottom of the page,
25     under the controlled substances work group,
```

1    here there are three people identified.

2    Miranda Johnson with two projects where she's

3    the owner and yourself.  Do you see that?

4         A.    I do.

5         Q.    Okay.

6               And it says that you have a

7    "responsibility for ownership of building an

8    automated diversion analytics tool that

9    enables the company's ability to identify

10   chainwide indicators of potential diversion

11   activity."

12              Do you see that?

13        A.    I do.

14        Q.    Okay.  The automated diversion

15   analytics tool that you were building, was

16   that focused on detecting potential theft and

17   loss in operations asset protection?

18        A.    It was -- it was focused on

19   that effort.

20        Q.    Okay.  It was not focused on

21   illegitimate use of the pills?

22        A.    Correct.

23        Q.    And it wasn't focused on abuse

24   of the pills.  It was again focused on

25   robberies, burglaries, theft during transit?

1          A.      Correct.

2          Q.      Correct?

3                  Okay.  And the analytical tool

4    that you were trying to build, were you

5    building that within a SQL software or

6    something else?

7          A.      We were building that through a

8    third-party contractor.

9          Q.      Which third party?

10         A.      That would have been

11   Sysrepublic.

12         Q.      And what is Sysrepublic?

13         A.      Sysrepublic is a software

14   development company.

15         Q.      And with whom did you work in

16   building the automated version analytics tool

17   at Sysrepublic?

18         A.      There were numerous.

19   Renee DeWolf.

20         Q.      Okay.  Renee was the primary

21   person but there were a lot of them?

22         A.      Yes.

23         Q.      And did you complete this

24   project?

25         A.      Unfortunately, no.

1    Q.    Why not?

2    A.    It became very technical and --

3    as the process evolved and programming and

4    coding continued, the company could not

5    develop the program to the level that we had

6    executed the contract from.

7    Q.    I'm sorry, I don't understand

8    what that means.

9          So --

10   A.    It means they couldn't give us

11   what they asked for.

12   Q.    All right.  I understand you

13   weren't getting what you wanted.  I'm trying

14   to understand.  So you said it became very

15   technical.  The process evolved.  The

16   programming, the coding, it continued.  But

17   the company, the third party could not

18   develop the program to the level that you had

19   executed in the contract?  Okay.  And I want

20   to break your answer into little core pieces.

21   Okay?

22          So you said it became very

23   technical.  What do you mean by this project

24   became very technical?

25   A.    As it relates to all aspects or

1    all pieces of data that we were pulling into

2    this project, it was not just from one data

3    source.  It was from multiple data sources.

4         Q.    Which data sources?

5         A.    Those were the Teradata.  Those

6    also came from the daily long pulls.  All of

7    the things that we were pulling manually

8    earlier, this was an opportunity and an

9    effort to consolidate those and automate that

10   process to increase efficiency and reduce all

11   of the other manual labor.

12        Q.    You mentioned Teradata.  Were

13   you also pulling data from Reddwerks?

14        A.    No.

15        Q.    What about Buzzeo?

16        A.    No.  All of the data that came

17   out of the -- from distribution, all of those

18   uploaded into Teradata.

19              So we pulled all of our

20   information from Teradata, from third-party

21   vendors, from Alarm Central, relating to the

22   alarm codes.  And also from GENCO, which is

23   our reverse distributor.

24        Q.    What about Archer?  Is Archer

25   data included in this?

1          A.      It was not.

2          Q.      Now, how did the process

3    evolve?

4          A.      Can you clarify?  I'm --

5          Q.      That was part of your answer.

6    You said that the program became very

7    technical, and as the process evolved and the

8    programming continued, it couldn't develop

9    the program to the level that you had

10   executed in the contract.

11              So you mentioned process

12   evolution.  I'm trying to understand.  How

13   did it evolve?

14         A.      The process of building this

15   data system that we had asked for.  There

16   are -- there were key asks.  And from those

17   asks, as those began to -- as the coding

18   continued, to try to achieve those, it was

19   unable to do so.

20         Q.      So as the project was being

21   developed, the programming continued to

22   become bigger and bigger and bigger, and it

23   wasn't delivering what you had anticipated or

24   expected when you initially signed the

25   contract?

1      A.      What it was doing was becoming

2   challenging -- or not challenging.  It was

3   becoming difficult to keep those systems

4   updating and doing it in a timely fashion so

5   that the output was productive.

6      Q.      And were those limitations

7   because of the data size or limitations due

8   to processing power?

9      A.      I don't know.  I'm not -- that

10  was not -- I'm not a technical person, so I

11  don't -- I would have to defer to the

12  technical specialist on that.

13     Q.      Well, I mean, you were on the

14  team.  That's why I'm asking you.  So you're

15  running into these problems.  Did anyone

16  explore whether bringing more processing

17  power behind it would enable you to get a

18  better handle on all of the data that was

19  input, so you could get the output?

20          MR. VARNADO:  Object to form.

21          THE WITNESS:  I don't recall

22      that being a discussion point around

23      that point -- around that data point.

24     Q.      (BY MR. ECKLUND)  Okay.  And as

25  part of the work group for controlled

1    substances, were you also engaged with

2    Miranda Johnson in connection with her

3    projects?  Or was she responsible for her --

4    execution of those?

5        A.    She was responsible for

6    execution of those.

7        Q.    In your role within operations

8    and asset protection, did you consider DEA

9    risk scores for controlled substances?

10                MR. VARNADO:  Object to form.

11                THE WITNESS:  Not as a part of

12        our investigative process.

13        Q.    (BY MR. ECKLUND)  Did you ever

14    provide reports or present in front of any of

15    the board members for Walmart?

16        A.    Are you talking about at the

17    executive level?

18        Q.    Yes.

19        A.    No.

20        Q.    Any senior executive

21    management?

22        A.    I have had conversations with

23    our VP and I've had conversations with vice

24    presidents that -- I don't know what your

25    definition of senior executive is.

```
 1          Q.      That's a fair point.
 2                  We have chairpeople, CEOs, and
 3      the like, along the board would be at the
 4      uppermost levels that I'm thinking of.  Then
 5      you would have the people that would lead or
 6      be responsible for particular departments,
 7      divisions, obligations within the company.
 8                  So general counsel.  Chief
 9      financial officers and the like.
10                  VPs, probably be a level below
11      for me.
12                  And that might not be the case
13      for Walmart.
14                  So, I'm wondering, to what
15      level did you report up to about your work in
16      your investigations?  So it sounds like a
17      couple of VPs?  And anyone above the VP level
18      in Walmart?
19          A.      I did not report above the VP
20      level within Walmart.
21          Q.      Okay.
22                  Did you ever present to any
23      panels of VPs or just the one VP?
24          A.      I've been in meetings in
25      collaboration with multiple VPs at the same
```

Highly Confidential - Subject to Further Confidentiality Review

1    time.

2        Q.    No, I'm not asking whether

3    you've been in meetings with them

4    collaboratively.  I'm talking about

5    presentations of the work you're doing.  Did

6    you give presentations?  Did you tell them,

7    "Hi, I'm Greg Beam, and I want to give you

8    guys an update on this big project that I've

9    been handling.  This is what we've been

10   doing.  This is why we're doing it.  This is

11   why this is important.  This is what the

12   needs are.  This is what we need to continue

13   to work towards.  We're on pace to meet our

14   deadlines, our goal, second quarter of next

15   year."

16           I'm talking about presentations

17   to those people.  They come in and watch you.

18           MR. VARNADO:  Object to form.

19           THE WITNESS:  No.  I don't

20       recall any conversation or

21       presentations of that form.

22       Q.    (BY MR. ECKLUND)  Okay.

23           (Walmart-Beam Deposition

24       Exhibit 10, June 2014 Subj: RE: Cut

25       Report from D.C.  WMT_MDL_000008419,

1          was marked for identification.)

2          Q.    (BY MR. ECKLUND)  This is going

3    to be marked as Exhibit 10, I believe.

4               And this is an email from

5    Miranda Johnson to you, Mr. Beam, that bears

6    Bates stamp 8419.

7               And if you look at the bottom,

8    it's from Miranda to you, June 10, 2014.  Cut

9    report from DC.

10              And she's referring to DC 6045;

11   correct?

12              She's talking about controlled

13   substances.

14              MR. VARNADO:  Object to form.

15         Q.    (BY MR. ECKLUND)  In the body

16   of the email.

17              Do you see that?

18         A.    I don't know that she's

19   referring to 6045.  But I can see that it

20   refers to controlled substances.

21         Q.    Was there any other DC that was

22   distributing controlled substances on or

23   around June of 2014, aside from 6045?

24         A.    Not for C-IIs.

25         Q.    Okay.  And the ones that you

1    were cutting, i.e. to 20 bottles, those were

2    C-IIs?

3            A.      Correct.

4            Q.      So it would have to be 6045,

5    because it's talking about controlled

6    substance orders.  It's talking about

7    reductions to cut to the 20-bottle limit.

8                    Do you see that?

9            A.      I see the cut and the specific

10   reference to bottles.

11           Q.      And there's no other store

12   where they were doing that -- or no other

13   distribution center where they were doing

14   that.  So fair assumption, she's referring to

15   6045?

16                   MR. VARNADO:  Object to form.

17                   THE WITNESS:  I don't see 6045.

18           But I understand how that could be

19           concluded.

20           Q.      (BY MR. ECKLUND)  You don't

21   disagree with the conclusion?

22           A.      I can neither agree or

23   disagree.  It's just not here.

24           Q.      Okay.  Now, Miranda's writing

25   to you and she says, "Does your team get a

1    cut report from the DCs?  We were walking

2    through the as-is project for the SOM project

3    and someone mentioned the report.  We weren't

4    sure who was receiving it.  I believe that it

5    lists all the CS orders that the DC reduced

6    to a specific level, i.e. 20 bottles."

7              What is the "as-is process"?

8         A.    That was a -- that was one of

9    Miranda's projects.  I'm not familiar with

10   what she was reviewing there in total.

11        Q.    Okay.  So we showed that

12   document.  We're talking about SOMs, the

13   suspicious order programs.  And you were in

14   the same group.  But this isn't something

15   that you have any understanding about, as-is

16   process?

17        A.    Correct.

18        Q.    Okay.  And the SOM project that

19   she references, do you know what she's

20   talking about there?  The SOM project?

21        A.    I know that -- I know, in --

22   just in title only.  I'm not familiar with

23   any of the work processes that went into

24   that.

25        Q.    Now, you responded to her that

1    you don't receive those reports.  You don't

2    get the cut reports.  "We don't, largely due

3    to size."

4              And then you continue, "We were

5    told it was too big to email or get to us

6    electronically.  Has that changed?  We would

7    love to get it if that is the case.  Greg."

8              Ms. Johnson works in the same

9    area as you?  The same region of the country?

10   A.    She does work here globally --

11   I mean from the home office.  And she is

12   field facing.

13   Q.    And do you know whether it

14   would have been -- do you have any

15   understanding of how large these reports are

16   that they couldn't be provided to you

17   electronically?

18   A.    Well, within the context of

19   this, as we're sitting here today, this was

20   in reference -- and it -- or miscommunication

21   and a misunderstanding.

22              As she was communicating to me,

23   she was talking about one report.  As I was

24   responding to her, I was thinking about

25   another report.

1        Q.     What report were you thinking

2  about?

3        A.     I was thinking of a top 25

4  report which is printed out by the logistics.

5  It's not an online computer.

6        Q.     Why would you have loved to get

7  the top 25 report?

8        A.     Because that would have been

9  another review, opportunity for us to review

10  and take that into consideration with some of

11  the other reports.

12        Q.     Would you not have done the

13  same thing with cut reports?

14        A.     As I stated, we were getting

15  the cut reports.  I did not necessarily refer

16  to those as cut reports.  Around this time,

17  Miranda was just getting acclimated with her

18  new role.

19        Q.     So you were already getting cut

20  reports.  There was confusion in your

21  response?

22        A.     Correct.

23        Q.     You had them already.  So you

24  wrote back saying that you'd love to.  You

25  thought they were too big to email.  You

1    remember thinking about something completely

2    different?

3            A.      Completely different.

4            Q.      Mr. Beam, do you recall

5    participating in a Webex with Miranda Johnson

6    and Roxy --

7                    MR. VARNADO:  Object to form.

8            Q.      (BY MR. ECKLUND)  -- concerning

9    suspicious order monitoring evaluations and

10   where your assistance would be beneficial?

11                   MR. VARNADO:  Sorry.

12                   THE WITNESS:  I don't recall

13       that specifically.

14           Q.      (BY MR. ECKLUND)  Do you know

15   who Roxy is?

16           A.      I do.

17           Q.      Who is Roxy?

18           A.      Roxy was a data manager and

19   analyst working and reporting to Miranda.

20           Q.      And that's Roxy Reed?

21           A.      That is Roxy Reed.

22           Q.      Have you at any point in time

23   since 2015 provided assistance in connection

24   with suspicious order monitoring evaluation?

25                   MR. VARNADO:  Object to form.

```
 1                    THE WITNESS:  We've conducted
 2         additional due diligence.
 3         Q.     (BY MR. ECKLUND)  What type of
 4     due diligence have you conducted?
 5         A.     We have looked at additional
 6     data points, and also did some eyes-on along
 7     with some social media research.
 8         Q.     Anything else?
 9         A.     No, sir.
10         Q.     What is an RTF form?
11         A.     Can you put that in context?
12         Q.     Unfortunately, I can't.
13                It's referenced in an email
14     that you sent.  You wrote, "Is there a way to
15     mine the RTF forms to collect Rx comments
16     without having to drill into each incident
17     number.  Is that what's contained in the RTF
18     form section?"
19                I'm trying to understand what
20     an RTF form is.
21                    MR. VARNADO:  Can you show him
22         the document, Counsel?
23                    MR. ECKLUND:  Sure.  I'll put
24         it up on the screen.
25                    THE WITNESS:  Was there
```

1           additional communication on this

2           email?

3                Q.     (BY MR. ECKLUND)  Yeah, there

4      is.  If you want the document, you can have

5      it.

6                A.     Could I see that, please?

7                Q.     Sure.

8                       (Walmart-Beam Deposition

9           Exhibit 11, September 2017 email

10          chain.  Subj:  RE: Archer Question.

11          WMT_MDL_000007391-7394, was marked for

12          identification.)

13               Q.     (BY MR. ECKLUND)  This is going

14     to be marked as Exhibit 11.

15                      The second-to-the-last page is

16     your email.

17                      MS. HOSMER:  Can you read the

18          Bates numbers?

19                      MR. ECKLUND:  It starts at

20          7391.

21               Q.     (BY MR. ECKLUND)  So what's an

22     RTF form?  That's what I'm after.  I mean, it

23     appears to be refusal-to-fill forms.

24               A.     Is that what this is

25     referencing?  Oh, refusal-to-fill forms.

1    Q.    Now, in your role within asset

2    protection, did you consider or complete

3    refusal-to-fill forms?

4    A.    No.

5    Q.    That's not something you used

6    in your role?

7    A.    It is not something that we

8    completed.

9    Q.    Okay.  Is it something you

10   considered?

11         Aside from not completing them,

12   is it something that you considered?

13   A.    It is something that at this

14   particular point we did not have access to.

15   So it is something we want to explore to

16   determine the value of that.

17   Q.    So fair to say prior to

18   September 12th, 2017, refusal-to-fill forms

19   were not forms that you would have considered

20   in your role within asset protection?

21   A.    That is correct.

22   Q.    Because they weren't provided

23   to you?

24   A.    They weren't provided.

25   Q.    Okay.  Just going to the

1    refusal-to-fill form, I do apologize.  This

2    is the font size and as big as it was

3    provided to us.

4                   Within the refusal-to-fill form

5    from 2017, it's got type of refusal counts.

6    Altered prescription, forged prescription,

7    unable to resolve red flags, home office

8    blocked prescriber, blanket refusals.

9                   Do you see that?  It's in the

10   refusal metrics.

11                  And then you can see it again

12   in the counts.  Refusal-to-fill count and

13   refusals by type, reason for refusal, altered

14   prescription, forged prescription, unable to

15   resolve red flags, blanket refusal.

16                  Do you see that?

17        A.     I see the right column clearly,

18   the left column less clearly.

19        Q.     Okay.  Would the forged

20   prescriptions have been something that you

21   would have wanted to have access to in your

22   role in asset protection?

23                  You talked earlier about

24   forgeries.

25        A.     It is something that we had --

1    at this time we had asked for.  We did not

2    know this existed --

3           Q.    Okay.

4           A.    -- prior to that.

5           Q.    And I'm asking, would those

6    forms have been useful to you in your role in

7    asset protection as concerns forgeries and

8    other preventions of theft and loss of

9    controlled substances?

10               MR. VARNADO:  Object to form.

11               THE WITNESS:  Potentially.

12          Q.    (BY MR. ECKLUND) And why do you

13   believe those would have been potentially

14   useful to you?

15          A.    As those were loaded in this

16   particular system, those are not determined

17   to be your -- proven to be forgeries at that

18   point.

19               This is an assessment.

20          Q.    So these aren't necessarily

21   closed investigations?  These are just

22   beliefs at this point?

23          A.    These are forms that are

24   completed by operations.  Not by our team.

25          Q.    Okay.  So you're not sure

Highly Confidential - Subject to Further Confidentiality Review

1    whether the 1,820 forged prescriptions were

2    in fact investigated and ultimately found by

3    operations asset protection to be forgeries?

4         A.    I do not know that.

5         Q.    Do you see at the top within

6    health and wellness compliance practice just

7    below that you have "Add new incident.

8    Search incidents, search DEA 106 filings.

9    Search drug repository.  Search facilities.

10   Show off facilities."

11             Do you see that?

12        A.    I do.

13        Q.    Were you able to search DEA 106

14   filings at this time?

15        A.    Not using this tool.

16        Q.    You were able to do it using a

17   different tool?

18        A.    We were communicating with our

19   practice compliance partners who would send

20   us that list.

21        Q.    So you would communicate with

22   people within the compliance group, and they

23   would use this RTF database and generate you

24   a list?

25        A.    I don't know where the list

```
 1    came from.  Whenever we got it, it was a
 2    list.
 3              It did not have any indication
 4    nor was there anything that would reveal
 5    where that particular list came from.
 6        Q.    So you don't know how it was
 7    created.  You just know if you asked for the
 8    list, you got the list?
 9        A.    Correct.
10        Q.    And it came from compliance?
11        A.    Correct.
12        Q.    And the same thing for
13    searching incidents.  If you wanted
14    information about incidents that compliance
15    had picked up, you could request the
16    information and they could give you a list?
17        A.    If there were incidents -- we
18    were not aware of those particular -- or what
19    was contained in those particular lists at
20    that point in time.
21              As we communicated with
22    practice compliance, they would share
23    whatever information they had knowledge of.
24        Q.    Okay.  If you'd go to the page
25    bearing 7392.  It's a screenshot.  It says
```

1    "Enterprise, governance, risk and

2    compliance."

3                You weren't a part of the

4    enterprise, governance, risk and compliance

5    group, were you?

6                It's on the right-hand side.

7        A.     Enterprise, governance -- oh.

8                At that particular -- I was not

9    a part of that particular group that was --

10   that had access to all of this data in this

11   tool.

12       Q.     Okay.  So all of this data and

13   all of this tool was not something that you

14   had access to?

15       A.     Correct.

16       Q.     And if you wanted to get

17   information from this tool, you'd have had to

18   specifically ask for it?

19       A.     I would have had to have

20   obtained that information from our compliance

21   partners.

22       Q.     Okay.  Now, in the email on the

23   first page, Roxy Reed wrote you about Archer.

24   She talks about Archer questions.  She said,

25   "I swore that we confirmed access in our

1   meeting a month or so ago.  It looks like you

2   should definitely be able to see SOM.  Let me

3   review.  Can I impersonate you?  If you are

4   working in Archer, it may kick you out."

5              Do you recall what the

6   questions were concerning Archer at this

7   point?

8       A.      At this point we were obtaining

9   access.  GI was obtaining access to Archer.

10      Q.      What is GI?

11      A.      Roxy --

12              Global investigations.

13      Q.      Thank you.

14      A.      My apologies.

15              Roxy Reed was the -- one of the

16  administrators of Archer.  So it was through

17  her that we were obtaining that access.

18              She had to set us up in the

19  system.

20      Q.      Okay.  And then, in your

21  response, you wrote, "Sorry for the delay,

22  Roxy.  Yes, please do.  We might have to do

23  the same thing for several of the people on

24  the team as well."

25              What team members were you

Highly Confidential - Subject to Further Confidentiality Review

1    thinking of that might need access to Archer?

2          A.      Our analyst group.

3          Q.      Okay.  Anybody else?

4          A.      And our investigators.

5          Q.      How many analysts and how many

6    investigators were you thinking?  Just

7    numbers.  Broad brush.

8          A.      The entire group.  So it would

9    have been five analysts.

10         Q.      And how many investigators?

11         A.      Six investigators at that time.

12         Q.      And there's no overlaps, so

13   it's 11 people?

14         A.      Correct.

15         Q.      Okay.  Thank you.  And none of

16   those 11 people prior to September of 2017

17   had access to Archer?

18         A.      Correct.

19         Q.      Okay.

20         A.      Not that component of Archer.

21   Archer is a big system.

22         Q.      So not the SOM portion of

23   Archer?

24         A.      Correct.

25         Q.      Okay.  And they would not have

1    had access to the RTF forms?

2         A.    Correct.

3         Q.    Okay.

4               (Walmart-Beam Deposition

5         Exhibit 12, 9/28/17 email from Brandi

6         Williamson.  WMT_MDL_000030095-30114,

7         was marked for identification.)

8         Q.    (BY MR. ECKLUND)  I'm going to

9    give you a fairly lengthy exhibit.  And what

10   I'd ask you to do, in the interest of time,

11   is just to peruse the bold tops of the pages.

12              Are your eyes okay?

13        A.    Yes.  I just had to adjust.

14        Q.    Okay.  Again, if you need a

15   break, let me know.

16              The email is not as important.

17   You see it was sent from Brandi Williamson to

18   you September 28, 2017.  Bears Bates stamp

19   30095.

20              The first page is privileged.

21   I want us to focus on some of these elements.

22              So the SOM incident process.

23   That's on something that involved you.  It's

24   at page 30099.

25              Does this involve you at this

1    time?

2         A.    Oh, no.  No, sir.

3         Q.    Okay.  And the Archer reports

4    process, did that involve you?

5         A.    It did not.

6         Q.    Both portions, DEA incident

7    reports and also blanket refusal-to-fill

8    report.

9         A.    Correct.

10        Q.    And then also the next page,

11   refusal-to-fill reports.  So this does not

12   involve you.  We just talked about this.

13        A.    Correct.

14        Q.    And then we've got what appears

15   to be health and wellness controlled

16   substances team process documentation.

17             Were you involved in the

18   McKesson threshold report?

19        A.    I was not at this point.

20        Q.    SOM evaluations?

21        A.    No.

22        Q.    And what is Candice?  Is

23   Candice a person?

24        A.    I don't know, to be honest.

25        Q.    All right.  Supply logics

```
 1    evaluations.  Were you involved in that?

 2         A.     Only in review.

 3         Q.     How would you be involved in

 4    the review?

 5         A.     Of supply logics tool?  How

 6    they used evaluations or how they used supply

 7    logics in this process, I can't speak to.

 8    I'm not aware of it.

 9         Q.     Okay.  But I'm asking the

10    specifically within health and wellness

11    controlled substances team process.

12         A.     Yeah.

13         Q.     Were you involved in their

14    supply logics evaluations, not supply logics

15    evaluations within operations asset

16    protection?

17         A.     No.

18         Q.     DEA information request.  Did

19    you ever respond on behalf of the controlled

20    substances team to the DEA concerning

21    controlled substances?

22         A.     No.

23         Q.     "Know your customer" updates?

24         A.     No.

25         Q.     Are you familiar with "know
```

1    your customer" obligations?

2         A.    I'm not -- no.

3         Q.    Okay.  Prescriber blocks?

4         A.    I was not a part of it.

5         Q.    Humana controlled substances

6    usage notification.  And again, it looks like

7    it's handled by someone, a computer program

8    referred to as Candice.

9         A.    I'm not a part of that.

10        Q.    Okay.  McKesson threshold

11   reports?

12             You were not involved in those.

13   Did you ever consider any of them?

14        A.    We had reviewed them initially,

15   but no.

16        Q.    Suspicious order monitoring

17   evaluations, SOM evaluations.  We talked

18   earlier about orders of interest, suspicious

19   orders and appropriate orders.  You testified

20   that that wasn't something you dealt with?

21             Supply logics.  We talked about

22   this.

23             So it appears you were not

24   involved in any of the processes that are

25   described in what has just been marked as an

1    exhibit.  Is that fair?

2         A.     That is fair.

3         Q.     And specific as to the health

4    and wellness compliance portion of Walmart?

5         A.     Yes, sir.

6         Q.     Mr. Beam, what's RILA?

7                MR. VARNADO:  Object to form.

8         Q.     (BY MR. ECKLUND)  I'll ask a

9    different way.

10               Mr. Beam, what's the Retail

11   Industry Leaders Association?

12        A.     That is -- as I understand it,

13   that is the -- those are just a

14   conglomeration of retail outlets that discuss

15   retail sales in general.

16        Q.     Okay.  And are you actively

17   involved in RILA?

18        A.     No.

19        Q.     Okay.

20               Do you recall presenting on

21   behalf of Walmart at a RILA meeting held in

22   Washington, DC February 21st through the 22nd

23   of 2018?

24        A.     I do not recall having a

25   meeting there.  I remember a meeting being

1    scheduled, but subsequently cancelled.

2        Q.    Do you know why the meeting was

3    cancelled?

4        A.    It was cancelled by my

5    immediate supervisor.  And it was timing, and

6    time of year, and other business

7    requirements.

8        Q.    Okay.  So is it your

9    understanding that the meeting did not take

10   place without you?  At all?  Or that you did

11   not attend the meeting and it may have taken

12   place?

13       A.    It did not take place with

14   Walmart participating.

15       Q.    Okay.

16             Do you know whether the meeting

17   took place?

18       A.    That part, I do not know.

19       Q.    Okay.

20             But nobody provided you any

21   presentation summaries, email correspondence,

22   "You missed a great meeting.  This is what we

23   talked about"?

24       A.    No.

25       Q.    In your role within asset

1    protection, did you do work on behalf of both

2    Walmart and Sam's Clubs, or only Walmart?

3         A.    Investigative work, we did for

4    both.

5         Q.    Okay.  And there are no

6    distinguishing features or attributes of

7    investigation concerning Sam's Club that

8    differed from what you would do for Walmart;

9    correct?

10        A.    That is correct.

11        Q.    The process is the same?  The

12   workload would have been the same?  The

13   analysis that you would undertake would be

14   the same?  The five analysts, the six

15   investigators, those are the same people?

16        A.    That would be correct.

17        Q.    Okay.

18              (Walmart-Beam Deposition

19              Exhibit 13, September 2015 email

20              chain.  Subj: RE: SOM Evaluation

21              Notifications. WMT_MDL_000016816, was

22              marked for identification.)

23        Q.    (BY MR. ECKLUND)  Mr. Beam,

24   you've been handed an exhibit bearing Bates

25   stamp 16816.  It's a one-page email from

Highly Confidential - Subject to Further Confidentiality Review

1    Miranda Johnson to you with your response to

2    Miranda Johnson, Roxy Reed, and Gary Smith.

3              Or Smith, depending on how he

4    pronounces his last name.  I'd like to direct

5    your attention to the original email sent by

6    Ms. Johnson.  "We've started sending out

7    notifications to ops leadership."

8              Who is ops or ops leadership?

9         A.    That is operations leadership.

10   That is going to be the folks who manage

11   processes in execution in the field.

12        Q.    And is that part of your

13   department?  Is that part of logistics?

14        A.    No.  Operations is its own

15   division.

16        Q.    It's a stand-alone division?

17        A.    Yes, sir.

18        Q.    Okay.  And is Gary -- is it

19   Smith or Smith?

20        A.    Smith.

21        Q.    Is Gary Smith involved in the

22   operations department?  Or division?

23        A.    No, sir.  Gary Smith is an

24   investigator on my team.

25        Q.    Okay.  So Ms. Johnson wrote,

Highly Confidential - Subject to Further Confidentiality Review

1    "We have started sending out notifications to

2    ops leadership" -- operations leadership,

3    "when we began a SOM evaluation (at the

4    practice compliance level).  I have asked

5    Roxy to start copying you on these so you

6    have visibility when" -- I suspect she meant

7    "begin an evaluation."  Not "being."

8              Spell check would not have

9    picked that up.

10             Do you see that?

11        A.    I do.

12        Q.    Okay.

13             Did you ask for visibility of

14   the evaluations they were conducting for the

15   SOMs?

16        A.    At this time, I did not.

17        Q.    Do you have an understanding of

18   why Ms. Johnson wanted you to have visibility

19   of the SOM evaluations?

20             MR. VARNADO:  Object to form.

21             THE WITNESS:  As I'm sitting

22        here today, in front of you, I cannot

23        recall the substance, or the context

24        of these two pieces of communication.

25        Q.    (BY MR. ECKLUND)  Okay.  Well,

Highly Confidential - Subject to Further Confidentiality Review

1    if you look at the top, you wrote back,

2    "Great.  We will start a process of reviewing

3    in the background and coordinate with you

4    both on anything we find that might be

5    relevant to the review."

6                 Do you recall ever sharing with

7    Ms. Johnson or Ms. Reed anything that you

8    found relevant?

9                 MR. VARNADO:  Object to form.

10                THE WITNESS:  I don't recall.

11        Q.    (BY MR. ECKLUND)  And you wrote

12   in the plural, "We," so there's a possibility

13   that perhaps Mr. Smith had provided some

14   relevant information to Ms. Johnson and

15   Ms. Reed.

16                If Mr. Smith had done so, would

17   he have copied you on the correspondence?

18                MR. VARNADO:  Object to form.

19                THE WITNESS:  I don't -- I

20        can't answer specifically.

21        Q.    (BY MR. ECKLUND)  Any reason to

22   believe, sitting here today, that anyone,

23   either you or Mr. Smith or any of your other

24   investigators, provided information that

25   might have been relevant to their review

Highly Confidential - Subject to Further Confidentiality Review

```
1    after your own process of reviewing the
2    background in the SOM evaluations?
3              MR. VARNADO:  Object to form.
4              THE WITNESS:  I have no reason
5         to believe that.
6              MR. ECKLUND:  Okay.
7         Q.   (BY MR. ECKLUND)  And if you
8    had done so, that would have been documented?
9    There would have been an email or some other
10   documentation provided to Ms. Reed and
11   Ms. Johnson for their consideration?
12        A.   There would have been an email.
13        Q.   Okay.  It would not have been a
14   telephone phone call, saying, "Hey, I need
15   you to turn to this page," long conversation,
16   nothing written down.  It would have been
17   documented.
18        A.   Correct.
19        Q.   Okay.  So fair to say that the
20   absence of the document would be the absence
21   of occurrence?
22             MR. VARNADO:  Object to form.
23             THE WITNESS:  I do not recall
24        any episodes.
25             MR. VARNADO:  We've been going
```

1      about another hour and 15.  Take

2      another break.

3                   MR. ECKLUND:  Sure.

4                   VIDEOGRAPHER:  3:56.  We are

5      off the video record.

6                   (Recess taken, 3:57 p.m. to

7      4:05 p.m.)

8                   VIDEOGRAPHER:  4:05.  We are on

9      the video record.

10          Q.     (BY MR. ECKLUND)  Mr. Beam, do

11    you have any recollection of events in 2009

12    concerning recordkeeping violations within

13    Walmart's Texas pharmacies?

14                  MR. VARNADO:  Object to form.

15                  THE WITNESS:  I don't have

16      recollection of specifics of that.

17          Q.     (BY MR. ECKLUND) Just

18    generally, do you have any recollection that

19    it even happened?

20          A.     I don't have a recollection of

21    that specifically.

22          Q.     We're going in circles.  Do you

23    have any --

24          A.     I have no recollection of that

25    occurring in Texas.

1          Q.      General or specific, you have

2     no recollection, no memory of a recordkeeping

3     violation involving Walmart's pharmacies in

4     Texas in or around 2009?

5                  I can share with you some

6     additional details that may help you.

7          A.      Please.

8          Q.      So it's my understanding that

9     the pertinent authorities alleged during a

10    2006 accountability audit that "Five Walmart

11    and Sam's Club pharmacies in the southern

12    district of Texas failed to provide invoices

13    for controlled substances, and failed to

14    timely file records indicating loss or theft

15    of drugs to the DEA.

16                  "And that the authorities

17    further allege that Walmart violated the

18    Comprehensive Drug Abuse Prevention and

19    Control Act by failing to provide those

20    documents."

21                  Do you have any recollection,

22    now, of some of that history of the events

23    concerning the 2006 accountability audit or

24    the payment of any fines by Walmart

25    concerning recordkeeping violations at these

1    pharmacies in the southern district of Texas?

2         A.    It does not ring any bells.

3         Q.    Would those records have been

4    created by your department, operations asset

5    protection, or a different department or

6    division within Walmart?

7              MR. VARNADO:  Object to form.

8              THE WITNESS:  They would not

9         have been created by our department.

10        Q.    (BY MR. ECKLUND)  Okay.  Given

11   that the allegations concerned failure to

12   provide invoices for controlled substances

13   and to timely file records indicating loss or

14   theft of drugs to the DEA, would any of your

15   investigators or analysts been involved in

16   the analysis of the loss or theft of drugs?

17             MR. VARNADO:  Object to form.

18             THE WITNESS:  It was related to

19        an investigation.

20        Q.    (BY MR. ECKLUND)  So if there

21   was no investigation, there would have been

22   no analysis within your group?

23        A.    Not within our group, correct.

24        Q.    Okay.

25             And fair to say, since you have

1    no recollection of these events, you also

2    have no recollection of any attempts or

3    efforts to improve the systems in place

4    within Walmart to prevent these types of

5    recordkeeping violations from occurring in

6    the future?

7         A.    That -- I do not.

8               I have no recollection of

9    those.

10        Q.    And if that had happened, there

11   would be documents concerning the changes

12   that were implemented to prevent those

13   recordkeeping violations?

14              MR. VARNADO:  Object to form.

15              THE WITNESS:  I can't speak to

16        that.  I was not part of it.

17        Q.    (BY MR. ECKLUND)  Well, not

18   just a part of it.  You don't recall if it

19   ever happened?

20        A.    Correct, I don't.

21        Q.    Mr. Beam, you can take your

22   time to look through this document.  It will

23   likely be the last exhibit we'll mark today.

24              (Walmart-Beam Deposition

25   Exhibit 14, September 25 email chain.  Subj:

1    Significant Compliance Issues,

2    WMT_MDL_000047185-47187, was marked for

3    identification.)

4              [Document review.]

5              MS. HOSMER:  Can you give us

6         the Bates number?

7              MR. ECKLUND:  Sorry, did you

8         ask for the Bates range?

9              MS. HOSMER:  I did.

10             MR. ECKLUND:  47185.

11             THE WITNESS:  Okay.

12        Q.    (BY MR. ECKLUND)  Okay.  Let's

13   start with the email sent by Ms. Harris.

14   There are a number of individuals that were

15   included on this email, including Dave

16   Ferguson, Beth Schommer, Richard Leahy,

17   Ronetta Francis, in compliance, James Langman

18   and Frank Yiannas?

19        A.    I presume that is correct.  I'm

20   not familiar with that name.

21        Q.    And Sonie Hilger.

22              Looking at those names, are any

23   of those individuals within your department

24   or division, operations asset protection?

25        A.    No.

1        Q.      If you look above -- well,

2    let's start with just the subject line.  The

3    subject is "Significant compliance issues."

4               "Please let me know by close of

5    business today if you have a significant

6    compliance issue that would rise to the level

7    of notifying the audit committee.  The agenda

8    that I have for meeting on Thursday for now

9    includes an update on employment compliance,

10   and an update on conflict minerals."

11              I suppose that was intended to

12   mean "conflict materials," but perhaps I'm

13   mistaken.

14              "If you have any additional

15   updates, please send an email with the

16   subject matter, a brief summary of the issue,

17   potential impact to Walmart, compliance

18   strategy.

19              "Going forward, we'll do this

20   via a share port site with a template for you

21   to complete as we discussed in our staff

22   meeting."

23              I'm confident that you were not

24   included in the staff meeting because this

25   was in the compliance group.

```
 1                     But I do have some questions

 2       about notifications to the audit committee.

 3                     Do you know whether they're

 4       referring to operations audits and asset

 5       protection audits, or whether they're talking

 6       about logistics and compliance audits?

 7           A.      I'm not familiar with what was

 8       reported to the board in the audit committee.

 9                     That was -- that was

10       information that Jim Langman was collecting

11       across several different work streams.

12           Q.      Does your group conduct audits?

13           A.      We do conduct audits.

14           Q.      Do you conduct audits

15       concerning compliance issues?

16           A.      We conduct audits on controlled

17       substances related to theft, or process and

18       procedures.

19                     And, I mean, nothing specific

20       to compliance issues.

21           Q.      What types of processes and

22       procedures would you audit?

23           A.      Controlled substance receiving,

24       controlled substance processing.

25                     And in the store level.
```

1    Q.    When you say "receiving," what

2    do you mean by "receiving"?

3    A.    Meaning our -- whenever those

4    drugs are delivered to the store, are the

5    pharmacy staff receiving those particular

6    drugs and are they accounting for that as

7    does the box and delivery mechanism appear to

8    be tampered with?

9        And are they put away in a

10   timely fashion?

11   Q.    So delivery by the truck to the

12   pharmacy confirming that the bottles haven't

13   been opened or manipulated so that a bottle

14   that's supposed to have 90 tablets, has 200,

15   or the box has been opened as evident by the

16   tape and certain other materials sticking out

17   and haphazardly retaped.

18       You're looking for indications

19   that somebody was manipulating or opening or

20   toying with, tampering with drugs being

21   delivered?

22   A.    That is correct.

23   Q.    Okay.

24       And then processing.  That's

25   confirming that what was received is what was

1    ordered.

2         A.    According to the information we

3    have in front of us, yes.

4         Q.    Okay.  So you didn't get too

5    many pills.  You didn't get too few.  You got

6    what you asked for.  If you wanted oxycodone,

7    you got the oxycodone.  If you ordered

8    hydrocodone, you got the hydrocodone.  There

9    was no confusion, you didn't get the wrong

10   codone.

11        A.    Correct.

12        Q.    Did you have any involvement in

13   employment compliance?  We talked earlier

14   about good people who may have made bad

15   decisions.  Those were your terms?

16        A.    Yes.  That part, I've never --

17   I've never had discussions around employment

18   compliance.

19        Q.    So it didn't involve you.

20        A.    No.

21        Q.    Okay.  If we go above,

22   James Langman sends an email to George

23   Chapman and Julie Stroud.

24              "George, please fill this out

25   to the C-II strategy we have in place via

1    quantity limits" -- and that was the cutting

2    we've talked about throughout the day,

3    cutting the bottles -- "and the updates that

4    Brad Nelson is involved in with the upgrade

5    of the C-II warehouse and how this protects

6    us from the recent CVS and Walgreens DEA

7    actions against their licenses.  Thanks, Jim.

8              "Julie, should any of yours go

9    on this?  Thanks, Jim."

10             So he continued on.

11             I want to ask you a couple of

12   questions.

13             In 2012, were you aware of the

14   CVS and Walgreens DEA actions?

15        A.    I was aware of what was in the

16   public media.

17        Q.    Did you take any steps to

18   improve, enhance, or change your processes or

19   procedures in light of those?

20             MR. VARNADO:  Object to form.

21        Q.    (BY MR. ECKLUND)  Public media

22   reviews that you reviewed?

23             MR. VARNADO:  Same objection.

24             THE WITNESS:  Nothing, other

25        than what we were discussing

Highly Confidential - Subject to Further Confidentiality Review

1       previously.

2                 And that would have been when

3       the AT was -- we were continuing to

4       develop that program as much as

5       possible.

6       Q.      (BY MR. ECKLUND) Were you

7  concerned that you were not protected from a

8  potential DEA action in or around 2012

9  because of the processes that you had in

10 place at the time?

11                MR. VARNADO:  Object to form.

12                THE WITNESS:  I couldn't -- I

13      couldn't answer that in terms of what

14      I was feeling and thinking at that

15      time.

16      Q.      (BY MR. ECKLUND) James Langman

17 was concerned about it, though?

18                MR. VARNADO:  Object to form.

19      Q.      (BY MR. ECKLUND)  He was

20 concerned that they needed to take steps to

21 protect themselves in light of the recent CVS

22 and Walmart DEA actions.  Do you see that?

23                MR. VARNADO:  Object to form.

24                THE WITNESS:  I see

25      Jim Langman's -- or James Langman's

1           email to George, but I can't -- I

2           can't interpret that with any degree

3           of certainty.

4           Q.    (BY MR. ECKLUND)  Okay.  And in

5    light of that email, no one, not Jim or

6    James Langman, George Chapman or

7    Julie Stroud, reached out to you and asked if

8    there was anything your department or

9    division could do to assist them in further

10   protecting Walmart from DEA actions in light

11   of the recent CVS and Walgreens loss of

12   licensures -- or actions taken against their

13   licenses?

14           MR. VARNADO:  Object to form.

15           THE WITNESS:  They did not

16       reach out anything beyond what we've

17       already discussed with DAT.

18           Q.    (BY MR. ECKLUND)  If you can go

19   to the preceding page.  At the bottom, it's

20   compliance strategy.

21           It talks about "Asset

22   protection, in-house review, purchase across

23   all pharmacies was completed."

24           Is that something that was

25   conducted by your group?

1        A.      Our group provided some

2    shipment numbers for the larger review.

3        Q.      Did you do anything else

4    besides providing shipment numbers?

5        A.      That was it.

6        Q.      Did you conduct any type of a

7    warehouse review?

8        A.      We did not.

9        Q.      Okay.  Do you know who did?

10       A.      I do not.

11       Q.      Do you know where the data came

12   from for asset protection?

13       A.      Oh.

14               MR. VARNADO:  Object to form.

15       Q.      (BY MR. ECKLUND)  So you

16   provided shipment information?

17       A.      Correct.

18       Q.      Where did those numbers come

19   from?

20       A.      Those numbers came from

21   Teradata.

22       Q.      This continues, "Policy change

23   was implemented to require manage checking of

24   oxycodone prescriptions within the state's

25   prescription monitoring program if the state

1    has an active program."

2              Are you familiar with

3    prescription monitoring programs at the state

4    level?

5         A.    I'm familiar that they exist.

6         Q.    Okay.  Do you consider state

7    prescription monitoring programs in

8    connection with your work in asset

9    protection?

10        A.    We do not have access to those.

11        Q.    I'm not asking whether you have

12   access to the state's underlying computer

13   systems, just that they have policies or

14   programs that they've implemented to try and

15   better protect the public in their -- within

16   their geographic bounds.  I'm asking whether

17   you've considered those changes.  For

18   example, if a state says, We're going to take

19   these steps or measures to prevent

20   over-dispensing of oxycodone -- you're

21   talking about oxycodone here -- let's limit

22   to 30 pills, as opposed to whatever the

23   doctor may have prescribed.

24              You've cut bottles before.

25   Were you also considering in asset protection

1    reducing the number of pills provided to an

2    individual patient in accordance with any

3    state PMP?

4              MR. VARNADO:  Object to form.

5              THE WITNESS:  That is outside

6         of our scope.  That is not a decision

7         we would have made.

8         Q.    (BY MR. ECKLUND) And you also

9    wouldn't have considered daily limit that any

10   state PMP would have implemented?

11             MR. VARNADO:  Object to form.

12             THE WITNESS:  That is, again,

13        outside of our scope.

14             MR. ECKLUND:  Okay.

15        Q.    (BY MR. ECKLUND)  And it's also

16   fair to say you probably wouldn't have

17   considered any state changes concerning the

18   payment for oxycodone or other prescription

19   opioids with cash and little or no doctors'

20   engagement or involvement?  And I'm thinking

21   specifically about those pain clinics that

22   were referenced in some of the documents that

23   you had found perusing the internet.

24        A.    Would we have considered the

25   state limitations?  That is something that we

1    have no authority or ability within the

2    company to accept or not accept.

3         Q.    It continues, "Asset protection

4    conducts controlled substance audits on any

5    location that tries to order more than the

6    allotted amount of controlled substances each

7    week."

8              Do you see that?

9         A.    I do.

10        Q.    So these are the -- these are

11   those cut reports, the dailies and the

12   weeklies, and what people are looking at on a

13   monthly basis as well.  Those are the reports

14   you're talking about.  Those might trigger

15   audits?  Or are they talking about something

16   else?

17        A.    Those -- those are those

18   reports, from logistics AP.

19        Q.    Okay.  So these are logistics

20   reports, so the over 20 reports, the over 50

21   reports.

22        A.    Correct.

23        Q.    Any other reports?

24        A.    No.  Those are -- those are the

25   reports that would trigger those audits.

1    Q.    So when somebody tries to order

2  more than the allotted amount of the

3  controlled substances, they get the flag, and

4  there may have been an audit.

5    A.    Yeah, there's -- a couple of

6  those reports might have been -- I think

7  there was one we discussed earlier called a

8  405 report.  But it's -- all of those are

9  flag reports.

10    Q.    Did you personally conduct any

11  of those audits?

12    A.    I did not personally.

13    Q.    Did any of your analysts

14  conduct those audits?

15    A.    They did.

16    Q.    Do you know approximately how

17  many audits your analysts conducted?

18    A.    I have -- I could not give you

19  a number.

20    Q.    Do you know relatively speaking

21  what percentage of their time they devoted to

22  those audits?  There's five analysts.

23  There's all the other obligations they have.

24  Is there a lion's share of their role in

25  responsibility and time in the office or is

1    this a smaller part of their day-to-day

2    operations?

3                MR. VARNADO:  Object to form.

4                THE WITNESS:  It was

5         all-inclusive as a part -- I mean as

6         the analysts' role.  That's all they

7         do is conduct audits for various

8         reasons.

9         Q.    (BY MR. ECKLUND)  So all the

10   analysts did was conduct audits?

11        A.    Mm-hmm.  (Witness nods.)  Pull

12   data and complete audits.

13        Q.    Pull data and?

14        A.    It's part of the process of

15   conducting an audit to pull data.

16        Q.    So they just audit?

17        A.    Mm-hmm.

18        Q.    And the investigators are not

19   involved in these policies?

20        A.    They're involved in reviewing

21   the results of the audit.

22        Q.    So the audits would be

23   conducted by the analysts and the results of

24   the analysts's audit would be shared with the

25   investigators, all six?  Or just one?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      The one responsible for a

2     geographic area.

3          Q.      And that investigator would

4     review the audit for that location and then

5     do what with it?

6          A.      They would then determine if

7     there's a reason for opening an

8     investigation.  Or if that is -- would

9     trigger an email telling the market director,

10    "You need to complete these forms answering

11    these questions."

12         Q.      If you could turn to the first

13    page.  There's an email from Phyllis Harris

14    to George Chapman and James Langman,

15    copying -- -- and it gets sent up to you for

16    the answer.

17              She's looking -- Phyllis Harris

18    is asking the question, "What's our average

19    number?"

20              And Phyllis Harris is the

21    senior vice president and chief compliance

22    officer at the time.

23              And Mr. Chapman sends along to

24    you, and he asks you if you could give the

25    current national average for

1    oxycodone 30 milligrams immediate release.

2    "Can you give me the average for 2011 for all

3    stores, then a breakout for all Florida

4    stores for 2011."

5              Do you see that?

6        A.    I do.

7        Q.    Do you respond with data pulls

8    that are specific to Walmart?  It says, "I

9    believe we can help with that.  Let me do

10   some data pulls."

11             Do you respond with data pulls

12   that are specific to Walmart?

13       A.    Walmart and Sam's.

14       Q.    You didn't consider any

15   competitor's data?

16       A.    I don't have access to

17   competitors' data.

18       Q.    You didn't consider any

19   information that McKesson may have had?

20       A.    Like what?

21       Q.    McKesson is a distributor.  You

22   get some of your products from them.  Could

23   you have reached out to them and asked them

24   "What's the average that you're seeing at

25   McKesson"?

```
 1                    MR. VARNADO:  Object to form.

 2                    THE WITNESS:  That would --

 3           I've never reached out to McKesson to

 4           ask about competitor information

 5           specifically simply because McKesson

 6           has made it known that we will not

 7           discuss.  You are our competitors --

 8           or your competitors.

 9           Q.     (BY MR. ECKLUND) I apologize.

10                  Did you purchase or acquire

11     data from any third-party vendor, for

12     example, IMS data or IQVIA data?

13           A.     We did not, no.  I mean, our

14     department.

15           Q.     Did you have access to it

16     because another department purchased it?

17           A.     We had access to some degree of

18     portal, on that portal, but nothing specific

19     in this context.

20           Q.     The degree of the portal on

21     that portal.  Okay.  So I'm trying to

22     understand that.  So the portal that you were

23     able to access, would it have shown

24     additional information about averages for

25     oxycodone?  Or average numbers?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      If a person was able to

2    navigate that portal when we had access to

3    it.  You possibly could have dug that

4    information out, but there's no way to

5    validate that.  And if I couldn't validate it

6    internally with the information we have, I

7    was not going to consider or use that.

8       Q.      Okay.  So Walmart might have

9    had additional analytical capabilities to use

10   that portal, but because the data within the

11   portal couldn't be validated independently

12   within Walmart, the data would not be

13   considered?

14              MR. VARNADO:  Object to form.

15      Q.      (BY MR. ECKLUND)  By you.

16      A.      By us.

17      Q.      By you.  And you're the one

18   responding with the answer.

19              MR. VARNADO:  Object to form.

20              THE WITNESS:  I'm responding

21          with this in terms of total

22          Walmart/Sam's Club.

23              MR. ECKLUND:  Let's take a

24          five-minute break.

25              VIDEOGRAPHER:  4:28.  We are

1      off the video record.

2              (Recess taken, 4:28 p.m. to

3      4:39 p.m.)

4              VIDEOGRAPHER:  4:39.  We are on

5      the video record.

6      Q.     (BY MR. ECKLUND)  Okay.

7  Mr. Beam, I have a few questions and I just

8  wanted to make sure we have clear testimony

9  on these issues.

10             We talked earlier about the

11 drug diversion coordinators referenced in the

12 controlled substance monitoring program that

13 was in place between 2010 and 2014.

14             Do you recall which of your

15 analysts or investigators would have been

16 responsible for the Ohio region?

17 A.     The drug diversion coordinators

18 were not a part of the Controlled Substance

19 Monitoring Program.  They were a part -- they

20 were the investigators that were

21 investigating pharmacy incidents during that

22 time frame.

23 Q.     So the -- do you know which of

24 the pharmacy -- so the pharmacy managers were

25 to forward the reports to the appropriate

1    drug diversion coordinators for further

2    review.  Do you recall which of the drug

3    diversion coordinators was responsible for

4    Ohio?

5         A.    In 2009, I do not.  Because we

6    rotate people as they transition off the team

7    and on the team, though sometimes get

8    shuffled around and different people will be

9    responsible for different geographic areas.

10            So when Travis Fought came on,

11   he may have replaced someone who was covering

12   Southeast and that person moved to perhaps

13   the Northeast.

14        Q.    Were there reporting structures

15   or records that reflect to whom the reports

16   should have been forwarded for further review

17   throughout the entire period of time 2010

18   through 2014?

19            MR. VARNADO:  Object to form.

20            THE WITNESS:  None that I am

21        aware of.

22        Q.    (BY MR. ECKLUND)  Do you know

23   who would know if there were documents that

24   would reflect to whom these reports should

25   have been forwarded during the entire window

Highly Confidential - Subject to Further Confidentiality Review

```
1     of time?
2           A.      I don't.
3           Q.      Mr. Beam, I'd like to direct
4     your attention back to Exhibit 1 at Bates
5     range 57344.
6                   It's towards the middle.
7                   It's from your 2017 annual
8     performance evaluation.
9           A.      344?
10          Q.      Yes.  57344.
11                  And I'm specifically interested
12    in the nine lines above the redacted
13    privilege box.
14          A.      Yes, sir.
15          Q.      Okay.  What is ISD AGILE?
16          A.      ISD is our information systems
17    development group, and the Agile Group is
18    a -- for lack of a better term, a quick
19    response group that is trying to align
20    projects across multiple departments so that
21    you don't have multiple projects going and
22    trying to accomplish the same thing.
23          Q.      Was the ISD project focused on
24    diversion concerns for SOM?
25          A.      During this time frame, that
```

1    would have been the DA team.  Diversion

2    analytics program.

3            Q.      Diversion analytics tool?

4            A.      Yes, sir.

5            Q.      And what is the diversion

6    analytics tool?

7            A.      That was the tool that was

8    being programmed by Sysrepublic.

9            Q.      And that's the one that didn't

10   work?

11           A.      Correct.

12           Q.      So that's the one that never

13   happened because they couldn't deliver as per

14   the contract.

15                   So your team spent four hours

16   per week attempting to validate the process,

17   attempting to assure its accuracy and

18   attempting to ensure it's consistent, but it

19   didn't work.  So you abandoned that?

20           A.      We did.  We decommissioned,

21   yes.

22           Q.      Now, the contract was just

23   terminated or did you sue them for any

24   breach?  Failure to deliver?  Anything like

25   that?

1         A.      I'm not aware of any actions as

2    a result of that.

3         Q.      Were there any efforts to

4    identify an alternative vendor to try and

5    work with you on the development of a

6    diversion tool?

7                 MR. VARNADO:   Object to form.

8         Q.      (BY MR. ECKLUND)  Or adapt?

9         A.      At this point, there was not.

10        Q.      I'm talking since then.

11        A.      Oh.  So it's been -- we have

12   not reached back out to another outside

13   vendor.

14        Q.      What about internally.  Anyone

15   internally trying to develop a DAT?

16        A.      We have analytics processes

17   through those programs that you had

18   highlighted earlier.

19        Q.      Which programs are we talking

20   about?

21        A.      The Alteryx and Tableau.

22        Q.      Tableau and Alteryx.

23        A.      Yes.

24        Q.      Okay.  Which brings us to the

25   remaining lines.

Highly Confidential - Subject to Further Confidentiality Review

████

████

████

4          So the analysts that are

5    described here, that's your team of analysts

6    or is that a different team of analysts?

7          A.    That is --

8               MR. VARNADO:  Do you know where

9          it is?

10              THE WITNESS:  No.  Our

████

████

████

████

████

████

17              But it is just a broader

18    exposure on the larger group.

19          Q.    (BY MR. ECKLUND)  So help me

████

████

22          A.    Correct.

23          Q.    Did they continue to report up

24    to you once that merger of the teams

25    happened, or did they report to someone else?

1        A.      No, they reported to the senior

2    director of analytics.

3        Q.      So they were no longer

4    reporting to you?

5        A.      Correct.

█    █          ████████████████████████████

█    ██████████████████████████████████████

█    ██████████████    ██████████████████████

9    health and wellness specific Tableau, were

10   they reporting to you or to the senior

11   director of analytics?

12       A.      They were reporting to the

13   senior director of analytics at that time.

14       Q.      And who was the senior director

15   of analytics at that time?

16       A.      Fred Helm.

17       Q.      I'm sorry, Fred?

18       A.      Helm.  H-E-L-M.

19       Q.      Okay.  Thank you.

█                ████████████████████████████

█    ██████████████████████████████████████████

█    ███████████████████████████████████████

█    ██████████    ████████████████████████████

24               What's a CAP Index?

25       A.      I forget the acronym, but it is

1    an index scoring of risk based on area

2    reported police incidents.

3            Q.      Okay.  So it's considering law

4    enforcement information?

5            A.      Correct.

6            Q.      And how would Walmart acquire

7    or obtain the CAP Index data?

8            A.      Several departments within the

9    company to include asset protection

10   operations also use that CAP Index score.

11   And that CAP Index score comes from a

12   third-party vendor.

13           Q.      Do you know which vendor?

14           A.      I do not.

15           Q.      Do you have access to that

16   data?

17           A.      I have access to information

18   that comes from that data.

19           Q.      In what form do you have access

20   to that data?

21                   MR. VARNADO:  Object to form.

22                   THE WITNESS:  The information

23           would be the CAP Index score.

24           Q.      (BY MR. ECKLUND)  And you get

25   access to the CAP Index score in the Tableau

1    dashboard?

2          A.    As it references here, I cannot

3    recall specifically how that CAP Index is a

4    part of that.  Going back to the beginning,

5    they're continuing to add and take away data

6    and its elements.  So the CAP Index, as it

7    relates here, that is -- that -- a lot of

8    this is information that was passed to me by

9    Fred, so I can't speak to what the specifics

10   are that they were obtaining from that.

11         Q.    Okay.  So the police incident

12   reports that are captured in the CAP Index

13   scores, that's not something that you would

14   consider in connection with your audits or

15   your investigations of thefts or loss of

16   controlled substances?

17         A.    Yes.  We have -- we have looked

18   at that --

19         Q.    You have.

20         A.    -- relative to burglary and

21   robberies.  Because then you can capture

22   where else that is occurring there, whether

23   or not that particular location is at a high

24   risk.

25         Q.    And beyond burglaries and

Highly Confidential - Subject to Further Confidentiality Review

1  robberies have you considered CAP Index data

2  in connection with your investigations or

3  your audits?

4          MR. VARNADO:  Object to form.

5          THE WITNESS:  Not that I

6     recall.

7     Q.   (BY MR. ECKLUND) It continues,

█  ████████████████████████████████████

9          What are controlled substance

10  inventory trends?

11     A.   Those are the trends that we're

12  seeing as -- those are the investigative

13  results we're continuing to see.

14     Q.   And DEA risk scores?

15          DEA risk scores?

16     A.   I can't speak to the specifics

17  on that either.

18     Q.   Okay.  So fair to say it's also

19  not something that you would consider in

20  connection with your role in the company?

21     A.   Well, it's not fair to say

22  that.  As it is written here, I do not recall

23  the specifics around what that is.

24     Q.   So you don't know what it is,

25  but it's possible you use it?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I don't know what it is, so I

2    can't say if we use it or not.

3          Q.    Okay.  You'd have to ask

4    Fred Helm?

5          A.    I would have to go back and do

6    some research on that.

7          Q.    Okay.  And it's also possible

8    that someone in compliance might be using it

9    to answer questions you may have, would be

10   using those DEA risk scores to provide you

11   answers?

12               MR. VARNADO:  Object to form.

13               THE WITNESS:  I can't respond.

14       I really don't know at this point.

15         Q.    (BY MR. ECKLUND)  Okay.  Now,

16   the associate's comments, those are written

17   by you; correct?

18         A.    They are.

Highly Confidential - Subject to Further Confidentiality Review



14        Q.     So it's a collaborative process

15    that leads to the completion of your

16    comments?

17        A.     Mm-hmm.  (Witness nods.)

18        Q.     Okay.  With whom did you

19    collaborate in creating this evaluation?

20                MR. VARNADO:  Object to form.

21                THE WITNESS:  I don't recall

22         specifically, but there would have

23         been multiple.

24        Q.     (BY MR. ECKLUND) Multiple

25    people?

```
 1              A.      Yeah.

 2              Q.      Okay.  And you continue to

 3      produce heat maps of most vulnerable areas.

 4      And again, that's concerning burglary and

 5      robbery specifically?  The heat maps?  Or

 6      something broader?

 7                      Don't look at him.

 8              A.      I'm thinking.

 9              Q.      Okay.

10              A.      It would have been all theft

11      regarding -- and to include burglaries and

12      thefts.

13              Q.      Okay.

14                      So thefts, burglaries, and

15      thefts again, you said?

16                      So -- and robberies?

17              A.      Robberies and burglaries and

18      thefts.

19              Q.      Okay.  And nothing beyond those

20      thefts, burglaries and robberies?

21              A.      No.
```

■            ■       ■       ■■■■■■■■■

```
23      you're talking about areas that are high

24      crime?  Or are you talking about areas where

25      the security is not as robust?
```

Highly Confidential - Subject to Further Confidentiality Review

2    recall today, those heat maps are saying this

3    is where our highest group activity is at

4    this particular point for all of that -- for

5    all thefts.

6         Q.    So theft activities is what

7    you're looking at?

8         A.    Yes.

9         Q.    So you're not talking about a

10   potential lapse in security that needs to be

11   addressed.  It hasn't been addressed yet.

12   There's a vulnerability.  You're talking

13   about there are areas where there's higher

14   rates or higher percentages of theft,

15   burglary and robbery?

16        A.    Correct.

17        Q.    And those are the areas that

18   would be vulnerable as you were describing it

19   here.

Highly Confidential - Subject to Further Confidentiality Review

2          A.      Correct.

3          Q.      Okay.

4                  MR. ECKLUND:  Mr. Beam, thank

5          you for your time today.  I have no

6          further questions.

7                  MR. VARNADO:  No further

8          questions from Walmart.

9                  VIDEOGRAPHER:  4:55 p.m.  We

10         are off the video record.  This

11         concludes the video deposition of

12         Greg Beam.

13                 (Proceedings recessed at

14         4:55 p.m.)

15                      --o0o--

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2          I, DEBRA A. DIBBLE, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter, Certified Realtime Captioner,
      Certified Court Reporter and Notary Public,
 4    do hereby certify that prior to the
      commencement of the examination, GREGORY BEAM
 5    was duly sworn by me to testify to the truth,
      the whole truth and nothing but the truth.
 6
            I DO FURTHER CERTIFY that the
 7    foregoing is a verbatim transcript of the
      testimony as taken stenographically by and
 8    before me at the time, place and on the date
      hereinbefore set forth, to the best of my
 9    ability.
10          I DO FURTHER CERTIFY that pursuant
      to FRCP Rule 30, signature of the witness was
11    not requested by the witness or other party
      before the conclusion of the deposition.
12
            I DO FURTHER CERTIFY that I am
13    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
14    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
15    that I am not financially interested in the
      action.
16
17
18
19    _____
      DEBRA A. DIBBLE, RDR, CRR, CRC
20    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
21    Certified Court Reporter
22
      Dated: 1/18/19
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4      carefully and make any necessary corrections.

 5      You should state the reason in the

 6      appropriate space on the errata sheet for any

 7      corrections that are made.

 8              After doing so, please sign the

 9      errata sheet and date it.

10              You are signing same subject to

11      the changes you have noted on the errata

12      sheet, which will be attached to your

13      deposition.

14              It is imperative that you return

15      the original errata sheet to the deposing

16      attorney within thirty (30) days of receipt

17      of the deposition transcript by you.  If you

18      fail to do so, the deposition transcript may

19      be deemed to be accurate and may be used in

20      court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        ERRATA

 2    PAGE   LINE   CHANGE

 3    _____  _____  _____

 4                  REASON: _____

 5    _____  _____  _____

 6                  REASON: _____

 7    _____  _____  _____

 8                  REASON: _____

 9    _____  _____  _____

10                  REASON: _____

11    _____  _____  _____

12                  REASON: _____

13    _____  _____  _____

14                  REASON: _____

15    _____  _____  _____

16                  REASON: _____

17    _____  _____  _____

18                  REASON: _____

19    _____  _____  _____

20                  REASON: _____

21    _____  _____  _____

22                  REASON: _____

23    _____  _____  _____

24                  REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3

4          I, GREGORY BEAM, do hereby certify
      that I have read the foregoing pages and that
5     the same is a correct transcription of the
      answers given by me to the questions therein
6     propounded, except for the corrections or
      changes in form or substance, if any, noted
7     in the attached
      Errata Sheet.
8

9

10

11

12     _____

       GREGORY BEAM                        DATE
13

14

15     Subscribed and sworn to before me this

16     _____ day of _____, 20 _____.

17     My commission expires: _____

18

19     _____

20     Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2

 3       PAGE       LINE

 4       _____      _____      _____

 5       _____      _____      _____

 6       _____      _____      _____

 7       _____      _____      _____

 8       _____      _____      _____

 9       _____      _____      _____

10       _____      _____      _____

11       _____      _____      _____

12       _____      _____      _____

13       _____      _____      _____

14       _____      _____      _____

15       _____      _____      _____

16       _____      _____      _____

17       _____      _____      _____

18       _____      _____      _____

19       _____      _____      _____

20       _____      _____      _____

21       _____      _____      _____

22       _____      _____      _____

23       _____      _____      _____

24       _____      _____      _____

25
```