1                UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3
    IN RE:  NATIONAL PRESCRIPTION      Case No. 1:17-MD-2804
4   OPIATE LITIGATION
                                       Hon. Dan A. Polster
5   APPLIES TO ALL CASES
6
    _ _ _ _ _ _ _ _ _ _ _ _ _ /
7
8        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
9
       VIDEOTAPED
10   DEPOSITION OF: CHRISTOPHER BELLI
11   DATE:          December 20, 2018
12   TIME:          9:35 a.m. to 12:05 p.m.
13
     PLACE:
14                  201 North Franklin Street
                    Suite 3400
15                  Tampa, Florida
16   PURSUANT TO:  Notice by counsel for
                    Plaintiffs for purposes of
17                  discovery, use at trial
                    or such other purposes
18                  as are permitted under
                    the Ohio Rules
19                  of Civil Procedure
20   BEFORE:        LISA A. SIMONS-CLARK, RMR, CRR
                    Notary Public, State of
21                  Florida at Large
22                  Pages 1 to 210
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1 APPEARANCES:
2 MARK P. PIFKO, ESQUIRE
  Baron & Budd, P.C.
3 15910 Ventura Boulevard, Suite 1600
  Encino, California 91436
4 (818) 839-2333

  - and -

5
6 WILLIAM G. POWERS, ESQUIRE
  Baron & Budd, P.C.
6 600 New Hampshire Avenue NW
  The Watergate, Suite 10-A
7 Washington, DC 20037
  (202) 333-4562
8        Attorneys for Plaintiffs and PEC
9
  ELISA P. McENROE, ESQUIRE
10 Morgan Lewis & Bockius, LLP
  1701 Market Street
11 Philadelphia, Pennsylvania 19103-2921
  (215) 963-5917
12
  - and -
13
  KELLY A. MOORE, ESQUIRE
14 JOHN M. MALOY, ESQUIRE
  Morgan Lewis & Bockius, LLP
15 101 Park Avenue
  New York, New York 10178
16 (212) 309-6612
       Attorneys for Rite-Aid and Rick Chapman
17
18 APPEARANCES VIA TELEPHONE AND STREAM
19 ERIN GIBSON ALLEN, ESQUIRE
  Marcus & Shapira, LLP
19 301 Grant Street
20 One Oxford Centre, 35th Floor
  Pittsburgh, Pennsylvania 15219
21 (412) 338-5202
       Attorney for HBC
22
23 JOANNE CACERES, ESQUIRE
  Jones Day
24 77 West Wacker
  Chicago, Illinois 60601
25 (312) 782-3939
       Attorney for Walmart

Page 3

1 APPEARANCES VIA TELEPHONE AND STREAM, CONTINUED:
2 WEISS NUSRATY, ESQUIRE
  Covington & Burling, LLP
3 One City Center
  850 Tenth Street, NW
4 Washington, DC 20001
  (202) 662-6000
5      Attorney for McKesson
6 SEAN A. McCORMICK, ESQUIRE
  Arnold & Porter Kaye Scholer, LLP
7 777 South Figueroa Street, Suite 4400
  Los Angeles, California 90017
8 (213) 243-4000
       Attorney for Endo and Par
9
  SHANA E. RUSSO, ESQUIRE
10 Reed Smith, LLP
  136 Main Street, Suite 250
11 Princeton, New Jersey 08540
  (609) 987-0050
12      Attorney for AmerisourceBergen
13 KATELYN ADAMS, ESQUIRE
  Williams & Connolly, LLP
14 725 Twelfth Street, N.W.
  Washington, DC 20005
15 (202) 434-5107
       Attorney for Cardinal Health
16
  JAY LICHTER, ESQUIRE
17 Baron & Budd, P.C.
  15910 Ventura Boulevard, Suite 1600
18 Encino, California 91436
  (818) 839-2333
19
  GRETCHEN KEARNEY
20 LITIGATION PARALEGAL
  Baron & Budd, P.C.
21
22
  ALSO PRESENT:
23
  Jeff Fleming, the videographer
24 Willow Ashlynn, Trial Tech
25

Page 4

1            INDEX
2                     PAGE
  DIRECT EXAMINATION BY MR. PIFKO          6
3 CERTIFICATE OF OATH            208
  REPORTER'S CERTIFICATE         209
4 ERRATA SHEET                   210
5
       (ATTACHED TO THE TRANSCRIPT)
6 EXHIBITS                  MARKED
7 RITE AID BELLI 1 - Rite_Aid_OMDL_0015454 to 15506   17
8 RITE AID BELLI 2 - Printout of Mr. Belli's
     LinkedIn profile              53
9
  RITE AID BELLI 3 - Rite_Aid_OMDL_0016717 to 719   68
10
  RITE AID BELLI 4 - Rite_Aid_OMDL_0015079 to 15081  74
11
  RITE AID BELLI 5 - Rite_Aid_OMDL_0014035 with
12    attachments              79
13 RITE AID BELLI 6 - Rite_Aid_OMDL_0014727 to 14802  97
14 RITE AID BELLI 7 - Rite_Aid_OMDL_0014379 to 14452 115
15 RITE AID BELLI 8 - Rite_Aid_OMDL_0017279 to 17292,
     with attachments             121
16
17 RITE AID BELLI 9 - Rite_Aid_OMDL_0021819 to 21823 137
18 RITE AID BELLI 10 - Rite_Aid_OMDL_ 0017321 to 322,
     with a Power Point attachment        141
19 RITE AID BELLI 11 - Rite_Aid_OMDL_ 0017445 to 17448 145
20 RITE AID BELLI 12 - Rite_Aid_OMDL_0014487 to 14490 149
21 RITE AID BELLI 13 - Rite_Aid_OMDL_0038075 to 77   154
22 RITE AID BELLI 14 - Rite_Aid_OMDL_ 0017328 with a
     native spreadsheet              160
23
  RITE AID BELLI 15 - Rite_Aid_OMDL_0040184 to
24    0040198                 164
25 RITE AID BELLI 16 - Rite_Aid_OMDL_0014948 to 51   175

Page 5

1        THE VIDEOGRAPHER: We are now on the record.
2 My name is Jeff Fleming. I am a videographer for
3 Golkow Litigation Services. Today's date is
4 December 20, 2018. The time is 9:35 a.m.
5        This is -- this video deposition is being held
6 in Tampa, Florida, in the matter of National
7 Prescription Opiate Litigation MDL No. 2804 for
8 the United States District Court for the Northern
9 District of Ohio, Eastern Division.
10       The deponent is Christopher Belli. Will
11 counsel please identify themselves for the record?
12       MR. PIFKO: Good morning. Mark Pifko from
13 Baron & Budd on behalf of Plaintiffs and the PEC.
14       MR. POWERS: Will Powers, Baron & Budd.
15       MS. McENROE: Good morning. Elisa McEnroe
16 from Morgan Lewis & Bockius on behalf of Rite-Aid
17 and the witness, and together with me today I have
18 my colleagues Kelly Moore and John Maloy.
19       MR. PIFKO: And then can we get everyone on
20 the phone to state your name and your firm and
21 your client?
22       MS. CACERES: Joanne Caceres from Jones Day
23 representing Walmart.
24       MS. ALLEN: Erin Gibson Allen from Marcus &
25 Shapira representing Defendant HBC.

Page 6

1    MS. RUSSO: Shana Russo from Reed Smith --
2    MS. ADAMS: Kate Adams --
3    THE REPORTER: One more time.
4    MS. RUSSO: Shana Russo --
5    MS. ADAMS: Kate Adams representing Cardinal
6  Health.
7    MS. RUSSO: Shana Russo with Reed Smith
8  representing AmerisourceBergen Corporation.
9    MR. McCORMICK: Sean McCormick for the Endo
10  and Par defendants.
11    THE VIDEOGRAPHER: Thank you. The court
12  reporter is Lisa Clark and will now swear in the
13  witness.
14        CHRISTOPHER BELLI,
15  the witness herein, being first duly sworn on oath, was
16  examined and deposed as follows:
17    THE WITNESS: I do.
18        DIRECT EXAMINATION
19  BY MR. PIFKO:
20    Q. Good morning, Mr. Belli.
21    A. Good morning.
22    Q. My name is Mark Pifko. We just met a few
23  minutes ago for the first time off the record. I'm
24  going to be asking you some questions today. Let's
25  start by having you state and spell your name for the

Page 7

1  record.
2    A. Christopher, C-h-r-i-s-t-o-p-h-e-r, Belli,
3  B-e-l-l-i.
4    Q. Okay. And have you ever had your deposition
5  taken before?
6    A. No.
7    Q. So I assume in preparing with your counsel,
8  they went over some of the basic parameters, but we're
9  going to go over a couple of the rules of the road just
10  so that we're all on the same page here. Okay?
11    A. Okay.
12    Q. First and foremost, you were just administered
13  the oath. Do you understand that?
14    A. Yes.
15    Q. Okay. And so that means that if you are
16  dishonest or you lie or are misleading intentionally,
17  that you could be subject to penalties from the court.
18  Do you understand that?
19    MS. McENROE: Objection to form.
20    THE WITNESS: Yes.
21  BY MR. PIFKO:
22    Q. Is there any reason why you're unable to tell
23  the truth today?
24    A. No.
25    Q. Are you undergoing any medical treatment or

Page 8

1  taking any -- any substances that would impair your
2  memory or your ability to provide truthful and accurate
3  testimony today?
4    MS. McENROE: Objection to form.
5    THE WITNESS: No.
6  BY MR. PIFKO:
7    Q. Is there any reason you can think of that this
8  deposition should not go forward?
9    A. No.
10    Q. Okay. So you've been doing fine so far. When
11  I ask a question, we need an audible response instead
12  of nodding your head or shrugging your shoulders. Do
13  you understand that?
14    A. Yes.
15    Q. Okay. And we can't have you say uh-huh or
16  uh-uh because when you see it in writing, it looks
17  the -- basically a yes and a no kind of look the same.
18  So try to give a verbal yes or no rather than saying
19  uh-huh or uh-uh. Okay?
20    A. Yes.
21    Q. I'm going to be asking you about some events
22  in the past. I don't want you to guess, but I am
23  entitled to your best recollection of the events.
24  Okay?
25    A. Yes.

Page 9

1    Q. And then if I ask a question that you don't
2  understand, please let me know and I'll rephrase it.
3  Understood?
4    A. Yes.
5    Q. If you answer the question, I'm going to
6  assume that you understand it. Okay?
7    A. Yes.
8    MS. McENROE: Can we take a quick break for
9  one second?
10    MR. PIFKO: Sure.
11    THE VIDEOGRAPHER: Off the record, 9:39 a.m.
12    (Brief recess was taken.)
13    THE VIDEOGRAPHER: On the record, 9:39 a.m.
14  BY MR. PIFKO:
15    Q. All right. So we just went over the basics of
16  a deposition. So you used to work for Rite-Aid,
17  correct?
18    A. Correct.
19    Q. And you understand that we're here today in
20  connection with a lawsuit that asserts claims against
21  various companies, including Rite-Aid. Do you
22  understand that?
23    A. Yes.
24    Q. When -- what years did you work for Rite-Aid?
25    A. 2007 to 2013.

Page 10

1    Q.   Did you have the same position while you
2  worked at Rite-Aid?
3    A.   No.
4    Q.   Okay.  What was the first position you held?
5    A.   The first position was an operations manager
6  in Atlanta, Georgia.
7    Q.   What was the time period you held that?
8    A.   2007 to 2009.
9    Q.   And then you moved to another position?
10   A.   I moved to Charlotte, North Carolina, as a
11  senior operations manager.
12   Q.   What was the time period for that job?
13   A.   2009 to 2011.
14   Q.   And then what was your next position?
15   A.   Senior manager of transportation.
16   Q.   Where was that located?
17   A.   Rite-Aid headquarters.
18   Q.   In Camp Hill?
19   A.   Yes.
20   Q.   What was the time period for that?
21   A.   2011 to 2012.
22   Q.   And what was your next position?
23   A.   Senior director of regulatory compliance and
24  pharmacy returns.
25   Q.   That was also in Camp Hill?

Page 11

1    A.   Yes.
2    Q.   And that was from 2012 to when?
3    A.   2013.
4    Q.   And then in 2013, you left the company?
5    A.   Yes.
6    Q.   Do you remember approximately what month that
7  was?
8    A.   October.
9    Q.   For that position, the regulatory compliance
10  position, do you remember approximately the month you
11  started?
12   A.   I don't.
13   Q.   Do you know if it was in the beginning of the
14  year or end of the year?  Do you have any sense?
15   A.   I don't remember.
16   Q.   Okay.  What's your highest level of education?
17   A.   I have a Bachelor's Degree from University of
18  Tennessee.
19   Q.   What year did you get that?
20   A.   I graduated in 2002.
21   Q.   Did you go straight through four years, like a
22  standard four-year university?
23   A.   Actually, three and a half years.
24   Q.   Okay.  Did you attend any graduate courses
25  after that?

Page 12

1    A.   No.
2    Q.   Have you gone to any school since then?
3    A.   No.
4    Q.   What's your current position?  Do you work for
5  somebody else right now?
6    A.   Yes, for team Novo Nordisk.  It's a
7  professional sports team.  I'm the VP of compliance,
8  HR, and finance.
9    Q.   Did you start that job right after you left
10  Rite-Aid?
11   A.   Yes.
12   Q.   You've had the same position there since you
13  left Rite-Aid to now?
14   A.   I started in just compliance, and then over
15  the past few years I've taken on new roles.
16   Q.   Okay.  When you were operations manager in
17  Atlanta, did you have any responsibilities that
18  concerned controlled substances?
19   A.   No.
20   Q.   How about when you were a senior operations
21  manager in Charlotte?
22   A.   No.
23   Q.   How about manager of transportation in
24  Camp Hill?
25   A.   No.

Page 13

1    Q.   So I assume you had some responsibilities when
2  you were regulatory compliance senior director --
3    A.   Yes.
4    Q.   -- with -- concerning controlled substances.
5  "Yes"?
6    A.   Yes.
7    Q.   Okay.  Are you familiar with the scheduling of
8  controlled substances?
9        MS. McENROE:  Objection to form.
10       THE WITNESS:  Yes.
11  BY MR. PIFKO:
12   Q.   Like Schedule 1, 2, through 5, you understand
13  that?
14   A.   Yes.
15   Q.   Okay.  Do you know what the difference is,
16  roughly, between the different schedules?
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  Yes.
19  BY MR. PIFKO:
20   Q.   Okay.  What's your understanding of what the
21  difference is?
22   A.   The C2 through C5, the addictive level of each
23  drug.  Like 2 being opioids and 3, slowly going down to
24  5.
25   Q.   The risk of addiction is higher the lower the

Page 14

1  schedule number; is that correct?
2      MS. McENROE: Objection to form.
3      THE WITNESS: No. C5 would be less risk for
4  addiction.
5  BY MR. PIFKO:
6  Q. Right. So as you go lower in scheduling --
7  A. Yes.
8  Q. -- the higher the risk; is that correct?
9      MS. McENROE: Objection to form. You may
10  answer.
11      THE WITNESS: Yeah. C5 would be less
12  addiction than C2.
13  BY MR. PIFKO:
14  Q. Okay. As part of your job as senior director
15  of regulatory compliance, did you undertake to become
16  familiar with the Controlled Substances Act?
17      MS. McENROE: Objection to form.
18      THE WITNESS: Yes.
19  BY MR. PIFKO:
20  Q. What -- did you take any courses?
21  A. I -- I worked with our government affairs
22  department and attended some conferences. Mainly the
23  government affairs.
24  Q. Did they have a formal training seminar they
25  provided to you?

Page 15

1  A. No. We had a lot of policies and procedures
2  already in place, so it was a matter of reviewing those
3  and working -- any questions I may have had working
4  with government affairs.
5  Q. Is there a particular individual you remember
6  working with in government affairs to do your training?
7  A. Yes.
8  Q. What was the name of that person?
9  A. Janet Hart.
10  Q. Anyone else?
11  A. Sophia Lai.
12  Q. Anyone else?
13  A. No.
14  Q. What -- do you have an understanding about
15  what Janet's position was at that time, her official
16  title?
17  A. I don't recall her official title.
18  Q. How about Sophia?
19  A. I don't recall her official title either.
20  Q. Who -- who was your boss when you were senior
21  director of regulatory compliance?
22  A. Rick Chapman.
23  Q. Are you aware that he was deposed earlier this
24  week?
25  A. Yes.

Page 16

1  Q. Have you seen his deposition transcript?
2  A. No.
3  Q. When you -- so when you became senior director
4  of regulatory compliance, you were provided with
5  various policies and procedures of the company; is that
6  correct?
7  A. Yes, I was provided, but I was also familiar
8  with a lot of them from working in distribution
9  centers.
10  Q. Okay. When did you first become familiar with
11  these policies and procedures while working at
12  distribution centers?
13  A. In probably 2009ish we started an audit team,
14  an internal audit team, and I was on the audit team,
15  and we used to audit internally the distribution
16  centers, and we audited all their policies and
17  procedures.
18      So that's when I first saw a lot of the
19  policies and procedures outside of the obvious ones
20  that I already knew from the operations I was involved
21  in.
22  Q. Did your auditing include any issues
23  concerning controlled substances?
24  A. We audited controlled substances.
25  Q. How -- in what way did you audit controlled

Page 17

1  substances?
2  A. To make sure the DCs were following the
3  policies and procedures put in place.
4  Q. So do you believe that you have an accurate
5  understanding of what Rite-Aid's policies and
6  procedures were with respect to handling and
7  distributing controlled substances?
8      MS. McENROE: Objection to form.
9      THE WITNESS: I did at the time. I can't say
10  I probably remember all of them exactly right now,
11  but I do remember some.
12  BY MR. PIFKO:
13  Q. So from time to time during the course of this
14  deposition I'm going to be handing you documents.
15  A. Okay.
16  Q. They're going to have a little sticker on it
17  with a number; and then I'm sure that, in preparing for
18  the deposition, Rite-Aid's counsel went over this, but
19  there's little numbers on the bottom. They're called
20  Bates numbers, and each page in the case has a unique
21  number, and I'll be referring to the pages that way.
22  A. Okay.
23      (Rite-Aid Belli Exhibit No. 1 was marked for
24  identification.)
25  BY MR. PIFKO:

Page 18

1  Q. So I'm handing you what's marked as Exhibit 1.
2  You can take your time to look at the exhibit as long
3  as you feel that you need. I'm going to tell you I
4  only have a question about one of the pages, even
5  though this is a lengthy document.
6      Let the record reflect that the witness is
7  reviewing Exhibit 1. For the record, Exhibit 1 is a
8  document headed Rite Aid of Maryland, Inc., DBA
9  Rite Aid Mid-Atlanta Customer Support Center (DC No.
10 10) Standard Operating Procedures Index. It's Bates
11 labeled Rite_Aid_OMDL_0015454 through 15506.
12     Have you seen this document before?
13 A. Yes.
14 Q. When was the last time you believe you saw it?
15 A. I don't recall.
16 Q. Okay. Sometime during -- you were working for
17 Rite-Aid you believe you saw this document before?
18 A. Yes.
19 Q. Okay. Can you tell me what this is?
20 A. It's the SOP for the DCs.
21 Q. When you say "SOP for the DCs," what do you
22 mean?
23 A. It's the standard operating procedures for the
24 Perryman Distribution Center.
25 Q. If you could turn your attention to the page

Page 19

1  that's Bates labeled with that name I gave you earlier,
2  Rite_Aid_OMDL_0015459. Are you there?
3  A. Licensing --
4  Q. Yeah.
5  A. Yes.
6  Q. So this is an SOP called Licensing
7  Requirements. Agree?
8  A. Yes.
9  Q. Are you familiar with this?
10 A. No.
11 Q. Okay. It says Effective Date January 5th,
12 2009. Do you see that?
13 A. Yes.
14 Q. Is this a format of SOP that you're -- you
15 have experience having seen while working at Rite-Aid?
16     MS. McENROE: Objection to form.
17     THE WITNESS: This is one format. We have
18   many SOPs.
19 BY MR. PIFKO:
20 Q. Okay. But this is one of the formats that
21 you're familiar with seeing?
22 A. Yes.
23 Q. Okay. Do you see here -- it's got a couple
24 numbers here. I want to direct your attention to 4.8
25 towards the bottom of the second last paragraph

Page 20

1  there. Do you see that?
2  A. Yes.
3  Q. It says DC 10 is a Wholesale Distributor for
4  Rite Aid corporation and is engaged in the "Wholesale
5  Distribution" of Prescription Drugs and Devices which,
6  for the purposes of this criteria, means distribution
7  of Prescription Drugs and Devices to persons other than
8  a consumer or patient and includes the offer to sell;
9  deliver; offer to deliver; give away; or transfer,
10 whether by passage of title, physical movement, or
11 both. Do you see that?
12 A. Yes.
13 Q. Do you understand that DC -- Rite-Aid's DC 10
14 was a wholesale distributor?
15 A. To our internal -- they're inner company
16 sales, so we only ship to our own stores.
17 Q. Okay. But for the purposes of shipping to
18 Rite-Aid's own stores, you understood that the Perryman
19 facility was a distributor under the Controlled
20 Substances Act?
21     MS. McENROE: Objection to form.
22     THE WITNESS: We were a distribution center
23   that were supplying product to our internal
24   stores.
25 BY MR. PIFKO:

Page 21

1  Q. The Perryman facility was -- have you heard
2  the term "a registrant" under the Controlled Substances
3  Act?
4  A. Yes.
5  Q. Okay. Do you understand that the Perryman
6  facility was a registrant under the Controlled
7  Substances Act?
8  A. Yes.
9  Q. Okay. Were there any other -- and as a
10 registrant, that means that the Perryman facility was
11 licensed to distribute controlled substances; is that
12 correct?
13     MS. McENROE: Objection to form.
14     THE WITNESS: Yes.
15 BY MR. PIFKO:
16 Q. Were there other facilities, distribution
17 centers, at Rite-Aid that were registrants who were
18 licensed to distribute controlled substances?
19 A. Yes.
20 Q. Which other distribution centers?
21 A. Woodland and Tuscaloosa and Charlotte.
22 Q. Any others?
23 A. No.
24 Q. So do you know the, roughly, the geographic
25 regions that these distribution centers serviced?

Page 22

1     MS. McENROE: Objection to form.
2     THE WITNESS: Yes.
3 BY MR. PIFKO:
4     Q. Okay. I'm just -- I'm not asking you
5 particular cities --
6     A. Yeah.
7     Q. -- but roughly the states. Do you know --
8     A. For some of the distribution centers.
9     Q. Okay. Well, let's talk about the Perryman
10 facility. Do you know, roughly, which states it
11 serviced?
12     A. I do not.
13     Q. Okay. How about if you think of portions of
14 the country, can you describe what your understanding
15 of what general region the Perryman facility serviced?
16     MS. McENROE: Objection to form.
17     THE WITNESS: The East Coast.
18 BY MR. PIFKO:
19     Q. How about Woodland?
20     A. The West Coast.
21     Q. How about Tuscaloosa?
22     A. Tuscaloosa and Charlotte both would be
23 Southeast.
24     Q. How about states like Ohio, Kentucky, and
25 West Virginia, do you know which service --

Page 23

1 distribution center serviced those areas?
2     A. Perryman.
3     Q. As part of your job duties, did you, at the
4 time, have some more detailed familiarity with the
5 geographic regions serviced by the various distribution
6 centers?
7     A. Yes.
8     Q. So then there -- am I correct that there are
9 other distribution centers, in addition to the four
10 that you named?
11     A. Yes, but they didn't all ship pharmacy.
12     Q. Okay. So it's only -- so while there are
13 other distribution centers for Rite-Aid, only those
14 four locations distributed controlled substances; is
15 that correct?
16     A. Yes.
17     Q. And when we were looking back and talking
18 about how the Perryman facility was a registrant of the
19 Controlled Substances Act, do you have an understanding
20 of which types of controlled substances were
21 distributed through that facility?
22     MS. McENROE: Objection to form.
23     THE WITNESS: Not the details of the NDCs, no.
24 BY MR. PIFKO:
25     Q. How about by scheduling?

Page 24

1     A. I knew it, yes.
2     Q. Okay. What -- what -- which schedule -- what
3 type of scheduled products did you understand that the
4 Perryman facility distributed?
5     A. 3 through 5.
6     Q. And how about the Woodland facility?
7     A. The same.
8     Q. How about the Tuscaloosa facility?
9     A. The same.
10     Q. Charlotte?
11     A. The same.
12     Q. Did -- at any time to your knowledge, did any
13 of those facilities distribute Schedule 2 products?
14     A. No.
15     Q. Okay. Do you have an understanding of what an
16 opioid is?
17     MS. McENROE: Objection to form.
18     THE WITNESS: Yes.
19 BY MR. PIFKO:
20     Q. Okay. What's your understanding of what an
21 opioid is?
22     A. It's a medication that's prescribed for -- for
23 various reasons.
24     Q. Can you give me any examples of products that
25 you understand to be opioid products?

Page 25

1     A. Hydrocodone, OxyContin.
2     Q. Any others?
3     A. Those are the two that I can think of.
4     Q. How about Tramadol, have you ever heard of
5 that?
6     A. I've heard of it, yes.
7     Q. Do you know if that's an opioid?
8     A. I'm not sure.
9     Q. Did you have an understanding that, among the
10 Schedule 3 through 5 products that were distributed by
11 these four distributors, that they included -- that
12 included opioid products?
13     MS. McENROE: Objection to form.
14     THE WITNESS: Yes.
15 BY MR. PIFKO:
16     Q. Okay. Have you ever heard of something called
17 a hydrocodone combination product?
18     A. No.
19     Q. Have you ever heard the term "suspicious order
20 monitoring"?
21     A. Yes.
22     Q. What does that mean to you?
23     MS. McENROE: Objection to form.
24     THE WITNESS: It's the due diligence that was
25 done to ensure the controlled substances stayed

Page 26

1 within the supply chain and there's no diversion.
2 BY MR. PIFKO:
3 Q. Do you know what diversion is?
4 A. Yes.
5 Q. What's your understanding of what diversion
6 is?
7 A. When a controlled substances leaves its chain
8 of custody and gets into the hands of someone that it
9 wasn't intended for.
10 Q. Do you understand Rite-Aid, as a registrant,
11 to have a duty to prevent diversion or to engage in
12 efforts designed to prevent diversion?
13 MS. McENROE: Objection to form.
14 THE WITNESS: Yes.
15 BY MR. PIFKO:
16 Q. Do you have an understanding of what practices
17 and procedures Rite-Aid had in place to attempt to
18 prevent diversion?
19 MS. McENROE: Objection to form.
20 THE WITNESS: Yes.
21 BY MR. PIFKO:
22 Q. Do you have an understanding of what
23 procedures and practices and policies Rite-Aid had in
24 place to identify and report suspicious orders?
25 MS. McENROE: Objection to form.

Page 27

1 THE WITNESS: Yes.
2 BY MR. PIFKO:
3 Q. Do you know what a suspicious order is?
4 MS. McENROE: Objection to form.
5 THE WITNESS: Yes.
6 BY MR. PIFKO:
7 Q. Okay. Can you tell me what a suspicious order
8 is?
9 A. It's anything that's, I guess, out of the --
10 out of the ordinary, not normal. It could be -- it
11 could be various reasons, but, I mean, it's -- there's
12 not, like, I mean, a clear definition. It would be --
13 it's unique to each store or situation. There's not a
14 blanket answer for a suspicious order.
15 Q. Okay. Let's talk about Rite-Aid's policies,
16 practices, and procedures that were designed to attempt
17 to prevent diversion. Okay?
18 A. Yes.
19 Q. What can you tell me, what were the procedures
20 that Rite-Aid had in place as a distributor to attempt
21 to prevent diversion?
22 MS. McENROE: Objection to form.
23 THE WITNESS: At the DC level or corporate
24 level?
25 BY MR. PIFKO:

Page 28

1 Q. Well, let's go through both.
2 A. Okay.
3 Q. So let's start at the distribution center
4 level.
5 A. At the distribution center level, there was
6 thresholds in place where if a picker received an order
7 above that threshold, that they would adjust the order
8 down to the threshold level.
9 Also, the pickers in those areas were senior
10 associates that worked there for a long time and were
11 very familiar with the stores they were picking for.
12 So if something seemed suspicious to them or out of the
13 ordinary to them, they could contact the store to do
14 further research.
15 We also had a replenishment system at the
16 store level where the orders that came to the
17 distribution center were already calculated based on
18 the store's volume, dispensing volume, which gave them
19 a suggested order quantity, which was based on their
20 history and then also asset protection. The government
21 affairs did various reviews and audits.
22 Q. Anything else?
23 A. No. I'm not that -- I mean, there may be
24 others, but those are the ones I recall.
25 Q. Okay. Let's go through some of the details of

Page 29

1 those. You said that there were thresholds, correct?
2 A. Correct.
3 Q. Okay. What's a threshold?
4 MS. McENROE: Objection to form.
5 THE WITNESS: It's a limit that we would never
6 pull over that amount.
7 BY MR. PIFKO:
8 Q. When you say "never pull," what do you mean?
9 A. Pick, pick an order, to ship to the store.
10 Q. So even if an order comes in that exceeds a
11 threshold, Rite-Aid would never ship an order beyond
12 the threshold; is that correct?
13 MS. McENROE: Objection to form.
14 THE WITNESS: Yes, unless there is an
15 exception for that store.
16 BY MR. PIFKO:
17 Q. During the time period that you worked for
18 Rite-Aid, are you familiar with what the thresholds
19 were?
20 A. I don't recall at this time. When I was in my
21 position I did.
22 Q. Do you know if most stores had the same
23 threshold?
24 A. All -- most stores had the same threshold with
25 the exceptions, with the exception stores that were

Page 30

1  reviewed periodically.
2      Q.  Have you heard of the term that the thresholds
3  were around 5,000?  Does that sound familiar?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  Yes.
6  BY MR. PIFKO:
7      Q.  Okay.  So most stores had a threshold of
8  5,000, and then there was a handful of stores that had
9  some other threshold?
10     A.  Correct.
11     Q.  Do you recall, roughly, what percentage of
12 stores had the -- were the exception stores?
13     A.  It was under 10.
14     Q.  Okay.  Out of what, thousands of stores; is
15 that correct?
16     A.  Correct.
17     Q.  Okay.  Do you remember any of those stores?
18     A.  I do not.
19     Q.  Do you know how the threshold was calculated
20 originally?
21     A.  I do not.
22     Q.  So that was already in place when you took
23 your job?
24     A.  Correct.
25     Q.  Did you ever speak to anyone about how the

Page 31

1  thresholds were calculated?
2      A.  No.
3      Q.  Are you familiar with any training that --
4  what -- sorry, let's back up.  You used the term
5  "picker"; is that correct?
6      A.  Yes.
7      Q.  What's a picker?
8      A.  An order selector, the associate in the DC
9  that selects the order for the store.
10     Q.  Are you familiar with the process by which an
11 order selector selects items in an order for the store?
12     A.  There's multiple processes, but I'm familiar
13 with some of them, yes.
14     Q.  Okay.  Is order selector the official title of
15 the people who do that job?
16     A.  I'm -- I -- I don't know the official title.
17 I don't recall the official title.
18     Q.  But you recall "order selector" being a term
19 that's --
20     A.  Yes.
21     Q.  -- used?
22     A.  Yes.
23     Q.  So what's your understanding of how an order
24 selector fulfills an order?  You said there's multiple
25 ways.  Just -- let's go through the first way that you

Page 32

1  recall.
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  They could have picked off
4      paper.  It could have been pick-to-light.  Paper
5      is a paper order with the store number listed and
6      the order that they're selecting.  Pick-to-light
7      was a system where the order is lit up in front,
8      and it told them the number to select of that
9      item.
10 BY MR. PIFKO:
11     Q.  Do you know how or why an order could come in
12 by paper versus pick-to-light?
13     A.  Its technology in the DC.
14     Q.  Okay.  With respect to the DCs that
15 distributed controlled substances, do you know, did
16 they have pick-to-light systems?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  Some DCs did; some -- I -- some
19     did not.  It depended on the items they were
20     pulling.  If it was a fast-moving item and it was
21     efficient at pick-to-light, it would.
22 BY MR. PIFKO:
23     Q.  Okay.  How about with respect to Schedule 3
24 controlled substances, do you know if all those items
25 were through the pick-to-light system?

Page 33

1      A.  I don't recall.
2      Q.  Okay.  So in a situation where there's a paper
3  order, where does -- how does an order selector receive
4  the piece of paper, do you know?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  They -- there was a stack of
7      orders, and they would pull their order that was
8      next in line, and they would select for that
9      store.
10 BY MR. PIFKO:
11     Q.  So it's like a -- I'm trying to visualize the
12 situation.
13     A.  Yeah.
14     Q.  It's like a store.  They get a -- they get,
15 like, a shopping list, the order, and then they have to
16 walk through aisles and put items into some sort of
17 container.  Is that how it works?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  Into a tote, yes.  They would
20     have a piece of paper, the store, what they're
21     selecting, and yes, they would pull it off the
22     bins and put it into a red tote.
23 BY MR. PIFKO:
24     Q.  What is -- a tote, is it like a bag, or is it
25 like a plastic container?

Page 34

1    A.  It's a plastic container.
2    Q.  Okay.  Like -- I travel a lot.  Like those
3  containers at the airport you put your suitcase in or
4  bigger?
5        MS. McENROE:  Objection to form.
6  BY MR. PIFKO:
7    Q.  When you go through security, if you know what
8  I'm talking about.
9    A.  I -- it's a red tote.  I mean, it's a tote
10  just like you see at any distribution center is using
11  they ship it in.  It's common in distribution.
12    Q.  Okay.  So they have the order.  It tells you
13  the name of the item and the quantity -- the quantity
14  of the item and then they walk through the warehouse
15  and put those quantities into the tote and set it aside
16  to be shipped; is that correct?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  That's their step in it, yes.
19  BY MR. PIFKO:
20    Q.  Okay.  When a paper order comes in and it
21  exceeds the threshold, how does the order selector know
22  that the order is exceeding the threshold?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  There's -- they went through
25    training, and there was sheets hanging up through

Page 35

1    the pick area of the threshold amounts, and there
2    was an amount of -- there was actually on the pick
3    area what the threshold was.  So there would be a
4    sticker next to it.
5  BY MR. PIFKO:
6    Q.  Okay.  So let's say, for example, there's a
7  hydrocodone combination product that's in an order, and
8  the piece of paper printed out says a thousand units of
9  this item, and you -- the order selector goes to the
10  area where that product is.  There's a label on there
11  that says you can't fill an order higher than this many
12  units; is that correct?
13        MS. McENROE:  Objection to form.
14        THE WITNESS:  Yes.
15  BY MR. PIFKO:
16    Q.  Okay.  What about when there's a pick-to-light
17  system, let's talk about how that works.
18    A.  The same thing.
19    Q.  Okay.  So when -- how does an order come in
20  through the pick-to-light system?
21    A.  They scan a label, which was the order label,
22  and it would light up the pick-to-light system.
23    Q.  Okay.  And so the pick-to-light system has
24  lights on an item on the shelf.  So when they're
25  walking down, they see which shelf -- which shelves

Page 36

1  they're supposed to go to?
2    A.  Correct.
3    Q.  And then when they get to the specific item,
4  there's an LED display that has the number of units
5  they're supposed to pick?
6    A.  Yes.
7    Q.  Does -- if they're picking an item that has a
8  threshold associated with it, how do they know what the
9  threshold is in the pick-to-light system?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  The same way I described
12    earlier, it was marked on the pick site.
13  BY MR. PIFKO:
14    Q.  Okay.  Does the LED display automatically
15  reduce itself to the threshold if the order comes in
16  exceeding the threshold?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  No.  The picker would reduce
19    the -- adjust the order down.
20  BY MR. PIFKO:
21    Q.  Okay.  So they walk up, and let's say that the
22  threshold is a thousand -- is a thousand but the order
23  is for 2,000.  They go up.  The screen will read 2,000,
24  but there's a sign that says only put a thousand in
25  there, and then they press a button to make it go down

Page 37

1  to a thousand; is that correct?
2    A.  Yes.
3    Q.  So you said there was training that was
4  provided for the order selector; is that correct?
5    A.  Yes.
6    Q.  Did you ever attend any of the training
7  sessions?
8    A.  No.
9    Q.  Do you know if there was written materials
10  that were provided to the order selectors in connection
11  with the training?
12    A.  Yes.
13    Q.  Have you ever seen the training materials that
14  were provided to them?
15    A.  Yes.  I mean, not since I've been employed or
16  worked in Rite-Aid, but yes.  There was -- there was
17  documents that existed.
18    Q.  Was it a single manual for being an order
19  selector, or do you know if it was various different
20  documents?
21    A.  It was various documents.
22    Q.  Did you ever draft any portions of those
23  documents?
24    A.  Not of the training documents, no.
25    Q.  Okay.  But you're familiar with them?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    A.  I remember seeing them, yes.
2    Q.  And do you believe that they had portions of
3  them that explained how the thresholds functioned?
4    A.  Yes.
5    Q.  And in the training manual, it told them if an
6  item exceeded the threshold, that they should only put
7  the amount up to the threshold in the tote; is that
8  correct?
9        MS. McENROE:  Objection to form.
10       THE WITNESS:  I don't recall the exact
11   language that was in the SOPs.
12 BY MR. PIFKO:
13   Q.  But that's your understanding of what the
14 process was; is that correct?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  Yes.  I know they went through
17   training on how the thresholds worked when pulling
18   controlled -- C2 -- C3s.  Excuse me.
19 BY MR. PIFKO:
20   Q.  And just to be clear, I know what you mean;
21 but for the record, when you say "C2," that's a
22 Schedule 2 controlled substance or "C3," that's a C3
23 controlled substance; is that correct?
24   A.  Correct.
25   Q.  Do you know, if an order exceeded a threshold,

Page 39

1  if there was any -- okay.  So an order selector only
2  fills the order up to the threshold, correct?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  Correct.
5  BY MR. PIFKO:
6    Q.  Is there any other process that comes into
7  play when an order comes in that exceeds a threshold?
8    A.  The order selector kept a log.  They would
9  call the store and confirm with the store, and they
10 would do research, and there was a log of every one of
11 those incidents.
12   Q.  So every time an order exceeded a threshold,
13 the policy was that the order selector needed to call
14 the store?
15   A.  Yes.
16   Q.  And they were -- they were obligated to write
17 down that they called the store?
18   A.  Yes.
19   Q.  Do you know, was there a policy on what types
20 of information they were supposed to obtain when they
21 called the store when an order exceeded a threshold?
22   A.  I don't recall, but they would do research
23 with the store and log actually who they talked to at
24 the store and any conversation they had.
25   Q.  But you don't know what they were supposed to

Page 40

1  ask about the order that exceeded the threshold?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  They were doing their due
4    diligence and research to find out why the order
5    exceeded the threshold.
6  BY MR. PIFKO:
7    Q.  And then they would write that down in the
8  document?
9    A.  In the log.
10   Q.  Okay.  What's the log called?
11   A.  I don't recall the name of the log.
12   Q.  Have you ever heard of a thing called --
13 something called a threshold log?
14   A.  Yes.  I mean --
15   Q.  Is that --
16   A.  I don't know if that was the exact name of the
17 log, but yes, there was a threshold log.
18   Q.  Can you think of any other documentation that
19 you recall seeing in connection with thresholds?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  No.
22 BY MR. PIFKO:
23   Q.  So the -- these calls that were made, they
24 were kept in some sort of log.  It may be the threshold
25 log, but it may be a different name of a document; is

Page 41

1  that correct?
2    A.  It was kept in a log.  I don't remember the
3  exact name of the log.
4    Q.  Was that a computerized log?
5    A.  It was a handwritten log.
6    Q.  Okay.  And was that log sent to somebody?
7    A.  It was kept on file at the DC; and, if there
8  was a DC audit from the DEA or any regulator, they
9  would have a file showing their -- their process for
10 the thresholds.
11   Q.  Was that log kept in some centralized file
12 area in the distribution center?
13   A.  Yes.
14   Q.  Okay.  Do you know the process by which the --
15 you said the logs -- so an order selector is supposed
16 to make a phone call, talk with the store and take
17 notes, and then they write it down in a log, correct?
18       MS. McENROE:  Objection to form.
19       THE WITNESS:  Correct.
20 BY MR. PIFKO:
21   Q.  And then what's the -- how does that -- do you
22 know how that paper then gets sent to the central
23 filing area in the distribution center?
24   A.  I do not.
25   Q.  Okay.  Do you believe it would have been sent

Page 42

1 somewhere daily or weekly or monthly? Do you have any
2 idea of the periods?
3     MS. McENROE: Objection to form.
4     THE WITNESS: There was a handwritten log that
5     also -- I mean, there's multiple logs because
6     there was logs that would generate for -- for
7     ARCOS reasons and things like that.
8     So you may have had duplicate information that
9     could have been on the threshold log that appeared
10     on other logs, but the intent for that log was
11     kept in a file at the DC.
12 BY MR. PIFKO:
13     Q.  Do you know if there were occasions when --
14 did an order selector have the ability to decide not to
15 ship an order after they made a call to the store?
16     A.  I don't recall an incident.
17     Q.  You don't recall if that was the process?
18     A.  If that was in the process, that it was deemed
19 suspicious, they would not ship.
20     Q.  Okay.  So the order selector, under the
21 company's policies, had the discretion to decide, based
22 on the conversation, not to ship an order?
23     A.  They would confirm with, after talking to the
24 store, they would also confirm with corporate, which
25 would be government affairs.

Page 43

1     Q.  Do you have an understanding about the process
2 by which an order selector would communicate with
3 someone at government affairs?
4     A.  I -- I don't recall the exact process.
5     Q.  Okay.  So were they supposed to call someone
6 at government affairs after an order exceeded
7 thresholds?
8     A.  No.  They -- because not all orders that
9 exceeded threshold were suspicious orders.  These
10 orders were already being calculated based on the store
11 history when sent to the DC.
12     So the order -- the orders coming to the DCs
13 were already adjusted on the store's volume, and then
14 if an order exceeded threshold, it did not make the
15 order automatically suspicious.  So that's why the
16 picker was calling the store to investigate.  So this
17 was kind of our second layer of reviewing an order.
18     Q.  Okay.  But -- so it's your understanding that
19 on every single occasion that an order exceeded
20 threshold, the order selector was supposed to make a
21 call to the store?
22     A.  When an order exceeded a threshold, they would
23 do the research to find out why the order was exceeding
24 the threshold.
25     Q.  And then they were supposed to write that

Page 44

1 down.  We talked about that, correct?
2     A.  Then they kept a log.
3     Q.  Okay.  And then on some occasions but not all
4 occasions they could then call someone in government
5 affairs?
6     MS. McENROE: Objection to form.
7     THE WITNESS: If they thought the order was
8     suspicious.
9 BY MR. PIFKO:
10     Q.  Okay.  So if, based on their conversation with
11 the store, they felt that an order was suspicious, it
12 was the company's policy that they then needed to call
13 someone in government affairs?
14     A.  If an order would have been found suspicious,
15 then yes, they would have contacted corporate.
16     Q.  Based on the order selector's decision; is
17 that correct?
18     MS. McENROE: Objection to form.
19     THE WITNESS: If the order -- after the order
20     selector did the research with the store, if it
21     was -- if it needed to get escalated to the next
22     level by being suspicious, if it was suspicious,
23     then they would contact government affairs.
24 BY MR. PIFKO:
25     Q.  What I'm trying to ask is if it was the order

Page 45

1 selector's decision as to whether -- so you think
2 there's a fork in the road, an order exceeds a
3 threshold.  They make a call to the store.  They can
4 either do nothing or they can call government affairs,
5 correct?
6     MS. McENROE: Objection to form.
7     THE WITNESS: Most of the calls to the stores
8     could be if an order was fat-fingered at the
9     store, they typed an error.  So those type of
10     conversations would not be suspicious orders; and
11     again, these were our internal stores.
12     We knew these stores very well.  We'd pull
13     these store orders weekly for most stores.  So we
14     had the relationship with the stores.  These
15     weren't -- we weren't shipping to stores outside
16     our network.  I mean, we were well aware of these
17     stores.
18     So at that level, a decision could be made if
19     it was just a store error; and also again, these
20     orders were already being calculated when they
21     were sent to the DC.  This was just a second layer
22     that we were using to bring the threshold down.
23 BY MR. PIFKO:
24     Q.  Okay.  Fair enough.  I'm just trying to -- I'm
25 just trying to understand.  If you think of, like, a

Page 46

1  decision tree: So order exceeds the threshold. Then
2  the next thing that the order selector must do was call
3  the store, correct?
4      MS. McENROE: Objection to form.
5      THE WITNESS: I mean, I can't speak to that.
6  That -- if an -- yes.
7  BY MR. PIFKO:
8      Q.  Okay. So it's the company's policy that if an
9  order exceeded threshold, they must call -- the order
10 selector must call the store; is that correct?
11     MS. McENROE: Object to form.
12     THE WITNESS: I can't recall exactly what was
13 written in the procedure.
14 BY MR. PIFKO:
15     Q.  Okay. So there may be occasions when an order
16 could exceed the threshold and they didn't call the
17 store?
18     MS. McENROE: Object to the form.
19     THE WITNESS: No. I mean, it was in the
20 procedure.
21 BY MR. PIFKO:
22     Q.  Okay.
23     A.  I --
24     Q.  That's what they're supposed to do; is that
25 correct?

Page 47

1      A.  Yes.
2      Q.  Okay. And then after they call the store,
3  they have two choices: They can call someone in
4  government affairs and say that they think the order is
5  suspicious, or they can do nothing and proceed to fill
6  and ship the order so long as it's under the threshold;
7  is that correct?
8      MS. McENROE: Objection to form.
9      THE WITNESS: Again, if an order is above the
10 threshold, it did not make the order suspicious.
11 They -- they were trying to find out, confirm with
12 the store if that quantity was what they really
13 needed.
14 BY MR. PIFKO:
15     Q.  Right. And I'm just -- I'm just -- all I'm
16 trying to get you to tell me is what the process is.
17 Okay? So I understand we have an order that exceeded
18 the threshold. Then the order selector's job is to --
19 they're supposed to call the store in that situation,
20 correct?
21     MS. McENROE: Objection to form.
22     THE WITNESS: I'm trying to explain
23 conceptually what we did, but this is six, seven
24 years ago, so the exact steps are -- I mean, I
25 don't recall the exact steps. So conceptually is

Page 48

1  what I'm explaining the process to you.
2  BY MR. PIFKO:
3      Q.  Right. And I'm just trying to understand. So
4  then they call the store, and they have -- they can
5  then just decide that they're going to ship the
6  order --
7      A.  No, we never --
8      Q.  -- up to the threshold, or they can call
9  government affairs and say I think this is
10 suspicious --
11     MS. McENROE: Objection.
12 BY MR. PIFKO:
13     Q.  -- after they talk to the store; is that
14 correct?
15     MS. McENROE: Objection to form.
16 BY MR. PIFKO:
17     Q.  Is there any other option they could do?
18     MS. McENROE: Objection to form.
19     THE WITNESS: All the orders were brought down
20 to the threshold.
21 BY MR. PIFKO:
22     Q.  Right. That's what I mean. They could ship
23 it up to what the threshold is?
24     MS. McENROE: Objection to form.
25     THE WITNESS: Correct. I mean, if the order

Page 49

1  was above the threshold, they brought it down to
2  the threshold, and we'd create a log, and they'd
3  call the stores to confirm the order quantity.
4      If, at that point, an order was suspicious for
5  some reason, which, in my time in this position,
6  we never had a suspicious order, then it would be
7  routed to the proper channels.
8  BY MR. PIFKO:
9      Q.  Okay. And if it wasn't deemed to be
10 suspicious after that call, they would ship it in the
11 quantity that was -- did not exceed the threshold; is
12 that correct?
13     MS. McENROE: Objection to form.
14     THE WITNESS: They would ship it in the
15 quantity that was already calculated by a
16 replenishment system saying that's what the store
17 needed.
18 BY MR. PIFKO:
19     Q.  Okay. So long as that didn't exceed the
20 threshold?
21     A.  Correct.
22     Q.  Could they, based on that conversation,
23 override the threshold and decide, I talked to the
24 store, I need to fill this order beyond the threshold?
25     A.  No.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    Q.  You've talked a little bit about -- okay.  I
2  want to back up.  Do you know if the order selectors
3  were given training on how to make a decision about
4  whether an order was suspicious?
5    A.  Yes.  There was a DC procedure.
6    Q.  How -- what was the DC procedure on that?
7    A.  I don't recall.
8    Q.  Was there -- was it in writing somewhere?
9    A.  Yes.
10    Q.  Okay.  So there was some sort of training and
11  written procedure that instructed order selectors on
12  how, when making a call to a pharmacist, to decide if
13  an order was suspicious?
14    A.  They had a procedure for suspicious order
15  monitoring, yes.
16    Q.  Your answer was a little -- a little different
17  than my question and it's --
18    A.  I don't recall the details of the -- in the
19  procedure of suspicious monitoring, but there was a
20  procedure for the associate on identifying suspicious
21  orders.
22    Q.  Okay.  So there's some written procedure that
23  told an order selector how -- what factors they should
24  consider in deciding whether an order is suspicious?
25    A.  Again, I don't recall what -- the exact

Page 51

1  details of that procedure, but yes, there was a
2  procedure for the associate on suspicious order
3  monitoring.
4    Q.  And to your knowledge, the entire time that
5  you worked at Rite-Aid, there was no order that had
6  been found to be suspicious?
7    A.  While I was in my position, there was no
8  suspicious orders reported.
9    Q.  Okay.  Let's talk about you.  You talked
10  about -- I don't remember exactly the language that you
11  used, but we were talking about the process by which an
12  order is -- is made.  Do you have an understanding
13  about how an order comes through the -- starting at the
14  store?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  I don't know -- I do not know
17    how the store -- I'm familiar with the concept of
18    a replenishment system, but I do not know the
19    details of how a store order was placed.
20  BY MR. PIFKO:
21    Q.  Okay.  Do you have an understanding that it
22  was automated?
23    A.  Yes.
24    Q.  Okay.  Do you agree that the replenishment
25  system looked at the demand of items that were being

Page 52

1  sold and made a comparison to inventory on hand and
2  then projecting based on what was being sold, put in an
3  order for the amount it believed was necessary to
4  continue supply; is that correct?
5       MS. McENROE:  Objection to form.
6       THE WITNESS:  Yes.  I mean, there was a
7    calculation that was looking at on-hand and
8    dispensing that would generate a suggested order
9    quantity.
10  BY MR. PIFKO:
11    Q.  And so on occasions, that suggested order
12  quantity could exceed the threshold; is that correct?
13    A.  Yes.
14    Q.  Do you know any other factors that the
15  ordering system used to -- other than measuring the
16  demand for items and the amount going out the door
17  versus inventory as far as how it selected an order
18  quantity?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  No.
21  BY MR. PIFKO:
22    Q.  Do you know if the order system took into
23  account any other factors that occurred at a pharmacy,
24  such as whether there was theft?
25       MS. McENROE:  Objection to form.

Page 53

1       THE WITNESS:  I'm not -- I'm not familiar with
2    all the details of how the replenishment, like --
3  BY MR. PIFKO:
4    Q.  Okay.
5       MS. McENROE:  Mark, we've been going just
6    about an hour, if there's a time soon that's good
7    for a break.
8       MR. PIFKO:  Yeah, we can take a break in just
9    a minute.
10  BY MR. PIFKO:
11    Q.  Do you know if there was documentation on how
12  the order, the replenishment system, worked?
13    A.  Yes.
14    Q.  Okay.  We can take a break.  We started at
15  what -- do you know if there was a name for the
16  documentation on how the order replenishment system
17  functioned?
18    A.  I have no idea what the name would be.
19    Q.  Okay.
20       THE VIDEOGRAPHER:  Off the record, 10:29 a.m.
21    (Brief recess was taken.)
22       THE VIDEOGRAPHER:  On the record, 10:51 a.m.
23    (Rite-Aid Belli Exhibit No. 2 was marked for
24  identification.)
25  BY MR. PIFKO:

Page 54

1    Q.  I'm handing you what's marked as Exhibit 2.
2    A.  Okay.
3    Q.  For the record, Exhibit 2 is a printout of
4  your LinkedIn profile, and I really just had a quick
5  question.
6    A.  Okay.
7    Q.  Take your time to look at it and make yourself
8  comfortable that it's accurate.  What I want to know
9  is, earlier we kind of talked about your work history
10  and your education.
11       What I want to know is, is this Exhibit 2
12  correct?  Is it more correct than your memory?  Can we
13  rely on this as documentation of what you did, the time
14  periods, et cetera?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  No, because this says it was
17       Rite-Aid's employment the whole time.  Whereas,
18       actually, I started with Eckerd and then Brooks
19       Eckerd and then Rite-Aid.  So it was through
20       multiple buyouts, but the reason just Rite-Aid is
21       listed is because it's easier to show when looking
22       for employment --
23  BY MR. PIFKO:
24    Q.  Okay.
25    A.  -- but no, this is --

Page 55

1    Q.  We'll fix that, but then --
2    A.  Okay.
3    Q.  -- any other issues that you want to -- let's
4  go back to, you know, there's -- it says, on the bottom
5  right-hand corner, it has the page out of 4.
6    A.  Okay.
7    Q.  So let's go -- the last page is basically
8  blank.  The page 3 of 4 is the earlier thing, your
9  education there; is that correct?
10       MS. McENROE:  You're talking about the
11       University of Tennessee Knoxville?
12       THE WITNESS:  Tennessee.  Yes.
13  BY MR. PIFKO:
14    Q.  Okay.  That reflects your degree and the time
15  period that you attended that university?
16    A.  Yes.
17    Q.  Okay.  Then you've got an internship here; is
18  that correct?
19    A.  I did -- that internship was during -- I took
20  a semester off.  So that's why I stated three and a
21  half years.
22    Q.  Okay.
23    A.  So I took a semester off to do that
24  internship, and then I came back and graduated.
25    Q.  Okay.  The next job that you had, the Dollar

Page 56

1  Tree job, is that accurate?
2    A.  Yes.  That was my first job --
3    Q.  Okay.
4    A.  -- when I graduated.
5    Q.  And then so when you started, you actually
6  worked -- so it says here that you started in 2004, but
7  you believe it was some iteration of Eckerd?
8    A.  It was Eckerd.
9    Q.  Okay.  So that was for Eckerd.  The entire
10  time that was Eckerd?
11    A.  Yes.
12    Q.  Okay.
13    A.  Well, at some point -- I don't remember when
14  Brooks bought Eckerd, but yeah, it was somewhere during
15  that position.
16    Q.  Okay.
17    A.  I don't recall the year.
18    Q.  Roughly 2004.  Does that sound right?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  I don't recall.
21  BY MR. PIFKO:
22    Q.  Okay.
23    A.  I -- I remember being in that position when it
24  happened, but --
25    Q.  Okay.  So at some point in that first job,

Page 57

1  Brooks and Eckerd had some sort of corporate
2  transaction, and it was Brooks Eckerd after that?
3    A.  Correct.
4    Q.  And then so the next job up, that was for
5  Brooks Eckerd?
6    A.  Correct.
7       MS. McENROE:  And for clarity of the record,
8       that's the operation manager position?
9       MR. PIFKO:  Yes.
10  BY MR. PIFKO:
11    Q.  And then any other changes to the -- other
12  than that, is it accurate, what's on there?
13       MS. McENROE:  Objection to form.
14       THE WITNESS:  Yes.
15  BY MR. PIFKO:
16    Q.  Okay.  Then the senior manager job, was that
17  for Rite-Aid or still for Brooks Eckerd?
18    A.  For Brooks Eckerd.
19    Q.  Any other changes to that?
20    A.  No.
21    Q.  Okay.  Then going up to the operations manager
22  job at the bottom of 2 of 4.
23    A.  Yes.
24    Q.  Is that accurate?
25    A.  The operations manager, 2007 to 2009?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  Q.  Yeah.
2  A.  Yes, that's when I joined Rite-Aid.
3  Q.  Okay.  So at some point in the middle of that
4  or you think when you started that job it was all
5  Rite-Aid?
6  A.  When I started that job, it was -- it was
7  Rite-Aid.  The previous job was at Brooks Eckerd
8  corporate headquarters, so we closed that, and I did
9  not move to Camp Hill when I was in the op position.
10  So I went back out to the distribution center.
11  Q.  Okay.  So then looking at page 2 of 4,
12  everything on there is accurate; is that correct?
13  MS. McENROE:  Objection to form.
14  THE WITNESS:  Yes.
15  BY MR. PIFKO:
16  Q.  And then going to the first page, everything
17  on that page is accurate?
18  MS. McENROE:  Objection to form.
19  THE WITNESS:  Yes.
20  BY MR. PIFKO:
21  Q.  All right.  Thank you.  You can put that
22  aside, and we'll go back to talking --
23  A.  Okay.
24  Q.  -- about the suspicious order policies and
25  procedures.

Page 59

1  So I believe you said that the -- when an
2  order exceeded the threshold, the order selector was
3  supposed to conduct the investigation; is that correct?
4  A.  It would start the research process, yes.
5  Q.  Okay.  And were they supposed to tell anyone
6  else about the invest -- that they were doing some sort
7  of investigation?
8  MS. McENROE:  Objection to form.
9  THE WITNESS:  I -- I don't recall the exact
10  details of the procedure.
11  BY MR. PIFKO:
12  Q.  And then after they finished talking to the
13  store, they -- were they -- if they didn't believe it
14  was suspicious, were they supposed to, other than
15  writing it down in the log, were they supposed to tell
16  anyone else?
17  MS. McENROE:  Objection to form.
18  THE WITNESS:  If it was not suspicious, then
19  it would be logged, and that would be it.
20  BY MR. PIFKO:
21  Q.  And that's it?
22  A.  Well, the -- it would be communicated to
23  the -- I would get -- I don't know who else was on
24  there, but I would get reports that showed the
25  adjustments.  So it wasn't -- so I did see it through

Page 60

1  E-mail, but it was a different log than the handwritten
2  log.
3  Q.  Okay.  So let's talk about that.  You
4  received, by E-mail, reports of orders that exceeded
5  the threshold?
6  MS. McENROE:  Objection to form.
7  THE WITNESS:  I receipted -- I received a --
8  the log.  It was a different version of that log.
9  It was the adjustments that were being done.
10  BY MR. PIFKO:
11  Q.  Do you know -- so you said it was a
12  handwritten log, and then it would -- you must -- you
13  got it by E-mail.  So somebody converted that into a
14  digital format?
15  MS. McENROE:  Objection to form.
16  THE WITNESS:  Correct.
17  BY MR. PIFKO:
18  Q.  Do you know whose job it was to do that?
19  A.  I do not.
20  Q.  Someone at the distribution center?
21  A.  Yes.
22  Q.  Okay.  So you received these reports from all
23  distribution centers when you were in the compliance
24  position?
25  A.  I don't -- I don't recall.  It would have been

Page 61

1  different versions of the reports.
2  Q.  All I'm trying to say is, it's not that you
3  had responsibility for one particular distribution
4  center.  The reports that you received on these
5  threshold exceedances were company-wide, to your
6  knowledge; is that correct?
7  MS. McENROE:  Objection to form.
8  THE WITNESS:  Correct.  We had the same
9  process in all of our distribution centers.
10  BY MR. PIFKO:
11  Q.  So somebody from the distribution center would
12  E-mail it to you?
13  A.  I would get a version of that information in
14  an E-mail.
15  Q.  From somebody at the distribution center?
16  A.  From the DEA coordinator.
17  Q.  Okay.  And each distribution center, each of
18  those four distribution centers that handled controlled
19  substances had a DEA coordinator?
20  A.  Correct.  And I did misspeak earlier.  There
21  was -- I left out Liverpool, which would have been a
22  fifth distribution center.
23  Q.  Okay.
24  A.  I thought of it after.
25  Q.  That one also handled controlled substances?

Page 62

1　A.　Correct.

2　Q.　So there's five?

3　A.　Yes.

4　Q.　And each one of those has a DEA coordinator?

5　A.　Yes.

6　Q.　Do you remember the names of any of the DEA

7　coordinators?

8　A.　Marian Wood was for Perryman.　Barb, I can't

9　think -- remember her last name -- was for Woodland.

10　Tuscaloosa had two.　Bill Walker was the most recent,

11　and prior to that, Patricia.　Liverpool was Kim.　I

12　don't remember Charlotte.　I don't recall.

13　Q.　If it comes to you, you can tell me.　Do you

14　know what the job responsibilities were for the DEA

15　coordinator?

16　A.　I mean, they had a list of responsibilities.

17　You need to be more specific.　I mean, they were --

18　they were responsible for -- to be -- I mean, they

19　ensured compliance with the DEA in the DC.

20　Q.　As senior director of regulatory compliance,

21　did they report to you?

22　A.　They did not.

23　Q.　Who did they report to?

24　A.　The pharmacy manager in the DC.

25　Q.　Did you interact with them regularly?

Page 63

1　　　MS. McENROE:　Objection to form.

2　　　THE WITNESS:　Yes.

3　BY MR. PIFKO:

4　Q.　And so those people would send you the data on

5　orders that exceeded the threshold?

6　　　MS. McENROE:　Objection to form.

7　　　THE WITNESS:　Yes.

8　BY MR. PIFKO:

9　Q.　How -- what was the frequency with which they

10　would send it to you?

11　A.　I don't recall.

12　Q.　Was it a regular sending of it?

13　A.　Yes.

14　Q.　Okay.　So was it -- it was daily or weekly.

15　You don't remember?

16　A.　I don't recall because there was, again, there

17　was different versions that affected different parts,

18　but I received multiple logs.　I believe that log was

19　monthly, but I don't remember exactly.

20　Q.　Do you know if that log, to your recollection,

21　contained all the information that would have been in

22　the handwritten log?

23　A.　I don't recall, but we did review the

24　handwritten log when our internal audit team would be

25　auditing the DCs.　That was one of our steps.

Page 64

1　Q.　Okay.　And so that was going to be my

2　question.　Have you ever seen the handwritten log?

3　A.　Yes.

4　Q.　Okay.　Can you describe what it looks like?

5　A.　I don't recall the exact columns and what was

6　written, but it -- it had all the details of who the --

7　what the research was, who they spoke to, the date, the

8　quantities, the NDC number, but I don't recall exactly

9　what it looked like.

10　Q.　I was asking you if they spoke to anybody else

11　after they called the pharmacy, and you -- then we

12　started talking about these logs.　So do you know if,

13　when an order exceeded a threshold, the order selector

14　had to talk to anybody -- anybody else other than the

15　pharmacy?

16　　　MS. McENROE:　Objection to form.

17　　　THE WITNESS:　I don't recall the exact

18　　procedure.

19　BY MR. PIFKO:

20　Q.　Do you know if, after they completed their

21　discussion with the pharmacy, they had to talk to

22　anyone else?

23　　　MS. McENROE:　Objection to form.

24　　　THE WITNESS:　I don't recall the exact steps

25　　they took in the -- I know there's a written

Page 65

1　　procedure that they followed, but I don't remember

2　　the exact steps.

3　BY MR. PIFKO:

4　Q.　Do you know if any data was collected on the

5　ordering patterns of the stores by anyone?

6　　　MS. McENROE:　Objection to form.

7　　　THE WITNESS:　I don't recall.

8　BY MR. PIFKO:

9　Q.　You don't know either way?

10　A.　I -- I mean, no, I don't -- I don't recall.　I

11　mean, our -- obviously our replenishment system, that's

12　what that was; but other than that, I know asset

13　protection reviewed and government affairs reviewed

14　those things, but I -- I don't know the details of what

15　they reviewed.

16　Q.　So did you ever speak with anyone in asset

17　protection or government affairs about reports they may

18　have generated concerning ordering patterns?

19　A.　I know they reviewed the information, but that

20　was not my area of responsibility, and they were the

21　experts in that area, so I knew they were doing it, but

22　I didn't review the reports with them.

23　Q.　How do you know that they were doing that?

24　A.　When I took over the position, one of the

25　first things I did was learning kind of how everything

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  worked, and I spent time with asset protection and
2  spent time with government affairs, learning what they
3  did and what they reviewed but not in detail.
4      I just got kind of explained their
5  responsibilities and the steps they were doing but --
6  so yeah, I didn't go into detail at that point. It was
7  more me just kind of learning the -- who was doing what
8  and the responsibilities.
9      Q. Who specifically did you meet with at that
10 time?
11     A. Sophia Lai in asset protection and Janet in
12 government affairs, Janet Hart.
13     Q. How much time did you spend with them to get
14 that level of familiarity?
15     A. I mean, the initial was, I mean, a few days,
16 but then our relationship was on a daily basis. I
17 mean, I worked with Janet a lot and Sophia a lot.
18     Q. Did you ever look -- were you going to say
19 something? Sorry.
20     A. No. Go ahead.
21     Q. Did you ever look at any of the reports that
22 they had seen?
23     MS. McENROE: Objection to form.
24     THE WITNESS: I didn't review their reports,
25 no. I know they had -- I know they had processes

Page 67

1     in place and procedures they followed for doing,
2     on the store side, review and the order system;
3     but I -- I'm not sure exactly what they did.
4  BY MR. PIFKO:
5     Q. Okay. So you've never seen any reports that
6  they may have reviewed or considered?
7     MS. McENROE: Objection to form.
8     THE WITNESS: No. I have not.
9  BY MR. PIFKO:
10    Q. Do you know if any reports about ordering
11 patterns were provided to order pickers for them to
12 examine in connection with their selection of orders?
13    MS. McENROE: Objection to form.
14    THE WITNESS: I don't know if reports were
15    provided to them, but I do know they knew the
16    stores very well. Most of those pickers were
17    senior associates that worked in there a long
18    time, so there was not much turnover, and they
19    were very familiar with the stores.
20 BY MR. PIFKO:
21    Q. Did you ever meet -- did you ever meet any of
22 the people who were order selectors?
23    A. Yes.
24    Q. "Yes"?
25    A. Yes.

Page 68

1     Q. What was the circumstances under which you met
2  with those people?
3     A. Visiting the DC. I mean, I worked in DC
4  operations for a long time. So when I visited DCs, I
5  would visit different areas of the DC, and obviously I
6  would visit with the pharmacy areas and meet the
7  pickers, and we didn't sit down and have full
8  conversations. I knew a lot of them, but it was like a
9  hello and how are things going type thing.
10    Q. Have you visited all five distribution centers
11 that distributed controlled substances?
12    A. Yes.
13    Q. Throughout your time at Rite-Aid or only when
14 you were senior director of regulatory compliance?
15    A. Throughout my time at Rite-Aid.
16    (Rite-Aid Belli Exhibit No. 3 was marked for
17 identification.)
18 BY MR. PIFKO:
19    Q. I'm handing you what's marked as Exhibit 3.
20 Take a moment to review that. For the record, Exhibit
21 3 is a three-page document Bates labeled
22 Rite_Aid_OMDL_0016717 through 719. Let me know when
23 you're done reviewing that.
24    A. Okay.
25    Q. Have you seen this document before?

Page 69

1     A. I -- this first page looks familiar, yes.
2     Q. When do you think the last time was that you
3  saw it?
4     A. Back when I was working for Rite-Aid. So, I
5  mean, when we -- when we would audit distribution
6  centers, we would review their processes and
7  procedures. So, I mean, I definitely would have saw it
8  through that process.
9     Q. It says at the bottom Revised 09/2005. Do you
10 see that?
11    A. Yes.
12    Q. Is that a format that you're familiar with,
13 those numbers at the bottom, and then it says D.C. 10
14 DEA No. 0236073?
15    A. I don't recall. I mean, it was -- it may have
16 been a local DC 10 thing, but I'm not sure.
17    Q. Okay. DC 10, that's the Perryman facility,
18 correct?
19    A. Correct.
20    Q. So you're familiar with the process that's
21 being reflected here?
22    MS. McENROE: Objection to form.
23    THE WITNESS: Yes. I, however, don't know if
24    this is the most up-to-date procedure that was
25    created.

Page 70

BY MR. PIFKO:

1  Q. Do you know what this is reflecting, this
2  document, Exhibit 3?
3  A. It's the process we described, talked about
4  earlier.
5  Q. Okay. So it says that the associate, that's
6  the order selector; is that correct?
7  A. Yes.
8  Q. Okay. Then it says that the associate can
9  call the pharmacy manager or the pharmacist on duty to
10 verify the order quantity if it exceeds the threshold,
11 correct?
12 A. Are you in the --
13 Q. The first paragraph.
14 A. The first paragraph? Yes.
15 Q. And then it says that if the store verifies
16 that the quantity is correct, the associate notifies
17 them that you can't send more than 50 units. Do you
18 see that?
19 A. Yes.
20 Q. And then it says, If the store indicates that
21 an ordering error has occurred, the associate will
22 short the order to the pharmacist's requested quantity.
23 Do you see that?
24 A. I see that, yes.

Page 71

1  Q. And then it says, In both cases the associate
2  will make note of the order in the Above Average Order
3  Monitoring Log. Do you see that?
4  A. Yes.
5  Q. Does that refresh your recollection about the
6  name of the log that they used?
7  A. No. Again, I don't know -- I mean, this is
8  2005 that there's -- it could have been -- this policy
9  could have been updated five times since then with
10 names changing, and so I can't say this is the exact
11 policy I saw or this was the exact policy that was in
12 place when I was in the position.
13 Q. Have you ever seen something called an Above
14 Average Order Monitoring Log?
15 A. I know there was a log that the DC 10 kept,
16 yes.
17 Q. But you don't know what it was called?
18 A. I don't recall the name. It was --
19 Q. And you don't know if you've seen something
20 called an Above Average Order Monitoring Log?
21 A. I -- I saw -- the log that this is
22 referencing, I'm aware of that log. What it was
23 called, I don't remember if that was the exact name of
24 it.
25 Q. Okay.

Page 72

1  A. I mean, if --
2  Q. It says here in the last paragraph that if an
3  order is being picked by the night shift personnel,
4  they simply short the order to the threshold and then
5  enter it into the monitoring log. Do you see that?
6  A. Yes.
7  Q. Do you agree that's what it says?
8  A. I agree.
9  Q. Is that consistent with what your
10 understanding of what the practice was?
11 A. And that was primarily because there was no
12 pharmacy on duty at night, so --
13 Q. Okay. So in the situation where an order came
14 in during the night shift that exceeded the threshold,
15 there was no call made; is that correct?
16 A. No, that's not correct. I mean, there was
17 still research done. It just may have been the next
18 day, but because they couldn't get an answer at that
19 time, that was what they -- the only thing they could
20 do.
21 Q. Okay. So you're familiar with the process
22 that occurred when an order that exceeded the threshold
23 came in at night?
24 A. I'm familiar with the way it's written, yes,
25 and I know why it was written that way, because there

Page 73

1  would be no pharmacy on duty, but it doesn't mean that
2  the research was still not done.
3  Q. Okay. But -- so you're telling me that the
4  research on those orders was still done?
5  A. There was some sort of research still done.
6  There was still a log kept, and there was still notes
7  kept on how the order was handled and what was done.
8  Q. But you don't know what research was done?
9  A. I don't recall.
10 Q. You don't know for sure if they actually
11 called the pharmacist on those orders?
12     MS. McENROE: Objection to form.
13     THE WITNESS: On the evening pick orders?
14 BY MR. PIFKO:
15 Q. Yeah.
16 A. The log would state exactly who they spoke to
17 and what was done.
18 Q. Okay.
19 A. So --
20 Q. So in order to know exactly what occurred, the
21 only way we would be able to do that is to look at the
22 log?
23     MS. McENROE: Objection to form.
24     THE WITNESS: Correct.
25 BY MR. PIFKO:

Highly Confidential – Subject to Further Confidentiality Review

Page 74

1    Q.  Okay.  And is that -- would you say that
2    that's true for the orders that occurred in the day
3    that exceeded the threshold?  The only way we know
4    exactly what occurred is to look at the log; is that
5    correct?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  I -- I can't recall what
8        happened six years ago every single day through
9        the picks.  So the log would be your best -- would
10       be the best source to find out the steps that were
11       taken on a store order over the threshold.
12       (Rite-Aid Belli Exhibit No. 4 was marked for
13   identification.)
14   BY MR. PIFKO:
15   Q.  I'm handing you what's marked Exhibit 4.  Take
16   a moment to review that.  It's marked also a three-page
17   document, Rite_Aid_OMDL_0015079 through 15081.  Let me
18   know when you're done reviewing that document.
19   A.  Okay.
20   Q.  Are you familiar with what this document is?
21   A.  It's a newer version of the previous document
22   we looked at.
23   Q.  It says at the bottom Revised February 2008.
24   Agree?
25   A.  Yes.

Page 75

1    Q.  Okay.  Is this something that you're familiar
2    with from your time working at Rite-Aid?
3    A.  Again, I don't remember if this is the most
4    current version of the policy, but I am familiar
5    with -- with the process, the concept of the process
6    that they did in the DC.
7    Q.  For the most part, these are -- the first page
8    is pretty similar, except that the Exhibit 4 in the
9    second full paragraph talks about a ▮▮▮▮▮ average
10   movement of all controlled drugs, and Exhibit 3 talks
11   about a ▮▮▮▮▮ average movement.  Do you see that?
12       MS. McENROE:  Objection to form.
13   BY MR. PIFKO:
14   Q.  It's the second sentence of the second
15   paragraph.
16   A.  Yes.
17   Q.  Do you have an understanding about the
18   difference between the -- a ▮▮▮▮▮ average movement
19   and a ▮▮▮▮▮ average movement?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  I do not.
22   BY MR. PIFKO:
23   Q.  Do you know what an average movement is?
24   A.  Yes.
25   Q.  Okay.  What is an average movement?

Page 76

1    A.  That was a calculation in the replenishment
2    system.  So it would have been the average -- the
3    volume of the store, but I -- I don't know why the
4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5    Q.  You said that's a calculation in the
6    replenishment system?
7    A.  Yes.
8    Q.  Do you understand what exactly that
9    calculation is?
10   A.  No.
11   Q.  Do you have a rough idea?
12   A.  I know the concept of -- of how the
13   replenishment system worked and how the -- I mean, it's
14   based on volume and dispensing in the store and on
15   hand, but how -- the details of that, no, I can't speak
16   to that.
17   Q.  Okay.  And the concept of average movement,
18   what did you say your understanding was of that again?
19   A.  It would be -- it's the volume of the store.
20   Q.  So average movement means the store volume
21   over some time period?
22   A.  Yes.
23   Q.  Okay.  And so Exhibit 3 talks about a ▮▮▮▮▮
24   average, and Exhibit 4 talks about a ▮▮▮▮▮ average.
25   You don't know why there was a change?

Page 77

1    A.  No.
2    Q.  Do you know if there was any other
3    calculations, any other variances in ▮▮▮▮▮▮▮▮▮▮ on
4    this type of document?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  No.
7    BY MR. PIFKO:
8    Q.  Do you have any understanding about what
9    the -- that calculation was intended to do?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  What this calculation is
12       intended to do?
13   BY MR. PIFKO:
14   Q.  In the context of this document.
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  This was -- I mean, it's
17       using -- again, this -- that -- that's the first
18       step in our suspicious order monitoring.  I mean,
19       it's looking at the volume of the store, the valid
20       dispensings for prescriptions.
21       So we didn't ship any more to the store -- any
22       more volume than the store needed, based on the
23       volume of that store.  So we weren't -- it wasn't
24       a blind amount that we were shipping to a store.
25   BY MR. PIFKO:

Page 78

1    Q.  But as we talked about earlier, the threshold
2  for all stores during the entire time that you can
3  recall was the same except for a handful of 10 or so
4  stores --
5        MS. McENROE:  Objection to form.
6  BY MR. PIFKO:
7    Q.  -- is that correct?
8    A.  That's correct, but that was the second step.
9  We were already -- the orders were already being
10 calculated on the store volume and the store need.  So
11 this was -- the threshold was the second layer that we
12 put on top of that.
13       So if that still exceeded what our system said
14 they could have, we'd still bring it down to the
15 threshold.
16   Q.  When you say "that's the second step," what do
17 you mean -- what's the first step?
18   A.  Well, the replenishment system was kind of --
19 it was calculating.  So we never shipped more than the
20 store would need based on the volume.
21   Q.  Based on the demand, as we talked about
22 earlier?
23   A.  Based on the demand, yeah.
24   Q.  The auto -- the auto refill of the orders
25 based on what the demand was at that store; is that

Page 79

1  correct?
2        MS. McENROE:  Object to the form.
3        THE WITNESS:  Correct.
4  BY MR. PIFKO:
5    Q.  That's what you're referring to as the first
6  step?
7    A.  The DC, the orders the DC received, was based
8  on a replenishment order generated by the replenishment
9  system, which was calculated on the store volume.
10       (Rite-Aid Belli Exhibit No. 5 was marked for
11 identification.)
12 BY MR. PIFKO:
13   Q.  I'm handing you what's marked as Exhibit 5.
14 Take a moment to review that.  Let me know when you're
15 done.  For the record, Exhibit 5 is a several-page
16 document Bates labeled Rite_Aid_OMDL_0014035, and then
17 it's got an attachment which was a native spreadsheet
18 which was Bates labeled Rite_Aid_OMDL_001436.
19       All the native printouts have the same Bates
20 number because it's native, so there weren't different
21 pages.  Let me know when you're done reviewing that.
22 Okay.  If you see on the first page of Exhibit 5, it's
23 got your name there, correct?
24   A.  Correct.
25   Q.  So Marian Wood is sending this to Janet,

Page 80

1  Andrea, and you, correct?
2    A.  Correct.
3    Q.  And we talked about Marian.  She's -- she was
4  a DEA coordinator at one of the locations?
5    A.  Correct, at the Perryman Distribution Center.
6    Q.  Janet's name has come up already.  Do you know
7  who Andrea is?
8    A.  She worked for Janet.
9    Q.  Do you know what her role was?
10   A.  I don't know her exact role, no.
11   Q.  Have you ever met her?
12   A.  Yes.
13   Q.  She was under Janet in some capacity?
14   A.  Yes.
15   Q.  So the subject of this E-mail is Above
16 Threshold July 2012.  Do you see that?
17   A.  Yes.
18   Q.  And then it attaches this document that says
19 Threshold Log 2012.XLS.  Do you see that?
20   A.  Yes.
21   Q.  Looking at Exhibit 5 and including the cover
22 E-mail and then the printouts from the spreadsheet, do
23 you recognize what this document is that was attached
24 to the E-mail?
25       MS. McENROE:  Objection to form.

Page 81

1        THE WITNESS:  Yes, I remember seeing it.
2  BY MR. PIFKO:
3    Q.  When you said you got an electronic version of
4  orders that exceeded the threshold, is this the -- what
5  you received?
6    A.  This would be one, but this is not -- there's
7  other things on here than C3s too.
8    Q.  Fair enough.  But when you just said that, you
9  mean the product, the items that are listed here, is
10 not just controlled substances.  Is that what you're
11 saying?
12   A.  Correct.  This -- this would not be -- this is
13 a version -- that's why I was speaking earlier, the
14 version of the handwritten log is made up of other
15 ones.  So this would not match the handwritten log
16 because the handwritten log and the threshold log,
17 would be only controlled substances.
18   Q.  Okay.  So this contains more information than
19 the handwritten log, correct?
20   A.  Correct.
21   Q.  But this is the information that you received
22 with some regularity.  You didn't recall exactly how
23 often, but this is --
24   A.  This is -- yeah, I mean, now that I see it, I
25 recall it was monthly.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1   Q.  Okay.  So this reflects -- refreshes your
2   recollection that you received this type of report
3   every month?
4   A.  I -- I can't say I received it every -- yes.
5   I mean, I -- it was was a monthly report.
6   Q.  So let's look at the first page of the
7   attachment.  Can you explain what the columns are here?
8   A.  Date, it's obvious.  Store number, item
9   number, description of the item, quantity ordered,
10  allowable quantity, and reason.
11  Q.  Okay.  So when we see allowable quantity, is
12  that the threshold?
13  A.  I -- I don't -- I don't recall.  I think so.
14  Q.  How about the Reason column, do you know what
15  information is being reflected there?
16  A.  That would have been the notes from the call
17  to the store.  So pharmacy in charge is who they spoke
18  to, wanted all 41, so --
19  Q.  So, for example, you just read from the second
20  line.  It says SW.  That means spoke with?
21  A.  Yes.
22  Q.  And then PIC means pharmacist in charge?
23  A.  Correct.
24  Q.  And then it's got their last name?
25  A.  Correct.

Page 83

1   Q.  And then it has a note, like in this case it
2   says, Wanted all 41?
3   A.  Yes.
4   Q.  Okay.  So if there was any communication with
5   the pharmacy, it's reflected here in the Reason
6   section?
7       MS. McENROE:  Objection to form.
8       THE WITNESS:  Yes.  I mean --
9   BY MR. PIFKO:
10  Q.  Having seen the handwritten notes that were in
11  the log at the distribution center, was there anything
12  else in the handwritten notes that would be beyond
13  what's in here?
14  A.  I don't recall.  There could be more detail,
15  but I'm not sure.
16  Q.  Let's go down a few lines here.  There's a
17  line that says the item is 105047.  It's, I don't
18  know, just kind of eyeballing it, maybe 10 lines down.
19  The date is 5/9/12.
20  A.  Okay.
21  Q.  Are you there?
22  A.  Yes.  Yes.
23  Q.  Okay.  Do you see that item description?
24  A.  Yes.
25  Q.  Do you know what that is?

Page 84

1   A.  Hydro.
2   Q.  That's a Schedule 3 controlled substance?
3   A.  Yes.
4   Q.  And it has the C3 there?
5   A.  Correct.
6   Q.  Okay.  And so it says the allowable quantity
7   is 10, and the amount ordered was 11?
8   A.  Yes.
9   Q.  And then it just has the reason as the auto
10  replenishment system?
11  A.  Yes.
12  Q.  Okay.  And it doesn't reference any call being
13  made.  Do you see that?
14  A.  Yes.
15  Q.  Okay.  So we don't know that there was anyone
16  called on that particular order, correct?
17      MS. McENROE:  Objection to form.
18      THE WITNESS:  It doesn't mean there wasn't any
19      research done.  I can't give the exact reason why
20      auto replen was listed, but you see that it was --
21      the quantities over the threshold were small and
22      was -- in that case, but it doesn't mean that
23      research wasn't done.
24  BY MR. PIFKO:
25  Q.  Was there a practice that if a quantity over

Page 85

1   the threshold was small, like you just said, that there
2   wouldn't be a call?
3   A.  No.
4   Q.  Do you have an understanding -- a lot of these
5   say auto replen as the reason.  Do you see that?
6   A.  Yes.
7   Q.  Do you have an understanding of what that's
8   intended to reflect?
9   A.  I don't; but the threshold limit that is set,
10  I mean, there are stores that had high volume that
11  probably -- not probably, but based on their volume,
12  legitimately could have received volume or shipments
13  over that threshold because it's a high-volume store,
14  but we still did not ship it and still brought it down
15  to the threshold.
16      So there -- there would be cases that it
17  wouldn't be suspicious just because it's a high-volume
18  store and they, based on their volume, legitimately
19  needed a volume above that threshold.  That just was a
20  limit that was set internally.
21  Q.  Do you know what Tramadol is?
22  A.  No.  I mean, I know of it, but I don't --
23  Q.  Are you aware that Tramadol is an opioid
24  painkiller?
25      MS. McENROE:  Objection to form.

Page 86

1    THE WITNESS:  I don't.
2  BY MR. PIFKO:
3    Q.  You don't know either way?
4    A.  I'm not aware if it's an opioid or not.
5    Q.  Okay.  Let's look at the -- there's one a few
6  lines down dated May 2nd, 2012.  There's an item
7  quantity ordered of 62.  Do you see that?
8    MS. McENROE:  Can you say that one more time
9  where you are?  I'm sorry.
10    MR. PIFKO:  Yeah, I'm looking --
11    THE WITNESS:  What's the store number?
12  BY MR. PIFKO:
13    Q.  Store No. 3246.
14    A.  Okay.
15    Q.  Do you see that order?
16    MS. McENROE:  Are we going up?  I'm sorry.
17    THE WITNESS:  Yes.
18    MS. McENROE:  I'm still having trouble.  Oh, I
19  see.
20  BY MR. PIFKO:
21    Q.  It's like five lines down or so.
22    MS. McENROE:  Willow has it.  I got it.  Thank
23  you.
24    MR. PIFKO:  And you can see it on the screen
25  as well.

Page 87

1    MS. McENROE:  Yeah, that's what I was just
2  saying.  Yeah.  Thank you.
3  BY MR. PIFKO:
4    Q.  So do you see that the quantity ordered is 62?
5  Do you see that there?
6    A.  Yes.
7    Q.  Okay.  But the allowable quantity is 50?
8    A.  Yes.
9    Q.  Okay.  Do you have an understanding about
10  whether that's, based on your experience, you said that
11  the one that was 1 over the threshold was relatively
12  low.  Do you have an understanding that -- whether 62
13  as a quantity was much higher than 50?
14    MS. McENROE:  Objection to form.
15    THE WITNESS:  I don't because I can't -- I
16  don't know that store's history or volume, so I
17  can't speak to that.
18  BY MR. PIFKO:
19    Q.  But would you say that -- you said that 11
20  was, when the threshold was 10, was only a little bit
21  over the threshold.  Do you recall saying that?
22    A.  Yes.
23    Q.  Okay.  Do you believe that 62 is a lot over
24  the threshold or a little?
25    MS. McENROE:  Objection to form.

Page 88

1    THE WITNESS:  Again, I don't know -- I -- I
2  can't -- I don't know that store's volume.  I'm
3  not familiar with that store, so I can't -- I
4  can't say if that would be a high order for that
5  store or not.  It may be -- based on the store's
6  volume, it may not be high.
7  BY MR. PIFKO:
8    Q.  But the threshold is 50.  You concede that
9  here, correct?
10    A.  I do.
11    Q.  Okay.  And so is 62 -- all I'm asking you, is
12  62 a lot over 50 --
13    MS. McENROE:  Objection.
14  BY MR. PIFKO:
15    Q.  -- based on your experience?
16    MS. McENROE:  Objection to form.
17    THE WITNESS:  Again, the threshold is not
18  based on the store volume.  So I don't know that
19  store's volume.  So 62 may not be high for that
20  store.  I -- because I don't know the order
21  history or the order volume of that store.
22  BY MR. PIFKO:
23    Q.  And then for this one, it just has as the
24  reason auto replenish.  Do you see that?
25    A.  Yes.

Page 89

1    Q.  So you don't know if a call was made based on
2  that entry, correct?
3    A.  I know research would have been done.  I don't
4  know -- I can't speak to what research would have been
5  done.
6    Q.  When you say you know research would have been
7  done, why do you say that?
8    A.  Because in the log, part of the process is
9  they -- we -- there was research and steps done for
10  every -- every order.  I just -- I can't speak to or
11  recall what was done on -- for each reason situation.
12    Q.  Do you know why some of these have an entry
13  that says spoke with somebody and others don't?
14    A.  I do not.
15    Q.  If you look in this document, do you see any
16  occasions where it says anything other than spoke with
17  the pharmacist and wanted in the quantity?
18    MS. McENROE:  Objection to form.
19    THE WITNESS:  Yes, there's other reasons in
20  there.
21  BY MR. PIFKO:
22    Q.  Okay.  What are the other reasons you see?
23    A.  Exceptions for 15 bottles only.
24    Q.  Do you know what that refers to?
25    A.  No.

Page 90

1  Q.  Any others?
2  A.  Exception for a hundred bottles only.
3  Q.  Do you know what that refers to?
4  A.  No.
5  Q.  Any others?
6  A.  Do you want me to read all the spoke withs,
7  the different names or --
8  Q.  I'm asking you -- I see -- would you agree
9  the main two reason codes are auto -- auto replenish is
10 the main reason in here, and then others say spoke with
11 pharmacist and say wanted and the quantity; and I was
12 asking you if there are other entries and for you to
13 tell me if you knew what they meant.
14     MS. McENROE:  Objection to form.  And, Mark,
15     are you only talking about this particular page of
16     the Excel?
17     MR. PIFKO:  Yeah, the whole Exhibit 5.
18     MS. McENROE:  Oh, so there are more pages too.
19     THE WITNESS:  I mean, there's more -- there's
20     more exception ones in there.  There's picks and
21     quantity of two.
22 BY MR. PIFKO:
23 Q.  Let's -- the exception ones, do you know any
24 of the ones that say exception, do you know what that
25 means?

Page 91

1  A.  No.
2  Q.  And do you see one that said pick -- what page
3  of the document is that on?
4  A.  They're not page numbered, but it's the third
5  to the last page.  It's in the bottom.  It says picks
6  in quantity of two.
7  Q.  Do you know what that means?
8  A.  No.
9  Q.  When you received this report, what did you do
10 with it?
11     MS. McENROE:  Hold on a second.
12     MR. PIFKO:  Okay.
13     MS. McENROE:  Did you want him to continue?
14     Because there's another page here.
15 BY MR. PIFKO:
16 Q.  When you received this document, what did you
17 do with it?
18 A.  I was looking through it for -- I was looking
19 at the allowable quantity over store quantity and
20 making sure nothing stood out or any reasons were,
21 like, where wanted a thousand, so we shipped a
22 thousand, like, things that were completely out of
23 line.
24 Q.  Did you get training on what you were supposed
25 to look for in here?

Page 92

1  A.  No, but I wasn't the only one looking at it,
2  too.  I mean, I knew the concept of the report, and it
3  was also going to Janet and Andrea, too.  So I wasn't
4  the only one looking at it.
5  Q.  You said that you were looking at the order
6  quantities and comparing them to the thresholds.  Is
7  that what you said, or did I mishear you?
8  A.  I would look through and see -- because it
9  obviously goes along with the reason.  So I'd look at
10 the quantity ordered and allowable quantity and then
11 the reason.
12 Q.  So let's go back to that one on the first page
13 that we were looking at with the -- let's look, for
14 example, at the hydrocodone one we were looking at.
15 There was that one we were looking at where it had 11?
16 A.  Uh-huh.  (Indicates affirmatively).
17 Q.  And the allowable quantity is 10?
18 A.  Yes.
19 Q.  And then there's one below it where the
20 quantity ordered was 15 and the allowable quantity is
21 10?
22 A.  Well, and remember, too, the allowable
23 quantity is a threshold.  It doesn't mean it was the
24 allowable quantity to ship to the store.  I mean,
25 this -- the orders were still being calculated on the

Page 93

1  volume of the store.
2  Q.  Right.
3  A.  So that allowable quantity was just a
4  threshold that we put in place.
5  Q.  Okay.  Well, I was going to ask you, so you're
6  telling me that you would review these and look at the
7  order quantity and the threshold and the reason.  So
8  when you look at those lines, what does that tell you?
9     MS. McENROE:  Objection to form.
10     THE WITNESS:  The 11 and 10?  It shows me that
11     the replenishment system generated an order of 11,
12     and we reduced it to 10.
13 BY MR. PIFKO:
14 Q.  But in the course of your being the senior
15 director of regulatory compliance and you were getting
16 these monthly, you said, what would you do if you saw
17 an entry like that?  What would you do with that
18 information?
19 A.  There's nothing suspicious with that entry.
20 Q.  How do you know that?
21 A.  Because the quantity ordered, 11, could be
22 valid based on the store volume or would be the volume
23 of the store -- based on the store volume.
24 Q.  How about the next one that was 15 and the
25 threshold is 10, what would you do with that one?

Page 94

1    A.   The same.  And this, again, Janet was
2  primarily the one doing the store research side.  So
3  that was another set of eyes looking at the DC side,
4  but Janet was reviewing the pharmacy side of the store
5  side, so -- and I don't know if Sophia is on that one,
6  too; but I know there's processes of looking at these
7  things other than me just scanning this.
8    Q.   Fair enough.  All I'm asking you today is what
9  you did --
10    A.   Yes.
11    Q.   -- and what you remember.
12         So what -- thinking back to your job duties,
13  if you saw this 15 and where the order is 10 or the
14  quantity threshold is 10 and it says auto replenish as
15  the reason, what would you do with that information?
16    A.   If I would have seen anything that's
17  documented that looked suspicious to me, I would have
18  gone to Janet to get more detail on it.
19    Q.   Do you ever remember any occasions where you
20  saw something that looked suspicious to you?
21    A.   No.
22    Q.   You said something earlier about the auto
23  replenishment system, and then you said something about
24  if the store legitimately needs the order.  Do you
25  recall saying that?

Page 95

1    A.   Yes.
2    Q.   What did you mean by if the store legitimately
3  needs the order?  How do you know that?
4    A.   I just meant that the volume that was -- the
5  replenishment was calculated, and I believe I was
6  referring to the threshold when I -- when I said that,
7  that there's -- there -- we did have high-volume
8  stores, that they had orders above the threshold, but
9  we still knocked it down to the threshold as a second
10  level of screening.
11         So when I said legitimately, meaning that we
12  were losing sales in that store because of our process.
13    Q.   But I guess what I'm asking is, just how do
14  you know that the order was legitimate, just based on
15  the volume?  Is that what you're saying?
16    A.   I mean, we filled valid prescriptions and
17  dispensed based on valid prescriptions.  So the volume
18  that moved out of the pharmacy was through
19  prescriptions, and there was -- the replenishment
20  system calculated on hand and what they needed based on
21  the volume.
22    Q.   Do you know if the replenishment system
23  calculated whether there were forged prescriptions that
24  were being used to fill --
25    A.   I can't say.

Page 96

1         MS. McENROE:  Objection to form.
2  BY MR. PIFKO:
3    Q.   -- prescriptions?
4    A.   I can't say.
5    Q.   You don't know either way?
6    A.   I don't know.
7    Q.   Do you know if there were occasions when
8  certain stores did fill forged prescriptions?
9         MS. McENROE:  Objection to form.
10         THE WITNESS:  I -- I don't know.  I didn't
11    work in pharmacy operations.
12  BY MR. PIFKO:
13    Q.   That was never -- something you were never
14  aware of?
15    A.   No.
16    Q.   Are you familiar with whether there were any
17  enforcement actions brought against Rite-Aid by any
18  government agencies concerning filling of any invalid
19  prescriptions?
20    A.   No.
21    Q.   You don't know either way?
22    A.   I'm not aware of any.
23    Q.   Are you aware of any enforcement actions taken
24  by any government agency concerning issues with
25  reporting theft of controlled substances at any

Page 97

1  Rite-Aid pharmacies?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  I am not aware of any.
4  BY MR. PIFKO:
5    Q.   When you -- well, at any time in your
6  position, did anyone communicate to you anything about
7  any enforcement actions taken by any government
8  agencies?
9    A.   No.
10         MS. McENROE:  Objection to form.
11         (Rite-Aid Belli Exhibit No. 6 was marked for
12    identification.)
13  BY MR. PIFKO:
14    Q.   I'm handing you what's marked as Exhibit 6.
15  For the record, Exhibit 6 is a document Bates labeled
16  Rite_Aid_OMDL_0014727 through 14802.  Can you take --
17  the earlier pages are an E-mail, and then it's
18  attaching a document that's entitled RITE AID
19  DISTRIBUTION CENTER DEA REGULATORY GUIDELINES.
20         Take a minute to review that.  I understand
21  the guidelines is a lengthy document.  You can look at
22  it as much as you need to, but I was only going to ask
23  you some questions about particular pages.
24    A.   Okay.  I'm ready.
25         MS. McENROE:  Did you read the cover E-mail?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1      THE WITNESS: I did read the E-mail, yes.
2  BY MR. PIFKO:
3      Q.  Okay.  First, do you recall the discussion
4  reflected in the E-mail in the first four pages?
5      A.  Briefly.  It was just getting the books
6  bounded.  We had -- the books existed in the
7  distribution centers, but I was in the process of just
8  kind of updating it and cleaning it up and making it
9  look like a presentable book.  I mean -- it was all --
10     Q.  When was it -- okay.  When was the last time
11 you saw the documents in Exhibit 6?
12     A.  Yesterday.
13     Q.  Okay.  How about before that, when was the
14 last time you saw them?
15     A.  When I was working for Rite-Aid.
16     Q.  Okay.  At the time that you would have sent
17 this?
18     A.  Yes.  This is -- if I remember correctly, this
19 was kind of towards right before I was leaving the
20 company.
21     Q.  Do you know what was -- can you tell me --
22 sorry -- what's reflected in the discussion in this
23 E-mail?  What's -- what are you doing here?
24     A.  Getting the book bounded.
25     Q.  Okay.

Page 99

1      A.  The book existed in the DC.  We updated some
2  sections in here; and by doing that, I had the book
3  bounded and sent out to the DCs that have versions, the
4  clean versions of it, and they also had it
5  electronically.
6      Q.  So this was a project that you took on when
7  you were senior director of regulatory compliance to
8  make sure that the distribution centers had
9  sufficiently presentable books reflecting the DEA
10 policies; is that correct?
11         MS. McENROE:  Objection to form.
12         THE WITNESS:  They -- no.  I mean, they had
13     current versions of the book.  When I updated the
14     book, we made new versions of the book and had it
15     bounded.  So this book existed.  This was just a
16     newer version of it.
17 BY MR. PIFKO:
18     Q.  Okay.  So one of the projects you worked on as
19 senior director of regulatory compliance was to do some
20 updates to this book; is that correct?
21     A.  One of my -- yeah.  I mean, I just was
22 making -- was doing -- making sure we were consistent
23 in all the DCs and all the policies were being --
24 current.
25     Q.  Did someone ask you to take that

Page 100

1  responsibility on, or did you initiate that on your
2  own?
3      A.  I initiated it on my own.
4      Q.  Do you remember the nature of any revisions
5  that you made?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  I don't.  They were very little.
8      It was -- the processes and procedures weren't
9      necessarily updated.  It may have been terminology
10     updated or made more current, but that was it.
11 BY MR. PIFKO:
12     Q.  What led you to want to make those changes and
13 take that project on?
14     A.  I was responsible for an audit team also and
15 worked in audit.  So I was having policies and
16 procedures current and updated, and it was something
17 that -- and consistency was something that was
18 important to me, so --
19     Q.  So you were familiar with these policies
20 throughout your tenure at Rite-Aid?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  I was familiar with them when I
23     took the position of regulatory compliance.  Prior
24     to that, I would not have needed to know all these
25     procedures in here.

Page 101

1  BY MR. PIFKO:
2      Q.  You talked about how, when you took on the
3  job, you reviewed certain procedures.  Do you recall
4  that?
5      A.  Yes.
6      Q.  Is this one of the procedures you would have
7  reviewed when you took the job of senior director of
8  regulatory compliance?
9      A.  Yes.
10     Q.  So to your knowledge, this is a true and
11 correct copy of what the procedures were at that time
12 back in September 2013?
13     A.  Yes.
14     Q.  So I want to direct your attention to, I
15 guess, the first page of the policies, which is
16 Rite-Aid -- or Rite_Aid_OMDL_0014733.  Are you there?
17     A.  Yes.
18     Q.  Okay.  So this says in the second paragraph,
19 The following DEA GUIDELINES were prepared in response
20 to a need for a single source of current information
21 for RITE AID regarding Drug Enforcement Administration
22 policies and the requirements of the Comprehensive Drug
23 Abuse Prevention Act -- it's got a citation to the
24 public law -- otherwise known as the Controlled
25 Substances Act of 1970 and the implementing

Page 102

1 regulations. Do you see that?
2 A. Yes.
3 Q. Do you agree with that statement?
4 MS. McENROE: Objection to form.
5 THE WITNESS: Not -- I don't know if I would
6 agree with it, "were prepared in response to meet
7 a single" -- I mean, we had policies and
8 procedures for everything in place.
9 So to say it was in response to a certain
10 thing, I mean, that may be not completely
11 accurate. I mean, we had policies and procedures
12 for everything we did in our distribution centers,
13 so that would -- that would have been the need but
14 also to comply with regulations.
15 BY MR. PIFKO:
16 Q. But this says it's a single source of current
17 information. You had an understanding that there was a
18 desire to have a single document company-wide that
19 would have information about Controlled Substances Act
20 compliance?
21 MS. McENROE: Objection to form.
22 THE WITNESS: There was other documents and
23 other procedures outside of this document.
24 BY MR. PIFKO:
25 Q. Okay. But you had an understanding that there

Page 103

1 was a desire to have some sort of single source
2 document. Is that why it says this?
3 MS. McENROE: Objection to form.
4 THE WITNESS: I don't know why it says this.
5 I can't speak to that.
6 BY MR. PIFKO:
7 Q. Okay. Let's go down to the last full
8 paragraph. Do you see that?
9 A. Yes.
10 Q. Okay. It says, RITE AID is responsible for
11 ensuring compliance with DEA regulatory requirements,
12 and that responsibility for compliance cannot be
13 abdicated or transferred to anyone else. Do you see
14 that?
15 A. Yes.
16 Q. Do you agree with that statement?
17 MS. McENROE: Objection to form.
18 THE WITNESS: I mean, Rite-Aid is responsible
19 for ensuring compliance with DEA regulatory
20 requirements, yes, I agree with that. The
21 responsibility for compliance cannot be abdicated
22 or transferred to anyone else, I can't speak to
23 that. I mean, it would be situational, so I don't
24 know.
25 BY MR. PIFKO:

Page 104

1 Q. Is this consistent with what your
2 understanding of what the company's policy was at the
3 time?
4 A. I don't recall.
5 Q. How about the next sentence here, it says, The
6 legislative and social intent of regulating Controlled
7 Substances and products that contain List I chemicals
8 is consistent with the mission of RITE AID in servicing
9 the public good. Do you see that?
10 A. Yes.
11 MS. McENROE: Objection to form.
12 BY MR. PIFKO:
13 Q. Did I read that correctly?
14 MS. McENROE: One correction. It's serving,
15 not servicing.
16 BY MR. PIFKO:
17 Q. Let me read it again for clarity.
18 MS. McENROE: Thank you.
19 BY MR. PIFKO:
20 Q. The legislative and social intent of
21 regulating Controlled Substances and products that
22 contain List I chemicals is consistent with the mission
23 of RITE AID in serving the public good. Did I read
24 that correctly?
25 A. Yes.

Page 105

1 Q. Okay. Is that consistent with your
2 understanding of Rite-Aid's policy?
3 A. I -- I'm not sure. I mean, our mission was to
4 provide the necessary medical -- the necessary medical
5 prescriptions for patients in need. So if that -- so
6 in serving the public good, that's what it's referring
7 to.
8 Q. It also is saying that the legislative and
9 social intent of regulating controlled substances is
10 serving the public good. Do you understand it to be
11 saying that as well?
12 A. To prevent diversion. I mean, that's our --
13 yes.
14 Q. And then it says, To achieve these important
15 goals, RITE AID supports the proper and appropriate use
16 of Controlled Substances and products that contain
17 List I chemicals for legitimate use and seeks to
18 eliminate any and all diversion of Controlled
19 Substances and products that contain List I chemicals.
20 Do you see that?
21 A. Yes.
22 Q. Do you -- did I read that correctly?
23 A. Yes.
24 Q. Do you agree that was a policy of Rite-Aid?
25 MS. McENROE: Objection to form.

Page 106

1    THE WITNESS:  Yes.
2  BY MR. PIFKO:
3    Q.  What do you understand the phrase "eliminate
4  any and all diversion" to mean as used in that
5  sentence?
6    A.  I mean, that was -- I mean, we were
7  eliminating -- I don't know if eliminate is the right
8  word, but our goal was to prevent diversion in the
9  supply chain.
10    Q.  And what did you do to -- let me ask a
11  different question.  So is it your understanding that
12  there was a desire, as a registrant, to eliminate any
13  and all diversion?
14    MS. McENROE:  Objection to form.
15    THE WITNESS:  We had procedures and policies
16   in place to prevent diversion.
17  BY MR. PIFKO:
18    Q.  Do you have an understanding about why the
19  company had those policies and procedures in place?
20    A.  To be compliant with regulations.
21    Q.  And as it says here above "and also to serve
22  the public good," would you agree with that?
23    A.  I don't --
24    MS. McENROE:  Objection to form.
25    THE WITNESS:  Can you re-ask the question?  I

Page 107

1   don't --
2  BY MR. PIFKO:
3    Q.  Yeah.  Do you believe that -- so it's talking
4  about the legislative intent of controlled substances,
5  and we talked about that earlier, that it says that
6  part of that is to serve the public good.  Do you
7  agree?
8    A.  The public good and -- yeah, in providing
9  prescriptions for patients in need.
10    Q.  So the public good and prescribed -- and
11  providing prescriptions for patients in need, correct?
12    MS. McENROE:  Objection to form.
13    THE WITNESS:  Correct.
14  BY MR. PIFKO:
15    Q.  Is that what you're saying?
16    A.  That was -- I mean, our business was to
17  dispense prescriptions for patients that needed the
18  products we sold.
19    Q.  Okay.  All I'm trying to ask you is, do you
20  understand that by attempting to eliminate diversion,
21  that that is part of what's being reflected here as
22  serving the public good?
23    MS. McENROE:  Objection to form.
24    THE WITNESS:  I mean, indirectly, yes.
25  BY MR. PIFKO:

Page 108

1    Q.  I want to direct your attention to the
2  guideline regarding suspicious order monitoring.  It's
3  at page 14756.  Let me know when you're there.
4    A.  Okay.
5    Q.  Take a minute to review this, and let me know
6  when you're ready to discuss this page.
7    A.  Okay.
8    Q.  Is this consistent with your understanding of
9  what the company's policy was concerning suspicious
10  order monitoring?
11    A.  For the DC portion, yes.  There was other
12  policies and procedures related to this throughout the
13  company.
14    Q.  Among other things, Item 6 here, it says, All
15  discussions, investigations, and reports will be
16  maintained in the file designated "Suspicious Orders,"
17  which is -- the word "Suspicious Orders" is in quotes.
18  Do you see that?
19    A.  Yes.
20    Q.  Is that an accurate description of the way
21  records and reports concerning the suspicious order
22  monitoring were kept?
23    MS. McENROE:  Objection to form.
24    THE WITNESS:  At the DC level, yes.
25  BY MR. PIFKO:

Page 109

1    Q.  So at the DC level, there was a file
2  designated "Suspicious Orders"?
3    A.  There would have been a file "Suspicious
4  Orders" that contained the logs and anything related to
5  the process --
6    Q.  That were --
7    A.  -- not necessarily suspicious orders.
8  Meaning -- it didn't mean that everything in the file
9  was a suspicious order.  It was maintaining our program
10  that we did.
11    Q.  That would have been all the -- everything in
12  the "Suspicious Order" file would have been all the
13  documents that we've talked about.  The logs, correct?
14    A.  The necessary research that was done.
15    Q.  And any research that was done; is that
16  correct?
17    A.  Yes.
18    Q.  Sorry.  I just want to get -- so we're not
19  talking over each other.  So --
20    MS. McENROE:  Let him finish the question.
21    THE WITNESS:  I'm sorry.
22    MS. McENROE:  No problem.
23  BY MR. PIFKO:
24    Q.  It's okay.  We've been doing fine so far.  So
25  to be clear, the handwritten reports that we were

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 talking about that the order fillers would have filled
2 out if an order exceeded a threshold, that would have
3 been maintained in the suspicious order file at the
4 distribution center; is that correct?
5    A. There -- there was files maintained in the
6 distribution center. I can't speak to the exact label
7 that was on it, and there may have been multiple files,
8 but there were files at the DC level on everything
9 we did related to suspicious order monitoring.
10    Q. Okay. And so if there was a -- if there was
11 any investigation or a discussion concerning an order,
12 it would have been kept in a suspicious order file?
13    A. Correct.
14    Q. That's a hard copy file or an electronic file?
15    A. It would be hard copy. I mean, when the DEA
16 came to audit our distribution centers, I mean, this
17 file would come out and be presented to them.
18    Q. Did the company, to your knowledge, have a
19 practice of how long they would maintain those files?
20    A. There was a retention policy, but I don't
21 recall what they were.
22    Q. Do you see -- let's look at the first
23 paragraph here. It says, All orders containing
24 Controlled Substances are reviewed and verified for
25 order quantity and size to not exceed the determined

Page 111

1 order history threshold. Do you see that?
2    A. Yes.
3    Q. Is that consistent with your understanding of
4 the company's policy?
5    A. It's consistent with this portion of the
6 policy related to the distribution center.
7    Q. How was that policy met?
8    MS. McENROE: Objection to form.
9    THE WITNESS: How was it --
10 BY MR. PIFKO:
11    Q. In practice, how did you do that?
12    A. It was the steps we spoke about earlier. So
13 if an order was over the threshold, then it would be
14 reduced down to the threshold.
15    Q. Okay. Where does it say here in the policy
16 that if an order is over threshold, that you can reduce
17 the order and ship it under threshold?
18    A. In the previous policy that we were -- we were
19 reviewing. This policy is explaining the suspicious
20 order monitoring, the process. It's not saying -- it's
21 not the individual picker process, the SOP that we
22 spoke about earlier that explained that.
23    Q. Okay. You agree with me that nothing on this
24 guideline concerning suspicious order monitoring says
25 anything about cutting orders if they exceed the

Page 112

1 threshold. Do you agree with me?
2    MS. McENROE: Objection to form.
3    THE WITNESS: No, because it says any order
4    exceeding the threshold is immediately forwarded
5    to the department manager for further
6    investigation.
7 BY MR. PIFKO:
8    Q. In practice, do you know if that actually
9 happened, that any order exceeding the threshold was
10 forwarded to the department manager?
11    A. Yes. The logs were kept.
12    Q. Who is the department -- who was the
13 department manager?
14    A. It would have been the pharmacy manager.
15    Q. At the distribution center?
16    A. Correct.
17    Q. And so it's your understanding that the logs
18 containing these exceedances were forwarded to the
19 pharmacy manager?
20    A. That was the process.
21    Q. Did you understand that the pharmacy manager
22 did any investigation?
23    A. I can't speak to that. The process was for
24 investigation, research to be done.
25    Q. So you don't know if the pharmacy manager

Page 113

1 conducted any investigation?
2    A. There was -- it would have been noted in the
3 log what was done.
4    Q. Okay. If the pharmacy manager conducted an
5 investigation, we would see it in the log?
6    A. If he was part of the investigation, yes.
7    Q. It says in Item 3 here, A review is performed
8 to determine the legitimacy of the order. Appropriate
9 documentation of the review is maintained on file. Do
10 you see that?
11    A. Yes.
12    Q. What's your understanding of what review was
13 performed to determine the legitimacy of the order?
14    A. Again, that's the -- the log we were reviewing
15 earlier with the notes. So that would have been the
16 research done to validate the order.
17    Q. It says, If an order -- in Item 4, it says, If
18 an order -- I'm paraphrasing. If an order is
19 suspicious, then it gets reported to the corporate
20 office, who is then supposed to notify the DEA. Do you
21 see that?
22    A. Yes.
23    Q. And then in Item 5 -- I'm paraphrasing again,
24 but it says, If an order is suspicious, then Government
25 Affairs department determines whether it can ship or

Page 114

1  not ship it, correct?
2      A.  Yes.
3      Q.  To your knowledge during your tenure there, no
4  orders were ever reported as suspicious, correct?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  While I was the -- in my last
7       position there, no.
8  BY MR. PIFKO:
9      Q.  How about before that, do you know?
10     A.  I don't know.
11     Q.  It's around noon.  We can take a lunch break.
12         MS. KELLY:  That's fine.
13         MS. McENROE:  Yeah.  It's up to you.
14         THE VIDEOGRAPHER:  Off the record, 12:05 p.m.
15         (Luncheon recess.)
16         THE VIDEOGRAPHER:  On the record, 12:51 p.m.
17  BY MR. PIFKO:
18     Q.  Welcome back.  I want to ask you a question,
19  going back to Exhibit 5, if you want to put that in
20  front of you real quick.
21     A.  Okay.
22     Q.  Do you remember this was the monthly --
23     A.  Yes.
24     Q.  -- orders above threshold that you received,
25  correct?

Page 115

1      A.  Yes.
2      Q.  This list, you received this after all these
3  orders were shipped, correct?
4      A.  Correct.
5          (Rite-Aid Belli Exhibit No. 7 was marked for
6  identification.)
7  BY MR. PIFKO:
8      Q.  I'm handing you what's marked as Exhibit 7.
9      A.  Okay.
10     Q.  Take a minute to look at this.  Do you recall
11  before the break that we were looking at Exhibit 6 at
12  the -- Rite-Aid's DEA regulatory guidelines?  And for
13  the record, Exhibit 7 is another earlier version of the
14  regulatory guidelines Bates labeled
15  Rite_Aid_OMDL_0014379 through 14452.
16         Take as much time as you need, but I just had
17  a couple quick questions.
18     A.  Okay.  I was just verifying it's an earlier
19  version we looked at, yes.
20     Q.  Okay.  Well, you see on the first page there's
21  an E-mail?
22     A.  Yeah.
23     Q.  And it -- well, it's --
24     A.  Well, it says 2000 --
25     Q.  -- an earlier E-mail than Exhibit 6.  Agreed?

Page 116

1  Exhibit 6 is --
2      A.  Yes.
3      Q.  -- an E-mail dated September 27th, 2013,
4  whereas Exhibit 7 is dated December 4th, 2012.  Agree?
5      A.  Yes.
6      Q.  Okay.  Do you recall why you were receiving
7  the Regulatory Guidelines in 2012?
8          MS. McENROE:  Objection to form.
9          THE WITNESS:  I was send -- I was sending
10      them; I wasn't receiving them.
11  BY MR. PIFKO:
12     Q.  Sorry.  Do you recall why you were sending
13  them?
14     A.  I don't.  Jason Delorenzo was in
15  transportation.  He wasn't anything -- he didn't work
16  in regulatory, so it may have been -- I don't know.
17     Q.  It says here, based on the E-mail, that the
18  document name is DC Pharmacy Controlled Drug SOPs 2007.
19  Do you see that?
20     A.  Yes.
21     Q.  Do you agree?
22     A.  Yes.
23     Q.  So you believe this is a 2007 version?
24     A.  Yes.
25     Q.  Okay.  If you want to compare Exhibit 6, the

Page 117

1  first page of the policy, to the first page of the
2  policy on Exhibit 7, based on my review of that page,
3  it appears to be the same, the full -- the full
4  paragraphs.  Let me know if you disagree.
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  I mean, without comparing them
7       line by line, it appears to be the same, but I
8       can't --
9  BY MR. PIFKO:
10     Q.  Then I want to direct you to the page, if you
11  have both open, that we were looking at concerning the
12  suspicious order monitoring.  In Exhibit 6, that was
13  0014756; and in Exhibit 7, that is 0014404.  So let me
14  know when you're there.
15     A.  Okay.
16     Q.  You -- did I understand your testimony
17  correctly that when you said when you were sending the
18  print -- them to be printed in books in 2013, that you
19  had done some cleanup.  It was like basically what
20  you -- I think what you would have said was it wasn't,
21  like, substantive changes, just little cleanup to the
22  document; is that correct?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  Correct.
25  BY MR. PIFKO:

Page 118

1  Q. Okay. I note here that I believe -- and you
2  can take your time to review and let me know if you
3  disagree, but that the procedures here on Exhibit 6 and
4  7 regarding Suspicious Order Monitoring are the same.
5  Do you agree?
6  A. The procedure section --
7  Q. The Steps 1 through 6?
8  A. Correct, they are the same.
9  Q. Okay. But there is a difference in that the
10 2007 version is called EXCESSIVE ORDER MONITORING, and
11 the version you sent in 2013 says SUSPICIOUS ORDER
12 MONITORING. Do you see that?
13 A. Yes.
14 Q. Is that a change that you made?
15 A. Yes.
16 Q. Okay. What was the reason for making that
17 change?
18 A. Excessive order monitoring, it was implied
19 that excessive orders were suspicious. So it didn't
20 really describe this -- this program; and what we were
21 actually doing is suspicious order monitoring, not
22 excessive order monitoring, because not all excessive
23 orders are suspicious.
24      So it was just cleaner and getting in line
25 with the DEA regulations of having the suspicious order

Page 119

1  monitoring program; but yeah, we didn't change the
2  procedure because the procedure was still -- it was
3  being -- it was sufficient, and we were doing it
4  correctly, so it was just really cleaning up the book.
5  Q. And like you testified earlier, no one asked
6  you to make that change. You took it upon yourself to
7  make that change.
8  A. I went through the book and worked with and
9  got the opinions of the DEA coordinators and also
10 Janet. So it wasn't -- I didn't make the decision
11 to -- I made suggestions, and we decided as a group on
12 what things we would change and not change.
13 Q. Was this changing excessive order monitoring
14 to suspicious order monitoring something you discussed
15 with Janet?
16 A. I don't recall every change to this book. She
17 reviewed every change to the book.
18 Q. How about do you recall having a discussion
19 about that change with the DEA coordinators?
20 A. The same. They -- all the changes that were
21 suggested were reviewed, and everyone had a chance to
22 put opinion on it.
23 Q. But you don't recall having a specific
24 discussion about making that exact change?
25 A. No. It was -- I mean, there was multiple

Page 120

1  discussions about the revisions to the book. So I
2  can't recall the exact incident when we discussed this
3  section.
4  Q. Did you discuss the revisions over E-mail?
5  A. I'm sure there was some over E-mail and then
6  some over the phone. I don't --
7  Q. Do you think -- continue.
8  A. I would say I don't -- I don't recall relating
9  to this section, how it was.
10 Q. Do you think you exchanged red lines over
11 E-mail of the document?
12 A. I don't recall.
13 Q. How -- how would you normally have
14 communicated -- well, the distribution center DEA
15 coordinators, they weren't located in the same city as
16 you, correct?
17     MS. McENROE: Object to form.
18     THE WITNESS: Correct.
19 BY MR. PIFKO:
20 Q. How would you normally communicate with them?
21 A. I would have -- E-mail or phone, and then
22 Janet would have been -- I was down the hall from her,
23 so I walked to her office a lot. So things like this
24 would have been, because of the size, would have
25 probably been viewed as a hard copy.

Page 121

1  Q. Why do you say that?
2  A. Well, just because of the size. I mean, I
3  would have -- I can't speak to this particular time,
4  but I would have -- a lot of times I would walk into
5  Janet's office, and we'd sit down and go through things
6  together.
7      So it wasn't always in E-mail, and I usually
8  would not call her on the phone since she was a few
9  doors down. And to clarify, the DCs, if this was
10 sent -- when it was sent to the DCs, if they didn't
11 have opinions or feedback, it didn't necessarily mean
12 that there would be a red line version coming back and
13 forth.
14 Q. But you would have sent them their -- any
15 changes that you were thinking of by E-mail, correct?
16     MS. McENROE: Objection to form.
17     THE WITNESS: I would have sent them the final
18     version, yes.
19 BY MR. PIFKO:
20 Q. But you said you discussed potential changes
21 with them?
22 A. Everyone had a chance to offer their opinion
23 on the changes in the document. I don't recall how
24 those meetings took place.
25     (Rite-Aid Belli Exhibit No. 8 was marked for

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 identification.)
2 BY MR. PIFKO:
3     Q.  I'm handing you what's marked as Exhibit 8.
4 For the record, Exhibit 8 starts with an E-mail, and
5 it's got an attachment.  It's Bates labeled
6 Rite_Aid_OMDL_0017279.
7         The E-mail matching it then is just two pages
8 to 17280; and then the attachment is Bates labeled
9 Rite_Aid_OMDL_0017281 because it was produced natively.
10 All those pages have the same number on them.  Do you
11 know what, they -- some of them have the page 17289.
12         MS. McENROE:  Mark, is there --
13         MR. PIFKO:  Yes, there are differences.  There
14 must be --
15         MS. McENROE:  Is it fair to say --
16         MR. PIFKO:  Oh, there's different attachments,
17 that's why.  Okay.
18         MS. McENROE:  Is it fair to say that you're
19 representing that this is a family of documents
20 produced together?
21         MR. PIFKO:  Yeah.  I believe if you look on
22 the first E-mail, that it's got several
23 attachments here.  One, two -- 12 spreadsheet
24 attachments.
25 BY MR. PIFKO:

Page 123

1     Q.  And I'm not going to ask you detailed
2 questions about what's on every page.  I just wanted to
3 ask you if you know, generally, what this is.
4     A.  Yes.
5     Q.  Okay.  What is the document that's reflected
6 here?
7     A.  This -- the overall audit summary and the
8 items that say checklist after, and then physical
9 security assessment was our supply chain internal audit
10 checklist.  So when we go in and audit a DC, these are
11 the checklists we'd follow.
12         The first one, the auto fail questions within
13 each checklist, we had questions designated as an auto
14 fail.  So if they got a "no" on those items, then they
15 would fail that section automatically.
16         Revisions and recap, this was following a
17 meeting.  This was after a few -- I don't recall how
18 many DCs we've audited, but this checklist was kind of
19 a work in progress.  So we were building this checklist
20 as we were going along.
21         So we met with members of the audit team and
22 reviewed the checklist to decide if there needed to be
23 revisions because a lot of questions -- when you're out
24 there doing the audits, a lot of the questions were
25 duplicates or were basically automatic yeses.  You

Page 124

1 could never answer it no, just the way it was phrased.
2 So we went through and corrected some of the grammar
3 and then removed questions that were kind of irrelevant
4 or a duplicate.
5     Q.  And so this is generally reflective, subject
6 to the revisions you're talking about, of the checklist
7 that would have been used in the audit?
8     A.  Yes.
9         MS. McENROE:  Objection to form.
10 BY MR. PIFKO:
11     Q.  And you mentioned that earlier in your tenure
12 with Rite-Aid you did some audits; is that correct?
13     A.  I was -- yeah, I was a member of the audit
14 team when I was working in the distribution center.
15     Q.  I understand you said there was some
16 fine-tuning about taking out some questions and the
17 language used in some questions, but this is -- was
18 this generally consistent with the practice when you
19 had -- were a member of the auto -- the audit team as
20 well?
21     A.  I can't speak to that.  I wasn't in charge of
22 the audit team; I was a member of the audit team.  So
23 revisions that may have been done, I may necessarily
24 not have been involved in.
25     Q.  I think you misunderstood my question.  I'll

Page 125

1 ask -- was that just -- the checklist, the formatting
2 of the checklist and the like is what I'm asking
3 about --
4     A.  Yes.
5     Q.  -- not the changes to the checklist.
6         MS. McENROE:  Objection to form.
7         THE WITNESS:  When I was on the audit team, it
8     was the same -- the same checklist, not -- the
9     same type of checklist and same process we
10     followed as it's in here.
11 BY MR. PIFKO:
12     Q.  I'll represent to you that none of these
13 checklists deal with suspicious order monitoring.
14 Would you agree that the audits didn't concern
15 suspicious order monitoring?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  No, I wouldn't agree.  There's a
18     DEA checklist that we would use.
19 BY MR. PIFKO:
20     Q.  Is the DEA checklist, if you look at the
21 attachments here, is that one of the checklists?
22     A.  It would have been under the regulatory
23 checklist.
24     Q.  Okay.  So let's -- this would have been
25 accurate as of 2012, correct --

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  A.  Yeah.  Yes.
2  Q.  -- with the date it's being done?
3     Okay.  So let's find that spreadsheet.
4     MS. McENROE:  If it's at all helpful and if
5  it's right, Mr. Pifko, I think that that checklist
6  starts with 2 of 24, and it's a 24-page --
7     THE WITNESS:  It's 17290.  These are all
8  different or no?
9  BY MR. PIFKO:
10  Q.  Each checklist has a Bates number, but then
11  within the Bates number -- or within a checklist, the
12  Bates number is the same.
13  A.  Is this --
14     MS. McENROE:  Yeah, so I think the first page
15  of the regulatory checklist, to be confirmed by
16  the witness, of course, ends in Bates 17290.
17     MR. PIFKO:  Right.
18     THE WITNESS:  Correct.
19     MS. McENROE:  So are we all on the same page?
20     THE WITNESS:  Yes.
21  BY MR. PIFKO:
22  Q.  And it starts with the first page that is with
23  that Bates number, correct?
24     MS. McENROE:  I think that's a question for
25  you.

Page 127

1     THE WITNESS:  Repeat the question.  I'm sorry.
2  BY MR. PIFKO:
3  Q.  That checklist, it starts -- the first time
4  you see that portion of the checklist is the first time
5  you see the 12790 (sic) Bates label.  The one before
6  that ends in 17289.
7  A.  Correct.
8  Q.  Okay.  So that's how we know when it starts,
9  and it's -- the first page has got this Rite-Aid DC
10  Self-Assessment Program Regulatory Checklist Summary of
11  Results.  Do you see that?
12  A.  Correct.  Yes.
13  Q.  And then we can tell it's that one because
14  then when you go to the actual spreadsheet, it's got
15  the A8 on the top of it, correct?  Those actually look
16  like page numbers.  It's got A.08, .01, .02.  Do you
17  see that in the top right-hand corner?
18  A.  Yes.
19  Q.  All right.  So this was a regulatory
20  checklist?
21  A.  Yes.
22  Q.  And this says it's revised as of June 6, 2012.
23  Do you see that on the left at the top?
24  A.  Yes.
25  Q.  Okay.  Can you point me to where there are

Page 128

1  questions concerning suspicious order monitoring?
2  A.  11, 14, 15, 31.  I think that's the majority
3  of them, most of them.
4  Q.  Okay.  So 11, 14, 15, 31.  Is that all of
5  them?
6  A.  Yes.
7  Q.  Okay.  So nothing else in this audit checklist
8  concerns suspicious order monitoring other than those
9  items?
10     MS. McENROE:  Objection to form.
11     THE WITNESS:  I said 15, correct?
12  BY MR. PIFKO:
13  Q.  Yeah.  I have 11, 14, 15, 31.
14  A.  Correct.
15  Q.  Okay.  So I want you to walk me through how
16  this -- how to read this.  So let's look at -- for
17  example, most of them don't have anything in the
18  Authoritative Reference column, but 15 is one of the
19  ones you mentioned.  It says ADM-10, DRG's.  What is
20  that referring to?
21  A.  The DEA reg -- the document we reviewed
22  earlier, the big -- the regulatory guidelines.
23  Q.  Is it Exhibit 6 and 7?
24  A.  I'm sorry?
25  Q.  Exhibit 6 and 7?

Page 129

1  A.  Yes.
2  Q.  Okay.  What does ADM-10 mean?  I assume DRG
3  means DEA Regulatory Guidelines, which is the name of
4  that document?
5  A.  Correct.  Yeah.  AMD-10 (sic).  I don't know
6  for sure, but I wanted to make sure.  It was another
7  SOP in the DC 10, but I'm not sure.  I don't remember
8  what policy that was.
9  Q.  Okay.
10  A.  It's another policy.
11  Q.  Then the next column over is Workpaper
12  Reference.  There's nothing in -- anything in any of
13  those columns.  What does that refer to?
14  A.  This -- because this isn't a completed audit
15  checklist, so if you had a completed audit checklist,
16  any work papers or any research tied to answering that
17  question would reference that.
18  Q.  Okay.  So if you're conducting the audit and
19  you're evaluating the answer to that question and you
20  needed to look at documents, you would write them in
21  there?
22  A.  You could have a -- yes.  You could have a
23  document that you've created with your notes that you'd
24  reference, or yes, if you were verifying something, you
25  would log in there what reference you used to say yes

Page 130

1  or no to the question.
2      Q.  And then how about the Risk Rating?
3      A.  It was high, medium, or low, and that was
4  based on -- that could evaluate the points.  So if you
5  see, the highest was four points.  I think the mediums
6  were 2, and lower 1s, that's using the score
7  calculations.
8      Q.  Who decides the points in the risk profiles?
9      A.  These checklists came from our internal
10  insurance group, which was outside of supply chains.
11  So we also had another internal audit group, which was
12  Rite-Aid's.  So these checklists originally came from
13  them and then were tweaked by us along the way, our
14  internal group.
15      So a lot of these ratings were established
16  originally by them.  Some of them may have been -- or
17  some of them were updated also, but I -- I mean, it was
18  a group -- I mean, it wasn't -- I wasn't deciding, just
19  me.  It was a discussion between multiple people.
20      Q.  When something is ranked as a high risk, what
21  does that mean?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  It was -- I mean, the risk --
24      the Risk Rating, I mean, in that area.  So if it
25      was a higher risk item, it would be, I mean, a

Page 131

1      higher risk is as it's stated.
2  BY MR. PIFKO:
3      Q.  I guess what I'm trying to figure out is, risk
4  to what, to the company's success or, like, risk to --
5  do you have an understanding about what's the risk
6  measuring?
7      MS. McENROE:  Objection to form.
8      THE WITNESS:  Not to the company's success.  I
9      mean, it would be to multiple areas because
10      it's -- the regulatory would be risk to -- with
11      regulatory agencies, where they may be -- you may
12      have some of the other sections, the risk could be
13      internal to the DC.  It depends on the question
14      and the area you're referring to.
15  BY MR. PIFKO:
16      Q.  Okay.  So with respect to questions that
17  concern suspicious order monitoring, that is a risk to
18  regulatory compliance; is that correct?  Am I
19  understanding you?
20      MS. McENROE:  Objection to form.
21      THE WITNESS:  Some of them can be, yes.
22  BY MR. PIFKO:
23      Q.  So, like, let's look -- you said 11 --
24      A.  Yes.
25      Q.  -- concerned suspicious order monitoring.  It

Page 132

1  says, Verify that the excessive order monitoring policy
2  is known and available.  Do you see that?
3      A.  I do, yes.
4      Q.  And then it has a medium level risk?
5      A.  Yes.
6      Q.  Who -- can you explain what that means as far
7  as it being ranked medium level risk?
8      A.  Well, because that question, if I remember,
9  that question was actually removed because all it's --
10  it's stating, is there a policy available.  It's not
11  stating -- so that was one of the ones when I was
12  referring to it, of course it's available.  All the DCs
13  had it, but we were more concerned were they actually
14  enforcing the policy.
15      So medium risk, meaning if -- I mean, if they
16  have the policy, that's great.  That's not what we were
17  interested in.  We were interested in whether they were
18  following the policy.
19      Q.  Of any of these ones you mentioned here, let's
20  see, 11 -- and 13, Is an ARCOS file kept capturing all
21  RC 80, 87, and 007 adjustments to C3-A/Controlled
22  drugs?  Do you see that?
23      A.  Yes.
24      Q.  What's that -- what's that saying?
25      A.  That was the -- the RCs are adjustment codes,

Page 133

1  and those are reportable to ARCOS reporting.  So it's
2  just verifying what it says, so --
3      Q.  So that's -- I don't want to cut you off.
4      A.  So that's high risk because obviously it's DEA
5  compliance.
6      Q.  Okay.  So if you don't comply, that puts the
7  company at high risk of being in trouble with the DEA;
8  is that correct?
9      MS. McENROE:  Objection to form.
10      THE WITNESS:  Correct.
11  BY MR. PIFKO:
12      Q.  15 seems similar to 11.  11 was Verify the
13  excessive order monitoring policy is known and
14  available.
15      A.  Yeah.
16      Q.  15 says Verify that the controlled drug
17  procedure is known and available.  Agreed?
18      A.  Yes.
19      Q.  Those are similar?
20      A.  It's similar that we're -- it's verifying that
21  a policy is available.
22      Q.  14, If a threshold is ever adjusted, is
23  documentation available to support the change?  Do you
24  see that?
25      A.  Yes.

Page 134

1    Q.   You said that concerns suspicious order
2  monitoring, correct?
3    A.   Well, it's -- it was part of the suspicious
4  order monitoring policy, but just because a threshold
5  is adjusted didn't mean the order was suspicious.  So
6  it was just making sure the proper research was done.
7    Q.   And that's listed as a medium risk?
8    A.   Yes.
9    Q.   Okay.  Can you explain what that means?
10   A.   All of these -- I mean, there's medium, that
11  it doesn't mean that it wasn't being done.  That's why
12  I mentioned 31, because 31 was the high risk, and it
13  refers to the controlled drug SOPs, which all of those
14  previous ones we discussed are within that, those SOPs.
15       So -- and that says are they adhering to the
16  controlled drug.  That's what we were concerned with,
17  not if they had the policy available or if the
18  documentation is available or -- we were concerned
19  whether they were actually following the policies.
20   Q.   Okay.  So as far as ranking them, you're
21  saying that 31 was a higher risk than 14 if you didn't
22  comply?
23   A.   I mean, 14 was a -- was within 31.  I mean,
24  those steps and processes were in 31.  So I can't
25  answer why that one was medium, but the -- this -- if

Page 135

1  they weren't doing something they were supposed to, the
2  high-risk question is 31 because all of those were
3  subsets of the controlled drug SOP.
4        So that's -- that's what we were concerned
5  with, if they were adhering to that and following that,
6  not having things on hand.
7    Q.   Do you know if 14 was removed at some point
8  from the audit checklist?
9    A.   I'm not -- I'm not sure about 14.  I don't
10  recall.
11   Q.   Then let's move over in the columns.  So
12  Autofail you explained.  If you don't pass that, that
13  means you automatically fail the audit?
14   A.   You fail that section.
15   Q.   Okay.  Would that be -- like we're looking at
16  Section 8 of the checklist, right, at the top it says
17  A8; and, if you go back to the first page, you know,
18  there's all the different ones?
19   A.   Yeah.
20   Q.   So this is Section 8.  You agree?
21   A.   Yes.
22   Q.   Okay.  So if you fail one of these within
23  Section 8, you failed that section.  Is that what's
24  reflected in that column?
25   A.   Yeah.  If you turn to the first page of the

Page 136

1  regulatory audit, it shows the number of questions, the
2  auto fail and kind of how -- total possible points.  So
3  if you were to hit an auto fail, it takes you
4  mathematically where you would be in the red to failing
5  is the maximum amount of points you could get.
6    Q.   Then moving over, what are the -- what's the
7  next column that says Yes, No, N/A?
8    A.   You're answering the questions.
9    Q.   Okay.
10   A.   So the N/A exists because we -- if we were --
11  if it was a DC that didn't have pharmacy, then that
12  would be N/As, but we still did a regulatory audit on
13  that DC.
14   Q.   And then Possible Points, that's how much,
15  when you're adding up the score, the answer contributes
16  to the total score?
17   A.   Correct.
18   Q.   And then Points Deducted, what does that
19  reflect?
20   A.   If you marked yes, then how many points were
21  deducted.  So it's basically the possible points.  If
22  you get the question wrong, then the possible points
23  would be deducted from the total.
24   Q.   Is the goal to get a low score or a high
25  score?

Page 137

1    A.   A high score.
2    Q.   Okay.  So if you're supposed to be doing
3  something and you say no, then points get deducted?
4    A.   Correct.
5    Q.   And if you're not supposed to be doing
6  something and you say no, then you would add points,
7  correct?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  No.  Points just wouldn't be
10   deducted.
11  BY MR. PIFKO:
12   Q.   Okay.  Oh, okay.  So you start with all the
13  points?
14   A.   You start with all the points.
15   Q.   And then for everything you're doing wrong,
16  you start subtracting?
17   A.   Yes.
18   Q.   Okay.
19       (Rite-Aid Belli Exhibit No. 9 was marked for
20  identification.)
21  BY MR. PIFKO:
22   Q.   I'm handing you what's marked as Exhibit 9.
23  For the record, Exhibit 9 is a multi-page document.  It
24  says -- well, I guess the headings on different pages
25  are different, but it's Bates labeled

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  Rite_Aid_OMDL_0021819 through 21823.  Go ahead and
2  review that, and let me know when you're done.
3      It looks like the last pages are shipping
4  labels, but the first two pages contain other
5  information.  Do you know what's being reflected here?
6      A.  I don't know the details, but it's -- I mean,
7  it's a receiving worksheet.
8      Q.  What's a receiving worksheet?
9      A.  It would -- the worksheet they used when they
10 received in pharmacy or front -- it could be front-end
11 products, too, but this particular one is pharmacy
12 related.
13     Q.  So this is something that the pharmacy
14 receives?
15     A.  The distribution center.
16     Q.  Okay.  So that's what I'm trying to
17 understand.  So who gets this?
18     A.  I don't know.  Hold on.  I'm sorry.  Yes, this
19 would be at the distribution center.  I can't really
20 read the second page that well, but yes, this would
21 have been at the distribution center.
22     Q.  Here, this appears to reflect materials from
23 McKesson.  The first page has a vendor named McKesson,
24 and the second page at the top on the right looks like
25 it had been highlighted.  It says McKesson as well.  Do

Page 139

1  you see that?
2      A.  Yes.
3      Q.  Are these shipments to the distribution center
4  from McKesson?
5      A.  Yes.
6      Q.  This is just reflecting the nature of what was
7  in a particular shipment to the distribution center?
8      A.  Yeah, it appears to be an inbound shipment
9  going from McKesson to the distribution center.
10     Q.  Do you know, were stores allowed to order
11 directly from McKesson?
12     A.  I'm not familiar with the store process,
13 exactly how it worked.
14     Q.  Okay.  Have you ever seen this document,
15 Exhibit 9, in the course of your job?  Was this
16 something that you had seen?
17     A.  I mean, not this particular one; but receiving
18 worksheets, I mean, were common for anything that came
19 in to distribution, whether it was pharmacy or front
20 end.  There was a receipt process.
21     Q.  Okay.  What do you do with this information?
22 Just use it for inventory control?
23     MS. McENROE:  Objection to form.
24     THE WITNESS:  I don't know how this -- what
25     was done at the DC with this.  I mean, it's the

Page 140

1      records of the receipt, but in this particular
2      case it's controlled substances.
3  BY MR. PIFKO:
4      Q.  How do you know that?
5      A.  Because it says controlled drugs on it.
6      Q.  Where does it say that?  On the first page on
7  the left there?
8      A.  Yeah.  So there would have -- obviously a
9  record has to be kept of everything coming in.
10     Q.  You said that you looked at this when you
11 worked at the distribution center?
12     MS. McENROE:  Objection to form.
13     THE WITNESS:  No, I didn't say that.
14 BY MR. PIFKO:
15     Q.  You said you would -- you had some familiarity
16 with these?
17     A.  Well, yeah, just because I've -- I mean, I
18 worked in distribution a long time.  So, conceptually,
19 I know what this is, but I didn't have -- I didn't do
20 this, this function, at the DC.
21     Q.  Okay.  That's what I was trying to get at.
22     A.  Yeah.
23     Q.  So you never had a job where you had to take
24 this and do something specific with it?
25     A.  No.

Page 141

1      Q.  Have you ever heard the term "DSD"?
2      A.  Yes.
3      Q.  What does that mean to you?
4      A.  Drop ship.
5      Q.  Okay.  What's a drop ship?
6      A.  Coming -- I mean, drop ship to a store would
7  be something being direct through the store, not
8  through distribution, not through supply chain.
9      Q.  Okay.  So that's like something gets ordered
10 but it doesn't go to the distribution center; it just
11 goes directly from whoever the supplier is to the
12 store?
13     A.  Yeah, like tobacco and drinks in the coolers
14 and things like that.
15     (Rite-Aid Belli Exhibit No. 10 was marked for
16 identification.)
17 BY MR. PIFKO:
18     Q.  I'm handing you what's marked as Exhibit 10.
19 For the record, Exhibit 10 is a two-page E-mail
20 attaching a native document, and the Bates label is
21 Rite_Aid_OMDL_0017321, 322, and then there's a
22 multi-page Power Point which we'll discuss and identify
23 with the witness.  Let me know when you're done
24 reviewing the document.
25     A.  Okay.

Page 142

1    Q.   So if you go to the first page of Exhibit 10,
2    it's an E-mail from you to a couple people.  Who's
3    Eric Hungardner -- or Hungarter?
4    A.   Eric, and the other one is Norman, they were
5    actually the team leads on the -- for the audit team at
6    that time.  So I was, at this point, I was on the audit
7    team.  I wasn't over the audit team, so --
8    Q.   And then you're sending them audit training?
9    A.   I was -- yeah, this whole -- the whole
10   document was not mine.  We were doing -- so the audit
11   team, the members on the audit team, were -- worked out
12   in the distribution centers.  There were -- the two
13   teams were made up of people that worked in the DC.
14        So every year the new teams would go through
15   trainings, but they -- they were auditing areas that
16   they were -- that they worked in and knew very well.
17   So this was kind of an introduction in the training to
18   do the program and some of the, like, lessons learned.
19        Some of the audit questions can be very --
20   when you read them for the first time, they may not be
21   very -- you don't understand the intent of the
22   question.  You can misread what the intent was.
23        So this was kind of clarifying the intent of
24   the question so everyone understood, when they were
25   auditing, we were consistent on what we were auditing;

Page 143

1    and then the last -- the last part was we staged, like,
2    a fake audit, that on-the-floor training.
3        So those were the answers, but they walked out
4    in the DC, and we had certain things staged, so -- just
5    to get them in the audit way of thinking, but yeah,
6    it's --
7    Q.   So let's go to the first page of the
8    attachment, the Supply Chain Audit Team.  Are you
9    there?
10   A.   Okay.
11   Q.   It looks like the actual cover page.
12   A.   Oh, sorry.
13   Q.   Okay.  So what is this?  It says DC CSA
14   Training.  What does that mean?
15   A.   Supply -- I don't remember what CSA stands
16   for.
17   Q.   The Controlled Substances Act?
18   A.   No.
19   Q.   Okay.  It's different than that?
20   A.   Yes.  This is -- it has to do with audit.
21   It's nothing to do with the Controlled Substances Act.
22   Q.   DC stands for distribution center?
23   A.   Yes.  It was Certified Self-Assessment.
24   Q.   Okay.  What is that intended to reflect,
25   Certified Self-Assessment?

Page 144

1    A.   This was a self audit.  So we were doing a
2    self -- this was supply chain doing a self-audit on
3    itself.
4    Q.   So you're auditing the audit process?
5    A.   We were auditing our distribution centers.
6    Q.   Okay.
7    A.   This is the name of the program.  DC CSA, this
8    is what -- our program was a self-assessment audit
9    program.  So this is the training on that.
10   Q.   Does this reflect all areas of the audit?
11   A.   These are the sections of the -- of the
12   checklist, yes, with the exception of the physical -- I
13   believe there's a physical security one, which was
14   actually done by loss prevention.  We didn't do that
15   one.
16   Q.   And you're looking -- you're looking at the
17   first page after the cover page, and it's got the
18   different sections?
19   A.   Yeah.  Yes.
20   Q.   So this has the regulatory section that we
21   discussed before, correct?
22   A.   Correct.
23   Q.   Is there anything in here about suspicious
24   order monitoring?
25   A.   No, but I -- I didn't see anything, but it

Page 145

1    wouldn't necessarily have to be because this was not --
2    this was not the audit, the actual audit we were doing.
3    This was questions that may have come up through our
4    audit process that we were clarifying if there was
5    confusion on certain line items or certain things; and
6    there was -- and you're seeing an after effect, too.
7        I mean, there was the checklist, the grammar
8    and the -- and the questions, sometimes when you read
9    them, sometimes, like I said, you didn't know the
10   intent of the question because it could be confusing.
11   So we were constantly revamping those questions so it
12   was very clear what we were looking for.
13        So some of these are -- it's really just
14   clarifying things like that.  So the suspicious order
15   monitoring and the referencing processes were pretty
16   clear, what you were looking for.  I can't speak to why
17   these were on there, but these were the ones that,
18   somewhere along the process, may have been questioned.
19        (Rite-Aid Belli Exhibit No. 11 was marked for
20   identification.)
21   BY MR. PIFKO:
22   Q.   I'm handing you what's marked as Exhibit 11.
23   A.   Okay.
24   Q.   For the record, Exhibit 11 is a three-page
25   E-mail attaching a native document.  The Bates label is

Page 146

1 Rite_Aid_OMDL_0017445 through 17448, and then it's got
2 a six-page native attachment. Take a minute to review
3 that, and let me know when you're done.
4    A. Okay.
5    Q. What's being reflected in the attachment here?
6    A. So after we did an audit on a distribution
7 center, there would be a -- well, this -- this part is
8 the summary of the store by section.
9    Q. When you say "this part," you're looking at
10 0017446?
11    A. Yes. So this is the summary of the audit for
12 the Perryman Distribution Center. So that's being sent
13 out, what the results are. The Power Point attached is
14 when -- obviously you saw all -- the big checklist. We
15 would consolidate the checklist into the major findings
16 and do a exit out-brief with the general manager of the
17 DC when we left.
18    So this document you see is the major findings
19 that came from the audit, and this was then maintained
20 by me, where I continued to follow up until they were
21 resolved, and it shows the date of who resolved it and
22 when it was resolved, and we had a share drive where
23 all this was -- could be tracked by and seeing it
24 updated.
25    Q. So you would save these audit summaries on

Page 147

1 your share drive?
2    A. Yeah. I mean, all these -- there would be
3 records of these audit summaries.
4    Q. How often did you do audits on the
5 distribution centers?
6    MS. McENROE: Objection to form.
7    THE WITNESS: The internal auditing would
8    audit each distribution center once a year.
9 BY MR. PIFKO:
10    Q. You said there was two teams?
11    A. Yes.
12    Q. How many people were on a team?
13    A. I don't recall the exact number.
14    Q. And it's made up of people from all over the
15 company?
16    A. Correct.
17    Q. And so a team, an audit team, can include
18 people from -- that come from different distribution
19 centers?
20    A. Yes.
21    Q. Is there -- do you have to have a specific --
22 are there specific job titles that lead one to be on
23 the audit committee?
24    A. Yes. Usually the general manager of the
25 distribution center would recommend names, and that was

Page 148

1 based on their performance in a DC and if they had
2 knowledge, good knowledge, of certain areas; and then
3 those names would be reviewed by me and Wilson, people
4 within the supply chain, and Rick, and we'd select the
5 team.
6    This is when I was over regulatory. Prior to
7 that, I'm -- I can't speak to that process, how they
8 selected; but, when I was there, this is what we'd do.
9    Q. Okay. You mentioned "Rick." You meant
10 Rick Chapman?
11    A. Yes.
12    Q. Okay. And then the other name, Wilson?
13    A. Wilson, yes.
14    Q. Who is that?
15    A. The SVP over supply chain.
16    Q. Okay. Let's take another short break.
17    MS. McENROE: Sure.
18    THE VIDEOGRAPHER: Off the record, 1:42 p.m.
19    (Brief recess was taken.)
20    THE VIDEOGRAPHER: On the record, 1:58 p.m.
21 BY MR. PIFKO:
22    Q. Did you ever attend any Buzzeo conferences
23 when you worked at Rite-Aid?
24    A. I attended one, yes.
25    Q. Okay. Just -- so it's your recollection that

Page 149

1 you just attended it on one occasion?
2    A. Yes. I believe the first year that I was in
3 the position.
4    Q. In 2012?
5    A. Yes.
6    (Rite-Aid Belli Exhibit No. 12 was marked for
7 identification.)
8 BY MR. PIFKO:
9    Q. I'm handing you what's marked as Exhibit 12.
10 For the record, it's a four-page document Bates labeled
11 Rite_Aid_OMDL_0014487 through 14490. Take a minute to
12 review it, and let me know when you're done.
13    A. Okay.
14    Q. If you look at the first page of Exhibit 12,
15 this appears to be sent after you attended the
16 conference. Do you agree?
17    A. Yes.
18    Q. Okay. Do you know who Dave Jabowski -- I'm
19 going to mess up that name right there -- Jakubowski?
20    A. I don't remember him, no.
21    Q. Okay. Someone that you would have met at the
22 conference apparently?
23    A. Yes.
24    Q. Okay. So you agree you attended the 15th
25 annual conference in 2012?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1     A.   Yes.
2     Q.   Do you see there's an attachment here, a case
3  study, Suspicious Order Monitoring - A Total Solution.
4  Do you see that?
5     A.   Yes.
6     Q.   Did you review this when you received it?
7     A.   I don't recall.  I mean, it was a sales pitch.
8     Q.   When you say "a sales pitch," what do you mean
9  by that?
10     A.   At the Buzzeo conference -- I attended the
11  Buzzeo conference with the intent to expand my
12  knowledge about DEA compliance because I was new to the
13  position, and this -- there was a lot of talk about a
14  lot of systems and programs and a lot of sales of
15  different systems, and this was one of them that Buzzeo
16  was actually part of and owned.
17          So yeah, I mean, they were -- there was a
18  section at the conference speaking about this, and I
19  spoke to him about it, just to expand my knowledge, and
20  they were sending more information on it; but it wasn't
21  anything that I was -- that I did anything with, I
22  guess.
23     Q.   Well, that was going to be my next question.
24  After attending this conference, did you make any
25  changes to the suspicious order monitoring --

Page 151

1     A.   No.
2     Q.   -- procedures that existed at the time?
3     A.   No.  I mean, we were doing everything we were
4  supposed to be doing, so there was no changes that
5  needed to be made.
6     Q.   Is this the only one of these conference
7  you -- conferences you ended up attending?
8     A.   Yes.
9     Q.   Did anyone else from Rite-Aid go to this
10  conference with you?
11     A.   I don't recall.
12     Q.   They may have?
13     A.   They may.  Yeah, I'm not sure.
14     Q.   Was this something that your predecessors in
15  regulatory compliance attended, to your knowledge?
16     A.   I don't recall.
17     Q.   When you came back from the conference, did
18  you discuss any of the things that you learned with
19  anyone?
20     A.   I mean, I would always meet with Rick and
21  give, if I was traveling on behalf of the company, some
22  kind of report back on what I did.  I didn't gain a
23  whole lot from this conference.  It was more selling
24  software and other ideas that weren't a fit to us, or
25  we were already doing more than these things were

Page 152

1  suggesting, so --
2     Q.   Did you have suspicious order monitoring
3  software at this time?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  I mean, define "software."  We
6     had our different steps that we were doing.  We
7     didn't -- we had the replenishment system, which
8     was calculating the orders, and the threshold
9     system we spoke about.
10  BY MR. PIFKO:
11     Q.   Well, you said they were selling some
12  suspicious order monitoring software?
13     A.   Yes.
14     Q.   I think some of that's reflected in here.
15     A.   Yes.
16     Q.   Did you have software that did anything that's
17  described in here?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  I can't remember everything that
20     was described in there; but, as far as making
21     store specific orders and quantities, that's what
22     our -- essentially our replenishment system did,
23     and I believe there was some reporting software in
24     there, which we were generating reporting.
25          So, I mean, I don't remember everything in

Page 153

1  there, but -- and some of the stuff wasn't fit to
2  us because we were shipping to our own stores.  We
3  weren't shipping to outside stores, so --
4  BY MR. PIFKO:
5     Q.   What did you feel didn't fit to you because
6  you were shipping to your own stores?
7     A.   I don't -- I don't recall, but, I mean, some
8  of the software was geared towards, like, distributors.
9  So we didn't have -- we didn't need some of the
10  functions that would have been in there since we
11  were -- basically our replenishment system did
12  everything, so -- and they're our own stores.  They
13  weren't outside stores.
14     Q.   Did you feel like you knew everything that was
15  going on in your own stores?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  Me -- I mean, I -- I trusted the
18     people that did know what was going on in the
19     stores.
20  BY MR. PIFKO:
21     Q.   I'm just asking because you made a
22  differentiation between the fact that you distributed
23  to your own stores versus someone who distributes to
24  somebody else.
25          MS. McENROE:  Objection to form.

Page 154

1　　　　THE WITNESS: I'm not --
2　　　　MS. McENROE: Is there a question? I just
3　　want to make sure we're clear.
4　　　　THE WITNESS: I meant there was internal --
5　　internal sales. We were not shipping to customers
6　　outside of our company.
7　BY MR. PIFKO:
8　　　Q. Okay. And -- but what I'm saying is, what did
9　　that -- as a result of that, what was the significance
10　of that, in your mind?
11　　　A. That we knew our customer. There was -- I may
12　not have personally known the details of that store,
13　but there was other people, other functions, asset
14　protection, government affairs, that did know what was
15　going on in those stores.
16　　　　So just because I didn't personally know,
17　there was other groups within our company that did.
18　　　(Rite-Aid Belli Exhibit No. 13 was marked for
19　identification.)
20　BY MR. PIFKO:
21　　　Q. I'm handing you what's marked as Exhibit 13.
22　This is something that was marked yesterday -- or two
23　days ago in Mr. Chapman's deposition as Exhibit 2. For
24　the record, it's Bates labeled Rite_Aid_OMDL_0038075
25　through 77. Take a minute to review this, and let me

Page 155

1　know when you're done.
2　　　A. Okay.
3　　　Q. Have you seen this before?
4　　　A. Yes.
5　　　Q. When was the last time you saw this?
6　　　A. Yesterday.
7　　　Q. Before that, when was the last time you saw
8　it?
9　　　A. When I was -- I mean, I don't recall the exact
10　date, but when I was in my position. It was an ongoing
11　project, so I don't know when I saw this.
12　　　Q. This talks about the Suspicious Order
13　Monitoring Project. Do you see that?
14　　　A. Yes.
15　　　Q. Do you know what the Suspicious Order
16　Monitoring Project is?
17　　　A. Yes.
18　　　Q. Can you tell me what it is?
19　　　A. It was a project to bring -- I think I
20　described that we had all these separate systems in
21　place: The replenishment system and the DC threshold.
22　Asset protection was doing their thing, and government
23　affairs was doing their thing.
24　　　　So when I was new to the position, I was
25　working with all these different departments and seeing

Page 156

1　all these different things they were doing, but we
2　didn't have a platform to display it. We had -- it was
3　very segmented.
4　　　　So what I was wanting was something that, if
5　the DEA came into the DC, I -- or it came in anywhere,
6　we could show this robust system that we had, that
7　otherwise it was -- the way it currently was, it was
8　harder to display because it was so many different
9　groups and reports and people handling things.
10　　　　So I was trying to bring everything into one
11　system that was easily displayed. When the DEA came
12　in -- and an example, they'd audit the Perryman DC, and
13　they saw their process and their process only, and they
14　complimented that process but if they only knew
15　everything else we did too, and that was kind of the
16　hope of this, was to be able to show them everything we
17　did, not just that DC portion.
18　　　Q. Was this something that was your idea to do?
19　　　A. Yes.
20　　　Q. When did you first present the idea of doing
21　this?
22　　　A. I don't recall the exact date. I mean,
23　somewhere -- it would have been somewhere around when
24　this project was first starting. I mean, I had the
25　idea for a while because, like I said, there was all

Page 157

1　these things we were doing, but there wasn't an easy
2　way of displaying it, so --
3　　　Q. So this is dated in June 2013. So you believe
4　it was somewhere around this time that you presented
5　the idea? Or 2012 -- or no. Sorry. This was in 2013.
6　　　A. I honestly don't recall the exact date.
7　　　Q. Who did you first speak with about the idea of
8　doing this?
9　　　A. It would have been Janet and Rick and maybe
10　Sophia. I'm not sure, but everyone that was involved
11　with it.
12　　　Q. Do you know who Marcia is?
13　　　A. Marcia?
14　　　Q. Oh, sorry. Yeah.
15　　　A. She is -- she worked in IT.
16　　　Q. Okay. So on June 12th, 2013, she sends
17　this -- excerpts from some form that says, Please
18　review the Description, benefit and provide any updates
19　or additional information, and then she sends that to
20　Rick Chapman and Richard Reinsburrow, and then Rick
21　forwards it to you. Do you see that?
22　　　A. Yes.
23　　　Q. Do you know where Marcia got the language for
24　the description in here?
25　　　A. I don't recall. It would have been a

Page 158

1 combination of -- this was a growing document that just
2 started as an initial request, and things were added
3 along the way, so I can't speak to exactly where each
4 line came from.
5    Q. Well, you said that this -- the idea of doing
6 this was your idea?
7    A. Yes.
8    Q. Did you write something up for someone?
9    A. Yes, I --
10     MS. McENROE: Objection to form.
11     THE WITNESS: I would have done the initial
12   request.
13 BY MR. PIFKO:
14    Q. Okay. So do you believe that this language
15 would potentially have come from a document, another
16 document, that you wrote?
17    A. When -- when the -- this is a system request.
18 So when you're requesting the project, you fill out a
19 form that looks just like this. This was a printout of
20 the online form. So it would have started like this
21 from me.
22    Q. So you -- there's like a portal through the
23 company, and you can go and open up this form and type
24 information in?
25    A. Correct.

Page 159

1    Q. And so you would have been the first person to
2 have put language in for that?
3    A. Yes.
4    Q. And you discussed what you were going to do
5 with Janet and Rick?
6    A. I discussed, yeah, my idea and how I wanted to
7 present everything together into one system, yes.
8    Q. And so when you first opened -- the form is
9 called a Project Initiation, correct?
10    A. Yes.
11    Q. Okay. So when you first open a project
12 initiation form, you -- you were the one who did that
13 for this?
14    A. Yes.
15    Q. So this language in the description says,
16 Develop effective controls against the diversion of
17 controlled substances and conduct adequate due
18 diligence to ensure that controlled substances
19 distributed from the Distribution Centers are for
20 legitimate business needs. Do you see that?
21    A. Yes.
22    Q. Is that language that you would have written?
23     MS. McENROE: Objection to form.
24     THE WITNESS: No.
25 BY MR. PIFKO:

Page 160

1    Q. You don't believe that that's language you
2 wrote?
3    A. I don't -- I don't recall, but again, this was
4 created throughout the process. So people could have
5 added their comments along the way. So I -- it's hard
6 to say if I wrote that or not.
7    Q. Is that consistent with what your
8 understanding of this project was? It says
9 Description.
10    A. No. I mean, we had -- those controls were
11 already in place. So the effect of this project was
12 basically to display them in one place. So we had --
13 this project was not created to create effective
14 controls.
15     It was to -- I mean, "display the effective
16 controls" would have been a better word, but we already
17 had these -- we already had effective controls in
18 place. This was simply, as I stated earlier, just
19 bringing them in a easily format to display.
20    (Rite-Aid Belli Exhibit No. 14 was marked for
21 identification.)
22 BY MR. PIFKO:
23    Q. I'm handing you what's marked as Exhibit 14.
24 It's a one-page document Bates labeled
25 Rite_Aid_OMDL_0017328. It's a native spreadsheet page.

Page 161

1 Let me know when you're done looking at this.
2    A. Okay.
3    Q. Do you know what this is?
4    A. It was part of my review.
5    Q. Have you seen this before?
6    A. Yes.
7    Q. When was the last time you saw this?
8    A. When I would have -- when this review would
9 have been conducted.
10    Q. Based on looking at the document, when would
11 this review have been conducted?
12    A. The review period states Fiscal Year '14, so
13 I -- I don't recall when the actual review was done,
14 but --
15    Q. How about roughly?
16    A. I mean, it had to be either '12 or '13 when I
17 was in the role.
18    Q. Okay. Did you fill this out or someone else
19 fills this out?
20    A. It's a combination. I would have sent --
21 these are the objectives for the upcoming year. So I
22 would have sent some suggested objectives, and then
23 Rick Chapman would have filled in other ones, too.
24    Q. So let's look at the -- it says Instructions.
25 It says Associate's Name, Chris Belli. That's you,

Page 162

1 correct?
2   A.  Correct.
3   Q.  Job Title:  Senior Director Regulatory
4 Compliance.  That's your job, right?
5   A.  Yes.
6   Q.  And the Instructions say, Identify and list
7 future performance goals -- future is in bold --
8 business actions, and target measures (weights) that
9 should be accomplished within the next Fiscal Year.  Do
10 you see that?
11   A.  Yes.
12   Q.  Okay.  And then it's got this chart here.  The
13 first one is BUSINESS GROWTH.  Do you see that?
14   A.  Yes.
15   Q.  Who would have provided that information?
16   A.  It would have been a combination of Rick and
17 I.
18   Q.  Okay.  It says, Develop Suspicious Order
19 Monitoring system and eliminate the need for DC
20 thresholds.  Agree?
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  Yes.  It's referring to the
23    system I was -- we were speaking about earlier,
24    about bringing all our current processes together.
25 BY MR. PIFKO:

Page 163

1   Q.  Okay.  And the words here used were that you
2 were going to develop a suspicious order monitoring
3 system; is that correct?
4   A.  We had a system in place.  This was just a
5 system I was referring to earlier of bringing all of
6 the current processes in one place for -- to be viewed
7 easily.
8   Q.  Do you know why you used the word "develop"
9 here?
10   A.  I mean, we were -- it was developing a new
11 system, a new way of viewing it, but we weren't
12 developing new processes.
13   Q.  You notice in the second one that that's the
14 first thing you talk about, work to be accomplished.
15 The second one you say develop a more streamlined
16 process for distribution center prescription returns to
17 third party processor.  Do you see that?
18   A.  Yes.
19   Q.  Did I read that correctly?
20   A.  Yes.
21   Q.  Okay.  But you didn't say in the first one
22 that you were going to streamline the process, did you?
23       MS. McENROE:  Objection to form.
24       THE WITNESS:  No.
25 BY MR. PIFKO:

Page 164

1   Q.  You could have said that though apparently,
2 right?
3       MS. McENROE:  Objection to form.
4       THE WITNESS:  I did say "Develop a more
5    streamlined process for DC RX returns to third
6    party processors," so --
7 BY MR. PIFKO:
8   Q.  Right.  But in the first one you could have
9 said you were streamlining the process or something to
10 that effect, correct?
11       MS. McENROE:  Objection to form.
12       THE WITNESS:  No.
13 BY MR. PIFKO:
14   Q.  You couldn't have used that language?
15   A.  I mean, I could have used any language, but
16 the thing was to develop an SOS system that's not just
17 necessarily a streamlined process.  The system was
18 just, again, taking our current processes and making
19 them viewable.
20       Why a certain word was not used, I can't speak
21 to that, but I can tell you what that means.
22       (Rite-Aid Belli Exhibit No. 15 was marked for
23 identification.)
24 BY MR. PIFKO:
25   Q.  All right.  I'm handing you what's marked as

Page 165

1 Exhibit 15.  This is a document that was also
2 introduced yesterday as Exhibit 7.  Take a minute to
3 review it.  For the record, it's Bates labeled
4 Rite_Aid_OMDL_0040184 through 0040198.  Let me know
5 when you're done.
6   A.  Okay.
7   Q.  Can you tell me what Exhibit 15 is?
8   A.  This is just a more in-depth knowledge
9 description of the previous project we talked about.
10 There's -- when projects were over a certain dollar
11 amount or -- they had to have a project initiation
12 document started, and this was just a
13 further-down-the-road version of what we previously
14 looked at.
15   Q.  Okay.  So there were -- you agree there was
16 various iterations of this form over the next several
17 months?
18   A.  Yes.  There would have been revisions and
19 edits along the process.
20   Q.  Did you contribute to making the edits on this
21 form?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  Not only -- not just me.  It
24    could have been anyone involved in the project.
25 BY MR. PIFKO:

Page 166

1    Q.  Well, my question was just if you contributed
2  to making some of the edits in here.
3    A.  Yes.
4    Q.  Let's go to Appendix A, which is -- it starts
5  on Bates label page Rite_Aid_OMDL_0040195.  Are you
6  there?
7    A.  Yes.
8    Q.  Do you know what's being reflected in Exhibit
9  A?
10   A.  The different parameters and it looks like the
11  tables involved.  I think we had to create new tables
12  to gather the information into a different format so it
13  could be reported the way we wanted to report it.  So
14  ████████████████████████████████████  These were
15  new fields and new calculations.
16   Q.  So that was going to be my question.  To your
17  knowledge, were these calculations being performed
18  prior to the designing of this project?
19      MS. McENROE:  Objection to form.
20      THE WITNESS:  They were, but it may have been
21   in a different table or location.  So these had to
22   be duplicated into when they were creating a
23   portal app. because this was going to be not in a
24   host screen or a canned report it was going to be.
25      So yes, some of these were in different

Page 167

1    formats, but this is the format it was going to be
2    in for this report -- or this project.
3  BY MR. PIFKO:
4    Q.  Can you say with certainty that all the
5  calculations reflected in Exhibit A were calculations
6  that were already being calculated at the time of this
7  report?
8      MS. McENROE:  Objection to form.
9      THE WITNESS:  I cannot say because I didn't
10   review all the reports involved in suspicious
11   order monitoring, but, I mean, Janet or Sophia or
12   everyone involved in the process may have seen it.
13  BY MR. PIFKO:
14   Q.  Have you ever seen documents with any of the
15  calculations reflected in Exhibit A?
16   A.  I mean, it's hard to say because I don't know
17  how, in a report, I would have seen it.  It could have
18  been this same information, but it could have had a
19  different title or a different name.  These are what --
20  the parameters and how they were going to be labeled
21  for this project.
22      So, I mean, a lot of these were things that
23  were built in automatically to the replenishment
24  system, and I can't speak if some of these showed up on
25  asset protection's reports or government affairs'

Page 168

1  reports.
2    Q.  We can go through all of them.  I'm trying to,
3  in the interest of time -- but can you say that you've
4  seen any document with any of these calculations --
5      MS. McENROE:  Objection.
6  BY MR. PIFKO:
7    Q.  -- sitting here today?
8      MS. McENROE:  Objection to form.
9      THE WITNESS:  All these ones that speak to
10   suggested percent over suggested order, those
11   would have been listed in the reports, but I can't
12   recall which ones I have and haven't seen.  We --
13   I mean, I had lots of reports I looked at and saw.
14   I just -- it was too long ago to recall.
15  BY MR. PIFKO:
16   Q.  Sorry.  I didn't hear your testimony though.
17  I'm looking at your -- I believe it's page 13 of the
18  document, 0040196, is that where you are?
19   A.  Yes.
20   Q.  Okay.  So the second column -- the second row
21  there says ████████████████████████████
22  ████████.  Do you see that?
23   A.  Yes.
24   Q.  Is that something -- a calculation you believe
25  you've seen before?

Page 169

1    A.  We had a sequel -- it was a system that you
2  could take any table you wanted to and generate a
3  report.  So if you wanted to see a specific thing to a
4  store, you could create the port and pull it and do a
5  calculated field.  So some of these fields were
6  calculated in reports that were out there.
7    Q.  What type of reports?
8    A.  There was -- I mean, there was lots of
9  reports.  I didn't -- again, this was something that
10  asset protection and government affairs would have
11  reviewed more because I was reviewing things on the DC
12  level; and they were -- they knew the store level
13  better, but there was -- there was reports that existed
14  that I've seen, not that I necessarily created them or
15  looked at them, but I know they existed, and those
16  were -- I was stating I knew these existed, and I can't
17  confirm that all -- which ones existed and which on
18  here didn't exist currently because I didn't have
19  access to all of them, but I'm not saying they didn't
20  exist.
21   Q.  So as senior director of regulatory
22  compliance, did you make decisions using any of the
23  fields that you're seeing reflected in Exhibit A?
24      MS. McENROE:  Objection to form.
25      THE WITNESS:  What -- can you be more specific

Page 170

1  on "decisions"?
2  BY MR. PIFKO:
3     Q.  Did you make any decisions in discharging your
4  job duties based on the types of statistics that are
5  reflected in Exhibit A?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  I had -- no.  I mean, all those
8     procedures and policies that we reviewed earlier
9     is what my decisions were based on.
10 BY MR. PIFKO:
11    Q.  And those weren't based on any of these
12 calculations, correct?
13       MS. McENROE:  Objection to form.
14       THE WITNESS:  Not necessarily, because the
15    replenishment system was accounting for some of
16    these calculations.  So when the order came to the
17    DC, it was already based on the need of that
18    store; and then again, all the threshold logs we
19    kept and the procedures and processes in place at
20    the DC level were followed.
21       At the same time, Janet and Sophia were doing
22    their necessary reviews on the store level, which
23    would have been a lot of these reports.  Go ahead.
24 BY MR. PIFKO:
25    Q.  The threshold review, we looked at that

Page 171

1  earlier.  That doesn't contain any of these
2  calculations as outputs on it, does it?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  The threshold log?
5  BY MR. PIFKO:
6     Q.  Right.
7     A.  No, because we were logging a store's order --
8  the log.  You would see some of these suggested order
9  quantities, some of these certain fields would have
10 been on that report; but the calculation, there wasn't
11 a calculation done.
12    Q.  We can go back to Exhibit 13.  Well, actually,
13 really quick before we do that, these fields that are
14 in here in Exhibit A, do you know who -- who wrote --
15 who wrote these, came up with these?
16    A.  I'm not sure.
17    Q.  Did you have any discussions with anyone about
18 which, if any of these, to include or not include in
19 this process?
20    A.  No.  I mean, again, my goal in the project was
21 to take all of the current procedures and processes we
22 were doing and bring them to a viewable platform.  So
23 that's why there was so many other people involved,
24 because there was certain areas of the business where
25 that was their specialty.  So I -- it wasn't a project

Page 172

1  I could drive by myself.
2     Q.  Real quick, I want to go -- still stay on
3  Exhibit 15.  Go to page 5, which is also 0040188.  Tell
4  me when you're there.
5     A.  I'm there.
6     Q.  The heading of that is Suspicious Order
7  Review.  Do you see that?
8     A.  Yes.
9     Q.  Okay.  It says, Today -- that would be as of
10 the date of this, which was October 9th, 2013 --
11 blanket thresholds are manually enforced at 5,000
12 dosage units per individual NDC per week per store
13 regardless of dispensing volume or trends.  Do you see
14 that?
15    A.  Yes.
16    Q.  To your understanding, is that an accurate
17 statement?
18    A.  Yes.
19    Q.  This is a labor intensive process with
20 opportunity for order lines to be missed.  Do you see
21 that?
22    A.  Yes.
23    Q.  Is that an accurate statement?
24    A.  That it's a labor intensive process, yes.
25    Q.  And that there's an opportunity for order

Page 173

1  lines to be missed?
2     A.  I mean, there's always an opportunity for
3  human error.
4     Q.  To your knowledge, was there any way, at this
5  time or anytime before, that the company was monitoring
6  ordering trends at its stores?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  I -- I can't speak to, again,
9     what government affairs and asset protection was
10    looking at.  The replenishment system obviously
11    took trends into effect.  That's what it used, was
12    trends.
13 BY MR. PIFKO:
14    Q.  And it made trends to make its suggested
15 orders, correct?
16    A.  Yes, based on volume.
17    Q.  But the thresholds were uniform for all
18 stores, regardless of the ordering, right?
19    A.  Correct.
20       MS. McENROE:  Objection to form.
21 BY MR. PIFKO:
22    Q.  So going back to Exhibit 13 on that same
23 second page there -- let me know when you're there.
24    A.  Okay.
25    Q.  It's got a Benefit section.  Do you see that?

Page 174

1    A. Yes.

2    Q. Do you know what that is intended to reflect

3 in the context of this project initiation form?

4        MS. McENROE: Objection to form.

5        THE WITNESS: I mean, the Benefit section is

6    there because most of these projects cost money.

7    So when there's a decision process on why the

8    project will be completed, then it's what's the

9    ROI or the benefit on the project.

10 BY MR. PIFKO:

11   Q. And what was your understanding of what the

12 benefit of this project was?

13   A. For me, it was to show off the great job we

14 were doing in the program and throughout the company,

15 in the DCs and through asset protection and government

16 affairs.

17   Q. The language here, do you see this, it says

18 Compliance. Can you read that aloud?

19   A. Compliance with 21 U.S.C. 823 and/or

20 C.F.R. 1307.74(b) to detect and report suspicious

21 orders of controlled substances through the

22 Distribution Centers.

23       Do you want me to read the whole thing?

24   Q. Do you -- well, just with that sentence --

25   A. Okay.

Page 175

1    Q. -- is that consistent with what your

2 understanding of the benefit of this project was?

3    A. No, because we were already compliant with it.

4 So, I mean, the benefits, some things were in here just

5 because initially, I mean, it was going to be a hard

6 sell because it wasn't something we needed; we were

7 already doing all this.

8        So some things may have been added just to

9 create an urgency-type thing for someone that was

10 looking at it, but these -- we were already compliant;

11 we were already doing these things. This was not

12 something that we had to have or had to do.

13       It was, for me, something I wanted to do,

14 again, to be able to display easily all the things that

15 we were doing and have it all in one central location.

16   Q. Do you know who wrote this language?

17   A. I do not.

18       (Rite-Aid Belli Exhibit No. 16 was marked for

19 identification.)

20 BY MR. PIFKO:

21   Q. I'm handing you what's marked as Exhibit 16.

22 It is a document that was also admitted yesterday as

23 Exhibit 3. I'm sorry. I keep saying "yesterday." In

24 the Chapman deposition as Exhibit 3. It's

25 Rite_Aid_OMDL_0014948 through 51. Take a minute to

Page 176

1 review that, and let me know when you're done.

2    A. Okay.

3    Q. Have you seen this document before?

4    A. Yes.

5    Q. When was the last time you saw this?

6    A. Yesterday.

7    Q. And before yesterday, when was the last time

8 you saw it?

9    A. It would have been the dates on the E-mails.

10   Q. Can you tell me what's reflected in these

11 E-mails?

12   A. They're -- it's referring to -- I guess there

13 was an attachment to this, which isn't present, but

14 there's -- it's referring to the PI that we -- a

15 version that we reviewed, I don't know what version,

16 but the document we reviewed earlier, and it's asking

17 for comments.

18       It gives an explanation of the Appendix A,

19 which we were referring to earlier, which is the

20 parameters that are available to report on, and she's

21 asking about benefits to list in the PI.

22   Q. Let's talk about that portion that's on the

23 second page, correct? Karyn -- Karyn is writing to

24 you. She says, on Monday, September 23, 2013, at 8:35

25 a.m. -- or sorry. You're writing to Karyn, and it

Page 177

1 says, Karyn, We are not submitting any labor benefits.

2 All benefits are related to compliance. Do we need to

3 quantify it some way? Do you see that?

4    A. Yes.

5    Q. Do you remember asking her about that?

6    A. Yes.

7    Q. What -- why were you asking her that?

8    A. When we submit this PI, it's -- if you're --

9 if you submit a PI that doesn't have anything listed in

10 the Benefits, then obviously it will be harder to get

11 approved for something that we don't necessarily need

12 to have.

13       So we were trying to figure out what should we

14 list in that section because, again, the benefit isn't

15 necessarily compliance because we were already

16 compliant. So how do we -- how do we list this in the

17 document stating that we're basically taking all the

18 stuff we're already doing and putting it in a different

19 format. So there was a discussion on what we were

20 going to list in the Benefits.

21   Q. So your testimony is that even though you say

22 here "All benefits are related to compliance," this

23 wasn't related to compliance?

24       MS. McENROE: Objection to form.

25       THE WITNESS: Well, I mean, of course it would

Page 178

1　be related to compliance because that's what we
2　were -- we were gathering -- it was a suspicious
3　order monitoring program and that we were already
4　doing and putting it into one location we could
5　easily display, so --
6　BY MR. PIFKO:
7　Q.　Well, you just testified that this wasn't
8　related to compliance.
9　　　MS. McENROE:　Object to form.
10　　　MR. PIFKO:　Can you read that back for me,
11　please?
12　　　MS. McENROE:　Can you read the question and
13　the answer?
14　　　(The requested portion was read by the
15　reporter.)
16　BY MR. PIFKO:
17　Q.　So you just testified the benefit to this
18　isn't necessarily compliance, but you said here that
19　the benefit is related to compliance.　Which is true?
20　　　MS. McENROE:　Objection to form.
21　　　THE WITNESS:　It's -- I mean, it's two
22　different uses of the word "compliance."　I mean,
23　I'm saying that we were -- we were compliant.　So
24　it's not necessarily -- this project was not
25　created to make us compliant.

Page 179

1　　　It's related to compliance, regulatory
2　compliance, because this is something we would
3　show the DEA or whoever asked to see our
4　suspicious order monitoring program.
5　BY MR. PIFKO:
6　Q.　She just read your testimony.　You said the
7　benefit isn't necessarily compliance.　Is that not an
8　accurate statement?
9　　　MS. McENROE:　Objection to form.
10　　　THE WITNESS:　It's not related to being
11　compliant with something.　I was referring to --
12　this was not created in order to make us compliant
13　with -- with an agency or with -- with anything.
14　We were already being compliant.
15　　　When I state "all benefits are related to
16　compliance," it's to regulatory compliance.　I'm
17　not saying that we're not -- in here, I don't say
18　we're not compliant.　I'm saying it's just related
19　to compliance.
20　BY MR. PIFKO:
21　Q.　Let's see what Janet says in response.　Do you
22　see that up above?
23　A.　Yes.
24　Q.　Can you read that out loud for me?
25　A.　Compliance is huge.　In the most recently

Page 180

1　filed but then dismissed lawsuit in McDowell County,
2　West Virginia, the county commissioners filed a suit
3　against Rite-Aid and several independent pharmacies for
4　four counts relating to drug diversion.
5　　　Much of the discovery documentation in that
6　case was around suspicious orders.　Several of the
7　other counties in West Virginia have filed suit against
8　many wholesalers for shipping the products into
9　West Virginia and causing the drug problem.　I will put
10　something together for Karen for tomorrow when she
11　returns.
12　Q.　So in response to you saying "All benefits are
13　related to compliance," Janet writes, Compliance is
14　huge and then provides this explanation.　Agree?
15　　　MS. McENROE:　Objection to form.
16　　　THE WITNESS:　Yes.
17　BY MR. PIFKO:
18　Q.　Do you have an understanding about what she
19　meant when she said "compliance is huge"?
20　A.　No.
21　Q.　Did you discuss all these lawsuits that she
22　mentions here?
23　A.　No.
24　Q.　Were you aware of the fact that there had been
25　lawsuits brought by county commissioners against

Page 181

1　Rite-Aid?
2　A.　No.
3　Q.　Well, you're on the E-mail --
4　A.　I mean, I was --
5　Q.　-- correct?
6　A.　I wasn't aware prior to reading this E-mail.
7　Q.　Okay.　At the time that you received this
8　E-mail, did you discuss the fact that there were
9　lawsuits against the company concerning drug diversion
10　with anyone other than counsel?
11　　　MS. McENROE:　Objection to form.
12　　　THE WITNESS:　No.
13　BY MR. PIFKO:
14　Q.　At the time you received this, were you
15　concerned that there had been lawsuits filed against
16　the company concerning drug diversion?
17　A.　No, because I knew we were doing everything
18　correctly.
19　Q.　Did you have any understanding about why Janet
20　was raising these lawsuits in the context of this
21　discussion about this suspicious order monitoring
22　program?
23　A.　No.
24　Q.　Let's go back to Exhibit 15.　I want to go to
25　page 9, which is the section about benefits.　It's

Page 182

1  0040192. So do you see here it looks like it still has
2  language from the template in there that's sort of
3  bracketed by the carets? Do you see that?
4      A.  Yes.
5      Q.  It said -- it says, Provide the Benefits
6  template located in, it's got a blank, to your Business
7  Partner. Do you see that?
8      A.  Yes.
9      Q.  Okay. And then above that it says, Complete
10 the below benefits template, right?
11     A.  Yes.
12     Q.  Okay. What's supposed -- do you have an
13 understanding about what sort of information is
14 supposed to be conveyed here?
15     A.  The same information we were referring to
16 earlier. There's -- there's the cost of doing this
17 project. So what's the benefit in doing the project?
18     Q.  So why are we doing this project, right?
19     MS. McENROE:  Objection to form.
20     THE WITNESS:  The reasons -- I mean, things
21     listed in here aren't necessarily things that
22     are -- I'm reading it. I mean, as you can see,
23     it's the reason we're -- I mean, it's the
24     benefits, yes. It doesn't imply we're not doing
25     things already, but it's the benefits of doing.

Page 183

1  BY MR. PIFKO:
2      Q.  So this section is intended to convey the
3  reasons why you would do this project. Agree?
4      MS. McENROE:  Objection to form.
5      THE WITNESS:  No, because -- not all the
6     reasons because, for me, the reason was, again, as
7     I explained, to bring all of our current processes
8     and procedures in place and put them in one
9     location.
10     If that was listed as a benefit in there, it
11     may -- they're going to be like, Well, I mean,
12     it's one of those things we don't, again, have to
13     have. It's nice to have. I wanted to have it
14     because I wanted, when the DEA came into the
15     distribution center, I wanted to show off all this
16     great stuff we did.
17     So it would have been great to have it because
18     it was hard to display otherwise, but to spend
19     that much money on something that we don't
20     necessarily have because we already had processes
21     in place, for some people, it wouldn't be
22     considered a benefit. There was a --
23 BY MR. PIFKO:
24     Q.  Did you -- did you write to anyone, saying
25 that you just wanted to do this to bring all your

Page 184

1  current processes in place?
2      A.  That -- I can't speak to that, if it was in an
3  E-mail or not. I mean, that was -- that was -- that
4  was the initial intent of this project; and then there
5  was so many business units involved then and because
6  there's a PI, little things were added here and there
7  that otherwise wouldn't have been created on its own
8  PI.
9      And then there was a growing -- there was a
10 growing talk about suspicious order monitoring at that
11 time; and, if, you know, the DEA agents audited our DCs
12 and saw our current system and were happy with it, we
13 didn't know if, a year from now or two years from now,
14 that they'd come in and want to see something different
15 or more.
16     So the intent of this project was to get ahead
17 of that; and, if they did come into a DC and wanted to
18 see more, we could display our whole suspicious order
19 monitoring system and not just the DC aspect.
20     So we were trying, I mean, to get ahead of
21 that also. So it wasn't just displaying it, so --
22     Q.  You said there was a growing talk of
23 suspicious order monitoring at that time. What did you
24 mean by that?
25     A.  The DEA, there was just -- I mean, obviously

Page 185

1  that conference -- there was a talk that having a
2  program and having a program in place was important,
3  that they were -- that they looked at it and they were
4  going to audit it and you had to have a system and all
5  that stuff.
6      So it was just a growing trend; and, when our
7  agents -- when we would get audited in DC, that was one
8  of the things obviously they looked at; and again, they
9  commented on having -- thinking we had a great system
10 already in place. So it was just a growing trend
11 within the DEA.
12     Q.  Did you ever interact with any DEA agents?
13     A.  Only over E-mail.
14     Q.  Okay. Can you remember the names of any of
15 them?
16     A.  No.
17     Q.  When you say the DEA said you had a great
18 system, is that something a DEA agent told you?
19     A.  It was in an audit at the Perryman
20 Distribution Center.
21     Q.  Do you remember the name of that DEA agent?
22     A.  No.
23     Q.  Did you meet -- did you meet with them
24 personally?
25     A.  No, but we have a log of the visit and their

Page 186

1  report at the Perryman Distribution Center.
2      Q.   So that's not a comment that you heard
3  directly yourself?
4      A.   No, but it's -- it's in the log from the visit
5  from the DEA.
6      Q.   That -- who wrote -- who wrote the log?
7      A.   I can't -- I don't remember who wrote the log,
8  who was at the DC.
9      Q.   Someone at Rite-Aid?
10     A.   Someone at Rite-Aid, yes.
11     Q.   Let's go back to the Benefit statement here.
12 Do you have an understanding -- well, so let's look at
13 this part that's highlighted here.  Can you read that
14 portion for me, beginning with Recent?
15     A.   Recent DEA fines for controlled substance
16 distributors have been tied to shipping suspicious
17 orders to registrants, parenthesis, pharmacies.  WAG,
18 80 million (DC DEA license surrendered).  Cardinal
19 Health, 34 million (DC DEA license surrendered).
20 McKesson, 13 million.
21     Q.   Do you have an understanding about what that's
22 reflecting there and why that's included here in the
23 benefit statement?
24          MS. McENROE:  Objection to form.
25          THE WITNESS:  No, I did not add that.

Page 187

1  BY MR. PIFKO:
2      Q.   Do you know what the -- those fines are about?
3          MS. McENROE:  Objection to form.
4          THE WITNESS:  In detail, no.
5  BY MR. PIFKO:
6      Q.   How about generally?
7      A.   I mean, no.  I mean, just what was, around
8  that time, what was on TV and stuff, but I knew no
9  particulars of the case.
10     Q.   What do you recall seeing on TV about that?
11     A.   I just remember it having to do with Florida,
12 but no more than that.
13     Q.   You believe all those had to do with Florida?
14     A.   I'm not sure, no.
15     Q.   But you saw something on TV about Florida and
16 people getting fined for drug diversion?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  Yes.
19 BY MR. PIFKO:
20     Q.   The next section here says McDowell County
21 West Virginia recently filed suit (since withdrawn)
22 against 3 Rite-Aid Pharmacy locations and 3 Independent
23 Pharmacies in the county for excessive sales of opioid
24 medications.  Included in the suit was language
25 concerning suspicious orders to three -- to the three

Page 188

1  Rite-Aid pharmacies, how identified, how resolved and
2  outcome.  Do you see that?
3      A.   Yes.
4      Q.   Do you have an understanding about what that
5  means?
6      A.   No.
7      Q.   Do you know why that's in here?
8      A.   No.
9      Q.   The next sentence -- the next section here
10 says, DEA has started -- stated numerous times
11 controlled substance distributors must have a protocol
12 to identify and report suspicious orders based on
13 individual pharmacy volume, not generic limits for all
14 registrants.  Do you see that?
15     A.   Yes.
16     Q.   Do you have an understanding about what that
17 means?
18     A.   I understand what it means, yes.
19     Q.   What's your understanding of what that means?
20     A.   That the volume, the orders that we ship from
21 the distribution center, should not have -- should be
22 unique to the store.
23     Q.   And why do you -- why do you believe that
24 that's a requirement?
25          MS. McENROE:  Objection to form.

Page 189

1          THE WITNESS:  I -- why do I believe it's a
2  requirement?
3  BY MR. PIFKO:
4      Q.   Yeah.  Well, this is saying that you have to
5  have a protocol to identify and report suspicious
6  orders based on individual pharmacy volume, not generic
7  limits for all registrants, and I asked what you
8  understood to mean, and you said that each store
9  has to receive a unique volume; is that correct?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  That's correct.
12 BY MR. PIFKO:
13     Q.   Okay.  And so I'm saying, why is it that you
14 believe each store has to receive a unique volume?
15     A.   I was just stating what that meant.  I didn't
16 write this sentence.  I was -- so I was stating that
17 this is referring to each store having a unique volume.
18     Q.   Was that a requirement that you understand to
19 be -- understood at the time to be in place?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  Yes.  Our replenishment system
22 did that.
23 BY MR. PIFKO:
24     Q.   Because of the amount it sent to every store
25 was different?

Page 190

1    A.   The amounts set -- or sent to each store was
2  calculated based on that store's volume and its
3  dispensing.  So yes, it would be different.
4    Q.   Do you have an understanding about why that
5  section is in here in the Benefit section of this
6  project?
7    A.   I do not.
8    Q.   The next sentence -- the next sentence says,
9  Controlled substance distributors must have a
10 suspicious order monitoring system in place which can
11 be provided to and explained to the DEA on any routine
12 inspection visit.  Do you see that?
13   A.   Yes.
14   Q.   Do you have an understanding about why that's
15 in here?
16   A.   No.
17   Q.   Take your time to look at this document.
18 Is -- is there any language in here about what you were
19 saying about the purpose of this project being to show
20 off what you were already doing?
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  No, it's not.
23 BY MR. PIFKO:
24   Q.   That language is not in here anywhere?
25   A.   It's not in there because it wouldn't be a

Page 191

1  selling point to approving it because it's stuff we
2  were -- these things we were already doing.
3    Q.   Who had to approve this?
4    A.   I think it went all the way up to the CFO.
5    Q.   Who was the CFO at that time?
6    A.   Frank.
7    Q.   Do you know his last name?
8    A.   Vitrano maybe.  I'm not sure.
9    Q.   Do you know if this was ultimately submitted
10 to him for approval?
11   A.   I do not know.
12   Q.   Do you know if this was ultimately
13 implemented?
14   A.   I do not know.
15   Q.   Let's go to page 5, which is 0040188.  We
16 looked at some of the first two sentences.  The third
17 sentence there says, In addition, stores which truly
18 need this quantity must order it from McKesson.  Do you
19 see that?
20   A.   Yes.
21   Q.   What does that mean?
22   A.   I wasn't -- I'm not familiar with the pharmacy
23 operation side.  That would have been something the
24 store would have done.
25   Q.   Then it says, A new Billing application will

Page 192

1  be developed which will, and it's got all these bullet
2  points.  Do you see that?
3    A.   Yes.
4    Q.   Is it your understanding that any of these
5  bullet points were already being done?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  I mean, this is -- a lot of it's
8    automating the things that are currently done.  So
9    some of these bullet points would not exist --
10   they only exist here because it's an automated
11   process now, like the override codes and things
12   like that; but, however, there's -- there was
13   parameter -- I mean, the thresholds were set at
14   the DC level, and this would be moving to not
15   having the blanket threshold in place and have it
16   more dynamic by store as a second layer, meaning,
17   some stores could have higher threshold or lower
18   threshold based on the volume.
19 BY MR. PIFKO:
20   Q.   Let's talk about that for a second.  You
21 understood that part of this project was to make it so
22 that every store would have its own unique threshold?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  Well, threshold, but they
25   already had their unique shipment.  This is the

Page 193

1    second layer that the DC did, where they would
2    adjust the orders down to the threshold.
3        So we were already doing unique orders.  So
4    referring to the threshold, yes.  The second part
5    that the DC did would be another -- another layer
6    that would be unique to the store.
7  BY MR. PIFKO:
8    Q.   Do you remember discussing with people that
9  you were going to add the functionality to the system
10 to have unique thresholds for every store?
11        MS. McENROE:  Objection to form.
12        THE WITNESS:  Are you referring to the -- at
13   the DC level or through the replenishment system?
14 BY MR. PIFKO:
15   Q.   At any time in connection with this project.
16   A.   That was going to be an addition, and this
17 project was for the secondary threshold to be unique by
18 store and not a blanket threshold.
19   Q.   Do you have an understanding about why there
20 was a desire to do that?
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  To make it more at the store --
23   at the store level and not have a blanket
24   threshold.
25 BY MR. PIFKO:

Page 194

1    Q.   But why -- why have a store level threshold as
2    opposed to a blanket threshold?
3    A.   Because it would be unique to that store's
4    volume.
5    Q.   Why would you want to do that?
6    A.   Because it's specific to that store.  I
7    mentioned earlier that we were actually -- the
8    replenishment system was generating an order unique to
9    that store.  The DC was doing a blanket threshold after
10   that that would adjust an order down.
11       Sometimes a store's order -- the stores may
12   have been high-volume stores, and we were actually
13   reducing product that they needed to get to our
14   customers.  So this would allow them to get the volume
15   they needed through its history.
16   Q.   So a benefit of having a store level threshold
17   would be that some stores could order -- could have a
18   higher threshold and order more product?
19   A.   The benefit would be getting our customers the
20   prescription and product they needed.
21   Q.   Because you -- some stores would have a higher
22   threshold.  Is that what you're saying?
23   A.   Because -- because the current process, some
24   of the thresh -- some of the stores, we would adjust
25   the inventory down, and they were not getting the

Page 195

1    product they needed.
2    Q.   And so under this newer system, you'd have a
3    higher threshold for some stores, and then you could
4    send more product to them; is that correct?
5    A.   Through the new system, we would still have
6    the replenishment system, which would generate the
7    order that the store needed based on their volume; and
8    then the threshold also would be calculated into that,
9    and it would be more unique to that store's volume
10   using the new calculations.
11   Q.   Do you have an understanding about what these
12   override reason codes are?
13   A.   Yes.
14   Q.   What's your understanding of what those are?
15   A.   So when the -- these were going to -- so the
16   way the -- the threshold worked now, it was after the
17   fact.  So an order came.  We spoke earlier they would
18   adjust the order down.  Then that would create an
19   adjustment because they're being ordered down.
20       This review was going to take place before the
21   order got to the DC.  So, therefore, when that order
22   actually got to the DC, the DC would actually pick the
23   quantity that was displayed, so there was no manual
24   adjustment.
25       So the review process was happening the time

Page 196

1    before the order hit the DC.  So the reason codes would
2    be what steps they took.  So it was also removing the
3    manual log, threshold log, that we were writing.  That
4    was all going to be electronic.
5        The comments would be in there electronically,
6    which obviously all that stuff is a benefit of this,
7    too, is removing the paper and going to electronic; but
8    the reason codes would be the reasons kind of similar
9    to what's in the threshold log:  They call the store,
10   who they spoke to.
11   Q.   So -- understood.  What -- walk me through how
12   that process would work.  So you said that there was
13   going to be some new review before the order hit the --
14   hit the distribution center.
15       MS. McENROE:  Objection to form.
16   BY MR. PIFKO:
17   Q.   Can you walk me through, the order gets --
18   A.   I mean, this was a -- this was still a
19   project, so it wasn't developed yet.  So to say exactly
20   how it was going to work and if that was actually how
21   it was going to work, from my time being there, it's
22   hard to say; but the concept was, after the order
23   was -- it was calculated using all the parameters we
24   had in place, and it came to -- the DC would have the
25   review if it was above that threshold and then have

Page 197

1    reason codes to -- like contact the store, and the
2    reason codes could be a store error or whatever it may
3    be; but that was, at their point, to be able to select
4    the reasons and the steps they took and the research
5    and what was -- and the decision made.
6        And then it would have certain routing from
7    there based on the reason code they selected; and, I
8    mean, that was -- obviously it was -- it was in a
9    dropdown box so it could be consistent through
10   reporting.  It wasn't a text field, and then we needed
11   the reason code for routing.
12   Q.   Routing how?  What do you mean by that?
13   A.   If -- let's say a DC did find a suspicious
14   order.  Then it would alert government affairs
15   automatically, and then they would look to DEA.  So
16   it's that type of routing of the -- based on the reason
17   code, who -- who needed to see it and where it went,
18   which was all being done manual or through E-mail or
19   through a phone call as it was then.
20       So this was automating it and making it,
21   again, in one system where you could pull it up easy
22   and report on it and not have to look through paper
23   logs.
24       MS. McENROE:  Mark, we're hoping to take a
25   break when you get a chance when it's a good time.

Page 198

1      MR. PIFKO: Sure. We can take a -- we can
2  take a break now.
3      THE VIDEOGRAPHER: Off the record, 3:10 p.m.
4  (Brief recess was taken.)
5      THE VIDEOGRAPHER: On the record, 3:23 p.m.
6  BY MR. PIFKO:
7    Q. A couple more questions about Exhibit 15. If
8  you want to turn to page 6, which is
9  Rite_Aid_OMDL_0040189. Are you there?
10   A. Yes.
11   Q. Okay. The heading of that is Trending
12 Reports. Do you see that?
13   A. Yes.
14   Q. It says that, the first sentence, In addition
15 to monitoring orders daily, the need exists to monitor
16 ordering patterns of a store over time. Do you see
17 that?
18   A. Yes.
19   Q. Do you have an understanding about what that
20 means?
21   A. It's just describing the -- why the reports
22 below need to exist. It's not saying that they don't
23 already exist, but these are the reports that were
24 going to be built into this new system.
25   Q. Well, it says "the need exists to monitor

Page 199

1  ordering patterns of a store over time." Do you
2  understand why you would need to monitor ordering
3  patterns of a store over time?
4      MS. McENROE: Objection to form.
5      THE WITNESS: I mean, yes, you're looking for
6    certain patterns by store.
7  BY MR. PIFKO:
8    Q. Why would you need to do that?
9      MS. McENROE: Objection to form.
10     THE WITNESS: It's -- it's part of the
11   suspicious order program. I mean, that was one of
12   the aspects of one of the things they looked at.
13 BY MR. PIFKO:
14   Q. So it's your testimony that the company was
15 doing that at this time and times before?
16   A. Yes. Asset protection and government affairs
17 were looking at reports that analyzed that before.
18   Q. Have you ever seen a report that monitored
19 store ordering patterns over time?
20   A. No. I wasn't involved in that.
21   Q. Have you ever talked to anyone in asset
22 protection or government affairs who -- about reports
23 that monitored ordering patterns at a store over time?
24     MS. McENROE: Objection to form.
25     THE WITNESS: I know they had reports that

Page 200

1  they reviewed that looked at different things at
2  the store level, but I can't speak to the details
3  of that. They had a process. Asset protection
4  had a process of reviewing stores and auditing
5  stores and looking at what stores did, but I was
6  not involved in that process, so --
7  BY MR. PIFKO:
8    Q. So you don't really know if they were
9  monitoring ordering patterns at a store over time
10 because you never saw anything or ever talked to anyone
11 about that, correct?
12     MS. McENROE: Objection to form.
13     THE WITNESS: I know they had processes in
14   place to review stores. What the specifics of
15   those reports and what -- what you would define as
16   a pattern, I -- I'm not sure, but I know they had
17   reports that they reviewed on the store side.
18 BY MR. PIFKO:
19   Q. Okay. That's the extent of your knowledge?
20   A. Yes.
21   Q. Do you see here it's got these different
22 bullet points about -- every one but the -- well, the
23 first one talks about Appendix A. We already did that,
24 but then the other ones say, Provide a portal report of
25 NDCs, and it's got various parameters. Do you see

Page 201

1  that?
2    A. Yes.
3    Q. Do you have any understanding that any of
4  these things were being calculated at this time
5  already?
6    A. I can't answer what was calculated. Again, a
7  lot of this -- this doesn't -- because a report was
8  listed in here doesn't mean we didn't have it. It
9  means that we wanted it included in this new system
10 where everything was in one location so you didn't have
11 to get it in some other form. You could go here, and
12 it had everything you needed.
13   Q. But you had never seen reports on any of those
14 bullet points, correct?
15     MS. McENROE: Objection to form.
16     THE WITNESS: I wouldn't have seen it because
17   it wasn't my responsibility.
18 BY MR. PIFKO:
19   Q. At the very bottom here, it says, Should
20 establish a threshold for the ndc or roll up rather
21 than solely relying on replenishment calculations
22 driven off historical dispensing trends. Do you see
23 that?
24   A. Yes.
25   Q. Do you understand what that means?

Page 202

1   A. Not really, no.

2   Q. Let's go to the next page. There's a section

3   called Assumptions. Do you see that?

4   A. Yes.

5   Q. First, it says, This process assumes that the

6   distribution centers will pro-actively contact each

7   store on the Suspicious Order Review screen. Do you

8   see that?

9   A. Yes.

10   Q. Do you know what that means?

11   A. It just means in order for this process to

12   work, the reason codes and the dropdown box referred to

13   earlier, that the DC would have to perform that

14   function, that it's not going to do that automatically.

15   Q. The next bullet point says, Corporate

16   associates will not force distribute unreasonably large

17   quantities of control drug items using the Merchandise

18   Distribution or Pharmacy Replenishment Trend Adjustment

19   applications. Do you see that?

20   A. Yes.

21   Q. Do you know what that means?

22   A. I do not.

23   Q. The last bullet point says, McKesson's systems

24   contain sufficient controls to manage the DSD

25   purchases. Do you see that?

Page 203

1   A. Yes.

2   Q. Do you know what that means?

3   A. It's just referring that McKesson would

4   have -- has a similar system that then -- we do,

5   that -- control orders going to Rite-Aid stores.

6   Q. So an assumption is that McKesson would have a

7   system for drop ship purchases made by the stores; is

8   that correct?

9   A. I -- I can't speak to that. I'm just -- I

10   was -- I know that's what the assumption is about, but

11   I didn't have interaction with McKesson, or I wasn't

12   responsible for DSD to the stores, so --

13   Q. DSD means drop ship, though, right? You said

14   that earlier.

15   A. It does, yes.

16   Q. Do you know if this was ever implemented?

17   A. I do not.

18   Q. You don't know either way?

19   A. No.

20   Q. You left the company sometime after this,

21   correct?

22   A. I left --

23   MS. McENROE: Objection to form.

24   THE WITNESS: I left them while this was going

25   on.

Page 204

1   BY MR. PIFKO:

2   Q. Okay. Do you remember approximately the month

3   when you left?

4   A. October.

5   Q. Okay. Do you -- what -- what -- why did you

6   make a decision to leave Rite-Aid?

7   ███████████████████████████████████████

8   ███████████████████████████████████████

9   ██████████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████

12   Q. I know how that is.

13   A. You can see all the moves that -- we moved all

14   over, so it was -- I promised her we'd move back.

15   Q. That's where you live now?

16   A. Yes.

17   Q. I want to talk for a second about your

18   preparation for the deposition.

19   A. Okay.

20   Q. I don't want to ask about any attorney-client

21   communications. I'm sure that in preparing for this

22   deposition, your counsel went over the concepts here;

23   but when did you first learn about -- that you were

24   going to be deposed in this case?

25   A. I don't recall the exact date. It was, I

Page 205

1   would say, a few weeks ago maybe. I don't remember. I

2   mean, I knew it was going on, but I didn't know -- I

3   mean, I don't remember the exact date. I don't recall

4   the exact date I was actually notified that it was

5   happening.

6   Q. What did you do to prepare for the deposition?

7   A. Other than meeting with Kelly, John, and Elisa

8   yesterday and once last week, nothing.

9   Q. Okay. You met with them in person yesterday?

10   A. Yes.

11   Q. Okay. And you met -- did you meet with them

12   in person the other time?

13   A. Yes.

14   Q. Where was that meeting?

15   A. In New York.

16   Q. How long was the meeting yesterday?

17   A. Six hours. Five, six hours.

18   Q. How long was the meeting in New York?

19   A. Maybe seven or eight hours.

20   Q. Did you review documents when you met them in

21   New York?

22   A. Yes.

23   Q. And you reviewed documents yesterday?

24   A. Yes.

25   Q. Is anyone paying you for your testimony here

Page 206

1 today?

2    A.  No.

3    Q.  Did you talk about that you were going to

4 testify with anyone from Rite-Aid other than the

5 lawyers?

6    A.  Current employees of Rite-Aid?  No.

7    Q.  How about former employees?

8    A.  Just Rick Chapman.

9    Q.  You told him that you were going to testify?

10    A.  Only because I knew he was going to be in

11 Tampa at the same time, and I haven't seen him in a

12 long time -- or he lives in Tampa, I should say.  So I

13 was -- really just for logistics to meet, and that was

14 it.

15    Q.  When did you talk to him?

16    A.  When I was -- a few weeks ago.

17    Q.  Did you talk about your -- your work at

18 Rite-Aid with him?

19    A.  No.

20    Q.  Did you meet with him here and talk about your

21 work with Rite-Aid?

22    A.  No.

23    Q.  All right.  Subject to any direct questions,

24 Rite-Aid's counsel might have a few.  I don't have any

25 further questions at this time.

Page 207

1        MS. McENROE:  Can we take a quick break?

2        THE VIDEOGRAPHER:  Off the record, 3:33 p.m.

3        (Brief recess was taken.)

4        THE VIDEOGRAPHER:  On the record, 3:35 p.m.

5        MS. McENROE:  No questions from us.  Just

6 thank you very much.

7        MR. PIFKO:  All right.

8        THE VIDEOGRAPHER:  Off the record, 3:35 p.m.

9        (Deposition concluded at 3:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 208

1           CERTIFICATE OF OATH

2

3

4 STATE OF FLORIDA

5 COUNTY OF HILLSBOROUGH

6

7

8    I, Lisa A. Simons-Clark, RMR, CRR, Notary

9 Public, State of Florida, certify that CHRISTOPHER

10 BELLI personally appeared before me on the 20th day of

11 December, 2018, and was duly sworn.

12

13    WITNESS my hand and official seal this ____ day of

14 December, 2018.

15

16    _____

17    Lisa A. Simons-Clark, RMR, CRR

18    Notary Public - State of Florida

19    My Commission Expires:  7/1/20

20    Commission No. GG 001980

21

22

23

24

25

Page 209

1        REPORTER'S CERTIFICATE

2

3 STATE OF FLORIDA

4 COUNTY OF PINELLAS

5

   I, Lisa A. Simons-Clark, Registered Merit

6 Reporter, Certified Realtime Reporter, certify that I

was authorized to and did stenographically report the

7 deposition of CHRISTOPHER BELLI; that a review of the

transcript was requested; and that the transcript is a

8 true and complete record of my stenographic notes.

9

10    I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

11 nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

12 financially interested in the action.

13

14    Dated this ____ day of December, 2018.

15

16    _____

17    Lisa A. Simons-Clark, RMR, CRR

18

19

20

21

22

23

24

25

Page 210

1        ERRATA SHEET

2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3  IN RE:  National Prescription Opiate Litigation
       WITNESS:  CHRISTOPHER BELLI

4     DATE OF DEPOSITION:  December 20, 2018

5  PAGE  LINE   CHANGE          REASON

6  ____ ____  _____

7  ____ ____  _____

8  ____ ____  _____

9  ____ ____  _____

10  ____ ____  _____

11  ____ ____  _____

12  ____ ____  _____

13  ____ ____  _____

14  ____ ____  _____

15  ____ ____  _____

16  ____ ____  _____

17  ____ ____  _____

18  ____ ____  _____

19  ____ ____  _____

20

    Under penalties of perjury, I declare that I have read

21  the foregoing document and that the facts stated in it

    are true.

22

23

    _____

24  DATE       CHRISTOPHER BELLI

25  Reporter:  Lisa A. Simons-Clark, RMR, CRR