```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :
 7
 8               HIGHLY CONFIDENTIAL
 9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                    -  -  -  -
12              JANUARY 22, 2019
13                    -  -  -  -
14       VIDEOTAPED DEPOSITION OF FRED BENCIVENGO,
15   taken pursuant to notice, was held at Marcus &
16   Shapira, One Oxford Center, 35th Floor,
17   Pittsburgh, Pennsylvania 15219, by and before Ann
18   Medis, Registered Professional Reporter and Notary
19   Public in and for the Commonwealth of
20   Pennsylvania, on Tuesday, January 22, 2019,
21   commencing at 2:08 p.m.
22                    -  -  -  -
23           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
25
```

Page 2

```
 1           A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3     WAGSTAFF & CARTMELL, LLP
        BY: TYLER HUDSON, ESQUIRE
 4     4740 Grand Avenue, Suite 300
        Kansas City, Missouri 64112
 5     816.701.1100
        thudson@wcllp.com
 6
 7  On behalf of Defendant AmerisourceBergen Drug
    Corporation
 8
        (By Phone/Livestream)
 9     JACKSON KELLY, LLP
        BY: ANDREW N. SCHOCK ESQUIRE
10     50 South Main Street, Suite 201
        Akron, Ohio 44308
11     330.252.9078
        anschock@jacksonkelly.com
12
13  On behalf of Defendant Cardinal Health, Inc.
14     PIETRAGALLO GORDON ALFANO BOSICK &
        RASPANTI, LLP
15     BY: JOHN A. SCHWAB, ESQUIRE
        One Oxford Centre, 38th Floor
16     301 Grant Street
        Pittsburgh, Pennsylvania 15219
17     412.263.2000
        jas@pietragallo.com
18
19  On behalf of Defendants Endo Pharmaceuticals, Endo
    Health Solutions and Par Pharmaceuticals
20
        (By Phone/Livestream)
21     ARNOLD & PORTER KAYE SCHOLER LLP
        BY: JAKE MILLER, ESQUIRE
22     777 South Figueroa Street
        Los Angeles, CA 90017-5844
23     213.243.4000
        jake.miller@arnoldporter.com
24
25
```

Page 3

```
 1        A P P E A R A N C E S (Continued)
 2  On behalf of Defendant HBC Service Company
 3     MARCUS & SHAPIRA, LLP
        BY: JOSHUA A. KOBRIN, ESQUIRE
 4     One Oxford Centre, 35th Floor
        Pittsburgh, Pennsylvania 15219
 5     412.471.3490
        kobrin@marcus-shapira.com
 6
 7  On behalf of Defendant McKesson Corporation
 8     COVINGTON & BURLING, LLP
        BY: MEGHAN MONAGHAN, ESQUIRE
 9     One CityCenter
        850 Tenth Street, NW
10     Washington, DC 20001-4956
        202.662.5807
11     mmonaghan@cov.com
12
        On behalf of Defendant Walmart
13
        (By phone/Livestream)
14     JONES DAY
        BY: RICHARD M. BRODSKY, ESQUIRE
15     150 West Jefferson Avenue, Suite 2100
        Detroit, Michigan 48226
16     313.230.7699
        rbrodsky@jonesday.com
17
18  Also present
19     Tyler Crotty, legal videographer
20
21
22
23
24
25
```

Page 4

```
 1              * I N D E X *
 2  FRED BENCIVENGO                        PAGE
 3    EXAMINATION BY MR. HUDSON      7, 170, 180
      EXAMINATION BY MR. KOBRIN         156, 179
 4
 5      * INDEX OF HBC-BENCIVENGO EXHIBITS *
 6  NO.        DESCRIPTION              PAGE
    Exhibit 1  Giant Eagle Retail Operations -    19
 7     Pharmacy Operations 11/13/14
        org chart
 8     HBC_MDL00002216
 9  Exhibit 2  Giant Eagle Retail Operations -    19
        Pharmacy Operations 6/1/15
10      org chart
        HBC_MDL0002222
11
12  Exhibit 3  Email, 6/26/13, from S. Cook to     68
        A. Anthony, et al., subject:
13      Giant Eagle CSMP - 06/26/2013,
        attaching CSMP Giant Eagle
14      Threshold Report 062613.xlsx
        HBC_MDL00136237 - 00136238
15  Exhibit 4  Email, 7/16/13, from S. Medina      72
        to A. Anthony, et al., subject:
16      Giant Eagle CSMP 07.16.13
        attaching Giant Eagle CSMP
17      07.16.13.xlsx
        HBC_MDL00079510 - 00079511
18
19  Exhibit 5  Email, 7/16/13, from S. Medina      72
        to A. Anthony, et al., subject:
20      Giant Eagle CSMP 07.17.13
        attaching Giant Eagle CSMP
21      07.17.13.xlsx
        HBC_MDL00079386 - 00079387
22  Exhibit 6  Email, 7/18/13, from S. Medina      72
        to A. Anthony, et al., subject:
23      Giant Eagle CSMP, attaching
        Giant Eagle CSMP 07.18.13.xlsx
24      HBC_MDL00079491 - 00079492
25
```

Page 5

```
 1  * INDEX OF HBC-BENCIVENGO EXHIBITS (Continued) *
 2  NO.        DESCRIPTION              PAGE
    Exhibit 7  Email, 7/22/13, from S. Medina     72
 3     to A. Anthony, et al., subject:
        Giant Eagle CSMP 7/22,
 4      attaching Giant Eagle CSMP
        07.22.13.xlsx
 5      HBC_MDL00079213 - 00079214
 6  Exhibit 8  Email, 10/18/13, from F1 Batch     72
        User to S. Cook, et al., subject:
 7      Email of DEA Threshold Warning
        Report_8164, attaching DEA
 8      Threshold Warning Report_8164.xls
        HBC_MDL00174476 - 00174477
 9
    Exhibit 9  Email chain, 7/1/08, from D.       77
10      Casar to J. Liliestedt, et al.,
        subject: RE: Vicodin quota ?????????
11      HBC_MDL00179373 - 00179374
12  Exhibit 10  Conference call invitation,       90
        1/9/13, from G. Chunderlik to
13      J. Millward, et al., subject:
        Narcotic Audit Application,
14      attaching requirements for the
        application
15      HBC_MDL00041837 - 00041850
16  Exhibit 11  Copy of Narcotic of Audit Chain   103
        Discrepancies Summary_07-01-13
17      HBC_MDL00032853 (native)
18  Exhibit 12  Copy of Narcotic of Audit Chain   103
        Discrepancies Summary_October 2013
19      HBC_MDL00032878 (native)
20          - - - -
21
22
23
24
25
```

Page 6

P R O C E E D I N G S

- - - -

THE VIDEOGRAPHER: We are now on the record. I'm a videographer retained by Golkow Litigation Services. Today's date is Tuesday, January 22, 2019, and the time is 2:08 p.m.

This video deposition is being held at One Oxford Centre, Pittsburgh, PA, in the matter of National Prescription Opiate Litigation MDL, for the Northern District of Ohio.

The deponent is Fred Bencivengo.

Will counsel please identify themselves and state whom they represent.

MR. HUDSON: Ty Hudson of Wagstaff & Cartmell for plaintiffs.

MS. MONAGHAN: Meghan Monaghan from Covington & Burling on behalf of McKesson.

MR. SCHWAB: John Schwab on behalf of Cardinal.

MR. KOBRIN: Josh Kobrin of Marcus & Shapira, on behalf of HBC Service Company.

THE VIDEOGRAPHER: And counsel on the phone, please identify yourselves.

MR. BRODSKY: This is Richard Brodsky from Jones Day on behalf of Walmart.

Page 7

MR. MILLER: Hi. This is Jake Miller from Arnold & Porter on behalf of the Endo and Par defendants. I don't know if others on the phone are having this issue, but at least for me, the realtime feed does not appear to be working. I'm not seeing any text generated on the screen.

MR. SCHOCK: This is Andrew Schock of Jackson Kelly for the AmerisouceBergen Drug Corporation.

THE VIDEOGRAPHER: The court reporter is Ann Medis, and she will now swear in the witness.

FRED BENCIVENGO,
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HUDSON:

Q. Sir, could you please state your full name for the record.

A. Fred Bencivengo.

Q. And what is your current address?

A. 3556 Layer Road in Warren, Ohio.

Q. Have you ever had your deposition taken before?

A. Yes.

Q. How many times?

Page 8

A. Once.

Q. And what was the nature of that case?

A. It was an overdose actually on methadone, and I was an expert witness for the defense.

Q. And when was that, how long ago?

A. In the middle '90s.

Q. Well, it's been a little while. So I'll just make sure that we understand the ground rules. I'm going to be asking questions. From time to time counsel may object. Unless your counsel instructs you not to answer, will you agree to answer my questions?

A. Yes.

Q. And if you don't understand my question, will you let me know so I can rephrase it?

A. Sure.

Q. Is it fair that if you answer my question, I can assume that you understood it?

A. Yeah.

COUNSEL ON PHONE: Can others confirm, is the text working for them on the live feed? Because it's not working for me.

THE VIDEOGRAPHER: We are going off the record. The time is 2:11 p.m.

Page 9

(Recess from 2:11 p.m. to 2:21 p.m.)

THE VIDEOGRAPHER: We're going back on the record. The time is 2:21 p.m.

BY MR. HUDSON:

Q. Mr. Bencivengo, did I pronounce that correctly?

A. Yes.

Q. You understand that you're under oath?

A. Yes.

Q. You're swearing to tell the truth just like you would if you were in a courtroom in front of a judge and a jury?

A. Yes.

Q. You're doing a good job of this, but if you could, just give audible answers as opposed to nonverbal nods or things like that.

A. Okay.

Q. And then lastly, if you need to take a break at any time, just let me know, and we can go off the record. All I would ask, if there's a pending question, you answer that before we go off the record; is that fair?

A. Yes.

Q. What did you do to prepare for the deposition today?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.   Met with counsel.
2    Q.   Approximately how many hours did you
3  meet?
4    A.   With breaks and lunch, probably about
5  seven hours.
6    Q.   Did you look at documents?
7    A.   Yes.
8    Q.   Before meeting with counsel for that
9  seven-hour meeting, had you done anything else to
10 prepare for this deposition?
11   A.   No.
12   Q.   Had you talked to anyone about this
13 deposition?
14   A.   Josh.
15   Q.   Other than counsel.
16   A.   No, no.
17   Q.   I want to start then with your
18 education.  If you could, just describe where you
19 went to college.
20   A.   I have a bachelor's degree in pharmacy.
21 I got in 1992 from Ohio Northern University.
22   Q.   So explain to me what that degree is.
23 Is that a pharmacy degree?
24   A.   At that time, it was a five-year degree;
25 correct.

Page 11

1    Q.   And would you describe it as a pharmacy
2  degree or degree from pharmacy school?
3    A.   It's a pharmacy school.  I have a
4  pharmacy degree.
5    Q.   After you received your pharmacy degree,
6  what did you do?
7    A.   I worked for an independent from '92 up
8  until 2000 in various roles.  We had about four
9  stores and their single pharmacy, mail order
10 pharmacy.  It split off.  I managed the four
11 stores.  It split off to four stores of retail and
12 one pretty nice size nursing home pharmacy.  I got
13 out of that part and became the operations
14 director of the retail side.
15   Q.   What was the name of that company?
16   A.   Conva-Med, C-O-N-V-A-Med.
17   Q.   Where was that company located?
18   A.   We had four stores.  The headquarters
19 was out of Cornersburg; Cornersburg, Ohio,
20 Austintown.
21   Q.   And is that where you were located?
22   A.   When we first started -- when we first
23 started, we started in Brookfield, moved out to
24 that location.  Then my office got moved over down
25 towards Youngstown.

Page 12

1    Q.   Why did you leave Conva-Med?
2    A.   They closed.
3    Q.   And why did they close?
4    A.   Some bad business deals from the owners.
5    Q.   Was there any sort of investigation by
6  the DEA or others of the company?
7    A.   No.  It was a typical independent
8  closing.  We just couldn't do it anymore, and we
9  sold our files.
10   Q.   So when you mean bad business deals, you
11 just mean like financially they just made
12 decisions that caused them to lose money instead
13 of make money?
14   A.   Yeah.  The two owners were clashing.
15   Q.   We're starting to talk over each other,
16 and I'm sometimes guilty of that, too.  So if we
17 could, as best you can, let me finish my question
18 and then I will do my very best to let you finish
19 your answer before we start talking because,
20 otherwise, she's going to become very upset with
21 us.
22     So Conva-Med closed in 2000, and at that
23 point, did you go to work for Giant Eagle?
24   A.   Yes.
25   Q.   And what was your first role at Giant

Page 13

1  Eagle?
2    A.   I was the pharmacy manager in the store
3  in Ravenna, Ohio.
4    Q.   Say the name of the town again.
5    A.   Ravenna.
6    Q.   How long did you remain at that store?
7    A.   Until approximately the end of 2006.
8    Q.   And at that point, were you promoted to
9  a pharmacy district leader?
10   A.   Correct.
11   Q.   What territory did you have in 2006 when
12 you became a pharmacy district leader?
13   A.   The Akron/Canton area.
14   Q.   And do you remain in that role as a
15 pharmacy district leader today?
16   A.   Yes.
17   Q.   Is pharmacy district leader sometimes
18 referred to as a PDL?
19   A.   That's exactly what it is, yeah.
20   Q.   So if I use the acronym PDL, you'll know
21 what I mean, pharmacy district leader?
22   A.   Yes.
23   Q.   Has your territory, PDL territory
24 changed between 2006 and today?
25   A.   Actually, I'm back to the stores I was

Page 14

1  in in 2006. But, yes, it's changed over the year.
2      Q. If you could, just walk me through the
3  evolution over that, I think, it's 12 years or so.
4      A. Not hitting the dates correctly, I had
5  had that territory probably for about two years.
6  I took over the Youngstown/Erie, Pennsylvania
7  region for a very small period of time. I went up
8  in east Cleveland after that.
9      Q. And the east Cleveland territory, how
10  long did you have that?
11      A. For a couple of years.
12      Q. Do you have a ballpark on what those
13  years would be?
14      A. Probably from I want to say '15 maybe to
15  '17.
16      Q. And how about when you switched over to
17  the territory in Pennsylvania, did you add those
18  stores, or did you shift completely from Ohio to
19  Pennsylvania?
20      A. There's not enough stores in Erie, so I
21  had Youngstown/warren. There was 13 or 14 stores
22  there and then the five or six stores in Erie.
23      Q. But all of those stores in Pennsylvania?
24      A. Yeah. It was a split. There was like
25  13 or 14 in Ohio, and the rest were in

Page 15

1  Pennsylvania.
2      Q. And then in 2017, then you went back to
3  the region that had the Akron?
4      A. Yeah. They redraw the lines every once
5  in a while, add stores, take stores away. But for
6  the most part, the stores I have now were the
7  stores I started at, for the most part.
8      Q. So during the entire -- is it 12 years?
9  Is that about right?
10      A. Yes.
11      Q. -- 12-year period, you were continuously
12  covering stores in Ohio?
13      A. Correct.
14      Q. But for a couple of years you had -- you
15  were added some stores in Ohio, I mean, in
16  Pennsylvania as well; correct?
17      A. Correct.
18      Q. In terms of the State of Ohio, do you
19  have a sense of how many pharmacies Giant Eagle
20  has?
21      A. Probably about -- I'm assuming about
22  120, somewhere around there.
23      Q. And of those, how many -- over your 12
24  years, I know it's sort of fluctuated a little
25  bit, how many of those Ohio pharmacies did you

Page 16

1  cover or have you covered?
2          MR. KOBRIN: If you know.
3          THE WITNESS: 60 to 80.
4  BY MR. HUDSON:
5      Q. And from 2006 until today, would you say
6  the prescription volume of opioids has gone up,
7  down or remained constant in that 12-year period?
8          MR. KOBRIN: Object to form.
9          THE WITNESS: I would say it went up,
10  and now it's backing back down a little bit.
11  BY MR. HUDSON:
12      Q. And at what point would you say that it
13  hit the height of the rise, I guess?
14      A. I can't even assume that, but I can tell
15  you that it started declining when they made --
16  once they made Vicodin a CII.
17      Q. So Vicodin is a hydrocodone combination
18  product?
19      A. Yes.
20      Q. So when it was reclassified from a
21  Schedule III to a Schedule II in October of 2014,
22  you would say that that's sort of a point in time
23  that you can point to where you felt like that
24  changed?
25      A. Changed prescribing habits.

Page 17

1      Q. And since that change, the amount of
2  prescriptions for opioids, at least in your
3  territory, has gone down?
4          MR. KOBRIN: Object to form.
5          THE WITNESS: I don't see that number,
6  so I'm not going to -- I don't know.
7  BY MR. HUDSON:
8      Q. Well, you see the prescription volumes
9  in your territory; right?
10      A. I see a total number of prescriptions
11  for the week, not broken down what they are.
12      Q. Right. And that's all I was saying. As
13  a whole, the opioids as a whole you --
14          MR. KOBRIN: Object to form.
15          THE WITNESS: The prescription volume as
16  a whole with opioids being a small part of it
17  along with everything else we dispense, I see it
18  doing this (indicating).
19  BY MR. HUDSON:
20      Q. I guess my questions are focused on
21  opioids. So for opioids -- and let's make it more
22  precise and say opioid, the volume of
23  prescriptions being filled by Giant Eagle
24  pharmacy.
25      So in your role as a PDL in your territories

Page 18

1  in Ohio, over the 12-year period that you've been
2  in that role, would you say that the opioid
3  prescription numbers for Giant Eagle pharmacies
4  has gone up, down or remained constant?
5      MR. KOBRIN:  Object to form.
6      THE WITNESS:  From 2006 to -- what was
7  the final date?
8  BY MR. HUDSON:
9      Q.  To present.
10     MR. KOBRIN:  If you know.
11     THE WITNESS:  I would say up a little
12 and then back down.
13 BY MR. HUDSON:
14     Q.  And then when you say back down, then
15 that was the point that you made about Vicodin
16 switching from a Schedule III to a Schedule II?
17     A.  Correct.
18     Q.  In your 12 years as a PDL, who did you
19 report to?
20     A.  I started reporting to Randy Heiser and
21 then Anthony Mollica and then Greg Carlson, Mark
22 Doerr.  At present it's Michael Chappell.
23     Q.  So it's five different people.  Any
24 sense of the timeframes of when those direct
25 reports for you changed?

Page 19

1      A.  No, no.  I mean, Randy promoted Anthony,
2  and they were both still with us.  Instead of
3  reporting to Anthony or instead of reporting to
4  Randy, we would report to Anthony.  You could
5  see -- I'm sure you can get whenever Anthony left
6  is when we started reporting to Greg.  Then it
7  just falls into place.
8      (HBC-Bencivengo Exhibits 1 - 2 were marked.)
9  BY MR. HUDSON:
10     Q.  I'll mark here as Exhibit 1 a copy of an
11 organizational chart.  This is the earliest one we
12 could find.  This at least gives us one point in
13 time.  Actually, I'll go ahead and mark another
14 one, too.
15     MR. HUDSON:  So Exhibit 1 is 6016 and
16 Exhibit 2 is 6017.
17 BY MR. HUDSON:
18     Q.  These are a couple of organizational
19 charts.  It looks like in this time in November of
20 2014 and June of 2015 you were reporting to
21 Mr. Carlson.
22     A.  That's correct.
23     Q.  Does this give you any more recollection
24 on when you maybe began reporting to Mr. Carlson?
25     A.  If this is the earliest we got, then I

Page 20

1  would say 2013, 2014.  It was as soon as Randy
2  left.
3      Q.  That's helpful.  We can figure it out
4  from there.  So you as a PDL, you and the other
5  PDLs then reported directly up to the
6  vice-president of pharmacy operations?
7      A.  At the time, correct.
8      Q.  And does that remain true today, that
9  your direct report is the VP of pharmacy
10 operations?
11     A.  No.
12     Q.  Who do you report up to now?
13     A.  Mike Chappell is the operations
14 director.
15     Q.  So now you report to the operations
16 director?
17     A.  Correct.
18     Q.  Did Giant Eagle reorganize in terms of
19 the reports?
20     A.  Yes.  Greg left.  Yeah, they did a
21 little bit of reorganization, just who you report
22 to.
23     Q.  Is the operations manager still part of
24 the pharmacy department?
25     A.  Yes.  It's the operations director,

Page 21

1  director of operations.
2      Q.  So in your role as a pharmacy district
3  leader, describe what your responsibilities are.
4      A.  It started off buying drugs.  Anything
5  that falls under operations.  So whether it's
6  involved with hiring, firing, enforcing policies,
7  corrective actions, taking care of any quality
8  issues and whatever else my boss would ask us to
9  do which pertains to running a pharmacy,
10 controlling labor, helping in buyouts.
11     Q.  Is your role limited to overseeing the
12 particular retail pharmacies in your territory?
13     A.  Correct.  I oversee 33 pharmacies.  Like
14 if someone is on vacation, I might cover their
15 stores for a week just as a point person.
16     Q.  Sure.  But for example, you're aware
17 that there was a warehouse, HBC warehouse in
18 Washington, Pennsylvania?
19     A.  I'm aware of it.
20     MR. KOBRIN:  Object to form.
21 BY MR. HUDSON:
22     Q.  And would you have any responsibilities
23 related to that warehouse?
24     A.  No.
25     Q.  How did your -- how does your

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 compensation work as a pharmacy district leader?
2 Like do you obtain a base salary and then
3 incentive compensation, or how does this
4 compensation system work for PDLs?
5     MR. KOBRIN: Object to form.
6     THE WITNESS: It's basically just a
7 percentage higher than the pharmacy manager.
8 Bonus structure is if there's any bonuses based on
9 company overall performance. I don't have any
10 drivers for myself. I mean, there are goals, but
11 they don't determine any part of my bonus. It's
12 all or none. We all seven get it or we all seven
13 don't get it.
14     Q. When you say you all seven get it, you
15 all seven would get a bonus if whatever the target
16 is is met?
17     A. Correct.
18     Q. What is the target for PDLs?
19     A. It's based on store Giant Eagle sales,
20 Giant Eagle as a company, not pharmacy. We're not
21 separate out. We separate out as we talking
22 today. This is the first time. But every other
23 year has been -- if the pharmacy -- if Giant Eagle
24 was projected to hit this target as a company and
25 we did, then the seven people under this district

Page 23

1 leader would get the bonus.
2     Q. Would it be those seven people or it
3 would be everybody companywide including the PDLs
4 and then PDLs would get a certain percentage
5 bonus?
6     A. Correct.
7     Q. So the comp system, to your knowledge,
8 between 2006 and 2018 was set up so that everyone
9 would get a salary and then a bonus, and a bonus
10 would be set off of a performance metric for the
11 company as a whole. And then the only difference
12 for any particular types of employees would be the
13 percentage bonus that they would get?
14     MR. KOBRIN: Object to form.
15     THE WITNESS: The only change we made
16 was in the past starting in 2006. Even when I was
17 in the store, just the pharmacy manager was
18 eligible for the bonus. We changed. The staff
19 pharmacist and the floater pharmacist can share a
20 piece of that, too.
21 BY MR. HUDSON:
22     Q. I want to make sure I understand the
23 compensation system that existed from 2006 to
24 2018.
25     Am I correct though that employees who

Page 24

1 potentially were eligible for a bonus, the way
2 that bonuses were determined was based off of the
3 total performance of the company?
4     A. Correct.
5     Q. And then particular categories of
6 employees that were eligible for bonuses, like you
7 as a PDL, for example, you and the other six PDLs
8 would all be entitled to the same percentage
9 bonus?
10     A. Correct.
11     MR. KOBRIN: Object to form.
12 BY MR. HUDSON:
13     Q. And that was true, just to close out
14 this topic, that was true that entire 11 years or
15 12 years until -- 2019 is what you're saying is
16 when now the structure is changed?
17     A. Correct.
18     Q. So from your individual standpoint,
19 there was no way for you to achieve any particular
20 bonus or incentive compensation based off of any
21 individual performance?
22     A. No.
23     Q. What about raises in salary, did those
24 differ among PDLs?
25     A. Salaries may differ a little depending

Page 25

1 on when we were hired, but the raise was always
2 standard. If it was two percent, everyone got two
3 percent.
4     Q. So year to year the salaries weren't
5 based off of performance metrics, your individual
6 performance of sales that occurred in your
7 territory or any individual financial metrics like
8 that?
9     A. You said salary. You mean salary or
10 bonus?
11     Q. Salary. Sorry.
12     A. No, no.
13     Q. And you already testified about the
14 bonus; right?
15     A. Correct.
16     Q. So to your knowledge, there was no
17 ability to get an increase in salary or any sort
18 of incentive compensation based off of any
19 individual performance by yourself or the
20 pharmacies in your territories?
21     MR. KOBRIN: Object to form.
22     THE WITNESS: That's correct.
23 BY MR. HUDSON:
24     Q. Tell me, if you can recall, the first
25 time that you heard the phrase suspicious order

Page 26

1 monitoring.
2    A.  Years.  It's at least 14, 15, somewhere
3 around there.
4    Q.  Back at some point when you became a
5 PDL?
6    A.  Oh, for sure, yes.
7    Q.  I guess even 14, 15 would be before
8 that; right?  So prior to becoming a PDL, you'd
9 heard of the phrase suspicious order monitoring?
10    MR. KOBRIN:  Object to form.
11    THE WITNESS:  When I became a PDL in
12 2007, no, I didn't hear that before in the store.
13 BY MR. HUDSON:
14    Q.  You had not heard that phrase before?
15    A.  In the store, no.
16    Q.  So at some point when you became a PDL,
17 you learned of the phrase suspicious order
18 monitoring?
19    A.  Correct.
20    Q.  And do you recall how you learned of
21 that phrase?
22    A.  We attend meetings.  We're copied on
23 emails.  We attend seminars.  So it's probably
24 either we were looking at software at a seminar or
25 I was with George Chunderlik.

Page 27

1    MR. KOBRIN:  Don't speculate.  If you
2 know.
3    THE WITNESS:  That's how it is.  It was
4 nothing formal.  There's suspicious order
5 monitoring, and we're going to look at some
6 software and some things to solve it.
7 BY MR. HUDSON:
8    Q.  Do you remember any more specifically
9 though how you came to understand -- let me take a
10 step back.  Let me ask it this way.  To you what
11 does the phrase suspicious order monitoring mean?
12    A.  Looking at an order to make sure it's
13 not suspicious.
14    Q.  What in your mind is a suspicious order?
15    A.  Something maybe -- if I'm ordering 10
16 bottles of something a week and all of a sudden I
17 order 25, it's suspicious.  It might not be
18 something bad.  It's just something we have to
19 look at.
20    Q.  So one example of a suspicious order
21 would be an order of unusual size?
22    A.  Correct.
23    Q.  I guess the example you gave would be
24 one that would be an order that deviated from the
25 past; right?  You said it used to be they were

Page 28

1 ordering 10 and now they're ordering 25 --
2    MR. KOBRIN:  Object to form.
3 BY MR. HUDSON:
4    Q.  -- bottles.  Did I understand that
5 right?
6    A.  Correct.
7    Q.  Any other orders or types of orders that
8 you can think of that would fall within your
9 understanding of suspicious orders?
10    A.  No.
11    Q.  Do you have any understanding of whether
12 manufacturers, distributors or dispensers have any
13 obligations under federal law to monitor orders of
14 controlled substances?
15    MR. KOBRIN:  Object to form.
16    THE WITNESS:  You have to repeat that
17 question.
18 BY MR. HUDSON:
19    Q.  Sure.  Do you have any understanding of
20 whether manufacturers, distributors or dispensers
21 have any obligations under federal law to monitor
22 suspicious orders of controlled substances?
23    A.  Yes.
24    Q.  What is your understanding?
25    A.  It's basically what you just said, just

Page 29

1 to make sure that nothing is out of the ordinary,
2 make sure nothing is suspicious, make sure
3 everything is -- make sure what we're ordering is
4 what is needed.
5    Q.  And do you have an understanding of
6 whether or not there's different obligations for
7 distributors versus dispensers?
8    A.  I've never worked for a distributor, so
9 I can only speak for dispensers, but yes.
10    Q.  Do you have any knowledge about the
11 obligations of the Controlled Substances Act as
12 they relate to distributors?
13    MR. KOBRIN:  Object to form.
14    THE WITNESS:  No.  I've never worked for
15 a distributor.
16 BY MR. HUDSON:
17    Q.  And I assume then you've never attended
18 seminars or education or training, anything like
19 that, that would relate to obligations of
20 distributors to monitor controlled substances?
21    MR. KOBRIN:  Object to form.
22 BY MR. HUDSON:
23    Q.  Suspicious orders of controlled
24 substances.
25    MR. KOBRIN:  Object to form.

Page 30

1    THE WITNESS: Correct.
2 BY MR. HUDSON:
3    Q. How about dispensers, that would be like
4 the retail pharmacies in your territory; right?
5    A. Correct.
6    Q. Have you attended any seminars or
7 obtained any training on the obligations of retail
8 pharmacies to monitor for suspicious orders?
9    MR. KOBRIN: Object to form.
10    THE WITNESS: I had some training on
11 what the expectations are through George.
12 BY MR. HUDSON:
13    Q. Through George Chunderlik?
14    A. Yeah.
15    Q. Was that all of the PDLs or just you?
16    A. I believe it was all the PDLs, but I'm
17 not going to speculate on that. I know that I
18 started receiving questions from the office. I
19 was interested in it, so I reached out to him. He
20 spent some time with me on it.
21    Q. Do you have any ballpark timeframe on
22 when you and George went over it?
23    A. I would say last year sometime, but I
24 don't remember.
25    Q. How about prior to -- let's just zero in

Page 31

1 on anything prior to 2016, any conversations with
2 anyone at Giant Eagle or seminars or training or
3 anything else specifically focused on monitoring
4 suspicious orders of controlled substances.
5    MR. KOBRIN: Object to form. Are you
6 talking about from a store to a distribution or
7 are you talking generally?
8    MR. HUDSON: In general.
9    THE WITNESS: No.
10 BY MR. HUDSON:
11    Q. How much interaction would you say that
12 you had with Mr. Chunderlik or Mr. Millward or
13 anyone else from their team between 2009 and 2016?
14    A. We interact almost daily, especially
15 when Millward was here.
16    Q. You interacted with -- who would you say
17 you interacted with daily?
18    A. Probably Joe Millward.
19    MR. KOBRIN: Are you talking about for
20 the entire period of time?
21    THE WITNESS: He has some different
22 roles, too.
23 BY MR. HUDSON:
24    Q. We'll get into that. Who else would you
25 say during that 2009 to 2016 timeframe that you

Page 32

1 would interact with besides Mr. Millward?
2    A. Millward, Adrienne Anthony. Almost
3 everyone on this list. It's a small group.
4    Q. When you say everyone on that list, are
5 you looking at Exhibit 1 or Exhibit 2?
6    A. 1 and 2.
7    Q. So Exhibits 1 and 2, who are you --
8 you're looking to the left under people underneath
9 Mr. Millward?
10    A. Yes.
11    Q. Adrienne Anthony, George Chunderlik?
12    A. Lynne Kolas.
13    Q. Lynne Kolas?
14    A. Yep, Rick Springer. In that big box
15 only a couple of them.
16    Q. Which ones, which people in the big box?
17    A. Rick Westfall.
18    MR. KOBRIN: He's talking about people
19 you interacted with on a daily basis.
20    THE WITNESS: Oh, yeah, these guys are
21 in the field.
22 BY MR. HUDSON:
23    Q. Mr. Millward was the head of pharmacy
24 quality and compliance?
25    A. Correct.

Page 33

1    Q. And so what is your understanding of his
2 role for pharmacy quality?
3    A. That's why when you said who did you
4 interact with the most, I interacted with him
5 mostly on quality, following up on incidents,
6 whether things are errors or not, pharmacists in
7 trouble with errors, trying to correct that kind
8 of stuff. So my interactions were more with him
9 on the quality side and less on the compliance
10 side.
11    Q. How about Mr. Chunderlik, did you have
12 regular communications with him, or did you
13 usually work through Mr. Millward?
14    A. I'd usually work through Mr. Millward.
15    Q. Tell me, if you could, the types of
16 quality issues that you would work through with
17 Mr. Millward or others in his group.
18    MR. KOBRIN: Object to form.
19    THE WITNESS: Any time an error is made
20 in the pharmacy, there's a procedure we go
21 through. You follow up on every single one of
22 them. So in his role in that time period, we
23 would follow up with him. Here's what happened.
24 Here's my action plan. And we'd work the plan,
25 and there would be an outcome out of it.

Page 34

BY MR. HUDSON:

Q. When you say work the plan, you mean some sort of action items are put in place to solve whatever the problem was that led you to reach out to him?

A. Correct.

Q. Can you think of some examples of errors or problems that would come up from time to time in pharmacies?

MR. KOBRIN: Object to form.

THE WITNESS: Wrong drugs, wrong directions, wrong patient label. The list goes on and on. We -- I won't use the word expect, but those things happen. You try to minimize them. But if you have someone kind of out of that bell curve, that's when this group gets involved. So we can either help them. Are they at the wrong store? Are they in the wrong position?

We go through painstaking steps to keep them, but sometimes unfortunately the decision is made to let them go.

BY MR. HUDSON:

Q. How about on the compliance side, what would be examples of compliance issues that you would reach out to Mr. Millward or his team about?

Page 35

MR. KOBRIN: Object to form.

THE WITNESS: We have to do monthly audits of our narcotics, CIIs. Again, monthly, so if I look at those and something is missing, if they expect to have 630 in the tablet and there's 540, we need to investigate that and find out. So that's when George and Joe and the state board and the DEA get involved. We either find it -- sometimes we don't find it. But the second we're notified via email, we start the process.

BY MR. HUDSON:

Q. How are you notified about the results of the monthly audits?

A. They're emailed to me.

Q. Other than monthly audits, are there any other compliance issues you can think of that existed in the 2009 to 2016 timeframe where you would interact with Mr. Millward or his group?

A. If something was off. We have strengths in place. Perpetual inventory, if that was off. If we were getting a delivery and there's supposed to be ten bottles of Vicodin and there's only nine and the pharmacist signed for it, got to get involved. So any sort of issue with drug coming in and drug going out.

Page 36

Q. So if inventory counts were wrong?

A. Exactly.

Q. Then that would be an example of where you would get them involved.

Any other compliance issues you can think of where you were interacting with Mr. Millward or his group?

A. Compliance issues, I mean, I guess compliance is such a big umbrella. If a customer would come in and we would deem the prescription wasn't valid and we weren't going to fill it, we just wanted to make sure everyone knew about it and these are the reasons why and we're going to send them away.

Q. Would you reach out to Mr. Millward or someone in his group each time a pharmacy would decide not to fill a prescription, or how would there be -- how would the decision be made as to whether or not to contact them or not?

MR. KOBRIN: Object to form. Who is "them"?

MR. HUDSON: Mr. Millward or his group.

THE WITNESS: Only if there was a situation where the customer would come back and say, I'm going to sue you, or there was any kind

Page 37

of threat made. The majority of the time, I think these people know if you're giving it back to them. They're out the door.

Q. Did any of the pharmacies in your territory ever keep logs of prescriptions that were attempted to be filled or not filled by the pharmacists?

MR. KOBRIN: Object to form.

THE WITNESS: No.

BY MR. HUDSON:

Q. As you sit here today, do you have any sense of how many times pharmacists in your territory would decide not to fill a prescription?

MR. KOBRIN: During the entire time?

MR. HUDSON: Yeah, between 2009 and 2016.

MR. KOBRIN: If you can give an answer.

THE WITNESS: I can't speculate. I can tell you a hundred percent it happens.

BY MR. HUDSON:

Q. Did any pharmacist in your territory between 2009 and 2016 ever bring to your attention any concerns about patients or prescribers or pain clinics where patients were coming and trying to fill prescriptions and the pharmacist felt like

Page 38

1 they may not be valid or they'd be at risk of
2 diversion?
3      MR. KOBRIN: Object to form.
4      THE WITNESS: Yes.
5 BY MR. HUDSON:
6    Q. How many times would you say that
7 happened?
8    A. Again, with the new law being capped, I
9 couldn't even speculate. I know that it happens.
10    Q. Do you remember any of the details
11 around any times where pharmacists ever raised
12 concerns with you?
13    A. The majority of the time, if the doctor
14 has a bad name in the area. So they wanted to
15 know if they could not fill any prescriptions from
16 Dr. Bencivengo. We don't -- we support them a
17 hundred percent on their decision to fill or not
18 fill, but we don't support just blankly saying
19 we're not filling any prescriptions from a doctor.
20    We have a process in place. You do your due
21 diligence. You make a decision that way. If part
22 of the due diligence says this guy doesn't need a
23 script, he's a bad doctor, then send them on the
24 way. We don't have any list of doctors that we
25 don't fill for.

Page 39

1    Q. In your territory in Ohio, from time to
2 time were there doctors identified by pharmacists
3 that they believe to be bad doctors?
4    A. Yes.
5    Q. Did you or anyone else at Giant Eagle
6 keep a log or a record of bad doctors in Ohio that
7 a prescription being written by them at least
8 raised a red flag of concern?
9    A. Again, no official log. I've walked
10 into many stores and saw something hand scribbled
11 on a bulletin board, be careful of these three
12 doctors; not do not fill, just but be careful.
13    Q. Was that more of an individual store to
14 individual store?
15    A. An FYI. If I'm coming in as a floater
16 that day, this is what I should look for.
17    Q. Was there any sort of log or -- I'm
18 trying to think of a good -- report, any way that
19 Giant Eagle is memorializing diversion risks at
20 the pharmacy level in terms of bad doctors or
21 anything else that would cause there to be a
22 concern about the diversion of controlled
23 substances?
24      MR. KOBRIN: Object to form. What do
25 you mean by bad doctors?

Page 40

1 BY MR. HUDSON:
2    Q. Well, you used the phrase bad doctors;
3 right?
4    A. Correct.
5    Q. Bad doctor in your mind means a doctor
6 that's at risk for writing a prescription that is
7 not for medically valid purposes; right?
8    A. Right. We're not going to put -- the
9 only time we take a doctor out of our database
10 system is once his license has been taken away.
11 The process doesn't change no matter who the
12 doctor is because, because he's a bad doctor, two
13 people still might need something he's writing.
14    So we're still going to do the exact same
15 steps every single time. We're going to call.
16 We're going to get the diagnosis. We're going to
17 get how many times he's been on it, what are the
18 other treatment options. We're going to run the
19 OARRS report.
20    Q. If you could, and I do this all the
21 time --
22    A. I'm talking fast?
23    Q. Yeah.
24    A. We don't keep a list. There's no list
25 of bad doctors. That's not how we keep the drugs

Page 41

1 off the street.
2    Q. Was there any report or log though or
3 repository, anything where any information or data
4 was kept about doctors or concerns about risk of
5 diversion?
6      MR. KOBRIN: Object to form.
7      THE WITNESS: Nothing on doctors, no.
8 BY MR. HUDSON:
9    Q. What about pain clinics or institutions
10 or any particular prescribing organizations that
11 were a concern?
12    A. I'll give you the same answer every
13 time. We don't paint with a broad brush. If a
14 pharmacist would call me and say, I have a concern
15 about this clinic, my response is, call the Ohio
16 state Board, have the Board agent come down. They
17 can investigate it and they can get back to us on
18 what we should do.
19    And then we'll look at each script
20 individually and go through the same steps we do
21 every single time.
22    Q. What are those steps that you go through
23 every single time?
24    A. So you drop off a prescription. Are you
25 a new customer? Do I know you? If you've been

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 coming to me for ten years and I know your
2 diagnosis, you're in stage IV cancer, I'm going to
3 fill your script. You're not getting a hard time.
4    If you're a new customer and you're 25 miles
5 away and you're going to that suspicious doctor
6 and it's 8:50 at night, we're probably not going
7 to fill it. We're probably going to call the
8 doctor in the morning. We're probably going to
9 run the OARRS report, which is required because
10 you're a new customer and a new patient, I mean, a
11 new prescription. We're going to get some
12 information.
13    After that information is gathered, if we
14 still deem that it's legit to the best of our
15 knowledge, we'll fill it. If we don't feel it is,
16 then we won't fill it.
17    Q. And is there any criteria that
18 pharmacists apply across Giant Eagle, or instead
19 is it just the individual judgment of each
20 pharmacist at each pharmacy?
21    MR. KOBRIN: Object to form.
22    THE WITNESS: I'm sure you've heard the
23 red flags, what we're using. They sign off on a
24 CBT that they've read that and understand it.
25 That's part of the -- that's one weapon in the bag

Page 43

1 along with the OARRS report. The person standing
2 in front of you is another.
3 BY MR. HUDSON:
4    Q. You're ahead of me now. I don't
5 actually understand. You used a phrase, not the
6 OARRS report, but you said something else that
7 would generate red flags. You made reference to
8 some report or some -- CDT.
9    A. The red flags report. You said do we
10 use standard -- is there a standard across the
11 chain.
12    Q. Right.
13    A. All our pharmacists are taught about the
14 red flags, what to look for.
15    Q. I guess what does CBT stand for?
16    A. Computer-based training.
17    Q. I'm trying to catch up, but I'm behind.
18 Tell me, what is computer-based training?
19    A. It's a vehicle that Giant Eagle uses for
20 training. So everyone has to do the OSHA once a
21 year. Everyone has to do fraud, waste and abuse.
22 So the way to track it is you go on the computer.
23 You sign in. You watch the video. You answer the
24 questions. You acknowledge at the end that you
25 saw it or read it, and you're good for the year.

Page 44

1    On the flip side, if something would happen,
2 someone can't hide behind "I don't know what
3 you're talking about," because I pull up the date
4 and say, well, on May 5 you watched this video.
5    Q. Tell me, if you could, what are the
6 topics or what issues are covered in CBT.
7    MR. KOBRIN: Object to form.
8    THE WITNESS: It could be anything that
9 Giant Eagle or anything that the pharmacy wants to
10 get across, any training.
11 BY MR. HUDSON:
12    Q. So it's a proprietary, I guess, software
13 program or training video put together by a group
14 of people at Giant Eagle?
15    A. Correct.
16    Q. Who makes the decision about what
17 content to include in the CBT from year to year?
18    MR. KOBRIN: Object to form. If you
19 know.
20    THE WITNESS: The compliance stuff would
21 be George.
22 BY MR. HUDSON:
23    Q. And then would it have been Joe Millward
24 before George?
25    A. They were both in the role. So it would

Page 45

1 have been one of the two.
2    Q. And then who decides though overall what
3 the CBT video for that year looks like? Is there
4 somebody who ultimately makes the decision, or is
5 it just a compilation of a group of different
6 people coming together?
7    MR. KOBRIN: Object to form.
8    THE WITNESS: I have no idea. I'm not
9 part of that.
10 BY MR. HUDSON:
11    Q. Do you know whether Mr. Millward or
12 Mr. Chunderlik contributed any compliance material
13 to any of the CBTs over the years?
14    A. Not to my knowledge. I would assume in
15 their roles, but I don't know.
16    Q. Would you have to take the CBT each
17 year?
18    A. Yes.
19    Q. Do you have any recollection of there
20 being any compliance content on any of the CBTs
21 that you took over the years?
22    A. There was compliance content in there,
23 yeah. I don't know where it came from. It didn't
24 say this is from Joe or this is from George. It's
25 just compliance.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  Q. Sure. And I guess I was more in
2  general trying to figure out how much compliance
3  material as a whole was included in the CBTs.
4  A. At minimum, at bare minimum you're going
5  to see fraud, waste and abuse, make sure we're
6  compliant to that.
7  Q. Do you have any recollection of there
8  being any content relating to suspicious order
9  monitoring?
10  A. No.
11  Q. Do you know whether or not the
12  compliance group had any responsibilities for
13  investigating any suspicious orders of controlled
14  substances?
15  MR. KOBRIN: Object to form.
16  THE WITNESS: I'm not in that group.
17  BY MR. HUDSON:
18  Q. And I guess just to make sure -- and I
19  apologize. Sometimes I ask you questions that I
20  just got to ask so I get a clear record.
21  As far as your role as a pharmacy district
22  leader, did you ever learn in that role by
23  interacting with the compliance group that there
24  was any obligation of the compliance group to
25  investigate any orders that had been flagged as

Page 47

1  being suspicious orders of controlled substances?
2  MR. KOBRIN: Object to form.
3  THE WITNESS: I mean, I didn't learn
4  from them, but again them being in the compliance
5  group, talking about any kind of suspicious
6  ordering with them, one would assume that that's
7  part of their job. But I'm not going to say it as
8  a fact because I don't know.
9  BY MR. HUDSON:
10  Q. That's what I'm trying to get at, is do
11  you have any understanding. Over the years in
12  your role as a PDL, did you come to learn at all
13  what the compliance group's obligations were --
14  A. No.
15  MR. KOBRIN: Let him finish his
16  question.
17  BY MR. HUDSON:
18  Q. -- as it related to monitoring
19  suspicious orders of controlled substances?
20  MR. KOBRIN: Object to form.
21  THE WITNESS: No.
22  BY MR. HUDSON:
23  Q. Do you have any recollections of how
24  many times you were contacted by Mr. Millward or
25  Mr. Chunderlik asking about any specific shipment

Page 48

1  or order of controlled substance that they had
2  flagged as being potentially suspicious or
3  concerning?
4  MR. KOBRIN: Object to form.
5  THE WITNESS: I can't give you an exact
6  number, but, yes, both of them were contacted via
7  email or via phone call.
8  BY MR. HUDSON:
9  Q. Do you have any sense, as you sit here
10  today, how many times that happened? In other
11  words, was it two or three times or 50 times or
12  500 times?
13  MR. KOBRIN: What time period are we
14  talking about?
15  MR. HUDSON: Between 2009 and 2016.
16  THE WITNESS: I can't even guess. I
17  mean, that's so long ago. It happened. I can
18  tell you that.
19  BY MR. HUDSON:
20  Q. Can you think of the specifics of any
21  shipments or orders to any particular stores
22  within Ohio where Mr. Millward or Mr. Chunderlik
23  was asking you questions about the store, the
24  pharmacist or anything that had caused a red flag
25  to raise in terms of being concerned about

Page 49

1  diversion?
2  MR. KOBRIN: Object to form.
3  THE WITNESS: In those time periods
4  you're talking?
5  BY MR. HUDSON:
6  Q. Yes.
7  A. Nothing comes up in those time periods.
8  Q. And when you say those time periods, you
9  mean 2009 to 2016?
10  A. Yes.
11  Q. Have issues come up more recently?
12  A. I wouldn't say more recently. Because
13  we're talking a closer period of time, more come
14  to my mind that I can think of.
15  Q. Sure. That's what I'm trying to get at.
16  A. It's two. So it's not like it's a big
17  number.
18  Q. You can think of two times --
19  A. Yes.
20  Q. -- in 2017 or 2018 where you had
21  discussions with Mr. Chunderlik or others in the
22  compliance group about particular orders had been
23  flagged as being suspicious?
24  A. Correct.
25  MR. KOBRIN: Object to form. You're

---

Page 50

1 using the term suspicious orders and flagged
2 orders concurrently or interchangeably.
3        MR. HUDSON:  Because they are.
4        MR. KOBRIN:  I don't them they are to
5 the witness.  I think you're causing confusion
6 with him regarding flagged and suspicious orders.
7        THE WITNESS:  Okay.  That makes sense.
8        MR. HUDSON:  I'll let you clear that up.
9        MR. KOBRIN:  Well, I'm flagging that
10 issue for you.
11        Should we take a break?
12        MR. HUDSON:  Yeah, that's fine.  Take a
13 quick break.
14        THE VIDEOGRAPHER:  We are going off the
15 record.  The time is 3:11 p.m.
16        (Recess from 3:11 p.m. to 3:42 p.m.)
17        THE VIDEOGRAPHER:  We're going back on
18 the record.  The time is 3:42 p.m.
19 BY MR. HUDSON:
20        Q.  Welcome back, Mr. Bencivengo.  Before
21 the break, we were talking about pharmacists and
22 potential red flags for diversion, and you had
23 made reference to OARRS reports and CBTs, and that
24 kind of took us down this road.
25        So I want to go back to my original question

---

Page 51

1 which was:  For Giant Eagle pharmacists, was there
2 any sort of uniform criteria that existed to apply
3 to try to determine whether to fill a prescription
4 or not?
5        MR. KOBRIN:  Object to form.
6        THE WITNESS:  We have document control
7 dispensing.  In that document it lists the red
8 flags, what to look for to do the due diligence
9 and to make that decision.
10 BY MR. HUDSON:
11        Q.  As you sit here today, do you have a
12 recollection of what those red flags are?
13        MR. KOBRIN:  Object to form.  Do you
14 want to show him the document?
15        MR. HUDSON:  I don't have it.
16        THE WITNESS:  I mean, I can't name every
17 single one of them, but obviously the age, the
18 distance, the distance they drive, the distance
19 from the doctor to the pharmacy and the distance
20 where they live and to the pharmacy.  If they
21 mention the drugs by the street names, Percs,
22 Vics.  Any kind of combination product, the
23 trinities, the pain reliever, the muscle relaxer,
24 those are usually a sign that calls might need to
25 be made.

---

Page 52

1 BY MR. HUDSON:
2        Q.  And in Ohio in your 12 years there, in
3 your experience, were there patients coming into
4 pharmacies that were trying to get drugs that
5 weren't for medically necessary purposes?
6        MR. KOBRIN:  Object to form.
7        THE WITNESS:  Yes.
8 BY MR. HUDSON:
9        Q.  And how did you come to that opinion?
10        A.  As a practicing pharmacist or as a
11 person in my role right now?
12        Q.  Yeah, just as a whole, in other words,
13 really through those 12 years in your role as a
14 PDL.
15        A.  By doing the due diligence we needed to
16 do to fill those prescriptions, by viewing the red
17 flags, and then once it was determined, that's
18 when it was determined this wasn't necessary.
19        Q.  Did you have enough interaction with
20 pharmacists and just the communities of Ohio to
21 get a sense of whether or not opioid diversion or
22 opioid abuse was a problem in the communities
23 where your territory existed?
24        MR. KOBRIN:  Object to form.
25        THE WITNESS:  Enough with the

---

Page 53

1 pharmacies, not in the communities.  I know the
2 communities we serve really well.  I've been doing
3 this for a while.
4 BY MR. HUDSON:
5        Q.  Sure.  That's what I guess I'm asking,
6 is:  Do you get a sense from the pharmacies that
7 you served and just the communities as you got to
8 know them that those communities in your territory
9 were at higher risk for potential diversion of
10 opioids and opioid abuse?
11        MR. KOBRIN:  Higher risk than what?
12 Object to form.
13        THE WITNESS:  I'm not sure what you're
14 asking.  Every community has a risk of -- it
15 doesn't -- it can be wealthy.  It can be poor.
16 There's no area that would stand out more.  I'm
17 not really sure what you're asking.
18 BY MR. HUDSON:
19        Q.  I'm asking you in your experience as a
20 PDL, have you come to get a sense of whether
21 certain communities are more at risk than other
22 communities for opioid diversion or opioid abuse?
23        A.  No.
24        Q.  During your time as a PDL, did you get a
25 sense of whether the communities in Ohio were --

---

Page 54

1 the communities in Ohio in your territories had
2 risk for opioid diversion?
3       MR. KOBRIN: Object to form. Asked and
4 answered.
5       THE WITNESS: Again, all the communities
6 in my territory have that risk. There's affluent
7 areas and there's poor areas. It happens in every
8 community.
9 BY MR. HUDSON:
10      Q. Could you tell the difference though
11 between Pennsylvania, for example, when you
12 covered that territory and Ohio?
13      A. No.
14      Q. No difference?
15      A. No difference, no.
16      Q. Do you have any other territories or
17 areas of the country that you've ever worked with
18 pharmacies to have any other sense beyond Ohio and
19 Pennsylvania?
20      MR. KOBRIN: Object to form.
21      THE WITNESS: No.
22 BY MR. HUDSON:
23      Q. Did you over time get a sense of whether
24 or not there's an opioid crisis in our country?
25      MR. KOBRIN: Object to form.

Page 55

1       THE WITNESS: Yes.
2 BY MR. HUDSON:
3       Q. And what was your view?
4       A. My view of the crisis or how -- my view
5 is you can't turn on the TV or open Facebook.
6 It's everywhere.
7       Q. That's what I was asking. Do you agree
8 with the idea that there is an opioid crisis in
9 our country?
10      MR. KOBRIN: Object to form.
11      THE WITNESS: Based on the sensation of
12 the media, yeah, there's definitely something.
13 BY MR. HUDSON:
14      Q. Well, that's what I guess I'm trying to
15 get at. You've got boots on the ground in a
16 territory in Ohio that you've covered, and in that
17 you've covered those communities and the
18 pharmacies in those communities; right?
19      A. Right.
20      Q. So what I'm trying to get a sense of is
21 your firsthand knowledge in those communities, is
22 that consistent with the way the opioid crisis has
23 been discussed or portrayed in the media?
24      MR. KOBRIN: Object to form.
25      THE WITNESS: I don't compare that. I

Page 56

1 don't really work in the communities and the
2 stores. I'm not a practicing pharmacist in a
3 community, so I don't know what -- I know some
4 docs. I know some areas, but I don't work in the
5 community.
6 BY MR. HUDSON:
7       Q. Sure. And I guess what I'm trying to
8 get a sense of is you've at least got roughly 30
9 pharmacists who are in different stores in Ohio
10 who are reporting up to you. And when they've got
11 problems, then you've got problems; right?
12      A. Yes.
13      Q. So what I'm trying to get a sense of is
14 in your 12 years covering those territories, one
15 of the problems that you were dealing with was
16 concerns over opioid diversion.
17      A. Yeah. Again, I've dealt with them in
18 the poor stores we have. I've dealt with them in
19 our richest stores we have. There's no division
20 line. It's going to happen. I know where you're
21 going. Everyone knows West Virginia. There's
22 areas where obviously it's happening more. I
23 don't have stores in West Virginia.
24      Q. Right that's what, I guess, I'm getting
25 a sense of. Do you feel like that same sort of

Page 57

1 saturation or concern that was in West Virginia
2 was also in Ohio?
3       A. No.
4       Q. Guarding against opioid diversion, would
5 you say in your role as a PDL that was something
6 that you would spend a lot of your time on, a
7 minority of your time on?
8       A. I would say somewhere in between. Part
9 of being a pharmacist -- I don't need to spend a
10 lot of time on it because that process happens in
11 our stores every single day. That's part of
12 dispensing a prescription. It doesn't matter if
13 you're in West Virginia or if you're in
14 California. You have the same responsibilities
15 dispensing a prescription every single time.
16      So I don't have to spend a lot of time on it
17 because I'm hiring people and paying people to do
18 their job, and part of their job is doing what you
19 just said.
20      Q. Is there any way -- I've asked you
21 certain questions -- as we sit here today to be
22 able to monitor or track or gauge whether or not
23 the efforts at the pharmacy to guard against
24 diversion actually prevented the diversion of
25 opioids?

Page 58

1 MR. KOBRIN: Object to form.
2 THE WITNESS: Rephrase that.
3 BY MR. HUDSON:
4 Q. I'm trying to get a sense of whether
5 there's any criteria or data, any sort of metrics
6 we could look at to try to figure out whether
7 Giant Eagle's efforts to prevent opioid diversion
8 actually were effective.
9 MR. KOBRIN: Object to form.
10 THE WITNESS: I wouldn't have any access
11 to those records. I don't know if they exist. I
12 could just say that we've prevented prescriptions
13 from being filled based on the stuff we spoke
14 about already.
15 BY MR. HUDSON:
16 Q. Right. But in terms of the number of
17 prescriptions or how many or any of those specific
18 circumstances, this is not something that's
19 tracked by Giant Eagle?
20 MR. KOBRIN: Object to form.
21 THE WITNESS: To my knowledge. I don't
22 do that tracking, no.
23 BY MR. HUDSON:
24 Q. And again, just to close out this topic
25 on pharmacists who are making the decision whether

Page 59

1 or not to fill prescriptions, you talked about
2 age, distance from the doctor to the pharmacy, and
3 then from the patient to the pharmacy, I believe.
4 A. Correct.
5 Q. Mentioning drugs by their street name.
6 Anything else you can think of that's in that
7 manual on looking for red flags?
8 MR. KOBRIN: Object to form.
9 Misrepresents his testimony. I think he included
10 some others during his listing.
11 THE WITNESS: One item you didn't list I
12 thought was if someone comes in and says, do you
13 have a specific manufacturer. That's usually a
14 flag because they want to sell on the street. So
15 if they're asking for a specific manufacturer,
16 that's always a flag, too.
17 BY MR. HUDSON:
18 Q. And I think you mentioned -- another one
19 you mentioned, I believe, was combination
20 products, if they were asking for certain
21 combination products. Anything else you can think
22 of, as you sit here, that would be red flags for
23 potentially not filling a prescription?
24 MR. KOBRIN: Object to form.
25 THE WITNESS: First time patient, run

Page 60

1 OARRS reports, never on anything and they're
2 starting off with the highest dose of Oxycontin
3 there is. A phone call should probably be made.
4 What are we treating here? What's the diagnosis?
5 Let's get some documentation. That's the big
6 ones.
7 MR. KOBRIN: Are you asking him to try
8 and remember what's in the controlled substances
9 manual, or are you asking him what his red flags
10 are?
11 BY MR. HUDSON:
12 Q. My original question -- we've sort of
13 gone down a windy road. My original question was:
14 Is there a set of uniform criteria that
15 pharmacists apply? Then I think you've made
16 reference to a manual.
17 A. A dispensing document. We have that
18 document. If we had it, we could look at it.
19 Q. I don't have it. I'm sure your counsel
20 probably has a copy he'll use with you.
21 Let's switch topics and talk about the
22 relationship between the retail pharmacies and
23 McKesson or Anda who are the Schedule II
24 distributors into those Giant Eagle pharmacies;
25 correct?

Page 61

1 A. Correct.
2 Q. Did you at some point in time as a PDL
3 learn that McKesson or Anda had set thresholds for
4 the number of controlled substances that could be
5 shipped to particular retail pharmacies in a given
6 month?
7 MR. KOBRIN: Object to form.
8 THE WITNESS: Only, yes, if something
9 was questioned or if I received an email on a
10 threshold.
11 BY MR. HUDSON:
12 Q. If you could, just unpackage what that
13 means.
14 MR. KOBRIN: Object to form.
15 THE WITNESS: From my understanding,
16 like I said, I just want to make sure everyone
17 understands here that I don't have an office. I'm
18 in the field. So anything that is being done at
19 the office, I don't know where they're pulling it
20 from. It's handed to me and, said here's an order
21 or here's something we're looking at.
22 So to your point, the threshold, I'm not sure
23 if it was McKesson who said it. I just got an
24 email that said store A is approaching a
25 threshold. What do you think? We had five or six

Page 62

1 different questions, five or six starting
2 questions, and then anything else we could add to
3 decide if we should increase that threshold or
4 not.
5 BY MR. HUDSON:
6    Q. And did you have any regular practice
7 that you followed in trying to figure out whether
8 or not to take steps to try to get the threshold
9 for that store raised?
10   A. Yes. That's what I just alluded to.
11 There was five or six questions we would call and
12 ask the store, did a new practice open up, did we
13 buy a pharmacy, did a pharmacy close, do we have
14 any other -- am I missing something. Why is
15 business increasing here? Do you need this? Or
16 the threshold is high. It's the 30th of the month
17 and tomorrow it resets. We are not going to reset
18 it. They're not always reset.
19   Q. Can you remember specific instances
20 where Giant Eagle did not reset thresholds and
21 just stopped?
22   A. Yes.
23   Q. How many times would you say stores in
24 your territory had thresholds applied and there
25 was just a determination made not to raise those

Page 63

1 thresholds?
2    MR. KOBRIN: Object to form. Are we
3 talking about McKesson now or HBC thresholds?
4    MR. HUDSON: We're talking about any
5 thresholds of stores in his territory. So
6 thresholds that apply to his pharmacies.
7    THE WITNESS: Again, we're going back.
8 I didn't log the times I did it, but I can say
9 that it happened. It happened for sure. Five
10 times, six times? It happened.
11 BY MR. HUDSON:
12   Q. That's all I'm trying to get a sense of.
13 Between 2009 until the present, just how many
14 times you can think of where there were thresholds
15 for controlled substances that were being applied
16 either by McKesson, HBC or any other
17 distributor --
18   A. I would probably say at least --
19   MR. KOBRIN: Wait. Let him finish. I'm
20 not sure what the question is.
21 BY MR. HUDSON:
22   Q. -- and Giant Eagle made the decision to
23 keep those thresholds in place and not take steps
24 to try to raise them?
25   MR. KOBRIN: You've been saying reset in

Page 64

1 your other questions. I think we're getting a
2 little confused here.
3    MR. HUDSON: Just say "Objection.
4 Form." If he understands it -- he can ask
5 clarifying questions.
6    MR. KOBRIN: I'm asking you. You don't
7 have to answer my question. I'm asking you
8 straight up.
9 BY MR. HUDSON:
10   Q. Did you understand the question?
11   A. You got to repeat it.
12   Q. In your role as a pharmacy district
13 leader, and I'm focused on between 2009 and the
14 present, are there specific times where McKesson
15 or Anda or HBC, some distributor, had a threshold
16 that was in place and then you at the retail
17 pharmacy level, you or others in your territory
18 made the decision to maintain that threshold and
19 not try to take steps to get that threshold
20 increased?
21   MR. KOBRIN: Object to form.
22   THE WITNESS: Yes. That happened.
23 BY MR. HUDSON:
24   Q. And do you have a sense from 2009 to
25 2016, that seven-year time period, how many times

Page 65

1 there was a threshold that was applied that
2 resulted in a particular store not being able to
3 continue to order controlled substances?
4    MR. KOBRIN: Object to form.
5    THE WITNESS: I want to say a minimum of
6 ten times. I know the way I did it was if you
7 were getting towards the end of the month, there
8 was really no good reason for me to increase it or
9 to recommend -- I didn't have the power to
10 increase it, but to recommend to increase it. We
11 would just hold off. If it was a day or two, we
12 definitely wouldn't reset that.
13 BY MR. HUDSON:
14   Q. During that nine-year time period, you
15 can remember ten instances or so when you made the
16 decision not to increase the threshold for a
17 particular store?
18   MR. KOBRIN: Object to form. He said
19 that he didn't make any decisions about increasing
20 a threshold already.
21   THE WITNESS: Recommendations.
22 BY MR. HUDSON:
23   Q. That you made the recommendation to
24 increase the threshold?
25   A. To not increase the threshold; right.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q.  Excuse me.  Let's just make sure my
2  question is clear.  So you can remember ten
3  instances or so where there was a specific
4  threshold that was being imposed on a store, and
5  you made the decision not to recommend to -- not
6  to recommend that that threshold be increased?
7    A.  Correct.
8    Q.  Do you have any sense of how many times
9  Giant Eagle stores were bumping up against
10 thresholds in that nine-year period, stores in
11 your territory?
12       MR. KOBRIN:  Object to form.  Asked and
13 answered.
14       THE WITNESS:  No, I don't.
15 BY MR. HUDSON:
16   Q.  Is there anywhere we could go to see
17 documentation that would tell us whether a
18 particular store in a particular month was bumping
19 up against a threshold?
20   A.  Yeah.  Probably somebody at the office
21 could give that you information.
22   Q.  That's what I'm trying to figure out.
23 Is there some sort of form or comparison that we
24 could do to figure that out to your knowledge?
25   A.  You might check with the office.  I

Page 67

1  don't --
2    Q.  Fair enough.  I'm just trying to
3  understand what you personally know in terms of
4  how the reporting is done so that I could get some
5  sense of how many times those thresholds were
6  being bumped up against by particular stores.  And
7  I guess what you're saying is talk to the office.
8    A.  Correct.
9    Q.  Anybody in particular at the office that
10 would be most knowledgeable?
11       MR. KOBRIN:  Object to form.
12       THE WITNESS:  George.
13 BY MR. HUDSON:
14   Q.  George Chunderlik?
15   A.  Um-hum.
16   Q.  Do you know if there was ever a point in
17 time where McKesson would send out the thresholds
18 in advance of stores bumping up against those
19 thresholds, in other words, sending them out so
20 that Giant Eagle pharmacies would know what the
21 thresholds were for that month?
22       MR. KOBRIN:  Object to form.
23       MS. MONAGHAN:  Object to form.
24       THE WITNESS:  Not the pharmacies.
25

Page 68

1  BY MR. HUDSON:
2    Q.  How about to you as a pharmacy district
3  leader?
4        MS. MONAGHAN:  Object to form.
5        MR. KOBRIN:  Object to form.
6        THE WITNESS:  Nope, not -- no.
7  BY MR. HUDSON:
8    Q.  Did you or anyone on your team ever take
9  steps to try to avoid hitting thresholds that were
10 set for particular stores by McKesson or Anda or
11 another distributor?
12       MS. MONAGHAN:  Object to form.
13       MR. KOBRIN:  Object to form.
14       THE WITNESS:  No.  Like an example would
15 be?
16 BY MR. HUDSON:
17   Q.  In other words, like the prescribing,
18 you choose to prescribe or fill orders with a
19 different product that wasn't up against that
20 threshold.
21   A.  No.
22       (HBC-Bencivengo Exhibit 3 was marked.)
23 BY MR. HUDSON:
24   Q.  Let me hand you what I marked as
25 Exhibit 3.  My question is just if you could let

Page 69

1  me know if you've seen that document and if so,
2  describe for me what it is.
3        COUNSEL ON PHONE:  Can we get a Bates
4  number on Exhibit 3, please?
5        MR. HUDSON:  Sure.  Exhibit 3 is
6  HBC_MDL00136237 through 238, but 238 is a
7  multi-page spreadsheet, Excel spreadsheet.
8        (Witness reviewed the exhibit.)
9  BY MR. HUDSON:
10   Q.  Have you had a chance to review
11 Exhibit 3?
12   A.  Yes.
13   Q.  What is Exhibit 3?
14   A.  It looks like it was an email that was
15 sent to all the district managers on a couple
16 stores that were getting close to hitting certain
17 thresholds.
18   Q.  This is an email sent by Sabrina Cook.
19 At the bottom, do you see her signature page?  It
20 shows she's an account manager at McKesson.
21   A.  Yeah.
22   Q.  Do you know Sabrina Cook?
23   A.  No.
24   Q.  Have you ever met Sabrina Cook to your
25 knowledge?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    A.  No.
2    Q.  Do you have any recollection of
3  receiving this email?
4    A.  I remember receiving emails like this on
5  stores.  Like I said, this isn't all my stores.
6  This is a group of stores.
7    Q.  So then if we could, turn to page 2 of
8  Exhibit 3.  It looks like the title here is CSMP
9  Giant Eagle Threshold Report.
10   A.  Okay.
11   Q.  Do you see that?
12   A.  Yes.
13   Q.  It looks like this is an Excel
14  spreadsheet in its native format.  If we go back
15  to the next page, I think this is the format.  Are
16  you able to read this document, read and
17  understand the spreadsheet portion of it?
18   A.  Yes.
19   Q.  If you could, describe for me what you
20  know about this.
21   A.  It looks like it was some stores that
22  were a couple of mine.  It looks like a couple of
23  my stores are on here.  They're looking at
24  thresholds that were sent.  They're telling us
25  that they're starting to come up against their

Page 71

1  threshold.  The low is 60 percent up to almost,
2  what, a hundred percent on one of them.  It's just
3  a range.  I took these as FYI emails.
4    Q.  Sure.  This was an email sent on
5  June 26.  And then do you know if this spreadsheet
6  then is as of June 26 where these stores stood on
7  the thresholds that had been set by McKesson?
8         MR. KOBRIN:  If you know.
9         MS. MONAGHAN:  Object to form.
10        THE WITNESS:  Yeah.  If I'm to assume
11  the information is correct, then that's where
12  these stores stood when this email was sent.
13  BY MR. HUDSON:
14   Q.  I'm just trying to establish the
15  foundation, I guess, is the legal term for the
16  document.
17     To the best of your knowledge, this is an
18  email with an Excel spreadsheet attached that has
19  thresholds for certain stores that had been set by
20  McKesson.
21        MS. MONAGHAN:  Object to form.
22  BY MR. HUDSON:
23   Q.  Is that your understanding?
24        MR. KOBRIN:  Object to form.  If you
25  know, if you understand it.

Page 72

1         THE WITNESS:  That's my understanding.
2  BY MR. HUDSON:
3    Q.  That's all I'm asking.  And you
4  indicated that you've seen some of these from time
5  to time.  Let me just hand you what I've marked as
6  Exhibit 4.  I'm just going to mark a few more of
7  these.  We can go through them all.
8    (HBC-Bencivengo Exhibits 4 - 8 were marked.)
9  BY MR. HUDSON:
10   Q.  So we've marked here as Exhibits 3, 4,
11  5, 6, 7 and 8 documents.  Let me just go through
12  and put on the record the Bates ranges of each
13  one.  Exhibit 3 is HBC_MDL00136237 through 238.
14  We talked about that one.  Exhibit 4 is
15  HBC_MDL00079510 through 511.  Exhibit 5 is
16  HBC_MDL00079386 through 387.  Exhibit 6 is
17  HBC_MDL00079491 through 92.  Exhibit 7 is
18  HBC_MDL00079213 through 214.  And Exhibit 8 is
19  HBC_MDL00174476 through 77.
20     Mr. Bencivengo, my question is just
21  Exhibits 3 through 8, are these the same type of
22  reports that are being sent by McKesson to Giant
23  Eagle PDLs, including yourself, relating to
24  certain thresholds for controlled substances?
25         MR. KOBRIN:  If you know.

Page 73

1         MS. MONAGHAN:  Object to form.
2         THE WITNESS:  Yes, to certain stores.
3  BY MR. HUDSON:
4    Q.  And was it your practice to review these
5  spreadsheets when you received them?
6    A.  Yes.
7    Q.  And why did you review them?
8    A.  Well, they were being sent to me.  We're
9  looking at the parameters.  Being in operations,
10  if we don't get drugs, it affects operations.  So
11  a lot of these reports we're all copied on because
12  she doesn't know whose stores we have.  We have a
13  bunch of emails with my name on them.
14     Exhibit 4, I would have gotten that.  I would
15  have went to the fifth column.  I would look at
16  those store numbers and deleted it because none of
17  my stores were on there.  It would be another FYI.
18   Q.  Sure.  Do you know why the decision was
19  made to send these reports to Giant Eagle?
20         MR. KOBRIN:  Object to form.
21         THE WITNESS:  I don't know, no.
22  BY MR. HUDSON:
23   Q.  Do you know when you started receiving
24  these reports?
25   A.  I want to say in 2013, yeah, 2013.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.   And so you've testified if you looked at
2  the report and you didn't see any of your stores,
3  then you likely deleted it and it was done.
4    If you did see your stores, then what would
5  you do?
6    A.   I would go over to -- I'd go over to the
7  last column, which is threshold percent, and kind
8  of see where they're standing.
9    Q.   So let's just take Exhibit 3, for
10 example.  If we turn to the third page of
11 Exhibit 3, and you said you'd look for your stores
12 in the fifth column over, that would be the Base
13 Code column; right?
14   A.   Yeah, the store number, number 2404.
15   Q.   Right.  So then if you saw certain of
16 your stores, then you would go to the far right
17 column that's called the Threshold Percent Column?
18   A.   Um-hum.
19   Q.   Then you would look to see how close to
20 a hundred percent those stores were?
21   A.   Correct.
22   Q.   And if the stores were close to a
23 hundred percent, what would you do?
24   A.   Look at the date of the email.  It's
25 June 26.  Probably not do much on this one.  We're

Page 75

1  getting towards the end of the month.
2    Q.   It's June 26.  What would be the store
3  numbers that would be stores in your territory on
4  this report that's Exhibit 3?
5    A.   We'll start on page 2.
6    Q.   Just for the record, you mean the fourth
7  page of the exhibit, the second page of the
8  spreadsheet?
9    A.   136238.  1154.001.  Are you there?
10   Q.   Yep.
11   A.   Store 0216.
12   Q.   0216.  I got it.  0216.  Okay.
13   A.   They're at 98 percent.
14   Q.   Yes.
15   A.   I'm still not doing anything.  I wasn't
16 a big fan of increasing these thresholds unless
17 there was -- like I said, there had to be a reason
18 to do it.  But I'm willing to wait out three more
19 days of June to have it reset.
20   It looks like store 43 was mine.  It's at
21 79 percent.  Then the last store at the bottom,
22 4032, was mine.
23   Q.   Were there ever times that you can
24 recall when you received these spreadsheets and
25 then took steps to try to increase thresholds for

Page 76

1  particular stores?
2    MR. KOBRIN:  Object to form.
3    THE WITNESS:  I would never act on my
4  own to increase the threshold.  I might make a
5  call to see what was going on, if they needed it,
6  but I wouldn't increase the threshold.  The only
7  time I increased the threshold was the store
8  usually reached out to me and said, our order is
9  being held up and these are the reasons why.
10   Then I would push back and say, well, why do
11 we need -- I didn't give them numbers.  They all
12 know about a threshold.  You know about a
13 threshold.  You know you're allowed to order so
14 many.  You're reaching that.  What's the reasons?
15   Then if those reasons were determined to be
16 valid reasons, then my recommendation would be to
17 increase it.  I will tell you that was not the
18 case most of the time.
19 BY MR. HUDSON:
20   Q.   Did any pharmacist ever indicate to you
21 that having thresholds applied so that medicines
22 would then not be available to be dispensed was
23 bad for business?
24   A.   No.  Listen, pharmacists don't even want
25 to dispense this stuff.  So there's no -- it makes

Page 77

1  their life a hell of a lot easier if they can hand
2  it back and say we can't get it.  So there's no...
3    Q.   You never remember times where people
4  were indicating that if you had to apply the
5  thresholds, that would be problematic for
6  business?
7    A.   It would be problematic for business --
8  I'm trying to think of some times it might happen.
9  Because there were two separate ordering systems
10 that were being used here, too, the hand ordering
11 and then the CSOS.  There was a slower turnaround
12 time if you had a hand order.
13   So if there was a situation where McKesson
14 would be closed, it was a holiday, that holiday
15 bumped into a weekend, so something like that,
16 there would have to be a reason why.  Just not
17 good for business is never a reason why.
18   (HBC-Bencivengo Exhibit 9 was marked.)
19 BY MR. HUDSON:
20   Q.   I'll show you this email.  I will
21 represent to you that this was an email that I
22 think we found in your custodial email file.
23   MR. KOBRIN:  This is nine?
24   MR. HUDSON:  This is nine, yeah.
25

Page 78

BY MR. HUDSON:

Q. This was an email between Jerry
Liliestedt --

A. Liliestedt, yeah.

Q. Who is Jerry Liliestedt?

A. He was a PDL at the time.

Q. -- and then the manager of 4016.

A. Okay.

Q. Do you know if that was you or someone
else?

A. Well, this would have been Jerry's
store. So the manager, whoever it was. Probably
Ross down at 4016 down in Bolivar.

MR. KOBRIN: Just for the record, the
witness' name is not anywhere on this. Are you
representing that this was in his custodial file?

MR. HUDSON: Yeah.

COUNSEL ON PHONE: Could we get a Bates
number for Exhibit 9?

MR. HUDSON: Exhibit 9 is
HBC_MDL00179250.

THE WITNESS: I don't see 4016. I see
5878 on here.

BY MR. HUDSON:

Q. 4016. If you look in the To and the

Page 79

From, manager 4016, does that mean the manager of
store 4016?

A. My two says manager 5078 Rx.

MR. HUDSON: Let's just take two minutes
and go off the record.

THE VIDEOGRAPHER: We're going off the
record. The time is 4:20 p.m.

(Recess from 4:20 p.m. to 4:21 p.m.)

THE VIDEOGRAPHER: We're going back on
the record. The time is 4:22 p.m.

MR. HUDSON: For the record, I'm
withdrawing what I previously marked as Exhibit 9.
Exhibit 9 is HBC_MDL00179373 through 374. I'll
give a copy to the witness, your copies.

BY MR. HUDSON:

Q. Mr. Bencivengo, I will again represent
to you that this Exhibit 9 is an email chain that
we've identified as coming from your custodial
file.

MR. KOBRIN: I just want to state for
the record that his name is not on it. That would
suggest that it's not something he's ever seen
before. But I understand you representation.

BY MR. HUDSON:

Q. Mr. Bencivengo, if you turn to the

Page 80

second page of this exhibit, this is an email from
Manager 4030 Rx. Do you see that?

A. Yes.

Q. And then it's to two different
distribution lists; right?

A. Yeah. The manager from the store is
sending it to other stores.

Q. And he's sending it to -- one
distribution list is STR_Pharmacy_COD?

A. Correct.

Q. Who is that list?

A. The pharmacies in Cleveland, Akron,
Canton and Cleveland.

Q. Those are the pharmacies in Akron,
Canton and Cleveland. Okay. And then there's
another distribution list there STR_Pharmacy_COL.

A. Columbus.

Q. And would you have been a recipient on
one or both of those distribution lists?

A. I don't know. I don't know if I get the
COD ones. I have my distribution list. There's
so many distribution lists. I don't know if I am
or not at that time.

Q. You may or may not, you just don't know?

A. Yeah.

Page 81

Q. So in the first email, the manager in
store 4030, do you know which store that is?

A. Tallmadge.

Q. Say it again.

A. Tallmadge.

Q. Spell it.

A. T-A-L-L-M-A-D-G-E.

Q. That's Tallmadge in Ohio?

A. It's in Ohio. It's in the Akron area.

Q. So the manager of that store is writing
to the other pharmacists on that distribution list
that you've identified with the subject of Vicodin
Quota, question mark, question mark, question
mark. "Has anyone ever heard of a Giant Eagle
store that's met its quota of Vicodin generic for
the year and is not able to dispense any more
because they can't order any more and, therefore,
have to transfer out all the Rxs for Vicodin that
have refills," there's a bunch of question marks.
"If this is the case, I need to know if I'm
getting close to our quota," bunch of exclamation
points. "Thanks to anyone who can shed light on
this subject."

And then down below, it says, "Barb, how can
we get around this," bunch of questions marks. "I

Page 82

1  have no strengths coming in. Steve."
2      Do you know who Steve is?
3      A.  No, no. I'm assuming Barb --
4      MR. KOBRIN:  Don't assume.
5      THE WITNESS:  Barb Carlson was a
6  district manager, and she had store 4030 in 2008.
7  BY MR. HUDSON:
8      Q.  Then if we go to the first page, it says
9  this is from Jerry Liliestedt to Greg Carlson with
10  a copy to STR_Pharmacy_Specialists.
11      A.  Correct.
12      Q.  So this would be you?
13      A.  The pharmacy district leaders.
14      Q.  So this would be a forward by
15  Mr. Liliestedt or I guess it would be from him to
16  Greg Carlson with a copy to you and the other
17  PDLs?
18      A.  Yes.
19      Q.  He wrote here, "Greg, store 5878 has
20  outgrown their CIII usage. Can we adjust their
21  numbers ASAP. They are dealing with a Fuelperks!
22  coupon." Do you know what that is?
23      A.  Yes.
24      Q.  What's a Fuelperks! coupon?
25      A.  Back in those days, we used to run gift

Page 83

1  cards to compete with the other pharmacies. We'd
2  run promos where if you bring in -- you transfer
3  your prescription, you'd get a $25 gift card for
4  the store. There's parameters on it.
5      Q.  So the Fuelperks! coupon was like a --
6  was it a pharmacy coupon?
7      A.  It was for the store. It was for like
8  either $20, $25 off groceries, X amount off your
9  gas.
10      Q.  You could use it anywhere in the store
11  including the pharmacy?
12      A.  No, not the pharmacy. It came from the
13  pharmacy. You couldn't use it in the pharmacy.
14      Q.  "They're dealing with a Fuelperks!
15  coupon, and I don't know where they'll end up.
16  This goes for generic Vicodin and many other
17  CIIIs. If you'd like, I can fax you their latest
18  invoice that shows the myriad of items they are
19  being denied. Very bad for business. Thanks for
20  your help."
21      Do you know what Jerry meant by that when he
22  wrote that to Greg Carlson?
23      A.  We were losing scripts it looks like at
24  that store. We weren't getting another order.
25      Q.  Jerry at least was saying that's bad for

Page 84

1  business?
2      A.  In Jerry's opinion, yes.
3      Q.  This would be an example of at least one
4  pharmacist who is indicating where thresholds were
5  preventing prescriptions from being dispensed,
6  that was bad for business?
7      MR. KOBRIN:  Object to form.
8  BY MR. HUDSON:
9      Q.  Would you agree with that?
10      A.  If you can't fill any prescriptions,
11  right, it's bad for business.
12      Q.  Then if we go to the top, it's from
13  Donald Casar. What was Donald Casar's role?
14      A.  I believe at the time he was actually --
15  he was a PDL. Then he took over the quality
16  program, but I think in 2008 he worked out of
17  Columbus. He was the PDL in Columbus.
18      Q.  So he wrote back to Jerry and Greg
19  Carlson and the PDLs and Anthony Mollica and Betty
20  McGeary?
21      A.  She was our secretary at the time.
22      Q.  He wrote back to them in response and
23  said, "Greg is on vacation this week. I spoke to
24  Telicia Lyndsey at McKesson, and there are
25  thresholds that each store has based on prior

Page 85

1  month's usage for certain controlled substances.
2  It's a program that DEA has launched in May of
3  this year to decrease the likelihood of diversion.
4      "Since thresholds are set according to
5  monthly usage, all stores that were having issues
6  will be able to order today and receive product
7  tomorrow (it is now July).
8      "Greg will have to work with McKesson on
9  stores that may need their thresholds increased or
10  decreased. Hope this helps."
11      Do you see that?
12      A.  Yes, sir.
13      Q.  Would you be copied on emails like this
14  where there were discussions about thresholds from
15  time to time?
16      MR. KOBRIN:  Object to form. Calls for
17  speculation.
18      THE WITNESS:  I'm copied on 300 emails a
19  day. This was Jerry having an issue with his
20  store. He's probably copying us in case we were
21  having the same issues.
22  BY MR. HUDSON:
23      Q.  Did you have any issues with any of your
24  stores in Ohio like Jerry was having in this
25  particular instance in 2008?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A.  I would say yes.
2    Q.  Did you ever have instances where
3  pharmacists in your territory indicated to you
4  that these thresholds were bad for business?
5    A.  I don't remember them saying bad for
6  business.  I have to see the context of how they
7  were saying it.
8    Q.  Did you have any pharmacists that were
9  saying bad for business in the same way that Jerry
10  was saying it here in Exhibit 9 that we've been
11  looking at?
12    A.  No.
13        MR. KOBRIN:  Object to form.
14  BY MR. HUDSON:
15    Q.  I'm sorry.  I didn't hear your answer.
16    A.  No.
17    Q.  Did you ever have any discussions with
18  anyone at McKesson that you recall about adjusting
19  thresholds?
20        MS. MONAGHAN:  Object to form.
21        THE WITNESS:  No.
22  BY MR. KOBRIN:
23    Q.  Would that be true between 2009 and
24  2016?  To the best of your knowledge, as you sit
25  here, you can't recall having any discussions

Page 87

1  directly with McKesson about adjusting thresholds
2  for stores in your territory?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  Let me get a
5  clarification.  When you say discussions, am I
6  picking up the phone and calling McKesson, or am I
7  responding to an email that someone might have
8  sent from McKesson or Greg?
9  BY MR. HUDSON:
10    Q.  Either one.
11    A.  There were probably instances and times
12  when I responded to some emails.
13    Q.  Putting those emails to one side, any
14  time that you picked up the phone and talked to
15  anyone at McKesson --
16        MS. MONAGHAN:  Object to form.
17  BY MR. HUDSON:
18    Q.  -- about adjusting thresholds for
19  particular stores?
20    A.  No.
21        MR. KOBRIN:  Object to form.
22  BY MR. HUDSON:
23    Q.  Are you aware of whether there were
24  other PDLs at Giant Eagle who did have discussions
25  with McKesson about adjusting thresholds?

Page 88

1        MR. KOBRIN:  Object to form.
2        THE WITNESS:  No.
3  BY MR. HUDSON:
4    Q.  In other words, as you sit here today,
5  you just don't know one way or the other?
6    A.  We would call our people in RIDC and let
7  them take care of it.
8    Q.  What's in RIDC?
9    A.  That's just a nickname we use for the
10  office out here in Pittsburgh.
11    Q.  In the corporate offices?
12    A.  Um-hum.
13    Q.  Who would be most likely to be involved
14  in those phone calls between you and the corporate
15  office?
16        MR. KOBRIN:  Object to form.  Regarding?
17        THE WITNESS:  Regarding threshold?
18  BY MR. HUDSON:
19    Q.  Yeah.
20    A.  Greg Carlson.
21    Q.  Are there times where you can remember
22  calling Greg Carlson to talk about adjusting
23  thresholds at particular stores, McKesson
24  thresholds?
25        MR. KOBRIN:  Object to form.

Page 89

1        THE WITNESS:  I don't ever remember
2  calling Greg and talking to him about it.
3  BY MR. HUDSON:
4    Q.  Do you know whether -- are you aware of
5  any times where other PDLs would have
6  communication with Greg Carlson or others in the
7  corporate office about adjusting thresholds set by
8  any distributors?
9        MS. MONAGHAN:  Object to form.
10        MR. KOBRIN:  Object to form.
11        THE WITNESS:  No.
12  BY MR. HUDSON:
13    Q.  Did you ever come to learn that HBC as a
14  distributor of hydrocodone combination products
15  and other Schedule III, IV and V controlled
16  substances had set thresholds?
17    A.  In my area, threshold was an umbrella
18  term.  I don't know if it was HBC, if it was
19  McKesson, if it was Anda.  It was just a threshold
20  I was looking at.  So I didn't determine who it
21  came from or who made these thresholds.  My job
22  was to act on the threshold and determine what we
23  were going to do.
24    Q.  Sure.  In your role, did you have any
25  understanding of which distributors had set

Page 90

1 thresholds or just in general these are thresholds
2 that our stores have to live with and you never
3 really knew who the source of the threshold was?
4      MR. KOBRIN:  Object to form.
5      THE WITNESS:  That's correct.
6 BY MR. HUDSON:
7      Q.  Just to be clear, the latter, that you
8 didn't know?
9      A.  I didn't know.
10      Q.  Did you understand though at some point
11 HBC, an operating arm of Giant Eagle, started to
12 distribute certain controlled substances into the
13 Giant Eagle retail pharmacies?
14      A.  Yes.
15      Q.  Did that have any impact on your job?
16 In other words, did that make any changes to what
17 you did as a PDL for controlled substances that
18 were coming from HBC as opposed to those coming
19 from McKesson or Anda?
20      MR. KOBRIN:  Object to form.
21      THE WITNESS:  No.
22      (HBC-Bencivengo Exhibit 10 was marked.)
23 BY MR. HUDSON:
24      Q.  I want to shift gears now and talk about
25 the pharmacy audits that you were talking about

Page 91

1 previously.  So I'm going to hand you what I
2 marked as Exhibit 10.
3      MR. HUDSON:  Exhibit 10, the internal
4 number is 5033.
5 BY MR. HUDSON:
6      Q.  Mr. Bencivengo, is Exhibit 10 an email
7 from George Chunderlik to you and others with the
8 subject Narcotic Audit Application?
9      A.  Yes.
10      Q.  And he's sending this in January of
11 2013?
12      A.  Yes.
13      Q.  And then attached to this email, it
14 looks like the first page, so page 2 of the
15 exhibit, at the top the title is Store
16 Requirements Summary, Narcotic Audit Application,
17 and then it walks through and talks about how to
18 create a baseline and then how the narcotic audit
19 program is going to work.
20      MR. KOBRIN:  Object to form.
21 BY MR. HUDSON:
22      Q.  Is that right?
23      A.  That's what it looks like, yes.
24      COUNSEL ON PHONE:  Can we get a Bates
25 number on this exhibit when you have a chance?

Page 92

1      MR. HUDSON:  HBC_MDL00041837 through
2 850.
3 BY MR. HUDSON:
4      Q.  It looks like there's -- from the
5 attachments, it looks like there's four different
6 PDFs that were attached to this email relating to
7 the narcotic audits.
8      Would these have been documents that you
9 looked at back in January of 2013?
10      A.  Yes.
11      Q.  Did you then begin to use this program
12 to input information for purposes of narcotic
13 audits?
14      MR. KOBRIN:  If you remember.
15      THE WITNESS:  Our stores did, yeah.
16 BY MR. HUDSON:
17      Q.  Tell me, if you would, how that worked.
18      MR. KOBRIN:  Object to form.
19      THE WITNESS:  We always had -- we did
20 monthly counts of our narcotics, our CIIs, our
21 safe, from the time I got there, from 2000.  And
22 then some stores kept a perpetual inventory in a
23 binder.  Some stores kept it on an Excel sheet.
24 So we were all doing it, but all doing it a
25 different way.

Page 93

1      So we got to the point where floaters would
2 come in, dispense something.  They didn't know if
3 they should go to the binder, to a program.  So it
4 was decided that although we were already doing
5 it, we were going to write this program and have
6 it done all one way, the same way through all the
7 stores.  So that's basically why this was
8 developed.
9 BY MR. HUDSON:
10      Q.  Just describe for me then how this
11 program worked and what you as a PDL did as part
12 of this process to start narcotic audits.
13      A.  So we started step one with the
14 baseline.  And then from that point on, the
15 monthly requirement is every store needs to
16 complete an audit.  So the requirement is every
17 month.  So January to January 31 you have to do
18 it.
19      The program is set up to start flagging on
20 the 30th if they're getting up to 30 days.  So if
21 they did it January 10, but they're for some
22 reason going to do it February 15, I'll start
23 getting emails that store XXX is out of
24 compliance.  Even though they're not, they still
25 have all of February to do it, it's just alerting

Page 94

1  me that these stores are still -- so I'll monitor
2  those as we get towards the end of the month.
3      Maybe four or five days before the end of the
4  month, if I have any left, I'll pick up the phone
5  and say, look, just a reminder.  You guys haven't
6  done your audit yet.  And every store does this
7  every month.  There's never been an issue with the
8  store not completing an audit.
9      Q.  So the store inputs information, and
10  then what happens to that?
11     A.  Into this program.  So then once the
12  purchases and dispensings and everything is into
13  the program, I'll get a sheet or I'll get an email
14  that the store submitted it.  And then I'll
15  actually get different -- like I might get three
16  or four drugs that were one off or one over or 30
17  over.  We want to know why.
18     And a lot of times it's just the way orders
19  were applied.  But if something is on there that's
20  off, there has to be a reason it's off.  It can't
21  just be unknown.  If it's a tablet, sometimes it
22  might just be a discount.  If it's a bottle, then
23  we're going to dig into it quickly and find out
24  what the heck happened to it.  That's the purpose
25  of this.

Page 95

1      Q.  And then would a report be generated
2  that would show the comparison between whatever
3  the baseline was at the start of the month to the
4  end of the month, or how did the audit process
5  work?
6      A.  There's two columns.  It would say
7  Expected, On Hand.  So if you expected to have 30
8  and you had 29 on hand, there's another column
9  that you have to put a reason.  A lot of times if
10  you look at the problem, it's a broken tablet.
11  That's the reason why we're short.
12     Again, if it says expected 600 and we have
13  400 and they have unknown, something has to
14  happen.  That's my job, to start the
15  investigation.
16     Q.  And when, if you recall, did these
17  reports begin to be generated?
18     A.  The first time they put the report in is
19  when we get monthly emails.  From the time we
20  started this, whenever it was determined we were
21  going to start this -- if we started it in --
22     Q.  And that's what I was trying to figure
23  out.  When did it start?  I mean, it's sometime
24  after January of 2013; right?
25     A.  Correct.  I would assume because we had

Page 96

1  a conference call on this thing, it was rolled out
2  very quickly.  So whenever this started, those
3  reports started generating.
4      Q.  So sometime in early 2013, Giant Eagle
5  started creating these narcotic audit reports?
6      MR. KOBRIN:  Object to form.  He
7  testified that they were doing it prior to that.
8      THE WITNESS:  We always were doing -- we
9  always were counting monthly.  This was just a way
10  we all do it uniformly.
11  BY MR. HUDSON:
12     Q.  Right.  But you didn't have the reports
13  following this program; right?
14     A.  Following this program, no.
15     Q.  That's all I was getting at.  So this
16  email, Exhibit 10, there's a program that's now
17  being implemented.  And as a result of that, then
18  there's going to be a monthly audit process that's
19  going to be the same at all of the pharmacies
20  across all of Giant Eagle?
21     A.  Correct.
22     Q.  Then once these reports began being
23  generated, for stores in your territory, would you
24  say that there were a small amount of audit
25  problems, a large amount?  What did those reports

Page 97

1  look like?
2      MR. KOBRIN:  Object to form.
3      THE WITNESS:  For the most part, they're
4  dead on.  There's times where, like I said, you'll
5  get something that's off.  If it's usually a
6  bottle, it's usually either something was ordered,
7  it wasn't applied at the time we counted it, so
8  the computer thought we had something.  But then
9  they'll have in the response "On order for
10  tomorrow."  It just wasn't applied yet.  So when
11  you apply the order, all of a sudden, we have the
12  right amount again.
13     So a lot of times it's just counting.  It's
14  just when the reports were ran and what you have
15  sort of in queue to order.
16  BY MR. HUDSON:
17     Q.  Let's say if there's 30 stores in your
18  territory, how many would you say have issues in
19  any given month?
20     MR. KOBRIN:  Object to form.  What do
21  you mean by issues?
22     MR. HUDSON:  Issues where the count is
23  off or the expected is different than the actual.
24     MR. KOBRIN:  Object to form.
25     THE WITNESS:  Once or twice.  It's not

Page 98

1 that big of an issue, because we counted so many
2 times. We're so controlled on it that we -- we're
3 doing back -- every prescription you're filling --
4 so you come in and fill a prescription. I count
5 it twice. I back count it.
6    There's a program we have in the computer
7 that says you should have, and we see if that
8 matches up. So we're doing it daily as we're
9 dispensing, and we're doing it monthly, and then
10 we're doing it yearly.
11 BY MR. HUDSON:
12    Q. And that's what I'm trying to get a
13 sense of, is when you would get those monthly
14 audit reports for the stores in your territory,
15 there'd maybe be one item per store --
16    A. Yeah.
17    Q. -- or would there be some times where
18 there's --
19    A. If maybe --
20    Q. If I could finish my question.
21    In a given month are there stores where there
22 are no discrepancies between expected and actual?
23    MR. KOBRIN: Object to form. Are you
24 counting the, quote-unquote, counting issues that
25 he referred to earlier, or are you asking him for

Page 99

1 things that aren't explained?
2 BY MR. HUDSON:
3    Q. Did you understand my question?
4    A. Yeah. Yes, there is. But most of it is
5 either a broken tablet -- it's accounted for. I
6 don't get too many reports that say unknown. If
7 there's an issue, in the next column, there's a
8 reason why it's short.
9    Q. Well, I guess what I'm trying to just
10 get a sense of is how big overall are the actual
11 reports that get emailed to you? Size-wise are
12 they big? In other words, are you dealing with
13 five issues, are you dealing with 50 issues in any
14 given month?
15    MR. KOBRIN: Object to form.
16 BY MR. HUDSON:
17    Q. Does it change greatly, or is it pretty
18 uniform?
19    MR. KOBRIN: Object to form. I'm
20 unclear what you mean by issues. He's kind of
21 talked about different levels of problem here.
22    THE WITNESS: Issues, I'm not sure what
23 kind of issues we're talking about. It's anywhere
24 from maybe two to ten drugs that they identify on
25 there. It doesn't mean there's issues. Sometimes

Page 100

1 there's two drugs and the counts are dead on.
2 BY MR. HUDSON:
3    Q. It's my understanding as part of these
4 narcotic audits, reports are generated. Do I have
5 that right?
6    A. Yes.
7    Q. And those are generated each month;
8 right?
9    A. Yes.
10    Q. And those reports are then emailed or
11 somehow sent to you?
12    A. Yes.
13    Q. And do the reports include only your
14 stores or all of the stores for all of the
15 different PDLs?
16    A. Just my stores.
17    Q. So you only get a report that has just
18 your stores?
19    A. When store 4016 submits it, hits send, I
20 get an email that it was completed with that sheet
21 on there that I was telling you about if there's
22 any discrepancies.
23    Q. And then is there some sort of
24 compilation document that gets created each month
25 that shows just the total audit for all of Giant

Page 101

1 Eagle?
2    A. Again, there could be. I'm not
3 privileged to that report. I'm responsible for my
4 32 stores.
5    Q. So each month for your 32 stores, are
6 you getting an individual report from each store?
7    A. Yes.
8    Q. And you're saying in any given month on
9 average -- and I know these are just averages --
10 but each particular store would have how many
11 different line items on the report that's sent to
12 you?
13    MR. KOBRIN: Object to form.
14    THE WITNESS: It could be anywhere --
15 I've seen two items on there up to 20 items on
16 there. I mean, there's no -- again, I don't want
17 to cloud the word issues. It doesn't mean there's
18 any issues on there. It's just these were off.
19 Here's the reason why. We're good.
20 BY MR. HUDSON:
21    Q. If there was an audit though and there
22 was an expected amount and then there was an
23 actual amount, there's an issue in the sense that
24 the count was off; right?
25    MR. KOBRIN: Object to form.

Page 102

1 Argumentative.
2      THE WITNESS: I'll give you one example,
3 the one I keep using. I'm expecting to have 30
4 Ritalin in the bottle. I only have 29. I go to
5 the next column. It says broken tablet. On the
6 next visit, I'm going to go in and make sure
7 there's a broken tablet in there. If there's a
8 broken tablet in there, we don't have an issue.
9 BY MR. HUDSON:
10     Q. Right. And I guess all I was getting at
11 is the idea of the audit is each line item on
12 there is a potential issue that's been raised.
13 And you're saying you would then go and
14 investigate and determine whether or not it's a
15 real issue or something that's already been
16 addressed?
17     MR. KOBRIN: Object to form.
18 Misrepresents his testimony.
19     THE WITNESS: That's actually correct.
20 If the report says here's a potential problem, as
21 long as there's no -- like I said, in that next --
22 the next column is the column we keep forgetting
23 to talk about. If there's a reason in there, then
24 nine times out of ten, it's because an order
25 wasn't applied yet. There's an open 222 form.

Page 103

1 That's the reason. They're not short. They're
2 short on paper.
3 BY MR. HUDSON:
4     Q. Right. And that's all I'm getting at.
5 The audit is supposed to bring to your attention
6 or the organization's attention where there's a
7 potential issue because the count is off on paper.
8     But your point is that doesn't mean there's
9 an actual real problem with the product. It may
10 or may not mean that depending on what the
11 explanation is?
12     MR. KOBRIN: Object to form.
13     THE WITNESS: That's correct.
14 BY MR. HUDSON:
15     Q. So I've tried to find examples. I'll
16 just mark a couple of documents and see if these
17 are. What I'm marking as Exhibit 11 is Bates
18 labeled HBC_MDL00032853, but the native document
19 is a multi-page spreadsheet. I'll hand you that.
20     MR. KOBRIN: Do you know if
21 Mr. Bencivengo has seen this document?
22     MR. HUDSON: I don't. We'll get there.
23 I'll mark this Exhibit 12.
24     (HBC-Bencivengo Exhibits 11 - 12 were marked.)
25

Page 104

1 BY MR. HUDSON:
2     Q. Have you had a chance to look at
3 Exhibits 11 and 12?
4     A. Yes.
5     Q. The front of Exhibit 11 is dated
6 July 7th of 2013, and it looks like this is an
7 Excel workbook with the title Copy of Narcotic of
8 Audit Chain Discrepancies Summary_07-01-13. And
9 then the location was the F:Randy Heiser\Quality
10 Folder_Joe Millward\compliance
11 information.zip\compliance information\compliance
12 information\controlled drug procedure\monthly
13 audit summaries. Did I get that right?
14     A. Yes.
15     Q. I'm guessing this probably is not the
16 form in which you've ever seen these narcotic
17 audits.
18     A. When the store does the report, this is
19 exactly how the report comes to me per store.
20     Q. Right. That's what I was going to say.
21 The worksheet is in the same format as the store
22 submits it into the program, but this compilation
23 document is probably not anything that you as a
24 PDL would see because it looks like this covers
25 all of the pharmacies.

Page 105

1     A. These are all the pharmacies; correct.
2     Q. So, for example, if we look at
3 Exhibit 11, it looks like this was the narcotic
4 audit chain discrepancy summaries from June 1,
5 2013 through June 30, 2013; right?
6     A. Okay.
7     Q. Do you see that at the top?
8     A. Yeah.
9     Q. So this would be the June 2013 one. And
10 then it looks like the first 16 pages would
11 relate -- well, the first 15 pages plus half of
12 the 16th page looks like on the left you are
13 identified as the specialist for those stores.
14     A. Okay.
15     Q. So if I'm understanding you right, you
16 would have expected or you would have received
17 from each one of the stores here a list of audit
18 discrepancies for those particular stores as
19 opposed to receiving it in this one big
20 compilation document?
21     A. Correct. This answers the question
22 better that you asked me the first time. So if
23 you look at the first page, down where it says
24 pharmacy 178, down to pharmacy 178, that's the
25 email I get for store 178, right there. Then from

Page 106

1 201 and vice versa.
2    Q.   And so on and so on.
3    A.   So by the time this report is generated,
4 I've already seen all these.  I've already taken
5 action on all these.  It's a nonreport.  Like I
6 said, if it's sent, it's deleted.  I don't need
7 it.  I've already seen these reports.
8    Q.   Got it.  So this report, and this is
9 just one example, but for June of 2013, for
10 pharmacy No. 178, it looks like there's 18 issues
11 for that store; right?
12    A.   Okay.
13    Q.   And then you said though you've got to
14 go look at the discrepancy column to try to figure
15 out whether there's some sort of discrepancy
16 identified or not; right?
17    A.   Correct.
18    Q.   So for store 178, it looks like there's
19 a variety of different explanations here.  The
20 first one, it looks like there were 20, a
21 difference of 20.  Then the next one was 20 and
22 then 24, 25, 10, 10, 130, 70, 140, 2, 1, 1, 300,
23 1, 75, 140, 75 and 120.  So the discrepancies vary
24 quite a bit --
25    A.   Yes.

Page 107

1    Q.   -- in size; right?
2       MR. KOBRIN:  Object to form.
3 BY MR. HUDSON:
4    Q.   And then, for example, if we look down
5 to the -- the count is off by one.  Where the
6 expected was 168 and the actual was 167, the count
7 is off by one, and that would be an example like
8 you talked about where there's one broken tablet
9 there; right?
10    A.   Correct.
11    Q.   In a number of these though they say we
12 are -- like, for example, if you go down a few
13 from that one, the expected was 250, but the
14 actual was 110.  It says we're 140 short on this
15 NDC because we are 140 over on NDC 406036301 which
16 we used up to get rid of that NDC.  What's that
17 mean?
18       MR. KOBRIN:  Object to form.
19       THE WITNESS:  As you know, there's
20 different generic manufacturers.  We try to stick
21 to one, but there was periods of time where either
22 something is unavailable, it's not under contract
23 anymore, so you've got to switch manufacturers.
24 But you still have to use the old manufacturer up
25 first.

Page 108

1    So when you build the prescription, if I
2 have -- we'll look at the first one on top because
3 it's easy.  So if I have a prescription for ten of
4 these patches and I bill for ten, you can only
5 bill at the time.  It's the time this report was
6 ran.  You can only bill for one generic
7 manufacturer.  So you bill for the one generic
8 manufacturer, but you used five of this generic
9 and five of another generic.
10    So when the reports were ran, we billed for
11 ten of this.  We only have five.  It says we're
12 minus five.  But on the other one, we didn't bill
13 for it at all.  We used that to complete the
14 order.  So we're up and over.  So they had the
15 correct amount of patches on the shelf.  It's not
16 an issue.
17 BY MR. HUDSON:
18    Q.   How do you know if it's not an issue
19 though?
20       MR. KOBRIN:  Object to form.  He just
21 explained.
22       THE WITNESS:  Because that's why.  We're
23 using up old NDC numbers to start using new
24 product.
25

Page 109

1 BY MR. HUDSON:
2    Q.   Right.  But here what you're saying is
3 then you're then going and the next time you're
4 using a different product and then assigning it a
5 different product number so the inventory -- to
6 make the inventory count right.  Did I understand
7 that right?
8       MR. KOBRIN:  Object to form.
9       THE WITNESS:  There's two objects here.
10 There's one object here.  So I'm going to bill --
11 right now I've been using this up.  This is the
12 old one.  We just got this in.  This is sitting
13 here brand new.  So I'm filling a prescription for
14 two of these objects.  I bill for two of this
15 particular product, not this one.  I go over to
16 the shelf.  I take this one away.  Now the
17 computer doesn't know what I'm doing.  It says
18 I've taken two of these.  So what do I have?  I
19 have minus five -- I have minus one.
20 BY MR. HUDSON:
21    Q.   By why does the computer say --
22    A.   Because every drug has an NDC number,
23 and we're billing that NDC number.
24    Q.   So why not just use the one and one so
25 that what you're using is consistent with how you

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  created the inventory?
2      A.  Because you can only bill one at a time.
3  So you bill one.  Then you can bill the other one.
4  As you take them off the shelf, I'm down to minus
5  one.  I've got two here.  But I'm only handing you
6  the two that the doctor wrote.  Now I have minus
7  five and one.  But at the end of the day, I should
8  have one.  I have one.
9      Q.  Until those steps are taken to use some
10  other NDC code to then go and replace the one that
11  you took that wasn't in the system, there is a
12  discrepancy in the system; right?
13      MR. KOBRIN:  Object to form.
14      THE WITNESS:  In the system, but the
15  report -- this report is working exactly like we
16  want the report.  We can say a hundred percent
17  that no one took five patches and put them in
18  their pocket.  We have the correct number on the
19  shelf.  There's a reason why.  It's not just
20  unknown.  They can tell you the script number.
21  They can look at the prescription.  We know every
22  step of what happened.
23  BY MR. HUDSON:
24      Q.  I guess I'm just confused why the need
25  to take one product and use that even though there

Page 111

1  was -- I agree in every case there's an NDC that
2  they're saying, well, you used this NDC instead of
3  that NDC.  I guess I'm just confused as to why
4  there's a disconnect between what you can bill for
5  and what your inventory says.
6      MR. KOBRIN:  Object to form.
7      THE WITNESS:  I'm not sure what you're
8  asking.  You can only bill for one product per
9  transaction.  So we're billing -- especially if
10  you see two.  At the time you couldn't even split
11  them up.  So you only have one chance to bill one
12  product.  We billed that product.  We billed that
13  NDC number.  And then you use what you've got on
14  the shelf until that was gone.  Then you flip over
15  the order points, the new products.  Then this
16  goes away next month because now we're using the
17  right stuff again.
18  BY MR. HUDSON:
19      Q.  But that does create an audit
20  discrepancy in the short term or it doesn't?
21      MR. KOBRIN:  Object to form.
22      THE WITNESS:  It doesn't create an audit
23  discrepancy.  We know what we're doing.  We have a
24  reason why.
25

Page 112

1  BY MR. HUDSON:
2      Q.  I understand that you're saying you
3  understand what you're doing.  You have a reason
4  why.  But it creates an audit discrepancy in that
5  it shows on this report, the purpose of which is
6  to audit inventory; is that fair?
7      MR. KOBRIN:  Object to form.
8      THE WITNESS:  No, it's not accurate.
9  BY MR. HUDSON:
10      Q.  What is wrong with what I just said.
11      A.  You're saying -- I can read the column
12  with you, discrepancy.  But it's not really a
13  discrepancy because we've determined what the
14  discrepancy is.  So it's a nonaction.
15      Now, I'm not saying that me might go into the
16  store during one of my audits, pop open and say,
17  okay -- I have this with me and say, they should
18  have ten on the shelf.  I better make sure they
19  have them in there.  And I might take a peek in
20  the safe just to make sure as a doublecheck.
21  That's how I use this report.
22  BY MR. HUDSON:
23      Q.  That's what, I guess, I'm getting at.
24  Unless you physically go and look at the count,
25  you can't look at the inventory tracking system

Page 113

1  and determine whether it's right or not because
2  there's a discrepancy between what's being
3  reported and the physical inventory that exists.
4  And that's why it's popping up on this audit
5  discrepancy report; right?
6      MR. KOBRIN:  Object to form.
7  Argumentative.  Asked and answered.  He's
8  testified about what he views as a discrepancy.
9      THE WITNESS:  There's not a discrepancy
10  in inventory.  There's a discrepancy -- there's a
11  discrepancy that's showing up on a particular NDC.
12  I'm not worried about the NDC.  I'm worried about
13  this store should have ten fentanyl patches.  I
14  don't care what the NDC is.  If they have ten, the
15  inventory is on.  If they have five, there's a
16  discrepancy.  But there's no discrepancy here.
17  BY MR. HUDSON:
18      Q.  And I guess all I'm trying to figure out
19  is in order to determine that there's ten fentanyl
20  patches, how do you go and do that?
21      MR. KOBRIN:  Object to form.
22  BY MR. HUDSON:
23      Q.  Do you look in the system or do you
24  physically go to the store and look and see how
25  many fentanyl patches there are?

Page 114

1    MR. KOBRIN: Object to form.
2    THE WITNESS: You can physically go, but
3 there's no reason to do that.
4 BY MR. HUDSON:
5    Q. Is the inventory system at Giant Eagle,
6 is it organized and set up by NDC, or is it set up
7 by fentanyl patches?
8    MR. KOBRIN: Object to form.
9    THE WITNESS: It's set up by both. We
10 have five boxes of this NDC and we have two boxes
11 of this NDC. When you pull up fentanyl patches,
12 you can see all the different NDCs you have.
13 BY MR. HUDSON:
14    Q. But for this report, for one reason or
15 the other, Giant Eagle set up a program that was
16 flagging audit discrepancies by NDC number; is
17 that fair?
18    A. Yes.
19    Q. And whether you agree or disagree with
20 whether that's a good system or not, all I'm
21 getting at is when you're using a product that has
22 one NDC as opposed to another, that's creating a
23 discrepancy that's popping up on this report.
24    And I think, if I'm understanding your
25 testimony right, what you're saying is while it's

Page 115

1 on this report, you don't view it as a true
2 discrepancy because you have ways of confirming
3 that, in fact, the product that's supposed to be
4 there is there.
5    MR. KOBRIN: Object to form.
6    THE WITNESS: You were so close. I
7 don't consider it a discrepancy because I have a
8 reason why. I expect to have ten patches. I have
9 ten patches.
10 BY MR. HUDSON:
11    Q. And all I'm saying is from the
12 standpoint of this program, somebody at Giant
13 Eagle decided they needed to have this program and
14 they needed to have whatever column headings it
15 has, and whoever decided that, you went with a
16 program that does have a column that says
17 discrepancy.
18    And for any time the NDC number -- the counts
19 are off by NDC numbers, those end up on this
20 report as being a discrepancy.
21    MR. KOBRIN: Object to form. Asked and
22 answered. Misstates his testimony.
23 BY MR. HUDSON:
24    Q. Do you agree with that?
25    A. I've explained it. I don't have any

Page 116

1 more to add to it.
2 BY MR. HUDSON:
3    Q. If we turn to the next page then, page
4 2, at the top do you see there for that
5 hydrocodone combination product there were
6 supposed to be 805 of that count, and there were
7 only 801?
8    A. Yes.
9    Q. So that count is off by four; right?
10    A. Yes.
11    Q. Would you agree that that would be a
12 problem?
13    MR. KOBRIN: Object to form.
14    THE WITNESS: You're asking for an
15 opinion. It could be a miscount. It's not
16 something we're going to -- when it becomes a
17 problem is if every month I see minus two, minus
18 three, if a trend starts forming.
19 BY MR. HUDSON:
20    Q. So something like this where the count
21 would only be off by four and the reason given is
22 "Unknown," would that be something that you would
23 consider to be a problem?
24    A. No, because I'm looking at what the
25 headers are. This particular store purchased a

Page 117

1 thousand tablets, dispensed 614 of them. They're
2 off by four. No, I don't consider that a problem
3 for this month.
4    Q. Why not?
5    A. Because it could just be a miscount.
6 Four could have got stuck in the tray, thrown
7 away. There's nothing sticking out right now
8 based on the quantities that they dispensed that
9 month.
10    Q. Go down four more line entries. Do you
11 see the one with the oxycodone?
12    A. Yes.
13    Q. With the 90. So the expected count is
14 90 and the actual count is zero, and the reason
15 given is "Unknown." Would that be a problem to
16 you?
17    A. No. I'll tell you why. Because it
18 doesn't say 90. It says minus 90. In other
19 words, they dispensed them. They billed for them.
20 Then we order them and we gave them to the guy.
21 So now we have zero. The explanation should have
22 been better. But any time we have more than we
23 should have, I'm not concerned.
24    Q. So here you're saying the expected would
25 be minus 90, the actual is zero, and the

Page 118

1 difference is 90?
2    A.  The difference is 90, correct, because
3 what happened there is a prescription was brought
4 in.  We didn't have any.  We had zero.  We billed
5 for the 90 tablets which brought us into the
6 negatives.  They happened to do the narcotic order
7 that day.  We're expecting minus 90.
8    Now, they could have put in there we have
9 minus 90, which technically we did because we
10 already billed for it.  But then the next day when
11 the stuff comes in, we fill the prescription.  Now
12 we have ten.  We probably got, I'm assuming, a
13 bottle of a hundred.
14    Q.  So here even though the actual count is
15 zero, you're saying you think there's an
16 explanation there that would explain the
17 discrepancy and it wouldn't raise an issue?
18    MR. KOBRIN:  Object to form.  He didn't
19 say he thinks.  He explained the discrepancy.
20    THE WITNESS:  We were expecting minus
21 and we have zero.  So at the end of the day, we
22 have zero.
23 BY MR. HUDSON:
24    Q.  You turn back to page 5.  Down the
25 column do you see 1254 is the count, expected

Page 119

1 count?
2    A.  What store number are you looking at?
3    Q.  1225.
4    A.  What was the number?
5    Q.  1254.
6    A.  Okay.
7    Q.  And you see then the expected is 1254.
8 The actual is 1239, so you're at minus 15.
9    A.  Yep.
10    Q.  And that's a hydrocodone combination
11 product?
12    A.  Um-hum.
13    Q.  And the reason given or the explanation
14 is "Unknown."  Would that be a problem to you?
15    A.  No, because -- the only problem here is
16 the reason.  Have you ever seen that product?
17    Q.  I have not.
18    A.  It's a liquid.  It's thick.  It's mucus
19 thick.  So the chances of that being accurate, if
20 it's stuck on the side -- they're guesstimating on
21 there.  I'm not concerned about a tablespoon of
22 cough medicine.  That's probably along the sides
23 of the bottle somewhere.  So again, it's not an
24 issue.
25    Q.  Let's go to page 6 then.  Here we've got

Page 120

1 store 4022 towards the bottom, and then I'm
2 looking in particular at the fourth from the
3 bottom.  We've got an expected count of a hundred,
4 an actual count of 80, so we're minus 20 of the
5 hydrocodone product.  And then in the description
6 here it says "Not sure how these were lost,"
7 question mark.
8    A.  Yeah.
9    Q.  Would that be a concern to you?
10    A.  To me that would be a concern because I
11 don't like the -- I don't know how these were
12 lost.  So my recommendation would be to fill out
13 the DEA 106, report it and then get -- we have a
14 whole chain of things that happen when we think
15 there's a loss.
16    Q.  Do you know whether or not this one was
17 reported to the DEA as lost?
18    MR. KOBRIN:  Object to form.
19    THE WITNESS:  I don't know.
20 BY MR. HUDSON:
21    Q.  Let's look at the one right underneath
22 it.  It's another hydrocodone combination product.
23 Expected count is 256.  Actual count is 206.
24 We're minus 50 here.  And then the reason given is
25 "Miscounts," question mark.

Page 121

1    A.  That never flies.
2    Q.  So this would be another problem?
3    A.  Yeah.
4    Q.  And would your expectation be that --
5    A.  It wouldn't be another problem.  It
6 would be the first problem that we talked about
7 that's actually a problem now.  That's a
8 considerable amount of tablets.
9    Q.  So the 20 tablets in the line item right
10 above?
11    A.  Yeah, these two.
12    Q.  That's all I meant when I said another.
13 The first one is the line item where there was
14 supposed to be a hundred and now there's 80.  And
15 then the next one is there was supposed to be 256
16 and there's 206.
17    Would you agree that both of those are
18 problems?
19    A.  I would agree.  Especially the second
20 one is a problem.
21    Q.  Why would you say that especially the
22 second one is a problem as opposed to the first?
23    A.  Again, this is how I do it.  It's just
24 that quantity.
25    Q.  Did you have in your mind if the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 quantity was less than a certain amount, then it
2 probably wouldn't be a problem that would be
3 elevated?
4     A. No. I mean, I just go by the -- I'm
5 going to lose my train of thought here -- by I
6 think it's the DEA if it's a substantial loss. If
7 you fill 10,000 scripts or 10,000 tabs and you're
8 down two tabs, that's not substantial.
9     Q. So either one of these two --
10     MR. KOBRIN: Can I just have an
11 objection to the extent these two may or may not
12 be outside the jurisdiction? Can I have a
13 standing objection to the relevancy?
14     MR. HUDSON: Yes. You can have a
15 standing objection.
16     MR. KOBRIN: Well, as to the relevancy,
17 I'm not sure 4022 is inside or outside the
18 jurisdiction.
19     MR. HUDSON: I don't think you have to
20 make relevancy objections in depositions. I'll
21 give you a standing one.
22 BY MR. HUDSON:
23     Q. So for these two hydrocodone combination
24 products where the counts had discrepancies, would
25 you expect there to be DEA reports for one or both

Page 123

1 of these?
2     A. I would expect.
3     Q. For both or only the second one?
4     A. I would expect both.
5     Q. Describe for me how that process would
6 work if there was a discrepancy like this. Who
7 within Giant Eagle would then submit that DEA
8 report?
9     A. The pharmacy manager submits the DEA 106
10 as soon as we suspect anything. We don't wait to
11 investigate it. It's submitted the day we find
12 it. There's a -- I believe Joe Millward would be
13 There's an Ohio investigational form that has the
14 steps you need to fill out. It's a box. It's a
15 document with three boxes on it. Call the state
16 Board of Pharmacy. Called the state Board of
17 Pharmacy, check the box off. Do the 106. Fax it
18 in. We print it. George gets a copy. And it
19 stays open. We contact LP. Rick Shaheen they
20 come in and investigate.
21     Q. Either Giant Eagle or HBC, somewhere at
22 the company I'd probably be able to figure out how
23 many DEA 106s were submitted and when?
24     A. Yes.
25     Q. Let's keep moving back to page 15. I'm

Page 124

1 now on store 5878. I'm down the tenth line item.
2 Here the expected count is 1048 and then the
3 actual count is 953. So the count is off by 95
4 for a hydrocodone combination product, and then
5 the discrepancy column has listed "Unknown."
6     A. Yes.
7     Q. Would that be another example of a
8 problem?
9     A. Yes.
10     Q. And would you expect there to have been
11 a DEA 106 submitted for this particular
12 discrepancy?
13     A. Yes.
14     Q. If we keep going down for the same store
15 5878, down close to about ten more line items, the
16 count is supposed to be 334 and it's 244. So that
17 count is off by 90 for another hydrocodone
18 combination product. Do you see that?
19     A. Yes.
20     Q. And there the discrepancy reason given
21 is "Unknown."
22     A. Yes.
23     Q. Is this another discrepancy that would
24 rise to the level of being reported?
25     A. It should be to the DEA.

Page 125

1     Q. To the DEA with the 106. And then if we
2 move down to page 16, we're on the last page of
3 the stores in your territory, here we've got the
4 very last line item for store 6414.
5     Do you see there's a hydrocodone combination
6 product, and the count was supposed to be 414 and
7 the actual count was 376, so it's off by 38?
8     A. Again, I'm going to the other column
9 there, because using the DEA's definition of
10 substantial, we used 2484 tablets and we're down
11 38. One could argue either way, that's
12 substantial or not substantial. They may have
13 erred and put it in or they may have not.
14     Q. Are you concerned that the reason given
15 here is "Unknown"?
16     A. Any time we see unknown is when I take a
17 little more -- I dig in a little more, maybe do a
18 store visit to see if there's some counting issues
19 or whatnot. But that usually gets a flag for me
20 when I see unknown.
21     Q. Would you say that this particular
22 report for June of 2013 would be normal or
23 abnormal?
24     MR. KOBRIN: Object to form.
25     THE WITNESS: You mean see all the

Page 126

1 emails I get or this particular form?
2 BY MR. HUDSON:
3     Q.  No, just meaning like this list, the
4 line items, the number of line items, the issues
5 being flagged, the sort of overall.
6     If you look at your stores in your territory,
7 is this about what you'd expect to see every
8 month, or is this an abnormal report?
9     We can look at this one, too, the other one
10 we've got once you've finished.
11     A.  (Indecipherable) would fit about --
12 let's make sure all the stores are listed.  We're
13 comparing to this one?
14     Q.  No.  Just in general.  What you can
15 recall from this audit process, would you say that
16 this report though, the audit from June of 2013,
17 was pretty normal or in line with the other
18 reports or abnormal?
19     MR. KOBRIN:  Object to form.  During the
20 entire period that he reviews these kinds of
21 audits or all audits?
22     MR. HUDSON:  These particular reports.
23     THE WITNESS:  I can't say.  We're
24 talking 2013.  I have fresh ones in my inbox with
25 two lines on them.

Page 127

1 BY MR. HUDSON:
2     Q.  That's all I'm getting at, is do you
3 feel like this was an abnormally -- because for
4 the stores in your territory we've got 15 and a
5 half pages of discrepancies; right?
6     A.  Um-hum.
7     Q.  And we went through and we found four or
8 five discrepancies that rose to the level that you
9 had indicated that those may need to be reported
10 to the DEA with a 106.
11     All I'm getting at is that in 2013 and 2014,
12 2015, 2016, that kind of timeframe, would this be
13 the report in terms of the number of line items
14 and the issues that are being raised that would be
15 pretty typical, or do you feel like in June of
16 2013 there were more issues than normal?
17     MR. KOBRIN:  Object to form.  Asked and
18 answered.
19     THE WITNESS:  I'm not going to
20 speculate.  All I can tell you is looking at this
21 report, this is what it is.  I don't have any
22 reports to look at to compare it to right now or
23 recollection.
24 BY MR. HUDSON:
25     Q.  Let's look then, if we could, at

Page 128

1 Exhibit 12.  And this looks to be the same exact
2 type of report.  It looks like it came from the
3 same location on the F drive.  The difference is
4 this one is from October of 2013 whereas the first
5 one was from July of 2013.  So we're about --
6     COUNSEL ON PHONE:  Can we get a Bates
7 number on Exhibit 12?
8     MR. HUDSON:  Sure.  Exhibit 12 is
9 HBC_MDL00032878.  But it's another spreadsheet
10 that's a thick document that's -- I don't know.
11 It's not numbered.  But it's probably greater than
12 50 pages.
13 BY MR. HUDSON:
14     Q.  So if we look at this particular report
15 from Exhibit 12, on the second page, do you see
16 this one is showing that it's an audit
17 discrepancy.  It's a narcotic audit chain
18 discrepancy summary 10/1/2013 through 10/31/2013.
19     A.  Yes.
20     Q.  So this would be one that was looking at
21 discrepancies from October of 2013, and it would
22 be a report that was generated in early November.
23     A.  Okay.
24     Q.  Does that make sense?
25     MR. KOBRIN:  Object to form.

Page 129

1     THE WITNESS:  Yeah.  Again, the same
2 answer as the last time.  By the time this is
3 generated, I've already seen --
4 BY MR. HUDSON:
5     Q.  Right.  Exactly.  You beat me to the
6 punch.  So again, same deal, for the first -- it
7 looks like your stores are listed here on the
8 first -- let's count these -- 16, 15-2/3, so about
9 16 pages again in this one.
10     Again, for those particular stores, you would
11 have received their individual reports to you
12 broken down by store.  So store 178 would
13 have sent you their individual report.  Store 203 would
14 have sent you their individual report.  You would
15 have gotten each one of those separately?
16     A.  Right.
17     Q.  Here if we could take a look again,
18 similar in terms of format, and then we've got the
19 same discrepancies column here.  And again, I just
20 want to walk through this and see if there's -- if
21 there are discrepancies that would rise to the
22 level of being problems that arose from the
23 October 2013 audit.
24     So if we turn to page 3 of the exhibit, page
25 2 of the spreadsheet there, where it shifts to

Page 130

1  store 209 and then the second line item down on
2  store 209, we've got a hydrocodone combination
3  product where the expected count is 645 and the
4  actual count is 523. So we've got a count that's
5  off by 122.
6      A.  Um-hum.
7      Q.  And then in the explanation or
8  discrepancies column, it says "Triple counted.
9  Quantity equals 523." Would that be problematic
10 to you?
11     A.  Yes.
12     Q.  And then if you look at the line item --
13 before we leave that one, so for this one where
14 the count was off by 122, would that be a
15 discrepancy that you would expect to be reported
16 with a DEA 106?
17     A.  The one we just talked about, the minus
18 122 one?
19     Q.  Yes.
20     A.  Yes.
21     Q.  And then underneath it, we've got a
22 count for another hydrocodone combination product
23 where we've got a count of -- expected count of
24 392, an actual count of 391. So you're off by one
25 there it looks like.

Page 131

1      A.  Correct.
2      Q.  Would that be a concern?
3      A.  No.
4      Q.  If we move back to -- so now I'm going
5  to go back two more pages. So I'm now on store
6  465. And I'm on the fourth one down where you've
7  got the Oxy there.
8      A.  Yeah.
9      Q.  You got an expected count of 113, an
10 actual count of 23. So it's minus 90. And in the
11 discrepancy it says "201766 not counted on the
12 sheet," question mark, question mark, question
13 mark.
14     MR. KOBRIN: Object to form.
15 BY MR. HUDSON:
16     Q.  Does that make sense?
17     A.  Yes.
18     Q.  What does that mean?
19     A.  Remember, this report is generated off
20 things that we've purchased and things we've
21 dispensed. For some reason, when he ran this
22 dispensing, it says we should have, you already
23 read it, 113. He counts them. We have 23. So
24 his next thing is start an investigation on what
25 happens. He's down 90.

Page 132

1      So he starts looking at all his dispensings
2  on the report that was generated. For some
3  reason, prescription number 2017666 was written
4  for 90. It wasn't on that report.
5      Q.  Got it. So he's giving a probable
6  explanation for what happened here?
7      MR. KOBRIN: Object to form.
8      THE WITNESS: He's giving the reason
9  what happened. That 90 wasn't on the report.
10 BY MR. HUDSON:
11     Q.  I would say he's giving the reason.
12 Only he put three question marks next to what he
13 wrote; right?
14     A.  Correct. He's questioning why it's not
15 on there.
16     Q.  Right. In other words, he's saying,
17 look, I think what happened is 2017666 not counted
18 on the sheet, question mark, question mark,
19 question mark; right?
20     MR. KOBRIN: Object to form.
21     THE WITNESS: He's saying I know what
22 happened. We're missing -- we're down 90. I
23 found the 90. That's the way it works.
24 BY MR. HUDSON:
25     Q.  I understand. I just don't know why he

Page 133

1  would add three question marks after that.
2      MR. KOBRIN: Object to form.
3      THE WITNESS: We looked at emails with
4  16 question marks. I don't know why they do it.
5  BY MR. HUDSON:
6      Q.  Fair enough. I didn't write this stuff.
7  We're just going through it.
8      So we go up to two line items here. The
9  first one and the second one are a couple of
10 hydrocodone combination products. It looks like
11 we've got a count that's off by three for the
12 first one with the description of "Unknown" and
13 then a count that's off by nine for the second one
14 and it says minus nine outdated.
15     Would either one of those be problematic to
16 you?
17     A.  No, for the same reason. The first one
18 is only three tablets on dispenses of 981. There
19 could be a miscount.
20     On the second one, he actually accounts for
21 it. We have nine tablets that are sitting
22 quarantined to be returned. We took them out of
23 the system already.
24     Q.  Outdated, that's like a term of art.
25 You know what that means. That would explain

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 that.
2     How about if we go down to the sixth line
3 item there.  Do you see the hydrocodone
4 combination product where the expected count is
5 521 and the actual count is 493.  We've got 28
6 that aren't accounted for, and the reason or the
7 discrepancy is "Unknown."  Would that be a
8 problem?
9     A.  Based on the way I do it, yes.  There's
10 got to be a reason.  It can't just be unknown.
11     Q.  So would you expect there to be a DEA
12 106 reported for that discrepancy?
13     A.  I would expect there would be one, yeah.
14     MR. KOBRIN:  Can we take a break?  Do
15 you want to take a break.
16     THE WITNESS:  Yeah.
17 BY MR. HUDSON:
18     Q.  Can we just finish this?  I'm almost
19 done.
20     MR. KOBRIN:  Yeah.  How many more
21 questions do you think you have?
22     MR. HUDSON:  Just going through, there's
23 probably like, I don't know, six more.  They're
24 just going to be the same questions every one.
25     MR. KOBRIN:  Why don't we just take a

Page 135

1 quick break.
2     MR. HUDSON:  Okay.  We'll take a break.
3     THE VIDEOGRAPHER:  We're going off the
4 record.  The time is 5:29 p.m.
5     (Recess from 5:29 p.m. to 5:51 p.m.)
6     THE VIDEOGRAPHER:  We're going back on
7 the record.  The time is 5:51 p.m.
8 BY MR. HUDSON:
9     Q.  Mr. Bencivengo, before the break, we
10 were talking about this audit report from October
11 of 2013, and we are on page 5 of the exhibit,
12 which is page 4 of the spreadsheet.
13     The particular line item, there's a
14 hydrocodone product for store 465, and the
15 expected count is 521 and the actual count is 429.
16 That count was off by 28 with the reason given as
17 "Unknown"; correct?
18     A.  Correct.
19     Q.  And in your mind, would that be a
20 problem?
21     A.  Looking at dispensing 3900 tablets of
22 it, I would probably say no.
23     Q.  If we look at the next page of this
24 exhibit and we go down to the bottom, for store
25 4022, four line items from the bottom, the

Page 136

1 expected count is 470 and the actual count is 382.
2 So this time we're off by 88 for a hydrocodone
3 combination product with the reason given as
4 "Unknown loss."
5     Would that create a problem in your mind?
6     A.  It's a reportable issue.
7     Q.  And by that do you mean a DEA 106
8 report?
9     A.  Yes.
10     Q.  If we go to the next page, I'm down
11 under store 4031 about eight from the bottom.  The
12 expected count was 36.  The actual count was zero.
13 And the explanation given is "liquid incorrect
14 measurement."
15     Would that make sense that that would cause
16 the count to be off by 36?
17     A.  Yeah.  And that's that same liquid we
18 spoke about, a very thick viscous liquid.  You're
19 basically doing a guesstimate.  There's nothing to
20 measure on the bottle.  You're not pouring it.
21 You're doing this (indicating) and kind of giving
22 your best assumption.  So that's not an issue.
23     Q.  You can say definitively you think that
24 one would not be an issue?
25     A.  Yeah.

Page 137

1     Q.  If we go down to the bottom, the last
2 one here, again another hydrocodone combination
3 product at store 4031.  The expected count is 160.
4 The actual count is a hundred.  So we're 60 off.
5 And the reason given is "Did not dispense any.
6 Did not receive any.  Missing 60 tablets."
7     Would that be a problem?
8     A.  That would be something that I would
9 assume we would report to the DEA 106.
10     Q.  If we go to the next page, here for
11 store -- now I'm moving to store 3042.  And midway
12 down the page here, we've got a count where the
13 expected count is 20.  The actual is zero.  So
14 we're off by 20 with an explanation of "Unknown."
15     Then right underneath that we've got another
16 hydrocodone product there where the expected count
17 was minus 1.  The actual count is zero.  So it
18 looks like we're off by one with the reason given
19 as "Unknown."
20     Would either one of those be problematic?
21     A.  No.  That first one is that liquid.  So
22 we're basically talking about a tablespoon again,
23 a little over a tablespoon of missing liquid we
24 can't account for.  And the second one, she's
25 actually over in tablets.  She's over one, not

Page 138

1 under.
2    Q.  So situations where the count is wrong
3 because they're over would not be something that
4 would raise a problem or a concern?
5    A.  No, no.
6    Q.  If we keep back going back, now I'm back
7 to store 4152.  It looks like two-thirds of the
8 way down there's an expected count of 213 and an
9 actual count of 223.  So we're off by 10 to the
10 positive.  Then it says "Unknown."
11      MR. KOBRIN:  What page are you on?
12      MR. HUDSON:  They're not numbered.
13 Store 4152.  The top is 4124.  So then it fades
14 into 4152.  So we're down the last -- it's the
15 last line item for that store 4152.  We've got
16 hydrocodone combination product, expected count of
17 213, actual count of 223.  You're off by ten to
18 the positive, but the reason given is
19 "Unknown..possible misconduct," question mark,
20 question mark.
21    When the count is positive like that, would
22 that be a potential problem?
23      MR. KOBRIN:  Object to form.  I think
24 you misread the used for balance explanation.
25      MR. HUDSON:  You're right.  I did.

Page 139

1 "Unknown..possible miscount," question mark,
2 question mark.  Thank you.
3 BY MR. HUDSON:
4    Q.  Would that be a potential problem?
5    A.  No.  It probably was somebody got
6 shorted.
7    Q.  If we go to the next page, third from
8 the bottom, first line item for store 5830, we've
9 got morphine, expected count of 20, actual count
10 of zero, so we're minus 20.  "Unable to find.
11 Previous pharmacist never counted bottles and
12 submitted improperly.  Will continue to look on
13 shelves as day progresses."
14    Would that be an issue?
15    A.  It was an operational issue, yeah, for
16 the reason given.
17    Q.  Would that be a reportable event?
18    A.  It should be.
19    Q.  So that would be another DEA 106 issue
20 if you couldn't find the morphine that was
21 missing?
22    A.  That would be the appropriate thing to
23 do; correct.
24    Q.  If you go to the -- nothing on the next
25 page.  We go to the next one after that.  Store

Page 140

1 5839, Focalin, do you see that line item?
2    A.  Yeah.
3    Q.  It's about eight down.  Expected count
4 of 198, actual count of 138.  So 60 are missing.
5 What is Focalin?
6    A.  It's another form of Ritalin.
7    Q.  And then here the discrepancy
8 explanation is "I don't feel comfortable on this
9 one.  Still searching, but no explanation on minus
10 60.  Only 30 dispensed last period and never had
11 discrepancy before."
12      MR. HUDSON:  Object to form.
13 BY MR. HUDSON:
14    Q.  Would that be a potential reportable
15 event?
16    A.  Yeah.  We probably should fill out a 106
17 based on the dispensing and watch it next month.
18    Q.  If you go on down, so I'm still --
19 actually I'm not.  Now I'm on store 5863.  And
20 there's a hydrocodone combination product with an
21 expected count of 853 and an actual count of 796.
22    A.  You said 5863?
23    Q.  I'm sorry.  Expected count of 853,
24 actual count of 796.
25      MR. KOBRIN:  Object to form.  He's

Page 141

1 asking you about the store, I think.
2 BY MR. HUDSON:
3    Q.  The store is 5863.  The expected count
4 on the hydrocodone combination product is 853.
5 The actual count is 796.  So it's off by 57.  And
6 the discrepancy says "Possibly miscount since
7 8/4/13 audit."
8    Would that be a problem?
9    A.  10,772 tablets, probably a couple
10 different generics on that one.  That one seems to
11 be standing out.  So that would probably just be
12 put on something we'd watch.
13    Q.  If you look to the next one right
14 underneath that, now we're at store 5878.  What is
15 that product, methyphenid?
16    A.  Ritalin generic.
17    Q.  We've got generic Ritalin, expected
18 count of 110, actual count of 80.  We're off by 30
19 and the reason given is "Unknown."
20    A.  Yeah.  It's going to be something we
21 should report to the DEA on the form.  It looks
22 like -- because it's an even 30, it's probably one
23 of those situations -- I'm not going to assume
24 what it was.
25    Q.  That would be a reportable event?

Page 142

1    A.  Um-hum.
2    Q.  If you go to the last one on this page
3  for store 5878, what is that product, dexmethyl?
4    A.  It's the same.  It's an upper, same
5  class.
6    Q.  And then there it looks like the count
7  is missing by 45, expected 144, actual 99.  And
8  again, reason given is "Unknown."
9    Would that be another discrepancy that would
10  be a problem?
11    A.  It would be a reportable issue to look
12  into; correct.
13    Q.  Then if we turn to the next page at the
14  top, the first entry we have another hydrocodone
15  combination product.  The expected count is 1332.
16  The actual is 1233.  So the count is short 99, and
17  the reason given is "Unknown."
18    A.  Yes.
19    Q.  Would that be a problem for store 5878?
20    A.  Same answer.  It would be reported and
21  looked into.
22    Q.  And then about for the line item right
23  underneath it, which is another hydrocodone
24  combination product, it looks like there that the
25  count is off by 58.  There's 58 tablets missing.

Page 143

1  The reason given is "Unknown."
2    A.  Yeah.  At that volume, that's a great
3  one.  I'm not sure if that was reported or not
4  because of the tablets dispensed and the
5  definition by the DEA.
6    Q.  So 58 tablets missing?
7    A.  Out of 3000.
8    Q.  Would be a close call?
9    A.  Yeah.
10    Q.  If we go down then to the sixth line
11  item, morphine, do you see the count was supposed
12  to be 270, and it's 185.  So we've got 85 missing.
13  And the reason given is "Unknown."
14    MR. KOBRIN:  Object to form.
15    THE WITNESS:  Yes.
16  BY MR. HUDSON:
17    Q.  Would that be a problem?
18    A.  It would be reported on the 106, should
19  be.
20    Q.  How many DEA 106 reports to your
21  knowledge has Giant Eagle filed for stores in your
22  territory?
23    MR. KOBRIN:  Object to form.  Do you
24  have a time period?
25

Page 144

1  BY MR. HUDSON:
2    Q.  Ever, if you know.
3    A.  I don't know.  I don't fill them out.  I
4  recommend to fill them out.
5    Q.  Do you know if for any of the line items
6  that we've talked through on Exhibits 11 and 12
7  whether there were any DEA reports, 106 reports
8  filed for any of these items?
9    A.  That's the procedure.  So, yes, they
10  should have been done.
11    Q.  Right.  I understand.  You've testified
12  and explained and sort of walked through and said
13  yes or no on whether a DEA 106 form should have
14  been filed.
15    My question is just:  Do you know whether any
16  DEA 106 reports were actually filed?
17    MR. KOBRIN:  Do you have anything to
18  show him or anything to refresh him on this?
19    MR. HUDSON:  I don't.
20    MR. KOBRIN:  And this is in 2013?  All
21  the ones you're referring to are in 2013?
22    THE WITNESS:  I don't know.  That's the
23  procedure.
24  BY MR. HUDSON:
25    Q.  And consistent with that procedure, it

Page 145

1  would be the pharmacist at the store that you
2  would expect to have filed the DEA 106s?
3    A.  Correct.
4    Q.  Now having looked at two of these
5  reports, one from June and one from October of
6  2013, do you have any greater sense of whether or
7  not these sorts of discrepancies were typical in
8  the 2013, 2014 timeframe, or whether or not these
9  two reports had more issues than the other reports
10  in terms of what you can remember?
11    MR. KOBRIN:  Object to form.
12    THE WITNESS:  I can't -- we're
13  comparing -- all I can compare is the two things
14  you just handed me.
15  BY MR. HUDSON:
16    Q.  You've got no frame of reference beyond
17  looking at these two?
18    A.  I have an email from today.  One store
19  has two line items on it.
20    Q.  So it's fair to say that today, you can
21  say confidently that the number of discrepancies
22  is far less than what we've looked at in
23  Exhibits 11 and 12?
24    MR. KOBRIN:  Object to form.  Vague.
25    THE WITNESS:  It is vague.  If I compare

Page 146

1  the store in my email to one of these stores, yes,
2  it's lower today.
3  BY MR. HUDSON:
4      Q.  All I'm saying is Exhibits 11 and 12,
5  we've got 15 pages of line items for stores that
6  are in your territory; right?
7      A.  Correct.
8      Q.  And then today what you're saying is if
9  we went and looked at that report, it would be a
10 page or less; right?
11     A.  Correct.
12     Q.  Were you surprised to see as many issues
13 as there were on these reports and in particular
14 relating to hydrocodone combination products?
15         MR. KOBRIN:  Object to form.
16         THE WITNESS:  Just for some operational
17 stuff we do with our reporting, I'm not surprised.
18 I'm confident most of this stuff is accounted for
19 just through errors.  It's not on the street
20 somewhere.  We didn't lose it or sell it.  It's
21 accounted for.  I mean, you see from these reports
22 we capture every little thing here.
23 BY MR. HUDSON:
24     Q.  The pharmacists who are filling out
25 these reports did their very best to try to

Page 147

1  provide explanations for why these discrepancies
2  existed; right?
3         MR. KOBRIN:  Object to form regarding
4  discrepancies.
5         THE WITNESS:  Yeah.  That's the purpose
6  of the form, to capture anything, to itemize it,
7  to research it.
8  BY MR. HUDSON:
9      Q.  So if there was an explanation for
10 discrepancies that existed, you would expect them
11 to be put in this audit report in the column that
12 says discrepancy; right?
13     A.  Yeah.
14         MR. KOBRIN:  Object to form.
15 BY MR. HUDSON:
16     Q.  So were you surprised the number of line
17 items that we walked through where the description
18 was unknown?
19     A.  Not really.
20     Q.  Was that pretty typical to have that
21 many discrepancies with an unknown explanation?
22         MR. KOBRIN:  Object to form.
23 Argumentative.
24         THE WITNESS:  It's typical to the report
25 we looked at here today.

Page 148

1  BY MR. HUDSON:
2      Q.  Typical for the two reports that we
3  looked at, right, from 2013?
4      A.  Yes.
5      Q.  We went through and saw, I don't know,
6  20 or so items at least from these two months
7  where there were hydrocodone combination products
8  that had been missing and the reason given was
9  "Unknown"; right?
10     A.  Well, yeah, but out of how many?  20 out
11 of all these?  20 out of 17 pages.
12     Q.  There's 16 pages of line items with
13 discrepancies.  All I'm getting at is --
14     A.  It wasn't all hydrocodone though.  We
15 looked at Ritalin.  You looked at other things
16 besides hydrocodone.
17     Q.  Sure.  But I'm just saying we've looked
18 at hydrocodone line item entries, and there were
19 probably 20 of them or so where the reason given
20 for the discrepancy was "Unknown."
21         MR. KOBRIN:  Object to form.  If we know
22 how many there are, we should say how many there
23 are.
24         THE WITNESS:  We looked at hydrocodone
25 along with Focalin and Ritalin and things like

Page 149

1  that.  I didn't count them.
2  BY MR. HUDSON:
3      Q.  I guess all I'm getting at is one of the
4  contentions made in this case is that Giant Eagle
5  had inventory processes and controls in place that
6  would catch any errors.
7      Can you agree that these reports raise real
8  questions about whether or not the inventory
9  system was counting all of the errors that existed
10 at Giant Eagle retail pharmacies?
11         MR. KOBRIN:  Object to form.
12         THE WITNESS:  I can't agree with that.
13 I think the reports are doing what it's supposed
14 to do.
15 BY MR. HUDSON:
16     Q.  As you sit here today, can you say under
17 oath whether or not Giant Eagle retail pharmacies
18 ever figured out what the cause of the
19 discrepancies were when the reason given was
20 unknown?
21         MR. KOBRIN:  Object to form.  It's not
22 appropriate on so many levels.  He said that they
23 would either fill out a 106 or they would
24 investigate it, but to try and --
25         MR. HUDSON:  He said they were supposed

Page 150

1  to, Josh.  Please don't testify.
2       MR. KOBRIN:  -- about a report five
3  years ago is ridiculous.
4       THE WITNESS:  Under oath I can say that,
5  yes, we did figure out some.
6  BY MR. HUDSON:
7       Q.  And as you sit here today, do you have
8  any idea which ones you did or which ones you
9  didn't?
10      A.  No.
11      Q.  And is there any sort of tracking form
12 or log that I could look at to try to figure out
13 which of these issues were resolved and which ones
14 remained unresolved or unknown?
15      MR. KOBRIN:  Object to form.
16      THE WITNESS:  I would check with Lynne
17 Kolas or George Chunderlik.
18 BY MR. HUDSON:
19      Q.  To your knowledge, you're not aware of
20 any log?
21      A.  No.
22      Q.  So once you get these audit reports,
23 there isn't a further report of some kind that's
24 created by Giant Eagle that would then track open
25 discrepancies that would then give us a report of

Page 151

1  what ultimately happened with any investigations
2  on these items?
3       MR. KOBRIN:  Object to form.  He said
4  what happens.  Ask him to repeat it.
5       THE WITNESS:  I don't see the report.  I
6  discussed previously that when there's a loss, we
7  file a 106.  If we think there's a loss, there's
8  an investigational form I mentioned with three
9  boxes on it that gets faxed in the office.  It
10 sits open while we investigate with LP.
11      A period of time goes by.  If no one
12 responds, then Lynne Kolas will send it back to
13 the store and say whatever happened here.  Oh, we
14 found it.  It was in the trash.  We close it out.
15 Or we've looked.  It's lost.  We can't find it.
16 It doesn't mean -- it might have gotten thrown
17 away.  It might have been an error.  But they're
18 all closed out eventually.  They don't just kind
19 of sit there kind of hanging out.
20 BY MR. HUDSON:
21      Q.  So where would I go to look to figure
22 out as a result of these audit reports which
23 issues there was further paperwork filled out and
24 then ultimately what happened with those
25 discrepancies?

Page 152

1       MR. KOBRIN:  Object to form.
2       THE WITNESS:  Only if we suspected a
3  loss that we were concerned about that we would
4  open up one of those tabs.  So Lynne Kolas would
5  be the person to ask.
6  BY MR. HUDSON:
7       Q.  Do you know the locations those would be
8  to try to figure out what came of those issues?
9       A.  No.
10      Q.  And I know you've said this, so I'm
11 repeating myself.  I just need to make sure the
12 record is clear.
13      As you sit here today, for any one of these
14 line items, you don't know what actually happened
15 in terms of further paperwork filled out by
16 anybody at Giant Eagle relating to any of these
17 particular line items?
18      MR. KOBRIN:  Object to form.
19 BY MR. HUDSON:
20      Q.  Is that fair?
21      MR. KOBRIN:  Object to form.
22      THE WITNESS:  It's not accurate.  We
23 have a procedure in place.  I can't sit here and
24 say under oath that it was followed a hundred
25 percent of the times, but we have a procedure in

Page 153

1  place.  If one of these show up as unknown,
2  there's actions that are taken.
3  BY MR. HUDSON:
4       Q.  Right.  That's why I was trying to get a
5  sense of, if you had any sort of idea how many
6  times DEA 106 reports had been filled out, like to
7  give some sense of -- I'm just trying to gauge
8  whether you have any understanding of whether or
9  not the procedures that were supposed to be
10 followed were followed for each of the line items
11 that are on each of these reports.
12      MR. KOBRIN:  Object to form.
13      THE WITNESS:  If they followed
14 procedure, then they were followed.  I don't have
15 any reports.  I have no reporting that comes to me
16 that says these ten stores submitted DEA 106s.  I
17 don't have any access to those reports.
18 BY MR. HUDSON:
19      Q.  That's what I'm trying to get at, is
20 what you have personal knowledge about.  Do you
21 have personal knowledge to know whether or not for
22 these particular line items on these reports the
23 procedures were followed?
24      MR. KOBRIN:  Object to form.  You're
25 asking him his personal knowledge about particular

Page 154

1  line items in a report that he's never seen before
2  today that's several years old; is that accurate?
3        MR. HUDSON:  Well, we've got to go back
4  and reestablish the foundation.
5  BY MR. HUDSON:
6     Q.  Mr. Bencivengo, you testified before for
7  the line items that related to the stores where
8  you're a specialist, you would have received the
9  reports in substantially the same form, but they
10 would have come from each store each month;
11 correct?
12    A.  Correct.
13    Q.  So then once you get those line item
14 reports, my question is:  For those where there
15 are still open issues and there's discrepancies
16 and the reason given is unknown, do you, as you
17 sit here today, have any personal knowledge about
18 whether Giant Eagle followed its procedures and
19 then filled out any paperwork to then go and
20 follow up on those discrepancies?
21       MR. KOBRIN:  Object to form.
22       THE WITNESS:  Yes.  If and only if it
23 was determined that it was a substantial loss and
24 we should start the process.  If I'm down one
25 tablet out of 10,000, nothing happened.

Page 155

1  BY MR. HUDSON:
2     Q.  Right.  So in those instances on these
3  line items where it was determined that there
4  would be a substantial loss, do you as you're
5  sitting here today have any personal knowledge
6  about whether or not anyone from Giant Eagle then
7  followed up and followed the procedure and filled
8  out paperwork to report those issues?
9        MR. KOBRIN:  Object to form.
10       THE WITNESS:  Yes.  We went through that
11 procedure already.
12 BY MR. HUDSON:
13    Q.  Right.  I know.  And you've said you
14 expected the paperwork to be filled out; correct?
15    A.  Correct.
16    Q.  All I'm doing is I just want to make
17 sure that I've exhausted what you actually know in
18 your head.
19       Do you know, as you sit here today, whether
20 any paperwork for any of these items was, in fact,
21 actually filled out?
22       In other words, were you personally involved
23 in the process?  Did you hear that it got filed?
24 Did anybody report back to you in any way, shape
25 or form?  Do you know whether or not for the line

Page 156

1  items we've talked about whether or not anybody
2  actually went and filed the paperwork?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  I can't tell you from six
5  years ago whether it happened or not.  I know it
6  happens.  I know what the procedure is.  I can't
7  remember in 2013 if someone filled one out.
8     I completely understand.  That's all I'm
9  asking, is the best of your recollection.  That's
10 all you can do.
11       MR. HUDSON:  I don't have any further
12 questions.
13       MR. KOBRIN:  Let's go off the record
14 real quick.
15       THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 6:15 p.m.
17       (Recess from 6:15 p.m. to 6:34 p.m.)
18       THE VIDEOGRAPHER:  We're going back on
19 the record.  The time is 6:34 p.m.
20              EXAMINATION
21 BY MR. KOBRIN:
22    Q.  Mr. Bencivengo, earlier today in your
23 testimony you talked about opioid usage and
24 scripts going up and down in the past.  I think
25 you said that you thought they might have started

Page 157

1  going down around 2014.  Do you recall that
2  testimony?
3     A.  Yes.
4     Q.  On what did you base that testimony?
5     A.  Just on my readings and continuing
6  education, journals outside of Giant Eagle.
7     Q.  So that wasn't based on any Giant Eagle
8  data?
9     A.  No.
10    Q.  What kind of Giant Eagle data did you
11 get?  Did you not get specific opioid data
12 concerning opioid use?
13    A.  The only data I get weekly is the Mono
14 scripts that my 32 stores fill.  It's a
15 conglomeration of every script we fill.
16    Q.  It's not broken out?
17    A.  It's not broken out.  The only thing we
18 break out is flu shots.
19    Q.  We talked about licensed doctors who had
20 caused some concerns for pharmacists in the
21 pharmacies you oversee as a PDL.  Do you recall
22 that testimony?
23    A.  Yes.
24    Q.  And opposing counsel asked you lots of
25 questions about whether you refused scripts from

Page 158

1 those doctors as a matter of policy or how you
2 kept track of those doctors or which scripts were
3 refused. Do you recall that?
4     A.  Yes.
5     Q.  If a doctor was identified as a licensed
6 doctor who was causing concern for pharmacists,
7 what steps would your pharmacists take in your
8 pharmacies?
9     A.  Well, I think, for the most part, you go
10 in the stores and see a doctor's name on a cork
11 board, taped to a monitor so that anybody that
12 comes in there is aware that we're not not filling
13 all scripts from this doctor, but we're going to
14 scrutinize and drag that prescription through the
15 mud as much as possible to make sure it's for a
16 legitimate purpose.
17     A guy comes in. It's after the hours. We
18 can't get ahold of the doctor. It's not getting
19 filled. What we normally do after that is send an
20 email out at times or call the local stores and
21 say we just turned this guy away and this is the
22 reason. It goes out to the stores. I've had
23 times or I've heard of times where other stores,
24 CVS, has called us. If we have a store across the
25 street, a competitor, we may call the competitor

Page 159

1 and say, you know what, we just sent this guy
2 there with a script. He took it back. He may be
3 coming over to you now and this is why. But
4 they're in the same area, so they have all the
5 same docs anyway.
6     Q.  So even if the person with a script from
7 the doctor who's kind of identified by the
8 pharmacy, even if that particular person bringing
9 that particular script in didn't raise any red
10 flags, you would still scrutinize that script?
11         MR. HUDSON:  Object to the form.
12 BY MR. KOBRIN:
13     Q.  Would you still scrutinize the script
14 even if the patient bringing in the script from a
15 doctor who had caused some concern for your
16 pharmacists? Would you still scrutinize it even
17 if there were no red flags?
18         MR. HUDSON:  Object to the form.
19         THE WITNESS:  If it's from that doctor,
20 is that what you're asking?
21 BY MR. KOBRIN:
22     Q.  Yes.
23     A.  We would scrutinize it.
24     Q.  How would you scrutinize it?
25     A.  Reading the OARRS report, calling for

Page 160

1 the diagnosis whether he wants to give it to us or
2 not, and only filling it during his business
3 hours. And if you can't get ahold of him to
4 verify that he even wrote the script, then we
5 would either give it back or -- it all depends.
6     There's two options. We'll call the doctor
7 in the morning for you. Come back and get it. Or
8 the guy might say, no, just give it to me. Then
9 we would try to call CVS or send an email out and
10 warn we just gave the script back. This is why.
11     Q.  You said that anyone who comes in can
12 see the name on the cork board. By that do you
13 mean anyone, customers?
14     A.  No. It's back in the pharmacy facing
15 us.
16     Q.  So everyone at the store would know to
17 scrutinize this doctor's script?
18     A.  The pharmacists, yes.
19     Q.  We talked earlier in relation to your
20 testimony about doctors who were licensed but
21 still caused some concern to your pharmacists
22 about rejecting scripts. Do you recall that?
23     A.  Yes.
24     Q.  And I know you said that you were -- I
25 believe your testimony was that you were a hundred

Page 161

1 percent certain that it happened and the scripts
2 were rejected, but you couldn't give an exact
3 description of when that happened. Do you recall
4 that?
5     A.  Yes.
6     Q.  Is that accurate?
7     A.  It's an inexact number. I would say
8 that it happens weekly for the main reason, which
9 hasn't changed, is they always need it two or
10 three days early, early, early. So you start
11 billing. It comes back too soon. You look at the
12 OARRS report. You see the last time it was
13 filled, and we don't fill it.
14     Q.  So it did happen regularly, we'll say,
15 that scripts were rejected at the pharmacy that
16 you oversaw?
17     A.  Correct.
18         MR. HUDSON:  Object to the form.
19 BY MR. KOBRIN:
20     Q.  Did it happen regularly?
21     A.  Yes.
22     Q.  You testified a little bit about
23 thresholds and the thresholds, whether they be
24 from McKesson or Anda or HBC. Do you remember
25 that?

Page 162

1    A.  Yes.
2    Q.  And I think at one point you told
3  opposing counsel that at least ten times you had
4  not raised thresholds when a store was hitting its
5  threshold, I guess.  Do you recall that testimony?
6    A.  Correct, yes.
7    Q.  When you said that at least ten times
8  you had not raised the threshold of a store that
9  was hitting its threshold, did you mean every time
10  the stores hit their thresholds, they raised their
11  thresholds except those ten times?
12    A.  No.  I meant that if a store reached out
13  to me and said we can't get a product, and they
14  weren't even aware of a threshold, but I get that
15  report that was shown to me, at least ten times I
16  would have just -- no matter what the reason was.
17  Most of the time it was because we were getting
18  close to the end.  I just would not okay an
19  increase in threshold.  The majority of the time I
20  get that report and just delete it.  I wasn't a
21  fan of increasing thresholds.
22    Q.  So they would be up against the
23  thresholds or they would be passing their
24  threshold and they wouldn't ask you and you
25  wouldn't ask them.

Page 163

1    A.  Correct.  They didn't know there was a
2  threshold.  They didn't know there was a
3  threshold.  They never asked if there was a
4  threshold and never asked me to increase the
5  threshold, so I didn't do it.
6    Q.  So the at least ten times was situations
7  where they explicitly asked you and you said no?
8    A.  Correct.  Specifically called, said we
9  can't get this.  I need you to help me get it.
10    Q.  We can return to Exhibits 11 and 12 for
11  a moment.  Do you recall opposing counsel walked
12  you through a couple of lines on the pages in
13  these audit reports or documents that related to
14  your stores?
15    A.  Yes.
16    Q.  How many stores do you oversee as a PDL?
17    A.  32.
18    Q.  And there are about -- I think opposing
19  counsel represented there were about 15 pages of
20  your stores in here?
21    A.  Correct.
22    Q.  So there's less than a page per store;
23  is that right?
24    A.  Correct.
25    Q.  And opposing counsel walked you through,

Page 164

1  I think, a variety of different products, mostly
2  hydrocodone combination products and Ritalin
3  products; is that right?
4    A.  Correct.
5    Q.  A lot of them you said that you could
6  resolve looking at the explanation provided on the
7  document; is that right?
8    A.  Yep.
9    Q.  And then there were a handful that you
10  said might require further investigation or a DEA
11  106?
12    A.  Correct.
13    Q.  What does it tell you that there were a
14  lot on here that related to -- that raised
15  issues -- strike that.
16    What does it tell you -- what does it mean to
17  you that there are lines on this report that are
18  resolved in the report or that you can resolve
19  simply by looking at the report?
20    MR. HUDSON:  Object to the form.
21  BY MR. KOBRIN:
22    Q.  Strike that.
23    We saw a lot of different amounts that the
24  count was off.  Some of them were off by one.
25  Some of them were off by as much as 90; is that

Page 165

1  right?
2    A.  Yes.
3    Q.  And some of them you said were off
4  because there's a tablespoon or less that's going
5  to stick to the container; is that accurate?
6    A.  Correct.  It's the same medicine over
7  and over.  It's a thick cough medicine.
8    Q.  So those seem to be small discrepancies;
9  is that accurate?
10    MR. HUDSON:  Object to the form.
11  BY MR. KOBRIN:
12    Q.  Are those discrepancies significant to
13  you?
14    A.  No.
15    Q.  What does it mean that there are
16  discrepancies that aren't significant to you that
17  are in this report?
18    A.  It tells me that Giant Eagle has these
19  stringent guidelines in place to capture every
20  little thing down to a tablespoon of liquid that
21  in the big picture is totally irrelevant because
22  we're eyeballing something.
23    Not only does it capture a tablespoon of
24  liquid.  It itemizes it, makes you put a reason in
25  why.  And for the majority of the time, there's no

Page 166

1 discrepancy. We know where it's at, and we don't
2 have a loss.
3 　　Q. Some of them were as high as 90 as we
4 just said or even higher in some cases. How
5 many -- strike that.
6 　　How many pills do your pharmacies dispense
7 each month?
8 　　A. Well, let's put it this way. My 32
9 stores a week dispense -- last week they dispensed
10 450,000 scripts. And if they were all just
11 scripts for ten, it's thousands and thousands and
12 thousands and thousands of pills.
13 　　Q. So being off by one or two or a
14 tablespoon or even being off by amounts in the 10s
15 and 20s or even higher, is that a significant
16 loss? Is that a significant margin of error?
17 　　A. No. It's not a significant loss when
18 you're talking -- that's what they're calling for.
19 Because if you using thousands of tablets and
20 you're down ten, it's not a significant loss.
21 　　Q. You mentioned that for the few that
22 opposing counsel identified where the issue could
23 not be resolved by looking at the document, that
24 Giant Eagle would fill out a DEA 106 form; is that
25 right?

Page 167

1 　　MR. HUDSON: Object to the form. It
2 mischaracterizes the testimony and the evidence.
3 　　You can answer.
4 　　THE WITNESS: We fill out a 106 form.
5 That's the procedure we're supposed to follow;
6 correct.
7 BY MR. HUDSON:
8 　　Q. So for the ones that were unresolved and
9 were significant, would you fill out an 106?
10 　　THE WITNESS: Those are the ones, not
11 all. Not all the unknowns are filled out, just
12 the ones that we deem are significant losses.
13 That starts the process, 106. We don't wait for
14 any investigation. We fill the 106 form out, get
15 it in, which can be amended later when we find
16 them.
17 BY MR. KOBRIN:
18 　　Q. And that significance test, is that
19 something that Giant Eagle created or is that
20 something --
21 　　A. It's something the DEA keeps it gray.
22 If you feel that that number is a significant
23 number of the tablets you dispensed, then get it
24 in.
25 　　Q. So the DEA says they only want you to

Page 168

1 report significant --
2 　　A. Significant losses, yeah.
3 　　Q. That's what they say?
4 　　A. That's why I keep using that word. It's
5 not a Giant Eagle thing. That's from the DEA
6 website.
7 　　Q. After you fill out the 106, is Giant
8 Eagle done with its issue here --
9 　　A. No.
10 　　Q. -- with resolving the numerical
11 discrepancy?
12 　　A. No. We have people run reports in the
13 background of everything we ordered from whether
14 it's Anda, our warehouse, or whatnot. We go
15 through all dispensings, make sure all that is
16 added up.
17 　　There was an example in here where that one
18 script was missing that we were supposedly short
19 90, but the script was missing. So we weren't
20 short 90. There's times where they dispense
21 something. We have minus. We should have zero.
22 We should have ten. They dispense -- the script
23 is for 90. We have 10. So we're down 80 on the
24 report, but then the next day it comes in. So
25 we're back to even again.

Page 169

1 LP gets involved. Rick Shaheen will come
2 out. He comes out to any store. We ask him to
3 come out to look at cameras, to do investigations.
4 Two instances come to mind right now where we
5 actually saw the pharmacist while he's talking to
6 another team member take the bottle of tablets and
7 just throw them in the garbage can. When we see
8 that, both times the pharmacist actually went into
9 the dumpsters at Giant Eagle, not our trash, but
10 the big huge dumpsters in the parking lot and
11 found the tablets.
12 　　Q. So you were able to the video to show
13 that a pharmacist inadvertently had thrown them
14 away?
15 　　A. Yeah.
16 　　Q. And then that pharmacist went out and
17 got them?
18 　　A. He went out, yeah.
19 　　Q. So this is after this. You guys kind of
20 work to resolve it and then do you contact the DEA
21 and say you found it?
22 　　A. Well, I close out that other form I was
23 telling you about. We email Lynne and say this
24 closes out. What happens from that point on is
25 the office. I don't know after that.

Page 170

1   Q.  And you mentioned LP.  What is LP?
2   A.  Loss prevention.
3   Q.  And they're the people who kind of help
4  you research all these issues at the next level?
5   A.  Yes.
6   Q.  I think we're all set.
7       MR. KOBRIN:  Pass the witness.
8           RE-EXAMINATION
9  BY MR. HUDSON:
10   Q.  In terms of scripts rejected, you
11  testified that it happens weekly.  Is that just
12  your sense from, as you sit here today, the best
13  of your recollection?
14   A.  It's my sense of just from me being in
15  the store from the time period we're talking, to
16  conversations about compliance with my team
17  members, what are some of the reasons we're
18  turning away scripts.
19   Q.  Is there any reason why Giant Eagle
20  couldn't have kept a scripts rejected log or
21  written down on the computer system or somewhere
22  each instance where a prescription was rejected
23  and the reason it was rejected?
24       MR. KOBRIN:  Object to the form.
25       THE WITNESS:  There would be no reason

Page 171

1  to keep a log like that.  You're determining
2  whether you're going to fill something or not fill
3  it.  You make the determination.  You can put into
4  the computer refilled too soon or whatnot.  If you
5  take the script back, there's no record in the
6  computer of the script.
7  BY MR. HUDSON:
8   Q.  Right.  All I'm saying is in the
9  computer system or somewhere could Giant Eagle
10  keep a log of scripts that were rejected due to
11  suspicion of diversion?
12       MR. KOBRIN:  Object to form.
13       THE WITNESS:  No, because some of those
14  don't even get into our system.  If you bring a
15  piece of paper to me and I do everything that we
16  spoke about here for the last -- since 1:00 or
17  2:00, that prescription might not get dropped
18  through our system and even get in the system.  So
19  there's no record of the prescription even there.
20  We just hand it back to you.  You take it away.
21  BY MR. HUDSON:
22   Q.  Right.  I guess what I'm saying is, is
23  there any reason why Giant Eagle couldn't keep a
24  log of some kind or a repository, like you take
25  the script and you go, this thing, this just

Page 172

1  doesn't look right to me.  I'm not filling this
2  script.  In my professional judgment, this isn't
3  legitimate.  Here's the name and what they were
4  trying to fill and then the reason for rejecting
5  it is because this doesn't look legitimate to me
6  and I think it's a possible risk of diversion.
7      Is there any reason why Giant Eagle
8  pharmacists couldn't as a matter of practice have
9  kept a log of prescriptions where they decided not
10  to fill them?
11       MR. KOBRIN:  Object to form.
12       THE WITNESS:  I don't know.  I don't
13  know why we would ever look at that log.  I do not
14  know what purpose it would serve.  We've already
15  determined we're not filling it.
16  BY MR. HUDSON:
17   Q.  Well, one purpose would just be to have
18  some sense, as we sit here today, of how many
19  prescriptions there were that were at risk of
20  diversion that were rejected; right?
21       MR. KOBRIN:  Object to form.
22       THE WITNESS:  It would help you here
23  today, yes.  It would help what you're trying to
24  go after.  It would help.  But it wouldn't give us
25  anything.

Page 173

1  BY MR. HUDSON:
2   Q.  Well, it would help Giant Eagle, too,
3  because if you said that weekly -- it's your sense
4  that weekly pharmacists within your territory are
5  rejecting filling prescriptions, you could go to
6  that rejected prescription log and look at it.
7  And then we'd be able to say, yeah, Pennsylvania
8  is right.  Look down the log.  Every week there's
9  a pharmacist that's not filling a prescription.
10       MR. KOBRIN:  Object to form.
11  Argumentative.
12       THE WITNESS:  That was my response.  It
13  would help your case, but it wouldn't do anything
14  for me.  I would never have to see that.  They
15  didn't fill the script.  They did what they're
16  supposed to do.
17  BY MR. HUDSON:
18   Q.  Were you ever concerned or to your
19  knowledge was anyone at Giant Eagle ever concerned
20  about diversion of opioids?
21   A.  All of Giant Eagle is concerned.  Any
22  pharmacist, any pharmacy is concerned about
23  diversion of opioids.
24   Q.  Would keeping records and trying to
25  track the reasons why prescriptions are not filled

Page 174

1  potentially serve a role to Giant Eagle in
2  becoming better at preventing diversion?
3      MR. KOBRIN:  Object to form.
4      THE WITNESS:  I don't believe it would.
5  BY MR. HUDSON:
6      Q.  Similarly, on Exhibits 11 and 12, when
7  you look at the line items, there's well over a
8  hundred, probably a couple hundred line items from
9  pharmacies in your territory of inventory
10 discrepancies just for these two months, right --
11     MR. KOBRIN:  Object to form.
12 BY MR. HUDSON:
13     Q.  -- that we've looked at?
14     A.  We looked at about 20 discrepancies.
15 The rest of the report are all resolved issues.
16     Q.  Well, let's look at back then at
17 Exhibit 11.  We looked at 20 discrepancies where
18 the reason for it was unknown; right?
19     MR. KOBRIN:  Object to form.  If we're
20 going to say 20, we should know what we're talking
21 about here.
22 BY MR. HUDSON:
23     Q.  We went through.  The record is what is.
24 We went through them; right?  Whatever it is it
25 is.

Page 175

1      A.  We looked at some.  We looked at some.
2      Q.  Right.  There were a number that we
3  walked through where the reason for it was
4  unknown; right?  But in these two reports, in each
5  report there's well over a hundred discrepancies
6  that are being reported by pharmacies that are in
7  your territory; correct?
8      MR. KOBRIN:  Object to form.
9      THE WITNESS:  No.  I don't know where
10 that number is coming from.
11 BY MR. HUDSON:
12     Q.  Let's look at Exhibit 11 then.  We're
13 going to look on the left.  The specialist is Fred
14 Bencivengo.  If we look down the first page, we've
15 got 23.  If you go to the next page, 35.  I mean,
16 you just go on down.  It's pages; right?
17     Then we go to the third page, the next page,
18 every one of these line items are a discrepancy
19 where the inventory count is off; right?
20     MR. KOBRIN:  Object to form.
21 BY MR. HUDSON:
22     Q.  We're up to page 7.  We keep going.
23 Page 8, page 9, page 10, page 11, page 12, page
24 13, page 14, page 15, up through half of page 16,
25 those are all pharmacies that were in your

Page 176

1  territory where the count at the store was off.
2      In other words, the expected count -- when
3  they went to audit it, the expected count was
4  different than the actual count.
5      MR. KOBRIN:  Object to form.
6      THE WITNESS:  No, based on counting of
7  certain NDCs as we discussed.  But the majority
8  that I'm looking at out of the ones you just read
9  have all been resolved.
10     I don't want to keep going around and around
11 in circles.  But the 20 that we spoke about that
12 were unresolved or unknown were issues.  No action
13 is needed here.  This report is working as needed.
14     There's expected.  There's an actual.
15 There's a discrepancy.  There's a reason why
16 there's a discrepancy.  All pills accounted for.
17 BY MR. HUDSON:
18     Q.  Where is the column that I look at that
19 says issue resolved?
20     A.  Discrepancy, we are 20 short on this NDC
21 because we were 20 over on the other NDC.  20
22 over.  Under is zero.  We have the right amount.
23     Q.  Which we used to get rid of?
24     A.  Yeah.
25     Q.  So in your mind, as you sit here today,

Page 177

1  your view is that that discrepancy is resolved?
2      A.  Yes.
3      Q.  But up until the point that they used
4  one product to get rid of the other product, at
5  some point in time, that inventory count was off?
6      A.  Perpetual, yeah, on paper.
7      Q.  Right.  That's all I'm getting at, is
8  the idea that the inventory count or the inventory
9  system was beyond there being any issues and that
10 there was this closed system where the count was
11 tracked closely all the way through until the
12 prescription was filled.
13     All I'm getting at is Giant Eagle created
14 this system to do an audit, and at least in the
15 two months that we've looked at, the audit report
16 generated well over a hundred items each month
17 where there's a discrepancy between what was
18 expected to be there and what was actually there?
19     MR. KOBRIN:  Object to form.
20 BY MR. HUDSON:
21     Q.  Do you agree with that or disagree with
22 that?
23     MR. KOBRIN:  Object to form.
24     THE WITNESS:  I disagree with it based
25 on -- we're saying two separate things.  The

Page 178

1 inventory -- I don't care about the discrepancy
2 report. The inventory is there. We're expected
3 to have it. We have it. But we have an
4 explanation. We also have a report -- we also
5 have this other -- like we're 20 short in NDC
6 because we're 20 over.
7     We also have -- we also have an NDC that we
8 shouldn't have any that we have 20. So the math
9 works. They found it. That's the purpose of
10 this, to make sure that we have the correct number
11 of tablets, not the correct number of NDC, just
12 the correct number of tablets.
13 BY MR. HUDSON:
14     Q. Somebody at Giant Eagle though decided
15 to come up with this audit program, and it's
16 flagging well over a hundred issues. Can we agree
17 with that?
18     A. Yes.
19     Q. Now, when you talked about thresholds,
20 do you know, do you have any sense, even a
21 ballpark idea, of how many times stores within
22 your territory were up against hitting thresholds
23 each month over the 12 years you were a PDL?
24     A. No.
25     Q. I don't believe I have any further

Page 179

1 questions. Thank you for your time.
2         RE-EXAMINATION
3 BY MR. KOBRIN:
4     Q. One quick question. Opposing counsel
5 just raised the fact that someone came up with
6 this program and it's flagging over a hundred
7 issues. You noted that a lot of those issues were
8 resolved; is that right?
9     A. Correct.
10     Q. What does that tell you about the system
11 that's flagging all the issues even though they're
12 resolved?
13     A. It's collecting everything. We don't
14 have to have a report that shows us this. We're
15 overkilling. If the purpose of keeping -- if the
16 purpose is diversion, preventing diversion, then
17 we're doing it.
18     We're caught up on NDC numbers, but we have
19 the right amount of stuff in the pharmacy, and
20 that's what this report is telling me. That's why
21 I look at the report. He counted 14 or 20 on
22 here. Mostly every single one of those were
23 accounted for. There were no issues on this
24 report.
25     Q. Is this a good record of what's

Page 180

1 happening at the pharmacy?
2     A. Yes.
3     Q. Thank you. No further questions.
4         RE-EXAMINATION (Continued)
5 BY MR. HUDSON:
6     Q. When you say this is a good record of
7 what's happening at the pharmacies, what do you
8 mean by that?
9     A. It shows that we're in control of the
10 inventory.
11     Q. Where do I look on that report to see
12 that everything that's supposed to be in the
13 pharmacy is in the pharmacy?
14         MR. KOBRIN: Object to form.
15         THE WITNESS: This discrepancy, we've
16 covered it. My answer is not going to change.
17 BY MR. HUDSON:
18     Q. I understand. I'm just trying to figure
19 out from that report how you reach the conclusion
20 that the system is working when we went over a
21 number of items where the explanation for the
22 discrepancy is unknown. We only looked at two
23 reports from two months.
24         MR. KOBRIN: Object to form.
25 Argumentative. Asked and answered.

Page 181

1         THE WITNESS: I've already answered that
2 question. I don't know what else to add to that.
3 BY MR. HUDSON:
4     Q. I just want to give you another chance
5 if there's anything you can think of as to why it
6 is in your mind you think that those reports
7 indicate that Giant Eagle was dealing with all of
8 the issues to prevent diversion when we went
9 through several -- a lot of items on each one of
10 the reports and the reason for the discrepancy was
11 unknown and they were hydrocodone combination
12 products.
13         MR. KOBRIN: Object to form.
14 Misrepresents the record. Argumentative.
15         THE WITNESS: That's not factual. We
16 went through about 20. Some were hydrocodone.
17 Some were Ritalin. Some were dextromethorphan.
18 So yes, there were some on there, but there were a
19 lot of others on here that are unresolved.
20         MR. HUDSON: No further questions.
21         THE VIDEOGRAPHER: This marks the end of
22 the testimony of Fred Bencivengo. We are going
23 off the record. The time is approximately
24 7:00 p.m.
25         (Whereupon, at 7:00 p.m., the taking of

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 the instant deposition ceased.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 183

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF ALLEGHENY          )  SS:
3          C E R T I F I C A T E
4      I, Ann Medis, Registered Professional
5 Reporter, Certified Livenote Reporter and Notary
6 Public within and for the Commonwealth of
7 Pennsylvania, do hereby certify:
8      That FRED BENCIVENGO, the witness whose
9 deposition is hereinbefore set forth, was duly
10 sworn by me and that such deposition is a true
11 record of the testimony given by such witness.
12      I further certify the inspection,
13 reading and signing of said deposition were not
14 waived by counsel for the respective parties and
15 by the witness.
16      I further certify that I am not related
17 to any of the parties to this action by blood or
18 marriage and that I am in no way interested in the
19 outcome of this matter.
20      IN WITNESS WHEREOF, I have hereunto set
21 my hand this 25th day of January, 2019.
22
      _____
23           Notary Public
24
25

Page 184

1 COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
COUNTY OF ALLEGHENY          ) S H E E T
2
3    I, FRED BENCIVENGO, have read the foregoing
pages of my deposition given on January 22, 2019,
4 and wish to make the following, if any,
amendments, additions, deletions or corrections:
5
6 Page  Line  Change and reason for change:
7 ____ ____ _____
8 ____ ____ _____
9 ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18
19 In all other respects, the transcript is true and
correct.
20
21    _____
         FRED BENCIVENGO
22
23 _____ day of _____, 2019.
24 _____
         Notary Public
25