```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :
 7
 8              HIGHLY CONFIDENTIAL
 9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                    - - - -
12                JANUARY 18, 2019
13                    - - - -
14      VIDEOTAPED DEPOSITION OF MICHAEL BIANCO,
15   taken pursuant to notice, was held at Marcus &
16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,
17   Pennsylvania 15219, by and before Ann Medis,
18   Registered Professional Reporter and Notary Public in
19   and for the Commonwealth of Pennsylvania, on Friday,
20   January 18, 2019, commencing at 9:07 a.m.
21                    - - - -
22           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23               deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  A P P E A R A N C E S
 2    On behalf of Plaintiffs
 3             WAGSTAFF & CARTMELL, LLP
               BY:  TYLER HUDSON, ESQUIRE
 4             AND  THOMAS SIDLINGER, ESQUIRE
               4740 Grand Avenue, Suite 300
 5             Kansas City, Missouri  64112
               816.701.1100
 6             thudson@wcllp.com
               tsidlinger@wcllp.com
 7
      On behalf of Defendant AmerisourceBergen Drug
 8    Corporation
 9             (By Phone/Livestream)
               JACKSON KELLY, LLP
10             BY:  ANDREW N. SCHOCK ESQUIRE
               50 South Main Street, Suite 201
11             Akron, Ohio  44308
               330.252.9078
12             anschock@jacksonkelly.com
13
      On behalf of Defendant Cardinal Health, Inc.
14
               PIETRAGALLO GORDON ALFANO BOSICK &
15             RASPANTI, LLP
               BY:  JOHN A. SCHWAB, ESQUIRE
16             One Oxford Centre, 38th Floor
               301 Grant Street
17             Pittsburgh, Pennsylvania  15219
               412.263.2000
18             jas@pietragallo.com
19
      On behalf of Defendants Endo Pharmaceuticals, Endo
20    Health Solutions and Par Pharmaceuticals
21             (By Phone/Livestream)
               ARNOLD & PORTER KAYE SCHOLER LLP
22             BY:  SEAN P. HENNESSY, ESQUIRE
               601 Massachusetts Avenue, NW
23             Washington, DC  20001-37453
               202.942.5743
24             sean.hennessy@arnoldporter.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S (Continued)
 2    On behalf of Defendant HBC Service Company
 3              MARCUS & SHAPIRA, LLP
               BY:  JOSHUA A. KOBRIN, ESQUIRE
 4             AND  ROBERT M. BARNES, ESQUIRE
               One Oxford Centre, 35th Floor
 5             Pittsburgh, Pennsylvania  15219
               412.471.3490
 6             jkobrin@marcus-shapira.com
               rbarnes@marcus-shapira.com
 7
 8    On behalf of Defendant McKesson Corporation
 9             (By Phone/Livestream)
               COVINGTON & BURLING, LLP
10             BY:  RAJ PAUL, ESQUIRE
               One CityCenter
11             850 Tenth Street, NW
               Washington, DC  20001-4956
12             202.662.5807
               rpaul@cov.com
13
14    On behalf of Defendant Walmart
15             (By phone/Livestream)
               JONES DAY
16             BY:  NICOLE LANGSTON, ESQUIRE
               77 West Wacker
17             Chicago, Illinois 60601
               312.782.3939
18             nlangston@jonesday.com
19
      Also present
20
               Adam Balenciaga, legal videographer
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      * I N D E X *
 2    MICHAEL BIANCO                                PAGE
 3      EXAMINATION BY MR. HUDSON              8, 191
        EXAMINATION BY MR. SIDLINGER              163
 4      EXAMINATION BY MR. KOBRIN            185, 201
 5
 6           * INDEX OF HBC-BIANCO EXHIBITS *
 7    NO.                 DESCRIPTION           PAGE
      Exhibit 1   Giant Eagle Pharmacy As of      28
 8                February 2015 organizational chart
                  HBC_MDL00002219
 9
      Exhibit 2   Email chain, 9/9/13, from G.     36
10                Carlson to K. Remas, subject: RE:
                  Controls at HBC
11                HBC_MDL000135002 - 00135024
12    Exhibit 3   20131030_Daily_HBC_Controls      52
                  HBC_MDL00002348
13
      Exhibit 4   Email, 10/25/13, from L. Wasielak  52
14                to G. Carlson, et al., subject:
                  Anda/GE Demo Meeting Minutes 131016,
15                attaching Anda GE Meeting
                  Minutes_131016.docx
16                HBC_MDL00135030 - 00135036
17    Exhibit 5   Email, 11/11/13, from G. Carlson   56
                  to M. Bianco, subject: Fw: Controlled
18                Substance Suspicious Monitoring,
                  attaching invite_4469.ics
19                HBC_MDL00136771 - 00136772
20    Exhibit 6   Email chain, 12/5/13, from J.      60
                  Millward to A. Mollica, et al.,
21                subject: 2401
                  HBC_MDL00132815 - 00132816
22
      Exhibit 7   Email chain, 1/11/14, from G.      71
23                Carlson to M. Bianco, subject: Fyi
                  FW: Daily HBC Suspicious Purchasing
24                Report - 01/09/14
                  HBC_MDL00134729
25
```

```
 1       * INDEX OF HBC-BIANCO EXHIBITS (Continued) *
 2    NO.               DESCRIPTION                    PAGE
      Exhibit 8    Email chain, 1/15/14, from G.          87
 3                 Carlson to J. Millward, et al.,
                   subject: FW: Qualitest SOM,
 4                 attaching Wholesaler
                   Questionnaire.docx
 5                 HBC_MDL00134936 - 00134940
 6    Exhibit 9    Email chain, 1/22/14, from J.          89
                   Millward to G. Carlson, et al.,
 7                 subject: FW: Wholesale Distributor
                   Questionnaire, attaching Wholesale
 8                 Distributor Questionnaire
                   HBC_MDL00135570 - 0013557
 9
      Exhibit 10   Qualitest Wholesale Distributor/      90
10                 Chain Distribution Center
                   Questionnaire
11                 ENDO_HSGAC_0000841 - 0000843
12    Exhibit 11   Email chain, 5/9/14, from M. Cullen   95
                   M. Bianco, subject: FW: Purdue
13                 Meeting Request
                   HBC_MDL00154218 - 00154219
14
      Exhibit 12   Email, 7/31/14, from E. Brantley      97
15                 to M. Murphy, subject: Giant Eagle
                   ENDO_HSGAC_0017819 - 0017820
16
      Exhibit 13   Email, 8/22/14, from M. Murphy to     97
17                 E. Brantley, subject: FW: Qualitest/
                   Giant Eagle, attaching Risk
18                 Evaluation Report by T. Sheller
                   ENDO_HSGAC_0007616 - 0007639
19
      Exhibit 14   Email chain, 10/1/14, from M.        111
20                 Bianco to J. Millward, subject: FW:
                   Narcs found in tote
21                 HBC_MDL00137363 - 00137364
22
      Exhibit 15   Email, 4/9/15, from S. Green to D.   134
23                 Stevens, et al., subject: All
                   policies for VAWD reflected as of
24                 5:00pm today, attaching various
                   policies
25                 HBC_MDL00078594 - 00078668
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        * INDEX OF HBC-BIANCO EXHIBITS (Continued) *
 2    NO.                   DESCRIPTION                  PAGE
      Exhibit 16  Invitation from G. Carlson to R.      151
 3                McClune, et al., for Pharmacy
                  Quarterly Meeting on 11/11/14
 4                HBC_MDL00015549 - 00015608
 5    Exhibit 17  Email chain, 12/18/13, from G.        163
                  Carlson to M. Bianco, et al.,
 6                subject: RE: Hydrocodone APAP/
                  Elixir/TabConv Progr status
 7                HBC_MDL00171642 - 00171645
 8    Exhibit 18  Email chain, 5/22/14, from G.         172
                  Carlson to M. Bianco, subject: Re:
 9                CSMP Report: Follow-Up with Account
                  Manager
10                HBC_MDL00135101 - 00135103
11    Exhibit 19  Email chain, 4/18/14, from M.         179
                  Bianco to G. Carlson, subject: Re:
12                35 missing tote
                  HBC_MDL00135668 - 00135670
13
14                          - - - -
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2                    - - - -

 3              THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Adam Balenciaga.  I'm a

 5    videographer retained by Golkow Litigation

 6    Services.  Today's date is January 18, 2019, and

 7    the time is 9:07 a.m.

 8         This video deposition is being held at

 9    Marcus & Shapira, LLP, One Oxford Centre, 35th

10    Floor, Pittsburgh, PA 15219, in the matter of

11    National Prescription Opiate Litigation,

12    MDL No. 2804, for the United States District Court

13    for the Northern District of Ohio, Eastern

14    Division.

15         The deponent is Mike Bianco.

16         All counsel will be noted on the stenographic

17    record.  Will all counsel identify themselves.

18              MR. HUDSON:  Ty Hudson and Thomas

19    Sidlinger of Wagstaff & Cartmell for plaintiffs.

20              MR. SCHWAB:  John Schwab on behalf of

21    Cardinal Health.

22              MR. KOBRIN:  Joshua A. Kobrin of Marcus

23    & Shapira on behalf of HBC Service Company.

24              THE VIDEOGRAPHER:  Anyone on the phone?

25              MR. PAUL:  This is Raj Paul of Covington
```

Highly Confidential - Subject to Further Confidentiality Review

1    & Burling on behalf of McKesson.

2         MS. LANGSTON:  This is Nicole Langston

3    from Jones Day on behalf of Walmart, Inc.

4         MR. HENNESSY:  This is Sean Hennessy

5    from Arnold & Porter on behalf of the Endo and Par

6    Pharmaceutical defendants.

7         MR. SCHOCK:  Andrew Schock of Jackson

8    Kelly on behalf of AmerisourceBergen Drug

9    Corporation.

10         THE VIDEOGRAPHER:  Anyone else?

11     The court reporter is Ann Medis and will now

12    swear in the witness.

13              MICHAEL BIANCO,

14    having been first duly sworn, was examined

15           and testified as follows:

16              EXAMINATION

17   BY MR. HUDSON:

18     Q.   Good morning, sir.  Could you please

19    state your name for the record.

20     A.   Mike Bianco.

21     Q.   Mr. Bianco, my name is Ty Hudson, and I

22    represent the plaintiffs here today.  I'm going to

23    be asking you some questions in this deposition.

24       What is your current address?  Do you live

25    here in the Pittsburgh area?

```
 1        A.   Yes, sir.

 2        Q.   And are you currently employed by Giant

 3   Eagle?

 4        A.   Yes.

 5        Q.   Have you ever had your deposition taken

 6   before?

 7        A.   No.

 8        Q.   Let's just make sure then that we

 9   understand the process before we get going.  I'm

10   going to be asking you questions, and you're going

11   to be giving answers.  Do you understand that?

12        A.   Yes.

13        Q.   At some point your counsel may put

14   objections on the record or other counsel may put

15   objections for the record for the court just to

16   preserve that.  Unless your counsel instructs you

17   not to answer, can we agree that you'll answer my

18   questions?

19        A.   Yes.

20        Q.   You do understand that you're under

21   oath.  Although we're here in an office at a law

22   firm, it has the same force and effect as if we

23   were in a courtroom in front of a judge and a

24   jury.  Do you understand that?

25        A.   Yes.
```

```
 1        Q.   If you don't understand my question,

 2   will you let me know so I can reframe it?

 3        A.   Yes.

 4        Q.   And the flip side of that is, is it fair

 5   that if you do answer my question, it's fair for

 6   me to assume that you did understand it?

 7        A.   Yes.

 8        Q.   And you're doing a great job of this,

 9   but we need audible answers rather than head

10   nodding or other nonverbals.  Okay?

11        A.   Understood.

12        Q.   And then lastly, at any time if you want

13   to take a break, just let me know and we can go

14   off the record.  All I would ask is that you

15   answer any question that's pending at the time.

16   Is that fair?

17        A.   Yes.

18        Q.   Let's just start with your preparation.

19   What did you do to prepare for this deposition

20   today?

21        A.   I met with counsel yesterday to discuss

22   the process.

23        Q.   About how long was that meeting?

24        A.   A few hours, five hours.

25        Q.   Did you look at any documents?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    I did.

2         Q.    Did those refresh your recollection in

3    any way?

4         A.    Yes.

5         Q.    Any particular documents you recall

6    reviewing that refreshed your recollection?

7              MR. KOBRIN:  Objection.  I don't want

8    him talking about particular documents.  That's

9    work product that we selected from the file.

10             MR. HUDSON:  You're taking the position

11   that it's privileged or work product if he

12   reviewed documents that refreshed his

13   recollection?

14             MR. KOBRIN:  The documents that I put

15   together I think are privileged, yeah.

16             MR. HUDSON:  Are you going to instruct

17   him not to answer?

18             MR. KOBRIN:  I'd rather you not answer

19   that.  Are there any documents that you would cite

20   that you particularly remember?  The answer "yes"

21   or "no" is fine, but I don't want to get into

22   specifics.  Are there particular documents that

23   you recall right now that refreshed your

24   recollection?

25             THE WITNESS:  No.
```

```
 1   BY MR. HUDSON:

 2        Q.   Let's shift gears and talk about your

 3   education.  Where did you attend college?

 4        A.   Duquesne University.

 5        Q.   And did you obtain a degree from

 6   Duquesne?

 7        A.   I did.

 8        Q.   What was your degree?

 9        A.   Doctor of pharmacy.

10        Q.   When did you graduate from pharmacy

11   school?

12        A.   2013.

13        Q.   And when did you start pharmacy school?

14        A.   2005.

15        Q.   And did you work while you attended

16   pharmacy school?

17        A.   I did.

18        Q.   And during that time, it looked to me,

19   and I've looked at your LinkedIn profile, so I'll

20   try to kind of shortcut this background, but it

21   looked like for most of the, I guess, 13 years,

22   from 2005 until the present, you've worked at

23   Giant Eagle with a couple of exceptions.  It looks

24   like you were at -- you were the director of

25   orientation of Duquesne; right?
```

```
 1        A.    Correct.

 2        Q.    And that was from 2008 to 2010?

 3        A.    Yes.

 4        Q.    And then it looked like you had about a

 5   five-month stint at HC Pharmacy in 2015.

 6        A.    Yes.

 7        Q.    Otherwise -- I guess one other.  It

 8   looked like you were a pharmacy intern at a

 9   women's hospital for about a year and a half.

10        A.    Correct.

11        Q.    But then otherwise, it looked like the

12   remaining 10 or 11 years were at Giant Eagle.

13        A.    Yes.

14        Q.    If you could, just walk me through those

15   jobs that you had at Giant Eagle and what your

16   responsibilities were.

17        A.    Starting from --

18        Q.    Starting from 2005.

19        A.    I started in 2005 as a pharmacy

20   technician doing day-to-day technician tasks,

21   which that would include ringing a register,

22   counting medication, data entry.  And then after

23   that I was on a --

24        Q.    If I could, now you're going to pharmacy

25   school and working at the same time?
```

```
 1        A.    Correct.

 2        Q.    Go ahead.

 3        A.    After that, I was on a software

 4   implementation team where we trained

 5   nonpharmacists, pharmacy staff how to use our

 6   dispensing software.  And then my work with Giant

 7   Eagle, then I was on a support desk team where our

 8   pharmacies would call in and ask questions

 9   pertaining to how to use the software.

10        From there I was manager of pharmacy

11   inventory and vendor relations, which essentially

12   was maximizing inventory utilization, so turns,

13   et cetera, with the main focus of reducing shrink,

14   the unknown loss, or I'm sorry, known loss which

15   would be expired products.

16        And then after that, I took a reduced

17   capacity because my school load picked up.  And

18   then from there I was category manager where I

19   oversaw our sourcing of products for pharmacy.

20        Q.    And is that the role you're still in

21   today?

22        A.    I'm sorry.  No.  I apologize.  After

23   that, I went to UPMC.  When I came back, now I'm

24   on what's called the managed care side where we

25   do -- my main focus is contracting with insurance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    companies.

 2         Q.   And you've had that role for a little

 3    more than three years?

 4         A.   Correct, 2015 I think, end of 2015.

 5         Q.   Let's go back, if we could, to the first

 6    role that you described, the pharmacy software

 7    implementation team.

 8         A.   That was the second.

 9         Q.   Oh, you're right.  You were pharmacy

10    intern for a couple years; right?

11         A.   Correct.  I think two years, yes.

12         Q.   So you're right.  The second job then,

13    the pharmacy software implementation team member,

14    was that software implementation at the Giant

15    Eagle retail pharmacies?

16         A.   Yes.

17         Q.   Did you have any responsibilities

18    related to the HBC warehouse?

19         A.   During?

20              MR. KOBRIN:  Object to form.

21    BY MR. HUDSON:

22         Q.   Doctor, this time period from 2007 to

23    2009 when you're dealing with software

24    implementation.

25         A.   When I was dealing with the software,
```

1    no.

2         Q.   At that point in time, from 2007 to

3    2009, were you aware that Giant Eagle had created

4    a warehouse?

5         A.   Yes.

6         Q.   Was that generally known as the HBC

7    Service Company warehouse or the HBC warehouse?

8         A.   I don't recall.  I think it was just the

9    warehouse.

10        Q.   Were you aware at that time or did you

11   become aware at some point that Giant Eagle had

12   created an operating division or an entity known

13   as HBC Service Company?

14             MR. KOBRIN:  Object to form.

15             THE WITNESS:  Can you repeat that.

16   BY MR. HUDSON:

17        Q.   Sure.  At this time in the 2009

18   timeframe, were you aware that Giant Eagle had

19   created an operating division or a subsidiary that

20   was known as HBC Service Company?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  When I was -- as a store

23   technician or intern and then on the pharmacy

24   team, the software implementation team, I don't

25   believe I was aware of that.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. HUDSON:

2        Q.   Did you become aware of that at some

3    point in time?

4        A.   Yes.

5        Q.   Do you have any sort of ballpark

6    recollection of when that was?

7        A.   When I took on the vendor relations,

8    inventory manager position.  So '9, '10.  '10 I

9    think is when I started that.

10       Q.   It looks like from your LinkedIn profile

11   maybe it was in 2011.

12       A.   Yes, yeah.

13       Q.   So fair to say that in the 2007 to 2009

14   timeframe, in your role as the pharmacy software

15   implementation team, did you have any occasion to

16   visit the warehouse, the HBC warehouse?

17       A.   During that time, no.

18       Q.   If we jump forward, it looks like as you

19   discussed, then you came back to Giant Eagle in

20   2011 on the inventory, focused on inventory?

21       A.   I came back originally on the pharmacy

22   support team, so fielding questions at a technical

23   help desk.

24       Q.   And where was that desk located?

25       A.   At our corporate office in Pittsburgh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And then were you promoted into the

 2   manager, pharmacy inventory and vendor income

 3   role?

 4        A.   Yes.

 5        Q.   And then I think you indicated at that

 6   time you learned about the HBC operating division.

 7        A.   Correct.

 8             MR. KOBRIN:  Object to form.

 9   BY MR. HUDSON:

10        Q.   And how did you learn of that?

11        A.   It would have been part of understanding

12   how our supply chain worked.

13        Q.   And what was your understanding at that

14   time of how the supply chain worked specifically

15   for controlled substances that were being shipped

16   through the HBC warehouse?

17        A.   Really just that we housed them, that we

18   had some of them in that location, and some were

19   sourced from other locations like McKesson or

20   Anda.

21        Q.   At this timeframe from 2011 to 2013, did

22   you ever visit the HBC warehouse?

23        A.   Yes.

24        Q.   How many times?

25        A.   I believe just once.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And why did you visit it?

2    A.   Just to see the facility.

3    Q.   And at that time were you aware of who

4  was overseeing that facility?

5    A.   Yes.

6    Q.   And who was that?

7    A.   I believe Christy Hart was.

8    Q.   Was there somebody in particular

9  overseeing the controlled substances portion of

10  the warehouse?

11    A.   I believe Christy was overseeing the

12  whole warehouse.

13    Q.   What about Matt Rogos, is that a name

14  that is familiar?

15    A.   Yes.  Matt was -- yes.  Matt would have

16  overseen the warehouse as well.  I'm sorry.  I

17  think Christy might have reported in to him.

18    Q.   And do you know the timeframe of when

19  Matt oversaw the warehouse?

20    A.   He left before I did originally, but I'm

21  not sure of the specifics.

22    Q.   Explain to me what that means.

23    A.   I believe he left Giant Eagle before.

24  I'm sorry.  I left in 2015.  I believe he left

25  before me, but I don't know exactly when before.

1    Q.   In your inventory role, did you come to

2  learn about any of the controls that existed at

3  the HBC warehouse for controlled substances?

4    A.   No.

5    Q.   In this inventory role from 2011 to

6  2013, did you know one way or the other whether

7  the HBC warehouse had any controls for the

8  controlled substances that were shipped in and out

9  of that facility?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  I know we had physical

12  barriers such as a cage that they were in.  But

13  from the day-to-day operations, I wasn't involved

14  in those.

15  BY MR. HUDSON:

16    Q.   At some point in time after you left

17  your inventory role and assumed different roles at

18  Giant Eagle, did you learn more about how the HBC

19  warehouse operated day to day in terms of the

20  controls for the controlled substances that were

21  shipped in and out of the facility?

22    A.   With respect to their controls for

23  controlled substances, no.

24    Q.   And is that true as you sit here today,

25  meaning at no point in time that you've worked at

1    Giant Eagle did you become aware of the controls

2    or processes that were applied at the HBC

3    warehouse as it relates to controlled substances?

4         A.    At the physical location, no.

5         Q.    Who would you say would be most

6    knowledgeable about the day-to-day controls or

7    procedures that were applied at the HBC service

8    warehouse?

9         A.    During what timeframe?

10        Q.    From 2009 to 2014.

11        A.    We had a compliance team that was

12   responsible for some of that.  I didn't get

13   involved in this part of the business.  But our

14   compliance team, which was made up of Joe Millward

15   and George Chunderlik and then Christy Hart and

16   Matt Rogos.

17        Q.    And then you indicated that Matt left at

18   some point in 2014 or 2015.  Would Walter Durr be

19   his successor that would be --

20        A.    I believe so, yes.

21        Q.    Other than Joe Millward, George

22   Chunderlik, Christy Hart, Walter Durr and Matt

23   Rogos, anyone else you can think of that may have

24   knowledge about the day-to-day procedures or

25   controls at the HBC service warehouse?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I'm sure there are others, but none that

 2   I can think of now.

 3        Q.    At some point did you become aware that

 4   there are federal regulations that apply to

 5   distributors who are -- have a DEA license to

 6   distribute controlled substances?

 7        A.    Yes.

 8        Q.    And how did you come to learn of that

 9   federal framework?

10        A.    I'm not sure of the details around it.

11   I don't know if it was through my pharmacy

12   training or through work.  I don't know.

13        Q.    Do you have an understanding of what

14   obligations exist for distributors under the

15   Controlled Substances Act?

16        A.    Yes.

17        Q.    What is your understanding of the

18   obligations?

19              MR. KOBRIN:  Object to form.

20              THE WITNESS:  The obligations under the

21   Act would include physical barriers, suspicious

22   order monitoring, a combination of those.

23   BY MR. HUDSON:

24        Q.    Anything else you can think of?

25        A.    This wasn't my area of focus, so no.
```

1      Q.   Do you have any knowledge about problems

2   with opioid abuse or opioid diversion that's

3   occurred in Ohio or generally in the United

4   States?

5           MR. KOBRIN:  Object to form.

6           THE WITNESS:  Other than what I've seen

7   on the news or read in articles, no.

8   BY MR. HUDSON:

9      Q.   And from what you've seen and what

10  you've heard, what is your understanding of

11  problems with opioids in the United States?

12          MR. KOBRIN:  Object to form.

13          THE WITNESS:  That they're being

14  misused, I believe, whether it be prescription or

15  illicit.

16  BY MR. HUDSON:

17     Q.   Do you have any knowledge about the

18  opioids that were most likely to be abused or

19  diverted?

20     A.   No.

21     Q.   Do you understand that at some point,

22  Giant Eagle decided to obtain a DEA license to

23  become a distributor for Schedule III, IV and V

24  controlled substances?

25     A.   At what location?

1      Q.    At the HBC service location.

2      A.    Yes.

3      Q.    Were you involved in any of the decision

4  making to obtain that DEA license to become a

5  distributor?

6      A.    No.

7      Q.    Do you know who was involved in making

8  the decision to become a distributor?

9      A.    I do not.

10     Q.    Is it your understanding that the HBC

11  service warehouse had a license to act as a

12  distributor for Schedule III, IV and V controlled

13  substances?

14     A.    Yes.

15     Q.    And is it your understanding that that

16  license name was in the name of HBC Service

17  Company as opposed to Giant Eagle?

18     A.    Yes.

19     Q.    I don't want to know if you've had any

20  conversations with lawyers.  I don't want to

21  anything that's privileged.  But in your capacity

22  as a businessperson at Giant Eagle, did you obtain

23  any knowledge about why the license was in the

24  name of HBC Service Company?

25     A.    No.

1       Q.   Is it your understanding that HBC

2   Service Company acted as a distributor for

3   hydrocodone combination products from November of

4   2009 to October of 2014?

5       A.   I don't know the exact timeframe, but,

6   yes, they did distribute hydrocodone products.

7       Q.   Do you know whether or not hydrocodone

8   combination products were rescheduled from a

9   Schedule III to a Schedule II controlled

10  substance?

11      A.   I do.

12      Q.   And did that occur in or around October

13  of 2014?

14      A.   I don't remember the time.

15      Q.   Were you involved in any of the business

16  implications that that had for HBC or Giant Eagle

17  when hydrocodone combination products were

18  reclassified from Schedule III to Schedule II?

19           MR. KOBRIN:  Object to form.

20           THE WITNESS:  Yes.

21  BY MR. HUDSON:

22      Q.   And tell me what business implications

23  that had for Giant Eagle or HBC.

24           MR. KOBRIN:  Object to form.

25           THE WITNESS:  It would have changed our

1    product line and then how we were sourcing it,

2    meaning how our pharmacies were buying it, would

3    have changed as well.

4    BY MR. HUDSON:

5        Q.   Do you understand how it changed?

6        A.   I believe we stopped carrying that

7    product or distributing that product out of the

8    HBC facility and began to buy it from another

9    distributor, but I don't remember details.

10       Q.   Were you involved at all in the decision

11   making around whether to continue to act as a

12   distributor for hydrocodone combination products

13   or instead go with McKesson or Anda or another

14   distributor for those opioids?

15           MR. KOBRIN:  In 2014?

16           MR. HUDSON:  In 2014.

17           MR. KOBRIN:  Object to form.

18           THE WITNESS:  Can you repeat that?

19   BY MR. HUDSON:

20       Q.   Sure.  Were you involved in any of the

21   decision making around whether HBC or Giant Eagle

22   would continue to distribute hydrocodone

23   combination products or instead turn to McKesson

24   or Anda or another distributor to distribute those

25   products into Giant Eagle pharmacies in 2014?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. KOBRIN:  Object to form.

 2                THE WITNESS:  Yes.

 3    BY MR. HUDSON:

 4        Q.   Tell me what you recall about those

 5    meetings and the decisions that were made.

 6        A.   For the rescheduling, I believe we met

 7    just to discuss -- I don't know who we would have

 8    met with, but it was discussed that it was

 9    changing from CIII to a CII.  We didn't have the

10    license to distribute CIIs at the time, so we were

11    just going to stop carrying it.

12        Q.   Did that have business implications for

13    Giant Eagle?

14                MR. KOBRIN:  Object to form.

15                THE WITNESS:  Yes.

16    BY MR. HUDSON:

17        Q.   And what were those business

18    implications?

19                MR. KOBRIN:  Object to form.  Asked and

20    answered.

21                THE WITNESS:  Where we were sourcing the

22    inventory from, the product line at our warehouse,

23    how our pharmacies were obtaining it.

24    BY MR. HUDSON:

25        Q.   Did it have a financial impact on Giant
```

1    Eagle?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  I presume it did.  I don't

4    recall.

5              MR. KOBRIN:  Don't assume anything.

6    BY MR. HUDSON:

7        Q.   By no longer acting as the distributor

8    for hydrocodone combination products, were those

9    products then less profitable for Giant Eagle?

10       A.   I don't know.

11       Q.   Do you know whether or not Giant Eagle

12   saved money by becoming the distributor for

13   Schedule III, IV and V controlled substances?

14             MR. KOBRIN:  Object to form.

15             THE WITNESS:  During what time?

16   BY MR. HUDSON:

17       Q.   2009 to 2014.

18       A.   I don't know on specifics.

19       Q.   Do you know why Giant Eagle made the

20   decision to become a distributor of controlled

21   substances?

22       A.   No.

23             (HBC-Bianco Exhibit 1 was marked.)

24   BY MR. HUDSON:

25       Q.   Let me hand you what I've marked as

1    Exhibit 1.  And this is just an organizational

2    chart.  This one is from February of 2015.

3           Does this look accurate to you?

4           A.   Yes.

5           Q.   And at this time you were in the role of

6    category manager, pharmacy?

7           A.   Correct.

8           Q.   And you reported to Mr. Doerr?

9           A.   Correct.

10          Q.   Did this organizational structure remain

11   largely the same during the entire time that you

12   were the category manager of pharmacy, so from

13   August of 2013 to July of 2015, or were there

14   changes during that time period?

15          A.   There were changes.

16          Q.   Did you report to somebody other than

17   Mr. Doerr during that time period?

18          A.   Yes.

19          Q.   Who did you report to?

20          A.   Greg Carlson.

21          Q.   And when did you stop reporting to

22   Mr. Carlson?

23          A.   I believe it would have been -- I don't

24   recall.

25          Q.   Any ballpark idea?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   When Mark would have come to the

 2   organization.  I'm not sure when.

 3        Q.   I'm sure we can figure that out.

 4        So was Greg Carlson your direct report?  In

 5   other words, was he the highest officer within the

 6   pharmacy division?

 7             MR. KOBRIN:  Object to form.

 8             THE WITNESS:  During what time?

 9   BY MR. HUDSON:

10        Q.   During this 2013 to 2015 time period.

11        A.   No.

12        Q.   Who did Mr. Carlson report to?

13        A.   During that time, Brett Merrell oversaw

14   pharmacy, I believe, as well, as well as Mark.

15        Q.   And then as the category manager for

16   pharmacy, who reported up to you in the

17   organization?

18             MR. KOBRIN:  Object to form.

19             THE WITNESS:  During the time period of

20   when?

21   BY MR. HUDSON:

22        Q.   August of 2013 to July of 2015.

23        A.   There were several organizational

24   changes during that time, but it would have

25   been -- do you want names or positions?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Yeah.  Just explain to me what you
 2   recall in terms how the organization was when you
 3   came into that role and then, if you could, walk
 4   through how it changed over time.
 5            MR. KOBRIN:  Object to form.
 6            THE WITNESS:  When I came into that
 7   role, there was one person on our team Kris Remas,
 8   who was a buyer.  That team expanded to two
 9   individuals that did what we called Rx quick
10   ordering which was getting specific products for
11   specific patients.  And then Erin Hart joined the
12   team as well who supported me on the generics
13   piece.
14   BY MR. HUDSON:
15        Q.   And as the category manager, were you
16   responsible for buying certain prescriptions or
17   all prescriptions, or how did that work?
18            MR. KOBRIN:  Object to form.
19            THE WITNESS:  I would have overseen the
20   pharmacy category.
21   BY MR. HUDSON:
22        Q.   What does that mean?  What does pharmacy
23   category mean?
24        A.   That would have been all prescription
25   items as well as select over-the-counter items.
```

1      Q.   And would that be true for all buying by

2   Giant Eagle from any manufacturer?

3      A.   I don't understand.

4      Q.   As the category manager for the

5   pharmacy, were you the one who was responsible for

6   overseeing the buying of these prescriptions and

7   over-the-counter medications from manufacturers?

8           MR. KOBRIN:  Objection.

9   BY MR. HUDSON:

10     Q.   Or what was your role?

11          MR. KOBRIN:  Object to form.

12          THE WITNESS:  Yes.  I would have

13  overseen the team that did that.

14  BY MR. HUDSON:

15     Q.   And that would have included the

16  purchasing of opioids?

17     A.   During that time, yes.

18     Q.   And did Giant Eagle or HBC buy directly

19  from the manufacturers of certain opioids?

20          MR. KOBRIN:  Object to form.

21          THE WITNESS:  Yes.

22  BY MR. HUDSON:

23     Q.   Did that include hydrocodone combination

24  products?

25     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Were the contracts between Giant Eagle

 2   or HBC and the opioid manufacturers, did those

 3   include rebates?

 4             MR. KOBRIN:  Object to form.

 5             THE WITNESS:  I don't recall the

 6   specifics.

 7   BY MR. HUDSON:

 8        Q.   Do you know what a rebate is?

 9        A.   That's a broad term.  At the high level,

10   yes.

11        Q.   What is a rebate?

12        A.   It would be a payment after the purchase

13   of an item.

14        Q.   So would it be a payment from who to

15   who?

16        A.   From the seller to the buyer.

17        Q.   And how would you obtain a rebate?

18             MR. KOBRIN:  Object to form.

19   BY MR. HUDSON:

20        Q.   In other words, how would the buyer

21   become eligible to obtain a rebate from the

22   seller?

23        A.   It would depend on the situation.  If

24   you purchased the item.

25        Q.   So were they set up where if you were
```

```
 1   able to purchase a certain volume of a drug, that

 2   may entitle you to rebates from the seller?

 3        A.   I don't remember specifics about those.

 4        Q.   Do you remember anything generally about

 5   that, how the rebates worked?

 6        A.   Rebates with respect to pharmacy

 7   sourcing?

 8        Q.   Yeah, and specifically opioids.  In

 9   other words, the relationship and the buying

10   between Giant Eagle or HBC and the opioid

11   manufacturers.

12             MR. KOBRIN:  Object to form.

13             THE WITNESS:  No.

14   BY MR. HUDSON:

15        Q.   Were rebates something that Giant Eagle

16   or HBC was focused on trying to obtain?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  I mean, we would have

19   purchased the item with the least net cost.

20   BY MR. HUDSON:

21        Q.   Right.  And rebates would be one way to

22   reduce the net cost of the purchase; right?

23        A.   It could be, yes.

24        Q.   Was that something that you -- in your

25   role as the category manager of pharmacy, is that
```

```
 1    something that you were focused on, ways to reduce

 2    the net cost of opioid purchases?

 3        A.   Not specific to opioids, but all items.

 4        Q.   Were there ever discussions or

 5    strategies on how to maximize the use of rebates

 6    to reduce the net purchasing cost of opioids or

 7    other drugs?

 8             MR. KOBRIN:  Object to form.

 9             THE WITNESS:  Yes.

10    BY MR. HUDSON:

11        Q.   And were you involved in those

12    discussions?

13        A.   Yes.

14        Q.   And were rebates one of the strategies

15    that Giant Eagle tried to use to reduce the net

16    purchasing cost for opioids?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  We would have looked at

19    all opportunities, so all ways to bring our net

20    cost down.

21    BY MR. HUDSON:

22        Q.   In addition to rebates, what are some

23    other ways that Giant Eagle or HBC could bring its

24    net costs down?

25        A.   Competitive bidding.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Anything else?

 2        A.   That would be the main driver, is

 3   competitive bidding.

 4        Q.   I want to shift gears and focus in on

 5   suspicious order monitoring.  I think you

 6   testified it's your understanding that's one of

 7   the obligations for distributors under the

 8   Controlled Substances Act.

 9             MR. KOBRIN:  Object to form.  Misstates

10   testimony.

11             THE WITNESS:  It's part of the

12   requirements, yes.

13             (HBC-Bianco Exhibit 2 was marked.)

14   BY MR. HUDSON:

15        Q.   Let me hand you what I've marked as

16   Exhibit 2.

17             MR. HUDSON:  On Exhibit 2, the internal

18   number is 1162.

19   BY MR. HUDSON:

20        Q.   I will represent to you, Mr. Bianco,

21   that this email was the first email that I could

22   find where you were on emails or had involvement

23   with suspicious order monitoring.  I'll give you a

24   minute to read that.

25             My first question is going to be:  Do you
```

```
 1    recall having any involvement in suspicious order

 2    monitoring prior to this time in September of

 3    2013?

 4              MR. KOBRIN:  Object to form.  Assumes

 5    facts not in evidence.

 6              THE WITNESS:  Can you repeat the

 7    question.

 8    BY MR. HUDSON:

 9        Q.   Sure.  This email chain, and I'm going

10    to start with the first email which is on the

11    second page, it's from Greg Carlson to you and

12    Allen Lowther with a copy to Kris Remas, dated

13    September the 9, 2013.  Do you see that email?

14        A.   Yes.

15        Q.   And the subject is Controls at HBC;

16    right?

17        A.   Correct.

18        Q.   And then in the body of this email,

19    Mr. Carlson is talking about HBC's efforts to

20    address suspicious order monitoring to meet the

21    federal requirements of 21 CFR 1301.74(b); right?

22        A.   Say that again.  I'm sorry.

23        Q.   Sure.  In the body of this email,

24    Mr. Carlson is talking about HBC's handling of

25    suspicious order monitoring to meet federal
```

```
 1   requirements of 21 CFR 1301.74(b).  Do you see
 2   that?
 3        A.   I do not.  I see that he cites it.
 4        Q.   Well, we'll go through the email in a
 5   minute.  My question thought before we get into
 6   the email is just:  Do you have any recollection
 7   of having any involvement with suspicious order
 8   monitoring prior to September of 2013?
 9             MR. KOBRIN:  Object to form.  Assumes
10   facts not in evidence.
11             THE WITNESS:  No.
12   BY MR. HUDSON:
13        Q.   Did you have any knowledge prior to
14   September of 2013 of what efforts HBC was taking
15   to monitor suspicious orders of controlled
16   substances?
17        A.   I don't know.
18        Q.   To the best of your recollection, as you
19   sit here today, do you have any idea when you
20   first learned about suspicious order monitoring?
21             MR. KOBRIN:  Object to form.
22             THE WITNESS:  I think I mentioned
23   earlier I don't know when I became familiar with
24   some of the regs, whether it was through school or
25   through work.
```

1    BY MR. HUDSON:

2        Q.   Do you know why Mr. Carlson copied you

3    on this email in September of 2013?

4        A.   I don't, no.

5        Q.   Let's go through this.  Do you think

6    that you read this email when you received it?

7        A.   Yes.

8        Q.   So Mr. Carlson wrote, "Mike and Allen, I

9    would like to explore our options around sourcing

10   controls other than HBC.  Here are the options I'm

11   thinking."

12       Do you know what he meant by that?

13       A.   That he wanted to look for sourcing

14   options for controlled substances.

15       Q.   So at this point in time in September of

16   2013, was Mr. Carlson contemplating HBC no longer

17   acting as a distributor for controlled substances?

18           MR. KOBRIN:  Object to form.  Calls for

19   speculation.

20           THE WITNESS:  I don't know what he was

21   presuming at that time.

22   BY MR. HUDSON:

23       Q.   On down at the bottom of his email, he

24   said, "I can talk to each of you in person for

25   more details."

1          Do you see that?

2          A.    I do.

3          Q.    Do you have a recollection of talking to

4    Mr. Carlson about the controls at HBC at this time

5    period in September of 2013?

6          A.    Not -- no, not on this particular

7    occasion.

8          Q.    Do you have any recollection of this

9    email?

10         A.    No.

11         Q.    Mr. Carlson wrote, "Here on the options

12   I'm thinking.  1. Run all controls currently at

13   HBC through McKesson with indirect contracts."

14   Right?

15         A.    Correct.

16         Q.    What does that mean?

17               MR. KOBRIN:  Object to form.

18               THE WITNESS:  An indirect contact would

19   be a contract that's loaded through your

20   wholesaler that rebates the drug down to a lower

21   net cost.

22   BY MR. HUDSON:

23         Q.    So who was act as the distributor of

24   controlled substances if you went with option one?

25               MR. KOBRIN:  Object to form.

```
 1   Speculation.

 2            THE WITNESS:  According to this,

 3   McKesson.

 4   BY MR. HUDSON:

 5       Q.   So option one would involve HBC no

 6   longer acting as a distributor of controlled

 7   substances.  Instead McKesson would become the

 8   distributor through indirect contracts?

 9       A.   Correct.

10            MR. KOBRIN:  Object to form.

11   BY MR. HUDSON:

12       Q.   Then number two says, "Give McKesson all

13   of our control volume and have them bid on the

14   whole bucket.  How much would we lose giving this

15   all to McKesson?"

16       Is option two the idea that HBC would no

17   longer act as the distributor and McKesson would

18   be the distributor for all controlled substances,

19   and they would also have the direct contracts with

20   the manufacturers?

21            MR. KOBRIN:  Object to form.

22            THE WITNESS:  I believe.

23   BY MR. HUDSON:

24       Q.   And then his question is:  How much

25   would we lose giving this all to McKesson; right?
```

```
1        A.    That's what it states.

2        Q.    Is that something that you looked into?

3        A.    I don't -- I don't recall.

4        Q.    Do you know whether someone looked into

5   that?

6        A.    I don't know.

7        Q.    Do you know whether or not anyone at

8   Giant Eagle or HBC ever determined how much the

9   organization would lose giving all of the

10  controlled substances to McKesson?

11       A.    In September of 2013?

12       Q.    In this timeframe.

13       A.    I don't remember.

14       Q.    Let's go to option three then, "Utilize

15  Anda as a virtual warehouse for controls.  We can

16  use the current HBC transmission logic and just

17  send that EDI order over to Anda to fill for

18  controls only."

19            Do you understand what that means?

20            MR. KOBRIN:  Object to form.  Misstates

21  the evidence.  Speculative.

22            THE WITNESS:  Not in detail, no.

23  BY MR. HUDSON:

24       Q.    Do you have a general understanding of

25  what he's talking about as option three?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    How would a virtual warehouse work?

 3        A.    I don't know those particulars.

 4        Q.    In general, what's your understanding of

 5   how option three would work?

 6        A.    Just reading what he says, we would

 7   transmit our order to Anda and they would fill the

 8   orders.  But any other details beyond that, I

 9   don't know.  I'm not familiar with the virtual

10   warehouse.

11        Q.    Down below do you see Mr. Carlson writes

12   two individual notes to Allen and Kris?

13        A.    Yes.

14        Q.    The first one to Allen says, "Can you

15   reach out to Eric at HEB and ask him how they

16   handle suspicious order monitoring to meet federal

17   requirements (Title 21 CFR 1301.74(b)).  Do they

18   have a way to block orders if they go over their

19   monthly limit."

20        Do you see that?

21        A.    I do.

22        Q.    At this point in time in September of

23   2013, did you have any knowledge about how HBC

24   handled suspicious order monitoring to meet

25   federal requirements of 21 CFR 1301.74(b)?
```

1    A.   I think I stated I know we had physical

2    barriers, but the day-to-day operations I wasn't

3    familiar with.

4    Q.   Do you know whether or not at this time

5    in September of 2013 HBC did any monitoring of

6    controlled substances to look for suspicious

7    orders?

8         MR. KOBRIN:  Object to form.  Asked and

9    answered.

10        THE WITNESS:  I do not.

11   BY MR. HUDSON:

12   Q.   At this point in time in September of

13   2013, did you have any knowledge specifically of

14   the requirements of 21 CFR 1301.74(b)?

15        MR. KOBRIN:  Object to form.

16        THE WITNESS:  I would need to see what

17   specifically that is referencing.  I don't know

18   the regs that well.

19   BY MR. HUDSON:

20   Q.   Did you have any knowledge -- let me ask

21   it this way.  I'll represent to you that's the

22   suspicious order monitoring subsection of the

23   Controlled Substances Act.

24        Was that something -- again, I'm just trying

25   to get an understanding of what you knew in

Highly Confidential - Subject to Further Confidentiality Review

1    September of 2013.

2        Is that something that you dealt with or had

3    any familiarity with?

4            MR. KOBRIN:  Object to form.

5            THE WITNESS:  I may have learned it

6    through school or through work, but I don't

7    remember when I learned about it.

8    BY MR. HUDSON:

9        Q.   Did you have -- up until this point in

10   September of 2013, did you have any role at Giant

11   Eagle or any other organization where you were

12   designing or implementing a suspicious order

13   monitoring system?

14       A.   No.

15       Q.   Did you have any role -- up through this

16   point in September of 2013, did you have any role

17   at any organization where you were executing on a

18   suspicious order monitoring system?

19       A.   No.

20       Q.   Then let's go to the next note from

21   Mr. Carlson to Kris.  He said, "Can you ask Val if

22   Biceps or DCOPS has any functionality that would

23   allow us to block a store from order of product in

24   a certain subgroup?  If a store hit a threshold on

25   hydrocodone, could we go in and block that store

```
 1    from ordering those products until the month

 2    resets?"

 3         Do you know what he meant by that --

 4              MR. KOBRIN:  Object to form.

 5    BY MR. HUDSON:

 6         Q.   -- set of questions to Kris?

 7              MR. KOBRIN:  Object to form.  Calls for

 8    speculation.

 9              THE WITNESS:  I mean, I'm familiar with

10    biceps and DCOPS at a high level, that they were

11    our ordering systems.

12    BY MR. HUDSON:

13         Q.   Biceps and DCOPS were the ordering

14    system that Giant Eagle or HBC used at that time?

15         A.   I believe.

16         Q.   Would it be -- was that the warehouse's

17    ordering system where they would order products

18    from particular manufacturers?

19              MR. KOBRIN:  Object to form.

20              THE WITNESS:  I don't recall which was

21    which, but I know one of those was used to order

22    from a manufacturer.

23    BY MR. HUDSON:

24         Q.   And was the other one then used at the

25    retail level?
```

```
 1        A.    I'm not sure of the other one.  I'm not
 2  sure how they interfaced with each other.
 3        Q.    Tell me what you know just generally
 4  about how the ordering system worked at HBC, at
 5  the warehouse.
 6              MR. KOBRIN:  Object to form.
 7              THE WITNESS:  During this time?
 8  BY MR. HUDSON:
 9        Q.    Yep.
10        A.    A store would transmit an order to the
11  warehouse.  The warehouse would pick and pack it,
12  generally speaking.
13        Q.    So that would cover the relationship
14  between the warehouse and the individual retail
15  pharmacies; right?
16              MR. KOBRIN:  Object to form.
17              THE WITNESS:  Correct.
18  BY MR. HUDSON:
19        Q.    Tell me what you know about the ordering
20  system as it relates to HBC acting as a
21  distributor and making orders from manufacturers.
22        A.    Can you repeat that.
23        Q.    Sure.  I'm focusing specifically on HBC
24  as a distributor.  Would HBC make orders directly
25  to manufacturers?
```

1      A.    My team would, yes.

2      Q.    Your team would?

3      A.    On behalf of them.

4      Q.    Was that a computerized process?  In

5  other words, did you have a computer system you

6  used to make those orders?

7      A.    They were manually keyed in, yes, into a

8  system.

9      Q.    What was the name of that system?

10     A.    I don't recall.

11     Q.    Was that one Biceps or DCOPS?

12            MR. KOBRIN:  Object to form.

13            THE WITNESS:  It may have been.

14  BY MR. HUDSON:

15     Q.    Do you know whether or not at this time,

16  in September of 2013, the HBC warehouse had the

17  functionality that would allow HBC to block a

18  store from ordering a product in a certain

19  subgroup?

20            MR. KOBRIN:  Object to form.

21            THE WITNESS:  I do not.

22  BY MR. HUDSON:

23     Q.    Do you know at this time whether or not

24  HBC had the ability to block orders to a retail

25  pharmacy if those orders would hit or exceed a

1    certain threshold?

2            MR. KOBRIN:  Object to form.

3            THE WITNESS:  I read in the email, but I

4    did not know.  I do not know.

5    BY MR. HUDSON:

6        Q.    That's not something you knew one way or

7    the other how the warehouse operated?

8        A.    I don't recall.  I didn't get into the

9    day to day, like I said.

10       Q.    Do you know whether or not at this time

11   in September of 2013, Mr. Carlson was focused on

12   trying to address the monitoring of controlled

13   substances at the HBC warehouse?

14           MR. KOBRIN:  Object to form.  Calls for

15   speculation.

16           THE WITNESS:  I can't speculate on what

17   he was attempting to do here.  It could have been

18   many things.

19   BY MR. HUDSON:

20       Q.    Does this email refresh your

21   recollection in any way about this particular

22   topic that we've been talking about?

23       A.    No.

24       Q.    Do you remember whether you or others

25   had conversations with Mr. Carlson at this time or

1    later about the monitoring that was occurring at

2    the HBC warehouse?

3         A.   No.

4         Q.   At any point in time, did you come to

5    learn more about how the HBC warehouse monitored

6    controlled substances for suspicious orders.

7         A.   Yes.

8         Q.   What timeframe was that when you learned

9    more?

10        A.   I'm not sure of specific dates, but it

11   would have been after that.  I know I was informed

12   on orders when they would be blocked or stopped at

13   the warehouse or investigated, and that was on the

14   rare occasion that I would be included.

15        Q.   And specifically what do you recall

16   about that?

17        A.   Just that they happened.  I didn't get

18   into the operations of the warehouse.

19        Q.   Do you have a recollection of how many

20   times orders were stopped at the warehouse?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  I don't, no.

23   BY MR. HUDSON:

24        Q.   Do you have any recollection of how many

25   times suspicious orders were investigated by HBC?

1      A.    I don't know.

2      Q.    Do you have any knowledge about the

3   criteria that was applied at the warehouse to try

4   to determine whether an order was suspicious?

5      A.    No.

6      Q.    And were all of those answers be true

7   from 2009 until today, meaning even today you

8   don't have knowledge about when orders are blocked

9   or criteria that are applied to conduct

10  investigations or any of the other day-to-day

11  events that occur at the HBC or Giant Eagle

12  warehouse?

13         MR. KOBRIN:  Excluding any information

14  that you may have learned from any counsel that

15  you talked to.

16         THE WITNESS:  No.  I mean, yes, those

17  are true.  I'm not familiar with those.

18  BY MR. HUDSON:

19     Q.    If we turn now back to the first page of

20  this email, I'm guessing that -- it seems like

21  you're copied on these emails but were not

22  directly involved in trying to figure out any of

23  the solutions or drill down on what any of these

24  other companies were doing; is that fair?

25     A.    Correct.

1    Q.   Other than just sitting here and reading

2  this email, you don't have any recollection of

3  anything that occurred during this time period

4  relating to how HBC was going to handle controlled

5  substances or monitor controlled substances?

6    A.   Correct.

7         (HBC-Bianco Exhibit 3 was marked.)

8  BY MR. HUDSON:

9    Q.   I'll hand you what I've marked as

10  Exhibit 3.

11         MR. HUDSON:  And Exhibit 3, the internal

12  number is 1052.

13  BY MR. HUDSON:

14    Q.   Mr. Bianco, my question is:  Do you

15  recognize what we've marked as Exhibit 3?

16    A.   No.

17    Q.   Have you ever heard -- other than the

18  with discussions with counsel, have you ever heard

19  the phrase daily threshold reports?

20    A.   No, not that I remember.

21         (HBC-Bianco Exhibit 4 was marked.)

22  BY MR. HUDSON:

23    Q.   I'll hand you what I've marked as

24  Exhibit 4.

25         MR. HUDSON:  Exhibit 4, the internal

Highly Confidential - Subject to Further Confidentiality Review

1    number is 1177.

2    BY MR. HUDSON:

3        Q.   Mr. Bianco, Exhibit 4 is an email with

4    an attachment with some meeting minutes, and you

5    are not copied on the email it doesn't look like

6    to me.  But if you turn to the second page, in the

7    last paragraph, you are referenced as -- your name

8    is there in the sentence that says, "Anthony

9    Mollica would be the registrant.  Joe Millward and

10   George Chunderlik will be coordinators and then

11   potentially Mike Bianco and Greg Carlson as POAs."

12       Do you have any recollection of these meeting

13   minutes or what it meant by POA?

14       A.   No.

15       Q.   Do you have any recollection of reading

16   these meeting minutes?

17       A.   I have not had a chance to read them,

18   no.

19            MR. KOBRIN:  I want to note for the

20   record that I know you already noted that he's not

21   on the email, but he's also not listed among the

22   attendees at this meeting even though there's

23   reference in the minutes.

24   BY MR. HUDSON:

25       Q.   Mr. Bianco, have you had a chance to

1    look at the minutes?

2        A.    Just page 1, yes.

3        Q.    In general, do you remember attending a

4    meeting where Anda gave an explanation of the

5    controlled substance online source, or CSOS I

6    think sometimes it's referred to, software?

7            MR. KOBRIN:  Object to form.  He's not

8    listed on the minutes as having been one of the

9    attendees.

10            THE WITNESS:  I would have seen the

11    software, but not -- I don't know in what format.

12    BY MR. HUDSON:

13        Q.    Do you know whether or not you attended

14    any meetings relating to the implementation of the

15    CSOS or C-S-O-S software?

16        A.    I don't recall.  I don't remember the

17    specifics on how that worked.

18        Q.    Do you have any knowledge about any of

19    the functionality of this CSOS software?

20        A.    Yes.

21        Q.    Do you have any knowledge about how the

22    software works in particular as it relates to

23    monitoring of orders from a supplier to a

24    wholesaler?

25        A.    Not specifics.

1      Q.   Do you know whether or not the software

2  had any functionality that allowed Giant Eagle or

3  HBC to in an automated way stop or block

4  particular shipments?

5      A.   I do not, no.

6      Q.   Is this document something that you

7  believe you saw at any time?

8      A.   The meeting minutes in particular?

9      Q.   Yes.

10      A.   I don't -- I don't know.

11      Q.   How about, if you look, I think one of

12  the things that's contained within these meeting

13  minutes are just some explanations of the

14  functionality of the software.

15      Do you know whether or not that's something

16  that you would have reviewed at any point in time?

17      A.   I don't recall.

18      Q.   If you look at page 2 of the minutes, on

19  the top you see in bold it says Red Flag?

20      A.   Yes.

21      Q.   Then it says CII Limits/Month, and then

22  there's an explanation in the next two paragraphs.

23  Is that anything you have any familiarity with?

24      A.   No.

25      Q.   Do you know when Giant Eagle implemented

Highly Confidential - Subject to Further Confidentiality Review

```
1    the CSOS or C-S-O-S software?

2         A.   Yes.  It was while I was in the category

3    manager position, but I don't know the exact date.

4         Q.   Do you know if it was in 2015?

5         A.   I don't recall.

6              (HBC-Bianco Exhibit 5 was marked.)

7    BY MR. HUDSON:

8         Q.   I'll hand you what I've marked as

9    Exhibit 5.  I'm just going to ask you if you

10   recognize that document.

11        A.   No.

12        Q.   In references to the previous email

13   chain, we looked at the email chain in September

14   of 2013 from Greg Carlson to you and a couple of

15   other gentlemen.  Do you remember that email?

16        A.   Yes.

17        Q.   And at that point in time, I believe you

18   indicated that Mr. Carlson was talking about HBC

19   potentially no longer distributing controlled

20   substances but instead having Anda or McKesson

21   handle that.

22             MR. KOBRIN:  Object to form.

23   BY MR. HUDSON:

24        Q.   Do you remember the options that we

25   talked about, option one, option two and option
```

1    three?

2         A.   I do.

3         Q.   Now we're going to turn to this email

4    that we've marked as Exhibit 5.  And this is in

5    November of 2013; right?

6         A.   Yes.

7         Q.   And the top email is from Mr. Carlson to

8    you with a forward of the subject Controlled

9    Substance Suspicious Monitoring; right?

10        A.   Yes.

11        Q.   Do you know why Mr. Carlson forwarded

12   that email to you?

13             MR. KOBRIN:  Object to form.  Calls for

14   speculation.

15             THE WITNESS:  I do not.

16   BY MR. HUDSON:

17        Q.   Do you know whether or not you attended

18   a meeting around this time on the topic of

19   controlled substance suspicious monitoring?

20        A.   Yes.

21        Q.   Do you have any knowledge of any of the

22   discussions that were occurring at Giant Eagle in

23   November of 2013 relating to controlled substance

24   suspicious monitoring?

25        A.   I don't recall.  I was still in school

1    at this time.

2         Q.   If we go down to the bottom email, it

3    looks like it's a meeting invite.  Is that what it

4    looks like to you?

5         A.   It appears to be.

6         Q.   And that's a meeting that's going to

7    take place at Century 3.  Is that a room or

8    building at the Giant Eagle campus?

9         A.   It's an office or a meeting room.

10        Q.   And it looks like the two topics for

11   discussion, number one is discussion of the

12   process developed for identifying pharmacies

13   ordering excessive controlled substances, and then

14   number two is discussion of the monitoring and

15   steps to be taken when a pharmacy appears on the

16   above list.  Do you see that?

17        A.   I do.

18        Q.   Do you know whether or not Giant Eagle

19   or HBC developed a process for identifying

20   pharmacies ordering excessive controlled

21   substances?

22        A.   I know we had one in place, but I don't

23   know when it was developed or any of the specifics

24   around it.

25        Q.   Do you know who developed it?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.   I do not.

 2          Q.   Do you know why it was developed?

 3          A.   I don't.  I don't know.  I would be

 4    speculating if I answered that.

 5          Q.   Did you have any involvement at all in

 6    the development of the process?

 7          A.   No, not that I recall.

 8          Q.   Do you know what steps were to be taken

 9    when a pharmacy appeared on the above list of

10    pharmacies ordering excessive controlled

11    substances?

12               MR. KOBRIN:  Object to form.

13               THE WITNESS:  I don't know what list

14    but, no, I wasn't involved in the day-to-day

15    operations.

16    BY MR. HUDSON:

17          Q.   I assume then to the best of your

18    knowledge, you don't have any recollection of

19    attending that meeting?

20          A.   I don't, no.

21               MR. KOBRIN:  Do you want to take a break

22    after this exhibit?

23               MR. HUDSON:  If you need to.

24               MR. KOBRIN:  Do you want to take a

25    break?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yeah.

 2                    MR. KOBRIN:  Do you want to take a break

 3    now?

 4                    THE WITNESS:  We can finish this.

 5                    MR. HUDSON:  Now is as good a time as

 6    any.  We can go off the record.

 7                    THE VIDEOGRAPHER:  The time is

 8    10:11 a.m.  We're off the video record.

 9                    (Recess from 10:12 a.m. to 10:25 a.m.)

10                    THE VIDEOGRAPHER:  The time is

11    10:25 a.m.  We are now back on the video record.

12                    (HBC-Bianco Exhibit 6 was marked.)

13    BY MR. HUDSON:

14         Q.   Mr. Bianco, I'm handing you what I've

15    marked as Exhibit 6, and as you can see, we're

16    just walking through in time.  So we're up to

17    December of 2013 here.

18         At this point in time, had you completed

19    pharmacy school?

20         A.   No.

21         Q.   December of 2013.

22         A.   I graduated like mid December of 2013.

23         Q.   So you're nearing the end of pharmacy

24    school at this point --

25         A.   Within weeks.
```

```
 1          Q.    -- in December of 2013?

 2          A.    Yes.

 3          Q.    Take a minute, if you would, to look at

 4    this email chain.

 5                (Witness reviewed the exhibit.)

 6                THE WITNESS:  Okay.

 7    BY MR. HUDSON:

 8          Q.    Have you had a chance to review the

 9    email chains?

10          A.    Yes.

11          Q.    So the bottom email that spans onto the

12    second page is from you to Matt Rogos, Christy

13    Hart and some others; right?

14          A.    Correct.

15          Q.    And then a copy to Joseph Millward, Greg

16    Carlson and Shawn Voyten, and the subject is

17    Pharmacy 2401 Do Not Send item 00187393; right?

18          A.    Correct.

19                MR. KOBRIN:  Object to form.

20    BY MR. HUDSON:

21          Q.    Do you have any recollection of what was

22    happening at this time in December of 2013 when

23    you sent this email?

24                MR. KOBRIN:  Object to form.

25                THE WITNESS:  Other than what I've read
```

1    today, no.

2    BY MR. HUDSON:

3         Q.   Do you know why you were sending an

4    email at this time to the HBC team?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  Other than what I read

7    here, no.

8    BY MR. HUDSON:

9         Q.   And here you wrote, "HBC team, Can you

10   please be sure pharmacy 2401 does not receive item

11   00187393, buprenorphine, 8 milligram SL tab, until

12   further notice.  Pharmacy 2401's ordering of this

13   product has been flagged as suspicious and are

14   being reported to the DEA."

15        Did I read that right?

16        A.   Yes.

17        Q.   Do you know who flagged the order as

18   suspicious?

19        A.   I don't recall.

20        Q.   Do you know why the order was flagged as

21   suspicious?

22        A.   No.

23        Q.   Do you know the monitoring system at HBC

24   worked at this time?

25        A.   Other than orders were sometimes

```
 1    stopped, no.

 2         Q.   Do you know who decided that this order

 3    should be reported to the DEA?

 4         A.   No.

 5         Q.   Do you know the criteria that were

 6    applied to decide to report this order to the DEA?

 7         A.   No.

 8         Q.   In the next paragraph you wrote, "Please

 9    print this communication and begin keeping a file

10    for suspicious orders that have been identified

11    and the steps taken to address these orders."

12         Did I read that right?

13         A.   Yes.

14         Q.   Was that a request that you were making

15    to Mr. Rogos, Ms. Hart and the others that are

16    listed on this email chain?

17         A.   That's how it reads, yes.

18         Q.   And why were you asking that they begin

19    keeping a file for suspicious orders that have

20    been identified and the steps taken to address

21    these orders?

22         A.   I don't recall.

23         Q.   Was it your hope and expectation that

24    HBC or others in the Giant Eagle organization

25    would begin keeping a file for suspicious orders
```

1   that have been identified and steps taken to

2   address these orders?

3           MR. KOBRIN:  Object to form.

4           THE WITNESS:  I don't remember.

5   BY MR. HUDSON:

6       Q.   Do you know whether or not the people on

7   this email followed your request to start keeping

8   a file for suspicious orders that have been

9   identified?

10      A.   I don't know.  This was pretty much the

11  extent of my involvement in this process.

12      Q.   But you do agree that you were asking

13  the team to start keeping a file for suspicious

14  orders that have been identified and the steps

15  taken to address these orders; right?

16          MR. KOBRIN:  Object to form.

17          THE WITNESS:  That's what it reads.

18  BY MR. HUDSON:

19      Q.   And do you know whether or not someone

20  on the team did print this communication from you

21  to them?

22          MR. KOBRIN:  Object to form.  Asked and

23  answered.

24          THE WITNESS:  I don't recall.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:
 2       Q.   Then down in the next paragraph, it
 3   says, "We will be taking a two-pronged approach
 4   for this order.  One, stopping the shipment of the
 5   order and reporting it" -- sorry.  Let me start
 6   over.
 7       "We'll be talking a two-pronged approach for
 8   this order, stopping the shipment of the order and
 9   reporting it to the DEA as well as having a
10   corporate staff member investigate the usage and
11   determine the causation of the suspicious order."
12       Do you know why you wrote this to the team at
13   the time?
14       A.   I don't recall.
15       Q.   Do you know how you came to decide on
16   this two-pronged approach?
17       A.   I don't recall.
18       Q.   Do you have any independent recollection
19   of any discussions with anyone around this time
20   about suspicious order monitoring?
21       A.   No.
22       Q.   At this time in December of 2013, did
23   you have regular communications with Mr. Millward,
24   Mr. Chunderlik or others about suspicious order
25   monitoring, or was this, to the best of your
```

```
 1   recollection, kind of an isolated email?

 2            MR. KOBRIN:  Object to form.

 3            THE WITNESS:  I don't remember.  I would

 4   get emails similar letting me know that orders

 5   were stopped, but that's about it.

 6   BY MR. HUDSON:

 7       Q.   Do you know why you were getting the

 8   emails?

 9       A.   I was -- a lot of it was just

10   informational, but I was a point of contact for

11   HBC.

12       Q.   Did you have an understanding one way or

13   the other of whether or not orders that were

14   exceeding thresholds were being stopped by the HBC

15   warehouse?

16       A.   I knew that orders were being stopped,

17   but I don't know why.  I don't recall why, why or

18   kind of the reasoning.

19       Q.   It was your understanding or belief that

20   the HBC warehouse was actually stopping the

21   physical shipment of orders that had been flagged?

22            MR. KOBRIN:  Object to form.

23            THE WITNESS:  Sometimes they would.

24   BY MR. HUDSON:

25       Q.   Do you know how many times?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't.

 2        Q.    Do you know when?

 3        A.    It would have been during the -- if they

 4   did, it would have been during their nightly

 5   order.

 6        Q.    Other than this particular order that

 7   we've been discussing in this email, are you aware

 8   of any other specific orders that you know of that

 9   were stopped by the HBC warehouse?

10        A.    Yes.

11        Q.    Which other orders are you aware of?

12        A.    There are others that are not opioids,

13   that are -- any time there would be what are

14   called a conversion factor, those would be

15   stopped.  It happened occasionally.

16        Q.    Would a conversion factor -- does that

17   have anything to do with shipments that are at

18   risk of diversion or suspicious orders?

19             MR. KOBRIN:  Object to form.

20             THE WITNESS:  I don't know.

21   BY MR. HUDSON:

22        Q.    What is a conversion factor?

23        A.    It's used in our system that -- I'm

24   trying to think of an easy way to explain it.

25   This is a poor example, but if you have a bottle
```

1  of a hundred, and you want to order one bottle of

2  a hundred, do you order one or do you order a

3  hundred, and that conversion factor helps the

4  systems to talk to know if you get one bottle

5  or -- if the intent was to order one bottle or one

6  tablet.  So it's really a way the dispensing

7  system can talk to an ordering system.

8      Q.  So are you saying that if the conversion

9  factor -- if there's an error, you meant to order

10  one bottle of a hundred pills but instead you

11  ordered a hundred bottles of a hundred pills, then

12  that would be an order that would be stopped?

13      A.  It could be, yes.

14      Q.  That's different than an order being

15  suspicious because it's at risk of diversion;

16  right?

17          MR. KOBRIN:  Object to form.

18          THE WITNESS:  I didn't deal with any of

19  the investigations or anything.  So I don't know.

20  I can't really answer that.

21  BY MR. HUDSON:

22      Q.  What criteria were applied by the

23  warehouse to stop orders because of a conversion

24  factor issue?

25      A.  I don't know.

1       Q.   To your knowledge, what types of

2  shipments or when were shipments stopped because

3  of a conversion factor issue?

4       A.   I don't know details, but generally

5  conversion factors are not on every item.  So your

6  oral solids tend to not have those.  Usually it's

7  an injectable, any type of medication that doesn't

8  come in like a round milliliter.  Not every item

9  has it.  Like a flu shot you would get half an ML

10 dose.  So that would have a conversion factor on

11 it.

12      Q.   Am I correct though that orders that

13 were stopped because of a conversion factor issue,

14 that's a different issue than an order that's at

15 risk for diversion because of it being a

16 suspicious order?

17           MR. KOBRIN:  Object to form.  Asked and

18 answered.  Conclusory.

19           THE WITNESS:  It could be.

20 BY MR. HUDSON:

21      Q.   Give me an example of when an order that

22 was stopped because of a conversion factor issue

23 would also involve a suspicious order that's at

24 risk of diversion?

25           MR. KOBRIN:  Object to form.

1         THE WITNESS:  I don't know.  I didn't do

2    any of the investigations on suspicious orders.

3    So all I would know is that an order was stopped.

4    BY MR. HUDSON:

5         Q.   Would you know why the order was

6    stopped?

7         A.   No.

8         Q.   Would you know who decided to stop the

9    order?

10        A.   Yes.

11        Q.   And how would you know that?

12        A.   Because whoever told me they stopped it.

13        Q.   I mean, was there a systematic process

14   in place where each and every time an order was

15   stopped at the HBC warehouse, we need to let Mike

16   Bianco or his team know?

17        MR. KOBRIN:  Object to form.

18        THE WITNESS:  I was not the -- no, not

19   for every order, no.

20   BY MR. HUDSON:

21        Q.   So whether an order was stopped or not,

22   it's not something you know one way or the other

23   in a comprehensive way?

24        MR. KOBRIN:  Object to form.

25        THE WITNESS:  Correct.

```
 1                (HBC-Bianco Exhibit 7 was marked.)

 2    BY MR. HUDSON:

 3        Q.   I'm going to hand you, Mr. Bianco, what

 4    I've marked as Exhibit 7.  This is an email chain.

 5    We're into January of 2014.

 6                MR. HUDSON:  Our internal number is

 7    1219.

 8    BY MR. HUDSON:

 9        Q.   Let me know when you've had a chance to

10    review that.

11                (Witness reviewed the exhibit.)

12                THE WITNESS:  Okay.

13    BY MR. HUDSON:

14        Q.   What is Exhibit 7?

15        A.   It appears to be an email communication.

16        Q.   Do you know why Kayla Voelker initiated

17    this email communication?

18                MR. KOBRIN:  Object to form.

19    Misrepresents the evidence.

20                THE WITNESS:  No, other than the

21    subject.

22    BY MR. HUDSON:

23        Q.   And what is the subject of her email?

24        A.   Daily HBC suspicious purchasing report

25    and the date.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And do you know what that means, daily

2   HBC suspicious purchasing report?

3      A.   I could speculate, but I don't know what

4   that report is.

5      Q.   On the first email, you are not copied

6   on that email; right?

7      A.   Correct.

8      Q.   And then the next email appears to be

9   from Mr. Millward to Todd Roahrig.  And now you

10  are copied on Mr. Millward's email; correct?

11     A.   Yes.

12     Q.   Do you know why he copied you into his

13  email?

14          MR. KOBRIN:  Object to form.

15          THE WITNESS:  No.

16  BY MR. HUDSON:

17     Q.   Who is Todd Roahrig?

18     A.   Todd is a pharmacy district leader.

19     Q.   You sometimes call those PDLs?

20     A.   Yes.

21     Q.   So he was a PDL?

22     A.   Yes.

23     Q.   So he, Mr. Millward, is letting the PDL

24  know that store 8 had been flagged for hitting

25  their threshold for total hydrocodone products;

1    right?

2          A.    That's how it reads, yes.

3          Q.    And then if we go up to the next email,

4    we've got the PDL, Todd, writing back to

5    Mr. Millward and yourself and the others; right?

6          A.    Yes.

7          Q.    And he's writing back there.  Is he

8    giving an explanation for why he believes this

9    particular order is large in size?

10              MR. KOBRIN:  Object to form.

11              THE WITNESS:  It appears to be.

12   BY MR. HUDSON:

13         Q.    And is the explanation that it's flu

14   season?

15              MR. KOBRIN:  Object to form.

16              THE WITNESS:  No.

17   BY MR. HUDSON:

18         Q.    What's the reason for why the order to

19   quantity is what it is?

20         A.    The way it reads is -- do you want me to

21   read the email?

22         Q.    Sure.

23         A.    Renee replied that she has had a ton of

24   scripts for this and a lot of Os due to cough and

25   cold season, and this is a particular choice of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    syrup for a prescriber there, I believe.

 2         So it appears to be prescribers' habits for

 3    cough and cold.

 4              MR. KOBRIN:  Can you just finish your

 5    answer.

 6              THE WITNESS:  Sure.  It continues.  "I

 7    don't have details but assuming 8 ounces is a

 8    typical Rx, that's only 34 scripts, so not

 9    probably unreasonable at their volume."

10    BY MR. HUDSON:

11         Q.   Mr. Carlson wrote back to you, "I

12    thought flu did not impact our numbers."  Correct?

13         A.   Correct.

14         Q.   Is this an example of an order that was

15    flagged as being potentially suspicious?

16         A.   It appears to be.

17         Q.   So in Exhibit -- if we go back to your

18    email in Exhibit 6, would this be -- would your

19    email directed to the team where you wrote,

20    "Please print this communication and begin keeping

21    a file for suspicious orders that have been

22    identified and the steps taken to address these

23    orders," would Exhibit 7 be an example of an order

24    that was shipped where you had an expectation that

25    someone would begin keeping a file for orders like
```

Highly Confidential - Subject to Further Confidentiality Review

1    this and the steps taken to address the orders?

2           MR. KOBRIN:  Object to form.

3    Misrepresents the evidence.

4           THE WITNESS:  No.

5    BY MR. HUDSON:

6       Q.   This would not be an example of an order

7    that had been flagged?

8       A.   This was.  Based on the email chain, it

9    was flagged and investigated, but I don't -- I'm

10   only reading off the email, but it doesn't

11   identify it as suspicious.  They identified a

12   reason for it.

13      Q.   Well, let's look at Mr. Millward.

14   Mr. Millward was the compliance officer; right?

15      A.   I don't know what his title was, but he

16   oversaw compliance.

17      Q.   He oversaw compliance.  He wrote to the

18   PDL.  He said, "Store 8 is flagging as having hit

19   their threshold for total hydrocodone products.

20   Can you please check to see if this is an anomaly

21   or that the order should be considered

22   suspicious."

23      Right?

24      A.   Yes.

25      Q.   So he is trying to figure out whether

1    this is a suspicious order or not; right?

2           MR. KOBRIN:  Object to form.  Calls for

3    speculation.

4           THE WITNESS:  He asked that question,

5    yes.

6    BY MR. HUDSON:

7       Q.   Right.  And so would this be an example

8    of where your expectation was that Giant Eagle or

9    HBC would begin keeping a file for suspicious

10   orders that have been identified and the steps

11   taken to address these orders?

12          MR. KOBRIN:  Object to form.  That

13   almost exact question has already been asked and

14   answered.

15          THE WITNESS:  No.  I didn't have any

16   expectations of their day-to-day operations.

17   BY MR. HUDSON:

18      Q.   Let's go back then to Exhibit 6.  What

19   did you mean when you wrote, "Please print this

20   communication and begin keeping a file for

21   suspicious orders that have been identified and

22   the steps taken to address these orders"?

23      A.   I don't recall, but, again, this --

24   unless I'm missing part of this email, this wasn't

25   considered a suspicious order.

```
 1        Q.   Can we agree that in Exhibit 7, it was

 2   an order that was flagged as being above the

 3   threshold?

 4             MR. KOBRIN:  Object to forms.

 5             THE WITNESS:  Based on Joe's email, yes.

 6   BY MR. HUDSON:

 7        Q.   Do you agree that a suspicious order is

 8   an order of unusual size?

 9             MR. KOBRIN:  Object to form.

10             THE WITNESS:  I don't know.

11   BY MR. HUDSON:

12        Q.   When you said begin keeping a file for

13   suspicious orders, what did you have in mind as to

14   what a suspicious order would be?

15             MR. KOBRIN:  Object to form.  He's

16   already explained what he understood this to mean.

17             THE WITNESS:  I don't really have -- I

18   don't know what our -- I don't recall really.

19   BY MR. HUDSON:

20        Q.   Do you have any -- as you sit here

21   today, do you have any knowledge of what a

22   suspicious order is?

23        A.   From being a pharmacist, yes.

24        Q.   What is a suspicious order?

25        A.   It would be an order that is -- my
```

1    understanding is that would be intended for

2    diversion or nonlegitimate purposes for that

3    order.

4        Q.   And was the idea of HBC creating a

5    suspicious purchasing report to try to flag orders

6    that would be at risk for diversion?

7            MR. KOBRIN:  Object to form.  He's

8    already testified he doesn't know about the

9    suspicious purchasing report.

10           THE WITNESS:  I don't know what the

11   purpose of this report is.

12   BY MR. HUDSON:

13       Q.   But regardless of your definition, if we

14   go back to your email in Exhibit 6, in December of

15   2013, you did think it was a good idea for Giant

16   Eagle or HBC to start keeping a file?

17           MR. KOBRIN:  Object to form.

18   BY MR. HUDSON:

19       Q.   Right?

20           MR. KOBRIN:  Object to form.

21   Misrepresenting his testimony.

22           THE WITNESS:  I asked that -- in this

23   email, it looks like I asked that a file be

24   created.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:

 2        Q.   Right.  And the file would be created

 3   for suspicious orders that have been identified

 4   and the steps taken to address these orders;

 5   right?

 6        A.   That's how it reads, yes.

 7        Q.   Is there anything more that you can say

 8   as you sit here today about what you had in mind

 9   for what that file would look like?

10        A.   No.

11        Q.   Anything more you can say as you sit

12   here today as to why you thought it would be a

13   good idea to create such a file?

14             MR. KOBRIN:  Object to form.

15   Misrepresents the evidence.  He never talked about

16   this being a good idea.  He admitted that it looks

17   like he sent the email.

18             THE WITNESS:  Yes.  I know that I sent

19   an email that says to create a file, but other

20   than that, I don't recall anything.

21   BY MR. HUDSON:

22        Q.   Well, you did ask the file to be created

23   because you thought it was a good idea to create a

24   file; right?

25             MR. KOBRIN:  Object to form.
```

1    Misrepresents the evidence -- his testimony.

2    Excuse me.

3            THE WITNESS:  All I can say is that I

4    wrote an email that asked for a file to be

5    created.

6    BY MR. HUDSON:

7        Q.   And if a file was created that had the

8    orders that had flagged as being suspicious and

9    the steps that were taken to resolve those orders,

10   then if we were setting here today and I asked you

11   the question which orders were flagged and what

12   was done to go and investigate those, we could

13   just go look at a file that was created and know

14   the answer to those questions; right?

15           MR. KOBRIN:  Object to form.  Calls for

16   speculation.

17           THE WITNESS:  If a file was created, you

18   could reference that, yes.

19   BY MR. HUDSON:

20       Q.   Right.  And that would tell us which

21   orders had been flagged and what was done to go

22   and investigate those particular orders?

23           MR. KOBRIN:  Object to form.

24           THE WITNESS:  No.  It would tell you

25   what orders were identified as suspicious, not

Highly Confidential - Subject to Further Confidentiality Review

```
 1   ones that were flagged.

 2   BY MR. HUDSON:

 3       Q.   Right.  So if the organization began

 4   keeping a file for suspicious orders that have

 5   been identified and the steps taken to address

 6   these orders, which is what you wrote in your

 7   email, then if we were sitting here today, we

 8   would know which orders had been flagged as

 9   suspicious and then the steps that had been taken

10   to go and address these orders; right?

11           MR. KOBRIN:  Object to form.  Ty,

12   you're --

13   BY MR. HUDSON:

14       Q.   Is that fair?

15           MR. KOBRIN:  Object to form.  You're

16   mixing the verbs that are used here and the

17   definitions and you're saying it's flagged as

18   suspicious.  The witness is clearly

19   differentiating between orders that are flagged

20   and orders that are identified as suspicious

21   orders.

22           MR. HUDSON:  He's not testified to that

23   at all.  If you want to testify to that, you're

24   welcome to.  You can ask him whatever clarifying

25   questions you want.  It's "Objection.  Form."  And
```

Highly Confidential - Subject to Further Confidentiality Review

 1    then you can go and clarify it.

 2             MR. KOBRIN:  I'm allowed to state my

 3    reasons for the objection.

 4             MR. HUDSON:  You're not actually.

 5             MR. KOBRIN:  You're confusing the record

 6    and you're confusing the witness.

 7             MR. HUDSON:  Your objection has been

 8    noted and the witness can answer the question.

 9             MR. KOBRIN:  It has been noted, but I'd

10    rather you didn't interrupt me while I'm making

11    it.  You're confusing the witness and I'd rather

12    you didn't confuse the issues here or at least --

13             MR. HUDSON:  And I'd rather you not

14    coach the witness.

15    BY MR. HUDSON:

16        Q.   Sir, am I reading you email correctly?

17    Did you write -- let's just go through it again,

18    start over.  In your email, which we're on

19    Exhibit 6 and we're in the second paragraph, you

20    said, "Please print this communication and begin

21    keeping a file for suspicious orders that have

22    been identified and the steps taken to address

23    these orders."

24        What did you have in mind for what that file

25    would look like?

1            MR. KOBRIN:  Object to form.  Asked and

2    answered.

3            THE WITNESS:  I don't recall.

4    BY MR. HUDSON:

5        Q.    Would there be -- did you have an

6    expectation that emails and communications like

7    what is in Exhibit 7 would be part of a file?

8            MR. KOBRIN:  Object to form.

9            THE WITNESS:  No.

10   BY MR. HUDSON:

11       Q.    Why would Exhibit 6 be a communication

12   to print and keep, but Exhibit 7 would not?

13           MR. KOBRIN:  Object to form.  Asked and

14   answered.

15           THE WITNESS:  I think I already alluded

16   to this was -- six was identified as suspicious.

17   Seven appears to be being investigated.  Other

18   than what I read though, I don't know outcomes,

19   et cetera.

20   BY MR. HUDSON:

21       Q.    In six that order was flagged as

22   suspicious, too; right?

23           MR. KOBRIN:  Object to form.

24           THE WITNESS:  Can you repeat that.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HUDSON:
 2        Q.   Sure.  Exhibit 6, that email, that's an
 3    order that was flagged as suspicious; correct?
 4        A.   It was identified as suspicious.
 5        Q.   Right.  And then it was investigated;
 6    right?
 7             MR. KOBRIN:  Object to form.
 8             THE WITNESS:  Based on this email, it
 9    looks like it had already been investigated.
10    BY MR. HUDSON:
11        Q.   Right.  So Exhibit 6 involves a shipment
12    of buprenorphine that has been flagged and then it
13    was investigated and then it was determined that
14    the shipment should be stopped and the DEA should
15    be contacted; correct?
16             MR. KOBRIN:  Object to form.
17             THE WITNESS:  That's how it reads.
18    BY MR. HUDSON:
19        Q.   Now, if we look at Exhibit 7, this is
20    also a shipment that's been flagged.  And then we
21    see the email chain that involved the
22    investigation; right?
23        A.   If this is the full investigation, yes.
24        Q.   And do you know if this is the full
25    investigation?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I do not.

 2        Q.    What you see on Exhibit 7, would this be

 3   an example where an investigation was conducted

 4   and it was determined that the order was not

 5   suspicious?

 6             MR. KOBRIN:  Object to form.  He's

 7   already testified that he doesn't know the extent

 8   of the investigations.

 9             THE WITNESS:  I don't know.  I didn't

10   get involved in the investigation process.

11   BY MR. HUDSON:

12        Q.    As a member of the Giant Eagle team

13   that's being copied here though, do you have an

14   opinion one way or the other of whether or not

15   this would be an order that had been determined to

16   be not suspicious?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  I don't have an opinion,

19   no.

20   BY MR. HUDSON:

21        Q.    Can we agree that Mr. Carlson was

22   raising questions to you privately about whether

23   it made sense that the flu would be a good

24   explanation for why this order quantity was what

25   it was?
```

 1      A.    Can you repeat that.

 2      Q.    Sure.   The top email from Mr. Carlson to

 3   you, is he there in that email questioning

 4   privately to you whether it makes sense that flu

 5   season would be an explanation for the quantity of

 6   this order?

 7           MR. KOBRIN:   Object to form.

 8           THE WITNESS:   He wrote he thought flu

 9   did not impact our numbers.

10   BY MR. HUDSON:

11      Q.    And you agree that the PDL -- do you

12   agree that the PDL was explaining that a

13   particular prescriber was prescribing medication,

14   hydrocodone combination products due to the cough

15   or cold season?

16      A.    That's what it states, yes.

17      Q.    So in Exhibit 7, this email chain, do

18   you see any explanation for this particular order

19   from store 8 that would give you comfort that it

20   wasn't suspicious?

21           MR. KOBRIN:   Object to form.

22   BY MR. HUDSON:

23      Q.    Or at risk for diversion.

24           MR. KOBRIN:   Object to form.   Asked and

25   answered.

```
 1              THE WITNESS:  I didn't oversee the
 2     investigation process, so my opinion really
 3     wouldn't bear on this situation.
 4     BY MR. HUDSON:
 5          Q.   Do you know whether or not this was an
 6     order that was reported to the DEA?
 7          A.   I do not.
 8          Q.   Do you know whether or not this is an
 9     order that was stopped?
10          A.   We're still on seven; correct?
11          Q.   Correct.
12          A.   I do not.
13          Q.   At this point in time in January of '13,
14     did you have an understanding of how the
15     monitoring system was working on a day-to-day
16     basis?
17              MR. KOBRIN:  Object to form.
18              THE WITNESS:  No.
19              (HBC-Bianco Exhibit 8 was marked.)
20     BY MR. HUDSON:
21          Q.   I'll hand you what I've marked as
22     Exhibit 8.
23              MR. HUDSON:  Exhibit 8, the internal
24     number is 1223.
25              (Witness reviewed the exhibit.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HUDSON:

 2         Q.   Have you had a chance to look at the

 3    emails?

 4         A.   The emails, yes, not the attachment.

 5         Q.   Take a look, if you would, at the

 6    attachment.  I think it's a questionnaire from a

 7    manufacturer.

 8         A.   Correct.

 9         Q.   Did you from time to time -- were you

10    asked to fill out or complete questionnaires from

11    manufacturers about HBC's distributor or

12    wholesaler process?

13         A.   This is the only one I recall the

14    organization being requested.

15         Q.   Do you have a recollection of this

16    particular manufacturer questionnaire?

17         A.   Vaguely.  I remember receiving it.

18         Q.   And in the top email, was Mr. Carlson

19    asking you to review the questionnaire?

20         A.   Yes.

21         Q.   With Mr. Millward?

22         A.   Asked me to review it with Joe, yes.

23         Q.   And then below is an email from the

24    manufacturer, and it's Qualitest; right?

25         A.   Correct.
```

1      Q.    And they were indicating in that email

2    that they received questionnaires from 67 percent

3    of their customers but had not received a

4    completed questionnaire from Giant Eagle; right?

5      A.    That's what it reads.

6      Q.    And do you recall whether you met with

7    Joe to talk about the suspicious order monitoring

8    at HBC?

9      A.    I don't remember specifics on this.

10     Q.    Mr. Carlson alludes to recent

11   enhancements.  Do you know what he meant by that

12   in his email?

13          MR. KOBRIN:  Object to form.

14          THE WITNESS:  I do not.

15   BY MR. HUDSON:

16     Q.    So this email that we marked as

17   Exhibit 8 is dated January 15, right, of 2014?

18     A.    Correct.

19          (HBC-Bianco Exhibit 9 was marked.)

20   BY MR. HUDSON:

21     Q.    Let me hand you what I'm going to mark

22   as Exhibit 9.  This is an email from Mr. Millward

23   to Greg Carlson, George Chunderlik and Shawn

24   Voyten.  And then you and Mr. Mollica are copied

25   on this email; right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   And this is again referencing this

3  Qualitest questionnaire; right?

4      A.   Yes.

5           (HBC-Bianco Exhibit 10 was marked.)

6  BY MR. HUDSON:

7      Q.   And then the last exhibit on this topic

8  I've got for you I'm marking as Exhibit 10.  And

9  this one, if you turn to --

10          MR. HUDSON:  Exhibit 10, the internal

11  number is 123, P-GEN 123.

12  BY MR. HUDSON:

13     Q.   If you turn to the last page of this

14  one, down there at the bottom do you see there --

15  is that your signature dated February 3, 2014?

16     A.   Yes.

17     Q.   And does this indicate that in February

18  of 2014 you, in fact, completed the Qualitest

19  questionnaire?

20     A.   It states that I signed off on it, yes.

21     Q.   And were you the one who actually filled

22  it out?

23     A.   I don't recall.

24     Q.   But you did sign and print your name;

25  right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I signed my name.

2          Q.    You wouldn't do that unless you reviewed

3    what you were signing; right?

4          A.    Not necessarily.

5          Q.    Do you think it's possible that this

6    questionnaire was signed by you without you

7    reading it?

8          A.    I signed a lot of documents.  I don't

9    remember if I read this one in particular or not.

10         Q.    So if we go back to Exhibit 8, that's on

11   January 15 of 2014; right?

12         A.    Exhibit?

13         Q.    Exhibit 8.

14         A.    Yes.

15         Q.    And at that point in time, Qualitest was

16   asking for this questionnaire back; right?

17         A.    In 2014, yes.

18         Q.    And then on February 3, 2014 is when you

19   signed and dated it.  So that's about a little

20   more two weeks; is that right?

21         A.    Yes.

22         Q.    And then if we go to Exhibit 9 is an

23   email from Mr. Millward to Mr. Voyten and

24   Mr. Carlson where he writes, "Are we reporting PSE

25   (a listed chemical) sales from HBC to the stores

1    monthly?  I assume it is through ARCOS to comply

2    with 21 USC 830(b).  Are the records being

3    retained for two years?  We need lock down at SOM

4    SOP ASAP."

5         Do you see that?

6         A.   Yes.

7         Q.   Do you know what he meant by "We need

8    lock down at SOM SOP ASAP"?

9         A.   I do not.

10        Q.   Do you know whether or not at this time

11   in January of 2014 HBC had a suspicious order

12   monitoring policy?

13        A.   Yes.

14        Q.   And did HBC have a suspicious order

15   monitoring policy?

16        A.   Yes.

17        Q.   Was it a written policy?

18        A.   I don't recall.

19        Q.   Did you have any direct involvement in

20   trying to determine what suspicious order

21   monitoring policy or program HBC had?

22             MR. KOBRIN:  Object to form.  Asked and

23   answered.

24             THE WITNESS:  No.

25

```
 1    BY MR. HUDSON:

 2        Q.   If we look -- if we then turn to

 3    Exhibit 10 and go to the last page of that

 4    exhibit, question four, it says, "Please provide a

 5    copy of your suspicious order monitoring program

 6    SOP or summary of program."  Do you see that?

 7        A.   Yes.

 8        Q.   And then you wrote underneath that, "The

 9    Giant Eagle suspicious order monitoring program

10    utilizes purchase order threshold monitoring to

11    identify, investigate and report suspicious drug

12    orders by the individual pharmacy registrants."

13    Right?

14        A.   That's what it reads, yes.

15        Q.   How did you come to learn that this is

16    the program that HBC had in place?

17        A.   I don't recall.

18        Q.   Do you know if you were the one, you or

19    someone else supplied this information to

20    Qualitest about Giant Eagle's suspicious order

21    monitoring program?

22        A.   If it was supplied to Qualitest?

23        Q.   Do you know if you were the one who

24    supplied this?  In other words, did you get this

25    information from someone else, or did you go out
```

Highly Confidential - Subject to Further Confidentiality Review

1   and figure out and determine this is what Giant

2   Eagle's suspicious order monitoring program was?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  I would have had Joe do

5   that as oversight of compliance.

6   BY MR. HUDSON:

7        Q.   So you were relying on Joe to tell you

8   and provide you with the information about Giant

9   Eagle's suspicious order monitoring program?

10             MR. KOBRIN:  Object to form.

11             THE WITNESS:  Yes.

12   BY MR. HUDSON:

13        Q.   Did you ever independently go and verify

14   whether or not Giant Eagle had a suspicious order

15   monitoring program that was monitoring thresholds

16   to identify, investigate and report suspicious

17   drug orders?

18        A.   I don't recall.

19        Q.   As you sit here today, do you have any

20   recollection of doing any sort of independent

21   review or investigation to try to figure out

22   exactly what the HBC program looked like?

23        A.   I don't recall.

24        Q.   When you say you don't recall --

25        A.   I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And I guess just so that the record is

2   clear, when you say don't recall, does that mean

3   as you sit here today, you don't have any specific

4   recollection of going and doing that, but that

5   doesn't mean that you didn't; you really don't

6   recall?

7      A.   Correct.

8           (HBC-Bianco Exhibit 11 was marked.)

9   BY MR. HUDSON:

10     Q.   I'm going to hand you what I'm marking

11   as Exhibit 11.  And we're now in Exhibit 11 up to

12   May of 2014.  And this appears to be an email

13   chain where somebody named Michael Cullen who

14   appears to be connected to Purdue is emailing

15   asking about getting together to talk about a

16   monitoring program for opioids.

17          Does that seem to be what this email chain is

18   about?

19     A.   Can you repeat the question?  Sorry.  I

20   was reading.

21     Q.   Sure.  Is this an email chain from a

22   gentleman from Purdue who was wanting to meet up

23   with you or someone in compliance to talk about a

24   monitoring program?

25     A.   Part of it, yes.

```
 1         Q.   And do you know whether or not you, in
 2    fact, did meet with this gentleman to talk about a
 3    monitoring or compliance program at Giant Eagle?
 4         A.   I don't remember meeting with him, but I
 5    would have -- I didn't oversee our monitoring
 6    program.
 7         Q.   Do you know whether or not anyone from
 8    Giant Eagle or HBC ever met with Mr. Cullen to
 9    talk about a monitoring program?
10         A.   I do not.  I don't remember if I did.
11         Q.   I've only got one copy of this.  So I'm
12    just going to hand this to you.  This just looks
13    like -- and we don't need to mark it because it's
14    not that important.  I'm going to use another
15    exhibit with you that's got more detail.
16         Does this look like in late July an email
17    from somebody named Eric Brantley to Mr. Murphy
18    with a copy to you about scheduling a Giant Eagle
19    site visit?  You can ignore -- all the handwriting
20    is mine.
21              MR. KOBRIN:  If he's going to look at
22    it, if we mark it as an exhibit, is that okay?  We
23    can make other copy of it if you want.
24              MR. HUDSON:  Yeah.  That's fine.  It's
25    got my handwriting on it.  I don't think it's
```

 1    really necessary.

 2            THE WITNESS:  What was the question?

 3    BY MR. HUDSON:

 4        Q.   Is this an email where you were copied

 5    that was talking about setting up a site visit at

 6    the HBC warehouse?

 7        A.   It just says a site visit.  It doesn't

 8    necessarily say where.

 9            (HBC-Bianco Exhibit 12 was marked.)

10    BY MR. HUDSON:

11        Q.   Let me show you then what I'm marking as

12    Exhibit 12.

13            MR. KOBRIN:  Well, this is going to be

14    Exhibit 12.  This is going to be Exhibit 13.

15            MR. HUDSON:  Mark that as 12.

16            (HBC-Bianco Exhibit 13 was marked.)

17    BY MR. HUDSON:

18        Q.   I'll hand you what I marked as 13.

19            MR. KOBRIN:  Do you want me to read the

20    Bates range for the record?

21            MR. HUDSON:  Yeah, you can.

22            MR. KOBRIN:  Exhibit 12 is

23    ENDO_HSGAC_0017819.

24    BY MR. HUDSON:

25        Q.   Seeing Exhibits 12 and 13, does that

1    refresh your recollection at all about a site

2    visit?

3        A.    No.

4        Q.    Do you have any recollection of talking

5    to a consultant about compliance at the HBC

6    facility as part of a site visit?

7        A.    I don't recall a discussion.

8        Q.    If you look at Exhibit 13 and you turn

9    back to the third page, do you see there it says

10   Risk Evaluation Report?

11       A.    Yes.

12       Q.    It says primary contacts Mike Bianco,

13   pharmacy manager, and Greg Carlson, senior

14   director of pharmacy?

15       A.    Yes.

16       Q.    And then if we turn back to the

17   executive summary and we look down through there,

18   for example, in the second paragraph, do you see

19   references to yourself where it says "According to

20   Mr. Bianco"?  Then if we look down into the third

21   paragraph, you see it begins, "According to

22   Mr. Bianco," and in the fourth paragraph it again

23   says "Mr. Bianco related," and then in the last

24   paragraph it talks about "According to

25   Mr. Bianco."

1        A.    I see my name, yes.

2        Q.    Do you recall having discussions with a

3    PCG senior division consultant?

4        A.    No.

5        Q.    Do you ever remember meeting somebody

6    named Tony Sheller?

7        A.    No.

8        Q.    Do you have any reason to believe that

9    Mr. Sheller did not travel to the Pittsburgh

10   corporate headquarters of Giant Eagle and

11   interview you?

12       A.    No.

13       Q.    Do you think that that occurred?

14       A.    Based on this, yes.  I just don't recall

15   it.

16       Q.    And would you have at some point in time

17   been given a copy of this report?

18       A.    I don't know.

19            MR. KOBRIN:  For the record, I note that

20   he's not copied on the email that has the report

21   attached to it.  There's no indication that he

22   received it.

23   BY MR. HUDSON:

24       Q.    You were though -- if we go back to

25   Exhibit 12, you were involved in setting up the

Highly Confidential - Subject to Further Confidentiality Review

1   meeting for this site visit to occur; right?

2           MR. KOBRIN:  Object to form.  Misstates

3   his testimony.

4           THE WITNESS:  I don't recall this

5   meeting.  So I don't know my involvement.

6   BY MR. HUDSON:

7       Q.   If you can hand me back Exhibit 12, and

8   I apologize since we've only got one copy.

9   Exhibit 12 though does talk about setting up -- it

10  says, "Matt, reach out to Mike Bianco at Giant

11  Eagle to schedule a site visit."  Then it provides

12  a 412 number that I'm assuming is your number.  It

13  says, "I've copied him on this email."  Right?

14      A.   Yes.

15      Q.   So the email does indicate that somebody

16  is reaching out to you and has your phone number

17  to set up this site visit; right?

18      A.   Yes.

19      Q.   If you look at Exhibit 12 and you

20  compare it to Exhibit 13, do you agree that these

21  emails are talking about the same site visit that

22  occurred at the Giant Eagle corporate

23  headquarters?

24      A.   Yes.

25      Q.   So as you sit here today, you don't have

1    any reason to believe that that site visit did

2    not, in fact, occur; right?

3         A.    Correct.

4         Q.    So if we go to -- and you see here in

5    Exhibit 13 that the Pharma Group, in fact, then

6    put together a document that then -- that's

7    entitled a Risk Evaluation Report; right?

8         A.    Correct.

9         Q.    Then the location is the location of the

10   HBC warehouse; right?

11        A.    I believe that was the address, yes.

12        Q.    Now, if we go to the executive summary,

13   it looks like Mr. Sheller traveled to Pittsburgh

14   to the corporate headquarters of Giant Eagle;

15   right?

16        A.    Yes.

17        Q.    And it says, "At the corporate location

18   Consultant Sheller met with Michael Bianco, Jr.,

19   corporate pharmacy manager, Greg Carlson,

20   corporate senior director of pharmacy, and Joe

21   Millward, corporate compliance senior manager."

22   Right?

23        A.    It reads that, yes.

24        Q.    It says, "These three individuals

25   provided most of the information noted in this

Highly Confidential - Subject to Further Confidentiality Review

1    report."  Correct?

2        A.   Correct.

3        Q.   Then it says, "Immediately after this

4    meeting, Consultant Sheller traveled to the

5    registered warehouse in Washington, Pennsylvania

6    and met with Matt Rogos, distribution operations

7    manager.  Mr. Rogos provided the remainder of the

8    information in this report."

9        Did I read that right?

10       A.   Yes.

11       Q.   Now, if we go down to the fourth

12   paragraph that starts out, "At each customer of

13   controlled substances and PSEs at the Giant Eagle

14   retail pharmacy, copies of all the pharmacies' DEA

15   and state regulatory licenses are retained at the

16   HBC corporate office in Pittsburgh, PA."

17       Then it says, "Mr. Bianco related that there

18   are corporate policies that must be followed in

19   the distribution and dispensing of any controlled

20   drug at either the distributor or pharmacy level.

21   These policies are shared with the responsible

22   controlled drug handlers at the facility and the

23   pharmacist in charge at the pharmacy."

24       Did I read that right?

25           MR. KOBRIN:  Object to form.  Misstates

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the evidence.

 2          THE WITNESS:  Yes.

 3   BY MR. HUDSON:

 4      Q.   What was your basis for stating that

 5   there are corporate policies that must be followed

 6   in the distribution and dispensing of any

 7   controlled drug at either of the distributor or

 8   pharmacy level, if you recall?

 9      A.   As I mentioned, I was aware that there

10   were policies in place.  I just don't know the

11   specifics behind them.

12      Q.   And from whom did you learn that there

13   were policies in place?  Would that be again

14   Mr. Millward?

15      A.   I don't remember.

16      Q.   In the last sentence, you said, "These

17   policies are shared with the responsible

18   controlled drug handlers at the facility."

19          Did you mean at the HBC facility.

20          MR. KOBRIN:  Object to form.  You're

21   reading from a report that he never reviewed and

22   didn't write and you're reflecting it's his

23   verbatim statement.

24          MR. HUDSON:  It's him.  He did make the

25   statement.  It says "Mr. Bianco related" and then
```

Highly Confidential - Subject to Further Confidentiality Review

1    it goes on.

2             MR. KOBRIN:  Right.  But again, we've

3    established he didn't write this.  We have no

4    evidence that he ever reviewed it.  We have no

5    evidence he's ever seen it until now.

6    BY MR. HUDSON:

7         Q.   Mr. Bianco, do you have any doubt that

8    you gave statements to Mr. Sheller in August of

9    2014?

10        A.   I don't doubt that I spoke with him, no.

11        Q.   In speaking with him, do you believe

12   that what's contained in the fourth paragraph is

13   accurate?  In other words, as you sit here today,

14   is that consistent with your recollection at the

15   time?

16        A.   I don't remember this meeting, but it's

17   highly unlikely that I was the one speaking to

18   this.  Based on this, given the people in the

19   room, it's highly unlikely I was the one that was

20   conducting the meeting.

21        Q.   You believe that perhaps it was

22   Mr. Carlson or Mr. Millward or someone else who

23   actually made those comments, but they were

24   attributable to you?

25        A.   That's likely, yes.

1           MR. KOBRIN:  Ty, my objection wasn't to

2    anything about whether he believes he met with him

3    or anything.  It's the way that you stated the

4    question, as if he had stated the exact words in

5    the report.

6    BY MR. HUDSON:

7        Q.   Mr. Bianco, if you go to the bottom, the

8    last paragraph, it indicates that "The facility

9    was last inspected in May of 2013 by DEA, and

10   according to Mr. Bianco, minor record keeping

11   violations were detected and immediately

12   rectified."  I've got the same question.

13       Do you think that that was information that

14   you would have provided or maybe that was somebody

15   else but that was attributed to you?

16       A.   Yes.  It's highly unlikely that I made

17   that -- that I actually made that statement.  I

18   didn't handle the record keeping or the day-to-day

19   compliance.  I was aware that the DEA came in or I

20   would have been aware I should say.

21   BY MR. HUDSON:

22       Q.   Were you aware of whether there were any

23   violations that were flagged by the DEA?

24       A.   No.

25       Q.   Are you aware of any actions that were

Highly Confidential - Subject to Further Confidentiality Review

1    taken to rectify those issues?

2        A.    No.

3        Q.    If we turn to the next page of the

4    executive summary, in the second full paragraph,

5    it says, "All orders of a controlled substance

6    and/or PSEs by the Giant Eagle pharmacies are

7    first screened by the corporate computer.  An

8    unusual order is held at the facility and reviewed

9    by the loss prevention office before it is

10   released for distribution."

11       Do you know whether that's information that

12   you would have provided or someone else?

13       A.    I wouldn't have known.  This is the

14   first I'm seeing that level of detail.

15       Q.    And as you sit here today, do you know

16   at the time in August of 2014 whether, in fact,

17   the facility had the ability to hold orders at the

18   facility?

19       A.    Do I know --

20           MR. KOBRIN:  Object to form.

21           THE WITNESS:  Do I know if that was

22   possible?

23   BY MR. HUDSON:

24       Q.    Yes.

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    It is possible?

2          A.    That orders could have been held, yes.

3          Q.    And how would that process work?

4                MR. KOBRIN:  Object to form.

5                THE WITNESS:  We've talked about this

6     previously, but they could be -- I mean, one way I

7     know is that they could have been identified by

8     somebody in the warehouse and held.

9     BY MR. HUDSON:

10         Q.    So they would be physically held?

11         A.    Not necessarily, but, yes.

12         Q.    All I'm asking is, because I want to

13    make sure the record is clear:  Was there an

14    automated process for flagging and holding orders

15    or would it be more of a manual process where if

16    something was flagged, then it would just involve

17    a picker or the supervisor at the warehouse

18    physically just putting the order aside and

19    waiting?

20               MR. KOBRIN:  Object to form.

21               THE WITNESS:  I don't know their -- I

22    don't know how that operation worked in detail

23    that you're describing it.  I know that orders

24    could have been held, but I don't know how that --

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:

 2        Q.   That's what I'm asking.  How do you know

 3   that orders could be held?

 4        A.   Well, I was copied on emails where the

 5   orders were held.

 6        Q.   Do you know though as you sit here today

 7   that they were, in fact, held?

 8        A.   Based on the emails that we saw, I mean,

 9   yes.

10        Q.   Are you referring back to Exhibit 6?

11             MR. KOBRIN:  Object to form.  I think he

12   mentioned earlier -- you had a whole colloquy

13   about holding orders and opioid and nonopioid

14   holds.

15             THE WITNESS:  Six, yes, is an example of

16   an order held.

17   BY MR. HUDSON:

18        Q.   So in Exhibit 6 explain to me how that

19   order was held.

20             MR. KOBRIN:  Object to form.  He's

21   already told you he doesn't know.

22             THE WITNESS:  I don't know other than

23   what I'm reading here.

24   BY MR. HUDSON:

25        Q.   That's what I'm saying.  As you sit here
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    today, do you have actually have firsthand

 2    knowledge that the HBC warehouse had the ability

 3    to hold or stop orders?

 4            MR. KOBRIN:  Object to form.  Asked and

 5    answered.

 6            THE WITNESS:  Yes.

 7    BY MR. HUDSON:

 8       Q.   And how then did that occur?

 9            MR. KOBRIN:  Object to form.  Asked and

10    answered.

11            THE WITNESS:  I mean, I'm reading an

12    email that I wrote that says an order was stopped.

13    BY MR. HUDSON:

14       Q.   I'm trying to get an understanding of

15    what you're relying on other people to tell you.

16    Did somebody tell you the order had been

17    stopped --

18            MR. KOBRIN:  Ty, are you asking if he

19    went to the warehouse to stop the order himself?

20    BY MR. HUDSON:

21       Q.   -- versus you having firsthand knowledge

22    of how the process worked and how orders were

23    stopped?

24            MR. KOBRIN:  Object to form.  Ty, this

25    has been gone over several times in this
```

Highly Confidential - Subject to Further Confidentiality Review

1   deposition.  He's told you he knew the orders were

2   stopped.  He's told you that he didn't understand

3   the exact technicalities of it.  I don't

4   understand why you're beating this witness up

5   about this issue.

6           THE WITNESS:  I never physically went

7   there to stop an order or see an order physically

8   stopped.

9   BY MR. HUDSON:

10      Q.   And as you sit here today, you don't

11  know the process of how an order could be stopped?

12  I'll be real honest with you.  The reason why I'm

13  asking is because other witnesses have testified

14  that orders can't be stopped.

15          MR. KOBRIN:  Object to form.

16  Misrepresents the testimony of other witnesses.

17          THE WITNESS:  I don't know how --

18          MR. HUDSON:  The record will tell that.

19          THE WITNESS:  I don't know how they

20  were -- I don't know the details behind it.

21  BY MR. HUDSON:

22      Q.   Is it fair to say it was your

23  understanding at this time that orders could be

24  stopped, but you didn't understand how, you didn't

25  understand who did it, and you didn't understand

Highly Confidential - Subject to Further Confidentiality Review

```
 1    how the process worked?

 2            MR. KOBRIN:  Object to form.

 3            THE WITNESS:  Yes.

 4    BY MR. HUDSON:

 5       Q.   Fair enough.  Thank you.

 6            MR. KOBRIN:  Can we take just a quick

 7    break?

 8            MR. HUDSON:  Sure.  Let's go off the

 9    record.

10            THE VIDEOGRAPHER:  The time is 11:23.

11    We're going off the video record.

12            (Recess from 11:23 a.m. to 11:42 a.m.)

13            THE VIDEOGRAPHER:  The time is

14    11:42 a.m.  We are now back on the video record.

15    BY MR. HUDSON:

16       Q.   Mr. Bianco, let's move to a new topic.

17    Were you ever involved in any DEA inspections?

18       A.   Formal inspections, not that I remember.

19            (HBC-Bianco Exhibit 14 was marked.)

20    BY MR. HUDSON:

21       Q.   Let me hand you what I've marked as

22    Exhibit 14.

23            MR. HUDSON:  The internal number is 1226

24    for this one.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:

 2        Q.   This looks like two emails.  I'm going

 3   to start with the bottom email.  And that was from

 4   you to STR_Pharmacy_PDLs.  Do you see that?

 5        A.   I do.

 6        Q.   Are you emailing then a distribution

 7   list of all the Giant Eagle PDLs?

 8        A.   Yes.

 9        Q.   And then you're copying Mr. Millward,

10   Ms. Matty, Mr. Shaheen and Mr. Carlson; right?

11        A.   Yes.

12        Q.   And the subject is Narcs Found in Tote?

13        A.   Correct.

14        Q.   And it's September 25, 2014; right?

15        A.   Correct.

16        Q.   And in this email you're indicating that

17   a narcotic tote was returned to the HBC warehouse

18   today with no identifying marks; right?

19        A.   Yes.

20        Q.   And then below you've identified what

21   the contents are in that tote there; right?

22        A.   It appears to be.

23        Q.   The top one is two units of a

24   hydrocodone combination product; right?

25        A.   Correct.
```

1    Q.   And then if we go on down, the fifth

2    item down is one unit of a hydrocodone combination

3    product; right?

4    A.   Correct.

5    Q.   And then the sixth item is another one

6    unit of a hydrocodone combination product?

7    A.   Correct.

8    Q.   And then below that you wrote,

9    "Additionally, we have seen a large number of

10   totes being returned to the warehouse with their

11   contents still inside, many of which are

12   refrigerated or controlled items.  Please attempt

13   to address this as you see fit."

14       Now, if we go up above to your -- that's in

15   October.  If we go up to the top email, this is an

16   email from you to Mr. Millward with a copy to

17   Mr. Carlson; right?

18   A.   To who?

19   Q.   It's an email from you to Mr. Millward

20   with a copy to Mr. Carlson.

21   A.   Yes.  Sorry.

22   Q.   And you're forwarding your email below;

23   right?

24   A.   Yes.

25   Q.   And that was the narcs found in tote

Highly Confidential - Subject to Further Confidentiality Review

1    email; right?

2        A.   Correct.

3        Q.   So this is about a little less than a

4    week after your September 25 email is this forward

5    on October 1; right?

6        A.   Correct.

7        Q.   In here you said, "Hi, Joe.  As you

8    likely know, the DEA was in for an inspection of

9    the warehouse today specifically asking about

10   hydrocodone-containing products."

11       Do you see that?

12       A.   Yes.

13       Q.   Do you have any recollection other than

14   what you're reading in this email about this DEA

15   next of the warehouse today asking about

16   hydrocodone-containing products?

17            MR. KOBRIN:  Object to form.

18            THE WITNESS:  No.

19   BY MR. HUDSON:

20       Q.   Here you wrote, "At the time the

21   warehouse reported having no

22   hydrocodone-containing products on hand."

23   Correct?

24       A.   Yes.

25       Q.   Then in the next paragraph you said,

Highly Confidential - Subject to Further Confidentiality Review

1    "Currently, we have one case of a

2    hydrocodone/APAP5/325 that was intended for 6510."

3         Is that a particular store, 6510?

4         A.   Yes.

5         Q.   "Which is being shipped out tonight

6    after discussion with Tracy Patel.  We also have

7    one tote of which the contents are described below

8    that was returned to the warehouse.  The original

9    owner of the returned tote is not able to be

10   identified by Donna Matty or myself through

11   various methods.  Can you tell me how you would

12   like these contents to be handled.  I would like

13   to have the four units of hydrocodone-containing

14   products out of the warehouse by 10/5 so we can

15   avoid any issues with the schedule change."

16        Do you see that?

17        A.   Yes.

18        Q.   Does this email from you to Mr. Millward

19   and a copy to Mr. Carlson indicate that on

20   October 1 when you were writing this email, there

21   were hydrocodone combination products that were at

22   the warehouse?

23        A.   On October 1, yes.

24        Q.   And you wrote this email at 1827.  Would

25   that be 6:27 at night?

1      A.    Assuming the time stamps are correct,

2  yes.

3      Q.    And here in this email you're writing

4  that there was a DEA inspection of the warehouse

5  today, which means on October 1; right?

6      A.    That's what it reads, yes.

7      Q.    And at that inspection where that DEA

8  came in, the warehouse reported to the DEA having

9  no hydrocodone-containing products on hand;

10  correct?

11      A.    That's what it reads, yes.

12      Q.    But that wasn't true; right?

13          MR. KOBRIN:  Object to form.

14          THE WITNESS:  I don't know that.

15  BY MR. HUDSON:

16      Q.    In this email that you forwarded, you

17  forwarded an email from September 25 that talked

18  about a tote being returned to the HBC warehouse

19  that had four units of hydrocodone combination

20  products; right?

21      A.    Yes.

22      Q.    And in your above email, you're talking

23  about shipping it out that night, the night of

24  October 1, right, from the warehouse?

25      A.    That's what it reads.

1     Q.   So that tote was there that day when the

2  DEA was inspecting; right?

3     A.   I don't know that.

4     Q.   You can't tell that from reading your

5  below email and this email?

6     A.   I wasn't physically at the location.  So

7  I don't know where the tote in question was or how

8  it was handled.

9     Q.   In this email that you're writing to

10  Mr. Millward, we know where the tote was, right,

11  because you're talking shipping it out that night?

12          MR. KOBRIN:  Object to form.  Where are

13  you talking about they were shipping it out that

14  night?

15  BY MR. HUDSON:

16     Q.   Do you see that, Mr. Bianco?

17     A.   Can you repeat that.

18     Q.   Sure.  You said currently -- or you

19  said, "Currently we have one case of

20  hydrocodone/APAP 5/325..."  What is that?

21     A.   That's -- I can't remember if it's

22  Vicodin or Norco.  I think it's Norco, the generic

23  Norco.

24     Q.   "...that was intended for 6510, which is

25  being shipped out tonight after discussion with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Tracy Patel."  And who is Tracy Patel?

 2         A.   She's an PDL.

 3         Q.   So this is indicating the HBC warehouse

 4    is going to ship this hydrocodone-containing

 5    product to -- it's going to ship it out that

 6    night.  Is that a fair reading of this email.

 7         A.   I don't know where it was shipping from.

 8    It just says that it was shipping.

 9         Q.   You can't tell from your email where it

10    was shipping from, that particular

11    hydrocodone-containing product?

12         A.   I can make an assumption.

13         Q.   What would your assumption be?

14              MR. KOBRIN:  Object to form.

15              THE WITNESS:  Strictly speculating, it

16    would be from the warehouse.

17    BY MR. HUDSON:

18         Q.   Is there anywhere else that you can

19    think of as you sit here now where that

20    hydrocodone-containing product would be other than

21    the warehouse?

22         A.   At the time I believe it wasn't a CII.

23    How it was handled didn't have as -- the DEA

24    doesn't regulate it as tightly.  So I don't know

25    where it was.  I can't speak to where it was.
```

1      Q.   So if it was a hydrocodone-containing

2   product, since it's less regulated, in your mind,

3   somehow it's less critical that you tell the truth

4   to the DEA about which products are there?

5           MR. KOBRIN:  Object to form.

6   BY MR. HUDSON:

7      Q.   I don't understand what that means.

8           MR. KOBRIN:  Object to form.  Misstates

9   the testimony and it's argumentative.

10          THE WITNESS:  You don't understand what

11  what means?

12  BY MR. HUDSON:

13     Q.   Why did you say that hydrocodone was not

14  a CII at the time?

15     A.   I thought you had said earlier that

16  hydrocodone changed in late October 2014.

17     Q.   It changed at some point in

18  October 2014; right?

19     A.   Okay.

20     Q.   Do you know specifically when it

21  changed?

22     A.   I don't know off the top of my head, no.

23     Q.   Do you know why the DEA was conducting

24  this inspection?

25     A.   I do not.

1      Q.    Do you know why they were asking about

2    hydrocodone-containing products?

3      A.    I do not.

4      Q.    Do you know why the warehouse reported

5    having no hydrocodone-containing products on hand?

6      A.    I do not.

7      Q.    From your email, do you think it's fair

8    to infer that you're saying that there were

9    hydrocodone products that are on hand, but they're

10   being shipped out as soon as possible?

11          MR. KOBRIN:   Object to form.

12          THE WITNESS:   At what time?

13   BY MR. HUDSON:

14     Q.    On October 1.  One shipment you're going

15   to ship out later that night on October 1, and the

16   other shipment you're trying to get shipped out by

17   10/5.

18     A.    We can infer that as of October 1 at

19   6:30 p.m. there was hydrocodone there.  That's

20   fair.

21     Q.    Right.  So we know for sure that on

22   October 25, 2014, you wrote to all the PDLs about

23   a tote that had been returned to the HBC warehouse

24   that day that contained four units of hydrocodone

25   combination products; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    And then we also know that in your email

 3     of October 1, you reference that tote again, and

 4     you say, we also have one tote of which the

 5     contents are described below, and that's your

 6     email from September 25, right, that was returned

 7     to the warehouse?  The original owner of the

 8     returned tote is not able to identify by Donna

 9     Matty or myself -- is not able to be identified by

10     Donna Matty or myself through various methods;

11     right?

12          A.    That's what it reads.

13          Q.    Then you said, "Can you tell me how you

14     would like these contents to be handled?"  And you

15     wrote, "I would like to have the four units of

16     hydrocodone-containing products out of the

17     warehouse."

18          When you say out of the warehouse, that

19     indicates that at least on October 1 at 6:27 p.m.

20     when you wrote this email that they're in the

21     warehouse; right?

22               MR. KOBRIN:  Object to form.

23     BY MR. HUDSON:

24          Q.    Do you agree with that?

25          A.    (Nodding.)
```

1    Q.    And you want them out within the next

2    four days, by 10/5, so you can void issues with

3    the schedule change; right?

4    A.    That's what it says.

5    Q.    As you sit here today, do you believe

6    that the warehouse conveyed information to the DEA

7    that was not accurate?

8    A.    I don't know.

9    Q.    Was the purpose of your email to

10   Mr. Millward to make him aware of what had been

11   told to the DEA and make sure that those

12   hydrocodone combination products were out of the

13   warehouse as soon as possible?

14   A.    I think the purpose would have been to

15   let him know about the hydrocodone products in the

16   warehouse at that time.

17   Q.    Why then did you mention the DEA

18   inspection?

19   A.    I don't know.

20   Q.    Why did you mention that the warehouse

21   reported having no hydrocodone-containing

22   products?

23   A.    I don't know.  I don't know if that was

24   said to the DEA or not.

25   Q.    You think from your email it's possible

Highly Confidential - Subject to Further Confidentiality Review

1    that the warehouse did not report to the DEA of

2    having no hydrocodone-containing products on hand?

3         A.   I can't speak to that.  I wasn't there.

4         Q.   Let's look more carefully then, if we

5    can go back up to the top paragraph of your email.

6    This is what you wrote on October 1.

7         "As you likely know, the DEA was in for an

8    inspection of the warehouse today specifically

9    asking about hydrocodone-containing products.  At

10   the time the warehouse reported having no

11   hydrocodone-containing products on hand."

12        In your mind, is there any doubt at all that

13   the HBC warehouse reported to the DEA on October 1

14   that it had no hydrocodone-containing products on

15   hand?

16        A.   I don't know.  I don't know if the DEA

17   asked if there was any on hand.  I wasn't at

18   the...

19        Q.   You don't know whether or not the DEA

20   asked the warehouse whether there were

21   hydrocodone-containing products on hand?

22        A.   I don't know how I could know that.

23        Q.   You wrote it in your email, didn't you?

24        A.   No.

25        Q.   You say, "As you likely know, the DEA

```
 1    was in for an inspection of the warehouse today

 2    specifically asking about hydrocodone-containing

 3    products."

 4         Then you went on and said, "At the time the

 5    warehouse reported having no

 6    hydrocodone-containing products on hand."

 7         In your mind is there any uncertainty as to

 8    what you wrote?

 9              MR. KOBRIN:  Object to form.

10              THE WITNESS:  I can read what I wrote.

11    BY MR. HUDSON:

12         Q.   You agree that that day when the DEA was

13    there, what you're writing is that the warehouse

14    told the DEA that there were no

15    hydrocodone-containing products on hand; right?

16         A.   I disagree.

17         Q.   You don't think that's what's written in

18    that paragraph?

19         A.   I know definitively that's not what's

20    written in the paragraph.

21         Q.   What do you think the warehouse told the

22    DEA?

23         A.   I don't know.

24         Q.   What was your overall point in writing

25    this email to Mr. Millward who was the head of
```

Highly Confidential - Subject to Further Confidentiality Review

1    compliance at the time?

2        A.   I don't remember.  As I said earlier, I

3    could speculate that it was likely to tell him at

4    time of day that there may have been products on

5    hand.

6        Q.   Why would it be important to tell him

7    that there were hydrocodone products on hand?

8             MR. KOBRIN:  Object to form.

9             THE WITNESS:  Based on my email because

10   we wanted them out of the warehouse by 10/5.

11   BY MR. HUDSON:

12       Q.   And why did you want them out of the

13   warehouse by 10/5?

14       A.   So we can avoid any issue with the

15   schedule change.

16       Q.   What about the DEA, is there any

17   connection between the DEA coming and asking about

18   hydrocodone-containing products and the decision

19   to ship out the hydrocodone combination products

20   that you identified as being on hand?

21            MR. KOBRIN:  Object to form.

22            THE WITNESS:  Can you repeat that.

23   BY MR. HUDSON:

24       Q.   Sure.  Is there any connection between

25   the DEA conducting this inspection of the

1    warehouse that day and your decision to email

2    Mr. Millward and Mr. Carlson about shipping out

3    the hydrocodone combination products as soon as

4    possible or at least by 10/5?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  I don't -- I don't know.

7    BY MR. HUDSON:

8        Q.   If it was just about shipping the

9    hydrocodone combination products out, would there

10   have been any need to reference that the DEA had

11   made an inspection that day?

12       A.   They're two separate paragraphs, so...

13       Q.   So you think these are two unconnected

14   points?

15       A.   No.  I don't know.

16       Q.   Does this cause you concern as you're

17   sitting here today reading these two paragraphs

18   that it's possible that the HBC warehouse may have

19   provided inaccurate information to the DEA about

20   whether it had hydrocodone-containing products on

21   hand?

22             MR. KOBRIN:  Object to form.

23             THE WITNESS:  No.

24   BY MR. HUDSON:

25       Q.   It does not?

```
 1        A.    It doesn't state that they did.

 2        Q.    Do you think it's possible that the

 3   warehouse reported to the DEA that it had no

 4   hydrocodone-containing products on hand when, in

 5   fact, the warehouse did have

 6   hydrocodone-containing products in the warehouse

 7   at the time of the DEA inspection?

 8              MR. KOBRIN:  Object to form.  Calls for

 9   speculation.

10              THE WITNESS:  Is that possible?  Yes.

11   BY MR. HUDSON:

12        Q.    And from the contents of your email,

13   doesn't it appear to be highly likely that that's

14   what happened?

15              MR. KOBRIN:  Object to form.

16              THE WITNESS:  No.  We had a very close

17   relationship with the DEA.  So I don't know what

18   the conversations specifically were about, but

19   they could have been about many issues surrounding

20   the hydrocodone change, schedule change.

21   BY MR. HUDSON:

22        Q.    We do know though as part of that

23   conversation, the warehouse did report to the DEA

24   having no hydrocodone-containing products on hand.

25   We know that; right?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.    No.

2     Q.    We don't know that?

3     A.    I don't know who they reported that to.

4     Q.    You think it's possible in the same

5  paragraph you wrote about a DEA inspection of the

6  warehouse asking about hydrocodone-containing

7  products and in the next sentence you changed the

8  subject completely and talked about a report to

9  somebody other than the DEA about having no

10  hydrocodone-containing products on hand?

11          MR. KOBRIN:  Object to form.

12  Argumentative.

13          THE WITNESS:  And what was the question?

14          MR. HUDSON:  Would you mind reading back

15  the question.

16          (The record was read back.)

17  BY MR. HUDSON:

18     Q.    Do you understand the question?

19     A.    I'm not changing the subject entirely.

20  I'm still talking about hydrocodone.  But, again,

21  I can't -- I don't know what they said.  I wasn't

22  there.  I don't know what was reported.  I would

23  presume the DEA has a report on that date.

24     Q.    Sir, that first paragraph, you're

25  recapping a DEA inspection that occurred and what

Highly Confidential - Subject to Further Confidentiality Review

1  you told the DEA about hydrocodone-containing

2  products; right?

3      A.   No.  I was not there to report anything

4  to the DEA.

5      Q.   But you're not -- in that paragraph you

6  are not recapping what happened at that DEA

7  inspection that day?

8      A.   In the first sentence, yes.

9      Q.   Only the first sentence.

10     A.   I don't know.  I don't recall this

11  email.  I don't recall the situation.

12     Q.   As you're sitting here today, just

13  understanding the English language and that

14  paragraph and how it's written, is there any doubt

15  in your mind that those two sentences are

16  connected and that you're talking about a DEA

17  inspection of the warehouse, about

18  hydrocodone-containing products, and exactly what

19  the warehouse reported to the DEA?

20          MR. KOBRIN:  Object to form.

21  Argumentative.  Asked and answered.

22          THE WITNESS:  Was there concern?  What

23  was the leading part of that?  Was there concern

24  that I --

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:
 2        Q.   I just want to get your best testimony
 3   on the record about the first paragraph.  When you
 4   read that paragraph as you sit here today, is your
 5   best recollection of what you wrote back on
 6   October 1 -- are those two sentences connected and
 7   are you reporting to Mr. Millward and copying
 8   Mr. Carlson, your boss at the time, about a DEA
 9   inspection of the HBC warehouse and what the
10   warehouse reported to the DEA?
11             MR. KOBRIN:  Object to form.
12             THE WITNESS:  I guess if I had any
13   concern -- I don't recall this email.  But if I
14   had any concern that there was a suspicious order,
15   I wouldn't put it in five words in an email at
16   6:30 at night, or a dozen words.
17   BY MR. HUDSON:
18        Q.   My question though wasn't about a
19   suspicious order.  My question is that first
20   paragraph, it's just what the warehouse told the
21   DEA about whether there were hydrocodone
22   combination products at the warehouse at the time
23   of the inspection and then you reporting to them
24   later about what your understanding of what was at
25   that warehouse later that night.
```

1    Isn't that what's going on in this email?

2    A.   Like I said, I wouldn't -- if I had

3    concerns that there was a suspicious response to a

4    DEA inspection, I would have taken further steps

5    than to put it in several words in an email at

6    6:30 at night.

7    Q.   With all due respect, it's not just

8    several words.  In the second paragraph goes in

9    and you describe in detail exactly how to solve

10   the problem and get those hydrocodone combination

11   products out of the warehouse as soon as possible;

12   right?

13          MR. KOBRIN:  Object to form.

14          THE WITNESS:  I disagree with that.

15   BY MR. HUDSON:

16   Q.   You do agree that for one case of the

17   hydrocodone products, you're shipping those out

18   later that same night; right?  It's 6:27 at night

19   and you're going to ship that case out later that

20   night.

21   A.   Correct.

22   Q.   Is that usual or unusual for shipments

23   to be shipped out after 6:30 at night?

24   A.   Our first wave I don't believe started

25   until 6:30 at night.  I can't remember if it was

1  6:30, 7:30 or 8:30, but it was something similar

2  to that.

3      Q.   We can agree that what you identified in

4  this second paragraph was a case of

5  hydrocodone-containing products that had been

6  meant to be shipped to store 6510, but it hadn't.

7  So now you're putting in place a plan to get that

8  shipped out of the warehouse that night on

9  October 1?  Can we agree on that?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  I did not put the plan --

12  it doesn't look like I put the plan in place.  I'm

13  letting them know what the plan was.

14  BY MR. HUDSON:

15      Q.   But you're relaying to them what the

16  plan was for that particular case?

17      A.   Correct.

18      Q.   And then for the second, the tote that

19  you talked about before that had been in the

20  warehouse for about a week and hadn't been

21  claimed, it also had hydrocodone-containing

22  products.  And then in the rest of the paragraph

23  you're laying out or relaying to the head of

24  compliance and your boss the plan to get that

25  shipped out of the warehouse, too; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.  I'm asking if they can tell me how
 2   they should be handled.
 3        Q.   And then because you're laying out for
 4   them a recommendation what you think should
 5   happen; right?
 6             MR. KOBRIN:  Object to form.  Misstates
 7   the evidence.
 8             THE WITNESS:  No.
 9   BY MR. HUDSON:
10        Q.   At a minimum you're telling them you
11   would sure like to see the product out of the
12   warehouse by 10/5 so that you can avoid any issue
13   with the scheduling change.
14        A.   Agreed.
15        Q.   Do you know whether or not those
16   hydrocodone-containing products were, in fact,
17   shipped from the warehouse that night?  Do you
18   have any recollection?
19        A.   No.
20        Q.   Do you know anything more about this
21   topic than what we've talked about?
22        A.   The topic of changing schedules?
23        Q.   Yeah, this DEA inspection and then the
24   plan for shipping these two hydrocodone-containing
25   products.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.   The conversion of the schedule,

 2   yes.

 3              (HBC-Bianco Exhibit 15 was marked.)

 4   BY MR. HUDSON:

 5        Q.    We'll move to a new topic and hand you

 6   what I've marked as Exhibit 15.  Exhibit 15 is a

 7   thick set -- it's a cover email with a set of

 8   attachments, and the subject of this email is All

 9   Policies for VAWD Reflected as of 5:00 p.m. Today.

10        Do you recognize Exhibit 15, Mr. Bianco?

11        A.    Flipping through it, they look like

12   policies, but without having an opportunity to

13   read them all.

14        Q.    This is an email from Sara Green; right?

15        A.    Appears to be, yes.

16        Q.    And who is Sara Green?

17        A.    Based on her signature, she was an

18   executive secretary.  I'm not sure.

19        Q.    And she's then distributing this set of

20   policies to a distribution group that includes

21   yourself and others?

22        A.    Yes.

23        Q.    And she wrote down in the body of the

24   email, "Good afternoon.  Sorry for so many emails

25   throughout the day.  Attached are all final PDF
```

1    version policies for VAWD as well as the document

2    retention policy and chart.  If you have any

3    questions, let me know."

4         A.   Yes.

5         Q.   Were you part of the group that reviewed

6    these policies before they were put into final

7    form?

8         A.   On each specific policy, again, without

9    having an opportunity to read them, I may have

10   interacted on some of them, but I don't know

11   without having an opportunity to review them all.

12        Q.   What is VAWD?

13        A.   Verified accredited wholesale

14   distributor.

15        Q.   And is that a certification that you can

16   obtain?

17        A.   I believe through NABP.

18        Q.   Through NABP?

19        A.   National Association of Boards of

20   Pharmacy.

21        Q.   And did the HBC warehouse ever get VAWD

22   certification?

23        A.   I don't believe so.

24        Q.   Did the HBC warehouse ever apply for

25   VAWD certification?

```
 1       A.   I'm not -- I'm not sure if we ever
 2  actually applied or not.
 3       Q.   Were you part of the effort to create
 4  these policies for VAWD?
 5       A.   I helped on some of the policies, but,
 6  again, without reading all of these, I'm not sure
 7  which ones I did or did not.
 8       Q.   Let's go back, if we could.  For this
 9  purpose, I'll just use the Bates numbers that are
10  in the bottom right, the Bates ending number.  So
11  go back, if you could, to Bates 629.
12       A.   Is that this?
13       Q.   Exactly.  It's the HBC_MDL.
14       A.   What was the number?
15       Q.   The ending number is 629.
16       A.   Okay.
17       Q.   And if you could, at the top it says
18  Security Policy.  Do you see that at the top
19  right?
20       A.   Yes.
21       Q.   And then, if you could, do you see the
22  table that's got two columns?
23       A.   Yes.
24       Q.   Explain to me, if you could, how to read
25  that, if you know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't know.  The policy number -- I
 2   don't know the details on kind of the logic behind
 3   this, but effective date to me would be when it
 4   was effective, created date.  I mean, I'm
 5   speculating at this point.
 6        Q.   You don't know how to read the Giant
 7   Eagle policy?
 8             MR. KOBRIN:  Object to form.  You asked
 9   him to explain to you the chart at the top.
10             THE WITNESS:  I understood it that you
11   wanted me explain the parts of it.  I can read it,
12   yes.
13   BY MR. HUDSON:
14        Q.   I'm just saying, do you understand it?
15             MR. KOBRIN:  The policy or the chart?
16             MR. HUDSON:  The chart.
17             THE WITNESS:  The chart, yes.  I
18   understand what a policy number is.
19   BY MR. HUDSON:
20        Q.   The policy number -- there's a specific
21   number within Giant Eagle that's assigned to this
22   policy, and this is one is 30-18; right?
23        A.   Yes.
24        Q.   And then the effective date of 8/1/14
25   tells us that this date became an effective policy
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    at Giant Eagle on August 1, 2014; right?
 2            MR. KOBRIN:  Object to form.  I think
 3    you meant this policy.
 4            MR. HUDSON:  That's what I meant, yes.
 5            THE WITNESS:  This policy was effective
 6    8/1/14?
 7    BY MR. HUDSON:
 8        Q.  Correct.
 9        A.  Yes.
10        Q.  And it was created on 8/1/14, too;
11    right?
12        A.  Yes.
13        Q.  And then the policy owner would be Matt
14    Rogos?
15        A.  Yes.
16        Q.  What does that mean, policy owner?  Does
17    that have a significance?
18            MR. KOBRIN:  If you know.
19            THE WITNESS:  I'm not sure.
20    BY MR. HUDSON:
21        Q.  Have you ever been the policy owner of
22    any Giant Eagle policies, to your knowledge?
23        A.  I don't recall.
24        Q.  Do you know what the reference number is
25    underneath that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    If we go to the next column on the

 3   right, it says Version/Revision Number.  Do you

 4   know what that means?

 5        A.    The version number?

 6        Q.    Yes.

 7        A.    Yeah.  It's the version.

 8        Q.    So this is the first version of this

 9   particular policy?

10        A.    Correct.

11        Q.    And then the revision date is 4/9/15?

12        A.    Correct.

13        Q.    Then the last reviewed date is the

14   4/9/15.

15        A.    Correct.

16        Q.    And then the department is HBC Service

17   Company; right?

18        A.    Yes.

19        Q.    So would this be a policy that related

20   to HBC Service Company?

21        A.    Without reading it, yes.

22        Q.    Explain to me then if there's a revision

23   date of 4/9/15 and a creation date of 8/1/14, but

24   the version that we're looking at is version 1,

25   does that mean that there were no changes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't know.  I wasn't on our policy

 2    committee internally, so I don't know the logic

 3    behind all of those.

 4          Q.    Let's turn back, if we could.  The next

 5    one is 633.

 6          A.    Okay.

 7          Q.    This one is Inventory Control Suspected

 8    Losses policy.  And it's got the same effective

 9    date, date created and revision dates; right?

10          A.    It appears to, yes.

11          Q.    And then if we turn to the next one

12    that's Bates ending 636, it's got the same created

13    date and the same revision date; right?

14          A.    Yes.

15          Q.    It's the 8/1 for the effective date and

16    created date, and then the revision date is again

17    4/9/15?

18          A.    Correct.

19          Q.    If we turn to the next one that's on

20    638, we can again just pull up that table, again,

21    we've got an effective date and created of

22    8/1/14 and a revision date of 4/9/15; right?

23          A.    Correct.

24          Q.    If we go to the next one on 640, 640 is

25    the ending Bates number, we pull that table up,
```

1    again, we've got the same effective date, created

2    date of 8/1/14.  We've got the same revision or

3    last reviewed date of 4/9/2015; right?

4         A.    Correct.

5         Q.    If we go to the next one that's ending

6    in 642 -- skip that one because that one doesn't

7    apply to HBC.  Go to to 644.

8         A.    Okay.

9         Q.    Do you see the reference is another HBC

10   policy?

11        A.    That's what the reference is, yes, but I

12   don't know kind of the logic that supports this.

13        Q.    This one, you're actually the owner of

14   this one; right?

15        A.    Appears to be, yes.

16        Q.    Do you know what that means?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  I believe I would have

19   been responsible for ensuring the policy was being

20   enacted.  Again, it's several years ago, three

21   jobs ago, so I don't really remember.

22   BY MR. HUDSON:

23        Q.    If we go to the next one at 647, this is

24   again another HBC policy, and we've got effective

25   date 8/1/14 and revision date of 4/9/15; right?

```
 1          A.    Correct.

 2          Q.    If we go to the next one at 649, do you

 3   see there again we've got another policy for HBC

 4   Service Company, effective date 8/1, created date

 5   8/1, revision date 4/9/15?

 6          A.    Correct.

 7          Q.    If we go to the next one at 653, we've

 8   got another HBC policy with an effective date of

 9   8/1/14, a created date of 8/1/14 and a revision

10   date of 4/9 and a last reviewed date of 4/9;

11   right?

12          A.    Correct.

13          Q.    If we go to the next one, that's Bates

14   ending 656, again another HBC policy created on

15   8/1/14 with an effective date of 8/1/14, a

16   revision date of 4/9/15 and a last reviewed date

17   of 4/9/15; right?

18          A.    Correct.

19          Q.    If we go to the next one at 658, another

20   HBC policy created on 8/1/14, effective date of

21   8/1/14, revision date of 4/9/15, and last reviewed

22   date of 4/9/15; right?

23          A.    Correct.

24          Q.    Then if we go to the next one at 662,

25   this one is actually slightly different.  We've
```

1  got the same effective date and the same created

2  date of 8/1/14; right?

3       A.   Correct.

4       Q.   But this one was actually revised on

5  November 25, 2014, and it was last reviewed on

6  4/9/15; right?

7       A.   Correct.

8       Q.   So this is the first one that we have

9  that wasn't last reviewed, then revised on 4/9/15

10  of the ones that we've reviewed so far; right?

11            MR. KOBRIN:  Object to form.  State that

12  again.

13            THE WITNESS:  I wasn't keeping track of

14  each of them.

15  BY MR. HUDSON:

16       Q.   Let's go then, if we could, to the next

17  one, 665.  Again, we've got 8/1 effective date,

18  8/1 created date.  Then we've got back to the same

19  revision date and the same last reviewed date of

20  4/9/15; right?

21       A.   Correct.

22       Q.   So it looked like to me that all of

23  these policies all purport to be created on 8/1/14

24  and be effective on 8/1/14.

25            MR. KOBRIN:  Object to form.  Misstates

1    the evidence.  What do you mean by all?  Just the

2    ones you pointed out?

3    BY MR. HUDSON:

4        Q.   If there's one in here that you can find

5    that wasn't, let me know.

6            MR. KOBRIN:  Effective on 8/1/14?  I

7    believe the one you skipped, you don't think that

8    one is?

9            MR. HUDSON:  That one didn't apply to

10   the HBC warehouse.

11           MR. KOBRIN:  You said all of these.

12   BY MR. HUDSON:

13       Q.   Mr. Bianco, do you have any

14   understanding of the process that went into

15   creating these written policies for the HBC

16   warehouse?

17       A.   Very high level, that a group or

18   individual would get together and put a policy

19   together, but that's about it.

20       Q.   Do you know what the purpose was of

21   creating -- it looks like there's a common nucleus

22   for these that were -- a whole bunch of these

23   policies were created on 8/1/14 and had an

24   effective date of 8/1/14.  Do you know if there's

25   any magic to that date?

```
 1        A.   That specific date I don't remember.

 2             MR. KOBRIN:   Object to form regarding

 3   the word magic.

 4   BY MR. HUDSON:

 5        Q.   Are you aware of whether Giant Eagle or

 6   HBC had a practice of keeping written policies

 7   that were created?

 8             MR. KOBRIN:   Object to form.

 9             THE WITNESS:   Did we have a practice of

10   that?

11   BY MR. HUDSON:

12        Q.   Yes.

13        A.   Yes.

14        Q.   In other words, should we expect to be

15   able to find in Giant Eagle or HBC's files a copy

16   of the 8/1/14 version of these policies that were

17   created --

18        A.   I don't know.

19        Q.   -- around that time?

20        A.   I don't know.

21        Q.   Knowing what you know about Giant

22   Eagle's practices, would you expect there to be

23   one?  In other words, can we agree this is a

24   packet of policies that were being revised on

25   April 9, 2015; right?
```

1       A.    Appears to be.

2       Q.    But you agree with me that all of them

3   that we looked at, none of them were created on --

4   an original was created on April 9, 2015.  They

5   were all revised on this date; right?

6            MR. KOBRIN:  Object to form.

7   Misrepresents the document, the evidence.

8            THE WITNESS:  I don't know, again,

9   without kind of looking through.  I can't answer

10  that.

11  BY MR. HUDSON:

12      Q.    We walked through some; right?

13      A.    Yeah.

14      Q.    You just talked about when the effective

15  date was and the created date was.  And we talked

16  about when the revision date was; right?

17      A.    Yes.

18            MR. KOBRIN:  Object to form.  Ty, you're

19  misrepresenting the evidence.  We've established

20  it didn't say all.

21            MR. HUDSON:  I didn't say all.  I said

22  the ones that we walked through.  You're happy to

23  ask him questions at the end, Josh.  If you think

24  that I'm mischaracterizing something, please do

25  that.  You'll clean it up if I messed it up, and

 1   it's entirely possible that I did.

 2   BY MR. HUDSON:

 3       Q.   But I'm going to do my very best, sir,

 4   to ask honest, clean, clear questions.

 5       My question is:  Of the policies that we went

 6   through and we've gone through ten or so and we've

 7   gone through and looked at what the effective date

 8   was and the created date and then we looked at the

 9   revision date.  We just did that; right?

10       A.   Correct.

11       Q.   For all of those, the revision dates --

12   for those policies that we were looking at, a lot

13   of the revision dates were on 4/9/15; right?

14       A.   A lot of them, yes.

15       Q.   A lot of those had an effective date and

16   a created date of 8/1/14.  Do you remember that?

17       A.   Yes.

18       Q.   So would you expect that on the

19   effective date and the created date of 8/1/14,

20   there would be somewhere at Giant Eagle a hard

21   copy of those policies that were created on or

22   around August 1, 2014?

23       A.   I don't know.  As I said, I don't sit on

24   the committee that puts policies together at Giant

25   Eagle, so I don't know the processes and how that

1    works.

2         Q.    For these revised policies that were

3    being created on April 9, 2015, we've got this

4    email sending around final versions of the revised

5    policies.  Can we agree to that?

6         A.    Yes.

7         Q.    Would you expect on or around August 1,

8    2014 that there would have been some exercise

9    where the company would have sent around the final

10   versions of those policies that were going to be

11   put into effect?

12        A.    As I stated, I don't know how that would

13   have worked.  I don't sit on that committee, so I

14   don't know what their standard practices are.

15        Q.    Did you sit on the committee on April 9,

16   2015?

17        A.    On the policy committee, no.

18        Q.    This email is being distributed to you

19   on April 9, 2015; right?

20        A.    Correct.

21        Q.    You the same role on August 1, 2014 that

22   you did on April 9, 2015; right?

23        A.    Yes.

24        Q.    To the best of your recollection, as you

25   sit here today, do you know whether there was a

1  similar exercise in August of 2014 where there was

2  a set of those policies that were going to go into

3  effect were circulated?

4        A.    I do not know, but I think it's

5  important this is not the policy committee this

6  distribution list.  So I don't know how they would

7  have been handled.

8        Q.    What I'm getting at though is at least

9  on this point on April 9, 2015, you are being

10  copied on an email that's sending around these new

11  versions of the policies; right?

12       A.    I am, yes.

13       Q.    And all I'm asking is:  Would it be your

14  expectation, whether you received it or not, would

15  it be your expectation that there would be a

16  similar exercise that happened around August 1,

17  2014 when those original policies were getting put

18  into place?

19       A.    I don't know.

20       Q.    Is it possible that there were not

21  copies of these policies that were created on or

22  around August 1, 2014?

23       A.    Anything is possible.  So yes.

24       Q.    Do you have any knowledge about that?

25       A.    About what?

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   Whether or not there were, in fact,

2   policies version 1 or prior copies, drafts,

3   whatever you want to call it of these policies

4   that were created on or around August 1, 2014.

5       A.   Without looking through each policy, I

6   wouldn't know.  But I generally don't

7   independently verify our policies to know if one

8   is out there or not.

9       Q.   If you wanted to independently verify

10  them, where would you go and look?

11           MR. KOBRIN:  Object to form.

12           THE WITNESS:  I would ask the policy

13  committee.

14  BY MR. HUDSON:

15      Q.   In August of 2014, to the best of your

16  recollection, who was on the policy committee?

17      A.   I don't know.  I just know I wasn't on

18  it.  I really don't.

19      Q.   Do you know in April of 2015 who was on

20  the committee?

21      A.   No.  I know there's legal representation

22  and others, but I don't know who's on that

23  committee.  And today as an employee, I don't know

24  who's on that committee.

25      Q.   Do you know if VAWD ever raised any

1    concerns about these policies?

2         A.    I left Giant Eagle very shortly after

3    this.  So, no, I don't know if we ever met with

4    them.  I don't know if we actually submitted an

5    application or not.

6         Q.    Do you have any knowledge about why the

7    HBC facility did not obtain a VAWD certification?

8         A.    No.

9         Q.    Do you know whether or not the HBC

10   facility submitted a VAWD application?

11             MR. KOBRIN:  Object to form.  Asked and

12   answered.

13             THE WITNESS:  I don't know if we ever

14   actually submitted it.

15             (HBC-Bianco Exhibit 16 was marked.)

16   BY MR. HUDSON:

17        Q.    Jump to a new topic and hand you a new

18   document that I've marked as Exhibit 16.  It

19   appears to me that Exhibit 16 is an email being

20   distributed by Mr. Carlson to a distribution list

21   including you about a meeting that's going to

22   occur at the Edgewood Town Center, and it looks

23   like the start time for the meeting is

24   November 11, 2014.  Am I reading that cover right?

25        A.    Yes.

1    Q.   And then if we go to the second page, it

2    looks like it says Pharmacy Quarterly Staff

3    Meeting, November 11, 2013.

4    A.   Yes.

5    Q.   And then I've just got a couple

6    questions here focused on -- again, if we look at

7    the Bates, it would be the Bates ending 558 on the

8    bottom right.

9         MR. KOBRIN:  Do you want to take some

10   time to look through the document?

11        THE WITNESS:  Yeah.

12   BY MR. HUDSON:

13   Q.   You see that this staff meeting is

14   separated at the top into sections.

15   A.   Yes.

16   Q.   My question is really only going to be

17   focused on the fifth section.  It says CSOS.

18   A.   Do you have a page number?

19   Q.   The Bates ending is 558.

20   A.   Okay.

21   Q.   It says at the top "DEA's Controlled

22   Substance Ordering System (CSOS) allows for secure

23   electronic transmission of Schedule II controlled

24   substance orders without the supporting paper

25   Form 222."  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   So this is referencing -- I think we

 3   talked about this earlier.  This is that CSOS

 4   system that Giant Eagle was contemplating

 5   implementing; right?

 6        A.   Correct.

 7        Q.   We're now in November of 2014; right?

 8        A.   Yes.

 9        Q.   So here in the first bullet point, it

10   says, "Hydrocodone going CII has increased the

11   priority on rolling out."

12        Do you know what that means?

13        A.   No.

14        Q.   The next bullet point is "Goal is to

15   have in place by Q3 FY15."  Do you know what that

16   means?

17        A.   Q3 FY15 would be our quarter three of

18   our fiscal year 2015.

19        Q.   And what's it mean by goal is to have it

20   in place, if you know?

21        A.   I can allude that it's the CSOS would be

22   in place.

23        Q.   The next bullet point says "All sites

24   need to get registered with the DEA."  Do you see

25   that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Then the next was "Ordering will occur

 3   through enterprise software that will allow orders

 4   to flow to either McKesson or Anda."  Right?

 5        A.    Correct.

 6        Q.    Then the last one is "Central signer at

 7   office."

 8        A.    Correct.

 9        Q.    The top bullet point about "Hydrocodone

10   going CII has increased the priority on rollout,"

11   you've got no understanding of what that means?

12              MR. KOBRIN:  Object to form.

13              THE WITNESS:  Just that hydrocodone

14   going CII has increased the priority.

15   BY MR. HUDSON:

16        Q.    Why was that, if you know?

17              MR. KOBRIN:  Object to form.

18              THE WITNESS:  Hydrocodone moved to a

19   CII.  So now it would have to be ordered

20   differently than how it was ordered when it was a

21   CIII.

22   BY MR. HUDSON:

23        Q.    Did Giant Eagle or HBC have the ability

24   to order hydrocodone at this time before the CSOS

25   system was implemented?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    So then what would about hydrocodone

 3   going CII would increase the priority on rolling

 4   out, if you know?

 5        A.    It would be another line item on a paper

 6   document.

 7        Q.    Was there a high volume of hydrocodone?

 8        A.    I don't know.

 9        Q.    Let's turn, if we could, back to a

10   separate section that's entitled Procurement

11   Update, and it's presented by Mike Bianco.  And

12   this is Bates ending 575.

13        A.    Okay.

14        Q.    Take a minute if you would just to read

15   that.

16        A.    Okay.

17        Q.    So let's turn if we could to the first

18   page of your presentation, which is the Bates

19   ending 576.  If you could, just explain to us what

20   this slide means, what you're saying here?

21        A.    We must have renegotiated the contract

22   with McKesson at the time, and these are the

23   savings figures.

24        Q.    The last dash says, ███████████ in

25   annual spend moved out of HBC warehouse to
```

```
 1    McKesson."  Is that a reference to the hydrocodone

 2    combination products?

 3         A.   It was if we renegotiate the whole

 4    contract, we would have looked at all items.  I

 5    believe we did have a renegotiation with McKesson

 6    at this, at this time.

 7         Q.   But to the best of your recollection,

 8    when you're looking at this, you believe that you

 9    saved ████████████ during the renegotiation or you

10    were spending ███████████ more?

11         A.   Saved.

12         Q.   And that's true even though there was a

13    ███████████ in annual spend moved out of the HBC

14    warehouse to McKesson?

15         A.   It appears to be, yes.

16         Q.   Explain to me, if you could, if you

17    recall, how you got to the ████████████ savings

18    number.

19              MR. KOBRIN:  Object to form.

20              THE WITNESS:  I don't remember the

21    details on that.  I mean, generally what we do is

22    we take -- it's a bid process.  So you take your

23    lowest net cost on each item, and then you come

24    back with that.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:

 2        Q.   If you look at the four dashes, the

 3   second dash and the third dash, the second one

 4   says, "███████████ currently in fiscal year

 5   margin build."  Right?

 6        A.   Yep.

 7        Q.   What does that mean?

 8        A.   That ████████████ would have been

 9   already accounted for in '15.

10        Q.   And then the next one is "████████

11   vendor income impact."  And is the impact positive

12   or negative?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  I don't know.  I would

15   assume it's -- I don't know.  I don't remember the

16   details around this negotiation.  I'm sorry.

17   BY MR. HUDSON:

18        Q.   That's kind of what I was getting at, is

19   trying to figure out if it was, in fact,

20   ████████████████  in savings or it was a ███████████████

21   impact because the hydrocodone products were no

22   longer being housed in the HBC facility and now

23   McKesson was going to be the distributor for those

24   products.

25             MR. KOBRIN:  Object to form.
```

```
 1              THE WITNESS:  Was there a question?
 2   BY MR. HUDSON:
 3        Q.   That's what I'm trying to figure out.
 4   If you look at the second and third dashes, you
 5   see ███████████  currently in fiscal year '15
 6   margin build"?
 7        A.   Yes.
 8        Q.   And then the next one is ██████████
 9   vendor income impact"; right?
10        A.   Correct.
11        Q.   If you add those together, that's
12   ██████████; right?  Do you agree?
13        A.   Yes.  So it must have been a positive
14   margin impact.
15        Q.   So you think that this is saying that
16   the McKesson contract renegotiation was going to
17   save ████████████?
18        A.   Correct.
19        Q.   But in terms of how, from just looking
20   at this slide, you can't say how it is that Giant
21   Eagle was saving it other than just the contract
22   itself was being renegotiated and the terms were
23   going to lead to ████████████  in savings?
24        A.   Yeah.  This is the November bid;
25   correct?  We looked at every item.  It's an
```

Highly Confidential - Subject to Further Confidentiality Review

 1    extremely intensive process.  You look at every

 2    item and work to get the lowest net cost and

 3    understand the impact of that.

 4        Q.   I got that.  I was just trying to make

 5    sense of the ████████████ and ████████████, if you

 6    know, and what those -- what's built into those

 7    two numbers.

 8        It does seem, at least to me, like that would

 9    be the ████████████.  I'll also admit I'm an

10    accounting major, so this isn't terribly

11    pertinent.  But I was just kind of trying to

12    figure it out because I was curious.

13        A.   I mean, we would have looked at it.  I

14    don't know.

15        Q.   Fair enough.  Do you have any sense of

16    what the hydrocodone combination products volumes

17    were in terms of dosage units or pills that were

18    shipped by the HBC warehouse between November 2009

19    and October 2014?

20        A.   No.  In 2009 I was in still in school

21    all the way up through, so no, up through 2013.

22        Q.   Are you aware of any shipments of

23    hydrocodone combination products that were flagged

24    by the HBC warehouse as being beyond thresholds?

25             MR. KOBRIN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I believe we saw an email

 2    earlier that stated that.

 3    BY MR. HUDSON:

 4       Q.   That one in the end, do you know what

 5    happened, whether or not that order was actually

 6    shipped or not shipped?  That was the one relating

 7    to store 8; right?

 8       A.   I think it was Exhibit 10 maybe.

 9       Q.   I'm thinking maybe it was Exhibit 7.

10       A.   If it didn't state in the email, I don't

11    know.  I don't recall.  If it states in the email,

12    then I can read what was on the email.

13       Q.   And are you aware of any pharmacists

14    that refused to fill prescriptions for hydrocodone

15    combination products on the grounds that it was at

16    risk of diversion?

17       A.   Specific examples you're asking?

18       Q.   Yeah.

19       A.   I don't know of any specific examples.

20       Q.   How about investigations of flagged

21    orders of hydrocodone products other than the one

22    that we talked about today in Exhibit 7?

23       A.   Am I aware of them?

24       Q.   Yes.

25       A.   Yes.
```

1    Q.    I mean, in other words, you're aware of

2    specific investigations that occurred other than

3    the ones that we've talked about today?

4    A.    Not specific examples, no.

5    Q.    Do you have any sense of the volume, in

6    other words, the number of investigations that

7    occurred?

8    A.    No.

9    Q.    Do you know who conducted the

10   investigations?

11   A.    During which time period?

12   Q.    November of 2009 to October of 2014.

13   A.    I can only speak to the time when I

14   was -- the only ones I'm aware of would be Joe

15   Millward.  And part of it is because I wasn't in a

16   role that I knew was even in the corporate office.

17   But Joe Millward, Rick Shaheen.  And I know they

18   had teams, but I don't know who necessarily was on

19   those teams.  George Chunderlik would have been

20   another one, I think.

21   Q.    Do you know how many investigations that

22   team conducted?

23   A.    No.

24        MR. KOBRIN:  Object to form.

25

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. HUDSON:
2         Q.   Do you know what criteria was applied in
3    conducting those investigations?
4              MR. KOBRIN:  Object to form.  I think we
5    covered all this stuff.
6              THE WITNESS:  No.
7              MR. HUDSON:  I don't think I have any
8    further questions.  He's just got a couple that
9    will take probably ten minutes.  Do you want to
10   just knock those out?
11             MR. KOBRIN:  Yeah.  You want to just
12   knock them out and do lunch?
13             MR. HUDSON:  Yeah.
14             MR. KOBRIN:  We'll probably have a
15   little bit of cleanup I think.  Actually, we
16   should ask Mike.  Do you want to take a break?  Do
17   you want to have lunch?
18             THE WITNESS:  I'm okay.
19             MR. KOBRIN:  Are you sure?
20             THE WITNESS:  Yes.
21        Let's take a break actually.  I'll use the
22   rest room.
23             MR. KOBRIN:  We'll take a very quick
24   break.
25             THE VIDEOGRAPHER:  The time is
```

1    12:44 p.m.  We're going off the video record.

2              (Recess from 12:44 p.m. to 12:55 p.m.)

3              THE VIDEOGRAPHER:  The time is

4    12:55 p.m.  We are now back on the video record.

5              (HBC-Bianco Exhibit 17 was marked.)

6                        EXAMINATION

7    BY MR. SIDLINGER:

8        Q.   Sir, my name is Thomas Seidlinger.  I'm

9    going to ask you a few questions.  It shouldn't

10   take too long.  I'm handing you what's been marked

11   as Exhibit 17.

12             MR. SIDLINGER:  That exhibit has an

13   internal reference number HBC-1195.

14   BY MR. SIDLINGER:

15       Q.   This exhibit appears to be a discussion

16   between Boca Pharmaceutical -- are you aware of

17   that company?

18       A.   With Boca, yes.

19       Q.   If we look at the bottom of the first

20   page, this is the beginning of an email that

21   starts on December 17, 2013, and it continues onto

22   the next page.  This email is from Mike Lupo at

23   Boca Pharmaceutical to someone called Allen

24   Lowther.

25             Are you aware of who Allen Lowther is?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Yes.

2     Q.    Who is that?

3     A.    Allen was in our -- I can't remember if

4  it was indirect or direct.  I think it was direct

5  procurement, on the procurement side, so the

6  department internally on our procurement side.

7     Q.    So he's a GE employee or Giant Eagle

8  employee?

9     A.    Yes.

10    Q.    And the subject is regarding hydrocodone

11 APAP Elixir/Tab Conv Progress Status.  And

12 continuing to the email, Mr. Lupo is saying to

13 Allen, "Just a quick FYI regarding your December

14 program status.  December 1, 2013 to December 17,

15 2013 you purchased a total of 1152 bottles

16 combined.  The threshold for the month is 3250

17 bottles in order to qualify for the rebate this

18 month."

19       Now, when he's saying in order to qualify for

20 the rebate this month, does that mean to you that

21 Giant Eagle HBC would have to order 3250 bottles

22 hydro APAP elixir to be able to reach that rebate?

23    A.    I want to read the document.

24    Q.    Absolutely.

25    A.    What was the question?  I apologize.

1    Q.    Looking back at Mr. Lupo's email on page

2    2, it says the threshold for the month is 3250

3    bottles.  According to the subject line, we're

4    discussing hydro APAP elixir.

5         Is it the case -- is it your understanding

6    that what Mr. Lupo is saying is that Giant Eagle

7    would have to order 3250 bottles of hydro APAP

8    elixir in order to qualify for the threshold?

9    A.    That's how it reads, yes.

10   Q.    Then in the first paragraph, the first

11   sentence, he gives you the amount that had been

12   ordered up to the 17th of that month,

13   December 2013, which he represents is 1152

14   bottles; is that correct?

15   A.    Yes.

16   Q.    Will you look back then on the first

17   page.  After that email, there's internal

18   discussion at Giant Eagle or HBC.  First Allen

19   discusses with Mr. Carlson and you -- he forwards

20   you that, and he notes that you achieved the

21   rebate in November with a $48,000 credit coming;

22   is that correct?

23   A.    Yes.

24   Q.    So this is a monthly thing with -- a

25   monthly rebate program where every month, if you

Highly Confidential - Subject to Further Confidentiality Review

1    reach a certain threshold, you could get money

2    back to Giant Eagle; is that correct?

3            MR. KOBRIN:  Object to form.

4            THE WITNESS:  Without seeing the

5    agreement, it appears to be.

6    BY MR. SIDLINGER:

7        Q.   Then you ask Allen and Mr. Carlson the

8    status on the tabs.  What does tabs mean?

9        A.   Tablets.

10       Q.   Okay.  And Carlson then inquires to you

11   and Allen on December 18, 2013 whether -- he says,

12   "Can we hit the December number?"

13       When he says, "Can we hit the December

14   number," to you does that mean the number

15   represented on the second page of 3250 bottles?

16       A.   Yes.

17       Q.   And then above that, a few hours, two

18   and a half hours later, on Wednesday, December 18,

19   2013, you send an email to Mr. Carlson and Allen.

20   And in that email, the first sentence you say is,

21   "Can we add to the $4/$10 list or do a free

22   promotion?"

23       What is a $4/$10 list?

24       A.   The $4 and $10 list was a list of

25   medications that had a low UNC, UNC price of $4

1    and $10.

2         Q.   What's UNC?

3         A.   I'm sorry.  Usual and customary price,

4    so the cash price.

5         Q.   And you say "or do a free promotion."

6    Are you suggesting here that you do some promotion

7    to be able to hit the December number?

8         A.   I think I was likely joking about this,

9    but -- I think I was likely joking.

10        Q.   If your joke was taken at face value,

11   would it be suggesting that there be a promotion

12   to increase that number?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  The two individuals on

15   this list wouldn't have taken it at face value or

16   on this email wouldn't have taken it at face

17   value.  But, yes, to the lay person.

18   BY MR. SIDLINGER:

19        Q.   Would the joke be that it would be

20   preposterous that would be suggesting some type of

21   promotion for hydro?

22        A.   Yes.

23        Q.   Why is that preposterous?

24        A.   Because we had traditionally taken a

25   stance where we don't promote control II through

Highly Confidential - Subject to Further Confidentiality Review

1    Vs, Schedule II through V medication.

2         Q.   And if you were promoting that, if you

3    were trying to increase your numbers through

4    promotion, then that would be a promotion of this;

5    correct?

6              MR. KOBRIN:  Object to form.

7              THE WITNESS:  I believe, yes.

8    BY MR. SIDLINGER:

9         Q.   Let's go onto the next sentence that you

10   have here.  "I'm not sure we're going to be able

11   to hit the December numbers.  We're at 1152 and

12   need to get to 3250."

13        Just continuing through, "Total weekly burn

14   through 670."  So what does that mean to you, the

15   total weekly burn through 670?

16        A.   It looks like our typical movement on

17   this was 670 units.  I don't know what unit is

18   based on this.

19        Q.   You continue after that and you say, so

20   we'd really have to pick up some movement.  We may

21   with the blocking of the higher standards, but I

22   don't know if we'll pick up that much.

23             MR. KOBRIN:  Object to form.  I think

24   you misread that sentence.

25

```
 1   BY MR. SIDLINGER:

 2        Q.   Let me reread it, just the end.  "We may

 3   with the blocking of the higher strengths, but I

 4   don't know if we'll pick up that much."

 5        So taken as a whole, this email is you say

 6   jokingly representing that you should do some type

 7   of free promotion to increase the amount of hydro

 8   sales that you have to then hit some threshold

 9   that's going to allow you to get a rebate from

10   Boca Pharmaceuticals; is that correct?

11             MR. KOBRIN:  Object to form.

12             THE WITNESS:  Can you repeat that.  I'm

13   sorry.  There was a lot of parts to that.

14   BY MR. SIDLINGER:

15        Q.   Absolutely.  Taken as a whole, you are

16   suggesting, perhaps jokingly, that you do some

17   type of promotion to increase your numbers in

18   December of 2013 for hydrocodone APA elixir and

19   perhaps in doing so increase those numbers

20   sufficiently to hit your threshold for your rebate

21   from Boca Pharmaceuticals?

22             MR. KOBRIN:  Object to form.  I object

23   to the term perhaps jokingly.  He made clear that

24   that was a joke because the company had a policy

25   not to promote at all II through V medications,
```

1    controlled substances.

2    BY MR. SIDLINGER:

3        Q.   Would you answer.

4        A.   I mean, the premise of the question is

5    somewhat misleading because it was clearly stated

6    as a joke, knowing our traditional position on it.

7    But, yes, we were looking for market share, if it

8    was taken at face value.

9        Q.   So this is a discussion though of --

10   this discussion does center around whether or not

11   Giant Eagle pharmacies will be able to sell enough

12   hydrocodone to meet a rebate threshold; is that

13   correct?

14       A.   No.

15       Q.   How so?  How is it not that?

16       A.   I believe this is purchase.  So it's not

17   necessarily what we were dispensing.  It's what

18   we're purchasing.

19       Q.   So it's a question of whether or not

20   you'll be able to purchase enough hydrocodone APAP

21   elixir to be able to meet that threshold and

22   receive a rebate from Boca Pharmaceuticals?

23       A.   Correct.

24       Q.   And the three of you, Mr. Carlson,

25   yourself and Allen here, are concerned whether or

1    not that's the case, whether or not you will meet

2    that threshold; is that correct?

3         A.   We're discussing it, yes.

4         Q.   Let's discuss then, stepping back, you

5    represented earlier that as a category manager,

6    part of what you're doing is setting up deals with

7    various vendors to facilitate pharmaceuticals for

8    Giant Eagle and HBC.  Is that fair?

9              MR. KOBRIN:  Object to form.

10             THE WITNESS:  Yes.

11   BY MR. SIDLINGER:

12        Q.   As part of that, did you ever have the

13   opportunity to discuss with McKesson any increases

14   to their internal thresholds for Giant Eagle

15   pharmacies?

16        A.   Yes.

17        Q.   Did McKesson ever provide you

18   information about how close to thresholds Giant

19   Eagle pharmacies were at any particular time?

20        A.   I don't recall whether specifics were

21   given or not.

22        Q.   Do you know of something called a CSMP

23   report?

24        A.   No.

25        Q.   I'll represent to you that that means

1    controlled substance monitoring program at

2    McKesson.  Do you recall hearing that acronym used

3    at all?

4         A.   No.

5              (HBC-Bianco Exhibit 18 was marked.)

6    BY MR. SIDLINGER:

7         Q.   I'm going to mark as Exhibit 18

8    something that has an internal reference number

9    P-HBC-1201.  The very first email, if we go to the

10   last page or the next to last page, it begins with

11   an email from what has an address email of

12   SAPHELP@McKesson.com.  It was sent on May 22,

13   2014, and it was sent to someone named Sabrina

14   Cook at McKesson, someone named Telicia Lyndsey at

15   McKesson and then since there are not email

16   addresses, I'm guessing the remainder of those

17   people are employees of Giant Eagle.

18        Would you confirm for me that the remainder

19   of those names are Giant Eagle employees?

20             MR. KOBRIN:  If you know.

21             THE WITNESS:  Not all of them are

22   currently Giant Eagle employees.

23   BY MR. SIDLINGER:

24        Q.   At the time do you believe that all of

25   them were?

```
 1        A.    Yes.

 2        Q.    And the subject line, if we turn to the

 3   next page, includes CSMP Report Follow-up with

 4   Account Manager.

 5        Having seen this, do you recall having seen

 6   any other similar emails where there's something

 7   called CSMP report that's being sent from

 8   McKesson?

 9        A.    I think I stated before I don't remember

10   the term CSMP, and I'm not on the original email

11   from McKesson.

12        Q.    We're going to go to the first page

13   here.  We'll go to when you do become involved.

14   And that is the second email where it says from

15   Joseph Millward on May 22, 2014.  It's to you.

16   Todd Roahrig is cc'd on that.  It's just

17   forwarding -- it's a forward of a previous

18   conversation about this report.

19        Joe states to you, "Based on the research and

20   documentation from 4008, can you please request

21   that McK increase the oxycodone threshold."

22        Now, let's just break that down for clarity's

23   sake.  4008, is that a store number?

24        A.    Yes.

25        Q.    So Giant Eagle pharmacy 4008.  And
```

1    Mr. Millward is asking you to request from -- is

2    McK McKesson?

3         A.    Traditionally, we've referred to them as

4    McKesson or McK, yes.  We refer to McKesson as

5    McK.

6         Q.    So he's asking you to request from

7    McKesson an increase in oxycodone thresholds for

8    that 4008 store; is that correct?

9         A.    Yes.

10        Q.    And you respond to him.  If you go to

11   the one above and you look below, it says Bianco,

12   Jr., Mike, (pharmacy) wrote:  Do you have

13   precrafted language that's been used in the past?

14   I assume the generic "raise the threshold" is not

15   sufficient here.

16             MR. KOBRIN:  I think you misread that

17   slightly.

18   BY MR. SIDLINGER:

19        Q.    I assume a generic "raise the threshold"

20   is not sufficient enough.

21             So if we look at raise the threshold, which

22   you put in quotes there, is it your belief that

23   what's being discussed here is a threshold set at

24   McKesson?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And from the prior email from Joe

2   Millward, that threshold being discussed then

3   would be the oxycodone threshold for store 4008?

4      A.   Yes.

5      Q.   And so you're asking then in this email

6   it looks like, because the top says Carlson,

7   Gregory, you're asking Mr. Carlson what has been

8   used in the past to request from McKesson an

9   increase in thresholds?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  Are you asking that?

12   BY MR. SIDLINGER:

13      Q.   Yeah.  Is that what's occurring here?

14      A.   Yes.

15      Q.   And Mr. Carlson then replies to you at

16   the very top.  He says, "Just copy and paste the

17   store's response and ask for a 10 percent

18   increase."

19      Do you know how he arrived at the 10 percent

20   figure?

21          MR. KOBRIN:  Object to form.

22   BY MR. SIDLINGER:

23      Q.   Do you know how he arrived at that

24   10 percent increased figure?

25      A.   No.

```
 1              MR. KOBRIN:  Object to form.

 2    BY MR. SIDLINGER:

 3        Q.   Do you recall in your discussions with

 4    McKesson how you would arrive at the amount of an

 5    increase to request?

 6        A.   I don't --

 7              MR. KOBRIN:  Object to form.

 8              THE WITNESS:  I don't believe we

 9    specifically requested percent increases.  I think

10    we gave them the information, but they created

11    their own thresholds.

12    BY MR. SIDLINGER:

13        Q.   You don't think you -- you'd be

14    surprised if you requested percent increases?

15        A.   I don't recall that.  I don't know if

16    they were ever granted that way.  I just don't

17    recall the procedure.  Typically, we gave them the

18    information, and they created that.

19        Q.   And what would lead to you requesting a

20    threshold increase?  Is there some triggering

21    event that says I think we might need to increase

22    the amount for this store?

23              MR. KOBRIN:  Object to form and

24    foundation.

25              THE WITNESS:  I never was the one that
```

1    initiated that request.  So it would always come

2    from somebody else.  I would be a pass through,

3    like a conduit to McKesson.  They were my vendor.

4    BY MR. SIDLINGER:

5        Q.   Who would that come from?

6        A.   Either compliance, the store, PDL.

7        Q.   And what's your understanding as to why

8    they would be requesting that you go ahead and

9    request an increase in the threshold?

10       A.   That they would have hit their

11   threshold.

12       Q.   How would they know that they hit their

13   threshold?

14       A.   I don't know that.

15       Q.   Isn't the threshold the internal

16   McKesson threshold?

17            MR. KOBRIN:  Object to form.

18            THE WITNESS:  When you say internal, do

19   you mean Giant Eagle's internal threshold?

20   BY MR. SIDLINGER:

21       Q.   Well, you're asking McKesson to increase

22   the amount that you can purchase of a certain drug

23   from McKesson; is that correct?

24       A.   Yes.

25       Q.   And so to be able to know that you need

1    to increase that number, you'd have to know what

2    that number is.

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  You would need know that

5    you hit that number, not know what that number is.

6    BY MR. SIDLINGER:

7         Q.   So McKesson -- to know that, McKesson

8    would have to provide you with what they have set

9    as their threshold for you to hit, or is there

10   some other way that that number is set?

11             MR. KOBRIN:  Object to form.  He just

12   said he wouldn't need to know that exact

13   information.

14   BY MR. SIDLINGER:

15        Q.   Who sets the McKesson threshold?

16        A.   McKesson.

17        Q.   If you are going to hit or hit that

18   threshold, who would tell you that you hit that

19   threshold?

20        A.   No one would tell me that.

21        Q.   Who would tell Giant Eagle that they hit

22   that threshold?

23        A.   McKesson.

24        Q.   And to ask for an increase in the

25   threshold then, Giant Eagle would have to already

1    have known that they have either hit or come close

2    to hitting the McKesson threshold?

3              MR. KOBRIN:  Object to form.

4              COUNSEL ON THE PHONE:  Object to form.

5              THE WITNESS:  Correct.

6              (HBC-Bianco Exhibit 19 was marked.)

7    BY MR. SIDLINGER:

8         Q.   The last document that we have --

9              MR. KOBRIN:  Is this going to be fairly

10   quick?

11             MR. SIDLINGER:  There's just one more.

12             MR. KOBRIN:  You said you'd be 10

13   minutes, and we're at 25 now.

14             MR. SIDLINGER:  This is the last one.

15        Exhibit 19 has an internal reference number

16   P-HBC-1165.

17   BY MR. SIDLINGER:

18        Q.   We skip to the second page to review the

19   first email.  That email is from -- well,

20   actually, it looks like it includes an even

21   earlier email that doesn't have a date.

22        The first email with a date in the chain is

23   from you to Mr. Millward, Mr. Chunderlik and then

24   you include some additional parties on the cc.

25   The subject is 35 Missing Totes.  The date is

```
 1    April 18, 2014.

 2         And your email then says, "Joe and George, I

 3    confirmed with 35" -- is it your understanding

 4    that 35 means pharmacy 35?

 5         A.   Yes.

 6         Q.   "I confirmed with 35 that they did not

 7    receive the missing tote from yesterday."

 8         What's a tote, sir?

 9         A.   A tote is what the products were shipped

10    in.

11         Q.   So what controlled substances and

12    presumably noncontrolled substances are shipped

13    in?

14              MR. KOBRIN:  Object to form.

15              THE WITNESS:  What the products that the

16    pharmacy received were shipped in, not necessarily

17    prescription or otherwise.

18    BY MR. SIDLINGER:

19         Q.   It says, continuing on with the email,

20    "...the contents of which are below."

21         And we skip to the last page.  There's a

22    number of what appear to be pharmaceuticals and

23    quantities next to them.  The third one is hydro

24    probably codone, APAP with two at a hundred units

25    is how I'm reading that.  Is that how you're
```

1    reading that, too?

2         A.   No.  The way I would read that is two

3    units of hydrocodone -- hydrocodone acetaminophen

4    5/325, a hundred tablet bottles, so two units.

5         Q.   Thank you.  Then the next one is similar

6    for one unit, but instead of 5/325 -- sorry.

7    Instead of 5/325 it's 300; correct?

8         A.   Yes.

9         Q.   So we are talking at least in part about

10   hydrocodone-containing products; correct?

11        A.   Yes.

12        Q.   Let's go back to your email.  The second

13   sentence of your email says, "We contacted all

14   other stores on their route, and they do not have

15   it and the warehouse has confirmed that it was

16   shipped.  Would you like pharmacy 35 to complete a

17   Form 106?"

18        Now, does Form 106 refer to DEA Form 106?

19        A.   Yes.

20        Q.   Is DEA Form 106 a suspected loss form?

21        A.   I don't know the official title of it,

22   but, yes, it's commonly known as lost or stolen

23   form.

24        Q.   Then the remaining emails that happen

25   after this point I'm going to take to be

Highly Confidential - Subject to Further Confidentiality Review

1    discussions within HBC and GE as to who should be

2    responsible for filling out that form.  So if we

3    look at the one directly above, it says -- this is

4    from Joseph Millward.  It says according to Bill

5    Runick -- who is Bill Runick, sir?

6        A.   I believe that's a typo.  Rumcik, he is

7    a PDL.

8        Q.   So he's a pharmacy district leader

9    probably I would assume for store 35?

10       A.   You could assume.  I don't know.

11       Q.   It says, the store discovered the

12   problem and did not sign for the missing tote.

13   The responsibility for completing the DEA Form 106

14   belongs to HBC.  The reason would be loss in

15   transit.  Bill and I can provide guidance in

16   completing the controlled substance theft/loss

17   reporting form.

18            MR. KOBRIN:  There's a slight misread

19   there.  I'm not asserting that it's substantive,

20   but it says Bill or I, not Bill and I.

21            MR. HUDSON:  Thank you.

22   BY MR. SIDLINGER:

23       Q.   Above that there's an email from you.

24   It says, "Do I need to follow up with

25   HBC/McKesson, or is it their responsibility?

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Remember I've only passed about 60 hours ago lol."
 2       What's the passed about 60 hours ago?
 3       A.   My pharmacy boards.
 4       Q.   So you recently passed your pharmacy
 5   boards within the last number of days?
 6       A.   Yes, from the date this was written.
 7       Q.   And above Mr. Carlson is saying that HBC
 8   needs fill out the form, but that we -- I'm
 9   assuming the people in this email chain -- can do
10   it on their behalf.  It says, "McKesson never
11   takes ownership of the product.  Do you want me to
12   submit?"
13       Then you say to Mr. Carlson, "You kidding?
14   Billy called me up and Billied," in quotes, "me
15   and said you never want your name on that.  I
16   really thought it was the store's job to report
17   it.  Notes say that, but not necessarily say they
18   owned it."
19       So this to me is representing that you had a
20   discussion with Bill Runik or what's his name?
21       A.   Rumcik.
22       Q.   And that Mr. Rumcik had suggested to you
23   that you don't want be the one to submit the Form
24   106; is that correct?
25       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And if we go above that where it says --

2  the email directly above where you write, "What

3  you said you'd submit...yes, please do.  Bill has

4  convinced me I'm going to jail if I fill it out on

5  this one."

6      Mr. Carlson then replies, "Chicken.  Did you

7  steal it?"

8      And you reply, "Yes, I am chicken.  No, I did

9  not steal it.  Just would like to officially have

10  my license in hand before I have to hand it back."

11      So in that very top sentence, what are you

12  saying there?

13          MR. KOBRIN:  Object to form.

14          THE WITNESS:  It says, yes, I am chicken

15  on the record.

16  BY MR. SIDLINGER:

17      Q.   Are you suggesting that you're just

18  emphasizing the fact that you do not want to be

19  the one to submit the 106 form?

20          MR. KOBRIN:  Object to form.  I think he

21  established that he talked about how he was

22  relatively new having just taken the boards.

23          THE WITNESS:  Yeah, I'm answering Greg's

24  question, are you chicken.

25

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. SIDLINGER:  No further questions.

2    Appreciate it.

3              THE VIDEOGRAPHER:  The time is 1:24 p.m.

4     We're going off the video record.

5              (Recess from 1:24 p.m. to 2:13 p.m.)

6              THE VIDEOGRAPHER:  The time is 2:13 p.m.

7    We're now back on the video record.

8                        EXAMINATION

9    BY MR. KOBRIN:

10        Q.   Mr. Bianco, you spoke earlier today with

11   plaintiffs' counsel about the Controlled

12   Substances Act.  Do you remember that?

13        A.   Yes.

14        Q.   In your education and in your career,

15   have you studied the Controlled Substances Act?

16        A.   Yes, not in detail, but highlights.

17        Q.   And have you also looked at the

18   regulations of the Controlled Substances Act?

19        A.   Yes.

20        Q.   Based on your knowledge and experience

21   and education and your career, what is the central

22   thrust of the Controlled Substances Act and its

23   regulations?

24        A.   It's the security requirements, so a

25   combination of different processes in place that
```

Highly Confidential - Subject to Further Confidentiality Review

1    would allow you to safeguard from theft or

2    diversion.

3         Q.   You also spoke earlier today about

4    conversion factors.  Do you remember that?

5         A.   Yes.

6         Q.   I believe you testified about conversion

7    factor errors causing some orders to be stopped at

8    the warehouse.

9         A.   Yes.

10        Q.   Is that accurate?  When an order at the

11   warehouse is stopped because it's unusual or

12   different, does HBC know what caused the order to

13   be unusual or different?

14        A.   They do not.

15        Q.   So if it was a conversion factor error,

16   how would they find out it was a conversion factor

17   error rather than potential diversion issue?

18        A.   The only way the root cause would be

19   identified is through an investigation from

20   whoever was doing the investigation at the time,

21   whether it be the warehouse or a corporate member.

22        Q.   So when you refer to them as conversion

23   factor errors that caused orders to be stopped,

24   they weren't stopped because someone said that's a

25   conversion factor error.  They were stopped

1   because there was something unusual about it?

2        A.   Yes.   There would be no way for them to

3   know it was a conversion factor or not.   They

4   would have no idea.

5        Q.   Could you look at Exhibit 7.

6        A.   Okay.

7        Q.   Do you have that in front of you?

8        A.   Yes.

9        Q.   Plaintiffs' counsel asked you about Greg

10  Carlson's email at the top of that exhibit where

11  Greg Carlson says to you, "I thought flu did not

12  impact our numbers?"   Do you see that?

13       A.   Yes.

14       Q.   Now, I know that you don't remember this

15  specific email; is that right?

16       A.   Correct.

17       Q.   At the time of this email in early 2014,

18  did you have conversations with Greg Carlson about

19  flu impacting Giant Eagle's numbers?

20       A.   Greg and I would joke a lot about -- we

21  had a pretty jovial relationship, but we would

22  often attribute changes in a -- sales year over

23  year variance to flu which upper management

24  didn't -- they wouldn't allow us to attribute

25  changes to flu.   So that's kind of where it came

1    from, I think.

2         Q.   So he's here joking about upper

3    management telling you not to attribute things to

4    flu even though you thought that they were

5    attributable to flu?

6         A.   Correct.

7         Q.   How certain are you that this email from

8    Mr. Carlson to you about thinking flu did not

9    impact our numbers, how certain are you that

10   that's a joke?

11        A.   I'm certain.  Like I said, we had a

12   pretty -- as seen by other emails that were shown

13   today, we had a very jovial relationship.

14        Q.   Could you turn to Exhibit 14.

15        A.   Okay.

16        Q.   Do you have that in front of you?

17        A.   Um-hum.

18        Q.   You had a long conversation with

19   plaintiffs' counsel about who the warehouse had

20   reported having no hydrocodone-containing products

21   on hand to.  Do you recall that?

22        A.   Yes.

23        Q.   And plaintiffs' counsel insisted that

24   you were referring to a report to the DEA.

25   Reading this today, who else to your mind could

1　the warehouse have been -- strike that.

2　　　Reading this today, do you interpret that as

3　being reporting to a particular entity or who else

4　could you have been referring to that the

5　warehouse reported to?

6　　　MR. HUDSON:  Object to the form.

7　BY MR. KOBRIN:

8　　　Q.   Strike that.  Reading this today, how do

9　you interpret that second sentence in the first

10　paragraph of your email to Mr. Millward?

11　　　A.   I think I had mentioned earlier that I'm

12　not comfortable deducing who I'm talking about

13　reporting.  It could have been reported to me, to

14　their leadership.  In any of our systems it could

15　have been reported into, our inventory systems.

16　It could have been to the DEA.  I'm just not

17　comfortable saying who that was reported to.

18　　　Q.   But when you'd refer to things as being

19　reported, would it be sometimes reported to

20　systems or reported to databases and the like?

21　　　A.   Yes.

22　　　Q.   Turn to Exhibit 19.  Reading over these

23　emails between you and Greg Carlson as well as

24　Mr. Bianco, how would you characterize these

25　emails?

1     A.    Jovial, probably immature as well.

2     Q.    Are they serious, or are you joking?

3     A.    No.  Complete jokes, yeah, other than

4  the seriousness of the 106.

5     Q.    You're joking about going to jail or

6  being chicken and all those other things?

7     A.    Exactly.

8     Q.    You're just trying to figure out who

9  should be filling out the forms properly?

10    A.    Exactly.

11    Q.    And who should be the best party to do

12 that.

13    A.    Yes.

14    Q.    At this time you joked in this about

15 having just passed your boards; is that correct?

16    A.    No.  I did just pass my boards.

17    Q.    Right.  But you're joking about how you

18 have just passed them and so you don't want to run

19 any problems or do anything that could potentially

20 be controversial after having just passed your

21 boards.  You're joking about that; correct?

22    A.    Correct.  At the time I didn't have a

23 license.  I just had passed my boards.

24    Q.    So when was it that you passed your

25 boards based on this email?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    April of '14, but I'm not sure of the

2  date.

3     Q.    A lot of the emails you looked at today

4  then were prior to April of '14; is that accurate?

5     A.    Yes.

6     Q.    So you were not even a board certified

7  pharmacist at that time?

8     A.    Correct.  I was not licensed.

9     Q.    So in some of these cases, were you a

10  more junior person on these email threads?

11     A.    I think on every email I was the least

12  senior member on them that we looked at today.

13     Q.    Some of the emails that you read today,

14  were you instructed by other people to send them

15  or were you following instructions from more

16  senior members of the Giant Eagle organization?

17     A.    I presume, yes.

18     Q.    That you.

19                    RE-EXAMINATION

20  BY MR. HUDSON:

21     Q.    Mr. Bianco, at what point in time did

22  the HBC warehouse gain the ability to stop orders

23  for things like the conversion factor errors?

24     A.    In my tenure at Giant Eagle, they've

25  always had the ability to.

1    Q.   And how would that happen?  Would there

2    be a trigger in the computer system, or how would

3    those orders get stopped, if you know?

4         MR. KOBRIN:  Object to form.  Asked and

5    answered.

6         THE WITNESS:  My tenure while I was at

7    the corporate office, not necessarily with Giant

8    Eagle because I wasn't aware of what was happening

9    when I wasn't at the corporate office, but I don't

10   know the details on how they were stopped or what

11   was involved.  I just know that orders were

12   stopped.

13   BY MR. HUDSON:

14   Q.   And as you sit here today, you don't

15   have any idea whether or not any orders were

16   stopped because they were suspicious orders at --

17   risk for diversion; right?

18        MR. KOBRIN:  Object to form.  He

19   wouldn't know why they were stopped at the time

20   they were stopped.  We've established that.

21        MR. HUDSON:  Great.  Then he can say

22   that, but you don't need to.

23        THE WITNESS:  We looked at one email

24   today that it was stopped for suspicious

25   activities and reported to the DEA.

1    BY MR. HUDSON:

2         Q.   Right.  And I think you testified

3    previously that you weren't sure how it was

4    stopped or when it was stopped or any of the

5    details surrounding that; right?

6         A.   Correct, other than what --

7         Q.   That would that be true for any orders

8    relating to suspicious order monitoring.  In other

9    words, you don't know any of the details of a

10   particular order that was stopped at HBC or why it

11   was stopped or how it was stopped?

12        A.   Other than what I read today; correct.

13        Q.   You testified now that the central

14   thrust of the Controlled Substances Act is the

15   security requirement; is that right?

16        A.   Yes.  That's my understanding.  I'm not

17   an attorney.

18        Q.   What does central thrust mean?

19        A.   I don't know if I used those words.

20        Q.   I think counsel actually used them, and

21   you said yes.  So when you said yes, why do you

22   have the view that central -- that the central

23   thrust of the Controlled Substances Act is the

24   security requirement?

25        A.   My understanding is it's a combination

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of everything and, for lack of a better term, one
 2    shirt doesn't fit all or one size doesn't fit all.
 3         Q.   Right.  So we've got security --
 4              MR. KOBRIN:  Can you let him finish.
 5    You're interrupting.
 6              MR. HUDSON:  I think he was done.
 7              MR. KOBRIN:  Were you finished?
 8              THE WITNESS:  Go ahead.
 9    BY MR. HUDSON:
10         Q.   So you've got the security requirements
11    that are one section; right?
12         A.   Correct.
13         Q.   And then another section is suspicious
14    order monitoring; right?
15              MR. KOBRIN:  Object to form.
16    Misrepresents the regulations.
17              THE WITNESS:  I believe so.
18    BY MR. KOBRIN:
19         Q.   And your point is that when you say one
20    size fits all, you mean you've got to be able
21    to -- that those are different sections that have
22    different requirements that you've got to meet; is
23    that fair?
24              MR. KOBRIN:  Object to form.
25    Misrepresents testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I believe it's a

2     combination of everything.  I'm not an expert in

3     the area, but I believe it's a combination of

4     everything.

5     BY MR. HUDSON:

6          Q.   Sure.

7          A.   Given who you're selling it to, who your

8     clientele is, what product mix.  There's a lot of

9     things that would go into what is needed.

10         Q.   And I just want to make sure the record

11    clear.  You're not suggesting that the suspicious

12    order monitoring isn't an important section of the

13    Controlled Substances Act; right?

14         A.   It is a part of the Controlled

15    Substances Act, yes.

16         Q.   You agree HBC had an obligation to

17    comply with that section; right?

18         MR. KOBRIN:  Object to form.  It's

19    misrepresenting the regulations versus the

20    statute.

21         THE WITNESS:  We had an obligation to

22    follow the law.

23    BY MR. HUDSON:

24         Q.   And one of the things that the federal

25    framework says is to order suspicious monitors of

Highly Confidential - Subject to Further Confidentiality Review

```
1    controlled substances; is that fair?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  Can you repeat that?

4    BY MR. HUDSON:

5         Q.   Sure.  One of the requirements of the

6    federal framework for controlled substances is to

7    monitor suspicious orders, to have a program in

8    place to monitor suspicious orders of controlled

9    substances?

10        A.   Again, I'm not an expert on this area,

11   but my understanding is it's part of it, part of

12   it meaning it has to be -- there are several

13   factors that need to be put into place.

14        Q.   And is that one of them?

15        A.   I believe it could be one of them, yes.

16        Q.   You said that you had a lot of

17   conversations with Greg and had a good

18   relationship relating to jokes back on this

19   Exhibit 7.

20        So is the joke that Greg is saying -- he's

21   just joking with you saying I thought flu did not

22   impact our numbers.  I don't get what that joke

23   is.

24        A.   We traditionally were not allowed to --

25   it's not that we weren't allowed to.  We would
```

1    attribute changes year over year with when flu

2    season hit or when cough and cold season hit.  As

3    you can assume, there's a lot of therapies that

4    are driven by what disease state you have, cough

5    and cold, flu, et cetera.

6        So we would often correlate changes in year

7    over year trends to flu or cough and cold season

8    when that hit.  Our management never accepted that

9    as a reason for sales to have fluctuated.

10       Q.   When you say your management, the people

11   who you reported to?

12       A.   Above Greg.

13       Q.   So within the organization, there were

14   some in the organization who believed that flu was

15   not an attribute that would cause a fluctuation in

16   the numbers, but you and Greg didn't agree with

17   that.

18            MR. KOBRIN:  Object to form.

19   BY MR. HUDSON:

20       Q.   So you're joking about that?

21            MR. KOBRIN:  Object to form.  Calls for

22   speculation and misrepresents the testimony.

23            THE WITNESS:  I can tell you I didn't

24   agree with that, but I can't speak for Greg.

25

```
 1   BY MR. HUDSON:

 2       Q.   I thought you testified that's how you

 3   knew it was a joke.

 4       A.   We would joke about it, yes.

 5       Q.   But here you know it and in this email

 6   that's what you're saying, right, is that he

 7   doesn't actually believe that, he's joking about

 8   it?

 9       A.   That's how I interpret it today.  I

10   mean, I would need to talk to Greg if he felt that

11   way.

12       Q.   Are you sure or not sure whether Greg is

13   joking or not?

14       A.   I am certain he is joking in this.

15            MR. KOBRIN:  As he's answering the

16   question.

17   BY MR. HUDSON:

18       Q.   Then you're certain that Greg is of the

19   view that flu can impact the numbers?

20       A.   In this situation, yes.

21       Q.   Let's look, if we could, real quick back

22   to Exhibit 14.  I know we spent a lot of time on

23   that.  I just want to make one point.

24            MR. HUDSON:  If we can pull up 1226.

25
```

```
1   BY MR. HUDSON:

2       Q.   There was one thing I missed before.  If

3   we turn to the first paragraph, you were just

4   asked some questions about whether you were

5   talking about the DEA, reporting to the DEA or

6   someone else.

7       You do agree with me in the first -- you've

8   got a clause there in the beginning of the second

9   sentence where you said at the time.

10      A.   There is a clause, yes.

11      Q.   And that's following the sentence that

12  says, "As you likely know, the DEA was in for an

13  inspection of the warehouse today specifically

14  asking about hydrocodone-containing products."

15  Right?

16      A.   Yes.

17      Q.   So you agree that at the time is a

18  reference to the first sentence?

19           MR. KOBRIN:  Object to form.

20           THE WITNESS:  It could be.

21           MR. KOBRIN:  What do you mean by a

22  reference to the first sentence?

23  BY MR. HUDSON:

24      Q.   You're saying in the first sentence of

25  the email the DEA came in and gave an inspection,
```

Highly Confidential - Subject to Further Confidentiality Review

1   right, and was asking about hydrocodone

2   combination products.  Then your second sentence

3   you started out at the time.

4        My question is:  You're referencing then at

5   the time that the DEA came in for the inspection;

6   right?

7        A.   That's how I read it.

8        Q.   Right.  The warehouse reported having no

9   hydrocodone-containing products on hand.  So at

10  the time the DEA came in for an inspection, the

11  warehouse reported having no hydrocodone products

12  on hand.

13       Is there any doubt in your mind, as you sit

14  here today, that the warehouse was making their

15  report to the DEA?

16            MR. KOBRIN:  Object to form.

17            THE WITNESS:  I think I've answered that

18  several times, but I don't know who they reported

19  or how it was reported.  I wasn't at the DEA

20  inspection.

21  BY MR. KOBRIN:

22       Q.   Right.  And that's what you testified to

23  before, and I'm just hoping that when you saw the

24  way that you had written the sentences together

25  and you said at the time referencing back to the

Highly Confidential - Subject to Further Confidentiality Review

1    DEA inspection, that may clarify in your head

2    that, yeah, now that I see that, the DEA was

3    probably the only one there doing the inspection

4    at the time.  And so it would make logical sense

5    that that's who the warehouse would be reporting

6    to.

7              MR. KOBRIN:  Object to form.

8    BY MR. HUDSON:

9        Q.   Do you think that's fair or unfair, or

10   you just don't know?

11       A.   I think I've answered that before.  I

12   don't know who they're reporting to.

13             MR. HUDSON:  No further questions.

14                  RE-EXAMINATION

15   BY MR. KOBRIN:

16       Q.   I know you talked about how you don't

17   know the details of how orders were stopped.  But

18   you know, do you not, that they were stopped at

19   the warehouse if they were unusual or different

20   from your experience; is that accurate?

21       A.   Yes.

22       Q.   Thank you.

23             MR. HUDSON:  No further questions.

24   Thanks for your time.

25             THE VIDEOGRAPHER:  The time is 2:30 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    This concludes the video deposition.

 2              (Whereupon, at 2:30 p.m., the taking of

 3    the instant deposition ceased.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   COMMONWEALTH OF PENNSYLVANIA  )

 2   COUNTY OF ALLEGHENY           )      SS:

 3                  C E R T I F I C A T E

 4              I, Ann Medis, Registered Professional

 5   Reporter, Certified Livenote Reporter and Notary

 6   Public within and for the Commonwealth of

 7   Pennsylvania, do hereby certify:

 8              That MICHAEL BIANCO, the witness whose

 9   deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12              I further certify the inspection,

13   reading and signing of said deposition were not

14   waived by counsel for the respective parties and

15   by the witness.

16              I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage and that I am in no way interested in the

19   outcome of this matter.

20              IN WITNESS WHEREOF, I have hereunto set

21   my hand this 23rd day of January, 2019.

22

     _____

23                           Notary Public

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A

     COUNTY OF ALLEGHENY            )     S H E E T

 2

 3       I, MICHAEL BIANCO, have read the foregoing

     pages of my deposition given on January 18, 2019,

 4   and wish to make the following, if any,

     amendments, additions, deletions or corrections:

 5

 6   Page  Line   Change and reason for change:

 7   ____  ____   _____

 8   ____  ____   _____

 9   ____  ____   _____

10   ____  ____   _____

11   ____  ____   _____

12   ____  ____   _____

13   ____  ____   _____

14   ____  ____   _____

15   ____  ____   _____

16   ____  ____   _____

17   ____  ____   _____

18

19   In all other respects, the transcript is true and

     correct.

20

21                  _____

                    MICHAEL BIANCO

22

23   _____ day of _____, 2019.

24   _____

                  Notary Public

25
```