```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4

 5    ----------------------------) MDL No. 2804

 6    IN RE:  NATIONAL PRESCRIPTION )

 7    OPIATE LITIGATION            )

 8    ---------------------------  ) Case No. 17-md-2804

 9    THIS DOCUMENT RELATES TO:    )

10    ALL CASES                    )

11    ----------------------------) Hon. Dan A. Polster

12

13                 HIGHLY CONFIDENTIAL

14       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16             VIDEOTAPED DEPOSITION OF

17                   DEBORAH BISH

18

19               February 1, 2019

20

21                   Toledo, Ohio

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          The videotaped deposition of DEBORAH BISH,

6    called by the Plaintiffs for examination, taken

7    pursuant to the Federal Rules of Civil Procedure of

8    the United States District Courts pertaining to the

9    taking of depositions, taken before JULIANA F.

10   ZAJICEK, a Registered Professional Reporter and a

11   Certified Shorthand Reporter, at the Renaissance

12   Toledo Downtown Hotel, 444 North Summit Street,

13   Toledo, Ohio, on February 1, 2019, at 8:06 a.m.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         LEVIN PAPANTONIO THOMAS MITCHELL
           RAFFERTY & PROCTOR P.A.
 4         316 South Baylen Street, Suite 600
           Pensacola, Florida 32502
 5         205-396-3982
           BY:  JEFF GADDY, ESQ.
 6              jgaddy@levinlaw.com
 7
      ON BEHALF OF WALGREEN CO.:
 8
           BARTLIT BECK LLP
 9         54 West Hubbard Street, Suite 300
           Chicago, Illinois 60654
10         312-494-4400
           BY:  KATHERINE M. SWIFT, ESQ.
11              kate.swift@bartlit-beck.com
12
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
13    AMERISOURCEBERGEN DRUG CORPORATION:
14         JASZCZUK, P.C.
           311 South Wacker Drive, Suite 3200
15         Chicago, Illinois 60606
           312-442-0509
16         BY:  MARGARET M. SCHUCHARDT, ESQ.
                mschuchardt@jaszczuk.com
17
18    ON BEHALF OF McKESSON CORPORATION:
19         TABET DIVITO & ROTHSTEIN LLC
           209 South LaSalle Street, 7th Floor
20         Chicago, Illinois 60604
           312-762-9461
21         BY:  KYLE A. COOPER, ESQ. (Telephonically)
                kcooper@tdrlawfirm.com
22
23
24
```

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
     PHARMACEUTICALS INC., PAR PHARMACEUTICAL, INC. AND PAR
 3   PHARMACEUTICAL COMPANIES, INC. (FKA PAR PHARMACEUTICAL
     HOLDINGS, INC.):
 4
         ARNOLD & PORTER KAYE SCHOLER LLP
 5       70 West Madison Street, Suite 4200
         Chicago, Illinois 60602-4231
 6       312-583-2435
         BY:  CAITLIN MARTINI MIKA, ESQ.
 7            (Telephonically)
              caitlin.mika@arnoldporter.com
 8
 9   ON BEHALF OF WALMART INC.:
10       JONES DAY
         77 West Wacker Drive
11       Chicago, Illinois 60601-1692
         312-269-4164
12       BY:  PATRICK J. BEISELL, ESQ. (Telephonically)
              pbeisell@jonesday.com
13
14   ON BEHALF OF HBC SERVICES:
15       MARCUS & SHAPIRA LLP
         One Oxford Centre, 35th Floor
16       Pittsburgh, Pennsylvania 15219
         412-471-3490
17       BY:  DARLENE M. NOWAK, ESQ. (Telephonically)
              nowak@marcus-shapira.com
18
19   ALSO PRESENT:
20       MS. KATIE MAYO,
              Levin Papantonio Thomas Mitchell
21            Rafferty & Proctor P.A.
22       MR. MICHAEL TOTH, Trial Technician
23   THE VIDEOGRAPHER:
         MR. MICHAEL NEWELL,
24       Golkow Litigation Services.
```

```
 1                    I N D E X
 2   WITNESS:                                    PAGE:
 3    DEBORAH BISH
 4         EXAM BY MR. GADDY....................   10
 5         EXAM BY MS. SWIFT: ..................  475
 6         FURTHER EXAM BY MR. GADDY............  493
 7
 8                     * * * * *
 9
10                  E X H I B I T S
11   WALGREENS - BISH EXHIBIT             MARKED FOR ID
12    No. 1    4/5/12 E-mail chain, Subject:      16
               Jupiter/Perrysburg C2 Orders;
13             WAGMDL00751658 - 659
14    No. 2    6/28/12 E-mail chain with          19
               attachment, Subject: FW: Czar doc
15             from S. Thoss;
               WAGMDL00317097 - 098
16
      No. 3    Deborah Bish LinkedIn page         27
17
      No. 4    Annual Performance Review, 9/1/11  43
18             - 8/31/12, Deborah Bish
19    No. 5    Printout from the DEA website re   65
               Title 21 CFR Part 1301, Section
20             1301.74
21    No. 6    Documents titled "Handling        74
               Suspicious Drug Orders,"
22             Originated 9/8/98, Revised 2/15/05
               and "Handling Suspicious Orders
23             and Loss of Controlled Drugs,"
               Originated 9/8/98, Revised
24             2/15/05; WAG00001910 - 911
```

```
 1                    E X H I B I T S (Continued)
 2    WALGREENS - BISH EXHIBIT                MARKED FOR ID
 3      No. 7     Walgreens policy re: RX              76
                  Questionable Order Quantity, Orig
 4                12/11/2006, Written by: Shelley
                  Crisel; WAGMDL00757788
 5
        No. 8     5/11/11 e-mail chain with            94
 6                attachment, Subject: Re: VAWD
                  Question; WAGMDL00751821 - 823
 7
        No. 9     Authentication of Prescription      118
 8                Order Policy, Orig 12/11/2006, Rev
                  Date 10/07/2013;
 9                WAGMDL00749381 - 407
10      No. 10    6/19/13 e-mail chain with           140
                  attachments, Subject: FW:
11                RxIntegrity Team and DEA
                  agreement: Action Required;
12                WAGMDL00316771 - 785
13      No. 11    5/9/12 e-mail chain, Subject: FW:   147
                  Drug Quantities;
14                WAGMDL00751871 - 872
15      No. 12    5/29/12 e-mail chain, Subject: RE:  182
                  Suspicious Drug process;
16                WAGMDL00751808 - 810
17      No. 13    U.S. DOJ DEA Letter dated 5/17/06   198
                  to Mr. Todd Polarolo, Distribution
18                Center Manager, Walgreen Company;
                  WAGMDL00709510 - 512
19
        No. 14    5/27/06 Memorandum from Justin      217
20                Joseph to Todd Polarolo Re: DEA
                  Audit Preliminary Response
21                03-06-06; WAGMDL00709508 - 509
22      No. 15    E-mail chain with attachment;       224
                  WAGMDL00757762 - 773
23
24
```

```
 1                    E X H I B I T S (Continued)
 2   WALGREENS - BISH EXHIBIT               MARKED FOR ID
 3     No. 16    8/16/17 E-mail chain with         228
                 attachment, Subject: CD orders -
 4               2; WAGMDL00183798 - 800 and
                 WAGMDL00205379 - 452 and
 5               WAGMDL00208715 - 716
 6     No. 17    U.S. DOJ DEA Letter to Walgreen    253
                 Co. 12/27/07; WAGMDL00753976 - 77
 7
       No. 18    Internal Audit Report, 12/22/08,   283
 8               Subject: DEA Compliance -
                 Perrysburg DC;
 9               WAGMDL00757163 - 148
10     No. 19    Settlement and Memorandum of       312
                 Agreement; WAGMDL00490963 - 974
11
       No. 20    Multiple letters from Walgreens to 333
12               DEA Miami Field Division, Re:
                 Walgreens Jupiter DC;
13               wagmdl00655723 - 738
14     No. 21    4/16/12 e-mail chain, Subject: RE: 390
                 C2 orders for #13056;
15               WAGMDL00119552 - 555
16     No. 22    Top document titled "Order Item    406
                 Detail," dated 8/18/10;
17               WAGMDL00674562 - 575
18     No. 23    Administrative Inspection Warrant, 411
                 Case No. 3:13 MJ 7003;
19               WAGMDL00493697 - 700
       No. 24    U.S. DOJ DEA Subpoena;             416
20               WAGMDL00493694 - 718
21     No. 25    2/8/13 e-mail chain Subject: FW:   422
                 Important DEA Reminder;
22               WAGMDL00698433 - 434
23     No. 26    2/15/13 e-mail with attachment,    432
                 Subject: FW: Draft communication;
24               WAGMDL00303243 - 245
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)

 2   WALGREENS - BISH EXHIBIT                 MARKED FOR ID

 3    No. 27   2/20/13 e-mail chain, Subject: Re:    436

               Perrysburg CIII-CV - follow-up;

 4             WAGMDL00357519 - 521

 5    No. 28   2/26/13 e-mail chain, Subject: RE:    445

               Perrysburg C111-CV - follow up;

 6             WAGMDL00358459 - 462

 7    No. 29   Meeting invite sent 2/27/13,          458

               Subject: Perrysburg CIII-CV -

 8             follow up; WAGMDL00335835 - 837

 9    No. 30   5/26/12 e-mail chain, Subject:        467

               Fwd: INFO: Suspicious Drug

10             process; WAGMDL00709301 - 303

11    No. 31   5/30/12 e-mail chain, Subject: RE:    470

               Suspicious Drug process;

12             WAGMDL00752192 - 194

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          THE VIDEOGRAPHER:  We are now on the record.
2              My name is Michael Newell.  I am a
3     videographer for Golkow Litigation Services.  Today's
4     date is February 1st, 2019, and the time is 8:06 a.m.
5              This deposition is being held in Toledo
6     Ohio in the matter of National Prescription Opiate
7     Litigation for the Northern District of Ohio, Eastern
8     Division.
9              The deponent today is Deborah Bish.
10             Will counsel please identify themselves.
11        MR. GADDY:  Jeff Gaddy with Levin Papantonio for
12    the Plaintiffs.
13        MS. SCHUCHARDT:  Margaret Schuchardt, Jaszczuk
14    P.C., on behalf of AmerisourceBergen Drug Corporation.
15        MS. SWIFT:  Kate Swift for Walgreens.
16        MS. MIKA:  Caitlin Mika for the Endo and Par
17    entities.
18        MS. SWIFT:  Did you hear that?
19        THE COURT REPORTER:  No.
20        MR. GADDY:  One more time, please.
21        MS. MIKA:  Caitlin Mika, M-i-k-a, for the Endo
22    and Par entities.
23        THE VIDEOGRAPHER:  The court reporter today is
24    Juliana Zajicek, who will now swear in the witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEBORAH BISH,

 2   called as a witness herein, having been first duly

 3   sworn, was examined and testified as follows:

 4                    EXAMINATION

 5   BY MR. GADDY:

 6        Q.    Good morning, Ms. Bish.

 7        A.    Good morning.

 8        Q.    Could you please state your name for the

 9   record?

10        A.    Deborah Bish.

11        Q.    And you work at Walgreens, correct?

12        A.    Yes.

13        Q.    How long have you worked with Walgreens?

14        A.    16 years, I think.

15        Q.    Has your entire time at Walgreens been in

16   the Perrysburg distribution center?

17        A.    Yes.

18        Q.    At some period of time while you were with

19   Walgreens in Perrysburg, were you the C-II function

20   manager?

21        A.    Yes.

22        Q.    From what period of time?

23        A.    From the time they opened it until the

24   time they closed it.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.

2    A.    I don't remember the years.

3    Q.    When you started at Perrysburg, were you

4  the C-II function manager?

5    A.    No.

6    Q.    Okay.  Do you remember when you became the

7  C-II function manager?

8    A.    Not really.  I don't know the year.

9    Q.    Okay.  Can you give me an approximation?

10   A.    I was in Rx for a year-and-a-half.  I

11 think I was in receiving for a year.  I think I

12 started in 2002.  So probably 2005, '6, somewhere in

13 there.

14   Q.    And when did you stop being the C-II

15 function manager?

16   A.    Whenever they told us we were going to

17 outsource our C-IIs, and I don't remember that date

18 either.

19   Q.    Okay.  Can you give me an approximation?

20   A.    I just don't know.  I was there eight

21 years, I think, as a C-II manager.  I was -- I did

22 that for eight years, but I don't know exactly when I

23 started.  Therefore, I can't tell you exactly when I

24 ended.

1       Q.     Okay.  So if you started in approximately

2    2005, you would have ended in approximately 2013?

3       A.     '13, yeah, if that's the right year.

4       Q.     Were you the only C-II function manager

5    that ever served at Perrysburg?

6       A.     Yes.

7       Q.     Did Walgreens ever distribute Schedule II

8    drugs out of Perrysburg prior to you becoming the C-II

9    function manager?

10      MS. SWIFT:  Objection; foundation.

11   BY THE WITNESS:

12      A.     Not that I know of.

13   BY MR. GADDY:

14      Q.     Prior to you becoming the C-II function

15   manager in Perrysburg, was Walgreens distributing

16   Schedule III controlled substances?

17      A.     Yes, they were, um-hum.

18      Q.     Was Walgreens distributing Schedule III

19   controlled substances when you started at Perrysburg?

20      A.     I believe so.  I was not in charge of

21   that, but I believe so, um-hum.

22      Q.     Okay.  And it's accurate to say that

23   Walgreens no longer distributes any controlled

24   substances from Perrysburg?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     They no longer distribute C-IIs, I don't

2  know about III through Vs because I'm in receiving

3  now.  I don't...

4      Q.     You said that you -- you had to give us an

5  approximation as far as the date that Walgreens

6  stopped distributing Schedule II controlled

7  substances.

8             Is there any time period or event that you

9  correlate that stoppage with?

10     MS. SWIFT:  Object to the form.

11  BY THE WITNESS:

12     A.     Yeah, I'm not -- I'm not sure what you

13  mean.  I -- I just know they decided they were going

14  to not distribute C-IIs and all of our orders started

15  going to AmerisourceBergen, I believe.

16  BY MR. GADDY:

17     Q.     While you were the C-II function manager

18  at Perrysburg, how many stores did Perrysburg

19  distribute controlled sub -- Schedule II controlled

20  substances to?

21     MS. SWIFT:  Objection; foundation.

22  BY THE WITNESS:

23     A.     Did they -- how many did they distribute

24  C-IIs to?

```
 1   BY MR. GADDY:

 2        Q.    Correct.

 3        A.    Well, it changed.  I mean, I think we

 4   started with 700 stores, but as we grew and took on

 5   new -- like when we opened the Connecticut Northeast,

 6   we took those stores so it grew.  And I think

 7   eventually we were up to around 5,000 out of the 8,000

 8   that we had at the time.

 9        Q.    So of the approximately 8,000 total

10   Walgreens, Perrysburg was distributing Schedule II

11   controlled substances to approximately 5,000 of them?

12        A.    To my recollection.  I can't swear to

13   that.

14        Q.    Okay.  And were these in -- can you give

15   me an overview of the -- of some of the different

16   states that Perrysburg would have distributed Schedule

17   IIs to?

18        A.    We started with Indiana, Illinois, Ohio,

19   Michigan.  And then as we grew we started -- then I

20   said, like I said, we took on the Northeast, like

21   Connecticut and New York, and then when Jupiter shut

22   down, we took down -- took on the Florida, Georgia,

23   Tennessee, Alabama stores, I believe.

24        Q.    Okay.  Did you distribute to Kentucky?
```

```
 1        A.    I think so.  I can't remember any store in

 2   Kentucky exactly, but I would think so if it was

 3   within that region.

 4        Q.    Did you distribute controlled substances

 5   into West Virginia?

 6        A.    Again, I don't remember a specific store,

 7   but it would make sense that we did.

 8        Q.    And you mentioned -- or you referenced

 9   Jupiter shutting down.

10             Do you know why Jupiter shut down?

11        A.    No, I was never told.  I was never told.

12        Q.    As Jupiter shut down, that increased

13   the -- the burden on Perrysburg, correct?

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.    It increased our stores.  I didn't think

17   it was a burden, but it increased our stores.

18   BY MR. GADDY:

19        Q.    Sure.  And sorry.  That was a bad

20   question.

21             It increased the number of stores that you

22   served out of Perrysburg, correct?

23        A.    That's correct.

24                  (WHEREUPON, a certain document was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked Walgreens - Bish Deposition

 2                    Exhibit No. 1, for identification, as

 3                    of 02/01/2019.)

 4    BY MR. GADDY:

 5        Q.    I'm going to show you what I'll mark as

 6    Exhibit No. 1, P-WAG 249.

 7        A.    Um-hum.

 8        Q.    And do you see this is an e-mail dated

 9    April 5, 2012?

10        A.    Um-hum.

11        Q.    And it's an e-mail from Matt Nye?

12        A.    Yes.

13        Q.    Do you know who Matt is?

14        A.    Yes.

15        Q.    And he works in the computer room in

16    Perrysburg?

17        A.    Yes.

18        Q.    Okay.  And it looks like you are copied on

19    this e-mail?

20        A.    Yes.

21        Q.    And the subject is "Jupiter/Perrysburg

22    C-II Orders."

23              Do you see that?

24        A.    Um-hum, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    It says:

 2              "Hi Linda, I tried giving you a call and

 3        ended up leaving a long-winded message that I just

 4        deleted, figuring an e-mail would make more sense.

 5        Anyway, I'm sure by now you know what's happening in

 6        the Jupiter with the DEA."

 7              Do you see that?

 8        A.    Um-hum.

 9        Q.    Do you know what's being referred to

10        there?

11        A.    I'm assuming he means the fact that --

12        that they shut down.  I don't know what he means.

13        I -- he didn't tell me.

14        Q.    Okay.  You said that you didn't -- you

15        told me a minute ago that you didn't know why Jupiter

16        shut down.  You -- you did know that the DEA went

17        into -- to Jupiter with warrants and subpoenas,

18        correct?

19        A.    I heard that, yes, but I was never told

20        why they shut down or if -- what happened.  I was just

21        told they were there.

22        Q.    Okay.  But you knew that the shutdown of

23        Jupiter happened -- happened after the DEA went into

24        the Jupiter distribution center, correct?
```

```
 1     A.     Yes, I did know that.

 2     Q.     Okay.  It says:

 3            "Anyway, I'm sure by now you know what's

 4     happening in Jupiter with the DEA, but if not, they

 5     might temporarily be unable to ship C-II drugs to

 6     their stores due to some issues they are having with

 7     their licenses."

 8            Do you see that?

 9     A.     Um-hum.

10     Q.     It says:

11            "We're working on the possibility of us

12     temporarily taking over their C-II stores until they

13     get things sorted out and the biggest problem is that

14     C-II is physically too small to fit more people in to

15     work so we need to add an additional shift to really

16     make this happen."

17            Do you see that?

18     A.     Um-hum.

19     Q.     After looking at this e-mail, do you

20     recall that there were some changes that had to be

21     made at Perrysburg to accommodate the new stores that

22     were brought on because of the shutdown at Jupiter?

23     A.     I know we had to make changes because of

24     new stores being brought on.  I don't know they were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    all from Jupiter, but as we increased stores, we had
 2    to increase people to handle the volume, yes.
 3         Q.    And does this -- is this timeframe
 4    consistent with your recollection in early 2012,
 5    April 2012 is when Jupiter began having problems after
 6    the DEA had come in?
 7         MS. SWIFT:  Objection; foundation.
 8    BY THE WITNESS:
 9         A.    Yeah, I don't -- I don't remember,
10    frankly, but, again, I don't know they were having
11    problems.  I just know they -- they weren't going to
12    ship C-IIs any more and we were getting their stores.
13    BY MR. GADDY:
14         Q.    Okay.  And -- but this e-mail is from
15    April of 2012, correct?
16         A.    Right.
17         Q.    I'll show you what I'll mark as Exhibit 2.
18               (WHEREUPON, a certain document was
19                marked Walgreens - Bish Deposition
20                Exhibit No. 2, for identification, as
21                of 02/01/2019.)
22    BY MR. GADDY:
23         Q.    Do you recognize this as being a --
24    another e-mail?
```

```
 1        A.    Yes, but I don't know either of those

 2   people.

 3        Q.    Okay.  And I'm really just going to be

 4   asking you about the attachment to this.

 5        A.    Okay.

 6        Q.    If you turn the page, you see there is --

 7   it looks like it's a draft, some draft language, and

 8   then at the top it says "For the Czar."

 9              Do you see that?

10        A.    Um-hum.

11        Q.    Do you know what this is referring to?

12        A.    No.  I don't know what is -- what "the

13   Czar" is either.

14        Q.    Okay.  And it says:  -- if you look at the

15   first page, you see it's a Walgreens e-mail, correct,

16   Walgreens e-mail addresses?

17        A.    I see Sue Thoss's e-mail address.  Oh,

18   and, yeah, Anika is Walgreens, yes.

19        Q.    Okay.  And the -- and the e-mail went to

20   Tasha Polster, do you see that, the very top one?

21        A.    Uh-huh.

22        Q.    And do you know who Tasha is?

23        A.    No.

24        Q.    Have you ever heard of her?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, uhn-uhn.

 2        Q.    Have you ever interacted with Tasha

 3   Polster that you are aware of?

 4        A.    No, not that I'm aware of.

 5        Q.    Have you ever received any training or

 6   guidance related to controlled substances from Tasha

 7   Polster?

 8        A.    Not that I'm aware of.

 9        Q.    Okay.

10        A.    Uhn-uhn.

11        Q.    If you look at the attachment on the next

12   page, it says "From the Czar" at the top.  It says:

13             "Currently we have 12 parent buildings

14   around the Continental" -- "Continental US that have

15   the ability to handle C-III through V drugs and PSE."

16             And that refers to pseudoephedrine,

17   correct?

18        A.    Yes.

19        Q.    It says:

20             "One of the 12 facilities in Florida

21   (Jupiter) we have shifted those items to a nearby

22   facility in Orlando, Florida."

23             Do you see that?

24        A.    Yes.
```

1    Q.    If you skip a paragraph there, the next --

2    first part of the next sentence, it says:

3          "There are three facilities that carry

4    C-II product."

5          Do you see that?

6    A.    Yes.

7    Q.    And, again, I think if we flip back to the

8    first page, this is in the June 2012 timeframe.

9          Do you see that?

10    A.    Um-hum.

11    Q.    What three facilities did Walgreens have

12    that carried C-II?

13    A.    It was Woodland, California; Jupiter,

14    Florida; and Perrysburg.

15    Q.    Okay.  If you skip another paragraph and

16    start where it says "these facilities," do you see

17    where I am?

18    A.    Yep.

19    Q.    It says:

20          "These facilities are located in

21    Perrysburg, Ohio servicing approximately 5200 stores;

22    Woodland, California approximately 1600 stores; and

23    Jupiter, Florida approximately 1200 stores."

24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.     Yes.

 2       Q.     It says:

 3              "Jupiter previously had 2400 stores, but

 4   1200 were shifted to Perrysburg due to the concerns

 5   with the DEA."

 6              Did I read that correctly?

 7       A.     Yes.

 8       Q.     Is that consistent with your memory that

 9   as far as the number of stores that Perrysburg --

10       A.     I don't know.

11       Q.     -- was servicing and the fact that

12   approximately 1200 stores were shifted to Perrysburg

13   due to concerns with the DEA?

14       A.     I know we got Jupiter stores.  I didn't

15   know it was -- I was never told it was over concerns

16   from the DEA, but we did get -- I can't tell you if it

17   was 1200, though.  I don't remember that.

18       Q.     And we'll talk more about this in a little

19   bit, but did anybody ever tell you about what any of

20   the concerns were that the DEA had?

21       A.     No.

22       Q.     Did anybody ever tell you that Walgreens

23   entered into a settlement agreement with the DEA?

24       A.     No.
```

1      Q.     Did anybody ever tell you that the

2   settlement agreement that Walgreens entered into with

3   the DEA applied to all distribution centers that

4   Walgreens had?

5      A.     Well, if they never told me about it, then

6   they wouldn't have told me what it entailed.  They

7   never told me about it.

8      Q.     When -- we've used the term or the phrase

9   "C-II"?

10      A.     Um-hum.

11      Q.     What does that mean to you?

12      A.     Class II drugs.

13      Q.     Okay.  How would you just in your own

14   words --

15      A.     High street value, that's what I was told.

16      Q.     I'm sorry.

17      A.     They had a high street value.

18      Q.     Okay.  And what does that mean to you?

19      A.     That means to me that if you sell them on

20   the street you make a lot of money doing it, that's

21   what I -- that's what it means to me.

22      Q.     Okay.  Can you give me an example of some

23   of those drugs?

24      A.     OxyContin, morphine, oxycodone, fentanyl.

1    Q.    Okay.  And so when you were the C-II

2    function manager, these were the types of drugs that

3    were under your purview?

4    A.    Yes.

5    Q.    I'm going to -- as I ask you questions

6    today, I'm going to probably use the -- the term

7    "distribution timeframe".

8    A.    Okay.

9    Q.    And just so you're clear about what I'm

10   referring to, is I'm asking only about the time when

11   Walgreens was distributing controlled substances.

12   A.    C-IIs or...

13   Q.    Sure.

14   A.    Okay.

15   Q.    Sure.  C-IIs for your perspect -- well,

16   let me -- let me ask it this way:  Have you ever had

17   any responsibilities or duties dealing with C-III

18   through V drugs?

19   A.    No.

20   Q.    Okay.  And if I was to ask you specifics

21   about the -- the methodologies that are utilized at

22   Perrysburg to distribute C-IIIs through Vs, would you

23   be able to answer --

24   A.    No.

1      Q.    -- any questions about that?

2      MS. SWIFT:  Object to the form.

3  BY THE WITNESS:

4      A.    No.

5  BY MR. GADDY:

6      Q.    So -- so for the purposes of your

7  clarification, yes, I'll be asking you about C-II

8  drugs since that's -- that's your -- your area of

9  experience with Walgreens?

10     A.    Right.

11     Q.    Correct?

12     A.    Right.

13     Q.    Okay.  So when I refer to the distribution

14  timeframe, I'm only asking you about the period in

15  which Walgreens distributed Schedule II drugs.

16     A.    Okay.

17     Q.    Okay.

18          And your best guess at what that time

19  period is, is approximately 2005 through approximately

20  2013?

21     MS. SWIFT:  Object to the extent it

22  mischaracterizes the testimony.

23  BY THE WITNESS:

24     A.    Right, because I don't really remember the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    years.  I just don't.

 2    BY MR. GADDY:

 3         Q.    Let me show you what I'm going to mark as

 4    Exhibit No. 3.

 5                   (WHEREUPON, a certain document was

 6                    marked Walgreens - Bish Deposition

 7                    Exhibit No. 3, for identification, as

 8                    of 02/01/2019.)

 9    BY MR. GADDY:

10         Q.    And tell me if you recognize this as being

11    your -- a copy of your -- of your LinkedIn page?

12         A.    Well, I never go to LinkedIn, but this --

13    this looks like me, yes.

14         Q.    Okay.  At some point in time do you -- do

15    you recall creating this page?

16         A.    At some point in time, yes.

17         Q.    Okay.  Do you know about when that would

18    have been?

19         A.    No.  A long time ago.

20         Q.    Okay.  And do you see it has got your name

21    at the top?

22         A.    Um-hum.

23         Q.    And just below there it says "Function

24    Manager at Walgreens"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Right.

 2        Q.     Is that still your title today?

 3        A.     Yes.  We are all function managers.

 4        Q.     And under Experience, we are going to go

 5   in reverse order, but just so I can kind of try to get

 6   a sense of how up-to-date this is, it says that you've

 7   been a function manager at Walgreens from 2 --

 8   October of 2002 through the present.

 9               Do you see that?

10        A.     Yes.

11        Q.     And what I'm trying to figure out is, is

12   when you think the present would be for the purpose of

13   this particular profile?

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.     I don't understand what you are asking me.

17   BY MR. GADDY:

18        Q.     Sure.

19               So the present could be today if you

20   created this last night.  And I think I understand you

21   to say that you did not create this last night, so --

22        A.     No.  I haven't been on LinkedIn for years,

23   so.  And I only did this because my daughter told me I

24   should, but, yeah, I don't know when I put this on
```

Highly Confidential - Subject to Further Confidentiality Review

1    there.

2         Q.    Okay.

3         A.    So if you are asking me if it's not

4    updated, that would probably be right.

5         Q.    I'm asking you when you think it is

6    updated through?

7         A.    I have no idea.

8         Q.    Okay.

9         A.    I really don't.  I don't know.

10        Q.    Okay.  Flip to the second page for me,

11   please.

12        A.    Okay.

13        Q.    And it says at the bottom you went to Kent

14   State University?

15        A.    Yes.

16        Q.    And did you get a degree from Kent State?

17        A.    No.

18        Q.    How many years did you -- did you attend

19   classes there?

20        A.    I went there for one year and I went to

21   Scottsville Community College for one year, also in

22   Michigan, because that's where I lived at the time.

23        Q.    And it looks like was this Quality Farm &

24   Fleet Distribution Center, was that your first job out

Highly Confidential - Subject to Further Confidentiality Review

1  of college?

2         A.     Out of college, no.

3         Q.     What else did you do?

4         A.     I worked for a CPA for a year.

5         Q.     Okay.

6         A.     And then I worked for a factory for a year

7  and did data processing.  This was the first

8  supervisor job I had, management job.

9         Q.     Okay.  What did you do for Quality Farm &

10 Fleet Distribution Center?

11        A.     We just handled all of the returns that

12 came back from customers, getting them back to vendors

13 for credit.

14        Q.     Okay.  And you did that for just over

15 three years?

16        A.     Yes.

17        Q.     And then your -- it looks like your next

18 position was at Kohl's Department Stores, also working

19 with returns?

20        A.     Right.

21        Q.     And you did that for a little over

22 eight-and-a-half years?

23        A.     Yep.

24        Q.     Anything in either of those two positions,

1    the job at Kohl's or the job at Quality Farms, that

2    had anything to do with controlled substances?

3        A.    No.

4        Q.    Okay.  Any interact -- any job duties or

5    responsibilities at Kohl's or Quality Farm that had

6    you dealing with federal regulations regarding

7    controlled substances?

8        A.    No.

9        Q.    Anything dealing with federal regulations

10   at all?

11       A.    No.

12       Q.    Okay.  Anything -- nothing, I assume,

13   dealing with the DEA at all?

14       A.    No.

15       Q.    Okay.  And I assume nothing deal with

16   pharmaceuticals at all?

17       A.    No.

18       Q.    Okay.  And if you flip back to the first

19   page, it looks like you started at Walgreens in 2002?

20       A.    Um-hum.

21       Q.    And let me ask you about a couple of the

22   entries --

23       A.    Okay.

24       Q.    -- that are made here.  The first thing,

1   it says:

2            "Managed and participated in initial

3   startup of distribution center/departments."

4            Do you see that?

5        A.    Yes.

6        Q.    What are you referring to there?

7        A.    Well, they hired the manager six months

8   before they actually started operations.  So that

9   first six months we went out to other DCs and trained.

10  And I was initially hired to run Rx on day shift, the

11  Rx department.

12       Q.    Okay.  So when you were hired by

13  Walgreens, was Perrysburg not operational?

14       A.    No, they weren't.

15       Q.    Okay.  And so if you started in October

16  of 2002, about how long did it -- did it -- was it

17  after you started that Perrysburg became operational?

18       A.    They started receiving in January of 2003

19  to get the freight in and then they started outbound

20  operations in I think March, March or April of 2003.

21       Q.    Okay.  And what was your role during that

22  time period?

23       A.    I was the Rx function manager on day

24  shift.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  What does that mean?

2    A.    That means I managed the process of

3    bringing in our -- any of the Rx freight, picking it,

4    stocking it and shipping it out.

5    Q.    By "Rx," do you mean pharmacy?

6    A.    Yeah.

7    Q.    Okay.  So that would be prescription

8    drugs?

9    A.    Right.

10    Q.    Okay.  And when you were doing that in

11    early 2003, did that include Schedule III to V drugs?

12    A.    I -- ooh, I don't remember.  I -- I don't

13    remember if it did or not.  I don't remember.  Sorry.

14    Q.    No, that's fine.

15          Below that first paragraph you list

16    several what you call key accomplishments.

17          Do you see that?

18    A.    Um-hum, um-hum.

19    Q.    And I'm looking all of the way down at the

20    bottom of the page, the very last entry.  It starts

21    "2006."

22          Do you see that?

23    A.    Yep.

24    Q.    It says:

1           "2006 - selected to coordinate and manage

2    startup of Class II vault which included the creation

3    of policy and procedures, initial recruitment and

4    training of department."

5           Do you see that?

6    A.    Yes.

7    Q.    And can you explain to me what you are

8    referring to there?

9    A.    Well, because they asked if anyone was

10   interested in -- in running that department and I said

11   I was.  So they then sent me to Woodland for two weeks

12   by myself in order to be trained by the manager there

13   and then they sent me to Jupiter to be trained by the

14   manager -- the C-II manager there for a couple of

15   weeks, then I came back.

16          I interviewed people in our building.  We

17   don't interview people.  Typically it's just by

18   seniority who gets what job.  For the vault they

19   allowed me to interview them so I could select, hand

20   select people.  I selected eight or ten team members.

21   And then I went back to Flor -- to Woodland,

22   California with those team members, and then I took

23   them to Jupiter as well to be trained and do the job,

24   yeah.

1      Q.    Okay.  And what was -- what was happening,

2  you all were installing a vault, you all were starting

3  to distribute C-IIs?  Explain to me what -- what you

4  were being trained to do.

5      A.    At their DCs?

6      Q.    Yes.

7      A.    At the other DCs?

8            Well, every -- every function, like our

9  SAIL coordinator sat with the SAIL coordinator, their

10  comparable counterpart at those DCs, and went through

11  what their responsibilities were for that job.

12      Q.    What -- what was the purpose of this?

13  What was Walgreens beginning to do at Perrysburg?

14      MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16      A.    Well, they were going to start

17  distributing C-IIs, so we had the workforce know how

18  to do that, the right way to do that.

19  BY MR. GADDY:

20      Q.    Okay.  So this 2006 entry where -- where

21  you were coordinating and managing the startup of this

22  Class C-II vault, that would be the time period that

23  Perrysburg began to distribute C-IIs?

24      MS. SWIFT:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    It appears so.  I don't know.  I mean, I

 3   have 2006.  I don't know what month it was, but...

 4   BY MR. GADDY:

 5       Q.    Okay.  And was there any -- so the -- so

 6   the training that you -- that you underwent involved a

 7   couple of weeks at Woodland's and a couple of weeks at

 8   Jupiter?

 9       A.    By myself and then I went back for a

10   couple of weeks with the team members that I had hired

11   and selected.  I went back to both DCs with those team

12   members.

13       Q.    Okay.

14       A.    Yeah.

15       Q.    It also says that -- that you were --

16   involvement in that process included the creation of

17   policy and procedures?

18       A.    Correct.

19       Q.    Can you explain what -- what you mean by

20   that?

21       A.    I mean there was nothing in writing, and

22   I'm -- I like policies and proceed -- written policies

23   and procedures, so I took notes the whole time I was

24   at both DCs on both trips and created policies and
```

1    procedures which I then sent to both of them and said:

2    Is this correct?  Did I understand this correctly?

3    And so we had written policies and procedures.

4        Q.    Okay.  So was your intention to create

5    uniform policies and procedures across the

6    distribution centers?

7        A.    Well, yeah, that makes sense.  I mean, I

8    don't know that we could be exactly alike because we

9    were different states and I know some states have

10    different laws, but that -- yeah, that was the

11    intention, so we'd all do the same thing.

12       Q.    And why would you want them to all be

13    consistent?

14       A.    Well, because there is only -- to me there

15    is probably only one way to do it correctly, so you've

16    got to make sure that you are all doing it that way.

17    I...

18       Q.    Okay.  The last entry in that paragraph

19    says:

20             "Complied with DEA regulations resulting

21    in positive audits."

22             Do you see that?

23       A.    Um-hum.

24       Q.    What DEA regulations are you referring to

Highly Confidential - Subject to Further Confidentiality Review

1   there?

2       A.   Oh, I don't remember.  The audits I think

3   were the internal audits we did every month.  That's

4   what -- and we always came out even, so I may have

5   been saying we're -- we're doing -- you know, we are

6   receiving accurately, we are picking accurately, we

7   are taking inventory every day and coming out even,

8   that's why our audits come out even.  I'm guessing

9   that's what I was referring to.

10      Q.   So when you are referring to audits in

11  this context, you are talking about whether or not

12  there is any drugs missing?

13      A.   Yes.

14      Q.   Okay.  So would it be fair to say that --

15  that there were also audits performed from time to

16  time where either Walgreens internal audit department

17  or the DEA would come in to determine whether or not

18  the distribution center was complying with DEA

19  regulations and audit the compliance with different

20  regulations?

21      MS. SWIFT:  Objection; foundation.

22  BY THE WITNESS:

23      A.   I don't really know what -- I don't recall

24  internal auditing.  I'm not even sure who is in that

Highly Confidential - Subject to Further Confidentiality Review

1   department.  And the DEA only came down once the whole

2   time we were there, that I recall, maybe twice.

3   BY MR. GADDY:

4        Q.    Okay.  Well --

5        A.    But I don't think they did an audit, you

6   know what I'm saying.  I don't know what they were

7   doing, but...

8        Q.    Well, for example, you -- you are familiar

9   with what a DEA 222 form is, correct?

10       A.    Um-hum, right, um-hum.

11       Q.    And there's rules and regulations about

12  how that form has to be filled out, correct?

13       A.    Right, right.

14       Q.    Are you familiar with any internal reviews

15  or audits where either the Walgreens internal audit

16  department or the DEA or maybe some outside

17  independent agency would come into the distribution

18  center, look through your files and your records and

19  tell you, Hey, great, you are filling out the 22

20  form -- 222 forms just how they are supposed to be,

21  or, Hey, you are leaving this line blank and it really

22  needs to be filled in correctly?

23       A.    Yes, I do remember that.

24       Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     They came in and we were putting the

 2   data -- you have to put the date shift and we were

 3   putting it on the top line and then drawing a line

 4   down and they said we had to enter it on every line,

 5   the entire date.

 6        Q.     Okay.  You said "they came in."  Who came

 7   in?

 8        A.     The DEA, I do remember them coming in.  It

 9   was the two women from Detroit.

10        Q.     Okay.  And I just kind of picked an

11   example at random.  Is that -- that process by which

12   your kind of internal policies and procedures of

13   complying with DEA regulations and that process being

14   audited, did that occur on any recurring basis?

15        MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17        A.     Not that I remember, but I hadn't thought

18   of the 222s until you said that, but not that I

19   recall, no.

20   BY MR. GADDY:

21        Q.     Okay.

22               So, let me go back to the last line in

23   your -- in this paragraph here.

24        A.     Okay.
```

```
1       Q.    Because originally you told me that you

2    assumed that the positive audits was just related to

3    the counts of the drugs being correct?

4       A.    Of any -- we called them DEA mini audits,

5    yeah.

6       Q.    Okay.  So when I -- when I look -- when

7    you look at "complied with DEA regulations," did -- do

8    you have an understanding of what you were -- what you

9    meant there?

10      A.    No, I couldn't possibly remember what I

11   meant there, but...

12      Q.    Okay.  Well, there is a lot of different

13   rules and regulations --

14      A.    Right.

15      Q.    -- from the DEA that apply to Schedule II

16   drugs, correct?

17      A.    Right.

18      Q.    And as the C-II function manager, would it

19   been -- have been your job to be familiar with those?

20      A.    I would try to be familiar with those that

21   are relative to C-IIs and what I did.

22      Q.    Okay.  And it would have been your job to

23   not only be familiar with them but to make sure that

24   they were followed within the distribution center,
```

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2        MS. SWIFT:  Object to the form, vague.

3    BY THE WITNESS:

4        A.    I would say if I -- if I knew it was a

5    rule to do that, that was my job to make sure that was

6    done, if that's your question.

7    BY MR. GADDY:

8        Q.    I think so.

9            So my question was is that -- let me ask

10   it this way:  Was there anybody higher than you in the

11   distribution center as far as responsibilities for

12   Schedule II drugs?

13       MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15       A.    Just the building manager.

16   BY MR. GADDY:

17       Q.    Okay.  And who was -- who was that during

18   this distribution time period?

19       MS. SWIFT:  Object to form.

20   BY THE WITNESS:

21       A.    Steve Kneller, I believe.

22   BY MR. GADDY:

23       Q.    Okay.  But as far as kind of the subject

24   matter expert with the distribution center on C-IIs,

Highly Confidential - Subject to Further Confidentiality Review

1    that was you?

2         A.    Yes.

3         MS. SWIFT:  Object to the form.

4    BY MR. GADDY:

5         Q.    I'll show you what I'll mark as Exhibit

6    No. 4.  This is P-WAG 2733.

7                   (WHEREUPON, a certain document was

8                    marked Walgreens - Bish Deposition

9                    Exhibit No. 4, for identification, as

10                   of 02/01/2019.)

11   BY THE WITNESS:

12        A.    Oh.

13   BY MR. GADDY:

14        Q.    Oh, I'm sorry.  I gave you one too many.

15   You can hand that to Kate?

16        MS. SWIFT:  Do you need one back, Jeff?

17        MR. GADDY:  No.

18   BY MR. GADDY:

19        Q.    Do you see this is your annual performance

20   review?

21        A.    Yes.

22        Q.    And I'm just going to look at a couple

23   of -- of highlights out of here.

24              If you look -- and using the number on the

 1   bottom right-hand side of the page, if you would turn

 2   to, and this is going to be a little bit confusing,

 3   but it is actually the second time that it says

 4   Page 10 out of 15.

 5        A.    Mine says out of 17.

 6        MS. SWIFT:  Yeah, this looks like an incomplete

 7   document for the record.

 8        MR. GADDY:  Well, Kate, I did rip off the

 9   salaried information because I didn't think that was

10   relevant, but --

11        MS. SWIFT:  It looks like it is missing a couple

12   of the other reviews is all from memory.  I'm just

13   going from memory.

14        MR. GADDY:  Oh, okay.  That's all we took out.

15   BY THE WITNESS:

16        A.    Okay.  But I have 17.  So what page do you

17   want me to go to?

18   BY MR. GADDY:

19        Q.    There is actually three -- I think it is

20   three or four different reviews, so flip back towards

21   the front a little bit.

22        A.    Oh, I see what you are saying.

23        MS. SWIFT:  Then I've got an incomplete version

24   I think is the problem.  Mine just goes Page 1 through

```
 1   15.

 2        THE WITNESS:  Is yours the same as mine?  Do you

 3   want to see if that's right?  Oh, see mine was from 9

 4   of 2012.

 5        MS. SWIFT:  And this one is from 9 of 2011 to

 6   August of 2012.  It looks like that's why --

 7        MS. SCHUCHARDT:  Yeah, 2010 and this one is

 8   2013.

 9        MS. SWIFT:  Got it.  So we've got little bits

10   and pieces stapled separately.

11        MR. GADDY:  Yeah, all right.  Let's hand them

12   back, please.

13        MR. SWIFT:  I'm going to give them all back to

14   you.

15        MR. GADDY:  Thank you.

16        MS. SWIFT:  We've already written on some of

17   them.  Apologies.

18        MR. GADDY:  No problem.  Give me just a minute.

19        MR. BEISELL:  As long as we have got a second, I

20   just wanted to announce myself.  This is Patrick

21   Beisell from Jones Day.  I missed the first minute or

22   two.

23        MR. COOPER:  I would also like to do the same.

24   Kyle Cooper on behalf of McKesson.
```

1    BY MR. GADDY:

2        Q.    Okay.  All right.  It looks like we are

3    only going to have the one copy, and it is going to be

4    Exhibit No. 4, and that is the performance review from

5    9/1/11 through 8/31/12?

6        A.    Correct.

7        Q.    Do you see that, Ms. Bish?

8        A.    Yes.

9        Q.    And sorry about the confusion there.

10       A.    That's all right.

11       Q.    But if you turn to Page 10 of 15, you

12   should get where I was trying to go.

13       A.    Okay.

14       Q.    And do you see there on the top half of

15   the page it looks like there is some entries under

16   Reviewer and it has you and then it has Justin Joseph.

17            Do you see that?

18       A.    Um-hum.

19       Q.    And who is Mr. Joseph?

20       A.    Today he is the general manager of the

21   building.  I don't know what he was then.  He might

22   have been ops manager.  I don't remember.

23       Q.    Okay.  Well, was he your immediate

24   supervisor at some point in time?

1       A.      Yes, I believe so.

2       Q.      Okay.  And under the comments, Mr. Joseph

3   says:

4               "You know every aspect of the C-II

5   department and are a valuable resource for people

6   throughout the company."

7               Do you see that?

8       A.      Yes.

9       Q.      Do you agree with the comments by-- by

10  Mr. Joseph that -- that you knew every aspect of the

11  C-II department?

12      A.      I knew what I was responsible for within

13  our realm of C-II.  I can't say I knew every aspect of

14  C-II department in every building.  I knew in my

15  building.

16      Q.      Okay.  If you go down to the bottom of the

17  page, do you see there are some more comments by

18  Mr. Joseph?

19      A.      Uh-huh.

20      Q.      He says there, he says:

21              "Thank you for everything to do with C-II.

22  You hold yourself and your team to high standards and

23  ensure everyone is being treated fairly.  Your

24  understanding of the C-II rules and regulations are

1    second to none."

2              Do you see that?

3        A.    Um-hum, um-hum.

4        Q.    And that was the input of your manager as

5    it relates to your knowledge and understanding of the

6    rules related to Schedule II drugs, correct?

7        A.    Correct.

8        Q.    And that's consistent with -- with what

9    you told us that when it came to Schedule II drugs you

10   were the -- the subject matter expert for lack of a

11   better word on that topic within the Perrysburg

12   distribution center?

13       MS. SWIFT:  Object.  Object to the form.

14   BY THE WITNESS:

15       A.    Correct.

16   BY MR. GADDY:

17       Q.    While you were the C-II function manager

18   at Perrysburg, did you have any duties or

19   responsibilities regarding suspicious order

20   monitoring?

21       MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23       A.    The SAIL coordinator, we did get a

24   suspicious order monitoring -- or a suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    report from corporate which the -- went to the SAIL

2    coordinator.  That was part of her responsibility to

3    file it.  I -- yeah, I didn't do anything with it.

4    BY MR. GADDY:

5         Q.    Okay.  There was a C-II SAIL coordinator?

6         A.    Um-hum.

7         Q.    Okay.  I had the opportunity to talk with

8    Jen Diebert who I understand was the C-III through V

9    coordinator for some period of time.

10        A.    Uh-huh.

11        Q.    Would it be fair to say that -- that

12   Ms. Diebert, what she did with III through Vs did not

13   overlap with what you did with C-IIs?

14        A.    It did not, no.

15        Q.    Okay.  So who were -- who was the C-II

16   coordinator?  Or excuse me.

17        A.    The SAIL coordinator?

18        Q.    Yes.  Thank you.

19        A.    It was Brook Best.  Brook Best who is now

20   married and I don't know her last name now, but...

21        Q.    Okay.  Is she the only C-II SAIL

22   coordinator that worked with you during your time as a

23   function manager?

24        A.    No.  We also had Lori Fenimore for a short

Highly Confidential - Subject to Further Confidentiality Review

1    time.

2         Q.    And who else?

3         A.    Those are the only two I remember.  Oh,

4    no.  There was a Chad, and I don't remember his last

5    name either.

6         Q.    Did these people serve concurrently at the

7    same time or only one at a time?

8         A.    One at a time.

9         Q.    Okay.

10             Okay.  So you said that the C-II SAIL

11   coordinator would receive a suspicious order report?

12        A.    I believe so.

13        Q.    Okay.  Who would they receive that report

14   from?

15        A.    I don't know specifically the person.  I

16   just know that we got it in -- in the mail, in the

17   interoffice mail.  I don't know who it came from.

18        Q.    Okay.  Do you know what department it came

19   from?

20        A.    No.

21        Q.    Okay.  What -- what was done with it after

22   it was received?

23        MS. SWIFT:  Objection; foundation.

24   BY THE WITNESS:

1      A.    What was done, it was given to the SAIL

2  coordinator.  What she did with it, I really don't

3  recall.

4  BY MR. GADDY:

5      Q.    Okay.  What was she supposed to do with

6  it?

7      MS. SWIFT:  Objection; foundation.

8  BY THE WITNESS:

9      A.    I don't recall.  I -- you know, there was

10  so much that she was responsible for that I -- there

11  is -- I learned her job from day one, but then after

12  we grew and grew and I got more involved in the floor

13  and the physical handling of the freight that I just

14  trusted her to do what she knew what she had to do, I

15  mean.

16  BY MR. GADDY:

17      Q.    Okay.  Well, she reported to you, correct?

18      A.    Um-hum, yeah.

19      Q.    Okay.  And did she do any -- did she even

20  look at the suspicious order report?

21      MS. SWIFT:  Objection; foundation.

22  BY THE WITNESS:

23      A.    I couldn't answer that.

24  BY MR. GADDY:

```
 1        Q.   Do you know whether or not she ever even

 2   looked at the suspicious order report?

 3        MS. SWIFT:  Objection; foundation.

 4   BY THE WITNESS:

 5        A.   I couldn't answer that.  I don't know.

 6        MS. SWIFT:  Let me get my objection out --

 7        THE WITNESS:  Oh, I'm sorry.

 8        MS. SWIFT:  -- before you start talking about.

 9        MR. GADDY:  Sure.

10   BY MR. GADDY:

11        Q.   So, we were all talking over each other.

12             Do you know whether or not your C-II SAIL

13   coordinator ever even looked at the suspicious order

14   report?

15        MS. SWIFT:  Objection; foundation.

16   BY THE WITNESS:

17        A.   I don't know.

18   BY MR. GADDY:

19        Q.   Do you know whether or not your C-II SAIL

20   coordinator ever did any evaluation or analysis of the

21   suspicious order report that they received?

22        MS. SWIFT:  Objection; foundation.

23   BY THE WITNESS:

24        A.   I don't know.
```

1   BY MR. GADDY:

2        Q.    This report was received monthly?

3        A.    I don't --

4        MS. SWIFT:  Objection; foundation.

5   BY THE WITNESS:

6        A.    I don't know.

7   BY MR. GADDY:

8        Q.    Okay.  Do you have any recollection of any

9   time during the distribution timeframe of any C-II

10  SAIL coordinator ever providing you any information

11  about that suspicious order report?

12       MS. SWIFT:  Objection; vague as to time.

13  BY THE WITNESS:

14       A.    No.

15  BY MR. GADDY:

16       Q.    During the entire time that you were the

17  C-II function manager at -- at Perrysburg, did you

18  ever look at the suspicious order report?

19       MS. SWIFT:  Objection; foundation.

20  BY THE WITNESS:

21       A.    Not that I recall.

22  BY MR. GADDY:

23       Q.    I'm sorry?

24       A.    Not that I recall.

1      Q.     Okay.  During the entire time that you

2  were the C-II function manager at Perrysburg, did you

3  ever ask anyone to look at the con -- the suspicious

4  order report?

5      A.     I expected the C-II coordinator did

6  whatever she was trained to do with it when she was at

7  Woodland and Jupiter.  So it -- I can't say that I

8  asked.

9             What was your question again, did I ask

10  anyone?

11     Q.     Did you ever ask anyone to look at it,

12  evaluate it, analyze it, anything like that?

13     A.     I did not ask someone to do that.

14     Q.     Did you ever ask for updates from your

15  C-II SAIL coordinator about what was going on with

16  those suspicious order reports that were coming in?

17     A.     No.

18     Q.     How is it that you know that suspicious

19  order reports were coming in to the distribution

20  center?

21     A.     I remember seeing a printed copy of

22  something that said suspicious drug report, but I

23  don't -- again, it went to the SAIL coordinator and

24  she did with it whatever she was trained to do with it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    at Woodland and Jupiter.  Either it was filed or, you

 2    know, I don't...

 3         Q.    Do you know that she did with it what she

 4    was trained to do?

 5         A.    I don't -- I didn't see it done, if that's

 6    your question, so.

 7         Q.    Well --

 8         A.    I trusted that she did what she was

 9    trained to do.

10         Q.    But you don't know if she did it or not?

11         MS. SWIFT:  Object to the form.

12    BY THE WITNESS:

13         A.    I --

14         MS. SWIFT:  Asked and answered.

15    BY THE WITNESS:

16         A.    I can't say that I know what she did with

17    it, but I'm sure she filed it would be my guess.

18    BY MR. GADDY:

19         Q.    When you say "filed it," what do you mean

20    by that?

21         A.    I mean, I don't think she threw it in the

22    trash.  I think she kept it as a -- you know, as a

23    record.  I don't know how long or what she did with

24    it.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Well, where would it be kept?

2    A.    In one of her file drawers, I would guess.

3 I don't know.

4    Q.    Okay.  Is there any file depository within

5 the distribution center where -- where records such as

6 that are kept?

7    A.    We have boxes of records from when the

8 vault was opened, yes.

9    Q.    Okay.  What does -- I think you said that

10 you saw reports that said what suspicious drug

11 order --

12    A.    Something, yeah, I saw a report that said

13 that at the top.  I don't -- but I didn't handle it or

14 do anything with it.

15    Q.    Okay.

16    A.    It went to her.

17    Q.    What's your understanding of the

18 information that would have been contained in that

19 report?

20    MS. SWIFT:  Objection; foundation.

21 BY THE WITNESS:

22    A.    Well, by the title alone, I would guess

23 that the information in that report were orders that

24 we were questioning if they were valid, maybe.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GADDY:

 2       Q.    Okay.

 3             Was somebody at the distribution center in

 4   charge of following up on those orders?

 5       A.    Well, I followed up on any orders that

 6   came through that were above what I knew to be

 7   reasonable for a store or any store just by the

 8   physical handling of it.  We would never pick -- like

 9   we would get orders occasionally for a hundred of

10   something and we never did those.  We just called the

11   store and said, Did you really want a hundred?  And

12   they'd go, Oh, no.  I wanted a hundred pills.  I would

13   need one bottle of a hundred, you know, we would do

14   that, but we never filled those orders.

15       Q.    Sure.  And -- and that deals with, you

16   know, excessive queries, excessive order queries and

17   things like that, correct?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.    I did not hear the -- that excessive order

21   query is something I did not do in our department.  I

22   believe the computer room did that, but I did not do

23   that.

24   BY MR. GADDY:
```

```
 1        Q.    Okay.  Well, what you just referenced as
 2   far as looking for -- for unusually --
 3        A.    Quantities.
 4        Q.    -- the -- where people are wanting numbers
 5   of pills instead of bottles, we'll talk about that in
 6   a minute, but I want to make sure we kind of tie up
 7   this whole suspicious order report --
 8        A.    Okay.
 9        Q.    -- that you said you saw from time to
10   time.
11              You never looked at it, I think we've
12   established that, correct?
13        A.    Correct.
14        MS. SWIFT:  Objection to the form,
15   mischaracterizes the testimony.
16   BY MR. GADDY:
17        Q.    Okay.  Was anybody in -- was anybody in
18   the distribution center -- do you know whether or not
19   anybody in the distribution center was reviewing that
20   report?
21        MS. SWIFT:  Objection; asked and answered.
22   BY THE WITNESS:
23        A.    The SAIL coordinator, it was part of her
24   job, so I would have to assume she was doing it, but
```

1    did I stand over her shoulder all day, no.  I -- she

2    was -- that was part of her job, so I did not do it.

3    BY MR. GADDY:

4        Q.    Okay.

5              So, I had asked you earlier what was your

6    understanding of the information that was contained in

7    that report, and you had said that you thought it

8    might be orders in which you all were questioning the

9    validity of the orders.

10       A.    Um-hum.

11       Q.    Do you recall that generally?

12       A.    Um-hum.

13       Q.    Okay.  Who in the distribution center was

14   charged with orders in that report, following up on

15   those?

16       MS. SWIFT:  Object to the form, asked and

17   answered.

18   BY THE WITNESS:

19       A.    Well, my understanding was we had people

20   at corporate that were doing that, we had people in

21   the computer room that were doing that.  I thought the

22   report was just a report that we filed because they

23   were taking care of that.  I did not look -- do that.

24   BY MR. GADDY:

1      Q.     Okay.  But you were the C-II function

2   manager, correct?

3      A.     Right.  That's right.

4      Q.     Okay.  Did you know who was looking into

5   these orders that you all assumed were invalid orders?

6      MS. SWIFT:  Objection; asked and answered.

7   BY THE WITNESS:

8      A.     Again, all I knew is that the computer

9   room was running queries and the corporate office had

10  some program that was supposed to be, you know,

11  keeping orders that were unusual from coming through

12  to us, so.

13  BY MR. GADDY:

14     Q.     Okay.  Was there a -- did you maintain

15  anywhere within the distribution center a list of

16  these stores that were placing these potential invalid

17  orders?

18     MS. SWIFT:  Objection; vague.

19  BY THE WITNESS:

20     A.     No, not that I recall.

21  BY MR. GADDY:

22     Q.     Do you ever recall your C -- your C-II

23  SAIL coordinator coming to you and saying, you know,

24  Ms. Bish, we have, you know, stores X, Y and Z who

Highly Confidential - Subject to Further Confidentiality Review

```
 1   keep showing up on the suspicious order report.  Maybe

 2   we need to -- to flag any orders that come from those

 3   stores because I keep seeing them in the suspicious

 4   order report?

 5           Do you recall that happening?

 6   A.    No.

 7   Q.    Do you recall anybody in the computer room

 8   ever coming to you and making similar comments about,

 9   Hey, we've gotten this suspicious order report in and

10   we've looked at it and we need to be -- be wary of

11   stores A, B and C because they keep submitting

12   these -- these orders that -- that are popping on the

13   suspicious order report?

14           Do you ever recall that happening?

15   A.    Yes.

16   Q.    Okay.

17   A.    The computer room called me.  Apparently

18   there is a query they were running on checking

19   quantities, anything over a certain quantity, and --

20   Q.    Well, I'm asking about the suspicious

21   order report.

22   MS. SWIFT:  Let her finish her answer.

23   THE WITNESS:  Oh.

24   MS. SWIFT:  Finish your answer.
```

```
 1        THE WITNESS:  Oh, okay.

 2   BY THE WITNESS:

 3        A.    Well, I think they are kind of the same

 4   thing.  Did they get the information from that report?

 5   I don't know where they got their information.  It

 6   could have come off a computer screen, it could have

 7   come off of a report.  I don't know.  But if they had

 8   a query that showed them that there was too much

 9   ordered, they would call the pharmacy manager.  And if

10   they couldn't get ahold of him, they would call me at

11   home and I would just tell them put it on my desk

12   until I looked at it in the morning, called the

13   pharmacy manager.  But whether -- where that

14   information came from, was it a printed report, was it

15   a disk, was it a -- I don't know.

16   BY MR. GADDY:

17        Q.    Okay.  And the purpose of that was to make

18   sure that somebody hadn't entered the number of pills

19   they wanted instead of the number of bottles?

20        MS. SWIFT:  Object to form.

21   BY THE WITNESS:

22        A.    Well, the purpose of that was to make sure

23   that what they wanted -- what they ordered was what

24   they intended to order and to make sure they really
```

```
 1    needed it.

 2    BY MR. GADDY:

 3        Q.    You were -- you were making sure they

 4    hadn't entered an order by mistake?

 5        MS. SWIFT:  Object to the form.

 6    BY THE WITNESS:

 7        A.    Well, not only that, but, yeah, that was

 8    the case sometimes.  Some -- sometimes they would

 9    enter 11 instead of 1 or whatever.  But, yeah, and

10    sometimes they actually needed a larger than normal

11    quantity, and I would ask them why and they would tell

12    me why.  And, you know, sometimes I would call Barb

13    Martin who was our pharmacy inventory person who had

14    all of the -- you know, the history of their sales,

15    and say, Does this sound right to you?  And she would

16    say, Yeah, and then I would go ahead and dispense it.

17    There was only one time that I recall ever calling a

18    store that they said, Yeah, I really do want that, and

19    then they told me why, so.

20        Q.    Okay.  Let me go back to where I started

21    with this.

22              As far as that suspicious order report,

23    are you aware of anybody, whether it's the SAIL

24    coordinator, the computer room, corporate, anybody
```

```
 1   ever contacting you after reviewing the suspicious

 2   order report and giving you any updates or information

 3   at all?

 4       MS. SWIFT:  Objection; asked and answered.

 5   BY THE WITNESS:

 6       A.   No.

 7   BY MR. GADDY:

 8       Q.   What is your understanding of what a

 9   suspicious order is?

10       A.   An order that would be suspicious because

11   it's quantities that would be above the average

12   quantity ordered or the expected quantity ordered.

13       Q.   How do you have that understanding?

14       A.   Just by knowing what suspicious means, I

15   mean.

16       Q.   Just the common definition of the term

17   "suspicious"?

18       A.   Yeah.

19       Q.   Do you recall ever being provided any

20   training or education by -- by Walgreens or attending

21   any -- any DEA seminars about the -- the obligations

22   related to suspicious order monitoring?

23       A.   No.

24       MS. SWIFT:  Object to the form.
```

```
 1   BY MR. GADDY:

 2        Q.    Have you ever been -- ever attended any

 3   DEA presentations in any form or fashion?

 4        A.    No.

 5        Q.    Walgreens has never sent you to hear --

 6   hear from DEA agents talk about diversion of

 7   controlled substances or -- or the duties or

 8   obligations under the regulations?

 9        A.    No.

10        Q.    I'll show you what I'll mark as Exhibit

11   No. 5.  This is P-GEN 10.

12                  (WHEREUPON, a certain document was

13                   marked Walgreens - Bish Deposition

14                   Exhibit No. 5, for identification, as

15                   of 02/01/2019.)

16   BY MR. GADDY:

17        Q.    And this is -- if you look at the top of

18   the page, this is a printout from a -- from the DEA

19   website.

20        A.    Uh-huh.

21        Q.    And this is one particular regulation that

22   I'm just going to ask you if you've seen or if you are

23   familiar with.

24                  Do you see about a third of the way down
```

1    the page, it's a little bit faded, but it says

2    Title 21 Code of Federal Regulations?  It is just

3    under the heading at the top.  I'm sorry.

4         A.    Oh, up here.

5         Q.    Under the picture.

6         A.    Oh, okay.  Yeah.

7         Q.    And then below that it says "Part 1301"

8    and below that it says "Security Requirements" and

9    then it has the regulation 1301.74.

10             Do you see that?

11        A.    Um-hum.

12        Q.    Okay.

13             During the course of your time as the C-II

14   function manager, did you ever have the opportunity to

15   review any of the federal regulations related to the

16   distribution of controlled substances?

17        A.    I don't recall.

18        Q.    Do you recall anybody at Walgreens

19   corporate or otherwise ever -- ever giving you these

20   regulations or giving you any training on these

21   regulations?

22        A.    I don't recall that either.

23        Q.    Okay.  If you go down to paragraph (b), it

24   starts:  "The registrant shall".

```
 1       A.     Um-hum.

 2       Q.     Do you see where I am?

 3       A.     Um-hum.

 4       Q.     And it says:

 5              "The registrant shall design and operate a

 6   system to disclose to the registrant suspicious orders

 7   of controlled substances."

 8              Do you see that?

 9       A.     Um-hum.

10       Q.     Did you know that that was an obligation

11   that Walgreens had under the federal regulations?

12       MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14       A.     I thought we did have a computer program

15   that did that.  So this -- you know what I mean,

16   before the orders ever dropped, I thought we had a

17   program that ferreted those out.

18   BY MR. GADDY:

19       Q.     And you thought that based on seeing the

20   suspicious order report in the distribution center

21   from time to time?

22       MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24       A.     No.
```

```
 1    BY MR. GADDY:

 2         Q.    Okay.

 3         A.    I thought that because that's what I was

 4    told.

 5         Q.    Okay.  Who were you told that by?

 6         A.    One of the programmers for C-II, Ann

 7    Anaya, who I don't think is with the company any

 8    longer, but...

 9         Q.    Okay.  Did she work at Perrysburg or

10    somewhere else?

11         A.    At corporate.

12         Q.    Okay.  In what department?

13         A.    The -- she was part of the programming

14    department.  I don't know what they called it.  IT,

15    yeah.

16         Q.    And what did she tell you about that

17    program?

18         A.    She -- she didn't give me the details.

19    She just said there is a program that -- that will

20    keep -- will bounce out orders that are above what

21    they should be for their history, for their, you know,

22    history at that particular store.  So if they normally

23    do a hundred of something and we get an order for 200

24    of something, that's going to throw that out and send
```

Highly Confidential - Subject to Further Confidentiality Review

1    it back.

2        Q.    Okay.  Did -- did she show you the policy

3    or the procedure for how that worked?

4        A.    No.

5        Q.    Do you know the timeframe in which she

6    told you that was happening?

7        A.    No, I have no idea.

8        Q.    Did she talk to you at all about how that

9    program changed over time or when that program was

10   initiated?

11       A.    No.

12       Q.    Okay.  The paragraph (b) contin --

13   continues on to say:

14            "The registrant shall inform the Field

15   Division Office of the Administration in his area of

16   suspicious orders when discovered by the registrant."

17            Do you see that?

18       A.    Um-hum.

19       Q.    Did -- at any time while you were the C-II

20   function manager, did you ever contact the DEA

21   regarding an order of controlled substances that you

22   received?

23       A.    No.

24       Q.    Would that have been something that ever

```
 1    would have occurred to you to do?

 2        MS. SWIFT:  Object to the form.

 3    BY THE WITNESS:

 4        A.    Probably not because we didn't fill the

 5    orders that were odd or large.  You know, when I

 6    called the store, like I said, there was only one case

 7    that I remember that they actually said, Yes, I really

 8    want 80 of those or whatever.  So, no, there was -- I

 9    wouldn't have thought of calling them.

10    BY MR. GADDY:

11        Q.    Okay.  Well, when you say "orders that

12    were odd or large," I mean, you -- you shipped to -- I

13    think we just saw over 5,000 different stores,

14    correct?

15        A.    Um-hum, um-hum.

16        Q.    And I'm sorry.  You have to say yes or no

17    for her.

18        A.    Oh, yes.  Sorry.

19        Q.    And is it fair to say that -- that those

20    stores are in all different types of markets?

21        A.    Right, that's fair to say, yeah.

22        Q.    For example, there is a Walgreens in

23    Perrysburg, is -- is there?

24        A.    Yes, um-hum.
```

```
1       Q.    Okay.  There is Walgreens in Cleveland,

2   correct?

3       A.    Yes.

4       Q.    Chicago?

5       A.    Yep.

6       Q.    So there is Walgreens in -- in big cities,

7   Walgreens in small towns, correct?

8       A.    Right, yes.

9       Q.    When you were looking at these orders, did

10  you do any evaluation of the population size that --

11  that these stores were serving?

12      A.    No.

13      Q.    Did you do any evaluation of how far the

14  patients were traveling to get to those stores to have

15  their prescriptions filled?

16      A.    No.

17      Q.    Did you do any evaluation of the numbers

18  and types of doctors that were writing the

19  prescriptions for these C-II drugs?

20      A.    No.

21      Q.    Okay.

22            Every time that an order came in, did

23  you -- did you do an historical analysis on that

24  particular store for every single order that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   received?

 2        A.    No.

 3        Q.    So when you say you didn't fill the orders

 4   that were odd, that would mean the orders that jumped

 5   off the page as being very large and would require a

 6   follow-up phone call to the store to make sure that

 7   they didn't make an error when they were typing in

 8   their order?

 9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    Well, to make sure that they didn't make

12   an error or that they didn't really need it.  But,

13   like I said, again, there was only one case where I

14   recall them actually saying, Yes, that's what I need.

15   BY MR. GADDY:

16        Q.    Okay.  Usually it was, Oh, shoot.  I meant

17   3 and I typed 300?

18        A.    Usually, yeah.

19        Q.    And in those cases you would just delete

20   the 300 and put in a 3?

21        A.    Right.

22        Q.    It goes on to say in paragraph (b), it

23   says:

24              "Suspicious orders include orders of
```

Highly Confidential - Subject to Further Confidentiality Review

1    unusual size, orders deviating substantially from a

2    normal pattern, and orders of unusual frequency."

3            Do you see that?

4        A.    Um-hum.

5        Q.    Prior to just now, right here today in

6    this deposition, had you ever read that subsection of

7    this regulation before?

8        A.    I don't remember.  I don't remember if I

9    did or not.

10       Q.    Okay.  Do you recall anybody at Walgreens

11   ever giving you any training regarding this topic?

12       A.    Regarding orders deviating substantially

13   all -- from a normal pattern, that -- no, because,

14   again, that's something that I thought was done at

15   corporate.  They have all of the sales history.  In

16   the DCs we don't have that.

17       Q.    Okay.  But you were the C-II function

18   manager at Perrysburg, correct?

19       A.    Yep, yep.

20       Q.    Okay.  And you were the person, I think,

21   that Mr. Joseph said that your knowledge of C-IIs was

22   second to none, correct?

23       A.    Um-hum, yes.

24       Q.    Okay.  Let me show you another policy that

```
 1    would have been in place when you started at the

 2    Perrysburg distribution center.

 3              I'll mark this as Exhibit No. 6.

 4                   (WHEREUPON, a certain document was

 5                    marked Walgreens - Bish Deposition

 6                    Exhibit No. 6, for identification, as

 7                    of 02/01/2019.)

 8    BY MR. GADDY:

 9         Q.    Do you see the -- look at the bottom of

10    the page.  Do you see the -- the web address for kind

11    of the -- the Walgreens Intranet?

12         A.    This one down here?

13         Q.    Yes, ma'am.

14         A.    Yeah, um-hum, yes.

15         Q.    Okay.  And then it -- the top of the

16    page it's the -- one of the policies that was housed

17    there, "Handling Suspicious Drug Orders."

18              Do you see that?

19         A.    Yes, yes.

20         Q.    And if you look at just below the

21    paragraphs, it has the original date of the policy of

22    September of '98.

23              Do you see that?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And then the revised date of February 15,

2    2005?

3        A.    Right.

4        Q.    Okay.  And it says -- for the policy, it

5    says:

6              "The Logistics and Planning Department

7    sends the suspicious control drug order reports" --

8    excuse me -- "suspicious control drug orders report to

9    all distribution centers."

10             Do you see that?

11       A.    Um-hum.

12       Q.    And that's consistent with what you said

13   that they would come in and -- and I think that the

14   SAIL coordinator was in charge of that, right?

15       A.    Yes.

16       Q.    It says:

17             "The report lists controlled drug orders

18   that may be of unusual size for a store in its

19   category, of unusual frequency for a store in its

20   category, or deviating from a normal pattern for a

21   store in its category."

22             Do you see that?

23       A.    Yep.

24       Q.    It then goes on to say:

 1                 "The distribution center must file all

 2      records for five years."

 3                 Do you see that?

 4         A.    Yes.

 5         Q.    Okay.  The policy, you would agree with

 6      me, doesn't say that anything should be done with

 7      those reports other than file them?

 8         A.    That's the only action I see, yes.

 9         Q.    Okay.  And you are not aware of anybody at

10      the distribution center doing any other action other

11      than just filing them, is that fair?

12         A.    With this report, yes, if that's what you

13      are referring to.

14         Q.    Okay.

15                 Let me ask you some questions now about

16      the process that you've told us a little bit about as

17      far as spot-checking of -- of some of the orders that

18      came in.

19                 I'll show you what I'll mark as Exhibit

20      No. 7.

21                     (WHEREUPON, a certain document was

22                      marked Walgreens - Bish Deposition

23                      Exhibit No. 7, for identification, as

24                      of 02/01/2019.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GADDY:

 2        Q.    Do you see the Walgreens policy -- the

 3   Walgreens logo at the top of this document?

 4        A.    Um-hum, yes.

 5        Q.    And the subject here is:  "Rx Questionable

 6   Order Quantity."

 7              Do you see that?

 8        A.    Yes.

 9        Q.    And the original date of this policy is

10   12/11/2006.

11              Do you see that?

12        A.    Yes.

13        Q.    And it looks like this is the original

14   policy as there is no revision date.

15              Do you see that?

16        A.    Yes.

17        Q.    Okay.  And this policy was written by

18   Shelley Crisel?

19        A.    That's what it says.

20        Q.    Do you know who that is?

21        A.    No.

22        Q.    Okay.

23        A.    Someone at Mt. Vernon, I would assume.  It

24   was written at Mt. Vernon.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  That's another distribution center?

 2        A.    Yes, um-hum.

 3        Q.    And it says the Purpose of this policy is:

 4              "To establish procedures for verifying

 5   questionable store order quantities on Rx items."

 6              Do you see that?

 7        A.    Yes.

 8        Q.    And it says under the Scope:

 9              "This procedure covers the steps in

10   verifying questionable store order quantities prior to

11   order processing on Rx items."

12              Do you see that?

13        A.    Yes.

14        Q.    And that's what you told us a little bit

15   about that you would look for -- for orders that would

16   maybe -- maybe jump off the page as far as their size

17   and you would want to do some follow-up on those,

18   correct?

19        A.    Yes.

20        Q.    Okay.  Under Procedure under Section A, it

21   says:

22              "The responsibilities of the computer room

23   personnel and SAIL team," it says, "Prior to Order

24   Processing."
```

1          And in the first under No. 1 there, it

2    says:

3          "Once the transmissions have been received

4    from the stores to its fullest, you run a query for

5    the" -- "for the cycle date and then it says:  "Any Rx

6    order greater than 24 SKUs."

7          Do you see that?

8      A.   Um-hum.

9      Q.   SKUs means a unit?

10     A.   Pieces, um-hum.

11     Q.   Okay.  So one bottle of pills would be one

12   SKU?

13     A.   Yes.

14     Q.   Okay.  It says:

15          "Any Rx order greater than 24 SKUs," or

16   24 units, "of one item should print on a query in

17   store numerical order along with SS items."

18          Do you see that?

19     A.   Um-hum, yes.

20     Q.   What's SS items?

21     A.   Self serve.

22     Q.   Okay.  And that would be like which --

23     A.   Non-Rx items.

24     MS. SWIFT:  Let him finish his question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE WITNESS:  Oh, sorry.
 2   BY MR. GADDY:
 3        Q.    That would be what we'd call like
 4   front-of-store items?
 5        A.    Yes.
 6        Q.    Like paper towels, toilet paper, that type
 7   of stuff?
 8        A.    Yes.
 9        Q.    Was 24 the number of -- let me -- let me
10   make sure that we are clear on that.
11              So when -- when we say one SKU, if we are
12   talking about a 100-count bottle of OxyContin, so a
13   bottle with a hundred pills in it, that would be one
14   SKU?
15        A.    Yes.
16        Q.    Okay.  What was the number of SKUs or
17   units that it would require to flag for you to do any
18   type of follow-up phone call to the pharmacy?
19        MS. SWIFT:  Object to the form.
20   BY THE WITNESS:
21        A.    There wasn't really a number.  It would
22   be -- generally any number in the triple would be a
23   definite flag, anything over a hundred would be a
24   definite flag, so.
```

```
 1   BY MR. GADDY:

 2        Q.    Okay.  Is a hundred the number or was

 3   there not a number or --

 4        A.    There was not a number in particular.  It

 5   was any number -- any order that looked funny or

 6   didn't look right.  There was no number that I used.

 7   The computer room did, apparently, but I didn't.

 8        Q.    Okay.  Now, when -- who would you get this

 9   report from?

10        A.    What report?

11        MS. SWIFT:  Objection to form.

12        THE WITNESS:  Sorry.

13   BY MR. GADDY:

14        Q.    This report that would show you the

15   quantities of -- of orders for you to look out and see

16   if anything jumped off the page at you?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    There was no report that I got that

20   would -- that was just from the pickers is actually

21   who would find that if -- if they got an order for a

22   hundred of something, they would go, This isn't right,

23   and they would bring it to me and I would call the

24   store.  It wasn't a piece of paper form.
```

1  BY MR. GADDY:

2      Q.    Prior to the orders for C-IIs going to the

3  pickers for them to start -- and let me back up a

4  little bit, because I used the term "pickers."  I

5  think I know what that means, but let me make sure

6  it's clear.

7          Tell me in your words what a picker is?

8      A.    A picker is the team member who actually

9  takes the product out of the vault and puts it in a

10  container that's going to go get audited and then

11  boxed and shipped to the store.

12      Q.    Okay.  And so these are people that are --

13  that are taking the pill bottles off the shelf,

14  putting them in the bag and they end up getting on the

15  truck?

16      A.    Right.

17      Q.    Okay.  Prior to an order going to the

18  picker first for Schedule II drugs, is this -- this

19  review that you've told us about a couple of times

20  where you are looking for numbers that I think your

21  words were don't look right, triple digit orders,

22  anything that jumps off the page at you, is that

23  review done before the orders go to the pickers?

24      MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    Okay.  First of all, I didn't -- I don't

 3   believe I said I reviewed something.  I said if an

 4   order popped out, and that's how I knew it popped out

 5   because the pickers would come to me and say, This is

 6   way too much, something is wrong with this, so I would

 7   call the store.  It wasn't like a printed report that

 8   I looked at, if that's what you thought.

 9   BY MR. GADDY:

10        Q.    No.  And your -- I did.  I made an

11   assumption, so that's my fault.

12              So this process that you've told us about

13   where you're looking for -- for large numbers or

14   numbers that pop out, that was not something -- that

15   was done after orders went to the pickers?

16        A.    Yes, for us, yes.

17        Q.    Okay.  And the only way for anything, any

18   of these questionable orders to be brought to your

19   attention would be if a picker brought it to your

20   attention?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    Anything that stuck out would have been

24   brought to me by the picker, yes.
```

1    BY MR. GADDY:

2        Q.    Okay.  So if the picker doesn't bring it

3    to your attention, there is not a process in which you

4    find it organically on your own?

5        A.    No, that's the pros --

6        MS. SWIFT:  Object to form.

7        THE WITNESS:  Oh, sorry.

8    BY THE WITNESS:

9        A.    That's the process the computer room does.

10   That query they run is run before the orders get to me

11   to pick.  So, whatever quantity they were using for

12   C-II, they would run their quant -- whatever this

13   query is which I didn't know really existed, but...

14   BY MR. GADDY:

15       Q.    Okay.

16       A.    It's not what I did.  It is what the

17   computer room did prior to the orders coming to me.

18       Q.    Okay.  Do you know whether or not the

19   computer room in Perrysburg did this?

20       A.    I believe -- yeah, I know they did because

21   he used to contact me.  If he found things on this

22   report that were high, he would contact me and say

23   either, I called the supervisor and here is what we

24   did, or I called the store manager wasn't -- the

1    pharmacy manager wasn't there, so that's when he asked

2    me what to do, and I would always tell him just leave

3    it on my desk and I would call him in the morning.

4        Q.    Okay.  So, let me say back to you what I

5    think you've said and you tell me if I get it right or

6    not.

7        A.    Okay.

8        Q.    You would get notifications from the

9    computer room about orders that were questionable to

10   them and you would get notifications on occasion from

11   the pickers about orders that were questionable to

12   them?

13       A.    Correct.

14       Q.    Okay.  And your job at that point in time

15   would be to contact the store and determine if they

16   actually meant to order what they ordered and, if so,

17   whether or not they really needed it?

18       A.    Correct.

19       Q.    Okay.

20             Okay.  All right.  Let's keep reading

21   through the -- and -- and I think what you told me is

22   you don't know what number the computer room was using

23   for this magic number?

24       A.    Correct.

1    Q.    Okay.  You -- okay.

2          If you look at the -- under No. 2, it

3    says:

4          "The CR/SAIL personnel working the query

5    will review the listing.  If there is a questionable

6    quantity, the pharmacy is contacted at that store and

7    the order is questioned.  If the order is incorrect,

8    the original order for the item is deleted and rekeyed

9    correctly."

10         Did I read that right?

11   A.    Yes.

12   Q.    And is that consistent with your

13   understanding of how this particular process worked?

14   A.    I don't know what the CR is but --

15   Q.    I think it is computer room.

16   A.    Oh, okay.

17   Q.    Would that make sense?

18   A.    Yeah, that would make more sense.

19         Yes, that sounds correct.

20   Q.    So the purpose of this process is that if

21   you see an order that -- that looks questionable, you

22   call the store and ask them whether or not that order

23   is actually correct?

24   A.    Intentional, um-hum.

```
 1        Q.    That's the first step, whether or not they

 2   intentionally ordered that enough -- that amount,

 3   correct?

 4        A.    Correct.

 5        Q.    Okay.  And according to this policy, if

 6   the order is incorrect, then you delete it and put in

 7   the correct order?

 8        A.    Well, I would edit it.  I would call it

 9   editing it, but not delete it and reorder it.  I would

10   just edit it, yeah.

11        Q.    Sure.

12              So in the example that I think you gave

13   earlier, if somebody had typed in 100 and you called

14   them and they said, Yeah, we want 100 pills, you would

15   say, Well, gee, you really only need one?

16        A.    Right.

17        Q.    That's the type of -- of errors or

18   confusion issues that this policy is geared to -- to

19   catch?

20        MS. SWIFT:  Object to form.

21   BY THE WITNESS:

22        A.    I -- I don't know if that's what it's

23   geared to catch.  I didn't write it, but...  So, I

24   mean, it says that.  It makes sense.
```

```
 1   BY MR. GADDY:

 2        Q.    Okay.  It goes on to say in No. 3, it

 3   says:

 4              "Once all orders have been reviewed for

 5   accuracy, computer room personnel is notified to

 6   kickoff order processing."

 7              Do you see that?

 8        A.    Yes.

 9        Q.    Okay.  It doesn't say anything in here

10   about -- and I think you've already told me that you

11   didn't do this, but it doesn't say anything in here

12   about the distribution center doing any type of

13   analysis or evaluation of past ordering practices or

14   ge- -- population densities or number of doctors or

15   any of those types of things, correct?

16        MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18        A.    It doesn't say that, correct.

19   BY MR. GADDY:

20        Q.    Well, and you didn't do those types of

21   things, correct?

22        MS. SWIFT:  Objection; mischaracterizes the

23   testimony.

24   BY THE WITNESS:
```

1      A.    I did not do that.

2   BY MR. GADDY:

3      Q.    Okay.  You weren't trying to determine by

4   looking at data points whether or not a particular

5   order was -- was justified or not, you were trying to

6   determine whether or not they really meant to order

7   that number?

8      A.    Or --

9      MS. SWIFT:  Objection; mischaracterizes the

10  testimony.

11  BY THE WITNESS:

12     A.    Or really needed it.  It could be either

13  one.

14  BY MR. GADDY:

15     Q.    And if they really needed it and the order

16  they entered was correct and you had the inventory,

17  you would fill the order?

18     A.    I may call Barb Martin first who was

19  the -- she was the one who had the sales history for

20  the store, and if it really seemed unusual, I would

21  call her and say, Does that sound right to you?  And

22  she would look at their past history, and it was

23  really up to her, I mean.

24     Q.    Okay.  Did you tell me earlier that you

Highly Confidential - Subject to Further Confidentiality Review

1    recall that happening one time?

2         A.    Um-hum.

3         Q.    Okay.

4         A.    Because that was the only time I remember

5    a store saying, Yes, I do want that.

6         Q.    Okay.  And so there was only one time

7    while you were a C-II function manager that you called

8    to check for one of these potential fat finger errors

9    or mist -- entry errors and -- and you called the

10   store and they said, Yes, we actually do need that

11   large amount?

12        A.    That I can remember, yeah.

13        Q.    Okay.  And do you think you called Barb

14   that particular time?

15        A.    I think I probably did.

16        Q.    Okay.  And did she approve the order to be

17   filled or did she tell you to do something different?

18        A.    Well, I -- I think she had told -- I think

19   I filled the order, so she must have told me to fill

20   it.  I don't remember her actually saying that, but it

21   was too long ago, but I'm sure she told me to.

22        Q.    Okay.  So it would be accurate to say that

23   the entire time you were the C-II function manager at

24   Perrysburg working with this questionable order

Highly Confidential - Subject to Further Confidentiality Review

```
 1   quantity process, there was one time in which you

 2   called to check and see whether or not it was an error

 3   or real order, they said, No, it's a real order.  We

 4   really want that amount.  You believe you elevated it

 5   to Barb and Barb cleared it to be delivered?

 6        MS. SWIFT:  Objection; mischaracterizes the

 7   testimony.

 8   BY MR. GADDY:

 9        Q.    Is that correct?

10        A.    That sounds correct, yeah.

11        Q.    If you look at Paragraph B, it says:

12              "Responsibilities of the Rx team member

13   personnel," and if you keep reading, it says -- it

14   talks about the -- the picking process.

15              Do you see that?

16        A.    Yes.

17        Q.    And then it says:

18              "1.  As Rx team members are picking

19   orders, if an order seems questionable, SAIL office

20   will be contacted via phone for order accuracy

21   verification."

22              Do you see that?

23        A.    Um-hum.

24        Q.    And that's the second -- the pick, I think
```

1   you already told us that, the pickers were the second

2   group of people that you would have received a

3   notification from if they saw something they thought

4   was questionable?

5        A.    Correct, um-hum.

6        Q.    Okay.  And -- but, again, your same answer

7   that -- that you just gave as far as there only being

8   one time where you followed up with a store, asked

9   them about this, this order, and they said, No, we

10   really do need that large amount, you contacted Barb

11   and she cleared the order, that same -- that applies

12   to -- to any notifications from the pickers too,

13   correct?

14      MS. SWIFT:  Objection to the form.

15   BY THE WITNESS:

16        A.    That is from notifications from the

17   pickers.  That is where that came from.

18   BY MR. GADDY:

19        Q.    Okay.

20        A.    Yeah.

21        Q.    Okay.  So you're not -- you're not making

22   a distinction between any notifications you would have

23   received from Matt and the folks in the computer room

24   and the pickers?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. SWIFT:  Objection to the form.

 2   BY MR. GADDY:

 3      Q.    Correct?

 4      A.    Correct.

 5      Q.    Okay.  And, again, it goes on to say -- in

 6   No. 2 it says:

 7          "The SAIL team member contacts the

 8   pharmacy personnel at the store for order

 9   verification.  If order is incorrect, a replenishment

10   markdown is done."

11          So, again, same as the -- the previous

12   con -- concept, contact the store to find out if they

13   really meant to order what their order indicates,

14   correct?

15      A.    Correct.

16      Q.    You agree there is nothing in this

17   particular policy that talks about suspicious orders

18   whatsoever?

19      A.    Well, it's talking about questionable

20   store order quantities, so.

21      Q.    So bad question.  Bad question on my part.

22          The term "suspicious order" is not used in

23   this policy?

24      A.    No, it's not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    I'll show you what I'll mark as Exhibit

 2   No. 8.

 3               (WHEREUPON, a certain document was

 4                marked Walgreens - Bish Deposition

 5                Exhibit No. 8, for identification, as

 6                of 02/01/2019.)

 7   BY MR. GADDY:

 8        Q.    That one time where you had to -- or where

 9   you decided to contact Barb Martin and ask her about

10   an order that -- that you thought was -- was unusually

11   large and the order was cleared, you didn't report

12   that to the DEA, correct?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    No.

16   BY MR. GADDY:

17        Q.    Okay.  Is that something you would have

18   even considered doing?

19        A.    I don't really know what I would consider

20   doing at that time, but I know I didn't.

21        Q.    Would you have been aware that there were

22   any policy or procedures or federal regulations in

23   place that would have gothern -- governed whether or

24   not you should have contacted the DEA about any orders
```

1    such as that?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    Uhn-uhn, no.

5    BY MR. GADDY:

6        Q.    Okay.  Had anybody at Walgreens ever told

7    you to report to the DEA any orders that -- that you

8    received in that were of unusual size or quantity?

9        A.    No.

10       MS. SWIFT:  I'm sorry to interrupt, but I just

11   got a notification that the real-time got cut.

12   Anything we can do to get that back up and running?

13       MR. GADDY:  Do you want to take a break?  It is

14   about an hour and 20 minutes.

15       MS. SWIFT:  It is up to you, totally up to you.

16       MR. GADDY:  Well, if we are going to stop for

17   this, then sure.

18       MS. SWIFT:  That's fine.

19       THE VIDEOGRAPHER:  We are going off the record

20   at 9:22.

21                (WHEREUPON, a recess was had

22                 from 9:22 to 9:40 a.m.)

23       THE VIDEOGRAPHER:  We are back on the record at

24   9:40.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GADDY:

 2        Q.    Ms. Bish, I'm handing you what I've marked

 3   as Exhibit No. 8.  And if you see on the front page,

 4   this is an e-mail between a couple of folks at

 5   Walgreens.  I'm really going to be asking you about

 6   the attachment, but -- but it looks like this was sent

 7   to a Tammy Trumbull.

 8              Do you see that?

 9        A.    Uh-huh.  Yes.

10        Q.    Do you know Tammy?

11        A.    Yes.

12        Q.    And who -- who is Tammy?

13        A.    She is the administrative manager.

14        Q.    Of the Perrysburg distribution center?

15        A.    Yes.

16        Q.    Has she been in that position the entire

17   time that you have been there?

18        A.    No.

19        Q.    Okay.  Who did that before her?

20        A.    It was a gentleman.  I don't remember his

21   name.

22        Q.    Has -- has she been in that position for

23   quite some time?

24        A.    Yes.
```

```
 1          Q.    Okay.  Let's turn to the attachment.

 2                And -- which is the very next page.  And

 3    if you look at the top of the page, do you see we are

 4    looking at, again, a policy -- a Walgreens policy, "Rx

 5    Questionable Order Quantity"?

 6          A.    Yes.

 7          Q.    And if you look at the -- the right-hand

 8    side of that, you see that same date from the last

 9    one, the original policy, 12/11/06?

10          A.    Um-hum, right.

11          Q.    Do you see that?

12          A.    Yes.

13          Q.    And you looked back at the last one to

14    verify?

15          A.    Yes.

16          Q.    And do you see that this is actually a

17    revised copy because it looks like it was revised

18    April 8th, 2010?

19          A.    Yes.

20          Q.    Do you see that?

21          A.    Yes.

22          Q.    And if you would, it might make -- it

23    might make it quicker if you put the original policy

24    next to this one so that I can only ask you about any
```

 1  of the differences.  And --

 2      MR. GADDY:  Can I have the last one?

 3  BY MR. GADDY:

 4      Q.    And it looks like the -- the purpose is --

 5  is identical, correct?

 6      A.    Yes.

 7      Q.    And the same thing with the scope, it

 8  looks like that is identical, correct?

 9      A.    Yes.

10      Q.    And if you look under III.A, the

11  procedures as far as contacting the pharmacies for

12  these -- these orders that -- that jump off the page

13  in determining whether or not they are accurate, it

14  looks like 1, 2 and 3 there are all identical.

15          Do you see that?

16      MS. SWIFT:  Object to the form, mischaracterizes

17  the document.

18  BY THE WITNESS:

19      A.    Yes.

20  BY MR. GADDY:

21      Q.    And then if you look under B, as far as 1

22  and 2, those -- kind of the second part about how the

23  pickers are also supposed to contact you if they see

24  anything, it looks like that's identical also?

```
 1        A.    Yes.

 2        Q.    Okay.  And -- and so it looks like what's

 3   added, though, what's new in this 2010 version is

 4   Part C, correct?

 5        A.    Yes.

 6        Q.    Okay.  And so I'll ask you about that

 7   in -- in -- in just a second.

 8              Let me ask you a couple of other

 9   questions --

10        A.    Okay.

11        Q.    -- first.

12              How often would -- would this process

13   happen?  And -- and -- and maybe an easier way to ask

14   that is how often would C-II orders come into the

15   distribution center?

16        A.    They came in every day.

17        Q.    Okay.  And the orders that came in every

18   day, would they be filled that same day?

19        A.    Yes.

20        Q.    Okay.  Were there ever occasions in

21   which -- well, let me ask you this:

22              So -- so this process that we've been

23   talking about where you might have to call a

24   pharmacy --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.      Uh-huh.

2       Q.      -- that's something that takes how long?

3       MS. SWIFT:  Object to the form.

4   BY THE WITNESS:

5       A.      It depends.  If the pharmacy manager is

6   available and answers the phone, it doesn't take very

7   long.  If you have to wait for them to call you back,

8   it could take longer.

9   BY MR. GADDY:

10      Q.      It -- it is generally the same day?

11      A.      Oh, yeah, um-hum.

12      Q.      Okay.  Are there ever occasions under this

13  policy where you are holding orders for -- for days or

14  weeks at a time before you fill them?

15      A.      No.

16      Q.      Okay.  Are there ever occasions during

17  your time at C-II -- as the C-II function manager

18  where you are ever holding any orders for days or

19  weeks at a time for -- for any reason related to

20  investigating the order?

21      A.      Not related to investigating the order.

22      Q.      Okay.  What would be a reason that you

23  would hold an order for days or weeks at a time?

24      A.      Occasionally a new store would open late,
```

1    so we'd be told we had to hold the order till they

2    were ready to receive it.

3         Q.    Okay.  Any other reasons that you can

4    think of?

5         A.    Not that I can think of.

6         Q.    Okay.  And when you say "a new store would

7    open late," that would be a situation where a store is

8    supposed to open on January 1st and it turns out they

9    don't open until February 1st and so all of the orders

10   that were ready to go out the door need to sit -- need

11   to sit in the -- the warehouse for an extra month?

12        A.    In the vault, um-hum.

13        Q.    Okay.  And I'm sorry.  You've got to say

14   yes or no.

15        A.    Yes.

16        Q.    Okay.  So, as far as this process that

17   we've been talking about a little bit, it sounds like,

18   and tell me if I'm wrong, but it sounds like either

19   the computer room or the pickers, anybody that would

20   have identified these orders that -- that needed a

21   call to the -- a call to the store, that would have

22   gone to you as the C-II function manager?

23        MS. SWIFT:  Object to the form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2   BY MR. GADDY:

 3        Q.    Okay.  Anybody other than you that would

 4   have been in charge of handling that issue?

 5        MS. SWIFT:  Object to the form.

 6   BY THE WITNESS:

 7        A.    Well, my lead if I wasn't there.  I mean,

 8   I had someone that filled in when I was sick or on

 9   vacation.

10   BY MR. GADDY:

11        Q.    Sure, sure.

12              But if you weren't -- if you were there

13   and you were working like normal course of business --

14        A.    Uh-huh.

15        Q.    -- the buck stopped with you as far as

16   following up on any of these orders that the computer

17   room or the pickers flagged?

18        MS. SWIFT:  Objection to form.

19   BY THE WITNESS:

20        A.    I would say yes.

21   BY MR. GADDY:

22        Q.    And one of the things that -- that you --

23   that I think you said you did was first that you

24   would -- your first question to the store would be,
```

Highly Confidential - Subject to Further Confidentiality Review

1    Did you really mean to order this amount.

2           And it sounds like, and tell me if I'm

3    wrong, but it sounds like every time but one the

4    answer was, Whoops, no, I didn't, reduce the order, is

5    that accurate?

6       MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8       A.    That's to my recollection.  It could be

9    more, but that's all I can remember is one that I

10   actually...

11   BY MR. GADDY:

12      Q.    One time where you said, Hey, did you

13   really mean to order this number and every time but

14   one they told you it was a mistake?

15      A.    Yes.

16      Q.    Okay.  And you said from there -- I think

17   you said the other thing that you would do is

18   determine whether or not they really need that amount,

19   correct?

20      A.    Right, I would ask them why they needed it

21   and, actually, the case that I recall, and that's

22   probably why I remember it, is she said she had a

23   patient that had 48 hours to live and she needed it

24   for that patient.

1    Q.    Okay.  What I'm interested in is what

2    information or data you would have had to review --

3    A.    Uh-huh.

4    Q.    -- to help you answer the question of why

5    do you need it?  And it sounds like one piece of

6    information or data would have been what was provided

7    verbally by the store?

8    A.    By the pharmacy manager.

9    Q.    Okay.  Any other information or data that

10   you had at your disposal to consider why a particular

11   store might have needed a high quantity of C-IIs?

12   A.    The only other source would have been

13   Barb Martin, who I also would call on occasion.

14   Q.    Okay.  At --

15   A.    At corporate, not at the DC.

16   Q.    Correct, correct.  She didn't work in the

17   distribution center?

18   A.    Uhn-uhn.

19   Q.    Okay.  And -- okay.  And you've told us

20   that you recall calling her about this one particular

21   order --

22   A.    Uh-huh.

23   Q.    -- and that she -- presumably you passed

24   on the information to her that you had received from

Highly Confidential - Subject to Further Confidentiality Review

1  the store?

2       A.    Right.

3       Q.    And she told you to fill the order?

4       A.    Right.

5       Q.    So would it be fair to say that the only

6  information you had that you had access to was

7  whatever was provided to you by the store, and that to

8  get other information, whether it's historical data

9  or -- or patterns or whatnot, you would have to go

10  through corporate via Barb Martin, is that fair?

11       A.    That's fair, yes.

12       Q.    Okay.  And you think -- and you think you

13  did that on -- on that one occasion?

14       A.    Yes.

15       Q.    Okay.

16             Okay.  So let's look at Paragraph C.  I

17  guess it is III.C of this 2010 policy.

18             Are you with me?

19       A.    Yes.

20       Q.    It says: "Responsibilities of Walgreens

21  company."

22             And No. 1 says:  "Suspicious store orders

23  and inquiries are handled through the corporate office

24  internal audit department."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Do you see that?

 2        A.     Yeah, I see that.

 3        Q.     What is the corporate office internal

 4   audit department?

 5        A.     It's a department where they do internal

 6   audits, but I couldn't tell you exactly what they do.

 7        Q.     Okay.

 8        A.     I don't know.

 9        Q.     What do they do internal audits of?

10        MS. SWIFT:  Objection; foundation.

11   BY THE WITNESS:

12        A.     I couldn't tell you.  I don't know.

13   BY MR. GADDY:

14        Q.     How -- can you tell me any members of the

15   internal audit department?

16        A.     Yarbrough is a familiar name, but I don't

17   really know if he was with internal audit.

18        Q.     You said Yarbrough?

19        A.     Yeah.

20        Q.     But you don't know if he was with internal

21   audit or not?

22        A.     Not for sure, uhn-uhn.

23        Q.     Okay.  Anybody else?

24        A.     I don't recall any other names, uh-uh.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Do you ever recall anybody else

2   from internal audit ever coming to the distribution

3   center in Perrysburg?

4      A.    If they did, they didn't tell me they were

5   with internal audit.  I don't...

6      Q.    Do you ever recall being asked to pull any

7   information for internal audit?

8      A.    No.

9      Q.    Ever being asked to pull any -- any data

10   or reports for the internal -- internal audit

11   committee or internal audit department?

12      MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14      A.    No.

15   BY MR. GADDY:

16      Q.    Do you know how many people make up the

17   internal audit department?

18      A.    No.

19      Q.    Do you know whether or not the internal

20   audit department has ever issued any reports or

21   findings related to the Perrysburg distribution center

22   and its compliance with DEA regulations?

23      A.    No, I don't.

24      Q.    Do you ever recall being a part of any

1    meetings or training seminars where results of

2    internal audits of Perrysburg were -- were discussed?

3        A.    No, I don't remember any of those.

4        Q.    Okay.  Did you know that -- that

5    suspicious orders and inquiries were -- were handled

6    through the internal audit department?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    No.

10   BY MR. GADDY:

11       Q.    Do you ever recall being instructed or

12   requested by anybody with internal audit to -- to edit

13   or halt an order for C-IIs?

14       A.    No.

15       Q.    Do you ever be -- requested or advised by

16   anybody at Walgreens anywhere to -- to halt or edit a

17   C-II -- a C-II order?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.    Just the case I already gave you if -- was

21   if a store was going to open late, we were supposed to

22   hold it, yeah.

23   BY MR. GADDY:

24       Q.    Okay.  It goes on to say:

1           "Suspicious orders are then reported by

2      corporate to the FDA and/or DEA for controlled

3      substances within three days."

4           Do you see that?

5      A.    I see that.

6      Q.    Do you know whether or not that ever

7      happened?

8      A.    No, I don't know.

9      Q.    Did you have any visibility into that

10     process whatsoever?

11     A.    No.

12     Q.    Have you ever had any interaction with

13     anybody at Walgreens regarding suspicious order

14     monitoring?

15     MS. SWIFT:  Object to the form, vague.

16     BY THE WITNESS:

17     A.    Other than conversations with Ann Anaya

18     where I knew there was a program regarding, you know,

19     suspicious orders, no.

20     BY MR. GADDY:

21     Q.    Okay.  If you go to the next page, there

22     is actually a Roman numeral IV which is also new to

23     the 2010 version.

24           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Um-hum.

2        Q.      And it talks about training?

3        A.      Yes.

4        Q.      And it says in No. 1, it says:

5                "The SAIL function manager will be

6    responsible for the training and enforcement of all

7    the procedures."

8                Do you see that?

9        A.      Yes.

10       Q.      Are -- are you aware of -- of any training

11   ever being provided on this policy to any of the team

12   members at Perrysburg?

13       A.      I'm not aware of this written policy being

14   given to anyone, the team members, if that's -- that's

15   what you are asking me.

16       Q.      Okay.  Do you recall any -- there being

17   any training or guidance given to, whether it's --

18   it's the folks in the computer room or the pickers on

19   what they are supposed to be looking for as far as

20   contacting you about these questionable orders that --

21   that you might need to check for accuracy?

22       A.      Well, they just -- they just knew that if

23   it was -- they knew what was high because they picked

24   every day and they picked all stores every week, so
```

```
 1   they knew if something was unusually high.  There

 2   wasn't really training given to them to identify that.

 3       Q.    Did you -- I mean, they're -- you are --

 4   this is talking about over 5,000 stores, right?

 5       A.    Um-hum.

 6       Q.    Would -- would it be safe to say that you,

 7   when you see a store number, do you know what store

 8   that is?

 9       A.    No.

10       Q.    Okay.  So if you see, I want to say the

11   store numbers were five digits?

12       A.    Correct.

13       Q.    So -- so if you saw Store 12345, that

14   doesn't -- you don't know that -- that, Oh, we're

15   talk -- that's the store in Perrysburg, Ohio, you

16   don't particularly know where that store is or what

17   population it serves or -- or what its typical

18   business is or anything like that, is that correct?

19       A.    That's correct.

20       Q.    Okay.  So when you say the pickers do this

21   every day and they know what they are seeing, you are

22   not telling me that -- that they know exactly how many

23   bottles Store 12345 typically gets on an average

24   order, are you?
```

1      A.    No, that's not what I'm telling you.

2      Q.    Okay.  You are just saying as a whole

3   chain wide they're -- they're aware of what comes in?

4      A.    They -- they are aware of what was

5   unusually large.

6      Q.    On a chain-wide basis?

7      A.    On a chain-wide basis, yes.

8      Q.    You -- do you see any -- any potential

9   problems or issues with using a chain-wide basis to

10  evaluate size of -- sizes of orders?

11     MS. SWIFT:  Object to the form.

12  BY THE WITNESS:

13     A.    Well, I mean, every store would be

14  different based on where it's at.  Some were in

15  hospitals, some were in corporate offices, so...

16  BY MR. GADDY:

17     Q.    And -- and you would agree with me, it

18  would be fair to say that a -- that a store at a

19  hospital is probably going to need more C-IIs than a

20  store in Perrysburg, Ohio?

21     A.    Possibly, that would make sense.

22     Q.    And -- and you agree with me that it would

23  be possible that there could be an unusually large

24  number of bottles for Perrysburg, but that might be a

1    normal order of bottles for a hospital, is that fair?

2        A.    That would be fair, um-hum.

3        Q.    Okay.  But you didn't have a daily

4    practice of calling all of the Walgreens stores and

5    hospitals, did you?

6        A.    No.

7        Q.    Okay.  So these or -- these orders that

8    were going to hospitals, those weren't popping on a

9    daily basis for you to follow up on, were they?

10       MS. SWIFT:  Objection; foundation.

11   BY THE WITNESS:

12       A.    No.

13   BY MR. GADDY:

14       Q.    Okay.  So what you would see is normal

15   orders for stores in a hospital setting were not high

16   enough to flag for you to do any follow-up calls or

17   investigation on, is that correct?

18       MS. SWIFT:  Objection; foundation.

19   BY THE WITNESS:

20       A.    That would be correct, because what

21   flagged them was, like, triple -- 300 of something.

22   Not even in a hospital do you need 300 of something.

23   I mean, that's what would flag them right away that

24   something was wrong.

1  BY MR. GADDY:

2      Q.    It had to be something crazy for it to

3  flag on this report for you to do a follow-up?

4      A.    Well, it had to be something large.  I

5  don't know if I would say crazy, but yeah.

6      Q.    Outside of being told by Anaya at some

7  point in time for -- that -- that it -- excuse me --

8  being told by Anaya at some point in time that at some

9  other point in time there was some type of system in

10  place --

11      A.    Uh-huh.

12      Q.    -- did you ever have any interaction with

13  anybody at Walgreens regarding suspicious orders?

14      MS. SWIFT:  Object to the form and foundation.

15  BY THE WITNESS:

16      A.    Just the computer room supervisor,

17  Matt Nye, the one we talked about earlier.

18  BY MR. GADDY:

19      Q.    Okay.

20            And what, if anything, would Matt tell you

21  about -- and -- and -- and I'm not talking about the

22  questionable orders, the -- not -- not about these

23  policies and this procedure here.

24      A.    Okay.

1    Q.    But I'm asking specifically about the --

2    the suspicious order report that you said would come

3    into the C-II SAIL --

4    A.    Uh-huh.

5    Q.    -- or -- or the suspicious orders that's

6    handled by internal audit.

7          Did you have -- did you have any

8    conversations with Matt Nye about that suspicious

9    order report or -- or specifically the -- what

10   Walgreens referred to as suspicious orders?

11   MS. SWIFT:  Object to the form of the question.

12   BY THE WITNESS:

13   A.    Suspicious orders would be the query he

14   ran, I -- that's how I understood it, and then I -- he

15   would talk to me about those.  If he couldn't get

16   ahold of the store, he would tell me.

17          Is that what -- the query you are talking

18   about?  No.

19   BY MR. GADDY:

20   Q.    What you are talking about is what we've

21   been talking about for the last hour or so?

22   A.    Um-hum.

23   Q.    Okay.  So no.  I'm talking about something

24   different than that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Okay.

 2        Q.    I'm talking about what -- well, let me ask

 3   you this:  Did Matt refer to those as suspicious

 4   orders?

 5        A.    I don't recall --

 6        Q.    Okay.

 7        A.    -- his verbiage, no.

 8        Q.    I'm ask -- what I'm trying to ask about,

 9   and -- and -- and I'm just going to be sus -- specific

10   to the phrase "suspicious orders."

11        A.    Okay.

12        Q.    Because that's what's used here in this

13   policy as it relates to internal audit and that's what

14   I think you told me was on that report that the

15   C-II -- that -- that Lori --

16        A.    Right.

17        Q.    -- who was the C-II SAIL coordinator,

18   would get, correct?

19        A.    Correct.

20        Q.    Or -- or -- or Brook was the other one,

21   right?

22        A.    Um-hum.

23        Q.    Did you ever have any conversations or

24   interactions with anybody at Walgreens, other than
```

1    this Anaya conversation you told us about, regarding

2    suspicious order reports or suspicious orders, and --

3    and I'm confining it to that -- to that specific term?

4         MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6         A.    Not that I recall.

7    BY MR. GADDY:

8         Q.    Okay.  Do you know -- do you know a Mark

9    Betterridge?

10        A.    Yes.

11        Q.    Who is Mark and what did he do?

12        A.    He is another function manager at the DC.

13        Q.    Okay.  What is his purview -- what's under

14   his purview?

15        A.    Right now he is in NAKL mod, one of our

16   pick mods.

17        Q.    Okay.  Has he ever had any

18   responsibilities whatsoever for controlled substances?

19        A.    I didn't really follow C-III through V and

20   their activity when I was in receiving as a manager,

21   so I couldn't really answer that.  He may have during

22   that frame.  I don't know.

23        Q.    He never had any responsibilities over

24   C-IIs?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    No.

2        Q.    Okay.  What about, do you know a person

3   named James Gill?

4        A.    Yes.

5        Q.    And how do you know Mr. Gill?

6        A.    He is also another manager on night shift.

7        Q.    Okay.  Has Mr. Gill ever had any

8   responsibilities for C-IIs?

9        A.    No.

10       Q.    Okay.  Do you know whether or not he had

11  any responsibilities over C-III through Vs?

12       A.    He may have.  I don't really remember.  I

13  don't remember.

14       Q.    Okay.  I'm going to show you what I'll

15  mark as Exhibit No. 9, and this is going to be what I

16  believe is the final version of that same policy.

17                   (WHEREUPON, a certain document was

18                    marked Walgreens - Bish Deposition

19                    Exhibit No. 9, for identification, as

20                    of 02/01/2019.)

21  BY MR. GADDY:

22       Q.    Do you see we are looking at the top of

23  the page another Walgreens document and it looks like

24  the subject has changed now.  It now says:
```

1      "Authentication of Prescription Order Policy"?

2           A.     Right.

3           Q.     But if you look at the origination date,

4      it is the same, the 12/11/06?

5           A.     Yes.

6           Q.     And you can look at it, you can scan it if

7      you want, but it looks like Roman numerals I, II and

8      III are identical to the one -- or excuse me -- at

9      least I, II, and III.A and B are going to be

10     identical.

11          A.     That's what it looks like.

12          Q.     Okay.  And it looks like -- and we are

13     going to talk about some of the changes, but first you

14     see up -- up at the top, this is the October 2013

15     policy, or -- or I should say version of policy,

16     correct?

17          A.     Correct.

18          Q.     Okay.  And so this would be after --

19     excuse me -- one of the -- some of the -- one of the

20     first documents we looked at were some of those, I

21     think it was an April 2012 e-mail where they were

22     discussing the DEA concerns in Jupiter.

23                 Do you recall that?

24          A.     Is it something we talked about earlier

1    today?

2         Q.    It was -- you can pull it out and look at

3    it if you want to.

4         A.    Okay.

5         Q.    I think it's No. 1.

6         A.    So No. 1 was about us taking over

7    Jupiter's -- possibly taking over Ju -- Jupiter's

8    orders.

9         Q.    Okay.  And does it reference the, I think

10   the first sentence says:  You probably heard what's

11   going on with the DEA?

12        A.    "You know what's happening in Jupiter with

13   the DEA" it says, yes.

14        Q.    Okay.  And that's an April 2012 e-mail?

15        A.    Yes.

16              Are we done with that one?

17        Q.    Yes, ma'am.  I was just trying to put it

18   in -- in kind of a time context.

19              So this policy you see is October 2013,

20   correct?

21        A.    Correct.

22        Q.    So this is going to be post-DEA issues in

23   Jupiter, right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    It's post the other, yeah.

3      Q.    And it says here in Paragraph C, under

4   Responsibilities of Walgreens, and -- and this is --

5   this paragraph -- this -- what's written here is

6   different than what we saw in the last one, right?

7      A.    Right.

8      Q.    The last one said that suspicious order

9   monitoring was under the purview of the internal audit

10  committee or internal audit department?

11     A.    Yes, um-hum.

12     Q.    This one says:  "The Walgreens strategic

13  inventory management system."

14           And you're familiar with SIMS?

15     A.    Yes.

16     Q.    And that's your online ordering system?

17     A.    Operating system, uh-huh.

18     Q.    Okay.  It says:

19           "So the Walgreens SIMS will stop what

20  would be considered suspicious controlled drug orders

21  from being released for picking at the DC based on the

22  algorithm that looks at past sales and order

23  frequency."

24           Do you see that?

1      A.    Yes.

2      Q.    And does that sound familiar to what Anaya

3  told you when you asked her about that?

4      A.    Yes.

5      Q.    Okay.  And that would be what we see in

6  this October of 2013 policy, correct?

7      A.    Correct.

8      Q.    Okay.  So, let me ask you this:  Were you

9  aware that orders were being either cut or -- or

10  blocked from coming into the distribution center for

11  C-IIs?

12      MS. SWIFT:  Object to the form.

13  BY THE WITNESS:

14      A.    Do you mean prior to '13 or after?  When?

15  At any time?

16  BY MR. GADDY:

17      Q.    At any time.

18      A.    Well, the program would have, this program

19  that we just read about, my understanding was that

20  would not allow orders to come in that were above what

21  was reasonable for their location and history and

22  whatever.

23      Q.    Okay.  And you had that understanding at

24  the time or you have that understanding from looking

```
 1   at this document?

 2       A.    Oh, I had that understanding at the time.

 3       Q.    Okay.  How, if at all, did that impact

 4   what you did in the distribution center?

 5       MS. SWIFT:  Object to the form.

 6   BY THE WITNESS:

 7       A.    In regards to what, how we handled large

 8   orders or how...?

 9   BY MR. GADDY:

10       Q.    To any part, any portion of your job?

11       MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13       A.    So how did that change our -- it -- it

14   didn't change anything we did.  We still called stores

15   if we got something that was too high.

16   BY MR. GADDY:

17       Q.    Okay.  I didn't think it did.  I just

18   wanted to make sure.

19       A.    Yeah.

20       Q.    But -- okay.  So nothing changed from your

21   perspective once -- once SIMS started reducing or

22   cutting orders?

23       MS. SWIFT:  Object to the form.

24   BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Correct?

2        A.    Not that I noticed.

3        Q.    Okay.

4        A.    Not that I was aware of.

5        Q.    You still -- I'm sorry.

6        A.    Not that I was aware of.

7        Q.    You still had orders come in every day and

8   you still processed those orders every day?

9        A.    Correct.

10       Q.    You still ran this, had the computer room

11  and the pickers be looking out for potential orders

12  that were entered in error?

13       A.    Correct.

14       Q.    You continued to place phone calls to

15  stores if you saw something very large that you

16  thought might be inaccurate?

17       A.    Correct.

18       Q.    Okay.  If you look at the very bottom

19  right-hand corner, do you see there is some Bates

20  numbering down there?

21       A.    The WAGMD?

22       Q.    Yes, ma'am.

23       A.    Uh-huh.

24       Q.    If you'd turn for me, please, to the
```

1    page ending in 394.  And at the top of the page you

2    see -- should see something that says:  "Mt. Vernon

3    Stores - DC" number and then an "Order Error Process."

4            Are you with me?

5    A.    Yep.  Yes.

6    Q.    And it says in the first paragraph there,

7    it says:

8            "Once it has been confirmed that the

9    adjusted transmissions are across, the sale or the

10   computer room TM will start reviewing stores' Rx

11   transmissions and see if there are any Rx items that

12   have been ordered greater than ▇ SKUs of one WIC."

13           Would WIC be an item?

14   A.    Right.

15   Q.    Okay.  So if I was to change the last

16   phrase of that sentence to -- to layman terms, they --

17   what they are saying there is they are looking if any

18   store ordered more than ▇ bottles of OxyContin?

19   MS. SWIFT:  Object to the form, mischaracterizes

20   the document.

21   BY THE WITNESS:

22   A.    Yeah, that's not how I would read it, only

23   because I know that Mt. Vernon didn't handle C-IIs.

24   BY MR. GADDY:

Highly Confidential – Subject to Further Confidentiality Review

```
 1      Q.    Okay.

 2      A.    So they --

 3      Q.    ███bottles of Vicodin?

 4      A.    If that was III through V, yes.

 5      Q.    Okay.  And -- and -- but that's what that

 6  means, ██ would be referring to bottles, the SKUs

 7  would be referring to bottles and WIC would be

 8  referring to one particular product?

 9      A.    Right, that's correct.

10      Q.    Okay.  So that could be ███rolls of paper

11  towels, of Bounty paper towels?

12      A.    Correct.

13      Q.    Okay.

14      MS. SWIFT:  Object to the form.

15  BY MR. GADDY:

16      Q.    And it goes on to say:

17            "If there is an item that appears to be

18  questionable, a call will be made to the pharmacy of

19  the respective store to review the order and make the

20  change if needed, prior to OP-order processing."

21            Do you see that?

22      A.    Yes.

23      Q.    Okay.  And that's, again, consistent with

24  what you've been telling us over the last little bit
```

```
 1   here, correct?

 2        A.   Correct.

 3        Q.   And if you look down below that, it looks

 4   like there has been two examples that have been copy

 5   and pasted maybe into this document.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   And if you look at the first one, it has,

 9   on the left-hand side, it has an item number and an

10   item description and then it has, in the second box

11   there, it has, it looks like a store to be shipped to

12   and then it has an order number.

13             Do you see that?

14        A.   Yes.

15        Q.   And it looks like in this particular one,

16   it looks like somebody entered 30 but when they

17   followed up on it, they really only wanted three,

18   correct?

19        A.   Correct.

20        Q.   And if you look down at the example below,

21   it looks like there are two -- two examples given

22   there, one where somebody ordered 300 of something but

23   they really only wanted three and another one where

24   they ordered 400 of something but really only wanted
```

Highly Confidential - Subject to Further Confidentiality Review

1    four.

2         Do you see that?

3    A.    I see that.

4    Q.    And are these examples here consistent

5    with the types of issues that you were looking for and

6    identifying when you went through this particular

7    process?

8    MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10   A.    While I don't understand what process you

11   are referring to, we didn't have a report we looked

12   at, as I stated earlier.  It was just the computer

13   room would -- would call us if something looked

14   unusually high and if -- or the picker would tell me

15   if it looked unusually high.

16   BY MR. GADDY:

17   Q.    Okay.  So you didn't have anything in

18   writing like this?

19   A.    No.

20   Q.    You just had a verbal notification from

21   the computer room or a verbal notification from the

22   pickers?

23   A.    Correct.

24   Q.    Okay.  But would these be consistent with

Highly Confidential - Subject to Further Confidentiality Review

1    the type of errors that you would be finding and --

2    and contacting the store to correct?

3        A.    Yes.  Sometimes they were just fat -- you

4    know, mistakes in entering.

5        Q.    Okay.  If you'd turn with me, please, to

6    the Bates number ending 383, so it's actually going to

7    be going back towards the front.

8        A.    Okay.

9        Q.    The top of the page, it says:  "Suspicious

10   Order Monitoring Program, Policy and Procedures for

11   the Pharmaceutical Integrity Team."

12            Do you see that?

13       A.    Yes.

14       Q.    Are you familiar with the pharmaceutical

15   integrity team?

16       A.    Yes.

17       Q.    In what way?

18       A.    That's the team that I think Barb Martin

19   was a part of, or a supervisor of, or in some capacity

20   she was with that group, I believed.

21       Q.    Okay.

22       A.    That was my understanding of her position.

23       Q.    Okay.  Do you know of anybody else that

24   was with that group?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Not off the top of my head, no.

 2      Q.    How long do you think the pharmaceutical

 3   integrity team has been in place?

 4      MS. SWIFT:  Objection; foundation.

 5   BY THE WITNESS:

 6      A.    I would have no idea.  It was some -- they

 7   were out of corporate.  I don't know how long they

 8   were there.

 9   BY MR. GADDY:

10      Q.    Okay.  If you look at the section entitled

11   "Overview," do you see where I am?

12      A.    Uh-huh, yes.

13      Q.    It says:

14            "Walgreens distribution centers must take

15   reasonable measures to identify its customers,

16   understand the normal and expected transactions

17   conducted by those customers, and identify

18   transactions involving controlled substances that are

19   suspicious in nature."

20            Do you see that?

21      A.    Yes.

22      Q.    Are you aware of anybody at the Perrysburg

23   distribution center that was doing those things?

24      A.    Well, the part that says:  "Reasonable
```

Highly Confidential - Subject to Further Confidentiality Review

1  measures to identify its customers, understand the

2  normal and expected," again, we had -- did not have

3  the databases to know what was normal for any store to

4  order an item, you know what I mean.

5      Q.   So it would --

6      A.   So --

7      Q.   -- be impossible for anybody to --

8      MS. SWIFT:  Did you -- did you finish your

9  answer?

10  BY THE WITNESS:

11      A.   Oh.  Well, I was also going to say, it

12  says, "Identify transactions involving," this is what

13  the pharmacy integrity -- this -- this is actually

14  what I thought the program was doing, the computer

15  program that was put in place that was supposed to

16  check all of this.

17  BY MR. GADDY:

18      Q.   Okay.

19      A.   Before it came to us.

20      Q.   Your understanding is there was not

21  anybody at the dis -- distribution center doing these

22  things, correct?

23      MS. SWIFT:  Object -- object to the form,

24  foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    Above and beyond what I've already said

 3   about them bringing orders to me and the computer room

 4   calling me, no.

 5   BY MR. GADDY:

 6       Q.    Okay.

 7             And -- and I -- what I think I heard you

 8   say is that -- that because you didn't have data it

 9   would be impossible for you or anybody at the

10   distribution center to do these things?

11       MS. SWIFT:  Object to form.

12   BY THE WITNESS:

13       A.    I think what I said was it would be

14   impossible for us to know what was normal and expected

15   for any particular store because we didn't know their

16   order history.

17   BY MR. GADDY:

18       Q.    Right.

19             And -- and you are serving over -- over

20   5,000 stores, correct?

21       A.    Per week, uh-huh.

22       Q.    Okay.  And you have orders that come in

23   every day?

24       A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     And you have to process all of those

2  orders every day?

3     A.     Yes.

4     Q.     Okay.  So you can't possibly differentiate

5  between what's normal and expected for each of these

6  5,000 stores because every day you are seeing new

7  stores and new orders?

8     A.     The only thing that would stand out are

9  the really large ones, as I've already said, yeah.

10    Q.     Sure.

11           It goes on to say that:

12           "The distribution centers mu" -- and I'm

13  going to go to the second half of that first sentence.

14  It starts with:

15           "The Walgreens distribution centers must

16  take reasonable measures," and you just talked a

17  little bit about the normal and expected transactions,

18  but it goes on to say:  "identify transactions

19  involving controlled substances that are suspicious in

20  nature."

21           Do you see that?

22    A.     Are you right under -- over -- I -- I --

23    Q.     I'm still in the --

24    A.     -- I was lost from the beginning.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    No, I'm sorry.  I'm still in the -- we

 2   just -- we just did a couple of -- of question and

 3   answers about the normal and expected --

 4        A.    Right.

 5        Q.    -- aspect of that sentence.

 6        A.    Right.

 7        Q.    So now what I'm asking about is the third,

 8   kind of --

 9        A.    In the same sentence?

10        Q.    Yes, ma'am.

11        A.    Okay.  Okay.

12        Q.    Where it says:  "Identify transactions

13   involving controlled substances that are suspicious in

14   nature."

15              Do you see that?

16        A.    Yes.

17        Q.    And -- and again, that sentence starts

18   with:  "The distribution centers must" do this.

19              Do you see that?

20        A.    Yes.

21        Q.    So --

22        A.    It says they "must take reasonable

23   measures."

24        Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Is that where you are talking?  Yeah.

 2        Q.    Yes, ma'am.

 3              Other than what you've already told us

 4   about --

 5        A.    Uh-huh.

 6        Q.    -- with looking for these orders that

 7   might be errors --

 8        A.    Uh-huh.

 9        Q.    -- did you in the distribution centers,

10   the C-II function manager, take any steps to identify

11   controlled substances that are suspicious?

12        MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14        A.    Other than what I've already talked about,

15   no.

16   BY MR. GADDY:

17        Q.    If you go down to the last -- it's the

18   second-to-last sentence in the same paragraph, it

19   says, "In making" on the right-hand side of the page.

20        A.    Yep, yes.

21        Q.    It says:

22              "In making these assessments, the

23   distribution center may consider the pharmacy's

24   clinical business needs."
```

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2      A.    Yes.

3      Q.    Did you have any information as the C-II

4  function manager about the clinical business needs of

5  any particular store?

6      A.    Not unless I called Barb.

7      Q.    Okay.  And you did that one time?

8      MS. SWIFT:  Object to the form, mischaracterizes

9  testimony.

10  BY THE WITNESS:

11     A.    No, I did that one time on an order that

12  the store said they really did want, that's, you know,

13  that's what you are referring to.

14           I would call her several times just

15  questioning things if I thought something looked funny

16  or an order was particularly large or whatever and

17  then she would share with me either it's in hospital

18  or, you know, whatever, whatever the reason would be.

19  BY MR. GADDY:

20     Q.    Okay.  Did you have any way independent of

21  calling Barb to consider the pharmacy's clinical

22  business needs?

23     A.    No.

24     Q.    Okay.  It says:  "The DC may consider the

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy's location."

2              Do you see that?

3    A.    Um-hum.

4    Q.    Was that something that you -- that you

5    ever did to determine whether or not an order should

6    be filled?

7    A.    No.

8    Q.    It says:  "And the DC may consider the

9    pharmacy's population served."

10             Do you see that?

11   A.    Yes.

12   Q.    Was that something that you ever did in

13   considering whether or not an order should be filled?

14   A.    No.

15   Q.    Okay.  You said that you called Barb from

16   time to time to ask her questions about things.

17   A.    Um-hum.  Yes.

18   Q.    Were -- were you calling -- how many times

19   do you believe you called her to ask about a

20   pharmacy's clinical business needs?

21   MS. SWIFT:  Object to the form, foundation.

22   BY THE WITNESS:

23   A.    I would have no idea.  Over eight years I

24   couldn't tell you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GADDY:

 2         Q.    Okay.  How many times do you recall over

 3    that eight years Barb telling you not to fill an

 4    order?

 5         MS. SWIFT:  Object to the form, foundation.

 6    BY THE WITNESS:

 7         A.    I really don't remember her -- any

 8    particular conversation to recall if she ever said

 9    don't fill an order.

10    BY MR. GADDY:

11         Q.    As you sit here today, you don't recall

12    Barb ever telling you to not fill an order, correct?

13         MS. SWIFT:  Object to the form.

14    BY THE WITNESS:

15         A.    Correct, I don't remember if she ever told

16    me to not fill an order or not, uhn-uhn.

17    BY MR. GADDY:

18         Q.    Okay.  It goes on to say:

19               "Walgreens must report to the DEA any

20    order that is determined to be suspicious."

21               Do you see that?

22         A.    Yes.

23         Q.    And safe to say that if that was

24    occurring, it was not -- you were not doing it and you
```

Highly Confidential - Subject to Further Confidentiality Review

1    were not directing that it be done, correct?

2         A.    I personally was not, no --

3         Q.    Okay.  And you --

4         A.    -- that's correct.

5         Q.    -- you personally were not reporting and

6    you personally were not directing that it be reported?

7         A.    I was not doing either because I thought

8    that's what the pharmacy integrity team did.

9         Q.    Okay.  And you don't have an understanding

10   of how long the pharmacy integrity team had been

11   there?

12        A.    No.

13        Q.    Okay.  Let me show you P-WAG 225.

14              So it was your understanding that the

15   pharmaceutical integrity team was the one in charge

16   with being on the lookout for and looking for these

17   orders, correct?

18        MS. SWIFT:  Object to form --

19   BY THE WITNESS:

20        A.    Reporting.

21        MS. SWIFT:  -- vague.

22   BY MR. GADDY:

23        Q.    This is going to be Exhibit No. 10.

24              (WHEREUPON, a certain document was

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked Walgreens - Bish Deposition

 2                    Exhibit No. 10, for identification,

 3                    as of 02/01/2019.)

 4    BY MR. GADDY:

 5        Q.    And if you look at the -- the lower e-mail

 6    on the page from Tasha Polster?

 7        A.    Yes.

 8        Q.    And what's the date of that e-mail?

 9        A.    June 19th, 2013.

10        Q.    Okay.  And if you look in about the middle

11    of the "to" line, I think you'll find your name.

12        A.    Yes.

13        Q.    Okay.  And so you received this e-mail?

14        A.    Yes.

15        Q.    And it looks like --

16        A.    It appears so.

17        Q.    I'm sorry?

18        A.    It appears so.

19        Q.    Okay.  And it looks like next to your name

20    is Tammy who is the administration manager at

21    Perrysburg?

22        A.    Yes.

23        Q.    Okay.  And the subject is:  "Rx Integrity

24    Team and DEA agreement:  Action Required."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2      A.     Yes.

 3      Q.     The e-mail says:

 4              "Hello, for those of you that don't know

 5      me, I'd like to introduce myself and my team.  My name

 6      is Tasha Polster.  I am the Director of Pharmaceutical

 7      Integrity."

 8              Do you see that?

 9      A.     Yes.

10      Q.     It says:

11              "I know Sue Thoss has given you my

12      information, but I would like to formally introduce

13      myself and let you know who to reach out to if you

14      have any questions or concerns."

15              Do you see that?

16      A.     Yes.

17      Q.     I had asked you earlier about Tasha

18      Polster and now you are --

19      A.     Uh-huh.

20      Q.     -- seeing here -- her here on this e-mail.

21              Is this refreshing your memory about who

22      she is or -- or does it not do anything for you?

23      A.     It is not doing anything for me.

24      Q.     Okay.  It says:
```

1          "The overview document provides a brief

2     description of what my team does and the names and

3     contact information of each of my managers by

4     division.  Feel free to reach out to any" -- "any of

5     us."

6          Do you see that?

7     A.    Yeah.

8     Q.    So, do you see here in this e-mail that --

9     that you are being introduced to the pharmaceutical

10    integrity team in June of 2013, correct?

11    A.    Correct.

12    Q.    Okay.  Do you recall whether or not you

13    had any interaction with them whatsoever prior to June

14    of 2013?

15    A.    Well, I don't know who "them" is.

16    Q.    The pharmaceutical integrity team.

17    A.    Okay.

18          Like I said, I used to talk to Barb, but I

19    couldn't tell you what years I talked to her or if it

20    was prior to June of 2013.

21    Q.    Okay.  Well, if I was to represent to you

22    that Barb Martin is not on the pharmaceutical

23    integrity team --

24    A.    Um-hum.

```
 1       Q.     -- and so and with that representation, do

 2   you recall ever having any contact or interaction with

 3   the pharmaceutical integrity team prior to June 2013?

 4       MS. SWIFT:  Object to form.

 5   BY THE WITNESS:

 6       A.     Well, not knowing -- I know Sue Thoss and

 7   I've talked to her, but I wouldn't have known if she

 8   was on this team or not, so I don't know how I can

 9   answer that.

10   BY MR. GADDY:

11       Q.     Okay.  Well, let me give you some names of

12   folks that are --

13       A.     Okay.

14       Q.     -- on the team and ask --

15       A.     Okay.

16       Q.     -- you if you know them.

17              And I'd just read -- I'll just kind of try

18   to list some names and then tell you when I'm done and

19   you tell me if you know any of them.

20       A.     Okay.

21       Q.     Patty Daugherty, Ed Bratton, Chris

22   Diamond, any of those folks?

23       A.     No.  They don't sound familiar.

24       Q.     Okay.  Eric Stahmann?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No.

2      Q.    So as it relates to having interactions

3   with folks about verifying orders or checking orders,

4   is Barb Martin that person for you?

5      A.    She was, yes.

6      Q.    So this June 2013 introduction to the

7   pharmaceutical integrity team, do you know whether or

8   not you had even heard of that team before this?

9      A.    I had heard of the pharmaceutical

10  integrity team, because, as I said, I thought Barb

11  Martin was a part of that, but I -- this Tasha just

12  doesn't -- isn't familiar to me.  It is not ringing a

13  bell at all.

14     Q.    Okay.  Okay.  Let's go back to No. 9.

15     A.    Number -- oh, okay.

16     Q.    Okay.

17           Okay.  And I'm on Bates No. 383 still.  Is

18  that where you are?  I'm sorry.

19     A.    383?

20     Q.    Yes, ma'am.

21     A.    Okay.

22     Q.    Okay.  You recall we went over some of

23  the -- some of the Overview section here?

24     A.    Yes.

```
1        Q.    Okay.  It goes on to say, it -- it has

2   this -- this entry here:

3              "How to identify normal and expected

4   transactions," and then below that it has some -- some

5   entries.  One of the topics is "ceiling limits."

6              Do you see that?

7        A.    Yes.

8        Q.    Does -- does that term mean anything to

9   you?

10       A.    No.

11       Q.    Okay.

12       A.    I know what it means just because I know

13  what it means, but, no, it doesn't -- relative to

14  Walgreens, it doesn't mean anything to me.

15       Q.    Okay.  The -- okay.  And that's what I was

16  getting at, within -- within Walgreens and as it

17  applies to orders of controlled substances, does that

18  mean anything to you?

19       A.    No.

20       Q.    Okay.  If you look down at the very bottom

21  of the page, there is a heading that says Tolerance

22  Limits.

23              Do you see that?

24       A.    Yes.
```

1      Q.      And, again, with the same preface of as it

2   relates to Walgreens and any policies regarding the

3   ordering of controlled substance, does that mean

4   anything to you?

5      A.      I've heard the term.

6      Q.      In what context?

7      A.      I mean, I know what a tolerance is, so I

8   would guess that's the definition of that, but that's

9   the only context.

10      Q.      Well, and -- and I'm -- to be fair to you,

11   I'm not asking you to guess, so I'm asking if you've

12   heard the -- the word "tolerance" used in the context

13   of ordering controlled substances within Walgreens?

14   And if so, how -- what it means?

15      MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17      A.      I don't have any memory of that, no.

18   BY MR. GADDY:

19      Q.      Okay.  Can you turn with me, please, to

20   Bates number ending 395.

21            And do you see at the top of -- excuse

22   me -- it looks like another Walgreens policy.  In the

23   top right it says:  "List 1 Chemical Stores and

24   Handling"?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    Did your duties and responsibilities have

3   anything to do with List 1 chemicals?

4        A.    I don't recall what List 1 chemicals are,

5   so I couldn't answer that.

6        Q.    Okay.  Was there anything under your

7   purview, any products under your purview other than

8   Schedule II controlled substances?

9        A.    No.

10       Q.    Let me show you what I'll mark as

11  Exhibit 11.  This is going to be P-WAG 252.

12                  (WHEREUPON, a certain document was

13                   marked Walgreens - Bish Deposition

14                   Exhibit No. 11, for identification,

15                   as of 02/01/2019.)

16  BY MR. GADDY:

17       Q.    And if you look at this document, do you

18  see this is an e-mail chain, and we are actually going

19  to start at the first e-mail in the chain which starts

20  at the bottom of the page with an e-mail from

21  Matt Nye.

22                  Are you with me?

23       A.    Yes.

24       Q.    And do you see that he sends this e-mail
```

1    on Tuesday, May 8th, 2012?

2        A.    Right.

3        Q.    And he sends it to you and it looks like

4    to Lori Fenimore who was your C-II SAIL coordinator?

5        A.    Yes.

6        Q.    Okay.  And if you look at the next page,

7    it looks like he also copies the computer room.

8            I guess they had a group e-mail?

9        A.    Yes.

10       Q.    Okay.  What -- were there group e-mail

11   accounts that you would have been on?

12       A.    I don't recall.  I'm on some now in

13   inbound.  I don't recall any when I was in C-II.

14       Q.    Okay.

15       A.    That doesn't mean I wasn't, I just

16   don't...

17       Q.    Was there a function manager e-mail --

18   group e-mail account or...?

19       A.    Oh, there was.  Yeah, I have would have

20   been on that.

21       Q.    Okay.  Was it just -- was it -- is that

22   what it was, function managers?

23       A.    Um-hum.  Still is.

24       Q.    Okay.  Is there a SAIL e-mail account?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I believe there is.

 2        Q.    Would you have been on that?

 3        A.    No, I don't think so.

 4        Q.    Any others other than function manager?

 5        A.    No, that was the only -- that -- well,

 6   then or now?  Now I'm also on the -- all of the

 7   inbound group e-mails, but --

 8        Q.    Okay.

 9        A.    -- because that's where I work now.

10        Q.    No.  And -- and thanks for asking.

11   Because I'll, again, just -- I'll try to tell you

12   otherwise, but otherwise -- but if I -- if I'm

13   intending to do something differently, but otherwise

14   I'm just asking about the distribution time period

15   when Walgreens would have been distributing

16   Schedule II drugs.

17        A.    Okay.  Okay.

18        Q.    Okay.  So let's look at Matt's e-mail.  He

19   says:

20             "With what's happening in Jupiter," and

21   this is May of 2012, right?

22        A.    Yep.

23        Q.    Okay.  And remember Exhibit No. 1 was the

24   April 2012 e-mail talking about the DEA issues going
```

1    on in Jupiter.

2              Do you recall that?

3        A.    Yes.

4        Q.    So it says:

5              "With what's happening in Jupiter, my

6    operators who do C-II are starting to question whether

7    or not the quantities for drugs that they typically

8    let go is correct.  When we first started doing C-II,

9    the direction we got (possibly from Jupiter) was to

10   call the stores for any orders above ■ units of the

11   following items."

12             Do you see that?

13       A.    Yes.

14       Q.    Okay.  So we've looked at a couple of

15   those different policies.  I think one said ■ SKUs

16   was the -- was the -- the magic number, one, I think

17   from Mt. Vernon, said ■, and now we see here that

18   Matt is saying he may have been told at one point in

19   time that it was ■, correct?

20       A.    It looks like that's what he thought it

21   was, yeah.

22       Q.    Okay.  Do you recall anything different

23   or -- or --

24       A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you recall whether there even was a

2   firm number?

3      A.    The computer room was really the ones, the

4   only ones that had a number of orders, a number of, a

5   quantity of a certain item to look for.  We didn't do

6   that down on the floor.  That was supposedly done

7   before, again, it ever got to us, either by this

8   system or by the computer room.

9      Q.    Okay.  And then you see there he -- he has

10  a -- a list, a list of -- of some items, correct?

11     A.    Yes.

12     Q.    And he says oxy -- it looks like oxycodone

13  5-milligrams?

14     A.    Yes.

15     Q.    Okay.  That -- that's not the only

16  strength of oxycodone that you would distribute, is

17  it?

18     A.    No.

19     Q.    Okay.  What other strengths of oxycodone

20  would you distribute?

21     A.    I think we had 10, 20, 30, I think --

22  well, I might be thinking OxyContin.  I'm not sure.

23     Q.    Well, OxyContin is oxycodone, right?

24     A.    Well, it is the brand name.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sure.

2    A.    Okay.  But this says oxycodone, so I

3    thought you were talking oxycodone only.

4    Q.    Okay.  Do you --

5    A.    But the OxyContin we had 80-milligram, I

6    remember that.

7    Q.    Okay.  Well -- well, okay.  So for

8    OxyContin you had 5, 10, you said 20?

9    A.    Well, I actually said that for oxycodone,

10   but for the OxyContin we had, I think there was even a

11   15.

12   Q.    Okay.

13   A.    But, yeah, it ranged, like, every ten --

14   it would be 10, 20, 30 and then I remember an 80.  I

15   don't -- and maybe a 60 in the middle.

16   Q.    Okay.  But for this list that Matt says he

17   looks for --

18   A.    Uh-huh.

19   Q.    -- when evaluating these orders, what he

20   lists there is the oxycodone 5-milligrams?

21   A.    Yes.

22   Q.    Okay.

23   What other in -- I didn't realize

24   originally that you were making a distinction, so my

Highly Confidential - Subject to Further Confidentiality Review

1    fault.

2              So what were the doses -- what were the

3    strengths of oxycodone in addition to the 5-milligram

4    that he says he looks for?

5       A.    Those are the ones that we also had,

6    10-milligram, 20-milligram, 30-milligram, and I don't

7    remember beyond that.

8       Q.    Okay.  And the next drug that he says he

9    actually looks for is Methadose, correct?

10      A.    Um-hum, yes.

11      Q.    And is that 10-milligram the only strength

12   of Methadose that you all distributed?

13      A.    I don't recall that at all.  I mean, I

14   remember that drug.  I don't recall what strengths we

15   had.

16      Q.    Okay.  And he indicates that he looked for

17   the 10-milligram methadone, correct?

18      A.    Correct.

19      Q.    Any other strengths of methadone that

20   Walgreens distributed?

21      A.    I don't recall that one either.

22      Q.    Okay.  And fentanyl is listed there,

23   correct?

24      A.    Yes.

1      Q.     Okay.  I think earlier when I had asked

2    you about what Schedule II drugs you -- you

3    distributed, you mentioned some of those, you also

4    mentioned, I think, morphine?

5      A.     Um-hum.

6      Q.     Okay.  Were there any others that --

7    Schedule II drugs that Walgreens distributed that you

8    don't see listed here in Matt's list?

9      A.     Yes.  Several.

10     Q.     Okay.  Which ones?

11     A.     Oh, I have -- I could in no way name those

12   off now.  There were probably ██ per bay and there

13   were probably ██ bays, so that would be ██ items.  I

14   don't recall what those all were.

15     Q.     Okay.

16     A.     These were some of them.  I mean, I

17   remember these, I remember OxyContin.

18     Q.     Okay.  Hydromorphone?

19     A.     Yes.  Adderall, we had some Adderalls.

20     Q.     So Matt goes on to say:

21            "It's common that stores order ██ plus and

22   sometimes even ██ plus SKUs."

23            That would mean bottles, right?

24     A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So:
 2              "It's common that stores order ▮ plus and
 3    sometimes even ▮ plus bottles of these though
 4    intentionally.  Last night for example, I think ▮
 5    plus stores had quantities above ▮bottles for some
 6    of these items.  If we called each of these stores to
 7    confirm (assuming the pharmacy manager was actually
 8    available this late), it would take us hours before we
 9    could run OP/OF."
10              Do you see that?
11        A.    Uh-huh, uh-huh.  Yes.
12        Q.    What -- what's "OP/OF"?
13        A.    Order pick/order fill.
14        Q.    Okay.  Pross -- it would -- saying it
15    would take hours before you could process the orders?
16        A.    Right.
17        Q.    "Most of these stores with huge orders
18    just get short with us and tell us that they are pain
19    clinics and that any future orders this high are okay
20    and not to call again."
21              Correct?
22        A.    That's what it says, yeah.
23        Q.    Okay.  And so those orders where they are
24    saying that there is pain clinics, the order that's
```

Highly Confidential - Subject to Further Confidentiality Review

1    that high is okay and don't call again, those orders

2    are getting filled, correct?

3        A.    Unless there is anything that stood out as

4    being human -- you know, way over what we would expect

5    to pick for that item for any store, as I said before.

6        Q.    Okay.

7        A.    So...

8        Q.    But what Matt is telling you is that when

9    they would call these stores they would call and be

10   told that they were pain clinics, that orders that

11   high were okay, and that you shouldn't call again?

12       A.    That's what it says, yeah.

13       Q.    Okay.  And did Matt stop those orders

14   and -- and prevent them from going through?

15       MS. SWIFT:  Objection; foundation.

16   BY THE WITNESS:

17       A.    I don't know if he did or not.  I'm not

18   sure I'd know if he did or not.

19   BY MR. GADDY:

20       Q.    Do you ever recall getting a report from

21   Matt that he had called a store and told, We have a

22   pain clinic, orders this high are okay and don't call

23   again and you directed him to not fill the order?

24       A.    Well, I never got a report from Matt.  All

Highly Confidential - Subject to Further Confidentiality Review

1    I got was a phone call, generally, and, no, I don't --

2    I would have not told Matt to hold an order.  If there

3    was an order that needed held, I would have held it.

4    I wouldn't have needed to call him, you know what I

5    mean.

6         Q.    Okay.  After receiving information from

7    Matt --

8         A.    Uh-huh.

9         Q.    -- did you ever tell him to hold and not

10   ship an order for a reason such as this, a store says

11   that there is a pain clinic, that orders that high are

12   okay, and to stop calling?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    Not that I recall.

16   BY MR. GADDY:

17        Q.    Outside of this e-mail right here, do you

18   ever recall Matt telling you that he would be told

19   from time to time that these high orders are because

20   of pain clinics and that orders that high are okay and

21   to stop calling?

22        A.    Aside from the e-mail?

23        Q.    Aside from this e-mail right here --

24        A.    Yeah.

1     Q.     -- and this e-mail in May of 2012.

2     A.     I remember he and I discussing how to tell

3    what quantities to use, but aside from this e-mail

4    about the pain clinics and what he was told, this is

5    the only -- I mean, I see that I got this e-mail.  It

6    makes sense, but I don't have -- remember having other

7    conversations with him.

8     Q.     Okay.

9            Did you ever tell him to stop an order

10   because the justification from the store for the

11   orders was pain clinics?

12    A.     No.

13    MS. SWIFT:  Object to the form.

14   BY MR. GADDY:

15    Q.     Matt in the computer room is then asking,

16   and I think the e-mail was to you and Lori Fenimore,

17   your C-II SAIL, correct?

18    A.     Correct.

19    Q.     He says:

20           "Can you guys give us some real, updated

21   guidelines on the drugs that are going to be an issue

22   if the DEA audits us?  Do you have a list of pain

23   clinics where it would be acceptable to go above the

24   normal quantity for these items?  Did I leave any

Highly Confidential - Subject to Further Confidentiality Review

```
1     items out of the list that are important to check?"

2            Do you see that?

3     A.    Yeah.

4     Q.    Okay.

5     A.    I see that.

6     Q.    So -- so here in -- in May of 2012 it

7     looks like Matt's aware of the DEA investigation going

8     on in Jupiter, right?

9            MS. SWIFT:  Object to the form.

10    BY THE WITNESS:

11    A.    Well, I don't -- does he say that?

12    BY MR. GADDY:

13    Q.    Well, he says --

14    A.    Oh --

15    Q.    -- "with what's happening in Jupiter."

16    A.    -- "with what's happening in Jupiter."

17           So he is aware something is happening in

18    Jupiter.  I don't know what he is aware of.

19    Q.    Okay.  Well, in the last paragraph he

20    is -- he is wondering about what happens if the DEA

21    audits Perrysburg, right?

22    A.    He is looking for updated guidelines on

23    the drugs that are going to be an issue if the DEA

24    audits us, that's what it says.
```

1    Q.    Okay.  So it looks like he is aware that

2    something is happening in Jupiter?

3    A.    Um-hum.

4    Q.    And he is questioning what number of

5    bottles should be of interest to him and his team for

6    these particular drugs, correct?

7    A.    Correct.

8    Q.    And he only lists four individuals drugs

9    and specific dosage or strength levels for three of

10   those drugs, correct?

11   A.    Correct.

12   Q.    Okay.  And it looks like he is also asking

13   you about pain clinics and whether or not that's a

14   justification to ship higher quantities of pills?

15   MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17   A.    Okay.  I -- I don't see him asking me if

18   that's justification.  He is just stating that that's

19   what they are telling him, right?  That's what I'm

20   reading.

21   BY MR. GADDY:

22   Q.    Well, in the last, second-to-the-last

23   sentence, he says:

24                "Do you have a list of pain clinics where

1    it would be acceptable to bow" -- "to go above the

2    normal quantity for these items?"

3         A.    Okay.

4         Q.    Do you see that?

5         A.    Yeah.

6         Q.    Did you have anything to give him there?

7         A.    No.

8         Q.    Okay.  Had anybody from corporate given

9    you a list of pain clinics that were approved?

10        A.    No.

11        Q.    Had anybody from -- from corporate given

12   you any information that could help you answer Matt's

13   question as it related to -- to high orders of pills

14   due to pain clinics?

15        MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17        A.    Not that I recall, no.

18   BY MR. GADDY:

19        Q.    Do you know why -- why Matt and the

20   computer room were only checking for the 5-milligram

21   oxycodone pills?

22        A.    No.

23        Q.    When you saw that Matt and his team were

24   only checking for excessive orders of the 5-milligram

Highly Confidential - Subject to Further Confidentiality Review

```
1    oxycodone pills --

2         A.    Uh-huh.

3         Q.    -- would that have caused you concern?

4         A.    No, because, again, I thought we had a

5    program in place that would automatically cut orders

6    down and if something did get through, we would catch

7    it, just by it being excessive --

8         Q.    Okay.

9         A.    -- in and of itself, regardless of the

10   store or where it was.

11        Q.    But if Matt in the computer room isn't

12   running checks for the 10-milligram pills, the

13   15-milligrams --

14        A.    Uh-huh.

15        Q.    -- the -- the 20-milligrams --

16        A.    Uh-huh.

17        Q.    -- I think the 8 -- the 80-milligram

18   OxyContins --

19        A.    Uh-huh.

20        Q.    -- that would be a hole in -- in -- in the

21   process, right?

22        MS. SWIFT:  Objection; assumes facts not in

23   evidence and calls for a hypothetical.

24   BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Well, I don't think so because, again, it

2   wasn't his query that was causing orders to be cut.

3   It was whatever they were doing -- whatever the system

4   was doing is what was supposed to be cutting them down

5   and that we were supposed to catch anything that came

6   through in spite of that.

7   BY MR. GADDY:

8        Q.    Right.

9             And I'm asking about the second part of

10  that process, the -- when you say you catch anything

11  that comes through.

12       A.    Oh, oh, I see what you are saying.

13       Q.    Okay?  And what Matt is telling you here

14  is that he runs that report for the oxycodone

15  5-milligrams, right?

16       A.    Right.

17       Q.    Okay.  So if he is not running that report

18  for the 10-milligrams or the 20-milligrams or the

19  15-milligrams or the 80-milligram pills, that would be

20  a problem, right?

21       MS. SWIFT:  Objection; hypothetical.

22  BY THE WITNESS:

23       A.    It shouldn't be because we would -- we

24  didn't -- when we caught big orders, we didn't say,
```

1    Oh, it's -- it's for not -- it's for oxycodone, we

2    have to address it, it is for Adderall, we don't have

3    to address it.

4             Any item that was excessive in quantity we

5    would call the store.  Whether he told me, you know

6    what I mean, or I'm just -- I probably shouldn't say

7    that.  It didn't matter what item it was in

8    particular, if it was a higher than what we would

9    expect quantity for any store, we would call the

10   store, not just for these four items, for any item we

11   picked.

12   BY MR. GADDY:

13       Q.    Okay.  But you got your information about

14   who to call a store, of which stores to call from Matt

15   in the computer room, right?

16       MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18       A.    Not -- no, not -- not in itself.  He

19   would -- he would call me if he couldn't get ahold of

20   a store, but the stores that had high orders had

21   nothing -- Matt had nothing -- was not involved in

22   those.  It was the pickers that would come to me and

23   say, This store wants 100 of this, that's bizarre,

24   call them, and I would.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GADDY:

 2        Q.    Okay.  Well, and tell me if I'm wrong, but

 3   I thought you told me that you would get information

 4   from the computer room, notification -- notifications

 5   from the computer room, and also notifications from

 6   the pickers?

 7        A.    Correct.

 8        Q.    Okay.  Okay.

 9              So if Matt is only running his report for

10   that one particular strength of oxycodone --

11        A.    Uh-huh.

12        Q.    -- you would have to rely on the pickers

13   to give you any notifications about excessive orders

14   of the other strengths of the oxycodone, correct?

15        MS. SWIFT:  Objection; hypothetical, asked and

16   answered several times.

17   BY THE WITNESS:

18        A.    Yeah, I would rely on the pickers, um-hum.

19   BY MR. GADDY:

20        Q.    Okay.

21              Okay.  It looks like you respond to Matt

22   the same day.

23              Do you see that?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    You say:  "Matt:  This has been an issue

2    for us as well."

3              What did you mean by that?

4        MS. SWIFT:  Objection; calls for speculation.

5    BY THE WITNESS:

6        A.    I mean that we also noticed the orders

7    getting bigger.

8    BY MR. GADDY:

9        Q.    Okay.  It says:

10             "To your point, Walgreens is so diverse

11   now, it is common for some stores to" -- "to order and

12   dispense 80 or 100 bottles of one of the items below."

13             Do you see that?

14       A.    Yes.

15       Q.    It says:

16             "For others, that would be outrageous.  We

17   have no way of knowing."

18             Do you see that?

19       A.    Yes.

20       Q.    You had no way of knowing whether or not

21   any particular orders were justified for any

22   particular store, is that correct?

23       MS. SWIFT:  Object to the form.

24   BY THE WITNESS:
```

```
 1      A.     Any particular quantity of an item on the

 2  order?

 3  BY MR. GADDY:

 4      Q.     Correct.

 5      A.     Oh, okay.

 6             All we could do is call the store if it

 7  looked like it was too big.

 8      Q.     And if the store told you that that's what

 9  they wanted, then you would send the order?

10      A.     I would use --

11      MS. SWIFT:  Objection; mischaracterizes the

12  testimony.

13  BY THE WITNESS:

14      A.     I would generally call Barb Martin first.

15  BY MR. GADDY:

16      Q.     Okay.

17      A.     Whatever her title was.

18      Q.     And you recall calling Barb Martin one

19  time and she told you to fill the order?

20      MS. SWIFT:  Objection, mischaracterizes the

21  testimony.

22  BY THE WITNESS:

23      A.     I remember calling Barb Martin one time in

24  particular, but I called her many times over the eight
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    years, I didn't call her one time over the eight-year

 2    period.

 3    BY MR. GADDY:

 4         Q.    Okay.  You don't ever recall Bob -- Barb

 5    Martin telling you to not fill an order?

 6         A.    I do not recall that, no.

 7         Q.    Okay.  But -- but this is an accurate

 8    statement, that last sentence in that paragraph:

 9              "We," I assume you mean the distribution

10    center, or -- or you and Lori?  Who do you mean there

11    when you say:  "We have no way of knowing"?

12         MS. SWIFT:  Object to the form.

13    BY THE WITNESS:

14         A.    Oh, that means we, the C-II department, is

15    what I would have meant.

16    BY MR. GADDY:

17         Q.    Okay.  You and the C-II department had no

18    idea what happens to the pills after they go on the

19    truck, is that fair?

20         MS. SWIFT:  Object to the form.

21    BY THE WITNESS:

22         A.    No, that's not fair.

23    BY MR. GADDY:

24         Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Well, after they go on the truck, they

 2   would go to the pharmacy at the store.

 3      Q.    Are they still under your control when

 4   they get on the truck after they are on the truck?

 5      A.    No.

 6      Q.    Okay.  After the order goes to the store,

 7   do you do any -- any follow-up with the store or the

 8   pharmacy?

 9      A.    No.

10      Q.    Okay.

11      A.    They may call me and say I didn't get what

12   I ordered or I got, you know, something I didn't

13   order, something like that, but I didn't call them.

14      Q.    Okay.  And what you say in the second

15   sentence is, at this point in time, it is common for

16   stores to order and dispense 80 or 100 bottles of

17   these Schedule II controlled substances, correct?

18      A.    Correct.

19      Q.    That's not something that you are raising

20   any issue about, is that fair?

21      MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23      A.    Well, for some stores it is common.  There

24   were -- we did get to a point where there were certain
```

1    store numbers that we knew had big orders and those

2    were the ones I would call Barb about and find out are

3    they in a hospital, are they in a -- across the street

4    from a pain clinic or whatever, you know, those I

5    would call on.  But the majority of the stores did not

6    order quantities in the hundreds of bottles of a --

7    any item at one -- in one order.

8    BY MR. GADDY:

9         Q.    Okay.  Did you keep a list anywhere of

10   these stores that -- that were -- where you say it was

11   common for those stores to -- to order ■ to

12   ■ bottles of these items?

13        A.    Not a written list, no.

14        Q.    Okay.  I mean, you wouldn't want to keep

15   calling Barb about the same Walgreens that's located

16   in a hospital, right?

17        A.    Right.

18        Q.    So if -- if Store 01234 was in a hospital,

19   you'd want to know that so that when you saw the high

20   orders coming in you could just push those through,

21   correct?

22        A.    Correct.

23        MS. SWIFT:  Object to form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Correct.

2   BY MR. GADDY:

3        Q.    Did you have any -- any type of list like

4   that or did you have it in your memory a certain

5   number of stores?

6        A.    It was in my memory.  It wasn't a written

7   list.

8        Q.    Okay.  Well, what you say is that:

9             "It is common for some stores to order and

10  dispense ██ to ██ bottles of the items.  For others,

11  that would be outrageous.  We have no way of knowing."

12            Correct?

13       A.    Correct.

14       Q.    You then go on to say:

15            "Therefore, I consulted Barb Martin, Rx

16  pharmacy manager at corporate."

17            Correct?

18       A.    Correct.

19       Q.    That's consistent with what you told us,

20  that if you had a question you would call Barb, right?

21       A.    Yes.

22       Q.    And it says:

23            "Her direction was to simp" -- "was simply

24  to not order for the stores via fax or phone."
```

Highly Confidential - Subject to Further Confidentiality Review

1        Do you recall her telling you that?

2        A.    I don't remember her telling me that, but

3    I wrote that, so she must have.

4        Q.    Okay.  You then go on to say:

5        "The large quantities are okay to ship so

6    long as they are system generated" --

7        A.    Uh-huh.

8        Q.    -- "and the store did not circumvent the

9    store ordering system."

10       A.    Correct.

11       Q.    Do you see that?

12       A.    Yes.

13       Q.    So Barb has told you that the large

14   quantities are good to go, correct?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    She has told me that we don't have to hold

18   those or question those as long as they have been

19   system generated because of the program that will

20   automatically look at their history, their order

21   history and their location and whether they are in a

22   hospital, and all of the things that I don't have

23   access to, before it drops the order.

24   BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  And so this is May 2012, right?

 2        A.    Yes.

 3        Q.    Okay.  And she is telling you the large

 4   quantities are -- are good to go as long as the store

 5   didn't manipulate the system?

 6        A.    Right, as long as it came through the

 7   system, yeah.

 8        Q.    It says this was at the direction of her

 9   director.

10              Do you see that?

11        A.    Yes.

12        Q.    Who was her director?

13        A.    I don't remember.

14        Q.    If you go down to the next paragraph, it

15   says:

16              "Frankly, I was not aware that somebody

17   gave you a number of 35, as we have hundreds of stores

18   that exceed that."

19              Do you see that?

20        A.    I see that.

21        Q.    Fair to say that it had not been your

22   practice to call any store that placed an order of

23   more than 35 bottles for a C-II?

24        MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    That would be correct.

 3   BY MR. GADDY:

 4        Q.    It says:

 5             "We try to catch the outrageous ones

 6   during the pick and audit process so I have no problem

 7   with you only trying to catch the triple digit orders

 8   on any item."

 9             And you -- and you underlined that phrase,

10   right?

11        A.    Right.

12        Q.    Okay.  So it looks like there you are kind

13   of setting the magic number at -- at 100 is what you

14   are interested in -- in Matt and the computer room

15   folks looking at?

16        MS. SWIFT:  Objection to form.

17   BY THE WITNESS:

18        A.    That was just my suggestion.  I wasn't

19   setting anything, but that was my suggestion.  Yeah.

20   BY MR. GADDY:

21        Q.    And -- and to be fair to you, you are not

22   trying to write a policy in this e-mail, right?

23        A.    Right.  Right.

24        Q.    You are just giving him some anecdotal
```

Highly Confidential - Subject to Further Confidentiality Review

1    suggestions about what to be on the lookout for?

2        A.    Right.

3        Q.    Was there any written policy or procedure

4    within Walgreens that -- that told you what the --

5    what the magic trigger number should be?

6        MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8        A.    The computer room supposedly had a number

9    and apparently it was 35.  We did not.  We were not

10   given a number.

11   BY MR. GADDY:

12       Q.    Okay.

13             Do you have in -- is it your impression

14   even -- and I -- I saw how Matt said that there was

15   this 35 number in his first e-mail, but here you are

16   saying that there's hundreds of stores that exceed

17   that, right?

18       A.    Yes.

19       Q.    You agree that -- that leading up to this

20   May 2012, Matt wasn't actually calling all of these

21   hundreds of stores every day for anything over 35?

22       MS. SWIFT:  Objection; foundation.

23   BY THE WITNESS:

24       A.    I don't know.  I have to read it again.

Highly Confidential – Subject to Further Confidentiality Review

1    Is that what he said?

2              Well, it doesn't really -- it doesn't seem

3    very clear to me whether they did at that point or

4    not.  It just said if we called the stores it would

5    take hours.  I don't see anywhere where he says we are

6    not calling the stores or we are calling the stores

7    for that quantity.

8    BY MR. GADDY:

9         Q.    Did you have an understanding of whether

10   or not he was calling hundreds of stores every day?

11        A.    I did not have any understanding of who he

12   was calling.  I knew he had been given a number and he

13   was running a report and calling stores.  I -- that

14   was as far as it went with me.

15        Q.    Do you think he was calling hundreds of

16   stores every day?

17        MS. SWIFT:  Objection; foundation.

18   BY THE WITNESS:

19        A.    I have no idea.

20   BY MR. GADDY:

21        Q.    You then say:

22              "The items listed below," and I am back on

23   your e-mail.  It says:  "The items listed below have

24   no significance."

1          Do you see that?

2     A.    Correct.

3     Q.    What do you mean by that?

4     A.    Meaning I didn't know why he had a list of

5  those four items versus all items.  I didn't know what

6  significance those particular four items had.

7     Q.    At any time while you were with Walgreens,

8  were -- were you provided any training or education by

9  anybody with Walgreens on what types of drugs were

10  most commonly abused?

11     A.    I probably had phone conversations about

12  that, but no written --

13     Q.    Okay.

14     A.    -- information.

15     Q.    What do you -- who would you have had

16  co -- phone conversations with about that?

17     A.    The other DCs, perhaps, or Barb or whoever

18  I would just be conversing with about, you know,

19  orders, or...

20     Q.    Okay.

21          Are -- are these instructional

22  conversations or anecdotal conversations?  I mean,

23  give me a little context if you could, please.

24     A.    I really -- I really can't recall the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   context of any conversation to tell you if they are

 2   anecdotal -- anecdote -- whatever that word is that I

 3   can't say.  Anecdote -- say it again.

 4        Q.    Anecdotal?

 5        A.    Anecdotal or --

 6        Q.    It is like me trying to say algorithm.

 7        A.    Yeah.  I don't remember.

 8        MS. SWIFT:  You said it very nicely.

 9        MR. GADDY:  I did, didn't I?

10   BY THE WITNESS:

11        A.    Yeah.

12              Sorry.  I can't remember.

13   BY MR. GADDY:

14        Q.    Let me ask it this way:

15              Were you ever giving -- given any

16   instruction or attended any -- sent to any classroom

17   session or attend any -- any type of -- of PowerPoint

18   presentation or anything like that where you were

19   told, for example, OxyContin is being very highly

20   abused and pills are being crushed and people are

21   injecting the pills, anything -- and -- and that's

22   just one specific example, but --

23        A.    Right.

24        Q.    -- at any time while you were with
```

```
 1   Walgreens did -- did anybody with the company provide

 2   to you any education or training on C-IIs being

 3   abused?

 4        MS. SWIFT:  Object to the form.

 5   BY THE WITNESS:

 6        A.    No.  I think that was just known by

 7   society in general.

 8   BY MR. GADDY:

 9        Q.    Okay.  You knew that from media reports

10   and --

11        A.    20/20, Dateline.

12        Q.    Okay.

13        A.    Yeah.

14        MS. SWIFT:  Let him finish his question.

15        THE WITNESS:  Oh, I thought he was done.

16   BY MR. GADDY:

17        Q.    So when you say:  "The items listed below

18   have no significance," you're just saying there is

19   nothing special about those pills and those strengths?

20        A.    Correct.

21        Q.    Okay.

22              You would -- I assume you would agree that

23   it would be just as important to look for high orders

24   of the 80-milligram oxycodone pills as it would the
```

```
 1   5-milligrams?

 2        A.    I would agree.

 3        Q.    Okay.  You would agree that it would be

 4   just as important to look for excessive orders of

 5   the 10s, the 15s, the 20s, all of those other

 6   strengths of oxycodone, correct?

 7        A.    Correct.

 8        Q.    You go on to say:

 9              "What we try to do is catch the stores

10   orders in which the" -- is that pharmacy manager?

11        A.    Yes.

12        Q.    -- "did not review and someone ordered

13   pills" -- "ordered by pills rather than bottles."

14              Do you see that?

15        A.    Yes.

16        Q.    And you say:

17              "For instance, today we received an order

18   for 101 bottles of an item.  The store wanted one."

19              Correct?

20        A.    Correct.

21        Q.    And, again, that's consistent with what we

22   spent a lot of time this morning talking about, that

23   you were looking for these ordering inaccuracies or

24   ordering errors, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    You then say:

 3              "It is Justin's call if he wants to have

 4    you only screen the triple digit ones.  You can't

 5    possibly be calling all the stores with orders over

 6    35."

 7              Correct?

 8        A.    Correct.

 9        Q.    So whether Matt and his folks were calling

10    those stores or not, your guidance is for him to not

11    do that?

12        A.    My guidance was I don't know how you could

13    do that.

14        Q.    Okay.  And -- and I -- and your guidance

15    is triple digit orders?

16        A.    Yeah, that was doing -- my solution.  He

17    and I were trying to figure out, I think, what -- what

18    was the right thing to do and that was my suggestion.

19        Q.    And -- and that suggestion was reasonable

20    because, A, it was common for stores to order and

21    dispense 80 to 100 bottles of those items.

22        A.    Uh-huh.

23        Q.    And, B, because Barb Martin had told you

24    the big items were -- were okay to ship as long as the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   stores didn't manipulate the system?

 2      A.   The system, yep.

 3      Q.   I'm going to show you a later e-mail on

 4   this same topic.  This is going to be Exhibit No. 12,

 5   P-WAG 255.

 6                 (WHEREUPON, a certain document was

 7                  marked Walgreens - Bish Deposition

 8                  Exhibit No. 12, for identification,

 9                  as of 02/01/2019.)

10   BY MR. GADDY:

11      Q.   And if you flip to the second page to

12   where we start this chain, it starts with an e-mail

13   that -- that I'm not able to read from Sharon Horkott.

14           Do you know who that is?

15      A.   It doesn't ring a bell.

16      Q.   Okay.  And let me ask you about several

17   folks on the -- on the "to" line there.  The first one

18   is Dwayne Pinon.

19           Do you know who that is?

20      A.   Yes.  He was a lawyer, I believe.

21      Q.   Okay.

22           Have you had the opportunity to have any

23   professional interaction with -- with Mr. Pinon

24   through the course of your job duties?
```

```
 1        MS. SWIFT:  That's just a yes-or-no question.

 2   BY THE WITNESS:

 3        A.    I have no idea.  I don't recall.

 4   BY MR. GADDY:

 5        Q.    Okay.

 6              Do you -- has there ever been a situation

 7   where you've needed to call Mr. Pinon and ask him

 8   questions about anything that you are doing at the

 9   distribution center?

10        MS. SWIFT:  And, again, just answer yes or no.

11   BY THE WITNESS:

12        A.    No.

13   BY MR. GADDY:

14        Q.    The next person listed there is

15   Kristine Atwell.

16        A.    Yes.

17        Q.    Do you know who that is?

18        A.    Yes.

19        Q.    Who is Ms. Atwell?

20        A.    She was the C-II function manager at

21   Jupiter.

22        Q.    Okay.  Was -- as far as you know, was she

23   the only one there -- the -- let me put that in a

24   better way.
```

```
 1              So you were the only C-II function manager

 2    over the life of C-II distribution at Perrysburg,

 3    right?

 4         A.    Right.

 5         Q.    Would -- same with Kristine at -- in

 6    Jupiter?

 7         MS. SWIFT:  Objection; foundation.

 8    BY THE WITNESS:

 9         A.    I don't know.  There could have been

10    someone before her.  I don't know.

11    BY MR. GADDY:

12         Q.    Okay.

13         A.    She was the one when I went there to

14    train, so...

15         Q.    Okay.  Okay.

16              So when you started, I think the date on

17    the LinkedIn was 2006, you would have gone and met

18    with Kristine to train?

19         A.    Right.

20         Q.    Okay.  So was she the one that trained

21    you?

22         A.    Yes.

23         Q.    Who was the C-II function manager for

24    Woodland's?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That did change.  Initially the first time
 2   I went out it was Phil someone.  I don't remember his
 3   last name.  He quit shortly after I went out.  And
 4   when I went back the second time it was Dave someone.
 5   I don't remember his last name either.
 6        Q.    Okay.
 7              Were there -- did -- the function
 8   managers, you, Kristine, Phil and/or Dave, did you all
 9   ever have regular meetings where you all would get
10   together and talk about issues common to your
11   position?
12        A.    No.
13        Q.    Did you ever get together with anybody
14   in -- in a -- in a meeting or update setting from
15   folks that worked at different distribution centers to
16   kind of talk about common issues for the distribution
17   centers?
18        A.    Did I?
19        Q.    Were you ever involved in any of that?
20        A.    No.
21        Q.    Okay.
22              Okay.  Well, regardless, do you see the
23   subject line of that e-mail is:  "Suspicious drug
24   process"?
```

1      A.      Um-hum.

2      Q.      And if you look above, it looks like Steve

3  Kneller forwards that e-mail around to some people,

4  correct?

5      A.      Correct.

6      Q.      And Steve, I think you said, was the

7  distribution center manager at Perrysburg?

8      A.      He was during some timeframe, although I

9  don't know which years.  He started as ops manager,

10  then he became manager.

11      Q.      Okay.

12      A.      Yeah.

13      Q.      And it looks like it went to Matt in the

14  computer room, Jen Diebert, who was the SAIL for C-III

15  through Vs, and Tammy Trumbull, who was the admin

16  manager, correct?

17      A.      Correct.

18      Q.      Would you have been on -- on this group

19  e-mail, it looks like it is --

20      A.      I am not on the DCM-MO-IO group --

21      Q.      Okay.

22      A.      -- if that's what you are asking.

23      Q.      And Steve asked these people:  "Are we

24  cool with this?"

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    All right.  If we go up, flip the page, do

4  you see Matt's response?  And it looks like he brought

5  you into the mix, he copied you?

6     A.    Yes.

7     Q.    And he says:

8          "I have some questions."  He says:

9  "Excessive to us for C-II is any item over

10  100 bottles."

11          Correct?

12     A.    Correct.

13     Q.    And that's con -- and -- and if you look

14  at the date of this e-mail, this is May 29th of 2012,

15  right?

16     A.    Right.

17     Q.    So this is a couple of weeks after you've

18  told him that you would look at triple digits as

19  opposed to the 35 that he had been using, right?

20     A.    Right.

21     Q.    Okay.  So it looks like he accepted that

22  number.

23     A.    Well, yeah, it does look that way.

24     Q.    Okay.  It says:

Highly Confidential - Subject to Further Confidentiality Review

1          "Excessive to us for C-II is any item over

2    100 bottles.  Is this acceptable?  Do we need to

3    change the threshold at which we call for C-II

4    overages?  If we go much lower, we're going to need

5    significantly more time to run C-II as calling each

6    store takes about five minutes."

7          Did you see that?

8     A.    Yes.

9     Q.    So at least at this point, late May

10   of 2012, the magic number or trigger number that was

11   being used for C-IIs at Perrysburg was 100 bottles of

12   a controlled substance, correct?

13      MS. SWIFT:  Objection; foundation.

14   BY THE WITNESS:

15      A.    It looks like that's what he is asking if

16   we should use.

17   BY MR. GADDY:

18      Q.    Well, he says that that's what they use

19   and he is asking whether or not that's okay, right?

20      A.    Right.

21      Q.    Okay.  So at this point in time, according

22   to Matt, who I think you told us is the one that's

23   running this, this initial query --

24      A.    Right.

1      Q.      -- anything at 100 bottles or below would

2   not pique their interest as far as a follow-up call to

3   a pharmacy, correct?

4      MS. SWIFT:  Objection; foundation.

5   BY THE WITNESS:

6      A.    I really can't tell.  From this verbiage

7   on here, I can't tell if he is already doing that or

8   if he is asking if it's okay to do that.  So I don't

9   know how I could answer that.

10  BY MR. GADDY:

11     Q.    Okay.

12           Well, he says:  "Excessive to us for C-II

13  is any item over 100 bottles," right?

14     A.    I see that, um-hum.

15     Q.    Okay.

16     A.    And then he says:  "Is this acceptable?"

17  So I don't know if he is doing that.

18     Q.    And then he says:

19           "Do we need to change the threshold at

20  which we call for C-II overages," right?

21     A.    Yes.

22     Q.    Okay.  So he is asking whether or not it

23  can stay where it is or whether or not it needs to be

24  changed?

Highly Confidential – Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Objection; asked and answered, lacks

 2   foundation.

 3   BY THE WITNESS:

 4        A.    Well, he is definitely questioning what

 5   should be the number.  I see that.

 6   BY MR. GADDY:

 7        Q.    Okay.  He goes on to say:

 8              "Oftentimes, no one at the pharmacy can

 9   make the decision to change the order.  Do we just

10   leave it and e-mail Linda for being suspicious or make

11   it 100 bottles and log it?"

12              Do you see that?

13        A.    Yes.

14        Q.    It says:

15              "Currently we drop it to 100 bottles if we

16   can't get a real answer from anyone."

17              Do you see that?

18        A.    Yes.

19        Q.    Do you understand that to mean that if --

20   that if he can't get somebody to say, Yes, we really

21   need 120 or whatever the -- the -- the larger order

22   is, that he just drops it to 100 and sends that?

23        MS. SWIFT:  Objection; foundation.

24   BY THE WITNESS:
```

```
1       A.    Well, it kind of -- it's -- the document
2   looks like that's what he is saying, but he is asking,
3   Do we just leave it and e-mail Linda, et cetera, et
4   cetera.  And he is saying, Currently we drop it to
5   100.  But, again, I'm -- I don't work up there.  I'm
6   not real sure, but...
7   BY MR. GADDY:
8       Q.    What are the number of pills that these
9   C-II bottles contain?  I mean, I assume there is a
10  range, right?
11      A.    Generally a hundred, a hundred pills.
12      Q.    Okay.
13      A.    Um-hum.
14      Q.    So when he is talking about that he would
15  fill without making a phone call any item that's 100
16  or less, that's 100 -- an order for 100 bottles would
17  be, what, 10,000 pills?
18      MS. SWIFT:  Objection; mischaracterizes the
19  document.
20  BY THE WITNESS:
21      A.    If that's -- if he means that.  I call a
22  SKU a bottle of a hundred.  I don't know what he calls
23  it, but I would think the same.
24  BY MR. GADDY:
```

```
 1        Q.    Well, you don't think he means 100 pills,

 2   do you?  You don't think he is saying he calls for

 3   every order of more than one bottle?

 4        A.    No --

 5        MS. SWIFT:  Object to the form.

 6   BY THE WITNESS:

 7        A.    -- I don't think so.

 8   BY MR. GADDY:

 9        Q.    That wouldn't make any sense, would it?

10        A.    It would not, no.

11        Q.    I mean, in the last e-mail you -- you told

12   him it is common to have stores order 80 to

13   100 bottles?

14        A.    Right.

15        Q.    Okay.  And you are filling these orders

16   for over 5,000 stores a week, right?

17        A.    Correct.

18        MS. SWIFT:  Objection; form.

19   BY MR. GADDY:

20        Q.    And according to this policy that Matt

21   is -- or -- or I should say practice that Matt is

22   saying is in place at this time, shipping 10,000 pills

23   of Schedule II controlled substances is something that

24   would happen without any follow-up activity to that
```

Highly Confidential - Subject to Further Confidentiality Review

1    particular store?

2        MS. SWIFT:  Objection; mischaracterizes the

3    document and lacks foundation.

4    BY THE WITNESS:

5        A.    I wished I knew what Matt was -- I wish I

6    was in Matt's head.  If he is saying they currently

7    drop it down to 100 SKUs if they can't get an answer,

8    then that must -- that would be 10,000, if they

9    were -- if they were bottles of a hundred, depending

10   on what the item was, but...

11   BY MR. GADDY:

12       Q.    Okay.  So if -- even if they order more

13   pills, according to this e-mail from Matt, they'll

14   just send them 10,000 pills?

15       MS. SWIFT:  Same objections, lacks foundation.

16   BY THE WITNESS:

17       A.    It sounds like what he is -- that's what

18   he is trying to establish in this e-mail is what does

19   he do if it's over a hundred.  And what he is saying

20   is that currently they drop it down to a hundred SKUs.

21   So that's what the document says.

22   BY MR. GADDY:

23       Q.    Okay.  All right.  I want to switch topics

24   a little bit here and ask you some more questions

Highly Confidential - Subject to Further Confidentiality Review

1    about some -- some of the suspicious order reports.

2        A.    Can I take a quick restroom break?

3        Q.    Absolutely.

4        A.    Okay.  Just --

5        Q.    Whenever you want.

6        A.    -- five seconds is all I need.

7        THE VIDEOGRAPHER:  We are going off the record

8    at 11:07.

9                (WHEREUPON, a recess was had

10                from 11:07 to 11:19 a.m.)

11        THE VIDEOGRAPHER:  We are back on the record at

12    11:19.

13    BY MR. GADDY:

14        Q.    Okay.  Ms. Bish, I'm going to switch

15    topics a little bit and ask you a little bit more

16    about the suspicious order program and the suspicious

17    order reports and see if -- see if anything that I say

18    or show you jogs your memory about anything that

19    you --

20        A.    Okay.

21        Q.    -- knew about or -- or were told at your

22    time at Walgreens.

23            To put some of these documents in context,

24    my memory is that we've agreed after looking at your

```
 1    LinkedIn profile that it was early 2006 that you began

 2    the process of bringing the C-II distribution onboard

 3    at Perrysburg, is that fair?

 4         MS. SWIFT:  Objection; mischaracterizes the

 5    testimony and the document.

 6    BY THE WITNESS:

 7         A.    I think that's what it said.

 8    BY MR. GADDY:

 9         Q.    Did you have a chance to look back at

10    that?

11         A.    Well, it says October of 2002, let's

12    see -- oh, yeah, 2006, there it is, yeah.

13         Q.    Okay.  And tell me if I'm wrong, but I

14    think you said that you believed you all started

15    distributing product in March or April of 2006 after

16    going through some training at some of the other

17    distribution centers?

18         MS. SWIFT:  Objection; mischaracterizes the

19    testimony.

20    BY THE WITNESS:

21         A.    I didn't recall.  I was talking about the

22    regular DC when we opened and how we went out and

23    then -- is that what you are talking about?

24    BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I'm sorry.  So I got confused.

2            So it was in 2002 that you opened the

3      Perrysburg dis -- distribution center for products not

4      including C-IIs, correct?

5      A.    Correct, correct.

6      Q.    Okay.  And at some point in 2006 is when

7      the C-II distribution came online at Perrysburg?

8      A.    Right.

9      MS. SWIFT:  Objection; mischaracterizes the

10     testimony.

11     BY MR. GADDY:

12     Q.    I'm sorry, Ms. Bish.  I didn't get your

13     answer?

14     A.    Correct, it says:  "2006 - selected to

15     coordinate and manage startup of C-II vault," so...

16     Q.    Okay.  Do you remember what time of year

17     it was in 2006?

18     MS. SWIFT:  Objection; asked and answered.

19     BY THE WITNESS:

20     A.    I don't recall.

21     BY MR. GADDY:

22     Q.    Okay.  When you underwent the training for

23     the C-II --

24     A.    Uh-huh.

1      Q.     -- when you went to Woodland --

2      A.     Uh-huh.

3      Q.     -- for a week or two and then you went to

4  Jupiter for a week or two and then I think you went

5  back with your team?

6      A.     Right.

7      Q.     To both locations?

8      A.     Right.

9      Q.     Do you recall ever receiving any training

10  during those sessions regarding suspicious order

11  monitoring?

12      MS. SWIFT:  Objection; asked and answered.

13  BY THE WITNESS:

14      A.     I don't recall training specific to

15  suspicious order monitoring.  It was mainly, this is

16  what you do, you know, these are the forms you have to

17  fill out, if -- they explained the 106, how you filled

18  it out, you know, but I don't recall any specific to

19  that, no.

20  BY MR. GADDY:

21      Q.     Okay.  Let me show you what I will mark as

22  Exhibit 13.

23                  (WHEREUPON, a certain document was

24                    marked Walgreens - Bish Deposition

```
 1                    Exhibit No. 13, for identification,

 2                    as of 02/01/2019.)

 3    BY MR. GADDY:

 4         Q.    P-WAG 2422.

 5               And do you see this is a letter on DEA

 6    U.S. Department of Justice letterhead?

 7         A.    Yes.

 8         Q.    And it looks like the letter is stamped

 9    May 17, 2006?

10         A.    Yes.

11         Q.    And it is addressed to a Todd Polarolo?

12         A.    Polarolo, yeah.

13         Q.    Okay.  Thank you.

14               And who was that?

15         A.    He was the distribution manager at the

16    time.

17         Q.    Okay.  And this was in Perrysburg, Ohio?

18         A.    Yes.

19         Q.    Okay.  And -- okay.  So let's look at the

20    letter.  It says:

21               "During the month of March 2006, Diversion

22    Investigators Angela Francis and James Rafalski of the

23    DEA completed a regulatory investigation of your

24    firm."
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    It says:

4          "The regulatory investigation revealed

5    recordkeeping inadequacies and security deficiencies.

6    The discrepancies noted are as follows."

7          Do you see that?

8     A.    Yes.

9     Q.    Do you recall this DEA inspection in March

10   of 2006?

11    A.    I recall -- I don't recall -- they came to

12   our building in the middle of the night once.  I don't

13   know when that was.  And prior to that they had come

14   down, but I thought it was two women, I don't recall a

15   man, so I don't know which one they are talking, I

16   don't remember which year each one was.

17    Q.    Okay.  So you remember two different

18   occasions?

19    A.    Um-hum.

20    Q.    Fair?

21    A.    Um-hum.

22    Q.    You have to say yes or no.

23    A.    Yes.  Sorry.

24    Q.    Were you there for either of those two

1    occasions on the premises?

2         A.    I was there when they arrived during the

3    day.  When they came at ten o'clock at night, they

4    called me at home and I came in.

5         Q.    Okay.  Both times the DEA came on

6    Perrysburg property that you are aware of, were you

7    serving in the capacity of a C-II function manager?

8         A.    Yes.

9         Q.    Okay.  When the two occasions that you

10   recall DEA coming on property --

11        A.    Uh-huh.

12        Q.    -- while you were the C-II function

13   manager, did you have any interactions with the DEA?

14        A.    Yes.

15        Q.    Okay.  So let's start with the first one.

16              Was that the one at night or the one

17   during the day?

18        A.    I believe that was the one during the day.

19        Q.    Okay.  Did you know that they were coming

20   in advance?

21        A.    I -- I don't recall if I knew they were

22   coming or not.

23        Q.    Okay.  The time that they came -- the

24   second time they came, the one at night, did you know

1    in advance that they were going to be coming?

2         A.    No.

3         Q.    How many DEA agents came the first time

4    during the day?

5         A.    I really -- there were two that came back

6    to my office.  If there -- there could have been more

7    that stayed upfront.  I don't -- I don't know.  My --

8    my -- I'm in the ops cluster in -- halfway through the

9    building.  There may have been more that came in the

10   front door.  Two came back to my office.

11        Q.    Okay.  Describe for me just in your own

12   words how that happened, the DEA coming in to see you

13   at the Perrysburg distribution center.

14        A.    How it happened?

15        Q.    Just -- just walk me through it.  If you

16   were to -- to get home at the end of the day and one

17   of your family members asked you what happened, I

18   would imagine that would be noteworthy.  Walk me

19   through it like you would have one of your family

20   members as far as what happened when the DEA came into

21   the Perrysburg distribution center.

22        MS. SWIFT:  Object to form.

23   BY THE WITNESS:

24        A.    Well, to my memory, it wasn't anything

1    that seemed like a bad thing.  They came, they sat

2    across from my desk, they had asked to see some 1-0 --

3    in particular, 106 forms, which of course they get a

4    copy of them when we file it anyway, they had asked to

5    see our 222 forms, an example of those, so I just

6    pulled what they asked for.

7            I mean, and, again, I -- I recall it being

8    two women that were there.  In fact, I know it was the

9    two women were the ones in my office, one being this

10   Francis -- Angela Francis.

11       Q.    Okay.  So you know who that is?

12       A.    Um-hum.

13       Q.    How long were they there that -- on that

14   first occasion?

15       A.    I really don't remember, but I would think

16   at least half a day.

17       Q.    Okay.

18       A.    Four hours.

19       Q.    Okay.  Was it just the one day?

20       A.    To my recollection, it was just the one

21   day.

22       Q.    What did they do during the course of

23   those four hours?

24       A.    Asked to see just what I said, they would

Highly Confidential - Subject to Further Confidentiality Review

```
 1    say we need to see the 106 for Store ABC, you know,

 2    1234 filed on this date.  And I would go pull it and

 3    show it to them.  And then they wanted to see 222

 4    forms that had already been completed, they wanted to

 5    see some that had not been shipped yet, they would --

 6    you know, just examples of our paperwork.

 7         Q.    Okay.  And the four hours that they were

 8    there, approximately four hours, is -- is that a fair

 9    description of what they did for those four hours,

10    asked for different forms of documentation that you

11    would be expected to have on file?

12         A.    Yes.

13         Q.    Okay.  Anything other than them asking for

14    specific records or documentations during that first

15    visit?

16         A.    Not that I recall.

17         Q.    Did you have any -- strike that.

18               After you had that interaction with the

19    DEA, did you make a report about what had happened

20    to -- to anybody at Walgreens?

21         A.    No, not a written report, uhn-uhn.

22         Q.    Okay.  Did you report even verbally to

23    anybody at Walgreens about what had happened?

24         A.    I don't remember reporting verbally, but
```

Highly Confidential - Subject to Further Confidentiality Review

1    I'm sure I went to the manager and said, Well, you

2    know, here is what they asked for and this is what I

3    gave them.  I -- I don't recall that conversation, but

4    I'm sure I would have done that.

5         Q.    Did the -- do you recall them raising any

6    specific questions or concerns when they came in on

7    that first occasion?

8         A.    Not with me.

9         Q.    Okay.  Do you recall anybody else that

10   they met with during that first occasion?

11        A.    I -- I would have no way of knowing --

12        Q.    Okay.

13        A.    -- who they saw before me or after me.

14   I -- I didn't follow them, you know.  I don't know.

15        Q.    Was -- was somebody escorting them around

16   the -- the premises?  I mean, was -- was Tammy the

17   admin manager kind of in charge or do you recall?

18        A.    Someone must have walked them back,

19   otherwise they wouldn't have known where I was.  I --

20   and I don't recall who that was, who actually walked

21   them back to my office, I don't remember.

22        Q.    Okay.  Do you recall receiving any

23   feedback after the DEA had come on that first occasion

24   about their findings or conclusions about what they

Highly Confidential - Subject to Further Confidentiality Review

1    asked to see and what they looked at?

2        A.    The only thing I remember is, I think I

3    mentioned that already, is that we -- when we were

4    read -- when we was writing in the date items were

5    shipped on the 222 form, we had been writing the date

6    at the top and a straight line down.  And they said,

7    you know, we had to write the date on every line.

8    That's the only thing I remember that they brought --

9    that I heard about.

10       Q.    And that was feedback that you received

11   from the DEA after that first visit?

12       A.    Well, it didn't come from the DEA.  I

13   believe it came from -- internally from Todd or, you

14   know, someone internally.

15       Q.    Okay.  Did Todd have the same job that

16   Steve Kneller had?

17       A.    Todd was the manager and Steve was the ops

18   manager initially.  And then Todd was promoted and

19   Steve became manager.

20       Q.    Okay.  Tell me about the second occasion

21   that the DEA, that you are aware of that the DEA

22   visited the Perrysburg distribution center?

23       A.    That was the one they came and I, believe

24   it or not, remember the time because I had just gone

1   to bed.  It was like ten o'clock at night.  So I just

2   got dressed, went back in, and it was basically the

3   same thing, only this time there were a lot more of

4   them.  I do recall that there were several officers in

5   the front by the OP desk when I walked in.  There were

6   still only two that came back to my office and

7   specifically asked for, again, the same thing.  They

8   asked for forms, you know, can you show us this, we

9   want to see samples of that, and so that's what I gave

10  them.  I gave them what they asked for.

11       Q.    Okay.  When you say there were more that

12  time, approximately how many do you think there were?

13       A.    I probably saw four additional people, but

14  I -- that's what I saw when I walked in.  They could

15  have already gone over here or over there, so I don't

16  really -- I couldn't really say.

17       Q.    When you say "four additional," do you

18  mean four plus the two?

19       A.    Yes.

20       Q.    Okay.  So you saw six?

21       A.    Yes.

22       Q.    Any indication of why they came at

23  ten o'clock at night?

24       A.    I -- no.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    But regardless, you had to be called out
 2   of bed to go back in to the Walgreens distribution
 3   center to deal with the DEA?
 4        A.    They asked me to, yes.
 5        Q.    And approximately how long did you have to
 6   stay at the distribution center after being called out
 7   of bed?
 8        A.    I think it was about four in the morning,
 9   three or four in the morning.
10        Q.    Okay.  So you were there for several
11   hours?
12        A.    Yes, uh-huh.
13        Q.    Okay.  And what type of -- of documents
14   were they asking you to pull during this time?
15        A.    The same as the first time, the 106 forms,
16   the 222 forms.  I don't really recall anything aside
17   from those.  I mean, I'm sure they asked for other
18   things, but those are the only ones I remember.
19        Q.    Other than asking you for documents or
20   records, did they ask you any questions about your
21   practices?
22        A.    I don't remember if they did or not.
23        Q.    Okay.  Do you recall them talking to
24   anybody else on that occasion?
```

```
1       A.      Anybody else from the DEA?

2       Q.      I'm sorry.

3               Do you recall the DEA talking to anybody

4    else at the distribution center?

5       A.      They didn't talk to anyone else, not that

6    I know of, but they could have easily talked to anyone

7    that I wouldn't have been aware of.

8       Q.      Was it the same two female agents from the

9    first time that you spoke with?

10      A.      I only remember the -- I only remember

11   Angie being one of them.  I can't recall who the

12   second one was.

13      Q.      How often have you had the occasion to --

14   to interact with Angie?

15      A.      That would have been the second time.  She

16   was there the first time, too.

17      Q.      Okay.

18      A.      Yeah.

19      Q.      Other than those two times where -- where

20   Agent Angela Francis has come to the distribution

21   center, have you ever interacted with her?

22      A.      I have talked to her on the phone.

23      Q.      Okay.

24      A.      If that's what you call interaction, yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sure.

2          And in what context -- or let me ask you

3    this first:

4          How many times do you believe you've --

5    you've spoken with Investigator Francis?

6    A.    Probably just once or twice.  It wasn't

7    often.

8    Q.    Okay.  So add that to the two in-person

9    meetings and four plus --

10   A.    Three or four, uh-huh.

11   Q.    Okay.  In what context have you had

12   conversations over the phone with the DEA Investigator

13   Angela Francis?

14   A.    One time when we were picking a bottle of

15   pills, the lid wasn't on tight and when we picked it

16   they went flying.  So I knew how to handle damages,

17   you had to, you know, save all of the pills and go

18   through this process, but one of our team members

19   accidentally stepped on a couple of pills, so all I

20   had was a little pile of powder.  I didn't know if I

21   had to save that and scrape it up or if I could just

22   clean it up.  And so I had to call and ask her how do

23   I handle that, because I didn't know.  And I had

24   called the other C-IIs and they had never had that

1    happen, so I had to call her because I didn't know who

2    else to call.

3         Q.    Any other context in which you ever recall

4    reaching out to Investigator Francis?

5         A.    I remember -- I mean, I may have called

6    her another time, but I can't remember what for, so I

7    don't know.

8         Q.    Okay.  Safe to say you never reached out

9    to Angela Francis to notify her of excessive orders of

10   controlled substances?

11        A.    No.

12        Q.    Okay.  So if we go back to this May 17,

13   2006 letter from the DEA to Mr. Polarolo, did I say

14   that right?

15        A.    Pola -- it is a weird name, Polarolo.

16        Q.    Polarolo?

17        A.    Yeah.

18        Q.    Okay.

19              And it indicates there that Investigator

20   Francis and Investigator Rafalski -- excuse me -- of

21   the DEA did a regulatory investigation of Walgreens.

22              Do you see that?

23        A.    Correct, yes.

24        Q.    And just knowing, going through those two

Highly Confidential - Subject to Further Confidentiality Review

1    visits that the DEA made to Perrysburg that we just

2    talked about, do you remember whether one of those

3    would have been the 2006 timeframe or would those have

4    been after that or do you not know?

5        A.    I don't know.

6        Q.    Okay.  And it indicates that their

7    investigation revealed some recordkeeping inadequacies

8    and security deficiencies and then it lists them here.

9              Do you see that?

10       A.    Yes.

11       Q.    The very first one says:

12             "The formulation utilized by the firm for

13   reporting suspicious ordering of controlled substances

14   was insufficient."

15             Do you see that?

16       A.    Yes.

17       Q.    Okay.  And according to what I think we've

18   established from your LinkedIn, this would have been

19   in the time period that the C-II vault and C-II

20   distribution process at Perrysburg was coming online,

21   correct?

22       A.    It would appear to be, yes.

23       Q.    And the DEA is telling you that in this

24   time period Walgreens' formulation for reporting

```
 1    suspicious orders is insufficient, correct?

 2         MS. SWIFT:  Object to form.

 3    BY THE WITNESS:

 4         A.    Correct.

 5    BY MR. GADDY:

 6         Q.    Okay.  And you agree with me that -- that

 7    that's not a good thing, right?

 8         MS. SWIFT:  Object to the form.

 9    BY THE WITNESS:

10         A.    Well, it's saying that -- I haven't read

11    the rest of it yet, which I'd like to in a second, but

12    I had never heard this.

13    BY MR. GADDY:

14         Q.    And -- and -- and I'll let you read it as

15    much as you want to read, my question is just simply

16    directed to that first sentence of Paragraph 1.

17              You would agree with me it's not a -- it

18    would not be a good thing for the DEA to come in and

19    say, Hey, your -- your system for reporting suspicious

20    orders is insufficient?

21         MS. SWIFT:  Take your time to read whatever you

22    need to read to answer the question.

23         THE WITNESS:  Okay.

24         MS. SWIFT:  And objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    Okay.  I've never heard of that

 3   calculation, but someone must have told them that

 4   that's what we did.

 5   BY MR. GADDY:

 6        Q.    And they said it was insufficient, right?

 7        A.    Yes, they did think it was insufficient.

 8        Q.    Okay.  And -- and you agree that's not a

 9   good thing?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    It would not seem to be, without knowing

13   the details, but it would not seem to be a good thing,

14   no.

15   BY MR. GADDY:

16        Q.    Okay.  And if you skip a sentence, there

17   is another sentence under the -- about the middle of

18   that paragraph on the right-hand side, it starts:

19   "The system in place."

20              Do you see that?

21        A.    Oh -- yes.

22        Q.    It says:

23              "The system in place determined the amount

24   of daily prescriptions filled by each of its customers
```

1    of both non-controlled and controlled substance

2    prescriptions.  This amount was utilized to place each

3    customer in groupings each containing 25 customers.

4    Of these 25 customer groupings, the firm calculated

5    the average order per item of each controlled

6    substance.  The firm then took the average and

7    multiplied that figure by three."

8            Do you see that?

9    A.    Yes.

10   Q.    It says:

11           "This calculated figure was then used as

12   the base to report suspicious orders above such

13   figure."

14           Do you see that?

15   A.    Yes.

16   Q.    Okay.  So, it says the system was

17   insufficient and then it describes the system that

18   Walgreens was using.

19           Were you aware of that particular system

20   for identifying suspicious orders?

21   A.    No.

22   Q.    Did anybody at Walgreens ever explain to

23   you how suspicious orders were identified?

24           MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY THE WITNESS:

2       A.    Yes, it was explained to me that the

3   computer room ran a query and that the system itself,

4   again, would cut orders down if they were too high,

5   making them suspicious.

6   BY MR. GADDY:

7       Q.    Okay.  Was it ever explained to you in any

8   sort of detail what the computer room or the system

9   or -- did it ever -- were you -- was it ever explained

10  to you what they were looking at?

11      MS. SWIFT:  Object to the form.

12  BY THE WITNESS:

13      A.    Well, I know the computer room was looking

14  at a certain quantity of -- and, again, that's

15  debatable what that quantity was.

16          The program itself, I understood it,

17  whether they had said that directly, my understanding

18  was that it was going to look at the -- the background

19  and the history and, you know, their sales and their

20  inventory and determine if it was reasonable for them

21  to order those amounts.

22  BY MR. GADDY:

23      Q.    Okay.  And that was something that was

24  told to you by Anaya?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Ann Anaya, yes.

2        Q.      Ann Anaya, thank you.

3        A.      Uh-huh.

4        Q.      And -- and that was -- what was told to

5   you by Ann Anaya was consistent with what we looked at

6   in that -- that Rx integrity document.

7                It talked about the different things that

8   could be considered as far as clinical needs and

9   population and those types of things, is that right?

10       A.      That sounds right.

11       Q.      Okay.  And that was that -- that was

12  attached to that 2013 policy about the questionable

13  orders, correct?

14       MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16       A.      I'd have to check, I don't remember even

17  that long ago, but...

18  BY MR. GADDY:

19       Q.      What I'm -- what I'm getting at, were you

20  told anything back in 2006, was this conversation with

21  Ann Anaya back in 2006?

22       A.      I -- I don't remember.  That -- I mean,

23  that's been years ago.  I just don't remember.

24       Q.      Did Ann Anaya tell you anything about
```

Highly Confidential - Subject to Further Confidentiality Review

 1    grouping customers into groups of 25 and coming up

 2    with an average order and multiplying by three?

 3         A.    No, that's the first I've read that or

 4    heard of that.

 5         Q.    Okay.  But you recognize here in this

 6    letter from the DEA that the DEA is saying that's the

 7    system that Walgreens had in place and that that

 8    system was in -- insufficient?

 9         A.    They believe it's insufficient it says,

10    yes.

11         Q.    I'll show you what I'll mark as Exhibit

12    No. 14.  This is P-WAG 2421.

13                   (WHEREUPON, a certain document was

14                    marked Walgreens - Bish Deposition

15                    Exhibit No. 14, for identification,

16                    as of 02/01/2019.)

17    BY MR. GADDY:

18         Q.    And do you see this is a Walgreens

19    memorandum?

20         A.    Yes.

21         Q.    And it looks like this is about ten days

22    after that DEA letter came in after the DEA had

23    inspected Perrysburg, right?

24         A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And it's -- the "re" line is:  "DEA

2    audit preliminary response."

3          Do you see that?

4    A.    Yes.

5    Q.    If you go back to the prior document,

6    there is one last thing I should have showed you, and

7    look at the third page, the second-to-last paragraph,

8    it starts:  "Please advise."

9    A.    Yes.

10   Q.    It says:

11         "Please advise this office in writing

12   within 30 days of the action taken or planned to

13   correct these violations."

14         Do you see that?

15   A.    Yes.

16   Q.    So the DEA, not only is they -- are they

17   telling Walgreens that there is a problem, but they

18   want a response from Walgreens, correct?

19   A.    It appears they want them to advise them

20   of, you know, the action they are going to take, yes.

21   Q.    And -- and even though we just looked at

22   Item No. 1 as far as the issues that the DEA noted, if

23   you look at this letter, you see there is -- it looks

24   like ten separate issues that the DEA identified as

Highly Confidential - Subject to Further Confidentiality Review

1    far as deficiencies within the Perrysburg distribution

2    center?

3         MS. SWIFT:  Object to the form, foundation.

4    BY THE WITNESS:

5         A.    But they aren't all C-II.  They are

6    talking about List 1 chemicals and...

7    BY MR. GADDY:

8         Q.    Absolutely.

9         A.    Oh.

10        Q.    And I don't -- I don't -- I didn't mean to

11   limit my question to C-IIs.

12        A.    Okay.  All right.

13        Q.    Did you agree with me, there's ten

14   separate issues that they -- that they identified?

15        MS. SWIFT:  Object to the form, foundation.

16   BY THE WITNESS:

17        A.    I'd have to read each one.  I mean, I am

18   assume -- I -- I don't know, is each point stating

19   there is something wrong or are they just stating -- I

20   don't -- I'd have to read it.

21             Do you want me to read it?

22   BY MR. GADDY:

23        Q.    Well, you see there are ten numbered

24   paragraphs, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes, I do, uh-huh.

2      Q.     And the first paragraph is the only one we

3  really looked at in detail and that was the one where

4  the DEA was saying that the -- the -- the formulation

5  for reporting suspicious orders was insufficient,

6  right?

7      A.     Right.

8      Q.     Okay.  But then there is also different

9  paragraphs numbered 2 through 10, correct?

10     A.     Yes.

11     Q.     So let's go back to, I think No. 14, which

12  is about -- a memo about ten days later, correct?

13     A.     Yes.

14     Q.     And it says, the "re" line is:  "DEA audit

15  preliminary response."

16            Do you see that?

17     A.     Yes.

18     Q.     And about the third paragraph down, the

19  heading is:  "1301.74(b)," correct?

20     A.     Correct.

21     Q.     And if we read there in that paragraph, it

22  says:

23            "DEA feels that the suspic" -- "suspicious

24  order report is inadequate."

Highly Confidential - Subject to Further Confidentiality Review

1            Do you see that?

2      A.    Yes.

3      Q.    Okay.  And that's consistent with what the

4  DEA said in their letter, right?

5      MS. SWIFT:  Object to the form.

6  BY THE WITNESS:

7      A.    That's what the letter said, right, the

8  previous letter.

9  BY MR. GADDY:

10     Q.    It said:

11           "They specifically did not like the DEA

12  factor and would like to know how we determine it.

13  They would like a better description of the formula

14  used to determine a suspicious order."

15           Do you see that?

16     A.    Yes.

17     Q.    It says:

18           "The explanation of the formula is:"  It

19  says:  "All stores are put into groups of 25 based on

20  the amount of daily prescriptions filled.  The average

21  is then taken from the orders to the DC on each group

22  of 25.  The result is average order times DEA factor

23  equal trigger."

24           Do you see that?

```
 1      A.    Yes.

 2      Q.    It goes on to say:

 3            "They said the formula should be based on

 4      (size, pattern, and frequency)."

 5            Correct?

 6      A.    Correct.

 7      Q.    At any point in time during this 2006

 8      timeframe, did anybody come to you as the -- as the

 9      C-II function manager --

10      A.    Uh-huh.

11      Q.    -- and ask you for any input on developing

12      any type of suspicious order reporting system?

13      MS. SWIFT:  Objection; calls for speculation.

14      BY THE WITNESS:

15      A.    Not that I recall.

16      BY MR. GADDY:

17      Q.    Okay.  Did anybody come to you as the --

18      as the C-II function manager, the person in charge of

19      Schedule II controlled substances at the Perrysburg

20      distribution center, and tell you that the DEA felt

21      you were doing an inadequate job of reporting

22      suspicious orders, and not you personally but

23      Walgreens?

24      A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Not that I recall.

 2       Q.    At any point in time during this 2006

 3  period did anybody from Walgreens come to you and say

 4  we need to press pause on shipping Schedule II drugs

 5  out the door, the DEA has told us our system is

 6  insufficient or inadequate, we need to get -- figure

 7  this out before we continue to distribute.

 8              Do you recall that ever happening?

 9       A.    No.

10       Q.    At any point in time while you were the

11  C-II function manager at the Perrysburg distribution

12  center from -- from whenever C-IIs started going out

13  the door in '05 or '06 through whenever they stopped

14  in 2013-ish, did you ever have a -- a whole wholesale

15  shutdown and stoppage of distributing Schedule II

16  controlled substances because of concerns expressed by

17  the DEA regarding suspicious order monitoring?

18       MS. SWIFT:  Object to form.

19  BY THE WITNESS:

20       A.    Not that I recall.

21  BY MR. GADDY:

22       Q.    Okay.  You see in the subject line of this

23  memo that it's talking about that the -- the DEA audit

24  actually took place back in March?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    Okay.  Let me show you what I'll mark as

3   Exhibit No. 15.  This is P-WAG 2783.

4                    (WHEREUPON, a certain document was

5                    marked Walgreens - Bish Deposition

6                    Exhibit No. 15, for identification,

7                    as of 02/01/2019.)

8   BY MR. GADDY:

9        Q.    And, again, using the Bates number on the

10  bottom right-hand corner, if you could turn to the

11  Bates ending 772.

12                Are you with me?

13       A.    Yes.

14       Q.    And I am -- I am on Bates No. 772.

15       MR. GADDY:  I'm waiting on him to find the page.

16  BY THE WITNESS:

17       A.    Oh.

18       MS. SWIFT:  That's fine.

19  BY THE WITNESS:

20       A.    I'm like, what are we waiting...  Okay.

21  BY MR. GADDY:

22       Q.    Okay.  All right.  I think we are here

23  now.

24                So you see this is an e-mail from Justin
```

Highly Confidential – Subject to Further Confidentiality Review

1    Joseph --

2        A.    Yes.

3        Q.    -- at the top?

4        A.    Yes.

5        Q.    And the subject, again, is this:  "DEA

6    audit recap from March."

7              Do you see that?

8        A.    Yes.

9        Q.    And here he says:

10             "Today's discussion centered around

11   suspicious drug report and PSE items.  Highlighted in

12   red are the items that I am struggling to come up with

13   an answer for."

14             Do you see that?

15       A.    Yes.

16       Q.    Okay.  And Justin Joseph was who?

17       A.    Well, he is now the building manager.

18   Back then he was probably -- he may have been the

19   admin manager, administration manager back then.  I'm

20   not sure what his title was during 2006.

21       Q.    Okay.  Well, it looks like he sent this

22   e-mail to -- to Todd Polarolo?

23       A.    Um-hum.

24       Q.    Who we just talked about, Sue Thoss, Steve

1    Kneller, some of these other folks that we've

2    mentioned before, correct?

3         A.    Correct.

4         Q.    And the first topic that he is asking

5    questions about is the suspicious drug report.  He

6    says:

7              "Where does the DEA factor come from?"

8              Do you see that?

9         A.    Yes.

10        Q.    And the response says:

11             "This is our determination of a suspicious

12   order."

13             Do you see that?

14        A.    Yes.

15        Q.    Okay.  Prior to -- to looking at this

16   document, did you know that -- that Walgreens had --

17   had independently come up with some DEA factor to

18   determine a suspicious order?

19        MS. SWIFT:  Object to the assume -- object to

20   the form of the question, assumes facts not in

21   evidence.

22   BY THE WITNESS:

23        A.    I -- I did not know about this -- this --

24   what we read prior to this what -- how they determined

Highly Confidential - Subject to Further Confidentiality Review

1    that, no, I did not know that existed.

2    BY MR. GADDY:

3         Q.    Okay.  And do you know who that Kalani

4    Reelitz, or if that's a person or -- or what that

5    means?

6         A.    No, I don't recall that name.

7         Q.    Okay.  The next question says:

8               "How do we get the average?"

9               Do you see that?

10        A.    Yes.

11        Q.    And it says:

12              "This is by DC and takes the number of

13   daily scripts filled by a store, then groups stores in

14   groups of 25.  Then there is an average taken of the

15   orders by item."

16              Do you see that?

17        A.    Yes.

18        Q.    And it looks like the same individual

19   provided that update as well?

20        A.    That's what it looks like, yeah.

21        Q.    And -- and you recognize that as

22   describing the same system that ultimately the DEA

23   described in its letter and says was insufficient?

24        MS. SWIFT:  Objection, foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    It sounds like the same, yeah.

 3   BY MR. GADDY:

 4        Q.    Do you know if you have ever looked at one

 5   of those suspicious order reports?

 6        MS. SWIFT:  Object to the form.

 7   BY THE WITNESS:

 8        A.    I have seen a printed one.

 9   BY MR. GADDY:

10        Q.    I'll show you what I'll mark as

11   Exhibit 16, which is P-WAG 11.

12                  (WHEREUPON, a certain document was

13                   marked Walgreens - Bish Deposition

14                   Exhibit No. 16, for identification,

15                   as of 02/01/2019.)

16   BY MR. GADDY:

17        Q.    And do you see this is a e-mail from

18   Eric Stahmann?

19              Do you see that?

20        A.    Yes.

21        Q.    And I think you told me you do not know

22   who that is, correct?

23        A.    No, I don't.

24        Q.    Okay.  And it looks like the e-mail is
```

Highly Confidential – Subject to Further Confidentiality Review

1    dated in 2017 but the attachment has a August 2010

2    date on it.

3              Do you see that?

4    A.    Oh, yes, um-hum.

5    Q.    And the subject is:  "CD orders"?

6    A.    The subject is CD orders?  I don't see

7    that, but...

8    Q.    Oh, I'm sorry.  The subject line of the

9    e-mail?

10   A.    Oh, yes, um-hum.

11   Q.    Okay.  And were you aware that at -- that

12   there was a period of time in which the suspicious

13   order reports was delivered to the distribution center

14   on actually, like, a CD-ROM?

15   A.    I only remember seeing it printed,

16   although at some point I would have expected it to go

17   to a disk of some kind.

18   Q.    Okay.  Turn with me, if you would, please,

19   to Bates ending 441.

20             Are you with me?

21   A.    Yes, um-hum.

22   Q.    And this -- I don't know what size paper

23   this typically would print on, but because it's

24   probably not what we have in front of us, the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    formatting is a little bit weird, but I'm going to

 2    start at what I think is -- would be the top of a

 3    page which is about two-thirds of the way down the

 4    page.

 5              On the left-hand side it says date --

 6    A.    Oh.

 7    Q.    -- and then it says 8/2/10.

 8              Do you see where I am?

 9    A.    Eight -- 441, correct?

10    Q.    Yes, ma'am, and you can look on that

11    screen right in front of you and where he is

12    highlighting it, and that might help you get oriented.

13    A.    Oh, okay.

14              Oh, yeah, yeah, okay.

15    Q.    Okay.  And do you see right there kind of

16    above that but in the middle it says -- it has got a

17    page number there, 11655?

18    A.    Yes.

19    Q.    And these reports that you saw, were they

20    pretty thick?

21    A.    I would say that thick.

22    Q.    Okay.  About an inch?

23    A.    Yeah.

24    Q.    And you see that it -- it's got the date
```

Highly Confidential - Subject to Further Confidentiality Review

1   8/2/10 and then to the right of that it says:

2   "Suspicious control drug orders for the month of

3   July 2010."

4           Do you see that?

5       A.    Yes.

6       Q.    Okay.  And below that it has a sales

7   district, a Walgreens store number, and then an

8   address.

9           And this particular store just happens to

10  be in Cleveland, Ohio, correct?

11      A.    Correct.

12      Q.    When you said that you had seen the hard

13  copy report before, does this look vaguely familiar to

14  you, this format?

15      A.    Well, again, it was more -- it was longer,

16  obviously.

17      Q.    Okay.

18      A.    You know, it was just regular printer

19  paper, but, yeah, this format looks familiar.

20      Q.    Okay.  And for what purpose did you look

21  at one of these reports previously?

22      A.    To hand it to the SAIL coordinator.

23  That's what I did with it.

24      Q.    Okay.  Did you -- would you ever have read

Highly Confidential - Subject to Further Confidentiality Review

```
 1   it?

 2        A.    No, I never went through one page by page.

 3        Q.    Okay.  Would you have ever had made

 4   notations about stores that are listed on this report

 5   as having suspicious control drug orders?

 6        MS. SWIFT:  Object to the form, vague.

 7   BY THE WITNESS:

 8        A.    No.

 9   BY MR. GADDY:

10        Q.    Would you have -- ever have given this

11   report to anybody other than the C-II SAIL

12   coordinator?

13        A.    I don't believe so, no.  That's who I

14   would have given it to.

15        Q.    And other than her filing the report, you

16   don't know that she did anything else with it?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    That's correct.

20   BY MR. GADDY:

21        Q.    Okay.  All right.  So let's see if we can

22   figure out what these -- what these are saying.

23              So, under the address you see there is the

24   two horizontal lines?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.

 2        Q.     And then below there it says -- it has got

 3   a Walgreens item number and it lists on the left-hand

 4   side a -- a DNC number.

 5               Do you see that?

 6        A.     Um-hum.

 7        Q.     And every drug, every control drug has a

 8   DNC number, correct?

 9        A.     It is an NDC, but correct, uh-huh.

10        Q.     Did I say something different?

11        A.     I thought you said "DNC."

12        Q.     Oh, thank you.

13        A.     NDC.

14        Q.     NDC.

15        A.     Yeah.

16        Q.     So every control drug has an NDC number,

17   correct?

18        A.     Correct.

19        Q.     That's unique to that particular drug?

20        A.     Correct.

21        Q.     Okay.  And then to the right of that --

22   that NDC number it gives a description of the drug and

23   this particular drug looks like it is a hydrocodone

24   combination product, correct?
```

 1      A.    Correct.

 2      Q.    Just above the description, do you

 3  recognize this formula that we've just read in some of

 4  these -- these other doc -- other documents of average

 5  order times DEA factor equals trigger?

 6      MS. SWIFT:  Object to the form.

 7  BY THE WITNESS:

 8      A.    Yes, it looks like that's what they were

 9  talking about before, although I don't have it in

10  front of me again, but...

11          Which of these have the actual formula on

12  it?

13  BY MR. GADDY:

14      Q.    I think it was the --

15      A.    Was it this one?

16      Q.    -- Walgreens response.  I think it was the

17  memo, the Walgreens memo in the paragraph that started

18  1301.74(b).

19      A.    Oh.  Oh, yeah, there it is.  "Average

20  order times DEA factor equals trigger."  Okay.  Yeah.

21      Q.    That's what we see here, right?

22      A.    Yeah.

23      MS. SWIFT:  Object to the form, mischaracterizes

24  the document.

Highly Confidential – Subject to Further Confidentiality Review

```
1    BY MR. GADDY:

2        Q.    And then below the description of the

3    drug, you see that it -- it has some numbers that look

4    like they follow that formula, it has an average order

5    of five, a DEA factor of three, and then if you were

6    to multiply those you would get the trigger of 15.

7              Is that math correct?

8        MS. SWIFT:  Objection; lacks foundation.

9    BY THE WITNESS:

10       A.    It appears that's what they've done, yes.

11   BY MR. GADDY:

12       Q.    Okay.  And then if you flip the page, you

13   see the -- it looks like you have a chart here on this

14   left -- on this next page with three columns, correct?

15       A.    Yes.

16       Q.    One for the date ordered, the second for

17   the quantity, and the third for the number of the

18   distribution center, correct?

19       A.    Correct.

20       Q.    Okay.  And it looks like, if we -- I think

21   we were looking -- I think this report was for the

22   suspicious control drug orders for the month of July.

23             Do you recall that's what it said on the

24   previous page at the bottom?
```

```
 1      A.    Right.

 2      MS. SWIFT:  Objection; lacks foundation.

 3  BY MR. GADDY:

 4      Q.    But what we are looking at here is it is

 5  listing the orders for June and then below there the

 6  orders for May.

 7            Do you see that?

 8      MS. SWIFT:  Objection; lacks foundation.

 9  BY THE WITNESS:

10      A.    I see the orders listed for June and what

11  appear to be orders for May.

12  BY MR. GADDY:

13      Q.    Okay.  And then let's jump to the far

14  right-hand column, and that says "DC."

15            Do you see that?

16      A.    Yes.

17      Q.    And there is the number 11 for all of

18  these orders for this particular hydrocodone

19  combination product.

20            What does 11 mean to you?

21      A.    That's our -- well, 11 is the Perrysburg

22  DC, but the C-II DC was 13.

23      Q.    Okay.  So that would tell you these were

24  not C-IIs, this hydrocodone combination product,
```

```
 1   correct?

 2       MS. SWIFT:  Object to the form.

 3   BY THE WITNESS:

 4       A.   Well, I can't really say that because I

 5   don't know that they would define it down that fine.

 6   I mean, DC 13 was part of DC 11.

 7   BY MR. GADDY:

 8       Q.   Okay.

 9       A.   So I don't...

10       Q.   Well, let -- let's move on and we'll get

11   some clarity on that in just a minute --

12       A.   Okay.

13       Q.   -- I think.

14            Okay.  So anyway, it looks like if you

15   look at the quantities ordered during June for this

16   particular pharmacy in Cleveland starting at the

17   bottom, they ordered three on the -- three bottles on

18   the 2nd, two bottles on the 4th, three bottles on the

19   9th and all of the way up through the 30th.

20            Do you see that?

21       A.   Yes.

22       Q.   And if you look down below there, it looks

23   like they've totaled the number of bottles ordered.

24            Do you see that, and added them up to be
```

Highly Confidential - Subject to Further Confidentiality Review

1   26?

2       A.    That's what it looks like, yeah.

3       Q.    Okay.  And then it has a percentage listed

4   there, 173.

5            Do you see that?

6       A.    Yes.

7       Q.    And if you go back to the formula at the

8   bottom of the previous page saying that the trigger

9   was 15, and this particular store has ordered

10  26 bottles during the month of June, I'm not asking

11  you to get out a calculator, but does it look that --

12  that there was a product -- that the trigger was

13  exceeded so that the amount ordered was approximately

14  173 percent of the trigger?

15       MS. SWIFT:  Object to the form.

16  BY THE WITNESS:

17       A.    I couldn't say that.  I don't -- I don't

18  really know what the hundred -- it doesn't really say

19  what the 173 percent is.

20  BY MR. GADDY:

21       Q.    Okay.  Well --

22       A.    So...

23       Q.    100 percent of 15 is 15, right?

24       A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.

2        A.    Oh, so you do want me to do the math?

3        MS. SWIFT:  You just said you didn't want her to

4    do the math.

5    BY MR. GADDY:

6        Q.    I said I don't want you to get out a

7    calculator to do the math.

8        A.    Oh, okay.

9        MS. SWIFT:  You don't have to do math in your

10   head.

11   BY MR. GADDY:

12       Q.    You agree that 100 percent of 15 is 15?

13       A.    Yes.

14       Q.    You agree that 200 percent of 15 would be

15   30?

16       A.    Yes.

17       Q.    Okay.  And what the total no -- order

18   entered here is 26, correct?

19       A.    Correct.

20       Q.    And they indicate that it is not

21   200 percent, but it is 173 percent.

22             Do you see that?

23       A.    Yes, I do.

24       MS. SWIFT:  Object to the form.

```
 1   BY THE WITNESS:

 2        A.    I do see that, yeah.

 3   BY MR. GADDY:

 4        Q.    Okay.  So my question to you is, were you

 5   ever asked to -- at the distribution center to halt or

 6   hold or prevent shipment of any orders of -- for

 7   controlled substances because a store had exceeded

 8   this trigger amount?

 9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    Not that I recall, uh-uh.

12   BY MR. GADDY:

13        Q.    Okay.

14             Were you ever -- and if you see that --

15   that here for this particular store for the month of

16   June it is giving the orders that were placed

17   throughout the month, correct?

18        A.    Throughout what?

19        MS. SWIFT:  Objection to the form, foundation.

20   BY MR. GADDY:

21        Q.    Throughout the month of June.

22        MS. SWIFT:  Same objection.

23   BY MR. GADDY:

24        Q.    Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    Yes.

2       Q.    June of 2010, do you see that?

3       A.    I see those dates, yeah.

4       Q.    And I think you've already told us that

5   orders come in every day, orders get filled every day,

6   correct?

7       A.    Correct.

8       Q.    Okay.  When -- were you ever told at the

9   end of the month, do you ever recall being told by

10  anybody at Walgreens towards the end of the month,

11  Hey, this particular store has already hit their DEA

12  limit, this order, for example, of five -- for five

13  bottles coming in on June 30th, don't fill that order,

14  this store has already hit their limit.

15          Do you ever recall ever being told that by

16  anybody at Walgreens?

17      MS. SWIFT:  Objection; assumes facts not in

18  evidence.

19  BY THE WITNESS:

20      A.    No, I don't recall ever being told that.

21  BY MR. GADDY:

22      Q.    Okay.  If you look for this same store, it

23  also gives the orders from the month of May.

24          Do you see that below there?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Objection; lacks foundation.

 2   BY THE WITNESS:

 3        A.    I see the May dates, yes.

 4   BY MR. GADDY:

 5        Q.    Okay.  And it has orders spanning from

 6   May 3rd, 2010 through May 26th, 2010.

 7              Do you see that?

 8        A.    I see those dates, yeah.

 9        Q.    And it totals those orders as 16, correct?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    Yes.

13   BY MR. GADDY:

14        Q.    And then it gives a percentage that would

15   be fairly consistent of that being barely over the

16   15-bottle threshold, correct?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    If that's what that represents, which it

20   apparently does.

21   BY MR. GADDY:

22        Q.    Okay.  And, again, you don't recall any

23   situations for this that would have been similar with

24   this scenario here where this May 26th, 2010 order
```

```
 1    comes in for two bottles and you're told, Ms. Bish, as

 2    the C-II function manager, you can't allow that order

 3    to be filled because those two bottles are going to

 4    push them over this 15-bottle threshold for this

 5    particular drug?

 6         A.    That's correct, I don't recall ever being

 7    told that.

 8         Q.    Okay.  If we look down to the next entry,

 9    do you see there is a NDC number and a description for

10    a new drug?

11         A.    Yes.

12         Q.    And that's oxycodone, right?

13         A.    No.  I see oxy APAP.

14         Q.    Okay.

15         A.    At the bottom of that same page?

16         Q.    Oxycodone APAP?

17         A.    Yes.

18         Q.    Okay.

19         A.    I'm sorry, yeah.

20         Q.    And what is your understanding of what

21    that drug is?

22         A.    It is a combination of oxycodone and I

23    forget the other -- the other drug that the APAP is

24    standing for, but anyhow, it is a combination.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  But it contains oxycodone?

 2        A.    Yes.

 3        Q.    Which is a Schedule II drug?

 4        A.    Correct.

 5        Q.    Okay.

 6        A.    It says "DC 13," so that must be what that

 7   means.

 8        Q.    You knew where I was going there.

 9              So this would be the distribution center

10   for the C-II facility at Perrysburg, correct?

11        A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

█

█

█

█    █    █    █

█

6      Q.    Okay.  And -- and as we saw from one of

7  your earlier e-mails, it was common for some stores to

8  fill -- order and -- and for you to fill 80 to

9  100 bottles of Schedule II controlled substances on a

10  single order, correct?

11      MS. SWIFT:  Object to the extent it

12  mischaracterizes the documents.

13  BY THE WITNESS:

14      A.    There were -- but there were some store

15  orders that called for that many bottles, yeah.

16  BY MR. GADDY:

17      Q.    Okay.  And at no point in time did anybody

18  tell you that, Hey, of these 500 pill bottles of

19  oxycodone APAPs, the monthly trigger is 18 bottles.

20          Nobody ever gave you that information,

21  right?

22      MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24      A.    No, because I thought, again, that was

Highly Confidential - Subject to Further Confidentiality Review

 1    being handled by a system -- the system and the

 2    computer room combined.  So we were not given trigger

 3    numbers.

 4    BY MR. GADDY:

 5         Q.    Okay.  And I understand that you had your

 6    own personal thoughts and understandings about what

 7    may or may not have been happening in other places,

 8    but nobody ever gave this trigger information to you,

 9    is that correct?

10         A.    That's correct.

11         Q.    Okay.  Tell me if I'm wrong, but I presume

12    that if somebody had told you, Hey, Ms. Bish, this

13    particular -- you know, these stores should never get

14    more than 18 bottles of this particular drug in a

15    month --

16         A.    Uh-huh.

17         Q.    -- because that's our trigger amount, you

18    would have put in place some type of mechanism to make

19    sure that that didn't happen?

20         A.    Well, I would have had to have the

21    computer room do that because I visually couldn't have

22    done that, but, yeah, they would -- they would have

23    had to put something in place, but I -- I thought we

24    did have something in place.

1    Q.    Okay.  So you were never given information

2    or -- strike that.

3         So if you turn the page, do you see that

4    it -- at the start of the very bottom of the last

5    page, and then as we look we continue to see the

6    orders for the month of July that this particular

7    store placed for this particular oxycodone product.

8         Do you see that?

9    MS. SWIFT:  Object to form.

10   BY THE WITNESS:

11   A.    What page are you on, because I closed

12   mine?

13   BY MR. GADDY:

14   Q.    I'm sorry.  I started on 442 at the very

15   bottom, because that's where we left off.

16   A.    Okay.

17   Q.    And do you see there is the first entry

18   for July 29th and it has four bottles --

19   A.    Right.

20   Q.    -- filled from DC 13?

21   A.    Yes.

22   Q.    And if you flip the page, you see the rest

23   of the orders that were filled during the month of

24   July?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      MS. SWIFT:  Objection; lacks foundation.

 2  BY THE WITNESS:

 3      A.    Well, I don't know if these orders filled.

 4  Again, I know they were orders that were put in, I can

 5  see that.

 6  BY MR. GADDY:

 7      Q.    Okay.  And it lists orders on July 8,

 8  July 15 and July 22 all from DC 13, correct?

 9      A.    Correct.

10      Q.    Okay.  And then it totals the orders there

11  and it lists 25 orders and then it gives a percentage

12  that, again, I won't make you divide it yourself.

13            Do you see that?

14      A.    Yes.

15      Q.    Okay.

16            And, again, you were never given any

17  information that this particular store in Cleveland

18  was ordering bottles of oxycodone product that were

19  above their trigger and were listed on the suspicious

20  order report?

21      MS. SWIFT:  Objection; foundation.

22  BY THE WITNESS:

23      A.    No.

24  BY MR. GADDY:
```

```
1          Q.    If you look at, for the month of June, do

2    you see that this store has orders listed totalling

3    39 bottles of this particular unit, which I believe

4    it -- I mean, did I get that right, that it was a

5    500-count bottle?

6          A.    Yes.

7          Q.    Okay.

8          A.    That's correct.

9          Q.    So in June there were orders placed by

10   this store for 39 500-count bottles of this oxycodone

11   product, correct?

12         MS. SWIFT:  Objection -- objection; foundation.

13   The document speaks for itself.

14   BY THE WITNESS:

15         A.    Correct, that's what it looks like, yes.

16   BY MR. GADDY:

17         Q.    And -- and the percentage there is -- is

18   over 200 percent, correct?

19         A.    Correct.

20         Q.    And if you keep going down, it also has

21   the orders listed for the month of May.

22               Do you see that?

23         A.    Yes.

24         Q.    And it -- again, because of the formatting
```

1    it cuts out in the middle and then you have to go to

2    the bottom of the page to see where they total it.

3              Are you with me?

4         A.    Um-hum, yes.

5         Q.    And it totals there 22 orders, which again

6    is over 100 percent of the DEA trigger that Walgreens

7    itself had set, correct?

8         MS. SWIFT:  Object to the form; mischaracterizes

9    the document.

10   BY THE WITNESS:

11        A.    That's how -- that's what it says, that's

12   what the form says, yeah.

13   BY MR. GADDY:

14        Q.    Okay.  But, again, you were never asked

15   to -- to not ship any orders to any -- any particular

16   store because they showed up on that suspicious order

17   report?

18        A.    That's correct.

19        Q.    Okay.  Do you know if anybody thought you

20   at the distribution center, or Lori, your SAIL

21   coordinator, or Brook, were looking at this suspicious

22   order report that was sent to you?

23        MS. SWIFT:  Object to the form; foundation,

24   compound.

```
 1   BY THE WITNESS:

 2        A.    Do I know if a -- do I know if other

 3   people thought we were looking at it?

 4   BY MR. GADDY:

 5        Q.    Yeah.

 6        A.    No, I don't know.

 7        Q.    I mean, you definitely had a copy of it,

 8   right?

 9        A.    I saw one -- I've seen these come in.

10   They don't look exactly like that, but I've -- I've

11   seen one.  I can't tell you how often they come in,

12   though.

13        Q.    Okay.  And as far as you know, all that --

14   all that Lori or -- or Brook did with these reports

15   when they got them was file them?

16        A.    Correct.

17        Q.    Do you recall these reports coming in,

18   these suspicious order reports coming in during the

19   entire time period that you were the C-II function

20   manager?

21        MS. SWIFT:  Objection; calls for speculation.

22   BY THE WITNESS:

23        A.    I don't recall seeing them but more than

24   once or twice, but that doesn't mean they weren't
```

1    coming in, you know, so.

2    BY MR. GADDY:

3        Q.    Okay.  Well, and -- and I'm -- I'm asking

4    you this question because, you know, we -- when we

5    looked at your personnel file, you're -- you know, I

6    think you're -- they said your knowledge of the C-II

7    systems was -- was second to none.

8        A.    Uh-huh.

9        Q.    So do you recall during what time period

10   these -- these reports were being shipped to the

11   distribution center?

12       MS. SWIFT:  Object to the form; asked and

13   answered.

14   BY THE WITNESS:

15       A.    I don't recall that, no.

16   BY MR. GADDY:

17       Q.    Do you know whether or not those reports

18   were sent to the DEA?

19       MS. SWIFT:  Objection; foundation.

20   BY THE WITNESS:

21       A.    No, I don't know that.

22   BY MR. GADDY:

23       Q.    Do you ever recall the admin manager,

24   whether Tammy Hensley or Trumbull?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    It is Hensley now.  It was Trumbull.

 2   Uh-huh.

 3        Q.    Okay.  Do you ever recall her do -- saying

 4   anything or doing anything with the suspicious order

 5   reports?

 6        MS. SWIFT:  Objection; foundation.

 7   BY THE WITNESS:

 8        A.    I don't -- I don't know what she did.  I

 9   mean, I don't know her job.

10   BY MR. GADDY:

11        Q.    I'll show you what I'll mark as

12   Exhibit 17.  It is P-WAG 2683.

13                    (WHEREUPON, a certain document was

14                     marked Walgreens - Bish Deposition

15                     Exhibit No. 17, for identification,

16                     as of 02/01/2019.)

17   BY MR. GADDY:

18        Q.    Do you see this is a letter on U.S.

19   Department of Jus -- Justice DEA letterhead?

20        A.    Yes.

21        Q.    And the date of this letter is

22   December 27th, 2007.

23                    Do you see that?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      And do you see this letter is addressed to

2    Walgreens?

3        A.      Yes.

4        Q.      And it says:  "Attention:  C-II manager."

5                Do you see that?

6        A.      Yes.

7        Q.      And would that have been you?

8        A.      Yes.

9        Q.      Do you recall receiving this letter?

10       A.      I don't recall receiving it, no.  I'm sure

11   I did.

12       Q.      Was it common for you to receive letters

13   from the DEA?

14       A.      No.

15       Q.      Okay.  If you look, let's look at the back

16   page and the signature block, it looks like this

17   letter is from Joseph Rannazzisi, Deputy Assistant

18   Administrator, Office of Diversion Control.

19               Do you see that?

20       A.      Yes.

21       Q.      Do you know who Mr. Rannazzisi is?

22       A.      I don't know him.  I have heard his name.

23       Q.      Okay.  In what context have you heard his

24   name?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Just in conversation about the DEA between

 2   the manager and the -- you know, I just don't know who

 3   he is.  I don't know if I have ever met him.

 4        Q.    Okay.  And in what way have you heard

 5   Mr. Rannazzisi discussed within Walgreens?

 6        A.    Oh, I can't remember.  I don't remember

 7   the specific conversations, but the name is familiar

 8   to me.

 9        Q.    Okay.  Okay.  Let's look at the -- at the

10   letter.

11              It says:

12              "Dear Registrant:  This letter is being

13   sent to every entity in the United States registered

14   with the DEA to manufacture or distribute controlled

15   substances."

16              Do you see that?

17        A.    Yes.

18        Q.    And -- and Walgreens wasn't manufacturing

19   any controlled substances, were they?

20        A.    No.

21        Q.    You were just distributing at this time,

22   right?

23        A.    Correct.

24        Q.    It says:
```

1          "The purpose of this letter is to

2    reiterate the responsibilities of controlled substance

3    manufacturers and distributors to inform DEA of

4    suspicious orders in accordance with 21 CFR

5    1301.74(b)."

6          Do you see that?

7      A.   Yes.

8      Q.   Okay.  And -- and I'll represent to you

9    that's the par -- particular paragraph of that statute

10   or regulation that we looked at a little bit -- a

11   little bit ago.

12         Do you recall that?

13     MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15     A.   No.

16   BY MR. GADDY:

17     Q.   Okay.  No, that's fine.  I think it's

18   listed again here.  We don't have to go back and look

19   at it.

20     A.   All right.

21     Q.   Now that we've -- we've read this first

22   paragraph, do you recall receiving this letter?

23     A.   No.

24     Q.   Do you recall --

```
 1              It says, in the next paragraph:

 2              "In addition to, and not in lieu of, the

 3    general requirement under 21 USC 823, that

 4    manufacturers and distributors maintain effective

 5    controls against diversion, DEA regulations require

 6    all manufacturers and distributors to report

 7    suspicious orders of controlled substances."

 8              Do you see that?

 9       A.    Yes.

10       Q.    When you received this letter in December

11    of 2007, did you already have that understanding?

12       MS. SWIFT:  Objection; calls for speculation.

13    BY THE WITNESS:

14       A.    The understanding of what?  That...

15    BY MR. GADDY:

16       Q.    That Walgreens had the obligation to

17    report suspicious orders of controlled substances.

18       MS. SWIFT:  Object to the extent it calls for a

19    legal conclusion.

20    BY THE WITNESS:

21       A.    I don't know that I had the understanding

22    it had to be reported.  I didn't -- I -- my

23    understanding was that I wasn't to report it.  If

24    someone else was, I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. GADDY:

2       Q.   Okay.  It says:

3            "Title 21 CFR 1301.74(b), specifically

4   requires that a registrant 'design and operate a

5   system to disclose to the registrant suspicious orders

6   of controlled substances.'"

7            Do you see that?

8       A.   Yes.

9       Q.   It says the registrant must design the

10  system, correct?

11      A.   Yes.

12      Q.   Okay.  And do you recall that we looked at

13  some documents that talked about this formula that

14  Walgreens had in place, there was the one with the

15  groupings of the 25 stores.

16           Do you recall that?

17      A.   Uh-huh.

18      Q.   Okay.  And then we just looked at these

19  other suspicious orders -- these suspicious order

20  reports that had the -- the -- the number times the

21  DEA factor equal the trigger, right?

22      A.   Right.

23      Q.   Okay.

24           It says:

1                "The regular" -- "regulation clearly

2     indicates that it is the sole responsibility of the

3     registrant to design" -- "to design and operate

4     such" -- "such a system.  Accordingly, the DEA does

5     not approve or otherwise endorse any specific system

6     for reporting suspicious orders."

7                Do you see that?

8         A.    Yes.

9         Q.    When you got this letter, do you recall

10    whether or not you asked anybody what your system was

11    for identifying and reporting suspicious orders?

12        A.    No, I don't recall if I asked anybody what

13    that was.

14        Q.    It goes on to say:

15                "Past communications with DEA, whether

16    implicit or explicit, that could be construed as

17    approval of a particular system for reporting

18    suspicious orders should no longer be taken to mean

19    that the DEA approves a specific system."

20                Do you see that?

21        A.    Yes.

22        Q.    Okay.

23                Prior to looking at this letter just now,

24    did you have any understanding of whose responsibility

Highly Confidential – Subject to Further Confidentiality Review

1  it was to -- to identify and report suspicious orders?

2    MS. SWIFT:  Object to the form.

3  BY THE WITNESS:

4    A.    Did I have any idea whose responsibility

5  it was to identify?  Well, I knew it was Walgreens'

6  responsibility and I was under the understanding we

7  were identifying suspicious orders through that

8  systemic program and the computer room.

9  BY MR. GADDY:

10    Q.    Okay.  It goes on to say:

11         "The regulation also requires that the

12  registrant inform the local DEA division office of

13  suspicious orders when discovered by the registrant."

14         Do you see that?

15    A.    Yes.

16    Q.    And they've actually underlined "when

17  discovered"?

18    A.    Correct.

19    Q.    It says:

20         "Filing a monthly report of completed

21  transactions (such as, an excessive purchase report or

22  high unit purchases) does not meet the regulatory

23  requirements to report suspicious orders."

24         Do you see that?

Highly Confidential – Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    What we just looked at were monthly

 3   reports, correct?

 4        MS. SWIFT:  Objection; lacks foundation.

 5   BY THE WITNESS:

 6        A.    They appear to be monthly orders placed,

 7   yeah.

 8   BY MR. GADDY:

 9        Q.    I think that if you -- I think the title

10   that we looked at on that first page was Suspicious

11   Order Report for July 2010.

12              Do you recall that?

13        A.    Yes, I see it, um-hum.

14        Q.    Okay.  So that was a -- it was a report

15   for the entire month of July, correct?

16        A.    Monthly.

17        MS. SWIFT:  Objection; lacks foundation.

18   BY THE WITNESS:

19        A.    That's what it appears to be, yeah.

20   BY MR. GADDY:

21        Q.    Okay.  But this says:

22              "Filing a monthly report of completed

23   transactions does not he meet the regulatory

24   requirement to report suspicious orders."
```

```
 1              Do you see that?

 2      A.    Yes.

 3      Q.    Do you recall after getting this letter

 4  from the DEA reaching out to anybody and telling them

 5  that monthly reports were not sufficient according to

 6  the DEA?

 7      MS. SWIFT:  Object to form.

 8  BY THE WITNESS:

 9      A.    I don't recall doing that.  Sorry.

10      MS. SWIFT:  That's okay.

11  BY THE WITNESS:

12      A.    I don't recall doing that, but just

13  knowing me, if I got something like this, I likely

14  would have called Barb again just to let her know or

15  sent her a copy and I would have filed it and asked if

16  I was to do something different or, you know.

17  BY MR. GADDY:

18      Q.    Okay.  Specifically on the issue of the

19  frequency of reporting, do you recall telling anybody

20  that once a month wasn't good enough?

21      A.    No, I don't --

22      MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24      A.    -- I don't recall telling anybody that.
```

1   BY MR. GADDY:

2       Q.    Do you recall anybody -- do you recall

3   raising that as -- as a -- as a point of concern and

4   anybody telling you that -- that it didn't apply to

5   Walgreens or that what Walgreens was doing was

6   sufficient?

7       MS. SWIFT:  Object to the form.

8   BY THE WITNESS:

9       A.    No.

10  BY MR. GADDY:

11      Q.    Do you have a specific memory of sending

12  this letter to anybody?

13      A.    I don't have a specific memory.  I'm just

14  saying that if I -- this looks like something today I

15  would do the same thing, I would call Barb and I would

16  say, What do I do with this?  Give her a copy.  That's

17  what I would have done then, I would think.

18      Q.    Okay.  You also said that you would have

19  filed it.

20            What does that mean?

21      A.    Put it in a Pendaflex file folder and file

22  it, literally file it.

23      Q.    Okay.  In -- in a -- in a manila

24  folder-type thing?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Correct, yeah.

2        Q.      So who would know that it was in there?

3        A.      The SAIL coordinator.

4        Q.      Do you remember giving this letter to Lori

5    or -- or Brook, the SAIL coordinators?

6        A.      No, I don't remember who I gave it to.

7        Q.      Do you remember having any conversations

8    with Brook or Lori, the SAIL coordinators, about the

9    concerns that the DEA was raising as it related to

10   suspicious order reporting generally?

11       MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13       A.      No, I don't recall having that

14   conversation.

15   BY MR. GADDY:

16       Q.      Okay.  It goes on to say in that third

17   paragraph, right in the middle, it says:

18              "Registrants are reminded that their

19   responsibility does not end merely with the filing of

20   a suspicious order report.  Registrants must conduct

21   an independent analysis of suspicious orders prior to

22   completing a sale to determine whether the controlled

23   substances are likely to be diverted from legitimate

24   channels."
```

```
 1                    Do you see that?

 2        A.    Yes.

 3        Q.    Okay.  Fair to say that -- that within the

 4   distribution center, outside of this process of

 5   calling for what you think are -- are order entry

 6   errors, that there was no independent analysis being

 7   performed prior to processing and completing an order?

 8        MS. SWIFT:  Object to the form.

 9   BY THE WITNESS:

10        A.    Not that I did.  Someone else there may

11   have done that.  I -- I did not do that.

12   BY MR. GADDY:

13        Q.    But as the person whose C-II knowledge is

14   second to none --

15        A.    Uh-huh.

16        Q.    -- in the distribution center --

17        A.    Uh-huh.

18        Q.    -- are you aware of any other independent

19   analysis of suspicious orders that was taking place

20   prior to the orders going out the door?

21        MS. SWIFT:  Object to the form; asked and

22   answered throughout the day.

23   BY THE WITNESS:

24        A.    No, I'm not aware of anyone doing that at
```

```
 1    the distribution center.

 2    BY MR. GADDY:

 3        Q.    There's a word used in that sentence that

 4    we just read, "diverted," and then it says "from

 5    legitimate channels."

 6              Do you see that?

 7        A.    Yes.

 8        Q.    What does that mean to you?

 9        A.    To me that means orders that are likely to

10    be going places that are not pharmacies or Walgreens

11    pharmacies.  That's what that would mean to me.

12        Q.    Okay.  Do you have any -- can you give me

13    examples of what -- of activity that would be

14    diversion?

15        MS. SWIFT:  Object to the form.

16    BY THE WITNESS:

17        A.    Not really.  I mean, it is just that when

18    it says "legitimate," to me legitimate means real,

19    authentic, that's where it's supposed to -- you know,

20    it is what it says it is.  So that's, to me, what

21    legitimate means.

22              So what's your question again, an example

23    of an illegitimate, is that what you said?

24    BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    An example of when controlled substances

 2   would be diverted?

 3       MS. SWIFT:  Object to the form, vague.

 4   BY MR. GADDY:

 5       Q.    For example, if you put a bunch of C-IIs

 6   on a truck and somebody robs the truck -- -

 7       A.    Uh-huh.

 8       Q.    -- would you agree that that would be an

 9   ex -- an example of diversion?

10       A.    It would be an example, yeah, I would say

11   it would be.

12       Q.    Okay.  Are you familiar with the phrase

13   "doctor shopping"?

14       A.    The phrase of what?

15       Q.    "Doctor shopping."

16       A.    No.

17       Q.    Okay.  Are you familiar with the phrase

18   "pill mill"?

19       A.    Yes.

20       Q.    Okay.  What does that mean to you?

21       A.    To me that means a pharmacy that's not a

22   chain but some individual pharmacy would -- that is

23   not being discriminant or doing due diligence when

24   they fill prescriptions.
```

1      Q.     Okay.  And do you agree that that could

2   lead to diversion?

3      MS. SWIFT:  Object to the form, vague.

4   BY THE WITNESS:

5      A.     It would seem so.  I don't know enough

6   about it to really say for sure, but it would

7   certainly seem so.

8   BY MR. GADDY:

9      Q.     If you flip to the next page and look at

10   the top of the page, it says:

11          "Registrants that rely on rigid formulas

12   to define whether an order is suspicious may be

13   failing to detect suspicious orders."

14          Do you see that?

15      A.     Yes.

16      Q.     It says:

17          "For example, a system that identifies

18   orders as suspicious only if the total amount of a

19   controlled substance" -- "substance ordered during one

20   month exceeds the amount ordered the previous month by

21   a certain percentage or more is insufficient.  This

22   system fails to identify orders placed by a pharmacy

23   if the pharmacy is placing unusually large orders from

24   the beginning of its relationship with the

```
 1    distributor."

 2               Do you see that?

 3        A.    Yes.

 4        Q.    When you received this letter, what did

 5    you understand that portion to mean?

 6        MS. SWIFT:  Object to form, calls for

 7    speculation.

 8    BY THE WITNESS:

 9        A.    I can't really say what I -- what I

10    thought it meant way back then.  I don't know.

11    BY MR. GADDY:

12        Q.    Okay.  When you read this paragraph here

13    about the -- the formulas that the DEA was looking for

14    for a -- for -- for folks like Walgreens to design to

15    identify and report suspicious orders, did you do any

16    follow-up with, whether it's Barb or corporate or

17    whoever, to ask about what system you all had in place

18    and ask whether or not it was a rigid formula, like

19    they are saying is bad, or whether or not it was

20    something different?

21        MS. SWIFT:  Object to form; compound, calls for

22    speculation.

23    BY THE WITNESS:

24        A.    No, I don't recall doing any follow-up
```

1    with them, because I thought we had a system in place.

2    BY MR. GADDY:

3        Q.    Okay.  Fair enough.

4              If you go down to the next paragraph, it

5    says:

6              "When re" -- "when reporting an order as

7    suspicious, registrants must be clear in their

8    communications with the DEA that the registrant is

9    actually characterizing an order as suspicious.

10   Daily, weekly, or monthly reports submitted by a

11   registrant indicating excessive purchases do not

12   comply with the requirement to report suspicious

13   orders, even if the registrant calls such reports

14   suspicious order reports."

15             Do you see that?

16       A.    Yes.

17       Q.    That report that we just looked at is what

18   Walgreens called, I think it said "suspicious order

19   reports," right?

20       A.    That's what it said, yeah.

21       Q.    Okay.  And it was a -- it was a, I think

22   we just established, a monthly report, right?

23       MS. SWIFT:  Objection; lacks foundation.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    It appeared to be.

 2   BY MR. GADDY:

 3        Q.    Okay.  When you saw -- when you received

 4   this letter from Joseph Rannazzisi with the DEA and he

 5   is talking about some of the factors that should be

 6   considered in reporting suspicious orders, did you go

 7   and grab the latest copy of the suspicious order

 8   report that you had received in-house to look and see

 9   whether or not it was a monthly report, whether it was

10   just showing excessive purchases, or -- or any of

11   these things that are being talked about here?

12        A.    Not that I recall.

13        Q.    Okay.  Did you direct your SAIL

14   coordinators, whether it was Brook or Lori or Chad at

15   the time that you received this -- this letter --

16        A.    Uh-huh.

17        Q.    -- and ask them to take the letter and --

18   and -- and analyze the letter versus the suspicious

19   order report that you received there in-house and ask

20   them to see whether or not the suspicious order report

21   was in compliance with the direction you are getting

22   from the DEA?

23        A.    Yeah, I can't remember back that far.  So

24   I'd have to say again I -- I don't recall.
```

1      Q.   Do you recall whether or not you advised

2  up the chain, whether it was Barb or -- or somebody

3  else in -- in corporate, that, Hey, we get this

4  suspicious order report, here I just got a letter from

5  the DEA that I think you told us doesn't happen very

6  often, right?

7      A.   Right.

8      Q.   I mean, it is a rare occasion for you to

9  get a -- get a letter, especially from the deputy

10 assistant administrator of -- of the Office of

11 Diversion Control at DEA, right?

12     A.   Well, it was just unusual to get a letter

13 from the DEA period --

14     Q.   Right.

15     A.   -- no matter who it is from.

16     Q.   You agree it is something that -- that you

17 would definitely have take -- taken notice of?

18     A.   Um-hum.

19     Q.   Okay.  Something that you would have

20 wanted to take seriously, right?

21     A.   Right.

22     Q.   Okay.  You don't have any memory of -- of

23 you comparing the letter versus the suspicious order

24 report or asking your SAIL coordinators to or asking

Highly Confidential - Subject to Further Confidentiality Review

1    anybody up the chain, such as Barb Martin or -- or

2    anybody else to do that, is that fair?

3         A.    What's fair is all I did was -- if I --

4    and I'm, again, not certain of this, but I would have

5    thought I would have sent this to Barb, a copy of it

6    to Barb and filed one here in the building.  I don't

7    recall having a SAIL coordinator take out a suspicious

8    drug report and compare it line to line.  You know, I

9    don't recall doing that, no.

10        Q.    Okay.  Other than maybe sending it to Barb

11   and putting it in a file, do you recall any action

12   whatsoever that you took or that you directed to be

13   taken in response to this letter?

14        A.    No.

15        MS. SWIFT:  Objection; asked and answered.

16   BY MR. GADDY:

17        Q.    It then goes on to say:

18             "Lastly, registrants that routinely report

19   suspicious orders, yet fill these orders without first

20   determining that order is not being diverted into

21   other than legitimate medical, scientific, and

22   industrial channels, may be failing to maintain

23   effective controls against diversion."

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    What do you understand that to mean?

 3       MS. SWIFT:  Object to the form.

 4  BY THE WITNESS:

 5       A.    I understand that to mean what it says.

 6  BY MR. GADDY:

 7       Q.    That you have to -- that if you get a

 8  suspicious order --

 9       MS. SWIFT:  Were you finished with your ans --

10  answer?

11       THE WITNESS:  Yeah.

12       MS. SWIFT:  Okay.

13  BY THE WITNESS:

14       A.    Okay, so I guess what -- what I'm reading

15  this to say, it says:

16            "Registrants that" -- "Registrants that

17  routinely report suspicious orders, yet fill these

18  orders without first determining that order is not

19  being diverted."

20            But our orders always went to Walgreens

21  drugstores with registered DEA numbers, so would that

22  be -- that doesn't mean it was sent to Joe's pharmacy

23  on the corner, you know what I mean?

24  BY MR. GADDY:
```

1      Q.     Okay.

2      A.     So isn't that answering that or not?

3      Q.     Well -- well, let me ask you a couple of

4  questions about that.

5      A.     Okay.

6      Q.     Is it your assumption that if your orders

7  are going to Walgreens stores, that they can never be

8  suspicious?

9      MS. SWIFT:  Object to the form.

10  BY THE WITNESS:

11      A.     Never be suspicious to whom, I mean?

12  What -- I -- I don't understand what you are asking me

13  for.

14  BY MR. GADDY:

15      Q.     Okay.  Do you understand that sentence to

16  be saying that if you report the orders as

17  suspicious --

18      A.     Uh-huh.

19      Q.     -- prior to filling them, you actually

20  have to do some due diligence and clear the orders to

21  make sure you know that they are not being diverted?

22      MS. SWIFT:  Object to the form; calls for a

23  legal conclusion.

24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Well, I know -- I knew that we had to,

 2  again, call on orders that seemed suspicious, but I

 3  don't think that's what you are asking me, is it?

 4  BY MR. GADDY:

 5      Q.    No, ma'am.

 6      A.    I'm sorry.

 7      Q.    I think --

 8      A.    I'm dense, but...

 9      Q.    And -- and let me try and be as clear as

10  possible.

11      A.    Okay.

12      Q.    And I don't always do a good job of that,

13  so tell me if it is still not clear.

14            I think we've established that on a

15  monthly basis you received a suspicious order report

16  into the distribution center and that was the

17  responsibility of the SAIL coordinator, correct?

18      A.    Correct.

19      Q.    Okay.  I think we've also established that

20  there were never any time periods in which you were

21  asked to hold orders, correct?

22      A.    Correct.

23      Q.    Okay.  Do you understand this paragraph to

24  be saying that prior to filling a suspicious order
```

Highly Confidential - Subject to Further Confidentiality Review

1    that's reported:  "Registrants that routinely report

2    suspicious orders, yet fill these orders without first

3    determining the order is not being diverted," do you

4    understanding that -- understand that sentence is to

5    be saying you have to do some type of due diligence to

6    clear the order prior to filling it?

7         MS. SWIFT:  Object to the form; calls for a

8    legal conclusion.

9    BY THE WITNESS:

10        A.    No, actually, I'm understanding that to

11   say that we have to make sure the order is going to

12   one -- our -- one of our drugstores and not being

13   diverted into other legitimate, blah, blah, blah.

14   That's how I understand it.

15   BY MR. GADDY:

16        Q.    So your interpretation of that sentence is

17   as long as the order is going to a Walgreens store

18   that it's okay?

19        MS. SWIFT:  Object to the form, calls for a

20   legal conclusion.

21   BY THE WITNESS:

22        A.    Well, as long as it's -- it would have

23   been checked before it ever got shipped out as far as

24   suspicious quantities by the methods I've already

1    talked about, you know what I mean, by the computer

2    room's query, the systemic issue of the sys -- the

3    system trying to, you know, mark down items that are

4    too high and the pickers bringing things to me that

5    were too high or seemed too high.

6    BY MR. GADDY:

7        Q.    Okay.  I think I got confused myself.

8        MS. SWIFT:  Well, that was pretty clear.

9    BY MR. GADDY:

10       Q.    When you say it would have been checked

11   before it was shipped out, you are referring back to

12   this conversation that you had at some point in time

13   with Ann Anaya?

14       MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16       A.    I'm referring back to the three -- the

17   three things we already talked about, which was the

18   computer room running whatever query they were

19   running, the system automatically not letting orders

20   drop if they were too high, and the pickers -- and/or

21   the pickers coming to me if they saw something that

22   seemed way out of place for quantity.

23   BY MR. GADDY:

24       Q.    Do you have any understanding whatsoever

1   of what the computer room was -- was doing or running

2   to screen these orders?

3      MS. SWIFT:  Objection; asked and answered.

4   BY THE WITNESS:

5      A.    I only know they were running a query.

6   That's about the extent of it.

7   BY MR. GADDY:

8      Q.    Okay.  So -- and then we've -- we've

9   talked ad nauseam about what the high -- the high

10  numbers that you would -- that would be reported to

11  you either by the computer room or the pickers,

12  correct?

13     A.    Correct.

14     Q.    Keeping this sentence in mind that --

15  where it says:  "Registrants that routinely report

16  suspicious orders, yet fill these orders without first

17  determining that the order is not being diverted," are

18  you aware of anybody at the distribution center level

19  did -- that ever did any type of investigation or

20  analysis of any of the orders that came in other than

21  what you've talked to us about as far as the -- the

22  phone calls to the stores that you would make if there

23  was something eye popping that you thought might be an

24  error?

```
 1        MS. SWIFT:  Object to the form.

 2             Do you mean also other than everything she

 3   just said?

 4   BY MR. GADDY:

 5        Q.    You can go ahead and answer.

 6        A.    Okay.  Could you repeat it, because now

 7   I'm lost.

 8             Did it -- what did you say, it was the

 9   first part of the question?

10        Q.    So keeping this sentence in mind where it

11   says:  "Registrants that routinely report suspicious

12   orders, yet fill these orders without first

13   determining that the order is not being diverted,"

14   okay?

15        A.    Okay.

16        Q.    What I'm asking you is if you are aware of

17   anything at the distribution center, any

18   investigation, any analysis, any type of -- of due

19   diligence or follow-up that anybody is doing outside

20   of what you've already told us about --

21        A.    Talked about.

22        Q.    -- as far as the orders that you believe

23   may be errors?

24        MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GADDY:

 2       Q.   Are you aware of anything that anybody

 3   else was doing?

 4       MS. SWIFT:  Asked and answered many times.

 5   BY THE WITNESS:

 6       A.   Yeah, not that I'm aware of.

 7       MS. SWIFT:  Can I just ask how long we have been

 8   going?

 9       THE VIDEOGRAPHER:  Just over four hours.

10       MS. SWIFT:  No, I'm sorry.  This last chunk.

11       THE VIDEOGRAPHER:  Oh.

12       MS. SWIFT:  It feels like it, but...

13       THE VIDEOGRAPHER:  An hour and 18 minutes.

14       MS. SWIFT:  I'll just note that it is lunchtime.

15       MR. GADDY:  That's fine.  We can go ahead and

16   break for lunch.

17       MS. SWIFT:  Thanks, Jeff, I appreciate it.

18       THE VIDEOGRAPHER:   Going off the record at

19   12:38.

20               (WHEREUPON, a recess was had

21                from 12:38 to 1:14 p.m.)

22       THE VIDEOGRAPHER:  We are back on the record at

23   1:14.

24   BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Ms. Bish, I want to ask you one more thing

2   about this Rannazzisi letter and then we'll move on

3   from that.

4            If you would turn to the second page for

5   me, please, the second full paragraph on the -- on the

6   page, the second sentence that starts:  "Daily,

7   weekly, monthly" on the right-hand side of the -- of

8   the paragraph.

9      A.    Oh, um-hum.

10     Q.    It says:

11           "Daily, weekly" -- the second paragraph,

12  second sentence, starts:  "Daily, weekly, or monthly

13  reports submitted by registrant indicating excessive

14  purchases do not comply with the requirement to report

15  suspicious orders, even if the registrant calls such

16  report" -- "reports suspicious order reports."

17           Do you see that?

18     A.    Yes.

19     Q.    Okay.  And you recall we've looked at one

20  of those Walgreens suspicious order reports earlier,

21  right?

22     A.    We looked at one, yes.

23     Q.    Okay.  Do you recall -- I think you've

24  told us that you received this letter in December

1    of -- of 2007, that you know you would have filed it

2    and that you believe you may have sent it to Barb,

3    correct?

4         A.    Correct.

5         Q.    And that's Barb Martin?

6         A.    Correct.

7         Q.    After you received this letter in December

8    of 2007, do you recall there being any change in the

9    practice of Walgreens having these monthly suspicious

10   order reports?

11        MS. SWIFT:  Objection; calls for speculation.

12   BY THE WITNESS:

13        A.    The -- not that I noticed.  The suspicious

14   monthly reports still came monthly, I mean...

15   BY MR. GADDY:

16        Q.    Let me show you what I will mark as

17   Exhibit No. 18.  This is P-WAG 240.

18                  (WHEREUPON, a certain document was

19                   marked Walgreens - Bish Deposition

20                   Exhibit No. 18, for identification,

21                   as of 02/01/2019.)

22   BY MR. GADDY:

23        Q.    And I'm actually going to be at --

24        MR. GADDY:  I think you are going to have the

1    document in reverse order.  I am actually going to be

2    at Page No. 1, which is probably going to be the last

3    page of the document.

4              There you go.

5    BY MR. GADDY:

6         Q.    And do you see, Ms. Bish, this is a

7    Walgreens document entitled "Internal Audit Report" at

8    the top?

9         A.    Yes.

10        Q.    And it has a date on it of December 22nd,

11   2008, correct?

12        A.    Correct.

13        Q.    That would be approximately a year after

14   you received this Rannazzisi letter, is that fair?

15        A.    Correct, um-hum.

16        Q.    Okay.  And it says, the subject is:  "DEA

17   compliance-Perrysburg distribution center."

18              Do you see that?

19        A.    Yes.

20        Q.    Do you recall ever seeing one of these

21   internal audit reports before?

22        A.    No.

23        Q.    And it has a "from" line and it lists four

24   names and next to all of them it says "internal

Highly Confidential - Subject to Further Confidentiality Review

```
 1    audit."

 2              Do you see that?

 3    A.    Yes.

 4    Q.    The last person listed there is a

 5    Yarbrough?

 6    A.    Yes.

 7    Q.    I think you've mentioned that name earlier

 8    today?

 9    A.    Yes.

10    Q.    Do you know Mr. Yarbrough's first name, or

11    Mrs. Yarbrough?

12    A.    Well, seeing the "B" it kind of is jogging

13    my memory, it's Brian maybe.

14    Q.    Okay.

15    A.    Brian Yarbrough.

16    Q.    Okay.  And tell me what your interaction

17    with Brian has been?

18    A.    I don't recall our interaction.  The name

19    just rang a bell.  So I -- I knew he was in internal

20    audit.  I don't recall any of our interactions.

21    Q.    Okay.  Do you ever recall Brian or any --

22    anybody else that you knew of being from internal

23    audit being in the Perrysburg distribution center and

24    doing any type of activity that would have led to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compilation of a report?

 2         A.    I don't recall if they -- if they came to

 3    the DC and saw me, I don't recall talking to them.

 4         Q.    And in your role as the C-II function

 5    manager, would it be fair to say that you have no

 6    memory of Brian Yarbrough or anybody else in internal

 7    audit coming and sitting down to talking -- talking

 8    with you and asking you questions for the purposes of

 9    performing an audit of the distribution center?

10         A.    Yes, that would be correct.

11         Q.    Okay.  And it looks like this report was

12    sent to Steve Kneller, who at the time was the manager

13    of the Perrysburg distribution center.

14               Do you see that?

15         A.    Yes.

16         Q.    And also Dan Coughlin who it has as the

17    regional vice president.

18               Do you know Mr. Coughlin or who he is?

19         A.    I've heard his name.  I don't know him.

20         Q.    Does he work out of the distribution

21    center?

22         A.    No.

23         Q.    Do you know where he works out of?

24         A.    I assumed corporate office or home office.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  And that's Deerfield?

 2        A.    Yes.

 3        Q.    And -- and let's see, the conclusion is

 4   there in the middle of the page in -- in the box,

 5   correct?

 6        A.    Yes.

 7        Q.    It says:

 8              "In our opinion, internal controls that

 9   ensure compliance with DEA regulations at the

10   Perrysburg distribution center require improvement."

11              Do you see that?

12        A.    Yes.

13        Q.    During this timeframe, December 2008,

14   early 2009, do you re -- do you recall Mr. Kneller or

15   anybody else from -- from corporate or otherwise from

16   Walgreens coming and telling you that there were

17   improvements needed for the distribution center to

18   comply with DEA regulations?

19        A.    No, I don't recall that.

20        Q.    It says:

21              "In addition, some of these issues pertain

22   to all company distribution centers and should be

23   addressed to avoid potential DEA sanctions."

24              Do you see that?
```

1       A.      Yes.

2       Q.      Similar question, during this time period

3   did anybody from Walgreens ever come and tell you

4   that -- that there was the potential for DEA sanctions

5   if there were not improvements made to some of the

6   compliance issues at the distribution center?

7       A.      No.

8       Q.      Okay.

9       A.      Not to my recollection.

10      Q.      It says:

11              "Specifically, our review found four

12  issues previously cited in the DEA's May 2006

13  inspection report that are still open."

14              Do you see that?

15      A.      Yes.

16      Q.      And do you recall we looked at some of

17  that -- a little bit of that May report and that was

18  the one that said the suspicious order reporting was

19  insufficient.

20              Do you recall that?

21      A.      Yes.

22      Q.      It says:

23              "In addition, four issues noticed" --

24  "noted in our previous audit, which was July 2005,

```
 1    remain un-remediated."

 2            Do you see that?

 3    A.    Yes.

 4    Q.    And then it says:

 5            "Areas requiring the greatest level of

 6    improvement are as follows," and it breaks them into

 7    two categories:  One is DC wide and one is Perrysburg.

 8            Do you see that?

 9    A.    Yes.

10    Q.    For all of the distribution centers, the

11    second bullet point reads:

12            "Suspicious controlled drug order

13    processing and reporting."

14            Do you see that?

15    A.    Yes.

16    Q.    And then the fourth bullet point for all

17    distribution centers says:

18            "Lack of formalized C-II controlled

19    substance policies and procedures."

20            Do you see that?

21    A.    Yep.

22    Q.    I asked you generally about the -- the

23    audit that took place and whether anybody ever

24    notified you about that.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Specifically as to these two issues that

2     both touch on Schedule II controlled substances, the

3     suspicious controlled drug order process and recording

4     and the formalized C-II controlled substance policies

5     and procedures, did anybody from internal auditing,

6     anybody from corporate, anybody at all with Walgreens

7     come to you and tell you that those were two areas

8     that had been identified as requiring improvement so

9     as to avoid potential DEA sanctions?

10          A.    No, not to my recollection.

11          Q.    Do you recall if we -- that when we looked

12     in your LinkedIn profile, one of the things that you

13     had indicated you had had the opportunity to do when

14     you were bringing the C-II department online --

15          A.    Uh-huh.

16          Q.    -- was draft some policies and procedures,

17     correct?

18          A.    Correct, yep.

19          Q.    That was something that fell directly

20     within your purview, correct?

21          A.    Correct.

22          Q.    And that was something that -- that you

23     put together, I think you said after and in

24     coordination with visiting with the folks at Woodlands

Highly Confidential - Subject to Further Confidentiality Review

```
1    and the folks at Jupiter, correct?

2        A.    Correct.

3        Q.    Okay.  At any point in time after you had

4    done that, did you receive any feedback from anybody

5    else at Walgreens, corporate, Barb Martin, internal

6    auditing, Steve Kneller, or those types of folks, that

7    there were any deficiencies with the policies or

8    procedures that you put together?

9        A.    Not that I recall.

10       Q.    Did anybody ask you to improve on them

11   or -- or make them more extensive or -- or -- or

12   anything like that?

13       A.    No, uhn-uhn.

14       Q.    Under Perrysburg specifically, the first

15   bullet point is:

16             "Significant concern regarding the growing

17   in-transit controlled drug losses."

18             Do you see that?

19       A.    Yes.

20       Q.    Do you know what's being referred to

21   there?

22       A.    I believe that's talking about the

23   pilferage of UPS, FedEx packages.

24       Q.    Okay.  Did you have any involvement with
```

Highly Confidential - Subject to Further Confidentiality Review

1    trying to remedy that situation?

2         A.    I can't say I had involvement in remedying

3    the situation.  I generally sometimes -- you know, I

4    know we -- I had to report it to the local police, of

5    course fill out the DEA 106, or maybe the store did

6    that if it was in transit to them, but I personally

7    did not go out and interview suspects or do anything

8    like that, no.

9         Q.    Okay.  Okay.  If you'd turn the page --

10   page for me, please.  The very top under Background it

11   says:

12              "Internal audit's examination for

13   compliance with DEA regulations and company policies

14   for the distribution of controlled drugs was conducted

15   November 17 through 21, 2008."

16              Do you see that?

17        A.    Yes.

18        Q.    And it says:

19              "The company policies and procedures

20   regarding controlled drugs are communicated to the DCs

21   via the online compliance manual."

22              Do you see that?

23        A.    Yes.

24        Q.    Do you know what's being referred to

1    there, the online compliance manual?

2         A.    Not exactly, no.

3         Q.    Is that something that -- that you had

4    access to?

5         A.    Well, I don't know exactly what they are

6    referring to, so I don't know if I had access or not.

7         Q.    But did you know that -- that the internal

8    audit department was doing at Perrysburg a -- an

9    examination of whether or not your distribution center

10   was in compliance with DEA regulations regarding

11   controlled drugs?

12        A.    No, I don't believe I knew that.

13        Q.    Until we started looking at this document,

14   did you know that that had happened?

15        MS. SWIFT:  Object to form.

16   BY THE WITNESS:

17        A.    No, I didn't know that that had happened.

18   BY MR. GADDY:

19        Q.    Okay.

20             At no time did anybody come to you and

21   say, Hey, these are the -- these are the changes,

22   these are the improvements, these are the -- the edits

23   we are making to policies based on this internal audit

24   that we perf -- that we had performed?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     They -- I don't recall anyone coming to

 2   me, no.

 3        Q.     It says under -- under Objective, it says:

 4               "The purpose of our review was to

 5   ascertain if the Perrysburg distribution center is in

 6   compliance with DEA regulations and Walgreens'

 7   policies relating to controlled dis" -- "drug

 8   distribution, handling, and reporting."

 9               Do you see that?

10        A.     Yes.

11        Q.     Under the Scope it says:

12               "The review focused on the internal

13   controls established by Walgreens distribution centers

14   to ensure compliance with DEA regulation Section 1300

15   found in Title 21 of the Federal Code of Regulations."

16               Do you see that?

17        A.     Yes.

18        Q.     And you recall that we've looked at some

19   of the regulations during the course of our time here

20   today?

21        A.     We've looked at a couple, yes.

22        Q.     Under the Findings, it says:

23               "Our review found compliance with the

24   following items."
```

1          Do you see that?

2     A.    Yes.

3     Q.    And it looks like they listed three

4  different areas where -- that they had examined

5  that -- that they found the distribution center was in

6  compliance, right?

7     A.    That's what it looks like, yeah.

8     Q.    It looks like one related to

9  pseudoephedrine receiving and shipping reports, one

10 related to retention of records, and one related to

11 controlled substance shipping policies and procedures,

12 right?

13    A.    Right.

14    Q.    And if you go down to the next paragraph,

15 it says:

16          "Our review disclosed opportunities for

17 improvement of compliance controls in the areas

18 specified below.  Management has addressed our

19 concerns and corrective action has either been

20 performed or is in the process of remediation."

21          Do you see that?

22    A.    Yes.

23    Q.    It says:

24          "Detailed descriptions of our finding and

Highly Confidential - Subject to Further Confidentiality Review

1    recommendations, along with management responses, are

2    included in Attachment A as indicated."

3            Correct?

4    A.    Yes.

5    Q.    And then it looks like it lists several

6    different areas, and -- and specifically for -- for

7    our conversation today, I'm most interested in the

8    second one which says:  "Controlled drug reporting."

9            Do you see that?

10   A.    Yes.

11   Q.    Okay.  And then the last one that's

12   indicated on there is:  "Lack of C-II controlled drug

13   policies and procedures."

14           Do you see that?

15   A.    Yep.

16   Q.    Okay.  If you turn the page, we are going

17   to be on page -- Page 1 of Exhibit A.

18           Are you with me, Ms. Bish?

19   A.    Yes, the POC reporting requirements?

20   Q.    And that -- yeah, yep.  And actually turn

21   one more page.  Sorry.

22   A.    Okay.  That's what I thought.

23   Q.    And -- okay.

24           So on Page 2 of Exhibit A, we see the date

1    of 12/22/08 up in the top left-hand corner?

2        A.    Correct.

3        Q.    And the Issue No. 2 is:  "The controlled

4    drug reporting."

5              Do you see that?

6        A.    Yes.

7        Q.    And it states:

8              "Walgreens is required to have a process

9    to disclose to the DEA any suspicious orders of

10   controlled drugs that deviate from the normal size,

11   pattern, and frequency.  Any orders that are deemed to

12   be suspicious are required to be reported to the DEA

13   upon discovery."

14             Do you see that?

15       A.    Yes.

16       Q.    And then it goes on to say:

17             "Walgreens produces a monthly suspicious

18   controlled drug order report."

19             Do you see that?

20       A.    Yes.

21       Q.    Okay.  And I think we established this is

22   about a year after you personally received the

23   Rannazzisi letter, right?

24       A.    Yes.

1    Q.    And that was the letter that -- that,

2 among other things, said in there that -- that monthly

3 reports for suspicious orders was -- was not

4 appropriate, correct?

5    A.    Yes, it did say that.

6    Q.    Okay.  There is several sections of -- of

7 what the internal audit folks found that's -- that's

8 been redacted that I'm not able to ask you about.

9          Do you know if Brian Yarbrough is an

10 attorney?

11    A.    No, I don't know that.

12    Q.    Do you know if any of those internal audit

13 folks are attorneys?

14    A.    I don't know the other three, so I

15 couldn't -- I don't know.

16    Q.    Okay.  Okay.

17          Well, the next thing that we can see there

18 is -- is the recommendation that the internal audit

19 folks were providing, correct?

20    A.    Correct.

21    Q.    And what they say is:

22          "We recommend discussions continue with

23 the cross-functional team consisting of logistics,

24 corporate and regulatory law, and loss prevention

Highly Confidential - Subject to Further Confidentiality Review

```
 1    departments."

 2            And then we can't really see much after

 3    that.  Do you see that?

 4        A.    Yes.

 5        Q.    And it looks like the management who was

 6    assigned to respond to this was Dan Coughlin over in

 7    the far right-hand column?

 8        A.    Yes, that's what it looks like.

 9        Q.    And what he says here is:

10            "We will coordinate another meeting during

11    the third quarter to continue discussions on reporting

12    suspicious controlled drugs orders."

13            Do you see that?

14        A.    Yes.

15        Q.    And it looks like he has an estimated date

16    for this next meeting of about five months after this

17    report, is that correct?

18        A.    Yes.

19        Q.    Okay.  Would you agree with me that --

20    that there didn't seem to be a very heightened sense

21    of urgency about addressing this issue in this report

22    if the meeting is set five months later?

23        MS. SWIFT:  Object to the form, foundation.

24    BY THE WITNESS:
```

1    A.    Well, I don't know what -- what is one

2    person's urgency isn't necessarily another's.

3    BY MR. GADDY:

4    Q.    Okay.  Let me just ask for you.

5    A.    Okay.  For me.

6    Q.    For you, if you -- if you had gotten a

7    letter, as you did in 2000 -- in December of 2007

8    saying you shouldn't be doing monthly reports of

9    suspicious orders, that doesn't comply with the

10   regulations, and if you have results of an internal

11   audit a year later that says that's an issue that we

12   flagged where we are concerned about potential

13   sanctions from the DEA if we don't fix this issue, and

14   you see that you are still doing monthly reports of

15   suspicious orders a year later --

16   A.    Uh-huh.

17   Q.    -- would you agree that setting a meeting

18   to talk about it five months down the road, in your

19   opinion, your opinion only, would you agree that's not

20   exactly demonstrating a sense of urgency?

21   MS. SWIFT:  Objection; lacks foundation.

22   BY THE WITNESS:

23   A.    Well, it would, but it sounds like he is

24   not -- he is saying the next cross-functional meeting,

```
 1    but in the meantime I -- I understand that the people

 2    are going to talk to each other and discuss their

 3    ideas.  But my understanding is on May 31st, then,

 4    they are going to get together and say here is what

 5    we've come up with, you know, and decide what they are

 6    going to do.

 7    BY MR. GADDY:

 8        Q.    Okay.

 9        A.    That's how I read it.

10        Q.    Do you -- is that a sense of urgency to

11    you or no?

12        MS. SWIFT:  Object to the form.

13    BY THE WITNESS:

14        A.    So you are asking for my personal opinion.

15    I -- I would -- I probably would have done it a couple

16    months sooner personally, but...

17    BY MR. GADDY:

18        Q.    You would agree that if they had set a

19    meeting in two or three or four, even five days, I

20    think we would be in agreement that that was

21    demonstrating a sense of urgency?

22        MS. SWIFT:  Objection; lacks foundation.

23    BY THE WITNESS:

24        A.    Well, I -- I would think a couple of weeks
```

1    is what I would have given it, but yeah, not three,

2    four, five days, but...

3    BY MR. GADDY:

4         Q.    So a couple of weeks you would have -- you

5    would have agreed was -- was demonstrating a sense of

6    urgency, a couple of days you definitely would agree

7    was demonstrating a sense of urgency, right?

8         A.    Yeah, that would be -- a couple of days

9    would definitely be urgent.

10        Q.    That would show that -- I mean, a couple

11   of days, that would show it was -- it was a pretty

12   high priority to get it -- to get it addressed,

13   correct?

14        A.    In my opinion, yeah.

15        Q.    Okay.

16              Turn with me, if you would, it is going to

17   be the very last page of the document, or the very

18   first page, I believe it is 14, of Exhibit A.  And you

19   see this is the section about the development of C-II

20   controlled drug policies and procedures.

21              Do you see that?

22        A.    Yes.

23        Q.    And it says in the issue box that:

24              "The logistics and planning department

```
1    utilizing the online compliance manual to communicate

2    management's objectives, policies and procedures for

3    C-III through V controlled drug process to ensure

4    compliance with DEA regulations."

5              Do you see that?

6    A.     Yes.

7    Q.     It goes on to say:

8              "Based on the past DEA compliance reviews

9    performed at DCs housing C-II controlled drugs, IA has

10   noted the need to formalize the policies and

11   procedures specific to the C-II controlled drug

12   process due to recurring issues and unknown procedures

13   to ensure regulatory compliance."

14             Do you see that?

15   A.     Yes.

16   Q.     Do you agree with what the internal audit

17   department is saying here that -- that it would be a

18   good thing to have consistent policy and pre --

19   procedures in place as it relates to the handling and

20   reporting of C-II drugs?

21             You would agree with that, right?

22   A.     Yes, I would.

23   Q.     And if you look under the Risk section, it

24   says:
```

1          "If C-II controlled drugs policies and

2     procedures are not documented and available for

3     reference, employees could make compliance decisions

4     that are not in the best interests of Walgreens."

5          Do you see that?

6     A.    Yes.

7     Q.    And you agree that -- that if you don't

8     have consistent and available policies and procedures,

9     that that could lead to problems?

10    A.    Well, I don't know if it would lead to

11    problems, but you always want to be consistent with

12    your three DCs running a C-II, you would want each of

13    them doing it the same way just because -- that's the

14    same way with any department, you know.

15    Q.    It goes on to say in the Recommendation

16    section:

17          "The logistic and planning department

18    should develop and update the online compliance manual

19    to include policies and procedures covering the entire

20    C-II controlled drug process."

21          Do you see that?

22    A.    Yes.

23    Q.    And -- and I -- and -- and I think it

24    would be fair to say that during the course of today

Highly Confidential - Subject to Further Confidentiality Review

```
1    I've asked you questions about a lot of different

2    processes --

3         A.    Uh-huh.

4         Q.    -- in the C-II process.

5         A.    Uh-huh.

6         Q.    Does that make sense?

7         A.    Yeah.

8         Q.    Okay.  Do you agree with that?

9         A.    Yeah, you've asked me a lot of questions

10   about that, yeah.

11        Q.    Okay.

12              And -- and you would agree that there has

13   been many times where you've had to tell me, Look, I

14   know you are asking about C-IIs, but that falls

15   outside of my purview for what I do with C-IIs.

16              Is that fair?

17        A.    Yes, some of them, yeah.

18        Q.    Okay.  Was this ever done, this -- this

19   recommendation here from December of 2008, was -- was

20   it ever done where there were policies and procedures

21   putting together that covered the entire C-II

22   controlled drug process so that somebody like you who

23   might get a letter from Joe Rannazzisi about issues or

24   compliance-related matters with the C-II process could
```

1    be properly informed to how to respond to that letter

2    or to who to send that letter to or what actions to

3    take?

4        MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6        A.    I actually do think they did put C-II --

7    something for C-II policies on the Intranet, which is

8    where I think they are referring to back over here

9    about a compliance manual online for everyone to view.

10   That's where I think they're re -- put their -- that's

11   what they are referring to, I believe.

12   BY MR. GADDY:

13       Q.    Okay.  After that happened, do -- do you

14   recall there being any training session or

15   instructional opportunity where you could actually sit

16   down and learn the entire C-II controlled drug process

17   so that you could answer some of these questions about

18   the suspicious order monitoring program or ceiling

19   limits or threshold limits or things like that that

20   you haven't really completely been in the loop about

21   today?

22       MS. SWIFT:  Object to the form, compound.

23   BY THE WITNESS:

24       A.    Well, the things it lists here, first of

Highly Confidential - Subject to Further Confidentiality Review

```
 1   all, no, I -- I don't recall anyone saying you need to

 2   go read all of these.  But I was aware that they were

 3   there, but, again, the suspicious drugs and all of

 4   that I thought were being handled by other

 5   departments, but what they have listed here are things

 6   that I would expect to have in that manual, the

 7   receiving, shipping, DEA forms, vault combination

 8   changes, how often do you make them, why do you make

 9   them, power of attorney letters, you know, on and on.

10   BY MR. GADDY:

11        Q.   Do you agree that you would have been in a

12   better position to respond to or forward on the letter

13   you got from Joe Rannazzisi had you actually had some

14   substantive knowledge about the suspicious order

15   monitoring process that was being utilized at

16   Walgreens?

17        MS. SWIFT:  Object to the form, mischaracterizes

18   the testimony.

19   BY THE WITNESS:

20        A.   I don't know.  Say that a -- or repeat

21   that a minute, can you?

22   BY MR. GADDY:

23        Q.   Sure.

24             So I -- I think you've told us a couple of
```

```
 1    times that you were under the impression --

 2         A.    Uh-huh.

 3         Q.    -- that somebody at corporate, maybe Barb

 4    Martin, maybe somebody else, maybe some other group,

 5    was doing some type of monitoring or screening

 6    process.

 7               Is that generally fair?

 8         A.    Right, the program, yeah.

 9         Q.    Okay.

10         A.    The computer program, whatever.  Uh-huh.

11         Q.    You get this letter in from Joe

12    Rannazzisi, you file it, you believe you may have sent

13    it to Barb Martin.

14         A.    Uh-huh.

15         Q.    My question for you is:  Do you agree that

16    you could have better res -- been in a better position

17    to respond to that letter or in a better position to

18    forward it to -- to the appropriate people or in a

19    better position to raise concerns that are addressed

20    in that letter had you actually had some substantive

21    knowledge about what Walgreens was doing specifically

22    as it related to sus -- suspicious order monitoring?

23         MS. SWIFT:  Objection; compound,

24    mischaracterizes the testimony.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    Would I have perhaps sent it to different

 3   people.  I might have sent it to more internal audit

 4   people.  I can see where that would have assisted me

 5   with knowing that.  I can't really say it would have

 6   made a difference otherwise.

 7   BY MR. GADDY:

 8       Q.    Well, for example, the -- the Rannazzisi

 9   letter says that monthly reports of suspicious orders

10   are -- are -- is not appropriate, not the way to do

11   it, right?

12       A.    Right.

13       Q.    Yeah.

14       A.    Yeah.

15       Q.    And we know now because we've looked at

16   one of those today, that that's what Walgreens was --

17   was doing was suspicious or -- monthly reports of

18   suspicious orders, right?

19       MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21       A.    Yeah, that's what the form said.  I just

22   don't know what else they were doing on top of that

23   already.

24   BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Sure.

2              And -- and tell me if I'm wrong, but my

3      presumption was that if you knew that Walgreens'

4      practice was just doing simple monthly suspicious

5      order reports and sending them to the DEA --

6      A.      Uh-huh.

7      Q.      -- and then you got a letter from the DEA

8      saying that's not the way to do it, I imagine that you

9      would have raised a flag and said, Hey, this is

10     serious, this is how we are doing it, the DEA is

11     saying you can't do it this way --

12     A.      Right.

13     Q.      -- we've got to take some action and

14     change something?

15     A.      Right.  That's what I mean.  I would have

16     sent it to internal audit people instead, because they

17     are the ones to me that would be more -- this would be

18     more relative to than Barb Martin --

19     Q.      Okay.

20     A.      -- is what I'm saying.

21     Q.      And -- and -- and you would have raised

22     that specific issue if that was one that you had been

23     able to identify, right?

24     A.      Yes.  I would have asked them to look at

 1    it and say are we -- you know, are we doing anything

 2    besides the printed report.

 3        Q.    Okay.  But because you didn't have this

 4    other knowledge about what was actually being done and

 5    because you weren't reviewing the suspicious order

 6    reports, you didn't have that ability or that --

 7    that -- you didn't have that knowledge that that was

 8    something that should be raised, is that fair?

 9        MS. SWIFT:  Object to the form of the question.

10    BY THE WITNESS:

11        A.    Well, it's fair to say that I would

12    have -- I would have not -- I -- I might have sent it

13    to different people.  I still don't think it would

14    have -- and those people that I thought would have the

15    most power to change things or tell me what else they

16    were doing besides the printed report, but I didn't

17    know what else they were doing.

18    BY MR. GADDY:

19        Q.    Now, we've referenced it a couple of times

20    already and I think we've looked at some e-mails from

21    April and May of 2012 that referenced issues going on

22    with the DEA at Jupiter.

23        A.    Uh-huh.

24        Q.    Do you recall that generally?

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.     Yes.

2      Q.     Okay.  And you certainly became aware that

3   the DEA began an investigation into the Jupiter

4   distribution center.

5             Is that fair?

6      A.     Well, I knew they had gone to the

7   distribution center.  I didn't know actually that they

8   were investigating, but, you know, that would be an

9   assumption.  I don't know that.  No one told me that.

10     Q.     Okay.  Do you know that Walgreens entered

11  into a settlement agreement with the DEA regarding

12  allegations that Walgreens had violated certain

13  provisions of the Controlled Substance Act?

14     A.     No, I wasn't aware of that either.

15     Q.     Okay.  I'm going to show you what I'm

16  going to mark as Exhibit No. 19.

17             (WHEREUPON, a certain document was

18              marked Walgreens - Bish Deposition

19              Exhibit No. 19, for identification,

20              as of 02/01/2019.)

21  BY MR. GADDY:

22     Q.     Do you see the -- this is P-WAG 1.

23             Do you see the very top page, top of the

24  first page says Settlement and Memorandum of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Agreement?

 2         A.    Yes.

 3         Q.    And if you read that first paragraph, it

 4    says:

 5               "This Memorandum of Agreement is entered

 6    into by and between DOJ and DEA and Walgreens."

 7               Do you see that?

 8         A.    Yes.

 9         Q.    Okay.  Do you know if you have ever seen

10    this page before?

11         A.    Just with my prep session.

12         Q.    Okay.  And when did you have the

13    opportunity to -- to prepare for the deposition today?

14         A.    Yesterday.

15         Q.    Okay.  And was that the only time?

16         A.    No.

17         Q.    Okay.  When was -- when was the other

18    occasion or occasions?

19         A.    I don't remember the dates.

20         Q.    How many times?

21         A.    Three times total.

22         Q.    Okay.  About how many hours each time?

23         A.    Two or three hours each.

24         Q.    Okay.  And during those meetings, you had
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the opportunities to look at some documents?

 2        A.    I was shown this document, which I hadn't

 3    seen.

 4        Q.    Okay.  Well, this wasn't the only document

 5    you were shown, was it?

 6        A.    No.  There were others.

 7        Q.    Okay.  And during those -- those prep

 8    sessions you were shown this document, it was fair to

 9    say it was the first time you were ever shown this

10    document?

11        A.    Yes.

12        Q.    Okay.  And had anybody at Walgreens prior

13    to this litigation that we are here taking your

14    deposition in, anybody at Walgreens ever shown you

15    this document before?

16        A.    No.

17        Q.    Okay.  When you were shown this document

18    during your -- your prep session, if it was only two

19    or three hours, I'm guessing you didn't get to read

20    the whole thing?

21        A.    No.

22        Q.    Okay.  Did you get to read any particular

23    portions of it?

24        A.    No.
```

```
 1        Q.    Okay.  If you look at -- I'm going to go

 2   under Procedural Back -- Background.

 3        A.    Okay.

 4        Q.    You see it says:

 5              "Walgreens owns or operates (or has

 6   previously owned or operated) distribution centers

 7   that are or were registered with DEA as distributors

 8   of Schedule II through V controlled substances under

 9   the provisions of the Controlled Substances Act."

10              Do you see that?

11        A.    Yes.

12        Q.    And I think you told us earlier that there

13   were only three that were approved to distribute

14   C-IIs, right?

15        A.    Right.

16        Q.    And that was --

17        A.    That I knew.

18        Q.    Okay.  And that was Jupiter, Woodland and

19   Perrysburg where you worked?

20        A.    Right.

21        Q.    Okay.  If you go down to the third

22   paragraph, do you see where it says that on April 7th,

23   2011, Walgreens entered into a settlement and release

24   agreement and a different MOA with the DEA.
```

```
 1              Do you see that?

 2      A.    And a different --

 3      Q.    Oh, I'm sorry.

 4      A.    Oh.

 5      Q.    "Entered into a settlement and release

 6   agreement and administrative MOA with the DEA."

 7              Do you see that?

 8      A.    Yes.

 9      Q.    And it says that's at Appendix A?

10      A.    Yes.

11      Q.    If you look at the very bottom of the

12   page, you'll see it says 1 of 349.

13      A.    Um-hum.

14      Q.    That's the numbering system I'm going to

15   use.

16      A.    Okay.

17      Q.    So let's turn to Appendix A real quick,

18   which is on Page 19.

19              Are you with me?

20      A.    Am I?  Appendix A?

21      Q.    Yes.

22      A.    Yeah.

23      Q.    And you see at the top it says

24   Administrative Memorandum of Agreement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.     Yes.

 2      Q.     And under Background it says:

 3             "On September 30th, 2009, the Deputy

 4   Assistant Administrative Office of Diversion Control

 5   issued an order to show cause proposing to revoke DEA

 6   Certificate of Registration," and it gives a number,

 7   "of Walgreens," and then it gives a number.

 8             Does that look like a store number?

 9      A.     Yes.

10      Q.     "Located at a particular address in

11   San Diego, California."

12             Do you see that?

13      A.     Yes.

14      Q.     It goes on to say that:

15             "That order to show cause alleged that

16   that particular Walgreens store dispensed controlled

17   substances to individuals based on purported

18   prescriptions issued by physicians who were not

19   licensed to practice medicine in California, dispensed

20   controlled substances to individuals located in

21   California based on internet prescriptions issued by

22   physicians for other than a legitimate medical purpose

23   and/or outside the usual course of professional

24   practice in violation of Federal and state law; and
```

Highly Confidential - Subject to Further Confidentiality Review

1    dispensed controlled substances to individuals that

2    Walgreens" or at that particular store "knew or should

3    have known were diverting the controlled substances."

4         Do you see that?

5         A.    Yes.

6         Q.    The first agreement that we were looking

7    at and that we'll go back to in a moment dealt with --

8    with what started at the Jupiter distribution center.

9         This is obviously dealing with a store in

10   San Diego, correct?

11        A.    Correct.

12        Q.    Did you, prior to us just looking at this

13   just now, did you have any understanding that there

14   was an earlier settlement agreement between Walgreens

15   and the DEA dealing with this particular store in

16   San Diego?

17        A.    No.

18        Q.    Do you see that the No. 3, the third

19   allegation listed there, dealt with that particular

20   Walgreens store's filling prescriptions that they knew

21   or should have known were being diverted?

22        A.    Knew or should have known, yeah, I see

23   that, um-hum.

24        Q.    So you'd agree with me that that's a

Highly Confidential - Subject to Further Confidentiality Review

1    possibility for -- for controlled substances to be

2    diverted even if they are going to Walgreens stores?

3         MS. SWIFT:  Objection to form; calls for a legal

4    conclusion.

5    BY THE WITNESS:

6         A.    Well, it says they -- they dispensed them

7    to individuals at the store -- oh, I see what they are

8    saying, "knew or should have known were diverting."

9              Oh, I'm not sure how they would have

10   known.  How would they have known?  Oh, I'm sorry.  I

11   can't ask you a question.

12        Q.    My question to you is -- is that do you

13   see there that part of this settlement agreement that

14   Walgreens entered into related to this store in

15   San Diego --

16        A.    Uh-huh.

17        Q.    -- that one of the reasons that they had

18   to enter into this settlement agreement were

19   allegations that this particular Walgreens store was

20   dispensing controlled substances to individuals that

21   it knew or should have known were diverting those

22   drugs?

23        A.    Yeah, I can see that.

24        Q.    Okay.  All right.  So turn with me to

1    the -- to the next page, Page 20, and Paragraph 4

2    says:  "Obligations of Walgreens."

3              Do you see at the very top of the page it

4    said:  "Terms and conditions for this settlement

5    agreement"?

6         A.    Yes.

7         Q.    Under A, it says:

8              "Walgreens agrees to maintain a compliance

9    program to detect and prevent diversion of controlled

10   substances as required under the Controlled Substances

11   Act and applicable DEA regulations."

12             Do you see that?

13        A.    Yes.

14        Q.    And:

15             "This program shall include procedures to

16   identify the common signs associated with the

17   diversion of controlled substances including but not

18   limited to, doctor-shopping and requests for early

19   refills."

20             Do you see that?

21        A.    Yes.

22        Q.    And if you go down to paragraph C, we see

23   another item that Walgreens agreed to, it says:

24             "Walgreens shall implement, maintain

Highly Confidential - Subject to Further Confidentiality Review

```
 1   policies and procedures to ensure that prescriptions

 2   for controlled substances are only dispensed to

 3   authorized individuals pursuant to federal and state

 4   law and regulations."

 5            Do you see that?

 6   A.     Yes.

 7   Q.     And then if you go to Paragraph D, you see

 8   another item that Walgreens agreed to, which is:

 9            "Walgreens shall not knowingly fill an

10   invalid prescription or a prescription that it

11   reasonably believes was issued for other than a

12   legitimate medical purpose or by a practitioner acting

13   outside the usual course of professional practice."

14            Do you see that?

15   A.     Yes, I see that.

16   Q.     And were any of these items that you were

17   made aware of by anybody at Walgreens as far as this

18   settlement that Walgreens was entered into based on

19   these 2009 allegations?

20   A.     I have not seen any of these before, is

21   that what you are asking?

22   Q.     I'm asking that -- I know you haven't seen

23   it, but I'm asking if anybody told you about it?

24   A.     No.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Flip back to the first page for me,

2  please.

3            Oh, sorry, first page of the whole

4  document.  And now I'm going to go down to Paragraph 5

5  and so we are going to go back to this -- this

6  investigation that started at Jupiter.

7      A.    Okay.

8      Q.    And do you see where -- you see -- are you

9  with me on Paragraph 5?

10     A.    Yep, yep.

11     Q.    It says:

12           "On September 13, 2012, the DEA, by its

13  administrator, Michelle M. Leonhart, issued an order

14  to show cause and immediate suspension to registration

15  to Walgreens Jupiter."

16           Do you see that?

17     A.    Um-hum.

18     Q.    And it directs us to -- to Appendix B.

19     A.    Right.

20     Q.    So let's go and look at that.  It's going

21  to be -- you are going to see Appendix B on Page 27

22  and then you can turn one page to get to the -- to the

23  actual order to show cause.

24           Are you with me?

```
 1        A.      Yes.  Uh-huh.

 2        Q.      And you see up at the top this Order to

 3   Show Cause is on DEA letterhead?

 4        A.      Yes.

 5        Q.      And it's dated September 13th, 2012.

 6                Do you see that?

 7        A.      Yes.

 8        Q.      And it says:

 9                "In the matter of Walgreens Company

10   Jupiter, Florida address."

11                Do you see that?

12        A.      Yes.

13        Q.      And it's entitled "Order to Show Cause and

14   Immediate Suspension of Registration," correct?

15        A.      Correct.

16        Q.      It then says, in the first sentence under

17   Notice, it says:

18                "Notice is hereby given to inform Walgreen

19   Corporation of the immediate suspension of DEA

20   Certificate of Registration," and then it gives a

21   number, "pursuant to certain statute, because such a

22   registration constitutes an imminent danger to the

23   public health and safety."

24                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.      Yes.

2       Q.      Did anybody at Walgreens ever tell you

3   that the DEA had determined that were the Jupiter

4   distribution center to continue to operate, distribute

5   C-II drugs, that the DEA considered that to constitute

6   an imminent danger to the public health and safety?

7       A.      No.

8       Q.      Okay.  Would you agree that that's a

9   pretty serious allegation?

10      A.      If it were true, yes, it would be.

11      Q.      Okay.  If you go to Paragraph 2 --

12      A.      Uh-huh.

13      Q.      -- on the next page --

14      A.      Uh-huh.

15      Q.      Do you see where it says:

16              "Since 2009, the State of Florida has been

17  the epicenter of a notorious, well-documented epidemic

18  of prescription drug abuse."

19              Do you see that?

20      A.      Yes.

21      Q.      Did you have that understanding back in

22  2009, 2010, 2011?

23      A.      Yeah.  That would have just been from the

24  news.  My understanding is not from Walgreens.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  Nobody at Walgreens gave you any

2   information about there being an epidemic of

3   prescription pill abuse in Florida?

4        A.    No.

5        Q.    Did anybody at Walgreens give you any

6   information about any epidemic or -- or -- or crisis

7   or serious increase in drug abuse or drug overdoses

8   in, you know, the Appalachian region that would have

9   been in the Perrysburg area, the West Virginia,

10  Kentucky, Southern Ohio, at those -- those areas?

11       MS. SWIFT:  Objection; compound.

12  BY THE WITNESS:

13       A.    I don't recall anyone talking to me about

14  that in other -- those states, no.

15  BY MR. GADDY:

16       Q.    It goes on to say:

17            "In July 2011 the Florida Surgeon General

18  declared a public health emergency based on the

19  prescription pill epidemic which results in an average

20  of seven overdose deaths per day in Florida."

21            Do you see that?

22       A.    Yes.

23       Q.    Okay.  Was that something you were aware

24  of?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    No.

 2      Q.    If you go down to Paragraph 5, it says:

 3            "According to DEA records, in 2011,

 4   Walgreens operated 7,862 retail pharmacies in the

 5   United States."

 6            Do you see that?

 7      A.    Yes.

 8      Q.    And I think you told us earlier that it

 9   was a little over 8,000, so you added -- Walgreens has

10   added several stores since then, correct?

11      A.    Yes, that's my guess is that it is 8,000,

12   around 8,000, um-hum.

13      Q.    It says:

14            "16 of the top 25 largest Walgreens retail

15   oxycodone purchasers, including the top six

16   purchasers, were in Florida and supplied by

17   respondent," which is Walgreens.

18            It says:

19            "The following table shows these six

20   stores and their yearly oxycodone purchases for 2009

21   through 2011."

22            Do you see that?

23      A.    Yes.

24      Q.    Do you see the chart on the top on the
```

Highly Confidential - Subject to Further Confidentiality Review

1    next page?

2         A.    Yes.

3         Q.    And it looks like on the left-hand column

4    it gives a store number and a location of a particular

5    store.

6         A.    Uh-huh.

7         Q.    Do you see that?

8         A.    Yes.

9         Q.    And then the next several columns it looks

10   like gives the number of dosage units of oxycodone

11   purchased by those stores in 2009, 2010 and 2011.

12             Do you see that?

13        A.    Yes.

14        Q.    Okay.  And the first one that is listed

15   there is Hudson, Florida.

16             Do you see that?

17        A.    Yes.

18        Q.    And it looks like in 2009 that store got

19   approximately 388,000 dosage units of oxycodone, 2010

20   it went up to 913,000, and then in 2011 it went up to

21   2.2 million dosage units.

22             Do you see that?

23        A.    Yes.

24        Q.    Would you agree with me that that is a

1    significant increase in dosage units of oxycodone over

2    that two-year period?

3        A.    That appears to be a significant increase.

4        Q.    And -- and I think, again, I'm not going

5    to ask you to bust out a calculator, but -- but would

6    you agree with me that that's an approximately

7    500 percent increase?

8        MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10       A.    Yeah, I don't -- I don't know because I'm

11   not doing it in my head, but I just don't know why.

12   I -- I don't know why.

13   BY MR. GADDY:

14       Q.    Okay.  Regardless, whether -- whether --

15   whether you do the math and it is 500 percent or not,

16   you agree it is a significant increase in oxycodone?

17       A.    It is an increase, yes.  Uh-huh.

18       Q.    Okay.  The next entry there is for

19   Fort Meyers, Florida, and you see that in 2009 they

20   received 98,000 dosage units, in 2010 496,000 dosage

21   units, and then in 2011 over 2.1 million dosage units.

22            Do you see that?

23       A.    Yeah, I see that.

24       Q.    Again, just roughly doing the math, that

```
 1    looks like approximately a 2,000 percent increase from

 2    2009 to 2011.

 3              Does that look like about right to you?

 4         MS. SWIFT:  Objection to form.

 5    BY THE WITNESS:

 6         A.    I don't know.  I'm not that good at math.

 7    I don't know.

 8    BY MR. GADDY:

 9         Q.    Okay.  Well, it increased more than

10    20 times, right?  Because a --

11         MS. SWIFT:  Object to the form.

12    BY MR. GADDY:

13         Q.    Because a hundred thousand times 20 would

14    be 2 million and it went up more than that, right?

15         MS. SWIFT:  Object to the form.

16    BY THE WITNESS:

17         A.    Well, yeah, I see it says it went up to

18    that, yeah.

19    BY MR. GADDY:

20         Q.    Okay.  The third store indicated there is

21    for Oviedo, Florida.

22              Do you -- do you know how many people live

23    in Oviedo, Florida?

24         A.    No.  I never heard of it.
```

1    Q.    Okay.  Do you see there in 2009 that

2    particular town got 80,000 oxycodone dosage units, in

3    2010 they got 223,000 dosage units, and in 2011 they

4    got over 1.6 million dosage units.

5         Do you see that?

6    A.    I see that.

7    Q.    You -- you agree that that increased 15,

8    16, 17 times over that from 2009 to 2011, correct?

9    MS. SWIFT:  Objection to form.

10   BY THE WITNESS:

11   A.    That's what the form says, yeah.

12   BY MR. GADDY:

13   Q.    And -- and we won't go through every

14   single one of those, but would you you would agree these

15   are significant increases in the amount of oxycodone

16   going into these towns in Florida over a two-year

17   period?

18   MS. SWIFT:  Object to form.

19   BY THE WITNESS:

20   A.    The form makes it look like there is a big

21   increase, yes, the numbers on there.

22   BY MR. GADDY:

23   Q.    Is there any policy or program or practice

24   that would have been in place at the Jupiter

```
 1   distribution center that -- that should have prevented

 2   this from happening that you are aware of?

 3       MS. SWIFT:  Objection; foundation.

 4   BY THE WITNESS:

 5       A.   I wouldn't know what they are doing down

 6   there.  I also don't know their state laws, so I'm

 7   not -- I couldn't answer that.

 8   BY MR. GADDY:

 9       Q.   If you look at No. -- Paragraph No. 7, do

10   you see it says:

11            "DEA's investigation of respondent also

12   revealed that Walgreens failed to detect and report

13   suspicious orders by its pharmacy customers, in

14   violation of 21 CFR 1301.74(b)."

15            Do you see that?

16       A.   Yes.

17       Q.   Okay.  And if you go about halfway down

18   that paragraph, there is a sentence that starts,

19   "Walgreens knew or should have known."

20            Are you with me?

21       A.   Yes.  Uh-huh.

22       Q.   It says:

23            "Walgreens knew or should have known about

24   their obligations to report suspicious orders, as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligations were spelled out in detail in three

 2    letters from DEA's deputy adminis" -- "assistant

 3    administrator, Office of Diversion Control, sent to

 4    every registered manufacturer and distributor,

 5    including Walgreens, on September 27th of '06,

 6    February 7th of '07, and December 27th of 2007."

 7            Do you see that?

 8    A.    Yes.

 9    Q.    Do you recall that we looked at that

10    letter from December 27th of 2007 from Joe Rannazzisi,

11    the deputy to assistant administrator, the Office of

12    Diversion Control, that was addressed to you?

13    A.    Yes.

14    Q.    The C-II manager, right?

15    A.    Yes.

16    Q.    Okay.  And here in this -- this order to

17    show cause from September of 2012, almost five years

18    after that letter is sent out, you see the DEA is

19    saying that Walgreens should have known about their

20    obligations because of that letter, correct?

21    A.    Yeah, I don't see exactly where you are

22    now, but I do recall that.

23    Q.    Do you recall that we looked at the -- we

24    talked earlier about the Rannazzisi letter that said
```

Highly Confidential - Subject to Further Confidentiality Review

 1    don't give us the monthly suspicious order reports,

 2    and then we looked at the audit report from a year

 3    later where you said that's what you were still doing

 4    and it said let's have a meeting in May.

 5              Do you remember that?

 6       MS. SWIFT:  Objection; mischaracterizes the

 7    documents.

 8    BY THE WITNESS:

 9       A.    I remember them saying they were going to

10    meet the internal auditors, we were going to meet,

11    yes.

12    BY MR. GADDY:

13       Q.    Do you know how long Walgreens continued

14    to send simply the monthly suspicious order reports?

15    Do you know for how long that continued to happen?

16       A.    No, uhn-uhn.

17       Q.    I'll show you what I'll mark as

18    Exhibit 20.  This is P-WAG 1803.

19                  (WHEREUPON, a certain document was

20                  marked Walgreens - Bish Deposition

21                  Exhibit No. 20, for identification,

22                  as of 02/01/2019.)

23    BY MR. GADDY:

24       Q.    Do you see the first page of this document

```
1    is on Walgreens letterhead?

2         A.    Yes.

3         Q.    And it's dated January 5th, 2010?

4         A.    Yes.

5         Q.    Do you see that?

6               And it is addressed to the DEA Miami field

7    division and it is regarding the Walgreens Jupiter

8    distribution center?

9         A.    Yes.

10        Q.    And it says:

11              "Enclosed is the suspicious control drug

12   orders report for the last month available."

13              Do you see that?

14        A.    Yes.

15        Q.    And then it has the regis -- the DEA

16   number and the address for the Wal -- for the Jupiter

17   distribution center, correct?

18        A.    Correct.

19        Q.    Okay.  And if you flip through this

20   report, do you see that what you are looking at here

21   are cover letters for different months and different

22   years, as you go through, of the exact same letter

23   sending the exact same monthly report to the exact

24   same DEA Miami field division office?
```

1        MS. SWIFT:  Objection to form, foundation.

2    BY THE WITNESS:

3        A.    Yeah, I don't -- I don't know if it is the

4    exact same report.  I -- I'm assuming there is an

5    attachment or something.

6    BY MR. GADDY:

7        Q.    Absolutely.  And -- and what I intended to

8    say is, if I didn't, was a cover -- these were cover

9    letters.

10       A.    Right.

11       Q.    So do you see the first -- first page that

12   we looked at, it looks like a cover letter that's

13   dated January 5th, 2010, and it says:  "Enclosed is

14   the suspicious control drug order report for the last

15   month," correct?

16       A.    Right, uh-huh.

17       Q.    If you flip the page and look at the very

18   next one, it is from February of 2010, correct?

19       A.    Correct.

20       Q.    Addressed to the same DEA Miami field

21   division office, right?

22       A.    Right.

23       Q.    And again it has that same language:

24   "Enclosed is the suspicious control drug order report

1    for the last month."

2              Do you see that?

3    A.     Yes.

4    Q.     And if you go -- it looks like we didn't

5    have one for March, so it looks like we've got from

6    April, also providing a monthly report.

7              Do you see that, April of 2010?

8    A.     Um-hum.

9    Q.     And if you flip through here, do you see

10   the Bates ending 729?

11   A.     Um-hum.

12   Q.     It looks like there is still the same

13   monthly report is going to the same DEA field office

14   related to the Jupiter distribution center in January

15   of 2011, correct?

16   A.     Correct.

17   Q.     If you flip one page, the next one we have

18   here is May 2011, same monthly reports going, correct?

19   MS. SWIFT:  Objection to form.

20   BY THE WITNESS:

21   A.     That's how it appears.

22   BY MR. GADDY:

23   Q.     If you keep flipping through, you see

24   reports, the monthly reports going in June, July,

1    August, September, October, November, and December

2    of 2011, correct?

3        A.    They are cover letters for those, yeah.

4        Q.    And in December of 2011, that would be

5    approximately four years after you had received that

6    letter from Joe Rannazzisi saying that monthly reports

7    of suspicious orders was not sufficient, correct?

8        MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10       A.    Correct, his letter was dated December

11    of 2007.

12    BY MR. GADDY:

13       Q.    Okay.  And if you turn the page to the

14    very last page of this document, it looks like the

15    last one that we have here is the same monthly report

16    being sent to the DEA in January of 2012, correct?

17       A.    That's what it looks like, yes.

18       Q.    Okay.  So when you -- when Walgreens

19    receives this order to show cause in September

20    of 2012, do you agree that it makes some sense while

21    they are saying that Walgreens in that first sentence

22    of Paragraph 7 failed to detect and report suspicious

23    orders in violation of that particular regulation?

24       MS. SWIFT:  Objection to form.

```
 1   BY THE WITNESS:

 2        A.    I'm sorry.  I lost where you were on here.

 3   BY MR. GADDY:

 4        Q.    Sure.

 5        A.    What are you reading?

 6        Q.    I'm on Page 30, Paragraph 7.

 7        A.    Okay.

 8              I'm sorry.  You'll have to repeat the

 9   question now.  I forgot.

10        Q.    Absolutely.

11        A.    I didn't know where you were.

12        Q.    So, and maybe it is a little bit more

13   helpful to start at the bottom of the paragraph, the

14   section that starts:  "Walgreens knew or should have

15   known."

16        A.    Oh, okay.

17        Q.    Do you see that?

18        A.    Yep.

19        Q.    "Walgreens knew or should have known about

20   their obligations to report suspicious orders as the

21   obligations were spelled out in detail in three

22   letters from the DEA."

23              And then it gives the dates and one of

24   those is that December 27th letter that we looked at,
```

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2        A.    Correct.

3        Q.    Okay.  And you agree that with that in

4    mind, that you had received this letter, that they are

5    charging in the first sentence of Paragraph 7 that

6    Walgreens failed to detect and report suspicious

7    orders as required by that particular regulation?

8        MS. SWIFT:  Object to the form of the question.

9    BY THE WITNESS:

10       A.    Yeah, it says "the respondent," but,

11   again, corporate was doing a lot -- I thought was

12   doing a lot of that and the respondent refers to

13   Jupiter, I think, doesn't it?

14   BY MR. GADDY:

15       Q.    I think Walgreens -- I think respondent

16   means Walgreens.

17       A.    Walgreens in general, okay.

18       Q.    Yes.

19             Okay.  So, again, you relied on -- on your

20   assumption that corporate was doing something above

21   and beyond?

22       A.    Um-hum.

23       Q.    Okay.

24             If you look at Paragraph 8 on the next

1    page, do you see that it says:

2            "Notwithstanding the ample guidance

3    available, Walgreens has failed to maintain an

4    adequate suspicious order reporting system and as a

5    result has ignored readily identifiable orders and

6    ordering patterns that, based on the information

7    available throughout the Walgreens corporation, should

8    have been obvious signs of diversion occurring at

9    Walgreens' customers pharmacies."

10           Do you see that?

11   A.    Yes.

12   Q.    Okay.  At any point in time after this was

13   served on Walgreens in September of 2012, did anybody

14   come to you and say that the DEA has found some --

15   some issues with the way that we're identifying and

16   reporting the suspicious orders and we need to change

17   the way we are doing things so that we can make sure

18   the pills are getting to people that actually need

19   them?

20   MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22   A.    Not that I recall.

23   BY MR. GADDY:

24   Q.    Okay.  It says:

1           "Respondent's practice with regard" -- in

2    Paragraph 9.  I'm sorry.

3           "Respondent's practice with regard to

4    suspicious order reporting was to send to the local

5    DEA field office a monthly report labeled suspicious

6    controlled drugs orders."

7           Do you see that?

8    A.    Yes.

9    Q.    And that's familiar with what we just

10   looked at with all of those cover letters, right?

11   A.    Right.

12   Q.    If you go down to Paragraph 10, it says:

13          "As made clear in the regulation, a case

14   called Southwood, and the December 27th letter," which

15   is the '07 letter which is the one we went over

16   earlier, "to distributors from the DEA, suspicious

17   orders are to be reported as discovered, not in a

18   collection of monthly completed transactions."

19          Do you see that?

20   A.    Yes.

21   Q.    It goes on to say:

22          "Moreover, commensurate with the obs" --

23   "obligation to identify and report suspicious orders

24   as they are discovered is the obligation to conduct

Highly Confidential - Subject to Further Confidentiality Review

1    meaningful due diligence in an investigation of the

2    customer and the particular order to resolve the

3    suspicion and verify that the order is actually being

4    used to fulfill legitimate medical needs."

5            Do you see that?

6        A.    Yes.

7        Q.    And, again, you are not aware of anybody

8    at the distribution center that was doing that type

9    of -- of due diligence or investigation into any

10   particular order that was showing up on these

11   suspicious order reports?

12       MS. SWIFT:  Objection; mischaracterizes the

13   testimony.

14   BY THE WITNESS:

15       A.    No, because I didn't go through the

16   suspicious order report.  If it -- if you are talking

17   just about the orders on the report, no.

18   BY MR. GADDY:

19       Q.    Okay.  It goes on to say that:

20            "This analysis must take place before the

21   order is shipped."

22            Do you see that?

23       A.    Um-hum.

24       Q.    You agree that you never held an order to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    wait for there to be an investigation or an analysis

 2    of whether or not the drugs in that order were going

 3    to legitimate medical needs?

 4         MS. SWIFT:  Objection; mischaracterizes the

 5    testimony.

 6    BY THE WITNESS:

 7         A.    Well, I don't know that I'd ever have any

 8    way of knowing if the doctors that wrote them were

 9    legitimate at the DC, but, no, I -- I never held an

10    order waiting to see if it was a legitimate

11    prescription.

12              Is that what you are asking?

13    BY MR. GADDY:

14         Q.    I -- I'm asking consistent with what is --

15    is being said here:

16              "Conduct" -- "there is the obligation to

17    conduct meaningful due diligence in an investigation

18    of the customer and the particular order to resolve

19    the suspicion and verify the order is actually being

20    used to fulfill legitimate medical needs."

21              Do you see where I read that?

22         A.    Right, I do, but to me that says we had to

23    know the doctor wrote that correctly and that -- I

24    mean, that's how I read that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    In any way, shape or form did you or
 2   anybody else at the distribution center do that?
 3       MS. SWIFT:  Objection; lacks foundation.
 4   BY THE WITNESS:
 5       A.    No, not to my knowledge.
 6   BY MR. GADDY:
 7       Q.    It says:
 8             "No order identified as suspicious should
 9   be fulfilled until an assessment of the order's
10   legitimacy is concluded."
11             Do you see that?
12       A.    Yes.
13       Q.    It goes on to say:
14             "As such, Walgreens' reports, consisting
15   of nothing more than an aggregate of completed
16   transactions, did not comply with the requirement to
17   report suspicious orders as discovered, despite the
18   title respondent attached to these reports."
19             Do you see that?
20       A.    I see that.
21       Q.    And again, even though this -- this is
22   written in this order to show cause that's dated
23   September 2012, that's the same information that you
24   were provided in a letter to you back in December
```

Highly Confidential - Subject to Further Confidentiality Review

1    of 2007, correct?

2         MS. SWIFT:  Object to the form, vague.

3              What information?

4    BY THE WITNESS:

5         A.    Well, yeah, the part of the letter that's

6    included in that paragraph that you just read, yeah,

7    I --

8    BY MR. GADDY:

9         Q.    Was provided to you back in December of

10   '07, right?

11        A.    '07.  Uh-huh.

12        Q.    Okay.  Look at Paragraph 12 for me,

13   please.  And I'm going to ask you some questions about

14   some of these paragraphs here specifically because

15   they are talking about Ms. Atwell and the C-II

16   function manager at -- at Jupiter.

17              And she had the same equivalent title that

18   you had, correct?

19        A.    Correct.

20        Q.    Equivalent responsibilities that you had,

21   correct?

22        A.    Correct.

23        Q.    Do you recall ever being told or hearing

24   at Walgreens that -- that Ms. Atwell had attempted to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    flag issues or raise concerns about orders or

 2    pharmacies and that those concerns fell on deaf ears

 3    and that nothing happened with that?

 4        MS. SWIFT:  Objection to form.

 5    BY THE WITNESS:

 6        A.    I was never informed.  Uh-uh.

 7    BY MR. GADDY:

 8        Q.    I'm sorry?

 9        A.    I was never informed of that.

10        Q.    It goes on to say:

11             "Respondent's employee," in Paragraph 12,

12    "with overall responsibility for Schedule II drug

13    operations, the C-II function manager, raised

14    questions within the corporation about what she

15    correctly identified as unusually large orders for

16    Schedule II narcotics placed regularly by several

17    customer pharmacies.

18             "Based on the evidence available to DEA,

19    none of these orders were reported to DEA as

20    suspicious and all appear to have been shipped,

21    without any further due diligence."

22             Do you see that?

23             Do you see that?

24        A.    Yes.
```

```
 1        Q.    If we look at Paragraph A, it says:

 2              "In January of 2011, the Jupiter's C-II

 3   function manager expressed concern about the enormous

 4   volume of 30-milligram oxycodone being ordered by

 5   three stores."

 6              And it gives the three store numbers.  Do

 7   you see that?

 8        A.    Yes, um-hum.

 9        Q.    It says:

10              "Concluding in an e-mail to the manager of

11   Rx inventory drugstores," do you recognize that to be

12   Barb Martin's title?

13        A.    That's what I thought her title was.

14        Q.    Okay.  And -- and Ms. Martin works in

15   corporate headquarters in Deerfield, correct?

16        A.    Correct.

17        Q.    And it says that this was --

18              "This concluded in an e-mail to the

19   manager of the Rx inventory drugstores at Walgreens

20   corporate headquarters in Deerfield, Illinois, that

21   she felt the stores needed to justify the large

22   quantity.  With regard to one particular store in

23   Port Richey, she noted that respondent had shipped

24   this store 3,271 bottles of 100-count 30-milligram
```

```
 1    oxycodone, over 300,000 dosage units, in the 40-day

 2    period from 12/1/10 to 1/10/11."

 3              Do you see that?

 4       A.    Yes.

 5       Q.    Do you agree that's a significant number

 6    of oxycodone pills?

 7       A.    Yes, that's a significant number of

 8    oxycodone pills.

 9       Q.    "It caused her to question how they can

10    even house this many bottles.  She then inquired of

11    the same corporate manager, how do we go about

12    checking the validity of these orders."

13              Do you see that?

14       A.    Yes.

15       Q.    Okay.  And I guess -- I -- I believe that

16    you told me there had been a handful of occasions

17    where you had done something similar as follows -- as

18    far as calling Barb Martin and asking her about

19    specific orders that came in, correct?

20       A.    Correct.

21       Q.    Okay.  And as far as you know -- well --

22    well, first, let me ask you this:  No. 1, you never

23    took the step of identifying and reporting to the DEA

24    those orders as being suspicious, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Correct, I did not report.

2     Q.    You never directed anybody to report those

3   orders to the DEA as suspicious, correct?

4     A.    Correct.

5     Q.    Okay.  As far as -- as you sit here today,

6   you can't remember Ms. Martin ever telling you not to

7   fill one of those orders, correct?

8     A.    Correct.

9     Q.    Okay.  And as you sit here today, you

10   don't know that any of those orders that you called

11   Ms. Martin about were ever reported to the DEA as

12   suspicious, is that fair?

13     A.    I wouldn't know that because I wasn't the

14   one that did it, but that would be fair, yeah.

15     Q.    And, in fact, based on your memory, all of

16   those orders would have been filled?

17     MS. SWIFT:  Object to the form, foundation.

18   BY THE WITNESS:

19     A.    All of the orders that I called her on, do

20   you mean?  Yeah, correct.

21   BY MR. GADDY:

22     Q.    Okay.  Paragraph B goes on to say:

23           "Despite having raised these concerns from

24   the distributor to a supervisor at corporate

1    headquarters, none of these orders were reported as

2    suspicious and there appears to have been no other

3    inquiry conducted into the circumstances of the

4    enormous amount of narcotics being shipped to that

5    particular store in Port Richey, a town of less than

6    3,000 people in a county with a population of

7    approximately 475,000 people."

8            Do you see that?

9    A.    Yes.

10   Q.    It goes on to say that:

11           "Despite the fact that the distribution

12   center" -- "center manager had raised questions about

13   this store's ordering volume to a corporate manager in

14   January of 2011, the very next month, Walgreens filled

15   and shipped orders totalling another 285,000 dosage

16   units of 30-milligram oxycodone to the same pharmacy."

17           Do you see that?

18   A.    Yes.

19   Q.    It says:

20           "Again, there is no evidence of any due

21   diligence conducted by Walgreens or anyone else within

22   their corporation to verify the legitimacy of these

23   orders in order to fulfill their obligation to

24   maintain effective controls against diversion."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2        A.    Yes.

 3        Q.    Okay.  You've told us several times today

 4   that you acted on the assumption or the belief that

 5   there were other units at corporate or otherwise that

 6   were doing some other type of analysis or

 7   investigation or -- or due diligence.

 8              Is that -- is that fair?

 9        A.    Yes.

10        Q.    Okay.  When you look at the increase of

11   orders that we looked at on that chart that showed

12   the -- the huge, the -- the spikes of 500 up to

13   2,000 percent over a two-year period --

14        A.    Uh-huh.

15        Q.    -- and when you read about these issues

16   where -- where Kristine is saying, How do they even

17   house this many bottles on the shelves and yet the

18   orders were getting filled, does that give you cause

19   for concern about what, if anything, actually was

20   happening at a corporate level or -- or behind the

21   scenes that you were assuming or believing may have

22   been happening?

23        A.    Well, the increase in the number of pills,

24   I believe, was influenced by the -- the change in a
```

1    state law in Florida, if I understand correctly.

2         So we would have gotten more of those

3    opioid orders than we did prior because they changed

4    the law, if -- if I'm correct.  So the volume that it

5    increased I have some understanding of why that might

6    have happened.

7         As far as her bringing these things up and

8    them not -- what -- how are they saying that in here?

9    Whatever they said in here.  Oh, there is no evidence

10   of any due diligence, I guess the only thing I would

11   say is that I would think they would have jumped on

12   something a little quicker or done something quicker.

13   I'm sure they were doing something in response to all

14   of this, but it may not be apparent to you, I or

15   anyone else, but I don't believe they would have just

16   sat there and done nothing.

17        Q.    Okay.  So even after --

18        A.    It is just not who they are.

19        Q.    Even after --

20              (Reporter clarification.)

21   BY THE WITNESS:

22        A.    It is just not who they are.

23   BY MR. GADDY:

24        Q.    Okay.  So even after seeing the large

```
 1    spikes from '09 to '010 to '11 --

 2        A.    Uh-huh.

 3        Q.    -- and even after seeing that some of

 4    these concerns raised by Kristine, who is your

 5    equivalent in a different distribution center --

 6        A.    Right.

 7        Q.    -- and the orders continue to be shipped

 8    and continue to be shipped in -- in high volumes, you

 9    still believed that there was something else going

10    behind that was designed to stop this?

11        A.    I do believe there was something there.

12    Maybe it wasn't working, but I believe there was

13    something there, yes.

14        Q.    Well, clearly it wasn't working, right?

15        MS. SWIFT:  Object to the form, foundation.

16    BY THE WITNESS:

17        A.    Right.  So what's your -- do you have

18    another question?

19    BY MR. GADDY:

20        Q.    I mean, you agree that it clearly was not

21    working?  If there was something in place, it clearly

22    was not working if a store like --

23        A.    Well, I can't say that because, remember,

24    it's a -- my understanding was, it was based on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   history, previous order -- previous sales, inventory

 2   which, you know, one store a hundred would be normal,

 3   maybe another store 20 would be normal.

 4        Q.    Can you think of any situation in which --

 5        A.    So how could I --

 6        MS. SWIFT:  Are you finished with your answer?

 7        THE WITNESS:  Yeah, I am.

 8   BY MR. GADDY:

 9        Q.    Can you think of any situation in which

10   the order history for a particular pharmacy would

11   justify a 2,000 percent increase in 30-milligram

12   oxycodone pills over a two-year period?

13        A.    I can't answer that because I didn't have

14   the history of an -- any store, so.  I can't answer

15   that.

16        Q.    So you referenced a change in the law in

17   Florida.

18        A.    Yeah.

19        Q.    When did you become aware of any change in

20   the law in Florida that would have justified any --

21   any changes in prescribing habits?

22        A.    During my prep for this.

23        MS. SWIFT:  Don't tell him anything about our

24   conversations.
```

```
 1        THE WITNESS:  Okay.  Okay.

 2   BY MR. GADDY:

 3        Q.    Okay.  Back in 2009, 2010, 2011, 2012,

 4   heck, all of the way up until 2017 --

 5        A.    Uh-huh.

 6        Q.    -- you had no knowledge whatsoever about

 7   any -- any change in any laws that would have

 8   justified any increase in prescribing habits for any

 9   pharmacy in Florida, is that fair?

10        MS. SWIFT:  Object to the form, compound, calls

11   for speculation.

12   BY THE WITNESS:

13        A.    That would -- that's -- that would -- that

14   sounds fair, yeah.

15   BY MR. GADDY:

16        Q.    Okay.  And if there was some change in the

17   law that would have increased the prescribing habits

18   or -- or the dispensing, I guess is probably the

19   better way to put it, so if there was some change in

20   the law that would have called for increased

21   dispensing at pharmacies, you would expect to see that

22   at all pharmacies in Florida, correct?

23        MS. SWIFT:  Object to the form, foundation.

24        THE WITNESS:  Well, no, it would probably depend
```

Highly Confidential - Subject to Further Confidentiality Review

1   on their geographic region and how big they were and

2   all of those things, all of those factors.

3   BY MR. GADDY:

4        Q.    Well, let me ask it this way:  If there

5   was some change in the law that meant that

6   prescriptions were more likely to be dispensed at

7   pharmacies versus at doctors's offices, is there any

8   reason that you know of that Walgreens would get a

9   disproportionate number of those increased

10  prescriptions as opposed to CVSs or Walmarts or

11  Rite Aids or independent pharmacies?

12       MS. SWIFT:  Objection; assumes facts not in

13  evidence.

14  BY THE WITNESS:

15       A.    The only reason I can think of is that we

16  have more stores, they are on every corner and they

17  are more convenient.

18  BY MR. GADDY:

19       Q.    Turn to Page 29 for me, please, of this

20  order to show cause.

21       A.    Backwards?

22       Q.    Yes, ma'am.  In Paragraph 4 is what I'm

23  going to look at.

24       A.    Okay.

```
 1      Q.    Do you see it says:

 2            "Since 2009, Walgreens' Jupiter, Florida

 3      distribution center has been the single largest

 4      distributor of oxycodone products in Florida."

 5            Do you see that?

 6      A.    Yes.

 7      Q.    It goes on to say:

 8            "At about the same time as the abuse of

 9      prescription drugs became an epidemic in Florida,

10      Walgreens' Florida retail pharmacies, supplied by

11      respondent, commanded an increasingly large percentage

12      of the state's growing oxycodone business."

13            Do you see that?

14      A.    Yes.

15      Q.    It says:

16            "In 2010, only three Walgreens retail

17      pharmacies were in the top 100 purchasers of

18      oxycodone."

19            Do you see that?

20      A.    Yes.

21      Q.    "In 2011, 38 Walgreens pharmacies made the

22      top 100 and six were in the top ten."

23            Do you see that?

24      A.    Yes.
```

```
 1        Q.     And then it says through May of 2012, 44

 2   Walgreens pharmacies are in the top 100 oxycodone

 3   purchasers.

 4               Do you see that?

 5        A.     Yes.

 6        Q.     Do you have any explanation for why, if

 7   it's a change in the law --

 8        A.     Uh-huh.

 9        Q.     -- to make people fill more prescriptions

10   at pharmacies as opposed to doctor's office, why is it

11   only Walgreens pharmacies that are shooting up the top

12   100 list?

13        MS. SWIFT:  Objection; lacks foundation, assumes

14   facts not in evidence.

15   BY MR. GADDY:

16        Q.     Do you have any explanation for that?

17        MS. SWIFT:  Also asked and answered several

18   times.

19   BY THE WITNESS:

20        A.     I don't have -- I don't know that it is

21   only Walgreens pharmacies that in -- you haven't

22   listed everyone else.

23   BY MR. GADDY:

24        Q.     Well, Walgreens went from three in the top
```

1    100 --

2         A.    Uh-huh.

3         Q.    -- to 38 in the top 100 to 44 in the top

4    100.

5         A.    Right.

6         Q.    Do you see that?

7         A.    Yeah, I do.

8         Q.    Okay.  Do you have any explanation for why

9    it is Walgreens' pharmacies that are surging into the

10   top 100 oxycodone purchasers during this timeframe as

11   opposed to any particular other pharmacies?

12        A.    So by your --

13        MS. SWIFT:  Objection; mischaracterizes the

14   document.

15             Sorry.  Go ahead.

16   BY THE WITNESS:

17        A.    So by your question you are saying no

18   other pharmacy chain had this -- had this kind of an

19   increase, is that what you are --

20   BY MR. GADDY:

21        Q.    I'm asking you, do you have any

22   explanation for why Walgreens went from 3 to 38 to 44

23   in the top 100?

24        MS. SWIFT:  Objection; lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    Other than the change in the law that I

 3   mentioned before, no.

 4   BY MR. GADDY:

 5       Q.    Does that change in the law impact

 6   Walgreens differently than any other pharmacy?

 7       MS. SWIFT:  Objection; lacks foundation.

 8   BY THE WITNESS:

 9       A.    I don't believe it would.

10   BY MR. GADDY:

11       Q.    If we go back to where we were on Page 32,

12   and we've read through that Paragraph 12(b) --

13       A.    Uh-huh.

14       Q.    -- that talked about -- and -- and one of

15   the things that it looks like was being considered by

16   the DEA in here was the -- that all of these pills

17   were going into Port Richey which was a town of, it

18   says, less than 3,000 people.

19             Do you see that?

20       A.    Yes.

21       Q.    At any point in time did -- did anybody

22   come to you and -- and advise that you or anybody else

23   in the distribution center start looking at or

24   considering population sizes of where these C-IIs were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    going and whether or not to -- to do any type of

 2    follow-up?

 3         MS. SWIFT:  Object to the form.

 4    BY THE WITNESS:

 5         A.    No, because we didn't have that

 6    information.  That's, again, something I would have

 7    expected Barb Martin's group to do or the Rx integrity

 8    group to do --

 9    BY MR. GADDY:

10         Q.    Okay.

11         A.    -- because they had the information.

12         Q.    Okay.  I mean, we looked at some of those

13    e-mails earlier where I think you suggested that Matt

14    use triple digits --

15         A.    Uh-huh.

16         Q.    -- as kind of a baseline to --

17         A.    Um-hum.

18         Q.    -- and then -- and then we saw later that

19    it looks like Matt had adopted that.

20              Do you recall that generally?

21         A.    Uh-huh, yes.

22         MS. SWIFT:  Objection; mischaracterizes the

23    document.

24    BY MR. GADDY:
```

1    Q.    And at any point in time did anybody come

2  to you and say, Look, maybe we need to have lower

3  limits for stores in -- in small towns like Port

4  Richey and maybe the limit there needs to be only ten

5  bottles and -- and we call for anything over ten

6  bottles and then if it's going to -- to -- to a bigger

7  city, like Chicago, that maybe then we can go with a

8  higher lump number like 25 or 30 bottles.

9         Did that ever happen?

10    A.    No, but again, I would expect the computer

11  program, because that's my understanding of what that

12  did, was take all of that into consideration.  Before,

13  you know what I mean?

14    Q.    What does the word "systemic" mean to you?

15    A.    Something done by a system as opposed to a

16  human being.

17    Q.    Okay.  Do you have an understanding of the

18  word "systemic" as meaning throughout or -- or -- or

19  companywide or body wide or -- or anything of that

20  nature?

21    MS. SWIFT:  Object to the form.

22  BY THE WITNESS:

23    A.    Oh, not necessarily.  Systemic could be

24  our system, someone else's system.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Is that what you mean?

 2   BY MR. GADDY:

 3       Q.    Well, turn with me, if you would, please,

 4   to Page 38.  And I'm going to look at Paragraph 23.

 5                 Are you with me?

 6       A.    Uh-huh.

 7       Q.    It says:

 8                 "Voluntary dispensing restrictions enacted

 9   either in anticipation of or in reaction to regulatory

10   action, do not indicate to me that" -- "that

11   respondent and its parent company have recognized and

12   adequately reformed the systemic shortcomings

13   discussed herein."

14                 Do you see that?

15       A.    Yes.

16       Q.    What does that mean to you in that

17   context?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.     In what it says -- what I understand that

21   to say is that the system that was supposed to be --

22   that we had in place to adjust orders based on their

23   geographic location, et cetera, may have needed

24   tweaked, that's what I read that as saying.
```

```
 1   BY MR. GADDY:

 2        Q.    Well -- well, you agree it probably needs

 3   a little bit more than a tweak based on the fact that

 4   they are saying that the operation of the distribution

 5   center is in imminent danger of the public health and

 6   safety, do you agree with that, it probably needs a

 7   little bit more than just a tweak?

 8        MS. SWIFT:  Objection; foundation.

 9   BY THE WITNESS:

10        A.    No, because I -- I never saw proof that

11   the imminent danger was -- you know, that's kind of...

12   BY MR. GADDY:

13        Q.    Okay.  Well, look at the very next page.

14        A.    Okay.

15        Q.    It says -- it is a paragraph that starts

16   "IN" at the top of the page in all caps and bolds.

17        A.    Uh-huh.

18        Q.    It says:

19              "IN view of the foregoing and based on the

20   information before the agency as of the issuance of

21   this notice, it is my preliminary finding pursuant to

22   a statute" -- or "two particular statutes, that

23   Walgreens' continued registration is inconsistent with

24   the public interest."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Do you see that?

 2        A.    Yes.

 3        Q.    If you look at the next page, this is

 4   signed by who?

 5        A.    Michelle Leonhart.

 6        Q.    And -- and what's her title?

 7        A.    The administrator of the DEA.

 8        Q.    Okay.  So the DEA is saying that Walgreens

 9   continued to be registered to -- to distribute

10   controlled substances is inconsistent with the public

11   interest, correct?

12        A.    That's her opinion, yes.

13        Q.    Okay.  And it goes on to say, if you read

14   through the next paragraph, the second half of that

15   paragraph says:

16              "Respondent's continued registration while

17   these proceedings are pending constitutes an imminent

18   danger to the public health and safety."

19              Do you see that?

20        A.    Yes.

21        Q.    The same phrase that we saw at the

22   beginning, right?

23        A.    Right.

24        Q.    It says:
```

```
 1                  "Accordingly, purs" -- "pursuant to

 2      certain statutes and regulations and authority granted

 3      to the administrator of the DEA, the DEA Certificate

 4      of Registration is hereby suspended effective

 5      immediately."

 6                  Do you see that?

 7          A.    Yes.

 8          Q.    If you read down in the next paragraph, it

 9      says:

10                  "The special agents and diversion

11      investigators of the DEA who serve this order to show

12      cause and immediate suspension of registration are

13      authorized to place under seal or remove for

14      safekeeping all controlled substances that Walgreens

15      possesses."

16                  Do you see that?

17          A.    Yes.

18          Q.    Did you have an understanding that the DEA

19      agents actually went in and put a new padlock on the

20      C-II cage there in Jupiter?

21          A.    No.

22          Q.    Did you know that they restricted the

23      ability of Walgreens to even go in and get the C-IIs

24      that were in the Jupiter distribution center?
```

```
 1        A.     No.

 2        Q.     Would you agree that that shows a pretty

 3   high level of concern on behalf of the DEA if they put

 4   their own padlock on the C-II cage that they won't

 5   even let Walgreens go in to where they can get the

 6   pills?

 7        MS. SWIFT:  Objection; foundation.

 8   BY THE WITNESS:

 9        A.     Well, it -- it is clear they were

10   concerned or they wouldn't be using this language.

11   So, yeah, that would show that they were concerned,

12   yeah.

13   BY MR. GADDY:

14        Q.     And -- and based on what we've read in

15   this document, would you agree that they had good

16   reason to be concerned?

17        A.     I'm not really convinced of that because

18   I -- I am not knowledgeable enough in, you know, the

19   whole -- the whole -- the whole country's infatuation

20   with oxycodones all of a sudden.  I just -- I -- I

21   couldn't answer that and feel good about that.  I

22   can't -- I can't say I agree with them because I don't

23   know enough information.  I don't know what the

24   program was doing, what it wasn't doing.  I don't have
```

```
1    any of that information, so...

2        Q.    If you had called Barb Martin or somebody

3    else equivalent to her --

4        A.    Uh-huh.

5        Q.    -- like Kristine did, and had told her

6    that I think these stores need to justify these

7    orders, we've sent them over 3,000 orders over a

8    40-day period --

9        A.    Uh-huh.

10       Q.    -- 3,000 bottles over a 40-day period --

11       A.    Uh-huh.

12       Q.    -- I don't even understand how they are

13   housing all of these bottles on the shelf, if you had

14   expressed concern like that to corporate and nothing

15   happened, the pills were shipped, they weren't

16   reported to the DEA, and in the following months you

17   continued to ship them hundreds of thousands of pills,

18   would that have concerned you?

19       MS. SWIFT:  Object to the form, mischaracterizes

20   the facts.

21   BY THE WITNESS:

22       A.    What that would have done was have me call

23   them again and say, What have you done so far.  I know

24   they would have done something.
```

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. GADDY:

2        Q.    You would have taken some action --

3        A.    In my opinion.

4        Q.    Oh, I'm sorry.

5        A.    No, I was just saying my opinion is they

6   had to be doing something.  Just because I wasn't

7   privy to that -- what they were doing doesn't mean

8   they weren't doing anything, so I would have called

9   again.

10       Q.    Well, you agree that what we've looked at

11  shows that -- that nothing was done?

12       MS. SWIFT:  Objection; mischaracterizes the

13  facts.

14  BY THE WITNESS:

15       A.    Well, I don't know which -- which things

16  we looked at you are referring to, but the fact that

17  they were shipped again, is that what you are

18  referring to?

19  BY MR. GADDY:

20       Q.    I'm asking you whether or not we've read

21  anything in here --

22       A.    Uh-huh.

23       Q.    -- that said that Walgreens took any

24  action, any action whatsoever to prevent or stop pills

1    going to this store that Kristine, the C-II function

2    manager, was calling and saying, they need to justify

3    these.  They don't have room on the shelves for these

4    pills.

5         A.    Uh-huh.

6         Q.    Have you seen anything that says that

7    Walgreens corporate did anything to stop or slow down

8    pills going to that store?

9         MS. SWIFT:  Object to the form of the question.

10             Do you mean anything in this legal

11   document, is that what you are asking her?

12        MR. GADDY:  The question is clear.

13        MS. SWIFT:  Object to the form of the question.

14   It's vague, mischaracterizes the facts in evidence.

15   BY THE WITNESS:

16        A.    So I'm sorry.  You are going to have to

17   ask me again now.

18   BY MR. GADDY:

19        Q.    Sure.

20             I'm asking you whether or not anything

21   that we've looked at --

22        A.    Uh-huh.

23        Q.    -- anything that we've read, shows that

24   Walgreens took any action whatsoever in response to

```
 1    Kristine's concerns that she read --

 2        MS. SWIFT:  Objection; same -- same objections

 3    and also lack of foundation.

 4        MR. GADDY:  I'll have -- can I finish my

 5    question before you object, please?

 6        MS. SWIFT:  Sure.  I thought you were done.

 7    BY MR. GADDY:

 8        Q.    Is there anything that we've looked at,

 9    anything that we've read --

10        A.    Uh-huh.

11        Q.    -- in this document --

12        A.    Uh-huh.

13        Q.    -- that shows that Walgreens corporate did

14    anything whatsoever to stop or limit oxycodone pills

15    going to this particular store after Kristine raised

16    issues saying, I think they need to justify these

17    orders --

18        A.    Uh-huh.

19        Q.    -- I don't even think they can house these

20    many bottles on the shelf, we've already sent them

21    3,000 bottles over the last 40 days, have you seen

22    anything that shows that anybody at corporate did

23    anything to stop or limit pills going to that store?

24        MS. SWIFT:  Objection to the form of the
```

```
 1   question, it lacks foundation.

 2   BY THE WITNESS:

 3        A.    Well, I wouldn't expect to see anything

 4   because this is a DEA document and they are not trying

 5   to support that we did anything.  They are trying to

 6   just, you know, show that we did not.

 7   BY MR. GADDY:

 8        Q.    So -- so the answer to my question is

 9   no --

10        MS. SWIFT:  Objection; asked and --

11   BY MR. GADDY:

12        Q.    -- you didn't see anything?

13        MS. SWIFT:  -- asked and answered.

14   BY THE WITNESS:

15        A.    Either way, that we did or did not, it

16   could go either way.

17   BY MR. GADDY:

18        Q.    Okay.  The answer to the question is no,

19   you didn't see anything in here about anything that

20   corporate did to slow down pills to that store?

21        MS. SWIFT:  Objection; asked and answered.

22   BY THE WITNESS:

23        A.    I wouldn't know what corporate was doing.

24   I don't know what they were doing in response to her.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    I don't know what they were doing.

2    BY MR. GADDY:

3         Q.    Have you seen anything?  I'm not asking

4    what you know.  I'm asking have you seen anything in

5    this document that we reviewed that corporate did

6    anything to limit or restrict pills going to that

7    particular store that Kristine was repeatedly raising

8    issues about?

9         MS. SWIFT:  Objection; asked and answered.

10   BY THE WITNESS:

11        A.    Not in this document, no.

12   BY MR. GADDY:

13        Q.    Thank you.

14             Okay.  So we've looked at some of the

15   information here in the order to show cause.  Let's go

16   back to the front and look at some of the information

17   in the settlement agreement.

18             So if you can just flip back to Page 1.

19   And actually flip one time to Page 2.  And do you see

20   about two-thirds of the way down the page there is the

21   section that starts Stipulation and Agreement,

22   correct?

23        A.    Correct.

24        Q.    Okay.  It says there in the second
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    paragraph, it says:
2            "Walgreens acknowledges that suspicious
3    order reporting for distribution to certain pharmacies
4    did not meet the standards identified by DEA in three
5    letters from DEA's administrator" -- excuse me --
6    "DEA's deputy assistant administrator, Office of
7    Diversion Control," and then it lists that three
8    letters, and one of those is the December 2007 letter
9    that you received, correct?
10        A.    Correct.
11        Q.    Did anybody from Walgreens ever tell you
12   that they acknowledged that their suspicious order
13   reporting did not meet DEA standards?
14        MS. SWIFT:  Objection; mischaracterizes the
15   document.
16   BY THE WITNESS:
17        A.    No.
18   BY MR. GADDY:
19        Q.    Now, if you go to the next page, and we
20   are still under the Stipulation and Agreement, Roman
21   numeral No. I says "General," correct?
22        A.    Correct.
23        Q.    And the first paragraph talks about the
24   intent to effect a settlement, but let's go down to
```

Highly Confidential - Subject to Further Confidentiality Review

1    Paragraph II where it says "Covered Conduct."

2              Are you with me?

3    A.    Yes.

4    Q.    And it says:

5              "For the purposes of this agreement,

6    covered conduct shall mean the following," and then

7    it -- it lists -- it has some lists below there,

8    correct?

9    A.    Correct.

10   Q.    And the first section deals with

11   distribution centers.

12             Do you see that?

13   A.    Yes.

14   Q.    The first item says:

15             "Conduct alleged in the September 13th,

16   2012 order to show cause issued to Walgreens Dupe" --

17   "Jupiter in DEA's filing," it is referencing the order

18   to show cause that we looked at just a minute ago.

19             Do you see that?

20   A.    Yes.

21   Q.    And it -- and it is indicating that that

22   conduct in there is covered by this settlement

23   agreement.

24             Does that -- do you -- does that make

Highly Confidential - Subject to Further Confidentiality Review

```
 1   sense to you?

 2        MS. SWIFT:  Object to the form.

 3   BY THE WITNESS:

 4        A.    I guess.  Kind of.

 5   BY MR. GADDY:

 6        Q.    Okay.  Well, let's go to the second

 7   paragraph and see what other conduct is covered by

 8   this settlement agreement.

 9        A.    Okay.

10        Q.    It says:

11              "Failure regarding any distribution

12   center."

13              Do you see that?

14        A.    Um-hum.  Yes.

15        Q.    So you understand that that's not limited

16   to Jupiter, right?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    Yes.

20   BY MR. GADDY:

21        Q.    Okay.

22        A.    I see that.

23        Q.    It says:

24              "Failure regarding any distribution center
```

1    to maintain effective controls against the diversion

2    of controlled substances into other than legitimate

3    medical, scientific and industrial channels, as

4    required by that particular statute."

5            Do you see that?

6    A.    Yes.

7    Q.    It goes on to say:

8            "Including any failures to conduct

9    adequate due diligence to ensure that controlled

10   substances were not diverted into other than

11   legitimate channels, on or before the effective date

12   of this agreement."

13           Do you see that?

14   A.    Yes.

15   Q.    Did anybody from Walgreens ever come and

16   tell you that this settlement agreement that was

17   entered into by Walgreens with the DEA covered conduct

18   within the Perrysburg distribution center?

19   A.    No.

20   Q.    Did anybody from Walgreens ever tell you

21   that there was going to have to be a change or an

22   amendment or an edit or -- or even a tweak, as you've

23   said, to the suspicious order monitoring policies and

24   procedures as a result of this settlement with the

1    DEA?

2         A.    No, not to my recollection.

3         Q.    And -- and you were the C-II function

4    manager at Perrysburg during this timeframe, correct?

5         A.    Correct.

6         Q.    The only person higher than you with any

7    C-II responsibilities would have been the manager of

8    the entire distribution center, right?

9         A.    Right.

10        Q.    Okay.  If you look at Paragraph 3, it

11   says:  "Failure regarding any distribution center."

12             Do you see, again, that's any distribution

13   center?

14        A.    I don't know where you are at.

15        Q.    I'm sorry.  I'm at the top of Page 4.

16        A.    Oh, okay.  Okay.  I've gotcha.

17        Q.    Are you with me?

18        A.    Yes.

19        Q.    It says:

20             "Failure regarding any distribution center

21   to" -- "to timely detect and report suspicious orders

22   of controlled substances."

23             Do you see that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Again, did anybody tell you that

 2   there was now a settlement agreement in place between

 3   DEA and Walgreens that applied to not only Jupiter but

 4   also Woodland's and the Perrysburg distribution

 5   centers regarding timely detecting and reporting of

 6   suspicious orders?

 7        A.    Not that I recall.

 8        Q.    Okay.  Anything about the answers you just

 9   gave me to the previous paragraph that you would

10   change as it relates to this paragraph?

11        MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13        A.    I don't understand what you are asking me.

14   BY MR. GADDY:

15        Q.    Sorry.  I was trying not to ask the same

16   four questions again.

17        A.    Oh.

18        Q.    You, in your position as the C-II function

19   manager, nobody came and told you that, Hey, we've

20   entered a settlement with the DEA regarding some of

21   these allegations and we've got to change the way we

22   do things regarding controlled substances.

23              Is that fair, that never happened?

24        MS. SWIFT:  Object to form.
```

```
 1   BY THE WITNESS:

 2        A.    No one came and told me personally, no.

 3   BY MR. GADDY:

 4        Q.    Did -- did you receive information that

 5   that was happening through any other channel?

 6        MS. SWIFT:  Object to the form.

 7   BY THE WITNESS:

 8        A.    Not that I recall.

 9   BY MR. GADDY:

10        Q.    If you look at Paragraph 7, it says:

11              "Conduct regarding any distribution center

12   that's inconsistent with the CSA," which is the

13   Controlled Substances Act, "and it's implementing

14   regulations on or before the date of this agreement."

15              Do you see that?

16        A.    Yes.

17        Q.    Okay.  And, again, nobody came to you and

18   said that because there are these allegations that we

19   are operating inconsistent with the Controlled

20   Substances Act there's going to be any types of -- of

21   changes or amendments or edits to the policies,

22   procedures or practices at Walgreens, fair?

23        A.    Fair.

24        Q.    Did you ever have the opportunity to train
```

Highly Confidential - Subject to Further Confidentiality Review

1    or educate your staff, you know, your SAIL

2    coordinator, I think we have -- you have team members

3    that help you pick and work in the vault, things like

4    that, did you ever have the opportunity to, after this

5    order to show cause and settlement agreement came out

6    late in 2012, early 2013, to train or educate them on

7    any new processes or procedures that they needed to do

8    to be in compliance with the settlement agreement?

9         A.    Not that I recall.

10        Q.    If you'd flip for me, please, to Page 7 of

11   349.

12              Near the top of the page do you see it

13   says:  "Walgreens General Obligations"?

14        A.    Yes.

15        Q.    And do you see Paragraph C underneath

16   there?

17        A.    Yes.

18        Q.    Do you see it says:  "Walgreens agrees to

19   pay the United States $80 million"?

20        A.    Yes.

21        Q.    Do you agree with me that that's a

22   significant amount of money for Walgreens to pay to

23   the United States?

24        A.    That's a significant amount of money,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    period, for anyone to pay to anyone, yes.

 2         Q.    Why do you think the settlement had to be

 3    such a significant amount of money?

 4         MS. SWIFT:  Objection; foundation.

 5    BY THE WITNESS:

 6         A.    I have no idea.

 7    BY MR. GADDY:

 8         Q.    Do you think that has anything to do with

 9    the significance of the allegations?

10         MS. SWIFT:  Objection; foundation.

11    BY THE WITNESS:

12         A.    I really have no idea where they get them

13    from.

14    BY MR. GADDY:

15         Q.    Do you see right below that it says:

16    "Obligations of the DEA"?

17         A.    Let me find it.

18               "Within ten days of the effective date,"

19    is that where you are talking?

20         Q.    I was just talking about the heading.

21         A.    Oh, down here.  Oh, okay.  Yeah.  Yes, I

22    see that.

23         Q.    Do you see Paragraph B, it says:

24               "Within five business days of the
```

1    effective date of this agreement, DEA agrees to unlock

2    the controlled substances storage area at Walgreens

3    Jupiter and make its contents available to Walgreens."

4              Do you see that?

5         A.   Yes.

6         Q.   So as components of this obligation -- or

7    excuse me.  Components of this settlement agreement

8    not only included Walgreens having to pay $80 million,

9    but it also allow for the DEA to unlock and take the

10   padlock off the -- the C-II case that they had put on.

11             Do you see that?

12        A.   Yes.

13        Q.   Turn with me, please, to -- it is Page 14.

14             We've gone through some of the original

15   terms and conditions of the settlement agreement, but

16   do you see the top of this page is labeled "Addendum"?

17        A.   Yes.

18        Q.   And it says in the first sentence there:

19             "The parties agree that Walgreens will

20   maintain the following specific compliance measures

21   for the duration of this agreement."

22             Do you see that?

23        A.   Yes.

24        Q.   And it says under A1 that:

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    "Walgreens will maintain a department of
 2      pharmaceutical integrity, composed of personnel with
 3      pharmacy-related training and managerial personnel,
 4      who shall be trained in relevant diversion-related
 5      issues."
 6                    Do you see that?
 7          A.    Yes.
 8          Q.    Did you have an understanding that the
 9      main -- maintenance and the -- the existence of a --
10      the pharmacy integrity unit came out of the settlement
11      agreement?
12          A.    No, I was not aware of that.
13          Q.    Can you flip back in your stack for me and
14      pull out No. 10.  I'm sorry.  Document No. 10, Exhibit
15      No. 10.
16          A.    Exhibit 10 -- oh, I don't know where that
17      is.
18          Q.    It's the -- the e-mail from Tasha Polster.
19          A.    Oh, the exhibit.  Gotcha.  That was way
20      back.
21          Q.    I know.  I'm sorry.
22          A.    That's all right.
23                I have 9, 11 and 12.  Oh, here it is.
24      Okay.
```

1      Q.    See, this e-mail from Tasha, the one in

2  the middle of the page dated June 19th, 2013?

3      A.    Yes.

4      Q.    And the subject is:  "Rx integrity team

5  and DEA agreement."

6            Do you see that?

7      A.    Yes.

8      Q.    And she says:

9            "For those of you who don't know me, I

10  would like to introduce myself and my team.  My name

11  is Tasha Polster and I am the director of

12  pharmaceutical integrity."

13           Do you see that?

14     A.    Yes.

15     Q.    Did you lose your page of where we were in

16  the -- in the settlement agreement?

17     A.    No, I don't think so.

18     Q.    Okay.  Good.  Flip back --

19     A.    I think I kept it in there.

20     Q.    Flip -- flip back --

21     A.    15?

22     Q.    -- to Page 11.

23     A.    Oh, well, I guess I did then.

24           Okay.

1        Q.     Do you see the date that this agreement

2    was signed by Walgreens?

3        A.     Yes.

4        Q.     What was that date?

5        A.     June 10th.

6        Q.     2013?

7        A.     '13, um-hum.

8        Q.     Okay.  And the time that you get this

9    first e-mail from the pharmaceutical integrity team

10   where they are introducing themselves to you is

11   June 19th, 2013, correct?

12       A.     Correct.

13       Q.     Does that timing make a little bit more

14   sense now that you see this paragraph on Page 14

15   talking about the requirement that the pharmaceutical

16   integrity team be in existence as a part of this

17   agreement?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.     Yeah, that makes sense.

21   BY MR. GADDY:

22       Q.     If you look at Item No. -- or Paragraph

23   No. 6 on Page 15.

24       A.     Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    It says -- again, this is more of the

2   addendum to this agreement, correct?

3      A.    Correct.

4      Q.    It says:

5           "Beginning in 2014, Walgreens will exclude

6   any accounting for controlled substance prescriptions

7   dispensed by a particular pharmacy from bonus

8   computations for pharmacists and pharmacy technicians

9   at that pharmacy."

10           Do you see that?

11      A.    Yes.

12      Q.    As the C-II function manager, did you have

13   an awareness that pharmacists were being bonused based

14   on how many controlled substance prescriptions they

15   filled?

16      A.    No.

17      Q.    Do you see any potential conflict of

18   interest with a potential policy like that?

19      MS. SWIFT:  Objection to form.

20   BY THE WITNESS:

21      A.    Well, first of all, let me say I think our

22   pharmacists probably have the highest integrity, but I

23   have to because I believe in this company.  I don't

24   think any pharmacist would go so far as to make up a

1    prescription to get a bigger bonus, you know what I

2    mean.  I don't think they'd do that.

3    BY MR. GADDY:

4         Q.    Okay.  I understand that you -- you are

5    certainly proud to work for Walgreens.

6         A.    Uh-huh.

7         Q.    Okay.  You've been working for Walgreens

8    for 17 years?

9         A.    A long time, yeah.

10        Q.    Okay.  You have a lot of history with

11   them, correct?

12        A.    Yeah.

13        Q.    Okay.  And, but in fairness, there's over

14   8,000 Walgreens stores, right?

15        A.    Right now I'm not sure how many there are,

16   but, yeah, at least that.

17        Q.    Okay.  You haven't even come close to

18   meeting all of the pharmacists --

19        A.    No.

20        Q.    -- that Walgreens employs, do you,

21   correct?

22        A.    That's correct.

23        Q.    Okay.  And many stores -- or I'll assume

24   most stores employ multiple pharmacists, correct?

```
 1        A.     Correct, yeah.

 2        Q.     And you're not trying to say that you can

 3   sit here today and testify to the character or

 4   behavior patterns of all of the pharmacists that

 5   Wal -- Walgreens performs, can you -- employs, not

 6   performs, sorry?

 7        A.     Yeah.

 8               No, I'm not testifying that.  I'm just

 9   saying that I can't imagine we would hire, or whoever

10   is responsible for hiring at Walgreens, hiring,

11   picking, interviewing the pharmacists, would bring

12   people on that didn't have integrity.  I just -- I

13   don't see that happening.

14        Q.     You didn't, by any chance, see the article

15   that was published yesterday that talked about the

16   Walgreens' pharmacist that had to quit because after a

17   decade they realized they weren't licensed?

18        A.     No.

19        Q.     Okay.

20        A.     I did not see that.

21        Q.     Well, then I won't ask you about it.

22        MS. SWIFT:  It never stopped you before.

23        MR. GADDY:  Hmm?

24        MS. SWIFT:  Never mind.
```

1    BY MR. GADDY:

2        Q.    Let me show you this document.  I'll mark

3    this as No. 21.  This is P-WAG 2709.  I'll give this

4    to you.

5                    (WHEREUPON, a certain document was

6                     marked Walgreens - Bish Deposition

7                     Exhibit No. 21, for identification,

8                     as of 02/01/2019.)

9    BY MR. GADDY:

10       Q.    And do you see this is another e-mail

11   chain from with -- from within Walgreens?

12       A.    Um-hum, yes.

13       Q.    And let's -- let's start at the -- the

14   beginning of the chain and you'll come into play after

15   a few e-mails, but if you turn to the second-to-last

16   page, there is a 4/16/12 e-mail from a particular

17   pharmacy manager and the subject line is:  "C-II

18   orders."

19               Do you see where I am, at the very bottom

20   of the page?

21       A.    Oh, 4/16, okay.

22       Q.    Are you with me?

23       A.    Yes.

24       Q.    And it says:

```
 1                    "Elaine, can you help me increase my

 2       orders on narcotics?  Every time I order narcotics,

 3       very little comes in.  We are losing scripts because

 4       of this.  For example, I ordered 30 bottles of

 5       oxycodone 30-milligrams.  Only three bottles came in

 6       today."

 7                    Do you see that?

 8       A.    Yes.

 9       Q.    And if you go up to the next e-mail in the

10       chain, it looks like Elaine reaches out to you.  It

11       says:

12                    "Hello Deb, can you assist on this issue?"

13                    Correct?

14       A.    Correct.

15       Q.    And if you go up to the next e-mail on the

16       chain, it looks like you do what you told us you do

17       from time to time and reach -- reached out to

18       Barb Martin, correct?

19       A.    Correct.

20       Q.    You say:

21                    "Barb, how do we compensate for stores in

22       the situation below?  It looks like for this

23       particular store there was a buyout."

24       A.    Correct.
```

1    Q.    And -- and is that in layman's terms where

2    two pharmacies kind of combine into one?

3    A.    Well, it is where we take over an already

4    existing pharmacy, like a little independent --

5    Q.    Okay.

6    A.    -- so they have an inventory already but

7    it may not be sufficient to fill our customers.

8    Q.    Understood.  Thank you.

9         So you raise the issue to Barb there,

10   correct?

11   A.    Yes.

12   Q.    If you go to the -- flip to the bottom of

13   the next page, we see Barb's response, and she says:

14        "DEA regulations require all distributors

15   of controlled substances to systematically review and

16   modify orders based on sales patterns.  The orders are

17   being modified as the store is making dramatic changes

18   to the suggested order quantity.  One of our DCs in

19   Florida and several stores are currently under

20   investigation for high purchases of C-II medications."

21        Do you see that?

22   A.    Yes.

23   Q.    And, again, that is consistent with the

24   timeframe, this April of 2012 when the DEA was looking

```
 1    into the activity of the Jupiter?

 2         A.    Um-hum.

 3         Q.    She goes on to say:

 4               "I would request the store not make any

 5    more changes to their C-II order."

 6               Do you see that?

 7         A.    "Not make any changes," yeah.

 8         Q.    If you go back -- if you go up to the next

 9    e-mail, it looks like Elaine reaches out to Josephine

10    Kramer.

11               Do you see that?

12         A.    Yep.

13         Q.    Do you know who that is?

14         A.    No.

15         Q.    She says:

16               "Josie, I need your insight, pharmacy is

17    trying to order enough C-IIs to fill the increased

18    volume from the buyout.  Unfortunately, they are

19    having to turn patients away due to the warehouse not

20    send enough of a supply.  This is going" -- "this is

21    significantly going to impact the store's retention of

22    scripts from Jersey Shore and possibly the bonus tied

23    to Mark.  Can you assist?"

24               Do you see that?
```

1       A.      Yes.

2       Q.      Do you see there where there are

3   situations where even getting controlled substances

4   into the store was -- was an issue as it related to

5   impacting the potential bonus for a pharmacist?

6       A.      Well, who is Elaine Lee first of all?  Is

7   that a pharmacist, a pharmacy manager, a pharmacy

8   tech, who is that?  Do you know?

9       Q.      I don't know.  I can't tell you.

10      A.      Yeah, I don't know who it is either.

11  Well, the pharmacy manager of that store e-mailed

12  Elaine Lee.  I just don't know who that is.

13      Q.      Regardless, there has been a concern

14  raised about controlled substances getting to the

15  store and a concern about if they don't get there it

16  might impact somebody's bonus?

17      A.      Correct.  I'm trying to determine if that

18  person writing that would have that knowledge or is

19  just talking, you know.

20      Q.      Well, regardless of what knowledge they

21  have, the concern about a bonus being impacted by

22  controlled substances not getting to the store is

23  being raised.

24              Do you agree with that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    It is being raised, correct.

 2      Q.    Okay.  And again, I know that you said

 3  that you -- you -- you want to believe that the

 4  Walgreens' pharmacists are good people and that

 5  Walgreens would only hire good people, but do you see

 6  how there could be a potential conflict of interest if

 7  pharmacists receive bigger bonuses if they dispense

 8  more controlled substances?

 9            And if you don't, that's fine.  I'm just

10  asking if you see how that could be a conflict of

11  interest.

12      A.    I can see that this person feels that can

13  be a conflict.  I mean, this person is clearly

14  bringing that up.  I just don't know who this person

15  is, which bothers me a little bit, but...

16      Q.    It is an issue that's being raised and

17  maybe it is an issue in your mind that shouldn't come

18  into play when we are talking about dispensing drugs

19  that I think, as you put it earlier, have a high

20  street value?

21      MS. SWIFT:  Object to the form.

22  BY THE WITNESS:

23      A.    Right.

24  BY MR. GADDY:
```

1    Q.    All right.  Let's go back and look at a

2    little bit more in this settlement agreement and then

3    we'll be done with that document.

4          If we go to Page 16.  So we are still in

5    this -- if you flip back, do you see we are still in

6    this addendum to the settlement agreement?

7          Do you see that?

8    A.    Um-hum, yes.

9    Q.    And the first section that we looked at

10   was General, the second was Pharmacies, and this last

11   section, Section C, is related to distribution

12   centers, correct?

13   A.    Correct.

14   Q.    Okay.  Under No. 1, do you see where it

15   says:

16         "Within a week of the effective date of

17   the agreement, Walgreens" -- excuse me -- "will

18   designate a DEA contact point in its department of

19   pharmaceutical integrity to address inquiries

20   regarding suspicious order monitoring and reporting.

21   At least one existing employee at each Walgreens

22   distribution center that distributes controlled

23   substances will receive appropriate training on

24   suspicious order monitoring requirements and on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting relevant issues to the department of

 2    pharmaceutical integrity."

 3            Do you see that?

 4    A.    Yes.

 5    Q.    Okay.  So do you see there in that last

 6    phrase, it says:

 7            "At least one person at each Walgreens DC

 8    that distributes controlled substances must receive

 9    appropriate training on suspicious order monitoring."

10            Do you see that?

11    A.    Yep.

12    Q.    Okay.  Did you receive such training?

13    A.    Not that I recall.

14    Q.    Okay.  All right.  I'm back on No. 10

15    again, the e-mail from Tasha Polster.

16    A.    Okay.

17    Q.    About a week after this was signed,

18    June 19th, 2013.

19            Do you see that?

20    A.    Uh-huh, yes.

21    Q.    We went through the first paragraph of

22    that -- of her e-mail where she is introducing folks.

23    The second paragraph she says:

24            "The" -- "the distribution center
```

 1    controlled substance contact personnel spreadsheet has

 2    the name that Sue gave me who is responsible for

 3    reading the distribution center suspicious order

 4    monitoring policy and procedure.  I need documentation

 5    of one person in each distribution center."

 6            Do you see that?

 7       A.   Yes.

 8       Q.   And -- and that's fairly consistent with

 9    what we just read that would be required, right?

10       A.   Right.

11       Q.   But I think you said you don't remember --

12    you don't recall ever getting any training on

13    suspicious order monitoring, right?

14       A.   No, I don't remember getting it.

15       Q.   Do you know if anybody in Perrysburg ever

16    did?

17       A.   No, I don't know if it -- if anybody in

18    Perrysburg ever did.  I don't re -- they could have

19    trained maybe the SAIL coordinator, but I don't recall

20    that.

21       Q.   As -- as the person who knows more about

22    C-IIs in the distribution center than anybody else,

23    did the SAIL coordinator or anybody else ever come to

24    you and say, Hey, I am now your source for suspicious

1   order monitoring questions because I've received this

2   training?

3        MS. SWIFT:  Object to the form.

4   BY THE WITNESS:

5        A.    Not that I recall.

6   BY MR. GADDY:

7        Q.    Do you agree that -- that it -- it seems

8   to me, and tell me if I'm wrong, it occurs to me that

9   you would have been the most appropriate person to get

10  the suspicious order monitoring training seeing as

11  you're the buck-stops-here person when it comes to

12  Schedule II drugs?

13        Does that make sense to you?

14        A.    No.  I would think the SAIL coordinator

15  would get it.

16        Q.    Okay.  Did the SAIL coordinator -- and who

17  would have been your coordinator in this period of

18  time, would it have been Lori or Brook?

19        A.    I've already said I don't remember who

20  served when.  I just know those were the three people

21  that were my --  a SAIL coordinator at one time or

22  another.  Chad was the last one.

23        Q.    Okay.

24        A.    But I don't know what years each of the

Highly Confidential - Subject to Further Confidentiality Review

1    other two were there.

2         Q.    Okay.

3         A.    So I don't know.

4         Q.    In the last paragraph, Tasha goes on to

5    state:

6               "It has been a long year-and-a-half

7    getting this DEA settlement in place.  We want to

8    ensure we have proper documentation and accountability

9    for this compliance piece."

10              Do you see that?

11        A.    Um-hum.

12        Q.    Do you know that -- a year-and-a-half from

13   '13 is early '12.

14              Do you agree with that?

15        A.    Yes.

16        Q.    Did -- did you know there had been

17   discussions going on with the DEA all of the way back

18   to early '12 about a settlement agreement?

19        A.    No.

20        Q.    Nobody ever asked for your input?

21        A.    No, not that I recall.

22        Q.    I got a little sidetracked, but you saw

23   up at -- two paragraphs up it said the DC contact

24   personnel spreadsheet has the names of who's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    responsible --

 2         A.    Uh-huh.

 3         Q.    -- for the -- for the suspicious order

 4    monitoring policy and procedure.

 5               Do you see that?

 6         A.    Yes.

 7         Q.    Turn to the last page of this document for

 8    me, please.

 9               And do you see a spreadsheet with the

10    distribution centers on it?

11         A.    Um-hum, yes.

12         Q.    And who is entered for Perrysburg?

13         A.    Myself and Tammy Trumbull.

14         Q.    Okay.  And you don't ever remember getting

15    any training on the suspicious order monitoring,

16    right?

17         A.    Right.

18         Q.    Do you know whether or not Tammy ever got

19    any training on suspicious order monitoring?

20         A.    I would have no way of knowing.

21         Q.    And, in fact, if you look to the right,

22    the second column from the right is the date that

23    training was done?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    Okay.  And there is no date entered for
2    you and no date entered for Tammy, right?
3         A.    Right.
4         Q.    And the SAIL coordinators aren't even
5    listed on here, are they?
6         A.    No.
7         Q.    But this --
8         A.    Well, ours aren't.  I don't know about the
9    other locations.
10        Q.    Sure.  That's fair.
11        A.    Actually, Susan Day is on there and she is
12   the SAIL coordinator --
13        Q.    Okay.
14        A.    -- for Woodland.
15        Q.    There is no Perrysburg SAIL coordinator
16   listed on here, correct?
17        A.    Correct.
18        Q.    Okay.  It looks like some other folks had
19   had their training done, but at -- at least as of this
20   date neither you nor Tammy had?
21        A.    That's what it appears.
22        Q.    And as far as you know, you never had any
23   training done on suspicious order monitoring, correct?
24        A.    Not that I recall.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    All right.  Same page -- sorry, I lost my

2  spot.

3             Page 16.  And I'm on C-II now.

4       A.    Okay.

5       Q.    It says there:

6             "For the purpose of complying with

7  suspicious order monitoring and reporting requirements

8  for orders to be supplied by a Walgreens distribution

9  center, Walgreens will maintain the tolerance

10 threshold, ceiling limits, and other elements of its

11 current suspicious order monitoring and reporting

12 system."

13            Do you see that?

14      A.    Yes.

15      Q.    And I -- I think I've asked you generally

16 about those terms and you've told me that you heard --

17 heard them but really don't have a detailed

18 understanding of what that means in the context of the

19 suspicious order system, right?

20      A.    Right.

21      Q.    Okay.  And it says:

22            "Those must be in place either for the

23 duration of this agreement or until Walgreens

24 distribution activities are transitioned to a third
```

Highly Confidential - Subject to Further Confidentiality Review

1    party."

2              Do you see that?

3        A.    Yes.

4        Q.    Were you aware that when this agreement

5    was executed that Walgreens was already discussing

6    getting out of the distribution business and

7    outsourcing those activities to a third party?

8        A.    No, I wasn't aware of that.

9        Q.    But regardless, that's what happened with

10   the --

11       A.    We did --

12       Q.    -- AmerisourceBergen, correct?

13       A.    We did outsource it eventually, yes.

14   Uh-huh.

15       Q.    Do you know how long it was after this

16   June 2013 settlement agreement was entered that you --

17   that Walgreens outsourced their distribution

18   activities to AmerisourceBergen?

19       MS. SCHUCHARDT:  Objection to form and

20   foundation.

21   BY THE WITNESS:

22       A.    I don't remember.

23   BY MR. GADDY:

24       Q.    If you'd skip down a couple of

```
 1   sentences --

 2        A.    Uh-huh.

 3        Q.    -- there is one that starts:  "Walgreens

 4   agrees not to ship."

 5        A.    Oh, yeah.

 6        Q.    It says:

 7              "Not to" -- "Walgreens agrees not to ship

 8   any order of interest or suspicious order in whole or

 9   in part unless and until Walgreens resolves the

10   reasons that caused it to designate the order."

11              Do you see that?

12        A.    Yes.

13        Q.    That phrase "orders of interest," have you

14   ever heard that before?

15        A.    No.

16        Q.    Let me ask you, I think this will be

17   quick, on the first portion of that paragraph where it

18   was talking about tolerances and ceilings, I'll show

19   you what I'm marking as --

20        A.    Page 17, if I believe -- I just closed it.

21        Q.    Well, I think it's 6 -- I think you are

22   right, it is 17.

23        A.    17, I've got it.

24        Q.    Oh, I'm going to show you what I've marked
```

1    as Exhibit 22, which is P-WAG 2102.

2                    (WHEREUPON, a certain document was

3                     marked Walgreens - Bish Deposition

4                     Exhibit No. 22, for identification,

5                     as of 02/01/2019.)

6    BY MR. GADDY:

7        Q.    Do you see this document, top right-hand

8    corner, it says -- has a date on it 8/18/10?

9        A.    Yes.

10       Q.    And at the top middle of the page it -- it

11   has the name "Ranick" and then below that it says

12   "Order Item Detail"?

13       A.    Yes.

14       Q.    Do you know Marcie Ranick?

15       A.    No.

16       Q.    Now, before we go -- get into this, have

17   you ever seen a report like this before?

18       A.    No.

19       Q.    Do you see in the top right-hand corner

20   under the date it says "suspicious order"?

21       A.    Um-hum.

22       Q.    And then on the -- in the kind of the top

23   section it has a store number, district number, and if

24   you go all of the way down it has an item description

1    and lists hydromorphone?

2        A.    This is a print screen, but, yeah, I see

3    all of that.

4        Q.    Okay.  What -- do you know what system

5    this would have been a print screen from?

6        A.    No.

7        Q.    I mean, does this look like SIMS?

8        A.    I mean, it would be -- it looks -- yeah,

9    it looks like, yeah, one of our -- it looks like a

10   SIMS system, but I don't know what query brings that

11   up or what they are looking at.

12       Q.    Okay.  And then down at the very bottom of

13   the page, it says:  "Suspicious reason code:" --

14       A.    Uh-huh.

15       Q.    -- "T-exceeds tolerance limit."

16       A.    Uh-huh.

17       Q.    Do you see that?

18       A.    Um-hum.  Um-hum.

19       Q.    Did -- does this form make sense to you in

20   any way, shape or form?

21       A.    Well, I mean, I could guess what it means,

22   but I don't know what it means.

23       Q.    Yeah, I -- I don't want you to guess.

24             You've never seen it before, never had

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a -- never had any reason to use it within the

 2    distribution center?

 3        A.    I didn't, no.

 4        Q.    Nobody during this -- this time period,

 5    nobody notified you that there was any suspicious

 6    orders for this particular drug and provided you with

 7    a report such as this?

 8        A.    No.

 9        Q.    These print screens look pretty similar

10    but some of them are a little bit different.  If you

11    turn the page one time, the next one at the top, it

12    looks like it has an abbreviation for loss prevention.

13              Do you see that?

14        A.    Oh, um-hum.

15        Q.    And, again, to the right it has got the

16    same date, 8/18/10, and it says "order review."

17              Have you ever seen this page before?

18        A.    No.

19        Q.    Anything like this before?

20        A.    No.

21        Q.    It says:  "Source name President's Plaza."

22              Do you see that?

23        A.    That's -- that was our DC, we were called

24    President's Plaza, I believe.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.

2    A.    I don't know where that came from, but...

3    Q.    That was the Perrysburg's DC's name or...?

4    A.    I thought it was.  I could be wrong.  I

5    know we are 13, but I thought President's Plaza was

6    also another thing they used to refer to us.  Maybe

7    not.

8    Q.    And turn with me, please, to the Bates

9    number ending 571.

10          Do you see this particular report has a

11    different date on the top, 8/3/10, again below that it

12    says:  "Suspicious order"?

13    A.    Um-hum, yes.

14    Q.    Do you see where I am?

15    A.    Yes.

16    Q.    And this has a -- the title of this

17    appears to be "Threshold Violations-Monthly."

18          Do you see that?

19    A.    Yes.

20    Q.    And down there in the -- the data section,

21    it has the -- the WIC number for oxycodone and -- and

22    gives the description of oxycodone 20-milligrams.

23          Do you see that?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Is this a report that you have ever seen

 2  before?

 3      A.    No.

 4      Q.    Is this a -- you don't know -- nobody has

 5  ever given you this report or given you information

 6  about these types of reports for suspicious orders

 7  within Walgreens?

 8      A.    Not that they've identified it was called

 9  threshold violations, no, I've -- I've never seen

10  this.

11      Q.    Is it fair to say that you have not ever

12  seen any suspicious order report other than the one

13  we've talked about earlier that you understood came

14  into the distribution center and your SAIL coordinator

15  was in charge of filing?

16      A.    Correct.

17      Q.    The last part of that paragraph on Page 16

18  that we read, it read:

19            "Walgreens agrees not to ship any order of

20  interest or suspicious order in whole or in part until

21  Walgreens resolves the reasons that caused it to

22  designate the order as an order of interest or

23  suspicious."

24            Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And I know I've asked you about this

3   already, but I don't know if I've asked you

4   specifically after this time period in June 2013.

5           After this agreement was entered, did

6   anybody ask you or anybody on your team to do any type

7   of due diligence or investigation into any potential

8   suspicious orders?

9      MS. SWIFT:  Object to the form.

10  BY THE WITNESS:

11     A.    Not that I recall.

12  BY MR. GADDY:

13     Q.    Now, we talked about it a little bit

14  earlier, but the DEA also came in to the Perrysburg

15  distribution center, correct?

16     A.    Yes.

17     Q.    I'll show you what I'll mark as

18  Exhibit 23.

19              (WHEREUPON, a certain document was

20               marked Walgreens - Bish Deposition

21               Exhibit No. 23, for identification,

22               as of 02/01/2019.)

23  BY MR. GADDY:

24     Q.    And this is P-WAG 15.

1          Do you see at the top of this document it

2     says:  "In the United States District Court for the

3     Northern District of Ohio, Western Division"?

4          A.     Yes.

5          Q.     And over to the left it says:

6                 "In the matter of the administrative

7     inspection of Walgreens Corporation" and it has the

8     Perrysburg distribution center address there?

9          A.     Yes.

10         Q.     And over on the right-hand side of the

11    page it has the name of a particular magistrate judge

12    and then it says below that:  "Administrative

13    Inspection Warrant."

14                Do you see that?

15         A.     Yes.

16         Q.     If we flip to the last page of the

17    document, do you see the date that this order was

18    entered?

19         A.     Yes.

20         Q.     And that was February 5th, 2013?

21         A.     Correct.

22         Q.     So that would have been before the

23    settlement agreement that we just looked at was

24    signed, right, we saw that was in June of '13?

```
 1       A.      Right.

 2       Q.      Okay.  So while that investigation was

 3  going on in Jupiter, we see this -- this warrant dated

 4  this date related to Perrysburg, correct?

 5       MS. SWIFT:  Object to the form.

 6  BY THE WITNESS:

 7       A.      I didn't know this was a warrant, but I

 8  see this piece of paper with all of this information,

 9  yes.

10  BY MR. GADDY:

11       Q.      Sure.

12               Well, you see in the top right-hand

13  portion of the caption it says "Administrative

14  Inspection Warrant"?

15       A.      Oh, there is the word, okay.  Yes, I do.

16       Q.      And it says:

17               "To:  Wayne Groves, Diversion Investigator

18  and any other authorized Diversion Investigator Or

19  Special Agent of the DEA of the DOJ.

20               "Application having been made and probable

21  cause, as defined" in certain statutes and

22  regulations, "having been shown by the affidavit of

23  Wayne Groves for an inspection of the controlled

24  premises of Walgreens," in Perrysburg, "it appears
```

```
 1    that such inspection is appropriate under" this

 2    particular statute.

 3              Do you see that?

 4        A.    Yes.

 5        Q.    Did you have an understanding that prior

 6    to the DEA coming in and serving this warrant and

 7    asking for documents and asking questions that they

 8    had to make an initial showing to a court that that

 9    was justified?

10              Did you have an understanding of that?

11        A.    No.

12        Q.    Okay.  Did anybody ever tell you that at

13    Walgreens?

14        A.    No.

15        Q.    It goes on to say that:

16              "Therefore, pursuant to the provisions of

17    that statute, you are hereby authorized to enter the

18    above described premises, within business hours, for

19    the following purposes."

20              And if you flip through here, you see he

21    has got a bunch of different paragraphs talking about

22    a bunch of different things that these DEA agents are

23    allowed to do.

24              Do you see that generally?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    And we'll only look at a couple of these

 3  paragraphs.  The very first one under A says:

 4             "To inspect and copy records, reports,

 5  files, official order forms, and other documents

 6  required to be made, kept and maintained under certain

 7  provisions" -- or excuse me -- "under the provisions

 8  of the Controlled Substances Act."

 9             Do you see that?

10       A.    Yes.

11       Q.    And then if you flip to Page 4, do you see

12  it kind of has a catchall there and in Paragraph A it

13  says:

14             "All other records which refer to or

15  relate to the distribution of controlled substances."

16             And in Paragraph B it says:

17             "All records pertaining to the filing of

18  suspicious order reports with the local field division

19  office of DEA pursuant to 21 CFR 1301.74(b)."

20             Do you see that?

21       A.    Yes.

22       Q.    "As well as records pertaining to a

23  distributor maintaining effective controls against

24  diversion pursuant to certain statutes."
```

Highly Confidential - Subject to Further Confidentiality Review

1         Do you see that?

2    A.    Yes.

3    Q.    Did the DEA show you this warrant when

4    they came in?

5    A.    Not me, no.

6    Q.    Okay.  Did anybody ever tell you that the

7    DEA was there pursuant to an administrative

8    investigative warrant --

9    A.    No.

10   Q.    -- excuse me -- administrative inspection

11   warrant?

12   A.    No.

13   Q.    Did anybody ever tell you why you were

14   having to give documents to the DEA?

15   A.    No.

16   Q.    I'll show you P-WAG 16 that I'll mark as

17   Exhibit 24.

18              (WHEREUPON, a certain document was

19               marked Walgreens - Bish Deposition

20               Exhibit No. 24, for identification,

21               as of 02/01/2019.)

22   BY MR. GADDY:

23   Q.    And do you see the very top of this, it

24   says:  "U.S. Department of Justice/Drug Enforcement

Highly Confidential - Subject to Further Confidentiality Review

1    Agent" -- "Drug Enforcement Administration Subpoena"?

2        A.    Yes.

3        Q.    And at the bottom left-hand corner, do you

4    see that there is a date down there that looks

5    consistent with this date of the warrant?

6        A.    Yes.

7        Q.    Okay.  February 4th, 2013?

8        A.    Um-hum.

9        Q.    And, again, in the "to" line you see that

10   this is addressed to Walgreens Corporation?

11       A.    Yes.

12       Q.    Perrysburg, Ohio, that's your distribution

13   center?

14       A.    Yes.

15       Q.    If you read there, it says:

16             "Greeting, by the service of this subpoena

17   upon you by Diversion Investigator Wayne Groves, who

18   is authorized to serve it, you are hereby commanded

19   and required to appear before Investigator Groves, an

20   officer of the DEA, to give testimony and to bring

21   with you and produce for examination the following

22   books, records, and papers at the time and place

23   hereinafter set forth."

24             Do you see that?

```
 1        A.    Yes.

 2        Q.    Did Investigator Francis or any of the

 3   other DEA agents that you met with at the distribution

 4   center ever give you a copy of these subpoenas?

 5        A.    Not that I recall.

 6        Q.    Okay.  This one here says, in the next

 7   paragraph:

 8              "Pursuant to an official investigation

 9   being conducted by the DEA, provide the following

10   information and documentation by Walgreens."

11              And it gives the Perrysburg address,

12   correct?

13        A.    Yes.

14        Q.    And it says:

15              "Any and all written and electronic

16   records and correspondence regarding the sale and

17   purchase of controlled substance between 2/1/11 and

18   2/5/13."

19              Do you see that?

20        A.    Yes.

21        Q.    And anything the DEA asked for you

22   certainly gave them, correct?

23        A.    Yes.

24        Q.    And we are not going to go through all of
```

```
 1    these, but as you flip through this packet, you'll see

 2    several other subpoenas.  So specifically go to the

 3    page ending 701, using the Bates number.

 4        A.    701?

 5        Q.    Yes, ma'am.

 6        A.    Okay.

 7        Q.    And specifically I'm going to -- we are

 8    going to look at what this subpoena is asking for in

 9    that middle paragraph after the colon.

10        A.    Okay.

11        Q.    Do you see it says:

12              "All written and electronic correspondence

13    of suspicious controlled substance orders and

14    suspicious List 1 chemical orders reported by

15    Walgreens."

16              Do you see that?

17        A.    No, I'm sorry.

18              After the colon you said?

19        Q.    Oh, I'm sorry.  The colon in the middle of

20    Paragraph 2.

21        A.    Oh, right here.  Okay.

22        Q.    It says:

23              "All written and electronic correspondence

24    of suspicious controlled substance orders and
```

1    suspicious List 1 chemical orders reported by

2    Walgreens to the DEA."

3            Do you see that?

4    A.    Yes.

5    Q.    Is that something that they asked you for?

6    A.    I don't remember.  They asked me for many,

7    many things.  I would have no way of remembering.

8    Q.    If they asked you for evidence of

9    controlled substance orders -- excuse me -- suspicious

10   controlled substance orders, what would you have done?

11   A.    Evidence of suspicious controlled -- I

12   probably would have pulled out the reports or the disk

13   if they had been disks by then.

14   Q.    The ones that -- that the C-II SAIL

15   coordinator would have filed?

16   A.    Um-hum.

17   Q.    Do you recall whether this -- this visit

18   in early February 2013 --

19   A.    Uh-huh.

20   Q.    -- was that the first one during the day

21   or the second one at night or do you remember?

22   A.    I don't remember.

23   Q.    Okay.  Do you recall that -- well, let me

24   ask you this:  Did you know at this time that the C-II

1    cage in Jupiter had already been locked up by the DEA?

2         A.    Do I know on February 5th?  I don't know

3    when I had found that out, that they had closed.  I

4    just knew they closed.

5         Q.    Okay.  After the DEA came to Perrysburg --

6         A.    Uh-huh.

7         Q.    -- with the warrant, with these subpoenas

8    asking for records and asking questions, was there a

9    legitimate concern that the DEA was going to shut down

10   Perrysburg, too?

11        A.    From whom, a legitimate concern by whom,

12   me?

13        Q.    You or -- or other people within the

14   distribution center?

15        A.    I did wonder why they were there.  I

16   didn't really -- I wasn't concerned they were going to

17   shut us down.  I just wondered why they were there.  I

18   remember wondering.  Yeah.

19        Q.    When DEA came to Perrysburg asking

20   questions and asking for documents, you certainly

21   cooperated with them, correct?

22        A.    Correct.

23        Q.    Okay.  You didn't give them any pushback

24   or refuse to turn things over, refuse to answer

```
 1   questions or anything like that?

 2        A.    No.

 3        Q.    Okay.  I'll show you what I'm going to

 4   mark as Exhibit No. 25.  This is P-WAG 2604.

 5                    (WHEREUPON, a certain document was

 6                     marked Walgreens - Bish Deposition

 7                     Exhibit No. 25, for identification,

 8                     as of 02/01/2019.)

 9   BY MR. GADDY:

10        Q.    And do you see that this is a -- an e-mail

11   chain and it looks like the substantive e-mail is --

12   starts about a third of the way down the page?

13        A.    Yes.

14        Q.    And the subject is:  "Important DEA

15   Reminder."

16              Do you see that?

17        A.    Yes.  The Compass is a store -- is a

18   retail store, the way they communicate is on a Compass

19   system, which I didn't have.

20        Q.    Okay.  Do you see there it says:

21              "District and market leaders, on

22   Wednesday, February 6th, the DEA inspected the

23   Perrysburg distribution center in Ohio and requested

24   records pertaining to controlled substances."
```

```
 1                Do you see that?

 2        A.     Yes.

 3        Q.     Okay.  And this e-mail is being sent on

 4   February 7th, right?

 5        A.     February 8th, yeah.  Oh, the 7th down --

 6        Q.     Sure.  So the top -- so the top e-mail is

 7   February 8th?

 8        A.     Right.

 9        Q.     But it looks like the e-mail talking about

10   the inspection on the 6th was sent the very next day

11   on the 7th, right?

12        A.     Uh-huh, right, uh-huh.

13        Q.     And it says:

14               "For your reference, the following Compass

15   communication will be provided to your stores today."

16               And it says:  "Compass message 2/7/13

17   store and pharmacy managers."

18               Do you see that?

19        A.     Yes.

20        Q.     And so it looks like this message is being

21   sent out to all of the stores the day after the DEA

22   came into Perrysburg, correct?

23        A.     That's what it looks like, yeah.

24        Q.     Okay.  It says:
```

```
 1                    "On Wednesday, February 6th, the DEA

 2      inspected the Perrysburg distribution center in Ohio

 3      and requested records pertaining to controlled

 4      substances."

 5                    Do you see that?

 6           A.    Yes.

 7           Q.    It goes on to state:

 8                    "Walgreens policy is to cooperate with

 9      regulatory agencies and law enforcement."

10                    Do you see that?

11           A.    Yes.

12           Q.    Skip down to the next paragraph.  It says:

13                    "The procedures below provide a brief

14      overview of steps to take in the event that you

15      receive a warrant at your location."

16                    Do you see that?

17           A.    Yes.

18           Q.    Okay.  No. 1 it says:

19                    "Ask DEA agents for identification and the

20      purpose of their visit and allow agents immediate

21      access to the pharmacy department and direct them to

22      the requested records."

23                    Do you see that?

24           A.    Yes.
```

```
 1        Q.     That sounds appropriate, correct?

 2        A.     Yes.

 3        Q.     The next bullet point says:

 4               "District and pharmacy team members are

 5   not required," and that's underlined, right?

 6        A.     Yes.

 7        Q.     "To answer any questions, participate in

 8   any interviews" -- or excuse me -- "participate in

 9   interviews, or provide written statements to the DEA

10   investigators."

11               Do you see that?

12        A.     Yes.

13        Q.     It goes on to say:

14               "Participating in these requests may

15   potentially expose the company and the individual team

16   member to liability."

17               Do you see that?

18        A.     Yes.

19        Q.     Do you know what liability Walgreens is

20   worried about being exposed to if district or pharmacy

21   team members talk to the DEA?

22        A.     No, I'd have no way of knowing that.

23        Q.     Did anybody tell you to not talk to the

24   DEA because of concerns about exposing the company or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   yourself --

 2        A.    Uh-huh.

 3        Q.    -- to liability?

 4        A.    No.  Just the opposite, actually.

 5        Q.    Do you recall earlier when we looked at

 6   that internal audit report --

 7        A.    Uh-huh.

 8        Q.    -- and it noted that there were concerns

 9   with the suspicious order reporting system at

10   Walgreens?

11        A.    Yes.

12        Q.    And that there were risks involved as far

13   as potential DEA sanctions, do you remember that

14   generally?

15        MS. SWIFT:  Objection to the extent it

16   mischaracterizes the document which is not in front of

17   the witness.

18   BY THE WITNESS:

19        A.    I was going to say, I don't remember that

20   verbiage, no, but -- the second part of what you said,

21   I don't.

22   BY MR. GADDY:

23        Q.    Okay.  Well, let me start over with just

24   the first part.
```

```
 1              Do you recall generally that we looked at

 2    that internal audit report earlier?

 3         MS. SWIFT:  Object -- same objections.

 4    BY THE WITNESS:

 5         A.    I do recall that we looked at the internal

 6    audit report, yeah.

 7    BY MR. GADDY:

 8         Q.    Okay.  And do you recall the internal

 9    audit report raised concerns about the suspicious

10    order monitoring reporting system at Walgreens?

11         MS. SWIFT:  Same objections.

12    BY THE WITNESS:

13         A.    Can I look at it again?

14    BY MR. GADDY:

15         Q.    Absolutely.

16         A.    You are talking about this, right?

17         Q.    Yes, ma'am.

18         MS. SWIFT:  How much time do we have on the

19    record?

20         THE WITNESS:  Huh?

21         MS. SWIFT:  I was asking Mike.

22         THE VIDEOGRAPHER:  Six seventeen.

23         MS. SWIFT:  Six seventeen.

24    BY THE WITNESS:
```

1       A.     "Significant concern regarding the growing

2    in-transit controlled drug losses," is that what he

3    is -- maybe I should wait.

4       MS. SWIFT:  He'll ask another question.

5    BY MR. GADDY:

6       Q.     Do you have the document in front of you

7    now?

8       A.     Yes.  Uh-huh.

9       Q.     Do you see where the -- where the internal

10   audit report found issues with the controlled drug

11   reporting process?

12      A.     Controlled drug, security, screening,

13   receiving.

14      Q.     It was Bullet Point No. 2.

15      A.     Under --

16      Q.     Under All --

17      A.     -- the Perrysburg DC.

18      Q.     Under All DCs.

19      A.     Okay.  I was looking under Perrysburg.

20             Yeah, suspicious controlled drug order

21   processing and ordering, yes.

22      Q.     And that was an issue that they -- that

23   was something that the internal audit folks had found

24   an issue with when they had done their audit at

```
 1    Perrysburg, correct?

 2         MS. SWIFT:  Objection; foundation.

 3    BY THE WITNESS:

 4         A.   Correct, that's what it looks like.

 5    BY MR. GADDY:

 6         Q.   And if you flip through that document and

 7    turn to Exhibit A, you'll see that -- I think it is

 8    the second page of Exhibit A.

 9         A.   Exhibit A.

10         Q.   And this is Exhibit 240.  P-WAG 240.

11         A.   I don't see any -- is Exhibit A within

12    this?

13         Q.   Yes, ma'am, it is the -- the very next

14    page.  It is the spreadsheet is Exhibit A.

15              Do you see it's up here?

16              If we go to the next page of Exhibit A.

17         A.   Oh, there we go.

18         Q.   Do you see in the middle of the page it

19    has "Controlled Drug Reporting"?

20              Do you see that?

21         A.   Yeah.

22         Q.   And this document, this audit was done

23    December of 2008, correct?

24         A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And here they identified an issue

 2  regarding Walgreens controlled drug reporting,

 3  correct?

 4      MS. SWIFT:  Object to the form.

 5  BY THE WITNESS:

 6      A.    That's what it says, yeah.

 7  BY MR. GADDY:

 8      Q.    And they noted that Walgreens produces a

 9  monthly suspicious controlled drug order report,

10  right?

11      A.    Right.

12      Q.    And we have talked ad nauseam about that

13  as it related to the Rannazzisi letter from a year

14  earlier, correct?

15      A.    Correct.

16      Q.    And there is something in the Risk column

17  that -- that I'm not able to see right now and it had

18  a recommendation that -- that a meeting take place

19  between these different departments, correct?

20            Do you recall looking at all of this now?

21      A.    Yes, um-hum.

22      Q.    And you recall that if you look at the

23  final column, the decision was is that there would be

24  a meeting in May -- on May 31st, 2009, about five
```

Highly Confidential - Subject to Further Confidentiality Review

 1   months later, right?

 2        A.    Right.

 3        Q.    Okay.  And we had a discussion about sense

 4   of urgency.

 5        A.    Right.

 6        Q.    And whether or not that was -- setting a

 7   meeting five months later was a sense of urgency and I

 8   think you said that you would have liked to have seen

 9   it done a few months earlier?

10        A.    Right.

11        Q.    And I said, Well, gee, we would certainly

12   agree that if it was done within a couple of days,

13   that would have been exhibitive of a sense of urgency,

14   correct?

15             Do you recall that?

16        A.    I recall saying I would have liked to have

17   seen it done sooner.  I don't recall saying a couple

18   of days.  Certainly that would have made it a major

19   urgent issue if I saw it done in two days.  That's a

20   pretty quick response, I think.

21        Q.    Let's go back to Exhibit 25.

22        A.    Okay.

23        Q.    The commune -- the Compass communication?

24        A.    Oh, okay.  All right.

1      Q.    How many days did it take Walgreens to

2   send a communication out to all of their stores

3   advising them that they don't need to talk to the DEA

4   and that if they do they might expose Walgreens and

5   themselves to liability?

6      A.    One day.

7      Q.    I'll show you what I'll mark as Exhibit

8   No. 26.  This is P-WAG 1361.

9              (WHEREUPON, a certain document was

10             marked Walgreens - Bish Deposition

11             Exhibit No. 26, for identification,

12             as of 02/01/2019.)

13  BY MR. GADDY:

14     Q.    Do you see this is an e-mail between Barb

15  Martin and Patty Daugherty?

16     A.    Yes.

17     Q.    And this is dated February 15th, 2013,

18  correct?

19     A.    Yes.

20     Q.    This is about a week after the DEA came

21  into Perrysburg with the warrant subpoenas?

22     A.    Yes.

23     Q.    And the subject of this e-mail is "Draft

24  Communication."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Do you see that?

 2        A.    Yes.

 3        Q.    It says:

 4                 "Patty, Per my voicemail, here are copies

 5     of the draft communication to go out to the stores

 6     serviced by Perrysburg.  This is to be sent out if

 7     Perrysburg has to close."

 8                 Do you see that?

 9        A.    Yes.

10        Q.    If you flip to the next page, you'll see

11     that communication.

12                 Do you see that?

13        A.    Yeah, I see the communication, yes.

14        Q.    And it says:

15                 "Beginning the week of February 18, 2013,

16     stores that have been receiving their Schedule II

17     controlled substance orders from the Walgreens

18     distribution center in Perrysburg, Ohio will now have

19     their orders shipped from the local Cardinal center."

20                 Do you see that?

21        A.    Yes.

22        Q.    You agree that -- I mean, this is -- the

23     DEA came in the first week of February and the -- and

24     the -- the concern is, is that by February 18th you
```

1   might have to start filling orders from third parties.

2          Do you see that?

3     MS. SWIFT:  Objection; foundation.

4   BY THE WITNESS:

5     A.    Well, they are recommending that we start

6   sending them to third parties.

7   BY MR. GADDY:

8     Q.    You agree that there was a legitimate

9   concern that now that Jupiter has been shut down that

10  Perrysburg is -- is potentially getting shut down as

11  well?

12    MS. SWIFT:  Objection; foundation.

13  BY THE WITNESS:

14    A.    Well, it doesn't really say why she is

15  sending this out or why they -- why they would be

16  doing this, but that would make sense.

17  BY MR. GADDY:

18    Q.    Well, look at the e-mail on the first

19  page.

20    A.    Yeah.

21    Q.    And look at the third sentence of the

22  e-mail.

23    A.    "To be sent out if Perrysburg has to

24  close."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Oh, has to close is what you are saying.
 2    Oh, okay.
 3         Q.    Do you see that?
 4         A.    So your question was again?
 5         Q.    Sure.
 6              You agree that there was legitimate
 7    concern -- we know Jupiter has been shut down -- or
 8    had to close, and you agree that there is now
 9    legitimate concern that Perrysburg is also going to
10    have to close because of this investigation by the
11    DEA?
12         MS. SWIFT:  Objection; foundation.
13    BY THE WITNESS:
14         A.    I don't know if it is because of the
15    investigation, but there is -- this displays there is
16    concern that we are going to have to close.
17    BY MR. GADDY:
18         Q.    Okay.  So we don't know if it is because
19    of the investigation by the DEA?
20         A.    I have no way of knowing that, no.
21         Q.    Okay.  But we know that this draft
22    communication about it maybe having to close comes
23    about a week after the DEA comes in with a warrant and
24    subpoenas, right?
```

```
1        A.    Right.

2        MS. SWIFT:  Objection; foundation.

3   BY MR. GADDY:

4        Q.    Were you kept in the loop on this?

5        A.    No.

6        Q.    I'll show you what I'll mark as

7   Exhibit 27.  This is P-WAG 2022.

8                  (WHEREUPON, a certain document was

9                   marked Walgreens - Bish Deposition

10                  Exhibit No. 27, for identification,

11                  as of 02/01/2019.)

12  BY MR. GADDY:

13       Q.    Do you see this as being another Walgreens

14  e-mail chain, and we'll go down and actually we are

15  only going to look at an e-mail you are on, okay?

16       A.    Okay.

17       Q.    So if you see about two-thirds,

18  three-quarters of the way down the page there is a --

19  an e-mail from Vinayak?

20       A.    Yes.

21       Q.    And that e-mail is dated February 20th,

22  2013, right?

23       A.    Yes.

24       Q.    So now we are up to about two weeks,
```

Highly Confidential - Subject to Further Confidentiality Review

1    two-and-a-half weeks after the DEA came into

2    Perrysburg with the warrant and subpoenas, correct?

3        MS. SWIFT:  Object to form and foundation.

4    BY THE WITNESS:

5        A.    Yes.

6    BY MR. GADDY:

7        Q.    And the subject of this e-mail is:

8    "Perrysburg C-III through V follow-up."

9            Do you see that?

10       A.    Yes.

11       Q.    And you are actually there on the bottom

12   of the "to" line.

13           Do you see that?

14       A.    Yes.

15       Q.    Okay.  And if you look at this e-mail, and

16   you can flip to the next page if you wanted to look at

17   it in total, it is divided into -- into sections, one

18   for C-II, and one for C-III through V, and then one

19   for PSE.

20           Do you see that?

21       A.    Yes.

22       Q.    Okay.  And, again, the -- the subject line

23   was -- was "Perrysburg follow-up" and under C-II, do

24   you see the first bullet point there?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    It says:

 3             "Perrysburg will continue to pick what

 4   they can until the DEA comes and shuts them down."

 5             Do you see that?

 6       A.    Yes.

 7       Q.    What does that mean to you?

 8       A.    That means --

 9       MS. SWIFT:  Objection; foundation.

10   BY THE WITNESS:

11       A.    That means to me that whoever Vinayak

12   Pandit is, that he felt that we were going to pick

13   and -- and that the DEA was going to shut us down.

14   That's what he felt.  I just don't know who that is.

15   BY MR. GADDY:

16       Q.    Okay.  By continue to pick, does that mean

17   you are going to continue to -- to fill C-II orders

18   that come into Perrysburg?

19       A.    Yes.

20       MS. SWIFT:  Objection; foundation.

21   BY THE WITNESS:

22       A.    Yes.

23   BY MR. GADDY:

24       Q.    Is that what -- when "pick" is used as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    verb here, is that what that is meaning?

 2         MS. SWIFT:  Objection; foundation.

 3    BY THE WITNESS:

 4         A.    "Pick" to me means pick an order, that's

 5    all.

 6    BY MR. GADDY:

 7         Q.    Okay.  It looks like maybe there -- that

 8    was the original plan and then it looks like

 9    underneath there there are some updates.

10              Do you see it says "updates 2/20"?

11         A.    Yes.

12         Q.    And then it says:

13              "Bill Groth confirmed Perrysburg will stop

14    shipping C-II starting March 1st."

15              Do you see that?

16         A.    Yes.

17         Q.    It goes on to say:

18              "The distribution center has roughly

19    $30 million in C-II inventory which should be down to

20    minimal dollars by next Friday."

21              Do you see that?

22         A.    Yes.

23         Q.    Do you have any understanding or

24    appreciation for the dollar amounts of controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    substances that you would distribute on a daily or

2    weekly basis when you were -- when Walgreens was

3    distributing C-IIs?

4         A.    No.  Dollar amounts weren't something that

5    was really part of the distribution.  It was receive,

6    ship, pick, you know.

7         Q.    I totally understand.

8              I'm trying to get a sense of volume.  I

9    understand 5,000 or just under 5,000 stores a week --

10        A.    Uh-huh.

11        Q.    -- is what you processed orders from and

12   shipped orders to, correct?

13        A.    Correct.

14        Q.    Okay.  I would assume that efforts were

15   made to make it an equal amount of stores on every day

16   or an equal --

17        A.    Correct.

18        Q.    -- amount of volume on every day?

19        A.    Equal amount of stores.  We had no idea

20   what the volume was until it came in.

21        Q.    There you go.

22              Do you have any understanding or

23   appreciation for the average volume of pills or -- or

24   SKUs, pill bottles, that you would fill on a daily or

Highly Confidential - Subject to Further Confidentiality Review

1    a weekly basis?

2        MS. SWIFT:  Objection; compound.

3    BY THE WITNESS:

4        A.    No, I wouldn't have an average -- I

5    wouldn't be able to come up with an average number.

6    BY MR. GADDY:

7        Q.    Okay.  If you keep going down the bullet

8    points, the one, two, three, the fourth one on the

9    next page starts:  "PDQ ordering."

10       A.    Yes.

11       Q.    Do you know what "PDQ" means?

12       A.    Yes.

13       Q.    What does it mean?

14       A.    Do you want to know what they initially

15   told me it meant, was pretty damn quick, that's what

16   they told me it meant.  But it is basically an order

17   that a store -- they have a -- one order a week that

18   the system creates for them based on their activity

19   and then the other four days of the week or five days

20   of the week they have the ability to order an item

21   if -- if they get a script in for something they don't

22   have, they can enter it in the system and have it

23   shipped individually.

24       Q.    Okay.  And that was a mechanism that was

Highly Confidential - Subject to Further Confidentiality Review

1    in place if the once-a-week ordering system wasn't

2    enough to fill their needs?

3        A.    Or didn't have the right type of item.   If

4    they got a script in for something they didn't have

5    or...  Uh-huh.

6        Q.    It says:

7              "The plan is to con" -- "to continue to

8    allow PDQ ordering for stores even when they are being

9    serviced by the wholesalers."

10             Do you see that?

11       A.    Yes.

12       Q.    Okay.  How -- during the distribution

13   period and when you were the C-II function manager,

14   how did PDQ ordering impact your daily obligations?

15       A.    You mean our daily labor on the floor to

16   handle PDQs or --

17       Q.    Sure.

18       A.    You said "obligations."  I didn't know

19   what you meant by that.

20       Q.    Yeah.  I -- I guess here is what I'm

21   trying to get at.

22       A.    Okay.

23       Q.    Did the PDQ orders become a -- a normal

24   part of the ordering process to where you couldn't

Highly Confidential - Subject to Further Confidentiality Review

1    tell the difference between a normal order and a PDQ

2    order --

3         A.    Oh, no.

4         Q.    -- or was there some different process for

5    PDQs?

6         A.    Yeah, it was -- you could always tell the

7    difference, PDQs picked in a box this big

8    (indicating), regular orders picked in a tote that big

9    (indicating).  PDQs were onesie-twosie, they were

10   never -- rarely, you know, big quantities or a

11   large -- or even different items for that matter.

12        Q.    Okay.  Were -- were there any -- was there

13   any type of review, analysis or screening of the PDQ

14   orders that you did?

15        MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17        A.    There may have been at corporate or at the

18   computer room, but at my level, no, they weren't

19   looked at any -- at all.

20   BY MR. GADDY:

21        Q.    Okay.  At -- at your level a PDQ order

22   came in, you processed it and filled it?

23        A.    Correct.

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Because it went through the system.

2  That's what we had to make sure.

3     Q.    Excuse me.  If you go down to the next

4  heading in this e-mail, it is "C-III through V,"

5  correct?

6     A.    Yes.

7     Q.    And it says:

8           "Perrysburg will make all the quantity

9  unavailable."

10          Do you see that?

11    A.    Yes.

12    Q.    Looking at this now, do you recall that

13 shortly after the DEA inspection at Perrysburg that

14 all C-III through V drugs were redirected to other

15 distribution centers?

16    A.    No, I don't recall that.

17    Q.    Okay.

18    A.    I really paid little attention to III

19 through V because they weren't under my umbrella of

20 responsibility.

21    Q.    Okay.  Let me show you what I'll mark as

22 Exhibit 28.  This is P-WAG 2026.

23             (WHEREUPON, a certain document was

24              marked Walgreens - Bish Deposition

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Exhibit No. 28, for identification,

 2                    as of 02/01/2019.)

 3     BY MR. GADDY:

 4          Q.    And turn with me, if you would, please, to

 5     Page 461.  It is the third page of the document.

 6          A.    Okay.

 7          Q.    And if you look, it looks like it is a

 8     calendar invite from Vinayak about a third of the way

 9     down the page.  It looks like very similar to the last

10     e-mail that we just read.

11                Do you see that?

12          A.    Yes.

13          Q.    Okay.  So you've got to flip back one to

14     see who the -- who the e-mail is from.  You see at the

15     very bottom of the previous page there is an e-mail

16     from Vinayak?

17          A.    Yes.

18          Q.    And go back so we can see the e-mail and

19     we see that it's to a bunch of folks and, again, you

20     are included on the "to" line.

21          A.    Uh-huh.

22          Q.    Do you see that?

23          A.    Yes.

24          Q.    And it says:
```

Highly Confidential - Subject to Further Confidentiality Review

1            "FYI slight change in plans.  Cardinal has

2    red flagged 367 stores that were serviced out of

3    Perrysburg and won't be able to service them."

4            Do you see that?

5        A.    Yes.

6        Q.    Do you know what that means that "Cardinal

7    has red flagged 367 stores"?

8        A.    No.  I do recall them -- that happening,

9    but I never was told why.

10       Q.    Did you ever try to find out what that

11   meant?

12       A.    I may have asked, but whoever I asked

13   didn't know the answer, I may not have pursued it

14   beyond that.  I don't recall.

15       Q.    Did you ever -- I'm sorry.

16       A.    I don't recall.

17       Q.    Did you ever get an answer to what that

18   meant that Cardinal had red flagged 367 stores?

19       A.    Not that I recall.

20       Q.    It goes on to say:

21            "Due to this change there was a decision

22   made that Perrysburg will continue to pick C-II past

23   March 1st."

24            Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Okay.  So I think we've looked earlier

 3   that -- that Perrysburg was going to stop shipping

 4   C-IIs on 3/1 and now you decided that that's not going

 5   to be the case anymore, correct?

 6        MS. SWIFT:  Object to form.

 7   BY THE WITNESS:

 8        A.    That's what it looks.

 9   BY MR. GADDY:

10        Q.    Okay.  If you keep reading up the chain,

11   it looks like you respond to Vinayak there?

12        A.    Yes.

13        Q.    And you say:

14              "With this update please provide the

15   volume of these 367 stores so we can determine how

16   many team members we need to keep in C-II past

17   Friday."

18              Do you see that?

19        A.    Yes.

20        Q.    I would imagine there were some

21   administrative and logistical issues kind of going on

22   in your department --

23        A.    Right.

24        Q.    -- with this announcement that there is
```

1   not going to be a C-II distribution out of Perrysburg

2   anymore, correct?

3        A.    Correct.

4        Q.    Okay.  Explain to me what was going on

5   behind the scenes there with you and your department

6   now that you had this announcement, and this is

7   February 26th, so this is two-and-a-half, three weeks

8   after the DEA came in, had this been building for some

9   period of time that you were shutting down C-IIs or

10  was this a pretty quick process?

11       MS. SWIFT:  Object to the form.

12  BY THE WITNESS:

13       A.    For me personally it was a quick process.

14  I didn't know it was coming.  It is just one day this

15  is what we are doing and then we are transferring our

16  freight to Woodland, I believe is where we sent our

17  inventory that we had.

18  BY MR. GADDY:

19       Q.    Okay.  So let me break that down into two

20  separate pieces.

21            It happened very quickly for you as far as

22  being told that C-II distribution was being ceased out

23  of Perrysburg, correct?

24       A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Who would have given you that information?

2     A.    I don't recall.  It could have come from

3  any source.  It could have come from the DC manager or

4  the operations manager or somebody at corporate.  I

5  don't recall who told me.

6     Q.    Did you have any hint or any inclination

7  that that was coming?

8     A.    I can't say that I had a -- an hint or

9  inclination that that was coming.  I have to say I was

10  surprised because I thought we ran a really tight ship

11  and I was surprised.

12     Q.    Had anybody given you any indication,

13  maybe it's information from what the DEA was saying to

14  Jupiter, maybe it's from internal audit or maybe it's

15  from corporate or -- had anybody given you any

16  indication that there were problems or issues with the

17  distribution of controlled substances from Perrysburg

18  that would cause you to be in a situation where you

19  would stop shipping?

20     A.    Not that I recall.

21     Q.    So the next thing that you said was that

22  you put in action a plan to get your inventory out of

23  the vault in Perrysburg --

24     A.    Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.     -- into Woodland's, correct?

2        A.     I believe it was Woodland.  I'm not sure

3   of that, but...

4        Q.     Okay.  Well -- well, we know it wasn't

5   Jupiter, right?

6        A.     Jupiter, right, that's why I said it must

7   have been Woodland.

8        Q.     Right.

9        A.     That's the only one left, yeah.

10       Q.     We know that the vault at Jupiter already

11  had a padlock on it, right?

12       MS. SWIFT:  Object to form, foundation.

13  BY THE WITNESS:

14       A.     I didn't know that, but...

15  BY MR. GADDY:

16       Q.     We know it now?

17       A.     Yes, uh-huh.

18       Q.     Okay.  Maybe you don't know, but you told

19  me the stores -- the states or the areas that you

20  serviced and obviously you told me about the states

21  within the kind of area right around Perrysburg, Ohio,

22  Kentucky, Tennessee, you said Indiana, I believe,

23  Illinois, and then you said there were some stores up

24  in Connecticut --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Uh-huh.

2        Q.      -- in the northeast area, is that -- is

3    that correct?

4        A.      To my recollection, yeah.

5        Q.      Okay.  It wasn't the plan that the

6    Woodland's distribution center in California would

7    start supplying those stores, was it?

8        A.      I wasn't told what the plan was.  I

9    couldn't answer that.

10       Q.      Would it be fair to you that it was con --

11   or excuse me.  Would it be fair to say that it was

12   conveyed to you that there was a sense of urgency to

13   get the controlled drugs out of the vault in

14   Perrysburg and get them to Woodland's?

15       A.      Well, it wasn't something we were

16   lollygagging a -- around with, so if you want to call

17   that a sense of urgency.  I just know there was a

18   certain date we had to have them out by.

19       Q.      Okay.

20       A.      Once I was told.

21       Q.      Now that you -- we have had the

22   opportunity today to look at some information and some

23   documents --

24       A.      Uh-huh.
```

Highly Confidential – Subject to Further Confidentiality Review

```
1        Q.     -- and you saw that the DEA, after serving

2    subpoenas and warrants, went into Jupiter and

3    padlocked their C-II vault --

4        A.     Uh-huh.

5        Q.     -- and didn't let them get their drugs out

6    of there --

7        A.     Uh-huh.

8        Q.     -- does that make some sense as to why you

9    wanted to get the Perrysburg vault -- vault emptied

10   and transferred to Woodland?

11       MS. SWIFT:  Object to the form of the question.

12   BY THE WITNESS:

13       A.     So you are asking me if that's why the

14   people above me in management made the decision to do

15   that, was it based on what was -- happened at Jupiter?

16   BY MR. GADDY:

17       Q.     Well, I don't think you can get in their

18   head and tell me that.

19       A.     Yeah, I can't.

20       Q.     I wish you could but I don't think you

21   can.

22       A.     Yeah, you are right.

23       Q.     I'm just asking whether or not that made

24   sense?
```

```
 1        MS. SWIFT:  Object to the form of the question.

 2   BY THE WITNESS:

 3        A.    It -- it could -- yeah, it could follow,

 4   but I -- I don't know if I -- I don't know who knew

 5   that.  I don't know if anybody knew that.

 6   BY MR. GADDY:

 7        Q.    But that would be logical?

 8        MS. SWIFT:  Object to the form of the question.

 9   BY THE WITNESS:

10        A.    To some, yes.

11   BY MR. GADDY:

12        Q.    Let me ask you this:  You said who -- you

13   don't know who knew that, right?

14        A.    No.

15        Q.    Who -- do you have any idea who knew what

16   was going on at a high level at these distrib --

17   different distribution centers as far as the DEA

18   investigations?

19              Do you know who that would have been?

20        MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22        A.    The building manager, I would think, would

23   have known, but I -- I can't remember who was the

24   manager at the time they came in.
```

```
 1   BY MR. GADDY:

 2        Q.    Sure.

 3              Who at corporate?  So, obviously the -- I

 4   would assume the -- the person -- probably everybody

 5   in Jupiter knows that they put a lock on the Jupiter

 6   C-II --

 7        A.    Yeah, I'm sure.

 8        Q.    -- door?

 9              I mean, that's -- you would agree with

10   that, right?

11        A.    Right.

12        Q.    I'm trying -- you were at one of the other

13   C-II distribution centers that Walgreens had and you

14   didn't know, right?

15        A.    Right.

16        Q.    You didn't even really know that the DEA

17   was the reason they shut down until you started

18   preparing for this deposition, right?

19        A.    Right.

20        Q.    Okay.  I'm trying to figure out on a big

21   picture level, macro level, 30,000-foot view, who

22   actually has this information and -- and knowledge.

23              Do you know?

24        MS. SWIFT:  Objection; foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    No, I don't know.  It could be a -- I

 3   would -- it could be a lot of people.  All of the

 4   people on the -- this Vinayak or whoever the -- I

 5   don't know who these people are.

 6   BY MR. GADDY:

 7       Q.    If you had been given the information

 8   about what happened at Jupiter and some of the

 9   allegations that were made --

10       A.    Uh-huh.

11       Q.    -- and some of the -- some of the problems

12   the DEA identified --

13       A.    Uh-huh.

14       Q.    -- do you think you could have done your

15   job better?

16       MS. SWIFT:  Objection; calls for speculation.

17   BY THE WITNESS:

18       A.    Personally in the vault, probably not.  I

19   would have needed programming to be fixed, which I

20   can't do.  That -- the volume we did, you just

21   couldn't look at every order.  You just couldn't do

22   it.  So I -- I would need it to be systemic, which I

23   don't know how to do.

24   BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Well, that "systemic" word, I mean,

2    that was something that we saw that the DEA alleged,

3    right, that there were systemic issues --

4    A.    Um-hum.

5    Q.    -- correct?

6    A.    Um-hum.

7    Q.    Okay.  So you couldn't have personally saw

8    those problems that we looked at earlier.

9    MS. SWIFT:  Objection.  Object to the form.

10    BY MR. GADDY:

11    Q.    But do I -- do I trust that had you known

12    about those problems you would have taken action,

13    whether it was Matt in the computer room or Barb, the

14    Rx purchasing manager, that you would have taken some

15    actions to -- to see what, if anything, they were

16    doing to try to solve some of these problems so that

17    that -- those types of things didn't happen at

18    Perrysburg?

19    MS. SWIFT:  Object to the form.

20    BY THE WITNESS:

21    A.    I would think that we would have put our

22    heads together to try to figure out how to fix it,

23    yeah.

24    BY MR. GADDY:

```
 1     Q.    And -- and if it was something as serious

 2  as that where the DEA is saying that -- that the --

 3  the operation of the facility is an imminent threat to

 4  public health and safety, you would have gone about

 5  and you would have set a meeting much quicker than

 6  five months out.

 7          Is that fair to say?

 8     MS. SWIFT:  Objection to form, mischaracterizes

 9  the facts.

10  BY THE WITNESS:

11     A.    I would have had -- like I said, I would

12  have thought that we would have gotten our heads

13  together.  I would certainly think that we could have

14  accomplished that in less than five months, yes.  I

15  don't know if we could have solved it, but...

16  BY MR. GADDY:

17     Q.    Well, you can't solve it until you start

18  getting together and talking about it, right?

19     A.    Right.

20     MS. SWIFT:  Objection to the form.

21  BY MR. GADDY:

22     Q.    That's -- and that's a very first step,

23  would you agree?

24     MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2        A.    Yes.

3    BY MR. GADDY:

4        Q.    So if we look -- go back to this document,

5    you are asking Vinayak for the list of the stores so

6    that you know how many team members you need to keep

7    on and then the original e-mail at the top of the

8    first page, it looks like Doug Peterson tells you that

9    he'll probably know, you know, give him a day, but he

10   says Wednesday.  So it looks like your e-mail is from

11   Tuesday, so it looks like you might know the next day.

12            Do you see that?

13       A.    Yes.

14       Q.    Was everybody within the C -- C-II

15   department able to keep a job at Walgreens after --

16       A.    Oh, yes.

17       Q.    Okay.  People were just able to be moved

18   around to other areas?

19       A.    Oh, yeah, um-hum.

20       Q.    Let me show you P-WAG 2016 that I'm going

21   to mark as Exhibit 29.

22            (WHEREUPON, a certain document was

23             marked Walgreens - Bish Deposition

24             Exhibit No. 29, for identification,

```
 1                    as of 02/01/2019.)

 2   BY MR. GADDY:

 3        Q.    And do you see this -- the top of the

 4   page, again, we've got an e-mail or meeting invite

 5   from Vinayak?

 6        A.    Yes.

 7        Q.    And now it's 2/27/13.

 8              Do you see that?

 9        A.    Um-hum.

10        Q.    So we are continuing kind of along this

11   timeline.  Again, the subject down in the middle of

12   the page is:  "Perrysburg follow-up."

13              Do you see that?

14        A.    Yes.

15        Q.    And I think you're in the middle of the

16   "to" line this time, but you see you are included on

17   this -- this e-mail or calendar invite, whichever it

18   is.

19              Do you see that?

20        A.    Yes.

21        Q.    Down there at the bottom there is a list

22   of required attendees, so I'm guessing this is a

23   meeting invite, and over on the right-hand side of the

24   page, second line up, do you see here you are listed
```

1    as a required attendee to this meeting to talk about

2    Perrysburg?

3        A.    Yes.

4        Q.    If you look at -- and let's go in order.

5    So turn to the second page for me, please.  And we see

6    the original update under C-II:

7              "Perrysburg will continue to pick what

8    they can until the DEA comes and shuts them down."

9              Do you see that?

10       A.    Yes.

11       Q.    Okay.  And if you go down, there are some

12   updates on 20 -- 2/22 and then there are also some

13   updates on 2/27.

14             Do you see that?

15       A.    Yes.

16       Q.    It says:  "Continue to service potentially

17   red flagged stores."

18             Do you see that?

19       A.    Yes.

20       Q.    And that's consistent with that last

21   e-mail that we looked at where you were trying to

22   figure out the volume of those 367 stores so that you

23   could have enough team members to continue to service

24   that, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    So the fact that they had been

 3   quote/unquote red flagged by Cardinal Health was not

 4   going to prevent Walgreens from supplying them with

 5   controlled substances?

 6        A.    Correct, because I never did get the

 7   definition of red flagged by -- I don't know why

 8   they -- what that means.

 9        Q.    Okay.  You tried to find out but nobody

10   would tell you?

11        MS. SWIFT:  Object to the form, mischaracterizes

12   the testimony.

13   BY THE WITNESS:

14        A.    Or no one knew.

15   BY MR. GADDY:

16        Q.    I'm sorry?

17        A.    Or no one knew.  The people I asked didn't

18   know, so...

19        Q.    Okay.  And you were never able to get that

20   information despite trying to get it?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    I didn't try for -- it is like I asked

24   every day different people.  I asked a couple of
```

Highly Confidential - Subject to Further Confidentiality Review

1   people.  No one really understood what it was about,

2   so I moved on.

3   BY MR. GADDY:

4        Q.    Okay.

5        A.    Yeah.

6        Q.    So it says the plan -- it says:

7              "Rx purchasing team is working on the

8   stores.  The plan is to send the store list of the 367

9   stores to the distrib" -- "distribution center by end

10  of day."

11             Do you see that?

12       A.    No.  I'm just trying to figure out where

13  you are.

14       Q.    I'm sorry.  I'm at the first bullet point

15  under 2/27.

16       A.    Oh, okay.

17       Q.    Updates 2/27.

18       A.    Rx purchasing, okay, got it.

19       Q.    So you see that:

20             "Rx purchasing working on the stores."

21       A.    Uh-huh.

22       Q.    "The plan is to send the store list of the

23  367 stores to the DC by end of day."

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And that was the store list that you had

 3   been asking about, right?

 4        A.    Yes.

 5        Q.    Okay.  It says:

 6              "Additional items are being ordered into

 7   the Perrysburg distribution center to help service the

 8   stores."

 9              Correct?

10        A.    That's what it says, yes.

11        Q.    If you skip down a couple of bullet

12   points, do you see where it starts out:  "367 red

13   flagged stores"?

14        A.    Yes.

15        Q.    It says:

16              "Doug" -- or "Denny/Doug to determine what

17   we need to do to process orders for these stores to

18   account for the order redirects properly."

19              It goes on to say:

20              "Redirects to Cardinal need to be stopped

21   as Cardinal is not fulfilling orders as they are

22   considered suspicious."

23              Do you see that?

24        A.    Yes.
```

1    Q.    Do you recall that in all your attempts to

2   find out what it meant by a red flagged store, did

3   anybody tell you that that meant that Cardinal Health

4   considered orders to those stores to be suspicious?

5    A.    Not that I recall.  I don't recall getting

6   an answer at all.

7    Q.    Okay.  If somebody had told you that

8   Cardinal Health had made a decision that filling

9   orders to those 367 stores would have been filling

10   suspicious orders --

11    A.    Uh-huh.

12    Q.    -- would that have caused you any concern

13   about supplying those stores out of the Perrysburg

14   distribution center?

15    A.    Not unless I knew what data they were

16   using to -- I mean, it could be Cardinal's definition

17   of a suspicious order is anything over five pieces.

18   You know, I don't know what their definition is of

19   that, so I'd have to first know what they based that

20   on.

21    Q.    Is -- isn't that information that you

22   would have liked to have had, though, before you

23   facilitated Schedule II drugs going to those 367

24   stores?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I trusted these people who were giving me

 2   this direction, so I -- I did not -- wasn't concerned

 3   about servicing those stores.

 4        Q.    Okay.

 5        A.    Because I trusted these people would not

 6   have us do that if we shouldn't be.

 7        Q.    Okay.  So you were putting your reliance

 8   on -- is it the corporate folks, is that --

 9        A.    If that's the Doug and -- I don't know who

10   these people are.  I can't remember anymore.  It was

11   too long ago, but, yeah, the Doug and the Bill and all

12   of these people's names that are on here, obviously,

13   you know, have something to do with store orders and

14   what their history is and, you know, things I don't

15   have.

16        Q.    Absolutely.

17              So in your position you relied on the

18   information given to you by folks in -- in other

19   departments, whether it's just corporate, whether it's

20   internal audit, whether it is -- it is IT, whether it

21   is Barb Martin's group --

22        A.    Uh-huh.

23        Q.    -- you relied on them and because of -- of

24   your trust in those people, you were willing to
```

1    continue to supply these stores?

2         A.    Yes.

3         Q.    Is that fair?

4         A.    Yes.

5         Q.    And if you go up to the -- the last

6    update, which is on the first page, it says:  "Updates

7    3/1."

8         A.    Uh-huh.

9         Q.    And it says:

10              "Perrysburg will continue to serve the 367

11   red flagged stores for another month."

12              Do you see that?

13        A.    Yes.

14        Q.    And that's consistent with your -- your

15   memory of how it happened?

16        A.    I don't have a memory of when any of this

17   happened, so I can't say it's consistent with that.  I

18   just don't remember the dates and, yeah.

19        MS. SWIFT:  What do we got on the record?  Is it

20   seven yet?

21        THE VIDEOGRAPHER:  In eight minutes.

22        MS. SWIFT:  Eight minutes left, okay.

23   BY MR. GADDY:

24        Q.    Do you remember when you stopped servicing

Highly Confidential - Subject to Further Confidentiality Review

```
1    those stores?

2        A.    No.  I'm sorry.  I am 65.  My memory quit

3    about -- about three years ago.

4        Q.    I understand.

5        A.    Yeah.

6        MR. GADDY:  All right.  Let's take a short

7    break.

8        THE VIDEOGRAPHER:  We are going off the record

9    at 4:03.

10                  (WHEREUPON, a recess was had

11                    from 4:03 to 4:22 p.m.)

12        THE VIDEOGRAPHER:  We are back on the record at

13    4:22.

14                  (WHEREUPON, a certain document was

15                   marked Walgreens - Bish Deposition

16                   Exhibit No. 30, for identification,

17                   as of 02/01/2019.)

18    BY MR. GADDY:

19        Q.    Ms. Bish, I'm going to shift gears a

20    little bit and show you what I've marked as

21    Exhibit 30.  It is P-WAG 2677.

22              And I'll take you down to the very bottom

23    of the page.  Do you see it is an e-mail from a woman

24    named Sharon Horkott?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Um-hum.

 2       MS. SWIFT:  Do you have any more copies?

 3       MR. GADDY:  I'm sorry.

 4       MS. SWIFT:  This is Exhibit 30, you said?

 5       MR. GADDY:  Yes.

 6   BY MR. GADDY:

 7       Q.    And it is dated May 25th, 2012.

 8       A.    Yes.

 9       Q.    And it looks like, if you flip the page,

10   you see we can't see the -- the substance of the

11   e-mail, but you see the --

12       A.    Oh, yeah.

13       Q.    -- the subject is:  "Suspicious drug

14   process."

15             Do you see that?

16       A.    Yes.

17       Q.    Okay.  And in response to this, just above

18   it, you see an in -- e-mail from Denman Murray?

19       A.    Yes.

20       Q.    The same date, to Sanjay Bhana.

21             Do you see that?

22       A.    Yes.

23       Q.    And he says:

24             "FYI, DCs have a plan to decrease orders
```

1    if instructed."

2              Do you see that?

3    A.    Yes.

4    Q.    And if we look on that bottom e-mail, you

5    were included there, correct, far right-hand side?

6    A.    Yes, um-hum.

7    Q.    Do you recall there being any plan to

8    decrease orders at the distribution center?

9    A.    No, I don't recall any plan to do that.

10   Q.    Do you recall doing anything to decrease

11   orders in the distribution center?

12   A.    Ever?  Not unless I found one to be

13   ordered by mistake and fixed it.

14   Q.    But other than that, you don't recall ever

15   having anything to do with decreasing orders from the

16   distribution center --

17   A.    No.

18   Q.    -- for controlled substances?

19   A.    No.

20   Q.    Okay.  Let me show you one more document.

21   This is going to be Exhibit No. 31.  This is

22   P-WAG 256.

23              (WHEREUPON, a certain document was

24              marked Walgreens - Bish Deposition

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Exhibit No. 31, for identification,

 2                    as of 02/01/2019.)

 3   BY MR. GADDY:

 4       Q.    And if you flip with me to the second

 5   page, it looks like we see the same e-mail from Sharon

 6   Horkott on May 25th, 2012.

 7              Do you see that?

 8       A.    I see the same subject line, yeah.

 9       Q.    Sure.

10              And --

11       A.    I can't see the e-mail, but...

12       Q.    -- again, we can't read the body of the

13   e-mail, right?

14       A.    Right.

15       Q.    Do you know who Sharon Horkott is?

16       A.    No.

17       Q.    Okay.  And, again, we see that same e-mail

18   and you are included on that e-mail?

19       A.    Yes.

20       Q.    And it looks like there is a response to

21   that from Tammy.

22              Do you see that?

23       A.    Yes.

24       Q.    And Tammy sends this response.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you recognize any of those folks on the

2    "to" line there?

3      A.    Just Matt and I, the carbon copy, I -- I

4    mean.

5      Q.    Okay.  And it is the same -- same subject

6    line:  "Suspicious drug process?"

7          Do you see that?

8      A.    Yes.

9      Q.    And Tammy says:

10          "Hello, regarding the below, do you see

11   this as we do not need to check orders for overages

12   anymore for controls?  From the conference call my

13   understanding was that we did not need to check orders

14   that were system-generated from the store because they

15   were already being checked through the system to make

16   sure that they didn't exceed a threshold."

17          Do you see that?

18      A.    Yes.

19      Q.    With that insight from -- from Tammy that

20   she -- it looks like she got from a conference call

21   that maybe was the subject of the original e-mail --

22      A.    Uh-huh.

23      Q.    -- does that refresh your memory at all

24   about this -- this process for either decreasing

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders or -- or reviewing orders for threshold?

 2              Does that do anything for you?

 3       A.    No.

 4       Q.    Okay.  She goes on to say in the second

 5    paragraph, second sentence that starts at the end of

 6    the fir -- end of the first line, she says:

 7              "But we are unclear about the checking of

 8    orders and if it should still be done for C-III

 9    through C-V and how this will work for C-II also."

10              Do you see that?

11       A.    Yes.

12       Q.    She goes on to say that:

13              "Our computer room currently checks C-IIs

14    orders daily, should they continue to do this and if

15    so what SKU amount is really considered suspicious?"

16              Do you see that?

17       A.    Yes.

18       Q.    In that first part about the computer room

19    looking at the C-II orders, that's consistent with

20    what you told us throughout the course of the day,

21    correct?

22       A.    Correct.

23       Q.    And that they would note -- they would

24    either themselves call a pharmacy if they thought
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there was an error or notify you?

 2         A.    Correct.

 3         Q.    Correct?

 4         A.    Uh-huh.

 5         Q.    But you see here Tammy is asking:  "What

 6    SKU amount, how many bottles is really considered

 7    suspicious?"

 8               Do you see that?

 9         A.    Um-hum, I see that.

10         Q.    Okay.  And is that a question that you

11    would have been able to answer for Tammy?

12         A.    No.

13         Q.    There is a response just above that from

14    an Audrey Phillips.

15               Do you know who that is?

16         A.    No.

17               Well, I can see at the bottom it says SAIL

18    coordinator in Waxahachie, Texas, but...

19         Q.    Okay.

20         A.    Which, again, they don't have a C-II

21    vault, so it makes me believe they are more referring

22    to C-III through V, but I don't know that.

23         Q.    Okay.  And do you have an appreciation

24    that the suspicious order requirement doesn't just
```

1    apply to C-IIs but it also applies to all controlled

2    drugs?

3        A.    Yes.

4        Q.    Okay.  And so we see Audrey saying here to

5    Tammy:

6              "Hey, did anyone answer you?  I didn't get

7    the impression we shouldn't check orders.  I got it

8    that orders were adjusted prior to us getting them, so

9    I could see where it would be double-checking."

10             Do you see that?

11       A.    Yes.

12       Q.    And, again, this is May of 2012, correct?

13       A.    Yes.  Uh-huh.

14       Q.    And in the last line there, and you see

15   that this SAIL manager from this particular

16   distribution center says:

17             "I think your question regarding what is

18   suspicious is a good one.  Maybe Barb Martin can

19   answer."

20             Do you see that?

21       A.    Yes.

22       Q.    Okay.  Do you know whether or not Tammy at

23   Perrysburg or -- or Audrey, the SAIL coordinator at

24   this Texas distribution center, ever got an answer to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what a suspicious order is?

 2        A.    No, I don't know.

 3        Q.    Did you ever get an answer or would you

 4    ever be able to give an answer as the C-II function

 5    manager for Perrysburg about what a suspicious order

 6    is?

 7        MS. SWIFT:  Object to the form.

 8    BY THE WITNESS:

 9        A.    No, because, again, it depends on where

10    they are located, what population they are in, things

11    that I don't have access to.  I couldn't determine

12    that.

13        MR. GADDY:  Okay.  Thank you, Ms. Bish.  That's

14    all I have for you.

15        MS. SWIFT:  I'm sorry, Deb, I have got just a

16    few questions.  I'll try to keep it quick.

17        THE WITNESS:  Come on.

18        MS. SWIFT:  I'll just stay here if that's okay

19    with everybody.

20                        EXAMINATION

21    BY MS. SWIFT:

22        Q.    Ms. Bish, do you live here in Ohio?

23        A.    Yes.

24        Q.    Where do you live?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     In Perrysburg.

2        Q.     How far is Perrysburg from where we are

3   sitting right now in Toledo?

4        A.     About 15 minutes.

5        Q.     How far is it from Cleveland?

6        A.     From here?

7        Q.     Yes.  Perrysburg.

8        A.     About two hours.

9        Q.     How -- how far is Perrysburg from

10  Cleveland?

11       A.     About two hours.

12       Q.     How long have you lived in Perrysburg?

13       A.     16 or 17 years.

14       Q.     Did you move to Perrysburg to take your

15  job at Walgreens?

16       A.     No.  Actually, I commuted the first nine

17  months and decided commuting was not for me so I

18  moved.  I didn't plan on moving, yeah.

19       Q.     Did you grow up in Ohio?

20       A.     Yes.

21       Q.     Are you married?

22       A.     No.

23       Q.     Do you have kids?

24       A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    How many kids do you have?

 2        A.    Three.

 3        Q.    I apologize if you just said this, but how

 4   long have you worked for Walgreens?

 5        A.    I didn't just say that, I don't think.

 6   Since 2002, I believe, or 2003.  I always get them

 7   mixed up.

 8        Q.    Have you spent all of that time working in

 9   the Walgreens Perrysburg distribution center?

10        A.    Yes.

11        Q.    For some period of the time that you have

12   worked for Walgreens at the Perrysburg distribution

13   center, were you responsible for controlled

14   substance -- for C-II controlled drugs with respect

15   to -- well, let me just strike that question.

16        A.    Okay.

17        Q.    For some time while Walgreens was

18   distributing controlled substances, were you

19   responsible for C-IIs?

20        A.    Yes.

21        Q.    How many people worked for you when you

22   were the C-II function manager while Walgreens was

23   distributing C-IIs?

24        A.    I believe we started with eight to ten and
```

1   then as we increased stores and opened more stores we

2   ended up with I think around 15 on two shifts.

3       Q.   What types of things did the people who

4   worked for you while Walgreens was distributing C-IIs,

5   what types of things did your direct reports do?

6       A.   They would pull the orders, pull

7   replenishment, de-trash the orders, stock the orders,

8   pick, audit, ship.

9       Q.   What does it mean to de-trash --

10      A.   Receive.

11      Q.   What does it mean to de-trash an order?

12      A.   That's when you take the carton that the

13  vendor sends the product in and you take all of the

14  individuals -- units out and put them in a -- you

15  know, some kind of a tub so that they are easier to

16  pick and you don't have labels sticking to packing and

17  plastic and all of that.

18      Q.   You -- you said also there were people who

19  worked for you in audit.

20      A.   Yes.

21      Q.   Did I hear that correctly?

22      A.   Yes.

23      Q.   What did the people who were auditors do,

24  the ones who worked for you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yeah.  They would scan the pick docs.  So

 2   the order would come up and then they would scan every

 3   single bottle of drugs through the scanner and as they

 4   scan it, it drops off, so when they are done they can

 5   see that it is picked accurately or if it is short or

 6   over or whatever.

 7      Q.    I'd like you to just at a high level walk

 8   us through the process of how an order for C-II drugs

 9   made its way through the distribution center during

10   the timeframe when Walgreens was distributing

11   controlled substances.

12         But my -- my first question about that for

13   you is:  Do you know whether there were things that

14   happened to an order for C-IIs before the order got to

15   the distribution center?

16      MR. GADDY:  Objection to form, foundation.

17   BY THE WITNESS:

18      A.    No, I don't know what happened before it

19   got to me.

20   BY MS. SWIFT:

21      Q.    Walk us through, if you could, please, the

22   order process or the -- the process that an order goes

23   through from the time that it hits the distribution

24   center to the time it gets placed in a truck to go to
```

Highly Confidential - Subject to Further Confidentiality Review

1    a Walgreens store.

2        A.    Okay.  Well, when it initially gets

3    dropped into our -- we call dropped into our system,

4    the computer room is -- does their query to pull out

5    the -- what they considered or were told were

6    suspicious drug orders and call the stores on those.

7    The orders then would come down to us, they'd be

8    printed on pick docs and we'd have labels, but they

9    would scan, take them into the vault, scan -- scan

10   them in the pick mod and start picking however many

11   called for.  It goes out to the audit station and

12   again they would audit, scan every piece through the

13   audit station to make sure the order was correct, and

14   then they would put it on the scale for UPS or FedEx,

15   put it in the box, tape the box shut, you know, print

16   the UPS/FedEx label.

17       Q.    Were there various points in the process

18   that you just described of how an order makes its way,

19   you know, from it -- it arrives at the DC to when it

20   is shipped to a store, were there various points in

21   that process when somebody at the DC was looking to

22   see whether that order was requesting an unusually

23   large quantity of controlled substances?

24       A.    Yes.

```
 1        MR. GADDY:  Objection to form.

 2   BY MS. SWIFT:

 3        Q.    What were those points?

 4        A.    Well, the first point would have been Matt

 5   before I ever really got the order brought down to me,

 6   the second point would have been the picker, the third

 7   one would have obviously been the auditor, because

 8   they all knew what was considered a regular-type order

 9   and what was out of range for us.

10        Q.    You mentioned Matt.  Who is Matt?

11        A.    Matt Nye in the computer room.

12        Q.    What is your understanding of what the

13   computer -- computer room did with respect to looking

14   to see if an order was unusually large?

15        A.    Right.  My understanding was --

16        MR. GADDY:  Objection to form, foundation.

17   BY THE WITNESS:

18        A.    -- they ran a query, but I don't know what

19   quantity exactly, as we found today we -- that seemed

20   to change.  But I don't know what -- they had a

21   benchmark they were supposed to look for and not --

22   make sure that -- they were supposed to call the store

23   and find out if that's what -- the same thing that I

24   used to do when we found them in the vault, call the
```

1    store, verify that's what they really intended to

2    order.

3    BY MS. SWIFT:

4         Q.     You also mentioned another point when

5    somebody in the DC could identify if an order was

6    unusually large being with the pickers.

7              What did the pickers do?

8         A.     The pickers would depict the light system,

9    which is how we picked by, would come up and say how

10   many pieces they are supposed to pick of what item.

11   If that would come up and say 88 and it is something

12   that normally we pick three or four of, they wouldn't

13   pick it.  They would just bring it to me.

14        Q.     And what would you do?

15        A.     I would call the store.

16        Q.     And what would you ask the store?

17        A.     Did you intend to order 88 or is that

18   supposed to be eight or -- that's what I would do.

19   And like -- like I said before, the only time I -- I

20   only remember one time that a store actually wanted a

21   large quantity.

22        Q.     And what happened when you called that

23   store, what did the store tell you?

24        A.     That's the store that told me they had a

1    cancer patient that only had 48 hours to live.

2        Q.    I think you mentioned another point where

3    somebody else in the DC had an opportunity to identify

4    whether an order was unusually large, is that right?

5        A.    Yes.

6        Q.    And -- and what was that?  Who was --

7    who -- who would that have been?

8        A.    The auditor?

9        Q.    Yes, I think that's right.

10       A.    Yeah.

11       Q.    What did the auditor do?

12       A.    The auditor took -- would scan the pick

13   doc to bring the order up and then scan each piece

14   from the tote they picked into -- into a box, a bag,

15   actually, we put them in a bag, and then as they scan

16   it, it comes off the order so that when they are done

17   they know that the order was picked properly.  And

18   then they seal the bag, put it in the box.

19       Q.    And what would they do if an order was

20   unusually large?

21       MR. GADDY:  Objection to form, speculation.

22   BY THE WITNESS:

23       A.    They would bring it to me, the same thing

24   they would do in the pick mod, yeah.

 1   BY MS. SWIFT:

 2        Q.    Would you treat orders that the folks who

 3   were auditors brought to you the same way you

 4   traded -- treated orders that the pickers brought to

 5   you?

 6        A.    Yes.

 7        Q.    Meaning you would call the stores?

 8        A.    Call the stores, yeah.

 9        Q.    You -- let's see.

10        A.    We had an outside line put in the vault

11   because most of our phones wouldn't dial outside, so

12   that's why we did that, so I wouldn't have to come all

13   the way inside.  So I would just call them from the

14   vault.

15        Q.    Meaning you would call the store --

16        A.    Store --

17        Q.    -- from the vault?

18        A.    Um-hum, um-hum.

19        Q.    You had an outside phone line put inside

20   the vault so that you could call stores?

21        A.    Yes.  Yes.

22        Q.    And that was so that you could call stores

23   so you could ask them about unusually large orders?

24        A.    Yes.

Highly Confidential – Subject to Further Confidentiality Review

1    Q.    You testified earlier today that you

2  personally did not typically know the details or data

3  about individual stores.

4         Did I -- did -- am I recalling your

5  testimony correctly?

6    A.    Yes.

7    Q.    Is that why -- is the fact that you

8  personally lacked that information, is that why you

9  called the stores?

10    A.    Yes.

11    MR. GADDY:  Objection to form.

12  BY THE WITNESS:

13    A.    Because it was the only way that I had to

14  know if they need -- really needed what they -- and

15  intended to order what they punched in.

16  BY MS. SWIFT:

17    Q.    Is that also why you sometimes called

18  Barb Martin at the corporate office?

19    A.    Yes.  Because she had the data I needed.

20    Q.    Do you have any personal knowledge of

21  Walgreens ever shipping any orders of unusual

22  quantities of controlled substances to Walgreens

23  stores without first checking to see if those orders

24  were justified?

Highly Confidential – Subject to Further Confidentiality Review

```
 1        MR. GADDY:  Objection to form.

 2   BY THE WITNESS:

 3        A.    Not if they had the large quantities in

 4   there that alerted us, they would have always been

 5   checked.

 6   BY MS. SWIFT:

 7        Q.    Do you have any personal knowledge of

 8   Walgreens ever shipping controlled substances into any

 9   illegitimate channels?

10        MR. GADDY:  Objection to form.

11   BY THE WITNESS:

12        A.    No.

13   BY MS. SWIFT:

14        Q.    Do you have any personal knowledge of

15   Walgreens ever shipping controlled substances to a

16   Walgreens store that then diverted those controlled

17   substances into an illegitimate channel?

18        A.    No.

19        Q.    Did you personally take steps in your job

20   to make sure that Walgreens did not ship unusually

21   large quantities of controlled substances to Walgreens

22   stores?

23        MR. GADDY:  Objection to form, leading.

24   BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.     In addition to calling the store or you
 2  are saying -- is that the point you are try -- asking?
 3  BY MS. SWIFT:
 4      Q.     Let me see if I can ask it in a more
 5  open-ended way.
 6      A.     Sorry.
 7      Q.     We've talked about a number of steps in
 8  the ordering process where unusually large orders may
 9  have been brought to your attention.
10      A.     Right.
11      Q.     In that process did you take steps to make
12  sure that Walgreens wasn't shipping unusually large
13  quantities of controlled substances to the stores?
14      MR. GADDY:  Objection to -- objection to form,
15  leading.
16  BY THE WITNESS:
17      A.     Yes, I would call the store and usually
18  mark the order down because they didn't really want
19  what they ordered, if it was an unusually large
20  amount.
21  BY MS. SWIFT:
22      Q.     If you would, please, pull out of your
23  stack of exhibits Exhibit 14.
24      A.     Okay.
```

```
 1        Q.    Exhibit 14 is the memorandum from

 2   Mr. Todd -- I'm sorry -- it is from Justin Joseph to

 3   Todd Polarolo dated May 27th, 2006, with the "re"

 4   line:  "DEA audit preliminary response March 6th,

 5   2006."

 6              Correct?

 7        A.    Yes.

 8        Q.    Do you remember getting questions about

 9   this memorandum earlier today?

10        A.    Yes.

11        Q.    I believe you testified you had never seen

12   it before, correct?

13        A.    Correct.

14        Q.    Okay.  I just have a couple of questions

15   about it.

16              Just to refresh your memory a little bit,

17   counsel asked you questions about the third paragraph

18   in the memo regarding the regulation with

19   No. 1301.74(b).

20              Do you see that?

21        A.    Yes.

22        Q.    Do you remember those questions?

23        A.    I don't remember the questions, no.

24        Q.    Do you remember the questions about the
```

```
1    visit by the DEA to the Perrysburg distribution

2    center?

3         A.    Um-hum.

4         Q.    In the 2006 timeframe?

5         A.    Yes.

6         Q.    Do you remember looking at this document

7    and another document from the DEA about issues the DEA

8    had raised with respect to a suspicious ordering

9    report?

10        A.    Yes.

11        Q.    All right.  Turn if you would, please, to

12   the second page of Exhibit 14, the May 27th, 2006 memo

13   from Mr. Joseph.

14        A.    Which way?  Are you on the same one?

15        Q.    Yep.

16        A.    Oh, okay.

17        Q.    Did I say -- Exhibit 14 is what I meant to

18   say.

19        A.    Okay.

20        Q.    And I would like to direct your

21   attention -- do you see the little heading that says

22   "Closing Notes" towards the bottom of the page?

23              It is right there.

24        A.    Oh.  Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Then look, if you would, at the second

2  paragraph under Closing Notes.

3      A.    Okay.

4      Q.    Let's see.  It says:

5            "They are going to recommend a letter of

6  admonition as it was our first DEA audit."

7            Do you see that?

8      A.    Yes.

9      Q.    Then it says:

10           "We will have 30 days to respond to the

11 letter.  If our response meets their requirements, we

12 will not hear back from them."

13           Do you have any recollection at all that

14 the DEA came back after this point in time after

15 the -- after Walgreens responded to these issues?

16     MS. SWIFT:  Objection to form, foundation.

17 BY THE WITNESS:

18     A.    No.

19 BY MS. SWIFT:

20     Q.    You can set that one aside.

21           Pull out of your stack, please,

22 Exhibit 16, which is the Eric Stahmann e-mail that

23 attaches something with the file name CD Corp. 8-2010.

24 It is one of the thicker ones.

Highly Confidential – Subject to Further Confidentiality Review

```
1      A.    Right here.

2      Q.    Do you remember questions about the

3  reports that are attached to the e-mail marked as

4  Exhibit 16?

5      A.    Yes.

6      Q.    Do you have any idea whether the orders

7  that flagged on these reports marked as Exhibit 16

8  were calculated the same way in 2010 as they were

9  calculated in 2006 or any other timeframe?

10     A.    No, I don't.

11     Q.    Do you know whether any or all of the

12  orders that appear to be reflected on the reports

13  attached to Exhibit 16 were actually shipped?

14     A.    No.

15     MR. GADDY:  Objection to form --

16  BY THE WITNESS:

17     A.    I don't.

18     MR. GADDY:  -- and foundation.

19  BY MS. SWIFT:

20     Q.    You testified earlier today about a couple

21  of visits from DEA to the Perrysburg distribution

22  center.

23          Do you remember those questions?

24     A.    Not specific questions.  I remember
```

1    questions about their visits, yeah.

2         Q.    I believe you testified that you met -- I

3    can't remember, honestly, did you testify that you met

4    both times with Agent Angie Francis?

5         A.    Yes.

6         Q.    And either of the times that you met with

7    DEA agents at Perrysburg, did those agents ever raise

8    any concerns with you about the way that Walgreens was

9    monitoring or reporting suspicious orders or

10   potentially suspicious orders?

11        MR. GADDY:  Objection to form --

12   BY THE WITNESS:

13        A.    Not that I recall.

14        MR. GADDY:  -- foundation.

15   BY MS. SWIFT:

16        Q.    Has the Perrysburg distribution center

17   ever been sanctioned by the DEA?

18        A.    Not that I know of.

19        Q.    Has the DEA ever shut down the Perrysburg

20   distribution center?

21        A.    No, uhn-uhn.  We are st -- we are open.

22        Q.    And you are not aware of whether -- well,

23   let me just ask it.

24             Are you aware of whether the DEA ever shut

```
 1   down Perrysburg even for a limited period of time?

 2        MR. GADDY:  Objection --

 3   BY THE WITNESS:

 4        A.    No.

 5        MR. GADDY:  -- form, foundation.

 6        MS. SWIFT:  Thank you, Ms. Bish, I don't have

 7   any other questions.

 8        MR. GADDY:  I need about two minutes and then

 9   I'll -- I -- I promise I won't even be that long.

10        THE WITNESS:  Promises, promises.

11        THE VIDEOGRAPHER:  We are going off the record

12   at 4:44.

13              (WHEREUPON, a recess was had

14               from 4:44 to 4:46 p.m.)

15        THE VIDEOGRAPHER:  We are back on the record at

16   4:46.

17                    FURTHER EXAMINATION

18   BY MR. GADDY:

19        Q.    Ms. Bish, I will start with Exhibit 14

20   that your attorney just had you look at.

21              Do you have that one still in front of

22   you?

23        A.    Yeah.  I have no idea where I put it, but

24   it is here somewhere.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  You can look at mine if you want.

 2        THE WITNESS:  Yeah, just let me look at yours.

 3   BY THE WITNESS:

 4        A.    Okay.

 5   BY MR. GADDY:

 6        Q.    And do you recall when we looked at it

 7   first that we looked at that -- that Paragraph 3

 8   talking about how the DEA indicated that Walgreens'

 9   suspicious order -- ordering report was inadequate,

10   correct?

11        A.    Correct.

12        Q.    Is it fair to say that when I showed you

13   this in, I guess this morning, that was the first time

14   that you had ever seen that, correct?

15        A.    Correct.

16        Q.    Was that the first -- and that was, in

17   fact, the first time that you had ever heard that

18   there was any allegation from the DEA that back in

19   2006 they -- they felt that you were -- that Walgreens

20   suspicious order reporting system was inadequate,

21   correct?

22        A.    Correct.

23        Q.    I think the word -- language they used in

24   their letter was "insufficient," correct?
```

```
1      A.     Well, it says "inadequate," but okay.

2      Q.     This was the Walgreens -- this is an

3   internal Walgreens document, right?

4      A.     Um-hum.

5      Q.     Okay.  And this is the one that if you --

6   if you turn to the -- to the next page, the one

7   that -- that your attorney just showed you that talked

8   about that if your response met the requirements that

9   Walgreens would not hear back from the DEA, correct?

10     A.     Oh, yes, um-hum.

11     Q.     Okay.  Would you have expected, knowing

12  that you didn't even know that the DEA was complaining

13  about a suspicious order reporting system, would you

14  have expected that you would have had any indication

15  from the DEA about whether or not they were pleased or

16  not pleased with any response that Walgreens provided?

17     A.      I can't say that I would have expected it,

18  but I would have expected them when they were sitting

19  across from my desk for five hours to tell me if

20  something was not as it should be.

21     Q.     Well, you don't even remember when they

22  were sitting across from your desk, do you?

23     A.     Just during one of the audits, the one at

24  night that I came in for and the one during the day.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.    Okay.  And during those times they were

2  gathering information from you, correct?

3      A.    Correct.

4      Q.    They were asking you for reports, correct?

5      A.    Correct.

6      Q.    They were asking you to pull documents and

7  give them documents, correct?

8      A.    Correct.

9      Q.    Okay.  And I think that what we've kind of

10  established today is that there were a lot of stuff

11  that was going on at a higher level --

12      A.    Uh-huh.

13      Q.    -- regarding suspicious order monitoring

14  that you really didn't know anything about, is that

15  fair?

16      A.    That's fair.

17      Q.    Okay.  And I think that -- that you even

18  said earlier that when it came to a lot of this stuff,

19  you weren't exactly in the loop, that's fair?

20      MS. SWIFT:  Object to the form.

21  BY THE WITNESS:

22      A.    Yeah, I don't remember saying that, but I

23  would -- I would agree that there were many -- as you

24  can see in all of these e-mails, a lot of them I'm not
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    included on.

2    BY MR. GADDY:

3         Q.    Okay.  And -- and just for example, the

4    one we are looking at here, this is between Justin

5    Joseph and Todd Polarolo, right?

6         A.    Right.

7         Q.    And they were folks that were above you,

8    correct?

9         A.    Correct.

10        Q.    And we went through the internal audit

11   report where they identified problems with the

12   suspicious ordering -- order monitoring system,

13   correct?

14        A.    Correct.

15        Q.    You weren't privy to any of that

16   information, were you?

17        A.    No.

18        Q.    You weren't on the invite list to the

19   meeting to talk about the suspicious order monitoring

20   system and how that should be fixed, were you?

21        A.    No.

22        Q.    In that meeting and those documents where

23   Walgreens internal audit was acknowledging that there

24   were problems, you recall that was December 2008?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3        A.    I don't recall.  I'd have to look, but I

 4   take your word for it.

 5   BY MR. GADDY:

 6        Q.    Well, do you remember it was a year after

 7   the Rannazzisi letter from the DEA --

 8        A.    Uh-huh.  Uh-huh.

 9        Q.    -- saying don't do the monthly reports?

10        A.    Right.

11        Q.    And that was December 2007?

12        A.    '7.

13        Q.    Okay.  So this Exhibit 14 that you were

14   shown by your attorney where the D -- where you are

15   acknowledging or Walgreens is acknowledging that the

16   DEA believes the suspicious order report is

17   inadequate, that's back in 2006, right?

18        A.    Yes.

19        Q.    And we've looked at documents today from

20   the Walgreens internal audit department in December

21   of 2008, two-and-a-half years after that, where

22   Walgreens is still saying that their suspicious order

23   monitoring program needs work and has risk involved?

24        MS. SWIFT:  Objection asked --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GADDY:

 2       Q.   Do you recall that?

 3       MS. SWIFT:  Asked and answered and beyond the

 4   scope.

 5   BY THE WITNESS:

 6       A.   I don't remember the word "risk," but I do

 7   remember them saying that they had concerns about it.

 8   BY MS. SWIFT:

 9       Q.   Do you remember there was a column for

10   risk --

11       A.   Uh-huh.

12       Q.   -- and the whole thing was blacked out so

13   I couldn't ask you about it?

14           Do you remember that?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.   I remember there were several things

18   blacked out on forms, but not that specific one.

19   BY MR. GADDY:

20       Q.   And then you recall that we've looked at

21   the cover letters of those suspicious orders, of those

22   monthly reports that were sent to the DEA all of the

23   way through, what was it, January of 2012, I believe?

24       A.   Oh, was it '12, '11 or '12, yeah.
```

1      Q.    All right.  Now, the other thing I want to

2  touch on just very quickly is the excessive order --

3      A.    Query.

4      Q.    -- report.

5            Query?  What would -- what would you like

6  to call it, excessive order query?

7      A.    I don't -- I don't do that.  So I just

8  notice in here it is all called the excessive order

9  query, I believe.

10     Q.    Okay.  Well, if I say "excessive order

11  query," you know what I'm talking about?

12     A.    Yeah, yeah.

13     Q.    Okay.  So when we talked earlier, you only

14  mentioned getting notifications from the computer room

15  occasionally because usually I think you said Matt

16  handled that on his own?

17     A.    Correct.

18     Q.    And that you said you generally got them

19  from the pickers.  And just a few minutes ago for the

20  first time I heard you say a third person or position?

21     A.    The auditor.

22     Q.    Of the auditor.

23     A.    Uh-huh.

24     Q.    Okay.  Is there any reason you didn't

Highly Confidential - Subject to Further Confidentiality Review

1    mention that before to...?

2         A.    I just didn't think of it, yeah.

3         Q.    Okay.  Was there anything that made you

4    think of it?

5         A.    Nothing in particular.

6         Q.    Okay.

7         A.    Well, when she asked me to go

8    step-by-step-by-step what -- what happens when the

9    orders come in, then I was visualizing where it goes

10   and I went, Okay, then it goes to the auditor.

11   What -- I didn't do that before.

12        Q.    Okay.  So you told us before, and tell me

13   if I'm wrong, but that you would occasionally get

14   notifications from Matt?

15        A.    Um-hum.

16        Q.    And that you would regularly get

17   notifications from folks that were doing the picking?

18        A.    Well, define regularly.  I don't remember

19   saying regularly.  I was saying that if something came

20   up unusually large the pickers would bring it to me.

21        Q.    Okay.

22        A.    I don't remember saying how often.

23        Q.    I'm doing a bad job of trying to figure

24   out where the auditors, how frequently you would get

Highly Confidential - Subject to Further Confidentiality Review

```
 1   reports from auditors about --

 2       A.   Not frequently.  It usually came from the

 3   picker.

 4       Q.   Okay.  Would you get them from the

 5   auditors more or less than you would get them from

 6   Matt?

 7       A.   More or less what?

 8       Q.   Than you would get them from Matt in the

 9   computer room?

10       A.   Oh, I would -- it would be about the same.

11       Q.   Okay.  And what you're -- what you're

12   looking for in those situations are orders that were

13   entered by the stores in error, correct?

14       MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16       A.   Correct.

17   BY MR. GADDY:

18       Q.   Okay.

19       A.   Or with -- or that they needed it but I

20   still need to know why they are ordering so much.

21       Q.   Okay.  And I think that you said that

22   there is only one situation where you remember calling

23   them about what you think was an error --

24       A.   Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    -- and finding out that, in fact, it was

2  not an error?

3      A.    Correct.

4      Q.    So most of the time that you would see one

5  of these incredibly large numbers flag on this report,

6  something like 300 where they really meant three --

7      A.    Uh-huh.

8      Q.    -- you would call the store and they would

9  confirm for you that it was an error, correct?

10      A.    Correct.

11      Q.    You weren't doing any analysis of the

12  population size that serviced these stores, correct?

13      A.    No.

14      MS. SWIFT:  Objection asked and answered.

15  BY MS. SWIFT:

16      Q.    You weren't doing any analysis of the

17  geographical locations of the patients or the

18  prescribers as it related to the store, is that

19  correct?

20      MS. SWIFT:  Objection; asked and answered.

21  BY THE WITNESS:

22      A.    No, that's correct, yes.

23  BY MR. GADDY:

24      Q.    Okay.  You weren't doing any analysis of

1    the doctors that were writing the prescriptions?

2         MS. SWIFT:  Objection; asked and answered.

3    BY THE WITNESS:

4         A.    No.

5    BY MR. GADDY:

6         Q.    Okay.  In fact, I think you told us that

7    you wouldn't have the ability to do any of that -- any

8    of that type of analysis because you didn't have that

9    information?

10        A.    That's correct.

11        MS. SWIFT:  Objection; asked and answered.

12   BY MR. GADDY:

13        Q.    Okay.  As far as the number of bottles of

14   controlled substances, and I guess specifically

15   Schedule II controlled substances --

16        A.    Uh-huh.

17        Q.    -- that would require folks in the

18   computer room to do any type of flagging or

19   notification of the stores --

20        A.    Uh-huh.

21        Q.    -- do you recall we saw the e-mail where

22   Matt in the computer room indicated that that number

23   was 100 bottles?

24        MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    Well, it started -- it started at 35.  I

 3   mean, we saw different quantities in there, but the

 4   most current e-mail indicated that it would be a

 5   hundred, yeah.

 6   BY MR. GADDY:

 7       Q.    Okay.  And so anything under a hundred,

 8   according to Matt, he wasn't doing any phone calls or

 9   any follow-ups on?

10       MS. SWIFT:  Object to the form and the

11   foundation, asked and answered and this is beyond the

12   scope --

13   BY THE WITNESS:

14       A.    I don't know.

15       MS. SWIFT:  -- of the redirect.

16   BY THE WITNESS:

17       A.    I don't know what -- what he was -- he

18   wasn't telling me about it, let's put it that way.  I

19   don't know what else he did with it.

20   BY MS. SWIFT:

21       Q.    Okay.  And so under that system, there

22   could be an order for 90 bottles of a hundred-count

23   pill for a Schedule II controlled substance --

24       A.    Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    -- and that order would have been

2  processed and filled by the Perrysburg distribution

3  center to the Walgreens store without there being a

4  phone call or without there being any follow-up or

5  without there being any notification of somebody like

6  Barb or her equivalent?

7      MS. SWIFT:  Objection; asked and answered,

8  beyond the scope, foundation.

9  BY THE WITNESS:

10     A.    It would be if it went through the system

11 because the system should have not allowed that if it

12 was excessive for that store's geographic region and

13 past history.

14 BY MR. GADDY:

15     Q.    But we know that -- that according to your

16 e-mail, I believe --

17     A.    Uh-huh.

18     Q.    -- it was common for orders of 80 to

19 100 bottles to come in through the system --

20     A.    Uh-huh.

21     Q.    -- and your direction from Barb Martin per

22 her director --

23     A.    Uh-huh.

24     Q.    -- was to fill those orders if they came

Highly Confidential - Subject to Further Confidentiality Review

1    in?

2         MS. SWIFT:  Object to the form, asked and

3    answered.

4    BY THE WITNESS:

5         A.    Correct.

6         MS. SWIFT:  Beyond the scope.

7    BY THE WITNESS:

8         A.    That's correct.

9         MR. GADDY:  Thank you, Ms. Bish.  That's it.

10        THE WITNESS:  Are we really done now?

11        MS. SWIFT:  Thanks, Deb.

12        THE WITNESS:  You don't have any questions for

13   me, do you?

14        THE VIDEOGRAPHER:  We are going off the record

15   at 4:56 p.m.

16              (Time Noted:  4:56 p.m.)

17              FURTHER DEPONENT SAITH NOT.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3             I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5             That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9             That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14             That the said deposition was taken before

15    me at the time and place specified;

16             That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21             IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 5th day of February, 2019.

23

24             JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2

 3

 4    Case Caption:  In Re: National Prescription

 5                   Opiate Litigation

 6

 7           DECLARATION UNDER PENALTY OF PERJURY

 8

 9           I declare under penalty of perjury that I

10    have read the entire transcript of my Deposition taken

11    in the captioned matter or the same has been read to

12    me, and the same is true and accurate, save and except

13    for changes and/or corrections, if any, as indicated

14    by me on the DEPOSITION ERRATA SHEET hereof, with the

15    understanding that I offer these changes as if still

16    under oath.

17

18                                 DEBORAH BISH

19

20    SUBSCRIBED AND SWORN TO

21    before me this        day

22    of                  , A.D. 20__.

23

24            Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 DEPOSITION ERRATA SHEET

 2      Page No._____Line No._____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No._____Line No._____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for change:_____

20      Page No._____Line No._____Change to:_____

21      _____

22      Reason for change:_____

23      SIGNATURE:_____DATE:_____

24                      DEBORAH BISH
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                      DEBORAH BISH
```