Highly Confidential - Subject to Further Confidentiality Review

1             UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4

5    ----------------------------x

6    IN RE: NATIONAL PRESCRIPTION    ) Case No.

7    OPIATE LITIGATION               ) 1:17-MD-2804

8    APPLIES TO ALL CASES            ) Hon. Dan A. Polster

9    ----------------------------x

10

11

12

        VIDEOTAPED DEPOSITION OF GARY L. BOGGS

13

                  WASHINGTON, D.C.

14

             THURSDAY, JANUARY 17, 2019

15

                    9:07 A.M.

16

17

18

19

20

21

22

23   Pages: 1 - 429

24   Reported by: Leslie A. Todd

```
 1        Deposition of GARY L. BOGGS, held at the law

 2    offices of:

 3

 4

 5                    COVINGTON & BURLING, LLP

 6                    One CityCenter

 7                    850 Tenth Street, N.W.

 8                    Washington, D.C. 20001

 9                    (202) 662-6000

10

11

12

13        Pursuant to notice, before Leslie Anne Todd,

14    Court Reporter and Notary Public in and for the

15    District of Columbia, who officiated in

16    administering the oath to the witness.

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFFS:

 4        WILLIAM HAWAL, ESQUIRE

 5        SPANGENBERG SHIBLEY & LIBER, LLP

 6        1001 Lakeside Avenue, East, Suite 1700

 7        Cleveland, Ohio 44114

 8        (216) 697-3232

 9

10        TROY RAFFERTY, ESQUIRE

11        LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &

12          PROCTOR, P.A.

13        316 South Baylen Street

14        Pensacola, Florida 32502

15        (850) 435-7163

16

17   ON BEHALF OF THE WORCESTER, MASSACHUSETTS

18   PLAINTIFFS:

19        BETH KASWAN, ESQUIRE

20        SEAN T. MASSON, ESQUIRE

21        SCOTT & SCOTT ATTORNEYS AT LAW, LLP

22        230 Park Avenue, 17th Floor

23        New York, New York 10169-1820

24        (212) 223-6444
```

```
 1   APPEARANCES (Continued):

 2   ON BEHALF OF McKESSON CORPORATION:

 3        ANDREW STANNER, ESQUIRE

 4        MEGHAN E. MONAGHAN, ESQUIRE

 5        COVINGTON & BURLING LLP

 6        One City Center

 7        850 Tenth Street, N.W.

 8        Washington, D.C. 20001-4956

 9        (202) 662-5261

10

11   ON BEHALF OF THE WITNESS:

12        MICHAEL J. SATIN, ESQUIRE

13        MILLER & CHEVALIER

14        900 16th Street, N.W.

15        Washington, D.C. 20006

16        (202) 626-6009

17

18   ON BEHALF OF AMERISOURCEBERGEN DRUG:

19        STAN PERRY, ESQUIRE

20        LINDSAY A. DEFRANCESCO, ESQUIRE

21        REED SMITH, LLP

22        811 Main Street, Suite 1700

23        Houston, Texas 77002-6110

24        (713) 469-3847
```

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF CARDINAL HEALTH:

 4         JOSEPH S. BUSHUR, ESQUIRE

 5         WILLIAMS & CONNOLLY LLP

 6         725 Twelfth Street, N.W.

 7         Washington, D.C. 20005

 8         (202) 434-5013

 9

10    ON BEHALF OF HBC CO.:

11         SCOTT D. LIVINGSTON, ESQUIRE

12         MARCUS & SHAPIRA, LLP

13         One Oxford Centre, 35th Floor

14         Pittsburgh, Pennsylvania 15219

15         (412) 471-3490

16

17    ON BEHALF OF JANSSEN PHARMACEUTICALS AND JOHNSON &

18      JOHNSON:

19         EMILIE WINCKEL, ESQUIRE (Telephonically)

20         O'MELVENY & MYERS, LLP

21         1625 Eye Street, N.W.

22         Washington, D.C. 20006

23         (202) 383-5300

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:

 4         SETH WIENER, ESQUIRE (Telephonically)

 5         ARNOLD & PORTER KAYE SCHOLER LLP

 6         601 Massachusetts Avenue, N.W.

 7         Washington, D.C. 20001-3743

 8         (202) 942-5435

 9

10    ON BEHALF OF WALMART:

11         RICHARD M. BRODSKY, ESQUIRE (Telephonically)

12         JONES DAY

13         150 West Jefferson Avenue, Suite 2100

14         Detroit, Michigan 48226-4438

15         (313) 733-3939

16

17    ON BEHALF OF UCB:

18         DIANE E. LIFTON, ESQUIRE (Telephonically)

19         HUGHES HUBBARD & REED, LLP

20         One Battery Park Plaza

21         New York, New York 10004-1482

22         (212) 837-6000

23

24
```

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF C&R PHARMACY:

 4         AMANDA ROSENTHAL, ESQUIRE (Telephonically)

 5

 6    ALSO PRESENT:

 7         EVAN WOLFE (Trial technician)

 8         DANIEL HOLMSTOCK (Videographer)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    C O N T E N T S

 2   EXAMINATION OF GARY L. BOGGS               PAGE

 3        By Mr. Hawal                       17, 387

 4        By Mr. Rafferty                        266

 5        By Mr. Stanner                         353

 6

 7                    E X H I B I T S

 8             (Attached to transcript)

 9   MCKESSON-BOGGS DEPOSITION EXHIBITS         PAGE

10   No. 1    Letter from the DEA dated

11            September 27, 2006, Bates

12            MCKMDL00478906 TO 00478908          37

13   No. 2    Letter to McKesson Corporation

14            from the DEA, dated December 27,

15            2007, Bates MCKMDL00478910 to

16            00478911                           48

17   No. 3    Settlement and Release Agreement

18            and Administrative Memorandum of

19            Agreement, Bates MCKMDL00536478 to

20            00536501                           57

21   No. 4    GAO Report on Prescription Drugs,

22            State Monitoring Programs Provide

23            Useful Tool to Reduce Diversion,

24            May 2002                           64
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)

 2                    (Attached to transcript)

 3    MCKESSON-BOGGS DEPOSITION EXHIBITS              PAGE

 4    No. 5     PowerPoint presentation on Effective

 5              Controls Against Diversion of

 6              Controlled Substances, August 26, 2009 66

 7    No. 6     USA Today article, "DEA aims big to

 8              stem painkiller black market"        109

 9    No. 7     Article entitled "American Pain:

10              The Largest U.S. Pill Mill's Rise

11              and Fall," June 6, 2012              119

12    No. 8     Summary of DEA-HDMA Meeting

13              (Dec. 19, 2011), by the HDMA,

14              Bates MCKMDL00546285 to 00546288     121

15    No. 9     PowerPoint presentation on

16              State of Prescription Drug

17              Abuse, by Gary Boggs, Bates

18              MCK-AGMS-006-0000880 to 006-0000933  127

19    No. 10    McKesson Operating Manual,

20              Controlled Substance Monitoring

21              Program, Bates MCKMDL00409301 to

22              00409320                             151

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)

 2                    (Attached to transcript)

 3    MCKESSON-BOGGS DEPOSITION EXHIBITS              PAGE

 4    No. 11    Letter to Covington & Burling from

 5              U.S. Department of Justice, dated

 6              August 13, 2014, Bates MCKMDL

 7              00409224 to 00409246                  159

 8    No. 12    E-mail re Hydrocodone reports,

 9              Bates MCKMDL00543914 to 00543916      186

10    No. 13    (Exhibit number not used.)

11    No. 14    McKesson Corporation, U.S.

12              Pharmaceutical Controlled Substance

13              Monitoring Program, Presentation to

14              the West Virginia Attorney General

15              September 1, 2015, Bates MCKMDL

16              00695063 to 00695112                  196

17    No. 15    E-mail string re Daily & Suspicious

18              Orders Electronic Reporting, Bates

19              MCKMDL00543692                        217

20    No. 16    Establishing Opioid Threshold,

21              P1.5009                               223

22    No. 17    E-mail re Status of Threshold

23              Change Request for Dale's Pharmacy,

24              Bates MCKMDL00165027                  226
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3    MCKESSON-BOGGS DEPOSITION EXHIBITS              PAGE

 4    No. 18    Customer Care, Controlled Substance

 5              Monitoring Program (CSMP), Bates

 6              MCKMDL00596566 to 00596578            231

 7    No. 19    ISMC Controlled Substance Monitoring

 8              Program (CSMP) Outbound Calls, Bates

 9              MCKMDL00574192 to 00574201            233

10    No. 20    E-mail string re Good Day #1,

11              Bates MCK_00167825 to 00167827        235

12    No. 21    E-mail re Marc's CSCP Threshold

13              Report, Bates MCKMDL00485800          240

14    No. 22    E-mail string re CSMP and CVS -

15              Action plans, Bates MCKMDL00627048

16              to 00627049                           247

17    No. 23    Press Release: CVS Pharmacy Inc.

18              Pays $5M to Settle Alleged

19              Violations of the Controlled

20              Substance Act, P1.296 to P1.296.2     252

21    No. 24    Press Release: CVS to Pay $3.5

22              Million to Resolve Allegations that

23              Pharmacies Filled Fake Prescriptions,

24              P1.300 to P1.300.2                    253
```

```
  1              E X H I B I T S (Continued)

  2              (Attached to transcript)

  3  MCKESSON-BOGGS DEPOSITION EXHIBITS              PAGE

  4  No. 25    Press Release: Drug Diversion

  5            Claims Against CVS Health Corp.

  6            Resolved With $450,000 Civil

  7            Settlement, P1.301 to P1.301.2      254

  8  No. 26    Press Release: CVS to Pay $11

  9            Million to Settle Civil Penalty

 10            Claims Involving Violations of

 11            Controlled Substances Act,

 12            P1.305 to P1.305.2                   254

 13  No. 27    E-mail string re Govt Contact,

 14            Bates MCKMDL00544143                 258

 15  No. 28    PowerPoint Presentation: McKesson

 16            Prescription Drug Abuse, the

 17            National Perspective, Bates

 18            MCKMDL00407451 to 00407475           259

 19  No. 29    E-mail string re FYI, Bates

 20            INSYS-MDL-006972647 to 006972648     262

 21  No. 30    E-mail string re Report on House

 22            Energy & Commerce Subcommittee

 23            Hearing on DEA and FDA Transparency,

 24            Bates MCKMDL00661483 to 00661485     268
```

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3    MCKESSON-BOGGS DEPOSITION EXHIBITS            PAGE

 4    No. 31    Drug Operations Manual, 55-

 5              Controlled Substances, Bates

 6              MCKMDL00346554 to 00346690          273

 7    No. 32    Exemplar DU 45 report sent to DEA   282

 8    No. 33    Summary of the DEA-HDMA Meeting on

 9              Suspicious Orders, Meeting Date:

10              September 7, 2007, Bates MDKMDL

11              00574906 to 00574907               285

12    No. 34    Memorandum, Subject: Internet

13              Presentation with McKesson Corp. on

14              September 1, 2005 (DFN: 060-06.05),

15              Bates MCKMDL00496859 to 00496875    294

16    No. 35    E-mail string re Mapes and ABC

17              Presentation notes, Bates MCKMDL

18              00622532 to 00622534               302

19    No. 36    Spreadsheet re Cuyahoga County,

20              P1.1888 to P1.1888.17              306

21    No. 37    Spreadsheet re Summit County,

22              P1.1889 to P1.1889.31              307

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  E X H I B I T S (Continued)

 2                  (Attached to transcript)

 3   MCKESSON-BOGGS DEPOSITION EXHIBITS                PAGE

 4   No. 38   Letter to Geoffrey Hobart, Covington

 5            & Burling, from DEA, dated

 6            November 4, 2014, Bates MCKMDL

 7            00409453 to 00409458                      321

 8   No. 39   McKesson Operations Manual,

 9            Lifestyle Drug Monitoring Program,

10            MCKMDL00330211 to 00330216                329

11   No. 40   Letter to Linden Barber, DEA,

12            from Hyman, Phelps & McNamara,

13            dated April 25, 2007, Bates

14            MCK-HOI-002-0000001 to 002-0000007   331

15   No. 41   Spreadsheet, P1.2112 to P1.2112.4     333

16   No. 42   E-mail string re Franklin and Med

17            Fast - New Castle - Level II, Bates

18            MCKMDL00540036 to 00540038                338

19   No. 43   E-mail string re CSMP New Castle

20            1/26/09 90% +, Bates MCKMDL00540065

21            to 00540069                               342

22   No. 44   E-mail string re Monthly Drug Usage

23            Report - March, Bates MCKMDL00565981

24            to 00565982                               344
```

```
 1                E X H I B I T S (Continued)

 2                  (Attached to transcript)

 3   MCKESSON-BOGGS DEPOSITION EXHIBITS              PAGE

 4   No. 45    E-mail re Franklin Pharmacy On-Site

 5             DEA#AF2953657, Bates MCKMDL00554545

 6             to 00554575                          345

 7   No. 46    (Exhibit number not used.)

 8   No. 47    Spreadsheet                          370

 9   No. 48    Letter to Geoffrey Hobart,

10             Covington & Burling, United States

11             Department of Justice, dated

12             March 20, 2014, MCKMDL00409174 to

13             00409179                             413

14   No. 49    E-mail string re Marc's 27WT, Bates

15             MCKMDL00476860 to 00476864           417

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2              -------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Daniel Holmstock.  I'm the

 5    videographer for Golkow Litigation Services.

 6    Today's date is January 17th, 2019.  The time on

 7    the video screen is 9:07 a.m.

 8              This video deposition is being held at

 9    the law offices of Covington & Burling LLP at One

10    City Center, 850 10th Street, Northwest, in

11    Washington, D.C., in the matter of In Re:

12    National Prescription Opiate Litigation, pending

13    before the United States District Court for the

14    Northern District of Ohio, Eastern Division.

15              Our deponent today is Mr. Gary Boggs.

16              Counsel will be noted on the

17    stenographic record for appearances.

18              The court reporter is Leslie A. Todd,

19    who will now administer the oath to the witness.

20                   GARY L. BOGGS,

21        and having been first duly sworn,

22        was examined and testified as follows:

23                 DIRECT EXAMINATION

24    BY MR. HAWAL:
```

1     Q    Good morning, Mr. Boggs.

2     A    Good morning.

3     Q    Please tell us your full name.

4     A    Gary Lee Boggs.

5     Q    Mr. Boggs, you've given depositions

6  before?

7     A    I have.

8     Q    Approximately how many times?

9     A    Dozens of times throughout my career.

10    Q    All right.  You understand that you're

11 testifying as if you would be in front of a judge

12 and a jury this morning?

13    A    I do.

14    Q    All right.  What have you done to

15 prepare yourself for this deposition today?

16    A    I've had meetings with counsel in

17 preparation for it.

18    Q    How many meetings?

19    A    There was about four.

20    Q    All right.  And how long were those

21 meetings?  How much time total did you spend with

22 counsel?

23    A    I didn't keep track of it.  I mean it

24 was four days.

1      Q      Approximately.

2      A      Approximately six, seven hours a day

3    times four.

4      Q      And have you reviewed any deposition

5    transcripts that have been taken in this case of

6    other witnesses?

7      A      I have not.

8      Q      Okay.  What is your current position

9    with McKesson?

10     A      I am Vice President of Regulatory

11   Affairs and Compliance.

12     Q      And how long have you had that position?

13     A      Since August of last year.

14     Q      And can you tell me what your job

15   responsibilities are or a description of what --

16   what you do, what your role is?

17     A      Sure.  I'm responsible for overseeing

18   the controlled substance monitoring program at

19   McKesson for the independent small, medium chain

20   pharmacies, hospitals, veterans, government

21   accounts, and overseeing a team that implements

22   that program across the United States.

23     Q      Who do you report to?

24     A      I report to Barbara Rowland, who is the

```
 1   senior vice president of Regulatory Affairs and

 2   Compliance.

 3        Q    And prior to the current position that

 4   you hold, what position did you have at McKesson?

 5        A    I was a senior director of Regulatory

 6   Affairs for the East region.

 7        Q    And over what period of time did you

 8   hold that position?

 9        A    From late November of 2013 until August

10   of 2018.

11        Q    And is that when you started with

12   McKesson, in late 2013?

13        A    In late November 2013, yes.

14        Q    And what was your job responsibility as

15   senior director of Regulatory Affairs for the East

16   region?

17        A    It's similar to what it is now, except I

18   covered only half of the United States, the

19   eastern half of the United States.

20        Q    Would I understand your job

21   responsibility to have been, for the entire time

22   that you've been with McKesson, to see to it that

23   McKesson complies with the federal laws and

24   regulations which exist in an effort to prevent
```

1    the diversion of controlled substances outside of

2    the legal framework or legal channels?

3            MR. STANNER:  Object to the form.

4            THE WITNESS:  I believe that that's part

5    of the responsibilities, yes.

6    BY MR. HAWAL:

7        Q    As I understand it, before you joined

8    McKesson in 2013, you were an employee of the Drug

9    Enforcement Administration, the DEA?

10       A    I was.

11       Q    All right.  Over what period of time

12   were you with the DEA?

13       A    From approximately June of 1985 until

14   the end of June 2012.

15       Q    And starting in June of 1985, I'm going

16   to ask you to take us through what positions you

17   held with the DEA.  Can you tell us what your

18   position was when you first started and what your

19   responsibilities were?

20       A    Sure, I'd be happy to.

21            I became a special agent with the Drug

22   Enforcement Administration in 1985, was

23   transferred from Orlando, Florida, to Detroit.  I

24   was a special agent in the Detroit office until

Highly Confidential - Subject to Further Confidentiality Review

1    about March of 1999, when I was promoted to a

2    group supervisor in Detroit.  I --

3         Q    Excuse me, if I can interrupt for a

4    minute.

5              Up through March of 1999, did you have

6    any responsibilities in dealing with manufacturers

7    or distributors of controlled substances?

8         A    Not very much, no.  Very little.

9         Q    So you stopped at March of 1999.  Can

10   you continue and take us forward with your

11   positions with the DEA.

12        A    Sure.  I was a group supervisor

13   beginning around March of 1999.  I oversaw as a

14   group supervisor two or three different units.

15   Then I was a unit chief, also in Detroit, over the

16   special services section.

17             I was then transferred to headquarters

18   here in the District in 2003.  I was a unit chief

19   in the Office of Special Intelligence.  Was then

20   promoted in January of 2006 to be the executive

21   assistant in the Office of Diversion Control, and

22   I held that position until I retired from the DEA

23   in June of 2012.

24        Q    All right.  And as executive assistant

```
 1    in the division of -- what -- what was that again?

 2    What --

 3         A    At the time it was called the Office of

 4    Diversion Control.  It's now the Diversion Control

 5    Division.

 6         Q    And what were your responsibilities in

 7    that position?

 8         A    My responsibilities were, I would sort

 9    of say like a chief of staff to the person

10    overseeing that section.  We had day-to-day

11    responsibilities for the implementation of the

12    regulatory aspect of the Controlled Substances

13    Act, overseeing the DEA registrants that were

14    authorized to handle controlled substances.

15    That's essentially it.

16         Q    And the DEA registrants that you're

17    referring to would be wholesalers like McKesson?

18         A    That's one example of them.

19         Q    Another would be manu- --

20              (Interruption by counsel on the phone.)

21         Q    Another would --

22              MR. HAWAL:  Can we please have people on

23    the phone mute their lines?

24              (A discussion was held off the record.)
```

```
 1              MR. HAWAL:  Yeah, let's go off the

 2     record.

 3              THE VIDEOGRAPHER:  The time is 9:15 a.m.

 4     We're going off the record.

 5              (Resolving technical difficulties.)

 6              THE VIDEOGRAPHER:  The time is 9:20 a.m.

 7     We're back on the record.

 8              MR. HAWAL:  Bill Hawal for plaintiffs.

 9              MR. RAFFERTY:  Troy Rafferty for

10     plaintiffs.

11              MR. WOLFE:  Evan Wolfe, technical

12     support, for plaintiffs.

13              MS. KASWAN:  Beth Kaswan for plaintiffs

14     in the Massachusetts state action.

15              MR. LIVINGSTON:  Scott Livingston for

16     Defendant HPC.

17              MR. BUSHUR:  Joseph Bushur for Cardinal

18     Health.

19              MR. PERRY:  Stan Perry of Reed Smith for

20     AmerisourceBergen.

21              MR. SATIN:  Michael Satin for Miller &

22     Chevalier on behalf of Gary Boggs.

23              MS. MONAGHAN:  Meghan Monaghan from

24     Covington & Burling on behalf of McKesson.
```

```
 1                    MR. STANNER:  Andrew Stanner of

 2    Covington & Burling on behalf of McKesson.

 3                    MR. HAWAL:  Folks on the phone, can you

 4    please identify yourselves?

 5                    MR. WIENER:  This is Seth Wiener from

 6    Arnold & Porter for Endo and PAR defendants.

 7                    MS. WINCKEL:  Emilie Winckel from

 8    O'Melveny for Janssen and J&J.

 9                    MR. BRODSKY:  Richard Brodsky from Jones

10    Day for Walmart.

11                    MS. ROSENTHAL:  Amanda Rosenthal --

12                    MR. HAWAL:  One at a time, please.

13                    THE REPORTER:  Amanda --

14                    MS. ROSENTHAL:  Rosenthal.

15                    MR. HAWAL:  For whom?

16                    MS. ROSENTHAL:  C&R Pharmacy.

17                    MR. HAWAL:  Anyone else?

18                    MS. LIFTON:  Diane Lifton, Hughes

19    Hubbard, for UCB.

20                    THE REPORTER:  Can you repeat your name,

21    please?

22                    MS. LIFTON:  Diane Lifton, L-I-F-T-O-N.

23                    THE REPORTER:  Thank you.

24    BY MR. HAWAL:
```

1      Q    Mr. Boggs, before we went off the

2    record, I believe that you mentioned that you

3    joined DEA's Office of Diversion Control in

4    January of 2006; is that correct?

5      A    That's correct, yes.

6      Q    And were you -- in that position, were

7    you responsible for interacting with wholesalers

8    and manufacturers of controlled substances?

9      A    I was.

10      Q    And was part of your job responsibility

11    to ensure that they were complying with the

12    Controlled Substances Act and federal laws and

13    regulations relating to controlled substances?

14      A    It was.

15      Q    All right.  And was your direct

16    supervisor Mr. Rannazzisi?

17      A    He was.

18      Q    And how long was he your direct

19    supervisor?

20      A    The entire -- from 2000 -- January 2006

21    till I retired in June of 2012.

22      Q    Before you became an employee of

23    McKesson in late 2013, was there a period of time

24    that you were a consultant for McKesson?

```
 1        A    I consulted for McKesson just for a

 2   couple of times prior to becoming an employee of

 3   McKesson, yes.

 4        Q    And over what period of time did that

 5   occur?

 6        A    It would have been, I believe, around

 7   the summer of 2013, on and off a couple of times.

 8        Q    And what did -- what was your role --

 9   what did you -- what were you doing or what were

10   you asked to do as a consultant for McKesson?

11        A    I was asked to look at the Regulatory

12   Affairs program that they had.  I was asked to

13   provide some training.  I was asked to speak at a

14   couple of different conferences that McKesson had

15   put on for other folks outside of McKesson.

16        Q    And who at -- who at McKesson recruited

17   you or retained you to be a consultant?

18        A    Don Walker.

19        Q    Did you know Don Walker prior to that

20   time?  Were you acquainted with him in any way?

21        A    I might have -- in my capacity at DEA,

22   may have been at a meeting that he was at, but

23   other than that, I did not know him.

24        Q    And who was it that encouraged you or
```

1  recruited you as an employee to join McKesson in

2  2013?

3            MR. STANNER:  Objection.  Form.

4            THE WITNESS:  They advertised a

5  position, and I talked to Don Walker about it.

6  BY MR. HAWAL:

7      Q    When you were with the DEA, did you

8  always try to fairly and accurately set forth the

9  policies and positions of the DEA in your

10 communications with pharmaceutical distributors

11 and their trade association, HDMA?

12           MR. SATIN:  Mr. Boggs, I'm going to

13 instruct you not to answer that question to the

14 extent doing so would require you to disclose

15 information you acquired while you were at DEA --

16 at the DEA, to the extent that information is not

17 public and part of your official responsibilities

18 and duties.

19 BY MR. HAWAL:

20     Q    Will you answer the question, sir?

21     A    I -- I did not receive clearance from

22 the government to speak while I was there, so I

23 don't believe that I can answer that question.

24     Q    Is it your position that your

```
 1    interactions with various distributors is in some

 2    way confidential information?

 3              MR. SATIN:  Objection.  Sir, it's not

 4    his decision to make.

 5              MR. HAWAL:  I under- --

 6              MR. SATIN:  It's the government's

 7    decision to make, so it's not a question for him.

 8    He doesn't have authorization to speak.  The

 9    government can't be here.  So he can't provide

10    those answers until the government gives him

11    clearance to do so.

12              MR. HAWAL:  Well, the government -- the

13    government's position, as I understand it and as

14    was expressed at the time of a conference with the

15    court, is that if there is information that was in

16    the public domain, that the witness is permitted

17    to provide answers to those kinds of questions.

18              Is that -- is your understanding

19    different?

20              MR. SATIN:  If it is public information,

21    that's correct.  Your question, as I understood

22    it, was not calling for just public information.

23    BY MR. HAWAL:

24         Q    Well, sir, what is your understanding
```

1    of -- of what HDMA was?

2         A     HDMA is a trade association for

3    manufacturers and distributors.

4         Q     And is it your understanding that the

5    HDMA had periodic meetings where representatives

6    of various pharmaceutical distributors of

7    controlled substances would attend?

8              MR. SATIN:  You may answer that question

9    to the extent doing so would not require you to

10   disclose non-public information that you acquired

11   during the course of your employment.

12             THE WITNESS:  It's my understanding that

13   they would have those types of meetings, yes.

14   BY MR. HAWAL:

15        Q     And those meetings would also be

16   attended by employees or representatives of HDMA,

17   the trade association?

18             MR. STANNER:  Object to the form of the

19   question.  Vague, time frame.

20             THE WITNESS:  Could you be more

21   specific?

22   BY MR. HAWAL:

23        Q     During the time that you were with the

24   Office of Diversion Control, would meetings that

Highly Confidential - Subject to Further Confidentiality Review

1   would be attended by pharmaceutical manu- --

2   pharmaceutical distributor representatives also be

3   attended by employees or representatives of HDMA?

4       A   They may have, and other times they may

5   not have.

6       Q   Did you attend such meetings?

7       MR. SATIN:  Mr. Boggs, I'm going to

8   instruct you not to answer that question for the

9   same reasons we expressed earlier.

10       MR. HAWAL:  The HDMA would indicate --

11   attendance at meetings of HDMA would indicate that

12   that's public information.  There's -- there's

13   nothing that's confidential about HDMA as it

14   relates to Mr. Boggs, is there?

15       MR. SATIN:  I don't know.

16       The instruction to Mr. Boggs is,

17   Mr. Boggs, to the extent he believes that it was

18   public information, he can answer it.  To the

19   extent the information -- he's revealing

20   information that's not public, he can't.

21   BY MR. HAWAL:

22       Q   Mr. Boggs, when you attended meetings

23   with the HDMA, did you consider those -- that

24   information to be generally public?

```
1          A     I did not, no.

2          Q     In terms of your work with the Office of

3    Diversion Control, did you attend public meetings

4    where you set forth the positions of the DEA -- of

5    the DEA with respect to maintaining appropriate

6    obligations under the Controlled Substances Act?

7          A     I believe that I did speak at some

8    public conferences about the Drug Enforcement

9    Administration and the regulatory requirements.

10         Q     And its positions with regard to the

11   obligations of wholesalers like McKesson to

12   maintain appropriate legal obligations with

13   respect to avoiding the diversion of controlled

14   substances?

15         A     In some form of that, yes.

16         Q     And would those be meetings in which or

17   presentations in which HDMA members and/or

18   representatives of drug wholesalers like McKesson

19   would also be in attendance at?

20         A     I don't recall whether or not any of

21   those representatives were in attendance or not.

22         Q     When you were with the Office of

23   Diversion Control, were you required to know what

24   the legal obligations of pharmaceutical
```

```
 1    distributors were with regard to their compliance

 2    with federal laws and regulations?

 3              MR. SATIN:  Objection.

 4              Mr. Boggs, don't answer that question to

 5    the extent it would require you to disclose

 6    non-public information that you have obtained in

 7    the course of your work at DEA.

 8    BY MR. HAWAL:

 9         Q    Do you -- do you refuse to answer, sir?

10         A    I am -- do not want to break the law, so

11    I don't -- I have not been cleared to answer

12    non-public information.

13         Q    Well, sir, do you have knowledge about

14    the substance of the Controlled Substances Act?

15              MR. SATIN:  To the extent that knowledge

16    comes from your time at the DEA, don't answer

17    that.

18              If you want to ask him about his time at

19    McKesson and his knowledge of those laws, you may

20    do so.

21              THE WITNESS:  I -- from my time at

22    McKesson, I am aware of what some of the

23    regulatory obligations are, yes.

24    BY MR. HAWAL:
```

1        Q      Were those regulatory obligations that

2    you became aware of when -- since you've been with

3    McKesson, were they the same obligations that

4    existed prior to that time as -- as to the period

5    of time that you were with the DEA?

6               MR. SATIN:  That question necessarily

7    calls for his knowledge when he was at DEA, so

8    object.

9               Don't answer that question.

10              MR. STANNER:  Object to the form.

11              THE WITNESS:  For the most part, I

12   believe they are.  There have been some recent

13   legislative changes to some of the regulatory

14   obligations.

15   BY MR. HAWAL:

16       Q      The regulatory obligations that apply to

17   distributors of controlled substances were created

18   with the Controlled Substances Act in 1970; is

19   that correct?

20       A      Approximately that time, yes.

21       Q      And up until the time of recent changes

22   in the law as a result of Congressional action,

23   have the obligations under the Controlled

24   Substances Act been fairly consistent and uniform

1    since 1970?

2            MR. STANNER:  Objection to the form.

3            THE WITNESS:  To the best of my

4    knowledge, the regulatory obligations as written

5    in the 21 CFR have not changed.

6    BY MR. HAWAL:

7        Q    Are you familiar with the Distributor

8    Initiative Program?

9            MR. SATIN:  To the extent that your

10   knowledge comes from your time with the DEA, don't

11   answer that question.

12           THE WITNESS:  I am familiar with the

13   Distributor Initiative in general, yes.

14   BY MR. HAWAL:

15       Q    And are you familiar with the purpose of

16   the Distributor Initiative Program?

17       A    I don't believe that I'm cleared to

18   answer that question.

19       Q    What is your understanding as to when

20   the opioid crisis was first appreciated in the

21   United States?

22       A    I believe that it began approximately

23   three decades ago.

24       Q    And is it your understanding that the

Highly Confidential - Subject to Further Confidentiality Review

1    opioid crisis since that time has consistently

2    worsened in terms of its effect on individuals as

3    well as communities and governmental entities in

4    the United States?

5            MR. STANNER:  Object to the form.

6            THE WITNESS:  I believe that that is an

7    accurate representation.

8    BY MR. HAWAL:

9        Q    Were you aware that Mr. Rannazzisi sent

10   a letter to all distributors in the United States

11   on September 27th, 2006?

12           MR. SATIN:  Objection to the extent that

13   calls for --

14           THE REPORTER:  I'm sorry, Counsel, can

15   you speak up a little bit?

16           MR. SATIN:  Yeah, I'm sorry.

17           Objection to the question.

18           And I instruct Mr. Boggs not to answer

19   that question insofar as it requires him to

20   disclose information about his time when he was at

21   the DEA.

22           THE WITNESS:  I'm aware that that --

23   that letter's -- that the distributors have that

24   letter, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2        Q    All right.  And what is your

 3   understanding as to the purpose of

 4   Mr. Rannazzisi's letter?

 5             MR. SATIN:  Objection.

 6             Mr. Boggs, don't answer that question.

 7             MR. HAWAL:  Counsel, we've already taken

 8   Mr. Boggs' deposition and he answered questions

 9   about that letter in some detail earlier this

10   year.  Is it your position that something has

11   changed since his last deposition?

12             MR. SATIN:  Yes, I've spoken to the

13   government -- I spoke to Mr. Bennett yesterday,

14   and he made very clear that he should not be

15   answering questions about his time at the DEA for

16   information that is non-public and as part of his

17   official duties without authorization from the

18   government.

19             So I wasn't at that hearing, but I can

20   tell you that Mr. Boggs does not have

21   authorization to do that.

22             MR. HAWAL:  Let's take a break.

23             THE VIDEOGRAPHER:  The time is

24   9:35 a.m., and we're going off the record.
```

```
 1              (Recess.)

 2              THE VIDEOGRAPHER:  The time is 9:53 a.m.

 3    We're back on the record.

 4              (Plaintiffs' Exhibit No. 1 was

 5              marked for identification.)

 6    BY MR. HAWAL:

 7       Q    Mr. Boggs, I'm going to hand you what

 8    we've marked as Plaintiffs' Exhibit 1.

 9              Plaintiffs' Exhibit 1 is the

10    September 27th, 2006 Department of Justice, Drug

11    Enforcement Administration letter to McKesson,

12    correct?

13       A    It is.  It's a generic letter.  I

14    don't -- I don't know if this specific one was to

15    McKesson.

16       Q    And since you've joined McKesson, have

17    you seen this letter since you've joined McKesson?

18       A    I have.

19       Q    And do you know since you've joined

20    McKesson that this letter was sent to every

21    distributor by Mr. Rannazzisi in September of

22    2006?

23              MR. STANNER:  Object to the form.

24              THE WITNESS:  I believe that that's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct, yes.

 2    BY MR. HAWAL:

 3        Q    All right.  In fact, in the first

 4    paragraph, Mr. Rannazzisi indicates that this

 5    letter is being sent to every commercial entity in

 6    the United States registered with the Drug

 7    Enforcement Administration to distribute

 8    controlled substances, correct?

 9        A    You've read that correctly, yes.

10        Q    All right.  And you know since you've

11    seen this letter that Mr. Rannazzisi, his

12    intention was to reiterate to the distributors,

13    including McKesson, the responsibilities of

14    controlled substance distributors in view of the

15    prescription drug abuse problem in our nation --

16    our nation currently faces, correct?

17            MR. STANNER:  Object to the form.

18            THE WITNESS:  I believe you would have

19    to ask him about his intention.  I --

20    BY MR. HAWAL:

21        Q    Well, when was the first time that you

22    saw this letter?

23            MR. SATIN:  Objection, pursuant to

24    Touhy.
```

```
 1              THE REPORTER:  Pursuant to?

 2              MR. STANNER:  Touhy, T-U-O-H-Y, I

 3    believe is the correct spelling.

 4              MR. STANNER:  T-O-U.  O-U.

 5              MR. SATIN:  T-O-U-H-Y.

 6              THE WITNESS:  I'm sorry, I don't know

 7    that I can answer that question.

 8    BY MR. HAWAL:

 9         Q    How long have you been aware that

10    controlled prescription drugs, that their abuse is

11    a serious and growing health problem in the United

12    States?

13              MR. STANNER:  Object to the form.

14              THE WITNESS:  I know that prescription

15    drug abuse has been around for decades and

16    decades.

17    BY MR. HAWAL:

18         Q    And you know that it continually

19    worsened over time?

20              MR. STANNER:  Object to the form.

21              THE WITNESS:  I believe that's correct,

22    yes.

23    BY MR. HAWAL:

24         Q    Now, since you've joined McKesson, did
```

1    you know that distributors must be vigilant in

2    deciding whether a prospective customer can be

3    trusted to deliver controlled substances only for

4    lawful purposes?

5            MR. STANNER:  Object to the form.

6            THE WITNESS:  I can't speak for all

7    distributors.  For -- for McKesson, I understand

8    that we have an obligation to maintain control.

9    BY MR. HAWAL:

10       Q    And do you understand that that

11   responsibility is critical?

12       A    I understand that --

13           MR. STANNER:  Object to the form.

14           THE WITNESS:  -- it's very important,

15   yes.

16   BY MR. HAWAL:

17       Q    Mr. Rannazzisi in his letter in the

18   third paragraph in the last sentence indicated

19   that:  "This responsibility is critical, as

20   Congress has expressly declared that the illegal

21   distribution of controlled substances has a

22   substantial and detrimental effect on the health

23   and general welfare of the American people."

24           Is it your understanding as a McKesson

1    employee that that is a true statement?

2        A    I believe that that's a true statement,

3    yes.

4        Q    And have you known since you joined

5    McKesson that, as Mr. Rannazzisi indicates in the

6    next paragraph:  "Although most distributors are

7    already well aware of the following legal

8    principles, they are reiterated here as additional

9    background for this discussion"?

10            Did you know that he was reiterating

11    what distributors should have known as of 2006

12    based upon your work at McKesson?

13            MR. STANNER:  Object to the form.

14            MR. SATIN:  Objection that -- as I

15    understand the question, even though you're

16    asking as -- at McKesson, you're asking him to

17    talk about what he understood Mr. Rannazzisi --

18    I'm not pronouncing his name correctly -- but what

19    that gentleman was doing as of 2006.

20            So I would instruct you not to answer

21    that to the extent the answer requires you to

22    disclose information from that time period.

23            THE WITNESS:  I -- you'd have to ask

24    his -- him what his intent was.

```
1    BY MR. HAWAL:

2        Q    Let's go to page 2 of this letter.

3             In the second paragraph, Mr. Rannazzisi

4    says:  "Even just one distributor that uses its

5    DEA registration to facilitate -- facilitate

6    diversion can cause enormous harm."

7             As an employee of McKesson with your --

8    based on your current knowledge, do you agree with

9    that statement?

10       A    I -- I think that you would have to look

11   at the facts and circumstances of what -- whatever

12   the incident was and to the extent of whether or

13   not it was horrific or not.

14       Q    Well, let's assume for the sake of my

15   question that a distributor fails to report

16   suspicious orders or block orders that are

17   suspicious and delivers them to a customer.

18            Do you believe, based upon your current

19   understanding of federal laws, regulations and how

20   the distribution of controlled substances work,

21   that just one distributor that facilitates

22   diversion can cause enormous harm?

23            MR. STANNER:  Object to the form,

24   compound, vague.
```

1        THE WITNESS:  I think the first part of

2  your statement was about failure to report a

3  suspicious order.  That's a reporting requirement.

4  And it -- you may be assuming that that order was

5  shipped and maybe it wasn't shipped.

6        The other second part of that is

7  assuming that even if it was shipped, that it

8  somehow may or may not have been diverted.

9  BY MR. HAWAL:

10     Q    Well, let's assume it was diverted.  If

11  it was diverted, do you agree that that would

12  cause or could cause enormous harm?

13        MR. STANNER:  Object to the form.

14        THE WITNESS:  It depends on the facts

15  and circumstances.  I mean you could have one

16  shipment that might be a hundred pills that could

17  be diverted -- that could be diverted and simply

18  cause some harm.  Whether or not that's, quote,

19  enormous harm, I think is relevant to the fact of

20  the volume of what was shipped.

21  BY MR. HAWAL:

22     Q    Well, so -- so in your -- in your

23  opinion, volume matters?

24     A    It could matter.  It depends on the

Highly Confidential - Subject to Further Confidentiality Review

1    facts and circumstances.

2        Q    Well, assuming sufficient volume

3    diverted into elicit channels, do you believe that

4    that could cause enormous harm as set forth in

5    Mr. Rannazzisi's letter?

6            MR. STANNER:  Object to the form.

7            THE WITNESS:  It could.

8    BY MR. HAWAL:

9        Q    And what kind of harm would you

10   contemplate could be caused by diversion?

11       A    If people illegally took it, they could

12   become addicted from it or any other consequences

13   associated with that.

14       Q    Including harms to communities?

15           MR. STANNER:  Object to the form.

16           THE WITNESS:  I -- I wouldn't want to

17   speculate without more facts, and I -- you would

18   have to look at the facts and circumstances.

19   BY MR. HAWAL:

20       Q    Well --

21       A    I don't want to paint with a broad

22   brush.

23       Q    Well, hypothetically, if diversion

24   occurs in sufficient quantities, do you agree,

Highly Confidential - Subject to Further Confidentiality Review

1  based upon your understanding from your work at

2  McKesson in the diversion arena, that that can

3  cause harm to communities?

4      A    It could cause harm in there.  It

5  depends.

6      Q    And could cause harm to governmental

7  agencies?

8           MR. STANNER:  Object to the form.

9           THE WITNESS:  I -- you'd have to be more

10  specific.

11  BY MR. HAWAL:

12      Q    Well, increased costs for treatment of

13  individuals who are addicted, for example?

14           MR. STANNER:  Object to the form.

15  Speculation.

16           THE WITNESS:  That may be a consequence

17  of someone becoming addicted, that they need to

18  seek treatment.  Whether or not that was directly

19  related to the diversion of that or something that

20  they had legitimately, I think you'd have to look

21  at the facts.

22  BY MR. HAWAL:

23      Q    To -- in the -- continue on --

24  continuing on in Mr. Rannazzisi's letter in 2006,

```
1    he says:  "The DEA regulations require all

2    distributors to report suspicious orders of

3    controlled substances."

4             Based upon your understanding of -- of

5    the federal laws and regulations as a McKesson

6    employee, is that a true statement?

7         A    The regulations do require distributors

8    to build and operate a system to identify and

9    report suspicious orders.

10        Q    And how long has that been the case?

11        A    I believe --

12             MR. SATIN:  Objection to the extent that

13   requires you to rely on your work when you were at

14   the DEA.

15             THE WITNESS:  It's my understanding that

16   that was a regulation that was implemented with

17   the enactment of the Controlled Substances Act.

18   BY MR. HAWAL:

19        Q    In 1970?

20        A    Around that time frame, yes.

21        Q    At -- from your work at McKesson, did

22   you know that at the time that this letter was

23   sent, the DEA was actively investigating McKesson

24   for violations of the Controlled Substances Act?
```

 1                  MR. STANNER:  Objection to the form.

 2                  THE WITNESS:  Could you -- could you

 3     repeat the question?

 4     BY MR. HAWAL:

 5          Q     Yes.  As an employee of McKesson, do you

 6     know that at the time this letter was sent, the

 7     DEA and the DOJ was actively investigating

 8     McKesson for violations of the Controlled

 9     Substances Act for failing to maintain effective

10     controls against diversion of certain

11     pharmaceutical opioid products?

12                  MR. SATIN:  And objection.

13                  You can't rely, though, on your time at

14     the DEA to answer that question, so it would only

15     be based on information you obtained while at

16     McKesson.

17                  MR. STANNER:  Object to the form, calls

18     for speculation.

19                  THE WITNESS:  I believe that that was

20     the case, yes.

21     BY MR. HAWAL:

22          Q     Did you bring with you when you joined

23     McKesson your wealth of knowledge that you gained

24     as a DEA agent, and do you use that knowledge in

```
 1    your current position and employment?

 2         A     I use my experiences gained from there,

 3    yes.

 4         Q     I assume that's why McKesson retained

 5    you, for your knowledge and experience as a DEA

 6    agent.  True?

 7         A     I think that that's partially accurate,

 8    yes.

 9               MR. HAWAL:  Evan, can we bring up 910,

10    Bates, the second Rannazzisi letter.

11               (Plaintiffs' Exhibit No. 2 was

12               marked for identification.)

13    BY MR. HAWAL:

14         Q     Mr. Boggs, I'm handing you what has been

15    marked as Exhibit 2 is a U.S. Department of

16    Justice, Drug Enforcement Administration letter to

17    McKesson Corporation, dated December 27th, 2007,

18    signed by Joseph Rannazzisi.  Bates No.

19    MCKMDL00478910.

20               Have you seen this letter since you've

21    left the DEA?

22         A     The copy that I have is not a complete

23    document.  Only -- only one page.

24               MR. STANNER:  Oh, sorry.  What -- some
```

```
 1   of these look like they're double-sided.  This one

 2   is not.  The actual exhibit is not.

 3              MR. HAWAL:  Well, can you peel that off?

 4              MR. STANNER:  I can.  Lucky break.

 5   BY MR. HAWAL:

 6       Q    Have you seen this letter since you've

 7   left the DEA?

 8       A    I have.

 9       Q    And Mr. Rannazzisi apparently in

10   December of 2007 thought it was necessary to send

11   McKesson and other distributors a second reminder

12   of their legal obligations under the Controlled

13   Substances Act and federal regulations.

14              MR. SATIN:  Object --

15   BY MR. HAWAL:

16       Q    True?

17              MR. SATIN:  Objection.

18              Do not answer that question.

19              MR. STANNER:  Object to the form.

20   BY MR. HAWAL:

21       Q    The first paragraph of the letter

22   indicates that:  "The purpose of this letter is to

23   reiterate the responsibilities of controlled

24   substance manufacturers, distributors -- and
```

```
 1    distributors to inform DEA of suspicious orders in

 2    accordance with 21 CFR 1301.74(b)."

 3              Is it your understanding that that

 4    obligation exists today based upon your work at

 5    McKesson?

 6         A    It is.

 7         Q    And existed as far back as 1970?

 8         A    That's correct.

 9         Q    And according to Mr. Rannazzisi, the DEA

10    regulations require all manufacturers and

11    distributors to report suspicious orders of

12    controlled substances.

13              That's a true statement, accurate?

14         A    That's what the regulation requires,

15    yes.

16         Q    And he goes on to say:  "It specifically

17    requires that a registrant," quote, "design and

18    operate a system to disclose to the registrant

19    suspicious orders of controlled substances," close

20    quote.

21              Is it your understanding that that's an

22    accurate statement?

23         A    That's what the regulation says, yes.

24         Q    And he goes on to say:  "The regulations
```

1    clearly indicates that it is the sole

2    responsibility of the registrant to design and

3    operate such a system."

4            Do you agree with that statement?

5        A    That's what the regulation requires,

6    yes.

7        Q    He goes on in the next paragraph to say

8    that:  "The regulation also requires that the

9    registrant inform the local DEA division office of

10   suspicious orders when discovered by the

11   registrant," and he emphasized the words "when

12   discovered."

13           Is that an accurate statement as to what

14   the regulations require?

15       A    I believe that's what the regulations

16   require, yes.

17       Q    And he goes on to say in that paragraph:

18   "Registrants are reminded that their

19   responsibility does not end merely with the filing

20   of a suspicious order report.  Registrants must

21   conduct an independent analysis of suspicious

22   orders prior to completing a sale to determine

23   whether the controlled substances are likely to be

24   diverted from legitimate channels."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Is that an accurate statement --
 2                 MR. STANNER:  Object --
 3    BY MR. HAWAL:
 4       Q    -- based upon your work at McKesson?
 5                 MR. STANNER:  Object to the form.
 6    Vague.
 7                 THE WITNESS:  I don't know that that's
 8    specifically in the regulation.
 9    BY MR. HAWAL:
10       Q    Well, do you agree that that's an
11    accurate statement?
12                 MR. STANNER:  Object to the form.
13                 THE WITNESS:  I believe that part of
14    McKesson's regulatory program encompasses due
15    diligence that we conduct on our customers.
16    BY MR. HAWAL:
17       Q    In the next paragraph he goes on to say
18    that:  "The regulation specifically states that
19    suspicious orders include orders of an unusual
20    size, orders deviating substantially from a normal
21    pattern, and orders of an unusual frequency."
22                 Is that a fair and accurate statement?
23       A    I believe that is what the regulations
24    require.
```

1        Q    And he goes on to say that:  "The size

2    of an order alone, whether or not it deviates from

3    a normal pattern, is enough to trigger the

4    registrant's responsibility to report the order as

5    suspicious."

6             Do you agree with that statement as

7    being accurate?

8             MR. STANNER:  Object to the form.

9             THE WITNESS:  I believe that that could

10   be part of the analysis in determining whether or

11   not the order is of unusual size or deviating

12   substantially from a pattern or unusual frequency.

13   BY MR. HAWAL:

14       Q    As a -- as a McKesson employee, do you

15   believe that that is one of the responsibilities

16   of a distributor in -- in terms of performing its

17   due diligence?

18             MR. STANNER:  Object to the form, vague.

19             THE WITNESS:  I believe our

20   responsibility is to design and operate a system

21   to disclose suspicious orders as defined in the

22   regulations.

23   BY MR. HAWAL:

24       Q    Well, do you believe that an order that

```
 1    deviates from a normal pattern should trigger a

 2    responsibility to determine whether the order is

 3    suspicious?

 4             MR. STANNER:  Object to the form.

 5             THE WITNESS:  That is one of the

 6    definitions of "a suspicious order" under the

 7    regulations.

 8    BY MR. HAWAL:

 9        Q    On page 2 of this letter in the second

10    paragraph, Mr. Rannazzisi states:  "Daily, weekly

11    or monthly reports submitted by a registrant

12    indicating," quote, "excessive purchases," close

13    quote, "do not comply with the requirement to

14    report suspicious orders, even if the registrant

15    calls such reports suspicious order reports."

16             Do you agree that that is an accurate

17    statement as you understand it from your work at

18    McKesson?

19             MR. STANNER:  Object to the form.

20             THE WITNESS:  Well, it depends on what

21    those orders were that were contained in the --

22    what they -- what's defined as "an excessive

23    order."  An excessive order could be an order of

24    unusual size, frequency or pattern, and therefore
```

1    would be a suspicious order as defined under the

2    regulations.

3    BY MR. HAWAL:

4         Q     In the next paragraph, he says:

5    "Lastly, registrants that routinely report

6    suspicious orders, yet fill these orders without

7    first determining that the order is not being

8    diverted into other than legitimate medical,

9    scientific and industrial channels may be failing

10   to maintain effective controls against diversion."

11          Do you agree that that is an accurate

12   statement as set forth by Mr. Rannazzisi?

13          MR. STANNER:  Object to the form.

14          THE WITNESS:  The -- at my time at

15   McKesson, my understanding is that a registrant

16   such as distributors have an obligation to

17   maintain effective controls against diversion.

18   BY MR. HAWAL:

19        Q     And so you agree that that's an accurate

20   statement?

21          MR. STANNER:  Object to the form.

22   Vague, "accurate."

23          THE WITNESS:  I think it describes, at

24   least in part, what could be a review or a due

1    diligence that is conducted to determine whether

2    or not something might be diverted.

3    BY MR. HAWAL:

4         Q    Are you -- do you disagree with that

5    statement?

6         A    I don't know that I disagree with it.

7    I -- I understand what our obligations are under

8    the regulations.

9         Q    You're aware of, since you joined

10   McKesson, that McKesson prior to 2010 was not

11   complying with its obligations to main- --

12   maintain effective controls to prevent diversion

13   of controlled substances; mainly -- namely, opioid

14   pills into the illegal marketplace?

15            MR. SATIN:  Mr. Boggs, to answer that

16   question, you can only rely on information you

17   learned at -- while at McKesson.

18            MR. STANNER:  Object to the form.

19            THE WITNESS:  Could you repeat the

20   question?

21   BY MR. HAWAL:

22        Q    Yes.  Since you've joined McKesson, have

23   you become aware that prior to 2010, McKesson was

24   not complying with its obligations to maintain

Highly Confidential - Subject to Further Confidentiality Review

1  effective controls to prevent the diversion of

2  controlled substances?

3          MR. STANNER:  Object to the form.

4          MR. SATIN:  Same instruction.

5          THE WITNESS:  It was my understanding

6  that they were not necessarily reporting

7  suspicious orders.

8  BY MR. HAWAL:

9      Q    You're aware that in May of 2008,

10  McKesson entered into a settlement agreement and

11  signed a memorandum of understanding or memorandum

12  of agreement with the U.S. Department of Justice

13  and the DEA whereby McKesson agreed to pay a fine

14  of $13.25 million for failing to maintain

15  effective controls against diversion of certain

16  controlled substances at various of its

17  distribution centers in the United States?

18          MR. STANNER:  Object to the form.

19          THE WITNESS:  I'm aware of that

20  settlement, that that settlement agreement

21  happened.

22          (Plaintiffs' Exhibit No. 3 was

23          marked for identification.)

24          MR. HAWAL:  Andrew.

```
 1                  MR. STANNER:  I'm sorry.

 2    BY MR. HAWAL:

 3         Q    Mr. Boggs, I handed you what's been

 4    marked as Exhibit 3.  It is a document marked --

 5    Bates stamped MCKMDL00536478.  It is a Settlement

 6    and Release Agreement and Administrative

 7    Memorandum of Agreement, which is dated May 2nd,

 8    2008.

 9              You've seen this document previously?

10         A    Not since my time at McKesson, no.

11         Q    Well, did you see this document when

12    your deposition was taken this past summer?  Do

13    you recall that?

14         A    No, I don't recall.

15         Q    In any event, you're aware that this

16    agreement was executed between the Department of

17    Justice and McKesson?

18         A    I do.

19         Q    And if we look at page 10 of this

20    document, it's a document that was signed by

21    various individuals, including John Hammergren,

22    president of McKesson Corporation, and Donald

23    Walker, senior vice president.

24         A    I see that.
```

1            MR. STANNER:  Sorry.  The Bates number

2    is MCKMDL00536487.  The page numbers jump around.

3    BY MR. HAWAL:

4         Q    Mr. Hammergren is the president of

5    McKesson today?

6         A    He is not.

7         Q    When did he stop being president of

8    McKesson?

9         A    I don't know.

10        Q    Well, can you give me an approximation?

11        A    I can't.

12        Q    Don Walker is still with McKesson?

13        A    He is not.

14        Q    When did he leave McKesson?

15        A    Maybe a year after I was hired by

16   McKesson, approximately.

17        Q    On page 3 of this document, at the very

18   top, "McKesson was alleged to have failed to

19   maintain adequate controls against the diversion

20   of controlled substances on or prior to

21   December 31st, 2007, at all distribution

22   facilities operated, owned or controlled by it."

23            Do you see that?

24        A    I do.

1          Q     And paragraph 4, it says that "McKesson

2     was alleged to have failed to detect and report

3     suspicious orders of controlled substances."

4                Is it your understanding that this was

5     the basis for this settlement resulting in

6     McKesson agreeing to make changes to its diversion

7     control efforts and to pay a fine of $13.25

8     million?

9                MR. STANNER:  Object to the form, vague,

10    compound.

11               THE WITNESS:  I believe that that's what

12    it says in the document, yes.

13    BY MR. HAWAL:

14         Q     And if you look at the terms and

15    conditions below that where McKesson assumed --

16    did McKesson assume certain obligations as a

17    result of this settlement with the Department of

18    Justice and the DEA?

19         A     That's what it says in the document,

20    yes.

21         Q     Well, did you know that that was in fact

22    true as a result of your employment with McKesson?

23               MR. STANNER:  Objection.  Form.

24               THE WITNESS:  Only inasmuch as what's in

1    the document.

2    BY MR. HAWAL:

3        Q    As a result of this settlement, McKesson

4    agreed to maintain a compliance program designed

5    to detect and prevent diversion of controlled

6    substances as required under the CSA, the

7    Controlled Substances Act, and applicable DEA

8    regulations, and then it goes on to indicate that

9    McKesson would establish thresholds for controlled

10   substances.

11            Is it your understanding that that was

12   part of the obligations assumed by McKesson as a

13   result of the settlement?

14       A    That's what it says on the document,

15   yes.

16       Q    And the document also indicates that

17   McKesson would have its employees be trained in

18   the detection of suspicious orders.  True?

19       A    That's correct.

20       Q    And required McKesson to not only

21   identify orders that are suspicious but report

22   those suspicious orders to the DEA.  True?

23            MR. STANNER:  Object to the form, vague.

24            THE WITNESS:  That's correct.

```
 1   BY MR. HAWAL:

 2        Q    As an employee of McKesson, did you --

 3   would you expect that McKesson would take this

 4   obligation seriously?

 5             MR. STANNER:  Object to the form.

 6             THE WITNESS:  Since my time at McKesson,

 7   I've seen nothing more than them taking their

 8   regulatory obligations seriously.

 9   BY MR. HAWAL:

10        Q    Well, was it your -- would it be your

11   expectation that by virtue of Mr. Walker and

12   Mr. Hammergren signing this settlement agreement

13   with the DEA, that it would in fact take the

14   obligations that it is said to have assumed on

15   page 3 as being taken seriously?

16             MR. STANNER:  Object to the form,

17   speculation.

18             THE WITNESS:  I assume that to be

19   correct.

20   BY MR. HAWAL:

21        Q    At this point in time in 2008, would it

22   be fair to say that the opioid crisis in the

23   United States was exploding?

24             MR. STANNER:  Object to the form,
```

 1    characterization, vague, speculation.

 2            MR. SATIN:  And objection to the extent

 3    you're relying on your official work at the DEA,

 4    don't answer with respect to that work.

 5            THE WITNESS:  I don't know that I can

 6    answer that question.

 7    BY MR. HAWAL:

 8        Q    Well, sir, I mean, were you -- you

 9    weren't living in a DEA bubble in 2008, were you?

10    Were you paying attention to what was in the news

11    media and in various forms, whether it be print

12    or -- or television?

13        A    I was paying attention to my duties and

14    responsibilities at the Drug Enforcement

15    Administration.

16        Q    Were you also aware that in the public

17    domain, by virtue of media reports, that it was

18    prominently identified in this time period that

19    the opioid epidemic was exploding in the United

20    States?

21            MR. STANNER:  Object to the form.

22            THE WITNESS:  I know that there were

23    media articles about the opioid epidemic during

24    that time frame.

```
 1              (Plaintiffs' Exhibit No. 4 was

 2              marked for identification.)

 3              MR. HAWAL:  Andrew.

 4              I'm going to use the ELMO.

 5   BY MR. HAWAL:

 6       Q    Mr. Boggs, I'm handing you what has been

 7   marked as Plaintiffs' Exhibit 4.  It's a 2000 --

 8   May of 2002 report of the United States General

 9   Accounting Office, entitled "Prescription drugs:

10   State monitoring programs provide useful tools to

11   reduce diversion."

12              Have you seen this document?

13              MR. STANNER:  So let me just clarify,

14   Mr. Hawal.  What this appears to be is the cover

15   page --

16              MR. HAWAL:  Yeah.

17              MR. STANNER:  -- and an excerpt.  This

18   is not the entire document.  Is that accurate?

19              MR. HAWAL:  It's not the entire

20   document.

21              MR. STANNER:  I just want to clarify.

22              MR. HAWAL:  I'm just going to ask him

23   about one paragraph on page 2.  Well, actually,

24   it's on page 4.
```

```
 1   BY MR. HAWAL:

 2        Q    On the back of page 4, on the back of

 3   the exhibit that you have in front of you, it

 4   states:  "The diversion and abuse of prescription

 5   drugs are associated with incalculable costs to

 6   society in terms of addiction, overdose, death and

 7   related criminal activities.  DEA has stated that

 8   the diversion and abuse of legitimately produced

 9   controlled pharmaceuticals constitute a

10   multibillion dollar illicit market nationwide."

11             Based upon your experience, sir, is that

12   a true statement?

13             MR. STANNER:  Object to the form.

14             MR. SATIN:  And object to the extent

15   it's calling for you to rely on your time at the

16   DEA.  You can't rely on that information or

17   disclose information about your work at the DEA in

18   answering that question.

19             THE WITNESS:  I think that the abuse of

20   prescription drugs can cause societal issues and

21   costs associated with societal issues.

22   BY MR. HAWAL:

23        Q    So you do agree with that statement?

24             MR. STANNER:  Same objection.
```

```
 1                 THE WITNESS:  Without some of -- seeing

 2      some of the specific facts in terms of the

 3      adjectives used in there, I don't know whether I

 4      can necessarily agree.  I mean, it is a horrific

 5      problem in this country.

 6                 (Counsel conferring.)

 7                 (Plaintiffs' Exhibit No. 5 was

 8                 marked for identification.)

 9      BY MR. HAWAL:

10         Q    Mr. Boggs, I have handed you a

11      PowerPoint presentation marked as Exhibit 5.  Have

12      you -- have you seen this document before?

13                 MR. SATIN:  We have a document that's

14      got writing in the middle.  I don't know if that's

15      a mistake.

16                 MR. HAWAL:  No, it's -- it's the way it

17      was produced to me.  I don't know whose writing it

18      is, but...

19                 MR. STANNER:  Do you -- I see there's no

20      Bates number on it.  Are you aware of where it was

21      produced from?

22                 MR. HAWAL:  I -- I am not.  And I don't

23      have one with the Bates number on it.

24      BY MR. HAWAL:
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q    In any event, this is a document that

2  was apparently created by someone at the DEA.

3  Would that be a fair statement, Mr. Boggs?

4       A    I don't recall --

5            MR. STANNER:  Object.  Form and

6  foundation.

7            THE WITNESS:  I don't recall ever seeing

8  this document before.

9  BY MR. HAWAL:

10      Q    Well, are you familiar with the logos on

11  the front page of the document as being logos

12  associated with the Department of Justice and the

13  DEA, Office of Diversion Control?

14      A    They certainly appear to be, yes.

15      Q    Are you aware that such a meeting or

16  that such meetings occurred in approximately 2009,

17  2008, and the late 2000s?

18            MR. SATIN:  Objection.

19            MR. STANNER:  Vague.  Object to the form

20  of the question.

21            MR. SATIN:  And objection pursuant to

22  Touhy.  Do not answer that.

23  BY MR. HAWAL:

24      Q    Let's go to slide number 3 under "Closed

 1    System."

 2                    MR. HAWAL:  Do you have it?

 3                    (Counsel conferring.)

 4    BY MR. HAWAL:

 5        Q    Slide number 3.  Do you see that the --

 6    where it identifies "Closed System," it's reported

 7    that:  "When a registrant fails to adhere to their

 8    responsibilities, those violations represent a

 9    danger to the public and jeopardize the closed

10    system of distribution."

11                    Is it your understanding that as a

12    result of your work at McKesson that that is in

13    fact an accurate and true statement?

14                    MR. STANNER:  Object to the form.

15                    THE WITNESS:  I would agree that if --

16    potential failure to adhere to a responsibility

17    could have some consequences to that.

18    BY MR. HAWAL:

19        Q    And on slide number 15, this slide

20    reiterates what the obligations of a wholesaler,

21    including McKesson, is and has been since 1970 as

22    it relates to suspicious orders.  True?

23                    MR. STANNER:  Object to the form of the

24    question and foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It appears to reiterate

 2    the regulation, yes.

 3    BY MR. HAWAL:

 4        Q    And on the next page, slide 16, is it

 5    your understanding that the reporting of a

 6    suspicious order does not relieve a distributor,

 7    including McKesson, of the responsibility to

 8    maintain effective controls against diversion?

 9              MR. STANNER:  Object to the form.

10              THE WITNESS:  It's my understanding that

11    the distributors, you know, have an obligation to

12    identify and report suspicious orders, and they

13    have an obligation to maintain effective controls

14    against diversion.

15    BY MR. HAWAL:

16        Q    Well, other than just reporting

17    suspicious orders, what other obligations does a

18    distributor have such as McKesson?

19        A    I --

20              MR. STANNER:  Objection.  Calls for a

21    narrative.

22              THE WITNESS:  A distributor has a

23    responsibility to maintain security over those

24    controlled substances that are maintained in our
```

1    warehouses, and we do that through cages and

2    vaults and security cameras, and all of those

3    kinds of things, while those things are in our

4    possession.

5    BY MR. HAWAL:

6        Q    Well, we're talking about reporting

7    suspicious orders.

8             What other -- in the context of this

9    statement, what other responsibilities does a

10   distributor have which is not relieved simply by

11   reporting suspicious orders?

12            MR. STANNER:  Objection to the form of

13   the question.

14            THE WITNESS:  Well, what the -- what

15   you're asking me about is the -- maintaining

16   effective controls against diversion, and part of

17   that is the security while they're in our

18   possession.

19   BY MR. HAWAL:

20       Q    Well --

21       A    That's maintaining effective controls

22   against diversion.

23       Q    Well, let's -- let's just focus for a

24   moment on suspicious orders as this slide is

Highly Confidential - Subject to Further Confidentiality Review

 1    focused on.

 2            What other responsibilities does a

 3    distributor like McKesson have beyond simply

 4    reporting a suspicious order as it relates to

 5    suspicious orders?

 6            MR. STANNER:  Object to the form of the

 7    question.

 8            THE WITNESS:  Well, there's two

 9    different obligations that we have.  Under the --

10    as you're asking me about suspicious orders, our

11    obligation under the regulation is to design and

12    operate a system to identify suspicious orders,

13    and then report those to the DEA.  That's the

14    regulation for suspicious orders.

15    BY MR. HAWAL:

16       Q    Well, does that obligation also require

17    McKesson to not ship a suspicious order unless

18    it's determined through due diligence that it is

19    unlikely to be diverted into illicit channels?

20            MR. STANNER:  Objection to the form.

21            THE WITNESS:  I'm not -- I'm not aware

22    anywhere in the regulation it says not to ship.

23    It says to identify and report suspicious orders.

24    BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review

1    Q    Do you ship suspicious orders without

2    determining that they're going to be diverted?

3    A    Under our system today, we have a system

4    that identifies suspicious orders, we block those

5    orders, and we don't ship those orders.

6    Q    How long has that been the case at

7    McKesson that suspicious orders were blocked and

8    not shipped?

9         MR. STANNER:  Object to form.

10        THE WITNESS:  McKesson has been blocking

11   orders probably 2007, 2008.

12   BY MR. HAWAL:

13   Q    Or at least should have been, true?

14        MR. STANNER:  Object to the form of the

15   question.

16        THE WITNESS:  The regulation does not

17   say that we -- to block.  It says to identify and

18   report suspicious orders.

19   BY MR. HAWAL:

20   Q    Since you have joined McKesson, have you

21   gone back to determine what McKesson was doing

22   with suspicious orders in 2007 and 2008?

23   A    I have reviewed some materials of the

24   type of programs that they had back in -- around

1    2007, 2008.

2         Q    And was -- is it your understanding that

3    McKesson undertook a responsibility to block and

4    not ship suspicious orders?

5              MR. STANNER:  Object to the form to the

6    extent it's asking for speculation.

7              THE WITNESS:  I understand that part of

8    the program was to block an order and not ship it.

9    Yes.

10   BY MR. HAWAL:

11        Q    Is it your understanding that that was

12   one of the responsibilities that McKesson assumed

13   and undertook as part of its settlement with the

14   Department of Justice and DEA in 2008?

15             MR. STANNER:  Objection.  Speculation.

16             THE WITNESS:  I think it was part of the

17   program that they created in response to the

18   settlement agreement.

19   BY MR. HAWAL:

20        Q    In other words, McKesson made an

21   obligation or set forth an obligation and

22   undertook an obligation, according to that

23   settlement agreement, that it would not only

24   report suspicious orders to the DEA but it would

1    block and not ship suspicious orders.  True?

2              MR. STANNER:  Objection to the form,

3    speculation.

4              THE WITNESS:  I believe as part of the

5    settlement agreement that they were required or

6    agreed to design and operate a system to identify

7    suspicious orders and that they would block those

8    orders.

9    BY MR. HAWAL:

10       Q    And if we look at slide number 17, the

11   DEA, according to this PowerPoint presentation,

12   indicated that it cannot advise a distributor of

13   an order if an order is legitimate or not.

14             Do you see that?

15       A    I see that, yes.

16       Q    Has the DEA ever -- since you've been at

17   McKesson, has the DEA ever advised you or anyone

18   at McKesson otherwise than what is stated here?

19             MR. STANNER:  Object to the form to the

20   extent he knows about anyone at McKesson.

21             THE WITNESS:  I don't recall having any

22   discussions with anyone from DEA regarding that

23   specific area.

24   BY MR. HAWAL:

1          Q    Well, has DEA ever, to your knowledge,

2     informed McKesson that -- anything contrary to

3     what is stated here, that the DEA cannot advise a

4     distributor if an order is legitimate or not?

5               MR. SATIN:  And objection to the extent

6     it's asking you for your knowledge while at the

7     DEA, don't answer that.

8               THE WITNESS:  Since I've been at

9     McKesson, I have not seen anything from DEA that

10    even -- that discusses this topic.

11    BY MR. HAWAL:

12         Q    Is it your understanding as an employee

13    of McKesson that it is McKesson's obligation, and

14    not the DEA's, to determine whether an order is

15    suspicious or legitimate?

16              MR. STANNER:  Object to the form.

17              THE WITNESS:  I understand the

18    regulation requires businesses such as McKesson to

19    design and operate a system that discloses to

20    McKesson or other distributors suspicious orders

21    as defined in the regulation.

22    BY MR. HAWAL:

23         Q    Is it your understanding as an employee

24    of McKesson that it would not be appropriate

1   simply to accumulate suspicious order reports and

2   provide them in bulk to the DEA at the end of the

3   month, but, rather, the obligation is to report to

4   the DEA suspicious orders when they are

5   discovered?

6            MR. STANNER:  Object to the form of the

7   question.

8            THE WITNESS:  I'm not sure if there are

9   certain parts of agreements that McKesson may have

10  entered into with the DEA to report things in a

11  different manner other than what the regulation

12  requires.  It's my understanding a regulation

13  requires us to report them when discovered.

14  However, I know that there are certain terms of

15  the settlement agreements that somewhat deviate a

16  little bit from the way the regulation is actually

17  written.

18  BY MR. HAWAL:

19       Q    Well, are you aware of any document

20  which sets forth an agreement between the DEA and

21  McKesson whereby it would be appropriate for

22  McKesson to accumulate suspicious order reports

23  and send them in bulk at the end of a month as

24  opposed to sending them when they are discovered?

```
 1              MR. STANNER:  Object to the form.

 2              THE WITNESS:  I don't know if there's

 3    any agreements between McKesson and the DEA prior

 4    to my employment that would have deviated from the

 5    regulatory requirements.

 6    BY MR. HAWAL:

 7        Q    As a result of your work with McKesson,

 8    are you aware of any published calculations or

 9    algorithms from the DEA which informed McKesson or

10    other distributors as to what orders should or

11    should not be reported to the DEA as suspicious?

12        A    Not that I'm aware of.

13        Q    According to slide number 17, the DEA is

14    identifying to distributors that it is their

15    responsibility to determine which orders are

16    suspicious and make their own decisions as to

17    whether or not those orders should be shipped or

18    not.  True?

19              MR. STANNER:  Objection.  Vague, "true."

20              THE WITNESS:  I understand under the

21    regulations that the distributor has an obligation

22    to design and operate a system that discloses to

23    the distributor those suspicious orders.

24    BY MR. HAWAL:
```

1      Q    Since you've been with McKesson, have

2   you ever seen or are you aware of the DEA ever

3   endorsing any calculations that were proposed by

4   any distributor, including McKesson, that would be

5   used to identify suspicious orders?

6      A    Are you asking strictly for calculations

7   or --

8      Q    Yes, sir.  For -- for calculations that

9   were created or proposed by DEA on how a

10  distributor like McKesson should be used to

11  identify suspicious orders.

12          MR. STANNER:  Object to the form.

13          THE WITNESS:  Not calculations

14  specifically.  There's been other guidance, but

15  not calculations.

16  BY MR. HAWAL:

17     Q    As to your knowledge, as a result of

18  your work at McKesson, has the DEA ever published

19  or provided any kind of advisory opinion to

20  McKesson or any other distributor regarding the

21  identify -- identification of an order as

22  suspicious?

23     A    I believe that --

24          MR. STANNER:  Object -- I'm going to

```
1    object that it's vague.  Sorry.

2              THE WITNESS:  I believe if you read the

3    September 27th, 2006 letter from Joe Rannazzisi

4    that you have submitted as an exhibit to me today,

5    it puts forth some red flags that might be used in

6    understanding of -- identification of certain

7    suspicious orders.

8    BY MR. HAWAL:

9         Q    All right.  So you're referring to

10   Exhibit 1, the third page of Mr. Rannazzisi's

11   letter of September 27th, 2006?

12        A    That's correct.

13        Q    And in that letter, Mr. Rannazzisi is

14   identifying examples of circumstances that might

15   be indicative of diversion of controlled

16   substances?

17        A    I am.

18        Q    And in paragraph 1, it says:  "Ordering

19   excessive quantities of a limited variety of

20   controlled substances while ordering few, if any,

21   other drugs might be an indication that diversion

22   is occurring."

23        A    That's correct.

24        Q    And the same would be true with bullet
```

1    point number 2:  "Ordering a limited variety of

2    controlled substances in quantities that are

3    disproportionate to non-controlled medications

4    that are ordered"?

5        A    That's correct.

6            MR. STANNER:  Object -- I'm going to

7    object to the form of that question.  It's unclear

8    if you're asking if that's true or if that's what

9    it says.

10           MR. HAWAL:  I'm asking whether or not --

11   well, let me clarify.  Obviously it's what he

12   said.

13   BY MR. HAWAL:

14       Q    But do you agree that that's an accurate

15   statement?

16       A    I believe that it -- it is a red flag or

17   could be indicative of diversion, depending on the

18   facts and circumstances.

19       Q    And number 3:  "Ordering excessive

20   quantities of a limited variety of controlled

21   substances in combination with excessive

22   quantities of lifestyle drugs."  Is that an

23   accurate statement?

24       A    That's what it says, yes.

```
 1           Q     And what are lifestyle drugs?  Opioids?

 2           A     No, I believe in the context of this,

 3    lifestyle drugs may be things like testosterone

 4    or -- you know, steroids or Viagra, or other

 5    things like that, hair growth drugs.  People have

 6    different definitions of "lifestyle drugs."

 7           Q     And number 4:  "Ordering the same

 8    controlled substances from multiple distributors"

 9    could be another red flag?

10           A     That's what --

11                 MR. STANNER:  Object to the form of the

12    question.

13    BY MR. HAWAL:

14           Q     So Mr. -- and then -- and then

15    Mr. Rannazzisi has ten additional bullet points.

16    I will not read them all.  But he is attempting to

17    provide distributors with examples of what they

18    should be looking for as part of their due

19    diligence with regard to their responsibility to

20    identify suspicious orders and not ship them.

21                 MR. SATIN:  Object --

22    BY MR. HAWAL:

23           Q     True?

24                 MR. SATIN:  Objection.  Do not answer
```

```
 1    that question as it calls for the witness to

 2    testify about what Mr. Rannazzisi's intentions

 3    were back then.

 4    BY MR. HAWAL:

 5         Q    Well, would it be a fair interpretation

 6    of these various bullet points that Mr. Rannazzisi

 7    set forth on this page as setting forth examples

 8    of what distributors should look for in

 9    determining whether an order is suspicious and

10    shouldn't be shipped?  Would that be fair -- as

11    you sit here, a fair understanding of what this

12    document is intended to express?

13              MR. STANNER:  Objection to the form of

14    the question.

15              MR. SATIN:  Objection as well.  Do not

16    answer that.

17    BY MR. HAWAL:

18         Q    Are these things that you at McKesson

19    look for now as factors in determining whether an

20    order may be suspicious or not?

21         A    There may be some on here that we would

22    look at.  Most of these are focused predominantly

23    on -- on what would be a rogue internet pharmacy,

24    which in today's environment is almost
```

Highly Confidential - Subject to Further Confidentiality Review

1    nonexistent.  So we don't necessarily look at

2    these in the same context today as we might have

3    before.

4        Q    But in any event, you at McKesson would

5    not use this as an algorithm to report or to

6    identify suspicious orders.  True?

7            MR. STANNER:  Object to the form of the

8    question, "use this as an algorithm."

9            THE WITNESS:  I'm not sure I understand

10   your question.  I mean, McKesson uses today very

11   sophisticated algorithms to identify suspicious

12   orders.

13   BY MR. HAWAL:

14       Q    Well, I understand that, and the

15   algorithm is created on the basis of McKesson's

16   own input of information as to how a suspicious

17   order should be identified.  True?

18            It independently makes that

19   determination on its own?

20       A    Yes, it does.

21            MR. STANNER:  Object to the form of the

22   question.

23   BY MR. HAWAL:

24       Q    Have you -- did you see these letters

Highly Confidential - Subject to Further Confidentiality Review

1    before they went out, these Rannazzisi letters,

2    both Exhibit 1 and Exhibit 2?

3             MR. STANNER:  Object to the form of the

4    question.

5             You're referring to 2006?

6             MR. HAWAL:  Yes, and 2007.

7             MR. SATIN:  Objection.  Don't answer

8    that question.

9    BY MR. HAWAL:

10       Q    Did you have any role in drafting these

11   letters?

12            MR. SATIN:  Objection.  Don't answer

13   that question.

14   BY MR. HAWAL:

15       Q    Based upon your work at McKesson, are

16   monthly limit reports or excessive purchase

17   reports sent to the DEA as a part of its

18   suspicious order monitoring and reporting

19   requirements?

20            MR. STANNER:  Object to the form.

21   Vague.

22            THE WITNESS:  Since I've been at

23   McKesson, we have engaged with an independent

24   third-party expert in the area to develop very

1    sophisticated and dynamic thresholds that we have

2    employed as part of our due diligence program or

3    our controlled substance monitoring and suspicious

4    order reporting requirements.

5    BY MR. HAWAL:

6        Q    Does that result in McKesson sending to

7    the DEA monthly ingredient limit reports or

8    excessive purchase reports as part of its efforts

9    to identify suspicious orders?  Is that -- do you

10   do that?

11               MR. STANNER:  Object to the form of the

12   question.

13               THE WITNESS:  We report suspicious

14   orders to the DEA daily.  Some of those suspicious

15   orders may be orders that are excessive purchases

16   or orders that are unusual size.

17   BY MR. HAWAL:

18       Q    But that is based upon a due diligence

19   investigation, correct?

20               MR. STANNER:  Objection.  Vague.

21               THE WITNESS:  No, it's not.

22   BY MR. HAWAL:

23       Q    What is it based on?

24       A    It's based on the algorithm.

```
 1          Q    And who created -- who creates the

 2    algorithm?

 3          A    We hired an independent consultant that

 4    has expertise in mathematics and economics.

 5          Q    And who -- and who -- what company is

 6    that?

 7          A    The Analysis Group.

 8          Q    Do you know whether the Analysis Group,

 9    other than sending reports to the DEA, has been in

10    contact with the DEA as to how to create its

11    algorithms?

12               MR. STANNER:  Objection.  Speculation.

13               THE WITNESS:  Only inasmuch as there --

14    I attended some meetings that AGI was in where

15    they presented their calculation methodology to

16    the DEA, yes.

17    BY MR. HAWAL:

18          Q    But did the DEA ever provide its input

19    on how that methodology should be created, or did

20    it rely upon the Analysis Group to create its own

21    algorithm?

22               MR. STANNER:  Objection to the extent it

23    calls for speculation.

24               THE WITNESS:  I don't believe the DEA
```

1    provided any input when -- when I was present.

2    BY MR. HAWAL:

3        Q    Was it ever contemplated -- well, strike

4    that.

5            Since you've come to McKesson, did you

6    ever learn from the DEA that McKesson could

7    delegate to its customers the legal obligations to

8    prevent diversion of controlled substances?

9            MR. STANNER:  Objection to the form.

10            THE WITNESS:  I'm not sure I understand

11    your question.

12    BY MR. HAWAL:

13        Q    Well, we've talked about all the legal

14    obligations that a company like McKesson has as a

15    distributor to put in place a system to prevent

16    the diversion of controlled substances, right?

17        A    That's correct.

18        Q    Have you ever been told by the DEA that

19    McKesson could delegate that legal obligation to

20    its pharmacy customers?

21        A    It -- the pharmacy customers have their

22    own regulatory obligations to maintain effective

23    controls against diversion.

24        Q    So does -- does McKesson delegate its

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligations under the Controlled Substances Act to

 2    customers?

 3         A    Not to my knowledge.

 4         Q    I mean, it's McKesson's obligation, and

 5    it's a non-delegable obligation, true?

 6         A    Well, all registrants have various

 7    obligations.  So, you know, it's not just

 8    McKesson's obligation and nobody else's.

 9         Q    I under- --

10         A    Other registrants have obligations as

11    well.

12         Q    I understand.  But my question relates

13    to the obligations of a distributor like McKesson.

14    It has certain legal obligations, correct?

15         A    That's correct.

16         Q    You agree with me that McKesson cannot

17    delegate its obligations to a customer?

18         A    I agree.

19         Q    Would you agree that one of the key

20    provisions of the new Controlled Substance

21    Monitoring Program, or CSMP, that was established

22    in 2008 as a result of the settlement with the

23    Department of Justice and the DEA, was the

24    creation of thresholds?
```

```
 1              MR. STANNER:  Object to the form.

 2              THE WITNESS:  I believe that that's

 3    correct, yes.

 4    BY MR. HAWAL:

 5         Q    Is the creation of thresholds considered

 6    one of the important cornerstones of McKesson's

 7    diversion prevention efforts?

 8              MR. STANNER:  Object to the form, calls

 9    for speculation, vague.

10              THE WITNESS:  It is one -- one piece of

11    that program.

12    BY MR. HAWAL:

13         Q    Is it an important piece?

14         A    It's an important piece in terms of

15    fulfilling our obligations to report -- identify

16    and report suspicious orders.  We -- we have

17    several other parts of our program that are

18    probably much more important to our program.

19    BY MR. HAWAL:

20         Q    And if a customer wanted to exceed its

21    monthly limit or threshold for any opioid product,

22    the protocol since 2008 would require the customer

23    to provide McKesson with a legitimate business

24    reason for doing so.  True?
```

```
 1                MR. STANNER:  Objection.  Calls for

 2       speculation.

 3                THE WITNESS:  From my review of the

 4       previous program in its form, that was part of

 5       that program.

 6       BY MR. HAWAL:

 7          Q    And the obligation for a customer to

 8       provide a legitimate business reason for exceeding

 9       its limit or threshold, that would be necessary

10       before the threshold would be increased by

11       McKesson.  True?

12                MR. STANNER:  Same objection.

13                THE WITNESS:  There may be other reasons

14       to increase or decrease a threshold, but that's

15       one way that an increase would occur.

16       BY MR. HAWAL:

17          Q    Well, does McKesson still require a

18       customer to provide a legitimate business reason

19       in order to increase its limit or threshold for a

20       given opioid product?

21          A    There's different --

22                MR. STANNER:  Object -- I'm sorry.

23       Object to the form.  Just the use of the word

24       "still," assumes facts.
```

```
 1                THE WITNESS:  There's different reasons

 2     that a customer's threshold might be adjusted,

 3     whether it be upward or downward, and so there's

 4     different reasons when those thresholds are

 5     changed.

 6     BY MR. HAWAL:

 7          Q    Well, what are some of the reasons that

 8     you're aware of that would justify increasing a

 9     customer's threshold other than a legitimate

10     business reason?

11          A    We could have a glitch in our computer

12     system that didn't calculate things correctly, and

13     we would have to modify that to -- to make -- you

14     know, if you will, make the customer whole in

15     terms of their thresholds.

16                There may be other reasons outside of a

17     business reason for a customer -- for a threshold

18     to be increased.

19          Q    Give me an example of something that

20     would be outside of a legitimate business reason

21     that would justify increasing a customer's

22     threshold for an opioid pharmaceutical.

23          A    The customer may have been subject to a

24     burglary or robbery that wiped out their entire
```

1    inventory and needed to be replenished after that.

2        Q    Well, wouldn't that fall within a

3    legitimate business reason for an increase?

4        A    I certainly wouldn't consider a

5    burglary --

6        Q    Well --

7        A    -- a business reason.

8        Q    Well, it -- well, it's -- it would be a

9    business reason for -- from the perspective of the

10   customer, not from the perspective of the burglar,

11   true?

12       A    That's correct.

13       Q    If a customer wanted a threshold

14   increase without a legitimate business reason,

15   would that threshold increase -- or should that

16   threshold increase be considered a suspicious

17   order?

18            Do you understand -- let me rephrase --

19   let me rephrase the question.

20            Assuming -- let's assume a customer

21   contacts McKesson and says, Look, I need to

22   increase my threshold, and it provides no

23   legitimate business reason.  Would that be

24   considered a suspicious order?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    No.

 2        Q    What if it was shipped without a

 3   legitimate business reason, should it be

 4   considered a suspicious order?

 5             MR. STANNER:  Object to the form of the

 6   question.

 7             THE WITNESS:  If they were requesting an

 8   increase?

 9   BY MR. HAWAL:

10        Q    Yeah, if a customer requested an

11   increase, did not provide a legitimate business

12   reason, and McKesson shipped it, should that be

13   considered a suspicious order?

14             MR. STANNER:  Object to the

15   hypothetical.  Form of the question.

16             THE WITNESS:  I think you're assuming

17   that we granted the increase.

18   BY MR. HAWAL:

19        Q    Yeah, hypothetically, I'm asking you to

20   assume --

21        A    Well, I didn't think that was part of

22   the question.  I thought you just asked if they

23   had requested an increase.

24        Q    A customer requests an increase, no
```

Highly Confidential - Subject to Further Confidentiality Review

1    legitimate business reason is provided, and

2    McKesson ships -- provides the increase and ships

3    the additional product, the opioid, would that be

4    considered or should it be considered a suspicious

5    order?

6            MR. STANNER:  Object to the form of the

7    question, assumes facts, foundation.

8            THE WITNESS:  Based on your

9    hypothetical, that increase would probably not

10   have been granted in the first place.

11   BY MR. HAWAL:

12       Q    It shouldn't be granted, right?

13       A    My -- unless there was additional

14   follow-up or whatever to get some additional

15   information, that -- that increase might not have

16   been granted.

17       Q    And do you agree that the law requires

18   that suspicious orders that are blocked should not

19   be shipped to the customer?

20           MR. STANNER:  Sorry.  Object to the form

21   of the question.  "Orders that are blocked" --

22           MR. HAWAL:  Yes, sir.

23           MR. STANNER:  -- "should not be

24   shipped."

```
 1              THE WITNESS:  I don't know that there's

 2   anything in the law that there's a requirement to

 3   not ship that -- that.  It says to identify and

 4   report suspicious orders.

 5   BY MR. HAWAL:

 6       Q    So is it your position that a suspicious

 7   order that is identified and reported can be

 8   shipped or should be shipped?

 9              MR. STANNER:  Object to the form of the

10   question, calls for a legal conclusion.

11              THE WITNESS:  Under our program, we

12   block the order and don't ship it.

13   BY MR. HAWAL:

14       Q    All right.  And why do you do that?

15       A    Because we have -- we -- that is the way

16   we have structured our program.  There have been

17   recent court rulings that if you operate a

18   different type of a program to involve

19   decision-making to ship that, it requires some

20   additional due diligence before you can ship that.

21   We choose a more conservative approach in the way

22   we operate our program.

23   BY MR. HAWAL:

24       Q    You -- you do that in order to
```

```
 1   effectively exercise your responsibility to avoid

 2   diversion, true?

 3           MR. STANNER:  Object to the form.

 4           THE WITNESS:  Well, I think, first of

 5   all, you have to understand that a suspicious

 6   order does not equal a suspicious customer.  It's

 7   important to understand that -- that orders that

 8   are simply of unusual size or deviate

 9   substantially from a normal pattern or -- or

10   frequency are simply that.  Without further

11   knowing more about the customer, you don't know

12   whether or not that suspicious order is destined

13   for diversion or not.  And we know from our

14   experience, more likely than not that that's not

15   the case.

16           So to focus on a suspicious order is

17   actually misplaced.  If you really want to know

18   whether or not diversion may or may not occur, you

19   need to know the customer.  And so part of our

20   program is extensive due diligence so that we know

21   our customer.

22   BY MR. HAWAL:

23       Q    Well, the first -- the first reason to

24   be looking at your customer would be the
```

1    identification of suspicious orders, which could

2    in fact lead you to identify a suspicious

3    customer, true?

4            MR. STANNER:  Object to the form of the

5    question.

6            THE WITNESS:  Well, you could have a

7    customer that places an order for a 100-count

8    bottle of pills or one bottle of 500 pills, and

9    that would never be identified as a suspicious

10   order, and when it's shipped to the customer, the

11   customer diverts it, and it would never be

12   identified as a suspicious order.

13   BY MR. HAWAL:

14       Q    I understand that there are all sorts of

15   possibilities, but the fact of the matter is that

16   suspicious orders can lead you to a suspicious

17   customer, true?

18           MR. STANNER:  Object to the form of the

19   question.

20           THE WITNESS:  Without knowing more about

21   the customer, no.

22   BY MR. HAWAL:

23       Q    Well --

24       A    There is an assumption that a suspicious

1    order equals a suspicious customer, and that's

2    very misplaced from my experience.

3         Q    Well, sir, are you talking about --

4    what -- what experience are you talking about?

5         A    My experience at McKesson.

6         Q    Well, the -- the terms and conditions of

7    the 2008 settlement agreement called for the

8    identification and detection of suspicious orders.

9    True?

10        A    That's correct.

11        Q    Do you see one word in this entire

12   agreement that talks about suspicious customers?

13             MR. STANNER:  I'm sorry, which exhibit

14   are you referring to?

15             MR. HAWAL:  I don't remember the -- the

16   number, but it's the settlement release and

17   agreement.

18             MS. MONAGHAN:  This is 3.

19             MR. STANNER:  Obviously we don't want

20   him to read the entire thing here.

21             MR. HAWAL:  Yeah, I don't.

22   BY MR. HAWAL:

23        Q    Did you ever see anything in this

24   obligation that McKesson undertook in 2008 that

Highly Confidential - Subject to Further Confidentiality Review

1   talks about anything other than suspicious orders

2   and the need to identify them and report them?

3           MR. STANNER:  Object to the form of the

4   question, assumes facts.

5           THE WITNESS:  It talks about maintaining

6   effective controls against diversion.

7   BY MR. HAWAL:

8       Q    Mm-hmm.  And I think we went through --

9       A    Sure.

10      Q    -- a number of times that

11  paragraph 1(a) identifies suspicious orders.  And

12  by my count, it's three in that paragraph.  And if

13  you go to paragraph (c), it again talks about

14  suspicious orders.

15          But nowhere do I see anything about

16  suspicious customers.  Am I incorrect?

17      A    I don't -- without reading the entire

18  document, I don't know that it speaks to it or

19  not.  I'm not sure what your question is.

20      Q    Well, if you would like to at -- you

21  know, during the course of the break to -- to read

22  the entire document and tell me where you find

23  suspicious customers, I'll be happy to allow you

24  to come back and correct -- correct me.  Okay?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SATIN:  Counsel, I don't think he

2    can do that.  If you want him to read this now and

3    give you an answer, he can do it.  But he can't --

4    you can't ask him to do work outside of the

5    hearing.  If you want an answer --

6          MR. HAWAL:  Well, I can -- I can ask him

7    anything I'd like.  I mean, we are going to be

8    taking breaks during -- and including a lunch

9    break, and if -- if you or McKesson's counsel

10   wants to assist the witness to identify suspicious

11   customers in this document, I would be happy to do

12   that as well.

13   BY MR. HAWAL:

14      Q    As part of this settlement agreement,

15   did it -- does it appear to you that the DEA and

16   the Department of Justice expected McKesson to

17   provide its employees, including sales

18   representatives, with adequate training and

19   guidance on how to implement and obey this new

20   Controlled Substance Monitoring Program?

21          MR. STANNER:  Object --

22          MR. SATIN:  Objection -- sorry.

23   Objection.  Do not answer that as it's asking for

24   what the DEA was intending.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. HAWAL:

2        Q    You've read this -- you've read this

3    document previously, correct?

4        A    I only -- I have not read it cover to

5    cover, no.

6        Q    Well, is it your expectation as a

7    McKesson employee that McKesson's sales

8    representatives and Regulatory Affairs

9    representatives should have adequate training on

10   how to implement and effectively follow the

11   Controlled Substance Monitoring Program that

12   McKesson has created?

13            MR. STANNER:  Object to the form.

14            THE WITNESS:  I believe that that was

15   part of the settlement agreement for the -- for

16   the terms of the -- during the terms of the

17   settlement agreement.

18   BY MR. HAWAL:

19       Q    And do you believe as a McKesson

20   employee that that should be an obligation that

21   McKesson should have followed and adhere to?

22            MR. STANNER:  Object to the form.

23            THE WITNESS:  I believe that it was part

24   of the agreement during the terms of the life of
```

1    this agreement and what they were responsible for.

2    BY MR. HAWAL:

3        Q    Before creating the CSMP as a result of

4    this settlement agreement, did McKesson have what

5    is referred to as a Lifestyle Drug Monitoring

6    Program?

7        A    That's my understanding, yes.

8        Q    And in that context, lifestyle drugs

9    referred to what?

10           MR. STANNER:  Objection.  Calls for

11   speculation.

12           THE WITNESS:  From -- from reading the

13   documents, it referred to drugs that they had

14   discussed with the DEA regarding drugs that were

15   used pursuant to a rogue internet pharmacy.

16   BY MR. HAWAL:

17       Q    Drugs that were prone to diversion?

18           MR. STANNER:  Same objection.

19           THE WITNESS:  All drugs are prone to

20   diversion that are controlled.

21   BY MR. HAWAL:

22       Q    Well, we're talking about controlled

23   substances, right?

24       A    That's what I said, all controlled

1    substances are prone to diversion.

2         Q    Well, lifestyle drugs under that program

3    referred to controlled substances such as opioids?

4              MR. STANNER:  Same objection.

5              THE WITNESS:  I believe that that was

6    part of that program, yes.

7    BY MR. HAWAL:

8         Q    And under that program, did McKesson

9    also have a threshold for retail pharmacies?

10             MR. STANNER:  Same -- same objection.

11             THE WITNESS:  That was my understanding,

12   yes.

13   BY MR. HAWAL:

14        Q    And was the across-the-board threshold

15   set at 8,000 for a controlled substance,

16   individual controlled substances?

17             MR. STANNER:  Same objection.

18             THE WITNESS:  It was my understanding

19   that those were a base threshold for a -- for a

20   narrow set of controlled substances, yes.

21   BY MR. HAWAL:

22        Q    And which controlled substances did you

23   understand had an 8,000 threshold under the

24   lifestyle monitoring program?

Highly Confidential – Subject to Further Confidentiality Review

```
 1                    MR. STANNER:  Same objection.

 2                    THE WITNESS:  I'd have to go back and

 3     refer to the documents.  I haven't -- I don't

 4     recall specifically which ones.

 5     BY MR. HAWAL:

 6          Q    Well, would it -- would it include

 7     oxycodone, for example?

 8          A    I believe it did.

 9                    MR. STANNER:  Same objection.

10     BY MR. HAWAL:

11          Q    Hydrocodone --

12                    MR. STANNER:  Same objection.

13     BY MR. HAWAL:

14          Q    -- as well?

15          A    I believe it did, yes.

16          Q    And under that program, was McKesson

17     supposed to generate reports if a customer

18     exceeded a monthly purchase of 8,000 oxycodone or

19     hydrocodone pills?

20                    MR. STANNER:  Same objection.

21                    THE REPORTER:  Excuse me, did you have

22     an answer?

23                    MR. STANNER:  I thought he did.

24                    I thought you answered.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It was my understanding
 2     that they generated reports, yes.
 3     BY MR. HAWAL:
 4         Q    Okay.  And if a customer -- under that
 5     program, if a customer exceeded that threshold,
 6     McKesson was obligated to conduct a Level I,
 7     Level II or Level III investigation of that
 8     customer?
 9              MR. STANNER:  So let me just make a
10     standing objection here.
11              To the extent the questions are asking
12     him to reiterate what's in the program, it calls
13     for speculation.  It's based on hearsay.
14     Otherwise, the objection stands.
15     BY MR. HAWAL:
16         Q    Go ahead, sir.
17         A    That was my understanding, yes.
18         Q    And shipping in excess of 8,000 pills --
19     controlled substances to a customer without
20     conducting such a Level I, Level II or Level III
21     review would have been a violation of the program?
22              MR. STANNER:  Same objection.
23              THE WITNESS:  I don't know if I would
24     classify it as a violation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2        Q    Well, what would you classify it as?

 3        A    Just a -- it was a -- that was how the

 4   policy was -- or the program was structured.

 5        Q    Well --

 6        A    It wasn't -- it wasn't a legal

 7   obligation to do it in that manner.

 8        Q    Well, the program was created in an

 9   effort to prevent diversion of controlled

10   substances.  Can we agree to that?

11             MR. STANNER:  Again, same objection.

12             THE WITNESS:  I think it was -- I

13   don't -- I don't really know why it was -- I mean

14   I wasn't here at that time, so I don't know that I

15   can speak to what the intent was at that time.

16   BY MR. HAWAL:

17        Q    Well, can -- can you think of another --

18   I mean you -- you just talked about the -- that

19   your familiarity with certain components of the

20   program that set thresholds for certain controlled

21   substances like oxycodone and hydrocodone at 8,000

22   required an investigation if the customer ordered

23   more than the threshold.

24             Can you think of any reason for those
```

Highly Confidential - Subject to Further Confidentiality Review

1    policies at McKesson other than to prevent

2    diversion?

3              MR. STANNER:  Same objection.

4              THE WITNESS:  I think it was twofold.  I

5    think one was to understand and identify and

6    prevent diversion, and also to understand

7    legitimate businesses and the service of those

8    legitimate businesses.

9    BY MR. HAWAL:

10       Q    And given that understanding and -- and

11   your knowledge of those policies that were in

12   effect, if a customer exceeded the threshold

13   without a Level I, Level II or Level III

14   investigation by McKesson, and the product was

15   shipped, that would have been in violation of its

16   own policies, true?

17             MR. STANNER:  Same objection.

18             THE WITNESS:  I believe that that would

19   be correct, yes.

20   BY MR. HAWAL:

21       Q    As of 2011, did you make occasional

22   public statements expressing your frustration as a

23   DEA agent whereby you believed that certain

24   distributors were not following their obligations

```
 1    under the law to prevent diversion of controlled

 2    substances?

 3         A    I'm not sure that I agree with the

 4    characterization of it being my frustration.  I --

 5    I'm sure that I -- during that time frame, I made

 6    public statements on a variety of different

 7    topics.

 8         Q    Well, did you make some public

 9    statements that were critical of distributors with

10    respect to violating their obligations under the

11    law to prevent diversion of controlled substances?

12         A    If you have a specific example that we

13    could talk about --

14         Q    Well, we --

15         A    -- I would be more than happy to.  I --

16    I don't recall every --

17         Q    You don't recall ever doing that?

18         A    I don't recall every statement I made.

19         Q    Do you recall making a statement to

20    USA Today which was published in 2012?

21         A    During my time at DEA, I made dozens of

22    statements to the media.  I don't recall off --

23    any one in particular.

24              MR. HAWAL:  I think we're on Exhibit 6.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  (Plaintiffs' Exhibit No. 6 was

 2            marked for identification.)

 3            MR. HAWAL:  I'm going to use the ELMO.

 4    BY MR. HAWAL:

 5       Q    Mr. Boggs, I'm handing you what has been

 6    marked as Exhibit 6.  Is an article that was in

 7    the USA Today on February 28, 2012, where it says:

 8    "DEA aims big to stem painkiller black market."

 9    And then below that it says:  "Cardinal Health

10    says it didn't look the other way."

11            Do you remember seeing this article at

12    or near the time that it came out?

13       A    I don't recall it, no.

14       Q    All right.  If we go to -- I think it's

15    the fourth page, it attributes certain statements

16    to you.  And the paragraph starts with:  "'Within

17    the closed system, each license holder has

18    responsibilities to maintain control of the drugs

19    and keep them from getting to illegitimate

20    players,' DEA Special Agent Gary Boggs said."

21            First of all, is that an accurate

22    statement?

23            MR. STANNER:  Object to the form, vague.

24            THE WITNESS:  The registrants have a
```

```
 1    legal obligation to maintain effective controls --
 2    BY MR. HAWAL:
 3         Q    So it is --
 4         A    -- against diversion.
 5         Q    It is an accurate statement.
 6         A    I agree.
 7         Q    And do you deny having made that
 8    statement to a USA Today reporter in that context?
 9         A    I don't.
10         Q    Do you deny having a conversation with a
11    USA Today reporter about the subject of diversion
12    of controlled substances and distributors'
13    obligations?
14         A    I do not.
15         Q    Okay.  And then it goes on to say:
16    "'The law requires distributors, such as Cardinal
17    Health, to have systems to detect suspicious
18    orders, which must then be reported to the DEA.
19    The Agency repeatedly warns distributors that the
20    size of an order alone triggers the distributors'
21    responsibility to report it to the DEA,' Boggs
22    said."
23              First of all, was that an accurate
24    statement?
```

```
 1              MR. STANNER:  Object to the form.

 2    Accurate that it's there, or accurate that he said

 3    it, or is the statement itself substantively

 4    accurate?

 5              THE WITNESS:  I believe you read it

 6    correctly.

 7    BY MR. HAWAL:

 8         Q    Well, is it -- is it a true statement?

 9         A    It's a paraphrase of the regulation,

10    yes.

11         Q    Again, do you have any reason to deny

12    having made that statement to a USA Today

13    reporter?

14         A    I do not.

15         Q    Then it says:  "'Distributors must cut

16    sales to those drugstores with suspicious orders,

17    even if they have a valid DEA license,' he said."

18              Is that also a true statement?

19              MR. STANNER:  Same objection.

20              THE WITNESS:  I don't know that I agree

21    with the characterization of that.  We have an

22    obligation to maintain effective controls against

23    diversion, and if that means stopping sales, that

24    could be, based upon the facts and circumstances,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the outcome.

 2    BY MR. HAWAL:

 3        Q    And then it has a statement in

 4    quotations:  "If all those players involved are

 5    either complicit or not doing their due diligence

 6    correctly, that whole system comes tumbling down."

 7             Do you disagree that you made that

 8    statement?

 9        A    I don't.

10        Q    And then below that it has further

11    statements attributable to you.  It says:

12    "'Distributors can act more quickly than law

13    enforcement if they know something is wrong,'

14    Boggs said."

15             Do you have any reason to dispute having

16    said that statement?

17             MR. STANNER:  Again, I'm going -- I'm

18    going to object to the foundation on all the

19    questions that are clearly paraphrases and not

20    quotations.

21    BY MR. HAWAL:

22        Q    Do you agree -- do you have any reason

23    to disagree that you made such a statement or a

24    statement to that effect?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A     I do not.

2          Q     And then it goes on to say:  "'We have

3    to investigate things in a different manner than a

4    company that can act on a suspicious order.  We

5    have to meet constitutional and legal

6    requirements.  They don't have to sell to

7    someone,' Boggs said.  'They have a moral

8    obligation as keepers of powerful and dangerous

9    substances to make sure those substances are used

10   for legitimate medical purposes.'"

11               Do you have any reason to dispute having

12   made those statements?

13         A     I do not.

14         Q     Looking at the context of these

15   statements and in terms of what this article is

16   reported to be about, would it be fair to say that

17   you as a DEA agent at the time were expressing

18   dissatisfaction or frustration with certain

19   distributors as to their failure to maintain

20   effective controls to prevent the diversion of

21   controlled substances?

22               MR. STANNER:  Object to the form.

23               MR. SATIN:  And I -- objection.  I'm

24   objecting pursuant to Touhy.
```

Highly Confidential - Subject to Further Confidentiality Review

1           I don't quite understand the question.

2    You can ask him about what he said but not why he

3    said it or what was going on at DEA at the time

4    that may have informed this statement.

5           MR. HAWAL:  Counsel, this -- this is --

6    he clearly made a public statement, and I believe

7    that the Touhy requirements allow me to explore

8    the circumstances of this public statement.  I

9    don't understand how you can object in the context

10   of what he says here.

11          MR. SATIN:  So I -- I had a conversation

12   with the AUSA, Mr. Bennett, on this subject, and

13   while it's permissible to ask about the fact of

14   those public statements, but what is behind those

15   statements, the circumstances, the motives, the

16   background material, that is off-limits.  That's

17   an issue you'll have to take up with the

18   government.

19          MS. KASWAN:  We've been going quite a

20   while.  Can we take a break?

21          MR. STANNER:  The witness is fine, so

22   we're happy to keep going.  Obviously, people

23   should feel free to use the restroom.

24          MS. KASWAN:  I could use a break.

```
 1              THE VIDEOGRAPHER:  The time is

 2    11:24 a.m.  We're going off the record.

 3              (Recess.)

 4              THE VIDEOGRAPHER:  The time is

 5    11:41 a.m., and we're back on the record.

 6    BY MR. HAWAL:

 7         Q    Mr. Boggs, continuing on with the

 8    USA Today article that we've been discussing,

 9    there's another statement that is attributable to

10    you, and it says:  "'You can have the ostrich

11    approach.  You can stick your head in the sand and

12    ignore blatant signs,' Boggs said."

13              And then it goes on to say:  "This

14    company is sitting in a state that has been the

15    epicenter of the problem.  It's no secret that the

16    drug of choice is oxycodone.  I don't think you

17    have to be that strong of an investigator to put

18    two and two together," close quote.

19              Are those statements that you would have

20    made?

21              MR. STANNER:  Object to the form of the

22    question, the word "attributable."

23              THE WITNESS:  I -- I believe that

24    they're correct, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2       Q    Were these -- were these the kinds of

 3   statements that are attributive -- attributed to

 4   you in this article that you would have been

 5   generally making during this frame?

 6            MR. STANNER:  Object to the form of the

 7   question.

 8   BY MR. HAWAL:

 9       Q    In 2012.

10            MR. STANNER:  Same objection.

11            THE WITNESS:  I don't know that I

12   understand your question when you say --

13   BY MR. HAWAL:

14       Q    Well --

15       A    -- "generally making."

16       Q    Well, were these the kinds of statements

17   that you were generally making to individuals who

18   would have been inquiring about the opioid crisis

19   and certain distributors not living up to their

20   obligations under federal regulations?

21            MR. SATIN:  Counsel, I'm sorry to

22   interrupt.  Are you asking about statements he was

23   making --

24            MR. HAWAL:  In the public domain.
```

Highly Confidential - Subject to Further Confidentiality Review

1            MR. SATIN:  -- in the public domain?

2            MR. HAWAL:  Yes, sir.

3            THE WITNESS:  This is a statement I made

4    in this particular article.  I don't recall every

5    statement that I made during that time frame.

6    BY MR. HAWAL:

7        Q    Let me ask you this:  When you left DEA,

8    did you get some type of clearance from the DEA to

9    go work for McKesson?

10       A    I believe that I was interviewed by

11   McKesson counsel on -- on that.

12       Q    Well, I'm not so concerned about

13   McKesson's counsel.  But did you seek clearance

14   from the DEA to go work for a distributor?

15       A    I don't recall doing that, no.

16       Q    So you don't have any type of written

17   agreement with the DEA that allowed you to go work

18   for McKesson?

19       A    I do not.

20       Q    Okay.  So as far as you know, there were

21   no restrictions placed upon you by the DEA as to

22   what you could or could not communicate with

23   McKesson about as it relates to your pre, or --

24   prior employment with the DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. STANNER:  Object to the form of the

 2      question.

 3                    THE WITNESS:  I don't have any

 4      restrictions that I'm aware of, no, other than

 5      what we're talking about today.

 6                    MR. STANNER:  Mr. Hawal, I think someone

 7      on the phone is complaining about the microphones.

 8                    Can the people on the phone hear us?

 9                    (UNIDENTIFIED SPEAKER):  It sounds like

10      the mics have been turned down a little bit.  I

11      don't know if there's a way to adjust the volume.

12      We were fine before the break.

13                    MR. STANNER:  I think we just tried to

14      do that.  Has there -- have you -- have you

15      noticed any change?  We just tried -- we just

16      changed the volume.

17                    (UNIDENTIFIED SPEAKER):  No, not yet.

18                    THE VIDEOGRAPHER:  Do you hear anything

19      better now?

20                    (UNIDENTIFIED SPEAKER):  Yes.  Much

21      better.  Thank you.

22                    MR. STANNER:  Great.  If people on the

23      phone could mute their phones, that would be very

24      helpful.  Thanks.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                (Plaintiffs' Exhibit No. 7 was

 2                marked for identification.)

 3    BY MR. HAWAL:

 4        Q     Mr. Boggs, I'm handing you what has been

 5    marked as Plaintiffs' Exhibit 7, which is a

 6    different article but also from 2012.  And this

 7    was published in Bloomberg Businessweek.  The

 8    title of the article is "American Pain:  The

 9    Largest U.S. Pill Mill's Rise and Fall."  "There

10    were 335 million prescriptions for painkillers

11    written in 2011.  Is it any wonder some of them

12    were from criminals?"

13                And my question is, do you recall being

14    interviewed by someone from Bloomberg Businessweek

15    at or around this time where you made certain

16    statements that were -- that appeared in this

17    article?

18        A     I do not.

19        Q     I'm going to put on the screen a

20    paragraph that has certain statements that are

21    attributable to you.  And it says:  "Gary Boggs,

22    Special Agent with the DEA's Office of Diversion

23    Control says, 'The cases that the DEA has brought

24    in recent years involved wholesalers knowingly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    making enormous sales to customers that were

 2    per se in violation of DEA rules.  The notion put

 3    out by HDMA that somehow or another the DEA is not

 4    providing essential information to them is simply

 5    not accurate,' says Boggs.  'It's a smoke screen.

 6    It's a step out of desperation.'"

 7              Do you remember making such statements

 8    in 2012?

 9              MR. STANNER:  Object to the form,

10    compound.  Vague if you're referring to the

11    quotation on the preceding sentence.

12              MR. HAWAL:  Yes.

13    BY MR. HAWAL:

14         Q    Do you -- do you remember making such

15    statement?

16              MR. HAWAL:  I'm sorry?

17              MR. STANNER:  I'm sorry, you said,

18    "Yes."  Do you mean -- are you referring just to

19    the quotation --

20              MR. HAWAL:  Yes.

21              MR. STANNER:  -- or to the entire --

22              MR. HAWAL:  Yeah, quotations.

23              THE WITNESS:  I -- I don't recall making

24    them.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HAWAL:

 2        Q    Were these statements that were

 3    consistent with statements that you would have

 4    been making at that time in the public domain?

 5        A    It appears a statement that I made for

 6    this article.

 7        Q    Okay.  And in -- in June of 2012, were

 8    you still a DEA employee or had you retired as of

 9    that time?

10        A    I retired at the end of that month.

11        Q    Okay.  I'm going to hand you another

12    exhibit.  I think we're at Exhibit 8.

13            (Plaintiffs' Exhibit No. 8 was

14            marked for identification.)

15    BY MR. HAWAL:

16        Q    With regard to the statement that was in

17    the Bloomberg publication, you referred to HDMA.

18    HDMA is the trade association for pharmaceutical

19    wholesalers like McKesson and Cardinal and

20    AmerisourceBergen?

21        A    It was formerly HDA -- or HDMA.  Now

22    it's HDA.  Yes, it is.

23        Q    And you have attended HDMA meetings?

24            MR. SATIN:  Are you asking about since
```

```
 1    he left the government or before?

 2    BY MR. HAWAL:

 3        Q    Well, let's talk about since you left

 4    the DEA, have you attended HDMA meetings?

 5        A    I don't believe I have, no.

 6        Q    Sir, I'm handing you Exhibit No. 8,

 7    which is a summary of a DEA/HDMA meeting,

 8    December 19th, 2011.  At the bottom, there's a

 9    bottom paragraph that discusses statements

10    attributable to you.

11             In two thousand -- in December of 2011,

12    would you have stated that:  "The DEA's single

13    greatest concern was the belief that wholesale

14    distributors were lax in analysis, review and

15    acting on their own ARCOS data"?

16             MR. SATIN:  Mr. Boggs, I'm going to

17    object to the extent that question calls for you

18    to disclose non-public information based on your

19    work when you were at DEA.

20             THE WITNESS:  I don't believe I can

21    answer that question.

22    BY MR. HAWAL:

23        Q    At that time, would you have stated that

24    the data that you were seeing from wholesalers
```

Highly Confidential - Subject to Further Confidentiality Review

1    was, quote, pretty egregious, close quote?

2             MR. SATIN:  Same instruction.

3    BY MR. HAWAL:

4        Q    Would you have said that:  "The DEA had

5    not seen" --

6             MR. HAWAL:  The next page, Evan.

7    BY MR. HAWAL:

8        Q    -- "had not seen changes in registrants'

9    behavior that it expected after presenting its

10   analysis of ARCOS data to them, so we have upped

11   our game"?

12            MR. SATIN:  Same instruction.

13            THE WITNESS:  I don't believe at this

14   time I can answer that question.

15   BY MR. HAWAL:

16       Q    The second paragraph of that page says

17   that:  "DEA stressed this point repeatedly

18   throughout the meeting.  They seemed frustrated

19   and stated this was occurring even among wholesale

20   distributors that had been in DEA's suspicious

21   educational meetings and even among those who had

22   suspicious SO monitoring programs."

23            "SO" would be suspicious order

24   monitoring programs?

```
 1          A    That's what it says in the document,

 2   yes.

 3          Q    "Their belief is that if the wholesale

 4   distributors were to look at their own data,

 5   problem customers would be very evident."

 6               Were these statements that you were

 7   convey -- conveying to the distributor trade --

 8   trade organization, trade association during this

 9   time frame?

10               MR. SATIN:  Same --

11               MR. STANNER:  Object --

12               MR. SATIN:  Same instruction.

13               MR. STANNER:  Object to the form of the

14   question.

15               THE WITNESS:  I don't believe at this

16   time I can answer that question.

17   BY MR. HAWAL:

18          Q    Mr. Boggs, since you went to McKesson,

19   were you aware or did you become aware that the

20   DEA continued to investigate McKesson and its

21   failures to live up to the 2008 settlement

22   agreement and its own obligations that it assumed

23   as a part of that agreement?

24               MR. STANNER:  Objection to the form of
```

Highly Confidential - Subject to Further Confidentiality Review

1    the question, compound, vague, misstates.

2            THE WITNESS:  I'm aware since I came to

3    McKesson that there had been an investigation of

4    the company related to that, that resulted in a

5    settlement, yes.

6    BY MR. HAWAL:

7        Q    And have you undertaken since you joined

8    McKesson to look at the basis for the charges by

9    the Department of Justice and the DEA that led to

10   the later settlement by McKesson?

11           MR. STANNER:  Object to the form of the

12   question.  I object to the use of the word

13   "charges by the Department of Justice."  I'm not

14   aware of any such thing.

15           THE WITNESS:  I have -- I reviewed the

16   settlement agreement and the terms within the

17   settlement agreement.

18   BY MR. HAWAL:

19       Q    Was it any part of your obligation or

20   job function to look at McKesson's failures since

21   2008 in order to try and correct them or improve

22   McKesson's Controlled Substance Monitoring

23   Program?

24           MR. STANNER:  Object to the form, vague.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  There are certain terms

 2    and requirements under that settlement agreement

 3    that I'm responsible for overseeing that, and part

 4    of my job is to oversee ways that we can continue

 5    to evolve and improve our program to make sure

 6    that we're doing the best that we can to adhere to

 7    our regulation -- our regulatory obligations.

 8    BY MR. HAWAL:

 9         Q    Well, would you agree with me that it

10    would be difficult to make improvements if one

11    didn't go back and determine where improvements

12    were necessary or needed?

13              MR. STANNER:  Object to the form,

14    misstates the testimony.

15              THE WITNESS:  I -- I think in some times

16    that's an opportunity to do that.  I think other

17    times you have to take into consideration that,

18    you know, what may or may not have led to some

19    issues that, you know, many years ago was for a

20    different time and different type of diversion

21    scheme where the red flags may have been different

22    than what they are today.

23              So I want to make sure that I'm not

24    looking at things that are no longer valid in
```

1    today's environment, so I'm looking more forward

2    and what is today's thread, if you will, of

3    diversion, and how best that we can identify that.

4    Not necessarily looking retrospective to schemes

5    that are no longer a relevant factor.

6    BY MR. HAWAL:

7        Q    Well, you would agree generally that if

8    one doesn't look at past mistakes, one won't learn

9    from their past mistakes.  Is that true?

10            MR. STANNER:  Object to the form of the

11   question.

12            THE WITNESS:  I think that that's

13   generally a -- a solid thing.

14            (Plaintiffs' Exhibit No. 9 was

15            marked for identification.)

16            MR. HAWAL:  Evan, 880.

17   BY MR. HAWAL:

18       Q    Mr. Boggs, I've handed you what has been

19   marked as Plaintiffs' Exhibit 9, bearing Bates

20   stamp MCK-AGMS-0060000880.

21            It is a PowerPoint presentation, "State

22   of Prescription Drug Abuse," with McKesson's name

23   at the top, and your name and the term "Olive

24   Branch."

```
 1              Do you recall this PowerPoint

 2    presentation?

 3         A    I do.

 4         Q    Did you have a chance to review this

 5    when you were preparing for this deposition with

 6    your counsel?

 7         A    I --

 8              MR. STANNER:  Objection to the extent it

 9    calls for privileged information.

10    BY MR. HAWAL:

11         Q    Did you review this?

12         A    I've looked at this document, yes.

13         Q    As part of your preparation for this

14    deposition?

15         A    I did.

16         Q    And this was prepared -- what does

17    "Olive Branch" mean?

18         A    Olive Branch is where the McKesson's

19    national redistribution center is.  It's Olive

20    Branch, Mississippi.

21         Q    Okay.  And this would have been prepared

22    after you left the DEA?

23         A    It would.

24         Q    Did it contain information that you
```

Highly Confidential - Subject to Further Confidentiality Review

1    would have learned or become aware of when you

2    worked for the DEA?

3         A    It did.  It does.

4         Q    Did you seek and obtain any clearance

5    from the DEA to make this presentation or put this

6    material together?

7         A    I did not.

8         Q    Now, when you reviewed this PowerPoint

9    presentation, did it appear to you to be correct

10   and accurate?  Was there anything -- or was there

11   anything that stood out as being inaccurate or

12   that you deemed required correction?

13        A    I --

14             MR. STANNER:  You're asking -- I'm

15   sorry, Counsel, you're asking at the time it was

16   prepared or since then?

17             MR. HAWAL:  No, when you -- when he

18   reviewed it in preparation for his deposition.

19             MR. STANNER:  My mistake.

20             THE WITNESS:  When I reviewed it, it

21   appeared to be an accurate representation of the

22   presentation that I gave.

23   BY MR. HAWAL:

24        Q    And when was it presented and -- and

```
 1    where?

 2         A    It was presented at the national

 3    redistribution center, McKesson's national

 4    redistribution center in Olive Branch,

 5    Mississippi.  It would have been probably sometime

 6    in the summer of 2013.

 7         Q    And this was when you were retained to

 8    be a consultant for McKesson?

 9         A    It was.

10         Q    And who was in attendance for you to

11    present this to?

12         A    The individuals that were part of

13    McKesson's Regulatory Affairs program were in

14    attendance.  There were representatives at the

15    distribution center leadership team, such as a

16    distribution center manager or a distribution

17    center director of operations from across the

18    country were in attendance.  Don Walker was in

19    attendance.  There were several other individuals.

20    I don't recall every single one of them.

21         Q    When you prepared this PowerPoint

22    presentation, were you using and/or including

23    information which you considered to be accurate?

24         A    I was using information related to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the -- the presentation.  I mean, I --

 2         Q    Well, did you --

 3         A    -- I wasn't trying to provide any

 4    inaccurate information.

 5         Q    Well, I assume that when you were making

 6    this presentation to McKesson, you were intending

 7    to provide accurate information, true, as you

 8    understood it?

 9         A    Absolutely.

10         Q    Okay.  And the title of the -- on the

11    next page is "The Impact of Effective Compliance:

12    Protecting America from Prescription Drug

13    Diversion."

14              Is that a title that you created?

15         A    It is.

16         Q    And if we go to page 883, you have two

17    planes colliding, and you're referring to two

18    drugs, two opioid drugs, oxycodone and Percocet.

19              What was your purpose of having two

20    airplanes colliding in midair with that slide?

21         A    The purpose is to grab the attention of

22    the audience and recognize something significant.

23         Q    Okay.  And the last bullet point on that

24    page, you indicate that "Manufacturers fueled the
```

1    use of prescription painkillers."

2              What did you mean by that statement?

3         A    What I meant by that statement, which is

4    reflected in the -- the next slide, is an example

5    of a manufacturer who was involved in an

6    investigation or a settlement with the government

7    that was about the false or misleading of

8    OxyContin, which was specifically to Purdue

9    Pharma.

10        Q    And the next page references Purdue

11   Pharma in a $635 million fine that was imposed on

12   Purdue for misleading advertising about its

13   OxyContin product?

14        A    That's correct.

15        Q    And you -- you consider that to be one

16   of the causes of the opioid crisis in the United

17   States?

18              MR. STANNER:  Object to the form of the

19   question.

20              THE WITNESS:  I think it has a

21   contributing factor, yes.

22   BY MR. HAWAL:

23        Q    And then the next page, you reference a

24   company, Cephalon, in a $425 million fine, which

1    it ended up agreeing to pay as a result of

2    inappropriate marketing of its drug fentanyl?

3         A    That's correct.

4         Q    Again, a factor that you considered to

5    be contributing to the opioid crisis in the United

6    States?

7              MR. STANNER:  Object to the form.

8              THE WITNESS:  I did.

9    BY MR. HAWAL:

10        Q    And then the next page you have a chart

11   or graph depicting rising opioid deaths, sales,

12   and treatment admissions from 1999 to 2010.

13   Correct?

14        A    I do.

15        Q    Would you agree, sir, that as -- the

16   quantity of opioids that are diverted into the

17   illicit marketplace has a direct relationship to

18   increases in deaths of patients as well as

19   treatment admissions?

20             MR. STANNER:  Object to the --

21             MR. SATIN:  Objection to form.

22             MR. STANNER:  Object to the form of the

23   question, use of the phrase "diverted into the

24   illicit marketplace."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't think that that's

 2   what this slide represents, so I don't agree with

 3   the way you've characterized that.

 4   BY MR. HAWAL:

 5       Q    So are you saying that you do not agree

 6   that as greater amounts of opioid pills are

 7   diverted into the illicit marketplace, that the

 8   probability is that the number of addictions and

 9   deaths will increase?

10              MR. STANNER:  Same -- same objection.  I

11   think it --

12              MR. HAWAL:  I understand.  All you have

13   to do is say, "Objection," Andrew.

14              MR. STANNER:  Okay.

15              MR. HAWAL:  That would be appreciated,

16   because the rules require no speaking objections.

17              MR. STANNER:  I'm just trying to be

18   helpful.

19   BY MR. HAWAL:

20       Q    Sir?

21              MR. HAWAL:  I understand.  Thank you.

22              THE WITNESS:  I -- I think there is a

23   correlation between diversion and -- and

24   associated problems with diversion.
```

```
 1   BY MR. HAWAL:

 2        Q    Well, true.  And the greater the amount

 3   of diversion, the greater the likelihood is of

 4   ensuing harm, such as addiction and death.  True?

 5        A    I believe that's a fair statement, yes.

 6        Q    What was the source of this information

 7   used to create this graph or chart?

 8        A    I -- I don't recall.

 9        Q    And two slides later, you have "Checks

10   and Balances under the CSA."

11             CSA refers to the Controlled Substances

12   Act?

13        A    It does.

14        Q    And are you quoting the Act as to what

15   the obligations of a wholesaler are in order to

16   identify a controlled substance -- or identify

17   suspicious orders as part of its obligation to

18   prevent diversion?

19        A    Not --

20             MR. STANNER:  Object to form.

21             THE WITNESS:  I'm sorry.

22             Not necessarily the Act but the

23   implementing regulation.  This is part of the

24   regulation.  But, yes, I'm quoting that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HAWAL:

 2         Q    And you have a slide, and,

 3    unfortunately -- well, let me reference the Bates

 4    number, 892, where you have a graph -- well, you

 5    have photograph depicting what can happen when the

 6    types of checks and balances are not followed,

 7    correct, and you have a collapsing building?

 8         A    That's what's on the slide, yes.

 9         Q    Are you trying to emphasize how

10    important it is for distributors like McKesson to

11    strictly follow their legal obligations under the

12    Controlled Substances Act and the federal

13    regulations relating to controlled substances?

14         A    What I'm trying --

15              MR. STANNER:  Object to the form,

16    compound.

17              THE WITNESS:  What I'm trying to depict

18    here is, is all of the members within the closed

19    system of distribution, which would include

20    distributors, but it's not just isolated to them.

21    It's for all of them, all the --

22    BY MR. HAWAL:

23         Q    Including --

24         A    -- responsible --
```

1          Q     Including manufacturers of opioids,

2     right?

3          A     And pharmacists -- or pharmacies and

4     pharmacists and doctors.

5          Q     On page 897, you reference "Florida pill

6     mills, resulting oxy spills."

7                Was there a particular problem in

8     Florida in the late 2000s, including 2009 and

9     2010, as it related to large quantities of opioids

10    being diverted into the illicit marketplace?

11         A     There was a significant diversion scheme

12    related to pain -- rogue pain clinics or what were

13    often referred to as pill mills.

14         Q     And where were those pill mills getting

15    their OxyContin, do you recall?

16               MR. STANNER:  Object to the form.

17               MR. SATIN:  And objection to the extent

18    it's asking for you to disclose information from

19    the -- your official work at DEA.

20               THE WITNESS:  I don't think I can answer

21    that question at this time.

22    BY MR. HAWAL:

23         Q     Well, did you tell your audience when

24    you presented this slide in 2013 what the source

```
 1     of the OxyContin was in Florida?

 2               MR. STANNER:  Object to the form,

 3     "source."

 4               THE WITNESS:  Well, this is not related

 5     specifically to OxyContin.  This is related to

 6     oxycodone, which is --

 7     BY MR. HAWAL:

 8          Q    Okay.  Oxycodone.  I apologize.

 9          A    -- which is broader.

10          Q    Did you tell your audience where the

11     oxycodone was being obtained?

12               MR. STANNER:  Same objection.

13               THE WITNESS:  I don't recall.

14     BY MR. HAWAL:

15          Q    Do you recall that it was from -- at

16     least partially from Mallinckrodt?

17               MR. SATIN:  Same --

18               MR. STANNER:  Same objection.

19               MR. SATIN:  Same instruction.

20               THE WITNESS:  I don't believe I made

21     that statement at all.

22     BY MR. HAWAL:

23          Q    On the next slide, 898, you indicated

24     oxycodone deaths in Florida rose from 340 in 2005
```

 1    to 1516 in 2010, a 346 percent increase.

 2              Do you recall where you obtained that

 3    information?

 4         A    I believe I obtained that information

 5    from the Florida Medical Examiner's public

 6    website.

 7         Q    And then on page 903, you have a slide

 8    that references:  "A national epidemic:  More than

 9    45 people die per day from prescription opioids."

10    And then you have some statistics.

11              And then you have the last sentence:

12    "Economic impact to America, $57 billion per

13    year."

14              Do you recall where you obtained that

15    data?

16         A    I believe there was a study published

17    that was publicly available on the internet that I

18    obtained that from.  I don't recall the -- the

19    exact study, but I recall obtaining it off of the

20    internet.

21         Q    And -- and do you -- and do you recall

22    what kind of economic impact was being measured

23    when it was being referred to as 57 -- $57 billion

24    per year?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I don't recall specifically, no.   There

 2   was several different areas.  I just don't recall

 3   specifically which ones.

 4        Q    Well, was it -- was it primarily

 5   economic impact or largely economic impact to

 6   municipalities, counties and states --

 7             MR. STANNER:  Object to the form.

 8   BY MR. HAWAL:

 9        Q    -- across the United States?

10             MR. STANNER:  Sorry.  Object to the

11   form, asked and answered.

12             THE WITNESS:  I don't recall it being

13   that specific.  I recall it being more of -- loss

14   in work productivity, things like that, addiction

15   or something like that.  But I don't recall it

16   specifically drilling down to what a county or

17   city would -- the amount attributable to that.  I

18   don't recall that.  I recall it more lost wages,

19   lost productivity.

20   BY MR. HAWAL:

21        Q    Have you seen any studies or statistics

22   that reference the cost to communities, both

23   cities and counties and states, as it relates to

24   the economic impact of the opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. STANNER:  Object to the form.

 2                THE WITNESS:  Not that I recall

 3   specifically that, no.

 4   BY MR. HAWAL:

 5        Q    The next slide says:  "Are we

 6   contributing to the problem," question mark.

 7                Are you -- you're referring to

 8   distributors, right?

 9        A    I am.

10        Q    And you're referencing problems that you

11   have seen as to what a distributor -- what certain

12   distributors have been doing to contribute to the

13   opioid crisis, correct?

14        A    The bullets that are in here are focused

15   specifically on a diversion scheme, and in this

16   case it would have been a pill mill or rogue pain

17   clinic.  But that -- that was the focus of -- of

18   this particular slide and what some of the bullets

19   might be associated with that.

20        Q    Well, a pill mill is not going to get

21   pills unless it gets them directly from a

22   distributor or manufacturer, correct?

23                MR. STANNER:  Object to the form.

24                THE WITNESS:  Generally speaking, that's
```

Highly Confidential - Subject to Further Confidentiality Review

1    true.

2    BY MR. HAWAL:

3        Q    Yeah.  And are you trying to emphasize

4    that part of the problem that was occurring with

5    certain pill mills is that distributors were

6    shipping controlled substances in exorbitant

7    amounts as one factor?

8            MR. STANNER:  Same objection.

9            THE WITNESS:  I believe it was more of

10   in terms of a specific or cumulative amounts that

11   would be going to a single location over a period

12   of time.

13   BY MR. HAWAL:

14       Q    I mean, for example, if a small

15   community in a given state that has, you know, 600

16   adults -- you know, a population of 600 adults and

17   is getting hundreds of thousands of opioid pills

18   provided to one pharmacy in such a small

19   community, that would indicate to you an example

20   of an exorbitant amount of pills going to a

21   potentially suspicious customer.  Fair?

22       A    It could be, yes.

23       Q    This PowerPoint also supports the

24   proposition that the greater the number of opioid

```
 1   pills diverted, that the greater the likelihood of

 2   harm to patients.  True?

 3        A    I'm sorry, where are we at?  Which slide

 4   are you on?

 5        Q    The same one that we've been

 6   referencing.  I mean that's -- that supports

 7   the --

 8        A    I'm not sure which bullet you're looking

 9   at.

10        Q    Well, I'm looking at the entire -- the

11   totality of the bullet points that you raise in

12   this that would support the notion that the

13   greater number of opioid pills that are diverted,

14   the greater the likelihood of harm that is caused.

15   True?

16             MR. STANNER:  Object to the form.

17             THE WITNESS:  I don't think that that's

18   what this slide -- this slide doesn't talk about

19   harm.

20   BY MR. HAWAL:

21        Q    Well, what other than harm would result

22   from an exorbitant amount of pills being shipped

23   to a given community where there's a known

24   epicenter of diversion?
```

```
 1              MR. STANNER:  Same -- same objection.

 2              THE WITNESS:  I mean there can be

 3   certain situations where an exorbitant amount is

 4   totally legitimate.  I mean on its face,

 5   exorbitant amount is a red flag.  It doesn't

 6   necessarily mean where you can jump to the

 7   conclusion an exorbitant amount automatically is

 8   diversion.

 9   BY MR. HAWAL:

10      Q    I'm not -- I'm not saying automatically,

11   but generally speaking, would you agree that an

12   exorbitant amount going to a small community that

13   is also in the epicenter of diversion, that that

14   would be consistent with a greater degree of harm?

15      A    I think it requires a greater -- you

16   know, more diligence to determine what's going on

17   and what the factors are there, and maybe it's

18   diversion or maybe there's a legitimate reason.

19      Q    Well, are you -- are you -- did you

20   create this slide because you knew that this had

21   been happening?

22      A    I created this slide because of the

23   rogue pill mills in Florida.

24      Q    So you knew that this was happening,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    exorbitant amounts of -- of opioids were being

 2    provided to certain customers by distributors in

 3    areas that were known to be epicenters of

 4    diversion.  True?

 5              MR. STANNER:  Object to the form.

 6              THE WITNESS:  For the pill mill, yes,

 7    that was the purpose of the slide.

 8    BY MR. HAWAL:

 9         Q    And each of these factors would be a

10    potential red flag that a distributor should be

11    looking at.  Correct?

12         A    They are -- they are red flags that you

13    should look at, yes.

14         Q    And these would be red flags that would

15    not have been first known in 2013, but would have

16    been red flags that distributors should have been

17    aware of for many years.  True?

18              MR. STANNER:  Object to the form.

19              THE WITNESS:  I don't know that that's

20    necessarily the case.  We're -- we're talking

21    about a couple of significant diversion schemes

22    that occurred at a period of time that have

23    never -- never happened before in this country.

24    So the red flags sometimes are very specific to
```

1  that criminal scheme that may not be applicable to

2  other types of schemes or other day-to-day

3  operations of regular pharmacies or practitioners.

4  BY MR. HAWAL:

5      Q    Well, sir, if a -- if a distributor in

6  2005 was aware that these red flags were occurring

7  in a given community or related to a given

8  customer, should these have been red flags in 2005

9  as well as they were in 2013?

10          MR. STANNER:  Object to the form.

11          MR. SATIN:  And objection.  Don't answer

12  that if you're going to disclose non-public

13  information that you obtained while at the DEA.

14          THE WITNESS:  I think that they are red

15  flags, yes.

16  BY MR. HAWAL:

17      Q    Now, going to slide 907.  "Communication

18  Advanced Warnings."  These are bullet points that

19  indicate how distributors should have been aware

20  of their obligations to prevent diversion.

21  Correct?

22          MR. STANNER:  Object to the form.

23          THE WITNESS:  These -- these are some

24  indicate -- or some examples of where information

1    was available to distributors, yes.

2    BY MR. HAWAL:

3         Q     And the next slide refers to ARCOS data.

4    What were you intending to communicate with that

5    slide?

6         A     That we need to as a distributor look at

7    the data, the ARCOS data, and look as -- at that

8    and whether or not there's any indication in there

9    that we need to follow up on.

10        Q     And when you reference -- when you're

11   referring to ARCOS data, you're referring to data

12   that distributors have relating to the quantity of

13   different opioids that are being distributed to

14   given customers?

15        A     Specific -- ARCOS data specific to that

16   distributor.

17        Q     Yes.

18        A     It's not all-encompassing --

19        Q     Right.

20        A     -- of what is going to a customer.

21        Q     I mean, for example, McKesson has

22   information in its data or its -- in its system

23   which identifies over time how many pills --

24   individual pills of a given opioid were

```
 1   distributed to a given customer.  True?

 2                MR. STANNER:  Object to the form.

 3                THE WITNESS:  That McKesson distributed,

 4   yes.

 5   BY MR. HAWAL:

 6        Q    Right.  And early warning sign for an

 7   emerging trend would reflect -- would reflect your

 8   message to McKesson as to the importance of

 9   looking at the quantity of controlled substances

10   that are being supplied to given customers, right?

11                MR. STANNER:  Object to the form.

12                THE WITNESS:  That's correct.

13   BY MR. HAWAL:

14        Q    And then on slide 920, you have a slide

15   that's identified "Detecting Suspicious Orders,"

16   and I assume that you were informing the McKesson

17   employees that were at the presentation that it's

18   important to look at red flags.  Correct?

19        A    That's correct.

20        Q    And not only have employees be vigilant

21   about individual customers, but also listening to

22   those employees when they identify signs that are

23   suspicious for diversion?

24                MR. STANNER:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  That's correct.

 2    BY MR. HAWAL:

 3        Q    And that would be part of the onboarding

 4    process when a new customer is coming to McKesson

 5    for the first time?

 6                  MR. STANNER:  Object to the form.

 7                  THE WITNESS:  That's correct.

 8    BY MR. HAWAL:

 9        Q    And periodically visiting individual

10    pharmacies to try and determine whether they are

11    legitimate or whether they are involved in

12    diversion?

13                  MR. STANNER:  Same objection.

14                  THE WITNESS:  That's correct.

15    BY MR. HAWAL:

16        Q    And what do you mean by, "Do not rely

17    solely on thresholds or algorithms as a shortcut

18    to detect suspicious orders"?

19        A    I mean that we need to conduct

20    additional -- or conduct due -- due diligence, I'm

21    sorry, of our customers, making sure that we

22    understand what they're doing, whether or not they

23    give us reason to believe that they're going to

24    fulfill their regulatory obligations.
```

```
 1        Q    And that -- that part of it would be

 2   that if a customer, for example, wants to increase

 3   their threshold, that requires some due diligence

 4   on the part of McKesson before the threshold is

 5   increased, correct?

 6             MR. STANNER:  Object to the form.

 7             THE WITNESS:  Generally speaking, yes, I

 8   would agree with that.

 9   BY MR. HAWAL:

10        Q    And that should have been occurring how

11   far back at a company like McKesson?

12             MR. STANNER:  Object to the form.

13             THE WITNESS:  Thresholds were not

14   necessarily something that was an industry

15   practice until probably 2006, '7 time frame.  So

16   around that time frame, I guess.

17   BY MR. HAWAL:

18        Q    Well, it could have been an industry

19   practice earlier than that.  There's nothing

20   unique about setting thresholds that coincides

21   with 2006 and 2007.  True?

22             MR. STANNER:  Object to the form.

23             THE WITNESS:  It -- it's one methodology

24   to identify and report suspicious orders.  There
```

1    may be others.

2            (Plaintiffs' Exhibit No. 10 was

3            marked for identification.)

4    BY MR. HAWAL:

5        Q    Mr. Boggs, I'm going to hand you what's

6    been marked as Exhibit 10.  This is 301,

7    Operations Manual.

8            Mr. Boggs, I take it you've seen

9    McKesson's Operations Manual for the Controlled

10   Substance Monitoring Program?

11       A    I have.

12       Q    If you look at page 13 of 16, and the

13   numbering is at the top right-hand corner, this --

14   is this the -- this is the manual for the

15   Controlled Substance Monitoring Program that was

16   enacted as a part of McKesson's obligations with

17   its 2008 settlement?

18           MR. STANNER:  Object to the form of the

19   question, foundation.

20           THE WITNESS:  It -- it was the -- the

21   program for -- that was instituted in 2008 for --

22   BY MR. HAWAL:

23       Q    And if you look at page 13 of 16 under

24   "Due Diligence" -- do you see where it says

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "Customer Communications"?

 2         A    I do.

 3         Q    The first bullet point under that, it

 4    says:  "All communications regarding controlled

 5    substances are subject to subpoena and discovery."

 6              Discovery, do you understand discovery

 7    to be discovery by DEA investigations as well as

 8    discovery in legal proceedings as we are

 9    participating in here today?

10         A    That would be my understanding, yes.

11         Q    And it says in the third bullet point:

12    "Write information as if it were being viewed by

13    the DEA."  Do you see that?

14         A    I do.

15         Q    Does that convey to you a reminder to be

16    careful about how communications are occurring in

17    written format?

18              MR. STANNER:  Object to the form of the

19    question.  Calls for speculation, hearsay,

20    foundation.

21              THE WITNESS:  I don't agree with the

22    characterization of that.  I think that the intent

23    is to make sure that we're clear and that there's

24    not a -- a way to misconstrue what's being written
```

Highly Confidential - Subject to Further Confidentiality Review

1    so that someone -- a third party that may not know

2    anything about what transpired would -- would

3    understand it with -- with some clarity.

4    BY MR. HAWAL:

5        Q    Well, let's go to the next highlighted

6    bullet point.  It says:  "Refrain from using the

7    word 'suspicious' in communications.  Once

8    McKesson deems an order and/or customer

9    suspicious, McKesson is required to act.  This

10   means all controlled substances sales to that

11   customer must cease, and the DEA must be

12   notified."

13          As a former DEA representative, does it

14   trouble you that McKesson is formally instructing

15   its employees to refrain from using the word

16   "suspicious" in communications because of the

17   obligation that follows identifying an order as

18   suspicious?

19          MR. STANNER:  Object to the form of the

20   question on several bases.  I'll avoid a lengthy

21   objection.

22   BY MR. HAWAL:

23       Q    Does that trouble you, sir?

24       A    I think with my understanding and

Highly Confidential - Subject to Further Confidentiality Review

1    experience over the years is that -- and I think I

2    spoke about it earlier, is there is a -- often

3    misunderstanding that when we say "suspicious

4    order," that it's automatically a suspicious

5    customer.

6              And I think that over the years, I've

7    had a better appreciation for the fact that there

8    are many legitimate reasons why orders could be

9    placed why they are, and oftentimes the label

10   "suspicion" is misused in the context of how we

11   normally would think of that term.  And I think

12   that being prudent in terms of when something is

13   suspicious needs to be more clearly defined and

14   understood of when we -- when we say "suspicious,"

15   that it is -- there is something suspicious about

16   it, and not just label that because that's the

17   definition in the regulation.

18        Q    Well, or is this more consistent with

19   the public statements that you were making to the

20   publications that we identified earlier where you

21   were being critical of certain wholesalers in

22   terms of keeping their heads buried in the sand

23   like an ostrich with regard to their failure to

24   report suspicious orders and continue to ship to

Highly Confidential - Subject to Further Confidentiality Review

```
1    customers that were suspicious?

2           MR. STANNER:  Object to the form of the

3    question.

4           THE WITNESS:  I don't think those

5    statements that I made correlate to what you're

6    referring to here in the document at all.

7    BY MR. HAWAL:

8       Q    Well, what do the statements that you

9    made correlate to then, sir?

10      A    It correlates to making sure that you

11   have an understanding of your customer and you

12   know your customer, and you're not ignoring maybe

13   red flags or you're looking at some of the data

14   that might be indicative of -- of further review.

15      Q    Who were you criticizing in those

16   statements that you made to the USA Today and

17   Bloomberg News?

18      A    I -- that's -- those statements were

19   made five or six years ago.  I -- I don't even

20   recall that it was --

21      Q    So you don't recall --

22           THE REPORTER:  I need to get the rest of

23   the answer.  "I don't even recall," and you said

24   something else.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               THE WITNESS:  That it was made -- that

 2    those statements were made five or six years ago,

 3    and I don't recall which specific distributor that

 4    I was referring to or if I was just referring in

 5    general -- generalities.

 6    BY MR. HAWAL:

 7        Q    Well, the one article dealt specifically

 8    with Cardinal.  True?

 9               MR. STANNER:  Object.  Vague.  If you

10    want to point to an exhibit.

11               THE WITNESS:  That's what the article

12    was.

13    BY MR. HAWAL:

14        Q    Well --

15        A    I don't know that my discussions with

16    that reporter was more general in the context of

17    them writing an article that related to Cardinal.

18        Q    Well, would it be fair to characterize

19    those statements as being critical of certain

20    distributors in terms of their failures to monitor

21    suspicious orders and to do due diligence in terms

22    or preventing diversion?

23               MR. PERRY:  Objection.  Form.

24               THE WITNESS:  I -- I would think that's
```

Highly Confidential - Subject to Further Confidentiality Review

1    a fair statement, yes.

2    BY MR. HAWAL:

3        Q    Now, after the 2008 settlement

4    agreement, you became aware when you were with

5    McKesson that McKesson was -- continued to be

6    under investigation by the DEA, correct?

7                MR. STANNER:  Object to the form.

8                THE WITNESS:  After I was employed by

9    McKesson?

10   BY MR. HAWAL:

11       Q    Yes, sir.

12       A    I understood that there was still a

13   settlement being negotiated between McKesson and

14   the government.

15       Q    Well, did you become aware that rather

16   than improve and adhere to the promises and

17   obligations that were made by McKesson as a part

18   of that 2008 settlement, that the DEA and the

19   Department of Justice determined that McKesson had

20   a continuing systemic or companywide failure to

21   take meaningful steps to prevent diversion of

22   opioids?

23                MR. STANNER:  Object to the form of the

24   question.

```
 1              THE WITNESS:  I don't know that I would

 2    agree with the characterization of "systemic."  I

 3    don't recall anything in any of the documents that

 4    there was systemic.  There was agreements in the

 5    settlement agreement that McKesson acknowledged

 6    that at various times they had not reported

 7    suspicious orders.

 8    BY MR. HAWAL:

 9         Q    Well, did you recall that the

10    investigation that was conducted by the Department

11    of Justice made a determination that McKesson had

12    a systemic problem throughout the United States at

13    multiple distribution centers from 2008 forward?

14              MR. STANNER:  Object to the form of the

15    question, misstates.

16              MR. SATIN:  And objection -- objection

17    to the extent you're asking him for his -- his

18    answer as it relates to his work at the DEA as

19    opposed to what he learned while he was at

20    McKesson.

21              MR. HAWAL:  I specifically asked what he

22    came to know as a result of his working at

23    McKesson.

24              THE WITNESS:  I --
```

```
 1                 MR. SATIN:  That's not in that question,

 2     just to be clear.  That's not what the question

 3     was, that one.

 4     BY MR. HAWAL:

 5          Q    Sir, after you joined McKesson, did

 6     you -- were you made aware, either by speaking to

 7     McKesson personnel or reviewing documents at

 8     McKesson, that the Department of Justice made the

 9     claim that there were systemic problems throughout

10     various distribution centers of McKesson

11     throughout the country?

12                 MR. STANNER:  Object to the form.

13                 THE WITNESS:  I'm aware that the

14     settlement encompassed several different

15     distribution centers.

16                 (Plaintiffs' Exhibit No. 11 was

17                 marked for identification.)

18     BY MR. HAWAL:

19          Q    Sir, I'm handing you what has been

20     marked as Exhibit 11.  It is an August 13th, 2014

21     letter from U.S. Attorney John Welsh --

22                 MR. HAWAL:  Yeah, 224.

23     BY MR. HAWAL:

24          Q    Have you seen this letter.  It's a
```

```
 1    23-page letter outlining various problems that

 2    were identified as a part of the investigation of

 3    the Aurora, Colorado, distribution center.

 4             MR. STANNER:  Object to the form of the

 5    question.

 6             THE WITNESS:  I -- I have seen this

 7    document, yes.

 8    BY MR. HAWAL:

 9        Q    When did you last see it?

10        A    I looked at it briefly in some of the

11    preparation for this deposition.  I didn't read it

12    cover to cover, but I -- I've seen it a couple

13    different times.

14        Q    And you saw it -- did you also see it as

15    a part of your employment at McKesson or during

16    the time you were employed at McKesson?

17        A    I did.

18        Q    Who was in charge of the distribution

19    center at Aurora from a Regulatory Affairs

20    standpoint during 2009, 2010 through 2013?

21             MR. STANNER:  Objection.  Speculation.

22             THE WITNESS:  I believe it was Tom

23    McDonald.

24    BY MR. HAWAL:
```

1      Q     And Tom McDonald is still employed with

2    McKesson?

3      A     He is.

4      Q     Would you agree that this letter sets

5    forth alarming investigative findings that would

6    reflect a deliberate indifference to the legal

7    obligations under the Controlled Substances Act?

8           MR. STANNER:  Object to the form of the

9    question, argumentative.

10          THE WITNESS:  I think it sets forth some

11   areas of concern that would warrant further

12   review, yes.

13   BY MR. HAWAL:

14     Q     Do you believe that it would set forth

15   or -- or evidence a deliberate indifference to the

16   many harms that were being caused by the opioid

17   epidemic?

18          MR. STANNER:  Object to the form, legal

19   conclusion.

20          THE WITNESS:  I don't agree with the

21   characterization of "indifference."  In my time at

22   McKesson, I've not seen any evidence of

23   indifference.

24   BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Well, you weren't with McKesson when

 2   this investigation was largely being conducted.

 3   True?

 4        A    You asked me if I thought that this

 5   represented indifference, and I'm --

 6        Q    Yes.

 7        A    -- saying that my time, my five years at

 8   McKesson and talking to hundreds of people in

 9   McKesson, I have not seen any evidence of

10   indifference to its regulatory obligations.

11        Q    Well, this --

12        A    And I don't know that it would have just

13   all of a sudden happened prior to that, but I

14   didn't -- I have not seen any evidence of

15   indifference.

16             MR. HAWAL:  I'm going to move to strike

17   the answer as nonresponsive.

18   BY MR. HAWAL:

19        Q    My question, sir, is you were not with

20   McKesson when this investigation was being

21   conducted in Aurora, Colorado.  True?

22             MR. STANNER:  Object to the form of the

23   question.

24             THE WITNESS:  That's correct.
```

```
 1    BY MR. HAWAL:

 2         Q    Would you have expected Tom McDonald, as

 3    the Regulatory Affairs person in charge of the

 4    Aurora, Colorado distribution center, to have been

 5    made aware of these findings that are referenced

 6    in this exhibit?

 7              MR. STANNER:  Object to the --

 8    BY MR. HAWAL:

 9         Q    In this letter?

10              MR. STANNER:  Object to the form of the

11    question.

12              THE WITNESS:  I would have expected

13    that, yes.

14    BY MR. HAWAL:

15         Q    Are you aware that Mr. McDonald

16    testified in deposition not long ago that he had

17    never seen this letter and was not made aware of

18    the findings that are recited in this letter?

19              MR. STANNER:  Same objection.

20              THE WITNESS:  I've not seen his

21    transcript.  I have no idea what he testified to.

22    BY MR. HAWAL:

23         Q    Do you find that surprising?

24              MR. STANNER:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I -- yes.

 2   BY MR. HAWAL:

 3       Q    Would you expect that a diligent company

 4   would want to investigate whether or not these

 5   allegations were true or not?

 6                MR. STANNER:  Object to the form.

 7                THE WITNESS:  It's my understanding that

 8   we have, and we have taken significant steps to

 9   address these issues.

10                MR. HAWAL:  I'm not -- move to strike as

11   nonresponsive.

12   BY MR. HAWAL:

13       Q    My question, sir, is would you expect a

14   company like McKesson to have investigated whether

15   these findings in this 23-page letter were true

16   and accurate?

17                MR. STANNER:  Object to the form of the

18   question.

19                THE WITNESS:  We have reviewed our

20   program and taken steps to address the issues that

21   are in here.  I think I'm being responsive to your

22   question.

23   BY MR. HAWAL:

24       Q    When did you take steps to respond to
```

Highly Confidential - Subject to Further Confidentiality Review

1    this letter?  Or these shortcomings?

2         A    Ever since I've --

3              MR. STANNER:  I'm sorry.  Object to the

4    form.

5              THE WITNESS:  Ever since I've been at

6    McKesson.

7    BY MR. HAWAL:

8         Q    Let's go to page 11 of this document.

9    Under paragraph B, it says:  "Aurora's Desire For

10   Increased Sales Overrode Its Obligations to Report

11   Suspicious Orders.  Our investigation has revealed

12   a disturbing pattern.  McKesson-Aurora's desire

13   for increased sales and retaining its customers

14   overrode its obligations to report suspicious

15   orders.  We have identified this trend across

16   several different areas."

17             As a former DEA agent and current

18   McKesson employee, do you find that allegation to

19   be particularly troubling?

20             MR. STANNER:  Object to the form of the

21   question.

22             THE WITNESS:  An allegation of that,

23   if -- yes.  An allegation like that would be

24   concerning, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HAWAL:

 2         Q    In fact, McKesson agreed to pay a

 3    $150 million fine as a result of a settlement of

 4    many of the allegations contained in this 23-page

 5    letter.  True?

 6              MR. STANNER:  Object to the form of the

 7    question.

 8              THE WITNESS:  I don't think that's

 9    accurate at all.

10    BY MR. HAWAL:

11         Q    Well, do you --

12         A    The civil penalties relates to

13    non-reporting of suspicious orders.  There's no

14    other penalty -- civil penalty provision other

15    than that, and that's what -- the only way that

16    the dollars can be calculated --

17         Q    Well, you --

18         A    -- is related to failure to report a

19    suspicious order.

20         Q    Were you involved in negotiating the

21    settlement between McKesson and the Department of

22    Justice?

23         A    I was not.

24         Q    And did McKesson accept responsibility
```

1    as part of that $150 million settlement?

2              MR. STANNER:  Objection.  Form of the

3    question.

4              THE WITNESS:  As I recall, there's --

5    there's some context to that in the settlement

6    agreement, yes.

7    BY MR. HAWAL:

8         Q    Let me ask you -- it says that:

9    "McKesson Aurora set its initial thresholds for

10   its pharmacy customers very high.  McKesson

11   Aurora's review process was not even triggered

12   until an individual pharmacy sold more than

13   10 percent of that pharmacy's average volume

14   for -- from a 12-month period, from 2007 to 2008,

15   a year in which McKesson had settled claims

16   because diversion was flourishing in McKesson-

17   supplied pharmacies."

18             Did you make any determination that that

19   was not a true statement?

20             MR. STANNER:  Object to the form of the

21   question.

22             THE WITNESS:  I did not retrospectively

23   go look at thresholds that were back during this

24   time frame.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HAWAL:

 2         Q    Did anyone at McKesson?

 3              MR. STANNER:  Objection.  Calls for

 4    speculation.

 5    BY MR. HAWAL:

 6         Q    To your knowledge?

 7         A    We were looking at setting thresholds

 8    for -- in today, since I've been with McKesson.

 9         Q    No, that's not my question, sir.  My

10    question is, did anyone to your knowledge go back

11    and make a determination whether or not this

12    statement is true?

13              MR. STANNER:  Same objection.

14              THE WITNESS:  Not to my knowledge, no.

15    BY MR. HAWAL:

16         Q    And then below that in the -- not the

17    next paragraph, but it says:  "In some cases,

18    McKesson Aurora set some thresholds so high at the

19    outset that the pharmacy customer would never

20    exceed it, and thus, never -- and thus, never

21    trigger any review as to whether an order was

22    indeed suspicious."

23              Do you know whether or not that is a

24    true statement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A     I don't know if it is or not.

 2              Q     Did anyone to your knowledge go back and

 3    investigate whether or not thresholds were

 4    artificially set so high so that a customer would

 5    never bump up against a threshold and a suspicious

 6    order report would not have to be made?

 7                    MR. STANNER:  Objection to the form of

 8    the question.

 9                    THE WITNESS:  What we did was hire an

10    outside third party to look at what our orders

11    were being done since I've been with McKesson

12    going forward, and whether or not we need to --

13    how they need to be appropriately set.

14    BY MR. HAWAL:

15              Q     But no one went back -- backwards to

16    assess whether or not these allegations were true

17    and accurate?

18                    MR. STANNER:  Objection.  Speculation.

19    BY MR. HAWAL:

20              Q     To your knowledge.

21              A     I don't know whether or not that review

22    went back and looked at that specific data or not.

23              Q     And the company that you hired to do

24    that setting of the thresholds again is -- is who?
```

1          A     Currently it was the Analysis Group.

2          Q     And was there anyone before the Analysis

3     Group that was doing that at McKesson?

4          A     We had --

5                MR. STANNER:  Objection to the form of

6     the question.

7                THE WITNESS:  -- analysis or analytic

8     folks in McKesson that were setting the thresholds

9     previously.

10    BY MR. HAWAL:

11         Q     And when were those people brought on

12    board at McKesson to set thresholds?

13               MR. STANNER:  Objection.  Calls for

14    speculation.

15               THE WITNESS:  I don't know if they were

16    brought on board specifically to set thresholds.

17    That was part of their responsibility.  When they

18    were hired, I don't recall.

19    BY MR. HAWAL:

20         Q     On the next page, page 12, it says at

21    the -- in the first paragraph:  "McKesson Aurora

22    routinely manipulated the thresholds.  It would

23    often preemptively increase the thresholds of its

24    customers on particular drugs before the customer

```
 1    had even submitted a TCR (threshold change

 2    request) seeking a threshold increase.  These

 3    preemptive threshold increases were often in

 4    response to either the threshold warning reports

 5    or omit reports, the very reports that McKesson

 6    was supposed to rely upon to investigate customer

 7    activity."

 8            Do you have any basis to disagree that

 9    that was occurring in Aurora?

10            MR. STANNER:  Object to the form of the

11    question.

12            THE WITNESS:  I don't have any basis to

13    respond to it either way.

14    BY MR. HAWAL:

15        Q    If that is true, then it would be a very

16    troubling issue as it relates to McKesson's legal

17    obligation to avoid or prevent diversion.  True?

18            MR. STANNER:  Object to the form of the

19    question.

20            THE WITNESS:  I -- you'd have to look at

21    what the facts and circumstances were that caused

22    them to decide whether or not to adjust the

23    thresholds and whether or not there was a

24    legitimate reason to do that.  I -- I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2       Q    Well, this says that they were doing it

 3   preemptively without doing any kind of

 4   investigation.  Would that be troubling, sir, to

 5   you as a former DEA agent?

 6            MR. STANNER:  Object to the form.

 7            THE WITNESS:  It depends on what the

 8   facts are.  If the facts are that a customer

 9   needed an adjustment because there was a glitch in

10   the IT system to -- to reput them back at a

11   certain situation or whatever as a preemptive

12   move, I don't know.  I don't know what the facts

13   and circumstances are that -- for causing these

14   people to do what they were supposedly doing.  I

15   don't know.

16   BY MR. HAWAL:

17       Q    Well, would it be -- you think it would

18   be wise for someone to do an investigation to

19   determine whether or not these allegations were

20   true in order to effectuate a change?

21            MR. STANNER:  Object to the form of the

22   question.

23            THE WITNESS:  Since I've been at

24   McKesson, we looked at -- at what we were doing in
```

Highly Confidential - Subject to Further Confidentiality Review

1    the past and how -- how we can improve to make a

2    more stringent process, and so we -- I have looked

3    at --

4    BY MR. HAWAL:

5        Q    So the answer to my question is, yes --

6             THE REPORTER:  I have looked at?  I have

7    looked at?

8             MR. STANNER:  Let him finish the

9    question -- answer.

10            Did you finish your answer?

11            THE WITNESS:  I did.

12            MR. STANNER:  Okay.

13   BY MR. HAWAL:

14       Q    So the answer to my question is, yes, it

15   would be prudent for someone to investigate these

16   allegations to make sure that these kinds of

17   identified problems did not continue?

18            MR. STANNER:  Same objection.

19            THE WITNESS:  Well, there's an

20   assumption that there's a problem here without

21   knowing the facts and circumstances.  What we've

22   looked at was improving our process to adjust

23   thresholds and strengthen that process, and that's

24   what -- exactly what we've done.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HAWAL:

 2         Q    Was anyone reprimanded or fired or in

 3    any way negatively impacted as a result of what

 4    had been going on that resulted in McKesson paying

 5    a $150 million fine for its failure to effectively

 6    follow the Controlled Substances Act?

 7              MR. STANNER:  Objection.  Calls for

 8    speculation.

 9              THE WITNESS:  It's my understanding that

10    the CEO, Mr. Hammergren, testified that someone

11    had been displaced from McKesson.  I -- I'm not

12    privy to that information.

13    BY MR. HAWAL:

14         Q    So you don't know who was in any way

15    fired or otherwise disciplined for the violations

16    that gave rise to the $150 million penalty?

17         A    I don't --

18              MR. STANNER:  Objection to the form.

19              THE WITNESS:  I'm sorry.  I don't know

20    who that individual is or what other actions were

21    taken by senior management in the company.  I --

22    I'm not privy to that.

23    BY MR. HAWAL:

24         Q    Do you agree that -- do you agree that
```

1    in order to increase a threshold, some type of due

2    diligence would be required?

3              MR. STANNER:  Objection to the form.

4              THE WITNESS:  There may be circumstances

5    that don't require that.  Our process, if a

6    customer initiates a request, we do conduct due

7    diligence.  In fact, we conduct pretty extensive

8    due diligence.

9    BY MR. HAWAL:

10       Q    And do you recall that, according to

11   this 23-page detailed investigation report, that

12   almost no suspicious order reports were submitted

13   to the DEA from 2008 until 2013, until McKesson

14   was served with a warrant and a subpoena as part

15   of the investigation?

16              MR. STANNER:  Object to the form of the

17   question.

18              THE WITNESS:  I don't believe that this

19   is an investigative report.  This is a letter

20   outlining some -- some information by the

21   Assistant U.S. Attorney.  Other than that, I

22   understand what you're saying, and I agree.

23   BY MR. HAWAL:

24       Q    On page 18 of this letter, it

 1    identifies:  "Small rural communities in Colorado

 2    who were receiving large quantities of opioids

 3    which were significantly disproportionate to the

 4    adult population in those communities."  True?

 5              MR. STANNER:  Object to the form.

 6              THE WITNESS:  I see that, yes.

 7    BY MR. HAWAL:

 8        Q    That has been occurring in parts of the

 9    country besides Colorado.  True?

10              MR. STANNER:  Same objection.

11              THE WITNESS:  I believe that's correct,

12    yes.

13    BY MR. HAWAL:

14        Q    What -- what states come to mind that

15    also were receiving large quantities of opioids

16    from McKesson that was significantly

17    disproportionate to the population?

18              MR. STANNER:  Object to the form.

19              THE WITNESS:  West Virginia comes to

20    mind in terms of some pharmacies that are in more

21    rural parts of the country with small populations.

22    BY MR. HAWAL:

23        Q    Is that -- is that all, West Virginia

24    and Colorado?

```
 1        A     I haven't conducted a comprehensive

 2   study to answer that question, but I -- I don't

 3   know.  I --

 4        Q     That's -- that's one of the red flags

 5   that has long been identified as a potential

 6   indicator of diversion?

 7        A     It is a red flag, yes.

 8        Q     Despite this $150 million penalty or

 9   settlement that McKesson agreed to pay for

10   violations of the laws and regulations relating to

11   diversion of controlled substances, you're aware

12   that many employees of the DEA were -- who were

13   involved in these investigations were profoundly

14   disappointed that the fine was not much higher and

15   that some McKesson executives were not charged

16   criminally?

17              MR. STANNER:  Object to the form of the

18   question.

19              THE WITNESS:  I'm not aware of that, no.

20   BY MR. HAWAL:

21        Q     You've not -- have you ever watched any

22   of the "60 Minutes" segments on the opioid crisis

23   that contain interviews with your former

24   colleagues at DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A    I have seen one -- one of the "60

2   Minutes" segments, yes.

3        Q    And do you recall that some of those

4   "60 Minutes" segments had interviews with your

5   former colleagues where they expressed significant

6   disappointment that McKesson received such a small

7   fine and that no one was held personally

8   responsible?

9             MR. STANNER:  Object to the form of the

10  question.

11            THE WITNESS:  I don't agree with the

12  characterization that it was a small fine.  It's

13  the largest fine that the DEA has ever gotten,

14  and -- to whether or not they were disappointed or

15  not, I know that they -- that was what they said

16  in that interview.

17  BY MR. HAWAL:

18       Q    Based upon McKesson's settlement of the

19  150 million -- the $150 million settlement as a

20  result of the Department of Justice's

21  investigation and findings, was it rather clear to

22  you that McKesson was in fact contributing to the

23  opioid epidemic?

24            MR. STANNER:  Objection to the form of
```

1    the question.

2              THE WITNESS:  I don't know that you

3    could make that quantum leap just because of -- of

4    some failures that that contributed to the opioid

5    epidemic.

6    BY MR. HAWAL:

7        Q    Do you know --

8        A    Not reporting a suspicious order in and

9    of itself is a regulatory violation of an

10   administrative act of not making that report.

11       Q    So is it your position that McKesson has

12   not contributed to the opioid epidemic?

13       A    Well, I think -- first of all, I

14   believe, and I know McKesson believes, that the

15   opioid epidemic is a significant problem in this

16   country, and it's a problem that's evolved over

17   several years or several decades.  It's a -- the

18   deaths associated with it are horrific.  The

19   employees in McKesson are not immune from it.  The

20   family members at McKesson are not immune from it,

21   and that's why we take our regulatory obligations

22   seriously.

23              We do significant security procedures at

24   each and every one of our facilities to make sure

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that we maintain effective controls.  Because we

 2    have large volumes of controlled substances in

 3    those facilities, we have alarm systems, cameras,

 4    cages, concrete vaults.  We make sure that they're

 5    secure while they are in our possession.

 6              When we pass them on downstream to our

 7    customers, we make sure that we conduct a due

 8    diligence as best that we can to know our

 9    customers.  Does that mean we contributed to the

10    opioid epidemic?  I don't agree with that.

11         Q    Other distributors were also fined by

12    the DEA for failure to conform to the Controlled

13    Substances Act and -- and regulations.  True?

14    Besides McKesson.

15         A    There were other distributors that were

16    fined by the DEA, yes.

17         Q    And do you know what led to other

18    distributors' fines?

19         A    Define --

20              MR. STANNER:  Objection to the form.

21              MR. SATIN:  Objection --

22              THE WITNESS:  Define --

23              MR. SATIN:  Sorry.  Objection to the

24    extent you're asking -- or your answer would
```

1    reveal information about your work at the DEA.

2            THE WITNESS:  From any -- the public

3    information that I've read, it was related to a

4    failure to report a suspicious order.  That's the

5    only reason a civil fine can be levied on a

6    registrant.

7    BY MR. HAWAL:

8        Q    How many suspicious orders did McKesson

9    fail to report from 2008 through 2013?

10           MR. STANNER:  Objection to the form,

11   speculation.

12           THE WITNESS:  I -- I have no idea.  I

13   don't know.

14   BY MR. HAWAL:

15       Q    You don't know if it was ten or 10,000?

16           MR. STANNER:  Same objection.

17           THE WITNESS:  I don't know.

18   BY MR. HAWAL:

19       Q    Well, would that be important

20   information for you to know in order to be able to

21   det- -- even answer the question as to whether or

22   not McKesson contributed or not to the opioid

23   epidemic?

24       A    Not at all.  You're -- you're making an

1    assumption -- again, we talked about this earlier,

2    you're assuming a suspicious order is a suspicious

3    customer.  You're assuming that a suspicious order

4    if it's shipped, and most of the time McKesson

5    blocks those shipments, that it's diverted.  And

6    diversion can occur completely outside of the

7    closed system of distribution.

8         If you look at the National Survey on

9    Drug Use and Health, you have more than 50 percent

10   of the people who misuse opioids get them once

11   they've completely left the closed system of

12   distribution.

13        Sir, you're making an assumption that a

14   suspicious order equals a suspicious customer, and

15   that's often a fallacy.  It's a mistake that

16   people make.

17        Q    Sir, do you know how many suspicious

18   orders were not blocked but were shipped?

19             MR. STANNER:  Objection to the form.

20   BY MR. HAWAL:

21        Q    By McKesson?

22        A    During what time frame?

23        Q    From 2008 to 2013.

24             MR. STANNER:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It was prior to my

 2     employment.  I -- I don't know.

 3     BY MR. HAWAL:

 4         Q    So you don't -- so you don't have an

 5     answer to that question either, right?

 6         A    I do not.

 7         Q    Well, would you be concerned about a

 8     suspicious order being shipped and not blocked,

 9     and no due diligence being done to determine

10     whether or not that suspicious order should be

11     shipped?

12              MR. STANNER:  Objection to the form.

13              THE WITNESS:  Not necessarily.

14     BY MR. HAWAL:

15         Q    Okay.  Did you have a different

16     viewpoint when you were with the DEA?

17              MR. STANNER:  Objection --

18              MR. SATIN:  Objection.

19              MR. STANNER:  -- to the form.

20              MR. SATIN:  Same instruction.  Don't

21     answer that.

22              THE WITNESS:  I don't know that I can

23     answer at this time.

24     BY MR. HAWAL:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q     Do you know who Gary Hilliard is?

2      A     I do.

3      Q     What is he -- what's his position with

4   McKesson?

5      A     I don't believe he's currently employed

6   by McKesson.

7      Q     What was his position with McKesson?

8      A     I believe his title was director of

9   Regulatory Affairs.

10     Q     For what region?

11     A     I don't know that he had a specific

12  region.  I think he had some different

13  responsibilities.

14     Q     And just so that we're clear on the

15  record, what is the -- what is the job description

16  of someone who's a Regulatory Affairs -- director

17  of Regulatory Affairs?

18          MR. STANNER:  Objection to form.  Vague,

19  time frame.

20          THE WITNESS:  They have different

21  responsibilities depending upon where they are.

22  The directors of response -- or directors of

23  Regulatory Affairs that report to me have the

24  responsibility of overseeing a particular region.

1   Many of them, though not all of them, have a

2   Regulatory Affairs manager that reports to them to

3   assist them in overseeing the customers in a

4   particular region, conducting due diligence on

5   those customers, conducting due diligence in

6   customers that are prospective customers of

7   McKesson to determine whether or not we even want

8   to ship to them in the first place, and ongoing

9   due diligence to those customers while they're

10  McKesson customers.

11  BY MR. HAWAL:

12       Q    Regulatory Affairs is supposed to

13  monitor the company and customers to make sure

14  that diversion is not occurring?

15            MR. STANNER:  Objection to the form of

16  the question.

17            THE WITNESS:  Their -- their

18  responsibility is to conduct due diligence of

19  customers in an ongoing fashion to ensure that

20  when we pass those controlled substances that,

21  first and foremost, that they're licensed by the

22  state and registered by the DEA before we can even

23  supply them.  That from time to time changes.  The

24  status of that changes, and we need to try to

Highly Confidential - Subject to Further Confidentiality Review

```
1    monitor for that.
2              Their responsibility is for conducting
3    due diligence of those specific customers to
4    determine whether or not they were going -- those
5    customers are going to exercise their
6    corresponding responsibility under the regulations
7    and -- and handle those in a prudent manner.
8              (Plaintiffs' Exhibit No. 12 was
9              marked for identification.)
10   BY MR. HAWAL:
11       Q    I'm going to hand you what has been
12   marked as Plaintiffs' Exhibit 12, which is a
13   series of e-mails, and the page that I'm going to
14   refer you to is MCKMDL00543972, which is an e-mail
15   exchange between Sharon Mackarness and Gary
16   Hilliard in 2006.
17             MR. STANNER:  I'm sorry, I -- the Bates
18   number that we have here starts at --
19             MR. HAWAL:  Yeah, it's the second --
20   it's the backside of that.
21             MR. STANNER:  Right.  I have 543916.  I
22   believe you said 543972.
23             MR. HAWAL:  Well, I have one that's
24   Bates-stamped 972, and I have the same document
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Bates-stamped 00543915.

 2              MR. STANNER:  I --

 3              MR. SATIN:  We have the 915.

 4              MR. STANNER:  We have 915.

 5              MR. HAWAL:  Okay.  Well, let's just --

 6    let's go with that one.  I mean it's the same

 7    document, but --

 8    BY MR. HAWAL:

 9        Q    Do you see the -- the e-mail that says

10    from Sharon Mackarness to Gary Hilliard dated

11    October 26, 2006?

12        A    I do.

13        Q    The second paragraph says:  "JD brought

14    up a valid point in the meeting.  We are in the

15    business to sell product.  If we could produce a

16    report (you may already have one) that warned a

17    customer -- customer's approach to the threshold,

18    say at 85 percent of their 10,000 dosages, work

19    could begin on justifying an increase in threshold

20    prior to any lost sales."

21              Are you aware that at around this time

22    McKesson began to notify customers that they were

23    approaching their threshold so that a threshold

24    increase could be made, and therefore avoid the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   customer to come up against its threshold or

 2   limit, and therefore would require a suspicious

 3   order report?

 4           MR. STANNER:  Object --

 5           MR. SATIN:  Objection.

 6           MR. STANNER:  Objection.  Calls for

 7   speculation.

 8           MR. SATIN:  Objection pursuant to Touhy.

 9   Don't answer that if it would require you to

10   disclose information when you worked at the DEA.

11   BY MR. HAWAL:

12       Q    I'm asking you, as a result of your work

13   at McKesson, are you aware that at around this

14   time that process was implemented of notifying

15   customers of a threshold warning report?

16           MR. STANNER:  Same objection.

17           THE WITNESS:  I understand the question.

18   What I disagree with -- and I understand it at

19   that time.  What I disagree with is the context of

20   avoiding suspicious orders.  I don't think -- from

21   what I understand, the sole purpose was not to

22   avoid reporting or identifying a suspicious order.

23   BY MR. HAWAL:

24       Q    And how do you know that?
```

1      A      From reading different documents --

2      Q      Well --

3      A      -- and seeing things in there that --

4    that the purpose of doing that was not to avoid a

5    suspicious order.

6      Q      Well, was it -- was it to avoid losing

7    sales?

8            MR. STANNER:  Same objection.

9            THE WITNESS:  I -- at the time --

10   what -- what was occurring at the time or on

11   specific instances, you'd have to ask the

12   individual what their intent was.  I don't know at

13   this point.

14   BY MR. HAWAL:

15     Q      And -- and Gary Hilliard made the

16   determination that he thought it was a good

17   idea -- the e-mail response above that, he thought

18   that warning customers that they are approaching

19   their threshold was a good idea.  Right?

20           MR. STANNER:  Objection.  Calls for

21   speculation.

22           THE WITNESS:  That's what it says.  I

23   mean --

24   BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Do you -- have you spoken to Gary

 2   Hilliard about this?

 3          A    This is the first time I've ever seen

 4   it.  I've never seen this before.

 5          Q    Well, you're aware that the -- the

 6   process of threshold warning reports did become a

 7   company policy at McKesson as a result of your

 8   position at McKesson currently, right?

 9               MR. STANNER:  Object to the form of the

10   question.

11               THE WITNESS:  I'm sorry, could you

12   repeat that?

13   BY MR. HAWAL:

14          Q    Yeah.  You --

15          A    I'm not sure I agree with it.

16          Q    You've become aware that at around this

17   time McKesson began -- implemented a policy of

18   sending out threshold warning reports to

19   customers, true?

20          A    During that --

21               MR. STANNER:  Same objection.

22               THE WITNESS:  During that time frame,

23   yes.

24   BY MR. HAWAL:
```

1      Q     Yeah.  Has that stopped?

2      A     Yes, it has.

3      Q     Why?

4      A     We have taken a more conservative

5   approach of trying to manage our thresholds and

███   ████████████████████████████████

███   ██████████████████   ███████████████

███   ███████████████████████████████████

███   ███████████████████████████████████

███   ████████████████████████████████

███            █████████████████████████████

███   ██████████████████████████████

███   ███████████████████████████████

███   ███████████████████████████████

███   ███████   █████████████████████████

███   █████████████   So we don't, as a matter of policy,

17   discuss the thresholds with our customers.

18      Q     In fact, you don't want your customers

19   to know what their thresholds are, right?

20      A     We don't know --

21            MR. STANNER:  Objection to the form of

22   the question, vague.

23            THE WITNESS:  We don't know that it's a

24   relevant piece of information for the customer to

Highly Confidential - Subject to Further Confidentiality Review

1    have.

2    BY MR. HAWAL:

3         Q    So you do not provide customers with

4    their threshold amount, right?

5         A    We do not.

6         Q    But a threshold warning report would

7    allow a customer to determine what their threshold

8    was, right?

9         A    I don't know that -- as I understood

10   those warning reports is that it was just a --

11   letting the customer know they were approaching

12   the threshold.  I don't know that it specifically

13   said what the actual amount was or how close they

14   were or anything else.  I don't know that.

15        Q    Do you believe that it would -- was an

16   advisable position for the company to implement a

17   policy whereby the company would -- or company

18   employees would proactively contact a customer and

19   ask them if they needed to increase their

20   threshold prior to reaching it?

21             MR. STANNER:  Objection to the form of

22   the question.

23             THE WITNESS:  McKesson services

24   thousands and thousands of customers, and I would

Highly Confidential - Subject to Further Confidentiality Review

1    say from my time at McKesson and reviewing

2    thousands of customers, that the vast majority of

3    them are legitimate pharmacies or hospitals doing

4    what they need to do, and attempting to try to

5    help meet their legitimate needs would be a reason

6    to do that.  We don't do that today as a matter of

7    practice.

8                MR. HAWAL:  I'm going to move to strike,

9    other than the last sentence, as nonresponsive.

10   BY MR. HAWAL:

11        Q    You're aware that McKesson would

12   proactively contact customers between 2008 and

13   2012 with a warning report -- threshold warning

14   report with an invitation or -- or a question as

15   to whether they wanted their threshold increased

16   prior to them bumping up against their threshold.

17   Are you aware that that was done --

18               MR. STANNER:  Object to the form of the

19   question.

20   BY MR. HAWAL:

21        Q    -- as policy?

22               MR. SATIN:  Objection pursuant to Touhy.

23   Don't answer if it would reveal information about

24   your time at the DEA.

```
 1              THE WITNESS:  I -- I'm aware that that

 2    was happening --

 3    BY MR. HAWAL:

 4        Q    When was it --

 5        A    -- had happened before.

 6        Q    When was that practice terminated?

 7              MR. STANNER:  Object to the form.  Calls

 8    for speculation based on hearsay.

 9    BY MR. HAWAL:

10        Q    Approximately.

11        A    It was my understanding it stopped

12    before I came to McKesson.  Exactly when, I don't

13    know.

14        Q    Do you believe that that policy had the

15    potential for abuse in terms of sales

16    representatives placing revenue above concerns

17    about diversion?

18              MR. STANNER:  Object to the form.

19              THE WITNESS:  The -- as I stated before,

20    it's my understanding that the purpose of some of

21    that was to help ensure that the customers had

22    sufficient quantities of medication to treat the

23    legitimate needs of patients.

24    BY MR. HAWAL:
```

```
 1        Q    That's not my question, sir.

 2             My question was, do you believe that

 3   that policy had the potential for abuse in terms

 4   of sales representatives placing profit and

 5   revenue above concerns about potential diversion?

 6             MR. STANNER:  Object to the form.

 7   BY MR. HAWAL:

 8        Q    Either you do or you don't.

 9        A    That -- that can be a concern, yes.

10             MR. HAWAL:  Let's take -- let's take a

11   lunch break.

12             THE VIDEOGRAPHER:  The time is 1:14 p.m.

13   We're going off the record.

14             MR. STANNER:  Can we stay on the record

15   and put two quick things on the record?

16             MR. SATIN:  Very quickly.  When at times

17   I've said, "Same objection," as I think everyone

18   here knows, I'm not referring to the same

19   objection that another lawyer in this room makes,

20   but the same objection I previously made as it

21   relates to Touhy.

22             MR. STANNER:  I --

23             MR. HAWAL:  Understood.

24             MR. STANNER:  I'd just like to put on
```

1    the record what I mentioned before we got started

2    today at the beginning of the day.

3            So obviously since then a number of

4    questions have come up that have implicated this

5    DEA stuff.  It is our view that Mr. Boggs is

6    subject to seven hours of a deposition.  So to the

7    extent that you want reserve some time pending a

8    Touhy ruling, I would ask you to be mindful of

9    that throughout the day.  But we would not consent

10   to seven hours today and any additional time based

11   on DEA.  So please be mindful of that.

12           MR. HAWAL:  Will do.  Thank you.

13           THE VIDEOGRAPHER:  The time is 1:14 p.m.

14   We're going off the record.

15           (Lunch recess.)

16           THE VIDEOGRAPHER:  The time is 2:05

17   p.m., and we're back on the record.

18           (Plaintiffs' Exhibit No. 14 was

19           marked for identification.)

20   BY MR. HAWAL:

21       Q    Mr. Boggs, I'm going to hand you what

22   has been marked as Plaintiffs' Exhibit 14.

23           Did you make a presentation to the West

24   Virginia Attorney General on September 1st, 2015,

```
 1    on behalf of McKesson?

 2        A    I did.

 3        Q    And who else accompanied you from

 4    McKesson, if anyone?

 5        A    From McKesson, I don't believe there was

 6    anybody else.

 7        Q    And who initiated the presentation?  In

 8    other words, how did it come about?  Was it at --

 9    at your suggestion or at McKesson's suggestion or

10    the West Virginia Attorney General's suggestion?

11        A    I --

12            MR. STANNER:  Objection.  Calls for

13    speculation.

14            THE WITNESS:  I believe it was at the

15    request of McKesson through their counsel to the

16    Attorney General's Office.

17    BY MR. HAWAL:

18        Q    And what did you understand the purpose

19    of this presentation to be?

20        A    Was to provide the Attorney General and

21    his staff who might be in attendance what McKesson

22    was doing on our Controlled Substance Monitoring

23    Program and the efforts that were taken to conduct

24    due diligence on our customers.
```

Highly Confidential – Subject to Further Confidentiality Review

1      Q    Was it, in essence, an effort by

2  McKesson to tout the due diligence program that it

3  had in place to address the opioid crisis in West

4  Virginia?

5           MR. STANNER:  Objection.  Calls for

6  speculation.

7           THE WITNESS:  I think it was an effort

8  to inform the Attorney General on the efforts that

9  McKesson was taking in that particular state as

10  well as other states.

11  BY MR. HAWAL:

12      Q    Well, did you understand at the time

13  that you were making this presentation that there

14  was a crisis in West Virginia that hit that state

15  particularly hard with regard to deaths from

16  opioids and incalculable costs to communities

17  there?

18           MR. STANNER:  Object to the form.

19           THE WITNESS:  I'm aware that the state

20  of West Virginia has had a problem with opioid

21  abuse or prescription drug abuse.

22  BY MR. HAWAL:

23      Q    And the crisis in West Virginia is where

24  McKesson for years had shipped opioid pills in

Highly Confidential – Subject to Further Confidentiality Review

 1   enormous quantities to small towns with

 2   populations --

 3              MR. LIVINGSTON:  I'm sorry.  We can

 4   barely hear you on the phone.

 5              (A discussion was held off the record.)

 6              THE VIDEOGRAPHER:  The time is 2:08 p.m.

 7   We're going off the record.

 8              (Pause.)

 9              THE VIDEOGRAPHER:  The time is 2:10

10   p.m., and we're back on the record.

11   BY MR. HAWAL:

12        Q    Mr. Boggs, are you aware from the time

13   that you've been at McKesson that over the years

14   McKesson had shipped opioid pills to communities

15   that had small populations of hundreds or a few

16   thousand with enormous quantities of opioids that

17   were disproportionate to the populations of the

18   pharmacies servicing the community?

19              MR. STANNER:  Object to the form of the

20   question.

21              THE WITNESS:  I am.

22   BY MR. HAWAL:

23        Q    And did you meet with the West Virginia

24   Attorney General to convince him that McKesson had

Highly Confidential - Subject to Further Confidentiality Review

 1   not significantly contributed to the opioid

 2   crisis?

 3                MR. STANNER:  Object to the form of the

 4   question, "convince."

 5                THE WITNESS:  I don't recall that ever

 6   being discussed during that meeting at all.

 7   BY MR. HAWAL:

 8        Q    Because you would agree that McKesson

 9   had contributed to the West Virginia opioid

10   crisis, true?

11                MR. STANNER:  Object to the form of the

12   question on several bases.

13                THE WITNESS:  I would not.

14   BY MR. HAWAL:

15        Q    You would not.

16             Did you meet with him to apologize for

17   what McKesson had done to his state?

18                MR. STANNER:  Objection.

19                THE WITNESS:  I don't recall that ever

20   being discussed during the meeting.

21   BY MR. HAWAL:

22        Q    You're aware that the Attorney General

23   of West Virginia has filed a lawsuit against

24   McKesson and others related to the opioid epidemic

Highly Confidential - Subject to Further Confidentiality Review

```
1    in that state?

2              MR. STANNER:  Object to the form of the

3    question.

4              THE WITNESS:  I am.

5    BY MR. HAWAL:

6         Q    Was the lawsuit filed when you met with

7    him on September 1st, 2015, or was it filed

8    sometime thereafter?

9         A    I believe it was filed after that.

10        Q    By this time in September 1st of 2015,

11   the opioid epidemic had been well established not

12   only in West Virginia but across the country.

13   True?

14             MR. STANNER:  Object to the form.

15             THE WITNESS:  It had.

16   BY MR. HAWAL:

17        Q    And I'm going to refer you to slide 8 of

18   this PowerPoint presentation that you made to the

19   Attorney General of the State of West Virginia.  I

20   should mention that the Bates number for this

21   slide is MCKMDL00695070.

22             This was a slide that you prepared?

23        A    It is.

24        Q    And does this provide information as to
```

Highly Confidential - Subject to Further Confidentiality Review

1   what steps McKesson had in place in an effort to

2   prevent opioid diversion?

3        A    It does.

4        Q    Are these steps that you implemented as

5   a part of your efforts to improve McKesson's

6   diversion control of opioid pills?

7             MR. STANNER:  Object to the form,

8   compound.

9             THE WITNESS:  Mine and others since I've

10  been at McKesson, yes.

11  BY MR. HAWAL:

12       Q    And who -- who else would have

13  implemented or created these changes?

14       A    Several folks within the Regulatory

15  Affairs program.  Input from counsel, input from

16  analytical folks.

17       Q    And over what period of time were these

18  steps taken?

19       A    We continue to evolve our program on

20  a --

21       Q    Well --

22       A    -- continuously.

23       Q    -- this was dated September 1st, 2015.

24  When did this program begin at McKesson of

Highly Confidential - Subject to Further Confidentiality Review

1   strengthening its CSMP program as you describe in

2   this slide?

3       A    As we spoke earlier today, there was a

4   Lifestyle Drug Monitoring Program that started

5   around 2018 that evolved into the Controlled

6   Substance Monitoring Program in -- around 2008.

7   And we continued to -- we've continued to evolve

8   our program --

9       Q    I'm not interested in past evolution.

10  I'm interested in what you've done since you

11  joined McKesson in 2013.

12           Is that depicted here on this slide 8?

13      A    It is.

14      Q    All right.  One of the things that you

15  did was you established strong governance?

16      A    We did.

17      Q    What's that mean?

18      A    We have a national governance committee

19  made up of senior executives within McKesson that

20  are provided briefings and overviews on our

21  program, some of the different issues that might

22  be impacting our program or our customers as it

23  relates to controlled substances.

24           We have what we call the Regulatory

Highly Confidential - Subject to Further Confidentiality Review

1    Affairs operating committee, which is made up of

2    senior executives within the regulatory program,

3    myself, my boss, my colleagues at my level.  We

4    oversee policies and procedures and overview that.

5    Those are some examples of the governance.

6         Q    And was this something that was started

7    in 2014 or 2015, or can you tell us when it was

8    started?

9         A    I believe sometime around 2014.

10        Q    All right.  And the purpose of that is

11   to provide diligent oversight over McKesson's

12   obligations to conform to the federal laws and

13   regulations relating to maintaining effective

14   controls to prevent diversion?

15             MR. STANNER:  Object to the form.

16             THE WITNESS:  It is -- it is.

17   BY MR. HAWAL:

18        Q    And this could have been implemented in

19   2005?

20             MR. STANNER:  Object to the form.

21   BY MR. HAWAL:

22        Q    Feasible?

23        A    I don't -- I don't know that there

24   wasn't governance at that point in time.  It may

Highly Confidential - Subject to Further Confidentiality Review

1    not have been called the same thing or whatever,

2    or whether or not there was senior executives

3    overseeing or not, I -- I don't know.

4         Q    I didn't ask you whether you knew

5    whether that existed.

6              My question is, would that be something

7    that would be feasible to have been created at a

8    company like McKesson in 2005, for example?

9              MR. STANNER:  Object to the form.

10             THE WITNESS:  I'm not sure that it

11   wasn't done --

12   BY MR. HAWAL:

13        Q    I didn't ask you -- I'm asking you if it

14   was feasible to have created such a program if it

15   hadn't been in place.

16        A    If it did --

17             MR. STANNER:  Same objection.

18             THE WITNESS:  -- yes.

19   BY MR. HAWAL:

20        Q    If it --

21             THE REPORTER:  Excuse me.  We're talking

22   at the same time.

23   BY MR. HAWAL:

24        Q    In 2000, would it be feasible?

1        A     Yes.

2        Q     The next thing you mention is a larger

3   and experienced regulatory team.  What does that

4   mean?

5        A     We expanded the number of people on our

6   team.  We brought in different experience,

7   expertise and skill sets to our team as we evolved

8   our program.

9        Q     And that would have been feasible in

10  2000 and in 2005?

11             MR. STANNER:  Objection to the form.

12             THE WITNESS:  I believe it could have

13  been, yes.

14  BY MR. HAWAL:

15       Q     Why did you create a larger and more

16  experienced regulatory team after you came on

17  board to McKesson?

18       A     Our -- our program and the policies and

19  procedures and the due diligence reviews that we

20  conduct on our customers expanded and was more

21  in-depth.  It required a larger team to do that.

22       Q     Okay.  The next point you made to the

23  Attorney General was oversight and strong

24  leadership by senior diversion experts.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Anything particularly stand out as far
 2   as what change was made in that regard?
 3              MR. STANNER:  Object to the form.
 4              THE WITNESS:  Nothing stands out about
 5   that, no.
 6   BY MR. HAWAL:
 7       Q    That's something that could have been
 8   done in 2000 and 2005, true?
 9              MR. STANNER:  Same objection.
10              THE WITNESS:  That's true.
11   BY MR. HAWAL:
12       Q    The next thing you mention is a
13   comprehensive diligence of new and existing
14   customers.  Right?
15       A    Yes.
16       Q    And what -- what did that -- what does
17   that mean?  How -- how was that changed from what
18   it had been to now you have a comprehensive
19   diligence of new and existing customers?
20       A    We do a more in-depth review of the
21   customers in terms of expanded questions that we
22   ask the customers.  More frequent -- at -- more
23   frequently we ask them to provide data to us to
24   help us review that customer.  We conduct some
```

1   more open source datasets to look at anything that

2   may be on the internet or OIG database to look

3   into that, whether or not any sanctions have been

4   there.  We leverage various other data sources.

5       Q    And that's again something that could

6   have been done in 2000, 2005?

7              MR. STANNER:  Object to the form.

8              THE WITNESS:  Actually, some of that may

9   not have been available back then.  Some of the

10  dataset or data things, they may not have been

11  available.  We use software that's available today

12  that wasn't available back then.

13  BY MR. HAWAL:

14      Q    Well, in a general sense, the more

15  comprehensive diligence of new and existing

16  customers is something that could have been done

17  in multiple different ways.  True?

18             MR. STANNER:  Same objection.

19             THE WITNESS:  It could be.  It's just

20  what we use today, some of the tools that are

21  available to us today to do that were not

22  available, you know, 20 years ago.

23  BY MR. HAWAL:

24      Q    And then you go on to say now you have a

1    rigorous threshold change request approval

2    process, right?

3         A    That's correct.

4         Q    And how -- how has it changed to become

5    a rigorous threshold change request approval

6    process?

7              MR. STANNER:  Same objection.  Calls for

8    speculation.

9              THE WITNESS:  What we do is we take the

10   opportunity of a threshold change request to not

11   just look at the request but to refresh the due

12   diligence review of that customer, to review the

13   licensure of the staff at, say, a pharmacy, the

14   pharmacists and the technicians to see whether or

15   not they have any disciplinary action that may

16   have occurred since the first time we did that.

17   So those are -- those are some of the things that

18   we do.

19   BY MR. HAWAL:

20        Q    Again, something that could have been

21   done in 2000 and 2005, right?

22        A    That's correct.

23             MR. STANNER:  Same objection.

24             THE REPORTER:  Excuse me.

1              MR. STANNER:  You got to pause so I

2    can --

3              THE WITNESS:  My fault.

4              MR. STANNER:  Same objection, calls for

5    speculation.  Go ahead.

6    BY MR. HAWAL:

7         Q    A rigorous threshold change request

8    approval process would encompass making sure that

9    the customer has legitimate business reasons for

10   requesting a threshold increase?

11        A    That would be part of it, yes.

12        Q    And in fact, as you know from your work

13   at McKesson, that is something that was supposed

14   to have been done at McKesson before a threshold

15   change increase was made going back to 2007, 2006

16   time frame, true?

17             MR. STANNER:  Object to the form.

18             THE WITNESS:  I don't know if it wasn't

19   done back then or not.

20   BY MR. HAWAL:

21        Q    I didn't ask you that, sir.  Was it

22   supposed to have been done?

23             MR. STANNER:  Same objection.

24             THE WITNESS:  It was part of the review

1    process, yes.

2    BY MR. HAWAL:

3        Q    And sophisticated analytical tools,

4    you're talking about the algorithms that we

5    briefly touched on before there?

6        A    Not in that context, no.

7        Q    All right.  What is the sophisticated

8    analytical tools?  What are you referring to

9    there?

10   ▪ ████████████████████████████

▪ ████████████████████████████

▪ ██████████████████████████████

▪ ███████████████████████████

▪ ████████████████████████████

15   it's able to provide some analytical --

16       Q    Well, give me an example, if you would,

17   please.  Here you say you put in your customers'

18   purchase history or information.  What -- what

19   kind of information is generated to you that you

20   find to be useful for diversion control from that

21   program?

▪ ▪ ████████████████████████

▪ ██████████████████████████████

▪ ███████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

███  ██████████████████   ███████████████████████

███  █████████████████████████████████████████████

3    different analytical things like that.

4         Q    That's -- that's information that could

5    have been generated and analyzed back in 2000 and

6    2005, perhaps not with the same software but in

7    some fashion, true?

8              MR. STANNER:  Object to the form.

9              THE WITNESS:  Probably in some fashion,

10   just not with the robust ability that -- as that

11   software affords us.

12   BY MR. HAWAL:

13        Q    And then you have:  "Our focus on

14   improving awareness and providing better tools for

15   successful compliance."

16             Is there anything specific that you're

17   referencing there?

18        A    I don't recall off the top of my head,

19   no.

20        Q    And then you say:  "Improved education

21   and training."  Right?

22        A    Yes.

23        Q    And improved education and training

24   about diversion control and effective mechanisms

Highly Confidential - Subject to Further Confidentiality Review

1    to look for it and -- and deal with it?

2        A    This is probably a little bit more

3    all-encompassing.  It's internal training and

4    education, it's external training and education.

5    We provide training and education to our customers

6    about trends, about other evolving regulations

7    that might -- might be evolved within that would

8    impact our program or their ability --

9        Q    And that -- that could have been done in

10   2000 and 2005, true?

11            MR. STANNER:  Object to the form.

12            THE WITNESS:  That's true.

13   BY MR. HAWAL:

14       Q    Let's look at slide 28.

15            MR. STANNER:  If the folks on the phone

16   could mute their line, that would be great.

17   BY MR. HAWAL:

18       Q    Slide 28 identifies under the heading of

19   "Purpose and General Guidance," "McKesson has a

20   legal obligation to provide effective controls to

21   guard against theft and diversion of controlled

22   substances, and to design and operate a system to

23   identify suspicious orders of controlled

24   substances.  As part of McKesson's Controlled

```
 1   Substance Monitoring Program (CSMP), McKesson

 2   conducts regulatory investigative assessments of

 3   its customers."

 4            That is an obligation that has existed

 5   with McKesson going back to 1970.  True?

 6            MR. STANNER:  Object to the form.

 7            THE WITNESS:  That's true.

 8   BY MR. HAWAL:

 9       Q    And then you say:  "Assessments" -- the

10   last paragraph -- "Assessments are regulatory in

11   nature and should not be influenced by the

12   customer's overall sales volume, profitability or

13   strategic importance to the company."  Right?

14       A    That's correct.

15       Q    In other words, large chains that

16   provide McKesson with billions of dollars in -- in

17   sales and profits should not be afforded any

18   additional latitude than one would expect of a

19   small retail pharmacy in terms of diversion

20   control issues.

21            MR. STANNER:  Object to --

22   BY MR. HAWAL:

23       Q    Fair?

24            MR. STANNER:  I'm sorry.  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

1    form.

2              THE WITNESS:  That -- that's correct.

3    BY MR. HAWAL:

4        Q     And then to the right, you have:

5    "Thorough customer diligence review is completed

6    for new customer onboarding, threshold change

7    requests, proactive reviews, and event triggers --

8    triggered reviews.  Every diligence review is

9    documented.  Reports kept in customer due

10   diligence files."

11             Those are the steps that your company

12   takes or should take with regard to performing due

13   diligence reviews of customers?

14       A     They're steps that we take in our

15   program.

16       Q     How long has it been the practice of

17   McKesson to document diligent -- due diligence

18   reviews of customers?

19             MR. STANNER:  Object to the form.

20             THE WITNESS:  I believe there was

21   documentation before I came.

22   BY MR. HAWAL:

23       Q     Is it your understanding that that was

24   something that should have been done -- that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1   done or should have been done going back to 2005,

 2   for example?

 3              MR. STANNER:  Same objection.

 4              THE WITNESS:  I -- it could -- should

 5   have been documented, yes.

 6   BY MR. HAWAL:

 7        Q    And then you have "Reports kept in

 8   customer due diligence files," that would likewise

 9   be something that should have been done going back

10   to 2005?

11              MR. STANNER:  Same objection.

12   BY MR. HAWAL:

13        Q    At least?

14              MR. STANNER:  Same objection.

15              THE WITNESS:  I would agree with that,

16   yes.

17   BY MR. HAWAL:

18        Q    Let's go to slide 38.

19              The last bullet point says:  "Orders

20   that exceed monthly threshold are blocked and not

21   shipped to the customer."

22              When was that process or policy

23   implemented at McKesson?

24              MR. STANNER:  Objection to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I assume they were

 2    blocking shipments before I came to the company.

 3    BY MR. HAWAL:

 4         Q    Again, something that you would have

 5    expected to be done back to 2005, at least?

 6              MR. STANNER:  Object to the form.

 7              THE WITNESS:  As far as I know, it was

 8    being done then, yeah.

 9    BY MR. HAWAL:

10         Q    Yeah.  When you say "it was being done,"

11    have you gone back to make sure that every

12    threshold -- every order that exceeded the monthly

13    threshold that was blocked was not shipped to the

14    customer?

15              MR. STANNER:  Objection to the form,

16    calls for speculation.

17    BY MR. HAWAL:

18         Q    Have you gone back to make that

19    determination?

20         A    I did -- I have not.

21              (Plaintiffs' Exhibit No. 15 was

22              marked for identification.)

23    BY MR. HAWAL:

24         Q    Was that Exhibit 14?
```

```
 1        A    Yes.

 2        Q    I'm handing you what we've marked as

 3   Exhibit 15.  It's an e-mail chain --

 4             MR. WOLFE:  I don't --

 5             MR. HAWAL:  Yeah, it's 692, but I'm not

 6   sure that you have it, Evan.  I may put it on the

 7   ELMO.

 8   BY MR. HAWAL:

 9        Q    I'm handing you what we marked as

10   Exhibit 15.  Is an e-mail chain, MCKMDL00543692,

11   that references daily and suspicious orders

12   electronic reporting.

13             The e-mail at the bottom appears to be

14   from someone at the Department of Justice.  Do you

15   know who Neil Goretsas is?

16        A    I recall him being employed when I was

17   there at --

18        Q    At DEA?

19        A    Yes.  I don't -- I don't --

20        Q    Well, he is apparently providing someone

21   at McKesson, specifically Jenny Melton, some

22   information about sending daily and suspicious

23   order reports.

24             Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. STANNER:  Objection to the form of

 2     the question.

 3                  THE WITNESS:  I do.

 4     BY MR. HAWAL:

 5          Q    Do you know who Jenny Melton is?

 6          A    I've been on some conference calls

 7     throughout my tenure at McKesson that she was on.

 8          Q    Is she with Regulatory Affairs, do you

 9     know?

10          A    I know she's not.

11          Q    Okay.  According to Jenny Melton's

12     e-mail referencing Mr. Goretsas's e-mail, she says

13     she was not aware that there would be a suspicious

14     order report.  "Can you shed light on that?  Are

15     they looking for our existing suspicious report

16     being sent to the federal level or is this

17     something else?"

18                  And she's sending that to Donald Walker,

19     who responds:  "It is not my understanding that we

20     would transmit any suspicious orders."

21                  Don Walker was in Regulatory Affairs,

22     correct?

23                  MR. STANNER:  Object to the form.

24                  THE WITNESS:  He was the senior vice
```

Highly Confidential - Subject to Further Confidentiality Review

 1   president over the distribution operations, and as

 2   part of his duties and responsibilities, the

 3   Regulatory Affairs folks reported up to him.

 4   BY MR. HAWAL:

 5        Q    Does it surprise you that this e-mail

 6   chain indicates that it was Mr. Walker's

 7   understanding that suspicious order reports would

 8   not be transmitted?

 9             MR. STANNER:  Objection to the form.

10             THE WITNESS:  I don't know that I could

11   comment on this without knowing more information

12   or the context of all of this.

13   BY MR. HAWAL:

14        Q    When you were with the DEA, did you

15   expect suspicious order reports to be sent to DEA

16   by a company like McKesson?

17             MR. SATIN:  Objection.  Pursuant to

18   Touhy, do not answer that, to the extent that

19   doing so would reveal information you obtained

20   while at DEA.

21   BY MR. HAWAL:

22        Q    Are you willing to answer that, sir?

23        A    I'm not able to answer that at this

24   time.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Are you -- you mentioned -- you

 2   referenced Mr. Hammergren's testimony before

 3   Congress previously.

 4             Mr. Hammergren, you're aware, testified

 5   before Congress in his capacity as president of

 6   McKesson dealing with the opioid crisis.

 7        A    It was my understanding he testified as

 8   the CEO of the company.

 9        Q    Okay.

10        A    But -- I'm aware of that.

11        Q    Did you -- were you present for that

12   hearing or did you listen to it?

13        A    I was not present, but, yes, I did

14   listen to it.

15        Q    Do you remember that Mr. Hammergren

16   testified before Congress that if McKesson had its

17   current algorithm in place in 2007, that orders

18   which exceeded thresholds would not have been

19   shipped?  Do you recall that?

20             MR. STANNER:  Object to the form.

21             THE WITNESS:  I don't recall

22   specifically that, but I'll take your word for it.

23   BY MR. HAWAL:

24        Q    Well, does that -- does that sound
```

 1   correct that --

 2        A    I don't have any reason to doubt it.

 3        Q    Have you or anyone at McKesson gone back

 4   and run the data on opioid shipments from 2007 to

 5   2012 or any other past period through your current

 6   algorithms?

 7             MR. STANNER:  Object to the form.

 8             THE WITNESS:  Through our current

 9   algorithms?

10   BY MR. HAWAL:

11        Q    Yes, to see what shouldn't have been

12   shipped and was shipped during that time period.

13        A    Not to my knowledge.

14        Q    Is that something that can be done?

15             MR. STANNER:  Object to the form.  Calls

16   for speculation.

17             THE WITNESS:  I don't know.  I don't

18   know how far back the data is in the system, so

19   I -- I'm not qualified to answer that question.

20   BY MR. HAWAL:

21        Q    If the data was available, that would

22   permit one to determine what amount of opioids

23   should not have been shipped or supplied to

24   individual customers anywhere in the United

Highly Confidential - Subject to Further Confidentiality Review

1    States, true?

2            MR. STANNER:  Same objection,

3    speculation.

4            THE WITNESS:  Yeah, I -- I'm not

5    qualified to answer it.  I -- I would assume that

6    that would be the case, but I'm not qualified --

7    I'm not an IT person.

8    BY MR. HAWAL:

9        Q    Have you or anyone else at McKesson made

10   any effort to compare how many due diligence files

11   or investigations exist before 2014 in comparison

12   to how many should exist?

13           MR. STANNER:  Object to the form.

14           THE WITNESS:  I've not conducted that,

15   and I'm not aware that anyone else has.

16   BY MR. HAWAL:

17       Q    Have you or anyone else at McKesson gone

18   back to determine how many threshold increases

19   done by McKesson did not have a legitimate

20   business justification or diligence documentation?

21           MR. STANNER:  Same objection.

22           THE WITNESS:  I have not done that, and

23   I'm not aware of anyone else doing it.

24           (Plaintiffs' Exhibit No. 16 was

```
 1                   marked for identification.)

 2   BY MR. HAWAL:

 3        Q    Sir, I'm handing you what we've marked

 4   as Exhibit 16.

 5                It's a number of statements that I'm

 6   going to ask you whether you agree with that apply

 7   to establishing opioid thresholds at McKesson.

 8                Do you agree that thresholds are a

 9   critical part of CSMP at McKesson?

10                MR. STANNER:  Objection.  Form and

11   foundation.

12                THE WITNESS:  I think they're an

13   important part of our program, yes.

14   BY MR. HAWAL:

15        Q    And they were an important part of

16   McKesson's program certainly going back to the

17   creation of the CSMP in 2008 with its settlement

18   agreement, right?

19                MR. STANNER:  Same -- same objection.

20                MR. SATIN:  Objection with respect to

21   Touhy.  Don't answer if it would -- if your answer

22   would reveal information about your time at the

23   DEA.

24                THE WITNESS:  It is my understanding
```

1    they were -- started back around 2007 under the

2    Lifestyle Drug Monitoring Program.

3    BY MR. HAWAL:

4        Q    And do you agree that McKesson takes

5    great care in setting thresholds, or should?

6        A    I -- McKesson does take great care in

7    setting thresholds.

8        Q    And they should have taken great care in

9    doing so back to 2007, correct?

10              MR. STANNER:  Object to the form.

11              THE WITNESS:  I don't know that they

12    didn't.

13    BY MR. HAWAL:

14        Q    I didn't ask you that.  I'm asking you

15    whether they should have.

16        A    I think it would have been an important

17    thing, yes.

18        Q    And would you agree that each customer

19    is unique so that the threshold is specific to

20    each customer's business needs?  Is that a true

21    statement?

22        A    I would agree with it, yes.

23        Q    And McKesson should make informed

24    decisions based on established threshold

```
 1    information.  Is that a fair statement?

 2              MR. STANNER:  Object to the form.

 3              THE WITNESS:  I agree with the

 4    statement, yes.

 5              MR. HAWAL:  I didn't mean to throw it.

 6              MR. STANNER:  I was going to say, I'm

 7    going to give you the benefit of the doubt that

 8    but you didn't mean to throw it.

 9              (Plaintiffs' Exhibit No. 17 was

10              marked for identification.)

11    BY MR. HAWAL:

12         Q    Have you seen this e-mail before, dated

13    December 27th, 2010?

14         A    I don't believe I've ever seen this

15    document.

16         Q    This is a document from Jay Kramer -- or

17    to Jay Kramer from SharePoint?

18              MR. STANNER:  Object to the form.

19    BY MR. HAWAL:

20         Q    It's MCK_00168027.

21              MR. STANNER:  So just for the record, it

22    doesn't have the MDL Bates on it, so maybe it's

23    cut off due to some sizing or imaging.  The -- I

24    think it's 165027.  Bill, I --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. HAWAL:  Yeah, the copying -- it's
2    been copied so many times, it -- it's hard to make
3    out, but we've used it before.
4              MR. STANNER:  Sure.  It's a SharePoint
5    e-mail dated Monday, December 27, 2010, at
6    6:12 p.m.
7    BY MR. HAWAL:
8         Q    Have you seen this before?
9         A    I've never seen this before.
10        Q    Are you familiar with SharePoint?
11        A    I -- yes.
12        Q    What -- what is SharePoint?
13        A    SharePoint's kind of a software system
14   that McKesson and other companies use as a way to
15   manage certain functions.
16        Q    And is Dale's Pharmacy familiar to you?
17        A    It is not.
18        Q    No?  I want you to assume that Dale's
19   Pharmacy was indicted for distributing, selling
20   opioids to illicit customers in the state of
21   Colorado.
22              But do you see that the alleged business
23   decision that was used to justify increasing the
24   threshold by 8,000 doses of oxycodone was
```

```
 1   increased in volume during the holidays?

 2              MR. STANNER:  Object to the form.

 3              THE WITNESS:  I do.

 4   BY MR. HAWAL:

 5       Q    Do you think that's a legitimate

 6   business decision, sir?

 7       A    I think that one of the nuances, and

 8   particularly as we're going to the end of the

 9   year, in this particular circumstance it appears

10   that this was in December of 2010, what I've seen

11   through my experience is that at that particular

12   time of the year sometimes people are using the

13   end of their flexible spending accounts or other

14   things that might not roll over into the next

15   year.  And there is an increase in surgeries and

16   other things at that point in time of the year

17   that would have maybe have contributed to business

18   growth at that -- at that point.  So...

19       Q    Which is pure speculation on your part,

20   correct?

21              MR. STANNER:  Objection.  You've asked

22   him to speculate.

23              THE WITNESS:  Yeah, that was my

24   understanding.  You asked for my opinion on it.
```

```
 1   BY MR. HAWAL:

 2       Q    Well, let me ask you this:  There were

 3   only four days left in that month, right?  This is

 4   December 27th.

 5       A    That's correct.

 6       Q    And this customer is getting an increase

 7   of 8,000 doses for that month's threshold for

 8   oxycodone, right?

 9       A    I see that.

10       Q    Do you know if that increase was made

11   permanent?

12       A    No --

13            MR. STANNER:  Objection to the form.

14            THE WITNESS:  -- I don't know that.

15   BY MR. HAWAL:

16       Q    Would that trouble you?

17       A    Not necessarily, without knowing more

18   information.

19       Q    And that was approved by Tom McDonald?

20       A    That's what it says.

21            MR. STANNER:  Object to the form.

22            THE REPORTER:  That's what it says?

23            THE WITNESS:  That's what it says.

24   BY MR. HAWAL:
```

1          Q      And Mr. McDonald was the director of

2   Regulatory Affairs for the Aurora, Colorado

3   facility that prompted a 23-page letter from the

4   Department of Justice outlining a series of

5   violations of the Controlled Substances Act that

6   we've discussed previously, correct?

7              MR. STANNER:  Object to the form.

8              THE WITNESS:  That's correct.

9   BY MR. HAWAL:

10         Q      We talked earlier about McKesson

11  changing their practice of threshold increases to

12  increase them with a threshold warning report, and

13  then proactively contacting the customer to see if

14  they needed an increase before they ever bumped up

15  against their threshold.

16             Do you remember that?

17         A      I do.

18             MR. STANNER:  Objection.

19  BY MR. HAWAL:

20         Q      Do you know that that was the practice

21  at McKesson?

22             MR. STANNER:  Objection to the form.

23             THE WITNESS:  I do.

24             (Plaintiffs' Exhibit No. 18 was

Highly Confidential - Subject to Further Confidentiality Review

```
 1              marked for identification.)

 2   BY MR. HAWAL:

 3       Q    I'm handing you what we marked as

 4   Exhibit 18, is MCKMDL00596566, which is a

 5   Controlled Substance Monitoring Program document.

 6              And if we look at the next page, it

 7   instructs customers -- or it instructs employees

 8   to advise customers that thresholds are not

 9   published and are based on a 12-month purchase

10   history plus an additional margin to account for

11   growth, new customers.

12              So, in other words, McKesson had been

13   setting its thresholds at a certain level based

14   upon past sales, but included a buffer to

15   accommodate for potential increased business.

16   Right?

17              MR. STANNER:  Objection to the form,

18   compound.

19   BY MR. HAWAL:

20       Q    Is that your understanding of what was

21   being done based on your current employment at

22   McKesson?

23              MR. STANNER:  Same objection.

24              THE WITNESS:  That's what it says in the
```

1    document.

2    BY MR. HAWAL:

3        Q    Was it your understanding that's what in

4    fact had been happening at McKesson?

5            MR. STANNER:  Same objection.

6            THE WITNESS:  To some extent, yes.

7    BY MR. HAWAL:

8        Q    All right.  The general threshold for

9    independent retail pharmacies was 5,000, and

10   McKesson added the $3,000 -- or 3,000 increase to

11   accommodate for potential new growth and new

12   customers, right?

13           MR. STANNER:  Objection --

14   BY MR. HAWAL:

15       Q    Is that your understanding?

16           MR. STANNER:  Objection to the form.

17           THE WITNESS:  I have not had any

18   understanding of that granularity of how that was

19   done.

20   BY MR. HAWAL:

21       Q    Now, according to the next page, it

22   says, you know, in terms of what should be

23   communicated to the customer, it says:  "Tell

24   caller that you will forward the request, and that

1    someone from the McKesson Distribution Center will

2    call if the request is denied.  Otherwise, the

3    caller can consider the request approved."

4              And that would be in reference to

5    threshold increases, correct?

6              MR. STANNER:  Objection.

7    BY MR. HAWAL:

8         Q    The default was that unless you hear

9    otherwise, consider the increase in your threshold

10   to be approved.  Is that a fair interpretation of

11   that paragraph?

12             MR. STANNER:  Object to the form.

13             THE WITNESS:  I think that that's what

14   it says, yes.

15             (Plaintiffs' Exhibit No. 19 was

16             marked for identification.)

17   BY MR. HAWAL:

18        Q    I'm handing you what we marked as

19   Exhibit 19.  It's another Controlled Substance

20   Monitoring Program document relating to

21   thresholds.  Correct?

22        A    That's correct.

23        Q    And what it provides is that:

24   "Customers are proactively contacted when they

Highly Confidential - Subject to Further Confidentiality Review

1   near their threshold to facilitate the possible

2   increase of the threshold by the distribution

3   center manager."  Right?

4        A    I think you read that correctly, yes.

5        Q    And the policy on the next page that is

6   identified is, "The company will proactively

7   contact the customers when they reach 85 percent

8   of their threshold."

9             Do you see that?

10       A    I see that.

11       Q    So as we discussed earlier, McKesson had

12   a policy that customers that reached 85 percent of

13   their threshold would be -- would be contacted to

14   proactively see if they wanted to get an increase

15   in their monthly allotment or limit of opioids,

16   right?

17       A    I see that, yes.

18       Q    And in fact, a suggested talking point

19   was identified.  It says:  Hello, my name is,

20   blank.  I'm calling from McKesson's ServiceFirst.

21   May I speak to blank or who is the contact person

22   at the pharmacy.  I'm looking at your controlled

23   substance monitoring threshold purchase history,

24   and you're at 85 percent threshold.  These are --

```
 1    there are blank days left in the month, so you

 2    might want to check your shelves to make sure you

 3    have the inventory you need for the month.  You

 4    will receive the notification on your invoice when

 5    you have reached 90 percent threshold of -- on

 6    controlled items.

 7              So, in other words, that would allow a

 8    customer to know exactly what their threshold was,

 9    right?

10              MR. STANNER:  Object to the form.

11              THE WITNESS:  I don't know if it would

12    let them know exactly what it was, but --

13    BY MR. HAWAL:

14         Q    Well --

15         A    -- I understand that they would be able

16    to --

17         Q    Figure it out.

18         A    -- figure something out close to that.

19         Q    You don't do that anymore, correct?

20         A    We do not.

21         Q    Was that something that you changed?

22         A    It was not.

23              (Plaintiffs' Exhibit No. 20 was

24              marked for identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2       Q    I'm handing you what has been marked as

 3   Plaintiffs' Exhibit 20.  It is an e-mail exchange

 4   between Tom McDonald and Jake Kramer whereby Tom

 5   McDonald is identifying a customer with a high

 6   oxycodone ratio and provides data relating to that

 7   customer.  See that?

 8       A    I do.

 9       Q    So apparently Mr. McDonald is

10   identifying several pharmacies, or at least one,

11   that has a high oxycodone ratio.

12            What does that mean?  Does that mean

13   high in terms of comparison with other substances

14   being sold to it?

15            MR. STANNER:  Objection to form.

16            THE WITNESS:  I believe that's the case,

17   yes.

18   BY MR. HAWAL:

19       Q    One of the red flags that you've

20   identified before, high ratio?

21       A    It -- it would be a red flag, yes.

22       Q    And Mr. Kramer's response is "Everybody

23   is high, Tom.  Are we supposed to cut everyone

24   off?"
```

```
 1                Do you find that to be a troubling
 2    response by a McKesson employee when a red flag is
 3    identified regarding controlled substances?
 4                MR. STANNER:  Objection to form.
 5    BY MR. HAWAL:
 6         Q    Particularly oxycodone?
 7                MR. STANNER:  Objection to form.
 8                THE WITNESS:  I do.
 9    BY MR. HAWAL:
10         Q    Are you familiar with Marc's Pharmacy as
11    a customer of McKesson in the Akron and Cleveland
12    area in Ohio?
13         A    Not off the top of my head, no.
14         Q    You indicated that you had discontinued
15    the practice of providing customers with a
16    threshold warning report as they were approaching
17    their monthly limit for purchases of controlled
18    substances, right?
19                MR. STANNER:  Objection to the form.
20                MR. SATIN:  Objection.  The insinuation
21    of some of your questions, when you use the word
22    "you," if you could be clear as to whom you are
23    referring to.
24                MR. HAWAL:  I'm referring to you as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   McKesson.

 2              MR. STANNER:  Well, I think that's the

 3   issue.  To the extent he being -- he's being asked

 4   to speak for McKesson, I would have a standing

 5   objection to some of the earlier questions.  I

 6   think he is here in his personal capacity.  He can

 7   speak to what he personally knows.

 8   BY MR. HAWAL:

 9       Q    Well, sir, you were -- you were retained

10   by McKesson to make changes because of problems

11   McKesson had been having with its Controlled

12   Substance Monitoring Program and its

13   anti-diversion procedures prior to your arrival,

14   right?

15              MR. STANNER:  Objection.  Calls for

16   speculation.  Object to the form.

17              THE WITNESS:  I was hired to work and

18   oversee the regulatory program and improve it

19   wherever we could --

20   BY MR. HAWAL:

21       Q    Well --

22       A    -- improve it and evolve it.

23       Q    -- you knew that McKesson had had a

24   problem that resulted in a settlement agreement
```

1    and fine in 2008 where they promised to make

2    changes, and you know that changes -- well, you

3    know that -- that problems continued that resulted

4    in a $150 -- a $150 million settlement in 2000 and

5    -- what was it, '18 or '17?

6        A    '17.

7        Q    '17.  And those problems were occurring

8    from 2008 through 2013, right?

9            MR. STANNER:  Same objections, compound.

10           MR. SATIN:  And objection pursuant to

11   Touhy.  Do not answer if it would reveal

12   information you learned while at DEA.

13           THE WITNESS:  I was not aware of the

14   second matter until after I was retained by

15   McKesson.

16   BY MR. HAWAL:

17       Q    Right.  But you -- do you understand

18   that the reason they hired you as a former DEA

19   agent was to come aboard and clean up what had

20   been happening with regard to their anti-diversion

21   programs?

22           MR. STANNER:  Same objection, calls for

23   speculation.

24           THE WITNESS:  I don't know if I agree

Highly Confidential - Subject to Further Confidentiality Review

1   with the characterization.  I believe that I have

2   skill sets that can help improve and expand a

3   program and to continue to evolve that program.

4   BY MR. HAWAL:

5       Q    I want you to assume that Marc's is a

6   chain pharmacy that exists in Cuyahoga and Summit

7   counties in Ohio, and this is -- well, I

8   apologize.  I haven't marked it or identified it.

9   I'll do that.

10           (Plaintiffs' Exhibit No. 21 was

11           marked for identification.)

12  BY MR. HAWAL:

13      Q    I'm going to hand you what is marked as

14  Exhibit 21, which is an e-mail dated January 27,

15  2014, which provides -- with the subject "Marc's

16  Threshold Warning Report."

17           Apparently in 2014, McKesson was still

18  providing threshold warning reports as is

19  reflected in this document, correct?

20           MR. STANNER:  Objection to the form.

21           THE WITNESS:  McKesson -- for chains,

22  McKesson operates slightly different in terms of

23  interacting with the compliance programs of the

24  chains, and because the chains operate differently

Highly Confidential - Subject to Further Confidentiality Review

```
 1    based upon certain situations where they might

 2    self-warehouse for their entire group, there's a

 3    different exchange of information.

 4    BY MR. HAWAL:

 5         Q    So I understand then that McKesson

 6    decided that it was a good business practice and

 7    good for its obligations under the Controlled

 8    Substances Act to no longer notify small retail

 9    pharmacies about their thresholds by providing

10    threshold warning reports, but didn't think that

11    that was a good practice as relates to the larger

12    chain customers.

13              Is that my -- am I paraphrasing what you

14    just said correctly?

15              MR. STANNER:  Objection to the form.

16              THE WITNESS:  Not at all.  One is

17    we're -- we're not doing that to comply with the

18    Controlled Substances Act.  We do that as a matter

19    of course because the threshold for our

20    independent small, medium chains, not the retail

21    national chains, is to not disclose what that

22    threshold is to them.  It's different with the

23    chains because of the business model that they

24    have is vastly different than the business model
```

1   of an independent pharmacy, and we work with that

2   company -- the chain company's regulatory folks to

3   help understand what their chain stores need

4   because they operate differently.

5           We don't -- excuse me -- we don't tell

6   the individual stores.  We work with the

7   corporation -- corporate headquarters and their

8   folks as it relates to the program and the

9   operations and needs.

10  BY MR. HAWAL:

11      Q    So the -- with the chains, someone at

12  corporate headquarters makes the determination as

13  to what the appropriate thresholds are for

14  individual stores rather than McKesson doing so?

15          MR. STANNER:  Objection to the form.

16          THE WITNESS:  Typically McKesson will

17  make the -- the thresholds.  There may be some

18  instances a chain wants a more conservative one

19  for either a particular store or a particular base

20  code, and we work -- we interact and work with

21  their compliance teams.

22  BY MR. HAWAL:

23      Q    Well, let me ask you hypothetically, if

24  a retail customer, who is not part of a chain,

1    wants a threshold increase, you require a

2    legitimate business determination or explanation

3    as to why that increase is -- is appropriate, and

4    you do some due diligence investigation of that,

5    correct?

6         A    That's correct.

7         Q    And you deem that to be part of your

8    rigorous Controlled Substance Monitoring Program,

9    true?

10        A    True.

11        Q    But you delegate that responsibility for

12   the chains to someone at a corporate level, for

13   example, with a company like CVS and in this case

14   Marc's?

15             MR. STANNER:  Objection to the form.

16   You used the word "delegate."

17             THE WITNESS:  I think that you

18   completely misunderstood me.  We work with them.

19   We still conduct due diligence reviews of the

20   chains.  We still conduct threshold change

21   requests and due diligence and justification at a

22   chain level store.  We just do that through the

23   corporate entity, such as a CVS or a Rite Aid,

24   because they have a structured regulatory team.

1           We still do due diligence, and we still

2    do a threshold change request on those customers

3    regardless of whether they're a chain or whether

4    they're an independent.

5    BY MR. HAWAL:

6        Q    So you're saying that a CVS store in

7    Pensacola, Florida, that wants a threshold change

8    increase contacts McKesson, and McKesson does due

9    diligence at that store location to determine

10   whether an increase is justified at that location?

11   Is that what you're saying?

12           MR. STANNER:  Objection to the form.

13           THE WITNESS:  Not at all.  What I'm

14   saying is, if an individual store, or in this case

15   as an example a CVS chain, if an individual CVS

16   store needed an increase, they would work through

17   their corporate headquarters, and we would be

18   working through the corporate headquarters with

19   them to do that.

20   BY MR. HAWAL:

21       Q    So you're taking -- you're taking

22   someone at corporate headquarters at their word

23   that they are doing some type of due diligence for

24   a given store that they own as to whether or not a

1    threshold increase is justified.

2              MR. STANNER:  Objection --

3    BY MR. HAWAL:

4         Q    Fair?

5              MR. STANNER:  Objection to the form,

6    misstates.

7              THE WITNESS:  No, again you're

8    completely mischaracterizing or misunderstanding

9    me.

10   BY MR. HAWAL:

11        Q    Well --

12        A    They -- they would submit -- a local

13   individual store would submit a request up through

14   their corporate headquarters and their regulatory

15   team.  Then we would get that receipt into us, and

16   we would conduct a due diligence review and work

17   with the corporate headquarters to get that

18   information that we need to conduct our due

19   diligence review that we do, and assess whether or

20   not we're going to grant that --

21        Q    And --

22        A    -- threshold request.

23        Q    And what due diligence review do you do

24   at that individual store whose threshold is being

1    requested to be increased?

2            MR. STANNER:  Objection to the form.

3            THE WITNESS:  We would look at

4    potentially their purchase history for that

5    particular base code.  We would look at whether or

6    not they have been omitting for that particular

7    base code, whether or not we thought there was a

8    need for it based on the justification, and what

9    their current level was.  And we might deny the

10   threshold request, we might grant part of it or we

11   might grant all of it.

12   BY MR. HAWAL:

13       Q    And if that kind of due diligence is not

14   done, that would be a violation of your CSMP.

15   Correct?

16           MR. STANNER:  Objection to the form.

17           THE WITNESS:  It would not be -- it

18   would be within our protocols.

19   BY MR. HAWAL:

20       Q    CVS one of your customers?

21       A    CVS Caremark, I believe, yes.

22       Q    How long?

23       A    I'm -- I deal with the independent

24   small, medium chains, and my counterpart, Nate

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Hartle, is responsible for overseeing the national

 2   chains.

 3        Q    And isn't Tom McDonald, who we've talked

 4   about previously, isn't he in some capacity

 5   overseeing some of the chains, including CVS?

 6        A    No, he's not.

 7        Q    He's not.  Was he?

 8        A    He may have before I came on.  I

 9   don't -- I don't know that.

10             MR. STANNER:  Yes, let me just note

11   quickly for the record here, there's a previous

12   answer of the witness:  "It would be -- it would

13   be within our protocols."  I think it's

14   mistranscribed.  I think the testimony is:  "It

15   would not be within our protocol."

16             (Plaintiffs' Exhibit No. 22 was

17             marked for identification.)

18   BY MR. HAWAL:

19        Q    Mr. Boggs, was what your lawyer just

20   said accurate?

21        A    It is.

22        Q    I'm handing you what we've marked as

23   Exhibit 22, which is a series of e-mails between

24   someone at McKesson and someone at CVS.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Are you aware that CVS had not been --

 2    was refusing to provide data that McKesson was

 3    requesting as to the amount of controlled

 4    substances that were being sold and dispensed at

 5    its individual stores?

 6              MR. STANNER:  Object to the form.

 7              And if you need time to read the

 8    document, it's fairly lengthy.

 9              Counsel, if there a specific point --

10    part you want to point us to, let -- also I don't

11    believe that --

12              MR. HAWAL:  I'm sorry.

13              MR. STANNER:  I don't believe this -- I

14    don't believe the document that's up there is this

15    document, unless I'm missing something.  I have

16    MCKMDL00627048.

17              MR. HAWAL:  That's what I'm referring

18    to, but -- let me put it on the ELMO.

19              Can you zoom in on it, Evan?  Okay.

20    Thank you.

21    BY MR. HAWAL:

22         Q    The e-mail -- this is MCKMDL00627048.

23    The e-mail is from Ned McKenna to Brian Whalen,

24    with copies to Tom McDonald and others, and
```

```
 1   including Donald Walker.

 2            And it references -- it says:  "Brian,

 3   for your information, prior to the transition and

 4   in an effort to be proactive in the -- proactive

 5   as we set the CSMP thresholds for these 164

 6   stores, we asked CVS for the three months of sales

 7   data.  We were told we could not have it.  More

 8   recently we again asked for their most recent

 9   three months of sales from CVS.  Once again, we

10   were told we could not have the data.  Our

11   thinking with both requests was that if we had CVS

12   actual data, we could collaborate with CVS and set

13   very accurate and functional CSMP thresholds.

14   Unfortunately, we still do not have any CVS sales

15   data, except for McKesson's actual sales from July

16   after the transition was up and running."

17            Are you aware, sir, or do you recall

18   that CVS refused to provide on a consistent basis

19   sales data that you were requesting in an effort

20   to set thresholds at various of their pharmacies?

21            MR. STANNER:  Object to the form,

22   speculation.  Vague, "you."

23            MR. SATIN:  Again, also you used the

24   word -- this is a 2010 document, and he wasn't at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    McKesson.

 2    BY MR. HAWAL:

 3         Q    Well, are you -- are you aware going

 4    forward that CVS has refused to provide sales data

 5    for its various individual stores?

 6              MR. STANNER:  Objection.

 7              THE WITNESS:  I don't know if that's the

 8    case currently or not.  I have no -- I -- I don't

 9    know that.

10    BY MR. HAWAL:

11         Q    If they did refuse that, would that be a

12    problem?

13              MR. STANNER:  Object to the form.

14    Hypothetical.

15              THE WITNESS:  It would be a concern over

16    what CVS's reasoning would be for not providing it

17    or whatever.  I don't know what the -- the

18    foundation of it is.

19    BY MR. HAWAL:

20         Q    It is your understanding that CVS has

21    a -- has its own suspicious order monitoring

22    program?

23         A    CVS would not have a suspicious order

24    monitoring program.
```

1      Q     It would not have its own, is that what

2  you're saying?

3      A     They don't -- they fill prescriptions to

4  patients.  They don't --

5      Q     I'm talking about its corporate -- you

6  said you deal with the chains' corporate

7  representatives.

8      A     Right.

9      Q     Does the corporate headquarters have

10  some type of Regulatory Affairs department or

11  suspicious monitoring program?

12          MR. STANNER:  Objection to the form.  He

13  did not said that he did it personally.

14          THE WITNESS:  They would have a

15  suspicious order -- or, I'm sorry, they would have

16  a Controlled Substance Monitoring Program, but

17  they would not have a suspicious order program.

18  BY MR. HAWAL:

19      Q     What does their controlled substance

20  monitoring program consist of, if you know?

21      A     I -- I don't know.

22          MR. STANNER:  Object to the form.

23  BY MR. HAWAL:

24      Q     Who at the company should know that?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. STANNER:  Object to the form.

2              THE WITNESS:  I would say that Nate

3    Hartle would be -- be knowledgeable about that.

4    BY MR. HAWAL:

5         Q    Are you aware that CVS had multiple

6    instances where they were fined by the Department

7    of Justice as a result of their failure to

8    appropriately implement a suspicious monitoring

9    program and its failure to adhere to the

10   obligations under the Controlled Substances Act

11   and -- and regulations?

12             MR. STANNER:  Object to the form.

13             THE WITNESS:  I'm only aware of -- of

14   one for that.  I'm not aware of multiple ones.

15             (Plaintiffs' Exhibit No. 23 was

16             marked for identification.)

17   BY MR. HAWAL:

18        Q    Sir --

19             MR. HAWAL:  Evan, I'm going to use the

20   ELMO because you have the wrong one.

21   BY MR. HAWAL:

22        Q    I'm handing you what we marked as

23   Exhibit 23.  It's a document from the United

24   States Attorney's Office for the Eastern District
```

Highly Confidential - Subject to Further Confidentiality Review

1    of California, referencing the fact that CVS had

2    paid a $5 million penalty to resolve allegations

3    that it had violated the Controlled Substances

4    Act.

5              Do you see that?

6              MR. STANNER:  Object to the form.

7              THE WITNESS:  From my reading of this,

8    it -- it was a fine -- fine for recordkeeping

9    violations.

10   BY MR. HAWAL:

11        Q    Mm-hmm.  In violation of the Controlled

12   Substances Act?

13        A    Or the implementing regulations, yes.

14             (Plaintiffs' Exhibit No. 24 was

15             marked for identification.)

16   BY MR. HAWAL:

17        Q    I'm handing you what we marked as

18   Exhibit 24.  It is another release from the U.S.

19   Attorney's office for the District of

20   Massachusetts where CVS paid $3.5 million because

21   its pharmacists were filling fake prescriptions.

22             MR. STANNER:  Object to the form of the

23   question.

24             THE WITNESS:  I see that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:

 2        Q    Were you aware of that?

 3        A    No, I was not.

 4             (Plaintiffs' Exhibit No. 25 was

 5             marked for identification.)

 6   BY MR. HAWAL:

 7        Q    I'm handing you what has been marked as

 8   Exhibit 25.  It is another release from the U.S.

 9   Department -- or from, yeah, the U.S. Attorney's

10   Office for the District of Rhode Island where CVS

11   paid another civil penalty of $450,000 for

12   violations of the Controlled Substances Act by

13   filling invalid prescriptions and maintaining

14   deficient records.

15             MR. STANNER:  Objection to the form.

16             THE WITNESS:  I see it.

17   BY MR. HAWAL:

18        Q    Aware of that -- were you aware of that?

19        A    I was not aware of that, no.

20             (Plaintiffs' Exhibit No. 26 was

21             marked for identification.)

22   BY MR. HAWAL:

23        Q    Sir, I'm handing you what I've marked as

24   Exhibit 26.  Is that correct, is it 26 or 27?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A    26.

 2          Q    Is -- this one is from the Western

 3     District of Oklahoma whereby CVS agreed to pay

 4     $11 million to settle -- settle claims that it

 5     violated the Controlled Substances Act.

 6               MR. STANNER:  Objection to the form of

 7     the question.

 8     BY MR. HAWAL:

 9          Q    Do you see that?

10          A    I do see that.

11          Q    And at the bottom, in identifying the

12     reasons, it said it created and entered and

13     maintained invalid dummy DEA registration numbers

14     other than the valid DEA registration numbers of

15     the prescribing practitioners on dispensing

16     records, and in filling prescriptions for certain

17     prescribers whose DEA registration numbers were

18     not current or valid.

19               Were you aware of this civil penalty?

20               MR. STANNER:  Objection to the form,

21     assumes facts.  Calls for speculation.

22     BY MR. HAWAL:

23          Q    Which ones -- which CVS infractions were

24     you aware of that resulted in some type of -- of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   penalty or action by the Department of Justice?

 2       A    I'm aware of two CVS, Sanford, Florida,

 3   pharmacies that were -- there was some issues

 4   related to them.  I don't know whether or not

 5   there was actually a fine or what the final

 6   outcome of that was, but I -- I'm aware of that

 7   one.

 8       Q    Do you believe that these types of

 9   reports would be monitored by someone at McKesson

10   who is responsible for the CVS account?

11            MR. STANNER:  Objection to the form.

12            THE WITNESS:  I would expect that to

13   some extent.  I mean every -- every one of these

14   appear to be a large -- there was a large focus

15   related to the civil fine on recordkeeping

16   violations.

17   BY MR. HAWAL:

18       Q    Well, are recordkeeping violations

19   important to you?

20            MR. STANNER:  Objection to the form.

21   Vague.

22            THE WITNESS:  They're important, yes.

23   BY MR. HAWAL:

24       Q    And do you believe that this type of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    history with CVS would be something that McKesson

 2    should be aware of and should be monitoring?

 3         A    I -- to some degree, yes.

 4         Q    If -- if CVS refused to provide McKesson

 5    with data that McKesson deemed important enough

 6    for purposes of setting thresholds at McKesson --

 7    at CVS pharmacies, would you believe that it would

 8    be important as a former DEA agent to either

 9    insist on that data or tell a company like CVS,

10    We're not going to do business with you unless you

11    provide us with this data that we think is

12    important?

13              MR. STANNER:  Objection to the form,

14    assumes facts.

15              THE WITNESS:  I think it's important to

16    get the data if it's relevant to the -- or needed

17    to conduct a review of that customer.  Whether or

18    not the decision would be to not ship to -- to

19    them in its entirety would be, again, based upon

20    the facts and the circumstances.

21              MR. HAWAL:  What are we on now, 28?

22              MR. STANNER:  That last one was 26, I

23    thought.

24              (Plaintiffs' Exhibit No. 27 was
```

```
 1                marked for identification.)

 2   BY MR. HAWAL:

 3        Q    I'm handing you what has been marked as

 4   Exhibit 27.  It is several e-mails,

 5   MCKMDL00544143, between Bruce Skidgel and Donald

 6   Walker.

 7                And I'm -- I want to highlight to you

 8   the last sentence of -- of Mr. Skidgel's e-mail

 9   where it appears that he would have no hesitation

10   in terminating a customer given the fact that it's

11   a small account.

12                Would that be a fair interpretation of

13   what Mr. Skidgel is telling Mr. Walker?

14                MR. STANNER:  Objection to the form.

15   Foundation, speculation.

16                THE WITNESS:  If I could just take a

17   minute to read it.

18   BY MR. HAWAL:

19        Q    Mm-hmm.

20        A    (Peruses document.)  Could you repeat

21   your question?

22        Q    Yeah.  Do you believe that this

23   indicates Mr. Skidgel's willingness to terminate a

24   customer -- or willingness to terminate a customer
```

```
 1    because the customer was a small account for

 2    McKesson?

 3              MR. STANNER:  Objection to the form.

 4              THE WITNESS:  That's what it says, I

 5    agree with that.

 6    BY MR. HAWAL:

 7        Q    Mr. Boggs, I'm going to hand you what we

 8    previously marked at your earlier deposition as

 9    Exhibit 6, MCKMDL00407451.

10              MR. STANNER:  Is this 28?

11              MR. HAWAL:  Yeah.

12    BY MR. HAWAL:

13        Q    And we're going to mark it as Exhibit 28

14    for your deposition today.

15              (Plaintiffs' Exhibit No. 28 was

16              marked for identification.)

17    BY MR. HAWAL:

18        Q    You're familiar with the term

19    "diversion," "drug diversion"?

20        A    I am.

21        Q    And what is your understanding -- well,

22    strike that.

23              Are you familiar with the term "drug

24    migration" as it relates to diversion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A    I am.

2        Q    In other words, drugs that find their

3   way into the illegal distribution system in a

4   given community will not remain in that community;

5   they will -- some of those drugs will migrate to

6   adjacent communities and even different states.

7   Is that a fair statement as to what drug migration

8   refers to?

9             MR. STANNER:  Objection to form.

10            THE WITNESS:  I agree with that.

11  BY MR. HAWAL:

12       Q    That is something that has been well

13  recognized for quite a few years now?

14            MR. STANNER:  Objection to form.

15            THE WITNESS:  I -- I agree with the --

16  the definition of it.  As long as it's been

17  recognized, I don't know.

18  BY MR. HAWAL:

19       Q    In fact, I've heard the term referred to

20  as the "Blue Highway."  Have you heard that

21  phrase?

22       A    I've not heard that one, no.

23       Q    In any event, on page 465 of the -- this

24  is a PowerPoint that you created; is that correct?
```

```
 1          A    I believe so, yes.

 2          Q    And on page 465 of this PowerPoint,

 3    there is a map of the United States, and the title

 4    is "Drug Diversion Migration Out of Florida," and

 5    it has a series of arrows.

 6               Is that intended to show where drugs

 7    that were being diverted in Florida were finding

 8    their way to different parts of the country?

 9               MR. STANNER:  Objection to the form.

10               THE WITNESS:  What this is depicting is

11    the criminal schemes of pill mills in Florida, and

12    where those that were complicit in that criminal

13    scheme would -- would take those, you know, out of

14    Florida and into other locations throughout the

15    United States.

16    BY MR. HAWAL:

17          Q    And sell them in communities in Georgia,

18    Tennessee, Kentucky, Ohio, and Missouri?

19          A    That could be.

20          Q    And I take it this was based upon

21    information that you either researched or had

22    knowledge about?

23               MR. STANNER:  Objection to form.

24    Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  It is.

 2                 (Plaintiffs' Exhibit No. 29 was

 3                 marked for identification.)

 4     BY MR. HAWAL:

 5          Q    The last exhibit I'm going to have

 6     marked and ask you about is Exhibit No. 29.

 7                 And although it is an Insys document and

 8     the Bates number is INSYS_MDL006972647, it is a

 9     communication from John Bonner, director of

10     Product Management, Branded Rx, at McKesson Drug

11     in San Francisco.

12                 Do you know John Bonner?

13          A    I -- I do not.

14          Q    In any event, Mr. Bonner apparently,

15     according to the first sentence of his e-mail,

16     says:  "The enemy here is the DEA."  You see that?

17          A    I do.

18          Q    And do you believe that certain

19     pharmaceutical -- or pharmaceutical distributors

20     of opioid drugs consider the DEA the enemy?

21                 MR. STANNER:  Objection to form.

22     Objection to foundation as to this exhibit.

23                 THE WITNESS:  Can I just take a minute

24     and finish reading it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1  BY MR. HAWAL:

2       Q    Sure.

3       A    (Peruses document.)

4       Q    Have you read it?

5       A    I have.

6       Q    Does it trouble you as a former DEA

7  agent that certain employees of McKesson -- or at

8  least this employee of McKesson considers DEA the

9  enemy?

10           MR. STANNER:  Objection to the form.

11           THE WITNESS:  It does.

12 BY MR. HAWAL:

13      Q    Has that been some experience that

14 you've come to understand, that certain

15 manufacturers and distributors have considered the

16 DEA the enemy because of administrative

17 proceedings that the DEA has decided -- and the

18 Department of Justice has decided to bring for

19 violations of the Controlled Substances Act?

20           MR. STANNER:  Object to the form of the

21 question.

22           MR. SATIN:  Objection.  Pursuant to

23 Touhy, don't answer that question to the extent it

24 would disclose information you obtained while at
```

```
 1    DEA.

 2              THE WITNESS:  This is -- since I've been

 3    at McKesson, this is the first time I've seen

 4    anything like -- like this.

 5    BY MR. HAWAL:

 6         Q    Are you aware, sir, that McKesson and

 7    other opioid distributors, including their trade

 8    association HDMA, have donated funds for lobbying

 9    efforts to change the laws that allow the DEA and

10    the Department of Justice to bring enforcement

11    actions against companies that are wholesalers?

12              MR. STANNER:  Object to the form of the

13    question.

14              MR. SATIN:  Objection pursuant to Touhy

15    to the extent your answer would reveal such

16    information from your time at DEA.

17              THE WITNESS:  Since my time at McKesson,

18    I'm not aware of that.

19    BY MR. HAWAL:

20         Q    You're aware that a congressman in

21    Pennsylvania has sponsored legislation through

22    Congress that has changed the enforcement

23    responsibilities of the DEA and the Department of

24    Justice as it relates to wholesalers?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. STANNER:  Object to the form.

 2   BY MR. HAWAL:

 3        Q    Marino.  Tom Marino.

 4                MR. STANNER:  Same objection.

 5                THE WITNESS:  I'm aware --

 6                MR. SATIN:  Same objection with respect

 7   to Touhy.

 8                THE WITNESS:  I'm aware of that

 9   legislation.  I'm not agree -- I'm not sure I

10   would agree with the characterization that you

11   framed it out.

12   BY MR. HAWAL:

13        Q    Well, it's legislation that was passed

14   in 2016, correct?

15        A    That's correct.

16        Q    Do you know how much money McKesson has

17   contributed to lobbying efforts with Congressman

18   Marino and other congressmen to facilitate the

19   passage of that legislation?

20                MR. STANNER:  Object to the form.

21                THE WITNESS:  I do not.

22                MR. HAWAL:  Okay.  That's all the

23   questions I have.

24                MR. RAFFERTY:  Not for the plaintiffs,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    though.

 2                MR. STANNER:  Understood.

 3                MR. RAFFERTY:  Let's take a ten-minute

 4    break and will swap out some stuff.

 5                MR. STANNER:  That will be fine.

 6                THE VIDEOGRAPHER:  The time is 3:31 p.m.

 7    We're going off the record.

 8                (Recess.)

 9                THE VIDEOGRAPHER:  The time is 3:49 p.m.

10    We're back on the record.

11                    DIRECT EXAMINATION

12    BY MR. RAFFERTY:

13         Q    Mr. Boggs, good afternoon.  My name is

14    Troy Rafferty.  I'm representing the plaintiffs in

15    this case along with Mr. Hawal.  I'm going to ask

16    you some additional questions here for a bit,

17    okay?

18         A    Sure.

19         Q    Okay.  And if I talk over you, I

20    certainly don't mean to.  I know we're under time

21    crunches, and I'm going to do my best not to do

22    that, but if I do, I apologize, and I don't mean

23    to, and just point it out to me, or your counsel

24    will point it out to me.  Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    Sure.

 2        Q    You were just being asked some questions

 3   about a bill that was passed in 2016 by Mr. Hawal.

 4   Are you familiar with that?

 5        A    I am.

 6        Q    In fact, you have been of the opinion

 7   for several years, dating back even to your time

 8   at the DEA, that the distributors of opioids and

 9   narcotics had basically blown off the DEA.

10   Correct?

11             MR. STANNER:  Objection to form.

12             THE WITNESS:  I don't know if I would

13   necessarily characterize it that in its entirety.

14   BY MR. RAFFERTY:

15        Q    Well, how would you -- do you believe as

16   we sit here today that leading up to your

17   employment at McKesson that the distributors had

18   blown off the DEA?

19             MR. SATIN:  Objection pursuant to Touhy.

20   Don't ask that -- don't answer that if it's going

21   to reveal information you learned while at the

22   DEA.

23             THE WITNESS:  I don't believe I can

24   answer the question at this time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. RAFFERTY:

2         Q    All right.  Well, let me -- let me show

3    you what we're marking as Exhibit 30.

4              (Plaintiffs' Exhibit No. 30 was

5              marked for identification.)

6              MR. STANNER:  Thank you.

7    BY MR. RAFFERTY:

8         Q    Two -- 1.2033.  And this is

9    Bates-numbered MCKMDL00661483.

10             I'm going to direct your attention to

11   the middle e-mail.  That's the one I'm going to

12   ask you about, Mr. Boggs.

13             Do you know who Ann Berkey is?

14        A    She used to be employed by McKesson.  I

15   don't believe she's any longer employed by

16   McKesson.

17        Q    You had conversations with her in the

18   past about your time at the DEA and your

19   impressions of the -- of the interaction between

20   the distributors and DEA, correct?

21        A    I don't know that I had multiple

22   conversations with her.  I -- I recall a

23   conversation.

24        Q    Okay.  Well, let's take a look at what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Ms. Berkey says here in this e-mail dated April 8,

 2    2014.  You were at -- at McKesson at that time,

 3    correct?

 4         A    I was.

 5         Q    And here it says -- she's sending it to

 6    several people, and she says:  "A couple of

 7    updates since my message yesterday on this.  I met

 8    today with Gary Boggs, the new senior director of

 9    Regulatory Affairs for U.S. pharma for the East,

10    of the Mississippi River that is, who is based in

11    Livonia.  He is a former top official with the

12    DEA, and we talked extensively about this bill,

13    the hearing, ways we can work with the Agency, et

14    cetera.  He outlined in some detail the processes

15    that DEA has had in place for years to collaborate

16    with wholesalers and the way in which our

17    industry, CAH especially, has blown them off, to

18    the point that the DEA is now hammering all of

19    us."

20              Do you see that?

21         A    I do.

22         Q    Do you recall that conversation with

23    Ms. Berkey?

24              MR. STANNER:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Just in general, yes.
 2   BY MR. RAFFERTY:
 3       Q    In general?  Do you recall making that
 4   statement?
 5       A    I don't believe that's a quote.
 6                MR. STANNER:  Objection to the form.
 7   BY MR. RAFFERTY:
 8       Q    I didn't ask if it was a quote.  I asked
 9   if you made a statement or a statement similar to
10   that.
11                MR. STANNER:  No, objection to the form.
12   That wasn't what you asked.
13                THE WITNESS:  Not that --
14   BY MR. RAFFERTY:
15       Q    That's what I'm asking now.
16       A    Not that I recall in that context.  We
17   discussed the situation, we discussed different
18   things about that and --
19       Q    Well, "CAH especially," that's Cardinal
20   Health, correct?
21       A    That's correct.
22       Q    Okay.  And a distributor of narcotics
23   just like McKesson, right?
24       A    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q    Okay.  And, in fact, it says here that

2   you outlined in some detail the processes that the

3   DEA has had in place for years to collaborate with

4   wholesalers.  Do you see that?

5       A    I do.

6       Q    "And in which the industry has blown

7   them off to the point that the DEA is not

8   hammering all of us."

9            So at least with McKesson in 2014, you

10  were okay discussing all of the information you

11  had at the time relating to your period -- your

12  work at the DEA.  Right?

13           MR. STANNER:  Objection to the form.

14           MR. SATIN:  And to the suggestion that

15  it's his decision not to speak about these issues

16  right now, that is not up to him.

17           MR. RAFFERTY:  That's -- just object.

18  That's all.

19  BY MR. RAFFERTY:

20      Q    So you were -- at least in 2014, you

21  were sharing information from your time at DEA

22  with employees of McKesson.  True?

23      A    In -- in generalities, yes.

24      Q    Okay.  Including how -- how the DEA had

Highly Confidential - Subject to Further Confidentiality Review

1    processes in place to collaborate with the

2    wholesalers, correct?

3         A    That's correct.

4         Q    Okay.  And while you were at the DEA,

5    what processes were in place for you to

6    collaborate with wholesalers?

7              MR. SATIN:  Objection.  Pursuant to

8    Touhy, don't answer that question.

9    BY MR. RAFFERTY:

10        Q    All right.  Are you familiar with DU45

11   reports, Mr. Boggs?

12        A    Yes, a little bit.  Yes.

13        Q    And you are familiar -- I think you said

14   you went back and looked at the different -- the

15   different monitoring programs that were in place

16   at McKesson over the years, correct?

17        A    I -- I have looked at them, yes.

18        Q    Okay.  And are you familiar with

19   Section 55, Controlled Substances of the -- of the

20   drug operations manual?

21        A    Section 55 is part of McKesson's

22   operating manual.  Yes.

23        Q    Correct.  And, in fact, it was

24   Section 55 -- let me show you what we're marking

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as Exhibit 31.  It's going to be a lot later --
 2    lot lighter trip home for me.
 3              (Plaintiffs' Exhibit No. 31 was
 4              marked for identification.)
 5    BY MR. RAFFERTY:
 6         Q    So it is 1.1555.
 7              MR. STANNER:  This is Boggs 31?
 8              MR. RAFFERTY:  Boggs 31, yes, sir.
 9    BY MR. RAFFERTY:
10         Q    Do you recognize this as Section 55,
11    Mr. Boggs?  Do you see at the top it says "55 -
12    Controlled Substances"?
13         A    Yes.  I do.
14         Q    And it's dated July 2000.  Do you see
15    that?
16         A    I do.
17         Q    And if you look at it, it says in that
18    first paragraph there, it says -- well, under
19    number 1, it says "Federal Regulatory
20    Requirements," and then it's got, "A. General."
21    Do you see that?
22         A    I do.
23         Q    Okay.  And I'm not going to ask you
24    about everything in here.  Just a couple of
```

Highly Confidential - Subject to Further Confidentiality Review

1    sections about it.  Okay?

2            And are you aware that the DU45 reports

3    were mandated to be generated pursuant to this

4    section?

5            MR. STANNER:  Objection to form.

6            THE WITNESS:  I -- this was 13 years

7    before I came to McKesson.  I don't know what it

8    was man- -- if it was -- what was mandated.

9    BY MR. RAFFERTY:

10       Q    Well, but you reviewed it, you said,

11   right?

12       A    Only cursory.  I haven't -- this is --

13   this is not in place since I came to McKesson.

14       Q    Were you -- were you familiar with DU45

15   reports while you were at the DEA?

16            MR. SATIN:  Objection pursuant to Touhy.

17   Don't answer that if it would reveal information

18   you learned while at the DEA.

19            THE WITNESS:  I don't believe I can

20   answer that question at this time.

21   BY MR. RAFFERTY:

22       Q    Okay.  Are you -- okay.

23            Let's go ahead and just turn the page.

24   It should be at .29.  Down at the bottom, it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    should say at some point 1.555.29.

 2              MR. STANNER:  Sorry, at the top right of

 3    our documents.

 4              MR. RAFFERTY:  Top right, yes.  I'm

 5    sorry.  Mine is at the bottom.

 6              THE WITNESS:  What would -- what's the

 7    number again?

 8    BY MR. RAFFERTY:

 9         Q    29.

10         A    Okay.

11              MR. STANNER:  555.29.

12              THE WITNESS:  Okay.

13    BY MR. RAFFERTY:

14         Q    And here under Section c, it says:

15    "Daily Controlled Substance Suspicious Order

16    Warning Report."  Do you see that?

17         A    I do.

18         Q    And then it's got DU45L500.  Do you see

19    that?

20         A    I do.

21         Q    And it goes on and says:  "When an order

22    is entered through the central system, controlled

23    substance items are extracted (after passing

24    through front end order processing) and compared
```

Highly Confidential - Subject to Further Confidentiality Review

1    to in a subroutine to the purchases month-to-date

2    by customer/customer average purchases, average

3    purchases by customer class and product."

4            Did I read that correctly, sir?

5    A    I did.

6    Q    Okay.  And if you go down to the next

7    paragraph, it says:  "The same factors that are

8    used for the Customer Recap Variance," and then

9    it's got a lot of other things listed here, "are

10   also used for the Daily Controlled Substance

11   Suspicious Order Warning Report (three times

12   monthly average for Schedule II and III

13   reportables and eight times monthly averages for

14   IIIN-V."

15           Do you see that?

16   A    I do.

17   Q    Do you recall when you were at McKesson

18   and went back and reviewed this that you were --

19   that that was what a DU45 report was, was if there

20   was a sale three times the monthly average for a

21   Schedule II or III narcotic, that it would make it

22   to the DU45 report?

23   A    I did not go back and review it.

24   Q    Okay.  If we go back -- if we go to the

Highly Confidential - Subject to Further Confidentiality Review

1    next page, it says:  "Monthly Controlled Substance

2    Suspicious Purchase Report.  At the end of the

3    month (first workday of following month), you will

4    received the Monthly Controlled Substance

5    Suspicious Purchases Report."

6             Do you see that?  And they refer to it

7    as suspicious purchases report, right?

8        A    I do.

9        Q    And have you heard the DU45 referred to

10   as excessive purchase reports?

11            MR. STANNER:  Objection to form.

12            THE WITNESS:  I have.

13   BY MR. RAFFERTY:

14       Q    Okay.  Because that's really what they

15   are, right?  It's just if somebody's got some --

16   it's just a -- if they order three -- over three

17   times what their monthly average is, then it's an

18   excess purchase, and it gets put on the DU45

19   report, correct?

20            MR. STANNER:  Object to the form.

21            MR. SATIN:  And objection pursuant to

22   Touhy.  Only answer that question if it won't

23   reveal information you learned while at DEA.

24            THE WITNESS:  It doesn't mean it isn't a

```
 1    suspicious order report.

 2    BY MR. RAFFERTY:

 3        Q    I didn't -- I'm not asking that.

 4             I'm asking, is that how -- is that what

 5    it gets us to is an excessive purchase is three

 6    times over the monthly average?

 7             MR. STANNER:  Objection to form,

 8    speculation.

 9             THE WITNESS:  Based on what the criteria

10    established in here is, yes.

11    BY MR. RAFFERTY:

12        Q    And is it your -- was it your under- --

13    is it your understanding that these DU45s were

14    actually suspicious -- were suspicious order

15    reports?

16             MR. STANNER:  Objection to form.

17             THE WITNESS:  It's my understanding

18    that's what McKesson was submitting, yes,

19    suspicious order reports.

20    BY MR. RAFFERTY:

21        Q    And that was the DU45?

22        A    Yes.

23        Q    Okay.  In fact, if you keep going down,

24    and you go to the following page, .31.  "Customer
```

1    orders," it says at the top -- I'm sorry, about

2    the fourth line:  "Customer orders for items that

3    exceed the three times/eight times monthly average

4    will print as a suspicious order on the report."

5            Do you see that?

6        A    I do.

7        Q    All right.  So -- and then essentially,

8    based on this, the report would be generated, but

9    there would be no omit or stop of that order, nor

10   would there be any due diligence done in response

11   to those, correct?

12           MR. STANNER:  Objection.  Form,

13   speculation.

14           THE WITNESS:  I don't know if there was

15   or wasn't.  I don't know that.

16   BY MR. RAFFERTY:

17       Q    And you don't recall that as we sit here

18   today?

19       A    Recall what?

20       Q    Whether or not there -- the fact that

21   these were not blocked orders and they were not --

22   and they were not -- there was no due diligence

23   done in regards to those orders.

24           MR. STANNER:  Same objection.

```
 1              THE WITNESS:  This was 13 years before I

 2   ever was employed by McKesson.  I don't know if

 3   they blocked them or -- or did due diligence at

 4   that time frame or not.

 5   BY MR. RAFFERTY:

 6        Q    Did you become familiar with what the --

 7   what the process involved in generating and

 8   submitting the DU45 reports to the DEA was while

 9   you were at the DEA?

10              MR. STANNER:  Objection -- objection to

11   the form.

12              MR. SATIN:  And objection pursuant to

13   Touhy.

14              THE WITNESS:  I don't believe I can

15   answer that question at this time.

16   BY MR. RAFFERTY:

17        Q    Did you -- did you review DU45 reports

18   from McKesson or other distributors while you were

19   at the DEA?

20        A    I don't believe I can answer that

21   question at this time pursuant to Touhy.

22        Q    All right.  Well, let's take a look.

23              Do you know whether or not DU45 reports

24   are still submitted to the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I haven't been at DEA for six years.  I

 2   have no idea.

 3        Q    Well, do you know if McKesson still

 4   submits DU45 reports to the DEA?

 5        A    We submit suspicious order reports to

 6   the DEA, and we submit ARCOS reports to the DEA.

 7   That's what we submit.

 8        Q    That's not my question.  Do you submit

 9   reports that are known as DU45 reports to the DEA?

10             MR. STANNER:  Objection.  Vague, "you."

11             THE WITNESS:  No.

12   BY MR. RAFFERTY:

13        Q    Does McKesson --

14        A    Not in the context of a DU45, no.

15        Q    Okay.  I'm going to hand you what we're

16   marking as exhibit -- I think we're at 33, right?

17   I hope so because that's the next one I got.

18             MR. STANNER:  I had this as 31.

19             MS. MONAGHAN:  Yeah, we're on 32.

20             MR. RAFFERTY:  We're on 32?

21             (A discussion was held off the record.)

22             MR. RAFFERTY:  Go off the record for

23   just one second.

24             THE VIDEOGRAPHER:  The time is 4:02 p.m.
```

```
 1    We're going off the record.

 2              (A discussion was held off the record.)

 3              THE VIDEOGRAPHER:  The time is 4:02 p.m.

 4    We're back on the record.

 5              (Plaintiffs' Exhibit No. 32 was

 6              marked for identification.)

 7    BY MR. RAFFERTY:

 8        Q    All right.  I've just handed your

 9    counsel what we've marked as Exhibit 32,

10    Mr. Boggs.  And it is 1.2100.

11              So have you ever seen -- this, I'm going

12    to represent to you, was produced to us as an

13    example of a DU45 report that was submitted by

14    McKesson to the DEA.

15              Are you familiar -- have you seen any

16    type of document like that?

17        A    I have not seen it, no.

18        Q    Could you hold it up for the camera just

19    so -- because I'm going to represent to you that

20    that is two-sided, it's printed on both sides, and

21    it's approximately 600 pages long.

22              And if we look at it, it says -- it's

23    dated 4/3/2007, and it says "DU45J6B, Monthly

24    Controlled Substance Report."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Do you see that?

2        A    I do.

3        Q    And then if you go to the following

4    page, .2, just turn that one over.

5              All right.  And if we go -- and we look

6    at here, it says -- this is for the Distribution

7    Center 165 in Oklahoma City.

8              Do you see that up in the right corner?

9        A    I do.

10       Q    Okay.  And here it says:  "We are

11   sending a copy of the Monthly Controlled Substance

12   Suspicious Purchase Report for March '07.  This

13   report reflects purchases from customers for

14   Schedules II through V controlled substances which

15   exceed the item monthly average for the class of

16   trade.  A listing of the parameters used are

17   available upon request."

18             And then if you look, for example, right

19   below that, it's got "Selling Description:

20   Fentanyl patch," and it's got the order

21   quantities, which would be at the end there, 20,

22   20, and 20, which totals a total of 60 orders.

23             Do you see that?

24       A    I do.
```

1     Q    And it says the item monthly average was

2   five.  And if you look at the factor, that's three

3   or three times, which is what we saw was in the --

4   the Section 55, correct?

5     A    I do.

6     Q    And that means the item limit is 15, and

7   they were ordering 60.  And that's presumably why

8   they made this report, correct?

9          MR. STANNER:  Objection to form.

10          THE WITNESS:  That's correct.

11   BY MR. RAFFERTY:

12     Q    Then if you go -- I mean it goes on for

13   page after page after page of different opioids

14   and narcotics and their doses, and whether or not

15   the met or exceeded that, and it goes on for

16   approximately 600 pages.  Correct?

17     A    That's correct.

18     Q    In fact, you're aware that the DEA made

19   clear to all of the distributors that simply

20   submitting these excess purchase orders reports

21   did not satisfy the distributors' duties and

22   obligations under the Controlled Substances Act,

23   correct?

24          MR. SATIN:  Objection pursuant to Touhy.

```
 1    Don't answer if it's going to reveal any

 2    information from your time at DEA.

 3              THE WITNESS:  I don't believe I can

 4    answer that question right at this time.

 5    BY MR. RAFFERTY:

 6         Q    Okay.  In fact, if we look at what I'm

 7    going to mark as exhibit -- I just found 32.

 8    Okay.

 9              MR. RAFFERTY:  Well, too late now.

10    BY MR. RAFFERTY:

11         Q    So Exhibit 33 -- all right.  So I'm

12    marking as Exhibit 33 -- that's why I don't

13    pre-mark exhibits.

14              (Plaintiffs' Exhibit No. 33 was

15              marked for identification.)

16    BY MR. RAFFERTY:

17         Q    What years were you work -- working at

18    the -- in the diversion -- or at the DEA in

19    regards to diversion?

20              MR. STANNER:  Objection.  Form.

21              THE WITNESS:  I started in January of

22    2006, and I retired from that position and the

23    Agency at the end of June of 2012.

24    BY MR. RAFFERTY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    And then started with McKesson in 2013?

 2          A    Almost the end of 2013, yes.

 3          Q    Okay.  So here, looking at this

 4     particular -- it's 1823.  Here it says:  "Summary

 5     of DEA-HDMA meeting on suspicious orders.  Meeting

 6     date, September 7th, 2007."

 7               And it's got the different attendees of

 8     the HDMA, and then the DEA.  Mark Caverly, Kathy

 9     Gallagher, Mike Mapes and Lisa Sullivan.  Do you

10     know who those are?

11          A    I do.

12          Q    Okay.  You worked with them at the DEA?

13          A    I did.

14          Q    And here if you go down below, it says:

15     "He noted" -- in that first full paragraph in the

16     summary:  "He noted that DEA had met with

17     approximately 15 to 20 wholesale distributors one

18     on one."  Do you see that?

19          A    I do.

20          Q    Did you meet with any of the wholesalers

21     one on one during the September 2007 time period?

22               MR. SATIN:  Objection pursuant to Touhy.

23               THE WITNESS:  I don't believe I can

24     answer that question at this time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. RAFFERTY:
 2       Q    And it goes down and says:  "DEA's key
 3   takeaways from the meeting were," and it says:
 4   "DEA's policy was to expect more than just
 5   reporting suspicious orders.  If there was a
 6   suspicious order, the distributor should either
 7   stop the delivery or should evaluate the customer
 8   further before delivering it."
 9            Do you see that?
10       A    I do.
11       Q    That means that there should be due
12   diligence.  You would agree with that, right?
13            MR. STANNER:  Objection to form.
14   Misstates.
15            THE WITNESS:  I think that that's the
16   general concept of that, yes.
17   BY MR. RAFFERTY:
18       Q    Okay.  "Simply complying with the
19   suspicious orders regulatory requirement does not
20   mean in the Agency's view that the registrant is
21   maintaining an effective program to detect and
22   prevent diversion."
23            Do you see that?
24       A    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q    You would agree with that, wouldn't you?

2            MR. STANNER:  Objection to form.

3    BY MR. RAFFERTY:

4       Q    That just reporting a suspicious order

5    does not equate to maintaining an effective

6    program and detect and prevent diversion?

7       A    I agree.

8            MR. STANNER:  Objection to form.

9    BY MR. RAFFERTY:

10      Q    "In fact, DEA indicated that they did

11   not have resources to inspect every pharmacy."

12           You would agree with that, wouldn't you?

13           MR. STANNER:  Objection to form.

14           MR. SATIN:  Are you asking about his

15   present views or back then?

16   BY MR. RAFFERTY:

17      Q    You would agree with that today,

18   wouldn't you?

19           MR. STANNER:  Objection to form.  Calls

20   for speculation.

21           THE WITNESS:  I -- I don't know how many

22   resources they have at this point in time.

23   BY MR. RAFFERTY:

24      Q    Okay.  What about when you were at the

Highly Confidential – Subject to Further Confidentiality Review

```
1    DEA, did you agree that DEA did not have the

2    resources to inspect every pharmacy?

3            MR. SATIN:  Objection pursuant to Touhy.

4            THE WITNESS:  I don't think I can answer

5    that question at this time.

6    BY MR. RAFFERTY:

7        Q    Okay.  Do you agree that it was -- it's

8    important for the distributor to, quote, know

9    their customers, end quote?

10           MR. SATIN:  Are you asking about right

11   now?

12           MR. RAFFERTY:  Today.

13           THE WITNESS:  I think that that part --

14   that's due diligence.

15   BY MR. RAFFERTY:

16       Q    Okay.  And then we go over to the next

17   page, and it says:  "DEA also does not want to

18   receive suspicious order reports that merely

19   reflect volumes that went over a threshold.  They

20   wanted reports that are true suspicious orders.

21   Similarly, they do not want to receive what they

22   called excessive purchase reports which had been

23   used in the past."

24           Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I do.

 2        Q    And -- and that would be similar to what

 3   we just looked at, the DU45, right?  That's a

 4   report that just lists sales that exceeded a

 5   particular threshold.

 6             MR. STANNER:  Objection to form.

 7   BY MR. RAFFERTY:

 8        Q    Right?

 9        A    Which would be indicative of an order of

10   unusual size.

11        Q    I'm not asking that.  When they say that

12   they do not want to receive what they called

13   excessive purchase reports, that's what the DU45

14   was we just looked at, right?

15             MR. STANNER:  Objection to form.

16             THE WITNESS:  Right, but that doesn't

17   mean it's not a suspicious order report.

18             MR. RAFFERTY:  I -- move to strike

19   everything after -- after "right."

20   BY MR. RAFFERTY:

21        Q    Okay.  Now, it also says:  "DEA also

22   indicated that they were not going to make a

23   decision for the wholesale distributors as to when

24   an order was suspicious.  They feel this is up to
```

1    the distributor."

2         Would you agree with that today that

3    that's the way it should work?

4    A    The regulation requires us to design and

5    operate a system to identify suspicious orders and

6    report those to the DEA.

7    Q    And you would agree that simply -- for

8    example, today, if you were just submitting this

9    report that showed that sales went over a

10   particular threshold and nothing more, and no due

11   diligence was done and there were no omit reports

12   or no blocked orders, that wouldn't be satisfying

13   your obligations under the Controlled Substances

14   Act, correct?

15        MR. STANNER:  Object to the form.

16        THE WITNESS:  It depends on which

17   obligation you're referring to.

18   BY MR. RAFFERTY:

19   Q    The obligation to effect -- to maintain

20   effective controls against diversion.

21        MR. STANNER:  Same objection.

22        THE WITNESS:  I would agree with that

23   statement, yes.

24   BY MR. RAFFERTY:

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q    Okay.  And do you know -- and here in

2     this particular document, the DEA is specifically

3     informing the -- the manufacturers in 2007 that

4     this is not -- the distributors, I'm sorry -- the

5     distributors that that is not adequate to meet

6     your -- meet McKesson's obligations under the

7     Controlled Substances Act.  True?

8               MR. STANNER:  Object -- objection to the

9     form.  Are you referring to this document, meaning

10    Exhibit 33, this DEA --

11              MR. RAFFERTY:  Yes.

12              MR. STANNER:  Object to the form.

13              MR. SATIN:  Are you asking what the

14    document says or what his belief is as to what DEA

15    believed?

16    BY MR. RAFFERTY:

17         Q    That's what -- that's what the document

18    says, first of all, right?

19         A    That's what the document says, yes.

20         Q    Okay.  And did you agree with that and

21    would you agree with that back when you were at

22    the DEA?

23              MR. SATIN:  Objection pursuant to Touhy.

24              THE WITNESS:  I don't think I can answer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that question at this time.

 2    BY MR. RAFFERTY:

 3         Q    Now, you -- you agree with me that not

 4    only must -- speaking of today, while you're here

 5    at -- since you've been at McKesson, you would

 6    agree that you have an obligation not to just

 7    report but also to block suspicious orders --

 8              MR. STANNER:  Object --

 9    BY MR. RAFFERTY:

10         Q    -- and then perform due diligence on

11    those to determine whether or not they're likely

12    to be diverted to illegal uses, correct?

13              MR. STANNER:  Objection to the form on

14    several bases.  I'll save you the time unless you

15    want them.

16              MR. RAFFERTY:  That's okay.

17              THE WITNESS:  A regulatory obligation?

18    BY MR. RAFFERTY:

19         Q    Yes.

20         A    No, I don't agree with that at all.

21         Q    You don't agree with that.

22         A    I don't know anywhere in the regulation

23    that that's a requirement.

24         Q    Did you believe that when you were at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the DEA?

 2                MR. SATIN:  Objection pursuant to Touhy.

 3                THE WITNESS:  I don't believe I can

 4    answer that question at this time.

 5    BY MR. RAFFERTY:

 6         Q    In fact, let's go ahead and mark this as

 7    Exhibit 34, 1946.

 8                (Plaintiffs' Exhibit No. 34 was

 9                marked for identification.)

10    BY MR. RAFFERTY:

11         Q    This is a -- this is a document,

12    Mr. Boggs, dated September 1 -- well, it's

13    actually dated October 20, 2005 up in the top

14    right corner, but it's referencing a presentation

15    on September 1st, 2005.

16                Do you see that?

17         A    I do.

18         Q    Okay.  And then it says:  "Internet

19    presentation with McKesson Corp on September 1,

20    2005."

21                Were you aware that this was -- that

22    these types of meetings were taking place or had

23    taken place --

24                MR. SATIN:  Objection pursuant to Touhy.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. RAFFERTY:

 2        Q    -- with McKesson and the DEA during this

 3   time period?

 4             MR. SATIN:  Objection pursuant to Touhy.

 5             THE WITNESS:  I was not in the diversion

 6   program at this time.

 7   BY MR. RAFFERTY:

 8        Q    Did you become aware while you were at

 9   the DEA that these meetings were taking place?

10             MR. SATIN:  Objection pursuant to Touhy.

11             THE WITNESS:  During the time frame of

12   this -- this memorandum, I was not in -- in the

13   diversion program, so I didn't -- I wasn't aware

14   of this.

15   BY MR. RAFFERTY:

16        Q    It says here that the -- it looks at --

17   it's to Joseph Rannazzisi from Michael Mapes.

18             I believe you said you knew Michael

19   Mapes?

20        A    I do.

21        Q    Okay.  And it says here that Michael

22   Mapes -- "The purpose of the meeting was to

23   address the illegal domestic internet pharmacy

24   problem and their source of supply."
```

1            Do you see that?

2       A    I do.

3       Q    Okay.  And then if we turn this -- so

4  this is a memo, and it says -- I'm sorry, before

5  we turn, it says:  "Mr. Mapes opened the meeting

6  by presenting to the representatives of McKesson

7  Corp a PowerPoint briefing which explained the

8  common characteristics of internet pharmacies and

9  why their activities are illegal."

10           Do you see that?

11      A    I do.

12      Q    Okay.  And then it says at the bottom:

13  "Mr. Mapes finalized the presentation by advising

14  the representatives of McKesson Corp that they

15  needed to thoroughly review the materials which

16  had been presented to them and review in-depth the

17  purchasing patterns and quantities of their

18  customers.  Representatives of McKesson Corp

19  acknowledged understanding of the materials."

20           Do you see that?

21      A    I do.

22      Q    Okay.  Then if we turn to page .3, which

23  is the start of the actual PowerPoint, and it says

24  "Meeting with McKesson Corp, DEA Headquarters,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    September 1, 2005."  Do you see that?

 2         A    I do.

 3         Q    And then if we go to page .9 of this

 4    presentation.  At the bottom slide, it says

 5    specifically -- sorry, let me know when you get

 6    there, sir.

 7              Okay?

 8         A    Okay.

 9         Q    It says:  "Suspicious orders," and it's

10    got:  "21 CFR 1301.74 requires that registrants

11    design and operate system to identify suspicious

12    orders."  And then it says:  "Report suspicious

13    orders to DEA when discovered."

14              Correct?

15         A    That's what it says, yes.

16         Q    And you know today in your work with

17    McKesson that that's a requirement and has been a

18    requirement of the Controlled Substances Act since

19    its passage, correct?

20         A    That's correct.

21         Q    Okay.  And then if we turn to the next

22    page, it says:  "Suspicious Orders.  Reporting a

23    suspicious order to DEA does NOT," and it's got

24    "not" in all capitals, "relieve the distributor of
```

1    the responsibility to maintain effective controls

2    against diversion -- diversion."

3             Do you see that?

4        A    I do.

5        Q    Okay.  And you know that as -- as of

6    today that's true, correct?

7             MR. STANNER:  Objection to form.

8    BY MR. RAFFERTY:

9        Q    That simply reporting a suspicious order

10   does not relieve the distributor of its

11   responsibility to maintain effective controls

12   against diversion.

13            MR. STANNER:  Object to the form.

14            THE WITNESS:  I do.

15   BY MR. RAFFERTY:

16       Q    Okay.  And then if we go down, it says:

17   "Suspicious Orders.  DEA cannot tell a distributor

18   if an order is legitimate or not.  The distributor

19   must determine which orders are suspicious and

20   make a sales decision."

21            Do you see that?

22       A    I do.

23       Q    And do you agree with that today?

24       A    I -- I agree that that's an option that

Highly Confidential - Subject to Further Confidentiality Review

1    the distributors have, yes.

2         Q    Okay.  And so in two thousand -- as far

3    back as 2005, the DEA had told McKesson, according

4    to this, what you just read there, that simply

5    reporting the suspicious order isn't enough; that

6    McKesson's responsibility is to then perform due

7    diligence or look into the sale and the customer

8    and determine whether or not to make the sale or

9    ship the drug, correct?

10             MR. STANNER:  Objection to the form,

11   misstates.

12             THE WITNESS:  That's what it says here.

13   BY MR. RAFFERTY:

14        Q    Okay.  And in fact, that never changed.

15   I think Mr. Hawal showed you Mr. Rannazzisi's

16   letter.  Do you recall that?

17        A    There were a couple of them.  Is there

18   one in particular that you are referencing?

19        Q    1464.

20             MR. RAFFERTY:  Exhibit 1?

21             (Counsel conferring.)

22             THE WITNESS:  Exhibit 1?

23   BY MR. RAFFERTY:

24        Q    Exhibit 1, yeah.

```
 1                    So -- and this is in 2006.  So about a

 2     year after that presentation we just saw, the DEA

 3     was once again -- on page -- I'm sorry, sir,

 4     page 2, .2 -- on page 2 is telling McKesson and

 5     the other distributors:  "In addition to reporting

 6     all suspicious orders, a distributor has a

 7     statutory responsibility to exercise due diligence

 8     to avoid filling suspicious orders that might be

 9     diverted into then legitimate, medical

10     scientific -- into other than legitimate, medical,

11     scientific and industrial channels."

12                    Do you see that?

13          A    I do.

14          Q    Okay.  And Mr. Rannazzisi, you know who

15     he is, right?

16          A    I do.

17          Q    Did you work with him at the DEA?

18          A    I did.

19          Q    Okay.  And here he says:  "There is a

20     statutory responsibility to exercise due diligence

21     to avoid filling suspicious orders."

22                    When you avoid filling a suspicious

23     order, that means you block that suspicious order,

24     correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. SATIN:  You're asking him today

 2   about what he believes?

 3              MR. RAFFERTY:  Today.

 4   BY MR. RAFFERTY:

 5       Q    You understand that's what --

 6              MR. STANNER:  Objection to form.

 7   BY MR. RAFFERTY:

 8       Q    That's what -- when you avoid filling --

 9   if McKesson avoids filling a suspicious order,

10   that means they're blocking that order, they're

11   not shipping it.

12              MR. STANNER:  Objection to form.

13              THE WITNESS:  I'm not sure I understand

14   your question.  We -- we do block orders.

15   BY MR. RAFFERTY:

16       Q    That isn't my question.

17              Here's my question:  It says here that:

18   "There is a statutory responsibility to exercise

19   due diligence to avoid filling suspicious orders?"

20              Right?  That's what it says?

21       A    I'm not aware of a statutory or

22   regulatory obligation to block and not ship an

23   order.  We have -- we have a legal obligation to

24   maintain effective controls against diversion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    And here, Mr. Rannazzisi at the DEA is
 2    saying that you have -- you have a statutory
 3    responsibility to avoid filling suspicious orders.
 4    That's what he's saying, right?
 5          A    That's what it says.
 6          Q    Okay.  And you knew this letter had gone
 7    out to these distributors, correct?
 8               MR. SATIN:  Objection pursuant to Touhy.
 9               THE WITNESS:  I've seen the letter since
10    I've been at McKesson.
11    BY MR. RAFFERTY:
12          Q    Had you seen this letter prior to being
13    at McKesson?
14               MR. SATIN:  Objection pursuant to Touhy.
15               THE WITNESS:  I don't know that I can
16    answer that question at this time.
17    BY MR. RAFFERTY:
18          Q    All right.  Then in 2007 -- if we look
19    at this, which we will mark as Exhibit 35 --
20               (Plaintiffs' Exhibit No. 35 was
21               marked for identification.)
22    BY MR. RAFFERTY:
23          Q    And I'm going to ask you specifically
24    about one particular portion of this.
```

```
 1              Down at the bottom under -- the Gary

 2   Hilliard e-mail dated September 11th, 2007, Do you

 3   see that?

 4       A    I do.

 5       Q    Okay.  And it says:  "Don, I am

 6   attaching -- I am attending the DEA pharmaceutical

 7   conference today.  Mike Mapes, Chris Zimmerman, VP

 8   Corporate Security and Regulatory Affairs, ABC,

 9   spoke on drug diversion."

10              Do you know ABC is AmerisourceBergen?

11       A    I do.

12       Q    Okay.  And then he goes down and says:

13   "In my opinion, this could be the time bomb you

14   referenced.  ABC's program appears to be more

15   robust in the following areas.  I expect Mapes to

16   define this as the standard."

17              Then he goes through certain issues

18   there -- certain characteristics of ABC's policy.

19   Do you see that?

20       A    I do.

21       Q    And then it says:  "Tom" -- I'm sorry.

22   "Mapes presentation," do you see that down below?

23       A    I do.

24       Q    And it says:  "The requirement is to
```

1    report suspicious orders, not suspicious sales."

2    Do you see that?

3         A    I do.

4         Q    All right.  And then if you go down

5    further, it says:  "Registrants that routinely

6    report suspicious orders, yet fill these orders

7    with reason to believe they are destined for the

8    illicit market" -- and it says "and" but I believe

9    it's a typo and should be -- "are failing to

10   maintain effective controls against diversion."

11             Do you see that?

12             MR. STANNER:  Objection to form.

13   BY MR. RAFFERTY:

14        Q    Do you see that, sir?

15        A    I see what it says, yes.

16        Q    Okay.  And you would agree with me the

17   sentence doesn't really read right if the word

18   "and" is there as compared to "are"?

19        A    I understand.

20        Q    Okay.  Well, and you would agree with me

21   today in your working with McKesson, and you would

22   agree that registrants like McKesson that

23   routinely report suspicious orders but fill the

24   orders with reason to believe that they are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    destined for the illicit market are in fact

 2    failing to maintain effective controls against

 3    diversion, true?

 4              MR. STANNER:  Objection to the form of

 5    the question.

 6              THE WITNESS:  If they have reason to

 7    believe they're going to be destined, yes.

 8    BY MR. RAFFERTY:

 9         Q    "Registrant should make informed

10    decisions before making the sale."  Do you see

11    that?

12         A    I do.

13         Q    And that would be -- the way you make

14    informed decisions would be through, for example,

15    due diligence, right?

16         A    That's one way, yes.

17         Q    Okay.  I want to show you now -- and

18    you -- and you have agreed with me, I believe,

19    that in fact there's a requirement that suspicious

20    orders be reported to the DEA, correct?

21         A    There is a requirement for that, yes.

22         Q    Okay.  All right.  And it's your belief

23    that that had been being done at McKesson?

24              MR. STANNER:  Objection to form.  Vague.
```

Highly Confidential – Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Sorry, I apologize.

2     BY MR. RAFFERTY:

3          Q    And -- well, during your work at

4     McKesson, you have testified, I believe, that you

5     have thought that that obligation was being met;

6     is that true?

7          A    Since my -- my time with McKesson, I

8     believe that that's correct, yes.

9          Q    Well, have you gone back and looked at

10    whether or not that had been being done since

11    2006?

12         A    I did not.

13         Q    Okay.  In 2006, you would agree that

14    there was a requirement that suspicious orders be

15    reported to the DEA, correct?

16         A    I would agree with that, yes.

17         Q    Okay.  I'm handing you what we're

18    marking as Exhibit 36.

19              (Plaintiffs' Exhibit No. 36 was

20              marked for identification.)

21    BY MR. RAFFERTY:

22         Q    And I'm going to represent the first

23    page is something that I -- I typed up and

24    calculated for use of -- in the -- for use in the

Highly Confidential - Subject to Further Confidentiality Review

 1   deposition, because it's a voluminous record there

 2   that I'm attaching.

 3           I'm also going to hand you -- while

 4   we're doing it, I might as well give you the next

 5   one too, which is 37.

 6           (Plaintiffs' Exhibit No. 37 was

 7           marked for identification.)

 8   BY MR. RAFFERTY:

 9       Q    And 36 -- here, if we look at that, I

10   will tell you that this was -- this document, the

11   spreadsheet starting on page 2, was information

12   produced to us by McKesson as the omit reports

13   from 2006 forward.

14           Are you familiar with what omit reports

15   are, sir?

16       A    I am.

17       Q    Okay.  That's when there is a blocked

18   order and -- because it's -- it's suspicious, and

19   then -- well, tell me what you understand an omit

20   report to be.

21       A    A suspicious order report.

22       Q    Okay.  All right.  Here, if we look at

23   starting on page 2, you see the first date at the

24   top there under "Transaction," it's about four

Highly Confidential - Subject to Further Confidentiality Review

```
 1   categories over.  It's kind of hard to see.  You'd

 2   probably see it better up on the screen.  It's

 3   pretty small.

 4        A    I can see it.

 5        Q    You can see it?

 6        A    Yes.

 7        Q    Okay.  Transaction -- the first

 8   transaction date reads 5/27/2008.  So May 27,

 9   2008.  Do you see that?

10        A    I do.

11        Q    And so this report starts January 1,

12   2006.  But there are no -- according to McKesson's

13   records, there are no blocked orders from 2000 --

14   January 1, 2006, until May 26, 2008.

15            MR. STANNER:  Objection.  Form.

16   BY MR. RAFFERTY:

17        Q    Were you aware of that -- are you aware

18   of that right now as you sit here that for those

19   two years there were not even any blocked orders?

20            MR. STANNER:  Objection to the form,

21   foundation.

22            THE WITNESS:  I was -- I'm not aware of

23   that.

24   BY MR. RAFFERTY:
```

1      Q     That would be unusual for two years for

2   there not to be one single blocked order, wouldn't

3   it?

4            MR. STANNER:  Objection to the form.

5            THE WITNESS:  Not necessarily.  If this

6   is --

7   BY MR. RAFFERTY:

8      Q     No?

9      A     No, if we're talking about a specific

10   county, McKesson either -- McKesson may not have

11   had any customers in there or it may have had only

12   a few customers, or in those customers that were

13   there during that time frame may never ordered

14   anything that was of unusual size, frequency or

15   pattern.

16      Q     And you don't know that, though, right?

17      A     I don't.  I'm explaining to you why

18   there couldn't -- might not be without it being

19   some --

20      Q     Well, let's -- let's take a look at the

21   data from 5/27/08.  Let's see.  So -- well, hang

22   on a second before we get to that.

23            MR. STANNER:  Sorry, can -- can you just

24   clarify, is Cuyahoga 30 -- 37 or Summit is --

```
 1                 MR. RAFFERTY:  Cuyahoga is 36.

 2                 MR. STANNER:  Cuyahoga is 36.

 3                 MR. RAFFERTY:  30 -- no, 30 -- whatever

 4    the first one was I handed you.

 5                 THE WITNESS:  36 is Cuyahoga.

 6                 MR. RAFFERTY:  Cuyahoga.  And Summit is

 7    37.

 8                 MR. STANNER:  And so which one are you

 9    on now?

10                 MR. RAFFERTY:  Cuyahoga, the first one.

11                 MR. STANNER:  Got it.

12    BY MR. RAFFERTY:

13        Q    So, first, we can agree that, according

14    to this report, there were no blocked orders from

15    2006 to 2008, right?

16                 MR. STANNER:  Objection to the form.

17    BY MR. RAFFERTY:

18        Q    As you go into it, you go further in

19    dates, you go more recent.  It doesn't go

20    backwards.

21                 All right.  We're on a time crunch.

22    I'll withdraw that question.

23                 May 20 -- so May 27, 2008, if you look

24    at the next section over, it says "DEA reported
```

1    date."  Do you see that?

2         A    I do.

3         Q    And if you go down that, that's empty,

4    right?  There's no date given.  Correct?  As you

5    go down all of these different orders, all of

6    these omits.  Do you see that?

7         A    I do see that.

8         Q    In fact, if you go -- you can go all the

9    way to page .9.  And if you go down towards the

10   middle of the page --

11             MR. STANNER:  So the page -- your page

12   numbers are cut off on ours.  Can you give -- is

13   there a Bates or is it all the same?

14             MR. RAFFERTY:  912.  Bates 912.

15             MR. STANNER:  They're all 912.  Sorry.

16   So -- you just got to give us a different marker.

17   The first entry on page 9, I believe is --

18             MR. RAFFERTY:  Ride Aid --

19             MR. STANNER:  -- Rite Aid 4788.

20             MR. RAFFERTY:  -- 4788.

21             MR. STANNER:  Yeah.

22   BY MR. RAFFERTY:

23        Q    Okay.  Are you there?

24        A    What was it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1               MR. STANNER:  Rite Aid 4788.  You're

 2   right there.

 3   BY MR. RAFFERTY:

 4        Q    And if you look, the first date that is

 5   shown as a reported to the DEA date is August 1st,

 6   2013.  Do you see that?

 7        A    I do.

 8        Q    That means from May 27th to 2008, to --

 9   from May 27th, 2008, to July 31st, 2013, for -- I

10   will tell you that there was no reports made to

11   the DEA of any of those -- of any of those orders,

12   correct?

13               MR. STANNER:  Objection to the form.

14   Calls for speculation.

15   BY MR. RAFFERTY:

16        Q    There's no indication on the

17   spreadsheet that --

18        A    There's no indication on the spreadsheet

19   that a report wasn't made.  I don't know if a

20   report was or wasn't made.

21        Q    So that's five -- almost five years,

22   correct?

23               MR. STANNER:  Same objection.

24               THE WITNESS:  Approximately.
```

```
 1    BY MR. RAFFERTY:

 2         Q    Five years without a report of a

 3    suspicious order to the DEA.  Correct?

 4              MR. STANNER:  Same objection.

 5              THE WITNESS:  I think you misunderstood

 6    my testimony.  My testimony is, is that the

 7    document doesn't show a date.  It doesn't

 8    necessarily mean that a report wasn't made.

 9    BY MR. RAFFERTY:

10         Q    Do you have any evidence that any

11    reports were made during that five-year time

12    period in Cuyahoga County, sir?

13         A    I don't --

14              MR. STANNER:  Objection.  Calls for

15    speculation.

16              THE WITNESS:  I don't.

17    BY MR. RAFFERTY:

18         Q    Okay.  And in fact, if you add them up,

19    if you look at the first page of that -- that I

20    typed up that's not part of the material, I will

21    represent to you that there were 481 stop orders

22    between May 27th, 2008, and July 31st, 2013, with

23    zero reports -- according to this, with zero

24    reports to the DEA.
```

1          Do you see that?

2     A    I do.

3     Q    And if that in fact is true and there

4  are no reports being made over that five-year

5  period, that is not meeting McKesson's obligations

6  for the maintenance of effective controls,

7  correct?

8          MR. STANNER:  Objection to the form of

9  the question.

10          THE WITNESS:  No, actually, if there's

11  481 stopped orders, that is exactly what that is,

12  is maintaining effective controls.  They didn't

13  ship the order.

14  BY MR. RAFFERTY:

15     Q    Oh, is it your understanding they didn't

16  ship any of these orders?

17     A    That's what it says, "Stopped orders."

18     Q    Okay.  How long -- you can stop an

19  order, then -- and then allow a TCR to be done and

20  ship the order, right?

21          MR. STANNER:  Objection to form.

22          THE WITNESS:  I don't know if that was

23  the case or not.  I don't know.

24  BY MR. RAFFERTY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    You're guessing, because there's no

 2   indication --

 3             MR. STANNER:  Counsel, you're asking him

 4   to talk about a document from 2010.  It's all

 5   guessing.  That's -- they're your questions.

 6             MR. RAFFERTY:  No, they're not.

 7   BY MR. RAFFERTY:

 8        Q    In fact, in five years, none of these

 9   omits were reported to the DEA, correct?

10        A    You asked me if we were maintaining

11   effective controls by this document that you --

12   you created, and I'm saying that if there was 481

13   stops, that's exactly maintaining effective

14   controls against diversion.  They didn't ship

15   them.

16        Q    They ship them for how long, sir, do you

17   know?

18        A    All of these orders were not shipped.

19        Q    Ever?  Is that your understanding?

20             MR. STANNER:  Objection to the form of

21   the question.

22             THE WITNESS:  I'm reading the report

23   that you gave me on Exhibit 36, and from my

24   reading of that, none of these orders were
```

```
 1    shipped.

 2    BY MR. RAFFERTY:

 3         Q    Okay.  But you don't know that, do you?

 4              MR. STANNER:  Same objection.

 5    BY MR. RAFFERTY:

 6         Q    In fact, you can block an order and then

 7    unblock it.  Under the processes even today at

 8    McKesson, you can do that, right?

 9              MR. STANNER:  Same objection.

10              THE WITNESS:  That's an option, yes.

11    BY MR. RAFFERTY:

12         Q    Okay.  And so here we know that you also

13    always had the obligation, McKesson did, to report

14    suspicious orders, correct?

15         A    That's correct.

16         Q    Okay.  And we know for five years,

17    according to this report, that none of these

18    orders were actually reported to the DEA, correct?

19         A    According to this report, yes.

20         Q    Okay.  And in fact, if we go to Summit

21    County, and we look at this in the same light,

22    which is Exhibit 37, and we look at this, once

23    again we're looking at the top of page 2, the

24    first date is June 18th, 2018 -- I'm sorry,
```

Highly Confidential - Subject to Further Confidentiality Review

1    June -- yeah, June 18th, 2008.

2            Do you see that?

3        A    I do.

4        Q    Okay.  Nothing before that.  That's the

5    first entry on this spreadsheet, correct?

6        A    That's correct.

7        Q    And then if we go and we turn to

8    page .10, which is the first page where the DEA

9    report dates begin -- do you see that, the first

10   date of -- any order being reported to the DEA,

11   according to this spreadsheet, is August 1st,

12   2013, right?

13       A    I do -- I see that, yes.

14       Q    So almost the same exact time period

15   where no reports were being made to the DEA as it

16   was in Cuyahoga County, right?

17            MR. STANNER:  Objection to the form of

18   the question.

19            THE WITNESS:  I agree with that.

20   BY MR. RAFFERTY:

21       Q    Okay.  And if we add those up, that

22   would be 517 threshold breaches or stop orders,

23   and zero reports to the DEA.  I'll represent to

24   you I counted them.  So --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STANNER:  Objection to the form of

 2   the question.

 3   BY MR. RAFFERTY:

 4        Q    All right.  Now, interestingly --

 5              MR. STANNER:  Mr. Rafferty, I don't mean

 6   to interrupt you, if you're moving on to the next

 7   document, we have a new attorney in the room.

 8              Can you put your appearance on the

 9   record, please?

10              MS. DEFRANCESCO:  Absolutely.  Lindsay

11   DeFrancesco from Reed Smith for AmerisourceBergen.

12              MR. RAFFERTY:  Good.

13              MR. STANNER:  Fire away.

14   BY MR. RAFFERTY:

15        Q    All right.  Now, interestingly, if we

16   look at what we're going to mark as Exhibit 38.

17              (Plaintiffs' Exhibit No. 38 was

18              marked for identification.)

19              MR. RAFFERTY:  1433, Evan.

20   BY MR. RAFFERTY:

21        Q    And this may have been marked by

22   Mr. Hawal before, I don't know.  This is -- this

23   is the lengthy -- this is the 22, 23 pages --

24              MR. STANNER:  You can make it a new one.
```

 1                    MR. RAFFERTY:  What's that?

 2                    MR. STANNER:  You want to make a new

 3     one?

 4                    MR. RAFFERTY:  Yeah, let's just do that.

 5     It'll be faster and easier.

 6                    MR. STANNER:  So this is 30 -- 38.

 7     BY MR. RAFFERTY:

 8          Q    Okay.  38, okay.

 9                    All right.  So if we look at this, this

10     is a letter from the Department of Justice,

11     August 2014.  You're at McKesson at this point,

12     right?

13          A    That's correct.

14          Q    And were you made aware of this

15     correspondence when you were at -- while you've

16     been at McKesson?

17          A    (Peruses document.)

18          Q    Do you recognize it, sir?

19          A    (Peruses document.)

20                    MR. STANNER:  Oh, that -- what's up on

21     the visual and what's here are different

22     documents, at least what we have in our hands.

23     This is dated November 4th, 2014.

24                    MR. RAFFERTY:  What's the number of it?

```
 1    Oh, that's 1443.  I marked the wrong one.  I'm

 2    sorry.  It's 1430 -- it's 1433.  I should have

 3    marked it.  It's my fault.

 4              MR. STANNER:  Do you want these back?

 5              MR. RAFFERTY:  Yeah -- well, you can

 6    have them.  I don't care.  We've got plenty.

 7              (Counsel conferring.)

 8              MR. STANNER:  Exhibit 11.

 9              MR. RAFFERTY:  This is Exhibit -- this

10    is Exhibit 11?

11              MS. MONAGHAN:  What is up there is

12    Exhibit 11.

13              MR. RAFFERTY:  Okay.  Okay.  Good.  That

14    helps.

15              Okay.  Now I'm going --

16              MR. STANNER:  Okay.

17              MR. RAFFERTY:  Well, if I had gone

18    first, I would've had more time.

19    BY MR. RAFFERTY:

20         Q    All right.  Now, I'm going to screw

21    things up because I actually had marked the right

22    one.  I just pulled my -- my working copy was the

23    wrong one in that file.  So now we're going to

24    mark 38.
```

```
 1                  (Plaintiffs' Exhibit No. 38 was

 2                  remarked for identification.)

 3              MR. STANNER:  This is --

 4              MR. RAFFERTY:  This is 38, and this is

 5      one that had not --

 6              MR. STANNER:  This is the one from

 7      before?

 8              MR. RAFFERTY:  Yes.

 9              MR. STANNER:  Okay.  So not that one.

10              MR. RAFFERTY:  Right.

11              THE WITNESS:  We're looking at the --

12              MR. SATIN:  The one, the 38 that we had

13      marked 38 before and then we crossed out, we're

14      going back to that one?

15              MR. RAFFERTY:  Yeah.

16      BY MR. RAFFERTY:

17          Q    Okay.  So looking at 1433 -- I'm sorry,

18      looking at Exhibit 38, this is a letter from the

19      Department of Justice to the DEA dated

20      November 4th, 2014.

21              Do you see that?

22          A    I believe it's from the Drug Enforcement

23      Administration, but, yes, I see that.

24          Q    Which is a part of the Department of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Justice, true?

 2         A    It is, but it's not -- the letter is not

 3    from the Department of Justice.

 4         Q    Okay.  And in fact, if we look at this,

 5    and we look at the -- it says -- if we look at

 6    page .2, it says:  "We remain" -- the third full

 7    paragraph, sir.

 8              "That having been said, we remain

 9    concerned that McKesson fails to appreciate the

10    serious and systemic nature of the CSA-related

11    problems that DEA has observed in its several

12    investigations into your client's operations."

13              Do you see that?

14         A    I do.

15         Q    Okay.  Are you familiar with this

16    document, sir?

17         A    I believe I read it before, yes.

18         Q    Okay.  And in fact, they say it was

19    systemic in that paragraph.

20              And then if you go down to the next full

21    paragraph, they say:  "In order to release all

22    McKesson-owned DEA registrants from administrative

23    liability as you have requested, the agreed-upon

24    registration consequences must reflect not only
```

Highly Confidential - Subject to Further Confidentiality Review

1    the gravity of the offenses, but nationwide scope

2    of McKesson's failure to report suspicious orders

3    and to maintain effective controls against

4    diversion."

5              Do you see that?

6         A    I do.

7         Q    All right.  And then it says, the next

8    paragraph it goes on, and then the several

9    following paragraphs, it goes through numerous

10   distribution centers where from 2008 to 2013

11   reports of suspicious orders were not being made

12   by McKesson to the DEA.  Correct?

13             MR. STANNER:  Objection to the form.

14             THE WITNESS:  I see that.

15   BY MR. RAFFERTY:

16        Q    Okay.  In fact, it looks at McKesson

17   Aurora.  It says:  "Lacked a functional suspicious

18   order reporting system for approximately five

19   years," in that last full paragraph on page 2.

20             It says:  "McKesson Aurora reported a

21   total of 16 orders as suspicious (in one batch,

22   occurring in one quarter, related to one recently

23   terminated pharmacy), while it processed a total

24   of 1.6 million orders for controlled substances

1    from 2008 through 2012."

2             Do you see that?

3        A    I do.

4        Q    And then if we go to the next page:

5    "McKesson's distribution center in Livonia

6    reported no suspicious" -- it says at the top --

7    "reported no suspicious orders for approximately

8    five years after McKesson's settlement with the

9    DOJ."

10            You know that was in 2008, correct, the

11   settlement?

12       A    I do.

13       Q    Okay.  So there's five years.

14            And then it goes on in the next full

15   paragraph:  "Washington Court House, Ohio.  Here

16   again, McKesson did not report any orders as

17   suspicious for years after the settlement with DOJ

18   and DEA."  Do you see that?

19            MR. STANNER:  Objection to form.

20            THE WITNESS:  I do.

21   BY MR. RAFFERTY:

22       Q    And then going on to McKesson's

23   Lakeland, the next paragraph on page 4, McKesson's

24   distribution system, it says:  "Once again, in

1    derogation of its responsibilities under the CSA

2    and the 2008 MOA, McKesson Lakeland failed to

3    report suspicious orders to the DEA for a

4    five-year period."

5            Do you see that?

6        A    I do.

7        Q    And then going down, McKesson in

8    Methume -- Methuen, Massachusetts, in the next

9    paragraph:  "As with other distribution centers

10   McKesson operated, McKesson failed to report any

11   suspicious orders from May 2008 through November

12   2013."  Do you see that?

13       A    I do.

14       Q    And then, of course, what we know based

15   on what we just saw from Cuyahoga County and

16   Summit County, which is serviced by New Castle's

17   distribution center, correct?

18       A    I believe that's correct, yes.

19       Q    So we know in New Castle, at least for

20   Cuyahoga County and Summit County, from 2008 to

21   2013, there were no reports made to the DEA of

22   suspicious orders, correct?

23            MR. STANNER:  Objection -- objection to

24   form, misstates.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  According to the document,

 2    that's --

 3    BY MR. RAFFERTY:

 4        Q    According to that document.  That

 5    would -- that would basic- -- that would indicate

 6    a systemic and nationwide failure on McKesson's

 7    part during that time period.  You would agree

 8    with that, right?

 9              MR. STANNER:  Objection to form, calls

10    for a legal conclusion.

11              THE WITNESS:  It's an issue that needed

12    to be addressed, yes.

13    BY MR. RAFFERTY:

14        Q    Now, going to the LDMP you talked about,

15    and so you told Mr. Hawal, you were familiar with

16    the LDMP.  Do you recall that?

17        A    I -- I've read the documents regarding

18    that to some extent, yes.

19        Q    Okay.  And in fact, without going

20    through it, you know that the LD -- the LDMP

21    started in 2007, right?

22        A    That's my understanding, yes.

23        Q    Okay.  And in fact, it basically

24    established thresholds for four of the controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   substances, oxycodone, hydrocodone and two others,

 2   at 8,000 doses per unit -- per month, correct?

 3              MR. STANNER:  Objection to form.

 4              MR. SATIN:  Objection pursuant to Touhy.

 5              THE WITNESS:  I -- that's my

 6   understanding of it.

 7   BY MR. RAFFERTY:

 8        Q    Okay.  And if a -- if an order exceeds

 9   that 8,000 threshold, based on your review of it

10   while you've been at McKesson, you understand that

11   that -- there must be due diligence done before

12   that order is shipped.  Correct?

13              MR. STANNER:  Objection to form.

14              THE WITNESS:  Based on what?

15   BY MR. RAFFERTY:

16        Q    If it exceeds the threshold, then there

17   should be due diligence done as to whether or not

18   it's a legitimate order before it is shipped.

19              MR. STANNER:  Objection to form.  Vague,

20   timeline.

21              THE WITNESS:  Due diligence could be

22   done before determining whether or not it would be

23   shipped or not.

24   BY MR. RAFFERTY:
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q    Well, it should be done, right?

2            MR. STANNER:  Same objection.

3            THE WITNESS:  Based on what?

4    BY MR. RAFFERTY:

5       Q    It's an order exceeding the 8,000

6    threshold.

7       A    No, when you say "must," what are you

8    referring to?

9       Q    Well, is it your understanding that

10   McKesson in 2007 and 2008 could or could not,

11   whether they decided to or not, do due diligence

12   on an order that exceeded the threshold --

13           MR. STANNER:  Objection.  Form --

14   BY MR. RAFFERTY:

15      Q    -- before releasing?

16           MR. STANNER:  Objection to form.  Vague.

17           THE WITNESS:  They --

18           MR. SATIN:  Objection pursuant to Touhy.

19           THE WITNESS:  They could, yes.

20   BY MR. RAFFERTY:

21      Q    Do you know whether or not the LDMP --

22   if we look at exhibit -- I don't know what the

23   LDMP was, so --

24           MR. SATIN:  I don't -- I actually don't

```
 1    know that we've actually seen the LDMP.

 2              MR. RAFFERTY:  Okay.  Well, let's go

 3    ahead and do that real quick.  That will be

 4    Exhibit 39.

 5              (Plaintiffs' Exhibit No. 39 was

 6              marked for identification.)

 7              MR. RAFFERTY:  1333.

 8    BY MR. RAFFERTY:

 9        Q    Okay.  And if we look here, it says the

10    LDMP was -- the task is:  "This procedure outlines

11    requirements and activities to proactively review

12    customers' purchases of DEA identified lifestyle

13    drugs and actions to take based upon analysis of

14    customer purchases."

15              And that's talking about due -- due

16    diligence, correct?

17              MR. STANNER:  Objection to form.

18              THE WITNESS:  That's correct.

19    BY MR. RAFFERTY:

20        Q    Okay.  So even based on the LDMP, you

21    need to do due diligence on orders that exceed the

22    threshold.

23              MR. STANNER:  Objection --

24    BY MR. RAFFERTY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    According to the policy.

 2             MR. STANNER:  Objection to form.

 3             THE WITNESS:  That's my understanding,

 4   yes.

 5   BY MR. RAFFERTY:

 6        Q    Okay.  And if you're not doing due

 7   diligence, and just simply releasing sales without

 8   doing any due diligence for orders that exceed

 9   8,000, that would be in violation of McKesson's

10   own operating manual.

11             MR. STANNER:  Objection to the form.

12   Several grounds.

13             THE WITNESS:  I believe that would be

14   correct, yes.

15   BY MR. RAFFERTY:

16        Q    And that was put in place in order to --

17   to help maintain effective controls against

18   diversion.  That's the purpose of the LDMP.  You

19   would agree with that, right?

20             MR. STANNER:  Same objections.

21             THE WITNESS:  That would be my

22   understanding, yes.

23             MR. RAFFERTY:  Okay.  Let's look

24   at 1829.  1829.  And mark that as Exhibit 40.
```

```
 1              (Plaintiffs' Exhibit No. 40 was

 2              marked for identification.)

 3   BY MR. RAFFERTY:

 4        Q    And if you look at this, this is a

 5   letter to the Associate Chief Counsel, Diversion

 6   and Regulatory Litigation Section, DEA, back in

 7   April of 2007.  Do you see that?

 8        A    I do.

 9        Q    Okay.  And it says here under A,

10   "Lifestyle Drug Monitoring Program," and it says,

11   number 4:  "When a pharmacy customer appears on a

12   report for the first time (because they have met

13   or about to exceed 8,000 dosage units for the

14   month), the DC will review the orders to determine

15   whether it was justified based on the type of

16   customer, e.g., national chain account, and

17   historic -- and the historical purchases by the

18   customer.  If there are still questions, the

19   customer will not be allowed to exceed the 8,000

20   monthly dosage limit until a due diligence report

21   has been completed.  The DC operations and

22   regulatory staff will conduct a review of these

23   accounts which will include contacting the

24   customer to determine the basis for the request to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    exceed the monthly limit."

 2              Do you see that?

 3         A    I do.

 4         Q    Okay.  And that's being -- that is being

 5    represented to the DEA as to what's going to

 6    happen underneath the LDMP in satisfaction of its

 7    obligations to maintain effective controls.

 8              MR. STANNER:  Object --

 9    BY MR. RAFFERTY:

10         Q    Correct?

11              MR. STANNER:  Objection to form.

12              THE WITNESS:  I agree.

13    BY MR. RAFFERTY:

14         Q    Okay.  And then if we look at 2112, it

15    did not do that.

16              Once that's been reported to the DEA

17    that that's the process that's being used, and if

18    they don't do that, then they're violating their

19    own policy, they're violating what they told the

20    DEA, correct?

21              MR. STANNER:  Objection to form.

22              THE WITNESS:  I'm not sure I agree with

23    the characterization that they're violating what

24    they told DEA.  It wouldn't be consistent with the
```

Highly Confidential - Subject to Further Confidentiality Review

1    policy.

2    BY MR. RAFFERTY:

3        Q    Okay.  Well, and they're being --

4    representing to the DEA that that's what they're

5    going to do, right?

6            MR. STANNER:  Objection to form.

7            THE WITNESS:  Right.

8            MR. RAFFERTY:  Okay.  So let's mark 2112

9    as Exhibit 41.

10           (Plaintiffs' Exhibit No. 41 was

11           marked for identification.)

12   BY MR. RAFFERTY:

13       Q    Another very small spreadsheet.  And

14   this, I'll represent to you, is information from

15   the ARCOS database, Mr. Boggs.

16           And if you look at this -- this is one

17   particular pharmacy, this is the Rite Aid -- this

18   is in May of 2007, the Rite Aid Pharmacy in

19   Cuyahoga County, okay, 3402 Clark Avenue.

20           Do you see that address, the buyer

21   address?

22       A    I do.

23       Q    Okay.  And if we go all the way down to

24   the second to last entry, I'll tell you that it is

1    that second to last entry that is dated May 7th,

2    2007, with the purchase of 1,000 that puts that

3    store, that one store at 8100 doses for the month,

4    seven days into the month.  Okay?

5            MR. STANNER:  Objection to the form.

6    BY MR. RAFFERTY:

7        Q    Do you see that?

8        A    Okay.

9        Q    And I'll make that representation to

10   you.  You can do the math separately.

11           But assuming that's true, you'll see

12   that as the month goes on, and you go all the way

13   back to the final page, by the time you add up all

14   the way through May 31st, 2007, so orders that

15   were shipped to this Rite Aid by McKesson, it

16   totals a grand total of 26,900 oxycodone doses.

17           So what is that, approximately three --

18   over three times the amount of the threshold,

19   correct?

20           MR. STANNER:  Objection to form.

21           THE WITNESS:  I'll agree.

22   BY MR. RAFFERTY:

23       Q    And every order that's placed over that

24   threshold, according to what the LDMP is, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   according to what McKesson told the DEA was the

 2   process, there should have been due diligence done

 3   on these orders to determine whether or not they

 4   were legitimate before they were shipped, correct?

 5             MR. STANNER:  Objection to form.

 6             THE WITNESS:  That's what the policy

 7   states, yes.

 8   BY MR. RAFFERTY:

 9        Q    Okay.  And if they didn't do that, then

10   that would be violating the policy, true?

11             MR. STANNER:  Objection to form.

12             THE WITNESS:  That would be true.

13   BY MR. RAFFERTY:

14        Q    Okay.  And, in fact, there is no due

15   diligence -- there's no indication that any due

16   diligence had been done on this particular

17   pharmacy for these orders, and in that regard,

18   that would be not maintaining -- McKesson not

19   maintaining effective controls against diversion,

20   correct?

21             MR. STANNER:  Objection to the form.

22   Assumes facts, misstates, vague --

23             THE WITNESS:  I don't know if there was

24   due diligence done or not.
```

```
 1   BY MR. RAFFERTY:

 2        Q    Well, if there wasn't -- if there wasn't

 3   due diligence on this, that would concern you,

 4   correct?

 5             MR. STANNER:  Objection to form.

 6             THE WITNESS:  I don't know what they --

 7   if there was some information between McKesson and

 8   Rite Aid or not.

 9   BY MR. RAFFERTY:

10        Q    But if --

11        A    I have no idea what was done or not.

12   This is way before my time.

13        Q    But if there wasn't, that would concern

14   you, correct?

15             MR. STANNER:  Objection to form.

16             THE WITNESS:  It might.  I don't know

17   what was known.

18   BY MR. RAFFERTY:

19        Q    And it's important -- you would agree --

20   I think you told Mr. Hawal earlier in the day that

21   it's important to document that due diligence is

22   being done.

23             You would agree with that, true?

24             MR. STANNER:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I think it's important to

 2   do that, yeah.

 3   BY MR. RAFFERTY:

 4      Q    Okay.  Now, if we look at one particular

 5   pharmacy.

 6              MR. RAFFERTY:  How much time have I

 7   used?

 8              THE VIDEOGRAPHER:  You have four

 9   minutes --

10              MR. RAFFERTY:  Four minutes.  All right.

11   BY MR. RAFFERTY:

12      Q    You understood there were some red flags

13   -- you understand what the concept of red flags

14   are in terms of diversion, correct?

15      A    I do.

16      Q    And some of those red flags are, for

17   example, if a pharmacy is in a geographic area

18   where there's historical -- there's been a

19   historical high amount of abuse or usage of

20   opioids, correct?

21              MR. STANNER:  Objection to form.

22              THE WITNESS:  That -- that can be a red

23   flag, yes.

24   BY MR. RAFFERTY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    And it can -- if it's -- if it's a

 2    pharmacy in a small rural town and it's ordering

 3    massive amounts or large amounts per capita,

 4    that's another potential red flag, correct?

 5          A    It could be, yes.

 6          Q    Okay.  The percentage of controlled

 7    prescriptions, meaning the percentage of

 8    oxycodone, for example, compared to the total

 9    prescriptions, if it's too high, that's another

10    red flag, right?

11          A    It could be.

12          Q    Okay.

13               MR. RAFFERTY:  If we look at

14    Exhibit 1891.

15               MR. STANNER:  Sorry, are you handing us

16    one?

17               MR. RAFFERTY:  No, I say that for Evan's

18    purposes.  I'm sorry.

19               No, you know what, let's look at --

20    let's look at 1865, Evan.

21               And this will be Exhibit 42.

22               (Plaintiffs' Exhibit No. 42 was

23               marked for identification.)

24               MR. STANNER:  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. RAFFERTY:

 2         Q     And going back to that last section that

 3    we were just talking about, in fact, during your

 4    time at the DEA, if you had known or it was being

 5    reported to you that due diligence was not being

 6    performed on pharmacies under the LDMP by

 7    McKesson, and they were simply shipping the orders

 8    without that due diligence, that would concern you

 9    as a DEA agent, wouldn't it?

10              MR. SATIN:  Objection pursuant to Touhy.

11              MR. STANNER:  Objection to form.

12              THE WITNESS:  I don't believe I can

13    answer that question at this time.

14    BY MR. RAFFERTY:

15         Q     Okay.  If we look at what we've marked

16    as Exhibit 42, I'll represent to you this is a

17    document discussing a pharmacy in Warren, Ohio.

18              Do you know where Warren, Ohio, is?

19         A     In Ohio.  I don't know -- I don't know

20    exactly where in Ohio it is.

21         Q     It's approximately 56 miles, as I

22    calculated on my phone, from Cleveland.

23         A     Okay.

24         Q     Okay.  So it says here in this one, if
```

Highly Confidential - Subject to Further Confidentiality Review

1    you look at the page 2, it says:  "Franklin and

2    Med Fast, New Castle."  "Alex, in case Blaine

3    didn't get back to you, he wants a Level II done

4    on both of those accounts.  You said you were

5    going to talk to Gino, too.  Like I said, if he

6    wants those spreadsheets based on month-end

7    suspicious again, just let me know.  Franklin

8    bought more dosages than any retail account in

9    August and October."

10            Do you see that?

11       A    I do.

12       Q    And this is in 2007.

13            Then if you look at page 2 further up in

14   the e-mail chain, it says:  "Franklin's BPR has

15   been at or extremely close to 100 percent since

16   the start of BPR."

17            Do you know what BPR is?

18       A    BPR has to do with brand.  I don't

19   recall off the top of my head what the -- the PR

20   is.

21       Q    Okay.  "Most recently, his October BPR

22   was 98.79.  One thing to note:  The number one

23   leakage item was OxyContin 80 milligrams.  The

24   dispensing/purchasing discrepancy on this drug

Highly Confidential - Subject to Further Confidentiality Review

```
 1    caused a minus 2.10 percent decrease in his BPR."

 2            Do you see that?

 3    A     I do.

 4    Q     Leakage, what is that?

 5    A     Leakage, as I understand it, would be a

 6    customer's need that -- hypothetically, they

 7    needed 15,000 doses, they bought 10,000 from us

 8    and maybe 5,000 from Cardinal or ABC.  That would

 9    be -- the 5,000 would be the leakage."

10    Q     Which can be another red flag, right, if

11    a pharmacy is going and buying a controlled

12    substance -- the same controlled substances from

13    multiple distributors?

14            MR. STANNER:  Objection to form.

15            THE WITNESS:  It could be, yes.

16    BY MR. RAFFERTY:

17    Q     Okay.  All right.  Then if we go --

18    that's 2007.

19            And then if we look at -- and this is a

20    time period that the LDMP is established, correct,

21    November 2007?

22    A     I believe around that time frame, yes.

23    Q     Yeah, okay.  All right.  And then if we

24    go -- that means it would be 8,000 -- under the
```

1    LDMP, the threshold is 8,000 for, for example,

2    oxycodone?

3                MR. STANNER:  Objection to form.

4    BY MR. RAFFERTY:

5        Q    We saw that in the policy.

6                MR. STANNER:  Same objection, prior two

7    questions.

8                MR. RAFFERTY:  Okay.  And then if we

9    look at 1881, Evan.  And mark that as Exhibit 43.

10               (Plaintiffs' Exhibit No. 43 was

11               marked for identification.)

12   BY MR. RAFFERTY:

13       Q    It says here January 2009.  Do you see

14   that?

15               It says:  "Can you please approve the

16   attached TCR for lorazepam, oxycodone and

17   hydrocodone at Franklin Pharmacy.  A Level II

18   review is on file, and I was just in the store on

19   Friday.  Frank's business is up overall due to

20   relationships with local outpatient facilities and

21   regional pain management clinics."

22               That's another red flag too if a lot of

23   the prescriptions are being serviced by pain

24   clinics, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. STANNER:  Objection to form.

 2                THE WITNESS:  It may be.  It depends

 3      on -- on what the pain clinic is.

 4      BY MR. RAFFERTY:

 5           Q    All right.  Let's turn to page 4.  Here

 6      it says -- the threshold change form says, the

 7      current threshold for this pharmacy is 50,000 for

 8      oxycodone.

 9                See that down there, "current

10      threshold," number 250?

11           A    I do.

12           Q    And then it says:  "Increase amount" --

13      up at the top -- "20,000."  So they want to go

14      from 50,000 to 70,000 dosage units per month of

15      oxycodone, correct?

16                MR. STANNER:  Objection to form.

17                THE WITNESS:  That's what it appears,

18      yes.

19      BY MR. RAFFERTY:

20           Q    And then for hydrocodone, they go from

21      35 to 45,000.  Do you see that?

22           A    That would be the request -- the math on

23      the requested amount.

24           Q    Okay.  And then -- and do you know if
```

Highly Confidential - Subject to Further Confidentiality Review

1   this was approved?

2          MR. STANNER:  Objection to form.

3          MR. SATIN:  Objection pursuant to Touhy

4   to the extent your information is based on your

5   time at the DEA and your answering it would reveal

6   that information.

7          THE WITNESS:  I don't -- I don't know if

8   this was approved or not.

9          MR. RAFFERTY:  Okay.  Well, let's take a

10  look at 1876.  1876 is -- 1876.  We'll mark it as

11  Exhibit 44.

12          (Plaintiffs' Exhibit No. 44 was

13          marked for identification.)

14  BY MR. RAFFERTY:

15      Q    And here in 2009, so -- I'm sorry, in

16  2013, it shows on this chart, Franklin Pharmacy,

17  controls percentage to Rx purchased, 35.65.

18  That's down in the chart about halfway through.

19  Do you see that, Franklin Pharmacy?

20      A    I do.

21      Q    And it says 35.65 controls to Rx

22  purchased, and 31.25 oxy percentage of controls,

23  and that's high, isn't it?

24          MR. STANNER:  Objection to form.

```
 1              THE WITNESS:  Not just on the surface,

 2    no.

 3    BY MR. RAFFERTY:

 4         Q    Oh, okay.  Well, it says at the top:

 5    "We are going to set up CSMP visits for all of the

 6    accounts below.  This is based on Joel Lumpkin's

 7    monthly reports.  The first column represents

 8    higher than normal controls percent to total

 9    purchases.  The second column represents" -- this

10    would be IMSMC over 25 percent.  "The second

11    column represents high OxyContin purchases to

12    total control purchases (this is over 25

13    percent)."

14              Do you see that?

15         A    I do.

16         Q    So according to this, it's high, and

17    that's why it's being flagged, correct?

18              MR. STANNER:  Objection to form.

19              THE WITNESS:  I don't know what the

20    purpose of it is.

21              MR. RAFFERTY:  Okay.  Well, let's look

22    at 1912 now.  This is Exhibit 45.

23              (Plaintiffs' Exhibit No. 45 was

24              marked for identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. RAFFERTY:

 2        Q    And here, it says -- this is to Gary

 3   Boggs from Gary Davis.  So does this reflect

 4   your -- or refresh your memory that you're

 5   familiar with this Franklin Pharmacy?

 6        A    No, I --

 7             MR. STANNER:  Objection to form.

 8   BY MR. RAFFERTY:

 9        Q    Okay.  Well, let me show you a couple of

10   areas.  It says, to Gary Boggs from Gary Davis.

11   "I continued to research our concerns regarding

12   Franklin's Pharmacy and uncovered information last

13   night regarding the dispensing practices of the

14   staff at the pharmacy that are cause for concern,"

15   and then it goes through and lists some of those.

16             And then he says:  "My recommendation"

17   -- "This has resulted in my recommendation to

18   terminate the sale of controls to Franklin

19   Pharmacy."

20             Do you see that?

21        A    I do.

22        Q    And that is in 2015.

23             And part of what he does on page 76 of

24   the document, point -- 1912.76 at the top right
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    corner.  Do you see that?  Are you there?

 2         A    I am.

 3         Q    Okay.  And then if we look at that, he

 4    references that fact that the pharmacy was

 5    selected for an onsite after a review by Senior

 6    Director of Regulatory Affairs Gary Boggs of the

 7    New Castle solver.  And he says:  "Showed the

 8    pharmacy Rx/controls percentage at 32.09."  Do you

 9    see that?

10         A    I do.

11         Q    Okay.  And then if we go to the next

12    page, it says -- or, I'm sorry, go to page 87 --

13    .87.  And it talks about -- it's got a chart there

14    of the "Top six controls listed by monthly dosage

15    for the pharmacy below."

16              Do you see that?

17              And it's got monthly average, 41,224

18    dosage units of oxy, and 19,570 doses for hydro,

19    and oxycodone 30 milligrams, 6,302.  Do you see

20    that?

21         A    I do.

22         Q    And it says:  "It should be noted that

23    in fiscal year '16, quarter 1, solver for New

24    Castle that the pharmacy listed as the largest
```

1    dispensing pharmacy for 9,143 oxycodone doses."

2    Do you see that?

3         A    I do.

4         Q    And then if you go to the final page, it

5    says:  "The level of" -- and it's the second full

6    paragraph:  "The level of controls dispensed that

7    are discussed in detail above are themself -- in

8    themselves red flags that are of concern," and

9    then it lists several others.

10            Now, as this was being dispensed, and

11   the monthly average was 41,224 for oxycodone alone

12   and 20,570, do you know what the population is of

13   Warren, Ohio?

14        A    Not off the top of my head, I do not.

15        Q    Did you know it was 40,000 people, sir?

16            MR. STANNER:  Objection to form, asked

17   and answered.

18   BY MR. RAFFERTY:

19        Q    Look at -- look at page 77 of the

20   document.  .77.

21            It says at the top, "In 2013, the

22   population of Warren was listed at 40,768,"

23   correct?

24        A    It does.

Highly Confidential - Subject to Further Confidentiality Review

1        Q    So you're shipping in 40 -- over 40,000

2    dosage units, you've got thresholds set at 50,000

3    dosage units, and a request for 20,000 more being

4    shipped of oxycodone alone into a pharm- -- into a

5    pharmacy for -- dating all the way back to 2007,

6    so for eight years into a town that has fewer

7    residents than the amount of dosages are that you

8    are shipping in.  True?

9              MR. STANNER:  Objection to form.

10             MR. SATIN:  Objection to the "you."

11             THE WITNESS:  The other -- the sentence

12   after that is:  "The county has 206,044, and the

13   patients from that county certainly could have

14   gone to that pharmacy.

15   BY MR. RAFFERTY:

16       Q    Is that what you determined?

17       A    I'm saying that that's a possibility.

18   The same as you determined that -- how much they

19   went to that population.

20       Q    I'm reading a document that you were

21   involved in.

22       A    That --

23       Q    A pharmacy that you were involved in.

24   Yes or no, you were shipping into a pharmacy in a

Highly Confidential - Subject to Further Confidentiality Review

```
1    town of 40,000 people, dose -- oxycodone dosage

2    units of over 40,000 per month, and hydrocodone of

3    over 19,000 doses per month.  True?

4              MR. STANNER:  Objection to the form of

5    the question.  Objection to the "you."

6              MR. SATIN:  And it's a foundational

7    question.

8    BY MR. RAFFERTY:

9        Q    True?

10             MR. SATIN:  You haven't established that

11   he was the one doing the shipping, sir.

12             MR. RAFFERTY:  McKesson.

13             MR. STANNER:  Same objections.

14             THE WITNESS:  I'm trying to put this in

15   proper perspective for me to understand --

16   BY MR. RAFFERTY:

17       Q    I'm asking -- you don't get to ask --

18   you don't get to rephrase my question.

19             MR. STANNER:  Excuse me.  You can't talk

20   over him.  You asked the question.  He's giving

21   you the answer.

22             MR. RAFFERTY:  No, he's not.  He is

23   giving his answer he wants to give.

24             MR. STANNER:  You didn't even -- you
```

```
 1    didn't even listen to the words.
 2    BY MR. RAFFERTY:
 3         Q    Yes or no, sir, were you -- as McKesson,
 4    was McKesson shipping into a pharmacy in Warren,
 5    Ohio, a population of 40,000, oxycodone over
 6    40,000 doses a month, and hydrocodone over 19,000
 7    doses a month?
 8              MR. STANNER:  Same --
 9    BY MR. RAFFERTY:
10         Q    Yes or no?
11              MR. STANNER:  Same objections.
12              THE WITNESS:  Yes.
13              MR. RAFFERTY:  Nothing further.  I will
14    reserve the rest for the Touhy.
15              MR. STANNER:  So, we understand that's
16    your position, and I understand why.  Obviously
17    by -- if you choose to leave this open, that's
18    fine.  We do not concede necessarily that you're
19    entitled to do this.  We haven't -- we don't waive
20    any objections to your request to the DEA filed in
21    January, so we'll deal with all that in front of
22    the special master when the time comes.  But
23    understood.
24              MR. RAFFERTY:  Well, and one of the
```

1   things -- I also want to make sure our position on

2   the record is that if for some reason there is no

3   ability to ask the Touhy questions, that we then

4   are reserving the right to come back and finish up

5   the time.

6            MR. STANNER:  And we would object to

7   that.

8            The witness is here.  If you have

9   non-Touhy questions, you should feel free to ask

10  them.

11           MR. RAFFERTY:  All right.  So how much

12  time do we have left?

13           THE VIDEOGRAPHER:  Six hours and 12

14  minutes is currently used on the record.

15           MR. RAFFERTY:  48 minutes.

16           THE VIDEOGRAPHER:  Do you want to go

17  back on -- off the record?

18           MR. RAFFERTY:  Off the record, yeah.

19  I'm sorry.

20           THE VIDEOGRAPHER:  The time is 5:09 p.m.

21  We're going off the record.

22           (Recess.)

23           THE VIDEOGRAPHER:  The time is 5:19 p.m.

24  We're back on the record.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CROSS-EXAMINATION

 2   BY MR. STANNER:

 3        Q    Mr. Boggs, good evening.

 4        A    Good evening.

 5        Q    I want to ask you briefly about your

 6   career before McKesson.  How long did you work at

 7   the DEA?

 8        A    Probably a little over 27 years.

 9        Q    Okay.  And why did you decide to leave

10   your position at the DEA?

11        A    As a special agent for the government,

12   they have mandatory retirement at age 57.  There

13   are some exceptions that you can get a waiver,

14   which I was given a waiver for one year.  I worked

15   for about six or so months into that waiver, and

16   then I decided that I wanted to retire and spend

17   more time with my grandchildren and my daughter.

18        Q    And how long were you retired before you

19   started to work again?

20        A    I retired the end of June of 2012.  I

21   started doing some consulting probably around the

22   summer of 2013.

23        Q    And before you were at the DEA, what was

24   your job before that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    Before the DEA, I was a deputy sheriff

 2   in Orange County, Florida, for about eight and a

 3   half years.

 4        Q    What did you do before that?

 5        A    College student.

 6        Q    Mr. Boggs, I want to ask you some

 7   questions about diversion.  What is diversion?

 8        A    Diversion is the act of taking

 9   pharmaceutical controlled substances out of the

10   closed system of distribution or from legitimate

11   channels, patients, and then moving them into --

12   outside of that for abuse.

13        Q    And at McKesson, is it your

14   responsibility to prevent diversion?

15        A    Well, we can certainly present --

16   prevent -- try to prevent some of diversion.  We

17   certainly are not able to prevent all diversion.

18        Q    Well, why can't you prevent all

19   diversion?

20        A    Diversion can occur at different levels

21   outside of the distribution's control.  Diversion

22   can occur at a pharmacy by an employee pilfering

23   it.  It can occur by a pharmacy being burglarized

24   or robbed.  Diversion can occur even after
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    controlled substances have left with a legitimate

 2    patient and are sitting in a medicine cabinet of

 3    someone's home, and someone steals them out of

 4    that medicine cabinet, that's diversion.  We

 5    certainly can't control that.

 6         Q    Everything you just described is a

 7    crime.  Is that -- is there diversion other than

 8    crime?

 9         A    No, diversion --

10              MR. RAFFERTY:  Objection.

11              THE WITNESS:  Diversion is a crime.

12              MR. STANNER:  Sorry, can you tell me the

13    basis?

14              MR. RAFFERTY:  Well, I think it's lack

15    of foundation.

16              MR. STANNER:  Oh, okay.  I'll try and

17    lay a foundation then.

18    BY MR. STANNER:

19         Q    Is diversion crime?

20         A    In my opinion, it is, yes.

21         Q    Is it always a crime?

22         A    Yes.

23         Q    Okay.  So in your capacity at McKesson,

24    when you say you try to limit diversion, does that
```

Highly Confidential - Subject to Further Confidentiality Review

1   mean you're trying to limit crime?

2       A    I'm sorry, could you repeat the

3   question?

4       Q    Sure.  In your -- at McKesson, when you

5   say you -- part of your role is to try to limit

6   diversion, does that mean you're trying to limit

7   crime?

8       A    It means we're trying to identify or

9   prevent situations where a crime would occur.  As

10  I said earlier, we have security measures in our

11  facility to prevent employee pilferage.  If the --

12  if a rogue employee was to pilfer, that would be a

13  crime.

14      Q    And can you describe, what is a

15  diversion trend?

16      A    There's different types of schemes that

17  can occur that would cause a -- what I would

18  consider a trend.  We've -- we've seen diversion

19  trends, such as rogue internet pharmacies, be a

20  diversion trend.  It's a massive criminal scheme.

21  We've seen pill mills in Florida.  That's a

22  diversion trend and is a criminal scheme.

23      Q    Are pill mills still a problem?

24           MR. RAFFERTY:  Objection.

1           THE WITNESS:  There are still some pill

2    mills that can be a rogue pain management facility

3    or something to that nature, yes.

4    BY MR. STANNER:

5           Q    Okay.  Is that -- is that a diversion

6    trend that you're particularly focused on now?

7           A    We try to focus on anything within our

8    ability to prevent diversion, and we see some pain

9    management clinics that are rogue.  We see some

10   specifically bad doctors.  They're -- they're

11   certainly not in the same context as what we knew

12   like the Florida pill mills to be, they're nothing

13   like that at all.

14          Q    Okay.  What are diversion trends that

15   are occurring -- that have been occurring since

16   your time at McKesson?

17          A    Well, first, they're vastly different

18   than before.  They're looking at the pharmacies

19   where the pharmacists or their staff may not be

20   exercising appropriate due diligence.  That can be

21   one -- one area that we look at.  We certainly

22   still continue security measures around our

23   facility.

24          Q    Well, what -- what do you do to keep

```
1   abreast of diversion trends?

2       A    I read anything on the internet that I

3   can identify as diversion trends.  I read the

4   National Survey on Drug Use and Health.  I read

5   the DEA's annual report that they would put out on

6   their website on drug -- the national drug trend.

7   We attend conferences such as the National

8   Association of Drug Diversion Investigator

9   conferences, the National Association of State

10  Controlled Substance Authority, associations -- we

11  attend those conferences.  We attend other

12  conferences where DEA might be a keynote speaker

13  or break- -- have presentations at breakout

14  groups.

15      Q    What if a doctor writes a large

16  prescription, is that diversion?

17      A    It can be.  It may not be.  The mere

18  fact that it's large in and of itself doesn't mean

19  that it's diversion.  For the -- part of the

20  opioid epidemic has been fueled by

21  overprescribing.  That's not illegal prescribing

22  but it's overprescribing.

23      Q    Can you explain what the difference --

24  you just used two different terms,
```

Highly Confidential - Subject to Further Confidentiality Review

1    "overprescribing" and "illegal prescribing."  Can

2    you explain what you mean by those?

3         A    Sure.  Illegal prescribing would be when

4    a doctor would be complicit in a scheme that they

5    know the patient doesn't need it, the patient is

6    paying in cash, the doctor writes a prescription

7    for a patient they've never seen before or

8    examined before.  The doctor meets -- meets

9    someone in a parking lot and writes a prescription

10   in exchange for money.  Those would be illegal

11   prescriptions.

12            Overprescribing, on the other hand,

13   might be a situation where a doctor has a

14   legitimate patient, has a legitimate need for the

15   drugs, but instead of writing that prescription

16   for, say, 15 days, they write it for 30 days.

17   It's a perfectly legitimate prescription but it's

18   overprescribing.  It's prescribing more than what

19   that patient would need.

20        Q    Can you give a -- can you give the jury

21   an example of a prescription that might be

22   overprescription -- that might be an

23   overprescription without being diversion?

24        A    Sure.  You might have a patient go to a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    dentist and have a tooth -- tooth extraction, and

 2    the patient needs the medication for maybe a

 3    couple of days, but the doctor writes it for

 4    30 days.  That's overprescribing.

 5         Q    So does the -- does McKesson's

 6    compliance program target overprescribing, as

 7    you've just described it?

 8         A    It -- it can't.

 9         Q    Why not?

10         A    We don't see the prescription.  We're

11    prohibited by law under HIPAA from knowing

12    anything about the patient or any consultation

13    between the patient and the doctor, and we don't

14    have access to prescription -- the prescription

15    itself.

16         Q    You were asked some questions earlier

17    today about towns that received larger volumes of

18    pills relative to their population.  Do you

19    remember some of those questions?

20         A    I do.

21         Q    Do you know if those numbers are the

22    result of diversion or of overprescribing?

23         A    I don't.

24              MR. RAFFERTY:  Objection.
```

```
 1   BY MR. STANNER:

 2       Q    If -- if you know, do you -- do you know

 3   if those numbers are the result of prescribing --

 4   overprescribing or diversion?

 5       A    It could be a combination of both.

 6       Q    Are you able to say with any specificity

 7   how much overprescribing is part of the problem

 8   versus diversion?

 9       A    I -- it would be my experience that a --

10   a very large percentage of opioids that are out

11   there are -- are through overprescribing.

12            MR. RAFFERTY:   Objection.

13   BY MR. STANNER:

14       Q    While at McKesson, has your role

15   included responsibility for submitting suspicious

16   order reports?

17       A    It has.

18       Q    What is a suspicious order?

19       A    A suspicious order would be an order

20   placed by the customer that is -- has been deemed

21   as an order of unusual size, an order that

22   deviated substantially from a normal pattern or

23   frequent -- unusual frequency.

24       Q    Are you able to estimate roughly how
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    many orders McKesson gets of unusual size, pattern

 2    or frequency in a given month?

 3                 MR. RAFFERTY:  Objection.

 4                 THE WITNESS:  Probably thousands.

 5    BY MR. STANNER:

 6        Q    Mr. Boggs, I'll rephrase.

 7                 Mr. Boggs, do you know how many

 8    suspicious orders McKesson reports to the DEA in a

 9    typical month?

10                 MR. RAFFERTY:  Objection.

11                 THE WITNESS:  Thousands.

12    BY MR. STANNER:

13        Q    So does that mean that the customers who

14    place those suspicious orders are suspicious

15    customers?

16        A    Absolutely not.

17        Q    If a customer places a suspicious order,

18    does that mean the order is probably for some

19    illegal purpose?

20        A    Without knowing more about the customer

21    or more information, absolutely not.

22        Q    If a customer places a suspicious order,

23    does that mean that order is likely to be

24    diverted?
```

1     A     It does not.

2     Q     Well, if the orders are suspicious

3    orders, why doesn't that make the customers

4    suspicious?

5     A     I think that suspicion in this

6    particular context is not the type of suspicion

7    that -- in the way you and I might use the context

8    of suspicious.  That's the term under the

9    regulation as to what it's called.  But the order

10   is simply identified as an order of unusual size,

11   an order that deviates substantially from a normal

12   pattern or unusual frequency.

13    Q     So if you don't consider those orders

14   suspicious in the normal -- in the lay sense of

15   the term, why do you report them?

16    A     Because we have a regulatory obligation

17   to identify and report those orders that are

18   deemed under that three criteria.

19    Q     So can you give me an example of how a

20   legitimate pharmacy might place an order that you

21   would flag as suspicious, and yet not consider to

22   be suspicious in the lay sense?

23    A     You could have an order come in,

24   they're -- someone didn't put the correct amount

1    that they wanted.  They fat fingered a number in

2    there and made a -- made an error, and they're

3    trying to order actually more than what they

4    really intended to.  But because that order was

5    placed with us, that would be deemed as an order

6    of unusual size and reported as suspicious.

7              You may have a situation where a

8    customer has an increase in demand a particular

9    month and they've run out of supply, and when they

10   place an order, it exceeds their threshold, so it

11   might be unusual size.

12      Q    Can you -- can you give us an example of

13   how a typical customer orders with McKesson for

14   controlled substances?

15      A    Many of them order electronically

16   through CSOS, the Controlled Substances Ordering

17   System.  It's an electronic ordering system.

18      Q    And how often do they place orders?  A

19   typical customer, how often does a typical

20   customer place an order?

21      A    They may place orders daily.  They

22   may -- for a particular product, say, for example,

23   hydrocodone, they may order a thousand count

24   bottle today, and then they don't place any orders

Highly Confidential - Subject to Further Confidentiality Review

1    for hydrocodone over the next couple of days or a

2    week or so until they need to replenish their

3    stock.

4         Q    But would -- would that order of a

5    thousand strike you as a suspicious order?

6         A    Not at all.

7         Q    If that customer -- you just said the

8    customer might not order -- can you give me an

9    example of how that customer's ordering pattern

10   might play out over, say, ten days?

11        A    Again --

12             MR. RAFFERTY:  Objection.

13             THE WITNESS:  -- they may not order for

14   a couple of days.  They may order every day.  They

15   may have an automatic order -- ordering system in

16   place that places the order repeatedly.

17             There's a variety of different ways in

18   which they would -- would order, and they may not

19   -- they don't all order in the same fashion.

20   BY MR. STANNER:

21        Q    So if a customer orders in the way that

22   you just described, is that an unusual pattern or

23   frequency?

24        A    It may be an unusual frequency.  It

1  could be, yes.

2       Q    Does that give you -- so -- so what

3  would you do if a customer ordered in that way?

4       A    We would -- if it triggered a suspicious

5  order, that order would be blocked, it would not

6  be shipped, and that order would be reported to

7  the DEA.

8       Q    Is it possible that a customer might be

9  suspicious without ever placing a, quote/unquote,

10  suspicious order under the regulation?

11       A    Yes.

12       Q    Can you give me an example of how that

13  might happen?

14       A    We may see the -- a customer's -- what

15  they are actually ordering may be isolated to a

16  particular product or a particular strength of a

17  product, and they're not ordering necessarily

18  anything else, but yet the orders that they are

19  placing are not unusual size, frequency or

20  pattern.  Something like that might be a red flag

21  that would cause us to go out and look at that

22  customer and determine what's going on at that

23  customer.

24       Q    So if you were to find a customer that

Highly Confidential - Subject to Further Confidentiality Review

1  was suspicious but had no history of suspicious

2  orders, what would you do?

3      A    We would -- depending upon the facts and

4  circumstances, we might do an onsite visit and

5  talk to the owner or the pharmacist in charge

6  there.  We might get updated dispensing data from

7  the pharmacy on what they're actually dispensing

8  in total and review that from -- from the customer

9  to see if there's anything else that we need to be

10  concerned about, make some additional inquiries of

11  the customer as to what -- what's going on at

12  their facility.

13      Q    Would you -- would you consider

14  terminating a customer that had never placed a

15  suspicious order?

16      A    Many of the customers that we have

17  terminated may or may not have -- the reason for

18  the termination would not necessarily be that they

19  had or hadn't placed a suspicious order.

20      Q    In your position, do you ever review

21  reports of suspicious orders?

22      A    I receive them on a regular basis, and

23  from time to time during the week, I will -- I

24  will look at those reports, yes.

1        Q    Why do you look at the reports?

2        A    To see if there's anything in there that

3    I should be concerned about, or if there's

4    anything -- if a customer ordered an extremely

5    large volume of something that would have been

6    a -- not a typical order, I would be able to see

7    that, and maybe decide that someone from our team

8    needed to do some additional due diligence.

9        Q    How often do you look at a suspicious

10   order report and make a determination that

11   something -- some additional diligence is

12   warranted?

13       A    I look at them probably every day, every

14   other day.  I mean, I look at them very

15   frequently, but rarely do I find anything that --

16   of concern in those.

17       Q    Does that mean that you rarely have

18   concerns about your customers, or -- is that what

19   you're saying, you rarely have concerns about your

20   customers?

21       A    No, it means that rarely do I find any

22   of those orders to be concerning.  We do other due

23   diligence of our customers that that due

24   diligence -- because we're looking and knowing our

1  customer and conducting the due diligence of our

2  customer, that we find additional red flags that

3  are not borne out in a suspicious order report.

4      Q    So -- so is the suspicious order report

5  that you get every day, do you consider that a

6  useful tool for detecting potential diversion?

7      A    I do not.

8      Q    What other tools do you consider useful

9  in detecting diversion?

10     A    The tools that we use are things like we

11  get detailed questionnaires completed by the

12  customer that might -- depending upon their

13  responses to the questions in there, may be of a

14  concern and help us identify something.  Asking

15  the customer to provide dispensing data to us, and

16  we look at that dispensing data, and that would

17  provide some additional information.  Looking at

18  purchase history of that customer.  Looking on the

19  Board of Pharmacy website for sanctions for that

20  customer provides us useful information.

21     Q    So, Mr. Boggs, I'm going to show you

22  what I will mark here as Exhibit 47.  This is

23  Bates No. MCKMDL00616425.

24          MR. STANNER:  Here's some copies for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    counsel.  I can put it on the ELMO.

 2             It's a native -- it's not on there --

 3             MS. MONAGHAN:  It's a native and the

 4    Bates number is --

 5             MR. STANNER:  MCKMDL00616425.

 6             (Plaintiffs' Exhibit No. 47 was

 7             marked for identification.)

 8    BY MR. STANNER:

 9        Q    Mr. Boggs, looking here at Exhibit 47,

10    does this look familiar to you?

11        A    It does.

12        Q    What does it look like?

13        A    It's a suspicious order report, in this

14    particular case for the New Castle distribution

15    center of McKesson's.

16        Q    Okay.  And can you just -- I'm just

17    going to direct your attention just to the very

18    first line on this report.  It says -- it's the

19    line that begins with right under "DEA Number," it

20    says ████████

21             Do you see that?

22        A    I do.

23        Q    Okay.  Can you please explain what this

24    line on this report says?
```

1        A       That's the DEA number specific to that

2    customer.

3        Q       Okay.  And reading across, can you tell

4    us what information is contained on the first line

5    for that customer?

6        A       It's their customer name, and in this

7    case it's the Veterans Affairs Administration's

8    medical center in Cleveland in their inpatient.

9        Q       Okay.  And if you could just continue

10   and just go through the columns, tell us what it

11   says.

12       A       Located in -- in the state of Ohio.  The

13   next column is the transaction date for when this

14   particular customer placed this order.  The next

15   column is the date in which this was reported to

16   the DEA.  The next column is the NDC number, which

17   identifies the specific product that they ordered.

18   The material number is an internal identification

19   number that McKesson uses to identify that

20   material.

21               The next is a brief description of that

22   particular product that the customer was ordering,

23   and in this case, I believe it's buprenorphine

24   with naloxone, 30-count bottle, and the base code

Highly Confidential - Subject to Further Confidentiality Review

1    of 9064.  The quantity that they're ordering was

2    20 of individual -- or 30, I'm sorry, individual

3    bottles with that base code.  And the next column

4    is the number of bottles that were shipped for

5    that order, and in this case zero.  So nothing was

6    shipped.

7              The government sequence number is a

8    unique identifier number that the DEA uses in

9    conjunction with the DEA number when they put this

10   information into their system.  And then the last

11   number is -- of 87 -- or 8772 is the DC number for

12   the New Castle facility in Ohio --

13        Q    Okay.  So I --

14        A    -- in Pennsylvania.

15        Q    I want to go back to the original order

16   quantity.  I believe what you said was that the

17   number was 30.  Is that what you meant to say,

18   Mr. Boggs?

19        A    I was looking at a different line item,

20   but you're correct, yes, it's 40, and not -- on

21   the very first line.

22        Q    So what does that mean, 40 -- what does

23   the 40 mean in that context?

24        A    It means 40 -- excuse me, 40 of the

Highly Confidential - Subject to Further Confidentiality Review

1    material that they're ordering, so in this case

2    it's buprenorphine/naloxone, dosage unit 30.  So

3    it would be 40 of each of those 30.

4         Q    Okay.  And then the column to the right

5    of that says "Transaction quantity," and tell --

6    tell me again what that means.

7         A    It's zero.  That's how much of -- they

8    ordered 40, nothing -- zero was shipped.

9         Q    Okay.  This order that you've just

10   described, 40 doses of buprenorphine with naloxone

11   for the VA Medical Center, is that a suspicious

12   order under the regulation?

13        A    It is.

14        Q    What did McKesson do with that?

15        A    Reported it to the DEA.

16        Q    Was it shipped?

17        A    It was not.

18        Q    When you look at that order, do you --

19   do you -- does that give you some concern that the

20   VA Medical Center was going to divert that

21   buprenorphine with -- with naloxone?

22        A    No, it does not.

23        Q    Would you do due diligence on the VA

24   Medical Center in Cleveland because of this order

1    that they placed for buprenorphine with naloxone?

2        A    Not because of this order, no.

3        Q    If a customer -- any of the customers on

4    this list, for example -- well, let me start by

5    saying, as you look at this report here, were any

6    of the orders on this -- do any of the orders on

7    this list jump out at you now as suspicious in the

8    lay sense of the term?

9        A    They do not.

10        Q    As you look at this chart, are you able

11    to tell whether or not any of these entities --

12    these customers are engaged in or facilitating

13    diversion?

14        A    Not from this chart, no, or this report.

15        Q    Would you do due diligence around any of

16    these customers because they appear on this

17    suspicious order report?

18        A    Not based on what I'm seeing on this

19    particular chart.  There may be a circumstance

20    where I would see something where on the quantity

21    ordered would be an extremely large quantity, and

22    I might be familiar with the customer and that

23    seems very odd, I might would do something with

24    that.  But generally what we normally see on these

1    would not.

2        Q    So if -- if this report is -- does not

3    trigger diligence of these customers, what does

4    trigger diligence of these customers?

5        A    What triggers diligence within McKesson

6    in our Controlled Substance Monitoring Program, it

7    starts with determining whether or not McKesson --

8    a prospective new customer, whether or not we feel

9    comfortable enough with that new customer's

10   business model and their due diligence themselves

11   and their corresponding responsibility, whether or

12   not we will initially ship to them in the first

13   place.  And that doesn't always happen.  Some we

14   deny onboarding them as a customer for controlled

15   substances.

16           The other things that may come up is if

17   a customer asked for a threshold change request to

18   increase their base codes for a particular

19   product, under our program, not only do we

20   evaluate the merits of the inquiries, but we take

21   that opportunity to refresh our due diligence of

22   the customer each and every time.

23           We also have situations such as what we

24   call an event trigger.  If we receive a subpoena

Highly Confidential - Subject to Further Confidentiality Review

1   from a government agency or an inquiry from a

2   government agency, that would trigger another

3   due -- that would trigger a due diligence review

4   of that customer.

5        Q    So these orders that you've just looked

6   at here in Exhibit 47, what would have to happen

7   for any one of these orders to be shipped to that

8   customer?

9        A    In order for it to be shipped, we would

10  have to do some additional due diligence review

11  before we would ship that order, or at the begin

12  -- at the beginning of the month, the customer's

13  thresholds would start anew and the customer would

14  be able to order again at that point in time.

15       Q    So but you just -- you just said that

16  you don't do due diligence based on this report.

17  So what would hap- -- how would you do some due

18  diligence?

19       A    Like I said, if they submitted a

20  threshold change request to increase it because --

21  you know, if the customer gets a report -- or gets

22  a notice that their order was not shipped, and

23  that in that notice it said that they would have

24  exceeded their monthly thresholds, if the customer

```
 1   decides to request an increase as a result of the

 2   fact that we did not ship, then that would trigger

 3   us to do a due diligence review of that customer.

 4        Q    So, again, going back just to the first

 5   entry here, the VA Medical Center in Cleveland,

 6   when they did not receive this buprenorphine, is

 7   it your testimony that they might contact McKesson

 8   and ask for a threshold change?

 9        A    They might, yes.

10        Q    And if they were to do that, would that

11   trigger diligence?

12        A    Yes, it would.

13        Q    Okay.  So you were asked a number of

14   questions earlier -- well, let me just ask,

15   Mr. Boggs, are you aware that for some period of

16   time McKesson stopped making automated suspicious

17   order reports like this one to the Drug

18   Enforcement Administration?

19             MR. SATIN:  Objection pursuant to Touhy

20   to the extent you're going to provide information

21   based on your time at the DEA, including official

22   non-public information.

23             THE WITNESS:  Well, since my time at

24   McKesson, I know that they did not make some
```

1    reports at that -- during periods of time.

2    BY MR. STANNER:

3       Q    And do you believe that the failure to

4    report contributed to the opioid crisis?

5       A    I don't, because the order may very well

6    have been blocked and not shipped.  It doesn't

7    mean it was reported or not reported, but the

8    order may have been blocked, and McKesson was

9    blocking orders for quite some time.

10      Q    Okay.  How long have you been at

11   McKesson now, Mr. Boggs?

12      A    A little over five years.

13      Q    Have you seen anything in your time at

14   McKesson to make you think that McKesson is

15   responsible for the opioid crisis?

16      A    I have not.

17      Q    Do you think that McKesson takes its --

18   its obligations -- its regulatory obligations

19   seriously?

20      A    I do.  In fact, if I didn't think they

21   did, I wouldn't work for them.

22      Q    Well, when you went to work for them,

23   did you have -- was it -- was it your impression

24   that they took the regulatory obligations

```
 1    seriously then?

 2        A    It was my understanding that they -- I

 3    mean they hired me.  That was an example that they

 4    were taking their regulatory obligations

 5    seriously.  People that I had talked to during the

 6    consulting periods of time, I was -- the

 7    impression I had was that McKesson took the

 8    regulatory obligations seriously.

 9        Q    When you say the people that you -- took

10    their regulatory obligations seriously, who -- who

11    do you have in mind?  Did you -- did you ever

12    meet, for example, Don Walker?

13        A    I did.

14        Q    What were your impressions of Don

15    Walker?

16             MR. RAFFERTY:  Objection.

17             THE WITNESS:  That he was attempting to

18    do the right thing and he took his regulatory

19    obligations seriously.  He hired me for

20    consulting, and then ultimately hired me in the

21    role that I'm in now.

22    BY MR. STANNER:

23        Q    Have you ever seen anything in your time

24    at McKesson that makes you think that McKesson
```

```
 1    would prioritize profits over following the law?

 2         A    I have not.

 3         Q    In your time at McKesson, have you ever

 4    suggested terminating a customer and had the

 5    company push back on that?

 6         A    I have not.  They -- I have unilateral

 7    authority to terminate a customer regardless of

 8    any financial gain or loss to the company or

 9    financial gain or loss to the -- to the customer.

10    And since I've been at McKesson, our program has

11    probably stopped shipping to 250-some-odd

12    customers.

13         Q    You -- you were asked some questions

14    earlier about McKesson's algorithm.  How long did

15    it take to develop McKesson's current algorithm

16    for thresholds?

17         A    Taken --

18              MR. RAFFERTY:  Objection.

19              THE WITNESS:  It's taken years.

20    BY MR. STANNER:

21         Q    Can you be more specific?

22         A    We've -- I believe it was probably

23    sometime in either late 2014 or early 2015, or

24    whatever, when we engaged the Analysis Group, an
```

1  outside third party, to come in and conduct a

2  review of the data.  We met with them numerous

3  times.  Continue to meet with them.  We

4  established some initial algorithms, recognized

5  that there needed to be some modifications,

6  continued to tweak and adjust those modifications.

7  And we are still in -- looking at that for

8  different segments within the company.  It's taken

9  years.

10      Q    Why -- why does it take years to develop

11  an algorithm like that?

12          MR. RAFFERTY:  Objection.

13  BY MR. STANNER:

14      Q    Mr. Boggs, did you personally -- were

15  you personally involved in working with the team

16  to build the algorithm?

17      A    I was.

18      Q    Okay.  Why did it take years to develop?

19      A    Even though you can have statistically

20  sound or recognized within the mathematical

21  community of sound, acceptable practice of

22  methodologies, those methodologies are not one

23  size fits all.  You have various different markets

24  or different customers.  You have hospitals, you

1    have practitioners, you have long-term care

2    facilities, you have -- all of those are very

3    different from one another.  And so when you try

4    to establish that and come up with a methodology

5    or threshold algorithms, it's very challenging.

6                It's also -- we see differences around

7    the United States, different -- different

8    prescribing patterns by the doctors in and around

9    the States, so it's -- it's very difficult to do.

10      Q    So, I want you to just focus

11   specifically on retail pharmacies, not -- not

12   necessarily hospitals.  I take your point.  Not

13   necessarily hospitals.

14               Focusing just on pharmacies, why not

15   just set a threshold of 8,000 or 20,000 or 50,000?

16      A    Because there's various -- different

17   businesses require different quantities to meet

18   their legitimate patients.  You have some

19   customers also that are part of a buying group,

20   and they self-warehouse, and so they might

21   purchase certain products through their

22   self-warehouse, but then they purchase some from

23   McKesson.

24               Some customers obviously are sound

Highly Confidential – Subject to Further Confidentiality Review

```
 1    business folks.  They shop around.  They purchase

 2    some stuff from one distributor; they purchase

 3    some stuff from another distributor.

 4              So those are just some examples.

 5        Q    You were -- are you familiar with

 6    Franklin Pharmacy in Warren, Ohio?

 7        A    The one we spoke about earlier, yes.

 8        Q    Do you know what happened to Franklin

 9    Pharmacy in Warren, Ohio?

10        A    I terminated the sale of controlled

11    substances to that pharmacy.

12        Q    When did that happen?

13        A    I have to look at the exhibit here.

14              I believe it was sometime between the

15    end of May of 2015 and the first week of August of

16    2015.

17        Q    Why did you terminate Franklin Pharmacy?

18        A    Based upon our due diligence review of

19    that customer, we had concerns that they were not

20    exercising their corresponding responsibility, and

21    therefore we decided not to ship controlled

22    substances to them.

23        Q    Do you think Franklin Pharmacy was a

24    pill mill?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I don't think it -- I wouldn't classify

 2   it as a pill mill, no.

 3        Q    Do you know if Franklin Pharmacy had

 4   active licenses with the DEA or the Ohio Board of

 5   Pharmacy?

 6        A    They did.

 7        Q    So what were your concerns?  When you

 8   say you had concerns, what were your concerns?

 9        A    Our concern was that they were filling

10   some products or prescriptions that would be

11   called the Holy Trinity, which is indicative of

12   diversion, that they could not explain.  Some of

13   their sales, some of their patients, the radius

14   that they were servicing was concerning.  We

15   just -- we had just concerns that they were not

16   being prudent when presented with a prescription

17   for a controlled substance.

18        Q    Do you know how long the diligence

19   review took for Franklin Pharmacy?

20        A    I believe it took a couple of weeks.  I

21   believe.  I'm not sure.

22        Q    Do you conduct site visits as part of

23   your diligence program?

24        A    That is part of our due diligence
```

1    program, yes.

2         Q    Is it an important part of the program?

3         A    It's -- it's a component of it.  It --

4    it can be important, but it's a -- it's a

5    component of the program.

6         Q    Would you say it's the most important

7    component in your diligence program?

8         A    No.

9         Q    Why not?

10        A    We can identify red flags sometimes

11   through statistical analysis or we can ask the

12   customer to provide us dispensing data.  Our

13   review may find that there is a board sanction

14   from the Board of Pharmacy that we can do online.

15   We don't need to do a site visit to -- to obtain

16   that.  In fact, a site visit we wouldn't be able

17   to get that.

18             We may find something on the internet

19   that -- that would cause us concern.  There's

20   other ways and tools in which we use to exercise

21   our due diligence.

22        Q    So, Mr. Boggs, I -- I want to just

23   quickly go back to Exhibit 47 again, the

24   suspicious order report.  If you don't believe

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that these orders are likely to be diverted, why

 2   do you block them?

 3        A    We block them because it's our

 4   understanding that that's the expectation of the

 5   Drug Enforcement Administration.  It's a way for

 6   us to have a customer, if they need something

 7   above their thresholds, to provide us with a

 8   threshold change request and a justification for

 9   why they might need more.  It gives us an

10   opportunity to do additional due diligence of that

11   customer.

12             MR. STANNER:  Nothing further.

13             (A discussion was held off the record.)

14             THE VIDEOGRAPHER:  You want to go off

15   the record?

16             MR. RAFFERTY:  Let's Go off the record,

17   yeah.

18             THE VIDEOGRAPHER:  The time is 5:58 p.m.

19   We're going off the record.

20             (Recess.)

21             THE VIDEOGRAPHER:  The time is 6:07 p.m.

22   We're back on the record.

23             MR. RAFFERTY:  Before I get started on

24   behalf of plaintiffs, does anyone else on the line
```

1    or present have any questions of the witness?

2              And by virtue of everyone's silence,

3    I'll proceed.

4                   REDIRECT EXAMINATION

5    BY MR. HAWAL:

6         Q    Mr. Boggs, how many other former DEA

7    representatives or agents are now employed at

8    McKesson besides yourself, if you can estimate?

9         A    About six or seven.

10        Q    Does that include former DEA attorneys

11   as well as agents?

12        A    It did not, but there -- we -- there's

13   one.

14        Q    Just one.  And before 2013, do you know

15   whether any DEA agents were employed at McKesson,

16   former DEA agents?

17        A    There's a -- was a diversion

18   investigator, not a DEA agent, that was employed

19   by --

20        Q    Just one?

21        A    -- prior to my arrival, yes.

22        Q    Just one.  Okay.

23             Well, I heard you say that a company

24   like McKesson cannot prevent all diversion.  Is

1    that -- is that correct?

2         A    That's correct.

3         Q    Would you agree, though, that

4    wholesalers like McKesson can play an important

5    role in preventing diversion?

6         A    I would.

7         Q    Now, you were asked, and I believe you

8    testified, that since you've been at McKesson,

9    you've never seen anything to suggest that -- that

10   McKesson contributed to the opioid epidemic.

11             Is that a fair statement of what you

12   testified to?

13        A    It is.

14        Q    I want to take you back to Exhibit 38.

15             MR. HAWAL:  If Evan can bring it up.

16   BY MR. HAWAL:

17        Q    Which is the November 4th, 2014 letter

18   from the DEA to Geoffrey Hobart of Covington &

19   Burling.  Do you recall that Mr. Rafferty asked

20   you about this letter?

21        A    I believe so, yes.

22        Q    In fact, Covington & Burling is the law

23   firm that represents McKesson and has its counsel

24   seated directly to your left representing you in

Highly Confidential - Subject to Further Confidentiality Review

```
1    this deposition?

2              MR. STANNER:  Objection to the form.

3              THE WITNESS:  That's correct.

4    BY MR. HAWAL:

5         Q    And according to this DEA letter, in the

6    first paragraph it says:  "As a result of

7    McKesson's failure to maintain effective controls

8    against diversion of particular controlled

9    substances and to design and operate a system to

10   disclose to the registrants suspicious orders of

11   controlled substances," that this administrative

12   action was being taken against McKesson.

13             That's the conclusion of the DEA?

14             MR. STANNER:  Object to the form.

15             THE WITNESS:  I believe that's the case,

16   yes.

17   BY MR. HAWAL:

18        Q    And you disagree with that?

19        A    With what?

20        Q    That McKesson had failed to maintain

21   effective controls against diversion of particular

22   controlled substances and failed to design and

23   operate a system to disclose to the registrant

24   suspicious orders of controlled substances.  Do
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you disagree with that?

2         A    I don't, no.

3         Q    Let me take you to page 3 where certain

4    examples are being provided.

5              For example, in the first paragraph, it

6    talks about McKesson's distribution center in

7    Livonia, Michigan, had reported no suspicious

8    orders for approximately five years after

9    McKesson's settlement with the DOJ in 2008, and

10   remained silent even as it supplied 26 pharmacies

11   that were utilized in a drug trafficking

12   conspiracy.

13             Do you see that?

14        A    I do.

15        Q    Do you believe that that contributed to

16   the opioid epidemic or crisis?

17             MR. STANNER:  Objection to form.

18   Speculation.

19   BY MR. HAWAL:

20        Q    On a probability basis?

21             MR. STANNER:  Same objection.

22             THE WITNESS:  That criminal conspiracy

23   may have contributed to it.

24   BY MR. HAWAL:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Well, do you believe that McKesson

 2   providing opioid -- opioids to those pharmacies

 3   and submitting no suspicious order reports

 4   contributed to the opioid crisis?

 5            MR. STANNER:  Objection to the form.

 6   Speculation, assumes facts.

 7            THE WITNESS:  No.

 8   BY MR. HAWAL:

 9        Q    It goes on to refer to Preferred Care

10   Pharmacy, for example, went from ordering less

11   than 4,000 dosage units of hydrocodone products in

12   March and April of 2010 to regularly ordering

13   16,000 dosage units a month in August 2010, to

14   regularly ordering more than 20,000 dosage units a

15   month in 2011.

16            Do you agree that that is of concern?

17            MR. STANNER:  Same objections.

18            THE WITNESS:  It can be, yes.

19   BY MR. HAWAL:

20        Q    Well, do you -- as you sit here and you

21   see that, is that a concern to you as a former DEA

22   agent and someone in charge of McKesson's

23   anti-diversion efforts?

24            MR. STANNER:  Same objection.
```

```
 1                  THE WITNESS:  It can be a concern, yes.

 2   BY MR. HAWAL:

 3        Q    Well, I'm not asking you if it can be.

 4   I'm asking you if it is as you sit here and read

 5   this.

 6                  MR. STANNER:  Same objections.

 7                  THE WITNESS:  It's a -- would be a

 8   concern that we would want to find out more

 9   information about it.

10   BY MR. HAWAL:

11        Q    Did you ever make any determination of

12   what McKesson did about this in terms of

13   investigating this allegation?

14        A    Not on this specific one, no.

15        Q    And then in the second -- next paragraph

16   down, it says:  "McKesson's systemic failures were

17   also evident at its distribution center in

18   Washington Court House where McKesson did not

19   report any orders as suspicious for years after

20   the 2008 settlement with DOJ and DEA.  McKesson's

21   regional director of Regulatory Affairs told DEA

22   investigators that he did not know what a

23   suspicious order was."

24                  Did I read that correctly?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A    You did.

2         Q    Does that concern you that a regional

3    director of Regulatory Affairs would have told the

4    DEA that he does not know what a suspicious order

5    was?

6              MR. STANNER:  Objection to form.

7              THE WITNESS:  That would cause me a

8    concern, yes.

9    BY MR. HAWAL:

10        Q    That's -- that would be incomprehensible

11   to you, wouldn't it?

12             MR. STANNER:  Same objection.

13             THE WITNESS:  It would be something of

14   concern, yes.

15   BY MR. HAWAL:

16        Q    All right.  And then if we go farther

17   down, it says:  "McKesson WCH," Washington Court

18   House, "did not report anything suspicious about

19   Community Drug of Manchester, Kentucky, a pharmacy

20   located in a town of less than 1,000 adult

21   residents, ordering 20,000 to almost 50,000 dosage

22   units of oxycodone products on a monthly basis in

23   2011."

24             Another concern?
```

1              MR. STANNER:  Same objections.

2              THE WITNESS:  It would be a concern,

3    yes.

4    BY MR. HAWAL:

5         Q    And then it goes on to say:  "Even after

6    McKesson Washington Court House was aware that

7    this pharmacy was under investigation, it

8    continued to supply it with controlled substances

9    while apologizing for having to reduce thresholds

10   and promising to," quote, "bump up," close quote,

11   "those thresholds as soon as they could justify

12   doing so."

13             Sir, is that an incomprehensible concern

14   as you sit here and see that?

15             MR. STANNER:  Same objections.

16             THE WITNESS:  It's definitely a concern,

17   yes.

18   BY MR. HAWAL:

19        Q    And would that indicate to you that

20   McKesson was contributing to the opioid crisis

21   with that kind of evidence?

22             MR. STANNER:  Same objections.  Use of

23   the word "evidence."

24             THE WITNESS:  Not on the surface without

Highly Confidential - Subject to Further Confidentiality Review

1    additional facts and circumstances, no.

2    BY MR. HAWAL:

3         Q    And what would be the -- what would be

4    the legitimate business rationale for bumping up

5    thresholds as soon as they could justify doing so

6    in the face of what is stated here?  Can you come

7    up with one?

8         A    Not off --

9              MR. STANNER:  Objection -- objection --

10   BY MR. HAWAL:

11        Q    I'm sorry, I didn't hear you.

12        A    Not off the top of my head, I can't, no.

13        Q    "In September of 2012, federal and state

14   law enforcement officers executed a search warrant

15   on Community Drug as part of an investigation that

16   ultimately resulted in the criminal conviction of

17   the lead pharmacist and his wife.  Days after that

18   search warrant was executed, and covered by local

19   television news outlets, McKesson Washington Court

20   House contacted Community Drug telling it that it

21   would be seeking a," quote, "pretty sizable

22   increase," close quote, "in oxycodone and

23   hydrocodone thresholds for this store."

24              What does that tell you about McKesson's

 1   diligence and its willingness to deviate from its

 2   promises that it made to the Department of Justice

 3   and the DEA in 2008 to clean up its act as it

 4   related to suspicious order reporting?

 5            MR. STANNER:  Same objections.  Assumes

 6   facts, speculative, compound.

 7            THE WITNESS:  I can't tell from this

 8   whether or not McKesson was aware of the -- the

 9   facts that you just spoke about.

10   BY MR. HAWAL:

11       Q    You're aware, as we discussed earlier,

12   that McKesson ended up paying a $150 million fine

13   or penalty as a result of these types of

14   administrative proceedings that were initiated

15   against it by the Department of Justice and the

16   DEA --

17            MR. STANNER:  Objection to form.

18   BY MR. HAWAL:

19       Q    -- right?

20            MR. STANNER:  Objection to form.

21            THE WITNESS:  The $150 million fine

22   would be associated for not reporting suspicious

23   orders.

24   BY MR. HAWAL:

1        Q    And that's exactly what it wasn't doing

2    in these examples, right?

3             MR. STANNER:  Same objection.

4             THE WITNESS:  According to the document,

5    that's correct, yes.

6    BY MR. HAWAL:

7        Q    Which you have no basis to refute as you

8    sit here today, right?

9        A    I do not.

10            MR. STANNER:  Same objections.

11   BY MR. HAWAL:

12       Q    It goes on to say:  "In that same month,

13   McKesson Washington Court House, its blind eye for

14   suspicious ordering was again apparent when it set

15   a monthly threshold of 112,000 dosage units of

16   hydrocodone products for Family Discount Pharmacy,

17   one of three pharmacies located in Mount Gay, West

18   Virginia, with an adult population of less than

19   1500.  Even when Family Discount Pharmacy exceeded

20   that extraordinary threshold, making this rural

21   pharmacy one of the top purchasers of hydrocodone

22   in the state, no orders were reported as

23   suspicious."

24            Sir, are you still willing to sit here

Highly Confidential - Subject to Further Confidentiality Review

1   and testify that, based upon your knowledge from

2   the time you've been at McKesson, that McKesson

3   has not contributed to the opioid crisis in the

4   United States?

5        A    I am.  As far as I know, Family Discount

6   is still in business today, still has a DEA

7   registration.  We term- -- I terminated sales of

8   controlled substances to them.

9        Q    Why?

10       A    Because of conversations with the owner,

11  that we felt that they were not exercising their

12  corresponding responsibility.

13            But aside from the fact that the

14  government obviously was aware of that, as far as

15  I know today, that that pharmacy is still in

16  business, has never had an order to show cause,

17  has never had a state sanction against them as we

18  sit here today.

19       Q    And what about these other pharmacies

20  that are cited in this letter, are they still in

21  business and being serviced by McKesson?

22            MR. STANNER:  Objection.  Calls for

23  speculation.

24            THE WITNESS:  I -- I'd have to do some

1  research to see that.  I don't know if --

2  BY MR. HAWAL:

3      Q    Well, as we sit here, do you know if the

4  individual pharmacies, for example, Alexander's

5  Pharmacy in Dracut, Massachusetts, is still in

6  business and serviced by McKesson?

7      A    I don't know that one specifically.  The

8  Peoples Pharmacy that they speak out in Detroit,

9  we stopped shipping to them, and as far as I know,

10  they're still in -- they were still in business

11  for several months, if not still in business.

12     Q    So if diversion occurs, it's your

13  position that it's the pharmacy's fault, not the

14  distributor's fault, right?

15         MR. STANNER:  Objection to the form.

16  Misstates.

17  BY MR. HAWAL:

18     Q    Is that your testimony?

19         MR. STANNER:  Same objection.

20         THE WITNESS:  Well, I think we were

21  assuming that on some of these that diversion was

22  occurring when we don't even know that there's not

23  evidence in here that diversion was actually

24  occurring.  In some -- some of them there is, and

Highly Confidential - Subject to Further Confidentiality Review

```
1   some of them there's no information that diversion

2   has ever occurred at these locations.

3   BY MR. HAWAL:

4       Q    And -- and to your knowledge, no one at

5   McKesson has ever investigated these allegations

6   to determine whether diversion actually occurred

7   or didn't occur.  Is that your understanding?

8              MR. STANNER:  Object to the form.  Calls

9   for speculation, misstates.

10             THE WITNESS:  I don't know that we did

11  or didn't on some of these.  I know some of them

12  we did because I know personally that I terminated

13  Peoples Pharmacy, I terminated Family Discount

14  Pharmacy.

15  BY MR. HAWAL:

16      Q    Well, you also terminated Franklin

17  Pharmacy.  You talked about that.

18      A    In -- in Ohio, yes, I did.

19      Q    You terminated them in 2015, correct?

20      A    I -- I'd have to look specifically which

21  one.

22      Q    I thought that's --

23      A    The Franklin Pharmacy in Ohio would have

24  been around 2015.
```

1    Q    -- Warren.  And that would have been

2  eight years after it was onboarded in 2007?

3    A    That sounds about right, yes.

4    Q    Mm-hmm.  And as Mr. Rafferty went

5  through Exhibit 43, in 2009 -- in 2009, they had a

6  threshold of 50,000 for oxycodone, 35,000 for

7  hydrocodone on a monthly basis, and wanting an

8  increase of 20,000 and 10,000, respectively, to be

9  made a permanent increase.

10         And you made the determination in 2015

11  that this was indicative of potential diversion,

12  and you felt that they should be terminated,

13  right?

14         MR. STANNER:  Objection to the form.

15         THE WITNESS:  Right.

16  BY MR. HAWAL:

17    Q    It took seven years -- well, strike

18  that.

19         You made the determination that it was

20  listed as the largest dispensing pharmacy for

21  oxycodone doses and the second largest dispenser

22  of oxycodone of 30 milligram and fourth highest

23  dispenser of hydrocodone doses, and made a

24  determination that more due diligence was required

```
 1   and they should be terminated as a result of that

 2   due diligence, right?

 3              MR. STANNER:  Objection to form.

 4              THE WITNESS:  That's correct.

 5   BY MR. HAWAL:

 6       Q    And those same quantities of pills had

 7   been flowing into that pharmacy from McKesson

 8   since 2009.  Correct?

 9              MR. STANNER:  Objection to form.

10              THE WITNESS:  I think --

11              MR. SATIN:  Objection pursuant to Touhy.

12              THE WITNESS:  I think that that is an

13   example of how challenging and difficult some of

14   this is.  You can go into a pharmacy in one

15   particular time and not necessarily see anything

16   that's indicative of either diversion or a

17   pharmacist that's not exercising their

18   corresponding responsibility, and then you can go

19   back there several months later -- it happened in

20   Family Discount in Mount Gay, West Virginia.  We

21   go into there, we don't necessarily see anything.

22   We go back there again, follow up, and then we

23   find something.  They may have changed their staff

24   over that period of time.  They may have changed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    who they are supplying with controlled substances.

 2              The facts and circumstances can change,

 3    and this is just an example of just how

 4    challenging and difficult this is.

 5              MR. HAWAL:  Move to strike as

 6    nonresponsive.

 7              MR. STANNER:  Objection.

 8    BY MR. HAWAL:

 9         Q    Mr. Boggs, you mentioned that dispensing

10    data is important.

11         A    It's one of the tools that we use, yes.

12         Q    But even though you are not -- you are

13    not receiving dispensing data from CVS because

14    they refuse to provide it, you maintained a

15    relationship with CVS and didn't demand that they

16    provide it or they be terminated.  Fair?

17              MR. STANNER:  Object to the form.  The

18    use of the word "you," misstates.

19              THE WITNESS:  I don't know if that --

20    I'm not -- I don't deal with the national chains,

21    so I don't know what was said to them, whether or

22    not something was provided or what -- I don't --

23    I'm not familiar with that.

24    BY MR. HAWAL:
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q     Did you say that suspicious order

2     reports are not useful to you?

3     A     I have not found them to be particularly

4     useful.

5     Q     And is that since you've left the DEA or

6     did you consider them not useful when you were

7     with the DEA?

8           MR. SATIN:  Objection pursuant to Touhy.

9     You may answer so far as it -- it's not based on

10    information you obtained while you were at the

11    DEA.

12          THE WITNESS:  I don't believe that I can

13    answer that question at this time.

14    BY MR. HAWAL:

15    Q     Well, you can certainly answer the fact

16    that Mr. Rannazzisi, by virtue of the letters that

17    he wrote, he considered suspicious order reports

18    important and valuable, true?

19          MR. STANNER:  Objection.

20    BY MR. HAWAL:

21    Q     By virtue of what he put in the letters

22    that you saw, Exhibit 1 and Exhibit 2 or 3.

23          MR. STANNER:  Objection to the form.

24          THE WITNESS:  I -- I understand what was

1    in the letters in terms of what he thought about

2    it, and I would suggest --

3    BY MR. HAWAL:

4        Q    It spoke -- spoke for itself.

5             THE REPORTER:  You didn't get the rest

6    out.

7             THE WITNESS:  Yeah.  I would suggest if

8    you want to know what he was thinking about that,

9    you might have to ask him.

10   BY MR. HAWAL:

11       Q    Well, it's evident from the letters that

12   he wrote what he was thinking, true?

13            MR. STANNER:  Objection to the form.

14            THE WITNESS:  I -- I will take the

15   letter at face value, yes.

16   BY MR. HAWAL:

17       Q    And he was your supervisor, correct?

18       A    He was.

19       Q    He was the head of the Department of

20   Diversion Control at the DEA the entire time you

21   were in that department, true?

22       A    He was.

23       Q    And in terms of Mr. Rannazzisi's

24   letters, would -- do you believe it's unusual that

Highly Confidential - Subject to Further Confidentiality Review

 1    he would have to send repetitive letters to

 2    wholesalers to remind them of their obligations

 3    under the Controlled Substances Act and their

 4    obligations to send suspicious order reports to

 5    the DEA if he didn't believe that that was an

 6    important part of their obligation?

 7              MR. STANNER:  Object to the form.

 8              MR. SATIN:  Objection pursuant to Touhy,

 9    don't answer that question.

10    BY MR. HAWAL:

11        Q    As you sit here today, and based on what

12    you know and what you've seen in those letters, do

13    you believe that he would have sent those letters

14    if he did not have concerns about McKesson's and

15    other distributors' failures to live up to their

16    obligations under the Controlled Substances Act?

17              MR. STANNER:  Object to the form of the

18    question.

19              MR. SATIN:  Objection pursuant to Touhy

20    to the extent it still relies -- the answer relies

21    on the information you obtained at that time when

22    you were at the DEA.

23              THE WITNESS:  I don't believe I can

24    answer that question at this time.

```
 1    BY MR. HAWAL:

 2         Q    Well, since you've left the DEA, has --

 3    has Mr. Rannazzisi or any other DEA representative

 4    sent McKesson a letter saying, We don't want your

 5    suspicious order reports, they're of no value to

 6    us?  Has that ever happened?

 7         A    I'm not familiar with any letters that

 8    have that, no.

 9         Q    If those letters did go to the -- to

10    McKesson, you would know about it, wouldn't you?

11              MR. STANNER:  Object -- object to the

12    form of the question.

13    BY MR. HAWAL:

14         Q    Wouldn't you?

15         A    I would hope so, yes.

16         Q    Now, you testified that you send

17    suspicious order reports that -- that you believe

18    are legitimate suspicious -- represent suspicious

19    orders to the DEA as well as suspicious order

20    reports that you don't believe represent or are

21    suspicious.  Is that -- is that your statement --

22    was that your testimony?

23         A    I don't believe that was my testimony at

24    all.
```

1      Q    Well, I thought you said that you --

2   with Exhibit -- I can't remember the number, but

3   the exhibit that your counsel referenced --

4           MR. STANNER:  Exhibit 47.

5   BY MR. HAWAL:

6      Q    -- 47, that you sent a suspicious order

7   report relating to the VA in Cleveland to the DEA,

8   even though you didn't believe that that was a

9   suspicious order.

10     A    I believe it was a --

11          MR. STANNER:  Objection to the form.

12          THE WITNESS:  -- suspicious customer.

13  BY MR. HAWAL:

14     Q    Oh, okay.  Well, did you believe it was

15  a suspicious order?

16     A    I believe it was a suspicious order as

17  that is defined in the regulation, yes.

18     Q    All right.  But you didn't believe that

19  diversion could be occurring at the VA in

20  Cleveland?

21     A    Not --

22          MR. STANNER:  Objection to the form.

23  Misstates the testimony.

24          THE WITNESS:  Not based on this order,

Highly Confidential - Subject to Further Confidentiality Review

1   no.

2   BY MR. HAWAL:

3       Q    But you were -- you also would send

4   reports to the DEA that you thought could

5   represent diversion -- suspicious order reports

6   that could represent diversion, true?

7       A    I --

8            MR. STANNER:  Objection to the form.

9            THE WITNESS:  I don't believe I said

10  that at all.

11  BY MR. HAWAL:

12      Q    Does McKesson identify any orders which

13  are based on its due diligence which it actually

14  believes are illegitimate?

15           MR. STANNER:  I'm sorry, Counsel, could

16  you repeat that question?

17           MR. HAWAL:  Yeah.

18  BY MR. HAWAL:

19      Q    I mean, does McKesson identify either

20  for itself or for the DEA orders which are based

21  on its due diligence which actually confirms to

22  McKesson that it is engaged -- the customer is

23  engaged in diversion?

24           MR. STANNER:  Object to the form.

 1          THE WITNESS:  I think my experience --

 2   if I understand the question correctly, my

 3   experience is, is that what we look at is whether

 4   or not the customer is fulfilling their regulatory

 5   obligations when they receive orders, not

 6   necessarily whether or not we look at a specific

 7   order to determine whether or not diversion was

 8   occurring.

 9   BY MR. HAWAL:

10       Q    In any event, wholesalers like McKesson

11   play an integral part of the efforts at preventing

12   diversion.  True?

13       A    I believe we --

14          MR. STANNER:  Objection to form.

15          THE WITNESS:  -- play an important part.

16   BY MR. HAWAL:

17       Q    And -- and that is done by assisting the

18   DEA in identifying pharmacies who are selling high

19   volumes of opioid pills outside the levels of --

20   that are expected to be sold by pharmacies of like

21   size and comparable location?

22          MR. STANNER:  Same objection.

23          THE WITNESS:  We help the DEA inasmuch

24   as that we report orders that are unusual size,

```
1    frequency and pattern, and then the DEA can do

2    with them whatever they think for investigations.

3    We also report -- not only that, we report all

4    transactions that those customers purchase from us

5    for all Schedule II and Schedule III narcotics

6    through the ARCOS system.

7              So we have two different types of

8    reportings that we report to them to help them in

9    their mission.

10   BY MR. HAWAL:

11       Q    And -- and you believe that -- setting

12   aside your legal obligations as a company, do you

13   believe that that is the right thing to do as a

14   corporate citizen in this country?

15             MR. STANNER:  Object to the form.

16             THE WITNESS:  I believe that it's right

17   as a -- being a good corporate citizen to provide

18   the DEA with the regulatory requirements that we

19   are required to do, and we do.

20   BY MR. HAWAL:

21       Q    Well, then -- then why was McKesson not

22   providing suspicious order reports to the DEA for

23   a five-year period of time after it promised to do

24   so in 2008 at so many different distribution
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   centers across the country?

 2              MR. STANNER:  Objection.  Calls for

 3   speculation.

 4              THE WITNESS:  It's my understanding they

 5   were focused on customers that were suspicious and

 6   reporting those customers to -- to the DEA, that

 7   that was what the DEA was interested in.

 8   BY MR. HAWAL:

 9        Q    What are you -- are you -- are you

10   telling us what you understood as a DEA agent at

11   that time?  Where are -- where are you getting

12   that information from?

13              MR. STANNER:  Objection.  Counsel,

14   you've asked him to speculate.

15              MR. HAWAL:  Well, I understand, but

16   he's -- he's now telling -- I think he's giving us

17   information in violation of Touhy without his

18   counsel even objecting to it.

19              MR. SATIN:  Well, then maybe -- I don't

20   believe so.  I thought your question was asking

21   for him based on his time at McKesson to be

22   evaluating what he understood McKesson was doing

23   during those years that he learned in the course

24   of his work at McKesson.
```

```
 1              But I will certainly advise you,

 2   Mr. Boggs, not to disclose information that's

 3   non-public and official that you learned while you

 4   were at the DEA and -- and to make that clear.

 5              MR. HAWAL:  Okay.  P -- P-1431, please.

 6              (Plaintiffs' Exhibit No. 48 was

 7              marked for identification.)

 8   BY MR. HAWAL:

 9      Q    Sir, I'm handing you another letter from

10   the Department of Justice to another lawyer at

11   your lawyer's law firm, Covington & Burling, dated

12   March 20th, 2004 -- March 20, 2014.  I'm sorry.

13              Take a look at this letter.  And doesn't

14   it prominently reiterate that the DEA was not

15   looking for suspicious customers; it was looking

16   for suspicious orders?

17              It says --

18              MR. STANNER:  Objection to the form.

19   BY MR. HAWAL:

20      Q    It says:  "I cannot accept that the CSMP

21   implemented by McKesson after the 2008 settlement

22   was designed to identify suspicious customers.  It

23   is my informed belief that such a contention is

24   more rationalization than reality."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                And then he goes on to quote from the

 2    obligations that McKesson assumed in 2008, when it

 3    settled with the DEA and DOJ, where it repeatedly

 4    referenced the obligation to report suspicious

 5    orders, and nowhere does it relate to suspicious

 6    customers.

 7                Is that -- is that accurate, sir?

 8                MR. STANNER:  Objection to the form.  Is

 9    that an accurate reading of the letter or --

10    BY MR. HAWAL:

11        Q    Is it an accurate reading of the letter

12    and is it an accurate fact, as you understand it?

13                MR. STANNER:  Objection.  Compound.

14                MR. SATIN:  And, well, to the fact,

15    objection pursuant to Touhy.

16                MR. HAWAL:  Well, this is a 2014

17    document, sir.

18                MR. SATIN:  You're asking about events

19    that happened in 2008.

20    BY MR. HAWAL:

21        Q    Is it your -- I mean, does this letter

22    clarify your prior testimony that in fact the DEA

23    was looking for the reporting of suspicious orders

24    and not suspicious customers?
```

```
 1                    MR. STANNER:  Objection to the form,

 2     "clarify."

 3                    THE WITNESS:  I believe that that's what

 4     the letter says, yes.

 5     BY MR. HAWAL:

 6          Q    And do you have any documents from the

 7     DEA indicating otherwise?

 8                    MR. STANNER:  Objection to form.

 9                    THE WITNESS:  Not to my knowledge, no.

10     BY MR. HAWAL:

11          Q    And on page 3 of the letter, on the

12     second paragraph, it says:  "In fact, the idea

13     that a distributor would implement a CSMP that

14     concentrates on suspicious customers rather than

15     suspicious orders is contrary to the letter and

16     spirit of those provisions of the act and

17     regulations aimed at curbing diversion."

18                    Is that what it says?

19          A    That's what it says, yes.

20          Q    Was that your understanding when you

21     were with the DEA as well?

22                    MR. STANNER:  Objection.

23                    MR. SATIN:  Objection.  Touhy.

24                    THE WITNESS:  I don't believe I can
```

1  answer that question at this time.

2  BY MR. HAWAL:

3      Q    Were any of the answers that you gave in

4  your direct examination by your counsel informed

5  by information that you gained as a DEA

6  representative?

7           MR. STANNER:  Objection to the form of

8  the question.

9           THE WITNESS:  Not that I recall, no.

10          MR. STANNER:  Can I ask how long we've

11  been on the record?

12          THE VIDEOGRAPHER:  30 minutes.

13          MR. SATIN:  And I think the last

14  question asked about direct examination by his

15  counsel.  I never asked him any questions.

16          MR. HAWAL:  Yes.

17          MR. SATIN:  You're asking about the

18  direct examination that counsel for McKesson made.

19          MR. HAWAL:  Well, Counsel -- yeah,

20  Counsel --

21  BY MR. HAWAL:

22      Q    Let me ask you this, Mr. Boggs.  In your

23  preparation sessions for this deposition, were you

24  with counsel for McKesson?

```
1          A    I was.

2          Q    Okay.

3               (Plaintiffs' Exhibit No. 49 was

4               marked for identification.)

5   BY MR. HAWAL:

6          Q    I'm going to hand you what's been marked

7    as Exhibit 49, which is some e-mails in two

8    thousand -- March of 2014, when you were with --

9    an employee of McKesson.

10              And if you look to page 2 of this e-mail

11   chain, from David Graziano to Stephen Schmidt, he

12   says:  "Melanie called me this morning.  She

13   ordered 6 x 100 bottles of oxy and received 10 x

14   100.  This is kind of a slap in the face in our

15   conversation -- conversation efforts of threshold

16   rationale and change request procedures."

17              What would you expect McKesson to do if

18   they erroneously shipped more oxycodone to a

19   customer than the customer ordered?  Would you --

20              MR. STANNER:  Objection.

21   BY MR. HAWAL:

22         Q    What would you expect McKesson to do?

23              MR. STANNER:  Objection to form.

24              THE WITNESS:  They could do a couple of
```

 1    different things.  They can --

 2    BY MR. HAWAL:

 3        Q    Well, what would be appropriate for them

 4    to do?

 5        A    Either work with the customer to find

 6    out if there was additional quantities that they

 7    needed, or whether or not they were going to

 8    return the quantities over -- over the order.

 9        Q    Well, would it be appropriate for

10    McKesson to send someone to pick up the erroneous

11    order that exceeded the amount that was ordered

12    legitimately by the customer?

13            MR. STANNER:  Object to the form.

14    Speculation.

15            THE WITNESS:  That could be one option,

16    yes.

17    BY MR. HAWAL:

18        Q    Well, do you think it -- let's go to

19    page 1 of this exhibit.  It says:  "All:  They

20    gave the 222 form to McKesson on Wednesday.  Upon

21    manager review, it was discovered that the form

22    had five lines filled out, and the last line

23    completed box was filled in as a 6.  The form was

24    sent back to the account that night, and I was

```
 1   asked to call them the next morning before the

 2   driver arrived to inform them of the situation.  I

 3   talked to the pharmacist and informed her about

 4   her options, either do a new form or she could add

 5   something to line 6 which would make the 222 form

 6   legal.  She chose the latter and said she would

 7   fill in that line with 4 x 100 oxycodone/ APAP,

 8   which would make a total of 10 on the form.

 9   Attached is a copy of the form and you can see all

10   6 lines were filled in by the same person."

11              So if we go to the last page of this,

12   what happened with McKesson's blessing was because

13   of the error in shipment, rather than have the

14   product returned, they had the customer simply add

15   the four 100 order to conform with the mistake to

16   make it look like she had originally ordered ten

17   rather than six.

18              Do you think that's appropriate?

19              MR. STANNER:  Objection to the form on

20   several bases.

21              THE WITNESS:  It can be, as long as the

22   quantities are appropriately documented and

23   recorded on the proper form and the proper format,

24   that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HAWAL:
 2        Q    So -- so as a customer --
 3             MR. STANNER:  You have to let him finish
 4   the answer.
 5             MR. HAWAL:  I'm sorry.
 6             MR. STANNER:  You can finish your
 7   answer, Mr. Boggs.
 8   BY MR. HAWAL:
 9        Q    Were you finished or do you need to
10   finish?
11             MR. STANNER:  The last statement was:
12   "It can be, as long as the quantities are
13   appropriately documented and recorded on the
14   proper form and the proper format, that --"
15             THE WITNESS:  So that appropriately
16   documents what was -- what was shipped, yes.
17   BY MR. HAWAL:
18        Q    So even though a customer only needed
19   six 100 bottles of oxycodone, if McKesson makes
20   the mistake and ships ten, you believe it's
21   appropriate as a legitimate obligation to avoid
22   diversion to simply have the customer change their
23   initial order so it looks like they initially
24   ordered ten rather than six?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. STANNER:  Objection to the form.
 2                 THE WITNESS:  I'm not -- I'm not sure I
 3      would agree with the characterization of making it
 4      look like.  It's a documentation to show what left
 5      McKesson and what the customer received, and that
 6      both parties here are making an attempt to
 7      appropriately document what was shipped and what
 8      was received.
 9      BY MR. HAWAL:
10          Q    So it's about documentation.
11          A    Documentation is a requirement of it.
12      And if the customer had a legitimate need for
13      that --
14          Q    Well --
15          A    -- there was no -- there's nothing
16      nefarious here.
17          Q    -- the customer didn't have a legitimate
18      need.  The customer had a legitimate need for six
19      100 bottles, not ten.  Right?  That's what they
20      ordered.
21                 MR. STANNER:  Objection to the form.
22      BY MR. HAWAL:
23          Q    Right?
24          A    That's what they ordered, but that
```

Highly Confidential - Subject to Further Confidentiality Review

1   doesn't necessarily mean they -- they wouldn't

2   have taken more.  If they had the option to return

3   it, and that could have been an option -- so if

4   the customer didn't think they needed it, they

5   could have returned it.

6       Q    Let me ask you one last question,

7   Mr. Boggs.  By what percentage does your current

8   salary exceed the salary that you were earning as

9   a DEA agent in 2011?

10              MR. STANNER:  Objection to the form.

11              THE WITNESS:  I don't know off the top

12  of my head.

13  BY MR. HAWAL:

14      Q    Well, can you estimate how much more you

15  earned by a percentage?  I'm trying to avoid to

16  have to ask you your earnings.

17              By percentage, do you earn 200 percent

18  more, 500 percent more than you did as a DEA agent

19  as an employee of McKesson?

20              MR. STANNER:  Object to the form of the

21  question.

22              THE WITNESS:  I -- I don't know off the

23  top of my head.

24  BY MR. HAWAL:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Not even a remote estimate?

 2             MR. STANNER:  Same objection.

 3             THE WITNESS:  I'd have to think about it

 4   and come up --

 5   BY MR. HAWAL:

 6        Q    You mentioned that you wanted to retire

 7   and spend more time with your children or

 8   grandchildren, and that didn't work out very well,

 9   did it?

10             MR. STANNER:  Objection.

11             THE WITNESS:  In what context?  I

12   moved -- I moved from -- I was working and retired

13   from here in the Washington, D.C. area, and I

14   moved back to Michigan where they are.

15   BY MR. HAWAL:

16        Q    Well, you're working full time.

17             MR. STANNER:  Move to strike the

18   question and the answer.

19   BY MR. HAWAL:

20        Q    Right?

21        A    I am working --

22             THE REPORTER:  I didn't hear what you

23   said.

24             MR. STANNER:  I said move to strike the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    question and the answer.

 2    BY MR. HAWAL:

 3        Q    You're -- you're working full time

 4    currently, correct?

 5        A    I am.

 6        Q    And what is your plan as to how long

 7    you're going to continue working for McKesson?  Do

 8    you have any current --

 9             MR. STANNER:  I'm sorry, Mr. Hawal, are

10    you really doing an inquiry about whether or not

11    this man wants to spend time with his

12    grandchildren?  Is that how you want to end the

13    day?

14             MR. HAWAL:  Is -- is that on objection

15    or -- I don't understand.

16             MR. STANNER:  Yeah, it's a standing

17    objection to the line of inquiry, yes.

18             MR. HAWAL:  Thank you.

19             MR. STANNER:  How much time is left on

20    the record?

21             THE VIDEOGRAPHER:  37 minutes, 50 -- 58

22    seconds.

23             MR. STANNER:  You've got eight seconds.

24             MR. HAWAL:  Yeah, I'm waiting for an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    answer.

 2              THE WITNESS:  What was the question?

 3    BY MR. HAWAL:

 4         Q    How long do you intend to work full

 5    time?

 6         A    I don't know.

 7              MR. STANNER:  Thank you.

 8              MR. HAWAL:  No further questions.

 9              THE VIDEOGRAPHER:  Off the record.  The

10    time is 6:45 p.m.  We're going off the record.

11              (Whereupon, the deposition of

12              GARY L. BOGGS was adjourned at

13              6:45 p.m.)

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2        The undersigned Certified Shorthand Reporter

 3    does hereby certify:

 4        That the foregoing proceeding was taken before

 5    me at the time and place therein set forth, at

 6    which time the witness was duly sworn; That the

 7    testimony of the witness and all objections made

 8    at the time of the examination were recorded

 9    stenographically by me and were thereafter

10    transcribed, said transcript being a true and

11    correct copy of my shorthand notes thereof; That

12    the dismantling of the original transcript will

13    void the reporter's certificate.

14        In witness thereof, I have subscribed my name

15    this date:  January 21, 2019.

16

17                    _____

18                    LESLIE A. TODD, CSR, RPR

19                    Certificate No. 5129

20    (The foregoing certification of

21    this transcript does not apply to any

22    reproduction of the same by any means,

23    unless under the direct control and/or

24    supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2        Please read your deposition over carefully and

 3   make any necessary corrections. You should state

 4   the reason in the appropriate space on the errata

 5   sheet for any corrections that are made.

 6   After doing so, please sign the errata sheet

 7   and date it.

 8        You are signing same subject to the changes

 9   you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you. If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - - - - -

 2                     E R R A T A

 3                      - - - - - -

 4    PAGE LINE CHANGE

 5    _____ _____ _____

 6    REASON: _____

 7    _____ _____ _____

 8    REASON: _____

 9    _____ _____ _____

10    REASON: _____

11    _____ _____ _____

12    REASON: _____

13    _____ _____ _____

14    REASON: _____

15    _____ _____ _____

16    REASON: _____

17    _____ _____ _____

18    REASON: _____

19    _____ _____ _____

20    REASON: _____

21    _____ _____ _____

22    REASON: _____

23    _____ _____ _____

24    REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2        I,_____, do hereby

 3   certify that I have read the foregoing pages, and

 4   that the same is a correct transcription of the

 5   answers given by me to the questions therein

 6   propounded, except for the corrections or changes

 7   in form or substance, if any, noted in the

 8   attached Errata Sheet.

 9

10   _____

11   GARY L. BOGGS                         DATE

12

13

14   Subscribed and sworn to

15   before me this

16   _____day of_____,20___.

17   My commission expires:_____

18   _____

19   Notary Public

20

21

22

23

24
```