Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3

     IN RE: NATIONAL          )
 4   PRESCRIPTION             )  MDL No. 2804
     OPIATE LITIGATION        )
 5   _____  )  Case No.
                              )  1:17-MD-2804
 6                            )
     THIS DOCUMENT RELATES    )  Hon. Dan A.
 7   TO ALL CASES             )  Polster

 8

                 THURSDAY, JULY 19, 2018
 9

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                     - - -
12              Videotaped deposition of Gary L.
13   Boggs, held at the offices of The Cochran
14   Firm, D.C., 1100 New York Avenue, NW, Suite
15   340, Washington, DC, commencing at 9:05 a.m.,
16   on the above date, before Carrie A. Campbell,
17   Registered Diplomate Reporter and Certified
18   Realtime Reporter.

19

20

21                     - - -

22

             GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24

25
```

Page 2

A P P E A R A N C E S :

SPANGENBERG SHIBLEY & LIBER LLP
BY: WILLIAM HAWAL, ESQUIRE
 whawal@spanglaw.com
1001 Lakeside Avenue East
Cleveland, Ohio 44114
(216) 600-0114

LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY PROCTOR, P.A.
BY: TROY RAFFERTY, ESQUIRE
 trafferty@levinlaw.com
 (VIA TELECONFERENCE)
316 South Baylen Street
Pensacola, Florida 32502
(850) 435-7000

MORGAN & MORGAN
BY: SARAH FOSTER, ESQUIRE
 sarahfoster@forthepeople.com
 (VIA TELECONFERENCE)
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
(904) 398-2722
Counsel for Plaintiffs

COVINGTON & BURLING LLP
BY: ANDREW STANNER, ESQUIRE
 astanner@cov.com
 AMBER M. CHARLES, ESQUIRE
 acharles@cov.com
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
Counsel for McKesson

WILLIAMS & CONNOLLY LLP
BY: COLLEEN MCNAMARA, ESQUIRE
 cmcnamara@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5331
Counsel for Cardinal Health, Inc.

Page 3

REED SMITH LLP
BY: SHANNON E. MCCLURE, ESQUIRE
 smcclure@reedsmith.com
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Counsel for AmerisourceBergen

JONES DAY
BY: SARAH G. CONWAY, ESQUIRE
 sgconway@jonesday.com
555 South Flower Street, 15th Floor
Los Angeles, California 90071-2300
(213) 489-3939
Counsel for Walmart

PELINI CAMPBELL & WILLIAMS LLC
BY: PAUL B. RICARD, ESQUIRE
 pbricard@pelini-law.com
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Counsel for Prescription Supply,
Inc.

ZUCKERMAN SPAEDER LLP
BY: DANIEL P. MOYLAN, ESQUIRE
 dmoylan@zuckerman.com
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
(202) 778-1800
Counsel for CVS Indiana, LLC, and
CVS RX Services, Inc.

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: JOHN CELLA, ESQUIRE
 John.Cella@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

Page 4

MARCUS & SHAPIRA LLP
BY: SCOTT D. LIVINGSTON, ESQUIRE
 livingston@marcus-shapira.com
301 Grant Street, 35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

KIRKLAND & ELLIS, LLP
BY: PAUL J. WEEKS, ESQUIRE
 paul.weeks@kirkland.com
655 15th Street, NW, Suite 1200
Washington, DC 20005
(202) 879-5000
Counsel for Allergan Finance, LLC

JACKSON KELLY PLLC
BY: WILLIAM J. AUBEL, ESQUIRE
 william.j.aubel@jacksonkelly.com
 (VIA TELECONFERENCE)
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304) 340-1146
Counsel for Miami-Luken

MORGAN, LEWIS & BOCKIUS LLP
BY: JANE DUDZINSKI, ESQUIRE
 jane.dudzinski@morganlewis.com
 (VIA TELECONFERENCE)
77 West Wacker Drive
Chicago, Illinois 60601-5094
(312) 324-1000
Counsel for Teva Pharmaceuticals USA, Inc.,
Cephalon, Inc., Watson Laboratories,
Inc., Actavis LLC, Actavis Pharma,
Inc., f/k/a Watson Pharma, Inc.

MORGAN, LEWIS & BOCKIUS LLP
BY: MATTHEW R. LADD, ESQUIRE
 matthew.ladd@morganlewis.com
 (VIA TELECONFERENCE)
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
Counsel for Rite Aid

Page 5

VIDEOGRAPHER:
 DANIEL HOLMSTOCK,
 Golkow Litigation Services

– – –

Page 6

```
 1            INDEX
 2                      PAGE
 3   APPEARANCES................................  2
 4   EXAMINATIONS
 5     BY MR. HAWAL...............................  10
 6
 7            EXHIBITS
 8   No.    Description         Page
 9   McKesson-Boggs  US Department of Justice,   47
     Exhibit 1      Drug Enforcement
10               Administration, September
                 27, 2006 letter to DBS
11               Trading, Inc.,
                 DEA-9 - DEA-10
12
13   McKesson-Boggs  US Department of Justice,   55
     Exhibit 2      Drug Enforcement
14               Administration, December
                 27, 2007 letter to
15               Masters Pharmaceutical,
                 Inc.,
16               DEA-13 - DEA-14
17   McKesson-Boggs  Settlement and Release   57
     Exhibit 3      Agreement and
18               Administrative Memorandum
                 of Agreement,
19               MCKMDL00409289 -
                 MCKMDL00409299
20   McKesson-Boggs  Compliance Addendum   59
     Exhibit 4      between McKesson
21               Corporation and DEA
22   McKesson-Boggs  August 13, 2014 letter   66
     Exhibit 5      from John F. Walsh, US
23               Department of Justice, to
                 Geoffrey Hobart,
24               MCKMDL00409224 -
                 MCKMDL00409246
25
```

Page 7

```
 1   McKesson-Boggs  Prescription Drug Abuse,   86
     Exhibit 6      The National Perspective,
 2               MCKMDL00407451 -
                 MCKMDL00407475
 3
 4   (Exhibits attached to the deposition.)
 5   CERTIFICATE.................................100
 6   ACKNOWLEDGMENT OF DEPONENT...................102
 7   ERRATA......................................103
 8   LAWYER'S NOTES..............................104
```
```
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1        VIDEOGRAPHER:  We are now on
 2   the record.  My name is Daniel
 3   Holmstock.  I'm the videographer for
 4   Golkow Litigation Services.
 5        Today's date is July 19, 2018,
 6   and the time is 9:05 a.m.  This video
 7   deposition is being held at the law
 8   offices of The Cochran Firm at 1100
 9   New York Avenue, Northwest, Suite 340,
10   in Washington, DC, in the matter of
11   In Re: National Prescription Opiate
12   Litigation.  It's pending before the
13   United States District Court for the
14   Northern District of Ohio, Eastern
15   Division.
16        Our deponent today is Mr. Gary
17   Boggs.
18        Will counsel present please
19   identify themselves and whom they
20   represent.
21        MR. HAWAL:  William Hawal for
22   plaintiffs.
23        MR. MOYLAN:  Daniel Moylan,
24   Zuckerman Spaeder, for CVS.
25        MR. LIVINGSTON:  Scott
```

Page 9

```
 1   Livingston for defendant HBC.
 2        MS. MCCLURE:  Shannon McClure,
 3   Reed Smith, AmerisourceBergen Drug
 4   Corporation.
 5        MR. WEEKS:  Paul Weeks,
 6   Kirkland & Ellis, for Allergan
 7   Finance.
 8        MR. RICARD:  Paul Ricard,
 9   Prescription Supply, Inc.
10        MS. CHARLES:  Amber Charles
11   from Covington for McKesson as well as
12   the witness Gary Boggs.
13        MR. STANNER:  Andrew Stanner
14   from Covington on behalf of McKesson.
15        MS. CONWAY:  Sarah Conway from
16   Jones Day for Walmart.
17        MR. CELLA:  John Cella from
18   Arnold & Porter for Endo and Par.
19        MS. MCNAMARA:  Colleen McNamara
20   from Williams & Connolly for Cardinal
21   Health.
22        VIDEOGRAPHER:  Via telephone?
23        MR. LADD:  Matthew Ladd of
24   Morgan Lewis representing Rite Aid.
25        MS. DUDZINSKI:  Jane Dudzinski
```

Page 10

1 of Morgan Lewis representing
2 Defendants Cephalon, Teva, USA,
3 Actavis, LLC, Actavis Pharma, and
4 Watson Laboratories.
5 MR. AUBEL: Bill Aubel of
6 Jackson Kelly representing
7 Miami-Luken, Inc.
8 MR. RAFFERTY: Troy Rafferty on
9 behalf of the PEC.
10 MS. FOSTER: Sarah Foster from
11 Morgan & Morgan for plaintiff.
12 VIDEOGRAPHER: If there's no
13 other present, the court reporter is
14 Carrie Campbell, who will now
15 administer the oath.
16
17 GARY L. BOGGS,
18 of lawful age, having been first duly sworn
19 to tell the truth, the whole truth and
20 nothing but the truth, deposes and says on
21 behalf of the Plaintiffs, as follows:
22
23 DIRECT EXAMINATION
24 QUESTIONS BY MR. HAWAL:
25 Q. Mr. Boggs, good morning.

Page 11

1 A. Good morning.
2 Q. Will you please state your full
3 name?
4 A. Gary Lee Boggs.
5 Q. My name is Bill Hawal. I'm
6 here to take your deposition.
7 Have you ever had your
8 deposition taken before?
9 A. I have.
10 Q. Approximately how many times?
11 A. Dozens.
12 Q. As you know, if at any time you
13 don't understand my question or you need
14 clarification, please let me know.
15 Is that agreeable?
16 A. I will.
17 Q. And if you need to go back
18 during the course of this deposition to
19 correct any answers, feel free to do that.
20 All right?
21 A. Thank you.
22 Q. At the conclusion of the
23 deposition, I'm going to assume that you were
24 able to understand my questions if you
25 provided an answer.

Page 12

1 Is that fair?
2 A. It is.
3 Q. All right. Who are you
4 currently employed with?
5 A. I'm employed by McKesson
6 Corporation.
7 Q. And how long have you been
8 employed with McKesson?
9 A. I've been employed since
10 November of 2013.
11 Q. All right. And what position
12 do you hold with McKesson?
13 A. I'm the senior director of
14 regulatory affairs.
15 Q. And have you held that position
16 the entire time that you've worked for
17 McKesson?
18 A. I have.
19 Q. All right. Can you describe
20 for us the job responsibilities that you have
21 in that capacity?
22 A. I can.
23 I'm responsible for managing
24 the east region, which is, for the most part,
25 essentially the -- well, east of the

Page 13

1 Mississippi, the distribution centers that
2 are located in that region, with the
3 exception of the Chicago distribution center.
4 I have a team of about 13
5 individuals that report either directly or
6 indirectly to me that -- I'm responsible for
7 overseeing the day-to-day implementation of
8 our controlled substance monitoring program.
9 Q. All right. Before you joined
10 McKesson in November of 2013, did that job
11 position exist at McKesson, to your
12 knowledge?
13 A. It did not.
14 Q. All right. It was created to
15 accommodate your hiring?
16 A. It was created to accommodate
17 an expansion or an evolution of our program,
18 and there was more positions created.
19 Q. And who is your direct
20 supervisor? Who do you report to?
21 A. I report to the senior vice
22 president of regulatory and compliance.
23 Q. And who would that be?
24 A. The position is vacant at the
25 moment.

Page 14

1    Q.    And how long has it been
2  vacant, approximately?
3    A.    The end of June of this year.
4    Q.    And who occupied that position
5  prior to June, end of June of this year?
6    A.    Lina Brenner.
7    Q.    And did she retire or did she
8  leave for some other reason, if you know?
9    A.    She left McKesson for
10  another -- another job.
11    Q.    And do you know where she is
12  and who she is working for?
13    A.    I do not.
14    Q.    All right.  Is your job focused
15  on efforts to have McKesson comply with laws
16  and regulations which require it to maintain
17  effective controls to prevent the diversion
18  of controlled substances such as opioids into
19  the illicit marketplace?
20    A.    It is.
21    Q.    All right.  And were you hired
22  in 2013 because it was deemed that McKesson's
23  performance in that capacity was lacking?
24        MR. STANNER:  Objection to the
25    form.

Page 15

1        THE WITNESS:  I don't agree
2    with the characterization of that, no.
3  QUESTIONS BY MR. HAWAL:
4    Q.    Why were you hired if it
5  wasn't -- if it was up to -- up to par, if
6  the performance was up to par in terms of
7  that responsibility?
8        MR. STANNER:  Objection to the
9    form.
10        THE WITNESS:  I believe that
11    the company was expanding the
12    positions in the regulatory compliance
13    program, created that new position, I
14    applied for it and was subsequently
15    hired.
16  QUESTIONS BY MR. HAWAL:
17    Q.    Was it your job to try and
18  improve the company's performance in terms of
19  complying with the federal laws and
20  regulations that relate to the diversion of
21  controlled substances?
22    A.    I believe that part of my job
23  is to continually monitor the trends and make
24  sure that our program is contemporary, yes.
25    Q.    Well, do you believe that one

Page 16

1  of your job responsibilities and goals was to
2  improve on McKesson's performance in
3  comparison to what it had been in the past in
4  terms of preventing diversion and complying
5  with federal laws and regulations?
6    A.    I think that my job is to
7  always look to -- ways to improve our
8  program.
9    Q.    Do you believe that your job --
10  your hiring was intended to accommodate that
11  or accomplish that?
12    A.    I don't know what the
13  individual's mind was when they decided to
14  pick that position.
15    Q.    Who hired you?
16    A.    Don Walker.
17    Q.    Is he still with the company?
18    A.    He is not.
19    Q.    And what was his position when
20  you were hired in 2013?
21    A.    He was the senior vice
22  president of distribution operations for US
23  pharma.
24    Q.    As I understand it, prior to
25  joining McKesson in 2013, you were an

Page 17

1  employee of the Drug Enforcement Agency, DEA?
2    A.    I was an employee of the Drug
3  Enforcement Administration, yes.
4    Q.    And for what period of time?
5    A.    From 1985 until the end of June
6  of 2012.
7    Q.    And what positions had you held
8  for the DEA?
9    A.    I was -- throughout the entire
10  time I was a special agent.  I held positions
11  as a special agent, as a group supervisor, as
12  a unit chief and as an executive assistant.
13    Q.    And how long had you been an
14  executive assistant?
15    A.    I was an executive assistant
16  beginning in January of 2016 until I retired
17  from the Agency at the end of June of 2012.
18    Q.    And who did you report to or
19  who supervised you in that capacity?
20    A.    Joseph Rannazzisi.
21    Q.    When you were with DEA, did you
22  have any responsibilities there that required
23  your -- you to interface with McKesson
24  Corporation?
25    A.    I believe that during my tenure

Page 18

1 in the capacity as an executive assistant, I
2 attended one meeting with McKesson.
3     Q.    And when was that one meeting?
4     A.    I believe it was around
5 approximately 2006, 2007. I don't recall
6 specifically the date.
7     Q.    And who did you accompany to
8 that meeting with -- as far as the DEA was
9 concerned?
10     A.    I don't recall.
11     Q.    Was it more than one other DEA
12 representative?
13         MR. STANNER: Objection to the
14 form.
15         THE WITNESS: I believe it
16 would have been, yes.
17 QUESTIONS BY MR. HAWAL:
18     Q.    Do you remember who it was that
19 was a participant at that meeting on behalf
20 of McKesson?
21     A.    I believe Don Walker was a
22 representative at that meeting and that there
23 were a couple of other individuals. I don't
24 recall who they were.
25     Q.    Do you recall if that meeting

Page 19

1 was in September of 2006?
2     A.    I don't recall.
3     Q.    Have you met with other
4 pharmaceutical distributors other than
5 McKesson in your capacity as an executive
6 assistant for DEA?
7     A.    I believe I did, yes.
8     Q.    Do you recall who -- what other
9 companies you met with?
10     A.    I believe I might have had a
11 meeting with representatives from Cardinal.
12 I don't recall any others.
13     Q.    Do you know if McKesson
14 maintained any records, written records, or
15 other documents that memorialized what was
16 said during the course of that meeting?
17     A.    I believe that there was a
18 PowerPoint presentation that McKesson
19 provided during that meeting.
20     Q.    And what was the subject matter
21 of the PowerPoint presentation, if you
22 recall?
23     A.    I believe it was an overview of
24 their controlled substance monitoring
25 program.

Page 20

1     Q.    And who called the meeting?
2     A.    I don't -- I believe McKesson
3 did. I don't recall.
4     Q.    Was there an ongoing
5 investigation of McKesson by the DEA relating
6 to the adequacy of its diversion prevention
7 protocols, policies or performance prior to
8 that meeting?
9     A.    I believe there was, yes.
10     Q.    Do you know how long that
11 investigation had been occurring?
12     A.    I do not.
13     Q.    Were you part of the
14 investigative process?
15     A.    I was not.
16     Q.    Do you know who was at the DEA?
17     A.    I believe it was field
18 represent -- field representatives from the
19 Drug Enforcement Administration.
20     Q.    Do you know who was supervising
21 or overseeing that investigation?
22     A.    I don't recall.
23     Q.    Does your current position
24 require you to interact with the DEA?
25     A.    I do on occasions, yes.

Page 21

1     Q.    How frequently, approximately?
2     A.    I know that we've had probably
3 five meetings or so over the course of
4 several years since I've been with McKesson.
5 We've had -- I interact with the DEA on an ad
6 hoc basis as it might relate to needing
7 information, clarification, on a particular
8 issue for a distribution center.
9     Q.    Of the approximate five
10 meetings, are you indicating that that was
11 over the period from when you were hired in
12 November of 2013 until the present time?
13     A.    Yes.
14     Q.    All right. And has McKesson
15 maintained any records that memorialized
16 those meetings and what occurred during the
17 course of those meetings?
18     A.    There were PowerPoint
19 presentations given at each one of those
20 meetings.
21     Q.    And were those meetings
22 scheduled at the request of the DEA or at the
23 request of McKesson?
24     A.    I believe that some of them
25 were at the request of McKesson and some were

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 mutually agreed upon.
2    Q.    When was the last such meeting,
3 if you recall, approximately?
4    A.    June 4th and 5th of this year.
5    Q.    And what was the subject matter
6 of the June 4th and 5th meeting?
7    A.    The subject matter was an
8 overview of McKesson's controlled substance
9 monitoring program and discussions related to
10 the first audit report being submitted by the
11 independent review organization under the
12 terms of our settlement agreement.
13    Q.    Who are the DEA representatives
14 that you are accustomed to primarily deal
15 with on these subject matters since you've
16 been with McKesson?
17    A.    During those meetings that I'm
18 referencing, it was predominantly the senior
19 executive staff in the Office of Diversion
20 Control, now the Diversion Control Division,
21 at the DEA.  There were representatives from
22 the Department of Justice Narcotics and
23 Dangerous Drugs Section, and at some of the
24 meetings there were field representatives
25 from the Drug Enforcement Administration in

Page 23

1 attendance.
2    Q.    Can you provide us with some
3 names of the DEA representatives that were at
4 these meetings?
5        MR. STANNER:  Objection to
6    form.
7        THE WITNESS:  The -- at some of
8    the meetings, there was the Deputy
9    Assistant Administrator Lou Milione
10    was in attendance.  Demetra Ashley was
11    in attendance.  The diversion program
12    manager from St. Louis, Scott Collier,
13    was present.  There were executive
14    assistants to both Demetra Ashley and
15    Lou Milione were in attendance.
16        There were -- some of the staff
17    coordinators from the Drug Enforcement
18    Administration, Office of Diversion
19    Control, present.  At the most recent
20    meetings, the head of the diversion
21    program, John Martin, was present, and
22    the Deputy Assistant Administrator in
23    diversion was present, Susan Gibson.
24    There were representatives from
25    Narcotics and Dangerous Drugs present

Page 24

1 at that as well.
2 QUESTIONS BY MR. HAWAL:
3    Q.    You've been designated by
4 McKesson's counsel to be a representative of
5 the company for purposes of today's
6 deposition as the person most knowledgeable
7 concerning McKesson's interactions with the
8 DEA regarding distribution of controlled
9 substances, including compliance, regulatory
10 and administrative actions, communications
11 and penalties.
12        Do you understand that to be
13 the case?
14    A.    I do.
15    Q.    And are you the person at
16 McKesson that is most knowledgeable about
17 those subject matters?
18    A.    I believe I'm knowledgeable
19 about them, yes.
20    Q.    What did you do to become
21 knowledgeable about those matters as it
22 relates to what occurred at McKesson prior to
23 you joining the company in November of 2013?
24    A.    I've had meetings with counsel,
25 preparation, to prepare myself.

Page 25

1    Q.    What else have you done, if
2 anything, to prepare yourself and become
3 knowledgeable about those subjects prior to
4 November of 2013?
5    A.    I reviewed various documents,
6 PowerPoint presentations.
7    Q.    And documents relating to what
8 time period?
9    A.    I believe 2007 or so to the
10 present.
11    Q.    Did you review any documents
12 that predated 2007?
13    A.    I don't recall.
14    Q.    Did you speak with anyone at
15 McKesson about the subject matters in order
16 to familiarize yourself with what had been
17 occurring at McKesson prior to you joining
18 the company?
19    A.    I did not.
20    Q.    What is the volume, approximate
21 volume, of materials that you've reviewed?
22    A.    There were several documents,
23 PowerPoint presentations.  I'm not sure how
24 to describe the volume.
25    Q.    Well, you say "several

Page 26

1 documents." Is that more or less than five?
2　　A.　　More.
3　　Q.　　More or less than ten?
4　　A.　　More.
5　　Q.　　More or less than 20?
6　　A.　　Probably more.
7　　Q.　　More or less than 30?
8　　A.　　I don't know at that point.
9　　Q.　　Did you have any role in
10 gathering those documents?
11　　A.　　I did not.
12　　Q.　　They were provided to you by
13 counsel?
14　　A.　　They were.
15　　Q.　　Who at McKesson were the
16 individuals that primarily interacted with
17 the DEA relating to the diversion or
18 prevention of diversion of controlled
19 substances, say, between 2005 and 2013?
20　　　　MR. STANNER:　Objection to the
21　　form.
22　　　　THE WITNESS:　I believe that
23　　Don Walker would have been one of the
24　　main individuals that would have
25　　engaged with the DEA regarding that

Page 27

1　　topic.
2 QUESTIONS BY MR. HAWAL:
3　　Q.　　Do you know whether or not
4 McKesson documented in some fashion each of
5 the interactions that the company had either
6 through Mr. Walker or any other
7 representative with DEA concerning diversion
8 of controlled substances or prevention of
9 diversion?
10　　A.　　I believe that there may have
11 been letters or correspondence back and forth
12 between McKesson's attorneys and the DEA.
13　　Q.　　Well, I understand there may
14 have been letters back and forth.
15　　　　My question is a little
16 different, and that is, do you know whether
17 or not every interaction would have been
18 documented at McKesson in some fashion
19 relating to what discussions occurred, what
20 date they occurred and who were part of the
21 discussions?
22　　A.　　I believe that there -- if
23 there were PowerPoint presentations given,
24 there was copies of the PowerPoint
25 presentations that documented what was

Page 28

1 discussed during those meetings.
2　　Q.　　Well, if there was not a
3 PowerPoint presentation, would there be some
4 documentation of any interaction either by
5 e-mail, telephone or in person between
6 McKesson and DEA?
7　　　　MR. STANNER:　Objection to the
8　　form.
9　　　　THE WITNESS:　Not that I'm
10　　aware of.
11 QUESTIONS BY MR. HAWAL:
12　　Q.　　Have you seen documentation of
13 any meetings between DEA and McKesson other
14 than with PowerPoint presentations?
15　　A.　　Specific to meetings, I have
16 not.
17　　Q.　　Were you involved -- you
18 mentioned that you were part of one meeting
19 in 2006 when you were with DEA, one meeting
20 with McKesson.
21　　　　Did you ever have any reason to
22 correspond in writing with McKesson when you
23 were a DEA employee?
24　　A.　　I did not.
25　　Q.　　Did you ever have any role in

Page 29

1 creating or reviewing the content of any
2 written communications on behalf of DEA that
3 was sent to McKesson?
4　　A.　　I did not.
5　　Q.　　According to the Congressional
6 record for the May 8, 2018 hearing of the
7 Congressional Subcommittee on Oversight and
8 Investigations relating to opioid -- the
9 opioid epidemic and concerns about
10 distribution and diversion, that there were
11 meetings between DEA and McKesson in 2005 and
12 2006.
13　　　　Are you aware of that
14 transcript or aware of that hearing
15 referencing two meetings in 2005 and 2006?
16　　A.　　I'm aware of the hearing, yes.
17　　Q.　　All right. Do you recall that
18 there was reference to a meeting in 2005 and
19 2006 between McKesson and DEA?
20　　A.　　I do not recall that
21 specifically from the hearing.
22　　Q.　　You mentioned previously that
23 you were part of the meeting in 2016. Do you
24 recall that there was also a meeting in 2005
25 between DEA and McKesson?

Page 30

1    A.    I was not.  At the Drug
2  Enforcement Administration, I was not in the
3  Office of Diversion Control in 2005, so I'm
4  not aware of that meeting.
5    Q.    When did you become part of the
6  Office of Diversion and Control?
7    A.    January of 2006.
8    Q.    Have you seen any records at
9  McKesson that relate to a meeting in 2005
10 with DEA?
11   A.    Not that I recall.
12   Q.    Was the meeting in 2006
13 primarily initiated by the DEA?
14   A.    I believe it was initiated by
15 McKesson.
16   Q.    And what was your understanding
17 as to why McKesson initiated that meeting in
18 2006?
19   A.    That they wanted to provide an
20 overview of their controlled substance
21 monitoring program.
22   Q.    And is it your understanding
23 that that effort to provide the DEA with a
24 presentation was because DEA had found that
25 McKesson's controls relating to the diversion

Page 31

1  of controlled substances was inefficient or
2  lacking prior to that time?
3    A.    I believe that because there
4  was an ongoing investigation of McKesson at
5  that point in time, that they wanted to
6  provide an overview of their program and what
7  they were doing.
8    Q.    And what was the subject matter
9  of the ongoing investigation of McKesson by
10 the DEA at that time?
11   A.    The subject matter was
12 McKesson's compliance or obligations to
13 report suspicious orders to the Drug
14 Enforcement Administration.
15   Q.    Was it the DEA's determination
16 at that time that McKesson's compliance was
17 lacking?
18   A.    I believe that it was DEA's
19 position that McKesson had not reported
20 suspicious orders under certain
21 circumstances, yes.
22   Q.    So it was lacking?
23   MR. STANNER:  Objection to the
24 form.
25   THE WITNESS:  If you want to

Page 32

1  characterize that to be the case.
2  QUESTIONS BY MR. HAWAL:
3    Q.    And how long had that
4  investigation been ongoing?
5    A.    I don't recall when it first
6  began.  I think it might have began before I
7  became in the Office of Diversion Control.
8    Q.    How long did it continue?
9    MR. STANNER:  Objection to the
10 form.
11   THE WITNESS:  It culminated in
12 2008.
13 QUESTIONS BY MR. HAWAL:
14   Q.    Did the investigation also
15 relate to the distribution of controlled
16 substances to online pharmacies that were
17 diverting opioids into the illicit
18 marketplace?
19   A.    I believe that's the case, yes.
20   Q.    What is diversion?
21 How do you define the term
22 "diversion" as it relates to controlled
23 substances?
24   A.    I would define diversion as an
25 act of removing controlled substances from

Page 33

1  legitimate channels to illegitimate channels.
2    Q.    And that -- was that something
3  that the DEA was invested in trying to
4  prevent in the early, mid and late 2000s?
5    MR. STANNER:  Objection to the
6  form.
7    THE WITNESS:  It was.
8  QUESTIONS BY MR. HAWAL:
9    Q.    Were substantial efforts
10 devoted to that goal?
11   MR. STANNER:  Objection to the
12 form.  Objection to outside the scope
13 of the notice.
14   THE WITNESS:  I believe that
15 there were some -- a fair amount of
16 efforts to try to deal with the scheme
17 of rogue Internet pharmacies during
18 that time frame.
19 QUESTIONS BY MR. HAWAL:
20   Q.    And those efforts were -- was
21 it communicated to McKesson and other
22 distributors at that time that the DEA was
23 indeed focused upon that problem?
24   A.    I believe that there were at
25 least two letters written by Joseph

Page 34

1 Rannazzisi that addressed that topic, yes.
2    Q.    And were those letters directed
3 to pharmaceutical distributors because it was
4 well-recognized at that time that there was
5 an ongoing opioid crisis across the United
6 States?
7    A.    I believe that it was
8 recognized that there was a criminal scheme,
9 the rogue Internet pharmacy schemes, and
10 those efforts were trying to curb that and
11 prevent that scheme from flourishing.
12    Q.    Well, aside from there being a
13 scheme, was there a recognized opioid crisis
14 across the country that was resulting in
15 addiction and fatalities?
16         MR. STANNER:  Objection to the
17    form.  Objection to the notice.
18         THE WITNESS:  I believe that's
19    the case, yes.
20 QUESTIONS BY MR. HAWAL:
21    Q.    When did DEA first recognize
22 that there was an opioid crisis in the United
23 States?
24         MR. STANNER:  Objection to the
25    form.  Objection to the notice.

Page 35

1         THE WITNESS:  I believe that
2    the opioid crisis -- the federal
3    government recognized that through the
4    CDC, not through the Drug Enforcement
5    Administration.
6 QUESTIONS BY MR. HAWAL:
7    Q.    And when did you become aware
8 that that was the fact?
9         MR. STANNER:  Objection to the
10    form.  Objection to the notice.
11         THE WITNESS:  I don't recall
12    specifically when they -- the CDC made
13    that announcement.
14 QUESTIONS BY MR. HAWAL:
15    Q.    Well, do you recall generally
16 was it prior to 2000 or shortly after the
17 year 2000?
18    A.    It was a fair amount after
19 that.
20    Q.    When you say "a fair amount,"
21 what do you mean by that?
22    A.    Several years.
23    Q.    And were Mr. Rannazzisi's
24 letters and the meetings that DEA had with
25 McKesson and other distributors prompted by

Page 36

1 DEA's recognition that the diversion of
2 pharmaceutical opioids was occurring and
3 contributing to the opioid crisis or
4 epidemic?
5         MR. STANNER:  Objection to the
6    form.  Objection.  Outside the scope
7    of the notice.
8         THE WITNESS:  I think that that
9    would be fair assessment, yes.
10 QUESTIONS BY MR. HAWAL:
11    Q.    At the meeting that you
12 attended with McKesson in 2006, did you or
13 other DEA representatives inform McKesson
14 that its controls or systems that were
15 created and implemented were ineffective in
16 preventing substantial diversion of opioids
17 into the illicit or unauthorized sources?
18    A.    I don't recall us making
19 that -- statements during that meeting.
20    Q.    Those were statements that were
21 communicated to McKesson and other
22 distributors by -- through Mr. Rannazzisi's
23 letters, true?
24         MS. MCCLURE:  Objection to
25    form.

Page 37

1         THE WITNESS:  Could you repeat
2    the question?
3 QUESTIONS BY MR. HAWAL:
4    Q.    Yes.
5         Those concerns were
6 communicated via Mr. Rannazzisi's letters to
7 McKesson and other distributors, true?
8         MR. STANNER:  Objection to the
9    form.
10         MS. MCCLURE:  Same.
11         MR. STANNER:  Objection to the
12    notice.
13         THE WITNESS:  What concerns are
14    you referring to?
15 QUESTIONS BY MR. HAWAL:
16    Q.    I'm referring to the concerns
17 that McKesson and other distributors were not
18 implementing effective controls in order to
19 prevent the diversion of controlled
20 substances into the illicit marketplace.
21         MR. STANNER:  Objection to the
22    form.
23         THE WITNESS:  As I recall, the
24    letters were a reminder to the
25    distributors what their regulatory

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  obligations were in identifying and
2  reporting suspicious orders. And the
3  letters also provided some guidance in
4  terms of potential red flags that they
5  should be aware of to look at in
6  knowing their customer.
7  QUESTIONS BY MR. HAWAL:
8      Q.   Well, why was McKesson required
9  to receive a reminder of its obligations?
10         MR. STANNER: Objection to the
11     form.
12         THE WITNESS: Those letters
13     were sent to all distributors, not
14     just McKesson.
15 QUESTIONS BY MR. HAWAL:
16     Q.   Why were all distributors
17 required -- or why did they require reminders
18 of their obligations under federal law and
19 regulations with respect to preventing the
20 diversion of controlled substances?
21         MR. STANNER: Objection to the
22     form.
23         MS. MCCLURE: Objection.
24         THE WITNESS: I believe that
25     during that time frame that the rogue

Page 39

1  Internet pharmacy schemes were a
2  relatively new scheme to both law
3  enforcement and to the health care
4  industry, and it was sent out as a
5  reminder of potentially evolving red
6  flags that they should be cognizant of
7  in fulfilling their obligations to
8  report suspicious orders.
9  QUESTIONS BY MR. HAWAL:
10     Q.   Well, you previously testified
11 that there was an ongoing investigation of
12 McKesson because it was determined that they
13 were -- that it was not reporting suspicious
14 orders.
15         Do you recall that testimony?
16     A.   I do.
17     Q.   And was the intention of the
18 DEA in providing the letters to McKesson and
19 other distributors in part prompted by the
20 investigative findings relating to McKesson's
21 failure to report suspicious orders?
22         MR. STANNER: Objection to the
23     form. Objection. Outside the scope
24     of the notice.
25         THE WITNESS: I think it was an

Page 40

1  effort to remind all of the
2  distributors of their obligation to
3  report suspicious orders.
4  QUESTIONS BY MR. HAWAL:
5      Q.   Well, but McKesson was not
6  reporting suspicious orders, true?
7          MR. STANNER: Objection to the
8      form.
9          THE WITNESS: I believe under
10     certain circumstances that to be the
11     case, yes.
12 QUESTIONS BY MR. HAWAL:
13     Q.   Was that part of the
14 discussions that occurred at the meeting that
15 you participated in in 2006?
16     A.   I believe part of the
17 discussion was a reminder of the regulatory
18 obligations that distributors have to both
19 report suspicious orders and maintain
20 effective controls against diversion.
21         MS. MCCLURE: And, Bill, while
22     we're on just a quick pause, if I
23     could just clarify through the record
24     that an objection for one stands for
25     an objection for all so I don't

Page 41

1  keep --
2          MR. HAWAL: No problem.
3          MS. MCCLURE: -- interposing my
4      objections unnecessarily.
5          MR. HAWAL: Understood. Thank
6      you.
7          MS. MCCLURE: Thank you.
8  QUESTIONS BY MR. HAWAL:
9      Q.   The DEA did not have a meeting
10 with all distributors, true?
11         MR. STANNER: Objection to
12     form.
13 QUESTIONS BY MR. HAWAL:
14     Q.   In 2006?
15         MR. STANNER: Objection to the
16     form. Objection to the notice.
17         THE WITNESS: Not that I'm
18     aware of.
19 QUESTIONS BY MR. HAWAL:
20     Q.   The meetings that you're aware
21 of that occurred in 2006 were with --
22 specifically with McKesson and Cardinal?
23     A.   I don't recall specifically
24 when the meeting with Cardinal was. It may
25 have been 2006. It may have been at another

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 time frame.
2     Q.    All right.  But those are the
3 only two meetings that you recall since you
4 joined the Office of Diversion and Control?
5          MR. STANNER:  Objection to the
6     form.
7 QUESTIONS BY MR. HAWAL:
8     Q.    In 2006 or thereabouts?
9          MR. STANNER:  Objection to the
10    form.  Objection to the notice.
11         THE WITNESS:  There were
12    meetings with other registrants.
13    There were meetings with -- at that
14    time what was HDMA, the health care
15    industry trade -- or association.
16    There were several meetings.
17 QUESTIONS BY MR. HAWAL:
18    Q.    What were the meetings with
19 HDMA about?
20         MR. STANNER:  Objection to the
21    form.  Objection.  Outside the scope
22    of the notice.
23         THE WITNESS:  They were about a
24    wide variety of different things.
25    About attempts -- pending proposed

Page 43

1    legislation, regulations, obtain --
2    looking for clarity in the
3    regulations.  Several different
4    topics.
5 QUESTIONS BY MR. HAWAL:
6    Q.    Were most of the meetings in
7 2006 that you were aware of focused primarily
8 upon efforts to prevent diversion of
9 controlled substances?
10         MR. STANNER:  Same objections.
11         THE WITNESS:  I would say -- in
12    those particular instances, yes.
13 QUESTIONS BY MR. HAWAL:
14    Q.    Was your meeting in 2006 with
15 McKesson held prior to the show cause order
16 that was issued to McKesson on August 4th of
17 2006?
18    A.    I don't recall the specific
19 month that we had the meeting at the Drug
20 Enforcement Administration in terms of
21 whether it was before or after that.
22    Q.    You do know that in 2006 the
23 show cause order was issued to McKesson?
24    A.    I do.
25    Q.    And can you describe for us

Page 44

1 what your understanding is of what a show
2 cause order is?
3    A.    A show cause order issued by
4 the Drug Enforcement Administration is the
5 beginnings of an administrative procedure
6 against a registrant for the registrant to
7 show why the registration should or should
8 not be revoked.
9    Q.    All right.  And did you have
10 any role in recommending that a show cause
11 order be given to McKesson?
12    A.    I did not.
13    Q.    Do you know who at DEA did?
14         MR. STANNER:  Objection to the
15    form.
16         THE WITNESS:  It would have
17    been initiated by the field office
18    through the DEA's Office of Chief
19    Counsel.
20 QUESTIONS BY MR. HAWAL:
21    Q.    Did you have any discussions
22 with anyone at DEA about communications with
23 McKesson relating to the show cause order
24 that was made in 2006?
25         MR. STANNER:  Objection to the

Page 45

1    form.  Objection.  Outside the scope
2    of the notice.
3         THE WITNESS:  Not that I
4    recall.
5 QUESTIONS BY MR. HAWAL:
6    Q.    And what was the basis for the
7 show cause order to McKesson in 2006?
8    A.    I've not reviewed the order to
9 show cause.  I don't recall the basis of it.
10    Q.    You don't have any recollection
11 as to the reason that McKesson received the
12 show cause order in 2006?
13    A.    I have not reviewed that
14 document.  I don't know what's in that
15 document.
16    Q.    I'm not asking you whether
17 you've reviewed the document or whether you
18 know what's in it.
19         My question is whether or not
20 you have a recollection having been with DEA
21 in the Office of Diversion and Control in
22 2006 as to the basis for the show cause order
23 to McKesson?
24         MR. STANNER:  Objection to the
25    form.  Objection to the notice.

Page 46

1 THE WITNESS: I know that that
2 investigation involved the reporting
3 or lack of reporting of suspicious
4 orders.
5 QUESTIONS BY MR. HAWAL:
6 Q. And the lack of reporting of
7 suspicious orders results in the diversion --
8 or can result in the diversion of controlled
9 substances into the illicit marketplace,
10 true?
11 MR. STANNER: Objection to the
12 form. Objection. Scope of the
13 notice.
14 THE WITNESS: It can result in
15 that, yes.
16 QUESTIONS BY MR. HAWAL:
17 Q. You previously referred to
18 letters by Joseph Rannazzisi, the Deputy
19 Assistant Administrator of DEA's Office of
20 Diversion Control, to McKesson.
21 Do you recall that?
22 A. I do.
23 Q. Was Mr. Rannazzisi at the time
24 one of your supervisors?
25 A. He was my supervisor, yes.

Page 47

1 Q. And in 2006, he sent a letter
2 to McKesson on September 27, 2006.
3 You're aware of that?
4 A. He sent that letter to all
5 distributors.
6 Q. All right. Including McKesson?
7 A. Including McKesson.
8 Q. And you've looked at that
9 letter in preparation for your deposition
10 today?
11 A. I have.
12 (McKesson-Boggs Exhibit 1
13 marked for identification.)
14 QUESTIONS BY MR. HAWAL:
15 Q. Sir, handing you what has been
16 marked as Plaintiff's Exhibit 1 for purposes
17 of your deposition is a four-page letter
18 dated September 27, 2006, which is actually
19 addressed to DBS Trading, Inc., in
20 Cincinnati.
21 But do you recognize that this
22 letter is, in fact, the same letter that
23 would have gone out to all distributors at
24 that time?
25 MR. STANNER: Objection to the

Page 48

1 form.
2 MS. MCCLURE: Would you just
3 mind making just a note perhaps of the
4 Bates number on the document for
5 purposes of the transcript so there's
6 no --
7 MR. HAWAL: Sure. Well, this
8 one does not have a Bates number.
9 This is not part of the production.
10 MS. MCCLURE: Okay.
11 QUESTIONS BY MR. HAWAL:
12 Q. Have you had a chance to look
13 at the letter?
14 A. I have.
15 Q. Do you recognize this letter as
16 the letter that had gone out to all
17 distributors from the DEA on September 27,
18 2006?
19 A. I do.
20 Q. And this would have been a
21 letter that would have been sent to and
22 received by McKesson approximately at that
23 time?
24 A. Around that time frame, yes.
25 Q. Were you aware at the time that

Page 49

1 this letter was being sent?
2 A. I was.
3 Q. Did you have any involvement
4 into its content?
5 MR. STANNER: Objection.
6 Outside the scope of the 30(b)(6)
7 notice.
8 MR. HAWAL: Excuse me, but
9 before we go on, how can this be
10 outside the scope since it's
11 communication between DEA and
12 McKesson?
13 MR. STANNER: Sure. And this
14 deposition is a corporate deposition
15 of him as a representative of
16 McKesson. So to the extent you're
17 asking him to speak in his personal
18 capacity about his time at DEA, I
19 think it's outside the scope of this
20 notice. There will be a fact
21 deposition.
22 MR. HAWAL: Well, I'm simply
23 trying to put things in context.
24 MR. STANNER: I understand.
25 MR. HAWAL: Okay. Thank you.

Page 50

1     MR. STANNER: I'm just trying
2 to preserve the issues.
3 QUESTIONS BY MR. HAWAL:
4     Q.    I can't recall if you answered
5 my question, but did you have any role in
6 contributing to the content of this letter?
7     A.    I did not.
8     Q.    Was it -- did you see it before
9 it was sent out?
10     MR. STANNER: Same objection.
11     THE WITNESS: I believe I did,
12 yes.
13 QUESTIONS BY MR. HAWAL:
14     Q.    Did you have any disagreement
15 with its content or make any recommendations
16 to Mr. Rannazzisi as to any revisions to the
17 letter?
18     MR. STANNER: Same objections.
19     THE WITNESS: Not that I
20 recall.
21 QUESTIONS BY MR. HAWAL:
22     Q.    Do you recall whether or not
23 this letter was prompted by DEA's frustration
24 that certain distributors were not
25 effectively preventing the diversion of

Page 51

1 controlled substances, especially opioids, as
2 required by the Controlled Substances Act?
3     MR. STANNER: Objection to the
4 form and the notice.
5     THE WITNESS: I believe that it
6 was sent out to help ensure that
7 distributors were complying with their
8 obligations in order to help prevent
9 diversion.
10 QUESTIONS BY MR. HAWAL:
11     Q.    Was it also sent out because of
12 DEA's recognition that certain distributors
13 were not complying with their obligations
14 under the law and federal regulations?
15     MR. STANNER: Same objections.
16     THE WITNESS: I believe that
17 was the case, yes.
18 QUESTIONS BY MR. HAWAL:
19     Q.    And was that one of the reasons
20 that it was sent to McKesson?
21     MR. STANNER: Same objection.
22     THE WITNESS: It wasn't
23 specifically sent as being done
24 specifically to McKesson or any other
25 company.  It was done to send out to

Page 52

1 all distributors as a reminder.
2 McKesson was not a focus specifically
3 for this letter to go out.  It was
4 sent out to all distributors.
5 QUESTIONS BY MR. HAWAL:
6     Q.    I understand it was sent out to
7 all distributors, but McKesson had been under
8 investigation, a show cause order was issued,
9 and this letter was sent to McKesson, true?
10 At approximately the same time, true?
11     A.    True.
12     MR. STANNER: Objection to the
13 form.
14 QUESTIONS BY MR. HAWAL:
15     Q.    Given that scenario and those
16 circumstances, was it your expectation or was
17 it your understanding the DEA in sending this
18 letter to McKesson was informing it of its
19 obligations under the Controlled Substances
20 Act because of the determination and finding
21 that it had not been complying with its
22 obligations?
23     MR. STANNER: Objection to the
24 form and notice.
25     THE WITNESS: It was sent out

Page 53

1 to all the distributors as a reminder
2 of their obligations to help DEA in
3 its efforts to prevent diversion of
4 controlled substances.
5 QUESTIONS BY MR. HAWAL:
6     Q.    Do you believe that this letter
7 should have informed McKesson during this
8 time period of its obligations under the
9 Controlled Substances Act with respect to the
10 prevention of diversion of controlled
11 substances?
12     MR. STANNER: Continuing
13 objections.
14     THE WITNESS: I do.
15 QUESTIONS BY MR. HAWAL:
16     Q.    Did the DEA through this letter
17 intend to communicate to distributors,
18 including McKesson, some guidance on what
19 circumstances may indicate diversion by a
20 pharmacy customer to an illicit entity or
21 person?
22     MR. STANNER: Same objections.
23     THE WITNESS: I do.
24 QUESTIONS BY MR. HAWAL:
25     Q.    In this September of 2006

Page 54

1 letter, did Mr. Rannazzisi also warn
2 distributors, including McKesson, that if
3 they failed to comply with their legal
4 obligation to effectively prevent diversion,
5 that they could be the subject of criminal
6 and civil penalties?
7          MR. STANNER: Same objections.
8          THE WITNESS: I believe that's
9     the case, yes.
10 QUESTIONS BY MR. HAWAL:
11     Q.    And just one distributor that
12 uses its DEA registration to facilitate
13 diversion can cause enormous harm, true?
14          MR. STANNER: Same objections.
15          THE WITNESS: It would depend
16     on the facts and circumstances.
17 QUESTIONS BY MR. HAWAL:
18     Q.    Well, that's what
19 Mr. Rannazzisi pointed out to the
20 distributors via this letter, true?
21     A.    That's what's in the letter,
22 yes.
23     Q.    And did Mr. Rannazzisi find it
24 necessary to follow up with another letter to
25 distributors on December 27, 2007?

Page 55

1          MR. STANNER: Objection to the
2     form. Objection to the notice.
3          THE WITNESS: I'm aware of that
4     letter, yes.
5          (McKesson-Boggs Exhibit 2
6     marked for identification.)
7 QUESTIONS BY MR. HAWAL:
8     Q.    Sir, handing you what has been
9 marked as Exhibit 2 for purposes of your
10 deposition is a letter dated December 27,
11 2007, this time directed to Masters
12 Pharmaceutical, Inc.
13          Do you recognize this letter?
14     A.    I do.
15     Q.    And is this a letter that would
16 have been sent to all pharmaceutical
17 distributors at or around December 27, 2007?
18          MR. STANNER: Objection to the
19     form.
20          THE WITNESS: It would have.
21 QUESTIONS BY MR. HAWAL:
22     Q.    And it would have been sent to
23 and received by McKesson at or around this
24 time frame?
25     A.    That's correct.

Page 56

1     Q.    Was it determined at DEA that
2 it was necessary, again, to remind
3 distributors, including McKesson, of their
4 legal obligations under the Controlled
5 Substances Act to maintain effective controls
6 against the diversion of controlled
7 substances?
8          MR. STANNER: Objection to the
9     form.
10          THE WITNESS: It was.
11 QUESTIONS BY MR. HAWAL:
12     Q.    Why?
13     A.    There was a --
14          MR. STANNER: Objection to the
15     form. Objection. Outside the scope
16     of the notice.
17          THE WITNESS: During this time
18     frame, there was a continual problem
19     with the rogue Internet pharmacies and
20     we wanted to try to help prevent
21     diversion emanating out of that
22     particular scheme. And we wanted to
23     continue reminding the registrants who
24     were supplying these pharmacies of
25     their obligations in order to help

Page 57

1     stem the tide against those
2     distributions.
3 QUESTIONS BY MR. HAWAL:
4     Q.    And was there also a problem
5 with continuing failures to report suspicious
6 orders on the part of McKesson during this
7 time period?
8          MR. STANNER: Same objections.
9          THE WITNESS: I can't say
10     specifically during this time frame
11     whether or not there was.
12 QUESTIONS BY MR. HAWAL:
13     Q.    Getting back to the show cause
14 order that was provided to McKesson on
15 August 4th of 2006, did McKesson enter into a
16 settlement and administrative memorandum of
17 agreement on May 2, 2008, with the Department
18 of Justice and the DEA?
19     A.    It did.
20          (McKesson-Boggs Exhibit 3
21     marked for identification.)
22 QUESTIONS BY MR. HAWAL:
23     Q.    Sir, I'm handing you what I've
24 marked as Plaintiff's Exhibit 3 for purposes
25 of this deposition.

Page 58

1 Is that the settlement and
2 release agreement that was entered into
3 between McKesson and the Department of
4 Justice and the DEA?
5 MS. MCCLURE: While Mr. Boggs
6 is reading that, would you please
7 indicate for the record the Bates
8 number that appears on the first page
9 of the document?
10 MR. HAWAL: I am sorry. Bates
11 number is MCKMDL00409289.
12 MS. MCCLURE: Thank you.
13 QUESTIONS BY MR. HAWAL:
14 Q. Sir, is this the settlement
15 agreement that was entered into at that time?
16 A. I believe it is, yes.
17 Q. And McKesson agreed to pay a
18 fine of $13,250,000 as a part of that
19 settlement?
20 A. It did.
21 Q. In addition, McKesson agreed to
22 institute a compliance program to detect and
23 prevent diversion of controlled substances?
24 A. That was part of the agreement,
25 yes.

Page 59

1 Q. Is that program described as
2 the -- is it described in a compliance
3 addendum?
4 A. I believe it is.
5 (McKesson-Boggs Exhibit 4
6 marked for identification.)
7 QUESTIONS BY MR. HAWAL:
8 Q. Sir, handing you what's been
9 marked as Exhibit 4. Feel free to take a
10 look at it and ask you whether or not you
11 recognize that as a true and accurate copy of
12 the compliance addendum that was entered
13 into, which does not have a Bates number?
14 A. This is not a compliance
15 addendum from 2008.
16 Q. When is it? When is that one?
17 A. This is the most recent one.
18 Q. And when was the most recent
19 one entered?
20 A. It was -- we signed on
21 January 17, 2017.
22 Q. What were the general terms or
23 provisions of the compliance addendum in
24 2008?
25 A. There was an agreement to

Page 60

1 maintain effective controls against
2 diversion, a controlled substances monitoring
3 program, and it outlines that agree -- in the
4 agreement.
5 Q. And did the DEA communicate to
6 McKesson at that time that it intended or
7 expected McKesson to comply with the terms of
8 that addendum agreement and its new CSMP?
9 A. I believe that's the case, yes.
10 Q. Were you present for a
11 settlement meeting between McKesson and DEA
12 on September 19, 2007, that set forth the
13 groundwork for the settlement and/or the
14 compliance addendum?
15 A. Not that I recall.
16 Q. Do you know that such a meeting
17 took place?
18 A. Not that I recall.
19 Q. And as a part of that
20 settlement, did McKesson promise that it
21 would discharge its legal obligations
22 regarding the prevention of the diversion of
23 controlled substances?
24 A. I believe that to be part of
25 the terms of the agreement, yes.

Page 61

1 Q. And that would apply to all of
2 its distribution centers?
3 A. All of the distribution centers
4 that handled controlled substances, yes.
5 Q. And did DEA communicate to
6 McKesson at that time that it expected
7 McKesson would provide its sales reps with
8 adequate training and guidance on how to
9 implement the CSMP?
10 A. I believe that that required
11 the personnel in McKesson to do that, yes.
12 Q. Did the DEA also communicate to
13 McKesson at that time that it expected
14 McKesson would have its employees set
15 thresholds or limitations on the quantity of
16 controlled substances, including opioid
17 drugs, that a pharmacy customer could obtain
18 on a monthly basis?
19 A. That would have been part of
20 the program, yes.
21 Q. Was this considered and
22 communicated as such to McKesson to be a
23 particularly important component of the CSMP
24 that McKesson promised to implement?
25 A. I wasn't present at that, so I

Page 62

1 can't comment on how it was -- what the
2 intent of the -- those in attendance were.
3     Q.    Well, has that been an
4 important focus of yours since you've been at
5 McKesson, compliance with thresholds?
6     A.    My focus has been executing our
7 compliance program or controlled substance
8 monitoring program and making sure that we
9 were compliant on our regulations as a DEA
10 registrant.
11     Q.    And would that have included or
12 does that include the appropriate setting and
13 adherence to the thresholds?
14     A.    That's a part of our controlled
15 substance monitoring program, yes.
16     Q.    And what is a general
17 understanding of what a threshold is as it
18 relates to controlled substances?
19         MR. STANNER:  Objection to the
20     notice.  Outside the scope of the
21     notice.
22         THE WITNESS:  A threshold is a
23     cap or the amount that a customer can
24     purchase for a specific base code and
25     any products within that base code

Page 63

1     family during a month.
2 QUESTIONS BY MR. HAWAL:
3     Q.    In terms of the expectations
4 that were communicated to McKesson as a part
5 of this settlement in 2008, do you have any
6 basis to say that McKesson would not have
7 been clearly informed of what its obligations
8 were as a part of that settlement in terms of
9 the prevention of diversion of pharmaceutical
10 controlled substances, including opioids?
11         MR. STANNER:  Objection to the
12     form.
13         THE WITNESS:  I think that they
14     were informed as to what the terms of
15     the agreement were and what their
16     obligations were as a registrant.
17 QUESTIONS BY MR. HAWAL:
18     Q.    And were you involved in any
19 investigations by the DEA of various McKesson
20 distribution centers between 2008 and 2013?
21     A.    I was not.
22     Q.    You're aware that
23 investigations of McKesson continued during
24 that time period?
25     A.    I am.

Page 64

1     Q.    Did the DEA determine during
2 that time period that McKesson failed to live
3 up to its promises in the 2008 memorandum of
4 understanding or agreement and its
5 obligations under the CSMP?
6         MR. STANNER:  Objection to the
7     form.
8         THE WITNESS:  McKesson did
9     enter into another agreement with the
10     government.
11 QUESTIONS BY MR. HAWAL:
12     Q.    So the answer to my question is
13 yes?
14         MR. STANNER:  Objection to the
15     form.
16         THE WITNESS:  It is, yes.
17 QUESTIONS BY MR. HAWAL:
18     Q.    During that time period, from
19 2008 to 2013, were most of the communications
20 on behalf of the DEA to McKesson about its
21 failure to adhere to the 2008 settlement
22 agreement and its own CSMP communicated
23 through the US Department of Justice?
24         MR. STANNER:  Objection to the
25     form.

Page 65

1         THE WITNESS:  Could you --
2     could you repeat the question?
3         MR. STANNER:  Counsel, just not
4     to interrupt you, it's been going
5     about an hour, so when you hit a
6     decent point.
7         MR. HAWAL:  Well, let me just
8     finish up this question.
9         MR. STANNER:  Of course, yeah.
10 QUESTIONS BY MR. HAWAL:
11     Q.    During that time period from
12 2008 to 2013, were most of the communications
13 on behalf of the DEA with McKesson about the
14 failure to adhere to the 2008 settlement
15 agreement and its own CSMP communicated
16 through the US Department of Justice?
17     A.    I believe that they were
18 communicated through both the Drug
19 Enforcement Administration and the US
20 Department of Justice.
21         MR. HAWAL:  Take a break.
22         VIDEOGRAPHER:  The time is
23     10:04 a.m., and we're going off the
24     record.
25     (Off the record at 10:04 a.m.)

Page 66

1    VIDEOGRAPHER: The time is
2  10:18 a.m., and we're back on the
3  record.
4  QUESTIONS BY MR. HAWAL:
5    Q.   Mr. Boggs, have you seen
6  documents whereby the DEA and the Department
7  of Justice communicated to McKesson in 2014
8  that its failures to comply with the 2008 MOA
9  and its legal obligations were more than just
10 an isolated mistake but were systemic
11 failures?
12    MR. STANNER: Objection to the
13  form.
14    THE WITNESS: I have seen
15  letters that make those allegations,
16  yes.
17    (McKesson-Boggs Exhibit 5
18  marked for identification.)
19 QUESTIONS BY MR. HAWAL:
20    Q.   Sir, handing you what has been
21 marked as Plaintiff's Exhibit 5 bearing Bates
22 number 00409224.
23    Have you seen this -- has this
24 letter made its way to you following its
25 receipt by McKesson's counsel from the

Page 67

1  Department of Justice?
2    MR. STANNER: For the record,
3  this is Bates number MCKMDL00409224.
4    MR. HAWAL: Oh, I'm sorry. I
5  was looking at the wrong page.
6    THE WITNESS: I've seen this
7  document, yes.
8  QUESTIONS BY MR. HAWAL:
9    Q.   Was this document, to your
10 understanding, part of the discussions
11 between McKesson and its counsel and the
12 Department of Justice regarding a resolution
13 of additional charges brought by the
14 Department of Justice relating to McKesson's
15 failures to comply with the 2008 settlement
16 agreement and failures to adhere to its CSMP?
17    A.   It was related to the most
18 recent settlement, yes.
19    Q.   And does this document and
20 other allegations that were communicated
21 through the Department of Justice and the DEA
22 to McKesson during this time period indicate
23 or reflect that there were trends seen within
24 the company that McKesson's desires for
25 increased sales and retaining customers

Page 68

1  overrode its obligations to report suspicious
2  orders?
3    MR. STANNER: Objection to the
4  form.
5  QUESTIONS BY MR. HAWAL:
6    Q.   Between 2008 and 2013?
7    MR. STANNER: Objection to the
8  form.
9    THE WITNESS: I believe that it
10  speaks to that allegation.
11 QUESTIONS BY MR. HAWAL:
12    Q.   When you joined the company,
13 did you -- was one of your responsibilities
14 to go back and determine whether or not those
15 allegations were truthful or factual?
16    A.   It was not.
17    Q.   If we look at page 11 of this
18 document, it's the allegation of the
19 Department of Justice that a facility, a
20 distribution facility, in Colorado, a
21 McKesson distribution facility, was setting
22 its initial thresholds to customers at very
23 high levels?
24    MR. STANNER: Objection to the
25  form.

Page 69

1    THE WITNESS: Sorry, which page
2  are we on?
3  QUESTIONS BY MR. HAWAL:
4    Q.   11.
5    MR. STANNER: MCKMDL00409234.
6    THE WITNESS: That's what it
7  says in the letter, yes.
8  QUESTIONS BY MR. HAWAL:
9    Q.   And the first sentence of the
10 last paragraph on that same page also
11 indicates that that facility was setting some
12 thresholds so high at the outset that the
13 pharmacy customer would never exceed it and
14 thus never trigger any review as to whether
15 there was -- whether there was a suspicious
16 order, true?
17    A.   That's what it says, yes.
18    Q.   Now, if we look at the next
19 page, page 12, 00409235, it indicates that
20 the DEA found that McKesson was -- that that
21 facility was routinely manipulating
22 thresholds and would increase thresholds for
23 particular drugs even before the customer
24 requested a threshold change, true?
25    A.   That's what the letter says,

Highly Confidential - Subject to Further Confidentiality Review

---

Page 70

1  yes.
2      Q.    And then at the bottom of that
3  page, it found that McKesson was willing to
4  increase pharmacy thresholds for the
5  flimsiest of reasons and without adequate
6  investigation, true?
7          MR. STANNER:  Objection to the
8      form.
9          THE WITNESS:  That's what it
10     says in the letter, yes.
11  QUESTIONS BY MR. HAWAL:
12     Q.    And if we look at the next
13  page, 13, 00409236, they also found that by
14  looking at the due diligence files at that
15  facility McKesson frequently failed to
16  provide justifications as to why a customer's
17  threshold was being increased, true?
18     A.    I'm sorry, where is that?
19     Q.    Second to the last paragraph.
20  Starts with the word "fourth."
21     A.    Could you repeat the question?
22     Q.    Yes.
23          Was it -- was the DEA -- did
24  the DEA investigation, according to the
25  Justice Department, indicate that McKesson's

---

Page 71

1  facility from reviewing the due diligence
2  files showed that they frequently failed to
3  provide justifications as to why a customer's
4  threshold was being increased?
5          MR. STANNER:  Objection to the
6      form.
7          THE WITNESS:  That's what it
8      says in the letter, yes.
9  QUESTIONS BY MR. HAWAL:
10     Q.    And if we go to page 15, which
11  is 00409238, the very last sentence on that
12  page, page 15.
13     A.    I was missing page 14.  Is this
14  a complete document?
15          MR. STANNER:  So, Counsel, just
16      to clarify for the record --
17          MR. HAWAL:  I'm sorry.
18          MR. STANNER:  -- your version
19      of this document is double-sided and
20      the exhibit that we have is
21      single-sided, so we don't have
22      even-numbered pages.
23          MR. HAWAL:  Let me do this.
24      Let's take a break.
25          MR. STANNER:  To clarify, I

---

Page 72

1  think we have all the pages.  I think
2  they're just numbered differently.
3          MR. HAWAL:  Ah.  Okay.
4  QUESTIONS BY MR. HAWAL:
5      Q.    Sir, do you have a page 15?
6      A.    I don't have a page 14.  I have
7  a page 15.
8      Q.    All right.  Well, I'm going to
9  refer you to page 15.
10     A.    Okay.
11     Q.    Very last sentence.
12          MR. STANNER:  And the Bates
13      numbers are correct, so maybe just use
14      the Bates numbers instead of page
15      numbers.
16  QUESTIONS BY MR. HAWAL:
17     Q.    Page 15, which is 00409238, was
18  it determined by the Justice Department and
19  the DEA as communicated to McKesson that
20  while a great deal of effort went into
21  getting sales reps to increase sales, little
22  or no effort was spent on training these
23  sales reps to ensure compliance with the CSA,
24  Controlled Substances Act?
25     A.    That's what it says in the

---

Page 73

1  letter, yes.
2      Q.    And then if we go to -- do you
3  have page 16?
4      A.    I do not.
5          MR. STANNER:  So, again, just
6      to clarify, our copies appear to have
7      the material; it just wouldn't be
8      numbered as page 16.  So if you have a
9      Bates number, that might be
10     consistent.
11          MR. HAWAL:  00409239.
12          THE WITNESS:  I do not have
13      that page.
14          MR. HAWAL:  You don't?
15          MR. STANNER:  No, we do not
16      have -- so maybe the Bates numbers are
17      not consistent.  It doesn't appear the
18      letter has all of the substance.  So
19      if you want to take a break, we can
20      take a break.
21          VIDEOGRAPHER:  Off the record,
22      Counsel?
23          MR. HAWAL:  Let me do this.
24      Let me just try and make this simpler.
25

---

Page 74

```
 1   QUESTIONS BY MR. HAWAL:
 2       Q.    Reading from page 16, which is
 3   00409239 -- I'm going to pass it to you after
 4   I ask the question.
 5       A.    Okay.
 6       Q.    So --
 7           MR. STANNER:  Actually,
 8       maybe -- I'm sorry, Counselor, and I
 9       really don't mean to interrupt you,
10       but since this is the exhibit, maybe
11       we can work from the exhibit version
12       which is different -- numbered
13       differently.
14           MR. HAWAL:  Let me see if it
15       corresponds with what I have.
16           Let's take a break.
17           MR. STANNER:  Sure.
18           VIDEOGRAPHER:  The time is
19       10:28 a.m., and we're going off the
20       record.
21    (Off the record at 10:28 a.m.)
22           VIDEOGRAPHER:  The time is
23       10:31 a.m., and we're back on the
24       record.
25
```

Page 75

```
 1   QUESTIONS BY MR. HAWAL:
 2       Q.    Sir, again, directing your
 3   attention to page 16, which is 00409239, in
 4   the middle paragraph under number 5, did the
 5   DEA and the Department of Justice tell
 6   McKesson that its CSMP operations manual
 7   contains a troubling directive to McKesson
 8   employees to communicate in a manner that
 9   will not require the company to report
10   suspicious orders to the DEA?
11       A.    That's what it says in the
12   letter, yes.
13       Q.    What is a CSMP operations
14   manual?
15       A.    It contains the standard
16   operating procedures for the -- McKesson's
17   controlled substance monitoring program.
18       Q.    All right.  Would I be correct
19   to understand that it tells -- it's an
20   instruction manual that tells employees what
21   should be done to comply with the CSMP that
22   was implemented as part of the settlement in
23   2008?
24       A.    I believe that's correct, yes.
25       Q.    And if you look to page 21,
```

Page 76

```
 1   which is 00409244, under Conclusion, was it
 2   communicated to McKesson in 2014 that this
 3   McKesson facility made a calculated business
 4   decision to avoid reporting suspicious
 5   orders?
 6       A.    That's what it says in the
 7   letter, yes.
 8       Q.    As a DEA, former DEA
 9   representative, an employee, was such a
10   finding upsetting to you?
11           MR. STANNER:  Objection to
12       outside the scope of the notice.
13           THE WITNESS:  This is their
14       characterization made by the Assistant
15       US Attorney based on the facts that I
16       have not reviewed.
17   QUESTIONS BY MR. HAWAL:
18       Q.    Well, is such an allegation --
19   whether you are able to confirm the facts or
20   not, is such an allegation concerning to you
21   as a former DEA agent?
22           MR. STANNER:  Same objection.
23           THE WITNESS:  It would be.
24   QUESTIONS BY MR. HAWAL:
25       Q.    And these various allegations
```

Page 77

```
 1   and findings that were communicated to
 2   McKesson on August 13, 2014, were the result
 3   of the DEA investigation and findings that
 4   had been occurring from 2008 through this
 5   time period, true?
 6           Is that your understanding?
 7       A.    That's my understanding, yes.
 8       Q.    Were you in the circle of
 9   employees who were receiving these
10   communications on behalf of McKesson?
11           I mean, were these coming
12   across your desk, these Department of Justice
13   and DEA findings as to the failures of
14   McKesson to live up to its 2008 promises and
15   to live up to its legal obligations under the
16   Controlled Substances Act?
17           MR. STANNER:  Objection to the
18       form.
19           THE WITNESS:  Once, I don't
20       agree with the characterization that
21       you're raising a question.  To answer
22       specifically whether this was coming
23       across my desk, it was not.
24   QUESTIONS BY MR. HAWAL:
25       Q.    But we can agree that you did
```

Page 78

1 not conduct your own investigation as to
2 whether or not these allegations were true or
3 not, true?
4         MR. STANNER: Objection.
5     Outside the scope of the notice.
6         THE WITNESS: That's correct.
7 QUESTIONS BY MR. HAWAL:
8     Q.    How many distribution centers
9 across the country were found to be in
10 noncompliance with DEA regulations in 2008
11 that gave rise to that 2008 settlement
12 agreement with the Department of Justice?
13        MR. STANNER: Objection to the
14     form.
15        THE WITNESS: I would have to
16     go back look and see the exact number.
17     I don't recall.
18 QUESTIONS BY MR. HAWAL:
19     Q.    Well, certainly more than
20 several, true?
21     A.    I would not agree with the
22 characterization, no.
23     Q.    How many distribution centers
24 were part of the settlement agreement that
25 occurred between the Department of Justice

Page 79

1 and McKesson most recently in 2000 -- April
2 of 2015, how many distribution centers were
3 involved in that settlement?
4     A.    There were four specific ones
5 that were discussed in the settlement
6 agreement in terms of any --
7     Q.    Well, how many were listed in
8 the addendum to the settlement agreement?
9     A.    I seem to recall 12 or so.
10    Q.    Does that indicate to you a
11 systemic problem within the company?
12        MR. STANNER: Objection to the
13     form. Objection. Outside the scope
14     of the notice.
15        THE WITNESS: Not without any
16     additional facts and circumstances or
17     review of each individual ones of
18     those.
19 QUESTIONS BY MR. HAWAL:
20    Q.    And in response to these
21 charges, McKesson agreed in April of 2015 to
22 pay a $150 million penalty, true?
23    A.    It was part of the settlement
24 agreement, yes.
25    Q.    And did it agree again to

Page 80

1 change its practices regarding the prevention
2 of diversion of prescription opioids?
3     A.    I believe that was the case,
4 yes.
5     Q.    Did you agree that changes were
6 warranted?
7         MR. STANNER: Objection to the
8     form. Objection. Outside the scope
9     of the notice.
10        THE WITNESS: I would agree
11     that McKesson was evolving their
12     program to be contemporary with
13     today's environment and laws and
14     regulations.
15 QUESTIONS BY MR. HAWAL:
16    Q.    Well, while McKesson may have
17 been evolving its programs, the law wasn't
18 evolving, was it?
19        MR. STANNER: Objection to the
20     form.
21 QUESTIONS BY MR. HAWAL:
22    Q.    The legal responsibilities that
23 McKesson had were consistent from, when,
24 1970, to the present day?
25        MR. STANNER: Objection to the

Page 81

1     form. Objection. Outside the scope
2     the scope.
3         MR. HAWAL: Well, I'm
4     responding to his answer.
5     Go ahead.
6         THE WITNESS: The laws were,
7     but there were different diversion
8     trends that occurred that in and of
9     themselves had different red flags
10     that required evolution and -- to stay
11     contemporary with those evolving
12     trends.
13 QUESTIONS BY MR. HAWAL:
14    Q.    Well, the evolution of
15 McKesson's adherence to the laws went from
16 requiring a fine of 13 million in 2008 to a
17 fine of 150 million in 2014 because of its
18 failures to adhere to the terms of a
19 settlement agreement and the promises that it
20 made to the Drug Enforcement Administration
21 and the Department of Justice, true?
22        MR. STANNER: Objection to the
23     form.
24        THE WITNESS: I believe that
25     they were two different settlement

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1   agreements that involved two different
2   sets of circumstances.
3   QUESTIONS BY MR. HAWAL:
4       Q.   Well, we agree that McKesson
5   made promises to the Department of Justice in
6   2008, true?
7       A.   It entered into a settlement
8   agreement that had various terms of that
9   settlement agreement, yes.
10      Q.   Terms that McKesson promised it
11  would adhere to as a part of its settlement
12  of the charges that were brought against it
13  by the Department of Justice in 2008 and
14  before, true?
15          MR. STANNER:  Objection to the
16      form.
17          THE WITNESS:  I believe that's
18      the case, yes.
19  QUESTIONS BY MR. HAWAL:
20      Q.   All right.  And McKesson failed
21  to live up to those obligations and promises
22  after that time, true?
23          MR. STANNER:  Objection to the
24      form.  Objection.  Outside the scope
25      of the notice.

Page 83

1           THE WITNESS:  I believe in the
2       settlement agreement it acknowledged
3       that at certain times that it did not
4       report suspicious orders.
5   QUESTIONS BY MR. HAWAL:
6       Q.   Were you proud of the work that
7   the DEA was doing between 2006 and the time
8   that you left the DEA as it related to
9   efforts to prevent the diversion of opioids
10  and to try and reign in the opioid crisis?
11          MR. STANNER:  Objection.
12      Outside the scope of the 30(b)(6)
13      notice.
14          THE WITNESS:  I have been proud
15      of the work that I've done at the DEA
16      throughout the course of my entire
17      career.
18  QUESTIONS BY MR. HAWAL:
19      Q.   And some of the work that you
20  were directed to do, at least during that
21  time period, related to efforts to prevent
22  the diversion of opioid pharmaceutical
23  products into the illicit marketplace, true?
24          MR. STANNER:  Same objection.
25          THE WITNESS:  That would be

Page 84

1   true, yes.
2   QUESTIONS BY MR. HAWAL:
3       Q.   Since 2014 -- well, since --
4   since you started with McKesson, have you had
5   any interactions with your former colleagues
6   that were involved in the investigation of
7   McKesson between 2008 and 2013 --
8           MR. STANNER:  Objection to the
9       form.
10  QUESTIONS BY MR. HAWAL:
11      Q.   -- such as Mr. Rannazzisi?
12          MR. STANNER:  Objection to the
13      form.
14          THE WITNESS:  I did not have
15      interactions with Mr. Rannazzisi
16      regarding the most recent settlement.
17  QUESTIONS BY MR. HAWAL:
18      Q.   Well, have you spoken to him at
19  all between the point in time when you
20  started with McKesson until today?
21      A.   I have.
22      Q.   Under what circumstances?
23      A.   Just personal time, you know.
24      Q.   You still consider him a
25  friend?

Page 85

1           MR. STANNER:  Objection to the
2       form.
3           THE WITNESS:  I do.
4   QUESTIONS BY MR. HAWAL:
5       Q.   What about David Schiller, have
6   you spoken with him?
7           MR. STANNER:  Objection.
8       Outside the scope of the notice.
9           THE WITNESS:  I believe the
10      last time I spoke with him was at a
11      presentation that McKesson gave
12      regarding its controlled substances
13      monitoring program.
14  QUESTIONS BY MR. HAWAL:
15      Q.   Did you ever communicate with
16  either of them since you joined McKesson that
17  in your view McKesson's anti-diversion
18  efforts prior to 2013 were woefully
19  inadequate or words to that effect?
20      A.   I did not.
21      Q.   You deny doing so?
22      A.   Absolutely.
23      Q.   Are you familiar with the term
24  "drug diversion migration"?
25          MR. STANNER:  Objection.

Page 86

1 Outside the scope of the notice.
2 THE WITNESS: No.
3 QUESTIONS BY MR. HAWAL:
4 Q. You're not familiar with the
5 term "drug migration"?
6 MR. STANNER: Same objection.
7 THE WITNESS: No, I'm not.
8 MR. STANNER: And objection to
9 the form.
10 QUESTIONS BY MR. HAWAL:
11 Q. Has McKesson ever discussed
12 with DEA the subject of drug diversion or
13 drug -- not drug diversion, but drug
14 migration?
15 A. I'm not sure what context
16 you're defining drug migration.
17 (McKesson-Boggs Exhibit 6
18 marked for identification.)
19 QUESTIONS BY MR. HAWAL:
20 Q. I'm handing you what I've
21 marked as Plaintiff's Exhibit 6. It appears
22 to be a PowerPoint presentation of McKesson
23 dated 2014 entitled "Prescription Drug Abuse,
24 The National Perspective," 00407451.
25 Have you ever seen this

Page 87

1 PowerPoint presentation or a printed version
2 of it as you're looking at today?
3 MR. STANNER: So, Counsel, just
4 again, I think we're skipping Bates
5 numbers on this version of the
6 document.
7 MR. HAWAL: Great.
8 MR. STANNER: Maybe we should
9 check.
10 MR. HAWAL: Well, I'm only
11 going to go to one page.
12 MR. STANNER: But I just don't
13 know if he has the entire document.
14 MR. HAWAL: What's that?
15 MR. STANNER: I don't know that
16 he has the entire document.
17 MR. HAWAL: I understand.
18 Well, I will substitute it at the
19 conclusion of the deposition, but...
20 QUESTIONS BY MR. HAWAL:
21 Q. Do you have 00407465?
22 A. I do.
23 Q. It appears you do.
24 Have you ever seen this
25 document or that page 00407465?

Page 88

1 A. I've seen the document. I
2 don't recall specifically the page you're
3 referring to.
4 Q. Well, in what context would you
5 have seen this document?
6 MR. STANNER: Just for the
7 record, an objection to Exhibit 6 is
8 it's incomplete.
9 THE WITNESS: I don't recall
10 what context I would have seen it.
11 QUESTIONS BY MR. HAWAL:
12 Q. Do you know if you would have
13 had any role in preparing it?
14 A. I believe I may have, yes.
15 Q. And during the time that you
16 were with DEA or -- and/or the time that
17 you've been with McKesson, has there been any
18 discussion about the role that the intrastate
19 and interstate transport of diverted opioid
20 pharmaceutical products has had upon the
21 opioid crisis?
22 MR. STANNER: Objection.
23 Outside the scope of the notice.
24 THE WITNESS: There was, I
25 recall, discussions or topics where

Page 89

1 criminal groups would travel
2 intrastate and interstate to divert,
3 additionally, drugs in the black
4 market.
5 QUESTIONS BY MR. HAWAL:
6 Q. And was it the understanding
7 both while you were at DEA as well as at
8 McKesson and communicated to McKesson that
9 that problem is contributing to the opioid
10 crisis?
11 MR. STANNER: Objection to the
12 form.
13 THE WITNESS: I don't recall
14 that specific topic being discussed
15 with McKesson.
16 QUESTIONS BY MR. HAWAL:
17 Q. Do you agree that it's
18 contributing to the opioid crisis and has
19 been?
20 MR. STANNER: Objection.
21 Outside the scope of the notice.
22 THE WITNESS: Which?
23 QUESTIONS BY MR. HAWAL:
24 Q. The intrastate and interstate
25 transportation of illicit drugs that have

Page 90

1 been diverted from the legitimate
2 prescription pharmaceutical market into the
3 illicit marketplace?
4     MR. STANNER:  Same objection.
5     THE WITNESS:  If we're
6     referring to criminal organizations
7     through their scheme traveling
8     interstate or intrastate to sell those
9     diverted drugs, that would have
10     contributed to the opioid epidemic,
11     yes.
12 QUESTIONS BY MR. HAWAL:
13     Q.    Again, directing your attention
14 to page 00407465, and I'm going to put it on
15 the Elmo, do you see the arrows on this
16 diagram that's part of this McKesson
17 PowerPoint presentation?
18     A.    I do.
19     Q.    What do the arrows signify to
20 you?
21     A.    I believe it would be in
22 reference to the Florida fill mills and
23 oxycodone traveling out of the state of
24 Florida being diverted by illegal
25 trafficking.

Page 91

1     Q.    And the second to the last
2 arrow, where is it pointing to?
3     A.    It's pointing --
4     Q.    That would be northeast Ohio?
5     A.    The last arrow?
6     Q.    Second to last.
7     A.    Second to the last would be in
8 Ohio, yes.
9     Q.    Northeast Ohio, in fact?
10     MS. MCCLURE:  Object.
11     THE WITNESS:  That's just where
12     the arrow is.  I don't know that the
13     arrow is intended to be anything other
14     than the state of Ohio.
15 QUESTIONS BY MR. HAWAL:
16     Q.    Did you have any role in
17 studying this issue at McKesson?
18     A.    I did not.
19     Q.    Did you or any other McKesson
20 employee, to your knowledge, attend a DEA
21 distributors conference in Indianapolis on
22 May 10th and May 11, 2016?
23     A.    I believe someone from McKesson
24 would have attended that, yes.
25     Q.    Have you seen any documents

Page 92

1 that were generated as a result of that
2 attendance or that presentation or program?
3     A.    I have not.
4     Q.    Has DEA communicated to
5 McKesson the importance of determining
6 whether one of its pharmaceutical customers
7 is obtaining controlled substances, not only
8 from McKesson, but from other distributors at
9 the time -- same time it's obtaining
10 controlled substances from McKesson?
11     MR. STANNER:  Objection to the
12     form.
13     THE WITNESS:  I'm not sure I
14     understand your question.
15 QUESTIONS BY MR. HAWAL:
16     Q.    Has the DEA ever communicated
17 to McKesson, to your knowledge, the
18 importance of McKesson determining whether a
19 pharmacy customer is receiving controlled
20 substances from McKesson at the same time
21 that it's receiving controlled substances
22 from other distributors?
23     MS. MCCLURE:  Objection.
24     MR. STANNER:  Same objection.
25     THE WITNESS:  Not that I

Page 93

1 recall, no.
2 QUESTIONS BY MR. HAWAL:
3     Q.    Is that something that McKesson
4 monitors currently?
5     MR. STANNER:  Objection.
6     Outside the scope of the notice.
7     THE WITNESS:  We monitor --
8     we're able to obtain dispensing data
9     as we conduct our due diligence
10     reviews from our customers, and from
11     that due diligence, or that dispensing
12     information, we may be able to
13     determine potentially that the
14     customer is purchasing from outside of
15     just McKesson.
16     We also ask the customer on a
17     customer questionnaire whether or not
18     they have multiple or other
19     distributors that supply them with
20     controlled substances.
21 QUESTIONS BY MR. HAWAL:
22     Q.    Was that part of McKesson's due
23 diligence prior to 2013?
24     MR. STANNER:  Objection.
25     Outside the scope of the notice.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1      THE WITNESS:  I don't believe
2  that prior to 2013 that they were
3  getting the dispensing data
4  specifically from the customers.  I
5  believe that in some of the
6  questionnaires or some of the
7  discussions with the customers it
8  would have been asked whether or not
9  they were being serviced by other
10  wholesale distributors.
11  QUESTIONS BY MR. HAWAL:
12      Q.    For as long as you've been with
13  the DEA and then an employee of McKesson, has
14  the DEA consistently communicated to
15  distributors, including McKesson, the
16  importance of maintaining effective controls
17  and procedures to guard against the diversion
18  of controlled substances?
19      MR. STANNER:  Objection to the
20  form.  Objection to the scope of the
21  notice.
22      THE WITNESS:  I believe so,
23  yes.
24  QUESTIONS BY MR. HAWAL:
25      Q.    Have you ever seen any written

Page 95

1  communications from the DEA to McKesson or
2  any distributor that it was not required to
3  identify suspicious orders and report those
4  suspicious orders to the DEA?
5      MR. STANNER:  Objection to the
6  form.
7      THE WITNESS:  Not that I'm
8  aware of.
9  QUESTIONS BY MR. HAWAL:
10      Q.    For as long as you've been with
11  the DEA and then an employee of McKesson, has
12  the FDA -- I'm sorry, the DEA consistently
13  communicated to distributors, including
14  McKesson, the importance of blocking
15  suspicious orders that have been reported to
16  the DEA and not shipping them to the
17  customer?
18      MR. STANNER:  Objection to the
19  form.
20      THE WITNESS:  I do not believe
21  that they have -- that the DEA has
22  consistently done that, no.
23  QUESTIONS BY MR. HAWAL:
24      Q.    Have you seen any documents
25  that would be to the contrary that the DEA

Page 96

1  advised McKesson or any distributor that if
2  they identify a suspicious order, that it not
3  only needs to be reported to the DEA, but the
4  order must not be shipped?
5      MR. STANNER:  Objection to the
6  form.
7      THE WITNESS:  I believe that
8  one of the letters authored by Joseph
9  Rannazzisi spoke to blocking the
10  order.  I don't recall any other
11  information.
12  QUESTIONS BY MR. HAWAL:
13      Q.    Well, if you look at the
14  settlement agreement that McKesson entered
15  into in 2008, that specifically provides that
16  not only should suspicious orders be reported
17  to the DEA, but they should not be shipped,
18  true?
19      A.    I believe that's the case, yes.
20      Q.    Have you ever seen any
21  documents from the DEA which endorsed or
22  approved McKesson's controlled substance
23  monitoring program, or CSMP, or how it should
24  be implemented?
25      A.    The DEA?

Page 97

1      Q.    Yes, sir.
2      A.    Not that I'm aware of, no.
3      Q.    That discretion is left to
4  the -- is left to McKesson or was left to
5  McKesson, true?
6      MR. STANNER:  Objection to the
7  form.
8  QUESTIONS BY MR. HAWAL:
9      Q.    By the DEA?
10      A.    I believe that's the case, yes.
11      Q.    Have you ever seen any document
12  whereby McKesson communicated to the DEA that
13  it was incapable of identifying suspicious
14  orders or stopping their shipment?
15      A.    Not that I recall, no.
16      Q.    You were also identified as a
17  person most knowledgeable at McKesson about
18  controlled substance quotas, but we were told
19  that McKesson has no documents relating to
20  controlled substance quotas and does not set
21  quotas.
22      Is that familiar to you, sir?
23      MR. STANNER:  Objection --
24      THE WITNESS:  It's familiar to
25  me, yes.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 98

1    MR. STANNER: -- to the form.
2  QUESTIONS BY MR. HAWAL:
3    Q.    So is there any role -- does
4  McKesson play any role in setting quotas or
5  contributing to the establishment of quotas
6  for controlled substances?
7    MR. STANNER: Objection to the
8  form.
9    THE WITNESS: The Drug
10  Enforcement Administration sets the
11  quotas.
12  QUESTIONS BY MR. HAWAL:
13    Q.    All right. And McKesson and
14  other distributors do not play a role in
15  that?
16    A.    The only role that we would
17  play is the ARCOS reporting, the data that we
18  report via ARCOS, which is considered as part
19  of the DEA determination when setting the
20  quotas. That would be the only role that we
21  would play.
22    MR. HAWAL: All right. I don't
23  have any further questions. We are
24  going to reserve our right to reopen
25  this deposition once McKesson complies

---

Page 99

1  with the Special Master's order on
2  providing documents that predate 2013,
3  which have not been produced as a part
4  of the productions to date.
5    So subject to that, we're going
6  to suspend the deposition. Okay.
7    MR. STANNER: No questions for
8  McKesson.
9    MR. HAWAL: And I will
10  substitute a copy of that document,
11  Exhibit 6.
12    VIDEOGRAPHER: Anyone else?
13  The time is 10:57 a.m., July 19, 2018,
14  going off the record. End of the
15  videotaped deposition.
16  (Deposition concluded at 10:57 a.m.)
17      _ _ _ _ _ _ _
18
19
20
21
22
23
24
25

---

Page 100

1    CERTIFICATE
2
3    I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
5  of the examination, Gary Boggs was duly sworn
    by me to testify to the truth, the whole
6  truth and nothing but the truth.
7    I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
    before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
    ability.
10
11    I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
    that I am not financially interested in the
14  action.
15
16
    _____
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    California Certified Shorthand
19  Reporter #13921
    Missouri Certified Court Reporter #859
20  Illinois Certified Shorthand Reporter
    #084-004229
21  Texas Certified Shorthand Reporter #9328
    Kansas Certified Court Reporter #1715
22  Notary Public
23  Dated: July 24, 2018
24
25

---

Page 101

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8    After doing so, please sign the
9  errata sheet and date it. You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13    It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you. If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

---

Page 102

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4      I,_____, do
hereby certify that I have read the foregoing
5  pages and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12  _____
Gary L. Boggs                    DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

---

Page 104

_ _ _ _ _ _ _

LAWYER'S NOTES

1
2      _ _ _ _ _ _ _
3  PAGE   LINE
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25

---

Page 103

_ _ _ _ _ _ _

ERRATA

1
2      _ _ _ _ _ _ _
3  PAGE   LINE  CHANGE/REASON
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25