```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL       )   MDL No. 2804
     PRESCRIPTION OPIATE   )
 4   LITIGATION            )   Case No.
                           )   1:17-MD-2804
 5                         )
     THIS DOCUMENT RELATES TO )  Hon. Dan A. Polster
 6   ALL CASES             )
                           )
 7
 8
 9
                        — — —
10
             Thursday, February 14, 2019
11                      — — —
12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13                      — — —
14
15
16
17        Videotaped Deposition of BILL BRANDT,
     held at Locke Lord LLP, 2200 Ross Avenue,
18   Suite 2800, Dallas, Texas, commencing at
     9:07 a.m., on the above date, before
19   Michael E. Miller, Fellow of the Academy of
     Professional Reporters, Registered Diplomate
20   Reporter, Certified Realtime Reporter and
     Notary Public.
21
22
                        — — —
23
24           GOLKOW LITIGATION SERVICES
       877.370.3377 ph | fax 917.591.5672
25              deps@golkow.com
```

Page 2

A P P E A R A N C E S:

MOTLEY RICE LLC
BY: DAVID I. ACKERMAN, ESQUIRE
dackerman@motleyrice.com
401 9th Street N.W.
Suite 1001
Washington, D.C. 20004
(202) 232-5504
Counsel for MDL Plaintiffs

LOCKE LORD LLP
BY: C. SCOTT JONES, ESQUIRE
sjones@lockelord.com
MADELEINE BRUNNER, ESQUIRE
maddie.brunner@lockelord.com
2200 Ross Avenue
Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000
Counsel for Henry Schein Inc.

REED SMITH LLP
BY: STAN PERRY, ESQUIRE
sperry@reedsmith.com
811 Main Street
Suite 1700
Houston, Texas 77002-6110
(713) 469-3842
Counsel for AmerisourceBergen Drug
Corporation

BAKER HOSTETLER LLP
BY: MICHAEL W. MENGIS, ESQUIRE
mmengis@bakerlaw.com
811 Main Street
Suite 1100
Houston, Texas 77002
(713) 646-1392
Counsel for Cardinal Health

Page 3

A P P E A R A N C E S:

JONES DAY
BY: CASTEEL E. BORSAY, ESQUIRE
cborsay@jonesday.com
(via teleconference)
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215-2673
(614) 469-3939
Counsel for Walmart Corporation

MARCUS & SHAPIRA LLP
BY: PAUL MANNIX, ESQUIRE
pmannix@marcus-shapira.com
(via teleconference)
One Oxford Center
35th Floor
Pittsburgh, Pennsylvania 15219
(412) 471-3490
Counsel for HBC Services

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ZENO HOUSTON, ESQUIRE
zeno.houston@arnoldporter.com
(via teleconference)
250 West 55th Street
New York, New York 10019-1710
(212) 836-8000
Counsel for Endo Health Solutions
Inc., Endo Pharmaceuticals Inc., Par
Pharmaceutical, Inc. and Par
Pharmaceutical Companies, Inc.

VIDEOGRAPHER:

DARNELL BROWN,
Golkow Litigation Services

Page 4

INDEX

APPEARANCES                     2

PROCEEDINGS                     7


EXAMINATION OF BILL BRANDT:

    BY MR. ACKERMAN             9


CERTIFICATE              265

ERRATA                  267

ACKNOWLEDGMENT OF DEPONENT          268

LAWYER'S NOTES              269

Page 5

DEPOSITION EXHIBITS
BILL BRANDT
February 14, 2019
HENRY SCHEIN, INC.-BRANDT EXHIBITS          PAGE
Exhibit 1   Verifications Department        37
            Profile, Melville and Reno
            HSI-MDL-00022669 - 670
Exhibit 2   HSI Verification Procedures     86
            for Controlled Drug Orders
            issued February 5, 1998
            HSI-MDL-00404226 - 228

Exhibit 3   Controlled Substance           101
            Monitoring Procedure Issued
            December 3, 2012
            HSI-MDL-00000194 - 204
Exhibit 4   DEA Know Your Customer Due     120
            Diligence Procedure,
            Revised March 31, 2016,
            Rev. 1
            HSI-MDL-00000184 - 193
Exhibit 5   Bill Brandt LinkedIn          134
            Profile Printout

Exhibit 6   Interoffice Memorandum to      137
            Mullins, Brandt, Matalon,
            dated October 15, 2012
            HSI-MDL-00021781 - 782
Exhibit 7   E-mail from Abreu to          142
            Brandt, June 06, 2018
            HSI-MDL-00486513 - 514
Exhibit 8   U.S. Department of Justice,    152
            Drug Enforcement
            Administration letter dated
            September 27, 2006, from
            Rannazzisi
            HSI-MDL-00387177 - 180

Page 6

HENRY SCHEIN, INC.-BRANDT EXHIBITS          PAGE

Exhibit 9   U.S. Department of Justice,      155
            Drug Enforcement
            Administration letter to
            Henry Schein Inc.,
            December 27, 2007, from
            Rannazzisi
Exhibit 10  Executive Summary               159
            HSI-MDL-00404203 - 209
Exhibit 11  Cegedim Dendrite Henry          169
            Schein Visit Overview
            HSI-MDL-00386875 - 879
Exhibit 12  Cegedim Dendrite "New           177
            Account Issues Involving
            Controlled Substances"
            Discussion
            HSI-MDL-00231217 - 218
Exhibit 13  Cegedim Dendrite Draft          182
            Schein SOM Procedural
            Review
            HSI-MDL-00404369 - 373
Exhibit 14  Presentation, "Individual       192
            Opportunity/Issue,"
            presented by Tina
            Steffanie-Oak
            HSI-MDL-00072607
Exhibit 15  Interoffice Memorandum from     202
            Steffanie-Oak, February 17,
            2014
            HSI-MDL-00499366 - 371
Exhibit 16  E-mail Chain ending with        225
            Meeting Invitation,
            Subject: Suspicious item
            thresholds/Regulatory
            support and availability
            HSI-MDL-00019701 - 704

Page 7

HENRY SCHEIN, INC.-BRANDT EXHIBITS          PAGE

Exhibit 17  E-mail with Meeting             234
            Invitation, Subject:
            Scheduling a Team Meeting
            HSI-MDL-00002760
Exhibit 18  E-mail Chain ending with        238
            Meeting Invitation,
            Subject: Shipping controls
            to residences
            HSI-MDL-00002667 - 668
Exhibit 19  E-mail Chain ending with        242
            E-mail from Abreu to
            Schiavo and Brandt,
            February 01, 2012
            HSI-MDL-00020069 - 070
Exhibit 20  E-mail Chain ending with        245
            E-mail from Brandt to Abreu
            and Matalon, June 03, 2014
            HSI-MDL-00046124 - 127
Exhibit 21  e-mail Chain ending with        253
            e-mail from Steffanie-Oak
            to Butcher, January 26,
            2016
            HSI-MDL-00156897 - 899

Page 8

PROCEEDINGS

(February 14, 2019 at 9:07 a.m.)

THE VIDEOGRAPHER:  Good morning.  We are now on the record. My name is Darnell Brown.  I'm the videographer with Golkow Litigation Services.  Today's date is February 14th, 2019, and the time is 9:07 a.m.

This video deposition is being held in Dallas, Texas in the matter of In Re: National Prescription Opioid Litigation before the United States District Court for the Northern District of Ohio.

The deponent is Bill Brandt. Counsel, please identify yourselves for the record.

MR. ACKERMAN:  David Ackerman, Motley Rice, for the plaintiffs.

MR. JONES:  Scott Jones for defendant Henry Schein Inc. and the witness, and Maddie Brunner.

MR. MENGIS:  Michael Mengis, BakerHostetler, for Cardinal Health.

Page 9

MR. PERRY:  Stan Perry, Reed Smith, for AmerisourceBergen Drug Corporation.

THE VIDEOGRAPHER:  Those on the phone.

MS. BORSAY:  Casteel Borsay with Jones Day on behalf of Walmart.

MR. MANNIX:  Paul Mannix of Marcus & Shapira here on behalf of HBC Services.

MR. HOUSTON:  Zeno Houston from Arnold & Porter on behalf of Endo and Par.

BILL BRANDT,
having been duly sworn,
testified as follows:
EXAMINATION
BY MR. ACKERMAN:

Q.   Good morning, Mr. Brandt.

A.   Good morning.

Q.   We met off the record.  My name is David Ackerman.  I'm an attorney with Motley Rice representing the plaintiffs in this action.

Have you ever had your

deposition taken before?
A. No.
Q. Okay. Let me walk you through -- I'm sure your counsel told you a little bit about what's going to happen. I'll tell you a little bit as well.
A. Okay.
Q. So we are here. As you can see, there's a court reporter next to you, and a videographer. The court reporter, I think, is probably the most talented person in the room, because he will take down everything that's said. But as talented as he is, he cannot transcribe verbal -- or nonverbal actions.
A. Okay.
Q. So I'll be asking questions. Hopefully you'll be giving answers. I'd ask that you answer each question with a yes or a no and try to avoid uh-huhs or huh-uhs or shrugs or shakes of the head.
A. Okay.
Q. Also, he cannot transcribe when we speak over each other. He can only catch one person at a time. So even though it may

be painfully obvious where my question is going, I ask that you allow me to finish my question before you start your answer.
A. Okay.
Q. And I will try to do the same. I don't want to cut you off of any of your answers, and if I do cut you off, please let me know.
A. Okay.
Q. I don't know how long we'll go today, but we can take a break probably every hour, hour and a half. If at any time you want to take a break, let me know. We'll try to finish up the topic or questioning and then we'll go ahead and take a break.
A. Okay.
Q. I just ask that we don't take a break while a question is pending. I think these are the primary ground rules.
A. Okay.
Q. Have you taken any substance or under the influence of any medication that would affect your ability to testify truthfully today?
A. No.

Q. Okay. We can go ahead and step in and get started.
Would you state your name for the record, please?
A. Bill Brandt.
Q. How do you spell your last name?
A. B-R-A-N-D-T.
Q. And, Mr. Brandt, are you currently employed?
A. Yes.
Q. Where?
A. Henry Schein.
Q. And when did you start with Henry Schein?
A. October 1992.
Q. Prior to becoming employed with Henry Schein, did you have a job previous to that?
A. Yes.
Q. And what was that?
A. JCPenney.
Q. What was your position at JCPenney?
A. I was an operations supervisor.

Q. For how long were you at JCPenney?
A. I believe it was just shy of three years.
Q. And prior to JCPenney, were you employed anywhere?
A. I was in college.
Q. Do you have a college degree?
A. I do.
Q. From what college?
A. Chico State University.
Q. Where is Chico State University?
A. Northern California.
Q. Is it a bachelor's degree?
A. Yes.
Q. Did you have a major?
A. Psychology.
Q. Do you have any advanced degrees?
A. No.
Q. Your job at JCPenney, I assume it did not involve the distribution of controlled substances; is that correct?
A. That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   All right.  I had to check that
2  box.  Thank you.
3        When you started with
4  Henry Schein in October of 1992, what was the
5  first position that you held?
6    A.   The first position was
7  inventory control supervisor.
8    Q.   And where were you located?
9    A.   That was in Reno, Nevada.
10   Q.   For how long were you an
11 inventory control supervisor?
12   A.   For about a year.
13   Q.   And after that year, did you
14 assume another position at Henry Schein?
15   A.   At JCPenney or --
16   Q.   I'm sorry.  I was talking about
17 Henry Schein.
18   A.   Oh, I'm sorry, I apologize.
19   Q.   I think -- let me just make
20 sure I've got the timeline right.
21       You said you started as
22 inventory control supervisor at Henry Schein?
23   A.   I did.
24   Q.   And how long did you hold that
25 position?

Page 15

1    A.   I held that position for about
2  a year or so, yeah.
3    Q.   And then what was the next
4  position you held at Henry Schein?
5    A.   I believe it was in production,
6  picking and packing.
7    Q.   And for how long were you in
8  production?
9    A.   About a year as well.
10   Q.   Was that also in Reno?
11   A.   That was in Reno.
12   Q.   And when you say Reno, I assume
13 it's Reno, Nevada?
14   A.   Yes.  Yes.
15   Q.   After that, what was the next
16 position you held at Henry Schein?
17   A.   I believe for a little under a
18 year, I moved into a shipping supervisor
19 role, shipping and receiving I believe it
20 was.  Case pick.
21   Q.   And for how long were you in
22 that shipping and receiving role?
23   A.   I think that was about a year
24 as well.
25   Q.   Also in Reno?

Page 16

1    A.   Yes.
2    Q.   And after that, what was the
3  next position you held at Henry Schein?
4    A.   After that I had an opportunity
5  to go to France and help open a warehouse in
6  a city named Tours, France.
7    Q.   So for how long were you in
8  France?
9    A.   That was just shy of a year.
10   Q.   Well, I hope every position
11 hasn't been one year; otherwise, we might go
12 into lunch.  But we'll keep going.
13   A.   Okay.
14   Q.   After opening the warehouse in
15 France, did you hold another position with
16 Henry Schein?
17   A.   I returned to Reno, Nevada as
18 supervisor of -- I believe it was production
19 for a short time.
20   Q.   And when you say a short time,
21 is that -- about how long?
22   A.   About six months.
23   Q.   And after that, what was the
24 next position that you held at Henry Schein?
25   A.   I took a transfer to

Page 17

1  Indianapolis, our Indianapolis distribution
2  center.
3    Q.   And what did you do at the
4  Indianapolis distribution center?
5    A.   I managed a case pick building.
6    Q.   What is a case pick building?
7    A.   It's a separate building from
8  the main warehouse, and everything in the
9  warehouse is in full vendor cases, so no
10 individual loose pick items.
11   Q.   And so for how long were you
12 managing the case pick building in
13 Indianapolis?
14   A.   About a year.
15   Q.   And then after that?
16   A.   Customer service.  Back to Reno
17 to start a customer service team in Reno.
18   Q.   All right.  Let's take a break
19 there.  Let's -- because I think there's a
20 bunch of positions that I think I can just
21 ask a few questions about each time and we
22 can move on.
23   A.   Okay.
24   Q.   As inventory control
25 supervisor, which I believe is your first

Page 18

1  position at Henry Schein --
2     A.    Yes.
3     Q.    -- who did you report to?
4     A.    I reported to Ric Spellerberg,
5  the director of the facility.
6     Q.    And what were your
7  responsibilities?
8     A.    To maintain the inventory, to
9  check inventory accuracy, to set up the
10  inventory.  I was -- I was one of the
11  first -- first hired there, so it was my job
12  to help set up the inventory and make sure
13  that it was optimized for, you know,
14  production, for picking and that.
15     Q.    When you say inventory,
16  inventory of what?
17     A.    Inventory of all the products
18  that we sell, so -- that were stocked in
19  Reno.  I don't remember the exact number of
20  products, but it's a lot of -- a lot of
21  products.
22     Q.    And that includes prescription
23  drugs, correct?
24     A.    Yes.
25     Q.    Are there any other products

Page 19

1  that were stocked in Reno aside from
2  prescription drugs?
3     A.    Yes, consumable products.
4     Q.    When you say consumable
5  products, what do you mean?
6     A.    Toothbrushes, cotton balls,
7  gloves, cleaning supplies, anything a doctor
8  or a dentist might use.
9     Q.    Okay.  So was -- is that just
10  dental supplies or supplies for other medical
11  as well?
12     A.    No, it was medical, dental and
13  animal health.
14     Q.    Did you have any responsibility
15  as an inventory control supervisor for --
16  with respect to controlled substances?
17     A.    Yes.
18     Q.    Describe that.
19     A.    I was in charge of the drug
20  cage, so I supervised the drug cage.
21     Q.    What is the drug cage?
22     A.    It's -- the cage is where we
23  keep controlled substances.  In Reno it was
24  class III through V.
25     Q.    Is that still the case today?

Page 20

1     A.    Yes, I believe so.
2     Q.    Were class II controlled
3  substances stored somewhere else?
4     A.    Yes.
5     Q.    Where were they stored?
6     A.    Indianapolis.
7     Q.    So there were no class II
8  controlled substances in Reno?
9     A.    That's right.
10     Q.    Is that still the case today?
11     A.    Yes, I believe so.
12     Q.    Okay.  The next position you
13  said was something having to do with
14  production.  Generally what were your job
15  responsibilities in that position?
16     A.    To manage -- to help manage the
17  pickers and the packers, people who would
18  pick the orders and people who would package
19  them up to ship to customers.
20     Q.    And I assume as inventory --
21  going back to inventory control supervisor,
22  did you have any responsibility for detecting
23  suspicious orders?
24     A.    No.
25     Q.    Did you have any responsibility

Page 21

1  for customer due diligence?
2     A.    No.
3     Q.    In your role as -- in that role
4  in production, to whom did you report?
5     A.    I believe it was Nora -- I
6  can't remember her last name.  Nora was the
7  manager, ops manager that reported to
8  Ric Spellerberg, the director.  I forget her
9  last name.
10     Q.    And in production, did you have
11  any responsibility for detecting suspicious
12  orders?
13     A.    No.
14     Q.    Did you have any responsibility
15  for conducting customer due diligence?
16     A.    No.
17     Q.    The next role you said was
18  shipping and receiving?
19     A.    Uh-huh.
20     Q.    And what were your
21  responsibilities in that role?
22     A.    Again, to manage a team of
23  people who would load trucks, to manage the
24  shipping schedule, to assist with the
25  receiving and freight coming in.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    Q.    And did you -- who did you
2  report to in that role?
3    A.    I believe Ric Spellerberg
4  still.
5    Q.    Did you have any responsibility
6  with respect to identifying or detecting
7  suspicious orders of controlled substances?
8    A.    No.
9    Q.    And in that role as -- in
10 shipping and receiving, did you have any
11 responsibility with respect to conducting
12 customer due diligence?
13   A.    No.
14   Q.    The next role I have is opening
15 the warehouse in France.  Who did you report
16 to while you were in France?
17   A.    While in France, Bob Minowitz.
18   Q.    From France, you came -- you
19 came back to Reno?
20   A.    Yes.
21   Q.    And the next role I have is
22 supervisor of production; is that right?
23   A.    Yes.
24   Q.    Why did you leave France to
25 come back to Reno?

Page 23

1    A.    The assignment was complete.  I
2  went to set up the -- help set up the
3  warehouse and the inventory, so the
4  assignment was complete.  So I -- naturally I
5  came back to Reno, where I lived for a short
6  time, and then had an opportunity to transfer
7  to Indianapolis.
8    Q.    All right.  As the supervisor
9  in production, were your job responsibilities
10 generally the same as the production role
11 that you had held previously in Reno?
12   A.    Yes.
13   Q.    And did you also -- to whom did
14 you report during that period there?
15   A.    I believe it was still
16 Ric Spellerberg.
17   Q.    And did you have any
18 responsibilities for identifying or
19 investigating suspicious orders of controlled
20 substances?
21   A.    No, not at that time.
22   Q.    And did you have any
23 responsibility for conducting customer due
24 diligence?
25   A.    No.

Page 24

1    Q.    And then the next role you said
2  was in the Indianapolis distribution center?
3    A.    That's right.
4    Q.    So here, if I remember your
5  testimony correctly, there are class II
6  substances stored in the Indianapolis
7  distribution center; is that correct?
8    A.    That's correct.
9    Q.    And how were those stored at
10 the time in the distribution center?
11   A.    In a -- I apologize.
12   Q.    Sure.
13   A.    In a cement vault.
14   Q.    Was the vault locked?
15   A.    Yes.
16   Q.    Okay.
17   A.    And I wasn't in charge of --
18 that wasn't part of my role.
19   Q.    You read my next question.
20        Did you have any responsibility
21 with respect to class II controlled
22 substances?
23   A.    No.
24   Q.    So what were your
25 responsibilities during the time at the

Page 25

1  Indianapolis distribution center?
2    A.    My responsibilities were to
3  manage a case pick, vendor case pick
4  warehouse that was several miles from the
5  main warehouse.
6    Q.    Was the cement vault that you
7  described in the main warehouse or in the
8  case pick warehouse?
9    A.    It was in the main warehouse.
10   Q.    So it was not in the warehouse
11 where you worked?
12   A.    That's right.
13   Q.    What types of materials were
14 stored in the case pick warehouse that you
15 managed?
16   A.    Cases of gloves, cases of
17 towels, cases of drape sheets, some
18 equipment, things like that.
19   Q.    All right.  And that I think
20 then brings us to where you said you joined
21 the Reno customer service team; is that
22 correct?
23   A.    So I actually separated from
24 the company for a short time, a couple of
25 weeks, drove back to Reno, and the company

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 contacted me and advised that they had an
2 opportunity to -- they wanted to start a
3 customer service team in Reno, and they asked
4 if I was interested in interviewing for that.
5     Q.    All right.  So when did you
6 separate from the company?
7     A.    I believe it was February
8 of '96.
9     Q.    And why did you separate from
10 Henry Schein?
11     A.    Because my wife and I are both
12 from Northern California.  My wife was
13 pregnant at the time that I took the
14 transfer.  We had our first son in
15 Indianapolis, and we just weren't happy being
16 that far away from our family.
17     Q.    Approximately how long from
18 when you left Henry Schein was it until
19 someone contacted you about the opportunity
20 in Reno?
21     A.    I believe about two weeks.
22     Q.    Did you find new employment at
23 that time, or during those two weeks?
24     A.    No, I was looking, but I didn't
25 find anything.

Page 27

1     Q.    So who contacted you about the
2 new opportunity at Henry Schein?
3     A.    Peter Dellacroce.
4     Q.    And who is Peter Dellacroce?
5     A.    Peter -- now?  His role now or
6 then?
7     Q.    So then, and then we'll go to
8 now.
9     A.    I believe -- at that time I
10 believe he was -- I believe he might have
11 been the director of customer service.
12     Q.    And it sounds like he's still
13 with Henry Schein today?
14     A.    Yes.
15     Q.    And what is his role today?
16     A.    He's vice president of global
17 services.
18     Q.    When Mr. Dellacroce contacted
19 you, what did he say?
20     A.    He said that they were
21 thinking -- they had been thinking about
22 opening a call center in Reno.  We had worked
23 together in the past from an operations
24 standpoint because he was also in operations,
25 and they were very interested in just talking

Page 28

1 to me to see if I might have interest in
2 starting that team in Reno.
3     Q.    Had you ever worked in a call
4 center before?
5     A.    No.
6     Q.    I assume you accepted the
7 position?
8     A.    Yes.
9     Q.    And so what was your role at
10 that time?  What was your job title?
11     A.    Supervisor of customer service.
12     Q.    Did you have individuals who
13 reported to you?
14     A.    Yes.
15     Q.    How many?
16     A.    Five.
17     Q.    And what were your
18 responsibilities as supervisor of customer
19 service?
20     A.    To make sure that we answer the
21 phone, to make sure that the team was
22 trained, to provide support to the team of
23 agents.
24     Q.    At the time that you joined --
25 or you rejoined Henry Schein, was there

Page 29

1 already a customer service call center
2 anywhere?
3     A.    Yes.
4     Q.    Where?
5     A.    In Melville, New York.
6     Q.    So was this moving the call
7 center from Melville to Reno, or did they
8 start up a second call center?
9     A.    They started up a second call
10 center.
11     Q.    So were you involved with
12 designing the training materials?
13     A.    No, not at that time.
14     Q.    Yeah.  And I'm just talking
15 about at that -- during this period.
16     A.    At that period, no.  I was
17 trained.  I got -- I was trained on the
18 existing materials.
19     Q.    The role of supervisor of
20 customer service, who at that time were
21 Henry Schein's customers?
22         MR. JONES:  Object to the form.
23         MR. ACKERMAN:  You can answer.
24         So from time to time, Mr. Jones
25     may object to a question.  You can

Page 30

1    answer unless he instructs you not to
2    object -- not to answer.
3        A.    My understanding, dentists,
4    doctors, veterinarians.
5    BY MR. ACKERMAN:
6        Q.    For how long were you
7    supervisor of customer service?
8        A.    I believe -- I believe several
9    years, maybe two or three years.
10       Q.    Who did you report to?
11       A.    Jim Mullins.
12       Q.    And what was Mr. Mullins' title
13   at the time?
14       A.    At the time Jim was probably
15   the manager of customer service.
16       Q.    Was he located in Reno?
17       A.    No. Melville, New York.
18       Q.    Is Mr. Mullins still with the
19   company?
20       A.    Yes.
21       Q.    And what is his title now?
22       A.    Senior vice president, global
23   services.
24       Q.    After the two to three years
25   you were supervisor of customer service --

Page 31

1    I've lost track of my timeline so I'm not
2    going to guess the year, but what was the
3    next job you held at Henry Schein?
4        A.    It was manager of customer
5    service. I was promoted.
6        Q.    Were there additional
7    responsibilities that came with that
8    promotion?
9        A.    I think so. A bigger team,
10   managing more people, handling more call
11   volume.
12       Q.    As manager -- first of all, how
13   long were you manager of customer service?
14       A.    I believe until 2003. That's
15   when I was promoted to director.
16       Q.    About how long is that? Just
17   because I haven't added up the years that
18   we've been going through.
19       A.    I think about four or five
20   years, something like that.
21       Q.    Did you oversee the team, the
22   customer service team in Melville, as well as
23   manager of customer service?
24       A.    No, just the Reno team.
25       Q.    At that time how many customer

Page 32

1    service representatives reported to you -- or
2    let me ask the question differently.
3        At that time how many customer
4    service representatives did you oversee?
5        A.    I would -- I would estimate 20.
6        Q.    Did the customer service
7    representatives take orders for Henry Schein?
8        A.    No.
9        Q.    The training materials for the
10   customer service representatives, did they
11   address potential diversion of controlled
12   substances?
13       A.    No.
14       Q.    Did the training materials
15   address due diligence or customer due
16   diligence?
17       A.    In customer service, no.
18       Q.    And thank you for clarifying.
19   Yeah.
20       Did the training materials in
21   customer service address identification or
22   investigation of suspicious orders of
23   controlled substances?
24       A.    No.
25       Q.    Generally what types of

Page 33

1    inquiries were the customer service
2    representatives receiving in this time
3    period?
4        A.    Post sales, so things like
5    returns, order tracking, billing questions,
6    things like that. Anything that would happen
7    after a sale was what the team handles.
8        Q.    Did the training materials for
9    customer service representatives address
10   reports of abuse of controlled substances?
11       MR. JONES:  Object to the form.
12       A.    No, not that I'm aware of.
13   BY MR. ACKERMAN:
14       Q.    Are you aware of customer
15   service representatives at this time
16   receiving calls or inquiries reporting abuse
17   of controlled substances?
18       A.    Not that I'm aware of.
19       Q.    As manager of customer service,
20   who did you report to?
21       A.    Jim Mullins.
22       Q.    Did Mr. Mullins have a
23   different title at that time?
24       A.    Probably director of customer
25   service. I'm guessing.

Page 34

1    Q.    You said you held that
2  position, manager of customer service, until
3  about 2003; is that right?
4    A.    I believe so.
5    Q.    What was the next position at
6  Henry Schein that you held?
7    A.    Director of customer service.
8    Q.    And for how long were you
9  director of customer service?
10   A.    I believe 13 years.
11   Q.    So roughly until 2006?
12       MR. JONES:  Object to the form.
13  I think it's 2016.
14       MR. ACKERMAN:  I'm sorry, thank
15  you, yes.
16       THE WITNESS:  Yes.
17       MR. ACKERMAN:  It's early for
18  my math.
19   A.    Yes, about 2016 or '17 is when
20  I was promoted again.
21  BY MR. ACKERMAN:
22   Q.    What were your job
23  responsibilities as director of customer
24  service?
25   A.    Director of customer service,

Page 35

1  the added responsibilities, the increased
2  size of the team, so the team was getting
3  bigger in Reno.  And I also took
4  responsibility for the customer service team
5  in Melville, New York.
6    Q.    How large did the team get in
7  Reno?
8    A.    At that time, maybe 25 or so.
9    Q.    The customer service team in
10  Melville, did they handle the same types of
11  inquiries as the team in Reno, or were there
12  different inquiries that were routed to
13  Melville?
14       MR. JONES:  Object to form.
15   A.    Yes, the same.  Customer
16  service, the same.
17  BY MR. ACKERMAN:
18   Q.    As director of customer
19  service, did you have any responsibilities
20  related to suspicious order monitoring?
21   A.    Not originally, but that did
22  become part.  That did become part of my
23  responsibility.
24   Q.    When did suspicious order
25  monitoring become part of your

Page 36

1  responsibility?
2    A.    I don't recall exactly the
3  year, but it was sometime in the -- it was
4  sometime in the mid 2000s, I think.
5    Q.    And what responsibilities did
6  you assume with respect to suspicious order
7  monitoring at that time?
8    A.    I assumed the oversight of the
9  license verifications team in Melville and
10  Reno.
11   Q.    What is the license
12  verifications team?
13   A.    The license verifications team
14  is the team that checks orders that pend,
15  things that our system deems suspicious.
16   Q.    So you used a term there,
17  "orders that pend."  What does that mean?
18   A.    Orders that pend are orders
19  that are deemed as potentially suspicious
20  that we should review further.
21   Q.    And how do those orders get
22  deemed as potentially suspicious?
23   A.    Through a -- through a
24  threshold system that's built into our --
25  into our systems that would flag an order for

Page 37

1  unusual size, unusual frequency, unusual
2  pattern.
3       MR. ACKERMAN:  Let's mark this
4  as Exhibit 1.
5       (HenrySchein-Brandt Deposition
6  Exhibit 1 marked.)
7  BY MR. ACKERMAN:
8    Q.    So, Mr. Brandt, the court
9  reporter has handed you what's been marked as
10  Exhibit 1.
11   A.    Uh-huh.
12   Q.    Which is a two-page document
13  numbered HSI-MDL_00022669.  Take a moment to
14  review this document and let me know if
15  you've seen it before.
16       (Document review.)
17   A.    I don't recall seeing it, but I
18  clearly -- I'm sure I did.
19  BY MR. ACKERMAN:
20   Q.    Okay.  The title of the
21  document is Verifications Department Profile.
22  Is that the license verifications team that
23  you were just discussing?
24   A.    That's correct.
25   Q.    About midway down the page on

1 the left-hand side, it says number of TSMs.
2     Do you see that?
3     A.    Yes.
4     Q.    What does TSM stand for?
5     A.    TSM is Team Schein Member.
6     Q.    Is that employees who were
7 assigned to the team?
8     A.    Yes, yes.
9     Q.    And then above that it says
10 number of prompts.  What does that mean?
11     A.    Prompts would, I believe, refer
12 to phone prompts, so maybe -- I'm
13 speculating, but that could mean phone
14 prompts, 800 numbers coming in possibly.
15     Q.    Okay.
16     A.    Yeah.
17     Q.    Then this first sentence under
18 department scope of responsibility is:  The
19 verifications team is responsible for
20 ensuring compliance with all state and
21 federal licensure requirements for the
22 shipment of medical devices, prescription
23 drugs and controlled substances.
24     Is that an accurate description
25 of the responsibilities of the verifications

1 department at Henry Schein?
2     A.    I think -- I think it's an okay
3 description.  It's to review orders and to
4 make sure that we as a company stay in
5 compliance, yeah, with regulations.
6     Q.    And was that an accurate
7 description from the time that you assumed
8 responsibilities for suspicious order
9 monitoring?
10     A.    I believe so, yes.
11     Q.    Before you -- the suspicious
12 order monitoring responsibilities were in
13 your bailiwick, before you had those
14 responsibilities, who was responsible for
15 that aspect of Henry Schein's business?
16     A.    You know, I don't recall.  I
17 don't recall who managed that prior to me.
18     Q.    How did you become aware that
19 you were going to be assuming
20 responsibilities with respect to suspicious
21 order monitoring?
22     A.    I believe my boss, Jim Mullins,
23 advised that that would be included in my
24 scope.
25     Q.    And do you recall what he told

1 you at that time?
2     A.    No.  I think -- I mean, I don't
3 remember exactly, no, but it was probably an
4 overview of the department and everything
5 that it -- everything that goes along with
6 it, and I'm sure we had many discussions
7 about that, I would assume.
8     Q.    Was there a verifications
9 department in existence at the time that you
10 assumed responsibility?
11     A.    Yes.
12     Q.    When you assumed responsibility
13 for the verifications department, did you
14 receive any training on state and federal
15 licensure requirements for the shipment of
16 medical devices, prescription drugs and
17 controlled substances?
18     A.    Probably the SOP, so whatever
19 the standard operating procedures were at the
20 time, I'm sure I reviewed those; and then
21 conversations with Jim Mullins and with the
22 team.
23     Q.    Has that SOP evolved over time?
24     A.    Yes.
25     Q.    What do you recall about the

1 version of the SOP that you reviewed at the
2 time that you assumed responsibility for the
3 verifications department?
4     A.    I don't remember it exactly,
5 but I'm sure it included how to approach
6 orders that pend, what the process was for
7 the representatives and the things that
8 they -- guidance for them on how they should
9 conduct their due diligence.
10     Q.    If you look back at this
11 Exhibit 1, the next sentence under this
12 section, Department Scope of Responsibility,
13 says:  In addition, we are required to "know
14 our customer," when shipping controlled
15 substances according to Federal DEA
16 regulations.
17     Do you see that?
18     A.    I do.
19     Q.    Do you know why the phrase
20 "know our customer" appears in quotation
21 marks?
22     A.    Do I know why it's in quotes?
23 I guess because it's a wide -- at the time --
24 I don't know what the timing was of this
25 particular memo, but at the time I think that

Page 42

1  was -- if I wrote this memo, which I may
2  have, it was because maybe it wasn't as
3  defined. Maybe it wasn't clearly defined at
4  that time.
5      Q.    Is it clearly defined today?
6      A.    I believe so. I believe we've
7  put -- we've worked with our regulatory team
8  who really focuses on this type of thing, and
9  we've partnered with them as we always do,
10  and I believe we have a good process in place
11  now for that and a good understanding.
12      Q.    At the time that you assumed
13  responsibility for the verifications
14  department, was the verifications department
15  responsible for -- was the verifications
16  department required to know our customer when
17  shipping controlled substances?
18          MR. JONES: Object to the form.
19      A.    Not -- not formally, like we do
20  today. I think that has -- that has
21  definitely been an evolving requirement from
22  the government.
23  BY MR. ACKERMAN:
24      Q.    So when you say not formally,
25  was there an informal process in place when

Page 43

1  you first assumed responsibility for the
2  verifications department?
3      A.    Well, not informal, but we
4  didn't have a questionnaire. But we did have
5  things. Customers were -- had a segment, a
6  market segment and things like that that --
7  so we knew what type of practice the doctor
8  had, but we didn't have our questionnaire at
9  that time when I first started.
10      Q.    And what is the questionnaire
11  that you're referring to?
12      A.    It's our Know Your Customer
13  questionnaire.
14      Q.    When did the Know Your Customer
15  questionnaire get implemented?
16      A.    I don't recall exactly. I
17  would -- I would estimate 2014, around that
18  time.
19      Q.    How long is the questionnaire?
20      A.    How long? Two pages.
21      Q.    How many questions are on the
22  questionnaire?
23          MR. JONES: Object to the form.
24      A.    I believe around 20 questions.
25          ///

Page 44

1  BY MR. ACKERMAN:
2      Q.    Today does Henry Schein use the
3  questionnaire?
4      A.    Yes.
5      Q.    And how long is the
6  questionnaire that is in use today?
7      A.    I believe about 20 questions.
8      Q.    In 2014 or approximately 2014,
9  when the questionnaire was implemented, how
10  many questions were on the questionnaire?
11      A.    My recollection, a few short of
12  what we are today, so maybe 15 or 16
13  questions. I think we've added a few over
14  the last few years. When I say we, I'm
15  referring to regulatory.
16      Q.    And under what circumstances --
17  today, under what circumstances is the
18  questionnaire -- I assume the questionnaire
19  gets sent out to customers; is that correct?
20      A.    They can access it online, or
21  we can fax it to them, send it to them.
22      Q.    And so when does a customer
23  complete the questionnaire today?
24      A.    Just when we --
25          MR. JONES: Object to the form.

Page 45

1      A.    When we send it to them, so...
2  BY MR. ACKERMAN:
3      Q.    And when does it get sent to
4  them?
5      A.    If they're ordering controlled
6  substances, normally that would be the first
7  flag that would do that.
8      Q.    So at that time of a first
9  order of controlled substances; is that
10  correct?
11      A.    Not always, but depends what
12  they're ordering and upon -- you know, we
13  would review the account and when we deem --
14  when the team deems that it's necessary.
15      Q.    Are there procedures in place
16  today that specify when a questionnaire
17  should be sent to a customer?
18      A.    I believe so.
19      Q.    Well, since we skipped to
20  today, let me ask a couple of questions that
21  I haven't asked yet, which is: What is your
22  current role at Henry Schein?
23      A.    My current role, I was just
24  promoted to vice president.
25      Q.    And congratulations.

Page 46

1    A.    Thank you.

2    Q.    When was the promotion?

3    A.    It was announced yesterday,
4  actually.

5    Q.    So prior to that promotion or
6  two days ago, what was the role that you held
7  at Henry Schein?

8    A.    Executive director.

9    Q.    And for how long were you
10 executive director?

11   A.    Just about a year, a little
12 over a year.

13   Q.    What were your responsibilities
14 as executive director?

15   A.    Pretty much the same as
16 director, just managing both customer service
17 teams, oversight of license verifications
18 team, Reno/Melville, and our gatekeeping
19 team, Reno/Melville.

20   Q.    I see.  So you were director of
21 customer service for a long period, 13 years;
22 is that right?

23   A.    Yes.

24   Q.    And then you were executive
25 director for about a year?

Page 47

1    A.    Uh-huh.

2    Q.    And as of yesterday, you are
3  now vice president?

4    A.    Yes.

5    Q.    Understood.  Let's keep looking
6  at this verifications department profile
7  document.

8    A.    Okay.

9    Q.    The next -- actually that
10 sentence that I just read that said:  In
11 addition, we are required to know our
12 customer when shipping controlled substances
13 according to Federal DEA regulations.

14       Do you see that?

15   A.    Uh-huh.  Yes.

16   Q.    Have you received any training
17 on the federal DEA regulations referenced in
18 that sentence?

19   A.    Not -- I haven't personally,
20 no.

21   Q.    Have the members of the
22 verifications department received training on
23 the federal DEA regulations that are
24 referenced in that sentence?

25   A.    Yes, through our standard

Page 48

1  operating procedures and through training
2  courses with our regulatory team.

3    Q.    How many training courses with
4  the regulatory team do members of the
5  verifications department receive?

6       MR. JONES:  Object to the form.

7    A.    You know, I don't know the
8  exact number, but our manager, the manager of
9  the department, now the director, Shaun
10 Abreu, attends annual seminars, so DEA
11 seminars to stay up with the latest and
12 greatest, and we -- like I said, we work with
13 our regulatory team, and Shaun and our
14 regulatory team partner and, you know, try to
15 provide at least one annual training with the
16 team.  Like I said, we do use our procedures
17 to help the team, to help guide the team.

18 BY MR. ACKERMAN:

19   Q.    When you first assumed
20 responsibility for the verifications
21 department, was there training courses from
22 the regulatory team?

23   A.    I don't recall back then.
24 There certainly may have been.  I don't think
25 there's ever been anything overly formal.

Page 49

1  They may have come out to do a -- a
2  PowerPoint presentation or something like
3  that, but I don't recall specifically.

4    Q.    Are the training courses today
5  more formal?

6       MR. JONES:  Object to the form.

7    A.    No, just PowerPoint training,
8  so I would -- I wouldn't say so, no.

9  BY MR. ACKERMAN:

10   Q.    And have you ever attended one
11 of those training courses?

12   A.    I have.

13   Q.    When?

14   A.    I attended one probably in the
15 late 2000s, maybe 2010.  I attended one last
16 year.  I think those are the two I've sat in
17 on.

18   Q.    I'm sorry, I didn't want to
19 interrupt you.

20   A.    Those are the two I sat in on.

21   Q.    You did not attend the training
22 courses annually; is that correct?

23   A.    No.

24   Q.    Are the training courses an
25 annual requirement for members of the

Page 50

1  verifications department?
2       MR. JONES:  Object to the form.
3       A.    No, the courses I'm speaking
4  of, no.  The company does have some ethics
5  and courses like that that go through our
6  compliance department that everybody -- that
7  most Team Schein members are responsible to
8  formally take every year and to update,
9  things like ethics and harassment and things
10 like that.  So I'm not speaking of that.
11      I'm speaking of the partnership
12 that our team has with the regulatory team
13 and information they put together to help --
14 to help our verifications reps understand a
15 little bit more about the industry and about
16 how they should be looking at and conducting
17 some of their due diligence.
18 BY MR. ACKERMAN:
19      Q.    Okay.  So there are required
20 training -- annual required training courses
21 for Henry Schein employees; is that correct?
22      A.    Yes.
23      Q.    But those required annual
24 training courses don't include training on
25 identification and investigation of

Page 51

1  suspicious orders; is that right?
2       A.    I would say so.  I think that's
3  correct.
4       Q.    And they don't include training
5  on the DEA's Know Your Customer regulations?
6       MR. JONES:  Object to the form.
7       A.    Yeah, I don't believe that it
8  includes that.  It certainly may.  Like I
9  said, it's usually larger topics like ethics
10 and things like that.
11 BY MR. ACKERMAN:
12      Q.    Are you required to --
13      A.    Yes.
14      Q.    -- take the annual training
15 courses?
16      A.    Yes.
17      Q.    And have you taken them for
18 this year?
19      A.    Possibly.  I don't recall.
20      Q.    You took them for last year,
21 though, right?
22      A.    Yes.  Yes.
23      Q.    So what training courses did
24 you take last year that were required by
25 Henry Schein?

Page 52

1       A.    So harassment, antiharassment,
2  ethics.  I don't remember all of the topics
3  that are included, but those are pretty wide
4  topics that usually are about 45 minutes, and
5  it's a Corpedia type of training that has a
6  test at the end.
7       Q.    When you say Corpedia, is that
8  like an online training?
9       A.    Yeah, it's a delivery service.
10      Q.    Okay.  If you skip to the next
11 page of Exhibit 1, there's a header -- well,
12 first, I want to understand what some of the
13 acronyms are on the left side of this page at
14 the top, so -- or terms, because they're not
15 all acronyms.
16      The first one says abandonment
17 rate.  What is that?
18      A.    Abandonment rate is when a
19 customer calls in through our 800 number, and
20 we don't pick up the call before they hang
21 up.
22      Q.    So it's an abandoned call?
23      A.    Yes.
24      Q.    Understood.
25      Quality average?  What does

Page 53

1  that mean?
2       A.    Yes, we have a quality -- we
3  have a quality process.  We record phone
4  calls, and we score usually between five and
5  ten per agent per month, and have our -- we
6  have QA people who coach and who score the
7  calls.  We have an evaluation sheet and they
8  basically provide a final score for the call.
9       Q.    What metrics are used to score
10 the agent's performance?
11      A.    An evaluation sheet that has
12 some of the key -- you know, how they
13 answered the phone, phone etiquette, how well
14 they solved the problem for the customer.
15 It's around those types of things.
16      Q.    Are these written down
17 somewhere?
18      A.    Yes.
19      MR. ACKERMAN:  I don't know,
20 Scott, whether that's been produced or
21 not, but if it hasn't been, we'd ask
22 for that production.
23      MR. JONES:  We'll look at that.
24      MR. ACKERMAN:  Thank you.
25      ///

Page 54

BY MR. ACKERMAN:

Q.    The next heading says HA Pends.
What does that mean?

A.    HA Pends refers to orders that
pend due to state licensing.

Q.    HA, does that -- is that short
for something?

A.    I don't think so.  I don't know
what the -- it's a pend code.  It's just a
code.

Q.    I see.  So there are three
headings here, right?  It says HA Pends, HS
Pends and HK Pends?

A.    Uh-huh.

Q.    What's the difference between
HA Pends, HS Pends and HK Pends?

A.    I believe HA refers to state
licensing, and HS refers to more of the
controls in suspicious order monitoring.

Q.    And then HK?

A.    HK I believe is -- HK might be
like a first time order.  I'm not exactly
sure, to be honest with you.

Q.    So do I understand it correctly
that these letters refer to different reasons

Page 55

for why an order might pend?

A.    Yeah.  They're pend codes, so
yes, I believe so.

Q.    The next heading says:
Customer facing projects for 2014, and then
underneath it says:  Develop an online tool
for Know Your Customer, currently faxing the
information to them.  The online version will
provide an improved customer experience and
minimize the number of incorrect responses.

What is that referring to?

A.    So that refers to when we used
to fax -- and we still do to this day.  We do
some of these -- when we fax a form to a
customer, sometimes customers don't fill it
out completely, so the online -- the idea
with the online form is that we would make
all of the -- all of the boxes mandatory so
that they couldn't submit an incomplete form.

Q.    And when you're talking about a
form, is that the questionnaire that you were
describing earlier?

A.    Yes.

Q.    So once -- let's talk about
this time period, which I'm guessing is

Page 56

roughly 2014 based on this document, on that
heading.

A.    Uh-huh.

Q.    Once the questionnaire was
faxed to the customer and the customer faxes
back or returns the questionnaire to
Henry Schein in some form or manner, what's
the next step in the verification process?

A.    The next step is for the form
to be reviewed.

Q.    And who reviews the form?

A.    We have -- we have people on
the verifications team that are reviewers
that are in that role.

Q.    How many?

A.    Today, I don't know the exact
number.  I think we might have between five
and ten, somewhere in that range.

Q.    How many in 2014?

A.    I don't know, probably between
three and six.  It was probably lower than it
is today.

Q.    And are there written
guidelines for that review of the
questionnaire?

Page 57

A.    Just there's -- I believe
there's a work instruction.

Q.    When you say a work
instruction, is that -- is that a type of
document at Henry Schein?

A.    Yeah, like a training guide or
something like that.

Q.    Do you know what that might be
called or titled?

A.    I don't.

Q.    If you were looking to get a
copy of it, how would you get a copy?

A.    I would ask -- I would ask the
regulatory department or I would ask Shaun
Abreu.

Q.    Did you draft that work
instruction?

A.    Did I?

Q.    Yes.

A.    No.  I don't believe so.

Q.    Have you reviewed that work
instruction?

A.    Yeah, I believe I've seen it
before.  I've reviewed it.  I don't -- I
wouldn't pretend to be an expert on it or

Page 58

1  anything like that.
2      Q.   Did you have any input to -- or
3  did you suggest any changes to the work
4  instruction when you reviewed it?
5      A.   Not that I -- not that I
6  recall.  I mean, it's possible I may have
7  over the years if something stood out to me
8  or if something was brought to my attention
9  that was -- that needed to be changed, I
10  certainly may have, but I don't recall
11  anything specific.
12     Q.   Do you know who drafted the
13  work instruction?
14     A.   My -- I would -- I would assume
15  regulatory.  I would assume -- I shouldn't be
16  saying assume, but I think Shaun Abreu
17  probably had a hand in that.
18     Q.   And understanding you're
19  assuming, but that assumption is based on
20  your almost 30 years of experience at
21  Henry Schein; is that right?
22          MR. JONES:  Object to the form.
23  BY MR. ACKERMAN:
24     Q.   What's the basis for your
25  assumption?

Page 59

1      A.   Yeah, well, because I -- I
2  haven't been in this role for as long, of
3  course.  Regulatory is really responsible for
4  helping to shape the rules, so to speak, the
5  guidelines, and the verifications team is
6  really responsible for enforcement.
7          So I don't think anything would
8  ever be created by our team without --
9  without the regulatory team being the ones to
10  initiate it or, you know, to review it and
11  approve it.
12  BY MR. ACKERMAN:
13     Q.   All right.  The next heading on
14  this document says Best Practice Sharing.
15          Do you see that?
16     A.   Uh-huh.
17     Q.   And then it says to share
18  verifications tip sheet?
19     A.   Uh-huh.
20     Q.   Does that term ring a bell,
21  "verifications tip sheet"?
22     A.   It doesn't.  It doesn't.  Best
23  practice sharing is something -- it's a
24  company philosophy.  We do that throughout
25  the organization, just to make sure that

Page 60

1  we're all sharing and collaborating and
2  making sure that we're sharing.
3          So that -- it doesn't ring a
4  bell, to be honest with you, but...
5      Q.   And you sort of anticipated my
6  next question, which was what best practice
7  sharing means.  But is there -- sharing with
8  whom?
9      A.   Each other.  It could be a
10  manager to a manager.  It could be
11  supervisors.  It could be -- it could be
12  other Team Schein members, so...
13          MR. JONES:  If you get to a
14  transition point, can we take a short
15  break?
16          MR. ACKERMAN:  I was about to
17  say I think it's a good point for a
18  short break, yeah.
19          THE WITNESS:  Sure.
20          THE VIDEOGRAPHER:  The time is
21  now 10:08.  Going off the record.
22          (Recess taken, 10:08?a.m. to
23  10:30?a.m.)
24          THE VIDEOGRAPHER:  Time is now
25  10:30.  Back on the record.

Page 61

1  BY MR. ACKERMAN:
2      Q.   Thank you, Mr. Brandt.
3      A.   Sure.
4      Q.   I want to ask you a couple more
5  questions about the verifications department.
6  So if you look back at the first page of
7  Exhibit 1, it shows that there are 18
8  representatives in Melville, nine
9  representatives in Reno, or at least there
10  were at the time of this document.  I don't
11  know what the numbers are today.
12          But is there any difference in
13  the job responsibilities between the
14  representatives in Melville and the
15  representatives in Reno?
16          MR. JONES:  Object to the form.
17     A.   I don't know.  I don't know.  I
18  don't believe so.  I don't know.
19  BY MR. ACKERMAN:
20     Q.   Okay.  At the time you were
21  overseeing -- at the time of this document,
22  which is around 2014, you were overseeing
23  both the Melville team and the Reno team; is
24  that correct?
25     A.   I believe so.  I'm not a

Page 62

1  hundred percent sure on that, but I believe
2  so.
3      Q.    And why aren't -- is there --
4  what causes you not to be a hundred percent
5  sure?
6      A.    That I was over -- I'm not
7  exactly sure when I took responsibility for
8  the -- when I was granted the oversight of
9  that, of the team. Is that what you're
10  asking me? I'm not sure I understand your
11  question.
12     Q.    Yeah, sure. So going back to
13  this verifications department profile
14  document.
15     A.    Uh-huh.
16     Q.    It listed as -- the manager is
17  Shaun Abreu. Do you see that?
18     A.    Uh-huh.
19     Q.    And then the director has your
20  name; is that correct?
21     A.    Yes.
22     Q.    And is it correct at this time
23  that Shaun Abreu reported to you?
24     A.    Yes.
25     Q.    So at the time of this

Page 63

1  document, who was overseeing the Melville
2  verifications department team?
3      A.    Shaun.
4      Q.    And who was overseeing the Reno
5  verifications department team?
6      A.    Shaun, I believe. I believe
7  Shaun had responsibility for both.
8      Q.    And then you were overseeing
9  Shaun?
10     A.    Correct.
11     Q.    Thank you.
12           To your knowledge, was there
13  any difference in the responsibilities
14  assigned to the Melville verifications
15  department team at the time of this document
16  from the responsibilities assigned to the
17  Reno verifications department team?
18     A.    I don't know. Going back to
19  that year, I don't know.
20     Q.    Okay. At any point in your
21  tenure overseeing the verifications
22  department, has there been any distinction
23  between the responsibilities assigned to the
24  Melville verifications department team and
25  the responsibilities assigned to the Reno

Page 64

1  verifications department team?
2      A.    Not to my knowledge. Not to
3  my -- not that I...
4      Q.    When you say not to your
5  knowledge, does that mean that both the
6  Melville team and the Reno team were doing
7  the same thing --
8           MR. JONES: Object to the form.
9  BY MR. ACKERMAN:
10     Q.    -- to your knowledge?
11     A.    I wouldn't say that
12  necessarily. I just don't know that they
13  were doing the same -- if they were doing the
14  same thing.
15     Q.    Did the Melville verifications
16  department team have responsibility for
17  activities relating to orders of class II
18  controlled substances?
19           MR. JONES: Object to the form.
20     A.    I'm not sure I understand the
21  question.
22  BY MR. ACKERMAN:
23     Q.    Sure.
24           At the time of this document --
25     A.    Okay.

Page 65

1      Q.    -- roughly 2014 --
2      A.    Right.
3      Q.    -- it says: The verifications
4  team is responsible for ensuring compliance
5  with all state and federal licensure
6  requirements, correct?
7      A.    Correct.
8      Q.    Did the Melville -- the members
9  of the team who were assigned to Melville
10  have responsibility for ensuring compliance
11  with all state and federal licensure
12  regulations -- I'm sorry, state and federal
13  licensure requirements for class II
14  controlled substances?
15     A.    Yes, I believe so.
16     Q.    Did the -- at the time of this
17  document, the Reno verifications department
18  team have responsibility for ensuring
19  compliance with all state and federal
20  licensure requirements with respect to
21  class II controlled substances?
22     A.    Yes.
23     Q.    Has there ever -- during your
24  tenure has there ever been a point in time
25  during which either the Melville

Page 66

1 verifications department team or the Reno
2 verifications department team did not have
3 responsibility for ensuring compliance with
4 all state and federal licensure requirements
5 with respect to class II controlled
6 substances?
7     A.    I don't know.  I don't know.
8 Are you asking during my oversight of the
9 department?
10     Q.    Correct.
11     A.    Then -- so can you ask it
12 again.
13     Q.    Sure.
14     A.    I'm sorry, I just don't want to
15 make a mistake here.
16     Q.    No, that's fair.
17     A.    Okay.
18     Q.    During your oversight of the
19 department --
20     A.    Okay.
21     Q.    -- which -- let me just
22 establish this.
23         I believe based on prior
24 testimony, your oversight of the department
25 is approximately a 15-year period; is that

Page 67

1 correct?
2     A.    15 years?  I don't believe it's
3 been that long.
4     Q.    So it was 13 years as director?
5     A.    Uh-huh.
6     Q.    Is that right?
7     A.    Yes.
8     Q.    And then one to two years as
9 executive director?
10     A.    Yes.
11     Q.    So 14 to 15 years is
12 approximately the tenure of your oversight of
13 the department; would you agree with that?
14     A.    Approximately, yes.
15     Q.    So during that 14- or 15-year
16 period, was there ever a point in time during
17 which either the Melville verifications
18 department team or the Reno verifications
19 department team did not have responsibility
20 for ensuring compliance with all state and
21 federal licensure requirements with respect
22 to class II controlled substances?
23     A.    No.
24     Q.    I apologize if I asked this
25 earlier, but did your job responsibilities

Page 68

1 change at the time you were promoted from
2 director of customer service to executive
3 director?
4     A.    Not -- not -- no, not much.
5     Q.    When you say not much, was
6 there any change?
7     A.    Nothing I can think of here,
8 yeah.
9     Q.    And then you went from
10 executive director to vice president --
11     A.    Yesterday.
12     Q.    -- yesterday, so...
13         Will your job responsibilities
14 change or have they changed already?
15     A.    They haven't changed yet.  I'm
16 sure they probably will evolve.  It's usually
17 more of an evolvement than a direct -- when
18 you get the title, you don't -- there's not
19 always change.  Usually it's more of a
20 grooming situation, where you're -- by the
21 time you get promoted, it's -- you're -- 
22 normally you're already kind of doing what
23 they would like you to do.
24     Q.    During the period that you were
25 director of customer service and your -- or

Page 69

1 executive director of customer service, was
2 Mr. Abreu always within the department?
3     A.    Yes.
4     Q.    And did he have the same
5 general role during that time period?
6     A.    Yes.
7     Q.    So what were Mr. Abreu's
8 responsibilities with respect to the
9 verifications department during that 14-,
10 15-year time period?
11         MR. JONES:  Object to the form.
12     A.    Yeah, because it -- there's
13 been -- there's been changes over that time
14 period.
15 BY MR. ACKERMAN:
16     Q.    Okay.  So at the beginning,
17 what were Mr. Abreu's job responsibilities?
18     A.    Can you -- I don't know what
19 that means.
20     Q.    Sure.
21     A.    The beginning.
22     Q.    At the time that -- whenever it
23 was that you assumed responsibility for the
24 verifications department which was at some
25 point after you became director of customer

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  service, correct?
2      A.    Correct.
3      Q.    Was Mr. -- did Mr. Abreu have
4  responsibility for the verifications
5  department at that same time?
6      A.    No.
7      Q.    For approximately how long were
8  you overseeing the verifications department
9  before Mr. Abreu had responsibility for that
10 department?
11     A.    Several years.
12     Q.    So during that -- we'll call it
13 that initial several-year period, what were
14 your job responsibilities with respect to the
15 verifications department?
16     A.    Just general oversight of
17 support, more of a supportive role, I guess,
18 and trying to make sure that they had what
19 they need to do their jobs effectively.
20     Q.    So does general oversight mean
21 ensuring that individuals complied with
22 company policies?
23         MR. JONES:  Object to the form.
24 BY MR. ACKERMAN:
25     Q.    Let me ask the question

Page 71

1  differently.
2      A.    Yeah.
3      Q.    During that -- you said you had
4  general oversight.  What does general
5  oversight mean?
6         MR. JONES:  Objection, asked
7      and answered.
8      A.    Making sure that the team is --
9  has what they need to do -- to do their job;
10 supporting the manager of the department,
11 collaborating with the regulatory department.
12 BY MR. ACKERMAN:
13     Q.    Who was the manager during that
14 initial several-year period?
15     A.    Lisa Matalon.
16     Q.    And is Lisa Matalon still with
17 Henry Schein?
18     A.    Yes.
19     Q.    And what position is she now?
20     A.    Lisa is the director of
21 customer service.
22     Q.    Before the break, you made a
23 distinction between the regulatory department
24 and the verification department.
25     A.    (Nods head.)

Page 72

1      Q.    I'm going to ask a few more
2  questions about that.
3      A.    Okay.
4      Q.    What is the difference at
5  Henry Schein between the regulatory -- the
6  regulatory department and the verifications
7  department?
8         MR. JONES:  Object to the form.
9      A.    The regulatory department is
10 comprised of primarily lawyers, and they're
11 responsible for establishing the business
12 rules and regulations.
13         The license verifications team
14 is responsible really for the enforcement of
15 the business rules.  We collaborate -- we
16 collaborate quite closely with them.
17 BY MR. ACKERMAN:
18     Q.    During that initial
19 several-year period before Mr. Abreu became
20 manager of customer service, did your job
21 responsibilities include ensuring that the
22 representatives that you oversaw were
23 enforcing the rules correctly?
24         MR. JONES:  Objection.
25     A.    No.

Page 73

1  BY MR. ACKERMAN:
2      Q.    Was there anyone else at
3  Henry Schein who was responsible for
4  determining whether -- during that
5  several-year period, was there anyone else at
6  Henry Schein who was responsible for
7  determining whether the representatives were
8  enforcing the rules correctly?
9         MR. JONES:  Same objection.
10     A.    Yes.
11 BY MR. ACKERMAN:
12     Q.    And who was that?
13     A.    The regulatory department; the
14 manager, our manager.
15     Q.    The manager meaning
16 Lisa Matalon?
17     A.    Uh-huh.
18     Q.    Is that a yes?
19     A.    Yes.  Yes.  Sure.
20     Q.    And then once Mr. Abreu
21 joined -- at some point in time, Mr. Abreu
22 joined the verifications department; is that
23 correct?
24     A.    He started as the supervisor of
25 verifications, I believe.

Page 74

1    Q.   Okay.  Maybe we should make it
2  even more elementary probably for me.
3    A.   Okay.
4    Q.   But what is the leadership --
5  or in -- when you started with the
6  verifications department, what was the
7  leadership structure of the verifications
8  department?
9         MR. JONES:  Object to the form.
10    A.   At the time I took
11  responsibility --
12  BY MR. ACKERMAN:
13    Q.   Yes.
14    A.   -- for it, it was included in
15  my other scope of managing the customer
16  service teams.  Lisa Matalon was hired as the
17  manager of customer service for Melville,
18  New York, and she also had responsibility, I
19  believe, for the verifications team in
20  Melville, New York.
21    Q.   When you assumed responsibility
22  for the verifications department, was there
23  any verifications department in Reno?
24    A.   Yes.
25    Q.   And who had responsibility for

Page 75

1  the verifications department in Reno before
2  you assumed responsibility for that
3  department?
4    A.   It was from New York, so I
5  believe it was Donna Remondino, Lisa Matalon.
6    Q.   So at some point in time -- and
7  we're not quite sure of the year -- you
8  assumed responsibility for the verifications
9  department, correct?
10    A.   Yes.
11    Q.   Did you have direct oversight
12  responsibility over the sales
13  representatives?
14    A.   No.
15    Q.   Who had direct oversight
16  responsibility over the sales representatives
17  at that point in time?
18         MR. JONES:  Object to the form.
19    A.   I need more specifics.  I need
20  you to tell me what -- I don't know.  We have
21  multiple divisions of sales.
22  BY MR. ACKERMAN:
23    Q.   Okay.  So I'm talking about
24  just the verifications department.  And so
25  there was a point when you became -- or when

Page 76

1  your role as director of customer service
2  included oversight of the verifications
3  department?
4    A.   Yes.
5    Q.   And the -- it looks here there
6  were the verifications department -- if you
7  look at Exhibit 1, there are in Reno
8  representatives and a supervisor; is that
9  correct?
10    A.   Yes.
11    Q.   At the time that you assumed
12  responsibility for the verification
13  department, were there representatives and a
14  supervisor in Reno?
15    A.   Yes.
16    Q.   And who was the supervisor in
17  Reno?
18    A.   Maggie Koromi.
19    Q.   And is Ms. Koromi still with
20  Henry Schein?
21    A.   Yes.
22    Q.   And what is her position?
23    A.   Supervisor of verifications in
24  Reno.
25    Q.   Has she held that position

Page 77

1  throughout the entire time?
2    A.   She started as a customer
3  service rep.
4    Q.   So Ms. Koromi had a direct
5  supervisor, correct?
6    A.   Yes.
7    Q.   And when you first assumed
8  responsibility for the verifications
9  department, who was Ms. Koromi's direct
10  supervisor?
11    A.   I believe it was Donna
12  Remondino or Shaun.
13    Q.   And what was Donna Remondino's
14  position at --
15    A.   She was -- I apologize.
16    Q.   Yeah.
17         -- at that time?
18    A.   I apologize.
19         I believe supervisor of
20  verifications.
21    Q.   And what was Mr. Abreu's
22  position at that time?
23    A.   At that time I believe Shaun
24  was in gatekeeping.  I believe he was a team
25  leader in our gatekeeping group.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  Q. And then I assume that
2  Ms. Remondino or Mr. Abreu had a direct
3  supervisor with respect to their
4  responsibility with the verifications
5  department; is that right?
6  A. Uh-huh. Yeah. Can you clarify
7  what year?
8  Q. Yeah.
9  A. Okay.
10  Q. I'm still talking about the
11  initial period when you took over the -- or
12  when you assumed responsibility --
13  A. Okay.
14  Q. -- for the verifications
15  department.
16  MR. JONES: Let me just jump
17  in. I know we produced it. I don't
18  know if you have it, but the org
19  charts, that might facilitate some of
20  this.
21  MR. ACKERMAN: Okay.
22  MR. JONES: But I don't know if
23  you've got them.
24  MR. ACKERMAN: Yeah, I don't
25  have them with me.

Page 79

1  MR. JONES: Never mind. I was
2  going to say if you have them in
3  there, wheel them out and probably --
4  MR. ACKERMAN: No, I
5  understand.
6  BY MR. ACKERMAN:
7  Q. That initial period, to whom
8  did Ms. Remondino report?
9  A. I believe Lisa.
10  Q. Lisa Matalon?
11  A. I believe so.
12  Q. And then Lisa Matalon reported
13  to you?
14  A. Yes.
15  Q. Understood.
16  And that reporting structure,
17  I'll call it, where you have -- it looks like
18  a supervisor to a manager; is that right?
19  A. Uh-huh. Yes.
20  Q. And then a manager to a
21  director; is that right?
22  A. Yes. Yes.
23  Q. Is that still in place today?
24  A. Shaun is director today, and
25  Maggie is the supervisor of the Reno team,

Page 80

1  and we have a supervisor in Melville now,
2  Christine Stratton, and they both report to
3  Shaun directly.
4  Q. Okay. Thank you.
5  So going back to kind of my
6  original line of questioning on this, which
7  is it's your testimony that the regulatory
8  department is responsible for writing the
9  rules and the verifications department is
10  responsible for enforcing the rules; is that
11  right?
12  MR. JONES: Object to the form.
13  A. I believe so.
14  BY MR. ACKERMAN:
15  Q. And that's with respect to
16  suspicious order monitoring, correct?
17  A. Regulatory is responsible for
18  the -- for the creation of the policies.
19  Q. For suspicious order
20  monitoring?
21  A. Right.
22  Q. Then the verifications
23  department is responsible for enforcing those
24  policies with respect to suspicious order
25  monitoring; is that right?

Page 81

1  A. Yes.
2  Q. So the question I have is: Who
3  is responsible for ensuring that the policies
4  with respect to suspicious order monitoring
5  that are written by the regulatory department
6  are enforced correctly?
7  MR. JONES: Object to the form.
8  A. Regulatory. We partner with
9  regulatory, and it's -- I guess I suppose
10  it's all of our responsibilities.
11  BY MR. ACKERMAN:
12  Q. Okay. And how does -- has
13  regulatory -- let's talk about today.
14  Is regulatory responsible for
15  ensuring that policies concerning suspicious
16  order monitoring of controlled substances are
17  enforced correctly?
18  MR. JONES: Object to the form.
19  A. I don't know. Yeah, I don't
20  know.
21  BY MR. ACKERMAN:
22  Q. Okay. Today who is responsible
23  for ensuring that the sales representatives
24  in the verifications department are correctly
25  enforcing policies concerning suspicious

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 order monitoring of controlled substances?
2          MR. JONES:  Object to the form.
3      A.    There's no salespeople in
4 verifications.
5 BY MR. ACKERMAN:
6      Q.    Okay.  So I'll state it
7 differently.  Thank you.
8      A.    Okay.
9      Q.    Today at Henry Schein, who or
10 what department is responsible for ensuring
11 that the representatives in the verifications
12 department are correctly enforcing policies
13 concerning suspicious order monitoring of
14 controlled substances?
15          MR. JONES:  Object to the form.
16     A.    Our regulatory department and
17 our -- and our verifications management team.
18 BY MR. ACKERMAN:
19     Q.    And how does the regulatory
20 department go about ensuring that the
21 policy -- that the verifications department
22 is correctly enforcing policies related to
23 suspicious order monitoring of controlled
24 substances?
25          MR. JONES:  Object to the form.

Page 83

1          Answer, if you know.
2      A.    I don't know.  I don't know.
3 BY MR. ACKERMAN:
4      Q.    How does the verifications
5 department management team go about ensuring
6 that the verifications department
7 representatives are correctly enforcing
8 policies related to suspicious order
9 monitoring of controlled substances?
10         MR. JONES:  Object to the form.
11     A.    Yeah, I really don't know.
12 BY MR. ACKERMAN:
13     Q.    Okay.  If you wanted to find
14 out how the regulatory department goes about
15 ensuring that those policies are correctly
16 enforced, how would you do it?
17     A.    I would ask Shaun or our
18 regulatory department.
19     Q.    Who in the regulatory
20 department would you ask?
21     A.    Normally Sergio Tejeda or
22 Jeff Peacock.
23     Q.    And if you wanted to find out
24 how the verification management team goes
25 about ensuring that those policies are

Page 84

1 correctly enforced, how would you find out?
2      A.    I would ask Shaun, Maggie or
3 Christine.
4      Q.    I'm sorry, the last name was
5 Christine?
6      A.    Christine Stratton.  She's the
7 supervisor in Melville.
8      Q.    During your entire tenure of
9 overseeing the verifications department, have
10 your job responsibilities ever included
11 ensuring that the verifications department
12 representatives are correctly following
13 policies related to suspicious order
14 monitoring of controlled substances?
15         MR. JONES:  Object to the form.
16     A.    I don't -- I don't think so.
17 BY MR. ACKERMAN:
18     Q.    During your entire tenure at
19 Henry Schein, have you ever been involved in
20 the development of suspicious order
21 monitoring policies at the company?
22     A.    No.
23         MR. JONES:  Object to the form.
24     A.    No.
25         MR. JONES:  Just pause so that

Page 85

1 I don't interrupt you --
2          THE WITNESS:  I'm sorry.
3          MR. JONES:  -- or him.  Thank
4 you.
5 BY MR. ACKERMAN:
6      Q.    During your tenure, your entire
7 tenure at Henry Schein, have you been
8 involved in any disciplinary actions against
9 any verifications department representatives
10 for failing to properly follow Henry Schein's
11 suspicious order monitoring policies?
12         MR. JONES:  Object to the form.
13         MR. ACKERMAN:  What's the basis
14 for that objection?
15         MR. JONES:  It's overly broad,
16 vague and ambiguous as to disciplinary
17 actions, to failing to properly --
18 whatever properly means -- follow
19 Henry Schein's suspicious order
20 monitoring policies.  Which policies
21 are these specific SOPs?  Are they
22 pertaining to regulatory policies?
23 Are they pertaining to verifications
24 policies, and what time period?
25         MR. ACKERMAN:  Well, the time

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 period is in the -- it's not even
2 worth the argument.
3 BY MR. ACKERMAN:
4    Q.    During your tenure overseeing
5 the verifications department, were you
6 involved in any disciplinary actions against
7 verifications department representatives?
8    A.    Nothing specifically that I
9 recall.
10    Q.    Did disciplinary actions for
11 verifications department representatives fall
12 within your job responsibilities?
13    A.    Not directly, no.
14    Q.    There were others who would
15 have been responsible for that?
16    A.    Yes.
17    Q.    And who would those people have
18 been?
19    A.    The department manager,
20 department supervisors.
21       MR. ACKERMAN:  Let's mark this
22 as Exhibit 2.
23       (HenrySchein-Brandt Deposition
24    Exhibit 2 marked.)
25         ///

Page 87

1 BY MR. ACKERMAN:
2    Q.    Mr. Brandt, the court reporter
3 has handed you what's been marked as
4 Exhibit 2, which is a multipage document
5 numbered HSI-MDL_00404226 through 00404228.
6       I just noticed my copy of the
7 pages are out of order.  Are they out of
8 order on your copy as well?
9    A.    I'm not sure.
10    Q.    No, it looks like yours --
11       MR. JONES:  Mine's in order.
12       MR. ACKERMAN:  Yeah, so let me
13 rearrange mine so that we're talking
14 about the same document.
15       THE WITNESS:  Okay.
16 BY MR. ACKERMAN:
17    Q.    Take a moment to review this
18 document, let me know when you've had a
19 chance to review it.
20    A.    Okay.
21       (Document review.)
22    A.    Okay.
23 BY MR. ACKERMAN:
24    Q.    You've reviewed it?
25    A.    Yes.

Page 88

1    Q.    Have you seen this document
2 before?
3    A.    I don't recall from 1998.  It
4 was before my...
5    Q.    Yeah.  I see the date --
6    A.    Yeah.  Yeah.
7    Q.    -- and that's the reason I'm
8 asking.
9    A.    Yeah.
10    Q.    The document is titled
11 Henry Schein Inc. Verification Procedures for
12 Controlled Drug Orders.
13       Do you see that?
14    A.    Yes.
15    Q.    Are you aware of written
16 procedures for controlled drug orders that
17 were in existence during your oversight, the
18 time period that you oversaw the
19 verifications department?
20    A.    Yes.
21    Q.    Were they similar to these
22 procedures?
23       MR. JONES:  Object to the form.
24    A.    I don't know.  I don't know.
25 It's an evolution, so we update.  The

Page 89

1 regulatory team from time to time updates
2 these, and we partner with them to help
3 update.  Hence, they can try to keep them
4 consistent.
5 BY MR. ACKERMAN:
6    Q.    Are you involved with the
7 updating of the verification procedures --
8 let me reask that question.
9    A.    Okay.
10    Q.    Were you involved during your
11 tenure overseeing the verifications
12 department with updates to the verification
13 procedures for controlled drug orders?
14    A.    No, I don't believe so.
15    Q.    Skip to the third page, if you
16 would, of this document, the Bates
17 number 4228.
18       That number says:  HSI reports
19 orders to the local DEA office prior to
20 shipment if HSI determines after review that
21 the order is suspicious.
22       Do you see that sentence?
23    A.    Uh-huh, I do.
24    Q.    Was that Henry Schein's policy
25 during your tenure overseeing the

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  verifications department?
2      A.    Like I said, I -- the policies
3  have -- they're updated regularly, and it
4  happen -- it comes from the regulatory
5  department.  So I would say generally yes,
6  but it has -- the policies and procedures
7  have evolved significantly since this time.
8      Q.    Okay.  So the first part of the
9  sentence says:  HSI reports orders to the
10  local DEA office.
11          Have you at any point during
12  your tenure at Henry Schein had any role in
13  reporting orders to the local DEA office of
14  controlled substances?
15      A.    Myself, no.
16      Q.    Okay.  Who at Henry Schein
17  had -- was responsible for reporting orders
18  of controlled substances to the local DEA
19  office?
20          MR. JONES:  Object to the form.
21      Is there a time period that
22      you're wanting to focus on?
23          MR. ACKERMAN:  Sure.
24  BY MR. ACKERMAN:
25      Q.    During your tenure at

Page 91

1  Henry Schein.
2      A.    So the regulatory team, the
3  department manager.  So I think it -- those
4  would be the two that primarily were probably
5  responsible for that.
6      Q.    All right.  And then the second
7  half of the sentence says, "if HSI determines
8  after review that the order is suspicious."
9          Do you see that phrase?
10      A.    Uh-huh.
11      Q.    During your tenure at
12  Henry Schein overseeing the verifications
13  department, did you have any role in
14  conducting the review as to whether an order
15  was suspicious or not?
16      A.    No.
17      Q.    And during that same time
18  period, who generally was responsible for
19  conducting that review?
20      A.    The representatives, so it
21  would be the verifications representatives.
22      Q.    Thanks.
23          So here's what I'm trying to
24  understand.
25      A.    Okay.

Page 92

1      Q.    What other responsibilities did
2  the verifications representatives have?
3          MR. JONES:  What time period?
4  BY MR. ACKERMAN:
5      Q.    During your tenure overseeing
6  the verifications department --
7          MR. JONES:  Object to the form.
8  BY MR. ACKERMAN:
9      Q.    -- did the verifications
10  representatives do anything other than
11  reviewing orders to determine whether they
12  were suspicious?
13          MR. JONES:  Object to the form.
14      A.    Answer phone calls to do the
15  same.
16  BY MR. ACKERMAN:
17      Q.    Answer phone calls from --
18      A.    From customers, yeah.
19      Q.    Regarding special suspicious
20  orders?
21      A.    Yeah, reaching out to customers
22  to get a copy of the license, answering a
23  question if there was a question, advising
24  them that an order was pending for review.
25      Q.    So if your job responsibility

Page 93

1  as director of customer service included
2  oversight of the verifications department,
3  what aspects of the -- what aspects of the
4  verifications department were you overseeing
5  if you weren't involved in the review of
6  orders as to whether they were suspicious or
7  if you weren't involved in reporting orders
8  to the local DEA office?
9          MR. JONES:  Object to the form,
10      asked and answered.
11      A.    So it wasn't my direct
12  responsibility.  It was the responsibility of
13  the agents or supervisor and manager.
14  BY MR. ACKERMAN:
15      Q.    So what was your direct
16  responsibility?
17      A.    I had a responsibility for
18  customer service.  I had responsibility for
19  the gatekeeping team and for the license
20  verification team overall, to provide support
21  to ensure that they had what they needed to
22  do their job, to collaborate with the
23  regulatory team when it comes to license
24  verifications.
25      Q.    When you say for the

Page 94

1 verifications -- let's just focus on the
2 verifications team.
3     A.    Okay.
4     Q.    To have what they needed to do
5 to perform their job, what does that mean?
6     A.    To make sure that the manager
7 and the supervisors were managing the
8 department the right way, that they had the
9 staffing that they needed to help establish
10 goals, things like that.
11     Q.    Were you involved in
12 establishing goals for the department?
13     A.    Generally not.  Generally it
14 was the manager and the supervisors doing
15 that.
16     Q.    Were you aware during your
17 tenure of the goals for the department?
18     A.    Generally, yes.
19     Q.    And was part of your job
20 responsibility ensuring that those goals were
21 met?
22     A.    I would say yes.
23     Q.    Did the goals for the
24 verifications department include compliance
25 with Henry Schein's suspicious order

Page 95

1 procedures?
2     A.    The goals?  I don't think there
3 was ever a goal that specifically said that,
4 no.
5     Q.    What were some of the goals
6 that the verifications department sought to
7 meet during your tenure?
8     A.    Abandonment rate, making sure
9 we're answering the phones quickly, making
10 sure we're reviewing orders correctly and
11 accurately and making sure that the orders
12 were released timely so they could get
13 shipped on time to the customers once they
14 were cleared.  Those are some of the key
15 goals.
16     Q.    All right.  Let's talk through
17 some of those key goals.
18         The abandonment rate, why was
19 that a key goal?
20     A.    Why was it a key goal?
21     Q.    Yeah.
22     A.    It's a key goal in all of the
23 three departments that we -- that I oversee,
24 so it's important to us that when customers
25 call, that we try to pick up their phone

Page 96

1 calls quickly as we can.  We have to provide
2 good service.
3     Q.    Because if you don't meet that
4 goal, what could happen?
5     A.    If we don't meet that goal, the
6 abandonment rate would be high.  We could
7 lose customers.  We could cause customers to
8 be dissatisfied.
9     Q.    Okay.  So the next one you said
10 is:  Making sure we're reviewing orders
11 correctly and accurately.
12     A.    Uh-huh.
13     Q.    Is that right?
14         MR. JONES:  You have to say
15     yes, no.
16     A.    No, I'd say no to -- can you --
17 BY MR. ACKERMAN:
18     Q.    Yeah.  So I'm reading this off
19 the screen, so I want to make sure I
20 understand what this goal is.
21     A.    Okay.  Okay.  Okay.
22     Q.    So the next one I have on this
23 screen is:  Making sure we're reviewing
24 orders correctly and accurately and making
25 sure that the orders were released timely so

Page 97

1 they could get shipped on time.
2     A.    Uh-huh.
3     Q.    I think those might be two
4 different goals or maybe it's one goal.  I
5 don't know.  But that's my question.
6         First of all, is that one goal
7 or is that separate goals?
8     A.    That's two separate goals.
9     Q.    Okay.  So what is the first
10 goal there?
11     A.    The first goal is an
12 accuracy -- overall accuracy rating for a
13 rep.
14     Q.    All right.  And what does the
15 accuracy rating measure?
16     A.    I don't know.  I know that's a
17 goal, but it's really administered by the
18 department manager and the supervisor.
19     Q.    Okay.  And then the second goal
20 is the timely release, is that right, of
21 orders, right?
22     A.    Yes.  Yes.
23     Q.    And what cause -- what would
24 cause an order to not be released timely?
25         MR. JONES:  Object to the form.

Page 98

1  A.  There's a lot of different
2  variables.
3  BY MR. ACKERMAN:
4  Q.  What are some of them?
5  A.  To not be released timely?
6  Q.  Yes.
7  A.  If it's being reviewed, if
8  it's -- there's different reviews, so it
9  could be being reviewed in credit.  It could
10  be reviewed in verifications.  It could be a
11  new account that we're doing additional due
12  diligence.
13  Q.  But in terms of a goal for the
14  verifications department, right?
15  A.  Uh-huh.
16  Q.  How would the verifications
17  department measure whether it met its goal
18  for orders being released timely?
19  A.  We have a metric.  There's a
20  metric that Shaun and the team use to
21  measure -- to measure getting the amount of
22  orders that we're able to get to the
23  distribution center in time to ship.
24  Q.  And do you know what that
25  metric is?

Page 99

1  A.  I believe 98% currently.
2  Q.  And that means 98% of what?
3  A.  98% of the orders that come in
4  that we're able to -- that we're able to
5  validate and approve, that we get those to
6  the shipping distribution center in time for
7  them to pick, pack and ship so that it will
8  make it to the customer.
9  Q.  Does the verifications
10  department review every order?
11  A.  No.
12  Q.  What is the subset of orders
13  that are reviewed by the verifications
14  department?
15  A.  The orders that pend to us.
16  Q.  All right.  Is the timely
17  release metric measured against all orders
18  that are reviewed by the verifications
19  department?
20  MR. JONES:  Object to the form.
21  A.  It's a metric against the
22  orders that get released.
23  BY MR. ACKERMAN:
24  Q.  Take a look at the third page
25  of Exhibit 2.

Page 100

1  A.  Uh-huh.
2  Q.  And there are four numbered
3  items.  I'm going to focus on the fourth one,
4  which says -- and so the lead-in information
5  or lead-in sentence says:  In these
6  situations one of the following will occur.
7  Do you see that?
8  A.  Uh-huh, yeah.
9  Q.  Then number 4 says:  The
10  division head of the medical, dental or
11  veterinary department will review the
12  customer's account and determine if the
13  orders are compatible with the practitioner's
14  type of practice and the customer's
15  purchasing pattern.
16  Do you see that sentence?
17  A.  I do.
18  Q.  Okay.  Are you familiar with
19  that process at Henry Schein?
20  A.  No.
21  Q.  Was that process -- are you
22  aware during your tenure overseeing the
23  verifications department of any instance in
24  which a division head of the medical, dental
25  or veterinarian department reviewed the

Page 101

1  customer's account to determine if the orders
2  are compatible with the practitioner's type
3  of practice and the customer's purchasing
4  pattern?
5  A.  No.
6  MR. ACKERMAN:  All right.  You
7  can put that one aside.
8  Let's mark this as Exhibit 3.
9  (HenrySchein-Brandt Deposition
10  Exhibit 3 marked.)
11  BY MR. ACKERMAN:
12  Q.  Mr. Brandt, the court reporter
13  has handed you what's been marked as
14  Deposition Exhibit 3.  It's a multipage
15  document numbered HSI-MDL_194 through 204.
16  Take a moment to just review
17  this document.  Let me know if you've -- and
18  let me know when you've had a chance to
19  review it.
20  A.  Okay.
21  (Document review.)
22  BY MR. ACKERMAN:
23  Q.  Have you reviewed the document?
24  A.  Yes.
25  Q.  Have you seen this document

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 before?
2    A.    I guess I would say no.  I
3 don't recall.  I may have, but I don't recall
4 anything specifically.  It's from 2012, so
5 just prior to my -- I think prior to my
6 involvement with verifications.
7    Q.    Okay.  You testified earlier
8 that you reviewed SOPs, when you assumed
9 responsibility for the verifications
10 department; is that right?
11    A.    I probably did, yes.
12    Q.    Okay.
13    A.    Yeah.
14    Q.    Do you recall the names or
15 subjects of any of the SOPs that you
16 reviewed?
17    A.    I don't.  I don't recall the
18 exact document names.  Probably would have
19 been something like this.
20    Q.    In 2012, you were still
21 director of the customer service department,
22 correct?
23    A.    Uh-huh.
24    Q.    Did you -- yes?
25    A.    Yeah.

Page 103

1    Q.    And this Exhibit 3 is an
2 example of an SOP; is that right?
3    A.    Yes.
4    Q.    Did you review this SOP in
5 December 2012 or anytime thereafter?
6    A.    I don't know.  I didn't sign
7 it, so yeah, I don't know.
8    Q.    And so that was -- one of the
9 questions I had, so we can just go there.
10    A.    Yeah.
11    Q.    At the top of the first page of
12 Exhibit 3, it says title, document number,
13 prepared by, and then approved by, and there
14 are some signatures, correct?
15    A.    Yes.
16    Q.    Do you recognize those
17 signatures?
18    A.    I -- I believe so, yes.
19    Q.    And whose signatures appear on
20 that approved by line?
21    A.    Jim Mullins and Sergio Tejeda.
22    Q.    So at this time, in 2012, you
23 reported to Jim Mullins, correct?
24    A.    Yes.
25    Q.    And then the line directly

Page 104

1 above it says:  Prepared by Shaun Abreu and
2 Lisa Matalon, right?
3    A.    Yes.
4    Q.    And both of those individuals
5 reported directly to you; is that right?
6    A.    Yes.  Yes.
7    Q.    So this document, would you
8 agree, was prepared by individuals who
9 reported directly to you --
10    A.    Yes.
11    Q.    -- and then was approved by the
12 person to whom you directly reported; is that
13 accurate?
14    A.    He was one of the approves,
15 yes, in regulatory.
16    Q.    Did you have any -- did you
17 have any input into the drafting of this SOP?
18    A.    Not that I recall.
19    Q.    Did you draft the SOP?
20    A.    Not that I recall, no.
21    Q.    Were you involved in any
22 discussion concerning the drafting of this
23 SOP?
24    A.    Nothing specific that I recall,
25 but possibly.

Page 105

1    Q.    Were you involved in any
2 discussions concerning the need for revisions
3 to an SOP?
4    A.    Possibly.  I don't recall from
5 back here, though.
6    Q.    Okay.
7    A.    Yeah.
8    Q.    If you turn to the second page
9 of this document, there's a chart that says
10 Revision History.
11        Do you see that?
12    A.    Yes.
13    Q.    And here it says:  Original,
14 replaces R-03.10, suspicious orders
15 monitoring system review and release
16 procedure.
17        Do you see that?
18    A.    I do.
19    Q.    Do you know what that means?
20    A.    I take that to mean that this
21 document replaced a prior work instruction
22 document.
23    Q.    It says:  Issued December 3rd,
24 2012?
25    A.    Yes.

Page 106

1    Q.    Is that the issue date of the
2  prior SOP?
3    A.    It looks like it's the issue
4  date of this document.
5    Q.    If you look on the first page
6  under the heading Revised.
7       Do you see that?
8    A.    Uh-huh.
9    Q.    It says Original Issue.
10   A.    Uh-huh.
11   Q.    What does that mean, Original?
12 Do you know what that means, Original Issue?
13   A.    I don't.  I don't.
14   Q.    Is this document the first time
15 that Henry Schein's suspicious order
16 monitoring process was put in writing?
17   A.    I don't know.
18   Q.    If you wanted to know what the
19 first time was that Henry Schein's suspicious
20 order monitoring policy was put in writing,
21 how would you find out?
22   A.    I would ask regulatory.
23   Q.    Who in regulatory?
24   A.    Probably Sergio Tejeda or
25 Jeff Peacock.

Page 107

1    Q.    Look at page -- I guess it's
2  page 3 of this exhibit.
3    A.    Okay.
4    Q.    Under the heading Controlled
5  Substances Monitoring Procedure.
6       Do you see that?
7    A.    Yes.
8    Q.    It says:  Based on the federal
9  DEA requirements of the Controlled Substances
10 Act, all distributors of controlled
11 substances are required to "Know Your
12 Customer" and establish a system process to
13 monitor orders of unusual size and frequency.
14      Do you see that, that sentence?
15   A.    I do, uh-huh.
16   Q.    And I think we talked before:
17 Who at Henry Schein was responsible for
18 enforcing the system process or
19 system/process to monitor orders of unusual
20 size and frequency?
21   A.    Who's responsible?
22   Q.    Yes.
23   A.    The team that's responsible?
24   Q.    Yes.
25   A.    Would be the verifications

Page 108

1  team.
2    Q.    Okay.  The next paragraph says:
3  In 2008 Henry Schein Inc. engaged a DEA
4  consulting firm to help design and implement
5  an enhanced suspicious order monitoring
6  system to comply with the DEA Know Your
7  Customer requirement.
8       Do you see that sentence?
9    A.    I do.
10   Q.    Okay.  Were you involved with
11 Henry Schein -- or did you have any
12 involvement in Henry Schein engaging a DEA
13 consulting firm to help design and implement
14 an enhanced suspicious order monitoring
15 system?
16   A.    I'm aware of it, yeah.
17   Q.    Were you involved in the
18 process?
19   A.    No.
20   Q.    How were you aware or how did
21 you become aware that Henry Schein engaged a
22 DEA consulting firm in 2008?
23   A.    Conversations with regulatory.
24   Q.    Were you told why Henry Schein
25 engaged a DEA consulting firm in 2008?

Page 109

1    A.    Yes.
2    Q.    And what were you told?
3    A.    My understanding was to help
4  create a threshold, systemic algorithm for
5  the order pend process.
6    Q.    Do you know who the DEA
7  consulting firm is or was?
8    A.    I believe Buzzeo, Ron Buzzeo.
9       MR. JONES:  Dave has never
10 heard of them.
11      MR. ACKERMAN:  Oh, I think we
12 will by the end of today.
13 BY MR. ACKERMAN:
14   Q.    Let's go to page that's Bates
15 numbered HSI-MDL_198.
16   A.    Okay.
17   Q.    There's a heading that says
18 Verifications File Review Process.
19      Do you see that?
20   A.    I do, yeah.
21   Q.    Is this the process that would
22 be -- or should be followed by the
23 verifications team to determine whether to
24 ship a pended order?
25      MR. JONES:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A.    Can you ask your question
2 again?
3 BY MR. ACKERMAN:
4    Q.    Yeah.  Sure.  What -- let's
5 just ask it this way.
6         What process is described under
7 this heading here, Verifications File Review
8 Process?
9         MR. JONES:  Object to the form.
10    The document speaks for itself.
11    A.    It appears to be the Know Your
12 Customer questions, some of the Know Your
13 Customer questions.
14 BY MR. ACKERMAN:
15    Q.    And the Know Your Customer
16 questions are contained in the questionnaire
17 that you described earlier, right?
18    A.    Yes.
19    Q.    And the verifications
20 department was the department responsible for
21 sending out that questionnaire, correct?
22    A.    Yes.
23    Q.    And the verifications
24 department is the department responsible for
25 reviewing the returned questionnaires, right?

Page 111

1    A.    Yes.
2    Q.    So does this section here at
3 the bottom of page 198, continuing on to the
4 page numbered 199 -- does this section
5 describe the process to be followed by the
6 verifications department?
7    A.    I don't know.  The instructions
8 aren't that clear.
9    Q.    So the first sentence says:
10 Once the questionnaire is filled out by the
11 customer, the document will be reviewed to
12 see if the information they provided will
13 justify the release of their current and
14 future orders.
15         Do you see that sentence?
16    A.    Yes.
17    Q.    Who conducts the review of the
18 questionnaire to see if the information the
19 customer provided will justify the release of
20 current and future orders?
21    A.    Our verifications -- we have a
22 position called reviewer, so we have people
23 who do that.
24    Q.    Okay.  Is anyone else
25 responsible for reviewing that questionnaire?

Page 112

1    A.    The manager can get involved.
2 The supervisor may assist.  But generally
3 it's the reviewers that would be reviewing
4 the questionnaires when they come back.
5    Q.    And the reviewers, the manager,
6 the supervisor, they're all members of the
7 verifications department, right?
8    A.    Yes.
9    Q.    The next sentence says:  The
10 below items are looked at during the
11 decision-making process.
12         So I want to walk through each
13 of those items and just ask what it is the
14 person is looking for.
15    A.    Okay.
16    Q.    The first one says:  Is the
17 customer self-medicating?
18         And what does the reviewer look
19 at to determine whether the customer is
20 self-medicating?
21    A.    We specifically ask that
22 question on the questionnaire, if they are
23 self-medicating, if they're using the
24 controlled substances for their own -- for
25 themselves.

Page 113

1    Q.    And the customer is required to
2 respond to that question?
3    A.    Yes.
4    Q.    Other than the customer's
5 response, does the reviewer -- or let's say
6 at this time in 2012, did the reviewer look
7 at anything else to determine whether the
8 customer might be self-medicating?
9    A.    I don't know.
10    Q.    If you wanted to know, how
11 would you find out?
12    A.    Ask regulatory or Shaun.
13    Q.    All right.  The next bullet
14 point says:  Is the customer treating family
15 and friends.
16         Do you see that?
17    A.    I do.
18    Q.    How does the reviewer determine
19 whether the customer is treating family and
20 friends?
21    A.    There's a specific question
22 that asks that, asks the customer that
23 question.
24    Q.    On the questionnaire, right?
25    A.    On the questionnaire.

Page 114

1  Q.   And the customer has to answer
2  that question and return the questionnaire to
3  Henry Schein, correct?
4  A.   Yes.
5  Q.   Does the reviewer look at
6  anything other than the questionnaire to
7  determine whether the customer is treating
8  family and friends as part of the review
9  process?
10  A.   I don't know.
11  Q.   And if you wanted to know, how
12  would you find out?
13  A.   I would ask Shaun or
14  regulatory.
15  Q.   Okay.  The next one says:  Do
16  they accept insurance.
17     Do you see that?
18  A.   Uh-huh.
19  Q.   Is that also a question on the
20  questionnaire?
21  A.   I believe it is.
22  Q.   Okay.  And then there's
23  percentage of -- I'm going to try to shortcut
24  this a little bit.
25  A.   Okay.

Page 115

1  Q.   I think we all can see where
2  it's going, right?
3  A.   Okay.
4  Q.   Percentage of out-of-state
5  patients, scope of practice, these three
6  topics, are they all questions on the
7  questionnaire?
8  A.   I do believe they are.
9  Q.   All right.  And the customer is
10  required to answer those questions on the
11  questionnaire and return it to the company,
12  correct?
13  A.   Yes.
14  Q.   And then does the reviewer look
15  at any information aside from the answer on
16  the questionnaire to determine whether the
17  answers are accurate?
18     MR. JONES:  Object to the form.
19  I assume you're asking him as
20  of the time of this SOP?
21     MR. ACKERMAN:  Yeah, at the
22  time of the SOP.
23  A.   Yeah.  I don't know.  I don't
24  know.
25     ///

Page 116

1  BY MR. ACKERMAN:
2  Q.   Okay.  A couple more bullet
3  points here, right?
4  A.   Okay.
5  Q.   Scope of practice?  Of total
6  patients the practice sees, what percentage
7  receives controlled substances?  How many
8  practitioners are in the office?
9     Those next three, are those all
10  questions on the questionnaire?
11  A.   I believe they are.
12  Q.   Were they questions on the
13  questionnaire as of 2012?
14  A.   I don't know.
15  Q.   What -- what information would
16  the reviewer look at during the
17  decision-making process to review the --
18  whether the information provided justifies
19  the release of current and future orders for
20  those three bullet points?
21  A.   The questionnaire?
22  Q.   Yeah, the questionnaire, right.
23     Do you know whether the
24  reviewer would look at anything other than
25  the questionnaire?

Page 117

1  A.   I don't.
2  Q.   Sorry, I lost my place here.  I
3  had to scroll up.
4  A.   Okay.
5  Q.   The size of the practice to
6  justify quantities.
7     Do you see that bullet point?
8  A.   Yes.
9  Q.   What information would -- or
10  does -- did -- let me ask the question again.
11  Start over.
12  A.   Okay.
13  Q.   Size of the practice to justify
14  quantities.  In 2012 pursuant to this SOP,
15  what information did the reviewer review to
16  determine whether the size of the customer's
17  practice justified the quantities of
18  controlled substances ordered?
19  A.   I don't know.
20  Q.   If you wanted to know, how
21  would you find out?
22  A.   Shaun.  I would ask Shaun or
23  regulatory.
24  Q.   All right.  Let me skip one and
25  go to:  Google search reviews to see patient

Page 118

1 customer feedback.
2        Do you know what that means?
3    A.   I'm generally aware of what
4 that is.
5    Q.   So what is your general
6 awareness?
7    A.   My understanding is doing a
8 Google search to make sure that it's a
9 physical -- that there's a physical building
10 at the address that we're conducting our due
11 diligence on; it's not an empty lot.
12    Q.   Got it.  Let's skip to the next
13 page.
14    A.   Okay.
15    Q.   There's a heading that says
16 Justification Letter, right?
17    A.   Yes.
18    Q.   You see that first sentence
19 says:  If after completing our due diligence,
20 the reviewer's assessment of the account is
21 inconclusive based on the information
22 provided, Verifications will request a
23 justification letter from the customer.
24        Do you see that sentence?
25    A.   I do, yeah.

Page 119

1    Q.   The word "Verifications" is
2 capitalized.  Does that refer to the
3 verifications department?
4    A.   Yes.
5    Q.   And what is the justification
6 letter?
7    A.   I don't know specifically.  I
8 know that it's a letter to get additional
9 information from a customer.
10    Q.   Okay.  And if you skip down a
11 little bit, it's -- there's a sentence that
12 begins:  If the justification letter does not
13 satisfy our concerns.
14        Do you see that?
15    A.   Yes.
16    Q.   It says:  Then the customer's
17 file will be escalated to the verifications
18 management team for additional review.
19        Do you see that?
20    A.   I do.  Yeah.
21    Q.   Who is the verifications
22 management team?
23    A.   The supervisor and the manager.
24    Q.   Okay.  So you as the director
25 didn't play any role in reviewing or what

Page 120

1 I'll call second-level reviewing of the -- of
2 the review process, the verifications review
3 process?
4    A.   No.
5        MR. ACKERMAN:  I tell you what.
6 Let's take a -- let's go off the
7 record for a moment.
8        THE VIDEOGRAPHER:  The time is
9 now 11:45.  Going off the record.
10        (Recess taken, 11:45?a.m. to
11 12:37?p.m.)
12        (HenrySchein-Brandt Deposition
13 Exhibit 4 marked.)
14        THE VIDEOGRAPHER:  The time is
15 now 12:37.  Back on the record.
16 BY MR. ACKERMAN:
17    Q.   All right.  Mr. Brandt, we're
18 back on the record.
19    A.   Okay.
20    Q.   The court reporter has handed
21 you what's been marked as Exhibit 4.  It's a
22 multipage document beginning at Bates number
23 HSI-MDL_184 through 193.
24        Take a moment to review this
25 document.  Let me know when you've had a

Page 121

1 chance to review it.
2    A.   Okay.
3        (Document review.)
4 BY MR. ACKERMAN:
5    Q.   All right.  You've reviewed it?
6    A.   Yes.
7    Q.   Do you recognize Exhibit 4?
8    A.   I've seen it.  It's a
9 procedure, revised in 2012.
10    Q.   Okay.  And -- I'm sorry,
11 revised in --
12    A.   It looks like 2012 is the date
13 on it, right, or revised on 2016, March 31st.
14    Q.   So let me ask this:  Do you
15 have Exhibit 4 in front of you?
16    A.   Yes.
17    Q.   And do you have Exhibit 3 in
18 front of you?
19    A.   I do.
20    Q.   Is Exhibit 4 the procedure that
21 revised Exhibit 3?
22    A.   According to this, it says that
23 it is, yes.
24    Q.   And if you look on Exhibit 4 at
25 the third page under Revision History?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  A. Yes.
2  Q. Does that history indicate that
3 there were any revisions in this policy that
4 occurred between Exhibit 3 and Exhibit 4?
5  A. It doesn't look like that, no.
6  Q. Thank you.
7  Discussing -- or looking at
8 Exhibit 4 now.
9  A. Okay.
10  Q. On the first page, it says
11 prepared by Shaun Abreu.
12  We discussed who Mr. Abreu is.
13  A. Uh-huh.
14  Q. And Tina Steffanie-Oak. Do you
15 see that name?
16  A. I do.
17  Q. Who was or is Tina
18 Steffanie-Oak?
19  A. Tina Steffanie-Oak was in the
20 regulatory department.
21  Q. Okay. Is she still with
22 Henry Schein?
23  A. No, she's not.
24  Q. What position -- in 2016 what
25 position did Ms. Steffanie-Oak have with the

Page 123

1 regulatory department?
2  A. I don't know. I just know she
3 was in that department.
4  Q. Do you recognize the approval
5 signatures on Exhibit 4?
6  A. No, not really. I can't make
7 them out.
8  Q. Neither of those signatures are
9 yours, are they?
10  A. No.
11  Q. Did you have any involvement in
12 the drafting of Exhibit 4?
13  A. No.
14  Q. Were you in -- involved in any
15 discussions regarding any revisions to this
16 SOP that resulted in Exhibit 4?
17  A. No, not that I recall.
18  Q. Did you have any input into the
19 creation of Exhibit 4?
20  A. I don't think so, no.
21  Q. Or the document of Exhibit 4?
22  A. No.
23  Q. I'm going to ask you a couple
24 of questions about some changes from
25 Exhibit 3 to Exhibit 4.

Page 124

1  A. Okay. Okay.
2  Q. So it might help to have them
3 side by side.
4  A. All right.
5  Q. If you look at -- on Exhibit 3,
6 there's a heading that's number 5. It says
7 Related Documents.
8  Do you see that?
9  A. I do, yeah.
10  Q. And there's an underline under
11 that that says Customer Due Diligence
12 Questionnaires, right?
13  Do you see that reference?
14  A. I do.
15  Q. And that reference is to the
16 questionnaires that you've testified about
17 earlier that go out to customers, correct?
18  A. It looks like that, yeah. Yes.
19  Q. On Exhibit 4, it looks like
20 that the title of the document changed; is
21 that right? It now says Controlled Substance
22 Forms.
23  Do you see that?
24  A. Yes.
25  Q. Do you know why? Is that a

Page 125

1 different document altogether, or is that
2 just a change in the title?
3  A. I don't know exactly. I would
4 say it's a change in title based on the --
5 based on the subheadings below, the questions
6 below it.
7  Q. Right. And the headings below,
8 it looks like in Exhibit 3 it says
9 Practitioner Questionnaire, and in Exhibit 4
10 it says Practitioner Form.
11  Do you see that?
12  A. Yes.
13  Q. Were you involved in any
14 discussions regarding the decision to -- the
15 change in title of the document from a
16 questionnaire to a form?
17  A. Not that I'm directly aware of.
18 There were discussions about his
19 questionnaire, the right -- so I do recall
20 some general discussions about that, and is
21 questionnaire the right word, should it be
22 form. I do remember some discussions.
23  Q. What was the concern about --
24 what concerns were expressed about the use of
25 the term "questionnaire"?

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  A.  My recollection of that is the
2  term "questionnaire" is like a survey, so
3  customers -- it didn't always -- in our
4  opinion, it didn't always reflect that -- you
5  know, the urgency of it or -- there was --
6  you know, or that they wouldn't complete it.
7  Yeah.
8  Q.  At what point in time did the
9  title of the document change?
10  A.  Oh, I don't know.  So
11  apparently between 2012 and 2016 sometime.  I
12  don't know the exact date.
13  Q.  Okay.  There's a new form
14  listed there, if you compare the two
15  documents.  It looks like, first of all,
16  weight loss addendum and testosterone
17  addendum were deleted.  Do you know what the
18  weight loss addendum and testosterone
19  addendum reference in Exhibit 3 are?
20  A.  I think they're just on the
21  other page, on the top of page 2.
22  Q.  You're right.  But what are
23  they?
24  A.  What are they?  The addendums
25  are used to get additional information from a

Page 127

1  customer.  That's my understanding.
2  Q.  Why would Henry Schein want
3  additional information from a customer
4  regarding weight loss?
5  A.  I don't know specifically.
6  Q.  And why would Henry Schein want
7  additional information from a customer
8  regarding testosterone?
9  A.  I don't know.
10  Q.  Okay.  And there's a new form
11  added on Exhibit 4 called Researcher Form.
12  Do you see that?
13  A.  I do.
14  Q.  What is a researcher form?
15  A.  That, I don't know.
16  Q.  Let me ask about some of the
17  other forms.
18  A.  Sure.
19  Q.  The practitioner form that's
20  referenced on the first bullet point there,
21  is that the questionnaire that we were
22  talking about earlier?
23  A.  I don't know for sure, but it
24  does coincide with practitioner questionnaire
25  on Revision 3.  So I would assume it does.

Page 128

1  Q.  Florida form, do you see that?
2  A.  I do.
3  Q.  Why is there a separate Florida
4  form?
5  A.  Separate provision from
6  Florida, from the state of Florida, something
7  specific to that state.
8  Q.  What questions are on the
9  Florida form that aren't on the practitioner
10  form?
11  A.  I don't know.
12  Q.  Surgery center form, do you see
13  that?
14  A.  I do, yeah.
15  Q.  What's the surgery center form?
16  A.  A form, a questionnaire
17  specifically directed at a surgery center
18  setting.
19  Q.  EMS form, what's that?
20  A.  I would assume the same,
21  directed at an EMS practice or -- yeah.
22  Q.  Okay.  If you switch to -- or
23  turn to page 4.
24  MR. JONES:  Are you still on
25  Exhibit 4?

Page 129

1  MR. ACKERMAN:  Yeah, on
2  Exhibit 4.
3  BY MR. ACKERMAN:
4  Q.  It's page 4 of Exhibit 4, and
5  it's going to be page 3 of Exhibit 3.  Lines
6  up nicely that way.
7  And on Exhibit 3, the heading
8  at the top says Controlled Substance
9  Monitoring Procedure.
10  Do you see that?
11  A.  Yes.
12  Q.  And then on Exhibit 4, it says
13  Know Your Customer Due Diligence Procedure.
14  Do you see that?
15  A.  Yes.
16  Q.  Do you know why that change was
17  made?
18  A.  I don't.
19  Q.  And then in the language below,
20  it says in Exhibit 3:  Based on federal DEA
21  requirements of the Controlled Substances
22  Act, all distributors of controlled
23  substances are required to Know Your Customer
24  and establish a system/process to monitor
25  orders of unusual size and frequency.

Page 130

1  Do you see that?
2  A.  I do, yes.
3  Q.  And look at Exhibit 4, which
4  has almost the same language but adds at the
5  end, and deviating substantially from a
6  normal pattern.
7  Do you see that addition in
8  Exhibit 4?
9  A.  I do.
10  Q.  Do you know why that was added
11  in Exhibit 4?
12  A.  I don't.  I don't.
13  Q.  Were you involved in the
14  decision to -- were you involved in any of
15  these revisions that ended up in Exhibit 4?
16  A.  No, I don't --
17  MR. JONES:  Objection, form,
18  asked and answered.
19  A.  No, I don't believe so.
20  BY MR. ACKERMAN:
21  Q.  Under System Overview, again in
22  Exhibit 3, it says:  In 2008
23  Henry Schein Inc. engaged a DEA consulting
24  firm to help design and implement an enhanced
25  suspicious order monitoring system.

Page 131

1  Do you see that?
2  A.  I do.
3  Q.  And then in Exhibit 4, there's
4  no longer any reference to a DEA consulting
5  firm in that sentence?
6  A.  Uh-huh.
7  Q.  Do you know why the reference
8  to DEA consulting firm was deleted?
9  A.  No, I don't.
10  Q.  Okay.
11  A.  I don't.
12  Q.  Turn to page 6 of Exhibit 4.
13  Q.  Okay.
14  Q.  And at the bottom of page 6 are
15  the bullet points that we already went
16  through in painstaking detail, and I promise
17  I'm not going to do it again.
18  A.  Okay.
19  Q.  But my question for you this
20  time is:  Is there any -- between 2012 when
21  Exhibit 3 was issued and 2016 when Exhibit 4
22  was issued, is there any change in the method
23  or the procedures that the reviewers used to
24  evaluate the categories of information that
25  are listed here in Exhibit 4?

Page 132

1  A.  I don't know.  I -- yeah, I
2  would have to defer that to Shaun or
3  somebody.
4  Q.  Okay.
5  A.  Yeah, I don't know.
6  MR. JONES:  Are you just asking
7  him as far as what's in print?
8  MR. ACKERMAN:  No, no.  I'm
9  asking in terms of what the
10  representatives were doing.
11  MR. JONES:  Okay.
12  MR. ACKERMAN:  Yeah.
13  MR. JONES:  Object to form.
14  MR. ACKERMAN:  What's the basis
15  for that objection?
16  MR. JONES:  Lack of foundation,
17  calls for speculation, vague and
18  ambiguous, overly broad.
19  You're asking him what the
20  difference was that people were doing
21  under Exhibit 4 versus Exhibit 3?
22  MR. ACKERMAN:  Correct, people
23  in the department that he oversaw.
24  MR. JONES:  No, I understand
25  that.  It's still overly broad as to

Page 133

1  what they were doing.  It's vague and
2  ambiguous.
3  MR. ACKERMAN:  I think that's
4  misstating the question.
5  MR. JONES:  Well, I asked you
6  if that was your question, David, and
7  you said yes.  I'm not trying to
8  mischaracterize your question.
9  MR. ACKERMAN:  I understand
10  that, but the question was not what
11  they were doing.  The question is what
12  they were doing to review the
13  information that's listed in the
14  procedure.  So --
15  MR. JONES:  Okay.  All right.
16  MR. ACKERMAN:  It's not an
17  argument worth having.
18  MR. JONES:  No, I don't want to
19  argue.  I'm just trying to make sure
20  the record is clear.  I mean, if you
21  want to reask your question, that's
22  fine.
23  MR. ACKERMAN:  Don't need to.
24  Let's mark the next document as
25  Exhibit 5.

Page 134

1      (HenrySchein-Brandt Deposition
2   Exhibit 5 marked.)
3   BY MR. ACKERMAN:
4      Q.   Mr. Brandt, the court reporter
5   has handed you what's been marked as
6   Exhibit 5, which I'll represent is a printout
7   from the website LinkedIn --
8      A.   Yes.
9      Q.   -- of your profile.
10     A.   Yes.
11     Q.   Take a moment to review this
12  document and let me know when you've had a
13  chance to review it.
14     A.   Okay.
15        (Document review.)
16     A.   Okay.
17  BY MR. ACKERMAN:
18     Q.   Do you recognize this document?
19     A.   Yes.
20     Q.   Is this document something that
21  you drafted?
22     A.   Yes.
23     Q.   Let me direct your attention to
24  the top of the second page.
25     A.   Okay.

Page 135

1      Q.   And just -- actually, before
2   you do that, stay on the first page.
3        Here it lists the job titles
4   you've held, correct?
5      A.   Yes.
6      Q.   And then it lists underneath
7   the job titles your responsibilities at each
8   of those job titles, right?
9      A.   Yes.
10     Q.   And so if you look on page 1,
11  it says Director of Customer Service, right,
12  and that's that position that you held for a
13  long time?
14     A.   Uh-huh.
15     Q.   And then the description of the
16  responsibilities carries over to page 2.
17     A.   Uh-huh.
18     Q.   In the second-to-last sentence
19  there says:  Helped develop our suspicious
20  order monitoring system and standard
21  operating procedures.
22        Do you see that?
23     A.   I do.
24     Q.   Is that an accurate description
25  of your job responsibilities as director of

Page 136

1   customer service?
2      A.   Well, I over -- the people that
3   worked for me helped develop that, so I
4   reviewed it, I'm sure, and yeah.  So -- maybe
5   develop isn't a great word, but it was under
6   my -- it was people that were working for me
7   that were part of that.
8      Q.   So what did you do to help
9   develop Henry Schein's suspicious order
10  monitoring system and standard operating
11  procedures?
12     A.   Just overseeing the manager and
13  the supervisors that were involved in
14  partnering with regulatory to create -- you
15  know, create those documents and create those
16  procedures.
17     Q.   Okay.  There have been two
18  procedures, Exhibits 3 and Exhibit 4.
19     A.   Uh-huh.
20     Q.   Were there any other suspicious
21  order monitoring system and standard
22  operating procedures that you helped develop
23  during your tenure as director of customer
24  service?
25     A.   No.  I don't believe so.

Page 137

1   Overseeing them and reviewing them when it's
2   done would be more my -- that's kind of more
3   my role.
4      Q.   So your role is to make sure it
5   was limited to oversight of the individuals
6   and reviewing the completed work product; is
7   that right?
8      A.   Right.  I'm not the subject
9   expert, so I rely on the manager and the
10  supervisor to partner with our regulatory
11  team to come up with everything.  I would
12  read it to make sure I had a little bit of an
13  understanding of it and to see if there was
14  anything that I -- if I had a question about
15  anything.
16     Q.   Okay.
17     A.   I trusted the team.
18        MR. ACKERMAN:  All right.  You
19  can put that one aside.
20        THE WITNESS:  Okay.
21        MR. ACKERMAN:  Let's mark this
22  next one as Exhibit 6.
23        (HenrySchein-Brandt Deposition
24  Exhibit 6 marked.)
25        ///

Page 138

BY MR. ACKERMAN:

1 BY MR. ACKERMAN:
2    Q.    Mr. Brandt, the court reporter
3 has handed you what's been marked as
4 Exhibit 6.
5    A.    Yes.
6    Q.    It's a two-page document
7 numbered HSI-MDL_21781 through 21782.  Take a
8 moment to review this document and let me
9 know when you've had a chance to review it.
10    A.    Sure.  Okay.
11       (Document review.)
12 BY MR. ACKERMAN:
13    Q.    Have you reviewed it?
14    A.    Yes.  Yes.
15    Q.    Okay.  Do you recognize this
16 document?
17    A.    It was to me, so I'm -- it was
18 six years ago, so -- but yeah, I -- vaguely,
19 I guess.
20    Q.    I understand that your name's
21 on it.
22    A.    Yeah.
23    Q.    I'm just saying sitting here
24 today, do you recognize the document?
25    A.    Yeah.  Yeah.

Page 139

1    Q.    All right.
2    A.    Seems like a -- yeah.
3    Q.    And this is a memorandum sent
4 to you and others from Shaun Abreu and
5 Christine Stratton, right?
6    A.    That's correct.
7    Q.    It concerns a suspicious order
8 monitoring seminar; is that right?
9    A.    Uh-huh.
10    Q.    Did you have any discussions
11 with Mr. Abreu or Ms. Stratton regarding the
12 suspicious order monitoring seminar that's
13 described in this memorandum?
14    A.    Did I have discussions?
15    Q.    Uh-huh.
16    A.    I'm sure I did.
17    Q.    Do you recall any of the
18 discussions?
19    A.    No.
20    Q.    And at the time Mr. Abreu and
21 Ms. Stratton reported -- reported to you,
22 correct?
23    A.    No.  I think at the time they
24 reported to -- Shaun reported to Lisa
25 directly, Christine reported to Shaun, and

Page 140

1 then Lisa reported to me.
2    Q.    I understand.  Okay.  Thank
3 you.
4    A.    Uh-huh.
5    Q.    Turn to the second page of this
6 document, if you would.
7    A.    Okay.
8    Q.    And there's a -- in the last
9 heading it says Reporting Suspicious Orders.
10       Do you see that?
11    A.    I do, yes.
12    Q.    It says:  There are currently
13 two methods being practiced in industry today
14 for reporting suspicious orders to the DEA.
15 And it describes the first method, utilizing
16 the term "orders of interest," and then it
17 says:  The second method is to report the
18 order to the DEA as soon as it pends in your
19 SOM system and an investigation is started,
20 and then conduct your due diligence.
21       And then at the end of the
22 paragraph, it says:  The consultants advised
23 that even though DEA has not sanctioned
24 either method, any registrant that has
25 incurred civil penalties or been prosecuted

Page 141

1 by DEA has been required to utilize this
2 method of reporting.  Based on this the
3 guidance from the consultants was to report
4 more orders out of an abundance of caution.
5       Do you see that --
6    A.    Yeah.
7    Q.    -- that phrase?
8       Were you involved in any
9 discussions regarding utilizing one or other
10 of these methods for reporting suspicious
11 orders to the DEA?
12    A.    Maybe with the regulatory,
13 there were probably meetings or discussions
14 about it at the time, I would imagine.
15    Q.    Do you recall any of them?
16    A.    No, not specifically.
17    Q.    All right.  Do you recall any
18 discussion as to whether at the time
19 Henry Schein was using the first method or
20 the second method or another method to report
21 orders to the DEA?
22    A.    No.
23    Q.    At the time of this memorandum,
24 which is, what, October 2012?
25    A.    Uh-huh.

Page 142

1    Q.    Did you have any involvement in
2  determining which orders would be reported to
3  the DEA as suspicious?
4    A.    No.
5        MR. ACKERMAN:  Let's mark this
6  next one as Exhibit 7.
7        (HenrySchein-Brandt Deposition
8  Exhibit 7 marked.)
9  BY MR. ACKERMAN:
10   Q.    Mr. Brandt.
11   A.    Yes.
12   Q.    The court reporter has handed
13 you what's been marked as
14 Deposition Exhibit 7, and it's a two-page
15 document numbered HSI-MDL_486513 to 514.  I
16 just want to note for the record that the
17 document was marked highly confidential.
18   A.    Review it?
19   Q.    Yeah, take a moment to review
20 the document, and let me know when you've had
21 a chance to review it.
22   A.    Sure.
23       (Document review.)
24   A.    Done.  I'm done.
25       ///

Page 143

1  BY MR. ACKERMAN:
2    Q.    Have you had a chance to review
3  the document?
4    A.    Yes.  Yes.
5    Q.    Do you recognize it?
6    A.    I do.
7    Q.    And what is it?
8    A.    It's a memo from Shaun.
9    Q.    Well, it's an e-mail from
10 Shaun, right?
11   A.    An e-mail from Shaun, yeah.
12   Q.    And Shaun is forwarding to you
13 an e-mail that he sent to Jim Mullins on
14 October 23rd, 2017, correct?
15   A.    Yes.
16   Q.    Shaun writes: Hi Bill. Here
17 is one of the e-mails regarding Masters.
18       Do you see that?
19   A.    I do.
20   Q.    Okay.
21   A.    Uh-huh.
22   Q.    Do you have an understanding of
23 what the reference to Masters is?
24   A.    It was a decision.  It was a
25 court case.

Page 144

1    Q.    A court decision, right?
2    A.    A court decision, that's right.
3    Q.    Regarding the reporting of
4  suspicious orders of controlled substances,
5  correct?
6    A.    That's my understanding, yes.
7    Q.    Why did Shaun Abreu forward
8  this e-mail from October 2017 to you in June
9  of 2018?
10   A.    I don't know.  Maybe I may have
11 requested it, asked him to.  I don't know.
12   Q.    Did you have any discussions
13 with Mr. Abreu about the Masters decision
14 around that time, June of 2018?
15   A.    I'm sure we did, yeah.  I'm
16 sure we had discussions.
17   Q.    Why?  Why are you sure that you
18 had discussions?
19   A.    It was a relevant -- it was a
20 relevant change and, yeah, I remember
21 discussions with Shaun and with Jim and
22 regulatory to try to figure out how we were
23 going to comply and do what we needed to do.
24   Q.    Okay.  The e-mail from Shaun to
25 Jim Mullins is dated seven months earlier,

Page 145

1  right?
2    A.    Uh-huh.
3    Q.    Approximately?
4    A.    Yeah.
5    Q.    So my question is:  Why were
6  you discussing the Masters decision with
7  Shaun Abreu in June of 2018, seven months
8  after this e-mail that Shaun Abreu forwards
9  in October of 2017?
10   A.    Why was I?
11   Q.    Yes.
12   A.    I don't -- I don't know.  I may
13 have been putting together something.  I
14 don't recall why I asked him for that.
15   Q.    Okay.  If you look at bullet
16 point number 3 that Shaun Abreu sends that
17 bullet point says -- the second sentence:  We
18 have sought legal guidance from a number of
19 high profile attorneys and have received the
20 same opinion from everyone:  We should start
21 reporting orders when discovered as a result
22 of the Masters decision.
23       Do you see that?
24   A.    I do, yeah.
25   Q.    Is it your understanding that

Page 146

1  prior to October 2017, Henry Schein was not
2  reporting orders when discovered --
3  suspicious orders when discovered to the DEA?
4        MR. JONES:  Object to the form.
5        A.    Yeah, I don't know the exact
6  date that we changed, but we did change.  I
7  just don't know the date that we formally
8  did -- made that change.
9  BY MR. ACKERMAN:
10       Q.    Would Shaun Abreu have been
11 more knowledgeable about the date that
12 Henry Schein made that change?
13       A.    Yes, I'm sure he would be.
14       Q.    So if in October 2017, Shaun
15 Abreu writes we should start reporting orders
16 when discovered as a result, does that
17 indicate to you that at that time,
18 Henry Schein was not reporting suspicious
19 orders when discovered to the DEA?
20       A.    I guess --
21       MR. JONES:  Object to form.
22       A.    I don't know.  I don't know if
23 we were or not at that time.
24 BY MR. ACKERMAN:
25       Q.    Okay.

Page 147

1        A.    Yeah.
2        Q.    Sitting here today do you know
3  when Henry Schein reports suspicious orders
4  to the DEA?
5        A.    When we do?
6        Q.    Yes.
7        A.    Yes.
8        Q.    When?
9        A.    When it pends, when the order
10 pends prior to us doing our due diligence.
11       Q.    And how is it that you were
12 aware of the procedure now?  How did you
13 become aware of that procedure?
14       A.    Because it required additional
15 resource and just working with Shaun and
16 regulatory to make sure that we were in
17 compliance with the Masters ruling.
18       Q.    How did it require additional
19 resource?
20       A.    Just more people for the
21 letters.  We have to generate letters and
22 mail them to the local offices, I believe,
23 now.
24       Q.    So were you involved in -- I
25 assume it's hiring more people or bringing

Page 148

1  more people on to the verifications
2  department for that process?
3        A.    I was -- yeah, I probably
4  worked with Shaun to figure out how we were
5  going to do that.
6        Q.    And in what time frame did that
7  effort occur?
8        A.    It looks probably 2017
9  sometime.  Again, I don't know the exact
10 date.
11       Q.    Was it before or after this
12 October 2017 e-mail that Mr. Abreu forwarded
13 to you in Exhibit 7?
14       A.    Yeah, I don't recall.  I don't
15 recall if it was prior or after.
16       Q.    How many more people did the
17 verification department add in order to
18 effect this change in the manner in which
19 Henry Schein was reporting suspicious orders
20 to the DEA?
21       A.    I don't remember exactly what
22 we did.  I don't remember if we brought
23 somebody new or if we changed a role of an
24 existing person that -- it may have been
25 something to do with that, yeah.  And I know

Page 149

1  we did some automation to try to speed up the
2  process a little bit too.
3        Q.    Who else was involved in the
4  changes that you're describing to the
5  verifications department?
6        A.    It would have been Shaun Abreu.
7  I'm sure Maggie Koromi and Christine
8  Stratton, the supervisors may have been --
9  may have given ideas or suggestions.  And I'm
10 sure regulatory, the regulatory team, I'm
11 sure.
12       Q.    Is there a database of
13 suspicious orders at Henry Schein?
14       MR. JONES:  Object to the form.
15       A.    A database?
16 BY MR. ACKERMAN:
17       Q.    Does Henry Schein maintain a
18 list or a collection of the suspicious orders
19 that it had reported to the DEA?
20       MR. JONES:  Object to the form.
21 BY MR. ACKERMAN:
22       Q.    Does Henry Schein track the
23 suspicious orders that it has reported to the
24 DEA?
25       A.    Yes, we keep records, yes.

Page 150

1     Q.   And in what form are those
2 records maintained?
3     A.   I don't know.
4     Q.   Have you personally ever looked
5 up whether a customer was the subject of a
6 suspicious order reported to the DEA?
7     A.   Have I ever looked it up in our
8 system?
9     Q.   Correct.
10     A.   I don't think so, no.
11     Q.   Would you know how to do it, if
12 you wanted to?
13         MR. JONES: Object to the form.
14     A.   I have visibility -- I have
15 visibility to the pends screens, so I could
16 go in and check an order. I'm not an expert
17 on whether or not it's suspicious or not.
18 BY MR. ACKERMAN:
19     Q.   So you can check and see
20 whether an order pended, right?
21     A.   (Nods head.)
22     Q.   Would that screen indicate
23 whether an order was reported to the DEA?
24     A.   No. Not that I -- not that I'm
25 aware.

Page 151

1     Q.   I understand.
2     A.   Yeah.
3     Q.   If an order pended and then was
4 later cleared as not being suspicious by a
5 member of the verifications department, say,
6 would the pend screen still indicate that the
7 order had pended in the first place?
8     A.   Yes.
9     Q.   During your time at
10 Henry Schein, have you ever been involved in
11 customer due diligence?
12     A.   Have I ever personally been
13 involved in that?
14     Q.   Yes.
15     A.   I don't think directly. The
16 team -- the team does that.
17     Q.   You've overseen the team that
18 performs that aspect, right?
19     A.   Right.
20     Q.   But you personally have never
21 conducted customer due diligence?
22     A.   No, I don't think so, yeah.
23     Q.   As part of overseeing the team
24 that conducted the due diligence, were you
25 ever involved in that due diligence process?

Page 152

1     A.   In what way?
2     Q.   Somebody come to you with a
3 question?
4         MR. JONES: Object to the form.
5     A.   Yeah, I'm not an expert on it,
6 so I -- if I did get that type of question, I
7 would probably pretty quickly defer to Shaun
8 or one of the supervisors.
9 BY MR. ACKERMAN:
10     Q.   I'm not asking if you're an
11 expert. I'm just trying to find out the
12 nature and extent of your involvement, if
13 any, in the process.
14     A.   Yeah. Yeah. It's low.
15     Q.   Okay.
16     A.   Yeah.
17         MR. ACKERMAN: I suspect these
18 next two exhibits might go pretty
19 quickly.
20         THE WITNESS: Okay.
21         MR. ACKERMAN: Let's mark this
22 one as Exhibit 8.
23         (HenrySchein-Brandt Deposition
24 Exhibit 8 marked.)
25         ///

Page 153

1 BY MR. ACKERMAN:
2     Q.   Mr. Brandt, the court reporter
3 has handed you what's been marked as
4 Deposition Exhibit 8. It is a multipage
5 document numbered HSI-MDL_387177 through
6 387180.
7       Take a moment to review this
8 document, and let me know when you've had a
9 chance to review it.
10     A.   Okay.
11         (Document review.)
12     A.   Yep.
13 BY MR. ACKERMAN:
14     Q.   You've reviewed the document?
15     A.   Yep.
16     Q.   Have you seen it before?
17     A.   I don't recall seeing it, but I
18 may have back in 2006, yeah.
19     Q.   This is a letter from the DEA,
20 correct?
21     A.   Uh-huh.
22     Q.   It looks like the recipient
23 address might have been blacked out here, but
24 it's to -- it says -- I believe the letter
25 was received by Henry Schein; is that right?

Page 154

1    A.   I don't know.  I don't see that
2 on here, but more than likely our regulatory
3 department, is what I would think.
4    Q.   Okay.  Do you recall any
5 discussions -- or being involved in any
6 discussions in 2006 regarding Henry Schein's
7 due diligence procedures in reference to this
8 letter?
9    A.   I don't -- I don't specifically
10 recall, but it's very -- it's possible that I
11 would have had discussions with regulatory or
12 with Shaun or somebody.
13    Q.   Okay.  Look at the last page of
14 the letter.
15    A.   Uh-huh.
16    Q.   Signed by a man named Joseph T.
17 Rannazzisi.
18    A.   Uh-huh.
19    Q.   Is that name familiar to you?
20    A.   No.
21    Q.   Are you aware of any other
22 letters that Mr. Rannazzisi sent to
23 Henry Schein concerning due diligence
24 procedures or suspicious order monitoring?
25    A.   Nothing comes to mind, no.

Page 155

1    Q.   Were you involved -- do you
2 recall any discussions related to a 2007
3 letter from Mr. Rannazzisi concerning
4 suspicious order monitoring or controlled
5 substances?
6    A.   It doesn't ring a bell --
7    Q.   Okay.
8    A.   -- to me, no.
9       MR. JONES:  Are you going to
10 show him the letter?
11       THE WITNESS:  Was it to me?
12       MR. ACKERMAN:  We'll mark it.
13       (HenrySchein-Brandt Deposition
14    Exhibit 9 marked.)
15 BY MR. ACKERMAN:
16    Q.   Mr. Brandt, the court reporter
17 has handed you what's been marked as
18 Exhibit 9.  It's a two-page document Bates
19 numbered HSI-MDL_404079 through 404080.
20    A.   Yep.
21    Q.   Take a moment to review this
22 document, and let me know when you've had a
23 chance to review it.
24    A.   Okay.
25       (Document review.)

Page 156

1    A.   Okay.
2 BY MR. ACKERMAN:
3    Q.   Have you seen this document
4 before?
5    A.   Probably.  I don't know for
6 sure.
7    Q.   Does this document refresh your
8 recollection as to whether you were involved
9 in any conversations regarding Henry Schein's
10 due diligence or suspicious order monitoring
11 processes with reference to this letter?
12    A.   Looks like it went to our
13 Florida distribution center, so I -- I don't
14 recall anything specific.  I may very well
15 have been involved in a meeting or something
16 related to it, but I don't recall it directly
17 right now.
18    Q.   Take a look if you would at
19 the -- the last paragraph on the first page.
20    A.   Uh-huh.
21    Q.   You see that?
22    A.   Yep.
23    Q.   And it says:  This regulation
24 specifically states that suspicious orders
25 include orders of an unusual size, orders

Page 157

1 deviating substantially from a normal pattern
2 and orders of an unusual frequency.
3    A.   Uh-huh.
4    Q.   Do you see that?
5    A.   I do.
6    Q.   So that sentence states that
7 there are three types of orders that could be
8 classified as suspicious orders, correct?
9    A.   I believe so.  That's what it
10 says.
11    Q.   And the letter is dated
12 September 27, 2007, right?
13    A.   Yes.
14    Q.   Pull out Exhibit 3, if you
15 would, for a moment.
16    A.   3?
17    Q.   Yeah.  And turn to page 3,
18 please.
19       At the top of page 3 of
20 Exhibit 3, it says -- just to be clear,
21 Exhibit 3 is the 2012 SOP concerning
22 suspicious order monitoring, correct?
23    A.   Yes, that's what it looks like,
24 uh-huh.
25    Q.   So on page 3 at the top it

Page 158

1  says:  Based on the federal DEA requirements
2  of the Controlled Substances Act, all
3  distributors of controlled substances are
4  required to Know Your Customer and establish
5  a system/process to monitor orders of unusual
6  size and frequency.
7       Do you see that?
8       A.   I do.
9       Q.   So the SOP only references
10 unusual size and frequency; is that correct?
11      A.   That's what the -- that's what
12 this says.
13      Q.   And the 2007 letter from the
14 DEA references unusual size, orders deviating
15 substantially from a normal pattern and
16 orders of an unusual frequency.
17      Do you see that?
18      A.   I do.
19      Q.   Thank you.
20      MR. ACKERMAN:  You can put that
21 aside.
22      THE WITNESS:  Okay.
23 BY MR. ACKERMAN:
24      Q.   So we talked earlier about
25 Buzzeo, right?

Page 159

1       A.   Uh-huh.
2       Q.   And remind me again what your
3  understanding as to Buzzeo's role.
4       A.   My understanding --
5       Q.   With Henry Schein.
6            Yeah.
7       A.   I don't know much about him.  I
8  know that he was an ex-DEA guy.  What
9  capacity, I'm not sure.  And I know that
10 we -- he led some conferences on this topic
11 that Shaun attended and our regulatory team
12 attended, and we contracted with him I
13 believe to create our suspicious order
14 monitoring system or part of it.  That's my
15 understanding.
16      Q.   Is Buzzeo a person or a
17 company?
18      A.   I think both.  I don't know for
19 sure, but I think he does have his own
20 company that carries his name.
21      MR. ACKERMAN:  Okay.  Let me
22 mark this as Exhibit 10.
23      (HenrySchein-Brandt Deposition
24 Exhibit 10 marked.)
25      ///

Page 160

1  BY MR. ACKERMAN:
2       Q.   Mr. Brandt, the court reporter
3  has handed you what's been marked as
4  Exhibit 10.  It's a document numbered
5  HSI-MDL_404203 through HSI-MDL_404209.
6            Take a moment to review this
7  document, let me know when you've had a
8  chance to review it.
9       A.   Okay.
10      (Document review.)
11      A.   Okay.
12 BY MR. ACKERMAN:
13      Q.   Have you seen this document
14 before?
15      A.   I mean, it doesn't -- it
16 doesn't jump out at me, but I may have read
17 it back in 2005.
18      Q.   There's a reference at the top
19 to Kathleen Malone on the first page.
20 Kathleen Malone, Project Manager, Buzzeo
21 PDMA.
22      Do you see that?
23      A.   Yes.
24      Q.   Do you know who Kathleen Malone
25 is?

Page 161

1       A.   I don't believe so.
2       Q.   Have you ever spoken with
3  Kathleen Malone?
4       A.   Not that I remember, if I did.
5       Q.   The answer to the first
6  question probably answered the second.
7            The second paragraph states:
8  In year 2002 Jay Schein RPh conducted a study
9  averaging all orders for each product placed
10 over one year's time to determine the
11 significant threshold for each product
12 cumulative for six months.
13      Do you see that?
14      A.   Uh-huh, yes.
15      Q.   Do you know who Jay Schein RPh
16 is?
17      A.   I don't.
18      Q.   Do you know anything about the
19 study that's referenced in this letter?
20      A.   No, I don't think I -- I don't
21 think I have any specifics about it.
22      Q.   Did you ever hear about the
23 study before sitting here today?
24      A.   No.
25      Q.   Now, just to -- in 2005 had you

Page 162

1 assumed responsibilities for the verification
2 team?
3    A.    It's right around that time.  I
4 couldn't honestly tell you.  It was right in
5 that time frame --
6    Q.    Okay.
7    A.    -- when I -- I became director,
8 I believe -- what was it, 2003-ish?  So
9 Jim -- it was -- Jim -- kind of reported to
10 Jim for a while, and then I took that over.
11 It was right in those years, 2005, '6, or '7,
12 somewhere in that time frame I think I did.
13    Q.    Because there's some comments
14 in this document regarding actions of the
15 verifications team, and I wanted to go
16 through them with you and see whether they're
17 consistent, to the extent you remember, with
18 your recollection of how that team operated.
19    A.    Yeah, I don't know that I was
20 the guy at the time.
21       MR. JONES:  There's no question
22 pending.
23       THE WITNESS:  Okay.
24 BY MR. ACKERMAN:
25    Q.    But there's some other

Page 163

1 questions that I'm going to move through.  So
2 let's go to the second page here.
3    A.    Okay.
4    Q.    Let's look at finding number 2.
5 And that finding says:  There is no formal
6 process in place to review threshold data on
7 a periodic basis, nor is there currently a
8 staff pharmacist available to review the
9 system thresholds as stated in the standard
10 operating procedure.
11       Do you see that?
12    A.    I do.
13    Q.    Do you know whether that
14 statement was true as of 2005?
15    A.    No.
16    Q.    No, you don't know, or no, you
17 don't -- or, no, it was not true?
18    A.    No, I don't know.
19    Q.    Okay.
20    A.    I don't know.
21    Q.    Sure.  Yep.
22       And then if you go to finding
23 number 3, the third sentence there says:
24 Currently there is no formal process in place
25 to assess the appropriateness of the customer

Page 164

1 medical practice in relation to the drug
2 product being ordered.
3       Do you see that?
4    A.    I do.
5    Q.    When you assumed responsibility
6 for the verification department, verification
7 team, was there a formal process in place to
8 assess the appropriateness of the customer's
9 medical practice in relation to the drug
10 product being ordered?
11       MR. JONES:  Object to the form.
12    A.    Yeah, I don't know.
13 BY MR. ACKERMAN:
14    Q.    By the way, there's handwriting
15 on the side of this.
16    A.    Uh-huh.
17    Q.    Is that your handwriting?
18    A.    No.
19    Q.    Do you recognize the
20 handwriting?
21    A.    No.
22    Q.    Go to finding number 5, if you
23 would, on page -- it's the page that ends in
24 Bates number 206.
25    A.    Okay.

Page 165

1    Q.    And then it says:  When an
2 order pends as suspicious, the order and the
3 customer patterns are reviewed.  If it still
4 remains suspicious, a letter is sent to the
5 customer requiring an explanation of the
6 order.
7       Do you see that?
8    A.    I do.
9    Q.    The next sentence says:  A
10 pending order will not be released without a
11 return letter from the customer.
12       Is that an accurate description
13 of the process, of the review process for the
14 verification department --
15       MR. JONES:  Object to the form.
16 BY MR. ACKERMAN:
17    Q.    -- during your tenure?
18       MR. JONES:  Object to the form.
19    A.    Back at this time?
20 BY MR. ACKERMAN:
21    Q.    So let's start with back at
22 this time, sure.
23       MR. JONES:  Same objection.
24    A.    No.  No, I don't know.  I don't
25 know.

Page 166

BY MR. ACKERMAN:
 Q.    You don't know whether it's accurate?
 A.    I don't know, no.
 Q.    Okay.  In 2012, is this an accurate description of the -- let me ask the question this way.
       In 2012, if following a review the record still remains suspicious, did the verification team send a letter to the customer requiring an explanation of the order?
       MR. JONES:  Object to the form, misleading.
 A.    I don't know.  I don't know that.
BY MR. ACKERMAN:
 Q.    Take a look at Exhibit 3.
 A.    Okay.
 Q.    And go to page 6 of Exhibit 3.
 A.    Okay.
 Q.    You see the heading that says Justification Letter?
 A.    Uh-huh, yes.
 Q.    The first sentence says:  If

Page 167

after completing our due diligence the reviewer's assessment of the account is inconclusive based on the information provided, Verifications will request a justification letter from the customer.
       Is that correct?
 A.    Yes.
 Q.    So in 2012, it's accurate to say that the -- Henry Schein's operating procedure required that the verifications team request a justification letter from the customer if the reviewer's assessment of the account was inconclusive; is that right?
 A.    It looks like that, yes. That's what this says.
 Q.    And this -- now, going back to Exhibit 10, under finding number 5.
 A.    Uh-huh.
 Q.    It says:  When an order pends as suspicious, the order and the customer patterns are reviewed.  If it still remains suspicious, a letter is sent to the customer requiring an explanation of the order.
       Is that correct?
 A.    That's what it says, yes.

Page 168

 Q.    Are you aware of any change in procedure between 2005 and 2012 concerning requiring that a customer explain or justify an order?
       MR. JONES:  Object to the form.
 A.    I don't know.  Our -- the procedures evolve, so...
BY MR. ACKERMAN:
 Q.    Okay.
 A.    Yeah.
 Q.    Going back to Exhibit 10, the last couple of sentences of that finding 5 again, which is on the page numbered 206.
 A.    Yeah.
 Q.    It says:  When the letter is received and reviewed, if the explanation is found reasonable, the order is released and the letter retained on file.  A notation is made in the system that this letter has been received.  This letter then is used to clear additional excessive orders for the same customer.
       Do you see that?
 A.    Uh-huh.
 Q.    That phrase?

Page 169

 A.    Yes.
 Q.    Is it -- in 2012, was it Henry Schein's practice to use a prior justification letter to clear additional excessive orders for the same customer?
       MR. JONES:  Object to the form.
 A.    I don't know.
BY MR. ACKERMAN:
 Q.    Okay.  Is that Henry Schein's practice today?
       MR. JONES:  Same objection.
 A.    I don't know.
       MR. ACKERMAN:  You can put that one aside.
       THE WITNESS:  Okay.
       MR. ACKERMAN:  Let's mark this as Exhibit 11.
       (HenrySchein-Brandt Deposition Exhibit 11 marked.)
BY MR. ACKERMAN:
 Q.    Mr. Brandt, the court reporter has handed you what's been marked as Exhibit 11, which is a multipage document labeled HSI-MDL_0038675 through 00386879.
 A.    Yeah.

Page 170

```
1       Q.    And I apologize, it's 386875
2   through 386879.
3           Take a moment to review this
4   document, and let me know when you've had a
5   chance to review it.
6       A.    Okay.
7           (Document review.)
8       A.    Okay.
9   BY MR. ACKERMAN:
10      Q.    Do you recognize this document?
11      A.    No.  No, I'm sure I probably
12  read it.  I'm on it, copied on it, so I'm
13  sure I did review it ten years ago.
14      Q.    This document describes a
15  meeting that occurred on January 17th and
16  18th, 2008; is that correct?
17      A.    That's correct.
18      Q.    Did you attend that meeting?
19      A.    I probably did.  I was just
20  looking.  I don't see Shaun's name here or
21  Lisa, which is strange to me, but I may have.
22      Q.    There's a list of attendees at
23  the back, right?
24      A.    Yeah.
25      Q.    And you're listed as one of the
```

Page 171

```
1   attendees; is that right?
2       A.    Yes, uh-huh.
3       Q.    Do you recall anything about
4   this meeting?
5       A.    No, just general, just in
6   general refreshes my memory a little bit in
7   reading it.
8       Q.    And what does it refresh your
9   memory of?
10      A.    Just talking about our system
11  and things that we need to do to improve it.
12      Q.    If you look at the first page
13  it says:  The DEA's communication of
14  December 27th was used as a controlling
15  document for the morning discussion.
16          Right?  That's almost pretty
17  close to the bottom of the page.
18          Do you see that?
19      A.    Uh-huh, I do, yeah.
20      Q.    Exhibit 9 that we've already
21  looked at today, can you pull that out?
22      A.    Yeah.
23      Q.    What's the date of that
24  document?
25      A.    December 27th, 2007.
```

Page 172

```
1       Q.    Do you recall whether the
2   discussion in this January 17th and 18th,
3   2008 meeting referenced the DEA letter that
4   we marked as Exhibit 9?
5       A.    I don't recall.
6       Q.    If you go to the second page,
7   about halfway down the page says:  A smaller
8   workgroup consisting of Schein regulatory
9   staff and members of the verifications
10  department then discussed Schein's ongoing
11  procedures.
12          Do you see that?
13      A.    Uh-huh, I do.
14      Q.    You oversaw the verifications
15  department at this time, right?
16      A.    I don't know.
17      Q.    In 2008?
18      A.    Right around that time.
19      Q.    Okay.
20      A.    Yeah, I may have.  I may not
21  have.
22      Q.    Were you in part of this
23  smaller workgroup?
24      A.    I don't recall if I was.  I may
25  have been.  I honestly don't recall.
```

Page 173

```
1       Q.    Can you look at the -- there
2   are two arrows there underneath that
3   paragraph on page -- it's the page that ends
4   in 76.  It's the second page of the document.
5       A.    Okay.
6       Q.    Right?  I'm sorry, there's a
7   paragraph that begins questionable orders are
8   filled.
9           Do you see that?
10      A.    Yes.
11      Q.    And then there are two arrows
12  underneath it?
13      A.    Yes.
14      Q.    In the first arrow it says:  An
15  immediate adjustment will be made in Schein's
16  procedures to stop or pend the orders and to
17  then investigate to clear prior to shipment.
18          Do you see that?
19      A.    Uh-huh, I do.
20      Q.    Do you recall any discussion
21  regarding adjusting Schein's procedures in
22  that manner?
23      A.    No, not specifically.
24      Q.    Okay.
25      A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  Q.  Prior to this meeting, was
2  Schein shipping orders prior to investigating
3  orders that had pended?
4  A.  I don't believe so.
5  Q.  Okay.
6  A.  No.
7  Q.  Do you know what the
8  adjustment -- what would have been adjusted
9  in Schein's procedures, what the prior -- let
10 me strike that.  Let me ask a different
11 question.
12      What was the prior practice of
13 the verifications department that needed to
14 be adjusted as described in this document?
15      MR. JONES:  Objection, form.
16 A.  I don't know.
17 BY MR. ACKERMAN:
18 Q.  Okay.
19 A.  I don't know.
20 Q.  The second arrow says:  When
21 placing telephone calls to the physician's
22 order -- I'm sorry.
23 A.  Office.
24 Q.  Yeah.  When placing telephone
25 calls to the physician's office regarding

Page 175

1  controlled substance ordering procedures,
2  Schein's verifications department staff
3  should communicate with the physician
4  registrant.
5      Do you see that?
6  A.  I do.
7  Q.  Do you recall any discussion at
8  the meeting regarding this point?
9  A.  Not specifically.
10 Q.  Prior to this meeting, did the
11 verification department speak with someone
12 other than the physician or their registrant
13 when placing telephone calls to the
14 physician's office regarding controlled
15 substance ordering procedures?
16 A.  I don't know.  I don't know.
17 Q.  Independent of what's in this
18 Exhibit 11, do you remember any discussion
19 that occurred at this meeting?
20 A.  No.
21 Q.  Okay.  Do you -- I didn't mean
22 to cut you off if you were going to say
23 something.
24 A.  No, I wasn't going to say
25 something.

Page 176

1  Q.  Okay.  Were you involved in
2  changes to the procedures of the verification
3  department that -- well, strike that.  Let me
4  ask the question differently.
5      Were you involved in any
6  discussions following this meeting concerning
7  changes to the verification department's
8  procedures as a result of the discussions in
9  this meeting?
10 A.  Probably.  I probably was.  I
11 was an attendee.  I was part of the group, so
12 I --
13 Q.  Do you recall any of those
14 discussions?
15 A.  Not specifically, no.
16 Q.  All right.  Do you recall
17 whether anyone disagreed with the
18 recommendations of Cegedim Dendrite as
19 reflected in the document?
20 A.  I don't.
21 Q.  Did you have any opinion
22 regarding the recommendations of Cegedim
23 Dendrite?
24 A.  Did I at the time?
25 Q.  Yes.

Page 177

1  A.  I don't recall if I did.  I may
2  have.
3  Q.  Okay.
4      MR. JONES:  Since you're
5  getting between exhibits, can we
6  break?
7      MR. ACKERMAN:  Yeah, it's a
8  good time.  Let's take a break.
9      THE VIDEOGRAPHER:  The time is
10 now 2:00 p.m.  Going off the record.
11     (Recess taken, 2:00?p.m. to
12 2:16?p.m.)
13     THE VIDEOGRAPHER:  The time is
14 now 2:16.  Back on the record.
15     MR. ACKERMAN:  Let's mark this
16 one as Exhibit 12.
17     (HenrySchein-Brandt Deposition
18 Exhibit 12 marked.)
19 BY MR. ACKERMAN:
20 Q.  Mr. Brandt, the court reporter
21 has handed you what's been marked as
22 Exhibit 12.
23 A.  Uh-huh.
24 Q.  It is a two-page document
25 numbered HSI-MDL_231217 through 218.

Page 178

1  Take a moment to review this
2 document and let me know when you've had a
3 chance to review it.
4  A.  Okay.
5  (Document review.)
6  A.  Okay.
7 BY MR. ACKERMAN:
8  Q.  All right.  Have you seen this
9 document before?
10  A.  I don't think so.
11  Q.  Okay.  On the first page --
12 this, again, is another Cegedim Dendrite
13 document, right?
14  A.  Right.
15  Q.  And on the first page, the
16 first paragraph says:  As a part of
17 Henry Schein's revised suspicious order
18 monitoring system, all new accounts which
19 handle controlled substances will be the
20 subject of a due diligence inquiry.
21  Do you see that?
22  A.  I do.
23  Q.  Were you involved in any
24 discussions regarding due diligence inquiries
25 for all new accounts that handle controlled

Page 179

1 substances?
2  A.  I don't believe so.
3  Q.  Who at Henry Schein in 2008 was
4 responsible?  By who, I mean which
5 department, so let me ask the question again.
6  Which department in 2008 at
7 Henry Schein was responsible for conducting
8 due diligence inquiries on new accounts that
9 handle controlled substances?
10  A.  The license verifications team.
11  Q.  The team that you oversaw at
12 some point, right?
13  A.  Yes.
14  Q.  Okay.  The next sentence says:
15 During the due diligence inquiry, the new
16 account holder will be interviewed by Schein
17 staff over the telephone to determine whether
18 the new account appears qualified to handle
19 controlled substances.
20  Do you see that sentence?
21  A.  I do.
22  Q.  Did representatives in the
23 verification department conduct interviews
24 over the telephone with new accounts to
25 determine whether the account appeared

Page 180

1 qualified to handle controlled substances?
2  A.  I don't know.
3  Q.  A little bit down the page past
4 the bullet points, it says:  After the
5 interview, the customer should be provided
6 with a document with information pertaining
7 to controlled substances which addresses
8 basic legal issues such as legitimate medical
9 use.
10  Do you see that sentence?
11  A.  I do.
12  Q.  Were customer -- did
13 Henry Schein provide customers with a
14 document with information pertaining to
15 controlled substances that addressed basic
16 legal issues such as legitimate medical use?
17  MR. JONES:  Object to the form.
18  A.  I don't know.
19 BY MR. ACKERMAN:
20  Q.  At any point during the period
21 at which you oversaw the verifications
22 department, did representatives conduct
23 background investigations on new customers to
24 determine whether those customers were the
25 subject of any convictions or regulatory

Page 181

1 actions?
2  A.  Yes.
3  Q.  Was that the practice
4 throughout the entire period?
5  A.  That, I don't know.
6  Q.  Okay.  And how do you know that
7 those investigations were conducted?
8  A.  Speaking with Shaun and the
9 regulatory team.
10  Q.  At any point during your tenure
11 where you oversaw the verifications
12 department, the licensing department -- just
13 to be clear, when I say verifications
14 department, I understand that to also refer
15 to the licensing department.  Do you
16 understand that the same way?
17  A.  I do.  I do.
18  Q.  Okay.  I just want to make sure
19 that I didn't need to revisit a couple of
20 hours of questions.
21  MR. JONES:  I'm sure we can
22 reach a stipulation.
23  MR. ACKERMAN:  Yeah.
24 BY MR. ACKERMAN:
25  Q.  So at any point during your

Page 182

1 tenure of overseeing the verification
2 department, did representatives conduct
3 onsite visits as part of their due diligence
4 efforts with respect to Henry Schein
5 customers?
6 A. None of -- none of our
7 representatives. I don't believe any of our
8 representatives ever did.
9 MR. ACKERMAN: Okay. This
10 might be the last one on this topic.
11 Let's mark this as Exhibit 13.
12 (HenrySchein-Brandt Deposition
13 Exhibit 13 marked.)
14 BY MR. ACKERMAN:
15 Q. Mr. Brandt, the court reporter
16 has handed you what's been marked as
17 Exhibit 13, which is a multipage document
18 numbered HSI-MDL_404369 through 404373.
19 A. Yes.
20 Q. Take a moment to review this
21 document. Let me know if you've seen it
22 before.
23 (Document review.)
24 A. Okay.
25 ///

Page 183

1 BY MR. ACKERMAN:
2 Q. Have you seen this document
3 before?
4 A. I don't recall seeing it, looks
5 like, in 2007.
6 Q. Well, the --
7 A. Is that right? I don't know
8 the date.
9 Q. It doesn't have a date on it.
10 If you look at page 2, there's a reference to
11 a meeting on December 16th, 2009 at the
12 bottom.
13 Do you see that?
14 A. I do, yeah.
15 Q. So it appears the document
16 was --
17 A. Yeah.
18 Q. -- likely prepared after that,
19 at least after that date.
20 A. Uh-huh.
21 Q. And by December 16th, 2009, did
22 you have responsibility for the verifications
23 department?
24 A. Yes.
25 Q. And this is another Cegedim

Page 184

1 Dendrite document that's entitled Schein SLM
2 Procedural Review, correct?
3 A. Yes.
4 Q. And there are a couple of
5 findings in here that I'd like to ask you
6 about.
7 A. Sure.
8 Q. Turn to page 3 at the top of
9 the page. It says: Also it was learned that
10 customer accounts are established
11 electronically over the phone. During this
12 initial setup process, HSI staff indicated
13 that there is no procedure to develop any
14 information regarding controlled substances.
15 All new accounts are forwarded to the
16 customer service department where HSI
17 "gatekeepers" check the customers' addresses
18 against a public data base to assure that the
19 databases are accurate. The account holder
20 is also checked against a Lexus Nexus
21 database for any outstanding warrant and to
22 determine whether the customer is on a
23 Terrorist Watch List.
24 Do you see that?
25 A. I do.

Page 185

1 Q. Is that an accurate description
2 of the process for onboarding or for
3 establishing customer accounts in 2009?
4 MR. JONES: Object to the form.
5 A. I don't know.
6 BY MR. ACKERMAN:
7 Q. Okay. The term -- you see here
8 the -- in the third sentence it says: New
9 accounts are forwarded to the customer
10 service department or HSI gatekeepers, and
11 the word "gatekeepers" is in quotations,
12 right?
13 A. Uh-huh.
14 Q. First of all, the customer
15 service department was you. You were the
16 director of the customer service department
17 at this time; is that correct?
18 A. That's right, yes.
19 Q. You heard the use of the word
20 "gatekeepers" --
21 A. Yes.
22 Q. -- to describe individuals in
23 the customer service department?
24 And in what manner is that term
25 used at Henry Schein?

Page 186

1    A.    The gatekeepers are a small
2 group within the customer service team, and
3 they are responsible for the database
4 management, changes to account numbers,
5 changes to addresses, changes to phone
6 numbers, and initial vetting of new accounts
7 that get set up in the system, like it says
8 here.
9    Q.    Okay.  In terms of initial
10 vetting of new accounts, what is it that the
11 gatekeeper -- first of all, are there still
12 gatekeepers today at Henry Schein?
13    A.    Yes.
14    Q.    Are those gatekeepers -- do
15 those gatekeepers still have responsibility
16 for initial vetting of new accounts today?
17    A.    Yeah, reviewing new accounts,
18 yeah.
19    Q.    In 2009 what were the
20 gatekeepers' responsibility with respect to
21 the initial vetting of new accounts?
22    A.    I don't know everything.  Just
23 what it says here, the LexisNexis database, I
24 believe, to make sure they're not on the
25 terror watch list.  Really making sure that

Page 187

1 it's a valid address is the primary function
2 of the gatekeeping team, making sure that the
3 delivery address is in the UPS or the USPS
4 database so that it will ship to a valid
5 address.
6    Q.    And then today have those
7 responsibilities changed at all with respect
8 to vetting of new accounts?
9    A.    Not that I'm aware.
10    Q.    About midway down the page,
11 there's a paragraph that begins HSI uses.
12        Do you see that?
13    A.    Yes.
14    Q.    And the third sentence there
15 says:  Most of the orders that are pended are
16 for pseudoephedrine.
17        Do you see that?
18    A.    I do.
19    Q.    Was your verification
20 department responsible for investigating
21 orders of pseudoephedrine?
22    A.    Yes, when it was classified as
23 a controlled substance.
24    Q.    Okay.  And when was that?
25    A.    I don't recall the impact date.

Page 188

1    Q.    The next paragraph begins:  In
2 certain relatively rare instances, the order
3 will be forwarded to the regulatory
4 department for further follow-up and review.
5        Do you see that sentence?
6    A.    Yes.
7    Q.    Is that an accurate description
8 of the process in 2009?
9    A.    I don't know.  I don't know.
10    Q.    If you'd turn to the next page,
11 the header that says Conclusions and
12 Recommendations.
13        Do you see that?
14    A.    Yes.
15    Q.    The first bullet point says:
16 Some of the original recommendations are
17 still open including the development and
18 procedures that govern and control access
19 codes in the validation of the computer
20 system.
21        Do you see that?
22    A.    Yes.
23    Q.    Do you recall participating in
24 any of the discussions regarding that some of
25 Cegedim Dendrite's original recommendations

Page 189

1 were still open at the end of 2009?
2    A.    No.
3    Q.    All right.  And then skip about
4 halfway down the page.  It says:  New
5 accounts are opened without sufficient due
6 diligence investigations inquiries.  For the
7 most part, new accounts are opened based upon
8 a verification of the customer's DEA number,
9 which is not considered adequate by the DEA.
10        Do you see that, that sentence?
11    A.    I do.
12    Q.    Were you involved in any
13 discussions regarding whether new accounts
14 were opened with sufficient due diligence
15 investigations inquiries around the end of
16 2009?
17    A.    Not that I recall.
18    Q.    Okay.
19    A.    No.
20    Q.    Were you ever informed that new
21 accounts were opened based upon a
22 verification of the customer's DEA number and
23 not based on other due diligence?
24    A.    No, not that I recall.
25    Q.    And to be clear, it's the

Page 190

1 verification department that would have been
2 responsible for conducting due diligence for
3 new accounts, right?
4     A.    Gatekeepers?  The gatekeepers
5 are responsible for the initial due diligence
6 on a new -- newly opened account.
7     Q.    Okay.
8     A.    If it doesn't involve
9 licensing.
10     Q.    Got it.  And if it involves a
11 controlled substance, if the new contract
12 involves a controlled substance, would it
13 still be the gatekeeper who's responsible for
14 the due diligence?
15     A.    License verifications.
16     Q.    So that then is the
17 verifications department?
18     A.    Yes.
19     Q.    All right.  Now look at the
20 bottom of the page.  In the last sentence on
21 the page says:  However, the responsibilities
22 of the customer service department, the
23 verifications department, and the regulatory
24 department appear to be poorly defined and
25 reliant to some extent upon the judgment of

Page 191

1 individual employees regarding what types of
2 situations should be referred to management
3 for approval or forwarded to regulatory for
4 investigation.
5     A.    Uh-huh.
6     Q.    Do you see that sentence?
7     A.    I do.
8     Q.    Anyone ever discuss with you
9 that the responsibilities of the customer
10 service department, the verifications
11 department and the regulatory department were
12 poorly defined?
13     A.    Not that I recall.
14     Q.    Were you ever involved in
15 discussions or efforts to more clearly define
16 the responsibilities of those departments?
17     A.    Nothing specific that I recall.
18     Q.    Anything general?
19     A.    No, not that I recall.
20     Q.    All right.  You were a director
21 of the customer service department, right?
22     A.    Yes.
23     Q.    And you had responsibility for
24 overseeing the verifications department?
25     A.    Yes.

Page 192

1     Q.    Correct?
2     A.    (Nods head.)
3     Q.    So two of these three
4 departments referenced in this sentence were
5 within your oversight responsibilities; is
6 that right?
7     A.    Yes.
8     Q.    And before today, had you ever
9 seen this sentence that said that the
10 responsibilities of the customer service
11 department, the verifications department and
12 the regulatory department appear to be poorly
13 defined and reliant to some extent upon the
14 judgment of individual employees regarding
15 what types of situations should be referred
16 to management for approval or forwarded to
17 regulatory for investigation?
18     A.    No, I don't know that --
19          MR. JONES:  Object to the form.
20     A.    I don't recall seeing it.
21          MR. ACKERMAN:  Okay.  You can
22 put that one aside.
23          Let's mark this Exhibit 14.
24          (HenrySchein-Brandt Deposition
25 Exhibit 14 marked.)

Page 193

1 BY MR. ACKERMAN:
2     Q.    Mr. Brandt.
3     A.    Yes.
4     Q.    The court reporter has handed
5 you what's been marked as Exhibit 14.  It's a
6 document that was produced to us in native
7 format at the Bates number HSI-MDL_72607.
8 The exhibit consists of the slip sheet and
9 then the native file behind it.
10          Take a moment to review this
11 document, and let me know when you've had a
12 chance to review it.
13     A.    Okay.
14          (Document review.)
15     A.    Okay.
16 BY MR. ACKERMAN:
17     Q.    Have you ever seen this
18 document before?
19     A.    Not that I recall.
20     Q.    Okay.  The first page of the
21 presentation, right, says:  Individual
22 opportunity issue presented by Tina
23 Steffanie-Oak.
24          I think you earlier testified
25 as to who Tina Steffanie-Oak is or was.

Page 194

1  A.  Uh-huh.
2  Q.  Do you recall attending any
3  presentations by her concerning Know Your
4  Customer due diligence?
5  A.  Not specifically, no.
6  Q.  All right.  The next page
7  says -- is titled Opportunity Issue.
8      Do you see that?
9  A.  Yes.
10  Q.  And the first bullet point
11  says:  Are we in substantial compliance with
12  DEA SOM/KYC regulations, right?
13  A.  Right.
14  Q.  And do you have an
15  understanding as to what the acronym SOM/KYC
16  refers to in this document?
17  A.  Yes.
18  Q.  What is that?
19  A.  Suspicious order monitoring,
20  Know Your Customer.
21  Q.  And the next bullet point says:
22  We do not have KYC due diligence for
23  approximately 60% of our customers.
24  Remaining 40% has varying degrees of due
25  diligence (files are not consistent).

Page 195

1      Do you see that?
2  A.  I do.
3  Q.  Were you ever informed that
4  Henry Schein did not have Know Your Customer
5  due diligence for approximately 60% of its
6  customers?
7  A.  Not that I recall, no.
8  Q.  What department at Henry Schein
9  was responsible for conducting Know Your
10  Customer due diligence?
11  A.  The license verifications team.
12  Q.  And what department at
13  Henry Schein was responsible for maintaining
14  the Know Your Customer due diligence files at
15  Henry Schein?
16  A.  The license verifications team.
17  Q.  And you oversaw the license
18  verification team?
19  A.  Yes.
20  Q.  Does it strike you as odd that
21  no one ever mentioned to you that
22  Henry Schein did not have Know Your Customer
23  due diligence files for approximately 60% of
24  its customers?
25  A.  No, I don't know the context of

Page 196

1  this presentation, who it was given to, so
2  no.  But I don't recall being told that.
3  Q.  Okay.  Were you ever involved
4  in an effort to generate or conduct due
5  diligence for a large number of existing
6  Henry Schein customers?
7  A.  Yes.
8  Q.  And when was that?
9  A.  I don't recall the exact dates.
10  Q.  Was it more than ten years ago?
11  A.  Probably not.
12  Q.  All right.  So it was within
13  the last ten years?
14  A.  Yes.
15  Q.  Was it after 2012, within the
16  last five years?
17  A.  Possibly, yes.
18  Q.  And that was two different time
19  periods because my math was bad again, so let
20  me try that again.
21      Was it within the past five
22  years?
23  A.  Yeah, I don't recall the exact
24  dates.
25  Q.  Okay.  And what is it that you

Page 197

1  recall about that effort?
2  A.  I recall Shaun and the -- and
3  our team working with the regulatory team,
4  the team that Tina was on, to identify
5  accounts that they believed required
6  additional due diligence and a plan to
7  address that.
8  Q.  Were you part of that effort?
9  A.  I don't believe so.
10  Q.  You were just aware that it was
11  occurring?
12  A.  That's my -- that's my
13  recollection of it, yes.
14  Q.  Okay.  The third page of this
15  presentation is titled Potential Risks to
16  Henry Schein.
17      Do you see that?  Sorry, it's
18  probably the fourth page.  It's the third
19  substantive page.
20  A.  Potential Risks.
21  Q.  It's the next page.
22  A.  Yep.  Okay.
23  Q.  And there's a bullet point
24  there that says:  How vulnerable are we to
25  potential DEA regulatory action by not having

Page 198

1  complete due diligence on all customers
2  purchasing controlled substances?
3       Do you see that, that sentence?
4       A.  I do.
5       Q.  Were you involved in any
6  discussions with anyone at Henry Schein at
7  any time concerning the company's potential
8  vulnerability to DEA regulatory action by
9  virtue of it not having complete due
10 diligence on all customers purchasing
11 controlled substances?
12      A.  Not that I recall.
13      Q.  Okay.  Putting aside whether
14 you participated in those conversations, are
15 you aware of any conversations that occurred
16 regarding that topic?
17      A.  At what level?  I'm not sure I
18 understand the question.
19      Q.  At any level.  Did you ever
20 hear --
21      MR. JONES:  Object to the form.
22      A.  No, I don't recall that --
23 BY MR. ACKERMAN:
24      Q.  Did you hear that people at
25 Henry Schein were concerned that they were --

Page 199

1  they were vulnerable to DEA regulatory action
2  because of the status of due diligence files
3  on customers purchasing controlled
4  substances?
5       MR. JONES:  Object to the form,
6  mischaracterizes the document.
7       A.  I don't recall.  I don't recall
8  that.
9  BY MR. ACKERMAN:
10      Q.  Okay.  Turn to the next page.
11 It says Solution.  The first bullet point
12 says:  Develop and execute a plan to obtain
13 due diligence on all active customers
14 purchasing controlled substances within a
15 reasonable time frame.
16      Do you see that?
17      A.  I do.
18      Q.  Were you involved at all in the
19 development or execution of a plan to obtain
20 due diligence on all active customers
21 purchasing controlled substances?
22      A.  Not that I recall.
23      Q.  And the second bullet point
24 says:  Additional regulatory resources are
25 needed to prepare, review and to complete

Page 200

1  customer due diligence.
2       Do you see that?
3       A.  I do.
4       Q.  Were you involved in any
5  efforts to amass additional resources in
6  order to prepare, review and complete
7  customer due diligence?
8       A.  Not that I recall, and
9  regulatory didn't fall under my scope,
10 doesn't fall under my scope.
11      Q.  But due diligence was performed
12 by the verification department, correct?
13      A.  Uh-huh, yes.
14      Q.  And that was within your scope?
15      A.  Yes.
16      Q.  You mentioned that you were
17 aware that Mr. Abreu and the regulatory team
18 were undergoing an effort to identify
19 accounts that required additional due
20 diligence.
21      A.  Uh-huh.
22      Q.  How long did that effort last?
23      A.  Oh, I don't recall the exact
24 time, the time frame.
25      Q.  Did that effort identify any

Page 201

1  problem customers?
2       A.  I don't recall specifically.
3       Q.  Understanding you may not
4  recall the exact time frame of how long the
5  effort lasted, do you recall generally the
6  time frame?
7       A.  I don't.  I don't.
8       Q.  Was it more than a year?
9       MR. JONES:  Objection, form,
10 asked and answered.
11      A.  Yeah, I don't recall if it was
12 longer than a year.
13 BY MR. ACKERMAN:
14      Q.  Okay.  Was it longer than six
15 months?
16      MR. JONES:  Objection, form,
17 asked and answered.  He's already told
18 you that he doesn't have any specific
19 understanding or recollection.
20      A.  Yeah, I don't recall.
21      MR. ACKERMAN:  And I'm probing
22 it.
23      MR. JONES:  I know.  But he's
24 already answered your question, David.
25      MR. ACKERMAN:  That's fine.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    Just say objection to form.
2  BY MR. ACKERMAN:
3    Q.    Was it longer than six months?
4       MR. JONES:  Objection, form,
5    asked and answered twice.
6    A.    I don't recall if it was.
7  BY MR. ACKERMAN:
8    Q.    Was it longer than a month?
9       MR. JONES:  Objection, form,
10   bordering on harassing.
11   A.    I don't recall.
12      MR. ACKERMAN:  Let's mark this
13   next one as Exhibit 15.
14      (HenrySchein-Brandt Deposition
15   Exhibit 15 marked.)
16  BY MR. ACKERMAN:
17   Q.    Mr. Brandt, the court reporter
18  has handed you what's marked as Exhibit 15.
19  It is a multipage document numbered
20  HSI-MDL_00499366 through 00499371.
21   A.    Yeah.
22   Q.    Take a moment to review this
23  document, let me know when you've had a
24  chance to review it.
25   A.    Okay.

Page 203

1       (Document review.)
2    A.    Okay.
3  BY MR. ACKERMAN:
4    Q.    Have you seen this document
5  before?
6    A.    Yes.
7    Q.    When have you seen it?
8    A.    Back in 2014.
9    Q.    Okay.  And what is it?
10   A.    It's a summary of a meeting,
11  meeting minutes from a February 11th review.
12   Q.    And did you attend this
13  meeting?
14   A.    I believe I did.  I'm listed as
15  an attendee.
16   Q.    Do you recall attending the
17  meeting?
18   A.    I don't recall if I attended.
19   Q.    All right.  Some of the
20  attendees I think we've identified here, but
21  I just want to make sure that I understand
22  who they are.
23   A.    Okay.
24   Q.    The first one listed is
25  L. David?

Page 204

1    A.    Len David.
2    Q.    And what position did Len David
3  have in 2014?
4    A.    I believe he was our chief
5  compliance officer.
6    Q.    J. Peacock?
7    A.    Jeff Peacock.
8    Q.    And what position did
9  Jeff Peacock hold in 2014?
10   A.    Regulatory, may have been
11  director.
12   Q.    Okay.
13      Mr. Mullins, I think we've
14  discussed.  Mr. Tejeda.  The next one is you,
15  right?
16   A.    Yes.
17   Q.    L. Matalon?
18   A.    Lisa Matalon was the manager of
19  customer service at that time.
20   Q.    The next one is Mr. Abreu,
21  correct?
22   A.    Yes, Shaun reported to Lisa.
23  Lisa reported to me.
24   Q.    Okay.  And then the last one is
25  K. Romeo?

Page 205

1    A.    Ken Romeo.
2    Q.    Who was that?
3    A.    Ken was a regulatory associate
4  based out of Reno.
5    Q.    And the minutes were prepared
6  by Tina Steffanie-Oak?
7    A.    Yes.
8    Q.    Do you recall any of the
9  discussion at this meeting?
10   A.    Not specifically, no.
11   Q.    Okay.  Do you recall just
12  generally?
13   A.    Generally, yeah.
14   Q.    What do you recall?
15   A.    Just reviewing her findings and
16  listening to the opportunities and discussing
17  at a high level, you know, plans of action,
18  things that, you know, we would do.
19   Q.    Who did most of the talking?
20   A.    Tina Steffanie-Oak and
21  Ken Romeo would.
22   Q.    Was Ms. Steffanie-Oak tasked
23  with conducting an audit of the --
24  Henry Schein's SOM system?
25   A.    I don't recall.

Page 206

1    Q.    The meeting -- the title says
2  Meeting Minutes From Our February 11, 2014
3  Review of the SOM Audit Findings.
4         Do you know what SOM audit is
5  referred to in this -- in that title?
6    A.    Yes.
7    Q.    What?
8    A.    Suspicious order monitoring.
9    Q.    Right, that's what SOM stands
10  for.  My question I think is a little
11  different.
12        What is the SOM audit or who
13  conducted the SOM audit that is referenced in
14  the title of this document?
15    A.    I believe Tina Steffanie-Oak.
16    Q.    So the first finding says:
17  Current computerized suspicious order
18  monitoring system is dated, risk level high.
19        Do you see that?
20    A.    I do.
21    Q.    Do you recall any specific
22  discussion regarding the fact that the
23  current -- that Henry Schein's current SOM
24  system was dated?
25    A.    Nothing other than general

Page 207

1  discussion.  I don't remember any specifics
2  of it.
3    Q.    Were you involved in any
4  efforts following this meeting to update
5  Henry Schein's computerized suspicious order
6  monitoring system?
7    A.    Just on an oversight level.
8  Shaun -- Shaun and Lisa would have been more
9  into the details of that.
10    Q.    Okay.  At this point in 2014,
11  how long had Lisa Matalon been the manager of
12  the -- was she the manager of the customer
13  service division or of the verifications
14  department?
15    A.    Both.
16    Q.    Okay.
17    A.    Yeah.
18    Q.    So in 2014, how long had
19  Lisa Matalon been the manager of the
20  verifications department?
21    A.    Five years.
22    Q.    And in 2014, what was
23  Mr. Abreu's title with respect to the
24  verification department?
25    A.    Verifications supervisor, I

Page 208

1  believe.
2    Q.    How long had he been the
3  supervisor of the verifications department?
4    A.    I believe about four or five
5  years.
6    Q.    What department at Henry Schein
7  was responsible for the computerized
8  suspicious order monitoring system?
9    A.    Regulatory.
10    Q.    They were responsible for
11  designing it?
12    A.    Yeah, I believe.
13    Q.    Skip to number 2, finding
14  number 2 on the second page?
15    A.    Number 2?  Okay.
16    Q.    It says:  Individual account
17  thresholds for controlled substance purchase
18  may be adjusted by verifications without
19  regulatory and/or appropriate medical
20  guidance which could result in an
21  inappropriate product release.
22        Do you see that?
23    A.    I do.
24    Q.    It says risk level high, right?
25    A.    Uh-huh.

Page 209

1    Q.    So my first question:  Do you
2  recall any discussion at the meeting
3  concerning this topic?
4    A.    I don't.  Nothing -- not
5  specifically, no.
6    Q.    Okay.
7    A.    No.
8    Q.    There's a sub (a) there, right?
9    A.    Uh-huh.
10    Q.    And it says:  Decision-makers
11  in verifications department need additional
12  medical-related training and quantifications
13  to release controlled substances orders
14  without regulatory/medical guidance in some
15  instances.
16        Right?
17    A.    (Nods head.)
18    Q.    So do you recall any discussion
19  at this meeting concerning the need for
20  individuals in the verifications department
21  to receive additional medical-related
22  training?
23    A.    I do recall the discussion on
24  this because Ken Romeo was actually a doctor,
25  and I believe the thought in the room was

Page 210

1 that it's a good idea. But I don't think we
2 were completely convinced that it was
3 absolutely necessary.
4     Q.    Was there any discussion as to
5 who the decision-makers in the verifications
6 department were?
7     A.    I'm sorry, can you repeat it?
8     Q.    Sure. So the word
9 "decision-makers" is in quotes there, right?
10     A.    Right, uh-huh.
11     Q.    Was there discussion during
12 this meeting as to who the decision-makers in
13 the verification -- who were the
14 decision-makers in the verifications
15 department?
16     A.    Yeah, that -- that's a title,
17 so it's a job title, the SOM decision-makers.
18 I don't recall exactly who they were in 2014,
19 but it was probably a handful of
20 representatives.
21     Q.    And how are the decision-makers
22 different from representatives in the
23 verifications department?
24     A.    Their role. The role of their
25 position is different.

Page 211

1     Q.    So there -- if I understand the
2 verifications department, there are
3 representatives and then there are
4 decision-makers?
5     A.    Yes.
6     Q.    Was that the case throughout
7 your entire tenure overseeing the
8 verifications department?
9     A.    No.
10     Q.    And when did the verifications
11 department create the decision-maker role?
12     A.    When we implemented the
13 questionnaire.
14     Q.    In what way -- what
15 responsibilities did the decision-makers have
16 that differentiated them from regular
17 representatives in the verifications
18 department?
19     A.    I couldn't -- I couldn't
20 specify with any degree of accuracy. That
21 would have been Shaun and Lisa's expertise.
22     Q.    Were the decision-makers the
23 ones who reviewed the completed
24 questionnaires that came in from customers?
25     A.    Yes.

Page 212

1     Q.    So if the decision-makers were
2 reviewing the completed questionnaires, what
3 were the verifications department
4 representatives doing?
5     A.    Reviewing orders that were
6 pending in our system, but it may not have --
7 may or may not have included a controlled
8 substance. May have just been an Rx item,
9 may have been a -- it may have had a
10 controlled substance; it may have not.
11     Q.    Okay. Then there's a reference
12 here to -- so before we move on to there:
13 Did the decision-makers in the verifications
14 department ever receive additional
15 medical-related training to release
16 controlled substances orders?
17     A.    Yes.
18     Q.    When was that?
19     A.    I don't recall the exact date.
20     Q.    And what training did they
21 receive?
22     A.    It was a presentation from --
23 that Ken Romeo put together.
24     Q.    And was Mr. Romeo the one who
25 presented that presentation to the

Page 213

1 verifications department?
2     A.    Yes. Yes.
3     Q.    Did you attend that
4 presentation?
5     A.    I don't -- I don't believe I
6 did. I don't believe I attended his.
7     Q.    Were the decision-makers
8 located in both Melville and Reno, or were
9 they only in one location as opposed to the
10 other?
11     A.    At this time?
12     Q.    Yes.
13     A.    I believe only in Melville.
14     Q.    Is Henry Schein's headquarters
15 in Melville?
16     A.    Yes.
17     Q.    Did Mr. Romeo -- Mr. Romeo's
18 medical training presentation, how many times
19 did he give that presentation?
20     A.    Gosh, I don't recall if he did
21 the entire team in one sitting. He probably
22 didn't, so -- because we had to cover the
23 phones, so probably multiple times in each
24 location.
25     Q.    Was it a regular presentation

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  that occurred, you know, every six months, or
2  was it just done multiple times in a
3  relatively short time span?
4      A.   I don't know.  I don't recall.
5  I don't recall.  Shaun would probably know
6  that.
7      Q.   Okay.  Did the verification
8  department hire new decision-makers or task
9  different individuals with being
10 decision-makers after Mr. Romeo gave his
11 medical presentation?
12      MR. JONES:  Object to the form.
13      A.   I'm not sure I understand it,
14 understand what you're asking, so...
15 BY MR. ACKERMAN:
16      Q.   Mr. Romeo gave a medical
17 presentation at some point in time following
18 this meeting, correct?
19      A.   Yes.
20      Q.   Subsequent to that
21 presentation, were there additional people
22 who became decision-makers?
23      A.   Yes.
24      Q.   Did those additional people who
25 became decision-makers receive Mr. Romeo's

Page 215

1  presentation?
2      A.   I believe so.
3      Q.   If you wanted to find out
4  whether they had received it or not, how
5  would you do that?
6      A.   I would confirm with Sergio in
7  regulatory.  Ken was part of the regulatory
8  team.
9      Q.   Moving on to the next page,
10 ends in 368.
11      A.   Uh-huh.
12      Q.   There's a letter (b), and the
13 second sentence there says:  The current "gut
14 feeling" approach, while laudable, leaves
15 Schein exposed.  Operating within a closed
16 loop is usually dangerous.  During the
17 assessment process, accounts were identified
18 which needed further regulatory scrutiny but
19 were trapped within the closed loop.
20      Do you see those sentences?
21      A.   I do.
22      Q.   Do you recall any discussion at
23 this February 2014 meeting concerning the
24 verification team using a gut feeling
25 approach?

Page 216

1      A.   No, I don't.
2      Q.   Were you part of any changes
3  that were implemented in order to ensure that
4  the verification team was not employing a gut
5  feeling approach?
6      MR. JONES:  Object to the form.
7      A.   Yeah, I don't recall.  My
8  position is more of an oversight position, so
9  maybe Shaun and Lisa worked with regulatory
10 on that, but I don't recall anything
11 specific.
12 BY MR. ACKERMAN:
13      Q.   Part of your oversight position
14 is ensuring the company's compliance with
15 state and federal regulations, right?
16      A.   Yes.
17      Q.   So during the period where you
18 had oversight over the verifications
19 department, a member of Henry Schein is
20 identifying as a risk level high and
21 representing that members of your department
22 are using a gut feeling approach.
23      Did that cause you concern?
24      A.   Yes.
25      MR. JONES:  Object to the form.

Page 217

1  BY MR. ACKERMAN:
2      Q.   Did you have any discussions
3  with Ms. Matalon or Mr. Abreu regarding this?
4      A.   Yes.
5      Q.   What did you discuss with them?
6      A.   What did I discuss?
7      Q.   Yes.
8      A.   I don't recall exactly what we
9  discussed.
10      Q.   Do you recall generally what
11 you discussed?
12      A.   No.  I know we reviewed this.
13 We reviewed this in the meeting, but that's
14 all I remember.
15      Q.   You reviewed the minutes?
16      A.   The minutes.
17      Q.   In a separate meeting with
18 Ms. Matalon and Mr. Abreu?
19      A.   I don't recall if it was a
20 separate meeting or one meeting with
21 everybody, but there were -- I really don't
22 recall it at all, to be honest with you.
23      Q.   Finding number 3 at the bottom
24 of this page says:  Accounting data reported
25 to regulatory and verification underwriters

Page 218

1  as total sales may be materially misstated.
2      Do you see that?
3      A.   Uh-huh.  Yes.
4      Q.   Do you recall any discussion in
5  the meeting regarding that accounting data
6  reported to regulatory and verification
7  underwriters might have been materially
8  misstated?
9      A.   I don't recall any discussion
10 about that.
11     Q.   Were you involved in any
12 efforts following this meeting to ensure that
13 data reported to the verifications department
14 was not materially misstated?
15     A.   Not that I specifically --
16          MR. JONES:  Hang on one second.
17     Object to the form.
18          MR. ACKERMAN:  You can answer.
19     A.   Yeah, not that I specifically
20 remember.
21 BY MR. ACKERMAN:
22     Q.   Turn the page, finding
23 number 4.
24     A.   Okay.
25          MR. JONES:  And to be clear,

Page 219

1      we're talking about accounting data,
2      David.  I mean, I think your question
3      is misleading.
4  BY MR. ACKERMAN:
5      Q.   Did you ever conduct any
6  investigation to determine whether
7  information reported to the verifications
8  department that you oversaw was materially
9  misstated?
10          MR. JONES:  Objection, form.
11     A.   Not that I recall.
12 BY MR. ACKERMAN:
13     Q.   Finding number 4 on the page
14 that ends 499369, it says:  Current Schein
15 SOPs allow for existing customers a
16 three-time pend release of controlled
17 substances before an account is required to
18 produce full documentation of medical need on
19 many controlled substances.
20          Do you see that?
21     A.   I do.
22     Q.   Do you recall any discussion
23 during the meeting regarding this topic?
24     A.   Only what's in this.  I don't
25 remember anything else specific.

Page 220

1      Q.   Were you involved in any
2  changes to the SOPs following this meeting
3  that addressed when an account would be
4  required to produce full documentation of
5  medical need?
6      A.   Not that I remember.
7      Q.   Are you aware of whether the
8  SOPs were changed to address that topic?
9      A.   No.  I don't know.
10     Q.   You're not aware?
11     A.   I'm not aware.
12     Q.   All right.  Who would be
13 included in verifications upper management?
14     A.   Verifications upper management.
15     Q.   Yes.
16          MR. JONES:  Objection, form.
17     A.   Jim Mullins and myself, Jerry
18 Benjamin.
19 BY MR. ACKERMAN:
20     Q.   Okay.  If you look under this
21 heading 4, you see there's a subheading that
22 says Opportunities?
23     A.   Yes.
24     Q.   And then opportunity number 1
25 says:  Due diligence documents provided to

Page 221

1  Schein should be signed under penalty of
2  perjury, right?
3      A.   Yes.
4      Q.   Do you know whether that was
5  ever implemented?
6      A.   Yes, I believe it was.
7      Q.   And then opportunity number 2
8  says:  Acceptable level of risk for a second
9  "courtesy" release should be evaluated by
10 verifications upper management and programmed
11 accordingly into the computer system as a
12 hold for further documentation in the account
13 notes.
14          Do you see that?
15     A.   I do.
16     Q.   Did you ever following this
17 meeting evaluate a second courtesy release?
18     A.   Not that I recall specifically.
19     Q.   Did Mr. Mullins ever evaluate a
20 second courtesy release following this
21 meeting?
22     A.   I don't know.
23     Q.   Then there's a heading that
24 says Proposed Preliminary Actions directly
25 under the Opportunities, right?

Page 222

1    A.    Uh-huh.
2    Q.    It says:  Regulatory requested
3  that verifications use the complete list of
4  16 high-risk controlled substances instead of
5  the list of four controlled substances
6  currently being used to determine when
7  customer documentation is needed.
8         Do you see that?
9    A.    I do.
10   Q.    Do you recall any discussion
11 regarding using the complete list of 16
12 high-risk controlled substances as opposed to
13 a partial list of four controlled substances?
14   A.    No, nothing specific.
15   Q.    Do you know whether going
16 forward -- or do you know whether at this
17 time verifications was using a list of four
18 controlled substances to determine when
19 customer documentation was needed?
20   A.    No.
21   Q.    Do you know what the four
22 controlled substances were that were -- that
23 are referenced in this memorandum?
24   A.    No.
25   Q.    If you wanted to find out, how

Page 223

1  would you find out?
2    A.    I would ask Shaun or Sergio in
3  regulatory.
4    Q.    Okay.  Number 5 says:  Current
5  suspicious order monitoring system fails to
6  account for two potential deviant order
7  patterns.
8         You said the suspicious order
9  monitoring system falls within the regulatory
10 department, right?
11   A.    Yes.
12   Q.    Do you recall any discussion at
13 the meeting regarding the current SOM system
14 failing to account for two potential deviant
15 order patterns?
16   A.    No.
17   Q.    And then number 6 says:
18 Additional justification letters should be
19 reviewed by management.
20        Do you see that?
21   A.    I do.
22   Q.    Do you recall any discussion at
23 this meeting regarding whether additional
24 justification letters should be reviewed by
25 management?

Page 224

1    A.    No, I don't.
2    Q.    Do you recall any discussion
3  following this meeting regarding that topic?
4    A.    Not specifically, no.
5    Q.    Following this meeting, did you
6  ever review an additional justification
7  letter?
8    A.    No.
9    Q.    Following this meeting, did
10 Mr. Mullins ever review an additional
11 justification letter?
12        MR. JONES:  Object to the form.
13   A.    Not that I'm aware.
14 BY MR. ACKERMAN:
15   Q.    Number 9 on the last page says:
16 The decision-maker job position does not
17 exist at the Reno call facility.
18        Do you see that?
19   A.    I do.
20   Q.    Do you recall any discussion
21 regarding this topic?
22   A.    Not specifically, no.
23   Q.    Did Henry Schein establish a
24 decision-maker job position at the Reno call
25 facility following this meeting?

Page 225

1    A.    I don't know if -- how close in
2  relation to this meeting, but we have
3  established that position in the Reno call
4  center.
5    Q.    Okay.  Today how many
6  decision-makers are at the Reno call center?
7    A.    I don't even know.  I don't
8  know.
9         MR. ACKERMAN:  Good time for a
10 break?
11        MR. JONES:  Sure.
12        THE VIDEOGRAPHER:  The time is
13 now 3:22.  Going off the record.
14        (Recess taken, 3:22?p.m. to
15 3:35?p.m.)
16        THE VIDEOGRAPHER:  The time is
17 now 3:35, back on the record.
18        MR. ACKERMAN:  We've got a few
19 more documents to go.
20        THE WITNESS:  Sure.
21        MR. ACKERMAN:  Let's mark this
22 as Exhibit 16.
23        (HenrySchein-Brandt Deposition
24 Exhibit 16 marked.)
25        ///

Page 226

BY MR. ACKERMAN:

Q.    Mr. Brandt, the court reporter has handed you what's been marked as Exhibit 16. It is a multipage document. I'll note it's designated as highly confidential with the Bates number HSI-MDL_19701 through 19704.

A.    Okay.

Q.    Take a moment to review this document, let me know when you've had a chance to review it.

A.    All right.

(Document review.)

MR. ACKERMAN: While the witness is reviewing the document, I just want to state on the record that this is how the document was produced to us, but it appears to have two different e-mail chains merged together in the same document.

There are e-mails where the subject line is regarding pending HS order on the first two pages, carrying over into the third. And then it looks like the date switches to a

Page 227

later date and there's a subject line with a different reference, help with sorting spreadsheet.

I'm not sure --

MR. JONES: No, I will agree with your stipulation that this exhibit is unreliable and you shouldn't ask any questions about it.

MR. ACKERMAN: That was not my stipulation. All I was going to say was I only intend to ask you questions about the -- that portion of the e-mail chain that has the subject line: Pending HS order.

THE WITNESS: Okay.

MR. ACKERMAN: All right.

(Document review.)

THE WITNESS: Okay.

BY MR. ACKERMAN:

Q.    Understanding the different subject lines, but have you generally seen this e-mail chain before?

A.    Not in ten years.

Q.    That much I understand.

So turning to the second page.

Page 228

A.    Okay.

Q.    The e-mail at the bottom is an e-mail from Donna Remondino.

A.    Yes.

Q.    Have you already described who Ms. Remondino was?

A.    I believe so.

Q.    What was her position in 2007?

A.    She was the supervisor of verifications in Melville.

Q.    And she sends an e-mail to Sergio Tejeda, Albert Clancy. What was Mr. Clancy's position in 2007?

A.    Al was in regulatory.

Q.    Lisa Matalon and you?

A.    Uh-huh.

Q.    Stating -- and the subject line is: Pending HS Order.

The question is, and she writes: Sergio, I have an order that is currently pending suspicious with a zero threshold.

Do you see that?

A.    Uh-huh.

Q.    Do you have an understanding as

Page 229

what that means, an order that is currently pending suspicious with a zero threshold?

A.    No, I don't.

Q.    And then a couple -- it says: Thomas E. Long is ordering hydromorphone HCl tablets. The item is in the system with zero as the threshold for all to pend.

Do you see that?

A.    Yes, I do.

Q.    What does that mean, that the item is in the system -- do you have any understanding -- with zero as the threshold for all to pend?

A.    That means every order -- every time that gets ordered, it will pend for review.

Q.    Then Ms. Remondino said: I've checked the doctor's DEA and show he is listed as an MD.

And a little further down: I tracked all his orders in the system and show that they are all left at the front door. I am very hesitant to release this item.

Do you see that?

A.    Uh-huh.

Page 230

1   Q.   So that e-mail is sent on
2  March 21, 2007, and then nine days later --
3  nine days later, Ms. Remondino e-mails only
4  Ms. Matalon and says:  I released the order
5  today to ship to the doctor.  I had it on
6  hold for a response.  I have not gotten a
7  response from Sergio.  I never get any
8  response from Sergio on any issue that comes
9  up in verifications.  And then the e-mail
10  goes on.
11       And it appears that Ms. Matalon
12  then forwards the e-mail to you?
13   A.   Uh-huh.
14   Q.   My question is:  Do you have
15  any recollection of this situation?
16   A.   No, not specifically.
17   Q.   Okay.  Generally?
18   A.   No.
19   Q.   Is it unusual that orders of
20  hydromorphone HCl tablets would be left at
21  the front door of a -- of a
22  customer's delivery location?
23   A.   What was the ask?  Is it --
24   Q.   Yeah, sure.  So going back to
25  the second page.

Page 231

1   A.   Yeah.
2   Q.   Ms. Remondino writes:  I
3  tracked all his orders in the system and show
4  that they are all left at front door.
5   A.   Uh-huh.
6   Q.   Is that an unusual occurrence
7  in your experience at Schein?
8   A.   It depends on --
9       MR. JONES:  Object to the form.
10   A.   It depends on the -- if it's a
11  residence, then no.
12  BY MR. ACKERMAN:
13   Q.   Did Schein have any procedures
14  in place in 2007 that required that a
15  customer physically sign for deliveries of
16  class II controlled substances?
17   A.   I don't know.  I don't know.
18   Q.   Did you have any discussions
19  with Mr. Mullins regarding this situation?
20   A.   I don't recall.
21   Q.   Mr. Mullins writes here:  Bill,
22  can you please discuss directly with Sergio.
23       Right?
24   A.   Right.
25   Q.   Do you see that?

Page 232

1   A.   I do.
2   Q.   Did you have any discussions
3  with Mr. Tejeda regarding this situation?
4   A.   I'm sure I did.
5   Q.   Do you recall those
6  discussions?
7   A.   No, I don't.
8   Q.   In 2007, did individuals in the
9  verifications department have the authority
10  to release orders if they had not received
11  any response from the regulatory department?
12   A.   I don't know.
13   Q.   Ms. Remondino writes at the
14  bottom of page 1:  I released the order today
15  to ship to the doctor.  I had it on hold for
16  a response.
17       Do you see that?
18   A.   I do.
19   Q.   Does that suggest to you that
20  at least Ms. Remondino had the authority to
21  release an order even if it was -- if she had
22  not received a response from the regulatory
23  department regarding an inquiry?
24       MR. JONES:  Object to the form.
25   A.   I don't know.

Page 233

1  BY MR. ACKERMAN:
2   Q.   Ms. Matalon's e-mail to you
3  writes -- she writes at the bottom:  We have
4  become regulatory.  I think we need to meet
5  before Janet comes back and figure out what
6  are our responsibilities and what is theirs.
7  I feel we are doing much more than
8  verifications.
9       Do you see that?
10   A.   I do.
11   Q.   Do you recall any discussions
12  with Ms. Matalon regarding figuring out what
13  are verifications' responsibilities and what
14  are regulatory's responsibilities?
15   A.   Not specific to that.
16   Q.   Okay.
17   A.   Yeah.
18   Q.   Did you have any discussions
19  with anyone else concerning what the
20  responsibilities of the verifications
21  department were vis-?-vis the
22  responsibilities of the regulatory
23  department?
24   A.   Not that I recall specifically,
25  no.

Page 234

1  Q.   And then at the top of this
2  document is a -- what appears to be a meeting
3  invitation.  Would you agree?
4  A.   Yes.
5  Q.   It shows you as the organizer?
6  A.   Yes.
7  Q.   And the attendees are -- well,
8  you, Mr. Tejeda, Mr. Clancy and Ms. Matalon?
9  A.   Yes.
10  Q.   Did you convene this meeting?
11  A.   I don't remember.
12  Q.   Or it looks like it may have
13  been a telephone conference.
14  A.   Uh-huh.
15  Q.   Do you recall anything about --
16  do you recall a telephone conference on this
17  subject?
18  A.   No.
19      MR. ACKERMAN:  You can put that
20  one aside.
21      THE WITNESS:  Okay.
22      MR. ACKERMAN:  Let's mark this
23  as Exhibit 17.
24      (HenrySchein-Brandt Deposition
25  Exhibit 17 marked.)

Page 235

1  BY MR. ACKERMAN:
2  Q.   Mr. Brandt, the court reporter
3  has handed you what's been marked as
4  Exhibit 17.  It's a one-page document
5  numbered HSI-MDL_2760.  It's been designated
6  as highly confidential.
7  A.   Okay.
8  Q.   Take a moment to review this
9  document and let me know when you've had a
10  chance to review it.
11      (Document review.)
12  A.   Okay.
13  BY MR. ACKERMAN:
14  Q.   Okay.  You are not on this
15  document, and I will stipulate to that.
16  A.   Okay.
17  Q.   But I want to ask you a
18  question about something that appears in the
19  document.
20  A.   Okay.
21  Q.   Would you agree this document
22  appears to be an invitation from Donna
23  Remondino Tomaselli to certain individuals,
24  including Shaun Abreu, about scheduling a
25  team meeting?

Page 236

1  A.   Yes.
2  Q.   Who is Maggie Wilding?
3  A.   Maggie Wilding is now
4  Maggie Koromi, she's the supervisor in Reno.
5  Q.   In the verifications
6  department?
7  A.   In the verifications
8  department.
9  Q.   And who is or was
10  Judy LaBarbera?
11  A.   She was the team leader in
12  Melville for verifications.
13  Q.   So it looks like this is a team
14  meeting from -- between the verification
15  teams in Melville -- or that would have
16  included the verification -- at least
17  individuals in the verification teams in
18  Melville and Reno; is that right?
19  A.   They're discussing what the
20  agenda should be, it looks like to me.
21  Q.   Yes.
22  A.   Yes.
23  Q.   Now, near the bottom of the
24  page, it says:  Some things we can discuss,
25  and then there's a reference to SOM.

Page 237

1      And it says:  I hear some team
2  members giving information on orders pending
3  in SOM.  I do not want the reps giving detail
4  to the customers or sales rep to avoid a
5  pend.
6      Do you see that?
7  A.   I do.
8  Q.   Were you involved in any
9  discussion regarding verification department
10  representatives giving detail to customers or
11  sales representatives in order to avoid a
12  pending order?
13      MR. JONES:  Object.  Object to
14  the form.
15  A.   Not that I recall.
16  BY MR. ACKERMAN:
17  Q.   Did you ever hear about
18  representatives giving details to customers
19  or sales representatives to avoid pending the
20  order?
21  A.   Not that I recall.  We would
22  all be concerned as Donna was here, if we
23  heard.
24  Q.   If that had occurred, would you
25  have expected that one would have informed

Page 238

1  you of the occurrence?
2      A.    Not necessarily.  Not
3  necessarily, not knowing the severity of it,
4  I guess.
5      Q.    Okay.
6      A.    Yeah.
7          MR. ACKERMAN:  Mark this as
8      Exhibit 18.
9          (HenrySchein-Brandt Deposition
10     Exhibit 18 marked.)
11 BY MR. ACKERMAN:
12     Q.    Mr. Brandt, the court reporter
13 has handed you what's been marked as
14 Exhibit 18, which is a document numbered
15 HSI-MDL_2667 through 2668.
16     A.    Okay.
17     Q.    Take a moment to review this
18 document, let me know when you've had a
19 chance to review it.
20     A.    Okay.
21         (Document review.)
22     A.    Okay.
23 BY MR. ACKERMAN:
24     Q.    Have you seen this document
25 before?

Page 239

1      A.    Not in -- not in eight years.
2      Q.    This is an e-mail chain that
3  you are involved in, correct?
4      A.    Yes.
5      Q.    And at the -- on the second
6  page on the first e-mail, Ms. Matalon writes
7  to you that the DEA recommended to Mike
8  DiBello that in Florida we send a Know Your
9  Customer letter to each customer purchasing
10 controls to ensure that they are not
11 self-medicating or sending drugs to
12 residences.  We got a slap on the wrist for
13 the last occurrence in May, but the DEA said
14 the next time could be a penalty.
15         Do you see that?
16     A.    I do.
17     Q.    It says shipping controls.
18 Does that refer to controlled substances?
19     A.    Yes.
20     Q.    And do you know what she's
21 referring to where it says we got a slap on
22 the wrist for the last occurrence in May?
23     A.    No, I don't know what she's
24 referring to by that.
25     Q.    Okay.  Does this indicate that

Page 240

1  the DEA was concerned about doctors
2  self-medicating with controlled substances?
3          MR. JONES:  Object to the form.
4      A.    I don't know.
5  BY MR. ACKERMAN:
6      Q.    Was Henry Schein concerned
7  about doctors who self-medicated using
8  controlled substances they purchased from the
9  Schein company?
10         MR. JONES:  Object to the form.
11     A.    Yes.
12 BY MR. ACKERMAN:
13     Q.    In fact, the questionnaire form
14 that we talked about earlier, one of the
15 questions specifically was do you
16 self-medicate, right?
17     A.    That's correct.
18     Q.    And what is the reason that the
19 Schein company asks that question of
20 customers?
21     A.    Because that violates one of
22 our business rules and DEA regulations.
23     Q.    So then there is some
24 back-and-forth about identifying residential
25 offices, correct?

Page 241

1      A.    Uh-huh, yes.
2      Q.    And then a meeting or a call on
3  June 14th, 2011 to discuss -- discussing
4  residential -- or to discuss the issue that
5  Ms. Matalon raised, right?
6      A.    Yes, uh-huh.
7      Q.    Whatever -- do you know how
8  this -- or whether this issue was ever
9  resolved?
10     A.    I believe it was.
11     Q.    And what happened?
12     A.    I believe this started our
13 Google search protocol of searching for
14 residences on Google.
15     Q.    And tell me what is the Google
16 search protocol?
17     A.    I don't know exactly.
18     Q.    Just generally, yeah.
19         What was the protocol that
20 resulted from this situation?
21     A.    I don't know it exactly.
22     Q.    Okay.  But in general terms
23 what was it?
24     A.    Looking up an address on Google
25 to see if there's a physical building there,

Page 242

1  and if it looks like a residential versus a
2  professional building.
3      Q.    And if it looked like it was a
4  residential building as opposed to a
5  professional building, what then would
6  Henry Schein do?
7      A.    I don't know.  Yeah, I don't
8  know.
9          MR. ACKERMAN:  Okay.  Let's
10  mark this next one as Exhibit 19.
11          (HenrySchein-Brandt Deposition
12  Exhibit 19 marked.)
13  BY MR. ACKERMAN:
14      Q.    Mr. Brandt, the court reporter
15  has handed you what's been marked as
16  Exhibit 19.
17      A.    Okay.
18      Q.    Which is a document numbered
19  HSI-MDL_20069 through 20070.
20          Take a moment to review this
21  document, let me know when you've had a
22  chance to review it.
23      A.    Okay.
24          (Document review.)
25      A.    Okay.

Page 243

1  BY MR. ACKERMAN:
2      Q.    Do you recognize this document?
3      A.    No.
4      Q.    This is an e-mail chain on
5  which you are copied; is that correct?
6      A.    Yes.
7      Q.    Looking at the last e-mail on
8  the first page, it's from Mr. Abreu to
9  Craig Schiavo?
10      A.    Schiavo.
11      Q.    I think it's explanatory from
12  the next e-mail up, but what was
13  Mr. Schiavo's position at that time?
14      A.    Regulatory, analyst or
15  something.
16      Q.    And Mr. Abreu writes:  Please
17  see the attached file from the KYC proactive
18  process.
19          KYC stands for Know Your
20  Customer, right?
21      A.    Uh-huh, yes.
22      Q.    This doctor was
23  self-medicating, but he did 31,000 in sales
24  for 2011.  I had him send us justification
25  stating that he will no longer order the

Page 244

1  product to self-medicate, and that all future
2  controlled substances orders will be for
3  patient use.
4          Do you see that?
5      A.    I do.
6      Q.    What's the relevance of the
7  fact that the doctor did 31,000 in sales for
8  2011?
9          MR. JONES:  Object to the form.
10      A.    Nothing.  I don't know.  I
11  don't know what he meant by that.
12  BY MR. ACKERMAN:
13      Q.    If a doctor is self-medicating,
14  does it matter how much in sales the doctor
15  was doing for Henry Schein?
16      A.    I don't think so, no.
17      Q.    Did Henry Schein treat doctors
18  differently if they generated bigger sales
19  figures for the company?
20      A.    I don't believe so, no.
21      Q.    When Henry Schein was
22  considering whether the controlled substances
23  it was shipping were being used for
24  legitimate medical uses, did the sales
25  figures for the doctor factor into that

Page 245

1  consideration?
2      A.    I don't believe so, no.
3      Q.    Okay.  Did you ever ask
4  Mr. Abreu why he referenced the total number
5  of sales in this e-mail?
6      A.    I don't recall if I did or not.
7      Q.    Okay.
8          MR. ACKERMAN:  Let's mark this
9  as Exhibit 20.
10          (HenrySchein-Brandt Deposition
11  Exhibit 20 marked.)
12  BY MR. ACKERMAN:
13      Q.    Mr. Brandt, the court reporter
14  has handed you what's been marked as
15  Deposition Exhibit 20.  It's a multipage
16  document numbered HSI-MDL_00046124 through
17  46126.
18      A.    Okay.  27?
19      Q.    I'm sorry, 27.  Thank you.
20          Take a moment to review this
21  document, let me know when you've had a
22  chance to review it.
23      A.    All right.
24          (Document review.)
25      A.    Okay.

Page 246

BY MR. ACKERMAN:

1   Q.   Now, do you recognize this
2   e-mail chain?
3   A.   Not in four years, but yeah.
4   But I wrote it, obviously.
5   Q.   And these are e-mails to and
6   from you?
7   A.   Yes.
8   Q.   Okay.  Start at the back of the
9   chain on page 127 -- I guess it begins on
10  126.
11  A.   26, yeah.
12  Q.   And there's an e-mail from
13  Christine Stratton.
14      Do you see that?
15  A.   Yep.
16  Q.   In May 2014, was Christine
17  Stratton a Henry Schein employee?
18  A.   Yes.  She was, I believe, a
19  team lead for verifications.
20  Q.   She sends an e-mail to you and
21  to April Leal?
22  A.   Yes, my administrator, admin.
23  Q.   Okay.  And there's a copy to
24  Shaun Abreu and to Leah Mannino.

Page 247

1   A.   Leah was a team lead as well in
2   Melville for verifications.
3   Q.   Christine Stratton writes:
4   Hello, Bill.  The attached doctor is being
5   restricted for self-medicating.  The
6   doctor advised to cancel his order but did not want
7   to send anything to us in writing.  Please
8   just send the letter to him and not the DEA.
9       Do you see that?
10  A.   Uh-huh.
11  Q.   In 2014, did you have any
12  involvement in sending letters to customers
13  advising them that their orders were
14  restricted?
15  A.   Yes.
16  Q.   And what was that involvement?
17  A.   The letter was -- has my
18  signature on it.
19  Q.   Okay.  Did you do any
20  investigation before that letter was sent?
21  A.   Before the letter is sent?
22  Q.   Yeah.
23  A.   No.
24  Q.   So other than the letter having
25  your signature on it, were you involved in

Page 248

1   any other respect in the decision whether or
2   not to restrict an order --
3   A.   No.
4   Q.   -- to a customer?
5   A.   No.
6   Q.   And then the next e-mail is
7   your response, correct?
8   A.   Uh-huh, yes.
9   Q.   And it says:  Christine, let's
10  discuss this with the FSC and RSM before we
11  decide to restrict.  This is a really big
12  account, and I think we need some dialogue.
13      Do you see that?
14  A.   Yes.
15  Q.   First question:  What is FSC?
16  A.   Field sales consultant.
17  Q.   Who was the field -- what does
18  that mean, field sales consultant?
19  A.   It's just the salesperson
20  that's in the field that goes in to visit the
21  account.
22  Q.   And what is RSM?
23  A.   Regional sales manager.
24  Q.   And what responsibility does
25  the regional sales manager have?

Page 249

1   A.   I don't know, just to manage
2   the field sales reps, consultants.
3   Q.   Okay.  Why did you suggest
4   discussing with the field sales consultant
5   and regional sales manager before we decide
6   to restrict?
7   A.   Based on the -- what's in here,
8   the customer canceled the order, so there was
9   no pending order, and I thought a dialogue
10  would be appropriate.
11  Q.   Why do you think a dialogue
12  would be appropriate?
13  A.   I don't know, to advise them of
14  the situation.
15  Q.   You wrote:  This is a real big
16  account.
17  A.   Uh-huh.
18  Q.   Why did you write that?
19  A.   I don't know.  I don't recall.
20  Q.   Does Ms. Stratton's e-mail
21  advise this is a big account?
22  A.   Doesn't look like it, no.
23  Q.   So how did you know that it's a
24  big account?
25  A.   I -- I don't know.  I don't

Page 250

1 recall.
2     Q.    And then a few e-mails up,
3 there's another e-mail from Ms. Stratton on
4 June 3rd, 2014, and it says:  I just spoke to
5 the FSC, Emily.  She said the doctor was
6 really upset/mad about the situation, and
7 that she was already aware of it.
8     Do you see that?
9     A.    I do.
10     Q.    And you responded or -- well,
11 you replied only to Mr. Abreu and
12 Ms. Matalon, right, you said:  The
13 communication was too late here.
14     A.    Uh-huh.
15     Q.    I asked you guys to communicate
16 last month before the letter went out to try
17 to work something out to avoid upsetting this
18 account.
19     A.    Uh-huh.
20     Q.    Why didn't we reach out before
21 the letter went to the doctor?
22     Do you see that?
23     A.    I do.
24     Q.    Why were you upset that no one
25 had reached out to the field sales consultant

Page 251

1 before the letter went to the doctor?
2     A.    I think my intent here was to
3 advise the regional manager that it was --
4 that this was the course of action that was
5 happening, so that we didn't -- so that it
6 wouldn't be a shock to the account.
7     Q.    Okay.  Go to the e-mail.
8     A.    Uh-huh.
9     Q.    The top of the e-mail is
10 another e-mail from you to Mr. Abreu and
11 Ms. Matalon in the same chain, right?
12     A.    Yes.
13     Q.    And you write:  Thanks Shaun.
14 These large accounts don't get restricted
15 often, so it's important we connect with the
16 sales guys ASAP to make them aware in case
17 they want to try and work something out with
18 regulatory.
19     Do you see that?
20     A.    I do.
21     Q.    What did you mean by try and
22 work something out with regulatory?
23     A.    I don't recall exactly what --
24 you know, what I had in mind, but making them
25 aware, seeing if there was possibly a

Page 252

1 different way, if -- you know, I guess just
2 having the dialogue to see if there's
3 anything we can do to preserve their
4 relationship with the account.
5     Q.    For large accounts, right?
6     A.    Not necessarily.  I mean --
7     Q.    Well, your e-mail says:  These
8 large accounts don't get restricted often,
9 doesn't it?
10     A.    Yes.
11     Q.    And did you instruct Shaun that
12 he should reach out to the salesperson with
13 respect to every account that gets
14 restricted?
15     A.    No.
16     Q.    Was it the practice at
17 Henry Schein that when large accounts got
18 restricted, the sales reps were encouraged to
19 try and work something out with regulatory
20 department?
21     A.    No.
22     MR. ACKERMAN:  Let's take a
23 break.
24     THE VIDEOGRAPHER:  The time is
25 now 4:12, going off the record.

Page 253

1     (Recess taken, 4:12?p.m. to
2 4:31?p.m.)
3     THE VIDEOGRAPHER:  The time is
4 now 4:31.  Back on the record.
5     MR. ACKERMAN:  I believe this
6 is Exhibit 21.
7     (HenrySchein-Brandt Deposition
8 Exhibit 21 marked.)
9 BY MR. ACKERMAN:
10     Q.    Mr. Brandt, the court reporter
11 has handed you what's been marked as
12 Deposition Exhibit 21, which is a multipage
13 document numbered HSI-MDL_00156897 through
14 899.
15     Take a moment to review it.
16 You're not on it, but I just have a couple of
17 quick questions for you.
18     A.    Okay.
19     (Document review.)
20     A.    Okay.
21 BY MR. ACKERMAN:
22     Q.    Okay.  I'm going to ask you
23 just a couple of questions about the first
24 page of this e-mail, and there's an e-mail --
25 or of the document, all right?

Page 254

1     There's an e-mail from Doug
2 Crawford, who is a -- according to the
3 document, a Drug Enforcement Administration
4 diversion investigator.
5     Do you see that?
6   A.  Is it on the --
7   Q.  Sorry, on the first page.
8   A.  Yeah.
9   Q.  Just the top of the page?
10   A.  Yeah, Doug, okay.
11   Q.  And he writes to Ms. Tomaselli?
12   A.  Yes.
13   Q.  And he writes -- and this is
14 regarding Richard Mason. He writes: Here in
15 Ohio, doctors that dispense are required to
16 report to the Ohio prescription drug
17 monitoring program, ORS. ORS reports that
18 Dr. Mason has never reported any dispensing.
19 I ran ARCOS and found that Dr. Mason ordered
20 10,000 hydrocodones since 2012. I went to
21 Mason's practice to inspect the records which
22 he did not produce. I gave him time to find
23 the records and arrange a time to return to
24 the inspection.
25     A few days later the state

Page 255

1 pharmacy board went to inspect his records,
2 at which time Dr. Mason admitted to them that
3 he lied to me and had no dispensing records
4 because he was addicted to hydrocodone and
5 had been ordering hydrocodone from your
6 company for his personal use. If you need
7 any additional information, please let me
8 know.
9     Do you see that e-mail?
10   A.  I do. I haven't seen it
11 before.
12   Q.  I understand that, and you're
13 not on this e-mail.
14   A.  Yeah, I see it.
15   Q.  Would Dr. Mason have received a
16 practitioner questionnaire in 2012, assuming
17 he began ordering hydrocodone in 2012?
18     MR. JONES: Object to the form.
19   A.  I don't -- yeah, I don't know.
20 I don't want to speculate.
21 BY MR. ACKERMAN:
22   Q.  Okay. Would Henry Schein have
23 been shipping hydrocodone to Dr. Mason if he
24 had not completed a practitioner
25 questionnaire?

Page 256

1     MR. JONES: Object to the form.
2   A.  I don't know. I don't know.
3 2012, yeah, I don't know. Was it 2012? Is
4 that --
5 BY MR. ACKERMAN:
6   Q.  I used 2012 because the DEA
7 investigator writes: I ran ARCOS and found
8 that Mason ordered 10,000 hydrocodones since
9 2012.
10   A.  But it's not clear if that was
11 ordered through us.
12   Q.  Correct, it doesn't say who it
13 was ordered from?
14   A.  Okay.
15   Q.  But it does say further down:
16 Dr. Mason admitted to them that he lied to me
17 and had no dispensing records because he was
18 addicted to hydrocodone and had been ordering
19 hydrocodone from your company for his
20 personal use.
21     Right?
22   A.  That's what it says, yeah.
23   Q.  And Ms. Tomaselli responds: We
24 will restrict the account today.
25     Correct?

Page 257

1   A.  Yes.
2   Q.  She didn't respond and say we
3 have no record of shipping to Dr. Mason, did
4 she?
5   A.  No.
6   Q.  So my question again: Did
7 Dr. Mason complete a practitioner
8 questionnaire before Henry Schein shipped
9 hydrocodone to him?
10     MR. JONES: Object to the form.
11   A.  I don't know.
12 BY MR. ACKERMAN:
13   Q.  If you wanted to know, how
14 would you find out?
15   A.  I would ask Shaun or Donna.
16   Q.  If Dr. Mason had completed a
17 practitioner questionnaire and had indicated
18 on the questionnaire that he was
19 self-medicating, would Henry Schein have
20 shipped hydrocodone to him following that
21 questionnaire?
22     MR. JONES: Object to the form.
23   A.  No, we shouldn't.
24 BY MR. ACKERMAN:
25   Q.  If Dr. Mason had completed the

Page 258

1  questionnaire and indicated that he wasn't
2  self-medicating, that would not have tripped
3  any -- or that would not have -- that answer
4  would not have raised any concerns at
5  Henry Schein, correct?
6        MR. JONES:  Object to the form.
7      A.   If -- if he -- can you restate
8  that?
9  BY MR. ACKERMAN:
10     Q.   Sure.
11     A.   Okay.
12     Q.   The reviewers, the
13 decision-makers who -- I don't know whether
14 there were decision-makers at this time.
15     A.   Uh-huh, uh-huh.
16     Q.   But the decision-makers who
17 reviewed the questionnaires, one of the --
18 one of the questions they review is:  Are you
19 self-medicating?
20     A.   Correct.
21     Q.   Right?  It may not be stated
22 that way.  I'm just --
23     A.   Yeah.
24     Q.   -- summarizing.
25        If the answer is no, I am not

Page 259

1  self-medicating, that answer is -- does not
2  raise a red flag, correct?
3      A.   Typically, no.
4      Q.   Okay.  We can put that one
5  aside.
6      A.   Okay.
7      Q.   I want to just go through three
8  exhibits that we've already talked about.
9      A.   Okay.
10     Q.   Okay.  And let's start with
11 Exhibit 16.  Okay?
12     A.   Uh-huh.
13     Q.   Do you have that in front of
14 you?
15     A.   I do.
16     Q.   And Exhibit 16 is the 2007
17 e-mail -- or the e-mail regarding the pending
18 HS order, correct?
19        And in that -- on the first
20 page of this e-mail, a little more than
21 halfway down, Ms. Matalon writes to you:  We
22 have become regulatory.  I think we need to
23 meet before Janet comes back and figure out
24 what are our responsibilities and what is
25 theirs.  I feel we are doing much more than

Page 260

1  verifications.
2        Correct?
3        MR. JONES:  Did you read that
4  correctly?
5      A.   That's how it's stated.
6  BY MR. ACKERMAN:
7      Q.   Is that what Ms. Matalon wrote
8  to you?
9      A.   Yes.
10     Q.   And Ms. Matalon's concern in
11 that e-mail is that she wants to figure out
12 what are the responsibilities of the
13 verification department and what are the
14 responsibilities of the regulatory
15 department; is that correct?
16     A.   Yes.
17        MR. JONES:  Objection, form,
18 document speaks for itself.
19 BY MR. ACKERMAN:
20     Q.   Okay.  Now take a look at
21 Exhibit 13.  Exhibit 13 is the Cegedim
22 Dendrite document that's entitled Schein SOM
23 Procedural Review, correct?
24     A.   Yes.
25        MR. JONES:  Objection.  To be

Page 261

1  clear, it says draft on it, unlike the
2  other documents you went over with him
3  on that.
4  BY MR. ACKERMAN:
5      Q.   And we have established, I
6  think we had already testified that although
7  the document is undated, it had to have been
8  written at least after December 16th, 2009,
9  based on the reference to that date on
10 page 2; is that correct?
11        MR. JONES:  Objection, form,
12 calls for speculation.
13     A.   I don't know.  Yeah, I don't
14 know.
15 BY MR. ACKERMAN:
16     Q.   Take a look at page 2 of
17 Exhibit 16 at the bottom, right?
18     A.   16?
19     Q.   I'm sorry.  It's Exhibit 13.
20     A.   13?
21     Q.   Yeah.  I apologize.
22        It says:  On December 16, 2009,
23 Messrs. Williams and Owen returned for a
24 second visit as provided for in the agreement
25 between CDCS and HSI; is that correct?

Page 262

1    A.    Yes.
2    Q.    Turn to page 4 of that exhibit,
3  please.  At the bottom of page 4, does the
4  document say:  However, the responsibilities
5  of the customer service department, the
6  verifications department and the regulatory
7  department appear to be poorly defined?
8    A.    Yes.
9    Q.    Now turn to Exhibit 15.
10  Exhibit 15 are the meeting minutes from a
11  meeting in February 2014, correct?
12    A.    Yes.
13    Q.    And on page 2 of that document,
14  Ms. Steffanie-Oak wrote:  The verifications
15  team is operating in a latent closed loop
16  system.
17      Correct?
18    A.    Yes.
19    Q.    And at the bottom of that
20  paragraph, it says:  Also internal
21  documentation such as account notations
22  performed by the suspicious order HS teams is
23  not revealed to regulatory on a regular
24  basis.
25      Correct?

Page 263

1    A.    Yes.
2    Q.    And then on the next page under
3  letter (b), she wrote:  Better define the
4  limits under which an atypical account is
5  processed into the regulatory system.
6      Correct?
7    A.    Yes.
8    Q.    And Exhibit 15 is seven years
9  after Exhibit 16, correct?
10      MR. JONES:  Object to the form.
11    A.    Say that again?  What was your
12  question?
13  BY MR. ACKERMAN:
14    Q.    Exhibit 15 is dated
15  February 17th, 2014, correct?
16    A.    Yes.
17    Q.    And Exhibit 16 is dated
18  April 9th, 2007, correct?
19    A.    That's correct.
20    Q.    So almost seven years have
21  elapsed between these two documents.  Would
22  you agree?
23    A.    Yes.
24      MR. ACKERMAN:  I have nothing
25  further.

Page 264

1      MR. MENGIS:  I'll reserve my
2  questions.
3      MR. JONES:  We'll reserve our
4  questions.
5      MR. PERRY:  Reserve.
6      THE VIDEOGRAPHER:  The time is
7  now 4:45.  This concludes the
8  deposition.  Going off the record.
9      (Proceedings recessed at
10  4:45 p.m.)
11      --o0o--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1      CERTIFICATE
2    I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
3  Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
4  and Notary Public, do hereby certify that
prior to the commencement of the examination,
5  BILL BRANDT was duly sworn by me to testify
to the truth, the whole truth and nothing but
6  the truth.
    I DO FURTHER CERTIFY that the
7  foregoing is a verbatim transcript of the
testimony as taken stenographically by and
8  before me at the time, place and on the date
hereinbefore set forth, to the best of my
9  ability.
    I DO FURTHER CERTIFY that pursuant
10  to FRCP Rule 30, signature of the witness was
requested by the witness or other party
11  before the conclusion of the deposition.
    I DO FURTHER CERTIFY that I am
12  neither a relative nor employee nor attorney
nor counsel of any of the parties to this
13  action, and that I am neither a relative nor
employee of such attorney or counsel, and
14  that I am not financially interested in the
action.
15
16
17
18
19  MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
20  NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
21  Certified Court Reporter

Notary Public in and for the
22  State of Texas
My Commission Expires:  7/9/2020
23
Dated: 19th day of February, 2019
24
25

Page 266

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 268

## ACKNOWLEDGMENT OF DEPONENT

I, BILL BRANDT, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
BILL BRANDT                    DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

_____
Notary Public

Page 267

## ERRATA

PAGE  LINE  CHANGE

____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____

Page 269

## LAWYER'S NOTES

PAGE   LINE

____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____
____   ____   _____