Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3                         - - -

 4   IN RE:  NATIONAL         )

     PRESCRIPTION OPIATE      )  MDL No. 2804

 5   LITIGATION               )

     _____)  Case No. 1:17-MD-2804

 6                            )

     THIS DOCUMENT RELATES    )

 7   TO ALL CASES             )  Hon. Dan A. Polster

 8

 9

10                         - - -

11             Tuesday, November 27, 2018

12        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

13                 CONFIDENTIALITY REVIEW

14                         - - -

15

16         Videotaped deposition of Eric Brantley,

17   held at the Durham Hotel, 315 East Chapel Hill

18   Street, Durham, North Carolina, commencing

19   at 9:01 a.m., on the above date, before Karen

20   Kidwell, Registered Merit Reporter and Notary Public.

21                         - - -

22

23

24              GOLKOW LITIGATION SERVICES

             877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```

Page 2

```
 1           A P P E A R A N C E S:
 2  On behalf of the Plaintiffs:
 3     MCHUGH FULLER LAW GROUP
       BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4        mike@mchughfuller.com
       97 Elias Whiddon Road
 5     Hattiesburg, Mississippi  39402
       601-261-2220
 6
 7        and
 8     LEVIN PAPANTONIO THOMAS MITCHELL
       RAFFERTY & PROCTOR P.A.
 9     BY:  MICHAEL PAPANTONIO, ESQUIRE
          mpapantonio@levinlaw.com
10     BY:  ARCHIE C. LAMB, ESQUIRE
          alamb@levinlaw.com
11     316 South Baylen Street, Suite 600
       Pensacola, Florida  32502
12     205-435-7000
13        and
14     SEEGER WEISS LLP
       BY:  DAVID R. BUCHANAN, ESQUIRE
15        dbuchanan@seegerweiss.com
       77 Water Street, 8th Floor
16     New York, NY  10005
       212-584-0700
17
18
19  On behalf of the Cardinal Health, Inc.:
20     WILLIAMS & CONNOLLY LLP
       BY:  STEVEN M. PYSER, ESQUIRE
21        spyser@wc.com
       BY:  MATTHEW MONAHAN, ESQUIRE
22        mmonahan@wc.com
       725 Twelfth Street, N.W.
23     Washington, DC  20005
24     202-434-5899
25
```

Page 4

```
 1  APPEARANCES CONTINUED:
 2  On behalf of McKesson:
 3     COVINGTON & BURLING, LLP
       BY:  AMBER CHARLES, ESQUIRE
 4        acharles@cov.com
       850 Tenth Street, NW
 5     Washington, DC  20001
       202-662-5531
 6
 7  On behalf of Endo Pharmaceuticals, Inc., and
    Endo Health Solutions Inc. and Par:
 8
       McCARTER & ENGLISH, LLP
 9     BY:  AMY M. VANNI, ESQUIRE
          avanni@mccarter.com
10     1600 Market Street, Suite 3900
       Philadelphia, PA  19103
11     215-979-3848
12  On behalf of Purdue Pharma:
13     DECHERT LLP
       BY:  PAUL A. LAFATA, ESQUIRE
14        paul.lafata@dechert.com
       Three Bryant Park
15     1095 Avenue of the Americas
       New York,NY  10036
16     212-698-3539
17
18  On behalf of C&R Pharmacy:
19     COLLINSON, DAEHNKE, INLOW & GRECO
       BY:  AMANDA E. ROSENTHAL, ESQUIRE
20       (Via Telephone)
          amanda.rosenthal@cdiglaw.com
21     2110 East Flamingo Road
       Suite 305
22     Las Vegas, NV  89119
       702-979-2132
23
24
25
```

Page 3

```
 1  APPEARANCES CONTINUED:
 2  On behalf of the AmerisourceBergen:
 3     REED SMITH LLP
       BY:  ABIGAIL M. PIERCE, ESQUIRE
 4        apierce@reedsmith.com
       Three Logan Square
 5     1717 Arch Street, Suite 3100
       Philadelphia, Pennsylvania  19103
 6     215-241-7947
 7
 8  On behalf of HBC Service Company:
 9     MARCUS & SHAPIRA LLP
       BY:  DARLENE M. NOWAK, ESQUIRE
10       (Via Teleconference)
          nowak@marcus-shapira.com
11     BY:  PAUL MANNIX, ESQUIRE
          (Via Teleconference)
12        pmannix@marcus-shapira.com
       One Oxford Center, 35th Floor
13     301 Grant Street
       Pittsburgh, Pennsylvania  15219-6401
14     412-338-5214
15  On behalf of Walmart:
16     JONES DAY
       BY:  LOUIS P. GABEL, ESQUIRE
17        lgabel@jonesday.com
       150 West Jefferson Street
18     Suite 2100
       Detroit, MI 48226-4438
19     313-733-3939
20
21  On behalf of Prescription Supply, Inc.:
22     PELINI, CAMPBELL & WILLIAMS LLC
       BY:  PAUL B. RICARD, ESQUIRE
23        pbricard@pelini-law.com
       8040 Cleveland Avenue NW, Suite 400
24     North Canton, Ohio  44720
       330-305-6400
25
```

Page 5

```
 1  APPEARANCES CONTINUED:
 2  On behalf of Rochester Drug Cooperative, Inc.:
 3     ALLEGAERT BERGER & VOGEL LLP
       BY:  DAVID A. SHAIMAN, ESQUIRE
 4       (Via Telephone)
          dshaiman@abv.com
 5     111 Broadway, 20th Floor
       New York, NY  10006
 6     212-571-0550
 7
 8  On behalf of Validus Pharmaceuticals:
 9     FOX ROTHSCHILD LLP
       BY:  MAURA L. BURKE, ESQUIRE
10       (Via Telephone)
          mburke@foxrothschild.com
11     2000 Market Street, 20th Floor
       Philadelphia, PA  19103
12     215-299-2872
13
14
15  ALSO PRESENT:
16     Lauren E. Massey, Levin Papantonio
17     Sarah Merced, Levin Papantonio
18     Carol Moore, Levin Papantonio
19     Sandra Di Iorio, In-house counsel, Endo
20     Edna Johnson Jamison, McHugh Fuller
21     Scott Seigel, Seeger Weiss
22     Elina Rakhlin, Seeger Weiss
23     Evan J. Wolfe, Trial Technician
24     Dan Lawlor, Videographer
25                  - - -
```

Page 6

I N D E X

1
2 WITNESS/EXAMINATION                                    Page
3 ERIC BRANTLEY
4   By Mr. Papantonio                          15
5   By Mr. Fuller                              360
6   By Mr. Buchanan                            397
7   By Ms. Vanni                               560
8   By Mr. Lafata                              580
9   Further by Mr. Papantonio                  616
10  Further by Mr. Buchanan                    647
11
12
13
14           E X H I B I T S
15   Number        Description        Page
16 Cardinal-Brantley 1 ..........................16
     E-mail chain, Confidential, Bates
17   CAH-MDL2804_02142793-2801
18 Cardinal-Brantley 1 ..........................16
     Clawed back by Cardinal Health
19   Counsel
20 Cardinal-Brantley 2 ..........................24
     9/24/2007 E-mail, Steve Reardon to
21   Eric Brantley and others, Subject:
     DEA Suspicious Order Monitoring with
22   Summary of the DEA-HDMA Meeting on
     Suspicious Orders Meeting Date Sept.
23   7, 2007, FOIA Confidential Treatment
     requested by Cardinal, Bates
24   CAH_MDL_PRIORPROD-DEA07_01198345-358
25

Page 7

1           E X H I B I T S (Cont'd)
2   Number        Description        Page
3 Cardinal-Brantley 3 ..........................59
     3/11/2013 E-mail, Bill de
4    Gutierrez-Mahoney to Donald Walker
     and others, Subject:  HDMA notes,
5    Highly Confidential-Subject to
     Protective Order, Bates
6    MCKMDL00545341-347, with attachment
7 Cardinal-Brantley 4 ..........................72
     Settlement and Release Agreement and
8    Administrative Memorandum of
     Agreement between US DOJ DEA and
9    Cardinal Health, Inc. Confidential,
     Bates
10   CAH_MDL_PRIORPROD_DEA12_00001571-1618
11 Cardinal-Brantley 5 .........................115
     P1.324, 1999 Maps through P1.324.37
12
13 Cardinal-Brantley 6 .........................168
     9/1/2005 E-mail, Elaine Trautman to
14   Robert Giacalone, Subject: FW:
     Internet Pharmacies, FOIA
15   Confidential Treatment Requested by
     Cardinal, Bates
16   CAH_MDL_PRIORPROD_DEA07_02454619-621
17 Cardinal-Brantley 7 .........................193
     Presentation Supply Chain Integrity,
18   November 6th, 2008, Mark Hartman,
     Cardinal Health, Confidential, Bates
19   CAH_MDL2804_00225017-048
20 Cardinal-Brantley 8 .........................210
     Presentation CardinalHealth Operation
21   One Cardinal Health Quality
     Management Meeting, Opportunity Team
22   Presentations, 13-14 January 2005,
     FOIA Confidential Treatment requested
23   by Cardinal, Bates
     CAH_MDL_PRIORPROD_DEA07_01181262-1332
24 Cardinal-Brantley 9 .........................219
     Distribution Center Map
25

Page 8

1           E X H I B I T S (Cont'd)
2   Number        Description        Page
3 Cardinal-Brantley 10 ......................219
     2016 Death Map
4
5 Cardinal-Brantley 11 ......................219
     Distribution Center Map and 2016
6    Death Map combined
7 Cardinal-Brantley 12 ......................232
     5/12/2005 E-mail, Mark Mitchell to
8    Cassi Baker and others, Subject: Drug
     Wholesale Advisory Council, FOIA
9    Confidential Treatment Requested by
     Cardinal, Bates
10   CAH_MDL_PRIORPROD_DEA07_00318789
11 Cardinal-Brantley 13 ......................239
     7/27/2006 E-mail, Mignette Strife to
12   Dan Tolar, Subject: Facility
     Assessment - Birmingham, AL, with
13   attachments, Confidential, Bates
     CAH_MDL_PRIORPROD_DEA07_00828657-8674
14 Cardinal-Brantley 14 ......................257
     Presentation, McKesson, State of
15   Prescription Drug Abuse, Gary Boggs,
     Confidential, Exempt from Public
16   Disclosure, Subject to
     Confidentiality Agreement, Bates
17   MCKMDL00336833-6886
18 Cardinal-Brantley 15 ......................267
     US DOJ DEA, The Trafficking and Abuse
19   of Prescription Controlled
     Substances, Legend Drugs and Over the
20   County Products, February 21, 2013
     presentation, Bates
21   CAH_MDL2804_00094605-94835
22 Cardinal-Brantley 16 ......................274
     Chart, Purchases of Hydrocodone by
23   Known or Suspected Rogue Internet
     Pharmacies - 2006
24
25

Page 9

1           E X H I B I T S (Cont'd)
2   Number        Description        Page
3 Cardinal-Brantley 17 ......................279
     E-mail chain, top e-mail 10/3/2005,
4    Ed Dziadon to Richard Sydoriak,
     Subject: FW: Results from our
5    Internal Quarterly Audit, FOIA
     Confidential Treatment Requested by
6    Cardinal, Bates
     CAH_MDL_PRIORPROD_DEA07_00045902-904
7
8 Cardinal-Brantley 18 ......................281
     9/15/2006 E-mail, Rafael Varela to
9    Rob Betchley, Subject: Mike Williams,
     Confidential, Bates
10   CAH_MDL_PRIORPROD_DEA07_00997449
11 Cardinal-Brantley 19 ......................287
     E-mail chain, top e-mail 12/18/2007,
12   GLT Communication to GLT
     Communication, Subject: The Daily
13   Dose: Tuesday, December 18, 2007,
     Confidential, Bates
14   CAH_MDL_PRIORPROD_DEA07_00828103-111
15 Cardinal-Brantley 20 ......................299
     8/21/2018 State Reaches Agreement
16   with Cardinal on Drug Trading Issues,
     article, with attachment, Assurance
17   of Discontinuance Pursuant to
     Executive Law Section 63(15),
18   P1.4575-P1.4575.35
19 Cardinal-Brantley 21 ......................317
     May 10, 2007 News Release, US
20   Attorney's Office Western District of
     Virginia, The Purdue Frederick
21   Company, Inc. and Top Executives
     Plead Guilty to Misbranding
22   Oxycontin; will pay over $600
     Million, P1.4961-P1.4961.5
23
24 Cardinal-Brantley 22 ......................360
     Drawing done by Attorney Papantonio,
25   Oxy Express

Page 10

E X H I B I T S (Cont'd)

Number        Description        Page

Cardinal-Brantley 23 ........................360
  Drawing done by Attorney Papantonio,
  glut
Cardinal-Brantley 24 ........................364
  E-mail chain, top e-mail 12/5/2007,
  Bob Kurtz to Rafael Varela, Subject:
  RE: URGENT - More Information on DEA
  Suspension, FOIA Confidential
  Treatment Requested by Cardinal,
  Bates
  CAH_MDL_PRIORPROD_DEA07-00135433-434

Cardinal-Brantley 25 ........................375
  Charts, top chart Total Dosage of
  Oxycodone and Hydrocodone Shipped by
  Cardinal Health to Cuyahoga County,
  Ohio, Confidential-Subject to
  Protective Order, P1.4923
Cardinal-Brantley 26 ........................379
  GAO, Report to Congressional
  Requesters, December 2003, OxyContin
  Abuse and Diversion and Efforts to
  Address the Problem, P1.1087
Cardinal-Brantley 27 ........................413
  E-mail chain, top e-mail 3/7/2013,
  Sandra Parker to Jon Smollen and
  others, Subject:FW: Charts from DEA
  Meeting, Highly Confidential -
  Subject to Protective Order, Bates
  ENDO-OPOID_MDL-02975958-59 with chart
  attachments

Cardinal-Brantley 28 ........................434
  E-mail chain, top e-mail 2/27/2014,
  Keith Margolis to William Price and
  others, Subject: FW: Bellco,
  Qualitest SOMS letter and
  Quesionnaire 12/3, 1/20, 2/21,
  Confidential - Subject to Protective
  Order, Bates ABDCMDL00337067-73

Page 11

E X H I B I T S (Cont'd)

Number        Description        Page

Cardinal-Brantley 29 ........................449
  10/7/2013 E-mail, Eric Brantley to
  Eric Brantley, Confidential - Subject
  to Protective Order, Bates
  PAR_OPOID_MDL_0000018938-42
Cardinal-Brantley 30 ........................485
  10/7/2013 E-mail, Larry Shaffer to
  Eric Brantley, Subject: SOMS Info,
  with attachments, Confidential -
  Subject to Protective Order, Bates
  PAR_OPOID_MDL_0000018920-36

Cardinal-Brantley 31 ........................498
  10/20/2015 E-mail, Heather Jones to
  Stephen Macrides and others, Subject:
  DEA Regulatory Risk of Offering
  One-Time Buys of Controlled
  Substances to Customers, with
  attachments, Confidential-Subject to
  Protective Order, Bates
  PAR_OPOID_MDL_0000005961-5971

Cardinal-Brantley 32 ........................514
  E-mail chain, top e-mail 1/31/2017,
  Eric Brantley to Paul Hamby, Subject:
  RE: EXTERNAL: RE: Latest from DE,
  Confidential-Subject to Protective
  Order, Bates
  PAR_OPOID_MDL_0000093848-851

Cardinal-Brantley 33 ........................516
  1/26/2017 E-mail, Eric Brantley to
  Eric Brantley, Subject Attached
  image, with Compliance Addendum
  Attachment, Confidential-Subject to
  Protective Order, Bates
  PAR_OPOID_MDL_0000015775-15811

Cardinal-Brantley 34 ........................524
  DEA Compliance Manual, Cardinal
  Health, FOIA Confidential Treatment
  Requested by Cardinal, Bates
  CAH_MDL_PRIORPROD_DEA07_01383895-1384
  238

Page 12

E X H I B I T S (Cont'd)

Number        Description        Page

Cardinal-Brantley 35 ........................551
  4/27/2007 E-mail, Steve Reardon to
  Mark Parrish and others, Subject:
  Internet Pharmacy/ABC Update, with
  letter attachment, Confidential,
  Bates CAH_MDL2804_02102142-146

Cardinal-Brantley 36 ........................555
  E-mail chain, top e-mail 7/23/2007,
  Steve Reardon to Eric Brantley,
  Subject: FW: Distributor
  Notification, Confidential, Bates
  CAH_MDL_PRIORPROD_DEA07_02075115-5118
Cardinal-Brantley 37 ........................570
  Standard Operating Procedure,
  Qualitest, New Account Approval &
  Existing Account Review,
  Confidential-Subject to Protective
  Order, Bates
  PAR_OPOID_MDL_0000097389-391
Cardinal-Brantley 38 ........................573
  Standard Operating Procedure,
  Qualitest, Customer Due Diligence
  Visits, effective 12/23/2013,
  Confidential-Subject to Protective
  Order, Bates
  PAR_OPOID_MDL_0000097381-84
Cardinal-Brantley 39 ........................575
  Standard Operating Procedure,
  Qualitest, Cage/Vault Suspicious
  Order Monitoring, effective
  12/23/2013, Confidential-Subject to
  Protective Order, Bates
  PAR_OPOID_MDL_0000097379-380
Par-Brantley 40 ........................576
  Standard Operating Procedure, PAR,
  Identifying, Blocking, and Reporting
  Suspicious Orders, effective
  12/23/2013, Confidential-Subject to
  Protective Order, Bates
  PAR_OPOID_MDL_0000096529-532

Page 13

E X H I B I T S (Cont'd)

Number        Description        Page

Cardinal-Brantley 40 E-mail chain, top ........618
  e-mail 1/21/2008, Mike Kaufmann to
  Gary Dolch and others, Subject: RE:
  In the Penalty Box, Confidential,
  Bates
  CAH_MDL_PRIORPROD_DEA07_00827893-894

Purdue-Brantley 41 ........................583
  Document Details, Know Your Customer
  Due, 9/25/2017, Confidential-Subject
  to Protective Order, Bates
  PPLP004393084-098
Cardinal-Brantley 41 ........................641
  Article Too Many Bodies in Ohio
  Morgue, so Coroner Gets Death
  Trailer, P1.1453

Purdue-Brantley 42 ........................589
  Document Details, Identifying,
  Evaluating and Reporting Suspicious
  Orders, 9/25/2017,
  Confidential-Subject to Protective
  Order, Bates PPLP0043668538-543
Cardinal-Brantley 42 ........................665
  Supply Chain & DEA Compliance
  document, Highly Confidential -
  Subject to Protective Order, Bates
  ENDO-OPOID_MDL-02278909-917
Purdue-Brantley 43 ........................594
  Document Details, Downstream Customer
  Monitoring and Reporting, 1/25/2018,
  Confidential, Bates
  PPLPC023000971890-96

Page 14

E X H I B I T S (Cont'd)

| Number | Description | Page |
|---|---|---|

Cardinal-Brantley 43 .........................682
   E-mail chain, top e-mail 3/22/2013,
   Jill Connell to Tracey Hernandez,
   Subject: FW: composite risk
   assessment, Confidential-Subject to
   Protective Order, Bates
   PAR_OPIOID_MDL_0000035162-164, with
   attachment E0573

Cardinal-Brantley 44 .........................696
   4/17/2014 E-mail, Eric Brantley to
   Tracey Hernandez, Subject: SOM
   update, with Qualitest SOM update
   attachment, Confidential-Subject to
   Protective Order, Bates
   PAR_OPIOID_MDL_0000021256-72

---

Page 15

1  TUESDAY, NOVEMBER 27, 2018, DURHAM, NORTH CAROLINA

2         P R O C E E D I N G S

3              -oOo-

4      VIDEOGRAPHER:  We are now on the record.

5  My name is Dan Lawlor.  I'm a videographer with

6  Golkow Litigation Services.  Today's date is

7  November 27th, 2018, and the time is 9:01 a.m.

8      This video deposition is being held in

9  Durham, North Carolina, in the matter of

10  National Prescription Opiate Litigation, MDL

11  Number 2804.  The deponent is Eric Brantley.

12      Counsel will be noted on stenographic

13  record.

14      The court reporter is Karen Kidwell, who

15  will now swear in the witness.

16            ERIC BRANTLEY

17  being first duly sworn, testified as follows:

18            EXAMINATION

19  BY MR. PAPANTONIO:

20      Q.  Sir, state your name, please.

21      A.  Eric Brantley.

22      Q.  Put up document 3751, please.

23      MS. MOORE:  Cardinal-Brantley Number 1.

24      (Cardinal-Brantley 1 was marked for

25  identification.)

---

Page 16

1      (Cardinal-Brantley 1 clawed back by Cardinal

2  Health counsel.)

3  BY MR. PAPANTONIO:

4      Q.  Mr. Brown, take a look at that document,

5  would you?

6      Do you know who Corey Goldsand is?

7      A.  Yes.

8      Q.  Tell the jury who Corey Goldsand is.

9      MR. PYSER:  Objection.  Counsel, this is a

10  privileged document that was inadvertently

11  produced and has been clawed back.

12      MR. PAPANTONIO:  Well, we will take that

13  up with the court.

14      MR. PYSER:  Well, it's already been clawed

15  back, so there's no --

16      MR. PAPANTONIO:  When you say it's been

17  "clawed back," nobody has given me notice it's

18  been clawed back.  I've used it in -- in the

19  line of discovery, and we're going to use it in

20  the deposition.

21      MR. PYSER:  Well, no, we're not, Counsel,

22  because it's a communication between two

23  attorneys for Cardinal Health.  It's a clearly

24  privileged document.  We're clawing it back now.

25  Everyone on the document is a -- is an attorney.

---

Page 17

1      MR. PAPANTONIO:  No, they're not.  We'll

2  put it -- you can take it -- this portion of the

3  deposition you can put under camera if you want

4  to, but I'm going to ask this witness questions

5  about it.

6      MR. PYSER:  Counsel, we've clawed the

7  document back.  There's no basis to ask

8  questions about it.

9      MR. PAPANTONIO:  Well, I think the judge

10  has already ruled on the point of

11  attorney-client privilege.  He just ruled

12  Friday, if you were at the hearing, okay?

13      MR. PYSER:  That ruling has nothing to do

14  with this document.

15      MR. PAPANTONIO:  Well --

16      MR. PYSER:  That's an attorney-client

17  communication.  Upon discovery of this document,

18  it should have been produced -- it should have

19  been noted to the Defendants under the ethical

20  rules, because it's a clearly privileged

21  document.

22      MR. PAPANTONIO:  No.  No, this was one

23  of -- this was one of the documents that you all

24  tried to bury in stacks of other documents.

25      Now, I'm going to ask the question.  You

---

Page 18

1 can instruct him not to answer the question, at
2 which time we will reset the deposition and get
3 into this document another time.
4 I'm going to finish the deposition today;
5 don't get me wrong.
6 MR. PYSER: You can finish the
7 deposition --
8 MR. PAPANTONIO: But if you want --
9 MR. PYSER: -- but you can't use this
10 document.
11 MR. PAPANTONIO: If you want to put on the
12 record -- well, I'm going to ask the question,
13 and you can object as you see fit.
14 BY MR. PAPANTONIO:
15 Q. Sir, you -- you were a -- you were in
16 charge of regulatory -- regulatory is one of your
17 responsibilities with Cardinal; is that correct?
18 A. I worked in the quality and regulatory
19 affairs department.
20 Q. And -- and with you was a fellow named
21 Reardon; is that right?
22 A. Steve Reardon was my boss.
23 Q. And how many years was he your boss?
24 A. I would say 2005 to 2008, maybe.
25 Q. And did you have a system when you worked

Page 19

1 with Mr. Reardon where you would actually -- you'd
2 have a suspicious order that you would have in-house,
3 and then you would ship the product, even after being
4 notified that it might be suspicious?
5 Do you recall ever doing that,
6 Mr. Brantley?
7 A. No.
8 Q. Okay. And do you have any idea that the
9 company was carrying on a monitoring system where
10 they would identify and report potentially suspicious
11 excessive purchases of controlled substances after
12 the substances were shipped?
13 Had anybody ever told you that that was
14 going on with Cardinal?
15 A. We had ingredient limit reports that
16 were -- that were ran every month and submitted to
17 the DEA. And those ingredient limit reports were the
18 potentially suspicious orders --
19 Q. Okay --
20 A. -- and I reviewed those reports.
21 Q. Yeah, you reviewed them, and after you
22 reviewed them, you would ship anyway; is that
23 correct?
24 A. I would review the reports, and I would
25 conduct investigations of any downstream -- any

Page 20

1 pharmacies that I needed to investigate.
2 Q. And --
3 A. And I would conduct a site visit of those
4 pharmacies.
5 Q. And my question is, sir, there were times
6 when you, Brantley, saw suspicious orders and decided
7 to ship the orders anyway. That's a yes-or-no
8 question.
9 A. That is incorrect.
10 Q. Okay. So what -- what system did you use
11 before you would ship?
12 A. My job was to review the ingredient limit
13 reports on a monthly basis, and if I noticed any
14 pharmacies that I wanted to further investigate, I
15 would contact those pharmacies and I would conduct a
16 site visit. If those pharmacies were deemed
17 suspicious, they were shut off from controlled
18 substances, and they were reported to -- to Kyle
19 Wright at the DEA.
20 Q. And so --
21 A. That was my job.
22 Q. That was your job?
23 A. Yes.
24 Q. And you feel like you carried your job out
25 appropriately?

Page 21

1 A. Yes.
2 Q. Were you there -- what were the years that
3 you were in charge of that job?
4 A. I was never in charge of the -- the job.
5 But I was at the corporate office -- from 2005 till
6 about 2008, I had responsibility for reviewing the
7 ingredient limit reports and conducting
8 investigations.
9 Q. Had anybody told you that -- that within
10 management there was a feeling that few, if any,
11 directives from the company leadership were ever
12 passed down regarding controlled substances and
13 shipment of controlled substances?
14 MR. PYSER: Objection to the question to
15 the extent it comes from a document that's been
16 clawed back. It's an inappropriate question.
17 BY MR. PAPANTONIO:
18 Q. Is that the first --
19 MR. PYSER: And counsel -- and counsel's
20 violating ethical rules by continuing to use a
21 document that's been clawed back by the defense.
22 BY MR. PAPANTONIO:
23 Q. Is that the first time you've heard that,
24 sir?
25 A. Can you please repeat what you --

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    Q.  Yes.  Where management clearly understood
2  that there was few, if any, directives at all from
3  the company leadership regarding substances being
4  shipped after they were deemed suspicious orders?
5         MR. PYSER:  Same objections.
6         THE WITNESS:  This is my first time
7    hearing that, and I don't agree with that.
8  BY MR. PAPANTONIO:
9    Q.  Okay.  First time you've heard that is
10  today, though, right?
11    A.  As far as I -- I can recall, yes.
12    Q.  How long did you prepare for this
13  deposition?
14    A.  What do you mean, how long did I prepare?
15    Q.  How long did you sit down with anybody
16  from the company and prepare for this deposition?
17    A.  Well, I didn't sit down with anyone from
18  the company, but I did sit down with --
19    Q.  How many hours?
20    A.  -- with attorneys.
21         Several hours.  I don't know the exact
22  number of hours.
23    Q.  Okay.  So today -- and you're no longer
24  with Cardinal; is that correct?
25    A.  No, I'm not.

Page 23

1    Q.  Okay.  So today, what I'm going to be
2  asking you is what you have reviewed prior to the
3  time you came here and what you knew at the time that
4  you were an employee with Cardinal.  All right?
5    A.  Okay.
6    Q.  And so, sir, had anybody ever told you
7  that -- that your company was giving discounts to
8  people -- to -- to customers who were ordering large
9  bulk orders of narcotics?
10         MR. PYSER:  Counsel, same objection.  To
11    the extent you're reading from a document that's
12    been clawed back, it's inappropriate, and we
13    should cease the practice.  It's a violation of
14    the ethical rules and a violation of deposition
15    protocol that allows clawbacks of documents that
16    are clearly privileged.
17         MR. PAPANTONIO:  You're going to be able
18    to put this under camera if you want, Counselor.
19  BY MR. PAPANTONIO:
20    Q.  Had anybody ever told you that?
21    A.  No.
22         MR. PYSER:  Object to form.
23  BY MR. PAPANTONIO:
24    Q.  First time you ever heard it; is that
25  right?

Page 24

1         MR. PYSER:  Object to form.
2         THE WITNESS:  As far as I can recall.
3         MR. PAPANTONIO:  Okay.  Put up
4    document 4195.
5         MS. MOORE:  This will be
6    Cardinal-Brantley 2.
7    (Cardinal-Brantley 2 was marked for
8  identification.)
9  BY MR. PAPANTONIO:
10    Q.  Sir, state your name again for the record.
11    A.  Eric Brantley.
12    Q.  Okay.  And you're looking at document
13  number 4195.  Take a look at it.
14         Do you see it?  You're welcome to use the
15  screen, or you're welcome to use the hard copy we
16  give you, or you're welcome to use this screen up
17  here; this is easy to read.  However you want to do
18  it.  Feel free.
19    A.  That's blurry up there.  I'll -- I'll read
20  this.
21    Q.  All right.  Who is -- who is Steve
22  Reardon?
23    A.  Steve Reardon was my boss at the time.
24    Q.  And you see your name on there -- you see,
25  Mr. Brantley, where it says "To Brantley"?

Page 25

1    A.  Yes.
2    Q.  And who is McPherson?
3    A.  I don't know what her position was at the
4  time, but she was in the quality and regulatory
5  affairs department, I believe.
6    Q.  Do you recognize everybody on the -- on
7  the line where it says "To"?
8    A.  No.
9    Q.  Who don't you recognize?
10    A.  Al M-o-h-n, Mohn, Mohn.
11    Q.  You don't recognize Al Mohn; you never had
12  any contact with Al Mohn?
13    A.  I don't remember that name.
14    Q.  All right.  Let's read this first
15  paragraph.
16         It says:  "HDMA met with DEA officials
17  last Friday, September 7th, to discuss the agency's
18  current policy positions on suspicious orders."
19         Did you know that that meeting had taken
20  place?
21    A.  No.
22    Q.  Okay.  And in your review before you came
23  in here today, did any -- did you -- you weren't
24  shown this document, I take it?
25    A.  This particular --

Page 26

1    Q.  Yes.
2    A.  -- e-mail?
3    Q.  Right.
4    A.  This is my first time seeing this e-mail.
5    Q.  But it's got your name on it?
6    A.  It does.
7    Q.  Okay.  And it says:  "A summary
8  highlighting the key points made during the meeting
9  are attached for your review."
10       It says:  "DEA is setting a new standard
11 with which we must comply.  This is all coming about
12 as a result of the problem with Internet pharmacies
13 and controlled substance diversion."
14       Now, you -- you had some -- part of your
15 job was to be involved with Internet pharmacies,
16 wasn't it?
17    A.  Part my job was to try to identify
18 potential Internet activity from the ingredient limit
19 reports and investigate, yes.
20       MR. PAPANTONIO:  All right.  So would you
21    underline "Internet pharmacies" for me there,
22    Evan?
23 BY MR. PAPANTONIO:
24    Q.  And it says:  "Controlled substance
25 diversion."

Page 27

1       That was your job, wasn't it?  To -- to be
2  involved with controlling the substance diversion of
3  narcotics, correct?
4       MR. PYSER:  Object to the form of the
5    question.
6  BY MR. PAPANTONIO:
7    Q.  Is that true?
8    A.  My job was to review ingredient limit
9  reports and search for pharmacies that needed further
10 investigation and shut those pharmacies off if deemed
11 necessary and report that to the DEA.
12    Q.  And that's controlling substance abuse of
13 narcotics, true?
14       MR. PYSER:  Object to form.
15 BY MR. PAPANTONIO:
16    Q.  That's -- part of your goal was to stop
17 diversion of narcotics; yes or no?
18    A.  Part of our job was to help to prevent
19 diversion through the -- potential Internet
20 pharmacies, as well as the physical security in the
21 distribution centers and the cage and the vault and
22 everything else.
23    Q.  Right.  And --
24    A.  There was a lot to --
25    Q.  Well, sir --

Page 28

1    A.  -- security, you know --
2    Q.  Now, I'm just going to ask you
3  questions -- I'm going to ask you questions, okay?
4    A.  And I'm going to answer the questions.
5    Q.  If you're not clear about the question,
6  you tell me you're not clear.  If you want to give a
7  speech, Mr. Pyser is going to be able to talk to you
8  after the end of it; you can give your speeches.
9       So if I ask you a yes-or-no question, I
10 really want a yes-or-no answer.  Okay?
11       MR. PYSER:  Counsel, object -- object to
12    that speech.  The witness was answering your
13    question.  You cut him off.
14       MR. PAPANTONIO:  All right.
15       MR. PYSER:  He's allowed to answer your
16    questions in full.  You're not here to instruct
17    the witness on how to answer questions.  He's
18    here to answer your questions.  And that's what
19    we're going to do.
20 BY MR. PAPANTONIO:
21    Q.  Okay.  So now this goes on.  It says:
22 "Recently they suspended an ABC registration and used
23 the suspension to get them to implement a complex and
24 onerous suspicious order monitoring program that
25 meets the requirement, meets the criteria spelled out

Page 29

1  in HDMA."
2       Now, sir, you would agree it's a good idea
3  to have a system in place that -- that actually
4  monitors suspicious orders; you would agree with
5  that, wouldn't you?
6       MR. PYSER:  Object to form.
7       THE WITNESS:  It is required in the
8    regulation to have a system to help identify
9    suspicious orders --
10 BY MR. PAPANTONIO:
11    Q.  And --
12    A.  -- and to report those orders to the DEA.
13    Q.  And you knew that the day you went to work
14 with Cardinal; you understood that that was the law.
15 Correct?
16    A.  The day that I went to work with Cardinal
17 Health?
18    Q.  Yeah.
19    A.  I was not in this capacity.  And no, I
20 can't say that I was familiar with all the
21 regulations.
22    Q.  At some time you learned that that was the
23 law, though, to report suspicious orders, correct?
24       MR. PYSER:  Object to form.  Calls for
25    legal conclusion.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

BY MR. PAPANTONIO:

1  Q.  Is that true?

2  A.  At one point during my employment with Cardinal Health, I learned that it was the -- the requirement to report --

3  Q.  And you --

4  A.  -- suspicious orders.

5  Q.  And you understood not to do that would be breaking the law -- I mean, simply put: If you don't follow the law, you break the law, true?

6  MR. PYSER:  Object to form.  Calls for a legal conclusion.

7  THE WITNESS:  I understand that the regulation was that we were to design a system to identify and report suspicious orders, which we did.

8  BY MR. PAPANTONIO:

9  Q.  And if you don't do it, though, you're breaking the law, right?  That's all I'm asking.  If you don't do that, you and I can agree you're breaking the law?

10  A.  If a company --

11  MR. PYSER:  Object --

12  THE WITNESS:  -- fails to do that --

13  MR. PYSER:  Object --

Page 31

1  THE WITNESS:  -- they're outside of the regulation.

2  MR. PYSER:  Object to form.  Calls for a legal conclusion.  Asked and answered.

3  MR. PAPANTONIO:  Okay.  You're going to object as to form, and that's it.  Okay?  It's a form -- your role is to object as to form, not to tell him -- not to give him any indication of what you want him to say.

4  BY MR. PAPANTONIO:

5  Q.  Now, Mr. Brantley --

6  MR. PAPANTONIO:  Would you read back the part of his response that we actually got?

7  You didn't get it, did you?

8  THE REPORTER:  I didn't get it, because --

9  BY MR. PAPANTONIO:

10  Q.  What's the last thing you said before your -- your attorney jumped in there and started talking?  What -- what did -- what did you want to tell me?

11  A.  I don't recall.  You have to ask the question again.

12  Q.  Okay.  You understood, sir, that there was a law that said that you had to report suspicious orders; yes or no?

Page 32

1  A.  I understood --

2  MR. PYSER:  Object to the form.

3  THE WITNESS:  I understood there was a regulation around identifying and reporting suspicious orders.

4  BY MR. PAPANTONIO:

5  Q.  You knew it was law, CFR.  You knew it was a CFR, right?

6  MR. PYSER:  Object to form.

7  BY MR. PAPANTONIO:

8  Q.  Did you know that or didn't you?

9  A.  It is in the -- the CFR.

10  Q.  Okay.

11  A.  1301.74(b).

12  Q.  Oh, you even know it by heart, right?

13  A.  I know that it's 1301.74(b).

14  Q.  And you know that it's a law, true?

15  MR. PYSER:  Object to form.

16  BY MR. PAPANTONIO:

17  Q.  Correct?  It's the law?

18  A.  It's the regulation in -- in CFR, 21 CFR 1301.74(b).

19  Q.  And not to do -- not to conform with the regulation -- you're going to be seeing this a lot; I'm glad you know it by heart.

Page 33

1  But that's the regulation you're talking about, right?

2  MR. PYSER:  Object to form.

3  THE WITNESS:  If that is 1301.74(b), yes.

4  BY MR. PAPANTONIO:

5  Q.  You -- you know it by heart.  And to break that regulation would be breaking a regulatory law; correct or incorrect?

6  MR. PYSER:  Object to form.  Asked and answered.

7  MR. PAPANTONIO:  Not -- no, it hasn't been.

8  BY MR. PAPANTONIO:

9  Q.  Not to -- not to do this as you're instructed to do would be breaking a regulation, correct?

10  MR. PYSER:  Object to form.  Asked and answered, repeatedly.

11  BY MR. PAPANTONIO:

12  Q.  Yes or no?

13  A.  If one does not follow a regulation and one is not following that regulation -- I cannot answer to whether it is objecting a law.  It is a regulation.  I don't know the legal terminology between laws, regulation.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    I -- I do know that that's in the CFR as a
2  regulation.  And I do know the language of that
3  regulation was being followed.
4    Q.  Okay.  And you think it was being
5  followed, and we're going to be talking about whether
6  it was followed or not.
7    So you and I might disagree with that, but
8  you would agree, not to do it would be a violation of
9  a regulation, correct?
10    MR. PYSER:  Object to form.
11    THE WITNESS:  Not to follow the
12  regulation --
13  BY MR. PAPANTONIO:
14    Q.  Would be a violation?
15    A.  -- would not be following the regulation.
16    Q.  Yeah.  Are you -- are you afraid to use
17  the word "violation"?
18    MR. PYSER:  Object to form.
19  BY MR. PAPANTONIO:
20    Q.  I mean, you know what the term "violation"
21  means?
22    A.  I am not afraid to --
23    Q.  Well --
24    A.  -- use any word.
25    Q.  Okay.  Well, "violation" --

Page 35

1    A.  That's your words.
2    Q.  Well, let's say "violation."  Can you
3  use --
4    A.  I'm saying --
5    Q.  -- the word "violation" here?
6    MR. PYSER:  Object to form.
7    Give me a chance to object before you
8  answer his question.
9    Counsel, stop being argumentative with the
10  witness.
11    MR. PAPANTONIO:  I'm not.
12  BY MR. PAPANTONIO:
13    Q.  Sir, the word "violation":  Do you
14  understand what it means?  I take it you do.  You're
15  a bright man.  You understand what "violation" means,
16  right?
17    MR. PYSER:  Object to form.
18    THE WITNESS:  "Violate" means not to do
19  something --
20  BY MR. PAPANTONIO:
21    Q.  Right.  So if you don't --
22    A.  -- as -- as written.  Yes.
23    Q.  Right.  So if you don't follow the law as
24  it's written, you violate that law, right?
25    MR. PYSER:  Object to form.

Page 36

1  BY MR. PAPANTONIO:
2    Q.  True?  I mean, look at the camera and tell
3  me if that's not true or not.
4    A.  If one does not follow the regulation,
5  then they are not following that regulation.
6    Q.  Great.  Okay.
7    So we picked up with -- "Recently they
8  suspended an ABC registration and used the suspension
9  to get them to implement a complex and onerous
10  suspicious order monitoring."
11    Would you underline "complex" and
12  "onerous"?  We're going to come back to those
13  words.
14    ". . . complex and onerous suspicious
15  order monitoring program that meets the criteria
16  spelled out in the HDMA meeting summary."
17    Tell the jury what the "HDMA" is.
18    MR. PYSER:  Object to form.
19    THE WITNESS:  HDMA is a -- an agency
20  comprised of pharmaceutical distributors.
21  BY MR. PAPANTONIO:
22    Q.  And your company was part of the HDMA,
23  true?  Cardinal was part of the HDMA?
24    A.  Cardinal Health, I believe, was part of
25  HDMA, yes.

Page 37

1    Q.  And did you ever go to HDMA meetings?
2    A.  I've been to HDMA meetings.  I do not
3  think I attended any while I was at Cardinal, but I
4  don't remember.
5    Q.  Okay.  But you've been with other
6  companies besides Cardinal, right?
7    You've been with Kinray, correct?
8    A.  Yes.  Kinray is a Cardinal company.
9    Q.  And you're now with Purdue?
10    A.  Yes.
11    Q.  And both of those companies, one's a --
12  one is a narcotic distributor, and the other is a
13  narcotic manufacturer, correct?
14    MR. PYSER:  Object to form.
15  BY MR. PAPANTONIO:
16    Q.  True?
17    MR. PYSER:  Misstates evidence.
18    THE WITNESS:  Kinray is a distributor of
19  pharmaceuticals, over-the-counter controlled
20  substances.  Purdue is a manufacturer of
21  controlled substances.
22  BY MR. PAPANTONIO:
23    Q.  Well, I want to use the term -- it's a
24  narcotic, isn't it?
25    A.  It's not just a narcotic company, as you

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  said.
2      Q.  Yeah.
3      A.  It manufactures controlled substances --
4      Q.  But -- but --
5      A.  -- prescription drugs.
6      Q.  Right.  But Purdue manufactures narcotics,
7  correct?
8      A.  Purdue -- that is one of the things that
9  Purdue manufactures, yes.
10     Q.  And Kinray distributed narcotics, right?
11     A.  That is one of the many things that --
12  that Kinray distributed.
13     Q.  And Cardinal distributed narcotics?
14     A.  That is one of the many things that
15  Cardinal distributed.
16     Q.  When we talk about "opioid," that's a
17  narcotic, isn't it?
18     A.  I believe so.
19     Q.  Okay.  All right.
20         Then it goes on to say:  "ABC presented
21  their program at the DEA industry conference this
22  week that I attended, and I have attached a copy of
23  the presentation."
24         Now, you see Steve Reardon sent that to
25  you, didn't he?

Page 39

1      A.  Yes.
2      Q.  All right.  And he sent it back in 2007,
3  true?  September 2007, right?
4      A.  Yes.
5      Q.  And it says -- goes on to say,
6  "Suspicious" -- let me read it.  It says:  "A complex
7  and onerous" -- pick up from there:
8         ". . . complex and onerous suspicious
9  order monitoring program that meets the criteria
10  spelled out by the HDMA meeting summary.  ABC
11  presented their program at the DEA industry
12  conference this week."
13         Were you there when they presented that?
14     A.  No, I was not.
15     Q.  And -- "And I attended, and I have a copy
16  attached to the presentation."
17         So you didn't attend, but Steve Reardon
18  did, correct?
19     A.  Apparently.  That's what he says, yes.
20     Q.  Yeah.  It says:  "DEA referred to the ABC
21  program as the new industry standard."
22         MR. PAPANTONIO:  Underline that term, "the
23     new industry standard."
24  BY MR. PAPANTONIO:
25     Q.  Sir, you know what a -- you've -- you've

Page 40

1  worked with industry standards, both with -- well,
2  with Cardinal, industry standards with Kinray,
3  industry standards with Purdue, I take it?  You've
4  worked with industry standards with all three of
5  those companies, right?
6      A.  Yes.
7          MR. PYSER:  Object to form.  Vague.
8  BY MR. PAPANTONIO:
9      Q.  How many years have you been working with
10  industry standards within the distribution of
11  narcotics?
12     A.  Well, an industry standard is -- is what,
13  exactly?  I mean, an industry standard is what one
14  company may be doing.
15     Q.  Okay.  And it says:  "The DEA referred to
16  the ABC program as the new industry standard."
17         Do you see that?
18     A.  Yes.
19     Q.  All right.  It says:  "I will be setting
20  up a meeting to initiate discussions on this topic in
21  the near future."
22         Did you attend that meeting where there
23  were discussions about the industry standards for
24  narcotics?
25     A.  I don't recall if I was present at --

Page 41

1      Q.  That's fair enough.  That was a long time
2  ago, wasn't it?
3      A.  Yes.
4          MR. PYSER:  Counsel, please allow the
5      witness to answer your question --
6  BY MR. PAPANTONIO:
7      Q.  And it says --
8          MR. PYSER:  -- before you ask the next
9      one.
10  BY MR. PAPANTONIO:
11     Q.  It says:  "Additionally, I am aware that
12  MKC is in ongoing negotiations with DEA relating to
13  order to show cause."
14         Do you know who "MCK" is?
15     A.  I will take that to mean McKesson.
16     Q.  Okay.  And you worked with McKesson; you
17  were familiar with their business.  True?
18         MR. PYSER:  Object --
19  BY MR. PAPANTONIO:
20     Q.  What they did?
21         MR. PYSER:  Object to form.
22  BY MR. PAPANTONIO:
23     Q.  Or you didn't?
24     A.  I knew -- I knew that they were a
25  wholesale distributor.  I did not know the details of

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 their business, no.
2    Q.  They were a competitor of yours, weren't
3 they?
4    A.  They were another wholesale distributor,
5 just like Cardinal Health.
6    Q.  It says "an order to show cause."  What is
7 "an order to show cause"?  You've -- you've dealt
8 with those before, haven't you?
9       MR. PYSER:  Object to form.  Legal
10    conclusion.
11       THE WITNESS:  I have not dealt directly
12    with an order to show cause.
13 BY MR. PAPANTONIO:
14    Q.  Do you know what one is?  I mean, you've
15 worked around regulatory long enough to know what an
16 "order to show cause" is?
17    A.  I --
18       MR. PYSER:  Object to form.
19       THE WITNESS:  I have a general idea.
20 BY MR. PAPANTONIO:
21    Q.  Tell me what you think it is.
22    A.  I -- I think an order to show cause in
23 this case is if DEA has allegations against a
24 registrant, it gives the registrant an opportunity to
25 answer to those allegations.

Page 43

1    Q.  That's what it says; it says, "An order to
2 show cause affords a registrant the opportunity to
3 argue why a registration should not be suspended or
4 revoked."  Right?
5       Now, while you were with the company, with
6 Cardinal, there were -- your customers that you
7 worked with, they had suspensions and revocations of
8 their license to sell narcotics, people you worked
9 with, correct?
10       MR. PYSER:  Object to form.
11       THE WITNESS:  Can you reask the question?
12 BY MR. PAPANTONIO:
13    Q.  Yeah.  While you were charge of
14 regulatory, along with Reardon -- Reardon was your
15 boss, correct?
16    A.  Steve Reardon was my boss, correct.
17    Q.  That's the first part.  Now let me ask you
18 the second part:  While you were in that role, some
19 of the customers that you were working with actually
20 had their licenses suspended or revoked, true?
21    A.  I cannot recall any customers that had
22 licenses suspended or revoked.
23    Q.  Well, who -- who -- you say "customers."
24       Who had their -- who had their licenses
25 suspended or revoked for Cardinal?

Page 44

1       MR. PYSER:  Object to form.  Vague.
2 BY MR. PAPANTONIO:
3    Q.  Do you understand what I'm saying?
4    A.  I understand that by "customers," you mean
5 the hospitals, pharmacies, that --
6    Q.  Yeah.
7    A.  -- that Cardinal Health was shipping drugs
8 to.
9    Q.  Right.
10    A.  Yes.  I do not recall any pharmacies
11 having suspensions revoked.
12    Q.  Do you -- did you work with Internet
13 pharmacies?
14    A.  I did not work with Internet pharmacies.
15 I, during the course of my job, identify pharmacies
16 that were engaged with Internet activity.
17    Q.  Okay.  So --
18    A.  And we -- and we discontinued business
19 with those pharmacies, and we reported them to the
20 DEA.
21    Q.  Right.  We're going to talk about that as
22 we go along.
23       Did you talk -- but prior to coming in
24 here, did you review documents where Cardinal had
25 actual suspensions of their ability to sell

Page 45

1 narcotics?
2       MR. PYSER:  Object to form.
3       Instruct you not to answer the question to
4    the extent that it's anything you reviewed with
5    counsel.  If you reviewed it outside counsel,
6    you're free to answer the question.
7 BY MR. PAPANTONIO:
8    Q.  You understand?
9    A.  According to my attorney, I will not
10 answer the question on what documents I saw during my
11 meeting with counsel.
12    Q.  Sir, the first time you saw any documents
13 about suspension was when?
14       MR. PYSER:  You can -- you can answer the
15    question about when you might have seen -- if
16    you saw documents regarding suspensions.  Just
17    don't include in your answer any documents you
18    might have reviewed with counsel.  That make
19    sense?
20       THE WITNESS:  Yes.
21       MR. PYSER:  Okay.
22       THE WITNESS:  I do not recall when I have
23    reviewed documents concerning suspension.
24 BY MR. PAPANTONIO:
25    Q.  Matter of fact, you don't recall

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 suspensions at all, do you?
2       MR. PYSER: Object to form.
3 BY MR. PAPANTONIO:
4       Q. Is that what you told me a minute ago?
5 You don't -- you don't recall suspensions?
6       A. I recall suspensions. You asked had I
7 recall suspensions of customers. And my answer was
8 no.
9       Q. Oh, okay. Well, who do you recall
10 suspensions of?
11       A. I recall that at some point, there were
12 suspensions of DEA registrations for Cardinal Health.
13       Q. Explain to the jury what that means.
14       MR. PYSER: Object to form. Calls for a
15 legal conclusion.
16 BY MR. PAPANTONIO:
17       Q. Explain to the jury what you just -- what
18 you just said. Break it down for the jury right now
19 so they understand, before we go through this
20 deposition, what you recall about suspensions, before
21 I start asking you questions about it. Tell the
22 jury.
23       MR. PYSER: Object to form.
24       THE WITNESS: I do not remember the time
25 frame. But there were allegations -- it was

Page 47

1 alleged -- I don't remember the details around
2 shipments to customers.
3       I remember that during the course of my
4 job, identifying pharmacies, shutting those
5 pharmacies off from receiving controlled
6 substances, and reporting those pharmacies to
7 the DEA. And then at some point, I remember
8 those same pharmacies being a part of whatever
9 the documents were around the -- the suspension,
10 pharmacies that we had shut off 12 to 18 months
11 prior.
12 BY MR. PAPANTONIO:
13       Q. We'll show you documents, and we'll -- the
14 jury will be able to see what you cut off and when.
15 But we'll -- we'll leave that for the jury to look
16 at, but let me go ahead with what this says right
17 here.
18       MR. PYSER: Object to form on that last
19 speech.
20 BY MR. PAPANTONIO:
21       Q. Let me ask you a question. It says: "I
22 think it would be safe to assume that the DEA will
23 use this opportunity to get MCK to implement an
24 ABC-like program."
25       Who is "ABC"? Do you know?

Page 48

1       A. I would take ABC to be AmerisourceBergen.
2       Q. Okay. It says: "Also at the industry
3 meeting, the H.D. Smith director of regulatory
4 compliance was pulled aside and told that the DEA has
5 concern with some of their customers and to schedule
6 a meeting with DEA in D.C. to discuss that he should
7 bring his IT people with him."
8       See that?
9       A. Yes.
10       Q. Okay. And then this last paragraph, it
11 says -- put a box around this, if you can, because
12 this is where we're going to be spending some time.
13       It says: "We need to be proactive and
14 implement a program that we develop that will satisfy
15 DEA expectations, and this is not -- and is not
16 dictated to us by the Agency pursuant to regulatory
17 actions. The ABC program is not customer friendly
18 and results in delayed filing and delivery of
19 controlled substances -- substance orders to the
20 customer."
21       Do you see that? You see where I read
22 that? You got --
23       A. Yes.
24       Q. You got this letter, didn't you?
25       A. My name is on the address list, yes.

Page 49

1       Q. And then if you'll go to the next page,
2 let's take a look at what the -- actually let's go
3 right -- go to page 4, and we'll -- we'll just review
4 what the ABC -- the new program for ABC was. Page 4.
5       You see that? Looks like this
6 (indicating).
7       A. Yes.
8       Q. Okay. So AmerisourceBergen, which is the
9 company that we're talking about here, their
10 programs, it says: "Drug Enforcement Administration
11 Pharmaceutical Industry Conference."
12       You see that? September 11th, 2007?
13       A. Yes.
14       Q. And if you'll go to -- if you will go then
15 to the bottom of that page, it says: "Regulatory
16 responsibility. Title 21 of code -- of the Code of
17 Federal Regulations," and it gives 1301.71.
18       "All applicants and registrants shall
19 provide effective controls and procedures to guard
20 against theft and diversion of a controlled
21 substance."
22       Right? See that?
23       A. Yes.
24       Q. And you knew that -- you knew about that
25 statute, didn't you? When you were working, you knew

Page 50

1 about the statute, right?
2      A.   At the time that I was responsible for
3 reviewing the ingredient limit reports and
4 identifying pharmacies, yes.
5      Q.   And so what you were supposed to do --
6           MR. PAPANTONIO:  Underline, please,
7      Evan --
8 BY MR. PAPANTONIO:
9      Q.   "Provide effective controls and guard
10 against diversion."
11           See that?
12      A.   Yes.
13      Q.   "Guard against diversion of controlled
14 substances."  Right?
15           And it says:  "Distributor response:
16 Develop policy" -- and then it goes on to the next
17 page:  "Develop policy.  This is what a" -- do you
18 understand what I'm asking you here?
19      A.   No.  I'm listening to you read this --
20      Q.   Do you --
21      A.   -- slides.
22      Q.   Do you understand that ABC had a -- had
23 something in place to deal with diversion?  That's
24 what this letter is about; you understand that?
25           MR. PYSER:  Object to form.  Calls for

Page 51

1 speculation.
2           MR. PAPANTONIO:  Well, no, it doesn't.
3           THE WITNESS:  I understand that Cardinal
4      Health had a program in place --
5 BY MR. PAPANTONIO:
6      Q.   Well --
7      A.   -- to help identify and --
8      Q.   Do you understand, ABC laid out examples
9 of what they're doing in their program; and in the
10 letter, Reardon says it's "onerous"?
11           Do you recall that?  Do you want to go --
12 look at the letter again?
13      A.   No, I remember you reading that.
14      Q.   Okay.  You remember that Reardon said that
15 that would be too complex and too onerous?  Remember
16 that?
17           MR. PYSER:  Object to form.
18           THE WITNESS:  I remember you reading that
19      slide.
20 BY MR. PAPANTONIO:
21      Q.   Okay.  Well, then, let's look at what
22 these onerous things were.
23           "Distributors usually implement policies
24 that mirror the Code of Federal Regulations."
25           That's something that's a good idea,

Page 52

1 right?  You would agree with that, wouldn't you, sir?
2           MR. PYSER:  Object to form.
3           THE WITNESS:  It's our job to comply with
4      federal regulations.
5 BY MR. PAPANTONIO:
6      Q.   And that's not onerous, is it?
7      A.   It's our job to comply with the federal
8 regulations.
9      Q.   Okay.  And -- and according to the ABC
10 program, they say "physical security controls."
11           You had physical security controls?
12 Cardinal?
13      A.   Yes.
14      Q.   Do you know who Mike Williams is?
15      A.   That name does not ring a bell.
16      Q.   We'll talk about it in just a minute.
17           How about ". . . records and reports of
18 registrants, information, maintenance, and inventory
19 requirements."  See that?
20      A.   Yes.
21      Q.   Does that seem onerous to do that?  I
22 mean, you did it as a regulator.
23           Does that seem onerous, to have records
24 and reports of registrants with information about
25 maintenance and inventory?

Page 53

1           MR. PYSER:  Object to form.
2 BY MR. PAPANTONIO:
3      Q.   Does that seem onerous?
4      A.   First, I'm not a regulator, and I never
5 have been a regulator.  And -- can you repeat
6 everything you said --
7      Q.   Yeah.  Does -- does it seem onerous --
8      A.   -- referring to --
9      Q.   Does it seem onerous to you for a company
10 that's selling narcotics all over the country to have
11 a system that reports and -- reports registrants'
12 information, maintenance, and inventory?  Does that
13 seem onerous to you?
14           MR. PYSER:  Object to form.
15           THE WITNESS:  I -- I will say that a
16      company has to comply with the -- the
17      regulations.
18 BY MR. PAPANTONIO:
19      Q.   And that's what you -- that -- that was
20 part of your job, right?
21      A.   Part of my job was to help design and
22 implement a program to identify suspicious orders and
23 report those orders.
24      Q.   So would you disagree with Mr. Reardon
25 when he says that recording and reporting

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 registrants' information and maintenance is onerous?
2 　　　MR. PYSER: Object to form. Misstates
3 evidence.
4 　　　THE WITNESS: I can't speak to Steve's
5 wording or his thinking at the time.
6 BY MR. PAPANTONIO:
7 　　Q. Does that seem onerous to you, sir, to
8 report records and information and maintenance and
9 inventory requirements? Does that seem onerous to
10 you?
11 　　　MR. PYSER: Object to form.
12 　　　VIDEOGRAPHER: It seems like something
13 that -- that we did.
14 BY MR. PAPANTONIO:
15 　　Q. And we'll see in a minute, but --
16 　　A. Okay.
17 　　Q. So you don't think that's onerous, right?
18 　　　MR. PYSER: Object to form.
19 　　　THE WITNESS: I think it's something that
20 is in the CFR, that we did.
21 BY MR. PAPANTONIO:
22 　　Q. Okay. Well, we'll look at that in a
23 minute.
24 　　A. Okay.
25 　　Q. But right now, you don't think that's

Page 55

1 onerous, correct?
2 　　　MR. PYSER: Object to form. Asked and
3 answered.
4 　　　THE WITNESS: Again, I can't speak to
5 Steve's wording.
6 BY MR. PAPANTONIO:
7 　　Q. How about this? "Orders for Schedule I
8 and II controlled substances, ordering, filling,
9 executing, and endorsing DEA Forms 222."
10 　　　See that?
11 　　A. Yes.
12 　　Q. Does that seem onerous to you, and
13 complex?
14 　　A. Again, that is something that we did. And
15 that is something that's in the CFR.
16 　　Q. And you think you did that successfully?
17 　　A. I would say that we put forth our best
18 effort and did it successfully.
19 　　Q. Okay. So right now, your testimony,
20 Mr. Brantley, would be that your system was
21 successful in controlling narcotic distribution in
22 America? Is that your testimony?
23 　　A. I will say --
24 　　　MR. PYSER: Object to form. Misstates
25 testimony.

Page 56

1 　　　THE WITNESS: I will -- I will say that
2 the system was compliant with the regulation.
3 BY MR. PAPANTONIO:
4 　　Q. Was it successful in keeping control of
5 narcotics that were distributed throughout the
6 country; yes or no? That's all I'm asking for.
7 　　　MR. PYSER: Object to form.
8 　　　THE WITNESS: Well, so far what you've
9 mentioned is the -- the cage and vault
10 construction. And yes, that was compliant and
11 safe, as far as the security of the controlled
12 substances.
13 　　　You also mentioned maintenance and
14 inventory requirements. And we kept records for
15 Schedule II as well as Schedule III through V
16 controlled substances.
17 　　　Then you mentioned the order filling and
18 executing and endorsing of 222 forms, which
19 again, we did, and we were successful with
20 properly executing those 222 forms.
21 BY MR. PAPANTONIO:
22 　　Q. And you think you were successful in all
23 that, huh? Is that -- is that Eric Brantley's
24 testimony, that Cardinal was successful in
25 controlling the diverted -- diversion with the

Page 57

1 narcotics that it distributed? Is that your
2 testimony here today? That's the only thing I'm
3 wondering.
4 　　A. I can speak --
5 　　　MR. PYSER: Object --
6 　　　THE WITNESS: -- to what I did.
7 　　　MR. PYSER: Object to form.
8 Argumentative. Asked and answered.
9 BY MR. PAPANTONIO:
10 　　Q. You can speak to what you did. And did
11 you think you did it successfully?
12 　　A. I believe I did it successfully --
13 　　Q. All right. Well, we'll --
14 　　A. -- yes.
15 　　Q. We'll go through some of that and let the
16 jury decide that.
17 　　　MR. PYSER: Object to form.
18 BY MR. PAPANTONIO:
19 　　Q. Next -- next thing on here that -- when
20 we're talking about things that are onerous, that
21 Mr. Reardon determined was onerous, "other security
22 controls. Make a good faith inquiry. Report
23 suspicious orders. Report significant losses. Gray
24 area."
25 　　　You think it's -- you think it's onerous

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  to make a good faith inquiry to report suspicious
2  orders and report significant losses? Is that
3  onerous?
4      MR. PYSER: Object to form. Misstates
5  evidence.
6  BY MR. PAPANTONIO:
7      Q. Is that onerous, sir?
8      A. Again, I think that it's our
9  responsibility to comply with the regulations and
10 identify and report suspicious orders.
11     Q. Well, then, but as far as you're
12 concerned, it's not onerous to report suspicious
13 orders, true?
14     A. Again, I can't speak to "onerous." Those
15 were Steve Reardon's words. I can't speak to his
16 words or --
17     Q. But you can --
18     A. -- or his mindset at the time.
19     Q. You can speak to your words. Is that
20 something you would expect Cardinal to do, the very
21 things that we've read here? Is it your testimony
22 you've done all those things?
23     MR. PYSER: Object to form.
24     THE WITNESS: We had policies and
25 procedures in place that were in compliance with

Page 59

1  all of these things, and we did all of these
2  things that you've read on this slide.
3      MR. PAPANTONIO: Well, show him 1941,
4  please.
5  BY MR. PAPANTONIO:
6      Q. So your testimony is that your company at
7  that point was --
8      MS. MOORE: Cardinal-Brantley 3.
9      (Cardinal-Brantley 3 was marked for
10 identification.)
11 BY MR. PAPANTONIO:
12     Q. Your testimony, Mr. Brantley, is at the
13 time, that your company was reporting suspicious
14 orders, right?
15     A. We generate ingredient limit reports, and
16 we submitted those reports to the DEA every month.
17     Q. So you're reporting suspicious orders,
18 according to what your testimony is here today? Is
19 that a yes or a no?
20     A. We --
21     MR. PYSER: Object to form.
22     THE WITNESS: We filed ingredient limit
23 reports with the DEA every month.
24 BY MR. PAPANTONIO:
25     Q. So you did report suspicious orders,

Page 60

1  according to your testimony today, correct?
2      A. We reported orders that were on the
3  ingredient limit report to the DEA every month.
4      Q. Yeah. Okay. And so prior to coming here,
5  nobody showed you this document, I take it, right?
6      Take a look at this document. Look at the
7  -- let's just go right to -- to this -- bottom of
8  this. You see the bottom of the second page? I just
9  want to ask you this question.
10     A. Bottom of the second --
11     Q. Bottom of --
12     A. -- page? Where are you --
13     Q. -- the second page. Yeah.
14     A. Are you referring to --
15     MR. PAPANTONIO: Blow that to where he
16 can --
17     THE WITNESS: -- the last paragraph?
18     MR. PAPANTONIO: Blow -- blow that up to
19 where he can read that. I can't . . .
20 BY MR. PAPANTONIO:
21     Q. Says: "Later, had dinner with the group.
22 Interesting gossip came from Reardon, Quintero . . ."
23     Who's Quintero?
24     A. I don't recall.
25     Q. ". . . who relayed that Cardinal is not

Page 61

1  reporting suspicious orders to the DEA on the advice
2  of outside counsel Linden Barber."
3      MR. PAPANTONIO: Would you underline this
4  line because we're going to spend some time with
5  this.
6  BY MR. PAPANTONIO:
7      Q. Okay, so before I showed you this
8  document, I think it was your testimony that you --
9  your company was reporting suspicious orders, right?
10     MR. PYSER: Object to form. Vague as to
11 time frame, when you're showing him a 2013
12 document.
13 BY MR. PAPANTONIO:
14     Q. Your company was reporting suspicious
15 orders, according to you, in 2007; is that what you
16 told me just a minute ago?
17     A. My testimony was that we were submitting
18 ingredient limit reports to the DEA during the time
19 frame when I was reviewing the ingredient limit
20 reports from 2005 to whatever time someone else came
21 in and took that responsibility.
22     Q. And according to the law -- I'm showing
23 you this again. You know this law. You had a duty
24 as early as 1971 to report suspicious orders.
25     You know that, don't you, Mr. Brantley?

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    MR. PYSER:  Object to form.
2  BY MR. PAPANTONIO:
3    Q.  Yes or no?
4    MR. PYSER:  Object to form.  Asked and
5  answered.  Legal conclusion.
6    THE WITNESS:  I know that
7  21 CFR 1301.74(b) requires registrants to
8  identify and report suspicious orders.
9  BY MR. PAPANTONIO:
10    Q.  And that was all back -- all the way back
11  to 1971, wasn't it?
12    A.  I don't recall the exact year that the
13  regulation was written, but I do believe it was --
14  the '70s.
15    Q.  In the '70s?
16    A.  I don't recall --
17    Q.  Okay, well --
18    A.  -- the exact time, though.
19    Q.  And so your -- and so your testimony then
20  was that in 2007, your company was reporting
21  suspicious orders.  That's what you told me, correct?
22    A.  We were submitting ingredient limit
23  reports to the DEA every month, as -- as required by
24  21 CFR 1301.74(b).
25    Q.  Why don't you -- here.  Take this.

Page 63

1    And why don't you tell me where it says
2  "reporting ingredient reports" in there?
3    MR. PYSER:  Object to form.
4    Counsel, are you going to mark it as an
5  exhibit?
6    MR. PAPANTONIO:  No, we're going to --
7  we're going to -- we'll mark it before it's out.
8  BY MR. PAPANTONIO:
9    Q.  Show me where it says that it's okay to
10  just send in ingredient reports.  If you can find it
11  in that CFR, please tell me where it is.
12    MR. PYSER:  Object to form.
13    THE WITNESS:  "The registrant shall design
14  and operate a system to disclose to the
15  registrant suspicious orders of the controlled
16  substances."
17    In the case of Cardinal, that was
18  ingredient limit reports.
19  BY MR. PAPANTONIO:
20    Q.  Well, you see --
21    A.  "The registrant shall inform the field
22  division office of the administration in this area of
23  suspicious orders when discovered by the registrant."
24    We submitted those ingredient limit
25  reports to the DEA every month.

Page 64

1    Q.  And nevertheless, you have a document in
2  front of you that's written as late as 2013, with
3  your supervisor, Mr. Reardon, saying that -- hand me
4  that back, and let's look at it again.  We're --
5    A.  Mr. Reardon was not my supervisor in 2013.
6    Q.  Well, he was your supervisor in 2007,
7  wasn't he?
8    MR. PYSER:  Object to form.
9  BY MR. PAPANTONIO:
10    Q.  True?
11    A.  I do not recall when I transferred out of
12  the role.
13    Q.  He was your supervisor at some point,
14  wasn't he?
15    A.  Yes.
16    Q.  Okay.  And how many years was he your
17  supervisor?
18    A.  From 2005 until 2007-8.  I don't recall
19  the exact time.
20    Q.  And you think, when you left in 2007, that
21  there was a system to report suspicious orders?
22    That's what Mr. Brantley thinks today, as
23  he's talking to the jury here, right?
24    MR. PYSER:  Object to form.  Asked and
25  answered.

Page 65

1  BY MR. PAPANTONIO:
2    Q.  True?
3    A.  Yeah.
4    Q.  I mean, in good faith -- you really
5  believed there was a suspicious order program in
6  place when you left the company; is that your
7  testimony?
8    A.  There was a suspicious order program in
9  place while I was at the company.  And there is a
10  suspicious order in -- in place at the company, yes.
11    Q.  You thought that?
12    A.  I knew that because I worked on the
13  program.
14    My job was to identify such orders by
15  reviewing the ingredient limit reports, and in
16  addition, to go above and beyond, to go out and
17  conduct a site visit of that customer and shut that
18  customer off from controlled substances, and then
19  report not a suspicious order, but a customer to the
20  DEA.
21    Q.  And you wanted to do your job, didn't you?
22  You, Mr. Brantley, you wanted to do your job by
23  reporting suspicious orders, true?
24    A.  I -- that was my job.
25    Q.  That's what -- you did your job.  Let's

Page 66

1 read this again.
2        "Later, at dinner with the group,
3 interesting gossip came from Reardon, Quintero who
4 related that Cardinal" --
5        MR. PAPANTONIO:  Let's just be very
6 clear -- put a second line underneath it so I
7 make sure I'm -- I'm catching this right.
8        MS. CHARLES:  Counsel, can I object that
9 this is a McKesson confidential document, and I
10 have no record that you asked for permission of
11 that.
12        MR. PAPANTONIO:  Yeah, you -- you can
13 object.
14 BY MR. PAPANTONIO:
15     Q.  Cardinal is not --
16        MR. PYSER:  Actually, that's a valid
17 objection.  We've received no notice that this
18 document, produced by McKesson, which is marked
19 "highly confidential," has been designated --
20        MR. PAPANTONIO:  Yeah.
21        MR. PYSER:  -- to be used in this --
22        MR. PAPANTONIO:  All right.  We're
23 going --
24        MR. PYSER:  -- deposition.
25        MR. PAPANTONIO:  -- to use it.  You take

Page 67

1 it up with the judge.  This is going to be --
2        MR. PYSER:  And we're going to mark this
3 entire area of testimony as improper, to be
4 excluded --
5        MR. PAPANTONIO:  All right.
6        MR. PYSER:  -- and failure to follow
7 the --
8        MR. PAPANTONIO:  That's your right --
9        MR. PYSER:  -- deposition protocol.
10        MR. PAPANTONIO:  That's your right to do
11 it, sir.
12 BY MR. PAPANTONIO:
13     Q.  "Cardinal is not reporting suspicious
14 orders to DEA on the advice of outside counsel."
15        You see that?
16        MR. PYSER:  Object to form.  Vague as
17 to --
18 BY MR. PAPANTONIO:
19     Q.  You see that?
20        MR. PYSER:  Object to form.  Vague as to
21 time frame.
22 BY MR. PAPANTONIO:
23     Q.  Did I read that right?
24     A.  I see the line that you read.
25     Q.  Okay.  And this document was written in

Page 68

1 2013, correct?
2        MR. PYSER:  Object to form.  Calls for
3 speculation.
4        THE WITNESS:  According to this, the
5 e-mail was sent 2013.
6 BY MR. PAPANTONIO:
7     Q.  And it says this is on the advice of
8 outside counsel, Linden Barber.
9        Have you met Linden Barber?
10        MR. PYSER:  Object to form.  Misstates
11 evidence.  Speculation.
12 BY MR. PAPANTONIO:
13     Q.  Have you met Linden Barber?
14     A.  Yes, if you narrow a -- a time frame.
15     Q.  When did you meet him?
16     A.  I met Linden Barber -- I can't say what --
17 what year, but I was not in my role with -- as far as
18 reporting suspicious orders.  I was in a role as a
19 compliance officer at the time, the first time I met
20 Linden Barber.
21     Q.  And it's -- it's fair for me to say, based
22 on what you've told me so far, that in 2007, Eric
23 Brantley, you, believed that you had a suspicious
24 order system in place.  Correct?
25        MR. PYSER:  Object --

Page 69

1 BY MR. PAPANTONIO:
2     Q.  You believed -- you believed that in 2007;
3 is that true?
4        MR. PYSER:  Object to form.  Asked and
5 answered.
6 BY MR. PAPANTONIO:
7     Q.  Correct?
8     A.  We had a system in place, reviewing
9 ingredient limit reports and submitting those
10 ingredient limit reports to the DEA, as well as
11 conducting site visits of pharmacies identified on
12 those reports, discontinuing sales of controlled
13 substances to those pharmacies, and reporting those
14 pharmacies to the DEA.
15     Q.  And when you -- when you left, you thought
16 that was a successful program, didn't you?  You
17 thought, "We're doing a good job with this," didn't
18 you?
19        MR. PYSER:  Object to form.
20 BY MR. PAPANTONIO:
21     Q.  You thought you were doing a good job with
22 suspicious orders, didn't you?
23     A.  Please put a time frame on when I left.
24     Q.  Well, when you left --
25     A.  Do you mean when I left the role --

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  Q. When did you leave?

2  A. -- when I left the company?

3  Q. When you left the company, you thought

4 everything was good; suspicious orders are in place;

5 we're making sure narcotics don't get out there

6 without reporting suspicious orders.

7      That's what -- that's what Eric Brantley

8 thought?

9      MR. PYSER: Object to form.

10 BY MR. PAPANTONIO:

11  Q. True?

12     MR. PYSER: Object to form. Vague.

13 BY MR. PAPANTONIO:

14  Q. That's a true statement, isn't it? Eric

15 Brantley --

16  A. When I left Cardinal Health --

17  Q. Well, let me finish my question, just so I

18 can be real clear.

19      In 2007, when you left -- when you left

20 Cardinal Health, Eric Brantley believed that he had a

21 system in place that was a suspicious order system,

22 yes or no?

23     MR. PYSER: Object to form.

24     THE WITNESS: I did not leave Cardinal

25 Health in 2007.

Page 71

1 BY MR. PAPANTONIO:

2  Q. Well, when did --

3  A. I did not leave Cardinal Health until 2013

4 I believe.

5  Q. All right. In 2013, you were still there,

6 right? True?

7  A. I -- I was an employee at Kinray.

8  Q. And what's the date on that letter that

9 you're looking at in front of you where it says:

10 "Cardinal is not reporting suspicious orders to the

11 DEA"?

12  A. The e-mail apparently was sent March 11,

13 2013.

14     MR. PYSER: Object to form. Calls for

15     speculation.

16 BY MR. PAPANTONIO:

17  Q. All right.

18     MS. CHARLES: Counsel, can you please put

19 the Bates number, for clarity, on the record?

20     MR. PAPANTONIO: No, I won't put Bates

21 number. We'll read them in -- you're welcome to

22 read them in. We're not going to waste time

23 reading 15-digit --

24     MS. CHARLES: MCKMDL00545341.

25     I'm going to object to showing a McKesson

Page 72

1 highly confidential document to the witness that

2 did not provide -- showing it to him.

3     MR. PAPANTONIO: Show Mr. Brantley 4230,

4 please.

5     MS. MOORE: Cardinal-Brantley 4.

6     (Cardinal-Brantley 4 was marked for

7 identification.)

8     MR. PAPANTONIO: You see that settlement?

9 You got that, Evan? Could you blow that up,

10 that first page -- settlement release agreement

11 and administrative memorandum of agreement.

12 BY MR. PAPANTONIO:

13  Q. Now, you were there when this was -- this

14 is 2008. You were there in 2008? You were with

15 Cardinal in 2008, weren't you?

16  A. I was an employee of Cardinal Health in

17 2008.

18  Q. Okay. And then it goes on. This says

19 "Applicability," and then it goes, "Background."

20      Says: "Cardinal is registered with DEA in

21 27 facilities as distributors, Schedule II to V

22 controlled substances, under provision of the

23 Comprehensive Drug Abuse Prevention Act, 1970."

24      Remember, we talked about the date of the

25 Act, and you said it was in the '70s. And you were

Page 73

1 right. It was in '70s, wasn't it?

2  A. According to this, yes.

3  Q. Yeah.

4      "On November 28th, 2007, the DEA, by its

5 deputy administrator, Leon -- Michele Leonhart,

6 issued an order to show cause . . ."

7      And you told us you know what an order to

8 show cause is, right?

9     MR. PYSER: Object to form.

10     THE WITNESS: I spoke to -- I believe it's

11 a chance to give the -- the registrant an

12 opportunity to answer to allegations by the DEA.

13 BY MR. PAPANTONIO:

14  Q. So you were actually involved in this,

15 weren't you?

16     MR. PYSER: Object to form.

17 BY MR. PAPANTONIO:

18  Q. In -- in the order to show cause, you --

19 Eric Brantley was involved in that, true?

20  A. I was not involved in the order to show

21 cause.

22  Q. Who was?

23  A. I do not recall the individuals that would

24 have been. I suspect, legal.

25  Q. But were you working in regulatory in 2008

Page 74

1 when this memorandum came through from the DEA?
2    A. I do not know the exact -- are you saying
3 November 28th?
4    Q. Yeah.
5       MR. PYSER: Object to form. Vague.
6       What year are we talking about?
7       MR. PAPANTONIO: It's November 28th --
8    underline the one I -- underline that, so
9    counsel can understand what we're doing here.
10 BY MR. PAPANTONIO:
11    Q. November 28th, 2007, you were there.
12 True?
13    A. I was an employee of Cardinal Health, yes.
14    Q. "The DEA, by its deputy administrator,
15 Michele Leonhart, issued an order to show cause and
16 immediate suspension of registration to
17 Cardinal . . ."
18       You see that?
19    A. Yes.
20    Q. Didn't I just begin this deposition by
21 asking you whether you recalled any -- any
22 suspensions that Cardinal was involved with?
23       What did you tell me?
24       MR. PYSER: Object to form.
25       THE WITNESS: You asked me --

Page 75

1       MR. PYSER: Object to form.
2 BY MR. PAPANTONIO:
3    Q. What did you tell me?
4    A. You asked me did I recall suspensions of
5 Cardinal customers.
6    Q. Oh.
7    A. And I said no.
8    Q. Oh, it was "Cardinal customers." I'm
9 sorry, I didn't use the right word.
10       But this says --
11       MR. PAPANTONIO: Would you please
12    underline this.
13 BY MR. PAPANTONIO:
14    Q. It says: "Immediate suspension of
15 registration to Cardinal."
16       Is that clear?
17       MR. PYSER: Object to form.
18 BY MR. PAPANTONIO:
19    Q. Is that pretty clear to you?
20       MR. PYSER: Object to form.
21 BY MR. PAPANTONIO:
22    Q. Mr. Brantley, is that pretty clear to you?
23    A. Is what pretty clear?
24    Q. "Immediate suspension of registration to
25 Cardinal"?

Page 76

1    A. There was an immediate suspension order
2 issued, according to this document.
3    Q. Well, the jury is going to see how we
4 started this deposition, where you gave me answers
5 about it, and I want to make sure that we're clear
6 about what you said at the beginning of this
7 deposition.
8       In the beginning of the deposition, did
9 you tell me that there were no suspensions of
10 registration to Cardinal customers? That's what you
11 said, right?
12       MR. PYSER: Object to form.
13       THE WITNESS: I said I did not recall
14    suspensions of Cardinal customers.
15 BY MR. PAPANTONIO:
16    Q. Right. This is -- this is a suspension of
17 registration to the company itself, Cardinal,
18 correct?
19    A. This is a -- a suspension to Cardinal
20 Health.
21    Q. And it goes on to say: "With respect to
22 distribution facility" -- gives the address, Auburn,
23 Washington.
24       You know where that is, right?
25    A. It's in Washington state.

Page 77

1    Q. Right. And then it -- next one, it says
2 on December 5th, 2007 -- just so we have the dates
3 right -- it says: "The DEA, by its administrator" --
4 again, Michele Leonhart -- did you ever meet -- by
5 the way, did you ever meet Michele Leonhart?
6    A. I did not.
7    Q. Do you know who she is?
8    A. According to this document, she was the
9 deputy administrator.
10    Q. And that's all you know about it,
11 according to this document?
12    A. Yes.
13    Q. Did anybody with the company -- not your
14 lawyers, but anybody with the company review this
15 with you before you came in here to testify and give
16 your testimony about whether or not Cardinal had been
17 involved in any kind of suspensions?
18       MR. PYSER: Object to form.
19       THE WITNESS: Is your question did anyone
20    review this particular document with me?
21 BY MR. PAPANTONIO:
22    Q. Yeah.
23    A. No.
24    Q. Is this first time you've seen this
25 document?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.  It is the first time I have seen this
2  document during these proceedings.  It is not my
3  first time seeing this document.  I have read it at
4  some point over the last several years.
5    Q.  You knew about it all the way back to
6  2008, didn't you, about this document?
7    A.  I did not know about this document in 2008
8  because I did not review the document then.
9    Q.  Nobody with the company showed you this
10  document while you were employed as -- in regulatory,
11  correct?
12      MR. PYSER:  Object to form.  Vague as to
13  time.
14  BY MR. PAPANTONIO:
15    Q.  Is that true, that nobody showed you this
16  document while you were employed with regulatory in
17  2008?  Correct?
18    A.  I do not recall anyone at the company
19  showing me this document.
20    Q.  All right.  Well, let's -- let's go ahead
21  and spend some time with it and see what you think.
22      MR. PYSER:  Object to form.  The
23  document --
24  BY MR. PAPANTONIO:
25    Q.  It says -- it says --

Page 79

1      MR. PYSER:  To be clear, the document's
2    dated September of 2008, if you were employed in
3    regulatory at that time.
4      You're asking a misleading question,
5    Counsel.
6      MR. PAPANTONIO:  All right.  We'll clear
7    the question up.  I think it'll be very clear by
8    the time it's all over.
9  BY MR. PAPANTONIO:
10    Q.  It says:  "The DEA, by its administrator,
11  Michele Leonhart, issued an order to show cause" --
12      MR. PAPANTONIO:  Underline that word, "to
13  show cause."
14  BY MR. PAPANTONIO:
15    Q.  -- "and an immediate suspension of
16  registration to Cardinal."
17      Now, what does that mean, "an immediate
18  suspension"?  What does that mean?  Tell the jury,
19  now that you see this, tell the jury what "immediate
20  suspension" means.
21      MR. PYSER:  Object to form.  Legal
22  conclusion.
23      THE WITNESS:  I believe that "immediate
24  suspension" means an immediate suspension of the
25  DEA registration.

Page 80

1  BY MR. PAPANTONIO:
2    Q.  And they can't sell narcotics anymore.
3  That's what that means, right?
4      MR. PYSER:  Object to form.
5  BY MR. PAPANTONIO:
6    Q.  They can't sell narcotics -- December 5th,
7  2007, in Lakeland, Florida, they can't sell
8  narcotics, the Cardinal operation?
9      MR. PYSER:  Object to form.
10      THE WITNESS:  If there is an immediate
11    suspension order in place, a registrant cannot
12    sell controlled substances.
13  BY MR. PAPANTONIO:
14    Q.  And you didn't know about this prior to me
15  coming in here and asking you these questions, did
16  you?
17      MR. PYSER:  Object to form.
18  BY MR. PAPANTONIO:
19    Q.  True?  I mean, in fairness to you, you
20  just didn't know about this?
21      MR. PYSER:  Object to form.  Misstates
22    evidence.  Misstates testimony.
23      THE WITNESS:  I knew about this prior to
24    coming in.  Your question was, had anyone showed
25    me this document at Cardinal Health, and my

Page 81

1    answer was and is no.
2  BY MR. PAPANTONIO:
3    Q.  Well, if you knew it before you came in
4  here, when I asked you at the beginning of this
5  deposition, do you know whether or not Cardinal
6  pharmacies or customers, whether there's any
7  suspensions, what did you tell me?
8      MR. PYSER:  Object to form.  Asked and
9    answered.
10      THE WITNESS:  You asked me was I aware of
11    any suspensions of Cardinal customers.  And I
12    responded no, and I respond no again.  This --
13    this --
14  BY MR. PAPANTONIO:
15    Q.  But you knew about -- go ahead.
16    A.  This is a suspension order, as it reads,
17  of Cardinal, not a Cardinal customer.  So you asked
18  about customers, and I answered no.
19    Q.  Okay.  So this is not -- this is not just
20  the customer.  This is the company itself that is
21  being suspended by the DEA for immediate suspension,
22  correct?
23      MR. PYSER:  Object to the form.
24  BY MR. PAPANTONIO:
25    Q.  The company itself, that you worked for?

Page 82

1     MR. PYSER: Object to form.
2  BY MR. PAPANTONIO:
3     Q.  Correct?  Are you --
4     MR. PYSER: Object to form.  Misstates
5  evidence.
6     MR. PAPANTONIO: Let me finish my question
7  before you -- I -- I get it.  I get what you're
8  doing.  But you're going to have to listen to
9  the question.
10    MR. PYSER: Well, I'm trying to get in
11 there before, so --
12    MR. PAPANTONIO: All right.
13    MR. PYSER: All right.  Let me just ask --
14 give me a second to interject my objection.
15 That way it will be easier for you to finish
16 your question.  Okay?
17    MR. PAPANTONIO: Yes.
18    MR. PYSER: I'm not trying to interrupt
19 you, Counsel.
20    MR. PAPANTONIO: Okay.
21    MR. PYSER: -- I'm just not sure where
22 your question's answering --
23    MR. PAPANTONIO: Well --
24    MR. PYSER: -- ending because you're
25 asking a series of them in each -- in each

Page 83

1  question.
2     MR. PAPANTONIO: Let me see if I can ask
3  this question pretty clear.
4  BY MR. PAPANTONIO:
5     Q.  Immediate suspension of a registration to
6  Cardinal itself means Cardinal cannot sell narcotics
7  in Lakeland, Florida.  Yes?
8     MR. PYSER: Object to form.
9     THE WITNESS: If the Lakeland, Florida,
10    facility has an immediate suspension order,
11    Lakeland, Florida, cannot sell or distribute
12    controlled substances.
13 BY MR. PAPANTONIO:
14    Q.  And that's a Cardinal facility, correct?
15 According to this?
16    A.  This facility is a Cardinal Health
17 facility.
18    Q.  All right.
19    A.  Or at least was at the time.  I cannot
20 speak for now.
21    Q.  Fair enough.  Let's go on to number 4:
22 "On December 7th, 2007, the DEA, by its
23 administrator, Michele Leonhart, issued an order to
24 show cause and immediate suspension registration to
25 Cardinal with respect to its New Jersey facility."

Page 84

1     Do you see that?
2     MR. PAPANTONIO: Underline "New Jersey."
3     THE WITNESS: Yes, I see that.
4     MR. PAPANTONIO: And then underline, if
5  you would, please, "order to show cause" and
6  "immediate suspension of registration."
7  BY MR. PAPANTONIO:
8     Q.  And that's Swedesboro facility, right?
9     A.  That's what it says, yes.
10    Q.  So so far, we have a suspension of -- we
11 have suspension of the Auburn facility.
12    Have you ever been to the Auburn Cardinal
13 facility?
14    A.  In Auburn, no.
15    Q.  Have you ever been to the Lakeland
16 Cardinal facility that was suspended?
17    A.  I have been to the Lakeland facility.
18    Q.  Have you been to the Swedesboro facility
19 that was suspended?
20    A.  I have been to the Swedesboro facility.
21    Q.  Then -- okay, then the next one,
22 number 5 -- and by the way, those are -- those are
23 all different parts of the country.  We're not just
24 talking about one area of the country, are we?
25    Here, we're talking about Washington

Page 85

1  state.  We're talking about Florida.  We're talking
2  about New Jersey.  Those are different parts of the
3  country.  I just want to be sure we're clear on that
4  as we go.
5     These are different Cardinal facilities in
6  different parts of the country, correct?
7     MR. PYSER: Object to form.
8     THE WITNESS: It's a facility in
9     Washington state and Lakeland, Florida, and
10    Swedesboro, New Jersey.
11 BY MR. PAPANTONIO:
12    Q.  All across the U.S.  I mean, you know
13 where Washington state is, right?
14    A.  Yes.
15    Q.  All right.  Lakeland, Florida:  You said
16 you've been there?
17    A.  Yes.
18    Q.  All right.  It says: "On January 30,
19 2008, the DEA, by its deputy assistant, Joseph
20 T. Rannazzisi, issued an order to show cause to
21 Cardinal with respect to its distributor facility in
22 Stafford."
23    That's in Texas.  All right?  So we've
24 got --
25    A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.  -- so far we've got Auburn.  We've got
2  Lakeland, Florida.  We've got New Jersey, Swedesboro.
3  And now we've got another one at Stafford -- the
4  Stafford facility.  That's in Texas.
5        Have you been there, too?
6        MR. PYSER:  Object to form.
7        THE WITNESS:  I have been to the Texas
8    facility.
9  BY MR. PAPANTONIO:
10   Q.  And that's in January 2008.  Let's go to
11 the next one, please.
12       "The orders" -- "The orders to show cause
13 referenced above alleged, among other things, that
14 Cardinal failed to maintain effective controls
15 against diversion of particular controlled substance
16 into other than legitimate medical, scientific, and
17 industrial channels as evidenced by sales to
18 customers of Cardinal."
19       Did you know that was going on,
20 Mr. Brantley?  Did you know that your company was
21 failing to maintain effective controls --
22       MR. PAPANTONIO:  Underline "effective
23    controls," please.
24 BY MR. PAPANTONIO:
25   Q.  Your company was failing to maintain

Page 87

1  effective controls of controlled substances.
2        Did you know, when you were working
3    there -- I'm not saying you did know.  I'm just
4    asking, did you know that at all?
5        MR. PYSER:  Object to form.  And misstates
6    evidence.
7  BY MR. PAPANTONIO:
8    Q.  Did you know that?
9    A.  We had a program in place to identify and
10 report suspicious orders to the DEA, and we did.
11   Q.  Okay.  And you did, and whatever you were
12 reporting still wasn't adequate to protecting the
13 American public from narcotics, if we look at this
14 order, right?
15       MR. PYSER:  Object to form.
16 BY MR. PAPANTONIO:
17   Q.  True?
18   A.  We had a system in place.  We operate in
19 a -- in a closed supply chain.  We had a system in
20 place to identify orders and report those orders to
21 the DEA.
22   Q.  Let's see how well --
23   A.  Report pharmacies to the DEA.
24   Q.  Let's see how well it worked.
25       So far -- so far, your system that you're

Page 88

1  describing didn't work in Washington, in Auburn.  It
2  didn't work in Lakeland, Florida.  It didn't work in
3  New Jersey, at Swedesboro.  It didn't work in
4  Stafford facility in Texas -- so far.  Now, that's
5  just the beginning.
6        But so far, you would agree, your system,
7  according to the DEA, failed to do its job, if we
8  just look at this first page of the document.  Right?
9        MR. PYSER:  Object to form.
10 BY MR. PAPANTONIO:
11   Q.  Failed to do its job?
12   A.  These are allegations.
13   Q.  Well, sir, you pled to the allegations and
14 paid a fine -- did you know that?  Did you know your
15 company actually paid a fine?
16       MR. PYSER:  Object to form.  Misstates
17    evidence.
18       THE WITNESS:  I know that these were
19    allegations.  I know that there was settlement.
20    I do not believe there was any acknowledgment of
21    anything.  These were allegations from the DEA.
22 BY MR. PAPANTONIO:
23   Q.  Okay.  So you just paid up -- do you know
24 how much money you paid to the DEA?  I'm just curious
25 whether you know how much money you paid to the DEA

Page 89

1  because of the failure of your company to have a
2  controlled substance suspicious order system in
3  place.
4        Do you know how much you paid?
5        MR. PYSER:  Object to form.
6        THE WITNESS:  I do not recall how much the
7    company settled.
8  BY MR. PAPANTONIO:
9    Q.  All right.  Well, let's go up to the next
10 page, page 2.
11   A.  But the company did not fail to have a
12 system in place.  There was a system in place.
13   Q.  The DEA disagreed with you, didn't they?
14 They disagree that you had a system in place.  If we
15 look at just this part of the document, DEA did not
16 believe you had a system in place, according to this
17 document?
18       MR. PYSER:  Object to form.  Misstates
19    evidence.  Calls for speculation.
20       THE WITNESS:  This document did not say
21    that Cardinal Health did not have a program in
22    place.
23 BY MR. PAPANTONIO:
24   Q.  Oh?  Well, let's go to the next page.
25   A.  Okay.  Because the page that I read did

Page 90

1 not say that --
2    Q. Let's go to the next page, number 7.
3      It says: "DEA also alleges that Cardinal
4 failed to maintain effective controls against
5 diversion . . ."
6      Is that pretty clear to you? DEA says
7 that "Cardinal failed to maintain effective control
8 against diversion of controlled substances."
9      You see that?
10      MR. PYSER: Object to form.
11 BY MR. PAPANTONIO:
12    Q. You didn't -- you didn't -- you didn't --
13 see that line before you just gave me that last
14 answer, did you?
15    A. I do see that line, and I repeat my
16 previous answer.
17    Q. They were wrong, just -- DEA is wrong
18 here, huh?
19    A. This does not say that Cardinal Health did
20 not have a program in place.
21    Q. Sir, they took your license away. They
22 took your license away in Washington. Right? Yes?
23      MR. PYSER: Object to form.
24 BY MR. PAPANTONIO:
25    Q. They took your license away in Washington?

Page 91

1      MR. PYSER: Object to form.
2 BY MR. PAPANTONIO:
3    Q. Correct?
4      MR. PYSER: Object to form. Misstates
5 evidence. Asked and answered.
6      THE WITNESS: There was a -- there was an
7 order to show cause and an immediate suspension
8 of registration.
9 BY MR. PAPANTONIO:
10    Q. They suspended your license in Washington
11 to sell narcotics. They suspended your license in
12 Lakeland to sell narcotics. They suspended your
13 license in Swedesboro to sell narcotics. They
14 suspended your license in Texas to sell narcotics.
15 Correct?
16      MR. PYSER: Object to form. Asked and
17 answered.
18 BY MR. PAPANTONIO:
19    Q. Is that correct?
20    A. There was --
21      MR. PYSER: Object to form.
22      THE WITNESS: There was an immediate
23 suspension order issued for the facilities that
24 you mentioned.
25

Page 92

1 BY MR. PAPANTONIO:
2    Q. Okay. And then if you look down, the next
3 page, it goes on. I mean, the Jerry Steele Lane,
4 Georgia, facility, the McDonough facility.
5      Have you been there?
6    A. Yes.
7    Q. Where is that? You've been to Georgia;
8 you've been to the facility itself, haven't you?
9    A. Yes.
10    Q. And that's a Cardinal facility, correct?
11    A. It was at the time, yes.
12    Q. And you were in charge of Georgia, just --
13 that was part of your territory, wasn't it?
14    A. What do you mean by "in charge of
15 Georgia"? Do you mean --
16    Q. Oversight.
17    A. -- reviewing -- I -- I had no oversight of
18 Georgia. My job was to review ingredient limit
19 reports from all of the Cardinal facilities.
20    Q. Right. And so every one of these things
21 that we've been talking about, where the license has
22 been suspended, you were in charge of reviewing
23 reports, correct?
24      MR. PYSER: Object to form.
25      THE WITNESS: I was one individual that

Page 93

1 did review those reports. Those reports were
2 also submitted to the DEA from these particular
3 distribution centers.
4 BY MR. PAPANTONIO:
5    Q. Well, you might be confused about that, so
6 I'm going to let that one go.
7      But let me ask you this --
8      MR. PYSER: Object to form.
9 BY MR. PAPANTONIO:
10    Q. Strike that. Strike that.
11      And let me ask you this: So we're on
12 page -- we're on number 7 on page 2 of this document.
13      Now, we've talked about all these other
14 places, and now we're talking about McDonough
15 facility. And you reviewed orders for McDonough
16 facility, true?
17    A. I reviewed ingredient limit reports --
18    Q. And according to --
19    A. -- for the McDonough facility.
20    Q. -- the DEA, they say that "Cardinal failed
21 to maintain effective controls against diversion of
22 controlled substances at the following addresses."
23      MR. PAPANTONIO: Underline "following
24 addresses," please.
25

Page 94

BY MR. PAPANTONIO:

Q. First one there is McDonough, right? You actually visited the place, right?

MR. PYSER: Object to form.

THE WITNESS: That is the first facility listed.

BY MR. PAPANTONIO:

Q. And then the next one is all the way out in California, Valencia facility, right?

You visited that, true?

A. I believe I have been to the -- to the Valencia facility.

Q. And you reviewed reports coming from Valencia facility, correct?

A. I did review ingredient limit reports for the Valencia facility.

Q. And according to the DEA, the DEA is saying that Cardinal failed to maintain effective controls against diversion of controlled substances at Valencia facility, right?

MR. PYSER: Object to form.

THE WITNESS: This document alleges that Cardinal failed to maintain effective controls against diversion.

Page 95

BY MR. PAPANTONIO:

Q. Okay. And -- and then the next one is the Denver facility in Colorado. That's a totally different facility; that's in Colorado. True?

And you reviewed reports there, too, correct?

A. I did review ingredient limit reports for the Denver, Colorado, facility.

Q. All right. Let's go to -- let's go down to -- here it says "General" -- Stipulation agreement, General" -- specific questions I have for you.

A. Same page?

Q. Yes, sir, it's the same page.

You see where it says "general," the word "general" there?

A. Yes.

Q. Okay. It says: "Intentions of parties to effect settlement."

And then it -- it goes -- says: "In order to avoid the uncertainty and the expense of litigation, in furtherance of the parties' belief that a settlement, this administration is in the public interest, parties desire to settle and resolve . . ."

Page 96

You see that?

A. I do see that.

Q. ". . . parties desire to settle and resolve and hereby do settle and resolve all outstanding administrative claims and/or issues with respect to alleged failure of Cardinal" --

MR. PAPANTONIO: Underline "failure of Cardinal" --

BY MR. PAPANTONIO:

Q. ". . . to detect and report suspicious orders and alleged failure of Cardinal to maintain adequate controls against the diversion of controlled substances on or prior to September 30, 2008."

See that?

A. I do see that.

Q. All right. And then if you look down below that, you see where it says "covered conduct"?

"For purposes of this agreement, covered conduct shall mean the following. The conduct alleged in the orders to show cause."

See that?

A. Is that under the paragraph "No admission or concession"?

Q. See where it says "covered conduct"?

A. Yes.

Page 97

Q. "The conduct alleged in the orders to show cause," and then the -- go to the next page.

It says: "The alleged failure of Cardinal to maintain adequate controls of controlled substances prior to 2008."

That's when -- that's when you were in regulatory, prior to 2008, right?

MR. PYSER: Object to form. And misstates evidence. Rule of completeness.

BY MR. PAPANTONIO:

Q. You were there in regulatory in 2008?

A. I was in quality and regulatory affairs from 2005 until some point -- either 2007, 2008. I don't recall the exact time frame.

Q. And you were reviewing all of the reports for everything we've just covered -- Georgia, California, Florida, Colorado, Washington -- you were reporting -- you were the guy reporting -- reviewing reports, right?

A. We were reviewing those reports for those facilities.

Q. Says: "The alleged failure of Cardinal to maintain adequate controls against the diversion of controlled substances on or prior -- all -- at all distribution site facilities." Okay?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1   Let's -- let me slow -- let me slow down
2   here. This is -- we're on page 3 right now. Okay?
3   Are you on page 3?
4        A. Yes.
5        Q. Okay. At the very top of page 3, it says:
6   "The alleged failure of Cardinal to maintain adequate
7   controls against the diversion of controlled
8   substances prior -- on or prior to September 30th,
9   2008, at all" --
10       MR. PAPANTONIO: Would you underline "all
11   distribution facilities listed in Appendix A"?
12       Got that?
13  BY MR. PAPANTONIO:
14       Q. Now, remember what that says. We're
15  talking about the failure of Cardinal to maintain
16  adequate controls against the diversion of controlled
17  substance at all facilities that are listed in
18  Appendix A.
19       MR. PYSER: Object to form.
20  BY MR. PAPANTONIO:
21       Q. And let's look at Appendix A; see what it
22  has to say. Go to page 12, and then turn one more
23  page.
24       Now, I want to make sure these are all
25  facilities, sir, that you reviewed reports for.

Page 99

1   Start at the top, if you would, please.
2        "Cardinal facilities referenced in
3   paragraph 1 of this agreement."
4        That's just what we were looking at,
5   correct?
6        A. This is Appendix A to the agreement, yes.
7        Q. So this is Appendix A. And so in
8   Appendix A, it talks about New York operating under
9   DEA registration, correct?
10       A. Yes.
11       Q. And see where it gives a number there, it
12  even gives a DEA registration number?
13       A. Yes.
14       Q. Tell the jury how important that DEA
15  registration number is.
16       MR. PYSER: Object to the form.
17       THE WITNESS: The DEA registration number
18   is the license given to a registrant in order to
19   house and distribute controlled substances.
20  BY MR. PAPANTONIO:
21       Q. And it's way -- it's ways that DEA can
22  identify a particular facility, correct, by its -- by
23  its registration number?
24       A. That registration number is the license to
25  distribute controlled substances.

Page 100

1        Q. So if I wanted to find out about a
2   particular facility, say, in New York, one thing I
3   could look to is I could look to the registration
4   number, correct?
5        A. That registration number identifies the
6   DEA license, yes.
7        MR. PAPANTONIO: Underline that
8        registration number, please.
9   BY MR. PAPANTONIO:
10       Q. And then the next one, it says:
11  "Interstate Drive, Lakeland, Florida."
12       See that?
13       A. Yes.
14       Q. And then the next one is -- and these --
15  by the way, those two are Cardinal facilities, true?
16       A. Yes.
17       Q. And then the next one is Mississippi. We
18  hadn't talked about that, but that's a facility,
19  correct? That's a Cardinal facility?
20       A. At the time, I believe it was, yes.
21       Q. And then the next -- and by the way -- and
22  just so -- I want to be clear: You were also in
23  charge of reviewing reports coming out of Cardinal --
24  out of Madison, Mississippi?
25       A. I did review ingredient limit reports from

Page 101

1   Madison, Mississippi.
2        Q. Registration RC0221236. Those -- those
3   registration numbers are -- are important, aren't
4   they? I mean, keeping up with the facility, the
5   registration number is what allows the facility to
6   do -- to sell narcotics, true?
7        MR. PYSER: Object to form.
8        THE WITNESS: That registration number is
9        the DEA license --
10  BY MR. PAPANTONIO:
11       Q. Okay. Yeah.
12       A. -- to distribute controlled substances.
13       Q. It's important, isn't it?
14       A. You cannot distribute controlled
15  substances without a DEA registration.
16       Q. Right. And then the next one is
17  La Vergne, Tennessee. Did I say that -- La Vergne?
18  That's Tennessee.
19       And you also reviewed -- you also reviewed
20  that, reports coming out of there?
21       A. I do not believe I reviewed reports for
22  La Vergne, Tennessee.
23       Q. Okay. Knoxville, Tennessee: How about
24  that?
25       A. Yes.

Page 102

1  Q.  McDonough, Georgia:  You already told us
2  you did, right?
3  A.  Yes.
4  Q.  The next one is -- next one is number 7,
5  and that's in Ohio, right?
6  A.  Findlay, Ohio, yes.
7  Q.  And you reviewed reports there, true?
8  A.  Yes.
9  Q.  Yeah.  And just to be clear, now, what
10 we're reviewing here, just so we don't lose sight of
11 what we're talking about, these are facilities that
12 the DEA said were not complying, weren't at the --
13 did not have adequate controls against -- for
14 controlled substance.
15     DEA said these facilities listed, that
16 we're going over right now, did not have controls,
17 true?
18     MR. PYSER:  Object to form.  Misstates
19  evidence.
20 BY MR. PAPANTONIO:
21  Q.  Correct?
22  A.  According to the document, DEA alleged --
23  Q.  Yeah.
24  A.  -- that the pharmacies listed in
25 Appendix -- or, I'm sorry, the registrants listed in

Page 103

1  Appendix A --
2  Q.  And -- and these so far -- we've been
3  through all these, and there's only one facility that
4  you didn't review the reports for?  So far?
5  A.  So far.
6  Q.  Okay.  Let's go back to the list.  And
7  what -- what number you want?  13.  That's -- no, 8.
8     Groveport, Ohio:  Did you review reports
9  for them?
10  A.  If this is the NLC --
11  Q.  Yeah.
12  A.  -- I did not.
13  Q.  Okay.  Fair enough.
14     If you don't -- this is your time to tell
15 us what you did and didn't do, so -- feel free.
16     MR. PYSER:  Object to form.  Improper
17  speech.
18 BY MR. PAPANTONIO:
19  Q.  Stafford, Texas:  You did review reports
20 there, right?
21  A.  Yes.
22  Q.  Zanesville, Ohio:  You reported -- you
23 reviewed reports there, right?
24  A.  I do not believe I did reports for
25 Zanesville, Ohio.  I believe that is a repackaging

Page 104

1  operation.
2  Q.  Okay.  How about Reno, Nevada?
3  A.  I do not believe I reviewed reports for
4  Reno, Nevada.
5  Q.  And then how about Massachusetts?
6  A.  Are you referring to number 12 --
7  Q.  Yeah.
8  A.  -- Peabody, Massachusetts?
9  Q.  Peabody, Massachusetts.
10  A.  Yes.
11  Q.  Okay.  And again, these are -- this is an
12 appendix of places that the DEA said you were not
13 reporting the things that you were supposed to be
14 reporting to the DEA, correct?
15     MR. PYSER:  Object to form.  Misstates
16  evidence.
17     THE WITNESS:  This is what the DEA alleged
18  of not having -- whatever the wording was.  It
19  was not that you did not have a system in place,
20  but they alleged that -- can I go back and read
21  the --
22 BY MR. PAPANTONIO:
23  Q.  Yeah.  Go back and read it because I want
24 to make -- the next -- there it is:  "The alleged
25 failure of Cardinal to maintain" --

Page 105

1  A.  Yes.  DEA alleged --
2  Q.  -- "adequate controls against the
3  diversion of controlled substances."
4     And we can agree controlled substances are
5  narcotics, true?
6  A.  A narcotic is a controlled substance.
7  Q.  Yeah.  And so every one of these
8  facilities we're talking about, we're talking about
9  Cardinal selling narcotics from those facilities,
10 correct?
11  A.  Cardinal selling controlled substances
12 from those facilities, including narcotics, yes.
13  Q.  And it says that Cardinal failed to
14 maintain adequate control -- just to catch up with
15 where we were -- correct?
16     MR. PYSER:  Object to form.  Misstates --
17 BY MR. PAPANTONIO:
18  Q.  You failed to -- to maintain adequate
19 control?
20     MR. PYSER:  Object to form.
21     THE WITNESS:  DEA alleged --
22 BY MR. PAPANTONIO:
23  Q.  Yeah.
24  A.  -- failure to maintain adequate control.
25  Q.  And then you all signed the document and

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  paid the fine, didn't you?
2      MR. PYSER: Object to form.
3  BY MR. PAPANTONIO:
4      Q. Right?
5      A. It was a settlement.
6      Q. Yeah, right.
7      A. Yes.
8      Q. But you didn't just pay the money -- sir,
9  did you have a vote in whether you paid the money or
10  not?
11      MR. PYSER: Object to form.
12      THE WITNESS: I didn't have a vote, no.
13  But you left off the -- the "no admission or
14  concession" paragraph. You --
15  BY MR. PAPANTONIO:
16      Q. No, no, we're --
17      A. You skipped over that.
18      Q. Well, you don't -- the jury can --
19      A. You just asked, did we -- so . . .
20      MR. PAPANTONIO: Hand me that, please.
21  BY MR. PAPANTONIO:
22      Q. $34 million, did you --
23      MR. PAPANTONIO: No, I want one of those
24  candies, please.
25

Page 107

1  BY MR. PAPANTONIO:
2      Q. $34 million, did you know your company
3  paid $34 million? Huh?
4      MR. PYSER: Object to form.
5      THE WITNESS: I know now.
6  BY MR. PAPANTONIO:
7      Q. Does that seem like a -- that's pretty big
8  fine, isn't it, $34 million?
9      MR. PYSER: Object to form.
10      THE WITNESS: It's -- well, big as
11  compared to what?
12  BY MR. PAPANTONIO:
13      Q. Well, you're -- well, that's a good
14  question.
15      Did you know that at the time they paid
16  $34 million, your company was rated a $90 billion
17  company? Cardinal was rated a $90 billion company?
18  Did you know that?
19      MR. PYSER: Object to form.
20      THE WITNESS: At the time, I did not keep
21  up with sales or revenue.
22  BY MR. PAPANTONIO:
23      Q. Do you know how many employees Cardinal
24  had when you were working?
25      A. I do not.

Page 108

1      Q. How about 40,000? Does that sound
2  familiar to you? Did anybody ever tell you that you
3  had 40,000 employees worldwide?
4      A. I do not recall at the time how many
5  employees --
6      Q. Well, tell me --
7      A. -- Cardinal had.
8      Q. -- how many people were in charge of
9  reviewing documents about diversion of controlled
10  substance.
11      A. You have to give me a time frame.
12      Q. Any time. Just pick it.
13      How about 2007? How many people were
14  involved with reviewing the kind of things we're
15  talking about, reviewing reports from this list of
16  people -- this list of facilities, in 2007?
17      MR. PYSER: Object to form.
18      THE WITNESS: Well --
19  BY MR. PAPANTONIO:
20      Q. Would you like a -- would you like a mint?
21  They're pretty good.
22      A. Not yet. No, thank you.
23      Q. Okay. Go ahead.
24      MR. PYSER: Object to form.
25      THE WITNESS: There would have been an

Page 109

1  individual or individuals at the facilities who
2  submitted the ingredient limit reports to the
3  DEA, as well as -- I can't say a -- a certain
4  number at the corporate level. Two or three.
5  BY MR. PAPANTONIO:
6      Q. Two or three. Two or three people at the
7  corporate level. I think that's the number I had,
8  and that's what I was going to ask you.
9      It could have been two; it could have been
10  three, correct?
11      MR. PYSER: Object to form.
12  BY MR. PAPANTONIO:
13      Q. Correct?
14      A. Two or three individuals that actually
15  reviewed the reports.
16      Q. And you're selling narcotics all over the
17  country -- Ohio, California, Florida, Texas, all over
18  the country, Colorado -- right?
19      MR. PYSER: Object -- object to form.
20      THE WITNESS: There were distribution
21  centers at several states, yes.
22  BY MR. PAPANTONIO:
23      Q. And you've got 40 -- if I represented to
24  you 40,000 employees working for the company, would
25  you object to that, or would you just say, "I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 know"?

2    A. I would say I don't know. I . . .

3    Q. But you do know there were only three --

4 two or three people actually reviewing -- doing this

5 work of reviewing these documents; you know that?

6    A. That's not what I said. I said at the

7 corporate office --

8    Q. At the corporate office?

9    A. -- and then there were individuals at the

10 distribution centers who generated and submitted

11 those reports to the DEA.

12    Q. Well, the corporate office can shut things

13 down immediately if they want to, can't they?

14 Corporate office can shut a facility down immediately

15 if they see that there's a problem, right?

16        MR. PYSER: Object to form.

17 BY MR. PAPANTONIO:

18    Q. Yes?

19    A. I -- I don't know all of the authorities

20 that a corporate office holds.

21    Q. Go back to the list. Let's go ahead and

22 finish up this list. We're on number 14 -- 13.

23 Number 13, Wheeling, West Virginia. Right? That's

24 on the list.

25        Next is Auburn, Washington, on the list.

Page 111

1 Next is Kansas City, Missouri, on the list.

2 Valencia, California, on the list. Aurora, Illinois.

3 Elk Grove, California.

4        MR. PAPANTONIO: Go ahead and just

5    highlight them, so the jury --

6 BY MR. PAPANTONIO:

7    Q. Elk Grove, California. Hudson, Wisconsin.

8        I'm just curious; now we've been about all

9 over the country.

10        Were you in charge of reviewing reports in

11 Wisconsin, too?

12    A. I reviewed ingredient limit reports for

13 the Wisconsin facility.

14    Q. And it would be you and maybe two other

15 people?

16    A. Yes.

17    Q. You or two other people --

18    A. At the corporate --

19    Q. At the corporate level?

20    A. -- level.

21    Q. Yeah. You or two other people reviewing

22 all this stuff?

23        MR. PYSER: Object to form. Misstates

24    testimony.

25

Page 112

1 BY MR. PAPANTONIO:

2    Q. At the corporate level?

3    A. On the team --

4    Q. Right?

5    A. -- that I was a manager of --

6    Q. Yeah.

7    A. -- we reviewed the ingredient limit

8 reports, yes.

9    Q. And then we got, where did I -- Hudson,

10 Wisconsin. Then we got Greensboro, North Carolina.

11 We got Tolleson, Arizona. Denver, Colorado,

12 Swedesboro, New Jersey. Roanoke, Texas. Charles,

13 Missouri. Niagara Falls, New York.

14        You see that?

15    A. I do see that.

16    Q. Now, that list that we just reviewed is a

17 list that is in addition to -- in this document, in

18 addition, they're saying that -- if you go back to

19 page 1, just so we -- we remember what we're talking

20 about here because that's a lot of -- that's a lot of

21 different facilities.

22        But if we go back to page 1, it says:

23 "Cardinal is registered with DEA at 27 facilities."

24        See that? And then it gives a list of the

25 ones where they have actually -- been a suspension of

Page 113

1 registration, right underneath that. We talked about

2 that. One, two, three, four, five -- see that?

3 Right?

4        And then we've got a list of -- number 7,

5 if we go to the list on number 7, underneath that, it

6 says: "These are facilities where Cardinal failed to

7 maintain controls against diversion."

8        See that? One, two, three -- all over the

9 country?

10    A. Which page are you on?

11        MR. PYSER: Object to form.

12 BY MR. PAPANTONIO:

13    Q. I'm on page 2.

14        MR. PYSER: Object to form.

15 BY MR. PAPANTONIO:

16    Q. Right?

17        MR. PYSER: Object to form. Is there a

18    question?

19        THE WITNESS: What was your question?

20 BY MR. PAPANTONIO:

21    Q. Yeah. My question is: In addition to

22 those -- the first page, where we're talking about

23 facilities actually losing their license, then we've

24 got another set of -- of facilities that the DEA says

25 these facilities failed to maintain effective

Page 114

1 controls against diversion of controlled substances,
2 or narcotics. Right?
3        MR. PYSER: Object to form.
4        THE WITNESS: I see the DEA has written
5    that it alleges that Cardinal Health failed to
6    maintain effective controls against the
7    diversion of controlled substances.
8 BY MR. PAPANTONIO:
9    Q. And then we go to the appendix that we've
10 just been talking about -- what page? 12? 13?
11 Page 13.
12        And that gives us a list of facilities,
13 also Cardinal-owned facilities, Cardinal-owned
14 facilities that -- where the DEA is saying that you
15 failed to have an adequate program in those
16 facilities, too, right?
17        MR. PYSER: Object to form.
18        THE WITNESS: DEA alleged, yes.
19 BY MR. PAPANTONIO:
20    Q. Yeah, right. Well, let me show you
21 something. When is the first time you saw the death
22 map?
23        MR. PYSER: Object to form. Vague.
24 BY MR. PAPANTONIO:
25    Q. Have you seen -- have you seen the CDC

Page 115

1 death map?
2    A. I'm not familiar with a death map, no.
3    Q. Did nobody tell you that as early as 1999,
4 that this company had access to a map -- your
5 company, Cardinal, early as 19- -- had access to a
6 map that showed the progression of death from opioid
7 overdoses between 1999 and 2016?
8        MR. PYSER: Object to form.
9 BY MR. PAPANTONIO:
10    Q. Anybody ever show you that?
11    A. I'm not familiar with the death map.
12    Q. You've never seen that? And you --
13        MS. MOORE: Cardinal-Brantley 5.
14    (Cardinal-Brantley 5 was marked for
15 identification.)
16        MR. PYSER: Object to form.
17 BY MR. PAPANTONIO:
18    Q. And just to be clear, you have worked with
19 Cardinal. You've worked with Kinray -- that's owned
20 by Cardinal, right? Just so the jury understands,
21 Kinray is owned by Cardinal?
22    A. Kinray is a division of Cardinal, yes.
23    Q. Right. And so you've worked with
24 Cardinal. You've worked with Kinray Cardinal, and
25 then you've worked with Purdue. You've been in

Page 116

1 this -- you've been in this -- this business of
2 selling -- or been involved with the sale of opioids
3 for how many years total?
4    A. I have been in the pharmaceutical industry
5 since 2000.
6    Q. Okay. And nobody has shown you this death
7 map.
8        MR. PAPANTONIO: Could you put this up?
9        THE WITNESS: I do not recall seeing this
10 death map, or whatever this is.
11        MR. PYSER: Object to form.
12 BY MR. PAPANTONIO:
13    Q. Well, let me show it to you since this is
14 the first time you've seen it. That's page -- you'll
15 have it right in front of you. You can see it better
16 on the screen, though, the colors. I'm going to ask
17 you about the colors.
18        See those little red areas right there, up
19 on the screen? You might --
20    A. I do see red areas.
21    Q. Okay.
22    A. I can see it better on the --
23    Q. Okay. Wherever you can see it is fine
24 with me.
25        And then it's got brown -- it's got a

Page 117

1 brown below that. You see -- you see the scale,
2 estimated age, death rate per hundred thousand
3 people?
4    A. I do see that, to the right.
5    Q. So you never knew that while you were
6 involved with the sale of opioids, that the CDC was
7 actually following to find out how many people were
8 dying from overdoses of opioids?
9        MR. PYSER: Object to form.
10 BY MR. PAPANTONIO:
11    Q. Right?
12        MR. PYSER: Object to form. Misstates
13 evidence.
14 BY MR. PAPANTONIO:
15    Q. You --
16        MR. PYSER: It's not what this document
17 shows.
18 BY MR. PAPANTONIO:
19    Q. You never knew that?
20        MR. PAPANTONIO: We're going to stand by
21 the question.
22 BY MR. PAPANTONIO:
23    Q. You never knew that, correct?
24        MR. PYSER: Object to form. That
25 misstates what this document is.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

BY MR. PAPANTONIO:

1  BY MR. PAPANTONIO:
2      Q.  You never knew that?  You never knew --
3  well, let's say it this way:  You never even knew
4  there was something called a "death map," did you?
5          MR. PYSER:  Object to form.  There is no
6  indication that this document is called a "death
7  map."  It's misleading by counsel.
8  BY MR. PAPANTONIO:
9      Q.  Well, did you -- did you -- have you ever
10 seen this map?  You said "No, I've never seen" --
11 okay.
12     A.  I don't recall seeing this.
13     Q.  Okay.
14         MR. PAPANTONIO:  Well, hey, do me a favor,
15 would you, Evan, put 1999 on half the screen.
16 And then put all the way up to 2016 right beside
17 it.
18 BY MR. PAPANTONIO:
19     Q.  This might be fascinating for you.
20         MR. PAPANTONIO:  There you go, right
21 there.
22 BY MR. PAPANTONIO:
23     Q.  So, 2016.  Do you see that?
24     A.  I do.
25     Q.  You see it really well up on the screen.

Page 119

1  You see where it says "30 deaths per 100,000 people"?
2  You see that?  30 deaths, in the brown.  Correct?
3          MR. PYSER:  Object to form.
4          THE WITNESS:  I see it on the right,
5      the 30, at the bottom.
6  BY MR. PAPANTONIO:
7      Q.  30 -- uh-huh.  So between 1999, where this
8  starts out, it doesn't have all that brown, does it?
9          MR. PYSER:  Object to form.
10 BY MR. PAPANTONIO:
11     Q.  Does it?  Got a little bit of brown, but
12 not a lot of brown, does it?
13         MR. PYSER:  Object to form.  Counsel, it
14     appears from the document that --
15         MR. PAPANTONIO:  Let's -- I don't want a
16     speech.  I'm going to -- I'm going to ask
17     questions about the document without you leading
18     this witness.  It's very apparent what the
19     document says.
20         The document says while he was doing his
21     job with Cardinal that people were dying all
22     over the country.  And I'm going to ask him
23     about that.
24 BY MR. PAPANTONIO:
25     Q.  Now, I want to ask you the question --

Page 120

1          MR. PYSER:  And I'll make my objections,
2  Counsel.
3          MR. PAPANTONIO:  You make your objections.
4          MR. PYSER:  You're making misleading
5  statements about that.
6          MR. PAPANTONIO:  We'll let the jury decide
7  whether it's misleading.  The jury is going to
8  see this.
9  BY MR. PAPANTONIO:
10     Q.  Okay.  So you see where it says "30," at
11 the bottom, marked in brown?
12     A.  Yes.
13     Q.  Now, in 1999, tell me how many places you
14 see brown.
15     A.  On the actual map?
16     Q.  Yeah.
17     A.  I can't tell if there's any brown.
18     Q.  I can't see it.  I thought maybe you
19 could.
20         Okay.  You go to --
21         MR. PYSER:  Object to form.
22 BY MR. PAPANTONIO:
23     Q.  You go to 2016.  Can you see some brown
24 there on 2016?
25     A.  I --

Page 121

1      Q.  How about that?  Does that help you, if we
2  blow it up?
3          MR. PYSER:  Object to form.  And also
4      object that the document before the witness is
5      different in coloration than the document --
6  BY MR. PAPANTONIO:
7      Q.  Well, let's use the one on the -- let's
8  use the one that's on the screen, so the jury can see
9  it right along with you.
10         You see some brown on that document?
11         MR. PYSER:  Object to form.
12         THE WITNESS:  I see brown on the screen.
13 BY MR. PAPANTONIO:
14     Q.  It's all over the place, isn't it?
15         MR. PYSER:  Object to form.
16         THE WITNESS:  I see brown on the screen.
17 BY MR. PAPANTONIO:
18     Q.  All right.  Well, let me show you
19 something else.
20         And you understand that the brown
21 represents 30 deaths per 100,000.  The red represents
22 28 to 29 deaths per 100,000.  You see that?  How --
23 the progression of that?
24     A.  It says "The estimated age-adjusted death
25 rate per 100,000."

Page 122

1  Q.  Okay.  Good.
2      So let me show you -- let's take a look
3  at -- we've covered your distribution sites.
4      MR. PAPANTONIO:  Can you -- can you
5  superimpose the distribution sites over the
6  death map for him, please?
7  BY MR. PAPANTONIO:
8      Q.  Now first of all, before we get to the
9  second, to the -- these -- take a look, and I want to
10 make sure that all of those are -- are distribution
11 sites that Cardinal had that were doing business.
12     MR. PYSER:  Object to form.  Vague.
13 BY MR. PAPANTONIO:
14     Q.  Is there something vague about that?  That
15 I asked you -- I'm interested.
16         Is there something really vague about what
17 I just asked you?
18     A.  The time frame is vague because --
19     Q.  Well --
20     A.  -- what time frame are you referring to?
21     Q.  Let's say -- let's say up to two
22 thousand -- let's say 2008.
23     A.  At -- at 2008, did Cardinal Health have
24 all of these facilities?
25     Q.  Yeah.  How about 2013?  Weren't you there

Page 123

1  in 2013?
2      MR. PYSER:  Object to form.
3      THE WITNESS:  I can't say with a certainty
4  whether all of the facilities were present in
5  2008.  There was an acquisition.
6  BY MR. PAPANTONIO:
7      Q.  Well, the jury's heard about Swedesboro,
8  right?
9      A.  Yes.
10     Q.  Jury's heard about Wheeling, West
11 Virginia, right?
12     A.  You mentioned those.
13     MR. PAPANTONIO:  Did you -- can -- do you
14 have a -- do we have a pointer?  This is -- so I
15 can get this -- I want to -- do you have a laser
16 pointer?  Or can you do it?  Okay.  Good.
17 BY MR. PAPANTONIO:
18     Q.  Let's -- Swedesboro.  I want to make sure
19 we're not -- we're not mixing anything up.  Take --
20 Swedesboro, we talked about, right?  Wheeling, West
21 Virginia, right, talked about?  Zanesville, Ohio?
22         Now tell me when it -- stop me when I'm
23 wrong about the fact that we've talked about these
24 already in your testimony.
25         Zanesville, Ohio, we talked about, didn't

Page 124

1  we?
2      MR. PYSER:  Object to form.
3      THE WITNESS:  Zanesville was on the list,
4  and I believe I mentioned that during the time
5  frame when I was reviewing the reports from 2005
6  to 2007-8 time frame, somewhere, that I do not
7  recall Zanesville.  I believe that's the
8  repackaging operation.
9  BY MR. PAPANTONIO:
10     Q.  How about Findlay, Ohio?
11     A.  I believe that Findlay, Ohio, was there
12 during that time frame.
13     Q.  Just go throughout the country.  How about
14 Syracuse, New York, up there in the right corner?
15     A.  Yes.
16     Q.  Niagara Falls, New York?
17     A.  I do not know with a certainty if Niagara
18 Falls was there.  I believe that's ParMed, which was
19 an acquisition.  And I don't -- I do not remember
20 what year that company was acquired.
21     Q.  It's on the list, if you take a look at
22 the list.
23     MR. PYSER:  Object to form.
24 BY MR. PAPANTONIO:
25     Q.  You want to take a look at the list?

Page 125

1      A.  It was on that list, but your question
2  was, was I reviewing ingredient limit reports --
3      Q.  Okay.
4      A.  -- for them.
5      Q.  Well, let's --
6      A.  Was that there in 2008?  And I cannot say
7  with a certainty it was.
8      Q.  Fair enough.  Fair enough.
9      A.  I don't recall the acquisition date.
10     Q.  Lakeland, Florida, we talked about, right?
11 Stafford, Texas, we talked about, right?
12         You're going to have to tell me yes or no.
13 Yes?
14     MR. PYSER:  Object to form.
15     THE WITNESS:  Well, you don't give me a
16 chance to answer.  You asked a question, you say
17 "right."  And then you keep going.  So I'm
18 thinking you're making a statement --
19 BY MR. PAPANTONIO:
20     Q.  No.
21     A.  -- as opposed to asking a question.
22     Q.  Am I right about Stafford, Texas, being
23 something you -- a facility you actually reviewed?
24     MR. PYSER:  Object to form.
25     THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

BY MR. PAPANTONIO:

Q. Okay. And -- and Roanoke, Texas, is a facility you reviewed? Yes or no?

A. Yes.

Q. And Saint Charles, Missouri, correct?

A. Correct, in that I reviewed it, yes.

Q. And then all -- let's go all the way out to California. Valencia, California: You reviewed orders there, didn't you?

A. I reviewed ingredient limit reports, yes.

Q. And Elk Grove, California, you reviewed that?

A. I reviewed ingredient limit reports, yes.

Q. And Auburn, Washington, you reviewed that?

A. I reviewed ingredient limit reports, yes.

Q. Let me show you something now.

MR. PAPANTONIO: Could you superimpose that distribution facility with the death map -- with -- with the map that we've been -- that I've been calling "the death map." See what it looks like.

MR. PYSER: Object to form. Object to --

BY MR. PAPANTONIO:

Q. Have you ever seen --

MR. PYSER: -- using this demonstrative.

Page 127

BY MR. PAPANTONIO:

Q. Have you ever seen this reduced to something that would -- that demonstrates the expansion of opioid deaths in America? Have you ever seen that prior to today?

MR. PYSER: Object to form. And misstates evidence that the map makes that statement in any way, shape, or form.

BY MR. PAPANTONIO:

Q. Have you ever seen anything, whether it's this map or anything, that showed you the expansion of death among people throughout the United States from opioids?

MR. PYSER: Same --

BY MR. PAPANTONIO:

Q. Anything?

MR. PYSER: Same objections.

THE WITNESS: I have not seen this. And I do not recall any document or graph of, as you state, deaths across the country.

BY MR. PAPANTONIO:

Q. How about numbers? Anybody ever show you numbers, when you were working with the company, about people in Washington -- number -- this is the number of people dying in Washington; this is the

Page 128

number of people dying in Lakeland?

Did anybody ever spend any time going over that with you?

MR. PYSER: Object to form.

THE WITNESS: Again, when I was at the company, I do not recall seeing any numbers or graphs about, as you say, deaths across the country.

BY MR. PAPANTONIO:

Q. Why don't you tell me -- let's just -- since we got it up there, you've got around -- let's say Denver -- Denver, Colorado.

What -- what areas would Denver, Colorado, distribute to? They'd distribute right to that brown area, wouldn't they?

MR. PYSER: Object to form.

THE WITNESS: I do not recall the distribution parameters or --

BY MR. PAPANTONIO:

Q. You don't know where your company distributed? Is that -- you don't recall where your company distributed?

MR. PYSER: Object to form.

BY MR. PAPANTONIO:

Q. Is that what you're saying?

Page 129

A. I can't say into what city and county each distribution center distributed into.

Q. Well, can you tell me whether -- do you have any memory about Salt Lake City, Utah, whether it distributed in that area of brown?

MR. PYSER: Object to form.

THE WITNESS: Again, I don't know exactly where every distribution center distributed drugs.

BY MR. PAPANTONIO:

Q. And while you were an employee working, being paid by the company, through 2013, nobody even told you that there were agencies that were keeping out -- keeping up with the death of human beings relating to opioids.

Is that a correct statement?

MR. PYSER: Object to form. Misstates evidence.

THE WITNESS: I do not recall any conversations, while an employee at Cardinal Health, regarding --

MR. PAPANTONIO: Let's take --

THE WITNESS: -- death by opioids.

MR. PAPANTONIO: Let's take a ten-minute break.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  VIDEOGRAPHER: Going off the record. The
2  time is 10:33.
3  (A recess transpired from 10:33 a.m. until
4  10:52 a.m.)
5  VIDEOGRAPHER: We're going back on the
6  record, beginning of media file number 2. Time
7  is 10:52.
8  BY MR. PAPANTONIO:
9  Q. Now, Mr. Brantley, we had a pending
10 question when you walked out about that map that we
11 were talking about.
12 First of all, you -- you haven't talked to
13 counsel about any of this testimony, right? You know
14 the rule on that. Did somebody tell you the rule on
15 that, that you're not permitted to talk to counsel
16 during the break about questions that are pending in
17 this deposition?
18 A. I did not speak to counsel --
19 Q. You didn't speak --
20 A. -- regarding questions pending in this
21 investigation.
22 Q. So there was no discussion about -- about
23 testimony here; is that -- is that what you're
24 telling us?
25 A. That is correct.

Page 131

1  Q. All right. We're going to try to take
2  breaks if we can. That was a little longer than we
3  typically do.
4  MR. PYSER: Object to form.
5  BY MR. PAPANTONIO:
6  Q. All right. So, sir, if we get back to the
7  document we've been -- that we have been reviewing.
8  We just got off the map, and we showed -- I showed
9  you where the distribution facilities were
10 superimposed on a map.
11 Do you recall that?
12 A. Yes.
13 Q. And you told me, I think earlier, that you
14 had never seen that map, right?
15 MR. PYSER: Object to form.
16 THE WITNESS: That's correct.
17 MR. PYSER: Object to form.
18 BY MR. PAPANTONIO:
19 Q. Okay. Now would you go to page 16, since
20 we're going to talk about some specifics about some
21 of this --
22 A. Are we on the map, or --
23 Q. Page 16 on -- on the document 4230.
24 Now, you understand, again, this is a
25 continuation of the document we've been talking

Page 132

1  about -- you see that -- in the matter of Cardinal
2  Health, right? You see that?
3  A. I see that.
4  Q. And that's November 28, 2007. You see
5  that date?
6  A. That is the stamp, November 28, 2007.
7  Q. So in addition to some of the other issues
8  we've been talking about -- earlier we talked about
9  suspension. We talked about -- we talked about
10 facilities where the DEA didn't believe that there
11 was proper recording.
12 You recall those lists that we talked
13 about?
14 MR. PYSER: Object to form.
15 THE WITNESS: I do recall the list.
16 BY MR. PAPANTONIO:
17 Q. Okay. So on here, let's talk about some
18 other things.
19 It says: "Order to show cause and
20 immediate suspension of registration."
21 It says: "Notice is hereby given to
22 inform Cardinal Health of the immediate suspension of
23 drug enforcement -- DEA certificate registration."
24 And there it's -- if you look, it says:
25 "DEA certificate of registration is" -- and then it

Page 133

1  gives a number -- see, that's RW0191813 -- "is
2  assigned to Cardinal Health's Auburn, Washington,
3  distribution center."
4  That's another facility we haven't talked
5  about. You see that?
6  MR. PYSER: Object to form. Misstates
7  testimony.
8  THE WITNESS: I do see the sentence you
9  just read.
10 BY MR. PAPANTONIO:
11 Q. Okay. Now, correct me if I'm wrong, but
12 this is -- this is talking about the suspension of
13 the certificate of registration for Auburn,
14 Washington, correct?
15 A. This is a notice of immediate suspension.
16 Q. And then it says, under 2, it says:
17 "Respondent has failed to maintain effective controls
18 against diversion of a particular controlled
19 substance into other than legitimate medical,
20 scientific, and industrial channels in violation of
21 21 USC."
22 You see that?
23 MR. PYSER: Object to form.
24 BY MR. PAPANTONIO:
25 Q. Is that -- do you recall this incident

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 where Auburn, Washington, all the way up there in --
2 in Washington, that they had failed to maintain
3 controls for diversion?
4       MR. PYSER: Object to form.
5       THE WITNESS: To answer your first
6   question, I do see the sentence.
7 BY MR. PAPANTONIO:
8       Q. Okay.
9       A. And what was your second question again?
10      Q. I just wanted to make -- were you involved
11 with -- were you involved with checking orders for --
12 for Auburn, Washington?
13      I was reviewing ingredient limit reports
14 for Auburn, Washington.
15      Q. And you were at corporate headquarters,
16 correct?
17      A. I was at the corporate office.
18      Q. Says: "Respondent's largest purchaser of
19 combination hydrocodone products in 2007, Horen's
20 Drug Incorporated, is a pharmacy engaged in a scheme
21 to dispense controlled substances based on
22 prescriptions that are issued for other than
23 legitimate medical purposes by physicians acting
24 outside the usual course of professional practice.
25 This pharmacy dispenses excessive amounts of

Page 135

1 hydrocodone based on illegitimate prescriptions
2 originating from rogue Internet pharmacy websites in
3 violation of applicable federal and state law."
4       Now, the question I have about that: What
5   involvement did you have with -- with monitoring
6   Internet pharmacies?
7       MR. PYSER: Object to form. Misread the
8   statement in the document.
9       THE WITNESS: My involvement was to review
10   the ingredient limit reports on a monthly basis,
11   and conduct investigations of --
12 BY MR. PAPANTONIO:
13      Q. Did you do that with web -- with Internet
14 pharmacies?
15      A. I did that with all of the customers that
16 appeared on the ingredient limit reports.
17      Q. And Internet pharmacy was one of them --
18 Internet pharmacies, correct?
19      A. Again, all customers that appeared on the
20 ingredient limit report.
21      Q. Yeah. Okay. And this -- apparently these
22 people appeared -- because this -- this facility lost
23 its registration to sell narcotics in Washington;
24 this Cardinal facility, again, lost its registration
25 to sell narcotics, correct, according to this

Page 136

1 document?
2       MR. PYSER: Object to form.
3       THE WITNESS: According to this document,
4   there was an immediate suspension of the
5   registration for this facility.
6 BY MR. PAPANTONIO:
7       Q. And they said: "This pharmacy dispensed
8 excessive amounts of hydrocodone based on
9 illegitimate" --
10      MR. PAPANTONIO: Would you underline
11   "illegitimate" -- oh, you already got it --
12 BY MR. PAPANTONIO:
13      Q. -- "illegitimate prescriptions originating
14 from rogue Internet pharmacy websites."
15      What is a "rogue Internet pharmacy
16 website"?
17      MR. PYSER: Object to form.
18      THE WITNESS: I would say that a rogue
19   Internet pharmacy website is a website where an
20   individual could log on, place an order for a
21   drug, controlled substance, and have that order
22   or have that drug shipped to that individual's
23   house or place of business, what have you. And
24   there may have been a phone consultation or --
25   or something.

Page 137

1 BY MR. PAPANTONIO:
2       Q. Without being -- okay. Let me break that
3 down.
4       A. So, to make it a --
5       Q. First, let me ask the question. Okay,
6 here it is: First of all, we agree Cardinal dealt
7 with rogue Internet pharmacies, according to this
8 document? They -- they were your customers?
9       MR. PYSER: Object to form.
10      THE WITNESS: Cardinal had all types of
11   pharmacy customers: Hospitals, VA, DOD, so
12   forth.
13 BY MR. PAPANTONIO:
14      Q. Right. And so one of the things that you
15 know that the rogue Cardinal -- that the rogue
16 pharmacy would do is they would just ship narcotics
17 all the way across the country without a doctor ever
18 even reviewing whether the patient needed them, true?
19      MR. PYSER: Object to form.
20 BY MR. PAPANTONIO:
21      Q. Is that what you told me just a minute
22 ago?
23      A. I believe how a rogue Internet pharmacy
24 operates is an individual owned -- owned a website,
25 and that website was affiliated with pharmacies and

Page 138

1 doctors across the country. An individual could log
2 onto a computer and place an order for a prescription
3 drug or a controlled substance. And I believe there
4 was a phone consultation. There was a pharmacy
5 shipment directly to the individual.
6    Q. And you remember how many -- how many
7 years you dealt directly with Horen's Drug Store
8 there up in Washington that was a rogue Internet
9 pharmacy? Do you remember how many years you did
10 that --
11    MR. PYSER: Object --
12 BY MR. PAPANTONIO:
13    Q. -- Cardinal did that?
14    MR. PYSER: Object to form.
15    THE WITNESS: Is your question how many
16 years I dealt with Horen's Pharmacy? I never, I
17 should say, dealt with Horen's Pharmacy. But
18 from 2005 until -- whatever the time frame was
19 in 2007 or '8, I reviewed the ingredient limit
20 reports.
21 BY MR. PAPANTONIO:
22    Q. So you would have had to okay the shipment
23 to Horen's Pharmacy, wouldn't you?
24    MR. PYSER: Object to form.
25

Page 139

1 BY MR. PAPANTONIO:
2    Q. Eric Brantley would have had to okay it?
3    A. That is not correct. I reviewed
4 ingredient limit reports on a monthly basis.
5    Q. Well, I mean, somebody had to --
6    A. I did not okay a shipment.
7    Q. Somebody had to ship it to Horen's
8 Pharmacy. And in this document, they're saying
9 Cardinal shipped narcotics to this rogue Internet
10 pharmacy. That's what the document says, right?
11    MR. PYSER: Object to form.
12    THE WITNESS: The document says that there
13 were shipments of controlled substances to this
14 pharmacy.
15 BY MR. PAPANTONIO:
16    Q. And they called it a "rogue Internet
17 pharmacy," didn't they?
18    A. This document refers to it as a rogue
19 Internet pharmacy.
20    Q. And you're well aware of what the term
21 "rogue Internet pharmacy" means, aren't you?
22    A. I just stated --
23    MR. PYSER: Object to form.
24    THE WITNESS: I just stated what I thought
25 a rogue Internet pharmacy was.

Page 140

1 BY MR. PAPANTONIO:
2    Q. Fair enough.
3    It says: "Despite substantial guidance
4 provided to respondent by DEA regarding identifying
5 rogue pharmacies such as Horen's Drug and despite the
6 public information readily available to respondent"
7 -- now, you understand "respondent" here is Cardinal;
8 you know that, right?
9    When you hear the word -- when we hear the
10 word "respondent," we're talking about Cardinal,
11 correct?
12    A. I do understand that.
13    Q. Okay. "And despite the public information
14 readily available to respondent regarding Horen's
15 Pharmacy Drugs' association with rogue Internet
16 pharmacy websites, respondent" -- or Cardinal, right?
17 Right? Cardinal? When we see the word "respondent,"
18 we're talking about Cardinal?
19    A. Cardinal is the respondent.
20    Q. "Respondent repeatedly supplied Horen's
21 Drug Store with excessive amounts of hydrocodone.
22 Respondent distributed in excess of 600,000 dosage
23 units of hydrocodone to Horen's Drug Store from 2007
24 through -- through September -- excuse me, "March of
25 2007 through September of 2007."

Page 141

1    Do you see that?
2    MR. PYSER: Object to form.
3 BY MR. PAPANTONIO:
4    Q. Right?
5    A. I do see that.
6    Q. So here we have a rogue Internet pharmacy
7 that Cardinal is shipping in excess of 600,000 dosage
8 units of hydrocodone between March 2007 and
9 September 2007 according to this document, correct?
10    MR. PYSER: Object to form.
11    THE WITNESS: The document does not say
12 that Horen's Drug Store was a rogue Internet
13 pharmacy. It says, "Horen's Drug Store's
14 association with rogue Internet pharmacy
15 website."
16 BY MR. PAPANTONIO:
17    Q. Oh, it's just associated with a rogue
18 pharmacy? That's -- that's what you're saying here?
19    A. I just wanted to clarify your statement.
20 You stated that the document said that it was a
21 rogue --
22    Q. Yes.
23    A. -- Internet pharmacy, and it indeed says
24 it was associated with --
25    Q. They just --

Page 142

1    A. -- a rogue Internet pharmacy.
2    Q. They just did business with rogue
3 pharmacies, which were illegal, correct?
4    MR. PYSER: Object to form.
5 Argumentative.
6    THE WITNESS: Whatever DEA meant by
7 "association."
8 BY MR. PAPANTONIO:
9    Q. Rogue pharmacies were illegal, correct?
10    MR. PYSER: Object to form. Calls for a
11 legal conclusion.
12 BY MR. PAPANTONIO:
13    Q. They're illegal?
14    A. Rogue pharmacies were rogue pharmacies. I
15 believe the term "rogue" implies something.
16    Q. Is "rogue" legal? Does that mean it's
17 legal to you, when you hear the word "rogue"?
18    MR. PYSER: Object to form. Legal
19 conclusion.
20    THE WITNESS: I don't know what -- what
21 definition of "rogue" is implied here, but a
22 rogue Internet pharmacy is what I explained it
23 to be, what I thought it to be.
24 BY MR. PAPANTONIO:
25    Q. So -- so Cardinal -- just so we can break

Page 143

1 this down a little bit, Cardinal shipped 600,000
2 dosage units to Horen's Drug Store between 2007
3 and -- March 2007 to September 2007 -- and Horen's
4 had an association with an illegal Internet pharmacy,
5 correct?
6    MR. PYSER: Object to form.
7    THE WITNESS: Horen's had an association
8 with a rogue Internet pharmacy.
9 BY MR. PAPANTONIO:
10    Q. And so it says -- goes on to say:
11 "Including over 116,000 dosage units in July."
12    See that? 116,000 dosage units in July,
13 and over 120,000 -- 129,000 dosage units in August,
14 and over 122,000 dosage units in September.
15    Did these orders come across your desk?
16 Did you review these documents, these kind of
17 numbers?
18    A. These numbers should have been on the
19 ingredient limit report.
20    Q. Yeah.
21    A. Yes.
22    Q. And they were shipped, weren't they?
23 These -- these numbers were shipped? To the rogue --
24 to Horen's, which was doing business with a rogue
25 illegal pharmacy, correct?

Page 144

1    MR. PYSER: Object to form.
2    THE WITNESS: According to this document,
3    these numbers were shipped to Horen's.
4 BY MR. PAPANTONIO:
5    Q. And it says: "Respondent" -- or Cardinal
6 -- "Respondent, disregarding the clear indication
7 that Horen's Drug Store was engaged in diversion of
8 controlled substances, distributed unusually large
9 amounts of hydrocodone to Horen's Drug Store."
10    Now they're talking about your company
11 distributed those kind of numbers, right?
12    A. This document says that the respondent
13 shipped those numbers to Horen's Drug Store.
14    Q. Okay. Then it goes on to say -- the next
15 paragraph, you see where it -- pick up where it says
16 "Respondent has failed to maintain effective controls
17 against diversion."
18    You see that?
19    A. I see where it says: "It is my
20 preliminary finding that respondent has failed to
21 maintain effective control" --
22    Q. Right.
23    A. -- yes.
24    Q. You understand that was the final finding?
25 Did you know that?

Page 145

1    MR. PYSER: Object to form.
2 BY MR. PAPANTONIO:
3    Q. Did you even remember this? Did you even
4 remember shipping those kind of numbers to an
5 Internet -- to an organization that was doing
6 business with a rogue illegal Internet pharmacy?
7    A. I believe you asked two or three
8 questions. So --
9    Q. Okay, break it down for --
10    A. -- the first question was --
11    Q. Break it down for -- answer it any way you
12 want.
13    A. It said something about a final. I can't
14 speak to that. I can only say what it -- the
15 paragraph that we are addressing here says: "It is
16 my preliminary finding that the respondent has failed
17 to maintain" -- so forth and so on.
18    Q. And I asked you --
19    A. So what was your second question? Sorry.
20    Q. Did you remember that? Did you remember
21 shipping those kinds of numbers to an -- to Horen's
22 Drug Store, which was doing business with an illegal
23 Internet pharmacy?
24    MR. PYSER: Object to form.
25    THE WITNESS: I do not remember any -- any

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    numbers --
2  BY MR. PAPANTONIO:
3      Q.  Okay.
4      A.  -- shipped to customers during this time
5  frame.
6      Q.  Well, the next paragraph says:  "In view
7  of the foregoing, and pursuant to 21 USC and 8824 is
8  my preliminary findings that respondent" -- that's
9  Cardinal, right?  Correct? --
10     A.  Respondent is Cardinal.
11     Q.  -- "has failed to maintain effective
12 controls against diversion, and continued
13 registration of respondent would be otherwise
14 inconsistent with public health and safety."
15        Now, sir, how is diversion -- how does
16 diversion, according to -- in your experience, doing
17 this so many years, how does diversion create a
18 public health problem?
19        MR. PYSER:  Object to form.
20 BY MR. PAPANTONIO:
21     Q.  Tell the jury.
22     A.  I'm sorry?
23     Q.  No, go ahead.
24     A.  Your question is, how is -- how does
25 diversion --

Page 147

1      Q.  How does diversion create a public health
2  problem?
3      A.  In my opinion?
4      Q.  In your opinion.
5        MR. PYSER:  Object to form.
6        THE WITNESS:  Diversion could be the theft
7  of drugs.  Diversion is -- diversion happens
8  when drugs leave the secure supply chain in
9  which we operate in.
10 BY MR. PAPANTONIO:
11     Q.  That's a term, "secure supply chain."
12 That's what -- that's what I was going to ask you
13 about.
14     A.  So the -- the supply chain is, of course,
15 the manufacturer manufactures a prescription drug,
16 sells that drug to a wholesale distributor based on
17 an order that the wholesale distributor places.  That
18 wholesale distributor places orders based on the
19 pharmacies and the hospitals and the VA and the DOD
20 and such that they serve.  And those pharmacies place
21 orders based on scripts that are run in from
22 patients, written by doctors.  So that is the supply
23 chain.
24     Q.  Okay.  And if everything --
25     A.  So diversion is going outside of that

Page 148

1  supply chain --
2      Q.  Right.
3      A.  -- which we don't operate in.  Our -- our
4  supply chain is as I mentioned.
5      Q.  And it's illegal to operate in a -- it's
6  illegal to operate within a realm of diversion,
7  correct?  You'd agree with that?
8        MR. PYSER:  Object to form.
9  BY MR. PAPANTONIO:
10     Q.  Yes?
11     A.  If there -- if there is an entity that
12 operates outside of that chain, which Cardinal Health
13 does not --
14     Q.  Well, there -- according to this, you did.
15 Because Horen's was a drug store that was -- that was
16 supplying an illegal rogue pharmacy, and Cardinal was
17 the people that were supplying 600,000 dosage units
18 to Horen's Drug Store.
19        That's what this says, doesn't it?
20        MR. PYSER:  Object to form.
21 BY MR. PAPANTONIO:
22     Q.  I mean, that's what this document says?
23     A.  The document says that -- that Cardinal
24 shipped the -- the quantities that you mentioned
25 earlier to Horen's Drug Store.

Page 149

1        But again, in that supply chain, from
2  manufacturer to distributor to the pharmacy, all of
3  these are licensed entities by the State as well as
4  the DEA.  That's the supply chain in which Cardinal
5  operate -- operated and operates.
6      Q.  Right.  And in this situation, Cardinal
7  lost its license to operate because they weren't
8  playing by the rules, correct?
9        MR. PYSER:  Object to form.  Misstates --
10 BY MR. PAPANTONIO:
11     Q.  They were suspended.  The license was
12 actually suspended because Cardinal was not playing
13 by the rules of a supply chain?
14        MR. PYSER:  Object to form.
15 BY MR. PAPANTONIO:
16     Q.  Yes?
17        MR. PYSER:  Misstates evidence.
18        THE WITNESS:  The -- the registration for
19 this facility was suspended.  Not because
20 Cardinal was not playing by the rules, because
21 Cardinal operated within that chain.  There was
22 a player here, Horen's Drug Store, that was
23 operating apparently outside of the chain by
24 being associated with a rogue Internet pharmacy
25 or rogue Internet pharmacy -- yeah, rogue

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    Internet pharmacy website.
2   BY MR. PAPANTONIO:
3       Q.   Right.  And it says -- right, look at B.
4   You're answering the question, but here, look at B.
5       "Despite substantial guidance provided to
6   respondent" -- or that would be Cardinal -- "by DEA
7   regarding identifying rogue pharmacies such as --
8   such as Horen's Drug Store, and despite the public
9   information readily available to respondent regarding
10  Horen's Drug Store's association with rogue Internet
11  pharmacies, respondent repeatedly supplied Horen's
12  Drug Store with excessive amounts of hydrocodone."
13      That's what that just said.  Did I read
14  that right?
15      MR. PYSER:  Object to form.
16  BY MR. PAPANTONIO:
17      Q.   Did I read that right?
18      A.   That is what the document says.
19      Q.   And you were the guy in corporate that was
20  reviewing these orders, weren't you?
21      A.   I was an individual at the corporate
22  office that was reviewing ingredient limit reports on
23  a monthly basis.
24      Q.   And there were only two more of you,
25  weren't there?

Page 151

1       A.   At the corporate level?
2       Q.   Yeah.
3       A.   As far as the team that I managed, yes.
4       Q.   And this is -- and these drugs are going
5   out, these narcotic drugs are going out all over the
6   country, aren't they?  Yes?
7       A.   During --
8       MR. PYSER:  Object to form.
9       THE WITNESS:  During a certain time frame,
10      during a certain time frame, there were two or
11      three of us, from 2005 until, again, 2007-8 time
12      frame.
13  BY MR. PAPANTONIO:
14      Q.   There were --
15      A.   And then there were others added.  But
16  during that time frame, yes, there were two or three.
17      Q.   At corporate level?
18      A.   At the corporate level.
19      Q.   At corporate level, you have the right to
20  shut down anybody you want to at any time you want
21  to, once you see excessive orders coming in.
22      You have the right to do that, don't you?
23      MR. PYSER:  Object to form.
24  BY MR. PAPANTONIO:
25      Q.   At corporate?

Page 152

1       A.   At the corporate level, I had the ability
2   to identify customers based on the ingredient limit
3   reports --
4       Q.   And you didn't do that with Horen's Drug?
5       A.   -- and make a recommendation to --
6       Q.   Excuse me.  Go ahead.
7       A.   -- to discontinue sales to that particular
8   customer.
9       Q.   And you didn't do that with Horen's Drug,
10  did you?
11      MR. PYSER:  Object to form.  And objection
12      to that question as it was asked before.
13  BY MR. PAPANTONIO:
14      Q.   You didn't do that with Horen's Drug?
15      A.   I did not do what?
16      Q.   You didn't stop the flow?  You don't shut
17  Horen's Drug Store down, even though -- even though
18  the DEA talked to you about rogue pharmacies such as
19  Horen's Drug, you didn't shut them down, did you?
20      A.   Apparently, Horen's Drug Store was not
21  shut down --
22      Q.   Yeah.
23      A.   -- prior to DEA taking action on Horen's
24  Drug Store.
25      Q.   Well, let's see what it says.  Look at C:

Page 153

1   "Respondent, disregarding the clear indications that
2   Horen's Drug Store was engaged in diversion of
3   controlled substances, distributed unusually large
4   amounts of hydrocodone to Horen's Drug Store."
5       You see that?
6       MR. PYSER:  Object to form.
7       THE WITNESS:  I do see that.
8   BY MR. PAPANTONIO:
9       Q.   That's C.  And that would be -- that would
10  come across your desk, right?
11      A.   What would come across my desk?
12      Q.   Orders would come across your desks.  You
13  would review orders?
14      A.   Ingredient limit reports would come
15  across --
16      Q.   Yeah.
17      A.   -- my desk on a monthly basis.
18      Q.   Right.  Exactly.  And -- and then the next
19  one says:  "In view of the foregoing and pursuant to
20  21 USC, it is my preliminary finding that respondent"
21  -- that's Cardinal again -- "has failed to maintain
22  effective controls against diversion, and that the
23  continued registration of respondent would be
24  otherwise inconsistent with public health and
25  safety."

Page 154

1 Now, is this the first time that you
2 reviewed the fact that the DEA was shutting down
3 Cardinal's ability to do business with Horen's Drug
4 Store because it posed a public health and safety
5 threat?
6 MR. PYSER: Object to form.
7 BY MR. PAPANTONIO:
8 Q. Did you know that, prior to coming here
9 today?
10 MR. PYSER: Object to form.
11 THE WITNESS: Prior to coming here today,
12 I was aware that DEA issued a show cause and an
13 immediate suspension order for the Auburn
14 distribution center.
15 BY MR. PAPANTONIO:
16 Q. It says: "Moreover, it is my preliminary
17 conclusion that respondent's continued
18 registration while these proceedings are pending
19 would constitute" -- let me read it -- "It is my" --
20 let me just read it again.
21 "Moreover, it is my preliminary conclusion
22 that respondent's continued registration while these
23 proceedings are pending would constitute an imminent
24 danger to public health and safety."
25 You see that?

Page 155

1 How does -- how does -- how does diversion
2 create an imminent threat, in your experience?
3 What -- what examples can you give me of diversion
4 creating an imminent threat?
5 MR. PYSER: Object to form.
6 THE WITNESS: I believe that would be a
7 question for the DEA regarding what they view to
8 be an imminent threat.
9 BY MR. PAPANTONIO:
10 Q. So you --
11 A. That's a claim they made.
12 Q. So at this point, you don't -- you don't
13 have an opinion of how drugs cause an imminent threat
14 to public health?
15 MR. PYSER: Object to form.
16 THE WITNESS: In the case of this
17 paragraph that we're reading --
18 BY MR. PAPANTONIO:
19 Q. Yeah.
20 A. -- I cannot speak to what DEA claims to be
21 an -- I believe constitute an imminent danger to the
22 public health and safety.
23 Q. Okay. How many times have you seen your
24 company, while you were there, being told that their
25 conduct actually created an imminent threat to public

Page 156

1 health and safety? Can you recall right now how many
2 times your company -- how many times your company was
3 told that your company creates an imminent threat to
4 public health and safety? You recall?
5 MR. PYSER: Object to form.
6 THE WITNESS: Told by whom?
7 BY MR. PAPANTONIO:
8 Q. By the DEA or the Department of Justice.
9 A. Are you referring to immediate suspension
10 orders or --
11 Q. Yeah.
12 A. -- orders to show cause?
13 Q. Yeah. Both.
14 A. Well, according to this document, there
15 were four.
16 Q. Okay. And then we're going to -- that's
17 just part -- that's part of the answer, but let me go
18 ahead and ask it -- maybe I didn't ask the question
19 right, in fairness to you. Go to page 20.
20 You see where, page 20, it's talking:
21 "Notice is hereby given to inform Cardinal Health of
22 the immediate suspension of Drug Enforcement
23 Administration certificate of registration," and this
24 is Cardinal Health's Lakeland, Florida, distribution
25 center. You see that?

Page 157

1 A. I do see that.
2 Q. And then number 2, it says, down at the
3 bottom: "Respondent has failed to maintain effective
4 control against the diversion of particular
5 controlled substances in other than legitimate
6 medical, scientific, and industrial channels in
7 violation of 21 USC."
8 And they even give the dates, between
9 August 2005 and October 2007.
10 So in those years between -- here's my
11 question: In those years between 2005 and 2007, your
12 company failed to maintain effective controls against
13 the diversion of narcotics; is that a correct
14 statement? After you've just read that?
15 MR. PYSER: Object to form.
16 THE WITNESS: That is what the DEA
17 alleged.
18 BY MR. PAPANTONIO:
19 Q. It said: "Respondent distributed over
20 8 million dosage units of combination hydrocodone
21 products to customers" -- and then -- follow me here,
22 underline this -- "customers that it knew or should
23 have known were diverting hydrocodone into other
24 legitimate -- into other than legitimate medical or
25 scientific industrial channels."

Page 158

1    See that?
2    A.  I do see that.
3    Q.  Did you know that was going on while you
4  were working with the company?
5        MR. PYSER:  Object to form.
6  BY MR. PAPANTONIO:
7    Q.  That you were actually diverting
8  hydrocodone into other than legitimate medical or
9  scientific channels?  Did you know that, when you
10  were an employee with Cardinal?
11        MR. PYSER:  Object to form.
12        THE WITNESS:  While I was an employee with
13    Cardinal --
14  BY MR. PAPANTONIO:
15    Q.  Yes, sir.
16    A.  -- we reviewed ingredient limit reports
17  and -- and submitted those reports to the DEA.
18    Q.  According to this report, it didn't work
19  all that well, did it?
20        MR. PYSER:  Object to form.
21  BY MR. PAPANTONIO:
22    Q.  You weren't succeeding in your mission to
23  try to -- to do the things you said you were trying
24  to do.  It just wasn't working, was it?
25        MR. PYSER:  Same objections.  And

Page 159

1    argumentative.
2        THE WITNESS:  According to what you've
3    read on this first page, page 20, DEA has
4    alleged that the respondent has failed to
5    maintain effective controls.
6  BY MR. PAPANTONIO:
7    Q.  Yeah.  Let's go to the next page.  21.
8    "Many of the respondent's largest
9  purchases of combination hydrocodone products were
10  pharmacies engaged in a scheme" -- see the word
11  "scheme" there?
12    A.  I do see that word.
13    Q.  ". . . scheme to distribute controlled
14  substances based on purported prescriptions that are
15  issued for other than a legitimate medical purpose."
16    Do you see that?
17    A.  I do see that.
18    Q.  "And by physicians acting outside the
19  usual course of professional practice."
20    Do you see that?
21    A.  I do see that.
22    Q.  So according to this, your -- who are your
23  largest customers?  Who do you remember your largest
24  customers?
25    A.  I have no idea.

Page 160

1    Q.  Remember CVS?  Is that a large customer?
2    A.  If CVS was a customer, that's a large
3  customer, being a chain, yes.
4    Q.  Yeah.  And how about Walgreens?  Do you
5  remember Walgreens being a large customer?
6    A.  I don't remember if Walgreens was a
7  customer or not.
8    Q.  Don't remember that?
9    A.  I don't remember if Walgreens was a
10  customer.
11    Q.  Fair enough.  But according to this,
12  they're saying that your largest -- the largest
13  purchasers of your -- of your narcotics engaged in a
14  scheme.
15    What does that word, "scheme" -- you
16  understand what the word "scheme" means?
17        MR. PYSER:  Object to form.
18        THE WITNESS:  I have a general idea of
19    what a "scheme" is.
20  BY MR. PAPANTONIO:
21    Q.  Okay.  Just so we're on the same sheet
22  of --
23    A.  A -- a plan.
24    Q.  Yeah.
25    A.  Okay?

Page 161

1    Q.  A plan -- okay.  Let's call it a "plan" --
2  to distribute controlled substances, which are
3  narcotics, right?  "To distribute controlled
4  substances based on purported prescriptions that are
5  issued for other than legitimate medical purposes."
6        MR. PYSER:  Object to form.
7  BY MR. PAPANTONIO:
8    Q.  That's what that says, doesn't it?
9    A.  Well, to clarify, Schedule II controlled
10  substances --
11    Q.  Well, you were working -- you were the
12  person at -- in corporate, you and how many other
13  people -- say, 2008, how many other people were in
14  charge of doing all this review?
15        MR. PYSER:  Counsel, the witness did not
16    get a chance to finish his answer.  Please let
17    him finish his answer --
18        MR. PAPANTONIO:  I'm sorry.  I thought
19    you --
20        MR. PYSER:  -- before you ask your next
21    question.
22  BY MR. PAPANTONIO:
23    Q.  Your lips had stopped moving.  That's why
24  I thought you had finished your answer.  Go ahead.
25        MR. PYSER:  Counsel, that's inappropriate.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 Let him finish his answer. We don't need your
2 commentary.
3 BY MR. PAPANTONIO:
4 Q. Go ahead.
5 MR. PAPANTONIO: I don't need your
6 objection, either. Just object as to form. If
7 I'm doing something wrong, put it on the record.
8 This man -- I'm giving this man every
9 opportunity he wants to answer his questions.
10 MR. PYSER: That's what I'm here for.
11 MR. PAPANTONIO: You're the guy
12 interrupting his ability to answer.
13 BY MR. PAPANTONIO:
14 Q. Now, sir, I want to ask -- let's take all
15 that away, and let me ask you this question again.
16 You were one of the three people involved
17 in reviewing documents that showed whether there were
18 any abnormalities in the orders that were being filed
19 for narcotics all over the country? Yeah?
20 MR. PYSER: Object to form.
21 And if you need to finish your last
22 answer, you can always go ahead.
23 THE WITNESS: During the time frame
24 between 2005 and either late 2007, early 2008 --
25 I don't recall -- I was one of the individuals,

Page 163

1 yes, that was reviewing ingredient limit reports
2 for --
3 BY MR. PAPANTONIO:
4 Q. And -- and this -- this document's talking
5 about 2007, aren't they? See it says --
6 A. I believe that was the -- the time frame,
7 yes.
8 Q. Yeah. And then it says: "Retail
9 pharmacies in Florida order an average of less than
10 8,000 dosage units of hydrocodone per month."
11 Did you know that? Do you remember that
12 now, that retail pharmacies -- those are people you
13 sold to, right?
14 MR. PYSER: Object to form.
15 THE WITNESS: Cardinal Health did sell to
16 retail pharmacies, yes.
17 BY MR. PAPANTONIO:
18 Q. "In Florida." You sold in Florida, right?
19 A. Yes, we sold them to the state of Florida.
20 Q. ". . . order an average of less than 8,400
21 dosage units of hydrocodone per month."
22 See that?
23 A. I do see that.
24 Q. It says: "Respondent distributed
25 hydrocodone to pharmacies engaged in the diversion of

Page 164

1 controlled substances as reflected in the chart
2 below."
3 And then it says: "Respondent" --
4 Cardinal -- "knew or should have known that these
5 pharmacies were diverting hydrocodone into other than
6 legitimate medical, scientific, industrial channels."
7 That's what that says, doesn't it? You
8 see -- did I read that right?
9 First of all -- let's start there. Is
10 there anything you want to add to that paragraph?
11 A. That is -- that is how it reads.
12 Q. Okay. And then if we look at the chart
13 below, we then see in Florida, the average is less
14 than 8,400 dosage units hydrocodone a month, and then
15 it compares what Cardinal was actually sending to its
16 customers. See that?
17 MR. PYSER: Object to form.
18 BY MR. PAPANTONIO:
19 Q. Monthly average. Look at that -- look at
20 that area that says "Monthly Average." Read those
21 monthly average for MediPharm.
22 What does that say out next to -- under
23 "Monthly Average"? What does that say?
24 A. For MediPharm? 155,007.
25 Q. And for DRM, what does it say?

Page 165

1 A. 42,254.
2 Q. And let's look down to QR -- QRG. What
3 does it say?
4 A. 242,640.
5 Q. And let's look at United Prescriptions.
6 What does it say?
7 A. 287,025.
8 Q. And then if you look up to -- and those
9 are -- you understand those are Florida pharmacies,
10 right?
11 A. That's what this document states, yes.
12 Q. And so we compare those numbers to what
13 the DEA says is an average of less than 8,000 dosage
14 units. It's a pretty big difference, isn't it,
15 Mr. Brantley?
16 MR. PYSER: Object to form.
17 BY MR. PAPANTONIO:
18 Q. Pretty big difference?
19 MR. PYSER: Object to form.
20 THE WITNESS: There is a difference.
21 BY MR. PAPANTONIO:
22 Q. Yeah. 8,000 to 287,000, that's a pretty
23 big difference?
24 MR. PYSER: Object to form.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 166

BY MR. PAPANTONIO:
1

2    Q.   Okay.  You agree, that -- that's a big

3 difference, right?

4    A.   It's a difference.

5    Q.   Yeah.  All right.  So you know that --

6 that -- Reardon told you that the DEA had met with

7 him and said that anything over 5,000 a month should

8 be considered a suspicious order.  Did you know that?

9        MR. PYSER:  Object to form.

10 BY MR. PAPANTONIO:

11    Q.   Did you know that Reardon met with the

12 DEA, and the DEA told Reardon, who was your boss,

13 that anything over 5,000 orders, 5,000 units, should

14 be considered a suspicious order?

15        MR. PYSER:  Object to form.

16 BY MR. PAPANTONIO:

17    Q.   Correct?

18    A.   I do know that Steve had a meeting.

19    Q.   And -- and he didn't tell you that?

20    A.   And at some point, I believe that may have

21 been discussed.

22    Q.   Okay.  And you know the number was 5,000,

23 correct?

24    A.   If that's what you say was said during the

25 conversation, then . . .

Page 167

1    Q.   I don't want you to take my word for it.

2 I want to ask you.  I'm asking you straight up.

3    A.   Well, please show me the documentation --

4    Q.   I'm going --

5    A.   -- so I can know --

6    Q.   I'm going to. --

7    A.   -- that it's accurate.

8    Q.   I'm trying to figure out what you remember

9 and what you don't remember.  A, you remember Reardon

10 meeting with the DEA, don't you?

11    A.   I remember that happened.  I don't

12 remember the meeting.

13    Q.   And then you remember Reardon writing a

14 letter -- or writing an e-mail that went to you and

15 said that, we had a meeting and the number should not

16 be above 5,000; you know that?

17        MR. PYSER:  Object to form.

18 BY MR. PAPANTONIO:

19    Q.   Right?

20    A.   Again, I don't recall the meeting.

21    Q.   Yeah.

22        MR. PAPANTONIO:  Let me go ahead and show

23    it to him.  There's no -- show him 4781.  Hold

24    that other document you got there, hold that

25    right where it is, because we're going to get

Page 168

1    back to it after we do this.

2        MS. MOORE:  Cardinal-Brantley 6.

3        (Cardinal-Brantley 6 was marked for

4    identification.)

5 BY MR. PAPANTONIO:

6    Q.   See where it says "Steve Reardon" at the

7 top?

8    A.   Yes.

9    Q.   Okay.  And do you see where -- go to the

10 second page.

11        You see where it says "Pete Stoy," there,

12 about a quarter down?

13    A.   Yes.

14    Q.   And then it says "Internet pharmacies";

15 you see that?

16    A.   In the "Subject" line?

17    Q.   "Subject" line, right.

18    A.   I see that, yes.

19    Q.   And then it says -- it says, "Eric" -- is

20 that you?  Eric Brantley?

21    A.   I am Eric Brantley.

22    Q.   And you were the -- were you -- at this

23 point, you were the person that was reviewing

24 these -- these numbers that were coming across your

25 desk for these pharmacies?

Page 169

1    A.   This e-mail was sent August 2005.

2    Q.   Yeah.

3    A.   I was -- I was reviewing limit reports in

4 2005.

5    Q.   And it's got your name on it, right?

6        MR. PYSER:  Object to form.

7 BY MR. PAPANTONIO:

8    Q.   Correct?  It has your -- and it says, this

9 is from Eric -- from Steve Reardon, and it's -- you

10 see your name in the people who -- who actually

11 received this.  "Eric Brantley"?  See that?

12    A.   Are you referring to the e-mail at the

13 bottom of page 2?

14    Q.   Yeah.  Yeah.

15        MR. PYSER:  Just for the record, the video

16    was displaying a different e-mail, which I think

17    explains the confusion.

18 BY MR. PAPANTONIO:

19    Q.   Well, let's be clear about it.  We're

20 looking at -- are we looking at 4781 right now?

21        MR. PYSER:  Counsel, just to be clear, the

22    video before was showing --

23        MR. PAPANTONIO:  All right.

24        MR. PYSER:  -- the e-mail above, which

25    has --

Page 170

1 MR. PAPANTONIO: All right.

2 MR. PYSER: -- a different Eric on it.

3 MR. PAPANTONIO: Are we on the right --

4 we're on the right one.

5 MR. PYSER: Now you're on the right spot.

6 BY MR. PAPANTONIO:

7 Q. Okay. It says -- you see where it says

8 "Internet pharmacies"? "Subject, Internet

9 pharmacies"?

10 A. In the "Subject" line, yes.

11 Q. Yeah. It says: "DEA has recently

12 initiated investigations of Internet pharmacies who

13 are purchasing excessive quantities of controlled

14 substances, primarily phentermine and hydrocodone,

15 and dispensing these controlled substances without a

16 valid prescription."

17 Do you see that?

18 A. I do see that.

19 Q. "In that there was not the required

20 doctor-patient relationship."

21 Now you understand that rogue pharmacies

22 were just shipping this -- shipping narcotics

23 throughout the country in situations where a doctor

24 had not even reviewed or met with the patient? You

25 know that, right?

Page 171

1 MR. PYSER: Object to form.

2 THE WITNESS: I know that -- what a rogue

3 Internet pharmacy did was ship product to

4 customers based on a script from a doctor that

5 may not have performed a physical examination.

6 BY MR. PAPANTONIO:

7 Q. And we know that Cardinal supplied rogue

8 pharmacies like that, right?

9 A. Cardinal shipped drugs to pharmacies in

10 hospitals and VA and DOD and --

11 Q. And rogue pharmacies?

12 A. -- final dispensers.

13 Q. Rogue pharmacies, too. Let's not forget

14 that. You -- you want to add rogue pharmacies, that

15 Cardinal shipped narcotics to rogue Internet

16 pharmacies. We've already established that, right?

17 MR. PYSER: Object to form, and asked and

18 answered.

19 BY MR. PAPANTONIO:

20 Q. Am I right?

21 MR. PYSER: Object to form.

22 THE WITNESS: Are you referring to the

23 pharmacies listed in the previous --

24 BY MR. PAPANTONIO:

25 Q. Yeah.

Page 172

1 A. -- document?

2 Q. Yeah.

3 A. Cardinal shipped controlled substances to

4 the pharmacies listed in this --

5 Q. I'm not going to --

6 A. -- document.

7 Q. I'm not going to rehash. The jury's heard

8 it. DEA --

9 MR. PYSER: Object to form.

10 BY MR. PAPANTONIO:

11 Q. It says -- it says: "DEA has recently

12 initiated investigations of Internet pharmacies who

13 are purchasing excessive quantities of controlled

14 substances."

15 And they were actually purchasing them

16 from you, from your company, Cardinal, those

17 excessive substances.

18 MR. PYSER: Object to form.

19 BY MR. PAPANTONIO:

20 Q. Right? According to this?

21 A. According to this document, Cardinal

22 shipped controlled substances to the list of

23 pharmacies in the previous document.

24 Q. Okay. And it says: "And there was not

25 the required doctor-patient relationship." Correct?

Page 173

1 A. Are we still -- are we reading the same

2 e-mail?

3 Q. Yeah.

4 A. According to the e-mail, yes.

5 Q. So somebody could just call up an Internet

6 pharmacy, say, "Hey, I'd like 100 hydrocodone,"

7 without ever seeing a doctor, and Cardinal would ship

8 it, according to this?

9 MR. PYSER: Object to form.

10 BY MR. PAPANTONIO:

11 Q. True?

12 A. If someone called up a pharmacy and

13 ordered hydrocodone, there would have been a

14 prescription, and a pharmacy would have placed an

15 order with Cardinal, and if it's one of these

16 pharmacies listed, then Cardinal shipped to those

17 pharmacies.

18 Q. To rogue pharmacies?

19 MR. PYSER: Object to form.

20 BY MR. PAPANTONIO:

21 Q. Correct?

22 A. Cardinal -- Cardinal shipped to the

23 pharmacies listed.

24 Q. You don't like using the word "rogue." I

25 get it. But they were --

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1　A.　You --

2　Q.　-- considered -- they were --

3　A.　You --

4　Q.　-- qualified as rogue pharmacies?

5　A.　You have identified them as rogue

6 pharmacies.

7　Q.　Okay.　And the DEA --

8　　　MR. PYSER:　Object to form.

9 BY MR. PAPANTONIO:

10　Q.　-- did too, correct?

11　A.　And the DEA said that they were, I think,

12 associated with rogue Internet --

13　Q.　Okay.

14　A.　-- websites.

15　Q.　Good enough.

16　　　MR. PYSER:　Object to form.

17 BY MR. PAPANTONIO:

18　Q.　It says: "As part of this ongoing

19 initiative, the DEA has been meeting with drug

20 distributors, including Cardinal" -- right?　That's

21 what it says -- "and soliciting their assistance in

22 monitoring Internet pharmacy activities.　As a result

23 of these meetings, we have become aware that one

24 wholesaler has recently ceased doing business with

25 24 pharmacies located in Florida and Texas."

Page 175

1　　　But it wasn't your company that ceased

2 doing business with those 24 companies, was it?

3　　　MR. PYSER:　Object to form.

4 BY MR. PAPANTONIO:

5　Q.　You don't remember in 2005 where your

6 company ceased doing business with 24 pharmacies,

7 Florida or Texas, do you?

8　A.　We ceased doing business with several

9 pharmacies, I believe, including the ones listed in

10 this document.

11　Q.　Well, we're going to get to that.　I'm

12 going to -- we're going to talk about that, and I

13 want to make sure you understand -- I want to be sure

14 I understand -- you never knew that Reardon had been

15 told that anything in excess of 5,000 dosage units

16 should be considered suspicious order.　You never

17 knew that, did you?

18　　　MR. PYSER:　Object to form.　Misstates

19　evidence.

20 BY MR. PAPANTONIO:

21　Q.　We're going to read it in a minute, but --

22　A.　Steve went to a meeting, and there may be

23 a -- a communication.　I don't recall that meeting

24 with Steve Reardon.

25　Q.　Okay.　You weren't there, were you?

Page 176

1　A.　I don't recall a meeting.

2　Q.　You weren't there?

3　　　MR. PYSER:　Object.

4　　　THE WITNESS:　I don't recall --

5 BY MR. PAPANTONIO:

6　Q.　A meeting?

7　A.　-- a particular meeting.

8　Q.　You recall getting this, though, don't

9 you?　This document you're looking at is sent to you,

10 Eric Brantley?

11　A.　I don't remember my initial reading of his

12 e-mail.　I read this e-mail now.　I don't recall back

13 in 2000 --

14　Q.　'5?

15　A.　-- '5, receiving it.

16　Q.　Okay, but --

17　A.　That's not saying that I did not receive

18 it.　I don't recall.

19　Q.　Well, what was your job in 2005?

20　A.　As I've stated several times, my -- my job

21 was to review ingredient limit reports, conduct

22 investigations, and report those to the DEA.

23　Q.　And you knew that, in 2005, you should not

24 ship an order that's in excess of 5,000 dosage units

25 of hydrocodone a month?　You knew that, didn't you?

Page 177

1　　　MR. PYSER:　Object to form.　Misstates

2　evidence.

3 BY MR. PAPANTONIO:

4　Q.　I mean, you knew that there was a 5,000

5 number out there when you were working in your job

6 with Cardinal?

7　　　MR. PYSER:　Object to form.

8 BY MR. PAPANTONIO:

9　Q.　True?

10　A.　I knew that I had to review the ingredient

11 limit reports and report those after conducting

12 investigations.

13　Q.　Well, it says: "Additionally, DEA has

14 identified Colorado as the state that has an Internet

15 pharmacy problem."

16　　　Your -- part of your territory was

17 Colorado, wasn't it?

18　A.　I did review ingredient limit reports for

19 the Colorado facility.

20　Q.　It says: "Your excessive purchase reports

21 should be reviewed to see if you have customers that

22 are purchasing over 3,000 dosage units of phentermine

23 or 5,000 dosage units of hydrocodone a month."

24　　　You see that?

25　A.　I do see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.  Now, if we go back to the -- go back to
2  that chart that we just talked about there.
3        You would agree that 155,000 is larger
4  than 5,000?  I mean, pretty obvious, right?
5    A.  Agreed.
6    Q.  You would agree that 242,000 is certainly
7  bigger than 5,000, right?
8    A.  Agreed.
9    Q.  Go to the next page on 4230, please.
10       It says:  "Respondent knew that pharmacies
11 generally order a wide variety of controlled
12 substances and other drug products with wholesale
13 distributors.  Respondent also knew that orders that
14 deviate substantially from a normal pattern to a
15 suspicious -- were suspicious as the term 21 CFR --"
16       Now, I want to ask you, you understood
17 that one -- one thing you look at with the suspicious
18 order is the pattern of what the customer's ordering
19 changes, correct?
20   A.  A suspicious order is identified as an
21 order of unusual size, frequency, or that deviates
22 substantially from a normal pattern.
23   Q.  Right.  So you would have been able to see
24 that an order pattern went from 5,000 dosage units a
25 month to 287,000 dosage units a month, correct?

Page 179

1        MR. PYSER:  Object to form.  Calls for
2    speculation.
3  BY MR. PAPANTONIO:
4    Q.  You would have been able to see that?
5        MR. PYSER:  Object.
6  BY MR. PAPANTONIO:
7    Q.  It comes across your desk, doesn't it?
8        MR. PYSER:  Object to form.
9        THE WITNESS:  I receive the ingredient
10   limit reports every month.  And I review them.
11   And I will see quantities for the month.
12 BY MR. PAPANTONIO:
13   Q.  Well, what if you saw 5,000 to -- 5,000 to
14 200 and -- hang on just a second -- 5,000 to 287,000?
15 Or -- yeah, 5,000 to 287,000?  Would that look
16 suspicious to you?
17   A.  This is one, I would have contacted the
18 pharmacy, I would have conducted an investigation,
19 and I would have reported that pharmacy to the DEA,
20 which was done --
21   Q.  Yeah, well, let's see --
22   A.  -- in the case of this pharmacy.
23   Q.  -- if it was done.  We're going to talk
24 about that in just a second.
25       MR. PYSER:  Object to form.

Page 180

1        THE WITNESS:  Not only that -- if I may
2    continue to answer the question.
3  BY MR. PAPANTONIO:
4    Q.  You can continue to say anything you want,
5  but --
6    A.  The -- the ingredient limit reports --
7  reports were reported to the DEA every month --
8    Q.  And you --
9    A.  -- as required.
10   Q.  And you continued to do business -- even
11 though you would report a suspicious order, you'd
12 continue doing business with people like Horen's
13 Pharmacy, wouldn't you?
14       MR. PYSER:  Object to form.
15 BY MR. PAPANTONIO:
16   Q.  Yes?
17   A.  The pharmacies listed on the page before
18 me, page 21 of P423021, I believe these pharmacies
19 were -- Cardinal had discontinued business of
20 controlled substances and reported these pharmacies
21 to the DEA --
22   Q.  Well, we'll see what the --
23   A.  -- months --
24   Q.  Go ahead.
25   A.  -- prior -- I think 12 to 18 months prior

Page 181

1  to --
2    Q.  Yeah.  So your testimony is that --
3    A.  -- this document.
4    Q.  -- you thought that DEA found about --
5  found out about this by you reporting it?  Is that
6  your testimony here today?
7    A.  My testimony is that we reported -- we
8  submitted to the DEA ingredient -- ingredient limit
9  reports --
10   Q.  Well, I want to be sure --
11   A.  -- with these customers --
12   Q.  I want to be sure about what --
13   A.  -- on a monthly basis, and that I
14 conducted investigations and reported these customers
15 to the DEA.
16   Q.  So when the -- when the DEA says that we
17 discovered, the DEA found out about it, you're saying
18 that you actually are the ones reporting all this?
19 Is that your testimony here?
20       MR. PYSER:  Object to form.
21 BY MR. PAPANTONIO:
22   Q.  I want to be sure about that.
23   A.  Where does it say that the DEA said that
24 they discovered?
25   Q.  Listen to my question.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    A.  That was your question.
2    Q.  My question is:  You understand that right
3  now you're testifying that these -- these pharmacies
4  were only put on the DEA's radar because you reported
5  it?  Is that your testimony?
6    A.  I never said --
7    MR. PYSER:  Object -- hold on.  Object to
8  form.
9  BY MR. PAPANTONIO:
10    Q.  All right.  Go ahead.  I thought you said
11  that.  I want to be sure you didn't say that before
12  we spend a lot of time here.
13    A.  I never said that.
14    MR. PYSER:  Object to form.
15    MR. PAPANTONIO:  Okay.  All right.
16    MR. PYSER:  I'm going to object.
17    THE WITNESS:  What I said was --
18  BY MR. PAPANTONIO:
19    Q.  Go ahead.
20    A.  You asked me a question.  What I said
21  was --
22    Q.  Yeah.
23    A.  -- that on a monthly basis, we submitted
24  ingredient limit reports to the DEA, and these --
25  these customers would have been listed on those

Page 183

1  ingredient limit reports.
2    Q.  And you continued shipping to them,
3  though, didn't you?  You didn't --
4    A.  And then I conducted investigations of
5  these pharmacies, and we discontinued business with
6  these pharmacies and reported those --
7    Q.  Yeah, and so --
8    A.  -- to the DEA.
9    Q.  So -- so your testimony, I want to be
10  sure, is not -- this is not your testimony, that you
11  reported this and then stopped shipping.  Correct?
12    You're saying you reported it and we
13  stopped shipping?  Is that -- is that your testimony
14  here today?
15    MR. PYSER:  Object to form.  Asked and
16  answered.
17    MR. PAPANTONIO:  No, it's not.
18    MR. PYSER:  Misstates evidence.
19    MR. PAPANTONIO:  It's not been asked and
20  answered.  I want to be very clear on this.
21  BY MR. PAPANTONIO:
22    Q.  Your testimony is that you would report to
23  DEA, and you would stop shipping?  Is that what you
24  testified to?
25    MR. PYSER:  Object to form.

Page 184

1    THE WITNESS:  What I say -- said, and what
2  I say again, is that we submitted the ingredient
3  limit reports to the DEA every month, and
4  customers would have been on those reports.  And
5  if I had done an investigation of a customer and
6  made the recommendation to discontinue shipment,
7  we did that, and those pharmacies were reported
8  to the DEA.
9  BY MR. PAPANTONIO:
10    Q.  And that's why the DEA is calling your
11  conduct an imminent threat to public health?  You
12  understand that's what this is saying?
13    A.  I don't know why DEA made that --
14    MR. PYSER:  Object to form.
15    THE WITNESS:  -- allegation.
16  BY MR. PAPANTONIO:
17    Q.  So you're --
18    MR. PYSER:  Object to form on the
19  question.
20    And please let me interject --
21  BY MR. PAPANTONIO:
22    Q.  So you're saying --
23    MR. PYSER:  -- before you answer.
24  BY MR. PAPANTONIO:
25    Q.  -- the DEA just got it all wrong; that you

Page 185

1  -- that your company was not an imminent threat to
2  public health, that you didn't overship quantities of
3  narcotics?  That's your testimony here today; is that
4  right?
5    MR. PYSER:  Object to form.
6  BY MR. PAPANTONIO:
7    Q.  Yes or no?  It takes a yes-or-no answer
8  before we move on here.
9    A.  My testimony, as I have said repeatedly,
10  is that -- and these -- the case of these customers
11  on this form, or customers you are referring to, they
12  were on the ingredient limit reports, which were
13  submitted to DEA on a monthly basis.  And that if I
14  had identified customers such as these, I conducted a
15  -- an investigation.  And those customers, if deemed
16  necessary, we discontinued shipment of -- of
17  controlled substances to those customers and reported
18  those customers to Kyle Wright at the DEA.
19    Q.  And that's why they filed -- that's -- and
20  that's why they fined you $34 million, because you
21  did it right?  Is that your testimony?
22    MR. PYSER:  Object to form.
23    MR. PAPANTONIO:  Wait -- wait a second.
24  BY MR. PAPANTONIO:
25    Q.  Your testimony --

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 MR. PYSER: I'm not going to wait a
2 second.
3 MR. PAPANTONIO: Wait, wait.
4 MR. PYSER: When you --
5 MR. PAPANTONIO: Let me finish my --
6 MR. PYSER: -- ask a question --
7 MR. PAPANTONIO: Let me finish my
8 question.
9 MR. PYSER: -- I'm going to interject an
10 objection.
11 MR. PAPANTONIO: Let me finish my
12 question, because --
13 MR. PYSER: You had asked a question
14 that --
15 MR. PAPANTONIO: I know you --
16 MR. PYSER: -- there's a question mark on
17 it --
18 MR. PAPANTONIO: -- want to preach to him
19 right now, and it's very obvious where he's
20 going.
21 MR. PYSER: When you ask a question and
22 there's a question mark on the transcript, I'm
23 going to interject --
24 MR. PAPANTONIO: Okay.
25 MR. PYSER: -- an objection at that point.

Page 187

1 MR. PAPANTONIO: Well, I'm going to ask
2 the question again.
3 BY MR. PAPANTONIO:
4 Q. Is it your testimony, sir, that it was
5 your -- that you reported all this bad conduct, and
6 that the DEA said that you were violating the law,
7 and you were fined $34 million because you did things
8 right? Is that your testimony here, really?
9 MR. PYSER: Same objections. Object to
10 form.
11 BY MR. PAPANTONIO:
12 Q. I wonder, is that really your testimony
13 here today?
14 A. You've asked the same question several
15 times, so my answer does not change.
16 Q. Okay, good. Then --
17 A. I --
18 Q. -- what is your answer?
19 A. My answer is --
20 Q. Let me --
21 A. -- we submitted ingredient limit reports
22 to the DEA on a monthly basis --
23 Q. Great.
24 A. -- and that I conducted investigations --
25 Q. All right.

Page 188

1 A. -- and we discontinued business with
2 customers and reported that to Kyle Wright --
3 Q. And they --
4 A. -- at the DEA.
5 Q. -- fined you 34 --
6 MR. PYSER: Counsel, Counsel, let him
7 finish his answer --
8 BY MR. PAPANTONIO:
9 Q. Are you finished?
10 MR. PYSER: -- and stop interjecting --
11 BY MR. PAPANTONIO:
12 Q. Are you finished?
13 MR. PYSER: -- in the middle of his
14 answer.
15 BY MR. PAPANTONIO:
16 Q. Are you finished?
17 A. I -- I am finished now that --
18 Q. I thought you were.
19 So, so -- so they fined you $34 million
20 for doing things right? Is that your testimony?
21 MR. PYSER: Object to form.
22 BY MR. PAPANTONIO:
23 Q. Is that your testimony here today?
24 A. There were allegations made, and there was
25 a settlement.

Page 189

1 Q. Yeah. And so you're saying you paid --
2 you settled for $34 million because your company was
3 doing things right? Is that your testimony?
4 MR. PYSER: Object to form. Asked and
5 answered, repeatedly.
6 BY MR. PAPANTONIO:
7 Q. Yes or no.
8 A. There were allegations made. There were
9 issues of -- there were issues of show cause made.
10 And there was at some point a settlement. That's all
11 I can speak to.
12 Q. Okay. That's right. That's all you can
13 speak to, isn't it?
14 MR. PYSER: Object --
15 BY MR. PAPANTONIO:
16 Q. That's all you can speak to in this
17 deposition, isn't it? What you just said?
18 MR. PYSER: Object to form.
19 Argumentative.
20 BY MR. PAPANTONIO:
21 Q. Right?
22 MR. PYSER: You're crossing the line,
23 Counsel.
24 BY MR. PAPANTONIO:
25 Q. That's all you can speak to? Yes?

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1   A.  I can answer the questions that you ask
2   me.
3   Q.  Okay, well, let's -- let's see --
4       MR. PYSER:  Object to form.
5   BY MR. PAPANTONIO:
6   Q.  -- if you can answer this question.  Go to
7   the next paragraph, D.
8   A.  Which page are we on?
9   Q.  I'm on -- still on page 22.  It says: "On
10  September 2006, Eric Brantley, manager of quality and
11  regulatory affairs" -- that's you.  See that?
12  A.  I do see that.
13  Q.  It says, it says that you, the respondent
14  "sent an e-mail to DEA" -- right?  This is an e-mail
15  -- "E-commerce Section stating that respondent had
16  discontinued its sales of controlled substances to 13
17  Internet pharmacies."
18      That's what that said.  Read it again and
19  make sure I got that right -- I'll read it again.
20      "On September 1st, Eric Brantley" --
21  that's you, sitting in the chair right there, right?
22  A.  I am Eric Brantley.
23  Q.  ". . . manager of quality and regulatory
24  affairs, sent an e-mail to DEA commerce section
25  stating the respondent had discontinued its sales of

Page 191

1   controlled substances to 13 suspected Internet
2   pharmacies.  Included in respondent's report of
3   discontinued accounts was the -- was RKR Holdings,
4   RKR.  On that same date" -- let me make sure -- lot
5   slow -- you know, I want to make sure we get this
6   right.
7       "On that same date, respondent distributed
8   200 doses -- dosage unit combination products RKR
9   from September 1st to -- 2006, January 2007,
10  respondent distributed 393,000 dosage units."
11      Now, I read that right, didn't I?
12  A.  Yes.
13  Q.  So you reported it, and you continued to
14  ship anyway.  That was my question earlier, and you
15  didn't answer.
16      Does this paragraph answer that question
17  for you?
18      MR. PYSER:  Object to form.
19      THE WITNESS:  I reported RKR Pharmacy
20  along with several other pharmacies.  And I
21  recall this pharmacy because there was an
22  acquisition of a company.  I don't recall -- I
23  believe it was Dohmen -- and that acquisition,
24  that company was shipping to RKR as well.  Once
25  I discovered it on the ingredient limit reports,

Page 192

1   we discontinued.
2   BY MR. PAPANTONIO:
3   Q.  "September 1st, 2006, through
4   January 2007, Cardinal (respondent) distributed
5   393,000 dosage units of combination hydrocodone
6   products to RKR."
7       That's what it says, doesn't it?
8       MR. PYSER:  Object to form.
9       THE WITNESS:  That's how it reads.
10      MR. PAPANTONIO:  Yeah, okay.
11      Let's take lunch.  Just go ahead and take
12  lunch break.  Get it done.
13      MR. PYSER:  Let's -- let's keep going,
14  because --
15      MR. PAPANTONIO:  Oh, I don't mind.  I
16  mean, I just thought I'd give you --
17      THE WITNESS:  I'm fine.
18  BY MR. PAPANTONIO:
19  Q.  Okay.  Well, I'm fine, too.
20      All right, here we go.  Let's go ahead and
21  look at -- go ahead and --
22      MR. PAPANTONIO:  Give me 4689, please.
23      THE WITNESS:  Are we finished with this
24  document?
25

Page 193

1   BY MR. PAPANTONIO:
2   Q.  Not quite.  You might keep it handy.
3   We'll probably go back to that.
4       MS. MOORE:  This is Cardinal-Brantley 7.
5   (Cardinal-Brantley 7 was marked for
6   identification.)
7   BY MR. PAPANTONIO:
8   Q.  Now, who was Hartman?  Do you know who
9   that -- who Hartman is?
10  A.  I'm familiar with the name Mark Hartman.
11  Q.  How do you know him?
12  A.  At some point, I believe in 2008, he
13  joined the QRA organization in some form.  I think he
14  was a president or something.  I don't remember
15  exactly.
16  Q.  Okay.  And did you ever see -- have you
17  seen this document prior to coming in here?  He made
18  a -- Hartman made a presentation -- were you there
19  when he made his presentation?
20  A.  I don't remember if I was there for the
21  presentation, and I don't remember this document.
22  Q.  All right.  Well, look at page 26.
23  A.  26.
24  Q.  You see that one -- you see that one
25  statement, "The drug dealer is us"?

Page 194

1    A.  I do see that.

2    Q.  Do you know that Hartman represented to

3  the folks there that Cardinal was part of being a --

4  part of the drug dealer process?

5        MR. PYSER:  Object to form.  Misstates

6    evidence.  There's a quote from a different

7    person there.

8  BY MR. PAPANTONIO:

9    Q.  What does that say?

10       MR. PYSER:  That's outrageous, Counsel.

11  BY MR. PAPANTONIO:

12    Q.  What does that say?  "The drug dealer is

13  us."  You see that?

14    A.  It says:  "John Watson, National Drug

15  Czar, February 2007."

16    Q.  Okay.  And he showed this -- and he showed

17  this to the employees there with -- with your

18  company, Cardinal, correct?

19       MR. PYSER:  Object to form.

20       THE WITNESS:  That's what you said.

21    Again, I don't recall this -- this meeting or

22    this presentation.

23  BY MR. PAPANTONIO:

24    Q.  Did you ever meet Hartman and talk to him

25  about whether -- what he meant about "The drug dealer

Page 195

1  is us"?

2       MR. PYSER:  Object to form.

3       THE WITNESS:  I have met Mark Hartman, but

4    we have not had a discussion about "The drug

5    dealer is us" quote from John Watson, National

6    Drug Czar.

7  BY MR. PAPANTONIO:

8    Q.  Okay.  And let's look at page 2, as we

9  work our way to "The drug dealer is us" slide.

10       You understand this is slides that were --

11  that were prepared and shown to Cardinal employees.

12  You understand that, right?

13       MR. PYSER:  Object to form.  Misstates

14    evidence.

15       THE WITNESS:  If you say that.  I don't

16    recall this presentation.

17  BY MR. PAPANTONIO:

18    Q.  All right.  And then it says -- it talks

19  about Cardinal.  It says, "Number 19 on the

20  Fortune 500."  As far as being a Fortune 500 company,

21  they were number 19.

22       Did you know that?

23    A.  I know that now, from reading this slide.

24    Q.  And did you know that they had 43,500

25  employees, more than 25 countries -- in more than

Page 196

1  25 countries?

2    A.  I did not know that at the time.

3    Q.  So this is the first time -- that's 2008,

4  isn't it?  This is 2008 we're talking about?

5    A.  I don't know when this was drafted.

6    Q.  Well --

7    A.  Going back to the first slide, it says

8  November 6th, 2008.

9    Q.  Okay.  And so out of those 43,500

10  employees, there were three employees that were in

11  charge, in corporate, of reviewing orders that were

12  being placed all the way from Washington state to

13  Lakeland, Florida, correct?

14       MR. PYSER:  Object to form.

15  BY MR. PAPANTONIO:

16    Q.  In 2008?

17    A.  From about 2005 to late 2007, early 2008.

18  In November of 2008, there were more --

19    Q.  How many more?

20    A.  -- at the corporate level.

21    Q.  How many?

22    A.  I don't know the exact number, but there

23  were --

24    Q.  Was it more than five?

25       MR. PYSER:  Counsel, let him finish his

Page 197

1    answer.

2       THE WITNESS:  There were more than five.

3    A new VP came in.  Couple directors.  Again, I

4    don't know the exact number, but it was more

5    than ten, I would say.

6  BY MR. PAPANTONIO:

7    Q.  So they got 43,000 employees in the -- how

8  many years were you operating with just three

9  employees in quality control?

10       MR. PYSER:  Object to form.  Misstates

11    testimony.

12  BY MR. PAPANTONIO:

13    Q.  How many -- how many years were you

14  working in quality control, where there were 43,000

15  employees?

16       MR. PYSER:  Object to form.

17       THE WITNESS:  2005 to either late 2007 or

18    early 2008.  I don't recall the exact time

19    frame.

20  BY MR. PAPANTONIO:

21    Q.  And you see the first paragraph says:

22  "Cardinal Health is an 87 billion-dollar global

23  company."  See that?

24       Did you -- is that the first time you've

25  heard about how much money this company is --

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 considered a 87 billion-dollar global company?

2    A. I do see that now.

3    Q. And then it says, down here, second to the

4 last, it says: "Currently, Cardinal Health is ranked

5 number 19 on the Fortune 500."

6       We've already talked about that, correct?

7       MR. PYSER: Object to form. Asked and

8 answered.

9       THE WITNESS: I do see that.

10 BY MR. PAPANTONIO:

11    Q. Okay. And look at page 4.

12       It says: "Supply chain integrity is a

13 holistic approach to the supply chain."

14       This is what -- you were trying to explain

15 what the supply chain was, right?

16    A. Yes.

17    Q. Earlier?

18    A. Well, from the manufacturer to the

19 wholesale distributor to the final dispenser to the

20 patient, based on a script from a doctor.

21    Q. And if every part of it works right, then

22 we don't have diversion, hopefully, correct?

23    A. If every part of it works right, then from

24 the manufacturer down to the person with the script,

25 should get their drug.

Page 199

1       Those entities, manufacturers and

2 wholesalers, operate within that security supply

3 chain.

4    Q. Okay. So in -- go to page 7, please. I

5 just want to talk about what Mr. Hartman actually

6 said to the people in that -- or showed the people

7 in -- along with -- along with showing that "The drug

8 dealer is us," he didn't say that, but he showed it

9 to the audience, obviously, as part of his -- part of

10 his -- if you look at this page 7. Let's go down

11 this.

12       Let's start with the issue of diversion.

13 We have populated a couple of the boxes on our grid

14 to represent the tremendous problem of rogue Internet

15 drug sales.

16       Isn't that what we've just been talking

17 about, rogue Internet drug sales?

18       MR. PYSER: Object to form.

19 BY MR. PAPANTONIO:

20    Q. Didn't we just talk about drug Internet --

21    A. We discussed that in a previous document.

22    Q. Okay. Representing diversion for abuse,

23 so our beautiful supply chain flow shows an obstacle.

24 Here it is. "Drugs our kids are abusing. Vics,

25 nearly 10 percent of our high school seniors abuse

Page 200

1 this drug. 40 bars OxyContin, robotripping."

2       Do you know what "robotripping" is?

3       MR. PYSER: Object to form.

4       THE WITNESS: I do not.

5 BY MR. PAPANTONIO:

6    Q. You never heard the term?

7    A. I do not know what "robotripping" is.

8    Q. And while you were working there, you

9 didn't understand that -- that -- this concept that

10 drugs were being abused by kids? Did you not -- did

11 you not understand that when you were working there?

12       MR. PYSER: Object to form.

13       THE WITNESS: I did not -- I do not recall

14 this document, no.

15 BY MR. PAPANTONIO:

16    Q. Well, did you know that, though? Did you

17 know that drugs is -- I mean, this goes all the way

18 back, 2008 -- that drugs were being abused by kids?

19       MR. PYSER: Object to form.

20       THE WITNESS: I believe certain drugs have

21 been abused for a long time.

22 BY MR. PAPANTONIO:

23    Q. And it said "Vics." Tell us what a "Vic"

24 is.

25    A. I don't know what a "Vic" is.

Page 201

1    Q. Do you know what "Vicodin" is?

2    A. I do know what "Vicodin" is.

3    Q. What is "Vicodin"?

4    A. I believe it is a form of hydrocodone.

5    Q. And your company sold that, correct?

6    A. I believe --

7       MR. PYSER: Object to form.

8       THE WITNESS: I believe Cardinal Health

9 did sell hydrocodone.

10 BY MR. PAPANTONIO:

11    Q. You distributed Vicodin, didn't you?

12    A. Cardinal Health did distribute

13 hydrocodone.

14    Q. And you don't know what "robotripping" is?

15    A. I do not know what "robotripping" is.

16       MR. PYSER: Object to form.

17 BY MR. PAPANTONIO:

18    Q. And do you know what "Skittles" is, the

19 term "Skittles," when we talk about -- within the

20 drug use, what "Skittles" is?

21    A. I only know Skittles as the candy.

22    Q. That's what you think it is, is candy?

23       MR. PYSER: Object to form.

24 BY MR. PAPANTONIO:

25    Q. Correct?

Page 202

1     MR. PYSER: Object to form.
2  BY MR. PAPANTONIO:
3     Q. You know -- you know Skittles as candy?
4  Is that what you're telling the jury?
5     A. There is --
6     MR. PYSER: Object to form.
7     THE WITNESS: -- Skittles and candy. I
8  mean, it's a brand of candy, Skittles.
9  BY MR. PAPANTONIO:
10     Q. Have you ever heard Skittles being
11  referred to when the discussion of drugs come up?
12     A. I don't recall Skittles.
13     Q. Never heard the term?
14     A. I don't recall.
15     MR. PYSER: Object to form.
16     THE WITNESS: I don't recall Skittles.
17  BY MR. PAPANTONIO:
18     Q. And you weren't at this -- you weren't at
19  the -- this presentation where he's talking about all
20  these issues, correct? We've established that?
21     MR. PYSER: Object to form. Asked and
22  answered.
23  BY MR. PAPANTONIO:
24     Q. Right?
25     A. I do not recall this presentation.

Page 203

1     Q. And then it says: "There is a website
2  dedicated to the use of Skittles that will calculate
3  by body weight the number of pills one must ingest to
4  reach different levels of abuse."
5     Did you know that as you were distributing
6  narcotics throughout the country, that there was a
7  website dedicated to the use of Skittles, that could
8  actually have somebody calculate how many drugs they
9  needed to -- to ingest? Did you know that?
10     MR. PYSER: Object to form.
11     THE WITNESS: I was not aware of a website
12  referring to Skittles and body weight of abuse
13  which is outside of the closed supply chain.
14  BY MR. PAPANTONIO:
15     Q. Okay. So the DEA -- next paragraph: "DEA
16  estimates that nearly 7 million Americans currently
17  abuse prescription drugs, up 80 percent from 2000."
18     See that?
19     A. I do see that.
20     Q. When did you start with the company?
21     A. When did I start with Cardinal Health?
22     Q. No, with Cardinal -- yeah. When did you
23  start with them? 2000, right?
24     A. I started with a company that was acquired
25  by Cardinal Health in 2002. I started with that

Page 204

1  company in 2000. January of 2000, I started with
2  Bentley Trading Company. And sometime in 2002, they
3  were acquired by Cardinal Health.
4     Q. So in 2000, you were working with
5  Cardinal, correct?
6     MR. PYSER: Object to form. Misstates
7  testimony.
8  BY MR. PAPANTONIO:
9     Q. Right?
10     A. In 2002 --
11     Q. Does that misstate your testimony, to say
12  that -- let me just phrase it another way.
13     A. Well, you asked the question, and --
14     Q. Well, let me ask -- let me rephrase the
15  question.
16     MR. PYSER: Let him finish the -- let him
17  finish the answer, Counsel.
18  BY MR. PAPANTONIO:
19     Q. You were working --
20     MR. PAPANTONIO: No. You objected. I'm
21  going to rephrase the question.
22  BY MR. PAPANTONIO:
23     Q. So you were working in the area of opioids
24  as early as 2000, weren't you?
25     MR. PYSER: Object to form.

Page 205

1     THE WITNESS: In 2000, I was working for
2  Bentley Trading Company, in the -- in the
3  distribution center.
4  BY MR. PAPANTONIO:
5     Q. Okay. In narcotics, correct?
6     MR. PYSER: Object to form.
7     THE WITNESS: There were controlled
8  substances present.
9  BY MR. PAPANTONIO:
10     Q. And so --
11     A. Excuse me.
12     Q. Yeah. Go ahead.
13     A. There was Schedule III through V
14  controlled substances present. There was no vault,
15  so there was no Schedule II --
16     Q. So the --
17     A. -- controlled substances.
18     Q. "The DEA estimates that nearly 7 million
19  Americans currently abuse prescription drugs, up
20  80 percent from 2000."
21     And we're talking -- this document is
22  2008, correct?
23     A. This document, according to the first
24  page, 2008.
25     Q. So between -- according to Hartman, who

Page 206

1 worked for Cardinal, he says between 2000 and 2008,
2 that -- that there was -- that there -- the
3 prescription abuse was up 80 percent. Right?
4      MR. PYSER: Object to form.
5      THE WITNESS: That's what's written on
6   this page.
7 BY MR. PAPANTONIO:
8    Q. And during those years between 2005 and
9 2008, you were one of the people at Cardinal that was
10 actually determining how many -- how much drugs we
11 can send out throughout the country?
12      MR. PYSER: Object to form.
13 BY MR. PAPANTONIO:
14    Q. You were reviewing records? True?
15    A. I was reviewing ingredient limit reports,
16 yes.
17    Q. And it says: "10 percent of high school
18 seniors admit to abusing painkillers."
19      See that?
20    A. I do see that.
21    Q. "Every day, 2,500 youths 12 to 17 abuse a
22 prescription pain reliever for the first time."
23      See that?
24    A. I do see that.
25    Q. So that was the environment that you were

Page 207

1 working in when you were making a decision about
2 whether or not you should send drugs out to rogue
3 pharmacies. Correct?
4      MR. PYSER: Object to form. Vague as to
5   time.
6      THE WITNESS: Again, from 2005 to late
7   2007 -- or early 2008; I'm not certain -- it was
8   my job to review those ingredient limit reports,
9   operating in that closed supply chain.
10 BY MR. PAPANTONIO:
11    Q. Okay. So what I'm getting at is, this was
12 the environment that we just described. I don't want
13 to go through it again, but we just described the
14 environment that was existing with drug abuse during
15 the time that you were choosing to sell drugs to
16 rogue pharmacies that were operating on the Internet,
17 correct?
18      MR. PYSER: Object to form.
19      THE WITNESS: I was an employee of
20   Cardinal Health during the time frame of 2005 to
21   late 2007, early 2008, doing that job. I was
22   not -- I -- I did not have that role, I believe,
23   in November of -- of 2008; but yes, I was
24   employed with the company, doing that role, from
25   2005 to early 2008.

Page 208

1 BY MR. PAPANTONIO:
2    Q. And I'm asking you about the environment
3 that you were working in. You're aware that that
4 environment existed? The environment of drug abuse,
5 certainly -- this is talking about children.
6      But you were aware that this drug abuse
7 environment and culture was existing during the time
8 that you were shipping narcotic drugs to rogue
9 Internet pharmacies? Yes or no?
10      MR. PYSER: Object to form.
11      THE WITNESS: There has been some form of
12   drug abuse forever. Whether that drug is --
13 BY MR. PAPANTONIO:
14    Q. That doesn't answer my question. Listen
15 to my question.
16    A. What was -- well --
17    Q. Would you -- no, no -- no, no --
18      MR. PYSER: Let him finish the answer.
19      MR. PAPANTONIO: No, I'm --
20 BY MR. PAPANTONIO:
21    Q. Okay. Can you answer --
22      MR. PYSER: He was not --
23      THE WITNESS: I believe your question
24   was --
25

Page 209

1 BY MR. PAPANTONIO:
2    Q. Answer my question.
3    A. Your -- your question was, was I employed
4 doing my role that I've expressed during the time of
5 drug abuse? And I said there has been drug abuse.
6 And, yes, I was working for Cardinal Health during
7 the time period from 2005 to early 2008 or '7 in that
8 role where I was reviewing ingredient limit reports.
9    Q. Okay.
10    A. Was that your question?
11    Q. Well, if that's your answer, I'll go with
12 your answer right now because I know you want -- you
13 want to say what you want to say, so you -- that's
14 fine.
15      MR. PAPANTONIO: Show him 4765.
16      MR. PYSER: Object to form.
17      Strike the commentary from counsel.
18 BY MR. PAPANTONIO:
19    Q. Yeah. We're going to read -- I'm going to
20 read the question back in just a minute. I'm going
21 to read your answer back with this document, okay,
22 that we're about to look at.
23      MR. PAPANTONIO: Show him this document,
24   please.
25      MS. MOORE: Cardinal-Brantley 8.

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  (Cardinal-Brantley 8 was marked for
2  identification.)
3  BY MR. PAPANTONIO:
4     Q.  You know what this is, don't you?
5        MR. PYSER:  Object to form.
6  BY MR. PAPANTONIO:
7     Q.  Do you know what this is?
8     A.  At first glance, I do not.
9     Q.  Take a minute and look at it, so I can --
10 I'm going to ask you some questions about this, and I
11 want to make sure you know what it is.
12    A.  I see that the date is January 13 or 14th,
13 2005.  And I was not in the role that we've been
14 speaking of since this morning during that time
15 frame.
16    Q.  What were you doing in 2005?
17    A.  I moved to the corporate office, I
18 believe, in May 2005.  Prior to that, I was still
19 down in Texas, with the distribution center there.
20    Q.  Okay.  You did -- did you have a training
21 program in place when you left, for training people
22 in the field on how they should be involved with this
23 closed system that you talk about with narcotics?
24 Did you have a training system in place?
25    A.  Did I have a training system in place when

Page 211

1  I left --
2     Q.  Yeah.
3     A.  -- Cardinal Health, the company --
4     Q.  Yeah.
5     A.  -- in 2013?
6     Q.  Uh-huh.
7     A.  There was a training system.
8     Q.  Oh, there was?  Standardized training
9  system was in place?  Is that your testimony?
10       MR. PYSER:  Object to form.  Vague as to
11    time.
12 BY MR. PAPANTONIO:
13    Q.  Was that your testimony, that there was a
14 training -- a training system in place to standard --
15 let's call it "standardized training system" -- in
16 place when you left the company?
17       MR. PYSER:  Object --
18 BY MR. PAPANTONIO:
19    Q.  Is that what you're telling the jury?
20    A.  When I left --
21       MR. PYSER:  Object to form.
22       THE WITNESS:  When I left the company
23 in -- in 2013, training was conducted.
24 BY MR. PAPANTONIO:
25    Q.  Standardized training?

Page 212

1     A.  I don't know what --
2     Q.  Do you understand what --
3     A.  I don't know what your --
4     Q.  Well, let me show you.
5     A.  -- version of standardized --
6     Q.  I mean --
7     A.  -- training is, but training -- training
8  was conducted.  I myself conducted training --
9     Q.  Oh, you did?
10    A.  -- when I was at the company.
11    Q.  You did.  Okay.  So let's look at page 15,
12 see what it says.
13       See the top, it says:  "FY 05 current
14 state in estimated regulatory training cost."
15       It says:  "No standardized training
16 process."
17       You see that?
18       MR. PYSER:  Object to form.  Vague as to
19    time.
20 BY MR. PAPANTONIO:
21    Q.  Did I read that right?  "No" -- did I read
22 that right?  "No standardized training process"?
23       MR. PYSER:  Object to form.  Vague.
24 BY MR. PAPANTONIO:
25    Q.  Right?

Page 213

1     A.  That is what that statement says on the
2  slide.
3     Q.  It says, underneath it:  "Inconsistent
4  training across sites."
5     You see that?
6     MR. PYSER:  Object to form.
7     THE WITNESS:  I do see that on the slide.
8  BY MR. PAPANTONIO:
9     Q.  And then if you go down to "Current
10 State," let's see where they land.  It says:  "Lack
11 of corporate sponsorship for training.  Authority, if
12 there is any real accountability rests, if" -- I read
13 that -- let's -- let's start -- slow down.
14       "Lack of corporate sponsorship for
15 training authority, if there is any real
16 accountability, rests on individual sites in most
17 cases.  In most cases, no repercussions for problems
18 in training, not showing up, not completing training"
19 -- see -- what does that say, "testing"?
20       It says:  "Training process is nonexistent
21 in some sites."
22       You see that?
23       MR. PYSER:  Object to form.
24 BY MR. PAPANTONIO:
25    Q.  "Training process is nonexistent"?

Page 214

1     MR. PYSER: Object to form.
2  BY MR. PAPANTONIO:
3     Q. Do you see that?
4     A. I do see that.
5     Q. Okay. And we're talking about people that
6  are handling narcotics to be distributed throughout
7  the country. Women, children. And there's no -- the
8  training process is nonexistent in some sites.
9  Right?
10    MR. PYSER: Object to form. And
11    argumentative. And vague as to time.
12 BY MR. PAPANTONIO:
13    Q. Correct? That's what this says?
14    A. That's on this slide.
15    Q. Right. And this is -- this is 2000 --
16 this is 2005.
17    Now go to the next -- go to the next line,
18 right underneath, where it says: "Training process
19 is nonexistent in some sites." It says: "References
20 to insufficient training."
21    And it even lays out the references that
22 you can see where there's insufficient training.
23 That's what that says, isn't it?
24    MR. PYSER: Object to form.
25

Page 215

1  BY MR. PAPANTONIO:
2     Q. Right?
3     A. It says that there are references to
4  insufficient training.
5     Q. Okay. And right -- right under -- see
6  where it says "Numerous 483"?
7     "References to insufficient training, one
8  of root causes or symptom of causes, staff is not
9  trained -- staff not trained."
10    MR. PAPANTONIO: Underline "staff not
11    trained."
12 BY MR. PAPANTONIO:
13    Q. See that?
14    MR. PYSER: Object to form.
15 BY MR. PAPANTONIO:
16    Q. "Trainers not qualified."
17    MR. PAPANTONIO: Underline that.
18 BY MR. PAPANTONIO:
19    Q. And then it goes: "Training not provided
20 in a timely manner."
21    And then it goes: "No minimum training
22 requirements."
23    But didn't you just tell me that -- yeah,
24 when you left -- when you were there, there was a
25 training system involved?

Page 216

1     MR. PYSER: Object to form.
2  BY MR. PAPANTONIO:
3     Q. Did you tell me that?
4     A. Yes. So this document is dated, again,
5  January 13th, 14th, 2005.
6     Q. Right.
7     A. I joined -- I moved to corporate, I
8  believe, middle of the year 2005, around May. And I
9  myself conducted training. And when I left Cardinal
10 Health in 2013, there was training.
11    This document is dated January 13th of
12 2005.
13    Q. Okay, so you'd have been --
14    A. I can't speak to prior to my time at the
15 corporate office.
16    Q. Okay. Let me get this right: When did
17 Cardinal start selling narcotics across the
18 United States? What year?
19    MR. PYSER: Object to form. Asked and
20    answered.
21 BY MR. PAPANTONIO:
22    Q. Was it 1999?
23    A. I don't know when Cardinal started.
24    Q. Well, we know they were selling in 2000,
25 right? You know they were selling narcotics in 2000?

Page 217

1     A. Cardinal Health was distributing
2  controlled substances in --
3     Q. And now we're in 2005, and --
4     MR. PYSER: Counsel, again, please let him
5     finish his answer before you begin your next
6     question.
7  BY MR. PAPANTONIO:
8     Q. We're now in 2005. And there's no
9  training, according to this.
10    MR. PYSER: Object to form.
11 BY MR. PAPANTONIO:
12    Q. Right? Isn't that what it says?
13    MR. PYSER: Object to form. Calls for
14    speculation. Misstates evidence.
15    THE WITNESS: This slide states as you
16    read, the references to insufficient training.
17 BY MR. PAPANTONIO:
18    Q. Okay.
19    A. According to this slide.
20    MR. PAPANTONIO: Let's take a lunch break
21    now. We'll be back -- let's take 45 minutes.
22    VIDEOGRAPHER: Going off record at 12:09.
23    (Going off video record at 12:09 p.m.)
24    (Off record discussion.)
25    MR. PYSER: We're still on the record.

Page 218

1  That's incorrect.  There's no discussion about
2  any pending questions.  I refer counsel to the
3  order on discovery and Track 1 cases 2006-2018.
4  Communications between a witness and his or her
5  counsel during a break taken with no question
6  pending shall not be the subject of inquiry.
7  Such conversations are subject to the
8  attorney-client and work product privileges.
9      MR. PAPANTONIO:  No, they're not.  There's
10  another part to it.  But you -- you take
11  whatever avenue you want.  You want to talk to
12  him, go ahead.
13      MR. PYSER:  We will not discuss any
14  pending question, as the rules require.
15      MR. PAPANTONIO:  There's about a dozen of
16  them pending right now.
17      MR. PYSER:  So the record is clear, there
18  is no pending question.  And to the extent there
19  is, I object to any pending question.
20      MS. MOORE:  So Cardinal-Brantley 9 is
21  distribution center map.  Cardinal-Brantley 10,
22  2016 death map.  Cardinal-Brantley 11, 2016
23  death map and Cardinal distribution center map
24  combined.
25      (Cardinal-Brantley 9 was marked for

Page 219

1  identification.)
2      (Cardinal-Brantley 10 was marked for
3  identification.)
4      (Cardinal-Brantley 11 was marked for
5  identification.)
6      (Off the stenographic record at
7      12:12 p.m.)
8      (Returning to video and stenographic
9      record at 1:17 p.m.)
10      VIDEOGRAPHER:  We're going back on record.
11  Beginning of media file 3.  Time is 1:17.
12  BY MR. PAPANTONIO:
13      Q.  All right.  Sir, when we -- Mr. Brantley,
14  when we broke up, we were talking about 4765.  I
15  think it's in front of you right now.
16      Remember we talked about training?
17      A.  Yes.
18      Q.  Look at page 64.  It's document 4765.
19      A.  Did you say page 64?
20      Q.  Page -- yeah.  It's -- here it is.
21  4765.64.  It may not be the page number, but --
22      A.  Oh, okay.
23      Q.  -- what I'm looking at, 4765.64.
24      A.  I have it.  Thank you.
25      Q.  I think this is where we kind of left off

Page 220

1  on this.
2      So it says:  "Internal client perspective
3  of QRA."  And that's -- okay, "Internal client
4  perspective of QRA."
5      And that's where you worked as -- in your
6  role at QRA.  Correct?
7      A.  Yes, from 2005 till --
8      MR. PAPANTONIO:  Okay.  Let's underline
9  the first thing it says, "QRA model."
10  BY MR. PAPANTONIO:
11      Q.  See that?
12      A.  Yes.
13      Q.  This is when you were working in QRA,
14  correct?
15      A.  What's the date there?
16      Q.  Take a look at it.  It is 2005.
17      A.  Are we talking -- I was not in QRA in
18  January 2005, when this was --
19      Q.  Okay.
20      A.  -- presented.
21      Q.  So -- so it says:  "Number 1, quality is
22  not a mindset at Cardinal Health."
23      See that?
24      MR. PAPANTONIO:  Underline that:  "Quality
25  is not a mindset at Cardinal Health."

Page 221

1  BY MR. PAPANTONIO:
2      Q.  Then it says:  "We are not proactive."
3      MR. PAPANTONIO:  Underline "We are not
4  proactive."
5  BY MR. PAPANTONIO:
6      Q.  And then it says:  "This is not high
7  enough priority today."
8      See that?  "This is not high enough
9  priority today."
10      MR. PAPANTONIO:  Underline that.
11  BY MR. PAPANTONIO:
12      Q.  Do you see these things I'm reading -- I'm
13  reading to you?
14      A.  I do.
15      Q.  Okay.  Is this the first time you've seen
16  this?
17      A.  It is.
18      Q.  Did you know that quality, as late as
19  2005, was not a mindset at Cardinal Health?
20      MR. PYSER:  Object to form.
21  BY MR. PAPANTONIO:
22      Q.  Did you -- did you know that?
23      A.  I did not know that.  That is this
24  person's opinion.
25      Q.  Do you know who the person is?

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    A.  Please refresh my memory who wrote this.
2    Q.  We'll go back to it.
3    A.  Okay.
4    Q.  Okay.  Then the second thing it says --
5   did you know that in 2005, the -- attitude was,
6   "We are not proactive."
7        You see that?  "We are not proactive"?
8    A.  I do see that.
9    Q.  And this again is 2005.  And just refresh
10  your -- you're not sure when Cardinal started selling
11  narcotics, whether it was 1999, 2000; you simply
12  don't know.  Correct?
13       MR. PYSER:  Object to form.
14       THE WITNESS:  I don't remember when --
15  BY MR. PAPANTONIO:
16   Q.  Okay.
17   A.  -- Cardinal Health was started.
18   Q.  And it says:  "This is not high enough
19  priority today."
20       You see that?  "This is not high enough
21  priority today"?
22   A.  I see that.
23       MR. PAPANTONIO:  Would you flip up --
24  would you go to that -- that map, what I'll call
25  "the death map," and put it up on the screen,

Page 223

1   2005.  Just put it right next to this document,
2   if you would, where it says "This is not high
3   enough priority today."  2005.
4   BY MR. PAPANTONIO:
5    Q.  See, that's the map -- that's the map that
6   the CDC -- where it says "Source, National Center for
7   Health Statistics."  See that?
8        You know what CDC is, right?
9        MR. PYSER:  Object to form on the --
10  BY MR. PAPANTONIO:
11   Q.  Right?
12       MR. PYSER:  -- beginning part of that
13  question.  Misuse of the term "death map."
14       THE WITNESS:  I do know what CDC is.
15  BY MR. PAPANTONIO:
16   Q.  As a matter of fact, it even gives a -- it
17  even gives a site, even gives you a website you can
18  go to to find this.
19       Did you have a computer in your office?
20       MR. PYSER:  Object to form.
21       THE WITNESS:  I did have a computer.
22  BY MR. PAPANTONIO:
23   Q.  Okay.  And then it even gives citations,
24  doesn't it?  See down there?  And it tells you where
25  you can actually get the citations.  1999 through

Page 224

1   2016.  Do you see that?
2    A.  I can see that.
3    Q.  And then -- and then where we look at this
4   where this is saying "This is not a high enough
5   priority today," this is the number of people that
6   are -- are up here on this map, it's showing the
7   number of people affected by opioids, right?
8        MR. PYSER:  Object to form.  Misstates
9   evidence.
10       THE WITNESS:  I believe the map --
11  BY MR. PAPANTONIO:
12   Q.  I mean, you see the map, don't you, 2005?
13   A.  Yeah.  It's estimated age-adjusted death
14  rate per 100,000, yes.
15   Q.  Right.  And it says:  "Quality is not a
16  mindset at Cardinal Health."
17       Then it goes on to say, "We're not
18  proactive," and that "This is not a high enough
19  priority today."
20       And what I'm wondering, Mr. Brantley, is
21  how many people have to die of -- of drug overdoses
22  before it becomes a priority with Cardinal?
23       MR. PYSER:  Object to form.
24  BY MR. PAPANTONIO:
25   Q.  How many people have to die?

Page 225

1        MR. PYSER:  Object to form.
2        THE WITNESS:  This statement is, as far
3    as -- as far as quality, is someone's opinion.
4   BY MR. PAPANTONIO:
5    Q.  Sir, this was -- this is a -- this is a
6   Cardinal document.  This was created by Cardinal.  In
7   the front of it says "Operation 1, Cardinal Health
8   quality management."
9        We're talking about quality management,
10  right?  Correct?  That's what this document is,
11  quality management?
12       MR. PYSER:  Object to form.
13  BY MR. PAPANTONIO:
14   Q.  True?  Look at the front page.
15   A.  It says "Quality."
16   Q.  Look at the front page.  What does the
17  front of the document say?
18   A.  "Operation 1.  Cardinal Health quality
19  management meeting."
20   Q.  And what were you?  Weren't you a quality
21  manager?
22       MR. PYSER:  Object to form.
23       THE WITNESS:  Not in January 2005, I was
24  not.
25

Page 226

BY MR. PAPANTONIO:
Q. Right. Okay. So 2005, if we go back to that same page that says -- it says: "This is not -- This is not a high enough priority," what I'm wondering is, what does it take, in Eric Brantley's mind, to say that -- what number of deaths make this a high enough priority to pay attention to?
MR. PYSER: Object to form.
BY MR. PAPANTONIO:
Q. Eric Brantley --
A. Once again --
Q. Eric Brantley. How many people have to die?
A. Again I go back --
MR. PYSER: Object to form.
THE WITNESS: -- to the quality statement was, apparently, one individual's opinion.
BY MR. PAPANTONIO:
Q. Okay. We're going to -- we're going to talk about -- more about this document, but you don't even know who wrote that, do you?
MR. PYSER: Object to form.
THE WITNESS: I don't remember.
BY MR. PAPANTONIO:
Q. Okay. Because it's marked "Confidential"

Page 227

on the bottom of it, but you've seen this before. True?
A. I saw it when you gave it to me before lunch. That was my first time seeing it, that I recall.
Q. Well, let's look at the next line. It says: "When financials are tight, quality suffers."
Did you know that the quality of your quality management was dependent on your financial status as a company?
MR. PYSER: Object to form.
BY MR. PAPANTONIO:
Q. Did you know that? Somebody had made that determination?
A. Again, this is someone's opinion, and I can't speak to someone's opinion.
Q. Well, but did you -- had you ever talked to anybody about these things that are laid out in a -- in a team?
Now, let me just ask you: Who was Gary Dech? Delch? Dolch, D-o-l-c-h. Who was Gary Dolch?
A. Gary Dolch?
Q. Yeah.
A. I believe he was a VP or something like that in the quality regulatory affairs department.

Page 228

Q. Right. And how about Tony Esposito? You knew Tony, didn't you?
A. I don't recall Tony Esposito.
Q. Well, did you know John Figalora?
A. I don't think I've ever seen that name.
Q. Kim Arnold?
A. Again, I don't recall a Kim Arnold.
Q. Well, these are -- you see where they're all listed, it says: "Operation 1, Cardinal Health, Audit and Compliance."
You see that?
A. I do.
Q. And you were in quality compliance, weren't you? That was part of your role as quality compliance?
A. Again, January 13th through 14th, 2005, I was not in that role.
Q. Okay. And we know this -- let's say that Cardinal started selling these narcotics in the year 2000. We're five years down the road here.
You understand that? We're talking about 2005 here.
MR. PYSER: Object to form.
THE WITNESS: I understand you're just saying from 2000 to 2005, yes.

Page 229

BY MR. PAPANTONIO:
Q. Do you know what the death rate was for -- how many human beings were dying every day from opioids, specifically opioid narcotics, from overdoses? Do you know that number?
A. I do not know that number.
Q. Has anybody ever told you that number that you can think of, and maybe you forgot?
MR. PYSER: Object to form.
THE WITNESS: I do not recall anyone telling me that number, other than I think you may have discussed that prior to lunch on that chart.
BY MR. PAPANTONIO:
Q. All right. Let's go back to point 64, that same document. You see where it says "People"?
A. Yes.
Q. It says: "Under resourced today."
See that?
A. Yes.
Q. Says: "People we have are good, but they don't have enough bench strength."
Do you know how many employees this company had in 2005?
MR. PYSER: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1        THE WITNESS:  I do not.
2   BY MR. PAPANTONIO:
3        Q.  Do you know how many billions of dollars
4   they were making in 2005?
5        MR. PYSER:  Object to form.
6        THE WITNESS:  I do not.
7   BY MR. PAPANTONIO:
8        Q.  Do you know what the net worth of the
9   company was, in billions, in 2005?
10        MR. PYSER:  Object to form.
11        THE WITNESS:  I do not.
12   BY MR. PAPANTONIO:
13        Q.  And then -- then next, it says:  "Not
14   enough people."
15        You see that?
16        A.  I do.
17        Q.  And it says:  "We need to upgrade, and we
18   need to deepen our talent."
19        Do you see that?
20        A.  I do.
21        Q.  And then you see where it says
22   "Processes"?  It says:  "Keep us out of trouble, but
23   not very proactive or innovative."
24        You see that?
25        A.  I do.

Page 231

1        Q.  "Not very proactive or innovative."
2        Did you ever remember a time when you were
3   with the company where there was just -- y'all were
4   running out of money, and you just didn't have enough
5   money to go around and pay for employees?  Was there
6   ever a time like that that you recall?
7        MR. PYSER:  Object to form.
8        THE WITNESS:  Not that I recall.
9   BY MR. PAPANTONIO:
10        Q.  Was there ever a time where -- where you
11   all were so worried about finances that you couldn't
12   hire extra people to do some of these jobs that
13   needed to be done to -- to prevent diversion?  Do you
14   remember a time like that?
15        A.  I do not recall a time.
16        Q.  It says -- that first line -- "Not very
17   proactive.  Not innovative."
18        And again, we're in 2005 at this point.
19   It says, "Site level measurements and incentives can
20   hinder investment in quality."  See that?
21        A.  I do.
22        Q.  And then the last thing it says:  "Limited
23   policy standardization."
24        Do you know what that means?
25        A.  I do not.

Page 232

1        Q.  Fair enough.  All right.
2        MR. PAPANTONIO:  Show him 4631.  4631.
3        MS. MOORE:  Cardinal-Brantley 12.
4        (Cardinal-Brantley 12 was marked for
5   identification.)
6   BY MR. PAPANTONIO:
7        Q.  And this is 2005.  You see that?
8        A.  I do.
9        Q.  And were you there 5-12-2005?
10        A.  I was an employee of Cardinal Health,
11   May 12th, 2005, yes.
12        Q.  And then number 1, it says:  "We three
13   wholesalers were asked by Greg Jones if we have
14   specific protocol to monitor possible drug diversion
15   outside of ARCOS activity with Internet pharmacies or
16   wholesale accounts."
17        You see that?  "Greg Jones asked if we
18   have specific protocols to monitor."
19        You see that?
20        A.  I do see that.
21        Q.  "To monitor diversion."
22        You see that?
23        MR. PYSER:  Object to form.
24        THE WITNESS:  I do see that.
25

Page 233

1   BY MR. PAPANTONIO:
2        Q.  And then it says:  "To my knowledge, we do
3   not."
4        Do you see that?
5        A.  I do see that.
6        Q.  And then under -- underneath that, it
7   says:  "If a distributor or Internet pharmacy
8   customer is properly licensed and a legal entity to
9   purchase from us, we typically do not monitor what
10   they purchase or track who they sell to."
11        You see that?
12        A.  I do.
13        Q.  So according to that, I mean, you could
14   have an Internet company that is buying drugs over
15   the Internet.
16        They could be -- they could be a drug
17   cartel, for all you know, right, according to that?
18        MR. PYSER:  Object to form.
19   BY MR. PAPANTONIO:
20        Q.  They could be a drug cartel, couldn't
21   they?
22        MR. PYSER:  Same objection.
23        THE WITNESS:  Again, I go back -- I read
24   what this says, but ingredient limit reports
25   were submitted to the DEA.

Page 234

1 BY MR. PAPANTONIO:
2     Q.  That's not my question.  Listen to my
3 question very well.
4     A.  Your -- your question was if they --
5     Q.  If we -- if we buy what was just stated --
6 by -- who --
7         MR. PAPANTONIO:  Carol, let me have that
8 document again.
9 BY MR. PAPANTONIO:
10     Q.  If we -- if we agree with what was just
11 stated by Steve Reardon, who is -- who was your
12 supervisor, correct?
13     A.  What are we agreeing to?
14     Q.  Hang on.  Let -- let me finish my
15 question.
16     A.  Well, you asked a question --
17     Q.  No, I haven't asked a question.
18     A.  Okay.
19     Q.  If we agree what Steve Reardon says, that
20 "To my knowledge, we don't have a monitoring system,
21 and we typically don't monitor -- monitor or track
22 Internet sales," you don't know where the drugs are
23 going, do you?
24         MR. PYSER:  Object to form.  That's
25 blatantly misleading.  This is not an e-mail

Page 235

1     from Steve Reardon.
2         MR. PAPANTONIO:  It's got Steve Reardon's
3     name on it -- you're right.
4 BY MR. PAPANTONIO:
5     Q.  It's got Steve Reardon's name on it,
6 right?
7     A.  I was just going to ask, where did you
8 read that, because --
9     Q.  It's got --
10     A.  -- I don't remember reading that.
11     Q.  -- Steve Reardon's name.
12         I did misstate it, didn't I?
13         It says -- it says "Mark Mitchell" -- who
14 you know, correct?
15     A.  No.
16     Q.  You don't know Mark?
17     A.  No.
18     Q.  It says "To Steve Reardon."
19         Do you see "Reardon," right there?
20     A.  I do.
21     Q.  And he was your boss, correct?
22     A.  Yes.
23     Q.  And if we believe what is being said here,
24 let's -- actually, by Mark Mitchell, it says:  "To my
25 knowledge, we don't have a monitoring system for

Page 236

1 Internet pharmacies."
2         That's what it says, doesn't it?
3         MR. PYSER:  Object to form.
4         THE WITNESS:  That is what Mark says.  I
5     don't agree with that.
6 BY MR. PAPANTONIO:
7     Q.  Well, okay.
8     A.  Who is Mark Mitchell?  Vice president,
9 health system sales?
10     Q.  Yeah, who is Steve Reardon?  Steve Reardon
11 did your job, didn't he?
12         MR. PYSER:  Object to form.
13 BY MR. PAPANTONIO:
14     Q.  He was your boss, correct?
15     A.  Steve Reardon was my boss.
16     Q.  And he's on a document that says:  "You
17 know what?  We typically don't monitor Internet
18 sales."
19         That's what it says, doesn't it?
20     A.  It does say that.
21         MR. PYSER:  Objection.
22         THE WITNESS:  Steve did not draft that
23     document.
24 BY MR. PAPANTONIO:
25     Q.  And you understand --

Page 237

1         MR. PYSER:  Object to form.
2 BY MR. PAPANTONIO:
3     Q.  -- if you are not monitoring sales, this
4 stuff could be going all over the country, to drug
5 cartels, for all we know, right?
6         MR. PYSER:  Object.
7 BY MR. PAPANTONIO:
8     Q.  If that's true, it could be going to drug
9 cartels.  Yes?
10     A.  You started your question with, "If you
11 don't monitor sales."
12     Q.  Yes.
13     A.  And again I state, we were submitting
14 ingredient limit reports to DEA on a monthly basis.
15     Q.  That's not my question.  If we don't have
16 a way -- your company, Cardinal -- doesn't have a way
17 to monitor Internet sales, for all you know,
18 Mr. Brantley, those sales could be going to drug
19 cartels all over the country:  Yes or no?
20         MR. PYSER:  Object to form.
21         And also an objection to the prior
22     question.  I didn't want to disrupt --
23 BY MR. PAPANTONIO:
24     Q.  Yes or no?
25         MR. PYSER:  -- the questioner.

Page 238

1      THE WITNESS:  Again, you asked a question,
2   if we do not have this.
3   BY MR. PAPANTONIO:
4      Q.  Right.  If you don't --
5      A.  We did have this.  So that's my answer to
6   the question.
7      Q.  Not according to this document, you don't.
8      A.  This -- this document is not from Steve
9   Reardon.  It's from Mark Mitchell and health system
10  sales, who I do not know.
11     Q.  Sales.  He's in the business of sales,
12  right?
13         MR. PYSER:  Object to form.
14         THE WITNESS:  He's in --
15  BY MR. PAPANTONIO:
16     Q.  He's selling?
17     A.  He's in sales; he's not in QRA.
18     Q.  That doesn't make -- he's in sales, and he
19  works for the company, gets a paycheck from your
20  company, doesn't he?
21         MR. PYSER:  Object to form.
22  BY MR. PAPANTONIO:
23     Q.  Yes or no?
24     A.  At this -- time of this e-mail, I'm to
25  assume that he was an employee of the company, yes.

Page 239

1      Q.  All right.  All right, so let's talk about
2   444.  44 -- 4444.  How about that?  Take a look at
3   4444.
4          Right now, what I'm doing as you look at
5   this, I'm going through the systems that you had in
6   place while you were there.  Okay?
7          MS. MOORE:  Cardinal-Brantley 13.
8          (Cardinal-Brantley 13 was marked for
9   identification.)
10         THE WITNESS:  Okay.
11  BY MR. PAPANTONIO:
12     Q.  I'm asking you questions about the systems
13  that they had in place -- that you had in place.  So
14  as we go, take a look at this document, 4444.
15         Have you seen this document?
16         It's got your name on it; that's why I was
17  wondering.
18     A.  I don't recall seeing it, but if it was
19  sent to me --
20     Q.  Yeah, it was sent to you.
21     A.  -- back in 2006 --
22     Q.  Right.
23     A.  -- I'm sure I saw it at the time.
24     Q.  It says:  "Attached find the report
25  detailing the findings of the compliance assessment

Page 240

1   conducted at the pharmaceutical distribution facility
2   in Birmingham, Alabama."
3          That was an area that you were responsible
4   for, correct?
5      A.  By "responsible," if you mean did I review
6   ingredient limit reports --
7      Q.  Right.
8      A.  -- if it was a Cardinal Health
9   distribution center, yes.
10     Q.  Okay.  And it says:  "From June 26th to
11  June 29th, 2006, a regulatory compliance review was
12  conducted at the pharmaceutical distribution Dohman
13  facility in Birmingham."
14         You're familiar with that facility, right?
15     A.  No.  So -- this is probably why.  So if
16  this was a Dohmen facility --
17     Q.  Yeah.
18     A.  -- which is -- which is what you said,
19  I --
20     Q.  Well, tell the jury who a Dohmen facility
21  is.  We haven't talked about that.  Who are they?
22     A.  Again --
23         MR. PYSER:  Counsel, please let him finish
24  his answer.
25         THE WITNESS:  -- there was an acquisition

Page 241

1   at some point.  We discussed it earlier with, I
2   believe, the RKR, and you asked about sales --
3   BY MR. PAPANTONIO:
4      Q.  Right.
5      A.  -- and I told you that there was an
6   acquisition and a Dohmen.
7      Q.  Uh-huh.
8      A.  So if this was a Dohmen facility -- which
9   is why -- I'm very -- I'm not very familiar with the
10  Birmingham, Alabama, location.  It may have been a
11  Dohmen facility.  You read that somewhere.  I may not
12  have had responsibility --
13     Q.  It's got your name --
14     A.  -- for reviewing reports for Dohmen.
15     Q.  It's got your name on it, doesn't it?
16     A.  The -- the e-mail was sent to me, yes,
17  but --
18     Q.  Yeah.  And when you got -- so you got the
19  e-mail.
20         You don't remember getting the e-mail,
21  right?
22     A.  That is correct.
23     Q.  And then if you look at page 4, you see
24  where it says "Significant issues"?
25     A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    Q.  See where it says "DEA" -- it says: "DEA
2 theft loss reports are not submitted to DEA within
3 7 days of discovery."
4        And you know that they were supposed to
5 be, right?
6        MR. PYSER:  Object to form.
7        THE WITNESS:  DEA, theft loss reports.
8 Would that be a 106?
9 BY MR. PAPANTONIO:
10   Q.  Uh-huh.  You know they're supposed to be
11 reported, correct?  Within 7 days?
12       Yes or no?  Do you know?
13   A.  Sir, I'm -- I'm trying to remember the
14 regulation.  You asked me a question.
15   Q.  Okay.
16   A.  So I do know that the 106s must be filed
17 within a certain time of discovery.  I don't remember
18 the time frame.
19       If it says 7 days here, I'm going with
20 what it says here.  I know that it needs to be filed
21 within X amount of days of discovery.  I just don't
22 remember the exact time frame.
23   Q.  And why is that so important, that you
24 report theft from your facilities?  Tell the jury why
25 that's so important.

Page 243

1    A.  We report theft and loss from distribution
2 centers so that the DEA is aware that there has been
3 a theft or a loss at the facility.
4    Q.  Then it goes:  "Customers were receiving
5 scheduled product they were not entitled to receive
6 due to their DEA registrations are not being reviewed
7 and set up correctly in the computer system."
8        Is that something you were in charge of?
9        MR. PYSER:  Object to form.
10       THE WITNESS:  No, I was not in charge of
11 that.
12       And -- and I would just like to ask, was
13 this a Dohmen facility, or what was this --
14 BY MR. PAPANTONIO:
15   Q.  The document's going to speak for itself.
16 I don't think it's -- we're not just talking about
17 Dohmen.  If you take a look at it, you'll see that,
18 but . . .
19   A.  Okay.
20   Q.  So it says --
21   A.  No, I was not responsible for that.
22   Q.  Okay.  It says "There is" --
23       MR. PYSER:  Feel free to -- feel free to
24 review the document as long as you need in
25 order --

Page 244

1 BY MR. PAPANTONIO:
2    Q.  You see where it says --
3        MR. PYSER:  -- to answer the question.
4 BY MR. PAPANTONIO:
5    Q.  -- "There is no system to determine
6 excessive or suspicious ordering"?
7        Did you see that?  That's right up
8 underneath.  It says -- in plain words:  "There is no
9 system to determine excessive or suspicious ordering
10 by customers of controlled substance products."
11       You see that?
12   A.  I do see that.
13   Q.  And you know there's supposed to be,
14 correct?  There's supposed to be a system to
15 determine excessive or suspicious orders by a
16 customer?
17       MR. PYSER:  Object to form.
18 BY MR. PAPANTONIO:
19   Q.  True?
20   A.  21CFR states that a registrant should have
21 a system in place to detect and report suspicious
22 orders.
23   Q.  And this says there is no system.
24       That's what it says, doesn't it?  There is
25 no system; there is no system to determine suspicious

Page 245

1 ordering.  That's what this says, correct?
2    A.  So if -- if -- 
3    Q.  Well, first of all, answer my question.
4        There is -- according to this document,
5 there is no system to determine suspicious ordering,
6 according to that line.
7        That's what it says, right?
8    A.  According to that line --
9        MR. PYSER:  Object to -- object to form.
10       You've got to let him answer the question.
11       MR. PAPANTONIO:  No, I'm going to -- I'm
12 going to ask a question, and he's going to
13 answer the question.  If you want to give
14 speeches, that's your opportunity to do -- it's
15 called a redirect; you can do that.  Feel free
16 to do it.
17       MR. PYSER:  Counsel, you asked him a
18 question --
19       MR. PAPANTONIO:  I'm going to move on.
20       MR. PYSER:  -- "So that's what that says,
21 correct?"  He began to answer, and you asked a
22 different question.
23 BY MR. PAPANTONIO:
24   Q.  Is that what that says?  Correct?  Am I
25 right that this says, "There is no system to

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  determine excessive or suspicious ordering"?  Yes or
2  no?  Does it say that?
3       MR. PYSER:  Object to form.
4       THE WITNESS:  That is what this says.  And
5  if you are going to ask me questions about this
6  document, I would like to read it to see if it
7  is indeed Dohmen.
8  BY MR. PAPANTONIO:
9    Q.  Fine.  Go off the clock, because we're not
10  going to take time --
11       MR. PYSER:  No, we're going to stay on the
12  record --
13  BY MR. PAPANTONIO:
14    Q.  -- to read it on the record.
15       MR. PAPANTONIO:  No, we're not.  But we
16  stay on the record --
17       MR. PYSER:  He's going to read it if he
18  needs to read it.
19       THE WITNESS:  I want to read this document
20  to see if it --
21       MR. PAPANTONIO:  You can read it, but it's
22  not going to be on our time, friend; okay?  It's
23  not going to be on our time.
24       THE WITNESS:  I just want to read the
25  document.

Page 247

1       MR. PAPANTONIO:  Just keep up with the
2  time on this.
3  BY MR. PAPANTONIO:
4    Q.  We're not going to go on our time for you
5  to read the document.
6       How many hours did you prepare for this
7  deposition?
8    A.  This is my first time seeing this
9  document --
10    Q.  How many --
11    A.  -- and you're asking me questions -- you
12  asked me that earlier, and I said I did not know, and
13  that's my same answer --
14    Q.  Was it more than 12?
15    A.  More than 12 what?
16    Q.  Hours.
17    A.  Probably -- yes.
18    Q.  Was it two days?
19    A.  Meaning -- meaning 48 hours?  No.
20    Q.  Was it three days?
21    A.  Meaning 72 hours?  No.
22    Q.  How many hours was it?
23    A.  Again, I don't know.  But I did not review
24  this document.  You're --
25    Q.  Right.

Page 248

1    A.  You're asking me questions --
2    Q.  Nobody from the company showed you -- not
3  your lawyer, but nobody from the company showed you
4  this document before you came in here, where it says,
5  "There is no system to determine suspicious
6  ordering," nobody showed that to you prior to me
7  showing it to you right now, correct?
8       MR. PYSER:  Object to form.
9  BY MR. PAPANTONIO:
10    Q.  Yes or no?
11    A.  That is correct.
12       So I'm going to read the document if
13  you're going to continue asking me questions about
14  the document.
15    Q.  Only thing I'm asking you is one page.  If
16  your attorney wants to ask you questions after that,
17  he can do it, but I'm asking the questions I want to
18  ask.  That's my right to do it.  That's how this
19  works.
20    A.  And it's my right to read the document, I
21  believe.
22    Q.  You're right.  And you haven't read the
23  document.  Take a minute -- if you want to take --
24  and we're going to just go off the record --
25    A.  Okay.

Page 249

1    Q.  -- so we don't spend our time doing
2  something you haven't done before you came here
3  today.
4    A.  Okay.
5    Q.  Okay?
6       MR. PAPANTONIO:  Give me a time.
7       THE WITNESS:  How much time do I have?  Am
8  I limited?  Do I have ten minutes, do I have --
9  BY MR. PAPANTONIO:
10    Q.  You -- you have --
11    A.  -- five hours?
12    Q.  -- as much time as you want, because right
13  now we're going off the record --
14    A.  Okay.
15    Q.  -- and I'm going to get the time back
16  anyway.
17    A.  Okay.  Sounds good.
18       VIDEOGRAPHER:  Going off record.  Time
19  is 1:43.
20       (Off the video record at 1:43 p.m.)
21       MR. PAPANTONIO:  Keep the camera rolling.
22  No, I want the judge to see this.
23       MR. PYSER:  Counsel --
24       MR. PAPANTONIO:  No, I have the right to
25  do it.  I want the camera rolling, because I'm

Page 250

1  going to bring this up to special counsel. And
2  we're going to take the depo again if --
3      MR. PYSER: If you're going to keep the
4  camera rolling, we're on the record. You can
5  have it on the record or off the record.
6      MR. PAPANTONIO: We're off the record with
7  the camera rolling.
8      MR. PYSER: You can be on the record or
9  off the record, but you can't be off the record
10  with the camera on.
11      MR. PAPANTONIO: We're going to have the
12  camera on, and we're going to be off the record,
13  then, because we're wasting time because you
14  don't have this witness prepared. That's your
15  job. They meet with witnesses and they talk
16  with them about documents.
17      MR. PYSER: Counselor, you're showing him
18  a document from 12 years ago.
19      MR. PAPANTONIO: Right.
20      THE WITNESS: I've read what I needed.
21      MR. PAPANTONIO: You can. Okay. Good.
22      VIDEOGRAPHER: All right. Stand by to go
23  back on.
24      MR. PYSER: I will say for the record that
25  the time taken, because counsel wanted him to

Page 251

1  review a record should count against his own
2  time.
3  BY MR. PAPANTONIO:
4      Q. Okay. Upon review --
5      VIDEOGRAPHER: We're going back on the
6  video record. The time is 1:44.
7      (Back on the video record at 1:44 p.m.)
8  BY MR. PAPANTONIO:
9      Q. Upon review of purchase and sales, DEA
10  forms, you -- what -- tell me what DEA Form 222 is.
11      A. A DEA Form 222 is a form that's in
12  triplicate of a brown, a green, and a blue, that is
13  used for the sale and distribution of Schedule II
14  controlled substances.
15      Q. And according to this, it had customer
16  data missing. Correct?
17      A. I'm sorry, I just -- I lost my page.
18      Q. So it says --
19      A. What page are we on?
20      Q. We're on page -- what's that page number?
21      I don't know what page you're on. Hang
22  on. What is it -- 4. Page 4.
23      See where it says: "Upon review of
24  purchase and sales, DEA form 222, several errors were
25  found, including data was missing."

Page 252

1      You don't want data missing on a --
2  something that's a 222, do you? That's not a good
3  thing, is it?
4      MR. PYSER: Object to form.
5      THE WITNESS: Based on this statement, I
6  don't know what data was missing.
7  BY MR. PAPANTONIO:
8      Q. Then it says: "Controlled substance
9  returns to vendors are shipped without proof of
10  delivery."
11      You understand that? "Controlled
12  substance returns to vendors are shipped without
13  proof of delivery."
14      See that?
15      A. I do see that.
16      Q. That would be improper, wouldn't it?
17      MR. PYSER: Object to form.
18      THE WITNESS: I don't know if I fully
19  understand what that means.
20  BY MR. PAPANTONIO:
21      Q. Okay. Fair enough.
22      "Destruction and theft losses of ARCOS
23  reportable items are not being consistently reported
24  to ARCOS."
25      Tell the jury what "ARCOS" is. They've

Page 253

1  heard about it by this time in the trial, but tell
2  them what your -- you describe ARCOS for them.
3      A. ARCOS is an automated reporting tool for
4  Schedule II controlled substances. It tracks the
5  transactions of those drugs from receipt to sale. It
6  tracks -- basically -- basically that's it. It
7  tracks the movement of Schedule II ARCOS
8  reportable -- ARCOS reportable controlled substances.
9      Q. Go to the next page, point 5, very next
10  page.
11      See where it says "DEA," about halfway
12  down the page?
13      A. Yes.
14      Q. It says: "DEA quarterly exception report
15  is not used to verify customers' licensure is still
16  active."
17      See that?
18      A. I do.
19      Q. What is "a customers' licensure"?
20      A. The license. If the -- either the State
21  license or the DEA license; I don't know which one
22  this statement is referring to.
23      Q. So according to this, there's no report
24  used to verify a customer's license is even active,
25  correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1      MR. PYSER:  Object to form.
2      THE WITNESS:  According to this, a
3  quarterly exception report is not used.
4  BY MR. PAPANTONIO:
5      Q.  Yeah.  Well, tell -- what's a quarterly
6  exception -- what is that report?
7      A.  I really don't know.  There are various
8  ways to identify or to verify a DEA registration.
9  I'm not sure what the exception report, the quarterly
10  exception report is.
11      Q.  Fair enough.  Look at page 7.  Point 7.
12      You see where it says down here,
13  "Controlled substance order filing"?
14      A.  Yes.
15      Q.  "There is no system in place" -- "There is
16  no system in place to determine excessive purchasing
17  of controlled substance products."
18      Do you see that?
19      A.  I do see that.
20      Q.  And that is improper, not to have a system
21  to determine excessive purchasing?  That's improper,
22  isn't it?
23      MR. PYSER:  Object to form.
24      THE WITNESS:  The regulation states,
25  21 CFR 1301.74(b), that a system must be in

Page 255

1  place to identify and report suspicious orders.
2  BY MR. PAPANTONIO:
3      Q.  And if you'll go to -- tell us, first of
4  all, what is a "periodic controlled substance
5  inventory"?  What is that, "periodic controlled
6  substance inventory"?
7      A.  A periodic control substance inventory?
8      Q.  Uh-huh.
9      A.  There are several inventories taken of
10  controlled substances, so I don't know what this is
11  referring to.
12      But there is a daily movement count; any
13  controlled substance that had a movement the previous
14  day is counted in the cage and vault.  There is an
15  inventory taken at -- I think the end of the month
16  for certain substances.  You have your ARCOS report.
17  Inventory, you have your biannual, biannual
18  inventory.
19      So there are several inventories.  I don't
20  know what this one is exactly referring to.
21      Q.  Tell the jury why these inventory reports
22  are important.
23      MR. PYSER:  Object to form.
24      THE WITNESS:  Well -- well, I --
25

Page 256

1  BY MR. PAPANTONIO:
2      Q.  Why are they important?
3      A.  Which report are we referring to?
4      Q.  Any type of inventory report.
5      Why are inventory reports important?
6      A.  Well, the biannual inventory is required
7  by the CFR.
8      Q.  Right.
9      A.  Yes.
10      Q.  And tell the jury what that is.
11      A.  What is?
12      Q.  Biannual.
13      A.  It's an annual -- it's a report taken
14  every two years.
15      Q.  And it's to keep up with the drugs that
16  are supposed to have been moving through the hands of
17  Cardinal, correct?
18      A.  It's an inventory of all the drugs from
19  the cage vault.
20      MR. PAPANTONIO:  All right.  Let's go
21  1165.  Show him 1165.
22      MS. MOORE:  This will be
23  Cardinal-Brantley 14.
24  ( Cardinal-Brantley 14 was marked for
25  identification.)

Page 257

1  BY MR. PAPANTONIO:
2      Q.  You've seen this, haven't you?
3      A.  This is a McKesson document.
4      Q.  Right.  Have you seen this?
5      A.  No, I have not.
6      Q.  Do you understand that the same
7  presentation was made to Cardinal?  Did you know
8  that?
9      MR. PYSER:  Object to form.
10  BY MR. PAPANTONIO:
11      Q.  From the DEA?
12      MR. PYSER:  Object to form.
13      THE WITNESS:  Again, I've never seen this
14  document.
15  BY MR. PAPANTONIO:
16      Q.  Well, I'll show you --
17      A.  And it's a McKesson document.
18      Q.  Well, okay.  Did you know that Purdue --
19  you're working for Purdue right now, right?
20      A.  Correct.
21      Q.  And you know they were fined $635 million
22  in 2007?  You knew that, right?
23      MR. LAFATA:  Object to form.
24  BY MR. PAPANTONIO:
25      Q.  They were fined $635 million in 2007?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    MR. PYSER: Object to form.
2    MR. LAFATA: Object to form.
3    THE WITNESS: I don't know --
4  BY MR. PAPANTONIO:
5    Q. Right?
6    A. -- the exact amount. I -- there was some
7  type of fine or settlement at some point.
8    Q. Well, you know that they were criminally
9  indicted? You know that?
10    MR. LAFATA: Object to form.
11  BY MR. PAPANTONIO:
12    Q. Before you went to work with them, you
13  knew that, didn't you?
14    A. I did not know that.
15    MR. LAFATA: Same objection.
16  BY MR. PAPANTONIO:
17    Q. Is that the first time you've heard that?
18  The people you've been -- how many -- how many years
19  you been working with Purdue?
20    A. Since February 2017.
21    Q. Okay. So -- so I'm just telling you this
22  for the first time, that the company you went to work
23  for was criminally investigated, was fined
24  $635 million; that's the first time you've heard
25  that?

Page 259

1    MR. LAFATA: Object to form.
2    MR. PYSER: Object to form.
3    THE WITNESS: I do not know the details of
4    that settlement, or whatever that was.
5  BY MR. PAPANTONIO:
6    Q. Is that important to you, that you went to
7  work with a company that had actually been criminally
8  investigated by the Department of Justice?
9    MR. PYSER: Object.
10  BY MR. PAPANTONIO:
11    Q. Does that bother you at all, that you're
12  working for a company that's selling narcotics all
13  across the country, and they've been criminally
14  investigated by the Department of Justice? Does that
15  concern you at all, as we sit here?
16    MR. PYSER: Object to form.
17    THE WITNESS: With the scope of the --
18    whatever it is that you're referring to, that
19    settlement or whatever it is -- again, I don't
20    know all the details.
21  BY MR. PAPANTONIO:
22    Q. Right.
23    A. So to put it into the full context, I
24  can't answer that. I -- I'm employed by Purdue.
25    Q. But you knew this --

Page 260

1    A. I was aware of the settlement, penalty,
2  whatever it was.
3    Q. Did you -- were you aware of the fact
4  that -- that Purdue was accused of phoneying --
5  phoneying up research to make it look like the
6  product they were making was not addictive? Did you
7  know that --
8    MR. LAFATA: Object to form.
9  BY MR. PAPANTONIO:
10    Q. -- before you went to work with this
11  company, Purdue?
12    MR. PYSER: Object to form.
13    THE WITNESS: Again, I did not know the
14    details of the proceedings back then.
15  BY MR. PAPANTONIO:
16    Q. Go ahead.
17    A. I was aware of a monetary settlement or
18  fine or whatever it was, but I was not aware of the
19  details of the settlement. So I can't speak to that.
20    Q. All right. Well, we're going to go back
21  to that, but I just want to know what you knew prior
22  to coming in here.
23    Did you know that in 2000, the year 2000,
24  the GAO -- excuse me -- yeah, GAO had determined that
25  Purdue was making up lies about the safety of their

Page 261

1  product? Did you know that?
2    MR. PYSER: Object to form.
3  BY MR. PAPANTONIO:
4    Q. Prior to coming in here today, before you
5  went to work for them?
6    MR. PYSER: Object to form.
7    THE WITNESS: Again, I don't know all of
8    the details about the proceedings from the
9    settlement, fine, whatever it was.
10  BY MR. PAPANTONIO:
11    Q. Well, Mr. Brantley, is it important that
12  you know about the background of a company before you
13  go to work with them? Is that important to you, Eric
14  Brantley, as we sit here today?
15    A. Again --
16    MR. LAFATA: Object to form. Asked and
17    answered.
18  BY MR. PAPANTONIO:
19    Q. Is that important?
20    A. Again, I knew of some amount of a
21  settlement, fine, whichever it was; did not know all
22  the details. I have read some. And that's what I
23  know, and that's what I can speak to.
24    I do not -- to this day, I do not know all
25  of the details of whatever happened with the

Page 262

1 settlement or the fine or the case.
2    Q.  So it doesn't -- it doesn't matter to you,
3 right?  It doesn't matter to, Eric Brantley, that --
4 what Purdue did?  That just doesn't matter to you,
5 does it?
6       MR. LAFATA:  Same objection.
7       THE WITNESS:  Again, I was aware of an
8    amount of money that was paid for a fine,
9    settlement, back then.  I don't remember the
10    year, but I was aware of it.
11 BY MR. PAPANTONIO:
12    Q.  And you know what they did?  Can you tell
13 the jury what they did, as far as what your -- what
14 was in your head when you said, "Yeah, I'm going to
15 go to work with this company"?
16       What was in your head when --
17    A.  I did not know what they did.
18    Q.  You still today, you don't -- you still
19 don't know what they did?
20    A.  To this day, I have not read the details
21 of the settlement.
22       Just because I'm an employee of the
23 company does not mean I know everything that happened
24 as -- as far as a settlement or a fine or whatever
25 the case was.

Page 263

1    Q.  But you have a choice where you want to go
2 to work, don't you?  I mean, you can choose what
3 company you want to go to work for, correct?
4    A.  Yes.
5    Q.  And you made the choice, with the
6 information you had about Purdue, that you're going
7 to work with them --
8       MR. PYSER:  Object --
9 BY MR. PAPANTONIO:
10    Q.  -- true?
11       MR. PYSER:  Object to form.
12       THE WITNESS:  I am a current employee of
13    Purdue.
14 BY MR. PAPANTONIO:
15    Q.  Okay.  We'll come back to that.
16       Let's go to -- let's go to page -- do you
17 have the document?
18    A.  Are we still in the McKesson document?
19    Q.  Yeah.  Yeah, yeah.  Go to page -- go to
20 point 15 in that document.
21       MS. CHARLES:  I object to using a McKesson
22    confidential document.  You have not asked
23    permission to use the document with this
24    witness.  You only asked permission to use it on
25    Friday, with a further note that he is a Purdue

Page 264

1    employee, and you have not asked to use that for
2    this deposition.
3 BY MR. PAPANTONIO:
4    Q.  All right.  Go to page -- go to point 15,
5 please.
6    A.  Okay.
7    Q.  Now, you see this list that's up there.
8 You see this document -- see this list?  Have you
9 ever seen that list before?
10    A.  Again, this is a McKesson document, so I
11 would not have seen it.
12    Q.  Well, how about -- how about I'm getting
13 ready to show it to you in a Cardinal document?
14       Now, do you see --
15       MR. PYSER:  Object to form.
16 BY MR. PAPANTONIO:
17    Q.  You see where it says "DEA" --
18       MR. PYSER:  Strike counsel's speech.
19 BY MR. PAPANTONIO:
20    Q.  You see where it says "DEA numbers"?
21    A.  I do.
22    Q.  And you're going to love this.
23       What is the DEA number again?
24       MR. PYSER:  Object to form.
25

Page 265

1 BY MR. PAPANTONIO:
2    Q.  Let me ask you:  What is the DEA number?
3    A.  That's the DEA registration.
4    Q.  Right.  And what -- in -- why is that
5 important, that DEA number?
6    A.  That's the registration to distribute
7 controlled substances.
8    Q.  Right.  And a person that wants to find
9 out about one of these registrants, they can actually
10 track them down with the DEA number, can't they?
11    A.  What do you mean by "track them down"?
12    Q.  They can find out everything they want to
13 about any of these people through a DEA number, can't
14 they?
15       MR. PYSER:  Object to form.
16       THE WITNESS:  No.  The DEA number only
17    tells you their address and their -- the type of
18    registration, whether they're a distributor or a
19    pharmacy.  It tells you their location.
20 BY MR. PAPANTONIO:
21    Q.  But that's -- that's important
22 information, isn't it?  I mean --
23    A.  I mean, it --
24    Q.  It's important information, is what I'm
25 asking.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    A.  It tells you the name, address of the
2  registrant, and the type of registration:  Are they
3  engaged as a distributor or a pharmacy or a doctor?
4      That's what the DEA number tells you.
5    Q.  Right.  And the name of the pharmacy
6  certainly is important if you want to find out what
7  transactions took place with the name of the
8  pharmacy, with the pharmacy, right?  It's important?
9  The name of a pharmacy -- see how it's got the name
10  right there?
11    A.  The name of the pharmacy is a part of the
12  DEA registration.
13    Q.  And that's important, isn't it?
14      MR. PYSER:  Object to form.  Vague.
15      THE WITNESS:  I don't know what you're
16  asking.
17  BY MR. PAPANTONIO:
18    Q.  Well, let me show you what I'm asking.
19    A.  Okay.
20    Q.  Do you know that you're -- do you know --
21  and I'm wondering whether you did this or had
22  anything to do with it.
23      MR. PAPANTONIO:  Show him document 4831,
24    please.  Put these side by side.  Would you,
25    please.  This is page -- show him the document

Page 267

1  first.
2      MS. MOORE:  Cardinal-Brantley 15.
3    (Cardinal-Brantley 15 was marked for
4  identification.)
5  BY MR. PAPANTONIO:
6    Q.  Page -- go to page 175.  What it will be,
7  Mr. Brantley, you see down here in the corner, it
8  will have a point 175 on it:  Point 175.
9      MR. PAPANTONIO:  Can I have one of those
10    candies, please?
11      THE WITNESS:  Can I take the clip off?
12  BY MR. PAPANTONIO:
13    Q.  Yes, sir, you can take a clip off.
14    A.  I'm sorry, point 175?
15    Q.  Right.  175.
16    A.  Is it going to be this number -- this
17  number?
18    Q.  Here's what it's going to look like.  See
19  up there on the screen?  That's what it's going to
20  look like, the one to the right.
21    A.  I don't see a point number at the bottom
22  of the page.
23    Q.  You don't have a point 175?  Bottom
24  right-hand corner?
25    A.  Is it a CAH MDL number?

Page 268

1    Q.  It says -- it will say "P1" -- actually,
2  you know what's even better than that --
3    A.  Oh, is that the --
4    Q.  You see where --
5    A.  At the top?
6    Q.  You see right here, it's got 176 on it?
7  Go to the page that says 176.
8      You got it?
9    A.  Is it the same, this one, the screen?
10    Q.  Yes, sir.  It's the same one up on the
11  screen.
12    A.  I'll view it on the screen --
13    Q.  Okay.
14    A.  -- because I can't find it.
15      MR. PYSER:  You can take your time and
16    look at the document, if you want to look at the
17    document and review it.
18      THE WITNESS:  This numbering system, I'm
19    not seeing a point something.  And I'm trying
20    to --
21  BY MR. PAPANTONIO:
22    Q.  Well, maybe counsel can help you with it.
23  That's what -- that's what they're here for, is to
24  help you with this, so -- It's got a 176 --
25    A.  Ah, wait a minute.

Page 269

1    Q.  You got it?
2    A.  No, I thought that was it.  122 . . .
3    Q.  Bottom left-hand corner, it will have
4  a 176.
5    A.  Okay.  Now I see your --
6    Q.  There we go.
7    A.  -- system here.
8      I believe it's 175.
9    Q.  Okay.  175.
10    A.  Yes.
11    Q.  Okay.  So you got 175 in front of you,
12  right?
13    A.  Yes.
14    Q.  Now, you notice the difference between the
15  document that appears on the left side of the screen
16  and the document that appears on the right side of
17  the screen?  See that?
18      MR. PYSER:  Object to form.
19      THE WITNESS:  I'm going to look at it
20    here.
21  BY MR. PAPANTONIO:
22    Q.  Yeah, go ahead and look --
23    A.  I have glasses on, but that doesn't --
24  still doesn't allow me to see --
25    Q.  Yeah, look at -- that's fine.  But you see

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 the difference between what appears on the document
2 you're looking at and the document that McKesson sent
3 us? See that?
4         MR. PYSER: Object to form.
5         THE WITNESS: I see the two documents.
6 Again, what am I looking for?
7 BY MR. PAPANTONIO:
8     Q. Let me -- let me ask you a question about
9 it.
10        Were you responsible for removing -- were
11 you responsible for removing all those DEA numbers
12 and the names of the pharmacy that don't appear on
13 the Cardinal document?
14        MR. PYSER: Object to form.
15 BY MR. PAPANTONIO:
16    Q. It's pretty important, because we're going
17 to ask for sanctions on this. Okay?
18    A. Was I responsible for removing --
19    Q. Just so you understand -- yes, sir.
20    A. No.
21    Q. Do you -- do you understand that on the
22 Cardinal document, all of the -- all of the -- the
23 names of the pharmacy -- see that? They're not --
24 they're not there, are they?
25        MR. PYSER: Counsel, you just made a

Page 271

1 threat of sanctions. I'd like to understand the
2 basis for your threat of sanctions.
3         MR. PAPANTONIO: I won't --
4         MR. PYSER: If you're doing it -- if
5 you're doing it to intimidate the witness, it's
6 highly improper.
7 BY MR. PAPANTONIO:
8     Q. Then take sanctions out of it. That's not
9 between me -- that's between me and the lawyers.
10        But you understand that somebody left off
11 the numbers of the pharmacies on the one on the right
12 hand, and they left the names of the pharmacies on
13 the one on the right hand.
14        Do you see that?
15        MR. PYSER: Counsel, are you accusing DEA
16 of sanctions? Because this is a DEA
17 presentation --
18        MR. PAPANTONIO: No, I'm --
19        MR. PYSER: -- from 2013.
20        MR. PAPANTONIO: I'm accusing your -- I'm
21 accusing your company of removing it before we
22 got it. That's what I'm accusing it of.
23        MR. PYSER: Okay. And on --
24        MR. PAPANTONIO: So -- so --
25        MR. PYSER: -- what basis are you accusing

Page 272

1 Mr. Brantley of --
2         MR. PAPANTONIO: We'll -- we'll take --
3         MR. PYSER: -- something that's
4 sanctionable?
5         MR. PAPANTONIO: We'll take this up with
6 Mr. -- this is not about Mr. Brantley's problem,
7 unless he did it.
8         I suspect a lawyer did that that works
9 somewhere for your organization. So we're going
10 to find out.
11 BY MR. PAPANTONIO:
12    Q. Did you have anything to do with removing
13 the numbers, the DEA numbers, on the -- in the
14 document on the right?
15        MR. PYSER: Object --
16 BY MR. PAPANTONIO:
17    Q. Did -- did Eric Brantley have anything to
18 do with that?
19        MR. PYSER: Object to form.
20 BY MR. PAPANTONIO:
21    Q. Yes or no?
22    A. No.
23    Q. Did Eric Brantley have anything to do with
24 removing the names of the pharmacies there on the
25 right side of the document?

Page 273

1         MR. PYSER: Object to form.
2         THE WITNESS: No.
3 BY MR. PAPANTONIO:
4     Q. Eric Brantley?
5         Huh?
6     A. No.
7     Q. And you would agree, those -- that -- that
8 number and the name of that pharmacy tells you a lot,
9 doesn't it? If you want information about whether
10 there was any kind of misconduct by the pharmacy, you
11 got to know who they are, right?
12        MR. PYSER: Object to form. Asked and
13 answered.
14 BY MR. PAPANTONIO:
15    Q. True?
16    A. It identifies the name and the DEA
17 registration of the registrant.
18    Q. Okay. Now, the next document --
19        MR. PAPANTONIO: What number is this?
20        MS. MOORE: Internet pharmacy.
21        MR. PAPANTONIO: Yeah. Internet -- there
22 we go. Go to the next one, please. All right.
23 BY MR. PAPANTONIO:
24    Q. Now, you see these are all -- these --
25 these are Internet pharmacies. You see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    MR. PYSER: Counsel, if you're going to
2 ask him questions about an exhibit, can you show
3 him the document, please?
4    MR. PAPANTONIO: These are Internet
5 pharmacies. Yeah, I thought we did. Go
6 ahead --
7    MR. PYSER: You have not given the witness
8 that exhibit.
9    MR. PAPANTONIO: Yeah.
10    Here, take mine. Take mine. I'll use the
11 board up here.
12    (Cardinal-Brantley 16 was marked for
13 identification.)
14 BY MR. PAPANTONIO:
15    Q. You see the -- where it's all highlighted
16 in red?
17    MR. PYSER: Feel free to review this
18 exhibit. It doesn't have a Bates number on it.
19 It's unclear what it is.
20    MR. PAPANTONIO: Where is it?
21    MS. MOORE: It's this.
22    MR. PAPANTONIO: Oh, this is an exhibit.
23 This is a demonstrative exhibit. Okay.
24 BY MR. PAPANTONIO:
25    Q. Now, do you see where it's all highlighted

Page 275

1 in red?
2    MR. PYSER: Object to form.
3    THE WITNESS: I do see red highlights.
4 BY MR. PAPANTONIO:
5    Q. Those are pharmacies, sir.
6    Out of that entire list -- how many are
7 there? 34? 34, right?
8    A. This list does have 34 --
9    Q. Would --
10    A. -- entities.
11    Q. Would you count for the jury how many are
12 highlighted in red.
13    A. I count 21.
14    Q. Do you -- is there anybody in there with
15 those red that are not Cardinal customers, as far as
16 you know?
17    MR. PYSER: Object to form.
18    THE WITNESS: Is there anyone highlighted
19 in red --
20 BY MR. PAPANTONIO:
21    Q. That are not Cardinal customers.
22    A. -- that is not a Cardinal customer?
23    Q. Yeah.
24    MR. PYSER: Object to form.
25    THE WITNESS: Are you saying that was not

Page 276

1 a Cardinal customer in 2006?
2 BY MR. PAPANTONIO:
3    Q. Uh-huh.
4    MR. PYSER: Object to form.
5    THE WITNESS: I don't remember. I -- I
6 can't remember all the names of pharmacies.
7 BY MR. PAPANTONIO:
8    Q. Well, look at MediPharm.
9    You see that, "MediPharm" up there,
10 MediPharm? Isn't that number 1?
11    A. MediPharm, yes.
12    Q. Do you know that you -- that we went --
13 went through this already, but you remember the
14 document that I showed you, 4230, point 21, where we
15 found out that MediPharm had a monthly average in
16 sales of 155,000 opioids? You remember that? This
17 thing right here?
18    A. I do remember seeing that sheet.
19    Q. Okay. And do you -- can you go down the
20 list and tell us how many of those -- how many of
21 those that you can recall right now that you did
22 business with?
23    AccuMed: Do you remember them?
24    A. No.
25    Q. New Care: Don't remember them, huh?

Page 277

1    MR. PYSER: Object to form.
2    THE WITNESS: New Care rings a bell.
3 BY MR. PAPANTONIO:
4    Q. Okay. So you just don't -- it's been a
5 long time --
6    A. I remember some, and I don't remember
7 others. It's been a number of years.
8    Q. All right. Fair enough.
9    We're going to attach that to the
10 deposition, so hold that -- hold that thing with the
11 red -- with the red there.
12    All right. What else have you got here?
13 Stand by.
14    MR. PYSER: Counsel, I'm going to note for
15 the record the -- again, raising objection to
16 the improper threat of sanctions.
17    Had counsel done just a little bit of
18 research, they would have seen that this
19 document is available on a public website, with
20 a .gov address, listed exactly as it's shown,
21 with no pharmacies or DEA numbers listed.
22    MR. PAPANTONIO: Right, because Cardinal
23 removed them, and that's what we're going to
24 take out. It doesn't have anything to do with
25 Mr. Brantley.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    MR. PYSER: That allegation is ridiculous.
2  And the fact that you raised it with
3  Mr. Brantley --
4    MR. PAPANTONIO: We'll -- we'll -- we'll
5  see.
6    MR. PYSER: -- rather than raising it with
7  counsel, if you actually have a real concern --
8    MR. PAPANTONIO: We'll -- that's what --
9  that's what --
10    MR. PYSER: -- is absolutely improper.
11    MR. PAPANTONIO: That's what hearings are
12  for. Okay?
13    MR. PYSER: So you're -- you're more than
14  welcome to use the public website where this
15  document is available --
16    MR. PAPANTONIO: Right. Right.
17    MR. PYSER: -- without accusing Cardinal
18  or Mr. Brantley of removing information.
19    MR. PAPANTONIO: That's for another day.
20  Mr. Brantley hasn't been accused of anything.
21 BY MR. PAPANTONIO:
22    Q. You didn't do anything wrong, Mr.
23  Brantley.
24    You had nothing to do with that document,
25  did you? Either one of those documents. You had

Page 279

1  nothing to do with it?
2    A. I have not seen those documents.
3    Q. Okay. So that's clear.
4    MR. PAPANTONIO: Carol?
5  BY MR. PAPANTONIO:
6    Q. Sir, what we -- tell me, I asked you
7  earlier whether or not you know Mike Williams, and
8  you said -- I think you said you didn't know who he
9  was.
10    A. That name does not ring a bell.
11    Q. Okay. Now, so you have -- have you seen
12  this document, 4453?
13    She's going to get it for you right now.
14    A. Okay.
15    MS. MOORE: Cardinal-Brantley 17.
16    (Cardinal-Brantley 17 was marked for
17  identification.)
18    MR. PAPANTONIO: Do you have a way of
19  marking the section there? If you can mark a
20  section of the video? We've got -- we've got it
21  covered, that last section that we just did. We
22  got it.
23 BY MR. PAPANTONIO:
24    Q. Okay. So 4453. You see that?
25    A. I do.

Page 280

1    Q. Monday, October 2005. Results from an
2  internal quality audit.
3    Remember, we talked about the need to
4  audit and -- talked about that earlier?
5    A. About audits?
6    Q. Yeah.
7    A. Okay.
8    Q. Okay. So Mike Williams -- it says: "DEA
9  on site background information, package is not
10  update."
11    It says: "The alarm system has not been
12  tested by the alarm company."
13    You see that?
14    "CCTV equipment is not working properly."
15    Do you see that?
16    A. I do.
17    Q. Do you realize -- anybody tell you that
18  Mike Williams was accused of actually stealing and
19  reselling opioids from the facility where he was in
20  charge of security?
21    MR. PYSER: Object to form.
22 BY MR. PAPANTONIO:
23    Q. Had anybody told you that prior to coming
24  in here today?
25    MR. PYSER: Object to form.

Page 281

1    THE WITNESS: I -- I don't recall that,
2  no.
3  BY MR. PAPANTONIO:
4    Q. And if -- certainly if you've got the guy
5  in charge of security that's actually stealing
6  product and selling it on the street, that would be
7  called diversion, wouldn't it?
8    MR. PYSER: Object to form.
9    THE WITNESS: That would be called theft.
10 BY MR. PAPANTONIO:
11    Q. Would be called theft.
12    And do you understand -- since you don't
13  know Mike, take a look at 4485. Let's -- let's
14  introduce you to Mike Williams.
15    You would agree that theft of -- theft
16  from a facility that is supposed to be locked down
17  and protected actually promotes diversion, doesn't
18  it?
19    MS. MOORE: Cardinal-Brantley 18.
20    (Cardinal-Brantley 18 was marked for
21  identification.)
22    THE WITNESS: I'm sorry --
23 BY MR. PAPANTONIO:
24    Q. Yeah, you would agree that --
25    A. -- what's your question?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    Q.  -- a facility that's supposed to be locked
2  down and the product protected, if it's being sold
3  from the facility by the guy in charge, the head guy
4  at security, that actually promotes diversion,
5  doesn't it?
6         MR. PYSER:  Object to form.
7         THE WITNESS:  That's theft.
8  BY MR. PAPANTONIO:
9    Q.  Right.  Right.  That's theft, and that's
10 wrong.
11        And you should have systems in place that
12 prevent that, correct?
13   A.  And there are and were systems in place.
14   Q.  There were systems in place?  Let's read
15 this document.
16        It says:  "The police showed up at 7 p.m.
17 tonight asking to talk to a supervisor.  I asked both
18 officers to hide their badges and leave their guns
19 outside so that our folks would not freak out seeing
20 police seizing property.  I also gave them some old
21 Cardinal badges that they wore so folks would think
22 they were part of the audit team or something like
23 that.  The two other officers stayed in the
24 conference room with Althea and interviewed Jeff from
25 maintenance."

Page 283

1         Are you familiar with any of this?
2    A.  No.
3    Q.  This is the first time you've ever heard
4  this before?
5         MR. PYSER:  Object to form.
6         THE WITNESS:  Yes.  I do not recall any of
7  this.
8  BY MR. PAPANTONIO:
9    Q.  Okay.  And you don't have any idea how
10 long Mike was involved with security?  Head man at
11 security of this facility?  You don't have any idea?
12   A.  Again, I had not heard of Mike.
13   Q.  And you don't know how many incidents like
14 this, where there's theft from the -- from the
15 facility by employees where drugs are taken from the
16 vault and sold on the street?  You don't have any
17 idea how many times that occurred with Cardinal, do
18 you?
19        MR. PYSER:  Object to form.
20        THE WITNESS:  I do not know.
21 BY MR. PAPANTONIO:
22   Q.  And as a matter of fact, one reason you're
23 given a license to sell the product is because it's
24 your responsibility -- Cardinal's responsibility --
25 to make sure the product is not diverted by way of

Page 284

1  theft, correct?
2         MR. PYSER:  Object to form.
3         THE WITNESS:  One of the responsibilities
4  is to have systems in place for security of
5  controlled substances.
6  BY MR. PAPANTONIO:
7    Q.  And if you violate this -- if you -- if
8  you violate that, you're actually violating the
9  right -- well, you're violating the -- the standard
10 for how you ought to engage in business, aren't you?
11        MR. PYSER:  Object to form.
12        THE WITNESS:  This is referring to an
13 individual.  And again --
14 BY MR. PAPANTONIO:
15   Q.  Right.
16   A.  -- I don't know what this individual did.
17 I don't know the details --
18   Q.  Right.
19   A.  -- and so forth.
20   Q.  Oh, I believe.  I believe it.
21        But you don't know how many times this
22 occurred.  Let's -- let's read it.
23        You don't have any -- any idea how many
24 times this kind of thing occurred to your facilities
25 from Washington to Lakeland, do you?

Page 285

1         MR. PYSER:  Object --
2  BY MR. PAPANTONIO:
3    Q.  You have no idea?
4         MR. PYSER:  Object to form.
5  BY MR. PAPANTONIO:
6    Q.  Right?
7    A.  I do not know.
8    Q.  Okay.
9         It says -- see where it says:  "They
10 recovered from Mike pills for Xanax and OxyContin."
11        I'm reading right here, you see there
12 "They recovered" --
13   A.  I do see that.
14   Q.  "They recovered from Mike pills for Xanax
15 and OxyContin, 40 milligrams."
16        That's pretty strong, isn't it,
17 40 milligrams?
18        MR. PYSER:  Object to form.
19        THE WITNESS:  What is?  Oxycodone --
20 BY MR. PAPANTONIO:
21   Q.  Yeah.
22   A.  -- 40 milligrams?
23   Q.  That's pretty strong, isn't it?
24   A.  I couldn't speak to the strength.  There
25 are several strengths of oxycodone.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    Q.  "They suspect from the transcripts of
2  their chat log that Mike has done this in the past.
3  This time, his motivation was not money.  He was
4  supposedly exchanging pills for sex."
5        And that's the first time you've heard
6  that story?  That's the first thing I want to ask:
7  First time you heard that story?
8        MR. PYSER:  Object to form.
9        THE WITNESS:  Yes.
10 BY MR. PAPANTONIO:
11   Q.  And as we sit here, you're not able to
12 tell me how many times this very thing occurred
13 throughout the country, are you?
14       MR. PYSER:  Object to form.  Calls for
15   speculation.
16       THE WITNESS:  I do not know.
17 BY MR. PAPANTONIO:
18   Q.  But you are able to tell me that the
19 responsibility, once they found out that Mike
20 Williams was stealing pills and selling them for sex,
21 what was the responsibility of Cardinal once they
22 found that out?  Tell the jury.
23       MR. PYSER:  Object to form.
24       THE WITNESS:  The CFR states that a theft
25   and loss report or a 106 needs to be filed

Page 287

1  within X number of days of discovery.
2  BY MR. PAPANTONIO:
3    Q.  Didn't we establish -- I think we
4  established it was -- it was 7 days, right?
5    A.  I believe that's what our earlier document
6  said, 7 days.
7    Q.  All right.
8        MR. PAPANTONIO:  Show him a -- document
9    4999, please.
10 BY MR. PAPANTONIO:
11   Q.  And before we go to that, I just want to
12 be sure:  Nobody's talked to you about how many times
13 this occurred throughout the country, over what
14 period of time?
15   A.  That is correct.
16   Q.  Okay.
17       MS. MOORE:  Cardinal-Brantley 19.
18   (Cardinal-Brantley 19 was marked for
19 identification.)
20 BY MR. PAPANTONIO:
21   Q.  4999, see where it says, "2007"?
22       MR. PYSER:  4999?
23       MR. PAPANTONIO:  4999.
24       THE WITNESS:  Yes.
25

Page 288

1  BY MR. PAPANTONIO:
2    Q.  December 18, 2007.
3    A.  Yes.
4    Q.  You were still working with the company
5  then, weren't you?
6    A.  Yes.
7    Q.  It says:  "Cardinal Health gets another
8  controlled substance suspension."
9        See that?
10   A.  Yes.
11   Q.  It says:  "Dow Jones News Service."
12       And then it says:  "Drug wholesaler
13 Cardinal Health has notified customers that the U.S.
14 Drug Enforcement Administration suspended the
15 company's license to distribute controlled substance
16 from a third distribution center."
17       See that?
18   A.  Yes.
19   Q.  Do you remember this incident?
20   A.  I do not.
21   Q.  Well, you see where there's a -- there's
22 actually a -- a document -- if you look at the third
23 page, there's actually a news article that's attached
24 to the e-mail.  And it says:  "Cardinal Health gets
25 another controlled substance suspension."

Page 289

1        See that?
2        It says:  "Drug wholesaler Cardinal Health
3  Incorporated has notified customers that U.S. Drug
4  Enforcement Administration suspended the company's
5  license to distribute controlled substances from a
6  third distributor center."
7        See that?
8    A.  Yes.
9    Q.  Did you know about this?
10   A.  Are these the same three that were listed
11 in the earlier document that you showed me with the
12 settlement agreement?
13   Q.  Some of them are different.  That's why
14 we're going to go through them.
15       MR. PYSER:  Object to form.
16 BY MR. PAPANTONIO:
17   Q.  It says:  "In all three cases the DEA
18 cited problems with the center's distribution of the
19 narcotic pain reliever hydrocodone, known commonly as
20 Vicodin, a Cardinal spokesman said.  The suspensions
21 prohibit the distribution of any controlled
22 substances from the three centers, the spokesman
23 said.  Cardinal, based in Dublin, Ohio, wrote to
24 customers of its Swedesboro, New Jersey,
25 pharmaceutical distribution center last week that the

Page 290

1  DEA would suspend the license to distribute
2  controlled substances from the facility
3  December 13th, 2007."
4      Were you working with the company
5  December 13, 2007?
6      MR. PYSER:  Object to form.
7      THE WITNESS:  Yes.
8  BY MR. PAPANTONIO:
9      Q.  "Cardinal didn't issue a news release
10  about the latest suspension, which followed its
11  recent announcements that the DEA was suspending its
12  license to distribute controlled substances from its
13  centers in Auburn, Washington and Lakeland, Florida."
14      You see that?
15      A.  Yes.
16      Q.  And you knew about the suspensions.  We've
17  already talked about them, in Auburn, Washington, and
18  Lakeland, Florida, correct?
19      A.  Yes.  With the earlier document.
20      Q.  Right.  It says:  "The company operates
21  25 pharmaceutical distribution centers."
22      And the jury has already seen a picture of
23  those -- of those distribution centers, correct?
24      A.  I believe an earlier document said 27.
25      Q.  27; it did.  This says 25.

Page 291

1      A.  Yes.
2      Q.  "The DEA, in an order to Cardinal
3  suspending the Auburn license, said the company had
4  failed to maintain effective controls against the
5  diversion of a particular controlled substance,
6  citing the sale of hydrocodone to a pharmacy that
7  allegedly dispensed excessive amounts of drug based
8  on illegitimate Internet prescriptions."
9      Now, were you asked to get involved in
10  this investigation at all?  Did anybody from the DEA
11  call you and say, "We need your help as far as this
12  investigation's concerned"?
13      MR. PYSER:  Object to form.
14      THE WITNESS:  What investigation are you
15  referring to?  Because these -- these three are
16  the same that we discussed prior to lunch.
17  Right?
18  BY MR. PAPANTONIO:
19      Q.  Okay.  What -- what I'm asking you,
20  were -- listen to my question.
21      Were you asked to get involved in this at
22  all, as far as an investigation?  Were you asked to
23  comment or interviewed or any involvement in this
24  investigation that we're talking about right here?
25      A.  From the DEA?

Page 292

1      Q.  Yes, sir.
2      MR. PYSER:  Object to form.
3      THE WITNESS:  In regards to the Lakeland
4  facility, I had conversations with the Lakeland
5  DEA office as I made the recommendation to
6  discontinue business to certain pharmacies.  And
7  those were reported to the DEA.
8  BY MR. PAPANTONIO:
9      Q.  Okay.
10      A.  And I remember there was an e-mail
11  communication with -- I cannot remember her name, but
12  she was, I believe, the supervisor for the Florida
13  office.
14      Q.  It says -- okay.  It says:  "In spite of a
15  DEA warning about rogue Internet pharmacies,
16  Cardinal's Auburn branch distributed nearly
17  18 million dosage units of hydrocodone to retail
18  pharmacies in the first nine months of this year."
19      Now, do you remember that, that your
20  company distributed 18 million doses of hydrocodone
21  after the DEA had warned you about rogue Internet
22  pharmacies?  Do you remember that?
23      MR. PYSER:  Object to form.
24      THE WITNESS:  I don't remember how many
25  dosage units of a drug was distributed.

Page 293

1  BY MR. PAPANTONIO:
2      Q.  Okay.  Let's see about the next line, see
3  if you remember anything about that.
4      "In spite of the DEA warning about rogue
5  Internet pharmacies, Cardinal's Auburn branch
6  distributed nearly 18 million doses of -- dosage
7  units of hydrocodone to retail pharmacies in the
8  first nine months of this year, including 605,000
9  units to Burlington Drug Store, which received a
10  suspension of its DEA certificate of registration."
11      You see that?
12      A.  I do.
13      Q.  Now, Burlington -- you're familiar with
14  Burlington, too, aren't you?
15      MR. PAPANTONIO:  Underline Burlington,
16  please?
17      THE WITNESS:  I believe that's the one we
18  discussed earlier in an earlier document.
19  BY MR. PAPANTONIO:
20      Q.  Well, let's go on here.  Where is
21  Burlington?  Tell -- tell me where Burlington is.
22  Where -- where is the location of Burlington?  Is
23  it --
24      A.  I believe it was -- it was serviced by the
25  Auburn facility.  So I want to assume that it was in

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 Washington state.
2     Q. Was that within the purview of your job,
3 to take care of looking at -- at orders coming from
4 Washington state?
5     A. I did review ingredient limit reports for
6 the Auburn facility.
7     Q. Okay. You have 1941 in front of you. Go
8 ahead and take a minute and find 1941. 1941.
9     A. Is that in this document?
10     Q. Yes, sir. It's 1941. 1941.
11     A. Where would that number be?
12     Q. That's going to be probably right on the
13 left-hand --
14     A. Are we still talking about this document?
15     Q. No, sir. We're going to a different
16 document. We're going to 1941.
17     A. Is that one that I already have?
18     Q. Yes.
19     A. Okay.
20     Q. It will be your third -- about your third
21 exhibit there.
22     A. Give me --
23     Q. I told you that we'd come back to it.
24     A. You said 1941?
25     Q. 1941, right.

Page 295

1     A. Ah.
2     Q. You got it?
3     A. It's a pretty nice stack here.
4     MS. CHARLES: I'm repeating my earlier
5 objection about using this document.
6 BY MR. PAPANTONIO:
7     Q. So you see the first page on that
8 document, it says: "Perhaps the most surprising
9 revelation was Steve Reardon and Gilberto Quintero
10 saying Cardinal does not report suspicious orders to
11 DEA."
12     And then it says: "No upside."
13     You see that?
14     A. Yes.
15     Q. What is the "upside"? This says: "No
16 upside to reporting to DEA."
17     Why don't you tell us what you think is
18 the upside to reporting to the DEA?
19     MR. PYSER: Object to form.
20     THE WITNESS: I cannot speak to what Bill
21 Mahoney --
22 BY MR. PAPANTONIO:
23     Q. Right.
24     A. -- said.
25     Q. I don't want you -- no, I don't want you

Page 296

1 to.
2     A. Referring to "upside," I don't know what
3 that means.
4     Q. Well, there's a benefit in -- there's a
5 benefit in reporting what you're supposed to,
6 following the law, reporting to the DEA, correct?
7     MR. PYSER: Object to form.
8 BY MR. PAPANTONIO:
9     Q. I mean, that's a good thing, isn't it?
10     A. I cannot provide an opinion on what Bill
11 Mahoney from McKesson said.
12     Q. I don't want -- I don't want you to. I
13 want to ask you.
14     When you were working in quality
15 regulatory, there was an upside to actually telling
16 the truth about suspicious orders to the DEA: Yes or
17 no?
18     MR. PYSER: Object to form.
19     Counsel, if you're asking a question,
20 that's fine; but then take down the document you
21 say that you're not asking him about.
22 BY MR. PAPANTONIO:
23     Q. Yes or no?
24     A. And again, 21 CFR 1301.74(b) states that
25 the registrant shall design a system to identify and

Page 297

1 report suspicious orders.
2     Q. Right. And if you don't --
3     A. I can't speak to an upside or a downside.
4 There's the regulation, and you comply with the
5 regulation.
6     Q. Well, the downside is you're breaking the
7 law if you don't, true?
8     MR. PYSER: Object to form.
9 BY MR. PAPANTONIO:
10     Q. That's a downside. When you are breaking
11 the law, that's a downside, wouldn't you say?
12     A. Again, "upside" and "downside" is a --
13 seems like a figure of speech that I can't speak to.
14     Q. Okay.
15     A. I can tell you what the regulation is.
16     Q. Yeah. Let's go to to the second page.
17 Bottom paragraph.
18     "Later had dinner with the group.
19 Interesting gossip came from Reardon and Quintero,
20 who relate that Cardinal is not reporting suspicious
21 orders to DEA on the advice of outside counsel. We
22 don't get any credit for doing it."
23     You see that? "We don't get any credit
24 for doing it."
25     Now, you didn't say that, did you?

Page 298

1    MR. PYSER:  Objection.
2  BY MR. PAPANTONIO:
3    Q.  "We don't get any credit for reporting
4  suspicious orders to DEA."
5    MR. PAPANTONIO:  Underline that:  "We
6  don't get any credit for doing it."
7    MR. PYSER:  Object to form.
8  BY MR. PAPANTONIO:
9    Q.  See that?
10   A.  I do see that.
11   Q.  And then it says -- goes on and says:
12 "There is no upside."
13   MR. PYSER:  Object to form.
14 BY MR. PAPANTONIO:
15   Q.  Do you see that?  Those aren't your words,
16 because you would never use "upside" and "downside,"
17 is what you told us.
18   MR. PYSER:  Object to form.
19   THE WITNESS:  That's a terminology I -- I
20 can't speak to "upside," "downside."
21 BY MR. PAPANTONIO:
22   Q.  "There's no upside."
23   A.  I did not --
24   MR. PYSER:  Object to form.
25   THE WITNESS:  That's not a statement that

Page 299

1  I made.
2    MR. PAPANTONIO:  All right.  So what we're
3  going to do is we're going to -- these guys have
4  got some questions here.  I'm going to see if
5  I'm done.  Let's take ten minutes and do some
6  housekeeping to see if we can move on.  Okay?
7    VIDEOGRAPHER:  Off the record.  The time
8  is 2:27.
9    (A recess transpired from 2:27 p.m. until
10   2:42 p.m.)
11   VIDEOGRAPHER:  Going back on the record.
12 Beginning of media file number 5.  Time is 2:42.
13 BY MR. PAPANTONIO:
14   Q.  Sir, a little artwork here.
15   MR. PAPANTONIO:  Show him 4575, please.
16   MS. MOORE:  Brantley 20.
17   (Cardinal-Brantley 20 was marked for
18 identification.)
19 BY MR. PAPANTONIO:
20   Q.  Take a look at that, sir.
21   Have you ever seen that document?
22   A.  This -- is this a news release?
23   Q.  Uh-huh.  Have you ever seen it?
24   A.  I don't recall seeing this news release,
25 no.

Page 300

1    Q.  Okay, let's talk about it.  All right.
2  Let's see here.
3    "State reaches agreement with Cardinal on
4  drug trading issues."
5    You see that?
6    A.  Yes.
7    Q.  It says:  "Attorney General Spitzer today
8  announced an agreement with Cardinal to improve
9  safety and security practice in trading of
10 prescription pharmaceutical among wholesalers."
11   And you were aware of this investigation,
12 right?
13   A.  Yes.
14   Q.  Okay.
15   "An investigation by the Attorney
16 General's Office into trading pharmaceuticals on the
17 secondary market determined that certain trading
18 practices by wholesalers had the potential to
19 compromise the security and the safety of national
20 drug distribution."
21   Tell the jury what a "secondary market"
22 is.
23   A.  A secondary wholesaler would be a -- I
24 guess an alternate-source vendor; a -- I don't really
25 know what the exact definition of a secondary

Page 301

1  wholesaler would be, but it would be, I guess, a
2  smaller -- I don't know the exact definition.
3    Q.  That's okay.  I mean, you're not
4  expected --
5    A.  A nonauthorized distributor.
6    Q.  Yeah, that's okay.
7    It said:  "Cardinal, based in Dublin,
8  ranked 19th on the Fortune 500 list of America's
9  corporation -- largest corporation, is one of the
10 three primary distributors."
11   Now, tell me who the three primary
12 distributors are, from your -- from your memory.
13   A.  The -- the big three would be Cardinal
14 Health, AmerisourceBergen, and McKesson.
15   Q.  And they had special licenses to be able
16 to sell narcotics, correct?  McKesson, Cardinal, and
17 ABC?
18   A.  It takes a DEA registration with
19 Schedule II on it.
20   Q.  Not everybody can sell narcotics, correct?
21   A.  It takes a DEA registration with
22 Schedule II, yeah.
23   Q.  Right.  And you have to -- to get that,
24 you have to make certain promises that you're going
25 to do certain things in line with what the DEA

Highly Confidential – Subject to Further Confidentiality Review

Page 302

1 requires, true?
2    A.  You have to apply for an application with
3 the DEA.  I'm not familiar with what's all on the
4 application, but you do have to apply with the DEA
5 for that license.
6    Q.  It says: "Cardinal has agreed to adopt a
7 set of wholesale safe product practices to establish
8 a new standard for safe trading pharmaceuticals and
9 point the way forward for an industry that is vital
10 to the health of Americans."
11        You see that?
12    A.  Yes.
13    Q.  Do you remember what the -- do you
14 remember what your promise was about going forward
15 and establishing these new standards?  Remember what
16 your promise was, back in 2005?
17        MR. PYSER:  Object to form.
18        THE WITNESS:  If you're referring -- if
19    you're referring to the wholesaler safe product
20    practices --
21 BY MR. PAPANTONIO:
22    Q.  Yeah.
23    A.  -- this was around buying and selling
24 prescription pharmaceuticals from another wholesaler,
25 or pharmaceutical trading.  And it was all around

Page 303

1 pedigree.
2    Q.  It was around what?  Pedigree?
3    A.  Pedigree.
4    Q.  Tell the jury what "pedigree" is.
5    A.  So what a pedigree is is basically
6 tracking a -- a pharmaceutical drug back to an
7 authorized distributor.  And what an authorized
8 distributor is, or was at this time, was if you had
9 made two transactions with a -- with a manufacturer
10 within 24 months, per PDMA regulations, you were
11 considered an authorized distributor.
12        So that pedigree tracked all of the
13 movement from the drug back to an authorized
14 distributor.  Okay?  And that pedigree had to be
15 passed.
16        So the wholesale safe product practices
17 were -- and again, I'm trying to go by memory -- was
18 something that we had the customer sign, stating that
19 they would only purchase -- you know, I don't
20 remember the exact wording, but it was around passing
21 pedigree, and it was around authorized distributors.
22    Q.  Okay.  And look at the last paragraph.
23        "The investigation determined that
24 Cardinal purchased drugs from certain
25 alternate-source vendors despite risks associated

Page 304

1 with buying from those vendors to take advantage of
2 higher available profit margins."
3        Did you know that that was going on when
4 you were there?
5        MR. PYSER:  Object to form.
6 BY MR. PAPANTONIO:
7    Q.  At Cardinal?  That you were actually
8 buying from alternative sources so you could take
9 advantage of a higher profit margin?  Did you know
10 that?
11        MR. PYSER:  Object to form.
12        THE WITNESS:  I knew that we were buying
13    from other wholesalers, from alternate --
14 BY MR. PAPANTONIO:
15    Q.  You had no --
16    A.  -- source wholesalers.
17 BY MR. PAPANTONIO:
18    Q.  Go ahead.
19    A.  No, that's it.
20    Q.  Yeah.  So you had no idea that it was
21 going to make higher profit margins by doing that?
22 Is that what you're telling us?
23    A.  I never got into the profit or sale or
24 pricing.
25    Q.  "Cardinal also sold pharmaceuticals to

Page 305

1 certain customers, even in the the face of evidence
2 that those customers may have been illegally
3 diverting the drugs outside of their intended
4 channels of distribution."  Correct?
5        MR. PYSER:  Object to form.
6        THE WITNESS:  That is what it says.
7 BY MR. PAPANTONIO:
8    Q.  Did you know that that was going on?
9        MR. PYSER:  Object to form.
10        THE WITNESS:  Did I know what, exactly?
11    I'm sorry.
12 BY MR. PAPANTONIO:
13    Q.  Well, did you know that the investigation
14 had determined that Cardinal purchase drugs from
15 alternative sources, could take advantage of the --
16 the higher profits -- you said you didn't know about
17 that, correct?
18        MR. PYSER:  Object to form.
19        THE WITNESS:  Correct.
20 BY MR. PAPANTONIO:
21    Q.  You didn't know that?
22    A.  I don't know the pricing.
23    Q.  And you didn't know that Cardinal also
24 sold pharmaceuticals to certain customers, even in
25 the face of evidence that those customers may have

Page 306

1 been illegally diverting drugs outside their intended
2 channels of distribution?
3     MR. PAPANTONIO: Where is my document on
4 this? That's not it.
5 BY MR. PAPANTONIO:
6    Q. Did you know that?
7    A. This is referring to price diversion.
8    Q. I understand.
9       Did you know about this?
10     MR. PYSER: Object to form.
11     THE WITNESS: I knew that there were --
12 there were purchases made from alternate-source
13 wholesalers.
14 BY MR. PAPANTONIO:
15    Q. Okay.
16    A. That there was trading amongst
17 wholesalers.
18    Q. And this was taking place in New York,
19 correct?
20     MR. PYSER: Object to form.
21 BY MR. PAPANTONIO:
22    Q. Or all -- actually taking place all over
23 the country, true?
24     MR. PYSER: Object to form.
25     THE WITNESS: There was a facility when I

Page 307

1    started in Texas that was the trading company.
2 BY MR. PAPANTONIO:
3    Q. Right. And you knew that this -- this
4 practice was taking place all over the country, did
5 you not? Did you not know that?
6     MR. PYSER: Object to form.
7     THE WITNESS: This practice was taking
8    place in Texas.
9 BY MR. PAPANTONIO:
10    Q. Okay.
11    A. At the Texas facility. That was the
12 facility that bought and sold the product from other
13 wholesalers.
14    Q. Did it happen in other states besides
15 Texas?
16     MR. PYSER: Object to form.
17 BY MR. PAPANTONIO:
18    Q. This is New York Attorney General here.
19    A. The trading company was based in Texas.
20 That is the facility that purchased drugs from other
21 wholesalers and then distributed drugs to other
22 wholesalers in Texas. That's where the facility was
23 located.
24    Q. All right. I understand where the
25 facility is located, but you understand that that --

Page 308

1 that process of buying these drugs from that
2 secondary source and selling them all over the --
3 were being sold all over the country? You know that,
4 don't you?
5     MR. PYSER: Object to form.
6     THE WITNESS: They were sold into several
7    states, yes.
8 BY MR. PAPANTONIO:
9    Q. Okay. That's all I wanted.
10       Okay. So would you go to page 4 of this
11 document.
12       You see where that says -- this says, at
13 the top: "Attorney General of the State of New York
14 Medicaid Fraud Control Unit and Health Care Bureau in
15 the matter of Cardinal Health incorporated."
16       And this was during a time that you were
17 working for the company in 2005, correct?
18    A. Yes.
19    Q. Says: "Assurance of discontinuance
20 pursuant to executive law 6315." See that?
21    A. Yes.
22    Q. Now, let me see what it is you assured --
23 well, not you, but your company assured the Attorney
24 General of New York that you were going to do.
25       Number -- you see page -- point 5? It's

Page 309

1 the next page. It says: "Cardinal is one of the
2 three primary distributors of pharmaceuticals in the
3 United States. Up until it ended the practice in
4 2005, Cardinal, like other national full-line
5 distributors, bought and sold drugs in the secondary
6 market, buying from and selling to wholesale known as
7 alternative vendors."
8       So there was -- you know, did you know
9 whether McKesson was doing that?
10     MR. PYSER: Object to form.
11     THE WITNESS: I only knew what -- what
12    Cardinal Health was doing.
13 BY MR. PAPANTONIO:
14    Q. Okay. It says the -- it says: "As one
15 Cardinal employee wrote in a 2001 e-mail to
16 colleagues worried about the risk of ASV market, 'The
17 firm must understand the need to not kill the goose,
18 ASV, who is laying the golden eggs.' Through its
19 conduct, Cardinal has violated executive law 63(12)."
20       Are you familiar with that? 63(12)?
21     MR. PYSER: Object to form.
22     THE WITNESS: I cannot cite 63(12) at this
23    moment.
24 BY MR. PAPANTONIO:
25    Q. And do you know the employee who wrote in

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  2001 e-mail that they were worried about the risks of
2  the alternative-source market possibly killing the
3  golden -- killing the goose who is laying the golden
4  eggs? Did you know the employee who said that?
5       MR. PYSER: Object to form.
6       THE WITNESS: No.
7  BY MR. PAPANTONIO:
8       Q. I'm sorry. Did you -- did you answer
9  that?
10      A. No, I do not know who said that.
11      Q. Okay.
12      Go down to paragraph 5. It says: "Unique
13  opportunities. In 2003, internal Cardinal e-mail is
14  a compliance officer, one executive addressed the
15  issue of smaller vendors which provided unique
16  opportunities to Cardinal. Although the
17  acknowledging that the vendors are high risk, the
18  writer wrote that since we need the margin from these
19  high risk vendors, we will continue to buy from
20  them."
21      What is -- when you talk about a high-risk
22  vendor, tell me what that means to you, as somebody
23  in quality control?
24      A. A high-risk vendor -- again, this is going
25  back to price diversion and the secondary market. So

Page 311

1  depending on who you ask, a -- an alternate-source
2  vendor, according to this document, they're stating
3  that they -- some of them could have been high risk.
4       MR. PYSER: Object to form of the last
5  question.
6  BY MR. PAPANTONIO:
7       Q. And so you're -- you're dealing with a
8  high-risk vendor that is actually dealing with
9  narcotics, correct? I mean -- if we accept what that
10  says, you're dealing with narcotics. That's the
11  first thing you can agree with, right?
12      MR. PYSER: Object to form.
13      THE WITNESS: I actually don't remember if
14  Schedule II controlled substances were traded at
15  Trading Company.
16  BY MR. PAPANTONIO:
17      Q. Let's read on, then. Okay?
18      A. Okay.
19      Q. It says our -- "One employee in 2002 wrote
20  an e-mail discussing a newspaper article" --
21      A. Are you on another page? I'm sorry.
22      Q. Yes, sir. I'm on point 6 there.
23      A. Okay.
24      Q. Well, actually, you know what? Get
25  through this a little quicker. Go to page 7.

Page 312

1       See where it says H -- 11, excuse me.
2  That's 11 down there. See that 11? It says
3  "Cardinal" --
4       A. Page 7?
5       Q. Yes. Page 7. Point 7.
6       A. Oh, point 7. I'm looking at the page
7  number on the bottom.
8       Q. Point 7.
9       "Cardinal repeatedly sold pharmaceuticals
10  to customers that it knew or should have known were
11  diverting pharmaceuticals."
12      Were you one of the people at Cardinal
13  that knew that?
14      MR. PYSER: Object to form.
15      THE WITNESS: I was an employee at
16  Cardinal Health prior to March 2005.
17  BY MR. PAPANTONIO:
18      Q. Okay. But did you know -- did you ever
19  learn that Cardinal had repeatedly sold
20  pharmaceuticals to customers that it knew or should
21  have known were diverting pharmaceuticals? Did you
22  know that?
23      MR. PYSER: Object to form.
24      THE WITNESS: No, I --
25

Page 313

1  BY MR. PAPANTONIO:
2       Q. First time you saw that?
3       A. It is not the first time I have seen
4  the --
5       Q. Okay.
6       A. -- actual -- whatever this form is called.
7       Q. It says: "Prior to 2005, Cardinal made
8  numerous sales of pharmaceuticals to Nevada -- to a
9  Nevada company which purported to be a closed-door
10  pharmacy that served only nursing homes."
11      Then it says: "In a routine pattern, the
12  Nevada company placed two orders at the same time.
13  One was for products likely to be needed by its
14  stated patient population or nursing home residents,
15  typically in quantities of 1s or 2s, as would be
16  expected for its needs. The other was for much
17  higher quantities, included products unlikely to be
18  needed by nursing home residents. Despite this
19  pattern, Cardinal continued to fill the company's
20  dual orders as described."
21      Did you ever -- were you aware of this
22  pattern that was taking place in nursing homes in
23  Nevada?
24      MR. PYSER: Object to form.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 314

BY MR. PAPANTONIO:
1
2    Q.  This pattern of distribution?
3    A.  No.
4    Q.  The dual -- you understand what this is
5  saying there:  A dual pattern to distribution?  You
6  never did that, I take it, Mr. Brantley?  I have no
7  information that you did; I want to make sure you
8  didn't.
9    A.  No.
10    MR. PYSER:  Object to form.
11    Give me a moment to get the objection in.
12  BY MR. PAPANTONIO:
13    Q.  It says:  "Similarly, starting
14  January 2003, Cardinal was alerted to its customers
15  of the Carrington network of closed-door pharmacies
16  were diverting drugs."
17    Again, then it goes down -- I -- are you
18  familiar with the Carrington story, where they were
19  diverting drugs?  Was that something that came across
20  your desk?
21    MR. PYSER:  Object to form.
22    THE WITNESS:  I don't remember it.  But
23    it's not my first time hearing --
24  BY MR. PAPANTONIO:
25    Q.  Uh-huh?

Page 315

1    A.  It's not my first time hearing of
2  Carrington, but I don't remember.
3    Q.  Well, tell me what you know about
4  Carrington.
5    A.  I don't remember the details at all.  I
6  just -- the name sounds familiar.
7    Q.  Okay.
8    So after this, your company made a promise
9  that you were going to put together an anti-diversion
10  system for your company, didn't you?
11    I understand this is 2005.  Right?
12    A.  Does it state that in here?
13    Q.  I'm just asking you:  Do you know whether
14  they did or didn't?
15    MR. PYSER:  Object to form.
16    THE WITNESS:  Again, you're going back to
17    a time frame and you're asking me, did we put a
18    system in place.  I don't understand your
19    question.
20  BY MR. PAPANTONIO:
21    Q.  Well, did you put a system in place
22  after -- after the Attorney General told you were
23  doing things wrong?  Did you correct the problem?  Or
24  do you know?
25    MR. PYSER:  Object to form.

Page 316

1    THE WITNESS:  There was a system in place?
2    MR. PYSER:  Object to form.
3  BY MR. PAPANTONIO:
4    Q.  Well, there was a system in place at the
5  time this was occurring, where you were actually --
6  where you were actually buying secondary market?
7  You're saying you had a system in place --
8    MR. PYSER:  Object --
9  BY MR. PAPANTONIO:
10    Q.  -- to protect from diversion?  Is that
11  your testimony?
12    MR. PYSER:  Object to form.
13    THE WITNESS:  I was answering your
14    question, after the settlement, was there a -- a
15    system in place, and I say that there was a
16    system in place.
17    MR. PAPANTONIO:  Okay.  Show him 4961,
18    please.
19  BY MR. PAPANTONIO:
20    Q.  Now, that was New York we were talking
21  about, right?  That was New York Attorney General we
22  just got finished talking about, right?
23    A.  This is from the New York Attorney
24  General, yes.
25    Q.  Okay.  Now, this is 4961.

Page 317

1    MS. MOORE:  Brantley 21.
2    (Cardinal-Brantley 21 was marked for
3  identification.)
4  BY MR. PAPANTONIO:
5    Q.  Now, this is -- this is about Purdue, who
6  you're working with now.
7    And I wanted to ask you what you --
8  remember, I was asking you what you knew about Purdue
9  prior to the time you took the job?
10    A.  Yes.
11    Q.  And it says:  "John L. Brown, the United
12  States Attorney for the Western District of Virginia
13  and Virginia Attorney General announced today that
14  the Purdue Frederick Company, along with its
15  president, chief legal officer, and former chief
16  medical officer, have pleaded guilty to charges of
17  misbranding Purdue's addictive and highly abusable
18  drug, OxyContin."
19    Is that the first time that you've seen
20  those words, where they actually had to plead guilty
21  to misbranding highly addictive and abusable drug
22  OxyContin?
23    MR. LAFATA:  Object to form.
24  BY MR. PAPANTONIO:
25    Q.  Have you ever seen that before?

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1      MR. LAFATA: Same objection.
2      THE WITNESS: Again, like I stated
3   earlier, I did not review detailed documents of
4   this proceeding, settlement, whatever it was.
5   BY MR. PAPANTONIO:
6      Q. Well, would that have impacted your
7   decision to go to work for them, if you knew that
8   they had pleaded guilty to a criminal charge of
9   misbranding addictive abusable drug OxyContin, would
10  that have affected Eric Brantley's decision to go to
11  work for these people?
12     MR. LAFATA: Object to form.
13     THE WITNESS: Well, again, I'd have to
14  know in the full context. But to my knowledge,
15  oxycodone and OxyContin comes in a bottle with a
16  "C II" on it, which means it's a Schedule II
17  controlled substance. And that's issued by the
18  DEA. So --
19  BY MR. PAPANTONIO:
20     Q. Well, let me -- let's see what this says.
21     A. So it's known that it's a Schedule II
22  drug, and it contains oxycodone.
23     And the fact that it's Schedule II means
24  that it is prone to --
25     Q. So you don't know what they did, do you?

Page 319

1   You don't know what this company that you decided to
2   go to work for -- when did you go to work for them?
3      A. February 2017.
4      MR. LAFATA: Object to form.
5   BY MR. PAPANTONIO:
6      Q. Well, you see, what I'm trying to figure
7   out, Mr. Brantley, is we've been sitting here
8   questioning you about -- about your company Cardinal,
9   which you worked for, right?
10     In a second, I'm going to ask you about
11  Kinray, who you worked for.
12     And I'm wondering how you make a decision,
13  because -- how you make a decision on what company
14  you're going to go for and not go to work for.
15     MR. LAFATA: Object.
16  BY MR. PAPANTONIO:
17     Q. So -- so here's what I'm asking -- let me
18  ask you this question: Did you know that Purdue and
19  the three executives will pay a total of
20  $634 million? Did you know that, after they pleaded
21  guilty to a criminal offense? Did you know that?
22     MR. LAFATA: Object to form.
23     THE WITNESS: Again, prior to going to
24  work for Purdue, I did not know all of the
25  details. I have read a couple sentences from an

Page 320

1   article online from -- from Google or something.
2   BY MR. PAPANTONIO:
3      Q. Would you have --
4      A. Excuse me.
5      But I did not know the details of --
6      Q. Would you have gone to work for them if
7   you found out that the Purdue Frederick Company and
8   three executives admitted that Purdue fraudulently
9   marketed OxyContin by falsely claiming that OxyContin
10  was less addictive, less subject to abuse, and less
11  likely to cause withdrawal symptoms than other
12  medications? If somebody had told you that the day
13  you said, "I'm going to work for this company," would
14  you have gone to work for them anyway?
15     MR. LAFATA: Object to form.
16     THE WITNESS: Again, with my knowledge of
17  controlled substances, knowing that it is a
18  Schedule II controlled substance, and the API is
19  oxycodone, and the fact that it is a Schedule II
20  controlled substance, that means that it is
21  prone to abuse or addiction.
22  BY MR. PAPANTONIO:
23     Q. And you --
24     A. So knowing that, it's a Schedule II
25  controlled substance.

Page 321

1      Q. Well, how the about the fraud part? You
2   understand, these people admitted fraud in the way
3   they marketed? You didn't know that before I just
4   showed it to you, did you?
5      MR. LAFATA: Object to form.
6      THE WITNESS: I -- I understand that the
7   bottle has a "C II" on it, which means it is a
8   Schedule II controlled substance, which means it
9   is --
10     Q. Sir, you know --
11     A. So if the bottle had not had a Schedule II
12  on it, I may be able to answer that question. But
13  the fact that the bottle has a "C II" on it means
14  that it is a Schedule II controlled substance.
15     Q. Let me ask again.
16     Three executives for the company admitted
17  and pled guilty to a felony fraud in the way they
18  represented their -- their product, and that's okay
19  with you.
20     Is that -- is that what you're telling me?
21     MR. LAFATA: Object to form.
22  BY MR. PAPANTONIO:
23     Q. That's okay?
24     MR. LAFATA: Asked and answered, over and
25  over. Object to form.

Page 322

BY MR. PAPANTONIO:

Q.  Mr. Brantley?

A.  I was not an employee of Purdue at the time.  And I go back to saying that if the bottle -- if the three executives were referring to a controlled substance where the bottle had a "C II" on it, meaning that it is a Schedule II controlled substance, knowledge of a controlled substance that the industry has --

Q.  Okay.  And I guess go to page --

A.  -- I have that knowledge, and that's my answer to that question.

Q.  Okay.  Go to point 2.  Go to the next page.

You see about halfway down, it says: "The Purdue Frederick Company pleaded guilty to felony misbranding of OxyContin with the intent to defraud and mislead."

And you're saying you would have gone to work with a company even though you knew that; is that what you're saying?

MR. LAFATA:  Objection.  Asked and answered, about six times now.

MR. PAPANTONIO:  No, this is a new one.  This -- this is --

Page 323

MR. LAFATA:  Objection.  Asked and answered.

BY MR. PAPANTONIO:

Q.  Let me ask you --

A.  Again, the bottle of OxyContin has a "C" with a Roman numeral II on it, which means it is a Schedule II controlled substance issued by the DEA, which means, as a Schedule II drug containing oxycodone --

Q.  Highly addictive?

A.  -- it is prone to abuse.

Q.  It's highly addictive, right?  Highly addictive?

A.  The fact that a controlled substance has a "Schedule II" on it means that the DEA is saying -- has claimed that it is prone to addiction.

Q.  And you didn't -- and you knew, then, I take it, that -- what you're telling me, you knew then that the executives to Purdue, they actually pleaded guilty to a felony, misbranding OxyContin, where they misbranded OxyContin with an intent to defraud and mislead; you're saying you knew that when you decided, "I'm going to go to work with this stellar company, Purdue"?

MR. LAFATA:  Object to form.

Page 324

BY MR. PAPANTONIO:

Q.  Is that what you're telling us?

MR. LAFATA:  Same objection.

THE WITNESS:  I'm stating, again, I don't know what the misbranding was or so forth, but the brand, the label had a "C" with a Roman numeral Schedule II, which meant it was a Schedule II controlled substance, and the active ingredient is oxycodone.

So the fact that it is a Schedule II controlled substance means it is prone --

Q.  If they lied about --

MR. LAFATA:  Mr. Brantley, you can finish your answer.

BY MR. PAPANTONIO:

Q.  Go ahead.

A.  Prone to abuse and addiction.  So --

Q.  Right.

A.  You can't get around the "C" with a Roman numeral II on it.  That means --

Q.  Right.

A.  -- this is a Schedule II drug --

Q.  Right.

A.  -- that's prone to abuse and addiction.

Q.  And if they lied about it, that's

Page 325

something you're proud of?  If they lied about the addictive nature, is that something you're proud of?

MR. LAFATA:  Objection.  Badgering.

THE WITNESS:  Are you saying that they lied that it was a Schedule II controlled substance?

BY MR. PAPANTONIO:

Q.  Yeah.  Yeah.

MR. PYSER:  Object to form.

BY MR. PAPANTONIO:

Q.  Do you -- are you proud of the fact that you went from Cardinal, and you went to Kinray, and now you're with Purdue, with a company where the executives had to plead guilty to committing fraud and misleading the public about the addictive nature of their drug?  Does that make you proud to be with that company?

MR. LAFATA:  Object to form.

THE WITNESS:  To answer your first question, because you asked about two or three in that sentence --

BY MR. PAPANTONIO:

Q.  No.

MR. LAFATA:  The witness --

MR. PAPANTONIO:  No, no.  No, no, no, no,

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    no.
2        MR. LAFATA:  Mr. Brantley, you can finish
3    your answer.
4        MR. PAPANTONIO:  No, no, no.  Read the
5    question --
6        MR. LAFATA:  You will not interrupt his --
7        MR. PAPANTONIO:  I will interrupt his
8    answer --
9        MR. LAFATA:  Mr. Brantley, you may finish
10   your answer to that question by counsel.
11       THE WITNESS:  The -- the first --
12       MR. PAPANTONIO:  Whoa, whoa, whoa, whoa,
13   whoa.
14       MR. LAFATA:  Mr. Brantley, there's a
15   question on the table.
16       MR. PAPANTONIO:  There is not a question
17   on the table.
18       MR. LAFATA:  You can finish your answer.
19       MR. PAPANTONIO:  There's not a question on
20   -- read --
21       MR. LAFATA:  You can finish the answer --
22       MR. PAPANTONIO:  Read the question back,
23   Madam Court -- the question I asked him, I want
24   read back in the record, before --
25       MR. LAFATA:  No.  You've interrupted the

Page 327

1    witness.
2        Mr. Brantley, you may answer the
3    question --
4        MR. PAPANTONIO:  Read the question --
5        MR. LAFATA:  -- you're in the middle of
6    answering --
7        MR. PAPANTONIO:  No.  You're -- it's not
8    going to happen.  Hush.  It's not going to
9    happen.  Okay?
10       So read the question back.
11       MR. LAFATA:  Mr. Brantley, you may
12   continue with the answer you were giving
13   before --
14       MR. PAPANTONIO:  You may not, until the
15   question is read to you.
16       Madam Court Reporter, read the question
17   back to him that I asked.
18       MR. PYSER:  Mr. Brantley, you can finish
19   your answer.  And if they want the question read
20   back after that, they can go ahead all they
21   want.  But he can't interrupt your answer.
22       MR. PAPANTONIO:  Do you remember the
23   question?
24       MR. LAFATA:  Mr. Brantley, you can answer
25   the question you were in the middle of answering

Page 328

1    before counsel interrupted you.  That's the
2    proper --
3        THE WITNESS:  The -- first part of the
4    question was --
5    BY MR. PAPANTONIO:
6    Q.  Yeah.
7    A.  -- about executives lying.
8    Q.  Right.  They lied.
9    A.  And I said, are you stating that they lied
10   about the fact that it was a Schedule II controlled
11   substance?
12   Q.  The answer is yes.
13   A.  And you said yes.
14   Q.  Yes.
15   A.  So I don't know how you can lie about the
16   fact that something is a Schedule II controlled
17   substance when it's printed on every bottle.
18   Q.  What would they tell you --
19   A.  That's my -- that's my answer to the first
20   part of your question.
21       So if you can please repeat the second and
22   third part of that question.
23   Q.  Okay.  Second part is:  What were they
24   telling the American public about the addictive
25   nature of their drugs?

Page 329

1        Do you know the answer to that, since
2    you're going to give me all these answers?
3    A.  I can't speak to --
4    Q.  The company that you're working for right
5    now, who pled guilty a felony for fraud and
6    misleading -- misleading statements about their
7    product, can you please tell us what your company,
8    that you're so proud of, was telling the American
9    public?
10       MR. LAFATA:  Object to form.
11   BY MR. PAPANTONIO:
12   Q.  What -- what is it?  What were they
13   telling the American public?
14       MR. LAFATA:  Same objection.
15   BY MR. PAPANTONIO:
16   Q.  This is your chance.
17       MR. LAFATA:  Same objection.
18       THE WITNESS:  I have no idea what was
19   being said to the public.
20   BY MR. PAPANTONIO:
21   Q.  You have no idea.  That's what I was
22   trying to get at.  So the attorney down here is
23   objecting to what you -- he wants you to answer your
24   question.
25       But truthfully -- I'll ask it this way:

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  You have no idea what Purdue was doing to lie to the
2  American public, to commit fraud to the American
3  public, and to get fined for a $600,000 felony
4  criminal event.
5       You don't know the answer to that, do you?
6       MR. LAFATA: Object to the colloquy.
7  Object to the form.
8       THE WITNESS: I do not know the details of
9  the proceedings, what was said and what was not
10 said.
11 BY MR. PAPANTONIO:
12 Q.  Okay.
13 A.  Again, the only thing I know is that
14 OxyContin is oxycodone, and it comes in a bottle with
15 a "C II" on it, which means it's a Schedule II
16 controlled substance issued by the DEA, which means
17 it is prone to addiction.
18 Q.  We'll have the opportunity to talk about
19 this again at another deposition, okay?  Because I'm
20 going to move on.
21      MR. LAFATA: Object to the colloquy.
22 BY MR. PAPANTONIO:
23 Q.  It says -- you read the -- you read the
24 next-to-the-last paragraph here: "The falsification
25 of drug product information is very serious breach of

Page 331

1  the public trust."
2       You agree with that?
3  A.  Again, I don't know the details of what
4  was said and what was not said.
5  Q.  Well, I'm just asking, do you agree with
6  it?
7       MR. LAFATA: Objection.  Asked and
8  answered.
9  BY MR. PAPANTONIO:
10 Q.  That -- do you agree with the statement
11 that the falsification of drug product information is
12 very serious breach of the public trust?
13 A.  I would need to know the definition of
14 "drug product information."  That's a very broad
15 term.  It could be a lot of information -- like part
16 of the information is, is it a Schedule II drug?  And
17 if it is, what does that mean?
18 Q.  Well, we know this much, don't we: They
19 were prosecuted for it.  You know that, don't you?
20      MR. LAFATA: Object to form.
21 BY MR. PAPANTONIO:
22 Q.  You know that, don't you?  They were --
23 A.  I know according to this document, you've
24 mentioned a number, 600-or-so million dollars that
25 was paid.  So --

Page 332

1  Q.  Sir, I didn't say that.  I said that three
2  executives pled guilty to felonies.
3       You knew that when you signed up with
4  Purdue, didn't you?
5  A.  Earlier, you threw out a number.  You said
6  it was 600-and-some million.  You just said that you
7  did not say that, but you said it earlier.
8       So what was the second part to your
9  question, after you made that statement?
10 Q.  The second part is: You knew when you
11 signed up with this company that you were taking a
12 paycheck from a company that had pled guilty to fraud
13 and misleading the public about the dangers of
14 addiction with their product?  You knew that when you
15 signed on to this company?  You knew that?
16      MR. LAFATA: Objection to form.
17      THE WITNESS: When I signed on at Purdue,
18 I was aware of a proceeding where there was a
19 settlement or fine, or whatever it was, of
20 600-some million, or something like that.  Yes.
21 I was aware of --
22 BY MR. PAPANTONIO:
23 Q.  And that didn't bother you, signing up
24 with that?  Didn't bother you, did it?
25      MR. LAFATA: Object to form.  Asked and

Page 333

1  answered.
2       THE WITNESS: Again, having knowledge of
3  what OxyContin is, it's oxycodone that comes in
4  a bottle with a "C" with a Roman numeral II, so
5  it's a Schedule II controlled substance.
6  BY MR. PAPANTONIO:
7  Q.  Well, Mr. Brantley, you understand why I'm
8  asking this question, don't you?  Because you've been
9  sitting here --
10 A.  I --
11 Q.  -- all day -- wait a second.
12      You've been sitting here all day
13 testifying about the conduct of Cardinal.
14      Can we agree to that, that you've been in
15 that chair all day testifying about the conduct of
16 Cardinal.  True?
17      MR. LAFATA: Object to form.  Compound.
18      MR. PYSER: Object to form.
19      THE WITNESS: I would ask that you ask one
20 question at a time, because you're asking two or
21 three questions --
22 BY MR. PAPANTONIO:
23 Q.  No, no --
24 A.  -- and then when I try to answer you --
25 Q.  That's one question.

Page 334

1 A. -- you --
2 Q. It's one question.
3 A. -- you don't let me.
4 Q. You've been siting here all day long
5 testifying about the conduct of Cardinal. Yes or no?
6 MR. PYSER: Object to form.
7 THE WITNESS: I've been sitting here
8 answering questions about documents that you've
9 shown me and graphs and e-mails, and I've been
10 answering those questions.
11 BY MR. PAPANTONIO:
12 Q. And then I asked you about the new company
13 you're with, Purdue, who is a felon, pled felony
14 charges, and you said that you were willing to work
15 with them. True?
16 MR. LAFATA: Object to form.
17 BY MR. PAPANTONIO:
18 Q. That's what you said; you were willing to
19 work with Purdue.
20 A. Again, you showed me a document, and I
21 said that the knowledge I had was about the
22 settlement or the fine or whatever it was, and that I
23 took a job at Purdue Pharma.
24 Q. Okay. And then you did the -- and you
25 knew another company that you worked for -- just so

Page 335

1 we can get Eric Brantley's view of the world --
2 another company that you worked for was called
3 Kinray, correct?
4 MR. PYSER: Object to form. Harassing the
5 witness.
6 BY MR. PAPANTONIO:
7 Q. Is that correct? You worked for Kinray,
8 true?
9 A. Yes.
10 MR. PYSER: Object.
11 BY MR. PAPANTONIO:
12 Q. Tell the jury what years you worked for
13 Kinray before you went to work with Purdue. Tell us
14 what years those were.
15 A. I am trying to remember the exact years.
16 I know I left Kinray -- I left Kinray -- I want to
17 say October 2013.
18 Q. Right?
19 A. And I was there for I believe two years.
20 So I would have started in 2011, from '11 to 2013, is
21 what I am remembering.
22 Q. And you know that Kinray was -- was fined
23 $10 million for their conduct in the way they
24 distributed narcotics? You know that as you sit here
25 today, don't you?

Page 336

1 MR. PYSER: Object to form.
2 THE WITNESS: I read that somewhere, yes.
3 BY MR. PAPANTONIO:
4 Q. You said you read it somewhere?
5 A. Yes.
6 Q. Where do you think you read it?
7 MR. PYSER: Object to form.
8 THE WITNESS: I don't know. Probably
9 Google.
10 BY MR. PAPANTONIO:
11 Q. And you know --
12 A. I don't recall if I was an employee at
13 that time of the settlement or proceeding, whatever
14 it was.
15 Q. All right. So I want to ask you --
16 MR. PAPANTONIO: Could I get the -- could
17 I get the Elmo, please?
18 BY MR. PAPANTONIO:
19 Q. I want to talk to you a little bit about
20 Pleasantville.
21 You know where Pleasantville is, sir?
22 MR. PYSER: Counsel, if you're marking --
23 MR. PAPANTONIO: I'm going to mark it and
24 offer it. I'll do it at the right time. Okay?
25

Page 337

1 BY MR. PAPANTONIO:
2 Q. Do you know where Pleasantville is?
3 A. I do not.
4 Q. Okay. Do you know where -- have you --
5 have you worked West Virginia?
6 A. Have I worked in West Virginia?
7 Q. Uh-huh.
8 A. I have never worked in West Virginia.
9 Q. Have you reviewed -- have you reviewed
10 sales and distribution in the state of West Virginia?
11 A. During the 2005 to late 2007 or early 2008
12 time frame, I was responsible for viewing ingredient
13 limited reports, which would have included --
14 Q. Now, the --
15 A. -- the Wheeling, West Virginia, facility.
16 Q. Right. Okay. So if -- let's just make up
17 some facts, and I want to ask you what you know.
18 You -- well, first of all, you know that
19 there was a city in West Virginia where there was a
20 population -- I'm going to call it "Pleasantville."
21 You know what the real name is, don't you?
22 A. I do not.
23 MR. PYSER: Object to form.
24 BY MR. PAPANTONIO:
25 Q. That doesn't surprise me.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1        MR. PYSER:  Object to form.  Move to
2    strike counsel's --
3    BY MR. PAPANTONIO:
4        Q.  You know there was a city in -- you know
5    there was a city in West Virginia where there were
6    400 people, and there were 6 million pills sold to
7    those 400 people, and your company was involved in
8    selling 6 million pills to 400 people.
9        Did you -- have you ever heard that
10   before?
11       MR. PYSER:  Object to form.
12       MR. PAPANTONIO:  Name of the town?
13   I'm asking you, Michael.  Kermit?
14       THE WITNESS:  I have not heard of Kermit.
15   BY MR. PAPANTONIO:
16       Q.  Do you know what Kermit is?  Have you ever
17   heard of Kermit?
18       MR. PYSER:  Object to form.
19   BY MR. PAPANTONIO:
20       Q.  Huh?
21       A.  I have not heard of Kermit.
22       Q.  Have you ever heard of Mount Gay?
23       A.  I have not heard of Mount Gay.
24       Q.  But you're the person who cleared orders
25   for West Virginia; you're one of the people that did

Page 339

1    that, right?
2        A.  I reviewed --
3        MR. PYSER:  Object to form.
4        THE WITNESS:  I reviewed ingredient limit
5    reports that included --
6    BY MR. PAPANTONIO:
7        Q.  And nobody --
8        A.  -- the Wheeling, West Virginia, facility.
9        Q.  Okay.  Nobody told you that there was a
10   town called Kermit -- let's call it -- let's call it
11   Kermit, not Pleasantville.
12       There's a town called Kermit, with
13   400 people, and 6 million pills were pumped into the
14   city of Kermit.
15       You didn't know that, prior to me telling
16   you that right now?
17       MR. PYSER:  Object to form.
18   BY MR. PAPANTONIO:
19       Q.  Yes or no?
20       A.  I did not know that.
21       Q.  Okay.  Now, tell me, how would -- you've
22   been doing this a long time.  Tell me how 400 people
23   would absorb 6 million pills over a period of two
24   years?
25       MR. PYSER:  Object to form.  Misstates

Page 340

1    evidence.
2    BY MR. PAPANTONIO:
3        Q.  Tell me how that happened?
4        A.  I cannot state how 400 people -- are you
5    suggesting that 6 million pills were shipped to
6    400 people?
7        Q.  Yeah.
8        MR. PYSER:  Object to form.
9    BY MR. PAPANTONIO:
10       Q.  Is that the first you've heard that, that
11   6 million pills were shipped to 400 people?  That
12   surprises you, doesn't it?
13       MR. PYSER:  Object to form.  Misstates
14   evidence.
15   BY MR. PAPANTONIO:
16       Q.  Doesn't it?
17       A.  I have not heard it.
18       Q.  The first time you've heard it is me
19   telling you about it, right?
20       MR. PYSER:  Object to form.
21       THE WITNESS:  That is correct.
22   BY MR. PAPANTONIO:
23       Q.  And in these days that you prepared to
24   come here to testify, nobody even shared that with
25   you, had they?

Page 341

1        MR. PYSER:  Object.
2    BY MR. PAPANTONIO:
3        Q.  That 400 people, a city of 400 people,
4    that there were 6 million pills pumped into that
5    city.  Right?
6        MR. PYSER:  Object to form.
7        And I counsel the witness not to answer
8    any questions about his conversations with
9    counsel.
10   BY MR. PAPANTONIO:
11       Q.  You didn't know --
12       MR. PYSER:  That's privileged, and counsel
13   knows that it's privileged.
14   BY MR. PAPANTONIO:
15       Q.  Oh, did counsel tell you that?
16       MR. PYSER:  Counsel --
17   BY MR. PAPANTONIO:
18       Q.  Nobody -- nobody told you that, did they,
19   prior to coming here?
20       MR. PYSER:  Object to form.
21   BY MR. PAPANTONIO:
22       Q.  Let me ask the question again:
23       Did anybody from the company tell you that
24   there was a city, there were 400 people that had
25   6 million pills pumped into it over a period of two

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 years?
2       MR. PYSER: Object to form.
3 BY MR. PAPANTONIO:
4    Q. Anybody tell you that?
5       MR. PYSER: Object to form.
6       THE WITNESS: No one from the company told
7    me that.
8 BY MR. PAPANTONIO:
9    Q. Well, does that sound like too many pills
10 to you?
11       MR. PYSER: Object to form.
12 BY MR. PAPANTONIO:
13    Q. In all your experience working for Purdue
14 and then working for Kinray and working for Cardinal,
15 does that sound like too many pills being pumped into
16 an area of 400 people?
17       MR. PYSER: Object to form.
18 BY MR. PAPANTONIO:
19    Q. Two years?
20       MR. PYSER: Object to form.
21       THE WITNESS: So, not knowing the context,
22    earlier you stated that 6 million pills were
23    shipped to 400 people.
24 BY MR. PAPANTONIO:
25    Q. Right?

Page 343

1    A. And I asked, were they shipped to
2 400 people? Then you later stated they were shipped
3 to a town with residents of --
4    Q. Kermit.
5    A. -- of 400 people.
6    Q. Right.
7    A. So in the whole context, was it only the
8 400 people that consumed the 6 million pills, or were
9 there people coming in from other towns or states? I
10 don't know the context, so I can't answer the
11 question.
12    Q. Nobody showed it to you, did they?
13       How about -- let me ask you this.
14       MR. PYSER: Object to the form.
15 BY MR. PAPANTONIO:
16    Q. How about if we just have 3 million pills,
17 3 million pills shipped to Kermit over a period of
18 two years, with 400 people.
19       That's too many pills, isn't it?
20       MR. PYSER: Object to form.
21       THE WITNESS: My answer does not change.
22 BY MR. PAPANTONIO:
23    Q. All right. I believe that.
24       Now, you understand -- you traveled to
25 these areas, and they had salespeople that actually

Page 344

1 lived in these various areas, right? Salespeople?
2 True?
3       MR. PYSER: Object to form.
4 BY MR. PAPANTONIO:
5    Q. Yes?
6    A. I'm not familiar where the salespeople
7 lived.
8    Q. Well, did the salespeople --
9    A. But they were salespeople.
10    Q. They were salespeople, and they lived in
11 cities all over the country, correct?
12       MR. PYSER: Object to form. Whose
13 salespeople?
14 BY MR. PAPANTONIO:
15    Q. Yes or no? Cardinal had salespeople --
16 you know what I'm talking about. Cardinal had
17 salespeople that lived in these cities all over the
18 country.
19       Did you know that, prior to coming here
20 today?
21       MR. PYSER: Object to form.
22       THE WITNESS: Cardinal has salespeople
23    that lived in the various cities.
24 BY MR. PAPANTONIO:
25    Q. Yeah. And you've actually seen pictures,

Page 345

1 haven't you, of pill mills where people are actually
2 lined up around the pill mill to be able to get their
3 pill.
4       Have you ever seen pictures like that --
5       MR. PYSER: Object to form.
6 BY MR. PAPANTONIO:
7    Q. -- throughout the country?
8       MR. PYSER: Object to form.
9       THE WITNESS: Yes.
10 BY MR. PAPANTONIO:
11    Q. Yeah. And as a matter of fact, the
12 salesperson that lives in a city where there's a pill
13 mill has the ability to see the pill mill, right? I
14 mean, they drive by the pill mills; that's the way
15 it's set up. Right?
16       MR. PYSER: Object to form. Calls for
17    speculation.
18       THE WITNESS: I can't answer to where they
19    drive to.
20 BY MR. PAPANTONIO:
21    Q. Okay. So your testimony is you don't know
22 whether a salesperson living in a city where there's
23 pill mills with people lined up around them, you
24 don't know whether they would see that or not?
25 That's your testimony, correct?

Page 346

1    MR. PYSER: Object to form.
2    THE WITNESS: My testimony -- my testimony
3 is that I cannot answer to where a particular
4 salesperson would drive.
5 BY MR. PAPANTONIO:
6    Q. Well, do you know cities all over the
7 country where salespeople live, they would have
8 newspaper reports -- you ever seen newspaper reports
9 about overdoses in cities all over the country? You
10 ever see even one? Did anybody send you even one
11 article talking about people dying from overdoses
12 because of the product that your company was selling?
13    MR. PYSER: Object to form.
14 BY MR. PAPANTONIO:
15    Q. Did they ever do that?
16    A. No one has sent me an article.
17    Q. Have you seen any articles about your
18 company selling products that were killing people by
19 overdoses?
20    MR. PYSER: Object to form.
21 BY MR. PAPANTONIO:
22    Q. Yes or no?
23    MR. PYSER: Vague.
24    THE WITNESS: Which company are we
25 referring to?

Page 347

1 BY MR. PAPANTONIO:
2    Q. Cardinal.
3    A. Have I seen articles?
4    Q. Yeah.
5    A. Can you ask the question again, so I know
6 the --
7    Q. Yeah. Have you seen articles that state
8 that people were dying of overdoses relating to the
9 sale of opioids? Let's -- let's start there.
10    A. I've seen articles about people dying from
11 the abuse of opioids.
12    Q. And when did you start seeing those first
13 articles?
14    A. I don't recall when I first started seeing
15 the articles. They were over the last several years.
16    Q. Saw them in newspaper reports, I take it?
17 True?
18    A. I don't know if it was a newspaper report
19 or CNN or the TV or the Internet.
20    Q. But you -- you saw plenty -- would it be
21 fair to say you saw plenty of articles where people
22 were dying from drug overdoses related to opioids?
23    MR. PYSER: Object to form.
24 BY MR. PAPANTONIO:
25    Q. True?

Page 348

1    A. I don't know what the definition is -- what
2 the definition is of "plenty," but I have seen
3 articles over the last --
4    Q. Okay. If you had a city like -- let's
5 say --
6    A. -- couple years.
7    MR. PYSER: Sir, were you done with your
8 answer?
9    THE WITNESS: Yeah. I was just saying
10 that I have seen articles over the last couple
11 of years.
12 BY MR. PAPANTONIO:
13    Q. If you have a city like Kermit, sir,
14 and it's -- let's say 3 million pills are coming into
15 Kermit.
16    If 400 people can't absorb those pills,
17 where do the pills go?
18    MR. PYSER: Object to form.
19 BY MR. PAPANTONIO:
20    Q. Do you -- have you analyzed that at all?
21 When you were in quality control, did you ever
22 analyze -- if I'm shipping 3 million pills into a
23 city of 400 people, where did all the rest of the
24 pills go?
25    MR. PYSER: Object to form.

Page 349

1 BY MR. PAPANTONIO:
2    Q. You ever even thought about that prior to
3 coming in here today?
4    A. So which -- which question would you like
5 me to answer?
6    Q. Have you ever thought about what happens
7 when 3 million pills are shipped into a city of
8 400 people, what happens to the other pills if
9 they're not absorbed by those 400 people?
10    MR. PYSER: Object to form.
11    THE WITNESS: I cannot speak to exactly
12 where pills go. But again, not knowing the
13 context of -- I think you mentioned Kermit -- I
14 don't know if there are surrounding counties,
15 surrounding cities, if people came into -- I
16 don't know if it's rural area, if it's an urban
17 industrial area; have people traveled from a
18 neighboring county or city to come to it?
19    Again, I don't know the context of --
20 BY MR. PAPANTONIO:
21    Q. Right.
22    A. -- Kermit.
23    Q. So that tells me a lot. Tells me a lot,
24 because what you're saying is you're the guy that's
25 signing off on all of these drugs to be shipped all

Page 350

1 over the country, and you never even visited the
2 cities that you were shipping drugs to.
3     A.  I reviewed ingredient limit reports on a
4 monthly basis, and I submitted those reports, and
5 those reports were submitted to the DEA.  I conducted
6 investigations as necessary and reported those
7 pharmacies to the DEA.  I review ingredient limit
8 reports.
9     Q.  Did you go to Kermit?
10     MR. PYSER:  Object -- object to form on
11   the prior question.  I didn't want to --
12 BY MR. PAPANTONIO:
13     Q.  Did you go to Kermit?
14     MR. PYSER:  -- interrupt the question.
15   Object to form again.
16 BY MR. PAPANTONIO:
17     Q.  Did you visit Kermit?
18     MR. PYSER:  Object to form.
19     THE WITNESS:  I have not visited Kermit,
20   to my knowledge.
21 BY MR. PAPANTONIO:
22     Q.  Did you visit Mount Gay --
23     MR. PYSER:  Object to form.
24 BY MR. PAPANTONIO:
25     Q.  -- West Virginia?

Page 351

1     A.  I have not been to Mount Gay, West
2 Virginia, to my knowledge.
3     Q.  So you wouldn't know whether 3 million
4 pills were being shipped into a population of 400 or
5 not, would you?  You have no idea?  True?
6     MR. PYSER:  Object to form.
7     THE WITNESS:  I know nothing of Mount Gay
8   or Kermit.
9 BY MR. PAPANTONIO:
10     Q.  But nevertheless, you were the person that
11 was permitting -- you were signing off on orders in
12 places like West Virginia, weren't you?
13     MR. PYSER:  Object to form.  Misstates
14   evidence.
15 BY MR. PAPANTONIO:
16     Q.  Correct?
17     A.  I was reviewing ingredient limit reports
18 on a monthly basis.
19     Q.  Right.  Now, tell us, tell the jury what
20 the "Oxy Express" is.  Oxy Express.
21     A.  I don't know what the Oxy Express is.
22     Q.  You've never heard the term "Oxy Express"?
23 Is that -- is that your testimony today, really?
24     A.  I don't know what Oxy Express is.
25     Q.  Okay.  Did you know that there was --

Page 352

1 there was a connection between South Florida and all
2 the way up to Maine, where people would pick up
3 drugs, opioids, and sell them all along the way?  You
4 ever heard that before?
5     MR. PYSER:  Object to form.
6 BY MR. PAPANTONIO:
7     Q.  First time you've ever heard of an Oxy
8 Express?
9     MR. PYSER:  Object to form.
10     THE WITNESS:  Again, I have not heard the
11   term "Oxy Express."
12 BY MR. PAPANTONIO:
13     Q.  What term is a term that describes what I
14 just said?
15     A.  I've not heard the term "Oxy Express."
16     Q.  And you've --
17     A.  You just explained a -- a scenario.
18     Q.  And you've worked with Cardinal, and
19 you've worked with Kinray, and now you're there with
20 Purdue, and you've never heard of an Oxy Express; is
21 that your testimony?
22     MR. PYSER:  Object to form.
23 BY MR. PAPANTONIO:
24     Q.  Yes?
25     MR. PYSER:  Asked and answered.

Page 353

1     THE WITNESS:  I have worked for Cardinal,
2   Kinray, and as you said, now Purdue.  I'm not
3   familiar with the term "Oxy Express."
4 BY MR. PAPANTONIO:
5     Q.  Oh, Endo.  You worked for Endo, too,
6 didn't you?
7     A.  I did work for QualiTest Pharmaceuticals.
8     Q.  Okay, I missed Endo.
9     So you've worked for -- you worked for
10 Cardinal, you worked for Endo, you worked for Kinray,
11 you worked for Purdue, and not one time have you ever
12 heard the term "Oxy Express"; is that your testimony
13 here today?
14     MR. PYSER:  Object to form.
15     MS. VANNI:  Objection.
16     THE WITNESS:  Again, I have not heard the
17   term "Oxy Express."
18 BY MR. PAPANTONIO:
19     Q.  So, sir, if you got a town, you got a town
20 of 400 people, let's say just -- let's say just two
21 million pills are coming in there, a million a year.
22 Take it down to 2 million.
23     And if the 400 people, the children and
24 the mommas and the daddies, they can't absorb
25 those -- those 2 million pills, where do the other

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 pills go?
2 　　　MR. PYSER: Object to form.
3 　　　THE WITNESS: My answer does not change
4 from the other two or three times you asked the
5 question.
6 BY MR. PAPANTONIO:
7 　　Q. Have you ever heard of the term "glut"?
8 　　　MR. PYSER: Object to form.
9 BY MR. PAPANTONIO:
10 　　Q. Have you ever heard the term "glut"
11 before?
12 　　A. I have not heard the term "glut."
13 　　Q. Well, what -- do you understand what the
14 term "glut" means? I?
15 　　A. I do not know what "glut" means.
16 　　　What does "glut" mean?
17 　　Q. Well, you -- I'm not going to answer that
18 for you. I just want to know, you've been at this --
19 how many years have you just described that you've
20 been in the -- in the opioid business, and you never
21 heard the term "glut"?
22 　　　MR. PYSER: Object to form.
23 BY MR. PAPANTONIO:
24 　　Q. A glut of opioids in small towns; you've
25 never heard that term?

Page 355

1 　　　MR. PYSER: Object to form.
2 　　　THE WITNESS: To answer your -- one of two
3 or three questions --
4 BY MR. PAPANTONIO:
5 　　Q. Yeah.
6 　　A. -- the first one is, I've been in the
7 industry since January 2000.
8 　　Q. Okay.
9 　　A. And I have not heard the term "glut."
10 　　Q. Have you ever seen a -- you have the --
11 have you ever seen anything like I'm -- let's put it
12 up on the screen.
13 　　　MR. PYSER: Object to form.
14 　　　And, Counsel, are you going to be marking
15 those as exhibits?
16 　　　MR. PAPANTONIO: Oh, yeah. Yeah, I would
17 not dream of not putting my artwork in there.
18 　　　Hold it right there.
19 BY MR. PAPANTONIO:
20 　　Q. Let's go to Mount Gay, population
21 1,700 people.
22 　　　Do you know where Mount Gay is, sir?
23 　　　MR. PYSER: Object to form. Asked and
24 answered.
25 　　　THE WITNESS: Again, I do not -- it's in

Page 356

1 West Virginia.
2 BY MR. PAPANTONIO:
3 　　Q. Yeah. Do --
4 　　A. But I do not know where in West Virginia
5 Mount Gay is.
6 　　Q. But you were a person that signed off on
7 order requests in West Virginia, weren't you? You
8 were one of the three people that did that, right?
9 　　A. You say "signed off on order requests" --
10 I'm sorry.
11 　　　MR. PYSER: Object to form.
12 BY MR. PAPANTONIO:
13 　　Q. Or review?
14 　　A. You say "signed off on order requests." I
15 review ingredient limit reports on a monthly basis.
16 　　Q. Right. Okay. And you did that for West
17 Virginia, right?
18 　　A. I did that for the facility located in
19 Wheeling, West Virginia.
20 　　Q. All right. And you knew that -- that
21 there was a town -- you didn't know, I take it, that
22 there was a town called Mount Gay, where a population
23 of 1,700 people lived, never even heard that?
24 　　　MR. PYSER: Object to form.
25

Page 357

1 BY MR. PAPANTONIO:
2 　　Q. True?
3 　　A. Again, up until a few minutes ago when you
4 mentioned Mount Gay, I've never heard of Mount Gay.
5 　　Q. All right. Let's see what -- do you have
6 any -- so right now, you couldn't tell me how many
7 pills were sold in Mount Gay, as we sit here, right?
8 　　　MR. PYSER: Object to form.
9 　　　THE WITNESS: That is correct.
10 BY MR. PAPANTONIO:
11 　　Q. And you've been in this business -- you
12 worked for Cardinal for -- I'm sorry, how many years
13 total? Cardinal?
14 　　A. I started with a company, January of 2000,
15 that was acquired by Cardinal in 2002. And I left
16 Cardinal in 2013.
17 　　Q. And you've never heard of the term "glut,"
18 right?
19 　　　MR. PYSER: Object to form.
20 BY MR. PAPANTONIO:
21 　　Q. Never heard that?
22 　　A. I've never heard the term "glut."
23 　　Q. And you've never head of the term "Oxy
24 Express"; is that correct?
25 　　　MR. PYSER: Object to form.

Page 358

BY MR. PAPANTONIO:

1   Q. Yes or no?

2   A. I'm giving my lawyer a chance to see if he

3   wants to speak.

4   Q. Yes or no? You've never --

5   A. I've never --

6   MR. PYSER: Counsel -- object to form.

7   You've got to give me a chance to enter --

8   intersperse an objection if needed, and you've

9   got to give the witness a chance to answer your

10  question before you ask your next question.

11  BY MR. PAPANTONIO:

12  Q. Yes or no: You've never heard of the term

13  "Oxy Express"?

14  Easy. Yes or no?

15  MR. PYSER: Object to form.

16  THE WITNESS: Again, again, I have not

17  heard the term "Oxy Express."

18  BY MR. PAPANTONIO:

19  Q. Have you ever seen a depiction of what

20  happens with pills when a town like Mount Gay is

21  getting millions of pills and then understanding

22  where those millions of pills went if they weren't

23  absorbed in a town like Mount Gay? Have you ever

24  heard an analysis of that?

25

Page 359

1   MR. PYSER: Object to form.

2   BY MR. PAPANTONIO:

3   Q. Dealing with the -- dealing with the term

4   "Oxy Express"?

5   MR. PYSER: Object to form.

6   BY MR. PAPANTONIO:

7   Q. Have you ever heard of it?

8   A. Again, I've not heard the term "Oxy

9   Express."

10  MR. PAPANTONIO: Play this thing. Just go

11  ahead and play it.

12  BY MR. PAPANTONIO:

13  Q. So we got a town of 1,700 people. They

14  can't absorb the pills. So you didn't even know

15  there was something called an Oxy Express that

16  actually drove through Mount Gay and distributed

17  those pills along the Eastern Seaboard; nobody had

18  ever told you that prior to coming in here today,

19  right?

20  MR. PYSER: Object to form.

21  BY MR. PAPANTONIO:

22  Q. Huh?

23  A. Again, I have not heard the term "Oxy

24  Express."

25  Q. Fair enough. I believe that. All right.

Page 360

1   MR. PAPANTONIO: David, you want to --

2   or --

3   MR. FULLER: You want to take a quick

4   break?

5   MR. PAPANTONIO: Yeah, let's take a break.

6   VIDEOGRAPHER: We're going off the record.

7   The time is 3:31.

8   (A recess transpired from 3:31 p.m. until

9   3:44 p.m.)

10  (Cardinal-Brantley 22 was marked for

11  identification.)

12  (Cardinal-Brantley 23 was marked for

13  identification.)

14  VIDEOGRAPHER: We're going back on the

15  record. Beginning of media unit file number 6.

16  The time is 3:44.

17  EXAMINATION

18  BY MR. FULLER:

19  Q. Mr. Brantley, you've been speaking with

20  Mr. Papantonio for quite some time. I wanted just to

21  follow up on a few things and cover a few new areas;

22  I'm going to try not to repeat anything. Okay?

23  A. Okay.

24  Q. So the two or three people that also

25  filled your role from '05 to '07, who were they?

Page 361

1   A. Tim Dunham.

2   Q. Okay.

3   A. And Nick Rausch.

4   Q. Okay. And you were talking with

5   Mr. Papantonio about the memorandum agreement from

6   2007, 2008, correct? I think it's 4230.

7   A. Is that in this stack?

8   Q. Yeah, it's Exhibit Number 4.

9   A. Is there a number at the top, a PI number?

10  Q. 4230, if that helps you.

11  Not that one. Keep going.

12  A. Here it is.

13  Q. There you go.

14  I think you testified earlier, Cardinal

15  entered into -- Cardinal Health entered into this

16  memorandum agreement; is that right?

17  A. Yes.

18  Q. And you were there during this time frame.

19  This is the time frame where a bunch of facilities

20  lost their license, had their license suspended,

21  correct?

22  A. Yes.

23  Q. And Cardinal made certain obligations or

24  took on certain obligations as part of this

25  agreement; isn't that true?

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    A.  If they're listed in here somewhere.
2    Q.  Sure.  I think they start on page 3.
3  "Terms and conditions, obligations of Cardinal."
4       Do you see that?
5    A.  Yes.
6    Q.  And if you turn to page 4 and go to F --
7  see Section F there?
8    A.  Yes.
9    Q.  And you're aware, are you not, that
10  Cardinal, through Section F, agreed to do an 18-month
11  lookback and review its shipments to current
12  customers for -- let's see:  "Oxycodone, hydrocodone,
13  alprazolam, phentermine, retail and physician
14  customers for the 18 months immediately preceding the
15  execution of this agreement, and identify any
16  customers who purchased those same drugs that
17  exceeded thresholds."
18       Do you see that there?
19    A.  I do.
20    Q.  And you are therefore aware that Cardinal
21  took on this obligation and completed this
22  obligation.
23       Did you have any role in that?
24    A.  What time frame are we talking -- are we
25  talking --

Page 363

1    Q.  The agreement was entered in the end of
2  2008.
3    A.  So that would be -- no, I was no longer in
4  the role I was in when I was speaking -- speaking
5  earlier.
6    Q.  Where were you at this point?
7    A.  I was still at Cardinal Health, but
8  sometime in 2008, I moved over to where I was solely
9  doing the price diversion.
10    Q.  Okay.
11    A.  Monitoring and investigations.
12    Q.  Fair enough.
13       And you mentioned --
14    MR. FULLER:  Let's roll to 4722 and talk
15  again just briefly about the Lakeland facility.
16  BY MR. FULLER:
17    Q.  You mentioned several times that the
18  system that was in place was this reviewing
19  ingredient limit reports, correct, is what you would
20  do?
21    A.  Yes.
22    Q.  And you did that manually; is that right?
23    A.  Yes.
24       I'm sorry, you said 4722?
25    Q.  I'm sorry.  Yeah, I didn't even pass it

Page 364

1  out yet.
2    A.  Oh.
3    Q.  I apologize.
4    MR. FULLER:  Bates number 4722, and it's
5  Exhibit Number -- what's the exhibit number at
6  the bottom?
7    MS. JAMISON:  24.
8    MR. FULLER:  24.  Oh, the sticker?
9    THE WITNESS:  024.
10    MR. FULLER:  Got it.
11  (Cardinal-Brantley 24 was marked for
12  identification.)
13  BY MR. FULLER:
14    Q.  This will be Plaintiffs' Exhibit
15  Number 24.
16       And you see this e-mail, it starts off
17  from Mr. Kurtz, Bob Kurtz:
18       Do you know who Bob Kurtz is?
19    A.  I do not.  I think I've heard that name
20  before, but I don't remember who he was.
21    Q.  Operations manager down in Lakeland,
22  Florida; does that sound familiar?
23    A.  Again, I've heard the name before, but --
24    Q.  Fair enough.
25    A.  -- that still does not put it into

Page 365

1  context.
2    Q.  And he's sending it to Rafael Varela; do
3  you know Mr. Varela?
4    A.  I have heard that name as well.
5    Q.  If you scan down a little bit lower on the
6  e-mail, Mr. Varela is the compliance and QA manager
7  for Cardinal Health, Lakeland, Florida.
8       Do you see that?
9    A.  Yes.
10    Q.  Okay.  And it starts off -- now let's go
11  through the time frame.  I apologize.  December 5th,
12  2007.
13    MR. FULLER:  Up at the top, Evan.  There
14  you go.
15  BY MR. FULLER:
16    Q.  December 5th, 2007.  It's right about the
17  time that these immediate suspension orders are
18  coming out, correct?
19    A.  I don't remember the dates.
20  November 28th, 2007, was -- seems like to be the
21  first one, yes.
22    Q.  Okay.  So right about that time, and this
23  e-mail is in response, because it says "More
24  information on DEA suspension."
25       Do you see that there?

Page 366

1   A.   Yes.

2   Q.   And then it says: "Just some thoughts on

3   Auburn, Washington, incident that concern me."

4        It says -- and if we skip down to the next

5   paragraph: "The manual process we perform now with

6   the discovery of suspected excessive purchases being

7   left up to the keyer notifying myself or the picker,

8   double-checker, QCer questioning the amount being

9   processed seems to leave ample opportunity for

10  failure."

11       MR. FULLER:   And Evan, if you could

12  underline that.

13  BY MR. FULLER:

14  Q.   "Ample opportunity for failure."   It's

15  clearly a concern being voiced by the people in

16  Lakeland, right?

17       MR. PYSER:   Object to form.

18       THE WITNESS:   This is a concern being

19  stated by Bob Kurtz.

20  BY MR. FULLER:

21  Q.   And if you look back at 4230, what's the

22  date of the immediate suspension order for Lakeland?

23       Go to page 20.   4230, 20.

24       MR. FULLER:   You don't need to go, Evan;

25  just --

Page 367

1        MR. PYSER:   Is it -- on this first page,

2   is it December 5th?

3   BY MR. FULLER:

4   Q.   Yes?

5   A.   2007?

6   Q.   There you go.

7   A.   Okay.

8   Q.   Same day that e-mail is sent, isn't it?

9   A.   December 5th, 2007.   December 5th, 2007.

10  Yes.

11  Q.   They say: "A system-generated flag would

12  be a more complete, thorough method for

13  determining" -- or excuse me -- "of determining

14  spikes or excessive quantities than we are currently

15  performing."

16       Did I read that correctly?

17  A.   Yes.

18  Q.   And during that time frame, there was no

19  automated system for generating flags, was there?

20       MR. PYSER:   Object to form.

21       THE WITNESS:   To my knowledge, the system

22  was reviewing the ingredient limit reports that

23  I was doing then.

24  BY MR. FULLER:

25  Q.   You had the monthly reports that you were

Page 368

1   sending off, and then you had pickers and checkers

2   looking for excessive orders in the building, right?

3   A.   Yes.   That report was a computer-generated

4   report.

5   Q.   Right.   But there was no red flags that

6   got flagged, correct?

7        MR. PYSER:   Object to form.

8   BY MR. FULLER:

9   Q.   None?

10  A.   Every -- every entity that appeared on

11  that ingredient limit report had reached the

12  threshold requirement.

13  Q.   Exceeded the threshold, correct?

14  A.   Exceeded the threshold for -- reached or

15  exceeded the threshold for that substance.

16  Q.   And those reports came out well after

17  those products were shipped, after the pills were out

18  on the street, right?

19       MR. PYSER:   Object to form.

20       THE WITNESS:   Those were monthly reports.

21  BY MR. FULLER:

22  Q.   And the report came out after the pills

23  were already on the street, didn't they?

24       MR. PYSER:   Object to form.

25       THE WITNESS:   The report was generated

Page 369

1   after the shipments had shipped.

2   BY MR. FULLER:

3   Q.   It says: "As you know, I've investigated

4   many accounts, tracked their ordering history and

5   reached out for guidance and directions.   But without

6   someone bringing a suspected excessive quantity order

7   to our attention, many, many more could be going out

8   the door under our noses."

9        And as Mr. Papantonio showed you earlier,

10  that was the problem.   All the pills were going out

11  the door; no one was stopping them, wasn't it?

12       MR. PYSER:   Object to form.

13       THE WITNESS:   Well, the cage vault

14  personnel did have the ability to identify and

15  order at time of picking and report that order.

16  BY MR. FULLER:

17  Q.   Well, in order to do that, they would have

18  to know what they're picking.

19       You would agree with that, wouldn't you?

20  A.   Based on their knowledge.

21  Q.   They would have to know what they're

22  picking to be able to --

23  A.   They would have to know what's in front of

24  them, what they are picking.

25  Q.   Absolutely.

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1       MR. PYSER: Object to form.
2  BY MR. FULLER:
3       Q.   And if they don't, they can't do their
4  job, can they?
5       MR. PYSER: Object to form.
6       THE WITNESS: If they don't know what
7   they're picking?
8  BY MR. FULLER:
9       Q.   Absolutely.
10      A.   If they don't know what they're picking,
11  are you saying they can't do their job?  They can
12  still pick and ship orders, right?
13      Q.   They can pick and ship orders, but they
14  can't pick out the excessive orders, right?
15      MR. PYSER: Object to form.
16      THE WITNESS: If they don't know what
17   they're picking -- I'm just trying to
18   understand.  If they don't know what they're
19   picking, they can --
20  BY MR. FULLER:
21      Q.   If they don't know it's a Control II, or
22  what type of product it is that they're picking, they
23  can't do their job to bring it to someone's
24  attention, can they?
25      MR. PYSER: Object to form.

Page 371

1       THE WITNESS: Well, if you don't know what
2   you're picking, then you can't identify it, yes,
3   true.
4  BY MR. FULLER:
5       Q.   Fair enough.
6       And then it says, "I wonder, could a
7  similar situation happen in Lakeland and management
8  be questioned why wasn't this discovered?"
9       Do you see that there?
10      A.   Yes.
11      Q.   It happens the same day the immediate
12  suspension order is issued for Lakeland, doesn't it?
13      MR. PYSER: Object to form.
14      THE WITNESS: Yes, we did verify that the
15   two dates match the December 5th, yes.
16  BY MR. FULLER:
17      Q.   Pickers and checkers.
18      Do you know Mr. Baranski?
19      A.   I do not.
20      Q.   He was the director of operations -- is
21  the director of operations for the Wheeling facility.
22  You know the Wheeling distribution center in West
23  Virginia?
24      A.   I'm familiar with the Wheeling facility.
25      Q.   That also serviced not only West Virginia

Page 372

1  but portions of Ohio as well, correct?
2       A.   I don't remember.  I know that -- I'm sure
3  they service West Virginia.  It's possible they could
4  have serviced -- I just don't remember.
5       Q.   Well, let's see what Mr. Baranski had to
6  say about the picker's knowledge on what they were
7  picking.  Okay?  He would be the one to ask, you
8  would agree, correct?
9       MR. PYSER: Objection.
10  BY MR. FULLER:
11      Q.   He's the director of operations for that
12  facility.
13      MR. PYSER: Object to form.  Vague as to
14   time frame.
15      THE WITNESS: I can't say that he would be
16   the one to ask, I mean, at that level, but --
17  BY MR. FULLER:
18      Q.   He's the one that runs the building,
19  right?
20      A.   He has oversight of the -- he's the
21  director of operations of the facility.
22      Q.   He's the head honcho, as far as that
23  building, correct?
24      A.   He is the highest-ranking person at that
25  facility.

Page 373

1       Q.   Fair enough.
2       MR. FULLER: Go ahead.
3       (Whereupon a portion of a video played.)
4       "Q Now, when we're going to pick up
5  the product -- and let's deal with the
6  controls.
7       "A Sure.
8       "Q If you have -- and I guess this
9  depends on how you get the order.  If
10  I'm going to pick up the same substances
11  both in a brand name and in a generic,
12  how do I know which to grab, if I'm the
13  picker?
14       "A The unit tells them what
15  location to go to.
16       "Q And would the order have
17  specified whether it was picking up a
18  generic -- you know, something made by a
19  particular manufacturer versus a
20  generic?
21       "A We teach our people to pick from
22  location to tote.  I don't even care if
23  they know the product.  I want them to
24  know location to tote.
25       MR. PYSER: Object to form on the use of

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    the video, and the time frame.
2  BY MR. FULLER:
3      Q.  So according to Mr. Baranski, they're
4  picking by location only.  He doesn't even care if
5  they know the product.  Right?  That's what he
6  testified to, correct?
7      A.  He stated that he doesn't care whether
8  they know the product.  That does not mean that the
9  person picking does not know what the product is.  He
10  expressed his opinion.
11      Q.  Sure.  And according to him, the one over
12  the Wheeling distribution center, he doesn't even
13  care if they know the product:  Pick from location to
14  tote.
15          That's what he testified to, correct?
16      MR. PYSER:  Object to form.
17      THE WITNESS:  That is the statement that
18  he made.
19  BY MR. FULLER:
20      Q.  Okay.  Now, we looked at that MOU just for
21  a second.  Are you aware whether Cardinal did do an
22  18-month lookback over its distributions?
23      A.  I don't know.
24      Q.  Fair enough.  Let's go to 4923.
25      MR. FULLER:  Go ahead and pass them.

Page 375

1      (Cardinal-Brantley 25 was marked for
2  identification.)
3  BY MR. FULLER:
4      Q.  Now, what you have in front of you is a
5  chart of Cardinal distributions.
6          Oh, and I apologize; for the record, it is
7  Plaintiffs' Exhibit Number 29 -- 25.  This is
8  Cardinal's distributions into Cuyahoga County for
9  hydrocodone and oxycodone.
10          Do you see that there, at the top?
11      MR. PYSER:  Just for the record, we've got
12  a black-and-white version that the witness has,
13  and a color copy up on the screen.
14      MR. FULLER:  Yeah, you do.
15      Q.  Do you see that?
16      A.  Yes, I do see that at the top.
17      Q.  Okay.  And you see during the time frame
18  that you have been with Cardinal -- and let's go all
19  the way back to '96.  You're aware that 1996 is when
20  OxyContin came onto the market, correct?
21      A.  I do not remember when OxyContin came onto
22  the market.
23      Q.  Okay.  I'll represent to you it's around
24  1996.
25      A.  Okay.

Page 376

1      Q.  And you see the spike in pills from 1996
2  to 2008?  The dosage units going into Cuyahoga
3  County?
4      MR. PYSER:  Object to form.
5      THE WITNESS:  I do see an increase.
6  BY MR. FULLER:
7      Q.  And in fact, if you do the math, it's over
8  1,000 percent increase from 1996 to 2008?
9      MR. PYSER:  Object to form.
10  BY MR. FULLER:
11      Q.  Are you aware of anything in Cuyahoga
12  County that would have caused this increase in pain?
13      MR. PYSER:  Object to form.
14  BY MR. FULLER:
15      Q.  Any epidemic going on during that time
16  frame?
17      MR. PYSER:  Object to form.
18      THE WITNESS:  I'm not familiar with
19  Cuyahoga.
20      Q.  Do you know where Cuyahoga County is?
21      A.  I do not.
22      Q.  It's Cleveland, Ohio.
23      A.  Okay.
24      Q.  If we go to page 3 of the document.
25      A.  That was page 3.  You mean the third page?

Page 377

1      Q.  Yeah, the third page.
2      A.  It says.
3      Q.  I apologize; it's point 3, at the top.
4      A.  Okay.  Oh.  Gotcha.
5      Q.  This is the same information for Summit
6  County, which is Akron, Ohio.
7          You see the same spike from 1996 up to
8  2008 as well, correct?
9      A.  There is an increase.
10      Q.  And during this time frame, Cardinal was
11  aware -- well, let me back up.
12          In the anti-diversion group, the QRA
13  department, did you ever pull numbers like this to
14  look at the history and pattern of your customer
15  sales?
16      MR. PYSER:  Object to form.
17      A.  When I was doing my role from 2005 to
18  early '8 or late '7, whichever it was, I did not --
19  excuse me.  I did not pull such reports.
20      Q.  So you're not aware of anybody in the
21  diversion department, at least to your knowledge that
22  pulled such reports, correct?
23      MR. PYSER:  Object to form.
24      THE WITNESS:  I can't speak for what
25  others did.  I can only speak for what I did.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    Q.   And my question is:  To your knowledge, no
2  one pulled any type of reports of this nature,
3  correct?
4    A.   To my knowledge, I don't know if they did
5  or not.
6    Q.   Okay.  Now, you see the spike, and you see
7  the color on the overhead.  And as it represents at
8  the bottom, it's oxycodone and hydrocodone.
9         Do you see that there?
10   A.   Yes.
11   Q.   Okay.  And other than -- other than the --
12  strike that.
13        Let's move on to the pill comparison.
14  Actually, hold on one second, Evan.  You're aware,
15  are you not, that in the government -- let me ask it
16  differently.
17        You know that during the time frame that
18  you were at Cardinal, certain areas of the country
19  were having more of a problem with opioid abuse than
20  others, correct?
21        MR. PYSER:  Object to form.
22        THE WITNESS:  I actually learned that
23     after I left the company.  Again, that was more
24     through media than anything else.  And that
25     was . . .

Page 379

1  BY MR. FULLER:
2    Q.   Let's go to 1087.
3         Do you know what the GAO is?  Government
4  Accounting Office?
5    A.   I'm not familiar with the office.  I've
6  heard the term "GAO."
7    Q.   You've heard the acronym before, correct?
8    A.   Yes.
9         (Cardinal-Brantley 26 was marked for
10  identification.)
11        MR. FULLER:  This will be Plaintiffs'
12     Number 26.
13  BY MR. FULLER:
14   Q.   You see this document?  "OxyContin abuse
15  and diversion, and the effects to address the
16  problem.  Prescription drugs."
17        And what is the date indicated on this
18  document, Mr. Brantley?
19   A.   December 2003.
20   Q.   Okay.  And this is shortly after you came
21  to Cardinal, but you're still in Texas, right?
22   A.   In 2003 I was still in Texas, correct.
23   Q.   If you'll turn to page 14.  And let's see
24  what the government report says about who is having
25  problems with OxyContin, at least during this time.

Page 380

1    A.   Okay.  Do you mean point 14 at the top?
2    Q.   Yes, sir.  I'm sorry.
3    A.   I was thinking 14 at the bottom.  Okay.
4    Q.   Force of habit.  By the time you get used
5  to it, we'll be done.
6         See the last full paragraph with the last
7  paragraph on the page:  "Media reports of OxyContin
8  abuse and diversion began to surface in 2000.  The
9  reports first appeared in rural areas of some states,
10  generally in the Appalachian regions, and continued
11  to spread in other rural areas in large cities in
12  several states.  Rural communities in Maine,
13  Kentucky, Ohio, Pennsylvania, Virginia, and West
14  Virginia were reportedly being devastated by the
15  abuse and diversion of OxyContin."
16        Is that the first time you're seeing this?
17   A.   This is my first time seeing this
18  document, yes.
19   Q.   We can agree, can we not, that Cardinal
20  should have been aware of this, being that they were
21  a distributor of a dangerous substance during this
22  time frame, correct?
23        MR. PYSER:  Object to form.
24        THE WITNESS:  Are you saying that Cardinal
25     should have been aware of this document?  I -- I

Page 381

1  can't speak to that.
2  BY MR. FULLER:
3    Q.   So even though they're distributing
4  OxyContin, oxycodone, hydrocodone, across the
5  country, when the government does a massive
6  investigation and report based on those
7  distributions, your opinion is Cardinal doesn't
8  necessarily need to be aware of it, correct?
9        MR. PYSER:  Object to form.
10        THE WITNESS:  That's not what I said.
11     What I said is I don't know who would have read
12     the GAO report.  I -- again --
13  BY MR. FULLER:
14   Q.   Can we at least agree they should have
15  read it?
16   A.   I've heard of GAO, but I -- I don't know
17  who would have -- I don't know what this is.  I don't
18  know if this is a financial document.  It says it's
19  from the General Accounting Office.  Does that mean
20  it went to someone in accounting or finance?  I can't
21  speak to that.
22   Q.   Can we at least agree that they should
23  have been aware of it?
24        MR. PYSER:  Object to form.
25

Page 382

BY MR. FULLER:

1 Q. Cardinal should have been aware of this
2 report?
3 MR. PYSER: Object to form.
4 THE WITNESS: I can't agree that someone
5 should have read a document that came from the
6 General Accounting Office.
7 BY MR. FULLER:
8 Q. Fair enough.
9 And here it indicates several states that
10 are being more impacted. Ohio and West Virginia are
11 two of them, aren't they?
12 A. According to this paragraph.
13 Q. Well, let's look and see what's going on,
14 even shortly after this time frame, with the
15 distribution of OxyContin.
16 MR. FULLER: Let's go to the PowerPoint
17 presentation, Evan.
18 BY MR. FULLER:
19 Q. Now, here we're going to look at first,
20 Mr. Brantley, is comparison between Illinois and
21 Ohio, two neighboring states, correct?
22 Is that right, Mr. Brantley?
23 A. Yes.
24 Q. Similar in size, I'll represent to you,

Page 383

1 and you'll see, similar in population. And this is
2 just Cardinal distributions from 2006 through 2014.
3 All right?
4 A. Okay.
5 MR. FULLER: So let's see the first slide,
6 Evan.
7 BY MR. FULLER:
8 Q. So 2006, in Illinois, we have 4.9 million
9 pills of oxycodone distributed. In Ohio, we have
10 67 million oxycodone pills distributed.
11 Does that cause you any concern?
12 MR. PYSER: Object to form.
13 THE WITNESS: I don't know the context.
14 Where -- was Cardinal the primary supplier for
15 pharmacies in Ohio, and it was not the primary
16 supplier of pharmacies in Illinois?
17 BY MR. FULLER:
18 Q. That could be one explanation, right?
19 A. I don't know the -- you put numbers on the
20 screen, but I don't know the context of the customer
21 base in those states.
22 Q. Fair point. That could be one
23 explanation, right?
24 A. I would say that's probably an
25 explanation.

Page 384

1 Q. You think that may be the only
2 explanation, correct?
3 MR. PYSER: Object to form.
4 BY MR. FULLER:
5 Q. You don't know?
6 A. I don't know. That's just the first thing
7 that came to mind when you asked the question.
8 Q. Fair enough. How many customers do we
9 have in the respective state compared to Ohio, right?
10 MR. PYSER: Object to form.
11 BY MR. FULLER:
12 Q. And then what is everybody else
13 distributing to the respective states, correct?
14 MR. PYSER: Object to form.
15 THE WITNESS: I don't know who the primary
16 supplier is for the customers in Illinois. I
17 don't know what chains and --
18 BY MR. FULLER:
19 Q. Let's keep going through the slide, and
20 we'll get to that, okay?
21 A. Okay.
22 MR. FULLER: Let's go to 2007, Evan.
23 MR. PYSER: Counsel, do you have this as
24 an exhibit?
25 MR. FULLER: I don't have a printout, but

Page 385

1 I'll get you one. It's not a problem.
2 BY MR. FULLER:
3 Q. So in 2007, 5.9 million into Illinois and
4 72-plus million into Ohio, still.
5 Cause you any concern?
6 A. Again, I have my same response. I don't
7 know the customer base.
8 Q. Right.
9 A. I don't know if there's a large chain in
10 Ohio that's serviced by Cardinal and a large chain in
11 Illinois that's serviced by another wholesaler.
12 Q. Well, this time -- during this time frame,
13 you were servicing CVS; you know that, right?
14 2006-7, you're there reviewing ingredient limit
15 reports?
16 A. Of course I don't recall all back then,
17 but I -- I know that CVS is a Cardinal customer.
18 Q. Big customer. Nationwide company.
19 Correct?
20 A. CVS is a -- a large chain.
21 Q. Absolutely.
22 MR. FULLER: Let's keep going, Evan.
23 BY MR. FULLER:
24 Q. 2008, 6.3, 75 million. Still a huge
25 disparity.

Page 386

1 We can at least agree on that, correct?

2 MR. PYSER: Object to form.

3 THE WITNESS: There is a difference

4 between 75 million and 6 million, yes.

5 BY MR. FULLER:

6 Q. It's about 11-time difference, over

7 11-time -- 12-time difference, isn't it?

8 MR. PYSER: Object to form.

9 THE WITNESS: If you did the math that

10 fast in your head, I will accept that it's

11 12 times.

12 BY MR. FULLER:

13 Q. I will give you my pen if you want to

14 write it out.

15 A. I have a calculator.

16 Q. So let's keep going.

17 2009, 6.884. 2010, 7.6 to 94 million.

18 2011, 8.9, 96 million. 2012, 10 million to

19 100 million.

20 Now, we can both do the math on that,

21 Mr. Brantley, right: 10 times --

22 A. That was a little easier.

23 Q. -- the amount of pills?

24 MR. PYSER: Object to form.

25

---

Page 387

1 BY MR. FULLER:

2 Q. But 10 times the amount of pills into

3 Illinois by Cardinal compared to Ohio, right?

4 MR. PYSER: Object to form.

5 THE WITNESS: That's what that graph

6 states.

7 BY MR. FULLER:

8 Q. 2013, 2014.

9 MR. FULLER: Let's go to the next slide,

10 Evan.

11 BY MR. FULLER:

12 Q. So this is the number of customers.

13 1,716 Cardinal customers in Illinois; 1,744 Cardinal

14 customers in Ohio.

15 Very close, isn't it?

16 MR. PYSER: Object to form.

17 THE WITNESS: Just based on those numbers,

18 but that doesn't tell how many were chains, how

19 many were hospitals, how many was DOD, how many

20 was VA.

21 BY MR. FULLER:

22 Q. Sure.

23 A. That's just customers, so I -- I don't

24 know --

25 Q. But very close in the number of customers,

---

Page 388

1 isn't it?

2 MR. PYSER: Object to form.

3 THE WITNESS: For the overall customers,

4 without knowing the details, whether there was a

5 large chain or a hospital or a VA --

6 BY MR. FULLER:

7 Q. Well, let me ask: At least during the --

8 the first few years when this disparity is going on,

9 did anybody that you're aware of at Cardinal pull

10 this information and look and say, "Hey, look, we

11 know there's an outbreak of a problem in Appalachian

12 areas; let's compare them to like states and see

13 what's going on"?

14 You don't have any knowledge of that

15 happening at Cardinal Health, do you?

16 MR. PYSER: Object to form.

17 THE WITNESS: I don't know whether that

18 was done or not by --

19 BY MR. FULLER:

20 Q. At least nobody informed you if they did,

21 did they?

22 A. I was not aware.

23 Q. No one said, "Hey, when you're reviewing

24 your ingredient limit reports, pay particular

25 attention to Ohio, West Virginia"; you were never

---

Page 389

1 told that, were you?

2 A. When I review ingredient limit reports, I

3 reviewed them the same.

4 Q. So again --

5 A. I reviewed the reports.

6 Q. My -- my question, though, is, no one came

7 to you and said, "Hey, pay particular attention to

8 West Virginia and Ohio," did they?

9 MR. PYSER: Object to form. Asked and

10 answered.

11 THE WITNESS: I do not recall anyone

12 coming to me, but I looked at all of the

13 ingredient limit reports all the same.

14 BY MR. FULLER:

15 Q. Fair enough.

16 MR. FULLER: Keep going, Evan.

17 BY MR. FULLER:

18 Q. So this lays out the population. There's

19 a million more people in Illinois than Ohio, but Ohio

20 got over 10 times the number of pills.

21 You see that?

22 A. I do see that chart, yes.

23 Q. Can we at least agree that this deserves

24 some looking into as to why the disparity?

25 MR. PYSER: Object to form.

---

Page 390

1 BY MR. FULLER:
2     Q.  Would you agree with that?
3     A.  This states -- pills that Cardinal
4 shipped?  Is this -- is this just Cardinal?
5     Q.  Yes, sir.
6     A.  So again, I go back to my earlier
7 statement as far as not knowing what type of
8 registrants --
9     Q.  Fair enough.
10    A.  -- Cardinal was shipping into in the two
11 states, because that makes a --
12    Q.  Sure.
13    A.  -- a difference.
14    Q.  You can't tell by the raw numbers, right?
15    A.  Correct.  I -- I can't tell if it's a
16 chain or if it's a hospital --
17    Q.  But we at least need to do an
18 investigation to find out why; can we agree with
19 that?
20        MR. PYSER:  Object to form.
21        THE WITNESS:  Again, you first need to
22    know --
23 BY MR. FULLER:
24    Q.  You have to do your investigation to know.
25        MR. PYSER:  Object to form.

Page 391

1 BY MR. FULLER:
2     Q.  Is there a reason for this?
3     A.  I'd have to know if these are chains, if
4 these are retail, if these are hospitals.  I mean,
5 you have to have the complete picture or the proper
6 context before I can answer the question.
7        Again, I don't know what the customers
8    were.  I don't know if they were retail independents
9    in one state and chains in another state, or
10   hospitals, or . . .
11    Q.  And unless we pull the information, we're
12 not going to know.
13        We can agree with that, right?
14        MR. PYSER:  Object to form.
15        THE WITNESS:  Unless you can show me the
16    information that says, you know, how many chains
17    were in Ohio versus Illinois, and hospitals and
18    pharmacy -- I mean DOD, VA, so forth.
19 BY MR. FULLER:
20    Q.  And as far as you're aware, Cardinal never
21 pulled that information to do that comparison, did
22 they?
23        MR. PYSER:  Object to form.
24 BY MR. FULLER:
25    Q.  When you were there, they never pulled

Page 392

1 that information to do that comparison, did they?
2        MR. PYSER:  Object to form.
3        THE WITNESS:  Again, like I stated
4    earlier, I don't know.
5 BY MR. FULLER:
6     Q.  At least you're not aware of it if they
7 did, correct?
8        MR. PYSER:  Same objection.
9        THE WITNESS:  I don't know.  I'm not aware
10   if they did or not.
11 BY MR. FULLER:
12    Q.  Fair enough.
13        MR. PAPANTONIO:  Let's go to the next
14    slide, Evan.
15 BY MR. FULLER:
16    Q.  So this is distributions from all
17 distributors.  One of the questions you had earlier,
18 right, were we primary versus someone else?  Were we
19 primary in Ohio versus someone else being primary in
20 Illinois?  One of the concerns you voiced earlier,
21 right?
22    A.  Right.
23    Q.  And this shows that even going back to
24 2006, 29 million pills into Illinois, that's all
25 distributors; and 170 million going into a very

Page 393

1 similar state of Ohio, from all distributors.  And
2 this is just oxycodone.
3        And then we see in 2007, 30 and 190; and
4 it -- it keeps going with a huge disparity.  That's
5 what the information shows, correct?
6        MR. PYSER:  Object to form.
7        THE WITNESS:  The information shows there
8    is a difference between the two states in
9    shipments.
10 BY MR. FULLER:
11    Q.  Now, let me ask you:  There at Cardinal,
12 did anybody come to you, made you aware of any huge
13 epidemic of pain in the state of Ohio during this
14 time frame?
15        MR. PYSER:  Object to form.
16        THE WITNESS:  During that time frame, I
17    was not made aware of any -- as you say,
18    epidemic of pain.
19 BY MR. FULLER:
20    Q.  Okay.
21        MR. FULLER:  Let's go to the next slide,
22    Evan.
23 BY MR. FULLER:
24    Q.  So during this same time span in Illinois,
25 which has a million more people than the state of

Page 394

1 Ohio, you have 351 million pills compared to
2 2.1 billion pills in the state of Ohio.
3          MR. FULLER:  Next slide, Evan.
4 BY MR. FULLER:
5     Q.  Six times the number of pills into the
6 state of Ohio compared to Illinois.
7          Do you see that there?
8          MR. PYSER:  Object to form.
9          THE WITNESS:  That slide says that
10 Illinois received 351 million pills and Ohio
11 received 2.1.
12 BY MR. FULLER:
13     Q.  2.1 billion --
14     A.  Oh.
15     Q.  -- is what it's supposed to say.
16     A.  So it was a misprint.  Okay.  Now -- okay.
17     Q.  He changed it quick.
18          So let me ask the question again.
19 2.1 billion pills into the state of Ohio, and
20 12.8 billion pills -- excuse me.  351 million pills
21 in the state of Illinois.
22          MR. PYSER:  Object to form.
23          THE WITNESS:  That's what the slide
24 states.
25

Page 395

1 BY MR. FULLER:
2     Q.  And do you have any knowledge as to why --
3 strike that.
4          We can agree that that is a huge
5 disparity, right?
6          MR. PYSER:  Object to form.
7          THE WITNESS:  That is a difference.  And I
8 don't know why doctors wrote more scripts in
9 Ohio versus Illinois.
10 BY MR. FULLER:
11     Q.  But we do know who shipped more pills to
12 Ohio versus Illinois, don't we?
13          MR. PYSER:  Object to form.
14 BY MR. FULLER:
15     Q.  We saw the numbers coming out of Cardinal.
16 And Cardinal, as you stated earlier, is providing
17 pills to pharmacy, who have a regulatory obligation
18 to look for suspicious activity, don't they,
19 suspicious orders?  Correct?
20          MR. PYSER:  Object to form.
21          THE WITNESS:  According to the CFR, they
22 have an obligation to identify and report
23 suspicious orders.
24 BY MR. FULLER:
25     Q.  And as you mentioned earlier, they need to

Page 396

1 use the information they have to do so, don't they?
2 Correct?
3          THE WITNESS:  Yes.  And as I stated, we
4 used -- I used ingredient limit reports, and
5 they are also used at the division -- they were
6 distributed to the DEA from the distribution
7 centers.
8 BY MR. FULLER:
9     Q.  And the other part of that system is we
10 had pickers and checkers trying to flag excessive
11 orders, as we saw in Lakeland, which didn't work out
12 very well for Lakeland as well, correct?
13          MR. PYSER:  Object to form.
14          THE WITNESS:  The -- the pickers and
15 checkers were in addition to the ingredient
16 limit reports that were submitted to the DEA,
17 and -- and in addition to the review that I was
18 doing and submitting to the DEA.
19 BY MR. FULLER:
20     Q.  Right.  And you, as you testified earlier,
21 you reported customers to the DEA, not suspicious
22 orders, correct?
23     A.  I reported customers.
24     Q.  Fair enough.
25          MR. FULLER:  I don't have anything

Page 397

1 further.
2          VIDEOGRAPHER:  Going off record.  Time
3 is 4:19.
4          (A recess transpired from 4:19 p.m. until
5          4:25 p.m.)
6          VIDEOGRAPHER:  We're going back on record,
7 the beginning of media file number 7.  The time
8 is 4:25.
9          EXAMINATION
10 BY MR. BUCHANAN:
11     Q.  Mr. Brantley, good afternoon.
12     A.  Good afternoon.
13     Q.  My name is Dave Buchanan, and I have a few
14 other questions for you.  I want to kind of move
15 through a different period of time.
16          MR. BUCHANAN:  Evan, could we -- could we
17 go to the -- the CDC document?  I don't know the
18 exhibit number in the deposition, but it's
19 P1.324.3.
20 BY MR. BUCHANAN:
21     Q.  You recall looking at this with
22 Mr. Papantonio earlier?
23     A.  Yes.
24     Q.  Okay.  And you have it in your stack there
25 as well, if that's easier; I don't know what's best

Page 398

1 for you. But I just wanted to orient ourselves.
2       So as I understand it, sir, you first got
3 involved at least with companies involved in the
4 opioid and narcotics business in around 2001; is that
5 right?
6    A. I started with Bentley Trading January of
7 2000.
8    Q. Okay.
9    A. And that company was acquired, 2002, by
10 Cardinal Health.
11    Q. And on the screen, we have got this
12 period -- this is 2001.
13       That would have been during your period
14 with Cardinal or Billy Trading; is that right?
15    A. With Bentley Trading, yes.
16    Q. Bentley; thank you.
17       MR. BUCHANAN: Let's go forward to 2006.
18    All right. Thank you.
19 BY MR. BUCHANAN:
20    Q. So this would have been a period of time
21 when you were with Cardinal still, right?
22    A. Yes.
23    Q. And this would have been a point in time
24 when you had some role or involvement in connection
25 with suspicious orders, or at least monitoring and

Page 399

1 reporting functions from a regulatory perspective,
2 fair?
3       MR. PYSER: Same objections to the use of
4    this document.
5       THE WITNESS: 2006, yes.
6 BY MR. BUCHANAN:
7    Q. Okay.
8       MR. BUCHANAN: And can we scroll forward
9    to 2007.
10 BY MR. BUCHANAN:
11    Q. As I understand, you were still in that
12 function in 2007; is that right?
13       MS. VANNI: Object to the form.
14       THE WITNESS: 2007, yes.
15 BY MR. BUCHANAN:
16    Q. And did you stay in that function as well
17 in 2008?
18       MS. VANNI: Same. Objection. Form.
19       THE WITNESS: I'm not clear whether it was
20    late 2007 or early 2008 time frame where I
21    started the transition.
22       MR. BUCHANAN: Evan, could you scoot it
23    forward to 2008.
24 BY MR. BUCHANAN:
25    Q. All right. We see -- and you see the map

Page 400

1 on the screen, as it's changing over time, you see
2 blue starting to fade, white starting to pop, brown,
3 red, orange, yellow, indicating greater age-adjusted
4 death rates per 100,000 people.
5       Do you see that, sir, as we've been
6 looking at these?
7       MS. VANNI: Objection.
8       THE WITNESS: I am seeing the transition
9    of color.
10 BY MR. BUCHANAN:
11    Q. Okay. Okay. And did you stay in a
12 suspicious-order monitoring function in some way in
13 2009, '10, '11?
14       MS. VANNI: Objection to the form.
15       THE WITNESS: No. 2009, '10 and '11 --
16    2009, I moved to the McDonough, Georgia,
17    facility, and I was the compliance officer for
18    the McDonough, Georgia, facility until 2011,
19    until they closed the facility in 2011. That's
20    when I went to Kinray in New York, and I
21    commuted back and forth.
22       During both times I served in the capacity
23    as compliance officer, not in suspicious order
24    monitoring.
25

Page 401

1 BY MR. BUCHANAN:
2    Q. And "compliance officer," as that term was
3 being used in that 2009, '10, '11 period of time,
4 didn't include any responsibility or role or function
5 for suspicious order monitoring?
6    A. My only responsibility in that regard
7 would have been doing site visits, surveillance
8 visits, type thing, and then reporting back to the
9 corporate department that handled it.
10       MR. BUCHANAN: Could we go forward, Evan,
11    2009; let's just see how it looks.
12 BY MR. BUCHANAN:
13    Q. Getting better or getting worse, sir?
14       MS. VANNI: Objection.
15       THE WITNESS: Pardon me?
16 BY MR. BUCHANAN:
17    Q. Getting better, getting worse?
18       MS. VANNI: Same objection.
19       THE WITNESS: The -- by the color
20    transitioning?
21 BY MR. BUCHANAN:
22    Q. Yeah.
23    A. It's about the same.
24       MR. BUCHANAN: Next slide, please.
25

Page 402

BY MR. BUCHANAN:

1  BY MR. BUCHANAN:
2     Q.  Getting better or getting worse during
3  2010?
4        MS. VANNI:  Objection.
5        THE WITNESS:  2010's still looking about
6     the same.
7        MR. BUCHANAN:  Okay.  Let's fast forward,
8     2012, sir.
9  BY MR. BUCHANAN:
10    Q.  You -- I think in 2012 you joined
11 QualiTest; is that right?
12    A.  No.  Late 2013.  I believe October 2013 is
13 when I joined QualiTest.
14    Q.  Thank you.  Thank you.
15       So 2012, we'd agree, you got more red, you
16 got more orange, you got more yellow, more white --
17       MS. VANNI:  Objection.
18 BY MR. BUCHANAN:
19    Q.  -- than you had in 2007, 2008, when you
20 were fulfilling that suspicious order monitoring
21 role?
22       MS. VANNI:  Objection.
23 BY MR. BUCHANAN:
24    Q.  True?
25    A.  Yes.

Page 403

1     Q.  Okay.
2        MR. BUCHANAN:  Let's go to 2013.
3  BY MR. BUCHANAN:
4     Q.  This, now, would be your first year with
5  QualiTest; is that right?
6        MS. VANNI:  Objection to form.
7        THE WITNESS:  I believe October 2013.
8  BY MR. BUCHANAN:
9     Q.  Okay.  And you'd agree, sir, that
10 certainly this map is showing an increasing rate of
11 death on an age-adjusted rate basis as compared to
12 2001 when we first looked at the chart with
13 Mr. Papantonio, true?
14       MS. VANNI:  Object to the form.
15       THE WITNESS:  Based on this scale, yes,
16    the chart shows a color difference.
17 BY MR. BUCHANAN:
18    Q.  Okay.  When you were at QualiTest, sir,
19 QualiTest was a manufacturer of opioids and
20 narcotics.  Fair?
21       MS. VANNI:  Object to the form.
22       THE WITNESS:  They were a manufacturer of
23    prescription drugs, including controlled
24    substances, including narcotics.
25

Page 404

1  BY MR. BUCHANAN:
2     Q.  About 70 percent of which were controlled
3  substances, right?
4        MS. VANNI:  Object to the form.
5        THE WITNESS:  I don't know.
6  BY MR. BUCHANAN:
7     Q.  Okay.  You didn't have an appreciation,
8  sir, that the company -- the vast majority of the
9  company's business was in fact scheduled drugs?
10       MS. VANNI:  Object to form.
11       THE WITNESS:  You asked did I know was it
12    70 percent, and I said no, I did not know that
13    it was 70 percent.
14 BY MR. BUCHANAN:
15    Q.  Okay.  Fair enough.
16       Did you have an appreciation, sir, that
17 the vast majority -- or the majority of the company's
18 sales were for scheduled drugs?
19       MS. VANNI:  Object to form.
20       THE WITNESS:  There was a -- I can't -- I
21    don't know for sure, but that sounds about
22    right.  It was -- controlled substances was a
23    large part of the business, yes.
24 BY MR. BUCHANAN:
25    Q.  Okay.  And so let's -- let's orient

Page 405

1  ourselves, I guess, in terms of where QualiTest is in
2  the picture.  QualiTest is a generic manufacture of
3  drugs, true?
4        MS. VANNI:  Objection.  Form.
5        THE WITNESS:  Yes.
6  BY MR. BUCHANAN:
7     Q.  Okay.  They operated through a couple --
8  couple of different companies; you remember Vintage
9  Pharmaceuticals?  You remember that name?
10    A.  Vintage Pharmaceuticals, yes.
11    Q.  Okay.  They were one of the registrant
12 holders doing business as QualiTest, true?
13       MS. VANNI:  Object to the form.
14       THE WITNESS:  Yes, I -- I believe that
15    Vintage was one of the DEA registration.
16 BY MR. BUCHANAN:
17    Q.  Okay.  And I guess -- let's talk about
18 that DEA registration.
19       As I understand this, I mean, you can't
20 just decide, legally, that you'd like to distribute
21 or make or sell narcotics, scheduled narcotics,
22 without having a registration, true?
23       MS. VANNI:  Object to the form.
24       THE WITNESS:  A DEA registration is
25    required to handle controlled substances.

Page 406

1  BY MR. BUCHANAN:
2      Q.  Okay.  And as part of that registration
3  process, I mean, a manufacturer, a distributor, a
4  pharmacy, they're making a promise, right?
5      MS. VANNI:  Object to the form.
6      THE WITNESS:  I don't know the details of
7  acquiring a -- a registration.  You fill out an
8  application and -- and so forth, and pay the
9  fee, and a registration is issued.
10  BY MR. BUCHANAN:
11     Q.  It's a closed system, designed to be,
12  right?
13     A.  It is -- it is designed to be a closed
14  system.
15     Q.  When it's not a closed system, then we
16  have drugs, controlled drugs, leaking out of the
17  system, creating the risk of diversion, abuse,
18  addiction, and injury.  Fair?
19     MS. VANNI:  Objection to form.
20     THE WITNESS:  It is a closed system, like
21  I stated earlier, from the manufacturer to the
22  distributor to the pharmacy to the patient,
23  based on a script that he or she received from
24  the doctor.  That is the system.  So when it
25  goes outside of that system, that's not the

Page 407

1  system that the manufacturers and distributors
2  operate in.
3  BY MR. BUCHANAN:
4      Q.  And so when you get that registration, or
5  when you apply for it, apply to the government, say,
6  "I'd like to be a registrant; I'd like to be a
7  distributor," you're promising that "We're going to
8  maintain effective controls to prevent diversion,"
9  right?
10     MS. VANNI:  Object to the form.
11     THE WITNESS:  What comes with obtaining a
12  DEA registration is compliance with the Code of
13  Federal Regulations that govern controlled
14  substances.
15  BY MR. BUCHANAN:
16     Q.  Well, that's a statute, right?
17     A.  The statute, and --
18     Q.  Yeah.
19     A.  -- the Controlled Substances Act, and --
20  yes, 21 CFR, I believe 1300 to the end is what
21  governs controlled substances.
22     Q.  Staying with the the Controlled Substances
23  Act, staying with the statute, staying with the
24  federal law, you'd agree, sir, that a registrant, a
25  distributor, has to maintain effective controls to

Page 408

1  prevent diversion, true?
2      MS. VANNI:  Object to the form.
3      THE WITNESS:  That is part of the --
4  that's part of the regulation, yes.
5  BY MR. BUCHANAN:
6      Q.  That's part of the public trust?
7      MS. VANNI:  Object to the form.
8  BY MR. BUCHANAN:
9      Q.  You ask -- "you" being a manufacturer or
10  "you" being a distributor who wishes to distribute a
11  controlled substance -- asks for a registration so
12  that they can distribute controlled substances;
13  that's the ask of the government, right?
14     MS. VANNI:  Object to the form.
15     THE WITNESS:  One asks for a registration
16  so that they can either manufacture and/or
17  distribute controlled substances.
18  BY MR. BUCHANAN:
19     Q.  And in return, you commit to maintain
20  effective controls to prevent diversion.  Fair?
21     MS. VANNI:  Object to the form.
22     THE WITNESS:  That is what the regulation
23  states, and that is what registrants are held
24  to.
25

Page 409

1  BY MR. BUCHANAN:
2      Q.  That's what the statute states, right?
3      A.  That's what -- the statute.
4      Q.  Okay.  And so we'd agree at the point in
5  time, sir, in 2013 -- when did you first get
6  approached -- or did you get approached about joining
7  QualiTest?  How did that come about, sir?
8      MS. VANNI:  Object to the form.
9      THE WITNESS:  I believe it was indeed a
10  job search engine.  I was looking for a job,
11  simply because the commute from Atlanta to
12  La Guardia -- La Guardia is horrible, and I did
13  that for a year and a half, commuting.  I just
14  couldn't do it anymore, so I started looking for
15  another job.
16     So I believe the job search was on the
17  Internet; maybe Indeed or Monster, or whatever
18  the thing was at the time.  I don't remember.
19  BY MR. BUCHANAN:
20     Q.  So was it before or after you interviewed
21  for the job that you learned that QualiTest had
22  problems with their suspicious-orders monitoring
23  system?
24     MS. VANNI:  Object to the form.
25     THE WITNESS:  I never knew that QualiTest

Page 410

1 had problems with their suspicious order
2 monitoring system.
3 BY MR. BUCHANAN:
4    Q.  Not until you got there?
5       MS. VANNI:  Object to the form.
6       THE WITNESS:  When I got there, I wasn't
7 aware of any problems with the suspicious order
8 monitoring system.
9 BY MR. BUCHANAN:
10    Q.  Oh.  Okay.  We'll talk about that.
11       At the point in time when you were
12 interviewing with QualiTest, or about the time when
13 you joined, were you aware that the company was
14 selling billions of oxycodone pills on a yearly or
15 biyearly basis?
16       MS. VANNI:  Object to the form.
17       THE WITNESS:  I was not aware of the
18    quantity or sales of controlled substances by
19    the company.
20 BY MR. BUCHANAN:
21    Q.  Were you aware that the DEA had a sitdown
22 with them --
23       MR. PAPANTONIO:  Object to the form.
24 BY MR. BUCHANAN:
25    Q.  -- and said, "You're not doing what you

Page 411

1 need to do with regard to your suspicious order
2 monitoring"?
3       Were you aware of that, sir?
4       MS. VANNI:  Object to the form.
5       THE WITNESS:  What time frame are you
6    asking was I aware of it?
7 BY MR. BUCHANAN:
8    Q.  Would be March 2013.
9    A.  No, I mean what time frame are you asking
10 was I aware of a meeting with DEA?
11    Q.  I guess at the point in time before you
12 joined.
13    A.  Was it prior to my employment?  No, I was
14 not aware.
15    Q.  Okay.  Because before you joined, in fact,
16 the company had a little sitdown with the DEA, and
17 DEA expressed concern with what the company was doing
18 with regard to its monitoring of orders.  Fair?
19       MS. VANNI:  Object to the form.
20       THE WITNESS:  I was not aware of any
21    sitdown prior to my employment with QualiTest.
22 BY MR. BUCHANAN:
23    Q.  After you joined the company, sir, did you
24 subsequently learn that the company had a sitdown
25 with the DEA where the DEA expressed concern with the

Page 412

1 suspicious-order monitoring system the company was
2 employing?
3       MS. VANNI:  Same objection.
4       THE WITNESS:  After my employment, I did
5    have a meeting, and I was told that there was a
6    meeting with DEA.
7 BY MR. BUCHANAN:
8    Q.  The meeting, right?
9       MS. VANNI:  Objection.
10       THE WITNESS:  I don't know what "the
11    meeting" means, but there was a meeting with the
12    DEA.
13 BY MR. BUCHANAN:
14    Q.  Isn't that how you referred to it in your
15 presentation, sir, "the meeting"?
16       MS. VANNI:  Object to the form.
17       THE WITNESS:  I don't recall.
18 BY MR. BUCHANAN:
19    Q.  Okay.  Well, I mean, let's talk about
20 QualiTest in the scheme of narcotics and opioids.
21       MR. BUCHANAN:  Can I have, please, 575.
22 And what's our next in order for the deposition?
23 BY MR. BUCHANAN:
24    Q.  Sir, I'm going to pass you Exhibit 27 to
25 your deposition.

Page 413

1       (Cardinal-Brantley 27 was marked for
2 identification.)
3       MR. BUCHANAN:  Can you pull it up, please,
4 Evan, while we're getting copies distributed.
5 BY MR. BUCHANAN:
6    Q.  And I'll wait until you get one before I
7 ask you questions.  Here you go.  Here you are.
8       MR. BUCHANAN:  Counsel, there's a couple
9 coming over for you.
10 BY MR. BUCHANAN:
11    Q.  Sir, these are charts of -- that were
12 shown to the company at a meeting with the DEA in
13 March of 2013.  I direct your attention, please,
14 to -- I want to use the page numbers in the top
15 right, those little dot numbers; just dot 3, to get
16 it rolling.
17       First of all, have you seen these before?
18    A.  I did see these, I believe, in a binder.
19    Q.  Yeah.  We -- we don't actually get them in
20 a binder when they come to us in litigation, but
21 hopefully you recognize this as something you saw
22 while you were at QualiTest.
23    A.  Yes, that's what I mean.  I -- I believe I
24 saw them in a binder when I was there at QualiTest.
25    Q.  Okay.  So just to set the scene, as you

Page 414

1  understand this, sir, the DEA sat down with the
2  company in 2013, March of 2013, and identified a
3  number of concerns with regard to the company's
4  suspicious order practices.  True?
5      MS. VANNI:  Objection to form.
6      THE WITNESS:  If that says that in here --
7  I haven't read it yet; these are just graphs.
8  BY MR. BUCHANAN:
9      Q.  Do you have that recollection, sir?
10     MS. VANNI:  Objection.
11 BY MR. BUCHANAN:
12     Q.  Do you have that recollection or
13 understanding from your time at QualiTest that the
14 DEA sat down, presented charts -- these charts -- had
15 a discussion with the company where they raised
16 concerns with the company's practices as it related
17 to suspicious orders?
18     MS. VANNI:  Object to form.
19     THE WITNESS:  I do remember sitting down
20 and seeing the charts, and I do remember there
21 was a conversation that they had met with DEA.
22 I don't remember what the findings were or the
23 details from that conversation.
24 BY MR. BUCHANAN:
25     Q.  Okay.  And so this comes from the DEA's

Page 415

1  assembly of data across manufacturers and the
2  information they captured.  We're on point 3.
3      And you see the first two columns on the
4  left, sir?  Not really columns; like I said, the
5  vertical bars.  Vintage Pharmaceuticals and Generics
6  Bidco, LLC.
7      Do you see those two?
8      A.  Yes.
9      Q.  Now you recognize those companies, sir, as
10 QualiTest affiliates that were in the business of
11 making narcotics?
12     MS. VANNI:  Objection.
13     THE WITNESS:  I remember seeing Vintage
14 Pharmaceuticals and Generic Bidco.
15 BY MR. BUCHANAN:
16     Q.  Okay.  So this is showing, sir, if I've
17 got it right, that -- and follow along with me here.
18 We have got 102 million pills.
19     And what's the period of time, sir?
20 Vintage Pharmaceuticals, 102 million pills they're
21 making?  What year is that?
22     MS. VANNI:  Object to the use of this
23 document, to the extent it predates his
24 employment with the company.
25

Page 416

1  BY MR. BUCHANAN:
2      Q.  I think you said you saw it, right?
3  During your employment with the company, sir?
4      A.  Well, the question is -- the date is
5  March 6th, 2013, and during my employment, I did see,
6  again, a binder with these graphs in it.
7      Q.  Oh, good.  I just want to make sure we
8  were still on the same page.
9      102 million pills.  And this is -- this is
10 just one -- one tablet strength, and for one pill
11 bottle format, correct?
12     MS. VANNI:  Object to the form.
13 BY MR. BUCHANAN:
14     Q.  Oxycodone, 15 milligrams; you see that,
15 right?  Right there, sir?
16     A.  Yes, oxycodone, 15 milligrams.
17     Q.  Okay.  And between the two, what's that,
18 200 million pills?
19     MS. VANNI:  Object to the form.
20     THE WITNESS:  Yes.
21 BY MR. BUCHANAN:
22     Q.  200 million pills.  One dosage, one bottle
23 size, and one year; is that right?
24     MS. VANNI:  Object to the form.
25

Page 417

1  BY MR. BUCHANAN:
2      Q.  Is that what this shows, sir?
3      A.  According to this form --
4      MS. VANNI:  Same objection.
5      THE WITNESS:  -- yes, 200 million pills.
6  BY MR. BUCHANAN:
7      Q.  All right.  Let's -- let's move forward.
8  I guess I should -- I probably didn't set
9  this chart up right.  We'll do -- and we said -- and
10 I'm -- we're doing some rounding here, sir, just
11 because I think we're -- we're close enough if we're
12 within a million or so, but 200 million pills in
13 2011.  Fair?
14     MS. VANNI:  Objection.
15     THE WITNESS:  Yes.
16 BY MR. BUCHANAN:
17     Q.  Okay.  Could you scroll forward with me,
18 sir, to -- let's see -- point 10.  Two pages down.
19     Again we see that Vintage Pharmaceuticals
20 and Generics Bidco.  You see that?  First two columns
21 on the left?
22     A.  Yes.
23     Q.  What's that up to, roughly?  250?
24 250 million?
25     MS. VANNI:  Object to the form.

Page 418

1    THE WITNESS: Yes, about -- about 250.
2  BY MR. BUCHANAN:
3    Q.  All right.  250 million pills.  And that's
4  2012, right?
5    A.  Yes.
6    Q.  Okay.  So you went from 200 million oxy,
7  15 milligrams, in that one bottle size, to
8  250 million over that year.  Is that right?
9    MS. VANNI:  Object to form.
10    THE WITNESS:  This year was 2012.  I don't
11   remember what the other year was, but . . .
12  BY MR. BUCHANAN:
13    Q.  Okay.
14    MR. BUCHANAN:  And can I just have the
15   Elmo real quick, Evan.
16  BY MR. BUCHANAN:
17    Q.  So-- I just want to make sure we don't get
18  too far down; we're kind of keeping track, right?
19    A.  Okay.
20    Q.  Those are -- those numbers track, we've
21  been talking about?
22    MS. VANNI:  Object to the form.
23  BY MR. BUCHANAN:
24    Q.  Oxy, 15 milligrams, 100-count bottles,
25  200 million in 2011, 250 million in 2012, right?

Page 419

1    MS. VANNI:  Same objection.
2    THE WITNESS:  Yes.
3  BY MR. BUCHANAN:
4    Q.  Okay.  Oxycodone was a drug of abuse,
5  true?
6    MS. VANNI:  Objection.
7    THE WITNESS:  Oxycodone is a Schedule II
8    controlled substance.  As a Schedule II, it's
9    prone to abuse.
10  BY MR. BUCHANAN:
11    Q.  Okay.  And also prone to diversion; you
12  knew that, right, sir?
13    MS. VANNI:  Objection.
14    THE WITNESS:  By being a Schedule II drug,
15    that means it's prone to abuse and diversion.
16  BY MR. BUCHANAN:
17    Q.  Okay.
18    MR. BUCHANAN:  Let's see if we can get to
19   -- scroll forward a little bit.
20  BY MR. BUCHANAN:
21    Q.  The company also sold oxy, 15 milligrams,
22  in 500-count containers; isn't that right?
23    MS. VANNI:  Object to the form.
24  BY MR. BUCHANAN:
25    Q.  If you go to page 18.

Page 420

1    A.  Okay.
2    Q.  Sorry.  Been a few years.
3    All right.  Now we're back on 2011.
4    Oxy, 15-milligram, 500-count bottles; see
5  those?
6    A.  Yes.
7    Q.  And I guess you sold less of this
8  particular bottle size, right, sir?
9    MS. VANNI:  Objection.
10  BY MR. BUCHANAN:
11    Q.  That -- what's that, about 13 million?
12  Does that sound right?
13    A.  Yes.
14    Q.  All right.  Let's move on to point 24.
15    Okay.  This looks like -- what, about
16  23 million pills sold in 2012?
17    MS. VANNI:  Objection.
18  BY MR. BUCHANAN:
19    Q.  Of this oxy 15 in the 500-bottle count,
20  right?
21    MS. VANNI:  Same objection.
22    THE WITNESS:  Yes.
23  BY MR. BUCHANAN:
24    Q.  Okay.
25    MR. BUCHANAN:  Can I just flip back to the

Page 421

1    Elmo real quick, Evan.
2  BY MR. BUCHANAN:
3    Q.  All right.  I guess just in -- in these
4  two bottle counts, sizes, sir, you're up to a half a
5  billion pills in two years at QualiTest for oxy 15s,
6  right?
7    MS. VANNI:  Object to the form.
8    THE WITNESS:  270.  213.
9  BY MR. BUCHANAN:
10    Q.  I'm sorry, for two years, yeah, 200.
11  That's 450 -- I'm sorry, sir.  What is that?
12  About --
13    A.  About 490.
14    Q.  490.  Getting close?
15    A.  Yes.
16    Q.  All right.  Let's -- there was another
17  dosage strength of oxycodone that the company made
18  and sold, right?
19    A.  I believe so.  I'd have to see the data.
20    Q.  All right.  Let's see what that looks
21  like.
22    MR. BUCHANAN:  Could I please have --
23   let's go to page point 30, Evan.
24    MS. VANNI:  I'm sorry, what page?
25    MR. BUCHANAN:  Point 30.  Top right

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1  corner.
2      MS. VANNI:  Thank you.
3  BY MR. BUCHANAN:
4      Q.  All right.  And is this showing, sir,
5  the -- the pill counts manufactured and sold by the
6  two QualiTest entities in 2011 for the oxy
7  30-milligram dosage strength?
8      MS. VANNI:  Object to the form.
9      THE WITNESS:  Yes.
10  BY MR. BUCHANAN:
11      Q.  And what do you have, about 182 million
12  pills for 2011?
13      MS. VANNI:  Object to the form.
14  BY MR. BUCHANAN:
15      Q.  Does that look right to you, sir?
16      A.  Yes.
17      Q.  Okay.  All right.
18      MR. BUCHANAN:  Let's go to 2012.  Page
19  point 43.  All right.
20  BY MR. BUCHANAN:
21      Q.  Page point 43, two left columns.  That's
22  reflecting the production there for the other two
23  QualiTest facilities, Generics Bidco and Vintage
24  Pharmaceuticals.  Oxy, 30 milligrams, again in the
25  100-count bottle.

Page 423

1      And -- looks like you're growing the
2  market, huh?
3      MS. VANNI:  Object to the form.
4  BY MR. BUCHANAN:
5      Q.  What are we up to, 280 million?
6      MS. VANNI:  Object to the form.
7      THE WITNESS:  Yes.
8  BY MR. BUCHANAN:
9      Q.  Probably a little low with the 280, but
10  that's good enough for our purposes; two hundred
11  and --
12      MS. VANNI:  Object to the colloquy.
13      MR. BUCHANAN:  Okay, I'll be more precise.
14  BY MR. BUCHANAN:
15      Q.  285 million:  Does that sound closer to
16  you, sir?
17      A.  Yes.
18      Q.  Okay.  Wow.  Picked up 100 million pills
19  you sold between 2011, 2012.
20      All right, we're following each other,
21  right, sir?  My -- my writing is not the best, but
22  does that correlate with your memory of your
23  testimony?
24      A.  Yes.
25      Q.  Okay.  Let's move on.

Page 424

1      Let's see -- oxy -- I'm sorry, Oxy,
2  30 milligrams, and 500 count.
3      MR. BUCHANAN:  All right.  Can we go to
4  point 50.
5  BY MR. BUCHANAN:
6      Q.  And I think that's showing -- what, about
7  20 million pills, sir, in those two columns, if you
8  add them up?  Oxycodone, 30-milligram, 500s.  Okay?
9      A.  Yes.
10      Q.  All right.  Moving on to point 54, let's
11  look at the 2012 numbers.
12      Is that 46 million?
13      MS. VANNI:  Object to the form.
14  BY MR. BUCHANAN:
15      Q.  46 million dosage units, sir?
16      A.  Yes.  Yes.
17      Q.  Okay.  Close to a billion oxy, sir, in two
18  years, two dosage strengths?
19      Is that what you have?
20      MS. VANNI:  Objection.
21      THE WITNESS:  Give or take, yeah, close to
22  a billion.
23  BY MR. BUCHANAN:
24      Q.  A billion pills.  Oxycodone, highly
25  abused, highly diverted.  True, sir?

Page 425

1      MS. VANNI:  Objection.
2      THE WITNESS:  I can't speak if it's highly
3  abused or highly diverted.  It is definitely
4  prone to abuse and diversion.
5  BY MR. BUCHANAN:
6      Q.  Okay.  And the company made other schedule
7  drugs, right?
8      A.  Yes.
9      Q.  Hydrocodone was a popular one the company
10  sold?
11      MS. VANNI:  Object to the form.
12      THE WITNESS:  The company sold
13  hydrocodone.
14  BY MR. BUCHANAN:
15      Q.  And you know that hydrocodone was
16  ultimately a Schedule II; was that 2013, '14?
17      A.  It was up-scheduled, I believe, October of
18  one of those years.
19      Q.  Okay.  And another drug that was prone to
20  abuse, true?
21      MS. VANNI:  Object to the form.
22      THE WITNESS:  Yes.
23  BY MR. BUCHANAN:
24      Q.  And diversion?
25      MS. VANNI:  Same objection.

Page 426

1    THE WITNESS:  Yes.
2  BY MR. BUCHANAN:
3    Q.  Another one you made billions of tablets
4  of, right?
5    MS. VANNI:  Objection.
6    THE WITNESS:  I'd have to see the charts
7    to know how many tablets we made.
8  BY MR. BUCHANAN:
9    Q.  Okay.  Just -- let me just take you to
10  one, and -- we're going to have to build this one out
11  for this one, too, but -- can you go to point 59.
12    These are, again, the two QualiTest
13  facilities there on the bottom left:  Vintage and
14  Generics Bidco.
15    Do you see that?
16    A.  Yes.
17    Q.  Okay.  And I won't build the full chart
18  out, sir, but it's -- what's that, 262 million dosage
19  units of the hydrocodone 10s combined with
20  acetaminophen?
21    A.  Yes.
22    Q.  And that's just in the hundred-count
23  bottle, right?
24    MS. VANNI:  Object to the form.
25    THE WITNESS:  Yes.

Page 427

1    MR. BUCHANAN:  Could we go to point 67.
2  BY MR. BUCHANAN:
3    Q.  Looks like, sir, in 2012, you guys are up
4  to 560 million dosage units.  560 million dosage
5  units of hydrocodone 10, acetaminophen, in the
6  100-count bottle, in one year.
7    Do I have that correct, sir?
8    MS. VANNI:  Object to the form.
9    THE WITNESS:  Yes.
10  BY MR. BUCHANAN:
11    Q.  You wouldn't fuss with me, sir, in saying
12  that just based on your experience with one year and
13  one dosage and one combination, that you sold
14  billions in hydrocodone in 2011 and 2012, would you,
15  sir?
16    MS. VANNI:  Object to the form.
17    THE WITNESS:  I can't attest to the
18    billions, but I'm sure there was -- just from
19    what I've looked at so far, a billion, at least.
20  BY MR. BUCHANAN:
21    Q.  Yeah, and that was just --
22    A.  Yeah.
23    Q.  That was just for one, right?
24    There's other pages in here, and I've got
25  a limited window of time, so I'm going to -- I'm

Page 428

1  going to move along.  If the jury would like to look
2  at it, I'm sure they'll have the chance.
3    All right, sir.  So we can agree it's a
4  closed system -- supposed to be a closed system,
5  right?
6    MS. VANNI:  Object to the form.
7    THE WITNESS:  Yes.
8  BY MR. BUCHANAN:
9    Q.  And your promise as a registrant is that
10  you -- you, the registrant -- are going to ensure and
11  create effective controls to prevent diversion,
12  right?
13    MS. VANNI:  Object to the form.
14    THE WITNESS:  That we're going to have
15    systems in place to help prevent diversion, to
16    identify and prevent diversion.
17  BY MR. BUCHANAN:
18    Q.  Well, I mean, you're getting fuzzy on the
19  statute with me, sir.
20    We talked about the statute earlier,
21  right?
22    MS. VANNI:  Objection.
23    THE WITNESS:  Yes.  And the statute states
24    that the registrant shall implement a system to
25    identify and notify DEA of potential -- of

Page 429

1  suspicious orders.
2  BY MR. BUCHANAN:
3    Q.  "A registrant shall have effective
4  controls to prevent diversion."
5    Does that language sound familiar to you,
6  sir?
7    A.  I was referring to 21 CFR 1301.74(b).
8    Q.  And I'm referring you to the statute in
9  the Controlled Substances Act, sir.  It's a statute
10  you're familiar with; you cited it in your
11  PowerPoints, right?
12    MS. VANNI:  Object to the form.
13    THE WITNESS:  I may have put it in the
14    PowerPoints over time, yes.
15  BY MR. BUCHANAN:
16    Q.  Right.  And a registrant shall maintain
17  effective controls against -- to prevent diversion.
18    That's what the statute says, right?
19    MS. VANNI:  Object to the form.
20    THE WITNESS:  Yes.
21  BY MR. BUCHANAN:
22    Q.  As a manufacturer, sir, pumping out
23  billions of pills with hydrocodone, oxycodone, would
24  you agree, sir, that the company has a
25  responsibility, as a reasonable company, to prevent

Page 430

1 diversion?
2      VIDEOGRAPHER: Object to the form.
3      THE WITNESS: According to the statute and
4 the regulation that we both discussed, that's the
5 responsibility of a registrant.
6      MR. BUCHANAN: Even separate from that,
7 sir, this is dangerous stuff. True?
8      MS. VANNI: Object to the form.
9      THE WITNESS: The two drugs that you
10 mentioned are Schedule II controlled substances,
11 which means, as you know, they are prone to
12 abuse and diversion.
13 BY MR. BUCHANAN:
14   Q. Okay. And I said "dangerous."
15      Would you agree with me?
16      MS. VANNI: Objection. Form.
17      THE WITNESS: These are drugs that are
18 prescribed by a doctor and dispensed by a
19 pharmacy and consumed. So your definition of
20 "dangerous" is your definition, but they are a
21 prescription drug that are prescribed by doctors
22 and dispensed by pharmacies and so forth.
23 BY MR. BUCHANAN:
24   Q. Well, we looked at the chart, sir, and we
25 looked at overdose deaths. You see that? Remember,

Page 431

1 we went through from 2000 -- I think we picked it up
2 at 2006?
3   A. Yes, this chart.
4   Q. You looked at that, right?
5   A. Yes.
6   Q. You saw the death rate climb as the years
7 went along?
8      MS. VANNI: Objection.
9      THE WITNESS: I did see the change in
10 colors over the -- from 2001 to -- I think you
11 went up to '13 or something.
12 BY MR. BUCHANAN:
13   Q. Right. So this stuff, oxycodone,
14 hydrocodone, is dangerous; can we agree?
15      MS. VANNI: Objection.
16      THE WITNESS: I would say that the abuse
17 of these drugs could be dangerous.
18 BY MR. BUCHANAN:
19   Q. Right. A reasonable manufacturer, sir,
20 implements systems to prevent diversion, true?
21      MS. VANNI: Object to the form.
22      THE WITNESS: Manufacturers implement
23 systems to identify diversion.
24 BY MR. BUCHANAN:
25   Q. A reasonable one does that, right?

Page 432

1      MS. VANNI: Object to the form.
2 BY MR. BUCHANAN:
3   Q. Should do that.
4   A. A manufacturer that has a DEA
5 registration, per the statute and the -- the
6 regulation that we've gone over, is to identify -- is
7 to have a system in place to identify and report
8 suspicious orders.
9 BY MR. BUCHANAN:
10   Q. I'm just saying as a -- as a member of the
11 public -- and I'm -- I'm using a company as a
12 member -- as a member of the public in this country,
13 selling something that is addictive, that can lead to
14 overdoses, that can tear up families, that can tear
15 up communities, that can kill people, would you
16 agree, sir, even if the DEA didn't say anything more,
17 if you were going to pump out 2 billion pills, you
18 better take care in your distribution of this product
19 to make sure the usage is contained as designed?
20      MS. VANNI: Object to the form.
21 BY MR. BUCHANAN:
22   Q. Can we agree on that?
23      MS. VANNI: Objection.
24      THE WITNESS: I will say that a
25 manufacturer, per the regulation, should operate

Page 433

1 in a closed-door system and design a system to
2 identify and report suspicious orders.
3 BY MR. BUCHANAN:
4   Q. You see, sir -- would you agree, sir, that
5 when these products that you made billions of tablet
6 of in 2011 and 2012, when they leave legitimate
7 channels they've been manufactured to support,
8 heart-wrenching consequences can occur; would you
9 agree with me on that?
10      MS. VANNI: Object to the form.
11      THE WITNESS: The abuse of controlled
12 substances is sad.
13 BY MR. BUCHANAN:
14   Q. Would you agree, sir, as a responsible
15 corporate citizen, you got to do as much as you can
16 do to prevent drug abuse and diversion in the
17 communities?
18      Would you agree to that, sir?
19      MS. VANNI: Object to the form.
20 BY MR. BUCHANAN:
21   Q. As a responsible corporate citizen?
22   A. Again, I go back to the governing statute
23 and regulation --
24   Q. Okay.
25   A. -- of having a secure supply chain and

Page 434

1  designing a system to identify and report suspicious
2  orders.
3         MR. BUCHANAN:  Let's get 594 for the
4  witness and counsel.
5         And what's the next in order, Scott?  28?
6  Okay.
7  BY MR. BUCHANAN:
8      Q.  This is going to be Exhibit 28 to your
9  deposition, sir.
10     (Cardinal-Brantley 28 was marked for
11 identification.)
12 BY MR. BUCHANAN:
13     Q.  This is kind of fresh after your arrival
14 at the company, sir.  This is, I believe,
15 October 2013.
16         I'm sorry, there's an e-mail, and then
17 behind the e-mail, there's a letter.  I'm going to
18 spending my time with the letter.  You're free to
19 peruse the cover page if you'd like.
20         It's an October 18, 2013, letter.  "Dear
21 Valued Customer."
22         You see that, sir?
23     A.  Yes.
24     Q.  "A large percentage of QualiTest products
25 are categorized as controlled substances or listed

Page 435

1  chemicals that are regulated by the Drug Enforcement
2  Administration."
3         Sir, do you see that?
4      A.  Yes.
5      Q.  That's what you wrote in the letter, and
6  that's consistent with your memory, right?
7         MS. VANNI:  Objection to the
8  characterization of him writing the letter.
9         THE WITNESS:  This letter was signed by
10 Tracey Hernandez.
11 BY MR. BUCHANAN:
12     Q.  Oh, I see.  And -- and are you not cc'd on
13 this, sir?
14     A.  I'm listed at the bottom as a DE
15 Compliance Department contact.
16 BY MR. BUCHANAN:
17     Q.  Okay.  You are a DE Compliance Department
18 contact on this letter that went out to your
19 customers on October 18, 2013, correct, sir?
20         MS. VANNI:  Object to the form.
21         THE WITNESS:  Yes.
22 BY MR. BUCHANAN:
23     Q.  Okay.  Continuing the first paragraph, it
24 says, "These products, while necessary for patients,
25 can be targets for abuse and diversion."

Page 436

1         You'd agree with that statement; true,
2  sir?
3      A.  Yes.  As a controlled substance, they are
4  prone to abuse and diversion.
5      Q.  "And as a result, these products have
6  become highly desirable and to those seeking to abuse
7  or divert for profit."
8         See that?
9      A.  I do.
10     Q.  Okay.  You had that knowledge in 2013,
11 sir?
12         MS. VANNI:  Object to the form.
13         THE WITNESS:  Again, as a Schedule II
14    or III controlled substance, they are prone to
15    abuse and addiction.
16 BY MR. BUCHANAN:
17     Q.  I'm just -- I'm not asking you to reframe
18 it or give me something else; I just want to make
19 sure you had that knowledge.
20         You agree with that?
21     A.  I can only go back to the regulation.
22     Q.  Well, this doesn't relate to the
23 regulation, sir.  This is just a fact:  "Certain
24 QualiTest products have become highly desirable to
25 seeking to abuse or divert for profit."

Page 437

1         Do you agree or disagree, sir?
2      A.  That is the definition of a Schedule II
3  controlled substance.
4      Q.  I'm not asking whether it's a definition,
5  sir.  I'm asking you factually.
6         This is just an event?
7      A.  Factually, it is a Schedule II --
8  factually, it is a Schedule II controlled substance,
9  and as a Schedule II controlled substance, they are
10 prone to abuse and diversion.
11     Q.  Okay.
12         "When our products leave legitimate
13 channels they have been manufactured to support,
14 heart-wrenching consequences often occur."
15         See that, sir?
16     A.  I do.
17     Q.  Next in this letter to your valued
18 customers, sir, it's written response -- "As
19 responsible corporate citizens, individuals, parents,
20 friends, caregivers, relatives, and acquaintances, we
21 need to do as much as we can do to prevent drug abuse
22 and diversion in our communities."
23         Did I read that correctly, sir?
24         MS. VANNI:  Object to the colloquy in the
25    beginning.

Page 438

BY MR. BUCHANAN:

1 BY MR. BUCHANAN:

2    Q.  Did I read that correctly?

3    A.  Yes.

4    Q.  Thank you.

5        It states:  "Each company and individual

6 in the supply chain has that responsibility."

7        Did I read that correctly, sir?

8    A.  Yes.

9    Q.  "To put adequate controls in place to

10 discourage and prevent the diversion of prescription

11 products for uses other than those for which they

12 were originally intended."

13       Did I read that correctly, sir?

14   A.  Yes.

15   Q.  Okay.  And the context around this letter,

16 sir, is that you had a visit with the DEA down in

17 Washington in the spring of 2013, right?

18       MS. VANNI:  Object to the form.

19 BY MR. BUCHANAN:

20   Q.  I'm sorry, your QualiTest -- I'd say

21 co-employees, once you joined, but Ms. Hernandez and

22 others had a meeting with the DEA in the spring of

23 2013, right?

24   A.  There was a meeting with the DEA.

25   Q.  Okay.  And you were scheduled to go back

Page 439

1 and see the DEA again in October of 2013 and show how

2 you shored up your systems, right?

3        MS. VANNI:  Object to the form.

4        THE WITNESS:  I don't know if -- if there

5        was another meeting in October 2013.

6 BY MR. BUCHANAN:

7    Q.  Okay.  All right.

8        It states what you're going to do here at

9 the bottom.  You're making changes that may impact

10 your customers when placing orders, right?  Changes?

11   A.  Are you on the same page?

12   Q.  I am.  Second paragraph -- third

13 paragraph, sir:  "Some of these changes may impact

14 you in placing orders with us in the future," just to

15 orient you, sir:

16       You see that?

17       I'm going to read the --

18   A.  "QualiTest would like to make you aware of

19 some changes that we are making."  Okay, yes.

20   Q.  Okay.  So QualiTest was making changes,

21 right?

22       MS. VANNI:  Object to the form.

23       THE WITNESS:  Yes.

24 BY MR. BUCHANAN:

25   Q.  Okay.  "QualiTest is enhancing its due

Page 440

1 diligence efforts when fulfilling orders to provide

2 greater assurance that our products are purchased by

3 appropriate patients for prescribed uses."

4        Is that right?

5    A.  That's what it says.

6    Q.  Okay.  That's something reasonable for a

7 company to do, right?

8        MS. VANNI:  Object to the form.

9        THE WITNESS:  It's always good to make

10       enhancements.

11 BY MR. BUCHANAN:

12   Q.  Well, it's always good to do whatever you

13 can do to make something that's really dangerous less

14 dangerous; would you agree with me, sir?

15       MS. VANNI:  Objection.

16       THE WITNESS:  It's always good to enhance

17       any program.

18 BY MR. BUCHANAN:

19   Q.  Right.  And what you're talking about here

20 is products that have become highly desirable to

21 those seeking to abuse or divert for profit, right?

22   A.  I believe that was stated in the letter.

23   Q.  Okay.  And then you're talking about

24 changes that are going to be implemented, right, as a

25 responsible corporate citizen, right?

Page 441

1        MS. VANNI:  Object to the form.

2        THE WITNESS:  This letter is about the

3        changes that would be implemented.

4 BY MR. BUCHANAN:

5    Q.  Okay.  And you're just telling your

6 customers that, right?  So they're not surprised when

7 all of a sudden, if -- you know their orders start

8 getting canceled, right?

9        MS. VANNI:  Object to the form.

10       THE WITNESS:  Just telling the customers

11       about the changes.

12 BY MR. BUCHANAN:

13   Q.  Okay.  You say, "As a result, you may

14 receive more frequent inquiries from QualiTest

15 regarding your own suspicious monitoring efforts."

16       Let's pause on that.

17       So what you did when you implemented this

18 change is you started asking your customers, these

19 people -- well, withdrawn.

20       QualiTest is a manufacturer, true?

21   A.  Yes.

22   Q.  Also had a distributor registration, true?

23   A.  Yes.

24   Q.  Okay.  And so -- but when QualiTest is

25 selling to folks like Cardinal, your prior employer,

Page 442

1 they're a middleman, right? They're not -- they're
2 not dispensing the drug to patients, right?
3      A. Who's a middleman? QualiTest?
4      Q. Cardinal, wholesalers -- wholesalers,
5 distributors -- they're middlemen?
6      A. Your question wasn't clear. So you're
7 asking me whether Cardinal is a middleman or whether
8 QualiTest is a middleman?
9      Q. If it wasn't clear, I apologize, sir.
10 What I was saying is, QualiTest was making pills,
11 right?
12      A. QualiTest is the manufacturer of --
13      Q. We saw, you know, billions of scheduled
14 drugs being made in 2011 and 2012 alone, true?
15          MS. VANNI: Objection.
16          THE WITNESS: Yes, according to the -- the
17      graphs that we --
18 BY MR. BUCHANAN:
19      Q. Okay.
20      A. -- reviewed earlier.
21      Q. And then QualiTest is going to put those
22 in the hands of -- sometimes directly with retail
23 pharmacies, but mostly through distributors, right?
24          MS. VANNI: Object to the form.
25          THE WITNESS: Yes.

Page 443

1 BY MR. BUCHANAN:
2      Q. Right. And the distributors are then
3 going to route these things to their ultimate home, a
4 pharmacy, where they could be dispensed if they're
5 not diverted?
6      A. Right. They were selling to the final
7 dispensers: Pharmacies, hospitals, and so forth.
8      Q. So one of the things you're going to do is
9 you're going to start asking if they have suspicious
10 order monitoring processes, right? Going to start
11 knowing your customer, right?
12          MS. VANNI: Object to the form.
13          THE WITNESS: By the phrase start, I can't
14      speak to what was done prior to my arrival. So
15      to say that something is going to start with
16      this letter, again, I can't speak to what was
17      done prior to October 2013, when I arrived.
18 BY MR. BUCHANAN:
19      Q. Okay. But you were going to be asking
20 your customers for their suspicious-order monitoring
21 protocols, right?
22      A. That is a question on the attached
23 questionnaire.
24      Q. Yeah. I mean, that's -- that's what's
25 listed as a change, right? Some things are going to

Page 444

1 change, and that's one of the things you list as a
2 change, right?
3          MS. VANNI: Object to the form.
4          THE WITNESS: Show me the exact statement
5      so I can know exactly what it says, please. I
6      got lost in here.
7 BY MR. BUCHANAN:
8      Q. Okay.
9      A. Where, exactly --
10      Q. Beginning of the paragraph, it says "going
11 to be making some changes"; do you see that?
12      A. No, I mean to the question that you asked
13 about specifically what was going to change.
14      Q. Okay. "As a result, you may receive more
15 frequent inquiries from QualiTest regarding your own
16 suspicious-order monitoring efforts, the quantity of
17 the product you are ordering from us, or the customer
18 service."
19          Do you see that, sir?
20      A. Yes, "you may receive more frequent
21 inquiries," which means --
22      Q. My question to you, sir, is do you see
23 that?
24      A. Yes, it is, which means that they were --
25      Q. No, no. No, no, sir.

Page 445

1      A. -- prior to --
2          MS. VANNI: Let him finish.
3 BY MR. BUCHANAN:
4      Q. My question is: Do you see it?
5      A. I see it.
6          MR. FULLER: You'll have an opportunity to
7      do a direct examination --
8          MS. VANNI: No, let him answer
9      his question.
10          THE WITNESS: I was answering your
11      previous question.
12          MR. BUCHANAN: No, no, no. That's not how
13      it works. An examination -- an examination here
14      is supposed to proceed as it would in court. A
15      witness would not be permitted to do that in
16      court.
17          MS. VANNI: He's allowed to answer his --
18      your question.
19          MR. BUCHANAN: That's not an answer. The
20      answer was -- did it -- do you see that, sir?
21          MS. VANNI: It may not be an answer you
22      like --
23          MR. BUCHANAN: No, that's not --
24          MS. VANNI: -- that's an answer.
25          MR. BUCHANAN: Okay. We'll move along.

Page 446

1    It's not a matter of whether I like it or not,
2  sir.  I just like responsive answers to my
3  questions.
4        MS. VANNI:  Move to strike the colloquy.
5  BY MR. BUCHANAN:
6    Q.  All right.  You're also going to start
7  doing due diligence visits.
8    You see that, sir?
9        MS. VANNI:  Object to the form.
10       THE WITNESS:  I'm trying to read where it
11  says that.
12  BY MR. BUCHANAN:
13   Q.  Did you do due diligence visits while you
14  were at QualiTest, sir?
15   A.  Yes.
16   Q.  Okay.  This is -- what's the date of this
17  -- October 18th, 2013.  So this is -- what, two
18  weeks, two and a half weeks after you joined the
19  company?
20   A.  I don't remember my exact start date.  I
21  believe it was October 2013.  I don't remember when.
22   Q.  Do you remember sharing with your
23  colleagues, sir, your vision for QualiTest's
24  suspicious order monitoring system?
25       MS. VANNI:  Object to the form.

Page 447

1        THE WITNESS:  Are you referring to a
2  training?  Are you referring to a PowerPoint?
3  Are you referring to -- a conversation?
4  BY MR. BUCHANAN:
5    Q.  I'm referring to your vision for it.
6        MS. VANNI:  Object to the form.
7        THE WITNESS:  What was your original
8  question?
9  BY MR. BUCHANAN:
10   Q.  Do you recall sharing, sir, with your
11  colleagues, your vision for their suspicious order
12  monitoring system?
13       MS. VANNI:  Same objection.
14       THE WITNESS:  Again, on several occasions
15  I've had meetings with colleagues regarding
16  the -- the system.  So, yes, I remember sharing.
17  BY MR. BUCHANAN:
18   Q.  Okay.  And so this arises, as we said,
19  there was a -- there's this meeting with the FDA in
20  March of 2013.  There's a further meeting with FDA in
21  October of 2013.  You step in September of 2013.
22  True?
23       MS. VANNI:  Objection.
24       THE WITNESS:  Do you mean DEA?  You stated
25  "FDA."

Page 448

1  BY MR. BUCHANAN:
2    Q.  Thank you.  I appreciate the
3  clarification.  I'll withdraw that question.
4    There was a meeting with DEA, March of
5  2013, during which suspicious order monitoring was
6  discussed?
7        MS. VANNI:  Object to the form.
8        THE WITNESS:  I believe that's what we
9  reviewed.
10  BY MR. BUCHANAN:
11   Q.  There was a follow-up six months later,
12  right?
13       MS. VANNI:  Objection.
14   Q.  In October of 2013, with the DEA?
15   A.  I believe that's what you stated.
16   Q.  Okay.  And you joined the company in
17  September 2013, right?
18       MS. VANNI:  Objection.
19       THE WITNESS:  I don't recall if it was
20  September or October 2013.
21  BY MR. BUCHANAN:
22   Q.  Okay.
23   A.  Somewhere around that time frame.
24       MR. BUCHANAN:  Can we pass the witness 58,
25  please -- 583.  Excuse me.

Page 449

1  BY MR. BUCHANAN:
2    Q.  This is an e-mail, sir -- and I'll -- I'll
3  wait before I get into the meat of it -- from
4  yourself to yourself, Monday, October 7, 2013.
5    I'll represent to you, sir, I've seen
6  reference that you started on September 30.
7    Does that refresh your recollection?  I
8  mean, it's your testimony; I'm just asking if that
9  helps you remember.
10   A.  If you have seen something that stated I
11  started September 30th, I accept that.
12   Q.  Okay.  So we're looking now at --
13       MR. BUCHANAN:  What was the exhibit we
14  identified?  29?  This is Brantley 29.
15   (Cardinal-Brantley 29 was marked for
16  identification.)
17  BY MR. BUCHANAN:
18   Q.  "Below is a high-level outline of my
19  vision for our SOM program."
20   Do you see that, sir?
21   A.  Yes.
22   Q.  Okay.  You talk about implementing new
23  account setup criteria, correct?
24   A.  Yes.
25   Q.  Do you recall, sir, the implementation of

Page 450

1  questionnaires now for new accounts as part of the
2  setup process and the verification process of
3  QualiTest in this fall of 2013 time?
4      MS. VANNI: Object to form.
5      THE WITNESS: I did draft questionnaires.
6  I believe one was attached to the previous
7  document.
8  BY MR. BUCHANAN:
9      Q. Okay. So the letter that we just looked
10 at, the one from October, was that 18th? You're
11 saying you did the questionnaire that was attached to
12 that?
13     A. This looks like a draft of the
14 questionnaire that I did, yes.
15     Q. Okay. Well, it's -- it's attached to a
16 signed letter, right?
17     MS. VANNI: Object to the form.
18 BY MR. BUCHANAN:
19     Q. I'm just confirming, sir, that --
20 that's -- that's the one that went with it, right?
21     A. It's -- it's stapled to this letter, yes.
22     Q. Okay. And that's something you prepared
23 once you got to QualiTest, right?
24     A. This questionnaire is one that I -- it
25 looks like one that I prepared.

Page 451

1      Q. Okay. Getting back now to the -- what
2  exhibit are we on, Scott? 29?
3      It's a high-level outline of your vision
4  for the SOM program, right?
5      A. I'm sorry. I was on the wrong page.
6  Yes.
7      MS. VANNI: Object to the form.
8  BY MR. BUCHANAN:
9      Q. Okay. And basically there's going to be a
10 vetting process in connection with new accounts now,
11 right?
12     MS. VANNI: Objection.
13     THE WITNESS: There would be a vetting
14 process. You say "now." I don't -- again, I
15 can't speak to what was done prior to me.
16 BY MR. BUCHANAN:
17     Q. Okay. Well, if we go down here, third,
18 fourth bullet, we see: "The DEA compliance team will
19 verify DEA numbers, verify information on the
20 questionnaire, including license verification among
21 other things, conduct Internet research on the
22 company ownership and pick, including disciplinary
23 history."
24     Did I read that correctly, sir?
25     A. Yes.

Page 452

1      Q. That's something that's reasonable for a
2  company to do, is trade in billions of pills of
3  narcotics, true?
4      MS. VANNI: Objection.
5      THE WITNESS: That is part of the program
6  that I was rolling out as part of the
7  questionnaire, Know Your Customer, which is not
8  in 21 CFR 1301.74(b).
9  BY MR. BUCHANAN:
10     Q. Okay. So that's something that's
11 reasonable for a company who is trading in billions
12 of pills of narcotics to do, correct?
13     MS. VANNI: Object to the form.
14     THE WITNESS: That is something over and
15 above what the regulations stated, that we did.
16 BY MR. BUCHANAN:
17     Q. I'm not asking you that, sir. I'm asking
18 you whether it was reasonable for you to do that:
19 Yes or no?
20     A. It is something that we did.
21     Q. Okay. Was it unreasonable to do that?
22     A. You state reasonable --
23     MS. VANNI: Objection.
24     THE WITNESS: -- unreasonable; I'm stating
25 a fact. It was something that we did.

Page 453

1  BY MR. BUCHANAN:
2      Q. Okay, it was something --
3      A. It's a fact.
4      Q. -- that a responsible company would do,
5  right?
6      MS. VANNI: Objection.
7      THE WITNESS: It was something that
8  QualiTest did.
9  BY MR. BUCHANAN:
10     Q. Okay. We saw the letter before, sir, that
11 described the changes that were being implemented,
12 and said: "As responsible corporate citizens, we
13 need to do as much as we can do to prevent drug abuse
14 and diversion in our communities."
15     Do you recall reading that with me a few
16 minutes ago, sir?
17     A. I do.
18     Q. Okay. "Each company and individual in the
19 supply chain has that responsibility."
20     Do you recall reading that with me a few
21 moments ago, sir?
22     A. I see that.
23     Q. "To put adequate controls in place to
24 discourage and prevent the diversion of prescription
25 products for uses other than those for which they

Highly Confidential - Subject to Further Confidentiality Review

---

Page 454

1 were originally intended."
2    You see that, sir?
3    A. I do.
4    Q. Okay. All right. And what we see here in
5 your proposal, sir, are the adequate controls that
6 you were proposing to your team, right?
7       MS. VANNI: Object to the form.
8       THE WITNESS: These are my proposals that
9    I'm sharing with my team.
10 BY MR. BUCHANAN:
11    Q. Okay. Then you talk about -- if you
12 identify red flags, towards the bottom, you're going
13 to investigate that through an SOM manager, right?
14 Not a salesperson? Right?
15    A. (Reading) It's stating that the DEA team
16 member can engage the SOMS manager, who was -- I was
17 the SOMS manager.
18    Q. Okay. And then you get the wholesalers
19 and distributors; this is onboarding for them, right?
20    These are your proposals for your SOM
21 program, right?
22       MS. VANNI: Objection to form.
23       THE WITNESS: Yes.
24 BY MR. BUCHANAN:
25    Q. Okay. And on these, sir, again, you're

---

Page 455

1 going to do due diligence on your wholesale and
2 distributor customers, right?
3       MS. VANNI: Object to the form.
4       THE WITNESS: Yes.
5 BY MR. BUCHANAN:
6    Q. Okay. You also want to get an agreement
7 from your -- your supply chain that they're not going
8 to trade more than three times; is that right?
9    Do you see that, sir?
10    A. I do see that.
11    Q. Okay. Do you agree with me?
12    That was your proposal, sir?
13    A. That was in this original proposal, yes.
14    Q. Did you end up doing that?
15    A. I don't believe so.
16    Q. We go on the next page, it says "Cage
17 vault SOM." See that?
18    A. Yes.
19    Q. Let's talk about this. I mean, so these
20 are drugs -- and we went round and round as to
21 whether these are dangerous or not, and -- or the
22 extent of their danger. These are drugs, certainly
23 if they're Schedule II, sir, you got to keep them in
24 a safe and locked up, right?
25       MS. VANNI: Object to the form.

---

Page 456

1 BY MR. BUCHANAN:
2    Q. In a vault?
3    A. Schedule II drugs are stored in a vault.
4    Q. Right. This stuff, Schedule II drugs,
5 that you were pumping out billions of pills -- or at
6 least a billion pills -- between 2011 and 2012, when
7 it's in your facilities, got to keep it in a vault,
8 right?
9       MS. VANNI: Object to form.
10       THE WITNESS: Yes.
11 BY MR. BUCHANAN:
12    Q. Because it presents that much risk, right?
13       MS. VANNI: Object to form.
14       THE WITNESS: Because 21 CFR 1300 to end
15    states that Schedule II drugs are to be stored
16    in a vault.
17 BY MR. BUCHANAN:
18    Q. You understand that it's kept in a vault
19 because it's a highly addictive drug and it's prone
20 to diversion, right?
21       MS. VANNI: Object to form.
22    A. It's kept in a vault to be more secure,
23 because it is a Schedule II drug that is prone to
24 abuse and diversion.
25    Q. Right. So if you're going to keep it in a

---

Page 457

1 vault while it's in your facility, you'd agree with
2 me, sir, that as a responsible corporate citizen, you
3 should do your best, as the letter said, to make sure
4 that it stays within that closed system, right?
5       MS. VANNI: Object to form.
6       THE WITNESS: According to the
7    regulations, it is to be kept in a closed,
8    secure supply chain.
9 BY MR. BUCHANAN:
10    Q. That's right.
11    A. Yes.
12    Q. And you as a registrant, sir, you promised
13 to maintain effective controls to keep it in that
14 supply chain, true?
15       MS. VANNI: Object to form.
16       THE WITNESS: Again, as the regulation
17    states, if you have that DEA registration, you
18    are to maintain effective controls.
19 BY MR. BUCHANAN:
20    Q. So you're now on the job two weeks, sir,
21 and you'd -- you'd agree, sir, you're proposing to
22 revamp the company's SOM process; is that right?
23       MS. VANNI: Object to form.
24       THE WITNESS: Not knowing what the process
25    was prior to, these are my thoughts going in,

---

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1  that I would like -- these are my initial
2  thoughts, and apparently this was drafted to
3  myself. I don't know how --
4  BY MR. BUCHANAN:
5  Q. Okay.
6  A. -- far this got into distribution, but
7  these were my original thoughts of a system.
8  Q. You're proposing that you set thresholds
9  on a customer-by-customer basis, right?
10  A. Yes.
11  Q. Company didn't have thresholds before?
12  MS. VANNI: Objection.
13  BY MR. BUCHANAN:
14  Q. Right?
15  A. I don't know.
16  Q. I mean, you didn't look to see what the
17  company was doing before versus what it did after
18  changes were implemented, after the DEA visit in
19  March of 2013?
20  MS. VANNI: Objection.
21  THE WITNESS: I did not.
22  BY MR. BUCHANAN:
23  Q. Okay. And you identify a bunch of factors
24  you're saying should be looked at, right, in setting
25  those thresholds?

Page 459

1  A. Which page -- yes.
2  Q. It's page 2. Retail independent closed
3  door. Number of scripts dispensed per month,
4  percentage of scripts for controlled substances,
5  percentage of scripts from pain management clinics,
6  and doctors, number of vendors other than QualiTest,
7  demographics, number of pharmacies in the area,
8  purchase history, number of beds -- do you see all
9  those factors, sir?
10  A. I do.
11  Q. And what you're proposing, sir, is that
12  the company integrate a lot of information and try
13  and tailor a threshold that fits the customer, right?
14  Know Your Customer?
15  MS. VANNI: Object to the form.
16  THE WITNESS: Establish thresholds based
17  on the -- the customer information.
18  BY MR. BUCHANAN:
19  Q. Okay. And -- and moving on to wholesales,
20  wholesales and distributors, one of your check boxes
21  there is an existence of a robust SOM program, right?
22  A. Yes.
23  Q. It's a closed system. You should be doing
24  business with people, sir, that are maintaining that
25  closed system, right?

Page 460

1  MS. VANNI: Object to form.
2  THE WITNESS: We should be doing business
3  with companies that are in compliance with the
4  regulation.
5  BY MR. BUCHANAN:
6  Q. If you're not, if there's a break in that
7  system, sir, it's not a closed system anymore, right?
8  A. If there's a break in that system --
9  MS. VANNI: Object to the form.
10  THE WITNESS: -- they wouldn't have a
11  registration. So we do business with companies
12  that have a -- a registration.
13  BY MR. BUCHANAN:
14  Q. But we saw, obviously, in your Cardinal
15  examination, sir, a number of Cardinal entities were
16  doing business, sir, without effective SOM programs,
17  and their registrations were pulled, right?
18  MS. VANNI: Objection to form.
19  MR. PYSER: Object to form.
20  BY MR. BUCHANAN:
21  Q. Do you recall that?
22  A. Those entities were pharmacies, and
23  pharmacies do not have SOM programs. The pharmacist
24  has a corresponding responsibility that he or she
25  does not have to fill a script that a doctor has

Page 461

1  written. So there is a different standard for a
2  pharmacist versus a wholesaler.
3  Q. I guess my question wasn't clear. I was
4  referring to the wholesalers. Cardinal got their
5  registrations pulled on a bunch of sites, right?
6  MR. PYSER: Object to form.
7  MS. VANNI: Objection.
8  THE WITNESS: There were, I believe, four
9  sites that we discussed previously.
10  BY MR. BUCHANAN:
11  Q. Yeah. Sites. Distribution centers,
12  right?
13  A. Distribution centers.
14  Q. Right. Pushing out millions of pills,
15  right?
16  MS. VANNI: Objection.
17  THE WITNESS: Distribution centers that
18  were distributing tablets, pills, to customers.
19  BY MR. BUCHANAN:
20  Q. You said further, sir, chain warehouses,
21  they should also have an effective and robust
22  suspicious-order monitoring program, correct?
23  A. Yes.
24  Q. Okay. And then you talk about other
25  things a company should do, or you were proposing to

Page 462

1  do, as part of your suspicious-order monitoring
2  system, right?
3      A.  Yes.
4      Q.  Okay.  Well, first, there's threshold
5  events that you list, and these are circumstances
6  where a client or a customer -- wholesaler or
7  distributor, retail pharmacy -- wants to place an
8  order that goes beyond their threshold, right?
9          MS. VANNI:  Object to the form.
10         THE WITNESS:  Yes, when a customer has
11     reached an allotted dosage unit, yes.
12  BY MR. BUCHANAN:
13     Q.  Okay.  And then you can go through and try
14  to figure out why their order is greater than the
15  threshold you ascribed to them, right?
16         MS. VANNI:  Object to the form.
17         THE WITNESS:  Yes.
18  BY MR. BUCHANAN:
19     Q.  You say if that doesn't sort out, with
20  these factors that you list here, the DEA will be
21  notified on all cut/suspicious orders, right?
22     A.  Yes.
23     Q.  So you'd agree, sir, that if an order
24  comes in and it exceeds a threshold, it's not
25  appropriate for the company to structure that order

Page 463

1  in a way to stay within a threshold, true?
2          MS. VANNI:  Object to the form.
3          THE WITNESS:  If an order comes in and it
4      exceeds a threshold, then that's it.  It -- it
5      exceeds that threshold.
6          So are you stating a change to the order?
7  BY MR. BUCHANAN:
8      Q.  Yeah.  Yeah, I mean, the company shouldn't
9  change the order, the order size, to sneak it within
10  the threshold; shouldn't structure the order to fit
11  within the threshold.
12         Agreed?
13         MS. VANNI:  Object to the form.
14         THE WITNESS:  I wouldn't use your exact
15     verbiage, but if a company -- I mean, if an
16     order comes in that exceeds the threshold, that
17     event needs to be investigated.
18  BY MR. BUCHANAN:
19     Q.  Well, not only does it need to be
20  investigated, sir; if you cut it, you're supposed to
21  tell the DEA.  That's what you're proposing, right?
22     A.  If you cut that order, it's -- it's to be
23  reported to the DEA.
24     Q.  Right.  You got to tell the DEA if you cut
25  the size of that order, right?

Page 464

1      A.  When I say "cut," I don't refer to cut
2  down; I mean "cut," meaning cut.
3      Q.  Oh, I see.  Okay.
4      A.  That does not mean cut down.
5      Q.  You'd agree, sir, though, it's not
6  appropriate for the company to cut down the size of
7  an order to fit within a threshold, right?
8          MS. VANNI:  Object to the form.
9          THE WITNESS:  Again, my statement is that
10     if an order comes in that exceeds a threshold,
11     an investigation should be conducted.
12  BY MR. BUCHANAN:
13     Q.  Okay.  It's not my question to you, sir.
14     A.  But that's my answer.
15     Q.  Okay.  Then stay with my question, because
16  I get to ask them.
17         MS. VANNI:  Objection.
18  BY MR. BUCHANAN:
19     Q.  You'd agree, sir, that it's not
20  appropriate for a company to structure its customer
21  orders in a certain way so that they stay within the
22  thresholds, and therefore are not reported to the
23  DEA; that would not be appropriate, would it, sir?
24         MS. VANNI:  Objection to the form.
25         THE WITNESS:  I'm not a regulatory

Page 465

1  authority, so I can't speak to what is
2  appropriate.
3      Again, my answer is:  If an order comes in
4  that exceeds the threshold, an investigation
5  should be conducted.
6  BY MR. BUCHANAN:
7      Q.  Okay, sir.  You were, in fact -- wasn't
8  your position at this point in time, or at some point
9  in time during your period of QualiTest, the head of
10  suspicious-order monitoring?
11     A.  I was the manager of -- of
12  suspicious-order monitoring.
13     Q.  Okay.
14     A.  Regulatory authorities -- regulatory
15  authority.  I mean an agency, DEA, state government,
16  FDA.
17     Q.  Okay.  I just want to understand, sir --
18     A.  Whomever.
19     Q.  -- from Mr. Brantley's perspective as the
20  head manager of SOM for QualiTest from 2013 to '17,
21  or at least the beginning of '17, would you endorse a
22  decision by QualiTest to structure its customers'
23  orders in a way to stay within the thresholds and not
24  report those orders then to the DEA?
25         MS. VANNI:  Object to form.

Page 466

1      THE WITNESS:  That's the same question,
2   and I offer the same answer.  If an order comes
3   in, and it exceeds the threshold, an
4   investigation needs to be conducted.
5   BY MR. BUCHANAN:
6      Q.  All right.  Let's talk about, sir, what
7   else you're saying needs to be done.
8      Chargebacks.  All right?  Chargebacks
9   provide visibility to a manufacturer about what its
10  customers -- customers are selling, right?
11     MS. VANNI:  Object to the form.
12     THE WITNESS:  It provides a manufacturer
13  visibility in what a customer's customer is
14  ordering --
15  BY MR. BUCHANAN:
16     Q.  Okay.
17     A.  -- not selling.  Ordering.  From the
18  wholesaler.
19     Q.  Fair enough.  So what you can see as the
20  manufacturer, through chargeback data, in
21  consideration of chargeback data, is the extent to
22  which, for example, Cardinal, Cardinal's pharmacy
23  customers are ordering your product from Cardinal.
24  Fair?
25     A.  Yes.

Page 467

1      MS. VANNI:  Object to form.
2   BY MR. BUCHANAN:
3      Q.  Okay.  So what you're saying here is one
4   thing you got to start doing is looking at chargeback
5   data, right?
6      MS. VANNI:  Object to the form.
7      THE WITNESS:  Again, your verbiage of
8   "start doing" speaks to what was done prior to
9   me, and I can't speak to that.
10  BY MR. BUCHANAN:
11     Q.  Well, was chargeback data being done
12  before you got there, sir?
13     A.  I don't --
14     Q.  Was it being looked at?
15     A.  I don't know.
16     Q.  Okay.  Was it being looked at to evaluate
17  suspicious orders, to be more clear?
18     A.  I don't know.
19     Q.  Okay.  What you're saying here is that
20  monthly reports would be generated in review, and
21  chargeback data will be used to identify activity of
22  final dispensers with wholesalers.  That's one point,
23  right?
24     A.  Yes.
25     Q.  Identify suspicious activities of chains,

Page 468

1   right?
2      Do you see that?
3      A.  Yes.
4      Q.  Identify potential price diversion, right?
5      A.  Yes.
6      Q.  Okay.  Go on, and you list about your
7   wholesaler/distributor communications.
8      You're talking about sending letters to
9   your customers to get information about their
10  customers, right?
11     MS. VANNI:  Object to the form.
12  BY MR. BUCHANAN:
13     Q.  That's your proposal; this is your vision?
14     A.  If a customer --
15     Q.  Right?
16     MS. VANNI:  Objection.
17     THE WITNESS:  -- is identified, reviewing
18  the data, we'll reach out to the wholesaler to
19  ask for additional information regarding that
20  downstream customer.
21  BY MR. BUCHANAN:
22     Q.  Okay.  So that's a reasonable thing to do,
23  right?
24     MS. VANNI:  Objection.
25

Page 469

1   BY MR. BUCHANAN:
2      Q.  As a manufacturer of billions of pills of
3   scheduled narcotics?
4      MS. VANNI:  Objection.
5      THE WITNESS:  Again, your use of the term
6   "reasonable," I can't speak to.  I can state
7   what I wrote here is the fact that after
8   reviewing data, if a downstream customer was
9   identified, reach out to the wholesaler and ask
10  for additional information.
11  BY MR. BUCHANAN:
12     Q.  That's one way, sir, of trying to
13  implement an effective control against diversion,
14  right?
15     MS. VANNI:  Object to the form.
16     THE WITNESS:  That is one way of having an
17  effective control against diversion.
18  BY MR. BUCHANAN:
19     Q.  Okay.  All right, sir.  And you say you're
20  going to send letters; you're going to ask for
21  information from the wholesaler and distributor
22  customers, right?
23     MS. VANNI:  Object to the form.
24     THE WITNESS:  Yes.
25

Page 470

BY MR. BUCHANAN:

1    Q. You're also going to employ, as part of
2 your due diligence, sir, in knowing your customer and
3 your customer's customer, intelligence from
4 regulatory bodies, right?
5    MS. VANNI: Object to the form.
6    THE WITNESS: Yes.
7 BY MR. BUCHANAN:
8    Q. Intelligence from media sources, right?
9    A. Yes.
10    Q. Intelligence from industry organizations,
11 right?
12    A. Yes.
13    Q. Those are all good things, sir, to try and
14 keep this system closed, right?
15    MS. VANNI: Object to the form.
16    THE WITNESS: Those are all things that I
17 listed in this e-mail to myself of things to
18 implement.
19 BY MR. BUCHANAN:
20    Q. In your vision?
21    A. Yes.
22    Q. Okay.
23    A. In my -- in my initial thoughts of
24 building my version of a program.

*(Line numbers 1–24 correspond to lines above.)*

Page 471

1    Q. Okay. And to be clear, sir, chargeback
2 data has been around for years, right?
3    MS. VANNI: Object to the form.
4    THE WITNESS: I don't know how long
5 chargeback data had been around, but I know that
6 it is incomplete. Not every customer
7 participates in a chargeback program, and I
8 don't know how long it's been around.
9 BY MR. BUCHANAN:
10    Q. Okay. So staying with my question, you
11 just don't know how long it's been around?
12    A. I do not know how long chargeback data has
13 been around.
14    Q. Would it surprise you to learn, sir, that
15 Endo, the owner of QualiTest, had chargeback
16 agreements all the way back into the '90s? Would
17 that surprise you, sir?
18    MS. VANNI: Okay.
19    THE WITNESS: Again, I don't know how long
20 chargeback data has been around.
21 BY MR. BUCHANAN:
22    Q. Okay. And chargeback data, again,
23 provides visibility into what the end pharmacy is
24 ordering from the intermediary wholesaler or
25 distributor, correct?

Page 472

1    MS. VANNI: Object to the form.
2    THE WITNESS: That is some
3 identification -- that is some information that
4 could be gained from chargeback data.
5 BY MR. BUCHANAN:
6    Q. Okay.
7    A. But understand, chargeback data is a
8 financial transaction.
9    Q. Okay. In fact, you did use chargeback
10 data, didn't you, sir?
11    A. I did use chargeback data.
12    Q. Right. Okay. And the DEA presented
13 chargeback -- they presented data to you on your
14 customers' customers -- I shouldn't say "you," the
15 royal you, QualiTest "you" -- in March of 2013,
16 didn't they, sir?
17    MS. VANNI: Objection to the form.
18    THE WITNESS: In the ARCOS data.
19 BY MR. BUCHANAN:
20    Q. Yes. And you saw, in fact, the visibility
21 to what Cardinal's customers were buying from --
22 withdrawn.
23    You saw visibility to your product
24 downstream through your intermediary wholesalers,
25 true?

Page 473

1    MS. VANNI: Objection. Form.
2    THE WITNESS: The ARCOS data that was
3 provided, the DEA has a complete picture through
4 the ARCOS data.
5 BY MR. BUCHANAN:
6    Q. Right. And that provided visibility --
7 that provided visibility, sir, to what the pharmacies
8 were buying from the distributors, right?
9    MS. VANNI: Objection.
10    A. Based on the sheet of paper, the chart. I
11 have to see which graph because the charts that we
12 reviewed were all sales. It didn't -- it didn't list
13 any pharmacies.
14    Q. Fair enough. The subsequent pages do,
15 sir, but --
16    A. So I can't respond if it didn't --
17    Q. You know what, sir, why don't -- why don't
18 you pull it out and just go to the next page, right
19 after the first chart?
20    A. Pull what out?
21    Q. Do you have the exhibit -- the ARCOS data
22 we looked at?
23    MS. VANNI: What's the number?
24    THE WITNESS: Oh, yes.
25

Highly Confidential – Subject to Further Confidentiality Review

Page 474

BY MR. BUCHANAN:

1  Q.  If you just go to the second page, sir.

2  A.  I'm out of order, so is this the first
3  page?

4  Q.  Just --

5  A.  5.3?

6  Q.  Yeah, if you'll just turn the page, sir.

7  Do you see, sir, downstream --

8  MS. VANNI:  What page are you referring
9  to?  Because he's looking at page 4.  Is that --

10  THE WITNESS:  These are just states.  It
11  doesn't list customers.  This -- this lists
12  states.

13  BY MR. BUCHANAN:

14  Q.  Oh, I'm sorry.  Yeah, let's go to the next
15  page.

16  MR. BUCHANAN:  Can we go, please, to 575,
17  Evan.  Let's just go to 575.5.

18  BY MR. BUCHANAN:

19  Q.  You see, sir, what the DEA presented to
20  you in March of 2013 -- and I say "you," I mean
21  QualiTest -- included data on retail pharmacy
22  purchases from Morris & Dickson on this particular
23  page, right?

24  MS. VANNI:  Object to the form.

Page 475

1  THE WITNESS:  Yes.

2  BY MR. BUCHANAN:

3  Q.  Do you recognize Morris & Dickson as an
4  intermediary wholesaler/distributor?

5  MS. VANNI:  Object to the form.

6  THE WITNESS:  They are a wholesaler in
7  Louisiana.

8  BY MR. BUCHANAN:

9  Q.  Okay.  In fact, what you see there, sir,
10  is some pharmacies just -- that are off the charts in
11  terms of their purchases of, in this case, oxycodone,
12  15 milligrams, from Morris & Dickson, correct?

13  MS. VANNI:  Object to the form.

14  THE WITNESS:  Again, you use the term "off
15  the charts," and I don't know anything about
16  these pharmacies.  I don't know if they're
17  associated with hospitals.

18  Again, I don't know anything about the
19  pharmacies, so I can't --

20  BY MR. BUCHANAN:

21  Q.  Okay.

22  A.  -- speak to "off the chart," not knowing
23  what type of pharmacy --

24  Q.  Fair enough.  Okay.

25  A.  -- what size pharmacy --

Page 476

1  Q.  And what you do see, sir, is visibility
2  from the DEA data of what your customer's customer
3  was buying from Morris & Dickson -- Morris & Dickson,
4  correct?

5  MS. VANNI:  Object to the form.

6  THE WITNESS:  Yes, for these four
7  registrants.

8  BY MR. BUCHANAN:

9  Q.  Right.  And so what chargeback data allows
10  a manufacturer to do is prepare similar pictures of
11  what its customer's customer is doing -- should say
12  purchasing -- from a wholesaler/distributor, correct?

13  MS. VANNI:  Objection to the form.

14  THE WITNESS:  Chargeback data is not even
15  close to ARCOS data.  ARCOS data represents a
16  complete picture.  Chargeback data, again, is a
17  financial transaction based on a contract price
18  and a GPO, whereas ARCOS data, it is what it is.
19  If you receive it, ship it, it's captured via
20  ARCOS.

21  Not everyone participates in chargeback
22  data; chargeback does not capture everything.
23  So I cannot say that it's like ARCOS data.
24  ARCOS data is everything.

25

Page 477

1  BY MR. BUCHANAN:

2  Q.  Okay.  And -- and QualiTest is a
3  corporation, right?

4  A.  I believe it's a corporation.

5  Q.  In the business of making money, right?

6  MS. VANNI:  Objection.

7  THE WITNESS:  I can't speak to if the
8  business is making money.

9  BY MR. BUCHANAN:

10  Q.  In the business of making money?

11  MS. VANNI:  Form.

12  THE WITNESS:  I can say that the
13  Huntsville branch is no longer.

14  BY MR. BUCHANAN:

15  Q.  My -- my question to you, sir, was:
16  QualiTest itself is a business entity in the business
17  of making money, right?

18  MS. VANNI:  Objection to form.

19  THE WITNESS:  This day, no.  Back then, I
20  don't know how much money they made, but
21  QualiTest, the Huntsville campus is closed.

22  BY MR. BUCHANAN:

23  Q.  Oh, I see.  Okay.  So --

24  A.  So I don't know how much money they were
25  making, but they're closed.

Page 478

1    Q. Where I was going, sir, is chargebacks,
2  there are agreements that can surround the chargeback
3  data, right?
4    A. What type of agreements?
5    Q. Chargeback agreements.
6    A. Contractual agreements based on a
7  contractual price, with a group purchasing
8  organization or 340B contract with the government.
9  Again, it's so many different types of contracts.
10    Q. Pursuant to which parties exchange
11  information to exchange money based on the volume of
12  drug purchased, correct?
13       MS. VANNI: Objection to form.
14  BY MR. BUCHANAN:
15    Q. And the discounts ascribed to it?
16    A. Based on a sale of a chargeback --
17    Q. Okay.
18    A. -- a transaction happens that a pharmacy
19  purchases a drug from a wholesaler at a certain
20  price, based on a contract that pharmacy has with --
21  that the government or an organization, and based on
22  that, there's a transaction, a chargeback.
23    Q. Let's talk about customer due diligence
24  visits, sir.
25       So one of the things you're advocating is

Page 479

1  putting boots on the ground, right?
2    A. One of the things I'm advocating is going
3  out, and I will conduct a Know Your Customer visit of
4  the customer, to ensure that they have a SOMs program
5  and they demonstrate it for me.
6    Q. Right. And when I say "boots on the
7  ground" is actually going and looking at the
8  facility, right?
9       MS. VANNI: Object to form.
10       THE WITNESS: I'm going to discuss their
11  suspicious-order monitoring program.
12  BY MR. BUCHANAN:
13    Q. So that's one thing you're going to do,
14  right?
15    A. Sometimes that is at the corporate office;
16  it is not necessarily at the facility.
17    Q. Surveillance visits for retail independent
18  and chain pharmacies, true?
19    A. Yes.
20    Q. Observe clientele for suspicious activity?
21  Putting eyes on the customer, right?
22    A. That's a part of the surveillance visit.
23    Q. Looking for suspicious activity, right?
24       MS. VANNI: Object to the form.
25       THE WITNESS: Yes, a drug transaction in a

Page 480

1  parking lot.
2  BY MR. BUCHANAN:
3    Q. Long lines, right?
4    A. That could be deemed something of interest
5  to look into.
6    Q. I mean, that's what you put after
7  suspicious activity, long lines, right?
8    A. Well, if it's there, there it is, yes.
9    Q. Okay. Illicit drug use, right?
10    A. Yes.
11    Q. Out-of-state license plates, right?
12    A. Yes.
13    Q. Looking for suspected Internet activity,
14  right?
15    A. Yes.
16    Q. Remember that discussion with
17  Mr. Papantonio about Internet pharmacies, right?
18    A. It was a pretty in-depth discussion.
19    Q. Okay. And so looking for boxes, for
20  example, of -- you know, FedEx envelopes?
21       MS. VANNI: Object to the form.
22  BY MR. BUCHANAN:
23    Q. Right?
24    A. That can be one way to identify potential
25  activity.

Page 481

1    Q. Sure. Sure. And looking to see
2  whether -- and capturing information from these
3  customers, prescriptions paid for in cash?
4  Percentage of controlled substances: Are they doing
5  mostly controlled substances? Are they doing other
6  stuff? All this information you can ask for from the
7  customer, right?
8       MS. VANNI: Object to the form.
9       THE WITNESS: Yes.
10  BY MR. BUCHANAN:
11    Q. Okay. And so these are all things that a
12  reasonable company would do to implement a
13  suspicious-order monitoring system, right?
14       MS. VANNI: Objection.
15       THE WITNESS: Again, you use the term
16  "reasonable," and I just go back to the
17  regulation, that -- it states that -- should
18  implement a program to identify and report
19  suspicious orders, and also the regulation
20  states that -- having the closed supply chain.
21  BY MR. BUCHANAN:
22    Q. Right. Or is it just at this point in
23  time, sir, in 2013, that you started to get concerned
24  about the fines?
25       MS. VANNI: Objection.

Page 482

1 THE WITNESS: Again, I can't speak to what
2 the company did prior to -- to my arrival.
3 BY MR. BUCHANAN:
4 Q. Well, I guess that's my question, sir.
5 Was it -- was it the tens of millions of dollars of
6 fines you were seeing for other companies who were
7 not properly monitoring suspicious orders, or was it
8 the body count?
9 MS. VANNI: Objection.
10 BY MR. BUCHANAN:
11 Q. We looked at the body count between 2000
12 and 2012. You recall that, sir?
13 MS. VANNI: Objection.
14 THE WITNESS: Is that the color graph --
15 BY MR. BUCHANAN:
16 Q. Yeah.
17 A. -- you put on the screen?
18 Yes, I recall that.
19 Q. Okay. Because we saw a change in color
20 over the years, right? It didn't -- well, let's talk
21 about, before we get there, sir, how QualiTest
22 changed their practices.
23 MR. BUCHANAN: Where is it? Could I have,
24 please, 606.
25

Page 483

1 BY MR. BUCHANAN:
2 Q. Are you okay? You need a break? Or are
3 you all right?
4 A. No, I'm just stretching my leg. I'm fine.
5 Q. Okay.
6 All right, sir, can we pull up 606. This
7 looks like -- you know, if you started in September,
8 sir, this is shortly after you get to the company,
9 right? 2013?
10 A. Yes.
11 Q. Larry Shaffer; he's in DEA compliance; is
12 that right?
13 A. Yes, he was.
14 Q. Okay. And what Larry Shaffer sends you,
15 sir, are -- is titled "SOMs info."
16 SOMS is suspicious-order monitoring
17 system?
18 A. Yes.
19 Q. And did you call it "SOMS"?
20 A. I call it a "SOM".
21 Q. SOM? Okay.
22 A. S-O-M.
23 Q. All right. He attaches a couple of files.
24 One is called "SOMS violations," right?
25 I'm looking at the attachment list on the

Page 484

1 first page. You see that, sir? SOMS violations.xls?
2 A. Oh. Yes.
3 Q. Okay. And the first attachment, sir,
4 directing your attention to dot 2 -- I'm sorry,
5 dot 4. It's a collection of all the violations for
6 inadequate SOMS that have been imposed.
7 You see that, sir?
8 MS. VANNI: Objection to form.
9 THE WITNESS: I do see a list of the
10 violations.
11 BY MR. BUCHANAN:
12 Q. Okay. So the first attachment is a list
13 of violations. And, in fact, sir, are you aware that
14 some of the entities that are listed here are ones
15 that the DEA called to your attention that were
16 customers of your customer in the March of 2013
17 meeting?
18 MS. VANNI: Objection.
19 THE WITNESS: If they were listed in that
20 binder, I saw it after I started at QualiTest.
21 BY MR. BUCHANAN:
22 Q. Right. You would have seen that, right?
23 A. I stated earlier that I did see the
24 binder.
25 Q. And you would have seen the list of

Page 485

1 violations, right?
2 MS. VANNI: Objection to form.
3 THE WITNESS: I don't recall a list of
4 violations in the binder. I recall ARCOS data,
5 and I think some examples of some old court
6 cases.
7 BY MR. BUCHANAN:
8 Q. Okay.
9 A. But I don't recall any -- any list of
10 violations.
11 (Cardinal-Brantley 30 was marked for
12 identification.)
13 BY MR. BUCHANAN:
14 Q. We're in Exhibit 30 right now, sir, and
15 Exhibit 30 contains a list of violations, right?
16 A. Is that --
17 MS. VANNI: Objection to the form.
18 THE WITNESS: Is that what we're looking
19 at?
20 BY MR. BUCHANAN:
21 Q. That is. It is Exhibit 30 before you,
22 sir, and I've just taken you to dot 6. See that?
23 I'm sorry. Dot 4, 5, and 6 is a list of
24 SOM violations?
25 A. I guess this appears to be a list that

Page 486

1  Larry composed, yeah.
2      Q.   Okay.  And you see -- and I'm a little
3  tight on time, sir, but I'm sure you will have this
4  document.  It lists a number of facilities that have
5  been talked about today, and it further lists
6  facilities that were customers of your customer that
7  the DEA showed you in March of 2013, "you" being
8  QualiTest.
9      MS. VANNI:  Objection.
10 BY MR. BUCHANAN:
11     Q.   Do you see the list of violations, sir?
12     A.   I do.
13     Q.   Okay.  Let's -- let's go on with this file
14 because there's a PowerPoint in here sent to you
15 shortly after you joined.  "Current SOMS process."
16     You see this?
17     MS. VANNI:  Can you tell us what page
18 you're on, please?
19     MR. BUCHANAN:  Point 14.  Sorry, Counsel.
20     MS. VANNI:  Thank you.
21 BY MR. BUCHANAN:
22     Q.   Presently the SOMS process at QualiTest
23 was only implemented for your retail customers,
24 right?
25     MS. VANNI:  Objection.

Page 487

1      THE WITNESS:  This does not -- this page,
2      point 14, does not say it was only implemented
3      for retail pharmacy customers.
4  BY MR. BUCHANAN:
5      Q.   Okay.  Retail pharmacy is based on set
6  product threshold amounts, right?
7      A.   Yes.
8      Q.   And the sales department could change
9  them, right?
10     MS. VANNI:  Objection.
11     THE WITNESS:  It says that they were set
12     by the sales department.
13 BY MR. BUCHANAN:
14     Q.   Also says they can be changed by the sales
15 department, doesn't it, sir?
16     A.   Oh.  The next bullet point.
17     Q.   Yeah.  You know that's a conflict of
18 interest, right?
19     MS. VANNI:  Objection.
20     THE WITNESS:  Is that your opinion, or is
21     that a -- is that a --
22 BY MR. BUCHANAN:
23     Q.   I'm asking you, sir.
24     A.   -- in the regulation?
25     Q.   You know that.

Page 488

1      MS. VANNI:  Objection.
2  BY MR. BUCHANAN:
3      Q.   Having people whose goal is to push more
4  product, and billions and billions -- and we saw the
5  sales growth in at least those two years; you recall
6  looking at those numbers with me?
7      MS. VANNI:  Objection.
8      THE WITNESS:  I do recall looking at those
9      numbers.
10 BY MR. BUCHANAN:
11     Q.   Okay.  You would agree, sir, that having
12 the sales folks, giving them the discretion to just
13 change the thresholds on their own, that's not good
14 practice, right?
15     MS. VANNI:  Object to the form.
16     THE WITNESS:  Again, I cannot speak to the
17     practice that was set before me.
18 BY MR. BUCHANAN:
19     Q.   Well, that's certainly not the practice
20 you recommended, right?
21     A.   That was not my practice.
22     Q.   Okay.  Let's go to dot 15, "Issues with
23 current process."
24     And this is right around the time you're
25 joining, in 2013, right after the time billions and

Page 489

1  billions of oxy 15s, 30s, and hydrocodones were sold,
2  right?
3      MS. VANNI:  Objection.
4      THE WITNESS:  According to your reference
5      from the previous slide, when you stated how
6      many were sold --
7  BY MR. BUCHANAN:
8      Q.   Okay.
9      A.   -- there were -- I think we stated one or
10 two billion.
11     Q.   Okay.  So one, "The system only addresses
12 retail pharmacy by looking at product thresholds."
13     Did I read that correctly, sir?
14     A.   That's what it says.
15     Q.   "Other COTs" -- is that a term of art in
16 your field, sir?
17     MS. VANNI:  Object to the form.
18     THE WITNESS:  I don't know what a "COT"
19     is.
20 BY MR. BUCHANAN:
21     Q.   Classes of trade?
22     A.   Okay.
23     Q.   "Other classes of trade are not evaluated
24 for suspicious-order monitoring," correct?
25     A.   That's what it says.

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1    Q.  Okay.  Other classes of trade, that would
2  be wholesalers, right?
3       MS. VANNI:  Objection.
4       THE WITNESS:  Other classes of trade other
5  than pharmacies.
6  BY MR. BUCHANAN:
7    Q.  Right.
8    A.  It could be --
9    Q.  So wholesalers, distributors, hospitals?
10    A.  Those all could be other classes of trade.
11    Q.  Okay.  And so as of this point in time,
12  sir, nine months into 2013, other classes of trade
13  were not being evaluated for suspicious-order
14  monitoring, correct?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  According to this slide.
17  BY MR. BUCHANAN:
18    Q.  Mm-hmm.  Next says:  "Retail pharmacy
19  review and approval is handled by the sales
20  department," right?
21    A.  That's what it says.
22    Q.  Could you read the next sentence, sir?
23    A.  "Sales department should not set the
24  threshold amount or be involved with the releasing
25  held orders."

Page 491

1    Q.  Okay.  Just pause there for a moment.
2       So what this states, this PowerPoint of
3  the company from October of 2013, is the sales
4  department should not set the threshold amount,
5  first.
6       That's what it says, right?
7    A.  Yes.
8    Q.  Or be involved with releasing held orders,
9  right?
10    A.  I just want to say that you mentioned that
11  this was 2013; where it's printed, it says 2012.
12    Q.  Well, this is what was sent to you, sir,
13  by Larry Shaffer, on October 7th, 2013, correct?
14    A.  Yes.  I'm just stating when this document
15  says that it was printed, or --
16    Q.  Okay.
17    A.  -- or drafted.  2012.
18    Q.  You know when you got it?
19    A.  So I answered the question correctly.  You
20  asked if -- if you say 2013 but the document says
21  2012, I have to state that the document says 2012.
22    Q.  Fine.  So let's -- let's agree, sir, that
23  this is what Mr. Shaffer sent to you on October 7,
24  2013, following the list of violations for SOMS
25  processes, and -- looks like a summary of the

Page 492

1  suspicious-order monitoring system of QualiTest,
2  looking at dot 12, right?
3       MS. VANNI:  Objection to form.
4       THE WITNESS:  Yes.
5  BY MR. BUCHANAN:
6    Q.  Okay.  And, you know, the second page,
7  dot 13, says what is SOMS.  Next page says "Current
8  SOMS process."
9       And that's what you were being given in
10  October of 2013, correct, sir?
11    A.  Apparently this was e-mailed --
12       MS. VANNI:  Object to the form.
13       THE WITNESS:  -- to me in 2013.
14  BY MR. BUCHANAN:
15    Q.  Okay.  And it's run through issues with
16  the current process, and we were just talking about
17  the retail pharmacy review and approval being handled
18  by the sales department; DEA views this as a conflict
19  of interest, right?
20    A.  That's what it states here.
21    Q.  And considers the sales department as the
22  department that is driven by dollars, right?
23    A.  Again, that's what is stated here.
24    Q.  No, look, you've been in business --
25  you've been working for companies involved in selling

Page 493

1  drugs for 15, 20 years; you know the sales
2  department's goal is to sell, right?
3       MS. VANNI:  Object to the form.
4       THE WITNESS:  Sales department, their job
5    is sales, by their name.
6  BY MR. BUCHANAN:
7    Q.  Right.  I mean, the job description is not
8  suspicious-order monitoring, right?
9       MS. VANNI:  Object to form.
10       THE WITNESS:  I have not seen the job
11    description for a salesperson.
12  BY MR. BUCHANAN:
13    Q.  Well, sir, would you think that's
14  something they're trained in, to -- I mean, we saw
15  the sales growth between 2011 and 2012, right?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  Is that the color chart
18    again?
19       MR. BUCHANAN:  Can we go back to the Elmo.
20  BY MR. BUCHANAN:
21    Q.  That's the chart.
22    A.  Oh, yes.  I remember that.
23    Q.  Okay.  That's -- you know, a billion pills
24  or so of oxycodone in various formulations, right?
25    A.  Yes.

Page 494

1    Q.  And we got to a billion with just one, I
2  think, unit of hydrocodone for that same period of
3  time, right?
4        MS. VANNI:  Object to form.
5        THE WITNESS:  One strength.
6  BY MR. BUCHANAN:
7    Q.  One strength.  All right.
8      So sales was doing a good job, right?
9        MS. VANNI:  Object to the form.
10  BY MR. BUCHANAN:
11    Q.  In term of growing sales?
12        MS. VANNI:  Objection.
13        THE WITNESS:  I can't state whether they
14    were doing a good job or a bad job.
15  BY MR. BUCHANAN:
16    Q.  Well, you see it grew -- it grew between
17  2011 and 2012 pretty well, right?
18        MS. VANNI:  Objection.
19        THE WITNESS:  There was growth.
20  BY MR. BUCHANAN:
21    Q.  Okay.  And so during that period of time,
22  sir, the sales group had the ability to raise
23  thresholds for the customers, right?
24        MS. VANNI:  Objection.
25        THE WITNESS:  According to this document.

Page 495

1    Again, I wasn't there.
2  BY MR. BUCHANAN:
3    Q.  Okay.
4    A.  I can only speak to --
5    Q.  They also had the ability --
6    A.  Sorry.
7    Q.  They also had the ability to set
8  thresholds, right?
9    A.  Again, according to this document.
10    Q.  Okay.  "No separate and unbiased check for
11  order quantity outside of the sales and marketing
12  departments."
13      See that, sir?
14    A.  Yes.
15    Q.  "No separate unbiased check of order
16  quantity outside of sales and marketing department."
17      Did I read that correctly, sir?
18    A.  Yes.
19    Q.  "No check for order frequency and pattern
20  discrepancies."
21      Did I read that correctly, sir?
22    A.  Yes.
23    Q.  In fact, the regulation you cited to us
24  earlier in the CFR talks about unusual quantities,
25  unusual frequencies, things of that nature, as a

Page 496

1  suspicious order, correct?
2    A.  Unusual --
3        MS. VANNI:  Objection to form.
4        THE WITNESS:  Unusual size, frequency,
5    and -- that deviates substantially from a normal
6    pattern.
7  BY MR. BUCHANAN:
8    Q.  Right.  And so what this is saying, sir,
9  in this PowerPoint that was sent to you in 2013,
10  shortly after you joined, there was no check for
11  order frequency and pattern discrepancies, right?
12        MS. VANNI:  Objection.
13        THE WITNESS:  That's what this slide says.
14  BY MR. BUCHANAN:
15    Q.  And the system didn't allow to know your
16  customer, right?
17    A.  That's what the slide states.
18    Q.  Okay.  And so these are listed on "Issues"
19  with the current process; then we go to the next
20  page, and then the "Requirements for Improvement."
21      Do you see that, sir?
22    A.  Yes.
23    Q.  And there's, what, a dozen bullets?  Maybe
24  more?
25    A.  Around there.

Page 497

1        MS. VANNI:  Objection.
2  BY MR. BUCHANAN:
3    Q.  Okay.  Things you got to do to get this
4  thing in check, right?
5        MS. VANNI:  Objection.
6        THE WITNESS:  Requirements for
7    improvement.
8  BY MR. BUCHANAN:
9    Q.  Got to start looking at all trades and all
10  customers, right?
11        MS. VANNI:  Objection.
12        THE WITNESS:  This is asking to look at
13    all classes of trade, customers.
14  BY MR. BUCHANAN:
15    Q.  I mean, your biggest customers -- "you"
16  being QualiTest -- your biggest customers are
17  wholesalers and distributors, right?
18    A.  Yes.
19    Q.  And so in 2013, after twelve years of blue
20  going to white going to orange going to red, and
21  death rates increasing throughout this country, and
22  pills going from tens of millions to hundreds of
23  millions to billions, this company's not looking at
24  its largest trades, its largest customers, to
25  evaluate for suspicious orders?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 498

1    MS. VANNI:  Objection.
2  BY MR. BUCHANAN:
3    Q.  Right?
4    A.  That's what the PowerPoint stated.
5    Q.  Okay.
6    MR. BUCHANAN:  Can we take a short break?
7    MS. VANNI:  Can we also have a time check?
8    VIDEOGRAPHER:  Going off record.  Time
9  is 5:54.  Total time is 6:52.
10    (A recess transpired from 5:54 p.m. until
11    6:01 p.m.)
12    VIDEOGRAPHER:  We're going back on the
13    record.  This is beginning of media file
14    number 8.  Time is 6:01.
15  BY MR. BUCHANAN:
16    Q.  All right, sir.  Try and bring this in for
17  a landing here.  I've got a few minutes left on the
18  clock, so -- probably going to try and be as
19  efficient as I can.
20    Can you pass over to counsel -- it's E611.
21    (Cardinal-Brantley 31 was marked for
22  identification.)
23  BY MR. BUCHANAN:
24    Q.  While that's getting across the table to
25  you --

---

Page 499

1    MR. BUCHANAN:  And what's -- what exhibit
2    number is it, Scott?  31?  This is Brantley 31.
3  BY MR. BUCHANAN:
4    Q.  Sir, do you remember -- what is that, in
5  2015 or so -- getting in a bit of a fuss with your
6  sales colleagues at QualiTest?
7    MS. VANNI:  Object to the form.
8    THE WITNESS:  I don't remember.  Is -- is
9    this about a particular incident?
10  BY MR. BUCHANAN:
11    Q.  Well, this is about just -- frankly, a
12  practice at QualiTest, concerning promotional
13  discounting, one-time buys, bulk sales of narcotics.
14    Do you recall that?
15    MS. VANNI:  Object to the form.
16    THE WITNESS:  I don't remember that exact
17    conversation, but if this e-mail is that, I can
18    read this real quick.
19  BY MR. BUCHANAN:
20    Q.  Well, you were expressing concern, sir,
21  about -- let me just ask you some questions
22  independent of the document.
23    Do you remember having concerns about the
24  company sales practices -- that was the end of the
25  month, or the end of the quarter -- reaching out to

---

Page 500

1  customers and offering them one-time buys?
2    MS. VANNI:  Object to form.
3  BY MR. BUCHANAN:
4    Q.  Big volumes?  Discounts?  Remember that?
5    MS. VANNI:  Objection to form.
6    THE WITNESS:  I do not remember specific
7    conversations, but yes, I had conversations
8    about one-time buys.
9  BY MR. BUCHANAN:
10    Q.  That's -- let's look at the exhibit now.
11    You and your colleague, I guess it's
12  Heather Jones, sent it off to Mr. Macrides and
13  Magerkurth.  You're cc'd on it.  "Importance, high"?
14    A.  Yes.
15    Q.  "DEA regulatory risk of offering one-time
16  buys to customers from suspicious-order monitoring
17  perspective for upper management review," right?
18    A.  Yes.
19    Q.  You all were trying to call something to
20  the attention of management that was happening in the
21  sales function, right?
22    MS. VANNI:  Object to form.
23    THE WITNESS:  She was alerting -- she was
24    sending in an e-mail to DEA expressing this.  I
25    haven't read it yet.

---

Page 501

1  BY MR. BUCHANAN:
2    Q.  You said to the DEA?
3    A.  I'm sorry, I misspoke.  To management.
4    Q.  Because this didn't go to the DEA, right?
5    A.  This went to management.
6    Q.  Right.
7    A.  Again, I take that back.  I misspoke.
8  This was sent to members of management.
9    Q.  Okay.  And it says, "As discussed" --
10  "Dear Steve, as discussed, Eric Brantley and I have
11  put together a risk assessment regarding the DEA
12  regulatory risk of offering one-time buys of
13  controlled substances to our customers at the end of
14  every quarter, and how it impacts your SOMS program."
15    You see that, sir?
16    A.  Yes.
17    Q.  Okay.  And she writes, "I would like to
18  ensure that a dialogue is started at high levels to
19  stop the cycle of these one-time buys if possible,
20  and preferably in this quarter."  Right?
21    A.  Yes.
22    Q.  Because you all had concluded, sir, that
23  this practice of reaching out to customers and
24  offering them large quantities and discounts is
25  itself a suspicious order, right?

---

Page 502

1      MS. VANNI:  Objection.
2      THE WITNESS:  Where are you reading that,
3  so I can find it?
4  BY MR. BUCHANAN:
5      Q.  No, I'm -- do you recall that?  Do you
6  recall what I --
7      A.  I don't recall that exact verbiage.
8  That's what I'm asking, where --
9      Q.  Okay.
10      A.  -- so I can --
11      Q.  Let's go to point 3 -- I'm sorry, point 2,
12  just to orient ourselves.
13      "DEA regulatory risk of offering one-time
14  buys to customers from a suspicious-order monitoring
15  perspective."
16      A.  Okay.
17      Q.  "Prepared for upper management review
18  October 20, 2015."
19      You then cite the regulation concerning
20  suspicious orders, right?
21      A.  Yes.
22      Q.  "Suspicious orders include orders of
23  unusual size, orders deviating substantially from a
24  normal pattern, and orders of unusual frequency."
25      Do you see that, sir?

Page 503

1      A.  Yes.
2      Q.  And it continues.  I'm going to direct you
3  to the bottom; I'm a little tight on time.
4      It says, "Therefore, the extension of
5  one-time buy opportunities to customers presents a
6  tangible DEA regulatory risk for the company, because
7  the offer itself may be categorized as a suspicious
8  order."
9      Did I read that correctly, sir?
10      A.  Yes.
11      Q.  Okay.  Let me just ask:  As a factual
12  matter, did the company report its one-time buys to
13  the DEA as suspicious orders?
14      MS. VANNI:  Objection.
15      THE WITNESS:  A suspicious record is an
16      order that is placed by the customer, sent to
17      the customer.  I don't recall what orders were
18      sent to the DEA or not.  I don't -- I don't
19      recall specific orders.
20  BY MR. BUCHANAN:
21      Q.  Okay.
22      A.  So to say --
23      Q.  My question --
24      A.  To ask was a one-time buy reported, as a
25  general question, I would have to know a specific

Page 504

1  order.
2      Q.  Okay.  This practice that's being flagged
3  for senior management of offering one-time buys at
4  the end of quarters, larger volumes that would
5  ordinarily be bought at discounts, were those type of
6  orders reported to the DEA as suspicious orders?
7      MS. VANNI:  Objection.
8  BY MR. BUCHANAN:
9      Q.  Yes, no, or you don't know?
10      A.  If they were deemed suspicious, I would
11  say that how I handled a one-time buy situation, I
12  reached out to the customer.  It may have been a
13  short data item; I don't know what the situation was.
14      And I said, "What does this represent?  Is
15  this a one-month purchase or a two-month purchase?"
16  So forth.
17      If it was a two-month purchase, I locked
18  their DEA number up in the system so they cannot
19  order that controlled substance again until that time
20  had expired.
21      So that way, I could keep the pattern to
22  where -- if they -- if they were ordering 10,000,
23  10,000, and they went to 30,000, then 00, and then
24  10,000 again, that, I can't explain.  I cannot
25  explain the 10, 10, 30, and then back to 10 again.

Page 505

1      Q.  So you would --
2      A.  So that's how I regulated that.
3      Q.  I see.  So what you would do, sir, is
4  allow the customer, in a dialogue with you, structure
5  this in a way so that it would fit within a
6  threshold?
7      A.  No.
8      MS. VANNI:  Objection.
9  BY MR. BUCHANAN:
10      Q.  Okay.  Well, let's look at the next page,
11  sir.  The Controlled Substances Act says --
12      A.  Are you asking a question, or are you --
13      Q.  -- 611.4 --
14      A.  -- done with that?
15      Q.  We have your answer, sir.
16      A.  Okay.
17      Q.  "One-time buy orders represent an anomaly
18  that could potentially compromise the closed system."
19      Did I read that correctly, sir?
20      A.  Yes.
21      Q.  If a 60-to-180-day supply of a controlled
22  substance is distributed to a wholesale or chain at
23  one time or on a quarterly basis, there is an
24  undeniable probability that the supply will flow to
25  final dispensers, and eventually to end users or

Page 506

1 abusers, potentially increasing the risk of
2 diversion."
3        Did I read that correctly, sir?
4    A.  Yes.
5    Q.  "There is an undeniable probability that
6 the supply will flow to final dispensers and
7 eventually to end users or abusers" -- that is
8 diversion, right?
9    A.  If --
10       MS. VANNI:  Object to the form.
11       THE WITNESS:  If it gets to an abuser, I'd
12   have to know that definition of -- of what type
13   of abuse.
14 BY MR. BUCHANAN:
15   Q.  Right.  And then, "You know that it's a
16 question about whether these entities are willing or
17 capable of supporting the surplus inventory in a
18 closed and secure manner."
19       Did I read that correctly, sir?
20   A.  Yes.
21   Q.  You also were concerned because if you're
22 giving discounts to your wholesaler community,
23 they're probably passing that on to their customer
24 base, right?
25       MS. VANNI:  Objection.

Page 507

1 BY MR. BUCHANAN:
2    Q.  Isn't that what you write, sir?
3        MS. VANNI:  Objection.
4        THE WITNESS:  I can't say that.  It was --
5    it was probably -- it does say that it is likely
6    that the offer the customer took advantage of is
7    extended to at least a portion of their own
8    customer base.
9 BY MR. BUCHANAN:
10   Q.  Right.  And we go to the next page,
11 point 5.  The further concern you flag is the
12 secondary market.
13       You recall talking to Mr. Papantonio about
14 the secondary market?
15   A.  Yes.
16   Q.  Okay.  So "Manufacturers may potentially
17 be a supply source for nonreputable alternative
18 sources when one-time buys are extended to their
19 customers, who may in turn distribute this product to
20 the secondary market."
21       Right?
22   A.  That's what it says.
23   Q.  Okay.  Did the company stop -- did you
24 present this to upper-level management, sir?
25   A.  I believe this -- this e-mail was sent

Page 508

1 to -- was sent by Heather to management, and I was
2 copied.
3    Q.  Okay.  And how did that work out?  Did the
4 company stop their one-time buys?
5        MS. VANNI:  Object to the form.
6        THE WITNESS:  I believe so.
7 BY MR. BUCHANAN:
8    Q.  Okay.
9    A.  I'm -- I believe so.
10   Q.  And did the company go back after it made
11 that change, and did it notify the FDA -- excuse me,
12 the DEA -- withdrawn.
13       Did the company go back, as of this point
14 in time, when you said they could be characterized as
15 suspicious orders, and notify the DEA of all the
16 one-time buys it had facilitated in the period of
17 time you were there?
18       MS. VANNI:  Objection.
19       THE WITNESS:  Not to my knowledge.
20 BY MR. BUCHANAN:
21   Q.  Okay.  Is there a system at the company
22 where the due diligence that was conducted on the
23 customers and the customers of customers was tracked?
24       MS. VANNI:  Object to the form.
25       THE WITNESS:  Was there a time that the

Page 509

1 due diligence was tracked?  What do you mean by
2 "tracked"?
3 BY MR. BUCHANAN:
4    Q.  I'm sorry.  So as I understand this, sir,
5 you had a vision for what a suspicious-order
6 monitoring system would compose, right?
7        MS. VANNI:  Objection.
8        THE WITNESS:  Yes.
9 BY MR. BUCHANAN:
10   Q.  Okay.  One component of that was due
11 diligence, right?
12       MS. VANNI:  Objection.
13       THE WITNESS:  Meaning site visits, or due
14   diligence on -- I mean --
15 BY MR. BUCHANAN:
16   Q.  Yeah, it involved a lot of things, right?
17 But one thing you should be doing is you should be
18 looking on the Internet, right?  On your customers,
19 right?
20       MS. VANNI:  Objection.
21 BY MR. BUCHANAN:
22   Q.  That's one thing you should do?
23   A.  That's one of the things that was in
24 the --
25   Q.  Right.  You should be also --

Page 510

1    A.  -- e-mail.
2    Q.  -- drawing intelligence from industry
3  sources on your customers:  Are they pill mills?
4  Have they been subject to inquiry?  Are there other
5  red flags?
6        That's something you should be doing,
7  right?
8        MS. VANNI:  Object to the form.
9        THE WITNESS:  That's something I
10   suggested.  It doesn't say I -- I should be
11   doing it; it's something that I suggested.
12 BY MR. BUCHANAN:
13   Q.  Well, did there come a time, sir, where
14 the company implemented SOPs related to
15 suspicious-order monitoring?
16   A.  I drafted SOPs.  I can't speak to what the
17 company had prior to my arrival.
18   Q.  Okay.  And did some portion of your
19 proposal get considered and adopted by the company
20 with regard to suspicious-order monitoring?
21   A.  I did implement a portion.  I don't know
22 what portion of all this was implemented.  I haven't
23 read the entire thing, but --
24   Q.  Using chargeback data?
25   A.  I did review chargeback data.  This one.

Page 511

1    Q.  And so, notwithstanding the limitations
2  you talked about earlier, chargeback data was one of
3  the things you were going to be looking at to know
4  your customer's customer, right?
5    A.  Yes.  That was a thing that I looked at.
6    Q.  Okay.  Not something that had been done
7  prior to 2013, when you started with the company,
8  correct?
9        MS. VANNI:  Objection.
10       THE WITNESS:  I don't know.  Again, I
11   can't speak to what was done prior to the
12   company.
13 BY MR. BUCHANAN:
14   Q.  And that was the 13 bullets; you didn't
15 see that that was one of the things you had to start
16 looking at?
17   A.  That was an individual --
18       MS. VANNI:  Objection.
19       THE WITNESS:  -- expressing his thoughts.
20   Again, I have no knowledge of what was done
21   prior to 2013.
22 BY MR. BUCHANAN:
23   Q.  Getting back to the question, just as a --
24 you know, basic matter of company systems, did the
25 company keep records of its due diligence activities

Page 512

1  with regard to customers?
2    A.  I kept records.
3        MS. VANNI:  Object to form.
4  BY MR. BUCHANAN:
5    Q.  What's that?
6    A.  I kept records.
7    Q.  Hard copy, on a computer system, in a
8  Sharepoint?
9    A.  I kept hard copy of some records, and I --
10 I think everything was stored on -- on computer.
11   Q.  Okay.  So all your due diligence
12 activities that you were involved with and your group
13 was involved with was stored somewhere in a
14 Sharepoint at the company?
15   A.  It should be shored somewhere.
16   Q.  Okay.
17       Also, sir, when you decided to -- when an
18 order would come in and you would assign a code to
19 either release the order or not release the order, if
20 it tripped a wire, so to speak, did you keep track of
21 whether the DEA was notified of that order as a,
22 quote, suspicious order, or not?
23       MS. VANNI:  Object to the form.
24       THE WITNESS:  If an order was deemed to be
25   suspicious, I would e-mail the -- the DEA, and I

Page 513

1  would save a copy of that e-mail.
2  BY MR. BUCHANAN:
3    Q.  Okay.  And -- and what was the system the
4  company kept track of that stuff in?  Was there a
5  computer system where you tracked all that?
6    A.  I kept a -- I believe I kept a printed
7  version, and I kept a copy on my hard drive.
8  Eventually they may have been put on to a shared
9  drive.  I don't remember.
10   Q.  All right.  Last item, sir.
11       MR. BUCHANAN:  Can you pass 609 to the
12   witness, and 626.
13 BY MR. BUCHANAN:
14   Q.  Sir, as I understand this -- no, I'm
15 sorry.  I already gave you that one.  It's 613 and
16 626.
17       MR. BUCHANAN:  What are the exhibit
18   numbers going to be?
19       MS. VANNI:  Is this your last document?
20       MR. BUCHANAN:  It is.
21       MR. SEIGEL:  32 and 33.
22       MR. BUCHANAN:  Thank you, Counsel.
23 BY MR. BUCHANAN:
24   Q.  We'll keep this one real quick, sir.
25       You left the company to join Purdue in --

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1  sometime in 2017, right?
2      A.  February 2017.
3      Q.  Gotcha.  Okay.
4          And shortly before you joined Purdue,
5  there was a settlement that was reached, or an MOA
6  that was reached, between the DEA and McKesson.
7          Do you recall that?
8      A.  I do recall a McKesson MOA.
9          MR. BUCHANAN:  Did we pass it to the
10  witness?  613?  Can we get 613 to the screen?
11  Okay.  I'm sorry, it's 613, Evan.  There we go.
12  BY MR. BUCHANAN:
13      Q.  Sir, this is right before you leave.
14  You're having an exchange with a Mr. Hamby, from
15  U.S. IMS Health.
16          Do you see that?
17          MR. BUCHANAN:  What's the exhibit number
18  for the deposition?
19          MS. VANNI:  Object to the form.
20          MR. SEIGEL:  32 is 613.
21      (Cardinal-Brantley 32 was marked for
22  identification.)
23  BY MR. BUCHANAN:
24      Q.  Okay.  Exhibit 32, sir, before you, is
25  your exchange with Mr. Hamby concerning the McKesson

Page 515

1  settlement.
2          Do you see that?
3          MS. VANNI:  Object to the form.
4  BY MR. BUCHANAN:
5      Q.  MOA.  Excuse me.
6      A.  Yes.
7      Q.  Okay.  Passing you across the table, sir,
8  a copy of the MOA, which I believe reflects your
9  highlights.
10          Your initial e-mail at the bottom is
11  Monday, January 30, 2017, at 4:40.
12          "Gentlemen, I'm sure you've heard about
13  McKesson's $150 million settlement with the DEA.  I'm
14  sure you've also read the MOA and compliance
15  addendum."
16          And then it goes on and talks about your
17  assessment of the MOA.
18          Do you see that, sir?
19      A.  Yes.
20      Q.  Okay.  And then you note on the next page,
21  sir, "One can almost build an SOM program using this
22  document as a guide."
23          Did I read that correctly, sir?
24      A.  Yes.
25      Q.  Okay.  And that's one thing you did in

Page 516

1  industry, right, to inform yourself and continue to
2  collect information as you coordinate -- you looked
3  at what others were doing with regard to maintaining
4  effective controls to prevent diversion.  Fair?
5      A.  I read --
6          MS. VANNI:  Objection to form.
7          THE WITNESS:  I read MOAs from DEA to see
8      what they were thinking, because it was a moving
9      target on SOMS.  The regulation hasn't changed,
10      but DEA's interpretation is -- was fluid.
11  BY MR. BUCHANAN:
12      Q.  Okay.  So one of the things you did,
13  getting back to my question, sir, is you looked at
14  MOAs?
15      A.  I read MOAs.
16      Q.  Okay.  And you noted here that "One can
17  almost build an SOM program using this document as a
18  guide."  Correct?
19      A.  Yes.
20          MR. BUCHANAN:  Did you pass it across the
21  table?  Okay.
22      (Cardinal-Brantley 33 was marked for
23  identification.)
24  BY MR. BUCHANAN:
25      Q.  Passing you the last exhibit, sir.  That's

Page 517

1  Exhibit Number 33.
2          Exhibit 33, sir, is that the compliance
3  addendum that you're referring to in your e-mail with
4  Mr. Hamby?
5      A.  Yes.
6      Q.  The -- the compliance addendum from which
7  one could almost build an SOM program, fair?
8          MS. VANNI:  Object to the form.
9          THE WITNESS:  That's what I stated, yes.
10          MR. BUCHANAN:  Thank you.  I think
11  counsel's indulgence of a few extra minutes, I
12  appreciate that; I understand I'm out of time.
13          So at this point, I have to pass the
14  witness.
15          VIDEOGRAPHER:  Going off record.  The time
16  is 6:16.
17      (A recess transpired from 6:16 p.m. until
18      6:29 p.m.)
19          VIDEOGRAPHER:  We're going back on record,
20  beginning of media file number 9.  The time
21  is 6:29.
22
23          EXAMINATION
24  BY MR. PYSER:
25      Q.  Good afternoon, Mr. Brantley.

Page 518

1    A.   Good afternoon.
2    Q.   My name's Steven Pyser, and I represent
3 Cardinal Health.
4         Can you introduce yourself to the jury.
5    A.   Yes.  My name is Eric Brantley.
6    Q.   Where did you grow up, Mr. Brantley?
7    A.   Flint, Michigan.
8    Q.   And did there come a time when you went to
9 work as an employee of Cardinal Health?
10   A.   Yes.
11   Q.   When was that, approximately?
12   A.   I started with Bentley Trading in
13 January 2000, and that company was acquired by
14 Cardinal Health in 2002.
15   Q.   And how long did you work at Cardinal
16 Health?
17   A.   I left Cardinal Health 2013; I want to say
18 October, September.
19   Q.   So 2002 --
20   A.   2013.
21   Q.   -- to roughly 2013; we're talking about
22 11 years, roughly?
23   A.   Yes.
24   Q.   During your -- your 11 years, can you
25 describe from your perspective Cardinal Health's role

Page 519

1 in the health care distribution system in the United
2 States?
3    A.   Yes.  As a distributor, Cardinal purchases
4 prescription drugs, including controlled substances,
5 from the manufacturer and distributes those to final
6 dispensers:  Pharmacies, chain pharmacies, hospitals,
7 DOD, VA.  Things like that.
8    Q.   There's been a lot of discussion about
9 controlled substances.
10        Is Cardinal Health's role broader than
11 just controlled substances?
12   A.   Yes.  Controlled substances represent a
13 relatively small percentage of overall with Cardinal
14 distributes.  They distribute over-the-counter
15 products, all prescription drugs, everything down
16 from toothpaste and toothbrushes.
17   Q.   And in addition to the many things that go
18 to a hospital or a pharmacy, does Cardinal Health
19 also have a medical side unrelated to
20 pharmaceuticals?
21   A.   Yes.  So pharmaceutical distribution is
22 just one part of Cardinal Health.  There is a medical
23 side that has distribution centers across the
24 country, and various organizations that the company
25 owns.

Page 520

1    Q.   In your experience, does -- does Cardinal
2 Health ever interact directly with patients?
3    A.   No.
4    Q.   Does Cardinal Health ever interact
5 directly with doctors?
6    A.   No.
7    Q.   So if you could, starting around 2002,
8 describe -- actually, strike that.
9         Was there a point in time when your job at
10 Cardinal Health focused on anti-diversion efforts?
11   A.   Yes.
12   Q.   About when was that?
13   A.   2005.  Time frame 2005 till late 2007 or
14 early 2008, somewhere around in there.
15   Q.   And could you describe in your own words
16 what types of things you did as an employee for
17 Cardinal Health working on anti-diversion issues?
18        What were your main responsibilities?
19   A.   My main responsibilities were reviewing
20 ingredient limit reports on a monthly basis, and I
21 would conduct investigations as necessary on
22 pharmacies, and I would report those pharmacies to
23 the DEA -- report those pharmacies to the DEA.
24   Q.   When you say "conduct investigations,"
25 were there times when you went out and visited

Page 521

1 pharmacies?
2    A.   They would be site visits, yes.  I would
3 go out and visit the pharmacy and -- and ask
4 questions and see what was going on.  Do an
5 investigation.
6    Q.   You mentioned ingredient limit reports, or
7 ILRs.  What is an ingredient limit report?
8    A.   An ingredient limit report is -- is based
9 on a formula to identify a formula provided by DEA to
10 identify a certain limit or a threshold, as you will.
11 And so the report would generate for any customer
12 that exceeded that threshold.  And then that report
13 was sent to DEA every month.
14   Q.   And do you know where the criteria came
15 from for Cardinal Health to develop its ingredient
16 limit reports?
17   A.   Yes.  It came from the DEA.
18   Q.   In your job, were you at the Dublin center
19 for Cardinal Health, the corporate offices?
20   A.   Yes, I was in Dublin, Ohio, at corporate.
21   Q.   How did you receive the ingredient limit
22 reports that you reviewed?
23   A.   They came via mail, or like a UPS-type
24 service.
25   Q.   And do you know if anyone else other than

Page 522

1 yourself received identical ingredient limit reports
2 from the various distribution centers of Cardinal
3 Health?
4      A.  The distribution centers generate their
5 report.  Someone there reviewed the report.  The
6 report was sent to the DEA from the distribution
7 center, and then I reviewed the reports along with
8 members of the team.
9      Q.  So the ingredient limit reports that you
10 would be reviewing, DEA would have that full report;
11 is that fair?
12      A.  Yes.
13          MR. PAPANTONIO:  Objection.  Form.
14 Leading.
15 BY MR. PYSER:
16      Q.  Do you know whether anyone at DEA also
17 received ingredient limit reports?
18      A.  The ingredient limit reports were sent to
19 the DEA on a monthly basis.
20      Q.  You talked a little bit about site visits
21 and additional work you did beyond just reviewing the
22 ingredient limit reports.  It -- were there times
23 when you made decisions as a result of site visits?
24      A.  Yes.  If -- if during a site visit it was
25 deemed that they were doing, for instance,

Page 523

1 Internet -- they were associated with an Internet
2 pharmacy, then I would make a recommendation to
3 discontinue business with that -- or discontinue
4 controlled substance shipments with that pharmacy and
5 then report that pharmacy to Kyle Wright at the DEA.
6      Q.  And to your knowledge, when you made a
7 decision to discontinue business with a pharmacy, did
8 Cardinal Health follow that recommendation?
9      A.  Yes.
10      Q.  And when you reported a pharmacy to the
11 DEA, who did you send that information to?
12      A.  I sent the -- an e-mail to Kyle Wright at
13 DEA headquarters.
14      Q.  Who -- who is Kyle Wright?
15      A.  I don't remember his exact title, but I
16 believe he may have been over the e-commerce section.
17 But he was where registrants submitted such reports
18 to the DEA.
19      Q.  Was it your understanding that the purpose
20 of sending ingredient limit reports to DEA was to
21 comply with the DEA regulations for suspicious-order
22 reporting?
23      A.  Yes.
24      Q.  So why did you conduct site visits and
25 investigations of customers on top of the ingredient

Page 524

1 limit reports?
2      A.  That was over and above the requirement.
3 The requirement was to report the suspicious orders,
4 and then based on the report I saw, I would actually
5 go out and investigate the pharmacies to actually
6 report those pharmacies to the DEA as well, in
7 addition to orders.
8      Q.  Let's take a look at a document.
9          I'm showing you a document that's been
10 marked Exhibit 34 in this deposition.  It's a new
11 exhibit.
12      (Cardinal-Brantley 34 was marked for
13 identification.)
14 BY MR. PYSER:
15      Q.  Just so we can see it, I'll put it in
16 front of Exhibit 34, up on the Elmo.
17          What is Exhibit 34?
18      A.  This is the Cardinal Health DEA compliance
19 manual.
20      Q.  And if you look at the -- the table of
21 contents, does it cover several different areas of
22 DEA compliance?  It's a thick document, a couple
23 hundred pages.
24      A.  Yes.
25      Q.  And if you look at Section 7 of the DEA

Page 525

1 compliance manual, is that section titled "Required
2 Reports to DEA"?
3      A.  Section 7?
4      Q.  If you turn to Bates page ending 898 --
5      A.  Oh, yes.
6      Q.  -- of the table of contents.
7      A.  I see it.  I see it.
8      Q.  So let's go together to Section 7.
9          And I'll give you the Bates number, which
10 is going to be the number in the bottom right corner.
11 It's going to be Bates ending 937.
12          And to your recollection, was this DEA
13 compliance manual in effect during the time that you
14 worked at Cardinal Health?
15      A.  Yes.
16      Q.  Okay.  And specifically during the time
17 period 2005 through '07 or '08, when you were working
18 the anti-diversion area?
19      A.  Yes.
20      Q.  So if you look at Section 7-1, the
21 required reports to DEA, the first report mentioned
22 is ARCOS.
23          Can you tell me what an ARCOS report is?
24      A.  Yes.  The ARCOS report is -- is a report
25 of all movement of ARCOS-reportable controlled

Page 526

1  substances, the Schedule II controlled substances,
2  all movement. Those reports were sent to the DEA
3  every month.
4      Q.  So it's a report received by DEA about
5  every movement of every controlled substance; is that
6  a fair kind of shorthand for ARCOS?
7      A.  Yes, of all the ARCOS reportable
8  controlled substances, yes.
9      Q.  Now, if you -- were there any other
10 reports that went to DEA?
11     A.  Yes. The ARCOS report, the biannual
12 report, there was end-of-year inventory taken, the
13 ingredient limit reports every month.
14     Q.  Pausing on the ARCOS reports for a minute,
15 in a situation where a hospital or a pharmacy ordered
16 controlled substances from more than one distributor,
17 would the distributors necessarily know that that
18 hospital or that pharmacy received controlled
19 substances from multiple sources?
20         MR. PAPANTONIO: Objection to form.
21     Speculation as to what they would know.
22 BY MR. PYSER:
23     Q.  You can answer the question.
24     A.  No.
25     Q.  When you were at Cardinal Health, were you

Page 527

1  aware of what distributions a hospital or a pharmacy
2  might have received from other distributors, not
3  Cardinal Health?
4      A.  No.
5      Q.  To your knowledge, were ARCOS reports
6  submitted by all distributors?
7      A.  Yes. All registrants.
8      Q.  So in your understanding, by looking at
9  ARCOS reports, would DEA be able to see the full
10 picture of what a particular hospital or pharmacy
11 received from all distributors?
12         MR. PAPANTONIO: Objection as to form.
13     Speculating on what -- what DEA might know.
14         THE WITNESS: Yes, the DEA through the
15     ARCOS data has visibility into all transactions
16     of controlled substances from all registrants.
17 BY MR. PYSER:
18     Q.  Let me ask it a -- a slightly different
19 way, in response to the objection.
20         What's your understanding of what ARCOS
21 contains when you put together all of the ARCOS
22 submissions from all the distributors?
23         MR. PAPANTONIO: Objection as to form.
24         THE WITNESS: It would have data from all
25     of the DEA registrants; for instance, the

Page 528

1  wholesalers and all of the purchases and the
2  shipments of those controlled substances to
3  other DEA registrants. The complete picture.
4  You could see all of the drugs that a pharmacy,
5  for instance, was purchasing from every source
6  and all of the sales from the wholesaler to
7  pharmacies. It was a complete picture of all
8  the transactions of those controlled substances.
9  BY MR. PYSER:
10     Q.  Just to be clear, did Cardinal Health have
11 access to that information?
12     A.  No.
13     Q.  Did DEA have access to that?
14     A.  Yes.
15     Q.  Turning the page to 7-3, there's a section
16 titled "Suspicious Orders."
17         Do you see that?
18     A.  Yes.
19     Q.  And under it is listed 21 CFR 1301.74(b).
20 Do you see that?
21     A.  Yes.
22     Q.  What is that, 21 CFR 1301.74(b)?
23     A.  That's the regulation for suspicious
24 orders. It's -- states that registrant is
25 responsible for implementing, designing a -- a system

Page 529

1  to identify suspicious orders and report those to the
2  DEA. And further goes on to say that a suspicious
3  order is an order of unusual size, frequency, that
4  deviates substantially from a normal order pattern.
5      Q.  And Cardinal Health has a description
6  of -- underneath, in its compliance manual, of --
7  strike that.
8          In the compliance manual for Cardinal
9  Health, under "Suspicious Orders," can you read the
10 first sentence?
11     A.  "Wholesalers are" -- are you meaning the
12 first sentence under "Suspicious Orders"?
13     Q.  Correct, yes.
14     A.  "Wholesalers are responsible for designing
15 and operating a system that would disclose to the
16 wholesaler suspicious orders."
17     Q.  Did Cardinal Health have such a system in
18 2005, when you began your work in anti-diversion?
19     A.  Yes.
20     Q.  When you came into your role in 2005, was
21 that system already up and running?
22     A.  Yes.
23     Q.  In fact, if you look at the date of this
24 document, in the bottom left, you see that it's
25 April 5th, 2000?

Page 530

1    A.  Yes.
2    Q.  The next bold heading is "Establishing
3  Suspicious Order Criteria."
4        Do you see that?
5    A.  Yes.
6    Q.  And if you turn the page to page 7-4, you
7  see at the top of that page, it states, quote:
8  "Complying with 21 CFR 1301.74(b) is a two-step
9  process"?
10    A.  Yes.
11    Q.  Can you describe for me in your own words
12  what the two-step process that's discussed in
13  Cardinal Health's compliance manual are?
14    A.  Yes.  The ingredient limit reports that
15  are done are sent to the DEA every month, as well as
16  the cage vault personnel had the ability to identify
17  anything that they deemed to be suspicious and
18  reported that as well.
19    Q.  The -- the first description in the manual
20  says, "First, each Cardinal division submits to DEA
21  on a monthly basis an ingredient limit report,
22  Exhibit M."
23        I'd like to direct your attention to
24  Exhibit M in this document, which is Bates page
25  ending 4157, if you turn there with me.

Page 531

1        Is this an example of an ingredient limit
2  report?
3    A.  Yes.
4    Q.  It's a little bit hard to read on the
5  screen, but if you could help us out a little bit,
6  can you tell us what's in this document; what's in
7  this report that's sent to DEA?
8    A.  This is a report of the customers, along
9  with the date -- date of the transactions and the
10  drug, and the amount in -- in grams, what was ordered
11  of that controlled substance for the month.  And it
12  lists what the ingredient limit was and what the
13  total was for that drug.
14    Q.  Zooming in a little bit here, it gives the
15  customer name at the top, you mentioned, correct?
16    A.  Yes.
17    Q.  And then it provides the ingredient you
18  mentioned, right?
19    A.  Yes.
20    Q.  And then it speaks to specific orders
21  underneath, and those are sent to the DEA, right?
22    A.  Yes.
23    Q.  And then all the way on the right side of
24  the page gives some additional information, a
25  customer total and ingredient limit.

Page 532

1        Can you explain for us what those are?
2    A.  Yes.  The ingredient limit is the -- the
3  limit that was calculated using a formula received
4  from DEA, and then the customer total is what that
5  customer ordered that month.
6    Q.  I recognize this is just an example from
7  Cardinal Health's compliance manual, but was similar
8  information provided in each ingredient limit report
9  sent to the DEA during the time you were reviewing
10  ingredient limit reports?
11    A.  Yes.
12    Q.  You can go back to page 7-4.  And 7-4,
13  after it discusses Exhibit M, goes on to state:
14  "This report is based on a computer program which
15  monitors controlled substance purchases for a month
16  and compares these purchases to predetermined
17  averages or limits, and if a customer's purchase
18  quantities exceed the established parameters, the
19  customer's activity is printed on the report."
20        Is this an accurate description of the
21  ingredient limit report as you understood it?
22    A.  Yes.
23    Q.  Fair description of how it worked during
24  your time?
25    A.  Yes.

Page 533

1    Q.  And these parameters that are used for the
2  computer program, the established parameters that are
3  discussed, where did they come from?
4    A.  They came from DEA.
5    Q.  A little bit further down, it discusses
6  the second piece of Cardinal Health's two-step
7  process to comply with 1301.74(b).
8        And can you read for me in the next
9  paragraph the sentence beginning "Second"?
10    A.  "Second, on a daily basis, cage and vault
11  personnel should be policing and identifying
12  individual orders that appear excessive in relation
13  to what other customers are buying and/or the
14  customer's purchase history."
15    Q.  All right.
16    A.  Read the entire paragraph, or just that?
17    Q.  That's good.
18    A.  Okay.
19    Q.  Earlier in the day, when you were being
20  asked questions by plaintiff's counsel, they played
21  you a video of someone by the name of Mr. Baranski
22  talking about pickers and packers.
23        Do you recall that?
24    A.  I do.
25    Q.  In your experience, are there pickers and

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1 packers in Cardinal facilities for items other than
2 controlled substances?
3     A.   Yes.  So there are pickers and packers in
4 the general warehouse, and then there are separate
5 pickers and packers in the controlled substance cage,
6 and then separate packers in the vault -- separate
7 pickers and packers in a vault.
8     Q.   Is it true that the vast majority of
9 products that Cardinal ships have nothing to do with
10 controlled substances or opioids?
11     A.   That is correct.
12     Q.   In your experience, the folks who get
13 selected to work in the cage area or the vault area,
14 where Cardinal Health stores opioid medications, are
15 they the best of the best of Cardinal's warehouse
16 employees?
17     A.   Yes.  They are the crème de la crème, as I
18 call them.  The -- best ones are selected to work
19 in the cage and vault area.
20     Q.   So in your experience, would a reference
21 to pickers and packers just putting things in totes,
22 would that necessarily apply to cage and vault
23 employees, or would that be something different?
24     A.   No, the cage and vault pick process was --
25 was different.  There were other -- there were

Page 535

1 additional checks and balances on picking orders in
2 the -- cage and vault.  It was -- it was
3 different than how it was done in the general
4 warehouse.
5     Q.   In the event that through this second
6 process, someone in the distribution center
7 identified an issue, whose responsibility was it to
8 alert DEA of such an issue?
9     A.   That person would notify their supervisor,
10 and then someone at the division would notify DEA of
11 the suspicious order.
12     Q.   So -- so would that potentially come
13 straight from a distribution center, not necessarily
14 through corporate?
15     A.   That would come straight from the
16 distribution center.
17     Q.   Have you ever heard of the DEA's Internet
18 pharmacy initiative?
19     A.   Yes.
20     Q.   Okay.  What is it?
21     A.   It's guidance that they issued in relation
22 to identifying potential suspicious orders through
23 Internet pharmacies.
24     Q.   And who asked you to undertake the
25 Internet pharmacy initiative?

Page 536

1     A.   My boss, Steve Reardon.
2     Q.   What was Mr. Reardon's role at Cardinal
3 Health?
4     A.   At the time, I believe he was director of
5 quality and regulatory affairs.
6     Q.   And we're in kind of the 2005-2006 time
7 frame, right?
8     A.   Yes.
9     Q.   Do you know Mr. Reardon's background
10 before he came to work at Cardinal Health as director
11 of quality and regulatory affairs?
12     A.   I actually believe he was a police
13 officer.
14     Q.   Do you know where he was a police officer?
15     A.   I believe the Boston area.
16     Q.   As part of the Internet pharmacy
17 initiative, what -- what did you do to help comply
18 with the Internet pharmacy initiative?
19     A.   My role was, in addition to the
20 distribution centers submitting the report to DEA
21 every month, I would also review the reports, and I
22 would identify pharmacies that would need further
23 investigation, and I would conduct an investigation
24 and a site visit.  And based on those findings, I
25 would recommend -- make a recommendation to

Page 537

1 discontinue shipment of controlled substances to
2 those pharmacies and report those pharmacies to the
3 DEA.
4     Q.   I'd like to direct your attention to an
5 exhibit you looked at earlier; it should be right in
6 front of you.  It's marked as Brantley Exhibit 4.
7         Do you have that one?
8     A.   Yes.
9     Q.   And this was a settlement release
10 agreement and administrative memorandum of agreement.
11         Do you remember discussing that document
12 earlier today?
13     A.   Yes.
14     Q.   Is it true that on the first page of
15 Exhibit 4, it states that Cardinal has 27 separate
16 distribution facilities?
17     A.   Yes.
18     Q.   And are the distribution facilities --
19 generally; I know there's some unique ones -- but
20 generally speaking, do the distribution facilities
21 cover particular geographic areas?
22     A.   Yes.
23     Q.   To your knowledge, was there ever a
24 suspension order of any of the facilities that
25 shipped to the Northern Ohio area?

Page 538

1    A.   No.
2    Q.   A little bit more on Exhibit 4.  You spent
3 a fair bit of time talking about allegations that the
4 DEA -- the DEA had made.
5        To your knowledge, did DEA ever prove its
6 allegations?
7    A.   No.
8    Q.   In fact, there -- there was a piece that
9 was skipped over earlier when you were discussing
10 this document with counsel.  On page 2, there's a
11 section that counsel for the Plaintiffs didn't read
12 that begins, "No admission or concession."
13       Do you see that section?
14   A.   Yes.
15   Q.   And does it say:  "This agreement is
16 neither an admission by Cardinal of liability or of
17 the veracity of any allegation made by DEA in the
18 orders to show cause."
19       See that?
20   A.   Yes.
21   Q.   Did I read it correctly?
22   A.   Yes.
23   Q.   Is that consistent with your understanding
24 of this document?
25   A.   Yes.

Page 539

1    Q.   I believe you also have in front of you
2 Exhibit 8.
3        Do you see Exhibit 8?
4    A.   Yes.
5    Q.   Okay.  And is this document from January
6 of 2005?  Correct?
7    A.   Yes.
8    Q.   Okay.  You were asked whether you
9 recognize some of the names in that exhibit.
10       Do you recall that?
11   A.   Yes.
12   Q.   And the Plaintiffs pointed out some
13 criticisms or critiques that were part of the audit
14 in Exhibit 8.
15       Do you recall that?
16   A.   Yes.
17   Q.   And those were related to the -- the QRA
18 department, fair?
19   A.   Yes.
20   Q.   Okay.  Is the QRA department broader than
21 just anti-diversion work?
22   A.   Yes.
23   Q.   Do you have any reason to believe that the
24 document that counsel spent time talking to you about
25 has anything at all to do with anti-diversion work

Page 540

1 related to opioids?
2    A.   No.
3    Q.   You were also asked some questions about
4 an e-mail -- this is Exhibit 12 now; do you have
5 Exhibit 12 in front of you?
6    A.   Yes.
7    Q.   And Exhibit 12 was an e-mail from Mark
8 Mitchell.
9        Do you recall this document now?
10   A.   Yes.
11   Q.   And this e-mail was not to you, was it?
12   A.   No.
13   Q.   In the copy you were given, it has no
14 response from Steve Reardon to Exhibit 12, does it?
15   A.   No.
16   Q.   Exhibit 12 has statements from Mark
17 Mitchell about his knowledge of whether Cardinal
18 Health monitors purchases from hospitals or
19 pharmacies.
20       Do you recall that?
21   A.   Yes.
22   Q.   You were asked questions about
23 Mr. Mitchell's understanding.  Is Mr. Mitchell the
24 author of this e-mail in Exhibit 12?
25       Is he part of the QRA or anti-diversion

Page 541

1 team?
2    A.   No.
3    Q.   Was Mr. Mitchell's understanding of how
4 Cardinal Health monitored possible diversion correct?
5        MR. PAPANTONIO:  Objection as to what
6    Mr. Mitchell -- form.  Just form.  Just object
7    to form.  Let you figure it out.
8        THE WITNESS:  No.
9        MR. PAPANTONIO:  Objection as to form.
10 BY MR. PYSER:
11   Q.   Do you recall counsel for the Plaintiffs
12 asking you questions in which Mr. Mitchell made
13 statements about Cardinal Health's process for
14 anti-diversion steps?
15   A.   Yes.
16   Q.   Do you believe Mr. Mitchell's
17 understanding of how Cardinal Health monitored for
18 possible diversion and took anti-diversion steps is
19 correct?
20       MR. PAPANTONIO:  Objection to form.
21   Objection to form.
22       THE WITNESS:  No.
23 BY MR. PYSER:
24   Q.   What do you think is wrong about
25 Mr. Mitchell's understanding in Exhibit 12?

Page 542

1 MR. PAPANTONIO: Objection as to form.
2 THE WITNESS: We had a system in place.
3 BY MR. PYSER:
4 Q. Let me rephrase that question.
5 What do you disagree with from the
6 statements Mr. Mitchell makes in the e-mail at
7 Exhibit 12?
8 A. I disagree with the statement that he made
9 that we do not monitor what they purchase or -- or
10 track.
11 Q. Why do you disagree with that?
12 A. Because we monitor purchases of all of
13 our -- all of our customers.
14 Q. Is it the case that every entity that
15 receives any controlled substance from Cardinal
16 Health has to have a DEA license?
17 MR. PAPANTONIO: Objection as to form.
18 THE WITNESS: Yes.
19 BY MR. PYSER:
20 Q. Does Cardinal Health ship to anyone who
21 does not have a DEA license?
22 A. Not a controlled substance, no.
23 Q. When Plaintiffs' counsel was asking you
24 questions, they asked whether Cardinal Health
25 distributed to drug cartels.

Page 543

1 To your knowledge, has Cardinal Health
2 ever distributed to a drug cartel?
3 A. No.
4 Q. I believe you also have in front of you
5 Exhibit 13, which talks about a facility assessment
6 in Birmingham, Alabama.
7 You recall that document?
8 A. Yes.
9 Q. This was an e-mail that I believe you
10 received, along with others, about this facility
11 assessment in Birmingham.
12 Did this document, when you reviewed it,
13 cover all of the different parts of anti-diversion
14 reporting within Cardinal Health?
15 A. No.
16 Q. So, for example, did it cover Cardinal
17 Health's corporate anti-diversion work?
18 A. No.
19 Q. So is it fair to say that in addition to
20 whatever activity was happening at local distribution
21 centers, there was also other work being done at the
22 corporate level by people like yourself?
23 MR. PAPANTONIO: Objection as to form.
24 THE WITNESS: Yes.
25

Page 544

1 BY MR. PYSER:
2 Q. What other work was being done for
3 Cardinal Health -- rephrase the question.
4 What other work was being done for
5 Cardinal Health beyond the work that was being done
6 just at the distribution centers like the Birmingham,
7 Alabama, site?
8 A. I was reviewing the ingredient limit
9 reports, and I was conducting site visits and
10 investigations and reporting those customers to the
11 DEA.
12 Q. Were there times when you reported a
13 customer to DEA because you believed they might be
14 involved in Internet pharmacy activity?
15 A. Yes.
16 Q. And what did Cardinal Health do when it
17 came to believe that a customer might be involved in
18 Internet activity?
19 A. We discontinued shipments of controlled
20 substances to that customer and reported that
21 customer to the DEA.
22 Q. You were asked earlier today questions
23 about Exhibit 6.
24 Do you have Exhibit 6 in front of you?
25 A. Yes.

Page 545

1 Q. And in particular, you were asked about an
2 e-mail in Exhibit 6 from Steve Reardon, on which you
3 were one of the recipients.
4 You see that e-mail from August 30th,
5 2005?
6 It's on the second page of the document.
7 It's the bottom e-mail.
8 A. Yes.
9 Q. Okay. So we've got an August 30th, 2005,
10 e-mail from Steve Reardon. And in it, Mr. Reardon
11 states: "Your excessive purchase report should be
12 reviewed to see if you have customers that are
13 purchasing over 3,000 dosage units of phentermine or
14 5,000 dosage units of hydrocodone a month."
15 Do you see that language?
16 A. Yes.
17 Q. I just want to be clear about the reports
18 that we're talking about. These excessive purchase
19 reports that are referenced here, of having more than
20 3,000 or 5,000 dosage units, are those reports that
21 would have already been sent to the DEA?
22 MR. PAPANTONIO: Objection as to form.
23 THE WITNESS: Yes.
24 BY MR. PYSER:
25 Q. Who else would have received, in addition

Page 546

1 to yourself, these reports that are referenced at
2 3,000 dosage units or 5,000 dosage units, to your
3 knowledge?
4      A.  They were received at the distribution
5 level at the distribution centers, as well as my team
6 at -- at corporate as well as the DEA.
7      Q.  So in its normal practice, would Cardinal
8 Health have reported all of these orders that are
9 referenced here to the DEA?
10          MR. PAPANTONIO: Objection. Form.
11          THE WITNESS: Yes.
12 BY MR. PYSER:
13      Q.  Were there ever times when you personally
14 had to call a customer and tell them they would no
15 longer be eligible to receive controlled substances
16 from Cardinal Health?
17      A.  Yes.
18      Q.  To the extent that you can remember now,
19 ten years later, can you describe a little bit about
20 those phone calls?
21      A.  I don't remember the exact --
22          MR. PAPANTONIO: Objection. Hearsay.
23          THE WITNESS: I don't remember the exact
24   details, but they would be -- I would call the
25   customer and let them know that they were being

Page 547

1   shut off from receiving controlled substances.
2 BY MR. PYSER:
3      Q.  And when you made those calls, were the
4 pharmacists sometimes angry with you?
5          MR. PAPANTONIO: Objection. Hearsay.
6          THE WITNESS: Yes.
7 BY MR. PYSER:
8      Q.  Why? Did they tell you?
9      A.  Because they would not be --
10          MR. PAPANTONIO: Objection. Hearsay.
11          THE WITNESS: Because they would not be
12   receiving controlled substances from Cardinal
13   Health any longer.
14 BY MR. PYSER:
15      Q.  And these pharmacies that we're talking
16 about that Cardinal Health was refusing to ship to,
17 do you know, typically, did they still have a valid
18 DEA license?
19      A.  Yes.
20      Q.  In addition to your work in
21 anti-diversion, did you also do training of other
22 Cardinal Health employees?
23      A.  Yes.
24      Q.  Can you tell me a little bit about what
25 types of training you did?

Page 548

1      A.  I did training with members of senior
2 management, and I did training with the sales force,
3 and I did training with members of my team.
4      Q.  And just generally speaking, what was the
5 subject matter that you would train other people at
6 Cardinal Health on?
7      A.  On our Internet or anti-diversion policy.
8      Q.  And were those policies, talking about the
9 2005, '6, '7 time period, were those policies during
10 that time period consistent with what you understood
11 DEA wanted?
12          MR. PAPANTONIO: Objection as to what DEA
13   wanted.  Form.
14          THE WITNESS: Yes.
15 BY MR. PYSER:
16      Q.  Were the policies that Cardinal Health had
17 back in 2006 consistent with the guidance that you
18 received from DEA?
19      A.  Yes.
20      Q.  How did you come to the conclusion that
21 Cardinal's policies back in this time period were
22 consistent with the guidance you received from DEA?
23      A.  Kyle Wright with DEA told us.
24          MR. PAPANTONIO: Objection. Move to
25   strike. Hearsay, what they told this witness.

Page 549

1 BY MR. PYSER:
2      Q.  What did Mr. Wright tell you about
3 Cardinal Health's policies?
4          MR. PAPANTONIO: Objection as to form
5   about anything Mr. Wright told this witness.
6   Hearsay.
7          THE WITNESS: He said --
8 BY MR. PYSER:
9      Q.  You can answer.
10      A.  He said that we're doing the right things,
11 and we're going in the right directions, and that we
12 had a -- a good program.
13          MR. PAPANTONIO: Objection. Move to
14   strike. Just rank hearsay.
15 BY MR. PYSER:
16      Q.  Did you have a -- a strong working
17 relationship with Mr. Wright in DEA?
18      A.  Yes.
19      Q.  Did Kyle Wright from DEA ever tell you
20 that Cardinal Health's anti-diversion program was
21 deficient in any way?
22          MR. PAPANTONIO: Objection as to form.
23   Anything Mr. Wright told this witness, hearsay.
24          MR. PYSER: Counsel, you can object to
25   form and keep it at that.

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1     MR. PAPANTONIO: Okay. Form. I'll let
2  you figure it out for yourself. Okay.
3     THE WITNESS: No.
4  BY MR. PYSER:
5     Q. Did Mr. Wright ever tell you that Cardinal
6  Health's suspicious -- strike that.
7     Did you receive any suggestions or
8  critiques from DEA, from Mr. Wright in particular, on
9  Cardinal Health's system?
10    A. No.
11    Q. If back in 2006 or '7, Mr. Wright or
12  someone else at DEA had offered suggestions to
13  Cardinal Health on its suspicious-order monitoring or
14  reporting system, what would you have done?
15    A. We would have --
16    MR. PAPANTONIO: Objection. Speculation.
17  Speculation as to what was offered and what his
18  reaction would be.
19  BY MR. PYSER:
20    Q. You can answer.
21    A. We would have implemented those
22  suggestions.
23    Q. I'm showing you a document entitled
24  Exhibit 35.
25    (Cardinal-Brantley 35 was marked for

Page 551

1  identification.)
2  BY MR. PYSER:
3    Q. Do you recognize this document?
4    A. Yes.
5    Q. What is it?
6    A. It's an e-mail from my boss, Steve
7  Reardon, of a summary of a conversation that we had
8  with Kyle Wright.
9    Q. Okay. And the -- time period of that
10  call was on April 2007; is that right?
11    A. Yes.
12    Q. And Mr. Reardon states --
13    MR. PAPANTONIO: Just for the record,
14  objection to this entire document as hearsay.
15  Anything Mr. Wright talked to as far as
16  Mr. Reardon or Mr. Brantley is hearsay. We
17  object to the use of the document.
18  BY MR. PYSER:
19    Q. Direct your attention to the sentence that
20  begins: "The purpose of the call was to confirm we
21  have the appropriate program and processes in place.
22  Ask if there is anything else we should be doing,
23  reiterate our willingness to work with the agency on
24  this issue, and to extend an offer to meet with the
25  agency to further discuss the details of our

Page 552

1  program."
2    Do you see that language?
3    A. Yes.
4    Q. Based on your recollection, is that an
5  accurate description of the call?
6    A. Yes.
7    Q. If you look at the first bullet point, can
8  you read that out loud?
9    MR. PAPANTONIO: Continuing objection as
10  to hearsay and use of this document in part of
11  hearsay.
12    THE WITNESS: He thinks we are doing the
13  right things, heading in the right direction.
14  BY MR. PYSER:
15    Q. And that statement, that was described by
16  Mr. Reardon as the key feedback from Kyle.
17    Do you see that?
18    A. Yes.
19    MR. PAPANTONIO: Same objection as to what
20  Mr. Reardon characterized what Mr. Kyle told him
21  as hearsay.
22  BY MR. PYSER:
23    Q. And did Cardinal Health incorporate this
24  information that it learned from Mr. Wright into its
25  anti-diversion programs?

Page 553

1    A. Yes.
2    Q. What impact did those statements have on
3  you?
4    A. They made me feel that we had a good
5  program in place, and as he said, we were heading in
6  the right direction. We were doing the right thing.
7    MR. PAPANTONIO: Objection. Move to
8  strike. His statement is based on hearsay.
9  Foundationally on hearsay.
10  BY MR. PYSER:
11    Q. And the next bullet is, quote: "Stated
12  that Eric, who manages their program centrally in
13  Dublin, has established an excellent working
14  relationship with his office."
15    Do you see that statement?
16    A. Yes.
17    Q. Do you agree with that statement?
18    A. Yes.
19    Q. If you go to the next page in Exhibit -- I
20  believe we're -- we're at 35 -- is there a letter
21  attached?
22    A. Yes.
23    Q. Is it a letter you wrote?
24    A. Yes.
25    Q. And who did you send the letter to?

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1    A.   Jan Hamilton, with the DEA in the Miami
2 field division in Miami, Florida.
3    Q.   And there's some discussion in the letter
4 about information that had been provided back and
5 forth with DEA, in the first two paragraphs.
6        Do you see those paragraphs?
7    A.   Yes.
8    Q.   And I want to direct your attention to the
9 third paragraph, about ten lines down.  It begins:
10 "As mentioned above."
11        You see that language?
12    A.   Yes.
13    Q.   And it reads: "As mentioned above, all of
14 the Internet pharmacy accounts listed below have been
15 terminated as customers for controlled substances.
16 In addition, prior to this action on our part, DEA
17 had been notified by us of excessive purchases of
18 controlled substances via ingredient limit reports
19 for these accounts in advance of our decision.
20 Rather than wait upon a response from DEA, Cardinal
21 Health initiated the following actions as described
22 below.  That being the case, we believe that our
23 program is in accordance with DEA's expectations, and
24 we continue to improve it and add resources to it.
25 For example, we added an additional head count in

Page 555

1 February 2007."
2        Did I read that correctly?
3    A.   Yes.
4    Q.   Did you personally agree with the
5 conclusion in this letter that Cardinal's program was
6 in accordance with DEA's expectations?
7    A.   Yes.
8        (Cardinal-Brantley 36 was marked for
9 identification.)
10 BY MR. PYSER:
11    Q.   Showing you a document that's been marked
12 as Exhibit 36.
13        What is Exhibit 36?
14    A.   This is an e-mail from -- from Kyle Wright
15 that he was sent to wholesale with the -- listed
16 pharmacies that wholesalers had -- had discontinued
17 business with and notified DEA of that action.
18    Q.   Okay.  Did you receive e-mails like this
19 from Mr. Wright?
20    A.   Yes.
21    Q.   What would you typically do when you
22 received an e-mail like this from Mr. Wright, letting
23 you know that a wholesaler -- not necessarily
24 Cardinal Health, but some wholesaler -- had
25 discontinued distribution of controlled substances to

Page 556

1 particular pharmacies or hospitals?
2    A.   I would review the list to see if there
3 were any current Cardinal Health customers, and if
4 so, I would look into those customers; I would
5 conduct an investigation of those customers if they
6 were on the list.
7    Q.   Okay.  And were there times when a
8 customer appeared on the list and Cardinal Health
9 subsequently refused to do business with them?
10    A.   Yes.
11    Q.   And the pharmacies on this list, are they
12 pharmacies that necessarily lost their DEA license?
13    A.   No.
14    Q.   Okay.  So these are pharmacies that a
15 distributor had cut off but that DEA hadn't taken
16 their license from?
17        MR. PAPANTONIO:  Objection as to form.
18 Leading.
19        THE WITNESS:  Correct.
20 BY MR. PYSER:
21    Q.   Do you know whether or not the pharmacies
22 that are on this list as having been cut off by a
23 distributor still had their DEA license or not?
24    A.   Yes.
25    Q.   Did they have DEA licenses, typically,

Page 557

1 still?
2    A.   Yes.
3    Q.   Did there come a time when -- well, first
4 of all, let me ask:  Did you receive e-mails like
5 this periodically from Mr. Wright?
6    A.   Yes.
7    Q.   Did there come a time when DEA and Kyle
8 Wright stopped sending e-mails like the one we just
9 saw?
10    A.   Yes.
11    Q.   Do you know why?
12        MR. PAPANTONIO:  Objection as to form.
13 Speculating.
14        THE WITNESS:  I do -- I do not know why.
15 I can only speculate.
16 BY MR. PYSER:
17    Q.   But to your knowledge, DEA just stopped
18 providing this information to distributors.
19        You know that, right?
20    A.   Yes.
21        MR. PAPANTONIO:  Objection.  Form.
22 Leading on that last question.  Move to strike
23 the question.
24 BY MR. PYSER:
25    Q.   Did you continue to receive this

Page 558

1  information from DEA, or did it stop at some point?
2      A.  It stopped at some point.
3      Q.  Around 2010, did you begin work at a
4  Cardinal Health facility near Atlanta?
5      A.  Yes.  2009, I started work at the
6  McDonough, Georgia, distribution center.
7      Q.  And in your role at the McDonough,
8  Georgia, distribution center, did you have
9  responsibilities related to the physical security of
10 medications that were at that facility?
11     A.  Yes.  I was a compliance officer, so my
12 role was to conduct audits and assure compliance with
13 DEA, FDA, PDMA, OSHA, DOT regulations.
14     Q.  Can you in your experience compare the
15 specificity of regulations for DEA guidance on
16 physical security of handling medications versus
17 anti-diversion?
18     A.  Yes.  So the anti-diversion regulation is
19 21 CFR 1301.74(b), which states that the registrant
20 shall have a system in place to identify suspicious
21 orders and report those orders.  And it defines those
22 orders as orders of unusual size, frequency, or that
23 deviate substantially from a normal pattern.
24     As far as the regulations around physical
25 security, they were very detailed.  They went into

Page 559

1  the thickness of the vault walls, the type of
2  security system, the monitoring, the -- the testing,
3  the cage itself, the space between the cage and the
4  locking mechanism.  And it spelled out in detail a
5  thorough list of things to follow.
6      Q.  In your time at McDonough, and generally
7  at Cardinal Health, were distribution centers
8  regularly inspected by DEA?
9      A.  Yes.  There was a cyclical inspection
10 generally every two to three years or so.
11     Q.  In your experience at Cardinal Health for
12 over ten years, did you ever see Cardinal Health ship
13 an order that you believed would be diverted?
14     A.  No.
15     MR. PYSER:  No further questions.
16     VIDEOGRAPHER:  Going off the record.  Time
17 is 7:18.
18     (A recess transpired from 7:18 p.m.
19     until 7:23 p.m.)
20     MR. PAPANTONIO:  I'm going to move -- all
21 these documents are moved into evidence, so you
22 can take an inventory and accounting of them
23 after we're finished with these questions.
24     VIDEOGRAPHER:  We're going back on record,
25 beginning of media file number 10.  Time

Page 560

1  is 7:23.
2          EXAMINATION
3  BY MS. VANNI:
4      Q.  Good evening, Mr. Brantley.
5      A.  Good evening.
6      Q.  It's been a long evening.  Are you okay?
7      A.  I'm fine.  Thank you.
8      Q.  My name is Amy Vanni, as you know, and I
9  represent Endo and Par, and I'm going to be asking
10 you some questions.
11     When did you first begin working at
12 QualiTest?
13     A.  I believe September 30th, 2013.
14     Q.  And when you joined QualiTest, what was
15 your position?
16     A.  I was a manager of suspicious-order
17 monitoring.
18     Q.  And what group did you report to?
19     A.  DEA compliance.
20     Q.  What was the DEA compliance group
21 responsible for at QualiTest?
22     A.  They were responsible for DEA compliance
23 for the campus, so for the tablets manufacturing
24 facility, the liquids manufacturing facility, as well
25 as the distribution center.

Page 561

1      Q.  Okay.  And as part of -- SOMS was part of
2  the DEA compliance; is that -- is that fair to say?
3      A.  Yes.
4      Q.  How long did you work there?
5      A.  Until February 2017.
6      Q.  When you joined QualiTest, did it have a
7  SOMS program in place?
8      A.  Yes.
9      Q.  What is QualiTest's customer base?
10     A.  Primarily wholesalers and chain
11 distribution centers.
12     Q.  During the time that you worked at
13 QualiTest, did your position change?
14     A.  No.
15     Q.  Did anyone report to you?
16     A.  Yes.
17     Q.  I want to talk about some of the details
18 of the suspicious-order monitoring program when you
19 came on board at QualiTest, but before I do that,
20 first, as manager of the SOMS program, can you just
21 generally describe for the jury what "SOMS" is?
22     A.  "SOMS" stands for suspicious-order
23 monitoring, which meant that we -- we monitored
24 orders and implemented a Know Your Customer program.
25 So the -- or the program in detail is -- it -- it

Page 562

1   started with the Know Your Customer piece, so all
2   customers that ordered controlled substances received
3   a questionnaire, and on that questionnaire, we asked
4   certain background information. I asked about their
5   SOMS program. I asked the number and types of
6   customers that they have, whether there have been any
7   disciplinary actions, so forth and so on.
8       And then the -- the second piece of the
9   Know Your Customer was the site visit.
10      And then, as far as the SOMS system
11  itself, the day-to-day operation, all orders passed
12  through the algorithm. And if the algorithm
13  identified an order -- it was what I called an "order
14  of interest" -- we looked into that order, reached
15  out to the customer, asked for additional
16  information.
17      If, after receiving that information that
18  order was deemed to be suspicious, then we cut that
19  order, meaning reject it, and we reported that order
20  to the DEA.
21      The second part of the day-to-day
22  operation was I established thresholds based on IMS
23  dispensing data and information received from the
24  customer, as far as the number of customers that you
25  have.

Page 563

1       So I had the dispensing data for
2   pharmacies, chain pharmacies, mail order, and -- and
3   such. And I would multiply that by the number of
4   customers and have a threshold, a ballpark threshold.
5       And then I would figure out if we were a
6   primary for a certain drug, or a secondary, or just
7   one of several, because that dictated the percentage
8   of the national average that we would get.
9       So of course, primary status, a larger
10  percentage; secondary status was a lower percentage.
11  And then if we were one of several, there was like a
12  default percentage.
13      Q. With -- with respect to to the way
14  thresholds were set, is that -- is that a change that
15  you implemented when you came on board?
16      A. Yes, as -- as far as using a -- the IMS
17  dispensing data, yes.
18      Q. We heard some questions during Plaintiffs'
19  counsel's questioning of you with respect to sales
20  setting thresholds.
21      You recall that line of testimony?
22      A. Yes.
23      Q. Is that something that you changed when
24  you came on board?
25      A. Yes.

Page 564

1       Q. What is the purpose of a SOMS program?
2       A. One of the purposes of the SOMS program is
3   to comply with the regulation 21 CFR 1301.74(b). And
4   it's to identify potentially suspicious orders, and
5   to help to maintain that secure supply chain that we
6   spoke of earlier.
7       Q. You mentioned the algorithm and
8   identification of an order of interest. Is an order
9   of interest something that's different than a
10  suspicious order?
11      A. Yes. So an order of interest is any order
12  that's identified by the algorithm. So the algorithm
13  could identify an order, because it's -- it's based
14  on history. It needs something to compare it to, so
15  it needs an order history. So if it is a customer's
16  first time ordering a substance or if it's a new drug
17  that was released -- those are just a couple
18  examples -- then that order would be held by the
19  algorithm, because it has nothing to compare it to.
20      Q. And when an order is held by the
21  algorithm, what -- what would you do at that point in
22  time?
23      A. All orders that were held by the algorithm
24  were further researched, and when necessary, reached
25  out to the customer to ask for additional

Page 565

1   information.
2       Q. Okay. What -- I was going to ask you, can
3   you expound a little bit on what that research
4   involved?
5       A. Yes. Sometimes I would have information
6   from the customer in advance. So if a major
7   wholesaler had added a -- a new chain, if someone --
8   at one point someone picked up Target's pharmacies.
9   I was notified in advance, "Hey, you know, we just
10  picked up Target pharmacies to distribute."
11      They have X number of pharmacies. So I
12  know in advance, for instance, that a pharmacy chain
13  just acquired another pharmacy chain, how many stores
14  that they have for each distribution center, so I can
15  implement that into that other threshold -- so I
16  would know that in advance.
17      Q. In situations where you didn't know that
18  in advance, what would you do?
19      A. I would reach out to the customer and ask
20  them for additional information.
21      Q. During the interim, while you were doing
22  your investigation, what would -- what would happen
23  to that order?
24      A. That order was on hold until I received
25  adequate information. And if I did not receive

Page 566

1  adequate information, that order was cut or rejected,
2  and it was reported to the DEA.
3      Q.  And as your role as SOMS manager, you had
4  opportunity to do that on -- on occasions?
5      A.  Yes.
6      Q.  And if you felt like you had, as a result
7  of your investigation, enough information, and then
8  the order wasn't suspicious, what would happen?
9      A.  Well, then that order would be released,
10  and the reason from the customer was saved into the
11  SOM system.
12      Q.  How long would an investigation take,
13  generally?
14      A.  It depended on how long it actually took
15  the customer to respond to my e-mail.  So some could
16  take 10, 15 minutes, the research; some could take a
17  couple days.  But they remained on hold until I got
18  the information that I needed.
19          And if a customer just failed to respond,
20  you know, within 48 hours, I would just notify the
21  customer, "This order is getting cut," and I would
22  report it to the DEA.
23      Q.  You were asked some questions by
24  Plaintiffs' counsel about a March 2013 DEA meeting.
25          Do you recall that line of testimony?

Page 567

1      A.  Yes.
2      Q.  That line of questioning?
3      A.  Yes.
4      Q.  This predated your employment with
5  QualiTest, right?
6      A.  Yes.
7      Q.  You were aware of the meeting; is that
8  fair?
9      A.  I was told about the meeting, yes.
10      Q.  And as a result of that meeting, what
11  actions did -- if any -- did QualiTest take?
12      A.  I was hired in September, and I
13  implemented the system that I just outlined.  So
14  whatever sales had been doing was taken over by the
15  SOM team.
16      Q.  You were shown a document that was marked
17  as Plaintiffs' Exhibit 29, if you could pull that.
18          And it was an e-mail dated October 7th,
19  2013, from you to you.
20          Do you remember this -- being shown this
21  document?
22      A.  Yes.
23      Q.  So you were at the company just a little
24  over a week, or maybe two weeks, at this point in
25  time; is that fair?

Page 568

1      A.  Yes.
2      Q.  What was your purpose in -- in preparing
3  this document?
4      A.  Just -- this was a document so -- I just
5  arrived at the company, and I'm charged with -- with
6  managing the suspicious-order monitoring program.  So
7  I drafted this document, and I sent it to myself to
8  share with the team for feedback.  These are my
9  thoughts.  These are some things, you know, that I'm
10  planning.
11      Q.  Okay.  And were you able to implement some
12  of those proposals?
13      A.  Yes.
14      Q.  One of those proposals talks about
15  threshold events, correct?
16      A.  Yes.
17      Q.  And I believe we talked about the changes
18  you implemented with respect to thresholds; is
19  that -- is that fair?
20      A.  Yes.
21      Q.  It also mentions chargebacks, and you were
22  asked some questions about chargebacks.
23          Do you remember that?
24      A.  Yes.
25      Q.  Did you begin looking at chargeback data?

Page 569

1      A.  Yes, I reviewed chargeback data.
2      Q.  And customer due diligence visits:  Do you
3  remember that -- that line of questioning?
4      A.  Yes.
5      Q.  Did you personally visit customers in your
6  role as SOMS manager?
7      A.  Yes.
8      Q.  And -- and what was your purpose in doing
9  that?
10      A.  The purpose of the site visit, it was a
11  Know Your Customer visit, to actually do just that,
12  to get the know the customer.  My main purpose was to
13  discuss SOMS, so I would give them a high-level
14  overview of how our system operated, in case they
15  were contacted by me, they would know why.
16          And then the bulk of the meeting was about
17  their SOM system:  How did it work?  Did it follow
18  their SOP?  Give me a demonstration of their system.
19  So it was basically a SOMS visit.
20      Q.  Why was it important for you to understand
21  their SOMS program?
22      A.  Because I felt that the customer needed to
23  have a -- a SOMS program.  And I had already received
24  either an SOP or a kind of a high-level summary of
25  how their program operated, but I wanted to go on

Page 570

1 site and see it in action, see some examples, and
2 verify that they had one in place.
3 Q. This document also refers to SOPs, and you
4 just referred to some SOPs. Were you able to
5 implement SOPs as your role as SOMS manager?
6 A. Yes.
7 MS. VANNI: I'm going to mark as
8 Exhibit 37, I think, we're up to.
9 (Cardinal-Brantley 37 was marked for
10 identification.)
11 MS. VANNI: Hand that to you. Counsel.
12 MR. BUCHANAN: Thank you.
13 MS. VANNI: Of course.
14 BY MS. VANNI:
15 Q. Also put it on the -- for other people.
16 What I've put in front of you is an SOP
17 titled "Customer Due Diligence Visits." Is that
18 right?
19 A. I have the one for new account approval
20 and existing account overview or --
21 Q. Oh, yeah. Okay. Thank you. Take that
22 back. Sorry about that.
23 Can you identify this document?
24 A. Yes. This is an SOP that I drafted for
25 new account approval and existing account review.

Page 571

1 Q. And what was the purpose of this?
2 A. Purpose of this was having an SOP around
3 setting up new customers and reviewing existing
4 customers, from the point that I drafted this.
5 Q. If I could direct your attention to page 2
6 of that document, under General Section 1, letter A.
7 A. Yes.
8 Q. "The SOM team conducts a thorough review
9 and research of the customer, including ownership.
10 If the research concludes that the potential customer
11 poses an unreasonable risk for diversion of
12 controlled substances and/or List 1 chemicals, the
13 customer will be blocked from ordering controlled
14 substances and/or List 1 chemicals."
15 Did I read that correctly?
16 A. Yes.
17 Q. Is that a step that you would implement as
18 your role as SOMS manager?
19 A. Yes. If a new customer was set up, we
20 would conduct a review.
21 Q. Did you ever send questionnaires to
22 existing customers as well?
23 A. Yes.
24 Q. And what was your purpose in doing that?
25 A. Consistency, so that every customer would

Page 572

1 have a -- a questionnaire on file, along with number
2 of customers that they had, because I needed that to
3 establish thresholds, even for the existing
4 customers.
5 Q. "Section 2 of that document, Know Your
6 Customer, talks about the customer questionnaire, but
7 if I could direct your attention to letter B:
8 "The SOM team reviews and validates the
9 information provided by the customer. This
10 information includes but is not limited to . . ."
11 And it lists a number of things, but if I
12 could direct your attention to number 2:
13 "State and DEA licenses are verified and
14 any disciplinary action is researched."
15 Did I read that correctly?
16 A. Yes.
17 Q. If any disciplinary action during the
18 course of your research was identified, what would
19 happen?
20 A. I would review that action to see when
21 it take -- when it took place, what had taken place,
22 any revocations of licenses or suspensions, and that
23 would be reviewed with my boss in legal.
24 Q. And also number 4, affiliation with
25 Internet pharmacies: Why was that important?

Page 573

1 A. To see if there was affiliation with --
2 with Internet pharmacies, to make sure that there was
3 no affiliations with rogue Internet pharmacies, as
4 opposed to ones that were VIPPS certified or . . .
5 Q. If a customer failed to provide the
6 information that you were requesting, what would
7 happen?
8 A. If a customer failed to provide all the
9 information, then we would give them a period of time
10 to respond, and then we would -- we would not ship
11 controlled substances to them.
12 MS. VANNI: I'm going to mark as my next
13 exhibit Number 38.
14 (Cardinal-Brantley 38 was marked for
15 identification.)
16 MS. VANNI: Hand that to you, Counsel.
17 BY MS. VANNI:
18 Q. Can you identify for the record what that
19 is?
20 A. Yes. This is an SOP that I drafted around
21 customer due diligence visits.
22 Q. And what was your purpose in doing that?
23 A. To have an SOP in place as -- as far as
24 how to conduct a visit and how to proceed with those
25 visits.

Highly Confidential - Subject to Further Confidentiality Review

Page 574

1    Q.  Why is it important to have a standard
2  operating procedure in place?
3    A.  One, the DEA asked to see them, you know,
4  for doing an audit.  Two is to have a working
5  procedure of how to accomplish a task, just in case
6  someone fills the role that I'm in; anyone could step
7  in and have a procedure to follow to -- to do the job
8  or the task.
9    Q.  If I could direct your attention to the
10  second page of that document, under "Procedure":
11       "Customer due diligence site visits shall
12  be considered under the following circumstances."
13       And then it lists four.  One is "SOM team
14  requests a visit when more information is needed in
15  approving a new customer account request for
16  controlled substances or List 1 chemicals."
17       Did I read that correctly?
18    A.  Yes.
19    Q.  What instances would this occur?
20    A.  If a customer submitted a questionnaire
21  and they did not provide an SOP of their SOM system,
22  but produced kind of like a -- a summary, and there
23  wasn't much there to that summary; or if there were
24  something that was found on the Internet search as
25  far as any -- any disciplinary action, or some action

Page 575

1  taken with the owner, or that we needed to confirm or
2  actually get more information on, then a -- a site
3  visit would be warranted before we could open that
4  customer up to kind of clear those -- all those
5  things to get additional information.
6    Q.  And with respect to number 4, "SOM team
7  requests a visit when a customer requests to begin
8  ordering controlled substances, List 1 chemicals, or
9  is seeking a boundary increase" -- what does that
10  refer to?
11    A.  Yes, so when it's a new customer, we would
12  want to conduct a site visit.  And then if a customer
13  was seeking an increase that needed further
14  justification, then we would conduct a site visit.
15    Q.  And is that something that you would do as
16  part of your role as SOMS manager?
17    A.  Yes.
18       MS. VANNI:  My next exhibit, Number 39.
19       (Cardinal-Brantley 39 was marked for
20  identification.)
21       MS. VANNI:  If you could take a look at
22  that.  Counsel.
23  BY MS. VANNI:
24    Q.  Can you identify for the jury what
25  Exhibit 39 is?

Page 576

1    A.  Yes.  This is an SOP that I drafted around
2  the cage and vault personnel.  Monitoring.
3    Q.  And what was the purpose of this SOP?
4    A.  This was an SOP to spell out to give the
5  cage and vault personnel that were actually picking,
6  packing, and shipping orders the ability to identify
7  based on their knowledge anything that they felt was
8  suspicious.
9    Q.  As your role as SOMS manager, did you ever
10  conduct any training?
11    A.  Yes.
12    Q.  And who would you train?
13    A.  I actually conducted training of the -- of
14  the cage and vault personnel on this SOP, and I would
15  conduct training of the -- of my team.  I conducted
16  training of the sales force and sales management.
17       MS. VANNI:  Exhibit 40.
18       (Par-Brantley 40 was marked for
19  identification.)
20  BY MS. VANNI:
21    Q.  If you could identify for the jury what
22  Exhibit 40 is, please.
23    A.  This is an SOP that I drafted around
24  identifying, blocking, and reporting suspicious
25  orders.

Page 577

1    Q.  And what was your purpose in doing this?
2    A.  To have a procedure in place that can be
3  followed by someone that would follow me that could
4  step in and -- and do the role, and plus to have a --
5  a guide, a procedure in place for identifying orders
6  and reporting orders.
7    Q.  Does this SOP reflect what we talked about
8  with respect to the investigation that would be
9  conducted if you got a -- an order tagged by the
10  algorithm?
11    A.  Yes.
12    Q.  You can set that aside.
13       I want to look at exhibit -- Plaintiffs'
14  Exhibit Number 28.  It was a document you were shown
15  that was a letter written by Tracey Hernandez,
16  director of DEA compliance, on October 18th, 2013, to
17  the valued customers of QualiTest.
18       Do you have that document in front of you?
19    A.  Yes.
20    Q.  If I could direct your attention to the
21  third paragraph, third sentence:
22       "As a result of this enhanced process, you
23  may receive more frequent inquiries from QualiTest
24  regarding your own suspicious order monitoring
25  efforts, the quantity of product you are ordering

Page 578

1 from us or the customers' use service."
2      Did I read that correctly?
3      A.  Yes.
4      Q.  Do you remember being asked some questions
5 about this by Plaintiffs' counsel?
6      A.  Yes.
7      Q.  First of all, what does the word
8 "enhanced" suggest to you?
9           MR. BUCHANAN:  Objection to form.
10          THE WITNESS:  That we take something that
11     already exists and improve upon it.  Or to
12     expand it, make it robust.
13 BY MS. VANNI:
14     Q.  And you were also asked questions with
15 respect to more frequent inquiries from QualiTest
16 regarding your own suspicious order monitoring
17 efforts.  What does the word frequent -- "more
18 frequent inquiries" suggest to you?
19          MR. BUCHANAN:  Objection.  Form,
20     foundation.
21          THE WITNESS:  That there were inquiries
22     being made, and that they may be made more
23     frequently.
24 BY MS. VANNI:
25     Q.  How would you describe your interactions

Page 579

1 with the local office of the DEA?
2      A.  I would say we had a good relationship.
3 They would come to the facility, conduct an audit.  I
4 would send an e-mail of any suspicious order to the
5 Birmingham office, and I would e-mail or -- or call
6 with questions and received answers.  We had a good
7 working relationship.
8      Q.  You mentioned audits.  Would DEA
9 occasionally do audits at QualiTest?
10     A.  Yes.
11     Q.  What was the purpose of those audits?
12          MR. BUCHANAN:  Objection.  Foundation.
13          THE WITNESS:  Cyclical inspections.
14     The -- the different registrations would be
15     audited.  The distribution center, the tablets
16     manufacturing, the liquids manufacturing;
17     whatever registration we had would be audited.
18 BY MS. VANNI:
19     Q.  During your course as -- or during your
20 employment as SOMS manager, did the DEA ever do an
21 audit of the SOMS program at QualiTest?
22     A.  Yes.
23     Q.  And what was the result of that?
24     A.  They stated that we had a good program and
25 that --

Page 580

1           MR. BUCHANAN:  Objection.  Move to strike.
2           THE WITNESS:  They specifically said in
3      the -- the exit interview that we were very
4      knowledgeable about suspicious order monitoring
5      and that they liked our program.
6           MR. BUCHANAN:  Objection.  Form.  Move to
7      strike.
8 BY MS. VANNI:
9      Q.  As a result of that SOMS audit conducted
10 by the DEA, did you have to make any changes to the
11 SOMS program at QualiTest?
12     A.  No.
13          MS. VANNI:  Thank you.  I have nothing
14     further.
15          VIDEOGRAPHER:  Going off record.  Time
16     is 7:49.
17          (A recess transpired from 7:49 p.m. until
18          7:51 p.m.)
19          VIDEOGRAPHER:  We're going back on the
20     record, beginning of media file number 11.  Time
21     is 7:51.
22              EXAMINATION
23 BY MR. LAFATA:
24     Q.  Good evening, Mr. Brantley.  I know you've
25 been here for about ten and a half hours; I have a

Page 581

1 few additional questions for you.  All right?
2      A.  Okay.
3      Q.  Do you currently work for Purdue Pharma?
4      A.  Yes.
5      Q.  And how long have you worked at Purdue
6 Pharma?
7      A.  Since February 2017.
8      Q.  Do you work for the Purdue Frederick
9 Company?
10     A.  I work for Purdue Pharma LP.
11     Q.  Have you ever worked for the Purdue
12 Frederick Company?
13     A.  No.
14     Q.  What's your job title at Purdue Pharma
15 right now?
16     A.  Senior management -- senior manager,
17 ethics and compliance.
18     Q.  And as the senior manager of ethics and
19 compliance, who do you report to?
20     A.  I report to Alexis Stroud, the director of
21 ethics and compliance.
22     Q.  What are your primary responsibilities as
23 a senior manager of ethics and compliance?
24     A.  My primary responsibility --
25          MR. PAPANTONIO:  Objection.  Beyond the

Page 582

1    scope of direct.
2  BY MR. LAFATA:
3      Q.  You can answer.
4      A.  My primary responsibilities are suspicious
5  order monitoring.  I manage the suspicious order
6  monitoring program.
7      Q.  During the examinations today, there's
8  been reference to the term "customer."  In the
9  context of Purdue, what does a Purdue customer refer
10 to?
11     A.  A wholesale distributor.
12     Q.  And have you heard the phrase "customer's
13 customer"?
14     A.  Yes.
15     Q.  In the context of Purdue, what is the
16 customer's customer?
17     A.  Customer's customer would be the pharmacy,
18 hospital, et cetera, that the wholesaler distributes
19 Purdue products to.
20     Q.  Does Purdue sell medications directly to
21 patients?
22     A.  No.
23        MR. PAPANTONIO:  Objection.  Scope.
24        THE WITNESS:  No.
25

Page 583

1  BY MR. LAFATA:
2      Q.  Does Purdue sell medications directly to
3  doctors?
4        MR. PAPANTONIO:  Objection.  Scope.
5        THE WITNESS:  No.
6  BY MR. LAFATA:
7      Q.  I want to ask you some questions about the
8  procedures at Purdue for order monitoring and due
9  diligence.
10     (Purdue-Brantley 41 was marked for
11 identification.)
12 BY MR. LAFATA:
13     Q.  Mr. Brantley, I'm handing you Exhibit 41.
14 Mr. Brantley, can you identify Exhibit 41?
15        MR. PAPANTONIO:  Objection.  This document
16 is beyond the scope of cross.  There's been no
17 discussion about the contents of what's
18 contained in this document.
19        At this point, this -- this entire
20 examination seems to be shifting towards a
21 direct of -- of Purdue, of Mr. Brantley as a
22 Purdue witness.  This is well beyond the scope,
23 and I move to strike the use of even this
24 document.
25        MR. LAFATA:  Okay.  Speaking objections

Page 584

1  noted.
2  BY MR. LAFATA:
3      Q.  Would you please identify Exhibit 41.
4      A.  Yes.  This is an SOP that I authored
5  around Know Your Customer due diligence.
6      Q.  What is the scope of this SOP?
7      A.  This -- this SOP applies to all customers
8  purchasing Schedule II through V controlled
9  substances and List 1 chemicals.
10     Q.  Is this a fair and accurate copy of that
11 standard operating procedure?
12        MR. PAPANTONIO:  Continuing objection to
13 the use of this document and the line of
14 questioning beyond the scope of cross
15 examination.
16 BY MR. LAFATA:
17     Q.  You can answer.  Excuse me.
18     A.  Yes.
19        MR. BUCHANAN:  Counsel, this violates the
20 protocol.
21        MR. LAFATA:  That's not correct.  That's
22 not correct.
23        MR. BUCHANAN:  Questioners are permitted
24 only to the extent testimony specifically
25 concerns their client.

Page 585

1        MR. LAFATA:  Okay, well, this concerns my
2  client.
3        MR. BUCHANAN:  I'm -- I'm sorry, Counsel,
4  there was no examination concerning your client
5  to which this questioning pertains.  Did you
6  notice --
7        MR. LAFATA:  There was examination --
8  there was examination --
9        MR. BUCHANAN:  Did you notice this
10 deposition?
11        MR. LAFATA:  Your objection is noted.
12        MR. BUCHANAN:  No, no, no, my question --
13        MR. PAPANTONIO:  No, no, we're not going
14 to note objection and you waste our time --
15        MR. LAFATA:  You -- you heard -- you heard
16 examinations of Purdue.
17        MR. PAPANTONIO:  No, there was no
18 examination.
19        MR. LAFATA:  We're going to have -- yes.
20        MR. PAPANTONIO:  There was
21 cross-examination.  You are way beyond the
22 scope, and you --
23        MR. LAFATA:  This is ridiculous.  We're
24 going to get this on the record.
25        MR. PAPANTONIO:  Don't hold your hand up

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1  at me. You're wasting our time.
2      MR. LAFATA: Mr. Brantley --
3      MR. PAPANTONIO: You have no authority to
4  go forward with this examination.
5      MR. LAFATA: That's not correct.
6      MR. PAPANTONIO: You know that; everybody
7  in the room knows that.
8      MR. LAFATA: Hush.
9      MR. PAPANTONIO: So it's -- no, don't tell
10  me to hush. It's continuing objection. So
11  you're wasting my time and everybody in this
12  room's time --
13     MR. LAFATA: Counsel -- Mr. Brantley --
14     MR. PAPANTONIO: -- including the witness,
15  Mr. Brantley.
16     MR. LAFATA: Mr. Brantley --
17     MR. BUCHANAN: You were required to
18  provide two days' notice to the extent an
19  examination --
20     MR. LAFATA: No.
21     MR. BUCHANAN: -- was going to go beyond
22  90 minutes.
23     MR. LAFATA: I've had --
24     MR. PAPANTONIO: We have already --
25     MR. LAFATA: -- five minutes. I've been

Page 587

1  five minutes.
2      MR. PAPANTONIO: No, no, no. Not yours.
3      MR. LAFATA: This is --
4      MR. PAPANTONIO: The combined
5  examination --
6      MR. LAFATA: This is totally --
7  BY MR. LAFATA:
8      Q. Mr. Brantley, I have a question --
9      MR. BUCHANAN: No, no --
10     MR. PAPANTONIO: Don't cut me off.
11     MR. BUCHANAN: I'm noting for the record,
12  there has been no notice provided by defense
13  counsel for an examination going beyond
14  90 minutes.
15     MR. LAFATA: We haven't gone beyond
16  90 minutes.
17     MR. BUCHANAN: You are now treading
18  into --
19     MR. LAFATA: I've been five minutes.
20     MR. BUCHANAN: -- his history with Purdue
21  and SOMS processes at Purdue.
22     Counsel, it's inappropriate. There's been
23  no advance notice. I join in the objection to
24  strike and bar.
25     MR. LAFATA: Okay.

Page 588

1  BY MR. LAFATA:
2      Q. Mr. Brantley, does this Exhibit 41
3  accurately reflect Purdue's protocol for Knowing Your
4  Customer's due diligence?
5      A. Yes.
6      Q. All right.
7      MR. PAPANTONIO: Continuing objection to
8  use of the document and the line of questioning.
9      MR. BUCHANAN: And reserve the right to
10  re-call the witness to examine concerning
11  Purdue's processes, since this was not a subject
12  of examination.
13     MR. PAPANTONIO: And I -- I join in that.
14  This now raises the issue of making this witness
15  available for full examination in a Purdue
16  examination.
17     So, Counselor, if you're willing to do
18  that, let's go ahead and rock and roll.
19     MR. LAFATA: Absolutely not. Absolutely
20  not.
21     MR. PAPANTONIO: Well, no, you've opened
22  the door for it. So we -- Mr. Brantley, just so
23  you know, we will set your deposition again for
24  Purdue, based on what this lawyer has done here
25  right now, just so you know what's happening to

Page 589

1  you in this room. Okay?
2      (Purdue-Brantley 42 was marked for
3  identification.)
4  BY MR. LAFATA:
5      Q. Mr. Brantley, I'm handing you a copy of
6  Exhibit 42.
7      MR. PAPANTONIO: Same objection. Move to
8  strike the use of the document. Move to --
9  to -- move to object. I'm moving to object the
10  whole line of questioning. Well beyond the
11  scope of any cross-examination that took place
12  in this room.
13     Secondly, there was no notice of any
14  direct that was going to be taken. We're
15  entitled to a direct. Notice of that.
16     MR. LAFATA: I want the record to reflect
17  that counsel's extensive speaking objections
18  will not come from the time permitted me for
19  cross-examination --
20     MR. PAPANTONIO: Well, I'm just preserving
21  the record, sir, so --
22     MR. LAFATA: -- the direct examination for
23  the witness.
24     MR. PAPANTONIO: Yeah.
25     MR. BUCHANAN: It certainly will. As did

Page 590

1     all yours against ours.
2   BY MR. LAFATA:
3       Q.  Mr. Brantley, what is Exhibit 42?
4         MR. PAPANTONIO:  Same objection.  Same
5   objection on use of the document.  Continuing
6   objection as to this line of questioning.  It's
7   beyond the scope of cross-examination, in trying
8   to -- to go forward with the direct where the
9   Defendants have not been put notice -- where the
10  Plaintiffs have not been put notice on the
11  direct.
12  BY MR. LAFATA:
13      Q.  Mr. Brantley, what is Exhibit 42?
14      A.  It is an SOP on identifying, evaluating,
15  and reporting suspicious orders.
16      Q.  And who authored this SOP?
17        MR. PAPANTONIO:  Same objection.
18  Objection, continuing objection of this line of
19  questioning.
20  BY MR. LAFATA:
21      Q.  Mr. Brantley, who authored this SOP?
22      A.  I did.
23        MR. PAPANTONIO:  Same objection.
24  BY MR. LAFATA:
25      Q.  Okay.  And what is the scope of this SOP?

Page 591

1         MR. PAPANTONIO:  Line of -- same line of
2   objection on these -- on this line of
3   questioning.  Objection as to the question.
4   Move to strike any answer based on the question.
5         MR. LAFATA:  You're interfering with the
6   conduct of this examination.
7         MR. PAPANTONIO:  You go ahead with your
8   question.
9   BY MR. LAFATA:
10      Q.  Mr. Brantley --
11        MR. PAPANTONIO:  Let me worry about what
12  I'm interfering with.
13  BY MR. LAFATA:
14      Q.  -- what is the scope of this -- of this
15  SOP?
16      A.  This procedure applies to all customers
17  and customer orders for Schedule II through V
18  controlled substances and List 1 chemicals.
19        MR. PAPANTONIO:  Objection.  Move to
20  strike the answer.  Move to strike the answer
21  from a direct.
22        MR. LAFATA:  Okay.
23        MR. PAPANTONIO:  It is beyond the scope of
24  cross.
25        MR. LAFATA:  Counsel is physically

Page 592

1   interfering with the witness's answering of a
2   question.
3   BY MR. LAFATA:
4       Q.  Mr. Brantley, would you please --
5         MR. PAPANTONIO:  Go ahead with your
6   question --
7   BY MR. LAFATA:
8       Q.  -- repeat your answer --
9         MR. PAPANTONIO:  -- and I'll protect the
10  record.
11  BY MR. LAFATA:
12      Q.  -- about what the scope is of this
13  Exhibit 42.
14      A.  This procedure applies to all customers
15  and customer orders for Schedule II through V
16  controlled substances and List 1 chemicals.
17      Q.  And does this SOP accurately reflect
18  Purdue's policy for identifying, evaluating, and
19  reporting suspicious orders?
20        MR. PAPANTONIO:  Objection as to the
21  question.  Beyond the scope of
22  cross-examination.  Move to strike the use of
23  the document.  Move to strike the question.
24        THE WITNESS:  Yes.
25

Page 593

1   BY MR. LAFATA:
2       Q.  All right.
3         MR. PAPANTONIO:  Move to strike the
4   answer.
5   BY MR. LAFATA:
6       Q.  They don't like you answering these
7   questions, do they?
8       A.  No.
9         MR. BUCHANAN:  Frankly, Counsel, if you
10  wanted to conduct an examination, you should
11  have provided notice.
12        MR. PAPANTONIO:  There are rules --
13        MR. LAFATA:  This is --
14        MR. PAPANTONIO:  Counsel, there are
15  rules --
16        MR. LAFATA:  This is a direct examination
17  of a witness.
18        MR. PAPANTONIO:  -- that you have to
19  comply with.  Read them, and then we'll be --
20  we'll be glad to afford you a direct
21  examination.
22        But right now, just to be clear, we're
23  going to reset Brantley on Purdue, just so you
24  know that.
25        MR. LAFATA:  No, that's not -- that's not

Highly Confidential - Subject to Further Confidentiality Review

Page 594

1 right.

2 MR. PAPANTONIO: Well, it's going to

3 happen.

4 (Purdue-Brantley 43 was marked for

5 identification.)

6 BY MR. LAFATA:

7 Q. Mr. Brantley, I'm handing you a copy of

8 Exhibit 43. Here you go.

9 MR. PAPANTONIO: Same objection. Move to

10 strike the use of the document. Move to strike

11 any questioning or answers in regard to this

12 document.

13 BY MR. LAFATA:

14 Q. Mr. Brantley --

15 MR. PAPANTONIO: Beyond the scope --

16 BY MR. LAFATA:

17 Q. -- what is Exhibit 43?

18 MR. PAPANTONIO: -- of direct, beyond the

19 scope of cross-examination.

20 Q. You can answer.

21 Q. You can answer.

22 A. I'm sorry, what was your question?

23 Q. What is Exhibit 43?

24 A. This is an SOP that I drafted for

25 downstream customer monitoring and reporting.

Page 595

1 Q. Does this accurately reflect the standard

2 operating procedure for Purdue downstream customer

3 monitoring and reporting?

4 MR. PAPANTONIO: Objection as to form of

5 the question. Objection as to the question at

6 all beyond the scope of cross-examination.

7 Objection to any answer. Move to strike any

8 answer that -- that responds to that question.

9 BY MR. LAFATA:

10 Q. You can answer.

11 A. Yes.

12 Q. Okay.

13 MR. PAPANTONIO: Move to strike.

14 BY MR. LAFATA:

15 Q. Mr. Brantley, does Purdue, as part of its

16 order monitoring process, require its wholesalers and

17 distributors by questionnaire to make disclosures to

18 Purdue about their business practices?

19 MR. PAPANTONIO: Objection as to use --

20 objection as to the question beyond the scope,

21 objection as to response of any document that's

22 been introduced in the line of this question.

23 MR. LAFATA: I want this record to be seen

24 by the special master, because your conduct --

25 MR. PAPANTONIO: Oh, it will be. Trust --

Page 596

1 MR. LAFATA: -- is so outrageous.

2 MR. PAPANTONIO: Trust me, it will be.

3 BY MR. LAFATA:

4 Q. Mr. Brantley, you can answer my question.

5 A. Yes.

6 Q. Okay. And as part --

7 MR. PAPANTONIO: Move to strike.

8 BY MR. LAFATA:

9 Q. -- of those disclosures, does Purdue

10 require its wholesalers and distributors to prove

11 that they are licensed with federal government

12 agencies?

13 MR. PAPANTONIO: Objection --

14 THE WITNESS: Yes.

15 MR. PAPANTONIO: -- as to question.

16 BY MR. LAFATA:

17 Q. Which government agencies?

18 MR. PAPANTONIO: Beyond the scope of

19 cross-examination.

20 BY MR. LAFATA:

21 Q. Which government agencies?

22 A. DEA and State Board of Pharmacy.

23 Q. Does Purdue, as part of its suspicious

24 order monitoring program, require wholesalers and

25 distributors to disclose to Purdue their own

Page 597

1 suspicious order monitoring program information?

2 MR. PAPANTONIO: Objection as to form.

3 Objection as to the question. Beyond scope of

4 cross-examination.

5 BY MR. LAFATA:

6 Q. You can answer.

7 MR. PAPANTONIO: Move to strike the

8 question and any subsequent answer to the

9 question.

10 THE WITNESS: Yes.

11 BY MR. LAFATA:

12 Q. And does Purdue --

13 MR. PAPANTONIO: Move to strike the

14 answer.

15 BY MR. LAFATA:

16 Q. Does Purdue review that information?

17 A. Yes.

18 Q. Okay. Does Purdue require the wholesalers

19 and distributors, its customers, to disclose any

20 disciplinary actions the company may have had, the

21 wholesaler or distributors may have had with respect

22 to the Controlled Substances Act?

23 MR. PAPANTONIO: Same continuing

24 objection. Beyond the scope of

25 cross-examination. Move to strike the question.

Page 598

1  Move to strike the use of any document used
2  pursuant to the question. Move to strike any
3  answer given to the question.
4  BY MR. LAFATA:
5  Q.  You can answer.
6  A.  Yes.
7  Q.  And how often does Purdue require
8  distributors and wholesalers to make these
9  disclosures to it?
10  A.  On an annual basis.
11  MR. PAPANTONIO: Same objection.
12  Continuing objection. Beyond the scope.
13  BY MR. LAFATA:
14  Q.  And in addition to these disclosures, does
15  Purdue do research on the customers for any
16  disciplinary actions?
17  MR. PAPANTONIO: Objection as to form of
18  the question. Beyond the scope of cross.
19  THE WITNESS: Yes.
20  BY MR. LAFATA:
21  Q.  Okay. And does it do research on the
22  customer to look for any enforcement actions that may
23  have been brought against them?
24  A.  Yes.
25  MR. PAPANTONIO: Objection as to --

Page 599

1  objection as to the question. Beyond the scope
2  of cross-examination.
3  BY MR. LAFATA:
4  Q.  Does Purdue review the suspicious order
5  monitoring protocols of its customers?
6  MR. PAPANTONIO: Continuing objection.
7  Beyond the scope of cross-examination.
8  THE WITNESS: Yes.
9  BY MR. LAFATA:
10  Q.  Okay. As part of its order monitoring
11  protocol, does Purdue do any site visits to its
12  customers' places of business?
13  MR. PAPANTONIO: Same objection.
14  Continuing objection. Beyond the scope of
15  cross-examination, without any --
16  BY MR. LAFATA:
17  Q.  You can answer the question.
18  MR. PAPANTONIO: -- any -- excuse me.
19  Without any notice of direct to the
20  Plaintiffs in this case, pursuant to the rules
21  of the management order.
22  BY MR. LAFATA:
23  Q.  Go ahead.
24  A.  Yes.
25  Q.  Okay. And as part of these site visits,

Page 600

1  does Purdue review the suspicious order monitoring
2  protocol of the company that it visits?
3  MR. PAPANTONIO: Objection as to --
4  objection as to question beyond the scope.
5  THE WITNESS: Yes.
6  BY MR. LAFATA:
7  Q.  Would there -- if there were any deficient
8  results of those inspections that were discovered,
9  what would be done with respect to those -- what was
10  learned there?
11  MR. PAPANTONIO: Objection as to scope.
12  Objection as to speculative nature of the
13  question. Move to strike the question --
14  BY MR. LAFATA:
15  Q.  You can answer.
16  MR. PAPANTONIO: -- and any document used
17  pursuant to the question. Move to strike the
18  answer.
19  THE WITNESS: That would be reviewed by --
20  by members of management, and potentially would
21  not ship controlled substances to that customer.
22  BY MR. LAFATA:
23  Q.  If there is a deficiency in a customer's
24  suspicious order monitoring program as discovered as
25  part of these inspections, is that ever reported?

Page 601

1  A.  It would be reported, yes.
2  MR. PAPANTONIO: Objection as to the
3  question. Objection as to use of any document
4  in the action. Objection as to the answer,
5  and move to strike all three.
6  BY MR. LAFATA:
7  Q.  And Mr. Brantley, if the review that's
8  done reveals an unreasonable risk of diversion with
9  the wholesaler or distributor, will Purdue sell any
10  of its opioid medications to that customer?
11  MR. PAPANTONIO: Objection --
12  THE WITNESS: No.
13  MR. PAPANTONIO: -- as to question beyond
14  the scope.
15  BY MR. LAFATA:
16  Q.  You were asked questions today about
17  ARCOS. Do you remember that?
18  A.  Yes.
19  Q.  Does the DEA provide Purdue access to the
20  ARCOS data?
21  MR. PAPANTONIO: Objection as to anything
22  between -- in response to Purdue in particular.
23  It's beyond the scope of the cross-examination.
24  Responses to ARCOS in general will -- we're okay
25  with, but anything having to do with Purdue

Page 602

1 directly is beyond the scope.
2     MR. LAFATA:  That's an improper objection,
3 Counsel.
4     He likes to speak from the corner of the
5     room when he makes objections.
6 BY MR. LAFATA:
7     Q.  Mr. Brantley, does the DEA provide Purdue
8 with access to its ARCOS data?
9     A.  No.
10     MR. PAPANTONIO:  Objection as to form.
11 BY MR. LAFATA:
12     Q.  Okay.
13     MR. PAPANTONIO:  It's beyond the scope of
14 cross-examination.
15 BY MR. LAFATA:
16     Q.  So is Purdue able to use --
17     (Reporter requests clarification.)
18     THE WITNESS:  No.
19 BY MR. LAFATA:
20     Q.  Is Purdue able to use the DEA's ARCOS data
21 as part of its suspicious order monitoring program?
22     A.  No.
23     MR. PAPANTONIO:  Objection.  Move to
24 strike.  Move to -- move to strike the question
25 and the answer, both of them beyond the scope of

Page 603

1 cross-examination.
2 BY MR. LAFATA:
3     Q.  And Mr. Brantley, when Purdue receives an
4 order for an opioid medication, does the order go
5 through any process or review?
6     MR. PAPANTONIO:  Same objection.
7 Continuing objection on cross-examination and
8 use of any document related to this
9 cross-examination at all.
10 BY MR. LAFATA:
11     Q.  You can answer the question.
12     A.  All orders pass through an algorithm, and
13 the algorithm will hold an order that is out of the
14 ordinary, or an order of interest, yes.
15     MR. PAPANTONIO:  Move to strike.
16 BY MR. LAFATA:
17     Q.  And after that order is held, what happens
18 then?
19     MR. PAPANTONIO:  Objection as to question.
20 Beyond the scope.
21     THE WITNESS:  That order is reviewed, and
22 I reach out to the customer and ask for
23 additional information.
24     MR. PAPANTONIO:  Objection as to answer.
25 Move to strike.

Page 604

1 BY MR. LAFATA:
2     Q.  And if you reach out to the customer --
3     MR. PAPANTONIO:  Beyond the scope.
4 BY MR. LAFATA:
5     Q.  -- and ask for additional information and
6 you're not satisfied with the results, what happens
7 then?
8     A.  That order is rejected --
9     MR. PAPANTONIO:  Objection as to question.
10     THE WITNESS:  -- and reported to the DEA.
11     MR. PAPANTONIO:  Beyond the scope.
12 Objection, move to strike the answer.  Beyond
13 the scope of cross-examination.
14     MR. LAFATA:  Counsel is deliberately
15 speaking over the witness to interfere with the
16 conduct of this deposition.
17     MR. PAPANTONIO:  Well, it's going to be
18 taken again anyway, so, you know, it doesn't
19 make any difference.
20 BY MR. LAFATA:
21     Q.  Mr. Brantley, if -- if you are satisfied
22 with the information you receive from the customer
23 from your investigation, what happens then to the
24 order?
25     A.  Then the order is released, and the

Page 605

1 response is documented --
2     MR. PAPANTONIO:  Objection as to --
3     THE WITNESS:  -- in our system.
4     MR. PAPANTONIO:  Objection as to the
5     question.  Objection as to answer.  Beyond the
6     scope of cross-examination.
7 BY MR. LAFATA:
8     Q.  Mr. Brantley, if you're -- let me
9 rephrase.
10     Are there circumstances which an order can
11 be flagged by that algorithm but is, based on your
12 investigation, not found to be suspicious?
13     MR. PAPANTONIO:  Objection as to question.
14     Beyond the scope.
15     THE WITNESS:  Yes, there are several
16     circumstances.  For instance, if a customer
17     adds -- like I mentioned earlier, a new customer
18     base, or a new chain, and they tell me that in
19     advance, with the number of customers, that
20     order would still be flagged by the system
21     because it's an increase because the wholesaler
22     needs to -- needs to supply their customer as
23     well as stock their warehouse.
24     Also, if it is a initial order of a drug
25     family, that order would be held because there

Page 606

1  is no history for that algorithm to compare it
2  to. So those are just a couple of examples of
3  an order that could be identified by an
4  algorithm that are not suspicious, but are
5  flagged due to lack of history.
6      MR. PAPANTONIO: Objection as to the
7  answer. Move to strike. Beyond the scope of
8  cross-examination.
9      MR. LAFATA: Counsel, there's no question
10  before you pending.
11      MR. BUCHANAN: Just so the record is
12  clear, was notice provided of intent to conduct
13  an examination that exceeded 90 minutes?
14      MR. LAFATA: I never intended -- I still
15  don't intend to conduct an examination that
16  exceeds an hour and a half.
17      MR. BUCHANAN: No, no, I mean among --
18  among defense counsel.
19      MR. LAFATA: Okay. Well --
20      MR. BUCHANAN: We're over an hour and a
21  half.
22      MR. LAFATA: Well, part of it is because
23  of you and your colleagues' extensive colloquies
24  on the record. This is --
25      MR. BUCHANAN: My question --

Page 607

1      MR. LAFATA: All right.
2      MR. BUCHANAN: -- only, sir, was notice
3  provided? I just want to make sure that aspect
4  of the record is clear.
5      MR. LAFATA: All right.
6      MR. BUCHANAN: Was it provided? Yes or
7  no?
8      MR. LAFATA: There was no need to provide
9  notice because there's no intent or actual
10  examination over 90 minutes that I'm conducting.
11      MR. BUCHANAN: No, no. Among all defense
12  counsel.
13      MR. LAFATA: I'm not here to be deposed
14  by --
15      MR. PAPANTONIO: No, no. I want to
16  hear --
17      MR. LAFATA: I'm not here to be deposed by
18  you.
19      MR. PAPANTONIO: I want to hear his
20  statement on the record, because this is what
21  the special master has stated.
22      Mr. -- David, would you please finish what
23  you were saying? And I'll join in it.
24      MR. BUCHANAN: I'm not aware of notice
25  having been provided. If any defense counsel's

Page 608

1  provided notice of intent, collectively, to
2  conduct an examination beyond 90 minutes, would
3  you please so state on the record.
4      MR. PAPANTONIO: And to further join in
5  that, there is no notice that this -- that this
6  lawyer for Purdue was going to come into the
7  room and do a direct examination of this
8  witness. We're entitled to notice of that so we
9  can prepare cross-examinations that deal with
10  the very issues he's asking.
11      He's moved beyond cross. He understands
12  he has. He's now made it -- I believe it's
13  going to be important that we take Brantley's
14  deposition in Purdue alone.
15      MR. LAFATA: Okay. That's outrageous, so
16  your comments are, you know, just wasting time
17  now.
18  BY MR. LAFATA:
19      Q. Mr. Brantley, we need to continue with
20  your examination.
21      Mr. Brantley, do you personally deal with
22  the DEA with your work at Purdue?
23      MR. PAPANTONIO: Objection. Beyond the
24  scope. Same continuing objection.
25      THE WITNESS: No.

Page 609

1  BY MR. LAFATA:
2      Q. And as part of your investigation of
3  orders, if there is any doubt in your mind whether or
4  not to report an order for medications to the DEA,
5  how do you resolve that?
6      MR. PAPANTONIO: Objection. Beyond scope.
7      THE WITNESS: If I do not have substantial
8  information to release an order, that order is
9  cut, and it's reported to the DEA.
10  BY MR. LAFATA:
11      Q. What do you mean when say "the order is
12  cut"?
13      A. It is rejected.
14      MR. PAPANTONIO: I want to get something
15  on record.
16      Mr. Fuller, you're Plaintiffs' lawyer in
17  this room: Did you receive any notice from
18  Purdue to conduct a direct examination in this
19  -- in this --
20      MR. LAFATA: Okay, Counsel, you're
21  interfering with the examination.
22      MR. PAPANTONIO: No, no.
23      MR. LAFATA: You're interfering with the
24  examination.
25      MR. PAPANTONIO: Did you -- did you,

Page 610

1  sir -- I want this on the record.
2      MR. LAFATA:  You're interfering with the
3  examination.
4      MR. PAPANTONIO:  Did you prepare -- did
5  you receive any notice from -- I'm sorry, sir, I
6  don't even know your name.  What is your name?
7  BY MR. LAFATA:
8      Q.  Okay, Mr. Brantley, did you --
9      MR. PAPANTONIO:  What -- no, no, we're
10  going to get this on the record.
11      MR. LAFATA:  No.
12      MR. PAPANTONIO:  Mr. Fuller, did you
13  receive any notice at all that this counselor
14  was going to perform a direct examination of
15  Mr. Brantley at this setting?
16      MR. FULLER:  No, sir.
17      MR. LAFATA:  Counsel's statements --
18      MR. PAPANTONIO:  Mr. -- wait, wait -- wait
19  a second.
20      MR. LAFATA:  Counsel's statements --
21      MR. PAPANTONIO:  David --
22      MR. LAFATA:  -- on the record are actually
23  longer than the witness's testimony.
24      MR. PAPANTONIO:  David, did you receive
25  any notice from this -- from this lawyer stating

Page 611

1  that he was going to perform a direct
2  examination on behalf of Purdue at this setting?
3      MR. BUCHANAN:  No, sir.
4      MR. PAPANTONIO:  I can attest we did not
5  receive any notice at all saying that this
6  lawyer intended to come into the room and
7  conduct a direct examination of Mr. Brantley.
8      Move to strike all of this, and move to --
9  to reserve the right to be able to take a
10  cross-examination, a setting of just
11  cross-examination of Mr. Brantley.
12      Now go ahead, Counselor.
13      MR. LAFATA:  That's outrageous, what
14  you're doing.
15      MR. PAPANTONIO:  Well, great.
16      MR. LAFATA:  It's outrageous.
17      MR. PAPANTONIO:  You call it what you
18  want --
19      MR. LAFATA:  Yeah.
20      THE WITNESS:  -- but go ahead and -- and
21  proceed.
22  BY MR. LAFATA:
23      Q.  Mr. Brantley, as part of your work for
24  Purdue, have you ever heard any criticisms by the DEA
25  about Purdue's order monitoring program?

Page 612

1      MR. PAPANTONIO:  Objection as to form.
2  Beyond the scope.  Secondary.  It's hearsay.
3  BY MR. LAFATA:
4      Q.  You can answer.
5      MR. PAPANTONIO:  Move to strike the
6  question and any -- any subsequent answer to the
7  question.
8      THE WITNESS:  No.
9  BY MR. LAFATA:
10      Q.  When you joined Purdue in 2017, was there
11  already a program in place for suspicious order
12  monitoring?
13      MR. PAPANTONIO:  Objection.
14      THE WITNESS:  Yes.
15      MR. PAPANTONIO:  Objection.  Objection.
16  Beyond scope.
17  BY MR. LAFATA:
18      Q.  And during the time working for Purdue,
19  has Purdue, to your knowledge, ever released an order
20  that was believed that might be diverted?
21      A.  No.
22      Q.  With respect to your answers today with --
23  regarding your work for Purdue in the suspicious
24  order monitoring program and your job
25  responsibilities for Purdue, are your answers to

Page 613

1  those questions the same regardless of what state in
2  the country they might pertain to?
3      A.  Yes.
4      Q.  All right.
5      MR. PAPANTONIO:  Objection as to -- beyond
6  scope.
7  BY MR. LAFATA:
8      Q.  Mr. Brantley, do you have a copy of
9  Plaintiffs' Exhibit 26 in front of you?
10      A.  What does it look like?
11      Q.  The GAO.
12      A.  Oh, yes.
13      Q.  All right.  Mr. Brantley, on the cover
14  page of this, do you see a date?
15      MR. PAPANTONIO:  Objection as to question.
16      THE WITNESS:  Yes.
17  BY MR. LAFATA:
18      Q.  And what's the date there?
19      A.  December 2003.
20      Q.  Did you work for Purdue in December 2003?
21      A.  No.
22      Q.  Do you have any personal knowledge about
23  the content of this document?
24      A.  No.
25      Q.  Do you have any personal knowledge about

Page 614

1 the circumstances surrounding GAO's creation of this
2 document?
3      A.  No.
4           MR. LAFATA:  All right.  Pass the witness.
5           MR. PAPANTONIO:  Okay.  I want to get back
6 on the record.
7           Mr. Brantley, we're -- just so you know,
8 we're going to reserve the right for your
9 cross-examination dealing with Purdue.  The
10 questions I'm going to ask you now are uniquely
11 questions about Cardinal.
12           MR. LAFATA:  Mr. Brantley, you can
13 disregard --
14           MR. PAPANTONIO:  Can you please --
15           MR. LAFATA:  -- adverse counsel's --
16           MR. PAPANTONIO:  Carol, do you have the
17 documents?
18           MR. LAFATA:  -- instructions to you.
19           And the record should be clear that it was
20 never the intent to do any examination, any
21 direct examination over 90 minutes, and that the
22 protocol did not require that any notice be
23 given unless there was an intent to an
24 examination over 90 minutes.
25           And I think counsel's arguments, on their

Page 615

1 own, greatly exceeded even the testimony of the
2 witness.
3           MR. BUCHANAN:  Counsel, in my experience,
4 if somebody is going to do what you just did,
5 they discuss it with the Plaintiffs' counsel and
6 confer about so that everybody, as a courtesy,
7 can anticipate the impact on their travel plans.
8 To do what you just did, at the end of a
9 ten-hour day, is unprofessional.
10           MR. PAPANTONIO:  Well, it's not only
11 unprofessional, it's improper.  It's
12 unauthorized, it's improper.  This counselor
13 knows it and he knew it when he set -- when he
14 stood up here to do it.
15           So we're going to -- we're going to --
16 we're going to deal with this.  This won't be
17 something that's not dealt with, sir.
18           What is your name, by the way?
19           MR. LAFATA:  My name is Paul Lafata.
20           MR. PAPANTONIO:  Paul Lafata?  You'll see
21 us again on this one, okay?
22           MR. LAFATA:  I look forward to it.
23           MR. PAPANTONIO:  Yeah.
24           MR. PYSER:  Let's go off the record.
25 Let's take a break, since we've all got a

Page 616

1 little --
2           MR. PAPANTONIO:  What, do you want to take
3 a break?
4           MR. PYSER:  Yeah.  Just a quick break.
5           MR. PAPANTONIO:  Okay.  That's fine.
6           VIDEOGRAPHER:  Going off the record.  The
7 time is 8:14.
8           (A recess transpired from 8:14 p.m. until
9           8:20 p.m.)
10           VIDEOGRAPHER:  Go back on the record.
11 Beginning media file number 12.  Time is 8:20.
12           FURTHER EXAMINATION
13 BY MR. PAPANTONIO:
14      Q.  Mr. Brantley, first of all, you knew
15 before you started that examination with Purdue with
16 Mr. Lafata down there, you knew that you were going
17 to do direct examination, didn't you?  You knew you
18 were going to sit -- you knew you were going to sit
19 here and answer questions, didn't you, about -- for
20 Purdue?
21           MR. LAFATA:  Objection.  Instruct the
22 witness not to reveal any discussions he has
23 been having with counsel in preparation for
24 today's deposition, unless you can answer the
25 question without revealing that.  If you can

Page 617

1 answer the question without revealing that, then
2 you can answer.
3 BY MR. PAPANTONIO:
4      Q.  Sir, you knew before you came in here and
5 sat down and were questioned by the Purdue lawyer,
6 you knew you were going to give an examination, that
7 you were going to ask questions -- answer questions
8 about Purdue?  You knew that, didn't you?
9           MR. LAFATA:  Mr. Brantley, again, I
10 instruct you that if you're not able to answer
11 that question without revealing discussions with
12 counsel, which are privileged, and this guy
13 knows that, I instruct you not to answer.
14           MR. PAPANTONIO:  Okay, that's even more --
15           THE WITNESS:  At the advice of counsel,
16 I --
17 BY MR. PAPANTONIO:
18      Q.  Okay.  So in other words, you can't answer
19 that, you can't answer that, because if you answered
20 it, you would have to share what the advice of
21 counsel was, correct?
22      A.  At the advice of counsel, I'm -- I don't
23 answer the question.
24      Q.  All right.  Well, good.  I think you
25 established -- you answered my question right there.

Page 618

1   Okay. So --
2       MR. LAFATA: Move to strike. Move to
3   strike counsel's colloquy on that end there.
4   BY MR. PAPANTONIO:
5       Q. 4391, please. 4391.
6       (Cardinal-Brantley 40 was marked for
7   identification.)
8       MS. MOORE: Brantley 40.
9   BY MR. PAPANTONIO:
10      Q. Now let's talk about -- let's talk about
11  Cardinal.
12      See this document, it's 2008, right? See
13  that? Top of the document --
14      A. Yes.
15      Q. -- 2008. And where were you in 2008?
16      A. I was still in Dublin, Ohio.
17      Q. And you were working for Cardinal in 2008,
18  right?
19      A. Yes.
20      Q. And you see the subject is "In the penalty
21  box." What's the penalty box?
22      A. I don't know.
23      Q. Well, what is a penalty box? Do you know
24  what a penalty box is?
25      A. In hockey?

Page 619

1       Q. Yeah. It's when you do something wrong,
2   isn't it?
3       A. I'm not a hockey fan, but I've heard of
4   the penalty box in hockey. I don't watch hockey, but
5   I know it exists in hockey. I don't know the purpose
6   of it or what it is and so forth.
7       Q. Well, you know it's when you break a rule,
8   right? You go in the penalty box when you break a
9   rule. You know that, don't you?
10      A. No. Again, I've heard of a penalty box in
11  hockey, but I don't know what the penalty box is,
12  because I don't watch hockey.
13      Q. Mm-hmm.
14      MR. PYSER: Object to form.
15  BY MR. PAPANTONIO:
16      Q. So --
17      MR. PYSER: Object to this line of
18  questioning.
19  BY MR. PAPANTONIO:
20      Q. So you know what a penalty --
21      MR. PYSER: Beyond the scope of the
22  examination.
23  BY MR. PAPANTONIO:
24      Q. You know what a penalty box is, correct?
25      MR. PYSER: Move to strike this entire

Page 620

1   line of questioning.
2   BY MR. PAPANTONIO:
3       Q. You know what a penalty box is, right?
4       A. Like I just answered, I've heard of a
5   penalty box in the sport of hockey, but I do not know
6   what a penalty box is --
7       Q. Now --
8       A. -- because I don't watch hockey.
9       Q. Now, when Mr. Pyser started asking you
10  questions about how you did this right for the DEA,
11  how you followed this rule about the DEA, you
12  answered a lot of questions about that for -- for
13  Mr. Pyser, didn't you?
14      MR. PYSER: Object to form.
15      THE WITNESS: If Mr. Pyser had asked me
16  did I know what a penalty box was, I would have
17  gave him the same answer I gave you.
18  BY MR. PAPANTONIO:
19      Q. I know. But that's not --
20      A. I've heard about it in hockey; I don't
21  know what it is.
22      Q. That's not my question. You answered
23  questions from Mr. Pyser about how you followed --
24  how you followed the rules and how Cardinal followed
25  the rules expected of them by the DEA. When he asked

Page 621

1   you questions, you answered questions about that,
2   didn't you?
3       A. When he asked questions, I answered the
4   questions.
5       Q. Right. And some of them involved the fact
6   you were saying that you were -- you did everything
7   right; Cardinal did everything right where it came to
8   DEA. Isn't that what you told us?
9       A. I don't recall ever saying that Cardinal
10  did everything right or that I did everything right.
11      Q. But you did everything right?
12      A. I never recall saying that I did
13  everything right.
14      Q. Because you didn't do everything right,
15  did you?
16      MR. PYSER: Object to form.
17  BY MR. PAPANTONIO:
18      Q. Right?
19      A. I -- I was never asked a question did I do
20  anything -- did I do everything right. I've never
21  said that I did everything right.
22      Q. And you didn't do everything right,
23  correct?
24      MR. PYSER: Object to form.
25      THE WITNESS: I don't know what was . . .

Page 622

BY MR. PAPANTONIO:

1 Q. Well, Cardinal didn't do everything right,
2 did they?
3 MR. PYSER: Object to form.
4 THE WITNESS: I don't know, because you
5 have to define "right."
6 BY MR. PAPANTONIO:
7 Q. Well, let's --
8 A. That's --
9 Q. Let's do that right now. Let's -- let's
10 define --
11 A. That's subjective.
12 Q. Let's -- let's define "right."
13 MR. PYSER: Give me a chance to object.
14 THE WITNESS: Okay.
15 BY MR. PAPANTONIO:
16 Q. All right. It says -- you see the last
17 paragraph down here? It says "I wanted" -- it says
18 "fellow GLT members." What's GLT? What is GLT?
19 A. I don't know.
20 Q. Never heard of that?
21 It says, "I wanted to share some thoughts
22 on the subject of regulatory compliance since some of
23 our failures in this area are burdening our financial
24 performance in market capitalization."

Page 623

1 Now, how would your failures in your --
2 since you were -- you were giving us all this history
3 about how Cardinal did this right and that right,
4 tell me how your -- how your -- your failures in
5 regulatory compliance were burdening the financial
6 performance of -- of Cardinal or the market
7 capitalization of Cardinal. Tell us how that was.
8 A. You would have to ask Kerry Clark.
9 Q. So had you ever heard that prior to the
10 time that Mr. Pyser started asking you all these
11 questions about how -- whether or not Cardinal did
12 things right, had you even heard that the failure to
13 do things right, the failure to comply with
14 regulatory, was actually causing financial
15 performance problems for the -- for the company?
16 MR. PYSER: Object to form.
17 THE WITNESS: This is my first time seeing
18 this.
19 BY MR. PAPANTONIO:
20 Q. Doesn't surprise me.
21 And what year is it? What year is on top
22 of that document?
23 A. 2008.
24 Q. 2008. You told us you were still with the
25 company in 2008, and nobody showed you that, did

Page 624

1 they?
2 MR. PYSER: Object to form.
3 BY MR. PAPANTONIO:
4 Q. Let's go to the next page. It says, "One
5 of the most important small things was avoiding
6 penalties that give our competition an advantage."
7 Do you see that in the first paragraph?
8 "One of the most important small things was avoiding
9 penalties that give our competition an advantage."
10 A. Yes, I see that.
11 Q. What -- what advantage did your
12 competition have when you engaged in regulatory
13 misconduct?
14 MR. PYSER: Object to form.
15 BY MR. PAPANTONIO:
16 Q. Explain that to the jury.
17 A. Again, you would have to ask the -- the
18 author of this e-mail what he or she meant.
19 Q. Well, did you know that there was an
20 analysis according to whether you did something wrong
21 as far as how much it was going to cost the company
22 financially? Had you ever seen that analysis being
23 done before?
24 MR. PYSER: Object to form.
25

Page 625

1 BY MR. PAPANTONIO:
2 Q. Before I just showed this, had anybody
3 told you that they had in place an analysis, and the
4 analysis was a financial analysis that said, "When we
5 do something wrong, it costs the company money"? Is
6 that the first time you've heard that?
7 MR. PYSER: Object to form. Misstates
8 evidence.
9 BY MR. PAPANTONIO:
10 Q. Yes or no?
11 A. I have not seen this.
12 Q. Well, it says, "But we keep getting
13 penalties, big penalties that are costing us customer
14 loyalty."
15 You see, that's in the second paragraph.
16 "But we keep getting penalties, big penalties that
17 are costing us customer loyalty, employee loyalty,
18 and shareholder loyalty."
19 Well, I thought when you testified -- and
20 here's what I want to figure out: When you testified
21 for Mr. Pyser, didn't you say that you did things
22 right where it came to regulatory?
23 MR. PYSER: Object to form.
24 BY MR. PAPANTONIO:
25 Q. Didn't you say that?

Page 626

1     MR. PYSER: Object to form. And an
2  ongoing objection to use of this document --
3  BY MR. PAPANTONIO:
4     Q. Yes --
5     MR. PYSER: -- as beyond the scope.
6  BY MR. PAPANTONIO:
7     Q. Yes or no? Did you -- did you say that
8  when --
9     MR. LAFATA: I join that objection.
10  BY MR. PAPANTONIO:
11    Q. Did you -- did you say that when you were
12  questioned by Mr. Pyser?
13    MR. PYSER: Object to form.
14  BY MR. PAPANTONIO:
15    Q. That you -- that your company did things
16  right where it came to regulatory?
17    MR. PYSER: Object to form.
18    THE WITNESS: I stated that when asked
19  what Kyle Wright thought --
20  BY MR. PAPANTONIO:
21    Q. Yeah.
22    A. -- that that was his statement.
23    Q. Yeah. Well, Kyle Wright -- tell us your
24  relationship with Kyle Wright, while we're at it.
25  Tell us your friendship with Kyle Wright.

Page 627

1     MR. PYSER: Object to form.
2  BY MR. PAPANTONIO:
3     Q. How -- how many years does your friendship
4  with Kyle Wright go back?
5     MR. PYSER: Object to form.
6     THE WITNESS: There was a working
7  relationship with --
8  BY MR. PAPANTONIO:
9     Q. How many years?
10    A. -- with Kyle Wright while I --
11    Q. How many years?
12    A. I can't state how many years.
13    MR. PYSER: Object to form.
14  BY MR. PAPANTONIO:
15    Q. Do you socialize with Carl Wright?
16    A. I do not.
17    Q. Have you ever socialized with Carl Wright?
18    A. I have not.
19    Q. No time did you socialize with Carl
20  Wright; that's your testimony?
21    A. I socialize -- what do you mean --
22    MR. LAFATA: Objection.
23  BY MR. PAPANTONIO:
24    Q. Huh?
25    A. Please define "socialize."

Page 628

1     Q. Well, did you go have drinks with him?
2     MR. PYSER: Object to form. Asked and
3  answered.
4  BY MR. PAPANTONIO:
5     Q. Did you go have drinks with Carl Wright?
6     A. I don't drink --
7     Q. Did you have --
8     A. -- alcohol.
9     Q. -- dinner with Carl Wright?
10    A. I have not.
11    Q. What did you do with Carl Wright socially?
12    MR. PYSER: Object to form.
13    THE WITNESS: Nothing outside of work.
14  BY MR. PAPANTONIO:
15    Q. Okay. So you did nothing socially with
16  Carl Wright; that's your testimony here today. Is
17  that correct?
18    MR. PYSER: Object to form.
19  BY MR. PAPANTONIO:
20    Q. That's your testimony --
21    A. That's correct.
22    Q. -- right now, that you did nothing
23  socially with Carl Wright, true?
24    A. That is correct.
25    Q. All right.

Page 629

1     MR. LAMB: It's Kyle, Mike. Kyle.
2     MR. PAPANTONIO: Kyle. Excuse me. Kyle.
3  Kyle.
4  BY MR. PAPANTONIO:
5     Q. All right. Well, let's look at the next
6  paragraph. We'll get back to that.
7     It says, next paragraph, "Obviously the
8  biggest are the SEC issue, two consecutive Alaris
9  recalls." What's Alaris?
10    A. I don't know for sure. I think it's a
11  medical device or dispensing robot or something like
12  that.
13    Q. "A number of MPT recalls, and the DEA
14  controlled -- and the DEA controlled substance
15  license suspensions."
16    You see where it says that? "And the DEA
17  substance control" -- what is it --
18  "substance license suspensions in three locations."
19    You see where it says that?
20    A. Yes.
21    Q. All right. And then it goes on to say,
22  "Beyond these, Gary Dolch's quarterly QRA report
23  lists a startling number of issues, including six
24  OSHA violations and a significant fine at our
25  Syracuse, New York, facility. If you added up our

Highly Confidential - Subject to Further Confidentiality Review

---

Page 630

1 fines, settlements, and lost business over the last
2 18 months, the total would come close to $1 billion."
3 That's shocking, isn't it Mr. Brantley?
4 MR. PYSER: Object to form.
5 BY MR. PAPANTONIO:
6 Q. It's shocking. It says -- as a matter of
7 fact, it says right here, it's shocking, isn't it?
8 MR. PYSER: Object to form. Ongoing and
9 continuing objection to this line of
10 questioning. This document is beyond the scope
11 of examination.
12 BY MR. PAPANTONIO:
13 Q. Right? It says "shocking." Are you
14 shocked by the fact that your failure to comply with
15 regulatory actually cost a billion dollars?
16 MR. PYSER: Object to form. Misstates
17 evidence.
18 BY MR. PAPANTONIO:
19 Q. Does that surprise you?
20 MR. PYSER: Object to form.
21 THE WITNESS: Those are the author's
22 words.
23 BY MR. PAPANTONIO:
24 Q. Okay, but does that surprise you? If it's
25 more than a billion dollars in your failure to comply

---

Page 631

1 with regulatory, if it's more than $1 billion, that's
2 shocking, isn't it?
3 MR. PYSER: Object to form. Misstates
4 evidence.
5 BY MR. PAPANTONIO:
6 Q. You would say that's shocking, wouldn't
7 you?
8 MR. PYSER: Object.
9 THE WITNESS: I would not. I do not speak
10 to shocking or surprising or anything like that.
11 I can say what was stated in the document.
12 BY MR. PAPANTONIO:
13 Q. So your testimony is it's not shocking; to
14 Eric Brantley, it's not shocking that your failure to
15 comply with regulatory rules exceeded a cost to the
16 company of $1 billion? That is not shocking to Eric
17 Wright; is that -- Eric Brantley; is that correct?
18 MR. PYSER: Object to form. Misstates
19 evidence.
20 BY MR. PAPANTONIO:
21 Q. Yes?
22 A. My testimony is that I don't comment on
23 shocking or . . .
24 Q. Well, they're -- somebody is saying it's
25 shocking.

---

Page 632

1 A. The author of this --
2 Q. Who says -- well, let's look --
3 A. The author of this document stated that.
4 Q. Well, who is Mark Kaufmann? You know who
5 Mark Kaufmann is -- Mike Kaufmann. You know who that
6 is?
7 A. I don't remember what his title was. I
8 think he was a VP or something like that --
9 Q. Yeah, you knew him, didn't you? You knew
10 him?
11 A. I knew Mike Kaufmann.
12 Q. Okay. So do you -- and so you just
13 disagree that it's shocking that the company, because
14 of its failures to comply with regulatory rules,
15 actually was cost a billion dollars to the company?
16 You don't find that shocking, do you?
17 MR. PYSER: Object to form. Misstates
18 evidence.
19 BY MR. PAPANTONIO:
20 Q. Right? You don't find it shocking?
21 MR. PYSER: Object to form. Misstates
22 evidence. And renewing again the continuing
23 objection to this line of questioning as beyond
24 the scope.
25 THE WITNESS: Again, the -- the term

---

Page 633

1 "shocking" was used by the author of this
2 e-mail.
3 BY MR. PAPANTONIO:
4 Q. Okay. And then, see the line right
5 underneath that: "The conundrum is how can a company
6 that believes ethics is a core value find itself in a
7 situation -- such a situation?"
8 You see that? "How can a company that
9 believes ethics is a core value find itself in such a
10 situation?"
11 Why don't you tell me? Do you know,
12 Mr. Brantley, how a company could find itself in a
13 situation that it would violate so many regulatory
14 standards that it cost them a billion dollars in
15 losses financially?
16 MR. PYSER: Object to form. Misstates
17 evidence. Nothing about this says that
18 regulatory violations cost a billion dollars.
19 BY MR. PAPANTONIO:
20 Q. Can you tell me, the consortium is how can
21 a company that believes ethics is a core value find
22 itself in a situation? Do you have an answer to that
23 as we sit here today?
24 MR. PYSER: Object to form. Ongoing
25 continuing objection to this line of questioning

---

Page 634

1  as beyond the scope.
2        THE WITNESS:  I don't comment on the
3  authors of -- I have no opinion on a author's
4  use of words.  This is his question.
5  BY MR. PAPANTONIO:
6        Q.  You -- you knew, when you were working
7  there, that the lack of ethics at the company and the
8  lack of following regulatory rules with the company
9  was actually affecting the trust of the employees?
10  You knew that when you were there, didn't you?
11        MR. PYSER:  Object to form.
12        THE WITNESS:  I did not know that.  This
13  actually states that -- believes that ethics is
14  a core value.
15  BY MR. PAPANTONIO:
16        Q.  Well, let's see what it says in that --
17  you didn't know that the -- you didn't know that the
18  lack of filing -- filing -- following regulatory
19  standards with Cardinal was so bad that it was
20  affecting employees in their attitude about the
21  company?
22        MR. PYSER:  Objection.
23  BY MR. PAPANTONIO:
24        Q.  Where the employees did not trust the
25  company?  Did you know that?

Page 635

1        MR. PYSER:  Object to form.  Ongoing
2  objection.
3  BY MR. PAPANTONIO:
4        Q.  Just a simple question:  Did you know
5  that?
6        A.  I --
7        MR. PYSER:  Object to form.
8        THE WITNESS:  I'm not aware of any of
9  that.
10  BY MR. PAPANTONIO:
11        Q.  Okay.  Well, let's read it.
12        "As we begin to look at the 'Voice of the
13  Employee' results" -- you knew that there was -- and
14  actually you participated in -- that was actually --
15  they sent around a questionnaire, and they did --
16  they did a questionnaire that has to do with what
17  they call the "Voice of Employees."  You remember
18  that?
19        MR. PYSER:  Object to form.
20  BY MR. PAPANTONIO:
21        Q.  You actually responded to it, didn't you?
22        MR. PYSER:  Object to form.
23        THE WITNESS:  I do remember the Voice of
24  Employee questionnaires or whatever, but I
25  don't -- I don't recall if I participated or

Page 636

1  not.
2  BY MR. PAPANTONIO:
3        Q.  It says, "As we begin to look at the
4  'Voice of Employee' results, which are being compiled
5  and analyzed as we speak, it's clear we have vertical
6  communications issues, and our employees do not fully
7  trust their leaders."
8        Did you know that, prior to the time you
9  came in here to testify today, that the ethical
10  problem was so bad at Cardinal that according to
11  research that was done of the employees, they said
12  that the employees don't even trust the leaders?
13        MR. PYSER:  Object to form.  Beyond the
14  scope.
15  BY MR. PAPANTONIO:
16        Q.  Did you ever hear -- did you ever hear
17  that prior to coming here?  That's the only question
18  I'm asking.
19        MR. PYSER:  Object to form.
20        THE WITNESS:  I was not aware of that.
21  BY MR. PAPANTONIO:
22        Q.  All right.  Then it goes on to say,
23  "Perhaps our results-oriented culture is leaning to
24  ill-advised or short-sighted decisions."
25        Do you see that?

Page 637

1        MR. PYSER:  Same objections to the
2  continuing use of this document.
3        THE WITNESS:  I do see that.
4  BY MR. PAPANTONIO:
5        Q.  Okay.  This is a bad document for you,
6  isn't it?  I mean, it really is --
7        MR. PYSER:  Counsel, it's just beyond the
8  scope.
9        MR. PAPANTONIO:  No, it is a bad -- no, it
10  really is a bad document.  I agree.
11        MR. PYSER:  It doesn't have anything to do
12  with the issues --
13        MR. PAPANTONIO:  Okay.
14        MR. PYSER:  -- in play here.
15  BY MR. PAPANTONIO:
16        Q.  Let's -- let's be clear about the scope of
17  this document.  You were asked by Mr. Pyser direct
18  questions about regulatory issues of this company.
19  On his direct of you, you answered questions, didn't
20  you?
21        MR. PYSER:  Object to form.
22        THE WITNESS:  I did answer his questions.
23  BY MR. PAPANTONIO:
24        Q.  Okay.  And he asked you about regulatory
25  standards of the company, didn't he?

Highly Confidential - Subject to Further Confidentiality Review

Page 638

1      MR. PYSER:  Object to form.
2      THE WITNESS:  I don't recall all of the
3   questions that were asked.
4   BY MR. PAPANTONIO:
5      Q.  So it says -- let's go on the last
6   paragraph:  "In closing, let me make an important
7   point.  As Dave and Dwight would have concurred, the
8   regulatory bodies hold general management
9   accountable.  Their names are the ones on the FDA
10   consent order related to Alaris SE recall.  The final
11   DEA resolution may have a comparable outcome.  The
12   final DEA resolution may have a final outcome."
13      Now, this is -- this document was
14   written -- and you said you were still with the
15   company -- in 2008.  What was the pending DEA
16   question in 2008?
17      MR. PYSER:  Object to form.  Ongoing
18   objection to this line of questioning on this
19   document.
20      THE WITNESS:  I do not --
21      MR. PYSER:  Beyond the scope.
22      THE WITNESS:  I do not know what the
23   author was referring to when he said "the final
24   DEA resolution."
25

Page 639

1   BY MR. PAPANTONIO:
2      Q.  "While the" -- it goes on to say, "While
3   the legal and QRA functions are responsible for
4   helping us run our business, the general managers are
5   ultimately responsible for the results."
6      You'd agree with that, wouldn't you?
7      A.  I don't know who the general managers are.
8   So I -- I can't speak to that.
9      Q.  Well, the -- how about -- how about where
10   it says "So general managers need to proactively
11   search for potential quality and legal regulatory
12   issues, and when they find them, they need to make
13   the hard right calls, not the easy wrong calls."
14      Did you know about those -- those
15   words being used -- being -- being spoken?
16      MR. PYSER:  Object to form.  Ongoing
17   objection --
18   BY MR. PAPANTONIO:
19      Q.  You ever heard --
20      MR. PYSER:  -- to this line of --
21   BY MR. PAPANTONIO:
22      Q.  -- words like that --
23      MR. PYSER:  -- this line of questioning.
24   BY MR. PAPANTONIO:
25      Q.  -- being spoken?

Page 640

1      A.  No, I had not heard those words.  This is
2   my first time reading this document.
3      Q.  Well, it says, "This is a big issue, and
4   the leaders of Cardinal, we need to address it.
5   Accountability leadership is essential."
6      Now, you would agree with that:
7   Accountability leadership is -- is essential in any
8   organization, isn't it?
9      A.  Again, those are the words of an
10   individual.
11      Q.  Yeah.  Let -- let me -- let me ask you,
12   just -- just to -- did you know about the -- did you
13   know about the -- the death wagon that was up in
14   Ohio?  Did you see the articles where Ohio actually
15   had to bring in a -- a death wagon, that actually
16   drove around dead bodies from so many people dying up
17   in Ohio from opioid overdoses?
18      MR. PYSER:  Object to --
19   BY MR. PAPANTONIO:
20      Q.  Had you -- have you ever seen that before?
21      MR. PYSER:  Object to form.  This is way,
22   way, way beyond the scope of the examination.
23   It is entirely improper to bring in a new
24   exhibit, an entirely new subject that wasn't
25   touched upon in the direct examination.

Page 641

1      MR. PAPANTONIO:  No -- no, sir.
2   BY MR. PAPANTONIO:
3      Q.  You understand, you were asked -- you were
4   asked whether or not the regulatory aspects of
5   Cardinal were a success.  What did you tell us?
6      MR. PYSER:  Move to strike --
7      MS. MOORE:  Cardinal 41.
8      (Cardinal-Brantley 41 was marked for
9   identification.)
10      MR. PYSER:  -- this entire line of
11   questioning.
12   BY MR. PAPANTONIO:
13      Q.  What did you tell us?
14      MR. PYSER:  Move to strike --
15      MR. PAPANTONIO:  We're going to enter
16   this --
17      MR. PYSER:  -- this line of questioning.
18      MR. PAPANTONIO:  This document's coming in
19   whether they object to it or not.
20      MR. PYSER:  It is objected to --
21      MR. PAPANTONIO:  So -- so --
22      MR. PYSER:  -- in the line of
23   questioning --
24      MR. PAPANTONIO:  -- okay, that's fine.
25      MR. PYSER:  Let me put my objection on the

Page 642

1 record without --
2     MR. PAPANTONIO: Go ahead.
3     MR. PYSER: -- speaking over me.
4     MR. PAPANTONIO: Go ahead.
5     MR. PYSER: This line of questioning is
6 beyond the scope. This entire line of
7 questioning, the introduction of the exhibit is
8 beyond the scope, and it should be stricken from
9 the record. I have a standing objection to this
10 entire line of questioning.
11 BY MR. PAPANTONIO:
12     Q. Did you know that there was a rolling
13 morgue that had to be called in to Ohio -- the very
14 area, as a matter of fact, where you were reviewing
15 reports about the sale of opioids?
16     MR. PYSER: Object to form.
17 BY MR. PAPANTONIO:
18     Q. Did you know that? Had anybody ever told you
19 you about this before?
20     A. I was not aware of, as you say, a rolling
21 morgue.
22     Q. You never -- nobody ever told you about a
23 rolling morgue that had to be called up to Ohio
24 because there was so many dead bodies dealing with
25 opioids, correct?

Page 643

1     MR. PYSER: Object to form.
2 BY MR. PAPANTONIO:
3     Q. Right?
4     A. That is correct. I was never told
5 about --
6     Q. And -- and I believe --
7     A. -- as you say, a rolling morgue.
8     Q. I believe earlier you said -- we went
9 through your idea of what are important things for
10 people to understand and be aware of where it comes
11 to things like diversion. And you said, didn't you,
12 in the -- in the documents that were reviewed, that
13 news is important, that people stay abreast of what
14 news is, dealing with opioids. Right?
15     MR. PYSER: Object to form. Misstates
16 testimony.
17 BY MR. PAPANTONIO:
18     Q. Didn't you say that?
19     MR. PYSER: Ongoing objection to this line
20 of questioning.
21 BY MR. PAPANTONIO:
22     Q. Mr. Brantley, didn't you say that?
23     A. I -- that document was an outline at a
24 high level of things that I wanted to implement.
25     Q. And one thing you wanted to implement was

Page 644

1 the use of staying abreast of what news reports are,
2 correct?
3     MR. PYSER: Object to form.
4 BY MR. PAPANTONIO:
5     Q. In fairness to your good idea, that's one
6 thing you wanted to do?
7     MR. PYSER: Object to form. Object,
8 beyond the scope, as this is an examination
9 based on another plaintiff's counsel examination
10 of an Endo document. It has nothing to do with
11 the direct examination that was conducted by
12 counsel for the defense.
13 BY MR. PAPANTONIO:
14     Q. Well, let's not even talk about your
15 document. You believe it's important for a person in
16 your role, in your capacity, to stay informed about
17 what the various news reports are saying about the
18 industry. You -- you would agree that's important,
19 right?
20     MR. PYSER: Same objections.
21     THE WITNESS: The media, the -- the
22 documentation that I had listed in my report as
23 far as reviewing searches and Google searches
24 and such was for the customers.
25

Page 645

1 BY MR. PAPANTONIO:
2     Q. For the customers?
3     A. And researching customers.
4     Q. And so that article sitting in front of
5 you about the -- about a morgue, a rolling morgue
6 having to be brought in to Ohio, you didn't know
7 anything about that, right?
8     MR. PYSER: Object to form.
9 BY MR. PAPANTONIO:
10     Q. Correct?
11     A. I did not know anything about this. This
12 is not relating to a customer.
13     Q. Not related to a customer; it's just --
14     A. That's why I did not know anything about
15 this.
16     Q. Oh, it's just related to dead people,
17 isn't it?
18     MR. PYSER: Object to form.
19 BY MR. PAPANTONIO:
20     Q. Dead people.
21     MR. PYSER: Argumentative.
22 BY MR. PAPANTONIO:
23     Q. Right? Talking about dead people here.
24     MR. PYSER: Object to form.
25 Argumentative. Beyond the scope.

Page 646

BY MR. PAPANTONIO:

1  BY MR. PAPANTONIO:
2      Q.  Right?  You want to take a minute to look
3  at that document?
4      MR. PYSER:  Counsel, it's 8:41 p.m.  We're
5  not sitting here so you can harass the witness.
6  BY MR. PAPANTONIO:
7      Q.  Do you want to read that document before I
8  ask you the next question?
9      MR. PYSER:  Object to form.
10     If you want to read the document, you can
11  go right ahead.
12     THE WITNESS:  Do you want me to read the
13  document?
14  BY MR. PAPANTONIO:
15     Q.  You're welcome to.
16     A.  Are you going to ask a question relating
17  to the document?
18     Q.  I will.
19     A.  If you ask your question, then I will
20  determine whether or not I need to read the
21  document --
22     Q.  Well, we'll let the jury read it.
23     A.  -- to answer your question.
24     Q.  We'll let them determine.
25     MR. PYSER:  Object to form.

Page 647

1      MR. PAPANTONIO:  Dave, why don't you take
2  over from here.
3      MR. BUCHANAN:  Okay.
4      MS. MOORE:  P1-1453.  It's -- if you
5  would, sir -- this is Cardinal-Brantley 41.
6      Thank you, sir.
7      (Pause in proceedings.)
8      FURTHER EXAMINATION
9  BY MR. BUCHANAN:
10     Q.  All right, we're on the record.  Now,
11  Mr. Brantley -- go ahead; finish your sip.
12     A.  Thank you.
13     Q.  All right.  I just have a few follow-up
14  questions.  We'll try and keep this brief and -- and
15  bring this in for a landing pretty quickly here.  We
16  will not use our 90-plus minutes in further
17  examination.
18     You were shown Brantley Exhibits 37, 38,
19  39, and 40.  Do you have those before you?
20     A.  I see 40.
21     Q.  Yeah.
22     MR. BUCHANAN:  I can -- I can pop them up
23  here on the Elmo, if I can have the Elmo, Evan,
24  we'll move this along real quick.
25

Page 648

1  BY MR. BUCHANAN:
2      Q.  You remember these, sir?
3      A.  Yes.
4      Q.  In your examination of Par -- by Par
5  counsel?
6      And just so the record's not confusing,
7  sir, because some of these documents say "Par"; some
8  of these documents say "QualiTest."  What happened,
9  QualiTest -- Endo acquired Par, and QualiTest --
10  essentially those functions moved into Par?
11     MS. VANNI:  Object to the form.
12     THE WITNESS:  At some point, Endo acquired
13  Par.  And then Par and QualiTest -- I don't know
14  what the correct term is, but Par and QualiTest
15  kind of merged, for lack of a better term.
16  BY MR. BUCHANAN:
17     Q.  Yeah, whatever the -- you know, corporate
18  formation thing was --
19     A.  Right.
20     Q.  -- one went into the other, the other went
21  into the first.
22     Whatever it was, essentially, we see
23  QualiTest and Par, we can think of those as
24  essentially generic manufacturers of Class II,
25  Class III controlled substances, correct?

Page 649

1      A.  As well as other controlled substances and
2  prescription drugs.
3      Q.  Right.  And we -- you know, we didn't get
4  into too much of it, but the majority of the
5  production, certainly of QualiTest, was controlled
6  substances, correct?
7      A.  There -- there was a -- I don't remember
8  the percentage, but yes, it was mostly controlled
9  substances, I believe.
10     Q.  Okay.  And you spent some time with
11  counsel going through Exhibit 37, which the jury will
12  have on the screen.  They'll remember this one.
13     38, and it's -- excuse my quick notations
14  there in the top right corner.  That's just for
15  tracking it.  Customer due diligence visits, cage,
16  vault, suspicious order monitoring, and identify,
17  blocking, and reporting suspicious orders.  Remember
18  going through those with counsel?
19     A.  Yes.
20     Q.  Okay.  And these were all new SOPs in
21  2013, correct, sir?
22     A.  Those were SOPs that I drafted.
23     Q.  Right.  So they -- they would -- by
24  definition, sir, they would not have existed prior to
25  your arrival at the company, correct?

Page 650

1    A.  Those particular SOPs did not.
2    Q.  Right.  And we looked, did we not, sir, at
3  Exhibit 30, in your direct examination -- or my
4  initial examination of you, concerning issues with
5  the current process, right?  Do you recall looking at
6  this with me, sir?
7    A.  I do recall looking at that, yes.
8    Q.  Okay.  And just to orient ourselves on
9  Exhibit 30 -- I'm sorry, I guess I did have a sticker
10  on the front -- this is that e-mail from Mr. Shaffer
11  to yourself, SOMS info.  And recall that it included
12  all the violations in an Excel spreadsheet, that was
13  first couple of pages?  Remember that?
14    I can turn it so it's burned into our tape
15  here.  If this helps you.  I know it's been a day,
16  but . . .
17    A.  I do remember.
18    Q.  Okay.  We looked at that together.
19    All right.  And there's more information
20  here, and ultimately we get with current SOMS
21  process, says "Retail pharmacies based on set product
22  thresholds."  And they could be changed by the sales
23  department.  Right?
24    MS. VANNI:  Objection.  Asked and
25    answered.

Page 651

1  BY MR. BUCHANAN:
2    Q.  You see that at the bottom there, retail
3  pharmacy threshold amounts?
4    A.  Yes, that's what it says.
5    Q.  Okay.  And then, as of the time you
6  arrived in 2013, after that period of time where
7  millions and billions of pills of hydrocodone and
8  oxycodone had been sold, these were the current
9  issues with the SOMS process, right?
10    MS. VANNI:  Objection.  Form.
11    THE WITNESS:  As Mr. Shaffer listed on the
12    PowerPoint.
13  BY MR. BUCHANAN:
14    Q.  Right.  And you -- you don't dispute these
15  characterizations, right?
16    A.  I cannot speak to them, because I was not
17  there.
18    Q.  Right.  He was?
19    A.  He was.
20    Q.  Okay.  And so what he sent you to orient
21  you, one week into your post with QualiTest, was
22  this -- was this PowerPoint, correct?
23    MS. VANNI:  Objection.
24    THE WITNESS:  Yes.  I don't have it in
25    front of me, but I believe it was sent --

Page 652

1  BY MR. BUCHANAN:
2    Q.  Okay.
3    A.  -- like you said, my first week of
4  employment, or something like that.
5    Q.  And it said, "System only looks at retail
6  pharmacies."  Right.  See that?
7    A.  It says, "The system only addresses retail
8  pharmacies by looking at product thresholds."  It
9  does not say "System only looks at retail
10  pharmacies."
11    Q.  Okay, fair enough.  Okay.  It does say
12  here, "Other classes of trade are not evaluated for
13  SOMS," right?
14    A.  It does say that, yes.
15    Q.  Okay.  You understand "other classes of
16  trade" to be -- frankly what QualiTest's biggest
17  customers were, right?  Distributors and wholesalers?
18    MS. VANNI:  Objection.
19    THE WITNESS:  "Other classes of trade"
20    would include wholesalers, distributors, and
21    hospitals, whomever else, yes.
22  BY MR. BUCHANAN:
23    Q.  And I believe when you were asked
24  questions by Par counsel earlier -- not me, but by
25  Par counsel -- you told her that the majority of

Page 653

1  QualiTest and Par's business was to distributors and
2  wholesalers, fair?
3    A.  Yes.
4    Q.  Okay.  So, fair to say that as of this
5  point in time, at least by the person who was boots
6  on the ground at QualiTest, other classes of trades
7  were not evaluated for suspicious orders, right?
8    MS. VANNI:  Object to form.
9    THE WITNESS:  According to Mr. Shaffer,
10    yes.
11  BY MR. BUCHANAN:
12    Q.  Okay.  And that -- that statute that we
13  talked about, the Controlled Substances Act, that
14  required you all to maintain effective controls to
15  prevent diversion; that statute goes way back in
16  time, right?  Prior to 2013, right?
17    MS. VANNI:  Objection.
18    THE WITNESS:  Yes.
19  BY MR. BUCHANAN:
20    Q.  And prior to 2000, right?
21    A.  Yes.
22    Q.  Back to the '70s or earlier?
23    MS. VANNI:  Objection.
24    THE WITNESS:  I believe back to the '70s.
25

Page 654

BY MR. BUCHANAN:

1  Q. Okay. So that obligation to maintain
2  effective controls existed, certainly, before you
3  were selling billions and billions of pills to
4  wholesalers and distributors in 2011 and 2012,
5  oxycodone and hydrocodone. Fair?
6      MS. VANNI: Object to form.
7      THE WITNESS: It existed since the '70s.
8  BY MR. BUCHANAN:
9  Q. Okay. Well, that would give a company a
10 long time to figure out effective controls against
11 diversion then, right?
12     MS. VANNI: Objection.
13 BY MR. BUCHANAN:
14 Q. 30, 40 years?
15     MS. VANNI: Objection.
16     THE WITNESS: Since the '70s, when the
17 regulations made effective.
18 BY MR. BUCHANAN:
19 Q. Right. So if I understand your testimony
20 on examination by Par counsel, you started the
21 company on September 30th -- I don't think you could
22 remember that date when I was asking you questions.
23 You had your memory refreshed, I guess, on a break?
24 A. Yes, because either you or someone

Page 655

1  actually put the date up there of September 30th, and
2  I remembered that from someone's presentation.
3  Q. Fair enough. So while the Act had been
4  around for 30, 40 years about developing effective
5  controls, you started at the company on
6  September 30th, right?
7  A. 2013, yes.
8  Q. 2013. And one week later, sir, in one
9  week's time, you sent around your vision for an
10 effective suspicious order monitoring protocol.
11 Fair?
12     MS. VANNI: Object to the form.
13     THE WITNESS: I sent my -- my high-level
14 thoughts on what I wanted to do as far as
15 implementing a suspicious order monitoring
16 program.
17 BY MR. BUCHANAN:
18 Q. Right. So this company, notwithstanding
19 the existence of a CSA for years about the obligation
20 to maintain effective controls to prevent diversion,
21 was not looking at chargeback data before you got
22 there, right?
23     MS. VANNI: Objection.
24     THE WITNESS: I -- I don't know if they
25 were looking at chargeback data or not.

Page 656

1  BY MR. BUCHANAN:
2  Q. Okay. If I told you, sir, they were not,
3  would you dispute that?
4      MS. VANNI: Object to the form.
5      THE WITNESS: If you --
6  BY MR. BUCHANAN:
7  Q. As it relates to effective controls
8  against diversion?
9  A. If you showed me a document that stated
10 that they were not reviewing it, I would believe
11 that.
12 Q. You wouldn't dispute it?
13 A. I would believe that document.
14 Q. Okay.
15 A. Depending on who it was written by.
16 Q. Okay. And then this continues, and
17 further explains the retail pharmacy review is being
18 handled by the sales folks, right?
19     MS. VANNI: Object to the form.
20 BY MR. BUCHANAN:
21 Q. Fourth bullet? Sorry, right here, sir.
22 A. Yes.
23 Q. Okay. And that's a conflict of interest,
24 at least in the DEA's eyes, right?
25     MS. VANNI: Object to the form.

Page 657

1      THE WITNESS: According to Mr. Shaffer, he
2  stated that in that -- the bullet point.
3  BY MR. BUCHANAN:
4  Q. Okay. Well, let's just talk about it
5  going forward, in terms of setting thresholds, was
6  that coming out of the DEA compliance group going
7  forward, or was the sales department, the marketing
8  department, continuing to do it?
9  A. By "going forward," do you mean since I
10 arrived?
11 Q. Yeah. 2013, '14?
12 A. When I arrived, that practice was stopped,
13 and it was handled by --
14 Q. Okay.
15 A. -- my team.
16 Q. And so when you arrived, that would be the
17 period of time after the blue was mostly gone from
18 the map -- that's the death map -- after the blue was
19 mostly gone, in 2012, and we had white. And we had
20 orange. And we had yellow. And we had brown. In
21 terms of body counts, throughout this country, due to
22 opioid deaths. Fair?
23     MS. VANNI: Objection.
24     THE WITNESS: That was after the dates on
25 the maps that you put up on the screen.

Page 658

BY MR. BUCHANAN:

1 Q. Right. So it's after that body count,
2 after the escalating deaths, after QualiTest or Par
3 had sold billions and billions and billions of
4 oxycodone- and hydrocodone-containing products that
5 this SOMS process -- or you're hired, and a new SOMS
6 process gets implemented. Fair?
7 MS. VANNI: Objection.
8 BY MR. BUCHANAN:
9 Q. Is that the timing, sir? It happened
10 after you started?
11 A. During the time fame that you mentioned of
12 the chart, I started in 2013, which is after that.
13 And I enhanced the program.
14 Q. Understood, sir. And in fact the DEA
15 identified gaps in the program; isn't that right?
16 MS. VANNI: Object to the form.
17 BY MR. BUCHANAN:
18 Q. You understood, sir --
19 A. At -- at what point? The program since I
20 had been there or --
21 Q. Yeah, there were some questions by
22 counsel --
23 A. -- prior to my arrival?
24 Q. Withdrawn. I'm getting -- you know, it's

Page 659

1 late. I apologize. You've been here a long day. I
2 have too. It's not your fault, and I should slow
3 down, because I'm sure I do have ample time, and I'm
4 not going to use it.
5 There were some questions by counsel for
6 Par about a DEA audit of SOMS. Do you remember that?
7 A. During my time, yes.
8 Q. Okay. To be clear, that was -- that was
9 at a point in time after new SOPS had been
10 implemented, after you were putting boots on the
11 ground to actually start talking to wholesalers and
12 distributors, after you were looking at chargeback
13 data, after you were doing Internet investigations on
14 your customers and your customers' customers and
15 after you were considering intelligence that you were
16 collecting from other sources, that's the point in
17 time -- that was the audit you were talking about,
18 right?
19 A. Yes. So the --
20 MS. VANNI: Object to the form.
21 THE WITNESS: -- audit was after I became
22 SOM manager.
23 BY MR. BUCHANAN:
24 Q. And fair, sir, that, you know, in this
25 period of time before you arrived, there was

Page 660

1 intelligence that could be gathered on your
2 customers, right?
3 MS. VANNI: Objection.
4 BY MR. BUCHANAN:
5 Q. Before you arrived? Before you got there,
6 there were sources of intelligence on your customers,
7 true?
8 MS. VANNI: Objection.
9 THE WITNESS: Before I arrived, there was
10 the Internet, and -- and there were searches
11 available.
12 BY MR. BUCHANAN:
13 Q. And there were sources available on your
14 customers' customers, right?
15 MS. VANNI: Objection.
16 THE WITNESS: I cannot speak -- if you're
17 referring to chargeback data, I do not know what
18 data was -- what chargeback data was available
19 prior to me.
20 BY MR. BUCHANAN:
21 Q. Okay. So I mean, that's a discernible
22 fact, though, right? I mean, within the walls of
23 QualiTest, within the walls of Endo, within the walls
24 of Par, we can figure out when chargeback data was
25 available, right?

Page 661

1 VIDEOGRAPHER: Object to the form.
2 THE WITNESS: That is discernible, yes.
3 BY MR. BUCHANAN:
4 Q. Okay. And we know that before you got to
5 QualiTest, there were pill mills, right?
6 MS. VANNI: Object to the form.
7 THE WITNESS: I don't know exactly when
8 pill mills started. It started with the
9 Internet, and then, when the DEA cracked down,
10 on Internet, it kind of evolved to pill mills.
11 I don't recall the time frame.
12 BY MR. BUCHANAN:
13 Q. But before you got -- I mean, you remember
14 that discussion you had with Mr. Papantonio about --
15 during Cardinal, even during the Cardinal time, there
16 was concern about pill mills and Internet pharmacies.
17 Fair?
18 MS. VANNI: Objection to form.
19 THE WITNESS: Fair, yes.
20 BY MR. BUCHANAN:
21 Q. Okay.
22 A. Yes.
23 Q. So there was concerns about diversion well
24 before 2013, right?
25 MS. VANNI: Objection.

Highly Confidential – Subject to Further Confidentiality Review

Page 662

1    THE WITNESS: Diversion was a concern
2  before 2013.
3  BY MR. BUCHANAN:
4    Q. Right. Right. And in fact, I mean, we
5  know it's a concern because as a registrant, you make
6  a promise when you get that registration that you're
7  going to maintain effective controls to prevent
8  diversion, right?
9    MS. VANNI: Object to form.
10    THE WITNESS: As I stated earlier, that's
11  what the regulation says, that --
12  BY MR. BUCHANAN:
13    Q. That's what the statute says?
14    A. Yeah, the statute, regulation, I get them.
15    Q. Right. As a registrant, you are promising
16  to the American people, to the American government,
17  that you are going to operate within this closed
18  system to prevent diversion, right?
19    MS. VANNI: Objection.
20    THE WITNESS: I don't know if the statute
21  mentions a promise, but the statute does say
22  that you will have procedures in place to
23  prevent diversion.
24  BY MR. BUCHANAN:
25    Q. Yeah. I mean, don't you understand --

Page 663

1    A. The word "promising," I can't speak to
2  that. I don't recall that being in the regulation --
3    Q. Yeah. And frankly --
4    A. -- or the statute; I'm sorry.
5    Q. That's -- that's me, I think, trying to
6  make friendly with a statute. But when you file an
7  application, when you file an application, that is
8  your promise as a registrant to operate as a good
9  citizen within a closed system designed to contain
10  controlled substances within that system, right?
11    MS. VANNI: Object to form.
12    THE WITNESS: Again, since the regulation
13  does not mention the word "promise," I cannot
14  speak to promise.
15  BY MR. BUCHANAN:
16    Q. Okay. Would you fault -- would you fault
17  people, sir, for considering your application as a
18  registrant as a representation by you to the
19  government, and by extension to the American people,
20  that you're going to do your best to prevent
21  diversion? Would you fault people for perceiving
22  that's what you were willing to do when you went to
23  the DEA and said, I want to be a registrant?
24    MS. VANNI: Objection.
25    THE WITNESS: I can't speak to how one

Page 664

1  finds fault and at what one finds faults. And I
2  can't speak to other -- to someone else's
3  opinion.
4  BY MR. BUCHANAN:
5    Q. Okay. If the jury were to perceive, sir,
6  that when you made your application to the
7  government, that you were in fact making a promise to
8  do your best to have effective controls to prevent
9  diversion, at all times you were carrying that
10  license, at all times you were manufacturing, at all
11  times you were distributing, would you fault the jury
12  for understanding that that was essentially what you
13  were representing to the government?
14    MS. VANNI: Objection. Beyond the scope.
15    THE WITNESS: Again, you started that
16  question with the word "promise." And since
17  "promise" is not in the statute, I -- I cannot
18  speak to what is promised. I can only speak to
19  what's in the statute, and that the companies
20  will be in compliance with what the statute and
21  the regulation states.
22  BY MR. BUCHANAN:
23    Q. All right. So turning ourselves back,
24  we've got it on the screen. This is Exhibit 30. We
25  went through this earlier today. I just wanted to

Page 665

1  orient ourselves that as of the point in time here,
2  in 9/30/2013, or, you know, a few weeks after you
3  joined the company, these were the issues with
4  current process, right?
5    A. According to Mr. Shaffer.
6    Q. Okay. Somebody who had been there, boots
7  on the ground, before you got there, right?
8    MS. VANNI: Objection.
9    THE WITNESS: Mr. Shaffer was there prior
10  to my arrival, yes.
11  BY MR. BUCHANAN:
12    Q. Fair enough. Okay.
13    MR. BUCHANAN: Could I please have -- can
14  I please have 391?
15    MR. SEIGEL: Exhibit 42.
16    MR. BUCHANAN: This will be Brantley
17  Exhibit 42.
18    (Cardinal-Brantley 42 was marked for
19  identification.)
20  BY MR. BUCHANAN:
21    Q. And just to orient you, sir, I mean, you
22  saw some of the DEA charts that we looked at
23  together, where we did some calculations about the --
24  the substantial production of opioids and sale of
25  opioids by QualiTest; do you recall that?

Highly Confidential – Subject to Further Confidentiality Review

Page 666

1    A.  Would that be the ARCOS data graphs?
2    Q.  That -- that was the -- from the DEA
3  meeting in -- "the meeting," in March of 2013?
4        MS. VANNI:  Object to the form.
5  BY MR. BUCHANAN:
6    Q.  Do you recall that?
7    A.  Again, would that be the ARCOS data that
8  listed Generics Bidco and Vintage?
9    Q.  I -- I think you referred to it as
10  something you saw in a binder, and within the
11  company.
12    A.  Yes.
13    Q.  Do you recall that?  Okay.
14    A.  The ARCOS data that was in a binder.
15    Q.  Okay.  I'd like to show you, sir --
16        MR. BUCHANAN:  What did we call this?  40?
17        MR. SEIGEL:  42.
18        MR. BUCHANAN:  42.  All right.
19  BY MR. BUCHANAN:
20    Q.  I'd like to show you, sir, 42.  This is
21  supply chain and DEA compliance.  Okay?  Produced by
22  Endo and the MDL.  It's on the screen now.
23        MS. VANNI:  Objection.  Beyond the scope.
24  BY MR. BUCHANAN:
25    Q.  Let's see.  Executive sponsor, there's

Page 667

1  some folks -- do you know those people, sir?  Peter
2  Bigelow, Brian Lortie?
3    A.  No.
4    Q.  Okay.  And it says here, "BOD committee"
5  -- is that "board of directors," sir?
6    A.  I don't know.
7    Q.  Okay.  It says, "BOD committee, full
8  board" -- I'll just say "full BOD -- key action dates
9  off on the right.  "June 6th, 2013, ELC discussion."
10        Is that the executive leadership
11  committee, sir?
12    A.  I don't know for sure.  I think the "EL"
13  stands for executive leadership, so that could be
14  executive leadership.
15    Q.  Okay.  And then BOD, is that board of
16  director discussion?  Or you don't know what "BOD" is
17  referring to?
18    A.  I don't know for sure, but it could be
19  board of directors, as you stated.
20    Q.  Okay.
21    A.  That makes sense.  I just don't know for
22  sure.
23    Q.  Okay.  Well, let's -- at the bottom here,
24  it's talking about an assessment of critical risk
25  components.  You see that?

Page 668

1    A.  Yes.
2    Q.  And we're just going to work off my
3  highlights, try and move this along, all right?
4    A.  Okay.
5    Q.  And it says here, "Risk component two
6  impacted DEA remediation efforts to address the
7  compliance findings in our internal manufacturing
8  plants.  The potential business impact could vary
9  from formal agency regulatory observations during
10  external audits to agency regulatory actions
11  preventing us from commercially distributing one or
12  more products due to license revocation."
13        Do you see that?
14        MS. VANNI:  Just note my objection to use
15  of the document as an Endo document.  This
16  witness is a QualiTest employee.
17        Go ahead.
18        THE WITNESS:  I'm sorry.  Could you repeat
19  that?  Because I was trying to find the page.
20  You had skipped from page 1 all the way to -- I
21  think --
22        MR. BUCHANAN:  Evan, could you actually
23  pull it up on the screen?  It will make it
24  easier to navigate, and I've got some scribbles
25  on here.  Thank you.

Page 669

1  BY MR. BUCHANAN:
2    Q.  We're going to pull it up on the screen
3  for you.  Okay.  All right.
4        I'm sorry.  It's 391.6.  We were carrying
5  over from 391.5.
6        There was a statement by counsel that this
7  is an Endo document; I shouldn't be using it with
8  you.  Let's direct your attention to the "QualiTest
9  Business Unit" heading.  Do you see that, sir?
10    A.  Yes.
11    Q.  Is that in fact where you worked, sir,
12  QualiTest, at this point in time?  In 2013, at least,
13  when you joined?
14    A.  Yes.
15    Q.  Okay.  And it identifies a series of
16  items.  And actually, I do want to get back to the
17  carryover paragraph:  "The potential business impact
18  could vary from formal agency regulatory observations
19  during external audits to agency regulatory actions
20  preventing us from commercially distributing one or
21  more products due to license revocation."
22        Do you see that, sir?
23    A.  Yes.
24    Q.  Okay.  And it says in the second bullet --
25  could you read that for us, sir?

Highly Confidential – Subject to Further Confidentiality Review

Page 670

1    A.  The second bullet: "In a meeting with DEA
2  on March 6, 2013, DEA identified gaps associated with
3  our suspicious order monitoring system (SOMS) and
4  lack of monitoring of sales to customers' customers."
5    Q.  And to be clear, sir, that's a statement
6  with regard to the QualiTest business unit, right?
7        MS. VANNI:  Object to the form.
8        THE WITNESS:  According to this document,
9    yes, it's under the QualiTest business unit.
10  BY MR. BUCHANAN:
11    Q.  Seemingly from executives of the company.
12  Fair, sir?
13        MS. VANNI:  Objection.
14        THE WITNESS:  Whomever drafted this, yes.
15  BY MR. BUCHANAN:
16    Q.  Okay.  And --
17    A.  I didn't recognize those names that you
18  mentioned.
19    Q.  Okay.  It's been a few years; you don't
20  remember them?
21    A.  I -- I don't think I've ever heard of
22  those two names.
23    Q.  Okay.  All right.  And -- and talks about
24  action plans, right?
25    A.  Yes.

Page 671

1    Q.  See that?
2    A.  Yes.
3    Q.  To address various DEA-related concerns.
4  And it says "management's preparedness."  What did
5  the company say -- if you could scroll up a little,
6  Evan.
7        Management preparedness.  How prepared was
8  management for this?
9        MS. VANNI:  Object to the form.
10        THE WITNESS:  Management preparedness --
11    evolving.
12  BY MR. BUCHANAN:
13    Q.  Okay.  Evolving.  All right.  And then, so
14  third bullet down, under "Action Plans," to address
15  various DEA-related concerns -- you do understand,
16  sir, that the DEA had expressed concerns to QualiTest
17  about suspicious order monitoring at the meeting in
18  March of 2013.  True?
19        MS. VANNI:  Object to the form.
20        THE WITNESS:  I think I've seen that in
21    certain documents that were --
22  BY MR. BUCHANAN:
23    Q.  Okay.
24    A.  -- given to me throughout the course of
25  the day.

Page 672

1    Q.  Fair enough.  Thank you.  And when we
2  scroll down here, third bullet, it says, "Implement
3  the suspicious order monitor program."
4        Right?  Do you see that, sir?
5    A.  That's what it says.
6    Q.  "Implement the suspicious order monitor
7  program."  Okay?
8        The authors of this document certainly
9  didn't use the word "enhance," right?
10        MS. VANNI:  Object to the form.
11        THE WITNESS:  It says "implement."
12  BY MR. BUCHANAN:
13    Q.  Okay.  It didn't say "supplement," or
14  "spiff it up," right?
15        MS. VANNI:  Objection.
16        THE WITNESS:  No.
17  BY MR. BUCHANAN:
18    Q.  What -- what word did they use, sir?
19    A.  "Implement."
20    Q.  Thank you.  All right.  And it said, going
21  to do that by the end of 2013.  See that?
22    A.  Yes.
23    Q.  Might you be one of the additional head
24  count QualiTest was out scrambling to find before
25  they had to go back and see the DEA in the third

Page 673

1  quarter of 2013 to say, "We're going to do
2  something"?
3        MS. VANNI:  Objection to form.
4  BY MR. BUCHANAN:
5    Q.  Might you be that person, sir?
6        MS. VANNI:  Objection.
7        THE WITNESS:  Again, I can't speak to if I
8    was a person, but I was hired September 30th of
9    2013.
10  BY MR. BUCHANAN:
11    Q.  And you were hired into what position?
12    A.  SOMS manager.
13    Q.  SOMS manager.
14    A.  Yes.
15    Q.  Okay.  All right.  And that was in the end
16  of 2013, after those billions and billions of pills?
17        MS. VANNI:  Objection.
18  BY MR. BUCHANAN:
19    Q.  All right.  And what does it say there on
20  the next sentence?  I guess I should stop there.
21        "The program will" -- what?  "Will
22  create"?
23        Did I read that correctly, sir?  Second
24  sentence?  "The program will create" --
25    A.  Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 674

1    Q.  -- "a solution to monitor"?
2    A.  Yes, that's what it says.
3    Q.  Not "enhance," not "spiff it up," not just
4  add some window dressing.  It's going to create,
5  right?
6       MS. VANNI:  Objection to form.
7  BY MR. BUCHANAN:
8    Q.  "Create a solution to monitor," right?
9    A.  It says "Create solution to monitor."
10   Q.  Okay.  Good.  Let's go on.
11      What's it going to create a solution to
12 monitor?  What was the first thing it was going to
13 do?
14   A.  Are you asking me to read the bullet?
15   Q.  I am, yes, please, sir.  I'm -- I'm sorry.
16 It's getting late in the day.
17   A.  "Sales orders to customers."
18   Q.  Okay.  What's the next thing it's going to
19 create a solution to monitor?
20   A.  "Review of chargeback data."
21   Q.  Okay.  Does that help you understand, sir,
22 whether this company was looking at chargeback data
23 before you got to the company or not?
24      MS. VANNI:  Objection.
25      THE WITNESS:  It says that the program

Page 675

1     will -- will create a solution to monitor, and
2     one of the things is review of chargeback data.
3  BY MR. BUCHANAN:
4    Q.  Okay.  Let's go on.  It says it's going to
5  create a solution, create a solution to monitor, 1,
6  sales orders to customers.  That's a good thing to
7  do, right?
8       MS. VANNI:  Objection.
9       THE WITNESS:  That's -- that's part of a
10    SOMS program.
11 BY MR. BUCHANAN:
12   Q.  Right.  Because you can't really look for
13 suspicious orders and evaluate suspicious orders if
14 you're not even looking at the orders?
15      MS. VANNI:  Objection.
16 BY MR. BUCHANAN:
17   Q.  Could we agree on that?
18   A.  One has to look at an order to evaluate a
19 suspicious order.
20   Q.  Right.  Right.  And you got to look at the
21 whole class of trade.  You got to look at the
22 majority of your business, wholesalers and
23 distributors, right?
24      MS. VANNI:  Objection.
25

Page 676

1  BY MR. BUCHANAN:
2    Q.  National chain pharmacies?
3       MS. VANNI:  Objection.
4       THE WITNESS:  One has to look at the
5    customer base in order to --
6  BY MR. BUCHANAN:
7    Q.  Okay.
8    A.  -- identify potentially suspicious orders.
9    Q.  Pretty important, with a class of drugs
10 that you store in a vault in your warehouse, right?
11      MS. VANNI:  Objection.
12      THE WITNESS:  It is in the statute in the
13    regulations that --
14 BY MR. BUCHANAN:
15   Q.  This is stuff that people get addicted to,
16 stuff that people do all kinds of crazy things to try
17 and steal.  This is stuff that breaks up families,
18 makes people nonproductive at work, and kills people.
19 Right?
20      MS. VANNI:  Objection.
21      THE WITNESS:  The abuse of controlled
22    substances can lead to those things.
23 BY MR. BUCHANAN:
24   Q.  Right.  And that's what you said in your
25 letter that you sent out in the middle of 2013,

Page 677

1  right?
2       MS. VANNI:  Objection.
3  BY MR. BUCHANAN:
4    Q.  Heart-wrenching consequences.
5  Heart-wrenching consequences when this product gets
6  diverted and abused.  Right?
7       MS. VANNI:  Objection.
8       THE WITNESS:  Are you referring to the
9    letter that --
10 BY MR. BUCHANAN:
11   Q.  I'm referring to the October 18 --
12   A.  -- was signed by Tracey Hernandez?
13   Q.  I'm referring -- sorry.  I'm referring to
14 the October 18, 2013, letter that you were cc'd on,
15 right after you got to the company as a SOMS manager.
16 Do you recall that?
17   A.  Sir, I asked -- I have stacks of documents
18 ahead of me, in front of me.  I'm asking, are you
19 referring to the document -- the letter that was
20 signed by Tracey Hernandez?
21   Q.  To which you were copied on, yeah.
22   A.  The letter that was signed by Tracey
23 Hernandez, is -- is that the letter you're referring
24 to?
25   Q.  Yeah.  I -- I thought I was being clear

Page 678

1  with you.
2      A.  You never said yes or no.
3      Q.  Okay.  Because I'm the one asking the
4  questions.
5         But yes, I mean, to help you remember,
6  yes, it was a letter that was sent by Tracey
7  Hernandez a few weeks after you joined, after you
8  sent your vision for a proper SOM program, after you
9  were briefed on all the deficiencies that currently
10  existed, and after apparently you started preparing
11  standard operating procedures, all within a few weeks
12  of joining the firm, that letter.
13      MS. VANNI:  Object to the form.
14      THE WITNESS:  I do recall the letter that
15      was signed --
16  BY MR. BUCHANAN:
17      Q.  Thank you.
18      A.  -- by Tracey Hernandez.
19      Q.  There we go.  Now let's look at the
20  program --
21      MS. VANNI:  Objection.
22      MR. BUCHANAN:  I'm sorry.  Withdrawn.
23      And I apologize, Counsel.  I'm just
24      getting a little punchy.
25

Page 679

1  BY MR. BUCHANAN:
2      Q.  The program will create a solution to
3  monitor.  We talked about sales orders to customers.
4  We talked about review of chargeback data.  And it's
5  also going to create a solution to monitor, Know Your
6  Customers.  Right?
7      A.  It does say "Know Your Customer program,"
8  yes.
9      Q.  Yeah.  And a SOMS database.  Right?
10      A.  Yes, it says "SOMS database."
11      Q.  Okay.  And one of the things you were
12  advocating, sir, is not only looking at trends, not
13  -- you know, from the customer stuff, but going and
14  getting prescription-level data from IMS.  Right?
15  That was one of the things you said people should do.
16  Right?
17      MS. VANNI:  Object to the form.
18      THE WITNESS:  That's something that I said
19      that I would do in aiding me to establish
20      thresholds.
21  BY MR. BUCHANAN:
22      Q.  Right.  Look to see what prescribers are
23  the retail pharmacies selling to, or what -- what
24  prescribers are writing prescriptions for your drugs
25  and being filled at those retail pharmacies, right?

Page 680

1      A.  What the IMS data provided was dispensing
2  data from the pharmacy, how many dosage units of a
3  particular drug was dispensed.  It did not provide
4  prescriber data to review.
5      Q.  Are you -- are you not aware, sir, that
6  IMS data can provide prescriber-level data to you?
7      A.  I'm answering the question to what I
8  reviewed --
9      Q.  Okay.
10      A.  -- and what I referred to on my document
11  that you referenced.
12      Q.  Okay.
13      A.  Dispensing data.
14      Q.  All right, sir.  So these are all things
15  that are being done to address this kind of -- what
16  are they, gaps, I think that are highlighted above?
17  DEA identified gaps associated with your suspicious
18  order monitoring program, right?
19      MS. VANNI:  Object to the form.
20      THE WITNESS:  If that's what it says.  I
21      have to read it again.  Where is it?
22  BY MR. BUCHANAN:
23      Q.  There it is right there.  Identify gaps,
24  right?
25      A.  Yes.  That's what it says.

Page 681

1      Q.  So when you were answering questions about
2  audits of SOPs or SOMS programs, it certainly was not
3  this meeting with the DEA in 2013 that led to the
4  company creating a suspicious order monitoring
5  program, right?
6      MS. VANNI:  Objection.
7      THE WITNESS:  It was an audit conducted
8      while I was the SOMS manager.
9  BY MR. BUCHANAN:
10      Q.  Okay.  So after you fixed all the issues
11  with the current process and the billions and
12  billions of pills being sold and all the bodies
13  piling up, right?
14      MS. VANNI:  Objection.
15      THE WITNESS:  After I started with
16      QualiTest, September 30th, 2013.
17  BY MR. BUCHANAN:
18      Q.  Okay.  You can set that one aside.
19  Actually -- all right.
20      MR. BUCHANAN:  Could I please have 573?
21  Mark that as the next in order.  What are we up
22  to, 43?
23      MR. SEIGEL:  Brantley 43.
24      THE WITNESS:  Excuse me: Can I ask for
25      some more water, or get up --

Page 682

BY MR. BUCHANAN:

Q. Whatever you need.

A. -- and get some more water?

Q. If you need to stand or stretch, it's been a long day, and --

A. I just want to get some more water, please.

Q. I'd like to treat you like the guest of honor, sir. Do you need a minute?

A. I just need a bottle, yeah. Thank you.

We can go ahead. I didn't need a break. I just wanted to ask for some water.

Q. No worries. And -- and I'm pretty close. Okay?

MR. BUCHANAN: All right. What did we mark that as? 43?

MR. SEIGEL: 43.

MR. BUCHANAN: Okay, Evan, could you please pull up 573, please.

(Cardinal-Brantley 43 was marked for identification.)

BY MR. BUCHANAN:

Q. Just asking you, sir, first of all, this is from that March 2013 period of time. You mentioned Ms. Hernandez. She was a person who was

Page 683

involved in suspicious orders, at least in terms of DEA compliance, before you got there, right?

MS. VANNI: Objection.

THE WITNESS: She was the director of DEA compliance.

BY MR. BUCHANAN:

Q. Got it. Okay. Who was the suspicious order -- the SOM manager before you became it?

A. I don't know if there was a SOM manager.

Q. Okay. Well, that makes sense. They didn't have a SOM program before you got there, right?

MS. VANNI: Objection.

THE WITNESS: I believe there was a SOMS program in place.

BY MR. BUCHANAN:

Q. Okay. We just saw a document that talked about that, right?

MS. VANNI: Objection.

THE WITNESS: We saw a document written by someone that made some statements -- thank you -- that made statements, yes.

BY MR. BUCHANAN:

Q. Okay. Right. And we just read the executive briefing talking about creating a

Page 684

suspicious order monitoring program, right? Do you recall that document we just looked at, sir?

MS. VANNI: Object to the form.

THE WITNESS: I do.

MR. BUCHANAN: Okay. All right, Evan, could you please go to 573.6.

BY MR. BUCHANAN:

Q. So this is an integrated compliance risk assessment. You see that?

A. Yes.

Q. At the top? And it talks about the various areas, and -- and the risk name and the risk description and the composite risk, and there's an "H" and a big red -- see the red on the screen, sir? Or on your paper, either way? See it?

A. Yes.

Q. Okay. Cool. Let's go down to regulatory -- it's like the third row. It says "DEA, suspicious order monitoring." You see that?

A. Yes.

Q. It says, "Monitoring reporting not meeting all requirements. Inconsistency across Endo."

Do you see that?

A. Yes.

MR. BUCHANAN: And then -- Evan, could you

Page 685

blow up, please, you know, the heading and the -- for each of the columns. That will help me out. There you go. Let's pull that above. Okay.

BY MR. BUCHANAN:

Q. Does that make it easier to read it, sir? You can kind of see the headings that go with things.

So the risk name is what, that we've blown up for you?

A. The risk name is suspicious order monitoring.

Q. And the risk description is you're monitoring reporting's not meeting all requirements. That's what it says, right?

A. That's what it says.

Q. Composite risk: What color did they put in the box?

A. Red.

Q. And what letter did they put in the box?

A. H.

Q. Okay. Potential impact: What's written there?

A. "Fines. Required action with oversight. Cease selling to certain accounts."

Q. Okay. You know, how about as a potential

Page 686

1 impact, that we are not keeping the circle closed, in
2 the closed system of controlled substances?  How
3 about that as a potential impact?
4      MS. VANNI:  Object to form.
5 BY MR. BUCHANAN:
6      Q.  We can agree that the absence of measures
7 to prevent diversion jeopardizes the closed system.
8 True?
9      MS. VANNI:  Objection.
10      THE WITNESS:  The absence, but there is
11      another document that stated that it -- that
12      there was a -- a system in place.  So we have
13      two documents; one stating that there was a
14      system from the -- from Mr. Shaffer's
15      PowerPoint.  Then there was this last document,
16      written by another individual, or a set of
17      individuals, that stated otherwise.  So there's
18      conflicting --
19      MR. BUCHANAN:  Move to strike.
20 BY MR. BUCHANAN:
21      Q.  Okay?
22      A.  Okay.
23      Q.  If someone is not implementing effective
24 controls against diversion, we jeopardize the closed
25 system that's supposed to exist as part of a

Page 687

1 registration or a registrant's registration for
2 controlled substances, true?
3      MS. VANNI:  Objection.
4      THE WITNESS:  If someone is not
5      implementing a -- a system, they are not
6      complying with the statute nor the regulation.
7 BY MR. BUCHANAN:
8      Q.  Okay.  Jeopardizing the closed system.
9 Can you agree with me on that?
10      MS. VANNI:  Objection.
11      THE WITNESS:  Again, I --
12 BY MR. BUCHANAN:
13      Q.  You can't -- you can't go there, huh?
14      A.  As I've done all day --
15      MS. VANNI:  Objection.
16      THE WITNESS:  -- I stick with the statute
17      and the regulation.
18 BY MR. BUCHANAN:
19      Q.  Well, let's -- let's just now take a step
20 back now.  As a human being -- okay?  As a human
21 being aware that there is a product that is deemed so
22 concerning that it's got to be kept in a vault in a
23 warehouse, would you agree that the handlers and the
24 shippers and the customers need to take measures to
25 ensure that it stays within the closed system?  Would

Page 688

1 you agree with that?
2      MS. VANNI:  Objection.
3      THE WITNESS:  That's what the regulation
4      and the statute states.
5 BY MR. BUCHANAN:
6      Q.  So you can't just say it as a matter of a
7 reasonable company, a company dealing with something
8 really dangerous, should make sure that it knows it's
9 dealing with customers that are going to handle it
10 with the same level of care and with the same intent
11 for which that product was made?  You can't agree
12 with me on that, sir?
13      MS. VANNI:  Objection.
14      THE WITNESS:  Since 9:00 o'clock this
15      morning, I have consistently stated the statute
16      and the regulation, and I state that again.
17      21 CFR 1301.74(b), the registrant shall design
18      and implement a system to identify suspicious
19      orders and report those orders to the DEA.
20      Orders include orders of unusual size,
21      frequency, or that deviate substantially from a
22      normal pattern.
23      That has been my answer since
24      9:00 o'clock, and that is my answer until 9:00,
25      10:00, 12:00 o'clock, whenever we go.

Page 689

1 BY MR. BUCHANAN:
2      Q.  Okay, sir.  And you keep citing the
3 suspicious order regulation --
4      A.  And the statute that you've cited.
5      Q.  Okay.  And the statute is to have
6 effective controls against diversion, right?
7      A.  Correct.
8      Q.  Okay.  That is what a registrant shall do,
9 right?
10      A.  To be in compliance with the statute and
11 the regulation, yes.
12      Q.  Yeah, I mean, that's -- that's right.  I
13 mean, that's the concept, the closed system.  To be
14 in compliance, you got to have effective controls
15 against diversion.  Agreed?
16      A.  To be in compliance with the statute and
17 regulation --
18      Q.  Okay.
19      A.  -- yes.
20      Q.  All right.  So we can agree here that it
21 doesn't say anything, in terms of potential impact,
22 about breaking the closed system; we can agree it
23 doesn't say that, right?
24      MS. VANNI:  Objection.
25      THE WITNESS:  What does not say that?

Highly Confidential – Subject to Further Confidentiality Review

Page 690

1 BY MR. BUCHANAN:
2    Q. This -- what's blown up to your screen,
3 sir, from Exhibit 42, talking about potential impact
4 of not meeting requirements with regard to suspicious
5 order monitoring. We can agree that doesn't say that
6 diversion could occur? We agree it's not listed
7 there, right?
8    MS. VANNI: Objection.
9    THE WITNESS: It says, "Fines. Required
10 action with oversight. Cease selling to certain
11 accounts."
12 BY MR. BUCHANAN:
13    Q. Please stay with my question at this point
14 in the day, sir. I'm asking you, we can agree it
15 doesn't say, "could increase diversion"?
16    MS. VANNI: Objection.
17 BY MR. BUCHANAN:
18    Q. Can we agree it doesn't say that, sir?
19    A. That -- that section that you have blown
20 up does not say what you just stated.
21    Q. Thank you. Can we agree that it doesn't
22 say "may lead to additional deaths"?
23    MS. VANNI: Objection.
24 BY MR. BUCHANAN:
25    Q. Can we agree it doesn't say that?

Page 691

1    MS. VANNI: Objection.
2    THE WITNESS: That section that is blown
3 up does not say what you just stated.
4 BY MR. BUCHANAN:
5    Q. Can we agree that it doesn't say "may lead
6 to additional addicts" --
7    MS. VANNI: Objection.
8 BY MR. BUCHANAN:
9    Q. -- "and abusers"?
10    MS. VANNI: Objection.
11    THE WITNESS: The section that is blown up
12 does not say what you just stated.
13 BY MR. BUCHANAN:
14    Q. Right. Fines. Fines are -- that's money?
15    MS. VANNI: Objection.
16    THE WITNESS: There are monetary fines.
17 BY MR. BUCHANAN:
18    Q. Okay. That's what I thought.
19    All right. Evidence of risk includes both
20 DEA regulations and observations from inspection,
21 right?
22    A. That's what it states.
23    Q. Okay. Then it looks like what happened
24 there with Cardinal caught the eye here now of some
25 executives, right?

Page 692

1    MS. VANNI: Objection.
2    THE WITNESS: It does list Cardinal.
3 BY MR. BUCHANAN:
4    Q. Okay. The death maps didn't catch the
5 executives' attention, huh?
6    MS. VANNI: Objection.
7 BY MR. BUCHANAN:
8    Q. Just the fines?
9    MS. VANNI: Objection.
10 BY MR. BUCHANAN:
11    Q. And suspensions?
12    MS. VANNI: I will note at this point that
13 this recross is going beyond my direct, and I
14 just note my objection for the record. This is
15 supposed to be minute for minute, and we have
16 far exceeded that at this point.
17    MR. BUCHANAN: It's -- it's a 96-minute
18 examination conducted by defense counsel. And I
19 will not use anything close to that.
20    MS. VANNI: I didn't use 96 minutes.
21    MR. BUCHANAN: Oh, it's -- I don't think
22 that's way it works, Counsel.
23    MS. VANNI: Note my objection.
24    THE WITNESS: I'm sorry. Can you repeat
25 the question?

Page 693

1    MR. BUCHANAN: Can you read it back,
2 please.
3    (Whereupon the Court Reporter read the
4 previous question.)
5    MS. VANNI: Objection.
6 BY MR. BUCHANAN:
7    Q. Do you see any reference here, sir, in the
8 evidence of risk, to the death maps and the
9 escalating rate of overdose deaths?
10    MS. VANNI: Objection.
11    THE WITNESS: I do not see in the
12 highlighted area any reference to as you call a
13 death map.
14 BY MR. BUCHANAN:
15    Q. How about just escalating overdose deaths?
16    MS. VANNI: Objection.
17    THE WITNESS: It does not say what you
18 just stated.
19 BY MR. BUCHANAN:
20    Q. How about escalating abuse?
21    MS. VANNI: Objection.
22    THE WITNESS: It does not say that.
23 BY MR. BUCHANAN:
24    Q. Okay. I have some questions, sir, about
25 those suspicious order monitoring SOPS. I had them

Page 694

1  on the screen.
2        MR. BUCHANAN:  You can take that down,
3  Evan.
4  BY MR. BUCHANAN:
5     Q.  And I think counsel for Par walked you
6  through the details of those; you recall that?
7        MR. BUCHANAN:  Can I have 614, please.
8        THE WITNESS:  What document are we
9  referring to again?
10  BY MR. BUCHANAN:
11     Q.  I'm sorry.  Do you remember -- I think
12  it's 32.
13        Do you remember the SOPs that you were
14  involved with after you got to QualiTest?
15     A.  Oh, the SOPS that --
16     Q.  Okay.  I'm not going to show you those,
17  but I remember you discussed those with --
18     A.  Yes.
19     Q.  -- counsel?
20     A.  I do remember the SOPS --
21     Q.  Okay.
22     A.  -- discussing them.
23     Q.  I -- I think you said one of the things
24  you were going to do is you were going to go out and
25  get the suspicious order monitoring programs of your

Page 695

1  customers.  Is that right?
2     A.  That is something that we asked for on the
3  questionnaire, and that is something that I verified
4  during a site visit.
5     Q.  And my understanding of your testimony,
6  sir, was that you wouldn't ship if you didn't have
7  that information, right?  Because you needed
8  confidence that your customers had good SOM programs,
9  right?
10     A.  After we gave the customer a -- a period
11  of time, if they did not provide the information that
12  I had asked for, then the SOP states that we would
13  not ship to that customer.
14     Q.  Right.  Right.  And so how much time did
15  you give them to give you their SOP program?
16     A.  I don't recall.  It could have been on a
17  case-by-case basis.
18     Q.  Okay.
19     A.  I don't -- I don't know if it was spelled
20  out.
21     Q.  So it wouldn't have been appropriate to be
22  shipping to your customers who just were kind of
23  dodging your request on the SO -- the SOM program,
24  would it?
25        MS. VANNI:  Object to form.

Page 696

1        THE WITNESS:  If I asked the customer
2  about their SOMS program, then I needed to know
3  that they had a SOMS program, so I needed
4  something.
5  BY MR. BUCHANAN:
6     Q.  Right.  Okay.  So can we please pass the
7  counsel -- what is this?
8        MR. SEIGEL:  Brantley 44.
9        (Cardinal-Brantley 44 was marked for
10  identification.)
11  BY MR. BUCHANAN:
12     Q.  Sir, this is my last exhibit with you
13  today, unless examining counsel has further questions
14  for you.
15        So this is an update -- this is in 2014,
16  right?  An e-mail from you to Tracey Hernandez?  Look
17  at the cover page.
18     A.  This is an e-mail to Tracey Hernandez.
19     Q.  All right, great.  And you're attaching --
20  the subject is "QualiTest SOM update," attach a
21  PowerPoint.  Right?
22     A.  Yes.
23     Q.  Okay.  And let's go to -- if we could,
24  it's dot 11 in the top right corner, sir.
25        I'm sorry.  Actually we're going to use --

Page 697

1  and this is so, what, about six months after you sent
2  the letters out, that Ms. Hernandez's letter that we
3  saw, that I referenced again from October of 2013?
4     A.  I believe that letter was dated sometime
5  in October --
6     Q.  Right.  And we're --
7     A.  -- 2013.
8     Q.  -- we're now in April, right?
9     A.  This is April of 2014, yes.
10     Q.  All right.  And so let's get to -- where
11  is it?  Nothing is happening quick at this hour.
12        MR. BUCHANAN:  Point 9, Evan.
13        THE WITNESS:  I'm sorry.  What --
14  BY MR. BUCHANAN:
15     Q.  I'm sorry.  I was talking to our trial
16  tech.
17        "Wholesaler chain."  Do you see that?
18     A.  Yes.
19     Q.  Says, "The following customers have not
20  provided SOM information."  Do you see that?
21     A.  Yes.
22     Q.  Ahold, Drogueria Betances, F.W Kerr,
23  Kinney Drugs, Meijer, and Weis Markets.  Right?
24     A.  Yes.
25     Q.  This is six months after your letter went

Highly Confidential – Subject to Further Confidentiality Review

Page 698

1 out with the questionnaire, right?
2     A.  This is --
3         MS. VANNI:  Object to the form.
4         THE WITNESS:  This is after the e-mail was
5     sent from Tracey to --
6 BY MR. BUCHANAN:
7     Q.  Okay.
8     A.  -- to me, was it?  Or was that an e-mail
9 to the customer?  Or was that an e-mail from Tracey
10 to myself?
11     Q.  Well, the letter was addressed to the
12 customer.  You recall seeing that from October 2013?
13     A.  I -- I do.  I just don't recall if that
14 was the e-mail from her to me or her to a customer.
15     Q.  Okay.  So we're now about six months out,
16 and October 2013 letter --
17         MS. VANNI:  Well, I note that this --
18         MR. BUCHANAN:  After six months -- I'm
19     sorry?
20         MS. VANNI:  I just want to note that this
21     document that you're referring to, it's 14.9, if
22     I'm looking at the right one, right?
23         MR. BUCHANAN:  Yes.
24         MS. VANNI:  It's -- has a water mark of
25     2012 QualiTest Pharmaceuticals.

Page 699

1         MR. BUCHANAN:  I'm assuming that's a -- I
2     noted that, Counsel.  I'm assuming that's a
3     production artifact, because the e-mail at the
4     front -- and we -- we can agree that
5     Mr. Brantley was not there in 2012, true?
6         MS. VANNI:  That's correct.
7         MR. BUCHANAN:  Okay.
8 BY MR. BUCHANAN:
9     Q.  And you were forwarding an SOM update,
10 correct?
11     A.  Correct.
12     Q.  Okay.  And this is April 2014, from the
13 covering e-mail, 14.1, right?  From the cover of
14 the -- cover of the PowerPoint.  You see that, sir?
15     A.  Yes, correct.
16     Q.  And sometimes those PowerPoint footnotes
17 can be tough to get rid of.
18         All right.  So let's go forward now, back
19 to 614.9.  And we see F.W. Kerr still hasn't provided
20 you with SOM information, right?
21     A.  According to this -- this slide, yes.
22     Q.  So notwithstanding what was in your 2013
23 SOPs, as of April 2014, you still had customers that
24 had not provided you with SOM information, right?
25         MS. VANNI:  Object to the form.

Page 700

1         THE WITNESS:  According to this
2     PowerPoint, yes.  But I do not know when the
3     questionnaires were sent to the customers.
4     That's why I was asking about that e-mail, was
5     that from Tracey to me or Tracey to a customer.
6     I don't know when the questionnaires were sent
7     to the customer.
8 BY MR. BUCHANAN:
9     Q.  Well, one of the things you were supposed
10 to be doing with that SOP, sir, was knowing your
11 customer, in the first instance, right?
12         MS. VANNI:  Object to the form.
13         THE WITNESS:  That is part of the thing
14     with the SOP was Know Your Customer.
15 BY MR. BUCHANAN:
16     Q.  I think you called out, in examination
17 with counsel for Par and QualiTest, that one of the
18 important things you were looking for was, do they
19 have an SOM program, right?
20     A.  That is correct.
21     Q.  To maintain that closed system, right?
22     A.  As a part of our SOM system, I needed the
23 SOMS information, yes.
24     Q.  Can we agree, sir, that it would not have
25 been compatible with your SOPs to be shipping drug

Page 701

1 to -- drugs to wholesalers who didn't have SOM
2 programs?
3         MS. VANNI:  Object to form.
4 BY MR. BUCHANAN:
5     Q.  Can we agree?
6     A.  Again, I do not know when the
7 questionnaires were sent to the customers.
8     Q.  My question is more fundamental.  It would
9 not have been appropriate, under your SOPs, to be
10 selling drugs to wholesalers and distributors that
11 did not have a suspicious order monitoring program.
12 True?
13         MS. VANNI:  Object to form.
14         THE WITNESS:  It would not have been in
15     accordance with the SOP.
16 BY MR. BUCHANAN:
17     Q.  Okay.  And you all were still shipping to
18 Kerr during this period of time, right?
19         MS. VANNI:  Object to form.
20         THE WITNESS:  This does not state that
21     Kerr did not have a SOM program, just that I did
22     not have information at the time.  And again, I
23     note, I do not know when the questionnaire was
24     sent to Kerr, or any customer.
25

Page 702

BY MR. BUCHANAN:
1   Q.   You were pestering quite a bit to get it
3   from Kerr, weren't you?  Remember that?
4   A.   If I did not --
5        MS. VANNI:  Object to form.
6        THE WITNESS:  If I did not have a
7   questionnaire, I -- I continually asked the
8   customers for the questionnaire.
9   BY MR. BUCHANAN:
10   Q.   Right.  So we can look in the company's
11  order system, you'd agree, sir, and we can see
12  whether or not you were shipping orders to Kerr
13  during this point in time, true?
14   A.   Yes.
15   Q.   And we could look to see in your system,
16  sir, when you actually got SOM program information,
17  right?  You captured that, right?
18   A.   When I got SOM --
19        MS. VANNI:  Object to the form.
20        THE WITNESS:  -- program information from
21  these customers?
22  BY MR. BUCHANAN:
23   Q.   Yeah.
24   A.   It should be in the system somewhere.
25   Q.   Right.  Right, because you wanted to be

Page 703

1   ready in the event you had to actually see the
2   underlying data, right?
3        MS. VANNI:  Objection.
4   BY MR. BUCHANAN:
5   Q.   If somebody asked?
6   A.   I would have filed the information when I
7   received it.
8   Q.   Because you wouldn't want to just have a
9   paper program, with SOPs that looked pretty that
10  weren't really filed -- followed, right?
11        MS. VANNI:  Object to the form.
12        THE WITNESS:  Again, we had SOPs.  I do
13  not know when the questionnaires were sent to
14  the customer.  I don't know -- I do not know how
15  much time had -- had elapsed prior to me
16  providing this PowerPoint.
17  BY MR. BUCHANAN:
18   Q.   Do you remember getting leaned on by the
19  salesfolks about shipping orders to Kerr even though
20  you didn't have information on their SOP program?
21        MS. VANNI:  Object to the form.
22  BY MR. BUCHANAN:
23   Q.   When you were trying to hold it up, sales
24  was leaning on you to release it?  Do you remember
25  that?

Page 704

1        MS. VANNI:  Object to the form.
2        THE WITNESS:  I -- I don't recall specific
3   e-mails or instances with the sales.
4   BY MR. BUCHANAN:
5   Q.   Well, you were still having interactions
6   with sales even after these SOPs, right?
7        MS. VANNI:  Object to the form.
8        THE WITNESS:  I consistently had
9   interactions with sales, yes.
10  BY MR. BUCHANAN:
11   Q.   Right.  And you remember the salesfolks
12  leaning on you, sir, to release Kerr's order even
13  though you didn't have the SOM program for them?  Do
14  you remember that, sir?
15   A.   I do not remember that.
16   Q.   Do you remember identifying that they had
17  several pharmacies, several pharmacies that had been
18  identified as problematic pharmacies that they were
19  selling to?  Do you remember that?
20   A.   I don't remember the specifics --
21   Q.   Do you remember --
22   A.   -- about that.
23   Q.   -- getting leaned on by the sales team to
24  release Kerr orders notwithstanding your SOP?
25        MS. VANNI:  Object to the form.

Page 705

1        THE WITNESS:  Again, I answer just like I
2   did before:  I do not remember that.
3   BY MR. BUCHANAN:
4   Q.   So from your time at QualiTest and Par,
5   sir, could you tell me what systems you'd go and look
6   in to see how many orders you shipped, how many of
7   those oxycodones, how many of those hydrocodones you
8   shipped to Kerr, while they didn't give you any
9   assurance they even had a suspicious order monitoring
10  program?
11        MS. VANNI:  Objection.
12        THE WITNESS:  I would have to look at
13  Kerr's questionnaire to see if they had checked
14  the box, because I asked, "Do you have a
15  suspicious order monitoring program, yes or no?"
16  And they were checked.
17        Then below that, I would ask for an
18  example, either an SOP or a written summary.  So
19  Kerr could have stated they had a program and
20  had not yet provided a sample or SOP of that
21  program, for clarification.
22  BY MR. BUCHANAN:
23   Q.   My question to you, sir, is what systems
24  would you go to look at to see the orders that were
25  shipped to Kerr during this period of time.  The name

Highly Confidential - Subject to Further Confidentiality Review

Page 706

1 of it.
2     A.  All of the data was stored in the -- the
3 SOM tool, the algorithm.
4     Q.  Okay.  And it's a discernible fact in that
5 SOM tool, sir, whether orders were shipped in the
6 presence or absence of due diligence information
7 clearing the customer of red flags, right?
8     MS. VANNI:  Object to the form.
9     THE WITNESS:  No, that -- that SOM system
10     just stored order data.  That -- it was just a
11     repository for order data.  It didn't have
12     anything --
13 BY MR. BUCHANAN:
14     Q.  Where is the due diligence data, sir?
15     A.  That would be in the customer file.
16     Q.  Okay.  And you had a -- I assume that
17 suspicious -- excuse me, the SOM department, or the
18 SOM group, had an area where it kept its information
19 on each of the customers, right?
20     A.  Yes.  I had a folder for each customer,
21 and I believe it was also stored electronically.  But
22 I had a folder in a file cabinet --
23     Q.  Oh, you had a physical folder?
24     A.  I had a physical folder in a file cabinet
25 that stored all the questionnaires.

Page 707

1     Q.  Who did you hand all that stuff off to
2 when you left?
3     A.  When I left, the team that was in place
4 had access to all of my files.  And it -- again, it
5 was also stored electronically.
6     Q.  If you could just give us some names,
7 because that will just help me if I have to follow up
8 on it.
9     A.  Oh.  The members of team were Sherry Price
10 and Amy Cooper.
11     Q.  Okay.  Not Tracey Hernandez?
12     A.  Tracey Hernandez was not there when I
13 left.
14     Q.  She had left?
15     A.  She had left previously, yes.
16     Q.  Okay.  I don't have any further questions.
17 Thank you.
18     VIDEOGRAPHER:  Go off record?
19     MR. BUCHANAN:  Off the record.
20     VIDEOGRAPHER:  We're going off record.
21 The time is 9:35.
22     MR. PYSER:  Nothing further.
23     MS. VANNI:  Nothing further for me.
24     MR. BUCHANAN:  Thank you, sir.
25     Let's stay on the stenographic record and

Page 708

1 conclude the deposition.
2     MR. PYSER:  I have one request on the
3 record:  Any document or video or any
4 demonstrative that was used during the day, I'd
5 like to be marked as an exhibit, included in the
6 record, so that both defense counsel and
7 Plaintiffs' counsel have access to it.
8     MR. BUCHANAN:  Just so we're clear, I
9 believe demonstratives that were used by
10 Plaintiffs' counsel were all shown and burned
11 into -- they're preserved permanently in the
12 video record.  So you'll have a copy --
13     MR. PYSER:  As long as there is a record
14 of it.
15     MR. BUCHANAN:  They are preserved in the
16 video record.  Drawings, handwriting,
17 professional stuff is all burned into the video
18 feed.  So you will have that.
19     MR. PYSER:  Okay.  Thank you.
20     MR. BUCHANAN:  That concludes the
21 deposition.  Defense counsel has indicated no
22 further questions.  Everyone's got their
23 reservations.
24     And thank you, sir, for your time.  We
25 appreciate it.

Page 709

1     (The deposition was concluded
2     at 9:37 p.m.)
3     (Signature reserved.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 710

1  STATE OF NORTH CAROLINA
2  COUNTY OF MECKLENBURG
3
4  　　　I, Karen K. Kidwell, RMR, CRR, CLR, in and
5  for the State of North Carolina, do hereby certify that
6  there came before me on Tuesday, November 27, 2018,
7  ERIC BRANTLEY, who was by me duly sworn to testify to
8  the truth and nothing but the truth of his knowledge
9  concerning the matters in controversy in this cause;
10 that the witness was thereupon examined under oath, the
11 examination reduced to typewriting under my direction,
12 and the deposition is a true record of the testimony
13 given by the witness.
14 　　　I further certify that I am neither attorney
15 or counsel for, nor related to or employed by, any
16 attorney or counsel employed by the parties hereto or
17 financially interested in the action.
18 　　　This the 29th day of November, 2018.
19
20
21 　　　_____
22 　　　Karen K. Kidwell, RMR, CRR, CLR
23 　　　Notary Public #19971050142
24
25

Page 712

1  　　　E R R A T A
2  　VIDEOTAPED DEPOSITION OF ERIC BRANTLEY
3  PAGE  LINE　　CHANGE
4  ____  ____  _____
5  REASON:　_____
6  ____  ____  _____
7  REASON:　_____
8  ____  ____  _____
9  REASON:　_____
10 ____  ____  _____
11 REASON:　_____
12 ____  ____  _____
13 REASON:　_____
14 ____  ____  _____
15 REASON:　_____
16 ____  ____  _____
17 REASON:　_____
18 ____  ____  _____
19 REASON:　_____
20 ____  ____  _____
21 REASON:　_____
22 ____  ____  _____
23 REASON:　_____
24 　　　_____
25 (DATE)　　　　(SIGNATURE)

Page 711

1  ACKNOWLEDGMENT OF DEPONENT
2
3  　　　I, ERIC BRANTLEY, do hereby certify that I
4  have read the foregoing pages and that the same is a
5  correct transcription of the answers given by me to
6  the questions therein propounded, except for the
7  corrections or changes in form or substance, if any,
8  noted in the attached Errata Sheets.
9
10
11 　　_____
　　　ERIC BRANTLEY　　　Date
12
13
14
15 　　Subscribed and sworn to before me this ____ day
16 of_____, 20____.
17
18
19 　　_____
　　　Notary Public
20 My Commission Expires:
21
22
23
24
25

Page 713

1  _____
2  LAWYER'S NOTES
3  _____
4  PAGE  LINE　_____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25 ____  ____  _____