```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5    ----------------------------)

 6    IN RE:  NATIONAL PRESCRIPTION )

 7    OPIATE LITIGATION            ) Case No. 1:17-MD-2804

 8    ----------------------------) Hon. Dan A. Polster

 9    APPLIES TO ALL CASES         )

10    ----------------------------)

11

12                  HIGHLY CONFIDENTIAL

13         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14

15            The videotaped deposition of EDWARD

16    BRATTON, called for examination, taken pursuant to the

17    Federal Rules of Civil Procedure of the United States

18    District Courts pertaining to the taking of

19    depositions, taken before JULIANA F. ZAJICEK, a

20    Registered Professional Reporter and a Certified

21    Shorthand Reporter, at Bartlit Beck Herman Palenchar &

22    Scott, LLP, Suite 400, 54 West Hubbard Street,

23    Chicago, Illinois, on November 30, 2018, at 9:05 a.m.

24
```

## Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3      LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY & PROCTOR P.A.
4      316 South Baylen Street, Suite 600
       Pensacola, Florida 32502
5      205-396-3982
       BY:  PETER MOUGEY, ESQ.
6          pmougey@levinlaw.com
7  NAPOLI SHKOLNIK, PLLC
       360 Lexington Avenue, 11th Floor
8      New York, New York 10017
       212-397-1000
9      BY:  HUNTER J. SHKOLNIK, ESQ.
           hunter@napolilaw.com
10
11  ON BEHALF OF WALGREEN CO.:
12      BARTLIT BECK LLP
        54 West Hubbard Street, Suite 300
13      Chicago, Illinois 60654
        312-494-4400
14      BY:  PETER B. BENSINGER, JR., ESQ.
            peter.bensinger@bartlit-beck.com;
15          HAMILTON H. HILL, ESQ.
            hamilton.hill@bartlit-beck.com;
16          KATHERINE M. SWIFT, ESQ.
            kate.swift@bartlit-beck.com
17
18  ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
    AMERISOURCEBERGEN DRUG CORPORATION:
19
        REED SMITH LLP
20      Reed Smith Centre
        225 Fifth Avenue
21      Pittsburgh, Pennsylvania 15222
        412-288-3367
22      BY:  BRIAN T. HIMMEL, ESQ.
            bhimmel@reedsmith.com
23
24

## Page 3

1  APPEARANCES: (Continued)
2  ON BEHALF OF RITE AID CORPORATION (CUYAHOGA) and RITE
   AID OF MARYLAND, INC. D/B/A RITE-AID MID ATLANTIC
3  CUSTOMER SUPPORT CENTER INC.:
4      MORGAN LEWIS & BOCKIUS LLP
       77 West Wacker Drive
5      Chicago, Illinois 60601-5094
       312-324-1773
6      BY:  SCOTT T. SCHUTTE, ESQ.
           scott.schutte@morganlewis.com
7
8  ON BEHALF OF CARDINAL HEALTH, INC.:
9      WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
10     Washington, D.C. 20005
       202-434-5000
11     BY:  JULI ANN LUND, ESQ.
           jlund@wc.com
12
13  ON BEHALF OF PRESCRIPTION SUPPLY, INC.:
14      PELINI CAMPBELL & WILLIAMS LLC
        8040 Cleveland Avenue NW, Suite 400
15      North Canton, Ohio 44720
        330-305-6400
16      BY:  KRISTEN E. CAMPBELL TRAUB, ESQ. (Telephonically)
            kec@pelini-law.com
17
18  ON BEHALF OF McKESSON CORPORATION:
19      COVINGTON & BURLING, LLP
        3000 El Camino Real
20      5 Palo Alto Square, 10th Floor
        Palo Alto, California 94306-2112
21      650-632-4739
        BY:  DEVON MOBLEY-RITTER, ESQ. (Telephonically)
22          dmobleyritter@cov.com
23
24

## Page 4

1  APPEARANCES: (Continued)
2  ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
   PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
3  INC.:
4      ARNOLD & PORTER KAYE SCHOLER LLP
       777 South Figueroa Street, 44th Floor
5      Los Angeles, California 90017-5844
       213-243-4238
6      BY:  ERIC SHAPLAND, ESQ. (Telephonically)
           eric.shapland@arnoldporter.com
7
8  ON BEHALF OF DISCOUNT DRUG MART, INC.:
9      CAVITCH, FAMILO & DURKIN CO., LPA
       1300 East Ninth Street, 20th Floor
10     Cleveland, Ohio 44114
       216-621-7860
11     BY:  L. WILLIAM ERB, ESQ. (Telephonically)
           lwerb@cavitch.com
12
13  ON BEHALF OF WALMART INC.:
14      JONES DAY
        77 West Wacker Drive
15      Chicago, Illinois 60601-1692
        312-269-4164
16      BY:  PATRICK J. BEISELL, ESQ.
            pbeisell@jonesday.com
17
18  ON BEHALF OF HBC SERVICES:
19      MARCUS & SHAPIRA LLP
        One Oxford Centre, 35th Floor
20      Pittsburgh, Pennsylvania 15219
        412-471-3490
        BY:  ROBERT M. BARNES, ESQ.
21          rbarnes@marcus-shapira.com
22
23
24

## Page 5

1  ALSO PRESENT:
2      MS. JODI KLOCKENGA,
3          Napoli Shkolnik, PLLC;
4      MS. KAROLYNN SCHNEEGAS,
5          Levin Papantonio Thomas Mitchell
6          Rafferty & Proctor P.A.;
7      MR. COREY SMITH,
8          Trial Technician
9
10
11  THE VIDEOGRAPHER:
12      MR. STEPHAN HOOG,
13          Golkow Litigation Services.
14
15
16
17
18
19
20  REPORTED BY:  JULIANA F. ZAJICEK, C.S.R. NO. 84-2604.
21
22
23
24

Page 6

          I N D E X

WITNESS:                    PAGE:

EDWARD BRATTON

     EXAM BY MR. MOUGEY.................    9


               *****


          E X H I B I T S

WALGREENS-BRATTON EXHIBIT        MARKED FOR ID

No. 001  LinkedIn profile; P-WAG-1648      12

No. 002  21 C.F.R. Section 1301.74 (b);    37
         P-GEN-0041

No. 003  Defendants Walgreen Co. And       81
         Walgreen Eastern Co.'s Amended
         Objections and Responses to
         Plaintiffs' First Set of
         Interrogatories

No. 004  E-mail from Hugh Morrow to        145
         District53rx@walgreens.con,
         2/17/12, Subject: DEA Conference,
         w/attachment; P-WAG-1257,
         P-WAG-1257.001 and P-WAG-1257.002
          E X H I B I T S (Continued)

Page 7

WALGREENS-BRATTON EXHIBIT        MARKED FOR ID

No. 005  PowerPoint - Drug Trends          161
         Indianapolis, Indiana, December
         2012; P-WAG-1258

No. 006  E-mail chain, top one from Bratton  177
         to Patel, 8/19/13, Subject: Re:
         Controlled Substance Order
         Quantity Override Form; P-WAG-1146

No. 007  Settlement and Memorandum of      181
         Agreement between the US DOJ, US
         DEA and Walgreens, w/exhibits
         attached; P-WAG-0001-A and
         P-WAG-0001

No. 008  E-mail chain, top one from        222
         Daugherty to Kroeger, among
         others, 4/23/18, Subject: RE:
         Opioid Task Force Agenda 4/23,
         w/attachment; P-WAG-1172,
         WAGMDL00035669 - 683

No. 009  E-mail chain, top one from Bratton  231
         to Polster, 4/4/13, Subject: Re:
         Thought from the Project Forest
         meetings; P-WAG-1125

Page 8

          E X H I B I T S (Continued)

WALGREENS-BRATTON EXHIBIT        MARKED FOR ID

No. 010  E-mail from Bratton to Tisdell,    241
         7/3/13, Subject: PowerPoint for
         this mornings meeting, Attachment:
         Southern Operation
         2013-07-03.pptx; WAGMDL00021351 -
         361

No. 011  order from Judge Polster in the    248
         Federal Court of the Northern
         District of Ohio

No. 012  E-mail chain, top one from Tasha    297
         Polster to Bratton, among others,
         3/6/13, Subject: Red Flag to
         consider in the responses;
         WAGMDL00237599 - 605

No. 013  E-mail from Bratton to Gordon,      345
         5/2/13, Subject: CDC Data Project;
         WAGMDL00030705

No. 014  E-mail chain, top one from Bratton  349
         to Tasha Polster, 10/25/13,
         Subject: Re: Need a written status
         by noon Monday, w/attachments;
         WAGMDL00286665 - 684

Page 9

1    THE VIDEOGRAPHER:  We are now on the record.  My
2  name is Stephan Hoog.  I am the videographer for
3  Golkow Litigation Services.
4        Today's date is November 30th, 2018.  The
5  time is 9:05 a.m. as indicated on the video screen.
6        This video deposition is being held in
7  Chicago, Illinois In the Matter of National
8  Prescription Opiate Litigation, MDL No. 2804.  The
9  deponent is Edward Bratton.
10        All counsel will be noted on the
11  stenographic record.
12        The court reporter is Juliana Zajicek.
13        Will you please swear in the witness.
14        (WHEREUPON, the witness was duly
15        sworn.)
16    THE VIDEOGRAPHER:  Please proceed.
17        EDWARD BRATTON,
18  called as a witness herein, having been first duly
19  sworn, was examined and testified as follows:
20        EXAMINATION
21  BY MR. MOUGEY:
22    Q.  Good morning.  My name is Peter Mougey.  I
23  represent the Plaintiffs in this case.
24        Have -- have you ever been deposed before?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.   Once.

2    Q.   Once?

3    MR. HILL:  Just one second, are the monitors

4  supposed to be showing a feed or is this all --

5        (WHEREUPON, there was a short

6         interruption.)

7    THE VIDEOGRAPHER:  Go off the record at

8  9:06 a.m.

9        (WHEREUPON, discussion was had off the

10        record.)

11    THE VIDEOGRAPHER:  We are back on the record at

12  9:11 a.m.

13  BY MR. MOUGEY:

14    Q.   Mr. Bratton, you were describing to me

15  that you had been deposed one time before.

16        What other case was that that you were

17  deposed in?

18    A.   It was in a CID, not a case.

19    Q.   Okay.  And which -- which state AG?

20    A.   Mult- -- I -- I don't recall.  It was

21  multiple, unrelated to this matter.

22    Q.   You don't recall which states even?

23    A.   There was a number of.

24    Q.   You don't recall any of them?

Page 11

1    A.   New York, federal -- well, I was deposed

2  by the federal prosecutor from New York Southern

3  District.

4    Q.   Okay.  Any other states other than

5  New York that you recall?

6    A.   There were other states' lawyers on the

7  phone, but I don't recall which states.

8    Q.   And do you have a recollection of -- of

9  whether or not the CID ultimately resulted in a formal

10  complaint?

11    A.   I -- it has not at this point.

12    Q.   And do you re -- understand if there is

13  any proceeding found by any of the state AGs in the

14  investigation where your -- your confidential

15  statement was taken?

16    A.   Not that I'm aware of.

17    Q.   And do you have an understanding of what

18  the subject matter of that investigation was?

19    A.   Yes.

20    Q.   And -- and what is that?

21    MR. HILL:  And -- and Mr. Bratton, you can

22  answer his question.  I just caution you not to reveal

23  any attorney/client privileged communication you might

24  have had relating to this.

Page 12

1  BY THE WITNESS:

2    A.   Insulin prescription billing.

3  BY MR. MOUGEY:

4    Q.   Okay.  And when was the -- the date of

5  your statement?

6    A.   I don't recall the exact date.

7    Q.   And have -- do you have an understanding

8  generally of what year it was in or month?

9    A.   I think it was the end of last year, but I

10  don't recall the date.

11    Q.   And you've been at Walgreens since 2008,

12  correct, sir?

13    A.   I believe so.

14    Q.   And I'm going to hand you what we'll mark

15  as Bratton 1.

16        (WHEREUPON, a certain document was

17         marked Walgreens-Bratton Deposition

18         Exhibit No. 001, for identification,

19         as of 11/30/2018.)

20  BY MR. MOUGEY:

21    Q.   And that's your name on top of this

22  document, correct, sir?

23    A.   Yes.

24    Q.   And does -- you recognize this as your

Page 13

1  LinkedIn profile?

2    A.   Yes.

3    Q.   And the information that was entered into

4  your LinkedIn profile you entered in, correct, sir?

5    A.   Yes.

6    Q.   And have you had an opportunity to review

7  this in preparation for today?

8    A.   I did look at it, yes.

9    Q.   And is the information contained on

10  Branton 1 -- Bratton 1, excuse me, accurate?

11    A.   Yes.

12    Q.   Was -- at any point in time has anyone

13  directed you to remove any information from your

14  LinkedIn profile?

15    A.   No.

16    Q.   At any point in time have you changed or

17  altered the information put into your LinkedIn profile

18  since the inception of this litigation?

19    MR. HILL:  Object to the form.

20  BY MR. MOUGEY:

21    Q.   I'm sorry?

22    A.   No.

23    Q.   All right.  And is there a reason why you

24  don't give any description or department starting at

Page 14

1 the bottom of your LinkedIn profile under Quality
2 Analyst?
3     A.   I am not really a big user of LinkedIn and
4 so I just don't -- I haven't put much on there.
5     Q.   Do you have a CV or resume independent of
6 your LinkedIn profile?
7     A.   Yes.
8     Q.   Is there -- did you give it to counsel,
9 did counsel ask you for your -- your resume or your CV
10 in preparation for today?
11     MR. HILL:  An objection to -- to whether counsel
12 asked him for something.
13         You can answer whether you remember if you
14 provided the CV to counsel.
15 BY THE WITNESS:
16     A.   I don't recall providing it.
17 BY MR. MOUGEY:
18     Q.   So is your resume or CV at Walgreens, the
19 information different than what's on your LinkedIn
20 profile?
21     A.   Probably, yes.
22     Q.   Is it -- is there more detail under your
23 quality analyst than is on your LinkedIn profile?
24     A.   Yes.

Page 15

1     Q.   Is it in a readily accessible place?
2     A.   Yes.
3     Q.   Could you have somebody at the office pull
4 your CV or resume and e-mail it to counsel this
5 morning?
6     A.   No.  It's on my laptop at home.
7     Q.   Is there anyone at your house this morning
8 that --
9     A.   No.
10     Q.   -- that could pull your -- your CV?
11     A.   No.
12     MR. HILL:  Objection to form.
13 BY MR. MOUGEY:
14     Q.   Is there a reason why you didn't provide a
15 detailed CV to counsel?
16     MR. HILL:  Object to form.
17 BY THE WITNESS:
18     A.   I wasn't --
19 BY MR. MOUGEY:
20     Q.   Is there a reason why we were directed to
21 use these LinkedIn CVs that are -- so how much more
22 detail is on your -- your regular CV under quality
23 analyst that's on this LinkedIn profile that you don't
24 use?

Page 16

1     A.   It --
2     MR. HILL:  Object to the form.
3 BY THE WITNESS:
4     A.   It discusses my time and -- as a quality
5 analytic supervisor and a quality analyst.
6 BY MR. MOUGEY:
7     Q.   What -- what -- does it provide the
8 department under a quality analyst?
9     A.   Walgreens quality.
10     Q.   That's the department, Walgreens quality
11 is the department?
12     A.   I believe now it's called Walgreens
13 pharmacovigilance, but at that time it was called
14 quality.
15     Q.   Does your C -- resume on your home
16 computer have a -- a description of what your job
17 entailed as a quality analyst?
18     MR. HILL:  Objection to the form.
19 BY THE WITNESS:
20     A.   It's on --
21     MR. HILL:  Go ahead.
22 BY THE WITNESS:
23     A.   It's on my work computer, but it's at my
24 home.

Page 17

1 BY MR. MOUGEY:
2     Q.   And does it -- wherever it is, does your
3 resume have a detailed description under your role as
4 a quality analyst?
5     A.   It relates the accomplishments and
6 milestones that I had in that role.  I don't know that
7 it contains the roles and responsibilities.
8     Q.   What quality -- I'm sorry.
9         What accomplishments and milestones do you
10 have listed on your resume that are not on your
11 LinkedIn profile?
12     A.   I don't recall.
13     Q.   You don't recall anything at -- even
14 generally?
15     A.   No.  I -- we set up quality measurement
16 systems for central pharmacy operations is probably on
17 there.
18     Q.   And the department that you had, did
19 you -- you did list the department that you worked for
20 or the group?
21     A.   I don't recall.
22     Q.   So in addition to your milestones and
23 accomplishment under quality analyst, what other
24 information would be provided on your CV?

Page 18

1    A.  Probably about training and developing my
2  employees or, you know, projects, some of the projects
3  that I would be able to share.
4    Q.  The same answer for your role as a quality
5  and analytic supervisor from 2010 to February of 2013?
6    A.  Correct.
7    Q.  Would have provided additional information
8  under your resume than what you have in your LinkedIn
9  profile?
10   A.  Correct.
11   Q.  When is the last time that you went on
12  LinkedIn, just generally, general memory?
13   A.  Not frequently.
14   Q.  Two years ago?
15   A.  Probably less than that.
16   Q.  Less than that.
17       Within the last couple of years?
18   A.  At some point.
19   Q.  How often do you go on LinkedIn?
20   A.  Not very often.
21   Q.  How often do you update information on
22  LinkedIn?
23   A.  Not very often.
24   Q.  All right.  So let's go back down to --

Page 19

1    MR. MOUGEY:  Just for the record, we -- we've
2  asked for your resume, we asked for your CVs, and we
3  were told that we would have the same information on
4  LinkedIn that was -- and we were directed to pull it
5  off of LinkedIn from the beginning.
6        This is just another example in a long
7  line of pattern of us asking for information and
8  getting some de minimis amount of information when
9  there is documents readily available that could have
10 been asked of the witness to provide that are routine
11 and ordinary course that you produce.
12   MR. HILL:  What document request was that?
13   MR. MOUGEY:  Sitting here I don't recall, but
14 I -- I am a hundred percent positive Ms. Swift
15 referred us to LinkedIn profiles, that all of the
16 information we needed was there, and his is just
17 another example of an entry with no information dating
18 all of the way back to 2008.
19       So before Mr. Bratton's 30(b)(6), we would
20 appreciate his CV that he has on his work computer.
21   MR. HILL:  Yeah, we -- we just disagree with
22 your characterization --
23   MR. MOUGEY:  I'm sure you do.
24   MR. HILL:  Can I finish?  I let you talk.

Page 20

1        We disagree with your characterization.
2  We'd love it if you could send us the document request
3  number and we'll take a look at it.  And why don't you
4  just ask him what he does.  That might be easier.
5    MR. MOUGEY:  Well, it might be easier for
6  preparation if we had a regular resume.  That would
7  be -- that's routine and ordinary in any litigation
8  that you get the resumes --
9    MR. HILL:  Send us the document request.
10   MR. MOUGEY:  -- instead of referring us to a --
11 yeah.
12       Because you -- I'm going to read into the
13 record on an e-mail -- go back to the top, would --
14 thank you.  Good catch.
15   MR. HILL:  It's an e-mail?
16   MR. MOUGEY:  On October 11th --
17   MR. HILL:  It's an e-mail?
18   MR. MOUGEY:  -- October 11th from Ms. Swift to
19 Jeff Gaddy in our office, at the bottom of the second
20 paragraph, the -- the --
21       For purpose of function managers in
22 Perrysburg, Ohio, we've previously told you there were
23 two C-II function managers, asked about the e-mail,
24 and said the kind of information you were looking for

Page 21

1  is also commonly available publicly on sites liked
2  LinkedIn, which is the -- kind of the routine that
3  we've been told to go look at LinkedIn for CVs and
4  everything else.
5    MS. SWIFT:  Peter, this is Kate Swift for
6  Walgreens.  The e-mail that you just read has nothing
7  to do with the document request.  Plaintiffs have
8  never requested CVs in this case in a document request
9  that I am aware of.  If you can identify a document
10 request, we are happy to look into it.
11   MR. MOUGEY:  We've asked for --
12   MR. HILL:  What does this have to do with
13 Mr. Bratton?
14   MR. MOUGEY:  We have -- we have asked -- we have
15 asked so many times for wit -- witnesses that know
16 something about something, and as of right now we have
17 been given a parade of witnesses.
18       Kate, you've told us 50 times that
19 pharmaceutical integrity was all we are going to need
20 and that pharmaceutical -- if you go back and look at
21 the interrogatories verified by Mr. Bratton, they are
22 filled with pharmaceutical integrity response --
23 answers, and pharmaceutical integrity and
24 pharmaceutical integrity, yet no one knows anything

Page 22

1  prior to 2013.
2       And having real CVs would have made a -- a
3  huge difference in figuring out what custodians and
4  what witnesses -- since you didn't have any org
5  charts, this would have been a tool to help figure out
6  where -- what to use.
7  BY MR. MOUGEY:
8     Q.   So let's start at the -- the -- the
9  quality analyst that's blank other than the date.
10     MR. HILL:  We disagree with that
11  characterization, but we are happy to take this off
12  line.  And why don't we ask the witness some
13  questions.
14     MR. MOUGEY:  I appreciate your direction, but
15  why don't you give us the documents we need to prepare
16  for these depositions rather than blank entries with
17  timing and pointing us to publicly available sites
18  when there is a resume sitting on this man's work
19  desktop.  I would --
20     MR. HILL:  Why didn't you ask for it?
21     MS. SWIFT:  You didn't ask for it.
22     MR. HILL:  Why didn't you ask for it?
23     MR. MOUGEY:  We've asked for it on numerous
24  times.  Quality analyst --

Page 23

1     MR. HILL:  You didn't ask for it, sir.
2     MR. MOUGEY:  2008 --
3     MR. HILL:  You ask us for things and we give
4  them to you.  That's how this works.
5     MR. MOUGEY:  Yes, that's -- that's exactly how
6  this works.  This is just another example.
7  BY MR. MOUGEY:
8     Q.   Quality analyst, 2008 to August of 2010.
9  You see that in front of you in Bratton 1, correct,
10  sir?
11     A.   Yes.
12     Q.   It is blank as far as a job description,
13  correct, sir?
14     A.   Correct.
15     Q.   There is absolutely zero information under
16  Quality Analyst other than the date, correct, sir?
17     A.   Correct.
18     Q.   It doesn't include any job description
19  under Quality Analyst under your LinkedIn information,
20  correct, sir?
21     A.   Correct.
22     Q.   It doesn't give any scope of your
23  responsibilities, correct, sir?
24     A.   Correct.

Page 24

1     Q.   It doesn't give you the department that
2  you work in, correct, sir?
3     A.   Correct.
4     Q.   It is devoid of any information to help
5  one figure out what you do at -- at Walgreens from
6  2008 to August of 2010 other than the words "quality
7  analyst," correct, sir?
8     MR. HILL:  Object to the form.
9  BY THE WITNESS:
10     A.   It does say "quality analyst."
11  BY MR. MOUGEY:
12     Q.   That's it.  Other than that, it tells us
13  absolutely nothing, correct?
14     MR. HILL:  Object to the form.
15  BY THE WITNESS:
16     A.   Correct.
17  BY MR. MOUGEY:
18     Q.   Quality analyst could mean just about
19  anything in a wide various number of issues at -- at
20  Walgreens, correct, sir?
21     MR. HILL:  Object to the form.
22  BY THE WITNESS:
23     A.   I don't know.
24  BY MR. MOUGEY:

Page 25

1     Q.   You could be the quality analyst of
2  checking for how the refreshments are going in the
3  cooler section, correct, sir?
4     MR. HILL:  Object to the form.
5  BY THE WITNESS:
6     A.   It doesn't specify the roles.
7  BY MR. MOUGEY:
8     Q.   You -- you could be -- you could be the
9  quality analyst for identifying where Walgreens stores
10  are placed to get the maximum amount of traffic,
11  correct, sir?
12     MR. HILL:  Object to the form.
13  BY THE WITNESS:
14     A.   I don't know.
15  BY MR. MOUGEY:
16     Q.   It doesn't -- it doesn't tell us anything,
17  does it?
18     A.   I don't know.
19     Q.   So does it tell you anything other than
20  quality analyst if you were looking at this?
21     A.   No.
22     Q.   All right.  So let's -- what is a quality
23  analyst in your -- in your mind, sir, what is a
24  quality analyst?

Page 26

1    A.   So at this time I was responsible for
2    analyzing patient safety errors as it related to our
3    central pharmacy operations along with some other --
4    when we received complaints from stores or complaints
5    from customers about their experience at Walgreens.
6    Q.   Sir, do you go to meetings and group
7    meetings while you are in your -- any of your roles at
8    Walgreens?
9    A.   Yes.
10   Q.   And before you go to the meetings, do you
11   prepare for those meetings?
12   A.   Sometimes.
13   Q.   Do you review material often before you go
14   into those meetings?
15   A.   Sometimes.
16   Q.   And it's good to be prepared, right?
17   A.   Yes.
18   Q.   And you might gather some information to
19   go and prepare for those and -- and that's been vital
20   for your success moving up the food chain at
21   Walgreens, correct?
22   A.   It's helpful.
23   MR. HILL:  Object to the form.
24   BY THE WITNESS:

Page 27

1    A.   It's helpful.
2    BY MR. MOUGEY:
3    Q.   Yes, sir.
4        So other than analyzing patient safety
5    errors, what other roles did you have as a quality
6    analyst?
7    A.   As I mentioned, we would look into
8    complaints from both stores and patients, sometimes
9    special projects related to how we were delivering
10   services from the central pharmacy operations.
11   Q.   When you refer to complaints from stores
12   or complaints from customers, what -- what are you
13   referring to?
14   A.   We might receive complaints that a
15   store -- in that process we would have pharmacists
16   reviewing prescriptions for accuracy and technicians
17   typing those prescriptions and the store -- sometimes
18   the pharmacist would be unable to review the
19   prescription completely and so they would return it to
20   the store for the store pharmacist to review because
21   perhaps the image wasn't clear or they didn't have
22   access to all of the information that they needed and
23   the store would complain that, you know, they are very
24   busy and they should verify it more quickly and they

Page 28

1    didn't like it being pushed back -- pushed back to the
2    store to complete that work, or a customer might
3    complain that they were on hold on the phone too long
4    or they waited in the Drive-Thru too long or that they
5    weren't addressed in a manner that they liked in a
6    phone call or that the person wasn't able to help them
7    or other -- other customer service-type issues.
8    Q.   Did -- did you receive calls from a --
9    kind of a 1-800 number where people would complain
10   they sat in the drive-through too long?
11   A.   We would receive executive complaints, so
12   that's when somebody calls, like, 1-800 Walgreens and
13   it goes through the CEO's office or we would receive
14   sale complaints and those are complaints that the
15   stores -- customer would relate to the store staff and
16   the store staff would relate to us.
17   Q.   So a customer would call in and complain
18   about the line and -- and that would be part of your
19   job responsibility from 2008 to August of 2010 was to
20   answer those complaints?
21   A.   We might look into what in the process was
22   causing a delay and is there a way that we could avoid
23   those types of issues for customers in stores.
24   Q.   So quality analyst encompasses the

Page 29

1    customer's experience as a purchaser at Walgreens?
2    A.   Partially, yeah.
3    Q.   And quality analyst includes store
4    complaints from pharmacists about what's taking so
5    long about a certain prescription or something
6    arriving?
7    A.   Correct.
8    Q.   And you mentioned patient safety errors.
9        Could you explain to me a little more
10   detail what that means?
11   A.   There could be times when a patient comes
12   to pick up a prescription and they have the same last
13   name as another patient and they are given the
14   incorrect prescription or they -- the pharmacist
15   incorrectly verified the doctor's handwriting and they
16   are supposed to take it twice a day and they put three
17   times a day or -- or something like that.
18   Q.   Do you understand what the word
19   "diversion" means in the context of controlled
20   substances?
21   MR. HILL:  Object to the form.
22   BY THE WITNESS:
23   A.   I've heard it used many times.  I -- I
24   heard it used a lot of different ways, but...

Page 30

BY MR. MOUGEY:

1   Q.   So -- so the answer is yes, you do -- you
3   do understand what the word "diversion" means in the
4   context of controlled substances?
5        MR. HILL:  Same objection.
6   BY THE WITNESS:
7        A.   I believe I do.
8   BY MR. MOUGEY:
9        Q.   And what is your understanding of what
10  diversion means in the context of controlled
11  substances?
12       A.   A taking of drugs and moving them to a
13  purpose other than is legitimate.
14       Q.   When you say "taking" what do you -- "of
15  drugs," what do you -- what do you mean?
16       A.   It could be the theft from a Walgreens
17  location, it could be a patient selling their product
18  to another person, it could be the improper disposal.
19       Q.   Did your role as a quality analyst from
20  2008 to August of 2010 have any responsibilities for
21  diversion in -- of controlled substances in whatever
22  definition you are applying?
23       A.   Divert --
24       MR. HILL:  Object to the form.

Page 31

1   BY THE WITNESS:
2        A.   Diversion was not part of my roles and
3   responsibilities.
4   BY MR. MOUGEY:
5        Q.   As a quality analyst or --
6        A.   As a --
7        Q.   -- or ever?
8        A.   As a -- as a quality analyst.
9        Q.   All right.
10            Was diversion as you understand it with
11  controlled substances part of your job as a quality
12  and analytics supervisor?
13       A.   It was not part of my roles and
14  responsibilities.
15       Q.   So up until February of 2013 from the date
16  you started at Walgreens in 2008, zero percent of your
17  job responsibility included anything to do with
18  diversion of controlled substances?
19       MR. HILL:  Object to form.
20  BY THE WITNESS:
21       A.   There was one incident where we were asked
22  to look -- one of the -- the things that we were
23  responsible for was measuring the accuracy of our
24  accounting equipment in our -- so we had a central

Page 32

1   facility that dispensed prescriptions to stores or
2   mail-order clients, and they asked us to look at the
3   dispensing accuracy, sometimes the machines would
4   under or over count, and they asked us to look into a
5   shortage of tablets once and if the machines were
6   related to that shortage.
7   BY MR. MOUGEY:
8        Q.   And that's the only example you can think
9   of?
10       A.   Correct.
11       Q.   Well, how did your role change in 2010
12  with the title of quality and analytic supervisor?
13       A.   Previous to that I was an individual
14  contributor and after that I was managing a team of
15  about seven individuals.
16       Q.   But in the same scope of responsibilities,
17  correct?
18       A.   Similar, yes.
19       Q.   When you say "similar," what was the
20  difference?
21       A.   I was not responsible for the individual
22  contributors under me.  There was less involvement
23  with the call center component at that time, so less
24  of the -- they waited too long on hold or the person

Page 33

1   they talked to on the phone-type stuff.
2        Q.   Okay.  But other than that, very similar
3   scope of responsibilities that you had as a quality
4   analyst other than the fact that you were manage --
5   managing people?
6        A.   Correct.
7        Q.   February '13 your role changed as a
8   manager of pharmaceutical integrity, correct, sir?
9        A.   Correct.
10       Q.   And -- and, sir, you were in charge of the
11  southern region, correct?
12       A.   Correct.
13       Q.   And --
14       A.   Well, I was responsible with regard to Rx
15  integrity.  There is business operators that are
16  responsible for that operation in general, but...
17       Q.   When you say "business operators that are
18  responsible for that operation in general," what do
19  you mean?
20       A.   We have a Co-VP that's responsible for
21  each operation and then various field leadership
22  individuals that actually run the stores under --
23  under those operations.
24       Q.   Okay.  Let's come back to that.

Page 34

1    You have your biology undergrad, correct,
2  in 2007 you finished from St. Petersburg College,
3  correct?
4    A.   Correct.
5    Q.   And you began working as a certified
6  pharmacy tech that same year, right?
7    A.   Correct.
8    Q.   And then you moved onto the quality
9  supervisor as central pharmy op -- pharmacy operations
10  in Orlando, correct?
11    A.   Correct.
12    Q.   When did you move to the Chicago area?
13    A.   In around March 2013.
14    Q.   Oh, so consistent with this -- your role
15  in pharmaceutical integrity, you moved from Florida to
16  the Chicago area?
17    A.   Correct.
18    Q.   And was that a job-related move?
19    A.   Yes.
20    Q.   And that was -- would you consider that to
21  have been a promotion to manager of pharmaceutical
22  integrity?
23    A.   Yes.
24    Q.   And you've remained in pharmaceutical

Page 35

1  integrity from February of '13 unto the present time,
2  correct, sir?
3    A.   Correct.
4    Q.   And would you describe your role of
5  responsibilities as manager of pharmaceutical
6  integrity, it says "southern operation" on your
7  LinkedIn?
8    A.   So I will -- so the -- in addition to the
9  things listed here or -- or just as what I would
10  characterize it as?
11    Q.   Just what you believe your job was -- what
12  you believe your job was -- is in pharmaceutical
13  integrity.
14    A.   So, we would -- so I have two analysts
15  that report to me.  I would advise or -- or become
16  involved with issues they would escalate to me.
17    One of the things I was responsible for
18  early on was setting up our measure -- some of our
19  measurement systems and how we were monitoring stores
20  and pharmacies and -- as it related to controlled
21  substances.  We've spent a lot of time around 106
22  pharmacy, DEA 106s, how do we better capture and
23  report that information and how do we learn from that
24  to make improvements, and then the -- and then, you

Page 36

1  know, as listed here, investigating potential
2  violations.
3    There also, as part of our role, there
4  would be times when new -- states passed a new
5  regulation and we would help the field leaders
6  communicate that to stores and update policies and
7  procedures to be compliant with that change as various
8  states have various different rules and laws.
9    Q.   Let's take a couple of the examples you --
10  you gave.
11    The -- the monitoring stores and
12  pharmacies related to crow -- controlled substances,
13  give us some more detail of what that means?
14    A.   So we -- we would create reports and
15  metrics that measure what type of drugs are being
16  dispensed, how frequently, what quantities in various
17  different regions, how those were being paid for.  We
18  would measure pharmacists, which pharmacists were
19  filling what prescriptions.
20    Q.   Now, in your prior roles at Walgreens from
21  2008 to 2013, February, before you went to
22  pharmaceutical integrity, were you familiar with any
23  other departments that were fulfilling the same role
24  that you were in pharmaceutical integrity?

Page 37

1    MR. HILL:  Object to the form.
2  BY THE WITNESS:
3    A.   I -- not that I know of.
4  BY MR. MOUGEY:
5    Q.   Were you aware of any other departments in
6  your role as a quality analyst and quality analyst --
7  analytic supervisor from 2008 to February of '13 that
8  were responsible for monitoring controlled substances?
9    MR. HILL:  Object to the form.
10  BY THE WITNESS:
11    A.   At -- at that time, no.
12  BY MR. MOUGEY:
13    Q.   Did you see any other individuals or
14  departments that were running reports similar to what
15  you were running in pharmaceutical integrity?
16    A.   No.
17    Q.   Let me hand you what I'm going to mark as
18  Bratton 2, which is P-GEN 0041.
19    (WHEREUPON, a certain document was
20    marked Walgreens-Bratton Deposition
21    Exhibit No. 002, for identification,
22    as of 11/30/2018.)
23  BY MR. MOUGEY:
24    Q.   Sir, you understand that the -- Walgreens

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 acts as a distributor?
2     MR. HILL:  Object to the form.
3 BY THE WITNESS:
4     A.   We no longer act as a distributor.  We did
5 at one time.
6 BY MR. MOUGEY:
7     Q.   That you acted as a distributor up until
8 at least 2014, correct, sir?
9     MR. HILL:  Object to the form.
10 BY THE WITNESS:
11     A.   Correct.
12 BY MR. MOUGEY:
13     Q.   And that in Walgreens' role as a
14 distributor until 2014 that Walgreens supplied
15 Schedule II and Schedule III opiates to its
16 pharmacies, correct?
17     MR. HILL:  Object to the form.
18 BY THE WITNESS:
19     A.   Correct.
20 BY MR. MOUGEY:
21     Q.   And do you understand, sir, in Walgreens
22 role as a distributor that it had certain
23 responsibilities?
24     MR. HILL:  Object to the form.

Page 39

1 BY THE WITNESS:
2     A.   Generally, yes.
3 BY MR. MOUGEY:
4     Q.   And do you understand that the
5 responsibilities that Walgreen -- Walgreens had in its
6 role as a distributor in Schedule II and Schedule III
7 opiates were important?
8     MR. HILL:  Same objection.
9 BY THE WITNESS:
10     A.   Yes.
11 BY MR. MOUGEY:
12     Q.   And do you understand that part of
13 Walgreens' responsibilities as a distributor in
14 relation to Schedule II and Schedule III opiates were
15 to design a system to monitor for suspicious orders?
16     MR. HILL:  Objection to form.
17 BY THE WITNESS:
18     A.   I'm sorry.  Can you restate the question?
19 BY MR. MOUGEY:
20     Q.   Certainly.
21          Do you understand that part of Walgreens'
22 responsibilities as a distributor in relation to
23 Schedule II and Schedule III opiates were to design a
24 system to monitor for suspicious orders?

Page 40

1     MR. HILL:  Same objection.
2 BY THE WITNESS:
3     A.   I -- I don't know if that was required or
4 not.
5 BY MR. MOUGEY:
6     Q.   So beginning in 2013, February of 2013,
7 you became a manager of the southern operation for
8 pharmaceutical integrity, correct?
9     A.   Correct.
10     Q.   And you understand that pharmaceutical
11 integrity was charged with creating, designing,
12 implementing a system to identify suspicious orders,
13 amongst other issues, correct?
14     A.   I -- well, we didn't -- we were involved
15 in the creation and design, but it was collaborative
16 with other teams.  We did have a system in place to
17 report suspicious orders at that time.
18     Q.   Now, let's keep going on that issue then.
19          What -- what system did you have in place
20 to report suspicious orders at the time you started
21 with pharmaceutical integrity?
22     A.   So, it's called the Controlled Substance
23 Order Monitoring program, or CSOM.
24     Q.   And what was that?

Page 41

1     A.   It is a piece of software that works in
2 conjunction with our ordering system to track and
3 monitor controlled substance orders.
4     Q.   And what would the software do to track
5 and monitor controlled substance orders?
6     A.   I don't know all of the details of how the
7 software works, but I know that it would look at a
8 pharmacy's relative size in terms of how many
9 prescriptions per day it sold and then compare that to
10 other similarly-sized stores to try to develop an
11 average for each product, and that would be a target
12 that -- what that store should dispense.
13     Q.   And you're referring to, for example, a
14 ceilings or thresholds?
15     A.   I believe that's how the ceilings and
16 thresholds are determined, yes.
17     Q.   And do you have an understanding if a
18 order exceeded a ceiling or a threshold, if that order
19 was shipped?
20     A.   If an order exceeded a ceiling or
21 threshold, the system should flag it and it should not
22 be shipped.
23     Q.   And do you have an understanding, sir, of
24 the order that exceeded the ceiling and threshold and

Page 42

1 wasn't shipped, whether or not that order was reported
2 to the DEA as a suspicious order?
3     MR. HILL: Object to the form.
4 BY THE WITNESS:
5     A.   My understanding is if it -- if there was
6 a manual order that exceeded the ceiling or threshold,
7 we would flag that order and then we would reach out
8 to the store and ask for additional details about why
9 they are trying to order that product, and in some
10 cases it might be reported as suspicious.
11 BY MR. MOUGEY:
12     Q.   If it -- well, let's go through that in a
13 little more detail.
14         So, is it your testimony that if an order
15 exceeded a ceiling or threshold and wasn't shipped,
16 was it reported to the DEA?
17     MR. HILL: Objection to form and vague.
18 BY THE WITNESS:
19     A.   It would depend on the subsequent
20 investigation as to whether or not it would be --
21 BY MR. MOUGEY:
22     Q.   Can --
23     A.   -- reported.
24     Q.   Sorry.  I didn't mean to interrupt you.

Page 43

1         Were you finished?
2     A.   Um-hum.
3     Q.   Walk -- when you say it depends on the --
4 the investigation, walk me through kind of the -- do
5 you understand what a decis-- decision tree is?
6     A.   Yes.
7     Q.   Walk me through the decision tree of
8 whether or not an order that exceeded the ceiling or
9 threshold was reported to the DEA or not reported to
10 the DEA?
11     MR. HILL: Same objections.
12         Go ahead.
13 BY THE WITNESS:
14     A.   So to my knowledge what would occur would
15 be that we would send a e-mail to the store saying
16 that your order has been flagged for exceeding the
17 limits.  I don't think we would call out exactly what
18 they were.  The store would then contact us and if
19 they provided a legitimate reason why they needed the
20 additional product, we would not report them.  If they
21 don't reply or their answer is unsatisfactory, we
22 would report it as suspicious.
23 BY MR. MOUGEY:
24     Q.   And what period of time, do you have an

Page 44

1 understanding of what period of time that decision
2 tree analysis you just walked me through was in place
3 at Walgreens?
4     A.   That one, I believe, was from the time
5 that the CSOM was in place until -- for the store that
6 created the order they were no longer receiving
7 product from Walgreens.  So as they transitioned from
8 our distribution centers to ABC Drug Company.
9     Q.   All right.  So when do -- do you have an
10 understanding of when that CSOM was initiated or -- or
11 started?
12     A.   It was sometime before I started.  I don't
13 know the exact date.  I think it was October of the
14 previous year, 2012, but I -- I don't know the --
15     Q.   October of 2012?
16     A.   I believe.
17     Q.   Okay.
18     A.   I don't know the exact date, though.
19     Q.   So when you said the October before I
20 started, you mean the October before you started in
21 pharmaceutical integrity?
22     A.   Correct.
23     Q.   All right.  So prior to this October '12
24 CSOM, do you have an understanding of what was in

Page 45

1 place at Walgreens?
2     A.   Not a -- not a good one.
3     Q.   Okay.  Tell me your -- your general
4 understanding of what was in place prior to October
5 of 2012?
6     A.   I know there were --
7     MR. HILL: Object to form.
8     THE WITNESS: Sorry.
9 BY THE WITNESS:
10     A.   I know that there were some reports that
11 were looked at.  I know that the DCs performed some
12 review, but I don't know what basis or what process
13 they used to conduct that review.
14 BY MR. MOUGEY:
15     Q.   When you say the DCs performed some
16 review, you are referring to distribution centers?
17     A.   Yes.
18     Q.   And can you explain what -- what your
19 knowledge is about when a distribution center
20 performed review?
21     A.   Very limited.  I -- I've just heard people
22 mention that they reviewed it.  I don't know what --
23 any further details, really.
24     Q.   When you say you've heard people mention,

Page 46

1 what do you mean?

2    A.  Just through the last five years of this

3 job, I've heard it referenced by the inventory teams

4 or -- or other groups.

5    Q.  Anyone in particular?

6    A.  I don't recall.

7    Q.  So let's go back to Bratton 2.

8       You understand, sir, that there are

9 regulations from the Federal Government that set

10 responsibilities for distributors under the Code of

11 Federal Regulations?

12    A.  Correct.

13    Q.  And what I have in front of you, sir, is

14 21 Code of Federal Reg- -- Regulation, CFR,

15 Section 1301.74.

16       Do you see that, sir?

17    A.  Yes.

18    Q.  And it's titled "Other Security Controls

19 for Non-Practitioners; Nar" -- "Narcotic Treatment

20 Programmers" -- "Programs" -- I'm sorry -- "and

21 Compounders for Nar" -- "Narcotic Treatment Programs."

22       Do you see that?

23    A.  Yes.

24    Q.  And under Section B, it says:

Page 47

1       "The registrant shall design and operate a

2 system to disclose to the registrant suspicious orders

3 of controlled substances."

4       Did I read that first sentence right?

5    A.  Yes.

6    Q.  Now, as an employee of Walgreens, do you

7 believe that Walgreens had a system designed to

8 identify suspicious orders of controlled substances?

9    MR. HILL:  Object to the form.

10 BY THE WITNESS:

11    A.  At -- at what time?

12 BY MR. MOUGEY:

13    Q.  From the time you began in pharmaceutical

14 integrity.

15    A.  From the time I began, yes.

16    Q.  All right.  Do you believe that Walgreens

17 had a system in place designed to identify suspicious

18 orders of controlled substances prior to you starting

19 at pharmaceutical -- or in pharmaceutical integrity?

20    MR. HILL:  Ob- -- objection to the form.

21 BY THE WITNESS:

22    A.  I don't know.

23 BY MR. MOUGEY:

24    Q.  You don't know.

Page 48

1       You see in the first sentence, sir, that

2 it identifies "orders of controlled substances,"

3 correct?

4    A.  Correct.

5    Q.  Do you have an understanding that -- that

6 this section is referring to a system designed to

7 identify suspicious orders as opposed to suspicious

8 shipments?

9    MR. HILL:  Object to the form.

10 BY THE WITNESS:

11    A.  It -- it appears that way, yeah.

12 BY MR. MOUGEY:

13    Q.  And if you look at the next sentence:

14       "The registrant shall inform the field

15 division office of the administration in his area of

16 suspicious orders when discovered by the registrant."

17       Do you see that, sir?

18    A.  Yes.

19    Q.  And "when discovered by the registrant,"

20 do you have an understanding of what timeframe that

21 means?

22    MR. HILL:  Objection to the form.

23 BY THE WITNESS:

24    A.  I -- I don't know what they mean by

Page 49

1 discovered.

2 BY MR. MOUGEY:

3    Q.  Well, do you have an understanding or how

4 did you interpret that when -- what -- when discovered

5 means?

6    MR. HILL:  Objection to form.

7 BY THE WITNESS:

8    A.  I don't know.  From the -- I don't know.

9 BY MR. MOUGEY:

10    Q.  The third sentence:

11       "Suspicious orders include orders of

12 unusual size, orders deviating substantially from a

13 normal pattern, and orders of unusual frequency."

14       Do you see that, sir?

15    A.  Yes.

16    Q.  Did I read that correctly?

17    A.  Yes.

18    Q.  And -- and do you understand that that is

19 Walgreens' responsibility to have a system to identify

20 orders deviating substantial from the normal pattern

21 and orders of unusual frequency, correct, sir?

22    MR. HILL:  Objection to the form.

23 BY THE WITNESS:

24    A.  I -- I don't know.  I mean, I see that

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 that's what that says here.
2 BY MR. MOUGEY:
3    Q.   But no one has ever told you that's the
4 responsibility at -- of Walgreens during your tenure
5 at Walgreens?
6    A.   No.
7    MR. HILL:  Objection.
8         Hold on one second.  Sorry.  I ask you not
9 to -- counsel you not to disclose any attorney client
10 privileged communication you might have had about that
11 subject.
12 BY THE WITNESS:
13    A.   So we -- we rely on our regulatory law
14 group to guide us.  You know, I'm not an attorney and
15 there is a variety of case law and regulations and
16 state and federal.  So we rely on their guidance on
17 how to proceed as it relates to the patchwork of
18 regulations that we have to comply with.
19 BY MR. MOUGEY:
20    Q.   Sure.
21         And you relied on that regulatory law
22 group about the details of the regulatory framework?
23    A.   Correct.
24    Q.   And so when you had a question about the

Page 51

1 details of the regulatory framework, you would contact
2 the regulatory law group.
3         Does that make sense?
4    MR. HILL:  Objection to the form.
5 BY THE WITNESS:
6    A.   Correct.
7 BY MR. MOUGEY:
8    Q.   And so part of your training about the
9 details of this CFR we just went through, 1301.74, was
10 training from the regulatory law group, correct?
11    A.   I don't know that I would -- training per
12 se, but as -- as I started in the role, I know that we
13 were trying to report suspicious orders for RDCs.
14    Q.   I understand.  That's not what we are
15 talking about right now.  What we are talking about is
16 your interaction with the regulatory law group and
17 details about Section 1301.74.
18         Do you see that?
19    A.   Um-hum.
20    Q.   So interpretations of what you mentioned
21 of the -- I think you used the word "patchwork," case
22 law, regs, DEA interpretations, you would rely on the
23 regulatory group for those details?
24    A.   Correct.

Page 52

1    Q.   How often did you interact on a, say, a
2 monthly basis with any lawyers at Walgreens regarding
3 the details of the regulatory framework regarding to
4 the monitoring -- related to the monitoring of
5 controlled substances?
6    MR. HILL:  And Mr. -- Mr. Bratton, just don't
7 disclose any of the actual communications.  This is
8 just a question about timing and the numbers of
9 communications.
10 BY THE WITNESS:
11    A.   I -- I don't recall.  At the time I
12 started I can tell you that we talked with them
13 frequently on a variety of issues.  I don't recall
14 exactly on this one five years ago how often I spoke
15 with them.
16 BY MR. MOUGEY:
17    Q.   In that frequently on a variety of issues
18 related to the details of the regulatory framework
19 covering controlled -- monitoring of controlled
20 substances?
21    A.   Monitoring of controlled substances,
22 reporting of controlled substance loss, controlled
23 substance dispensing, et cetera.
24    Q.   Now, on those details that you talked to

Page 53

1 the regulatory law group about, when you said
2 frequently, is that twice a week, twice a day, just
3 generally?
4    A.   Twice a week, probably.
5    Q.   And that was more in the beginning when
6 you started with pharmaceutical integrity?
7    A.   I think it continues to this day.  Maybe
8 not on this topic as much.
9    Q.   So a couple times a week you would
10 interact with the regulatory law group about the
11 details of Walgreens' control monitoring system?
12    A.   Or details or specific incidents that
13 might arise, et cetera.
14    Q.   And -- and it's important for you as a
15 manager of the southern operation to have an
16 understanding of the regulatory framework covering
17 Walgreens' responsibilities in relation to monitoring
18 of controlled substances, correct?
19    MR. HILL:  Object to the form.
20 BY THE WITNESS:
21    A.   I -- I think for our group it was
22 important to execute the tasks and the -- the -- the
23 programs we've been implement -- charged with.  I
24 don't know that I need to understand the law to

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 understand what we needed to do.
2 BY MR. MOUGEY:
3    Q.  The question I asked you was a little
4 different.  What I asked was:  Is it important for you
5 as a manager of the southern operation to have an
6 understanding of the regulatory framework covering
7 Walgreens' responsibilities in relation to monitoring
8 of Schedule II and Schedule III opiates?
9    MR. HILL:  Object to the form.
10 BY THE WITNESS:
11    A.  I -- I don't know how to answer that
12 question.
13 BY MR. MOUGEY:
14    Q.  What's confusing to you about that
15 question?  Is it important that you understand the
16 regulatory framework?
17    MR. HILL:  Same objection.
18 BY THE WITNESS:
19    A.  I think I have a general concept, but I
20 don't think I'm an expert on all of the issues at
21 every level of government, no.
22 BY MR. MOUGEY:
23    Q.  Yeah, I don't -- I don't think I asked you
24 about whether you were an expert at every level of

Page 55

1 government.  What I asked was is it important as a
2 manager of the southern operation for Walgreens in
3 pharmaceutical integrity to understand, just
4 generally, the regulatory framework covering
5 Walgreens' responsibilities in relation to monitoring
6 Schedule II and Schedule III opiates?
7    MR. HILL:  Objection to the form.
8 BY THE WITNESS:
9    A.  I'm not sure.
10 BY MR. MOUGEY:
11    Q.  Has someone instructed you to -- to say
12 "I'm not sure" to questions about what Walgreens'
13 responsibilities were?
14    A.  No.
15    Q.  Have you been told just to -- if -- if
16 anyone asks you about what Walgreens' responsibilities
17 were, just to say I'm not sure?
18    A.  I'm trying to answer truthfully.
19    Q.  Well, let's go back to Bratton 1, okay.
20       Manager of pharmaceutical integrity,
21 southern operation, February 2013 to the present,
22 right?
23    A.  Um-hum.
24    Q.  Okay.  Now, you -- you put this next

Page 56

1 paragraph in your LinkedIn profile, correct?
2    A.  This is copied from my job posting.
3    Q.  Yes, sir.  So you put this in there,
4 right?
5    A.  I copy and pasted, yes.
6    Q.  You copied it.  And it's accurate,
7 correct?
8    A.  I believe so.
9    Q.  So Bratton 1, your profile:  "Responsible
10 for managing, creating, and managing controlled
11 substance dispensing, monitoring and reporting
12 programs."
13       Is that accurate, sir?
14    A.  Yes.
15    Q.  And that was part of the scope of your
16 responsibilities from February '13 on?
17    A.  Correct.
18    Q.  Second sentence:
19       "Developed, recommends, implements
20 programs, procedures and techniques which will
21 identify and minimize loss of company assets and
22 ensure the safety, compliance and security of the
23 ordering and dispensing of controlled substances,"
24 correct?

Page 57

1    A.  Correct.
2    Q.  Now, when you say controlled substances
3 in -- in this paragraph, that is a number of different
4 types of drugs, correct?
5    A.  Correct.
6    Q.  And you understand that this litigation is
7 about Schedule II and Schedule III opiates, correct,
8 sir?
9    A.  Correct.
10    Q.  And you understand, sir, in your role as
11 manager of the southern operation that those
12 Schedule II and Schedule III opiates are highly
13 addictive, correct?
14    MR. HILL:  Object to the form.
15 BY THE WITNESS:
16    A.  My understanding is they can be addictive
17 for some people.
18 BY MR. MOUGEY:
19    Q.  Yes, sir, they can be addictive to some
20 people.
21       And did you understand in February
22 of 2013, that the country was in the midst of an
23 opiate crisis?
24    MR. HILL:  Object to the form.

Page 58

1  BY THE WITNESS:
2      A.  I believe that I was becoming aware of it,
3  yes.
4  BY MR. MOUGEY:
5      Q.  And how did you become aware of that in
6  February of 2013?
7      A.  Partially through my -- my work,
8  partially, you know, you -- the news and things you
9  see on television.
10     Q.  Well, let's talk about the partially
11 because of your work.
12         How at work did you become aware that in
13 2013 the country was in the middle of an opiate
14 crisis?
15     A.  I don't recall the specific details.  I
16 know that we -- it was something that was, you know,
17 in our minds as we were drafting our policies and
18 procedures.
19     Q.  It was in your mind.
20         Help -- help me to understand how it got
21 in your mind?
22     A.  Direction from my boss --
23     Q.  Ms. Polster?
24     A.  Yes.

Page 59

1      Q.  And when you say "direction," what do you
2  mean?
3      A.  We would meet in meetings with our -- my
4  peers or our team members and discuss issues and she
5  would provide direction as to programs we should work
6  on.
7      Q.  Did anybody ever tell you that there had
8  been ongoing congressional investigations into the
9  opiate crisis almost 13 years by the time you started
10 in 2013?
11     A.  No.
12     Q.  Did anybody tell you that there was year
13 upon year upon year increase in the amount of opiates
14 dispensed across the country?
15     A.  I knew that.  I don't know that anyone at
16 work told me that.
17     Q.  Did anyone ever as part of your training
18 advise you that the amount of deaths had increased,
19 overdose deaths related to Schedule II and
20 Schedule III opiates had increased exponentially
21 beginning in late '90s, early 2000s?
22     MR. HILL:  Objection to the form.
23 BY THE WITNESS:
24     A.  I don't recall.

Page 60

1  BY MR. MOUGEY:
2      Q.  You don't recall.  You don't recall
3  walking in the first month of my job and somebody
4  saying, We are in the middle of an opiate crisis,
5  people are dying every day, Florida is the hot bed,
6  you are in charge of the southern operation, there is
7  drugs migrating up to Ohio, and it is our job as
8  distributors to monitor and identify controlled
9  substances?
10         Anything along those lines?
11     MR. HILL:  Objection to the form.
12 BY THE WITNESS:
13     A.  I don't recall.
14 BY MR. MOUGEY:
15     Q.  Anything saying this is -- this is very,
16 very, very important that we are on the front line of
17 defense for Walgreens and we dispense as -- as many --
18 or more opiates than anyone in the country?
19     A.  I don't recall.
20     Q.  You don't recall any meetings with a sense
21 of urgency like that?
22     A.  I -- when I first was in the role, we were
23 very focused on the settlement with the DEA and the
24 provisions that our legal teams had outlined that we

Page 61

1  needed to implement.  That was one of the critical
2  focuses at that time.
3      Q.  And the -- in the midst of the
4  investigations by the DEA, what are you referring to?
5      A.  The -- when I was there, it was the
6  settlement agreement that we had signed and so we
7  received a laundry list of -- of tasks and programs
8  and changes that we were working to implement.
9      Q.  And that was in -- the agreement was
10 signed.
11         Do you have a recollection of when the
12 agreement was signed?
13     A.  Shortly after I started.
14     Q.  Like in June of 2013?
15     A.  That sounds right.
16     Q.  Were -- did anyone alert you or notify you
17 from your date in February of '13 until the date the
18 agreement was signed about the ongoing investigations?
19     A.  We were in discussions about the terms of
20 the settlement and what that might include.  Some of
21 the things that the government had already outlined
22 that we had committed to.
23     Q.  Including the closing of six Walgreens'
24 stores in Florida, correct?

Page 62

1    MR. HILL:  Objection to the form.
2    BY THE WITNESS:
3      A.   I don't know if I knew that at that time.
4    BY MR. MOUGEY:
5      Q.   Including these -- the requirement that
6    six Walgreens' pharmacies were no longer dispensing
7    Schedule II and Schedule III narcotics?
8      A.   That was included in the eventual
9    settlement, but I don't know if I knew that that was a
10   condition at that time.
11     Q.   Were you a -- are you aware that there was
12   a -- a distribution center in Jupiter, Florida,
13   correct?
14     A.   I -- once I was in this role, yes.
15     Q.   As of February of 2013, were -- were you
16   aware that that Jupiter distribution center was part
17   of the investigation?
18     A.   I knew that they were no longer dispensing
19   and that there had been an order to show cause.
20     Q.   So let's go back to Branton -- I'm
21   sorry -- Bratton 2.
22          You have a general understanding that
23   Walgreens is charged with implementing a system
24   designed to identify suspicious orders, correct?

Page 63

1      A.   General --
2    MR. HILL:  Object to the form.
3    BY THE WITNESS:
4      A.   Generally, yes.
5    BY MR. MOUGEY:
6      Q.   Do you have an understanding that -- a
7    general understanding that Walgreens was required to
8    report suspicious orders to the DEA?
9    MR. HILL:  Same objection.
10   BY THE WITNESS:
11     A.   Generally, yes.
12   BY MR. MOUGEY:
13     Q.   And that suspicious orders include orders
14   of unusual size, correct?
15   MR. HILL:  Object to the form.
16   BY THE WITNESS:
17     A.   Yes.
18   BY MR. MOUGEY:
19     Q.   Orders deviating substantially from a
20   norther -- normal pattern?
21   MR. HILL:  Same objection.
22   BY MR. MOUGEY:
23     Q.   Correct?
24     A.   Correct.

Page 64

1      Q.   And orders of unusual frequency?
2      A.   Correct.
3      Q.   Do you have an understanding in February
4    of 2013 what Walgreens had been doing to perform due
5    diligence once an order had been identified as
6    suspicious?
7    MR. HILL:  Objection to the form.
8    BY THE WITNESS:
9      A.   As of the implementation of the CSOM or
10   before that?
11   BY MR. MOUGEY:
12     Q.   Let's start with that.
13          From October of 2012 until February of '13
14   when you started at pharmaceutical integrity, do you
15   have an understanding of what Walgreens was doing to
16   perform due diligence on suspicious orders?
17     A.   I believe so, yes.
18     Q.   And what was that understanding?
19     A.   So, if the -- we established a -- a
20   ceiling and tolerance for each product at each
21   location and if an order was attempted to be placed by
22   a store that exceeded that, we would then investigate
23   why that order was placed, and if it was deemed to be
24   suspicious, we would report it to the DEA.  Also, if

Page 65

1    the store did not reply, we would report it to
2    DEA.
3      Q.   Do you have an understanding where that
4    due diligence, beginning in October of '12 on, was
5    kept or stored once performed by Walgreens?
6    MR. HILL:  Ob- -- objection to the form.
7    BY THE WITNESS:
8      A.   Some of it is kept in the notes in the
9    CSOM system, some of it might also be in e-mail or --
10   or the steps we took to investigate?
11   BY MR. MOUGEY:
12     Q.   Yes, sir.
13     A.   Yeah, they might be e-mails or phone calls
14   that were conducted or notes that were placed in the
15   CSOM system.
16     Q.   If it's not in the CSO -- CSOM system,
17   where was the memorialization of those notes or phone
18   calls from the investigation, you called it?
19   MR. HILL:  Ob- -- objection to the form.
20   BY THE WITNESS:
21     A.   On -- I don't know.  I mean, it could
22   be -- as I said, it could be in an e-mail, it could be
23   in discussions that we had, but I don't know that
24   if -- if we didn't document it in that system, I don't

Page 66

1  know where else we would have documented it. But that
2  doesn't necessarily mean it didn't occur.
3  BY MR. MOUGEY:
4      Q.   Do you have a general understanding of the
5  suspicious order monitoring policies in place at
6  Walgreens prior to the CSOM in October of 2012?
7      A.   Not really.
8      Q.   Not really or -- or none?
9      MR. HILL:  Objection to form, asked and
10 answered.
11 BY THE WITNESS:
12     A.   Very little understanding prior to the --
13 2012.
14 BY MR. MOUGEY:
15     Q.   Ex- -- explain to me what you understood
16 was in place prior to the CSOM policy in October
17 of 2012?
18     A.   I know that there were reports that were
19 generated and sent. I don't know the criteria for how
20 those were produced. I know that DC staff would look
21 at orders, but I don't know what order criteria they
22 used to -- to look at those orders.
23     Q.   When you say orders were generated and
24 sent, sent to whom?

Page 67

1      A.   I believe DEA field offices.
2      Q.   But you are not sure?
3      A.   I'm not sure.
4      Q.   Who would know?
5      A.   Denny Murray from our inventory team, I
6  believe, or Barb Martin. Probably. I believe. I
7  don't know. Maybe others on those teams.
8      Q.   Well, when you started in -- in February
9  of '13 in pharmaceutical integrity and your charge was
10 creating a system for identifying suspicious orders,
11 did you go back and look at what history -- Walgreens
12 had done historically?
13     A.   There had already been a substantial
14 amount of effort put into the new system. It was
15 already up and running before I started, so I did not,
16 no.
17     Q.   It was up and running by February of '13?
18     A.   Yes.
19     Q.   And who had done that substantial amount
20 of work before you got there?
21     A.   I think that would be Tasha, I know Eric
22 started before I did, Eric Stahmann. Again, probably
23 Denny Murray, John Merritello, and Wayne Bancroft from
24 inventory teams.

Page 68

1      Q.   And do you know when Eric Stahmann
2  started?
3      A.   I don't. I -- it was a few months, I
4  think, before me.
5      Q.   A month or two before you?
6      A.   I don't know the exact timeframe. I know
7  it was shortly before I did. In that --
8      Q.   Did Ms. -- go ahead.
9      A.   In that role.
10     Q.   Was Ms. Daugherty part of that role of
11 developing and -- the system to identify suspicious
12 orders?
13     A.   I don't know. I think she may have
14 started after me, but I don't -- I don't know for
15 sure.
16     Q.   How well do you know Eric Stahmann?
17     A.   I mean, I've worked with him for some
18 number of years. I know him, you know, a medium
19 amount, I guess, I don't know.
20     Q.   There's four managers in pharmaceutical
21 integrity, correct?
22     A.   Well, there are three managers and then
23 our -- our boss, so...
24     Q.   And at inception in early '13, there were

Page 69

1  four, correct?
2      A.   Ah, correct, yes, I take that back.
3      Q.   And Mr. Stahmann is one of those -- one of
4  those managers, whether it is three or four, correct?
5      A.   Correct.
6      Q.   And -- and you are one of those managers,
7  whether it is three or four, correct?
8      A.   Correct.
9      Q.   And both of you are responsible for
10 different geographic parts of the country, correct?
11     A.   Correct.
12     Q.   You all interact regularly, I would
13 assume, in your roles in pharmaceutical integrity,
14 correct?
15     A.   Yes.
16     Q.   You sit in meetings with him regularly,
17 correct?
18     A.   Correct.
19     Q.   You -- you talk about policies and
20 procedures in those meetings, correct?
21     A.   Correct.
22     Q.   You talk about once those reports are
23 generated that you all perform investigations as a
24 result, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    A.   Correct.
2    Q.   You have significant interactions with
3  him, correct?
4    A.   Correct.
5    Q.   Would you consider him to be a subject
6  matter expert in suspicious order monitoring?
7    MR. HILL:  Object to the form.
8  BY THE WITNESS:
9    A.   Prior to the system or -- or now?
10 BY MR. MOUGEY:
11   Q.   Just when he started in early '13.
12   MR. HILL:  Object to the form.
13 BY THE WITNESS:
14   A.   I mean, I think he, as a -- you know, it
15 was a new system and we were all learning the details.
16 I would say I would characterize him as he knows a lot
17 about the system today.
18 BY MR. MOUGEY:
19   Q.   Okay.  And today would you -- would you
20 describe him as a subject matter expert in suspicious
21 order monitoring policies?
22   MR. HILL:  Objection to form.
23 BY THE WITNESS:
24   A.   Based on the CSOM, yes.

Page 71

1    MR. HILL:  Peter, whenever you get to a decent
2  breaking point.  We've been about an hour.
3    MR. MOUGEY:  That's fine.
4    MR. HILL:  It's up to you.
5    MR. MOUGEY:  If you want.  I mean, we started
6  about 9:15, but if you want to take a break, we can.
7    Can we just do a quick one, five minutes?
8    MR. HILL:  Sure, sure.
9    MR. MOUGEY:  Thank you.
10   MR. HILL:  Don't forget this.
11   THE VIDEOGRAPHER:  Going off the record at
12 10:08 a.m.
13   (WHEREUPON, a recess was had
14   from 10:08 to 10:20 a.m.)
15   THE VIDEOGRAPHER:  We are back on the record at
16 10:20 a.m.
17 BY MR. MOUGEY:
18   Q.   Sir, if we can go back to Bratton 1,
19 your -- the LinkedIn CV.
20   A.   Um-hum.
21   Q.   The last sentence underneath of your
22 Manager of Pharmaceutical Integrity:
23   "Responsible for investigating and
24 reporting potential violations of laws, regulations or

Page 72

1  company policy applicable to controlled substances to
2  the appropriate business units and director,
3  pharmaceutical integrity."
4    Correct, sir?
5    A.   Correct.
6    Q.   Did I read that right?
7    A.   Yes.
8    Q.   And, sir, you believe that you are armed
9  with enough knowledge at Walgreens through your
10 training to fulfill the scope of your responsibilities
11 as manager of pharmaceutical integrity, correct?
12   A.   I believe so.
13   Q.   Would you help me to understand what about
14 your background at Walgreens as a quality analyst and
15 quality analyt- -- analytic supervisor prepared you
16 for your role monitoring for suspicious orders,
17 performing due diligence or investigating those
18 orders, and reporting those to the DEA?
19   A.   Sure.
20   So in that role I was responsible for
21 developing metrics and measurement systems, and I
22 think that's a lot of in- -- the initial work that I
23 did in pharmaceutical integrity.  So how can you
24 monitor if you don't have data and insights into

Page 73

1  what's happening.
2    Also, I spent a lot of time looking at
3  transactions and the sequence in which prescriptions
4  were filled, and so I think that expanded out to, you
5  know, that could be applicable to the process of how
6  we fill and order controlled substance prescriptions.
7    Q.   Let's talk about the sequence for a
8  second.
9    What -- why would the sequence of which
10 the order in which prescriptions were filled be
11 important?
12   A.   The transactions and procedures that are
13 involved with filling all prescriptions also pertain
14 to controlled substances.
15   Q.   Right.  But why would the sequence be
16 important?
17   A.   Oh, I -- I mean, you know, the steps that
18 we have to take of verifying, reviewing prescriptions,
19 consulting the doctor, consulting with the patient,
20 the understanding of those helped understand the due
21 diligence and professional judgment of the pharmacists
22 and how they carry out the filling of scripts.
23   Q.   What you specifically said, "I spent a lot
24 of time looking at transactions and the sequence in

Page 74

1 which prescriptions were filled."
2     Correct, sir?
3    A.  Correct.
4    Q.  And you -- you stand by that statement,
5 correct, sir?
6    MR. HILL:  Object to the form.
7 BY THE WITNESS:
8    A.  Yes.
9 BY MR. MOUGEY:
10    Q.  Why is the sequence in which prescriptions
11 were filled important in pharmaceutical integrity?
12    A.  In -- well, it was important more to my
13 previous role. In pharmaceutical integrity I think it
14 would tell us about where and when we could insert
15 control points. You know, for instance, we had a
16 checklist. And so when should we do that checklist,
17 should we do it at the beginning, should we do it with
18 the patient, should we call the doctor, you know.
19     So having an understanding of the
20 production process of filling a prescription helped
21 suggest or recommend places to implement different
22 processes.
23    Q.  Because calling the doctor or the
24 prescriber is an important part of the equation at

Page 75

1 Walgreens to determine whether or not an order is
2 suspicious, correct?
3    MR. HILL:  Object to the form.
4 BY THE WITNESS:
5    A.  It can be a contributing factor.
6 BY MR. MOUGEY:
7    Q.  Yes, sir. And -- let me broaden that
8 up, when I said calling the doctor.
9     Understanding the doctor as the prescriber
10 is an important part of the equation at Walgreens when
11 determining whether or not an order is suspicious,
12 correct?
13    MR. HILL:  Object to the form.
14 BY THE WITNESS:
15    A.  Maybe I'm -- I'm -- I'm not clear on the
16 question. I'm sorry. Can you elaborate?
17 BY MR. MOUGEY:
18    Q.  Understanding a specific doctor's type of
19 business is an important part of the equation at
20 Walgreens when determining whether or not an order for
21 Schedule II or Schedule III narcotics is suspicious,
22 correct?
23    MR. HILL:  Objection to the form.
24 BY THE WITNESS:

Page 76

1    A.  Do you mean a prescription?
2 BY MR. MOUGEY:
3    Q.  Yes, sir.
4    A.  So, I know that pharmacists in the
5 exercise of their professional judgment may consider
6 the scope of practice of the prescriber and
7 conversations as to whether or not a prescription is
8 legitimate or -- or should be filled.
9    Q.  Now, if you go back to B-1, in that last
10 sentence:
11    "Responsible for investigating and
12 reporting potential violations of laws, regulations or
13 company policies."
14     Right?
15    A.  Correct.
16    Q.  So to kind of recap this morning, filling
17 in the holes of your LinkedIn CV here, prior to 10 of
18 2012, you have no detailed understanding of the
19 criteria used to identify suspicious orders at
20 Walgreens, correct?
21    MR. HILL:  Objection to form.
22 BY THE WITNESS:
23    A.  No detailed understanding.
24 BY MR. MOUGEY:

Page 77

1    Q.  And prior to October 2012, you have no
2 understanding what group at Walgreens was responsible
3 for performing investigation or due diligence on those
4 suspicious orders, correct?
5    A.  Correct.
6    Q.  And so prior to October of 2012, you have
7 no understanding of what reports, if any, were sent to
8 the DEA reporting suspicious orders, correct?
9    A.  I have an awareness that there were
10 reports. I don't understand how they were compiled
11 or -- or what -- or how or when they were sent.
12    Q.  You just have a general understanding that
13 some reports were sent and that's it?
14    A.  Correct.
15    Q.  No -- no idea of how they were generated,
16 correct?
17    A.  Correct.
18    Q.  No idea if there was a formula used to
19 generate those reports, correct?
20    MR. HILL:  Objection to the form.
21 BY THE WITNESS:
22    A.  Correct.
23 BY MR. MOUGEY:
24    Q.  No idea if there was an algorithm used to

Page 78

1  generate those reports, correct?
2      A.  Prior to '12 -- October of '12, correct.
3      Q.  No idea of whether or not they were done
4  manually or as part of a -- a software program,
5  correct?
6      A.  I know that there were people involved
7  with the generation.  I don't know if they were
8  looking at manually running queries to determine that
9  or if they looked at something system generated.  I
10  don't -- I don't know.
11      Q.  And, sir, do you have any understanding of
12  whether or not due diligence was performed on those
13  suspicious orders before they were shipped prior to
14  2000 and -- October of 2012?
15      A.  I -- I don't know what was done.
16      Q.  You understand, sir, that in two weeks
17  from today you are set to be deposed as the Walgreens'
18  30(b)(6) representative on numerous issues, correct?
19      A.  Correct.
20      MR. HILL:  Objection to the form.
21  BY MR. MOUGEY:
22      Q.  And you've been preparing for that
23  testimony, correct, sir?
24      MR. HILL:  Objection to the form.

Page 79

1      Also, you shouldn't be able to get into
2  work product and -- and what he might have done to
3  prepare for this, Peter.  I don't know what you are
4  asking for exactly here.
5      MR. MOUGEY:  I don't -- I didn't ask what he was
6  preparing for.
7  BY MR. MOUGEY:
8      Q.  Sir, I simply asked you, have you been
9  preparing for your deposition as a 30(b)(6)
10  representative for Walgreens, part of which will
11  include Walgreens' suspicious order monitoring
12  policies and procedures?
13      MR. HILL:  I'm just going to object to the -- to
14  the extent that calls for privileged information.  I'd
15  just caution you, sir, not to reveal any
16  communications that you've had with counsel or the
17  substance of those communications in any answer you
18  give to this gentleman's question.
19  BY MR. MOUGEY:
20      Q.  Okay.  For the -- do you want me to repeat
21  the question for you or do you have it?
22      A.  Yes.
23      Q.  Yes, you want me to repeat it or --
24      A.  No, no, yes, I have it.

Page 80

1      I'm not sure how to answer.
2      MR. HILL:  Because of a privilege issue?
3      THE WITNESS:  Potentially, yeah.
4      MR. HILL:  Okay.  Then we'll need to take a
5  break then and go through this.
6  BY MR. MOUGEY:
7      Q.  Let's just -- let me restate the question.
8      Have you been preparing, yes or no, as a
9  30(b)(6) representative for Walgreens to be able to
10  provide information on Walgreens' suspicious order
11  monitoring policies and procedures covering the period
12  at issue?
13      MR. HILL:  Objection to the form.
14      Peter, here is the problem.  To get -- for
15  this witness to answer that question would require him
16  to understand the different ways that he may have been
17  preparing for this deposition, which will necessarily
18  require him to disclose some of the information that
19  had been shared with him with counsel.
20      I'm not trying to be difficult, but I
21  don't know how this witness is -- he is here today as
22  a fact witness.  He is certainly prepared to be here
23  today to be a fact witness.  And I'm concerned that
24  this question is impossible to answer without

Page 81

1  divulging attorney/client or work product information.
2  BY MR. MOUGEY:
3      Q.  I'm going to hand you what I've marked as
4  Exhibit B-3, Bratton 3.  Sorry.
5          (WHEREUPON, a certain document was
6          marked Walgreens-Bratton Deposition
7          Exhibit No. 003, for identification,
8          as of 11/30/2018.)
9  BY MR. MOUGEY:
10      Q.  Direct your attention to the first page,
11  sir, in the middle, it says:
12      "Defendants Walgreen Company and Walgreens
13  Eastern Company's Amended Objections and Responses to
14  Plaintiffs' First Set of Interrogatories."
15      Do you see that, sir?
16      A.  Yes.
17      Q.  All right.  And if you would, sir, turn to
18  page 32.  It is the last numbered page.  And if you
19  look at the next page, it has -- says "Verification."
20      Do you see that?
21      A.  Yes.
22      Q.  All right.  And you see your name there at
23  the bottom of that page, correct?
24      A.  Correct.

Page 82

1    Q.   And "Edward Bratton, Manager,
2  Pharmaceutical Integrity, on behalf of Walgreen
3  Company and Walgreen Eastern Company."
4         Do you see that, sir?
5    A.   Yes.
6    Q.   And it starts out under Verification:
7         "I, Edward Bratton, subject to the
8  penalties and laws relating to unsworn falsification
9  to authorities, including 28 USC Section 1746, state
10 as follows."
11        Did I read that right?
12   A.   Yes.
13   Q.   Would you please read that next paragraph.
14 Out loud.
15   A.   "I" -- "I am mana-" -- "a manager in the
16 pharmaceutical integrity department at Walgreen Co.,
17 and am authorized to make this verification on behalf
18 of Walgreen Co. and Walgreen Eastern Co.
19 ('Walgreens').  I am making this verification on
20 behalf of Walgreens only and no other party.  The
21 information provided by Walgreens in these Amended
22 Objections and Responses to Plaintiffs' First Set of
23 Interrogatories has been compiled by employees and
24 legal counsel for Walgreens.  Although I do not have

Page 83

1  personal knowledge of all of the information set forth
2  herein, I am informed and believe that the matters
3  stated herein are true and correct."
4    Q.   Now, what did you do as part of your
5  investigation to affirm that you were informed and
6  believe that the matters stated in this document are
7  accurate?
8    A.   I discussed with legal counsel and others
9  the investigations that they made to reply to this.
10   Q.   All right.  So the information that you
11 received to verify that this was accurate was based on
12 your conversations with counsel?
13   A.   And others.
14   Q.   And who else?
15   A.   I believe Tasha Polster, we had some
16 discussion, and I know that there were meetings where
17 information was asked of others about the contents of
18 this document, I believe.
19   Q.   What -- what did -- what did you do to
20 inform yourself to verify that the matters stated
21 herein are true and correct?
22        MR. HILL:  And, sir, if any of this involves
23 counsel, I would instruct you not to reveal the
24 subject matter or the communication -- of the

Page 84

1  communications themselves.
2  BY THE WITNESS:
3    A.   I discussed with counsel about --
4  BY MR. MOUGEY:
5    Q.   I don't -- I don't want to know specific.
6  You said you discussed with counsel and you said you
7  discussed with Ms. Polster.
8         Anything other than a meeting with
9  Ms. Polster and counsel that you did to inform
10 yourself to verify that the matters stated herein are
11 true and correct?
12   MR. HILL:  Objection to the form.
13 BY THE WITNESS:
14   A.   No, nothing additional.
15 BY MR. MOUGEY:
16   Q.   Nothing additional.
17        How long did your conversation with
18 counsel last to inform yourself that the matters
19 stated herein are true and correct to the point where
20 you signed the verification?
21   MR. HILL:  Objection to the form.
22 BY THE WITNESS:
23   A.   It was a short discussion and then some
24 e-mails.

Page 85

1  BY MR. MOUGEY:
2    Q.   A short discussion.  15 minutes,
3  10 minutes?
4    A.   I don't recall the exact duration.
5    Q.   Not exact.
6    A.   Probably --
7    Q.   Less than a half an hour?
8    A.   Probably.
9    Q.   Less than 15 minutes?
10   A.   Maybe.  I don't recall.
11   Q.   Your discussion with Ms. Polster, how long
12 did your discussion with Ms. Polster last to inform
13 yourself enough on the matters stated herein to sign
14 this verification?
15   A.   Brief.  Five minutes.
16   Q.   Five minutes.
17        So your -- safe to say your total process
18 of verifying the matters in this document, less than
19 half an hour?
20   MR. HILL:  Objection to form.  That's not what
21 he said.
22 BY THE WITNESS:
23   A.   It was a short period of time.
24 BY MR. MOUGEY:

Page 86

1    Q.   Okay.  Your total process to verify the
2  matters stated in this document lasted less than a
3  half hour?
4        MR. HILL:  Objection to the form.
5  BY THE WITNESS:
6    A.   Yes.
7  BY MR. MOUGEY:
8    Q.   If you would, sir -- did anybody explain
9  the importance to you of verifying a document like
10  this?
11        MR. HILL:  Again, I'd instruct you not to reveal
12  the substance of any attorney/client communications in
13  your answer.
14        If you can't answer without --
15        THE WITNESS:  I can't -- I don't --
16        MR. HILL:  -- without doing that, then -- then
17  say that you can't answer without doing that.  We just
18  don't want to have communications revealed in this
19  setting.
20  BY THE WITNESS:
21    A.   I don't think I can answer without...
22  BY MR. MOUGEY:
23    Q.   You understand, irrespective of any
24  communication, that signing a verification in a

Page 87

1  federal proceeding is an important matter, correct?
2    A.   Correct.
3    Q.   So, sir, if you would, please turn to
4  Page 10.
5        Interrogatory No. 4, do you see that?
6    A.   Yes.
7    Q.   And it says:
8        "With Request" -- "In conjunction with
9  Request For Production No. 31, please identify any
10  orders you received that were at any point identified
11  as a possible suspicious order.  For each of these
12  suspicious orders provide."
13        It gives (a) through (f.)
14        Do you see that?
15    A.   Yes.
16    Q.   And it includes the date, the description,
17  whether it was reported to the DEA, the due diligence,
18  the date of any halt or suspension order, the dates
19  that order was shipped or fulfilled.
20        Did you see that?
21    A.   Yes.
22    Q.   What did you do to inform yourself to be
23  able to respond to Interrogatory No. 4?
24    A.   So now I'm -- that I've seen this, we did

Page 88

1  meet with counsel and myself and members of my team
2  took steps to provide this information.
3    Q.   What steps did you take?
4    A.   A -- a lot of this was how and for what
5  timeframe, what products to produce from our CSOM, and
6  then we queried that in the report and -- I believe
7  Steven Mills sent that over, the final version.
8    Q.   Okay.  The CSOM is October of 2012, right?
9    A.   Correct.
10    Q.   So what did you do to inform yourself
11  prior to October of 2012?
12    A.   I didn't.
13    Q.   Because you don't have any personal
14  knowledge that you can recall other than what we just
15  went through about Walgreens' policies and procedures
16  regarding suspicious orders prior to October '12,
17  right?
18    A.   Correct.
19    Q.   So you have to go to somebody else and
20  have them educate you, right?
21    A.   Correct.
22    Q.   But you didn't -- you did not go and ask
23  anyone else that you said -- or that you were aware of
24  that had personal knowledge prior to October '12,

Page 89

1  correct?
2        MR. HILL:  Ob- -- objection to the form.
3  BY THE WITNESS:
4    A.   Correct.
5  BY MR. MOUGEY:
6    Q.   So based on your understanding, a response
7  to Interrogatory No. 4 was post October of 2012 up to
8  the point where Walgreens was no longer distributing
9  Schedule II and Schedule III?
10    A.   I'm not sure.
11    Q.   But you understand that you -- you
12  verified and you informed yourself enough to provide
13  an accurate statement when signing this document,
14  correct?
15    A.   I -- I understand --
16        MR. HILL:  Object.
17        Go ahead.
18  BY THE WITNESS:
19    A.   -- that I signed it, yes.
20  BY MR. MOUGEY:
21    Q.   Yes.  But you can't say sitting here today
22  what you did, if anything, to inform yourself about
23  Walgreens' practices and policies prior to October
24  of 2012 related to suspicious orders of Schedule II

Page 90

1 and Schedule III opiates?

2    A.  I -- I know that -- so, I think there is a

3 privilege issue. I don't know. But --

4    MR. HILL: Well -- well, why don't -- why don't

5 we take a one-minute break and see what this privilege

6 is.

7    MR. MOUGEY: We'll just sit here tight while you

8 guys talk about it.

9    THE VIDEOGRAPHER: Going off the record at

10 10:38 a.m.

11      (WHEREUPON, a recess was had

12       from 10:38 to 10:42 a.m.)

13    THE VIDEOGRAPHER: We are back on the record at

14 10:42 a.m.

15 BY MR. MOUGEY:

16    Q.  The question pending, sir, was, sitting

17 here today, what did you do, if anything, to inform

18 yourself about Walgreens' practices and policies prior

19 to 2012 related to suspicious orders of Schedule II

20 and Schedule III opiates?

21    A.  So, for the interrogatories we met with

22 our counsel and compiled responses and we've reviewed

23 this draft. I think I was confusing the 30(b)(6) and

24 this previously.

Page 91

1    Q.  Well, look at Page 11, sir.

2      Do you see how the first couple of

3 paragraphs are objections?

4    A.  Um-hum.

5    Q.  And the --

6    MR. HILL: Are you say -- are you at the top of

7 11?

8    MR. MOUGEY: I am at the top of Page 11.

9 BY MR. MOUGEY:

10    Q.  "Subject to and without waiving its

11 objections..."

12      Do you see that, sir?

13    A.  Yes.

14    Q.  "...in accordance with Federal Rule of

15 Civil Procedure 33(d) and the Court's discovery

16 rulings, Walgreens will produce suspicious order

17 reports regarding opiates orders from Walgreens

18 pharmacies in the Track One jurisdictions, to the

19 extent any exist, remain in Walgreens' possession,

20 custody, or control, and are located following a

21 reasonable search. Walgreens will provide Bates

22 numbers for any such productions that they are made."

23      Do you see that, sir?

24    A.  Yes.

Page 92

1    Q.  And what did you do, sir, to inform

2 yourself about what suspicious order reports were

3 available prior to October of 2012 in order to sign

4 the verification of this interrogatory?

5    MR. HILL: Ob- -- objection to the form.

6 BY THE WITNESS:

7    A.  So I believe we met and discussed --

8    MR. HILL: And so just do not give him the

9 specifics of what you discussed with counsel.

10    MR. MOUGEY: I don't believe if -- if what is

11 signed on this verification came from counsel, the

12 fact that this gentleman signed that and verified it,

13 and his response to the Court is not protected by

14 attorney/client.

15    MR. HILL: I disagree with you.

16    MR. MOUGEY: Well, I --

17    MR. HILL: So I instruct you not to provide --

18 BY MR. MOUGEY:

19    Q.  Please -- please answer the question, sir.

20    MR. HILL: Do not disclose attorney/client

21 communications during this deposition.

22      Go ahead, sir.

23 BY MR. MOUGEY:

24    Q.  What do you think the purpose of you --

Page 93

1    MR. MOUGEY: Are we directing the witness not to

2 answer?

3    MR. HILL: I direct the witness not to disclose

4 any attorney/client communications.

5 BY MR. MOUGEY:

6    Q.  What did you do -- what did you do to

7 inform yourself about what suspicious order reports

8 were available prior to October of 2012 in order to

9 sign the verification of this interrogatory?

10    MR. HILL: Objection to the form.

11 BY THE WITNESS:

12    A.  I don't recall.

13 BY MR. MOUGEY:

14    Q.  If -- if your answer is I didn't do

15 anything without meeting with counsel, is that the

16 answer to your question?

17    MR. HILL: Objection to the form.

18 BY THE WITNESS:

19    A.  I don't know. I can't recall all of the

20 things that we discussed or the steps that were taken.

21 BY MR. MOUGEY:

22    Q.  Well, I don't -- your -- your counsel is

23 not allowing you to answer any questions about -- you

24 had with counsel to inform yourself.

Page 94

1    What did you do outside of your
2  discussions with counsel to inform yourself about what
3  suspicious orders reports were available prior to
4  October of '12?
5    A.  I -- I don't recall.
6    Q.  You recognize, sir, that when you signed
7  this document you -- your name is on this, Edward
8  Bratton, correct -- correct, sir?
9    A.  Correct.
10   Q.  As a manager of pharmaceutical integrity,
11 correct?
12   A.  Correct.
13   Q.  And you told this federal judge that the
14 information set forth herein that you informed
15 yourself and you believe the matters are true and
16 accurate, correct, sir?
17   MR. HILL:  Object to the form.
18     That's -- why don't you read the whole
19 thing.
20 BY MR. MOUGEY:
21   Q.  Just answer the question I asked you.
22   MR. HILL:  This is back on Page 32.
23 BY MR. MOUGEY:
24   Q.  It is the next page after 32.

Page 95

1    A.  I mean, although I do not have personal
2  knowledge of all of the information set forth herein,
3  I am informed and believe these matters stated herein
4  are true and correct, yes.
5    Q.  Mr. Bratton, what did you do to inform
6  yourself about what suspicious orders were available
7  to produce to the Plaintiffs prior to October of 2012?
8    A.  I know that --
9    MR. HILL:  Objection to the form.
10     Go ahead.
11 BY THE WITNESS:
12   A.  I know that there were efforts by others
13 to produce those -- that information.
14 BY MR. MOUGEY:
15   Q.  And what were those efforts by others and
16 who were they?
17   A.  I know that there were meetings and
18 discussions about where that information might be
19 stored.  I -- I believe it involved Eric Stahmann and
20 if there were people that were from the DCs that --
21 that kept copies and -- so, all related, I believe, to
22 document production.
23   Q.  And how did you come to know all of that
24 information?

Page 96

1    A.  Based on discussions or meetings.
2    Q.  With who?
3    A.  With legal counsel and with other members
4  of my team.
5    Q.  Other members of your team?
6    A.  Correct.
7    Q.  So when we asked you earlier about what
8  you did to prepare for these, and you said less than
9  30 minutes, you met with counsel and Ms. Polster, now
10 you've had meetings with other people on your team?
11   MR. HILL:  Objection.  He also said that he was
12 confusing 30(b)(6) and interrogatories.  That
13 misstates what he said.
14   MR. MOUGEY:  I spoke -- I do not want to hear
15 any more explanation out of you.
16   MR. HILL:  Don't lie to him.
17   MR. MOUGEY:  I don't want to hear any more
18 explanation.
19 BY MR. MOUGEY:
20   Q.  So you went outside and met with counsel
21 and you had a different answer than you had before, is
22 that accurate?
23   A.  I -- I'm going to restate what I said
24 previously, that I believe when you were questioning

Page 97

1  me previously that I was confusing the 30(b)(6)
2  preparation with this interrogatory.
3    Q.  And that enlightenment about that you were
4  confused between 30(b)(6) and interrogatories happened
5  after you went out in the hallway with counsel asking
6  for a break, correct, sir?
7    A.  Correct.
8    Q.  And then you realized you were confused,
9  correct, after your discussion with counsel?
10   A.  Correct.
11   Q.  So your answer that you gave previously
12 about less than 30 minutes and -- and with
13 Ms. Polster, what did -- what did that answer apply
14 to?
15   A.  The 30(b)(6) preparation.
16   Q.  You've spent less than 30 minutes
17 preparing for 30(b)(6) and meeting with Ms. Polster,
18 that's it?
19   A.  Up until this point, I believe.
20   Q.  So up until today you've spent 30 minutes
21 preparing for 30(b)(6) and you've had one meeting with
22 less than five minutes with Ms. Polster?
23   MR. HILL:  Objection to the form.
24 BY THE WITNESS:

Page 98

1    A.   I -- correct, I believe so.
2 BY MR. MOUGEY:
3    Q.   And you got that mixed up with the
4 interrogatory answers?
5    A.   Correct.
6    Q.   So did you go back to all of these
7 meetings you had and ask them, where are our
8 suspicious order reports prior to October '12?
9    A.   There were discussions about where those
10 were stored or if they were available.
11   Q.   Where were they stored and where were they
12 available?
13   A.   So I know that there is some system called
14 Mobius and they were trying to pull the reports from
15 there and copies of e-mails that were sent to field
16 offices and...
17   Q.   Were they successful being able to
18 identify reports out of Mobius?
19   MR. HILL:  Object to the form.
20 BY THE WITNESS:
21   A.   I -- I'm -- I know that there were
22 documents that were produced.  I don't know if they
23 specifically came from the Mobius system.
24 BY MR. MOUGEY:

Page 99

1    Q.   So you don't know whether or not they were
2 successful pulling them from Mobius, correct?
3    A.   Correct.
4    Q.   So you didn't inform yourself about where
5 the suspicious order reports prior to October '12 were
6 stored?
7    MR. HILL:  Objection to the form.
8 BY THE WITNESS:
9    A.   I -- again, I had discussions with people
10 that were looking for those documents and they told me
11 where they were looking and how -- the efforts they
12 were trying to undertake to get those documents.
13 BY MR. MOUGEY:
14   Q.   Right.  But all of those discussions you
15 had, you didn't even know where the suspicious order
16 reports prior to October '12 were stored, correct?
17   MR. HILL:  Same objection.
18 BY THE WITNESS:
19   A.   I don't know where they are stored now.  I
20 know that they were -- they were comments about where
21 they were -- came from originally.  I don't know the
22 disposition of those documents after their initial
23 use, no.
24 BY MR. MOUGEY:

Page 100

1    Q.   October 1, 2018, when you verified that
2 you had been informed enough to verify to a federal
3 judge the answers to these interrogatories, you were
4 not aware of the location of the suspicious order
5 reports sent to the DEA, and where they were kept,
6 correct?
7    MR. HILL:  Objection to form.
8 BY THE WITNESS:
9    A.   I believe that they -- it was true that
10 they were recovering them and producing them.  That's
11 what I thought.
12 BY MR. MOUGEY:
13   Q.   I understand that they were recovering and
14 then producing them.  I'm asking you where they were
15 stored, the suspicious orders.
16        When you signed this verification to a
17 federal judge, were you aware of where they were
18 stored?
19   MR. HILL:  Objection to the form.
20 BY THE WITNESS:
21   A.   I think I don't know personally, but I was
22 relying on others at the company with knowledge of
23 those matters to produce those documents.
24 BY MR. MOUGEY:

Page 101

1    Q.   And where were they, where were they
2 stored?
3    A.   I was relying on them to go recover them.
4    Q.   Is the answer I don't know?
5    A.   I don't know where they were stored, yeah.
6    Q.   Interrogatory No. 5:
7        "Please identify any persons employed by
8 you or who received consom" -- "compensation from you,
9 including any former employees, who reviewed or
10 analyzed data regarding the distribution and/or
11 dispensing of opiates or your opiate products,
12 including data regarding prescriber, customer and/or
13 pharmacy/dispenser that you own and/or control,
14 histories and trends for the State of Ohio from
15 January 1, 1990, to present."
16        Did I read that right?
17   A.   Yes.
18   Q.   So what did you do to inform yourself on
19 information to respond to Interrogatory No. 5 to
20 verify to the Federal Court that this was correct?
21   MR. HILL:  Objection to the form.
22 BY THE WITNESS:
23   A.   Again, I -- we met with counsel and others
24 and attempted to produce a list of employees that

Page 102

1  would have undertaken these roles.
2  BY MR. MOUGEY:
3     Q.  Now, you've been at Walgreens since 2008,
4  correct?
5     A.  Correct.
6     Q.  You would have an understanding, at least
7  from '08 on, who in Walgreens was responsible for
8  generating suspicious order reports, correct?
9     A.  No.
10    Q.  No idea?
11    A.  No.
12    Q.  Until you started in pharmaceutical
13  integrity, you were based out of Orlando and you
14  didn't know?
15    A.  Correct.
16    Q.  You didn't know who was responsible for
17  performing any due diligence on those suspicious
18  orders prior to when you started in pharmaceutical
19  integrity in January -- February 2013, correct?
20    A.  Correct.
21    Q.  So if you turn the page to Page 12, it
22  says:
23        "Subject to and without waiving its
24  objections, the following employees work in Walgreens'

Page 103

1  pharmaceutical integrity department, which is
2  response" -- "responsible for evaluating orders of
3  opiates from Walgreens pharmacies."
4        Did I read that right?
5     A.  Yes.
6     Q.  Okay.  So when are the people from
7  Walgreens pharmaceutical integrity department
8  responsible for evaluating suspicious orders?
9     A.  From the inception of the CSOM system and
10  establishment of our group.
11    Q.  That's post October of 2012, correct?
12    A.  Correct.
13    Q.  Who on this list knows anything about
14  Walgreens' suspicious order monitoring policies prior
15  to October of 2012?
16    MR. HILL:  Objection to form.
17  BY THE WITNESS:
18    A.  Eric Stahmann.
19  BY MR. MOUGEY:
20    Q.  Eric Stahmann, he -- okay.
21        Who else?
22    A.  From this list?
23    Q.  Yes, from this list.
24    MR. HILL:  When you say "this list," what are we

Page 104

1  referring to?
2  BY MR. MOUGEY:
3     Q.  The list on Page 12.  Do you see those
4  names?
5     MR. HILL:  But there's names right underneath
6  it, too.  Are you referring to them, too, or just the
7  box?
8  BY MR. MOUGEY:
9     Q.  The names on the list.  Do you see the
10  box?
11    A.  Oh, yeah, below the box.  So just in the
12  box?
13    Q.  Just in the box, the list?
14    A.  Per -- maybe Tasha Polster.  I don't know,
15  though, for sure.
16    Q.  You are not sure.
17        All right.  So who else on this list in
18  the box has personal knowledge about Walgreens'
19  suspicious order monitoring policies prior to October
20  of 2012?
21    A.  Perhaps also Steve Mills.
22    Q.  Anybody else?
23    A.  Not that I'm aware of.
24    Q.  Not that you are aware of.

Page 105

1        But -- but you -- you signed it, right?
2     A.  Um-hum.
3     Q.  Okay.  This list is included in the
4  document you signed, correct?
5     A.  Um-hum.
6     Q.  And you verified it, correct?
7     A.  Correct.
8     Q.  So let's look at the -- the paragraph
9  below.
10        "Additional Walgreens ... who have had
11  involvement with Walgreens' order monitoring systems,
12  including when Walgreens was distributing opiates to
13  its own pharmacies, include Steve Bamberg, Wayne
14  Bancroft, Sean Barnes, Barb Martin, John Merritello,
15  Denman Murray, Doug Peterson, and David Reiter."
16        Do you know all of those guys, ladies?
17    A.  Some.
18    Q.  Do you know who in that list would have
19  had personal knowledge about Walgreens' suspicious
20  order monitoring policies prior to October of 2012?
21    A.  I believe Steve Bamberg, Denny Murray,
22  Barb Martin, Wayne Bancroft from my personal
23  knowledge.
24    Q.  Okay.  I have got three.  Steve Bamberg,

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 Wayne Bancroft, Denman Murray, and who else?
2    A.   Barb Martin, John Merritello.
3    Q.   Okay.  Based on your understanding, those
4 folks are going to have pre-October 2012 knowledge
5 about Walgreens' suspicious order monitoring policies?
6    A.   I believe so.
7    Q.   Okay.  Now, let's go back up to the list
8 up top.
9         Quality and accreditation analyst.
10        Do you see that under Rebecca Heinzl?
11   A.   Yes.
12   Q.   What department is she in?
13   A.   I don't know.  I'm not familiar personally
14 with this individual.
15   Q.   Okay.
16   A.   That might be -- well, I don't know.  I
17 don't want to speculate.
18   Q.   Well --
19   A.   I believe she is --
20   Q.   -- you -- you -- you verified it to a
21 federal judge.  So, I mean, did you ask anybody,
22 Well --
23        MR. HILL:  Objection to the form.
24 BY MR. MOUGEY:

Page 107

1    Q.   -- who is -- who is Rebecca Heinzl that
2 I'm verifying?
3    A.   I be- --
4        MR. HILL:  Objection to the form.
5 BY THE WITNESS:
6    A.   I -- I believe that she is involved with
7 specialty pharmacy and so there might be some ordering
8 responsibilities or evaluating of certain specialty
9 products.
10 BY MR. MOUGEY:
11   Q.   But you're not sure?
12   A.   I'm not in -- sure of all of her
13 responsibilities.
14   Q.   So we've gone from I don't know who she is
15 to maybe specialty pharmacies, but you don't know all
16 of her scope of responsibilities.
17        So what -- what is specialty pharmacies?
18   A.   Specialty is a class of products that have
19 patients that have additional needs, HIV and liver
20 disease, a variety of high cost, high impact to the
21 patient disease states.
22   Q.   What about Steven Kennedy?
23   A.   Steven Kennedy is also -- was involved
24 with specialty.

Page 108

1    Q.   And he's -- his title was local specialty
2 quality?
3    A.   Correct.
4    Q.   And do you think that both Rebecca Heinzl
5 and Steven Kennedy are both in specialty pharmacy
6 business?
7    A.   Correct.
8    Q.   Okay.  What about the Jason, I'm going to
9 butcher his last name, Kluczyk?
10   A.   Kluczyk.
11   Q.   Kluczyk?
12   A.   Yeah.
13   Q.   What about Jason Kluczyk?
14   A.   He is on -- reports to me.  He is on our
15 team, pharmacy integrity.
16   Q.   So Erika Kryger is also specialty?
17   A.   Correct.
18   Q.   All right.  So on this table list we have
19 Rebecca Heinzl, Steven Kennedy and Erika Krieger that
20 don't work for pharmaceutical integrity, correct?
21   A.   Correct.
22   Q.   What relationship do -- does specialty
23 pharmacy have with pharmaceutical integrity?
24   A.   These individuals all reported to Tasha

Page 109

1 Polster at one time.  Some of them are no longer with
2 the company.  So they would report in up through
3 Tasha.
4    Q.   Okay.  Through pharmaceutical integrity?
5    A.   No.
6    Q.   Through how?
7    A.   Through -- through that specialty quality
8 group.
9    Q.   Was that a -- a -- Ms. Polster's role
10 prior to pharmaceutical integrity?
11   A.   Co, at the same time.  She -- she was the
12 director of multiple departments.
13   Q.   Ms. Polster ran multiple departments?
14   A.   Correct.
15   Q.   How many departments did Ms. Polster run
16 once pharmaceutical integrity was formed in the
17 beginning of 2013?
18   A.   Well, I think initially, if I'm
19 remembering correctly, it was just pharmaceutical
20 integrity.  For some period of time she had
21 third-party operations, which is involved with billing
22 of prescriptions and then that left and it's now back
23 under her.
24        And quality, I don't remember the exact

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 date when quality rolled into her group. And
2 specialty quality was later, but I don't remember the
3 date.
4    Q.   So specialty quality was at least late '13
5 or after?
6    A.   Yes.
7    MR. HILL:  Object to the form.
8 BY MR. MOUGEY:
9    Q.   And do you have any understanding of what
10 these three individuals from, I'm going to call it
11 specialty or special quality, that we just went
12 through, Rebecca, Steven and Erika, what role they
13 would have with Walgreens' suspicious -- suspicious
14 order monitoring policies?
15    A.   I -- as I'm thinking about it more and
16 my -- jogging my recollection, I think that there are
17 times when specialty pharmacy compounds certain drugs
18 and those compounds have to be -- and some of those
19 are narcotics and they're -- they're -- they have to
20 be ordered directly from the manufacturer and so can't
21 go through our system.  And so there is an individual
22 that reviews all of those orders.  However, it is a
23 very small number of prescriptions that we fill.
24    Q.   Minuscule?

Page 111

1    A.   Yes.
2    Q.   Yes.
3         And so any knowledge those three folks
4 would have regarding Walgreens' suspicious order
5 monitoring policies would also be very small, correct?
6    A.   They had a small scope on which they dealt
7 with, yes.
8    Q.   Okay.  So -- so you believe out of this
9 group Steven Mills and Eric Stahmann and Natasha
10 Polster would have information prior to the inception
11 of pharmaceutical integrity regarding Walgreens'
12 suspicious order monitoring policies?
13    A.   I believe that they may, yes.
14    Q.   You believe they may but you are not
15 really sure?
16    A.   I don't know everything that they know.
17    Q.   I'm not asking you if you know everything
18 they know.  All I'm asking you is would they have
19 material information --
20    A.   They may have --
21    Q.   -- about -- about suspicious order policy
22 at Walgreens prior to January of '13?
23    A.   They may have some information related to
24 those topics.

Page 112

1    Q.   But sitting here, you are not sure or have
2 any information one way or another?
3    MR. HILL:  Objection to the form.
4 BY THE WITNESS:
5    A.   I'm not -- I believe that they have
6 information prior to 2012.
7 BY MR. MOUGEY:
8    Q.   So how many -- do you know how many stores
9 there are at Walgreens, just generally?
10    A.   It changes constantly, but around 9,000, I
11 think.
12    Q.   Okay.  A lot, right?
13         So pre 2012 I'm -- I'm sorry -- pre
14 October of 2012, out of this entire 9,000, 7,000,
15 8,000s operation at Walgreens, we've identified Steve
16 Bamberg, Wayne Bancroft, Bob [sic] Martin, John
17 Merritello, Denman Murray along with the three people
18 from pharmaceutical integrity that would have
19 information regarding suspicious order monitoring
20 policy prior to October of 2012?
21    MR. HILL:  Objection to the form.
22 BY THE WITNESS:
23    A.   I believe that these individuals have that
24 knowledge.  There may have been others that are no

Page 113

1 longer with the company.  As we transitioned away from
2 filling controlled substances, I know that a lot of
3 the staff that were related to that function were laid
4 off.
5 BY MR. MOUGEY:
6    Q.   But -- but that -- I don't -- did someone
7 ask you to filter all of those people out that were no
8 longer there?
9    MR. HILL:  Objection to the form.
10 BY THE WITNESS:
11    A.   I don't recall.  I don't know.
12 BY MR. MOUGEY:
13    Q.   Well, let's go back to Interrogatory
14 No. 5:  "Please identify any persons employed by you,
15 or who received compensation from you..."
16         Do you see that?
17         So it's not just currently employed.  It
18 is who received compensation.
19         Do you see that?  It didn't say -- it
20 doesn't say who is currently receiving compensation,
21 correct?  So it's pretty much anyone who is employed
22 or received compensation, correct?
23    MR. HILL:  Objection to form.
24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1     A.   Who analyzed data regarding the

2 distribution?

3 BY MR. MOUGEY:

4     Q.   "... and dispensing of opiates or your

5 opioid products, including data regarding prescriber,

6 customer and/or pharmacy/dispenser that you own and/or

7 control, histories and trends for the State of Ohio

8 from January 1, 1990, to present."

9     Do you see that?

10     A.   Yes.

11     Q.   And it includes any former employees,

12 correct?

13     A.   Correct.

14     Q.   And it includes -- do you see the --

15 the -- the phrase "who received compensation"?

16     A.   Correct.

17     Q.   And you would agree that that would

18 include third-party vendors potentially, correct?

19     MR. HILL: Objection to form, and I would just

20 ask for the rule of completeness that you'd also read

21 our objections, Mr. Mougey.

22     MR. MOUGEY: If you want to do that later, you

23 are more than welcome to.

24 BY MR. MOUGEY:

Page 115

1     Q.   Who received compensation, you received --

2 you understand that that includes third-party vendors,

3 correct?

4     MR. HILL: Objection to the form.

5 BY THE WITNESS:

6     A.   I -- I don't know if it does.

7 BY MR. MOUGEY:

8     Q.   Well, what do you -- it's different, you

9 have employees and then you have "and people that

10 receive compensation," right?

11     A.   Correct, it says that, yes.

12     Q.   Yeah, and that would be reasonable to

13 include third-party vendors, correct?

14     MR. HILL: Objection to the form.

15 BY THE WITNESS:

16     A.   I don't know.

17 BY MR. MOUGEY:

18     Q.   Do you know if there is any 30 party --

19 third-party vendors that did -- performed any work for

20 Walgreens?

21     A.   Not that I'm aware of.

22     Q.   Regarding its controlled substance order

23 monitoring policies?

24     A.   Not that I -- I'm aware of.

Page 116

1     Q.   So over this time period responsive to

2 this interrogatory, one, two, three, four, five, six,

3 seven, eight people pre 2 -- October of 2012.

4     Do you see that?

5     A.   Yes.

6     Q.   Is that an accurate and complete list

7 responsive to this -- to Interrogatory No. 4?

8     MR. HILL: Objection to the form.

9 BY THE WITNESS:

10     A.   I think that it is complete to the extent

11 that we know who those people are. Again, I think

12 there may have been people that previously worked here

13 but haven't in some time and it would be difficult to

14 identify their roles and responsibilities going back a

15 number of years.

16 BY MR. MOUGEY:

17     Q.   Well, would it be important for you to go

18 ask Steve Bam -- Bamberg and Wayne Bancroft and Bob

19 Martin and John Merritello and Denman Murray and say,

20 Who are the other folks that were involved prior to

21 October 12th [sic]?

22     A.   I did have a conversation with Denny

23 Murray.

24     Q.   The rest of them as well?

Page 117

1     A.   No. But -- but most of these individuals

2 report to Denny, and so I spoke with Denny on -- on

3 this matter and I believe he told me that they weren't

4 able to -- to determine those people that might have

5 been at the DCs previously.

6     Q.   I can't read my own writing, but let me

7 see if I can get this name right, Layne Browling,

8 Layne, does that ring a bell?

9     A.   No.

10     Q.   Anybody with the initials LB?

11     A.   Not that I recall.

12     Q.   So your process to inform yourself about

13 folks that were -- understood the CSOM prior to

14 October '12 provided eight people in a company that

15 owns, 7, 8, 9,000 stores, pharmacies?

16     MR. HILL: Ob- -- objection to form.

17 BY THE WITNESS:

18     A.   Those are -- that's my understanding.

19 BY MR. MOUGEY:

20     Q.   Let's go to 13. It is on Page 18.

21     "Please identify all persons who were

22 responsible for administering, overseeing, developing

23 and/or implementing any and all policies, procedures,

24 systems or programs designed to detect and report

Page 118

1  suspicious orders or to maintain effective controls
2  against diversion of controlled substances from
3  January 1, 1990 to present."
4      Do you see that?
5  A.  Yes.
6  Q.  It is pretty much asking for any --
7  everyone who was responsible for or administering,
8  overseeing, developing or implementing, that's pretty
9  broad, correct?
10  A.  Correct.
11  Q.  Any policies, procedures, systems or
12  programs to detect and report suspicious orders,
13  correct?
14  A.  Correct.
15  Q.  And it goes on in the next sentence:
16      "This includes but is not limited to,
17  persons responsible for review, verification, approval
18  and release of suspicious orders or orders of
19  interest, as well as all persons with the ability to
20  override any system, from January 1, 1990, to present.
21  For each person listed, please provide their title and
22  the timeframe in which they served."
23      Do you see that?
24  A.  Yes.

Page 119

1  Q.  Can you think of any individuals that were
2  not identified in response to Interrogatory No. 5 that
3  would be responsive to Interrogatory No. 13?
4  A.  No.
5  Q.  And what did you do to inform yourself and
6  verify to the federal judge and the Plaintiffs in this
7  case that the list provided in response to No. 5 was
8  also responsive to Interrogatory No. 13?
9  A.  Discussions with counsel, and again,
10  discussions with the inventory folks, Denny Murray and
11  et cetera.
12  Q.  Well, when you say "et cetera," so you
13  went to the inventory guy, Denny Murray.
14      When you say "inventory," what's -- what's
15  that department do?
16  A.  R -- so Rx inventory is responsible for
17  the ordering and in-stock condition, management of our
18  inventory levels of pharmacy inventory.
19  Q.  And what does his department, what is the
20  overlap with suspicious order monitoring?
21  A.  So I -- I believe they were previously
22  responsible for portions of suspicious order
23  monitoring.
24  Q.  When you say "previously," what is your

Page 120

1  understanding of the timeframe that his department,
2  the inventory department, was responsible for
3  suspicious order monitoring?
4  A.  Prior to Rx integrity, but I don't know...
5  Q.  I mean any -- any -- that's a long period
6  of time.  Anything that's specifically?
7  A.  No.
8  Q.  All right.  Let's go back to 5 and walk me
9  through each one of these in -- in -- individuals that
10  you all have identified -- that you've identified here
11  and give me your timeframes and departments for when
12  these folks would have an understanding about
13  suspicious order monitoring policies at Walgreens?
14  A.  I'm sorry.  What page is -- are we on?
15  Q.  Page 12.  We have been searching for
16  someone that understands Walgreens' system prior to
17  October '12 for what feels like a long time, four or
18  five depositions, and we haven't found anybody yet.
19  So I need your help pointing me to who understands
20  Walgreens' system prior to October of 2012.
21      MR. HILL:  Objection to the form.
22  BY THE WITNESS:
23  A.  So, I believe that to be, in terms of the
24  system design, Steve Bamberg, Wayne Bancroft and John

Page 121

1  Merritello.
2  BY MR. MOUGEY:
3  Q.  Okay.  And help me understand what time
4  periods each one of them that you understand were
5  familiar with Walgreens' system to identify suspicious
6  orders?
7  A.  I -- I don't know -- they've all been in
8  their roles for -- their current roles for some period
9  of time is my understanding, long period of time.  I
10  don't know when it would have started, but I believe
11  it would have been prior to 2012.  I don't know how
12  far back that goes.
13  Q.  So Steve Bamberg, Wayne Bancroft and John
14  Merritello, correct?
15  A.  Correct.
16  Q.  And you know that they went back prior to
17  '12 but not -- not sure how much?
18  A.  I don't know how far back.
19  Q.  Okay.
20  A.  I know that John Merritello has been
21  involved with our order -- ordering system for across
22  the whole company, not just controls, for some time.
23  Q.  But you're not sure what his time period
24  is for suspicious order monitoring which you

Page 122

1  understand this litigation is about, correct?
2      MR. HILL:  Objection to the form.
3  BY THE WITNESS:
4      A.  I don't know the exact start date.
5  BY MR. MOUGEY:
6      Q.  I'm not asking for an exact start date.
7  What I'm looking for is just general ranges would be
8  helpful.  You know, '06 to '08, '05 to '09, something
9  along those lines.
10     A.  Well, I -- so let me just clarify.  Are we
11 talking -- I think that Steve, Wayne and John were
12 responsible for system design.  Barb, Denny are
13 responsible for more for the operational piece.  So I
14 don't know that John Merritello was overriding or et
15 cetera.  I think he was responsible for helping to
16 design the system that others might have used to
17 manage that.
18     Q.  Do you have an understanding of who --
19 what individual will have knowledge whether or
20 not due diligence was performed on suspicious orders
21 prior to 2012?
22     A.  I think that's going to be Denny Murray.
23     Q.  So 9,000 stores, we've got one -- one
24 person?

Page 123

1      MR. HILL:  Objection to form.
2  BY THE WITNESS:
3      A.  I don't think that's who was performing
4  all of that function.  I think that's who will know
5  about it that's still -- that we can produce, you
6  know, that we know who they are.
7  BY MR. MOUGEY:
8      Q.  All right.  Who -- Denny wasn't performing
9  it, but he would know about who is doing it, is that
10 what you are saying?
11     A.  I think he would know who.
12     Q.  Okay.  Do you know who was performing the
13 due diligence on any suspicious orders or orders of
14 interest, whatever you all want to call them, prior to
15 October of '12?
16     A.  I do not.
17     Q.  So when you verified this interrogatory
18 response, did someone ask you to make sure we identify
19 individuals responsible for performing due diligence
20 on suspicious orders?
21     MR. HILL:  Objection to form.
22         I caution the witness not to reveal any
23 attorney/client communication in your answer.
24 BY THE WITNESS:

Page 124

1      A.  So, I believe this to be a complete list
2  of what was asked.
3  BY MR. MOUGEY:
4      Q.  Well --
5      A.  I --
6      Q.  So you think that you -- you weren't asked
7  to go identify individuals for -- to perform due
8  diligence --
9      MR. HILL:  Objection to form.
10 BY MR. MOUGEY:
11     Q.  -- to perform due diligence on suspicious
12 orders?
13     MR. HILL:  Objection to form.
14 BY THE WITNESS:
15     A.  I -- I don't know.
16 BY MR. MOUGEY:
17     Q.  You've signed it, you verified a federal
18 pleading.  I've heard I don't know, I don't know, I
19 don't know, I've listened to counsel, I've had
20 conversations.  There is 9,000 stores.
21         Do you have any idea how many people work
22 for Walgreens?
23     A.  Well, I say that we objected that it was
24 overly broad and burdensome for any persons.  So,

Page 125

1  based on our counsel and our discussions, I believe
2  this to be correct to the best of my knowledge.
3      Q.  What I'm asking you is:  What were you
4  asked -- who were you asked to go identify?  Were you
5  asked to identify individuals that were performing due
6  diligence on suspicious orders?
7      A.  There were --
8      MR. HILL:  Objection to form and I'll give you
9  the same instruction I gave earlier.
10 BY MR. MOUGEY:
11     Q.  Yes or no, were you asked to go identify
12 individuals that were performing suspicious orders?
13     THE WITNESS:  What was the previous instruction?
14     MR. HILL:  I've asked you not to reveal any
15 attorney/client communications in your answer.
16 BY MR. MOUGEY:
17     Q.  Yes or no, were you asked to identify
18 individuals that were performing due diligence on
19 suspicious orders?
20     MR. HILL:  Also objection to form.
21 BY THE WITNESS:
22     A.  I will say that we -- I was tasked with
23 attending these meetings and discussing about who
24 might know this information.

Page 126

BY MR. MOUGEY:

1 BY MR. MOUGEY:
2    Q.   Simple question.  Were you asked to
3 identify individuals that were responsible for
4 actually performing the due diligence on suspicious
5 orders?
6    MR. HILL:  Same objections.
7 BY THE WITNESS:
8    A.   I -- I don't know that I can answer that
9 without revealing attorney/client conversations.
10 BY MR. MOUGEY:
11    Q.   You haven't been instructed not to answer.
12 I need you to answer this very, very, very simple
13 question.  We have been in the middle of discovery
14 with your company for months.
15        Were you asked to identify individuals
16 that were responsible for performing due diligence on
17 individuals in response to this interrogatory request?
18    MR. HILL:  Objection to form and same
19 instruction.
20 BY MR. MOUGEY:
21    Q.   You -- please answer the question.
22    A.   I'm not sure how to answer.
23    MR. HILL:  Do you have a -- a privilege issue?
24    THE WITNESS:  I -- I don't know.  Maybe I'm

Page 127

1 not sure.
2 BY MR. MOUGEY:
3    Q.   Then please answer the -- then answer the
4 question.
5    MR. HILL:  If you are concerned about answering
6 because of privilege, let's take a one minute.
7    MR. MOUGEY:  There is -- there is -- there is
8 absolutely zero privilege issue of whether or not you
9 were asked to identify individuals who performed due
10 diligence on suspicious orders in response to these
11 interrogatories.
12    MR. HILL:  Peter, I -- I disagree.  You -- you
13 are not allowed to ask him was -- did someone say
14 something to you and then get around the
15 attorney/client privilege that way.  He has answered
16 this question five times.  He has a concern about
17 privilege.  I'd like to take one minute and just clear
18 it up.  It may be the yes-or-no answer that you are
19 asking for.
20    MR. MOUGEY:  Or we'll have an epiphany about
21 something he didn't remember just this last time we
22 stepped into the hall in these meet and confers --
23 BY MR. MOUGEY:
24    Q.   Did -- were you asked -- this is a simple

Page 128

1 answer of whether or not you were asked to identify
2 people who performed due diligence on suspicious
3 orders --
4    MR. HILL:  Are you asking him if lawyers told
5 him that?
6 BY MR. MOUGEY:
7    Q.   -- in response to your interrogatories?
8    MR. HILL:  Are you asking him if lawyers told
9 him that?
10 BY MR. MOUGEY:
11    Q.   Anybody.  What was the scope that you
12 performed?
13    MR. HILL:  Anybody --
14 BY MR. MOUGEY:
15    Q.   Let's do it this way:  Did you seek to
16 identify individuals that performed due diligence on
17 suspicious orders?
18    A.   Yes.
19    Q.   And who -- how did you -- how did you go
20 investigate to find out individuals and identify
21 individuals responsive to this interrogatory who were
22 performing suspicious order -- due diligence on
23 suspicious orders?
24    A.   Meetings --

Page 129

1    MR. HILL:  Objection to the form.
2 BY THE WITNESS:
3    A.   Meetings and discussions with John
4 Merritello and Denny, et cetera.
5 BY MR. MOUGEY:
6    Q.   Two people?
7    A.   I think there were more than two people in
8 the meeting.  I can't recall.
9    Q.   Who else was in the meeting?
10    A.   I don't recall.
11    Q.   So out of 9,000 stores, you went to two
12 people and said, Please identify for me the
13 individuals responsible for performing due diligence
14 on suspicious orders?
15    A.   Prior to 2012, I -- those are the
16 individuals that I spoke with.
17    Q.   And who did they tell you?
18    A.   They -- one of their responses was they
19 don't recall the individuals that were involved
20 previously.  At that time themselves, this list of
21 individuals, Barb Martin, Sean Barnes, et cetera.
22    Q.   So these are the people on this -- this
23 list, on Page 12, whether it be the table and the
24 names below, that were responsible for actually

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  performing the due diligence on suspicious orders?
2      MR. HILL: Objection to the form.
3  BY THE WITNESS:
4      A.  I -- I'm not sure.
5  BY MR. MOUGEY:
6      Q.  You don't know.
7          Who do you think would know? Who out of
8  these people are going to be the one that we are
9  finally going to find the -- the witness that can
10 identify who was doing the due diligence on suspicious
11 orders?
12     A.  I think --
13     MR. HILL: Objection to form.
14 BY THE WITNESS:
15     A.  I think Denny Murray and Barb Martin would
16 know.
17 BY MR. MOUGEY:
18     Q.  Denny Murray and Bob [sic] Martin?
19     A.  Barb Martin.
20     MR. HILL: Barb Martin. You keep saying "Bob."
21 BY MR. MOUGEY:
22     Q.  I don't think I'm saying "Bob." Barb
23 Martin?
24     A.  Correct.

Page 131

1      Q.  Barb. Right?
2      MR. HILL: Right.
3  BY MR. MOUGEY:
4      Q.  Right?
5      A.  Yes.
6      Q.  Barb.
7          So it's important we talk to Barb as fast
8  as we can about the due diligence that Walgreens was
9  performing on suspicious orders, correct?
10     MR. HILL: Objection to form.
11 BY THE WITNESS:
12     A.  I -- I believe she may know.
13 BY MR. MOUGEY:
14     Q.  Okay. So that's the -- that's one of the
15 two people you can think of in your due diligence
16 responding to this interrogatory that will know who
17 was performing due diligence on suspicious orders?
18     MR. HILL: Objection to the form.
19 BY THE WITNESS:
20     A.  I believe that to be correct.
21 BY MR. MOUGEY:
22     Q.  And the other person's name, Denny, Denny
23 Murray?
24     A.  Den -- Denman, same individual.

Page 132

1      Q.  Denny, I thought you said Denny earlier?
2      A.  I did. He goes by Denny. Sorry.
3      Q.  Okay. Denman Murray.
4          So Denman Murray is the second person out
5  of 9,000 stores that you were able to ascertain that
6  knows something about performing due diligence on
7  suspicious orders?
8      A.  Correct.
9      MR. HILL: Objection to form.
10 BY MR. MOUGEY:
11     Q.  Now, think about, do you have any I --
12 earthly idea how many orders come in monthly for
13 Schedule II and Schedule III narcotics in '11, '12,
14 '13?
15     A.  It -- I -- it's a lot.
16     Q.  It's -- it's millions, right?
17     A.  I -- I don't know for sure.
18     Q.  And Walgreens is dispensing millions and
19 millions and millions of Schedule II and Schedule III
20 opiates in '10, '11, '12, '13, right?
21     A.  Pills, prescriptions?
22     Q.  Dosage units?
23     A.  Yes -- yes.
24     Q.  Walgreens has a material number,

Page 133

1  percentage of the market share in '10, '11, '12 on
2  Schedule II and Schedule III opiates, correct?
3      MR. HILL: Objection to the form.
4  BY THE WITNESS:
5      A.  I -- I'm not sure what you mean by
6  material.
7  BY MR. MOUGEY:
8      Q.  Large.
9      MR. HILL: Same objection.
10 BY THE WITNESS:
11     A.  I -- I -- I don't know the market share.
12 I mean, I know we are a large pharmacy, but I don't
13 know the market share.
14 BY MR. MOUGEY:
15     Q.  A large pharmacy that has a significant
16 amount of the market share for Schedule II and
17 Schedule III opiates, correct?
18     MR. HILL: Object to the form.
19 BY THE WITNESS:
20     A.  Yes.
21 BY MR. MOUGEY:
22     Q.  And your investigation into identifying
23 people who had knowledge about performing due
24 diligence on suspicious orders resulted in two people?

Page 134

1    MR. HILL:  Objection to form.
2    BY THE WITNESS:
3        A.   I -- this is the list that we produced,
4    yes.
5    BY MR. MOUGEY:
6        Q.   So the answer to my question is yes?
7        MR. HILL:  Same objection.
8    BY MR. MOUGEY:
9        Q.   We went through the list and the people
10   that have knowledge about due diligence on suspicious
11   orders prior to October of 2012 are two people?
12       MR. HILL:  Same objections.
13   BY THE WITNESS:
14       A.   I mean, those are the people that we
15   produced, yes.
16   BY MR. MOUGEY:
17       Q.   You understand that in two weeks you're
18   coming back and you and I get to do this again and
19   you're going to be wearing the hat of Walgreens.
20            You -- you understand that, right?
21       A.   Yes.
22       MR. HILL:  Objection to the form.
23   BY MR. MOUGEY:
24       Q.   And you're going to promise me and the

Page 135

1    other side of this table that you are going to be
2    armed with the knowledge to answer questions about pre
3    October 2012 questions regarding suspicious order
4    monitoring policies and procedures, right?
5        MR. HILL:  Sir, he is not here to make promises
6    about procedures.  If you have an issue with the
7    30(b)(6), you can ask us.  He is here to answer
8    questions about his factual knowledge.  Not make
9    promises about what he might know in a 30(b)(6)
10   deposition.  I'm sorry, that -- that's not a fair
11   question.
12   BY MR. MOUGEY:
13       Q.   You -- you can answer my question and he
14   can object later.
15            You understand that you are, as appearing
16   in a 30(b)(6), that you are making a promise to be
17   armed with the information to answer questions
18   regarding Walgreens' suspicious order monitoring
19   policies and procedures prior to some of 2012,
20   correct, sir?
21       MR. HILL:  Ob- -- objection to the form.  Same
22   point.
23   BY THE WITNESS:
24       A.   I -- I understand that I will be the

Page 136

1    30(b)(6) witness and I understand that in the
2    intervening time between now and that testimony that
3    I'll be prepared to testify in those matters.
4    BY MR. MOUGEY:
5        Q.   About issues regarding pre 2000 --
6    October 2012 suspicious order monitoring policies and
7    procedures, correct?
8        A.   I --
9        MR. HILL:  He'll be prepared to testify about
10   the topics that we've agreed to have him testify
11   about, including the objections to those.
12   BY MR. MOUGEY:
13       Q.   Is the answer to my question yes or no,
14   sir?
15       A.   I -- I don't know the content of what I'm
16   going to be prepared on yet, so...
17       Q.   Because you've spent 30 minutes so far?
18       A.   So I can't -- I can't see the future,
19   unfortunately, so...
20       Q.   If you'd look at Page 25 of your
21   interrogatories, Interrogatory No. 23.
22            "Describe any and all educational
23   information and/or other programs you have provided to
24   any customer and/or pharmacy/dispenser you own and/or

Page 137

1    control and any other person that address diversion,
2    safety, efficacy, misuse and/or prescription of
3    opiates or opiate products, from 1990 to the present."
4        Do you see that, sir?
5        A.   This is on Page 25?
6        Q.   25, yes, sir, Interrogatory No. 3,
7    correct?
8        MR. HILL:  23.
9    BY THE WITNESS:
10       A.   Interrogatory 23 on Page 25, yes.
11   BY MR. MOUGEY:
12       Q.   Yes.  Thank you.
13            Now, let's focus on educational pieces for
14   the pharmacy/dispenser.
15            Do you see that?
16       A.   Yes.
17       Q.   What type of educational programs does
18   Walgreens provide to its pharmacies, pharmacists and
19   employees of those pharmacies?
20       A.   Currently?
21       Q.   Any time responsive to this request.
22       MR. HILL:  Objection to the form.
23   BY THE WITNESS:
24       A.   I know that we have training through our

Page 138

1 good faith dispensing program and target good faith
2 dispensing. There is CEs that we have sponsored or --
3 or gotten available for pharmacists about dispensing
4 of controlleds and opioids. We've trained on
5 Naloxone. I know that we participated in various
6 outreach programs, and there were some internal
7 documents related to those and communications, like
8 this "It" -- "It Ends With Us" program.
9 BY MR. MOUGEY:
10    Q.   What CEs --
11    MR. HILL: Were you -- were you finished with
12 your answer, sir?
13 BY THE WITNESS:
14    A.   We also had training around our safe
15 medication disposal program. There is an opioid
16 component to that as well. And then recently we've
17 also put kits in place at stores or will be putting
18 them shortly in all of our stores that don't have a
19 kiosk to collect tablets that people wish to dispose
20 of, and there is training around that as well.
21 BY MR. MOUGEY:
22    Q.   Okay. Let's do prior to the 2013
23 agreement with the DEA, okay.
24       So based on your investigation, informing

Page 139

1 yourself so you can verify these interrogatories, what
2 educational or programs did you identify for any
3 Walgreens' employees about opiates or suspicious order
4 monitoring?
5    MR. HILL: Objection to form.
6 BY THE WITNESS:
7    A.   I don't -- I don't think we were able to
8 identify those due to the period of time. There
9 were -- I'm told there were programs, but I don't know
10 that we have retained those materials and they've been
11 superseded by other things.
12 BY MR. MOUGEY:
13    Q.   Were there programs put on by the DEA --
14    A.   No.
15    Q.   -- that your employees attended?
16    A.   I know that sometimes DEA would attend
17 meetings of pharmacists at the district level. I
18 don't know that that was comprehensive or complete
19 across the whole company and varied field office to
20 field office.
21    Q.   Well, let me hand you a document we've
22 identified. It is P-WAG 1257.
23       We'll come back to that. We'll come back
24 to that.

Page 140

1       Do your -- have an understanding -- or did
2 your investigation not reveal in response to
3 Interrogatory No. 3 that there were CEs put on by the
4 DEA that were offered to your employees?
5    A.   Not that I'm aware of.
6    MR. HILL: Objection. Just for the record, 23?
7    MR. MOUGEY: 23, okay.
8 BY THE WITNESS:
9    A.   Again, I -- I don't know if there was a
10 CE. I know that there was at times various meetings
11 that the DEA might have attended, but I don't think
12 that was comprehensive across our whole organization.
13 BY MR. MOUGEY:
14    Q.   Would you agree that the DEA would be a
15 good source of information about potential issues and
16 problems regarding Schedule II and Schedule III
17 narcotics?
18    A.   It can be.
19    Q.   And that the information provided by the
20 DEA is valuable for Walgreens when implementing its
21 responsibilities of suspicious order policy -- I'm
22 sorry -- suspicious order monitoring?
23    MR. HILL: Objection to the form.
24 BY THE WITNESS:

Page 141

1    A.   I can tell you that we receive varying
2 guidance from DEA field offices, sometimes
3 conflicting. We seek to use that information as best
4 we can, but it's not always 100 percent. We've had
5 field offices, for instance, tell us they don't want
6 our controlled substance suspic- -- suspicious order
7 reports. So --
8 BY MR. MOUGEY:
9    Q.   Who told you that?
10    A.   Field agents from dare -- various
11 different field offices have at times said, Stop
12 sending us these faxes with all of these orders.
13    Q.   Do you have that information directly from
14 one of the field agents?
15    A.   I've had that conversation with my
16 employees or analysts on our department that have been
17 sending out those communications that they've spoke to
18 field agents that said, We don't want this or, for
19 instance, another example, the -- the New Orleans
20 field office wanted to have a change in how we report
21 one-business-day letters about 106 losses that wasn't
22 consistent with any other field office. So we take
23 their comments under advisement, but...
24    Q.   But the question I asked you was: Did you

Page 142

1  have that can -- conversation directly.  So the answer
2  to my question is no, correct?
3      A.   Regarding the field agents?
4      Q.   Yes, that's exactly right, that's the
5  question I asked you a few minutes ago --
6      A.   I did not speak directly with the field
7  agent.
8      Q.   And so who told you that the DEA -- which
9  one of your employees told you the DEA asked to stop
10  sending suspicious order reports?
11      A.   I believe it was Steve Mills, Taylor
12  Mayur, and I'm trying to -- I can't recall.  We've
13  been told on numerous occasions, though.
14      Q.   But you -- did you take that information
15  and run it up the food chain to Ms. Polster?
16      A.   I think we discussed it with our
17  regulatory law team.
18      Q.   You did.
19      A.   And we continued to report respective of
20  their guidance.
21      Q.   And what memorialization or documentation
22  is there where the DEA told your group to stop sending
23  suspicious order reports?
24      MR. HILL:  Object to the form.

Page 143

1  BY THE WITNESS:
2      A.   They are -- I don't know.  It was some
3  time ago.  It might be e-mail.
4  BY MR. MOUGEY:
5      Q.   Did someone send a -- a letter or an
6  e-mail to the DEA asking for more information about
7  why they wanted to stop sending suspicious order
8  reports?
9      A.   I know --
10      MR. HILL:  Object to form.
11  BY THE WITNESS:
12      A.   I know that some of it was phone calls
13  because they would reply to the fax number that we
14  would fax it in on.  I don't know if there are e-mails
15  or not.
16  BY MR. MOUGEY:
17      Q.   So -- so in the middle of the opiate
18  crisis, deaths are going through the roof, overdoses
19  are through the roof, there -- DE -- DEA is imposing
20  fine after fine after fine, issuing orders of
21  suspension, the DEA called and said, You know what,
22  Walgreens, we really don't need any more suspicious
23  order reports.
24      Is that -- is that your testimony?

Page 144

1      A.   A --
2      MR. HILL:  Object to form.
3  BY THE WITNESS:
4      A.   -- a field agent from the DEA, yes.
5  BY MR. MOUGEY:
6      Q.   Yes.
7      Was that pre or post $80 million payment
8  to the DEA for Walgreens failing to implement its
9  suspicious order monitoring policies?
10      MR. HILL:  Objection to the form.
11  BY THE WITNESS:
12      A.   It -- it was after our settlement with the
13  DEA.
14  BY MR. MOUGEY:
15      Q.   Oh, it was -- it was post 2013?
16      A.   Correct.
17      MR. HILL:  Objection to the form.
18  BY THE WITNESS:
19      A.   It was post 2013.
20  BY MR. MOUGEY:
21      Q.   Okay.  The DEA, according to -- to you and
22  the people that you spoke with, told Walgreens post
23  DEA settlement, which is June of 2013, to stop sending
24  suspicious order reports?

Page 145

1      A.   A field agent of one of the offices of the
2  DEA spoke with one of my employees and said, We don't
3  want to receive these reports any longer.
4      Q.   And you believe that there should be an
5  e-mail or a letter confirming that from Walgreens back
6  to the DEA?
7      A.   I --
8      MR. HILL:  Objection to the form.
9  BY THE WITNESS:
10      A.   I don't know for certain.  I know that
11  there was internal discussion with our regulatory law
12  team.  There may be e-mails that exist somewhere.  I
13  don't know for certain.
14  BY MR. MOUGEY:
15      Q.   I'm going to hand you what I've marked
16  as 4.
17      (WHEREUPON, a certain document was
18      marked Walgreens-Bratton Deposition
19      Exhibit No. 004, for identification,
20      as of 11/30/2018.)
21  BY MR. MOUGEY:
22      Q.   Do you know a Patty Zagami?
23      A.   Yes.
24      Q.   And she is in the litigation regulatory

Page 146

1 law department, correct?
2    A.   Correct.
3    Q.   And do you see the date of this -- of her
4 e-mail is 2/17/2012, right?
5    A.   Correct.
6    Q.   And you see "Subject:  DEA conference,"
7 right?
8    A.   Correct.
9    Q.   And I'm -- right below it says, "RPH."
10       What's RPH stand for?
11    A.   Next to Patty's name, is that what you are
12 referring to?
13    Q.   "RPH, this is a great opportunity."
14       Do you see that?
15    A.   Oh, RPH is -- oh, at the top, yes.
16    Q.   I'm sorry.  Right below.
17    A.   Yes.
18    Q.   Upper -- right -- right below the
19 "Subject:  DEA conference" and in uppercase it's
20 "RPH."
21       Do you see that?
22    A.   Correct, yes.
23    Q.   All right.  Do you know what "RPH" stands
24 for?

Page 147

1    A.   Pharmacist, registered pharmacist.
2    Q.   Okay.  And:
3       "This is a great opportunity to earn seven
4 live CEs on a very hot topic.  You might want to
5 consider this if you have off that weekend."
6       Do you see that?
7    A.   Yes.
8    Q.   Now, had you seen e-mails similar to this
9 that the DEA was -- was offering conferences or CEs,
10 rather, on diversion?
11    A.   I've -- I've heard that they have at times
12 had CEs, yes.
13    Q.   Okay.  But in response to
14 Interrogatory 23, can you find me -- when you are
15 doing your due diligence and were asking for
16 educational information or other programs, maybe I'm
17 just missing it, but do you see anything in here where
18 we talk about DEA continuing education programs?
19    MR. HILL:  Where does it say in the rog that you
20 want --
21    MR. MOUGEY:  I don't need any speaking
22 objections from you guys.
23    MR. HILL:  I'm asking a question.
24    MR. MOUGEY:  I don't need you to ask a question.

Page 148

1 If you want to object to the form, object to the form,
2 but I don't want --
3    MR. HILL:  Object to the form.
4 BY MR. MOUGEY:
5    Q.   Do you see anywhere in response to
6 Interrogatory No. 23 that you told us and Judge
7 Polster that, Well, the DEA offered continuing
8 education to our employees?
9    A.   So the interrogatory says:  "Describe any
10 and all information or other programs you have
11 provided," so we didn't provide the DEA ones.
12    Q.   So by your legal department e-mailing your
13 RHPs, your pharmacists, saying this is a hot topic,
14 you should attend, you don't think that that's
15 responsive to Interrogatory No. 3 -- 23?
16    MR. HILL:  Objection to the form.
17 BY THE WITNESS:
18    A.   Personally, no, I do not.  I don't know
19 if --
20 BY MR. MOUGEY:
21    Q.   So --
22    A.   -- I'm not a lawyer.
23    Q.   -- previously when you responded and said,
24 Well, CEs that we sponsored, that's different than DEA

Page 149

1 continuing education programs?
2    A.   Correct.
3    Q.   So, in fact, the DEA did offer and
4 Walgreens did provide that opportunity to its
5 pharmacist to attend, correct?
6    MR. HILL:  Objection to form.
7 BY THE WITNESS:
8    A.   I -- I disagree.  We didn't pay them, we
9 didn't pay for the CE.  We just notified them that it
10 was available.  I don't think that would meet the
11 definition of providing, at least as I understand it.
12 BY MR. MOUGEY:
13    Q.   So you don't think this DEA conference
14 that your legal department identified for your
15 pharmacists on drug diversion conference was
16 responsible to:  "Describe any and all educational
17 information and/or other programs you have provided to
18 any, including pharmacy/dispenser," correct?
19    MR. HILL:  Objection to the form.
20 BY THE WITNESS:
21    A.   I -- I don't believe so.
22 BY MR. MOUGEY:
23    Q.   Well, why don't we spend a minute and go
24 through this document.  So on the e-mail the

Page 150

1  description is: "DEA to host drug diversion
2  conference in Florida."
3       Do you see that?
4   A.  Yes.
5   Q.  Now, the date of this is 2/17/2012.
6       So, where are you working at Walgreens in
7  2012?
8   A.  Central pharmacy operations in Orlando,
9  Florida.
10  Q.  In Orlando, Florida, okay.
11      And where were you based out of in
12 Orlando, where was your office?
13  A.  It is on Sand Lake Road near I Drive in
14 downtown -- not downtown, but the center area of
15 Orlando.
16  Q.  Is it a corporate headquarters or is it
17 a -- was there actually a -- a pharmacy in that
18 location?
19  A.  That was a pharmacy location that had some
20 support staff at it.
21  Q.  All right.  And that wasn't one of the
22 pharmacies that was -- that quit dispensing
23 Schedule II and Schedule III narcotics as a result of
24 the DEA investigation in 2013, was it?

Page 151

1   A.  They did not have a sh- -- order to show
2  cause, no.
3   Q.  And that was not one of the six Walgreens'
4  pharmacies that ceased dispensing Schedule II and
5  Schedule IIIs as a result of the DEA investigation in
6  2012 and 2013?
7   A.  It was not.
8   Q.  Okay.  So the description:
9       "Next month, the US Drug Enforcement
10 Administration will hold a conference to help
11 pharmacists identify and respond to prescription drug
12 diversion."
13      That's kind of what it says here, a hot
14 topic at this point, right?
15  A.  Yes.
16  Q.  The OxyContin overdose deaths are
17 exponentially increasing and had been for years in
18 Florida, correct?
19  MR. HILL:  Objection to form.
20 BY THE WITNESS:
21  A.  I -- I don't -- I know there was news and
22 things about deaths.  I don't know if they were
23 exponentially increasing or how many there were.
24 BY MR. MOUGEY:

Page 152

1   Q.  And part of the reason you didn't tell us
2  about this conference is because you didn't pay for
3  the -- the filing fee, right?
4   MR. HILL:  Objection to the form.
5  BY THE WITNESS:
6   A.  Not that I'm aware of, no.
7  BY MR. MOUGEY:
8   Q.  Yes, sir.  Excepting for this next
9  sentence says:
10      "The conference, which is free, will
11 enable pharmacists and pharmacy technicians to earn up
12 to seven continuing education credits."
13      Do you see that?
14  A.  Yes.
15  Q.  And -- and continuing education, that's
16 something that the pharmacists and pharmacy
17 technicians have to fill and meet each year, correct?
18  MR. HILL:  Objection to the form.
19 BY THE WITNESS:
20  A.  I believe for pharmacists.  I don't know
21 that techs have to, but...
22 BY MR. MOUGEY:
23  Q.  And this is in West Palm Beach, just a few
24 hour drive from Orlando, right?

Page 153

1   A.  Correct.
2   Q.  And it continues:
3       "The conference agenda includes sessions
4  on drug trends..."
5       And that's an important part of
6  identifying suspicious orders, correct, sir?
7   A.  I'm not sure what they mean by drug
8  trends.
9   Q.  You don't have any idea what the word
10 "trend" means?
11  A.  I don't know --
12  MR. HILL:  Object to the form.
13 BY THE WITNESS:
14  A.  I don't know that it relates to suspicious
15 orders.  I see that there are -- it says "drug trends"
16 there.
17 BY MR. MOUGEY:
18  Q.  Well, you see the word "diversion" in the
19 title, right?
20  A.  Correct.
21  Q.  And you understand that we are talking
22 about drug trends in the context of diversion,
23 correct?
24  A.  Correct.

Page 154

1 Q. And the -- the conference covers
2 pharmacists' responsibilities to minimize diversion
3 risks, drug theft prevention, requirements for retail
4 distributors, and the imp- -- implementation of
5 Florida's prescription drug monitoring program,
6 correct?
7 A. Correct.
8 Q. That's right up Walgreens' alley in -- in
9 July of 2012 regarding its SOM policies, correct?
10 MR. HILL: Objection to the form.
11 BY THE WITNESS:
12 A. I don't -- I can't say for certain.
13 BY MR. MOUGEY:
14 Q. Well, let's look through this and see what
15 you think about how -- so if you would, sir, just flip
16 through to the page that is at the very top right-hand
17 corner, it is 1257.002, "Commonly Abused Controlled
18 Pharmaceuticals."
19 MR. HILL: That -- that's on all pages.
20 MR. MOUGEY: That's not on all of yours?
21 MR. HILL: That's on all of them.
22 MR. MOUGEY: Oh, it is the same one on all of
23 them?
24 MR. HILL: Yeah.

Page 155

1 BY MR. MOUGEY:
2 Q. So it's about five pages in. I might be
3 off a page or two. It is up on the screen if you want
4 to see the -- the picture.
5 A. Okay.
6 Q. And we've got OxyContin as a -- one of the
7 commonly abused controlled pharmaceuticals, right?
8 A. Correct.
9 Q. Hydrocodone?
10 MR. HILL: Objection to the form.
11 BY MR. MOUGEY:
12 Q. Do you see that?
13 A. I see that on the page.
14 Q. Oxymorphone on the middle of the page?
15 A. I see that on the page, yes.
16 Q. We have oxy 30s at the bottom of the page?
17 A. Um-hum.
18 Q. And Alprazolam, which I can never
19 pronounce, on the bottom right-hand side?
20 A. Yes.
21 Q. And that was part of the -- the cocktails
22 that the DEA was asking distributors to be alert for,
23 correct?
24 MR. HILL: Object to the form.

Page 156

1 BY THE WITNESS:
2 A. I -- I don't see that here. I mean I see
3 that --
4 BY MR. MOUGEY:
5 Q. You don't know that?
6 A. -- it says "commonly abused prescription
7 pharmaceuticals." I don't -- but I didn't attend this
8 conference. I don't -- I don't have any of the
9 surrounding details.
10 Q. If you would turn in to a few more pages
11 that -- The Scope and Extent of the Problem, it has a
12 bar chart.
13 A. Okay.
14 Q. And this chart, according to the DEA,
15 identifies in blue a growing dosage units of narcotic
16 pain relievers at the bottom of the badge -- page.
17 Do you see that?
18 MR. HILL: Objection to the form.
19 BY THE WITNESS:
20 A. I -- I see the -- the numbers increased
21 from '04 to '07.
22 BY MR. MOUGEY:
23 Q. '04 is 4.3 million and by at the time it's
24 '07, 5.2 million?

Page 157

1 A. Correct.
2 Q. Go to the next page, "Percentage of Past
3 Month Non-Medical Use."
4 A. Yes.
5 Q. "18 to 25," "26 and older," you see that,
6 correct?
7 A. Yes.
8 Q. "Economic Impact" on the next page,
9 53.4 billion?
10 A. Yes.
11 Q. At the bottom, five drugs, OxyContin,
12 oxycodone, hydrocodone, amongst others, for two-thirds
13 of the economic burden.
14 Do you see that?
15 A. Yes.
16 Q. This all appears to be information that
17 would be extremely helpful to pharmacists and people
18 in Walgreens' department responsible for identifying
19 and performing due diligence on suspicious orders,
20 right?
21 MR. HILL: Objection to form.
22 BY THE WITNESS:
23 A. I think understanding the DEA's position
24 is always helpful. You know, for these pharmacists in

Page 158

1　West Palm Beach, this might have been a good lecture
2　to attend.
3　BY MR. MOUGEY:
4　　Q.　So this is a West Palm Beach problem?
5　　A.　That's where the conference was.
6　　Q.　It is.  But it's -- this -- this material
7　wouldn't be helpful for those individuals outside of
8　West Palm Beach?
9　　A.　It might have been.
10　　Q.　Do you have any understanding of whether
11　or not this or similar-type presentations were put on
12　around the country?
13　　A.　I -- I do not.
14　　Q.　As part of your investigation into
15　informing yourself to respond to these
16　interrogatories, did you ask around whether or not
17　these types of conferences were available?
18　　A.　I did.
19　　Q.　You did.
20　　　　But you didn't think they were responsive
21　to Interrogatory No. 23 because they weren't provided
22　by Walgreens, correct, sir?
23　　A.　Correct.
24　　Q.　But, sir, if you look to -- go back to, I

Page 159

1　think it was 4, the interrogatories -- don't lose your
2　page there, in the one we just left, because we are
3　going to go back to it -- go to Interrogatory No. 12.
4　　MR. HILL:  What page is that one on?
5　　MR. MOUGEY:  17.
6　BY MR. MOUGEY:
7　　Q.　"Please identify and date the location of
8　each DEA meeting, training, informational or
9　educational session, or briefing provided to you by
10　the Diversion Control Division, or other DEA
11　employees, related to the distribution of controlled
12　substances."
13　　　　Right?
14　　A.　Yes.
15　　Q.　And so we did ask, were there DEA meeting,
16　training, information or educational sess- -- sessions
17　provided to you by the diversion control -- control
18　division, correct?
19　　A.　Correct.
20　　Q.　But yet --
21　　MR. HILL:  Just for the record of completeness,
22　and we said we will produce documents to you, which is
23　what we did, including the document you are holding.
24　　MR. MOUGEY:  I appreciate that, but it is not

Page 160

1　appropriate in the middle of a deposition.
2　　MR. HILL:  It is.
3　　MR. MOUGEY:  No, it is not.  If you want, you
4　have your time to do it, if you want to ask him
5　questions later, I don't know -- the repeated speaking
6　objections in the middle of these objections --
7　　MR. HILL:  Sir, that is not a speaking
8　objection.
9　　MR. MOUGEY:  It is.
10　　MR. HILL:  Pretending to him that we said we
11　would produce it, and what we said was we will give
12　you the documents we have and that's what we did.
13　BY MR. MOUGEY:
14　　Q.　What did you do to find the docs -- the
15　documents -- you didn't do anything to find these
16　documents because you said they weren't responsive,
17　right?
18　　A.　There was --
19　　Q.　Because they weren't provided by you, so
20　you didn't do anything?
21　　A.　Me personally, no.
22　　Q.　No.
23　　　　Let me hand you what -- marked as 1258,
24　and hold onto the -- the --

Page 161

1　　MR. MOUGEY:  This is Bratton 5, I believe.
2　　　　(WHEREUPON, a certain document was
3　　　　marked Walgreens-Bratton Deposition
4　　　　Exhibit No. 005, for identification,
5　　　　as of 11/30/2018.)
6　BY MR. MOUGEY:
7　　Q.　Just look at the very first page of
8　Bratton 5.
9　　　　Do you see that it's the same title
10　page as Bratton 4?
11　　A.　Yes.
12　　Q.　Except in 4 it is in Indianapolis, Indiana
13　versus West Palm, correct?
14　　A.　Correct.
15　　MR. HILL:  In 5.
16　BY MR. MOUGEY:
17　　Q.　I'm sorry.  Bratton 5 -- 4 and 5 are
18　almost identical on the title page rather than one
19　says West Palm and one says Indianapolis, right?
20　　A.　Correct.
21　　Q.　But you didn't ask anybody, Hey, what DEA
22　conferences did we go to, rather we put it in the
23　middle of several hundred thousand documents and let
24　us find it.

Page 162

1    Is that the -- is that the plan?
2    MR. HILL: Objection to the form.
3 BY MR. MOUGEY:
4    Q.  Was that the plan, just to let us find it
5 in the several hundred thousand docs when a coup- --
6 couple of inquiries around Walgreens could have
7 pointed out some of these different types of
8 materials, correct?
9    MR. HILL: Objection to form.
10 BY THE WITNESS:
11   A.  I don't think that was the plan.
12 BY MR. MOUGEY:
13   Q.  I get that wasn't the plan.
14    So let's keep going through Bratton 4.
15    Please continue to turn to "Most Frequent
16 Method of Obtaining a Pharmaceutical Controlled
17 Substance for Non-Medical Use."
18    Do you see that?  "Friends and
19 family...for free!!"
20   MR. HILL: Peter, about how many pages in?
21   MR. MOUGEY: Just a couple more.
22    Next page, I think.  Keep going.
23    There we go.  Thank you.
24 BY MR. MOUGEY:

Page 163

1    Q.  Do you agree with the DEA slide: "Most
2 Frequent Method of Obtaining a Pharmaceutical
3 Controlled Substance for Non-Medical Use.  Friends and
4 Family... for Free!!"?
5    A.  I don't --
6    MR. HILL: Object to form.
7 BY THE WITNESS:
8    A.  I don't know how they arrived at this
9 conclusion.  There's no citations, so I don't think
10 they are lying on purpose, but I don't know it to be
11 true either.
12 BY MR. MOUGEY:
13   Q.  Would you agree that the larger the amount
14 of pills, Schedule II and III, that are diverted, the
15 higher the probability for abuse in the community?
16   MR. HILL: Objection to the form.
17 BY THE WITNESS:
18   A.  I don't know that to be true.
19 BY MR. MOUGEY:
20   Q.  Do you have any understanding that the
21 increase in the volume of Schedule II and III
22 narcotics that are dispensed, that there is a
23 connection to the amount of pills that are abused?
24   A.  I don't -- I don't know that to be true.

Page 164

1    Q.  It just kind of makes sense, wouldn't it,
2 if there are more pills in -- in homes' medicine
3 cabinets, more access, the higher the probability of
4 abuse, correct?
5    MR. HILL: Object to the form.
6 BY THE WITNESS:
7    A.  I don't know.  Also, I would point out
8 that the quantities that you pointed out on the
9 previous slide, the DEA approves all product before it
10 goes into the market, and if they were so concerned,
11 why didn't they reduce their quotas for opioid drugs?
12 BY MR. MOUGEY:
13   Q.  Do you know who they rely on when they are
14 making decisions about their quotas?
15   A.  I do not.
16   Q.  Do you know that that is in part Walgreens
17 about the -- the organic demand for those quotas?
18   MR. HILL: Objection to the form.
19 BY THE WITNESS:
20   A.  I did not know that.
21 BY MR. MOUGEY:
22   Q.  Next slide: "So Many Drugs in the
23 Household - Why?  Unreasonable quantities being
24 prescribed."

Page 165

1    Do you see that?
2    A.  I see that.
3    Q.  And that would be part of the importance
4 of the suspicious monitoring policy to identify
5 unreasonable quantities being prescribed, correct?
6    A.  Suspicious -- the shipment of orders and
7 the fulfillment of prescriptions are related but not
8 directly correlated -- or linked.
9    Q.  Sir, but the point of suspicious order
10 monitoring policies at Walgreens is to identify
11 suspicious orders and unreasonable quantities of
12 Schedule II and III narcotics being prescribed,
13 correct?
14   A.  Being --
15   MR. HILL: Object to form.
16 BY THE WITNESS:
17   A.  I believe it to be being shipped to the
18 store.
19 BY MR. MOUGEY:
20   Q.  And in order to be shipped, they have to
21 be prescribed, correct?
22   A.  No.
23   Q.  And that's Walgreens' job to identify
24 the suspicious order -- suspicious orders as part of

Page 166

1 their policy, correct?
2     MR. HILL: Objection to form.
3 BY THE WITNESS:
4     A.  Our policy is to identify those.  However,
5 just because a product is -- let's say we missed it
6 and it was shipped to the store, that doesn't mean it
7 just gets handed out the door.  It still has to have a
8 prescription be presented and then the due diligence
9 of the pharmacist to actually dispense that to a
10 patient.  We don't -- just because it was shipped
11 doesn't mean it was dispensed.
12 BY MR. MOUGEY:
13     Q.  And you would agree with me that good
14 faith dispensing and controlled order substance policy
15 monitoring are two different functions to prevent
16 diversion?
17     A.  Correct.
18     Q.  If you go about ten slides in, "OxyContin,
19 heroin."
20     A.  Oh.
21     Q.  Do you see that?
22     A.  Um-hum.
23     Q.  "Circle of addiction in the next
24 generation," right?

Page 167

1         Do you see at the top of the slide,
2 "Oxycodone"?
3     A.  Yes.
4     Q.  "OxyContin," and then you see "heroin" at
5 the bottom?
6     A.  Yes.
7     Q.  You have an understanding that
8 prescription pharmaceutical Schedule II and
9 Schedule III opiates increases the probability that an
10 individual will abuse heroin at some point?
11     MR. HILL: Objection to the form.
12 BY THE WITNESS:
13     A.  I understand that Schedule II and III
14 opioids have a higher potential for abuse.  I don't
15 know that is -- forces them to be abused or will
16 result in their abuse necessarily.
17 BY MR. MOUGEY:
18     Q.  I didn't ask you if it forced them.  I
19 asked you if it increased the probability of an
20 individual using heroin at some point --
21     A.  I don't -- I --
22     Q.  -- if they are addicted to Schedule II and
23 Schedule III opiates?
24     MR. HILL: Objection to the form.

Page 168

1 BY THE WITNESS:
2     A.  I don't know that to be true.
3 BY MR. MOUGEY:
4     Q.  At -- at the top of this page the DEA is,
5 at the continuing education conference, telling
6 pharmacists in the State of Florida that there is a
7 circle of addiction that begins with oxycodone and
8 continues into heroin, correct, sir?
9     MR. HILL: Objection to form.
10 BY THE WITNESS:
11     A.  I see that that's on the slides.  However,
12 in other slides they cited medical studies from
13 various colleges and other things and here they
14 haven't cited anything.  I see that it's there and
15 that's their opinion of whoever prepared this, but I
16 don't know that it is true fact.
17 BY MR. MOUGEY:
18     Q.  Have you ever seen anything at -- any
19 materials at Walgreens wherein Walgreens cites studies
20 about the causal connection between heroin and
21 Schedule II and Schedule III opiates?
22     A.  Not that I recall.
23     Q.  Do you understand that Walgreens has a --
24 what's called a Walgreens University?

Page 169

1     A.  Correct.
2     Q.  And that it puts on -- it puts on
3 educational material for its own employees, correct?
4     A.  Correct.  Typically corporate employees.
5 I don't know how much interaction they have with
6 field, at-the-store employees.
7     Q.  Yes, sir.
8         And they, "they" meaning Walgreens
9 corporate, brings in academics to educate its own
10 people, correct?
11     A.  I -- I don't know who they bring in or
12 what the content is.  All of the classes that I've
13 attended were led by staff of the -- of Walgreens.
14     Q.  And you would agree that in order to
15 present at Walgreens to corporate staff that it would
16 have to be somebody that knew what they were doing,
17 right?
18     A.  I don't know that to be true or untrue.
19     Q.  Do you think that Walgreens brings in
20 people to -- at Walgreens University that -- that
21 wouldn't know what they were doing or weren't experts
22 in their field?
23     MR. HILL: Object to the form.
24 BY THE WITNESS:

Page 170

1    A.   I don't know.

2    MR. HILL:  Peter, when you get to a decent

3 break -- breaking time.  We have been going about an

4 hour 40 and it's noon and lunch is here.

5    MR. MOUGEY:  Yeah, that would be --

6    MR. HILL:  So whenever you get to a break.

7    MR. MOUGEY:  That would be perfect.

8        Let me just finish this one --

9    MR. HILL:  Sure.

10   MR. MOUGEY:  -- line here.

11       I'll tell you what, I'll come back to it.

12 Let's just get finished with this and I'll come back

13 to that after lunch.

14 BY MR. MOUGEY:

15   Q.   So you are not aware of Walgreens taking

16 any positions, whether it be Walgreens University or

17 any other material, that there was a causal connection

18 between Schedule II and Schedule III narcotics and

19 heroin use?

20   A.   Not that I recall that Walgreens put

21 forth.

22   Q.   Were you aware of any educational material

23 as an employee at Walgreens based in Florida about the

24 increasing problem with overdose deaths in Florida

Page 171

1 related to Schedule II and Schedule III narcotics?

2    A.   Not that I am aware of.  However, in that

3 role we were not -- they -- there might have been

4 things provided to the field, but not that I'm aware

5 of.

6    Q.   Sure.

7    A.   I wouldn't have been privy to that.

8    Q.   And all I'm asking is what you were aware

9 of.

10       So your answer to my question is, no, I'm

11 not aware of anything that anybody told me at

12 Walgreens that there was increasing deaths

13 attributable to Schedule II and Schedule III narcotics

14 or opiates in Florida when you were base -- based out

15 of there?

16   MR. HILL:  Objection to the form.

17 BY THE WITNESS:

18   A.   I -- I did not receive any.

19 BY MR. MOUGEY:

20   Q.   Were you -- did you receive any training

21 or education that there were a significant problems

22 with doctor shopping in the State of Florida for

23 Schedule II and Schedule III narcotics?

24   MR. HILL:  Objection to form.

Page 172

1 BY THE WITNESS:

2    A.   I did not.

3 BY MR. MOUGEY:

4    Q.   Were you aware that there -- if there were

5 any educational training when you were employed by

6 Walgreens in the State of Florida that Florida was the

7 location for out-of-state patients, including Ohio,

8 with pills migrating?

9    MR. HILL:  Objection to form.

10 BY THE WITNESS:

11   A.   Not that I'm aware of from Walgreens.

12 I've heard that in the news that patients came to

13 Florida, but I -- not that I recall from Walgreens.

14 BY MR. MOUGEY:

15   Q.   Bear with me one second so I can close the

16 loop on that and we can take a break for lunch.

17   MR. MOUGEY:  I can't find it.  This is a good

18 time to stop.

19       Go ahead.

20   THE VIDEOGRAPHER:  Going off the record at

21 12:04 p.m.

22       (WHEREUPON, a recess was had

23        from 12:04 to 12:43 p.m.)

24   THE VIDEOGRAPHER:  We are back on the record at

Page 173

1 12:43 p.m.

2 BY MR. MOUGEY:

3    Q.   Mr. Bratton, before lunch you -- we were

4 looking through one of the DEA presentation slides, I

5 believe it was Bratton 4, and you mentioned the DEA

6 approved all of this or this was -- you pointed the --

7 your finger at the DEA.

8        Do you recall what I'm referring to?

9    A.   Yes.

10   Q.   And -- and you are referring to the -- the

11 quotas, right?

12   A.   Correct.

13   Q.   And is that your opinion sitting here that

14 this -- the fault for the runaway growth is the DEA's?

15   MR. HILL:  Objection to form.

16 BY THE WITNESS:

17   A.   My opinion is that this is a multifaceted

18 issue in which the DEA played a part.

19 BY MR. MOUGEY:

20   Q.   And do you believe that Walgreens' failure

21 to identify suspicious orders and halt shipments

22 played a role in the runaway growth?

23   MR. HILL:  Objection to the form.

24 BY THE WITNESS:

Page 174

1    A.   I don't know that we failed to do that.
2  I -- I disagree.
3  BY MR. MOUGEY:
4    Q.   Do you agree that continuing to send
5  additional product without a system that would limit
6  or review contributed to the runaway growth?
7    A.   I don't know.
8    Q.   You don't know?
9    A.   I don't know.
10    Q.   But you do know enough to point the finger
11  at the DEA?
12    A.   I know that they -- again, they played a
13  role in improving [sic] the quotas.
14    Q.   And after being in pharmaceutical
15  integrity at Walgreens now for five or six years, you
16  don't know enough of whether or not Walgreens'
17  inability to identify suspicious orders, perform due
18  diligence and halt those suspicious orders contributed
19  at all to the runaway growth?
20    MR. HILL:  Objection to the form.
21  BY THE WITNESS:
22    A.   I don't know that we've ever agreed to
23  that or that to be true.
24  BY MR. MOUGEY:

Page 175

1    Q.   Do you agree that Walgreens' previous
2  system would continue to send additional product to
3  the store without limit or review which made possible
4  the runaway growth?
5    A.   Based on what I know today, no.
6    Q.   Based on what you knew in 2013?
7    A.   So, I -- I believe you are referring to a
8  letter that I -- we prepared on.  I don't think that
9  that opinion that I felt in that e-mail was factually
10  informed.  I was -- as I've stated earlier, we were
11  very focused on implementing the settlement agreement
12  as it pertained to moving forward and not as the old
13  system functioned.  So I don't think my understanding
14  then or today can really be accurate as to the nature
15  of the old system.
16    Q.   But sitting here today in front of this
17  jury going through a DEA slide, you took no
18  hesitation, zero, with pointing out, without even a
19  question pending, that this is the DEA's fault, did
20  you, sir?
21    A.   I'm not --
22    MR. HILL:  Objection to the form.
23  BY THE WITNESS:
24    A.   I don't think it was the DEA's fault

Page 176

1  solely.  However, I would question, personally, why
2  that if they had so many concerns they would continue
3  to increase quotas.
4  BY MR. MOUGEY:
5    Q.   Yes, sir.
6       And you found it, at that point in time,
7  with no question pending, to point to the DEA as
8  continuing to increase quotas as the -- one of the
9  major components of the problem, correct, sir?
10    A.   I don't --
11    MR. HILL:  Objection to the form.
12  BY THE WITNESS:
13    A.   No.
14  BY MR. MOUGEY:
15    Q.   Do you want to withdraw your answer before
16  pointing your finger at the DEA?
17    A.   I didn't say it was a major component.  I
18  said it's a component.
19    Q.   Yes, sir.
20       Do you want to withdraw your answer
21  pointing the finger at the DEA?
22    A.   No, I do not.
23    MR. MOUGEY:  No. 6.
24       (WHEREUPON, a certain document was

Page 177

1       marked Walgreens-Bratton Deposition
2       Exhibit No. 006, for identification,
3       as of 11/30/2018.)
4    MR. MOUGEY:  It is 1146.
5  BY MR. MOUGEY:
6    Q.   So what I've put in front of you is an
7  e-mail from you to Amish Patel, correct, sir?
8    A.   Correct.
9    Q.   And it is dated 8/19/2013, correct?
10    A.   Correct.
11    Q.   And you are relaying that, subject to the
12  e-mail, "Controlled Substance Order Quantity Override
13  Form," correct, sir?
14    A.   Correct.
15    Q.   And in that e-mail you relayed to
16  Ms. Amish that:
17       "The previous system would continue to
18  send additional product to the store without limit or
19  review, which made possible the runaway growth of
20  dispensing of products like oxycodone."
21       Correct, sir?
22    A.   That is what is written there.
23    Q.   And, sir, that's after you've spent almost
24  five years at Walgreens and you are now into several

Page 178

1 months in your tenure at pharmaceutical integrity
2 department, correct, sir?
3     A.   Correct.
4     Q.   And based on your training, based on your
5 review of historical documents, you were comfortable
6 concluding that the runaway growth of dispensing of
7 products like oxycodone was due at least in part to
8 additional product being sent to the store without
9 limit or review, correct, sir?
10     MR. HILL: Objection to form.
11 BY THE WITNESS:
12     A.   No. I -- I did not and do not know enough
13 about the old system to make this statement. I -- I
14 think I was trying to implore Amish Patel to follow
15 the new system and I said this, but I don't -- based
16 on the little bit more that I know today, I think I
17 was describing our out-of-stock logic, but there are
18 other components to the logic other than just that.
19 BY MR. MOUGEY:
20     Q.   You've spent a significant amount of time
21 reviewing this document and going through your -- your
22 canned answer today for this -- for your testimony in
23 front of this jury, correct, sir?
24     MR. HILL: Ob- -- objection to form. And I

Page 179

1 object to you trying to ask what this witness did
2 during preparation with his counsel.
3 BY MR. MOUGEY:
4     Q.   Well, I didn't bring this up.
5     Did you -- sir, you brought up that you
6 reviewed this document during your preparation for
7 today, correct, sir?
8     A.   Correct.
9     Q.   And you prepared your answer for -- for me
10 presenting this document to you today, correct, sir?
11     MR. HILL: Ob- -- objection to form.
12 BY MR. MOUGEY:
13     Q.   Correct, sir?
14     A.   I thought about why I would have said this
15 at that time.
16     Q.   Yes, sir.
17     You've prepared an answer for today based
18 on looking at this document in preparation, as you
19 mentioned in your answer, correct, sir?
20     MR. HILL: Objection to the form.
21 BY MR. MOUGEY:
22     Q.   And you concluded, based on, at this
23 point --
24     THE COURT REPORTER: I'm sorry. I didn't get an

Page 180

1 answer.
2     THE WITNESS: I didn't answer.
3 BY MR. MOUGEY:
4     Q.   At this point in time, in August of --
5 19th of 2013, at the same time the DEA is presenting
6 the runaway growth with corresponding deaths in the
7 State of Florida, you knew enough to say that the
8 previous system at Walgreens would continue to send
9 additional product to the store without limit or
10 review, correct, sir?
11     That's what you said in -- in August
12 of 2013, correct, sir?
13     MR. HILL: Objection to the form.
14 BY THE WITNESS:
15     A.   I wrote that in the letter, in the e-mail.
16 I don't think that I knew then or now all of the
17 components of what the previous system entailed, and
18 so I don't think that I can make a factual assessment
19 at that time especially about how the system worked.
20 BY MR. MOUGEY:
21     Q.   But as of August of 2013, you were very
22 comfortable making the assessment that the runaway
23 growth was in response to a failure of Walgreens to
24 stop additional product being sent to the store

Page 181

1 without a limit or review, correct, sir?
2     A.   I wrote it in the e-mail.
3     Q.   And you were comfortable writing that in
4 the e-mail blaming the runaway growth on Walgreens'
5 inability to limit the continued shipments to its
6 dispensaries, correct, sir?
7     MR. HILL: Objection to the form.
8 BY THE WITNESS:
9     A.   One, this pertains to the stores that were
10 under investigation by -- by the DEA; two, again, I
11 don't think I really knew how the system worked, and
12 through hearsay and other things and maybe this is
13 what I thought at that time. I don't think it's
14 accurate.
15     MR. SHKOLNIK: Move to strike.
16 BY MR. MOUGEY:
17     Q.   I hand what I've marked as 7.
18     (WHEREUPON, a certain document was
19     marked Walgreens-Bratton Deposition
20     Exhibit No. 007, for identification,
21     as of 11/30/2018.)
22 BY MR. MOUGEY:
23     Q.   Sir, you're familiar with this agreement
24 between the DEA and Walgreens, correct, sir?

Page 182

1    MR. HILL: Objection to the form.
2  BY THE WITNESS:
3    A.  I'm familiar that a -- an agreement -- oh,
4  I'm not exactly sure.  What is this that I'm looking
5  at?
6    MR. HILL: Which -- which page is it?  I think
7  he is on the back.  Is it -- we start on the -- I
8  think you started on the back side.
9    MR. MOUGEY: We prefer you start on the front.
10   MR. HILL: Flip it over.  It's -- it's clipped
11 on the wrong side.
12   THE WITNESS: Oh.
13   MR. HILL: And then it's the next page.
14     Is it right here?
15   MR. MOUGEY: Yeah.
16   MR. HILL: I'd just object to the compilation
17 nature of the document.
18   MR. MOUGEY: What exactly is your objection to
19 the compilation of the document?
20   MR. HILL: So you -- you said Exhibit 7 and then
21 you talked about the settlement.  It appears, and I
22 can read the whole thing, but it appears Exhibit No. 7
23 has a bunch of other documents in it besides just the
24 settlement, is that right?

Page 183

1    MR. MOUGEY: It has all of the exhibits attached
2  to it which are incorporated by reference in the
3  document.
4    MR. HILL: So everything in Exhibit 7 is -- is
5  either the settlement agreement or exhibits?
6    MR. MOUGEY: Yes.
7  BY THE WITNESS:
8    A.  I'm familiar with the --
9    MR. SHAPLAND: This is Eric Shapland.  Does that
10 Exhibit 7 have a Bates number or is it something that
11 you can give us as far as a timeline?
12   MR. MOUGEY: It -- the signed -- the version
13 that we initially entered does not have a Bates
14 version, although we didn't receive a signed copy, we
15 had to find it on the internet, and after
16 requesting -- it is true.
17     After requesting the document, we did
18 receive a signed version, here, I'm going to say, in
19 the last two to three weeks, and it's Bates numbered
20 WAGMDL 490963 is the first page.
21   MR. HILL: Okay.  So the -- the document --
22   MR. SHKOLNIK: I will say on the record at the
23 Mills deposition you highlighted the fact that you had
24 just produced a signed copy a day before or a couple

Page 184

1  of days before.
2    MR. HILL: It wasn't the day before or a couple
3  of days before, and that was, like, three weeks ago
4  now.  So it wasn't two to three weeks ago.
5    MR. SHKOLNIK: And that doesn't make a
6  difference.
7    MR. HILL: No, it doesn't, but --
8    MR. SHKOLNIK: You didn't produce it originally
9  to --
10   MR. MOUGEY: We didn't receive it -- we didn't
11 receive this document initially.
12   MR. SHKOLNIK: Shaking your head and making
13 facial expressions is really unnecessary.
14   MR. HILL: Then why do you keep doing it?
15   MR. MOUGEY: We found it on the internet.
16   MS. SWIFT: The signed copy you did not find on
17 the internet.
18   MR. MOUGEY: The -- the -- the settlement
19 agreement that we initially used, and used for weeks,
20 that was not signed we found on the internet.  Only
21 after asking for it have we received it in the last
22 few weeks.  It was never produced.
23   MR. HILL: Just so --
24   MR. MOUGEY: Similar to the resumes, similar to

Page 185

1  the continuing education material, similar to the
2  suspicious order reports, we've had to find a lot of
3  this information on our own.
4  BY MR. MOUGEY:
5    Q.  So, sir, back to the question --
6    MR. HILL: Just -- just from the last of the
7  record, the -- the first page of the document,
8  Exhibit 7, it says P-WAG-0001 which then goes -- on
9  the right-hand corner which goes throughout the
10 document.  On the bottom of the page is -- the first
11 13 or so have a WAGMDL Bates label from 490963 --
12   MR. MOUGEY: That's the signed version.
13   MR. HILL: Yes, sir.
14     -- through, I'm just trying to make sure
15 it's clear, through 978.  Then the rest of the
16 document --
17   MR. MOUGEY: So we don't get confused, we have
18 Exhibit 7 as part of the deposition that can be
19 referred to.
20   MR. HILL: -- then the rest of it just says
21 Page 1 through 343.
22   MR. MOUGEY: Thank you.
23   MR. SHKOLNIK: Just so it's on the record, are
24 you -- is it the position of Walgreens that these are

Page 186

1 not the exhibits attached to this -- to this
2 agreement?
3      MR. HILL:  I have it -- do you want me to go
4 through it?  I have -- I'll go through it.
5      MR. MOUGEY:  Yeah, go ahead and take your time.
6      MR. HILL:  Sure, sure.
7      MR. SHKOLNIK:  Since you were supposed to
8 produce it pursuant to Court order.
9      MR. HILL:  We did produce them.
10      MR. SHKOLNIK:  Well, just let us know.  You made
11 a big point of it at the last deposition.
12      MR. HILL:  The one where you didn't -- where you
13 didn't use the signed copy even though you had it?
14      MR. SHKOLNIK:  That's all right.  We'll move on
15 to something else.
16      MR. MOUGEY:  That you were six months late in
17 producing?  I mean --
18      MR. HILL:  That's not true.
19      MR. MOUGEY:  -- your client pays an
20 $80 million --
21      MR. HILL:  That's not true.
22      MR. MOUGEY:  -- settlement and you don't produce
23 it?
24      MR. HILL:  That's not true.  You had it.

Page 187

1      MR. MOUGEY:  But no one can point us to the
2 Bates number of where it was produced?
3      MR. HILL:  Right here.
4      MR. MOUGEY:  Look at the Bates number on it.
5      MR. HILL:  You've got it.
6      MS. SWIFT:  You've got it.
7      MR. MOUGEY:  Look at the Bates.  It is 490,000.
8 It took you 490,000 pages -- we can go back and look
9 at when that was -- to find it.
10      MR. HILL:  You didn't have the settlement
11 agreement before that?
12      MR. MOUGEY:  To find it, the signed settlement
13 agreement?
14      MR. HILL:  You didn't have it?
15      MR. MOUGEY:  It is our job to find your
16 settlement agreements on the internet?
17      MR. HILL:  We produced it.  You had it.
18      MR. MOUGEY:  490,000 is the Bates stamp page.
19      MR. HILL:  I can't help that you didn't use it
20 at the proper times.
21      MR. MOUGEY:  You guys are incredible.
22      MR. HILL:  So, just to be clear, you -- you said
23 this was a -- a compilation of the exhibits.  The
24 first 13 pages appear to be a signed version of the

Page 188

1 settlement agreement.
2      MR. MOUGEY:  You know what, Hunter -- we have
3 used this same exhibit, 1 through 343, about five
4 times.  If you don't think it's the right one, you let
5 us know.  We put on top of it the signed, which is
6 490,000 Bates number, it took you 490,000 documents to
7 produce the signed copy.  We've got that now attached
8 to the front, okay.  So if you don't think 1 to 343 is
9 the correct attachments, please tell us between now
10 and the next deposition, okay.  I'm not going to take
11 the time for you now, after you've had it for a few
12 weeks, to tell us whether you think 1 through 343 is
13 the wrong version.
14      MR. HILL:  Okay.  We object to the -- the
15 document.
16      Go ahead.
17      MR. MOUGEY:  I'm sure you do.
18 BY MR. MOUGEY:
19   Q.   Sir, when did you become aware that
20 Walgreens agreed to pay $80 million to the DEA as a
21 result of its failure to have a designed --
22 well-designed suspicious order policy program and
23 perform due diligence on the suspicious orders?
24      MR. HILL:  Objection to the form.

Page 189

1 BY THE WITNESS:
2   A.   I -- I -- I can't comment on the first
3 part.  I don't know if that's what we agreed to.
4 However, I became aware of this shortly after, or the
5 week of, that it was officially announced.
6 BY MR. MOUGEY:
7   Q.   Turn to Page 2 of the document.
8      Do you see "Stipulation and Agreement"?
9   A.   Yes.
10   Q.   What -- do you understand what stipulation
11 and agreement means?
12   A.   I don't know.
13   Q.   You don't know what the word "stipulation
14 and agreement" -- the words "stipulation and
15 agreement" mean?
16   A.   I -- I'm not sure that I understand what
17 it means in the context of a legal document.
18   Q.   I'm not asking you -- I'm asking you, do
19 you understand what the words -- the words
20 "stipulation and agreement" mean?
21   A.   I believe so.  However, I know that
22 frequently there's words that are in common use that
23 mean a different thing in a legal document.
24      So, the common version of stipulation,

Page 190

1  yes, I know what that means.
2      Q.   You are not a lawyer, right?
3      A.   Correct.
4      Q.   You are not here in your capacity as a
5  lawyer, right?
6      A.   Correct.
7      Q.   And you are not an aspiring lawyer, right?
8      A.   No.
9      Q.   Okay.  You are here as manager of
10 pharmaceutical integrity today, correct?
11     A.   Correct.
12     Q.   So I'm not asking you in your capacity as
13 a lawyer or -- or anything else.
14         What do you understand stipulation and
15 agreement to mean?
16     MR. HILL:  Object to the form.
17 BY THE WITNESS:
18     A.   I'm not sure without reading the document.
19 BY MR. MOUGEY:
20     Q.   I -- I'm not asking -- I'm just saying the
21 two words, "stipulation and agreement"?
22     A.   Probably things that we agreed to.
23     Q.   There you go.
24         On Page 2, "Walgreens acknowledges," do

Page 191

1  you know what the word "acknowledge" means?
2      A.   Yes.
3      Q.   What does that mean?
4      A.   We agree.
5      Q.   "Walgreens acknowledges that suspicious
6  order reporting for distribution to certain pharmacies
7  did not meet the standards identified by DEA in three
8  letters from DEA's Deputy Assistant Director, Office
9  of Diversion Control, sent to every registered
10 manufacturer and distributor, including Walgreens, on
11 September 27th, 2006, February 7th, 2007, and
12 December 27th, 2007."
13         Do you see that?
14     A.   I see that.
15     Q.   And you understand that Walgreens, in your
16 words, agrees that its suspicious order reporting for
17 distribution to certain pharmacies did not meet the
18 DEA standards?
19     MR. HILL:  Objection to the form.
20 BY THE WITNESS:
21     A.   Yes.
22 BY MR. MOUGEY:
23     Q.   And the sentence after that:
24         "Furthermore, Walgreens acknowledges that

Page 192

1  certain Walgreens retail pharmacies did on some
2  occasions dispense certain controlled substances in a
3  manner not fully consistent with its compliance
4  under" -- "obligations under the Controlled Substance
5  Act."
6          Do you agree with me, sir, that Walgreens
7  stipulates and agrees to that language?
8      MR. HILL:  Objection to form.
9  BY THE WITNESS:
10     A.   I see that that's what's in the document,
11 yes.
12 BY MR. MOUGEY:
13     Q.   And based on your plain reading of the
14 document as manager of the pharmaceutical integrity
15 agreement [sic], Walgreens agrees to that language,
16 correct, sir?
17     MR. HILL:  Objection to the form.
18 BY THE WITNESS:
19     A.   I don't know.  I mean, I guess.
20 BY MR. MOUGEY:
21     Q.   When is the first time you saw this entire
22 agreement between the DEA and Walgreens?
23     A.   I don't recall.
24     Q.   Do you recall generally what -- what year?

Page 193

1      A.   I'm -- a lot of the work that I did was
2  based off of a -- an analysis and a document produced
3  by our legal team and our compliance team as here is
4  the to dos from this agreement.  And so I don't know
5  that I was intimately involved with this document at
6  any point.  I may have seen it by looking it up for
7  myself, but, again, the action items for my group were
8  from the settlement, these other groups said here is
9  what we need to implement and then we went and
10 implemented those things.
11     Q.   I need you to listen to the questions that
12 I ask, okay.
13     A.   Sure.
14     MR. HILL:  Object to the form.
15 BY MR. MOUGEY:
16     Q.   The question that I asked you was:  When
17 is the first time, if -- if at all, have you ever seen
18 this agreement between the DEA and Walgreens?
19     MR. HILL:  Objection to the form.
20 BY THE WITNESS:
21     A.   I don't recall.
22 BY MR. MOUGEY:
23     Q.   You don't recall ever seeing this?
24     MR. HILL:  Objection to the form.

Page 194

1  BY THE WITNESS:
2      A.  I don't -- I don't recall when.  I do know
3  that I've seen it.  I don't know if it was provided to
4  me or if I looked it up on the internet myself or
5  what.
6  BY MR. MOUGEY:
7      Q.  2013 you are now working for the
8  pharmaceutical integrity department at Walgreens and
9  your primary responsibility is to develop and
10  implement a system to monitor to -- identify, monitor and
11  report suspicious orders, correct?
12      MR. HILL:  Objection; form.
13  BY THE WITNESS:
14      A.  One of my responsibilities, yes.
15  BY MR. MOUGEY:
16      Q.  And you don't recall whether as part of
17  your charge, whether your scope of responsibility you
18  reviewed this document as you began in pharmaceutical
19  integrity?
20      MR. HILL:  Objection to form.
21  BY THE WITNESS:
22      A.  Again, as we were provided with a list of
23  action items from our legal and regulatory teams, I
24  don't remember if I reviewed the settlement itself or

Page 195

1  just our action items that we needed to complete.
2  BY MR. MOUGEY:
3      Q.  Do you feel like you were educated by the
4  legal and compliance team with that list resulting
5  from this significant payment by Walgreens to
6  understand the terms of this agreement?
7      A.  I think as it relates to what actions our
8  group was tasked with taking, yes.
9      Q.  Yes.  And you think you understood the
10  details and the shortcomings of Walgreens as Walgreens
11  moved forward with pharmaceutical integrity post this
12  agreement?
13      MR. HILL:  Objection to the form.
14  BY THE WITNESS:
15      A.  Based on what was provided to us in that
16  to-do document, I -- I think so.
17  BY MR. MOUGEY:
18      Q.  And it's -- it's vital, it is just -- to
19  look as you move forward to see where the holes or the
20  shortcomings were looking in the rearview mirror,
21  correct?
22      A.  Yes.
23      Q.  Weren't you worried that people and kids
24  in your backyard, whether it be Ohio or whether it be

Page 196

1  here in Chicago, were dying from overdoses from
2  Schedule II and III opiates dispensed from your
3  pharmacies?
4      MR. HILL:  Objection to the form.
5  BY THE WITNESS:
6      A.  I would never want anyone to die of an
7  overdose, whether it's from our pharmacies or anywhere
8  else.
9  BY MR. MOUGEY:
10      Q.  Right.
11          It's -- it's important, right, you
12  understood that this was a national epidemic and you
13  were charged with something very important in the
14  beginning of 2013, correct?
15      A.  Correct.
16      Q.  And you dove into this head first to try
17  and figure out what the solution was at Walgreens
18  moving forward, correct?
19      A.  Correct.
20      Q.  Am I -- it is safe to assume that you
21  probably reviewed a tremendous amount of information
22  in the beginning of 2013 to get your arms around what
23  you could help and what you could contribute to fix
24  the problem, correct?

Page 197

1      MR. HILL:  Objection to form.
2  BY THE WITNESS:
3      A.  I -- we did look at things.  I don't
4  recall the specifics, but, yes, we looked into it.
5  BY MR. MOUGEY:
6      Q.  And you worked hand in hand with your
7  regulatory and compliance departments to put together
8  a system and understand the problems moving forward,
9  correct?
10      A.  I believe so.
11      Q.  So let's go back to the 8/19/2013 e-mail
12  that you wrote in August 19th of 2013.
13      A.  The Exhibit 6?
14      Q.  Exhibit 6.
15          After your training, after the settlement
16  agreement came out, you drafted this e-mail, correct,
17  sir?
18      A.  Correct.
19      Q.  After legal and compliance from Walgreens
20  gave you the list of things to do, you wrote this
21  e-mail, correct, sir?
22      A.  Correct.
23      Q.  After you had armed yourself with the
24  information to fix the problem going forward, you

Page 198

1 drafted this e-mail, correct, sir?
2    MR. HILL: Objection to form.
3 BY THE WITNESS:
4    A. I drafted this e-mail to implore this
5 person to remain in compliance with company policy and
6 use the new system. I was never trained or educated
7 on how the old system worked, so...
8    MR. SHKOLNIK: Move to strike.
9    MR. HILL: Let him finish his answer.
10 BY MR. MOUGEY:
11    Q. You draft -- you drafted this e-mail on
12 August 19th, 2013, after you were given a full
13 debriefing by regulatory and compliance, correct?
14    MR. HILL: Objection to the form.
15 BY THE WITNESS:
16    A. The debriefing or report that we received
17 only contained forward-looking actions that we should
18 take and did not contain a breakdown of how the
19 ordering logic worked for --
20 BY MR. MOUGEY:
21    Q. That's not -- that's not the question I
22 asked you.
23       The question I ask you is: You drafted
24 this e-mail after you received the information that

Page 199

1 Walgreens thought was important from the settlement
2 agreement about developing and implementing a system
3 to identify suspicious orders, correct, sir?
4    MR. HILL: Objection to form.
5 BY THE WITNESS:
6    A. Yes.
7 BY MR. MOUGEY:
8    Q. And you wrote this e-mail after you were
9 given all of the important information from Walgreens
10 about developing a system that performed due diligence
11 on those suspicious orders, correct, sir?
12    MR. HILL: Same objection.
13 BY THE WITNESS:
14    A. I'm sorry. Can you repeat the question?
15 BY MR. MOUGEY:
16    Q. You drafted this e-mail after you were
17 given all of the important information -- -mation from
18 Walgreens about developing a system that performed due
19 diligence on suspicious orders, correct, sir?
20    A. What do you mean by "all important
21 information"?
22    Q. The information that Walgreens believed
23 was important, you were armed with that information
24 prior to drafting this e-mail, correct, sir?

Page 200

1    A. I was given a list of action items that we
2 should take based off of the settlement prior to
3 drafting this e-mail.
4    Q. And -- and whatever Walgreens believed was
5 important I am confident they gave you, sir, correct,
6 in order for you to stem -- or stop the tide or slow
7 down the tide of overdose deaths, correct, sir?
8    MR. HILL: Objection to the form.
9 BY THE WITNESS:
10    A. I -- I don't know that I was given every
11 piece of information that Walgreens has.
12 BY MR. MOUGEY:
13    Q. I'm not asking you if you received every
14 piece of information. What I'm asking you, sir, is
15 you believe you received information that was
16 important from Walgreens about performing due
17 diligence on suspicious orders before you drafted this
18 e-mail, correct, sir?
19    MR. HILL: Same objection.
20 BY THE WITNESS:
21    A. Yes.
22 BY MR. MOUGEY:
23    Q. You received from Walgreens the important
24 information necessary for your department to ensure

Page 201

1 that suspicious orders were not shipped prior to
2 drafting this e-mail, correct, sir?
3    MR. HILL: Objection to the form.
4 BY THE WITNESS:
5    A. I don't know. I'm -- we received
6 information about establishing the new suspicious
7 order monitoring system.
8 BY MR. MOUGEY:
9    Q. And based on all of that information that
10 you got from legal and compliance at -- at Walgreens,
11 you got from your managers at Walgreens, you felt like
12 you knew enough in August of 2013 to tell another
13 Walgreens employee that the runaway growth of
14 dispensing products like oxycodone was due at least in
15 part to Walgreens continuing to send additional
16 product to the store without limit or review, correct,
17 sir?
18    MR. HILL: Objection to --
19 BY MR. MOUGEY:
20    Q. Yes or no, sir?
21    A. I wrote that at that time. However, I
22 didn't --
23    Q. Yes, sir.
24    A. -- I was never trained on the previous

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  system and I think this statement is not -- I didn't
2  have enough information to really state this
3  factually.
4      MR. SHKOLNIK:  Move to strike.
5  BY MR. MOUGEY:
6      Q.   Were you educated in the beginning of
7  2013 -- strike that.
8          At any point in 2013 were you told that
9  there were issues with Schedule II and Schedule III
10 opiates traveling or migrating from Florida to Ohio?
11     MR. HILL:  Object to the form.
12 BY THE WITNESS:
13     A.   Not that I recall.
14 BY MR. MOUGEY:
15     Q.   Wouldn't that have been an important part
16 of your training at Walgreens in pharmaceutical
17 integrity to know that there were -- there was the
18 potential problem for pills migrating from Florida to
19 Ohio?
20     MR. HILL:  Same objection.
21 BY THE WITNESS:
22     A.   I don't know.
23 BY MR. MOUGEY:
24     Q.   You don't know if that was important or

Page 203

1  not?
2      A.   I don't.
3      Q.   Have you ever read this agreement at any
4  point in time in detail?
5      MR. HILL:  Objection; asked and answered.
6  BY THE WITNESS:
7      A.   Not in detail, no.
8  BY MR. MOUGEY:
9      Q.   Have you ever read it generally?
10     A.   I think -- I think I've glanced at it.
11     Q.   You glanced at it.
12          Your company paid $80 million, your
13 company paid a significant amount to the regulators
14 and you are now in pharmaceutical integrity and you
15 never sat down and read this agreement?
16     MR. HILL:  Objection to the form.
17 BY THE WITNESS:
18     A.   Again, this agreement was an input to a
19 process that we received an output from our legal
20 and regulatory team saying, Here is the actions that
21 are -- my group should take.  And so I didn't feel
22 that it was necessary to read the actual agreement
23 since we received a summary and report on what to do.
24 BY MR. MOUGEY:

Page 204

1      Q.   So the answer to my question is no, you
2  never sat down and read this agreement in detail?
3      MR. HILL:  Same objection.
4  BY THE WITNESS:
5      A.   Correct.
6  BY MR. MOUGEY:
7      Q.   And, sir, on Page 129 of this agreement
8  then, is it safe to conclude that you did not know
9  that the DEA was concerned that because of the
10 restricted access to controlled substances in their
11 states, many individuals from Ohio, Kentucky and other
12 states had tral -- traveled by the carloads to pain
13 clinics located in Florida to obtain prescriptions
14 for, for instance, oxycodone?
15     MR. HILL:  Objection to form and calling it
16 "this agreement."
17 BY THE WITNESS:
18     A.   I'm -- I'm sorry.  Where was that in this
19 document?
20     MR. HILL:  Are you referring to Page 129 of 343?
21 BY MR. MOUGEY:
22     Q.   129.
23     MR. HILL:  I'll just note for the record
24 that's -- that's a statement on behalf of the

Page 205

1  government.
2  BY MR. MOUGEY:
3      Q.   As part of this agreement --
4      A.   I'm lost.  Where are --
5      Q.   Page 129.
6      MR. HILL:  It is down at the bottom.  It doesn't
7  say it on those.  It's a different part of the
8  document.
9      MR. MOUGEY:  We appreciate your counsel's John
10 Madden color calling again and continued --
11     MR. HILL:  You have multiple -- it says page 1
12 of 13 --
13     MR. MOUGEY:  Then save it for later.  Object to
14 the form.
15     MR. HILL:  He is asking where it is.  Okay.
16 Fine.
17     MR. MOUGEY:  Just sit there like a potted plant
18 and if you have anything to say, say "objection to the
19 form."
20     MR. HILL:  No, don't tell him it's an agreement
21 when it's a statement from the government, how about
22 that?
23 BY MR. MOUGEY:
24     Q.   As part of this agreement, sir -- are you

Page 206

1  on Page 129?
2      A.   Is that what's displayed here?
3      Q.   129, yes.
4      A.   Okay.
5      Q.   As part of this agreement were you aware
6  that the DEA had concerns that as a result of the
7  restricted -- restricted access to controlled
8  substances in their states, many individuals from
9  Ohio, Kentucky and other states have traveled by the
10  carloads to pain clinics located in Florida to obtain
11  prescriptions, for example, for oxycodone?
12      MR. HILL:  Objection to form.
13  BY MR. MOUGEY:
14      Q.   Did you know that?
15      MR. HILL:  The misrepresentation.
16  BY THE WITNESS:
17      A.   I was not aware of that.
18  BY MR. MOUGEY:
19      Q.   If you turn to Page 131, top -- top of the
20  page, middle of the paragraph, the portion that begins
21  with "favorite location."
22      "Walgreens No. 03629 became a favorite
23  location of traffickers of prescription drugs and some
24  of these individuals would travel great distances to

Page 207

1  fill questionable prescriptions, primarily for
2  oxycodone and others."
3      Do you see that, sir?
4      MR. HILL:  Objection to form.
5  BY THE WITNESS:
6      A.   Yes.
7  BY MR. MOUGEY:
8      Q.   And you weren't aware that pill seekers
9  were traveling great distances to get oxycodones
10  filled at Walgreens pharmacies?
11      A.   I was not.
12      Q.   If you turn to Page 135, sir, the last
13  sentence on Page 135:
14      "Specifically, Walgreens 03629 dispensed
15  to customers who resided in 26 states and/or
16  commonwealths including the Appalachian regions of
17  Kentucky, Ohio and Tennessee."
18      Do you see that, sir?
19      A.   I do.
20      Q.   And, sir, were you aware at any point in
21  time after this agreement that Walgreens agreed to
22  shut down its Jup- -- Jupiter distribution center in
23  terms of Schedule II and Schedule III distribution?
24      A.   I believe after the agreement, yes, I was

Page 208

1  aware of that.
2      Q.   You became aware of that after the
3  agreement?
4      A.   I know that prior there was an order to
5  show cause.
6      Q.   Do you have any understanding of how many
7  Schedule III -- II and Schedule III distribution
8  centers were in Walgreens US?
9      A.   I don't know the exact number.
10      Q.   Three sound about right?
11      MR. HILL:  Object to the form.
12  BY THE WITNESS:
13      A.   I -- I don't -- I'm not sure.
14  BY MR. MOUGEY:
15      Q.   Another one was Perrysburg, Ohio?
16      A.   I believe so.
17      Q.   You understand that Perrysburg, Ohio also
18  agreed to stop distributing Schedule II and
19  Schedule III narcotics in late 2013, early 2014?
20      MR. HILL:  Objection to form.
21  BY THE WITNESS:
22      A.   I know that we did.  I don't -- I -- I
23  didn't know that -- or I didn't recall that -- that
24  Perrysburg was part of that agreement.  I know that we

Page 209

1  switched to an outside vendor.
2  BY MR. MOUGEY:
3      Q.   2014, two of the three distribution
4  centers at Walgreens were no longer distributing
5  Schedule II and Schedule III opiates, correct, sir?
6      A.   Correct.
7      Q.   All of the distributions on the eastern
8  seaboard from Walgreens, Walgreens stopped
9  distributing Schedule II and Schedule IIIs, correct,
10  sir?
11      MR. HILL:  Objection to the form.
12  BY THE WITNESS:
13      A.   As they trans- -- as our distribution
14  transitioned to ABC we stopped distributing.
15  BY MR. MOUGEY:
16      Q.   And that was purely coincidence that
17  Walgreens transitioned to ABC, it had nothing to do
18  with the fact that it agreed to pay a significant fine
19  with the DEA and received investigative subpoenas at
20  the Perrysburg distribution center, correct?
21      A.   I don't --
22      MR. HILL:  Objection to form.
23  BY THE WITNESS:
24      A.   I don't know.

Page 210

BY MR. MOUGEY:

1  Q.  Explain to me what daily delivery means at
3  Walgreens in early 2013.
4  A.  I'm -- have heard the name of the program,
5  but I do not know what it involves.
6  Q.  What is your understanding of what daily
7  delivery means?
8  A.  I know that we have a program today in
9  which we are working with ABC to receive C-II orders
10  daily instead of weekly --
11  Q.  Or at --
12  A.  -- amongst other controlleds and other
13  orders.
14  Q.  About early 2013, what does daily delivery
15  mean at -- at Walgreens?
16  A.  I don't know.
17  Q.  You have no idea?
18  A.  I don't recall.  I don't -- I don't know.
19  Q.  So in early 2 -- 2013 when an order was
20  identified as suspicious, how long was it held before
21  it was shipped?
22  MR. HILL:  Objection to form.
23  BY THE WITNESS:
24  A.  By Walgreens?

Page 211

1  BY MR. MOUGEY:
2  Q.  Yes.
3  A.  If an order was flagged as suspicious in
4  the new system, it was -- it would be not shipped.  It
5  would not be shipped.
6  Q.  How does that work in the context with --
7  well, you are not sure if there was daily delivery or
8  not?
9  A.  I don't recall.
10  MR. MOUGEY:  I'll tell you what, if you guys
11  don't mind, this is a good spot for a five-minute
12  break.
13  THE VIDEOGRAPHER:  Going off the record at
14  1:18 p.m.
15  (WHEREUPON, a recess was had
16  from 1:18 to 1:27 p.m.)
17  THE VIDEOGRAPHER:  We are back on the record at
18  1:27 p.m.
19  BY MR. MOUGEY:
20  Q.  All right.  Mr. Bratton, if you would pick
21  back up Bratton 4, which is the DEA PowerPoint CEA
22  material -- or CE material, rather, in Florida.
23  A.  Okay.
24  Q.  Now, we -- we -- we went through this

Page 212

1  before lunch, we went through several slides.
2  Have you ever seen this slide deck or
3  anything similar to it?
4  A.  There was -- not before preparation for
5  this deposition, no, not that I recall.
6  Q.  So is -- is the West Palm Beach document
7  that you reviewed in preparation for the -- for the
8  deposition or another one?
9  A.  There was a different slide deck that I
10  think was similar, but I don't -- I'm not sure if...
11  Q.  Is it Bratton 5, which is the Indianapolis
12  version?
13  A.  It looks familiar but I'm not sure if that
14  was the one that we...
15  Q.  But before your preparation for your
16  testimony, you don't recall seeing either of these two
17  versions?
18  A.  No.
19  Q.  Do you have any understanding of why
20  Bratton 5, Drug Trend -- Trends Indianapolis, Indiana,
21  December 2012 was in your custodial file produced by
22  Walgreens?
23  A.  No.
24  Q.  No idea?

Page 213

1  A.  Nope.
2  Q.  But you don't recall ever seeing this
3  document or looking through it in detail?
4  A.  I -- I do not.
5  Q.  I want to go back, just because I have it
6  tabbed, and it is easier for me, to Bratton 4, which
7  is the color PowerPoint version, and I want to go back
8  to the -- the wheel that we were looking at earlier in
9  relation to the cycle with heroin, circle of
10  addiction.  It is up on the screen, too, if it makes
11  it any easier for you.
12  Now, you haven't seen anything at
13  Walgreens or any material at Walgreens indicating that
14  there is a circle of addiction that includes a --
15  beginning with prescription opiates and ultimately
16  into heroin?
17  MR. HILL:  Objection to form.
18  BY THE WITNESS:
19  A.  I didn't -- I've never seen it presented
20  in this manner.  I -- I don't know -- I'm not going to
21  deny that opiates can contribute to addiction, but
22  I -- I don't know that I've received anything from
23  Walgreens.  I don't recall.
24  BY MR. MOUGEY:

Page 214

1    Q.   Anything from Walgreens discussing the
2  fact that Schedule II and III opiates can be a gateway
3  or initiation drug for heroin?
4       MR. HILL:  Same objection.
5  BY THE WITNESS:
6    A.   Not that I recall.
7  BY MR. MOUGEY:
8    Q.   And in Bratton 5, sir, I'll represent to
9  you is the Indianapolis version that was in your
10 custodial file, there is the -- what I believe to be
11 the exact same slide from the DEA on the circle of
12 addiction.
13      MR. HILL:  What page is that, Peter?
14      MR. MOUGEY:  I don't have a page number.
15 BY THE WITNESS:
16   A.   Okay.  I found it.
17 BY MR. MOUGEY:
18   Q.   You know what, I do know -- I do,
19 actually.  This one is Bates -- it is 118.
20   A.   Not --
21   Q.   Do you see that?
22   A.   I do.
23   Q.   But you don't ever recall looking at this
24 slide deck or the contents therein or...?

Page 215

1    A.   I don't recall, no.
2    Q.   Before your preparation?
3    A.   No.
4    Q.   Do you recall any of your training at
5  Walgreens at any point in time discussing the
6  relationship between Schedule II and Schedule III
7  opiates and a cycle into heroin?
8    A.   I know that it can be a risk factor.  I
9  don't recall any training, no.
10   Q.   When you say it could be a risk factor,
11 what do you mean?
12   A.   There is a potential for abuse of those
13 drugs, which is why they are in Schedule II, and it
14 can lead to addiction and abuse if misused.
15   Q.   And those can -- those meaning Schedule II
16 and Schedule III can lead to abuse of heroin?
17      MR. HILL:  Object to the form.
18 BY THE WITNESS:
19   A.   Abuse in general, and I know that heroin
20 is an opioid.  I don't -- I don't believe that I
21 received anything from Walgreens on it, though.
22 BY MR. MOUGEY:
23   Q.   And you don't recall seeing anything from
24 Walgreens during any of your training that Schedule II

Page 216

1  and Schedule III opiates can be a gateway drug for
2  heroin abuse?
3    A.   I don't recall receiving any training
4  materials from Walgreens.
5    Q.   And do you recall receiving any
6  information from Walgreens that Schedule II and
7  Schedule III opiates can be a gateway drug for heroin?
8    A.   I'm not sure what you mean by gateway, but
9  we've discussed that there are risk factors for
10 patients toy -- taking opioids in meetings and things
11 like that.
12   Q.   You don't know what I mean by gateway,
13 that's confusing to you, gateway?
14   A.   Yes.
15   Q.   You've never heard that term before?
16   A.   I've -- I've heard it, but I'm not sure on
17 how you are using it now.
18   Q.   It's a -- do you have an understanding
19 from Walgreens that a significant number of people who
20 use prescription opiates ultimately -- or ended up
21 using heroin?
22      MR. HILL:  Objection to the form.
23 BY THE WITNESS:
24   A.   No, and I would say if everybody that used

Page 217

1  opioids ever ended up addicted to heroin, we'd have a
2  much, much, much larger prodo -- problem than we have
3  today, so...
4  BY MR. MOUGEY:
5    Q.   That's the question I asked, right?  The
6  question I asked you was everyone that uses
7  Schedule II and Schedule III uses heroin.
8       Is that what I asked you?
9       MR. HILL:  Objection to form.
10 BY THE WITNESS:
11   A.   I'm sorry, but I thought that's what you
12 were saying.
13 BY MR. MOUGEY:
14   Q.   Everyone who uses -- takes one Lortab then
15 uses heroin, is that what you think I asked you?
16   A.   I --
17      MR. HILL:  Objection to form.
18 BY THE WITNESS:
19   A.   I'm sorry.  I -- maybe I didn't understand
20 the question.
21 BY MR. MOUGEY:
22   Q.   What I asked was that a -- a number of
23 individuals that ultimately used -- here, I'll read
24 the question back so then your counsel could continue

Page 218

1 to --
2    MR. HILL:  You said "a significant number."
3    MR. MOUGEY:  So your counsel that is shaking his
4 head again over there, which seems to be --
5    MR. HILL:  Well, you misstated the question.
6    MR. MOUGEY:  Oh, good, then shake your head
7 and -- and up and down and nod and -- and give
8 answers.
9    MR. HILL:  That's -- that's not true.
10    MR. MOUGEY:  So --
11    MR. HILL:  That's not true.
12    MR. MOUGEY:  It is true.
13    MR. HILL:  It's not true.
14    MR. MOUGEY:  It's happened -- it has happened in
15 every deposition.
16    MR. HILL:  You just muttered under your breath
17 that you knew something was coming.
18    MR. MOUGEY:  That doesn't -- but he didn't know
19 what I meant by gateway.  I could give you one of my
20 fifth graders and he'd understand what gateway means.
21    MR. HILL:  He asked for the definition.  You
22 didn't give it to him yet.
23    MR. MOUGEY:  I didn't ask for a definition.
24    MR. HILL:  He asked you for one.

Page 219

1    MR. MOUGEY:  I said do you know what gateway is
2 and he didn't know.
3    MR. HILL:  He asked --
4    MR. MOUGEY:  My fifth grader knows what gateway
5 is.
6    MR. HILL:  He asked you for it and you couldn't
7 give it to him.
8    MR. MOUGEY:  No.  I must be as -- as bad as my
9 fifth grader then.  So, if we're just as smart as you
10 guys, we'd all be just fine.  I don't know.  I don't
11 know what normal words mean.
12    MR. HILL:  Please just ask a question.
13    MR. MOUGEY:  I don't know what stipulation
14 means.  I don't know what agreement means.  I don't
15 know what gateway means.
16    MR. HILL:  You are being abusive again.  Please
17 stop.
18    MR. MOUGEY:  Abusive is wasting my time sitting
19 in these depositions and not -- Kate has completely
20 misrepresented who had knowledge and who didn't.
21    MR. HILL:  That's not true.
22    MR. MOUGEY:  We were told repeatedly --
23    MR. HILL:  That's not true.
24    MR. MOUGEY:  -- prescription integrity --

Page 220

1 pharmaceutical integrity is the department to take,
2 you don't need their resumes, use LinkedIn, and here
3 we are wasting everyone's time in this room.
4    MR. HILL:  Please stop.  Just ask a question.
5 That's not true.
6    MR. MOUGEY:  Maybe you ought to sit in on some
7 of these calls.  Maybe we wouldn't have these problems
8 if you would sit in on some of these meet and confers.
9 Maybe you all ought to put Kate somewhere else and you
10 can help us.
11    MR. HILL:  Kate is doing a great job.
12    MR. MOUGEY:  Yeah, that's -- that's why we are
13 here.
14    MR. HILL:  Please stop being abusive to her.
15 It's not right.
16    MR. MOUGEY:  Well, I -- I don't think it's right
17 I'm here on all day Friday taking a witness, the
18 fourth person, that doesn't know anything about prior
19 to 2013.
20    MR. HILL:  You knew -- you saw his LinkedIn
21 resume.  You knew what his thing was.  You asked to
22 depose him.
23    MR. MOUGEY:  It doesn't even have a description
24 of his job and the whole time he has got his resume

Page 221

1 sitting on his work computer.
2    MR. HILL:  Did you think when you came in here
3 today that he was not --
4    MR. MOUGEY:  No, actually, I now understand that
5 no one knows anything prior to 2013.
6    MR. HILL:  No, that's not fair.  That's not
7 true.
8    MR. MOUGEY:  It is true.
9    MR. HILL:  It's not true.  I'm sorry that you've
10 asked us to produce people that don't give you the
11 answers you'd like.
12    MR. MOUGEY:  Because that's what we wanted, we
13 wanted just post '13.  We wanted post settlement with
14 the DEA, that's it.
15    MR. HILL:  Please just ask him the question if
16 you have one.
17 BY MR. MOUGEY:
18    Q.  Have you received any training at all
19 from -- any information from Walgreens about
20 that individuals who misuse prescription opiate pain pills
21 are more likely to abuse heroin?
22    MR. HILL:  Object to the form.
23 BY THE WITNESS:
24    A.  I am aware of that fact.  I do not know,

Page 222

1 however, if I -- or recall that I received anything
2 from Walgreens.
3 BY MR. MOUGEY:
4    Q.   Wouldn't that have been important for you
5 to know that individuals that misuse prescription
6 opiate pain pills are more likely to abuse heroin?
7 Wouldn't that be important for you to know in your
8 day-to-day implementation of identifying suspicious
9 orders and performing your due diligence?
10   A.   I -- I would say that I -- I think I am
11 and was aware of that.  I don't know that it was
12 provided to me by Walgreens, though.  I don't -- I
13 don't recall.
14   Q.   Let me hand you what I've marked as
15 Bratton 8.
16        (WHEREUPON, a certain document was
17         marked Walgreens-Bratton Deposition
18         Exhibit No. 008, for identification,
19         as of 11/30/2018.)
20 BY MR. MOUGEY:
21   Q.   This is an e-mail from Ms. Daugherty.
22        Do you see that?
23   A.   Yes.
24   Q.   And she was one of the managers in

Page 223

1 pharmaceutical integrity in your department, correct,
2 sir?
3    A.   Correct.
4    Q.   And do you see the date of this e-mail,
5 4/23/2018?
6    A.   Yes.
7    Q.   And you see that you, on the second line,
8 you were one of the individuals to receive this
9 e-mail, correct, sir?
10   A.   Correct.
11   Q.   And you see that Ms. -- the -- the
12 attachment is titled, "Opiate Use and Stigma Slides,"
13 correct?
14   A.   Correct.
15   Q.   And under Subject:  "Opiate task force
16 agenda 4/23."
17        Do you see that?
18   A.   Yes.
19   Q.   And Ms. Daugherty relays that:  "Stigma
20 training doc attached for our call this morning.
21 Agenda and documents are also available on our
22 SharePort" -- "SharePoint site."
23        Do you see that, sir?
24   A.   Yes.

Page 224

1    Q.   Did you review this document in
2 preparation for your testimony today?
3    A.   I don't -- I don't -- I don't remember it,
4 if we did.
5    Q.   Why don't you turn, sir, to Slide 6 titled
6 "Opiate Statistics."
7    A.   Okay.
8    Q.   The first bullet, "Prescription opiates
9 and heroin."
10        Do you see that?
11   A.   I do.
12   Q.   "Nearly 80 percent of Americans using
13 heroin reported misusing opiates first."
14        Do you see that?
15   A.   I do.
16   Q.   The second bullet:  "Individuals who
17 misuse prescription opiate pain pills are 40 times
18 more likely to abuse heroin."
19        Do you see that, sir?
20   A.   I do.
21   Q.   Now, flip back to the first page of the
22 PowerPoint.  "Silence the stigma, opiate use disorder
23 and addressing stigma."
24        Do you see that, sir?

Page 225

1    A.   I do.
2    Q.   And "Alex Mills, PharmD."
3        Do you know who Alex is?
4    A.   I do not.
5    Q.   And below that, "Walgreen Co./Purdue
6 University College of Pharmacy, Stevan Mizimakoski."
7        Do you see that?
8    A.   I do.
9    Q.   Do you recall looking at this -- at this
10 presentation?
11   A.   I don't recall looking at it, no.
12   Q.   And it's just 4/23/2018?
13   A.   I don't recall.
14   Q.   And you agree that Walgreens brings in
15 speakers to help educate you and your colleagues to
16 help fulfill the roles in pharmaceutical integrity,
17 correct?
18   A.   We do meet and discuss with individuals
19 from time to time.  I don't -- I mean, I don't know
20 this was a presentation that we received, though.
21   Q.   Do you see, sir, that you received this
22 presentation at least in a PowerPoint form, correct?
23   A.   Correct.
24   Q.   And that Walgreens has individuals from

Page 226

1  outside to help put together presentations to educate
2  you and your colleagues about opiates in your role in
3  pharmaceutical integrity, correct?
4      A.   So, this document, I believe, was being
5  produced for consumption by the field based on the
6  fact that it's part of this task force. I don't think
7  that the intended audience was our group, though, you
8  know, it was circulated, obviously, amongst us.
9      So I'm not sure how I would
10  characterize -- I -- I -- does Walgreens bring in
11  speakers to -- to educate our team, is that what you
12  are asking?
13      Q.   Does Walgreens bring in some smart people
14  to help you all get educated on an issue that's
15  important for you in your job in pharmaceutical
16  integrity?
17      A.   They -- they might. I'm not sure that
18  this is one of those instances, but...
19      Q.   So does Walgreens create presentations for
20  you and your colleagues to help you get educated about
21  issues that are important in filling your role in
22  pharmaceutical integrity?
23      MR. HILL:  Object to the form.
24  BY THE WITNESS:

Page 227

1      A.   Again, I think this -- I -- I don't know.
2  This document, I believe, was for the field, and I'm
3  sure it was circulated to our team as evidenced by the
4  fact that I'm on the e-mail, but I don't think that we
5  were the intended audience so much as --
6  BY MR. MOUGEY:
7      Q.   I didn't ask you who the intended audience
8  was, I didn't ask you who you think the distribution
9  system was.
10      Were you, Ed Bratton, given information
11  from Walgreens to help educate you on important issues
12  faced -- that you faced in pharmaceutical integrity?
13      A.   Yes.
14      Q.   Yeah. It's easy.
15      MR. HILL:  Objection.
16  BY MR. MOUGEY:
17      Q.   So, and typically that information that
18  you were provided for educational purposes was based
19  on sound researched positions in the field, correct,
20  sir?
21      A.   I would hope --
22      MR. HILL:  Objection to the form.
23  BY THE WITNESS:
24      A.   I -- I don't know --

Page 228

1  BY MR. MOUGEY:
2      Q.   You would hope so, correct?
3      A.   Yes.
4      Q.   You wouldn't think that Walgreens is going
5  to bring in some willy-nilly presentation that doesn't
6  have any factual or scientific basis, correct?
7      A.   I would hope not.
8      Q.   Me too.
9      You would think that the information that
10  Walgreens is providing to you to help educate you on
11  issues would be scientifically sound, correct?
12      MR. HILL:  Object to the form.
13  BY THE WITNESS:
14      A.   I -- I -- I believe that they -- I would
15  hope that they are providing scientifically sound
16  information, yes.
17  BY MR. MOUGEY:
18      Q.   And sir, you see on the very first page of
19  this slide presentation Walgreens Company/Purdue
20  University College of Pharmacy.
21      And Purdue University, no matter what your
22  football allegiance may -- may be, that's a sound,
23  academic, preche -- prestigious school in -- in the
24  US, correct?

Page 229

1      A.   Yes.
2      Q.   And this gentleman from Purdue University,
3  College of Pharmacy, part of his presentation to
4  Ed Bratton at Walgreens in pharmaceutical integrity is
5  that individuals who misuse prescription opiate pain
6  pills are 40 times more likely to abuse heroin,
7  correct, sir?
8      A.   Correct.
9      Q.   And that nearly 80 percent of Americans
10  using heroin reported using opiates first, correct,
11  sir?
12      A.   Correct.
13      Q.   And that below that, this gentleman from
14  Purdue assigned dollar amounts attributable to
15  prescription opiate misuse, correct, sir?
16      A.   He did.
17      Q.   55.7 billion nationally, correct, sir?
18      A.   That's what it -- the slide says, yes.
19      Q.   25 billion in healthcare costs, correct,
20  sir?
21      A.   Correct.
22      Q.   25.6 billion in lost workplace
23  productivity, correct, sir?
24      A.   That's what's on the slide.

Page 230

1    Q.   5.1 billion in criminal justice costs,
2 correct, sir?
3    A.   Correct.
4    Q.   So if Walgreens thought enough of this
5 gentleman from Purdue University to put together a
6 presentation to help educate Ed Bratton on issues
7 facing you as part of your role in pharmaceutical
8 integrity, correct, sir?
9       MR. HILL:  Objection to the form.
10 BY THE WITNESS:
11    A.   Again, I don't know his intent was to
12 educate me, but I did receive this presentation.
13 BY MR. MOUGEY:
14    Q.   Other than helping educate you, why else
15 would Ms. Daugherty pass this around and -- "See doc
16 attached for our call this morning"?
17    A.   So we were -- as part of this -- the
18 subject, the opioid tasks force, we were developing
19 training materials for stores and pharmacists on how
20 to address issues related to opioids.  And so I
21 believe as part of this call we were reviewing this
22 material that was going to be going out to the field
23 potentially.
24    Q.   And Ms. Daugherty felt this was important

Page 231

1 enough to pass around for you and your colleagues to
2 consider including this as part of the opiate task
3 force materials, correct, sir?
4    A.   I -- I believe so.
5    Q.   I'm going to hand you what's marked as
6 Ex -- Bratton 9.
7       (WHEREUPON, a certain document was
8        marked Walgreens-Bratton Deposition
9        Exhibit No. 009, for identification,
10        as of 11/30/2018.)
11 BY MR. MOUGEY:
12    Q.   This is an e-mail to you -- to your boss,
13 correct?
14    A.   Yes.
15    Q.   I said "to" twice.
16       This is an e-mail from you to your boss,
17 correct?
18    A.   Yeah, yes, sorry.
19    Q.   No, that's my fault.
20       And it is dated 4/4/2013, correct?
21    A.   Correct.
22    Q.   And the subject line is:  "Thought from
23 the Project Forest meetings," correct?
24    A.   Yes.

Page 232

1    Q.   And what does Project Forest mean?
2    A.   I believe that was the project to
3 transition our distribution from Walgreens DCs to ABC.
4    Q.   And that was called Project Forest?
5    A.   Um-hum.
6    Q.   What -- why was it called Project Forest?
7    A.   I don't know.
8    Q.   You have no idea?
9    A.   They -- they tend to come up with weird
10 code names for every project.  I don't know why they
11 chose this one.
12    Q.   When you say -- when you are referring to
13 "they," who is that?
14    A.   The people that -- senior leadership, like
15 Project Felix, Project whatever, you know.
16    Q.   And so the transition from Walgreens
17 distribution to ABC is referred to as Project Forest?
18    A.   I believe so, yeah.
19    Q.   So as part of -- part of Project Forest,
20 you all were discussing transitioning from Walgreens
21 distribution centers to ABC distribution centers,
22 AmerisourceBergen?
23    A.   Correct, I believe so.
24    Q.   And you asked Ms. Polster a question where

Page 233

1 you said:
2       "I think so, I'm also wondering how we
3 actly our inter" -- "interception of suspicious orders
4 will work within the context of daily delivery."
5       Right?
6    A.   Um-hum.
7    Q.   Do you recall sending this e-mail?
8    A.   I don't.
9    Q.   Now, daily delivery means that there is
10 distrib-- supply of pharmaceuticals, including
11 Schedule II and Schedule III, going out on a daily
12 basis, right, correct?
13    A.   Correct.
14    Q.   And if an order is identified as
15 suspicious, flagged and not shipped, you were
16 wondering how those two would work side by side,
17 right?
18       MR. HILL:  Objection to form.
19 BY THE WITNESS:
20    A.   I think if -- down below I was talking
21 about Passport, which was part of this project, I
22 think.  What I do remember is that Passport was a
23 system for ABC to -- customers of ABC to order
24 directly and we didn't want them to -- our stores to

Page 234

1  be able to use Passport. We wanted it to always go
2  through our regular system.
3  BY MR. MOUGEY:
4      Q.  Why didn't you want them to be able to use
5  Passport?
6      A.  It -- they would no longer be subject to
7  our controlled substances order monitoring, they'd
8  only be subject to ABC's, and so we wanted to maintain
9  both systems and so we rem-- -- we ultimately removed
10  the ability to order controls from Passport.
11      Q.  Do you think it would be appropriate for
12  Walgreens' pharmacists to know what their thresholds
13  are from ABC?
14      MR. HILL:  Objection to form.
15  BY THE WITNESS:
16      A.  I'm not sure.
17  BY MR. MOUGEY:
18      Q.  You know what a threshold is, right?
19      A.  Yes.
20      Q.  Is a threshold different than a ceiling in
21  ABC parlance?
22      MR. HILL:  Same objection.
23  BY THE WITNESS:
24      A.  I'm not sure.  I know that it -- in our

Page 235

1  system there's -- it's different, it's implemented in
2  a different way than in their system.  Theirs is by
3  product family versus individual drug strength
4  combinations like ours, so I believe that threshold
5  and ceiling are similar, but I don't know the
6  intricate differences.
7  BY MR. MOUGEY:
8      Q.  And a threshold means that once its
9  crossed or got to that threshold, that no more
10  shipments go out without due diligence, correct?
11      A.  I believe so.
12      Q.  And that's an important part of any
13  feature that -- that suspicious orders are identified
14  and halted while due diligence is performed, correct?
15      A.  Correct.
16      Q.  And do you believe it would be appropriate
17  for stores, pharmacies, to know what the thresholds
18  are from ABC or any other vendor?
19      MR. HILL:  Objection to the form.
20  BY THE WITNESS:
21      A.  I don't know that it's appropriate or
22  inappropriate because, based on the fact that it is a
23  number of drugs, that they wouldn't know what drugs
24  are within each threshold, that it wouldn't really do

Page 236

1  them much good to know one way or the other.
2  BY MR. MOUGEY:
3      Q.  So it would be no big deal in your mind
4  that they would -- would know what the threshold was?
5      A.  We --
6      MR. HILL:  Same objection.
7  BY THE WITNESS:
8      A.  -- we don't typically share that
9  information with the store, but even if they had it, I
10  don't know that it would be useful to them really.
11  BY MR. MOUGEY:
12      Q.  You do not think that Walgreens shares the
13  thresholds with its stores?
14      A.  We do not -- as a matter of regular
15  business we do not.  I know that there have been times
16  when we share those thresholds.  However, I don't
17  think that -- knowing the threshold wouldn't be -- I
18  don't know how they would act on knowing that.
19  BY MR. MOUGEY:
20      Q.  If -- if the threshold was X amount of
21  pills for oxy 30s --
22      A.  But it's -- but it's not one item.  It's
23  a -- it's a number of items that they don't know what
24  those items are that go into that threshold.

Page 237

1      Q.  Is that true for ANDA?
2      A.  I don't know about ANDA.
3      Q.  Is that true for Cardinal?
4      A.  I don't know about Cardinal.
5      Q.  So you are just talking about ABC?
6      A.  Correct.
7      Q.  What about Walgreens' thresholds?
8      A.  Ours are per, it's called a PLN, and that
9  is a chemical and strength combined.  So 5-milligram
10  Perc-- -- 5-325 Percocet versus ABC's that might be ten
11  different strengths or multiple different items in the
12  same threshold.
13      Q.  So if a store is nearing the threshold,
14  whatever it is, and it's the end of the month and they
15  can push it over a day or two later, you don't think
16  that that's important that -- or a problem for a store
17  to know that they were nearing their -- their
18  threshold?
19      MR. HILL:  Object to the form.
20  BY THE WITNESS:
21      A.  I don't know how they would use that, what
22  they would be able to do with that information.  I
23  think that it's a rolling time period, so, as from
24  what I understand, so...

Page 238

BY MR. MOUGEY:

Q. Well -- go ahead. I'm sorry.

A. I don't -- I don't know that -- I don't know what that would let them do.

Q. Are you familiar with the concept interstoring?

A. Yes.

Q. If they are near a threshold -- what's interstoring?

A. So, interstoring is the ability to move product from one Walgreens to the other, which generally we've blocked post settlement in normal business practice.

Q. A couple of key words there, but generally you've stopped it?

A. Correct.

Q. Not overall, correct?

A. There --

MR. HILL: Object to form.

BY THE WITNESS:

A. There would need to be additional steps taken by the inventory team to allow it to be interstored, so a store can't just interstore on their own.

Page 239

BY MR. MOUGEY:

Q. But there are circumstances where stores have interstored without approval, correct?

A. Not without approval that I'm aware of.

Q. That you are aware of.

You think that every time a store has interstored it has received approval beforehand?

A. My under --

MR. HILL: Object to form.

BY THE WITNESS:

A. My understanding is that the inventory team would have to change the setting to allow an interstore to occur, so I don't -- I don't know if that could occur without their approval or -- I don't think it can happen without their approval.

(WHEREUPON, Mr. Peter B. Bensinger, Jr. entered the deposition proceedings.)

BY MR. MOUGEY:

Q. And prior to this agreement with the DEA in 2013, your understanding is that there was interstoring occurring?

A. Correct.

Q. And that would mean that a store in order

Page 240

to receive a Schedule II or Schedule III amongst other type of controlled substances would contact a nearby store and get any inventory or surplus that they had?

MR. HILL: Object to the form.

BY THE WITNESS:

A. Potentially.

BY MR. MOUGEY:

Q. And -- and the problem with that interstoring concept is that the store could bypass or fly under the radar of any controlled substance monitoring policy, correct, sir?

MR. HILL: Object to the form.

BY THE WITNESS:

A. Of a vendor. I'm not sure about our -- our internal system knows about interstores. I don't know if that was part of the logic or not for -- for our system prior. The current system would know that there has been an interstore and hold it against their ceiling limit.

BY MR. MOUGEY:

Q. Is part of your job in pharmaceutical integrity to analyze profits or costs?

A. Rarely, but not as a general course of business, no.

Page 241

Q. Do you recall performing any analysis on the cost to Walgreens of what the Jupiter center no longer distributing Schedule II or Schedule III narcotics, what the impact would be?

A. I don't recall. I don't.

Q. Let me hand you what will be marked as Bratton 10.

(WHEREUPON, a certain document was marked Walgreens-Bratton Deposition Exhibit No. 010, for identification, as of 11/30/2018.)

BY MR. MOUGEY:

Q. Do you see, sir, this is an e-mail from you to Lorinda Tisdell, Bate -- dated 7/3/2013, correct?

A. Yes.

Q. And who is Lorinda Tisdell?

A. She was the pharmacy -- VP of pharmacy for southern operation at that time. It's a position that no longer exists.

Q. What was the scope of her responsibility as VP of pharmacy for southern operation?

A. I -- I'm not sure of all of her responsibilities. I know that she was -- pharmacy

Page 242

1 execution broadly would be --
2　Q.　What does that mean?
3　A.　How -- how the stores are operating and
4 are they -- are they performing up to the quality and
5 standards of Walgreens.
6　Q.　From a quality perspective or from a
7 profit or both?
8　A.　Probably both.
9　Q.　Okay. And you were putting together a
10 report for Lorinda Tisdell, correct?
11　A.　Correct.
12　Q.　This is within a couple of weeks of the
13 significant monetary agreement between Walgreens and
14 the regulators, correct?
15　　MR. HILL: Object to the form.
16 BY THE WITNESS:
17　A.　I don't recall that. What was the date?
18 I -- it was in the chart.
19 BY MR. MOUGEY:
20　Q.　June of 2013?
21　A.　Yeah, within a few weeks or month.
22　Q.　Within a few weeks.
23　　The first page of this slide, within a few
24 weeks of the $80 million agreement with the

Page 243

1 regulators, you've got a PowerPoint put together
2 called "Southern Operation Pharmaceutical Integrity
3 Monthly Update," correct?
4　A.　Um-hum.
5　Q.　You see your name there at the bottom,
6 Ed Bratton, 7/3/2013, correct?
7　A.　Correct.
8　Q.　And if you turn, sir, to Bates No. 53,
9 "Jupiter Distribution Cost."
10　A.　Um-hum.
11　Q.　It says: "Total invoice cost of
12 distributed inventory was 9,013,462."
13　　$9,013,462, correct?
14　A.　Correct.
15　Q.　And in parens, "(WAC cost)," that's
16 Walgreens, correct?
17　A.　Correct.
18　Q.　"$10,991,339," correct?
19　A.　Correct.
20　Q.　And explain to me what you are calculating
21 in this PowerPoint?
22　A.　I'm trying to look at the document for
23 some context because I don't -- I'm not sure what this
24 was.

Page 244

1　　I don't -- I don't remember.
2　Q.　At this point, sir, the distribution
3 center is -- in Jupiter is winding down its
4 distribution of Schedule II and Schedule III
5 narcotics, correct?
6　A.　I don't remember if -- I don't remember
7 what happened to the inventory after the -- the
8 agreement for Jupiter.
9　Q.　You do understand that the Jupiter
10 distribution scanner -- center of the Schedule II and
11 Schedule III opiates were kept in a, what's called a
12 cage in the -- in the -- in the distribution center,
13 correct?
14　A.　I've heard that, yes.
15　Q.　And -- and -- but you're not aware -- you
16 don't -- familiar with how the Schedule II and
17 Schedule III are segregated in -- inside the
18 distribution center?
19　A.　Well, I've heard that they are locked in
20 a -- in a cage, yeah.
21　Q.　Are you aware that the DEA locked up the
22 Walgreens Jupiter distribution center during its
23 investigation, locking and prohibiting Walgreens
24 employees from accessing the cage with the Schedule II

Page 245

1 and Schedule III opiates?
2　　MR. HILL: Objection to the form.
3 BY THE WITNESS:
4　A.　I -- I didn't -- I did not know that.
5 BY MR. MOUGEY:
6　Q.　You didn't know that until sitting here
7 today?
8　A.　No. Excuse me.
9　Q.　No?
10　A.　No.
11　Q.　Until sitting here today, no one has ever
12 told you that?
13　A.　I knew that we weren't allowed to
14 distribute. I didn't know that it was literally
15 locked.
16　Q.　So you're calculating in -- on this
17 page titled "Jupiter Distribute" -- "Dis" --
18 "Distribution Cost" the additional cost Walgreens is
19 going to bear as a result of winding down its business
20 and shifting to a third-party vendor, correct, sir?
21　A.　I -- I'm not sure what I was calculating.
22 I -- I don't know.
23　Q.　Do you recall at any point in time you
24 were asked to perform any financial analysis on the

Page 246

1 cost to Walgreens of the distribution center closing?
2    A.   I don't, not that I recall.  I may have,
3 but I don't -- I --
4    Q.   Would that -- do you think that would be
5 in the scope of your responsibility at Walgreens to
6 perform financial analysis on the impact of a
7 distribution center winding down its operations to
8 distribute Schedule II and III opiates?
9    A.   Normally we would rely on our finance
10 department for that type of information.  Maybe if
11 Lorinda had a special request, I may -- obviously I
12 worked on something for her.  I -- I don't know if I
13 got the numbers from finance or if I computed them
14 myself.  I -- I just don't recall.
15    Q.   And, sir, this is at the same point in
16 time that you are receiving direction from -- what --
17 what department do you call it, the -- that you were
18 taking -- getting the details from on suspicious order
19 monitoring, is it regulatory and compliance?  What was
20 the name of it?
21    A.   Regulatory law and compliance.  Two
22 different departments --
23    Q.   Okay.
24    A.   -- that both worked to compile a list

Page 247

1 of -- of items.
2    Q.   All right.  So do you recall receiving
3 around the time of the agreement with the DEA
4 direction from reg -- regulatory law on what was the
5 details of the suspicious order monitoring program?
6    MR. HILL:  Object to the form.  The one thing
7 I'd just caution you, Mr. Bratton, not to divulge any
8 of the actual communication between the attorneys, if
9 there was any.
10 BY THE WITNESS:
11    A.   And I'm sorry.  Can you restate --
12    MR. MOUGEY:  I -- I think Judge Polster has
13 ordered that the details about the suspicious order
14 monitoring policies received from lawyers are not
15 privileged.
16    MR. SHKOLNIK:  I have a copy of the order.
17    MR. HILL:  I'm happy for him to talk about the
18 details of the suspicious order monitoring program,
19 but I'm not going to allow him to talk about his --
20 what lawyers said to him and what he said to the
21 lawyers.
22 BY MR. MOUGEY:
23    Q.   I'm handing you what I'm going to mark as
24 Bratton Exhibit 11.

Page 248

1    (WHEREUPON, a certain document was
2    marked Walgreens-Bratton Deposition
3    Exhibit No. 011, for identification,
4    as of 11/30/2018.)
5 BY MR. MOUGEY:
6    Q.   And I just want to be clear and that we're
7 on the same page.  Mr. Bratton, what's in front of you
8 that we've marked as 11 is an order from Judge Polster
9 in the Federal Court of the Northern District of Ohio.
10    Do you see that?
11    A.   I do.
12    Q.   And it is signed on the back page by
13 Judge Polster.
14    Do you see that?
15    A.   I do.
16    Q.   And --
17    MR. HILL:  Counsel, I don't know if you heard me
18 when you were finding your thing.  I'm not telling the
19 witness not to provide details of the SOMs.  What I'm
20 saying is I would like him not to -- to divulge the
21 details of what an attorney said to him or what he
22 said to an attorney.  That's all.
23    MR. MOUGEY:  Well, I think the witness has been
24 told not to answer repeated times today when asked

Page 249

1 about interpretations of SOMs, and you argued that it
2 was protected and instructed him not to answer.
3    MR. HILL:  Not -- not -- that's not true.
4    MR. MOUGEY:  Judge Polster --
5    MR. HILL:  That's not true.
6    MR. MOUGEY:  You definitely instructed the
7 witness not to answer questions when he said -- when
8 he wanted it from an attorney.
9    MR. HILL:  Sir, I -- what I said was I'd caution
10 the witness not to divulge what an attorney told you
11 and then I said he could answer.  He is allowed to
12 tell you the details of the SOM, just like the order
13 says.  He is not going to tell you what he said to the
14 lawyer or the lawyer said to him.  So, he's -- I'm
15 happy for him to tell you the details.
16    MR. MOUGEY:  So it's -- and I -- your
17 recollection that at no point in time today you have
18 instructed the witness not to answer questions about
19 details regarding suspicious order monitoring policies
20 received from lawyers?
21    MR. HILL:  I'm not somebody that you can change
22 your question to and pretend I just answered that
23 question.  I -- what the -- what's on the record is on
24 the record.

Page 250

1    MR. MOUGEY: I understand.

2    MR. HILL: I've told the witness --

3         No, let me finish, please. You asked me a

4    question.

5         I've told the witness when he can't

6    answer, when I instruct you not to. And many other

7    times I'd say, I caution you not to reveal the

8    attorney/client communication but you can provide the

9    details.

10        Earlier we had this long back and forth

11   and then you said, What were the details? And I said,

12   Great, now he can answer. It's very simple. It is

13   exactly what the judge ordered here.

14   MR. MOUGEY: Tell me what the distinction is,

15   because I'm sorry if I'm just a little slow. But

16   what -- what is the distinction between that he can't

17   answer the -- the communication with lawyers but he

18   can answer the details?

19   MR. HILL: If -- if he says to you, and I don't

20   know the answer to this because we haven't discussed

21   it, if he says, I asked the lawyer X and the lawyer

22   came to me and said Y, I believe that's privileged.

23   If you ask him what are the details of the SOM, like

24   the judge said, he can provide that to you. That's

Page 251

1    all I'm saying. He can't tell you the conversation he

2    had with the lawyer. And I don't think that's

3    controversial.

4    BY MR. MOUGEY:

5         Q.   So where did you learn the details about

6    the interpretations of the suspicious order monitoring

7    policies and procedures?

8         A.   Where did I learn the details --

9         Q.   Yes.

10        A.   -- of Walgreens suspicious order

11   monitoring?

12        Q.   Yes.

13        A.   Of how the system works is what you are

14   asking?

15        Q.   Yeah.

16        A.   Probably in meetings with the inventory

17   team and John Merritello and -- and --

18        Q.   Nothing -- no -- none of the -- all of

19   those answers earlier about asking about

20   interpretations and receiving it from legal

21   department --

22        A.   Of the settlement, yes.

23        Q.   Of -- of -- let's take a break. We can go

24   back and look at the transcript.

Page 252

1    THE VIDEOGRAPHER: Going off the record at

2    2:06 p.m.

3         (WHEREUPON, Mr. Peter B. Bensinger,

4         Jr. exited the deposition

5         proceedings.)

6         (WHEREUPON, a recess was had

7         from 2:06 to 2:29 p.m.)

8    THE VIDEOGRAPHER: We are back on the record at

9    2:29 p.m.

10   MR. SHKOLNIK: Is the -- is the phone on mute or

11   is it -- is it going back?

12   THE VIDEOGRAPHER: I un-muted it.

13   MR. SHKOLNIK: Oh, you un-muted it.

14   BY MR. MOUGEY:

15        Q.   Mr. Bratton, previously you mentioned that

16   pharmaceutical integrity department or group worked

17   with other teams within Walgreens to create spe- --

18   suspicious order monitoring programs.

19        Am I -- do I have that right?

20        A.   Yes.

21        Q.   And what other teams did -- did you work

22   with to create and implement the suspicious order

23   monitoring programs?

24        A.   So, the system was up and running before I

Page 253

1    started. However, my understanding is that we worked

2    with the inventory team, John Merritello, Wayne

3    Bancroft, to develop the new system. Our team was

4    responsible for the procedures and the communication

5    to the stores, from what I understand.

6         Q.   So when you say the inventory team and

7    Mr. Merritello, explain to me what the inventory

8    team's responsibility was?

9         A.   The computer system design and algorithms,

10   math, that went into initially setting up the

11   thresholds and the function of the system.

12        Q.   All right. So that was the scope of John

13   Merritello and Wayne Bancroft's input was the

14   algorithm design?

15        A.   Correct.

16        Q.   Any other teams other than Mr. Merritello

17   and Mr. Bancroft regarding the creation or

18   implementation of the suspicious order monitoring

19   policies that you work with?

20   MR. HILL: Object.

21   BY THE WITNESS:

22        A.   Not -- not that I'm aware of. We did at

23   times consult with compliance, I guess, but it was our

24   group that was implementing the procedures for the --

Page 254

BY MR. MOUGEY:

Q. When you say --

I'm sorry. Were you finished?

A. For the stores.

Q. When you say you consulted with compliance, what are -- what are you referring to?

A. So there was a document that's -- listed out action items from the settlement, and so they would audit us to say, are we -- are we meeting the requirements of that document.

Q. All right. So the action item document, do you believe that's been produced in the course of this litigation?

A. I don't know.

Q. Did you give it to -- to anyone to produce?

A. I don't think I have a copy of it anymore.

Q. Okay.

A. So no.

Q. So did you get it in an e-mail?

A. I probably did. I don't --

Q. You don't think so, right?

A. I don't know for -- I don't know for certain.

Page 255

Q. So who did that -- that document came from compliance?

A. Correct.

Q. And when you -- who is in compliance?

MR. HILL: Object to form.

BY THE WITNESS:

A. I can't think of their names off the top of my head. They've had some changes there. I -- I can't remember.

BY MR. MOUGEY:

Q. Lawyers, non-lawyers?

A. Non-lawyers, I believe.

Q. Non-lawyers in compliance?

A. Correct.

Q. All right. Are you familiar with a -- an administrative or an admin e-mail list serve?

A. No.

Q. Okay. I'll come back to that.

An administrative group?

A. No, I don't -- I don't -- I don't recall -- or I don't think I have enough information to -- I don't recall.

Q. Do you have any information about what -- who do you -- who is on the administrative group

Page 256

e-mail?

MR. HILL: Object to the form.

BY THE WITNESS:

A. I -- not that I can recall.

BY MR. MOUGEY:

Q. All right. What kind of backgrounds do the people in compliance have?

MR. HILL: Same objection.

BY THE WITNESS:

A. The two that I'm thinking of, one that I can remember her name is Margaret Majewski. She is a pharmacist, and then her boss, I can't remember his name, but he is a pharmacist also.

BY MR. MOUGEY:

Q. And what type of -- of input did compliance have in the suspicious order monitoring policies and procedures?

A. They were auditing us to ensure that we had met the requirements of the agreement.

Q. Okay. Anything else?

A. Not that I recall.

Q. Do you recall getting input from compliance that there were some flaws in the algorithm that needed to be fixed?

Page 257

MR. HILL: Object to the form.

BY THE WITNESS:

A. I -- I don't recall.

BY MR. MOUGEY:

Q. Do you recall getting any input from compliance that there were any portions of the policies or procedures of the suspicious order monitoring program that needed to be addressed?

A. I don't recall.

Q. Do you recall getting any input from compliance on the suspicious order monitoring policies and procedures at Walgreens?

A. I think because -- I -- I do not, and I think because that system was already in place be -- even before we finalized the agreement, they're -- they were -- there was many items in this document, removing bonuses from -- in certain employees and making sure we have other things in place that they were more focused on those.

Q. You realize that pharmaceutical integrity department had only been operating for a matter of months before you got there, right?

A. Correct.

Q. And you don't recall getting any input

Page 258

1 from compliance on any issues that needed to be
2 addressed?
3    MR. HILL:  Object to the form.
4 BY THE WITNESS:
5    A.   Not that I recall.
6 BY MR. MOUGEY:
7    Q.   Other than this checklist of things that
8 needed to be included?
9    A.   That's -- yeah, I mean there --
10   Q.   Do you -- go ahead.
11   A.   There was a report.  I don't remember all
12 of the contents of that document, but...
13   Q.   How many pages was it?
14   A.   Multiple.  I don't recall how many,
15 though.
16   Q.   All right.  I'm going to come back to that
17 report, okay.
18        Regulatory, so what do we call it, the --
19   A.   Regulatory -- regulatory law group.
20   Q.   Regulatory law group.
21        What is the difference of that group as
22 compared to the compliance group?
23   MR. HILL:  Objection to form.
24 BY THE WITNESS:

Page 259

1    A.   So, compliance is an auditor, so they will
2 say, you know, based off of -- so for example, there
3 was a -- in another process legal might conduct a
4 50-state review and say in each one of these states --
5    MR. HILL:  Mr. -- Mr. Bratton, just don't
6 disclose the actual communication between lawyers and
7 you.
8        Go ahead.
9 BY THE WITNESS:
10   A.   There was some requirement.  They would
11 then pass that to compliance, compliance would then
12 audit, Are we meeting the requirements of each one of
13 these items.
14 BY MR. MOUGEY:
15   Q.   So a policy or procedure would come out of
16 regulatory and go to the compliance that would
17 determine if it -- if it met with all of the different
18 applicable policies and procedures?
19   A.   Not a policy, a requirement would come
20 out, such as, Do we report the loss of pseudoephedrine
21 in this state to the state BNDD in Texas or whatever.
22   Q.   Okay.
23   A.   And then compliance would come to us and
24 say, Do you do this in Texas, do you do this in

Page 260

1 whatever state.  And then we would have to check our
2 policies to say, Yes, we do, or, you know, whatever
3 the case may be.
4    Q.   Would you receive those requirements
5 directly from the regulatory law group?
6    A.   We may in some instances.
7    Q.   I -- I'm going to -- I -- I'm confused by
8 this admin.
9        So EdBratton@administrativegroup, that
10 doesn't ring a bell to you on an e-mail?
11   A.   No.
12   Q.   So Eric Stahmann is not a lawyer, right?
13   A.   No.
14   Q.   And Patricia Daugherty is not an e-mail --
15 I mean not a lawyer?
16   A.   Correct.
17   Q.   And Natasha Polster is not a lawyer?
18   A.   Correct.
19   Q.   Earlier I asked you how many
20 communications you recalled having on a weekly basis
21 about -- with lawyers about policies and procedures
22 regarding suspicious order monitoring, correct?
23   A.   Correct.
24   Q.   And you -- and you said in the beginning a

Page 261

1 couple a week?
2    A.   Correct.
3    Q.   And I think you said that that continued
4 over the -- over a longer period of time, is that
5 right?
6    A.   Correct.
7    Q.   So you don't believe that compliance
8 filled -- you weren't seeking legal advice from
9 compliance, correct?
10   MR. HILL:  Object to the form.
11 BY THE WITNESS:
12   A.   From compliance?
13 BY MR. MOUGEY:
14   Q.   Right.
15   A.   No, I don't think so.
16   Q.   No -- no lawyers there, no -- no privilege
17 or -- well, let me ask it a different way.
18        You weren't seeking -- you weren't going
19 to compliance asking for interpretations of codes or
20 federal regs or anything along those lines?
21   A.   No.
22   MR. HILL:  Objection to form.
23 BY MR. MOUGEY:
24   Q.   You would -- your communication about

Page 262

1  interpretations or codes or regs or requirements would
2  be from regulatory, right?
3      A.   Yes.
4      Q.   All right.  And -- now I have -- your --
5  your -- your counsel has -- Walgreens' counsel has
6  produced a privilege log and on that privilege log
7  there are -- how many documents would you think that
8  over time from, you know, '13 until now you were on
9  that you were seeking legal advice?
10     A.   Myself personally?
11     Q.   Yeah.
12     MR. HILL:  Objection to the form.
13 BY THE WITNESS:
14     A.   I -- I don't know.
15 BY MR. MOUGEY:
16     Q.   I mean, do you think it's a -- a hundred,
17 do you think it's 50, do you think it's 75, 150,
18 what -- what do you think?
19     A.   What --
20     MR. HILL:  Object to the form and foundation.
21 BY THE WITNESS:
22     A.   What was the period of time?
23 BY MR. MOUGEY:
24     Q.   From '13 until '18, from the beginning of

Page 263

1  pharmaceutical integrity until just pretty much
2  running up to the beginning -- to this year, until
3  now.
4      MR. HILL:  Same objections.
5  BY THE WITNESS:
6      A.   Two per week, 52 weeks, five years, a
7  couple hundred.  With replies, maybe more.
8  BY MR. MOUGEY:
9      Q.   So if I were to tell you there were 1400
10 entries with your name on them, and I don't know if
11 that's chains or individual or unique documents, I'm
12 not sure, would that -- you would -- would that --
13 that obviously you think is a little bit more than
14 what your recollection is how many times you were on
15 e-mails with lawyers getting legal advice?
16     MR. HILL:  Objection to form.
17 BY THE WITNESS:
18     A.   With replies to chains, I -- I don't know,
19 that seems reasonable.
20 BY MR. MOUGEY:
21     Q.   Right.
22          So you might have to have six or seven
23 replies on that e-mail chain of two a week to get to
24 1400, right?

Page 264

1      MR. HILL:  Objection to the math.
2  BY THE WITNESS:
3      A.   Perhaps.
4  BY MR. MOUGEY:
5      Q.   Well, there is 200 a year, approximately
6  five years, that's about a thousand, right?
7      A.   Yes.
8      Q.   So you'd have to have some replies and
9  there would have to be a couple of weeks over a
10 five-year period to have 13, 1400 documents?
11         Help me to understand '13, '14, '15, what
12 kind of a -- I mean, what types of questions did you
13 have regarding suspicious order monitoring policies,
14 what were -- what were your -- what were your
15 questions, what -- what did you need -- what did --
16 what did you need help with?
17     MR. HILL:  Objection.  To the extent you are
18 asking what kind of questions he had for his lawyers,
19 I instruct you not to answer the questions where you
20 asked your lawyers for legal advice -- Walgreens'
21 lawyers for legal advice.
22 MR. MOUGEY:
23     Q.   What types of -- what types of input did
24 you need?  I'm not -- I didn't use the word "lawyers."

Page 265

1  What type of input would you need -- what were -- what
2  was the holes in all of the training you had, all of
3  the information you got from Walgreens, tell me
4  where -- what would -- where did you need more
5  information --
6      MR. HILL:  Objection.
7  BY MR. MOUGEY:
8      Q.   -- '13, '14, '15?
9      MR. HILL:  Objection to the form.
10 BY THE WITNESS:
11     A.   I -- I guess what I'll say is regarding
12 CSOM, infrequently.
13         Those e-mails probably represent a variety
14 and numerous other matters that we would consult with
15 them on, ranging from issues with employees, new
16 regulations coming into effect, a variety of topics.
17 And I would say the minority is probably CSOM if --
18 if --
19 BY MR. MOUGEY:
20     Q.   Well, let's go back to the list that you
21 said that you -- was created at or about the time of
22 the agreement with the DEA, okay.
23         Do you recall where that list came from?
24 Was that from compliance?

Page 266

1    A.   My -- yes, it was from compliance.
2    Q.   And do you recall what kind of information
3  was on that list?
4    A.   There was a list of -- of requirements
5  based off of the agreement with the DEA that we needed
6  to enact.  Like one of the ones that I can recall is
7  removing controlled substances from the bonus
8  calculation.  And so we were responsible for going and
9  making sure that getting done and then reporting back
10 to internal audit compliance that, yes, we've
11 completed this requirement of the -- of the audit
12 which was based off of the settlement agreement.
13   Q.   So it was a checklist of things that
14 needed to get done?
15   A.   Essentially.
16   Q.   All right.  What -- what other issues do
17 you recall being on that list other -- in -- in
18 addition to the removing the -- the bonus feature for
19 pharmacies -- pharmacists based on the number of
20 prescriptions?
21   A.   Sorry, other than the bonus issue?
22   Q.   Yes, sir.
23   A.   I know there were action items that were
24 for other groups as well, like the decommissioning of

Page 267

1  our -- of a -- our internal distribution centers.  I
2  can't -- I can't remember all of the other -- other
3  items that were on there.
4    Q.   Do you recall any other items that are on
5  there?
6    A.   I can't.
7    Q.   Was it a living, breathing document that
8  people were adding issues on as they were identified,
9  and what about this, and then somebody thinks about
10 this, and everybody was adding and checking off?
11   A.   There were -- there were comments and
12 things added to it, I believe, yeah, as we implemented
13 or, you know, challenges around we needed funding to
14 change the system and et cetera, et cetera.
15   Q.   Based off your time in -- in
16 pharmaceutical integrity, where are the suspicious
17 order monitoring reports kept?  Where are the -- the
18 actual reports kept or stored?
19   A.   For the new system, they are in a database
20 that contains all of the items and the responses from
21 our team and the field leaders and the stores.
22   Q.   All right.  And what database is that?
23   A.   It's -- I can't recall the address of the
24 database.  It's linked to the CSOKPI application.  But

Page 268

1  I -- I don't -- I don't know offhand the name of the
2  database.
3    Q.   Have you as a manager in pharmaceutical
4  integrity been instructed by your management to keep
5  all of your notes pertaining to due diligence in that
6  database?
7    MR. HILL:  Object to the form.
8  BY THE WITNESS:
9    A.   No.
10 BY MR. MOUGEY:
11   Q.   So sometimes you put your notes in, and
12 sometimes you don't?
13   A.   That would be accurate.
14   Q.   So sometimes you make a phone call, you
15 make a decision and you don't document that?
16   A.   That's possible, yes.
17   Q.   Okay.  Sometimes it's an e-mail and you
18 might not put it in the database?
19   A.   Correct.
20   Q.   So I asked you earlier in the day about
21 your geographic responsibilities and -- and -- and I
22 believe you were in charge of the southern part of the
23 US, correct?
24   A.   Correct.

Page 269

1    Q.   And obviously that -- or I'm assuming that
2  includes Florida?
3    A.   Correct.
4    Q.   And were there any specific issues that
5  you were made aware of in -- in -- or after June
6  of 2013 that needed to be addressed because of the
7  agreement with the regulators?
8    MR. HILL:  Objection; form.
9  BY THE WITNESS:
10   A.   Were there specific issues that needed to
11 be addressed in the settlement agreement?
12 BY MR. MOUGEY:
13   Q.   No.  Because of the settlement agreement.
14       On this checklist you are referring to,
15 were there some Florida-specific issues?
16   A.   I think one of the -- the issues was if
17 you have had your DEA license suspended, you can no
18 longer bill Medicare or Medicaid, so we had to disable
19 those for those six locations, and there were some
20 communications that we did to patients about why
21 they'd have to go to a different store if they had
22 Medicaid or Medicare.
23   Q.   If you'd go back to the big thick exhibit,
24 Bratton 7, and go to Page 6.

Page 270

1    Did anyone ever make you aware that
2 multiple Florida Walgreens' dispensaries/pharmacies
3 were forced to be shut down and no longer dispense
4 Schedule II or Schedule III?
5    MR. HILL: Object to the form.
6 BY THE WITNESS:
7    A.   I -- I was aware that these six stores
8 could no longer sell controlled substances or receive
9 controlled substances.
10 BY MR. MOUGEY:
11    Q.   So on Page 6, in paragraph (e), it says:
12    "Walgreens agrees to surrender" -- or "to
13 the surrender of the DEA registration to dispense
14 controlled substances for Schedule II through V at the
15 following facilities until May 26, 2014."
16    Correct?
17    A.   Correct.
18    Q.   Do you recall as part of the checklist or
19 any training after this agreement that anyone from
20 Walgreens walked you through what the problems or
21 issues were in those Florida-specific pharmacies?
22    A.   I -- I don't recall, no.
23    Q.   You don't recall any information being
24 passed along to you?

Page 271

1    A.   Not -- not in a training. I mean, maybe
2 conversations, but I don't -- I'm --
3    Q.   When you say "conversations," do you mean,
4 like, water cooler conversations or...
5    A.   I can't recall specifics of what was
6 discussed.
7    Q.   You don't --
8    A.   I know that this was a topic of
9 discussion, but I don't remember what was discussed.
10    Q.   Well, when you say you don't remember
11 specifics, it was a topic of conversation, I don't
12 remember any training, I mean, you were based in
13 Florida, right?
14    A.   Um-hum.
15    Q.   And then you moved to Chicago in the
16 beginning of '13, right?
17    A.   Correct.
18    Q.   And your area, one of your areas of
19 responsibility is Florida, right?
20    A.   Correct.
21    Q.   And you're just coming out of Florida and
22 you worked in -- in a pharmacy in Florida, correct?
23    MR. HILL: Object to form.
24 BY THE WITNESS:

Page 272

1    A.   In a -- no. Well, as the -- when I was a
2 quality supervisor and a quality analyst, we had a
3 mail-order pharmacy. It was not a retail pharmacy at
4 the central pharmacy operations.
5 BY MR. MOUGEY:
6    Q.   And your company agrees to no longer
7 dispense out of multiple pharmacies Schedules II
8 through V, correct?
9    A.   Correct.
10    Q.   The distribution center in Florida is
11 stripped of its distributor license of Schedule II and
12 III opiates, correct?
13    A.   Correct.
14    Q.   And if you turn to Page 78, do you see the
15 US Department of Justice Drug Enforcement
16 Administration, the top of that page?
17    A.   Yes.
18    Q.   November 26th, 2012?
19    A.   Yes.
20    Q.   Order to show cause?
21    A.   Yes.
22    Q.   And "In the matter of," and it's a
23 Walgreens store in Hudson, Florida.
24    Do you see that?

Page 273

1    A.   I do.
2    Q.   Do you see under Paragraph 2:
3    "Walgreens 03629 has consistently failed
4 to exercise its corresponding res" -- "responsibility
5 to ensure that controlled substances it dispensed were
6 dispensed pursuant to prescriptions issued for
7 legitimate medical purposes by practitioners acting
8 within the usual course of their professional
9 practice."
10    Do you see that?
11    A.   I do see that.
12    Q.   And you don't recall anyone taking you
13 through the individual provisions of -- of this
14 document that we have in front of you?
15    A.   Well, this is the accusation from the DEA,
16 correct?
17    Q.   That's not what I asked you, sir.
18    Do you recall anyone walking you
19 through --
20    A.   Not through this document, no.
21    Q.   Yes, sir.
22    And these accusations cover conduct that
23 Walgreens agreed to pay $80 million on, correct?
24    MR. HILL: Object to the form.

Page 274

1  BY THE WITNESS:
2      A.   I don't know what we agreed to.
3  BY MR. MOUGEY:
4      Q.   Paragraph 3, sir, same page.
5      "From late 2010 to November 2011,
6  Walgreens 03629 dispensed oxycodone to customers who
7  presented prescriptions with addresses and locations
8  from 26 states outside the State of Florida."
9          Do you see that, sir?
10     A.   I do.
11     Q.   "In addition, Walgreens 03629 dispensed
12 controlled substances primarily in suspicious cocktail
13 combinations of oxycodone," and you read the other
14 two?
15     A.   I'm sorry.  I lost where we are at.
16     Q.   Top of page -- bottom of Page 78, top of
17 Page 79.
18     A.   "Combinations of oxycodone, Alprazolam and
19 carisoprodol."
20     Q.   Yes, sir.
21          And that was a well-known combination of
22 drugs issued with -- with oxycod- -- -codone that were
23 a red flag, correct, sir?
24     MR. HILL:  Object to the form.

Page 275

1  BY THE WITNESS:
2      A.   It can in some cases be a red flag.
3  BY MR. MOUGEY:
4      Q.   Yes, sir.
5          And a red flag is I need to look a little
6  further, right?
7      A.   Correct.
8      Q.   And then under Paragraph 3(a), 3(b), 3(c),
9  (d), (e), (f), (g), it's doctor after doctor that
10 Walgreens was dispensing controlled substances with
11 significant -- you know, hundreds of miles from the
12 pharmacy, correct, sir?
13     MR. HILL:  Object to the form.
14 BY THE WITNESS:
15     A.   That appears to be the case, yes.
16 BY MR. MOUGEY:
17     Q.   I mean, 3(a) is a doctor with a DEA -- I'm
18 sorry -- that was based out of Miami and this
19 Walgreens was 300 miles from Miami, correct?
20     A.   Hudson, Florida to Miami, about 300 miles.
21     Q.   It says right here in (a) 300 miles.
22          Do you see that?
23     A.   I see that.
24     Q.   And then paragraph (c), Dr. Wayne is from

Page 276

1  Delray Beach, Florida, and that's 272 miles from 3 --
2  from Store 03629, correct, sir?
3      A.   That's what it says here.  I -- I don't
4  know the exact distance.
5      Q.   Yeah, I'm not asking.  I'm not trying to
6  test your -- your Google maps capability.  What I'm
7  trying to point out is that this Walgreens pharmacy
8  had issues with the DEA for dispensing to pill seekers
9  that the doctors wrote prescriptions hundreds of miles
10 away, correct, sir?
11     MR. HILL:  Object to the form.
12 BY THE WITNESS:
13     A.   That -- that appears to be true, yes.
14 BY MR. MOUGEY:
15     Q.   Now, did anyone educate you when you came
16 into pharmaceutical int- -- integrity that one of the
17 things that we need to be looking for from now on is
18 pain -- pill seekers that are geographically dispersed
19 or far away from the pharmacy?
20     MR. HILL:  Object to form.
21 BY THE WITNESS:
22     A.   I know that that is one of the things that
23 we added to our target drug checklist, so I know that
24 that's probably something we communicated as part of

Page 277

1  our GFD, target GFD policy going forward.
2  BY MR. MOUGEY:
3      Q.   And you're familiar with Walgreens' data
4  management capability, correct, to some extent?
5      A.   To some extent.
6      Q.   Yes, sir.
7          A pretty elementary data pull for
8  Walgreens prior to 2013 to run a regular report about
9  where pill seekers are from versus where the doctor
10 that wrote the prescription is located, correct?
11     MR. HILL:  Objection to the form.
12 BY THE WITNESS:
13     A.   That's something we could look at, yes.
14 BY MR. MOUGEY:
15     Q.   And that's a relatively -- I mean, you and
16 I could probably sit down and probably write some --
17 some code in the course of an afternoon figuring out
18 how to have doctors, pill seekers and pharmacy that
19 aren't geographically located near each other, right?
20     MR. HILL:  Objection to form.
21 BY THE WITNESS:
22     A.   The -- to determine that they were far
23 apart -- far apart is possible, however, that doesn't
24 paint the full picture of whether or not that's a

Page 278

1  legitimate prescription.
2  BY MR. MOUGEY:
3      Q.   It doesn't, but it helps spot red flags
4  and issues that need to be addressed, correct?
5      MR. HILL:  Object to form.
6  BY THE WITNESS:
7      A.   Correct.
8  BY MR. MOUGEY:
9      Q.   So the information that you all took after
10  this magnificent huge settlement agreement with the
11  DEA and you incorporated into pharmaceutical
12  integrity, this is not new technology or new
13  algorithms that no one could have come up with, this
14  is just post the DEA bringing Walgreens to the point
15  where it had to comply, correct?
16      MR. HILL:  Object to the form.
17  BY THE WITNESS:
18      A.   I -- I think the challenge with that is
19  patients would sometimes provide fake addresses.  We
20  can't always request an ID, depending on various state
21  laws.  Also, the pharmacists may have -- or should
22  have already known that and so is there a reason that
23  they over wrote or allowed the prescription to be
24  filled despite the distance, you know.

Page 279

1  BY MR. MOUGEY:
2      Q.   But there was no mechanism in place prior
3  to -- pharmaceutical integrity for Walgreens to spot
4  potential problems through red flags of practitioners,
5  pill seekers being remotely loc -- located compared to
6  the Walgreens pharmacy, correct?
7      A.   The --
8      MR. HILL:  Object to the form.
9  BY THE WITNESS:
10      A.   -- the patient's address and the
11  prescriber's information prints on the pharmacy
12  leaflet that the pharmacist would review before
13  dispensing the prescription.
14  BY MR. MOUGEY:
15      Q.   That's right, but there is no centralized
16  mechanism at Walgreens before pharmaceutical integrity
17  that was designed to spot or identify clusters or
18  patients that were located or resided a far distance
19  from the pharmacy, correct?
20      A.   Not that --
21      MR. HILL:  Object to the form.
22  BY THE WITNESS:
23      A.   Not that I'm aware of.
24  BY MR. MOUGEY:

Page 280

1      Q.   And that is not some technology that was
2  magically created in 2013, that was just a matter of
3  the compliance group putting together a team of five
4  or six people and saying, We've got to come up with a
5  system, right?
6      MR. HILL:  Object to the form, foundation.
7  BY THE WITNESS:
8      A.   Yeah.  There -- they provided a
9  recommendation that we put on our policy.
10  BY MR. MOUGEY:
11      Q.   A recommendation, Walgreens paid
12  $80 million, shut down six dispensaries and prohibited
13  them from -- stripped them of their license for
14  dispensing Schedule II and Schedule IIIs, correct?
15      MR. HILL:  Object to the form.
16  BY THE WITNESS:
17      A.   Six pharmacies, yes.
18  BY MR. MOUGEY:
19      Q.   Yes.  And another distribution center in
20  Jupiter as a result of this agreement, correct?
21      A.   As a result of the agreement.
22      Q.   This wasn't a meeting, this wasn't a get
23  together, it was Walgreens being forced to put some
24  systems in place, correct, sir?

Page 281

1      MR. HILL:  Object to the form.
2  BY THE WITNESS:
3      A.   We agreed to put these changes to our
4  prop -- operating practices in place after the
5  settlement or around the time of the settlement,
6  sometimes before, sometimes after.
7  BY MR. MOUGEY:
8      Q.   And absolutely nothing your group did,
9  pharmaceutical integrity, was technology, software,
10  databases, computers, that weren't available four,
11  five, six years earlier, correct?
12      MR. HILL:  Object to the form.
13  BY THE WITNESS:
14      A.   I -- I don't -- I don't know.
15  BY MR. MOUGEY:
16      Q.   You have no earthly idea?
17      A.   I -- I don't know what products or
18  software was or wasn't available.
19      Q.   Wayne Bancroft is a guy that's worked at
20  Walgreens for years, correct?
21      A.   I believe so.
22      Q.   And he is the one with help from John
23  Merritello that wrote the -- the algorithm, right?
24      A.   The math component, I believe.

Page 282

1    Q.   Right.  And these are just two guys at
2  Walgreens that wrote an algorithm, correct?
3    A.   Correct.
4    Q.   But this -- that algorithm could have been
5  drafted years before during congress -- as a result of
6  congressional hearings and the dispensing of
7  prescriptions of oxycodone and the increasing deaths,
8  all -- none of this -- all of this could have been
9  done before -- several years before, correct?
10   MR. HILL:  Objection to the form of the
11 question.
12 BY THE WITNESS:
13   A.   I -- I'm not aware of what challenges
14 could have or could -- did or did -- or could have
15 prevented them from intem -- implementing this sooner.
16 BY MR. MOUGEY:
17   Q.   But while oxycodone-related deaths are
18 increasing year to year to year, Walgreens saw fit to
19 pay its pharmacists a bonus based on the number of
20 prescriptions it filled, correct?
21   MR. HILL:  Same objection, form.
22 BY THE WITNESS:
23   A.   That's my understanding, yeah.
24 BY MR. MOUGEY:

Page 283

1    Q.   I mean, can't you see that as a problem,
2  that the per -- that the pharmacists are paid more
3  based on the number of prescriptions they fill,
4  including highly addictive Schedule II and
5  Schedule III narcotics?
6    MR. HILL:  Same objection.
7  BY THE WITNESS:
8    A.   I don't know.
9  BY MR. MOUGEY:
10   Q.   You don't see that as a problem?
11   A.   I think that there are -- controlled
12 substances and opioids specifically are a small
13 percentage of the total volume of a store.  And so to
14 pay a bonus on all of the scripts, I -- I don't know
15 that that's intrinsically wrong.  I -- I understand
16 that we removed it from the bonus calculation and --
17 and -- after the agreement, though.
18   Q.   But you don't see anything wrong sitting
19 here today while kids are dying, college-age kids are
20 dying, young adults are dying from oxycodone
21 overdoses, that your pharmacists in Walgreens were
22 paid a bonus based on the number of prescriptions they
23 wrote.
24      You don't see that as a problem?

Page 284

1    MR. HILL:  Ob- -- objection to form, foundation.
2  BY THE WITNESS:
3    A.   I don't know.
4  BY MR. MOUGEY:
5    Q.   You do know that oxycodone deaths were
6  increasing year to year to year in the 2000s, correct,
7  sir?
8    A.   Correct.
9    Q.   You do know that oxycodone overdoses were
10 increasing year to year in the 2000s, correct?
11   A.   Correct.
12   Q.   You do know that the largest problem areas
13 as far as age groups are is about 18 to 40 or 45,
14 correct?
15   A.   I didn't know that.
16      (Reporter clarification).
17 BY MR. MOUGEY:
18   Q.   You do know that young adults were the
19 biggest problem areas with Schedule II and
20 Schedule III narcotics --
21   MR. HILL:  I'll object to the form.
22 BY MR. MOUGEY:
23   Q.   -- or opiates use disorder, correct?
24   A.   I -- I didn't -- I don't know that.  I've

Page 285

1  actually heard that it is middle-aged adults, but...
2    Q.   Either way, you don't see any issue with
3  pharmacists being bonused based on the number of
4  prescriptions that they write?
5    A.   I think that pharmacists are healthcare
6  professionals that I don't think generally would
7  undermine their professional ethics for a few hundred
8  dollars or a few thousand dollars.
9    Q.   So Walgreens continued, while the deaths
10 mounted, while the overdoses mounted, Walgreens
11 continued to bonus its pharmacies because it really
12 wasn't a lot of money based on the total prescriptions
13 it filled, correct, sir?
14   A.   I don't --
15   MR. HILL:  Object to the form.
16 BY THE WITNESS:
17   A.   I don't know if that's the reason why,
18 but, again, I don't think a pharmacist would
19 intentionally harm someone.
20 BY MR. MOUGEY:
21   Q.   And sitting here today as a representative
22 of Walgreens, and you have now spent five years of
23 your career in pharmaceutical integrity, you see zero
24 issue with bonusing pharmacists for Schedule II,

Page 286

1 Schedule III opiates, highly addictive, based on the
2 number of scripts that they write?
3     MR. HILL: Same objections.
4 BY THE WITNESS:
5     A.  I -- I -- I -- the bonus was off of all
6 prescriptions that they dispense.  They -- pharmacists
7 don't generally write prescriptions.  And, again, I
8 think pharmacists are healthcare professionals that
9 don't seek to harm their patients, and so I -- I don't
10 know that that -- the bonus on a total script count
11 for their store is right or wrong.
12 BY MR. MOUGEY:
13    Q.  So the answer to my question is you don't
14 see any problem because they are healthcare
15 professionals that Walgreens' pharmacists are bonused
16 based in part on Schedule II and Schedule III highly
17 addictive opiates and the number of scripts that they
18 write?
19    A.  I -- I don't --
20    MR. HILL: Object to form.
21 BY THE WITNESS:
22    A.  I don't have any opinion on it.  I think
23 that, again, I think that they are trying to do the
24 right thing out there, pharmacists in general.

Page 287

1 BY MR. MOUGEY:
2    Q.  Business as usual at Walgreens, correct,
3 sir?
4    A.  No.
5    Q.  So relatively straightforward, simple
6 changes in Walgreens' system, for example, don't bonus
7 pharmacists on Schedule II and III narcotics, that was
8 changed in 2013, correct?
9    A.  Correct.
10    Q.  Orders that exceeded certain thresholds
11 were no longer filled post settlement with the
12 regulators, correct, sir?
13    MR. HILL: Objection to form.
14 BY THE WITNESS:
15    A.  I -- that system agreed -- existed before
16 the agreement.  Also, there was -- I don't know what
17 was happening in the -- the previous system.  So I
18 don't -- I don't know.
19 BY MR. MOUGEY:
20    Q.  October of 2012 is the system you are
21 referring to, correct, sir?
22    A.  Correct.
23    Q.  And you and I just went through on C-I the
24 Department of Justice order to show cause on one of

Page 288

1 the pharmacies is dated November 6th, 2012, correct,
2 sir?
3    MR. HILL: Where are we, Peter?
4 BY THE WITNESS:
5    A.  Page 78?
6 BY MR. MOUGEY:
7    Q.  Page 78, November 26th, 2012?
8    A.  Correct.
9    Q.  And you see on Page 85 that
10 Walgreens 04727 received an order to show cause on
11 November 6, 2012, correct, sir?
12    A.  80, November 26th?
13    Q.  85.
14    MR. HILL: November 26th.
15 BY THE WITNESS:
16    A.  Yes.
17 BY MR. MOUGEY:
18    Q.  Yes, sir.
19        November 26th, 2012, Walgreens received an
20 order to show cause regarding its Pharmacy Store 04727
21 from the Department of Justice, correct, sir?
22    A.  Yes.
23    Q.  And on Page 91, same date, November 26th,
24 2012, the Department of Justice sent Walgreens

Page 289

1 Store 06997 an order to show cause, correct, sir?
2    A.  91, yes.
3    Q.  And Bate -- Page 98 on February 4th, 2013,
4 Walgreens Store 03836 also received an order to show
5 cause from the Department of Justice, correct, sir?
6    A.  Correct.
7    Q.  And Page 109, Walgreens d/b/a 04391
8 received an order to show cause from the Department of
9 Justice on February 11th, 2013, correct, sir?
10    A.  Correct.
11    Q.  And on Page 115, Walgreens Store 03099
12 received an order to show cause from the Department of
13 Justice on February 19th, 2003, correct, sir?
14    A.  Correct.
15    MR. HILL: 2013.
16 BY MR. MOUGEY:
17    Q.  2013, correct.
18        Sir, Page 115, on February 9th, 2013,
19 Walgreens Store 03099 received an order to show cause
20 from the US Department of Justice, correct, sir?
21    A.  Correct.
22    Q.  So when you said, sir, that -- that before
23 pharmaceutical integrity department, Walgreens was
24 halting suspicious orders, that policy was implemented

Page 290

1 within months of all of those orders to show cause
2 that we just looked through, correct?
3     A.   The --
4     MR. HILL:  Object to the form.
5 BY THE WITNESS:
6     A.   The new policy was implemented around the
7 time of these orders to show cause, correct.
8 BY MR. MOUGEY:
9     Q.   And you have zero personal knowledge
10 sitting here today of any policy at Walgreens where
11 suspicious orders were halted before they were shipped
12 prior to October of 2012, correct, sir?
13     MR. HILL:  Object to the form.
14 BY THE WITNESS:
15     A.   I -- I don't have knowledge of the
16 previous system.  I don't know if there was or wasn't
17 a policy.
18 BY MR. MOUGEY:
19     Q.   So the answer to my question is yes, you
20 have zero knowledge of any policy at Walgreens not
21 shipping suspicious orders that were identified prior
22 to October of 2012, correct, sir?
23     MR. HILL:  Same objection.
24 BY THE WITNESS:

Page 291

1     A.   I -- I believe something existed.  I don't
2 know the details of it.
3 BY MR. MOUGEY:
4     Q.   Zero personal knowledge other than I
5 believe something existed, correct?
6     A.   Correct.
7     Q.   And, sir, do you believe it's just a
8 coincidence that Walgreens formed the pharmaceutical
9 integrity department on top of these open
10 investigations into these pharmacies and Walgreens
11 distribution center?
12     MR. HILL:  Objection to form.
13 BY THE WITNESS:
14     A.   I think one of the provisions is that we
15 maintain the group, of the agreement.  I don't know
16 why the group was formed initially.
17 BY MR. MOUGEY:
18     Q.   Initially.  What month did you start, sir,
19 February of 2013?
20     A.   Correct.
21     Q.   Do you have any idea when Ms. Polster
22 started?
23     A.   No.
24     Q.   Do you have any idea when Ms. Daugherty

Page 292

1 started?
2     A.   I don't.
3     Q.   Do you have any idea when Mr. Stahmann
4 started?
5     A.   Sometime in 2012, I believe.
6     Q.   Late 2012, correct?
7     A.   Correct.
8     Q.   The people brought in for pharmaceutical
9 integrity all started within 60, 90 days of you,
10 correct, sir?
11     A.   Around then, yeah.
12     Q.   You were all brand new into this
13 department, correct, sir?
14     A.   Cor -- correct.
15     Q.   Yes, sir.  And that is all right on top of
16 the orders to show cause and the suspension orders for
17 the pharmacies and the distribution centers in
18 Florida, correct, sir?
19     MR. HILL:  Object to the form.
20 BY THE WITNESS:
21     A.   The -- they are close in time, yes.
22 BY MR. MOUGEY:
23     Q.   Yes, sir.
24         And do you believe that the creation of

Page 293

1 pharmaceutical integrity to write new algorithms and
2 new systems is simply a coincidence to the timing of
3 the DEA's orders to show cause and issues and ISOs --
4 oh, shit.
5     MS. SWIFT:  Did you get that?
6     MR. MOUGEY:  I didn't say that.  I'm getting
7 tired.
8 BY MR. MOUGEY:
9     Q.   Do you believe, sir, that the integration
10 of pharmaceutical integrity and adding people into
11 that group was purely a coincidence on top of the
12 orders to show cause and the immediate suspension
13 orders issued by the DEA?
14     MR. SHKOLNIK:  Object to the form.
15 BY THE WITNESS:
16     A.   I don't have personal knowledge of why the
17 group was formed, if you are asking me to speculate.
18 BY MR. MOUGEY:
19     Q.   Why don't you go ahead and tell me what
20 you think?
21     A.   I think that due to the opioid issues in
22 Florida and elsewhere, Walgreens thought it was useful
23 to combine all of these functions into one group that
24 could better action this issue.

Page 294

1    Q.   Do you believe that pharmaceutical
2 integrity department beginning in '13 until Walgreens
3 ceased distributing Schedule II and Schedule III has
4 made a difference?
5        MR. HILL:  Object to the form.
6 BY THE WITNESS:
7    A.   I -- I hope so.
8 BY MR. MOUGEY:
9    Q.   Do you think that the amount of diversion
10 at Walgreens has decreased since the creation of
11 pharmaceutical integrity group?
12   A.   I know that as it relates to -- we have
13 various initiatives that we have through preventing
14 theft, identifying employee pilferage, good faith
15 dispensing, I think have reduced various areas of
16 diversion.
17   Q.   Do you think that a -- in your work in
18 pharmaceutical integrity, do you think that a -- a
19 pain management clinic is a red flag that needs to be
20 assessed based on the number of prescriptions coming
21 from that office?
22       MR. HILL:  Object to the form.
23 BY THE WITNESS:
24   A.   I think that -- only that it is a pain

Page 295

1 management clinic, no.  However, there are definitely
2 pain management clinics that we do sometimes look at
3 or have had issues with.
4 BY MR. MOUGEY:
5    Q.   Is there a higher probability that a pain
6 management clinic would be a red flag than any other
7 doctor's office in your opinion?
8        MR. HILL:  Object to the form.
9 BY THE WITNESS:
10   A.   It may be higher.  I -- I don't know how
11 much more than any other prescriber, though.
12 BY MR. MOUGEY:
13   Q.   The -- the overwhelming majority of the
14 diversion in Florida occurred from pain management
15 clinics, correct, sir?
16       MR. HILL:  Object to form.
17 BY THE WITNESS:
18   A.   I don't know.
19 BY MR. MOUGEY:
20   Q.   You have no idea?
21   A.   I don't know.
22   Q.   No one discussed the timeline or the
23 issues with pain clinics in Florida with you when you
24 started pharmaceutical integrity department?

Page 296

1    A.   I -- I don't recall.
2    Q.   Let me hand you what we'll mark as
3 Bratton 12.
4        Do you recall the e-mail exchange with
5 Ms. Polster, your boss, in the beginning of 2013 and
6 other members of your group wherein Denny Murray, who
7 you mentioned earlier, relayed that he believed that
8 pain -- a pain management clinic is a red flag by
9 itself?
10   A.   I don't recall that e-mail.
11   Q.   And that -- do you respect Mr. Murray's
12 opinion?
13   A.   Generally, yes.
14   Q.   Do you think he has knowledge about the
15 issues facing suspicious order monitoring policies and
16 the challenges?
17   A.   I think that he -- he is a source of
18 information.  He has been at the corporate office a
19 long time.  You know, he is not out there filling
20 prescriptions out in the field, but generally I'd say
21 he is knowledgeable about pharmacy matters.
22   Q.   Was there anything in place at Walgreens
23 when you started that -- when you began in
24 pharmaceutical integrity that required that the CSOM

Page 297

1 policies highlight or flag pain management clinics?
2    A.   So the controlled substance order
3 monitoring program determines what products are
4 shipped to a store.  That's not associated with any
5 doctor.  And we don't -- we don't sell drugs to -- to
6 doctors' offices.
7    Q.   I'm going to hand you what I'm -- what's
8 Bratton 12.
9        (WHEREUPON, a certain document was
10        marked Walgreens-Bratton Deposition
11        Exhibit No. 012, for identification,
12        as of 11/30/2018.)
13 BY MR. MOUGEY:
14   Q.   If you start in the middle of this page,
15 Denman Murray sends an e-mail to Tasha Polster and
16 Christopher Dymon, right?
17   A.   Yes.
18   Q.   And Tasha Polster and Christopher Dymon
19 are both in your group, pharmaceutical integrity,
20 right?
21   A.   At -- at that time.
22   Q.   At that time, correct?
23   A.   Yes.
24   Q.   And -- and Denny Murray as you -- you

Page 298

1 testified earlier is one of the gentleman that helped
2 write the algorithm for -- oh, no, I'm getting that
3 confused -- Denny Murray was one of the individuals
4 that was responsible for or understood the due
5 diligence policies for suspicious orders, correct?
6    A.   Correct.
7    Q.   And you would think that Mr. Murray, who
8 was one of the two individuals from the 9,000 stores
9 you could come up with that was knowledgeable about
10 due diligence on suspicious orders, would know kind of
11 what rocks to uncover, correct, sir?
12    MR. HILL:  Ob- -- objection to the form.
13 BY THE WITNESS:
14    A.   Yes.
15 BY MR. MOUGEY:
16    Q.   And one of the rocks that -- that
17 Mr. Murray thinks that -- that should be uncovered in
18 Walgreens' pharmacies is pain management clinics,
19 correct?
20    A.   In this e-mail, yes, correct.
21    Q.   He says:  "Pain management clinic is a red
22 flag by itself," correct, sir?
23    A.   He does.
24    Q.   And when the word "red flag" is used, that

Page 299

1 would -- that would mean that there would be some
2 additional due diligence that's required, correct,
3 sir?
4    MR. HILL:  Object to the form.
5 BY THE WITNESS:
6    A.   I -- when I hear the word "red flag," I
7 think about a pharmacist at a pharmacy filling a
8 prescription talking to the patient, yes.
9 BY MR. MOUGEY:
10    Q.   Yes, sir.  And when you talk -- went over
11 earlier that you are talking about the GFD, the good
12 faith dispensing policy, correct?
13    A.   Correct.
14    Q.   Which morphed into the targeted good faith
15 dispensing policy, correct?
16    A.   Well, they're -- they're -- they exist
17 together at the same time.
18    Q.   Yes, sir.
19       You testified almost right out of the
20 gates today that you believed that the suspicious
21 order monitoring policies was different than the GFDs
22 or good faith dispensing policies, correct?
23    A.   Correct.
24    Q.   And, sir, you would agree that a pain

Page 300

1 management clinic is a red flag for the suspicious
2 order monitoring policies at Walgreens, correct?
3    A.   I -- I -- I don't understand from this
4 e-mail or your statements because, again, we don't
5 ship drugs to doctors' offices or pain management
6 clinics.  An order of product is not associated before
7 it -- it is shipped or when it's ordered already with
8 a pain management clinic.  I don't -- I don't get how
9 the link between the pain management clinic
10 prescription and an order are -- are occurring.
11    Q.   So you believe that there is no
12 responsibility from Walgreens to perform any due
13 diligence on prescription writers whose patients are
14 coming to Walgreens?
15    MR. HILL:  Objection to form.
16 BY THE WITNESS:
17    A.   I think we need to perform due diligence
18 on all controlled prescriptions.
19 BY MR. MOUGEY:
20    Q.   Yes, sir, that's not what I asked.  Not at
21 the prescription level, not at the pharmacist level.
22 Okay?
23       Suspicious orders in the pharmaceutical
24 integrity department, your department --

Page 301

1    A.   Yes.
2    Q.   And --
3    A.   What -- what -- I'm sorry, what was the
4 question?
5    Q.   That was a statement.
6       Okay.  Suspicious orders in the
7 pharmaceutical integrity department, okay, not at the
8 pharmacists, not at the dispensary -- dispensing
9 level, okay?
10       So you have the ability in pharmaceutical
11 integrity to search your database by prescriber,
12 correct, sir?
13    A.   Correct.
14    Q.   You can see which prescribers are writing
15 what percentage of their prescriptions for Schedule II
16 and Schedule III, correct?
17    A.   Correct.
18    Q.   Again, that is not a complicated query,
19 correct, sir?
20    A.   No.
21    Q.   And one of the red flags, sir, would be to
22 identify practitioners that are writing
23 disproportionately high percentage of prescriptions
24 for Schedule II and Schedule III opiates, correct?

Page 302

1    MR. HILL: Object to the form.
2    BY THE WITNESS:
3    A.   I'm sorry. Can you repeat the question?
4    BY MR. MOUGEY:
5    Q.   One of the potential red flags would be
6    for Walgreens to organize its data to highlight
7    practitioners who are writing disproportionate, high
8    percentage of prescriptions for Schedule II and
9    Schedule III opiates, correct, sir?
10    MR. HILL: Same objection.
11    BY THE WITNESS:
12    A.   I -- I don't -- from the data that we
13    have, there are doctors -- one, it is not always
14    readily available to identify their specialty; two,
15    for millions of doctors across the entire company, if
16    you want to -- if you looked one up and Googled him,
17    yeah, but if you are trying to do a metaanalysis of
18    millions of prescribers, you have to go by what they
19    self report in NPPES. And many pain management
20    clinics say they are anesthesiologists or general
21    practitioners or whatever else, so that obscures the
22    data that you are asking for.
23       Additionally, there's a number of doctors
24    like thoracic surgeons, oncologists and Hospice

Page 303

1    doctors that write almost exclusively controlled pain
2    medicines for legitimate purposes.
3       So I -- just the quantity or percentage I
4    don't think is enough to make a determination about
5    whether a doctor is good or bad.
6    BY MR. MOUGEY:
7    Q.   I didn't ask you that. That's not what I
8    asked you. I didn't ask you if a doctor was good or
9    bad.
10       I said one of the means to identify
11    potential red flags was to identify prescribers who
12    are writing a disproportionate high percentage of
13    prescriptions for Schedule II and Schedule III
14    opiates, correct?
15    MR. HILL: Object to the form.
16    BY THE WITNESS:
17    A.   My answer is that percentage alone is
18    insufficient to identify a red flag by itself.
19    BY MR. MOUGEY:
20    Q.   An -- area that requires more
21    investigation, correct, sir?
22    MR. HILL: Same objection.
23    BY THE WITNESS:
24    A.   Again, I think there is some that write

Page 304

1    high percentages that are perfectly fine that if you
2    are presented -- a pharmacist was presented with that
3    script they may not have any objections because they
4    know the doctor because they have that local
5    information about that prescriber.
6    BY MR. MOUGEY:
7    Q.   Isn't that your job as part of
8    pharmaceutical integrity to spot red flags that need
9    to be followed up on, correct?
10    MR. HILL: Object to the form.
11    BY THE WITNESS:
12    A.   Red flags when filling prescriptions?
13    BY MR. MOUGEY:
14    Q.   Red flags. Do you -- do you -- what do
15    you think a red flag is?
16    A.   Your -- your statement is very broad. I'm
17    just trying to narrow.
18    Q.   What do you think a red flag is?
19    A.   When you say "red flag," I think of when a
20    pharmacist is filling a prescription, there is a list
21    of things that they go through in order to determine
22    if it is appropriate and that there are certain things
23    they should watch out for.
24    Q.   We cleared up ten minutes ago I wasn't

Page 305

1    talking about at dispensing level, okay? No GFD
2    policy right now, all right? No good faith
3    dispensing. I'm talking about pharmaceutical
4    integrity suspicious order monitoring policies, okay?
5    A.   Okay.
6    Q.   You can pull with a query the highest
7    prescribing doctors as a percentage for Schedule II
8    and Schedule III, correct?
9    A.   Correct.
10    Q.   And you do not believe that that is a --
11    warrants any further inquiry if a doctor has a
12    disproportionately high percentage of Schedule II and
13    Schedule III pres- -- prescriptions?
14    A.   I'm not --
15    MR. HILL: Object to the form.
16    BY THE WITNESS:
17    A.   I -- I'm not sure how that relates to
18    controlled substance order monitoring I guess is what
19    I'm unclear about.
20    BY MR. MOUGEY:
21    Q.   Perfect answer. So your answer is no, I
22    don't think it requires any further inquiry if a
23    doctor has a disproportionate high percentage of his
24    prescriptions in -- or her prescriptions in

Page 306

1 Schedule II or III opiates, correct, sir?
2     MR. HILL: Object to the form.
3 BY THE WITNESS:
4     A.  No.
5 BY MR. MOUGEY:
6     Q.  Does it warrant further inquiry or doesn't
7 it, if a prescribing physician has a
8 disproportionately high percentage of their overall
9 prescription writing in Schedule II and Schedule III
10 opiates, yes or no?
11     MR. HILL: Same objection.
12 BY THE WITNESS:
13     A.  By whom and when?
14 BY MR. MOUGEY:
15     Q.  For pharmaceutical integrity, isn't that
16 what you are sitting here today as?  I'm not asking
17 you here as your -- as your kid's football coach.
18         In pharmaceutical integrity after 2013 do
19 you believe, sir, that a disproportionate high
20 percentage of prescriptions from a prescriber for
21 Schedule II and Schedule III warrant further inquiry?
22     MR. HILL: Same objection, asked and answered
23 multiple times.
24 BY THE WITNESS:

Page 307

1     A.  Our team might look at certain doctors if
2 they have higher percentages.
3 BY MR. MOUGEY:
4     Q.  And what program or policy did Walgreens
5 have in place to identify those doctors on an
6 automated basis?
7     MR. HILL: Same objection.
8 BY THE WITNESS:
9     A.  We -- on a -- there isn't one on an
10 automated basis.
11 BY MR. MOUGEY:
12     Q.  And yet the gentleman, Denny Murray, who
13 you identified as one of the two people that was
14 knowledgeable about performing due diligence on
15 suspicious orders, says that a pain management clinic
16 is a red flag by itself, correct, sir?
17     A.  Correct.  However, there is no -- there's
18 no metadata element that would tell us a doctor is a
19 pain management clinic.
20     Q.  But a simple query into your system that
21 could easily have been written from code that identify
22 doctors that exceeded a certain percentage threshold
23 of their prescriptions in Schedule II and III
24 narcotics could have been automated the entire time,

Page 308

1 correct, sir?
2     MR. HILL: Object to the form.
3 BY THE WITNESS:
4     A.  We can pull that data and we have and
5 looked at it in the past.
6 BY MR. MOUGEY:
7     Q.  But there is absolutely no automated
8 system that did it on a regular basis, correct, sir?
9     A.  There is reporting servers and elements
10 that pull data about prescribers, but, again --
11     Q.  I'm not asking about --
12     MR. HILL: Let him finish.  Were you finished?
13 Finish your answer.
14 BY MR. MOUGEY:
15     Q.  No, I'm asking for a simple answer to my
16 question.
17     MR. HILL: Finish your answer.  Finish your
18 answer.
19 BY MR. MOUGEY:
20     Q.  Was there an automated system --
21     MR. HILL: Peter, he can finish his answer.
22     MR. MOUGEY: No.
23     MR. HILL: You can't cut him off.  He has asked
24 ten times.

Page 309

1 BY MR. MOUGEY:
2     Q.  Was there an automated system at Walgreens
3 that identified high percentage prescription writing
4 from prescribers in Schedule II and Schedule III
5 opiates, yes or no?
6     MR. HILL: Mr. Bratton, you can finish your
7 earlier answer.
8 BY THE WITNESS:
9     A.  So, we have a system to develop -- that
10 pulls reports about the percentage of controls,
11 opioids, various other data elements.  However, those
12 reports, again, you will get in those reports Hospice
13 providers, various other practitioners, not just bad
14 guys.
15 BY MR. MOUGEY:
16     Q.  I want you to listen to my question.  I
17 didn't ask you if you had controls, various other data
18 elements.  That's not what I asked.
19         What I asked you was: Is there an
20 automated system that generates reports -- I want you
21 to put everything down and just listen to me, okay?
22     MR. HILL: You just do what we need to do.
23 BY MR. MOUGEY:
24     Q.  Because I've asked you this question 15

Page 310

1  times.
2      MR. HILL: We agree. We agree.
3  BY MR. MOUGEY:
4      Q. I want an answer. A simple yes or no.
5      MR. HILL: You don't have to answer yes or no.
6  BY MR. MOUGEY:
7      Q. Was there --
8      MR. MOUGEY: Are you done?
9      MR. HILL: You've asked him this --
10 BY MR. MOUGEY:
11     Q. Was there an automated system that was
12 read -- that was run on a regular basis at Walgreens
13 identifying prescribers that had a high percentage in
14 Schedule II and Schedule III opiates, yes or no?
15     MR. HILL: Object to the form.
16 BY THE WITNESS:
17     A. Not opiates specifically, but control
18 percentages we have automated reports, yes.
19 BY MR. MOUGEY:
20     Q. And what are those reports called?
21     A. Prescriber ranking.
22     Q. And those are run on a regular basis and
23 are automated and given to you as part of your due
24 diligence?

Page 311

1      A. They're --
2      MR. HILL: Object to the form.
3  BY THE WITNESS:
4      A. The due diligence -- I -- I'm struggling,
5  again, with linking the two -- the prescriber to an
6  order.
7  BY MR. MOUGEY:
8      Q. I get that.
9      A. A store creates an order, they then fill a
10 prescription from a prescriber. So there is a ranking
11 of doctors that we do have that we have looked at at
12 times for various projects.
13     Q. I didn't ask at times, I didn't ask for
14 various projects. I've read the paper.
15     What I'm asking you is different. You
16 understand what the word "automated" means, right?
17     A. Yes.
18     Q. You understand what the word "regular" --
19 "on a regular basis," correct?
20     A. Correct.
21     Q. Is there an automated report on a regular
22 basis that's generated by Walgreens that identifies
23 high percentage prescribing doctors in Schedule II and
24 Schedule III opiates?

Page 312

1      MR. HILL: Object to the form.
2  BY THE WITNESS:
3      A. Not opiates specifically.
4  BY MR. MOUGEY:
5      Q. Controlled substances?
6      A. Yes.
7      Q. A regular, automated report?
8      A. Correct.
9      Q. What report is that?
10     A. The prescriber ranking.
11     Q. And that's -- that report is generated on
12 a regular -- how often is that report generated?
13     A. Every 90 days, I believe.
14     Q. Okay. So your answer about special
15 projects and on a -- when -- when we in -- inquire
16 into that, that's different than what you just said on
17 a 90 days?
18     MR. HILL: Object to form.
19 BY THE WITNESS:
20     A. The report generates in the server every
21 90 days. It is an on-demand report, though. So to
22 go -- it is not sent out to anyone. You have to go
23 view it.
24     MR. HILL: Why don't we take a break. It's been

Page 313

1  over an hour.
2      THE VIDEOGRAPHER: Going off the record --
3      MR. MOUGEY: I -- I want to finish this line of
4  questioning.
5  BY MR. MOUGEY:
6      Q. You're -- so in order to go find -- you
7  have to go find the report?
8      A. The user would have to go into our web
9  tool and go pull it up, yes.
10     Q. I'm not talking about a user, I'm talking
11 about you, okay.
12     Did you go and regularly look at that
13 report to pull high prescribing -- high percentage
14 prescribing doctors in controlled substances?
15     A. We -- we reference that report at times
16 when there are questions about specific prescribers.
17 We don't as a matter of course use that to go out and
18 say this doctor is good or bad.
19     Q. Was that report used prior to 2013
20 settlement agreement with the DEA?
21     MR. HILL: Objection to the form.
22 BY THE WITNESS:
23     A. No.
24     MR. MOUGEY: Let's take a break.

Page 314

1    THE VIDEOGRAPHER:  Going off the record at
2 3:30 p.m.
3        (WHEREUPON, discussion was had off the
4        record.)
5    THE VIDEOGRAPHER:  Back on the record at
6 3:30 p.m.
7 BY THE WITNESS:
8    A.   The report, though, did not exist before
9 the middle of 2013.
10 BY MR. MOUGEY:
11   Q.   Thank you.
12   THE VIDEOGRAPHER:  Going off the record at
13 3:31 p.m.
14       (WHEREUPON, a recess was had
15       from 3:31 to 3:43 p.m.)
16   THE VIDEOGRAPHER:  We are back on the record at
17 3:43 p.m.
18 BY MR. MOUGEY:
19   Q.   Mr. Bratton, would you mind walking me
20 through that report that you just mentioned that was
21 populated but not sent to you automatically regarding
22 the doctors.
23       What -- what data fields are in that
24 report?

Page 315

1    A.   That report looks at the quantity of
2 various -- there's various products that are ranked,
3 oxycodone, hydrocodone, Alprazolam, et cetera.  There
4 is about nine different ones.  It then looks at what's
5 the quantity prescribed by that doctor, what's -- in
6 the last 90 days, what's the quantity prescribed in
7 the previous 90 days, has there been a percentage of
8 change, what's the percentage of immediate release
9 oxycodone products, what, if any, percentage of his --
10 of the patients of the doctor are paying cash.  There
11 may be some others, but I can't recall at this time.
12   Q.   When you said it looks at what's the
13 quantity prescribed of the doctor, quantity of what?
14   A.   The quantity of -- so there is, I believe,
15 nine different products that we rank and then it looks
16 at the quantity of each one of those products.  All --
17 each of those factors for each of those rankings.
18   Q.   How far back does that data -- can you
19 currently pull?
20   A.   I don't -- I don't know right now.  I'd --
21   Q.   Do you have a general feel?  Do you go
22 back, four years, five years, ten years?
23   A.   We didn't create the report until mid
24 2013, so that would be as far back as might exist.  I

Page 316

1 don't know if we have any data retention policy on
2 that table in the database.  It might be purged.  I'm
3 not sure.
4    Q.   Wouldn't you want as much data you could
5 have so you can answer questions about trends or
6 patterns?
7    MR. HILL:  Object to the form.
8 BY THE WITNESS:
9    A.   I -- I don't know.
10 BY MR. MOUGEY:
11   Q.   You just analyze data, but you don't know
12 whether more data is better?
13   A.   It depends on what question you are trying
14 to answer.
15   Q.   Well, the more options you have when
16 analyzing data the better, right?
17   A.   Correct.  However, there is -- in a
18 database there is not unlimited space and so you have
19 to make decisions about what to keep and what not to
20 keep, otherwise you'd have to have unlimited money to
21 maintain the database.
22   Q.   So business decisions govern what data is
23 left for you all to do your job monitoring in your
24 department?

Page 317

1    MR. HILL:  Object to the form.
2 BY THE WITNESS:
3    A.   That might be part of it, yeah.
4 BY MR. MOUGEY:
5    Q.   What other reports are automated as part
6 of Walgreens system in 2013 that were populated on a
7 regular basis, other than the one you just mentioned?
8    A.   So, many of those are created in 2013.  We
9 have a ranking of stores similar to doctors, not as --
10 not on as many products as doctors, and it says --
11 shows the field leadership.  So this is one that is
12 shared with the field.  They get an e-mail letting
13 them know that it's available.  And it compares where
14 a store ranks compared to other stores.
15   Q.   Okay.  What other reports?
16   A.   We have a pharmacist GFD report and --
17   Q.   What's a pharmacist -- what's -- what's
18 in -- what's included in the pharmacist GFD report?
19   A.   So it's a ranking of the pharmacists,
20 similar to the doctors, what drugs they dispense most
21 frequently at their -- the stores they work at and
22 for -- rated on -- by, like I said, I think nine
23 different product.
24   Q.   What else?

Page 318

1    A.   We have some reports about DEA 106s, so
2  how often, what stores have a loss of controlled
3  substance due to what reasons, and there is some
4  details about the ones that are in progress, we have a
5  requirement to -- to complete those within 60 days by
6  the DEA, less time in some states, and so that tool
7  helps track where those reports are in that process.
8    Q.   And that's predominantly thefts, correct?
9    A.   Largely, yeah.
10    Q.   All right.  Other than the reports you've
11  just mentioned, anything else that are automated?
12    A.   Not that I can think of.
13    Q.   Are you drawing a distinction between
14  what's automated and sent to you on a regular basis
15  versus what's automated and you have to go look at?
16    A.   The pharmacist GFD and the store ranking,
17  when the report runs, there is an e-mail sent to the
18  field leaders and it says, This report is now
19  available, the new version is available to view.
20    Q.   All right.  Obviously you have a
21  suspicious order report that was coming to you and
22  Walgreens was still distributing, correct?
23    A.   I know -- I believe there was a report.  I
24  don't remember if it was myself or the analyst that

Page 319

1  received that report.
2    Q.   Okay.  Do you receive -- do you understand
3  how often they received it?
4    A.   I -- I don't recall.
5    Q.   What was -- what tool were you all using
6  to identify suspicious orders in 2013?
7    A.   The CSOKPI or CSOM system.
8    Q.   Would that populate -- or -- or generate a
9  report on a regular basis?
10    A.   I know that there was a weekly report of
11  suspicious orders that we would have to -- the
12  analysts would have to print and fax to the DEA field
13  offices.  I don't know if there -- I don't recall if
14  there is other reports that it would --
15    Q.   What about the --
16    A.   -- compile automatically.
17    Q.   What about the -- what about the re -- how
18  were you all identifying -- walk me through the
19  process in 2013 of what Walgreens did to identify
20  suspicious orders?
21    A.   So if a store tried to place an order that
22  exceeded their ceiling or -- or tolerance, the order
23  would be flagged.
24    Q.   What does -- what does flagged mean in

Page 320

1  that circumstance?
2    A.   That it exceeded the limit, either the
3  ceiling or tolerance, and there is --
4    Q.   Is that different than a red flag, I mean,
5  is it a different color flag or is there --
6    MR. HILL:  Objection.
7  BY MR. MOUGEY:
8    Q.   -- no flag or no color, or what's the
9  difference?
10    MR. HILL:  Object to the form.
11  BY THE WITNESS:
12    A.   No color.
13  BY MR. MOUGEY:
14    Q.   No color flag.
15    All right.  So that's just a regular
16  translucent flag?
17    A.   It was a flagged order that would then be
18  e-mailed to the store asking them to explain why
19  they've tried to exceed their ceiling limit or
20  tolerance.
21    Q.   Sir, you understand the concept that a
22  flag, red, whatever color it is, generates a little
23  bit of reason for further inquiry, correct?
24    A.   Yes.

Page 321

1    Q.   Okay.  And so the suspicious order report
2  does just that, it raises a flag, either you or the
3  analyst contacts the store, right?
4    A.   Correct.
5    Q.   And that was based on exceeding the
6  ceiling?
7    A.   Ceiling.
8    Q.   What's the terms?  I forget.
9    A.   Ceiling or tolerance.
10    Q.   Ceiling or tolerance.  And frequency I
11  believe, too, correct?
12    A.   Tolerance is the measure of frequency.
13    Q.   All right.  And there was a couple of
14  decisions to make at that point, right, whether or not
15  the order was -- needed an explanation from the
16  pharmacy, right?
17    A.   So we would automatically contact the
18  store and ask them for an explanation, we would
19  then -- if they didn't reply, we would automatically
20  report it as suspicious.  If they did reply, there
21  would be a process to -- to review with them why they
22  ordered it and there may be times when we would report
23  it as suspicious.
24    Q.   And that may or may not have been dac --

Page 322

1  documented in the database, right?
2     MR. HILL:  Object to the form.
3  BY THE WITNESS:
4     A.   I'm not sure if it -- if it's -- there may
5  be times it's outside the database.  There is
6  something in the database.  I'm not sure.
7  BY MR. MOUGEY:
8     Q.   So if the order triggered the flag and the
9  pharmacy didn't respond within 48 hours, what happened
10 to the shipment?
11    A.   Well, the shipment, no matter what, was
12 halted.
13    Q.   Okay.  So in the question I just asked,
14 it -- it wouldn't be shipped, right?
15    A.   Correct.
16    Q.   All right.  So if they didn't -- and that
17 was a 48-hour period, right, if they didn't respond in
18 48 hours, then it was considered suspicious, report
19 went to the DEA and it wasn't shipped, correct?
20    A.   I -- I believe so, yes.
21    Q.   Okay.  So if they did respond, the analyst
22 or yourself would engage in a conversation with the
23 pharmady -- pharmacy to determine if it was
24 suspicious, right?

Page 323

1     A.   Correct.
2     Q.   And even though it's a flag and it
3  warranted further inquiry, was that order shipped --
4  or I'd -- I'm sorry -- was that order identified to
5  the DEA as suspicious?
6     MR. HILL:  Object to the form.
7  BY THE WITNESS:
8     A.   Not -- if -- if we were able to resolve --
9  if the store gave a appropriate and credible answer as
10 to why they needed additional product, then it
11 wouldn't be reported as suspicious.
12 BY MR. MOUGEY:
13    Q.   So let's go through kind of the list in
14 your head of what you think were a reasonable
15 explanation that -- that the suspicious order or the
16 flagged order could go ahead and be shipped, okay?
17    A.   Just to clarify, if an order was flagged,
18 it is never shipped.  They may, if we find that there
19 is a legitimate reason, place a new order that we
20 would have to put an override in for them to be able
21 to place.
22    Q.   So that specific order may not be shipped,
23 you just have to enter a new entry and then that one
24 shipped, right?

Page 324

1     A.   Aft -- after an override was placed by
2  our --
3     Q.   That's kind of a matter of semantics,
4  right, the initial order is shipped after inquiry,
5  correct?
6     MR. HILL:  Object to the form.
7  BY THE WITNESS:
8     A.   The -- the initial order is never shipped
9  if it is flagged.  An additional order might be
10 placed --
11 BY MR. MOUGEY:
12    Q.   To re --
13    A.   -- that might be shipped.
14    Q.   To replace an additional order after
15 inquiry if you deem it not suspicious and then -- and
16 then the alternative order is shipped, how is that?
17    A.   Correct.
18    Q.   So could you please provide some examples
19 of -- based upon the flag and your inquiry into the
20 pharmacy, of what explanations met with your approval
21 to create an alternative order and then that one
22 shipped?
23    A.   Sure.
24       One example would be if the pharmacy had

Page 325

1  newly contracted with a -- a Hospice.  Another might
2  be that the -- a buyout had occurred and the
3  pharmacy's volume changed suddenly.  Our algorithm
4  bases the store's limits off of the last 13 weeks of
5  orders, and so if they've had a sudden change, instead
6  of them making the 13 weeks, if it's a legitimate
7  reason, like a buyout, we would increase their ceiling
8  limit and allow them to place a new order.
9     Q.   Let me stop you on that one.  It wasn't
10 always 13 weeks, though, it was 52 weeks at one point,
11 correct?
12    A.   With --
13    MR. HILL:  Objection to form.
14 BY MR. MOUGEY:
15    Q.   In '13?
16    A.   Within -- I -- I -- I don't know that to
17 be true.  I think --
18    Q.   Okay.
19    A.   -- my understanding is the CSOM system,
20 the current one that's still in use, was always
21 13 weeks.
22    Q.   All right.  So we have a contract with
23 Hospice, we have a buyout occurred, we have in the
24 13 weeks there is a sudden change.

Page 326

1     What else have you got?
2     A.   One of the products that's frequently
3  flagged is fentanyl, which is a very powerful patch
4  product that's used for administration of an opioid.
5  Normally it's used in end-of-life care for cancer
6  patients, but most stores don't normally order it.
7  And so the algorithm, if you've ordered zero, zero,
8  zero, zero, zero, any order at that point has now
9  exceeded the tolerance if -- if it's above a default
10 value of two.  And that product is typically
11 described -- prescribed in three or four quantity
12 boxes, and so almost every order for fentanyl for most
13 stores is going to trip that flag.
14    Q.   Okay.  Anything else because -- anything
15 else you can think of that would -- that was an
16 explanation when there was a suspicious order that
17 would meet with your approval to create an alternative
18 order and then ship that one?
19    MR. HILL:  Object to the form.
20 BY THE WITNESS:
21    A.   There is probably other -- there is
22 probably other permutations that I'm not thinking of.
23 Within the -- the buyout thing, there would be if
24 there was another pharmacy in a town that closed and

Page 327

1  now the customers are coming there or if we closed a
2  different Walgreens somewhere nearby or if a new
3  medical facility opened and their bang -- their
4  business has changed.  There -- there is probably
5  additionals that I'm -- that I'm not remembering right
6  now, but those are some examples.
7  BY MR. MOUGEY:
8     Q.   Okay.  So I'm -- I'm talking about once
9  pharmaceutical integrity department was created up
10 until when Walgreens stopped distributing opiates in
11 2014, are those answers that you just gave in that
12 time period?
13    A.   That --
14    MR. HILL:  Object to the form.
15 BY THE WITNESS:
16    A.   That -- those would be examples why we
17 might override a ceiling limit --
18 BY MR. MOUGEY:
19    Q.   Okay.
20    A.   -- even to -- until today.
21    Q.   Okay.  Now, one of the examples you gave
22 me, the 13-week sudden change, can you give me a
23 little more detail on that?
24    A.   That would be -- I was expounding on the

Page 328

1  buyout.  So one day one -- you know, Week 13 you now
2  have the buyout or a merger and acquisition volume
3  or -- or a store closing or whatever, we don't want
4  the store to have to wait 13 weeks to get the product
5  to accommodate the new patients that they are getting
6  that day.
7     Q.   Most of the examples you just gave me,
8  would you agree, are relatively rare?
9     MR. HILL:  Object to form.
10 BY THE WITNESS:
11    A.   The fentanyl one occurs thousands of times
12 a year.
13 BY MR. MOUGEY:
14    Q.   Outside of fentanyl, a new hospital coming
15 in, I'm assuming a new medical facility, that's
16 relatively rare?
17    A.   I -- I --
18    MR. HILL:  Object to the form.
19 BY THE WITNESS:
20    A.   -- I don't know how frequently it occurs.
21 I -- I know that we sometimes become in network with
22 facilities that we were previously not in network
23 with.  So that's another sort of variation on the
24 medical facility.

Page 329

1  BY MR. MOUGEY:
2     Q.   How many suspicious orders in 2013,
3  beginning of 2014 were getting flagged that warranted
4  further inquiry per week?
5     A.   In 2013?
6     Q.   Um-hum.
7     A.   I don't recall.
8     Q.   I mean, are -- are we talking -- I'm
9  just -- broke -- you are broken up into four
10 geographical areas, right?
11    A.   Right.
12    Q.   7, 8, 9,000 stores divided by four, there
13 are somewhere around 2,000 stores per geographical
14 region, is that right?
15    A.   About that, yeah.
16    Q.   Okay.  So, I mean, are you getting 20 or
17 are you getting 2,000?
18    A.   I don't -- I don't recall how many.
19    Q.   You don't recall whether you got 20 or
20 2,000 or anywhere in between?
21    A.   I -- I don't.  I know initially when we
22 rolled this out some stores were afraid to ask or
23 change their order at all, so we wouldn't get -- they
24 wouldn't -- even when they had legitimate need they

Page 330

1  wouldn't ask for more product, which caused other
2  problems.
3      Q.   All right.  Overriding the ceiling limit.
4          The ceiling limit was created by an
5  algorithm, correct?
6      A.   Correct.
7      Q.   And that algorithm compared like stores
8  with similar amounts of prescriptions, correct?
9      A.   Correct.
10     Q.   And are you familiar with the term "linear
11 regression"?
12     A.   Yes.
13     Q.   And the algorithm used a linear
14 regression, correct?
15     A.   Correct.
16     Q.   And I believe you used the word "default
17 by two" earlier?
18     A.   The tolerance would default to two if they
19 have no order history.
20     Q.   Okay.  What does that mean?
21     A.   So tolerance would normally be a measure
22 of frequency and my understanding of tolerance is a
23 measure of the frequency and the quantity of those
24 frequencies.  And so if they had no previous order

Page 331

1  history, so, therefore, they had no frequency, it
2  would default to a tolerance limit of two packages.
3      Q.   So the algorithm was attempting to
4  identify outlier orders that fell outside the average
5  based on a statistical analysis, correct?
6      A.   Correct.
7      Q.   And do you have an understanding of how
8  far outside the average an order had to be to be
9  considered suspicious and flagged?
10     MR. HILL:  Object to the form.
11 BY THE WITNESS:
12     A.   I -- I know that there is something called
13 a K value and that relates to how far outside the
14 average, but I -- I don't know how much, like, it
15 would have to be outside the average.
16 BY MR. MOUGEY:
17     Q.   Do you know what a K value is?
18     A.   I do not.
19     Q.   Do you know what standard deviation is?
20     A.   I do.
21     Q.   What is standard deviation?
22     A.   Standard deviation is a measure of the
23 variation in a number or series of numbers.
24     Q.   Do you have any idea what the standard

Page 332

1  deviation of an order had to be when compared to the
2  average to be considered suspicious?
3      A.   I do not.
4      Q.   Once an order is identified suspicious and
5  you contact the pharmacy or your analyst does and you
6  receive a -- what you believe is a satisfactory
7  response to your inquiry, okay, and you enter an
8  alternative order in and then ship it.
9          Do I have that down right?
10     A.   We would increase the ceiling limit and
11 then they would have to place a new order.
12     Q.   Is that initial order reported to the DEA
13 as suspicious?
14     A.   Not if we were able to resolve why it was
15 placed.
16     Q.   So regardless of the fact a flag was
17 placed on that order, you all at Walgreens do not
18 believe that that is a suspicious order?
19     MR. HILL:  Object to the form.
20 BY THE WITNESS:
21     A.   Not being flagged alone.
22 BY MR. MOUGEY:
23     Q.   Do you -- are you familiar with the term
24 at Walgreens "order of interest"?

Page 333

1      A.   Yes.
2      Q.   What is an order of interest at Walgreens?
3      A.   I believe that's the same as flagged.
4      Q.   So is it a -- do you believe it's a
5  two-stepped approach at Walgreens that an order of
6  interest is a flagged order and then only orders that
7  don't pass -- don't provide a satisfactory response or
8  don't respond within a certain amount of time, that
9  those are the suspicious orders?
10     MR. HILL:  Object to the form.
11     MR. MOUGEY:  That was a bad question.
12 BY MR. MOUGEY:
13     Q.   Two different categories, order of
14 interest, suspicious orders.
15         Do you agree with me there?
16     A.   I would -- my understanding is they are
17 the same.
18     Q.   You think orders of interest and
19 suspicious orders are the same?
20     A.   Oh, wait.  Sorry.  Flagged orders and
21 orders of interest are the same.  Suspicious orders
22 are ones that have failed our investigation.
23     Q.   All right.  So they either didn't respond
24 or they failed the investigation and that's a

Page 334

1 suspicious order?

2    A. Correct.

3    Q. All right. So if it's flagged or an order

4 of an in -- order of interest, you believe those are

5 the same?

6    A. I believe so.

7    Q. And an order of interest or a flagged

8 order are not reported to the DEA, correct?

9    A. It might be, but only being flagged would

10 not be enough to have it be reported.

11    Q. Sure. They either need to fail the

12 inquiry or not respond for it to be reported, correct?

13    A. Correct.

14    Q. So an order of interest being an outlier

15 based on the average and the linear regression does

16 not in and of itself warrant a suspicious order to go

17 to the DEA, correct?

18    A. Correct.

19    Q. So let's go back to an order is flagged

20 and you make an inquiry, all right.

21      Do you agree that the inquiry is kind of

22 synonymous with due diligence?

23    MR. HILL: Object to the form.

24 BY THE WITNESS:

Page 335

1    A. I -- I believe it is.

2 BY MR. MOUGEY:

3    Q. You are just -- you are calling to check

4 on the flagged order to see what -- what warranted the

5 order outside of the average, right?

6    A. Correct.

7    Q. And, now, if, in fact, that store gives

8 you a satisfactory response, the ceiling is changed,

9 correct?

10    A. Now that I'm thinking about it more,

11 sometimes we may change the ceiling if it's a

12 permanent change in business, like the buyout.

13 Sometimes there may be a one-time order only that is

14 allowed.

15    Q. How -- how do you know if end of '13 you

16 look back how many times a store has asked for a

17 ceiling increase?

18    A. The -- myself or the user that's referring

19 to --

20    Q. No, I'm -- whoever the user is, whether

21 it's you or someone -- you are on the phone, you are

22 talking to the pharmacy, they are giving you an answer

23 about why the flagged order was made, they are outside

24 the average, and you want to look back and think,

Page 336

1 Well, how many times have they given me this excuse in

2 the last six or seven or eight months.

3    Can you do that?

4    A. Yeah --

5    MR. HILL: Object to the form.

6 BY THE WITNESS:

7    A. -- the user or whoever it was reviewing it

8 could go into the system and see all of the previously

9 override -- overridden or denied ceiling increase

10 requests.

11 BY MR. MOUGEY:

12    Q. All right. So there is a way for the

13 system to capture how many overrides or whether it was

14 approved or not approved in 2013?

15    A. Yes.

16    Q. Is that captured automatically or does the

17 analyst have to enter it in manually?

18    MR. HILL: Object to the form.

19 BY THE WITNESS:

20    A. It's captured by the system automatically.

21 BY MR. MOUGEY:

22    Q. So whether the ceiling was approved,

23 increased, denied, or it was temporary would be in the

24 system?

Page 337

1    A. Correct.

2    Q. All right. Now, since you were at

3 Walgreens in 2013 until Walgreens ceased distributing

4 Schedule II and III in '14, do you have an

5 understanding on average how often a suspicious order

6 report was going to the DEA?

7    A. I know that we sent them out every week,

8 maybe twice a week, but I don't know the number

9 offhand how many were reported or...

10    Q. And I'm not asking you, like -- like,

11 2,932. I'm -- I'm wondering, are there ten or are

12 there thousands or do you have any recollection?

13    A. I don't recall.

14    Q. You don't recall. I mean -- I mean, if

15 there were thousands in '13, you would have to have

16 people standing there, you know, full time just

17 punching in fax numbers, I would think?

18    A. Well, the -- we would summarize the -- all

19 of the orders for that field date -- office and then

20 send that as one fax for all of the relevant

21 registrants for that field office.

22    Q. And how would those be summarized?

23    A. There would be a report that would be

24 exported from the -- the CSOKPI application and it

Page 338

1 would contain the order, the product, the quantity and
2 some other fields. I can't recall. It was a number.
3 And then each line would be -- you know, that store,
4 that item, and then that whole report would be faxed
5 to the field office.
6    Q.   Okay. Were the reports that were faxed to
7 the field office only from the pharmacies in that
8 specific geographic locations?
9    A.   That were within that field office's area
10 of responsibility as best we understood.
11   Q.   Which would make sense, right. I mean,
12 you are not going to send the field office in
13 San Diego the suspicious order report from Virginia,
14 right?
15   A.   Correct.
16   Q.   That would be overwhelming if you are the
17 field office in San Diego to get the suspicious orders
18 from Virginia, you'd have to filter all and sort all
19 of those out, right?
20   A.   Right.
21   MR. HILL:  Object to form.
22 BY MR. MOUGEY:
23   Q.   And make the DEA's job much harder,
24 correct?

Page 339

1    MR. HILL:  Same objection.
2 BY THE WITNESS:
3    A.   It would have if we had done that.
4 BY MR. MOUGEY:
5    Q.   Yes, sir. But you did -- you don't -- you
6 are not aware that you all ever did that, right?
7    MR. HILL:  Same objection.
8 BY THE WITNESS:
9    A.   Not that I'm aware of.
10 BY MR. MOUGEY:
11   Q.   Because that wouldn't make any sense?
12   MR. HILL:  Same objections.
13 BY THE WITNESS:
14   A.   Correct.
15 BY MR. MOUGEY:
16   Q.   All right. What -- did you export the
17 report out of the CSOM and put it in Excel or did it
18 go right out of the CSOM?
19   A.   They -- I believe it was in Excel and they
20 would print it and then put it in the fax machine and
21 send it to that field office.
22   Q.   Okay. If you wanted to go back today and
23 identify those suspicious order reports that were sent
24 to specific field offices of the DEA, could you do

Page 340

1 that?
2    A.   I believe so.
3    Q.   All right. Do you have any thoughts or
4 opinion on the algorithm that was used, whether or not
5 it was an effective tool?
6    A.   I -- I believe it was effective.
7    Q.   In 2013, 2014, I guess maybe we brought it
8 up, from late 2012 until Walgreens stopped
9 distributing C-II and C-III in 2014, do you believe
10 that the algorithm used was an effective tool to
11 identify suspicious orders?
12   A.   I believe it --
13   MR. HILL:  Object to form.
14 BY THE WITNESS:
15   A.   I believe it was effective.
16 BY MR. MOUGEY:
17   Q.   So was there a process with approving the
18 suspicious order reports generated out of the CSOM
19 before they were assimilated and sent to the field
20 office, the DEA field office?
21   A.   Not that I'm aware of.
22   Q.   How -- how fast, once the order is
23 flagged, how -- what was the turnaround time you all
24 sought to achieve to get reported to the DEA?

Page 341

1    A.   I believe -- I'm not -- I think it was
2 twice weekly, but I -- I'm not sure I recall.
3    Q.   It was pretty frequent?
4    MR. HILL:  Object to the form.
5 BY MR. MOUGEY:
6    Q.   And do you know who approved those reports
7 before they were sent, if anyone?
8    A.   I -- I don't believe that they were
9 approved.
10   Q.   Okay.
11   A.   It was just the -- whatever came out of
12 the system.
13   Q.   Whatever came out of the system was
14 populated and the analyst sent it?
15   A.   Correct.
16   Q.   Now, what -- what do you believe that
17 those reports were called? Or they -- did they have a
18 caption on them or a title on them?
19   A.   I -- to the best of my recollection, I
20 think it said suspicious order reports from, care of,
21 or from pharmacy integrity, if you have questions
22 contact us or Polster and then it had the details
23 below that.
24   Q.   Now, earlier you mentioned that you

Page 342

1 believed from others in your department that the DEA
2 said stop sending these reports?
3     A.   That's the comments that I had heard.
4     Q.   Are these the same reports that you are
5 talking about now that the DEA said stop sending?
6     A.   That certain field offices said they no
7 longer wanted, yes.
8     Q.   All right.  Do you know what timeframe
9 that was?
10     A.   2013 or 2014.
11     Q.   But you are not sure which year?
12     A.   I -- I -- it happened multiple times.  I'm
13 not sure of the exact dates.
14     Q.   And the analysts were the individuals
15 responsible for actually standing in front of the fax
16 machine and faxing them?
17     A.   Correct.
18     Q.   And these weren't automatically faxed,
19 from like, you know, your computer can fax stuff for
20 you?
21     MR. HILL:  Objection to form.
22 BY THE WITNESS:
23     A.   I think we eventually did something where
24 they could e-mail it, like, to the fax number, but

Page 343

1 initially they were faxing it out from a fax machine
2 and then they would wait for the confirmation fax.
3 BY MR. MOUGEY:
4     Q.   Now, I don't have your -- I'm sorry, I
5 don't have your bio in front of me, but your
6 undergraduate degree is in biology, right?
7     A.   Correct.
8     Q.   And do you have any graduate degree?
9     A.   No.
10     Q.   And did you undertake projects while at
11 Walgreens performing some evaluations or links between
12 prescribing and mortality?
13     A.   We had -- we attempted to.
14     Q.   And you attempted to link mortality to
15 Walgreens' prescription data to try determine if
16 you could identify high risk patterns of behavior in
17 patients that these drugs are prescribing -- writing
18 for these drugs, right?
19     A.   Correct.
20     Q.   And who helped you, did anyone help you
21 with that project?
22     A.   I know that we had tried to reach out
23 through our patient safety office to the CDC.  They
24 weren't able to provide the type of data that we would

Page 344

1 have needed to conduct that analysis.
2     Q.   Tell me what you were trying to
3 accomplish?
4     A.   We were trying to understand if there were
5 risk patterns that we could use to identify unhealthy
6 behavior or risky behavior by -- by patients that
7 might be part of a training material or some other
8 educational thing that we could provide to -- to
9 pharmacists about identifying abuse.
10     Q.   Was this your idea?
11     A.   I don't recall if it was my idea.
12     Q.   And your goal was to identify high risk
13 behavior, essentially, correct?
14     MR. HILL:  Object to the form.
15 BY THE WITNESS:
16     A.   Correct.
17 BY MR. MOUGEY:
18     Q.   By combining the CDC data with Walgreens
19 dispensing data?
20     A.   Correct.
21     Q.   And your thought was to take -- let me
22 hand you what -- hand you what's marked as Bratton 13.
23         (WHEREUPON, a certain document was
24           marked Walgreens-Bratton Deposition

Page 345

1         Exhibit No. 013, for identification,
2         as of 11/30/2018.)
3 BY MR. MOUGEY:
4     Q.   And this is an e-mail from you to Averill
5 Gordon?
6     A.   Um-hum.
7     Q.   Who is Averill Gordon?
8     A.   He was the head of our patient safety
9 organization at that time.
10     Q.   So you at -- according to this e-mail, it
11 sounds like you had had a discussion with Averill
12 regarding the CDC data project, right?
13     A.   Correct, and I believe he forwarded it off
14 to a contact that he had.
15     Q.   In -- in -- within Walgreens?
16     A.   No.  At the CDC.
17     Q.   All right.  So you were looking to try to
18 pull some data from the CDC and combine that or link
19 that with the Walgreens dispensing data, right?
20     A.   To establish if there was a link and if
21 there was what it might be.
22     Q.   And -- and this is May 2nd of 2013,
23 correct?
24     A.   Correct.

Page 346

1  Q.  So why don't you read the -- the paragraph
2  that begins with "in an effort."
3  A.  "In an effort to identify inappropriate
4  use and prevent diversion, I would like to conduct a
5  study of prescription opiate related deaths in an
6  attempt to link mortality data to Walgreens
7  prescription data, so that we might identify high risk
8  patterns of behavior in patients taking these drugs or
9  prescribers writing for these drugs.  This would
10  allows us to quantify and target our efforts towards
11  the areas of greatest harm."
12  Q.  So you were trying to take the mortality
13  data and correlate it or put it on top of the
14  Walgreens dispensing data to help your pharmacists?
15  A.  To -- to determine if --
16  MR. HILL:  Object to form.
17  BY THE WITNESS:
18  A.  To determine if there was a correlation
19  and maybe what -- what we could do with that data.
20  BY MR. MOUGEY:
21  Q.  So -- and you go on in the next paragraph
22  to say:
23      "To conduct this study we would need
24  identified mortality data from the CDC.  The type of

Page 347

1  request is referred to as 'mortality-multiple cause of
2  death, states and all counties-detailed.'"
3      Correct?
4  A.  Correct.
5  Q.  So you had done some homework already
6  analyzing what kind of data sets were available within
7  the CDC, correct?
8  A.  I believe that I tried to look up what
9  type of data sets they had.
10  Q.  And based on your analysis with your --
11  with your background, your science background, you
12  thought this is the data set that I would at least
13  like to start to look at, correct?
14  A.  Correct.
15  Q.  And you identify here 1 through 6
16  generally as the types of fields you needed within
17  that data set, correct?
18  A.  Correct.
19  Q.  And -- and they were listed as -- go
20  ahead, read them off, 1 through 6.
21  A.  General time and date, place of death, et
22  cetera.  Occurrence (state, county), demographics
23  (age, sex, race, marital status, education).
24      Underlying cause (ICD-10, CDC cause

Page 348

1  cozes -- codes), health conditions, other (tobacco
2  product, pregnancy, place).
3  Q.  So let's go back to 4 with the ope -- with
4  the parens, the ICD-10 code and the CDC cause codes.
5      Would you explain what you believe those
6  included?
7  A.  I believe that the -- I -- I think what I
8  was going after here was that the ICD-10 code would
9  have been what diagnosis they had on file.  In
10  retrospect, I'm not sure that that's something the CDC
11  would -- would ever have.  And then I -- I had seen on
12  some of their websites that they have dispositions for
13  different types of death based on what's reported, I
14  think, from the county medical examiners.
15  Q.  Because you were used to, in your time at
16  Walgreens, taking fairly large data sets and analyzing
17  the data and even in your time as a -- as a quality
18  analics -- analytics employee, correct?
19  A.  Correct.
20  Q.  And this was something you thought that
21  you would be helpful by extracting these two data
22  sets, linking them together and analyzing, correct?
23  MR. HILL:  Object to the form.
24  BY THE WITNESS:

Page 349

1  A.  I -- I thought that we could learn
2  something from this.
3  BY MR. MOUGEY:
4  Q.  Let me hand you what's marked as
5  Bratton 14.
6      (WHEREUPON, a certain document was
7      marked Walgreens-Bratton Deposition
8      Exhibit No. 014, for identification,
9      as of 11/30/2018.)
10  BY MR. MOUGEY:
11  Q.  And keep -- keep 13 handy.
12      Now 14 is an e-mail from you to Tasha
13  Polster, dated 10/25/2013.
14      Do you see that?
15  A.  Yes.
16  Q.  So it's a -- almost -- a little short of
17  six months after your conversation with Averill
18  Gordon, correct?
19  A.  Correct.
20  Q.  So if you open that 14, on the second
21  page under Mortality Rate, do you see mortality rate
22  data?
23  A.  Yes.
24  Q.  "New analysis of patient mortality for

Page 350

1  users of controlled substances," right?
2      A.   Correct.
3      Q.   "Measures rate of death versus normal
4  mortality rate for all patients," correct?
5      A.   Correct.
6      Q.   "May offer insights into risky prescribers
7  and potentially dangerous dosing/abuse trends,"
8  correct?
9      A.   Correct.
10     Q.   "Potentially an addict" -- "an
11 additional" -- or "an additional tool for evaluating
12 risk," correct?
13     A.   Correct.
14     Q.   So, as of almost six months later, you
15 were still working on this prod -- product trying to
16 offer insight into risky prescribers and potentially
17 dangerous dosing, right?
18     A.   I don't think I was working on it
19 continuously, but it was still something we were
20 working on.
21     Q.   Sure, I'm -- you would have been really
22 tired if you would have sat there for six months,
23 right? I mean, but this is a project that had been
24 ongoing for almost six months at this point, correct?

Page 351

1      MR. HILL:  Object to form.
2  BY THE WITNESS:
3      A.   I -- I don't believe it was continuous
4  effort on this. I think we had sort of stops and
5  starts. Initially there was some discussion with the
6  CDC and they weren't able to provide us anything and
7  then we identified at a later time an alternative
8  source for mort -- some mortality data.
9  BY MR. MOUGEY:
10     Q.   Where did you pull that mortality data
11 from?
12     A.   There is an indicator in our prescription
13 fulfillment system when a patient is marked as
14 deceased. And so we looked at patients that were
15 marked deceased and...
16     Q.   Tell me what data you pulled from
17 Walgreens trying to link these two together?
18     A.   So, we pulled the patients which had been
19 marked as a mortality -- that they were deceased, that
20 had received an opiate prescription in the last some
21 period of time, I don't recall exactly, and then we
22 sought to look at if there was any correlation between
23 the number of deceased patients and any particular
24 prescriber.

Page 352

1      Q.   What did you pull from the alternative to
2  the CDC database?
3      A.   So, that was the deceased indicator from
4  the patient profile, what patients received controlled
5  substances on their patient profile, and then we
6  compared that to what doctors had written those
7  prescriptions.
8      Q.   And -- and what did you do with the
9  analysis that you did?
10     A.   So the majority of the doctors we found
11 were for patients -- that had high patient mortality
12 were Hospice providers. So I provided that report to
13 my, I think she was a director then, but my boss,
14 Tasha Polster.
15     Q.   Did it go any further than Ms. Polster?
16     A.   I think there were some providers, again,
17 the majority were Hospice providers, oncology
18 providers. There were some doctors that we identified
19 that were not and I think she referred that to our CMO
20 office for further review.
21     Q.   How -- how much data, I mean, whether it
22 be in gigs, terabytes, lines, how much data did you
23 end up accumulating?
24     A.   The report itself was probably small

Page 353

1  because it would have just been the doctor's NPI
2  number and then some rate, a number. This was
3  leveraging our existing enterprise data warehouse
4  that's probably ter -- many, many hundreds of
5  terabytes. I don't know.
6      Q.   But not the reports but the actual data
7  set you were using to generate the reports, how large
8  was it?
9      A.   That's what I was -- was referring to.
10 The EDW system, Enterprise Data Warehouse is very
11 large. I don't know.
12     Q.   All right. Did you extract data out of
13 that data warehouse to -- to analyze?
14     A.   No, not -- unless we would need to combine
15 it with another source. So it contained all of the --
16 the items that we -- that we needed to perform this
17 analysis.
18     Q.   Did you export anything and sort it or put
19 it into Excel or a database to -- to further analyze?
20     A.   I think there was an Excel sheet probably
21 at some point that had the top -- top doctors that was
22 sent to the CMO's office.
23     Q.   Do you recall -- when you say CMO, who is
24 that?

Page 354

1   A.   The chief medical officer.
2   Q.   Of?
3   A.   Walgreens.
4   Q.   All right.  So Ms. Polster must have
5 thought that you did some pretty good work to send it
6 to the chief medical office of Walgreens, correct?
7   MR. HILL:  Object to the form.
8 BY THE WITNESS:
9   A.   I don't know.
10 BY MR. MOUGEY:
11   Q.   Did you ever talk to the chief medical
12 officer?
13   A.   Did I?
14   Q.   Yes, sir, about your project.
15   A.   I did -- I did not.
16   Q.   Did they -- did he ever respond or e-mail
17 back in any shape, form, or format?
18   A.   Not to me.
19   Q.   Did he respond or -- to any -- to
20 Ms. Polster?
21   A.   I don't --
22   MR. HILL:  Object to form.
23 BY THE WITNESS:
24   A.   I don't know.

Page 355

1 BY MR. MOUGEY:
2   Q.   So you never -- you -- after this work
3 that you did, you didn't hear back from anybody?
4   A.   I know that we -- there was some
5 discussion that they reviewed these, but we -- we
6 didn't choose to block any of them for a variety of
7 reasons.  Some were sys -- system issues.
8   Q.   And I'm not asking if you blocked anyone.
9 I'm just asking did you get any -- any input back from
10 the CMO or his office?
11   A.   I did not.
12   Q.   And did Ms. Polster receive any feedback
13 from the CMO or his office?
14   MR. HILL:  Objection to form.
15 BY THE WITNESS:
16   A.   I don't -- I don't know.
17 BY MR. MOUGEY:
18   Q.   All right.  I'm -- I'm a little confused.
19 I'm sorry.
20       Did you hear back -- so you -- you worked
21 on this data set, you -- you analyzed it, you put a
22 report together, you gave it to Ms. Polster, it went
23 to the CMO.
24       What happened after that?

Page 356

1   A.   So I -- again, I think we were looking at
2 is there a criteria we could develop to -- to block a
3 doctor, and based, I believe, on the review and our
4 other policies, they -- and some system limitations,
5 they chose not to proceed with any blocking.
6   Q.   But the -- the initial objective in
7 Bratton 13 was to identify high risk patterns of
8 behavior in patients taking these drugs or prescribers
9 writing for these drugs, correct?
10   A.   Correct.
11   Q.   So what about the other part of the
12 equation, were you able to identify high risk patterns
13 of behavior in patients taking these drugs?
14   A.   Without a lot of these other items, we
15 were very limited to what we could determine with
16 relation to patients.
17   Q.   But you thought this was a -- a viable
18 exercise if you had the right data sets to link CDC
19 mortality data to Walgreens' prescription data to
20 identify, No. 1, high risk patterns of behavior in
21 patients and, No. 2, of prescribers writing for these
22 drugs?
23   MR. HILL:  Same objection.
24 BY THE WITNESS:

Page 357

1   A.   Potentially, yes.  I think the -- the
2 challenge is we don't know in our system why they are
3 deceased, as opposed to the CDC's data.
4 BY MR. MOUGEY:
5   Q.   But based on your experience and
6 background, you thought that -- or you believed that
7 if you could get your hands on the right data sets
8 linking the mortality to prescription data was a
9 viable exercise?
10   MR. HILL:  Object to the form.
11 BY THE WITNESS:
12   A.   I think that I thought it was a -- I
13 thought it was a good exercise to undertake and there
14 might be conclusions that we could draw from that that
15 could be helpful, you know.  I don't -- I don't know
16 if we would have been able to discover these patterns
17 or not, but that's what I -- I think I hoped to do.
18 BY MR. MOUGEY:
19   Q.   Did anyone from Walgreens assist you in
20 this project?
21   A.   Not that I recall.
22   Q.   What about Averill?
23   A.   Well, I guess he had tried to reach out to
24 the CDC and then we didn't receive anything back from

Page 358

1  them.
2      Q.   Who helped you pull some of the data from
3  Walgreens' system?
4      A.   I pulled it myself.
5      Q.   Do you recall how far back you were able
6  to pull data to -- to -- to begin your analysis in
7  2013?
8      A.   Our database goes back a number of years,
9  but I don't remember what timeframe that I used --
10     Q.   Okay.
11     A.   -- to conduct the analysis.
12     Q.   Where -- do you know where this report is
13 that you generated now?
14     A.   I do not.
15     Q.   You don't have it on your hard drive or
16 anything at the office?
17     A.   I don't know.
18     Q.   And -- you -- you don't know?
19     A.   I don't know.
20     Q.   Did you -- did you look for it in response
21 to any production for this litigation?
22     MR. HILL:  Object to the form.
23 BY THE WITNESS:
24     A.   Our attorneys went through our computers

Page 359

1  and our e-mail and et cetera, so I did not, but --
2  BY MR. MOUGEY:
3      Q.   But you didn't look for it, though?
4      A.   Correct.
5      Q.   All right.  So you're not sure whether it
6  was produced or not?
7      A.   I don't know.
8      Q.   And do you recall what the report is
9  named?
10         Do you recall what the report is named?
11     A.   I do -- I don't recall.
12     Q.   Do you know if anyone specifically looked
13 for it?
14     A.   I don't know.
15     Q.   Did you tell them it was -- it was there,
16 where to go?
17     MR. HILL:  Object to the form.
18         And I'm going to instruct you not to
19 disclose communications with your counsel.
20 BY THE WITNESS:
21     A.   I -- I didn't look for it or discuss the
22 existence of it at the time that they were collecting
23 documents.
24 BY MR. MOUGEY:

Page 360

1      Q.   Did you review this -- the e-mail that --
2  the e-mail that we just went through in preparation
3  for your testimony today?
4      A.   This one, yes.
5      Q.   Yes -- yes.  And did it jog your memory
6  that, Oh, I wonder if we produced that report and --
7  and the work that I did?
8      A.   We didn't discuss if it was produced --
9      Q.   But it --
10     A.   -- no.
11     MR. MOUGEY:  If you'd give me just a minute,
12 Mr. Bratton, I think I'm done.
13     MR. HILL:  Peter, why don't you give us three
14 minutes in case I have anything.
15     MR. MOUGEY:  Uh-huh.
16     MR. HILL:  We can take the break right now.
17     MR. MOUGEY:  Yeah, that would be great.
18     MR. HILL:  Thanks.
19     THE VIDEOGRAPHER:  Going off the record at
20 4:33 p.m.
21         (WHEREUPON, a recess was had
22          from 4:33 to 4:41 p.m.)
23     THE VIDEOGRAPHER:  We are back on the record at
24 4:41 p.m.

Page 361

1      MR. MOUGEY:  And I don't have any further
2  questions.
3      MR. HILL:  I don't either.
4      MR. MOUGEY:  Okay.
5      THE VIDEOGRAPHER:  Going off the record at
6  4:41 p.m.  This concludes the videotape deposition of
7  Mr. Bratton.
8         (Time Noted:  4:41 p.m.)
9         FURTHER DEPONENT SAITH NOT.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

REPORTER'S CERTIFICATE

I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604, a Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness herein, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand on this 5th day of December, 2018.

JULIANA F. ZAJICEK, Certified Reporter

DEPOSITION ERRATA SHEET

Assignment No. 196763

Case Caption: In Re: National Prescription Opiate Litigation

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

EDWARD BRATTON

SUBSCRIBED AND SWORN TO
before me this      day
of          , A.D. 20__.

Notary Public

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____

EDWARD BRATTON

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____

EDWARD BRATTON