```
 1            IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

    ------------------------    )

 4   IN RE: NATIONAL             ) MDL No. 2804

    PRESCRIPTION OPIATE          )

 5   LITIGATION                  ) Case No.

    ------------------------    ) 1:17-MD-2804

 6                               )

    THIS DOCUMENT RELATES TO     ) Hon. Dan A. Polster

 7   ALL CASES                   )

    ------------------------    )

 8

 9               HIGHLY CONFIDENTIAL

10      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12          VIDEOTAPED 30(b)(6) DEPOSITION

13                       OF

14   WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO.

15                       BY

16                 EDWARD BRATTON

17

18               December 16, 2018

19                Chicago, Illinois

20

21

22          GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

23             deps@golkow.com

24
```

## Page 2

```
 6        The videotaped 30(b)(6) deposition of
 7   EDWARD BRATTON, called by the Plaintiffs for
 8   examination, taken pursuant to the Federal Rules of
 9   Civil Procedure of the United States District
10   Courts pertaining to the taking of depositions,
11   taken before CORINNE T. MARUT, C.S.R. No. 84-1968,
12   Registered Professional Reporter and a Certified
13   Shorthand Reporter of the State of Illinois, at the
14   offices of Bartlit Beck Herman Palenchar & Scott,
15   Suite 700, 54 West Hubbard Street, Chicago,
16   Illinois, on December 16, 2018, commencing at 9:03
17   a.m.
```

## Page 4

```
 1   APPEARANCES (Continued):
 2      NAPOLI SHKOLNIK, PLLC
        360 Lexington Avenue, 11th Floor
 3      New York, New York  10017
        212-397-1000
 4      BY:  HUNTER J. SHKOLNIK, ESQ.
           hunter@napolilaw.com
 5           (via telephonic communication)
 6
 7   ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
     aka WALGREEN CO.:
 8
        BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
 9      54 West Hubbard Street, Suite 300
        Chicago, Illinois  60654
10      312-494-4475
        BY:  PETER B. BENSINGER, JR., ESQ.
11         Peter.Bensinger@BartlitBeck.com
           KATHERINE M. SWIFT, ESQ.
12         kswift@bartlit-beck.com
13
     ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
14   ENDO PHARMACEUTICALS, INC.,
     PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
15   COMPANIES, INC. (f/k/a Par Pharmaceutical
     Holdings, Inc.):
16
17      BAKER & HOSTETLER LLP
        Key Tower - Suite 2000
18      127 Public Square
        Cleveland, Ohio  44114-1214
19      216-621-0200
        BY:  MELISSA D. BERTKE, ESQ.
20         mbertke@bakerlaw.com
           (via telephone/livestream)
21
22
23
24
```

## Page 3

```
 1   APPEARANCES:
 2      DAVID R. COHEN, ESQ.
        SPECIAL MASTER
 3      24400 Chagrin Boulevard, Suite 300
        Cleveland, Ohio  44122
 4      216-831-0001
        David@SpecialMaster.Law
 5
 6
 7   ON BEHALF OF THE PLAINTIFFS:
 8      LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY & PROCTOR P.A.
 9      316 South Baylen Street, Suite 600
        Pensacola, Florida  32502
10      205-396-3982
        BY:  PETER J. MOUGEY, ESQ.
11         pmougey@levinlaw.com
           PAGE A. POERSCHKE, ESQ.
12         ppoerschke@levinlaw.com
           WILLIAM BAKER, ESQ.
13         WCB850@gmail.com
           (via livestream)
14         LAURA DUNNING, ESQ.
           ldunning@levinlaw.com
15         (via livestream)
           JEFF GADDY, ESQ.
16         jgaddy@levinlaw.com
           (via livestream)
17
18
19      MOTLEY RICE LLC
        28 Bridgeside Boulevard
20      Mt. Pleasant, South Carolina  29464
        843-216-9250
21      BY:  JODI WESTBROOK FLOWERS, ESQ.
           jflowers@motleyrice.com
22         (via telephone/livestream)
23
24
```

## Page 5

```
 1   APPEARANCES (Continued):
 2   ON BEHALF OF McKESSON CORPORATION:
 3      COVINGTON & BURLING LLP
        850 Tenth Street, NW
 4      Washington, DC  20001-4956
        202-662-6000
 5      BY:  ANDREW STANNER, ESQ.
           astanner@cov.com
 6           (via telephone/livestream)
           MEGHAN MONAGHAN, ESQ.
 7         mmonaghan@cov.com
           (via telephone/livestream)
 8
 9   ON BEHALF OF CARDINAL HEALTH, INC.:
10      WILLIAMS & CONNOLLY LLP
        725 Twelfth Street, N.W.
11      Washington, DC  20005
        202-434-5013
12      BY:  MATTHEW C. MONAHAN, ESQ.
           mmonahan@wc.com
13
14
15   ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
     AMERISOURCEBERGEN CORPORATION:
16
        REED SMITH LLP
17      Reed Smith Centre - Fifth Avenue
        Pittsburgh, Pennsylvania  15222
18      412-288-3131
        BY:  BRIAN T. HIMMEL, ESQ.
19         bhimmel@reedsmith.com
20
21
22
23
24
```

Page 6

APPEARANCES (Continued):

ON BEHALF OF WALMART:
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601-1692
312-782-3939
BY: JASON Z. ZHOU, ESQ.
jzhou@jonesday.com
(via telephone/livestream)

ON BEHALF OF RITE AID:
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601-5094
312-324-1773
BY: SCOTT T. SCHUTTE, ESQ.
scott.schutte@morganlewis.com
(via telephonic communication)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
212-309-6141
BY: MATTHEW R. LADD, ESQ.
matthew.ladd@morganlewis.com
(via livestream)
JOHN M. MALOY, ESQ.
john.maloy@morganlewis.com
(via livestream)

ON BEHALF OF HBC COMPANY:
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
412-338-4383
BY: ROBERT M. BARNES, ESQ.
rbarnes@marcus-shapira.com
(via telephone/livestream)

Page 7

1  ALSO PRESENT:

2    ALEXANDRA M. GARLOCK, Paralegal,

     Levin Papantonio Thomas Mitchell

3    Rafferty & Proctor P.A.

4

5    COREY SMITH, Trial Technician

6

7

8  VIDEOTAPED BY: BEN STANSON

9

10

11  REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 8

I N D E X

EDWARD BRATTON          EXAMINATION
   BY MR. MOUGEY................. 11

E X H I B I T S
WALGREENS-BRATTON 30(B)(6)        MARKED FOR ID
No. 1   Plaintiffs' Amended Notice of      13
        Oral Videotaped 30(b)(6)
        Deposition of Edward Bratton
        of Defendant Walgreens
No. 2   First Notice of Deposition      15
        Pursuant to Rule 30(b)(6) and
        Document Request Pursuant to
        Rule 30(b)(2) and Rule 34 to
        Defendant Walgreens
No. 3   Second Notice of Deposition      18
No. 4   Defendants Walgreen Co. and      26
        Walgreen Eastern Co.'s
        Responses to Plaintiffs'
        '(First) Combined Discovery
        Requests'"
No. 5   Document, "Handling Suspicious      32
        Drug Orders";
        WAGFLDEA00001854 - 00001855
No. 6   Chemical Handler's Manual      32
        January 2004;
        WAGMDL00395965 - 00396033
No. 7   Document, Knowing Your      32
        Customer/Suspicious Orders
        Reporting;
        WAGMDL00387625 - 00387628

Page 9

E X H I B I T S
WALGREENS-BRATTON 30(B)(6)        MARKED FOR ID
No. 8   Document, "Controlled      32
        Substance Ordering, Evaluation
        of Controlled Substance
        Ordering Process";
        WAGMDL00395923 - 00395935
No. 9   6/23/08 Memo;      32
        WAGMDL00624503 - 00624509

No. 10   Document, Controlled Substance      32
         Threshold;
         WAGMDL00492132 - 00492149

No. 11   Document, "Suggested Questions      32
         a Distributor should ask prior
         to shipping controlled
         substances";
         WAGMDL00387638 - 00387640

No. 12   Document, "Business      32
         Requirements";
         WAGMDL00395937 - 00395956

No. 13   Document, "Functional      32
         Requirements & Macro Design";
         WAGMDL00400342 - 00400356

No. 14   Document, "Handling Suspicious      32
         Drug Orders";
         WAGFLDEA00000027

No. 15   Document, "Handling Suspicious      32
         Orders and Loss of Controlled
         Drugs"; WAGFLDEA00000028

No. 16   Document, "Business Requirements";  32
         WAGMDL00395957 - 00395964
No. 17   Flow chart; P-WAG-0037      80

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1        E X H I B I T S
 2  WALGREENS-BRATTON 30(B)(6)        MARKED FOR ID
 3  No. 18  PowerPoint, Walgreen Co.       119
           Controlled Substance
 4         Anti-Diversion and Compliance
           Program;
 5         WAGMDL00659801 - 00659856
 6  No. 19  Ven diagram prepared by        136
           Mr. Mougey at deposition
 7
    No. 20  10/11/12 e-mail string with    150
 8         attachment;
           WAGMDL00667936 - 00667943
 9
    No. 21  7/28/06 letter to Barbara K.    179
10         Dobric from Dwayne A. Piñon;
           WAGMDL00387642 - 00387650
11
    No. 22  6/23/08 memo;                  203
12         WAGMDL00624503 - 00624509
13  No. 23  10/01/09 Project Request Estimate; 245
           WAGMDL00492070 - 00492072
14
    No. 24  2/8/12 e-mail with attachment;  249
15         WAGMDL00325129 - 00325130
16  No. 25  July 2011, DEA Statistics;     262
           WAGMDL00492171
17
    No. 26  DEA Statistics; WAGMDL00492169  265
18
    No. 27  Handwritten chart prepared by   286
19         Mr. Mougey during deposition
20
21
22
23
24
```

Page 11

```
 1        THE VIDEOGRAPHER:  We are now on the record.
 2  My name is Ben Stanson.  I'm a videographer for
 3  Golkow Litigation Services.
 4        Today's date is December 16, 2018, and
 5  the time is 9:03 a.m.
 6        This video deposition is being held in
 7  Chicago, Illinois in the matter of National
 8  Prescription Opiate Litigation, pending in the U.S.
 9  District Court, Northern District of Ohio, Eastern
10  Division.
11        The deponent is Edward Bratton.
12        Counsel will be noted on the
13  stenographic record.
14        The Court Reporter is Corinne Marut.
15  Will you please swear in the witness.
16        (WHEREUPON, the witness was duly
17        sworn.)
18        EDWARD BRATTON,
19  called as a witness herein, having been first duly
20  sworn, was examined and testified as follows:
21        EXAMINATION
22  BY MR. MOUGEY:
23     Q.  Good morning, Mr. Bratton.  My name is
24  Peter Mougey.  I represent the Plaintiffs in this
```

Page 12

```
 1  matter.  You and I met two weeks ago during your
 2  fact witness.
 3        Sir, you understand here today that you
 4  are appearing in your capacity as a representative
 5  of Walgreens, correct, sir?
 6     A.  Correct.
 7     Q.  And as a representative of Walgreens,
 8  sir, you understand that as part of your
 9  responsibilities --
10        MR. MOUGEY:  Do we have who is all on the
11  phone?  Did we go through?  I missed that.
12        MR. SHKOLNIK:  Hunter Shkolnik here.
13        MR. MOUGEY:  I missed that.  That's my fault.
14  Let's do a quick roll call of who is on -- I missed
15  that again -- of who's on the phone.  We have
16  Hunter.  Who else is on?
17        MS. BERTKE:  Melissa Bertke from Baker
18  Hostetler on behalf of the Endo Defendants.
19        MS. MONAGHAN:  Meghan Monaghan and Andrew
20  Stanner on behalf of McKesson.
21        MR. ZHOU:  Jason Zhou with Jones Day on behalf
22  of Walmart.
23        MR. SCHUTTE:  Scott Schutte from Morgan Lewis
24  on behalf of Rite-Aid.
```

Page 13

```
 1        MS. FLOWERS:  Jodi Flowers, Motley Rice, on
 2  behalf of the Plaintiffs.
 3        MR. MOUGEY:  Okay.
 4  BY MR. MOUGEY:
 5     Q.  And, sir, as part of your obligations
 6  today as the corporate representative for
 7  Walgreens, you have an obligation to be prepared
 8  for the topics that you've been designated for,
 9  correct, sir?
10     A.  Correct.
11     Q.  And I'm going to hand you, Mr. Bratton,
12  a series of four exhibits, which are just some
13  housekeeping issues, and we're going to identify
14  this document as Bratton 30(b)(6) 1.
15        And I made five copies so Special Master
16  Cohen can have one as well.
17        (WHEREUPON, a certain document was
18        marked as Bratton 30(b)(6) Exhibit
19        No. 1:  Plaintiffs' Amended Notice
20        of Oral Videotaped 30(b)(6)
21        Deposition of Edward Bratton.)
22  BY MR. MOUGEY:
23     Q.  Let's just start with a couple of these
24  housekeeping documents, if you would.
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 14

1    So, we're looking at Bratton 30(b)(6)
2  Exhibit 1 and you see your name in the right-hand
3  corner on the first page, Edward Bratton, that's
4  been designated as the 30(b)(6) representative,
5  correct?
6    A.   Correct.
7    Q.   And you see below that Mr. Bratton will
8  be deposed as topics covering 1(a) through (n),
9  which we'll go through, of the first 30(b)(6)
10 notice filed June 15, 2018 and topics 6 through 8
11 and 17 through 22 of the second 30(b)(6) notice
12 filed on June 15, 2018, correct?
13   A.   Correct.
14   Q.   Have you seen this Amended Notice of
15 Videotaped Deposition before today?
16   A.   I don't know if I saw this exact
17 version, but it looks familiar.
18   Q.   Okay.  And, sir, you understand that
19 your testimony today could be used as Walgreens'
20 positions or opinions on certain matters for the
21 trial of this matter, correct?
22   A.   Yes.
23   Q.   And you understand that the testimony
24 that you give today is being videotaped and could

---

Page 15

1  be used in a trial for a jury to render an ultimate
2  decision in this case, correct?
3    A.   Correct.
4    Q.   Let me hand you what I'm going to mark
5  as Bratton 30(b)(6) 2.
6           (WHEREUPON, a certain document was
7           marked as Bratton 30(b)(6) Exhibit
8           No. 2:  First Notice of Deposition
9           Pursuant to Rule 30(b)(6) and
10          Document Request Pursuant to Rule
11          30(b)(2) and Rule 34 to Defendant
12          Walgreens.)
13 BY MR. MOUGEY:
14   Q.   This is titled "First Notice of
15 Deposition Pursuant to Rule 30(b)(6) and Document
16 Request Pursuant to Rule 30(b)(2) and Rule 34 to
17 Defendant Walgreens Boots Alliance."
18         Do you follow me, sir?
19   A.   Yes.
20   Q.   If you would, sir, the topics that you
21 have been designated to depose -- to provide
22 testimony on today on behalf of Walgreens is on
23 page 6 of that document, and specifically on page 6
24 and continuing into page 7, the topics listed under

---

Page 16

1  III, "Subject Matters for Testimony," (a) through
2  (n) as in no.
3    Do you see that?
4    A.   Yes.
5    Q.   And, sir, have you had an opportunity to
6  review Bratton 30(b)(6) Exhibit 2 before today?
7    A.   I believe, yes.
8    Q.   And if you turn to -- to page 2 of that
9  document, it says, "Duty to Prepare."
10   A.   Yes.
11   Q.   And the "Duty to Prepare," the paragraph
12 below that, "The testimony elicited in the
13 deposition represents Walgreens' knowledge, not the
14 individual deponent's knowledge."
15         Does that make sense to you, sir?  As
16 opposed to your testimony two weeks ago, that was
17 your personal knowledge, today you are here on
18 behalf of Walgreens, correct?
19   MR. BENSINGER:  Objection to form.
20 BY THE WITNESS:
21   A.   Correct.
22 BY MR. MOUGEY:
23   Q.   You are here today to provide testimony
24 that is Walgreens' position on certain matters,

---

Page 17

1  correct?
2    MR. BENSINGER:  Objection to form.
3  BY THE WITNESS:
4    A.   I'm -- I understand I'm here to provide
5  the corporate knowledge on these topics.
6  BY MR. MOUGEY:
7    Q.   And the second sentence, "Walgreens must
8  conduct a thorough investigation in response to the
9  Deposition Notice and must prepare a witness to
10 testify to all matters 'known or reasonably
11 available to the organization.'"
12         Did I read that correctly, sir?
13   A.   Yes.
14   Q.   And, sir, do you believe you've
15 fulfilled your obligation to prepare today on the
16 topics designated (a) through (n) on Bratton
17 30(b)(6) 2?
18   A.   I believe so.
19   Q.   Now, let's go back to page 6 of this
20 document, (a) through (n).
21         Let's just start with (a), "Your
22 past/present suspicious orders monitoring system,
23 SOMS program, policies and procedures."
24         Do you see that, sir?

---

Page 18

1    A.   I do.
2    Q.   I won't read these one by one.  And
3 you've read these before, correct, sir?
4    A.   Correct.
5    Q.   And you understand that the first
6 several of these all are related to Walgreens'
7 suspicious order monitoring policies and
8 procedures, correct?
9    A.   Correct.
10    Q.   And you understand, for example, in (b),
11 the "Know Your Customer" program policies and
12 procedures pertains to suspicious order monitoring
13 policies and procedures of Walgreens, correct?
14    A.   Correct.
15    Q.   I'm going to hand you what I've marked
16 as Bratton 30(b)(6) 3.
17          (WHEREUPON, a certain document was
18           marked as Bratton 30(b)(6) Exhibit
19           No. 3:  Second Notice of
20           Deposition.)
21 BY MR. MOUGEY:
22    Q.   Which is the Second Notice of Deposition
23 pursuant to Rule 30(b)(6), which has some
24 additional topics identified beginning on page 7.

Page 19

1          Sir, have you seen -- have you seen this
2 document before?
3    A.   I believe I have.
4    Q.   All right.  And if you would, sir,
5 please turn to page 7 of Bratton 30(b)(6) 3.
6    A.   Okay.
7    Q.   And on page 7, 6, 7 and 8, you've been
8 designated to provide testimony on behalf of
9 Walgreens.
10          Do you see "Your efforts to conduct
11 audits and/or investigations relating to your
12 suspicious order monitoring system to review past
13 practices and to ensure compliance with your legal
14 responsibilities"?
15          Correct, sir?
16    A.   Correct.
17    MR. BENSINGER:  Objection; compound.
18 BY MR. MOUGEY:
19    Q.   "Your interactions with the DEA
20 regarding distribution of controlled substances
21 including compliance, regulatory and administrative
22 actions, communications and penalties."
23          Do you see that, sir?
24    A.   I do.

Page 20

1    Q.   And, 8, "Your interaction with the
2 DEA/FDA related to the scheduling of controlled
3 substances and setting of quotas."
4          Correct, sir?
5    A.   Correct.
6    Q.   And then if you turn to page 9, I won't
7 read through each one of those, but 17 through 22
8 are additional topics you have been designated to
9 testify on today, correct, sir?
10    A.   Correct.
11    Q.   Do you see any of these that we have
12 just been through, the topics that you've been
13 designated on, that you believe you are not here to
14 testify on or that you haven't been prepared for?
15    MR. BENSINGER:  Objection to form.
16 BY MR. MOUGEY:
17    Q.   You can take your time and read through
18 them.
19    A.   I believe that these are all the ones
20 I've prepared for, yes.
21    Q.   Sir, you've been an employee of
22 Walgreens since 2006, correct, sir?
23    A.   I believe November 2006.
24    Q.   I'm sorry.  I am having a little bit of

Page 21

1 trouble hearing you.
2          November of 2006 is when you began your
3 tenure at Walgreens?
4    A.   Yes.
5    Q.   And you've filled different capacities
6 at Walgreens, correct?
7    A.   Correct.
8    Q.   And from 2006 until 2013, the beginning
9 of 2013, none of your roles had anything to do with
10 suspicious order monitoring policies or procedures,
11 correct, sir?
12    A.   Correct.
13    Q.   And until the beginning of February,
14 January, '13, your role had nothing to do with the
15 DEA and controlling Schedule II through V opiates,
16 correct, sir?
17    A.   Correct.
18    Q.   Only beginning in early '13 did your
19 role change into Pharmaceutical Integrity whose job
20 it was to monitor suspicious orders of controlled
21 substances, correct, sir?
22    A.   Correct.
23    Q.   So, in preparation for your testimony
24 today, sir, is it fair to say that you don't have

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 any personal knowledge of Walgreens' policies and
2 procedures regarding suspicious order monitoring
3 programs, policies and procedures prior to late
4 2012?
5    A.   Correct.
6    Q.   So, in preparation for today, you had to
7 kind of go back and familiarize yourself, with the
8 help of others, about Walgreens' suspicious order
9 monitoring system, their program, policies and
10 procedures, correct, sir?
11    A.   Correct.
12    Q.   And in order to do that --
13    MR. MOUGEY:  Who else just chimed in?
14    MR. BARNES:  This is Robert Barnes in
15 Pittsburgh for HBC.
16    MR. MOUGEY:  Thank you, Robert.
17 BY MR. MOUGEY:
18    Q.   In order to do that, sir, you had to
19 review a number of documents, including policies,
20 procedures, manuals at Walgreens, correct?
21    A.   That was part of my preparation, yes.
22    Q.   Now, when I say "a manual," kind of back
23 in the old days we'd have manuals and they'd be on
24 your desk maybe in a binder and that would contain

Page 23

1 all of the company's practices and procedures and
2 it would be an easy reference point.  Does that
3 make sense?
4    A.   Yes.
5    Q.   And I think as we have evolved with
6 technology, a lot of times those policies and
7 procedure manuals are on a firm intranet.  You're
8 familiar with the term "firm intranet"?
9    A.   Yes.
10    Q.   Meaning that the employees of a
11 particular company can go on the firm intranet and
12 look at the policies and procedures as a point of
13 reference, correct?
14    A.   Correct.
15    Q.   And Walgreens has a manual on suspicious
16 order monitoring policies and procedures that
17 covers what the criteria and the thresholds are for
18 suspicious order monitoring policies, right?
19    MR. BENSINGER:  Objection; vague, compound.
20 You can answer.
21 BY THE WITNESS:
22    A.   We have a -- documents that exist today
23 on how we monitor suspicious order monitoring, and
24 we have various design documents and other things

Page 24

1 that have detailed the past procedures or
2 processes.
3 BY MR. MOUGEY:
4    Q.   And I understand that there is design
5 documents and documents that -- that changed over
6 time.  What I'm looking for, though, is, is there a
7 suspicious -- a specific manual that you use today
8 that kind of captures Walgreens' suspicious order
9 monitoring policy and procedures?
10    A.   Internal to my team, we have some job
11 aids and procedure documents that I think would
12 parallel what you're describing.
13    Q.   So, Walgreens approximately has, give or
14 take on the time, about 250,000 employees, right?
15    A.   Correct.
16    Q.   There are, depending on the time,
17 anywhere from 4,500 to 7 or 8,000 stores across the
18 U.S., correct?
19    A.   Approximately.
20    Q.   And if the firm designates manuals that
21 are available to the employees of Walgreens on
22 various issues, correct?
23    A.   Correct.
24    Q.   And it's important that all of the

Page 25

1 employees, starting from pharmacy employees and lab
2 technicians up to pharmacists and all the way up to
3 corporate, have a central place for policies and
4 procedures that everyone can go to reference for
5 any specific topic, right?
6    MR. BENSINGER:  Objection; beyond the scope.
7 BY THE WITNESS:
8    A.   I don't know.  I mean, not every manual
9 is useful to every employee.  So I'm not sure.
10 BY MR. MOUGEY:
11    Q.   So you're not sure.  So, in preparation
12 for today and the topics that we just went through,
13 for example, (a), "Your past/present suspicious
14 orders monitoring system, SOMS program, policies
15 and procedure," was there a manual that you were
16 able to reference that tracked the policies and
17 procedures over time to fulfill Walgreens'
18 responsibilities under the Controlled Substance
19 Act?
20    A.   There was no single document that
21 contained all of those memorializing them
22 throughout time, no.
23    Q.   No single document?
24    A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.   No manual, right?

2    A.   Correct.

3    Q.   So, if anyone had any responsibility for
4    monitoring controlled substance orders, there was
5    no place to go at any point in time and look and
6    see what the specific policy or procedure was,
7    correct?

8    MR. BENSINGER:  Objection; mischaracterization.

9    BY THE WITNESS:

10   A.   At different times there would have been
11   different documents or places they would have to
12   look.  There is not a single document that contains
13   all those throughout the scope of the last 10, 12
14   years, no.

15   BY MR. MOUGEY:

16   Q.   Now, I hand you what we're going to mark
17   as Bratton 30(b)(6) 5 --

18   THE REPORTER:  That should be 4.

19   MR. MOUGEY:  4.  Thank you.

20      (WHEREUPON, a certain document was

21      marked as Bratton 30(b)(6) Exhibit

22      No. 4:  Defendants Walgreen Co. and

23      Walgreen Eastern Co.'s Responses to

24      Plaintiffs' '(First) Combined

Page 27

1       Discovery Requests.'")

2    BY MR. MOUGEY:

3    Q.   And this document is titled "Defendant
4    Walgreens Company and Walgreen Eastern Co.'s
5    Responses to Plaintiff's First Combined Discovery
6    Requests."

7       Do you see that, sir?

8    A.   Yes.

9    Q.   And if you would, sir, turn to page 6.
10   "Please produce each of your suspicious order
11   monitoring system (SOMS) policies and procedures
12   since January 1, 2006 and identify the Bates stamp
13   range for each; please identify the effective dates
14   each was in force and effect."

15      Do you see that, sir?

16   A.   I do.

17   Q.   And you see below on the bottom of
18   page 6 and beginning to the top of page 7 that
19   there are a series of what appear to be Bates
20   ranges, correct, sir?

21   A.   Correct.

22   Q.   Now, if you would, also, turn to
23   request 6 on page 9.

24   A.   Okay.

Page 28

1    Q.   "For each suspicious order you reported
2    to the DEA since January 2006, please identify
3    whether you declined the order or shipped the order
4    and produce all documents related thereto; please
5    identify the Bates stamp range for each case
6    related to Case Track One."

7       Do you see that, sir?

8    A.   I do.

9    Q.   And do you see under the response
10   Walgreens incorporates by reference its response
11   to -- I'm sorry -- yes, response to Request No. 2.

12      Do you see that?

13   A.   Um-hmm.

14   Q.   And request 2 is the one that we just
15   went through with the series of Bates ranges,
16   correct?

17   A.   Correct.

18   Q.   It says, if you look below, under
19   request 7 on the bottom of page 9, "For each
20   suspicious order you reported and then shipped
21   since January 1, 2006, please produce all documents
22   related to your due diligence for each; please
23   identify the Bates stamp range for each related to
24   Case Track One."

Page 29

1       Do you see that, sir?

2    A.   I do.

3    Q.   And then if you look down in the
4    response, Walgreens references its response to
5    Request No. 6, right?

6    A.   Yes.

7    Q.   You need to do a little mental
8    gymnastics here, but request 7 and request 6 all
9    respond back to request 2 in the Bates numbers in
10   request 2, right?

11   A.   That appears to be the case.

12   Q.   All right.  So, in preparation for your
13   testimony today, I've been handed approximately two
14   boxes of notebooks this morning.

15      Have you been -- you've been reviewing
16   documents in preparation for your -- for your
17   testimony today, correct?

18   A.   Correct.

19   Q.   Do you have an understanding of what's
20   in the binders that I've been handed this morning?

21   A.   I believe so.

22   Q.   And can you just generally describe to
23   me what those documents are?

24   A.   Those are documents that we and I

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 thought would be helpful for me during this
2 deposition to have as reference.
3     Q.   And how much time over the course of the
4 last two weeks have you spent preparing for your
5 testimony today?
6     A.   Probably between 60 and 70 hours.
7     Q.   So it's been a busy two weeks?
8     A.   Yes.
9     Q.   And the reason why I limit it to just
10 the two weeks is the last time I talked to you, you
11 had in large part not begun to prepare for your
12 testimony for today.  Am I stating that accurately?
13     MR. BENSINGER:  Objection; vague.
14 BY THE WITNESS:
15     A.   Mostly, yeah.
16 BY MR. MOUGEY:
17     Q.   Yes, sir.  Let me make sure I have that
18 right.
19         So, prior to your time in Pharmaceutical
20 Integrity, early '13, late 2012, you've had to go
21 back and familiarize yourself with Walgreens'
22 policies and procedures related to suspicious order
23 monitoring policies, correct?
24     A.   Correct.

Page 31

1     Q.   And almost all of that preparation for
2 today has been done in the last two weeks.  Am I
3 stating that accurately?
4     A.   Preparation by me, yes.
5     Q.   Yes, sir.  So, these notebooks behind
6 me, have you been using those over the last two
7 weeks to prepare yourself for your testimony today?
8     A.   They've been part of my preparation,
9 yes.
10     Q.   And the notebooks that I have behind me
11 that -- I'm assuming you've been through those and
12 you're familiar with them, correct?
13     MR. BENSINGER:  Asked and answered.
14 BY THE WITNESS:
15     A.   Fairly familiar, yes.
16 BY MR. MOUGEY:
17     Q.   And you -- you've been using those same
18 notebooks over the last two weeks to prepare
19 yourself?
20     A.   Yes.
21     Q.   So, I'm going to hand you what I'm going
22 to mark as Bratton 30(b)(6) 5 through Bratton
23 30(b)(6) Exhibit 15.  Okay.
24     MR. BENSINGER:  Counsel, are these premarked?

Page 32

1     MR. MOUGEY:  They are.
2         (WHEREUPON, certain documents were
3         premarked Bratton 30(b)(6) Exhibit
4         Nos 5 through 16; Description given
5         in Index.)
6 BY MR. MOUGEY:
7     Q.   All right.  I don't want you to take my
8 word for it.  We're going to check those.
9         But what you have in front of you, I
10 believe, or what I tried to do was to take the
11 Bates ranges in No. 2 which are incorporated into
12 request 6 and request 7 and those are the stack
13 that's in front of you.  Okay?
14         So, what I want -- they should be in
15 Bates order in the same.  If you would go to No. 6
16 on Bratton 30(b)(6) 4, I want to go through and
17 check off those Bates ranges that we were -- we
18 were given today to prepare.
19     A.   Okay.
20     Q.   Let me know when you get to page 6 on
21 Bratton Exhibit 4.
22     MR. MOUGEY:  Corey, if you can put the Bates
23 ranges up on the screen, that would be great.
24 BY THE WITNESS:

Page 33

1     A.   Okay.
2 BY MR. MOUGEY:
3     Q.   So, let's start with the first -- the
4 document in front of you.  And does the Bates range
5 begin with 1854?
6     A.   Of Exhibit 5?
7     Q.   Yes.
8     A.   I do not think so, no.
9     Q.   Exhibit 5 should look like this.  No?
10     MR. BENSINGER:  Mr. Mougey, there are two
11 Bates numbers.  Perhaps you could direct the
12 witness to the Bates number to which you are now
13 referring.
14     MR. MOUGEY:  Thank you.
15 BY MR. MOUGEY:
16     Q.   In the bottom, there is two numbers in
17 the right-hand corner and the smaller of which is
18 1854; and I think you and I are on the same
19 document, but I'm not sure.
20     A.   Yes.
21     Q.   Does it say 1854?
22     A.   Yes.
23     Q.   Let's check that one off.  I tried to
24 get these in order.  I'm not entirely sure I did.

Page 34

1 And if you look at Bratton Exhibit 6,
2 the last three digits are 965.
3 Do you see that, sir?
4 A. Yes.
5 Q. And if you look at Bratton 30(b)(6), the
6 next digit range is 625.
7 Do you see that, sir?
8 A. Yes.
9 Q. Okay. So far we have the first three in
10 a row, right? We have gone through the first three
11 Bates ranges on the bottom of page 6 of the
12 combined discovery responses, right?
13 A. Yes.
14 MR. BENSINGER: Mr. Mougey, you may want to
15 identify Exhibit 7. You just omitted to mention
16 the Bates range is Exhibit 7.
17 MR. MOUGEY: Thank you.
18 BY MR. MOUGEY:
19 Q. And the Bates ranges on Bratton 30(b)(6)
20 Exhibit 8 end with 923.
21 A. Yes.
22 Q. All right. And we can pick up the pace
23 here.
24 Bratton 30(b)(6) Exhibit 9 end with 503?

Page 35

1 A. Yes.
2 Q. And we're still going in order and we
3 are catching every one on bottom of page 6, top of
4 page 7, right?
5 A. I believe so, yes.
6 Q. And Bratton 30(b)(6) 10 end with the
7 Bates numbers 132.
8 Do you see that?
9 A. Yes.
10 Q. And Bratton 30(b)(6) 11, Bates numbers
11 end with 638. We are still going in order, right?
12 A. Yes.
13 Q. We've got them all so far, correct?
14 A. I believe so.
15 Q. And Bratton 30(b)(6) Exhibit 12 ends
16 with Bates ranges 937?
17 A. Yes.
18 Q. And Bratton 30(b)(6) Exhibit 13 end with
19 Bates ranges Exhibit 342?
20 A. Yes.
21 Q. And Bratton 30(b)(6) Exhibit 14 ends
22 with Bates No. 27, 027?
23 A. Yes.
24 MR. BENSINGER: Excuse me, Mr. Mougey. Were

Page 36

1 you just referring to Bratton Exhibit 14?
2 MR. MOUGEY: Bratton Exhibit 14, 30(b)(6) 14,
3 ends with Bates No. 027. Yes, sir.
4 MR. BENSINGER: The copy that you handed to me
5 ends with Bates No. 028. I have a loose sheet of
6 paper that ends in Bates No. 027, but it does not
7 have an exhibit sticker upon it.
8 MR. MOUGEY: That's the first page and the
9 loose piece of paper that does not have an exhibit
10 on it is -- if you'd just handwrite it on there for
11 me, that would be great -- that's Exhibit 14.
12 Bratton 30(b)(6) 14.
13 MR. BENSINGER: So, could you just state, so
14 the record is clear, which is the first page and
15 which is the second page of Bratton Exhibit 14.
16 MR. MOUGEY: "Handling Suspicious Orders" is
17 the title of the document, Bates No. 027, which is
18 marked as Exhibit 14, and Bates No. 28 is the
19 second page. Thank you. Okay?
20 BY MR. MOUGEY:
21 Q. Exhibit 15, Bratton 30(b)(6) 15 --
22 MR. MOUGEY: And, Peter, it looks like I have
23 a dupe. But it's 27 and 28 is the first one.
24 Bratton Exhibit 15 is also Bates No. 028.

Page 37

1 BY MR. MOUGEY:
2 Q. Do you see that, Mr. Bratton?
3 A. Yes.
4 Q. All right.
5 MR. BENSINGER: Mr. Mougey, the document that
6 you handed to me that has the exhibit sticker
7 Bratton 30(b)(6) Exhibit 15 begins with a Bates
8 No. 957.
9 MR. MOUGEY: And that mark as 16 for me.
10 MR. BENSINGER: So, the exhibit sticker on the
11 document is incorrect and I should change it?
12 MR. MOUGEY: Exactly what I just said. Why
13 don't you mark it as Exhibit 16 for me, Peter. You
14 got it? Great. Thank you. All right.
15 BY MR. MOUGEY:
16 Q. So, it looks like I have got all of the
17 exhibits in combined discovery request 2, 6 and 7
18 regarding Walgreens suspicious order monitoring
19 policies and procedures since January 1, 2006 that
20 we just went through, right?
21 A. I believe so, yes.
22 Q. Okay. Now, you have in front of you it
23 looks like four pages of a listing of specific
24 information. Is that right?

Page 38

1    A.   Yes.

2    Q.   Is that in the notebooks behind me?

3    A.   Yes.

4    Q.   Now, the 12 documents that we have just
5  gone through that are a response to suspicious
6  order monitoring policies combined discovery
7  request 2, 6 and 7, I'm assuming that at least
8  based on the stack behind me, there are
9  significantly more documents in this stack,
10  correct?

11    A.   There is additional documents in the
12  folders, yes.

13    Q.   What I was prepared to do this morning
14  is to have you walk me through Walgreens combined
15  discovery request 2 with the documents that I was
16  provided to prepare for today and have you explain
17  Walgreens' suspicious order monitoring policies and
18  procedures.

19         Are the documents that I just handed
20  you, the 12 different documents that were given to
21  me to prepare today, are those not enough to
22  provide a complete and accurate description of
23  Walgreens' suspicious order monitoring policies and
24  do I in fact need to reference the documents behind

Page 39

1  me?

2    MR. BENSINGER:  Objection; calls for a legal
3  conclusion.

4  BY THE WITNESS:

5    A.   I'm not sure.

6  BY MR. MOUGEY:

7    Q.   I mean do you need documents that are in
8  these notebooks behind me or are the 12 documents I
9  just gave you sufficient to be able to walk us
10  through?

11    A.   I think it would depend on your
12  questions.  There could be reference that I might
13  like to look at from the binders.

14    Q.   I would like for you to be able to walk
15  me through Walgreens' suspicious order monitoring
16  policies, procedures, the criteria used in those
17  throughout 2006 until the time -- point in time
18  when Walgreens stopped distributing.

19         Are the 12 documents that I've given you
20  enough for you to testify today on Walgreens'
21  position regarding its suspicious order monitoring
22  policies or do we need to use the box of documents
23  behind me?

24    MR. BENSINGER:  Objection; vague, compound.

Page 40

1  BY THE WITNESS:

2    A.   I may need to refer to the binders
3  during your questioning.

4  BY MR. MOUGEY:

5    Q.   Explain to me what you have in front of
6  you on those four sheets.

7    A.   This is a chronology of the documents
8  that are in the three binders.

9    Q.   A chronology of the documents that are
10  in the three binders.  And how many different
11  documents do you have on those four sheets, unique
12  documents?

13    A.   I'm not sure of the count.

14    Q.   Take a -- take a SWAG at it.

15    A.   Probably about 50.

16    Q.   About 50?

17    A.   Maybe more.

18    Q.   And we just went through on combined
19  responses to our discovery request in response to
20  No. 2, we went through about 12, right?

21    A.   Correct.  These are -- incorporate
22  multiple topics, but...

23    Q.   All right.  Why don't we start off with
24  the stack that I was given.  Okay.  Why don't we

Page 41

1  start off with the very first document that has the
2  Bates No. 1854 and it's titled "Handling Suspicious
3  Drug Orders."

4    A.   Okay.  It's Exhibit 5?

5    Q.   Pardon me?

6    A.   That's Exhibit 5?

7    Q.   Exhibit 5.  Thank you, yes.

8         Now, sir, explain to me what this
9  document is.  What is it?

10    A.   This was a document for the distribution
11  centers that detailed the policy regarding
12  suspicious order reporting.

13    Q.   If I look under http://snetapp on the
14  very bottom of the page.

15         Do you see that?

16    A.   I do.

17    Q.   And is that a designation off of or an
18  HTP off of Walgreens' intranet?

19    A.   I believe so.

20    Q.   And this is
21  handlingsuspiciousdrugorders.htm.

22         Do you see that, sir?

23    A.   Yes.

24    Q.   And walgreens.com/prodpublishers/dea/

Page 42

1 security/handlingsuspiciousorders.htm. Correct?
2    MR. BENSINGER: Objection.
3 BY THE WITNESS:
4    A. Yes.
5 BY MR. MOUGEY:
6    Q. And, sir, this was Walgreens' suspicious
7 order monitoring policy at least of beginning at
8 the beginning of 2006, correct, sir?
9    A. This document indicates it goes back to
10 1998, but at least 2006, yes.
11    Q. It does. You see that in the upper
12 right-hand corner where it says "Originated" --
13 upper-left hand corner, "Originated: 9/8/2008,"
14 correct?
15       Do you see that, "Originated 9/8/98"?
16    A. Oh, '98. Yes.
17    Q. Yes.
18    A. Sorry. I thought you said 2008.
19    Q. I might have. "Originated 9/8/98"?
20    A. Yes.
21    Q. But I don't have the copies from 9/8/98
22 until the revised 2/15/05. Do you see the date
23 right above it?
24    A. I do.

Page 43

1    Q. Are you familiar with what reiterations,
2 if any, there were from 9/8/98 to 2/15/05?
3    A. I don't believe we were able to -- to
4 find those documents. So, I'm not familiar with
5 them.
6    Q. So, it originated in some form and
7 fashion in '98; and the next revision we can tell,
8 at least from this document, was in 2/15/2005,
9 correct?
10    A. Correct.
11    Q. "Handling Suspicious Orders. The
12 Logistics and Planning Department sends the
13 Suspicious Control Drug Orders report to all
14 distribution centers. The report lists controlled
15 drug orders that may be of unusual size for a store
16 in its category, of unusual frequency for a store
17 in its category, deviating from a normal pattern
18 for a store in its category."
19       Do you see that?
20    A. I do.
21    Q. Okay. And this manual section is the
22 entirety, this section, of what Walgreens had in
23 place in its manual beginning in 2006, correct?
24    MR. BENSINGER: Objection; mischaracterization.

Page 44

1 BY THE WITNESS:
2    A. This document was used by the DCs in
3 conjunction with other policies and procedures that
4 they -- they had based on my interviews with them.
5 BY MR. MOUGEY:
6    Q. Because what we have in front of us, and
7 let's just continue to the next page so we have the
8 whole thing, and this next page is titled "Handling
9 Suspicious Orders and Loss of Controlled Drugs."
10       Do you see that, sir?
11    A. I do.
12    Q. And the "Policy, Distribution centers
13 must file all Suspicious Control Drug Orders
14 reports for five years. The administration manager
15 must complete the Report of Theft of Loss of
16 Controlled Substances (DEA Form 106) when any of
17 the following circumstances occur: A theft of
18 controlled drugs, no matter how small (also file a
19 police report); a substantial loss; all in-transit
20 losses or thefts as described above."
21       I didn't read everything, but does that
22 fairly capture the three bullet points?
23    A. Yes.
24    Q. Okay. Now, is there any other manual

Page 45

1 section that encapsulates Walgreens' position at
2 any point in time from 2005 to the beginning of
3 2012?
4    MR. BENSINGER: Objection; mischaracterization.
5 BY THE WITNESS:
6    A. A manual? Not that I have been able to
7 discover or find.
8 BY MR. MOUGEY:
9    Q. Not that you have been able to discover.
10 Not that anybody has shown you, correct?
11    A. Correct.
12    Q. Now, when I say "a manual," are you and
13 I on the same page? A document that encapsulates
14 the policies, procedures, governing Walgreens'
15 conduct to manage suspicious order monitoring
16 policies?
17    A. Correct.
18    Q. Now, this document that we have in front
19 of us, Bratton 30(b)(6) Exhibit 5, does not give
20 any guidance for Walgreens regarding the criteria
21 to use to identify unusual size, correct?
22    A. Correct.
23    Q. It doesn't give any guidance on what
24 constitutes unusual frequency, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    A.   Correct.

2    Q.   It doesn't give any criteria on what
3 constitutes deviating from a normal pattern,
4 correct?

5    A.   Correct.

6    Q.   It doesn't provide any thresholds,
7 correct?

8    A.   Correct.

9    Q.   Doesn't provide any parameters, correct?

10    A.   Correct.

11    Q.   Doesn't provide any definitions for any
12 of those sections, correct?

13    A.   Correct.

14    Q.   Now, it does not designate on Bratton
15 30(b)(6) Exhibit 5 whether or not suspicious orders
16 are sent to the DEA, correct?

17    A.   It does not in this page, no.

18    Q.   It doesn't in either of these two pages,
19 correct?

20    A.   Correct.

21    Q.   There is nothing in Walgreens' manual
22 about whether or not due diligence is performed
23 prior to shipment, correct?

24    A.   Not on this page, no.

Page 47

1    Q.   There is nothing in these two pages,
2 Bratton 30(b)(6) Exhibit 5, the Walgreens manual
3 that's in play as of 2/15/05, of whether due
4 diligence is performed at all on suspicious orders,
5 correct?

6    A.   Not on this document, no.

7    Q.   Can you point me to any other document
8 at Walgreens from -- that was in full force and
9 effect at the same time as Bratton Exhibit 30(b)(6)
10 5, any document, that encapsulates Walgreens'
11 policies and procedures for suspicious order
12 monitoring?

13    A.   During what time period?

14    Q.   At the time that this policy was in
15 effect in this manual section that we're looking at
16 in Bratton 30(b)(6) 5.

17    A.   So, I believe --

18    MR. BENSINGER:  Objection; mischaracterization.

19 BY THE WITNESS:

20    A.   I believe that this policy is still in
21 effect to this day, so there could be a variety of
22 documents --

23 BY MR. MOUGEY:

24    Q.   I'm not --

Page 48

1    A.   -- after the 2005 date that would
2 describe our handling of.

3    Q.   A variety of documents?

4    A.   Um-hmm.

5    Q.   And that variety of documents, is that
6 what you have in kind of a theme list or issue in
7 the four pages in front of you?

8    A.   Some of those characterize our systems
9 and policies around controlled substance order
10 monitoring.

11    Q.   If I'm an employee at Walgreens at
12 this -- from the date of this manual, 2005 on,
13 where would I go to find Walgreens' suspicious
14 order monitoring policies and procedures?

15    MR. BENSINGER:  Objection; mischaracterization.

16 BY THE WITNESS:

17    A.   I believe that those employees would
18 reach out to the relevant teams to ask about the
19 procedures.

20 BY MR. MOUGEY:

21    Q.   The relevant teams.  All right.

22      Now, there is 250,000 employees at
23 Walgreens.  Where in this manual section that's in
24 play as of '05, where does it tell me who to ask in

Page 49

1 that 250,000 people?

2    MR. BENSINGER:  Objection; mischaracterization.

3 BY THE WITNESS:

4    A.   It does not.  However, this policy
5 specifically is dealing with DC center employees,
6 so it wouldn't be relevant to all 250,000
7 employees.

8      And from my understanding, the
9 distribution center was in contact and knew the
10 teams to reach out to if they had questions.

11 BY MR. MOUGEY:

12    Q.   Oh.  So, this policy is, according to
13 your testimony today, is just for the distribution
14 centers?

15    A.   I believe so.

16    Q.   But the distribution centers, sir, what
17 was their role in suspicious order monitoring
18 policies and procedures at the point in time that
19 this manual came into play in 2005, the document we
20 have in front of you?

21    A.   What was --

22    MR. BENSINGER:  Objection.  Objection;
23 mischaracterization, vague.

24 BY THE WITNESS:

Page 50

1  A.  What was their role in producing this
2  document?  Or what was their role in --
3  BY MR. MOUGEY:
4  Q.  What was their role in Walgreens'
5  suspicious order monitoring policies and
6  procedures?
7  A.  You want me to describe the actions that
8  they took to monitor?
9  Q.  I do.  What was their role?
10  A.  Sure.  So, the distribution center staff
11  would, in early 2006, '7, at this time period,
12  would -- there was a query that they would run in
13  the mornings and they would identify orders of
14  unusual size with that query.
15  They -- the SAIL coordinators would run
16  that and, if they saw fit, would provide additional
17  details to management in the distribution center.
18  Additionally, the staff in the vault at
19  Perrysburg would be familiar with orders and so if
20  they were to see an order of unusual size or
21  quantity, they would reach out to their immediate
22  supervisor, one of which was Deb Bish, and she
23  would -- she -- in our interviews with her, she
24  indicated that if they saw an unusual order, they

Page 51

1  would reach out to the store and attempt to
2  investigate what -- why the order was of unusual
3  size and they might modify or change or delete that
4  order depending on the results of their
5  conversations.
6  Q.  What is the basis for your -- your
7  testimony?  What are you referring to?
8  A.  I am -- this is based on interviews with
9  distribution center staff.
10  Q.  So, there is no written policy or
11  procedure that you just referenced that -- that
12  process you just referenced?
13  A.  Not that I'm aware of for this time
14  period or for the 2005, '6, '7 period, no.
15  Q.  Why don't you -- let's do it this way.
16  Why don't you tell me when is the first
17  document that you have that you relied on for your
18  testimony today that, outside of Bratton 30(b)(6)
19  Exhibit 5, from January of 2006 until 12/31 of
20  2008, what written document encapsulates or
21  describes Walgreens' suspicious order monitoring
22  policy and procedures?
23  A.  One moment.
24  Some of the processes or procedures

Page 52

1  are -- are detailed in an e-mail from our -- from
2  Dwayne Piñon to DEA agent Barbara Dobric, and it
3  discusses how we were reporting at that time; and I
4  believe there was a request at that time to modify
5  the reporting to match the Chemical Handler's
6  Manual Appendix E-3.  But it discusses some of the
7  reporting we were doing at that time.
8  Q.  The only document -- can you come up
9  with anything else?
10  A.  One moment, please.
11  There's another e-mail in 2008 from
12  Dwayne Piñon to Lisa Sullivan in which they discuss
13  some of our reporting practices and monitoring
14  practices pursuant to Appendix E-3.
15  I'm sorry.  What was the end of the time
16  frame you were asking?  2008.
17  Q.  12/31/2008.
18  A.  I think that's all the documents that I
19  have in that time period.
20  Q.  So, the only thing from January 1, 2006
21  to the end of December 2008 is Bratton 30(b)(6) 5
22  that we just went through, right?
23  A.  Um-hmm.
24  Q.  And two e-mails.

Page 53

1  And you just put that notebook away.
2  Would you read those two, the Bates numbers of
3  those two e-mails.
4  A.  Sure.  Bates No. WAGMDL00387642 through
5  664 -- 645.  Ends in 645.
6  Oh, there is a -- there is an additional
7  one, WAGMDL00387646 through 7650.  And then the
8  Mapes e-mail is WAGMDL003876635 through 637.
9  Q.  So, how many documents total was that?
10  A.  I believe that's three.
11  Q.  That's three docs.
12  A.  Yeah.
13  Q.  Is that including Exhibit 5, the policy
14  section?
15  A.  No.  Four with Exhibit 5.
16  Q.  So, four with the policy section?
17  A.  Correct.
18  Q.  Three e-mails and one policy section.
19  Do I have that right?
20  A.  Correct.
21  Q.  Now, would you look through the combined
22  discovery responses that we went through, the 12
23  documents.  We have the manual.
24  A.  This is on page 6 of Response 2?

Page 54

1    Q.   Yes.
2    A.   Okay.
3    Q.   The stack that I have provided you.
4    A.   Yes.
5    Q.   What other -- which other of the three
6    e-mails you referenced are those given in response
7    to combined discovery response 2?
8        MR. BENSINGER:  Objection to form, vague.
9    BY THE WITNESS:
10       A.   So, you're asking are the Bates numbers
11   from those e-mails in the response 2?
12   BY MR. MOUGEY:
13       Q.   That's right.
14       A.   They are not.
15       Q.   They are not.  So, the response to
16   combined discovery request 2 that Walgreens was
17   ordered to produce, the suspicious order monitoring
18   systems policies and procedures since January 1,
19   2006, three of the first four documents that you've
20   referenced are not in response to that discovery
21   request, correct?
22       MR. BENSINGER:  Objection; vague.
23   BY THE WITNESS:
24       A.   My understanding is that we have

Page 55

1    provided the policies and those are listed here.
2    Additional to those policies are e-mails as
3    evidence of what we were doing at that time, which
4    are not in this, as far as I can tell.
5    BY MR. MOUGEY:
6        Q.   Well, I'm a little confused, then.  So,
7    help me out.
8        In response to Request No. 2 where we
9    ask for policies and procedures, is the only policy
10   and procedure in place at any point in time from
11   January of 2006 until Walgreens stopped
12   distributing, is the only policy and procedure
13   Bratton 30(b)(6) 5?
14       A.   Did that include -- one moment.
15       My understanding is there may be
16   additional documents that detail our -- what our
17   employees were doing at that time.  I'm not sure if
18   those are a policy or procedure.  But they -- I
19   mean, I believe they might be a procedure
20   describing, for example, later the review of CSO
21   flagged orders in the 2012 or '13 time period.
22       Q.   Are you referring to an e-mail or a
23   PowerPoint that was e-mailed around?  What are you
24   referring to, Mr. Bratton?

Page 56

1        A.   For example, the new hire documents,
2    WAGMDL00245867 that was Exhibit 12 in the Mills
3    deposition I believe describes a procedure that
4    we -- we used.
5        Q.   What you have in front of you in those
6    four sheets is in large part internal e-mails,
7    PowerPoints and internal forms giving updates and
8    changing Walgreens' suspicious order monitoring
9    system, correct?
10       MR. BENSINGER:  Objection; compound, vague.
11   BY THE WITNESS:
12       A.   To some extent, yes.
13   BY MR. MOUGEY:
14       Q.   Not to some extent.  What I'm asking you
15   for is you understand the importance of a manual or
16   a similar document encapsulating Walgreens'
17   suspicious order monitoring policies and
18   procedures, right?
19       A.   Yes.
20       Q.   And I'll just be frank with you.  The
21   problem I'm having, which is probably the same
22   problem that you've had the last two weeks spending
23   60 or 70 hours, is there is not any documents
24   laying out Walgreens' policies and procedures

Page 57

1    regarding its suspicious order monitoring policy
2    other than manual section in Bratton 5 and some
3    reiterations thereto along the way, correct?
4    That's it?
5        MR. BENSINGER:  Objection to form,
6    argumentative, mischaracterization.
7    BY THE WITNESS:
8        A.   There is no single document.  There is a
9    variety of documents that help describe the
10   practices of our -- our staff throughout time.  But
11   there is not a manual, no.
12   BY MR. MOUGEY:
13       Q.   And when I say "no single document," I'm
14   not trying to put them in a category.  What you're
15   referring to in these notebooks that we were handed
16   this morning that you've been working from the last
17   couple weeks and the notes you have in front of you
18   that you've working off of the last couple weeks,
19   those are all e-mails, forms and internal
20   PowerPoints describing the changes to Walgreens'
21   system along -- along the way, correct?
22       A.   There -- there would also be, like I
23   said, some job aids or process descriptions for
24   employees.

Page 58

1    Q.   Yes, sir.  But all in e-mails and
2  PowerPoint presentations and internal -- internal
3  memorandum, correct?
4    A.   I believe so.
5    Q.   There isn't a -- any one place to go get
6  Walgreens' suspicious order monitoring policy like
7  a manual section other than the manual section
8  referenced in Bratton 5, correct?
9    MR. BENSINGER:  Objection; mischaracterization.
10 BY THE WITNESS:
11   A.   There's no one single document, no.
12 BY MR. MOUGEY:
13   Q.   Now, I want to get all of the
14 reiterations I have of 5 in one place.  Okay.  So,
15 I'd like you to go to Bratton 30(b)(6) 14.
16   MR. MOUGEY:  Peter, I think this is the
17 document that I had -- I want to make sure you and
18 I are on the same page with the exhibit numbers and
19 the one you have front of you is the same one the
20 witness has and I have.
21   MR. BENSINGER:  Would you identify what you
22 have, Mr. Mougey, as the current Bates range of
23 Exhibit 14.
24   MR. MOUGEY:  I'm in the process of doing that.

Page 59

1  Exhibit 14 I have as Bates range 27.  I think you
2  have 27 and 28.
3    MR. BENSINGER:  Exhibit 14 is a single
4  page ending in Bates No. 027?
5    MR. MOUGEY:  Hence the 27, yes.  When I say
6  27, that means one page.  And then Exhibit 15 is
7  Bates No. 28.  That's also one page.
8    MR. BENSINGER:  Thank you.
9    MR. MOUGEY:  Got it?  All right.
10 BY MR. MOUGEY:
11   Q.   So, 27 and 28 Bates ranges are updates
12 to Walgreens' policies and procedures regarding its
13 suspicious order monitoring system, correct?
14   A.   Correct.
15   Q.   And let's start with Bratton 14, Bates
16 No. 27.
17   A.   Okay.
18   Q.   And this appears to be the same manual
19 section that we just reviewed in Bratton 5 that's
20 been updated in April of 2012, correct?
21   MR. BENSINGER:  Objection; mischaracterization.
22 BY THE WITNESS:
23   A.   So, the question is is this an updated
24 version of Exhibit 5?

Page 60

1  BY MR. MOUGEY:
2    Q.   It appears to be, yes, correct?
3    A.   Yes, yes.
4    Q.   They're both titled "Handling Suspicious
5  Drug Orders," correct?
6    A.   Correct.
7    Q.   Well, let's look at 12.  I'm sorry.
8  Exhibit 14, Bates No. 27.  And I'll read it out
9  loud.
10       "Effective calendar year 2012, the
11 Controlled Substance Order Monitoring and
12 Prevention System prevents suspicious control drugs
13 from being shipped to the stores.  In calendar year
14 2012, because of the program mentioned, suspicious
15 control drug reports are no longer generated as
16 their shipment is prevented by the system."
17       Do you see that?
18   A.   I do.
19   Q.   Did I read that right?
20   A.   Yes.
21   Q.   Let's stop right there.
22       So, from 2006, January, Bratton
23 Exhibit 30(b)(6) 5, suspicious control drug order
24 reports were sent to the distribution centers,

Page 61

1  correct?
2    A.   Correct.
3    Q.   Up until 2012 were suspicious order drug
4  reports sent to the DEA?
5    A.   My understanding is that they were --
6  the -- they were sent on disk I believe to the DEA,
7  yes.
8    Q.   And can you point to me in Exhibit 5 or
9  14 where Walgreens lays out what criteria it used
10 to identify the suspicious orders it sent to the
11 DEA?
12   A.   The criteria is not presented in these
13 exhibits, no.
14   Q.   It doesn't list it, correct?
15   A.   Correct.
16   Q.   Now, when you say "in these exhibits,"
17 the manual sections, Exhibit 5 and Exhibit 14, do
18 not give or identify the criteria for suspicious
19 order reports to the DEA, correct?
20   MR. BENSINGER:  Objection; mischaracterization.
21 BY THE WITNESS:
22   A.   The -- 4 -- excuse me.  5 and 14 don't
23 describe the method for adding the orders to the
24 report, no.

Page 62

BY MR. MOUGEY:

Q. In fact, they don't even designate or identify that suspicious orders are being sent to the DEA, correct?

A. These do not. However, based on interviews, my understanding is that our lost prevention and inventory teams were sending those to the DEA.

Q. At what point in time do you believe that Walgreens was sending what it believed were suspicious orders to the DEA starting in January of 2006?

A. My belief is, depending on the time frame, there were different criteria. However, in 2006 to 2012 that we were sending a CD that was based on the requirements in the Chemical Handler's Manual Appendix 3; and then after the new system came into effect, we changed that to orders that were identified as part of our SOMS phase 5 process.

Q. That's way down the line, right? SOMS phase 5 is implemented when?

A. 2012.

Q. 2012. Phase 5 is 2012. When in 2012?

Page 63

A. One moment. I will get the date.

Phase -- so, phase 4 was August of '12 and phase 5 was November of '12 and phase 3 was June of '12.

Q. What Bates number -- I'm sorry. Phase 3 is June of '12.

A. Yeah.

Q. What Bates number are you looking at?

A. This is WAGMDL00667940 is the page, but it's part of a document that starts at 7938.

Q. I just looked at them quickly, but is that a document that is provided to us in response to Request No. 2, the suspicious order monitoring policies and procedures beginning January 1, 2006?

So, if you go back to Bratton 4, do you see in response to 2, the document you just -- you just identified?

MR. BENSINGER: Objection; vague.

BY THE WITNESS:

A. I do not.

BY MR. MOUGEY:

Q. So, right now you've identified four -- you referred to four documents about -- I'm sorry -- five documents about Walgreens' suspicious

Page 64

order monitoring policies and procedures when you had to reference some e-mails in that document you just referenced. Four out of the five were not provided in response to the combined discovery request 2, correct?

A. Correct.

Q. Let's go back to where we started trying to get the totality of Walgreens' manual on handling suspicious orders and loss of control drugs and if you would, sir, please go to Exhibit 15.

A. Okay.

Q. Exhibit 15 is dated 4/4/2012.

Do you see that in the bottom right-hand corner?

A. I do.

Q. And you can see in the middle of the left-hand page originated in 9/8/1998. That was the same date that was on Bratton 5, correct?

A. Correct.

Q. And then revised 2/15/05, correct?

A. Correct.

Q. And then revised in 4/2 of 2012, correct?

Page 65

A. Correct.

Q. All right. So, let's go through Bratton 30(b)(6) 15.

"The distribution centers must file all suspicious control drug order reports for five years."

When it says "file," what is your understanding of what that means?

A. They would take a -- the -- when it was paper and place it in storage or the disk, they would place it into storage and retain it for recordkeeping purposes, like DEA inspections, et cetera.

Q. So, the -- do you see anything in 15 that requires that Walgreens file suspicious orders on controlled substances with the DEA other than the loss form 106?

A. This document does not describe the process that we used to report them, no.

Q. Do you have an understanding, sir, of whether or not the orders were shipped, and I'm talking about the time frame that we're looking at now, from beginning of 2006 up to this revised document Exhibit 15, of whether orders were shipped

Page 66

1 once they were flagged as suspicious but before due
2 diligence was performed?
3     A.   We were not able to find any evidence of
4 suspicious orders that were confirmed suspicious
5 that were shipped to stores.
6     Q.   Okay.  So, Walgreens didn't have any
7 suspicious orders that were shipped, is that your
8 testimony?
9     A.   Confirmed suspicious orders that were
10 shipped, we were unable to find any evidence of
11 that.
12     Q.   Keep those three documents in front of
13 you.
14     MR. BENSINGER:  Mr. Mougey, I see you are
15 searching for the next exhibit.  Would it be
16 convenient to take our first break at this time
17 while you organize?
18     MR. MOUGEY:  I have it in my hand, but I
19 appreciate if you'd like to take a break, we can.
20 I have it in my hand.  I just wanted to see what
21 number to name it.  So, if you would like a break,
22 let me know but I am fine.
23     MR. BENSINGER:  Why don't we take a short
24 break.  We have been going about an hour, and we

Page 67

1 can resume quickly.
2     MR. MOUGEY:  Five minutes okay?
3     MR. BENSINGER:  Yes.
4     MR. MOUGEY:  Okay.
5     THE VIDEOGRAPHER:  We are off the record at
6 10:10 a.m.
7         (WHEREUPON, a recess was had
8             from 10:10 to 10:21 a.m.)
9     THE VIDEOGRAPHER:  We are back on the record
10 at 10:21 a.m.
11 BY MR. MOUGEY:
12     Q.   So, Mr. Bratton, those four sheets that
13 you have in front of you there, those are the first
14 pages of these -- of the two boxes of notebooks
15 I've been given this morning, right?
16     A.   This is a compilation of the pages that
17 are -- the chronologies that are in each one of
18 those binders.
19     Q.   All right.  And Topics 1(a) through
20 1(n), along with 17, 18, 20, 21 and 22, you would
21 agree with me that that all -- that encompasses
22 suspicious order monitoring policies, correct?
23     A.   There is some overlap, but yes.
24     Q.   So, I have three notebooks of the

Page 68

1 suspicious order monitoring policies.  You see that
2 here in front of me, right?
3     A.   Yes.
4     Q.   So, if you go back to combined discovery
5 request 4, we ask for the policies and I was given
6 12 documents, right?
7     A.   Yes.
8     Q.   You would agree with me that there is --
9 what do you want to say? -- 100 documents in front
10 of me in these three notebooks?
11     A.   Some -- some number, yeah, close to
12 that.
13     Q.   You've been working with these three
14 notebooks, amongst others, over the last two weeks
15 in that 60, 70 hours you've been preparing to get a
16 command of what Walgreens' policies and procedures
17 were for its suspicious order monitoring system,
18 correct, sir?
19     A.   Correct.
20     Q.   Is what you have in front of you the
21 same description of what I have in front of me?
22         I'm going to hand you a page and you can
23 tell me if it's the same as to what -- as what you
24 have.

Page 69

1     A.   So, this -- what you have is the
2 chronology of that binder.  This chronology --
3 which I also have in my copy.  But this chronology
4 is a composite of all three of the binders.
5     Q.   Okay.  Are the -- and I'm not asking
6 locations.  Obviously you have yours in front of
7 you and I have mine in the notebook.
8         Is the content of what you have in front
9 of you the same that I have that was given to me
10 this morning?
11     A.   This is compiled from the chronologies
12 that you and I both have in the binders.
13     Q.   Clean answer is yes, right?
14     A.   Yes.
15     Q.   Let me see that back.
16         And you've been working off of that
17 document universe to identify Walgreens' suspicious
18 order monitoring policies over the last two weeks?
19     A.   Correct.
20     MR. MOUGEY:  I have a real problem with this.
21 Special Master Cohen, we have been asking and
22 asking and asking for Walgreens' suspicious order
23 monitoring policies, policies, procedures, every
24 which way I can think of.

Page 70

1    I have spent, Ms. Poerschke and I and
2  our team have spent hundreds and hundreds of hours
3  going through e-mails, policies -- I'm sorry --
4  e-mails, memos, PowerPoints because there is no
5  central place to go figure out what these are.
6    You were told in a request for an
7  extension to 12/21 in response to Request No. 2 and
8  the others we need more time.
9    To walk in this morning and find out
10  that for two weeks we've had an assimilation of
11  what they believe are the important documents
12  responsive to these requests, have charts, have
13  them taped into manila folders, all laying this out
14  and have had them put together for two weeks but
15  yet telling you they are not ready and never
16  supplementing these requests, I have 12 documents.
17    Now, we've spent hundreds of hours
18  trying to duplicate what they're doing, but it sure
19  would have been nice.  I don't have the benefit of
20  sitting down and interviewing these 15 or 20 people
21  to help me do that.  As you've just heard from
22  Mr. Bratton, he had to go interview people to
23  figure out what this stuff was.
24    The fact that they've had these for two

Page 71

1  weeks and we don't have them today and so when I
2  took a break, I -- what is my ask?
3    And to sit here and take this deposition
4  today knowing that they have had all this organized
5  and if I go to their system here, if I shift to
6  their notebooks, none of this is marked up.  I
7  don't have them highlighted, flagged.  I don't --
8  and I have a different subset.
9    So, what I ask that we do is let me get
10  an understanding, 30,000-foot view from now until
11  lunch, and then give me 48 hours to look through
12  these documents and let me go back and redo this
13  again on Tuesday of this week and go through the
14  documents that they have had for two weeks and the
15  same benefit that they've had.
16    They were ordered to produce this.  They
17  said they couldn't do it.  They asked for more
18  time, and then to walk in this morning and find out
19  they do it have done and didn't give it to us is
20  and exemplifies the frustration that we have been
21  going through over the last 90 days.
22    I'm just taken aback, to be honest with
23  you.  I am biting my tongue not to get more
24  frustrated, but I just -- I'm exhausted.  It's

Page 72

1  Sunday.  We have sat here and to find out they have
2  all this done is just infuriating.
3    So, my ask is let me finish a
4  30,000-foot view so I have a general understanding
5  of where we're going.  We'll finish around
6  lunchtime, and let me come back Tuesday and finish
7  with all of these organization that they have that
8  didn't provide to us.  That seems like a fair way
9  to do it.  And I will spend the rest of the day
10  today and Monday getting ready for Tuesday.
11    SPECIAL MASTER COHEN:  Do you want to respond?
12    MR. BENSINGER:  We prepared our witness for a
13  30(b)(6) deposition, discharging our duty of
14  preparation.
15    To assist the witness in answering
16  Mr. Mougey's questions, we prepared the chronology
17  as a resource to the witness, which refers to
18  documents, which as a courtesy we provided to
19  Mr. Mougey because we anticipated that the 30(b)(6)
20  witness in responding to questions may wish to
21  refer to corporate knowledge that is in the
22  documents in his binders.
23    All of the documents in the binders have
24  been produced in the case.  The fact that the

Page 73

1  witness interviewed certain Walgreens personnel,
2  it's entirely appropriate, foreseeable and the
3  30(b)(6) deposition is an opportunity for the
4  Plaintiff to determine the basis of our 30(b)(6)
5  designee's answers to questions Mr. Mougey has
6  prepared and some of those answers will be based
7  upon information learned in the interviews as
8  opposed to corporate knowledge reflected in the
9  documentation.
10    So, we are here prepared to answer the
11  questions that Mr. Mougey walked in with.
12    The witness has also made clear the
13  binders contain e-mails, they contain PowerPoints,
14  they contain in certain instances statements that
15  are policies, some of which have been identified in
16  the earlier Walgreens response to the
17  Interrogatory, and it's my understanding we have
18  been granted until December 21 to supplement the
19  responses.
20    That supplementation will include
21  certain documents we just identified which are
22  responsive but of which we either weren't aware
23  before or have since discovered.
24    And, so, we are prepared to continue

Page 74

1 today to answer questions.
2    SPECIAL MASTER COHEN: Can I see the manila
3 folder for just a minute?
4    MR. BENSINGER: I'm handing to Special Master
5 Cohen two manila folders that have four letter-size
6 pages which constitute the composite chronology to
7 which the witness has referred.
8        And, Special Master, the purpose of the
9 chronology was to enable our witness in responding
10 to a question from Mr. Mougey to readily be able to
11 identify whether there is corporate knowledge in a
12 particular document that's already been produced in
13 the case so that he could save time in responding
14 to counsel's questions.
15    SPECIAL MASTER COHEN: Can I ask what the
16 letters next to the dates D, A and S mean?
17    MR. BENSINGER: This document has three
18 columns. It begins with the date. The second
19 column has designations A, D or S, generally
20 indicating whether the document relates to the
21 issue of audits for the A, D refers to DEA
22 interactions and S refers to suspicious order
23 monitoring policies or procedures or practices.
24        So, it's a shorthand to enable the

Page 75

1 witness to determine where in the binder a
2 particular document is located.
3    MR. MOUGEY: Special Master Cohen, the step
4 that's obviously missing from this is that they
5 were ordered to produce exactly what's done in
6 front of them and told you that it wasn't ready and
7 they couldn't do it.
8        That's the problem that they failed to
9 see is that the witness has just testified that
10 he's been using these for two weeks all the while
11 telling you and us they weren't ready when in fact
12 they were.
13        And so to come in today -- that's
14 what -- to come in today and have -- you know how
15 long we have been asking for simple straight
16 answers to these so we could get organized.
17        And to have these 12 documents
18 responsive and to come in and find out that they
19 have this all organized, after telling you and I
20 that they don't and can't do it and want to 12/21,
21 yes, they told you I will get it to you on 12/21.
22 That assumes that they don't have all of this done
23 and just haven't produced it.
24        And this is -- this is just an example

Page 76

1 of what we have been dealing with since the
2 inception of this litigation and, quite frankly,
3 it's unfair and it is gamesmanship around the order
4 and they told you and Judge Polster, asked for an
5 extension and they are done. It's in large part
6 done.
7        Now, if they walked in this morning and
8 said, "Peter, I have these three documents that we
9 discovered finalizing our preparation in response
10 to this," I wouldn't say a word. We could go read
11 the docs on a break.
12        To walk in and say here's hundreds of
13 documents as opposed to the 12 we gave you, that's
14 not right, and to tell you that they couldn't do it
15 and in fact it's done sitting here.
16    MR. BENSINGER: May I reply?
17    SPECIAL MASTER COHEN: Yes.
18    MR. BENSINGER: Mr. Mougey has implied that
19 Walgreens has sat upon these chronologies in these
20 binders, effectively ambushing him at the last
21 minute. I represent that's not true.
22        For the last two weeks we have worked
23 hard with our witness to identify information
24 capturing corporate knowledge that the witness does

Page 77

1 not have based on personal knowledge, as he
2 attested earlier this morning.
3        The composite chronology we created at
4 the witness' request as an aid to enable him to
5 more readily find information that both the legal
6 team and Mr. Bratton identified as likely resources
7 for his to respond to questions.
8        So, I just want to clarify it is not the
9 case that Walgreens counsel or the witness have had
10 this material available, have sat upon it.
11        We have been duly diligent in
12 discharging our duty to prepare and have assembled
13 these materials throughout this two-week period
14 since the witness' fact deposition individually in
15 order to put him in a position to fairly respond to
16 questions about the state of Walgreens' corporate
17 knowledge.
18    SPECIAL MASTER COHEN: So, of the documents
19 that are listed in the two manila folders, have all
20 of them been produced already to Plaintiffs?
21    MR. BENSINGER: Yes.
22    SPECIAL MASTER COHEN: Have all of them been
23 identified when they were produced as responsive to
24 Interrogatory that asks for suspicious orders?

Page 78

1    MR. BENSINGER: I don't know the answer to
2  that question. I can inquire. I don't know the
3  answer to that.
4    MR. MOUGEY: I do. And the answer is easy.
5  There is 12 that they identified. That's it. And
6  those are the ones that we walked through this
7  morning and provided to Mr. Bratton and Mr. Bratton
8  testified that he's been using this set of
9  documents for two weeks to get prepared.
10    And I'm not implying that it's an
11  ambush. I'm saying this is an ambush, to walk in
12  this morning after asking for these for months and
13  being told no, we can't do it, no, it's a simple
14  search.
15    If I could give you how many times this
16  firm has told us just to run Google search -- I'm
17  sorry -- run simple searches in the discovery, that
18  it's right there, and to come in and find out that
19  they have been putting -- it's easy, just run a
20  simple search.
21    And to come in and find out that they
22  have four single-spaced pages of documents
23  organized responsive to combined discovery request
24  2, after telling you they couldn't do it, they told

Page 79

1  you, Special Master Cohen, "We can't do it, we need
2  more time," the proof is in the pudding. It's
3  done. It's done.
4    And they walk in here today and say this
5  isn't an ambush? They told you they can't do it.
6  It's finished. And to walk in and hand us three
7  boxes, two boxes with binders today, I don't know
8  how you can even say it with a straight face. I'd
9  be embarrassed.
10    SPECIAL MASTER COHEN: I think what you need
11  to do is to pick up with your questioning and see
12  what you can come to understand by noon and then
13  we'll see where we are.
14    MR. MOUGEY: Sounds good. Thank you.
15  BY MR. MOUGEY:
16    Q.  I've given you the 12 documents that I
17  was given. These are the tools I was given to take
18  this deposition today in response to Request No. 2.
19  Okay.
20    What I would like for you and I to do is
21  I would like to, from a 30,000-foot view, put
22  together a chart that you and I are working on and
23  I'm going to handwrite in and build out what is in
24  that four pages in front of you that you've been

Page 80

1  working with the last two weeks. Okay.
2    So, I'm going to take a clean sheet of
3  typing paper, and I want you to help me build out a
4  chart showing what Walgreens' suspicious order
5  monitoring policies are.
6    And I'm also, to help us, going to pass
7  you what I have -- what's the last exhibit?
8    MS. GARLOCK: 17 is the next.
9  BY MR. MOUGEY:
10    Q.  I'm going to hand you what P-WAG-0037
11  that we are going to mark as Bratton 17 to help
12  with this process.
13    (WHEREUPON, a certain document was
14    marked as Bratton 30(b)(6) Exhibit
15    No. 17:  Flow chart; P-WAG-0037.)
16  BY MR. MOUGEY:
17    Q.  What I'm handing you now is a chart to
18  help facilitate conversation. Okay? May look
19  familiar to some of us.
20    So, I want you to keep 17 handy, and you
21  and I are going to put together this chart; and I
22  want you to -- my handwriting is terrible, so I
23  want you to help me with the language and make sure
24  that I have accurately what you said, because at

Page 81

1  the end I want to introduce this chart as an
2  exhibit to give us kind of a 30,000-foot view of
3  what Walgreens' suspicious order monitoring
4  policies were and how they changed over time.
5  Okay?
6    So, the first column I'm going to have
7  is the date range. All right. And I'm going to
8  make this as easy as I can for you.
9    I want you to compartmentalize periods
10  of time of when Walgreens' suspicious order
11  monitoring policies and procedures stayed the same
12  and then walk me across whether due diligence was
13  performed, whether the orders were held prior to
14  being shipped -- I'm sorry -- were held prior to
15  performing due diligence and which department was
16  responsible.
17    So, I'm going to have you help me build
18  this chart across the -- the top of this page.
19  Okay?
20    A.  Okay.
21    Q.  So, what is the period of time,
22  beginning in January of '06, when is the ending
23  period for a compartmentalization of when
24  Walgreens' suspicious order monitoring policies and

Page 82

1 procedures remained almost the same?
2     MR. BENSINGER: Objection; vague.
3 BY THE WITNESS:
4     A.   Can you restate the date range, please.
5     MR. MOUGEY: And I will tell you what. If we
6 could just have "Objection to form," that would be
7 fantastic. I think that's been more than easy to
8 do and just "Objection to the form" would be much
9 appreciated.
10 BY MR. MOUGEY:
11    Q.   So I'm sorry. You said --
12    MR. BENSINGER: Mr. Mougey.
13 BY MR. MOUGEY:
14    Q.   -- you couldn't answer the question?
15    A.   I was asking you during what time period
16 you were referring to.
17    Q.   I'm asking you to tell me. Okay.
18        You tell me what time period you want to
19 start with beginning January of '06 until when that
20 Walgreens' policies and procedures for its
21 suspicious order monitoring process stayed almost
22 the same.
23    MR. BENSINGER: Objection; vague.
24    MR. MOUGEY: Please just object to the form.

Page 83

1 I do not --
2     SPECIAL MASTER COHEN: He can say "vague."
3     MR. BENSINGER: Mr. Mougey.
4     SPECIAL MASTER COHEN: You don't need to talk
5 to each other. You can say "vague." You can
6 ignore it.
7 BY THE WITNESS:
8     A.   So, there's a variety of processes and
9 procedures that have existed at different times.
10        So, the first one that I would say has
11 existed the longest and continues to exist is the
12 excessive quantity query and that's a query that
13 the DCs would run, the SAIL coordinator at the DC;
14 and based on interviews, that goes at least as far
15 back as the year 2000 but definitely 2006.
16 BY MR. MOUGEY:
17    Q.   All right. We'll call that excessive
18 queries?
19    A.   Quantity queries, yes.
20    Q.   And those were performed by the DC?
21    A.   That is my understanding.
22    Q.   Which role at the DC?
23    A.   The SAIL coordinator.
24    Q.   S-A-I-L, correct?

Page 84

1     A.   Yes.
2     Q.   And throughout the entire period of
3 time, from '06 to when?
4     A.   Continues today but not for controlled
5 substances obviously.
6     Q.   '06 to the current?
7     A.   Correct.
8     Q.   Fair?
9     A.   That's my understanding at this time.
10    Q.   Okay. And what was the criteria for the
11 excessive quantity criterias -- queries?
12    A.   So, it would look at line numbers in
13 orders and the parameters of which were adjustable
14 by the DC. They didn't -- and then they would run
15 that and if it was above the query that they set or
16 quantity that they set, the order would be flagged
17 and it would generate on a report.
18    Q.   What's the responsibility of a SAIL
19 coordinator?
20    A.   I don't know all of the responsibilities
21 of a SAIL coordinator; but as it relates to this,
22 they would run the report and review it. That's my
23 understanding.
24    Q.   So, let's go back to what the criteria

Page 85

1 or the parameters were. They would look at line
2 numbers in orders. What do you mean by that?
3     A.   Line items. So, a line would be a
4 particular product, its description, a quantity
5 that was ordered for that store.
6     Q.   What would they look at?
7     A.   If it exceeded a quantity that they set
8 in the query, they would then investigate or look
9 at those orders.
10    Q.   And what was the basis for the quantity
11 that they set in the criteria?
12    A.   They did not. Based on my interviews,
13 it was difficult to ascertain what that was. As
14 best as I can describe it as what they thought was
15 normal or customary.
16    Q.   So, Walgreens did not provide any
17 guidance to the DC SAIL coordinators about what
18 number of orders was abnormal or suspicious?
19    A.   Not that we --
20    MR. BENSINGER: Objection. Permit me to
21 object. Objection; vague.
22 BY THE WITNESS:
23    A.   Not that we have been able to ascertain.
24 BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   Q.   Did you -- how many hours did you spend
2   interviewing the DC SAIL coordinators?
3   A.   We weren't able to interview a SAIL
4   coordinator that worked during that time frame.  We
5   did speak to folks that they reported to or other
6   folks at the DC that would have had knowledge of
7   that process.
8   Q.   You didn't speak to anyone that actually
9   ran the queries?
10   A.   Not at the time that we were dispensing
11   controls.
12   Q.   Do you have examples of what some of the
13   criteria was to use the criterias to -- criteria to
14   identify suspicious orders?
15   A.   We had a conversation with Mr. Peterson
16   who described to us when -- he designed or wrote
17   this query initially and he gave us an overview of
18   what it might have looked like and what parameters
19   they might set, but that...
20   Q.   In the two boxes that we were just given
21   is a list of Walgreens employees interviewed.  So,
22   who did you interview that told you what the
23   process was in the distribution centers on this
24   list?

Page 87

1   A.   So, Doug Peterson described the query
2   that he authored for them.  I then spoke with --
3   let's see.  Deb Bish.
4   Q.   I'm sorry.  Deb who?
5   A.   Bish.
6   Q.   Oh.  Bish.  Okay.
7   A.   Jen Diebert, Justin Joseph.
8   Q.   I'm going to need you to go slower.  Who
9   is the next one, Diebert?
10   A.   Diebert, yes.
11   Q.   Okay.
12   A.   Justin Joseph and I believe Steve
13   Kneller.
14   Q.   Kneller with a?
15   A.   K.
16   Q.   So, I have Deb Bish, Jen Diebert, Justin
17   Joseph, Steve Kneller and Doug Peterson are the
18   people you interviewed that were familiar with what
19   queries were run?
20   A.   With the excessive quantity query.
21   Q.   Is there any other query that was being
22   run by the DC distribution centers to detect
23   suspicious order monitoring policies or procedures?
24   A.   Not that they were running, no.

Page 88

1   Q.   The five people you just mentioned, they
2   all have personal knowledge of the types of queries
3   the SAIL coordinators were running?
4   A.   I don't know -- they had knowledge of
5   the process.  I don't know if they knew about the
6   query itself.  But they -- they confirmed for us
7   that this was something that the SAIL coordinators
8   did.
9   Q.   That they had heard from somebody else
10   that they did?
11   A.   I believe Deb had more direct knowledge
12   because she was managing the SAIL coordinators, if
13   I'm recalling correctly.
14   Q.   And I believe that you mentioned that
15   there was code or something was written that was
16   used for the query.  Did I get that right?
17   A.   Correct.
18   Q.   And who wrote the code?
19   A.   Doug.  Doug Peterson.
20   Q.   Okay.  And in preparation for your
21   testimony today, do you know what the criteria was
22   to write -- for that query?
23   A.   I do not.
24   Q.   You don't know?

Page 89

1   A.   We were unable to ascertain.  My
2   understanding is that they could change that.  So,
3   you know, it could have varied over time.  But we
4   don't -- we don't know what they were running.  It
5   was not stored.
6   Q.   In your preparation for your testimony
7   today to explain Walgreens' past/present suspicious
8   order monitoring system, you are pointing to the
9   excessive quantity query run at the distribution
10   centers as one of the tools used, correct, sir?
11   A.   That's one of our monitoring processes.
12   Q.   And, sir, you recognize that topic (a)
13   in the first notice of 30(b)(6) deposition is your
14   responsibility to understand the past and present
15   suspicious order monitoring system, SOMS program,
16   policies and procedures, correct, sir?
17   A.   Correct.
18   Q.   And you would agree with me, sir, that
19   from '06 to the current, one of the tools that
20   you've identified was the excessive quantity
21   queries, and you are unable today to explain what
22   the formula used to run that query, correct, sir?
23   A.   Well, the formula would be that if the
24   line items quantity exceeded a number, it would be

Page 90

1  flagged on the report that morning.
2      Q.   Right.  But you don't know, after your
3  60, 70 hours of preparation over the last two
4  weeks, you were unable to ascertain the number on
5  the very first tool you identified, the excessive
6  quantity query, you don't know what the formula for
7  that query is, right?  Just that it exceeded some
8  number, right?
9      A.   Well, we know --
10     MR. BENSINGER:  Objection; argumentative.
11 BY THE WITNESS:
12     A.   We are aware of the formula.  We don't
13 know the parameter that the DCs would have used
14 each day to run that.
15 BY MR. MOUGEY:
16     Q.   Your knowledge of the formula is that it
17 exceeds a certain line item, correct?
18     A.   Yeah.
19     Q.   That is the extent of your knowledge of
20 the formula for the excessive quantity query is
21 that it just exceeds X.  Do I have that accurate?
22     A.   Correct.
23     Q.   You have no idea as a result of your
24 preparations for today what the formula is or what

Page 91

1  was used by the SAIL coordinators in the
2  distribution centers to identify suspicious orders
3  that were defined by excessive?
4      A.   We are not able to determine what the
5  number was that they used in that formula.
6      Q.   So, the easy answer to my question is
7  yes, I don't know what the formula that was used to
8  identify suspicious orders based on excessive line
9  quantity at the distribution center, right?
10     MR. BENSINGER:  Objection; mischaracterization.
11 BY THE WITNESS:
12     A.   If the formula -- the formula was if the
13 quantity is greater than X, it would be flagged.
14 The value that they used for X I do not know.
15 BY MR. MOUGEY:
16     Q.   Now, let's keep going with that process
17 with the excessive quantity query.
18         So, the formula that we don't know what
19 it is, if an order is triggered, what happens next?
20     MR. BENSINGER:  Objection; mischaracterization.
21 BY THE WITNESS:
22     A.   So, if an order were to appear as a
23 result of running the excessive quantity query, the
24 SAIL coordinator would investigate or escalate that

Page 92

1  to one of the other managers within the facility
2  who would then try to understand why the store was
3  ordering that quantity.
4  BY MR. MOUGEY:
5      Q.   And, sir, you would agree with me that
6  the orders that appeared based on the excessive
7  quantity queries were suspicious reports,
8  suspicious orders?
9      A.   They were possibly suspicious orders.
10     Q.   And was due diligence performed on those
11 possibly suspicious orders before they were
12 shipped?
13     A.   My understanding from interviewing the
14 DC staff is that they would investigate why the
15 store had placed that quantity before shipping the
16 order.
17     Q.   So, let's go to the chart that I have in
18 front of you with the -- not the one I have on the
19 Elmo, but the one that's in front of you.  Help me
20 out with what exhibit number that is.
21     A.   17 it is marked.
22     Q.   All right.  So, we're at the very top
23 of -- we're at the very top of this page, "Order
24 Received."  Okay.

Page 93

1          It goes into the distribution centers.
2  "Is order suspicious?  Yes.  No."  You following
3  me?
4      A.   Um-hmm.
5      Q.   Do you agree with this decision tree
6  that if an order is suspicious, it wasn't shipped?
7      MR. BENSINGER:  Objection; vague.
8  BY THE WITNESS:
9      A.   I'm sorry.  You said if the order isn't
10 suspicious it wasn't shipped?
11 BY MR. MOUGEY:
12     Q.   Let's do it through this chart.  You see
13 the order is received at the very top, correct?
14     A.   Correct.
15     Q.   And -- so, an order comes in.  Let's
16 just realtime it at a pharmacy.  Pharmacist types
17 in an order in one of the pharmacies, correct?
18     A.   Well, the orders placed at the pharmacy
19 would release from the system at a specified time,
20 but at the end of the day they would transmit to
21 the DC.
22     Q.   But they originated with the pharmacist,
23 correct?
24     A.   They could be a system-recommended order

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 or a pharmacist-generated order.
2    Q.    And those orders then would go to the
3 DC, correct, distribution center?
4    A.    Correct.
5    Q.    And the excessive quantity query is run
6 on the orders that were received on a daily basis?
7    A.    My understanding from the interviews
8 that I conducted is that the orders for the
9 previous evening, before they were picked, in the
10 morning they would run this query to determine if
11 there was anything on that report that they needed
12 to address.
13    Q.    And do you have or can you point me to
14 any examples of those reports, the excessive
15 quantity query?
16    A.    I do not have a document that shows
17 those, no.
18    Q.    So, that query is being run from '06 to
19 the current, correct?
20    A.    Correct.
21    Q.    And no one can find one copy or an
22 example of that excessive quantity query?
23    A.    I'm not sure that it produces -- I'm not
24 sure that it produces a deliverable.  It displays

Page 95

1 results on the screen that they then go address.
2 So, I don't know that they're printing it out and
3 walking around with it.
4    Q.    I'm not asking you if they are walking
5 around with it.  You understand that they can be
6 saved on a computer or on a hard drive or a shared
7 drive or anything along those lines, right?
8    A.    I understand they could be.  I don't
9 know that they are saving them is my -- what I'm
10 saying.
11    Q.    In any shape, form or fashion, no one
12 could produce, electronically, paper, an example of
13 one of these reports being generated?
14    A.    Not that we were able to find.
15    Q.    And they're still being run until today.
16 You said to the current time?
17    A.    Correct.  So, we could run one, but it
18 would only be for regular drugs at this point.
19    Q.    So, preparing yourself for this today to
20 understand what the formula was, you or someone at
21 your direction could have run one of these reports
22 to figure out what the formula was, correct?
23    MR. BENSINGER:  Objection; mischaracterization.
24 BY THE WITNESS:

Page 96

1    A.    We could determine the value -- again,
2 we know the formula.  We could determine the value
3 used by the DC today for orders that they were
4 shipping today, yes.
5 BY MR. MOUGEY:
6    Q.    Sir, you don't know the formula.  You
7 just know greater than X.  When you say "I know the
8 formula," your definition of "know the formula,"
9 your definition of being prepared today is I know
10 excessive quantity report was more than X.  Is
11 that -- I'm not mischaracterizing that, correct?
12    A.    I would characterize that as a formula,
13 yes.
14    Q.    More than X?
15    A.    Correct.
16    Q.    I don't know if it's 90 times more than
17 X, 1.5 times more than X.  We don't know, right?
18    A.    Because it's adjustable by the staff at
19 the DC, we do not know the value.
20    Q.    We don't even know what X is really,
21 right?  We don't know if it's based on one week.
22 We don't know if it's based on four weeks.  We
23 don't know if it's a based on a quarter.  We don't
24 know if it's 26.  We don't know if it's 52 weeks.

Page 97

1 Right?
2    A.    It would be the orders for the work in
3 progress that morning.  So, it would be orders that
4 are pending to be picked that day.
5    Q.    So, X is out of this batch of docs, are
6 there any big ones?  Out of this batch of orders
7 are there any large ones?
8    A.    Correct.
9    Q.    And is it more than X?
10    A.    Correct.
11    Q.    So, it just depends on any given day
12 what the universe of those orders is, correct?
13    A.    Correct.
14    Q.    And yet these are still being run as we
15 sit here today, yet you didn't ask anyone to pull
16 one of those so you could figure out what greater
17 than X was, correct?
18    A.    We did not ask for one to be pulled on
19 the basis that we -- that doesn't establish the
20 quantity that they would have used in the formula
21 at the time that we were shipping controlled
22 substances from our DCs.  So, no, we didn't ask
23 them.
24    Q.    And you could not find anything, past,

Page 98

1 present, identifying what those formulas were in
2 any form of a manual or operations guide or
3 anything along those lines, right?
4     A.   Not that we have been able to uncover,
5 no.
6     Q.   Did you reach out to any of the former
7 distribution SAIL coordinators to ask them?
8     A.   We spoke with Deb Bish who managed that
9 function in Perrysburg. We talked to her about it,
10 but she was not able to recall what the value was
11 that they would have used.
12    Q.   And that's a little different than the
13 question I asked. I didn't ask if you spoke to
14 anyone that managed them.
15         I asked you did you reach out to any of
16 the former distribution SAIL -- distribution center
17 SAIL coordinators to ascertain the information
18 about what formula, what the specific formula was?
19    A.   There was -- Deb had -- there was an
20 employee that worked at the time when we were
21 shipping controls from that facility, and Deb tried
22 to contact her but when she did, Deb informed us
23 that that employee didn't have any knowledge of or
24 recollection of what the values were in that query.

Page 99

1     Q.   So, we don't know what the formula. We
2 don't have any examples and there is no written
3 guidance. Correct?
4     MR. BENSINGER: Objection.
5 BY MR. MOUGEY:
6     Q.   Did I get that all right?
7     MR. BENSINGER: Objection; mischaracterization,
8 compound.
9 BY THE WITNESS:
10    A.   Again, if we know that it's greater than
11 X, we don't know the value that they plugged into
12 that formula, but -- there is no written documents.
13 BY MR. MOUGEY:
14    Q.   Let me do that one more time to make
15 sure I get the complete answer.
16         What I asked you was we don't have any
17 examples, correct?
18    A.   Correct.
19    Q.   We don't have the formula for the
20 excessive quantity query, correct, the specific
21 formula?
22    A.   We don't know --
23    MR. BENSINGER: Objection.
24    THE WITNESS: Sorry, Pete.

Page 100

1 BY THE WITNESS:
2     A.   We don't know the value that they used
3 in the formula at that time, no.
4 BY MR. MOUGEY:
5     Q.   And we don't have any manual or
6 operation, guidance or anything from Walgreens
7 giving the DC SAIL coordinators about what to use
8 or how to run the query?
9     A.   Not that the folks we interviewed could
10 recall, no.
11    Q.   Let's go back to the code that you said
12 that was written. What kind of code was written if
13 there was no built-in formula?
14    A.   So, it would be a SQL query that they
15 would run on the ordering system and there would be
16 a parameter, a value, again, that they could
17 update.
18    Q.   And the DC SAIL coordinators could
19 change that as they saw fit?
20    A.   Correct.
21    Q.   And you couldn't find any training
22 material used for any of the SAIL coordinators when
23 making a decision about what the formula was?
24    A.   My understanding of the training of the

Page 101

1 SAIL coordinators is as we brought new DCs online,
2 they would go shadow another SAIL coordinator at
3 another facility, but they -- we weren't able to
4 find any documents regarding that training.
5     Q.   Can you point me to any due diligence
6 files at any point in time that the excessive
7 quantity query was being run as to what the SAIL
8 coordinators were doing?
9     MR. BENSINGER: Objection; vague.
10 BY THE WITNESS:
11    A.   We were not able to find any files that
12 details the due diligence related to the excessive
13 quantity query.
14 BY MR. MOUGEY:
15    Q.   Let me go to (h) on Bratton Exhibit 2,
16 which is "Your past/present policies and procedures
17 related to due diligence following the detection of
18 a suspicious order."
19         Did I read that right? Do you have it
20 in front of you?
21    A.   This is page 6.
22    Q.   Page 6.
23    A.   A?
24    Q.   H as in --

Page 102

1    A.   H as in Henry.

2    Q.   -- Henry.

3         "Your past/present policies and

4    procedures related to due diligence following the

5    detection of a suspicious order."

6         Did I read that right?

7    A.   Yes.

8    Q.   And your testimony is that the excessive

9    quantity query run by the DC, if an order was

10   flagged, the SAIL coordinator would perform due

11   diligence, correct?

12   A.   That's what they describe to me, yes.

13   Q.   But you have not spoken to anyone that

14   had firsthand knowledge of that actually being

15   done, correct?

16   A.   There were folks from the DCs that were

17   familiar with the process and told me that that's

18   what was done.

19   Q.   None of the people that you spoke with

20   that are still at Walgreens were the individuals

21   responsible for actually performing the due

22   diligence, correct?

23   A.   Correct.

24   Q.   Now, were you able to identify any

Page 103

1    policies or procedures related to the type of due

2    diligence that the SAIL coordinators were supposed

3    to be performing on orders that were flagged in

4    response to the excessive quantity query?

5    A.   The procedure described to me by the

6    folks we interviewed was that they would call the

7    store and discuss the order with the store in an

8    attempt to determine if it was appropriate.

9    Q.   The question I asked you was a little

10   different.  The question I asked you -- well, I

11   guess I said policies or procedures.  I didn't say

12   in writing.  So, let me do it that way.

13        Were you able to identify any written

14   policies or procedures related to the type of due

15   diligence that the SAIL coordinators were supposed

16   to be performing on orders that were flagged in

17   response to the excessive quantity query?

18   A.   No.

19   Q.   What I just wrote down on our chart is

20   "Policies and procedures written," and the answer

21   is no, correct?

22   A.   Correct.

23   Q.   So, "'06 to current, excessive quantity

24   queries, the DC SAIL coordinator."  I got that

Page 104

1    right so far, right?

2         The specific criteria is "Line item,

3    what they thought was normal."  Do I have that

4    right?

5    A.   Yes.

6    Q.   But "Don't know specific formula."  Is

7    that accurate?

8    A.   Correct.

9    Q.   Okay.

10        MR. BENSINGER:  Objection; mischaracterization.

11   BY MR. MOUGEY:

12   Q.   "Possible suspicious orders" is next and

13   the answer is yes, correct?

14   A.   I'm sorry.  So, possible suspicious --

15   that we've discovered possibly suspicious orders --

16   Q.   Yes.

17   A.   -- using this process?  Yes.

18   Q.   And your testimony is that due diligence

19   was performed on those -- on those orders based on

20   your getting prepared today and interviewing these

21   witnesses, correct?

22   A.   Correct.

23   Q.   Yet you can't find any policy or

24   procedures that were -- that were written, correct,

Page 105

1    sir?

2    A.   Correct.

3    Q.   Now, you had policies and procedures

4    that were verbally described, correct?

5    A.   They were described to me verbally.

6    Q.   And what were those?

7    A.   That they would run the query each

8    morning, identify orders and then escalate or

9    investigate those.

10   Q.   And they would call the pharmacy?

11   A.   That's what was described to me.  They

12   would call the store, yes.

13   Q.   And just to make sure I'm clear.  There

14   is nothing in writing giving the SAIL coordinators

15   about what kind of questions to ask, what kind of

16   due diligence to perform, correct?

17   A.   Not that we were able --

18   Q.   There is no training material you could

19   identify, right?

20   A.   Correct.

21   Q.   So, sitting here today, sir, you were --

22   are unable to testify to the specific past policies

23   and procedures related to due diligence following

24   the detection of a suspicious order other than the

Page 106

1  fact that there was some done?
2      MR. BENSINGER: Objection; argument.
3  BY THE WITNESS:
4      A.   As it relates to the excessive quantity
5  query, we're relying on the test -- or the
6  interviews I conducted with DC staff that they
7  would run this each day and then investigate as
8  appropriate.
9  BY MR. MOUGEY:
10     Q.   And I appreciate that, but I would like
11 is a simple answer to my question.  Okay.
12         My question was: Sitting here today,
13 you are unable to testify to the specific past
14 policies and procedures related to due diligence
15 following the detection of a suspicious order other
16 than the fact that there was some done.  That's
17 accurate, right?
18     MR. BENSINGER: Objection.  That's argument.
19 BY THE WITNESS:
20     A.   They would call the store and discuss
21 with the store why they were ordering the quantity
22 and then based on the response given, they may
23 modify, ship or delete the order.
24 BY MR. MOUGEY:

Page 107

1      Q.   But what I asked was: Can you point us
2  to any specific guidelines or criteria or anything
3  in writing giving the SAIL coordinators guidance on
4  what questions to ask when performing their due
5  diligence on a suspicious order?
6      A.   No, not in writing.
7      Q.   Thank you.  Sitting here today, sir,
8  were you able to locate one example, anything in
9  writing, of a due diligence file on the orders that
10 were flagged as a result of the excessive quantity
11 query?
12     MR. BENSINGER: Objection; asked and answered.
13 BY THE WITNESS:
14     A.   No written documents, no.
15 BY MR. MOUGEY:
16     Q.   Let me make sure based on your last
17 answer that no one is walking around with a
18 document.  When I say "in writing," I mean recorded
19 in a computer or a database.  Are we on the same
20 page?
21     A.   Not that -- not that was saved, no.
22     Q.   Anything -- any memorialization?
23     A.   No.
24     Q.   Of any due diligence ever, any examples

Page 108

1  as a result of the excessive quantity query?
2      A.   Not in writing.  Just based on the
3  interviews that we conducted with the staff.
4      Q.   So, I'm going to have this redone when
5  we have some time so it can be read a little
6  easier, but the last column I have is that there is
7  "No due diligence files."  Is that accurate?
8      A.   I believe so.
9      Q.   So, let's go back to Bratton 30(b)(6)
10 17.  An order comes into the distribution center,
11 correct?
12     A.   Correct.
13     Q.   And at the distribution center it's your
14 testimony that there were reports run to identify
15 whether or not an order is suspicious, right?
16     A.   They would run the excessive quantity
17 query each morning, yes.
18     Q.   And the -- once an order was flagged on
19 that excessive order quantity query, it was not
20 shipped, correct?
21     A.   Not until based on the -- what I was
22 told, that until they were able to clarify what was
23 occurring with that order.  They wouldn't just ship
24 it.

Page 109

1      Q.   And once that DC SAIL coordinator
2  determined that that order was not suspicious, it
3  would go in this "Yes" column over here, correct?
4          I'm sorry.  I got it backwards.  Let's
5  keep going.
6          "Is Order Suspicious?  No."  It would be
7  shipped, right?
8      A.   Well, I would say it would go "Yes.
9  Conduct due diligence.  Is the suspicion dispelled?
10 Yes."  And then it would be shipped.
11     Q.   So, "Order Received.  Is order
12 suspicious?"
13         You would agree with me that any order
14 that is flagged on the excessive quantity criteria
15 would be flagged as a potential suspicious order,
16 correct?
17     A.   Potentially suspicious, yes.
18     Q.   Yes, sir.  And if it was not flagged on
19 the potential suspicious query, then it would go in
20 this "No" circle to the right, correct?
21     A.   Correct.
22     Q.   And it would be shipped?
23     A.   Potentially.
24     Q.   What else -- what other processes were

Page 110

1 in place that it would not be shipped?
2     A.   So, my understanding from talking to the
3 DC staff is that there was also -- the employees
4 that were working in the control vault would, when
5 they go to -- they would receive an order, they
6 would go to pick it and if it was an unusual
7 quantity or something was off to them, they would
8 then escalate that and then it would be
9 investigated as well.  So, there's a second.
10        But as far as the excessive quantity
11 query is concerned, it could end up being shipped.
12     Q.   So, if the order popped or was flagged
13 on the excessive quantity query, the SAIL
14 coordinator would then call the pharmacy to
15 inquire, correct?
16     A.   The SAIL coordinator or employees of the
17 DC.
18     Q.   Employees of the DC, the distribution
19 center?
20     A.   Correct.
21     Q.   I mean, like what kind of employees?
22     A.   When I spoke with Deb, she called
23 sometimes she said -- I'm -- she couldn't give me a
24 definitive list of who might be calling, but it

Page 111

1 sounded like to me either the SAIL coordinator,
2 herself as the function manager.  Those were the
3 ones that she mentioned.
4     Q.   So, we don't really have anything in
5 writing giving guidance to the folks calling, and
6 we really don't even know who was calling.  Is that
7 a fair statement?
8     A.   We don't know a complete list of who was
9 calling.
10     Q.   Other than maybe some folks from the
11 distribution center, we don't really know who was
12 calling to perform the due diligence either,
13 correct?
14     MR. BENSINGER:  Objection; mischaracterization.
15 BY THE WITNESS:
16     A.   I know definitively based on her first
17 accounts that Deb Bish at time called to confirm
18 those orders herself, and she mentioned that the
19 SAIL coordinators might also call.
20 BY MR. MOUGEY:
21     Q.   Might, but we're not sure?
22     A.   We can't be sure, no.
23     Q.   Okay.  So, other than one person, in
24 preparing for today to who performed the due

Page 112

1 diligence, contacting the pharmacies, the only
2 person you can say for sure is Deb Bish?
3     A.   She had firsthand accounts of calling
4 stores to do due diligence, yes.
5     Q.   So, I'm now in this square, "Conducting
6 Due Diligence."  You're in agreement with me so far
7 on this process, right?
8     A.   Correct.
9     MR. BENSINGER:  Objection; vague.
10 BY MR. MOUGEY:
11     Q.   And "Are Suspicions Dispelled?"  Do you
12 see that in the bottom left-hand corner?
13     A.   Yes.
14     Q.   If the answer is yes, the order is
15 shipped, correct?
16     A.   I believe so, yes.
17     Q.   When you say you believe so, what's --
18 what's keeping you from saying yes or no?
19     A.   There's possibility, again, that the
20 pickers might flag a concern.
21     Q.   Okay.  Who are the pickers?
22     A.   Those are the folks that are working in
23 the C-II vault that actually go get the order and
24 get it ready to be put in boxes or totes to go out

Page 113

1 of the DC.
2     Q.   Where did you learn the language
3 "pickers"?  Where did it come from?
4     A.   In discussions with the DC staff.
5     Q.   In getting prepared?
6     A.   Yes.
7     Q.   Had you ever heard the word "pickers" or
8 the description "pickers" for folks that worked in
9 the DC vault before getting prepared for this
10 30(b)(6)?
11     A.   Not as it relates to the DC vault.  I've
12 heard it in relation to other functions in
13 distribution centers.
14     Q.   I'm sorry.  I just got sidetracked.
15        What would be a reason why after the
16 SAIL coordinators or whoever was calling for the --
17 to the pharmacies to ask questions about the order
18 that was flagged, what other process was in place
19 that might prevent it from being shipped?
20     A.   So, when they -- the folks working in
21 the C-II vault would have the order and they would
22 go to the shelf to get the product off the shelf,
23 they might notice it was an unusual order, unusual
24 quantity or size, and then they might also escalate

Page 114

1  that to be investigated in addition to the SAIL
2  coordinator's efforts.
3         So, there's a possibility that on
4  certain orders the SAIL coordinator might have
5  called and the C-II function manager.
6     Q.   So, "Are Suspicions Dispelled?  No."
7  You see this kind of red or pink-colored circle.
8  And then "Do Not Ship Order."
9         Do you see that?
10    A.   Yes.
11    Q.   Do you believe this kind of flowchart or
12 diagram is an accurate depiction of Walgreens'
13 systems to identify suspicious orders, perform due
14 diligence and then ship those orders?
15    MR. BENSINGER:  Objection; vague.
16 BY THE WITNESS:
17    A.   As it relates specifically to the
18 processes in place on the day of at the DC, it's
19 mostly accurate, though I would say what probably
20 would happen in a flowchart would be, "Are
21 suspicions dispelled by the SAIL coordinator?  Yes.
22 Order is released to be picked."  And then that
23 other process would occur underneath that could
24 contain some of these same loops about due

Page 115

1  diligence and dispelling suspicions.
2         Also, it was told to me by the DC staff
3  that they might modify an order under certain
4  circumstances and then ship it.  So, there's
5  another path there.
6  BY MR. MOUGEY:
7     Q.   What criteria would it be that the DC
8  staff would modify an order and then ship it?
9     A.   Based on the interviews, they would
10 indicate there might be times when a store meant to
11 order, for example, 100 tablets but they
12 accidentally -- they keyed in 100 not realizing
13 that they were ordering 100 bottles; and based on
14 the discussion with the store, they would come to
15 understand that fact, change the quantity to what
16 the store actually wanted, which would be like, in
17 this example, one bottle of 100, and then they
18 would release that to be shipped.
19    Q.   Now, would you -- I see what you are
20 saying, somebody hit the wrong key when they were
21 keying something in, instead of a 10 it was a
22 1,000; and those -- the folks at the DC center were
23 looking for those types of issues?
24    A.   That would be caught in this process as

Page 116

1  well.
2     Q.   Okay.  Now, would you agree, then, that
3  the distribution center employees, when I say
4  "you," I mean Walgreens, that the distribution
5  center employees are an important part of
6  Walgreens' suspicious order monitoring system?
7     A.   Yes.
8     Q.   You would agree, then, that Walgreens'
9  distribution center employees are the front line
10 outside of the pharmacists when detecting
11 suspicious orders?
12    MR. BENSINGER:  Objection; vague.
13 BY THE WITNESS:
14    A.   They are the last person to interact
15 with an order before it ships.
16 BY MR. MOUGEY:
17    Q.   Would you agree that distribution center
18 employees are backstops to the pharmacist for
19 identifying suspicious orders?
20    MR. BENSINGER:  Objection; vague.
21 BY THE WITNESS:
22    A.   I'm not sure what you mean by the
23 relationship between the DC and the pharmacist.
24 Can you expand on that?

Page 117

1  BY MR. MOUGEY:
2     Q.   Well, you tell me.  I mean, is there --
3  are distribution center employees the backstop to
4  the pharmacist when detecting suspicious orders?
5     MR. BENSINGER:  Objection; vague.
6  BY THE WITNESS:
7     A.   What do you mean by backstop?
8  BY MR. MOUGEY:
9     Q.   They're the -- the tidal wall.  They're
10 the support.  They're the -- the department
11 responsible for backing up the pharmacist to
12 identify suspicious orders.
13    MR. BENSINGER:  Objection; vague.
14 BY THE WITNESS:
15    A.   I would characterize them as they're one
16 of multiple mechanisms that might detect a
17 suspicious order or possible suspicious order.
18 BY MR. MOUGEY:
19    Q.   So, it sounds to me that your testimony,
20 based on your preparation today, that the
21 distribution centers are much more than simply
22 supply warehouses, so to speak?
23    A.   As it relates to the shipment of
24 controlled orders, they would investigate and do

Page 118

1 due diligence if that's what you're implying.
2    Q.   Yes, sir.  They fill a much more
3 important function, the distribution centers, than
4 simply warehouses, correct?
5    A.   They were part of our detection
6 mechanism for monitoring controlled substance
7 orders.
8    Q.   So, the answer to my question is yes,
9 they fill a much more important function, the
10 distribution centers, than just warehouses,
11 correct?
12    MR. BENSINGER:  Objection; argumentative,
13 vague.
14 BY THE WITNESS:
15    A.   I'm -- I'm not sure what you really
16 mean.
17 BY MR. MOUGEY:
18    Q.   It sounds like what your counsel just
19 said.
20       So, what I'm asking, sir, is -- what I'm
21 asking you, sir, is a simple question.
22       The distribution centers fill a much
23 more important function than a warehouse, correct,
24 sir?

Page 119

1    A.   They are more than a warehouse.
2    Q.   And they fill an important function as
3 opposed to a warehouse when detecting suspicious
4 orders, correct?
5    MR. BENSINGER:  Objection; argument, asked and
6 answered.
7 BY THE WITNESS:
8    A.   The DC staff are an important part of
9 our system to detect and monitor controlled
10 substance ordering.
11 BY MR. MOUGEY:
12    Q.   I'm going to hand you what we are going
13 to mark as Bratton 30(b)(6) 18.
14       (WHEREUPON, a certain document was
15        marked as Bratton 30(b)(6) Exhibit
16        No. 18:  PowerPoint, Walgreen Co.
17        Controlled Substance Anti-Diversion
18        and Compliance Program;
19        WAGMDL00659801 - 00659856.)
20 BY MR. MOUGEY:
21    Q.   Now, the first page of Bratton 30(b)(6)
22 18 has been redacted due to privilege, and I can't
23 tell where exactly it came from or when it was
24 drafted.

Page 120

1       But if you turn to the first page, Bates
2 No. 802, and for the record it's WAGMDL659802, and
3 it's titled "Walgreens Controlled Substance
4 Anti-Diversion and Compliance Program."
5       Do you see that, sir?
6    A.   I do.
7    Q.   And do you see the date July 17, 2012?
8    A.   I do.
9    Q.   And below the message, "We want to work
10 with you.  We want to cooperate and avoid
11 litigation."
12       Do you see that, sir?
13    A.   I do.
14    Q.   And the message in the paragraph, the
15 third paragraph is that Walgreens' policies and
16 procedures are working.
17       Do you see that, sir?
18    A.   I do.
19    Q.   You're aware, at this point in time,
20 that there were several active investigations by
21 the DEA into Walgreens' policies and procedures
22 regarding suspicious order monitoring, correct,
23 sir?
24    A.   I --

Page 121

1    Q.   Look at your cheat sheet if you want to.
2 But July 2012.
3    A.   I don't recall the exact date of the
4 order to show cause.  I know some of them were
5 around this time.  So, based on that, there
6 probably was the DEA was conducting their
7 investigation.
8    Q.   The orders to show cause from the DEA
9 into Walgreens both as pharmacies and as
10 distribution centers began in 2008 and continued up
11 to the culmination of the Memorandum of Agreement
12 entered into in June of 2013.  Correct?
13    A.   I'm not sure if there was an order to
14 show cause in '08.
15    Q.   Why don't you, sir -- it would be
16 important that if Walgreens is meeting with the DEA
17 that the information given to the DEA is accurate,
18 correct, sir?
19    A.   I would agree with that.
20    Q.   You would agree that the information
21 that Walgreens is giving to the DEA be complete,
22 correct, sir?
23    A.   Correct.
24    Q.   And in your preparation for your

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 testimony today, you would believe that the
2 information you were receiving to give Walgreens'
3 position on issues like the distribution centers
4 performing important functions in the suspicious
5 order monitoring process would be accurate, right?
6     A.   I believe so.
7     Q.   You would expect as someone sitting here
8 today on a Sunday, I'm confident that you could
9 have something better to do than sitting answering
10 questions from me, if you are being asked to come
11 give testimony today on behalf of Walgreens, that
12 you, Mr. Bratton, be given accurate information,
13 correct, sir?
14     MR. BENSINGER:  Objection; argument.
15 BY THE WITNESS:
16     A.   I believe so.
17 BY MR. MOUGEY:
18     Q.   Yes, sir.  If you would, turn to Bates
19 No. 817 titled "Corporate and Distribution Center
20 Efforts."
21        Do you see that?
22     A.   I do.
23     Q.   And the slide at the top says, "The
24 Distribution Center Policies and Processes," and it

Page 123

1 walks through several bullet points about what the
2 distribution center policies and processes are,
3 right?
4     A.   Yes.
5     Q.   And you can see here that Walgreens is
6 telling the DEA that we are responsible for
7 customer authentication policy.
8        Do you see that?
9     A.   I do.
10     Q.   You see here that it's handling
11 suspicious drug order policy.
12        Do you see that?
13     A.   I do.
14     Q.   Suspicious order monitoring process,
15 ongoing evolution from 2009 to the present, right?
16     A.   Yes.
17     Q.   And line limit/thresholds, correct?
18     A.   Correct.
19     Q.   If you would, sir, look at the second
20 bullet point down that begins with "Distribution
21 Centers."
22     A.   Okay.
23     Q.   And it says, Walgreens is telling the
24 DEA that "Distribution centers distribute only to

Page 124

1 Walgreens pharmacies, but they never see patients
2 and they do not have the ability to detect trends
3 in local markets related to physician practices."
4        Do you see that, sir?
5     A.   I do.
6     Q.   And if you go to the next bullet point,
7 "Distribution Centers are not designed to be a
8 backstop to the pharmacists who are the front
9 lines; rather, Distribution Centers are more akin
10 to supply warehouses."
11        Do you see that, sir?
12     A.   I do.
13     Q.   Walgreens was explaining to the DEA in
14 this document that distribution centers are more
15 akin to warehouses, correct?
16     A.   I see that it says that there, yes.
17     Q.   And it goes on that "The stores, on one
18 hand, and corporate headquarters, on the other
19 hand, are best equipped to ensure compliance and
20 assist in combating controlled substance abuse."
21        Do you see that, sir?
22     A.   I do.
23     Q.   Walgreens is telling the DEA that the
24 distribution centers are not best equipped to

Page 125

1 combat suspicious orders, correct?
2     MR. BENSINGER:  Objection; characterization.
3 BY THE WITNESS:
4     A.   It says that they're not best equipped,
5 yes.
6 BY MR. MOUGEY:
7     Q.   And, sir, these bullets and the
8 information therein that we just reviewed appears
9 to contradict the information that you were told
10 that the distribution centers perform important
11 functions in identifying suspicious orders and
12 performing due diligence, correct, sir?
13     A.   This document, the line that you've
14 pointed out specifically, says they don't have the
15 ability to detect local market trends related to
16 physician practices, and I would -- I would agree
17 with this document that that is accurate because
18 they're viewing -- they don't have insight into
19 localities.
20        And as it relates to the second -- well,
21 third point on the page, but here it's talking
22 about controlled substance abuse.  And in my mind
23 that would be how patients are taking a
24 prescription, not related to suspicious order

Page 126

1  monitoring.
2      Q.   The last line, "The stores, on the one
3  hand, and corporate headquarters, on the other, are
4  best equipped to ensure compliance and assist in
5  combating controlled substance abuse."
6          Do you see that line?
7      A.   I do.
8      Q.   Do you agree with that line, that
9  sentence in this presentation that Walgreens was
10  providing to the DEA?
11     A.   I do agree.
12     Q.   And, sir, do you agree with this --
13  whoever put this presentation together from
14  Walgreens and presented to the DEA, that
15  distribution centers are more akin to supply
16  warehouses?
17     A.   As it relates to a clinical judgment
18  about abuse, yes.
19     Q.   Do you see the word "clinical judgment
20  about abuse" anywhere in this document, in this
21  page?
22     A.   Not on this page.
23     Q.   What it's referring to, sir, is ensuring
24  compliance.

Page 127

1          And, sir, you would agree with me that
2  Walgreens is responsible as a distributor for
3  ensuring compliance with the U.S. Code and the regs
4  promulgated thereunder to assist in combating
5  controlled substance abuse, correct?
6      A.   I -- Walgreens, we always are seeking to
7  be compliant and meet the requirements of the DEA.
8  Whether or not that deals specifically with abuse
9  or diversion, abuse specifically, I'm not sure if
10  that's in the reg or not.
11         But I -- I'm reading this document as in
12  the greater context that in the previous pages
13  where they're describing dispensing efforts in
14  Florida, that this is related to dispensing that
15  they're not a backstop but...
16     Q.   Are distribution centers an important
17  role in fulfilling Walgreens' responsibilities
18  under the Controlled Substance Act as a distributor
19  in identifying suspicious orders?
20     A.   They are a component in that system.
21     Q.   I didn't ask you if it was a component,
22  sir.  I asked you was -- what I asked you was --
23  and I need you to listen to my questions clearly
24  and please answer the question that I asked.  Okay?

Page 128

1          What I asked you was are distribution
2  centers an important role.  I didn't ask you if
3  they were a component.  Do you see the difference?
4          Are they an important role in fulfilling
5  Walgreens' responsibilities under the Controlled
6  Substance Act as a distributor in identifying
7  suspicious orders?
8      A.   Yes.
9      Q.   Are or is Walgreens' distribution
10  centers an important role or fill an important role
11  in performing due diligence on those suspicious
12  orders?
13     MR. BENSINGER:  Objection; asked and answered.
14  BY THE WITNESS:
15     A.   Yes.
16     MR. BENSINGER:  We have been going for about
17  an hour and ten minutes.  Is it convenient for us
18  to take a break now, Mr. Mougey?
19     MR. MOUGEY:  Whenever you'd like, Peter.  If
20  you need a break now, be more than happy to take
21  one.
22     MR. BENSINGER:  Let's take a short break.
23     THE VIDEOGRAPHER:  We are off the record at
24  11:34 a.m.

Page 129

1          (WHEREUPON, a recess was had
2              from 11:34 to 11:53 a.m.)
3      THE VIDEOGRAPHER:  We are back on the record
4  at 11:53 a.m.
5  BY MR. MOUGEY:
6      Q.   Before the break, I asked you if you
7  would agree with me that Walgreens as a distributor
8  is responsible for ensuring compliance with the
9  U.S. Code and the regs promulgated thereunder to
10  assist in combating controlled substance abuse,
11  correct?
12     MR. BENSINGER:  Objection.  Record speaks for
13  itself.
14  BY THE WITNESS:
15     A.   Again, I go back to I'm not sure if the
16  reg specifically addresses abuse or diversion.
17  However, we can always try to comply with the
18  relevant regulations and requirements.
19  BY MR. MOUGEY:
20     Q.   What I'm asking you is a little bit
21  different, sir.  What I'm not -- what I'm asking
22  you is whether you strive to be compliant.
23         What I'm asking you is, does Walgreens
24  agree with me that it is responsible as a

Page 130

1 distributor for ensuring compliance that it create
2 a system to identify suspicious orders and to
3 ensure those suspicious orders are not shipped to
4 the pharmacies?
5 MR. BENSINGER: Objection; scope, calls for a
6 legal conclusion.
7 BY THE WITNESS:
8 A. Based on my understanding, we have a
9 requirement to monitor and report suspicious orders
10 to the DEA.
11 BY MR. MOUGEY:
12 Q. And when you say "we," Walgreens as a
13 distributor plays a key role in developing a system
14 designed to identify suspicious orders, perform due
15 diligence on those orders and prevent diversion,
16 correct?
17 MR. BENSINGER: Same objection; scope, legal
18 conclusion.
19 BY THE WITNESS:
20 A. I -- I'm sorry. Can you restate the
21 question.
22 BY MR. MOUGEY:
23 Q. Sure. Walgreens as a distributor plays
24 a key role in developing a system designed to

Page 131

1 identify suspicious orders, perform due diligence
2 on those orders and prevent diversion, correct,
3 sir?
4 A. My understanding is we are tasked with
5 preventing diversion. Part of the regulations
6 stipulate development of systems to assist in
7 preventing diversion and the shipment of suspicious
8 orders.
9 Q. So, the answer to my question is yes,
10 sir, that Walgreens as a distributor plays a key
11 role in developing a system designed to identify
12 suspicious orders, perform due diligence on those
13 orders and prevent diversion, correct, sir?
14 MR. BENSINGER: Asked and answered.
15 BY THE WITNESS:
16 A. I'm unsure as to the legal requirements,
17 but I believe that, as I said, we work to comply
18 with the relevant regulations.
19 BY MR. MOUGEY:
20 Q. Well, unless you have an understanding
21 of what the regulations are, it's very difficult to
22 ensure compliance, correct?
23 MR. BENSINGER: Objection.
24 BY THE WITNESS:

Page 132

1 A. Correct.
2 MR. BENSINGER: I object to this argument as
3 beyond the scope based upon the order limiting the
4 scope of appropriate testimony in the case.
5 BY MR. MOUGEY:
6 Q. Sir, do you know what a Ven diagram is?
7 A. I do.
8 Q. So, if you and I were to come up with a
9 Ven diagram and in the middle here we have
10 Walgreens suspicious order monitoring policies --
11 policy as a distributor. Okay.
12 All right. There is a circle in the
13 middle. I just wrote that, put it under the Elmo
14 up on the screen, "Walgreens suspicious order
15 monitoring policy as a distributor," right?
16 A. Yes.
17 Q. In order to fill that role, to prevent
18 diversion, it uses information that it receives as
19 a dispenser, correct, sir?
20 MR. BENSINGER: Objection; vague.
21 BY THE WITNESS:
22 A. We use sales of prescriptions in our
23 suspicious order monitoring systems.
24 BY MR. MOUGEY:

Page 133

1 Q. Yes, sir. And information pulled from
2 the pharmacy is used to prevent diversion, correct?
3 A. It's part of our overall system, yes.
4 Q. Now, if we have another circle, circle
5 to the left is "Distributor."
6 Do you see that?
7 A. I do.
8 Q. Circle to the right is "Dispenser."
9 Correct?
10 A. Correct.
11 Q. And Walgreens is charged and responsible
12 for creating a system designed to identify
13 suspicious orders, correct?
14 MR. BENSINGER: Objection. Same objection. I
15 here refer to Special Master order dated 8/31/18
16 concerning -- 9/3/18 concerning interpretations,
17 agreement or disagreement.
18 SPECIAL MASTER COHEN: Overruled.
19 BY MR. MOUGEY:
20 Q. I'm simply asking, sir, is Walgreens'
21 role to prevent diversion through identification of
22 suspicious orders and due diligence, Walgreens
23 relies on information from the dispensing side,
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.   We use sales data to help drive those
2  decisions in the DC.
3    Q.   And that's not the only data that
4  Walgreens use to prevent diversion through its
5  suspicious order monitoring policies, correct?
6    A.   It's not the only data, correct.
7    Q.   Yes, sir.  And the data pulls that
8  Walgreens uses to implement its day-to-day duties
9  to identify suspicious orders can change over time,
10 correct?
11   A.   Our methods have changed over time, yes.
12   Q.   For example, you're familiar with the
13 Pharmaceutical Integrity Department, correct?
14   A.   Correct.
15   Q.   And Pharmaceutical Integrity Department
16 is charged with creating and implementing
17 Walgreens' suspicious order monitoring policies,
18 correct?
19   A.   Correct.
20   Q.   Pharmaceutical Integrity on multiple
21 occasions has pulled data from Walgreens, the
22 dispenser, to identify high-risk prescribers,
23 correct?
24   A.   Correct.

Page 135

1    Q.   And that's just one example, along with
2  the sales data, that Walgreens uses to implement
3  its responsibilities to identify potential
4  suspicious orders, correct?
5    A.   The prescriber data was not used to
6  identify potential suspicious orders.
7    Q.   It was used to identify potential areas
8  of diversion linked to high-risk prescribers,
9  correct?
10   MR. BENSINGER:  Objection.
11 BY THE WITNESS:
12   A.   That data was used to assess prescribers
13 and their prescription habits and inform our
14 dispensing practices at times.
15 BY MR. MOUGEY:
16   Q.   You would agree with me, sir, that
17 Walgreens, in its responsibility to prevent
18 diversion, pulls data and information from both the
19 dispenser side and the distributor side, correct,
20 sir?
21   A.   Yes.
22   MR. MOUGEY:  I'm going to mark this beautiful
23 depiction Bratton 30(b)(6) 19.
24          (WHEREUPON, a certain document was

Page 136

1          marked Bratton 30(b)(6) Exhibit
2          No. 19:  Ven diagram prepared by
3          Mr. Mougey at deposition.)
4  BY MR. MOUGEY:
5    Q.   Keep 17 handy.  We are going to come
6  back to that.  And let's go back to the chart when
7  we went down this rabbit hole, and I asked you, I
8  believe, before we started, if this chart on
9  Bratton 17 is an accurate depiction of Walgreens'
10 suspicious order monitoring decision-making process
11 in the due diligence?
12   MR. BENSINGER:  Asked and answered.
13 BY THE WITNESS:
14   A.   I would characterize it as incomplete,
15 but...
16 BY MR. MOUGEY:
17   Q.   What about it is incomplete?
18   A.   Again, I don't think it accurately -- if
19 this is a flowchart designed to depict the process,
20 this is a very generalized and simplified version
21 I think that doesn't accurately detail all the
22 steps in the order in which they occur.
23   Q.   All right.  So, we've gone through one
24 step so far, the distribution center SAIL

Page 137

1  coordinator, excessive quantity query, correct?
2    A.   Correct.
3    Q.   So, do you believe that Bratton 17 is an
4  accurate depiction of the process you described
5  through the excessive quantity query process?
6    A.   The challenge I have with this document
7  is that the ship order would be released to be
8  picked.  There then could be additional scrutiny of
9  that order after it was released.
10   Q.   All right.  I have written over here in
11 handwriting on 17 with the "pickers," and that's
12 kind of the fat finger report, if somebody hit a
13 couple extra zeros or something along those lines,
14 right?
15   A.   Could be for a variety of reasons.
16   Q.   But that's how you described it earlier,
17 correct?  It was an abnormal order that maybe had a
18 couple of extra zeros on the end that warranted
19 further inquiry, correct?
20   A.   That's one type of order that they would
21 scrutinize.
22   Q.   What other type of order would the
23 pickers scrutinize?
24   A.   If it's an unusually -- an unusual

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 quantity or size, they may ask why it's being
2 placed as it seems un -- inconsistent with the
3 orders they normally pick for that item.
4     Q.   And I apologize if I've already asked
5 you this, but have you been able to identify any
6 written training materials for the pickers and what
7 they used for criteria to identify unusual quantity
8 or size when filling orders?
9     A.   Not at this time, no.
10     Q.   Are you able to find any manual,
11 policies or procedures that the pickers use to
12 identify any suspicious or abnormal orders?
13     MR. BENSINGER:  Asked and answered.
14 BY THE WITNESS:
15     A.   We have not been able to find a written
16 document, no.
17 BY MR. MOUGEY:
18     Q.   And who told you about what the,
19 quote-unquote, "process" was for the pickers to
20 identify abnormal orders?
21     A.   So, the process described was described
22 to me by the DC staff that we interviewed.
23     Q.   And who specifically from the DC staff
24 told you about what the pickers' role was?

Page 139

1     A.   I know specifically that Deb Bish and I
2 discussed it.  I can't recall if I also discussed
3 it with, or to what detail, Justin and Jen Diebert
4 or Justin Joseph and Jen Diebert and Steve Kneller.
5     Q.   Let me make sure I am following you,
6 then.  So, here I'm back to this -- your list here
7 of "List of Walgreens Employees Interviewed."  Who
8 told you about the pickers policy?
9     A.   Deb Bish explicitly told me details
10 about how that was enacted including her own
11 personal experience.
12     Q.   All right.
13     A.   I believe there was also mention by Jen,
14 Justin and Steve.
15     Q.   Jen Diebert?
16     A.   Correct.
17     Q.   I'm going to put question marks because
18 you're not sure.  Jen, Justin and Steve, is that
19 what you said?
20     A.   Correct.
21     Q.   But you're not sure whether they had any
22 information about the pickers in their policies and
23 procedures at all.  All you can really remember is
24 that Deb had something to say about it?

Page 140

1     A.   Deb had a lot.  Deb had definitive
2 firsthand experience with the process.  I can't
3 recall the level of detail the others provided at
4 this time.
5     Q.   Do you recall what Deb's title is?
6     A.   I do not.
7     Q.   You don't recall what her title is?
8     A.   I believe it was the -- she was the C-II
9 function manager, but I can't recall.
10     Q.   A C-II function manager.  Did she
11 work -- did Ms. Bish work at the distribution --
12 did she work at one of the distribution centers?
13     A.   Yes.
14     Q.   Which one?
15     A.   Perrysburg I believe.
16     Q.   That was one of the ones that Walgreens
17 shut down?
18     A.   We no longer -- well, the DC is still
19 there.  We no longer ship controlled substances out
20 of.
21     Q.   And that was the reason for Walgreens
22 making the decision not to distribute controlled
23 substances II through V out of the -- I'm sorry --
24 II and III out of Perrysburg was what?

Page 141

1     A.   My understanding at this time is the
2 concern about disruption to the business as a
3 result of ongoing DEA matters.  We transitioned
4 dispensing -- or distribution to ABC.
5     Q.   Walgreens was concerned based on its
6 communications with the DEA that Perrysburg might
7 get shut down, correct?
8     A.   There was concern about uncertainty and
9 so in order to protect the business, we moved to
10 another distributor.
11     Q.   All right.  So let's go back to my
12 30,000 chart, foot chart, with all of the processes
13 and procedures in place at Walgreens to identify
14 suspicious orders.
15     So, we're at the excessive quantity
16 overview from '06 to the current time.
17     A.   Um-hmm.
18     Q.   What is the next kind of 30,000-foot
19 view description that you can explain to me and
20 this jury about what Walgreens policies and
21 procedures it had in place to detect suspicious
22 orders?
23     A.   So --
24     MR. BENSINGER:  Objection to the

Page 142

1 characterization of the exhibit. You can answer.
2 BY THE WITNESS:
3    A.   The next thing that comes to mind is,
4 and we have touched on it, would be the pickers.
5 BY MR. MOUGEY:
6    Q.   What time period does the pickers
7 encompass?
8    A.   Until we stopped distributing controls
9 from the facility.
10    Q.   Okay.  So, and they're looking for
11 abnormal orders.  Is that fair enough?
12    A.   Correct.
13    Q.   And if they found an abnormal order,
14 would that be considered suspicious?
15    A.   Possible suspicious order.
16    Q.   Okay.  So, I will put "yes" in the next
17 column.
18        And was there due diligence performed on
19 what the pickers identified?
20    A.   Based on the interviews that I
21 conducted, yes.
22    Q.   And I think we've already established
23 that there is no policy or procedures in writing,
24 right?

Page 143

1    A.   Correct.  Not that we've been able to
2 find.
3    Q.   And that the "Policies and Procedures
4 Verbally," the answer, like the previous, is yes
5 and that was to call the pharmacy?
6    A.   Correct.
7    Q.   And I apologize if you've already
8 answered this.  But the next column, is there any
9 due diligence, is there any evidence of the pickers
10 calling the pharmacy in the way of notes or
11 database entries or anything?
12    A.   Just the interview conversations that I
13 had with -- with DC staff.  No written documents
14 that we've been able to find.
15    Q.   Again, I apologize and I'm being a
16 little specific.  But when you say "no written
17 documents," I want to make sure we're saying the
18 same thing.
19        No entries in databases, no entries in
20 journals, no electronic, there is no evidence at
21 all other than your interviews that there was due
22 diligence performed by the pickers, correct?
23    A.   Not that we can directly link to the
24 pickers.

Page 144

1    Q.   Okay.  So, now we've got the excessive
2 quantity overview and we've got the pickers.
3        What's the next -- and the pickers were
4 in place, I'm sorry, from '06 to?
5    A.   Till we ceased distribution at the
6 particular DC.  So, it depends on which DC you're
7 referring to.
8    Q.   Let's just call it '13/'14.  Is that
9 fair?
10    A.   Fair.
11    Q.   I'm going to do the same for the
12 excessive quantity overview or did that continue
13 after even for dispensing?
14    A.   They use it for non-control drugs.
15    Q.   Okay.  So it's still ongoing?
16    A.   Yes.
17    Q.   Okay.  So, there is two examples.  Is
18 there any -- where else should we go after that?
19    A.   So, starting in -- let me just -- one
20 moment.  I need to refer to my notes.
21    Q.   Okay.  Please do.
22    A.   Going back we believe as far as 1998, we
23 had been reporting to the DEA field offices orders
24 that may be suspicious via either fax, letter or

Page 145

1 CDs at a later time.
2    Q.   Let me start putting in '98 until when?
3    A.   There is different iterations of this,
4 but for this one I believe it was through 2012.
5    Q.   All right.  And you're talking about the
6 Chemical Handler's report?
7    A.   Correct.
8    Q.   Manual?
9    A.   Correct.
10    Q.   That's going to be  '98 to '12?  Are you
11 comfortable with that?
12    A.   Let me check.  I may have an e-mail that
13 details.
14    Q.   Can I help you?
15    A.   Sure.
16    Q.   If you look at Exhibit 14, which is the
17 manual.  You tell me if that helps.
18    MR. BENSINGER:  Object to the
19 characterization.
20 BY MR. MOUGEY:
21    Q.   I can put it up there, Mr. Bratton, if
22 it helps a little bit.  I know there is a lot.  Put
23 it up on the Elmo.  This is Exhibit 14.
24        "Effective calendar year 2012, the

Page 146

1  Controlled Substance Order Monitoring and
2  Prevention System prevents suspicious control drugs
3  from being shipped to the stores. In calendar year
4  2012, because of the program mentioned, suspicious
5  control drug reports are no longer generated as
6  their shipment is prevented by the system."
7        Does that help you?
8     A.  Yes.
9     Q.  So, beginning -- effective beginning of
10  2012, there were no more suspicious orders going to
11  the DEA. Is that accurate?
12    A.  I don't think --
13    MR. BENSINGER: Objection; mischaracterization.
14  BY THE WITNESS:
15    A.  I don't think it's from the beginning of
16  2012. There was an implementation date. That's
17  what I'm trying to ascertain from the notes here.
18  BY MR. MOUGEY:
19    Q.  They're handwritten notes, are they not?
20    A.  No. I think there was an e-mail or a...
21        I'm having trouble finding the exact
22  document, but I believe it was the middle of 2012
23  that we ceased producing records as part of the
24  report based on the E-3 Chemical Handler's Manual.

Page 147

1     Q.  Let me -- that's an important part of
2  Walgreens' responsibility is to report suspicious
3  orders to the DEA, is it not?
4     A.  Yes.
5     Q.  And I mean, in fact, some of the three
6  notebooks I got handed this morning, it's titled
7  "Suspicious Order Monitoring Policies"; and that
8  would encompass reports being sent to the DEA,
9  correct?
10    A.  Correct.
11    Q.  And part of what you were charged with
12  being able to testify today includes the reports
13  being sent to the DEA, correct?
14    A.  Correct.
15    Q.  And how those policies changed over
16  time, right?
17    A.  Correct.
18    Q.  And the DEA Chemical Handler's Manual
19  was one of the formulas that was used by Walgreens
20  to send reports to the DEA, correct?
21    A.  The formula outlined in Appendix E-3
22  informed our reports, correct.
23    Q.  Yes, sir, and we'll get to that in a
24  minute. But what I'm asking you is the

Page 148

1  reiterations of your past and present SOMS program,
2  policies and procedures is one of the things that
3  we're here today to ask about, right? And you're
4  not sure when that -- when that stopped?
5     A.  I have the note here. I just need to
6  find it.
7     Q.  Okay. It's hard in all those documents,
8  isn't it?
9     A.  There is a number of them, yes.
10        So, I have an e-mail starting on
11  9/8/2010 saying the process to cut orders went
12  chain-wide last night. So...
13    Q.  It's confusing, isn't it?
14        The cutting orders as a result of some
15  of the algorithms occurred like in 2010 like you
16  identified, right?
17    A.  Yes.
18    Q.  And this manual section on Exhibit 14,
19  Bates No. 27, appears to indicate that the cutting
20  the orders occurred in -- began to occur in '12,
21  correct?
22    A.  It does -- it does indicate that.
23        I believe based on this "Controlled
24  Substance Ordering, Evolution of the Controlled

Page 149

1  Substance Ordering Process" document that it would
2  have been in November. It says here, "Deployed
3  November 2012."
4     Q.  What is the date of that document?
5     A.  This document was attached to an e-mail
6  that was sent on October 11, 2012.
7     Q.  Is your first page of that document
8  titled "Controlled Substance Ordering, Evolution of
9  Controlled Substance Ordering Process"?
10    A.  Correct.
11    Q.  And is that Bates numbered 395923?
12    A.  This one is Bates No. 00667938.
13    Q.  And do you have an understanding of how
14  many different versions of the "Controlled
15  Substance Ordering" document, the "Evolution of
16  Controlled Substance Ordering Process" there are?
17    A.  I -- I understand there were multiple
18  versions of this document.
19    Q.  Okay. But the one you have in front of
20  you is the one Bates numbered 667938?
21    A.  Yes, starts with that.
22    Q.  And what Bates number are you
23  referencing pointing out that Walgreens stopped
24  sending suspicious reports to the DEA because it

Page 150

1 was cutting those orders?
2     A.   My understanding is that when phase 5
3 was deployed, and this is Bates No. 667940, that
4 when phase 5 was deployed, we discontinued the
5 report that was based on the Appendix E-3.
6     Q.   All right.  While we're pulling it so we
7 have it, everyone has a copy in front of them, I'd
8 like you to be looking at your version and point me
9 to the language where it says, "We've stopped
10 sending suspicious reports to the DEA because we
11 are reducing the amount ordered"?
12    A.   It doesn't say that here on this page.
13 But my understanding after talking with all the
14 parties involved with the design is that the E-3
15 report stopped when the new phase 5 system was
16 deployed, at which point we switched to the new
17 reporting system.
18    Q.   Okay.  Let me hand this out just so we
19 have it.  I'm going to -- Bratton 30(b)(6) 20.
20         (WHEREUPON, a certain document was
21          marked as Bratton 30(b)(6) Exhibit
22          No. 20:  10/11/12 e-mail string
23          with attachment; WAGMDL00667936 -
24          00667943.)

Page 151

1 BY MR. MOUGEY:
2     Q.   And you were referencing Page No. --
3 Bates No. 7940, correct, sir?
4     A.   Correct.
5     Q.   And it's titled "Review of CSR History,"
6 correct?
7     A.   Correct.
8     Q.   And the title says, "The CSR process has
9 evolved through five phases since its inception in
10 2009.  Each phase has expanded and improves the
11 system's ability to identify and reduce excessive
12 orders."  Correct?
13    A.   Correct.
14    Q.   Now, No. 5 is the number you were
15 looking at before, correct?
16    A.   Correct.
17    Q.   And you were referencing that "Deployed
18 in November '12," which is phase 5, "Adds a ceiling
19 which limits the cumulative receipts of an item by
20 a store," and on the third column over, "Automatic
21 reductions to orders that exceed either tolerance
22 or ceiling threshold."  Correct?
23    A.   Correct.
24    Q.   Now, so you believe it was November '12

Page 152

1 that the -- that Walgreens stopped sending its
2 version of suspicious order reports to the DEA?
3     MR. BENSINGER:  Objection; mischaracterization.
4 BY THE WITNESS:
5     A.   I believe that's when we stopped sending
6 the report based off of the guidance from the
7 Chemical Handler's Manual Appendix E-3.
8 BY MR. MOUGEY:
9     Q.   Okay.  Now, while we're here, just bear
10 with me on this document, we are going down a
11 rabbit hole here for a second.  Okay?
12         So, as you reference, there is multiple
13 versions of this document, correct?
14    A.   Correct.
15    Q.   I'm going to hand you another version.
16 Okay.
17    MR. MOUGEY:  So, Alex, if we could pull
18 P-WAG-5133.
19         Thank you.
20 BY MR. MOUGEY:
21    Q.   It's already in front of you, No. 8.
22    A.   Okay.
23    Q.   If you just look at the title page, same
24 title page, "Controlled Substance Ordering," and I

Page 153

1 am comparing Bratton 8 and Bratton 20.  Okay.  Same
2 title page to the report, right?
3     A.   Correct.
4     Q.   That's easy.  These two, 8 and 20.  Same
5 cover page, right?
6     A.   Correct.
7     Q.   Okay.  Now, how long have you been
8 dealing with Exhibit 20?  When did you find
9 Exhibit 20?
10    A.   I think that was, we first --
11    Q.   When you first sat down to discuss with
12 Walgreens?
13    A.   I believe it was earlier this week that
14 we first went over this document, but I don't
15 recall the exact day.
16    Q.   Now, let's go to 8, and 8 is what we
17 were given by Walgreens' counsel in its combined
18 discovery.  Okay.
19         So, what I want you to do is I want you
20 to flip the page to the second page and you see
21 they are both titled "Background"; and I'm
22 comparing 8 and 20, and they both appear to be the
23 same, correct?
24    A.   Correct.

Page 154

1    Q.    Now, if you -- the one given to us as
2  part of combined discovery, 8 goes to "Phase 5
3  Functionality."
4        Do you see that?
5    A.    I do.
6    Q.    The one today that you're using and
7  identified earlier this week or actually early last
8  week has an additional slide in between, right?
9    A.    Correct.
10   Q.    Slide -- can you look through Exhibit 8
11 that was given to us as part of combined discovery
12 and see if you can find the "Review of CSR History"
13 in 8.
14   A.    That slide does not appear.
15   Q.    It doesn't appear.
16       Now, would you agree with me that Bates
17 No. 940 titled "Review of CSR History" goes through
18 phase 1 through 5 pointing out key distinctions,
19 correct?
20   A.    This is from Exhibit 8?
21   Q.    From 20.  From Exhibit 20, Bates
22 No. 940, the one that you started using last week,
23 goes through phases 1 through 5 and identifies key
24 distinctions.  Correct?

Page 155

1    A.    Yes.
2    Q.    Were these distinctions important in
3  identifying the differences in the phases 1, 2, 3,
4  4, 5 being deployed from August 9 until the end of
5  2012?
6    A.    This is helpful to understand the
7  changes as the software went out.
8    Q.    Yes, sir.
9    A.    The background slide does call out the
10 deployment date of November '12, but this has more
11 detail.
12   Q.    Yes, sir.  As a matter of fact, the
13 detail about what's covered and what's not and when
14 it was deployed is predominantly in slide 940 in
15 Exhibit 20, correct?
16   A.    Correct.
17   Q.    So, we started going down this path
18 trying to figure out when the Chemical Handler's
19 E-3, those suspicious reports we think were no
20 longer being sent to the DEA, and we think that
21 is --
22   A.    November of 2012.
23   Q.    -- November of '12, correct?
24   A.    Correct, approximately.

Page 156

1    Q.    So, '98 to approximately 11/12 we'll
2  call it the "Chemical Handler's Report E-3," is
3  that right?
4    A.    Correct.
5    Q.    And the criteria was three times?
6    A.    Well, that's part of the criteria.
7    Q.    Okay.  So, I'm going to start with
8  three times.  What's the other part of the
9  criteria?
10   A.    So, this is Appendix E-3.  I have a
11 Bates number of 396010.
12   Q.    Okay.
13   A.    "This voluntary formula is for use by
14 distributors to wholesale and retail levels.  The
15 formula calculates the quantity which, if exceeded
16 in one month, constitutes an order which may be
17 considered excessive or suspicious and therefore
18 require reporting to DEA.
19       "Add purchase quantities for the last 12
20 months for all customers within the same
21 distribution center and for customer type
22 (hospital, pharmacy or other) for any List I
23 chemicals containing item stocked by a distribution
24 center.

Page 157

1        "Add customer months for every record
2  used in the above total.  (Months within the last
3  12 that the customer purchases of the item that
4  were not zero).
5        "Divide the total purchases by the total
6  customer months.
7        "4." -- that's 3.
8        "4.  Then multiply the factor below to
9  give a maximum amount that the customer can order
10 per month before showing up on the suspicious order
11 report.
12       "Note:  Factor equals 3 for C-II and
13 C-III controlled substances containing List I
14 chemicals and 8 for C-III through IV and V
15 controlled substances and non-controlled OTC
16 products containing List 1" --
17       (Clarification requested by the
18 reporter.)
19   MR. BENSINGER:  You have to talk a little
20 slower and louder for the benefit of our court
21 reporter, if you would.
22   THE WITNESS:  My apologies.
23 BY THE WITNESS:
24   A.    -- "chemicals.

Page 158

1    "Item 5.  At the end of each month, a
2  report will be transmitted to the DEA (separate
3  reports for List I chemicals and Schedule II
4  through V controlled substances) of all purchases
5  of List I chemicals or C-II through V controlled
6  substances and List I containing OTC items by any
7  customer whose purchase quantities exceed the
8  parameters (above) any two consecutive months or in
9  three of any of the following six-month period.
10    "Using a computer to manage and report
11  on high-volume transaction business activities with
12  extremely short order cycle times (receipt to
13  delivery) is the only viable and cost-effective
14  methodology for the reporting of orders which may
15  be considered excessive or suspicious."
16    Q.   Which Bates No. are you referencing in
17  the version you have?
18    A.   396010.
19    Q.   So, I have written down Bates
20  No. 396010, correct?
21    A.   Correct.
22    Q.   So, "'98 to 11/12, Chemical Handler's
23  Report, List 3."
24    And, now, when that report was

Page 159

1  generated, were those orders shipped before due
2  diligence was performed?
3    A.   Being that this is a list of possible
4  suspicious orders, they could have shipped before
5  this order -- this report was generated.
6    Q.   Okay.  So, I'm still back on my chart,
7  "Possibility of suspicious orders, yes.  Due
8  diligence, yes, yes."
9    And for the third column, also before
10  they were shipped, yes or no?
11    A.   No.
12    Q.   No.
13    A.   Well, not as part of this report.
14  However, they may have been subject to other due
15  diligence.
16    Q.   But we're talking specifically about
17  this report, meaning they might have been in the
18  excessive quantity query report, correct?
19    A.   Correct.
20    Q.   Okay.  But independent, orders that were
21  flagged as a result of the Chemical Handler's
22  report, there was no due diligence performed on
23  those orders before they were shipped, correct?
24    A.   Not as a result of the E-3 report, no.

Page 160

1    Q.   Okay.  And were there -- was there ever
2  due diligence performed on the orders that were
3  flagged as part of the Chemical Handler's report?
4    A.   So, it's my understanding based on
5  discussions with folks from our inventory team and
6  loss prevention, they would look at a retrospective
7  analysis of a sample of these orders and review
8  them for appropriateness.
9    Q.   Okay.  But, again, that's retrospective
10  analysis.  Can you point me to any written policy
11  or procedures that give guidance to Walgreens
12  employees about -- about how to review that report?
13    A.   As this was a process that was managed
14  by a small group of people, I don't think there is
15  a written policy on how to review the report, no.
16    Q.   Okay.  And when you say it's reviewed by
17  a small group of people, which small group of
18  people?
19    A.   So, my understanding is it was Barb
20  Martin and Marcy Ranick reviewed these reports; and
21  there may have been other people in LP, loss
22  prevention, but we weren't able to establish who
23  they were.
24    Q.   Okay.  So, and Barb Martin and -- what

Page 161

1  was the other name?
2    A.   Marcy Ranick.
3    Q.   And Marcy Ranick.  Were they the ones
4  responsible, then, for performing any due diligence
5  on those reports?
6    A.   They would investigate the sample of the
7  orders in the report.
8    Q.   Right.  So, the answer to my question is
9  yes, they were the ones that were responsible,
10  right?
11    And Marcy Ranick is R-e-n-n-i-c?
12    A.   I believe it's R-n-i-c-k but --
13    Q.   R-n-i-c-k?
14    A.   Yeah.  I don't know.
15    Q.   Okay.  Fair enough.
16    So, no, there was no due diligence
17  before it was shipped but there was a I'm going to
18  write retrospective that Barb Martin and Mary
19  Ranick --
20    A.   Marcy.
21    Q.   Marcy.  I'm sorry.  Can't read my
22  writing.
23    -- Marcy Ranick performed, correct?
24    A.   Correct.

Page 162

1  MR. BENSINGER: Objection; incomplete
2 characterization.
3 BY MR. MOUGEY:
4  Q. And, again, there is no written policy
5 or procedures, correct?
6  A. Not that I'm aware of, no.
7  Q. And the -- whatever policy and procedure
8 there was, you received it verbally, correct?
9  A. Correct.
10  Q. And I'm assuming that's from Barb
11 Martin?
12  A. I discussed it with Barb, yes.
13  Q. Anybody else?
14  A. Unfortunately, Marcy was -- is no longer
15 with the company and we weren't able -- we tried to
16 contact her, but we were unable to do so.
17  Q. So, I'm going to write under "Policies
18 and Procedures," Barb Martin was the one that told
19 you what those were?
20  A. Correct.
21  Q. And do you have any evidence whatsoever
22 of any due diligence performed as a result of the
23 Chemical Handler's memo?
24  A. There are e-mails in which Barb is

Page 163

1 discussing orders that were included in the report.
2  Q. Do you have those identified?
3  A. I'm not sure if I have them in my
4 binder, but I do -- I recall looking at them I
5 believe.
6  Q. You don't have them in your binder, but
7 you recall looking at them?
8  A. I'm not sure if they're in the binder.
9  Q. Okay. But sitting here today in your
10 preparation, you can't point us to anything
11 specific in writing evidencing due diligence
12 performed by anyone at Walgreens as a result of the
13 reports run from the Chemical Handler's report,
14 correct?
15  A. I'm not sure. If you could give me one
16 moment.
17   So, there was an e-mail from Marcy
18 Ranick to Daniel Coughlin, Bates No. 660331, in
19 which Marcy was comparing her review of the 3X
20 Mobius reports to the new system when it was in
21 testing.
22  Q. Can I make this a little easier?
23  A. Sure.
24  Q. Is the due diligence you're going to

Page 164

1 point me over the periods of '98 to 11 of 2012
2 running that Chemical Handler's report two or three
3 or four e-mails?
4  A. Yes.
5  Q. Okay. So, I'm just going to write
6 down --
7  A. Well, and Barb's -- Barb's, interviews
8 with Barb Martin.
9  Q. So, two to I'll say five e-mails. How
10 does that sound? And Barb interview. How's that?
11 Is that fair?
12  A. Correct.
13  Q. Okay. Do you have any idea how many
14 suspicious orders were identified in those Chemical
15 Handler's reports?
16  A. I believe it was 5,500 approximately
17 something.
18  Q. The entire time?
19  A. Oh. I believe from 2006 to '12 it was
20 5,500. I don't know how many for the entirety of
21 that process and I believe that number is only for
22 Ohio.
23  Q. Yes. So, 5,500 only for Ohio from 2006
24 until November of 2012. So, it would be -- do you

Page 165

1 know, just generally speaking, how many excessive
2 orders were identified in that report nationwide
3 from '06 to '12?
4  A. I do not.
5  Q. Over 100,000?
6  A. Could be possible, yeah.
7  Q. And, so, here we are today and Walgreens
8 has no written policies about what to do when an
9 order appears on that report and only three to five
10 pieces of paper in e-mail saying that they
11 performed any due diligence on those. Is that a
12 fair statement?
13  A. My understanding is that we were
14 reporting those based off of the -- the
15 recommendation of the DEA and the E-3 saying only a
16 computer system can accomplish this.
17  Q. But that really wasn't the question I
18 asked you.
19   The question I asked you was: These
20 reports being run, at least from '06 to the late
21 '12, could be in excess of 100,000 excess reports,
22 and we can -- Walgreens can point to three to four
23 e-mails documenting due diligence over that time.
24 Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    A.   I believe so.
2    Q.   There is nothing else in writing
3 anywhere evidencing any due diligence on those
4 Chemical Handler Manual suspicious reports being
5 generated, correct?
6    A.   Not that I'm aware of at this time.
7    Q.   So, if you would, sir, the Chemical
8 Handler's Manual I have in front of you as
9 Exhibit 6.  This is one of the documents identified
10 in response to combined discovery 2.  Let me know
11 when you got it.
12   A.   Got it.
13   Q.   I want you to go to Bates No. 67.  It's
14 the third page in titled "Message From the
15 Administrator."
16   A.   Okay.
17   Q.   The first paragraph indicates, "The Drug
18 Enforcement Administration is pleased to provide
19 the Chemical Handler's Manual to assist you in
20 understanding the provisions of the chemical
21 control laws and their implementing regulations."
22       Do you see that?
23   A.   I do.
24   Q.   Did I read that right?

Page 167

1    A.   Yes.
2    Q.   All right.  And it goes on, "These laws,
3 including the Chemical Diversion and Trafficking
4 Act of 1988, the Domestic Chemical Diversion
5 Control Act of 1993, the Comprehensive
6 Methamphetamine Control Act of 1996, and the
7 Methamphetamine Anti-Proliferation Act amend the
8 Controlled Substances Act of 1970, the CSA."
9        Do you see that, sir?
10   A.   I do.
11   Q.   All right.  Now, as we go through this
12 document, let's go to Bates No. 71.  "Origins of
13 the Laws and Regulations."  Okay.
14       Now, have you read this document in its
15 entirety?
16   A.   Not in its entirety, no.
17   Q.   Are you familiar with this document?
18   A.   Yes.
19   Q.   Or just certain portions of it?
20   A.   Certain portions.
21   Q.   In any of the portions that you've read,
22 can you point me anywhere to the word "opiate" or
23 "opium" or any derivatives of that -- of those
24 words?

Page 168

1    A.   Not that I'm aware of, no.
2    Q.   Okay.  So let's read here.  "Origins of
3 the Laws and Regulations."  Second paragraph.
4        "DEA embarked upon a broad chemical
5 control program in 1989 that was based on the
6 Chemical Diversion and Trafficking Act of 1988.  At
7 that time, U.S. companies were the main source for
8 20,000 metric tons of various chemicals used
9 annually to manufacture cocaine in the Andean
10 countries of South America.  Among the principal
11 chemicals used by cocaine manufacturers are
12 acetone" -- I'm not going to get that next one.  Do
13 you know what it is?  Can you pronounce it for me?
14   A.   Methyl ethyl ketone.
15   Q.   Thank you.  And why don't you keep going
16 on that?
17   A.   Ethyl ether, potassium permanganate,
18 hydrochloric acid, methyl isobutyl ketone and
19 sulfuric acid.
20   Q.   None of those are opiates, right?
21   A.   Correct.
22   Q.   So, "The quantity of these chemicals
23 shipped to South America from the U.S. declined
24 greatly after the CDTA went into effect."

Page 169

1        Do you see that?
2    A.   I do.
3    Q.   "The CDTA was also effective in reducing
4 the supply of illicit methamphetamine."  Right?
5        Now, meth -- correct, sir?  Sorry.  You
6 have to answer.
7    A.   I see that, yes.
8    Q.   Now, methamphetamine is not an opiate,
9 right?
10   A.   Correct.
11   Q.   So, "The number of clandestine
12 laboratories seized in the first three years
13 following the law's implementation reversed the
14 trend of the previous three decades and declined by
15 61%."
16       Okay.  Now, let's go down to the last
17 paragraph.
18       Did you read this page specifically in
19 preparation for your testimony today?
20   A.   I did not.
21   Q.   Okay.  So, but you believe that Chemical
22 Handler's Manual and E-3 with the formula you
23 provided earlier on Bates No. 396010 is applicable
24 to opiates or opium-like drugs under the Controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  Substance Act?
2      A.   Based on the specification of C-II
3  through C-V, yes.
4      Q.   Yes, sir.  And you would agree with me
5  that there are C-II to C-Vs that are not opiates,
6  correct?
7      A.   Correct.
8      Q.   So, is there anything in this document
9  you can point me to that directly relates to
10  opiates under C-II and C-V?
11     A.   C-II through C-V drugs includes opiates.
12     Q.   Yes, sir.  But -- let's keep going.
13         Are you familiar with List I chemicals?
14     A.   I am.
15     Q.   Okay.  So, let's go down to that last
16  paragraph.
17         Do you see the sentence that begins with
18  "As chemicals rendered"?
19     A.   Yes.
20     Q.   "As chemicals rendered into legitimate
21  medicines purportedly for the commercial market,
22  these products were exempted from the CDTA
23  requirements.  The Domestic Chemical Diversion
24  Control Act of 1993 closed this loophole and

Page 171

1  required DEA registration for all manufacturers,
2  distributors, importers and exporters of List I
3  chemicals."
4         Okay.  Are you familiar with what a
5  List I chemical is?
6      A.   I believe it includes those previously
7  mentioned ones.
8      Q.   Why don't we go and turn to Bates
9  No. 977.  It's page 8 of the document.  And "Listed
10  Chemical" is in the middle of the page.
11     A.   Um-hmm.
12     Q.   "Listed chemical is any List I chemical
13  or List II chemical.  A listing appears in
14  Appendix A."
15         Do you see that?
16     A.   I do.
17     Q.   Okay.  And before we go back to
18  Appendix A, let's look at "List I Chemical," the
19  next paragraph.
20         "List I chemical is a chemical that, in
21  addition to legitimate uses, is used in
22  manufacturing a controlled substance in violation
23  of the CSA and is designated a List I chemical by
24  the DEA administrator or Congress."

Page 172

1         Do I get that right?
2      A.   Yes.
3      Q.   "Chemicals in List I generally are
4  precursors and have been determined by DEA to
5  require a greater level of control than other
6  listed chemicals.  Anthranilic acid" -- I'm going
7  to have you rattle those off.  Go ahead.
8      A.   "Ergotamine, piperidine, and drug
9  products containing ephedrine, pseudoephedrine or
10  phenylpropanolamine are examples of List I
11  chemicals."
12     Q.   All right.  Now, none of those are
13  opiates, right?
14     A.   None of these are opiates, though, I'm
15  not sure if this is an inclusive.
16     Q.   That's just mentioned that we just went
17  through, none of those are opiates, right?
18     A.   Correct.
19     Q.   Are you familiar that those are
20  drugs that are -- I'm sorry -- those are chemicals
21  that are used to create methamphetamine and bind
22  cocaine?
23     A.   I'm familiar that pseudoephedrine is a
24  precursor for methamphetamine.  I wasn't aware of

Page 173

1  the other.
2      Q.   "List" -- it goes on.  "List II chemical
3  is a chemical, other than List I chemical, that, in
4  addition to legitimate uses, is used in
5  manufacturing a controlled substance in violation
6  of the CSA and is designated a List II chemical by
7  the DEA Administrator or Congress.  Chemicals in
8  List II are generally reagents and solvents."
9         Right?
10     A.   Correct.
11     Q.   Now, opiates aren't generally reagents
12  and solvents, correct?
13     A.   No.
14     Q.   So, you don't see anything here on
15  page 8 of the listed chemical that refers to
16  opiates or any derivative thereof, correct?
17     A.   Not that I am aware of, no.
18     Q.   All right.  So, let's turn to page Bates
19  No. 95 or page 26 of the document that's titled
20  "Identification Codes for Listed Chemicals - List I
21  Chemicals."
22     A.   Okay.
23     Q.   Okay.  Now, the chemical is on the
24  left-hand side of that table and without reading

Page 174

1 all of them, would you please read through Bates
2 No. 95 and tell me if any of those chemicals listed
3 in this table on Bates No. 95 are opiates or
4 derivatives thereof.
5    A.   Not that I'm aware of.
6    Q.   These are all chemicals that are used as
7 precursors to meth, correct, sir?
8    A.   I don't know if they're used for meth.
9 But they're used as reagents it appears.
10    Q.   Reagents in the creation of meth,
11 correct?
12    A.   Of a chemical process that based on our
13 previous page might be methamphetamines.  I don't
14 know specifically.
15    Q.   Let's turn to Bates No. 96, List II
16 chemicals.  Please read on that table if you see
17 any opiates or any derivatives thereof on the
18 List II chemicals?
19    A.   I do not.
20    Q.   Now, the Bates number that you referred
21 to earlier when reading what the formula was was
22 396010, correct?  And that's page 41 of the
23 document.
24    A.   Yes.

Page 175

1    Q.   I just want to make sure I have this
2 right.
3        This -- this is E-3 that you've been
4 referring to as the basis for the formula used in
5 the Chemical Handler's report, correct?
6    A.   Correct.
7    Q.   Now, have you ever -- have you actually
8 reviewed in preparation for today the reports
9 generated by Walgreens based on the criteria you
10 gave previously based off of Bates No. 396010?
11    A.   I've reviewed a sample.
12    Q.   Yes, sir.  And does that sample that you
13 reviewed include all Schedule II and Schedule III
14 opiates that Walgreens distributes?
15    A.   I believe it does.
16    Q.   Does it include all Schedule II and
17 Schedule III opiates that Walgreens dispenses?
18    A.   It might not, no.  Not every --
19    Q.   I'm sorry?
20    A.   Not every item that we dispense was
21 carried in our DCs.
22    Q.   So, back to Bates Nos. 396010, "The
23 voluntary formula is used by distributors to
24 wholesale and retail levels.  The formula

Page 176

1 calculates the quantity which, if exceeded in one
2 month, constitutes an order which may be considered
3 excessive or suspicious."  Correct?
4    A.   Correct.
5    Q.   And throughout this page, the DEA in the
6 Chemical Handler's Manual references List I
7 chemicals, correct?
8    A.   Correct.
9    Q.   And List I chemicals, as we just went
10 through, does not contain opiates or any derivative
11 thereof, correct?
12    A.   No.  But it does say in Item 5, "List I
13 chemicals and/or C-II through V controlled
14 substances."
15    Q.   That contain List I chemicals, correct,
16 sir?
17        So, this entire report is about List I
18 and List II chemicals yet Walgreens reviews this --
19 includes in this report Schedule II through
20 Schedule V controlled substances that are opiate
21 derivatives?
22    A.   I'm not -- I'm not seeing where it says
23 C-II through V that contain List I chemicals.  It
24 says, "and List I containing OTC items."

Page 177

1    Q.   Sir, do you see under No. 1, "Add
2 purchase quantities for the last 12 months for all
3 customers within same distribution center and
4 customer type for any List I chemicals."
5        Do you see that?
6    A.   I do.
7    Q.   Under 2, "Add customer months for every
8 record used in the above total," which incorporate
9 List I chemicals from the preceding sentence,
10 correct, sir?
11    A.   Correct.
12    Q.   No. 3, "Divide total quantity purchases"
13 incorporates List I chemicals from No. 1, correct,
14 sir?
15    A.   Yes.
16    Q.   You can't divide total quantity
17 purchases by the total customer months in 3 without
18 referring back to 1, List I chemicals, correct,
19 sir?
20    A.   Correct.
21    Q.   And if you go to No. 4, "Then multiply
22 by the factor below."  That also incorporates
23 List I chemicals into the equation, correct, sir?
24    A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.   And if you continue to 5, "At the end of
2    each month, a report will be transmitted to the DEA
3    (separate reports for List I chemicals and
4    Schedule II through V controlled substances)."
5    Correct, sir?
6    A.   Correct.
7    Q.   This entire document is discussing
8    List I and List II chemicals used as a precursor
9    for meth and cocaine, correct, sir?
10   A.   I --
11       MR. BENSINGER:  Objection; scope.
12   BY THE WITNESS:
13   A.   I -- I'm not sure that that's true based
14   on the use of the "and/or" and, additionally, based
15   on guidance that we received from DEA field offices
16   that said that we should be submitting reports
17   regarding II through V substances using this
18   formula.
19   BY MR. MOUGEY:
20   Q.   Oh.  So, there is written guidance from
21   the DEA telling you all to use E-3 as the formula?
22   A.   Yes.
23   Q.   And where is that written guidance?
24   A.   So, the one I'm referring to

Page 179

1    specifically from the DEA field office in Detroit
2    was -- one moment.
3        So, in the letter from 7/28/06 from
4    Dwayne Piñon to Barbara Dobric at the DEA --
5    Q.   Stop you there for one second.  Let me
6    go ahead and get this entered so we all have it in
7    front of us.
8    A.   Sure.
9    Q.   I apologize for interrupting.
10       MR. MOUGEY:  It's P-WAG-5130.  Mark this as
11   Bratton 30(b)(6) 21.
12           (WHEREUPON, a certain document was
13            marked as Bratton 30(b)(6) Exhibit
14            No. 21:  7/28/06 letter to Barbara
15            K. Dobric from Dwayne A. Piñon;
16            WAGMDL00387642 - 00387650.)
17   BY MR. MOUGEY:
18   Q.   Before I interrupted you, you were
19   describing this as 7/28/2006, right?
20   A.   Correct.
21   Q.   And this is a letter to the DEA,
22   correct?
23   A.   Correct.
24   Q.   Not from?

Page 180

1    A.   In response to a regulatory
2    investigation.
3    Q.   All right.  Now, go ahead and explain --
4    well, let me ask you this.
5        Is there in this exhibit -- what I asked
6    you was is there written direction from the DEA
7    advising Walgreens to use the Chemical Handler's
8    report as a formula for opiate-related controlled
9    substances.
10   A.   I believe that we were responding in
11   this e-mail to Barbara Dobric based on
12   conversations that the DEA had with us.  So, it
13   doesn't appear that I have a copy of what the DEA
14   said, only our replies.
15   Q.   Yes, sir.  So, is it fair, then, that
16   under "Chemical Handler's Report" on my kind of
17   handmade chart in an attempt to figure all this
18   out, that "Verbal and no written direction from DEA
19   to use E-3."  Is that fair?
20       "Verbal and no written direction from
21   DEA to use E-3."  Is that fair?
22   A.   I seem to recall seeing an e-mail, but I
23   can't locate it now but maybe my recollection is --
24   is failing me here.

Page 181

1    Q.   Well, I mean, this Chemical Handler's
2    report is -- was used for maybe 14, 15 years,
3    right?
4    A.   Correct.
5    Q.   And that is a large part of what
6    Walgreens used to fulfill its obligations to
7    identify suspicious orders under the Controlled
8    Substance Act, correct?
9    A.   Correct.
10       MR. BENSINGER:  Objection.
11   BY MR. MOUGEY:
12   Q.   And more specifically, the Chemical
13   Handler's E-3 report is what Walgreens used to
14   fulfill its obligations to identify suspicious
15   orders regarding opiates or the derivatives
16   therefrom, correct?
17   A.   Correct.
18   Q.   Yet these orders, even though they were
19   identified on this report, over a period of a
20   decade continued to be shipped before due diligence
21   was performed, correct, sir?
22       MR. BENSINGER:  Objection; mischaracterization.
23   BY THE WITNESS:
24   A.   Again, there may have been due diligence

Page 182

1 performed at the time they were shipped. This
2 order was only -- this report was only
3 retrospective.
4 BY MR. MOUGEY:
5    Q. And this report by retrospective means
6 it was generated on a monthly basis, correct?
7    A. Correct.
8    Q. And it went -- every order that fit the
9 criteria under E-3 from around the country was sent
10 to every DEA field office around the country,
11 correct?
12    A. My understanding from speaking with the
13 loss prevention folks that were sending out these
14 reports is initially it was only sent to the field
15 office where the registrant was, so where the DC
16 was located.
17       But based on some requests from the DEA,
18 they -- they were struggling with -- that the store
19 might not be where that field office is, that the
20 registrant was but the store wasn't.
21       We then modified it to include shipments
22 from all DCs to all stores that were sent to all
23 field offices.
24    Q. So, when do you think -- first of all,

Page 183

1 who did you speak with at loss prevention that told
2 you that?
3    A. Eric Stahmann.
4    Q. Mr. Stahmann. So, Mr. Stahmann told you
5 that at a period of time, the orders from the DC
6 centers were shipped to the field offices around
7 the DC center?
8    A. That was his recollection.
9    Q. Or around the store?
10    A. Around the -- where the DC was
11 registered.
12    Q. Okay. And so we have C-II, there were,
13 through the entire period of time, 2006 to the
14 point Walgreens stopped distributing Schedule II
15 and Schedule III, there were three distribution
16 centers, Jupiter, Perrysburg and California,
17 correct?
18    A. Woodland, I believe, yes.
19    Q. Woodland, California. Do I have that
20 right?
21    A. I believe so.
22    Q. So, Walgreens at one period of time
23 would ship a report responsive to the criteria in
24 the Chemical Handler's Manual, List I, to the field

Page 184

1 offices in those three areas. Is that right?
2    A. That's my understanding.
3    Q. So, it's possible that these
4 distribution centers would cover orders from
5 pharmacies over multiple states obviously, correct?
6    A. Correct.
7    Q. Thousands of stores, right?
8    A. Correct.
9    Q. So, do you sitting here today have an
10 understanding for when or what period of time
11 Walgreens was shipping -- I'm sorry -- was sending
12 reports based on the Chemical Handler's Manual,
13 List I, E-3, to field offices located near the
14 distribution centers?
15    MR. BENSINGER: Objection; mischaracterization.
16 BY THE WITNESS:
17    A. Mr. Stahmann was unable to give me
18 specific windows of time. He just recalled that
19 the process did change.
20 BY MR. MOUGEY:
21    Q. And it changed to at some uncertain
22 point in time to sending the reports generated in
23 E-3 in the Chemical Handler's Manual to where?
24    A. I believe it was all field offices for

Page 185

1 all DCs.
2    Q. All right.
3    MR. BENSINGER: Mr. Mougey, we have been going
4 for about an hour 25 minutes. Is it convenient to
5 take our lunch break?
6    MR. MOUGEY: Sure. Sounds good to me. Thank
7 you.
8    THE VIDEOGRAPHER: We are off the record at
9 1:14 p.m.
10       (WHEREUPON, a recess was had
11        from 1:14 to 2:00 p.m.)
12    THE VIDEOGRAPHER: We are back on the record
13 at 2:00 p.m.
14 BY MR. MOUGEY:
15    Q. Mr. Bratton, we've identified three
16 different ways that Walgreens was identifying
17 suspicious orders.
18       Let's kind of go back to the last issue
19 you and I were discussing before the break, the
20 Chemical Handler's report L-3.
21       If these reports -- I'm sorry -- these
22 orders that were flagged as a result of the E-3
23 from the Chemical Handler's report were shipped
24 without due diligence and they -- there is no

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  evidence that due diligence was reported or done --
2  let me strike that whole thing. That was terrible.
3       Chemical Handler's report L-3, those
4  orders that appeared on or as a result of that
5  criteria on Bates No. 396010, there was not due
6  diligence on those orders unless it was caught in
7  one of the other metrics, right?
8       A.   I think that's accurate.
9       Q.   Okay. So, do you sitting here have an
10 understanding, "you" meaning Walgreens, have an
11 understanding of what the industry standard was
12 from 2006 to the point when Walgreens was no longer
13 distributing as the requirement to perform due
14 diligence on a flagged order prior to it being
15 shipped?
16      MR. BENSINGER: Objection; vague, scope.
17 BY THE WITNESS:
18      A.   I have come to understand through
19 discussions and this preparation that there was a
20 time at which other distributors were seeing an
21 elevated enforcement posture from the DEA in which
22 they began to transition away from the E-3 type
23 report to a system of hold, research and then ship
24 or not ship.

Page 187

1  BY MR. MOUGEY:
2       Q.   Do you believe that the report generated
3  as a result of the Chemical Handler E-3 was
4  sufficient to meet Walgreens' responsibilities
5  under the Controlled Substance Act and the regs
6  promulgated thereunder?
7       MR. BENSINGER: I object on the ground that
8  that's beyond the scope of the required testimony
9  based upon the Special Master's ruling of
10 September 3, 2018.
11      MR. MOUGEY: Do you want me to read it again?
12      SPECIAL MASTER COHEN: I'm looking at it.
13      MR. BENSINGER: Special Master, specifically
14 I'm referring to your ruling on the Walmart letter.
15      SPECIAL MASTER COHEN: I know what I said.
16      MR. BENSINGER: Very good.
17      SPECIAL MASTER COHEN: I'm going to allow
18 that.
19           (Clarification requested by the
20           reporter.)
21      SPECIAL MASTER COHEN: I said I'm going to
22 allow that.
23 BY THE WITNESS:
24      A.   I'm sorry. Should I answer?

Page 188

1  BY MR. MOUGEY:
2       Q.   Do you want me -- yes. Do you want me
3  to reread it for you?
4       A.   Yes, please.
5       Q.   Do you believe that the report generated
6  as a result of the Chemical Handler E-3 was
7  sufficient to meet Walgreens' responsibilities
8  under the Controlled Substance Act and the regs
9  promulgated thereunder?
10      A.   I believe that we thought it was.
11      Q.   When you say "thought it was," you
12 believe the answer is yes, that it was sufficient
13 to meet Walgreens' responsibilities under the
14 Controlled Substance Act and the regulations
15 promulgated thereunder?
16      A.   Yes.
17      Q.   Do you believe -- does Walgreens believe
18 that shipping orders that were flagged as a result
19 of the Chemical Handler's Manual E-3 without
20 performing due diligence complied with Walgreens'
21 responsibilities under the Controlled Substance Act
22 and the regulations promulgated thereunder?
23      A.   I believe we thought it did.
24      Q.   And I'm not asking if you believed if

Page 189

1  you thought. What I'm asking is did it or did it
2  not, meaning shipping before due diligence an order
3  that was flagged on that report, comply with
4  obligations -- with Walgreens' obligations under
5  the Controlled Substance Act and the regulations
6  promulgated thereunder? Yes or no.
7       MR. BENSINGER: I renew my objection and note
8  the mischaracterization of the witness' prior
9  testimony.
10      SPECIAL MASTER COHEN: Overruled.
11 BY THE WITNESS:
12      A.   I believe that we thought that that was
13 sufficient to meet the regulatory requirements.
14 BY MR. MOUGEY:
15      Q.   Do you believe sitting here that
16 Walgreens filled its responsibilities by shipping
17 orders that were flagged on E-3, Chemical Handler's
18 Manual, without due diligence fulfilled Walgreens'
19 responsibilities under the Controlled Substance Act
20 and the regulations promulgated thereunder?
21      A.   As the --
22      MR. BENSINGER: Asked and answered.
23 BY THE WITNESS:
24      A.   As I mentioned earlier, there may be due

Page 190

1  diligence that was performed before it was shipped,
2  though not in coordination with the Appendix E-3
3  report, but yes.
4  BY MR. MOUGEY:
5      Q.   Let me make sure I understand your --
6  those caveats.
7          You believe that Walgreens, if it
8  shipped orders that were flagged on the formula out
9  of the Chemical Handler's report, E-3, without
10 performing any due diligence, whatever test it was,
11 there was no due diligence, did that comply with
12 Walgreens' responsibilities under the Controlled
13 Substance Act and the regs promulgated thereunder?
14     A.   I can't say for certain that there was
15 no due diligence performed on those orders that
16 appeared in the E-3 report.
17     Q.   I understand.  And your preparation for
18 today included being able to identify what due
19 diligence, if any, occurred on specific orders,
20 correct?
21     A.   Correct.
22     Q.   So, what I'm asking you, sir, is other
23 than these three or four e-mails that you can point
24 to, if there was no due diligence performed on all

Page 191

1  of the orders that were identified using the
2  formula from the Chemical Handler's report, E-3,
3  did that fulfill Walgreens' responsibilities under
4  the Controlled Substance Act and the regulations
5  promulgated thereunder?
6      A.   So, just to clarify.  You're asking me
7  to speculate that if one of these orders had
8  shipped and we hadn't done due diligence, that
9  would not meet the requirements?
10     Q.   That's right.
11     A.   I would agree.
12     Q.   Okay.  Again, I apologize.  When you say
13 you'd agree, you'd agree that that would violate
14 Walgreens' responsibilities under the Controlled
15 Substance Act and the regulations promulgated
16 thereunder by not performing due diligence,
17 correct?
18     MR. BENSINGER:  Objection; calls for a legal
19 conclusion and an interpretation of the
20 regulations.
21 BY MR. MOUGEY:
22     Q.   You can answer.
23     A.   I would agree.
24     Q.   Again, let's go back to 30,000-foot view

Page 192

1  and explain to me what, if any, other reports or
2  mechanisms was Walgreens using post-2006 to
3  identify suspicious orders?
4      A.   There was also line limits that were in
5  place.  So, that is a process that no more than
6  a -- there is a maximum upper limit to the quantity
7  per line item that can be shipped.
8          In discussions with the inventory and DC
9  folks, they believe that line limits were in place
10 throughout this time, though until later we were
11 not able to definitively establish on what
12 products, but from their recollection they talked
13 about line limits.
14     Q.   I apologize for interrupting, but help
15 me.  Are line limits different than the excessive
16 quantity query?
17     A.   Yes.
18     Q.   Okay.  And, so, when you say line
19 limits, help me understand a little bit what you're
20 talking about because -- this is out of the
21 distribution center?
22     A.   Correct.
23     Q.   Okay.  So, start from scratch.  What are
24 line limits?

Page 193

1      A.   Line limit is, it refers to a line on
2  the order and it is the maximum quantity for a
3  particular product that that line can have the
4  quantity be.  So, for example, 100 tablets of
5  alprazolam can't exceed 5 bottles on any order.
6      Q.   Have you seen any reports that were
7  generated identifying orders that exceeded the line
8  limits?
9      A.   The line limit would be a hard stop that
10 can't be exceeded.
11     Q.   But have you seen any reports
12 identifying instances where that happened?
13     A.   I have not.
14     Q.   Have you seen any written policies or
15 procedures identifying what the criteria is for
16 when that happens?
17     A.   I have not -- I have seen e-mails and
18 presentations that speak about what drugs were
19 subject to line limits, but not what the quantity
20 and the number was at the time of the line limits.
21     Q.   Anything to see what the line limits
22 were, how they were created?
23     A.   We don't have written documentation as
24 to what the number was on the line limit.  We just

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  know that it was extant.
2      Q.   Do you know -- I'm sorry.  Go ahead.
3      A.   That's it.
4      Q.   Do you know what time period the line --
5  I'm just going to call it line limits -- the line
6  limits policy was in place?
7      A.   The interviews in which I conducted,
8  they thought that they had always been in place but
9  they could not quantify what items at what time
10 were subject to those line limits.
11          There are some later documents in 2012 I
12 think as part of that presentation to the DEA and
13 another internal document shortly thereafter that
14 details the products that were subject to line
15 limits, but we have been unable to determine what
16 the number was on the line limit.
17     Q.   Okay.  So let me make sure, going back
18 to our chart, I'm going to put "Line Limits" under
19 the "Criteria."  Does that make sense?
20     A.   Correct.
21     Q.   And under the "Date," I'm going to put a
22 question mark because we're not sure, right?
23     A.   2000 forward, but we're not sure what.
24     Q.   Did you say "2000 forward"?

Page 195

1      A.   Yeah.
2      Q.   But not sure.  I'm going to put a
3  question mark.  Is that fair?
4      A.   Fair.
5      Q.   Okay.  And under the "Criteria" I'm
6  going to put a question mark because we're not
7  sure?
8      A.   Criteria were certain drugs, products.
9      Q.   Okay.
10     A.   What those were at what time, we don't
11 know.
12     Q.   Okay.  So, kind of like the greater than
13 X.  We know that somebody's told you that line
14 items -- I'm sorry -- line limits were certain
15 drugs, but we don't know which ones, right?
16     A.   We -- we have in later documents a list
17 of chemicals, a list of products that were included
18 in the line limits.
19     Q.   List of products?
20     A.   Um-hmm.
21     Q.   Does that include opiates?
22     A.   Correct.
23     Q.   "List of products, chemicals but later."
24 Is that later date?

Page 196

1      A.   Correct.
2      Q.   So, again, not entirely sure what
3  certain drugs were at any one point in time and
4  what the criteria was?
5      A.   We're not able to establish what those
6  were with documentation.
7      Q.   Okay.  So, when those orders were
8  flagged, were they suspicious?
9      A.   They could also be suspicious.
10     Q.   Okay.  So, possibly suspicious like the
11 others and the answer is yes, then?
12     A.   Yes.
13     Q.   Okay.  The due diligence, is there any
14 mechanism to perform due diligence on an order that
15 tripped the line limits?
16     A.   There likely -- they would likely also
17 appear on the excessive quantity query.  The
18 difference here is that it would not allow,
19 regardless of an override -- so, even if the DC
20 staff investigated and found it not to be
21 suspicious, it's still -- they could still not
22 exceed the line limit in how much product was
23 shipped.
24     Q.   If I put in "Due Diligence" to say a

Page 197

1  "Hard Stop," is that accurate?
2      A.   Correct.
3      Q.   Okay.  So, I'm going to put "Hard Stop"
4  and then "/no" on the "Due Diligence."  Is that
5  fair?
6      A.   Again, I think there would be overlap
7  with excessive quantity query on these.  Also, if
8  the quantity exceeded the line limit, it wouldn't
9  be shipped at all.
10     Q.   I'll just leave the "Hard Stop."
11          So, continuing under "Policies and
12 Procedures Written," that's no, right?
13     A.   No.
14     Q.   And then "Policy and Procedures Verbal,"
15 it's yes but with uncertainty.  Is that fair?
16     A.   Yes.
17     Q.   And we already answered the no due
18 diligence.  I'm just going to call that a hard
19 stop.
20          And they weren't shipped if they
21 exceeded the line limit, right?
22     A.   That's my understanding, yes.
23     Q.   So, what department within Walgreens was
24 responsible for identifying what that hard stop

Page 198

1  number was?
2      A.   From my understanding, it was a
3  collaboration between the logistics, DCs, and the
4  inventory teams.
5      Q.   Okay.  So, those are three separate
6  departments?
7      A.   Well, DCs are part of logistics.
8      Q.   What people specifically did you talk to
9  that tried to help you understand what the line
10  limits were?
11      A.   The DC staff, when I talked to them, I
12  recall them talking about line limits.
13      Q.   Okay.  Who is that?
14      A.   Justin Joseph and for sure.  I think
15  Steve Kneller also.
16      Q.   Okay.  They are both DC staff?
17      A.   Correct.
18      Q.   Okay.
19      A.   I believe Bamberg, Steve Bamberg,
20  mentioned line limits as well.
21      Q.   All right.
22      A.   As Denny Murray and Barb Martin.
23      Q.   Is Steve Bamberg a DC staff?
24      A.   No.  He is a systems developer, but he

Page 199

1  had some awareness of line limits.
2      Q.   Okay.
3      A.   He wouldn't be responsible for
4  determining them, as best I can determine.
5      Q.   I got lost there after Steve.  So, I
6  have Justin Joseph, Steve Kneller, Steve Bamberg
7  and who else?
8      A.   Barb Martin.
9      Q.   And Barb Martin?
10      A.   And Denny Murray.
11      Q.   Okay.  Is Denny Murray a DC staff?
12      A.   He is in our Rx inventory team.
13      Q.   Okay.  And one more time I'm missing
14  one.
15      A.   Barb Martin.
16      Q.   That's right.
17      A.   Also Rx inventory.
18      Q.   But she works out of the DC offices?
19      A.   No.  What I'm saying is the DCs and
20  inventory would work together to set the line
21  limits is what I've understood from the interviews.
22      Q.   So, you talked to four people about line
23  limits and no one recalls any policy or procedure,
24  no one recalls the specific line item and no one

Page 200

1  recalls what the hard stop was, right?
2      A.   Correct.
3      Q.   Okay.  Do you think that that answer --
4  and I'm sorry that you're getting put in this
5  position, but you're only as good as the
6  information you get, right?
7      A.   Um-hmm.
8      Q.   And you're charged sitting here today as
9  getting up to speed, as we went through earlier,
10  duty to prepare to talk about the different
11  policies and procedures and formulas for suspicious
12  order monitoring.
13          But everything we've gone through so
14  far, there's been virtually nothing in writing on a
15  policy and procedure evidencing what the criteria
16  was.  Is that fair?
17      MR. BENSINGER:  Objection; argument.
18  BY THE WITNESS:
19      A.   The -- there's been limited policies and
20  procedures.  We have interviews and then also
21  variety of e-mails or presentations that reference
22  the line limits.  But the -- it's a limited set of
23  information.
24  BY MR. MOUGEY:

Page 201

1      Q.   What we have gone through so far, do you
2  agree that Walgreens' suspicious order monitoring
3  program, policies and procedures was a Byzantine
4  maze of patchwork of pieces put together?
5      MR. BENSINGER:  Special Master, I object that
6  this is argument and now asking for a personal
7  opinion, not asking for a corporate designee.
8      SPECIAL MASTER COHEN:  Sustained.
9  BY MR. MOUGEY:
10      Q.   Who was in charge of, and I apologize if
11  I already asked this, who was in charge of
12  implementing or looking at the line limit reports
13  on a daily basis?
14      A.   I don't know that they -- it wasn't a
15  report so much as it was a threshold in the system
16  that could not be exceeded.  So, I don't know that
17  anyone was reviewing the threshold on a daily
18  basis.
19      Q.   So, if an order exceeded the threshold
20  and wasn't filled, no one pointed you to any
21  automation or notification for any specific
22  individual that warranted to go take a closer look?
23      A.   No.
24      Q.   Would you agree that an order that

Page 202

1 tripped the line limit was suspicious?
2   A.  It was -- it would be possibly
3 suspicious.
4   Q.  But no one did any follow-up to see why
5 it was tripped?
6   A.  Not that I'm aware of.
7   Q.  All right.  So, now after the line
8 limits, what other policies were in place that
9 Walgreen used to fulfill its obligations as a
10 distributor under the Controlled Substance Act?
11   A.  Sure.  Let me switch to my other binder
12 here.
13      So, the next, if we're going in time
14 order, we began development and then deployment of
15 phase 1 in 2009.
16   Q.  All right.  So, 2009.  And that was an
17 algorithm written by Wayne Bancroft, correct?
18   A.  Correct.
19   Q.  And that algorithm is memorialized in a
20 memorandum, correct?
21   A.  Correct.
22   Q.  And that's part of your -- bear with me.
23      I think the first manual -- I'm sorry --
24 memo that memorialized Mr. Bancroft's memo was

Page 203

1 2008, correct?
2   A.  I believe so, yes.
3   MR. MOUGEY:  Alex, can I get 1757.
4      I hand you what we're going to mark as
5 Bancroft (sic) 30(b)(6) 22.
6      (WHEREUPON, a certain document was
7      marked as Bratton 30(b)(6) Exhibit
8      No. 22:  6/23/08 memo;
9      WAGMDL00624503 - 00624509.)
10 BY MR. MOUGEY:
11   Q.  June 23, 2008, correct, sir?
12   A.  Correct.
13   Q.  Written by Wayne Bancroft and Tracy
14 Morris, correct?
15   A.  Correct.
16   Q.  And to multiple other Walgreens
17 employees, correct?
18   A.  Correct.
19   Q.  The deliverable is "Proposal for
20 defining 'suspicious orders' in the Walgreen
21 distribution system," correct?
22   A.  Correct.
23   Q.  And the regarding, "DEA suspicious order
24 reporting," as I already mentioned, dated June 23,

Page 204

1 2008, correct?
2   A.  Correct.
3   Q.  "The DEA is requiring Walgreens to
4 monitor the orders for control substances that our
5 stores place on our distribution centers for
6 suspicious activity."
7      Do you see that in the first sentence?
8   A.  I do.
9   Q.  "Suspicious orders are defined in terms
10 of order size and order frequency.  This document
11 proposes a methodology for identifying suspicious
12 orders in terms of order size and order frequency."
13      Do you see that, sir?
14   A.  I do.
15   Q.  Okay.  So, there wasn't anything that
16 had changed in June of 2008 that warranted that
17 Walgreens was now all of a sudden responsible for
18 identifying suspicious orders, correct, sir?
19   A.  In the conversations that I had with --
20 with the folks that I interviewed, their consensus
21 was there was a shift in the industry and in the
22 DEA's enforcement posture, and this led us to look
23 for additional ways to try to get our hands around
24 the suspicious order question.

Page 205

1   Q.  But as we go back, and we don't
2 need this, the chart you and I have been putting
3 together, the earliest date you and I have
4 identified is '98.
5      So, Walgreens was aware that it was
6 responsible for designing a system to identify
7 suspicious orders going all the way back to '98,
8 correct?
9   A.  Correct.
10   Q.  Yes, sir.  So, the memo coming out in
11 2008, there was no sea change and all of a sudden
12 there was a new responsibility for Walgreens,
13 correct, sir?
14   A.  I don't believe that it was a new
15 responsibility, no.
16   Q.  So, this methodology written by
17 Mr. Wayne Bancroft and Ms. Tracy Morris, they were
18 charged with designing a new methodology within
19 Walgreens to identify suspicious orders, correct,
20 sir?
21   A.  Correct.
22   Q.  And, so, would you please explain to me
23 what your understanding, what's -- of what that
24 methodology was in 2008?

Page 206

1    A.   So, I think, you know, based off of
2  interviews and with these folks that were involved,
3  there were concerns from the DEA that the previous
4  E-3 reports were overinclusive, and we sought to
5  clarify that, but in the absence of any clarity, we
6  proceeded with this plan of action.
7        So, I'm not a Ph.D. in math like Wayne
8  is, but my understanding is that if it would look
9  back at the quantities that's normally ordered by a
10 store and it would use math to determine if that
11 quantity was irregular and if it was irregular, it
12 would -- it would flag it as potentially suspicious.
13   Q.   The algorithm written by Mr. Bancroft
14 was based on linear regression?
15   A.   I don't know if this one was.
16   Q.   Or was it the later one?
17   A.   I believe it was the later one, but,
18 again, I'm not an expert at this.
19   Q.   So, Mr. -- the system that Mr. Bancroft
20 was discussing in this memorandum dated June 23,
21 2008 was designed to identify outliers outside the
22 average of a certain store, correct?
23   MR. BENSINGER:  Objection; characterization.
24 BY THE WITNESS:

Page 207

1    A.   I'm not sure if it was on a
2  store-by-store basis or not or if it was compared
3  to all orders of that size.
4  BY MR. MOUGEY:
5    Q.   You just explain to me what you think
6  Mr. Bancroft -- and I understand that it's an
7  algorithm that is -- has a lot of Greek symbols in
8  it.
9        So, why don't you just tell me in your
10 own plain English what you think Walgreens' system
11 that it was discussing in June of 2008 to identify
12 suspicious orders?
13   A.   I think it would try to identify
14 quantities or frequencies outside of a normal
15 pattern and then flag those as potentially
16 suspicious.
17   Q.   And then what would happen once they
18 were flagged as potentially suspicious?
19   A.   Well, phase 1 starting in '09 was a test
20 and during that proof of concept phase, we were
21 evaluating the flagged orders to see if they really
22 met muster, if you will, and were something that we
23 would consider suspicious.
24        So, for about ten months, they were

Page 208

1  testing the system and refining the characteristics
2  of what might be identified.
3        Then in phase 2 --
4    Q.   Can I stop you there?  I apologize for
5  interrupting.
6        But when you said that phase 1 was a
7  test and during that proof of concept phase we were
8  evaluating the orders to see if they would really
9  pass muster.
10       So, what I want to know is when did
11 phase 1 go into place based on the final algorithm
12 from Mr. Bancroft?
13   A.   So, phase 1 was producing reports in
14 August of '09.
15   Q.   Okay.  Now, when I say "producing
16 reports," are you saying in a pilot concept or it
17 was implemented across all of the stores?
18   A.   Pilot concept.
19   Q.   Pilot concept.  But what I'm looking for
20 is when was it implemented across Walgreens in its
21 final form?
22   A.   Well, the phase 2, which is based off of
23 this initial algorithm, after they tested it in the
24 proof of concept, it went live in September of 2010.

Page 209

1    Q.   Okay.  So I'm back to our chart.  I've
2  now created a second page here because we ran out
3  of room on the first one.
4        So, phase 1 was not operational across
5  Walgreens.  Is that right?
6    A.   No.
7    Q.   I'm sorry.  Am I right that it wasn't
8  operational across Walgreens?
9    A.   Correct.  It was only a proof of
10 concept.
11   Q.   So, if I write "Phase 1 - not
12 operational," I'm going to just write "Proof of
13 concept."  Is that fair?
14   A.   That's fair.
15   Q.   Okay.  And you and I know from looking
16 at this memo that about June 2008 is when that -- I
17 won't say started because you clearly had done some
18 work, but at least memorialized.  How's that?
19       Okay.  So, to keep it general, should I
20 say 2008 to 2000 and -- phase 2 was implemented in
21 2010 you said, right?
22   A.   Correct.
23   Q.   So, can I put 2008 to 2010 under
24 phase 1?

Page 210

1    A.    Yes.
2    Q.    Is that fair?
3    A.    Fair.
4    Q.    Okay.  So, "2008 to 2010, phase 1 - not
5  operational, proof of concept."
6        Does that sound right?
7    A.    Correct.
8    Q.    Okay.  So, what do you refer to or what
9  does Walgreens refer to as Mr. Bancroft's algorithm
10  in phase 1?  What was the --
11    A.    The tolerance and frequency limits.
12    Q.    Okay.  So, I'm going to under "Criteria"
13  put "Tolerance and Frequency," and I am going to
14  reference this Bates number, 24503, as a reference.
15  Is that fair?
16    A.    Yes.
17    Q.    Is this memo a good memorialization of
18  that phase 1?
19    A.    Correct.
20    Q.    Okay.  So, phase 1, 24503.  I'm going to
21  put a 6 in front of it.  "624503, Tolerance and
22  Frequency," and that was on a pilot basis, correct?
23    A.    Correct.
24    Q.    So, let's talk about the pilot stores

Page 211

1  for a minute.  I get some of these mixed up a
2  little bit.  Is that Nevada, Tennessee?  Tell me
3  where the pilots were.  Do you remember?
4    A.    I believe some were in Nevada.  I'm
5  not -- I don't know -- I don't recall them
6  mentioning Tennessee.
7    Q.    Okay.  And when we say "pilots," were --
8  was the formula being run and was a report being
9  generated that suspicious orders were -- were going
10  to certain individuals within Walgreens?
11    A.    So, during that time, Barb Martin and
12  Marcy Ranick would review monthly data from the --
13  the stores, and there's some discussions that I've
14  had with Barb and also e-mails and notes that I've
15  seen where they would evaluate is this potentially
16  suspicious or not and, for instance, there's
17  examples where there is things that shouldn't have
18  been flagged or may have -- the system was
19  interpreting actions by the store incorrectly and
20  so those shouldn't be included in the flagging.
21    Q.    So, Bob and -- I'm sorry.
22        Barb Martin and Marcy Ranick were kind
23  of looking at the reports generated as a pilot?
24    A.    Correct.

Page 212

1    Q.    So, was it operational in the pilot
2  stores?
3    A.    It was only collecting data, from my
4  understanding.
5    Q.    Okay.  It was a beta test.  How's that?
6  Is that fair?
7    A.    That's fair.
8    Q.    So, it wasn't implemented in those pilot
9  stores.  It was beta testing to see what the
10  results were for accuracy and making sure
11  everything was running smoothly?
12    A.    Correct.
13    Q.    And that continued from '08 until 2010
14  when phase 2 was implemented, is that -- is that
15  accurate?
16    A.    When phase -- phase 2 was deployed, yes.
17    Q.    Okay.  And do you have an understanding
18  of when phase 2 was deployed?
19    A.    September 2010.
20    Q.    September 2010?
21    A.    Correct.
22    Q.    All right.  And please explain what
23  phase 2 is.  Is it the same methodology with the
24  tolerance and frequency that we just discussed in

Page 213

1  phase 1?
2    A.    So, they made some changes --
3    Q.    Okay.
4    A.    -- is what I was told and updated the
5  way the system was functioning and then --
6    Q.    Okay.
7    A.    -- once those changes were incorporated,
8  it was deployed in September of 2010, and at that
9  time it would automatically reduce orders that
10  exceeded the tolerance threshold.
11    Q.    Okay.  So, "Possible Suspicious Orders"
12  would be a yes, correct?
13    A.    Yes.
14    Q.    Okay.  Now, let me go back.  I should
15  have filled out the rest of these.
16        I'm just going to put "Beta" across all
17  these columns at the top.  Is that fair?
18    A.    Yes.
19    Q.    Okay.  Now, let me make sure I got this
20  right.
21        So, Mr. Bancroft's formula would run
22  through the system across the country and if an
23  order exceeded frequency or tolerance, the order
24  was reduced, correct?

Page 214

1    A.   Correct.

2    Q.   And if the order triggered frequency or
3 tolerance, was a suspicious report generated?

4    A.   No.

5    Q.   Okay.  So, you'd agree with me that
6 triggering frequency or tolerance, that that would
7 possibly be a suspicious order, correct?

8    A.   Possibly.  However, it would be reduced
9 before it was ever transmitted to the DC.

10   Q.   All right.  So, under "Possibly
11 Suspicious Orders," I'm going to put "Yes but
12 reduced."  Is that fair?  Is that accurate?

13   A.   Yes.

14   Q.   Okay.  The criteria under deployed in
15 9/10 in phase 2 was kind of the same thing I put in
16 this first column, "Some changes and updates,"
17 right?

18   A.   Updated tolerance and frequency, yes.

19   Q.   All right.  I'm going to put "Some
20 changes/updates to phase 1."

21        Do you know what those were, what the
22 changes and updates were?

23   A.   They are design documents.  I'm not sure
24 if they call out specifically like in a -- like

Page 215

1 before and after kind of format.  But I think they
2 detail what was implemented.

3    Q.   Do you believe that there is specific
4 documents that identify what the changes and
5 updates were from phase 1 to phase 2?

6    A.   There's the design docs, but you'd have
7 to compare the version 1 and version 2 design doc
8 and draw out the differences.  There was also some
9 e-mails from Marcy and Barb that said, you know,
10 this shouldn't be flagged or we need a new
11 category.  This is incorrectly --

12   Q.   Sitting here --

13   A.   -- being positioned.

14   Q.   Sorry.  Didn't mean to interrupt you.

15        But sitting here today you can't tell
16 this jury with specificity what the difference is
17 between phase 1 and phase 2 of Walgreens'
18 suspicious order monitoring policies, can you?

19   A.   I think we would have to do a review of
20 the business requirements for each phase and then
21 produce a deliverable, yeah, that would.

22   Q.   When you say "business requirements,"
23 you're referring to the internal memorandum
24 generated on an ongoing basis updating, correct?

Page 216

1    A.   The -- yes, and the design documents
2 that specify what the system shall do and how that
3 will be accomplished.

4    Q.   So, as part of your preparation for
5 today, no one's helped educate you on the
6 differences between phase 1 and phase 2 in kind of
7 a list of what the differences are, right?

8    A.   Not at that level of specificity.

9    Q.   Quite frankly, really, can you give me
10 any direction as to what the differences between
11 phase 1 and phase 2 are other than just pointing me
12 to the numerous business requirements documents
13 generated internally?

14   A.   I think there were some adjustments to
15 Steve or -- excuse me -- Wayne's formula.  I don't
16 fully understand how that -- those work.

17        As I said, I think they added
18 additional.  So, when it was flagged, it would have
19 a sort of a disposition as to why.  And they added
20 additional criteria or dispositions.

21        And then there were times when it was --
22 we looked at examples where it was the store
23 changed the order, but they may have actually
24 changed it to be less or in a way that was

Page 217

1 acceptable, but those were getting flagged because
2 it was touched at all by the store, which was not
3 appropriate based -- not an appropriate criteria to
4 mark it as suspicious, only that it was touched.

5    Q.   So, sir, sitting here today with Bratton
6 Exhibit 2, the First Notice of Deposition pursuant
7 to 30(b)(6), you can't explain to the jury what
8 Walgreens' standards and metrics were as elaborated
9 in Mr. Bancroft's memo with any -- with any
10 specificity other than what you just gave, correct?

11   A.   Correct.

12   Q.   So, how the formula worked, what the
13 formula was, what data it pulled, those aren't --
14 that's not information you have in response to (i)
15 today?

16   A.   Those are contained in the documents.

17   Q.   Yes, sir.  I'd have go back and kind of
18 compare all the different business requirements
19 documents and see if I can discern what the
20 differences were, correct?

21   A.   Correct.

22   Q.   Can you actually point me to a document
23 that says this is phase 2, this is it?

24   A.   So, there's a number of documents.  The

Page 218

1 first one would be the design for phase 2.
2    Q.   Before I interrupt, I just want to make
3 sure before you keep going.  What I'm looking for
4 is a final, final document with a final algorithm.
5 Can you -- not a series of documents with updates.
6       Can you point me to a final document
7 with a final algorithm formula?
8    A.   I believe that the micro design for
9 phase 2, and that's Bates No. 492076, outlines the
10 final formula for the system.  And there is an
11 attachment to that report that has a separate -- I
12 thought there was.
13    Q.   What concerns me a little bit about your
14 answer is you said "I believe."  Is it?  Is 492076
15 the final version of phase 2?
16    A.   I believe so, yes.  This is what they
17 would have built and implemented.
18    Q.   Okay.  You just use the word "I believe"
19 again.  Is that a caveat or are you saying that
20 is -- that is or you're not really sure?
21    A.   The challenge with any of our IT
22 projects is they would begin with this design doc
23 and as they deployed the software, if there were
24 defects or bugs that were identified as part of

Page 219

1 the -- so, any time we go through the business
2 requirements, functional requirements, macro
3 design, micro design, build, test, and then pilot.
4    Q.   Right.
5    A.   As part of the pilot, it's a limited
6 distribution smaller number of stores.
7    Q.   Get it.
8    A.   As part of that pilot, they may identify
9 defects in the product.
10    Q.   Okay.
11    A.   I -- we were unable to determine if
12 there were any of those documents that outlined any
13 defects --
14    Q.   Okay.
15    A.   -- that were -- would have -- might have
16 precipitated a change during the pilot phase.
17    Q.   So, the answer to my question is we're
18 not really sure what the exact final formula or
19 algorithm was that was actually deployed after the
20 macro, micro, pilot, you know, any tweaks or
21 changes right when it was deployed, right?
22    A.   I have no evidence that would lead me to
23 believe it wasn't what's in the micro design, but
24 I'm also not ruling out there is a possibility that

Page 220

1 something was changed.
2    Q.   Okay.  You would agree with me, sir,
3 that under (i), one of the questions we had today
4 that Walgreens was to prepare you on was the
5 metrics used to identify orders of unusual size,
6 orders deviating substantially from a normal
7 pattern and orders of unusual frequency, right?
8    A.   Yes.
9    Q.   And what we're discussing would fall
10 under (i), correct?
11    A.   Correct.
12    Q.   And, so, even sitting here after now
13 years later, months into this litigation, Walgreens
14 isn't able to tell us what the exact algorithm was
15 in 2009 that was deployed, correct?
16    A.   I reasonably believe, I feel, that this
17 was what was deployed but I can't --
18    Q.   You can't say for sure?
19    A.   I can't say with 100 percent certainty.
20    Q.   Okay.  Now, orders that were cut down
21 were based on this tolerance and frequency.  Were
22 there -- was there due diligence performed on the
23 order as it was submitted?
24    A.   Other than the previously discussed

Page 221

1 diligence, no.
2    Q.   So, there's no one at Walgreens that's
3 receiving these reports or the results of the phase
4 2 algorithm and performing due diligence on any of
5 these?
6    A.   Well, the orders after they were cut
7 would be released to the DC and the DC would --
8 would perform their diligence, but I know that Barb
9 and Marcy were still looking at these periodically
10 as well.
11    Q.   The orders that were -- that triggered
12 the formula for tolerance and frequency and were
13 cut, were those reported to the DEA as suspicious?
14    A.   They would not have been included in
15 the -- the Appendix 3-E report.
16    Q.   Or any report for that matter?
17    A.   Not based on the -- they might have been
18 in there, but they weren't included based on their
19 being flagged in this process.
20    Q.   There was no report for suspicious
21 orders being sent to the DEA as a result of orders
22 being cut based on tolerance and frequency, right?
23    A.   Not at this time, no.
24    Q.   Okay.  So, "Possible Suspicious Order"

Page 222

1  column, back to the chart, "Yes, but reduced.  No
2  SOR," suspicious order reports, "to DEA," I'm going
3  to say, "based on phase 2."  Is that fair?
4      A.   Yes.
5      Q.   And based on phase 2, order getting cut,
6  there was no due diligence on why the order
7  exceeded the tolerance and frequency either,
8  correct?
9      A.   Not based only on phase 2, correct.
10     Q.   Okay.  So, I said below that, "No on
11  phase 2."  Is that -- that's accurate, right?
12     A.   Other than the other diligence, no.
13     Q.   Yes, sir.  So, I think it's safe to
14  assume and there is not any policies and procedures
15  written on what due diligence to perform based on
16  the orders that were cut, right?
17     A.   Correct.
18     Q.   So, I'm going to put "Not on due
19  diligence for orders that were cut."  Is that fair?
20     A.   Yes.
21     Q.   Okay.
22     A.   There was retrospective analysis, but
23  not --
24     Q.   Before they were shipped?

Page 223

1      A.   Correct.
2      Q.   And the retrospective analysis was what?
3      A.   The LP, Marcy Ranick and Barb Martin
4  would review a sample of these and review the
5  appropriateness of the orders.
6      Q.   All right.  So, how do you know that?
7      A.   Based on discussions with them and
8  e-mails that I've seen where they discuss.
9      Q.   So, no -- no written policies or
10  procedures on what that due diligence was?
11     A.   No.
12     Q.   Okay.  So, I'm going to say "Policy and
13  Procedures on Due Diligence," I'm going to say,
14  "Nothing in writing other than e-mails and verbal
15  or interviews."  Is that fair?
16     A.   Correct.
17     Q.   All right.  So, phase 2.  How long was
18  phase 2 in play?
19     A.   Let me switch back to my reference
20  material here.
21     Q.   Are you looking for an end to phase 2?
22     A.   Yes.  So, phase 3 was deployed in
23  June of 2012.
24     Q.   Okay.  So, I'm going to say

Page 224

1  September '10 to May of '12 for phase 2, is that
2  right?
3      A.   Correct.
4      Q.   Okay.  So, phase 3 is June of '12,
5  right?
6      A.   Correct.
7      Q.   So, do you have an understanding --
8  actually, before we get into that, let me make sure
9  that you and I are clear on something.
10          When an order triggered the tolerance
11  and frequency under phase 2 and it was cut, let me
12  make sure you and I are saying the same thing, cut
13  meaning that the order was reduced to the amount
14  set internally by Walgreens.  Is that fair?
15     A.   Based on the algorithm developed by
16  Wayne.
17     Q.   Okay.  And, so, therefore, the order was
18  not sent from the distribution center?
19     A.   It was reduced and fulfilled.
20     Q.   Reduced and fulfilled.  Okay.  Fulfilled
21  meaning the order was reduced to the amount that
22  Walgreens said it was okay and then it was
23  fulfilled, correct?
24     A.   Correct.

Page 225

1      Q.   Okay.  Now, phase 3.  Was that process
2  still in place in phase 3?
3      A.   Correct.
4      Q.   Reduced and fulfilled?
5      A.   Correct.
6      Q.   Okay.  So, how long was phase 3 in play?
7      A.   Phase 3 was from June of '12 to
8  August of '12.
9      Q.   And what was different between phase 2
10  and phase 3?
11     A.   Further refinement of the math.
12     Q.   Okay.  So, what specifically?
13     A.   Let me take a look.
14          So, the frequency calculation was
15  updated and they specified in this -- this is --
16  I'm looking at the functional macro design
17  documents.  Do you need a Bates?
18     Q.   That would be wonderful.  Thank you.
19     A.   325172.  And this contains details on
20  how the frequency calculation was changed.
21     Q.   All right.  Are you comfortable that
22  that is 325172 is the final?
23     A.   Yes.
24     Q.   Okay.  So, what is your understanding

Page 226

1 generally about what the changes in the algorithm
2 were as elaborated on on 325172?
3     A.   One moment.
4         It says here that they were including
5 vendor orders in frequency.  So, previously we had
6 only considered orders from our own distribution
7 centers.
8     Q.   So, included under the "Criteria," I'm
9 going to put "Included vendor orders"?
10     A.   For consideration in frequency.
11     Q.   Just frequency?
12     A.   Correct.
13         And then they corrected an order -- an
14 issue in which an incorrectly adjusted quantity or
15 user adjusted quantity would -- it appears they
16 would appear incorrectly in the system.  So, they
17 were fixing a bug.
18     Q.   Okay.  And the bug was regarding?
19     A.   The order details.
20     Q.   Okay.  All right.  So, under "Criteria"
21 I put, "Same as 2 but included vendor orders for
22 consideration in just frequency and fixed a bug for
23 order details."  Is that right?
24     A.   Correct.

Page 227

1     Q.   Okay.  So, now, when an order was
2 reduced and fulfilled, I believe you called it,
3 under phase 2 and phase 3, were those orders
4 identified as suspicious and sent to the DEA?
5     A.   No.
6     Q.   Did Walgreens not believe that the order
7 that was reduced was a suspicious order?
8     A.   I believe that we believed that since it
9 was reduced, it was no longer met the criteria for
10 being suspicious.
11     Q.   So, it would just be reduced and then it
12 was no longer suspicious?
13     A.   Correct.
14     Q.   Oh, okay.  So, the order comes in,
15 formula reduces it, and then Walgreens says it's
16 not suspicious, right?  Did I get that right?
17     A.   Correct.
18     Q.   Okay.  But if I go back to Wayne
19 Bancroft's memo, all the way back in June of 2008,
20 which is Bratton 22, the proposal was to define
21 suspicious orders, right?
22     A.   Correct.
23     Q.   And this entire proposal that Mr. Wayne
24 Bancroft -- and you said he has a Ph.D. in math?

Page 228

1     A.   Correct.
2     Q.   Over these next few pages has a very
3 intricate algorithm, was designed to identify
4 orders that were outliers, correct?
5     A.   Correct.
6     Q.   And when it found those orders that were
7 outliers, he refers to those orders throughout his
8 memo as suspicious orders, correct?
9     A.   He does.
10     Q.   And, so, in June of 2008, those outlier
11 orders from the gentleman, the Ph.D. in math that
12 wrote this algorithm, said those are suspicious
13 orders, correct?
14     A.   He did.  However, Wayne being a smart
15 guy but is not a lawyer and I don't think this
16 represents our legal position on what these -- this
17 algorithm did.
18     Q.   And the legal position is that if the
19 suspicious orders reduced, it just magically is no
20 longer suspicious?
21     MR. BENSINGER:  Objection; beyond the scope,
22 calling for a legal opinion and interpretation.
23     SPECIAL MASTER COHEN:  Sustained.
24 BY MR. MOUGEY:

Page 229

1     Q.   Walgreens has to understand what the
2 industry standards are when implementing its
3 algorithm, correct?
4     MR. BENSINGER:  Objection; argument.
5 BY THE WITNESS:
6     A.   We -- we were implementing this program
7 for monitoring.  We believed we were meeting the
8 requirement via the Appendix E-3 reporting.
9 BY MR. MOUGEY:
10     Q.   If Walgreens thought it was meeting the
11 requirement under E-3, it brought in Wayne to write
12 a pretty sophisticated algorithm in 2008, right?
13     A.   Correct.
14     Q.   So, let's go back to understanding
15 industry standards.
16         Walgreens, in order to effectively
17 implement its responsibilities as a distributor,
18 needs to understand what the industry standards are
19 for identifying suspicious order monitoring,
20 correct?
21     MR. BENSINGER:  Objection; scope and again
22 calls for opinion testimony beyond the designation
23 of this corporate spokesperson.
24     SPECIAL MASTER COHEN:  Overruled.

Page 230

BY THE WITNESS:

A.  I'm sorry.  Can you repeat the question.

BY MR. MOUGEY:

Q.  Walgreens people have to understand what the industry standards are when implementing the suspicious order monitoring policies, correct?

A.  We were seeking to understand those.  I believe that the challenge for us was that the other distributors could not fully elaborate on what they thought they needed to do and when we tried to seek clarity from the DEA, we did not receive additional guidance when our -- our legal team inquired with them.

So, we were doing what we thought based off of feedback from other parties, things we had heard, would improve our system so that it would be more effective.

Q.  And when Mr. Bancroft, the Ph.D., sat down and wrote the algorithm with the input of people from Walgreens, you would expect that he went to other individuals to gather information to write the algorithm, right?

MR. BENSINGER:  Objection; calls for speculation, scope.

Page 231

BY THE WITNESS:

A.  I'm not sure what Wayne did to -- to write, author this other than what he's told me, which is he sat down and --

BY MR. MOUGEY:

Q.  What department is Steve Bamberg in?

A.  IT.

Q.  What department is Ed Choroski in?

A.  I don't know.

Q.  What department is Rick Gates in?

A.  Pharmacy operations.

Q.  What department is Tim Gorman in?

A.  I don't know.

Q.  What department is Scott Jonkman in?

A.  Loss prevention.

Q.  What department is Brian Leander in, please?

A.  I don't know.

Q.  What department is Barb Martin in?

A.  Barb Martin is in inventory.

Q.  What department is Dwayne Piñon in?

A.  Legal, regulatory, law.

Q.  What department is Linda Rambo in?

A.  I don't recall.

Page 232

Q.  What department is James VanOverbake in?

A.  I don't know.

Q.  So, just the people that you know sitting here, we have IT, we have loss prevention, we have inventory management and we have legal/regulatory just on this memo, the ones that we could identify, correct?

A.  Correct.

Q.  Mr. Bancroft took his work and brought it to multiple departments, correct?

A.  Correct.

Q.  And based on his input and his algorithm that he drafted, he believed that he was charged with identifying orders that were suspicious, correct?

MR. BENSINGER:  Objection; calls for speculation.

BY THE WITNESS:

A.  I can't tell you what Wayne believed.

BY MR. MOUGEY:

Q.  I'm asking what does it say right in this deliverable, "Proposal for defining 'suspicious orders,'" correct, sir?

A.  I see that it says that, yes.

Page 233

Q.  And what is Walgreens' position that an order that's identified by Mr. Bancroft's algorithm that is just reduced is no longer suspicious?  Where did that come from?

MR. BENSINGER:  Objection to characterization.

BY THE WITNESS:

A.  I think that was a legal interpretation by our regulatory/law team.

BY MR. MOUGEY:

Q.  And who specifically?

A.  I don't know.

Q.  So, the regulatory/law team said that an order that is flagged as a result of this algorithm and is identified by Mr. Bancroft's own language as suspicious is no longer suspicious if we reduce it and don't fill, correct?

MR. BENSINGER:  Mr. Bratton, I instruct you not to answer the question on the ground that as phrased it seeks to elicit attorney-client communication.

BY MR. MOUGEY:

Q.  Sir, isn't that actually -- what I'm asking you are the details of the metric of the suspicious order monitoring system.  All right.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    So, the metric that Mr. Bancroft used
2  identified these orders as suspicious, correct,
3  sir?
4    A.   Possibly suspicious.
5    Q.   It doesn't say "possibly" in the
6  deliverable, does it, sir?
7    A.   They're in quotes.  So, I don't know
8  what that means.
9    Q.   So, you read in when it's in quotes to
10 mean possibly?
11   A.   It's -- it's not definitively
12 suspicious.
13   Q.   Do you see the second sentence
14 underneath "Overview," "This document proposes a
15 methodology for identifying suspicious orders"?
16   A.   Correct.
17   Q.   That's not in quotes, right?
18   A.   No.
19   Q.   So, Mr. Bancroft, based on his work,
20 along with Tracy Morris, decides that an order that
21 is flagged as a result of his algorithm is
22 suspicious, correct?
23     MR. BENSINGER:  Objection; calls for
24 speculation.

Page 235

1  BY THE WITNESS:
2    A.   I'm sorry.  Can you repeat the question.
3  BY MR. MOUGEY:
4    Q.   Yes, sir.  Mr. Bancroft, based on his
5  work, along with Tracy Morris, determined that an
6  order -- you know what?  Let me ask the question
7  another way.
8        Mr. Bancroft and Tracy Morris' memo
9  delivered to multiple departments at Walgreens
10 determined that an order that is flagged as a
11 result of this algorithm is suspicious, correct,
12 sir?
13   A.   I think what he was attempting to
14 identify here were possible suspicious orders that
15 we would, as we see later in the development of
16 this system, that we would then flag for additional
17 review.
18   Q.   Sir, you see "suspicious orders" under
19 "Deliverable," correct?
20   A.   Correct.
21   Q.   You see in the very first sentence
22 "orders" and then "suspicious activity," correct,
23 sir?
24   A.   Correct.

Page 236

1    Q.   The first part of the second sentence
2  says "suspicious orders," correct?
3    A.   Correct.
4    Q.   The third sentence uses the language
5  "suspicious orders," correct?
6    A.   Correct.
7    Q.   Sir, you don't see the words in any of
8  that language "possible," "potential," "probable,"
9  do you?
10   A.   No.
11   Q.   You don't see anywhere in this memo that
12 talks about flagging orders that may or may not be
13 suspicious down the road, correct?
14   A.   Steve -- or Wayne didn't characterize it
15 that way, no.
16   Q.   No, sir.  Who changed Mr. Bancroft's
17 language based on his work in this memorandum that
18 an order that was flagged as a result of his
19 algorithm was no longer suspicious if it was
20 reduced?
21   A.   I don't know.
22     MR. BENSINGER:  Mr. Mougey.
23     MR. MOUGEY:  Allow me to just finish, please,
24 sir.

Page 237

1  BY MR. MOUGEY:
2    Q.   And, sir, you understand that as part of
3  your duty today to be prepared to testify on
4  Walgreens' positions that we are entitled to an
5  answer on the standards and metrics used to
6  identify orders of unusual size, orders deviating
7  substantially from a normal pattern and orders of
8  unusual frequency, correct, sir?
9    A.   Correct.
10   Q.   And, sir, you can't tell me what input
11 went into changing Mr. Bancroft's memorandum that
12 orders that were flagged as a result of his
13 algorithm were no longer suspicious, correct?
14   A.   I can't --
15     MR. BENSINGER:  Objection; vague.
16 BY THE WITNESS:
17   A.   I can't point to any specific
18 determination.
19 BY MR. MOUGEY:
20   Q.   You don't know the answer?
21   A.   No.
22     MR. BENSINGER:  Mr. Mougey, should we go off
23 the record, take a short break?
24     MR. MOUGEY:  Sounds good.  Thank you.

Page 238

1    THE VIDEOGRAPHER:  We are off the record at
2  3:06 p.m.
3         (WHEREUPON, a recess was had
4            from 3:06 to 3:18 p.m.)
5    THE VIDEOGRAPHER:  We are back on the record
6  at 3:18 p.m.
7    SPECIAL MASTER COHEN:  Just to explain how
8  this is going to happen going forward.  I've ruled
9  that Plaintiff is allowed, instead of seven hours,
10  eight hours of deposition time.  He can split up
11  that deposition time any way he chooses.
12       In other words, this -- today's
13  deposition will be recessed.  It will resume with
14  the remaining time.  And that is in order to allow
15  Plaintiffs' counsel to review the documents he was
16  just given, and the parties will work together to
17  find a time when that resumed deposition will take
18  place, preferably after the Defendants' document
19  production and responses to Interrogatories are
20  complete.
21       And because it's a relatively short
22  period of time, the hope is that that perhaps can
23  be piggybacked with another deposition here in
24  Chicago.

Page 239

1       Everybody understand?
2    MR. MOUGEY:  Yes, sir.
3    SPECIAL MASTER COHEN:  Okay.
4  BY MR. MOUGEY:
5    Q.   Mr. Bratton, if an order is identified
6  as suspicious, it would need to be reported to the
7  DEA, correct?
8    MR. BENSINGER:  Objection; calls for a legal
9  conclusion.
10  BY THE WITNESS:
11    A.   If it was confirmed to be suspicious --
12  I'm sorry.  At which time frame are you?
13  BY MR. MOUGEY:
14    Q.   Does it matter?  If Walgreens identifies
15  an order as suspicious, it's required to report it
16  to the DEA, correct?
17    MR. BENSINGER:  Objection; calls for legal
18  conclusion.  You may answer.
19  BY THE WITNESS:
20    A.   If we were previously reporting orders
21  that we thought may be suspicious prior to
22  December -- November of '12, after that point we
23  would report confirmed orders.
24  BY MR. MOUGEY:

Page 240

1    Q.   That's not the question I asked you.
2       The question that I asked you was:  If
3  Walgreens identifies an order as suspicious, it
4  needs to report it to the DEA when discovered,
5  correct?
6    MR. BENSINGER:  Objection; vague.  You can
7  answer.
8  BY THE WITNESS:
9    A.   If it's a confirmed suspicious order, I
10  would believe the answer is yes.
11  BY MR. MOUGEY:
12    Q.   And if Walgreens is not reporting
13  suspicious orders to the DEA as they are
14  discovered, it is not fulfilling its obligations as
15  a distributor, correct, sir?
16    MR. BENSINGER:  Objection.  That calls for a
17  legal conclusion and violates the Special Master's
18  order on scope.
19    SPECIAL MASTER COHEN:  Sustained.
20  BY MR. MOUGEY:
21    Q.   You understand that Walgreens has
22  obligations as a distributor, correct?
23    A.   Yes.
24    Q.   And where does -- and Walgreens

Page 241

1  understands that those responsibilities are defined
2  in places like the Controlled Substance Act,
3  correct?
4    A.   Correct.
5    Q.   And that Walgreens' obligations are
6  further refined under the Code of Federal
7  Regulations that are promulgated under the
8  Controlled Substance Act, correct?
9    A.   Correct.
10    Q.   And in order to or for Walgreens to
11  fulfill its obligations as a distributor, Walgreens
12  needs to understand what its roles and
13  responsibilities are, correct, sir?
14    A.   Correct.
15    Q.   And, sir, Walgreens understands that in
16  order to fulfill its obligations as a distributor,
17  one of its jobs is to report suspicious orders to
18  the DEA, correct, sir?
19    A.   Correct.
20    Q.   And if it doesn't report suspicious
21  orders to the DEA, it has not fulfilled its
22  obligation as a distributor, correct?
23    MR. BENSINGER:  Same objection.
24    MR. MOUGEY:  I have danced and tried to make

Page 242

1  them as happy as --
2      SPECIAL MASTER COHEN:  Sustained.
3      MR. MOUGEY:  I did not mention -- Special
4  Master Cohen, I haven't mentioned the CSA.  I
5  haven't mentioned the regs.  I'm asking what his
6  understanding of what the industry standards are.
7  I didn't even mention the code.  I didn't mention
8  his interpretation.
9      SPECIAL MASTER COHEN:  You need to move on.
10 BY MR. MOUGEY:
11     Q.  How does Walgreens understand what its
12 roles and responsibilities are as a distributor?
13 Where does it go to figure that out?
14     MR. BENSINGER:  Objection; vague.  You can
15 answer.
16 BY THE WITNESS:
17     A.  Communications with other members in the
18 industry, communications that we receive from the
19 DEA either through inspections, letters,
20 conferences that we attend, e-mails, communication.
21 Conglomerate of a multitude of sources.
22 BY MR. MOUGEY:
23     Q.  All right.  So, that's a good example,
24 letters, communications with the DEA helps

Page 243

1  Walgreens understand its roles and responsibilities
2  as a distributor, correct, sir?
3      A.  That's one of the ways that we can seek
4  to understand.
5      Q.  And you mentioned organizations.
6  Industry organizations, correct?
7      A.  Correct.
8      Q.  What industry organizations are you
9  referring to?
10     A.  So, there have been times at NACDS,
11 which is the National Association of Chain Drug --
12 National Association of Chain Drug Stores, there
13 have been times when the DEA has presented at those
14 trade organizations -- meetings.
15     Q.  What other trade organizations that
16 Walgreens belonged to that it believes helps
17 identify what its roles and responsibilities are as
18 a distributor?
19     A.  Additionally, we participate with the
20 National Association of Boards of Pharmacies, and
21 then we have less formal relationships with other
22 companies within the industry where we might share
23 information.
24     Q.  And that helps set industry standards,

Page 244

1  the less formal relationships with other
2  distributors?
3      MR. BENSINGER:  Objection; calls --
4  BY THE WITNESS:
5      A.  It can --
6      MR. BENSINGER:  Objection; calls for
7  speculation.
8  BY THE WITNESS:
9      A.  I think it can help us try to clarify
10 what the requirements are.
11 BY MR. MOUGEY:
12     Q.  The relationships and the communications
13 with other distributors?
14     A.  Or other pharmacies, et cetera.
15     Q.  Help -- the relationships with other
16 pharmacies and other distributors help clarify what
17 Walgreens' responsibilities are as a distributor.
18 Is that your testimony, sir?
19     A.  Yes.
20     Q.  Sir, the memo that we just left, Bratton
21 22.  I'm going to hand you what I'm going to mark
22 as Bratton 30(b)(6) 23.
23          (WHEREUPON, a certain document was
24           marked as Bratton 30(b)(6) Exhibit

Page 245

1           No. 23:  10/01/09 Project Request
2           Estimate; WAGMDL00492070 -
3           00492072.)
4  BY MR. MOUGEY:
5      Q.  23 is a little more than a year later
6  than the memo drafted by Wayne Bancroft on June 23,
7  2008, correct?
8      A.  Correct.
9      Q.  And in the memo on 23 there is an update
10 on the different phases of the suspicious order
11 algorithm, correct, sir?
12     A.  Correct.
13     Q.  And under "Description" in this update
14 on the algorithm, "Create a process to
15 systematically identify and prevent suspicious
16 orders for C-II and PSE drug items."  Correct?
17     A.  Yes, that's what's on the page.
18     Q.  So, as of October of 2009, a year after
19 the first memo, the algorithm was still designed to
20 identify and prevent suspicious orders, correct?
21     A.  Correct.  However, it was in testing and
22 this neither specifies probable or confirmed
23 suspicious orders.
24     Q.  And this doesn't make any distinction in

**Page 246**

1 this October 1, 2009 memorandum between probable or
2 potential suspicious orders.  It just simply says
3 an order that is flagged as a result of the
4 algorithm is suspicious, correct, sir?
5     MR. BENSINGER:  Object to the characterization.
6 BY THE WITNESS:
7     A.   It says here, "Any orders that are
8 deemed suspicious will be flagged as suspicious and
9 populated in a file to be sent to LP and Rx
10 Services for review and analysis."
11 BY MR. MOUGEY:
12     Q.   Do you agree that that is an accurate
13 statement about what the algorithm was designed to
14 do?
15     A.   That it would flag them as suspicious?
16 Again, I think there is a distinction here as
17 potentially or confirmed suspicious.  And, again,
18 this was during the testing period.  But yes.
19     Q.   Let's go through it sentence by
20 sentence.  The second sentence says, "An order
21 quantity will be deemed suspicious based on a
22 formula."  Correct, sir?
23     A.   It does say.
24     Q.   Is that an accurate statement that an

**Page 247**

1 order quantity will be deemed suspicious based on a
2 formula used to determine inconsistent ordering
3 patterns?
4     A.   That's what's on the page.
5     Q.   Is that accurate?  Does Walgreens
6 believe that statement is accurate, that an order
7 that was flagged as a result of the algorithm will
8 be deemed suspicious based on that formula?
9     A.   I believe that our position is that it
10 is a probable, not confirmed suspicious order.
11     Q.   Can you point me to anywhere -- well,
12 let's just keep going.
13         The next sentence, "Any orders that are
14 deemed suspicious will be flagged as suspicious."
15 Correct?
16     A.   Correct.
17     Q.   And the orders that are deemed
18 suspicious are orders that were flagged as a result
19 of the formula, correct?
20     A.   Correct.
21     Q.   So, you believe that's an inaccurate
22 statement of the policies as implemented by
23 Walgreens, correct, sir?
24     A.   I don't think that Rakesh, the author of

**Page 248**

1 this document, a programmer analyst, is in a
2 position to delineate the entire corporate policy
3 of Walgreens, no.
4     Q.   So, the simple answer is, in addition to
5 Mr. Bancroft, Mr. Khanna is wrong too, correct?
6     A.   Correct.
7     Q.   Yes, sir.  So, this is the second
8 document that is incorrect that an order flagged by
9 the system is suspicious, correct, sir?
10     A.   Probable suspicious would be a correct
11 characterization.  I don't -- again, I think there
12 is a distinction between confirmed and probable
13 that is not discussed in this document.
14     Q.   Yes, sir.  But the question I asked was:
15 This is the second document in a row that we've
16 looked at that you believe is incorrect that
17 designates an order flagged by the algorithm as
18 suspicious, correct, sir?  Yes or no.
19     A.   Neither of these documents I think make
20 any distinction between possible and confirmed
21 suspicious orders.
22     Q.   So, the simple answer to my question is
23 yes, that is the second document in a row that
24 we've looked at that have incorrectly stated that

**Page 249**

1 an order flagged by the system is deemed
2 suspicious, correct?
3     A.   They have failed to make a distinction
4 between probable and confirmed.  Both documents.
5     Q.   So, they are incorrect?
6     A.   They are incomplete.
7     Q.   So, sir, let me hand you what I'm going
8 to mark as Bratton 24, which is dated 2/8/2012.
9         (WHEREUPON, a certain document was
10         marked as Bratton 30(b)(6) Exhibit
11         No. 24:  2/8/12 e-mail with
12         attachment; WAGMDL00325129 -
13         00325130.)
14 BY MR. MOUGEY:
15     Q.   You see, sir, that this isn't from one
16 of the algorithm or one of the tech folks.  This is
17 from Barbara Martin, correct?
18     A.   Correct.
19     Q.   Ms. Martin that you've been citing all
20 day long about interview process, correct?
21     A.   Correct.
22     Q.   And this is dated 2/8 of 2012.  Do you
23 see that?
24     A.   Correct.

Page 250

1    Q.   Almost three and a half years after the
2  first memo we looked at with Wayne Bancroft,
3  correct, sir?
4    A.   Correct.
5    Q.   And Ms. Martin, the subject, and
6  attaches a document entitled "Suspicious Order
7  Monitoring Process," correct?
8    A.   Correct.
9    Q.   And she sent this to Denman Murray.  And
10 who is Denman Murray?
11   A.   Her boss.
12   Q.   You don't think she'd send her boss
13 something that was incorrect or inaccurate, right?
14   A.   I don't know.
15   Q.   I mean, you wouldn't expect Ms. Martin
16 is -- "Suspicious Order Monitoring Process,"
17 page 2.  Do you see the title?
18   A.   I do.
19   Q.   "Current Process."  Fourth bullet down.
20 "Original project design was to prevent the DCs
21 from filling any potential suspicious order."
22      Do you see that?
23   A.   I do.
24   Q.   "And to capture the data to identify

Page 251

1  stores with potentially suspicious activity for
2  loss prevention team to investigate."  Correct?
3    A.   Correct.
4    Q.   And underneath the "Enhancements," "The
5  system will identify stores that had order quantity
6  decreased and then placed order to vendor."
7  Correct?
8    A.   Correct.
9    Q.   So, between 2009 and 2012, when did
10 Walgreens decide that orders flagged from the
11 algorithm were no longer suspicious because they
12 had been cut?
13   A.   I don't know.
14   Q.   You don't know?
15   A.   I don't know.
16   Q.   Because if they were deemed suspicious,
17 orders that were flagged from the algorithm, they
18 were required to be reported to the DEA, correct,
19 sir?
20   MR. BENSINGER:  Objection; argument and calls
21 for a legal conclusion, scope.
22 BY MR. MOUGEY:
23   Q.   Do you need me to redo the question?
24   A.   I believe that our position at that time

Page 252

1  was that if we reduced the order, it was not
2  suspicious.
3    Q.   That's not what I asked.  I said if the
4  orders were deemed suspicious that were flagged by
5  the algorithm, they were required to be reported to
6  the DEA, correct, sir?
7    MR. BENSINGER:  Objection; calls for a legal
8  conclusion and a violation of the Walmart ruling by
9  Special Master Cohen on interpretation.
10   SPECIAL MASTER COHEN:  I'll allow it as asked.
11 BY THE WITNESS:
12   A.   I'm not sure that it was clear to us if
13 it was or it was not suspicious.  Again, we were
14 reaching out to the DEA and asking for clarity,
15 trying to discuss with field agents and receiving a
16 variety of responses.
17      So, our reporting stance at that time
18 was orders that are possibly suspicious are
19 reported in the Appendix E-3 report and these were
20 not.
21 BY MR. MOUGEY:
22   Q.   But that's not what I asked.
23      What I asked you, sir, was:  If the
24 orders were deemed suspicious that were flagged

Page 253

1  from the algorithm, they were required to be
2  reported to the DEA, correct, sir?
3    MR. BENSINGER:  Asked and answered and same
4  objection.
5  BY THE WITNESS:
6    A.   I would -- my belief, I think what our
7  position is was that if they were confirmed
8  suspicious after an investigation, they should be
9  reported.
10 BY MR. MOUGEY:
11   Q.   But that's a little different than the
12 question I asked.  Okay.  If you think the answer
13 is no, that's okay.
14      But what I asked was:  If the orders
15 were deemed suspicious that were flagged from the
16 algorithm, they were required to be reported to the
17 DEA, correct?
18   MR. BENSINGER:  I continue to object on the
19 ground Mr. Mougey is seeking to elicit an
20 interpretation of regulations and a legal
21 conclusion, not fact testimony about Walgreens'
22 practices.  And so I object.
23 BY MR. MOUGEY:
24   Q.   It's the same question I've asked four

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 or five times in a row.
2    A.   No, I don't believe they were required
3 to be reported.
4    Q.   All right.  We've now gone through phase
5 1 through 3.
6    A.   4.
7    Q.   I'm sorry.  Phase 1 through 4.  Thank
8 you.
9         What time frame was 4 initiated?
10    A.   4 was deployed August '12.  So, two,
11 three months after the previous version.  And then
12 5, it was in effect through November '12 when
13 version 5 came online.
14    Q.   And what was the difference with phase 4
15 from phase 3?
16    A.   It incorporated vendor orders and
17 partial fills to make them eligible for flagging or
18 reduction.
19         So, my understanding is 3 considered
20 vendor orders in its calculation, 4 would flag or
21 reduce vendor orders as well as our own DC orders.
22    Q.   I'm a little confused.  Help me with
23 what vendors.
24         So, up until June of 2012 with this

Page 255

1 whole algorithm, let's just say I come in with
2 1,000 orders, it's flagged and reduced to 500, and
3 I'm the pharmacist and I want to get that
4 Schedule II or Schedule III.
5         Can I just -- up until June of '12, can
6 I just pick up and order from another vendor
7 outside of Walgreens?
8    A.   It's possible.  I know at some point we
9 requested that our vendor no longer accept phone
10 orders though I haven't been able to definitively
11 establish when that occurred.
12    Q.   Let's do it another way.
13         Does Walgreens' system detect that when
14 an order has been flagged as a result of the
15 algorithm and reduced, up until June of '12, can a
16 pharmacist then order from another vendor?
17    A.   Yes.
18    Q.   And there was no monitoring of that
19 pharmacist ordering from another vendor once their
20 order had been reduced by Walgreens?
21    A.   I believe that Barb and Marcy were
22 looking at reports related to that.  I can't
23 comment on what monitoring the vendor did at their
24 distribution center.

Page 256

1    Q.   I didn't ask what that vendor did at
2 their distribution center.  We'll get into that
3 later.
4         What I'm asking you right now is
5 Walgreens had absolutely zero policy and procedure
6 in place in writing to detect pharmacies that --
7 whose orders were being reduced by the algorithm at
8 Walgreens and then ordering from another vendor up
9 to June of 2012, correct, sir?
10    A.   I -- no, I don't agree with that, and
11 the reason -- the basis that I give for that is I
12 believe that Barb and Marcy were seeing this type
13 of activity, which is why we sought to include
14 vendor orders in the system.
15    Q.   What makes you believe that Barb and
16 Marcy -- Barb and Marcy must have been really busy.
17 Barb and Marcy are everywhere, aren't they?
18    MR. BENSINGER:  Objection; argumentative.
19 BY MR. MOUGEY:
20    Q.   They are.  Barb and Marcy are filling a
21 tremendous amount of roles in the suspicious
22 ordering monitoring policies, aren't they?
23    A.   They are heavily involved with
24 inventory --

Page 257

1    Q.   Two people?
2    A.   -- and suspicious order monitoring.
3    Q.   Yes, sir.  Two people at the -- at that
4 level are filling multiple roles in an operation
5 that has anywhere, depending on the time frame, 5,
6 6, 7,000, stores, correct?
7    A.   Correct.
8    Q.   200,000 people and it's Barb and Marcy,
9 right, in a lot of the answers today, correct?
10    MR. BENSINGER:  Objection.
11 BY MR. MOUGEY:
12    Q.   So, what was the system in place at
13 Walgreens when it cut an order as a result of its
14 algorithm and reduced it to monitor a pharmacist
15 from going to another vendor like a Cardinal or
16 AmeriSource or Anda and ordering from that vendor?
17    A.   I believe that it was -- they would
18 monitor those as part of the audits, the
19 retrospective audits.
20    Q.   "I believe" sounds to me like a guess.
21         What policy and procedure is in place
22 that would oversee a pharmacist whose order was cut
23 and flagged by the algorithm from ordering from
24 another vendor up until June of 2012?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1     A.   Only the retrospective review that would

2 have been performed by loss prevention and

3 inventory.

4     Q.   And retrospective review, how often is

5 that?

6     A.   They told me that this was occurring

7 monthly.

8     Q.   What I asked was what -- not what they

9 told you, not what somebody said. I want to know

10 what written policies and procedures were in place

11 at Walgreens to detect when a pharmacist whose

12 order had been rejected and cut down as part of the

13 algorithm and then placed the order at another

14 vendor like a Cardinal, Anda or AmerisourceBergen,

15 and the answer is there were none, correct, sir?

16     A.   I believe there were no written

17 documents, no.

18     Q.   Thank you. You are familiar with the

19 term "interstoring"?

20     A.   Correct.

21     Q.   Interstoring is when one Walgreens

22 pharmacy would go to another Walgreens pharmacy to

23 help fill an order, correct?

24     A.   Transfer product between two stores.

Page 259

1     Q.   That was another loophole in Walgreens'

2 system when an order had been reduced, not filled,

3 that a store could go to another store and

4 interstore, correct?

5     MR. BENSINGER: Objection; argumentative.

6 BY THE WITNESS:

7     A.   There is a possibility that they could

8 interstore product.

9 BY MR. MOUGEY:

10     Q.   And what written system was in place at

11 Walgreens to detect and monitor interstoring for

12 Schedule II and III controlled substances up until

13 June of 2012?

14     A.   Other than the retrospective review, I

15 don't believe there was a process to prevent them

16 from interstoring at that time.

17     Q.   And I understand that's what people have

18 told you about the retrospective review, but the

19 question I asked you was a little different.

20     What written policies and procedures

21 were in place to monitor for interstoring, one

22 Walgreens goes to another Walgreens and gets

23 Schedule II or Schedule III opiates, after its

24 order had been flagged by the algorithm and

Page 260

1 reduced?

2     Not what somebody told you. Where is

3 the written policy and procedure?

4     A.   I don't believe there is one for that

5 time period.

6     Q.   Sir, isn't it also true that another

7 exception from phase 1 through June of 2012 was

8 that Rx Services would have the ability to remove

9 items from the order limitation process or even to

10 remove an entire store from the order limit program

11 for a limited amount of time?

12     MR. BENSINGER: Objection; compound.

13 BY THE WITNESS:

14     A.   The -- I understand that they had the

15 ability to, based on their judgment and evaluation

16 of the store or the item, exempt it from this

17 process, yes.

18     Q.   Let me make sure that we -- it's not

19 compound so it's not confusing.

20     Rx Services had the ability to remove

21 items from the order limitation that was being

22 monitored by Walgreens, correct?

23     A.   From the reduction, yes.

24     Q.   Yes, sir. And Rx Services also had the

Page 261

1 ability to remove from the reduction an entire

2 store?

3     A.   Correct, based on their evaluation of

4 that store.

5     Q.   What other loopholes other than the

6 ability to remove a store, the ability to remove

7 items, interstore, and the ability of a pharmacist

8 to order from another distributor, what other

9 loopholes are you aware of?

10     MR. BENSINGER: Objection; argument.

11 BY THE WITNESS:

12     A.   I believe that there is legitimate

13 reasons why stores might be removed from the

14 reduction or certain items based on a variety of

15 factors. However, I'm not aware of any additional

16 reasons that an order might not go through, so

17 I'm...

18     Q.   Isn't it possible that the button on the

19 computer interface could be turned off?

20     A.   By whom?

21     MR. BENSINGER: Objection; vague.

22 BY MR. MOUGEY:

23     Q.   By -- isn't it possible that a store was

24 turned off from the DEA internal review on the

Page 262

1 algorithm? It's possible a store could just be
2 turned off from the system, correct?
3 　　A.　My understanding would be that that's
4 possible based on exceptional circumstances.
5 　　Q.　Like and those exceptional circumstances
6 are like weather?
7 　　A.　No.　That that store has a different
8 book of business that warrants more -- more of that
9 type of product, that it's either being removed
10 from or the item is being removed from.
11 　　Q.　Sir, where are the written policies and
12 procedures that delineate when a store can be
13 removed because of its book of business?
14 　　A.　I don't believe there is a written
15 policy.
16 　　Q.　I'm going to come back to some of those
17 exceptions in a minute.　If I could direct your
18 attention to P-WAG-18 and 19.
19 　　　　Mr. Bratton, I'm going to hand you what
20 I'm going to mark as Exhibit 25.
21 　　　　　(WHEREUPON, a certain document was
22 　　　　　marked as Bratton 30(b)(6) Exhibit
23 　　　　　No. 25: July 2011, DEA Statistics;
24 　　　　　WAGMDL00492171.)

Page 263

1 BY MR. MOUGEY:
2 　　Q.　July 11.　Do you see that?
3 　　A.　I do.
4 　　Q.　"DEA Statistics," correct?
5 　　A.　Correct.
6 　　Q.　"How many orders are flagged each
7 month?"
8 　　　　According to this synopsis, in the month
9 of July, 20,699 items are marked suspicious,
10 correct?
11 　　A.　It says that there, yes.
12 　　Q.　And the next bullet, "For the orders
13 flagged, how many orders violated 1, 2 or all 3
14 flags?"
15 　　　　Do you see that?
16 　　A.　I see that.
17 　　Q.　And below are tolerance violation,
18 inventory violation and frequency violation,
19 correct?
20 　　A.　Correct.
21 　　Q.　So, this isn't the E-3 Chemical
22 Handler's Manual, correct?
23 　　A.　Correct.
24 　　Q.　This is the algorithm from Wayne, right?

Page 264

1 　　A.　Correct.
2 　　Q.　That this is referencing.　The
3 memorandum is referencing the algorithm all the way
4 back to the memo we saw in 2008.　This is a
5 variation several steps down the road in July of
6 2011, correct?
7 　　MR. BENSINGER:　Objection; foundation.
8 BY THE WITNESS:
9 　　A.　It appears to be in 2011.
10 BY MR. MOUGEY:
11 　　Q.　There is no other system in place at
12 this point in time other than the E-3 Chemical
13 Handler's, this and then the query that you
14 mentioned earlier, correct?
15 　　A.　Not that I'm aware of, no.
16 　　Q.　Yes, sir.　So, according to this memo,
17 20,699 items are marked suspicious, right?
18 　　A.　That's what it says, yes.
19 　　Q.　Yes, sir.　And those would be orders
20 that have been reduced and then filled, correct?
21 　　MR. BENSINGER:　Objection; mischaracterization.
22 BY THE WITNESS:
23 　　A.　I believe at this time they would be
24 reduced and filled.

Page 265

1 BY MR. MOUGEY:
2 　　Q.　But it was not, even though they are
3 being referred to as suspicious internally, these
4 orders were not reported to the DEA, correct, sir?
5 　　A.　Correct.　I think frequently internally
6 there is a conflation of probable suspicious and
7 confirmed suspicious.
8 　　Q.　I hand you what we're going to mark as
9 Bratton 30(b)(6) 24 -- 26.　I'm sorry.
10 　　　　　(WHEREUPON, a certain document was
11 　　　　　marked as Bratton 30(b)(6) Exhibit
12 　　　　　No. 26: DEA Statistics;
13 　　　　　WAGMDL00492169.)
14 BY MR. MOUGEY:
15 　　Q.　Similar memo from August of 2011,
16 correct, sir?
17 　　A.　It says it was for data in that month,
18 yes.
19 　　Q.　Yes, sir.　Which is the next month from
20 Bratton 23 we just looked at, correct?
21 　　A.　Correct.
22 　　Q.　Total of 40,176 items are marked
23 suspicious, correct?
24 　　A.　That's what it says there.

Page 266

1     Q.   And, again, we see below, tolerance
2 violation, inventory adjustments and frequency
3 violations, correct?
4     A.   Correct.
5     Q.   That is very similar to the algorithm
6 drafted by Mr. Bancroft back in 2008, correct?
7     A.   Correct.
8     Q.   And similar to the last month, the
9 orders that are flagged and then reduced internally
10 are being referred to as suspicious, correct, sir?
11     A.   That's how they refer to them here, yes.
12     Q.   And if you look all the way at the
13 bottom of that page, do you see the 102,116?
14     A.   Correct.
15     Q.   So, there had been 102,000 orders at the
16 time of this August '11 e-mail that had been cut
17 and reduced but not reported to the DEA because
18 they were not suspicious, correct, sir?
19     MR. BENSINGER:  Objection; mischaracterization.
20 BY THE WITNESS:
21     A.   It appears that there had been 102,000
22 that had been cut and reduced up until this time.
23 BY MR. MOUGEY:
24     Q.   Yes, sir. There had been 102,000 orders

Page 267

1 up and to this time in August of 2011 that had been
2 flagged, cut, reduced and, according to the
3 practices of Walgreens, not reported to the DEA as
4 suspicious, correct, sir?
5     A.   Correct.
6     Q.   And, sir, by looking at this memo, do
7 you have any understanding of how far back in time
8 the 102,000 went?
9     A.   I would -- not based only on this memo,
10 no.
11     Q.   Where was Walgreens recording the number
12 of orders that had been flagged, reduced and not
13 shipped?
14     A.   Based on conversations with Steve
15 Bamberg and others in the IT apparatus, I believe
16 that there is reporting that existed on a server
17 called ADR 4 or ADR 7. I'm not sure which one.
18 And I know that Barb would pull data from that to
19 review. So, I think that that's where that
20 information was kept.
21     Q.   So, Barb and -- sorry. Marcy?
22     A.   Yes.
23     Q.   Barb and Marcy are the ones responsible
24 for those 102,000 orders, looking at those

Page 268

1 retrospectively?
2     A.   A portion. They looked at a sample.
3     Q.   Yes, sir. Another potential weakness in
4 Walgreens' system is the overrides, correct, sir?
5     A.   I'm not sure what you mean by that.
6     Q.   Do you know what Walgreens referred to
7 as overrides?
8     A.   At what time?
9     Q.   Up until 2012.
10     A.   So, my understanding is that stores or
11 pharmacy supervisors could request an override
12 based on circumstances at the store. That's my
13 understanding.
14     Q.   So, we have gone through interstoring.
15 We've gone through calling another vendor. We've
16 gone through a store being removed from the system.
17     The pharmacist can also call and ask for
18 an override, correct?
19     A.   Correct. However, that has to be
20 approved by field leadership and the -- at one time
21 the inventory team and at a later date the
22 Rx Integrity team.
23     Q.   And just in Cleveland and Cuyahoga, from
24 2006 to 2013, early '14, when Walgreens stopped

Page 269

1 distributing, do you have any idea how many times
2 the stores in those two counties called and asked
3 and were approved for overrides?
4     A.   I do not know the number.
5     Q.   Have you seen documents that evidence
6 the number of overrides?
7     A.   I don't. I don't recall.
8     Q.   Does Walgreens have policies and
9 procedures in place in writing about what the
10 criteria for those overrides are?
11     A.   For certain, in 2013. Prior to that,
12 there may be. One moment.
13     There are documents that describe the
14 process of requesting an override, but I don't know
15 that we have it in the 2012 time period documents
16 that describe how inventory would make the
17 determination to override or not to override other
18 than in collaboration with the pharmacy supervisor.
19     Q.   Or what the criteria is for that
20 override, whether it's approved or not approved in
21 kind of a Walgreens policies and procedures on when
22 to approve an override and when not to approve an
23 override, correct?
24     A.   Correct.

Page 270

1    Q.   And the section that you're referring to
2  is simply a how do you go about filling out the
3  right section on the Walgreens intranet to request
4  the override, right?
5    A.   Correct.
6    Q.   More of an automation process, not
7  necessarily the policies and procedures on when it
8  is appropriate, right?
9    A.   Correct.
10    MR. MOUGEY:  I think this is a good time for a
11  break if it's all right with everybody else.
12    THE VIDEOGRAPHER:  We are off the record at
13  3:56 p.m.
14    (WHEREUPON, a recess was had
15    from 3:56 to 4:17 p.m.)
16    THE VIDEOGRAPHER:  We are back on the record
17  at 4:17 p.m.
18  BY MR. MOUGEY:
19    Q.   Mr. Bratton, I'd like to finish up this
20  chart to make sure I got everything here.
21    Phase 4, I have August '12, and I
22  apologize because I think you already told me, but
23  how long did phase 4 -- August '12 to when?
24    A.   November '12.

Page 271

1    Q.   Till November.  Okay.
2    And your understanding is that the
3  change in the criteria on phase 4 was that vendor
4  orders and partial fills were now under the DEA
5  requirement umbrella or were monitored, correct?
6    A.   Correct.
7    Q.   Tell me what the partial fill portion is
8  because I'm not -- I don't recall that.
9    A.   When a prescription in the front end is
10  marked as a partial fill or out of stock, it
11  reduces the -- the system thinks that the pharmacy
12  is out.  They may not actually be.  That may not
13  even be the store's intention.  They may just not
14  have enough to fill the complete quantity.  And, so,
15  that could trigger a replenishment order.  And, so,
16  I think that they were ensuring that it wasn't
17  unduly weighing partial fills in the algorithm.
18    Q.   Okay.  Any other changes in phase 4?
19    A.   No.
20    Q.   All right.  We just briefly discussed
21  interstoring.  When was interstoring -- when did
22  that become prohibited?
23    A.   I believe in phase 5.
24    Q.   Okay.  And phase 5 begins then in --

Page 272

1  sometime in 11/12?
2    A.   November '12, yeah.
3    Q.   November '12, okay.  Tell me what was
4  different in phase 5 from phase 4.
5    A.   The biggest -- well, there is a couple
6  differences.
7    First is that the frequency calculation
8  was replaced instead with a ceiling calculation,
9  and what that ceiling does is it considers the
10  amount of orders and the quantity of those orders
11  over a period of time as opposed to just how often
12  an order was placed irregardless of its size.
13    Q.   Okay.  Anything else?
14    A.   So, I believe at this point the system
15  would flag orders and reduce them to zero, and that
16  at that point the store -- we removed the frequency
17  threshold because it was superseded by ceiling.
18    Q.   Flag and replace to zero.  Explain to
19  that?
20    A.   So, whereas previously the orders were
21  cut to the quantity that the system -- so,
22  previously if you had a limit of 5 and you tried to
23  order 10, it would reduce it to 5.
24    Q.   Okay.

Page 273

1    A.   Now it is reducing an order that exceeds
2  the ceiling or tolerance to zero.
3    Q.   All right.  Anything else?
4    A.   I believe around this time we began the
5  process.  So, we reduced their order to zero and
6  then if they want to get additional product, they
7  would have to --
8    Q.   Reorder?
9    A.   -- do an override request.  If they just
10  reordered, it would be cut to zero again.
11    Q.   Okay.
12    A.   So, that wouldn't help them really.
13  They'd have to do an override request.  And also I
14  believe around the time this rolled out we began
15  investigating those flagged orders, even if they
16  were reduced to zero.
17    Q.   Okay.  And, so, "Investigating orders
18  that triggered algorithm."  How does that sound?
19  Order triggered by algorithm, by the algorithm, is
20  that right?
21    A.   Correct.
22    Q.   And when you say "investigated," you
23  mean due diligence?
24    A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1　Q.　Were they then reported to the DEA?
2　A.　If they were confirmed suspicious, they
3　would be reported to the DEA.　Initially I believe
4　by fax and then later by electronic fax to the
5　field office that's relevant to the store's
6　registration.
7　Q.　All right.　Let me just go through what
8　I just wrote down.
9　　"11/12."　And I'm assuming phase 5
10　lasted until Walgreens was no longer a distributor?
11　A.　There was a phase 6, but it had to do
12　with improvements primarily to the -- in some
13　documents they call it phase 6, but in other
14　documents they call it phase 2 of the dashboard.
15　Q.　Right.
16　A.　And, so, it was primarily with how the
17　Rx Integrity or inventory before that would view
18　this information that the system was generating.　I
19　don't believe it impacted the functioning of the
20　algorithm, though.
21　Q.　It was more of an interface issue?
22　A.　Correct.
23　Q.　Okay.　So, bear with me.
24　　11/12 till when, phase 5?

Page 275

1　A.　Till we ceased to be a distributor.
2　Q.　Pretty much till the end of the --
3　till --
4　A.　2014.
5　Q.　I'm going to just put "When Walgreens
6　out of distribution business."　Is that fair?
7　A.　For controlled substances, yes.
8　Q.　Yes.　Thank you.
9　A.　So, we continue to use the system today,
10　but as we are no longer a distributor, we don't
11　report the orders, but we still have the system in
12　place for --
13　　(WHEREUPON, there was a short
14　　interruption.)
15　MR. MOUGEY:　I hate to do this.　It's Cohen.
16　MR. BENSINGER:　Should we go off the record
17　for the housekeeping?
18　MR. MOUGEY:　Hey, David.
19　THE VIDEOGRAPHER:　Off the record at 4:23.　Do
20　you want it on?
21　MR. MOUGEY:　It's okay.
22　　(WHEREUPON, a recess was had
23　　from 4:23 to 4:27 p.m.)
24　THE VIDEOGRAPHER:　We are back on the record

Page 276

1　at 4:27 p.m.
2　BY MR. MOUGEY:
3　Q.　All right.　Mr. Bratton, you were in the
4　middle of explaining to us that you still use the
5　system today, but you're no longer a distributor.
6　We don't report the orders and you were -- can you
7　finish what you were explaining to us about the
8　system and as it's in place until today?
9　A.　So, I just wanted to make the
10　distinction that we continue to operate this
11　system.　However, as we're no longer a distributor,
12　we don't report flagged orders to the DEA.
13　Q.　All right.　So, the system in large part
14　that you're using today as a -- in the dispensing
15　capacity is almost identical to the system you were
16　using as a distributor?
17　A.　Well, we still use it to evaluate orders
18　before they're transmitted to ABC.　It still
19　relates to orders, not necessarily dispensing.
20　But, yes.　As a non-distributor.
21　Q.　Let's do it this way, then.
22　　So, the system that Walgreens is using
23　today, the phase 1 through 5, the steps that you
24　explained to us, are still being used today by

Page 277

1　Walgreens to fulfill its role even as a dispenser
2　or a pharmacy, correct?
3　A.　I think that we have continued --
4　MR. BENSINGER:　Objection to form.　Could I
5　have that -- give me just a moment to look at this
6　question, please.
7　　Objection to form based on the scope of
8　the question.
9　　Do you have it in mind?
10　THE WITNESS:　What's that?
11　MR. BENSINGER:　Do you have the question in
12　mind?
13　THE WITNESS:　No, I need it again.
14　MR. BENSINGER:　I objected to scope.　You can
15　answer.
16　BY MR. MOUGEY:
17　Q.　So, the question I asked was that the
18　system that Walgreens is using today as you
19　described, phase 1 through 5, the steps that you
20　explained to us, those are still being used today
21　by Walgreens to fulfill its role even as a
22　dispenser or a pharmacy, correct?
23　A.　I think that we continue to use it today
24　out of an abundance of caution and as a good

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 practice. I don't know that it's specifically
2 related to any responsibility as a dispenser.
3 Q. Okay. If it's not as a pharmacy or
4 dispenser, what other capacity would Walgreens be
5 using this system to discharge its duties on
6 controlled substances?
7 A. As I said, I think we continue to use it
8 out of an abundance of caution. Also, I -- from my
9 personal knowledge, my understanding is that it is
10 for our Know Your Customer program of our
11 distributor, they like that we have something in
12 place to screen our orders.
13 Q. Do any of the vendors that Walgreens
14 uses -- forget it. Let me just go back.
15 Talk about averages for a second and
16 Wayne Bancroft's, essentially the metrics used in
17 the algorithm as it changes over time. Okay?
18 A. Um-hmm.
19 Q. To some extent, the algorithm relies on
20 averages of stores of similar size, correct?
21 A. As of --
22 MR. BENSINGER: Objection; vague.
23 BY THE WITNESS:
24 A. As of phase 5, it does a linear

Page 279

1 regression and compares stores to stores of similar
2 volume.
3 BY MR. MOUGEY:
4 Q. Okay. And when we say "of similar
5 volume," that's measured as the number of
6 prescriptions, correct?
7 A. Total prescription sales for all
8 products.
9 Q. And as a result, stores are categorized
10 based on the number of total prescription sales for
11 all products, right?
12 A. Correct.
13 Q. And one of the measurements is the
14 percentages of a controlled substance as a
15 percentage of overall prescriptions for all
16 products, right?
17 A. I don't believe so. I believe it's the
18 proportion of that, each item compared to total
19 sales on an item-by-item basis, not a -- not at the
20 whole top level comparison.
21 Q. What impact would -- I'll tell you what.
22 There are some charts in your production with
23 the -- with a linear regression model graph,
24 correct?

Page 280

1 A. Correct.
2 Q. And I believe I've already passed -- I
3 will make it a little easier. Bear with me. Let
4 me find that.
5 One of those examples would be in the
6 controlled substance ordering that we have marked
7 as 8, would it not?
8 A. Of the -- of the linear regression?
9 Q. Yes.
10 A. This looks like a linear regression. I
11 don't know if this is real data or, you know, made
12 up. But this is what it would look like typically,
13 what's on slide or I have Bates No. 7941.
14 Q. And you're on Bates No. 7941?
15 A. 667941. But in the exhibit that you
16 provided.
17 Q. Yes. Let's look at Exhibit 8. It's a
18 different Bates number. The Bates number I'm
19 looking at is 395925. Do you see it?
20 A. Yes.
21 Q. It's on "Phase 5 Functionality - Ceiling
22 Calculation." Correct?
23 A. Correct. Same one I was looking at in
24 the other Bates number.

Page 281

1 Q. Okay. And part of your preparation
2 today was to understand the metrics that were used
3 as elaborated in (i) under the subject matters for
4 testimony, correct?
5 A. Correct.
6 Q. Now, you see on Bates No. 25, under
7 "Phase 5 Functionality - Ceiling Calculation."
8 Explain to us what ceiling calculation is.
9 A. So, ceiling calculation would look at,
10 for each individual item, what is the average
11 volume within a linear regression for each item
12 over initially a six-week period though later I
13 believe that was changed to 26 weeks.
14 So, if, for instance, the average store
15 that sells 200 scripts a day orders 5,000 dosage
16 units of that item, that would be the average.
17 And then there is some math that
18 determines average and standard deviations above
19 the average, and that would be the ceiling after
20 which the store would need to -- the order would be
21 flagged and reduced to zero if it was placed by the
22 staff.
23 And if they needed to go above that for
24 some reason, they would have to submit an override

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  form, at which time we'd have to evaluate the need
2  on a case-by-case basis.
3      Q.   So, what impact, if any, would increases
4  in volume for controlled substances distributed by
5  Walgreens have year to year on the line
6  demonstrating the ceiling on Bates No. 925?
7      A.   It's --
8      MR. BENSINGER:  Objection; beyond the scope.
9  You can answer.
10 BY THE WITNESS:
11     A.   If it impacted their total prescription
12 volume, which it may or may not, then it would
13 be -- move them into a bucket to be compared with a
14 store of that size, though it's in 50 script per
15 day increments, so you would have to -- it's --
16 you'd have to make it all the way into the next
17 bucket to change who you are being compared to.
18 BY MR. MOUGEY:
19     Q.   Okay.  So, let's now just assume we are
20 in the same bucket.  Okay.  Let's go through this.
21         And the line is titled "Ceiling for
22 Oxy 30."  Correct?
23     A.   That's on the slide, yes.
24     Q.   Yes.  And the -- all those dots are

Page 283

1  stores in the chain dosage unit for Oxy 30s based
2  on the same time frame.  It's comparing store to
3  store, right?
4      A.   Again, I don't know if this was test or
5  real data or just representative.  But it appears
6  that they're saying these are the store volumes for
7  a store of that sales volume of prescriptions.
8      Q.   Right.  So, all those dots based on that
9  metric would be individual stores' sales volume of
10 Oxy 30s, correct?
11     A.   Correct.
12     Q.   Now, the question I asked was:  If the
13 average dosage unit for Oxy 30s within that bucket
14 of comparable stores increased from one year to the
15 next, what impact, if any, would that have on the
16 ceiling for Oxy 30s?
17     A.   It's difficult to assess because you may
18 be filling the same number of prescriptions but
19 with more dosage units per script, given a certain
20 type of population in that area.
21         It would be difficult for any one item
22 because any single item composes just a few percent
23 of the store's volume at most, like 3 to 4% for the
24 biggest mover.

Page 284

1          And, so, even if you doubled on any one
2  item, which would be really difficult in this
3  system, but let's say for a moment you could, you'd
4  still only move your total script volume by 2 or
5  3%, which I don't think would be enough to get you
6  into the next bucket.
7      Q.   Okay.  I think that's where you and I
8  aren't communicating.  I apologize if my question
9  is awkward, but what I'm asking, though, isn't
10 going from one bucket to another.
11         What I'm asking is, is if there was an
12 increase bucket-wide, stores of a similar size, in
13 their Oxy 30 prescriptions without a corresponding
14 increase in overall prescriptions, that line
15 representing the ceiling would move upwards,
16 correct?
17     A.   If all stores had an increase in this
18 item, then the average for that item, the
19 chain-wide average would go up, yes.
20     Q.   Yes, sir.  And it doesn't necessarily
21 require all stores.  It requires enough stores to
22 move the average up, correct, enough of an increase
23 in Oxy 30 prescription that would increase the
24 average and therefore move the line for the ceiling

Page 285

1  further up the X -- the X and Y axis, correct?
2      A.   I think that's theoretically possible,
3  but I don't know that I am educated to comment on
4  how much or how significant it would be.  But I am
5  following what you're saying and I think that is
6  possible.
7      Q.   Do you recall anyone from in your
8  preparation analyzing the impact of increasing
9  dispensing of controlled substances, what impact
10 that would have on the ceiling for Schedule II and
11 III year to year?
12     A.   Since the time that I have been
13 involved, in February of '13, as a result of this
14 system, you know, all the green dots in that chart
15 are being cut off until they fall below this line.
16         We've generally seen almost all items
17 declining, initially to great complaint by stores
18 and in some cases patients and boards of
19 pharmacies.  And so I don't think that was
20 happening.  I don't recall if we specifically
21 analyzed that exact thing, though.
22     Q.   And I'm not asking you in your personal
23 capacity when you began at Pharmaceutical
24 Integrity.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    But did you see in preparation for today
2  and understanding the metrics any analysis of what
3  increases in prescriptions for Schedule II and
4  Schedule III opiates would have on the ceiling in
5  this algorithm?
6    A.  I have not.
7    Q.  What I want to do on this chart so we
8  can capture this work that we have done today
9  trying to --
10    MR. MOUGEY:  What number are we on, Alex?
11    I'm going to mark this chart, and we can
12  make copies of it, as Bratton 26.  Okay.  27.  I'm
13  sorry.
14        (WHEREUPON, a certain document was
15        marked as Bratton 30(b)(6) Exhibit
16        No. 27: Handwritten chart prepared
17        by Mr. Mougey during deposition.)
18  BY MR. MOUGEY:
19    Q.  And I have been reading these out as we
20  were going along.  Are you comfortable with the
21  language that I have included on here or would you
22  like to go through this and make sure that we are
23  on the same page and I have accurately captured
24  what you've been testifying to on this chart over

Page 287

1  the last few hours?
2    A.  If I may take a look at it.
3    Q.  Sure.  If you want me to read it out
4  loud and go through it up on the screen, I'd be
5  happy to do that too.
6    A.  The only question I have is I can't read
7  this on phase 3, "Further" something.
8    Q.  On phase 3.  "Further refinement."
9    A.  Okay.  Yes.
10    Q.  "Further refinement changes," and I
11  cited Bates No. 325172 with a dash "Final."  Does
12  that --
13    A.  Yes.
14    Q.  Other than that, are you comfortable
15  what I have on here captures, and fairly
16  accurately, what we have gone through over the last
17  few hours?
18    A.  I believe so.
19    MR. MOUGEY:  All right.  Why don't we -- this
20  is a good stopping point.  Tell us where we are and
21  we can all agree how much time I have left.
22    THE VIDEOGRAPHER:  5 hours and 51 minutes on
23  the record currently.
24    MR. MOUGEY:  So, 2 hours and 9 minutes left I

Page 288

1  think is right.  Is my math right?
2    MR. BENSINGER:  2 hours and 9 minutes in order
3  to attain a full eight hours as permitted by
4  Special Master Cohen.
5    MR. MOUGEY:  Sounds good.
6    MR. BENSINGER:  So, we will adjourn for today,
7  Mr. Mougey?
8    MR. MOUGEY:  Wonderful.  Thank you.
9    THE VIDEOGRAPHER:  We are off the record at
10  4:44 p.m.
11        (Time Noted:  4:44 p.m.)
12    FURTHER DEPONENT SAITH NAUGHT.
13
14
15
16
17
18
19
20
21
22
23
24

Page 289

1
2    I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
   Shorthand Reporter, do hereby certify:
3        That previous to the commencement of the
   examination of the witness, the witness was duly
4  sworn to testify the whole truth concerning the
   matters herein;
5        That the foregoing deposition transcript
   was reported stenographically by me, was thereafter
6  reduced to typewriting under my personal direction
   and constitutes a true record of the testimony
7  given and the proceedings had;
        That the said deposition was taken
8  before me at the time and place specified;
        That the reading and signing by the
9  witness of the deposition transcript was agreed
   upon as stated herein;
10        That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
11  such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in
12  the outcome of this action.
13
14        _____
          CORINNE T. MARUT, Certified Reporter
15
        (The foregoing certification of this
16  transcript does not apply to any
   reproduction of the same by any means, unless under
17  the direct control and/or supervision of the
   certifying reporter.)
18
19
20
21
22
23
24

Page 290

INSTRUCTIONS TO WITNESS

1  
2  

3  Please read your deposition over
4  carefully and make any necessary corrections. You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7  After doing so, please sign the errata
8  sheet and date it.
9  You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12 It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you. If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18  
19  
20  
21  
22  
23  
24  

---

Page 292

ACKNOWLEDGMENT OF DEPONENT

1  
2  
3  

4  I, EDWARD BRATTON, do hereby certify
5  under oath that I have read the foregoing pages,
6  and that the same is a correct transcription of the
7  answers given by me to the questions therein
8  propounded, except for the corrections or changes
9  in form or substance, if any, noted in the attached
10 Errata Sheet.
11  
12  
13 _____
14 EDWARD BRATTON          DATE
15  
16  
17 Subscribed and sworn
   to before me this
18 _____ day of _____, 20_____.
19 My commission expires:_____
20  
   _____ Notary Public
21  
22  
23  
24  

---

Page 291

- - - - - -
E R R A T A
- - - - - -

3  

4 PAGE LINE CHANGE
5 _____ _____ _____
6       REASON: _____
7 _____ _____ _____
8       REASON: _____
9 _____ _____ _____
10      REASON: _____
11 _____ _____ _____
12      REASON: _____
13 _____ _____ _____
14      REASON: _____
15 _____ _____ _____
16      REASON: _____
17 _____ _____ _____
18      REASON: _____
19 _____ _____ _____
20      REASON: _____
21 _____ _____ _____
22      REASON: _____
23 _____ _____ _____
24      REASON: _____

---

Page 293

LAWYER'S NOTES

1  
2 PAGE LINE
3 _____ _____ _____
4 _____ _____ _____
5 _____ _____ _____
6 _____ _____ _____
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____