Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION  | MDL No. 2804
                                  |
 4   OPIATE LITIGATION            | Case No. 17-MD-2804
                                  |
 5   This Document Relates to:    | Hon. Dan A. Polster
                                  |
 6   The County of Summit, Ohio,  |
     et al., v.                   |
 7   Purdue Pharma L.P., et al.   |
     Case No. 17-op-45004         |
 8                                |
     The County of Cuyahoga v.    |
 9   Purdue Pharma L.P., et al.   |
     Case No. 18-op-45090         |
10                                |
     City of Cleveland, Ohio v.   |
11   Purdue Pharma L.P., et al.   |
     Case No. 18-op-45132         |
12
                          - - -
13
                 Monday, December 3, 2018
14
                          - - -
15
           HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                          - - -
18
            Videotaped deposition of ROBERT BROWN, held
19      at Foley & Lardner LLP, One Biscayne Tower, 2
        Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:26 a.m., on the above date,
        before Susan D. Wasilewski, Registered
21      Professional Reporter, Certified Realtime
        Reporter and Certified Realtime Captioner.
22
23
                          - - -
24              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

```
 1    APPEARANCES:
 2       WEITZ & LUXENBERG, P.C.
         BY:  PAUL F. NOVAK, ESQUIRE
 3            TIFFANY ELLIS, ESQUIRE
         3011 West Grand Boulevard, Suite 2150
 4       Detroit, Michigan 48202
         (313) 800-4170
 5       pnovak@weitzlux.com
         tellis@weitzlux.com
 6       Representing Plaintiffs
 7
 8       FOLEY & LARDNER LLP
         BY:  JAMES W. MATTHEWS, ESQUIRE
 9       111 Huntington Avenue
         Boston, Massachusetts 02199
10       (617) 342-4000
         jmatthews@foley.com
11       Representing Anda Inc. and the witness
12
13       WILLIAMS & CONNOLLY LLP
         BY:  JULI ANN LUND, ESQUIRE
14       725 Twelfth Street, N.W.
         Washington, D.C. 20005
15       (202) 434-5239
         jlund@wc.com
16       Representing Cardinal Health, Inc.
17
18       REED SMITH LLP
         BY:  SUJEY S. HERRERA, ESQUIRE
19       1001 Brickell Bay Drive, Suite 900
         Miami, Florida 33131
20       (786) 747-0207
         sherrera@reedsmith.com
21       Representing AmerisourceBergen Corporation and
         AmerisourceBergen Drug Corporation
22
23
24
25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2        JONES DAY
          BY:  CASTEEL E. BORSAY, ESQUIRE
 3        325 John H. McConnell Boulevard, Suite 600
          Columbus, Ohio 43215
 4        (614) 281-3618
          cborsay@jonesday.com
 5        Representing Walmart
 6
 7        ROPES & GRAY LLP
          BY:  FEIFEI (ANDREA) REN, ESQUIRE
 8        1211 Avenue of the Americas
          New York, New York 10036-8704
 9        (212) 596 9303
          andrea.ren@ropesgray.com
10        Representing Mallinckrodt
11
12        ARNOLD & PORTER KAYE SCHOLER, LLP
          BY:  SEAN HENNESSY, ESQUIRE
13        601 Massachusetts Avenue, NW
          Washington, D.C. 20001
14        (202) 942-5644
          sean.hennessy@arnoldporter.com
15        Representing Endo and Par Pharmaceutical
16
17        COVINGTON & BURLING LLP
          BY:  AMBER CHARLES, ESQUIRE
18        One CityCenter, 850 Tenth Street, NW
          Washington, DC 20001-4956
19        (202) 662-5518
          acharles@cov.com
20        Representing McKesson Corporation
21
22    ALSO PRESENT:
23        JEFF FLEMING, Videographer
24
25
```

```
 1                    - - -
 2                 I N D E X
 3                    - - -
 4   Testimony of:  ROBERT BROWN                    PAGE
 5        DIRECT EXAMINATION BY MR. NOVAK.............  9
 6     CROSS-EXAMINATION BY MR. MATTHEWS............. 271
 7
                    E X H I B I T S
 8
                 (Attached to transcript)
 9
      ROBERT BROWN DEPOSITION EXHIBITS              PAGE
10
     Anda-Brown      Notice of Videotaped Deposition of    9
11   Exhibit 1       Robert Brown
12   Anda-Brown      E-mail - Subject: Potential          23
     Exhibit 2       DEA-HDMA Meeting -- Input
13                   Requested by December 12
                     Anda-Opioids_MDL_0000085677
14                   through 85690
15   Anda-Brown      E-mail - Subject: HDMA Weekly        27
     Exhibit 3       Digest, January 20: Distribution
16                   Management Conference and Expo to
                     Explore Critical Supply Chain
17                   Topics
                     Anda-Opioids_MDL_0000598068
18                   through 598071
19   Anda-Brown      E-mail - Subject: National           43
     Exhibit 4       Accounts Pipeline
20                   Anda-Opioids_MDL_0000546477 and
                     546478
21
     Anda-Brown      E-mail - Subject: (No subject)       66
22   Exhibit 5       Anda-Opioids_MDL_0000091399
                     through 91410
23
     Anda-Brown      Standard Operating Procedure        114
24   Exhibit 6       OPS-040-00
                     Anda_opioids_MDL0000056015 and
25                   56016
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S
 2                (Attached to transcript)
 3    ROBERT BROWN DEPOSITION EXHIBITS              PAGE
 4   Anda-Brown     E-mail - Subject: Information    118
     Exhibit 7      Requested by DEA Subpoena Received
 5                  June 27, 2016
                    Anda-Opioids_MDL_0000036508
 6                  through 36522
 7   Anda-Brown     E-mail - Subject: Glenn Burnie   133
     Exhibit 8      Pharmacist Settlement-Abuse
 8                  Updates
                    Anda-Opioids_MDL_0000560658
 9                  through 560660
10   Anda-Brown     E-mail - Subject: Report from SOM 137
     Exhibit 9      Review
11                  Anda-Opioids_MDL_0000546429 and
                    Anda_Opioids_MDL0000539208 through
12                  539217
13   Anda-Brown     E-mail - Subject: Revised Report  138
     Exhibit 10     Anda-Opioids_MDL_0000539140
14                  through 539150
15   Anda-Brown     E-mail - Subject: AUDIT - Top     177
     Exhibit 11     Customers
16                  Anda-Opioids_MDL_0000601903
                    through 601905
17
     Anda-Brown     E-mail - Subject: Follow Up Items 194
18   Exhibit 12     Anda-Opioids_MDL_0000084481
                    through 84488
19
     Anda-Brown     E-mail - Subject: Current         202
20   Exhibit 13     Suspicious Order SOPs
                    Anda-Opioids_MDL_0000143508
21                  through 143569
22   Anda-Brown     E-mail - Subject: Updated List of 221
     Exhibit 14     Customers Not Eligible to Purchase
23                  Controls from Anda
                    Anda-Opioids_MDL_0000543135 and
24                  543136
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3   ROBERT BROWN DEPOSITION EXHIBITS              PAGE

 4   Anda-Brown     E-mail - Subject: FINAL compliance   248

     Exhibit 15     docs for meeting tomorrow - BARB

 5                  PLEASE SEND

                    Anda-Opioids_MDL_0000132043

 6                  through 132066

 7   Anda-Brown     E-mail - Subject: Walgreens State    255

     Exhibit 16     Controls Summaries

 8                  Anda-Opioids_MDL_0000090454

                    through 90457

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                    - - -

2            THE VIDEOGRAPHER:  We are now on the record.

3      My name is Jeff Fleming, I'm a videographer for

4      Golkow Litigation Services.  Today's date is

5      December 3rd, 2018.  The time is 9:26 a.m.

6            This video deposition is being held in

7      Miami, Florida, in the matter of National

8      Prescription Opiate Litigation, MDL Number 2804,

9      for the United States District Court, Northern

10     District of Ohio, Eastern Division.

11           The deponent is Robert Brown.  Counsel will

12     be noted on the stenographic record.

13           The court reporter is Susan Wasilewski and

14     will now swear in the witness.

15           THE COURT REPORTER:  Sir, would you raise

16     your right hand?

17           Do you solemnly swear or affirm the

18     testimony you're about to give will be the truth,

19     the whole truth, and nothing but the truth?

20           THE WITNESS:  I do.

21           THE COURT REPORTER:  Thank you.

22           MR. NOVAK:  Before we begin, I'd like to

23     just put the appearance of counsel on the record.

24     This is Paul Novak and also Attorney Tiffany

25     Ellis of the Weitz & Luxenberg firm on behalf of

1    the Track One Plaintiffs pursuant to a notice of

2    deposition that was issued for the deposition

3    today under the Federal Rules of Civil Procedure

4    and the deposition protocol.

5          Can the other counsel place their appearance

6    on the record?

7          MR. MATTHEWS:  Good morning.  It's James

8    Matthews of Foley & Lardner for Anda, Inc., and

9    for the witness.

10          MS. LUND:  Juli Ann Lund from Williams &

11    Connolly for Defendant Cardinal Health.

12          MS. HERRERA:  Sujey Herrera from Reed Smith

13    for Defendant AmerisourceBergen Drug Corporation.

14          MR. NOVAK:  And counsel on the phone want to

15    place their appearance on the record?

16          MR. HENNESSY:  Good morning.  This is Sean

17    Hennessy from Arnold & Porter on behalf of the

18    Endo and Par Pharmaceutical defendants.

19          MS. BORSAY:  Good morning.  Casteel Borsay

20    with Jones Day on behalf of Defendant Walmart.

21          MS. CHARLES:  Good morning, Amber Charles

22    with Covington & Burling on behalf of Defendant

23    McKesson Corporation.

24          MR. NOVAK:  Any other counsel on the phone?

25                (No response.)

Highly Confidential - Subject to Further Confidentiality Review

1          MR. NOVAK:  All right.  We've marked as

2     Deposition Exhibit Anda-Brown 1 the Notice of

3     Videotaped Deposition for today, really more for

4     record purposes than anything else, but I'll hand

5     a copy to counsel if they need or want it.

6          (Anda-Brown Exhibit 1 was marked for

7     identification.)

8          ROBERT BROWN, called as a witness by the

9     Track One Plaintiffs, having been duly sworn,

10    testified as follows:

11                    DIRECT EXAMINATION

12    BY MR. NOVAK:

13    Q.   Good morning, Mr. Brown.  Could you state

14    your full name for the record?

15    A.   Robert I. Brown.

16    Q.   Okay.  And where do you currently live?

17    ███    ███    ████████████████████████████

18    ███    ████████████████████

19    Q.   Okay.  How long have you lived at that

20    address?

21    A.   Since December 2013.

22    Q.   I'd like to start by having you talk a

23    little bit about your educational background and

24    employment history prior to working at a time for

25    Anda.

```
 1              Can you give me a summary of just your

 2     educational background?

 3        A.   Okay.  I have a bachelor of arts degree from

 4     the University of Michigan majoring in history and

 5     political science, graduating December 1976, and I

 6     have a law degree from Wayne State University law

 7     school in Detroit, graduating December 1986.

 8        Q.   Okay.  Can you give me a brief description

 9     of any employment work you had in the pharmaceutical

10     industry prior to working for Anda?

11        A.   Prior to working for Anda, I was the senior

12     vice president and general counsel for the Harvard

13     Drug Group that was headquartered in Livonia,

14     Michigan, and I was at that position from April 2006

15     to April 2012.

16        Q.   Okay.  Is it fair to say that the work at

17     the Harvard Drug Group was your only work in the

18     pharmaceutical industry prior to your time at Anda?

19        A.   Yes.

20        Q.   Okay.  And what did you do -- or actually,

21     I'll start over.

22              Can you describe for me generally what type

23     of company Harvard Drug Group was?

24        A.   Harvard Drug Group was a secondary supply

25     wholesaler to the pharmaceutical industry primarily
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacies, as well as some other types of companies

 2    that sold pharmaceutical products and long-term care

 3    and some -- a few hospitals.

 4        Q.   Okay.  In the beginning of that answer you

 5    used the term "secondary supply wholesaler."

 6        A.   Correct.

 7        Q.   Can you give me a description as to what

 8    that term means?

 9        A.   Yes.  In the pharmaceutical distribution

10    industry there are three major primary wholesalers,

11    AmerisourceBergen, McKesson and Cardinal that

12    probably account for somewhere from 92 to 94 percent

13    of the business that is conducted in wholesale

14    pharmaceuticals.  Secondary, there are a number of

15    secondary suppliers that assist their customers who

16    may need items that their primary wholesaler does

17    not carry at a particular time or there may be a

18    certain brand -- brand is a bad term.  I was going

19    to say SKU but I don't know if that translates well.

20    But you have multiple manufacturers who make a

21    certain product in most cases and maybe the primary,

22    you know, carries three of those manufacturers,

23    maybe a secondary carries a fourth that is desirable

24    to certain customers of that pharmacy, so they'll

25    purchase from a secondary supplier for items that
```

1    they may not be able to get from their primary

2    wholesaler.

3        Q.   Okay.  I think we'll explore that a little

4    more later --

5        A.   Okay.

6        Q.   -- this morning.

7        A.   Okay.

8        Q.   But I appreciate your answer.  By the way, I

9    usually give a few instructions at the beginning of

10   the deposition, which I just completely skipped

11   over, so I'll do them now.

12       A.   Okay.

13       Q.   I want to make sure that when I ask

14   questions, make sure that your answer is verbal.

15   It's difficult for the reporter to transcribe

16   nonverbal answers, although they will get picked up

17   on the videotape.

18            Secondly if there is any question that I ask

19   that you don't understand or feel needs to be

20   rephrased, let me know, and I'll try to rephrase it

21   in a manner that makes sure we're both on the same

22   wavelength.

23            We've talked a little bit about your

24   experience at Harvard Drug Group.  Was Harvard Drug

25   acquired at some point?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Well, I guess at what -- acquired and at

 2   what time, because there were several transactions

 3   both before I arrived at Harvard and after I left.

 4   So I guess I'm trying to get some clarification on

 5   time period or, you know -- because --

 6        Q.   Let me -- I'll ask a different question.

 7        A.   Okay.

 8        Q.   Is Harvard Drug Group still in existence

 9   today?

10        A.   My understanding is that when Cardinal

11   Health purchased Harvard, I believe in 2014, and I

12   believe that the name Harvard is no longer utilized

13   in the industry.  I think it was merged into Belco,

14   I believe.

15        Q.   Okay.

16        A.   But that was -- I -- just to clarify, that

17   was after I left Harvard.

18        Q.   Yeah.  Can you give a general description as

19   to what your responsibilities were at Harvard Drug?

20        A.   They were varied because it was senior vice

21   president of business development and general

22   counsel, so I was responsible for external

23   acquisitions, we did five when I was there, and I

24   was responsible for finding the acquisitions and

25   vetting them and organizing the due diligence
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    process and working with the outside counsel and

 2    accountants to -- to finalize the agreements and

 3    help with the integration of those companies.

 4         I was responsible for all company internal

 5    agreements that dealt with vendors, with customers,

 6    with credit.  I was responsible for -- we had

 7    several offices throughout the country.  I was

 8    responsible for various leases.  I was responsible

 9    for managing our veterinary distribution -- First

10    Vet, which was a division of the company.

11         And, really, you know, worked -- we also had

12    a private label company that was incorporated into

13    Harvard called Major Pharmaceuticals.  I was

14    involved with the contracts that were there.  I

15    worked with pretty much every department, including

16    compliance.

17    Q.   Okay.  That was where I was going next.

18    A.   Okay.

19    Q.   Can you describe for me what your

20    responsibilities at Harvard Drug were as it related

21    to compliance?

22    A.   It was overall working -- working with the

23    compliance department and external counsel who

24    compliance -- the compliance department really had

25    more of the interface, direct interface, because
```

Highly Confidential - Subject to Further Confidentiality Review

1    they had been there -- they had all been people that

2    had been worked with before I got there, but

3    basically, you know, helping -- assisting when it

4    was necessary or when it was appropriate for me to

5    be involved with any contracts they had, any product

6    registrations, through Major, through any -- and

7    that role changed, I will tell you.

8            When I first got there it was more, you

9    know, legal working with customers.  As time went

10   on, and particularly after the -- a consent judgment

11   following -- or consent following a suspension order

12   was issued, I was -- I was the main person in

13   working with both the DEA and the administrative law

14   judge in ensuring that we got our license restored

15   and that we developed processes and procedures to

16   ensure that we would not have those issues again

17   with respect to controlled substances.

18   Q.   Okay.  The suspension to which you referred

19   in the last part of that answer, was issued by the

20   DEA against Harvard Drug?

21   A.   Yes.  I mean, signed by an administrative

22   law judge in June 2010.

23   Q.   Okay.  And can you describe for me the

24   circumstances which led to the DEA issuing a

25   suspension of Harvard Drug?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    At -- I'll try to put it in some context,

 2   because this was something that was taking place

 3   throughout the industry with the awareness of opioid

 4   distribution, so-called pill mill, both in, you

 5   know, in Florida and other places, and Harvard was

 6   one of the distributors that was probably, you know,

 7   caught, you know, like most of the industry, where

 8   probably didn't, in hindsight, didn't probably have

 9   the diligence that certainly has now in terms of

10   vetting customers and really, you know, examining

11   the types of customers and also the volumes of

12   controlled substances that were being sent or

13   distributed to pharmacies and, in some cases,

14   physicians as well.

15      Q.    Were there particular types of controlled

16   substances that were the subject of the DEA's

17   suspension order against Harvard Drug?

18      A.    It was primarily oxycodone.  There was some

19   hydrocodone products, but it was primarily

20   oxycodone.

21      Q.    And the DEA concluded that Harvard Drug

22   didn't exercise the requisite amount of due

23   diligence in adhering to suspicious order monitoring

24   requirements as it related to oxycodone?

25           MR. MATTHEWS:  Objection.
```

```
 1            MS. LUND:  Objection.
 2       A.   I think it was more -- it wasn't just
 3   suspicious orders.  It was an overall -- I would say
 4   an overall due diligence in terms of customers,
 5   customer vetting, in terms of, you know, knowing --
 6   knowing your customer.  And while that isn't, you
 7   know -- it may not be written that is a require --
 8   that is something that is a requirement, to know
 9   your customer, and I think they concluded that there
10   were certain customers that the company knew or
11   should have known required additional scrutiny.
12       Q.   Okay.  How is it that you came to work for
13   Anda?
14       A.   The way it worked was Harvard was acquired
15   by a company called Court Square Partners.  It was a
16   private equity firm.  The CEO, who had hired me, and
17   the president had retired and basically they brought
18   in a new executive team and they replaced pretty
19   much all the prior senior management.  I was
20   retained as senior -- as a general counsel, but they
21   had -- they were coming to a point where, you know,
22   they were looking into the future to -- private
23   equity, you look to sell the company, and, you know,
24   if you can eliminate people that -- salaries, I
25   don't say people, positions, you know, it probably
```

1    excels better and they made a determination they

2    didn't really need a general counsel, but the CEO

3    of -- who was the CEO, Terry Haas, had told Jay

4    Levine, who was the former president of Harvard,

5    look, Robert is doing a great job for us, I don't

6    want to see him out of a job, and that he knew that

7    Jay was -- had a very good relationship with Anda

8    and with Al Paonessa, who was the president of Anda

9    and he said, why don't you explore, even though Anda

10   was a competitor, why don't you see if they need

11   somebody who can do this.

12          And it turned out that Anda was looking for

13   a director of regulatory compliance focusing on DEA

14   and controlled substance issues, and because, as I

15   mentioned, once we had the suspension, I kind of

16   became immersed in working with our DEA counsel, and

17   our local counsel with respect to the administrative

18   law judge, as well as the DEA directly, and

19   internally to develop better systems and processes

20   so that we could get our license back, which we did,

21   and they were looking for someone to specialize in

22   that area, and they interviewed me and I began work

23   there on -- the end of April 2012.

24      Q.   Okay.  Who was it at Anda who interviewed

25   you for the position?

1      A.    It was -- there was a phone interview with

2   Al Paonessa, who was the president, and Michael

3   Cochrane who was the executive director of

4   regulatory compliance.  He was responsible for

5   licensing, for the operations of -- the compliance

6   operations of all the warehouses, which at that time

7   were two.  He had all the different responsibilities

8   and he really wanted somebody to focus on the

9   controlled substance issues.

10      So Allen -- Michael interviewed me by phone

11   and then in my in-person interview, Al and Patrick

12   Cochrane, who was the Vice President of Operations,

13   and I think it was some of the senior sales and

14   purchasing executives.  It turned out that the day I

15   came down for my interview, Michael's son was born

16   and so he wasn't able to attend my interview.

17      Q.    Okay.  In the interview process, were there

18   any particular responsibilities that were conveyed

19   to you as the types of things you would be working

20   on?

21      A.    Well, primarily to ensure that we were

22   selling -- basically to ensure that we were selling

23   the right products to the right customers and being

24   able to vet -- having enough information on each

25   customer to have systems in place to look at each

1    customer and determine are these the customers that

2    we -- that we need to sell to and what are we

3    selling to them.  That was the basic responsibility

4    that I was told.

5        Q.   And was there a particular emphasis, as you

6    were interviewing for the position, on selling the

7    right product to the right customer as it related to

8    opioids?

9        A.   Yes.  It was controlled substances, so

10   making determinations, should we sell controls at

11   all, are these the right -- to these customers, you

12   know, on a customer by customer basis, should we

13   sell controls, you know, what quantities.  If we

14   agree that we're satisfied, what quantities, what

15   products and really make sure that we had systems in

16   place to look at each customer and make a good

17   determination to protect the company.

18       Q.   As you were exploring the prospect of

19   working for Anda, did they describe to you, that is

20   representatives of Anda, any particular regulatory

21   challenges that they faced?

22            MR. MATTHEWS:  Objection.

23       A.   I mean, they really didn't -- that did not

24   come up in the discussions that we had, no.

25       Q.   Did anyone at Anda discuss with you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    outstanding regulatory compliance issues that the

 2    company had with the DEA?

 3        A.   Not during my interview process.

 4        Q.   Okay.  What else did you do to familiarize

 5    yourself with Anda prior to taking the position?

 6        A.   Basically, you know, learned about the

 7    company, went on the website, looked at, you know,

 8    where -- what their position in the industry was,

 9    who some of the key people were, some of the --

10    found out some of the customers.  Because Harvard

11    and Anda did share customers.  Now, again, I mean,

12    so I wasn't looking for sales information or pricing

13    or any of that, but just to understand, you know,

14    the type of business that Anda had.

15        Q.   Now, you had earlier characterized Harvard

16    Drug as a secondary wholesaler.

17        A.   Correct.

18        Q.   Is that an accurate description of Anda as

19    well?

20        A.   Yes, it is.

21        Q.   Okay.  And in particular, was it your

22    understanding coming into the position at Anda that

23    they were a secondary supplier, for the most part,

24    as it related to opioid products?

25             MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.  Yes.

2      Q.    Okay.  Prior to your time -- I'll start

3   over.

4            When you were at Harvard Drug, did you

5   participate in any industry trade associations that

6   dealt with the wholesale distribution of

7   pharmaceutical products?

8      A.    I'm trying to think of the time frame.  I

9   certainly read up on different items.  I did go to

10  some industry conferences and also I did -- because

11  again, my role was multifaceted.  I also went to

12  different conferences that were learning about

13  different aspects of the pharmaceutical industry in

14  general, and in many cases looking for what would be

15  a, you know, potential add-on for the company and

16  maybe a little bit out of the traditional, you know,

17  pharmaceutical distribution but maybe like to either

18  different products or different customers.

19           So yes, I did go to industry conventions or

20  seminars and I also read up on these and I -- and

21  also after we had our issues with the DEA, I did go

22  to some industry conferences to -- from HDA to

23  become more conversant with what others in the

24  industry were doing as well as what the HDA had

25  recommended and what they were doing with respect to

Highly Confidential - Subject to Further Confidentiality Review

1    DEA.

2        Q.   Okay.  You referred to HDA in that answer.

3    Can you tell me what HDA is?

4        A.   Well, it's now called -- it's now HDA,

5    Health Distribution Association.  It's the major

6    industry representative.  It used to be HDMA, Health

7    Distribution and Management Association, but it's

8    now primarily focused on distributors and it's based

9    outside of Washington, D.C.

10       Q.   Okay.

11            MR. NOVAK:  I'll have this marked.

12            (Anda-Brown Exhibit 2 was marked for

13    identification.)

14   BY MR. NOVAK:

15       Q.   We've had a document marked as Anda --

16   Deposition Exhibit Anda-Brown 2?

17       A.   Okay.

18       Q.   And the document is comprised of both an

19   e-mail and an attachment.  The e-mail sent to Robert

20   Brown from Michael Cochrane with -- bearing the

21   Bates number Anda_Opioids_MDL 85677, and then the

22   attachment is a multipage document bearing the Bates

23   number Anda_Opioids_MDL 85679 and continuing through

24   85690.

25       A.   Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Mr. Brown, is this an e-mail and attachment
 2    that you would have received during your employment
 3    with Anda from Michael Cochrane?
 4            MR. MATTHEWS:  Objection.
 5        A.   I -- based on what I'm seeing, it appears
 6    that's the case.  I don't have -- I don't have
 7    firsthand recollection of this, but yes, it -- you
 8    know, it's -- it look -- it certainly appears that I
 9    was -- that Michael sent me this survey and I'm sure
10    I reviewed it, if I -- although again, I don't
11    have -- I don't have firsthand recollection at
12    this -- as we sit here today, but it certainly looks
13    like something that I would have received.
14        Q.   Okay.  Now, at the top, in the portion of
15    the document that is the e-mail from Mr. Cochrane to
16    you, it simply says:  See below, we should go.
17            And that appears to be referencing a
18    potential DEA-HDMA meeting that HDMA was attempting
19    to schedule.
20        A.   Uh-huh.
21        Q.   Do you recall whether you actually attended
22    the meeting that's referenced in this document?
23        A.   You know, I don't recall and to be -- again,
24    I'm -- I don't really want to speculate, but I'm
25    just not sure if that meeting was ever actually
```

1    held.

2        Q.   Okay.  Let me ask you more generally.  What

3    was your understanding or, well, actually, I'll take

4    a step back and ask a different question.

5            During your time at Anda, did you

6    participate in any HDMA regulatory committees?

7        A.   Not committees.  I believe Michael was on

8    those, so I don't -- I don't believe I participated

9    on the committees themselves.

10       Q.   Okay.  In addition to committees, HDMA

11   provided conferences to educate industry

12   participants in regulatory compliance matters?

13       A.   Yes, they did.

14       Q.   Okay.  Did you participate in those?

15       A.   Yes.

16       Q.   Okay.  Did you review HDMA publications

17   designed to educate industry participants about

18   regulatory compliance?

19       A.   Yes.

20       Q.   Were there particular compliance

21   publications that HDMA issued that you were

22   knowledgeable of?

23       A.   I can't recall offhand but I -- I do know

24   that -- I don't know if it was publications or

25   e-mails or, you know, certain items that were

Highly Confidential - Subject to Further Confidentiality Review

1    distributed to industry, and yes, I would have -- I

2    would have reviewed those.  I'm not sure how to

3    quite characterize them but yes, I certainly did

4    review various HDMA recommendations, pronouncements,

5    et cetera.

6        Q.   Okay.  If you turn to the page of Deposition

7    Exhibit Anda-Brown 2, bearing the Bates number

8    85679.

9        A.   Okay.

10       Q.   There is a reference in the first bullet

11   point to a document titled:  HDMA Industry

12   Compliance Guidelines, Reporting Suspicious Orders

13   and Preventing Diversion of Controlled Substances.

14           Do you see that reference?

15       A.   Yes, I do.

16       Q.   Does that refresh your recollection as to

17   one of the publications that, issued by HDMA, that

18   you would have reviewed in your time at Anda?

19       A.   I can't say specifically.  I mean, I did

20   review a lot of industry publications -- documents

21   and so on.  I mean, I can't particularly say.  I

22   mean, this was -- this looks like it was, you know,

23   June 1st, 2011, which was before I got to Anda.

24   I -- I mean I just -- I don't know.

25       Q.   Okay.  But your understanding is that HDMA

1    provided these industry guidelines to provide

2    assistance to all the industry participants as it

3    related to distribution and regulatory compliance?

4         MR. MATTHEWS:  Objection.

5         MS. LUND:  Objection.

6    Q.   You can answer.

7         MR. MATTHEWS:  You can answer.

8    A.   My understanding is yes.

9    Q.   And you participated in industry conferences

10   from time to time?

11   A.   Yes.

12        MR. NOVAK:  We'll have this marked as

13   Anda-Brown 3.

14        (Anda-Brown Exhibit 3 was marked for

15   identification.)

16   BY MR. NOVAK:

17   Q.   We've had marked as deposition

18   Exhibit Anda-Brown 3, a document that appears to be

19   an e-mail from Robert Brown to a number of different

20   participants, which also forwards an HDMA weekly

21   digest.  The Bates number for the document is

22   Anda_Opioids_MDL 598068 through 598071.

23        And let me ask just a couple general

24   questions as it relates to Anda-Brown Exhibit 3.

25   The first one relates to the weekly digest.  Were

Highly Confidential - Subject to Further Confidentiality Review

1    those reports that you received on a weekly basis

2    during your time as the director of regulatory

3    compliance at Anda?

4        A.    Yes.

5        Q.    And was there useful information conveyed on

6    those as to things going on in the industry?

7              MR. MATTHEWS:   Objection.

8        A.    Yes.

9        Q.    Okay.   In particular, if you look at

10   Anda-Brown 3, the page ending in 598069, there is

11   reference -- there is reference at the top of the

12   page to a 2015 distribution management conference

13   and expo to explore critical supply and chain

14   topics.

15             Do you see that reference?

16       A.    Yes.

17       Q.    Okay.   And under that there are a number of

18   what are referred to as session highlights.   Do you

19   see that reference?

20       A.    Yes.

21       Q.    One of which is a bullet point entitled:

22   Applying ARCOS Data Analysis to Suspicious Order

23   Monitoring Programs.

24             Do you see that?

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Do you know whether you attended this

2    particular HDMA distribution management conference?

3    A.   Yes, I did.

4    Q.   Okay.

5         THE VIDEOGRAPHER:   Perfect.

6    Q.   Did you attend the session of the

7    distribution management conference dealing with the

8    application of ARCOS data to suspicious order

9    monitoring programs?

10   A.   I can't recall specifically, but I would --

11   without getting into speculation, I believe I would

12   have, I just can't specifically recall.  Sitting and

13   doing, but yes, that would have been something I

14   would have done.

15   Q.   Well, let me ask more generally.  Can you

16   describe for me your understanding as to how ARCOS

17   data might be used for purposes of facilitating

18   compliance with suspicious order monitoring

19   requirements?

20   A.   What the DEA requires is that orders of

21   Schedule II and Schedule III narcotics are

22   submitted, each distributor is -- manufacturer

23   and -- I'm trying to remember -- certainly,

24   actually, pharmacy are required to submit those

25   reports to the DEA and the DEA uses the data the way

1    they would use it and, you know, if -- I don't

2    really want to speculate because the DEA doesn't,

3    frankly has not in the past shared a lot of

4    information about the ARCOS data that they receive

5    based on, I guess, what they claim are privacy

6    concerns, so they haven't really shared, you know,

7    the exact way they use it, but certainly I would --

8    by getting information of what products are sold to

9    which customers and which and how -- and the

10   quantities and by how many sources, you know, I'm

11   sure that that -- I would think that would help them

12   in some of their analysis in determining trends in

13   the industry and maybe specific customers, but

14   again, I would say that some of that is speculation

15   only because they don't share the specifics of how

16   they utilize it.

17       Q.   Okay.  My question, I think, is a little

18   different.  What I'm asking is are there particular

19   uses of ARCOS data that Anda would use for purposes

20   of facilitating suspicious order monitoring

21   compliance?

22       A.   I would certain -- certainly the information

23   that is used in -- to prepare the ARCOS reports is

24   absolutely utilized.  I -- I'm not sure I would

25   characterize it that it would be the report itself.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It's really the data and the information that goes

 2    into those:  Sales reports, sales history, you know,

 3    for each customer, per product, per what -- yes, and

 4    that -- and some of that information is shared in

 5    ARCOS but it's actually a lot broader information

 6    that Anda would use.

 7        Q.   During the time that you were employed at

 8    Anda, did the ARCOS data to which you had access,

 9    was it solely the data supplied by Anda?

10        A.   Yes.

11        Q.   Did you have access to ARCOS data supply --

12    let me step back for a second.  I'll ask a different

13    question.

14             At various times during your employment at

15    Anda, they were a subsidiary of different drug

16    manufacturers.  Is that correct?

17        A.   Yes.

18        Q.   During the time, can you go through the

19    different manufacturers who owned Anda?

20        A.   To the best of my recollection, and there

21    was a little -- when I got there, Watson

22    Pharmaceuticals owned Anda.  At some point, I want

23    to say maybe 2013, but I'm not sure, Watson bought

24    Actavis, but the Actavis name became the company --

25    you know, the overriding company, I guess, for
```

Highly Confidential - Subject to Further Confidentiality Review

1    brands -- branding, and again, not -- not to be

2    confused with brand drugs, but the brand -- it was a

3    generic company.

4         And then in 2013 -- maybe 2013, 2014,

5    Allergan bought Actavis, and they used that name as

6    the encompassing, and Allergan was a brand

7    manufacturer and was buying -- you know, was getting

8    generics.  It was buying a generic -- bulk buying

9    the product.

10   Q.   Okay.

11   A.   And then, well, of course, before I left,

12   Teva then bought -- in 2016 Teva bought -- well,

13   they bought -- they bought the generic products from

14   Allergan and then they also acquired Anda.

15   Q.   Okay.  Before we went into that chain of

16   ownership, we were talking about ARCOS data.  During

17   the time you were employed at Anda, did you have

18   access to the ARCOS data submitted by any of the

19   manufacturers that you just identified?

20   A.   No.

21   Q.   Okay.  So you didn't have access to Watson's

22   ARCOS data?

23   A.   No.

24   Q.   And not Actavis's?

25   A.   No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Or Teva's?

 2        A.   No.

 3        Q.   Or Allergan's?

 4        A.   Correct.

 5             MR. NOVAK:  Okay.  Why don't we take our

 6        first break.

 7             THE VIDEOGRAPHER:  Off the record, 10:06 a.m.

 8         (Recess from 10:06 a.m. until 10:25 a.m.)

 9             THE VIDEOGRAPHER:  On the record, 10:25 a.m.

10   BY MR. NOVAK:

11        Q.   Okay.  We're back on the record.  Mr. Brown,

12   we talked a little bit about the discussions you had

13   with Anda employees and officers in the interview

14   process.  We didn't really go through what your job

15   responsibilities actually were when you began with

16   the company.  Can you describe those for me?

17        A.   There were, under regulatory compliance that

18   Michael, Michael Cochrane was executive director,

19   there was a licensing division or subset, and a

20   controlled substance subset, and I was responsible

21   for the controlled substance division of, if you

22   will, of regulatory compliance and when I came there

23   were two people who were analysts who reported to

24   me, and then the other -- the licensing -- the

25   people they reported to Emily Schultz.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  The people who reported to you were

2    who?

3    A.    Sabrina Solis and Mary Barber.

4    Q.    And what were your duties managing that

5    controlled substance area of compliance?

6    A.    I mean, the overall responsibility was to,

7    one, review every customer who applied for -- to

8    purchase controlled substance, substances.  Those

9    were new -- new control customers.

10         The other was to review current customers'

11    purchases of controlled substances in terms of what

12    they were buying, how much, all different -- all

13    different factors to ensure that we really had a

14    good handle on each customer buying controls.

15         The next part was if a customer, and we did

16    have limits on the amount of controls that a

17    customer could purchase in a given month and they

18    were by family, so, for example, alprazolam, if it

19    was 1,000 alprazolam a month, that would mean it

20    didn't matter if it was two milligram, one

21    milligram, .5 milligram, it was 1,000.  So we would

22    get requests from customers saying, you know, I'd

23    like to purchase more alprazolam, I've reached --

24    I'd like to raise my limits, so we would analyze

25    each one of those requests because they were done on

```
 1    an individual basis based on the -- based on

 2    information that a customer would submit to justify

 3    why they would want a limit increase, and so those

 4    are the kind -- those are the kinds of things that

 5    we would do.

 6          And, yeah, those were primarily -- it was

 7    really customer diligence at all different levels.

 8    Q.   Okay.  In that answer you said you would

 9    analyze each one of the requests of a customer to

10    increase their control limit.

11    A.   Uh-huh.

12    Q.   In answering that way, did you mean you

13    personally or someone within your team?

14    A.   It would either be Sabrina, Mary or myself.

15    Each person in our team had authority to make

16    decisions, but they were always free -- if they

17    weren't sure, they were free to come to me and I

18    would be happy to be -- not -- I would be the person

19    responsible if they had a question, but they had --

20    they had authority.  They were trained and Sabrina

21    had been with the company seven -- seven, eight

22    years by that time, Mary had been in compliance.  I

23    mean, they were both there before I was but she had

24    a compliance background.  So these were people that

25    were trained and were experienced to make decisions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  So the basic areas that we've covered

 2   so far that were your responsibilities when you

 3   started at Anda, were addressing new control

 4   customers, existing control customers, evaluating

 5   increases in controlled limits, and analyzing each

 6   of those requests.

 7      A.   Uh-huh.

 8      Q.   Were there additional responsibilities

 9   beyond those?

10           MR. MATTHEWS:  Objection.

11      A.   There were -- again, we -- we had a -- we

12   had a very robust customer, due diligence customer

13   review system, and the other component of that was

14   an electronic system that would look at orders of

15   controls and every order that came in, you know,

16   would -- there would be orders that would be --

17   would be held for further review, and it was the

18   responsibility of our team to look at each order and

19   make a determination based on the information that

20   we had on the customer as to whether that was a

21   valid order, and if we needed more information, we

22   would do that.  If we didn't, that's -- we would

23   make that decision.  So that was -- that was the

24   other part of it.

25           And one other item that we would do on
```

```
 1    probably a quarterly basis, and this was actually

 2    Sabrina handled a lot of this because she was very

 3    good with data, we would go over -- we would audit

 4    let's say sales of -- pick a drug, hydrocodone, in a

 5    particular region and we would look at each -- each

 6    customer that was buying controls in that region and

 7    see what the numbers were, what the -- what they're

 8    buying, what strengths they were buying.  We would

 9    compare that to other regions of the country, and

10    then we would do other -- well, who are our highest

11    carisoprodol or oxycodone purchasers and let's look

12    at each one of those and then go back and see, what

13    do we have on these customers, what's been their

14    trends, et cetera.  So we would spend a lot of time

15    really, you know, not just analyzing the day-to-day,

16    but going back, you know, several months or what

17    have you and making comparisons, because we had, you

18    know, all the sales data available that we were able

19    to look at for each customer.

20        Q.   Okay.  How about recordkeeping requirements,

21    were those part of your responsibilities as director

22    of regulatory compliance?

23        A.   In -- could you --

24             MR. MATTHEWS:  Objection.

25        A.   Could you be a little more specific on what
```

Highly Confidential - Subject to Further Confidentiality Review

1    records were -- you're referring to?

2        Q.   Well, did you have any responsibilities, as

3    it related to, assuring that recordkeeping

4    requirements for regulatory compliance purposes were

5    adhered to?

6        A.   I did not personally, if we're -- if you're

7    referring to required, if we're talking about CSOS

8    or 222 forms, no, I personally did not maintain

9    those.

10       Q.   Okay.

11       A.   Now, on other records --

12       Q.   Well, actually, we're almost to the point

13   where we will get into some different records.

14       A.   Okay.

15       Q.   But I just want to be clear.  If a DEA agent

16   came to Anda's offices and asked, who is responsible

17   for maintaining the records that we would like to

18   look at?

19            What would the company's answer be?

20       A.   Michael Cochrane.

21       Q.   Okay.

22            MR. MATTHEWS:  During what time period?

23       A.   During the time -- you're talking about

24   during the time I was there, correct?

25       Q.   Yes.  Yes.

```
 1       A.   And then -- well, then I -- during the time

 2   I was there, Jay Spellman, assumed that role

 3   afterward.

 4       Q.   Okay.  Now, you've touched upon a couple

 5   different types of electronic systems that were in

 6   place or databases --

 7       A.   Uh-huh.

 8       Q.   -- at Anda and I'd like to go through a

 9   whole array of --

10       A.   Okay.

11       Q.   -- different types of electronic systems.

12   One that you mentioned was CSOS.  Can you provide a

13   description as to what you meant by that term?

14       A.   Yes.  CSOS was actually, in fact -- CSOS is

15   an electronic ordering system for control -- for

16   Schedule II controlled substances.  A customer --

17   it's used two ways.  One, it's used for a

18   distributor to purchase controls -- Schedule II

19   controls from a supplier, so, for example, you know,

20   if Anda is buying a product from Qualitest and it's

21   a Schedule II item, they will submit that order

22   electronically.

23           Likewise, if Jim's Pharmacy is -- submit --

24   is buying Schedule II products from Anda, they will

25   submit an electronic order that is maintained by
```

Highly Confidential - Subject to Further Confidentiality Review

1    both the customer and the supplier and it's a record

2    and so it would go back and see each order and by

3    quantity.

4        Q.    When did Anda implement a -- by the way,

5    what does CSOS stand for?

6        A.    Controlled Substance Ordering System.

7        Q.    Okay.  Do you know when Anda implemented a

8    Controlled Substance Ordering System?

9        A.    I don't.  It was before -- before I arrived

10   there.

11       Q.    Okay.  Have you heard the term, TPS?

12       A.    Yes.

13       Q.    And what does TPS mean?

14       A.    TPS maintains -- it's a -- it's a ingrown --

15   it's a home grown system at Anda that maintains

16   certain sales data, sales history, and also current

17   status of each customer.  And it -- I mean, there

18   are many usages -- there are many uses to it.  I can

19   also be, I didn't use it as much, you know, product

20   pricing.  You can look at price of different

21   products, but it was widely used at Anda for many

22   purposes.

23           For compliance, for example, a -- you go to

24   the one page, you put in a customer number and when

25   the customer name, address, would come up, their

 1    current state of licenses, both their state and

 2    federal licenses, when they were -- when they

 3    expired, it would talk about whether -- it would

 4    show whether they were approved for controls, it

 5    would show whether they -- what documents they

 6    submitted.

 7         So it would give a picture of that customer,

 8    and then from there you could go into other screens

 9    that would show what they have purchased by

10    noncontrols, by controls, by product, by strength.

11    So we used that extensively in our review and

12    analysis.

13    Q.   Were due diligence materials, with respect

14    to particular customers, kept in the TPS system?

15    A.   No, no.  They were -- they were -- let me go

16    back.  They were noted either in the first page,

17    where it would show customer questionnaire, yes, no,

18    I think dispense report -- I think dispense report

19    was on there.  So it was noted whether they --

20    whether they were submitted, and there was a notes

21    section in TPS for each customer that whatever

22    determinations were made about a customer, whether

23    they were approved, not approved, whether they

24    were -- whether they were cut off, whether they --

25    limits were approved or not, or whether limit

```
 1    increases were denied, that was in the notes

 2    section, but the actual materials for each customer

 3    were kept in a separate O drive by customer number,

 4    which was the same customer number that was used in

 5    TPS.  The customer was assigned a number when they

 6    became a customer of Anda.

 7        Q.   That's just the customer account number?

 8        A.   Correct -- well, it -- yeah, I think it --

 9    yeah, it is the customer -- I was trying to remember

10    if it was the same account that was used for credit

11    and others.  I think it was.

12        Q.   You said the due diligence materials for

13    each customer are kept in the O drive.

14        A.   Yes.

15        Q.   Who is responsible for maintaining that?

16        A.   Every time it -- sorry.  We had -- again, we

17    had a set of different people who were analysts in

18    our group, so a customer would send in due diligence

19    to let's say, Mary, they send in a customer

20    questionnaire and dispense data.  The first thing

21    that she would be -- if she received it on her desk,

22    the first thing she'd be responsible for is, one,

23    putting it in the customer's file on the O drive,

24    and then secondly, going into the TPS customer page

25    and indicating that it was received and the date it
```

Highly Confidential - Subject to Further Confidentiality Review

1    was received.

2         So each analyst would be responsible for

3    ensuring that any time any customer information was

4    received, that it was placed in the O drive.  It

5    could be as simple as an e-mail communication to a

6    customer, and response to -- response from the

7    customer.  Whatever was there had to be placed

8    immediately.  Those files had to be updated and that

9    was a requirement.

10        (Anda-Brown Exhibit 4 was marked for

11   identification.)

12   BY MR. NOVAK:

13   Q.   We've had a document marked as Anda

14   Deposition -- or Anda-Brown Deposition 4, which is

15   comprised of a single page bearing the Bates stamp,

16   Anda_Opioids_MDL 546477, and then attached to that

17   is a document produced in native format bearing the

18   Bates number 546478.

19        We have brought an electronic copy of the

20   document that was produced in native format, if we

21   can put that on the screen, but I'll ask you a

22   quick -- a quick question with respect to just the

23   e-mail part.

24        Were these national accounts pipeline

25   documents something that were distributed to you on

```
1    a regular basis?

2       A.   Yes.

3       Q.   And would you in turn distribute them to

4    your staff?

5       A.   Yes.

6       Q.   What was their purpose?

7       A.   One business -- one segment of Anda's

8    business was regional pharmacy chains or they could

9    be supermarkets that had pharmacies, and there was a

10   group called National Accounts.  And National

11   Accounts were responsible for, you know,

12   obtaining -- of going to those -- that segment of

13   the pharmacy business and having meetings and trying

14   to get business from those types of companies.

15         And as a result, they would -- what we had

16   said was, look, we don't really want you to go down

17   the line, we don't know about it, the next thing you

18   do is you've got a contract and we're saying no, we

19   don't like this chain, we haven't -- we've heard,

20   you know, the information is bad, so let us just --

21   keep us in the loop at the front end as to what

22   you're looking at.

23         Now, most of the time, I would say a lot of

24   this never came to fruition, and frankly, even if

25   it -- even if it did, a lot of these people weren't
```

Highly Confidential - Subject to Further Confidentiality Review

1    necessarily looking to purchase controls, so it was

2    just more of an informational type of vehicle so

3    that we all knew -- nobody -- it's better to have

4    more information and more communication up front

5    than to find out about something that was in

6    progress and then we have to be the ones to say hold

7    it.

8         Q.   Okay.

9              MR. MATTHEWS:  Just -- before we go on, I

10        just want to put an objection on the record, that

11        the spreadsheet which Mr. Brown is being asked

12        about is produced today only in electronic form.

13        And as I understand it, we're not going to be

14        able to print a copy of what's been used to make

15        a record of the actual document that was used

16        here at the deposition, and so I object to that

17        procedure.

18             I also want to note that the spreadsheet

19        that's shown on the screen at this moment appears

20        to be not an actual record of anything

21        historical, but rather almost a training thing

22        because it lists under the column NAM, name of

23        NAM, and under the column account name, Joe

24        Schmoe's DrugMart, which I don't imagine is, in

25        fact, a real drugstore.  So I am not sure what we

Highly Confidential - Subject to Further Confidentiality Review

1      are looking at.  I understand it was produced

2      from the records of Anda but there is not going

3      to be a record of it after this deposition, so I

4      just want to put that on the record.

5          MR. NOVAK:  Okay.

6   BY MR. NOVAK:

7      Q.   What I think I'd like to do is go through

8   some of the different tabs in the National Accounts

9   Opportunity Pipeline, to get an understanding in a

10  little more detail as to how these types of

11  documents informed your work.  As your counsel

12  observed, this example sheet appears to be just a --

13  well, I don't know what it is, but why don't we go

14  to the next tab, which is example, Pipeline.

15          Can you describe for me what's depicted in

16  the example, Pipeline, tab of the National Accounts

17  Pipeline document?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8      Q.    Okay.  Why don't we go next to the example,

9  open issue tab.  Can you -- actually, I'm going to

10  skip ahead to the pipeline master file.

11         Now, a moment ago, when we were looking at

12  the example pipeline tab, you indicated that you had

13  not seen the document.  As you look at some of the

14  other tabs, are they more familiar to you?

15      A.    I can't say sitting here today that I

16  remember this particular document.  It looks like

17  some -- you know, it looks like something that I had

18  seen that I had -- the kind of documents I reviewed,

19  that I had received, that I had forwarded to our

20  team, but, I mean, I can't -- I can't tell you right

21  now, oh, yes, I remember, you know, right just off

22  the top of my head about CVS and Target and -- you

23  know, actually saw it.

24         So I can't specifically but, you know, I'll

25  be happy to answer any questions if I -- you know,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'll try to answer the questions to the best of my

 2    ability.

 3        Q.   Okay.  Just so we're clear, and this is

 4    looking back at the e-mail portion of Anda-Brown

 5    Deposition Exhibit 4 --

 6        A.   Yep.

 7        Q.   The National Account Opportunity Pipeline

 8    documents are the types of documents that you

 9    received and distributed to your employees?

10        A.   Correct.

11             MR. MATTHEWS:  Objection.

12        Q.   And this particular Excel spreadsheet, you

13    don't have any reason to believe, isn't one that you

14    would have received and forwarded to your employees

15    on November 9 of 2015, correct?

16        A.   Again, without knowing the date, are -- I'm

17    not -- if you could -- if you could go back on that

18    question.  Are you -- are you -- well, -- I'm trying

19    to -- I'm trying to make -- I'm trying to see if

20    you're saying that this was a document that was

21    November 9th and I attached it, if that's the case,

22    then, you know, the e-mail would speak for itself,

23    this was the type of report that I would send if it

24    was receive -- if it was sent to me, I would forward

25    it to our team, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  I want to go, while we're on the

 2   pipeline master file, so -- if you look at -- there

 3   is an item numbered 9, that makes reference to

 4   Leslie Harrington.  Who is Leslie Harrington?

 5        A.   Leslie Harrington is a national account

 6   manager, so she was responsible for obtaining these

 7   types of accounts.

 8        Q.   Okay.  And then the next column in the

 9   pipeline master file makes reference to Dale Hayes.

10   Is that the customer or potential customer who is

11   being discussed at this point in the spreadsheet?

12        A.   Yes.

13        Q.   Okay.  And for account status, that

14   indicates that this would be an existing account?

15        A.   Yes.

16        Q.   So Dale Hayes, as of this time in November

17   of 2015, is a company with whom Anda already had a
```

Highly Confidential - Subject to Further Confidentiality Review

1      ████████████████████

▮      ██████████████████████████

▮      ███████████

▮      ▮   ████████████████████████

▮      ████████████████████████████████

▮      ██████████████████████████

▮      ████████████████████████████████

▮      ████████

9          Q.   Okay.  And when you say Schedule II

10     controls, that would include opioid products like

11     OxyContin and fentanyl?

12         A.   It may.  There are nonopioid Schedule II

13     products, so I'm not sure which products -- by this

14     I couldn't tell which products she was -- she was

15     looking at.

16         Q.   Okay.  Then the next column makes -- or

17     makes reference to, department, and it refers to

18     compliance.

19             Is there anything significant on these

20     National Account Opportunity Pipelines -- let me --

21     I'll start with a different question.

22         A.   Okay.

23         Q.   Are the National Account Opportunity

24     Pipelines used in part to track anything that

25     compliance should be doing, your department should

Highly Confidential - Subject to Further Confidentiality Review

```
1    be doing as it relates to a particular customer?

2          MR. MATTHEWS:  Objection.

3    A.   I'm not sure that it's accurate, so I'll --

4    the way it's phrased is accurate.

5    Q.   Okay.

6    A.   If there was a relationship developed with a

7    national account customer, and it involved

8    controlled substances, the sale of controlled

9    substances, any controlled substances, before that

10   would be approved, I mean, you have several

11   different -- as we talked, several different

12   departments have to do things, have requirements.

13   The department has -- they have a requirement to get

14   it approved by the department, not necessarily vice

15   versa.  That's what I wanted to clarify.

16         Compliance would need to receive significant

17   data and information on that customer by location

18   and go through dispense data, questionnaire,

19   procedures, all the different things from that

20   customer, and if we weren't comfortable or we didn't

21   approve it, that deal -- they would not be selling

22   controls to that customer.  Any -- and it was done

23   on a store by store basis.  So basically, we had to

24   get complete information on each store, each

25   separation registration, in order to -- in order for
```

```
 1    that to go forward.  So it was more -- it was more a

 2    requirement of the -- of the national account

 3    manager to get approval rather than, you knowing

 4    compliance having to -- I just wanted -- semantics,

 5    I know, but --

 6        Q.   Okay.  I think when you initially described

 7    the purpose of National Account Opportunity Pipeline

 8    documents, you made reference to regional chains.

 9    Are national chains also tracked in these types of

10    documents on a regular basis?

11        A.   Yes.  Yes.

12        Q.   Okay.  Now, the next column is a reference

13    to department lead and it lists your name.

14        A.   Uh-huh.

15        Q.   Is that simply a reflection that you were

16    the lead in compliance associated with doing

17    whatever compliance needed to do in order to approve

18    or make a decision on the Schedule II full chain

19    rollout for Dale Hayes?

20             MR. MATTHEWS:  Objection.

21        A.   Yes.

22        Q.   And then the final column, column G, makes

23    reference to the sales phase/action items, and the

24    action item referenced for this particular Dale

25    Hayes customer is:  Will plan to pick up this
```

1    process with new buyer.

2           Can you give me a description as to what

3    that means?

4    A.    Again, not have -- just reading the document

5    as is, if you go to number 8, it says:  Still

6    considered independent as the deal has not closed

7    yet.  Just got assigned a new buyer Wednesday.  We

8    have played phone tag but no contacts as of yet.

9    Eventually move to -- because -- Ahold, which was

10   another regional chain, I believe, but this buyer

11   may have better insight into the role he would play

12   and if we could pick up where we had left off.

13          That is -- and if you look at 9, 10, 11,

14   that's all dealing with the sales managers

15   responsibility to deal with the buyer, because in

16   compliance case, it would be the sales manager going

17   to that buyer to say here's the data that our

18   compliance -- here's information that our compliance

19   department needs.  So they would either provide it

20   or they wouldn't.  If they don't, well, then we're

21   not worried about -- we're not worried about selling

22   controls to them.

23          But if you see, there is two below the

24   compliance -- 10 and 11 are the same -- the other

25   departments, it's the same status.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    And then continuing with the other columns,
 2    the Priority column, H, lists this as a high
 3    priority.
 4              Is this simply just a reflection as to how
 5    different sales opportunities at Anda are ranked in
 6    terms of priority?
 7              MR. MATTHEWS:  Objection.
 8         A.    That's -- that's my -- that was my
 9    understanding but I didn't create the document.
10         Q.    Okay.  If you can continue to scroll to the
11    right.  Okay.  And now scroll further down.
12              I want to go to another instance where there
13    are particular references to compliance, and it
14    might take a while until we get to -- okay.  Why
15    don't we go to number 21 and we'll start again.
16              Again, this is for the account manager
17    Leslie Harrington, she would have responsibility for
18    this account on the sales side?
19         A.    Uh-huh.
20         Q.    And this particular account is Meyer?
21         A.    Uh-huh.
22         Q.    An existing customer?
23         A.    Uh-huh.
24         Q.    And then there is referenced in columns D
25    and E, a new vault CSOS interface, and it references
```

```
 1    the departments as being IT and compliance.

 2        A.   Uh-huh.

 3        Q.   Can you describe for me your understanding

 4    as to what those different entries signify?

 5        A.   Again, no -- having no prior -- or no

 6    specific recollection outside of this document, so I

 7    can only, you know, go off what it says, Meyer was a

 8    regional supermarket chain that had pharmacies.  It

 9    was -- what it says here:  New vault CSOS interface.

10             I would, again, no knowledge and I'm just

11    trying to figure out what it says here, that Meyer

12    got a new vault.  Vault is what stores Schedule II

13    products.  Everyone who, you know, distributor has

14    to have a vault to store Schedule II products, and

15    sounds like they had a new vault and products are --

16    Schedule II products are shipped from the vault.

17    They are not taken out and put somewhere else and --

18    because they are shipped separately.

19             So this looks to me like they said there was

20    a new vault.  Since they are being picked and

21    shipped or even -- or being ordered, sounds like,

22    from Meyer, and so on, they were set up on CSOS and

23    the CSOS comes through that vault and there was an

24    IT issue with the CSOS due to the new vault

25    interface, and then because it involved CSOS and it
```

1    was really Michael and Emily who -- Schultz who

2    handled the CSOS, it fell under her purview to make

3    sure that that was -- that was accurate, because,

4    again, yeah, it's an IT issue to make sure that we

5    got the reports, but it was also, you know,

6    ultimately a compliance issue to make sure that

7    those reports were transmitted properly and

8    accurately.

9         But again, I wasn't -- I'm reading -- I'm

10   reading the form.  So I'm just trying to answer the

11   best of my ability.

12   Q.   This is based upon your understanding simply

13   reading the document in front of you?

14   A.   Correct.  That's correct.

15   Q.   Is it fair to say that these National

16   Account Pipeline spreadsheets are compiled at Anda

17   to communicate sales opportunities across different

18   departments of the company?

19        MR. MATTHEWS:  Objection.

20   A.   That was my understanding.

21   Q.   And what the status of the sales efforts

22   were?

23   A.   That's my understanding, yes.

24   Q.   And they were recorded contemporaneously in

25   order to convey the information to the different

1    departments?

2         MR. MATTHEWS:  Objection.

3    A.    Again, because it was created by the

4    National Accounts, we didn't create the document, I

5    don't know if I could -- I don't want to go as far

6    as to speculate what their intent really was.

7    Q.    Okay.  When you would disseminate these

8    pipeline documents to your employees, what was your

9    intent in doing so?

10   A.    To make sure that our team knew that if

11   there were issues that were requiring compliance --

12   you know, that required compliance or approval or

13   review or what have you, that they would know about

14   it, and if they see something, for example, let's

15   say Dale Hayes, all of the sudden there is data

16   from -- I don't know how many stores they had but

17   let's just hypothetically 100 -- 100 stores come in,

18   I didn't want our team to, oh, my God, we are

19   blind-sided here, we have got to look at it.  So I

20   wanted to kind of keep them in the loop and say this

21   might be coming through, I don't know if it will,

22   but if you see it, you'll know what it is and you'll

23   know where it is, at least keep it in the back of

24   your mind, this is something we have to analyze.

25   Q.    And as we have seen, there are certain

 1    instances where people within the compliance

 2    department are referenced as having a task to do; is

 3    that correct?

 4        A.   Well, as I mentioned earlier, the way the

 5    compliance department was structured, there were two

 6    teams.  There was Emily's team and there was my

 7    team.  So Emily -- it may not have been Emily

 8    actually doing it, but she was the lead.  Just like

 9    I would have been on the reviewing, you know,

10    dispense data and approving or rejecting sales of

11    controlled substances through a particular -- a

12    particular chain.

13        Q.   But at any rate, these documents would

14    sometimes be disseminated to identify

15    responsibilities for tasks to be performed by

16    someone within compliance?

17             MR. MATTHEWS:  Objection.

18        A.   I'm not sure that's the correct -- I

19    would -- what I -- I think more accurately it was

20    more of a notification, because it -- this was --

21    this was in the horizon.  I don't know if it will

22    ever come to fruition, but I'm just keeping you

23    informed, when we get it, we'll figure out who is

24    doing it, but I -- I had a philosophy that I liked

25    to keep our team informed of what was going on in

1    the company, especially if there was any -- if there

2    were any potential situations that would involve

3    compliance.

4        Q.    Okay.  Understanding that these were

5    potential sales opportunities, not necessarily ones

6    that materialized?

7        A.    Correct.

8        Q.    And so the purpose of the document was to

9    convey what might be on the horizon to the

10   compliance team?

11           MR. MATTHEWS:  Objection.

12       A.    Again, the purpose of the document was a

13   sales document.  It was transmitted, and again,

14   I'm -- if we look at the distribution list, it was

15   transmitted to various departments to give them a

16   heads-up of what might be coming.  So, you know, it

17   went to Chip Phillips, who was the president of the

18   company, went to Tricia Hew Chen, who was the chief

19   financial officer, went to Tom Perrine, who was the

20   IT -- head of IT, so -- it went to the head of

21   purchasing.  It went to all different departments to

22   just -- you know, as more -- as informational.

23       Q.    Okay.  It was a method of conveying the

24   status of sales opportunities across all the

25   different departments of the company?

```
 1        A.   That -- that, to my understanding, that was

 2   the -- you know, based on this, and again, I didn't

 3   create it and I didn't -- I wasn't the one who sent

 4   the original e-mail, but yes, that's my

 5   understanding.

 6        Q.   Okay.  Was part of your work in compliance

 7   at Anda, associated with performing some of the work

 8   necessary to either create a new sales account with

 9   the company or to expand upon what could be sold to

10   existing accounts?

11        MR. MATTHEWS:  Objection.  I'm not sure

12        that -- I'm not sure that really captures what

13        our role was.  I'll try -- I'll answer it to

14        my -- I'm trying to understand the question.

15        What our role was, that any sales opportunity

16        that came to the company that involved the sales

17        of controlled substances, had to be reviewed and

18        approved by compliance before those sales would

19        be permitted.

20        And I personally reviewed many of these

21        customers myself.  I personally did it.  Some of

22        the other members -- some of those other members

23        of our team handled, we parsed out the work, but

24        that was our responsibility.  It was -- like I

25        say, it was an approval or rejection process, and
```

1     making sure that all required information was

2     received from each of these potential -- either

3     potential control substance customers before they

4     were approved to purchase controls.

5     Q.   We've looked at the National Account

6     Pipeline spreadsheet as one method by which sales or

7     the sales department at Anda would communicate sales

8     opportunities to the compliance department.  What

9     are the other ways?

10          MR. MATTHEWS:  Objection.

11     A.   I mean, there are -- you know, if it's an

12     individual customer, individual pharmacy, you know,

13     the pharmacy representative will notify the customer

14     of the requirements of a customer seeking to

15     purchase controls.  First of all, it has to be an

16     existing customer, and then that customer would be

17     able to go to our website, print out a copy of the

18     customer questionnaire that we required of each

19     customer, they would fill that out, they would

20     provide dispense data that -- 90 day prior dispense

21     data for all products dispensed by that pharmacy by

22     unit, dosage unit, individual dosage unit and number

23     of prescriptions per item, and I believe -- I'm not

24     sure what time frame, but I think at some point we

25     started asking for their procedures for fill -- for

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing controls.  We wanted to know what their

2    procedures were.

3           And they would put that packet together.

4    There was a fax number on the questionnaire and they

5    would fax it in.  It was a dedicated fax line to be

6    submitted to compliance.  And it could go right to

7    compliance and that's how a customer -- a sales rep

8    would say, this is what you have to do, and a

9    customer would do it from there.

10          Or they could take the same documents and

11   e-mail them to a dedicated compliance e-mail.

12          So that's, you know -- and for independent

13   pharmacies, that was the most common way that sales

14   would at least -- would notify their customer of the

15   manner in which they were required to apply if -- to

16   purchase controls if they so desired.

17     Q.   Okay.  How about for regional or national

18   chains, how would that be communicated?

19     A.   It would be -- well, this was one way.

20   Another way would be that a national account manager

21   would say -- and this happened sometimes, although,

22   I can't recall a specific instance, but they would

23   say, look, I'm working on this opportunity, I've

24   got, you know, they want to purchase controls,

25   here's their -- I'd like to set up a call with you

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and I -- it could be somebody else I designate but
 2   in those cases it was usually me, and their
 3   compliance people and you tell them exactly what you
 4   need, let them know what is required and you guys
 5   can talk and see, you know, and so they understand
 6   what it is, so I'm not the messenger.
 7          That would happen from time to time as well.
 8   More than time to time, it happened a decent amount
 9   of times.
10      Q.   At the very beginning of that answer you
11   said:  Well, this was one way.
12      A.   This was one way, yeah.
13      Q.   What were you referring to when you said,
14   "this"?
15      A.   This -- this pipeline as a notification, but
16   if it got more --
17      Q.   Okay.
18      A.   -- detailed, for example, if there was a
19   new -- and I don't know if it ever came to fruition,
20   but just using the Dale Hayes example, okay, you're
21   talking to these people, if it ever got past that
22   stage, all right, we know about it, so if Leslie
23   Harrington were to pick up the phone or send me an
24   e-mail and said, you know, I talked to the buyer,
25   finally connected with them, they have a compliance
```

 1    director, can you talk to them?

 2         That would be -- that's how that would --

 3    Q.   Another way of communicating?

 4    A.   Yes.  Exactly.  Exactly.

 5    Q.   Okay.  That's, I think, all I have for

 6    Deposition Exhibit 4.

 7         Mr. Brown, were there particular standard

 8    operating procedures that you familiarized yourself

 9    with when coming to Anda?

10    A.   There were -- there were standard operating

11    procedures in place that I was given, I think,

12    probably my first day at Anda that I reviewed, yes,

13    and utilized in the -- and made sure our team

14    utilized in terms of conducting our day-to-day

15    affairs.

16    Q.   Okay.  Can you describe for me what

17    different standard operating procedures you used in

18    compliance on a day-to-day basis?

19    A.   Well, we used -- and it's -- I think I've

20    described some of it.  When we had a new customer --

21    a -- an existing customer who wanted to purchase

22    controls, we laid out all of the requirements that

23    we would need to review that request.  One SOP, I

24    believe, dealt with that.

25         Another SOP -- and not having those in front

 1   of me and not having reviewed them for the last few

 2   years, I can't recite them by rote, but one was

 3   also -- another one was as we discussed earlier, a--

 4   if a customer wishes to have an increase in the

 5   limits that they are allowed to purchase, monthly

 6   limits, what the process is for that, you know, and

 7   making sure that we went through that, and then

 8   there was another SOP that dealt with controlled

 9   substance orders that were, as we called them, of

10   interest or needed further review -- that we

11   would -- and the process we would use to verify

12   those orders, the information and how we would

13   analyze those and determine whether, you know, those

14   were legitimate orders or required additional

15   explanation or whatever disposition there would be.

16       Q.   Okay.  Let me have this marked as Anda-Brown

17   Deposition Exhibit Number 5.

18            (Anda-Brown Exhibit 5 was marked for

19   identification.)

20   BY MR. NOVAK:

21       Q.   We've had marked as deposition Exhibit -- or

22   Anda-Brown Deposition Exhibit 5, a document which

23   purports to be an e-mail exchange between you and

24   Michael Cochrane, is the first page and then

25   attached to that are what appear to be versions of

```
 1    three separate standard operating procedures at

 2    Anda, Standard Operating Procedure 28, Standard

 3    Operating Procedure 40, and Standard Operating

 4    Procedure 45.

 5            And I should note that the document bears

 6    the Bates number Anda_Opioids_MDL 91399 through

 7    91410.

 8            Is that an accurate characterization of what

 9    the document is?

10            MR. MATTHEWS:  Objection.

11        A.   Let me look.  From what I can tell.  I don't

12    have specific recollection other than this document.

13    Again, just reading it, it looks like -- again, I'm

14    just reading the words, that Michael and I had had a

15    conversation, that I had -- we had talked about

16    potential revisions to the SOPs once I had -- as I

17    say, I had reviewed -- I had been handed these when

18    I walked in and had had some time to review them.  I

19    had some suggestions.  It looks like, and again, I'm

20    not trying to speculate, but I'm looking at the

21    language, I may have attached a letter on May 31st

22    that outlined those changes.  Michael says, why

23    don't you just put them in the SOPs and that's what

24    it looks like I did.

25            But again, having no independent knowledge
```

Highly Confidential - Subject to Further Confidentiality Review

1    other than what the document says.

2    Q.   Okay.  Well, let's go through the e-mail

3    exchange itself.  The first one is an e-mail from

4    you to Michael Cochrane on May 31st, where it just

5    says, per our discussion today.  And then Michael

6    responds the following morning, June 1st, and says:

7    I think it looks great to streamline things and keep

8    things formatted the same way.  What do you think

9    about working specific things from this letter into

10    one or more of these existing SOPs or we can create

11    a new SOP in this format when an inspection is a

12    definite must.

13        And then you reply on the afternoon of June

14    1st at 2:39 and say:  I attempted to add the

15    pertinent sections to each of the existing SOPs as

16    appropriate.  Please let me know your thoughts when

17    you have a chance.

18        Do you have any reason to believe that you

19    didn't have the e-mail exchanges that are depicted

20    on the first page of Anda-Brown Deposition

21    Exhibit 5?

22    A.   I don't have any reason to believe that

23    didn't happen, no.

24    Q.   Okay.  This is an accurate depiction of the

25    e-mail exchanges that occurred between you and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Michael?
 2        A.   With one exception.  I don't -- unless it's
 3    attached here and I didn't really see it, I'm not
 4    sure -- this seems to imply -- the May 31st, seems
 5    to imply, per our discussion earlier today, and
 6    Michael's response, that I attached a document to
 7    the May 31st e-mail, and so if -- again, I'm
 8    implying, based on the language, so if that's the
 9    case and it's not attached, I don't know if this is
10    a complete depiction, is all, I guess, I'm saying.
11        Q.   Okay.  There may be an additional letter
12    that's referenced in that June 1st e-mail from
13    Michael to you?
14        A.   Based solely on what I'm seeing in this
15    document, yes.
16        Q.   Okay.  I want to go through a couple pages
17    now of the underlying SOPs.
18        A.   Okay.
19        Q.   And really, what I'm going to focus on
20    initially are just some of the data entry functions.
21        A.   Okay.
22        Q.   If you look at Standard Operating Procedure
23    40, and that begins at the Bates page,
24    Anda_Opioids_MDL 91403 of Deposition Exhibit 5,
25    first of all, let me start by asking what is the
```

Highly Confidential - Subject to Further Confidentiality Review

1   purpose of Standard Operating Procedure 40?

2       A.   The purpose is to set -- to establish the

3   procedures that are utilized to analyze any order

4   that is identified in the company's electronic

5   order -- control order monitoring system.

6       Q.   Is it fair to say that Standard Operating

7   Procedure 40 is designed to record those steps that

8   the compliance department would take in evaluating a

9   controlled substance account to determine whether

10  Anda would sell controlled substances to a

11  particular entity?

12          MR. MATTHEWS:  Objection.

13      A.   That's not -- that's not this SOP.

14      Q.   Okay.  That would be Standard Operating

15  Procedure 28?

16          MR. MATTHEWS:  Objection.

17      A.   Just -- I'm just looking to see.  Yes.

18      Q.   Okay.  So going to Standard Operating

19  Procedure 40, it is designed to record the steps

20  that Anda implements for purposes of operating a

21  suspicious order monitoring program?

22          MR. MATTHEWS:  Objection.

23      A.   No.

24      Q.   I still didn't get it right?

25      A.   No.

 1    Q.   How would you describe what the purpose of

 2   SOP 40 is?

 3    A.   The purpose of this procedure is to document

 4   the steps that are taken when an order is identified

 5   and held in the company's electronic order

 6   monitoring, order monitoring system.

 7    Q.   Okay.  And the electronic order monitoring

 8   system you are making reference to is the TPS

 9   system?

10    A.   I believe it was in TPS, yes.

11    Q.   Okay.  At least during your initial years?

12    A.   Uh-huh.

13    Q.   At Anda?

14    A.   Correct.

15    Q.   Was there a period in time that a different

16   system was in place while you were at Anda --

17    A.   Not while I was at Anda.

18    Q.   Let me finish the question.

19    A.   All right.

20    Q.   To identify orders of interest?

21         MR. MATTHEWS:  Objection.

22    A.   Not when I was at Anda.

23    Q.   When did you leave?

24    A.   January 2017.

25    Q.   Okay.  We'll get to the whole Buzzeo thing

```
 1    later.

 2            I want to direct your attention to the next

 3    page of Standard Operating Procedure 40.

 4            MR. MATTHEWS:  It's the page bearing Bates

 5        number Anda_Opioids_MDL ending 1404.

 6            MR. NOVAK:  Thank you.  I never mind if you

 7        clean up that type of stuff.

 8    Q.   There are different Roman numerals on this

 9    page of Standard Operating Procedure 40 dealing with

10    controlled substances and I'm just trying to figure

11    out the mechanics of how these things work.  At the

12    top of the page it says:  Refer to TPS customer

13    maintenance license info.

14            And then in parenthesis it says:  TPS 2.2.4.1.

15            What does that TPS 2.2.4.1 mean?

16    A.   In order to access different screens that

17    contain specific customer information, you would

18    go -- because this was a home designed -- this was a

19    system that was in place well before I got there,

20    you would push certain keys once you're in TPS that

21    would get you to the screen that contains the

22    information that you need to get.  So it was -- so

23    let's say, you know, give an example.  Yeah, I've

24    got to look at the -- so you say, gees, how do I get

25    the -- where do I find it?  Well, I don't have to go
```

 1    home.  You just pull out the SOP and it says you

 2    push these numbers and it gets you to that screen.

 3        Q.   Okay.  So if someone in the compliance

 4    department is evaluating whether a potential

 5    purchaser of a controlled substance has the

 6    necessary customer maintenance license, they would

 7    type in TPS 2.2.4.1 and that information should be

 8    contained there?

 9        A.   Yes.  It will show the state that they are

10    licensed in and then it will also show if a customer

11    questionnaire is on file.

12        Q.   Okay.

13        A.   That's a safeguard process, because in

14    reality, a customer wouldn't be able to order if

15    they didn't have those things, but it's a safeguard,

16    it's another double-check.

17        Q.   And in fact, part of setting up a new

18    customer would require that someone in compliance

19    actually enters the licensing information into TPS;

20    is that correct?

21        A.   That is correct, yes.

22        Q.   Okay.

23        A.   Well, let me -- I don't want to misstate.

24    For some licensing there was -- there is

25    department -- it has to be coordinated with

1    compliance but it may actually be customer setup.

2    There is a separate department that when a customer

3    comes in and they fill out their credit record and

4    they do this, whether or not they have -- let's say

5    they have a DEA license.  Most do.  It may be

6    customer setup that actually enters it but it's

7    coordinated with compliance, but the actual

8    entering, it may be someone else.  That's all.

9        Q.   Before compliance will sign off on the sale

10   of a controlled substance, there has to be the

11   necessary licensing information inputted so that

12   it's available in TPS 2.2.4.1, correct?

13       A.   That's a prerequisite before anything else

14   happens, yes, before the customers can even apply

15   or -- yeah, exactly.

16           MR. MATTHEWS:  Just to be clear, we're

17       talking about the time that he was at Anda,

18       right?

19           MR. NOVAK:  Yes.

20           MR. MATTHEWS:   Okay.

21   BY MR. NOVAK:

22       Q.   Now, the next Roman numeral says review

23   customer compliance notes, and then there is a

24   parenthetical, TPS 2.2.4.1/shift plus F4 and F8.

25           That is what you would have to type in to

1    the TPS system in order to obtain access to the

2    compliance notes for a particular customer?

3         A.   Correct.

4         Q.   So when someone in compliance takes notes

5    about various features of a particular customer who

6    is purchasing opioids from Anda, this is where those

7    notes would be kept?

8         A.   Just to clarify, it would be any controls.

9         Q.   Including opioids?

10        A.   Correct.

11        Q.   Okay.  But this is where the notes would be

12   kept?

13        A.   Correct.

14        Q.   Okay.  Who is it who can -- has the

15   authority to input notes in that section of the TPS?

16        A.   Only the compliance -- only designated

17   compliance representatives which would have actually

18   been the members of my team, Michael Cochrane and

19   Emily Schultz.

20        Q.   Okay.  The next section of standard

21   operating procedure is entitled Review Customer

22   Questionnaire, and the first bullet point under that

23   says:  Open customer questionnaire on share drive if

24   already saved.  And under that there is a reference

25   to -- in a parenthetical to what looks like it's an

```
 1      O drive folder.

 2             Is that accurate?

 3      A.   That is correct.

 4      Q.   Okay.  That's the O drive that you made

 5      reference to earlier, where the customer

 6      questionnaires are kept?

 7      A.   Correct.

 8      Q.   Okay.  Not in TPS?

 9      A.   Correct.

10      Q.   The O drive is a server maintained folder

11      that's available to anyone in Anda?

12             MR. MATTHEWS:  Objection.

13      A.   The O drive itself contains many folders

14      related to different information that is maintained

15      by Anda of all different sorts of items.  There are

16      specific folders dealing with compliance and this

17      particular folder is accessible only by authorized

18      designated people which would again be the people on

19      my team, Emily, and Michael Cochrane while I was

20      there.

21      Q.   Okay.  And so for this particular O drive

22      folder, security is tighter as to who can place

23      documents or change documents in that particular

24      folder; is that correct?

25      A.   That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.   Okay.  Now, the next category of information

 2   -- or the next Roman numeral in Standard Operating

 3   Procedure 40 is entitled:  Review Summarize

 4   Dispensing Data From Pharmacy, If on File.

 5           Do you see that reference?

 6      A.   Yes.

 7      Q.   Now, I don't see a reference for this Roman

 8   numeral as to where dispensing data from a pharmacy

 9   would be kept.  Do you know offhand where it's kept?

10      A.   It's kept in the O drive under:  Florida

11   Anda warehouse compliance customer questionnaire.

12      Q.   Okay.  And all of the information contained

13   in those different bullet points would be contained

14   in that O drive?

15      A.   That's correct.

16      Q.   Is the summary dispensing data kept in the

17   same subfolders as the customer questionnaire?

18      A.   By customer.  So in the O drive you list

19   every customer -- you have a separate folder for

20   each customer.

21      Q.   Okay.

22      A.   And that would include all of the

23   information that each customer has submitted as --

24   and again, as well as any e-mail, including any

25   e-mails that might have gone to the customer, and

 1    their responses, and so it would be by customer that

 2    data would be included.

 3        Q.   Okay.  If a customer has multiple stores,

 4    would there be even more subfolders, one for each

 5    store to reflect the dispensing data of each

 6    individual store?

 7        A.   There would be a -- it would be by customer

 8    number and we would try to -- I can't remember how

 9    we figured out how to make sure that they were

10    somewhat linked, but every -- every store location

11    would have its own individual customer folder,

12    including questionnaire, dispense data -- yeah, it

13    would have each -- each folder would have, yes.

14        Q.   Okay.  So if Walgreens had, say, 150 or 250

15    stores in the state of Ohio, there would be, kept in

16    the O drive, a separate customer questionnaire and a

17    separate summary dispensing data on file as for each

18    of them?

19             MR. MATTHEWS:  Objection.

20        A.   That's correct.  It's correct.  The only

21    thing I would maybe revise is there would be a

22    separate Walgreens folder that would list -- have a

23    folder for every location, regardless of state,

24    regardless of what -- just be if it was Walgreens,

25    store number, whatever, and would have all that

```
 1    information.

 2       Q.   I wasn't suggesting you kept it only for

 3    Ohio.

 4       A.   No, I know.  But I mean -- it's not also

 5    segmented by state is I guess what I'm saying.

 6       Q.   Okay.

 7       A.   You know, customer number 12345 is in

 8    Albuquerque and customer 12346 is in Anchorage, it

 9    would still be in -- it would each have their own

10    folder but it would be in a separate Walgreens

11    folder by --

12       Q.   Would there be a method to search it by

13    state?

14       A.   We could.  Yes, there were definitely -- we

15    had -- we had a lot of ways that would -- that would

16    slice and dice, so to speak.

17       Q.   I was about to use the same term.

18       A.   Which -- I will not tell you I was --

19    expertise, I had good people on my team to do that.

20       Q.   Who were the best slicers and dicers in your

21    department?

22       A.   Sabrina Solis and Latoya Samuels.

23       Q.   They would have the ability to go into the O

24    drive and extract data using various methods?

25       A.   O drive or TPS, because if it dealt with
```

1    customer sales information and purchasing history,

2    it would be in TPS.  So yes, they could work the

3    different systems to get that.  I need a report on,

4    you know, et cetera, how many customers we have in

5    Ohio that have bought so much whatever, and they

6    would be able to do that.

7        Q.   Okay.  The next category that is contained

8    in Standard Operating Procedure 40, under Roman

9    numeral 6 is:  Review TPS controlled substance

10   inquiry, and then the parenthetical 2.4.3.12.

11        What does that signify?

12       A.   Well, again, you push the same numbers and

13   you would look in TPS, because now it's not in the O

14   drive -- although -- well, let me go back on that a

15   little bit.  And these -- by the way, this was the

16   2012, April 5th, and these were -- these were

17   certainly reviewed each year and there may not have

18   been changes made but they were reviewed.

19        We did keep records of, for example, if

20   there -- if there were certain customers that were

21   purchasing a particular product from us as their

22   prime vendor, but that -- it would be in TPS but,

23   frankly, would also be in the O drive.  We'd have a

24   notation on that.  It would also be in the O drive

25   under the customer, we'd have a notation.  If they

Highly Confidential - Subject to Further Confidentiality Review

1    were, by chance, purchasing under a particular

2    program that we had from a, you know, based on a

3    particular NDC, we would have that in there, but it

4    would be both.

5         And then the other two are both definitely

6    in TPS.

7    Q.   Okay.  If you turn a couple pages in the

8    document to the page ending in Bates number 91406,

9    and again, we're still in Anda-Brown Deposition

10   Exhibit 5, this appears to be Standard Operating

11   Procedure 45.  Can you tell me what that standard

12   operating procedure is?

13   A.   That relates to certain instances and I used

14   one major example, but there were others, that

15   requests would come through the system called Remedy

16   and that was used for different departments by

17   salespeople or managers and they -- I think -- no,

18   maybe they were salespeople and they copied their

19   managers.  In the compliance case it would be a few

20   things.  It might be a customer -- so let me take

21   the fourth example first, because that's the easiest

22   one.

23        When we first approved a customer for

24   controls, you know, it was -- we did not

25   automatically allow them to purchase oxycodone and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    methadone.  We knew those were certain items we

 2    wanted to keep more of a limit on, so I can't

 3    remember how many months they had to purchase --

 4    they had to develop a control, whether it was 30 or

 5    60, before they were even eligible to purchase those

 6    items.

 7           So now a customer has been purchasing

 8    controls for 60 days and they say well, we'd like to

 9    apply to purchase this, and they would send a

10    request.  And so that would go through this thing

11    called Remedy, and again, I'm trying to recall time

12    frame but we established procedures for what they

13    would have to attach to that request in order for us

14    to even review it, but they would come through -- it

15    would come through the Remedy system, which is a

16    request to do something, and in this case customer

17    wants oxycodone, wants to purchase whatever, well,

18    how many, and why, and then you go through the whole

19    process, what's their order history, what's their

20    dispense data look like, send us new dispense data,

21    whatever it happened to be.

22           But if it was approved, then let's say you

23    would go in -- if that request was approved, they

24    had sent in everything in that they were required

25    and we were satisfied, okay, we would then -- we'd
```

 1    then go into the customer limit file, which is in

 2    TPS, customer control limits, and it would --

 3    oxycodone and methadone are always zero when a

 4    customer starts out -- and we'll say okay, we'll

 5    move it to 500 or 1,000, whatever it happened to be,

 6    if we approved it.  Then we would put a note based

 7    on da da da, it's in the O drive, customer has been

 8    approved to purchase oxycodone, 1,000 limit, or

 9    something like that.

10        Q.   Okay.

11        A.   And you could do the same thing for any one

12    of these three.  I just used that as an example of

13    how the system worked.

14        Q.   Okay.  So Standard Operating Procedure 45

15    was designed to be the procedures for Anda

16    compliance to create eligibility for a customer to

17    be able to purchase oxycodone or methadone?

18             MR. MATTHEWS:  Objection.

19        A.   That was one of the -- that was one item,

20    yes.  There are, as you can see, there are other --

21    other things that can be requested as well.

22        Q.   Let's talk about the others.  There is

23    also -- and this is under scope, if we're looking at

24    that particular portion of Standard Operating

25    Procedure 45, that there are four different bullet

Highly Confidential - Subject to Further Confidentiality Review

 1   points of things that this procedure is supposed to

 2   address?

 3   A.   And -- just to say -- again, I don't have --

 4        MR. MATTHEWS:  Wait for a question.

 5        THE WITNESS:  I'm sorry.  Okay.

 6   A.   Could you -- just --

 7   Q.   These are the -- these four bullet points,

 8   these are the particular issues that SOP 45 is

 9   designed to address for the company?

10        MR. MATTHEWS:  Objection.

11   A.   These are among the items, and again, not,

12   just -- this is the first time I've reviewed this in

13   a few years, but the phrase, this is to include,

14   means that there may be others, but these are most

15   common.

16   Q.   Okay.  So let's go through them one at a

17   time, corrective adjustment for pending order.  What

18   does that mean?

19   A.   Okay.  Customer is at 1,000 limit for

20   alprazolam, and they want to order -- they want to

21   order 200 more.  Okay?  That day.  Okay.  Well,

22   they'll put a note and then we'll say why?  Attach a

23   reason why, attach -- possibly attach new dispense

24   data, you know, and if we -- you know, let's say

25   they -- I can give you examples of reasons, not all

Highly Confidential - Subject to Further Confidentiality Review

```
 1    inclusive, but a customer says you know what, my

 █    ████████████████████████████████████████████

 █    █████████████████████████████████    █████

 █    ████████████████      █████████████████████

 █    ███████████████████████████████████████████

 █    ██████████████████████████████████████

 7            They might say, you know, I just picked up a

 8    new clinic, you know, Dr. Smith, he's five minutes

 9    from me, here is his specialty, here is his DEA

10    number, we might make a quick check, make sure there

11    aren't any issues with that doctor and the specialty

12    conforms with the request.  Okay.  And we'll say,

13    all right, if it makes sense, and we have enough

14    written documentation, not oral, but written, we

15    will approve and we'll move the limit up to 1200, as

16    an example.

17        Q.   Okay.

18        A.   That's where that comes in.

19        Q.   Now, similar to what we did with SOP 40, I

20    want to focus just on the mechanics of how the

21    information is kept.  Looking at the procedure, the

22    first step that is referenced there is:  Determine

23    type of remedy request.

24            How is that conveyed to the person who is

25    performing these steps in SOP 45, how do they
```

 1   determine what type of remedy request is being

 2   evaluated?

 3        A.   The person who submits the remedy request is

 4   responsible for typing in this is what I need, this

 5   is what I'm asking for.

 6        Q.   Okay.  Who is authorized to submit a remedy

 7   request within the company?

 8        A.   Any salesperson or their manager.

 9        Q.   So someone in sales comes across a control

10   limit of 1,000 pills that is imposed on a customer.

11   If they want to sell more than that 1,000 limit,

12   they have to communicate a request to compliance to

13   evaluate whether it's appropriate to exceed that

14   1,000-pill limit?

15             MR. MATTHEWS:  Objection.

16        Q.   As one example.

17             MR. MATTHEWS:  Objection.

18        A.   As an -- as an example, yes.

19        Q.   Okay.  And if that inquiry came in from

20   someone in sales, the way that compliance would

21   evaluate it is addressed in Standard Operating

22   Procedure 45?

23        A.   That is correct.

24        Q.   These are the steps that a compliance team

25   member should undertake in order to say yes or no to

1    the person in sales who is asking the question?

2        A.    Yes.

3        Q.    Okay.  Now, just looking at the mechanics,

4    so someone submits a remedy request, and the second

5    step that is referenced here in the procedure is:

6    Refer to TPS customer maintenance licensing info,

7    and then there is the TPS parenthetical information,

8    and there are several bullet points under that.

9            Can you walk me through what each of these

10   bullet point steps signifies?

Highly Confidential - Subject to Further Confidentiality Review

12        Q.    Okay.   The next bullet point is:   Observe

13    DEA license status of active/expired.

14             I take it this bullet point is just that the

15    compliance person in evaluating a review request

16    should look to see whether they've got an active

17    license on file?

18        A.    Correct.   Again, it's as I mentioned

19    previously, it's more of a double-check because if

20    their DEA is expired, they can't order anyway, but

21    it's just, again, double-check.

22        Q.    When you say they can't order anyway?

23        A.    System wouldn't allow them to order a

24    control with an expired license.

25        Q.    You mean if there is an expired license --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    DEA license.

 2        Q.    DEA license, there is already a security

 3   mechanism built into the TPS system that would

 4   prevent Anda from selling to that customer?

 5        A.    That is correct.

 6        Q.    Okay.  The next bullet point says:  Pay

 7   particular attention to the city/state of request.

 8              Actually, I interposed the word, the, but

 9   otherwise, I think I read it correctly.

10              What relevance does the city or state have

11   in evaluating a request to, say, increase the

12   threshold limit for OxyContin?

13        A.    Well, you know, as you -- as we talked

14   earlier on, we do get and did get updates from

15   various -- whether it's HDMA whether it's DEA,

16   whether it's other law enforcement about areas that

17   are particularly problematic for drug abuse and we

18   kind of knew where some of these were and we would

19   look and if it's an area that were -- we have some

20   concerns about, we're probably going to do some more

21   investigation before we go ahead and approve it.  I

22   mean, that's one other thing, let me ask for

23   additional information, whatever that happens to be

24   but we do want to know where we're selling to.

25   That's again, part of know your customer.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   Okay.  The next bullet point says:

2     Determine if a customer questionnaire is on file,

3     and then there is a parenthetical that says customer

4     flagged, Y.

5          What does that mean?

6     A.   It means that is there -- it will say,

7     customer questionnaire, and if it's N, meaning no,

8     we would not -- we would not approve any -- now,

9     again, some of this, if you -- you know, if you look

10    at the -- at the types, a lot of this would apply to

11    new account, customer -- and control eligibility.

12    You know -- a customer wants to order controls.

13    Sorry, we don't have a questionnaire on file, we

14    can't do it.  So that's what that is about.

15         Again, it wouldn't -- it wouldn't come into

16    play as much on the others because they wouldn't

17    have been approved for some of the other factors if

18    they didn't have a questionnaire on file, but

19    because they -- you know, this would be -- this

20    would more apply to a new customer, new account, new

21    control account.

22    Q.   Okay.  The next bullet point says:

23    Determine if the customer is currently flagged:  "Y"

24    for controls or "new".

25    A.   Again, is this customer now approved or is

1     this a new customer, are they already approved.

2     This would go to, you know, corrective adjustment,

3     control limit increase, oxycodone, methadone.  Well,

4     if they are not flagged for controls, if they are

5     not approved, those wouldn't apply because they are

6     not -- they're not approved for controls at all.  Or

7     are they a new account customer, which is the new

8     account.

9         Q.   Okay.  Now, earlier I think you said that a

10    new customer has a period of time before they're

11    eligible to even request to purchase controlled

12    substances?

13        A.   Correct.  Correct.

14        Q.   60 or 90 days?

15        A.   Yeah, I can't remember that.  I think it's

16    90 but I'm not sure.

17        Q.   So at the end of that period of time, if

18    they said, okay, my 90 days are up, I'd now like to

19    buy some OxyContin.

20             In order to do that would sales have to

21    submit a remedy review process request under these

22    procedures to have their status changed so that they

23    were eligible to purchase OxyContin?

24        A.   That would be -- well, all right, let me go

25    back.  They would not be able to purchase oxycodone

```
 1    at all, even if they were eligible to purchase

 2    controls.  Use alprazolam, why don't we use that,

 3    that would be easier.

 4           So again, as I mentioned, a customer could

 5    either submit the questionnaire and the dispense

 6    data and -- oh, I forgot to mention, I'm sorry,

 7    photographs of the pharmacy.  We also wanted to see

 8    that.  Because somebody could say, I'm a closed door

 9    pharmacy and then you've got -- or they could say

10    I'm a retail pharmacy and there's no front end and

11    that would be like a little sign, because again, we

12    want to verify as much as we can.

13           So they could either submit that directly to

14    compliance by the fax or e-mail, or they can submit

15    that information through the reps.  So if the rep

16    has that information, then they would submit it --

17    they could submit it, attach it to the remedy

18    request for a new customer, a new control

19    customer -- an existing customer seeking to purchase

20    controls.  So it could come through remedy.

21           And I will say there is one other, because

22    I'm trying to be -- you know, give you -- let's say

23    a customer provides us information through e-mail or

24    fax directly to compliance, and maybe the customer

25    then calls a day later, where am I, what did
```

1    compliance do, I want to order.

2          And so it could be -- a remedy request could

3    be from the rep:  A customer says they submitted

4    this, can you tell me status.

5          And then we would say we're in the process

6    of reviewing or we didn't get everything we needed,

7    or whatever it would be.

8    Q.    Okay.  The next two sections make reference

9    to review customer compliance notes and review

10   customer notes.  And then there are parentheticals

11   for where those are kept in the TPS system.  Is that

12   accurate?

13   A.    Correct.

14   Q.    Okay.  Let me ask a different question.  As

15   this material is input into the TPS system over

16   time, do old entries get changed or modified or is

17   it kind of a linear process, where new information

18   just continues to be added?

19         MR. MATTHEWS:  Objection.

20   A.    Notes can never be changed.  They are a

21   permanent record and so they are not changed and

22   they are not deleted.  They continue on and it's

23   linear.  So anybody going in to look at a customer

24   can see the entire history.

25   Q.    You can only add to the compliance notes --

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Correct.

 2       Q.    -- in the TPS system, you can't alter

 3   earlier entries of compliance notes in the TPS

 4   system?

 5       A.    That's correct.

 6       Q.    Okay.  And then the next category is review

 7   customer questionnaire, and in that category it

 8   says -- the first bullet point is:  Save new

 9   customer questionnaire to O drive if necessary for

10   recordkeeping.

11           That's simply to -- if a customer

12   questionnaire doesn't exist, it needs to be placed

13   into the O drive?

14       A.    Or -- and I can't remember at what point,

15   but we said we need -- we wanted a new customer

16   questionnaire every three years.  So it may be that

17   they were due -- in order to continue to be eligible

18   for -- to purchase controls, we needed annual

19   dispense data at least.  Now, if they were looking

20   for increases, we'd get it more frequently but not

21   less than once a year we'd get dispense data, and

22   that's if they kept ordering at the same rate,

23   otherwise more and then every three years we would

24   get a new customer questionnaire because it is a

25   rather extensive document but we wanted to see how
```

1    their business had changed and we reviewed

2    everything that came in and we would put it side by

3    side, so yes.

4        Q.   The next bullet point says:  Record date

5    customer questionnaire is received in TPS flagged,

6    "Y".

7             What does that mean?

8        A.   So it's two things, if it's a new customer,

9    a new existing customer applying to purchase

10   controls for the first time and they send a

11   questionnaire, you take the questionnaire, you go

12   back to that initial customer information sheet that

13   talks about their address and their licenses, and

14   you put in the date that you received the

15   questionnaire and you put "Y."

16            The second is, as I mentioned, they put an

17   updated questionnaire.  So now you go in and

18   that's -- you change the date to the new

19   questionnaire, and what that does, first of all it

20   makes it the most recent information we've received,

21   so you know, oh, they just received it, so you know,

22   oh, they are not due for one in another six weeks,

23   and it also alerts the analyst who is looking at the

24   file, oh, if they just got it today, and they've

25   been purchasing since 2013, there's another

Highly Confidential - Subject to Further Confidentiality Review

1    questionnaire in that folder, let me look at both of

2    them, when they are doing analysis.

3        Q.   So the existence of a new questionnaire in

4    the file for a particular customer doesn't mean that

5    the old customer questionnaire is deleted?

6        A.   Not at all.

7        Q.   Okay.  In the -- when it says "flag Y", that

8    is simply confirming in TPS that a customer

9    questionnaire is on file.

10       A.   Right.  If it's not, there is an N.

11       Q.   Okay.  And then the last bullet point, it

12   says:  Determine type of pharmacy reviewing, volume,

13   location, age, et cetera.

14            What is the purpose of that step in the

15   remedy review process?

16       A.   Well, let's look at volume first.  If this

17   is a customer that is -- dispenses 50 prescriptions

18   a week, and they -- and they are a new customer,

19   let's say they haven't -- let's take a couple

20   examples.

21            They dispense 50 a week and now they have

22   all this information that they want to purchase

23   controls from Anda, we're thinking well, you want to

24   purchase controls, we're not going -- we're going to

25   look at their dispense data and kind of match up,

```
 1    one, do they really need it, is this something --

 2    why aren't they getting this from their primary, and

 3    certainly it will affect -- impact the volume we

 4    agree to provide, if in fact we approve them at all.

 5    So that's one, a small or large pharmacy, who do

 6    they deal with and location.  If they are in a small

 7    town and they are dispensing, you know, 3,000 scrips

 8    a week, well, we want to know why that is, we want

 9    to get more information.  Are they located next to a

10    hospital, I mean what's going on here.

11            So that's that one.

12            And then age, if they are open six months

13    and they are already dispensing oxycodone and

14    methadone, we're going to have a concern about that.

15    Why would that be -- why would that be the first

16    thing you're getting as a new pharmacy.  I am using

17    different examples but that's the kind of things we

18    would look at.

19       Q.   And that information is all recorded in the

20    customer questionnaire?

21       A.   Correct.

22       Q.   Okay.  But the dispensing volume is

23    separately recorded from the -- or is that with the

24    customer questionnaire?

25       A.   It's in the O drive with the customer
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    questionnaire.

2    Q.   Okay.  The next category is conduct

3    necessary research online, doctors, locations,

4    demographics and there are a host of bullet points

5    underneath those.

6         I think they are fairly self-explanatory,

7    but my question is, where are those recorded?

8    A.   Those are in the O drive in the customer

9    file.

10   Q.   Okay.  So if one of your people is reviewing

11   a remedy request to increase a threshold for some

12   type of opioid to a purchaser, and they did some

13   additional research, that research would be

14   contained in the O drive in the customer

15   questionnaire file?

16   A.   That is correct.

17   Q.   Okay.  The next category is, I think, one I

18   just touched upon, the dispensing data from the

19   pharmacy.  And there are a number of bullet points
```

Highly Confidential - Subject to Further Confidentiality Review

12    it is.  We are not using this for any other purpose

13    other than compliance, and it's just easier to go

14    through that.

15          And we also were aware, particularly, with

16    independent pharmacies, they don't have -- the way

17    they run dispense data may not conform to that

18    standard, so they may send us more information, it

19    may be under alphabetical, it may contain it, but

20    instead of omeprazole being the highest down to, you

21    know, whatever, lisinopril, it could be it starts

22    with, you know, Adderall, and goes to Z, it goes to

23    zolpidem, so determining -- looking at that and

24    making sure, look, we've got to look at the numbers

25    here and it takes more time, but you have to do

Highly Confidential - Subject to Further Confidentiality Review

1    that.  So determining that.

2         Patient and script, we never really wanted.

3    We kept -- you know, cautioning, don't send --

4    that's HIPAA violation.  Now, I'm not going to say

5    that didn't get sent, but we would obviously never

6    disclose it, but what we're -- but -- I won't say it

7    wasn't helpful in certain cases, because if the same

8    ████████████████████████████████████████

█    ████████████████████████████████████████

█    ███████████████████████████████████████████

█    ██████████████████████████████████████

█    ███      ██      ███████████████████

█    ███      ██      █████████████████████

█    ██████████████████████████████████████

█    ███████████████████████      ████████████

█    █████████████████████████      ███████████

█    █████████████████████████████████

█    ██████████████████████████████████████

█    ███████████████████████████████████████████

█    ██████████████████████████████████████

█    ████████████████████████████████

█    ███████████████████████████████████████████

█    █████████████████      ███████████████████████

█    ████████████████████████████████████

█    █████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



6         So again, when you get that data, it's

7    instructing whoever's analyzing it to make sure they

8    understand how this is done.  Because they have to

9    know what their looking at, if they are going to

10   make an intelligent analysis, they have to know how

11   this has been presented so you can look at it

12   accurately.

1     Q.   Okay.  The next bullet point states:

2     Determine the level of control volume for time

3     frame.

4          And we've switched now to the page of

5     Deposition Exhibit Anda-Brown 5, ending in the Bates

6     number 1408.

7          Can you tell me what that step signifies?

8     A.   Well, over a 90-day period, which is the

9     period that we're asking for the dispense data,

10    what's their overall level of controls versus

11    noncontrols, what percentage.  I mean, are we

12    seeing -- and we looked at it, you know, so -- total

13    volume meaning number of units dispensed, control

14    versus noncontrol, and then if we look, the next one

15    is ratio.  So there's volume and then there is also

16    ratio of, you know, how many pills are they really

17    dispensing here and how does that compare to the

18    number of noncontrols.

19    Q.   Okay.  When you're looking at the ratio, the

20    higher the number of, say, opioid products that the

21    customer is purchasing as a percentage of his total

22    purchases, the more problematic that potentially

23    becomes?

24         MR. MATTHEWS:  Objection.

25    A.   It would require additional review based on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the individual circumstances of that customer.

 2        Q.    Okay.  Would it be considered a red flag?

 3              MR. MATTHEWS:  Objection.

 4        A.    Again, I prefer to say it would require

 5    additional review.

 6        Q.    Okay.  The next bullet point is:  Evaluate

 7    top products dispensed?

 8        A.    Yes.

 9        Q.    How is that factor used in the remedy review

10    process?
```

Highly Confidential - Subject to Further Confidentiality Review



13    Q.   Something about that answer struck me.

14  There's a difference between what the customer

15  purchases and what they dispense, correct?

16        MR. MATTHEWS:   Objection.

17    A.   Are you talking about purchasing from Anda

18  or purchasing --

19    Q.   Yeah.  What the customer purchases from Anda

20  versus what they sell to consumers.

21    A.   As a secondary, that would be -- as a

22  secondary, that would be across the board controls

23  or noncontrols, that is correct, for a secondary.

24    Q.   Right.

25    A.   So there is no -- whether it's -- whether

```
1    it's metformin or omeprazole or hydrocodone, that is

2    true for any product.

3         Q.   And what you're evaluating -- are you

4    evaluating both what they're requesting to purchase

5    from Anda, as well as what they're dispensing to

6    customers, to their consumers?

7         A.   It could be both or it could be either/or.

8    If we see -- if we see dispense data and I'll give

9    you two -- I'll give you a couple of different

10   examples on that.  If we see dispense data where the

11   highest product -- and this did happen on a few

12   occasions -- is oxycodone 30 and their next item was

13   methadone and the next item was hydromorphone 8

14   milligrams.  And the guy says.  I don't want to

15   purchase any of that from you, I don't even need

16   CII's, I just want to purchase lorazepam, you have a

17   good price on it, we would say no.  And our

18   philosophy was, if you wouldn't sell them oxycodone,

19   why would you sell them another control?  That was

20   the philosophy from the time I came there.  Mike --

21   Mike Cochrane was very clear on that.  No, it is

22   either all or nothing.  If you're not comfortable,

23   it doesn't matter if they are buying that from us,

24   because we're at the customer level, we're not

25   worried about what they are buying from us.
```

Highly Confidential - Subject to Further Confidentiality Review

1           On the other hand, so it doesn't matter what

2       they are buying, doesn't matter what they want to

3       buy from us, we will just not -- don't even turn me

4       on for CII's and just give me lorazepam and give me

5       1,000 a month and we would say no.

6           On the other hand, there would come a time

7       when, you know, we would evaluate percentages or

8       we'd look at a customer and say -- and we do this on

9       a, you know, monthly or quarterly basis, who has

10      been increasing their control ratios or adding --

11      because again, they had limits but who has been

12      adding -- and if they were purchasing more from us

13      and it got to a point where we're looking at --

14      we're seeing that they are purchasing more volume of

15      controls than they had a month earlier or two months

16      earlier or three months earlier, and understanding

17      we're secondary, we very well could say, you know

18      what, we're not comfortable with this pattern

19      anymore and we're not -- it's not one order, it's

20      just we're not comfortable with their pattern and --

21      so we looked at both.

22      Q.   Now, the last bullet points under Roman

23      numeral 7 states:  For an increase request,

24      determine if dispense data indicates a need for an

25      increase.

Highly Confidential - Subject to Further Confidentiality Review

1          What does that mean?

2     A.    Let's just say they have -- let's say

3     they're at 1200 limit for carisoprodol, could be

4     hydrocodone, whatever it is, and we look on their

5     dispense data and they're only dispensing 1500 or

6     1800 or 2,000.  Wait a minute, we're already -- or

7     2500.  Wait a minute, why do you need that increase

8     from us.  You're not dispensing enough to justify

9     that type of increase.  So you know, because again,

10    the more -- that's when you -- that's when you have

11    a little, you know -- and the next -- the next set

12    of analysis comes in.

13    Q.    Okay.  Now, if one of the compliance team

14    members in your department were making observations

15    about these different bullet points that we've just

16    been walking through on dispensing data, where would

17    they record their observations after having reviewed

18    it?

19    A.    They -- they would put that in the customer

20    notes or there are other times they would even, when

21    they respond to the remedy request -- so let's take

22    that last example:  Denied, customer only dispensing

23    X number of pills per month, increase not warranted.

24          So they put that in -- in the response to

25    the -- in the remedy and those are also recorded.

Highly Confidential - Subject to Further Confidentiality Review

1    So you go back, you look at that if it came up

2    again.

3        Q.   Okay.  Recorded where?

4        A.   In the -- in TPS.  That would be under

5    remedy -- I'm sorry, remedy, not TPS.  My mistake.

6    It would be recorded under -- because would it be --

7    in the response to the remedy, and I think -- and

8    again, I don't want to misstate, it's been a few

9    years, but I think on something like that it would

10   probably also go in the customer notes, something

11   like that.

12       Q.   Okay.  So it would be back, if we're looking

13   at the last page that we reviewed, ending in 1407,

14   it would be in the customer compliance notes or the

15   customer notes?

16       A.   Right.  Or again, it could also be in

17   remedy, the remedy notes themselves, because every

18   remedy opportunity -- see, in order to track it, the

19   person who is going through those requests has to,

20   what they call, close them out.  So there has to be

21   a disposition.  It can't remain -- I mean, it -- I

22   suppose it could remain open if -- the way it

23   remains open is we need more data in order to

24   fulfill this request.  And if you don't get the

25   data, you know, so it could be a couple days and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it's still open, you know, because we haven't
 2    gotten -- we haven't gotten the updated data.  So it
 3    stays open.
 4          But the goal is to get these adjudicated.  I
 5    mean, you don't want a customer waiting.  If there
 6    is a problem, you want to get that adjudicated.  So
 7    you don't really want to have these open forever.
 8    You want to get those -- you want to get them
 9    addressed as soon as -- as soon as makes -- as it
10    makes sense.  I mean we're not here to rush, because
11    it could require more analysis, but -- so when you
12    close out a remedy request, you know, you will
13    always put a reason, this is what happened, it was
14    denied for this reason or approved for this reason.
15          MR. MATTHEWS:  Is this a good time to take a
16       break or -- we've been going for a long time.
17          MR. NOVAK:  My goal is to get through this
18       document.
19          MR. MATTHEWS:  We've been going -- it's a
20       long document and we've been going for well over
21       an hour.
22          MR. NOVAK:  If you want a break --
23          MR. MATTHEWS:  We've been going for two
24       hours since the last break, so why don't we
25       actually just take a break, I'm exhausted, so
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1        five minutes and that will be it.

 2            THE VIDEOGRAPHER:  Off the record, 12:29 p.m.

 3        (Recess from 12:29 p.m. until 1:35 p.m.)

 4            THE VIDEOGRAPHER:  On the record, 1:35 p.m.

 5   BY MR. NOVAK:

 6        Q.   Mr. Brown, we had been going through various

 7   steps in implementation of -- related to the

 8   implementation of Standard Operating Procedure 45.

 9   I wanted to draw your attention down to what is

10   section Roman numeral 10 of the document that ends

11   in Bates page 1408.  This is still Anda-Brown

12   Deposition Exhibit 5 that we're referring to, and

13   the first bullet point under that says:  Once

14   eligibility is determined, a customer may request

15   the ability to submit information additional to the

16   due diligence previously provided.

17            My first question with respect to that

18   portion of the document is the due diligence

19   previously provided is a reference to what?

20        A.   The customer questionnaire, the dispense

21   data, the policies and procedures that the pharmacy

22   utilizes to dispense controls, the photographs that

23   the customer provides, and included in the customer

24   questionnaire, the names, license numbers, and

25   practice specialties of the top control prescribing
```

Highly Confidential - Subject to Further Confidentiality Review

1    physicians, and the most common conditions of the

2    patients, no names, that are receiving controlled

3    substances.  That was the standard.

4            As well as in reference to the one above,

5    you know, if there is something in the file that

6    indicates that the customer is using Anda for

7    particular products, particular SKUs or families.

8       Q.   And all of that information collectively is

9    what is referred to as the due diligence, as it's

10   referenced here in --

11      A.   Yes.

12      Q.   The bullet point under Roman numeral 10?

13           MR. MATTHEWS:  Objection.

14      A.   Yes.

15      Q.   And that is all contained in either TPS or

16   in the O drive?

17      A.   That is correct.

18      Q.   Is there any reflection of the due diligence

19   being performed that is indicated by the entry of a

20   yes or a no similar to what we saw with whether a

21   customer questionnaire had been received?

22           MR. MATTHEWS:  Objection.

23      A.   A determination of eligibility, so if a

24   customer is approved for controls, there will be a

25   note in the customer notes that will say, you

1    know -- mean, depending on how extensive, but there

2    will be a note that indicates that the customer was

3    approved.  It may -- I mean, again, it could be --

4    various things are said, all due diligence reviewed,

5    customer approved for controls.  If they are denied

6    for controls, it will say why, you know, top five

7    products were controlled substances, customer denied

8    access to controls.  So it will be -- most -- most

9    times it would be in the -- but for eligibility, it

10   will be in the customer notes, in TPS.

11        Q.   Okay.  Looking back a couple pages, the page

12   ending in 1406, the last bullet point:  Determine if

13   the customer is currently flagged Y for controls or

14   new.

15        That's an indication that sufficient due

16   diligence has been performed to authorize the sale

17   of controls, correct?

18        A.   That is correct.

19        Q.   But not necessarily sufficient due diligence

20   to increase the control limit?

21        A.   That is correct, because, I mean, you have

22   to -- so the approval process takes place first.

23   Very rarely at the time, unless there is some

24   specific reason or relationship, is a new customer

25   granted more than the initial limits.  It's very

Highly Confidential - Subject to Further Confidentiality Review

1   rare that they would ever start out on approval with

2   anything more than 1,000, was I think -- was the

3   standard opening limit, and again, that did not

4   include oxycodone or methadone.

5       Q.   Okay.  Is that what is referred to, again,

6   looking at page 1406, the standard control family

7   allocation of 1K?

8       A.   Correct.

9       Q.   Okay.  How is that measured, 1,000 what?

10      A.   Pills, dosage units.

11      Q.   So, for example, hydrocodone would be

12  limited to 1,000 pills?

13      A.   That is correct.

14      Q.   What other opioids would have that initial

15  limit in them once the customer is authorized to

16  purchase controls from Anda?

17      A.   When we started or when I started, meth --

18  or hydromorphone was also 1,000.  Later on that was

19  added to the -- to the -- oxycodone and methadone

20  limitation, but at the time -- at the time that

21  this, 2012, hydromorphone and oxymorphone were

22  1,000.

23      Q.   Okay.  Any other opioids that had 1,000

24  limitation on the control family?

25      A.   I want to say fentanyl, and that was later

Highly Confidential - Subject to Further Confidentiality Review

1    changed as well, but at the time it was 1,000.

2          I might add that at the time of 2012,

3    hydrocodone was a Schedule III.  I think it was 2014

4    that it was rescheduled.

5          (Anda-Brown Exhibit 6 was marked for

6    identification.)

7    BY MR. NOVAK:

8    Q.   We've had marked for identification purposes

9    Deposition Exhibit Anda-Brown 6, which is a two-page

10   document bearing the Bates number Anda_Opioids_MDL

11   56015 and 6.

12         This appears to be a -- well, let me just

13   ask you.  Can you identify what deposition

14   Exhibit Anda-Brown 6 is?

15   A.   No, I can't.  I've never seen this before,

16   before you just handed it to me.

17   Q.   Okay.  Was there ever a period that you're

18   aware of in Anda's operations, where the procedure

19   for making a determination of what control limit was

20   used, and standard operating procedures for

21   suspicious order monitoring was done, in the manner

22   that is depicted on page 2, under system formula in

23   3.1?

24         MR. MATTHEWS:  Objection.

25   A.   I'm not familiar with this and I -- I have

1    no knowledge of when or how this may or may not have

2    been utilized.

3        Q.   Okay.  How in the period of time that you

4    were at Anda as director of regulatory compliance,

5    was a system formula devised to determine orders of

6    interest for a suspicious order monitoring program?

7            MR. MATTHEWS:  Objection.

8        A.   It was already in place when I started, so

9    I'm -- I really don't have any firsthand knowledge

10   of how that was -- how that formula was arrived.  It

11   was -- I just don't have any knowledge of how it was

12   originally arrived at.

13       Q.   Well, if we can go back to Deposition

14   Exhibit Anda-Brown 5 for a moment, under the Bates

15   page ending 1403, it states under scope:  The

16   directives contained in this SOP apply to all Anda

17   DEA compliance analysts who are involved in the

18   review of a sales order deemed to be of interest.

19   Orders of interest are captured using historical

20   sales information with a user defined time frame by

21   looking at past averages of the following using a

22   user defined multiplier.

23           Can you describe to me what that means?

24       A.   I can describe in general terms that, looked

25   at customer sales order and what their sales history

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was -- has been over a particular time.  And to tell

 2    you the truth, I don't really remember if it was a

 3    rolling 30 days, 60 days, six months, I really --  I

 4    don't recall, because it was -- this standard was

 5    already in the system that was looking at orders, so

 6    it looked at it at a rolling history of that

 7    customer's orders and then looking at past averages

 8    using a user defined multiplier.  I really don't

 9    know what that multiplier was.  That was, again,

10    part of the IT system that was set up and created

11    before I got there.  So I utilized the functionality

12    in terms of what was an order of interest that

13    needed to be reviewed, but I really can't speak

14    specifically as to either the defined time frame or

15    what the multiplier was.

16         Q.    Okay.  So if I understand your answer

17    correctly, Anda would take an average user -- an

18    average amount that the customer ordered for a

19    particular opioid product, and multiply it by a

20    multiplier and if it exceeded -- if an order

21    exceeded that amount, then the order would be held

22    for review?

23              MR. MATTHEWS:  Objection.

24         A.    As far -- from a general standpoint, that

25    was, I believe, the methodology that was used to
```

Highly Confidential - Subject to Further Confidentiality Review

 1    hold orders.

 2         Q.    Okay.  But the average in terms of whether

 3    it was a 30-day average or a 60-day, you don't know

 4    what it was?

 5         A.    No, I don't, not at this time.

 6         Q.    And the multiple, it had to be two times

 7    that amount or three times that amount, you don't

 8    know what the multiplier was?

 9         A.    No.

10         Q.    And it's not actually set forth in the

11    Standard Operating Procedure Number 40?

12         A.    Correct.

13         Q.    Did you ever have discussions with the DEA

14    as to what the average -- how the average was

15    calculated or how the multiplier was selected?

16         MR. MATTHEWS:  Objection; compound.

17         A.    To my recollection, I don't -- in the times

18    that I was with the DEA and met with them and

19    inspections, I don't believe -- I don't remember

20    that coming up.

21         Q.    Okay.  Do you know if the multiplier was

██    ███████████████████████████████████████████████████

23    looked at in Anda-Brown Deposition Exhibit 6?

24         A.    No, I don't.

25         Q.    But basically, the way the orders of

 1    interest were determined, is you would take the

 2    multiplier and multiply it by the average.  If the

 3    order exceeded that amount it would be held and one

 4    of your people would have to review it?

 5         MR. MATTHEWS:  Objection.

 6    A.   Let me just clarify.  Nobody did that --

 7    nobody on our team ever physically multiplied --

 8    used a multiplier.  It was the system.  It was built

 9    into the system as a multiplier that would identify

10    the orders.

11    Q.   It was the TPS system that would

12    automatically kick that in and say aha, this is an

13    order of interest because it exceeds some multiple

14    of the customer's average order?

15    A.   That is correct.

16    Q.   Okay.

17         (Anda-Brown Exhibit 7 was marked for

18    identification.)

19    BY MR. NOVAK:

20    Q.   We've had marked for identification purposes

21    Deposition Exhibit Anda-Brown 7 which bears the

22    Bates range, Anda_Opioids_MDL 36508 through 36522.

23    A.   Okay.

24    Q.   The cover page appears to be, or to record

25    two e-mails sent by Robert Brown, the first to,

Highly Confidential - Subject to Further Confidentiality Review

 1    Brice D. Burchard at the US Department of Justice,

 2    and the second one to multiple individuals

 3    internally at Anda, and then attached to that cover

 4    e-mail are a number of documents.

 5         Is that a fair description of the Deposition

 6    Exhibit 7?

 7    A.   That's what it appears to be, yes.

 8    Q.   Okay.  Do you recall responding to a

 9    subpoena issued by the US Department of Justice?

10    A.   Frankly, we received several subpoenas,

11    whether it be from -- no, I don't -- it wasn't

12    Department of Justice.  It was the DEA.

13    Q.   Okay.

14    A.   It wouldn't have been the department -- it

15    would have been the DEA and we received, you know,

16    various subpoenas from DEA or state boards of

17    pharmacy, you know, with respect to records of

18    particular customers, so I certainly don't recall

19    that one, but --

20    Q.   Do you have any reason to believe that the

21    document that is the e-mail from Robert Brown to

22    Brice D. Burchard at US Department of Justice.gov or

23    USDOJ.gov, I should say, and the underlying

24    attachments are a true and accurate copy of what you

25    would have sent to the DOJ?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Without really seeing what was attached, I'm
 2   not -- I mean, I can't -- I can't comment other than
 3   what is referenced in the e-mail.  I really can't --
 4   to be, you know, really clear, I'd really have to
 5   see the attachments.
 6        Q.    Well, the attachments are described in your
 7   e-mail to Mr., Bouchard, can you review the document
 8   and make a determination as to whether those are
 9   indeed the attachments that are depicted?
10        A.    Let me see.  Well, fighting prescription
11   drug abuse isn't referenced.  It's a document that
12   we created, frankly, I created, and we utilized this
13   on our website, we utilized this for our sales team,
14   and for other customers.  Let's see, it does say
15   there was a questionnaire attached, but I'm not
16   really sure that the -- you know, when it says
17   questionnaire, is that our questionnaire or is it --
18   again, I don't -- I don't want to speculate because
19   this refers to some subpoena.  I don't know if it
20   was a customer subpoena or wether it was a subpoena
21   of our records.  Without seeing what was being
22   requested, it was hard for me to -- but, you know,
23   if -- if this was the case -- and I don't know.
24   It's certainly our questionnaire.  It is again, the
25   first -- the first part of it is a document that we
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    created in our department to -- for our customers

 2    and for people, you know, in our own -- internally

 3    as well, to explain what we do and why we do it.

 4    It's our customer questionnaire.  It is the sample

 5    dispensed data that I referred to earlier that, you

 6    know, we ask the -- the form in which we ask

 7    customers to provide information.  It is a revised

 8    SOP and this really -- let me see.  I'm trying to --

 9    I'm just trying to look at one item.

10         There was a revision on this, revised, and

11    where it looks like additional licensure information

12    was added to this SOP and then it was the letter to

13    the DEA that asked that we have -- we asked for our

14    Westin location will be authorized to serve as the

15    central recordkeeping location in accordance with

16    DEA -- the Code of Federal Regulations to keep all

17    records for all of our warehouses.

18         So it -- it might very well be, but I

19    can't -- again, I -- I don't know what the subpoena

20    asked for, so I'm a little bit -- I'm a little at a

21    disadvantage but, you know, it's a -- it's a

22    possibility if that's what they asked for, that's

23    what we sent them.

24    Q.   Okay.  Just so I'm clear, when you sent the

25    e-mail back to the US Department of Justice and
```

1    attached three documents, you wouldn't send

2    information to the Department of Justice that was

3    somehow not the documents that you were depicting

4    you sent?

5        A.   Oh, no.  Although, again, I do want to just

6    clarify.  It's not real -- I know the DEA is an

7    enforcement arm of the Department of Justice, but

8    it's not -- we did sent it to the DEA and that's who

9    we dealt with.

10       Q.   You did e-mail it to an individual at the

11   Department of Justice, correct?

12       A.   Well, yes.  He has a USDOJ e-mail, yes, he's

13   technically an employee, but again, we looked at it

14   as specifically DEA, yes.

15       Q.   Okay.  And when you sent the -- let's start

16   with just the Anda SOP Number 28, new account setup

17   information.

18       A.   Right.

19       Q.   Now, when you send new account setup

20   information to a customer, do you send a whole

21   packet of information that includes more than one

22   document?

23       A.   We really don't send anything to a customer.

24   They could either get it online -- they usually

25   would get it online and be able to print it off as I

Highly Confidential - Subject to Further Confidentiality Review

1    described earlier.  It's information needed to set

2    up an account.  It would be the customer sending

3    information to Anda, not vice versa.

4        Q.   If a customer contacts Anda and says I'd

5    like the information to set up an account, what does

6    Anda send them?

7        A.   Again, we might send them -- we might send

8    it but more often than not, more often than not

9    we're going to tell them go online and print it off

10   because then it doesn't get lost in the mail, it's

11   there -- it's not the same chance of something

12   getting lost or misplaced or a document not being

13   there.  Chances are, we would -- we would be

14   telling -- we would be asking the customer just

15   print off and send this to us.  There may be times

16   we would send it.  It wasn't that often, to be very

17   honest.

18       Q.   Mr. Brown, I'm Walmart and I'm about to

19   spend a billion dollars on pharmaceutical products.

20   I'm calling up Anda and saying, can you send me the

21   information, the packet of information that I need

22   to fill out to become a customer.  What do you send

23   them?

24            MS. CHARLES:  Object to form.

25       A.   Well, are you talking about new control --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    new control customer or new customer generally.  I
 2    just want to be clear, because there is different --
 3    there is different information, that's all.  I can
 4    tell you what we would send them from a
 5    control standpoint.
 6        Q.   Okay.  Let's start with that.
 7        A.   From a control standpoint, we would send
 8    them a copy of our customer questionnaire, a copy of
 9    our -- a copy of our dispense data format, and we
10    would also send them -- we probably -- in some cases
11    we probably would send them this other item
12    prescription drug -- prescription drug abusive, a
13    team effort -- or fighting prescription drug abuse,
14    a team effort, to explain what we do and why we do
15    it.
16        Q.   Okay.  So if I understand your answer
17    correctly, what you would send them is the two-page
18    document entitled:  Fighting Prescription Drug
19    Abuse, A Team Effort, that is depicted within
20    Deposition Exhibit Anda-Brown 7, bearing the numbers
21    ending in 6509 and 6510.
22        A.   Uh-huh.
23        Q.   You would also send them the customer
24    questionnaire bearing the numbers ending in 6511 --
25        A.   Uh-huh.
```

1    Q.   -- through 6515?

2    A.   Uh-huh.

3    Q.   And you would also send them an example --

4    or exemplar of the format in which 90 days of

5    dispensing data could be provided from them back to

6    you when they fill out the questionnaire?

7    A.   Right.

8    Q.   And that's depicted in the MDL numbers --

9    Anda_Opioids_MDL numbers ending with the four digits

10   6516 through 6518?

11   A.   Uh-huh.

12   Q.   Is that accurate?

13   A.   Correct.

14   Q.   Okay.  So that information goes to the new

15   customer?

16   A.   Uh-huh.

17   Q.   Let's look at the portion of it that's

18   entitled:  Fighting Prescription Drug Abuse, A Team

19   Effort, which is Deposition Exhibit Anda-Brown 7

20   starting at 6509.  And the first thing that is

21   referenced there, can you read the first sentence of

22   it for me?

23   A.   Prescription drug abuse and diversion have

24   become a nationwide epidemic resulting in more

25   deaths from misuse of prescription drugs than

Highly Confidential - Subject to Further Confidentiality Review

1    substances such as heroin and cocaine.

2        Q.   Okay.  So this is you opening a new account

3    with your customer and Anda is providing them

4    information about the problems associated with

5    prescription drug abuse?

6            MR. MATTHEWS:  Objection.

7        A.   Well, it's really -- that's one -- this is

8    not just used for new customers.  Again, we keep it

9    on our website as information to existing customers,

10   to people who can go on the website who may not be

11   existing customers at all, but be able to view what

12   we -- what we do, why we do it, and our -- you know,

13   our -- what are the concerns and how we try to

14   address those.

15       Q.   And part of the concerns that you're trying

16   to convey to the customer is that you need to

17   collect a lot of information from them because there

18   is a prescription drug abuse epidemic in the

19   country?

20           MR. MATTHEWS:  Objection.

21       A.   In order -- well, what we say is, we need to

22   collect information, we know there is an issue and

23   in order for us to allow you to purchase these

24   items, we need to have this information.

25       Q.   Okay.  Now, the last sentence in that first

1   paragraph at page 6509 states:  Currently, Americans

2   account for over 80 percent of the world's

3   population's usage of opioid drugs and 99 percent of

4   the total usage of hydrocodone.

5           Again, is this Anda attempting to educate

6   its customers on the potential abuses associated

7   with opioid products?

8       A.   It's explaining why, unless we have --

9   unless we get -- it goes on about knowing a

10  customer, unless we have a comfort level with our --

11  with our customers who are looking to buy these

12  products, we are not going to be able to provide

13  these items and there is, you know, there certainly

14  is an issue with them in terms of addiction, of

15  abuse, et cetera, that is concerning, yes.

16      Q.   Okay.  And the know your customer segment of

17  this is described in fuller detail in the third

18  paragraph of this communication to a potential

19  customer, which states, quote:  Manufacturers and

20  distributors are required to know their customers to

21  whom they are providing controls and maintain

22  suspicious order monitoring systems that identify

23  orders of controlled substances that vary from the

24  customer's normal frequency, size, and pattern.

25          You're conveying to the customer, as part of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    potentially opening an account with them, that you

 2    have to obtain certain know your customer

 3    information?

 4        A.    Uh-huh.

 5        Q.    I need verbal answers.

 6        A.    Yes.

 7        Q.    Okay.  And in particular, you need to obtain

 8    sufficient information to maintain suspicious order

 9    monitoring systems?

10        A.    Yes.

11        Q.    And to determine whether the orders that

12    those customers submit vary from the customer's

13    normal frequency, size, and pattern?

14              MR. MATTHEWS:  Objection.

15        A.    Yes.

16        Q.    In fact, the frequency, size, and pattern

17    are all part of the suspicious order monitoring

18    regulation, aren't they?

19              MR. MATTHEWS:  Objection.

20        A.    I -- I don't have it in front of me, but --

21    so I'd have to verify that, but I believe that's the

22    case, that's how it's defined.

23        Q.    Okay.

24        A.    Or at least listed in the -- in the code.

25        Q.    And then if we look at the next page of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    information that's provided to a potential new

2    customer, it starts at the top of the page:  We also

3    ask our customer to provide dispense data that lists

4    the total dosage units and number of prescriptions

5    for each prescribed product sold over the previous

6    90 days in descending order so that we have a

7    understanding of a customer's total volume, overall

8    product mix, control product mix and average number

9    of pills dispensed per prescription for each

10   dispensed item.

11        That also is communicated to the customer?

12   A.    That's correct.

13   Q.    And all of that information is incorporated

14   into the standard operating procedures that we

15   reviewed earlier today?

16        MR. MATTHEWS:  Objection.

17   A.    I can go back to that, but yes, I believe

18   that is the case, yes.

19   Q.    Okay.  Part of the performance of your

20   responsibilities at Anda involved keeping yourself

21   apprised of information as it related to the

22   existence of an opioid product epidemic, did it not?

23        MR. MATTHEWS:  Objection.

24   A.    Certainly I was required to maintain current

25   knowledge of controlled substance trends, issues,

```
 1    concerns, policy determinations, changes in

 2    statutes, regulations, yes.

 3        Q.   Okay.  And part of that was also keeping

 4    your staff informed about the nature of a

 5    prescription drug opioid epidemic, was it not?

 6            MR. MATTHEWS:  Objection.

 7        A.   Again, my responsibility was to inform our

 8    staff about all or most current developments and the

 9    most current statutes and regulations and findings

10    dealing with controlled substances, both if they

11    were -- if there were changes in state issues, if

12    there were changes in federal issues, trends,

13    et cetera.  So it's a pretty broad responsibility in

14    terms of knowledge base and sharing of information.

15        Q.   Okay.  And part of changes in federal issues

16    or trends that you provided to staff included

17    information about the nature of the opioid epidemic?

18            MR. MATTHEWS:  Objection.

19        A.   As -- as a -- as information came out,

20    again, in the context of controlled substances,

21    dealing with all -- dealing with many types of

22    issues, yes.

23        Q.   If you can go back a moment to Anda-Brown

24    Deposition Exhibit 3, if you look at the top of an

25    e-mail, and this is the page of Anda-Brown
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Deposition Exhibit Number 3 ending in 8068, if I'm

 2    reading the numbers correctly, and that's just a

 3    vision thing.

 4    A.   Sure.  Got it.  Got it.

 5    Q.   There you write to various members of your

 6    staff:  The latest DEA report on drug abuse can be

 7    found using the link below.  The findings are that,

 8    while prescription drug abuse is declining, there

 9    are more deaths due to overdoses of prescription

10    drugs than illegal items.  Heroin use is increasing.

11         You wrote that to your staff?

12    A.   Yes.

13    Q.   And you were doing that to make them

14    appreciate the importance of what they were doing?

15    A.   Yes.  And -- well, not only appreciate the

16    importance, but making sure that they understood

17    when they were doing it every day, what was going on

18    in the country, and what had was -- or DEA was

19    finding and how they viewed these items, yes, so

20    it's -- you know, it's a -- yes, it's a combination

21    of things.  It's a very important -- we always

22    stressed that, yes, we have a very important role

23    and this was from the company level at all --

24    company at all levels to help protect the public and

25    do the best we could to protect the public and also,
```

1    you know, we had a huge responsibility, but -- and

2    also to inform our staff of the latest developments

3    so they understood industry trends.

4           And if I may add, one of the things that,

5    you know, we ran into, although as time went on less

6    and less, was customers would say, ah, nobody else

7    asks for this information, nobody else got a

8    questionnaire and dispense data, you know, and we

9    wanted to have -- but they don't always -- they

10   don't talk to compliance all the time unless there

11   is an issue.  They talk to salespeople and we wanted

12   to give salespeople -- we also met with sales on a

13   regular basis to verbal -- and sometimes written,

14   this type of information, so if their customer says,

15   what do you -- why is your company asking me to do

16   this, they had a little bit of conversation about

17   why this -- why the company insisted that we get

18   this information, so --

19      Q.   Which is also, in part, why you included

20   that information on the exhibit we looked at a

21   moment ago?

22      A.   Correct.

23      Q.   In conveying it with the customer

24   questionnaire packet when you were opening a new

25   account?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Correct.  Correct.

 2           (Anda-Brown Exhibit 8 was marked for

 3      identification.)

 4      BY MR. NOVAK:

 5      Q.   We've had marked for identification purposes

 6      Anda-Brown Deposition Exhibit 8, which is a document

 7      bearing the Bates number Anda_Opioids_MDL 560658

 8      through 560660.  The only portion of the exhibit

 9      that I will ask you about is the page ending in

10      60658.

11           There is an e-mail there authored by you on

12      December 6th, 2013, to Thomas Skono.  Who is

13      Mr. Skono?

14      A.   Mr. Skono, I believe his title was, vice

15      president of a buying group, a large buying group

16      and a -- throughout the pharmaceutical industry,

17      especially among retail pharmacies, there are many

18      buying groups that band together.  They join a group

19      that has a central office and part of what that

20      group's responsibility is, a major part of it, is to

21      negotiate pricing with their various suppliers.  So

22      if a buying group represents 500 pharmacies and you

23      sign a contract with, you know, whether it be

24      McKesson or Anda or ABC, to -- we'll buy product

25      from you but we need certain -- what kind of pricing
```

1    can you get, we're buying in volume and it's a

2    negotiated type of deal and buying groups are really

3    set up primarily for that purpose, to buy product en

4    masse supporting the independent pharmacies.  A

5    chain like Walgreens, they are all -- they do that

6    on their -- that's a big chain, but this is allowing

7    independent pharmacies to have some type of buying

8    power.

9            So Epic is a very large buying group and

10   they are pretty much nationally, I believe, and they

11   were a very large customer of Anda and they had

12   pharmacies around the country, but we -- as much as

13   they were a big customer, we frankly did not approve

14   a lot of the pharmacies that they presented to us

15   for controls because we were concerned about the

16   dispense data and some of the other information we

17   had received from these pharmacies, and part of it

18   was the location, the geographic location, which I

19   mentioned before, and there were a fair amount of

20   pharmacies in -- from Epic that were located in the

21   Maryland, Virginia, DC area, and I was -- we had

22   communication.  I believe in educating customers and

23   I sent him this saying, look Tom, you've got all

24   these pharmacies and let me show you what the

25   perception is of the DEA in, you know -- of the drug

Highly Confidential - Subject to Further Confidentiality Review

```
 1    abuse issues and prescription drug items.
 2          So, you know -- and I don't -- to tell you
 3    the truth, I don't recall right offhand if this was
 4    prompted by a conversation I had from Tom saying,
 5    why aren't you approving more customers or I just
 6    volunteered, because we had a regular communication
 7    and, you know, I might have just -- said Tom, I just
 8    want you to see what's going on here.
 9    Q.   Okay.  And specifically what's going on or
10    what you're referencing is when you wrote to him:
11    Take a look at the first article in the attached,
12    the DEA claims that 10 percent of Baltimore's
13    population is addicted to heroine and that 85
14    percent began by using prescription drugs.
15          You were conveying that to him to make sure
16    he was aware of the linkage between prescription
17    drug abuse and heroin addiction?
18          MR. MATTHEWS:  Objection.
19    A.   That was only a part of it.  What I really
20    was trying to show him is this is the DEA's
21    perception of Baltimore, an area where you have a
22    good amount of pharmacies.  I'm not verifying -- I'm
23    not vouching for whether this is correct or isn't.
24    In terms of, is it true -- or 10 percent or -- I
25    don't know, that's the DEA saying it, but I am
```

1   trying to convey that you have pharmacies in an area

2   that the DEA has identified as extremely

3   problematic, and basically, we're going to be taking

4   a very close look at approving pharmacies in that

5   area with this in the back of our mind as our SOP

6   talks about city/state location, which we discussed

7   earlier and this is an example of that.  So I just

8   wanted to make him aware.

9           MR. NOVAK:  Take a quick five minute break

10      so I can move some paper around.

11          THE VIDEOGRAPHER:  Off the record, 2:21 p.m.

12          (Recess from 2:21 p.m. until 2:31 p.m.)

13          THE VIDEOGRAPHER:  On the record, 2:31 p.m.

14  BY MR. NOVAK:

15      Q.   Mr. Brown, do you know who Buzzeo is?

16      A.   Yes.  It has gone -- it's undergone -- it's

17  a company that's undergone several iterations.  It

18  was started by a former DEA executive, Ron Buzzeo,

19  it later became BuzzeoPDMA, it became Quintiles, I

20  think it was then -- and I can't remember the name

21  of the information service that -- the data that

22  they provide.  And then it was -- I think it is

23  IQVIA, now I believe.  So yes, I am familiar.  They

24  are a consulting company and they do a variety of

25  things in the pharmaceutical industry and various

Highly Confidential - Subject to Further Confidentiality Review

```
 1    consulting.

 2        Q.    During the time that you were director of

 3    regulatory compliance at Anda, did you contract with

 4    BuzzeoPDMA?

 5        A.    We did to -- we -- it was a two-pronged

 6    approach.  One was to do a review of our entire

 7    suspicious order monitoring system, which

 8    included -- includes our customer due diligence and

 9    what we do to vet customers and gather information,

10    and then also to look at the electronic system and

11    see if there were ways of upgrading or enhancing, I

12    should say, that system, because that's something

13    that they had indicated they, you know, they had a

14    system that's -- you know, that they wanted them to,

15    at least, look at ours and kind of compare it.

16            If I may add, we ultimately did engage them

17    to develop a new -- an enhanced electronic order

18    system.

19            (Anda-Brown Exhibit 9 was marked for

20    identification.)

21    BY MR. NOVAK:

22        Q.    We've had marked as Anda-Brown deposition

23    Exhibit 9, a document that is comprised on the front

24    page of an e-mail from Mr. Brown to Thomas Napoli --

25    yeah, from Mr. Brown to Thomas Napoli, dated
```

1    November 12, 2015, and it states:  Attached please

2    find the report from BuzzeoPDMA.  Did you utilize

3    any of the elements of the system that they

4    proposed, and if so, is this something we could look

5    at as we analyze potential revisions to our current

6    system?  Thank you.

7         Do you recall receiving -- oh, that was the

8    e-mail that is the cover page of Anda Deposition

9    Exhibit 9.

10   A.   Yes.

11   Q.   There is also attached to it, correspondence

12   from BuzzeoPDMA dated November 12 of 2015, addressed

13   to you.  Is this a compliance audit that you

14   requested BuzzeoPDMA perform for Anda?

15        MR. MATTHEWS:  Objection.

16   Q.   Of the suspicious order monitoring program?

17        MR. MATTHEWS:  Objection.

18   A.   We requested that Buzzeo come and do an

19   assessment of our, you know, of our then current

20   practices and procedures to give us an idea -- we

21   were always in a position of trying to enhance what

22   we had, always looking for, are there ways we could

23   be better.

24        (Anda-Brown Exhibit 10 was marked for

25   identification.)

Highly Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   We've had marked as deposition

 3    Exhibit Anda-Brown Deposition Exhibit 10, an e-mail

 4    and document that came the day after --

 5        A.   Uh-huh.  Okay.

 6        Q.   -- number 9 and this is an e-mail from B.

 7    Williamson at USIMS Health to you, that attaches a

 8    slightly revised version of the BuzzeoPDMA

 9    suspicious order monitoring audit; is that correct?

10        A.   Uh-huh.  Yes.

11        Q.   Okay.  And you recall receiving this

12    document?

13        A.   Yes, I do.

14        Q.   Do you recall offhand what the minor

15    modifications were between the document that came in

16    on November 12th, and the ones that came in on the

17    13th?

18        A.   No, I'd have to review both side by side.

19        Q.   Okay.  I'd like to direct your attention

20    first to the page of Buzzeo's suspicious order

21    monitoring assessment ending in Bates number 9142.

22        A.   Okay.

23        Q.   The second paragraph there states, roughly

24    midway through:  Robert Brown, the director of

25    regulatory affairs at Anda was the lead point of
```

Highly Confidential - Subject to Further Confidentiality Review

1    contact for the review.  Director Brown provided

2    background information, including SOM procedures for

3    the review and organized a series of meetings with

4    Anda's SOM staff to allow consultants to observe SOM

5    procedures at Anda firsthand.

6         Do you see that?

7    A.   Yes.

8    Q.   Is that an accurate characterization by

9    Buzzeo of the role that you played in assisting with

10   their performance of this suspicious order

11   monitoring assessment?

12   A.   As I recall, I facilitated their visit and,

13   you know, scheduled the people to speak with and

14   organized that, yes.

15   Q.   Okay.  And you facilitated a meeting that

16   the BuzzeoPDMA people had with Michael Cochrane, the

17   Executive Director of Regulatory Compliance at Anda?

18   A.   Yes, let me clarify, that Michael and I did

19   this jointly, but I was -- and he said, go ahead and

20   handle it, so I did.  I mean, asking them for the

21   assessment, you know, entering the agreement, having

22   the engagement was all done in coordination with

23   Michael.  It was not done independently or without

24   knowledge, let's put it that way.

25   Q.   Okay.  Also, the last sentence of that

Highly Confidential - Subject to Further Confidentiality Review

1    paragraph states:  There was an opening and closing

2    meeting with the aforementioned individuals and

3    Charles Phillips, President.

4         Is that consistent with your recollection?

5    A.    It is consistent with my recollection, yes.

6    Q.    Charles Phillips is the President of Anda?

7    A.    That is correct.

8    Q.    Okay.  The next paragraph makes reference to

9    Anda as a secondary drug wholesaler, and then in the

10   last sentence it notes that the firm is the primary

11   supplier for Publix and the sole secondary supplier

12   for Walgreens.

13        Is that accurate?

14   A.    It was as of whatever date this was written,

15   yes.

16   Q.    Okay.  Do you know, roughly, how many Publix

17   pharmacies Anda served as the primary supplier?

18   A.    I don't.  You know, I'd be offering a guess

19   and I don't know.  I know we reviewed data from all

20   of them and I know that we, you know, we worked

21   closely, but I really -- it may have been 100, but I

22   hate to hazard a guess, may have been a couple

23   hundred.  I just don't remember.

24   Q.    In your role as primary supplier to Publix,

25   were you also primary supplier for their controlled

1    Schedule II narcotics?

2    A.   Yes.

3    Q.   Including all opioids?

4    A.   Yes.

5    Q.   Okay.  For Walgreens, where Anda served as

6    the sole secondary supplier, do you have a rough

7    estimate as to how many Walgreens stores Anda served

8    that exclusive secondary supply function for?

9    A.   There is something -- 4,000, but I -- you

10   know, it's just something, again, I haven't reviewed

11   anything and it's -- I don't recall the exact

12   number.  I just -- that sounds like a figure but it

13   could be something else.

14   Q.   I'd like to direct you to the next page,

15   which ends in Bates number 9143, and looking at the

16   first paragraph, roughly six lines down, there is a

17   sentence that starts:  Although there have not been

18   any major official sanctions, the DEA has conferred

19   with Anda leadership on multiple occasions.  What

20   appeared as routine regulatory investigations in,

21   Groveport, Ohio and in Westin, Florida, were not

22   closed for long periods of time.

23        Do you see that reference?

24   A.   Yes.

25   Q.   Is that consistent with your understanding

Highly Confidential - Subject to Further Confidentiality Review

1    as to the regulatory investigations that occurred at

2    Groveport and Westin?

3          MR. MATTHEWS:  Objection.

4     A.   I do know there were -- there were some

5    delays in the Groveport, Ohio, and Westin, I know it

6    took -- it took -- the recertification took about

7    almost a year, but I will say that what the DEA

8    informed us on that was, that they just weren't in

9    any hurry because we were operating and they didn't

10   have any major concerns.

11    Q.   Now, we haven't really talked much about the

12   distribution facilities for Anda.  There were three

13   main distribution centers at the company during the

14   time that you were there, correct?

15    A.   Yes.

16    Q.   And those were located at Groveport, Ohio,

17   Westin, Florida, and Olive Branch, Mississippi?

18    A.   That's correct.

19    Q.   And the vast majority of the controlled

20   Schedule II narcotics that Anda delivered to its

21   customers, including almost all the opioids, went

22   through the Groveport, Ohio, facility, is that

23   correct?

24         MR. MATTHEWS:  Objection.

25    A.   To the best of my recollection.

```
 1        Q.   Okay.  Over 90 percent?

 2        A.   I don't know that amount.

 3        Q.   Now, down at the bottom of this page,

 4   BuzzeoPDMA's suspicious order monitoring assessment,

 5   there is a reference to a regulatory foundation.  Do

 6   you see that?

 7        A.   Yes.

 8        Q.   Okay.  And then a CFR regulation ending in

 9   section 1301.74 --

10        A.   Yes.

11        Q.   -- is cited there.  Is that the regulation

12   that governs the obligation for creating a system of

13   detection and disclosure of suspicious orders?

14             MR. MATTHEWS:  Objection, he can offer

15        testimony as to his understanding but he's not

16        here to testify about the law.

17             MR. NOVAK:  I'll -- you're right.

18   BY MR. NOVAK:

19        Q.   Is that your understanding as to what the

20   regulation is that forms the basis for the

21   suspicious order monitoring system that you worked

22   on at Anda?

23        A.   That -- the language describes suspicious

24   order -- a suspicious order system, that the

25   requirement that each registrant have some type of
```

1    system with respect to suspicious orders, yes.

2        Q.   And specifically that parenthetical B

3    states:  That the registrant shall design and

4    operate a system to disclose to the registrant

5    suspicious orders of controlled substances.

6             That is consistent with your understanding?

7        A.   That's the language of this provision.

8        Q.   And then the second sentence of sub-B

9    states:  The registrant shall inform the field

10   division office of the administration in his area of

11   suspicious orders when discovered by the registrant.

12   Suspicious orders include orders of unusual size,

13   orders deviating substantially from a normal

14   pattern, and orders of unusual frequency.

15            Earlier we talked about pattern, size, and

16   frequency as being the three factors in evaluating a

17   suspicious order, and I think your testimony was you

18   weren't sure if those track the regulation.  Are you

19   comfortable now with saying that they --

20            MR. MATTHEWS:  Objection.

21       A.   That -- that wording is contained in the

22   statute, yes, those prove -- those items, yes.

23       Q.   Okay.  If you can go to the next page of

24   Buzzeo's suspicious order monitoring assessment of

25   Anda, there is a paragraph there that states as

Highly Confidential - Subject to Further Confidentiality Review

```
 1    follows:  According to staff, questionnaires are

 2    mostly received electronically.  Anda has four

 3    employees assigned to SOM compliance activities.

 4    All staff workers can access any SOM customer

 5    account and work in the account.

 6         I'll stop there.  Is that an accurate

 7    depiction as to how the -- how many staff were

 8    employed and assigned to SOM compliance activities?

 9    A.    At that time I'm trying to remember if it

10    was four.  No, I think -- they met four but there

11    was another individual who worked in -- island -- up

12    by Niagara Falls in our office there, and he was

13    also on staff and a very -- a senior member.  So in

14    total, there were six including myself.

15    Q.    Okay.  So you, James Gatto, that was the

16    individual?

17    A.    Yes.

18    Q.    Sabrina Solis, Mary --

19    A.    Barber.

20    Q.    -- Barber and the other two?

21    A.    At that time it was Latoya Samuels and Tasha

22    Campbell and then Sabrina was actually reassigned to

23    the licensing portion of the compliance, because

24    they were also dealing with some other -- they also

25    gained some additional responsibilities in that
```

1    division, so Sabrina worked under Emily Schultz and

2    we brought in a gentleman named John Kincaide, who

3    had been in the contracts department.  So we didn't

4    lose anybody, the numbers stayed the same, but

5    Sabrina was reassigned at that point.

6        Q.   Okay.  I'll continue with the paragraph that

7    we've been looking at.  It continues:  New

8    questionnaires are assigned to the next available

9    staff worker.  It was reported by management that

10   customer due diligence activity, including checking

11   registrations and licenses, formatting and analyzing

12   prescription data, reviewing distances of patients

13   and physicians from the pharmacy, conducting

14   Internet research on the pharmacy and the primary

15   prescribers, reviewing professional board websites

16   for disciplinary action and physician training or

17   certifications and using Google maps for photographs

18   of the pharmacy in the area.

19           Is that an accurate depiction of the due

20   diligence activity that Anda's staff are involved

21   in?

22           MR. MATTHEWS:  Objection.

23       A.   Generally, yes.  Yes.

24       Q.   At that time?

25       A.   Yes.

1    Q.   And when I say at that time, I mean 2015.

2    A.   Correct.

3    Q.   Okay.  Now, the next paragraph begins:  The

4    process used to investigate these new applications

5    is referred to as the remedy review process.

6         Now, we looked at the remedy review process

7    this morning as Standard Operating Procedure 45 that

8    was contained in one of the previous deposition

9    exhibits.  Is that the remedy review process that's

10   referenced here?

11   A.   Yes.

12   Q.   Okay.  As a matter of policy, new accounts

13   may not order methadone or oxycodone and may not

14   order more than 1,000 of any controlled substance.

15        Consistent with your understanding as to the

16   policy at that time?

17   A.   Yes, at that time, yes.

18   Q.   An additional review will be required to

19   order methadone or oxycodone and/or to increase the

20   customer's order threshold.

21        Again, consistent with your understanding?

22   A.   Yes.

23   Q.   Now, down at the very end of the next

24   paragraph it states in the final sentence:  It was

25   also reported that the compliance department

Highly Confidential – Subject to Further Confidentiality Review

1    requests fresh dispensing data every year and a new

2    questionnaire every three years.

3         I think your testimony this morning had

4    touched upon the every three years for the customer

5    questionnaire.  I don't recall.  Did you also

6    identify that there was requests for fresh

7    dispensing data every year?

8    A.   Yes, I did say that, and I said, at minimum

9    once a year because in the event that they wanted to

10   be eligible for methadone or oxycodone or have a

11   limit increase, that they would have to provide

12   dispense data, so it may have been more than once a

13   year, but a minimum once a year, yes.

14   Q.   Okay.  Going to the next page of the Buzzeo

15   assessment of Anda's suspicious order monitoring

16   policy, I'll direct you first -- and this is the

17   page ending in Bates number 9146.

18        I'll direct you first to the top paragraph,

19   under electronic analysis of orders.  And it starts:

20   Anda's electronic SOM system is described in SOP040.

21        Is that the standard operating procedure we

22   were reviewing this morning?

23   A.   Yes, it is.

24   Q.   It continued --

25   A.   Let me just clarify.  It may have been

Highly Confidential - Subject to Further Confidentiality Review

```
1    updated or revised because I believe that copy was
2    2012, and it may have been revised as of 2015, but
3    basically, yeah, I mean -- I mean, I don't know if
4    that was -- again, I don't know which version that
5    they looked at, I just wanted to clarify, that's
6    all.
7        Q.   There are -- and let's take a break and talk
8    about that for just a quick second.
9        A.   Okay.
10            THE VIDEOGRAPHER:  Are we going off the
11    record?
12            MR. NOVAK:  No.  No.  No.
13       Q.   The standard operating procedures that we
14    reviewed this morning, SOP 28 for new customers,
15    SOP 40 for suspicious order monitoring, and SOP 45
16    for the remedy review program, all of those are
17    subject to review by compliance officials at Anda on
18    an annual basis, correct?
19       A.   That is correct.
20       Q.   And they're evaluated to determine if any
21    tweaks or revisions to them are necessary?
22       A.   That is correct.
23       Q.   And they are also signed off upon even if no
24    revisions are made to reflect the fact that they are
25    revised on an annual basis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That is correct.

 2        Q.    Or I'm sorry, reviewed on an annual basis?

 3        A.    Correct.

 4        Q.    Okay.  Now, going back to that top

 5   paragraph --

 6        A.    Yes.

 7        Q.    -- at the page ending in 9146 of Anda-Brown

 8   Deposition Exhibit 9 --

 9        A.    I think this is 10.

10        Q.    Oh, 10, I want to continue with the

11   description of SOP 40.  This procedure uses the term

12   orders of interest to describe customer orders that

13   are held or pended for additional investigative work

14   to determine whether the orders would be considered

15   suspicious and reported to the DEA as required by

16   the regulations.

17              Is that from your perspective an accurate

18   characterization of the procedure?

19        A.    Yes.  I mean, if I was changing the wording,

20   I might say whether the orders are valid or are

21   suspicious, because we're -- I mean, every order is

22   looked at to, you know, determine are -- is it a

23   valid order, is it safe, so I mean it's not just --

24   it's a two-way deal.  Every one in this -- we have

25   to be comfortable that it's a -- that it's a valid
```

Highly Confidential - Subject to Further Confidentiality Review

1    order.  So it may be semantics, but it's a -- you

2    know, it goes both ways.

3        Q.   Okay.  The next sentence states:  According

4    to the SOP, the system performs calculations based

5    upon customer historical user averages which are

6    multiplied by a defined multiplier to establish a

7    basis for pending an order for additional

8    investigation.

9            Is that, in your view, an accurate

10   characterization of SOP 40?

11       A.   I believe that it is, yes.

12       Q.   Okay.  I wanted to go back to SOP 40 for a

13   moment to be sure we are tracking the language

14   correctly in this next part.  It is Anda-Brown

15   Deposition Exhibit 5, and specifically the page of

16   Anda-Brown Deposition Exhibit 5 which ends in 1403.

17       A.   Uh-huh.

18       Q.   Now, in Anda-Brown Deposition Exhibit 5, it

19   states:  Orders of interest are captured using

20   historical sales information with a user defined

21   timeframe by looking at past averages of the

22   following using a user defined multiplier.

23           And when you provided testimony this

24   morning, you could not recall the period of time

25   over which the averages were calculated or the

Highly Confidential - Subject to Further Confidentiality Review

```
1      multiple that was used and they were not disclosed

2      in Standard Operating Procedure 40.

3          A.    Uh-huh.

4          Q.    There is, however, in the next paragraph of

5      Anda-Brown Deposition Exhibit 10, some more detailed

6      discussion of that, I believe in the second

7      paragraph, so let's go through that.

8                The first sentence of that second paragraph

9      of Anda-Brown Deposition Exhibit 10 States:
```

███████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████   ████████████████████████

██████████████████

              ██████████████████████████████   ███████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

```
23         A.    Yes, and -- and I believe, again, because I

24     hadn't read these in quite a while--

25         Q.    Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   -- that bullet number 4 does state that, and

2   I just noticed that myself.

3      Q.   Ah, how did we -- how did we both miss that?

4      A.   Exactly.  Exactly.

5      Q.   Okay.  And then the next part of Buzzeo's

6   suspicious order monitoring assessment states:  No

7   additional information regarding SOM attributes is

8   contained in the SOP.  However, during interviews

█   ████████████████████████████████████████

█   ██████████████████████████████████████

█   ███████████████████  ██████████████████████

█   ████████████████████████████████████

█   █████████████

█           ████████████████████████████████

█   ██████████████████████████████████████

█   ████████████████████████████████████████████

17   purposes of flagging an order of interest and

18   suspicious -- I'm sorry, in Standard Operating

19   Procedure 40?

20      A.    In seeing that, I do recall that that's what

21   I was told I mean by whoever -- somebody who had

22   first hand knowledge of when it was put in and how

23   it was created.

24      Q.    Okay.  So if I understand it correctly, for

25   an order to be flagged as an order of interest, it

Highly Confidential - Subject to Further Confidentiality Review

■ ████████████████████████████

2    a customer's typical historical order?

3        MR. MATTHEWS:  Objection.

4    A.   Again, not having designed it or really been

5    involved with the design, I can only speculate that

6    that's what -- that was my understanding from people

7    who actually did, you know, design that system.

8    Q.   Okay.  Well, we now know it's a rolling

■ ████████████████████████████

■ ████████████████████████████

11   when an order of interest is flagged for compliance

12   to review, correct?

13   A.   Based on -- based on this information.  I

14   can't tell you I have independent recollection, but

15   based on this information, I would say that sounds

16   like, from these two documents, that sounds like

17   this is -- this is how it worked.

18   Q.   Okay.  So as the director of regulatory

19   compliance during that time period at Anda, you

■ ████████████████████████████

21   other than just seeing it in this document?

22   A.   Again, I recall being told that that was the

23   case.

24   Q.   Okay.

25   A.   Yes, I do -- I do recall being told that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Now, in understanding how this works,
```

█ ████████████████████████████████████████████

█ ████████████████████████████████████████████

█ ██████████████████████████████████████████████████

█ ████████████████████████████████████████████████

█ ██████████████████████████████████████████████████████

█ ████████████████████████████████████

```
 8             MR. MATTHEWS:  Objection.

 9        A.   Well, let's keep in mind something.  There

10   were limits.  So the order would never go through if

11   it exceeded limits.  If it exceeded monthly limits,

12   no order would go through, so it's not just as --
```

█ ██████████████████████████████████████████████████

█ ███████████████████████████████████    ████████████████

```
15   go if it exceeded the monthly limit.

16        Q.   Because there were limits in addition to the
```

█ ████████████████████████████████████████████

```
18        A.   Correct.

19        Q.   Okay.  However, those limits could be
```

█ ██████████████████████████████████████████████████

```
21   dispensing particular opioid classes to customers

22   increased above the limit, correct?

23             MR. MATTHEWS:  Objection.

24        A.   No.  It wouldn't be automatic.  The only way

25   limits are increased and it goes through that in
```

```
 1    SOP 25 -- 28, or is it 45?  45, the only way that

 ▮    ███████████████████████████████████████████████████

 ▮    ████████████████████████████████████████████████

 4    rolling period, it has to do with the information

 5    that a customer provides to indicate why they should

 6    be -- why they should have their limit increased,

 7    what justification there is, what is it about their

 8    business, their dispense data, reason for

 9    purchasing.  So it's -- that determination is not

10    made on any kind of formula.  It's made on an

11    individual customer basis.

12        Q.   Right.  So in the example we were talking

13    about for OxyContin, a customer of Anda would not

14    get to a 2,000 pill per month average unless Anda

15    had performed a remedy review process as outlined in

16    Standard Operating Procedure 45 and satisfied

17    themselves that that 2,000-pill average was

18    appropriate for that customer?

19        A.   That is correct, and that's after they've

20    gone through a period of time of buying controls

21    other than oxycodone and methadone that would then

22    enable them to -- to provide enough information to

23    even justify or enable us to consent to selling them

24    any oxycodone and that would be 1,000 to start out.

25        Q.   Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   So yeah.  I think we've summarized that,

2    yes.

3        Q.   But just to be clear, Anda did have

4    customers when you were there that ordered 2,000

5    pills per month of OxyContin?

6        A.   That is correct.

7        Q.   In fact, Anda had some customers that

8    ordered much more than 2,000 pills per month?

9             MR. MATTHEWS:  Objection.

10       A.   I'd have to go back and look.  To my -- the

11   best of my recollection, there were some customers,

12   yes.

13       Q.   Okay.  And they would have gotten to those

14   higher levels by virtue of Anda's compliance people

15   performing a remedy review process, pursuant to

16   Standard Operating Procedure 45, that would have

17   enabled them to increase their limits.

18       A.   That is correct.

19       Q.   Okay.  Once they got those increased limits
```

■ ███████████████████████████████████████████

■ ███████████████████████████████████████████

■ ████████████████████████████████████████████

■ ████████████████████████████████████████████

■ ████████████████████

```
25            MR. MATTHEWS:  Objection.
```

```
 1        A.    Only if they got to -- if they were allowed

 2    to that limit to begin with.

 3        Q.    Right.

 4        A.    If they were allowed that limit to begin

 5    with, then, you know, I would say that we were

 6    comfortable enough in -- comfortable in allowing

 7    them to purchase that amount because we set that

 8    limit based on the information that they provided

 9    us.

10        Q.    Okay.  Well, let's go back for a minute to

11    Standard Operating Procedure 40, that is Anda-Brown

12    Deposition Exhibit 5, and there are a number of

13    bases upon which a particular limit may be

14    increased, that are articulated there?

15        A.    44 -- 45, right?

16        Q.    Well, let's look first at the ones that are

17    in 40.

18        A.    Actually, 40 does not deal with increased

19    limits.  40 deals with whether orders are -- what

20    happens in an order review process.

21        Q.    Okay.  Well, let's look at the bottom of the

22    page ending in Bates number 1404.  And it states the

23    following are release reasons for held orders.  Do

24    you see that?

25        A.    Yes.
```

```
1        Q.   So if an order is held let's say because it

2   exceeds the customer's limitation for OxyContin of

3   1,000 by --

4             MR. MATTHEWS:  Objection.

5        Q.   -- by 200 pills, so they ordered 1200 and

6   they are at 1,000 limit.

7             MR. MATTHEWS:  Objection.

8        Q.   Would the release reasons specified at the

9   bottom of page 1404 of Deposition Exhibit 5 be bases

10  upon which the customer's order could be released?

11            MR. MATTHEWS:  Objection.

12       A.   Well, really, there are eight reasons, as I

13  continue on to 1405 as well.

14       Q.   Okay.  And those eight reasons would, with

15  the appropriate due diligence being performed, allow

16  someone on your compliance team to release an order

17  that exceeded the 1,000-pill limit for OxyContin?

18            MR. MATTHEWS:  Objection.

19       A.   The limit would have to have been raised

20  before the order is released.  They couldn't order

21  1200 unless they were allowed to order, which means

22  the limit would have to be increased, and then

23  oftentimes it would be -- depending on the customer

24  history, it would be flagged because it was the

25  first time they ordered that much, or -- and/or --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    remember we talked a little bit about a secondary,

 2    being a secondary supplier.  And customers

 3    generally, not all the time, but generally customers

 4    who order from a secondary supplier order them --

 5    make those orders when their primary is either out

 6    or has a higher price or doesn't have that

 7    particular item.  So it's not a consistent ordering

 8    pattern.  So it may not be -- so they may order

 9    something -- they may order 800 of something in June

10    and they don't order another, that same product

11    again until November.  Well, the order would flag

12    and we want it to flag because at least we want to

13    see, oh, what are they ordering here, and it might

14    flag for that purpose but in the meantime they

15    needed 1200, because they said, we only ordered 8,

16    but we normally dispense 15,000 and we need to -- we

17    have a doctor who likes this product, this SKU and

18    you are the ones who carry it and you have a better

19    price, and they put all that in writing with the

20    doctor and the patient and all that, and we say

21    fine, but we'll approve that limit, but a lot of the

22    orders really hit because there is no established

23    pattern because it's a -- we're a secondary

24    supplier.

25         Q.   Okay.  In that answer you suggested that the
```

1    customer may typically order 15,000 units of

2    OxyContin?

3        A.   No.  I said they may dispense a total -- a

4    total of 15,000, they want to go from 1,000 to 1200

5    or 1,300 from us.  They want an extra 13 --  your

6    example, 1200, they may want an extra 200.  They

7    give us the reasons and we go back and say well,

8    they do 15,000 a year and their Metformin is at

9    50,000, it's a whole analysis.

10           But, I guess, what I'm saying is many

11   customers who are second -- who utilize -- who order

12   from their secondary are not necessarily ordering

13   the same product in the same quantities month after

14   month after month.

15       Q.   Okay.  It makes it more challenging for Anda

16   to figure out what a pattern of typical ordering is?

17           MR. MATTHEWS:  Objection.

18       A.   Correct.  Which is why -- yes, that's

19   correct.

20       Q.   And for that matter, Anda needs to obtain

21   dispensing data not only for the opioids that the

22   customer provides from Anda, but also the opioids

23   that the customer dispenses that it bought from its

24   primary supplier?

25           MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Again, I would just -- I would just change

 2   it to it's not just opioids, it's all controls and

 3   frankly, it's noncontrols as well because we look

 4   for that -- you know, conversely, if they are buying

 5   three noncontrolled products from us and that's all

 6   they are buying and those are the only noncontrolled

 7   products they are buying because we see what else

 8   they have dispensing from other people, that's

 9   another issue.  That's why we need to see the whole

10   picture.

11        Q.   Okay.  You understand we're talking today

12   and we're here because of an opioids epidemic, not

13   because of dispensing of other types of drugs,

14   right?

15             MR. MATTHEWS:  Objection.

16        A.   I understand, but if we're going to describe

17   the factors that we reviewed in determining whether

18   we were comfortable selling product, opioid -- if

19   we're selling opioids, we have to look at the entire

20   customer picture because even if, again, they are

21   not buying -- the example I used before, we don't

22   want oxycodone from you, we don't want any opioids,

23   we want to buy -- we want to only use lorazepam

24   because you have a good price on it but their top

25   six products are hydrocodone, hydromorphone,
```

Highly Confidential - Subject to Further Confidentiality Review

1    oxycodone 30 and oxycodone 15, we are not going to

2    sell to them.  So that's why we need the whole

3    picture.  I'm just trying to explain our analysis of

4    how we looked at customers and how we make these

5    decisions.

6         Q.   Okay.  I'm looking at the release reasons in

7    Standard Operating Procedure 40.  One of the reasons

8    that Anda's compliance people might release an order

9    that was flagged as an order of interest is because

10   your customer increased its supply to a new or

11   existing customer or patient.

12        A.   That's a -- yes.

13        Q.   Okay.

14        A.   Yes.

15        Q.   I'm just looking at these different factors

16   that Anda might use to release an order.

17        A.   Correct.

■        ■    ████████████████████████████

■        ████████████

■        ■    ██████

■        ■    ████████████████████████████

■   ████████████████████████████████████

■   ██████████████████

24        A.   Yes.

25        Q.   What does that mean?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   It means that they -- two things have

2   happened here.  They order -- I'll try to be -- give

3   you some -- a concrete example.

4        The order gets flagged because they order

5   1,000 hydrocodone 5 milligram in June.  Okay?  And

6   then they go ahead and they order -- then they ask

7   for an increase in October and we grant it and they

8   order 1200 -- let's say 200 more.  Well, that order
```

Highly Confidential - Subject to Further Confidentiality Review



4    Q.    Okay.   The next factor that Anda compliance

Highly Confidential - Subject to Further Confidentiality Review



22        To my knowledge, Anda did not discount

23    controls.

24        Q.    Right.  So when these increased orders came

25    in from the customer due to pricing or promotion

1    changes, it wasn't your price break that led to the

2    increase in the order, it was the price break that

3    the manufacturer offered and you allowed the

4    increased order to go through to reflect their price

5    break?

6        A.   Right.

7             MR. MATTHEWS:  Objection.

8        A.   And it -- when that happened -- and, again,

9    I would also -- I would also add that the

10   manufacturers we dealt with did their own due

11   diligence on us as well as certain customers,

12   especially there were some that they sold direct to

13   or sold direct through Anda as a -- as a supplier,

14   but they did their own due diligence as well as

15   ours.  So there were really two levels of due

16   diligence on -- on a lot of those items.

17       Q.   Okay.  You were specifically aware of those

18   types of promotion -- pricing promotions as it

19   related to Anda's parent from time to time, were you

20   not?

21            MR. MATTHEWS:  Objection.

22       A.   Sometimes we were.  It depended how it was

23   communicated, but if -- if we didn't -- let's put it

24   this way:  If we weren't aware when the order came

25   in, we investigated and validated whether that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the case.
 2       Q.    Okay.  Looking at the sixth reason for
 ■    ████████████████████████████      ████████████
 ■    ██████████████████████
 5           And I'm reading from Brown-Anda --
 6    Anda-Brown Deposition Exhibit 5, page ending in
 7    1405.
 8       A.    Uh-huh.
 9       Q.    Can you describe what that means?
10       A.    Again, I think we talked about this a little
11    bit this morning.  It's a -- let's say it's a --
 ■    ██████████████████████████
 ■    ████████████████████████████████
 ■    ██████████████████████████████
 ■    ████████████████████████
 ■    ██████████████████████████████
 ■    ████████████████████████████████
 ■    ██████████████████████████
 ■    ████████████████████████████
 ■    ██████████████████████████████
 ■    ██████████
22       Q.    Okay.  The next category of reasons for
23    release of a -- of a held order is administration
24    release, customer call not required.
25           What does that mean?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Let's use -- let's use Walgreens as an

 2   example, because that was always one.  We would see

 3   orders come through for -- a big -- the big one was

 4   amphetamine, Adderall, because that was one of the

 5   items that seemed like ABC was out of or we knew

 6   there was a shortage in the industry, and we

 7   happened to have Adderall, and we knew that their

 8   primary didn't, so we knew we were going to -- we

 9   knew ahead of time that, oh, yeah, they're going to

10   be out for a while, Walgreens will let us know when

11   it comes in, and we'll confirm it independently.  We

12   didn't do -- we had a lot of business intelligence

13   that we, you know, we used in our -- in our company.

14        But we -- let's say we knew that ABC was out

15   and we knew these pharmacies were all going to come

16   to us.  They hadn't ordered Adderall in a month or

17   two months.  Every one of those was going to hit,

18   you know, because they hadn't ordered.  It wasn't

19   patterned, it wasn't necessarily product they had

20   ordered in a while, but we knew it was coming, so we

21   released it because we had already done our due

22   diligence on these locations, we already knew that

23   they dispensed Adderall, we already knew the

24   quantities they dispensed it in, we set the limits

25   appropriately for those items in conjunction with
```

```
 1    being a secondary for them, but we also knew that

 2    they were out and, you know, we made whatever

 3    adjustments and so on to make -- to make, so we

 4    didn't have to call 500 stores to, oh, confirm that

 5    this is what the case -- because we already knew it.

 6         Q.   Okay.  Who was the primary wholesaler for --

 7    for Walgreens, if you know?

 8         A.   Well, when --

 9         Q.   Or during the time that you were at Anda.

10         A.   During the time they transitioned from

11    Cardinal, when they first started with us, to ABC.

12         Q.   Okay.  And the last reason listed under

13    Standard Operating Procedure 40 as a reason to

14    release a held order is release unchanged with

15    DEA/state authority concurrence.

16              What does that mean?

17         A.   There were instances, and I'll give you one

18    specific one, Publix has a pharmacy in the Moffitt

19    Cancer Center in Tampa, and, frankly, the DEA has

20    told us, you know, you don't even need diligence,

21    whatever they order, that's what the -- that's fine,

22    don't -- don't worry about it.  It hits your system,

23    don't worry, because that's what they're there for.

24    That's their -- that's their purpose.  This is who

25    they're serving, are cancer patients, and those are
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the -- they service the people who are already being

 2    treated in that facility.  So if they order 1,000

 3    more than they normally do or what have you, just

 4    don't worry about it.

 5        Q.  Let's go back to reviewing Anda-Brown

 6    Deposition Exhibit 10, the Buzzeo assessment of

 7    Anda's suspicious order monitoring program.

 8            Looking at the third paragraph that is

 9    contained there, it begins:  No additional SOM model

10    calculations are performed since Anda uses a

11    threshold base system and the assigned threshold

12    will control limits per order.

13            Is that an accurate statement, or was it at

14    the time this document was generated in 2015?

15        A.  Yes.

16        Q.  So the only calculation that is used for

17    purposes of flagging an order as being an order of

 ▉    ███████████████████████████████████████████████

 ▉    █████████████████████████████████

20        A.  That is my recollection.

21        Q.  Okay.  And then it continues:  As noted

22    above, new customers may not order controlled

23    substances initially.  Once approved for ordering

24    controlled substances, the customer may not order

25    more than 1,000 of any particular controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substance.

2         Again, consistent with your understanding in

3    2015?

4         A.   Correct.

5         Q.   And then it states a little further in the

6    paragraph:  According to Executive Director Michael

7    Cochrane, the thresholds were initially set at 5,000

8    per order.

9         Do you have an understanding as the

10   thresholds at Anda once being 5,000 pills per order?

11        A.   You know, I wasn't there.  This was before I

12   got there.  Sounds like maybe some conversation I

13   had heard, but I can't independently affirm

14   or confirm that that was the case.

15        Q.   Let's go next to page 6, which ends in the

16   four digits 9147 on Anda-Brown Deposition

17   Exhibit 10, and specifically under review of orders,

18   the Buzzeo PDMA assessment states:  Controlled

19   substances are pended either because they are in

███  ███████████████████████████████████████████████

21   times eight, or because they are in excess of the

███  ██████████████████████████

23        Let me stop there.  Where is the customer's

24   threshold recorded?

25        A.   It's -- so I will -- I will correct that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sentence, because that second part is not accurate,

 2    but to answer your question, they -- in TPS, every

 3    customer and -- I'm trying to remember which 2.2 --

 4    whatever the keys you press, but when a customer

 5    is -- what'll happen, a customer is set up.  Okay?

 6    A customer is approved.  So at the -- the default

 7    limits are at 1,000.  They're all set for 1,000,

 8    except for oxycodone and methadone that are zero,

 9    and there's a separate page for that.  So when it

10    goes Y, you can go from that page to 2.2.4, put the

11    customer number in, and it'll show you exactly what

12    their thresholds are.

13         It's not published in Anda to anyone, and

14    certainly the customer can't see it, but they can

15    figure it out, because if they get rejected for an

16    order that's over, they're going to know what it is.

17    Q.   Right.

18    A.   But I would say -- but that's -- actually,

19    I do -- so there are, yes, you can go into any

20    customer -- in TPS, you can work up any customer and

21    you can see the limits by drug family that they are

22    allocated.

23    Q.   Okay.

24    A.   But I do want to just make one correction.

25    An order isn't pended in the electronic system
```

```
 1    because it's in excess of the customer -- if it's in

 2    excess of the customer's threshold, it's not pended

 3    in that system.  It's rejected.  The order never

 4    gets to the electronic system, because it's exceeded

 5    the threshold.

 6        Q.   The -- let me understand -- see if I

 7    understand the interrelationship in terms of

 8    flagging orders --

 9        A.   Right.

█    █    ████████████████████████████████

█    ███████████████████████████  ███████████

12    either of those will result in the order being

13    flagged as an order of interest --

14        MR. MATTHEWS:  Objection.

15        Q.   -- correct?

█        ███████████  ███████

█    █    █████████████████████████

█    ██████████████████████████████████

█    ███████████████████████████████████

█    █████

█        █████████████████████████████

█    ██████████  █████████████████████

█    █████  ██████████████████████

█    █████

25        Q.   It -- when you say it doesn't go, it's held?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   The system will reject it.  The system will
 2   reject the order --
 3      Q.   Okay.
 4      A.   -- because they -- they've exceeded their
 5   limit.
 6      Q.   All right.  So it's simply -- what happens
 7   when the order has been rejected?
 8      A.    It never really gets -- it just -- the
 9   customer cannot order that product, cannot place an
10   order.
11      Q.   Unless they go through the remedy review
12   process in Standard Operating --
13      A.   Correct.
14      Q.   -- Procedure 45?
15      A.   That's correct.
16      Q.   Okay.  And for each Anda customer there
17   is -- there are threshold limits contained in the
18   TPS system?
19      A.   That is correct.
20      Q.   Also in the O drive?
21      A.   No.
22           MR. MATTHEWS:  Is this a good time for a
23      break?
24           MR. NOVAK:  Sure.
25           THE VIDEOGRAPHER:  Off the record, 3:33 p.m.
```

```
 1              (Recess from 3:33 p.m. until 3:47 p.m.)

 2              THE VIDEOGRAPHER:  On the record, 3:47 p.m.

 3    BY MR. NOVAK:

 4       Q.   I think that's all for Deposition

 5    Exhibit 10.

 6              MR. NOVAK:  Do you have the spreadsheet that

 7       goes with Exhibit 14?

 8              MS. ELLIS:  Yes.

 9              (Anda-Brown Exhibit 11 was marked for

10    identification.)

11    BY MR. NOVAK:

12       Q.   We've had marked next Anda Deposition

13    Exhibit 11 --

14              MR. MATTHEWS:  Anda-Brown.

15       Q.   -- Anda-Brown -- thanks -- Deposition

16    Exhibit 11, which consists of an exchange of e-mail

17    that are between Robert Brown, Sabrina Solis, and

18    Tasha Campbell.  The exhibit bears the Bates number

19    Anda_Opioids_MDL 601903 and 904, and then attached

20    to the e-mail was a spreadsheet bearing the Anda

21    Bates number MDL 601905.

22       A.   Okay.  I don't -- I don't have that, but I

23    guess you must have it.  It's on there?

24       Q.   The spreadsheet we will review

25    electronically.
```

1    A.    Okay.

2         MR. MATTHEWS:  Can I just put my objection

3    on the record to using a spreadsheet, an

4    electronic spreadsheet, with the witness, which

5    isn't being produced in hard copy form and as to

6    which there will be no record of a marked exhibit

7    in a deposition.

8         MR. NOVAK:  Sure.  I can provide to you -- I

9    mean, there's only so much paper I can lug to

10   Miami.  If it assists in resolving your

11   objection, I can certainly e-mail to you

12   immediately the electronic version of the

13   spreadsheet.

14        MR. MATTHEWS:  Sure.

15        MR. NOVAK:  Okay.

16        MR. MATTHEWS:  How many pages is it, do you

17   know?

18        MR. NOVAK:  I don't.  I just know at some

19   point our -- there was only so much we could do,

20   but --

21        MR. MATTHEWS:  Let me just say, what I'll

22   try to do is get the pages you're using printed

23   so we can print and mark it.

24        MR. NOVAK:  Okay.  Why don't we go off the

25   record just for a second and we'll get the

Highly Confidential - Subject to Further Confidentiality Review

1      logistics of this worked out.

2           THE VIDEOGRAPHER:  Off the record, 3:51 p.m.

3           (Recess from 3:51 p.m. until 3:52 p.m.)

4           THE VIDEOGRAPHER:  On the record, 3:52 p.m.

5      BY MR. NOVAK:

6      Q.   Looking first at the e-mail exchange, the

7      e-mail at the bottom of Anda Deposition --

8      Anda-Brown Deposition Exhibit 11 bearing the Bates

9      number ending in 1903, is an e-mail from your

10     subordinate, Sabrina Solis, to you, which states as

11     follows:  Robert, here is the first report that I

12     finished for auditing purposes as you requested.

13     Details.

14          And then there are a number of bullet points

15     underneath that.

16          Data includes all customers that have

17     purchased over the last year, not just the top 200,

18     national chains.  Vets and regional chains are

19     excluded from the report.  Only customers that are

20     flagged Y for controls today are included in the

21     report.

22          Now, let me stop there.  If a customer is

23     flagged Y for controls, it means that they are

24     authorized -- or Anda is authorized to sell controls

25     to them, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    That is correct.

 2      Q.    Okay.  And then the next bullet point says:

 ▮  ████████████████████████████    ███

 ▮  █████████████████████████████████

 ▮  ██████████████████████████████████████

 ▮  █████████████████████████████████

 ▮  ████████████████████████████████████

 ▮  █████████████████████████████

 9            I would wait to begin auditing these

10      customers until we are organized with other

11      initiatives so that the requests don't overlap.

12            Do you have an understandings as to what

13      Ms. Solis is conveying in this e-mail?

14      A.    Again, this is the first time I've thought

15      about this in four years, so -- over four years, but

16      if I recall, and what I think we said was, you know

17      what, I know we've got data on customers, we've got

18      questionnaires, but it might not be current, and,

19      you know, we may have 10,000 customers and did some

20      purchase 500 pills and they're not CIIs, and I want

21      to get the data but I'm not going to be as

22      concerned, but I want to know if we have customers

23      purchasing a good amount of product and we don't

24      have updated information, we need to -- we need to

25      figure out who those are, prioritize it, and get
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that information if we're going to continue to sell

 2    those customers controls.

 3          I want a list by -- especially those that

 4    are some that are increasing and, you know, ones

 5    that are -- have increased a percentage over one

 6    year, and also, you know, by pills the last -- you

 7    know, by total pills, percentage and then total

 8    pills of all controls.

 9          We did -- I will tell you that we did other

10    audits of oxycodone, methadone, hydromorphone,

11    even hydro -- and hydrocodone that were separate

12    from this that -- so we -- you know, those were the

13    top priority in terms if we didn't have -- you know,

14    if we didn't have current information by a certain

15    date, we would just send them a notice that we were

16    discontinuing all sales.

17          You know, and it had nothing to do with

18    whether they were, you know -- they had ordered

19    beyond or a limit increase.  We just didn't want

20    to -- we were not going to take that chance, but

21    this was a more general, because that's why it

22    included all controls.  We wanted to do -- wanted to

23    audit and make sure, you know, are we -- because at

24    that -- at that time we didn't have a mechanism --

25    we may now, and I think we actually looked at it
```

1   before I left -- a mechanism that would

2   automatically change -- you know, it would

3   automatically discontinue controlled sales if a

4   customer didn't turn their dispense data in, you

5   know, within a year.  So we had to -- we had to do

6   this by hand.

7       Q.   Okay.  And just so I'm clear, the bullet

8   point that says only customers that are flagged Y

9   for controls today are included in the report, means

10  that these customers are ones for whom Anda would

11  allow sales of controlled substances?

12      A.   That is correct.

13      Q.   Okay.  If we can switch to the spreadsheet.

14          Now, we'll start with the spreadsheet, and

15  what I want to make sure I'm clear about are a

16  couple of the columns.  Column G is entitled Control

17  Flag 7/22/14.  Do you see that?

18      A.   Yes.

19      Q.   Okay.  And is that the flag that corresponds

20  with Ms. Solis' observation in her e-mail that only

21  customers that are flagged Y for controls today are

22  included in the report?

23      A.   Yes.

24      Q.   Okay.  Now, if you look at line 5, there is

25  a customer named Mercy Family Pharmacy Regency and

Highly Confidential - Subject to Further Confidentiality Review

```
 1        it designates the type as Mercy Resource Management,

 2        Inc.  They are in Iowa.

 3              If you look at Column E, it says:  DD on

 4        file.  Yes or no.  7/22/14.  For ███████████

          ███████████████, the designation is no, DD is not

 6        on file.  Is that accurate?

 7           A.   That is accurate.

 8           Q.   Okay.  So this customer would not have any

 9        due diligence on file at Anda as of 7/22/14?

10           A.   That's correct.

11           Q.   But they do have a control flag, which

12        indicates that they are authorized to purchase

13        controls; is that correct?

14           A.   Correct.

15           Q.   How is it that a customer is authorized to

16        purchase controls if there's no due diligence on

17        file?

18           A.   To tell you the truth -- I mean, I know --

19        without looking at this particular customer, I would

20        speculate, and I don't want to do that.

21              I would say, on the other hand, that there

22        were occasions once -- once in a great while where

23        I'd have -- we'd have a customer say, you know what,

          ███████████████████████████████████████████████

          ████████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review

█  ████████████████████████████████████

█  ███████████████████████████████

█  █████████████████████████████████

█  ████████████████████████████████████

█  ████████████████████████████████████

█  ██████████████████

7        And on rare occasion we would do something

8    like that, but I don't know if that was what

9    happened with Mercy Resource Management.  I'd really

10   have to look and see what they -- what that was

11   about.

12   Q.   The second customer that appears to be in

13   the same position as Mercy Family is QOL meds at

14   line 8.  Again, no due diligence on file, but they

15   are authorized to purchase controls.

16       Is that correct?

17   A.   Yes.

18   Q.   And, in fact, they had an increase in the

19   amount of controls that they purchased of

█  ████████████████████████

21       Is that accurate?

22   A.   Yes.

23   Q.   Okay.  How is it, again, that a customer

24   with no due diligence on file is allowed to purchase

25   controls?

```
 1              MR. MATTHEWS:  Objection.

 2      A.    There is -- there is something specific

 3   about this group, and I'm trying to recall what it

 4   is, because they -- because, again, even in the --

 5   even in the e-mail that I sent to Tasha, I said,

 6   well, we want data.  We do have information of

 7   several stores.  They are not priority.

 8              And, again, I'm just recollecting.  They

 9   never bought Schedule II drugs.  They did not buy

10   opioids.  And I'm trying to remember who they --

11   they were -- they were a chain -- they were a small

12   group, and I'm trying to -- without -- I'm trying to

13   remember who they were that we felt, based on what

14   they were ordering, what they were buying, and the

15   nature of their business, it wasn't as high a

16   priority to collect data for them at that time.  And

17   they had been ordering from Anda for ten years.

18              MR. NOVAK:  Can we search in Column E for

19       all of the customers with the "no" on their due

20       diligence file?

21              You can scroll all the way down.

22   BY MR. NOVAK:

23      Q.    Now, as we've looked solely at the customers

24   who have no due diligence record on file, that have

25   nonetheless been authorized to purchase control, it
```

```
 1    appears that there are 322 customers in that

 2    category -- or, I'm sorry, 321, because I think the

 3    top row isn't populated.

 4         Would all of these be the same situation

 5    where, as you described for the first two, that they

 6    requested some amount of controls and Anda

 7    authorized it even without the due diligence on

 8    file?

 9    A.   Or they had been buying the same items for a

10    long time, not Schedule IIs, not opioids, and we had

11    a, you know, pretty good buying -- we had a very

12    good buying record of those.

13         So, I mean, I do see a lot of QOL, I see

14    Genoa Healthcare.  These were not independent

15    pharmacies by any means.  Again, I'd have to go back

16    through each one and really make that determination,

17    but from my recollection, that was the vast majority

18    of those.  Like I say, QOL, I'm looking at Genoa

19    Health, and those would be the ones that -- as I

20    said, they were not buying any Schedule IIs and not

21    buying any opioids.

22         They were buying a limited number of

23    products, and they had been buying for a long time.

24    But that's what I wanted to see -- I wanted to get

25    this right away.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Now --

 2           MR. MATTHEWS:  Can I interrupt you for a

 3      second?

 4           MR. NOVAK:  Yes.

 5           MR. MATTHEWS:  Would you mind e-mailing me

 6      the spreadsheet?

 7           MR. NOVAK:  Yeah.

 8           MR. MATTHEWS:  Maybe I need to take a closer

 9      look at it before the end of the day.

10           MR. NOVAK:  Okay.

11           MR. MATTHEWS:  Can we do this off the

12      record?

13           MR. NOVAK:  Sure.

14           THE VIDEOGRAPHER:  Off the record, 4:05 p.m.

15           (Recess from 4:05 p.m. until 4:07 p.m.)

16           THE VIDEOGRAPHER:  On the record, 4:07 p.m.

17      BY MR. NOVAK:

18      Q.   If we can go back to Anda-Brown Deposition

19      Exhibit 10 for a moment.

20      A.   Uh-huh.

21      Q.   And specifically the page ending with four

22      Bates number digits 9148.

23      A.   Uh-huh.

24      Q.   The top paragraph under the bullet points

25      starts off by stating:  Consultants observed real
```

```
 1   electronic files that were used to document due

 2   diligence activity for new accounts and other types

 3   of order adjustments.

 4           Do I take that to mean that consultants from

 5   Buzzeo PDMA came in to Anda and actually observed

 6   real electronic files on people's screens?

 7       A.   Yes.

 8       Q.   Okay.  Now, I'm going to take a huge leap

 9   and guess that Anda's not going to agree to let me

10   do that.

11           And -- and what I would like to know is if

12   there were -- how would one go about obtaining the

13   electronic files that record the due diligence for

14   particular customers?

15       A.   Well, again, in this case, because I -- and

16   I have personal knowledge because I did it.  I would

17   go into my screen.  I would go into my O drive.  I

18   would pull up, and I would show them examples of

19   what we had with the various customer files.

20           That's -- in terms of how they get

21   transmitted, I have no idea how it gets -- how that

22   file would get transmitted somewhere else.  I don't

23   know if it has to be copied.  I don't know if it can

24   be down -- I have no idea how that gets done.

25           I do know how it gets in there.  I know it
```

1    gets scanned and downloaded into that file -- into a

2    particular file.  When a questionnaire comes in, it

3    goes into that particular file for that customer.

4        Q.   And for the -- for the purchase history of

5    controlled Schedule IIs, is that recorded in the O

6    drive or the TPS?

7        A.   TPS.

8        Q.   Okay.

9        A.   And, again, not to belabor it, but it's

10   several different.  It shows controls.  It shows

11   noncontrols.  Then I -- it goes percentage of

12   controls, percentage -- then I can go in and say let

13   me see the number of hydrocodone purchases, and

14   it'll go down and I can look as long as it's been.

15   And they'll have it by -- by strength.  You know,

16   one month it's oxy, hydrocodone 5, one month 10/325,

17   et cetera, so I can see it that way and then play --

18   you know, play with that as well, so depending on

19   what I want to see out of that.

20       Q.   And that would lay out the whole order

21   history as well?

22       A.   Yes.

23       Q.   Okay.

24       A.   By -- in that case, it's by product, but I

25   could also go -- and I didn't do this too often,

1    but -- well, with specific orders, I did.

2         I'd go in and I'd see what the order itself

3    was on, you know, November 27th, 2012, what they

4    ordered on that day.  But then there were -- I could

5    also -- most of the time, I was doing it by history,

6    so I was doing it by product and by controls,

7    noncontrols.

8    Q.   Okay.  For the 321 accounts that we just

9    observed on the spreadsheet that was part of

10   Anda-Brown Deposition Exhibit 11, identified with

11   the Bates number 601905, would it be possible to go

12   back and verify whether controlled Schedule II

13   products were purchased by those 321 accounts in

14   2014?

15   A.   I assume it would -- I mean, it would be

16   possible by the system, and you could -- you could

17   do it -- well, you can look by purchases, and then

18   you could also look in TPS and see what their

19   limits -- what their limits were, because if they

20   were zeroed out, then they wouldn't have

21   purchased -- you know, could do it both ways.

22   Q.   Okay.  The limits that are recorded for each

23   customer, are they recorded with a history of when

24   they are adjusted?

25   A.   The adjustments are recorded in the -- in

1    the customer notes.

2        Q.   Okay.  So if the thresholds, for example,

3    are adjusted upwards or downwards, that's contained

4    in the customer notes?

5        A.   Correct.

6        Q.   And when a threshold is increased, for how

7    long a period of time is the increased threshold in

8    effect?

9        A.   It's in effect from that point forward.

10       Q.   Okay.

11       A.   Again, you know, reminding that we do get --

12   I know there are exceptions, but we do get due -- we

13   do get dispense data.  The only way we increase it

14   is with dispense data.  And from that point forward,

15   we get dispense data on a -- on a yearly basis.  So

16   it's kind of verified, you know, is that still

17   necessary.

18       Q.   Okay.

19       A.   And I would say, too, that there were times

20   when we would look at a customer's purchase history

21   with us, and maybe they're -- they have 1,000 limit

22   or 1,500 limit on a family, and they were only

23   purchasing 300 a month for 10 months or so.  And

24   we'd say to the rep, you know what, we're -- we're

25   reducing this limit.  They're not purchasing this

Highly Confidential – Subject to Further Confidentiality Review

1   from us, so why are we -- why are we keeping them at

2   that limit?

3           And we would reduce it, but we would also

4   let the sales rep know so it wouldn't come as a

5   surprise when they -- plus if the customer did try

6   to order the 1,000, well, you weren't -- you know,

7   you'd let them know.  You weren't purchasing so

8   you're -- you know, what have you.  There would be

9   some communication, it wouldn't come as a shock, and

10  the customer wouldn't get upset with just the idea

11  that, you know, you don't need us for that so why

12  would we give you that opportunity.

13          And that did happen.

14  Q.   And the adjustment of limits for all

15  customers is itself a separate data field that -- or

16  it -- or it's in customer notes?

17  A.    Well, the adjustment itself is in the

18  limits -- the individual customer limits, the

19  individual customer family limits.  You can actually

20  make the adjustment.  But then it's noted in the

21  notes as to when and why.

22  Q.   Okay.  So a history of all of Anda's

23  customers could be extracted just from the customer

24  notes field for each customer of the company?

25  A.    If there -- I mean, if there are any notes.

1    Let's say, for example, you have a customer that --

2    who was, you know, approved in 2014 and nothing has

3    happened.  I mean, they got approved, and it will

4    say approved.  And they've never adjusted their

5    limits, they've never asked for new products,

6    they've never done anything else.

7         It'll just -- you won't see many notes in

8    there.  And all it will really change is either

9    the -- is the date -- so let's just use 2014 as the

10   example.  You will see new dispense data when the

11   last date -- the most recent date it was submitted

12   and, you know, the most recent date that a customer

13   questionnaire was submitted.

14        But that's not -- that's not in the notes

15   section.  That's on the first page of the customer

16   information section.

17   Q.   Okay.  And that's also reflected in the due

18   diligence field?

19   A.   TPS, yes.

20   Q.   Okay.  Does the -- is the TPS -- is there a

21   TPS field that actually has a Y or N in the due

22   diligence?

23   A.   On the first -- in the first -- when you --

24   when you go to TPS and you type in a customer

25   number, the first page that pops up has the name,

```
1    the address, the DEA number, the state license

2    number.  If it's -- if the license expired, it will

3    be in red.  Otherwise, current.

4          And I think it -- I think it has -- if I

5    remember, it does have an expiration date.  And then

6    it will say DEA license, and there was one item in

7    the SOP that talked about see what schedules they're

8    approved for, because there are some DEA licenses

9    that don't -- they don't have -- the customer hasn't

10   been approved for Schedule II, for example, or II or

11   3N or whatever it happens to be.

12         So it will say all the schedules that it's

13   approved for, and then it will say, you know,

14   approved for controls, Y; customer questionnaire on

15   file, it will give Y give the date; and customer due

16   diligence and, it will give the date.

17         Yeah, you can find that all on the first

18   page.

19    Q.   Okay.

20         (Anda-Brown Exhibit 12 was marked for

21   identification.)

22         MR. NOVAK:  It's a two-parter.

23         MR. MATTHEWS:  Are these two separate?

24    What's going on here?

25         MR. NOVAK:  There's the e-mail and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      attachment -- actually, a couple attachments.
 2            MR. MATTHEWS:  All of which collectively is
 3      going to be Exhibit --
 4            THE COURT REPORTER:  12.
 5            MR. MATTHEWS:  Thank you.
 6  BY MR. NOVAK:
 7      Q.   We have had marked as Anda Deposition --
 8  Anda-Brown Deposition Exhibit 12 an e-mail sent from
 9  Michael Cochrane to Valerie Mitchell, who has a
10  usdoj.gov address, and then with a CC to Robert
11  Brown.
12            And then a number of documents are attached
13  to the e-mail:  an SOP 28 form, an SOP 40 form, and
14  then a reference to controlled substance sales as
15  broken down at the -- the Westin, Florida; Grove
16  Port, Ohio; and Olive Branch distribution centers of
17  Anda.
18            Mr. Brown, I'll -- oh, and I should also
19  reference that the Bates number for the agreement --
20  for the document is Anda_Opioids_MDL 84481.
21            MR. MATTHEWS:  Can I ask a question for
22      clarification?
23            MR. NOVAK:  Yes.
24            MR. MATTHEWS:  The attachments don't have
25      Bates numbers on them, that I see.  Is -- were --
```

 1      is it your position that the attachments were

 2      attached to the e-mail?

 3          MR. NOVAK:  Yes, and they appear to all have

 4      been printed in native format.

 5          We can go off the record for a second on

 6      that.

 7          THE VIDEOGRAPHER:  Off the record, 4:21 p.m.

 8          (Recess from 4:21 p.m. until 4:23 p.m.)

 9          THE VIDEOGRAPHER:  On the record, 4:23 p.m.

10  BY MR. NOVAK:

11      Q.   I want to direct your attention, Mr. Brown,

12  first, to the e-mail.  It purports to be an e-mail

13  from Michael Cochrane, on which you are cc'd, in

14  addition to a number of other individuals; and it's

15  addressed by Mr. Cochrane to Ms. Mitchell.

16          Looking down at the second paragraph, midway

17  through it reads, quote:  "Going forward we will not

18  commingle our customers cut off or refused with any

19  suspicious orders.  Rather than an e-mail containing

20  all the information from Emily Schultz, you'll

21  receive a separate e-mail from Robert Brown, as well

22  as a phone call, in the event there is a suspicious

23  order to report.  We will include all the specifics

24  regarding the order in our e-mail transmission as

25  well as a verbal via phone call to you or a

Highly Confidential - Subject to Further Confidentiality Review

1    designee."

2         You saw that portion of the e-mail?

3    A.   Yes.

4    Q.   Okay.  Do you recall back in 2014 when

5    Mr. Cochrane designated you as the one to convey

6    separately any suspicious order reports to the

7    Department of Justice or DEA officials?

8    A.   Yes, but I do want to clarify something on

9    that.

10   Q.   Yes.

11   A.   Because before I started, Anda had begun --

12   had had a practice for -- that Emily Schultz kept a

13   report that if there was -- if there were customers

14   that were denied, customers that were cut off, you

15   know, an order, and control customers who were no

16   longer, or customers -- and there were some

17   customers that were reinstated for controls if they

18   had significant changes in their dispense data or

19   what have you, or other information, and suspicious

20   orders, it was contained on a spreadsheet that was a

21   rolling spreadsheet that Emily would send to local

22   and -- field offices and DEA in Washington listing

23   all these, and it was a way of, in our thought, you

24   know, notifying the DEA that we've come across some

25   pharmacies or customers that we're not comfortable

1    with and you might want to take a look at them.

2         In our meeting of, I believe, it doesn't say

3    on here, but it was early September of 2014, we had

4    a meeting in Columbus with Valerie Mitchell and

5    two -- actually, if I remember correctly, Brittany

6    Freeman from DEA was not present.  She was by phone.

7    Duane Stickles was there.  Brice Burchard, who was

8    from New Orleans, but he -- Mississippi, and it was

9    Alberto Esteves, Michael Cochrane.  Alberto was our

10   warehouse director in Ohio, and Al Paonessa, who was

11   our President, and we met with them regarding the

12   Ohio -- status of the Ohio inspection, and one of

13   the things that came out of that, we explained what

14   we do in our procedures, and we prepared a pretty,

15   you know, extensive description of the systems, some

16   -- a lot of which we've gone over here, showed them

17   actual screens of what we looked at and information

18   and how we pulled up the 2.2.4.1.  We actually had

19   screen shots.

20        So we talked about this report that we were

21   sending, and Valerie Mitchell said, you know, just

22   having this list of customers doesn't really help

23   us, and if you're reporting suspicious orders, you

24   need to kind of flag it more specifically than just,

25   you know, put it on another column of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    spreadsheet, so what we'd like you to do is, if you

 2    deny a customer, tell us why.  You don't have to --

 3    it doesn't have to be a book, but indicate this is

 4    why you're denied; or you cut them off, what

 5    changed, why; if you're reinstated, why.  If it's

 6    shorter, we want to see that -- when you transmit

 7    the e-mail to our offices, we want that highlighted

 8    if they -- there's a suspicious order, and, you

 9    know, if you cut a customer off, was it by a -- was

10    it for an order, a suspicious, or was it something

11    else.

12            So that then revised -- I just want to give

13    this context.  That's -- that revised -- it wasn't a

14    separate form, it was -- it was an enhancement of

15    the current form and then an e-mail cover that

16    specifically identified if any -- that, you know,

17    any suspicious orders that were in that report.

18    Q.   Okay.  Let me follow up on that for a

19    moment.  What is the difference between Anda cutting

20    off a customer who submits an order because they're

21    not comfortable for some reason with the controlled

22    substance that the customer has ordered, on the one

23    hand, and determining that it's a suspicious order

24    on the other?

25            MR. MATTHEWS:  Objection.
```

```
 1        A.   We were not -- in 99 percent of the cases,

 2   we were not cutting off the customer because of a

 3   specific order.  We were cutting off a customer

 4   because over -- I'll give a couple of reasons could

 5   happen.  Customer's control purchase percentage over

 6   a three-month period went from 10 percent to 30

 7   percent.  Okay?  That's not any one order.  That's a

 8   pattern.  That's -- and it's controls.  It's not by

 9   family.  It's a pattern of overall control sales.

10        We're not -- we're not your control

11   supply -- we're not your controlled substance

12   supplier.  We are a secondary for all products

13   unless we have a specific arrangement with you, and

14   in most cases, retail pharmacies, we didn't have

15   that kind of specific arrangement.  So that was one

16   reason.

17        The second reason would be let's say we

18   approved a customer, we looked at their dispense

19   data, and oxycodone 30 was their 80th product and

20   they were averaging 50 pills a script.

21        Now we get updated dispense data and

22   oxycodone 30 is their third product and it's at 200

23   pills a script.  They have -- chances are they're

24   not buying it from us, but that's a significant

25   change that we're not comfortable with.
```

Highly Confidential - Subject to Further Confidentiality Review

 1              Or a customer -- a customer gives us some

 2     additional information about a -- or in a

 3     questionnaire, you know, they -- or an updated

 4     questionnaire, they give us their five physicians,

 5     and two of them have discipline action and they

 6     don't know that they have, and you call -- I did

 7     this myself.  I'd call the customer.  Do you know

 8     that, you know, two of your physicians have

 9     discipline actions?  Oh, no, I don't know.  Which

10     ones?

11              They'd be cut off, because to us that meant

12     that they were not able to fulfill their

13     corresponding responsibility, which the DEA hammered

14     every time either we met with them or we went to a

15     DEA seminar.  Corresponding responsibility.  If they

16     weren't carrying that out, then we would say we

17     can't do business with you anymore and we'd report

18     that to DEA.

19              But it really -- it was very rarely, almost

20     none, based on an individual order.  It was based on

21     something changed, if we cut them off.  Now, of

22     course, the denial is the first part of it, we never

23     sold them anything, and that was the reason, so --

24     but that's what we would do, and that's what --

25     that's what's referenced here.  I just wanted to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    clarify.

 2         (Anda-Brown Exhibit 13 was marked for

 3    identification.)

 4    BY MR. NOVAK:

 5         Q.   We've had marked Anda-Brown Deposition

 6    Exhibit 13, the front page of which is -- or the

 7    front three pages of which are an exchange of

 8    e-mails that purport to be from Robert Brown to

 9    various individuals within Anda, as well as

10    exchanged with a BWilliamson@US.IMShealth.com, and

11    then attached to that are various documents that

12    were included as an attachment to the e-mail.

13         The document bears Anda's Bates number

14    MDL143508 through 143559.

15         Mr. Brown, in interacting with Buzzeo PDMA,

16    was Mr. Williamson one of the individuals with whom

17    you interacted?

18         A.   Yes.

19         Q.   Your primary contact there?

20         A.   No, he was not the primary, but he was -- he

21    was the -- the DEA compliance person.  He was a

22    retired DEA agent, and so when it came to not -- not

23    statistical algorithms or things of that nature,

24    but, basically, you know, compliance, he was the

25    contact.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.   Towards the latter portion of your

2    employment at Anda, were you working with Buzzeo

3    PDMA on developing a new suspicious order monitoring

4    program?

5    A.   We were not -- it was not a new program.

6    What it was was enhancements to our -- what we were

7    doing, and it primarily focused on some different

8    statistical algorithms that they recommended over, I

9    think -- I think we had a rolling 30-day in ours and

10   they recommended maybe a longer rolling period

11   because of, as they indicated, you know, being a

12   secondary supplier, it's really hard to get a true

13   and accurate assessment of the -- of the validity of

14   an order just with 30 days.

15        So they made some changes in there and they

16   designed some screens that made it a little -- maybe

17   a little less cumbersome to be able to access more

18   information quickly rather than flipping screen to

19   screen to screen.  So they were working on that.

20        But one of the things that -- in the

21   engagement with Buzzeo was if they were going to

22   put -- if they were going to do the statistical

23   algorithm and they were going to, you know, make

24   some enhancements to the system, we wanted to make

25   sure that the SOPs, which, you know, let's say

```
 1    SOP -- at least SOP 40 was enhanced to accurately

 2    reflect what this system was -- and types of orders

 3    it was flagging and the algorithms that it was using

 4    so that it was consistent.

 5          And we did -- since we weren't -- you know,

 6    they were the experts in their system, not that

 7    we -- we needed -- we needed to have something in

 8    writing that, one, we would understand and we could

 9    explain, and two, the DEA comes in, we're not going

10    to say, oh, that's Buzzeo.  We weren't -- now, we

11    called some of their customers, and they said -- and

12    the smaller customers and their customers said, ah,

13    we just tell the DEA that we're using the Buzzeo

14    system and that's okay, they're fine.

15          Well, we definitely didn't feel comfortable

16    with that, so we wanted -- we wanted some additional

17    documentation that actually reflected what their

18    system was flagging or what -- or what they were

19    looking at, the factors, and so on.

20    Q.    Back when we were looking at Anda-Brown

21    Deposition Exhibit 10, the Buzzeo suspicious order

22    monitoring assessment of Anda, it made some

23    recommendations to migrate towards these statistical

24    algorithms as a basis of flagging orders to

25    determine whether they were suspicious.
```

```
 1      A.    Uh-huh.

 2      Q.    Was this part of an attempt to implement

 3   some of those recommendations?

 4           MR. MATTHEWS:  Objection.

 5      A.    This -- we were looking to, again,

 6   determine, you know, certain enhancements that we

 7   wanted to make to our -- to our system, yes.  And,

 8   again, as I mentioned, with a different -- maybe,

 9   you know, an enhanced statistical algorithm, and, as

10   I mentioned, you know, maybe taking into account

11   more -- a longer view of the customer's purchasing

12   history, again, from a secondary supplier

13   standpoint.

14           MR. NOVAK:  I want to go back to that last

15      question and break it up to address your

16      objection.

17   BY MR. NOVAK:

18      Q.    Let me start with a simple question.  In

19   Anda-Brown Deposition Exhibit 10, Buzzeo made

20   certain recommendations that Anda should migrate

21   towards a statistical algorithm as a method of

22   identifying potentially suspicious orders, correct?

23      A.    Or flagging orders of interest that needed

24   more review, yes.

25      Q.    Okay.  And was the effort that is reflected
```

Highly Confidential - Subject to Further Confidentiality Review

1    in Anda-Brown Deposition Exhibit 13 reflective of

2    attempting to implement some of those

3    recommendations?

4        MR. MATTHEWS:  Objection.

5    A.    There was a two-part process, and I don't

6    have the statement of work in front of me, but there

7    were two different -- because, if I recall, and I'm

8    recalling this, you know, from memory, that there

9    were -- there were different options for the

10   statement of work that we could -- we could engage

11   Buzzeo, and one portion of it was to develop a

12   statistics-based -- statistical algorithm-based

13   order monitoring, electronic order monitoring

14   system, that would enhance what we were doing.

15       The second part of it -- and these were two

16   different payments made.

17   A.    The second part of it was for them to draft

18   SOPs that reflected the -- that -- that system.  And

19   we -- we chose that as well because they knew their

20   system better than we would.

21       Us trying to write that SOP, we might

22   miss -- miss some things that, you know, would then

23   not allow us, when we did receive, you know, DEA

24   inspection and try to explain the system, we

25   might -- might say something that's incomplete.

1          So we -- we paid them to draft an SO -- an

2     SOP or various SOPs that looked at -- that reflected

3     that electronic system with the -- with other --

4     with the statistical algorithms.

5     Q.   Okay.

6     A.   So I get -- I just didn't think it was as

7     simple an answer as "yes" or "no."

8     Q.   All right.  I'd like to turn to one of the

9     attachments in Anda-Brown Deposition Exhibit 13 that

10    begins at the Bates numbers ending with the four

11    digits 3511.  And it appears to be a four-page

12    letter that is authored by a Mr. Joseph Rannazzisi,

13    the deputy assistant administrator at the office of

14    diversion control.

15         Are you familiar with this letter?

16    A.   It was sent to me, so I would -- you know, I

17    would gather at some point I have reviewed it.

18    Again, it was -- 2006 was the date.  I certainly

19    didn't review it contemporaneously when -- when --

20    as to when it was sent out, but, yes, I would have.

21         And it's been a long time, but I would -- I

22    would think that I have -- I did review this at some

23    point, yes.

24    Q.   Were you at Valley Drug in 2006 -- I'm

25    sorry, at -- at --

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.   Harvard?

2      Q.   -- Harvard Drug?

3      A.   I was at Harvard, yes.

4      Q.   Okay.  Do you recall receiving this letter

5    while at Harvard Drug?

6           MS. HERRERA:  Objection.

7      A.   I don't recall.

8      Q.   Do you have an understanding as to whether

9    this correspondence was sent to all DEA registrants

10   for controlled substance sales?

11          MR. MATTHEWS:  Objection.

12          MS. HERRERA:  Objection.

13     A.   I -- I don't really have an understanding

14   other than the first sentence of the letter, but I

15   can't validate whether that actually took place or

16   didn't.

17     Q.   Okay.  At the third page of the letter

18   ending in Bates range number 3513, there are a

19   number of different circumstances -- or a number of

20   different numbered sentences that are identified

21   under the heading "Circumstances" that might be

22   indicative of diversion.

23          Do you see that reference?

24     A.   Yes, I do.

25     Q.   Okay.  Are these circumstances something
```

1    that you reviewed as part of the performance of your

2    responsibilities at Anda?

3         MR. MATTHEWS:  Objection.

4    A.   Let me phrase it this way.

5         These were items that, when we looked at

6    dispense data and other customer information, these

7    were certainly items that were part of our --

8    among -- among many other things, were part of our

9    analysis.  I'm certainly not going to say that

10   because of this letter we did it.

11        I mean this -- and at Anda, I mean, frankly,

12   a lot of that was already in place.  But certainly

13   this does -- this paragraph does include certain

14   factors and -- and conditions that -- and so on that

15   we would look at through -- in a customer's due

16   diligence information that, you know, would

17   certainly, you know, stand out to us and we would

18   pay particular attention to, among others.

19   Q.   So your due diligence program was designed

20   to identify the types of certain circumstances that

21   are contained at page 3 of this Rannazzisi letter?

22        MR. MATTHEWS:  Objection.

23   A.   Well, again, our -- the -- the

24   information -- the way we reviewed information that

25   was provided by our customers certainly included

1    these items, but it was -- it was certainly -- that

2    was only -- these were only a certain portion of

3    what we really looked for.  We looked for a lot of

4    different things relating to controls.

5           So, you know, I mean -- and, again, that was

6    one of the reasons, you know, why it's so important

7    for us, and I think for -- for us to get dispense

8    because, you know, how would we know what they're

9    ordering from multiple distributors unless we look

10   at dispense data.  You don't know what they're

11   buying from anybody else.

12          So, again, this was -- these were things

13   that we looked at, but it wasn't due to this letter

14   and it certainly isn't the -- these aren't -- this

15   is not anywhere near the -- the only factors that we

16   reviewed.  These were included in our regular due

17   diligence and analysis.

18   Q.   Okay.  Running through the top of the page,

19   there are four circumstances that are identified

20   there.

21          The first is ordering excessive quantities

22   of a limited variety of controlled substances, e.g.,

23   ordering only phentermine, hydrocodone, and

24   alprazolam while ordering few, if any, other drugs.

25          Would you agree that that characterizes a

Highly Confidential - Subject to Further Confidentiality Review

1    circumstance that might be indicative of diversion?

2    A.    It depends.

3          I mean, in general, it would be something we

4    would look very closely at.

5          On the other hand, I can think of

6    circumstances where maybe, because of the nature of

7    the customer and the people that they're servicing,

8    it may be -- there may be an explanation.  I don't

9    know.

10         But we would certainly -- the burden of

11   proof, so to speak, would certainly be on that

12   customer to be very clear as to why, and -- and it

13   would be -- I would say it would be very, very hard

14   to justify selling controls to a -- to a customer

15   that would be doing that.

16   Q.    Okay.

17   A.    But I didn't want to foreclose that there

18   isn't the remote possibility that there could be a

19   business practice out there where that might make

20   sense, but, again, it's got to be very, very, very

21   clear.

22   Q.    So -- so that is a circumstance that is

23   suspicious, but there may be circumstances that

24   would, upon additional investigation, dispel the

25   suspicious?

Highly Confidential – Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.
 2        A.    It -- it -- let's put -- without -- without
 3   significant information to the contrary, we would --
 4   under those circumstances, we would -- if we saw
 5   either dispense data to that nature, chances are not
 6   very likely we would be opening a customer.
 7        Q.    It would be -- it would be tough to dispel
 8   the suspicion in that case?
 9              MR. MATTHEWS:  Objection.
10        A.    It would be difficult to justify the
11   ordering pattern.
12        Q.    Okay.  How about the second one, ordering a
13   limited variety of controlled substances in
14   quantities disproportionate to the quantity of
15   noncontrolled medications ordered?
16        A.    Again, it would definitely be a concern.
17   There might be specialty practices or -- or -- or a
18   specialty type of pharmacy but over -- over time, we
19   did see some pharmacies that really catered to
20   specific medical conditions, specific medical
21   practices, again, maybe closed door, and maybe there
22   was a justification for that.
23              But, again, in -- in order to, you know,
24   make us comfortable, there would have to be
25   significant information provided.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  The third one identified is -- as a

2    circumstance indicative of diversion is ordering

3    excessive quantities of a limited variety of

4    controlled substances in combination with excessive

5    quantities of lifestyle drugs.

6         First of all, do you have an understanding

7    as to what lifestyle drugs are?

8    A.   I really don't.  I'm not sure myself what

9    that refers to.  I'm sure it's an easy explanation,

10   but I don't -- I never use that term so I'm not

11   really sure what that means.

12   Q.   Okay.  Well then I'm going to skip that one

13   and go on to the fourth circumstance that is

14   identified in this letter as something that might be

15   indicative of diversion.

16        And it reads:  Ordering the same controlled

17   substance from multiple distributors.

18   A.   It -- again, it certainly is -- it -- it --

19   it certainly is indicative -- or it would require

20   further investigation.

21        On the other hand, at this point in time --

22   and I guess we will shortly, or somewhat shortly,

23   based on the legislation that was signed,

24   distributors will be able to get information from

25   ARCOS that will not name the suppliers but at least

Highly Confidential - Subject to Further Confidentiality Review

 1    will say they're getting alprazolam from the -- from

 2    four sources.

 3          Right now, there is really no way of knowing

 4    that unless the customer volunteers that

 5    information.

 6          In other words, go back to our

 7    questionnaire.  And we ask:  Who are your suppliers?

 8    Who are your other -- you know, let's say they'll

 9    say McKesson and ParMed.  Let's just use two as an

10    example.  And Anda, okay.  So you've got three.  But

11    unless -- and they give us dispense data.

12          But unless we were to say, well, do you

13    order -- how much do you order from Cardinal or ABC

14    and how much do you order from ParMed of

15    hydrocodone, it's really not easy to know that.  Is

16    it hydrocodone 5 or hydrocodone 10?  You order --

17    you know, hydrocodone 10, you have to go through

18    every product and really ask that question.

19          And it would be -- I think it would be very

20    difficult to obtain that information.

21          So, really, you have to almost, you know,

22    make some assumptions based on the information you

23    get that, yeah, they're ordering with these three

24    and how much do they really want?  And that's if

25    you're comfortable with the dispense data, if you're

1    comfortable with the practice, if you're comfortable

2    with the doctors, if you're comfortable with the

3    patient condition, if you're comfortable with their

4    procedures.

5         Then you might say, well, you know, we're

6    not their primary and they have another secondary so

7    we're probably not going to be interested in

8    supplying them with much but -- of that product.

9         But to break it down like this, I think

10   is -- in the real world is difficult to really get

11   that information.

12   Q.   Have you ever requested of a potential

13   opioid customer, as part of your due diligence,

14   information on the quantities of opioids they've

15   purchase from other distributors?

16   A.   Well, first of all, we know they're

17   purchasing from other distributors because when

18   they -- when they submit their data to apply and

19   they're dispensing 15 -- you know whatever number

20   they're dispensing -- we know they're getting it

21   from -- we knew they were getting it from others,

22   and we assume they are getting it from the -- the

23   suppliers that they've listed on their

24   questionnaire.  So we know that.

25        You know, do we -- do we ask them, well, how

Highly Confidential - Subject to Further Confidentiality Review

 1    much are you getting from Cardinal versus how much

 2    are you getting from, you know, ParMed, we probably

 3    don't do that, no.  But we know -- we know how much

 4    they're getting total, and we know who their

 5    supplier -- their other suppliers are.

 6        Q.   Okay.  Has Anda ever discussed internally

 7    the prospect of going to other data vendors to

 8    obtain more detailed information about where their

 9    customers are getting opioid prescriptions?

10             MR. MATTHEWS:  Objection.

11        A.   I think -- I -- to my knowledge -- to my

12    knowledge, I don't know of any source that would

13    provide that information with that specificity.

14        Q.   Okay.  Has Anda ever sought information

15    about the quantities of opioid products sold to its

16    customers from its parent companies, whether it be

17    Watson or Actavis or Teva or -- I'm missing the

18    fourth one.

19        A.   Well, first of all, except in limited cases,

20    the manufacturer is not selling the product directly

21    to the pharmacy.  They're selling it through other

22    distributors.

23             And one thing that all of these companies

24    maintained -- and I think rightfully so -- was that

25    the integrity of the industry -- I mean, why it

```
1    would be -- it would compromise, really, the

2    integrity of the closed system of distribution and

3    also, you know, the information to circumvent,

4    because they happened to open -- because they

5    happened to own one distributor, and they've got

6    seven others that they're supplying and to provide

7    information about those seven others.

8            They would not do it.  It would hurt their

9    place in the industry.  They would lose some of

10   those customers.  And I think it would be -- you

11   know, I don't think it's realistic that -- that we

12   wouldn't even put them on the spot to answer because

13   their answer would be no.

14           And let me -- let me be a little more -- let

15   me give a little more -- elaborate on that just a

16   bit.

17           When it came to auditing or, you know,

18   auditing their customers, which are distributors, in

19   the time I was there, the parent companies, they

20   would treat Anda just like they treated anyone else.

21   They would want our SOPs.  They'd want to -- they'd

22   want to understand our systems.  They'd want to

23   understand how we -- how we vet customers.  They'd

24   want to look at the information we maintained, and

25   they would treat us just like anyone else.
```

1    In fact, Tom Napoli, who was included in

2    that -- one of the e-mails was the person who had

3    come, either by phone or by letter or even visit,

4    and say, okay, I need -- I need to understand what

5    you're doing.

6    So we were treated no differently when it

7    came to compliance issues.

8    Q.   Can I just read that answer for a second?

9    Set aside Anda receiving information from

10   its parent about sales that the parent may make

11   through other distributors to particular customers.

12   Does Anda ever provide information about sales to

13   customers to other manufacturers?

14   A.   Usually not specific customers; however,

15   there are times, just like -- just like we have --

16   we have an electronic order system that will -- you

17   know, will flag certain orders of interest that

18   require different -- require additional integrity,

19   we've had cases where manufacturers will call us and

20   say, well, we got this order of hydrocodone that was

21   larger than you've ordered in the past.  Why?  And

22   we would have to provide a written explanation.

23   And in many cases, we would say, yes,

24   Walgreens primary was out of this product, and we

25   ordered -- we ordered more for you -- from you

Highly Confidential - Subject to Further Confidentiality Review

1    because we needed to supply them with their -- with

2    those items.

3        Q.   In your view, is it inappropriate to provide

4    that type of information to manufacturers?

5        MR. MATTHEWS:  Objection.

6        A.   Just like -- just like we'll ask a customer,

7    well, why did you -- why are -- why do you want --

8    why did you all of sudden order a particular product

9    that you hadn't ordered before and we're going to

10   want the name of the doctor who prescribed it or the

11   clinic that's ordering, I think they have a right.

12   And, you know, if they're doing their due diligence,

13   I don't -- I don't think that's -- you know, it's

14   the same thing that we do.

15       I mean, just -- I mean, I used to tell our

16   customers when they were complaining about

17   questionnaires, I said we fill out the same

18   questionnaire for our suppliers every year.  And

19   sometimes they'll even come onsite, they'll do

20   whatever they -- but whatever they decide to do,

21   we're -- if we want to continue to buy product from

22   them, we have to do the same thing.

23       So don't -- don't complain.  This is the

24   nature of the industry today.

25       Q.   So in those types of questionnaires, Anda

Highly Confidential - Subject to Further Confidentiality Review

```
 1    will provide information with respect to its

 2    customers to different manufacturers?

 3        A.   Well --

 4             MR. MATTHEWS:  Objection.

 5        A.   Well, those questionnaires don't ask for

 6    specific customers.  The questionnaires ask for, in

 7    many cases, what percentage of your, let's say,

 8    controlled substance are pharmacies, what percentage

 9    are closed door, what percentage are hospitals, what

10    percentage are independent pharmacies, which

11    percentage -- they don't ask the names of the

12    customers.  Those questionnaires don't ask, and we

13    don't ask.

14             But if, again, here's -- in a case where

15    it's a specific order that they are investigating

16    and determining if it's valid, yeah, I mean, that --

17    that would be -- and to be -- to be frank, I don't

18    think there's anybody in the industry that doesn't

19    know that Anda is a secondary supplier for

20    Walgreens, so it's -- there's no proprietary

21    information there.

22        Q.   Do any of Anda's -- strike that.

23             MR. NOVAK:  We can take a quick break.

24             THE VIDEOGRAPHER:  Off the record, 5:01 p.m.

25             (Recess from 5:01 p.m. until 5:12 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  On the record, 5:12 p.m.

 2              (Anda-Brown Exhibit 14 was marked for

 3      identification.)

 4      BY MR. NOVAK:

 5      Q.   We've had marked for identification purposes

 6      Anda-Brown Deposition Exhibit Number 14, which is

 7      comprised of a one-page e-mail bearing the Bates

 8      Number Anda_Opioids_MDL 543135, and there is a

 9      spreadsheet, an Excel spreadsheet, attached to the

10      e-mail that bears the Anda_Opioids_MDL Number

11      543136, which we are conveying electronically and

12      we'll also have up on the screen as we proceed with

13      the questioning.

14              Mr. Brown, Deposition Exhibit Anda-Brown 14

15      is an e-mail that you authored to various officials

16      at both the Department of Justice and also Anda

17      employees?

18              MR. MATTHEWS:  Sorry.  Do you have a copy

19         for me?

20              MR. NOVAK:  Oh.

21              MS. LUND:  I think you handed me two.

22              MR. MATTHEWS:  Oh, my codefendants stole my

23         copy.  I apologize.

24              MS. LUND:  In my defense, there's two

25         instead of three.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          THE WITNESS:  Yes, I see it.

 2   BY MR. NOVAK:

 3      Q.   Just so we're clear, this is an e-mail that

 4   you authored to the various recipients in the --

 5   that are identified in the "to" line?

 6      A.   That is correct.

 7      Q.   Okay.  And this reflects a list of customers

 8   that have been listed as not eligible or shut off?

 9      A.   Or reinstated.

10      Q.   Okay.  Can you explain to me how you

11   delineate between a customer whose control

12   privileges have been denied, between that category

13   and one who is no longer eligible?

14      A.   Yes.  A customer that is denied controls is

15   one who has applied for controls with Anda, first

16   time and they haven't receive controls before,

17   they've asked to purchase controls, and we've said,

18   based on the information that they have -- that they

19   have provided we are not -- we are not comfortable

20   with supplying controls.

21          A customer who has been cut off is one that

22   has been purchasing controls and for reasons that

23   we -- several reasons, some of which we actually

24   discussed earlier in connection with Exhibit 12, we

25   have decided that we are no longer comfortable
```

 1     providing controls.

 2     Q.   Okay.  Why don't we switch screens to the

 3     spreadsheet that was attached to your e-mail.

 4     A.   And, again, I'll elaborate a little bit for

 5     context.  This was something that was -- again, it's

 6     pursuant to the September 10th, 2014, e-mail that

 7     Michael Cochrane sent, and this was submitted every

 8     time there was an additional customer added or, in

 9     some cases, a -- a suspicious order.

10     Q.   Okay.

11     A.   It's a rolling -- it's -- you know, it's

12     really a rolling list.

13     Q.   So the first tab in the spreadsheet that was

14     attached and is part of Anda-Brown Deposition

15     Exhibit 14 is the customer cutoff tab?

16     A.   Uh-huh.

17     Q.   And these list an array of different Anda

18     customers, many of whom have something denoted in

19     the comments field?

20     A.   Uh-huh.

21     Q.   Now, when something is denoted in the -- in

22     the comments field as it is in this customer cutoff

23     tab, where would that information be extracted in

24     Anda's systems?

25     A.   It would be in the customer notes, in the

Highly Confidential - Subject to Further Confidentiality Review

1    TNTPS, because the same information is there.  Let

2    me again, just for clarification, it's not that it

3    was -- these are special customers who the notes are

4    there for.  This list had been provided on an

5    ongoing basis starting in, like, probably 2011, but

6    based upon our -- we just sent it as is.

7         During the meeting that we had in September

8    of 2014 that Michael Cochrane references in

9    Exhibit 12, Valerie Mitchell said, look, this list

10   doesn't really help us because it doesn't tell us

11   why.

12        Now, that was the first time we ever got

13   that feedback, so it isn't as if we ever asked,

14   we're sending this all the time for the three --

15   previous three years, and we thought we were helping

16   or being proactive with the DEA, and they never

17   said, well, there's a problem or there isn't a

18   problem.  They just, okay.

19        But when she said, you know, it doesn't

20   really help us because we need more explanation, so

21   we agreed starting -- you know, this was

22   September 10, so you'll notice 9/12/14 there's an

23   explanation --

24   Q.   Okay.

25   A.   -- and it goes from there.  So I just wanted

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to be clear on that.

 2        Q.   Let's -- let's look at that line item for

 3    9/12/14 --

 4        A.   Uh-huh.

 5        Q.   -- which is, I think, line 540 of the

 6    customer cutoff section of the spreadsheet.  That's

 7    for an account whose name is The Health and Beauty,

 8    d/b/a Lakeland account, in Ronkonkoma, New York.

 9        A.   Uh-huh.

10        Q.   Okay.  And then looking at the Anda comments

11    that are in Column I, it states:  Eight of the top

12    10 dispensed pills/tablets are controls, including

13    five strengths of oxycodone, and the customer did

14    not provide an explanation of the reasons for these

15    products being the most highly dispensed.

16             That would have been taken from the customer

17    notes?

18        A.   The -- well, let me go back.  This and --

19    this sheet and the customer notes are filled in

20    simultaneously.

21        Q.   Okay.

22        A.   So -- and I was the one who did it, so I can

23    explain to you what I did.

24        Q.   Okay.

25        A.   Let's say -- and this one, again, without
```

```
 1    seeing the customer file, I don't know exactly

 2    what -- what happened.  Okay?  But somehow or -- we

 3    got updated dispense data, I don't know why, don't

 4    if it was -- it was just part of the yearly deal or

 5    whether it was, you know, they were asking for

 6    increase.  I don't know what the reason was.  We

 7    went back and we compared the previous dispense

 8    data, and we said, oh, my gosh, this is not good,

 9    we're not comfortable.

10          So I would fill this sheet out, and then I

11    would turn around while -- again, almost

12    simultaneously, push the TPS button and put exactly

13    the same verbiage in.  And I would do -- it would

14    just say customer discontinued from controls or

15    customer cut off, reported to DEA.  It would have

16    the same notes.

17          And it would verify that this was on this

18    list -- this e-mail was submitted to the DEA.

19    Q.    Okay.  The e-mail that you wrote to the DEA,

20    that's the first page of Anda-Brown 14, states:  The

21    most recent determination was not based on the

22    suspicious order but rather information provided by

23    the customer.

24    A.    Uh-huh.

25    Q.    How do you know from looking at the
```

Highly Confidential - Subject to Further Confidentiality Review

1    spreadsheet that this particular pharmacy -- whose

2    name I forgot unless you scroll back -- Health and

3    Beauty d/b/a Lakeland Pharmacy in New York, that's

4    Anda Account Number 741026, how do you know that

5    this wasn't based upon a suspicious order?

6        A.   Because if you go all the way to the end of

7    this sheet, there is a category -- where is it?

8    Hmm.

9             Oh, all right.  I do know why.  Because it

10   would have said customer -- it would have

11   specifically stated in that comments Anda -- they

12   attempted to order da da da da da and -- oh, no,

13   there is another tab, "Suspicious Orders."  This is

14   "Cut Off," "Denied," "Reinstated," "Suspicious

15   Orders."  There's four tabs.

16            And if it was a suspicious order, it would

17   be under "Suspicious Order."

18       Q.   Is there something in Anda's files with

19   respect to this particular pharmacy that identifies

20   whether they placed orders for controlled substances

21   to Anda?

22       A.   If -- I'm sure they did because they were

23   cut off as opposed to being denied.  So at some

24   point they did -- they did have orders for controls.

25       Q.   Okay.  Well, if they had orders for controls

```
 1    and you cut them off because eight of the top ten

 2    dispensed pills or tablets are controls, including

 3    five strengths of oxycodone, and the customer didn't

 4    provide an explanation and the reasons for these

 5    products being the most highly dispensed, why

 6    weren't they reported as a suspicious order as

 7    opposed to simply being reported as a customer who

 8    was cut off?

 9         MR. MATTHEWS:  Objection.

10    A.   Again, without seeing the file, I can't -- I

11    don't want to speculate, except in most cases where

12    this happened, they were granted control privileges

13    because of the information they had previously

14    provided.

15         They either sent this data as part of their

16    annual requirement or they sent it because they were

17    asking to purchase something or purchase something

18    in quantities that they hadn't done previously.

19         Chances are -- I mean, I don't know if -- we

20    may or may not have ever sold them oxycodone or any

21    of these items.  When we -- when we agreed to sell

22    them product -- and again, without know -- without

23    seeing the file, I can't really, you know, be

24    specific, but in terms of describing our procedures,

25    it had not -- really wasn't a specific order.
```

```
 1              We got this information and we said we don't

 2      really care if they never ordered this stuff from us

 3      before, we don't like the data that they've provided

 4      that is different from the data that they provided

 5      to us previously, and we're not comfortable

 6      continuing to sell them controls based upon their

 7      dispense patterns.  It had nothing to do with an

 8      order.

 9      Q.   How is this distinguished from a controls

10      denied scenario?

11      A.   Controls denied is when they apply -- they

12      have not purchased controls.  They're applying to

13      purchase controls and we've said, no, we're denying

14      their -- we are -- we are not allowing them to

15      purchase controls based on the information that

16      they've provided.

17      Q.   Okay.  What would I look to in Anda's either

18      TPS system or O drive to determine whether there had

19      been an order submitted by this customer on or about

20      September of 2014?

21      A.   Well, you -- you could look at the TPS.

22      There is ordering history for that customer.

23      Q.   Okay.  And the ordering history would

24      demonstrate the different instances in which the

25      customer submitted an order for controlled
```

1    substances?

2      A.    Correct.

3      Q.    Okay.

4      A.    I -- I would -- I would say that in the time

5    I was there, most of the determinations that were

6    made, a customer did not often deal -- did not even

7    deal with products, for the most part, that we were

8    providing.  It was more to that particular customer,

9    not providing to other people but providing to that

10    customer.

11         It was -- we looked at the information they

12    were -- they were submitting, and we were not

13    comfortable with their overall either dispense

14    pattern or I'm sure you can find some that says --

15    especially, well, more under the controls denied

16    than under the cutoff.  You know, three -- two of

17    their doctors had discipline actions or -- or what

18    have you, so --

19      Q.    Now, without running through them, because

20    there are a ton of them --

21      A.    Yes, there are.

22      Q.    -- the Anda comments in the other -- for --

23    for the other customers where that field Column I is

24    populated, would those also be taken from customer

25    notes?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   All the --

2             MR. MATTHEWS:  Objection.

3        A.   Again, to -- just to clarify, if they were

4   done simultaneously.  Same notes except in the notes

5   section it would say customer -- you know,

6   whatever -- cut off, here is the reason, and they

7   were reported to DEA, but it was done

8   simultaneously.

9             It wasn't like, oh, well, I got this out of

10  the notes.  No.  The determination was made based on

11  the information and it was placed in two places --

12  or noted in two difference places, this e-mail and

13  then the customer notes.

14       Q.   If there is nothing contained in Column I,

15  is that an indication that Anda did not make a

16  determination that there was anything suspicious

17  about that particular customer?

18       A.   No.

19            MR. MATTHEWS:  Objection.

20       A.   As I indicated before, that's where you

21  could look at the notes, because, again, prior to

22  our September 2014 meeting, we didn't put comments

23  in -- in this sheet.  We just -- we sent it to DEA.

24            To tell you the truth, we never really

25  received much feedback, or any feedback, for that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   matter, but when we discussed it at our September

 2   meeting and said, look, we're letting you know about

 3   customers we have concerns about.  And Valerie

 4   Mitchell -- nobody else said this, but Valerie said,

 5   you know, it doesn't really do us much good if you

 6   don't tell us what the reasons are.  So we said,

 7   okay, we'll tell you the reasons.

 8           So from September 10th on, we put the

 9   reasons, but anything before September 10th, 2014,

10   we didn't put comments because that's -- we were

11   never asked to do that, and that never really came

12   up from anyone.

13       Q.   Had Anda made the determination that these

14   customers were engaging in suspicious orders with

15   other companies?

16       A.   Not necessary --

17           MR. MATTHEWS:  Objection.

18       A.   Not necessarily.  We had no way -- we would

19   have no way of knowing about -- as far as orders, we

20   would have no idea.

21           But based on what they're dispensing or

22   based on other factors or other information that

23   they provided, we were not comfortable.  Maybe it

24   was -- we don't know if they're fulfilling their

25   corresponding responsibility.  Maybe we're just not
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     comfortable with the dispense patterns that they

2     have.

3           And because, again -- I mean, sure, you

4     know, every pharmacy is different, but to be honest,

5     you know, what we -- we were much more comfortable

6     when we saw a pharmacy that had the dispense data

7     that was in our template.  We're a lot more

8     comfortable with that mix of product and -- of

9     controls and noncontrols and not seeing oxycodone in
```

15    Q.    Now, at the -- the beginning of that answer,

16    you said, quote, we would have no way of knowing

17    about as far as orders.  We would have no idea.  But

18    based on what they are dispensing or based off of

19    other factors or other information that they

20    provided, we were not comfortable.

21    A.    Uh-huh.

22    Q.    For these customers, you would have had

23    their dispensing history, correct?

24    A.    Uh-huh.  Correct.

25    Q.    And you would have their order history with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Anda?
 2        A.   Yes.
 3        Q.   And you would have a filled out customer
 4    questionnaire?
 5        A.   Yes.
 6        Q.   And you would have a products mix of the
 7    percentage of controls being dispensed as compared
 8    to noncontrols?
 9        A.   Yes.
10        Q.   And you would have a listing of the
11    physicians who were the top prescribers of
12    controlled products at those pharmacies?
13        A.   Yes.
14        Q.   Isn't that enough information to give you
15    some idea as to whether they were engaging in
16    suspicious orders?
17        A.   We don't know --
18             MR. MATTHEWS:  Objection.
19        A.   We have -- we have no idea what each order
20    looked like.  We don't know how often they're
21    ordering from other people.  We don't know what each
22    order is, consists of.  We don't know what -- that
23    what their -- what others -- other companies do in
24    terms of either thresholds or due diligence that
25    they do or anything else.
```

```
 1           So unless -- until we can actually see the

 2    orders and see the information, what products and

 3    each one are they ordering, what percentages, we

 4    have no idea.  They list three other distributors in

 5    their questionnaire.  We don't know what they're

 6    ordering from each one.  But we do know what we see

 7    that they're doing overall.

 8           Again, I think we distinguished between --

 9    we don't focus -- in this situation, it's not about

10    a particular order.  We don't know if the -- from

11    other people what each particular order is, and

12    that, to me, is -- if it's a suspicious order, it's

13    one order that they put in on August 28th and here's

14    the six products that they ordered and they're

15    different from what they ordered three weeks ago.

16           That's not what we -- that's not what we're

17    looking at here.  We're looking at are we

18    comfortable with this -- this customer -- these

19    customers could have been ordering fine from us.

20    But -- everything was fine, but we don't like what

21    they're dispensing overall.

22    Q.   I -- I didn't ask as to whether what they

23    were ordering from you was fine.

24    A.   I know.  I know.  I understand.

25    Q.   I was asking whether you thought you
```

1    possessed sufficient information to know whether

2    they were engaging in suspicious orders.

3            MR. MATTHEWS:  Objection.

4    A.    You know --

5    Q.    And your position is, based upon all the

6    information that you had in your files, that you

7    didn't know?

8    A.    I don't know.

9            MR. MATTHEWS:  Objection.

10   A.    I don't see the orders.  We do not see the

11   individual orders.  So without seeing the individual

12   orders that -- from another company.  Not -- not --

13   not the quantities per month or per 90 days or

14   anything else, but the specific order and what --

15   and what that -- their patterns are, what their

16   frequency is, or what -- whatever it happens to be,

17   we're not in a position to talk about orders from

18   somebody else.

19   Q.    Let's look at line 541, Accurate RX

20   Specialty in Q Gardens, New York.

21           Now, for that entity, the notes for Anda

```
 1       A.    Correct.

 2       Q.    Now, for that pharmacy, you would have a

 3   full due diligence file, correct?

 4       A.    Yes.

 5       Q.    And it would include the physicians that

 6   were the lead prescribers, and it would include --

 7   I'm sorry.

 8             Can I get a verbal answer to that question?

 9       A.    Yes.  Yes.

10       Q.    And it would include the customer

11   questionnaire?

12       A.    Yes.

13       Q.    It would include the dispensing data?

14       A.    Yes.

15       Q.    Both for controlleds and noncontrolleds?

16       A.    Yes.

17       Q.    It would include the average prescription

18   strength?

19       A.    Yes.

20       Q.    And from all of that information, you could

21   not make a determination as to whether a pharmacy

22   that has oxycodone 30 as its highest dispensed

23   pill/tablet by five times the next highest dispensed

24   product, and the next highest product was another

25   oxycodone product, that that wasn't a suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

1    order?

2         MR. MATTHEWS:  Objection.

3    A.   Again, without seeing the specific orders,

4    we don't know what combination.  We don't know when.

5    We don't know anything about how they're ordering.

6    There's a difference between an individual order,

7    which we don't see -- we don't see -- we only see

8    individual orders from us -- and what they're

9    dispensing and getting from other people.  We don't

10   know in which way they're getting it.

11        It would be a real presumption to be -- to

12   be able to say, oh, Cardinal, there are -- they're

13   submitting suspicious orders to Cardinal.  We can't

14   do that.  We have no information to that impact.

15   We're saying what we see and the determination we

16   make, we are not comfortable continuing to sell

17   controls based on their dispense pattern, not on any

18   particular order.

19   Q.   Let's go down to customer line number 559.

20        MR. NOVAK:  If we can scroll back to the

21   left and take a look at that one for a moment.

22        Nope, I think you passed it.

23   A.   I see it.

24   Q.   Mills Pharmacy on 640 Wessel Drive in

25   Fairfield, Ohio.

Highly Confidential - Subject to Further Confidentiality Review

```
1     A.    Uh-huh.

2     Q.    And for that pharmacy, Anda submitted in the

█ ████████████████████████████████████████████████████

█ ██████████████████████████████████████████████

█ ████████████████████████████████████████████

█ ██████████████████████████████  ████████████████

7     contained in their question -- customer

8     questionnaire does not explain this usage.

9     A.    Uh-huh.  Yes.

10     Q.    Again, this would be a pharmacy where you

11     have the dispensing data of what they provided to

12     their customers?

13     A.    Yes.

14     Q.    Correct?

15           You would have the information --

16     A.    Totals.  The totals of what they provided.

17     Of overall, to all customers of all pills, et

18     cetera.

19     Q.    Yes.

20     A.    Yes.

21     Q.    Both the controlled products and the

22     noncontrolled products?

23     A.    Correct.  Correct.

24     Q.    So you would have the percentages of each?

25     A.    Uh-huh.  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   You also would have a list of the top

 2   prescribers for the controlled substances?

 3        A.   Uh-huh.  Yes.

 4        Q.   You would have the prescription strengths?

 5        A.   Yes.

 6        Q.   You would have the average number of pills

 7   per prescription?

 8        A.   Yes.

 9        Q.   And with all of that information, you

10   wouldn't be able to determine whether that pharmacy

11   in Fairfield, Ohio, was engaging in suspicious

12   orders?

13             MR. MATTHEWS:  Objection.

14        A.   Engaging in suspicious orders from other

15   distributors?  Ordering from other distributors,

16   suspicious orders?  Placing suspicious orders with

17   other distributors?

18        Q.   Yes.

19        A.   No.

20             MR. MATTHEWS:  Objection.

21        A.   We don't -- look, just because oxy -- let me

22   give you an example here.

23             Oxycodone APAP 10/325 and oxycodone 30,

24   they're the highest dispensed product.  Let's say

25   they're at 15 and 12,000.  And the next highest
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    noncontrol is 2,000.

 2            Let's just -- I mean, I'm making up numbers,

 3    and of course, I'm making up numbers because I don't

 4    have any file in front of me, but, theoretically,

 5    that customer could order 1,000 or 2,000 oxycodone

 6    10/325, 2,000 oxy 30, and then order 300 of 20 other

 7    noncontrol products, theoretically.  I don't know if

 8    that hits Cardinal's system or McKesson's system.  I

 9    don't know how they do that.

10            Without seeing the order itself -- again,

11    we're talking about specific, individual orders.

12    We're not talking about overall customer

13    eligibility.  We're talking about a specific order.

14            There is no capacity that we would --

15    without seeing the specific order, one, we can't

16    make that judgment; and, two, we don't know --

17    it's -- it's another -- it's another -- it's another

18    distributor that we have absolutely no visibility

19    into other than their overall dispense pattern over

20    a 90-day period.

21            So, no, we would have no ability to say

22    any -- we don't even know what date they order on.

23    How would we be able to say a specific order is

24    suspicious?

25            We don't know what dates.  This is a 90-day.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It could be anywhere within that 90-day period
 2    they're ordering this, and we don't know what other
 3    products they're ordering with it.
 4           So, no, we -- that's -- that's just not
 5    something we would ever be able to do, and neither
 6    would Cardinal be able to look at that same
 7    information and say, oh, they're ordering
 8    suspicious -- they're submitting suspicious orders
 9    to Anda.  They can't do it.  It's just not possible
10    based on being able to see specific orders, because
11    we can't.
12           We don't see theirs, and they don't see
13    ours.  We see cumulative -- cumulative information.
14    Q.   Okay.  If there were a pharmacy sitting in
15    Cleveland in Ohio that dispensed a million
16    oxycodone 30 pills and the only other thing they
17    dispensed was a bottle of aspirin on an every month
18    basis, if those orders were being placed by
19    someone else -- with someone else, except for the
20    aspirin that they bought from Anda, is it your view
21    that you would be unable to determine whether they
22    were placing suspicious orders?
23           MR. MATTHEWS:  Objection.
24    A.   Again, we are notifying the DEA of a
25    customer that we are not comfortable with based on
```

Highly Confidential - Subject to Further Confidentiality Review

1    the information that we have, based on the

2    information that we've received, and we're telling

3    them, one, we're not selling to them; two, this is

4    the reason why, and we have concerns.

5         But I don't think there's any -- aside from

6    the inability, unless you can show me some

7    statutory, regulatory, or advisory document that

8    would either require or -- or suggest that one

9    distributor would tell about -- would go to the DEA

10   and say they're ordering -- they're -- and they're

11   making suspicious orders from another distributor,

12   that's -- I just never heard that before, and I

13   don't -- I just don't think it's -- it's within the

14   purview of the industry or it's ever been

15   contemplated that that would happen.

16   Q.   And you've never heard of another

17   distributor under similar circumstances reporting on

18   suspicious orders from another distributor?

19         MR. MATTHEWS:   Objection.

20         MS. CHARLES:   Objection; form.

21   A.   I've never heard of that, and I don't know

22   how they could because they don't know what the

23   order is.  You're talking about a specific -- when

24   you're doing that, you're talking about reporting a

25   specific order, and without knowing what that order

```
1    is, that specific order, it's -- I don't see how

2    anyone would be able to do that.

3       Q.   So the entire industry could have

4    information about a particular pharmacy that's

5    dispensing absurd amounts of OxyContin or other

6    controlled substances, and your position is the only

7    one that would be able to report them for a

8    controlled substance or a suspicious order is the

9    one for whom they placed the order with?

10          MR. MATTHEWS:  Objection.

11      A.   That's the only one that knows what the

12   order is, and the DEA knows because they get the

13   ARCOS data.

14          We were saying we have a concern about this

15   customer.  Again, we've ceased doing business with

16   them, and we've gone to the DEA and said we have a

17   concern.  And they see the ARCOS reports; they see

18   who's -- what they're ordering from other people;

19   and they see the individual orders.

20          I think we went, you know, pretty far in

21   terms of our responsibility.  We're not selling and

22   we're reporting them.  And to me -- and my own -- my

23   own view, I think it's a lot more valuable to

24   support a customer -- to report a customer than it

25   is maybe one particular or two particular orders.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I mean, whether or not Cardinal reported
 2    them, I'm not sure it really matters.  The DEA has
 3    been on notice that this is a bad customer in our
 4    mind, and this is why.
 5         Q.   But not through a suspicious order report?
 6         A.   No.
 7              MR. MATTHEWS:  Objection.
 8         A.   No.
 9              When we had suspicion -- when we had orders
10    that we considered suspicious, we reported it as an
11    order.  But for the vast majority, it was customers.
12         Q.   Let's go to the controls denied tab now.
13    There are a number of pharmacies on the controls
14    denied tab similarly that have entries in the "I"
15    column for -- that explains why the controls were
16    denied.
17         A.   Uh-huh.
18         Q.   Okay.
19         A.   Yes.
20         Q.   And let's just take Marlin Pharmacy as an
21    example.
22         A.   Yep.
23         Q.   The reasons identified in the "I" column are
```

Highly Confidential - Subject to Further Confidentiality Review

■ ████████████████████████████

■ ████████████████████████

■ ████████████████████

■ ██████████████████████████████

■ ████████████████████

6          Now, that was the basis upon which you

7    concluded that you would deny selling controls to

8    them.

9          A.   Correct.

10         Q.   But, again, based upon the information you

11   had, you didn't feel as though you had enough

12   information to report them for suspicious orders?

13         MR. MATTHEWS:  Objection.

14         A.   They didn't order from us.  They didn't

15   place an order.  They didn't -- they couldn't place

16   an order, so we had no order to report.

17         Q.   Okay.  Let's go next to the "Suspicious

18   Orders" tab.

19         A.   Okay.

20         Q.   Now, there are four orders that are

21   referenced in the suspicious order tab.

22         One for Orchard Drug in North Salt Lake,

23   Utah.

24         A.   Yes.

25         Q.   One for Cambridge -- Cambridge Springs

Highly Confidential - Subject to Further Confidentiality Review

1    Pharmacy in Cambridge Springs, Pennsylvania.

2            One for Bi-Mart Corp Medford in Medford,

3    Oregon.

4        A.   Yes.

5        Q.   And one for Pharmaceutical Services in

6    Silver Spring, Maryland.

7        A.   Yes.

8        Q.   Those are the only suspicious orders that

9    Anda reported for the reporting period that is

10   reflected in the May 20, 2016, e-mail that you

11   submitted to DEA and Department of Justice

12   officials?

13       A.   Yes.

14       Q.   Okay.  And what was it about these orders

15   that drew you to the conclusion that they were

16   suspicious?

17       A.   It was the -- it was the items that they

18   were ordering, the quantities that they were

19   ordering, the combinations that they were ordering.

20   My guess is they probably didn't -- yeah, and -- and

21   I don't know if they ordered those before or not.

22   I'd have to see.

23           But it was the -- it was the items in the --

24   in two of the cases, it was the combination.  And in

25   the other cases, it was the actual item.  And in the

Highly Confidential - Subject to Further Confidentiality Review

1   other case, it was hydrocodone that was larger than

2   the previous order and we -- we -- my guess is on

3   that one we might have -- we might have asked for an

4   explanation and we didn't get it.  So we didn't get

5   it within 24 hours, the order was deleted, reported

6   as suspicious, and the customer was cut off.

7           MR. MATTHEWS:  How are we doing on time?

8           THE COURT REPORTER:  Six hours and 19

9       minutes on the record.

10          (Anda-Brown Exhibit 15 was marked for

11      identification.)

12  BY MR. NOVAK:

13      Q.   We've had marked for identification purposes

14  Anda-Brown Deposition Exhibit 19.

15          MR. MATTHEWS:  15?

16          MR. NOVAK:  Oh, okay.  Sorry.  15.

17          THE COURT REPORTER:  Tricked you.  Sorry

18      about that.

19  BY MR. NOVAK:

20      Q.   The front page of which is an e-mail from

21  Tricia Chen to Barbara Aleman with CC's to a number

22  of individuals, including Michael Brown, the subject

23  being "A final compliance docs for meeting

24  tomorrow."  And then attached to it is a PowerPoint

25  presentation, in addition to a number of other

Highly Confidential - Subject to Further Confidentiality Review

```
 1    documents.
 2            But I wanted to start with the PowerPoint
 3    presentation.  First, is this a document you would
 4    have received back in June 22nd of 2016?
 5        A.   I would have received it, and I may have --
 6    again, not total recollection -- but certainly would
 7    have been part of putting it together.
 8        Q.   Okay.  So you participated in the present --
 9    or in the preparation --
10        A.   Yes.
11        Q.   -- of the PowerPoint, at least?
12        A.   On at least some of these items, yes.
13        Q.   Okay.  I'd like to go through a couple of
14    these.  First of all, what was the purpose of
15    creating this PowerPoint?
16        A.   The purpose was that -- in looking at the
17    attachments, Teva was in the process of
18    determining -- of purchasing Anda and wanted due
19    diligence -- their due -- they wanted to conduct
20    their due diligence on Anda's regulatory compliance.
21    And so these were documents that were put together
22    to explain the -- you know, both history and the
23    current -- the current condition or status of the
24    compliance department.
25        Q.   So you were preparing these materials for
```

1    the benefit of Teva in their performance of due

2    diligence in deciding whether they were going to

3    purchase Anda?

4        A.    Correct.

5              MR. MATTHEWS:  Objection.

6        A.    To my -- it was part of their -- their due

7    diligence in the purchase.  Whether that impacted

8    their ability -- their decision or not, I don't

9    know.

10       Q.    Okay.  I'd like to start with the compliance

11   organizational chart that is on the Bates page

12   ending with the digits 2045.

13             And this includes an organizational chart

14   for -- is it the regulatory compliance portion of

15   the company?

16       A.    Yes.

17       Q.    Okay.  And it sets out both you as the

18   director of compliance and Emily Schultz as the

19   associate direct -- director of regulatory

20   compliance?

21       A.    Yes.

22       Q.    And as of this time, you had five employees

23   that reported to you?

24       A.    Yes.

25       Q.    And they were James Gatto, Latoya Samuels,

Highly Confidential - Subject to Further Confidentiality Review

1    Mary Barber, John Kincaide, and Tasha Campbell?

2        A.    That is correct.

3        Q.    Okay.  And the individuals who were tasked

4    with performing the due diligence on transactions

5    and new customer applications for controlled

6    substances would have been these five individuals in

7    addition to yourself?

8        A.    That is correct.

9        Q.    Okay.  Now, the sales of controlled

10   substances are broken down here by warehouse.  Are

11   these the figures that are accurate for 2016 as to

12   sales of controlled substances coming out of each of

13   the three Anda distribution facilities?

14            MR. MATTHEWS:  Objection.

15       A.    As far as I can recall.  And I don't have --

16   know the dates.  It doesn't say which -- you know,

17   what -- what time frame or up to what time -- what

18   time period, but this was -- you know, this was --

19   this was -- this was data that we, you know,

20   received or that we collected internally and placed

21   it.  I just don't know the time period.

22       Q.    Okay.  So you don't know whether this is a

23   full year or just the sales --

24       A.    Partial.

25       Q.    -- the partial sales for 2016?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Correct.  Yeah.  This was -- let's see --
 2   June 22nd.  I don't know if it was June 1st.  I --
 3   I'm not sure.  I mean, it says 2016 total sales.  I
 4   don't know -- again, I don't have independent
 5   knowledge of -- of what the cut-off date was.
 6        Q.   Okay.  Now, the -- the figure referenced for
 7   the Ohio distribution center of control II --
 8   Schedule II items is 48 million and some change; is
 9   that correct?
10        A.   That's what the -- that's what the document
11   says.
12        Q.   Okay.  Do you have an independent
13   recollection as to what the typical Anda sales say
14   for a full calendar year around this time for
15   Schedule II controlled products were?
16             MR. MATTHEWS:  Objection.
17        A.   I can't say that I have an independent
18   recollection.
19        Q.   Okay.  Does 48 million sound about right for
20   half a year?
21             MR. MATTHEWS:  Objection.
22        A.   You know, I -- I really don't know myself.
23   I couldn't really hazard a guess.
24        Q.   Okay.  Now, Slide 6 makes reference to
25   21CFR1301.74 and sets out some requirements for
```

Highly Confidential - Subject to Further Confidentiality Review

 1    controlled substance compliance.

 2          I -- I take it you agree with the statement

 3    that is contained on Slide 6?

 4    A.    That's what the regulation says.  I mean,

 5    the statement is that, yes, that's the regulation

 6    and that's the requirement, yes.

 7    Q.    On the dispensing data that we reviewed for

 8    the -- for the various customers on the cut-off list

 9    that Anda submitted to the Department of Justice,

10    what prevented you from coming to the conclusion

11    that those customers had engaged in orders deviating

12    from a normal pattern?

13          MR. MATTHEWS:  Objection.

14    A.    They may not have been our orders.  They may

15    not have been from us.  I don't know that.  Without

16    looking at the customer's actual history, I don't

17    know if their orders from us deviated in any way.  I

18    don't know what they were ordering from us.

19          That's -- those are -- those conclusions

20    summarized the top products that they were

21    dispensing, period.  We don't -- I don't -- without

22     -- without having that customer file in front of me

23    and all the information we look at, I would have no

24    way of knowing what they -- what they ordered from

25    us.

```
 1        Q.   I didn't ask about whether they ordered it

 2    from you.  I asked simply whether you possess

 3    sufficient information to conclude that they were

 4    engaging in orders deviating from a normal pattern.

 5            MR. MATTHEWS:  Objection.

 6        A.   Again, as we discussed earlier, the only way

 7    I would know that -- the only orders I can see are

 8    what they were ordering from us.  And without seeing

 9    their order history, I would have no idea if they

10    were deviating from a pattern or not.

11        Q.   I'll skip Slide 7.

12            Now, in Slide 13, the PowerPoint

13    presentation that was created for Teva states:  Thus

14    far, in 2016, over 26,000 orders have been held for

15    review.  Of these, one order was determined to be

16    suspicious and was reported to the DEA.  The

17    customer was immediately denied control privileges.

18            Did you participate in authoring that slide?

19        A.   I probably did, because I had knowledge of

20    it.

21        Q.   Okay.  For the other 25,999 held orders, who

22    would have performed the due diligence in 2016?

23        A.   Any one of the six people, including myself,

24    who reviewed -- who were responsible for reviewing

25    each held order.
```

1    Q.   Okay.  So between the six of you, you would

2    have been responsible for approximately 4,333 orders

3    apiece if you were just divvying them up equally

4    among the six?

5    A.   If that was the case, yes.

6    Q.   Over a six-month period?

7    A.   Over a six-month period.

8    Q.   So 722 orders a month apiece for each of the

9    compliance members?

10   A.   If that's what the math -- if that's what

11   the math averages out to, yes.

12   Q.   Okay.  And the due diligence that would be

13   performed for roughly 722 orders that were held per

14   person in -- in your compliance team, those would be

15   all of the due diligence steps that we reviewed in

16   SOP 40?

17   A.   That's correct.

18   Q.   I think that's all I have for Anda-Brown 15.

19        MR. NOVAK:  Do you want to take a quick

20   break?

21        THE VIDEOGRAPHER:  Off the record, 6:03 p.m.

22        (Recess from 6:03 p.m. until 6:14 p.m.)

23        THE VIDEOGRAPHER:  On the record, 6:14 p.m.

24        (Anda-Brown Exhibit 16 was marked for

25   identification.)

```
 1    BY MR. NOVAK:

 2        Q.   We've had marked for identification purposes

 3    Deposition Exhibit 16, which is comprised of an

 4    e-mail -- a two-page e-mail -- or I should say an

 5    exchange of e-mails -- between Vicki Mangus and

 6    various people within Anda and then Robert Brown who

 7    apparently forwarded the e-mail to Michael Cochrane.

 8        A.   Just -- just to clarify, the people that

 9    it's -- that it is to, her e-mail, are all -- all

10    Walgreens people.  The only other Anda person other

11    than myself who is cc'd is Bill Versosky.  Everyone

12    else that -- the line "to," those are all -- those

13    are all people from Walgreens.

14        Q.   Okay.  What is Vicki Mangus' position within

15    Anda?

16        A.   At that time or now?

17        Q.   At that time.

18        A.   National Account Manager.

19        Q.   And what was Mr. Versosky's responsibility?

20        A.   He was Vice President of Sales.

21        Q.   Okay.

22        A.   So Vicki reported to him.

23        Q.   Okay.  Now, you -- I think we've discussed

24    earlier today that Walgreens was an account for

25    which Anda was the exclusive secondary distributor;
```

1    is that correct?

2        A.    It ultimately became.  I don't -- it not --

3    ultimately, it became -- Anda became the exclusive

4    secondary, yes.  Not at this time.  This was the

5    time of analysis, but yes.

6        Q.    And was -- would this document have been

7    prepared at a time when Anda was attempting to

8    obtain that sole secondary supplier status with

9    Walgreens?

10       A.    No.  It was at a time when Walgreen -- when

11   Anda was making a determination to see if it was --

12   if it was willing to ship controls.

13             If I recall -- and this is -- again, I don't

14   necessarily remember the whole series of events --

15   but they had some issues with some stores.  And I

16   think, if I recall, Cardinal -- they were going to

17   transition to another primary.  And -- and they

18   needed someone to at least, you know, provide

19   controls in the interim.

20             So not -- not sole -- not the primary but

21   still somewhat as a source of controls while they

22   were transitioning to the primary.

23       Q.    Now, Ms. Mangus' e-mail states in part:

24   Team Walgreens, as promised, I've attached a summary

25   dashboard report showing controls by state.  The

1    criteria utilized for this report is as follows:  If

13       What is -- what are the significance of

14    those particular features that she identifies?

15       MR. MATTHEWS:  Objection.

16      A.  We -- we had -- and I can't remember how

17    many stores -- several thousand to review.  And what

18    we said was if they -- if -- if any store hit any of

19    the criteria that we listed here, we would need

20    significant additional information beside -- we got

21    their dispense report.  That was the first thing we

22    got.  So obviously we derived the findings from the

23    dispense reports from each location, and then we

24    said if we came -- we were trying to do this in a --

25    sort of a -- you know, a systemic way that would let

Highly Confidential - Subject to Further Confidentiality Review

1    us see the kings -- the things we were really

2    concerned about down to the store level and

3    determine what steps to take next, and these are the

4    criteria.

5            So if you hit any one of these criteria, we

6    would need a more extensive questionnaire and -- and

7    most likely -- and I can't remember if it was at

8    this time or maybe a month later -- the doctors,

9    the -- the control prescribers, the patient

10   conditions for the people using their controls and

11   whether they were on a -- on a treatment plan.

12           We had separate information that we gathered

13   from -- any store that fell within any of those

14   criteria.

15       Q.   Okay.  Now, Vicki's e-mail continues to

16   state that, under the Walgreens state analysis,

17   59 percent of all Florida stores will require a

18   completed questionnaire.

19           Is that based upon the criteria that we've

20   just discussed?

21       A.   Yes.

22       Q.   Okay.  Don't all stores require a completed

23   questionnaire?

24       A.   Well, there are some cases of chains -- of

25   chains where we still get the dispense data for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    every one, but there are some cases where if the

 2    question -- if the information is the same, if they

 3    have the same procedures, if they have similar

 4    percentages of control/noncontrol, if, you know,

 5    they operate in the same way -- and we've had this

 6    with other chains -- that we would not make them

 7    fill out a four-page, five-page questionnaire.  We

 8    would get the commonality, and then we'd focus in on

 9    other questions that we may have.

10         But where stores deviated, then we want the

11    full questionnaire.  We want the full four- or

12    five-page questionnaire.

13    Q.   Okay.  During the time that you were at

14    Anda, did you ever report Walgreens to the DEA as

15    having specific stores for which you refused

16    controls?

17    A.   There were stores that we did not -- I'm

18    trying to remember if we actually -- I mean, I know

19    there were stores that we -- we failed -- that we

20    refused to -- to service.  But, to tell you the

21    truth, I can't recall if they were actually reported

22    to the DEA.

23         At the time, very, very frankly, I was not

24    running that report.  I kind of took that over in

25    2014.  So I don't really -- I just don't remember if
```

Highly Confidential – Subject to Further Confidentiality Review

1    that was the case.

2        Q.   When you say "the report" in that answer,

3    you're referring to the report that was made to the

4    DEA?

5        A.   Correct.

6        Q.   The one that, after September 10 of 2014,

7    you were identified as being responsible for, at

8    least separately supporting the suspicious orders?

9        A.   Well, yeah.  I mean, as -- I was the one

10   who -- after September 10th, I was the one who did

11   it all.  It just made more sense.  So I did -- I

12   just included those -- included the additional

13   information points, but I was the one who took over

14   that report.

15       Q.   Who was it prior to September 10 of 2014 --

16       A.   Emily Schultz.

17       Q.   -- that prepared those reports?

18       A.   Oh, I'm sorry.

19            Emily Schultz.

20       Q.   Okay.  And -- and you don't recall whether

21   there were any Walgreens stores that were ever

22   reported to the DEA as -- as stores that you had cut

23   off?

24       A.   Well, we had -- no.  You mean denied, not

25   cut off.

```
 1      Q.   Okay.  Denied.

 2      A.   I don't recall.

 3      Q.   How about cut off?

 4      A.   We -- I -- to my -- to my knowledge, we

 5   didn't cut them -- we didn't cut stores off.  We got

 6   data on a regular basis, but we did not cut them

 7   off.  And part of the reason was that -- let's see.

 8          This was November 20, 2012.  By the time we

 9   really started servicing these stores in -- in

10   2000 -- full blast, 2013, they had a full -- they

11   didn't have a full compliance team, but they had a

12   full compliance team.  And what did they call it?

13          They had a program that they used for all

14   stores.  Oh, shoot.  I know it's -- I know I've had

15   it.  It's something about proper dispensing

16   practices.  They called it -- it was actually where

17   each store had to fill out the information in order

18   for -- in order for their own -- in order for their

19   own compliance department to approve them to even

20   come to us for -- for controls.

21          I mean -- I mean, they wouldn't -- if they

22   weren't -- if they weren't doing the proper

23   practices, they wouldn't even allow them to buy from

24   us.

25          I'm trying to remember what they called it.
```

1    Vicki would probably know, and I just can't recall

2    what it was.

3        Q.    Looking at the second page of the e-mail

4    from Vicki Mangus to the Walgreen team with -- with

5    you cc'd, it makes reference to a third or

6    approximately one-third of Walgreens stores have oxy

7    ▮ ████████████████████████████████████

8    ▮ ████████████████

9        Did that concern you?

10       A.    Yes.    That's why they were -- that's why

11   they were identified.

12       Q.    What was your understanding, based upon

13   additional review, that they were selling that much

14   oxy at that many Walgreens stores?

15       MR. MATTHEWS:    Objection.

16       A.    To be honest, I don't even know -- I

17   identified those as stores that if they maintained

18   the same types of dispense patterns, we would not

19   service.

20       But, again, this was November, and I

21   think -- I don't think we started servicing them

22   until -- I want to say maybe -- even started

23   servicing Walgreens at all until probably May or

24   June, something like that, I think.

25       But at that time, when we got this data,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    which is -- and data is always a snapshot -- like I

 2    said, those -- those stores, we probably would not

 3    -- we would not service based on that.

 4        Q.   Okay.  So there were a number of Walgreens

 5    stores, then, that you decided not to service?

 6        A.   At that time, yes.  And, again, it -- I

 7    believe again that they underwent, in the next six,

 8    eight months, significant changes in their -- in

 9    their compliance, in their -- in their review store

10    by store.

11            And I think that, if I recall, that a lot of

12    the stores underwent significant changes in their

13    dispense patterns.

14        Q.   So your refusal to provide controls to a

15    number of the stores back at that time would be

16    recorded as controls denied in the spreadsheets that

17    you maintained for the different companies?

18        A.   Actually, there were spreadsheets, but

19    because -- this was frankly -- frankly, this

20    particular exercise, so to speak, was not I'm -- I

21    want to -- I want to get controls.

22            It was we're looking to Anda, would you

23    service us, so we're going to -- we're going to give

24    you preliminary information to see if you would even

25    consider servicing Walgreens and tell us does it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    even make sense.  Because if you reject enough of

 2    our stores and you're telling us you'll never

 3    service us, we'll go somewhere else.

 4         So it wasn't like, oh, I'm applying for

 5    controls.  It was like -- it was like two steps

 6    before I'm applying for controls.  We want -- we

 7    want you -- we know -- you know, we know compliance

 8    has to approve these.  Before we go too far down the

 9    line and look at any contracts or look at any

10    business arrangements, we want to see what -- what

11    would even happen here based on our current status.

12         And so we're going to give you information

13    that we normally don't share, but we're going to

14    give it and you tell us what -- what you think.

15    Q.   So they provided preliminary information to

16    Anda --

17    A.   Yes.

18    Q.   -- to get a gut reaction as to whether they

19    would have compliance issues based on their

20    dispensing data?

21    A.   Correct.

22         MR. MATTHEWS:  Objection.

23    A.   Yes.  That's --

24    Q.   And ultimately they did become the exclusive

25    secondary supplier or -- Anda did become --
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Yes.

2       Q.    -- the exclusive secondary supplier?

3       A.    Yes.

4       Q.    Do you know when that was?

5       A.    I want to say -- exclusive? -- I don't know

6    if it was 2014 or -- I don't -- the end of 2013 or

7    the beginning of 2014 or sometime in 2014.

8             I don't know the exact date, but there

9    was -- there was a lot -- this was -- this was the

10   first initial step in this thing, because they

11   were -- they were having some -- some issues and

12   they were frankly a little desperate and they were

13   looking for someone.

14            We said we don't care how desperate.  We're

15   going -- this is going to -- whatever you have to

16   do, you have to do, but we're going for do what we

17   have to do before we rush into anything.

18      Q.    Okay.  For purposes of reviewing the due

19   diligence that was performed for Walgreens stores

20   once they ultimately received control authorization,

21   those would similarly be contained in the same

22   places that we've talked about for the other retail

23   pharmacies?

24            MR. MATTHEWS:  Objection.

25      A.    To my knowledge -- and, again, I haven't

```
 1    been there in a couple of years -- but we did retain

 2    Walgreens' individual store data, store-by-store

 3    store information in the O drive under Walgreens.

 4         Q.   Okay.  So there is dispensing data in the O

 5    drive.  There is maybe a modified customer

 6    questionnaire to reflect the fact that it's a big

 7    chain?

 8         A.   Yes.

 9         Q.   And then all of the other information that

10    we've gone through that would comply with SOP 28,

11    SOP 40, and SOP 45, would be compiled and retained

12    for Walgreens?

13         A.   Yes.  I'll just make one note:  They had the

14    same procedures for every store, so we didn't get

15    thousands of copies --

16         Q.   Right.

17         A.   -- of the same one.

18              And, frankly, pretty much every Walgreens

19    looks the same inside, so we didn't get pictures of

20    each store, of each Walgreens.  So we got -- we did

21    get pictures of what a Walgreens store looked like,

22    but we didn't get 8,000 or however many there were

23    because they pretty much do look alike.

24         Q.   Have you ever -- to your knowledge, has Anda

25    ever submitted a suspicious order report to the FDA
```

Highly Confidential - Subject to Further Confidentiality Review

1    for any chain pharmacy?

2         A.   Did you say FDA or DEA?

3         Q.   DEA.  Thank you.

4         A.   There is one for Bi-Mart that was on there,

5    yes.

6         Q.   Okay.  Other than the Bi-Mart one, any for

7    Walgreens?

8         A.   Not to my knowledge, no.  No, I don't recall

9    any.

10        Q.   Any for Publix?

11        A.   No.

12             If I may add, in the times we met with the

13   DEA, they told us Publix is the -- like a gold

14   standard for -- for how they handle controlled

15   substances.

16             And, as I mentioned, even in our exit

17   interview in 2015, the DEA representative said, you

18   know, you don't even need due diligence on the

19   Moffitt Center.  You know what they do.  And we just

20   want to make sure that good patients who need

21   controls that really have conditions that warrant it

22   are getting it and they're not held up because, you

23   know, they're being denied to legitimate patients.

24             And they used that as an example.

25        Q.   We've gone through a number of different

Highly Confidential - Subject to Further Confidentiality Review

```
 1    databases or portals that are used by Anda.

 2            One that we haven't touched upon.  Have you

 3    heard of the Cognos system?

 4        A.   Yeah.  I didn't use it that much.  I

 5    think -- I think other people did for data -- for

 6    data -- you know, for -- for like doing reports.  I

 7    didn't really do reports.  That was, like I say,

 8    mostly Sabrina and Latoya.  But they did use Cognos,

 9    you know, to, you know, capture historic data,

10    either cumulate it, break it out, et cetera.

11        Q.   Okay.  What -- what is Cognos?  I don't even

12    know.

13        A.   It's -- it's a -- it's a -- it's data

14    repository.  And, frankly, I can't really tell -- I

15    can't really tell you much about it because I didn't

16    really use it on a daily basis.  I don't think I --

17    I'm trying to remember myself how it -- how I -- I

18    don't think I -- I don't think I used it very much.

19        Q.   And what was the purpose that they used it

20    for?

21        A.   They used it to file reports.

22            So, for example, the report that I -- that

23    Sabrina sent me about the customers, the one that we

24    referred to earlier, she -- she might have -- how

25    many -- you know, what do they -- what do they
```

Highly Confidential - Subject to Further Confidentiality Review

1    order, what's the percentage of controls, what

2    they've done.

3           And she was able to utilize that to get, you

4    know, historic data, cumulative data, things of that

5    nature.

6    Q.   Okay.

7           MR. NOVAK:  Take a quick break.

8           THE VIDEOGRAPHER:  Off the record, 6:33 p.m.

9           (Recess from 6:33 p.m. until 6:37 p.m.)

10          THE VIDEOGRAPHER:  On the record, 6:37 p.m.

11   BY MR. NOVAK:

12   Q.   Mr. Brown, when did you leave Anda?

13   A.   January 2017.

14   Q.   Okay.  What were the circumstances that led

15   to your departure?

16   A.   Following the purchase of -- of Anda by

17   Teva, Teva announced that they would require

18   significant position reductions throughout their --

19   all of their entities, and I think they were

20   shooting for 25 percent reduction in -- in the

21   workforce.  And so Anda was one of those that --

22   that really -- it was affected and my position was

23   eliminated.

24   Q.   Okay.

25   A.   Along with other members of the compliance

```
 1    department as well.

 2        Q.   All right.  Do you have an understanding as

 3    to what the compliance staffing for the suspicious

 4    order monitoring is for Anda today?

 5        A.   I -- I don't.

 6        Q.   Do you know how many employees they have?

 7        A.   I really don't.  I don't know if they've --

 8    I mean, when I left, I mean, there were -- of the

 9    six -- of the six dedicated people, three were left,

10    but I don't know if they've, you know, they had --

11    if they -- if they mingled the two facets, the

12    licensing and suspicious order, and they have some

13    people who are working on that.  So I really don't

14    know.  I don't know how that worked.

15        Q.   Okay.

16             MR. NOVAK:  That's all I have.

17             MR. MATTHEWS:  Anyone have anything?

18             I actually have a few questions.

19             Do I need to move?

20             THE VIDEOGRAPHER:  That's up to you.

21             MR. MATTHEWS:  I'm going to stay here.

22                     CROSS-EXAMINATION

23    BY MR. MATTHEWS:

24        Q.   Mr. Brown, I want to follow up on a few

25    questions.  My name is James Matthews, as you know.
```

```
 1    I represent you at this deposition today, and I

 2    represent Anda.  I have a few questions I want to

 3    follow up on.

 4         Early in the day, you were asked some

 5    questions about the know your customer idea, and you

 6    used the word "required" with respect to the know

 7    your customer diligence.

 8         Could you explain how you meant the word

 9    "required" with respect to know your customer?

10    A.   We were advised in -- in face-to-face

11    meetings with our DEA representatives here in

12    Florida and at DEA conferences that there was an

13    expectation that a registrant would -- would know

14    who they're selling controls to.  There is certainly

15    nothing in any statute or -- or regulation that

16    sets -- that uses -- that either uses that language

17    or sets it as a requirement.

18    Q.   Also during the day you were asked some

19    questions about reports submitted by Anda to DEA

20    which listed, among other things, customers that

21    Anda had denied controlled substances sales to or

22    had cut off.

23         And you mentioned, do you recall, that one

24    of the DEA agents that you met with told you that

25    those reports were not helpful.
```

```
 1              Do you remember that testimony?

 2              MR. NOVAK:  Objection.

 3         A.   Yes.  Yes.

 4         Q.   Okay.  Would you explain what you meant when

 5    you testified that DEA agents told you those reports

 6    were not helpful?

 7              MR. NOVAK:  Objection.

 8         A.   Well, specifically in our September 2014

 9    meeting, we were discussing with all of the DEA

10    representatives who were present of the different

11    aspects of our customer due diligence, suspicious

12    order monitoring, et cetera, our entire compliance

13    program.  And we said among those are -- as we've

14    been reporting for quite some time on customers who

15    were either cut off or denied or, in fact,

16    reinstated.

17              And Valerie Mitchell said, well, it would be

18    a lot more helpful if you would include the reasons.

19    We -- we don't really have the ability to utilize

20    those as much if -- but we would -- it would be

21    much -- we don't have the ability to utilize them in

22    their present format, but if you included additional

23    specific information, it would be -- it would be

24    helpful.

25         Q.   Was it your understanding that DEA was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    dissatisfied with the reports?

 2            MR. NOVAK:  Objection.

 3        A.  No.

 4        Q.  Was it your understanding that DEA believed,

 5    or Ms. Mitchell in particular believed, that the

 6    reports were inadequate in any respect?

 7            MR. NOVAK:  Objection.

 8        A.  No.

 9        Q.  With that in mind -- withdrawn.

10            MR. MATTHEWS:  I don't have any further

11    questions.

12            MR. NOVAK:  I think we're done.

13            MR. MATTHEWS:  Great.

14            THE WITNESS:  How much time was left?

15            THE VIDEOGRAPHER:  Off the record, 6:43 p.m.

16            (Whereupon, the deposition concluded at

17    6:43 p.m.)

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2         I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby

 5    certify that, pursuant to notice, the deposition of

 6    ROBERT BROWN was duly taken on Monday,

 7    December 3, 2018, at 9:26 a.m. before me.

 8         The said ROBERT BROWN was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness, and that a

16    review of the transcript was requested.

17

18    _____

19    Susan D. Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR

20    (The foregoing certification of this transcript does

21    not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

```
 1                    - - - - - -

 2                    E R R A T A

 3                    - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6      REASON: _____

 7   _____   _____   _____

 8      REASON: _____

 9   _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4    acknowledge that I have read the foregoing pages, 1

 5    through 278, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____      _____

13    ROBERT BROWN                                      DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

23    Notary Public

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1

2                         LAWYER'S NOTES

3     PAGE    LINE

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25    _____   _____   _____
```