Highly Confidential - Todd Cameron

1                    THE STATE OF MONTANA

              OFFICE OF THE ATTORNEY GENERAL

2             OFFICE OF CONSUMER PROTECTION

3

4                         - - -

5                  SEPTEMBER 26, 2018

6                 HIGHLY CONFIDENTIAL

7                         - - -

8

9          Oral testimony of TODD CAMERON, taken

10   pursuant to notice, was held at the law offices of

11   Baker & Hostetler, LLP, 250 South Civic Center Drive,

12   Suite 1200, Columbus, Ohio 43215, commencing at 10:23

13   a.m., on the above date, before Carol A. Kirk, a

14   Registered Merit Reporter.

15

16                        - - -

17

18

19

20

21           GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

22                deps@golkow.com

23

24

Highly Confidential - Todd Cameron

```
 1              DEPOSITION OF TODD CAMERON
 2                   APPEARANCES
 3                      - - -
 4

         LINDA SINGER, ESQUIRE
 5       MOTLEY RICE LLC
         401 9th Street, NW, Suite 1001
 6       Washington, DC  20004
         202-386-9626
 7       lsinger@motleyrice.com
 8       - and -
 9       NATALIE DEYNEKA, ESQUIRE
         MOTLEY RICE LLC
10       28 Bridgeside Boulevard
         Mount Pleasant, South Carolina  29464
11       843-216-9343
         ndeyneka@motleyrice.com
12
13       JENNIFER G. WICHT, ESQUIRE
         JOSHUA D. TULLY, ESQUIRE
14       WILLIAMS & CONNOLLY, LLP
         725 12th Street, N.W.
15       Washington, DC  20005
         202-434-5331
16       jwicht@wc.com
17
18    ALSO PRESENT:
19      Kaitlyn Anderson, Esquire
20      Kelley Hubbard via teleconference
21
22
23
24              DEPOSITION OF TODD CAMERON
```

Highly Confidential - Todd Cameron

```
 1                    INDEX TO EXAMINATION

 2    WITNESS                                      PAGE

 3    TODD CAMERON

 4         CROSS-EXAMINATION BY MS. SINGER:           8

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24              DEPOSITION OF TODD CAMERON
```

Highly Confidential - Todd Cameron

```
 1                  INDEX TO EXHIBITS
 2    MONTANA-CARDINAL      DESCRIPTION              PAGE
 3    Montana-Cardinal 1    Subpoena                  10
 4    Montana-Cardinal 2    Document titled, Cardinal  93
 5                          Health, Inc. v. Holder,
 6                          Attachment 13 to Defendants'
                            Opposition to Plaintiff's
 7                          Motion for Preliminary
                            Injunction"
 8
      Montana-Cardinal 3    Document titled, "Process to 116
 9                          Establish SOM Threshold
                            Limits," Bates-stamped
10                          CAH_MTAG_0001167 through 1170
11    Montana-Cardinal 4    Document titled, "Industry  132
                            Compliance Guidelines"
12
      Montana-Cardinal 5    E-mail from Mr. Todd, dated  172
13                          3/11/14, Bates-stamped
                            CAH_MDL2804_00220583
14
      Montana-Cardinal 6    Spreadsheet of suspicious   208
15                          reports
16    Montana-Cardinal 7    Text fields                 209
17    Montana-Cardinal 8    Spreadsheet                 218
18    Montana-Cardinal 9    Document titled "QRA SOME    222
                            Customer Analytics General
19                          Awareness Instructions,"
                            Bates-stamped CAH_MTAG_
20                          0001728 through 1745
21    Montana-Cardinal 10   Spreadsheet                 234
22    Montana-Cardinal 11   E-mail string ending with   237
                            an e-mail to Mr. Hartman
23                          from Mr. Cameron, dated
                            1/11/08, Bates-stamped
24                          CAH_MDL_PRIORPROD_DEA07_
```

Highly Confidential - Todd Cameron

```
 1            INDEX TO EXHIBITS (CONT'D)
 2  MONTANA-CARDINAL    DESCRIPTION              PAGE
 3  Montana-Cardinal 12  E-mail to GMB-QRA-Anti-   243
                         Diversion from Ms. Morse,
 4                       dated 12/3/08, Bates-
                         stamped CAH_MTAG_0001798
 5                       through 1833
 6  Montana-Cardinal 13  Document titled, "Sales -  292
                         Anti-Diversion Alert
 7                       Signals," Bates-stamped
                         CAH_MTAG_240 through 243
 8
    Montana-Cardinal 14  Document titled, "Cage/Vault  310
 9                       SOM Process," Bates-stamped
                         CAH_MTAG_0001614 through 1618
10
    Montana-Cardinal 15  Document titled "Daily       326
11                       Threshold Reporting,"
                         Bates-stamped CAH_MTAG_
12                       0001161 through 1166
13  Montana-Cardinal 16  Document titled "Sales -      329
                         Highlight Report," Bates-
14                       stamped CAH_MTAG_0001324
                         through 1328
15
    Montana-Cardinal 17  Document titled              333
16                       "Regulatory Notification of
                         Suspicious Orders and/or
17                       Suspension of Sales of
                         Scheduled/List 1 Substances,"
18                       Bates-stamped CAH_MTAG_
                         0000898 through 906
19
    Montana-Cardinal 18  Document titled "Standard     335
20                       Operating Procedures,
                         Pharmaceutical Distribution,
21                       Detecting and Reporting
                         Suspicious Orders and
22                       Responding to Threshold
                         Events," Bates-stamped
23                       CAH_MTAG_0001106 through
                         1101
24
```

Highly Confidential - Todd Cameron

```
 1              INDEX TO EXHIBITS (CONT'D)
 2   MONTANA-CARDINAL      DESCRIPTION               PAGE
```

|  | MONTANA-CARDINAL | DESCRIPTION | PAGE |
|---|---|---|---|
| 3 | Montana-Cardinal 19 | Document titled "Attention. Held Pending Regulatory Review," Bates-stamped CAH_MTAG_0001438 | 340 |
| 5 | Montana-Cardinal 20 | Document titled "Standard Operation Procedure, Corporate Quality and Regulatory Affairs, New Account Approval," Bates-stamped CAH_MTAG_0000316 through 323 | 343 |
| 9 | Montana-Cardinal 21 | Document titled "Standard Operating Procedure, Pharmaceutical Distribution, National Account Types that Bypass Corporate Quality and Regulatory Affairs Due Diligence," Bates-stamped CAH_MTAG_0000214 through 218 | 346 |
| 14 | Montana-Cardinal 22 | Document titled "Wholesaler/Distributor Questionnaire," Bates-stamped CAH_MTAG_383 through 387 | 352 |
| 16 | Montana-Cardinal 23 | Document titled "QRA SOM Customer Analytics General Work Instructions," Bates-stamped CAH_MTAG_0001728 through 1745 | 355 |

```
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Todd Cameron

```
 1                P R O C E E D I N G S

 2                      - - -

 3            MS. SINGER:  This is Linda Singer

 4        for the Montana Attorney General's

 5        Office.

 6            MS. DEYNEKA:  And Natalie Deyneka,

 7        also with MotleyRice and Linda Singer.

 8            MS. SINGER:  And on the phone,

 9        Kelly Hubbard from the Montana Attorney

10        General's Office.

11            MS. ANDERSON:  I'm Kaitlyn

12        Anderson, in-house counsel for Cardinal

13        Health.

14            MS. WICHT:  Jennifer Wicht from

15        Williams & Connolly for Cardinal Health.

16            MR. TULLY:  Josh Tully from

17        Williams & Connolly, also for Cardinal

18        Health.

19            THE WITNESS:  Todd Cameron of

20        Cardinal Health, the anti-diversion

21        group.

22                      - - -

23                TODD CAMERON

24   being by me first duly sworn, as hereinafter certified,
```

Highly Confidential - Todd Cameron

```
 1   testifies and says as follows:

 2                     EXAMINATION

 3   BY MS. SINGER:

 4        Q.    All right.  So as we're getting

 5   started, I just want to give you some

 6   suggestions, ground rules, whatever you want to

 7   call them.  Take as much time as you need to

 8   answer questions; standing, sitting, however you

 9   want to do them.

10             If you don't understand a

11   question, please ask me to rephrase it or ask me

12   to explain what I mean.  You were sworn in at

13   the start of this testimony.  I take it you

14   understand that you are testifying under oath

15   subject to a subpoena for testimony by the

16   Montana Attorney General's Office?

17        A.    Yes.

18        Q.    And you understand that a court

19   reporter is going to be transcribing your

20   testimony.

21        A.    Yes.

22        Q.    Is there any reason you can't

23   testify truthfully today?

24        A.    No.
```

Highly Confidential - Todd Cameron

```
 1              Q.     Have you ever testified in

 2    connection with Cardinal's anti-diversion

 3    program?

 4              A.     No.

 5              Q.     And how much time did you spend

 6    preparing for this deposition -- this testimony?

 7    We'll call it testimony.  That's what it is

 8    under Montana law.  How much time?

 9              A.     This deposition specifically?

10              Q.     Yes.

11              A.     Several hours.

12              Q.     Okay.  And other than your counsel

13    at Cardinal and at Williams & Connolly, is there

14    anyone else you consulted with in preparation

15    for today's testimony?

16              A.     Counsel at BakerHostetler.

17              Q.     Okay.  Any non-lawyers?

18              A.     No.

19              Q.     And were there any documents that

20    you reviewed?

21              A.     Yes.

22              Q.     And what documents did you review?

23              MS. WICHT:  Linda, I'll -- I think

24    that we've generally been doing this.  I
```

Highly Confidential - Todd Cameron

```
1              object on the basis of privilege to just

2              the question asking him to identify all

3              documents.  So I will instruct him not

4              to answer that one.

5                   To the extent there are individual

6              documents that you show him and you want

7              to ask if he reviewed that in prep, I

8              would allow him to answer that.

9                   MS. SINGER:  Okay.

10  BY MS. SINGER:

11        Q.   Are there any documents that you

12  reviewed on your own initiative that weren't

13  shown to you by counsel?

14        A.   No.

15        Q.   Okay.  And did you review the

16  subpoena that was issued by the Attorney

17  General's Office in advance of coming today?

18        A.   No.

19        Q.   Okay.  Do you know the topics or

20  subjects that were identified on that subpoena?

21        A.   No.

22                  MS. SINGER:  So this is going to

23              be Exhibit 1.

24                       - - -
```

Highly Confidential - Todd Cameron

1           (Montana-Cardinal Exhibit 1 marked.)

2                        - - -

3       A.    Should I read this?

4       Q.    Yes.  If you could take a look --

5  focus on the list of topics or subject areas.

6  That's at page III.  It's III, "Subject Matters

7  for Testimony."  If you could just skim through

8  those, please.

9           MS. WICHT:  You can go ahead and

10          read that.  While he's reading that,

11          Linda, my understanding of the

12          discussions that we had leading up to

13          this deposition are that -- and what

14          we're prepared to do today -- is that

15          Mr. Cameron is here in his individual

16          capacity, not as sort of a corporate

17          representative of Cardinal Health.

18              So I think -- and we'll see once

19          he reviews -- but I think he's -- in his

20          personal knowledge would cover many of

21          these.  But we didn't prepare him as a

22          corporate witness.  And he's not being

23          offered in that capacity today.

24          MS. SINGER:  Yes.  That is

1        understood.

2                MS. WICHT:  Okay.

3   BY MS. SINGER:

4        Q.    Mr. Cameron, have you had a chance

5   to look at the list of subjects?

6        A.    Yes.

7        Q.    All right.  Are you familiar with

8   all of those subject areas in your work at

9   Cardinal?

10       A.    I am familiar with the areas, yes.

11       Q.    Okay.  When did you start working

12  at Cardinal?

13       A.    August of 1993.

14       Q.    Was it your first job?

15       A.    It was.

16       Q.    And in what capacity did you start

17  with the company?

18       A.    I was involved in the IT

19  department around data elements of the

20  distribution side of the company.

21       Q.    And was that on the compliance or

22  marketing side of Cardinal Health?

23       A.    Marketing.

24       Q.    And can you take us through your

Highly Confidential - Todd Cameron

1   positions at Cardinal Health.

2          A.    I can try.  I was in --

3          Q.    If you can't, I can't.

4          A.    Right.  Yeah.

5                I was in the -- and the reason I

6   hesitate is when I started, the company was very

7   small.  And we didn't have the specific

8   department structure silos that we have today.

9   It was really kind of a group of -- it was very

10  small.  It was about 70 people when I started.

11               But I was in the marketing

12  department as far as customer data elements that

13  were used on the distribution side of the

14  business, and moved into an IT role that was

15  focused around customer IT solutions from an

16  inventory management standpoint side.

17               And then moved into what at the

18  time was referred to as sales administration.

19  Then went back into another IT role.  Then went

20  into a consumer health role, which was all the

21  front-end nonprescription products that Cardinal

22  carries.

23               Then went back into a sales

24  operations role.  And then went from there into

Highly Confidential — Todd Cameron

```
 1    the anti-diversion team.  And each of those

 2    steps had two or three jobs within those

 3    movements.

 4           Q.    Okay.  And so what is your current

 5    title at Cardinal?

 6           A.    I believe it is -- and I say that

 7    because I'm not sure what the actual HR roadmap

 8    title is.  But I believe it is SVP of supply

 9    chain integrity.

10           Q.    All right.  Do we need to check

11    your business card?

12           A.    Yeah, I don't have one with me.

13    But I think that's what it says.

14           Q.    So this is not the part of the

15    testimony where you're supposed to get squishy?

16           A.    Well, I haven't stood up yet.  So

17    I'm still sitting down.

18           Q.    Okay.  And so in your current

19    position, whatever it is, at Cardinal Health,

20    you're responsible for anti-diversion

21    compliance; is that correct?

22           A.    Correct.

23           Q.    And when did you first move into a

24    role related to anti-diversion compliance?
```

Highly Confidential - Todd Cameron

```
1          A.     Late 2012.

2          Q.     And what were the circumstances of

3    that transition?

4          A.     I moved in I believe it was

5    September of '12.  I was asked to take a lateral

6    move into that role from my current position at

7    the time to help the company continue to evolve

8    its anti-diversion program focused on data and

9    analytics.

10         Q.     And did you succeed somebody in

11   that position?

12         A.     I did.

13         Q.     And who was that?

14         A.     Michael Mone.

15         Q.     And to the extent you know, why

16   was he moved from that position?

17         A.     I don't know.  I know that Michael

18   is still here in a similar level capacity today

19   doing things with the Boards of Pharmacy.

20         Q.     And do you know why you were

21   chosen for the position?

22         A.     I was under the impression that

23   they wanted somebody that was good with numbers

24   and could understand customer data and help
```

1    determine what objective components would make

2    sense to evaluate customers.

3            Q.     Okay.  And is that the same

4    position that you're still in now?

5            A.     Basically, yes.

6            Q.     Okay.  And how many people report

7    to you?

8            A.     About 35.

9            Q.     And what job functions do they

10   have?  What kind of people are we talking about?

11           A.     As far as the roles?

12           Q.     Yes.

13           A.     Everything related around to

14   anti-diversion, knowing our customers, setting

15   thresholds, doing visits.

16                  MS. SINGER:  And let me just pause

17           for a second.

18                  Kelly Hubbard, can you hear us

19           okay?

20                  MS. HUBBARD:  Yes, I can.  Thank

21           you.

22   BY MS. SINGER:

23           Q.     Before you took this new position

24   or at any point, I take it you don't have any

Highly Confidential - Todd Cameron

```
 1    background in law enforcement or compliance?

 2          A.    I do not.

 3          Q.    And what awareness did you have

 4    of --

 5          A.    I have a criminal justice degree,

 6    but that probably doesn't count.

 7          Q.    As long as you don't have other

 8    criminal justice experience, that's a positive.

 9                What was your awareness of opioid

10    diversion and abuse at the time you moved into

11    your current position?

12          A.    At the time of the move, it was, I

13    would say, probably equal to other Cardinal

14    employees that were not part of the

15    anti-diversion group.

16          Q.    So specifically what were your

17    impressions about issues around opioid diversion

18    at that time?

19          A.    I knew that we obviously

20    distributed controlled substances.  I knew that

21    we distributed C-IIs, that we had a vault that

22    those were kept in that had specific ordering

23    requirements from customers.  We had certain

24    recordkeeping requirements.
```

1          And I knew that we supplied C-III

2     through Vs that were kept in a cage that had

3     different but still restrictions around them

4     from a customer ordering and recordkeeping

5     standpoint.  And that was pretty much it.

6          Q.    And when you talk about C-II and

7     C-III through C-V, those are the schedules of

8     controlled substances --

9          A.    Yes.

10          Q.    -- according to the DEA?

11          A.    Correct.  Yes.

12          Q.    And did you have any awareness of

13     outside of Cardinal what was going on with

14     opioid abuse and diversion in the larger

15     society?

16          A.    No.  Not from a prescription

17     standpoint.  Obviously I knew of heroin and

18     cocaine and drugs like that.

19          Q.    And what marching orders were you

20     given when you came into the position?

21          A.    I was instructed to continue to

22     evolve and build out the objective data driven

23     system and to help educate the business and the

24     sales forces on the components of the program

1    and to be able to help evaluate customers.

2         Q.    And was there a specific

3    deficiency or gap that you were brought in to

4    help fill?

5         A.    Not that I was aware of, no.

6         Q.    And in your position, both from

7    the get-go until now, who are the people you

8    work with most closely?

9         A.    I mean, I work obviously with my

10   team very closely.  Every day I work with the

11   business side of the company, those that are

12   interacting more directly with the customers.  I

13   work a lot with the legal teams around all the

14   pieces that we're putting together and rolling

15   out.

16        Q.    So who are the three to five

17   people that you interact most closely with?

18        A.    Oh, gosh.

19        Q.    We won't tell them.

20        A.    Yeah.  I don't know if I could

21   come up with only -- on a weekly basis, it's

22   probably 50 people that I interact with.

23        Q.    Okay.  And do you have a deputy, a

24   number two?

Highly Confidential - Todd Cameron

 1          A.    I have a next level down of direct
 2   reports, but I've got more than one.
 3          Q.    How many?
 4          A.    Four.
 5          Q.    Okay.  And who are they?
 6          A.    Kimberly Soisson, Patrick Dudley,
 7   Rich Ryu, R-y-u, and Danielle Roberts.
 8          Q.    And who is your counterpart on the
 9   sales side of Cardinal?
10          A.    I don't believe that I have one.
11          Q.    Okay.  So since you started in
12   your SVP role in compliance, what has been your
13   role in developing and implementing Cardinal's
14   suspicious order monitoring program?
15          A.    Can I go back one question?
16          Q.    Yes.
17          A.    So from a counterpoint standpoint
18   when I said I didn't have one, there are SVPs on
19   the sales side, but they're broken up by
20   specific classes of customer trade.
21          Q.    Okay.
22          A.    So I don't have a one to one, but
23   there are four or five other SVPs that handle
24   the business side of things that I interact

Highly Confidential - Todd Cameron

```
 1   with.

 2           Q.    Okay.  Thank you for clarifying

 3   that.

 4           A.    And I apologize.  Can you ask the

 5   question again?

 6           Q.    Yes.  So since you took your

 7   position as SVP on the compliance side in 2012,

 8   what has been your role in developing and

 9   implementing Cardinal's suspicious order

10   monitoring program?

11           A.    I came in in September of '12, and

12   the foundational work of a lot of the components

13   that were going to be used to evaluate customers

14   had already been identified.  And I've been

15   involved in constantly enhancing the use of

16   those.  As obviously numbers continue to change,

17   areas of diversion change.  So I've been

18   involved in continuing to evolve the core

19   components of the program that were in place

20   when I got there to where we are today.

21           Q.    And that program, when did the

22   building out of that start?

23           A.    I don't know.  It was in place --

24   it had been going on when I arrived in September
```

1   of '12.

2            Q.    Okay.  And when you got started in

3   your position, what kind of work did you do to

4   familiarize yourself with the elements of the

5   program?

6            A.    I spent a lot of time with the

7   leadership of the groups that touched the area

8   that I was involved in and then all the

9   individuals that had been doing a lot of work

10  prior to my arrival.

11           Q.    And is that the same group that's

12  in those roles today, or was it a different

13  circle of people?

14           A.    It was a slightly different circle

15  of people.

16           Q.    So who else was in that mix?

17           A.    Bob Giacalone, Gilberto Quintero,

18  Linden Barber, Nick Rausch.

19                 Those are the names.

20           Q.    And are those individuals still in

21  compliance functions at Cardinal?

22           A.    One has left compliance and moved

23  into the business side, and one has retired.

24           Q.    Which ones?

Highly Confidential - Todd Cameron

```
 1            A.    Bob has retired, Bob Giacalone has

 2     retired, and Nick Rausch has moved into the

 3     business.

 4            Q.    And the other two are still in

 5     compliance at Cardinal Health?

 6            A.    Yes.  Now -- I'm sorry.  When I

 7     say that, Linden was actually outside counsel at

 8     the time and did not become in-house until about

 9     a year ago.  But I worked with him extensively.

10            Q.    And over the period you've been in

11     this current role, have you ever received any

12     feedback from Cardinal that things weren't

13     moving quick enough, that you weren't doing

14     enough, any concerns expressed to you either

15     about the program or your performance?

16            A.    No.

17            Q.    Any concerns about the design of

18     the compliance program, the pieces of it, as you

19     talked about it?

20            A.    No.

21            Q.    Okay.  And what about the

22     implementation of the compliance program, any

23     concerns expressed about that?

24            A.    No concerns on any of the three
```

Highly Confidential - Todd Cameron

1   you just asked.  Just obviously constant

2   discussion, awareness, making sure that all the

3   bases were covered.

4           Q.    Okay.  Who do you report up to in

5   having those conversations?

6           A.    I report to Craig Morford.

7           Q.    Whose position is?

8           A.    I believe he is chief legal and

9   compliance officer.

10          Q.    Have you made any recommendations

11  to Cardinal about its compliance efforts that

12  haven't been adopted?

13          A.    No.

14          Q.    Any places that, as you sit here

15  now, you think Cardinal could be working more

16  effectively to prevent diversion?

17          A.    No.

18          Q.    Any improvements that are on your

19  wish list of things to get done in the year or

20  years ahead?

21          A.    Again, we are constantly evolving

22  and improving the system.  And we literally on a

23  weekly basis will be evaluating threshold

24  setting, threshold methodology, threshold

Highly Confidential - Todd Cameron

1   events, to determine if we are setting the dials

2   correctly.  But I don't have a specific thing

3   that has to happen.

4           Q.    Okay.  So you are satisfied that

5   there aren't currently any shortcomings in

6   Cardinal's compliance efforts or anti-diversion

7   efforts that need to be addressed?

8           A.    From Cardinal's distribution

9   position that we sit in in the supply chain, no.

10          Q.    And when you qualify that

11  response, what are you excluding?

12          A.    I mean it would be great if there

13  was something we could do to decrease the

14  overprescribing of opioids.  That would

15  obviously help a ton.

16          Q.    Okay.  Do you participate in your

17  current role at Cardinal in any trade

18  associations related to distribution or

19  compliance?

20          A.    Does HDA qualify as one?

21          Q.    In my book, yes.

22          A.    Then, yes, HDA.

23          Q.    And HDA is?

24          A.    I'm not sure -- they've changed

Highly Confidential - Todd Cameron

1   their name recently.  I'm not sure what HDA

2   stands for.

3           Q.    Okay.  Does it sound like the

4   Healthcare Distribution Alliance?

5           A.    I think so, yes.  There used to be

6   an M in there maybe.

7           Q.    Used to.

8           A.    Yeah.

9           Q.    They rebranded.

10          A.    Yes.

11          Q.    What is your role on Cardinal's

12  behalf in the HDA?

13          A.    Representing Cardinal on the calls

14  that take place with HDA and other distributors

15  around DEA compliance, anti-diversion issues,

16  new regulations that could be coming out from

17  either the federal government or specific state

18  governments.

19          Q.    Are there other people from

20  Cardinal who participate in those calls?

21          A.    There are.

22          Q.    Who else?

23          A.    I don't know everybody.  I know a

24  lot of the regulatory lawyers are involved in

Highly Confidential - Todd Cameron

```
 1    those calls.  Gary Cacciatore, Martha Russell,

 2    to name two of the attorneys that I think were

 3    usually on those calls.

 4           Q.    And how often do those calls

 5    happen?

 6           A.    I don't know that there's a

 7    specific cadence.  I would say it probably feels

 8    like maybe monthly.

 9           Q.    And do you have an official role

10    in HDA?  Do you serve on a board or a committee?

11           A.    No.

12           Q.    And, to your knowledge, does

13    anybody from Cardinal serve on the HDA's board

14    or committee?

15           A.    I don't know.  If they would, I

16    wouldn't know it.

17           Q.    Okay.  Are there any other

18    industry associations or organizations with

19    which you are involved?

20           A.    No.

21           Q.    Any associations that

22    manufacturers of opioids also participate in?

23           A.    That I'm involved?

24           Q.    Yes.
```

Highly Confidential - Todd Cameron

```
 1          A.    No.

 2          Q.    From your involvement in HDA

 3    calls, is that only distributors of prescription

 4    and other healthcare products or manufacturers

 5    as well?

 6          A.    I believe on the calls that I'm

 7    on, I think it's only distributors.  But I know

 8    there are a lot of other HDA calls that

 9    different groups are involved in that I'm not

10    on.

11          Q.    Okay.  And the calls you

12    participate in, is there a particular subject

13    area or group that they fall within?

14          A.    Usually related around controlled

15    substances.  And, again, a lot of it's been

16    around potential new regulations coming out from

17    specific state Boards of Pharmacy lately.

18          Q.    Okay.  And I take it there are

19    e-mails that flow from HDA to you and other

20    members of that group about those topics?

21          A.    I'm sure there are.

22          Q.    Okay.  Do you recall specifically?

23          A.    I do not.

24          Q.    And you mentioned that those calls
```

Highly Confidential - Todd Cameron

1    have been about regulatory developments.

2          A.    Yes.

3          Q.    Have there been discussions in

4    particular about DEA guidance and authority and

5    enforcement?

6          A.    The two subjects that I think have

7    been the most common lately that I can

8    specifically recall are Ohio is putting out a

9    new regulation around controlled substance

10   distributions, the things that distributors are

11   required to do from a due diligence standpoint.

12   And New York has put out or is putting out an

13   opioid tax.  Those have been -- probably the

14   last 15 calls I've been on have been about one

15   of those two subjects.

16         Q.    Okay.  And over the course of your

17   tenure, going back farther than the last couple

18   of weeks or months, are there other topics you

19   recall discussing?

20         A.    No.

21         Q.    Have there been any issues that

22   have come up relating to the State of Montana?

23         A.    No, not that I can recall.

24         Q.    Have you all discussed any issues

Highly Confidential - Todd Cameron

```
 1   relating to Congressional oversight or inquiries

 2   related to the distribution of opioids?

 3           A.    Not any calls I've been on.

 4           Q.    Any discussion of litigation over

 5   the distribution of opioids?

 6           A.    Not on any calls I've been on.

 7           Q.    Or state enforcement activity?

 8           A.    Other than the potential reg

 9   changes, no.

10           Q.    And have you personally

11   participated in any meetings with the DEA about

12   Cardinal's compliance?

13           A.    Yes.

14           Q.    And how often and when?  Can you

15   give us some details on that?

16           A.    I've been to DEA headquarters

17   three times since I've been in the role.

18           Q.    So this is going to be a piece of

19   cake compared to that.

20           A.    Yes.  They wouldn't let me stand

21   up either.

22                 I think I was there twice in 2015,

23   or maybe once in '15 and once in '16.  I can't

24   remember the exact time frame.  And then I was
```

Highly Confidential - Todd Cameron

 1   there again in the last six months.

 2        Q.   And what were the specific issues

 3   that were discussed during those meetings with

 4   the DEA?

 5        A.   We wanted to show our

 6   anti-diversion program to DEA, make them aware

 7   of kind of how we were doing the things that we

 8   were doing, and talk to them about understanding

 9   the suspicious orders that would be coming from

10   us.  And then have conversations about trying to

11   have collaborative discussions to help both of

12   us in controlling diversion.

13        Q.   And who did you meet with at DEA?

14        A.   So the first two times Lou Milione

15   was the acting deputy administrator, I believe

16   was the title, and then probably ten people on

17   his staff.  I can't remember all the specifics.

18   I remember Lee Reeves was in one of those

19   meetings.

20             And then this last time was with

21   probably about eight individuals from DEA.  I'm

22   not sure exactly what level everyone was.  But

23   Tom Prevoznik was the one -- was kind of, I

24   think, the ranking member of the room.

Highly Confidential - Todd Cameron

1      Q.    Okay.  And so when you say you

2   talked generally about your program and

3   suspicious orders DEA would be seeing, what

4   issues were you specifically lifting up for DEA?

5      A.    I wanted DEA to understand the

6   filters that we used to evaluate customers, and

7   to get some of their feedback on those filters.

8   And then, again, to explain how we were using

9   thresholds to control the controlled substance

10  distributions that we were making to customers

11  that would lead to suspicious orders.

12     Q.    When you say "filters," what do

13  you mean by that?

14     A.    All of the objective criteria that

15  we use to evaluate a customer's business model,

16  the contextual size of the pharmacy, the

17  controlled substance ratios, potential mixes

18  within specific controlled substances from a

19  strength standpoint.  Those types of things.

20     Q.    And was there any specific event

21  or initiative that sparked any or all of those

22  meetings?

23     A.    No.

24     Q.    And other than those three

Highly Confidential - Todd Cameron

```
1   meetings, had you previously had any meetings

2   with the DEA?

3         A.    No.

4         Q.    And did you give any kind of

5   materials or presentation to DEA?

6         A.    We presented each time to DEA, but

7   didn't leave anything.

8         Q.    Okay.  PowerPoint, I assume?

9         A.    Yes.

10        Q.    Okay.  And who else was with you

11  from Cardinal?

12        A.    The first time I went was Craig

13  Morford and Bob Giacalone.  The second time I

14  went was Bob Giacalone and Al Santos who had

15  just retired from DEA.  And then this last time

16  I went, it was just me and Linden Barber.

17        Q.    And during each of those meetings,

18  did you get any feedback from DEA about what you

19  all were doing?

20        A.    We did.

21        Q.    And what was that feedback?

22        A.    A lot of acknowledgment of

23  understanding now kind of how we set thresholds

24  and the effects that that then has on the number
```

Highly Confidential - Todd Cameron

1    of suspicious orders that we report to DEA.  And

2    obviously DEA is not going to give you the Good

3    Housekeeping seal of approval, but they told us

4    that we were looking at all the right components

5    and looking at them in the right manner to run

6    an anti-diversion program.

7         Q.    And when you talk about the

8    thresholds you were using to generate suspicious

9    orders --

10        A.    Yes.

11        Q.    -- again, what you were you trying

12   to clue DEA into?

13        A.    So we -- one of the core

14   principles of our program is that we are going

15   to use thresholds to ensure that the controlled

16   substance distributions we make to customers

17   make sense.  And that can be very tricky when

18   you have pharmacies that buy from three, four,

19   or five different wholesalers.

20              So we are focused on the slice, if

21   you will, of a business that comes to us from a

22   pharmacy, that we're going to ensure that that

23   specific slice looks within a normal range.

24              So you could have a pharmacy

Highly Confidential - Todd Cameron

1  that's very large and all in.  They look normal.

2  And their ratios make sense.  The volumes make

3  sense for the contextual size of the pharmacy.

4  But for whatever reason, they only want to give

5  you 20 percent of their total control and

6  non-control volume.  We're going to make sure

7  that that 20 percent slice looks normal.  Even

8  though in the total contextual size of the

9  customer, they could be fine, but you could be

10  getting a disproportionate share of controls

11  from one wholesaler.  We are going to force that

12  volume to look normal based on how we set

13  thresholds, which can lead to a lot more

14  threshold events.

15          We wanted DEA to kind of get some

16  visuals of how we do that so they would

17  understand why we were reporting the number of

18  suspicious orders and the levels of pill volume

19  that was triggering suspicious orders for

20  potential customers.

21          Q.    And were there any specific types

22  of customers or regions on drugs on which you

23  were focused with DEA, or was this an overall

24  presentation?

Highly Confidential - Todd Cameron

```
 1          A.    The focus from a drug standpoint

 2    was oxycodone and hydrocodone.  And we talked

 3    about other drugs as well.  But obviously those

 4    are two of the main drugs that are abused today.

 5    So we spent a lot of time on those drugs.  But

 6    there was no specific regionality to it.  We

 7    were looking at the entire country as a whole.

 8          Q.    And you said a couple of minutes

 9    ago that DEA doesn't give a Good Housekeeping

10    seal of approval.

11          A.    Yes.

12          Q.    Is it true that DEA also

13    specifically says, "It's your job to design and

14    operate an effective program"?

15          A.    That's what the reg says, yes.

16          Q.    Okay.  And that's what DEA, I

17    assume, also reiterates to you in these

18    meetings?

19          A.    Yeah.  Yes.

20          Q.    Have you ever done any meetings

21    with members of Congress on Cardinal's behalf?

22          A.    No.

23          Q.    Any other regulators?

24          A.    I've met with the Ohio Board of
```

Highly Confidential - Todd Cameron

```
 1   Pharmacy.  I'm trying to think -- I've met with

 2   several DEA field offices.  I think that's it.

 3          Q.    Okay.  Do you know if you've ever

 4   met with the DEA field office that covers the

 5   State of Montana?

 6          A.    I don't know what office that

 7   would be.  I know I met with the DEA office that

 8   is in Houston.

 9          Q.    What about Denver?

10          A.    I didn't go to Denver.  Houston.

11   And then I met with the office that is in

12   Louisiana.  I think the office is actually

13   Mississippi, but they cover Louisiana.  Those

14   are the two that come to mind.

15          Q.    Okay.  And in terms of the overall

16   focus of Cardinal's compliance efforts, you

17   mentioned that the DEA meetings focused on

18   oxycodone and hydrocodone.  Is it those two

19   drugs that you and Cardinal have been focused on

20   or drug families?

21          A.    No.  There are over 100 DEA base

22   codes or drug families that we monitor.  We've

23   got thresholds for every single one of those for

24   every customer that we have.
```

Highly Confidential - Todd Cameron

1    Q.    In terms of the bulk of your

2  efforts, though, what drugs are you really

3  spending time worrying about and addressing?

4    A.    We're focused on literally all 100

5  of the drug families from a methodology

6  standpoint.  But the majority of our threshold

7  events are for either oxycodone or hydrocodone.

8    Q.    Okay.  And when you're talking

9  with your team as you've mentioned about

10  compliance, how much of your attention is on

11  opioids as opposed to other problem areas?

12    A.    The majority.

13    Q.    All right.  So now in applying

14  your thresholds and evaluating and identifying

15  suspicious orders --

16    A.    Yes.

17    Q.    -- Cardinal relies on the order

18  data you have for your customers; is that

19  correct?

20    A.    That is one component of it, yes.

21    Q.    Okay.  What are the other data

22  sources that you look at?

23    A.    We have incorporated data from the

24  DEA that has been published.  We've incorporated

1    data from the CDC, data from IMS, and data from

2    Symphony Health.

3            Q.    What was the last one?

4            A.    Symphony Health.

5            Q.    Okay.

6            A.    It used to be called Wolters

7    Kluwer, if that rings any bells.

8            Q.    And I'm going to regret asking you

9    this question, but let's break those down.

10               So the data you get from ARCOS I

11   assume is the public reports that they do?

12           A.    So the DEA publishes things

13   like -- and I'll butcher the name.  But

14   dangerous drugs and something report that is

15   probably created from the ARCOS data.  But it's

16   more aggregate level data across regions around

17   total opioid volumes and the -- I can't think

18   the word.  For the manufacturers to -- the quota

19   data.

20           Q.    And so when you talk about

21   Cardinal's 20 percent, for instance, with a

22   customer, the DEA's data gives you the whole

23   picture of all distributors?

24           A.    Not at a customer level.  Just

1   across broad geographies, yes.

2          Q.    All right.  So that's the DEA

3   data.

4          A.    Yes.

5          Q.    And then I think the next thing

6   you mentioned was CDC.  What dataset is that?

7          A.    So there's a lot of CDC reports

8   that we've used that look at prescribing, the

9   rate of prescribing, for example, for opioids;

10  is that going up?  Is that going down?  Average

11  pills per prescription.  Those types of things.

12         Q.    And when you look at the CDC data,

13  are you looking at data on overdoses and

14  hospitalization or any of the other kind of

15  wonder data?

16         A.    We're focused on understanding

17  what the prescribing volumes are of those opioid

18  prescriptions.  And, again, kind of pills per

19  script.

20         Q.    Okay.  So does that mean you're

21  not looking at hospitalization and overdose

22  data?

23         A.    When you look at a lot of those

24  things, it includes opiates.  So it's got

1   heroin.  It's got the illicit street fentanyl

2   drug, which obviously we don't distribute.

3               So it has a lot of those things

4   factored in.  And you can't tell necessarily how

5   much were driven from which.  So there's not a

6   lot of value to us in that.

7               But, again, we're setting

8   thresholds at the customer level.  So there's no

9   way to determine which customer from what

10  pharmacy might have gone to a specific hospital

11  obviously.

12      Q.    Okay.  So your -- just because I

13  want to get us to an answer on this --

14      A.    Yes.

15      Q.    -- understanding the reasons --

16      A.    Yes.

17      Q.    -- Cardinal is not looking at

18  overdose or hospitalization data to help you

19  focus on particular regions of the country or

20  drug sources, for instance?

21      A.    No.  We're focused on aggregate

22  level dispense data from other sources that we

23  could tie back to actual prescription

24  medications that are filled at pharmacies.

Highly Confidential - Todd Cameron

 1          Q.    And are you saying, Mr. Cameron,

 2    that that data on hospitalizations and overdoses

 3    doesn't serve a useful role for your compliance

 4    program?

 5          A.    Yeah.  I'm not sure how we would

 6    be able to take hospitalization data that,

 7    again, would include things like heroin and

 8    figure out how to tie that back to a specific

 9    pharmacy's level of prescriptions that they

10    filled.  So I'm not sure how we would use that.

11          Q.    Okay.  So you wouldn't use it, for

12    instance, to see that there has been a spike of

13    overdoses in a particular state and know that

14    you want to look more closely at those

15    customers, for instance?

16          A.    We look at all 40,000 customers

17    that we distribute to regardless of what

18    overdose rates look like.

19          Q.    Okay.  So that was CDC data.

20                I think the next you mentioned was

21    IMS data.

22          A.    Yes.

23          Q.    And what data do you get from IMS?

24          A.    Again, there are a lot of

Highly Confidential - Todd Cameron

```
 1    published IMS sources that look at prescribing

 2    rates, pills per prescription, the morphine

 3    milligram equivalences, grams across those

 4    medications.  So IMS gives us very good high

 5    level industry data of what the trends are from

 6    a prescribing standpoint.

 7           Q.    Okay.  So what the volume of

 8    prescriptions are --

 9           A.    Yes.

10           Q.    -- what the nature of

11    prescriptions are?

12           A.    Exactly.

13           Q.    Okay.  And that's proprietary data

14    that Cardinal purchases, correct?

15           A.    No.  It's -- well, I don't know

16    the answer.  I know it comes from IMS.  I'm not

17    sure -- there are a lot of groups within

18    Cardinal that work directly with IMS.  It's not

19    just anti-diversion stuff.  So I'm not sure if

20    it was stuff that was purchased or if it was

21    stuff that was published publicly by IMS or not.

22           Q.    Okay.  And are there particular

23    datasets from IMS that you use most heavily?

24           A.    No.  I mean, I think they're very
```

Highly Confidential - Todd Cameron

1   good on the prescribing trends and what the

2   morphine milligram equivalences are.  Those are

3   probably the two main things.

4          Q.    Okay.  And do you use morphine

5   milligram equivalence or MMEs in setting

6   thresholds?

7          A.    We use it to evaluate customers.

8   And then part of that evaluation will be to set

9   the threshold.

10         Q.    So tell me what I said wrong that

11   you are correcting.

12         A.    So we set thresholds off of the

13   contextual size of the pharmacy, how big is the

14   pharmacy from a total scripts control versus

15   non-control, and then what are the pills that

16   the pharmacy is requesting and potentially

17   dispensing.

18         Q.    And the pills are the dosage

19   count?

20         A.    I'm sorry.  Yes.  Dosage units,

21   yes.

22         Q.    Okay.

23         A.    The MME helps us level set the

24   strength of opioids, for example, across the

Highly Confidential - Todd Cameron

1    opioids.  So it allows us -- because you could

2    have a pharmacy whose pill count is much lower

3    than other pharmacies but their MME could be

4    higher.  So you can't just focus on the pills

5    themselves.  You've got to evaluate all of that

6    context around those ratios.

7           Q.    And is that something that happens

8    within the data system that's setting and

9    applying thresholds, or is that something that

10   happens when a Cardinal investigator looks at a

11   particular customer that's been flagged?

12          A.    It's any time that we are

13   reviewing a specific customer, we're reviewing

14   that MME data.

15          Q.    Okay.  So it's not built into the

16   threshold levels themselves?

17          A.    No.

18          Q.    Okay.

19          A.    And it would be very -- back to my

20   DEA meeting.  Walking them through the program,

21   we report ARCOS data and suspicious orders at

22   the dosage unit level.

23                And, again, when you are focused

24   on ensuring that the volumes we distribute make

Highly Confidential - Todd Cameron

```
1    sense for the contextual size and share of that

2    size that comes through to Cardinal for that

3    specific pharmacy, if we kind of went the route

4    you were describing, we now would be reporting

5    suspicious orders to DEA on much lower pill

6    levels which would probably not make a whole lot

7    of sense and causing more confusion.

8              So it's very valuable for us to

9    evaluate the customers themselves, but we don't

10   use that specifically to set the threshold.

11        Q.    Okay.

12        A.    If that makes any sense.

13        Q.    Okay.  I think the next data

14   source you mentioned was Symphony or --

15        A.    Yes, Symphony Health.

16        Q.    Okay.  And what data do you get

17   there?

18        A.    Symphony, very similar company to

19   IMS as far as the output data-wise.  And

20   Symphony we get blinded industry data for

21   pharmacies of overall size of the pharmacy,

22   oxycodone, hydrocodone volumes, opioid volumes.

23   Those types of things.

24        Q.    And so that's by pharmacy without
```

Highly Confidential - Todd Cameron

```
 1    identifying the pharmacy?

 2         A.    Exactly.  Yes.

 3         Q.    So what does that let you see?

 4         A.    It allows us to understand what

 5    normal is across the country.  It allows us to

 6    understand what a normal deviation range is.  It

 7    allows us to segment customers based off of risk

 8    and to say, "This area should have this many

 9    customers to look normal," and that type of

10    thing.

11         Q.    Explain that last point to me.

12         A.    It allows us to understand what

13    the bell curve looks like and how many fall into

14    which part of the curve.

15         Q.    Have I missed any data source that

16    you're using in your anti-diversion efforts?

17         A.    You mentioned the -- our own

18    Cardinal internal customer distribution data.

19         Q.    Okay.  So now Cardinal has -- when

20    we talk about Cardinal's order data, you have

21    data on your customers, controlled substances

22    and non-controlled substances.

23         A.    Purchase-wise.  Can I add one

24    thing back to your previous question?
```

Highly Confidential - Todd Cameron

```
 1          Q.    You can.

 2          A.    We also do have --

 3          Q.    That's actually the joy of being

 4   in your position.  You can always --

 5          A.    Well, I feel bad for her.

 6                We also do have certain customers

 7   that sign what we call a data feed.  It allows

 8   us to see at the pharmacy level their

 9   adjudicated dispensing data.

10          Q.    Their adjudicated?  What does that

11   mean?

12          A.    It means it's the data that runs

13   through the switch for third-party

14   reimbursement.  So it does not include cash.  So

15   it's not a complete picture.  In some cases, it

16   could be 100 percent.  In some cases, it could

17   be 50 percent.  So it really varies by customer.

18          Q.    Okay.

19          A.    We also have that.

20          Q.    Okay.  And how many of your

21   customers, what proportion of your customers,

22   provide that data feed?

23          A.    I don't know the exact number.

24   Speaking of like in the retail space, it's
```

Highly Confidential - Todd Cameron

```
 1    probably half of the customers.  But I will tell

 2    you it's probably 80-plus percent of the volume.

 3             Q.    And that's true for controlled

 4    substances in particular?

 5             A.    Both equally.

 6             Q.    Okay.  And when we talk about

 7    these data sources, by the way, these are the

 8    same data sources that you've had available to

 9    you for your tenure in this position?

10             A.    We started purchasing the Symphony

11    data in 2013.

12             Q.    Okay.

13             A.    But everything else, yes.

14             Q.    Okay.  Now, I have to remember.

15    Yes.

16                   So Cardinal's order data includes

17    controlled and non-controlled substances that

18    you sell to your customers, correct?

19             A.    Yes.

20             Q.    And that's different than what you

21    report to the DEA in ARCOS, which is only

22    controlled substances?

23             A.    Yes.

24             Q.    Okay.
```

Highly Confidential - Todd Cameron

```
 1          A.    And I say yes to that.  I think

 2    ARCOS is C-IIs.  And then the narcotic

 3    analgesics that are III through Vs, I don't

 4    think -- it's not all controlled substances that

 5    are part of ARCOS.

 6          Q.    But you don't report to DEA any

 7    non-controlled substances?

 8          A.    Correct.

 9          Q.    Okay.  And so Cardinal can look at

10    how many controlled substances a customer or

11    customers in general are buying relative to

12    their non-controlled purchases?

13          A.    Yes.

14          Q.    And I think you mentioned earlier

15    that there's a ratio to that.

16          A.    Yes.

17          Q.    What is that ratio that triggers

18    an alert for Cardinal?

19          A.    I hesitate on the word "alert."

20    Sorry.  Again, we're reviewing every customer

21    that we distribute to.  If you're asking me kind

22    of like what's normal.  You know, that

23    20 percent line is about what I would say is a

24    normal ratio, 20 percent of controls to total.
```

Highly Confidential - Todd Cameron

```
 1            Q.    Okay.  So you would -- to make

 2   sure that I understand it and the record is

 3   clear --

 4            A.    Yes.

 5            Q.    -- Cardinal would expect that your

 6   customers are buying no more than 20 percent of

 7   their orders are for controlled substances?

 8            A.    No.  20 percent, I would tell you,

 9   is probably the average line across the country.

10            Q.    Okay.

11            A.    For not just Cardinal.  For the

12   industry as a whole.

13            Q.    Okay.  And so how do you integrate

14   that 20 percent ratio into your compliance

15   efforts?

16            A.    As we're reviewing customers, that

17   is one of the factors we look at, to see what

18   that control percentage is.

19            Q.    Okay.  And is that applied within

20   these datasets to identify customers who you

21   ought to be looking at?

22            A.    Yes.

23            Q.    Okay.  And I'm responding to a

24   hesitance in your face as you answer that.
```

Highly Confidential - Todd Cameron

1              So is there some scan that

2    Cardinal is doing of its order data to identify

3    customers who purchase -- whose orders include

4    more than 20 percent controlled substances?

5         A.    And I hesitated on the term

6    "orders."

7         Q.    Okay.

8         A.    So obviously a lot of orders

9    themselves will just be controlled substances.

10   So 100 percent of that order would be controls,

11   especially because CSOS and the 222 forms that

12   customers use to order C-IIs, nothing goes on

13   there but C-IIs.  So that order would be

14   100 percent for controls always.

15        Q.    So when you're looking at a

16   customer's data to apply that ratio --

17        A.    Yes.

18        Q.    -- are you looking at monthly

19   data, annual data?

20        A.    Monthly.

21        Q.    Okay.  And is that a fixed monthly

22   period, or is it a rolling 30-day period?

23        A.    The review would be a fixed month.

24   And I hesitated because we have monthly

1    thresholds, but they're staggered during the

2    month.  So some are set on the 8th, some on the

3    15th, some on the 22nd.  So everybody's

4    threshold doesn't reset on the same day, but the

5    review takes place during that calendar month.

6            Q.    Okay.  And are the different

7    threshold periods staggered by customer segment?

8            A.    They're staggered by customer

9    segment and by distribution center.

10           Q.    Okay.

11           A.    It allows us to put greater focus

12   on reviewing that customer when the held order

13   takes place.  Because they don't all happening

14   at the end of month at the same time, for

15   example.

16           Q.    Okay.  Based on Cardinal's order

17   data, we've talked about the fact that you can

18   look at controlled and non-controlled substances

19   across a customer's orders and across your

20   customers.  I take it you can also look at how

21   controlled substances are purchased together?

22           A.    Yes.

23           Q.    And is Cardinal looking, for

24   instance -- are you able to look at whether a

Highly Confidential - Todd Cameron

1   customer is buying certain combinations of

2   controlled substances or non-controlled

3   substances that may signal diversion?

4          A.    Yes.

5          Q.    And what are those combinations

6   you're looking for?

7          A.    We're looking at opioids overall,

8   so not just oxycodone and hydrocodone, all the

9   opioids combined.  We're looking at the percent

10  that's benzos.  We're looking at the percent

11  that's ADD/ADHD drugs.  Again, we're looking at

12  total controls.  We're breaking out oxycodone

13  and hydrocodone.  We're breaking out oxycodone

14  and hydrocodone within each family from a

15  strength standpoint.  Those type of things.

16         Q.    Okay.  And so when you say you're

17  looking at that, first of all, I just want to

18  establish, so you have all of those different

19  data fields?

20         A.    Yes.

21         Q.    And then when you're looking at

22  what you described there, which is combinations

23  of drugs, non-opioids, strengths of opioids, are

24  you looking at that for a threshold purpose or

Highly Confidential - Todd Cameron

1    for customer evaluation or both?

2            A.    Both.

3            Q.    Okay.  Explain how they're

4    integrated in setting thresholds in the first

5    place.

6            A.    So all of those factors, we are

7    using that data to determine should we even

8    distribute to that customer at all.  And then

9    we're using it to determine what the threshold

10   should be if we are going to distribute.

11           Q.    Okay.  And are those -- are those

12   thresholds set on a customer-by-customer basis?

13           A.    Yes.

14           Q.    So a customer in Helena, Montana

15   may have a different threshold for hydrocodone

16   than a customer in Whitefish?

17           A.    Yes.

18           Q.    And that's true even if they're in

19   the same customer segment, meaning they're both

20   small independent pharmacies?

21           A.    Yes.

22           Q.    And will they also have a

23   threshold for benzodiazepines?

24           A.    Yes, absolutely.

Highly Confidential - Todd Cameron

1      Q.    Okay.  And those may be different

2  as well?

3      A.    Yes.

4      Q.    And how many of your customers

5  have individualized thresholds versus

6  class-specific thresholds?

7      A.    We maintain over 10 million

8  thresholds on a daily basis.  So I'm not --

9  there would be a lot of overlap that your two

10  stores might have the same threshold, but they

11  don't have the same threshold on purpose to make

12  them the same.

13          It's the context for your

14  individual store versus her store would dictate

15  what that threshold looked like.  But they could

16  end up being the same.  But they're not

17  necessarily the same on purpose.

18      Q.    Are there customers for which you

19  can't set an individualized threshold?

20      A.    No.

21      Q.    Okay.  And the threshold is driven

22  by the order data --

23      A.    Yes.

24      Q.    -- for that customer, the order

Highly Confidential - Todd Cameron

1   data for other customers --

2          A.    Yes.

3          Q.    -- and the other data sources that

4   you've described --

5          A.    Yes.

6          Q.    -- correct?

7                And are you looking at the

8   population in Helena versus the population in

9   Whitefish, too?

10         A.    We're not looking at the

11  population.  But we're looking at the total

12  contextual size for the pharmacy of the control

13  and non-control volume of that pharmacy, which

14  is an indicator of the foot traffic, control and

15  specifically non-control, that's going into that

16  pharmacy.

17         Q.    And when you say "size," you mean

18  the size of the orders?

19         A.    No.  The size of the script volume

20  of control and non-control, or the pill volume

21  control and non-control.

22         Q.    Okay.  So explain that.

23         A.    So we would expect a

24  1,000-script-a-day pharmacy to do a lot more

Highly Confidential - Todd Cameron

```
1    oxycodone than 100-script-a-day pharmacy does.

2           Q.    In absolute numbers but not

3    relatively?

4           A.    I'm not sure I follow you.

5           Q.    So you would expect if that

6    1,000-script pharmacy is within the normal range

7    of having no more than 20 percent controls --

8           A.    And I'm sorry to interrupt you.

9    But 20 percent is not the range.  That's the

10   stone cold average.  It's not the range.

11          Q.    Okay.

12          A.    Yeah.

13          Q.    Okay.  And that 20 percent is all

14   the controlleds, not just oxycodone?

15          A.    Absolutely.

16          Q.    You expect that pharmacy that's

17   writing a 1,000 -- dispensing 1,000 scripts to,

18   let's say, have 100 oxycodone prescriptions that

19   it's dispensing?

20          A.    Yeah.  For example, yes.

21          Q.    Okay.  And if --

22          A.    That's not a real ratio, but that

23   would be an example number, yes.

24          Q.    Okay.  And so when you say you're
```

Highly Confidential - Todd Cameron

```
 1   looking at the contextualized footprint, tell

 2   me --

 3           A.    That that pharmacy that's filling

 4   1,000 prescriptions a day has got a lot more

 5   control and non-control volume to that pharmacy

 6   than the one that's only filling 100 scripts a

 7   day.

 8           Q.    Okay.  And how does that get you

 9   to population?

10           A.    Well, because you've got people

11   who are coming in getting prescriptions filled

12   in that pharmacy.

13           Q.    Okay.  And is there a reason

14   Cardinal doesn't look at population data?

15           A.    Again, we're using the

16   prescription volume as the indicator for the

17   contextual size ensuring that the ratios within

18   that volume looks within a normal range.

19                 But I'm not sure how you would

20   then set population to a threshold not knowing

21   what people or population went to which

22   pharmacy, especially when pharmacies border

23   other states.  And we have lots of pharmacies

24   that have customers that the closest pharmacy is
```

Highly Confidential - Todd Cameron

```
1    in the next state away that's only two miles

2    from them.

3            Q.    Right.  But you could use Zip

4    Codes and other factors to --

5            A.    You could.  But, again, you're

6    still going to have people traveling in and out

7    of, and you'd have to be able to debit from this

8    three-digit Zip.  And you wouldn't know where

9    the patient came from.

10           Q.    All right.  But you do know how

11   many pharmacies are in an area?

12           A.    You do.  But, again, you don't

13   know what patient came from what other

14   three-digit Zip Code into that three-digit Zip

15   Code, which is why we use the scripts.  And we

16   ensure that the volumes is within that -- meet a

17   normal standard.

18           Q.    How many orders of opioids does

19   Cardinal process in a year?

20           A.    I don't know the answer to that.

21   I'm not sure how many actual orders.

22           Q.    What volume of opioids, then, do

23   you distribute in a year?

24           A.    Off the top of my head, I couldn't
```

Highly Confidential - Todd Cameron

1    tell you what that number is.

2         Q.    Has that number -- all of the --

3    we've covered a lot of this, so let me just

4    catch up.

5              Does any of the data sources that

6    Cardinal purchases allow you to get a sense of

7    your market share?

8         A.    Yes.

9         Q.    And what data is that?

10        A.    The Symphony Health data does.

11   The IMS data might also.

12        Q.    And do you use that market share

13   data in inferring the other supplies of opioids

14   into an area or to a customer?

15        A.    In that data, you cannot see who

16   the customers are.  It's blinded data.  So

17   there's no way from that data to know what a

18   specific customer's other volume would be from

19   that data.

20        Q.    But you do know in an overall

21   geographic area, for instance?

22        A.    You do.  Now, the data is not

23   100 percent of the pharmacies.  So there are

24   pharmacies that are excluded.  And it could be

Highly Confidential - Todd Cameron

1    peanut buttered across the country that it's an

2    equal chunk missing from every state, or you

3    could have 100 percent in one state and only 50

4    in the other, and you would get a false sense of

5    security from that data, and that comp is

6    missing.

7         Q.    But that's true, I assume, of all

8    of the different data sources then.  There are

9    going to be gaps and overrepresentations?

10        A.    Yes.

11        Q.    Okay.  It's not distinct to the

12   Symphony data you're talking about?

13        A.    No.  Any industry data is not

14   going to be complete.  It won't give you a

15   complete picture of all the customers or all the

16   volume.

17        Q.    Okay.  Does Cardinal get any

18   information on pharmacy robberies or

19   drug-related arrests or any indications of

20   diversion, trafficking, et cetera?

21        A.    We're obviously monitoring the

22   media reports that come out every day when

23   pharmacies get raided or busted.  And then if a

24   pharmacy is robbed, we require them to provide

Highly Confidential - Todd Cameron

1    us with a copy of the 106 form that they turn in

2    to DEA so we can verify that they were robbed.

3         Q.    Okay.  So how are you using the

4    media scans you're doing, for instance, in your

5    compliance program?

6         A.    It allows us to know, one, if a

7    specific pharmacy has gotten in trouble.

8    Because the majority of the stories are usually

9    around bad patients that were selling

10   prescriptions, which we don't have any

11   visibility due to who the patient is at the

12   pharmacy level, so it helps us to know what

13   areas there's activity going on from a law

14   enforcement standpoint.

15        Q.    Okay.  So you use it to monitor

16   specific customers?

17        A.    Specific areas, yeah.

18        Q.    Okay.  So I'm sorry.  Explain how

19   the news reports get you to a specific area.

20        A.    There would be a news report that

21   says a pharmacy in Smithville USA was shut down

22   by the DEA.

23        Q.    Okay.  And then where do you go

24   from that?

Highly Confidential - Todd Cameron

1          A.      So we would take a look at

2    Smithville.

3          Q.      You'll look across all of your

4    customers in Smithville?

5          A.      Yes.

6          Q.      What will you do with those

7    customers?

8          A.      Depends.  You know, looking at the

9    ratios and the numbers, determine if we need to

10   do extra site visits on those pharmacies,

11   determine if we need to escalate them through

12   our review process.

13         Q.      And why would a particular

14   pharmacy in Smithville that has been the subject

15   of a DEA action signal that there are other

16   pharmacies in that area that may be problems

17   too?

18         A.      Well, oftentimes if that pharmacy

19   got raided, they're not going to be able to fill

20   prescriptions anymore because they've been shut

21   down.  So now that volume is going to go to the

22   other pharmacies in the area.  So we want to be

23   ahead of that volume shifting to any of those

24   pharmacies that might be our customers so we can

Highly Confidential - Todd Cameron

1    understand what's going on.

2            Q.    Meaning so that you won't have

3    thresholds cut off the supply they will need to

4    meet that customer --

5            A.    Meaning --

6            Q.    -- demand?

7            A.    Meaning that's probably not good

8    demand.

9            Q.    That's probably what?

10           A.    Probably not good demand.

11           Q.    Okay.

12           A.    If that pharmacy was raided and

13   shut down, they probably weren't filling

14   prescriptions that they should have been

15   filling, and that's probably not a volume you

16   want going to your other customers.

17           Q.    Okay.  So if you see that, an

18   increase in orders for controlled substances in

19   other pharmacies, you're going to want to pay

20   attention to that?

21           A.    Absolutely, yes.

22           Q.    And do you get any aggregate law

23   enforcement data?

24           A.    No.

Highly Confidential - Todd Cameron

1          Q.    Okay.  And Cardinal doesn't have

2     any hot spots or zones that you focus on

3     geographically?

4          A.    We look at all 40,000 customers we

5     distribute to.

6          Q.    Does Cardinal ever look at the

7     volume of opioids that goes into a jurisdiction

8     to determine whether there is likely diversion

9     in that area?

10         A.    We are setting the thresholds for

11    all 100 drug families for every customer at the

12    customer level and evaluating each pharmacy

13    individually.

14              So if you evaluate the risk of

15    those pharmacies and set those thresholds

16    properly, some of the parts can't be greater

17    than the whole.  So there would be no issue

18    there.

19         Q.    Unless you're wrong?  Yes or no?

20         A.    I'm not sure what you mean by

21    "wrong."

22         Q.    Well, it seems to me, as somebody

23    who's a lawyer and not a data person or an IT

24    person, that one check on whether the thresholds

Highly Confidential - Todd Cameron

1  have correctly calibrated the volume would be

2  whether they add up to the sum that doesn't make

3  sense --

4          A.    Right.

5          Q.    -- for the individual factors?

6          A.    And if every pharmacy makes sense,

7  then what you described can't happen.

8          Q.    Unless it happens?

9          A.    Well, it can't happen.  That's not

10  how thresholds work.

11          Q.    So then how do you explain a town,

12  Smithville in USA or Whitefish in Montana, when

13  you have a volume far exceeding the customer

14  base?

15          A.    You've got a distributor that was

16  potentially distributing too many controlled

17  substances into that area.  But, again, when

18  you're using the script volume as the context --

19  so if every pharmacy in the area is at a normal

20  range, then the sum of all those pharmacies

21  would still be at a normal range.

22          Q.    And so why wouldn't you, just as a

23  belt and suspenders step, also use a

24  population-to-supply metric just to make sure

Highly Confidential - Todd Cameron

1 that there wasn't something happening that was

2 problematic?

3          A.    And we're doing that with our

4 script data.

5          Q.    Explain how you're doing that.

6          A.    We're looking at what the ratios

7 are to the total prescriptions, control and

8 non-control, for opioids.

9          Q.    Okay.  So you have one measure,

10 but you're not doing the "We're supplying, as

11 Cardinal and as a share of a market, this many

12 opioids into a place compared to the population

13 of that place"?  You're not doing that?

14          A.    No.  No.  We're looking at the

15 script volume of those pharmacies and then the

16 share of that volume that's coming from us and

17 then analyzing the opioid volume.

18               (Reporter clarification.)

19          A.    We're using the script data to

20 ensure that the opioid volume is within a normal

21 range within the total volume of the pharmacy.

22          Q.    Okay.  Right.  But you could also

23 say, "No.  You're not using population.  You're

24 doing something different."

```
 1           A.     Yeah.

 2           Q.     Okay.  If Kelly Hubbard on the

 3   phone was to tell you hypothetically that

 4   Whitefish, Montana, population 7,000, was

 5   getting 10 million dosage units of opioids every

 6   year, would you think that there was a problem

 7   with that distribution into Whitefish?

 8           A.     I would not be able to make that

 9   assumption without seeing each individual

10   pharmacy and what each individual's pharmacy and

11   distributions and ratios look like within

12   Whitefish.

13           Q.     And what if it was a billion

14   pills?

15           A.     The opioid volume?

16           Q.     Mm-hmm.

17           A.     Again, I would need to know -- I

18   don't know how many pharmacies that are in

19   Whitefish.  I don't know what cancer centers are

20   in Whitefish.  I don't know anything about

21   Whitefish specifically.  I would need to see

22   each pharmacy individually and evaluate each one

23   of them individually.

24           Q.     And if we told you that there was
```

Highly Confidential - Todd Cameron

```
1   no cancer center or hospital in Whitefish --

2   let's take out some of the variables that I

3   understand you're putting into this with

4   reason -- would that change your view?

5            A.    Again, I would need to see each

6   individual pharmacy to make that evaluation.

7            Q.    So there's no volume of opioids

8   into a place that would be a categorical red

9   flag to you that there was diversion in that

10  area?

11           A.    I don't want to make the general

12  statement yes or no without being able to see

13  each individual pharmacy and evaluate each one

14  of those.

15           Q.    So the answer is no, there's no

16  level that would be a red flag --

17           A.    Without seeing the pharmacies.

18           Q.    -- without seeing --

19           A.    Yes, yes.

20           Q.    Okay.  Are you familiar with

21  reports that the DEA puts out, Report 4 and

22  Report 5, each year on state and Zip Code data

23  on the supply of scheduled controlled substances

24  into a jurisdiction?
```

```
 1          A.    I am not.

 2          Q.    Okay.  So obviously if you're not

 3    familiar with those, you don't review them?

 4          A.    No.  I never heard the term Report

 5    4 or Report 5 before.

 6          Q.    Okay.  Do you look at the increase

 7    of opioids into a jurisdiction year over year in

 8    looking at compliance efforts or potential

 9    diversion?

10          A.    From our distribution --

11          Q.    Yes.

12          A.    -- volume?  Yes.

13          Q.    Okay.  And how do you do that?

14          A.    We're looking at everything from

15    the customer level up.

16          Q.    Okay.  So let's go back to poor

17    Whitefish.

18          A.    Yes.

19          Q.    And I should be clear.  I'm not

20    signaling out Whitefish for any particular

21    reason.

22          A.    Yes.

23          Q.    But you would look at Cardinal's

24    overall supply of opioids into Whitefish and
```

Highly Confidential - Todd Cameron

```
 1   say, "Wow.  That went up 10 percent this year"?

 2          A.   We would look at every pharmacy in

 3   Whitefish and analyze each individual pharmacy.

 4          Q.   Okay.  So you're not looking at

 5   Whitefish as Whitefish but Whitefish as a series

 6   of individual pharmacies, that you're looking at

 7   increase of every pharmacy?

 8          A.   Yes.

 9          Q.   Okay.  That was very inarticulate,

10   but I think we understand each other.

11          A.   Yes.

12          Q.   We talked about --

13              MS. WICHT:  I only was taking a

14          breath to say we -- Todd, we've been

15          going for about an hour, and I just want

16          to check in.  If you're doing okay --

17              THE WITNESS:  I'm okay.

18              MS. WICHT:  -- it's fine to keep

19          going.  Okay.

20   BY MS. SINGER:

21          Q.   We talked about the prescription

22   data that Cardinal gets from IMS and Symphony.

23              Cardinal has a joint venture

24   called ArcLight.  Are you familiar with that?
```

Highly Confidential - Todd Cameron

```
 1              A.    I know ArcLight was a company

 2    that -- I think ArcLight has been out of

 3    business for like ten years.

 4              Q.    Okay.  Okay.  And so while -- and

 5    that would have preceded your tenure?

 6              A.    Yes.  I don't know that it's been

 7    ten years, but I don't -- I think it's been

 8    quite a while that ArcLight has been formed.

 9              Q.    So it's not in business now?

10              A.    Not that I'm aware of, no.

11              Q.    Okay.  And there's no data that

12    comes from this entity in the period that it was

13    in operation that you all used for compliance

14    functions?

15              A.    No.

16              Q.    Okay.  What about -- what are

17    Medicine Shoppe and Medicap Pharmacy.  Are you

18    familiar with those?

19              A.    I am.

20              Q.    And what are they?

21              A.    They are -- it is a franchise of

22    pharmacies that kind of operates as a co-op

23    across a common branding theme for the

24    pharmacies.
```

Highly Confidential - Todd Cameron

```
 1              Q.    So it's like a marketing

 2  assistance program --

 3              A.    Yes.

 4              Q.    -- that Cardinal provides to

 5  certain pharmacies?

 6              A.    Yeah.  It's a franchise.

 7              Q.    Got it.

 8              A.    Yes.

 9              Q.    And Cardinal owns this?

10              A.    I'm not sure what capacity.  But,

11  yes, we've got some -- something to do with the

12  Medicine Shoppe franchise.

13              Q.    Okay.  And do you distribute

14  opioids to these pharmacies, too?

15              A.    To some of them.  They don't have

16  to buy from us.

17              Q.    And do you get their dispensing

18  data?

19              A.    If they are customers that are

20  part of that batch I talked about earlier that

21  have signed up, then yes.

22              Q.    Okay.  But that's not all of them?

23  It's not a condition of their franchise?

24              A.    No.  They're not required to buy
```

1    from us either.

2            Q.    Okay.  And Kenray, are you

3    familiar with that?

4            A.    I am.

5            Q.    And what is Kenray?

6            A.    Kenray is a former regional

7    distributor in New York that Cardinal acquired

8    in the 2010, 2011, '12 time frame.

9            Q.    Okay.  And so that just became

10   part of Cardinal's operations?

11           A.    Exactly.

12           Q.    Did you acquire its data and order

13   history, too?

14           A.    Yes.

15           Q.    And do you use that for compliance

16   purposes?

17           A.    We have owned them since I've been

18   in the role the entire time.  So they all would

19   have been part of the normal Cardinal data when

20   I came on board.

21           Q.    Now, the data that you get from

22   IMS on prescribing and from Symphony and the

23   data feed --

24           A.    Yes.

Highly Confidential - Todd Cameron

 1        Q.     -- I think those are the three

 2   sources that give you prescription data and

 3   dispensing data; is that right?

 4        A.     Yeah.  I wouldn't say IMS.  IMS is

 5   more aggregate level overall industry numbers.

 6   But the other two get down to more granular.

 7        Q.     Okay.  Are there any other data

 8   sources that give you the more granular

 9   prescribing and dispensing data?

10        A.     No.

11        Q.     Okay.  And do you use that data --

12   forgive me if we've gone over this.

13            Do you use that data in your

14   granular compliance efforts?  Is that

15   integrated?

16        A.     Yes.

17        Q.     Okay.  And in what system does all

18   of this data live?

19        A.     A lot of them -- we've got

20   multiple IT systems that talk to each other that

21   some data -- partial is housed here, and other

22   pieces housed here, and we've got to pull it

23   together into a different system to use it, that

24   type of thing.

Highly Confidential - Todd Cameron

 1          Q.     Okay.  And what is the master

 2    system?

 3          A.     There isn't one master system.

 4    They're all different individual standalone

 5    systems with multiple purposes, and some

 6    purposes overlap and some don't.

 7          Q.     But from a compliance perspective,

 8    you have access to all of that data

 9    collectively?

10          A.     Yes.

11          Q.     And do you use that data in

12    setting thresholds?

13          A.     Yes.

14          Q.     Is there any data source that

15    tells Cardinal when a pharmacy dispenses drugs

16    to an out-of-state customer?

17          A.     No.

18                 Can I correct one thing I said

19    last on the question?

20                 We use all that data to evaluate

21    the customers and to understand that contextual

22    size, and that's how we set the thresholds.  So

23    it's basically what you said, but it's slightly

24    different.

1          Q.     Okay.  Tell me the difference.

2          A.     That data does not set thresholds.

3    That data helps complete the picture of the

4    customer, and that picture determines the levels

5    we're comfortable distributing.

6          Q.     Okay.  We'll come back to that.

7          A.     Okay.

8          Q.     So do your pharmacy customers tell

9    you who their biggest prescribers are for

10   controlled substances?

11         A.     Not necessarily.

12         Q.     Do some of them?

13         A.     If we ask.

14         Q.     And when would you ask a pharmacy

15   that question?

16         A.     It would depend on the specific

17   numbers and questions that we would have around

18   some of the numbers for the pharmacy that could

19   potentially lead to getting into prescriber

20   conversations.

21         Q.     So would you ask that as part of

22   your Know Your Customer process for a new

23   customer?

24         A.     It would depend on the numbers.

Highly Confidential - Todd Cameron

1      Q.     And which numbers?

2      A.     Depends on the drug.  So if

3  numbers are outside of normal ranges and that we

4  don't understand why for that type of pharmacy

5  or that contextual size, we could ask those

6  questions.

7      Q.     Okay.  But it's not part of your

8  standard onboarding unless there are questions?

9      A.     Yes.

10      Q.     And when you do have questions and

11  you get that data, do you run that prescriber

12  data against the IMS data or the Symphony data

13  or any other data source you have?

14      A.     I'm sorry.  Which data?

15      Q.     The biggest prescribers to a

16  pharmacy.

17      A.     There is no prescriber data in any

18  of that data.

19      Q.     Okay.  Do you look those

20  prescribers up in the DEA license lookup?

21      A.     Potentially.

22      Q.     When do you and when don't you?

23      A.     It will vary on the numbers of the

24  pharmacy that led to us asking the questions.

Highly Confidential - Todd Cameron

```
1          Q.    Okay.

2          A.    But if we're asking, we're going

3    to be doing some research on them.

4          Q.    Okay.  So beyond the data sources

5    that we've spent all of this time painfully

6    talking about, Cardinal has non-quantitative

7    sources of information too, right, meaning you

8    have PBCs or pharmacy consultants who are going

9    out into the pharmacies?

10         A.    Yes.

11         Q.    And how many sales representatives

12   does Cardinal have?

13         A.    Across all classes of drugs,

14   probably 500.

15         Q.    How often is a typical pharmacy

16   visited by a Cardinal sales rep?

17         A.    It depends on the overall size of

18   the pharmacy and the class of trade, but monthly

19   would be common.

20         Q.    And for a large customer, more

21   frequent than monthly?

22         A.    Could be.

23         Q.    And does Cardinal set any goals

24   for how many pharmacies its sales reps need to
```

Highly Confidential - Todd Cameron

1   visit in a particular period?

2          A.    I believe it does.  I'm not

3   involved in that process, but I know there's

4   some type of -- all the territories are

5   different sizes.  So it's not a flat number.

6   There's a bunch of factors that go into it.

7          Q.    Okay.  And how many -- and the

8   sales reps who go into pharmacies are instructed

9   to come back to Cardinal with any signs they see

10  of potential diversion?

11         A.    Yes.

12         Q.    And how many tips do you get from

13  your sales reps in a year about potential

14  diversion?

15         A.    We probably get questions from the

16  sales teams weekly.

17         Q.    And how many questions?

18         A.    It would vary by the week.

19  Sometimes one.  Sometimes five.  It would

20  depend.

21         Q.    Okay.  But somewhere in that

22  range?

23         A.    Somewhere in that range, I'd say

24  yeah.

Highly Confidential - Todd Cameron

```
1              Q.    And has that, by the way, been
2    consistent through your time period in the
3    position?
4              A.    It was much more frequent when I
5    initially took over the role just because of
6    continuing to roll out the analytic side of
7    this, that the sales force had to be very
8    involved in evaluating customers and helping us
9    understand certain pieces.  So it's leveled off
10   a little bit.  Now they understand kind of what
11   a good customer looks like versus a bad
12   customer.
13             Q.    And who do those tips or questions
14   come in to?
15             A.    It could come in to me.  It could
16   come in to anybody on my team.  It could come in
17   to a new accounts team if it's a new customer.
18   It could go to one of the field investigators.
19   It could come to anybody.
20             Q.    Okay.  You don't give standard
21   instructions on what to do with that?
22             A.    It often depends on who the person
23   is with the question, if they've got an existing
24   relationship with somebody, or depending on what
```

1   level they are could determine who they reach

2   out to.

3          Q.    Okay.  How do those tips or

4   questions come in?  Is it by phone, by e-mail,

5   by a form?

6          A.    Usually by phone.

7          Q.    And have there been any

8   instructions from Cardinal about how sales

9   representatives should document or convey

10  those -- that information?

11         A.    As far as like asking questions?

12         Q.    Or just conveying concerns.

13         A.    I'm not sure if there's a formal

14  structure to it or not.  But they know they can

15  raise their hand on any concern they have at any

16  time with any customer.

17         Q.    Okay.

18         A.    It's been very helpful for them to

19  have the process that we have, because it

20  prevents them from wasting time prospecting a

21  customer that we're going to deny or cut off six

22  months after they come on board.  So it's helped

23  them to understand the objective criteria, what

24  to look for to not waste their time trying to

Highly Confidential - Todd Cameron

1    bring on somebody that we're going to say no to.

2           Q.    And when you say no to a

3    customer --

4           A.    Yes.

5           Q.    -- do you then convey that

6    information to DEA or the Pharmacy Board, too?

7           A.    If we are denying them upfront?

8    No.  And it's a tricky process because you might

9    not have all the pieces, or you might get bad

10   information.  Then you could upset the customer,

11   and then they don't want to come back and try

12   again because we told them no.  So we don't

13   always see all the pieces until -- if they go

14   through the company process.

15          Q.    Now, you also talk presumably to

16   manufacturers of opioids about their suspicions

17   about customers, about pharmacies, for instance.

18          A.    Yes.

19          Q.    And are there particular

20   manufacturers with whom you have those

21   conversations regularly?

22          A.    There are.  I would say

23   Mallinckrodt is probably the most -- I don't

24   know if "busy" is the right word, but

Highly Confidential - Todd Cameron

1    Mallinckrodt is probably the most common.

2         Q.    Okay.  What was the word you used?

3         A.    Busy.

4         Q.    Okay.  And how long has that been?

5         A.    Since I've been in the role.

6         Q.    Okay.

7         A.    I mean, it could have been before

8    my realm.  I'm saying as long as I have been in

9    the role, that's been taking place.

10        Q.    Okay.  And who has that

11   conversation with Mallinckrodt at Cardinal?  Who

12   at Cardinal?

13        A.    It could be me -- it depends on

14   what the -- if it's a -- if they want to come

15   and talk to us about specific customers.  If

16   they say, "Hey, there's ten customers we want to

17   talk to you about," I'd be involved in that

18   conversation.

19              It could be a one-off, and it

20   could go to somebody in legal.  It could go to

21   somebody on my team.  If an investigator

22   happened to have been there when someone from

23   Mallinckrodt was there at the same point in

24   time, they might reach out to that person.

Highly Confidential - Todd Cameron

```
 1              Q.    Do you ever plan site visits

 2    jointly with a manufacturer?

 3              A.    No.

 4              Q.    And who at Mallincrodt keeps you

 5    busy?

 6              A.    Don Lohman was probably the person

 7    that I corresponded with the most.

 8              Q.    And has something happened to him?

 9              A.    No.  Something has.  I don't know

10    what has exactly changed in his role.  I don't

11    know if he's gained more things or been more

12    narrowly focused, but something has changed with

13    Don's job.  I'm not sure what it is exactly.

14              Q.    But he's not the person anymore?

15              A.    I don't want to say he's not, but

16    he might have other people under him now.  I

17    think Karen Walker was somebody who I dealt with

18    a lot, too.

19              Q.    Okay.  What about other

20    manufacturers?  Who were you frequently in

21    communication with?

22              A.    We've had communication with

23    Purdue.  We've had communication, I believe,

24    with J&J.  Mallinckrodt is the most common.
```

Highly Confidential - Todd Cameron

```
1          Q.    So if Mallinckrodt is your
2    busiest, how often are you hearing from
3    Mallinckrodt?
4          A.    It varies based on -- so it could
5    be a one-off customer.  That could be
6    frequently, or it could be once a quarter with a
7    ten-customer type of question.  So it really
8    depends on the number of customers more than the
9    frequency that kind of drives it.
10         Q.    Can you give a ballpark for how
11   many customers Mallinckrodt has raised with you
12   all?
13         A.    Hundreds.
14         Q.    Hundreds?
15         A.    Yeah.
16         Q.    Okay.  And then you mentioned
17   Purdue and J&J.
18         A.    Yes.
19         Q.    How do they compare if we're
20   talking about a number of customers?
21         A.    Volume-wise?  Not as frequent.
22         Q.    So are we talking 25?
23         A.    Yeah.  Probably someone -- again,
24   they're branded manufacturers.  Their volume is
```

Highly Confidential - Todd Cameron

```
 1    much lower.

 2         Q.    Okay.  And who is the contact at

 3    Purdue?

 4         A.    I can't remember the lady's name.

 5         Q.    And how about Johnson & Johnson?

 6         A.    I can't remember that person's

 7    name either.  We have a whole process that legal

 8    is involved in.  So there's a documentation to

 9    the request and those type of things.  So it's

10    not just me.

11         Q.    Okay.  And so who manages that

12    process at Cardinal?

13         A.    I don't know who the specific

14    person on the legal team is, but it lives in the

15    legal world.

16         Q.    Okay.  Does Cardinal give any

17    formal instructions or requests to the

18    manufacturers it buys from to notify it of

19    certain events or circumstances?

20         A.    We've had meetings with many of

21    them kind of similar to the DEA meeting to

22    review the program, the components, how it

23    works.  So a lot of the takeaways are kind of

24    understood through here's how -- because they
```

Highly Confidential - Todd Cameron

1    meet with all the wholesalers.

2              So they understand how the ABCs

3    and McKessons work as well.  So in meeting with

4    us and kind of going through those steps, they

5    understand what the things are that we're

6    looking at and why.

7         Q.    Okay.  And has that been going on

8    throughout your tenure?

9         A.    Yes.

10        Q.    And I take it, like DEA, there are

11   PowerPoints that get presented?

12        A.    Yes.

13        Q.    And do manufacturers have any

14   expectations of you as to what you're reporting

15   to them?

16        A.    Manufacturers are in a very unique

17   position because they get to see chargebacks.

18   So they know how much of all of their product is

19   going to a pharmacy from every wholesaler.  So

20   they can see pieces that we can't see.

21              They won't tell us who else is

22   supplying how much to them.  So they will ask us

23   questions about pharmacies.  Because, again, we

24   might only be seeing 20 percent of the volume of

1    that pharmacy, and they can see the other

2    80 percent.  So they've got a much better

3    vantage point at the customer level for their

4    product than we do.  So they do ask a lot of

5    questions about pieces that we're seeing to try

6    to kind of batch it all together.

7            Q.    And does that happen through these

8    formal interchanges?

9            A.    Yes.

10           Q.    Okay.  And you do that with all of

11   the opioid manufacturers?

12           A.    Every one that reaches out to us.

13   Again, there's no chargebacks in the branded

14   space.  It would only be a generic manufacturer

15   that would see chargebacks.

16           Q.    Okay.  So name the manufacturers

17   that come to mind.

18           A.    As far as?

19           Q.    As doing this chargeback and

20   review process.

21           A.    Mallinckrodt is the one that comes

22   to mind.  There's over 80, I think,

23   manufacturers.  And we don't -- we vary which

24   manufacturers we're doing business with.  So

Highly Confidential - Todd Cameron

1    we're not doing business with all 80 at one

2    time.  It could be a different ten today than it

3    is tomorrow based on profitability and

4    contracts.

5         Q.    Okay.  And in terms of your

6    contract and relationship with manufacturers, in

7    the opioid space, who are your principal

8    suppliers?

9         A.    As far as the manufacturers?

10        Q.    Yes.

11        A.    Oh, it's literally 80 of them.

12        Q.    And there are none that stand out

13   above the others?

14        A.    No.

15        Q.    Okay.  And explain how chargeback

16   data gives manufacturers a window -- explain

17   what it is granularly.

18        A.    So this is a -- I'm not the expert

19   in this area.  So I don't know if you really

20   want me to answer this question.  But

21   chargebacks at the manufacturer level get

22   submitted based off of the price the wholesaler

23   pays for the product versus what the customer

24   paid for the product.

Highly Confidential - Todd Cameron

```
1                    And if the wholesaler has to --

2     because of a contractual obligation with a

3     customer directly with the manufacturer, if the

4     wholesaler has to sell that product below the

5     wholesaler's contract cost, the manufacturer

6     makes the wholesaler whole.  In order to do

7     that, that data has to go to the manufacturer.

8     They can then see how much volume went to which

9     customer from every wholesaler.

10           Q.    And who is the expert on

11    chargeback data at Cardinal?

12           A.    I don't know.  Somebody in

13    purchasing.

14           Q.    Okay.  Now, we know that

15    Mallinckrodt has sent letters to distributors

16    saying "We want you to look at the following

17    customers" or -- you're raising your eyebrows.

18    So tell me why that is.

19           A.    Mallinckrodt doesn't send us

20    letters that say that.

21           Q.    Okay.  Are you familiar with a

22    letter that Mallinckrodt sent that was filed in

23    Cardinal Health versus Holder?

24           A.    I am not.
```

Highly Confidential - Todd Cameron

```
 1          Q.    Okay.

 2                      - - -

 3          (Montana-Cardinal Exhibit 2 marked.)

 4                      - - -

 5          Q.    So looking at Exhibit 2 --

 6          A.    Yes.

 7          Q.    -- beyond the exhibit cover page,

 8    is that letter familiar to you?

 9          A.    No.

10          Q.    Okay.

11          A.    You got the Karen Harper name

12    right there.

13          Q.    Bonus points for that.

14          A.    Thank you.

15          Q.    So you've never seen a letter like

16    this from Mallinckrodt?

17          A.    I'm sorry.  Okay.  Yes, I have.

18    So that's why I raised my eyebrows.  So this is

19    the Mallinckrodt chargeback cutoff letter is

20    what this is.

21                When you asked, you said asking

22    about a customer.  So we get these -- they're

23    not asking anything of us.  They are telling us

24    that they are no longer going to honor
```

Highly Confidential - Todd Cameron

```
 1    chargebacks for this specific customer or

 2    customers.

 3            Q.    Okay.

 4            A.    They're not asking anything of us.

 5            Q.    I'm sorry?

 6            A.    They're not asking anything of us.

 7            Q.    Okay.  And they notify you of that

 8    because it means you're no longer guaranteed --

 9            A.    Yes.

10            Q.    -- from a pricing perspective?

11            A.    Exactly.

12            Q.    Okay.  And what do you do from a

13    compliance perspective when you get a letter

14    like that?

15            A.    We cut the customer off from

16    controlled substances.

17            Q.    Invariably?

18            A.    Invariably.

19            Q.    And do you recall getting other

20    letters like that from Mallinckrodt?

21            A.    Absolutely.

22            Q.    And from other manufacturers as

23    well?

24            A.    I don't recall receiving them from
```

Highly Confidential - Todd Cameron

1  any other manufacturer, but definitely from

2  Mallinckrodt.

3          Q.    Okay.  And the reason Mallinckrodt

4  would cut off a customer from chargebacks is

5  there's something that has made them suspect

6  that customer is engaged in diversion?

7              MS. WICHT:  If you know what

8          Mallinckrodt was thinking.

9          A.    Yeah.  They don't say that in the

10  letter.  It just says they will no longer honor

11  chargebacks.  Again, knowing they can see all of

12  their volume from all sources to a pharmacy,

13  that's a logical assumption.

14          Q.    Okay.

15          A.    Which is why we stop selling them

16  controls even though it doesn't tell us to do

17  so.

18          Q.    What is the date on that letter?

19          A.    Sometime in 2011, September of

20  '11, the year before I left.

21          Q.    Okay.  And during your tenure, you

22  don't recall similar letters like that from

23  other manufacturers?

24          A.    It doesn't mean that I did not

Highly Confidential - Todd Cameron

1    receive them.  I just know that they don't come

2    with the frequency that Mallinckrodt's do.

3              Q.    Okay.  And if they did come in,

4    would you be aware of them?

5              A.    Yes.

6              Q.    Where are those letters?  I know

7    that there is a standard operating procedure

8    that refers to these letters.  Where are those

9    saved within Cardinal's system?

10             A.    That's a good question.  Because

11   Mallinckrodt is nice enough to send this to a

12   ton of people, and they BCC everybody.  So I

13   don't know who all it goes to.  But then I will

14   have ten different people in the purchasing that

15   receive this and forward it to me.  So any time

16   a letter comes out, I usually get about 20

17   copies of it.

18             Q.    And then what do you do -- where

19   does it get stored?

20             A.    We keep a file of -- a record of

21   the Mallinckrodt letters of the customers.

22   Because, again, there's no information on here

23   that's specific to the customer other than the

24   fact they've been put on the list.  Mallinckrodt

Highly Confidential - Todd Cameron

```
 1   also takes them off the list.  So you could get

 2   a letter a year later that says they've taken

 3   the customer off the list.  That's very common

 4   as well.

 5          Q.    Okay.  And then so what do you

 6   do --

 7               MS. WICHT:  Can we take a break

 8         whenever you're at a pausing point?

 9               MS. SINGER:  Of course.

10   BY MS. SINGER:

11          Q.    And so when you get a letter that

12   a customer has been reinstated, what do you do

13   with that customer?

14          A.    Do a site visit.

15          Q.    Always?

16          A.    Yes.

17          Q.    And then?

18          A.    And then determine if it's

19   somebody we're comfortable distributing

20   controlled substances to or not.

21          Q.    And do you recall how many times

22   that has happened?

23          A.    Taken off the list?

24          Q.    No.  Evaluated to put back on the
```

Highly Confidential - Todd Cameron

1     list.

2              A.    Oh, any time they get taken off,

3     we'll evaluate -- well, that's not true.  There

4     are oftentimes where we have terminated sales of

5     controls to a customer prior to the letter.  So

6     if we cut you off for our concerns, I don't care

7     if we got a letter or not from Mallinckrodt to

8     turn you back on, we'll turn you back on.

9              Q.    Okay.  So can you give me a rough

10    estimate of how many times you've heard that a

11    customer is back on the chargeback good standing

12    list?

13             A.    Sure.  Twenty.  And that's a swag.

14             Q.    And do you know roughly how many

15    of those you've ended up resuming business with?

16             A.    I don't.  But there have been

17    some.

18             Q.    And you've talked about

19    manufacturers notifying you of customers, either

20    in these meetings or through the chargeback

21    process.

22                   Are there times when Cardinal has

23    called a manufacturer and said, "Wow.  We think

24    there's something crazy happening with Smith's

Highly Confidential - Todd Cameron

```
 1    Pharmacy"?

 2            A.    I know we've had conversations

 3    with Mallinckrodt and Purdue about specific

 4    customers.

 5            Q.    And how -- why have you initiated

 6    it with those customers and those manufacturers?

 7    What is it about them?

 8            A.    One, we know they're willing to

 9    have those discussions with us.  And those are

10    two companies that come to mind that have

11    actually have come down and sat down with us and

12    talked about a process and reviewed our program.

13            Q.    And do you recall how many times

14    you've done that; referred a customer to a

15    manufacturer?

16            A.    I don't.  Again, a lot of the

17    conversations have taken place from the legal

18    department's perspective where they've had those

19    conversations and then circled back with me.

20            Q.    And has a manufacturer come to you

21    and said, "You're planning to cut off Smith's

22    Pharmacy.  They're a really good customer for

23    us.  I think you're misreading the data"?

24            A.    We've had --
```

Highly Confidential - Todd Cameron

```
 1              MS. WICHT:  Has that ever

 2         happened?  Is that what you're --

 3              MS. SINGER:  (Indicates

 4         affirmatively.)

 5              MS. WICHT:  Okay.

 6         A.    We've had manufacturers reach out

 7    and complain to us about thresholds.

 8         Q.    Okay.  Which manufacturers?

 9         A.    I can't remember.  And a lot of

10    them haven't been opioid manufacturers.  They've

11    been other controlled substances.  A

12    manufacturer would not know if we were getting

13    ready to cut a customer off.  We'd just cut them

14    off.  We wouldn't reach out before making a

15    decision.  If we see anything that concerns us,

16    we take action.

17         Q.    Okay.  So have any of them reached

18    out to you after you took action to say, "That's

19    a problem.  Why did you do it?  Reconsider."

20         A.    No.

21         Q.    And you say that some

22    manufacturers, not necessarily of opioids, have

23    raised concerns about thresholds.  Do you recall

24    whether any opioid manufacturers have raised
```

Highly Confidential - Todd Cameron

```
 1   concern about thresholds?

 2          A.    I don't think any opioid

 3   manufacturers have.

 4          Q.    And now Cardinal has marketing

 5   agreements with various manufacturers.  Is that

 6   something that you're aware of?

 7          A.    No.

 8          Q.    Do you get any data from marketing

 9   efforts that Cardinal undertakes with

10   manufacturers for your compliance efforts?

11          A.    Can you be more specific?

12          Q.    So is there any data you get from

13   various marketing programs that Cardinal is

14   running that you use in evaluating a customer or

15   otherwise looking at diversion?

16          A.    Give an example of what that type

17   of data would be.

18          Q.    So Cardinal runs copayment

19   programs --

20          A.    Oh, gotcha.

21          Q.    -- or adherence programs.

22          A.    Yes.  No, there would be no data

23   that would come out from that.

24          Q.    Okay.  Have you ever asked about
```

Highly Confidential - Todd Cameron

1   getting access to that data?

2        A.    I'm not sure what -- I follow what

3   data that would be.

4        Q.    I mean, presumably that -- I'm on

5   the outside here.  There are customer lists and

6   initiative -- things that Cardinal gets and then

7   is in touch with either patients or pharmacies,

8   right?  Does that data ever get filtered back to

9   you?

10       A.    Like distribution data?

11       Q.    I mean, again --

12       A.    I'm not sure what the data would

13  be that would be the output of that.

14       Q.    So you would be in the best

15  position to know --

16       A.    I don't think there is any data

17  that would be driven off of that.  I don't

18  think.  And if there is, I haven't seen it.

19       Q.    Okay.  Almost done with this

20  section.

21            Is there any source of data or

22  information that you use in your compliance

23  efforts that we haven't talked about?

24       A.    The only other piece would be the

1    data that we collect at the aggregate level when

2    we do site visits.

3            Q.    Okay.  And tell me what you mean

4    by that.

5            A.    So when we perform a visit on a

6    customer, we go in and we're capturing a lot of

7    the context pieces that I had referred to

8    earlier to see what that total picture looks

9    like.  We capture that information at the time

10   of the visit.

11           Q.    Okay.  And are you talking about a

12   questionnaire?

13           A.    No.  We're talking about when an

14   investigator goes in.  The pharmacy runs reports

15   while the investigator is there and gets the

16   information.

17           Q.    Okay.  So if the investigator has

18   gotten dispensing data --

19           A.    Yes.

20           Q.    -- or prescriber data?

21           A.    Yeah.  They collect aggregate

22   level dispensed, so total scripts, control,

23   non-control, total oxycodone pills, total

24   hydrocodone pills, those type of things.

Highly Confidential - Todd Cameron

```
 1          Q.     And does that get filtered into

 2     that customer's profile, or is it used more

 3     broadly by Cardinal?

 4          A.     Customer's profile, absolutely.

 5          Q.     And not more broadly?

 6          A.     It is already incorporated into

 7     the more broad data.

 8          Q.     Through the other data source?

 9          A.     Yes, exactly.

10          Q.     Okay.  Have you ever used an

11     outside vendor to assess whether there's other

12     data that Cardinal could be mining in its

13     compliance efforts?

14          A.     A vendor?  No.

15          Q.     Any kind of consultant?

16          A.     Not that I'm aware of.

17          Q.     Okay.  Have you ever worked with

18     anybody outside of Cardinal to advise you on how

19     to use the data you have more effectively for

20     compliance?

21          A.     Yes.

22          Q.     And who's that?

23          A.     Linden Barber.

24          Q.     Before he was with you?
```

Highly Confidential - Todd Cameron

```
1          A.    Yes.  He was outside.

2          Q.    Okay.  And in what entity was he?

3          A.    He was, I believe, outside

4    counsel.

5          Q.    Okay.  All right.  And have there

6    been any proposals you've received for other

7    data sources or other ways of using data you've

8    rejected?

9          A.    Not that I'm aware of.

10          Q.    Okay.  And any data which you've

11    had that Cardinal has said, "Nah, too expensive"

12    or "We don't need it"?

13          A.    I wish they could push down the

14    overprescribing.  That would help.

15          Q.    Have you ever talked to other

16    distributors about particular customers?

17          A.    About particular customers?  No.

18          Q.    Customers you've terminated or

19    rejected?

20          A.    No.

21          Q.    Have you ever talked about data

22    sources on any of these HDA calls or

23    conferences?

24          A.    Not on the calls that I've been
```

1    on, no.

2            Q.    Or with HDA generally?

3            A.    No.  And, again, I don't speak to

4    HDA a ton.  Again, there are so many different

5    Cardinal groups that interact with HDA.  I'm

6    only a small portion of it.

7                    MS. SINGER:  Okay.  We can take a

8            break now.

9                    THE WITNESS:  Thank you.

10                   (Recess taken.)

11   BY MS. SINGER:

12           Q.    All right.  So, Mr. Cameron, you

13   remain under oath.

14           A.    Yes.

15           Q.    Okay.  SOP is Cardinal terminology

16   for?

17           A.    Standard operating procedure.

18           Q.    So, as I understand it, an SOP is

19   what lays out the procedure across the country

20   on a particular process or topic; is that right?

21           A.    Yes.

22           Q.    And it's how Cardinal communicates

23   a policy or a procedure across the organization

24   or across a division; is that correct?

Highly Confidential - Todd Cameron

1          A.    Yes.

2          Q.    Okay.  So if an employee wanted to

3    figure out what to do on a particular issue,

4    they would go to the SOP, and it would tell them

5    how to handle it?

6          A.    Yes.

7          Q.    And you train your employees on

8    relevant SOPs; is that correct?

9          A.    We do.

10         Q.    And then SOPs are updated and

11   replaced and reviewed periodically.  Is that

12   true as well?

13         A.    Yes.

14         Q.    Okay.  And are employees who don't

15   follow SOPs, like, subject to discipline?  Is

16   this an important expectation?

17         A.    Yes.

18         Q.    In 2006 Cardinal and other

19   distributors received a letter from the Office

20   of Diversion Control about suspicious order

21   monitoring and anti-diversion efforts signed by

22   Joe Rannazzisi.  I assume you know what I'm

23   referring to?

24         A.    I do.

Highly Confidential - Todd Cameron

```
 1            Q.    And so -- I know this was before

 2    you were in your current position.  But do you

 3    know what Cardinal's response to that first 2006

 4    letter was?

 5            A.    As far as a response to DEA?

 6            Q.    And let me clarify.  I don't mean

 7    if you sent a responsive letter.  But what did

 8    Cardinal do or change in response to that letter

 9    as a result of that letter or following on that

10    letter?

11            A.    At that point in time, I was not

12    involved in the area in 2006 when the letters

13    were received.  So I'm not sure what changes

14    would have taken place at that specific point in

15    time.

16            Q.    And when you moved into your

17    position and acclimated yourself within the job,

18    is that not something you came across?

19            A.    I know that a lot of the changes

20    that had been made prior to my arrival had

21    connectivity back to those letters.

22            Q.    And how do you know that?

23            A.    Because we talked about a lot of

24    the components within the letters.
```

Highly Confidential - Todd Cameron

```
1            Q.    And who is "we"?  The people you

2    consulted?

3            A.    Yeah, exactly.

4            Q.    Okay.  And so what did they say

5    that connected those dots for you?

6                  MS. WICHT:  I will just give you a

7            caution here, because I think, as I

8            understand it, that at least some of

9            those conversations would have been with

10           lawyers.

11                 To the extent that you were

12           getting -- that Cardinal was getting

13           legal advice from lawyers on that, you

14           shouldn't reveal that.

15                 If there are things that you know

16           were done or discussed that weren't from

17           lawyers, then you're free to reveal

18           that.

19           A.    I know that there are multiple

20    letters.  So I'm not sure which letter

21    sequentially included which.  But I know there

22    are components in the letter that talk about

23    some of the objective pieces that we use to

24    evaluate customers.
```

Highly Confidential - Todd Cameron

1        Q.    Okay.  Meaning that Cardinal took

2    queues from those letters and made changes in

3    its SOPs or policies after those letters?

4        A.    I don't know if they took the

5    queues from the letters or if those were things

6    that they looked at prior to the letters,

7    because I came so much later than letters.  I

8    just know that some of the things in the letters

9    are components of the program.

10        Q.    Okay.  Have you seen a report that

11    was done to Cardinal's board in 2013 in

12    connection with a shareholder lawsuit against

13    the company?

14        A.    Yes.

15        Q.    Okay.  And is it accurate,

16    consistent with that report, that prior to 2008

17    Cardinal did not have an electronic system for

18    detecting and reporting suspicious orders?

19        A.    I'm not sure.

20        Q.    Okay.  Have you seen any evidence

21    that Cardinal did have such a system?

22        A.    I've not seen any components of

23    the program back at that point in time.

24        Q.    And do you -- Cardinal started

Highly Confidential - Todd Cameron

1    using thresholds in 2008; is that right?

2         A.    I'm not sure.

3         Q.    And do you know how Cardinal

4    reported suspicious orders or identified them

5    prior to 2008?

6         A.    I do not.

7         Q.    Are you familiar with excessive

8    purchase reports?

9         A.    I'm familiar with the concept.

10        Q.    Okay.  What is it?

11        A.    There was a reporting mechanism

12   that wholesalers were required to run I think at

13   the end of every month that was an algorithm

14   that came from DEA that identified shipments

15   that DEA wanted information on about customers.

16        Q.    Okay.  So, as you understand it,

17   an excessive purchase report was run on

18   customers that DEA identified with an algorithm

19   they used, or were they customers identified

20   through DEA's algorithm?

21        A.    DEA made the algorithm.  And then

22   the wholesaler ran the algorithm, and whatever

23   customers came out of being identified from the

24   algorithm, that information went to DEA.

Highly Confidential - Todd Cameron

1    Q.    Okay.

2    A.    That's my understanding.

3    Q.    Okay.  And was there any

4  suspicious order monitoring system, to your

5  knowledge, apart from the excessive purchase

6  reports?

7    A.    I don't know.

8    Q.    Did Cardinal have any procedure in

9  place not to ship orders identified in those

10  excessive purchase reports, to your knowledge?

11    A.    Again, I've got a very limited

12  knowledge of what those reports were.  But my

13  understanding is the wholesaler was supposed to

14  run them on distributions that were made.

15    Q.    Meaning that since they were

16  already made, there could be no stopped

17  shipment?

18    A.    That's my understanding.

19    Q.    Okay.  Now, as you understand it,

20  reporting a suspicious order is not the full

21  scope of Cardinal's duty under the Controlled

22  Substances Act or implementing regulations?

23    A.    Ask me that again.  Sorry.

24    Q.    Cardinal has to do more to comply

Highly Confidential - Todd Cameron

```
 1   with the law than just report a suspicious

 2   order?

 3            A.    Yes.

 4            Q.    Is that correct?

 5            A.    I believe so.

 6            Q.    Okay.  Do you have any hesitance

 7   about that?

 8            A.    I was only hesitating just from

 9   the standpoint of when you started to ask, I was

10   thinking about the reg itself around designing

11   and operating the system to identify suspicious

12   orders, and I was thinking about the specific

13   reg.  That's why I was hesitating.

14            Q.    Okay.  So it is a duty -- and

15   correct me if I'm misstating this -- to detect,

16   report, and prevent suspicious orders?  Is that

17   a correct statement as you understand it?  Or

18   put it in your own words.

19            A.    The reg specifically says that the

20   wholesaler -- that the registrant shall design

21   and operate a system to identify orders of

22   varying frequency, size, and pattern.

23            Q.    And report them promptly, report

24   them immediately to DEA?
```

Highly Confidential - Todd Cameron

```
1           A.    I don't think the reg says that.

2    That's why I was hesitating.  We do, but that's

3    what I thought.

4           Q.    Okay.  And Cardinal has

5    responsibility under the law to design and

6    operate a system that places effective controls

7    to prevent diversion?

8           A.    Yes.

9           Q.    Okay.  And that is in addition to

10   suspicious order reporting, correct?

11          A.    I believe so.

12          Q.    Okay.  So just having suspicious

13   order reports doesn't fully discharge your duty?

14          A.    Yes.  I'm not sure about the word

15   "duty" in all that, but yes.

16          Q.    Okay.  Do you know if there was an

17   SOP for stopping shipping of suspicious orders

18   prior to 2008?

19          A.    I do not know.

20          Q.    When are you aware that Cardinal

21   first had a procedure in place to stop shipping

22   suspicious orders?

23          A.    I do not know the specific date,

24   but I know that it was well before my arrival.
```

Highly Confidential - Todd Cameron

```
 1            Q.     Who was responsible for

 2   anti-diversion compliance from 2006 forward?

 3   You mentioned your predecessor.  Was there

 4   anybody else who had held that role?

 5            A.     I'm not sure.  I don't know.

 6            Q.     Okay.  So the name you gave

 7   before, I think, was Mr. Mone?

 8            A.     Yes.

 9            Q.     And is there anybody else you're

10   familiar with who had a senior role in

11   compliance before that?

12            A.     I'm not, but it doesn't mean that

13   person didn't exist.  I just had no dealings

14   with that area.

15            Q.     Are you familiar with the outside

16   vendor -- I'm sure I'm going to butcher the

17   name.  So you know where I'm going.  Cegedim

18   Dendrite.

19            A.     Yes.

20            Q.     Did I say it right?

21            A.     I don't know how to say it right

22   either, so yes.  That was good.

23            Q.     So for us, that's what it's going

24   to be.
```

Highly Confidential - Todd Cameron

```
 1          A.    I just call them Cegedim.

 2          Q.    Or we can go with Dendrite.  How's

 3   that?

 4          A.    There you go.  That's even easier.

 5          Q.    So what was their role in the

 6   suspicious order monitoring system at Cardinal?

 7          A.    So I apologize.  I don't -- there

 8   has been a lot of movement in the industry from

 9   a company standpoint.  So I'm not sure if

10   Cegedim is part of other companies or spun off

11   or got absorbed.  A lot of that part of the

12   industry has moved around a lot.  But they, I

13   know, were used at one point in time to do site

14   visits.

15          Q.    Okay.  And are you familiar with a

16   role they played in developing the threshold

17   system at Cardinal?

18          A.    I am not.

19          Q.    Okay.  You've never seen any

20   documents related to their work?

21          A.    Other than visits, no.

22                       - - -

23          (Montana-Cardinal Exhibit 3 marked.)

24                       - - -
```

1          Q.    All right.  Mr. Cameron, showing

2    you Exhibit 3, which is SOP -- the SOP on -- why

3    don't you read the title.

4          A.    "Process to Establish SOM

5    Threshold Limits."

6          Q.    Okay.  Are you familiar with that

7    SOP?  Whenever you're ready.

8          A.    I am not.

9          Q.    Either that iteration or any of

10   the later forms of it?

11         A.    Definitely not this iteration.

12         Q.    Okay.  Have you seen it in

13   subsequent forms?

14         A.    There are SOPs today around seven

15   thresholds.

16         Q.    Okay.  And it seems like that this

17   is a new -- that this is not a document or a

18   version of a document you're terribly familiar

19   with; is that right?

20         A.    Correct.

21         Q.    And how is that?

22         A.    How is that the case --

23         Q.    Yes.

24         A.    -- or how am I not familiar with

1   it?

2          Q.    So is it that SOPs, like our

3   personnel manual at my law firm, sit on the

4   shelf, or is it because -- I mean, tell me how

5   that is.

6          A.    I know the SOPs are updated

7   periodically and reviewed periodically.  When I

8   look at, for example, 0001169, I'm not sure what

9   all that stuff is.  As I read that, I'm assuming

10  that's got something to do with the DEA

11  algorithm from the previous stuff you were

12  asking about earlier.

13         Q.    Okay.

14         A.    That's my assumption.

15         Q.    Okay.  But the later version of

16  this that's current is not something that sits

17  on your desk and you refer to when you have a

18  question?  It doesn't sound that way.

19         A.    It would depend on what was being

20  discussed, the situation.  We use our working

21  guidelines much more.

22         Q.    And what are the working

23  guidelines?

24         A.    I would describe them as more

Highly Confidential - Todd Cameron

1   action oriented details around what's in the

2   SOPs.

3         Q.    So it's a level of detail beyond

4   an SOP that are more day-to-day practical?

5         A.    Yes.

6         Q.    Okay.  Do you know where the idea

7   of using thresholds for suspicious order

8   monitoring came from?

9         A.    I do not.

10        Q.    Mystery.

11        A.    They were there when I got there.

12        Q.    Okay.  And you never asked anybody

13  why; why does our system turn on this?

14        A.    Why does our system do what?

15        Q.    Turn on thresholds.  Why are they

16  such a central part of Cardinal's compliance

17  system?  Why do we use thresholds?

18        A.    Oh, I understood that it was to

19  limit the volume of controlled substances that

20  were distributed.

21        Q.    Okay.  And do you know why the

22  thresholds were the mechanism for doing that?

23        A.    I don't know that I ever thought

24  about it.

Highly Confidential - Todd Cameron

```
1           Q.     Okay.  When you first joined the

2   compliance side of Cardinal, how many people

3   were on the staff there?

4           A.     I'm not sure.

5           Q.     Can you give a rough estimate?

6   Was it 20, 100, 200?

7           A.     For all of compliance?

8           Q.     Yes.

9           A.     Hundreds.

10          Q.     Below 500?

11          A.     I don't know.

12          Q.     And how is it -- what is the size

13  of compliance now?

14          A.     Hundreds.

15          Q.     Larger or smaller than it was when

16  you first started?

17          A.     I would say larger.

18          Q.     Significantly larger?

19          A.     I don't see all the areas of

20  compliance because I'm not involved in them.  So

21  I don't know how much larger it's grown.

22          Q.     Okay.  So what is your area of

23  compliance?

24          A.     The anti-diversion controlled
```

Highly Confidential - Todd Cameron

1   substance monitoring program.

2          Q.    Okay.  And is that a division

3   within the compliance department?

4          A.    Yes.

5          Q.    Okay.  And how many people were in

6   that division when you joined it?

7          A.    I don't know the exact number, but

8   it's -- we are definitely bigger today than we

9   were when I started.

10         Q.    Okay.  And so it's some subset of

11  the hundreds.  I mean, again, are we talking

12  dozens?  Are we talking --

13         A.    As far as the increase?

14         Q.    How many people were there in 2012

15  when you -- well, yeah.

16         A.    Maybe -- I've never thought about

17  it, so I'm sorry.

18         Q.    It's okay.  I would say you're not

19  a numbers person, but you're clearly a numbers

20  person.

21         A.    But I just -- the bodies, I hadn't

22  thought about what it was then versus what it is

23  now.  Because, again, when I came in, they had

24  already started to make changes to the program.

Highly Confidential - Todd Cameron

```
 1   So a lot of the pieces were moving when I got

 2   there.  I don't know the exact numbers, what

 3   they were back then.

 4          Q.    Okay.  And so you don't know the

 5   head count now either?

 6          A.    I don't.  I guess -- can you ask

 7   me exactly what area you're asking me about?

 8          Q.    So I'm asking the anti-diversion

 9   effort that you are responsible for.

10          A.    My area specifically?

11          Q.    Yes.

12          A.    Okay.  And what's the question?

13          Q.    How many people work in it?

14          A.    About 35.

15          Q.    Okay.  And their responsibilities

16   are to run what areas of the anti-diversion

17   effort?

18          A.    The controlled substance

19   monitoring.

20          Q.    Okay.  And so that's data

21   analytics --

22          A.    Yes.

23          Q.    -- and investigations?

24          A.    Yes.
```

Highly Confidential - Todd Cameron

1        Q.    What other functions?

2        A.    Know Your Customer.

3        Q.    Okay.  Anything else?

4        A.    Those are the three main

5  components.

6        Q.    And how is your staff divided up

7  among those three?

8        A.    You want actual numbers?

9        Q.    Just roughly.  You know, most

10  people are in investigations or --

11        A.    It's pretty equally spread across

12  the segments.

13        Q.    Okay.  And do all of the

14  investigators who go out and do site

15  inspections, for instance, work in your unit?

16        A.    Yes.

17        Q.    And all of the data analytics on

18  the compliance side as opposed to the sales or

19  marketing side?

20        A.    Yes.

21        Q.    Now, thresholds are set for each

22  drug family, correct?

23        A.    Correct.

24        Q.    And so oxycodone has its own

Highly Confidential - Todd Cameron

```
 1   threshold, and fentanyl would be different for a

 2   particular customer?

 3          A.    Yes.

 4          Q.    Do you set threshold at the dosage

 5   level as well?

 6          A.    Yes.

 7          Q.    So there's a threshold for

 8   oxycodone 80 milligrams, a threshold for

 9   10 milligrams?

10          A.    For oxycodone, there's a threshold

11   at the DEA base code level, which is all

12   oxycodone family.

13          Q.    And so where does dosage come in?

14          A.    At that level.

15          Q.    Okay.  Meaning the DEA base code

16   incorporates dosages?

17          A.    Yes.

18          Q.    Okay.  And so you would have a

19   different threshold potentially for the

20   80-milligram dose and the 10-milligram dose?

21          A.    No, we would not.  It would all be

22   part of the oxycodone family.

23          Q.    So that threshold is going to

24   apply to every base code within that family?
```

Highly Confidential - Todd Cameron

```
1              A.     That's all the same base code.

2    It's all the oxycodone base code.

3              Q.     I confounded you with numbers.

4    Now you're getting me.

5              A.     Sorry.

6              Q.     That's okay.  So let's take

7    oxycodone has a base code.

8              A.     Yes.

9              Q.     You're going to set a threshold

10   for Smith's Pharmacy of 40,000 dosage units.

11             A.     Yes.

12             Q.     And that's going to apply for the

13   80-milligram, the 60-milligram, et cetera?

14             A.     All oxycodone.

15             Q.     Okay.  And then do those all get

16   added up into a master threshold for oxycodone,

17   meaning you can do 10,000, whatever I said, of

18   the 60, 10,000 of the 40, et cetera?

19             A.     Yes.

20             Q.     Okay.  What happens if you do

21   20,000 of the 20?  Can you make that up in 40s?

22             A.     What do you mean by "make it up"?

23             Q.     Meaning -- sorry.

24                    If you come in below a threshold
```

Highly Confidential - Todd Cameron

1   at a particular dosage unit, can you pick it up

2   in a different dosage unit?

3          A.    When you say "different dosage

4   unit," you mean --

5          Q.    Yes.  You're right.  A different

6   dose.

7          A.    So all oxycodone is in the same

8   oxycodone DEA family.

9          Q.    Mm-hmm.  So I'm sorry for not

10  understanding you.  But within the oxycodone

11  family, we have a series of doses?

12         A.    Yes.

13         Q.    Each of those has its own

14  threshold?

15         A.    No.  All oxycodone.

16         Q.    Has a threshold?

17         A.    Yes.

18         Q.    And you can mix it up however you

19  want within that threshold so as long as you

20  stay within it?

21         A.    At the oxycodone level, yes.

22         Q.    Okay.  And then there's a separate

23  one for hydrocodone?

24         A.    Correct.  Yes, exactly.

Highly Confidential - Todd Cameron

1      Q.     And I take it there are no

2  distinctions, for instance, if you order an

3  abuse-deterrent formulation versus a non-abuse

4  deterrent formulation for a threshold purpose?

5      A.     Within the oxycodone family, we do

6  have a subbase code that is focused on the

7  non-abused deterrent formulation.  So there's a

8  second threshold underneath the total oxycodone

9  threshold.

10     Q.     Okay.  And are there any other

11  subcodes beyond that for ADF formulations?

12     A.     Yes.

13     Q.     And what are those?  Is this a

14  rabbet hole I'm going to regret going down?

15     A.     No, no, no.  Oxycodone is the most

16  common.  There are instances where we could use

17  one within hydrocodone.  We can use one with

18  alprazolam.  We can use one -- we do use one

19  within buprenorphine.  We use one within

20  fentanyl.  Those are the most common ones.

21     Q.     Okay.  And there are subcodes

22  you're saying within those for abuse-deterrent

23  formulations?

24     A.     Or lack thereof.

Highly Confidential - Todd Cameron

```
 1          Q.    Okay.  And are there other

 2    subcodes that aren't abuse-deterrent

 3    formulations?

 4          A.    Meaning are there other drugs I

 5    didn't say just now?

 6          Q.    Meaning are there other subcodes

 7    within a class beyond ADF?

 8               MS. WICHT:  That aren't based on

 9          whether the drug is ADF?

10               MS. SINGER:  That's right.  Thank

11          you.

12          A.    And I would tell you that the base

13    code and subbase code isn't necessarily based on

14    ADF or not.  It's just based on what we know to

15    be potentially the more commonly abused strength

16    within that family.

17          Q.    So why do you create these

18    subcodes?  What impact do they have on

19    threshold?

20          A.    One of the things that we learned

21    from Linden when he came on is that --

22               MS. WICHT:  Linden is a lawyer,

23          and I can't -- I can't tell whether what

24          you're about to convey is something
```

Highly Confidential - Todd Cameron

```
 1            that's legal advice from Linden or not.

 2                 THE WITNESS:  I might be.  It

 3        probably is.

 4                 MS. WICHT:  So you can't reveal

 5        legal advice that came from Linden.

 6   BY MS. SINGER:

 7        Q.   It's overbroad, but -- without

 8   talking about the source of knowledge, what I'm

 9   asking you is, why would you distinguish certain

10   formulations or dosages within a drug family?

11   What impact does that have and why?

12        A.   It goes back to the concept we

13   talked about earlier around evaluating the

14   customer, the total size, the context of the

15   size, the ratios within certain controlled

16   substances.  That's where -- that's how we use

17   the subbase codes.

18        Q.   Okay.  So, again, that's --

19   conceptually that makes sense, but tell me how

20   that works in practice.

21                 So within oxycodone, what subcodes

22   do you have?  Is there something you lower

23   threshold on because it is more highly diverted

24   or abused?  Is there something you have a higher
```

Highly Confidential - Todd Cameron

```
1    threshold because it's less diverted?

2         A.    So you have an oxycodone threshold

3    that would be all oxycodone.  And then beneath

4    that, you would have a lower threshold that

5    would be for your oxycodone 15 and 30-milligram.

6         Q.    Okay.  Because those are highly

7    diverted?

8         A.    I wouldn't call them highly

9    diverted.  But those are the more commonly

10   diverted when a form of oxycodone is diverted.

11        Q.    Okay.  And, again, I don't want to

12   spend much more time on this.  And we're going

13   more slowly.

14              Within our -- let's say our

15   Smith's Pharmacy has a 60,000 threshold for

16   oxycodone.

17        A.    Yes.

18        Q.    Within that, you might have a

19   subunit that says, "But only 20,000 of that can

20   be 30 milligrams"?

21        A.    Yes.

22        Q.    Okay.  Are there other subcodes

23   other than dosage and ADF that you use to

24   identify more commonly diverted drugs?
```

Highly Confidential - Todd Cameron

```
1            A.     What do you mean when you say

2    "other than dosage"?  Because every threshold is

3    set based off a dosage amount.

4            Q.     Okay.  So you just said that you

5    might have a lower threshold for 30 or

6    15 milligrams.

7            A.     Dosage.

8            Q.     Yeah.

9            A.     Yes.

10           Q.     Okay.  So are there other

11   categories like that where you adjust how you're

12   treating threshold to account for more common

13   diversion?

14           A.     Yeah.  Those are the examples I

15   gave earlier; the buprenorphine, those.

16           Q.     Okay.  But what within them?

17           A.     Like what specific strength?

18           Q.     Meaning within them you're going

19   to have various dosages --

20           A.     Yes.

21           Q.     -- that signal the greater

22   likelihood of diversion, but it's all dose

23   related?

24           A.     Exactly.
```

Highly Confidential - Todd Cameron

```
 1         Q.    Okay.

 2         A.    Yes.

 3         Q.    Do you set thresholds differently

 4    within parts of the country or parts of a state

 5    that have known diversion problems, like West

 6    Virginia or Kentucky, for instance, and then

 7    higher in Montana?

 8         A.    No.  We evaluate each customer

 9    independently.

10         Q.    Okay.  So whether an area has

11    greater incident of diversion or less, the

12    threshold is going to drive up from the

13    customer, not from the context geographically?

14         A.    Yes.

15         Q.    Have you ever seen the HDA's

16    industry compliance guidelines?

17         A.    I'm not sure.

18                     - - -

19         (Montana-Cardinal Exhibit 4 marked.)

20                     - - -

21         Q.    All right.  Looking at Exhibit 4,

22    HDMA, then "Industry Compliance Guidelines,

23    Reporting Suspicious Orders and Preventing

24    Diversion of Controlled Substances."
```

Highly Confidential - Todd Cameron

 1                    Have you seen this guide before?

 2          A.    I'm not sure if I've seen it in

 3    this exact format or not.

 4          Q.    All right.  Are you familiar with

 5    the substance of these guidelines?

 6          A.    I know that our regulatory legal

 7    team is constantly reviewing these types of

 8    things and coming to us around the program.

 9          Q.    To ask for your feedback?

10          A.    It would depend on the subject.

11    It could be to ask for feedback.  It could be to

12    give us information of things that are changing.

13          Q.    Okay.  All right.  If you turn to

14    page 8.  About halfway down the page,

15    "Distributors are also encouraged to consider

16    the following when developing thresholds ..."

17          A.    Yes.

18          Q.    If you look at the second bullet,

19    it encourages distributors "to ascertain changes

20    in diversion patterns or emerging local or

21    regional concerns.  Such new information may be

22    used to adjust thresholds as appropriate."

23                    Do you all do that?  It doesn't

24    sound consistent with what you're describing.

Highly Confidential - Todd Cameron

```
 1                MS. WICHT:  Which set of bullets

 2          are you in?

 3                MS. SINGER:  The second page under

 4          "Distributors are also encouraged."

 5                MS. WICHT:  Oh, I see.  And you

 6          read the second part of it?

 7                MS. SINGER:  Yes.

 8                MS. WICHT:  Okay.  Thank you.

 9   BY MS. SINGER:

10          Q.    That's just not guidance that

11   Cardinal follows; is that correct?

12          A.    And which part -- the six-month's

13   sales history or reaching out to the DEA?

14          Q.    The reaching out to DEA and

15   looking at regional variations.

16          A.    We are definitely aware of

17   regional variations across the country.

18          Q.    But you don't incorporate them in

19   thresholds, because those are customer-based?

20          A.    We incorporate them in the

21   customer evaluation.

22          Q.    Do you incorporate them in setting

23   a customer's thresholds?

24          A.    We incorporate them in evaluating
```

Highly Confidential - Todd Cameron

1    the customer, and then that evaluation dictates

2    the thresholds.

3            Q.    So what I'm asking you is if you

4    knew that in Whitefish, Montana there was a

5    problem with Opana, diversion and injection,

6    would you then look at Smith's Pharmacy in

7    Whitefish and say, "We're lowering the Opana

8    threshold because Whitefish has an Opana

9    problem"?

10           A.    If we knew that Opana was a very

11   uncommonly prescribed drug in that area and a

12   customer was high from that drug, we would ask

13   questions to understand why.

14           Q.    Right.  But I don't think that's

15   responding to my question.

16                 Would you use it in setting that

17   customer's threshold?

18           A.    Yes.

19           Q.    And can you think of an example

20   where you've done that?

21           A.    Oh, gosh.  A specific customer

22   example?

23           Q.    Or a region that you knew --

24   right?  That there was a problem with a

Highly Confidential - Todd Cameron

```
 1   particular drug, so you lowered all your

 2   customers in that area's thresholds for that

 3   drug?

 4          A.    When we evaluate a customer, if

 5   the prescribing that is driving the dispensing

 6   into that area is out of the norm for that area,

 7   that would constitute a review of the customer.

 8   We would make a decision on how we should handle

 9   that customer differently.

10          Q.    Okay.  When you say "evaluating

11   customer and handling that customer

12   differently," are you talking specifically in

13   how you set a threshold for that customer?

14          A.    Yes.

15          Q.    Okay.  And so -- but you can't

16   think of a specific example where you've done

17   that with a drug or a region?

18          A.    I know we've done that thousands

19   of times.

20          Q.    Okay.  And tell me how to

21   reconcile that with your earlier statement that

22   you're looking at a customer's order history and

23   building out threshold from that.

24          A.    I never said looking at a
```

1    customer's order history in setting thresholds.

2            Q.    Okay.

3            A.    I didn't say that.

4            Q.    Okay.  So tell me -- again, I'm

5    just trying to get what you do.

6            A.    I'm just trying to follow the

7    question.  Sorry.

8            Q.    Okay.  So tell me how that works

9    in setting threshold.

10           A.    How what works?

11           Q.    How you -- what factors you take

12   into account.

13           A.    We evaluate the customer, the

14   business model, the overall context, the

15   variations within specific controlled substances

16   for that customer and specific strengths of

17   controlled substances for that customer.

18           Q.    And you do that for every

19   customer?

20           A.    Correct.

21           Q.    For every controlled substance

22   they buy?

23           A.    Correct.

24           Q.    And you do that when they onboard,

Highly Confidential - Todd Cameron

1   or you do that then again periodically?

2          A.    Both, yes.

3          Q.    And how often do you do that?

4          A.    Depends on the customer.

5          Q.    And how do you decide?

6          A.    The ratios and volumes of the

7   customer, threshold events, those types of

8   things.

9          Q.    Okay.  And who decides what the

10  threshold is going to be for a customer?

11         A.    It depends on the customer and the

12  size of the customer.

13         Q.    Okay.  So large customer, who does

14  that?

15         A.    It goes up to a legal group.

16         Q.    And so who decides in the first

17  instance?

18         A.    It depends on the size.

19         Q.    For a large customer?

20         A.    It could be -- it could have to go

21  to that group prior to turning the customer on.

22  That's very common.

23         Q.    Okay.  But somebody has made a

24  recommendation in the first instance and says,

Highly Confidential - Todd Cameron

```
 1    "Here's what I think the threshold would be for

 2    Walgreens in Billings."

 3           A.    Depending on the size, somebody

 4    might not make a recommendation.  We would get

 5    in the room and review all the factors I talked

 6    about earlier and make a decision.

 7           Q.    Okay.  And who's that group that's

 8    doing that then?

 9           A.    That's the large volume tactical

10    and analytical committee.

11           Q.    Okay.  And if it's an independent

12    pharmacy that's a smaller pharmacy, who does it

13    then?

14           A.    Depends on the size of the volume.

15           Q.    Okay.  So if it's a mid size

16    pharmacy?

17           A.    It would depend on -- when you say

18    "mid size," mid size for which drug?

19           Q.    For oxycodone.

20           A.    There are multiple levels of

21    escalation across the team that determines who

22    has to approve it.

23           Q.    Okay.  So hugely complicated,

24    obviously?
```

Highly Confidential - Todd Cameron

1    A.    Yes.

2    Q.    So sales rep comes in.  They're

3    excited.  They've signed up or they want

4    approval for a new customer in Montana.  How do

5    you all decide and based on what their threshold

6    is going to be?

7    A.    So the customer completes the Know

8    Your Customer questionnaire that gathers the

9    information that we need to review the customer.

10        At that point in time, we

11   determine, is this a customer that we want to do

12   business with?  If so, at what levels?  And then

13   that's when we would set the thresholds.

14   Q.    Okay.  And is this done through an

15   algorithm?  Is it done by, you know, subjective

16   determinations based on factors?  What --

17   A.    It's based on that review of the

18   customer to determine what volumes we're

19   comfortable with, and then you compare that to

20   what volumes they need.

21   Q.    So is this something that is made

22   based on an individual employee's skill and

23   experience?  Is it something that's driven by a

24   set of criteria and formulas?

Highly Confidential - Todd Cameron

```
1           A.    It's driven initially by the

2    concept of the formulas.  But then depending on

3    the volume, the group has to review it.

4           Q.    Okay.  How many new customers is

5    Cardinal bringing on with controlled substances

6    privileges every month?

7           A.    I don't know the exact number.

8    Maybe 50.

9           Q.    And you're going through this

10   detailed process for each of them?

11          A.    Yes.

12          Q.    And then for those that have been

13   identified as warranting further assessment?

14          A.    Yes.  Yes.

15          Q.    And for a large customer who has

16   approval on the threshold, who has final

17   decision?

18          A.    Oh.  It depend on how large.  But

19   if it's at the largest end of our spectrum, it

20   would be the LV TAC group.

21          Q.    And you mentioned before that you

22   have a level more detailed than SOPs.  I forget

23   what you called it.

24          A.    Working guidelines.
```

Highly Confidential - Todd Cameron

```
 1            Q.    Okay.  Do you have a working

 2    guidance that lays this out?

 3            A.    It may not in the manner in which

 4    you're asking the questions.  But, yeah, all the

 5    components are there.

 6            Q.    Okay.  And which working guidance

 7    is this?

 8            A.    I don't know.  You asked questions

 9    across a lot of them.

10            Q.    Okay.  Tell me which areas it

11    covers.  So which guidances would we need to put

12    the pieces together here?

13            A.    Probably all of them that you

14    have.

15            Q.    And how many of them are there?

16            A.    I don't know the exact number.

17            Q.    Okay.  Give me some of the subject

18    areas.

19            A.    Threshold setting.  That's

20    probably the big one.

21            Q.    Okay.  And what others?

22            A.    I'd start with that one.

23            Q.    Okay.  And then what would I read

24    next if I was really curious?
```

Highly Confidential - Todd Cameron

```
 1              A.    I'm not sure.  Whichever one you

 2    wanted to.

 3              Q.    Is there one on customer segments?

 4              A.    As far as?

 5              Q.    I'm just -- you said this was in

 6    multiple guidances.  So I'm just trying to

 7    figure out what other areas it would be in.

 8              A.    I'm not sure I follow the question

 9    about customer segments.

10              Q.    I'm just asking what other

11    guidances you have that lay out this process.

12              A.    The working guidelines would be --

13    yeah.

14              Q.    Okay.  Are they organized by

15    subject area?

16              A.    Yes.

17              Q.    And what are the subjects beyond

18    thresholds?

19              A.    I don't have all them in front of

20    me.

21              Q.    Just name of the ones that come to

22    mind.

23              A.    LV TAC.

24              Q.    Okay.  Anything else?
```

Highly Confidential - Todd Cameron

1       A.    No.

2       Q.    There was a period presumably when

3    Cardinal applied thresholds to all of its

4    customers presumably before your time in the

5    position; is that correct?

6       A.    Yes.

7       Q.    And when you were setting

8    thresholds initially, you looked at some

9    baseline data, right, to look at what was

10   average or normal --

11      A.    Yes.

12      Q.    -- correct?

13            And do you know what year was used

14   as that baseline?

15      A.    For the initial process, no.  As

16   far as when I was involved, that's where we

17   consulted with Linden who had just come from the

18   DEA.

19      Q.    Okay.  So that would have been in

20   2012?

21      A.    That's when I got there.  Linden

22   came before I did though.

23      Q.    Okay.  All right.  And was there

24   ever a time -- and so now when you're bringing

Highly Confidential - Todd Cameron

1    on a customer, you use 2018 data for what's

2    average or normal, correct?

3           A.    Yes.

4           Q.    Okay.  And is there a point by

5    which thresholds are reset to reflect the fact

6    that prescribing has gone down, for instance?

7           A.    Yes.

8           Q.    How does that happen?

9           A.    We are purchasing refreshed data

10   annually and comparing what the volumes look

11   like and looking how our customer distributions

12   compare to the rest of the market, and then make

13   any adjustments accordingly.

14          Q.    Okay.  And which data source is

15   this?

16          A.    IMS, Symphony Health.

17          Q.    Okay.  So if from -- and so when

18   you said comparing it to the market, explain

19   what that means.

20          A.    The national data.  So when we

21   purchase the Symphony data, for example, it's

22   for the majority of the retail market, not just

23   the Cardinal customers.

24          Q.    And so if you know that you are

Highly Confidential - Todd Cameron

1    40 percent or 20 percent of the market --

2          A.    Yes.

3          Q.    -- you will say, "So for our

4    customers, if overall sales is 100 million and

5    ours should be 20 million"?

6          A.    It would depend on what our --

7    each individual customer looked like.  Again,

8    back to that context around size for the total

9    control and total non-control prescriptions, you

10   could have larger customers.  You could have

11   smaller customers in the market.

12         Q.    So instead of me trying to put

13   words into your mouth, which never works well,

14   tell me, so you get this Symphony and IMS

15   dataset.

16         A.    Yes.

17         Q.    You look at it.

18         A.    Yes.

19         Q.    How does that translate into what

20   you do in adjusting or setting thresholds?

21         A.    We go through and try to

22   understand what those variational changes, if

23   any, look like and apply that then to the

24   threshold setting methodology.

```
 1          Q.    So if you found in 2014 when

 2   hydrocodone was rescheduled that sales of

 3   hydrocodone -- or prescriptions of hydrocodone

 4   or sales went down 30 percent, what would you

 5   do?

 6          A.    We would potentially reduce the

 7   hydrocodone thresholds.

 8          Q.    Is that what happened?

 9          A.    The 30 percent example?

10          Q.    Yeah.  I mean, did you go through

11   after the rescheduling and reset hydrocodone

12   schedules -- hydrocodone thresholds?

13          A.    Where appropriate, yes.

14          Q.    And what is that?  So some

15   customers and not others?

16          A.    To the customers that it was

17   applicable to make changes, we made changes.

18          Q.    And was that the majority of your

19   customers or --

20          A.    I don't know.  I'm not sure.

21          Q.    And how did you decide which

22   customers needed to be changed and which ones

23   didn't?

24          A.    Same contextual evaluation.
```

Highly Confidential - Todd Cameron

```
 1          Q.     Customer by customer?

 2          A.     Yes.

 3          Q.     Are overall threshold levels at

 4   Cardinal now higher or lower than what they were

 5   when you started in your position?  And I'm just

 6   talking about opioids in this question.

 7          A.     Lower.

 8          Q.     By how much?

 9          A.     I'm not sure.  40,000 customers.

10          Q.     Do you all ever add up -- so you

11   have 200 customers in Montana -- is that about

12   right?  Do you ever add up all of the thresholds

13   you have in Montana and figure out what supply

14   of opioids your customers there can purchase?

15          A.     Ask me that again.

16          Q.     Do you ever for the State of

17   Montana or any state take all of your customers,

18   look at the opioid thresholds, add them all up,

19   and check and see what the number looks like?

20          A.     We do what you just described at

21   the individual customer level.

22          Q.     And do you ever aggregate that?

23          A.     Yes.

24          Q.     And what happens?  In what context
```

Highly Confidential - Todd Cameron

1    is that done?

2          A.    We look at the gaps, the buffer

3    that would exist on what the volume is versus

4    the threshold to make sure we maintain the

5    proper gap between the threshold and the usage.

6          Q.    Meaning if a pharmacy customer was

7    buying at 20,000 oxycodone a month and the

8    threshold was 21,000, you might look and say,

9    "Well, we've not left enough of a margin there"?

10         A.    Or if that customer went, for

11   whatever reason, from 20,000 down to 5,000, we

12   would lower that threshold.

13         Q.    Okay.  Do you know how -- do you

14   ever get a report on threshold adjustments

15   across the customer base?

16         A.    We look at the number of threshold

17   changes that we make, yes.

18         Q.    Is that a report that Cardinal

19   runs or that you run?

20         A.    I'm hesitating because it's not

21   like an officially tagged report name or

22   something, but we do monitor the number of

23   changes that are made.

24         Q.    And in what context or group or

1   fashion do you do that?

2          A.    As far as?

3          Q.    Like, is that a -- is that an

4   evaluation meeting you do once a month?  Is it a

5   report one of your direct reports gives to you?

6          A.    It's part of a metrics that we run

7   to keep tabs on the program.

8          Q.    And how often do you do that?

9          A.    Once a quarter.

10         Q.    And who's involved in that process

11  of reviewing your metrics?

12         A.    A lot of people.

13         Q.    Are they all people who report to

14  you within your group?

15         A.    Inside and outside my group.

16         Q.    And is there anybody more senior

17  to you who's involved in that?

18         A.    Yes.  I think it goes up the

19  chain.

20         Q.    To whom?

21         A.    I'm not sure exactly who all gets

22  it.  It gets filtered through legal.

23         Q.    And there's an actual report that

24  you generate?

Highly Confidential - Todd Cameron

```
1           A.    That's why I hesitated before and

2    said it's not -- I wouldn't call it a report.

3    It's analytics that we constantly run to

4    determine the question you asked me.  Now, the

5    output of it would be numbers that would go into

6    a metric.

7           Q.    Okay.  And when you say you run it

8    up the chain, what are you running?

9           A.    So -- I'm sorry.  You lost me.

10          Q.    So you say it goes up the chain.

11          A.    Yes.

12          Q.    What is the "it"?

13          A.    Metrics.

14          Q.    Yes.  In what form?

15          A.    Numbers.

16          Q.    All right.  But there has to be --

17   is there an e-mail that you send?  Is there a

18   report you do?

19          A.    No.  It's metrics on a page.

20          Q.    Okay.  Does it have a title?

21          A.    I'm not sure -- again, it's a

22   culmination of a bunch of different pieces.  So

23   I don't know that there's a specific name for

24   the overall chunk of the metrics.  I call it our
```

1    metrics.

2           Q.    And so if I was to e-mail Jen

3    after this deposition and say, "Can you find

4    those reports that Todd Cameron was talking

5    about," what would I say to her so that you'd

6    know what to look for?

7                 MS. WICHT:  Hypothetically.

8           A.    I would -- again, Linden gets all

9    of them.  I would start with Linden is what I

10   would do.

11          Q.    Okay.  So just the reports you

12   send to Linden Barber?

13          A.    They're not reports.  They're

14   metrics.

15          Q.    Okay.  Whatever you had over

16   lunch ...

17                Okay.  So we got to this from the

18   question of whether you ever add up

19   thresholds --

20          A.    Yes.

21          Q.    -- in a particular jurisdiction.

22                And is that one of the metrics

23   that goes in the metrics that you send to Linden

24   Barber and others?

Highly Confidential - Todd Cameron

```
 1            A.    So I did not say we add up over a

 2   jurisdiction.

 3            Q.    Okay.  So what -- when you said --

 4            A.    At the customer level.

 5            Q.    So explain to me the distinction

 6   you're drawing.

 7            A.    Well, you're saying

 8   "jurisdiction."  What do you mean when you say

 9   "jurisdiction"?

10            Q.    I mean the State of Montana.

11            A.    So, no, we would not do it for

12   just the customers in Montana.  We would do it

13   for every customer.

14            Q.    Meaning every large customer,

15   every --

16            A.    Every customer.

17            Q.    Okay.  So that means you're

18   running -- whenever you run this report that's

19   not a report --

20            A.    Yes.

21            Q.    -- you are saying, "We distributed

22   this volume of opioids" or "Our thresholds

23   permitted the distribution of this volume of

24   opioids."  Is that correct?
```

1          A.     We constantly review what the

2    threshold is versus what the volume is being

3    distributed to the customer.

4          Q.     Across all your customers?

5          A.     Yes.

6          Q.     So you will be looking when you do

7    this "Our thresholds permit us to supply a

8    billion opioids."  You know, "Our actual sales

9    are at 750 million, so we've got 250 million

10   that may be unnecessary gap."

11         A.     At the individual customer level,

12   yes.

13         Q.     Tell me the distinction you're

14   drawing there.

15         A.     That we're looking at what each

16   customer's threshold is versus what the demand

17   is and ensuring that that threshold is set

18   properly.

19         Q.     So what is it that you're adding

20   up?

21         A.     Those thresholds.  But it's not

22   being done to determine what the aggregate, the

23   way you're phrasing an opportunity is.  It's

24   being done at the customer level to ensure the

Highly Confidential - Todd Cameron

1  customer thresholds are set properly.

2      Q.    Okay.  All right.  So to go back

3  to the question that was originally on the

4  table, there's no place where you're saying the

5  thresholds or sales for all customers in Montana

6  add up to this?

7      A.    In the exact way that you just

8  described it, no.

9      Q.    Okay.  And when you're parsing

10  that, it's because you're doing it at a customer

11  level but not as a jurisdictional or geographic

12  level?

13      A.    Yes.

14      Q.    And that's the difference between

15  what I'm asking and what you're answering?

16      A.    Yes.

17      Q.    In thinking about setting up a

18  system to prevent the diversion of opioids, like

19  to maintain effective controls, how far does a

20  threshold-based system get you?  How much

21  diversion will that let you identify?  Is it

22  80 percent of the total you'll pick up on

23  thresholds, or is that a smaller piece?

24      A.    I'm unsure.

Highly Confidential - Todd Cameron

```
 1            Q.    What I'm trying to get at is, how

 2   much of your compliance program is solved by

 3   thresholds?  Does it -- you know, we can ask --

 4            A.    I'd have no way of putting a

 5   percentage on it.

 6            Q.    Okay.  Your suspicious order

 7   reports, how many of those are identified

 8   through threshold exceedances?

 9            A.    If I understood your question,

10   every single one of them.

11            Q.    So how many of them come from --

12   how many suspicious order reports come from one

13   of the questions you get from a sales rep or a

14   tip that a sales rep calls in?

15            A.    All of the suspicious order

16   reports are because an order hit a threshold

17   that we did not have cause to release, and then

18   we canceled and reported the order.

19            Q.    Okay.  And so those are the

20   suspicious order reports that you submit to

21   DEA --

22            A.    Yes.

23            Q.    -- as they exceed threshold?

24            A.    Yes.
```

Highly Confidential - Todd Cameron

1    Q.    And so what do you call it when

2  Mallinckrodt sends you the letter and you

3  terminate a customer?  That's not a suspicious

4  order report?

5    A.    No.

6    Q.    What is it when a sales rep

7  submits, you know, a tip that they went to a

8  customer and saw a long line around the block,

9  you know, whatever?

10    A.    Yeah, we would investigate that

11  pharmacy.  There wouldn't be a specific order

12  that would be associated with that tip as you

13  called it.

14    Q.    And so when you determine that a

15  pharmacy is suspicious, then your decision is

16  sell controlleds or not sell controlleds?

17    A.    Yes.

18    Q.    And if you decide not to sell

19  controlleds, do you make a notification to

20  somebody?

21    A.    Depends on where the customer is

22  located.

23    Q.    Okay.  Are you always going to

24  notify the DEA?

Highly Confidential - Todd Cameron

```
 1          A.    No.

 2          Q.    When wouldn't you notify the DEA?

 3          A.    There are certain field offices

 4  that have asked to be notified.  And there are

 5  certain states or BOPs that have been asked to

 6  be notified.

 7          Q.    And do you know if Denver and

 8  Seattle are field offices that asked to be

 9  notified of terminated customers?

10          A.    I do not believe so.

11          Q.    And is the Montana Board of

12  Pharmacy one of the boards of pharmacy that you

13  notified?

14          A.    I do not believe so.

15          Q.    I take it sometimes when you have

16  a suspicious order, you don't terminate the

17  customer, right?  You just hold or delete that

18  order or cut the order.  And sometimes you do

19  decide it's a broader problem -- and I'm sorry.

20  You're nodding.  So yes?

21          A.    Yes.

22          Q.    And then you would terminate the

23  customer potentially?

24          A.    So you said about five things in
```

1    that string.  I was nodding because I was simply

2    trying to follow the question.  So what was the

3    specific question?

4         Q.    And now I don't even remember what

5    the specific question was.

6              So sometimes a suspicious order is

7    just a suspicious order?  You notify the DEA of

8    the suspicious order, correct?

9         A.    Yes.

10        Q.    But the customer may remain a

11   customer in good standing to whom you continue

12   to supply controlled substances?

13        A.    Yes.

14        Q.    In some instances when you're

15   investigating the threshold exceedance, you may

16   decide that the customer itself is potentially

17   engaged in diversion?

18        A.    Yes.

19        Q.    In which case if it was a DEA

20   field office that wanted to know, you would tell

21   them, or a Board of Pharmacy?

22        A.    Yes.

23        Q.    Okay.  How many customers did

24   Cardinal terminate last year?

1          A.     I don't know the exact number.

2   For the last 12 months, hundreds.

3          Q.     Hundreds?

4          A.     Yeah.

5          Q.     And how many of those started with

6   a suspicious order?

7          A.     Probably very few.

8          Q.     So very few were started by an

9   order that exceeded a threshold?

10         A.     As far as the termination, yes.

11         Q.     And so where did the majority of

12  them start from?

13         A.     Where the majority of what

14  started?  The termination?

15         Q.     The terminated customers.

16         A.     The customers most commonly are

17  terminated based off of the numbers, the review,

18  the contextual size, how much is controlled,

19  which specific controlled substances, potential

20  growth in a controlled substance, the mixes

21  within the controlled substance that we talked

22  about earlier.

23         Q.     And so how are -- in what context,

24  like how is Cardinal scanning the data to

Highly Confidential - Todd Cameron

1    identify those pharmacies?  Is that something

2    that you're doing at, you know, a monthly

3    review, or what's the process there?

4            A.    Oh, we've got a scoring system

5    that evaluates all of the objective criteria

6    components.  And we use that scoring system to

7    segment the customers along with volume.

8            Q.    And to identify the customers'

9    scores, is somebody triggering again a report

10   or --

11           A.    Yeah.  The score is viewed in a

12   bunch of different ways.

13           Q.    And what is the trigger that would

14   identify to the employees in your unit which

15   customers had a problematic score?

16           A.    The volume, and then the specific

17   mixes of controlled substances.

18           Q.    So that's what constitutes the

19   grounds for suspicion?

20           A.    Yes.

21           Q.    I'm just wanting a procedural

22   mechanism that causes you to know who that is.

23           A.    You lost me.  I'm sorry.

24           Q.    Are you guys running daily

Highly Confidential - Todd Cameron

1 reports?

2 　　　A.　Oh, I see.　Yes.　And we're

3 reviewing each individual customer for that

4 purpose, as well as when a threshold event

5 occurs.

6 　　　Q.　Okay.　And is there a daily -- is

7 there a report that is produced again or --

8 　　　A.　Again, I wouldn't call it a

9 specific report.　The analytics team is looking

10 at it.　The investigative team is looking at it.

11 I'm looking at it.　The legal team is looking at

12 it.　I made reference to LV TAC earlier.　Those

13 are factors that determine what customers go in

14 front of LV TAC.

15 　　　Q.　Right.　And there's something that

16 pulls them out of the data so that you know to

17 look at them.　And I'm just wondering what's

18 that interface?

19 　　　A.　As far as like a system?　Again,

20 the data exists in multiple systems.　So it

21 would depend on what area you were in that would

22 determine what you were looking at.

23 　　　Q.　Okay.　So if you were coming in

24 after this meeting and said, "I want to see

1    every customer who scored over" -- what would be

2    a score that would --

3            A.    Well, it would depend.  It would

4    depend.

5            Q.    So, again, how often and through

6    what vehicle are you all looking at this to

7    identify which customers need the deeper

8    contextual investigation?

9            A.    The easiest one is the threshold

10   event mechanism.  Each time there's an event,

11   the customer goes through the review process.

12           Q.    Okay.  But that's actually a small

13   percentage of your terminations?

14           A.    It's a small percentage of the

15   terminations, not a small percentage of the

16   customers.

17           Q.    Okay.  And so for those other

18   terminations, again, what lifted up those

19   customers for you to know to look at them?

20           A.    It could have been a threshold

21   event that caused us to go in and do a visit.

22   Again, what I talked about earlier was how we

23   set the thresholds, and we look at the

24   contextual size of the customer.  And the way we

Highly Confidential - Todd Cameron

1    set the thresholds prevents the volume from us

2    from becoming indicative of diversion.

3              So I would tell you the customers

4    we cut off in the last year to your point have

5    all been cut off because of volume outside of us

6    in the total dispensing the customer, not

7    purchases from us.

8         Q.    So meaning from all of those other

9    data sources?

10        A.    No, from the customer themselves

11   on what they're dispensing.

12        Q.    The data feed that you get from

13   the customer?

14        A.    No.  We go do a visit.

15        Q.    Okay.  And so how do you see what

16   they're dispensing volume is outside of

17   Cardinal?  How is that evident?

18        A.    That's when we have them run the

19   dispense reports when we do the visit that we

20   talked about earlier.

21        Q.    Got it.  Okay.  So just to make

22   sure I'm understanding, what you're saying is of

23   that pool of hundreds of customers you

24   terminated last year --

Highly Confidential - Todd Cameron

```
 1          A.    Yes.

 2          Q.    -- a small number of them were

 3   done on the basis of a threshold exceedance.

 4   But a threshold exceedance might cause you to do

 5   a site visit.  And during the site visit, you'd

 6   ask for their dispensing data.  That would be

 7   problematic.  And with other factors, you would

 8   terminate that customer?

 9          A.    Yes.

10          Q.    Okay.

11          A.    Yes.

12          Q.    We're communicating better.

13          A.    Yes.

14          Q.    And when you first started in your

15   position, was the number of customer

16   terminations higher or lower than what it is

17   right now?

18          A.    Higher.

19          Q.    By roughly what measure?  I mean,

20   double --

21          A.    I wouldn't know what factor to put

22   on to it.

23          Q.    In most of your terminations, what

24   types of customers are they?
```

Highly Confidential - Todd Cameron

```
 1          A.    Retail independents.

 2                MS. WICHT:  Can we take a restroom

 3          break when you're at an okay stopping

 4          point?

 5                MS. SINGER:  Yes.  You know what?

 6          Why don't we go ahead and do it now.

 7                (Recess taken.)

 8   BY MS. SINGER:

 9          Q.    So, Mr. Cameron, you have Exhibit

10   5.

11          A.    Yes.

12                MS. SINGER:  Did we give it to

13          you, Jen?

14                MS. WICHT:  I don't think so.

15                THE WITNESS:  It's not the same as

16          3, right?

17                MS. DEYNEKA:  I think it is.

18                MS. SINGER:  Oh, I'm sorry.

19   BY MS. SINGER:

20          Q.    So Exhibit 3, "Process to

21   Establish Suspicious Order Monitoring Threshold

22   Limits."  Do you have that in front of you,

23   Mr. Cameron?

24          A.    Yes.
```

1          Q.    So when you set thresholds, it was

2    set for specific customers and for classes of

3    customers, correct?

4          A.    It is set for each specific

5    customer.

6          Q.    Okay.  And one of the factors you

7    look at is the customer segment a customer

8    belongs to, whether they're a chain or an

9    independent retail pharmacy?

10         A.    That is a factor.

11         Q.    Okay.

12         A.    When I made reference to segment

13   earlier when we were talking, I was probably

14   talking about the segment of kind of the bell

15   curve again, but we do look at the class of

16   trade of the customer.

17         Q.    Okay.  And then -- all right.

18               Let's move to page 3, which is

19   Bates number 1169.

20         A.    Yes.

21         Q.    So at VI, it talks about

22   multiplying the monthly quantity of base code by

23   a factor --

24         A.    Yes.

Highly Confidential - Todd Cameron

```
 1          Q.     -- of 3, 5, or 8.

 2          A.     Yes.

 3          Q.     Can you explain where those

 4   factors come from and what their significance

 5   is?

 6          A.     I cannot.  I've never seen this

 7   before.  Again, I don't know if that is the

 8   DEA's algorithm that we talked about earlier or

 9   not.

10          Q.     Is that something that Cardinal

11   uses now?

12          A.     No.

13          Q.     Have they ever used it during your

14   tenure on the compliance side?

15          A.     No.

16                 MS. WICHT:  The algorithm you're

17          asking about, right?

18                 MS. SINGER:  I'm asking about this

19          multiplication by a factor of 3, 5, or

20          8.

21                 THE WITNESS:  Correct.

22                 MS. WICHT:  Maybe that's what you

23          were answering as to.  Sorry.  I didn't

24          mean to confuse -- okay.
```

Highly Confidential - Todd Cameron

```
 1         A.    Yeah.  I've never seen the 3, 5,

 2    or 8 before.

 3         Q.    Okay.  And then going to the first

 4    page, 1167 Bates number.  Under 4.0 Policy, the

 5    second and third lines have the sentence, "The

 6    baseline purchase pattern is then adjusted up by

 7    a statistically significant factor or variable

 8    to formulate the threshold limit."

 9              Have I read that correctly?

10         A.    Yes.

11         Q.    And is that a concept that

12    Cardinal still applies?

13         A.    No.

14         Q.    Okay.  So when you look at the

15    baseline level of what's normal or average --

16         A.    Yes.

17         Q.    -- do you gross that up by any

18    factor in setting a customer's threshold?

19         A.    No.  It would depend on the

20    specific individual customer, the context of all

21    the objective pieces of the customer, and the

22    volume needed of that customer.

23         Q.    Okay.  So meaning you might,

24    depending on the customer, or you might not?
```

Highly Confidential - Todd Cameron

1    A.    I'm sorry.  Ask me the question

2    again.

3         Q.    So you said whether you adjust for

4    some margin depends on the specific factors of

5    the customer.

6         A.    Yes.

7         Q.    So you do it sometimes and not

8    others?

9         A.    Yes.  I don't -- not in reference

10   to whatever that verbiage is that's written

11   here.

12        Q.    Okay.  So do you build in any

13   buffer to a threshold above the customer's

14   typical use?

15        A.    Yes.

16        Q.    And is there a set factor for

17   that?

18        A.    There is not.

19        Q.    Okay.

20        A.    It's going to vary by the volume,

21   the drug, and all the contextual factors for

22   that specific customer.

23        Q.    Okay.  So how big that buffer is

24   will vary, but the fact of the buffer is a

Highly Confidential - Todd Cameron

```
 1   constant?

 2          A.    Yes.  Can I correct that?  So when

 3   you say "a constant," not every customer gets a

 4   buffer.

 5          Q.    Okay.

 6          A.    Again, it will be individual

 7   customer based, and you could have customers

 8   that might be at the threshold limit, and that's

 9   what they're to get.

10          Q.    Okay.  And what would make you

11   decide -- how do you decide whether a customer

12   gets a buffer or not?

13          A.    We determine what the volume is

14   they need versus what we think an acceptable

15   normal range for that customer size and all the

16   contextual factors would be.

17          Q.    And so when you're doing this

18   review of each customer as they come in and all

19   the time, that's one of the judgments you're

20   making?

21          A.    Yes.

22          Q.    And do most of your customers have

23   buffers?

24          A.    Yes.
```

Highly Confidential - Todd Cameron

```
 1          Q.    And is there a typical buffer

 2   level?

 3          A.    No.

 4          Q.    Is there an average?

 5          A.    There probably is.  I have no idea

 6   what it is.

 7                         - - -

 8      (Montana-Cardinal Exhibit 5 marked.)

 9                         - - -

10          Q.    All right.  So now actual Exhibit

11   5.  All right.  Mr. Cameron, you should be

12   looking at CAH_MDL2804_220583.  That's the Bates

13   number at the bottom.

14          A.    Yes, yes.

15          Q.    All right.

16                MS. WICHT:  I think, Linda -- I'm

17          not going to cut off questioning on this

18          document.  I guess -- I think this is

19          obviously something that was produced in

20          the MDL.  As I understand the MDL

21          protective order, I'm not sure it would

22          allow --

23                MS. SINGER:  So Montana AG has

24          signed that protective order.
```

Highly Confidential - Todd Cameron

```
 1                MS. WICHT:  The MDL protective

 2         order?

 3                MS. SINGER:  Yep.

 4                MS. WICHT:  Okay.  Thank you for

 5         that information.  And as I said, I will

 6         let him answer questions on it, and

 7         maybe that resolves it.  I'll think

 8         about it.  But thank you.

 9                MS. SINGER:  Of course.

10   BY MS. SINGER:

11         Q.    All right.  So do you recognize

12   this as an e-mail to you?

13         A.    From me?

14         Q.    Oh, from you.  Yes.

15         A.    Yes.

16         Q.    All right.  And the subject reads

17   what?

18         A.    "Forward:  12 percent Buffer

19   Customer List."

20         Q.    Okay.  And this e-mail is from

21   2014, yes?

22         A.    Yes.

23         Q.    And so according to this e-mail,

24   there is a group of thresholds, thresholds
```

Highly Confidential - Todd Cameron

```
 1   ending in 3 that have a 12 percent buffer --

 2           A.    Yes, sir.

 3           Q.    -- across the board.  Is that

 4   correct?

 5           A.    It wouldn't be across the board,

 6   no.

 7           Q.    Okay.  So it says here, "Some

 8   thresholds now ending in 3, these have had a

 9   buffer of 12 percent applied to them."

10           A.    Yes.

11           Q.    Okay.  So tell me what in this

12   e-mail or your recollection makes you believe

13   that it was some customers and not others that

14   fit in the threshold ending in 3?

15           A.    The bottom e-mail.

16           Q.    Okay.  Read that.

17           A.    Do you want me to read the whole

18   thing?

19           Q.    Just the part that --

20           A.    So it's looking at two or more

21   threshold events in oxycodone or hydrocodone in

22   the last six months.  Had to be within three

23   days or left within the accrual cycle.  And then

24   it excluded secondary account thresholds, retail
```

Highly Confidential - Todd Cameron

1   independents, and had to be under 30,000

2   oxycodone or hydrocodone, and could not have a

3   threshold that ended in 9 or 5.

4          Q.    And what does the ending number of

5   a threshold tell you about a customer?

6          A.    It tells you the steps that were

7   taken from a review standpoint to set the

8   threshold.

9          Q.    Okay.  Meaning so something that

10  ends in a 9?  What has happened with that

11  customer?

12         A.    It's been set by LV TAC.

13         Q.    Okay.  And a threshold ending in

14  5?

15         A.    There's been some factors that

16  somebody has set that threshold and doesn't want

17  anybody to change the threshold.

18         Q.    So it's locked in?

19         A.    Yes.

20         Q.    And do you have a glossary that

21  explains what all of these different threshold

22  digit means?

23         A.    I believe there is, yes.

24         Q.    Okay.  So for this -- the group of

Highly Confidential - Todd Cameron

```
 1    customers who met these criteria --

 2           A.    Yes.

 3           Q.    -- a 12 percent buffer applied?

 4           A.    Yes.

 5           Q.    Okay.  And these were -- so

 6    accrual cycle --

 7           A.    Yes.

 8           Q.    What is that?

 9           A.    That is the window of days in

10    which the threshold is accumulated.  So, for

11    example, the month.

12           Q.    Okay.  And for Cardinal, that's a

13    30-day period?

14           A.    For the monthly threshold, yes.

15           Q.    Okay.  And is that -- you

16    mentioned before that you have staggered dates

17    so they don't all come up at once?

18           A.    Exactly.

19           Q.    So it's 30 days from that date to

20    the next month every time?

21           A.    Yeah.

22           Q.    It's not a rolling threshold?

23           A.    No.  It resets on a specific date.

24           Q.    Okay.  All right.  So for
```

Highly Confidential - Todd Cameron

```
 1    customers who'd had two or more exceedances for

 2    hydrocodone or oxycodone --

 3           A.    Yes.

 4           Q.    -- in the last six months?

 5           A.    Yes.

 6           Q.    And they're clearly customers who

 7    are running up against their threshold at the

 8    end of the month.

 9           A.    Yes.

10           Q.    Not secondary accounts.  What's a

11    secondary account?

12           A.    Back to the concept of ensuring

13    that the orders we distribute make sense for the

14    context of the volume that's coming to us for

15    the customer.  It's somebody who we would not

16    consider primary or buying the majority of their

17    non-controls and controls from us.  So they're

18    buying --

19           Q.    From somebody else?

20           A.    From somebody else.

21           Q.    Okay.  So for all of these

22    customers, this is basically -- these are

23    customers who are exceeding threshold at the end

24    of the month, you're giving them a 12 percent
```

Highly Confidential - Todd Cameron

1    buffer?

2           A.    Yes.

3           Q.    Okay.  All right.  So to your

4    point about contextualizing earlier, there are

5    also rules and classes that you apply for

6    certain kinds of customers?

7           A.    Yes.

8           Q.    How do you identify an improper

9    Internet seller?

10          A.    Any customer that we see that is

11   soliciting prescriptions over the Internet

12   without having the proper corresponding

13   responsibility interface with the patient and

14   the proximity to the doctor.

15          Q.    So they don't have a physical

16   location in the place where they're dispensing

17   prescriptions, right?  You're filling a

18   prescription in Kansas City, but you don't have

19   a pharmacy location there?

20          A.    Filling for a patient in Kansas

21   City, yes.

22          Q.    Okay.

23          A.    Yes.

24          Q.    And so how do you identify those

Highly Confidential - Todd Cameron

```
 1   pharmacies?

 2          A.    You can see it on -- you would see

 3   it on their website.

 4          Q.    And so who is scanning websites to

 5   find these?

 6          A.    We do when we vet the customers,

 7   when we visit them and turn them on.

 8          Q.    Okay.  And then one other question

 9   on the document that's Exhibit 3 again at Bates

10   numbers 1169 through 70.  Cardinal is giving

11   credit -- and this is 4.2.4a, very bottom,

12   carrying over to the next page.

13          A.    Yes.

14          Q.    -- for customers who have a loss

15   prevention program.

16                Is that something that Cardinal

17   still does?

18          A.    I'm sorry.  1169?

19          Q.    Yes.

20          A.    And then I'm reading 4.2.4a?

21          Q.    Yes.

22          A.    Okay.  And this is "i" I should be

23   reading?

24          Q.    Yep.
```

Highly Confidential - Todd Cameron

```
 1            A.    No, this is not something we do.

 2            Q.    Have you ever applied that policy

 3    during your tenure in compliance, that you give

 4    credit for having a loss prevention program?

 5            A.    It could have been in place when I

 6    first arrived.  I don't remember it being the

 7    case, but I know it's not part of how we set

 8    thresholds today.

 9            Q.    Did you proactively abolish that?

10    Was that something that you got rid of that you

11    recall?

12            A.    I do not recall that.

13            Q.    Okay.  Does it strike you as a

14    good policy?

15            A.    I don't think I've ever heard that

16    before, so I don't really -- I'm not really sure

17    about it.

18            Q.    Well, just looking at it now.

19            A.    Yeah.

20            Q.    Is this something you think makes

21    sense in an anti-diversion program?

22            A.    Again, we're looking at the

23    contextual size and factors of the customer to

24    set the thresholds appropriately based on each
```

Highly Confidential - Todd Cameron

```
1    individual customer.  That's not an objective

2    component that we would use.

3         Q.    Okay.  So no?

4         A.    Ask me again.

5         Q.    That's not a factor that you would

6    use in setting a customer's threshold?

7         A.    It is not a factor I use today.

8         Q.    That's not a factor you do use?

9         A.    Yes.

10        Q.    Do you think it makes sense?

11        A.    I don't know enough about what the

12   impetus was for it on how they were trying to

13   use it exactly.  So it's not fair for me to say

14   it makes sense or not.  I don't understand

15   enough about what the concept would really be,

16   how you do that.

17        Q.    Okay.  All right.  It's not

18   something that you would go back to your office

19   this afternoon and think you ought to put back

20   in place?

21        A.    No.

22        Q.    All right.  Next is Number 6.

23   Okay.  We're going to come back to that.

24              Do you know when Cardinal first
```

Highly Confidential - Todd Cameron

```
 1   reported a suspicious order in the State of

 2   Montana, a suspicious order arising in the State

 3   of Montana?

 4           A.    I do not know.

 5           Q.    Does 2013 sound right to you?

 6           A.    I do not know.

 7           Q.    Okay.  I want to go back for a

 8   second using your prerogative that you've used.

 9                 When we were talking about

10   terminated customers --

11           A.    Yes.

12           Q.    -- you said most of them weren't

13   terminated as a result of exceeding threshold?

14           A.    Yes.

15           Q.    And I just want to make sure I

16   understand that.  Is what you're saying they

17   were terminated for reasons other than exceeding

18   threshold?

19           A.    Yes.

20           Q.    But it was a threshold exceedance

21   that first triggered your scrutiny of the

22   customer?

23           A.    Could have been.

24           Q.    But you don't know?
```

Highly Confidential - Todd Cameron

```
 1              A.    I mean, some cases, it would have

 2    been, and some cases -- I mean, we have

 3    terminated customers that have never hit a

 4    threshold.  It just depends on the customer, our

 5    distribution percentage, what that customer

 6    looks like.

 7              Q.    How many customers who hit

 8    threshold are terminated?  What proportion?

 9              A.    I don't know the exact number, but

10    it would be a small percentage.

11              Q.    And is an order that exceeds a

12    threshold a suspicious order?

13              A.    By definition, yes.

14              Q.    It is an order that meets the CSA

15    and regulatory guidance for a suspicious order?

16              A.    Yes.

17              Q.    And do you think it actually

18    signals diversion?

19              A.    Not in every case.

20              Q.    In most cases?

21              A.    It would depend on the customer,

22    but the majority of our suspicious orders, we do

23    not believe that that customer is engaged in

24    diversion.
```

1         Q.    Are you aware when Cardinal put in

2    place its threshold system, there were a number

3    of customers that were kind of newly identified,

4    and Cardinal went through and sorted out who was

5    suspicious and who wasn't.  Is that an event

6    that you're familiar with generally?

7         A.    The concept makes sense to me.

8         Q.    Okay.  Do you know how many of

9    those customers that were identified through

10   that process were subsequently terminated?

11        A.    I do not.  I know there were

12   terminations prior to my arrival.

13        Q.    Okay.  And is there a process -- I

14   mean, we talked painfully about those metrics

15   that go up the chain.

16             Is there any kind of audit that

17   Cardinal does of your own thresholds, whether

18   they are appropriately tuned to identify

19   suspicious orders?  And are you going back and

20   doing the analysis of those to see if they

21   actually are pointing to suspicious orders of

22   customers?

23        A.    Again, by definition, every order

24   that hits our threshold that does not meet our

1  criteria is a suspicious order, which is why we

2  do not fill it and report it.

3          Q.    Okay.  And as you're thinking

4  about this from an anti-diversion perspective --

5          A.    Yes.

6          Q.    -- are threshold exceedances

7  actually pointing you to customers who you

8  believe are engaged in diversion?

9          A.    It would depend on the customer.

10  But, again, kind of back to my meeting with DEA,

11  based on how we set thresholds and our position

12  in the supply chain with that specific customer

13  will determine what volume of controlled

14  substances we are comfortable supplying to that

15  customer.

16              Many times that volume is well

17  below the volume the customer needs.  And the

18  total volume makes sense for the contextual size

19  of the customer.  But because we're only getting

20  a smaller portion, we're going to ensure that

21  that smaller portion makes sense analytically,

22  which leads to a lot of suspicious orders.

23          Q.    That aren't actually signs of

24  diversion?

Highly Confidential - Todd Cameron

1        A.    Yes.

2        Q.    In December 2007 -- I know this

3   was before your time.

4        A.    Yes.

5        Q.    So if you're familiar with it.

6   Cardinal sent a letter to Linden Barber when he

7   was at DEA and said based on these new

8   thresholds, that you had terminated certain

9   customers with AHOP drugs, which you will know

10  what it stands for, right?

11       A.    I do know what AHOP stands for.

12       Q.    Okay.  Which is what?

13       A.    Alprazolam, hydrocodone,

14  oxycodone, and phentermine.

15       Q.    That wasn't a test.  I couldn't do

16  it.

17       A.    That's what it is.

18       Q.    Greater than 30 percent of total

19  purchases?

20       A.    Right.

21       Q.    So all of these customers --

22       A.    So pulling the AHOP out threw me

23  off.  This is a letter from who to who?

24       Q.    From Cardinal to Linden Barber,

Highly Confidential - Todd Cameron

1  and said, "There are a bunch of customers from

2  our new thresholds that" --

3          A.    I'm sorry.  This is dated when?

4          Q.    December 2007.

5          A.    Okay.  Got it.  Sorry.

6          Q.    That's okay.  You're good at the

7  questioning.

8                That based on these thresholds,

9  these customers were buying -- that more than

10 30 percent of their purchases were for AHOP

11 drugs --

12         A.    Okay.

13         Q.    -- and that you were terminating

14 them.

15         A.    Okay.

16         Q.    Do you know anything about these

17 customers?

18         A.    I do not.

19         Q.    Okay.  Has the percentage of

20 orders that are being flagged as suspicious

21 changed over time?  This may be implicit in your

22 conversation with DEA.  But when you started in

23 your role in compliance, what percentage of your

24 opioid orders were flagged as suspicious?

Highly Confidential - Todd Cameron

1          A.    I don't know the specific

2    percentage of the orders that would have been

3    flagged.

4          Q.    Okay.  Do you know what it is now?

5          A.    Not as a percentage of the total

6    orders, no.

7          Q.    So in what form do you know those

8    numbers?

9          A.    I don't -- again, because each

10   threshold is set at the individual customer

11   level, I don't have an overarching X percent of

12   orders are held.

13         Q.    Okay.  So that's not one of the

14   metrics you look at?

15         A.    It is not.

16         Q.    Do you report suspicious orders

17   for reasons other than threshold exceedances?

18         A.    No.

19         Q.    When you terminate a customer,

20   have you ever done, for lack of a better word,

21   an autopsy on the customer to figure out when

22   you might have known that this was a customer

23   engaged in diversion or potentially engaged in

24   diversion?

```
 1          A.    Yes.

 2          Q.    Do you do that as a matter of

 3    course?

 4          A.    Yes.

 5          Q.    And what have you learned in that

 6    process?

 7          A.    We learned that the objective

 8    components we used to evaluate customers are

 9    appropriate.

10          Q.    And how can you tell that?

11          A.    Because the factors that cause a

12    customer to get reviewed usually come up prior

13    to the point in time in which we'd make a

14    determination to cut somebody off.  Oftentimes

15    it's growth that causes us to cut somebody off

16    and specific controls or specific strengths

17    within a control.

18          Q.    And is there a growth level that

19    tends to be highly indicative of diversion?

20          A.     There's not, because it really

21    depends on each individual customer that -- a

22    volume that might be indicative of diversion for

23    one customer is not at all for another customer

24    because that overall contextual size of each
```

Highly Confidential - Todd Cameron

1    customer.

2          Q.     So you haven't seen that while a

3    2 percent growth might be a signal in some

4    cases, 10 percent is always?

5          A.     No.

6          Q.     Okay.

7          A.     No.  It really does vary by

8    customer.

9          Q.     And so when you say it's

10   validated, the criteria you're using, have you

11   seen in those cases you've looked back on that

12   you could have told earlier?

13         A.     I don't think so.

14         Q.     So when you say that the signs

15   that you're looking at were present, what do you

16   mean by that?

17         A.     Well, when I say the signs are

18   present, obviously the factors are present for

19   any customer that's buying controls.  It's just

20   a matter of us identifying kind of back to that

21   bell curve concept at which point in time we

22   apply heightened scrutiny based on that mix and

23   where it falls into the segment is usually --

24   it's customers within those areas that are the

Highly Confidential - Todd Cameron

1  ones that potentially end up getting cut off.

2       Q.    And with one of those factors -- I

3  just want to go back.  You talked about this

4  20 percent as an average or normal level for

5  total orders that are controlleds as being

6  comfortable.

7       A.    Yes.  I didn't say orders, because

8  the order number is probably different based on

9  how controls get grouped into an order.

10      Q.    So volume?

11      A.    But as far as dispensed units or

12  scripts.

13      Q.    Okay.  Fair enough.  So when

14 you're looking at this in analyzing a customer,

15 do you apply some number greater or less than 20

16 when looking at it?

17      A.    There's a range for sure, yes.

18      Q.    And what's the range that you use?

19      A.    I would tell you a normal range

20 for controls is in that ██████ percent, common

21 range I would call it.

22      Q.    And is that true across the

23 opioids, so fentanyl same as oxycodone,

24 meaning -- you know what?  It was a nonsensical

Highly Confidential - Todd Cameron

1   question.  I'll withdraw it.

2              And when you're looking at that 15

3   to 25 percent, how are you factoring in the fact

4   that it's maybe higher MMEs or higher dose

5   generally?  How does that get weighted in

6   Cardinal's system?

7        A.    That's all part of the review

8   factor that -- to your point, it could be

9   25 percent, and your MME could be very, very

10  low.  It could be 10 percent, but your MME could

11  be high.

12       Q.    And that's something that once the

13  customer has been flagged to you and you're

14  sitting down with the file, that's one of the

15  things you're looking at?  It happens at a

16  customer-by-customer level?

17       A.    Yes.

18       Q.    Has the percentage or range

19  changed over time?

20       A.    Yes.

21       Q.    And what was it when you started?

22       A.    I would say it was probably

23  average was closer to 25 at that point in time.

24       Q.    Okay.  And, again, we were talking

Highly Confidential - Todd Cameron

1     about what's in that 20 percent that matters?

2            A.    Yes.

3            Q.    What are you looking for there?

4     If it is highly concentrated to oxycodone or

5     hydrocodone, is that a red flag to you?

6            A.    Yes.

7            Q.    Okay.  And are there other things

8     within that that are red flags?

9            A.    Yes.

10           Q.    What are they?

11           A.    The mix within the oxycodone.

12           Q.    You mean the dose?

13           A.    The strengths that you asked me

14    about earlier.  Same thing with hydrocodone.

15    Alprazolam, specific strengths within

16    alprazolam.  The benzos, ADD, ADHD drugs, total

17    opioids.

18           Q.    Okay.  And how do you figure out

19    which drugs are highly diverted?

20           A.    Linden Barber.

21           Q.    Okay.  And how does he figure it

22    out?

23           A.    He came from the DEA.

24           Q.    So the DEA is telling you, or he's

Highly Confidential - Todd Cameron

1   applying methods that he learned at DEA?

2        A.    I'm not sure where he learned

3   them.  But we've gotten a lot of consult from

4   Linden, yes.

5        Q.    Okay.  And do you know what data

6   he is looking at to make that judgment?

7        A.    I do not.

8        Q.    And have the drugs or doses you've

9   been looking at changed over time, too?

10       A.    Yes.

11       Q.    And in what way?

12       A.    They've decreased.

13       Q.    Meaning the volume of them has

14  decreased?

15       A.    And the ratios.

16       Q.    Okay.  And have new drugs or drug

17  families or doses become of concern that weren't

18  five years ago?

19       A.    Yes.

20       Q.    And what are those?

21       A.    I don't have a comprehensive list.

22  You know, you mentioned hydrocodone in October

23  of '14.  I saw the morphones go up.  Tramadol

24  had gone from not a control to a control.

1    Buprenorphine, while it's a treatment drug, has

2    abuse possible.  It's becoming more prevalent

3    prescribed to treat opioid addiction, but also

4    has abuse potential.  Those are some examples.

5         Q.    Now, one of the things in your

6    Know Your Customer criteria -- and I didn't put

7    a document with this.  So I will -- I will

8    confess to that, and hopefully it rings a bell.

9         A.    It's okay with me.

10         Q.    So it's indicates that customers

11    can -- that when you're looking at the

12    percentage of controlled substances, you're

13    looking only at Cardinal's orders as you

14    identified to DEA, recognizing that a customer

15    may be buying from other distributors.

16         A.    Yes.

17         Q.    So controlleds may be

18    overrepresented in Cardinal's supply?

19         A.    Yes.

20         Q.    And so a customer can give you

21    their order data --

22         A.    Yes.

23         Q.    -- and ask you to look at the

24    whole picture?

Highly Confidential - Todd Cameron

```
 1          A.    Yes.

 2          Q.    But Cardinal only gives them

 3   credit for 50 percent of non-cardinal

 4   purchases --

 5          A.    Yes.

 6          Q.    -- is that correct?

 7          A.    Correct.

 8          Q.    Is that because they're 50 percent

 9   less suspicious?

10          A.    No.

11          Q.    So why is that?

12          A.    Because if we gave 100 percent, we

13   would then be allowing customers to buy all of

14   their opioids from us --

15          Q.    Okay.

16          A.    -- which is obviously a bad thing.

17          Q.    And so it seems like the

18   incentives run in two ways, right?  You don't

19   want them to just buy their opioids from you,

20   but you'd also like them to buy their

21   non-controlleds from you, too?

22          A.    We are focused on ensuring that

23   the orders make sense for the context of the

24   customer for what they're dispensing in totality
```

1  and what they're buying from us.  And that's how

2  we ensure that what we distribute to that

3  customer, that all those orders, control and

4  non-control, make sense.

5        Q.   So a customer can avoid hitting

6  their threshold, right?  They can avoid being

7  cut off in two ways.  They can lower the

8  controlleds they're ordering from you, or they

9  buy more non-controlleds from you.  Either one

10  would solve that problem presumably.

11        A.   It depends on the customer.  If we

12  are not comfortable with their dispensing

13  totality, we cut them off regardless of the

14  volume that comes from us.

15        Q.   Understood.  But within this

16  universe of just looking at just the single

17  factor, those are the two ways you can rebalance

18  that equation; less controlleds, more

19  non-controlleds, correct?

20        A.   If we are comfortable with how the

21  customer looks in totality from a dispensing

22  standpoint, we will then ensure that the volume

23  of controls is proportionally within a normal

24  range of the non-controls.

Highly Confidential - Todd Cameron

```
1           Q.    Okay.  Meaning in the context of

2    other factors?

3           A.    I'm not sure I can say yes to that

4    or not.

5           Q.    I think you already did.

6           A.    Okay.

7           Q.    One of the things that has varied

8    in Cardinal's SOPs over the years is whether you

9    want sales representatives to let a customer

10   know that they're hitting threshold.

11          A.    Yes.

12          Q.    There used to be a dialogue

13   process, an early dialogue process.  Does that

14   ring a bell?  No?

15          A.    Can you tell me more?

16          Q.    Just where sales representatives

17   were encouraged to reach out to customers and

18   say, "Hey, you're close to threshold."

19          A.    Yes, yes.

20          Q.    Does that still happen?

21          A.    Sales is made aware if a

22   customer's accrual of controlled substances in a

23   specific drug family is disproportionate to the

24   threshold versus the time remaining in accrual
```

Highly Confidential - Todd Cameron

1   to understand if something has changed in that

2   customer's business and purchasing patterns.

3          Q.    Meaning if it is halfway into the

4   month and they're at two-thirds of the

5   threshold, the sales representative will reach

6   out?  And what is the conversation that they

7   have?

8          A.    They would talk about what the

9   previous historical purchases look like and what

10  it looks like they are trending towards and

11  trying to understand were you a secondary

12  customer that's becoming primary, did a pharmacy

13  up the street close and you've picked up new

14  patients, trying to understand what's changed

15  that caused that increase in volume.

16         Q.    Okay.  And so the customer comes

17  back to the sales rep with a legitimate

18  explanation; there's a new clinic that opened

19  nearby, a pharmacy down the street closed.  Then

20  what is Cardinal's response to that?

21         A.    It depends on what the drug is and

22  the volume of that drug and the context of the

23  customer.  It could be to increase the

24  threshold.  It could be to not increase the

Highly Confidential - Todd Cameron

1   threshold.  It could be to do a site visit.

2   Might have to go in front of LV TAC to make the

3   determination.

4           Q.    Okay.  And what -- in the ordinary

5   course, if the sales rep comes back with a

6   legitimate explanation, is it Cardinal's policy

7   to verify that explanation in every case?

8           A.    It depends on the numbers.

9           Q.    So that means -- if there's no --

10  if nothing else is ringing a bell for you, then

11  Cardinal's going to say, "Okay."  But if there's

12  something else that causes concern that you

13  might ask them to verify, do a site visit,

14  something else?

15          A.    Or the specific volume.

16          Q.    Okay.  Okay.

17          A.    So an increase from 2,000 to 3,000

18  probably wouldn't require a lot of extra steps.

19  Going from 30,000 to 50,000 would.

20          Q.    Okay.  So it's a discretionary or,

21  as you would say, a contextualized call as to

22  whether you're going to verify?

23          A.    Yes.

24          Q.    How many of your customers give

Highly Confidential - Todd Cameron

1    you the data on the orders from other

2    distributors?  You could do it as customers or

3    you could do it as volume.

4             A.    Tell me exactly what you mean by

5    give us the data.

6             Q.    Excuse me?

7             A.    Tell me exactly what you mean by

8    give us the data.

9             Q.    So you know this idea that if you

10   provide the data on your opioid orders from

11   another distributor or your non-opioid orders,

12   how many of your customers will give you that

13   data?

14            A.    And I'm sorry, but tell me what

15   you mean when you say "give us the data."

16            Q.    So when we talked about that

17   50 percent credit, that's the data I'm talking

18   about, which will be crystal clear in the

19   record.

20            A.    So that 50 percent delta would be

21   driven off of data feed and site visit.  It

22   wouldn't be something that would be given to us

23   by the customer that we would put any weight

24   into.

Highly Confidential - Todd Cameron

1    Q.    That would what?

2    A.    That we would put any weight into.

3  We wouldn't use --

4    Q.    That if they just printed it out

5  and handed it to you?  You're talking about

6  something where they give you electronic access?

7    A.    Yes, or we do a visit and capture

8  the information.

9    Q.    How would you capture that

10  information on a visit?

11    A.    That's when the investigators go

12  in, and they run the aggregate level dispense

13  data.

14    Q.    Meaning they go into the pharmacy

15  system themselves?

16    A.    Not the investigator, no.  The

17  pharmacy does, but the investigator is there

18  when it happens.

19    Q.    Okay.  The investigator is there

20  with the pharmacy staff who's running that

21  report?

22    A.    Yes.

23    Q.    Okay.  And that's just more

24  reliable than a customer putting it into a

1   survey?

2        A.    Yes.

3        Q.    Have you observed any trends in

4   the geographic supply of opioids over the five

5   years you've been there in that compliance role;

6   volumes, types of drugs?

7        A.    Yes.

8        Q.    And what have you observed?

9        A.    We've seen prescribing, to some

10  degree, start to come down.  We've seen, like we

11  talked earlier, the control percentage mixes

12  within oxycodone, for example, start to come

13  down.

14       Q.    And have you seen that in

15  particular parts of the country, or has that

16  been across the board?

17       A.    It would depend on how far down

18  your geography goes as to answer that question.

19       Q.    Tell me what you mean by that.

20       A.    Like, I can't speak to Whitefish.

21       Q.    But could you speak to Appalachia,

22  for instance?  Is that what you're saying?

23       A.    Yeah, not -- probably not as broad

24  as Appalachia but individual states within

1    Appalachia.

2            Q.    Okay.  And are there any trends

3    you've observed in Montana?

4            A.    No.

5            Q.    Have you observed any changes in

6    the class of trade -- I think is the term you

7    used -- of customers who are selling opioids or

8    engaged potentially in diversion of opioids?

9            A.    I'm sorry.  Ask me that again.

10           Q.    Have you seen any changes in the

11   class of customer, the trade, who are in the

12   volume that they are selling or whether they are

13   potentially engaged in diversion?

14           A.    Meaning?

15           Q.    Meaning have you seen that

16   national chains --

17           A.    Okay.

18           Q.    -- have become more of a problem

19   or rural areas?

20           A.    No.

21           Q.    Has Cardinal ever lowered

22   thresholds in an area because you observed an

23   oversupply into the area?  An oversupply of

24   opioids is what I mean.

Highly Confidential - Todd Cameron

```
 1          A.    Since I've been in the role?

 2          Q.    Yes.

 3          A.    No.

 4          Q.    And when you asked that question,

 5   is that because you know of something before you

 6   got involved or because you don't know what

 7   happened before you were involved?

 8          A.    I don't know what happened before

 9   I was involved.

10          Q.    Okay.  So, again, I know your

11   knowledge is really 2012 and later, but having

12   looked back at Cardinal's compliance and

13   anti-diversion program before you started, do

14   you think Cardinal was doing everything it

15   needed to to prevent diversion pre-2012?

16          A.    I really have no clue what was or

17   wasn't being done.

18          Q.    Okay.  So I think his title is

19   chairman, George Barrett.

20          A.    Yes.

21          Q.    When he testified in Congress last

22   year or this year, whenever it was, he said that

23   Cardinal's compliance system is better now

24   because it's more objective.
```

Highly Confidential - Todd Cameron

1      A.    Yes.

2      Q.    In what way has Cardinal's

3  compliance system become more objective?

4      A.    I think in our ability to use and

5  analyze data to objectively understand the

6  contextual size of the customer.

7      Q.    Okay.  So, again, to make sure I'm

8  understanding your comment in the context of

9  what you've said today, it sounds to me like

10  what you're saying is that the individualized

11  determinations you're making about customers are

12  more data driven or data informed, although

13  they're still decisions that you all are making

14  about individual customers?

15      A.    Yes.

16      Q.    Okay.  Meaning that it's not a

17  computer that's telling you pharmacy X or

18  pharmacy Y?

19      A.    Yes.

20      Q.    Okay.  What do you think is the

21  strongest feature of Cardinal's current system

22  to prevent diversion?

23      A.    The fact that we ensure that our

24  orders of controlled substances makes sense for

Highly Confidential - Todd Cameron

1   the contextual size of the customer that we're

2   supplying to.

3           Q.    So the thing you warned the DEA

4   about is actually the thing that you think is

5   most important?  Not critical.

6           A.    Did you say most important when

7   you asked the question the first time?  I don't

8   think you said most important.

9           Q.    Strongest feature.

10          A.    I think that's one of the things

11  that separates us from the rest of the industry.

12          Q.    And is there a piece of this that

13  you feel is the weakest feature of the program

14  right now?

15          A.    No.

16          Q.    And you talked about your

17  competitors -- and I know that they are your

18  competitors.  But how does Cardinal's

19  anti-diversion program differ from your

20  competitors, to the extent you know?

21          A.    I don't know how they evaluate

22  customers and set thresholds.  I just know that

23  our -- what you referred to earlier, that

24  50 percent, that functionality will ensure that

Highly Confidential - Todd Cameron

1    the orders are always going to make sense,

2    whether we're distributing 100 percent of a

3    customer's volume, 50 percent, or 10 percent, or

4    anywhere in between.  Like, that's probably the

5    big differentiating factor.

6            Q.    Okay.  So in this round of

7    Jeopardy, we're going to be turning to Montana

8    in particular.

9            A.    It's not been Double Jeopardy yet?

10           Q.    Right.  This is the lightning

11   round.

12                 Did you have a chance to look at

13   the suspicious order spreadsheet that Cardinal

14   provided to the State of Montana?

15           A.    I'm not sure.

16           Q.    Okay.  I hope your vision is good.

17           A.    It is up close.

18                      - - -

19       (Montana-Cardinal Exhibit 6 marked.)

20                      - - -

21           Q.    So showing you Exhibit 6.  So this

22   is -- you're welcome to borrow mine.  This is a

23   report that was produced to the State of

24   Montana.  It lists all of the suspicious order

Highly Confidential - Todd Cameron

1   reports that Cardinal filed with DEA for the

2   State of Montana from 2013 forward.

3          A.    Okay.

4          Q.    So we'll let you look at that for

5   a minute.

6          A.    And all the pages are the same,

7   right; it's just more data?

8          Q.    Right.  So they're different

9   orders --

10         A.    Yes.

11         Q.    -- but in the same format.

12         A.    The headers are all the same.

13         Q.    Exactly.

14         A.    Got it.

15                     - - -

16         (Montana-Cardinal Exhibit 7 marked.)

17                     - - -

18         Q.    These were the two documents that

19   we obtained from Cardinal that list suspicious

20   order reports.  So obviously Exhibit 7 that you

21   were given is text fields.  Very hard to read.

22   But I wanted you to have the two reports that

23   were produced to us.

24         A.    Yes.

Highly Confidential - Todd Cameron

```
 1              Q.    Okay.  And I'm not going to ask

 2    you specifics about individual orders.

 3              A.    Okay.

 4              Q.    I just wanted you to have the

 5    spreadsheets in front of you.

 6                    So in Exhibit 6 with the

 7    columns --

 8              A.    Yes.

 9              Q.    -- I think -- does it have a title

10    on it?

11              A.    It does not.

12              Q.    Okay.

13              A.    I mean, the columns have headers,

14    but there's no title on the document.

15              Q.    Okay.  So do you recognize Exhibit

16    7, the text fields?  Is that something you've

17    seen before?  Can you parse what that is?  It

18    was listed to us as "reported to DEA case."

19              A.    The individual pieces on here are

20    obviously familiar to me, but the format of it

21    I'm not sure.

22              Q.    Okay.  We'll do our best muddling

23    through them.

24                    So on the spreadsheet -- not the
```

Highly Confidential - Todd Cameron

```
 1   text file.  Exhibit 6.

 2           A.    Yes.

 3           Q.    There are 323 transactions.

 4           A.    Okay.

 5           Q.    But there are only 289 on the text

 6   file version.

 7           A.    Okay.

 8           Q.    Can you explain to us why there

 9   would be a discrepancy between those reports, if

10   you know.

11                 MS. WICHT:  Could you say the

12           numbers for me again, Linda?  I'm sorry.

13                 MS. SINGER:  So Exhibit -- one

14           exhibit is CAH_MTAG, Bates number 1329.

15           And the other is CAH_MTAG_1750, which

16           was called "Reported to DEA case."

17           A.    How much was on the first one?

18           Q.    I'm sorry.  1329, Bates number

19   1329, is orders reported to DEA.  1750 is orders

20   held by Cardinal's system in Montana.  That's

21   the difference.

22           A.    How many were on the big one?

23           Q.    What?

24           A.    How many were on the big
```

Highly Confidential - Todd Cameron

1    spreadsheet?

2         Q.    So on the big one -- let me just

3    double check.   1329 --

4         A.    Okay.

5         Q.    -- is 323.

6         A.    323?

7         Q.    Mm-hmm.

8         A.    Okay.

9         Q.    And 1750 is 289.

10        A.    And tell me what you called

11   Exhibit 6.

12        Q.    Now you're really --

13        A.    Sorry.

14        Q.    Exhibit 6, the spreadsheet, is

15   orders reported to the DEA.

16        A.    Okay.

17        Q.    And 1750, which is Exhibit 7, is

18   orders held by Cardinal's system.

19        A.    And we think the time frames are

20   identical?

21        Q.    Yes.  2013 forward.

22              And, again, this is not a math

23   test.  If there's an obvious reason to you why

24   there would be a difference in the numbers,

Highly Confidential - Todd Cameron

1    that's what we're trying to understand.

2               THE WITNESS:  Speak?

3               MS. WICHT:  I think so.  But do

4         you have a concern about privilege?  Is

5         that what you're --

6               THE WITNESS:  Huh-uh.

7               MS. WICHT:  Oh, yeah.  Go ahead.

8         A.    So my first question would be:

9    Are the start and end dates identical?  That

10   would be my first question.

11        Q.    So we do believe so, because they

12   were produced by you to us for the same period.

13   So let's assume that's the case.  Is there a

14   reason that you can think of as a data or policy

15   matter that there would be different numbers

16   here?

17        A.    There is.  Although, based on the

18   titles -- and the titles could have gotten

19   flip-flopped, but when I heard you say --

20        Q.    Including by me, in fairness.

21        A.    When I heard you say 323 and

22   289 --

23        Q.    Yes.

24        A.    -- that my initial reaction would

Highly Confidential - Todd Cameron

1  have been one was held orders.  And then the

2  lower number was the ones that were actually

3  canceled and reported as suspicious.  So the gap

4  would have been the orders that were viewed and

5  then released.

6          Q.    Okay.

7          A.    That would be my initial -- not

8  knowing any more than what I have in front of

9  me, that would be my initial reaction.

10         Q.    So an order that the larger number

11 is larger, because not every order that's

12 reported is ultimately -- no.  Other way around.

13         A.    Every order -- yeah.  So not every

14 order that hits a threshold is canceled and

15 reported.  The majority are.  But based on this,

16 my assumption was the slightly larger number

17 were the ones that hit the threshold.

18              The slightly smaller number were

19 the ones that were canceled and reported.  And

20 the gap between the two would have been the

21 number that were released.  That's strictly me

22 speculating based on what I'm looking at.

23         Q.    So why would an order that

24 exceeded threshold --

Highly Confidential - Todd Cameron

```
1          A.    Yes.

2          Q.    -- be released and not reported?

3          A.    So it would depend on a lot of

4    different factors.  It could be that we changed

5    the threshold.  Again, back to the conversation

6    we had around gaining information, we could have

7    changed the threshold.  It could have been --

8          Q.    So changed the threshold after the

9    order came in?

10         A.    Yes.  Exactly.  So threshold came

11   in, evaluate it, and decide to raise the

12   threshold.  Therefore, you release.  I don't

13   want to get into too much inside baseball.

14         Q.    We're here for inside baseball.

15         A.    Not from a privileged standpoint,

16   but just from a system nerd standpoint.

17               One thing that happens, when we

18   change a threshold during the month, every

19   subsequent order that goes over what the amount

20   was prior to the change until the next accrual

21   cycle reset looks like a released order.

22         Q.    Okay.

23         A.    And that throws -- so then you

24   could have ten orders that look like hit the
```

 1   threshold -- well, they didn't hit the new

 2   threshold.  So that's the way the system tracks

 3   it.  So that's a factor as well.

 4        Q.    So what you're saying is

 5   effectively the system doesn't recognize the

 6   threshold increase?

 7        A.    Until the next accrual cycle

 8   reset.  But that's not necessarily all the

 9   instances, but that is one factor.

10        Q.    And how would you figure that out?

11   Is there a way forensically?

12        A.    You could, yes.

13        Q.    Okay.

14        A.    You could manually go through and

15   look at what a threshold was when it was

16   changed.

17        Q.    So Jen is now thinking about the

18   request that's coming to her tomorrow.

19            Another question we had in looking

20   at this data is that we observed that in a

21   number of instances, Cardinal filed a suspicious

22   order report.  So it's not that delta we're

23   talking about between them.

24        A.    Yes.

Highly Confidential - Todd Cameron

```
 1          Q.    They're on both.

 2          A.    Yes.

 3          Q.    They were reported.

 4          A.    Yep.

 5          Q.    But then the same NDC product is

 6   shipped to the customer days later.

 7          A.    Not uncommon.  It would depend on

 8   when that accrual reset took place, that if

 9   there was a new accrual period, the threshold

10   does reset.  And if we determine that there's no

11   concerns of diversion, we should continue to

12   supply that customer, we would continue to

13   supply to them.

14          Q.    So, again, it just reinforces the

15   same point you made earlier --

16          A.    Yes.

17          Q.    -- that an exceedance is not

18   necessarily a suspicious order?

19          A.    Correct.  It is a suspicious order

20   by definition of the suspicious order.  It's not

21   necessarily indicative of diversion at the

22   customer level.

23                I can't believe you can read this

24   one.  It's like giving me a seizure.
```

Highly Confidential - Todd Cameron

1    Q.    We pull out no stops getting our

2  testimony.  The strobe light happens next.

3    A.    That's what it feels like.

4    Q.    In some of the reports, there is a

5  negative shipped quantity and dosage units,

6  just, again, as a general matter.

7    A.    Can you show me where you're

8  seeing that?

9    Q.    It's going to be another

10  spreadsheet, 1369.

11          MS. SINGER:  Is that what you've

12      got?

13          All right.  So we're going to need

14      another exhibit number.

15                  - - -

16      (Montana-Cardinal Exhibit 8 marked.)

17                  - - -

18    Q.    So I can't direct you to specific

19  lines, but some of them have negative numbers.

20    A.    Okay.  So this is not suspicious

21  orders.  This is just distribution data.

22    Q.    That's right.

23    A.    Yes.  And if you see a negative

24  number, because you are identifying a specific

Highly Confidential - Todd Cameron

```
1   window of time, for example, in this case 2016,

2   the net number during that time was negative 60.

3   So they may have purchased --

4           Q.    And returned?

5           A.    Yes.

6           Q.    Okay.

7           A.    And the returns during that time

8   frame were greater than the purchases.  So it

9   would show a negative number.

10          Q.    Not your favorite customers?

11          A.    It depends.

12          Q.    So going back to -- I'm sorry.  In

13  the same one, 1369, Exhibit 8.

14          A.    Yes.

15          Q.    Why would there be records of

16  shipment by Cardinal Health to Montana customers

17  that are in the ARCOS data --

18          A.    Yes.

19          Q.    -- but not on that shipment

20  report?

21          A.    And tell me what this shipment

22  report is.

23          Q.    Again, it is, I think, the list

24  you all produced of opioids distributed in the
```

Highly Confidential - Todd Cameron

```
 1   State of Montana by Cardinal.

 2              MS. WICHT:  And you're comparing

 3         to ARCOS data produced by DEA in the

 4         context of the litigation?

 5              MS. SINGER:  Yes.

 6              MS. WICHT:  Okay.

 7              If you know.  If you know, you can

 8         answer.

 9         A.   I don't know.  The only -- so,

10   again, I have no idea.  But if I were to guess,

11   one possible reason would be there are drugs

12   that are included in Exhibit 8 that are not

13   ARCOS reportable drugs, and that could be a

14   factor in this.

15              I don't know that for sure because

16   I don't know how this was pulled or any of that

17   stuff.  That's a guess.  I mean, so a great

18   example is when I look at this, DEA base code

19   5001 is tramadol.  And, for example, tramadol

20   was not a controlled substance in 2013.  So

21   that, I assume, would not be in ARCOS data.

22         Q.   Okay.

23         A.   If that makes any sense.

24         Q.   Yes.
```

Highly Confidential - Todd Cameron

```
 1                And can you also explain -- I'm
 2    not going to trouble you with the exhibit,
 3    because it's just a lot more paper.  But are
 4    there instances where Cardinal would ship more
 5    than a customer ordered?
 6          A.    No.
 7          Q.    Okay.  We found 157 examples of
 8    that.
 9          A.    And how are you seeing the order?
10          Q.    Again, this was --
11                MS. SINGER:  Do you have 1371?
12                MS. DEYNEKA:  It's the
13          distribution of opioid medications to
14          Montana on a per order basis from 2006
15          to 2018.
16                MS. WICHT:  That's what Exhibit 8
17          is -- or no.  That's what you're
18          comparing.
19          A.    So you're seeing an order for 100,
20    and you see a shipment of 110, for example.
21    Again, not being involved in how any of that was
22    created, my initial response to that would be I
23    don't know if maybe there was a backorder
24    situation where a product could have been on
```

Highly Confidential - Todd Cameron

1   backorder.  And then the backorder order would

2   have been released that would not have been tied

3   to that individual order that came after the

4   fact.  And you could have the backorder material

5   becomes part of the same order.  That would be

6   my initial reaction.  But, again ...

7            Q.    Okay.

8                  MS. SINGER:  Why don't we do 1728.

9            Q.    You think these are questions to

10  you.  This is really a test for Natalie.

11           A.    She's doing a good job.

12                       - - -

13       (Montana-Cardinal Exhibit 9 marked.)

14                       - - -

15           Q.    So we understand Exhibit 9, which

16  is CAH_MTAG_1728, to represent -- to include at

17  the back 17 --

18           A.    So wait.  These are the working

19  instructions you had.

20           Q.    I see you feel very vindicated by

21  that.

22                  Let me ask you a general question.

23  When we see a customer with a threshold level

24  set at 99,999 or 999,999,999, what does that

Highly Confidential - Todd Cameron

1    mean?

2         A.    So that is a systematic issue to

3    the subbases that we spoke of earlier, that we

4    may have had a subbase code in place for that

5    customer at one point in time.  And then when we

6    changed the subbase, again that base will

7    encompass, for example, hydrocodone -- all

8    hydrocodone strengths, sizes, brand, generic,

9    immediate release, extended release, everything

10   involved in the hydrocodone family.

11              We do not want the subbase, which

12   was a subset of that number, to affect the base

13   code.  So the system gives it what looks like a

14   huge number to ensure that it will always be

15   greater than the base.  Therefore, the base code

16   will always take effect.

17        Q.    But if the point of the subbase

18   code --

19        A.    Yes.

20        Q.    -- was to flag or restrict sales

21   of more likely to be diverted --

22        A.    Yes.

23        Q.    -- products --

24        A.    Yes.

Highly Confidential - Todd Cameron

1       Q.      -- why would you want to eliminate

2   that?

3       A.      Because they got put in place --

4   so, for example, the one that you're probably

5   looking at might be Zohydro.  And when Zohydro

6   came out, we were concerned because of the

7   strength of the product, that it might become

8   the next thing, and it didn't.

9               In fact, the volumes are

10  .1 percent of hydrocodone volume, and very

11  non-existent and rare.  So that's why we took

12  that off so it would not affect the other

13  pieces.

14      Q.      Okay.  We may be saving Natalie

15  then.

16      A.      But on the surface, it looks like,

17  oh, my gosh, what is this huge number.  And it's

18  system issue to ensure that the number will be

19  greater than the base code and it won't affect

20  the base code.

21      Q.      So we saw with some frequency,

22  too, with buyers who were terminated and then

23  restored, and then they would come back with

24  thresholds at 999,999.

Highly Confidential - Todd Cameron

```
1              A.    What do you mean when you say

2     buyers that were terminated?

3              Q.    So some -- again, what we

4     understand to be is customers were -- they could

5     no longer purchase controlled substances.

6              A.    Okay.

7              Q.    They're listed in the documents as

8     terminated.

9              A.    Okay.

10             Q.    Not just orders that were held or

11    deleted.

12             A.    Yes.

13             Q.    And then they came back.  It will

14    say "termination restored" or "customer

15    restored" or something like that.  And then the

16    threshold listed is 999,999.

17             A.    For the subbase, not for the base?

18             MS. SINGER:  Did you find that

19         spreadsheet?

20             MS. DEYNEKA:  I'm working on it.

21    BY MS. SINGER:

22             Q.    All right.  We'll skip it for now.

23    We can always deal with it separately.

24             A.    And it's tricky.  When you're
```

1    going through it, you've got to go back and make

2    sure you find the base code, because the base

3    code will trump the subbase.

4           Q.    Okay.  Why would you terminate a

5    buyer for certain opioids but not all opioids?

6           A.    Do you have a specific example?

7           Q.    I think you know the answer to

8    that.

9           A.    Can I see the specific example?

10          Q.    I can to show you that it

11   happened.  There were a number of cases of it.

12          A.    Do you have time, date ranges?

13          Q.    I don't.  They are knowable.  I

14   don't know them sitting here.

15          A.    That would not be a normal

16   procedure.

17          Q.    Okay.  Meaning if you find that a

18   customer is suspicious with respect to

19   hydrocodone, you're going cancel all of their

20   privileges?

21          A.    Yes.

22          Q.    And that would be what you would

23   expect to be the appropriate response?

24          A.    Yes.

Highly Confidential - Todd Cameron

```
1              Q.     Okay.

2              A.     Very similar to your Mallinckrodt

3     questions.  Mallinckrodt is for --

4     Mallinckrodt's oxy, we cut them off for all

5     controls.

6              Q.     Okay.  Does Cardinal supply

7     physicians directly?

8              A.     Not through its pharmaceutical

9     distribution business.

10             Q.     Okay.  Meaning Cardinal does, but

11    not within your purview?

12             A.     Not within the pharmaceutical

13    distribution business.  There's another business

14    that does that, but we do have thresholds in

15    place for those as well.

16             Q.     And are you responsible for

17    anti-diversion efforts with respect to those

18    sales?

19             A.     Yes.

20             Q.     And was there a period when

21    Cardinal started looking at its supplies to

22    individual physicians?

23             A.     I believe -- and this is before my

24    time -- that at one point in time, there was
```

Highly Confidential - Todd Cameron

```
 1    distributions from PD to physicians offices, but

 2    that's not the case today.

 3           Q.    Okay.

 4           A.    It gets tricky because clinics,

 5    physical clinics, use physician registrations

 6    that it might look like it's a doctor himself,

 7    but it's the doctor's DEA registration that the

 8    clinic is registered under.

 9           Q.    Okay.  And are there instances

10    where it would be reasonable or expected that a

11    customer is terminated with respect to one

12    distribution center but not another?

13           A.    No.

14           Q.    Okay.  I have an example of that

15    one.

16           A.    I know you do.

17           ▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18           A.    Yes.

19           Q.    Can you explain it?

20           A.    Can you tell me what the -- is one

21    of them either Denver or Salt Lake and the other

22    one is Wheeling, West Virginia?

23           Q.    So the number of I have, which may

24    reveal that to you, ▮▮▮▮▮▮▮▮
```

Highly Confidential - Todd Cameron

```
 1          A.     Do you have like data --

 2          Q.     I don't have --

 3          A.     -- transactional data.

 4                 (Discussion off the record.)

 5          Q.     And then the last general question

 6   is:  We found instances where Cardinal

 7   terminated a non-customer.  Why would that

 8   happen?

 9          A.     So I do not know the specific

10   example that you're referring to.  But I could

11   tell you, for example, in some of the media

12   pieces that we had talked about earlier, that if

13   we see a pharmacy gets rated or busted that is

14   not a customer, we will try to put a block in

15   place to ensure that customer never comes on

16   board.

17          Q.     Okay.  And so we found with ████

18   ████████████, Columbia Falls -- that was a

19   pharmacy that was terminated 7/13/2017 and

20   termination lifted 7/14/2017.

21                 Why would that happen?  414,860

22   dosage units.

23          A.     And the 414 is what time frame?

24          Q.     I think -- I don't know.  I don't
```

Highly Confidential - Todd Cameron

 1   know.

 2        A.    So it sounds like they were cut

 3   off for one day is what the data -- I would need

 4   the data.

 5        Q.    Okay.  See, after this experience,

 6   you're going to know Montana so well.

 7        A.    Right?  Yes.

 8        Q.    I know you said earlier when we

 9   talked about the buffer in threshold --

10        A.    Yes.

11        Q.    -- that that's going to be

12   individualized.

13        A.    Yes.

14        Q.    And how much of a buffer and

15   whether there's a buffer will depend on the

16   customer.

17        A.    Yes.

18        Q.    However, is it true that the

19   buffer shouldn't give a huge amount of extra

20   capacity, right?  You want to give some room,

21   but a buyer shouldn't have double its sales in

22   threshold?

23        A.    It would -- conceptually that

24   makes sense.  It would depend on the volume.  So

Highly Confidential - Todd Cameron

1   if it was 2,000 and going from 2,000 to 4,000,

2   that's different than going from 60,000 to

3   120,000.  But yes.

4           Q.    Okay.  In general, thresholds

5   should have a proximity --

6           A.    Yes.

7           Q.    -- to actual sales?

8           A.    Yes.

9           Q.    Okay.  We found certain of your

10  buyers didn't have thresholds at all.  Why is

11  that?

12          A.    Again, I would need to look at and

13  understand exactly what you're looking at, who

14  the customer was, what the time frame is.  I'm

15  not sure what data they got.

16          Q.    Okay.  Just asking generally.

17              And then the last couple general

18  questions we have from the data is -- there are

19  customers for whom you set thresholds where we

20  have no evidence that you sold them anything in

21  the relevant time period.  Why would that be?

22          A.    It could have been a customer that

23  came on board that through that Know Your

24  Customer process said they were going to buy X

Highly Confidential - Todd Cameron

1    and they never did.

2           Q.    Does that happen?

3           A.    Yeah.

4           Q.    Okay.

5           A.    Yeah.

6           Q.    And then the data we have shows a

7    reason for a threshold change.  I assume that's

8    something that has to be put into the system

9    when a threshold is changed?

10          A.    Yes.

11          Q.    So the reason it says "threshold

12   change to align with scripts volume and

13   historical purchase" --

14          A.    Yes.

15          Q.    -- what does that reflect?

16          A.    So that would be a situation where

17   the overall script volume, the total control and

18   non-control, has changed up or down that would

19   have led to that contextual picture of the

20   customer looking different and making the change

21   to the threshold.

22          Q.    Okay.  Has Cardinal become aware

23   of customers taking steps to try to evade

24   thresholds or other compliance efforts?

Highly Confidential - Todd Cameron

```
 1          A.    No.

 2          Q.    So you've not seen reports of

 3    structuring or other efforts to make orders in a

 4    way that avoids your screens?

 5          A.    Conceptually that totally makes

 6    sense.  But, no, I've not seen specific

 7    instances of that.

 8          Q.    Okay.  And thresholds are sent for

 9    monthly periods and yearly; is that correct?

10          A.    We have daily, monthly, and

11    quarterly.

12          Q.    But not yearly?

13          A.    But not yearly.

14          Q.    And the quarter, is that also like

15    the monthly, a fixed --

16          A.    Yes.

17          Q.    -- date?

18          A.    Yes.  It's three of the months.

19          Q.    We saw that some of the data was

20    modified to reflect consistent historical sales

21    data.

22          A.    I'm not sure what that means.

23          Q.    So it's a field you had in the

24    data that changed threshold and then said
```

Highly Confidential - Todd Cameron

1    "consistent historical sales data."

2              Do you know what that refers to?

3         A.    Not without seeing the specific

4    example, I wouldn't, no.

5         Q.    Okay.  So that phrase doesn't mean

6    anything to you?

7         A.    Say it to me one more time.

8         Q.    Consistent historical sales data?

9         A.    No.  That accompanied the

10   threshold change?

11        Q.    Yes.

12        A.    No.

13             MS. SINGER:  Okay.  So we're going

14        to mark this as 10.  Is that what we're

15        up to?

16                     - - -

17   (Montana-Cardinal Deposition Exhibit 10 marked.)

18                     - - -

19        Q.    It's not Bates numbered.  So at

20   the page that is pulled back, you can see on the

21   very bottom in the far right field --

22        A.    Okay.

23        Q.    -- is the field that I was

24   referring to.

Highly Confidential - Todd Cameron

1          A.    Got it.  All right.  I'm sorry.

2   So you're asking me about what that means?

3          Q.    Yes.

4          A.    So when I look at this --

5          Q.    And the field, just so we have a

6   clear record, that you're referring to is?

7          A.    "Threshold changed to align with

8   scripts volume and historical purchases."

9                So when I look at this specific

10  page, my assumption in looking at this is that

11  there was a mass update change.  So there was a

12  decision made around threshold setting

13  methodology that got applied to everybody that

14  shouldn't have been applied to that customer

15  because we could have been going through a

16  process to take buffer out.  And then that

17  process impacted that customer's level.  And

18  this was returning it back to the previous level

19  before the mass change reduced it.

20          Q.    Do you remember what kind of

21  global changes that Cardinal made during your

22  tenure, what kind of changes were made to

23  threshold setting?

24          A.    A lot of the drugs have floors

Highly Confidential - Todd Cameron

1   that's a minimum that everybody can get, that

2   we've made a lot of changes to the floors of

3   various drugs over the years.

4        Q.   And a floor, meaning unless you

5   ordered that much, you couldn't have any?

6        A.   No.  Floor would be the smallest

7   amount that everybody gets.

8        Q.   Okay.  So you couldn't purchase a

9   volume less than that?

10       A.   You could.  Your threshold will

11  just be at that -- almost the lowest common

12  denominator for a threshold.

13       Q.   Understood.  It is the threshold

14  for everybody who buys anything?

15       A.   Yes.  And then if you get more

16  than that, that's where the methodology comes

17  into play, yes.

18       Q.   Okay.

19       A.   That would be one example.

20       Q.   Okay.  When we talked about the

21  size of increases --

22       A.   Yes.

23       Q.   -- and whether that triggered a

24  concern about potential diversion, and you said

Highly Confidential - Todd Cameron

1    it depends on a lot of different things.

2              When you're looking at increases,

3    are you looking at that month to month, order to

4    order, year over year?

5         A.    It would vary, but month to month

6    would be the most common.

7         Q.    Okay.  So a customer that

8    increases by a little bit every month, how is

9    Cardinal picking up?

10        A.    Back to the concept of setting

11   that initial threshold properly, there's -- once

12   you move -- so to your question, increase it,

13   you're going to hit a zone that's going to

14   require two-person approval, LV TAC approval,

15   those type of pieces.  So you can't have

16   unlimited -- there are lines that dictate once

17   you hit the zone, it's got to be reviewed by

18   multiple people.

19                      - - -

20        (Montana-Cardinal Exhibit 11 marked.)

21                      - - -

22        Q.    All right.  So you could take a

23   minute and look, but Exhibit 11 is an e-mail

24   from you Friday, January 11, 2008, correct?

Highly Confidential - Todd Cameron

```
 1          A.    Yes.

 2          Q.    So one thing that's curious about

 3    this, is this is before you moved into

 4    anti-diversion.

 5          A.    Correct.

 6          Q.    And so how -- you can read the

 7    communication obviously before answering that.

 8    But the first question will be:  How were you

 9    involved in this chain before you were involved

10    in compliance?

11          A.    Okay.

12          Q.    So how were you involved in this

13    chain from your previous role?

14          A.    So in reading this e-mail, and not

15    remembering exactly the specifics of this, when

16    I was in the sales office and involved in

17    customer data, this team came to me and was

18    asking for me to produce data from a reporting

19    standpoint to give to them to allow them to

20    analyze the components that they were looking to

21    analyze as they were building out an IT solution

22    in the bigger picture.

23          Q.    Okay.  So in the e-mail at

24    CAH_MDL_PRIORPROD-DEA07_111090 --
```

Highly Confidential - Todd Cameron

```
 1          A.    Yes.

 2          Q.    We're actually going to do 92.

 3          A.    92?

 4          Q.    Yes.  So it talks about threshold

 5   creepers.

 6          A.    Yes.  Wait.  Let me find it.  Are

 7   you on the top half or bottom half?

 8          Q.    It's right in the middle of the

 9   page.

10          A.    Okay.

11          Q.    What is a threshold creeper, and

12   what has Cardinal done to deal with it?

13                And, you know, before you answer

14   that actually, so if you can read the second

15   paragraph of the e-mail from Michael Mone.

16          A.    Same page?

17          Q.    Yep.  To Mark Hartman.  It says --

18   it talks about "the potential for diversion

19   through a process of small adjustments --

20          A.    Yes.

21          Q.    -- that result in large changes

22   over time."

23          A.    Yes.  That's exactly what you just

24   asked me about.
```

Highly Confidential - Todd Cameron

1      Q.    Yes.

2      A.    Yes.

3      Q.    So these threshold creepers.  So

4  this is 2008.

5      A.    Yes.

6      Q.    How has Cardinal dealt with it?

7      A.    We have established the zones

8  that, again, as you move from one zone to the

9  other, we've got increased scrutiny on the level

10  of approval that needs to take place to move.

11      Q.    Okay.

12      A.    And I don't know that that didn't

13  exist back then from reading this e-mail, but

14  that's the concept.

15      Q.    Okay.  Meaning that when you've

16  moved more than a certain amount or moved

17  over -- or were requiring a certain increase in

18  threshold --

19      A.    Yes.  So --

20      Q.    -- there has to be -- go ahead.

21      A.    Yeah.  You're right.  So you were

22  asking me what's the difference between going

23  from 0 to 50 versus 2 for 25 months.  That's

24  where the zones come into play that looks at

Highly Confidential - Todd Cameron

 1   volume.  And when you hit a certain stage,

 2   whether it's multiple increases or one increase

 3   that got you to that, that's when the two-person

 4   approval -- that's when it has to come to my

 5   level.  That's when it has to go to LV TAC.

 6           Q.    And what is that trigger?

 7           A.    It varies by the specific drug.

 8   Higher for some, lower for others, depending on

 9   what the normal usage would be.  And then the

10   context of the size of that customer from a

11   total script perspective.

12           Q.    Okay.  So are you saying that for

13   oxycodone, for instance, the permissible

14   increase is X percent, and that will be

15   different than the percentage increase that's

16   permitted for fentanyl or a different drug

17   class?

18           A.    Yes.  It's tied to volume, not

19   percent increase.

20           Q.    Okay.  So explain that.

21           A.    To your point earlier of "I could

22   have 100 as an increase because it went from

23   1,000 to 2,000, but you could be at 100,000 and

24   only go up 10 percent, but that's 10,000 pills,

Highly Confidential - Todd Cameron

1   a much bigger jump than 1,000.  That's why it's

2   based off the volume of the individual drug

3   class.  And as that increases, that's where that

4   scrutiny comes into play.

5         Q.    Okay.  And where are those volumes

6   reflected in Cardinal's SOPs or working

7   guidelines or whatever it may be?  Where is it?

8         A.    So if you look at --

9         Q.    It is written down somewhere?

10        A.    Yes.

11        Q.    And it sets the specific volume by

12  drug?

13        A.    Yes.

14              MS. SINGER:  Go ahead.  You ask.

15              MS. DEYNEKA:  If at some point the

16              policy didn't have zones created, would

17              that have created a significant problem

18              for diversion?

19              THE WITNESS:  I don't know what

20              they did or didn't have placed outside

21              of the zone concept at that point in

22              time.

23              Obviously it's something based on

24              the e-mail they're aware of.  And,

Highly Confidential - Todd Cameron

 1          again, I don't know what behind the --

 2          out of my purview conversations took

 3          place on how they addressed it.

 4   BY MS. SINGER:

 5          Q.    Okay.  We identified four pharmacy

 6   customers in Montana, and we asked Cardinal to

 7   produce all of the diligence files related to

 8   those customers.  We just want to show them to

 9   you and make sure we have everything that would

10   go in a typical file.  So this will be Exhibit

11   12.

12                     - - -

13      (Montana-Cardinal Exhibit 12 marked.)

14                     - - -

15          Q.    All right.  So this relates to --

16              MS. SINGER:  Which pharmacy is

17          this?

18              MS. DEYNEKA:  Plaza United.

19   BY MS. SINGER:

20          Q.    This is the Plaza United Pharmacy,

21   which is where?  I have an address but not a

22   city.  So it is on 11th Avenue.

23                  And if you could just take a

24   minute and look at this.  These documents, first

Highly Confidential - Todd Cameron

1    of all, would have come from what system within

2    Cardinal?

3            A.    So are you looking at 1798?

4            Q.    Yes.  So we're looking at just for

5    the record CAH_MTAG_1798.

6            A.    So this appears to be what

7    probably was at that point in time the Know Your

8    Customer document.  Now, I say that.  This also

9    could have been a questionnaire that they could

10   have had the customer fill out if there was a

11   potential threshold event.  It could be that as

12   well.

13           Q.    Okay.  And then we move to

14   CAH_MTAG_1805.

15           A.    So this looks like the new -- this

16   is the actual new customer.  This was probably

17   the threshold event questionnaire, and this

18   looks like the new customer.

19           Q.    Meaning that this is the raw

20   questionnaire that then got entered into the

21   system producing 1798?

22           A.    Yes.  I'd look at 1805 as this was

23   the information that was gathered upon the

24   onboarding.  And then this was information that

Highly Confidential - Todd Cameron

1    was gathered at some point in the future from

2    the customer.

3            Q.    Okay.  All right.  And then

4    CAH_MTAG_1812?

5            A.    This is two minutes after 1798.

6    So my guess is that 1812 is some type of

7    verification on who filled out 1798.

8            Q.    And so this is an e-mail --

9            A.    Yes.

10           Q.    -- to Sherry Morse.

11                 How are e-mails captured in your

12   system and associated with a customer record?

13                 MS. WICHT:  From Sherry Norris.

14                 MS. SINGER:  Yes.  I'm sorry.

15           Thank you.

16           A.    In this specific example, this

17   e-mail went into a group mailbox that I assume

18   was done for storage purposes.

19           Q.    Okay.  And so if a regulatory

20   person or a sales rep e-mails a customer with a

21   question related to a threshold exceedance issue

22   you may have found, how does that get captured

23   in the system?

24           A.    If an e-mail was sent, it would be

Highly Confidential - Todd Cameron

1    kept in the e-mail system itself.

2         Q.    And is there any mechanism that

3    ties it to the customer profile or the customer

4    file?

5         A.    I don't think so.

6         Q.    Okay.

7         A.    I mean, there could have been back

8    then when they were e-mailing customers, but --

9    yeah.

10        Q.    Okay.  But not to your knowledge

11   now?

12        A.    No.

13        Q.    And then CAH_MTAG_1813 seems to

14   start a series of DEA --

15        A.    License verification.

16        Q.    Okay.  So when an investigator

17   looks up a pharmacy's registration or a

18   pharmacist's registration, you all capture that

19   someplace?

20        A.    Yes.

21        Q.    And explain what's done there.

22        A.    This is -- again, based on when

23   this was done -- I don't know if this was part

24   of the onboarding or happened later on in the

Highly Confidential - Todd Cameron

1   process, but we're just verifying the state and

2   federal licenses active for the pharmacy.  Part

3   of our Know Your Customer process.

4        Q.    And when an investigator does

5   that, right, you capture all of this --

6        A.    Yes.

7        Q.    -- so that you can show that it

8   was done?

9        A.    Yes.

10       Q.    Okay.  So everything an

11  investigator does to investigate either a new

12  pharmacy, a Know Your Customer, or a suspicious

13  order threshold exceedance is going to be

14  documented and kept for the file?

15       A.    Let me hear you say that one more

16  time.

17       Q.    Everything that an investigator

18  does to investigate a new customer -- doing a

19  Google search, looking up the pharmacy, all of

20  that is going to be kept and loaded into the

21  customer's file?

22       A.    Yes.

23       Q.    Okay.  And same is true when you

24  are investigating a threshold exceedance or

1   other event that peaks suspicion?

2          A.    It would depend on what that

3   investigation included.  There could have been a

4   phone call that might have happened between the

5   analyst and a customer.  That might not be

6   documented.  So there could be some

7   correspondence that might not actually get

8   documented.  But if a change was made, we would

9   document the reason for the change.

10         Q.    Okay.  And the investigation that

11  was done in connection with that change, if it

12  wasn't a phone call but some search that the

13  investigator did, all of that is going to be

14  captured?

15         A.    Yeah.  All the reasoning for the

16  change would be captured.

17         Q.    Okay.  And the backup for it?

18         A.    Depending on what it was.  So it

19  may be, like what you saw, script volume --

20  overall script volume increase -- like that is

21  what I mean when I say captured.  While you

22  change the threshold, you would put in what the

23  justification was for the change.

24         Q.    Okay.  But if the investigator did

Highly Confidential - Todd Cameron

```
1    a Google search on the customer, they're going

2    to print that out and add it to the file?

3            A.   So I'm making that face, because

4    when you say "investigator."  So -- they would

5    do that from an onboarding process.  As far as

6    in regards to a threshold event, I don't know

7    that that necessarily would get printed out from

8    a -- if for whatever reason they were doing some

9    type of Google -- but, again, in the

10   documentation, if they changed the threshold,

11   they would document the reason for the change.

12           Q.   Okay.  Meaning that if the

13   investigator had increased the threshold and had

14   verified that a hospice had opened in the

15   area --

16           A.   Yes.

17           Q.   -- that's all going to be

18   reflected that in that field?

19           A.   Yes.

20           Q.   And if they did a Google search to

21   verify that there was a new hospice center --

22           A.   I see what you're saying.  So in

23   your example, that would not be something that

24   we would necessarily Google search.  If the
```

Highly Confidential - Todd Cameron

```
 1    customer said based on what opened, that's where

 2    we would be looking at, the volumes from that

 3    customer, and -- everything that they're

 4    purchasing, non-control and control mixes,

 5    indicative of what supplying a hospice facility

 6    would look at, that's what we would be

 7    verifying.

 8           Q.    Right.  So you may decide for the

 9    reasons you said earlier that you don't need to

10    verify it.  But if you do verify it, is there

11    going to be a paper trail?

12           A.    Yes.

13           Q.    Okay.

14           A.    Yes.

15           Q.    All right.  So let's keep going

16    through this file.  So we've gone through the

17    license lookup.  Then CAH_MTAG_1819 and on is

18    the Ryan Haight Online Pharmacy survey?

19           A.    Yes.

20           Q.    Okay.  Is that something that's

21    verified, or is it a pure customer

22    representation?

23           A.    It's customer representation.

24           Q.    And then 1821 is another
```

Highly Confidential - Todd Cameron

1   registrant lookup.  Now, it looks like all of

2   these lookups are pharmacists.  Cardinal will

3   check the licensing of every pharmacist?

4          A.    It depends on the type of

5   customer.

6          Q.    Meaning?

7          A.    For example, with a CVS that could

8   have 30 pharmacists that could work at that

9   pharmacy and other ones, we wouldn't be able to

10  verify every single individual.  What we are

11  doing in this situation is verifying the

12  pharmacist in charge.

13         Q.    Okay.  And you also have here a

14  pharmacy tech --

15         A.    Yeah.

16         Q.    -- at 1828?

17         A.    Yep.

18         Q.    Again, everyone you look up,

19  you're going to have a record of?

20         A.    Yes.

21         Q.    You won't necessarily look up

22  everyone if it's a CVS?

23         A.    Yes.

24         Q.    Okay.  And then 1830.  QRA survey,

Highly Confidential - Todd Cameron

1    what's that?

2            A.    This is a surveillance visit that

3    was performed by Martin Murphy who, I assume,

4    was the PBC assigned to that customer.

5            Q.    Meaning the sales rep?

6            A.    Yes.

7            Q.    Okay.  And do we know from this

8    what would have triggered that --

9            A.    From this --

10           Q.    -- site visit?

11           A.    -- we don't.  It could have been

12   because of a threshold event.  It could have

13   been because based off the zone the customer is

14   in, we require these to happen on a specific

15   periodic basis.  It could have been one that's

16   scheduled to happen that hadn't happened, or it

17   could have been threshold event driven.

18           Q.    Okay.  But whenever that site

19   visit or survey happens, that's going to be

20   captured?

21           A.    Yes.

22           Q.    Okay.  And so from what you've

23   just gone through for Plaza United Pharmacy --

24           A.    Yes.

1      Q.    -- does this seem like a typical

2   diligence file for a customer?

3      A.    Yes.

4      Q.    Okay.  Is there anything that

5   would go in a diligence file that --

6      A.    Until you show me it's not.

7      Q.    There's no trick up my sleeve.

8            Is there anything that you would

9   expect to be in that file that isn't there?

10     A.    Not necessarily.  Again, it would

11  depend on what the volume and ratios are of that

12  customer.  If it were larger volume, there could

13  be investigative site visits that could take

14  place.  There could be -- if it was reviewed by

15  LV TAC, there could be an LV TAC review memo

16  that could be in there.

17     Q.    And if there was -- for instance,

18  it was a large customer, it was LV TAC memo,

19  it's going to be in there?

20     A.    It should be, yeah.

21     Q.    Okay.

22     A.    Again, depending on how far back

23  you're going could dictate what's in there or

24  what's not in there.

Highly Confidential - Todd Cameron

```
 1            Q.    Okay.  And is there a point at

 2    which the records get dicey?

 3            A.    I don't know if I'd call them

 4    "dicey" or not.  But, for example --

 5            Q.    That was my word.

 6            A.    For example, LV TAC was created

 7    out of the MOA with the DEA.  So there would be

 8    no LV TAC review prior to May of '12, for

 9    example.

10            Q.    Okay.  And why was LV TAC created?

11            A.    I don't know -- I wasn't involved

12    in any of the negotiation components obviously

13    of the MOA.  But it's my understanding that it

14    was to ensure that the larger volume customers

15    were reviewed by senior leadership.

16            Q.    And is there a difference between

17    an LV TAC customer and, for instance, a national

18    chain?

19            A.    No.

20            Q.    They're going to pick up the same

21    universe of customers?

22            A.    Yes.  Absolutely.  It's all volume

23    and ratio driven.

24            Q.    Okay.  So are you familiar with
```

Highly Confidential - Todd Cameron

1    the disk track held order report?

2         A.   I'm not familiar with that

3    specific report, but I'm familiar with disk

4    track and held orders.

5         Q.   Okay.  And you can run a report, I

6    believe, that lets you see how many held orders

7    there are at any particular moment; is that

8    right?

9         A.   Yes.

10        Q.   And is that an archive so that you

11   can see every order that's been held for a

12   customer, for instance, even if it's since been

13   released?

14        A.   I believe so.

15        Q.   And is that in disk track or

16   someplace else?

17        A.   I believe it's in disk track.

18        Q.   Okay.

19        A.   I think.

20        Q.   And there's a customer profile for

21   every customer, correct?

22        A.   And when you say "customer

23   profile," you mean --

24        Q.   I think it's in Winwatcher, maybe?

Highly Confidential - Todd Cameron

1           A.    Well, tell me what you mean when

2     you say "profile."

3           Q.    What?

4           A.    Tell me what you mean when you say

5     "profile."

6           Q.    It's basic demographics of a

7     customer.  It's what you would use to get the

8     key details.

9           A.    In relation to anti-diversion?

10          Q.    Yes.

11          A.    That wouldn't necessarily -- so

12    Winwatcher is the sales force automation tool.

13    So it's not our tool that it does thousands of

14    things as far as managing the business.  So

15    there would be profiles in there, but they

16    wouldn't necessarily be related directly to

17    anti-diversion.

18          Q.    Okay.  And are there

19    anti-diversion profiles?  And where do those

20    live?  In the ADC?

21          A.    Very good.  There are -- yes.

22    And, again, I was hesitant to say "profile,"

23    because this could be a profile, some review of

24    volumes.

Highly Confidential - Todd Cameron

1          Q.    "This" being the customer

2    diligence file?

3          A.    Yes.  That's why I wasn't sure

4    what you meant when you said "profile."

5          Q.    But ADC is the system where you

6    collect all of the relevant information about a

7    customer, or at least a thumbnail of them?

8          A.    Yes, most of the information.

9          Q.    Okay.

10         A.    Yes.

11         Q.    And ADC, explain how that came

12   into being.

13         A.    It is the tool that is used to

14   manage threshold and threshold events.  So you

15   made reference to disk track.  Disk track is the

16   pick, pack, and ship system that the orders come

17   into.  The thresholds live in disk track, but

18   ADC interacts with disk track that when the

19   threshold event happens in disk track, it tells

20   ADC, and you go into ADC and you work the

21   threshold event.

22         Q.    Okay.  And, again, ADC will keep

23   all of that historical information.  So if there

24   was --

Highly Confidential - Todd Cameron

```
1             A.    I don't believe that ADC would

2    keep all the held order historical information.

3    I assume it has a dropoff window.  Because it

4    actually happened in disk track.  It didn't

5    happen in ADC.  ADC was what was used to read

6    the information out of the disk track.  If that

7    makes any sense.

8             Q.    Okay.  And so IBM came in to

9    develop ADC for you, correct?

10            A.    I don't know.  It was developed

11   before I came into the role.  So I'm not sure

12   who did it.

13            Q.    And I want to make sure we cover

14   as a tangent.  So of the outside vendors and

15   consultants you've worked with who have either

16   helped in developing or evaluating various

17   aspects of the anti-diversion program, who have

18   you worked with?

19            A.    As far as technology vendors?

20            Q.    Any kind programmatic vendor

21   related to the anti-diversion program.

22            A.    I have not worked with any

23   technology vendors since I've been in the role.

24            Q.    Okay.  And how about
```

Highly Confidential - Todd Cameron

1    non-technology vendors?

2         A.    He's not a vendor.  But Linden

3    obviously was heavily involved in the creation

4    of the program.  And then the only other vendors

5    that we would work with would be the third

6    parties that we used to do site visits.

7         Q.    Okay.  And that's Cegedim

8    Dendrite?

9         A.    Yeah, it's not now.  And, again, I

10   don't know if -- it's a new -- I can't keep the

11   name -- so it's Cegedim, but then I think they

12   got bought by IMS, and it's Avantha.

13        Q.    And so you use them basically as

14   additional investigators to help do site visits.

15             How many investigators do you have

16   on your staff to do site visits?

17        A.    Seven.

18        Q.    And how many distinct pharmacy

19   customers does Cardinal have who order

20   controlled substances from you?

21        A.    Any controlled substance in any

22   volume?

23        Q.    Yes.

24        A.    I would guess 25,000 to 30,000.

Highly Confidential - Todd Cameron

```
 1          Q.    And if we were to narrow that down

 2   by customers who buy opioids, is that a smaller

 3   group?

 4          A.    Yes.

 5          Q.    And how much smaller?

 6          A.    20,000.

 7          Q.    Okay.  And so how many additional

 8   outside investigators do you use through

 9   Cegegim?

10          A.    I don't know the number of

11   investigators.  We give them a pool of customers

12   to do the visits on.  I don't know how many

13   investigators -- we pay a price per visit, not

14   per investigator.  So I'm not sure how many

15   investigators they have.

16          Q.    Okay.  And how many site visits do

17   you do in a year?

18          A.    Which type?

19          Q.    Tell me by type.

20          A.    So we have surveillance visits

21   that the sales team does, which is that example

22   we just looked at a minute ago.  We use third

23   parties to do surveillance visits.  And then we

24   use our internal investigators to do what we
```

Highly Confidential - Todd Cameron

1   call full visits.  It's what we talked about

2   earlier where they're going in, getting

3   aggregate level dispense data, looking at the

4   customer in totality.  And then we will use a

5   third party to do the full visits as well when

6   we have scheduling issues.

7                    We probably do 1,000 full visits a

8   year.  And we probably do 40,000 sales

9   surveillance visits.  And we probably do 2,000

10  third-party surveillance visits.

11           Q.    Okay.

12           A.    And those are all plus or minus.

13           Q.    Okay.  And when you talk about

14  visits, those may be visits to the same

15  customer, or does each of those represent a

16  distinct customer that you're seeing?

17           A.    The 1,000 full visits would

18  represent 90 to 95 percent distinct customers.

19  So 900 to 950 would be distinct.  The sales

20  surveillance visits would have overlap in them.

21           Q.    Okay.  And it's the full visit

22  that is the really check-under-the-hood visit?

23           A.    Yes.

24           Q.    And the -- I think you called it a

1    surveillance visit.  That's done by a sales rep?

2           A.    Or a third party.

3           Q.    Or a third party?

4           A.    Yes.

5           Q.    What is involved in that?

6           A.    It's going to the pharmacy.  It's

7    checking out the parking lot, sit in your car,

8    look at the comings and goings, looking for the

9    long lines, the out-of-state license plates, the

10   vans of teenagers pulling up out front, the

11   pharmacy that has no front end line around the

12   door, chicken wire and FedEx boxes, those types

13   of things.

14          Q.    And those are all going to be

15   documented in those questionnaires we saw in the

16   file?

17          A.    Yes.

18          Q.    And sales reps who do these -- I

19   just want to step back on that for a minute.  So

20   sales reps get a straight salary and a bonus?

21          A.    Yes.

22          Q.    And their bonus is not related to

23   volumes of controlled substances sold; is that

24   correct?

```
 1          A.    Correct.

 2          Q.    Is it volume related overall

 3   either in terms of volume of sales or new

 4   customers?

 5          A.    It is tied to overall volume, yes.

 6          Q.    Overall volume of purchases?

 7          A.    Yes.

 8          Q.    Including controlled substances?

 9          A.    Yes.  Not pulled out separately

10   with a separate target number, but it is a

11   subset inherently in the distributions.

12          Q.    And do sales reps have any metrics

13   they need to meet in terms of numbers of new

14   customers or volume of sales or increase in

15   sales?

16          A.    I don't know the answer to that

17   other than I know it varies probably by

18   territory, but I don't know exactly.

19          Q.    Okay.  But without knowing the

20   number, there are metrics.  There are subfloors

21   they have to meet?

22          A.    I don't know if there's -- to your

23   point, I don't know if there's a new business

24   metrics, for example.  Again, that's why I would
```

Highly Confidential - Todd Cameron

1   say it would vary by territory.  If you have a

2   very saturated territory where you have every

3   customer, you wouldn't have -- do you know what

4   I mean?

5           Q.    And are there any expectations on

6   the number of surveillance visits that your

7   sales reps are going to do?

8           A.    There is.

9           Q.    How much is that?

10          A.    It varies by territory based on,

11  again, the volume and contextual size of those

12  customers that we expect them to do visits on,

13  the customers that meet the criteria that we say

14  these are the customers that need to be visited.

15  And they've got to do it every 90 days.

16          Q.    Okay.  And what is the consequence

17  if a sales rep doesn't meet that metric?

18          A.    It is reflected in their annual

19  performance review.  And it makes their life

20  very difficult if that customer needs a

21  threshold change.

22          Q.    In what way?

23          A.    That we're not going to do it.

24          Q.    Okay.  And I take it there's no

Highly Confidential - Todd Cameron

1   disincentive from reporting a customer, meaning

2   that's not going to be held against a sales rep?

3          A.    No.  When we decide to cut off a

4   customer or if our threshold setting has a

5   dramatic impact on the customer's business that

6   causes them to decide to leave us, we back all

7   of that out of the customer's budget and

8   compensation and tracking so it doesn't affect

9   them in any way.

10         Q.    Okay.  And what happens if you

11  find -- if you terminate a customer or see a

12  pattern of suspicious orders and the sales rep

13  hasn't reported that customer, are there

14  consequences to that?

15         A.    It would depend on the specific

16  customer and were we terminating them because of

17  volume outside of us that the sales rep wouldn't

18  have had visibility into.  So it could.

19         Q.    Are you aware of any instance

20  where a sales rep has been disciplined or

21  dismissed because they didn't report?

22         A.    No.  Unfortunately, it's actually

23  the exact opposite, that because it all comes

24  out of their compensation, they err on the side

Highly Confidential - Todd Cameron

1    of throwing everybody they can out in front of

2    the bus, because it doesn't matter to them if we

3    cut them off or not.  So they're actually

4    overcutting off of the customers because it

5    doesn't affect their compensation any.

6              MS. SINGER:  Okay.  And I probably

7         have one more block to do.  I realize

8         you all may want one more break before

9         we conclude for the day, so whenever you

10        want to do it.

11             MS. WICHT:  Let's do it.

12             (Recess taken.)

13             MS. WICHT:  So we have -- as we

14        discussed briefly off the record, have a

15        clarification from some testimony

16        earlier today that we'd like to offer.

17             So as we talked about, I'm going

18        to ask Mr. Cameron just one or two

19        questions just to introduce it and allow

20        him to make the clarification.  And

21        then, of course, invite you to follow-up

22        on it as you deem appropriate

23        thereafter.

24             And it is -- I know this is

Highly Confidential - Todd Cameron

```
1           something that we consulted about over

2           the break.  So this is a clarification

3           that's being made after Mr. Cameron had

4           a conversation with his counsel during

5           the break.

6                   Okay.  So, Todd --

7                   THE WITNESS:  Yes.

8                   MS. WICHT:  -- earlier this

9           morning we were talking about some

10          meetings -- three different meetings

11          that you've had with the DEA, remember?

12                  THE WITNESS:  Yes.

13                  MS. WICHT:  Okay.  And the third

14          meeting in particular was one that

15          happened in 2018.

16                  THE WITNESS:  Yes.

17                  MS. WICHT:  And you had discussed

18          the fact that what you did at that

19          meeting was to present the program to

20          DEA and things of that nature, right?

21                  THE WITNESS:  Yes.

22                  MS. WICHT:  Okay.  And I think

23          that Ms. Singer had asked a question

24          about whether there were -- what I wrote
```

Highly Confidential - Todd Cameron

```
 1              down was something like a specific event
 2              that had triggered the meeting.
 3                     THE WITNESS:  Yes.
 4                     MS. WICHT:  And I wanted to
 5              clarify with you, for another person who
 6              was participating in that meeting?
 7                     THE WITNESS:  Yes.
 8                     MS. WICHT:  Was there a specific
 9              event that triggered the meeting?
10                     THE WITNESS:  Yes.  So my
11              meeting -- my purpose of going to meet
12              with DEA was because previous leadership
13              had changed over.  And the individuals
14              that were at the two previous meetings
15              were mostly gone from at least that
16              branch of the DEA.
17                     So I had been instructed by my
18              boss to go and meet with the new
19              leadership and present the program to
20              them.
21                     Linden came with me, because
22              Linden went to talk about suspicious
23              orders that we had identified internally
24              through our normal process that we had
```

Highly Confidential - Todd Cameron

```
 1          canceled and not shipped, but the orders

 2          through an IT glitch did not get

 3          reported to DEA.

 4               So Linden had gone to discuss with

 5          DEA the orders that, again, had not

 6          shipped but had not been reported and to

 7          hear from DEA if DEA wanted those to be

 8          submitted at the present time.

 9               MS. SINGER:  Okay.  All right.

10          Well, thank you for clarifying that.

11   BY MS. SINGER:

12          Q.   So that raises just two questions.

13   When had those orders not been reported?  What

14   time period was this?

15          A.   I believe it was 2012 through

16   2015.

17          Q.   And how many orders does this

18   involve?

19          A.   I don't know the exact number, but

20   it was around 14,000 and change.

21          Q.   Separate orders?

22          A.   Yes.

23          Q.   And did they relate to particular

24   customers, or were they across the country?
```

 1          A.    They were across the country.  But

 2    the majority of them were related to the subbase

 3    code concept that we had talked about earlier,

 4    that when we had put that subbase code logic in

 5    place, those orders were getting held.  We were

 6    canceling them based on customer review.  But

 7    they were not getting transmitted through the

 8    normal transmittal process to DEA.  But it was

 9    coast to coast, top to bottom, no specific DC or

10    state.  It was all across the board.

11          Q.    And do you know how many of those

12    orders involved opioids?

13          A.    I would assume the vast majority.

14          Q.    And do you know what the volume of

15    opioids was that was --

16          A.    For the orders?

17          Q.    Mm-hmm.

18          A.    I do not.  I do not.

19          Q.    And did the DEA take any action on

20    the basis of that disclosure?

21          A.    No.  I know that Linden had asked

22    them if they wanted us to submit them now.  And

23    I know the DEA was going to get back to Linden.

24    I'm unaware of them getting back to him or not.

Highly Confidential - Todd Cameron

1    I don't think they have.  But they would talk

2    directly to him.

3         Q.    Are you aware of other instances

4    where there were similar technology issues that

5    related either to orders not being reported or

6    orders being shipped that should have been held?

7         A.    I am not, no.

8         Q.    Okay.  And as a result of this

9    discovery --

10        A.    Yes.

11        Q.    -- what steps did Cardinal take to

12   understand the scope of it and to address it?

13        A.    We had gone through an audit

14   process that had identified the need to ensure

15   that -- kind of some of your questions earlier

16   about ADC and disk track, that that linkage

17   existed.

18               So an audit process was put in

19   place back in 2015 to ensure that that was

20   taking place.  What we hadn't done is we hadn't

21   then gone back retroactively to look to see if

22   any had happened prior to that.

23               And then in going through the

24   process of producing data for these pieces,

1   that's when it was uncovered.

2           But, no, it's the only piece.

3   None of the orders were shipped.  It still

4   canceled all the orders.  It just was not

5   transmitting the actual suspicious for those

6   individuals.

7       Q.   All right.  I appreciate that

8   disclosure.  We may come back to it.  But that's

9   all that I have for now.

10          Okay.  So we are literally going

11  to go into lightning round, and I'm going to go

12  through just a scatter shot of the things that

13  we didn't cover previously.  If I'm moving too

14  fast, same caveat, or you need context for any

15  of that stuff -- and this is really a test of

16  Natalie and not of you.

17      A.   She's passed so far.

18  BY MS. SINGER:

19      Q.   All right.  I'm trying to find

20  where we left off.  Is there a difference

21  between an order of interest and a suspicious

22  order in Cardinal parlance?

23      A.   Yes.

24      Q.   And what's the difference?

Highly Confidential - Todd Cameron

```
 1            A.    I would refer to an order of

 2     interest as an order when someone in the

 3     distribution center wants us to review a

 4     specific customer.

 5            Q.    And how would that get triggered

 6     by the distribution center?

 7            A.    They would reach out either via

 8     e-mail or phone call, or they would talk to the

 9     compliance officer at the distribution center

10     and do the same thing.

11            Q.    Okay.  And each distribution

12     center has a compliance officer?

13            A.    Yes.

14            Q.    And what is their role --

15            A.    And I was not including those

16     individuals when I said the 35 people earlier.

17            Q.    Okay.  And what is the role of the

18     compliance officer in a distribution center

19     distinct from what your team is doing here in

20     Ohio?

21            A.    They're responsible for all of the

22     regulatory requirements around the physical

23     security of the controlled substances at the

24     distribution center.
```

Highly Confidential - Todd Cameron

```
 1              Q.    Okay.  And I know that there's

 2    something in the SOPs about these huddles that

 3    are done at the distribution center.  Is that a

 4    concept that you're familiar with?

 5              A.    I'm familiar with the concept of a

 6    huddle.  I'm not sure what the specific huddles

 7    are that happened at the DCs.

 8              Q.    Okay.  When you say you're

 9    familiar with it, from like a football sense --

10              A.    Yes.

11              Q.    -- or within Cardinal?

12              A.    Just a group of people getting

13    together and huddling, yeah.

14              Q.    Okay.

15              A.    I don't know what takes place in

16    those --

17              Q.    Okay.

18              A.    -- specifically.

19              Q.    And do you know if they still

20    occur?

21              A.    I do not.

22              Q.    Okay.  And are there huddles

23    outside of -- I could have hours with the

24    huddle.
```

Highly Confidential - Todd Cameron

```
 1            A.    Well, a lot of teams have daily

 2    huddles to go over stuff, yes.

 3            Q.    Okay.  Does your team have a

 4    huddle?

 5            A.    I don't call them huddles, no.

 6    No, I don't use that term.

 7            Q.    Because you're self-respecting.

 8            A.    I don't use that term.

 9            Q.    All right.  So you're not -- is

10    there any kind of suspicious order related

11    compliance function that happens at the

12    distribution center?

13            A.    And that's where the order of

14    interest comes into play, because the DC, the

15    distribution center, cannot exceed the order to

16    pick, pack, and ship it until it has the

17    threshold process on our end.

18                 So if they are seeing the order,

19    that means it has cleared through the threshold.

20    So it's basically a second level check that even

21    though it's under the threshold, they have their

22    ability to raise their hand and stop an order

23    and then have us review a customer and ask

24    questions.
```

Highly Confidential - Todd Cameron

```
 1              Q.    And how often does that happen?

 2              A.    It happens frequently.

 3              Q.    And does that mean once a month,

 4    once a week?

 5              A.    Probably -- definitely monthly.

 6    Probably more frequently.  It depends on the

 7    distribution center, number of customers, number

 8    of the types of customers.  It varies by DC.

 9    But it's a fairly common occurrence to have them

10    ask us to review a customer.

11              Q.    And what do they see in the

12    distribution center that triggers that alert?

13              A.    They have a different view of the

14    customer, because they get to see a lot of the

15    ordering habits that might be for non-controls.

16    So they, again, can raise their hand at any

17    point and time and stop an order and say, "Hey,

18    I think it's weird that Joe is ordering X.  He

19    hasn't ordered that before.  Will you take a

20    look at this"?

21                    We also use the compliance

22    officers to do surveillance visits on the top

23    controlled substance customers at their

24    distribution centers, too.
```

1          Q.    Okay.  And for your investigators,

2    including your compliance officers, when they

3    played that role --

4          A.    Yes.

5          Q.    -- what kind of background do they

6    have?

7          A.    A lot of the -- our investigators

8    have former government investigator and law

9    enforcement background.  I'm not sure -- because

10   the COs report into the regulatory compliance

11   arm of QRA, I'm not sure where they've all come

12   from, what their backgrounds are.

13         Q.    Okay.  And when you say the

14   regulatory compliance side, how is that

15   different from what you do and supervise?

16         A.    That would be Linden's structure

17   today.  That would include the compliance

18   officers.  And it would include the regulatory

19   lawyers that are responsible for making sure

20   that we understand the regs, what they mean, how

21   to interpret them, how to follow them.

22         Q.    So is it fair to say that they are

23   the interface with state and federal regulators?

24         A.    Yes.

Highly Confidential - Todd Cameron

 1          Q.    From you to them and them to you?

 2          A.    Yes.

 3          Q.    Okay.  I've covered so much of it.

 4                So returning to site visits.

 5          A.    Yes.

 6          Q.    They can be requested by QRA,

 7    LV TAC, or the ethics and compliance hotline; is

 8    that correct?

 9          A.    Correct.

10          Q.    How do those tend to break down in

11    terms of what's triggering a site visit?

12          A.    The majority of the site visits

13    are conducted based off of the size of the

14    customer, size of controlled substance, size of

15    opioids, and then the contextural size of the

16    customer, that we have identified here's every

17    customer that is of this size, and we're just

18    going to go do site visits on this customer

19    annually because of the size of the customer.

20    That's probably the majority of them.

21                But, again, to your point, LV TAC

22    could request one.  When a new customer comes on

23    board, based on their size, we can do a site

24    visit before we agree to turn a customer on

Highly Confidential - Todd Cameron

```
 1    because of the size.

 2          Q.    Okay.  And your QRA team has both

 3    pharmacists and data analysts; is that right?

 4          A.    Yes.

 5          Q.    And what's -- I think the data

 6    analyst is self-explanatory.

 7          A.    Yes.

 8          Q.    But what role do your pharmacists

 9    play, and how many of them do they have?

10          A.    The pharmacists have been very

11    helpful in helping us understand the ancillary

12    prescription medications that go with a specific

13    disease state, as we had mentioned the cancer

14    piece before.

15              So they help us understand if you

16    are supplying a cancer center, here are the

17    anti-secretials, anti-nausea, here are the other

18    drugs we should see.

19              And we spend a lot of time with

20    them focusing on the non-retail class of trades

21    or the long-term care and the hospital business,

22    because it's very different from retail, and you

23    don't have a traditional prescription.  You've

24    got patients in beds and types of beds.  So
```

Highly Confidential - Todd Cameron

1    they've been very instrumental in helping us

2    build out that methodology.

3           Q.    And how many of those folks do you

4    have?

5           A.    We have three.

6           Q.    And how long have you had them on

7    your staff?

8           A.    They've been on staff since I've

9    been in the role.

10          Q.    And the ethics and compliance

11   hotline, who does that go to, the complaints

12   that come in through that, or tips?

13          A.    Tips or complaints as far as?

14          Q.    In general.  So if somebody is

15   calling the ethics and compliance hotline --

16          A.    Yes.

17          Q.    -- who is responsible for

18   monitoring those?

19          A.    There's a team of people that are

20   in a specific chunk of compliance.  I'm not sure

21   exactly what it's called.  That they're the ones

22   that receive the phone calls or the e-mails that

23   come in with whatever issue is raised.

24          Q.    Okay.  And I take it that's not

Highly Confidential - Todd Cameron

```
 1   within your area of supervision?

 2         A.    No, it's not.

 3         Q.    Who does that report up to?

 4         A.    I mean, it ultimately is somewhere

 5   under Craig Morford's.  I don't know who -- I'm

 6   not sure where in the tree that falls from a

 7   total high level leadership standpoint.

 8         Q.    Okay.  And have you had

 9   information forwarded to you from the compliance

10   hotline?

11         A.    I have.

12         Q.    What kind of stuff?

13         A.    I've had complaints where they

14   have called the hotline on me because I've cut

15   them off or because of threshold reductions.

16   They call and try to get me fired, I think.

17         Q.    You wear those with a badge of

18   honor, no doubt.

19         A.    Yeah, I guess.

20         Q.    How about beyond that --

21         A.    No.

22         Q.    -- customers complaining?

23               Have there been any former

24   employees, for instance, or current employees
```

1   who have called in with concerns?

2          A.    Not that I'm aware of, no.

3          Q.    And do you know how those calls

4   are documented?

5          A.    I know that there's an extensive

6   documentation process that they go through,

7   because it's all kinds of -- I think it goes to

8   a third party first, and then it comes into

9   Cardinal online.  So there's a third party that

10  manages all of it.

11         Q.    Do you know who that third party

12  is?

13         A.    I do not.

14         Q.    And the decision on whether a site

15  visit is required, who makes that?

16         A.    The decision on making a site

17  visit, it's dictated off of the size, the

18  volumes for that specific customer.  And then

19  the levels at which we make those visits has

20  been decided by senior leadership; me,

21  previous -- you know, everybody that's -- LV

22  TAC.  It's kind of the same concept of the

23  methodology for setting thresholds.  It's had

24  multiple people decide on those levels.

Highly Confidential - Todd Cameron

```
 1          Q.    So beyond those that are
 2   automatically triggered because of the size of
 3   the customer, the volume of their controls,
 4   there are site visits that are triggered by
 5   other events?
 6          A.    Yes.
 7          Q.    So in deciding with a threshold
 8   exceedance or a new customer whether a site
 9   visit is required and what kind of site visit is
10   required, who is making that call?
11          A.    The parameters of the program
12   would dictate if it was a size visit.  If it
13   was -- the analysts are able to request site
14   visits for any customers that they want.
15               To your point earlier about the
16   dispense data customers, we oftentimes will see
17   stuff in there that looks like there's excessive
18   volumes outside of us.  They can request a visit
19   for those reasons.
20               If the cash percentage doesn't
21   look right, they can request a visit.  The
22   customer could be asking for an increase and
23   they just want to get eyes in the pharmacy and
24   see what's going on.  So anyone on the team can
```

Highly Confidential - Todd Cameron

1    request a visit.

2         Q.    Okay.  So it's an analyst's call

3    unless it triggers one of these other size

4    metrics?

5         A.    Unless it falls into a bucket that

6    says you get visited if you look like this.

7         Q.    And are you doing any analytics

8    about the proportion of threshold exceedances

9    that involve a site visit or how many site

10   visits your analysts are requesting, for

11   instance?

12        A.    Ask me that -- that was a

13   two-parter.

14        Q.    I'll break it down.  Thank you for

15   keeping me honest.

16             So are you doing any analytics

17   about the number of threshold exceedances that

18   trigger site visits --

19        A.    Yes.

20        Q.    -- whether that's too high or too

21   low?

22        A.    Yes.  We're aware of how many

23   visits are taking place because of a threshold

24   event.  There's not a too high or a too low

Highly Confidential - Todd Cameron

```
 1    metrics, too, which is something we keep track

 2    of, because it is one of the factors that can

 3    trigger a visit.

 4          Q.    Okay.  And beyond the number of

 5    site visits you're doing --

 6          A.    Yes.

 7          Q.    -- are you looking at we had

 8    20,000 threshold exceedances and only 60 site

 9    visits, or 50 percent site visits and --

10          A.    So if you go back to how we set

11    the thresholds, and the concept that I know

12    you're tired of hearing of, we're taking that

13    volume of share of the customer.  A lot -- the

14    majority of our threshold events are getting

15    driven by customers who we have set at lower

16    levels because of the volume that's coming to us

17    that we are secondary or tertiary.  That's

18    driving a lot of the threshold events.  So those

19    aren't customers that we're going to be visiting

20    necessarily if our volume is low and we know

21    they're just trying to get an extra 1,000 pills

22    at the end of the month that we're not

23    comfortable distributing because we're in that

24    secondary or tertiary position.
```

Highly Confidential - Todd Cameron

1                 So it's not fair to tie the visit

2      piece back to that, because it's just -- it's

3      not going to look right, because so many of the

4      threshold events are driven by the lower volume

5      customers.

6                 Q.    Okay.  How do you know what your

7      distribution position is, whether you're

8      primary, secondary, or tertiary?

9                 A.    We ask.  The sales force knows.

10                Q.    How do they know?

11                A.    When you go in to call on a

12     customer, you see whose ordering system is

13     behind the counter.  You see whose totes are in

14     there.  You see whose labels are on the shelf

15     ordering product.

16                Q.    Whose "totes"?

17                A.    The delivery totes, yeah.  So when

18     the product comes, they come in totes, and you

19     see --

20                Q.    Not in the public radio sense?

21                A.    No, no, no, no.  Yeah, you see the

22     delivery boxes from the wholesaler that it comes

23     in.

24                      And the pharmacies are usually

Highly Confidential - Todd Cameron

```
 1    pretty transparent because they don't want to

 2    buy from five people.  They buy because it's a

 3    commodities market and price drives it.  So they

 4    would like to buy from one place if price wasn't

 5    an issue.  So they tell you.  We see it in the

 6    dispense data.  We understand when we do visits

 7    we capture the information.  We ask point-blank

 8    on the visit what percent of controls is coming

 9    from which wholesaler.

10         Q.    And I take it Cardinal has

11    incentives for people to put you in the primary

12    position?

13         A.    The position dictates the costing

14    structure of the product.

15         Q.    So is it the case that you either

16    have to order a certain volume or proportion of

17    your sales in order to get more favorable

18    pricing?  Is that how that works?

19         A.    There are a lot of factors that go

20    into it.  I know like, for example, we have a

21    credit department that looks at payment terms

22    and those types of pieces.  So a lot of that

23    factors into -- we've got buying groups.  A lot

24    of our customers are part of larger buying
```

Highly Confidential - Todd Cameron

```
 1    groups, and that can dictate the deal that goes

 2    to the buying group, and those types of things.

 3    So there's actually a lot of factors that drive

 4    what that price looks like.

 5         Q.    But is one of the factors the

 6    proportion of volume of business that they do

 7    with Cardinal?

 8         A.    It could be in certain instances,

 9    yes.

10         Q.    Okay.

11         A.    Yes.

12         Q.    I was struck by one fact in the

13    conversation we've had today in your testimony

14    that so much of the reporting is driven by

15    thresholds but so little of your expectation of

16    what is actually diversion.  Is that a fair

17    statement?

18         A.    I think so.

19         Q.    Okay.  Do you all do a training

20    program for your investigators?

21         A.    Yes.

22         Q.    And is that true for your

23    contracted-out investigators, too?

24         A.    Yes.
```

Highly Confidential - Todd Cameron

```
 1              Q.     And who's responsible for that?

 2              A.     The internal investigators I'm

 3     responsible for.  The third-party from a

 4     surveillance visit standpoint runs through

 5     Linden and the legal team.  And then the

 6     third-party full visits I'm responsible for.

 7              Q.     How many data analysts do you

 8     have?

 9              A.     Tell me what you mean when you say

10     "data analysts."

11              Q.     People who aren't pharmacists who

12     do data.

13              A.     Ten.

14              Q.     And has that been true throughout

15     your tenure?

16              A.     We've added a couple since I've

17     been in the role.

18              Q.     And just as a general matter, for

19     the things we've talked about, I assume you're

20     answering it for what things are now?

21              A.     Yes.

22              Q.     Are there things we've talked

23     about that were different when you started in

24     2012?
```

1          A.    I can't think of anything from a

2     conceptual standpoint that we're doing

3     differently than we were.  Again, we've got more

4     data.  We're seeing things, you know, from a

5     more complete picture.  Different drugs have

6     moved around in the hierarchy of things.  But,

7     no, it's pretty much consistent conceptually.

8          Q.    Okay.  Do you know if you have any

9     Montana customers who go through your LV TAC?

10          A.    I don't have anyone specific that

11     I can think of that's in Montana, but there very

12     well could be a customer in Montana that meets

13     the volume and ratio requirements, that we would

14     LV TAC them.

15          Q.    It's actually a verb?

16          A.    Yeah, unfortunately.

17          Q.    As long as they're not huddling,

18     that's okay.

19          A.    That's right.  Trust me, it's not

20     huddling.

21               MS. SINGER:  Can we pull MTAG 240.

22               MS. DEYNEKA:  Yes, we can.

23     BY MS. SINGER:

24          Q.    While Natalie's pulling that,

Highly Confidential - Todd Cameron

1  there is a list in your SOPs of things sales

2  reps should look at.  And you referred to a long

3  line of people, the not having a lot of other

4  product in the store.

5        A.    Yes.

6        Q.    Where does that list come from?

7        A.    That list was in existence when I

8  came into the role.  So I'm not sure what

9  sources that was compiled from.

10        Q.    Have you changed at all?

11        A.    I don't remember a specific one of

12  those that got changed.  But I know that it's

13  looked at periodically to determine if there

14  needs to be -- the verbiage needs to be altered

15  to make more sense or something needs to get

16  added or changed.  But, yeah, we can change it

17  if we need to, yes.

18        Q.    Okay.  But the basic elements

19  remain the same?

20        A.    The same, yes.

21        Q.    And when a sales rep is doing one

22  of these visits, do you know how long they

23  typically spend on site?

24        A.    It would vary depending on how

Highly Confidential - Todd Cameron

1    busy, how big the pharmacy is.  I would say

2    probably -- now, it would depend if they were

3    solely going to do that or if it was part of

4    doing other things.

5           Q.    Let me ask it a different way.

6           A.    Yes.

7           Q.    How long should the questionnaire

8    of looking for these things, the survey, take?

9           A.    Half an hour.

10          Q.    And is the expectation that the

11   rep is going to fill out every box?

12          A.    Yes.

13          Q.    And is there a QC process that if

14   you get one back that has gaps or holes, that

15   that is somehow flagged?

16          A.    You can't submit it if you don't

17   answer -- if every box isn't checked.

18          Q.    So it's rejected by the system?

19          A.    Yes.

20                      - - -

21      (Montana-Cardinal Exhibit 13 marked.)

22                      - - -

23          Q.    Okay.  All right.  So we're

24   looking at CAH_MTAG_240.  This is called

Highly Confidential - Todd Cameron

```
1    "Sales - Anti-Diversion Alert Signals."

2              Is this SOP familiar to you?

3         A.    Yes.

4         Q.    It's familiar to you?

5         A.    Yes.

6         Q.    Okay.  So one of the things that's

7    added in this policy is that sales reps are

8    performing these assessments or investigations.

9              Do you know why that was added?

10        A.    I don't.

11        Q.    And does this cover threshold

12   trigger investigations or Know Your Customer or

13   both?

14        A.    Both.

15        Q.    So one of the flags on Bates

16   number 241 --

17        A.    Yes.

18        Q.    -- I think it's the fifth bullet,

19   "Pharmacies ordering excessive quantities of a

20   limited variety of controlled substances."

21        A.    Yes.

22        Q.    You know that from the pharmacies'

23   order data for Cardinal?

24        A.    Correct.
```

Highly Confidential - Todd Cameron

```
 1              Q.    And what are you looking for
 2    there?
 3              A.    A pharmacy that only orders
 4    oxycodone 30-milligram.
 5              Q.    Okay.  And I'm sorry.  So this is
 6    something the sales rep is looking at, so they
 7    must be looking in the pharmacy's own order
 8    system; is that right?
 9              A.    They'd be looking at the orders
10    that would be coming into Cardinal from the
11    pharmacy.
12              Q.    Okay.  But they're doing this on
13    site at the pharmacy, or is this something
14    they're checking when they get back to the
15    office?
16              A.    That piece is probably something
17    that's an ongoing review that they would be
18    doing of each individual customer.
19              Q.    Okay.  And then moving down, one
20    of the -- the next bullet, "One or more
21    practitioners writing a disproportionate share
22    of the prescriptions for controlled substances
23    being filled."
24                    How do you know that?
```

Highly Confidential - Todd Cameron

1       A.     That would be part of a

2    conversation that the salesperson would have

3    with the individual pharmacy.

4       Q.     Okay.

5       A.     A lot of the things that we don't

6    have visibility to, we try to coach the

7    customers into being aware of.  And that's what

8    the sales force helps us with.

9       Q.     Okay.  So there the sales rep is

10   asking the pharmacy "Who are your big

11   prescribers?"

12      A.     They're not asking who are the big

13   prescribers.  But oftentimes you'll have the

14   pharmacies upset that they're hitting a

15   threshold, and they think they should be able to

16   get more.  And we say the threshold is not going

17   to change based on the factors that we see for

18   the pharmacy.

19             The PBC is helping coach the

20   customer on things they can do to then alter

21   their business to live within what we say are

22   normal amounts.

23      Q.     Okay.  And so how does that play

24   out with respect to this particular factor?

Highly Confidential - Todd Cameron

```
1              A.    It would be the PBC talking to the

2    customer and saying, "Hey, you need to take a

3    look at who all your doctors are," and "Do you

4    have doctors that are standing out that are

5    driving these volumes?  If so, you need to take

6    a hard look if you should be filing for that

7    doctor or not."

8              Q.    All right.  And then it moves down

9    to surgery centers.

10             A.    Yes.

11             Q.    And that is the ambulatory surgery

12   centers about halfway down the page.

13             A.    Yes.

14             Q.    How do you know how ordering is

15   being handled?  Are these, again, customer self

16   reports?

17             A.    Yes.

18             Q.    Okay.  Same with census?

19             A.    I'm sorry.  Which one are you

20   reading?  C?

21             Q.    D.

22             A.    D.  Sorry.

23             Q.    "High average daily census."

24             A.    Yes.
```

Highly Confidential - Todd Cameron

```
1          Q.    Okay.  And then moving down to

2    Physician's Offices.

3          A.    Yes.

4          Q.    "Is the physician's office

5    excessively purchasing controlled substances?"

6                How do you know what's excessive?

7          A.    They'd be having threshold events.

8          Q.    Okay.  Then number 2 on that page,

9    "If the customer exhibits two or more of the

10   anti-diversion alert signals, then the

11   salesperson is to complete an online survey."

12               In later versions of this policy,

13   that "2" flags is removed?

14         A.    Yes.

15         Q.    Why was that?

16         A.    I believe number 2 is making

17   reference back to one of the previous exhibits

18   that we looked at for the first pharmacy in

19   Montana.  And based on how we collect and

20   analyze the data, we now no longer ask customers

21   to complete those surveys.  We ask more specific

22   questions around the controlled -- more detailed

23   questions around the dispensing.

24         Q.    Okay.  So I understand what you
```

Highly Confidential - Todd Cameron

1    are saying.

2              A.    Yes.

3              Q.    But it sounds like it used to be,

4    that you hit two of these, then there was a

5    deeper reviewed triggered, and then -- is the

6    point not that it's not one or two, but the

7    process that follows?

8              A.    Yes.

9              Q.    Okay.  Now I understand.

10             A.    Yes.  Exactly.

11             Q.    Okay.  Then let's move to -- what

12   kind of training do sales reps get ongoing

13   through this process?

14             A.    They get trained around kind of

15   some of the pieces we talked about, those

16   obvious signs of diversion that they should be

17   looking for that makes a pharmacy look abnormal

18   from either a volume or ratio perspective.

19             Q.    And who provides that training?

20             A.    That's done by the training team.

21   And we're involved in creating the training that

22   the training team gives out.  But we've got a

23   full-time training team that the PBCs go through

24   ongoing training.

Highly Confidential - Todd Cameron

```
 1              Q.    I take it there are presentations

 2    and scripts and all of that stuff that go with

 3    it?

 4              A.    Yes.

 5              Q.    So Attachment 1 to this policy is

 6    at Bates number 242.  And it starts by saying,

 7    "We have heard consistent feedback that more

 8    tools are needed to perform regular customer

 9    data checks."

10                    Do you know what that's referring

11    to?

12              A.    Yes.

13              Q.    What is that referring to?

14              A.    It would be the report that it

15    mentions where it gives the sales force the

16    control to non-control view of the customers.

17              Q.    Okay.  So this was sales reps

18    expressing in a variety of ways that they wanted

19    more guidance and more data?  Is that what this

20    means?

21              A.    I believe when I look at this,

22    that this is -- this says "Don't distribute

23    externally."  I'm not sure if you're allowed to

24    have this.
```

Highly Confidential - Todd Cameron

```
 1          Q.    Say that again.

 2          A.    It says, "Don't distribute

 3    externally," so I'm not sure how you have this.

 4                I believe that this right here,

 5    this page, is making actually reference back to

 6    the e-mail you asked me about earlier.

 7          Q.    Okay.

 8          A.    That's what the output of that

 9    was, which was trying to get information into

10    the sales force's hands to understand what

11    increased levels they should be aware of at the

12    customer level.

13          Q.    Okay.

14          A.    That's what, I believe, this is

15    making reference to.

16          Q.    Okay.  All right.  And Tom

17    DeGemmis --

18          A.    Yes.

19          Q.    -- who is he?

20          A.    He was the head of the independent

21    sales force at that time.

22          Q.    Okay.  But he no longer is?

23          A.    He is no longer there, no.

24          Q.    And who has that role now?
```

Highly Confidential - Todd Cameron

```
 1          A.     Steve Lawrence.

 2          Q.     And the attachment goes on to talk

 3   about these highlight reports.

 4          A.     Yes.

 5          Q.     Those were discontinued; is that

 6   correct?

 7          A.     I believe they were, yes.

 8          Q.     And do you know why?

 9          A.     Not specifically, no.  I don't

10   know if then the other components that that

11   e-mail made reference to would be part of that

12   greater IT solution, then came into play, and

13   then these were no longer -- because these were

14   manual reports run on the Sales Operations side

15   for QRA that they were working on a bigger

16   solution.

17          Q.     Okay.  And this concept of yellow

18   flag, red flag, and watch list, does that still

19   exist within Cardinal in any way?

20          A.     The term "red flag" is obviously

21   used in many ways.  But as far as how these

22   three pieces are structured, no.

23          Q.     Okay.  And as I read this, for red

24   flag -- for all three groups, the watch list,
```

Highly Confidential - Todd Cameron

1    yellow flag, and red flag, these were

2    obligations to look at the customer with

3    different levels of urgency?

4           A.    Yes.

5           Q.    Is that fair?

6           A.    Yes.

7           Q.    In none of these instances did a

8    customer going on any of these three lists

9    trigger a do not ship requirement; is that

10   correct?

11          A.    These would be the sales force

12   specific views use, not reports that QRA was

13   using to make decisions to stop selling to

14   customers.

15          Q.    Okay.  So that's an entirely

16   different process --

17          A.    Yes.

18          Q.    -- correct?

19                So a customer being designated red

20   flag or yellow flag didn't trigger any other

21   suspicious order report or do not ship?

22          A.    It could have factored into how

23   QRA would set thresholds.  I wasn't -- I'm not

24   sure how they on the QRA side used it back then.

Highly Confidential - Todd Cameron

```
1          Q.    Okay.  All right.  But you don't

2   know?

3          A.    I do not know, no.

4          Q.    All right.  Is there a difference

5   between an order that's held and an order that's

6   deleted?

7          A.    A held order could be reviewed and

8   potentially released to be shipped.  An order

9   that's held and not released gets deleted.

10         Q.    Okay.  And do you know what

11  proportion of held orders are ultimately deleted

12  versus released?

13         A.    I don't know the exact number.

14         Q.    Do you know an inexact number?

15         A.    I was waiting for you to ask me.

16         Q.    I would say probably 90 to

17  95 percent are deleted?

18         A.    Are deleted?

19         Q.    Yes.  Which is why I thought on

20  that spreadsheet we looked at, the 323 versus

21  289, was probably the delta.

22               MS. SINGER:  Do you have the rest

23         of the report that goes with 253?

24
```

Highly Confidential - Todd Cameron

```
 1    BY MS. SINGER:

 2         Q.    While Natalie is responding to my

 3    ever changing requests, we can go to another

 4    one.

 5              So the SOP seems to make clear

 6    that when an order exceeds the threshold limit

 7    for a drug family, subsequent orders from the

 8    same drug family are held.

 9         A.    Yes.

10         Q.    That's correct?

11         A.    Yes.

12         Q.    And that's still Cardinal's

13    policy?

14         A.    Yes.

15         Q.    So we read that to say that if you

16    exceed threshold on oxycodone, you can still

17    purchase and get shipped hydrocodone?

18         A.    All the thresholds are at the DEA

19    base code level, and they're all independent of

20    each other.

21         Q.    Okay.  So why would a pharmacy's

22    orders of oxycodone be suspicious and not its

23    orders of hydrocodone?

24         A.    Again, because we are setting
```

Highly Confidential - Todd Cameron

1    those thresholds at each individual base code

2    level.  And they're not the same drugs, so they

3    would have different thresholds.

4          Q.    All right.  But when you're

5    looking at this from a customer perspective --

6          A.    Yes.

7          Q.    -- is it likely that a pharmacy is

8    diverting hydrocodone and not oxycodone?

9          A.    I don't know.

10         Q.    Are you aware of that happening?

11         A.    I know that I've seen instances

12   where DEA has gone after pharmacies for one of

13   those drugs and not the other.

14         Q.    Okay.  And are you aware in

15   Cardinal's experience of a pharmacy that was

16   diverting one opioid and not another?

17         A.    Yes.

18         Q.    So give me an example.

19         A.    We've seen pharmacies that were

20   doing oxycodone, high volumes of it in

21   proportion to the size of the pharmacy, most of

22   it 30-milligram, for example, and weren't doing

23   any hydrocodone.

24         Q.    So would your response be to

Highly Confidential - Todd Cameron

1   terminate that customer or continue to supply

2   them with hydrocodone because they weren't

3   diverting that?

4           A.     No.   We would terminate them for

5   all controls and cut them off.

6           Q.     But that's not what this policy

7   says.   This policy says you can continue to ship

8   the other drug family.

9           A.     You're talking about threshold

10  events or cutting a customer off?

11          Q.     I'm talking about for the

12  threshold events.

13          A.     Yeah.   That makes -- they're not

14  cutting them off.   Just they've reached their

15  threshold.

16          Q.     So they've reached their threshold

17  on oxycodone?

18          A.     Yes.

19          Q.     And you're comfortable continuing

20  to ship them hydrocodone or fentanyl as long as

21  that's within those base code thresholds?

22          A.     Yes.

23          Q.     And then when the next threshold

24  period resets, they get to start over again?

Highly Confidential - Todd Cameron

```
1          A.    Yes.

2          Q.    And they're shipping oxycodone

3     again?

4          A.    Yes.

5          Q.    Okay.  And do you look from a

6     compliance perspective at pharmacies that

7     continue to hit threshold month after month?

8          A.    Yes.

9          Q.    And in how many instances are you

10    then terminating the customer versus increasing

11    the threshold?

12         A.    It would depend on the individual

13    customer and specifically in our distribution

14    position.  So if you had a very low threshold

15    and we were supplying you 5,000 of your 30,000,

16    and we were okay with the 30,000, then we would

17    continue to cut the orders of 5,000 and report

18    them.

19              It again goes back to we're going

20    to ensure that the volume we distribute for the

21    share of that customer we have are going to make

22    sense analytically, which leads to a lot of

23    threshold events, which is why I say a lot of

24    threshold events comes from the lower volume
```

1    customers.

2          Q.    So it sounds like from what you're

3    saying then, in the vast majority of the cases,

4    threshold exceedances will not lead to

5    termination of a customer, and either you will

6    override the threshold increase, there's nothing

7    there, or you'll increase the threshold?

8          A.    Those are two outcomes that could

9    happen, yes.

10         Q.    But it sounds like those are also

11   the most frequent outcomes?

12         A.    The most frequent is to cancel and

13   report the order.  That's the most frequent.

14         Q.    And then the order could be

15   shipped next month.

16         A.    Once it resets, yes.  In the next

17   time frame.

18         Q.    Okay.  And so what I'm trying to

19   get at is, in that pattern of exceedances and

20   then shipped next months?

21         A.    Yes.

22         Q.    In most of those case when you

23   look at that customer's order data --

24         A.    Yes.

Highly Confidential - Todd Cameron

```
 1           Q.      -- you're going to continue to

 2    supply that customer?

 3           A.      It would depend.  If the total

 4    dispensing of the pharmacy was within normal

 5    acceptable ranges and we were just in a

 6    secondary or tertiary position versus we weren't

 7    comfortable with the customer's total

 8    dispensings, in that case we would cut them off.

 9           Q.      So I completely hear what you're

10    saying on the policy side.  I'm just wondering

11    about the pure -- the pure metrics of it.

12           A.      Yep.

13           Q.      So in most cases, that customer is

14    going to continue to be a customer receiving

15    orders over time?

16           A.      Yes.

17           Q.      And in a small fraction of those

18    cases, you're going to terminate the customer?

19           A.      I don't know if I want to say

20    small fraction.  But, yes, the majority of the

21    time, again depending on the individual customer

22    and the position we're in in the supply chain,

23    that will determine if we continue to supply

24    them or not.
```

Highly Confidential - Todd Cameron

```
 1                      - - -

 2        (Montana-Cardinal Exhibit 14 marked.)

 3                      - - -

 4        Q.    So Exhibit 14 is -- CAH_MTAG_1614

 5   is the Bates number.

 6        A.    Yes.

 7        Q.    And I want you to look at Bates

 8   number 1618.

 9        A.    Okay.

10        Q.    And, by the way, is this SOP on

11   cage/vault suspicious order monitoring familiar

12   to you?

13        A.    It is not.  This would be part of

14   the compliance officer side of things because

15   it's in the distribution centers, the security

16   cage and vault.

17        Q.    All right.  Number 8 on Bates

18   number 1618 indicates about halfway through,

19   "Notification does not apply to national chain

20   accounts."

21              And you can take a minute and read

22   the context.  But why are chain accounts treated

23   differently?

24        A.    So, again, this is not -- there's
```

1    your huddle on there.

2         Q.    Thanks.

3         A.    Yeah.  So this is not my area.  So

4    I am giving you my best interpretation of this.

5    But I would assume that the communication would

6    take place directly with the corporate office of

7    the national account as opposed to trying to

8    communicate and get information straight from

9    the individual pharmacy.

10        Q.    You referred earlier to that

11   survey that was no longer being done.

12        A.    Yes.

13        Q.    Do you know why that was

14   discontinued?

15        A.    The level at which the questions

16   were asked in the survey versus how we ask

17   questions today around a specific drug family,

18   we get into much more detailed questioning at

19   the customer level.

20             That survey was -- when you first

21   read it, it almost looked like it was a KYC.  It

22   wasn't getting into specific drug issues.  So

23   that was at that point in time sent as part of a

24   threshold.  Now is the threshold where we're

Highly Confidential - Todd Cameron

1  reaching out and asking about the specific drug

2  family, the strength.  So there's just a much

3  more detailed conversation that takes place

4  today that if it were in the form of a survey,

5  it would be 50 pages.

6        Q.    Okay.  And when you say KYC, I

7  assume you mean Know Your Customer?

8        A.    I'm sorry.  Yes.  Know Your

9  Customer, yes.

10       Q.    Okay.  Can customers initiate a

11 threshold increase?  Can a customer request?

12 Yes?

13       A.    Yes.

14       Q.    Okay.  And is there a formal

15 process that they have to submit something, or

16 how does that work?

17       A.    They're supposed to go through

18 their sales consultant.  Because, again, that's

19 where a lot of PBCs want the sales consultant

20 involved in the evaluation of the business so

21 they're not asking for stuff that they know

22 we're going to say no to, and we expect them to

23 be involved in asking a lot of these questions

24 and knowing the customer on their side.  So we

Highly Confidential - Todd Cameron

1   don't have a formal process for the customer to

2   reach out directly to us.  It comes in through

3   the PBC.

4           Q.    And either for a

5   customer-initiated request or your own

6   evaluation, do you know how many reviews end up

7   in an actual increase in threshold versus how

8   many are rejected?

9           A.    I don't, other than to say the

10  requests that are made for customers whose

11  volumes make sense within the context and

12  they're within the methodology, that we don't

13  see any concerns from diversion of those would

14  get increased.

15          Q.    And is that the majority of cases?

16          A.    I can't say either direction,

17  because oftentimes you'll have -- like we talked

18  about, a secondary customer that wants more,

19  that we're not going to move the threshold

20  because we're in a secondary position.

21          Q.    Okay.  And when you're the

22  primary, is that typically going to go through?

23          A.    It would depend on if they're

24  within methodology based on those factors.  But

Highly Confidential - Todd Cameron

1    if you are within methodology, from a review

2    standpoint, then those typically would get

3    approved.

4           Q.    And have you done any analysis of

5    how many customers have had their threshold

6    increased since 2012?

7           A.    Not since 2012.

8           Q.    And what baseline have you looked

9    at?

10          A.    We look at how many thresholds

11   that we change and how many went up and how many

12   went down.

13          Q.    And for what time period did you

14   do that?

15          A.    We've been looking at that for the

16   last probably couple years.

17          Q.    And you do that on an annual

18   basis?

19          A.    Quarterly.

20          Q.    Quarterly?

21          A.    Yes.

22          Q.    And what has been the conclusion?

23          A.    There hasn't been any conclusion,

24   because you've got so many customers that are

1   primary, secondary, tertiary, moving from

2   secondary to tertiary, moving from tertiary to

3   primary, new business, business that left, that

4   you're not looking at it from a same store sales

5   perspective to say it was a consistent customer

6   base.  You've got so many movement factors

7   within it, that you can't necessarily at the

8   high level draw any conclusions from it.

9           I know that doesn't answer your

10  question.  I'm sorry.  It's just there's too

11  many moving pieces at that level to make a

12  determination.

13      Q.    Okay.  And have you ever looked at

14  how many orders that are cut or denied in a

15  month or subsequently filled the next month?

16      A.    No.

17      Q.    Are there a suite or a set of

18  reports that you get every day or every month or

19  every quarter?

20      A.    There are data analytic pieces

21  that I would get on a monthly or quarterly

22  bases, yes.

23      Q.    Are we going to have this same

24  debate?

Highly Confidential - Todd Cameron

```
 1          A.    I can't tell.  It's up to you.

 2   That's why I was hesitating.  I was trying not

 3   to force you into that.

 4          Q.    Okay.  And so you are getting this

 5   information.  It may not come in a title passed

 6   on to your desk report?

 7          A.    Yes.

 8          Q.    And who provides it to you?

 9          A.    It could come from the analytics

10   group.  It could come from somebody on the

11   customer facing team.  It could be something

12   that I do myself.

13          Q.    Okay.  And is there kind of a set

14   that your staff knows you want to see something

15   on a regular basis, or how does that work?

16          A.    You know, there are certain

17   components.  One example would have been that

18   gap report that we talked about earlier.  That's

19   something that I like to review that they know I

20   want to see after they make the changes.

21          Q.    And are there other things like

22   that that come to your mind?

23          A.    I review all the investigative

24   site visits after they happen, as an example.
```

Highly Confidential - Todd Cameron

```
1         Q.    Okay.

2         A.    Those are the common ones.

3         Q.    Okay.  That's not the one that you

4    have 40,000?

5         A.    No, it's not.  No.

6         Q.    Which set of reports are those?

7         A.    It's the, as you put it, look

8    under the hood ones.  It's those.

9         Q.    Okay.

10        A.    Now, I do see all the ones that

11   have a yes answer.

12        Q.    And how many are there of those?

13        A.    Very small percentage.

14        Q.    Okay.  Do you have a rough

15   estimate?

16        A.    Less than 1 percent.

17        Q.    Are there reports that you owe to

18   your supervisors?

19        A.    There are metrics that we create

20   that we look at, yes.

21        Q.    And how often do you do that?

22        A.    Most of them are quarterly.

23        Q.    Okay.  And do you do an annual

24   report to them, including in the form of your
```

Highly Confidential - Todd Cameron

```
1   own self evaluation?

2         A.    Yes.

3         Q.    Okay.  And is that where those

4   metrics are reflected in your annual self

5   review?

6         A.    The metrics would not be part of

7   my self review, for example.

8         Q.    Okay.  But there is a quarterly

9   and annual --

10        A.    Yes.

11        Q.    -- process that you go through?

12        A.    Yes.

13        Q.    Have you been involved in any

14  reporting to Cardinal's board?

15        A.    Yes.

16        Q.    And when and what has that been?

17        A.    It's been kind of presenting the

18  program to the board of how we're doing, what

19  we're doing, why we're doing it the way that

20  we're doing it.

21        Q.    And are those reports or metrics?

22        A.    They're PowerPoints.

23        Q.    Okay.

24        A.    And I know that there are other
```

1   board discussions around certain pieces of this

2   that I'm not a part of.

3         Q.    Okay.  And how many reports to

4   Cardinal's board have you done?

5         A.    Thirty.

6         Q.    Okay.  And those took the form of

7   PowerPoints?

8         A.    Yes, or discussions.

9         Q.    Okay.  And have those been to the

10  full board or to a committee of the board?

11        A.    Both.  There's a subcommittee and

12  then a board.

13        Q.    And what's the subcommittee

14  called?

15        A.    I'm not sure.  I'm not sure what

16  the specific name is.

17        Q.    Okay.  And have you ever had board

18  members reach out to you with questions or

19  concerns?

20        A.    Not outside of those formal

21  meetings.

22        Q.    When did those meetings happen?

23        A.    We had one recently.  And then

24  another one was probably the year before.

Highly Confidential - Todd Cameron

```
 1           Q.    And what concerns did the board

 2   raise and what questions in the context of those

 3   discussions?

 4                 MS. WICHT:  Todd, I'm going to

 5                 interject.  I don't have any -- I don't

 6                 have any reason to understand that those

 7                 were privileged.  But I just raise that

 8                 for you in case for some reason you're

 9                 aware of it.

10           A.    Just a lot of questions around the

11   trends; you know, is prescribing going up, is it

12   going down, what does the customer base look

13   like, you know, whose -- questions around other

14   wholesalers and programs and things like that.

15           Q.    And are those conversations

16   reflected in board minutes?

17           A.    I don't know.

18           Q.    Have you ever seen any minutes of

19   those discussions?

20           A.    No.  I only get to be there for my

21   little part, and they kick me out.

22           Q.    And have there been any concerns

23   raised about Cardinal's program?

24           A.    Not that I'm aware of, no.
```

1        Q.    Have there been any discussions

2    with the board about DEA authority or

3    enforcement or DEA concerns about Cardinal's

4    compliance program that you've been involved in?

5        A.    Can you ask me that again?

6        Q.    So I'll break it down.  Have you

7    had any discussions with the board about the

8    nature or content or trajectory of DEA's

9    enforcement or inspections of Cardinal?

10        A.    No.  Now, I know that there are

11    discussions around the cyclic inspections that

12    take place with DEA and the distribution center,

13    but I wouldn't have spoken to that.

14        Q.    Okay.  Your focus in terms of

15    particular opioids as it's evolved, has it been

16    focused on pills, or have you seen diversion

17    with specific forms, meaning the cough syrups

18    or ...

19        A.    ProMeth with codeine is something

20    that we monitor and have thresholds for and have

21    customers off because of.

22        Q.    And any other drugs that come to

23    mind?

24        A.    Yeah.  I mean, we're looking at

Highly Confidential - Todd Cameron

1   morphine and methadone and hydromorphone and

2   oxymorphone and all of those drugs.  And there's

3   liquid forms of those.

4           Q.    Large volume customers, is there a

5   numeric cutoff for that?

6           A.    Yes.

7           Q.    Do you know what it is?

8           A.    I don't, because there's multiple

9   factors that play into it.  It can be a fixed

10  volume amount.  It can be a volume amount based

11  off the size of the customer, or it can be a

12  volume amount within the mixes within the volume

13  of that specific control.

14          Q.    And where are those criteria

15  reflected?

16          A.    They're definitely written down,

17  documented.

18          Q.    A guideline?

19          A.    I don't know if it's in a

20  guideline, but there's customer segmentation

21  definitions for sure.

22          Q.    Okay.  And LV TAC, how often does

23  it meet?

24          A.    Once a month.

Highly Confidential - Todd Cameron

```
1          Q.    And you're part of that group?

2          A.    I am.

3          Q.    And who are the other key players?

4          A.    Regulatory counsel is involved in

5     that.  The compliance officer could be

6     potentially involved if they've got some

7     knowledge of the customer, and then the

8     directors on my team.

9          Q.    And are there particular customers

10    who are teed up for discussion?

11         A.    Yes.

12         Q.    And is there an agenda?

13         A.    I wouldn't call it an agenda.  But

14    there's a list of customers.  And then all the

15    datasets around the customer that we review.

16         Q.    And those are circulated to the

17    members by e-mail?

18         A.    The components we review live in

19    the meeting.  The meetings are several hours

20    long.  So the components don't get sent around

21    because the files are huge.  But the list of the

22    customers is distributed ahead of time.

23         Q.    Okay.  And who's the person who

24    administers that process, of circulating the
```

Highly Confidential - Todd Cameron

1    agenda and --

2          A.    Various individuals on my team do.

3          Q.    Like?  Can you give me names?

4          A.    It varies on the team.  Do you

5    want multiple names?

6          Q.    Yes.

7          A.    Dani Roberts would be one.  Kim

8    Howenstein would be another.

9          Q.    Okay.  And are there minutes or

10   follow-up e-mails that go out after those

11   minutes?

12         A.    There are memos that are created

13   for customer review.

14         Q.    Okay.  "DEA Limit Over Threshold

15   Report," is that the report that generates

16   suspicious order reports for DEA?

17         A.    I'm not sure what that is based on

18   that name.

19         Q.    Okay.  So that name is not

20   familiar to you?

21         A.    That name is not familiar.

22         Q.    Okay.

23         A.    I would assume that it was the

24   algorithm report based on the way it sounds.

Highly Confidential - Todd Cameron

```
 1    But I don't know that for sure.
 2         Q.    Okay.  You mentioned earlier while
 3    Natalie was looking for those documents that
 4    you'd look at a customer's business model.
 5         A.    Yes.
 6         Q.    What are you looking for?
 7         A.    Is it a retail pharmacy, is it a
 8    hospital, is it an institutional retail
 9    pharmacy, is it a long-term care, is it mail
10    order.
11         Q.    Okay.  In January of 2013, you
12    implemented a new threshold setting methodology
13    that used the pharmacy's prescription count?
14         A.    Yes.
15         Q.    Do you remember what was different
16    about that and why you introduced it?
17         A.    That was the concept of trying to
18    take the total contextual size of the pharmacy
19    and use that size to translate it into a
20    threshold for controlled substances.
21         Q.    Okay.
22         A.    Back to my 1,000-script-a-day
23    pharmacy would do more oxycodone than
24    100-script-a-day pharmacy.
```

Highly Confidential - Todd Cameron

1                    - - -

2        (Montana-Cardinal Exhibit 15 marked.)

3                    - - -

4        Q.    All right.  So this is CAH_MTAG

5   Bates Number 1161.

6                So is that document familiar?  And

7   if you could, read the title of it, please.

8        A.    "Daily Threshold Reporting."

9        Q.    So on page 1164 of that --

10       A.    Yes.

11       Q.    -- it has a reference to that

12  report I mentioned, the over -- if you could say

13  the name.

14       A.    The daily threshold reporting?

15       Q.    Yes.  Does that give you any other

16  clues about what that's referring to?

17       A.    So what is on page 1164?

18       Q.    Yes.  It's Number 2, "E-mail

19  modified daily."

20       A.    Yeah.  I'm assuming --

21       Q.    And you're on the distribution

22  list?

23       A.    I am.  I'm going to read this real

24  quick.  Sorry.

Highly Confidential - Todd Cameron

```
 1                   So I'm assuming this is the report

 2      that would have been created notifying people of

 3      the threshold events that happened.

 4            Q.    Okay.

 5            A.    So basically an e-mail of all the

 6      held orders.

 7            Q.    Okay.  And those are sent out

 8      every day?

 9            A.    Yes.

10            Q.    And it doesn't sound like this is

11      a critical report in your mind, so you couldn't

12      remember it.  But do you know what people are

13      looking for in that report or if they are using

14      it?

15            A.    I don't know if it's used or for

16      what exactly, but the concept of it is to let

17      people know that a specific pharmacy had their

18      order canceled or reported as suspicious in case

19      a customer calls and says, "Hey, I didn't get my

20      order.  What happened?"

21            Q.    So this goes to the sales side as

22      well?

23            A.    Yes.  Exactly.

24            Q.    And then Bates Number 1165 has an
```

Highly Confidential - Todd Cameron

1   attachment that is the anti-diversion customer

2   profile.  Is this familiar to you?

3           A.    This specific view of it is not,

4   but components within it are familiar to me.

5           Q.    Okay.  So in hopes of finding some

6   of those.  "Total Number of Events" at the

7   bottom of the first column --

8           A.    Yes.

9           Q.    -- do you know what that

10  represents?

11          A.    I assume that represents number of

12  thresholds.

13          Q.    Okay.  And "QRA Restriction"?

14          A.    I would assume that would be a

15  customer has been cut off, but I'm not sure.

16          Q.    I'm sorry.  I missed that.

17          A.    It might be that the customer had

18  been cut off, but I'm not sure.

19          Q.    Okay.  And then on the second

20  column, "Percentage Order Quantity Above

21  Average"?

22          A.    I'm not sure.  This wasn't

23  something that was part of the e-mail that we

24  just talked about.  This is an internal QRA

Highly Confidential - Todd Cameron

```
 1    document --

 2           Q.    Okay.

 3           A.    -- that was back from 2008.

 4           Q.    So it's not currently used?

 5           A.    No.

 6           Q.    Okay.

 7           A.    No.

 8                        - - -

 9         (Montana-Cardinal Exhibit 16 marked.)

10                        - - -

11           Q.    So I just wanted to ask you about

12    the dialogue.

13           A.    Yes.

14           Q.    So it indicates that threshold

15    should not be shared with the customer.

16           A.    That's what -- yes, I read that

17    here.

18           Q.    Okay.  Is that still the policy?

19           A.    No.

20           Q.    And why was it and why isn't it?

21           A.    I don't know why it was back at

22    that point in time.  But today our philosophy is

23    we want the customers to understand our review

24    of them and how they look, especially compared
```

1    to their peers, and if we need them to -- some

2    of the questions you saw earlier about taking a

3    look at their own business and the doctors that

4    are filling for them, they can understand why

5    we're asking them to do so.

6            Q.    And I know we talked about you not

7    having heard concerns about structuring or

8    things like that, but presumably the earlier

9    concern is that customers would try to

10   manipulate threshold and fly under the radar

11   screen.  Is that not something that concerns

12   you?

13           A.    The way the system is designed

14   today -- again, taking what you're buying from

15   us in totality and then converting that into an

16   acceptable share of controlled substances,

17   that's why we do it the way that we do so the

18   customers can't gain the system.

19                 That's why we have so many

20   threshold events because they're trying to buy

21   what is their normal total volume of controls

22   from us, and we won't let them have it because

23   we're only getting a smaller share.  That's what

24   leads to some many threshold events.  That's how

Highly Confidential - Todd Cameron

1   we keep them from gaining it.

2          Q.    So we talked about the fact that

3   in some instances, you'll notify DEA when a

4   customer is terminated.

5          A.    Yes.

6          Q.    Will you notify DEA if you resume

7   sales to that customer?

8          A.    Yes.

9          Q.    What?

10         A.    Yes.

11         Q.    Why do you smile when you answer

12  that?

13         A.    Do you really think if we cut

14  somebody off and tell DEA, we'd ever turn them

15  back on again?

16         Q.    You don't?

17         A.    We never have, no.  That's

18  probably asking for trouble.

19         Q.    That's the point.

20         A.    Once you tell DEA, then ...

21         Q.    Okay.

22              MS. WICHT:  So your answer was

23         hypothetically if we ever did that, we

24         would tell DEA?

```
 1                    THE WITNESS:  Yes, yes.

 2    BY MS. SINGER:

 3         Q.    Okay.  But you certainly restore

 4    customers you've terminated?

 5         A.    We do.

 6         Q.    Yes?  But you don't tell DEA when

 7    that happens because --

 8         A.    No.  I'm saying if we were to tell

 9    DEA that we cut somebody off, we would probably

10    never turn you back on.

11         Q.    So you don't report in the first

12    instance?

13         A.    No.  We would report.  We would

14    just never change our mind.

15         Q.    So the only customers you would

16    restore are customers you hadn't reported to

17    DEA?

18         A.    I'm just saying if you tell DEA

19    you cut somebody off, you better be darn certain

20    before you turn them back on.  We would err on

21    the side of the conservatism and just never turn

22    them back on.

23         Q.    Okay.  So if you do turn them back

24    on, you didn't report them to DEA in the first
```

Highly Confidential - Todd Cameron

1   place, so you're not going to tell DEA you've

2   restored them?

3           A.    It would be in a state that we're

4   not asked by DEA to tell them.  That's what

5   determines if we tell them or not.

6           Q.    Okay.  Okay.

7           A.    If DEA wants us to tell them, we

8   tell them.

9           Q.    And then they're done?

10          A.    That would probably be a safe

11  assumption, yes.

12                        - - -

13      (Montana-Cardinal Exhibit 17 marked.)

14                        - - -

15          Q.    All right.  So Exhibit 17 starts

16  at CAH_MTAG_898.

17          A.    Yes.

18          Q.    And I just want to turn your

19  attention to 902.

20          A.    Okay.

21          Q.    Is that what a suspicious order

22  report looks like?

23          A.    I do not believe so.

24          Q.    Is that document familiar to you?

Highly Confidential - Todd Cameron

```
1              A.    When I look at this, I assume this

2     is something that existed with the DEA field

3     office specific.  But the suspicious orders that

4     we report go to corporate headquarters.  And I

5     believe --

6              Q.    Meaning DEA headquarters?

7              A.    Yes.  Sorry.  DEA headquarters.

8     And I believe the data -- I think it's kind of

9     similar to how ARCOS data goes.  It's a series

10    of information that I don't think -- it doesn't

11    look like this.

12             Q.    Okay.  Meaning it's not a single

13    order --

14             A.    No.

15             Q.    -- that you're reporting?  You're

16    reporting a group?

17             A.    Yes.  Exactly.

18             Q.    Okay.  And then --

19             A.    And I would guess that, for

20    example, if these were the seven components,

21    which I don't think they are, they'd be in one

22    row.

23             Q.    Okay.  And then if you could look

24    at 905 as well.  I'm assuming that the answer is
```

Highly Confidential - Todd Cameron

1  going to be the same, that that's not a

2  report -- that's not a notice you use anymore;

3  is that correct?

4      A.   Yeah.  And I don't know if it ever

5  was used.  I'm not familiar with this -- with

6  either of those two pieces.

7      Q.   Okay.  Earlier you talked about

8  the fact that some -- you know, that phone

9  conversations, for instance, between a sales rep

10 and a customer wouldn't be reflected in their

11 profile.

12      Does Cardinal record its lines?

13      A.   Not that I'm aware of.

14      Q.   Okay.  Even for sales reps

15 reaching out to solicit customers, none of that

16 is on recorded lines, to your knowledge?

17      A.   Not that I'm aware of.

18                  - - -

19    (Montana-Cardinal Exhibit 18 marked.)

20                  - - -

21      Q.   So if you could just recite the

22 Bates number at the bottom.

23      A.   CAH_MTAG_0001106.

24      Q.   That may be the -- can you turn it

Highly Confidential - Todd Cameron

1    around?  What's the first page?  Yes.  Read the

2    Bates number on the first page?

3            A.    Oh, sorry.  CAH_MTAG_0001101.

4            Q.    All right.  So we'll look at it in

5    that direction.

6            A.    Okay.

7            Q.    So on 1103 --

8            A.    Yes.

9            Q.    -- it indicates that

10   "Unintentional order entry errors must be

11   reported to DEA as suspicious."

12                MS. WICHT:  I'm sorry.  Which

13          page?

14                MS. SINGER:  1103.

15           A.    Which number are you looking at?

16           Q.    I don't know.

17           A.    Okay.  I'll find it.  I got it.

18   Okay.

19           Q.    The number -- what number is it?

20           A.    I believe it's 6.1.5.2.

21           Q.    Yes, 6.1.5.2.  Why is it that

22   Cardinal would report unintentional order entry

23   errors?

24           A.    When an order comes in that hits

Highly Confidential - Todd Cameron

```
 1   the threshold that we do not have the necessary

 2   information appropriate to release the order, we

 3   cancel and report the order.

 4          Q.   Okay.

 5          A.   So if you accidentally entered a

 6   higher number -- I mean, that's a great answer.

 7   I think we probably get that answer a lot.  "Oh,

 8   I didn't mean enter it.  I didn't mean to order

 9   that."  So we can't decipher between what hits

10   the threshold, and we don't release it.  We cut

11   and report it.

12          Q.   Okay.  And then 1104, 6.1.7.1.

13               And, by the way, before I ask you

14   that specifically, is this an SOP that you're

15   familiar with?

16          A.   Yes.

17          Q.   It is?  Is it still used by

18   Cardinal?

19          A.   I've got to be careful how I

20   answer that because it has my name on it.

21          Q.   I assume you're careful about

22   every answer you've given.

23          A.   I believe this is the most current

24   version of this specific SOP.  But I'm not
```

Highly Confidential - Todd Cameron

```
 1    100 percent positive there's not a more current

 2    version.

 3           Q.    All right.  So let's look at

 4    6.1.7.1.  It talks about what a deviation and an

 5    ordering pattern includes.

 6           A.    Yes.

 7           Q.    So for a, b, c, and d, it lists

 8    different factors.  Do you have numeric metrics

 9    that go along with these to determine, for

10    instance, what an unusually high percentage of

11    controlled substances are?

12           A.    Yes.

13           Q.    And same is true for each of

14    these, unusually high percentage of particular

15    strength?

16           A.    Yes.

17           Q.    And cumulatively larger than

18    expected for the customer?

19           A.    Yes.

20           Q.    And then other deviations is

21    obviously a subjective element?

22           A.    Yes.

23           Q.    Okay.  And then looking at 6.2.1.

24    What is a held order that warrants assessment as
```

Highly Confidential - Todd Cameron

1   opposed to a held order?

2          A.    It would be -- so a held order

3   that warrants assessment to the threshold as

4   opposed to held order that does not warrant

5   threshold change that you're just going to

6   report as suspicious and not review to make

7   changes.

8          Q.    So that's what you talked about

9   earlier.  It's an analyst's judgment, unless it

10  hits some of those other triggers?

11         A.    Yes.

12         Q.    So 1105 talks about "If the

13  decision is to retain the customer," it says,

14  you will continue to monitor the customer.

15              What does that involve?

16         A.    It would go back to that monthly

17  assessment of what all of the objective factors

18  look like for that specific customer and to

19  determine -- to some of your questions earlier,

20  they may not get terminated that month, but two

21  or three months later, if things haven't

22  changed, then they could be cut off.

23         Q.    So it's not like Cardinal has a

24  watch list?  It's that if this customer surfaces

Highly Confidential - Todd Cameron

```
 1   in other data reviews you're doing?

 2        A.    Yes, yes.

 3        Q.    Okay.

 4                    - - -

 5      (Montana-Cardinal Exhibit 19 marked.)

 6                    - - -

 7        Q.    Exhibit 19 is titled "Attention.

 8   Health Pending Regulatory Review."  It's Bates

 9   Number CAH_MTAG_1438.

10              Is that familiar to you?

11        A.    I've got 1417.

12        Q.    Sorry.  Let's sub in, and we'll

13   just --

14              MS. WICHT:  What number are we

15         supposed to have?  Sorry.

16              THE WITNESS:  1438.

17              MS. SINGER:  It's the same

18         document.

19              MS. WICHT:  Okay.

20   BY MS. SINGER:

21        Q.    So it can either be 1417 or --

22   what did you say the other Bates number is?

23        A.    1438.

24              MS. WICHT:  I have 1499.  Just
```

Highly Confidential - Todd Cameron

```
 1            want to make sure I have the right

 2            thing.  That's all.  That actually does

 3            look a little bit different.

 4                 Thank you.  I appreciate it.

 5   BY MS. SINGER:

 6            Q.    Is that familiar to you?

 7            A.    It is not.  I think I know what it

 8   is.

 9            Q.    What is it?

10            A.    It looks like something that would

11   go in the customer's tote, the delivery box, not

12   the other, when an order was held.  When a

13   threshold event occurred, this looks like what

14   would show up in lieu of the product.

15            Q.    Okay.  So that's handled by the

16   distribution center?

17            A.    Yes.

18            Q.    I'm going to try to do some of

19   these without pulling documents.  If you need to

20   see them, just ask.

21            A.    Okay.

22            Q.    So one of the things that your

23   Know Your Customer questionnaire asks is what

24   the customer's demographics are.
```

Highly Confidential - Todd Cameron

1                    Do you know what that means?

2          A.    Do you know how old that KYC is,

3    by any chance?

4          Q.    I'll know in a second.

5                    While Natalie is pulling that, how

6    often do you all decline new customers who are

7    brought to you?

8          A.    It goes in waves based on kind of

9    what's happening in the industry.

10         Q.    Meaning McKesson has a

11   distribution center shut down, you may see a lot

12   more new customers?

13         A.    Yes.  And we may decline more

14   customers at that point in time, yes.

15         Q.    So it's a cyclical process?

16         A.    Yeah.  I mean, we are always

17   reviewing and potentially denying customers,

18   but, you know -- Morris & Dickson had a

19   suspension recently, and we had a higher rate of

20   denials during that period of time, for example.

21         Q.    And to approve a new customer, is

22   there a level of sign-off required?

23         A.    Yes.

24         Q.    At what level?

Highly Confidential - Todd Cameron

```
 1            A.    It's very similar to the threshold

 2    approval piece, that it could potentially have

 3    to go in front of LV TAC to get approved.

 4            Q.    And what about when a customer is

 5    rejected?  Is there any upper level sign-off

 6    that's needed on that?

 7            A.    No.  If they don't pass the

 8    metrics, then they get denied.  You could pass

 9    the metrics but the volume is high enough that

10    we still want to put those in LV TAC.

11                        - - -

12        (Montana-Cardinal Exhibit 20 marked.)

13                        - - -

14            Q.    So Exhibit 20 is Bates Number 316.

15    And this is to allow you to see the customer

16    demographics, which is at 319, 6.3.2a.

17            A.    Thank you.  So I don't know if

18    customer demographics is name, city, state, Zip.

19    I'm not sure what they mean by demographics

20    there.

21            Q.    So that's not something that you

22    use in your evaluation?

23            A.    No.

24            Q.    Is a customer that's rejected
```

Highly Confidential - Todd Cameron

1    logged in your system in some way?

2           A.    Yes.

3           Q.    So you could pull out every

4    Montana pharmacy that sought to be a customer

5    and was rejected?

6           A.    Yes.

7           Q.    And you were going to qualify

8    something?

9           A.    I was just going to say that there

10   are times when we would do a perspective review

11   of a customer that we might not know who the

12   customer is to be able to know that.

13          Q.    Okay.  And when you take on a new

14   customer, what effort do you make to find out

15   who was distributing to them before?

16          A.    We ask at that point in time.

17          Q.    You ask the customer?

18          A.    Yes.

19          Q.    And you rely --

20          A.    Yes.

21          Q.    -- on the customer's word?

22          A.    Yes.

23          Q.    And I presume that you ask the

24   customer why they're in the market for a new

Highly Confidential - Todd Cameron

1    distributor?

2         A.    Yes.  Ask me the next question.

3         Q.    What?

4         A.    Do you want to ask the next

5    question?

6         Q.    Go ahead.  What's the next --

7         A.    How often do they say that they

8    were cut off?  Not very often.

9              MS. WICHT:  Cameron, don't do

10         that.

11        Q.    How often do they say they were

12   terminated?

13        A.    Not very often, which is why --

14        Q.    How often should they say they

15   were terminated?

16        A.    Again, that's why we set

17   thresholds the way that we do, so when you come

18   on board, even if the KYC is not filled out

19   accurately, we're going to be converting those

20   purchases into scripts and convert those into

21   thresholds.  So it's going to protect us right

22   out of the gate on how those thresholds are

23   calculated.

24              - - -

Highly Confidential - Todd Cameron

```
 1          (Montana-Cardinal Exhibit 21 marked.)

 2                        - - -

 3          Q.    So this is Bates number

 4   CAH_MTAG_214.

 5          A.    Thank you.

 6          Q.    So this is a retired policy

 7   related to national chain accounts, correct?

 8          A.    Correct.

 9          Q.    And there was a period of time

10   when Cardinal excluded chain accounts from its

11   Know Your Customer requirements; is that

12   accurate?

13          A.    I know that there are components

14   of the KYC that are completed by the national

15   accounts team for national accounts.

16          Q.    Okay.  But not the full Know Your

17   Customer diligence process?  You said components

18   that are --

19          A.    From the KYC.  So a lot of the

20   components when the customer comes on board to

21   fill out the information for national accounts,

22   that gets done by the national accounts team

23   because there's a corporate office that would be

24   involved in the completion in answering those
```

Highly Confidential - Todd Cameron

```
1    questions.

2                We still set the thresholds.

3    They're not involved in that process.  But as

4    far as the documenting of the KYC for the

5    national accounts, that's done by that team.

6          Q.    So my understanding is that

7    national chain accounts are treated differently

8    on the -- because of the assumption that they

9    have their own anti-diversion programs.  Is that

10   accurate?

11         A.    Treated differently in what way?

12         Q.    They aren't subject to the same

13   kind of Know Your Customer onboarding as

14   independents.

15         A.    That is true.

16         Q.    And does Cardinal make any effort

17   to audit or check a chain pharmacy's

18   anti-diversion program?

19         A.    The benefit to the national

20   accounts is we get corporate level --

21   corporate-provided store level data.  And those

22   national accounts buy all of their controls from

23   us.  So we actually have a better picture of the

24   national chains because they're not buying from
```

Highly Confidential - Todd Cameron

1   four or five wholesalers like independents are.

2   So I would say we actually have more scrutiny on

3   the chains than we do the independents.

4           Q.    Okay.  Because they give you more

5   data?

6           A.    Yes.

7           Q.    And because you're the only

8   distributor?

9           A.    Exactly.

10          Q.    And -- okay.  So understanding

11  that that gives you a confidence level --

12          A.    Yes.

13          Q.    -- do you all do any examination

14  of their own anti-diversion programs?

15          A.    No.

16          Q.    And has it always been the case

17  that chains have given you this corporate level

18  data for all of the pharmacies you supply?

19          A.    Since I've been in the role.

20          Q.    Okay.  Have you done any analysis

21  to determine whether chains or independents

22  generate more suspicious orders?

23          A.    Have we done specific analysis?

24  No.

Highly Confidential - Todd Cameron

```
1           Q.    Okay.  And what are you not saying

2    in that answer?

3           A.    No, we've not done specific

4    analysis.

5           Q.    Okay.  And if you look at 215.

6           A.    Yes.

7           Q.    It indicates -- never mind.

8    Withdrawn.

9                 Can you just talk me through a

10   couple of the terms?  National account alternate

11   care for mail order customer.  What are those?

12          A.    That would be an alternate care

13   customer, a nursing home, a long-term care

14   facility that is part of a national account.  So

15   not an independently-owned free-standing

16   facility or a handful of facilities that are

17   owned.  It's part of a larger corporate entity

18   that owns and controls those facilities.

19          Q.    Okay.  And a mail order customer?

20          A.    That would be a customer that we

21   supply to that fills mail order prescriptions

22   for a PBN.

23          Q.    Okay.  So that would be like

24   Caremark or --
```

Highly Confidential - Todd Cameron

```
 1          A.      Exactly.

 2          Q.      And do you do any audit of their

 3   compliance efforts?

 4          A.      No.  But we manage the thresholds

 5   for all the facilities that they purchase

 6   controls from us.

 7          Q.      And do they give you, in the same

 8   way national chains do, all of their data?

 9          A.      Yes.

10          Q.      And that's always been the case?

11          A.      We don't have some of the large

12   mail order pharmacies that we had when I came on

13   board.  And some of the large ones we have now

14   we didn't have when I came on board.  So for the

15   ones that we have now, we have received that

16   data since I've been in the role.

17          Q.      Okay.  And is the same data

18   provision true of all these other national

19   accounts, your warehouse accounts, managed care

20   accounts, PPO, HMO, all are the same

21   relationship where you get all of that data?

22          A.      Yes.

23          Q.      Okay.  What is the customer data

24   management and compliance team?
```

1          A.     CDMC is the group that maintains

2    the master non-purchasing customer data.

3          Q.     Say that one more time.

4          A.     They maintain all of the customer

5    information that's not sales data specific.

6          Q.     So payment terms and --

7          A.     Yes.

8          Q.     Okay.  You don't play any role in

9    that?

10         A.     No.

11         Q.     And have you done for those other

12   national accounts -- just going back to the same

13   question of how many suspicious orders they

14   generate.  Do you see any trends in those

15   accounts?

16         A.     The alternate care?

17         Q.     Just all of these national --

18   these bundle of national accounts.  Have you

19   observed anything with respect to their

20   suspicious orders?

21         A.     I will tell you that the large

22   national account chains are very focused on

23   their numbers, and the numbers continue to come

24   down.  They're very choosey over what control

Highly Confidential - Todd Cameron

1  scripts they fill.

2          Q.    And has that been true throughout

3  your period or something that has kicked in?

4          A.    It's been true since I've been in

5  the role.

6          Q.    I'm just going to give you a title

7  of the document while Natalie is pulling that.

8                 Suspension of Controlled

9  Substances Sales.  Is that a report title you're

10  familiar with?

11         A.    Not a report.

12         Q.    What?

13         A.    Not a report.  I assumed it was

14  going to be an SOP that we were going to --

15         Q.    No.

16         A.    I'm not familiar with a report

17  that says that, Suspension of Controlled

18  Substances Sales.

19                      - - -

20     (Montana-Cardinal Exhibit 22 marked.)

21                      - - -

22         Q.    So Exhibit 22 is CAH_MTAG_383.

23  And I just want you to look at Bates Number 386.

24                 So there's a series of bulleted

Highly Confidential - Todd Cameron

1    items, I think, in the second box on your left.

2            A.    Yes.

3            Q.    The only question there:  Do you

4    look at the same factors for chain pharmacies,

5    independents, and your other national accounts?

6            A.    Yes.

7            Q.    All of those factors are looked at

8    for all of your accounts?

9            A.    Yes.

10           Q.    Okay.  You indicated earlier

11   that -- I don't remember what the term was, but

12   the data that gives you access to prescriptions

13   that are covered by insurance, the switch?

14           A.    Yes.

15           Q.    So you get that data from an

16   independent source, or do you get it from your

17   pharmacy customers?

18           A.    The pharmacy customers agree for

19   us to receive the data.  Then we get the data

20   from the switch.

21           Q.    Okay.  And what do you use that

22   data for?

23           A.    We use that data to see for the

24   data that is included what the dispensing

Highly Confidential - Todd Cameron

```
 1   volumes look like for those pharmacies.

 2        Q.    Okay.  But it excludes cash

 3   payments.  So how do you know how much of a

 4   pharmacy's dispensing volume is in cash?

 5        A.    When we do the look-under-the-hood

 6   visit, that's one of the reports we have them

 7   run, is what percentage of the scripts are cash.

 8        Q.    Okay.  And is that something the

 9   customer provides or you're able to verify?

10        A.    The customer runs the report for

11   us.

12        Q.    Okay.  And you only get it for

13   those customers for which you do the full site

14   visit?

15        A.    Yes.

16        Q.    We talked about customer zone

17   earlier.

18        A.    Yes.

19        Q.    Can you just explain what a

20   customer zone is?

21        A.    So if you think of the concept of

22   the bell curve, it's taking a bell curve and

23   putting it into a nine-box grid, and then

24   placing the customers in those various grids,
```

Highly Confidential - Todd Cameron

```
1   similar to the concept of the bell curve;

2   normal, within a range, high on the far right,

3   high on the far left -- low on the far left I

4   should say.  It's that concept.

5        Q.   Okay.  And so how do you determine

6   for each customer class or type of account where

7   they fit in the bell curve?

8        A.   So we look at the national data

9   that we purchased to allow us to understand what

10  that curve looks like.  And then we'll take the

11  customer's purchasing data and potentially the

12  dispensing data if we do a visit or if they're

13  on the data feed, and then plot them accordingly

14  and see how they compare to their peer.

15            MS. SINGER:  All right.

16            CAH_MTAG_1728.  I will make this our

17            last.

18                      - - -

19       (Montana-Cardinal Exhibit 23 marked.)

20                      - - -

21  BY MS. SINGER:

22       Q.   So is this a document you

23  recognize?

24       A.   Yes.
```

Highly Confidential - Todd Cameron

1    Q.    Is that currently used?

2    A.    Yes.

3    Q.    And can you read the title?

4    A.    "QRA SOM Customer Analytics

5    General Work Instructions."

6    Q.    Okay.  What is a CIM -- and the

7    profit leader program are both referred to in

8    the document.

9    A.    Those -- CIM stands for Cardinal

10   Inventory Manager.  And it's a software that we

11   can provide to pharmacies.  It helps them

12   maintain appropriate inventory levels of their

13   prescription medication on the shelf.

14   Q.    Okay.  And then the profit leader

15   program?

16   A.    It is a program that utilizes that

17   switch data that we talked about to help the

18   customers run their business.

19   Q.    Okay.  And that's what generates

20   the score or allows you to generate the score

21   that you were talking about earlier?

22   A.    It allows you to generate the

23   score off of that data.  But we also generate

24   the score off the purchase data from us as well.

1          Q.     Okay.  And so how does the score

2    play out in your compliance efforts?

3          A.     The score dictates what level of

4    due diligence that we need to do for that

5    specific customer.  So each of the categories we

6    had talked about earlier, the control

7    percentage, oxy/hydro percentage, those all have

8    a score.  And that score then dictates the zone

9    from -- do we visit you, do we LV TAC you, do we

10   cut you off.

11         Q.     So will a customer's profile

12   indicate its zone?

13         A.     It does, but not in the -- not in

14   the scoring profile of it.  But you can -- you

15   can see what's on the volume based on the layers

16   of which you dig into the data.

17         Q.     Meaning if you're looking at the

18   data, you'll be able to identify what the zone

19   is?

20         A.     There are views of the data that

21   show you what zone the customer would fall into

22   for that drug family.

23         Q.     Okay.  And will the score also be

24   evident from the profile?

Highly Confidential - Todd Cameron

```
1          A.    The score will be, yes.

2          Q.    Okay.  And is there a score per

3   drug family?

4          A.    Yeah.  There's a score per

5   objective criteria; control, percentage,

6   oxy/hydro percentage, the mix within oxy, the

7   mix within hydro, those.

8          Q.    Which cut across drug families?

9          A.    Exactly.

10          Q.    Okay.  And it says in there that

11   CVS and Kroger are subject to a limited number

12   of objective criteria?

13          A.    Yes.

14          Q.    Why is that?

15          A.    Because CVS and Kroger, while they

16   supply us with the data, they self warehouse III

17   through Vs.  So they're not buying those from

18   us, so that purchase score is not going to

19   reflect the drugs that aren't coming through us.

20          Q.    Okay.  And it indicates at 1733

21   that you review historical data going back three

22   months up to six months.  Why those periods?

23   Why not longer?

24          A.    That's kind of the standard
```

Highly Confidential - Todd Cameron

1   starting time frame for the analyst.  But when

2   we get into like an LV TAC situation, we can

3   look at multiple years' worth of data.

4           Q.    Okay.  And that's -- never mind.

5                 And due diligence data info only

6   goes back 12 months?

7           A.    No.  It goes back further than

8   that.

9           Q.    Okay.  So that's incorrect or

10  outdated?

11          A.    No.  It's just saying evaluate the

12  last 12 months.  But you could have more data

13  than that.

14          Q.    Okay.  So the decision not to go

15  back further in looking at the order data or the

16  due diligence information, is that an

17  efficiency, kind of time savings?

18          A.    No.  It's more about getting the

19  current view of the customer.  And you could

20  have three site visits.  You can't base your

21  decision off a site visit that's three years

22  old.  You need to look at the most current

23  version of the site visit that took place.

24          Q.    Okay.  1734 talks about monthly

Highly Confidential - Todd Cameron

```
 1    drug distribution by strength.

 2              What's that?

 3        A.    I'm sorry.  Where are you looking?

 4        Q.    1734.

 5        A.    Okay.  Gotcha.

 6        Q.    What is that used for?

 7        A.    Each of the controlled substances

 8    that we monitor and set thresholds for, you've

 9    got the ability within that controlled substance

10    family to dig in and see what the trending is of

11    the individual strengths within that drug

12    family.

13              MS. SINGER:  Okay.  Can I take two

14         minutes and just make sure I've looked

15         at everything?  I'm going to step out

16         for one second.

17              (Recess taken.)

18    BY MS. SINGER:

19        Q.    A couple of cleanup questions.

20              So Cardinal provided us with data

21    on the suspicious order reports for Montana

22    which we talked about.  I know you don't have an

23    independent knowledge of that, but it basically

24    runs from 200 to 100 a year from 2013 forward.
```

1            What does that tell you about the

2   likelihood of suspicious order volume pre-2013?

3   Is there any inference you can draw?

4          A.   I don't think it would be fair for

5   me to try to not knowing what the customer base

6   looked like, what the review process was, what

7   the threshold setting methodology was at that

8   point in time.

9          Q.   Does zero strike you as unlikely

10  to be justified?

11         A.   I honestly can't say justified or

12  not.  I would have to understand how they were

13  doing, what they were doing for who the

14  customers were to be able to say if that made

15  sense or not.

16         Q.   Can you imagine a customer in a

17  state not generating a single suspicious order

18  in a year, or all customers in a state not

19  generating a single suspicious order?  I mean as

20  a professional.

21         A.   I know that the sound of it would

22  seem easy to make that distinction.  Again, I

23  just don't know what information they were

24  using, what their customer base looked like.  It

Highly Confidential - Todd Cameron

```
 1    wouldn't be fair for me to make that statement.

 2            Q.    Since you've been in your

 3    position, have you seen a statement in which

 4    there hasn't been a suspicious order during a

 5    year?

 6            A.    Not that I recall.

 7            MS. SINGER:  So you know what?

 8            It's been a long day.  There's some

 9            cleanup questions I could ask.  But,

10            Jen, I will bother you with them and

11            deal with them on the side to the extent

12            that there's anything important.

13            MS. WICHT:  Okay.

14            MS. SINGER:  Thank you very much.

15            THE WITNESS:  Thank you.

16            MS. SINGER:  I really appreciate

17            it.

18         (Signature not waived.)

19                     - - -

20            Thereupon, at 6:09 p.m., on Wednesday,

21    September 27, 2018, the sworn testimony was concluded.

22                     - - -

23

24
```

Highly Confidential - Todd Cameron

```
 1                    CERTIFICATE

 2   STATE OF OHIO         :

                                    SS:

 3   COUNTY OF FRANKLIN   :

 4

 5          I, TODD CAMERON, do hereby certify that I

 6   have read the foregoing transcript of my testimony

 7   given on September 26, 2018; that together with the

 8   correction page attached hereto noting changes in form

 9   or substance, if any, it is true and correct.

10                        _____

                         TODD CAMERON

11

12          I do hereby certify that the foregoing

13   transcript of the examination of TODD CAMERON was

14   submitted to the witness for reading and signing; that

15   after he had stated to the undersigned Notary Public

16   that he had read and examined his examination, he

17   signed the same in my presence on the _____ day of

18   _____, 2018.

19

                         _____

20                       NOTARY PUBLIC - STATE OF OHIO

21

22   My Commission Expires:

23   _____, _____.

24
```

Highly Confidential - Todd Cameron

```
 1                    CERTIFICATE
 2   STATE OF OHIO        :
                                      SS:
 3   COUNTY OF FRANKLIN   :
 4          I, Carol A. Kirk, a Registered Merit Reporter
     and Notary Public in and for the State of Ohio, duly
 5   commissioned and qualified, do hereby certify that the
     within-named TODD CAMERON was by me first duly sworn to
 6   testify to the truth, the whole truth, and nothing but
     the truth; that the sworn testimony then given by him
 7   was by me reduced to stenotype in the presence of said
     witness; that the foregoing is a true and correct
 8   transcript of the sworn testimony so given by him; that
     the sworn testimony was taken at the time and place in
 9   the caption specified and was completed without
     adjournment; and that I am in no way related to or
10   employed by any attorney or party hereto or financially
     interested in the action; and I am not, nor is the
11   court reporting firm with which I am affiliated, under
     a contract as defined in Civil Rule 28(D).
12
            IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my seal of office at Columbus, Ohio on
     this 8th day of October 2018.
14
15
16
17          _____
            CAROL A. KIRK, RMR
18          NOTARY PUBLIC - STATE OF OHIO
19   My Commission Expires:  April 9, 2022.
20               - - -
21
22
23
24
```

Highly Confidential - Todd Cameron

1         DEPOSITION ERRATA SHEET

2    I, TODD CAMERON, have read the transcript

     of my deposition taken on the 26th day of

3    September2018, or the same has been read to me.  I

     request that the following changes be entered upon the

4    record for the reasons so indicated.  I have signed the

     signature page and authorize you to attach the same to

5    the original transcript.

6    Page  Line  Correction or Change and Reason:

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____  Signature _____