Highly Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                      -   -   -

5   IN RE: NATIONAL PRESCRIPTION

6   OPIATE LITIGATION                Case No.

7                                    1:17-MD-2804

8   APPLIES TO ALL CASES             Hon. Dan A.

9                                    Polster

10  Case No. 1:17-MD-2804

11                     -   -   -

12                 March 21, 2019

13                     -   -   -

14      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

15             CONFIDENTIALITY REVIEW

16          Videotaped deposition of PAUL

17  CAMPANELLI, held at 250 West 55th Street,

18  New York, New York, commencing at 9:10 a.m.,

19  on the above date, before Marie Foley, a

20  Registered Merit Reporter, Certified

21  Realtime Reporter and Notary Public.

22             GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

24                 Deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2

 3    SEEGER WEISS LLP

 4    BY: DAVID R. BUCHANAN, ESQUIRE

 5        JENNIFER SCULLION, ESQUIRE

 6        77 Water Street

 7        8th Floor

 8        New York, New York  10005

 9        212.584.0700

10        dbuchanan@seegerweiss.com

11        jscullion@seegerweiss.com

12        Representing Plaintiffs

13

14    BRANSTETTER, STRANCH & JENNINGS, PLLC

15    BY: TRICIA HERZFELD, ESQUIRE

16        The Freedom Center

17        223 Rosa L. Parks Avenue, Suite 200

18        Nashville, Tennessee  37203

19        615.254.8801

20        triciah@bsjfirm.com

21        Representing the Tennessee Plaintiffs

22

23

24
```

```
 1    A P P E A R A N C E S:

 2

 3    ARNOLD & PORTER KAYE SCHOLER, LLP

 4    BY: JONATHAN L. STERN, ESQUIRE

 5        JOANNA PERSIO, ESQUIRE

 6        601 Massachusetts Avenue, NW

 7        Washington DC  20001-3743

 8        202.942.5000

 9        jonathan.stern@arnoldporter.com

10        Representing Endo and Par

11

12

13    DECHERT LLP

14    BY: JENNIFER PARK, ESQUIRE

15        Three Bryant Park

16        1095 Avenue of the Americas

17        New York, New York  10036-6796

18        212.698.3500

19        jennifer.park@dechert.com

20        Representing Purdue

21

22

23

24
```

```
 1    A P P E A R A N C E S:

 2

 3   COVINGTON & BURLING, LLP

 4   BY: FREDERICK BENSON, ESQUIRE

 5       One CityCenter

 6       850 Tenth Street NW

 7       Washington, DC  20001-4956

 8       202.662.6000

 9       Representing McKesson

10

11

12   JONES DAY

13   BY: ADAM HOLLINGSWORTH, ESQUIRE

14       North Point

15       901 Lakeside Avenue

16       Cleveland Ohio  44114-1190

17       216.586.3939

18       ahollingsworth@jonesday.com

19       Representing Walmart

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1    APPEARANCES VIA TELEPHONE AND STREAMING:

2

3    JOSHUA DAVIS, Arnold Porter

4    MICHAEL TYALOR, Bailey Wyant

5    PAUL E. ASFENDIS, Gibbons P.C.

6    ERIN ALLEN, Marcus & Shapira

7

8

9

10    ALSO PRESENT:

11        Charles Bachman, Seeger Weiss

12        Jobina Jones-McDonald, Endo

13        Henry Marte, videographer

14        Corey Smith, trial tech

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -  -  -

2                   TRANSCRIPT INDEX

3                                      PAGE
```

```
4   APPEARANCES...................... 2 - 5

5   INDEX OF EXHIBITS................. 7 - 21

6   EXAMINATION OF PAUL CAMPANELLI:

7   BY:  MR. BUCHANAN................. 23, 592

8   BY:  MS. HERZFELD................. 511

9   BY:  MR. STERN.................... 586

10  AFTERNOON SESSION................. 319

11  SIGNATURE PAGE.................... 600

12  ERRATA........................... 601

13  REPORTER'S CERTIFICATE........... 602
```

```
14

15

16

17                       -  -  -

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2                E X H I B I T S

 3                    -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                   PAGE
```

```
 5   Campanelli    Chart Endo Corporate          26

 6   Exhibit 201   History

 7

 8   Campanelli    Endo Opioid Drugs             43

 9   Exhibit 202

10

11   Campanelli    Qualitest Opioid Drugs        56

12   Exhibit 203

13

14   Campanelli    Par Opioid Drugs              60

15   Exhibit 204

16

17   Campanelli    CDC Vital Signs November      67

18   Exhibit 1     2011, Bates No.

19                 ENDO_OPIOID_MDL_00527673 -

20                 676

21   Campanelli    E-mail 11/14/01 with         102

22   Exhibit 3     attachment, Bates No.

23                 ENDO-CHI-LIT-00241435 - 436

24
```

```
 1                     -   -   -

 2                 E X H I B I T S

 3                     -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                   PAGE

 5   Campanelli    CDC report March 2016,       111

 6   Exhibit 2     Bates No.

 7                 ENDO_OPIOID_MDL_03705632 -

 8                 683

 9

10   Campanelli    The Epidemic                 113

11   Exhibit 205

12

13   Campanelli    1999-2017 Endo Total Pills   128

14   Exhibit 206

15

16   Campanelli    QT Total Pills/Units Counts  136

17   Exhibit 208

18

19   Campanelli    Par Total Pills/Units Counts 150

20   Exhibit 207

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      -   -   -

2                  E X H I B I T S

3                      -   -   -

4     ENDO-CAMPANELLI EXHIBITS                    PAGE

5     Campanelli   Annual Sales                   155

6     Exhibit 210

7

8     Campanelli   Annual Sales                   162

9     Exhibit 211

10

11    Campanelli   E-mail 7/14/03, with           168

12    Exhibit 11   attachment, Bates No.

13                 ENDO_OPIOID_MDL_01692316-321

14

15    Campanelli   Bloomquist article             174

16    Exhibit 12

17

18    Campanelli   E-mail 1/29/07, with           181

19    Exhibit 13   attachment, Bates No.

20                 ENDO_OPIOID_MDL_00860364-748

21    Campanelli   E-mail 8/24/01, with           189

22    Exhibit 14   attachment, Bates No.

23                 ENDO_OPIOID_MDL_03388209-210

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                       -   -   -

2                   E X H I B I T S

3                       -   -   -

4    ENDO-CAMPANELLI EXHIBITS                    PAGE

5    Campanelli    Endo History of Major Drugs  190

6    Exhibit 212

7

8    Campanelli    Slide deck, Bates No.         202

9    Exhibit 101   ENDO-OPIOID_MDL-04136658

10

11   Campanelli    Slide deck, Bates No.         210

12   Exhibit 15    ENDO-OPIOID_MDL-01139611

13

14   Campanelli    E-mail 10/7/2005, Bates No.  223

15   Exhibit 102   ENDO_OPIOID_MDL-01139609-610

16

17   Campanelli    Slide deck, Bates No.         231

18   Exhibit 16    ENDO-CHI_LIT-00078229

19

20   Campanelli    E-mail 4/5/02 with            243

21   Exhibit 103   attachment, Bates No.

22                 ENDO-OPIOID_MDL-04908487-488

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                       -   -   -

2                   E X H I B I T S

3                       -   -   -

4    ENDO-CAMPANELLI EXHIBITS                    PAGE

5    Campanelli   Slide deck, Bates No.      246

6    Exhibit 15   ENDO-OPIOID_MDL-01139611

7

8    Campanelli   CD&E 1999 Objectives,      251

9    Exhibit 104  Bates No.

10                ENDO-OPIOID_MDL-03258200-202

11   Campanelli   Slide deck, Bates No.      254

12   Exhibit 105  ENDO-OPIOID_MDL-02344002

13

14   Campanelli   E-mail 4/7/2001 with       268

15   Exhibit 19   attachment, Bates No.

16                END00152457-473

17

18   Campanelli   Endo Payments to NIPC,     273

19   Exhibit 21   2003-2012

20

21   Campanelli   Pain Management Today,     274

22   Exhibit 22   Bates No.

23                ENDO-OPIOID_MDL-01605952-958

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -

 2                 E X H I B I T S

 3                       -   -   -

 4     ENDO-CAMPANELLI EXHIBITS                    PAGE

 5     Campanelli    Slide deck, Bates No.         276

 6     Exhibit 23    KP360 0HIOMDL_000050938-1097

 7

 8     Campanelli    Slide deck, Bates No.         280

 9     Exhibit 24    KP360_0HIOMDL_000121628-728

10

11     Campanelli    Slide deck, Bates No.         282

12     Exhibit 25    ENDO-OR-CID-00749100-178

13

14     Campanelli    Evidence Review, Bates No.    283

15     Exhibit 40    ENDO-OPIOID_MDL-01463855-4070

16

17     Campanelli    ASSURANCE OF DISCONTINUANCE   288

18     Exhibit 106   UNDER EXECUTIVE LAW

19                   SECTION 63, SUBDIVISION 15

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2               E X H I B I T S

 3                    -   -   -

 4    ENDO-CAMPANELLI EXHIBITS                   PAGE

 5    Campanelli   CD                            294

 6    Exhibit 26

 7

 8    Campanelli   NIPC Executive Summary,       303

 9    Exhibit 28   Bates No.

10                 KP360-0HIOMDL-000241-244

11

12    Campanelli   E-mail 11/16/03, Bates No.   311

13    Exhibit 27   ENDO-OPIOID_MDL-01928285-286

14

15    Campanelli   Spreadsheet                   318

16    Exhibit 214

17

18    Campanelli   Spreadsheet                   318

19    Exhibit 213

20

21    Campanelli   Flash drive, Bates No.        318

22    Exhibit 209  ENDO_DATA-OPIOID_MDL-

23                 00000025-41

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -

 2                  E X H I B I T S

 3                       -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                    PAGE

 5   Campanelli    E-mail 8/2/2001 with          324

 6   Exhibit 31    attachment, Bates No.

 7                 ENDO-OPIOID_MDL-06234029-037

 8

 9   Campanelli    APF Pain Action Guide,        328

10   Exhibit 32    Bates No.

11                 CHI_000435580-597

12   Campanelli    APF Pain Action Guide, Bates 337

13   Exhibit 33    No. CHI_000432493-507

14

15   Campanelli    E-mail 3/16/04 with          343

16   Exhibit 34    attachment, Bates No.

17                 ENDO-OPIOID_MDL-02255331-346

18

19   Campanelli    Report of CIOMS Working      346

20   Exhibit 36    Group IV 1998

21

22   Campanelli    E-mail 8/21/2009 with        358

23   Exhibit 38    attachment, Bates No.

24                 ENDO-OPIOID_MDL-05968029-075
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -

 2                   E X H I B I T S

 3                       -   -   -

 4    ENDO-CAMPANELLI EXHIBITS                    PAGE

 5    Campanelli    Evidence Report/Technology    360

 6    Exhibit 39    Assessment Number 218

 7

 8    Campanelli    E-mail 1/23/2004 with         366

 9    Exhibit 44    attachment, Bates No.

10                  ENDO-OPIOID_MDL-03256654-717

11

12    Campanelli    Market Watch March 24, 2004   373

13    Exhibit 9

14

15    Campanelli    Book chapter                  385

16    Exhibit 45

17

18    Campanelli    Slide deck, Bates No.         389

19    Exhibit 46    ENDO-OPIOID MDL-04137791

20

21    Campanelli    E-mail 3/25/2002 with         393

22    Exhibit 107   attachment, Bates No.

23                  ENDO-OPIOID_MDL-04095507

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                          -   -   -

3                    E X H I B I T S

4                          -   -   -

5    ENDO-CAMPANELLI EXHIBITS                      PAGE

6    Campanelli  E-mail 12/20/2007 with          397

7    Exhibit 47  attachment, Bates No.

8                ENDO-OPIOID_MDL-02162731

9

10   Campanelli  E-mail 12/19/2007 with          404

11   Exhibit 49  attachment, Bates No.

12               ENDO-OPIOID_MDL-02086096-099

13

14   Campanelli  Slide deck, Bates No.           418

15   Exhibit 50  ENDO-CHI_LIT-00547543

16

17   Campanelli  Slide deck, Bates No.           421

18   Exhibit 51  ENDO-CHI_LIT-00012061

19

20   Campanelli  E-mail 4/30/2009 with           428

21   Exhibit 52  attachment, Bates No.

22               ENDO-OPIOID MDL-06127944-945

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                         -   -   -

2                    E X H I B I T S

3                         -   -   -

4    ENDO-CAMPANELLI EXHIBITS                      PAGE

5    Campanelli  DEA Brief May 2011, Bates No. 435

6    Exhibit 54  ENDO-OR-CID-00694084-087

7

8    Campanelli  E-mail 6/29/2011, Bates No.   442

9    Exhibit 53  END00259233-235

10

11   Campanelli  E-mail 3/5/2009 with          454

12   Exhibit 61  attachment, Bates No.

13               ENDO-CHI_LIT-00067298-327

14

15   Campanelli  E-mail May 31, 2012, Bates    470

16   Exhibit 66  No.

17               ENDO-CHI LIT-00008100-101

18

19   Campanelli  Test battery - results, Bayes 482

20   Exhibit 70  No. ENDO-CHI_LIT-00067901-954

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -  -  -

 2                   E X H I B I T S

 3                       -  -  -

 4   ENDO-CAMPANELLI EXHIBITS                      PAGE

 5   Campanelli  Q4 Face-to-Face Meeting,     484

 6   Exhibit 69  Chadds Ford December 7-8, 2009

 7               Bates No.

 8               ENDO-CHI_LIT-00064407-414

 9

10   Campanelli  Box of documents             488

11   Exhibit 108

12

13   Campanelli  Detail Visits to Dr. Adolf   495

14   Exhibit 110 Harper, 2008-2012

15

16   Campanelli  E-mail 4/20/2012 with        499

17   Exhibit 109 attachment, Bates No.

18               ENDO-OPIOID_MDL-02716741-742

19   Campanelli  NAVIPPRO report 3/13/2014,   524

20   Exhibit 500 Bates No.

21               ENDO-OPIOID_MDL-06183930-4083

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1

2                          -   -   -

3                      E X H I B I T S

4                          -   -   -

5    ENDO-CAMPANELLI EXHIBITS                      PAGE

6    Campanelli  NAVIPPRO report 5/17/2013,     532

7    Exhibit 501 Bates No. EPI001760592-680

8

9    Campanelli  NAVIPPRO report 8/19/2014,     538

10   Exhibit 502 Bates No.

11              ENDO-OPIOID_MDL-01459827-911

12

13   Campanelli  NAVIPPRO report 8/18/2015     546

14   Exhibit 503

15

16   Campanelli  NAVIPPRO report 8/19/2016,     550

17   Exhibit 504 Bates No.

18              ENDO-OPIOID_MDL-01232762-869

19

20   Campanelli  E-mail 11/13/2004, Bates No.  567

21   Exhibit 505 ENDO-OPIOID_MDL-02667006-007

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -   -   -

2                  E  X  H  I  B  I  T  S

3                        -   -   -

4    ENDO-CAMPANELLI EXHIBITS                    PAGE

5    Campanelli  Slide deck                      576

6    Exhibit 506

7

8    Campanelli  E-mail 3/23/2017, Bates No.   581

9    Exhibit 507 ENDO-OPIOID_MDL-01848038

10

11   Campanelli  E-mail May 17, 2018 with      593

12   Exhibit 111 attachment, Bates No.

13               PAR_OPIOID_MDL_0001895807-808

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DEPOSITION SUPPORT INDEX

 2

 3    DIRECTION TO WITNESS NOT TO ANSWER

 4      Page    Line

 5       - -none- -

 6

 7

 8    REQUEST FOR PRODUCTION OF DOCUMENTS

 9      Page    Line

10       - -none- -

11

12

13    STIPULATIONS

14      Page    Line

15       - -none- -

16

17

18    QUESTIONS MARKED

19      Page    Line

20       - -none- -

21

22

23

24
```

```
 1                    -   -   -

 2                  9:10 a.m.

 3              New York, New York

 4                    -   -   -

 5          THE VIDEOGRAPHER:  All right.

 6   We are now on the record.

 7          My name is Henry Marte.  I am a

 8   videographer with Golkow Litigation

 9   Services.

10          Today's date is March 21st,

11   2019, and the time is 9:10 a.m.

12          This videotaped deposition is

13   being held in New York, New York, in

14   the matter of National Prescription

15   Opiate Litigation.  The deponent today

16   is Paul Campanelli.

17          All appearances are noted on the

18   stenographic record.

19          Will the court reporter please

20   administer the oath to the witness.

21                    -   -   -

22

23

24
```

```
 1     PAUL CAMPANELLI, the Witness herein,

 2         having been first duly sworn by a

 3         Notary Public in and of the State of

 4         New York, was examined and testified as

 5         follows:

 6     EXAMINATION BY

 7     MR. BUCHANAN:

 8         Q.    Good morning, Mr. Campanelli.

 9     My name is Dave Buchanan.

10             Could you please state your name

11     for the record, sir?

12         A.    It's Paul Campanelli.

13         Q.    And, are you the current chief

14     executive officer of Endo?

15         A.    Yes.

16         Q.    You're also a board member of

17     Endo.

18             Is that right?

19         A.    Yes.

20         Q.    Okay.  Just so you understand

21     where I come from on this, I and others

22     working with us represent cities,

23     municipalities, counties who've been

24     impacted by the opioid epidemic.  They've
```

1    brought claims against you and other

2    entities.

3            Do you have some general sense

4    of that litigation, the opioid litigation

5    by municipalities, counties, cities?

6        A.    Yes.

7            MR. BUCHANAN:  Okay.  Can we go

8        off the record for a moment?

9            THE VIDEOGRAPHER:  The time is

10       9:11 a.m.

11           Off the record.

12           (Discussion held off the record.)

13           THE VIDEOGRAPHER:  We are back

14       on the record.

15           The time is 9:12 a.m.

16   BY MR. BUCHANAN:

17       Q.    I apologize for that

18   interruption, sir.

19           Just to restate where we were,

20   you are the current CEO of Endo.

21           Is that right?

22       A.    Correct.

23       Q.    You're board member of Endo?

24       A.    Correct.

1      Q.     I take it you're a shareholder

2    of Endo?

3      A.     Yes.

4      Q.     Okay.  As the CEO, that means

5    chief executive officer?

6      A.     Yes.

7      Q.     You are the senior-most officer

8    of the company?

9      A.     Yes.

10      Q.     As a board member, you're on the

11    board of directors of the company?

12      A.     Correct.

13      Q.     Board of directors is the group

14    that's appointed by the shareholders to

15    oversee the operations of the company,

16    correct?

17      A.     To govern the company, yes.

18      Q.     To govern the company, thank

19    you.

20           The board and its senior

21    officers are charged with returning value

22    and profits to shareholders, right?

23      A.     Yes.

24      Q.     Shareholders owner the company,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2         A.    Yes.

3         Q.    And you work for the

4    shareholders to make money for the

5    shareholders?

6         A.    Yes.

7         Q.    Thank you.

8              What I'd like to do, because

9    there's been some different acquisitions

10   and some different names, I want to see if

11   we can orient ourselves from the various

12   entities and get some common knowledge and

13   dates down.  We have a slide that

14   hopefully will simplify this.

15             MR. BUCHANAN:  Could we get

16        slide 2 over to counsel?

17             And what's that going to be

18        marked as an exhibit?

19             This is Exhibit 201.

20             (Campanelli Exhibit 201,

21        document, was marked for

22        identification, as of this date.)

23             MR. BUCHANAN:  My intent,

24        counsel, is to mark demonstratives

1      from 200 up.  With regard to

2      substantive exhibits, they'll be in

3      the first range of 100.  We may not

4      mark them all.

5   BY MR. BUCHANAN:

6      Q.    Showing you what's marked as

7   201, sir, it's a timeline of the Endo

8   corporate history.

9            You see off in the left, Endo

10  Pharmaceuticals actually goes back, well,

11  a long time, right?  Back to the 1920s?

12           MR. STERN:  Objection; lack of

13      foundation.

14      A.    This is back in the DuPont Merck

15  days.

16      Q.    This actually even precedes the

17  DuPont Merck days, correct, sir?

18      A.    Yes, correct.

19      Q.    You see the far left column Endo

20  Pharmaceuticals formed in 1920?

21      A.    Yes.

22      Q.    And that's a history that you've

23  referenced in annual reports and

24  shareholder reports over the years, that

Highly Confidential - Subject to Further Confidentiality Review

1    this is a company that goes back to the

2    1920s.

3              Correct, sir?

4              MR. STERN:  Objection; lack of

5         foundation.

6         A.    To the best of my knowledge,

7    that -- that is part of the original

8    predating DuPont Merck.

9              So, while in name, yes.  I don't

10   believe the company actually started until

11   about 1997.

12        Q.    Okay.  And, what you're alluding

13   to, sir, is that at some point in time,

14   the timeline indicates 1970, but without

15   regard to whether it was 1970 or '71 or

16   '69, DuPont acquired Endo, correct?

17        A.    That's what it says here.

18        Q.    Okay.  And then ultimately there

19   was a join venture between DuPont and

20   Merck to focus on pharmaceuticals,

21   correct?

22        A.    I -- I'm not sure of the case

23   there.

24        Q.    Okay.  Then in the late '90s,

1    1997 or so, some executives of what was

2    then operating as the DuPont Merck joint

3    venture essentially spun off the Endo

4    portfolio and established a new company

5    called Endo Pharmaceuticals.

6              Correct, sir?

7        A.    I think what happened was a

8    group of individuals were given an

9    opportunity to acquire a series of

10   products and acquired the name Endo back

11   in 1970.

12       Q.    Understood.

13             So whatever the corporate

14   transactional structure were, some

15   products that were currently being

16   promoted, manufactured, et cetera, by the

17   Merck DuPont joint venture were sold by

18   the DuPont Merck joint venture together

19   with the name Endo and a new company was

20   formed, correct?

21             MR. STERN:  I apologize,

22        Mr. Buchanan.  You're talking about

23        1970 now?

24             MR. BUCHANAN:  I was, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I think that's right.  That

2    three individuals bought a handful of

3    products and bought the name Endo back in

4    1997.

5        Q.    Okay.  And the CEO for that

6    reformed Endo Pharmaceuticals in 1997 was

7    whom?

8        A.    I believe it was Carol Ammons.

9    I believe that's her name.

10       Q.    Okay.  And then the company

11   operated for a number of years privately

12   and then ultimately went public and gained

13   public shareholders in 2000, right?

14       A.    I -- I'm not sure of the date.

15            I see it here on the sheet.  So

16   I have no reason not to believe it.

17       Q.    And I don't think that's going

18   to be a material point for us today.  I

19   just wanted to make sure we were oriented

20   here.

21            In 2010, we see an acquisition

22   of a then large generic pharmaceutical

23   company, correct?

24       A.    They acquired Qualitest, yes, a

1    generics company.

2        Q.    And 2010 is consistent with your

3    recollection, sir, of when that occurred?

4        A.    Yes.

5        Q.    Then we could probably skip over

6    2014 which references an Irish inversion.

7              Something I assume done for tax

8    returns and other reasons, right?

9        A.    Yes.

10        Q.    Okay.  And Endo is the U.S.

11    subsidiary going forward from that point

12    in time.

13              And then Endo acquired Par,

14    correct?

15        A.    Endo acquired Par in 2015.

16        Q.    Okay.  And so we have,

17    essentially, three pharmaceutical

18    companies that had their own portfolios.

19              If we look in the post-1997 era,

20    we've got Endo with a portfolio of

21    products it brought from DuPont Merck,

22    correct?

23        A.    Yes.

24        Q.    We've got Qualitest

1    Pharmaceuticals with its portfolio of

2    generics products, correct?

3        A.    Yes.

4        Q.    And we have Par with its

5    portfolio of products that were acquired

6    by Endo in 2015, correct?

7        A.    Correct.

8        Q.    And it looks like as a business

9    matter, after that merger or acquisition

10   in 2015, generic products, meaning

11   non-branded pharmaceutical products, were

12   consolidated in the Par brand, right?

13            MR. STERN:  Objection to the

14       form.

15       A.    In 2015 when Endo acquired Par,

16   the Qualitest portfolio fell under to the

17   Par portfolio in name and then was

18   governed under Endo.

19       Q.    And just to make sure we have

20   context in how you come to this, sir, you

21   came into the Endo entities through the

22   acquisition of Par in 2015?

23       A.    Correct.

24       Q.    Okay.  And, so, let's dial back

1    the clock and make sure we understand kind

2    of your role and involvement in the

3    pharmaceutical industry.

4            You were with Par from, what,

5    roughly 2000, 2001?

6        A.    2001.

7        Q.    Okay.  And moved through various

8    positions though.

9            Ultimately, you reached the CEO

10   position at Par, correct?

11       A.    Started in business development

12   and concluded as the CEO.

13       Q.    And you were the CEO from, what,

14   2010 or so?

15       A.    No.  I was the CEO from 2012 to

16   2015.

17       Q.    And, during your time at Par,

18   Par was also in the opioid business,

19   right?

20       A.    We had a small portfolio, yes.

21       Q.    And, at the time when Endo

22   acquired Par it was in the opioid business

23   still at that point, correct?

24            MR. STERN:  Objection to form.

1      A.    I'm sorry.  Could you repeat

2   that?

3      Q.    In 2015 when Endo acquired Par,

4   it was making opioid products for sale,

5   correct?

6      A.    Par?

7      Q.    Par.

8      A.    Yes.

9      Q.    I see the confusion with my

10   question.

11         In 2015 when Endo acquired Par,

12   Par was still in the business of making

13   opioid products, correct, sir?

14         MR. STERN:  Object to the form.

15      A.    Par was manufacturing and either

16   would have acquired and distributed

17   opioids from third parties.

18      Q.    Okay.  At the point in time in

19   2010 when Endo acquired Qualitest,

20   Qualitest, which you indicated was a

21   generic manufacturer of drugs, they also

22   had a portfolio of opioid products they

23   were manufacturing and distributing,

24   correct?

1    A.    That's my general understanding.

2    Q.    As of the time you became CEO of

3  Endo, the Endo company prior to the merger

4  was substantially invested in the pain

5  segment.

6         Fair?

7    A.    I'm a little confused with your

8  question.  I'm sorry.  Could you just

9  re --

10   Q.    No, no, that's fine.  And please

11  do that throughout the day if, for

12  whatever reason, we're not communicating

13  clearly or my questions aren't clear.

14        Prior to the acquisition of the

15  Par assets in 2015, I mean, you were a

16  part of that discussion and negotiation

17  back and forth with Endo?

18   A.    For the acquisition of Par, yes.

19   Q.    Yes.

20        And Endo ultimately paid, what,

21  8 billion dollars to acquire the Par

22  assets?

23   A.    Correct.

24   Q.    And if I understand correctly,

Highly Confidential - Subject to Further Confidentiality Review

1  sir, the Par assets had sold for 2 billion

2  dollars just a few years before that,

3  right?

4      A.    2.2 billion dollars.

5      Q.    So roughly a fourfold return for

6  the company, its shareholders, when it

7  sold in 2015?

8      A.    Generally, yes.

9          MR. STERN:  Objection to the

10     form.

11  BY MR. BUCHANAN:

12     Q.    Okay.  At the point in time when

13  you were having this discussion with Endo

14  in 2015 about selling Par, becoming

15  involved in Endo, Endo was in the pain

16  business at that point in time, right?

17     A.    It had a portfolio of products

18  that were detailed into pain, yes, amongst

19  others.

20     Q.    Endo was essentially known as a

21  pain management company, correct?

22     A.    In 2015?

23          2015 I think it was

24  transitioning to a specialty company.

1    Q.    You recognize historically, sir,

2    that Endo was a pain management company,

3    if we go back to the '90s, early 2000s,

4    2010.

5            Fair?

6    A.    Yes.

7    Q.    Okay.  And its portfolio of

8    products in pain management significantly

9    included opioid products, true?

10           MR. STERN:  Objection to the

11       form.

12   A.    My understanding was there was a

13   couple of opioid products in the

14   portfolio.

15   Q.    Okay.  Well, let's see if we can

16   orient ourselves more specifically.  We're

17   talking about opioid products today.

18   That's, essentially, the subject of the

19   case, for reasons we'll get into.

20           You have an understanding of

21   really in some sense what opioid products

22   do?

23   A.    Generally, yes.

24   Q.    Okay.  They bind to receptors in

1    the brain, among other things, right?

2              MR. STERN:  Objection to the

3         form.

4         A.    Sounds reasonable.

5         Q.    Okay.  They can trigger a series

6    of reactions in the body that can release

7    feelings of pleasure, euphoria, suppress

8    anxiety.

9              Fair?

10             MR. STERN:  Objection to the

11        form.

12        A.    These areas I really don't know.

13        Q.    Okay.  Do you have some general

14   sense, sir, that they can lead to a

15   subjective feeling of pleasure and

16   euphoria?

17        A.    Generally.

18        Q.    Okay.  And that's not something

19   that's really new or unique in the

20   portfolio of products that Endo brought

21   out in 1997, right?

22             MR. STERN:  Objection to the

23        form.

24        A.    I'm not sure I follow your

1   question.

2       Q.    I mean, I guess where I was

3   going is that's just the characteristic of

4   opioids, right?

5            MR. STERN:  Objection to the

6       form.

7       A.    I really don't know the -- the

8   specificity of the characteristics.  I

9   just don't, really.

10      Q.    Do you have some understanding,

11  sir, more broadly that, I mean, opioids go

12  back thousands of years.

13           Fair?

14      A.    Fair.

15      Q.    Obviously not in tablet form.

16  In different forms, but derived from the

17  opium poppy?

18      A.    Understood.

19      Q.    Over time, scientists figured

20  out how to synthesize those into either

21  drugs for pleasure or drugs for treatment?

22           MR. STERN:  Objection to the

23      form.

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2        Q.    Right?

 3        A.    I don't know about drugs for

 4    pleasure.

 5              I know that drugs were focused

 6    on for pain.

 7        Q.    Well, I mean, you've heard of

 8    opium dens, sir?

 9        A.    Yes.

10        Q.    And I just want to orient

11    ourselves.

12              I mean, this class of drugs that

13    kind of brings us in this room today had

14    predecessor compounds going back thousands

15    of years that had been the subject of

16    abuse and use, right?

17        A.    I understand abuse and misuse of

18    opioids, generally speaking, yes.

19        Q.    Okay.  And really this isn't the

20    first time we've had to deal with issues

21    of opioid abuse, even opioid epidemics?

22              MR. STERN:  Objection to the

23        form.

24        A.    Again, I'm not -- I'm not sure
```

1    specifically.

2        Q.    I just want to have an

3    understanding, even generally, sir.  I

4    mean, as the CEO of a company that still

5    has a portfolio of opioid products, I

6    mean, you do have some understanding that

7    there is a history with opioid products

8    and abuse and addiction, being diverted.

9            Fair?

10            MR. STERN:  Objection to the

11        form.

12        A.    As a CEO, I am aware of abuse

13    and misuse of opioids over time.

14        Q.    But that's something that you

15    didn't have to wait until 2010 to find

16    out, right?

17        A.    Me personally?

18        Q.    Yeah.

19        A.    Generally -- general

20    understanding, it would have been in -- in

21    probably the 2015 time frame that it

22    really became an awareness for me.

23        Q.    Okay.  We'll see if we can pin

24    that down as we move throughout the day,

1    sir.

2              I mean, just as a person growing

3    up over the last 50 or so years, you have

4    an awareness that drugs, whether it's

5    Morphine, whether it's OxyContin, whether

6    it's heroin, are highly sought and highly

7    abused.

8              Fair?

9              MR. STERN:  Objection to the

10        form.

11        A.    I am aware that these type of

12   drugs can be abused and misused, yes.

13        Q.    And that awareness, sir, you had

14   that prior to 2015?

15        A.    Fair, yes.

16        Q.    Okay.  Well, let's see if we can

17   maybe using this chart as a reference

18   point, see if we can see where the

19   company's various products fit in, if we

20   could.

21              MR. BUCHANAN:  Corey, could I

22        have slide 20 up on the screen?

23              I'll pass one over to counsel.

24              What exhibit number will this

1          be?

2                    I'm going to pass you Exhibit

3          202, a copy for the witness and

4          counsel.

5                    MR. STERN:  Thank you.

6                    (Campanelli Exhibit 202,

7          document, was marked for

8          identification, as of this date.)

9     BY MR. BUCHANAN:

10         Q.    Sir, I'll represent to you that

11    in the course of litigation, what happens

12    is we exchange information with each

13    other.  You'll give us a bunch of

14    documents.  We'll give you documents and

15    both sides will try and sift through that

16    and see what the state of play is.

17                   From records produced through

18    Endo over the years, we have an

19    understanding that Endo made various

20    oxycodone products.

21                   Do you have that awareness, sir?

22         A.    Yes.

23         Q.    Okay.  And on the left-hand

24    column we see several different, if you

Highly Confidential - Subject to Further Confidentiality Review

1    will, formulations of those products

2    together with brand names that were used

3    from time to time.

4              Do you see those?

5    A.    Yes.

6    Q.    Percocet, that's your brand,

7    right?

8    A.    Correct.

9    Q.    Percocet's been a brand of the

10    company since the '70s, correct?

11    A.    I know it's been approved for

12    many years.  I'm not sure about the

13    specific date.

14    Q.    Okay.  And Percocet contains

15    oxycodone as its active pharmaceutical

16    ingredient, correct?

17    A.    I believe that's one of them.

18    Q.    What is the active

19    pharmaceutical ingredient, sir, in

20    OxyContin?

21    A.    Oxycodone.

22    Q.    Okay.  And, so, we see that the

23    company here, Endo, is a manufacturer of

24    Percocet, an oxycodone product, as well as

1    another product called Endocet.

2            Do you see that?

3    A.    Yes.

4    Q.    Do you recognize that, sir, as

5    the generic formulation of the company's

6    Percocet product?

7    A.    Yes.

8    Q.    And for years, sir, the company

9    made, marketed and sold Endocet, correct?

10   A.    Yes.

11           MR. STERN:  Objection to the

12       form; lack of foundation.

13   BY MR. BUCHANAN:

14   Q.    Endocet and Percocet.  There's

15   also a reference to Percodan and Endodan.

16           Percodan is also your brand,

17   right?

18           MR. STERN:  Object to the form.

19   A.    I'm not familiar with it.  I see

20   it on the sheet here.

21   Q.    Okay.  Do you recognize that,

22   sir, as the combination of oxycodone and

23   aspirin?

24   A.    I'm not familiar with the drugs.

1    Q.    Okay.  I take it you wouldn't

2  dispute if we had records from -- from

3  your company that said you sold a bunch of

4  Percodan and Endodan that you actually did

5  so?

6            MR. STERN:  Objection to the

7       form.

8       A.    I -- I don't know, but I

9  wouldn't have any reason to dispute it.

10      Q.    Fair enough.

11            There's a reference to oxycodone

12  ER.

13            Do you see that?

14      A.    Yes.

15      Q.    That's the generic formulation

16  of a brand product, right, sir?

17      A.    Yes.

18      Q.    And please tell the jury what

19  the brand name of that product is.

20      A.    OxyContin extended-release.

21      Q.    And you sold a bunch of those

22  pills?

23            MR. STERN:  Objection to the

24       form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    Right?

3        A.    We sold -- we sold the product.

4        Q.    And we're going to talk about

5    volume at some point today.

6              I mean, at what point is it a

7    lot of product, sir?  I mean, are billions

8    of pills a lot of product?

9              MR. STERN:  Objection to the

10       form.

11       A.    I never thought about it in

12   terms of what a lot is.  It's usually

13   based upon what the wholesalers' purchase

14   orders are.

15       Q.    Right.

16             Would you be surprised to learn,

17   sir, that you sold billions of

18   oxycodone-containing products?

19             MR. STERN:  Objection to the

20       form.

21       A.    Again, if that was based upon a

22   purchase order, it would not surprise me.

23       Q.    Okay.  We'll have a chance,

24   hopefully, to look at that today.

1          And then we see Percolone and

2    Endocodone as two additional formulations

3    of oxycodone-containing products.

4          Do you see those?

5    A.    I see the names.

6    Q.    You're aware, sir, that

7    oxycodone products were target of abuse

8    and diversion in the market.

9          Fair?

10          MR. STERN:  Objection to the

11      form.

12    A.    I'm sorry.  Could you say that

13    again?

14    Q.    You're aware that

15    oxycodone-containing products were a

16    target of abuse and diversion in the

17    market?

18          MR. STERN:  Objection to the

19      form.

20    A.    I'm aware that it's -- it's

21    abused and misused.

22    Q.    Okay.  Let's look at the next

23    column, sir.  And I didn't go into each of

24    the -- staying in the left column for a

Highly Confidential - Subject to Further Confidentiality Review

1  moment, the oxycodone column.

2          You made a number of different

3  formulations in each of those products.

4  Well, not for all of them, but for some of

5  them.

6          Fair?

7          MR. STERN:  Objection to the

8      form.

9      A.    Again, I'm personally

10  familiar -- familiar with about three of

11  these products.  I -- I'm not familiar

12  with every product on this sheet here in

13  the left column.

14      Q.    I take it some of these products

15  were more popular than others?

16          MR. STERN:  Objection to the

17      form.

18      A.    I don't know if they were

19  popular or not.  I'm just not familiar

20  with their names.

21      Q.    Okay.  Well, some of these were

22  bigger sellers than others?

23      A.    I'm familiar with Endocet.  I'm

24  familiar with oxycodone ER and I'm

1    familiar with Percocet.

2    Q.    Okay.  Let's move forward now to

3    hydrocodone.

4    Company made a number of

5    hydrocodone-containing products, correct?

6    A.    I'm familiar with one product in

7    this column here, the Hydro/APAP.

8    Q.    And hydrocodone/APAP if we were

9    trying to link that with a brand name,

10    that would be Vicodin, right?

11    A.    That's my understanding.

12    Q.    So in the oxycodone column we

13    have you all making Percocet and the

14    generic form of OxyContin as kind of

15    common trade names, right?

16    MR. STERN:  Objection to the

17    form.

18    A.    I'm sorry.  Could you say that

19    one more time?

20    Q.    Yeah.

21    In the oxycodone column, just so

22    we can kind of link this up with some

23    branded names to the extent that they're

24    not branded names, we have you making

1    Percocet, OxyContin generic and Percodan

2    as brands.

3              Fair?

4              MR. STERN:  Objection to the

5        form.

6        A.    Percocet is the brand name.

7    Endocet is the generic name and oxycodone

8    ER is a generic name for OxyContin ER.

9        Q.    Okay.  Moving over to the second

10   column from the left, hydrocodone.  We see

11   you all making Vicodin, generic Vicodin.

12   Excuse me.

13             MR. STERN:  Objection to the

14       form.

15       A.    We make a generic version of

16   Vicodin, which is hydrocodone/APAP.

17       Q.    Okay.  Another drug that was

18   sought after and abused.

19             Fair?

20             MR. STERN:  Objection to the

21       form.

22       A.    Again, it -- I'm aware that has

23   been abused and misused.

24       Q.    Okay.  And then we have Morphine

```
1    in the middle.  Morphine sulphate.

2              Do you see that?

3       A.    Yes.

4       Q.    That was another product that

5    you made, right?

6              MR. STERN:  Objection to the

7         form.

8       A.     It's a product that -- it's a

9    generic version that was made, I believe,

10   at Qualitest.

11      Q.    Sir, I'll represent to you that

12   the data that I'm showing on this chart is

13   just for Endo.

14             I take it sitting here today --

15             MR. STERN:  Objection.

16   BY MR. BUCHANAN:

17      Q.    You can accept my representation

18   or not.  I will tell you that that's what

19   the data reflects.

20             MR. STERN:  Objection; lack of

21        foundation.

22             MR. BUCHANAN:  Okay.

23   BY MR. BUCHANAN:

24      Q.    Do you have any basis to
```

1    disagree, sir, that Endo actually made

2    morphine sulphate over the years, ER?

3        A.    I can't dispute that.

4        Q.    Okay.  Let's go one further

5    notch to the right.  Oxymorphone.

6              These were some big products for

7    the company, right?

8        A.    These were products which were

9    distributed by Endo, yes.

10       Q.    Marketed, promoted, distributed,

11   sold.

12             Fair?

13       A.    Correct.

14       Q.    We've got Opana, Opana ER and

15   Opana ER reformulated, correct?

16       A.    Yes.

17       Q.    And then we have another product

18   off to the right hydromorphone.

19             Do you see that?

20       A.    Yes.

21       Q.    And, are you familiar, sir, with

22   the concept of MMEs, Morphine equivalents?

23       A.    Yes.

24       Q.    There's different potencies of

Highly Confidential - Subject to Further Confidentiality Review

```
 1      the various opioids with regard to the

 2      effects on the various receptors in the

 3      brain.

 4              Fair?

 5      A.    I don't know that.

 6      Q.    You're familiar, sir, that

 7      certain products --

 8              MR. BUCHANAN:  Withdrawn.

 9      Q.    Within your business, sir,

10      certainly within the way these products

11      are promoted, a consideration that's to be

12      given with regard to dosing is how much

13      stronger in terms of potency the drug is

14      gram-for-gram relevant to Morphine.

15              Correct?

16              MR. STERN:  Objection to the

17          form.

18      A.    I know that MMEs are based on

19      the milligram equivalents.

20      Q.    Okay.  So, for example, one

21      milligram of Morphine -- excuse me.

22      Probably easier to go this direction.

23              MR. BUCHANAN:  Withdrawn.

24      Q.    One milligram of oxymorphone,
```

1    your Opana products, is equivalent to

2    three milligrams of Morphine, right?

3         A.    That -- that appears correct.

4         Q.    Okay.  Three-to-one --

5         A.    Correct.

6         Q.    -- is the MME conversion, right?

7               And with regard to your

8    oxycodone products and Morphine, that's,

9    what, one-and-a-half-to-one?

10              MR. STERN:  Objection to the

11        form.

12        A.    Yes.

13        Q.    And, so, essentially what that

14   means, sir, is that if we're looking at a

15   30 milligram Opana tablet, 30 milligram

16   Opana tablet --

17              MR. BUCHANAN:  Withdrawn.

18              MR. STERN:  Here comes the math.

19              MR. BUCHANAN:  Thank you.

20        That's why I went to law school.

21              Withdrawn.

22        Q.    If we look at a 30 milligram

23   Opana tablet or any of the oxymorphone

24   tablets there, that translates into

1    roughly 90 milligrams of Morphine, right?

2        A.    Three-to-one.

3        Q.    Three times 30, I think I can do

4    that without my calculator.  That's 90

5    milligrams.  All right.

6              Okay.  So, these are the Endo

7    products, sir.

8              Let me pass you over Qualitest's

9    products.

10             (Campanelli Exhibit 203,

11         document, was marked for

12         identification, as of this date.)

13   BY MR. BUCHANAN:

14       Q.    We talked a moment ago, sir,

15   about Qualitest's role and involvement

16   with regard to opioids and its

17   relationship with Endo.

18             Passing you what we're marking

19   as Exhibit 203.  Just let me know when you

20   have that, sir.

21             (Pause.)

22       Q.    Sir, I'll represent to you that

23   this is just a graphic reflecting the

24   various products that have been identified

1    in the order records from Qualitest over

2    the years.

3              We see, again, three columns.

4    And we're having some difficulty, I think,

5    showing the heading on the screen.  It's

6    kind of blacked out right now.

7              But on your printout, you can

8    see the headings, correct, sir?

9         A.    Yes.

10              MR. STERN:  I'm sorry,

11         Mr. Buchanan.  By headings do you mean

12         hydrocodone, oxycodone and

13         oxymorphone?

14              MR. BUCHANAN:  I did.  Thanks

15         for the clarification, counsel.

16    BY MR. BUCHANAN:

17         Q.    So, the heading at the top of

18    Exhibit 203 says "Qualitest opioid drugs,"

19    correct?

20         A.    Yes.

21         Q.    On the left-hand side we have

22    hydrocodone.

23              Do you see that?

24         A.    Yes.

1    Q.    In the middle we have oxycodone,

2    right?

3    A.    Yes.

4    Q.    And to the far right we have

5    oxymorphone?

6    A.    Yes.

7    Q.    Okay.  And do you have the

8    knowledge, sir, that in fact Qualitest was

9    in the business of making, selling and

10   distributing hydrocodone opioid products?

11        MR. STERN:  Objection; lack of

12        foundation.  Objection to the form.

13   BY MR. BUCHANAN:

14   Q.    You can answer.

15   A.    I'm aware that Qualitest

16   manufactured hydrocodone.

17   Q.    Okay.  And we talk hydrocodone

18   products, we're talking about

19   hydrocodone/APAP, that's that Vicodin

20   tablet, right?  Or the brand?

21   A.    That's my understanding.  Okay.

22   Q.    And we go to the middle column

23   here and we see oxycodone again and we

24   have oxycodone APAP at the bottom.

1          I think you told us a few

2   minutes ago oxycodone APAP would be the

3   Endo-branded product Percocet, right?

4          A.    Correct.

5          Q.    And then we have other oxycodone

6   tablets which if they were ER would be

7   OxyContins, right?

8          A.    If they were ER.

9          Q.    And if you just sold them plain,

10  it would just be OxyContin, right?

11              MR. STERN:  Objection to the

12       form.

13  BY MR. BUCHANAN:

14       Q.    IR?

15       A.    IR here is an immediate release

16  product.

17       Q.    Thank you.

18              Then on the right we have

19  oxymorphone, that's the active ingredient

20  in that drug that you marketed under the

21  brand name Opana, correct?

22              MR. STERN:  Objection to the

23       form.

24       A.    Oxymorphone here is a generic

1    version of Opana IR.

2         Q.    And we're already using terms

3    that may not be clear.  I guess IR is

4    immediate release?

5         A.    Correct.

6         Q.    ER is extended-release?

7         A.    Correct.

8         Q.    Okay.  So when we talk about

9    oxycodone ER, which I think you said was

10   OxyContin, that's oxycodone

11   extended-release, right?

12        A.    Yes.

13        Q.    If you're talking oxycodone IR,

14   that's the active ingredient in OxyContin

15   but for immediate-release?

16        A.    Yes.

17        Q.    Thank you.  All right.

18             Let's go forward to the next

19   one.  Some Par products.

20             Can we pass over, please,

21   Exhibit 204?

22             (Campanelli Exhibit 204,

23        document, was marked for

24        identification, as of this date.)

1    BY MR. BUCHANAN:

2        Q.    I think you told us, sir, that

3    you were the CEO of Par from 2012 to 2015,

4    correct?

5        A.    Correct.

6        Q.    And you worked there, I think,

7    from, what, 2000 to 2012 in various roles

8    as you escalated through the management

9    ranks, right?

10       A.    Yes, from 2001 through 2015.

11       Q.    Okay.  Let's just kind of get in

12   context, if you will, where Par was in the

13   mix, okay.

14             Par made fentanyl products,

15   right?

16       A.    No.

17       Q.    No, sir?

18       A.    No.

19       Q.    We have shipping records that

20   reflect that you were selling fentanyl.

21       A.    Par sold fentanyl.

22       Q.    Fair enough.

23             So the fuss or the disagreement

24   was "make" versus "sold"?

Highly Confidential - Subject to Further Confidentiality Review

 1         MR. STERN:  Objection to the

 2     form.

 3     A.    Correct.

 4     Q.    And help me out, sir.

 5           You didn't make, but you

 6   acquired it?

 7     A.    Correct.

 8     Q.    And then sold it?

 9     A.    Yes.

10     Q.    Does that mean you had a

11   contract manufacturer?

12     A.    Yes.

13     Q.    For each of these columns here

14   in the chart, and I probably should have

15   oriented us a little bit, these are Par

16   opioid drugs as we've identified from, if

17   you will, the order records that Par has

18   provided to us.

19           Fair?

20         MR. STERN:  Objection to the

21     form.

22   BY MR. BUCHANAN:

23     Q.    I'll tell you that.  That's my

24   representation.

1          Do you recollect, sir, selling

2    fentanyl-containing products while at Par?

3          MR. STERN:  Objection to the

4       form.

5       A.    Par sold two forms of fentanyl

6    products.

7       Q.    Okay.  They sold fentanyl

8    citrate?

9       A.    Yes.

10       Q.    And that's the lozenge or

11    lollipop?

12       A.    Correct.

13       Q.    You also sold fentanyl patch?

14       A.    We sold fentanyl patch for a

15    period of time.

16       Q.    Okay.  You also sold Morphine,

17    right?

18          MR. STERN:  Objection to the

19       form.

20       A.    We sold Morphine.

21       Q.    Okay.  Same qualification that

22    you provided with regard to fentanyl, sir.

23    That you sold it but didn't make it?

24          MR. STERN:  Objection to the

 1          form.

 2          A.     Par manufactured and sold

 3     Morphine.

 4          Q.     You did, okay.

 5                 Let's look at oxycodone ER, sir.

 6                 That would be the OxyContin,

 7     right?

 8          A.     Yes.

 9          Q.     So, Par, did they manufacture

10     and sell generic OxyContin?

11          A.     No.  Par sold.

12          Q.     Okay.  And with regard to

13     hydrocodone, looks like you sold some

14     liquids.  That would be the active

15     ingredient in Vicodin hydrocodone, right?

16                 MR. STERN:  Objection to the

17          form.

18                 MR. BUCHANAN:  I'll withdraw.

19     BY MR. BUCHANAN:

20          Q.     Hydrocodone, that's the active

21     ingredient in Vicodin?

22          A.     Correct.

23          Q.     And you sold hydrocodone

24     liquids, fair?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. STERN:  Objection to the

2       form.

3       A.    Par sold, did not manufacture,

4   Tussionex.

5       Q.    Okay.  And, certainly you were

6   kind of boots on the ground, so to speak,

7   or maybe not on the ground, but you were

8   at Par between 2010 and 2015 when these

9   products were either being made and sold

10  or sold by Par.

11          Fair?

12      A.    Fair.

13      Q.    Okay.  You have recollection

14  that those were, in fact, active products

15  in the Par portfolio eligible for

16  purchase.

17          Fair?

18      A.    Yes.

19      Q.    Okay.  You can set that aside.

20          MR. BUCHANAN:  You can take that

21      down, Corey.  Thank you.

22  BY MR. BUCHANAN:

23      Q.    We're doing pretty good on

24  agreeing with one another on the various

1    facts, sir.  I imagine we'll have some

2    fuss at some point today, but I want to

3    see if there's an area where we agree

4    there's no fuss.

5            No dispute, sir, that there is

6    an opioid epidemic in the country today.

7            Fair?

8            MR. STERN:  Objection to the

9        form.

10       A.    There's no dispute that there's

11   an opioid abuse epidemic.

12       Q.    You're qualifying it with the

13   word "abuse"?

14       A.    Correct.

15       Q.    I see.

16            When did you become aware that

17   there was an opioid epidemic of any form,

18   sir?

19            MR. STERN:  Objection to the

20       form.

21       A.    Where it resonated was in the

22   2015 time frame.

23       Q.    Okay.

24            MR. BUCHANAN:  Can I have

1    Exhibit 1?

2        (Campanelli Exhibit 1, document,

3    was marked for identification, as of

4    this date.)

5    BY MR. BUCHANAN:

6    Q.    To make this, I guess, easy

7    today, hopefully.  We'll see if it works.

8    We've got a good portion of the day's

9    exhibits in a binder before you.  We've

10    got a copy for your counsel.

11        MR. BUCHANAN:  Here you are

12    (handing).  There you go.

13    Q.    The tab is the exhibit number.

14    So when I say go to Exhibit 1, please, you

15    can just go to Tab 1.  Okay.

16        I will reference additional

17    numbers today.  That's more for my tech

18    down the end of the table so he can put

19    them up on the screen for our benefit.

20        MR. STERN:  Mr. Buchanan, excuse

21    me.  These will be marked.  There's no

22    exhibit stickers on mine.  They're

23    going to be -- we can deal with this

24    on a break.  We just need to make sure

Highly Confidential - Subject to Further Confidentiality Review

```
 1        we get them in the record the right

 2        way.

 3             MR. BUCHANAN:  The witness's are

 4        marked.

 5             MR. STERN:  They are, okay.

 6             MR. BUCHANAN:  We have an

 7        exhibit tab in the corner, hopefully

 8        if we've passed you the right binder,

 9        sir.

10             MR. STERN:  Yep.  Thank you.

11             (Pause.)

12    BY MR. BUCHANAN:

13        Q.   Sir, before you is --

14             MR. STERN:  I'm sorry,

15        Mr. Buchanan.  Can we straighten

16        out -- we can go off the record for a

17        minute?  It will be my time.  I just

18        want to straighten out the binders.

19             MR. BUCHANAN:  That's fine.

20             THE VIDEOGRAPHER:  All right.

21        The time is 9:47 a.m.

22             Off the record.

23             (Discussion held off the

24        record.)
```

1          THE VIDEOGRAPHER:  Okay.  The

2     time is 9:47 a.m.

3          Back on the record.

4  BY MR. BUCHANAN:

5     Q.    Sir, do you have before you the

6  binder that we passed you with exhibits

7  for today?

8     A.    Yes.

9     Q.    Okay.  If you turn to Tab 1,

10  that should be Exhibit 1 for today's

11  deposition.  There should be a notation on

12  the bottom right corner.

13     A.    Okay.

14          MR. BUCHANAN:  I'm going to ask

15     my tech, please, to pull up 1888,

16     E1888, for those viewing this.

17     Q.    Sir, in 2011, the CDC declared

18  an epidemic, right?

19     A.    I'm not sure that's what this is

20  saying.

21     Q.    Well, before you, sir, we have

22  the November 2011 CDC Vital Signs Alert,

23  correct?

24     A.    Correct.

1    Q.    It says: Prescription painkiller

2    overdoses in the U.S.

3          Do you see that?

4    A.    Yes.

5    Q.    Let's look at the first

6    sentence.

7          Could you read that into the

8    record, sir?

9    A.    (Reading) Deaths from

10   prescription painkillers - with an

11   asterisk - have reach epidemic levels in

12   the past decade.

13   Q.    Okay.  Let's pause on that.

14         In 2011, the CDC declared a

15   prescription painkiller death overdose

16   epidemic.

17         Correct?

18         MR. STERN:  Objection to the

19   form.

20   A.    That's what it says.

21   Q.    And we see what prescription

22   painkillers are being referred to,

23   correct?

24   A.    I see that.

1      Q.    There's a footnote at the bottom

2    it says:  Prescription painkillers refers

3    to opioid or narcotic pain relievers,

4    including drugs such as Vicodin - in

5    parentheses - hydrocodone.

6              You see that?

7      A.    I see it.

8      Q.    Each of the three entities'

9    drugs that we looked at included

10   hydrocodone products.

11             Fair?

12             MR. STERN:  Object to the form.

13     A.    I see the products listed.

14     Q.    We looked at drug charts just a

15   moment ago, sir.  I think it was 202, 203,

16   204.

17             You recall that?

18     A.    I recall.

19     Q.    Each of the products -- excuse

20   me.  Each of the charts reflect drug

21   products made by Endo, Par and Qualitest

22   with the active ingredient hydrocodone,

23   correct?

24             MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1         form.

2         A.    Not all made.

3         Q.    Sold, sir.

4         A.    Yes.

5         Q.    Okay.  I understand that as a

6    matter of the way you have chosen to do

7    business at various points in time, you

8    being a royal you, sometimes you contract

9    out manufacturing, correct?

10        A.    Correct.

11              MR. STERN:  Objection to the

12        form.

13   BY MR. BUCHANAN:

14        Q.    Nonetheless, you marketed and

15   sold, you being Qualitest, Par and Endo,

16   hydrocodone-containing products, correct?

17              MR. STERN:  Objection to the

18        form.

19        A.    We sold.

20        Q.    Okay.  So as it relates to the

21   first category, Vicodin, in parens

22   hydrocodone, we can agree that Par, Endo

23   and Qualitest all made

24   hydrocodone-containing products, correct?

1    A.    We sold these products

2    containing these actives.

3    Q.    We can agree, sir, that Par,

4    Endo and Qualitest also sold

5    oxycodone-containing products, correct?

6         MR. STERN:  Objection to the

7         form.

8    A.    The company sold

9    oxycodone-containing products.

10    Q.    Okay.  And with regard to

11    oxycodone-containing products, not just

12    any oxycodone products.  The company also

13    sold generic OxyContin.

14         Correct?

15         MR. STERN:  Objection to the

16         form.

17    A.    Par sold OxyContin

18    extended-release generics.

19    Q.    And for a period of time, Endo

20    did as well, correct?

21         MR. STERN:  Objection to the

22         form.

23    A.    Endo sold immediate-release

24    OxyContin.

1    Q.    Okay.  And for a period of time,

2    sir, in the mid-2000s, Endo actually sold

3    extended-release generic OxyContin,

4    correct, sir?

5             MR. STERN:  Objection to the

6        form.

7    A.    I don't know the answer to that.

8    Q.    Okay.  Let's move on to the next

9    item.  Opana oxymorphone.

10            Is that a product that was

11   marketed and sold by Endo?

12   A.    Yes.

13   Q.    That was your brand?

14            MR. STERN:  Objection to the

15       form.

16   A.    It's an Endo brand.

17   Q.    And we looked at documents --

18   excuse me, the charts of the various

19   products sold by Endo, Par and Qualitest.

20   We see other formulations of oxymorphone

21   that were sold by the three entities.

22            Fair?

23            MR. STERN:  Objection to the

24       form.

1    A.    There are other tablet forms

2    of -- of the molecules that you've

3    referenced.

4    Q.    Okay.  So, fair that when we

5    read deaths from prescription painkillers,

6    with an asterisk there, we see that the

7    CDC is referring to prescription

8    painkillers sold by the three entities now

9    composed in Endo, correct?

10          MR. STERN:  Objection to the

11       form.

12    A.    I see the words that CDC

13    published.

14    Q.    Okay.  Those words "deaths from

15    prescription painkillers" have reached

16    what, sir?

17    A.    Epidemic levels.

18    Q.    This is 2011, the end of 2011, I

19    guess at a point in time when you're

20    assuming the role or getting really to

21    assume the role of CEO of Par

22    pharmaceuticals, correct?

23    A.    Correct.

24    Q.    Par was making products

1    containing these active ingredients?

2            MR. BUCHANAN:  Excuse me.

3    Withdrawn.

4    Q.    Par was selling products

5    containing these active ingredients for

6    the treatment of pain in 2012, correct,

7    sir?

8    A.    Par was selling some of the

9    molecules that are listed in this asterisk

10   section of this article.

11   Q.    Okay.  You see, sir, that enough

12   prescription painkillers were prescribed

13   in 2010 to medicate every American adult

14   around the clock for a month?

15           MR. STERN:  Objection to the

16   form.

17   BY MR. BUCHANAN:

18   Q.    Do you see that, sir?

19   A.    No, I don't.

20   Q.    It's on the screen, and

21   sometimes that might be easier, but you're

22   certainly welcome to look at either.

23           Do you see the second highlight?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Enough prescription painkillers

2    were prescribed in 2010 to medicate every

3    American adult around the clock for a

4    month.

5              You did not have that awareness

6    in 2012?

7              MR. STERN:  Objection to the

8        form.

9        A.    No, I did not have that

10   awareness.

11       Q.    You did not have the awareness

12   that deaths from prescription painkillers

13   had reached epidemic levels?

14       A.    No, I did not have that

15   awareness.

16       Q.    Let's go to the next page, sir.

17             (Reading) Overdose deaths from

18   prescription painkillers have skyrocketed

19   during the past decade.

20             Do you see that at the top of

21   the page, sir?

22       A.    Yes, I see the words.

23       Q.    This is the CDC, right?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Center For Disease Control end

2    of 2011, correct?

3    A.    Correct.

4    Q.    Did you have that awareness,

5    sir?

6         MR. STERN:  Objection to the

7    form.

8    BY MR. BUCHANAN:

9    Q.    As of the end of 2011 or prior

10   to 2015, sir?

11   A.    No, I did not have that

12   awareness.

13   Q.    It states again:  Problem.

14        You see that on the left in

15   white.

16        (Reading) Prescription

17   painkiller overdoses are a public health

18   epidemic.

19        You see that, sir?

20   A.    I see that.

21   Q.    (Reading) Prescription

22   painkiller overdoses killed nearly 15,000

23   people in the U.S. in 2008.  This is more

24   than three times the 4,000 people killed

1    by these drugs in 1999.

2            You see that?

3    A.    I see it.

4    Q.    It's getting bad.

5            MR. STERN:  Object to the form.

6    BY MR. BUCHANAN:

7    Q.    Right?

8    A.    What's getting bad?

9    Q.    This problem.

10           Prescription painkiller

11   overdoses are a public health epidemic.

12           Is that not bad?

13   A.    That's bad.

14   Q.    This bad thing, sir, you were

15   not aware of until 2015?

16   A.    Again, it will be resonated in

17   2015.

18           At this point in time, whilst I

19   was not aware, our business was based upon

20   purchase orders that we receive from our

21   customers.

22   Q.    Well, sir, you had to decide as

23   a company, Par, Endo, Qualitest, you had

24   to decide what you were going to choose to

1    make and sell.

2          Fair?

3    A.    Yes.

4    Q.    And there is not some

5    requirement by law in your corporate

6    charter that you're going to sell drugs

7    even in the face of an epidemic, right?

8          MR. STERN:  Objection to the

9    form.

10   A.    What we do is, and I think you

11   and I would both agree that pain is also

12   important to be able to -- to address in

13   America.  We receive purchase orders from

14   our customers that are valid purchase

15   orders.  We produce to a demand plan based

16   upon our customer's purchase order.

17   Q.    Right.  But you said, referring

18   to Par, that this was not a big portion of

19   your Par portfolio, and you were starting

20   to make some of these products in this

21   time frame.

22         Fair?

23   A.    Correct.

24   Q.    Okay.  But you had to choose to

1    enter the market when you did to sell

2    opioids in the midst of an epidemic.

3         A.    We chose to enter into products

4    that were opioid-based in a mindful,

5    thoughtful manner based upon purchase

6    orders in a demand plan from our

7    customers.

8         Q.    Right.  But with regard to

9    opioid products or controlled substances,

10   sir, it's not quite that simple, right?

11              MR. STERN:  Object to the form.

12        A.    I'm not sure what you mean.

13        Q.    They're controlled substances,

14   right?

15        A.    Correct.

16        Q.    You've got to acquire active

17   pharmaceutical ingredients to make

18   controlled substances, right?

19        A.    Correct.

20        Q.    You've got to keep them in

21   safes, right?

22        A.    Correct.

23        Q.    By law, right?

24        A.    Correct.

1    Q.    Because the active

2    pharmaceutical ingredients that we're

3    talking about, oxymorphone, hydrocodone,

4    oxycodone, are extremely, extremely

5    dangerous, right?

6           MR. STERN:  Object to the form.

7    A.    When misused and abused, yes.

8    Q.    Am I correct, sir, that in your

9    factories that make products containing

10   these controlled substances, you've got to

11   have two employees watching the movement

12   of the pills from the left to the right in

13   the warehouse, right?

14   A.    Correct.

15   Q.    These drugs are prone to

16   diversion, right?

17          MR. STERN:  Object to the form.

18   A.    They're prone to misuse and

19   abuse.

20   Q.    They are prone to addiction,

21   right?

22          MR. STERN:  Object to the form.

23   A.    When misused and abused.

24   Q.    That is not something you needed

1    an alert from the CDC to know, correct?

2        A.    Again, it's not like we're

3    pumping out tablets without

4    responsibility.  We have a customer

5    requirement based upon their purchase

6    orders and that's what we're adhering to.

7              There's processes and procedures

8    in place.

9        Q.    But what it sounds like you had

10   to do, sir, is, with regard to several of

11   the controlled substances that Par made,

12   you said they didn't make them.  You had

13   to hire a contract manufacturer to make

14   them for you in this 2012 to 2015 period.

15             Right?  Am I correct on that?

16       A.    Third parties manufactured these

17   products for us, several of these

18   products, of which systems and procedures

19   would have been placed with our third

20   party, as well as Par Pharmaceutical.

21       Q.    So you decided, sir, that this

22   was something you would like to sell and

23   you went out and negotiated terms with

24   manufacturers to make those pills so you

1    could sell them into this epidemic

2    described by the CDC in 2011?

3              MR. STERN:  Objection to the

4         form.

5         A.    Again, we negotiated with third

6    parties to have third parties manufacture

7    the products with systems and procedures

8    in place in a thoughtful manner based upon

9    purchase orders from our -- our customers.

10        Q.    Let's look at the right, sir.

11   It says:  The supply of prescription

12   painkillers is larger than ever.

13             Do you see that?

14        A.    I see it.

15        Q.    You were filling that supply.

16        A.    We were filling a supply based

17   upon customer purchase orders which would

18   have been based upon prescriptions.

19        Q.    There's no question, sir, that

20   there were issues with the prescriptions

21   that were being written for these drugs.

22             Right, sir?

23             MR. STERN:  Objection to the

24        form.

1     A.    I don't know the answer to that.

2     Q.    Well, let's read the next

3  bullet.  I'm sorry, the second bullet

4  after that:  Many states report problems

5  with pill mills.

6           Do you see that?

7     A.    Yes.

8     Q.    What's a pill mill, sir?

9     A.    These are pain clinics that are

10  misusing opioids or other controlled

11  substances.

12     Q.    Pain clinics, there's a doctor

13  there, right?

14     A.    It's my understanding.

15     Q.    There's often a long line of

16  people in there, right?

17           MR. STERN:  Objection to the

18       form; lack of foundation.

19     A.    I don't know that answer.

20     Q.    Do you have any foundation on

21  that?  I mean, you're not aware of what

22  pill mills look like?

23     A.    I'm aware --

24           MR. STERN:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1        A.     I'm aware of what a pill mill

2    is.

3               I'm not aware of long lines

4    coming out of pill mills.

5        Q.     Doctors having their assistants

6    fill out prescriptions for patients

7    without actually conducting even a visit,

8    right?

9               MR. STERN:  Object to the form.

10   BY MR. BUCHANAN:

11       Q.     Or an examination?

12              MR. STERN:  Objection to the

13       form.

14       A.     That appears to be a legal, that

15   I -- something I don't know much about.

16       Q.     Well, certainly, sir, you

17   wouldn't want your sales team calling on

18   pill mills, right?

19              MR. STERN:  Objection to the

20       form.

21       A.     Are you referring to Par or

22   Endo?  Just so I'm clear.

23       Q.     I'm referring to the entities

24   that compose the current Endo.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The current Endo?

2    Q.    Mm-hm.

3    A.    We don't sell into -- into this

4    class of trade any longer.

5    Q.    As the CEO, you accept

6    responsibility for the company's conduct,

7    correct?

8         MR. STERN:  Objection to the

9         form; calls for a legal conclusion.

10   BY MR. BUCHANAN:

11   Q.    I'm not asking for a legal

12   conclusion.

13        Do you view yourself as

14   accountable for the acts of the company?

15        MR. STERN:  Objection to the

16        form.

17   A.    I -- I -- I'm certainly

18   responsible for the company being in my

19   position since September 2016.

20   Q.    Right.  And the company had an

21   existence prior to that point in time,

22   right?

23   A.    Through a different leadership

24   team.

1    Q.    And the company's responsible

2    for its acts over that period of time.

3         Fair?

4         MR. STERN:  Object to the form.

5    A.    I'm sorry?  Could you repeat the

6    question?

7    Q.    Sure.

8         I said the company's responsible

9    for the acts that it engaged in before you

10   joined the company, right?

11        MR. STERN:  Object to the form.

12   A.    I'm not really sure exactly what

13   you're saying.  Could you clarify it for

14   me.

15   Q.    Well, I'm just -- do you disavow

16   the company's conduct that preceded you?

17        MR. STERN:  Objection to the

18        form.

19   BY MR. BUCHANAN:

20   Q.    Preceded your presence at Endo

21   in 2015?

22        MR. STERN:  Objection to the

23        form.

24   A.    I'm not sure what the company

1    did before my tenure.  So I'm not sure how

2    to respond to that question.

3         Q.    I mean, you certainly wouldn't

4    endorse improper activity by the employees

5    of Endo if it was brought to your

6    attention today, correct?

7         A.    If something that was improper

8    brought to my attention today in my --

9    under my leadership, I would not endorse

10   it.

11        Q.    And you wouldn't endorse that

12   conduct if it happened before you were

13   there; would you?

14        A.    I would need to understand what

15   the specific details of what occurred and

16   understand both sides of an issue.

17        Q.    Okay.  How about that?  I mean,

18   have you -- have you had that internal

19   investigation done for the, you know, the

20   early 2000s with regard to what Endo did

21   and its marketing and promotion of

22   opioids?

23             MR. STERN:  Objection to the

24        form.

1          And to the extent this relates

2     to interactions with lawyers, I'd

3     instruct him not to answer.

4          MR. BUCHANAN:  Just the fact.

5     A.    I haven't looked into any matter

6  pre my -- my position as CEO.

7     Q.    Okay.  I mean, you have talked

8  about Endo's history publicly, correct?

9     A.    At a very, very high level.

10    Q.    Right.

11         I take it, sir, you'd want to be

12  aware, frankly, of issues that may have

13  happened with the regard -- with regard to

14  the way Endo conducted itself; wouldn't

15  you?

16         MR. STERN:  Objection to the

17    form.

18    A.    Again, I would rely on my

19  counsel to tell me if there was issues

20  that -- that were concerning.

21    Q.    You've heard the phrase "history

22  repeats itself"?

23    A.    I'm aware of the situation -- of

24  the -- the phrase.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Certainly, sir, you'd want to be

2    aware of history that may be negative to

3    insure that it doesn't repeat itself,

4    right?

5           MR. STERN:  Objection to the

6    form.

7    A.    It's a very general question,

8    counselor.

9           I'm highly focused on our

10   branded specialty force right now.  It's a

11   very different category.

12   Q.    Okay.  So, the supply of

13   prescription painkillers is larger than

14   ever.  That's what the CDC said in 2011.

15          Right?

16   A.    Could you point me to where

17   you're looking?

18   Q.    Yeah.  It's on the right-hand

19   side of the chart on the screen.  That's

20   the easiest way for me to orient you.

21   A.    Okay.  Thank you.

22   Q.    No worries.

23   A.    I see that back in 2011, yes.

24   Q.    (Reading) Many states report

1    problems with pill mills where doctors

2    prescribe large quantities of painkillers

3    to people who don't need them medically.

4    Some people also obtain prescriptions from

5    multiple prescribers by doctor shopping.

6              Do you see that, sir?

7    A.    I see it.

8    Q.    And my question to you a moment

9    ago was you certainly wouldn't want to

10   have sales reps, during this period of

11   time, sir, detailing pill mills, right?

12   A.    Fair.

13   Q.    Certainly wouldn't want to be

14   doing that at a point in time when

15   prescription painkiller overdoses are an

16   epidemic, right?

17             MR. STERN:  Object to the form.

18   A.    Certainly wouldn't want to do it

19   knowingly, all right.

20             So, I just want to make sure

21   we're clear here.  I am not entirely sure

22   that it's common knowledge what a pill

23   mill is.

24             If there was a sign on the door

1    that said pill mil, clearly I would not

2    want my sales reps to -- to detail into

3    something like that.

4         Q.    I'd assume you try and hire

5    people, sir, that would be even more

6    astute than just looking for a sign that

7    said pill mill, right?

8         A.    Again, we're getting into an

9    area that I'm just not real familiar with.

10        So, I don't know if a sales rep

11   can determine a pill mill or not.

12        Q.    Okay.  Just as a matter of

13   common sense, sir.  If a sales rep was

14   walking into a doctor office where there

15   were long lines, people were urinating and

16   getting sick in the waiting room, with

17   aggressive behavior, administrative staff

18   were filling out prescriptions without

19   visits, and there's a sign instructing

20   which particular pharmacies will actually

21   fill the doctor's prescriptions.

22        Would you expect your sales

23   team, sir, to be astute enough to report

24   that up and not call on that office?

1          MR. STERN:  Objection to the

2      form and lack of foundation.

3      A.    Again, as you define something

4  so broad and egregious, I would hope that

5  we have systems in place and training that

6  would make that occur.

7      Q.    You certainly wouldn't endorse

8  any activity by your company or its

9  employees to market and promote your

10  products into that physician's office,

11  right?

12          MR. STERN:  Objection to the

13      form; lack of foundation.

14      A.    I would hope we have training

15  procedures that would make the sales rep

16  aware.

17      Q.    I take it, sir, if you were

18  aware that sales reps were marketing and

19  promoting into that office and not

20  reporting it up, you'd seek discipline

21  related to that?

22      A.    Yes.

23      Q.    And you'd certainly hope that

24  the predecessor entity, or prior to your

1    time at Endo, that their leadership would

2    have done the same, right?

3              MR. STERN:  Objection to the

4         form.

5         A.    With that series of facts that

6    you've just communicated, yes.

7              MR. BUCHANAN:  Okay.  Can we go,

8         please, to point 3.

9              Let's -- can we blow up that

10        chart on the top right?

11        Q.    And there's probably an easier

12   to read blowup on your screen, sir.

13             We're at 1888.3.  Again still in

14   Exhibit 1.  Rates of prescription

15   painkiller sales, death and substance

16   abuse treatment admissions 1990 to 2010.

17             Do you see that, sir?

18        A.    Yes.

19        Q.    It plots three things, right?

20        A.    Yes.

21        Q.    Sales.

22             Do you see that?

23        A.    Yes.

24        Q.    Deaths?

1        A.    Yes.

2        Q.    And treatment, right?

3        A.    Yes.

4        Q.    Sales going up over the years.

5              See that?

6        A.    Yes.

7        Q.    Deaths going up over the years.

8              See that?

9        A.    Yes.

10       Q.    Treatment admissions going up

11   over the years?

12       A.    I see it.

13       Q.    Not good.

14             MR. STERN:  Objection to the

15       form.

16   BY MR. BUCHANAN:

17       Q.    Can we agree?

18       A.    Could you be more specific?

19       Q.    In any sense, is this good, sir,

20   other than with regard to shareholders

21   calculating sales?

22       A.    Increase in deaths is not good.

23       Q.    Increase in admissions for

24   treatment secondary to opioid abuse is not

1    good?

2              MR. STERN:  Objection to form;

3         lack of foundation.

4         A.    Again, sales, deaths and

5    substance abuse increasing obviously is

6    not a good thing.  Deaths increasing is

7    not a good thing.

8         Q.    Okay.  Your counsel objected on

9    the basis of lack of foundation.  I guess

10   that's because you said this was nothing

11   you were aware of prior to 2015.

12             Is that right?

13        A.    That's correct.  I haven't seen

14   this before.

15        Q.    And you told us that Par, the

16   company you were CEO of, in 2012 to 2015,

17   prior to the acquisition, was bringing new

18   opioid products to market at that point in

19   time, right?

20        A.    Can you be a little more

21   specific with that question?

22        Q.    I thought you told us earlier

23   today that Par brought some new opioid

24   products to market in this 2012 to 2015

1    period of time.

2            Did I misunderstand you?

3            MR. STERN:  Object to the form.

4      A.    I -- I -- I'm not -- I don't

5    think we brought new opioid products to

6    the market after 2012.

7      Q.    And when I say "new to the

8    market," I mean new for Par.

9      A.    Yeah, I don't think we brought

10   new generics to the market past 2012 that

11   were opioids.

12     Q.    I'll see if we can provide you

13   some information, and maybe I can get more

14   precise.

15           But would it be fair to say that

16   when you were the CEO of Par, none of your

17   leadership team, nobody in

18   pharmacovigilance, nobody came to you and

19   said sir, there's a big problem with

20   prescription painkillers?

21     A.    Again, as a generic company,

22   what we're doing is we're developing

23   substitutable products, and it's all based

24   off of the customers orders, as I said.

1    We certainly have our professionals in

2    place to keep our systems and procedures

3    at -- at what we hope is the highest

4    level, but that's the job of a generic is

5    to -- to develop a -- an AB-rated

6    substitutable product based upon the

7    customer's purchase order.  That's what we

8    do.

9        Q.    And just so we stay with my

10   question, and hopefully I get a responsive

11   answer.

12           Would it be fair, sir, that

13   nobody in Par told you that there was a

14   prescription drug epidemic prior to 2015?

15       A.    To the best of my knowledge, no.

16       Q.    What is the CDC, sir?

17       A.    Center For Disease Control.

18       Q.    The CDC declared a prescription

19   drug epidemic.

20           MR. STERN:  Objection to the

21       form.

22   BY MR. BUCHANAN:

23       Q.    In 2011.

24           MR. STERN:  Objection to the

1          form.

2     BY MR. BUCHANAN:

3          Q.    Right?

4          A.    That's what it says.

5          Q.    You at Par in 2011 were the CEO

6     of a drug company, right?

7          A.    No.

8          Q.    In 2012, sir?

9          A.    Yes.

10         Q.    A month after this came out?

11         A.    Yes.

12         Q.    Endo was in the opioid business,

13    in a big way, in 2011, right?

14               MR. STERN:  Objection to the

15         form.

16         A.    Endo sold several products that

17    contained opioids.

18         Q.    Endo's Qualitest subsidiary that

19    it bought in 2010 was in opioids in a big

20    way?

21               MR. STERN:  Object to the form.

22         A.    Qualitest manufactured and sold

23    a number of -- of opioid-based products.

24         Q.    Would you agree, sir, that

Highly Confidential - Subject to Further Confidentiality Review

1    there's a direct correlation -- there's a

2    direct correlation on this chart between

3    increasing sales, increasing deaths and

4    increasing treatments?

5              MR. STERN:  Objection to the

6         form; lack of foundation.

7         A.    That's what it says.

8         Q.    Do you agree?

9              MR. STERN:  Objection to the

10        form.

11   BY MR. BUCHANAN:

12        Q.    As the CEO of a pharmaceutical

13   company in this space?

14             MR. STERN:  Objection to the

15        form; lack of foundation.

16        A.    Can you just repeat the question

17   one more time for me, sir?

18        Q.    Do you agree, sir, that there's

19   a direct correlation on this chart between

20   increasing sales, increasing deaths and

21   increasing treatments?

22             MR. STERN:  He answered that

23        question.  You asked a different

24        question.

1    A.    Clearly you can see all three

2    lines are increasing over -- over time.

3    Q.    You agree there's a correlation

4    between them?

5          MR. STERN:  Objection; form;

6          lack of foundation.

7    A.    I certainly would like to have

8    more information tied back to this

9    document I've never seen before, but I can

10   see over time how as sales are increasing,

11   deaths are increasing and treatment is

12   also increasing.

13   Q.    So, it would seem to reason,

14   sir, that --

15         MR. BUCHANAN:  Withdrawn.

16   Q.    If I could, sir, I'd like to

17   take you to Exhibit 3.

18         (Campanelli Exhibit 3, document,

19         was marked for identification, as of

20         this date.)

21   BY MR. BUCHANAN:

22   Q.    Should be the third tab in your

23   binder.  Let's just make sure you and your

24   counsel are in synch.

1    You appear to be.

2         MR. BUCHANAN:  Corey, Exhibit 3

3    is E715.

4    BY MR. BUCHANAN:

5         Q.    Exhibit 715, sir, is a document

6    from 2011 concerning Endo's REMs.  And I'd

7    like to take you to, specifically --

8    you're welcome to peruse the pages, if

9    you'd like.  I'm going to take you to

10   dot-15.  And this is an Endo internal

11   document.

12        You see the Bates numbers in the

13   bottom right corner, sir?

14        A.    Yes.

15        Q.    It indicates that we received

16   these files from -- from the company.

17        And this is a slide prepared by

18   the company.

19        A.    Do you want me to go to the

20   slide?

21        Q.    Yeah, if you could.  It's

22   715.15.

23        MR. STERN:  When Mr. Buchanan

24   says dot-15, look at the top right.

1          MR. BUCHANAN:  And I guess it's

2     going to be hard.  You have to turn

3     landscape.  So give yourself enough

4     room to turn the binder.

5          THE WITNESS:  Okay.  I'm sorry.

6          MR. BUCHANAN:  No worries.

7          THE WITNESS:  Okay.

8  BY MR. BUCHANAN:

9     Q.    Before you, sir, is Exhibit 3.

10  We're on page dot-15.

11        You see there's a slide within a

12  slide, so to speak, right?

13     A.    I see it, yes.

14     Q.    There's a CDC slide there:

15  Unintentional overdose deaths involving

16  opioid analgesics parallel opioid sales

17  United States, 1997 to 2007.

18        Do you see that?

19     A.    Yes, I see it.

20     Q.    It talks about distribution by

21  drug companies and what the average

22  milligram per person were distributed in

23  1997, right?

24     A.    Yes, I see that.

1    Q.    You see that first bullet?

2    A.    Yes.

3    Q.    96 milligrams per person in

4    1997?

5    A.    Yes.

6    Q.    And looks like about, what

7    that's, seven times more over ten years?

8    A.    About.

9    Q.    Okay.  So in ten years, and

10   let's just orient ourselves, sir.

11         There had been opioids on the

12   market prior to 1997, right?

13   A.    Yes.

14   Q.    This is not a situation where

15   opioids are discovered in 1997, right?

16   A.    No.

17   Q.    There had been Morphine.  There

18   had been morphine sulphate.  There had

19   been MS Contin.

20         There had been drugs on the

21   market for years to provide opioid-related

22   benefits or opioid-related risks, right?

23   A.    Opioids had been on the market

24   prior to 1997.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So, what we see here, sir, is

2  from 1997 to 2007 a seven-fold increase in

3  the amount of drugs that are being pushed

4  out to Americans, right?

5           MR. STERN:  Objection to the

6      form.

7  BY MR. BUCHANAN:

8    Q.    Opioids.

9           MR. STERN:  Objection to the

10     form.

11   A.    Again, I see a seven-fold

12  increase from 1997 to 2007.

13   Q.    And the CDC helpfully gives us

14  some context on what that means.  698

15  milligrams per person in 2007.

16           You see that?

17   A.    Yes.

18   Q.    Enough for every American to

19  take a 5 milligram Vicodin every four

20  hours for three weeks.

21           Do you see that?

22   A.    That's what it says, yes.

23   Q.    We also see overdose deaths and

24  what they were in 1999.

Highly Confidential - Subject to Further Confidentiality Review

1              You see that?

2      A.     I do.

3      Q.     What's that number?

4      A.     2,901.

5      Q.     And what they are in 2007

6      11,499.

7              Do you see that, sir?

8      A.     Yes.

9      Q.     Not good.

10             MR. STERN:  Object to the form.

11     BY MR. BUCHANAN:

12     Q.     Can we agree?

13     A.     It's increased substantially.

14     Q.     Could we say that's scary?

15             MR. STERN:  Object to the form.

16     A.     I don't know the answer to the

17     definition of scary.

18             It's significantly increased.

19     Q.     Well, we know, certainly, sir,

20     that no one inside of Par was scared

21     enough about this opioid epidemic to bring

22     it to your attention in 2011, right?

23             MR. STERN:  Objection to the

24             form.

1      A.    I don't know if we were aware of

2    this at Par.

3      Q.    Wow.

4            MR. STERN:  Objection.

5    BY MR. BUCHANAN:

6      Q.    Are you serious?

7            MR. STERN:  Objection to the

8    form.

9      A.    Yes.

10     Q.    Well, in this Endo Power Point,

11   sir, from 2011, we see the slide within

12   the slide.  We talked about the CDC slide.

13   And what the Endo folks observe is that

14   the relationship between unintentional

15   overdose deaths and sales of RX.

16           RX means prescription.

17           Is that right?

18     A.    That's what it says.

19     Q.    And prescription opioids a

20   direct correlation.

21           Do you see that, sir?

22     A.    I see how they're both

23   increasing.

24     Q.    Well, at least the Endo folks at

Highly Confidential - Subject to Further Confidentiality Review

1    the time, the company you're now president

2    and CEO of, said a direct correlation

3    between unintentional overdose deaths and

4    sales of prescription opioids, correct?

5              MR. STERN:  Objection to the

6         form; lack of foundation.

7         A.    I see the slide, yes.

8         Q.    And they put some emphasis on it

9    for us, right?  They bold it, italicized

10   it, call it out, right?

11             MR. STERN:  Object to the form.

12   BY MR. BUCHANAN:

13        Q.    A direct correlation?

14             MR. STERN:  Object to the form.

15        A.    Again, you're showing me an Endo

16   slide.  While I see this, I'm not sure

17   whether or not Par would have been aware

18   of this.  It's possible.

19             This is referring to a REMS

20   program.  Clearly we would have REMS-based

21   products, a program for opioids.  So there

22   may have been the proper professionals

23   within Par that knew it.  I don't know the

24   answer to that.

1    As the CEO, this is something

2    that may or may not get to my level.

3    That's may -- that may be what's going on

4    here, sir.

5        Q.    Well, we could agree, sir, that

6    at least within Endo, Endo had the

7    awareness in 2011 --

8        A.    We can agree that --

9        Q.    Let me just finish my question

10   first.

11           We can agree, sir, that at least

12   within Endo, Endo had the knowledge of the

13   direct correlation between unintentional

14   overdose deaths and sales of prescription

15   opioids as reflected on this chart,

16   correct, sir?

17       A.    What we can agree is that Endo

18   had the knowledge and at the professional

19   level, if we're going back to the e-mail,

20   the communication of where this material

21   went, is you can see it did not go to a

22   CEO level at Endo.  It's quite possible

23   that Par had the same knowledge and also

24   would not have gone to the CEO level.

1    Q.    It's still an epidemic today,

2    right?

3              MR. STERN:  Object to the form.

4    A.    We have an opioid abuse crisis.

5    Q.    I mean, the CDC did not stop

6    writing about this in 2011, right, sir?

7    A.    I'm sure they did not.

8    Q.    Okay.  You've seen the 2016 CDC

9    guidelines?

10   A.    Where am I --

11   Q.    Have you seen the 2016 CDC

12   guidelines, sir?

13   A.    No, I have not.

14   Q.    Could you go, please, to

15   Exhibit 2.

16              (Campanelli Exhibit 2, document,

17        was marked for identification, as of

18        this date.)

19              MR. BUCHANAN:  Corey, could you

20        pull up E729?

21   BY MR. BUCHANAN:

22   Q.    Sir, let's go to the first page,

23   dot-1.  CDC guideline for prescribing

24   opioids for chronic pain.  United States

Highly Confidential - Subject to Further Confidentiality Review

1    2016.

2            Do you see that?

3    A.    I do.

4            MR. BUCHANAN:  Let's go to

5    dot-4, Corey.

6            Actually, let's just pull up

7    slide 44, Corey.  And we'll just mark

8    this.

9            You can look at the full

10   document, sir.  At any point when I

11   show you a slide today that's based on

12   an exhibit, feel free to look at the

13   full.

14           THE WITNESS:  Okay.

15           MR. STERN:  I'm sorry,

16   Mr. Buchanan.  I don't have a 44.

17           MR. BUCHANAN:  It's being passed

18   over to you.

19           MR. STERN:  Thank you.

20           MR. BUCHANAN:  I wasn't sure we

21   were going to need to use it.

22           What exhibit number?

23           This is Exhibit 205, a

24   demonstrative aid, sir.

1          (Campanelli Exhibit 205,

2      document, was marked for

3      identification, as of this date.)

4  BY MR. BUCHANAN:

5      Q.     You are free, of course, to look

6  at the page, which is dot-4, or you're

7  free to look at the demonstrative that's

8  on the screen.

9          MR. STERN:  Just to be clear,

10     Mr. Buchanan, for the record, what's

11     Exhibit 205, the demonstrative is not

12     the same thing as dot-4.  You just

13     said he can look at the screen or he

14     can look at --

15         MR. BUCHANAN:  It is.  It is.

16         MR. STERN:  What?  I may be on

17     the wrong 44.

18         MR. BUCHANAN:  I'm sorry.

19         You know what, let's clarify.

20         MR. STERN:  Should we hold on to

21     these?

22         (Pause.)

23         MR. BUCHANAN:  I'm not clear on

24     the confusion, sir.

1          MR. STERN:  Your representation

2     made it seem as though, and maybe I

3     misunderstood you, that dot-4 of

4     Exhibit 2 was the same document as

5     205.

6          So here's dot-4 and here's 205

7     (indicating).

8          MR. BUCHANAN:  Let me see.

9          MR. STERN:  These may be

10    excerpts.

11         MR. BUCHANAN:  No.  To be clear,

12    in the top right corner it says E729

13    of the --

14         MR. STERN:  Right.

15         MR. BUCHANAN:  Okay.  E729, sir,

16    is the source of the quotes that are

17    on the slide.

18         MR. STERN:  The source.  I'm

19    sorry.

20         I just want the record to be

21    clear that what is portrayed on 205 is

22    the not same thing as the text of

23    dot-4.

24         MR. BUCHANAN:  That's fine.  I

1    accept that, sir.  The text is as

2    reflected --

3              MR. STERN:  In here.

4              MR. BUCHANAN:  Yes.

5              For simplicity for the witness

6      on a dense page, we prepared these.

7    BY MR. BUCHANAN:

8      Q.    Sir, you are free to refer to

9    E729.4, which is the hard copy of the

10    document.

11             MR. STERN:  May I have a moment,

12      Mr. Buchanan, just to explain to Mr.

13      Campanelli.

14             So, this dot-4 refers to that

15      dot-4.

16             THE WITNESS:  Got it.

17             MR. STERN:  And these are

18      purported to be excerpts of this page.

19      This is the preceding page, the dot-3.

20             THE WITNESS:  Okay.

21    BY MR. BUCHANAN:

22      Q.    With that confusion hopefully

23    clarified either some by me or others, I'm

24    not sure, but I am ready to go if you are,

1    sir.

2          Are you familiar that the CDC

3    issued guidelines concerning the

4    prescription of opioids for chronic pain

5    in 2016?

6    A.    Not specifically.

7    Q.    Okay.  In their prescribing

8    guidelines, sir, they describe the

9    epidemic.

10         You see that on page dot-4 of

11   Exhibit 2?

12   A.    This sheet, sir (indicating)?

13         Where am I looking?  Am I

14   looking at this sheet?

15   Q.    You can look at either.

16   A.    I see these words.  I assume

17   that they're in the same.

18   Q.    (Reading) From 1999 to 2014,

19   more than 165,000 people -- persons died

20   from overdose related to opioid pain

21   medications in the United States.

22         Do you see that, sir?

23   A.    I see that.

24   Q.    That's alarming, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     That is not good.

3               MR. STERN:  Objection to the

4        form.

5     BY MR. BUCHANAN:

6        Q.     Fair?

7        A.     Fair.  Very bad.

8        Q.     We saw, sir, a moment ago the

9     direct correlation between sales and

10    deaths.

11               Do you recall that?

12       A.     I saw the sales going up and I

13    saw the increase in deaths, yes.

14       Q.     As the executive of a

15    pharmaceutical company looking at a

16    situation, sir, did you assess the role

17    that your sales played in escalating

18    opioid deaths over the years?

19               MR. STERN:  Objection to the

20       form.

21       A.     I did not assess my sales with

22    the opioid deaths.

23               We did take actions to stop

24    selling product.

1    Q.    Okay.  So then would it be fair

2    to say, sir, that you recognized that your

3    sale of opioid products was leading to

4    over -- overdose deaths?

5         MR. STERN:  Objection to the

6         form; lack of foundation.

7    A.    We were aware in 2016 when the

8    product was abused or misused it would

9    lead or could lead to deaths.

10   Q.    Okay.  We'll talk about that in

11   greater detail a little later.

12   A.    Okay.

13   Q.    (Reading) In the past decade -

14   according to the CDC - while the death

15   rates for the top leading causes of death,

16   such as heart disease and cancer, have

17   decreased substantially, the death rate

18   associated with opioid pain medications

19   has increased markedly.  Sales of opioid

20   pain medication have increased in parallel

21   with opioid-related overdose deaths.

22         Do you see that, sir?

23   A.    I see that.

24   Q.    That's the point we were talking

1    about?

2              MR. STERN:  Mr. Buchanan, I

3         apologize.  Can you, as you're doing

4         this, it's totally fine, I understand

5         what you're doing.  Can you at least

6         give us -- tell us where these

7         excerpts are appearing on the page?

8              MR. BUCHANAN:  I'm happy to have

9         somebody try and highlight this as we

10        proceed.  I'd rather continue with my

11        examination in the form that I'm

12        doing.

13             MR. STERN:  Okay.  Well, then

14        hold on just one moment so I can

15        orient myself.

16             (Pause.)

17             MR. STERN:  Thank you.

18   BY MR. BUCHANAN:

19        Q.    And just before counsel's

20   question or interruption, I want to get

21   back to my question.

22             That was:  In the past decade,

23   while the death rates for the top leading

24   causes of death, such as heart decease and

1  cancer, have decreased substantially, the

2  death rate associated with opioid pain

3  medication has increased markedly.  Sales

4  of opioid pain medication have increased

5  in parallel with opioid-related overdose

6  deaths.

7          Did I read that correctly, sir?

8      A.    Yes.

9      Q.    Okay.  That's that point we were

10  talking about a moment ago, sir, that

11  direct correlation between increasing

12  sales and increasing prescription overdose

13  opioid deaths, correct?

14     A.    I see the parallel.

15     Q.    (Reading) In 2013 - the CDC

16  continues - on the basis of DSM-IV

17  diagnosis criteria, an estimated 1.9

18  million persons abused or were dependent

19  on prescription opioid pain medications.

20          Do you see that, sir?

21     A.    I do.

22     Q.    That's not good.

23          MR. STERN:  Object to the form.

24

1    BY MR. BUCHANAN:

2        Q.    Do you agree?

3        A.    Is that a question?

4        Q.    It is.

5        A.    I'm sorry.  Could you ask it

6    again?

7        Q.    Do you agree, sir, that that's

8    not good?

9            MR. STERN:  Object to the form.

10       A.    1.9 million persons abuse is not

11   good.

12       Q.    Does it surprise you, sir, that

13   that abuse and dependence is having real

14   consequences on communities in this

15   country?

16           MR. STERN:  Object to the form.

17       A.    I'm aware of the impact in the

18   communities.

19       Q.    You're aware of the billions and

20   billions of dollars of financial impact,

21   human toll, loss of life, disruption to

22   family --

23           MR. STERN:  Objection.

24       Q.    -- that is being suffered in the

Highly Confidential - Subject to Further Confidentiality Review

1    communities in this country.

2         True?

3              MR. STERN:  Objection to form;

4         lack of foundation.

5    A.    I'm certainly -- I'm not aware

6    of the dollar amount you just indicated,

7    but clearly I am aware and sympathetic to

8    the families in the communities all around

9    the United States.

10   Q.    That awareness, sir, you

11   reached, it took four years, four years

12   for you, sir, as a pharmaceutical

13   executive, CEO of a company, to even

14   become aware of the existence of a

15   problem?

16              MR. STERN:  Objection to the

17        form and mischaracterizing --

18   BY MR. BUCHANAN:

19   Q.    Following the CDC announcement

20   in 2011?

21              MR. STERN:  Objection to the

22        form and mischaracterizing the

23        witness's testimony.

24   A.    As I said before, in 2015, the

Highly Confidential - Subject to Further Confidentiality Review

1   2015 time frame, it started to resonate

2   with me.

3       Q.    Would it surprise you, sir, if

4   this had resonated with people, with

5   families, with government agencies, with

6   the CDC in a massive human toll all around

7   you for years and years before 2015?

8           MR. STERN:  Objection to the

9       form; lack of foundation.

10      A.    Can you -- can you rephrase that

11  for me so I understand it better?

12      Q.    I'm saying, sir, would it

13  surprise you, there's 165,000 overdose

14  deaths secondary to prescription pain

15  medication between 1999 and 2014 and

16  you're saying, sir, that did not resonate

17  with you until 2015?

18          MR. STERN:  Objection to the

19      form.

20      A.    I was aware of an issue in terms

21  of the use of it being an epidemic abuse

22  issue, that did not resonate with me until

23  2015.  In my role, again, I was aware of

24  orders that would come in to our office

1    and we would process in normal course

2    based upon wholesaler use.  That's what we

3    were doing.

4        Q.    By definition, sir, as the

5    company selling controlled substances, you

6    know those substances, people want to get

7    them out of that controlled system, right?

8        MR. STERN:  Object to the form.

9        A.    We have systems and procedures

10    to protect against that.

11        Q.    They are products that are

12    targets for abuse and diversion, right?

13        MR. STERN:  Object to the form;

14        lack of foundation.

15        A.    They could be.  And that's why

16    we have systems and procedures and safes

17    and security cameras to help curb that.

18        Q.    165,000 people in 15 years died

19    from these pain medications in the United

20    States.

21        You see that?

22        MR. STERN:  Object to the form.

23    A.    I see it.

24        Q.    The estimate was in 2011 some

Highly Confidential - Subject to Further Confidentiality Review

1    400,000 treatment admissions every year

2    for opioid-related treatment secondary to

3    addiction or dependence.

4         You recall that?

5    A.    No.  I'm not following the

6    question, sir.

7    Q.    Do you recall in the 2011 sheet,

8    sir, 400,000 or so admissions for

9    treatment?

10   A.    Okay.  I recall that.

11   Q.    Does it surprise you, sir, that

12   there is a vast human toll that goes back

13   not just to 2015, 10, 15, 17, 18 years

14   since you were marketing and promoting

15   these drugs?

16        MR. STERN:  Objection to the

17        form.

18   A.    As I sit here today, I clearly

19   understand it.  It's a terrible situation.

20   We also have a duty and a responsibility

21   that there's millions of people that need

22   these drugs as well.

23        It's a terrible situation on the

24   deaths.  I admit to that.  And for that a

1    lot of people feel terrible, including

2    myself.

3        Q.    How many hundreds of people did

4    Par have working at in 2012, 2013, 2014?

5        A.    I'm sorry?

6        Q.    How many hundreds of people did

7    Par have working at it in 2012, '13, '14?

8        A.    Probably about a thousand.

9        Q.    Not one of a thousand people,

10   sir, in that entity brought the epidemic

11   to your desk and said "I've got real

12   concerns about what we're doing here"?

13       A.    As I sit here today, I don't

14   recall.  I'm not saying it didn't happen,

15   but I don't -- I don't recall that

16   happening.

17            MR. BUCHANAN:  I suggest we take

18       a short break.

19            MR. STERN:  Sure.

20            THE VIDEOGRAPHER:  Remove your

21       microphones, please.

22            The time is 10:38 a.m.

23            Off the record.

24            (Recess taken.)

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  We are back

2      on record.

3          The time is 10:53 a.m.

4   BY MR. BUCHANAN:

5      Q.    Sir, I'd like to circle back to

6   where we were finishing.  We were talking

7   about kind of where we were, so to speak,

8   in the last several years with regard to

9   this epidemic.

10          I want to kind of see where your

11  products kind of fit into the mix, if

12  that's okay.

13          Do you still have Exhibit 202?

14  You remember that pill chart we were

15  looking at?

16          MR. BUCHANAN:  Can you pull up

17      202, Corey?  Slide 20.

18  BY MR. BUCHANAN:

19      Q.    And these are the various

20  products that Endo has marketed and sold

21  over the years, correct, sir?

22      A.    I -- I know that it's marketed

23  Opana.  I'm not sure if it marketed or

24  pro -- I know it marketed and promoted

1    Opana and Percocet.  That I do know.

2        Q.    Okay.  Two big brands for the

3    company?

4        A.    Two brands, yes.

5        Q.    Okay.  Let's -- let's kind of

6    talk about what that means in terms of

7    sales.

8              MR. BUCHANAN:  I'm sorry.  Can

9        we go off the record for a moment?

10             THE VIDEOGRAPHER:  The time is

11       10:55 a.m.

12             Going off the record.

13             (Recess taken.)

14             (Campanelli Exhibit 206,

15       document, was marked for

16       identification, as of this date.)

17             THE VIDEOGRAPHER:  We are back

18       on the record.

19             The time is 11:03 a.m.

20    BY MR. BUCHANAN:

21       Q.    Sir, passing you what we've

22    marked as Exhibit 206.  This is a chart of

23    Endo's various products over the years and

24    sales volume in pills, or extended units.

1    I'll represent to you, sir, that it's

2    generated from data that's been identified

3    to us by defense counsel, Endo's counsel,

4    in this litigation.

5            We can see --

6            MR. BUCHANAN:  If you go to the

7        far left column, please, Corey.

8        Q.    We can see, if you will, various

9    products listings on the left and we can

10   see sales volume in extended units.

11   That's pills, or conversions for other

12   types of formulations, over the various

13   years.  And we see going back to 1999 Endo

14   was making Endocet.

15           You see that, sir?

16       A.    Yes.

17       Q.    I think you told us, and we saw

18   in the prior exhibit, that Endocet was a

19   generic form of Percocet, right?

20       A.    Correct.

21       Q.    So, in 1999, Endo made some 160

22   million Endocet tablets, according to

23   shipment data and reflected on this chart,

24   correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    We see Percocet, some hundred

3    million or so tablets, 102, 101.

4          You see that?

5    A.    Yes, I see it.

6    Q.    Okay.

7          MR. BUCHANAN:  And we can scroll

8    it all the way to the right, maybe,

9    Corey.  If you can split the screen so

10   we can kind of see where we were with

11   the product listing on the left and

12   the total pills that were sold on the

13   right.

14         There's a totals column, Corey.

15   Can you just give us the totals?

16         There we go.  Great.

17         Can you get them to the same

18   scale, roughly, so we can line them

19   up?  And really all I need is the

20   totals column, Corey.

21         Thank you.

22         There we go.  And if you can

23   mush them together so we can kind of

24   see the products and see the totals.

1    And they're a little off, I guess.

2         There we go.

3    BY MR. BUCHANAN:

4    Q.    So, you can see, sir, Endocet

5    total sales of this Percocet generic

6    formulation over the years roughly 4.2

7    billion pills.

8         You see that, sir?

9         MR. STERN:  Objection to the

10   form.

11   A.    No.  No, I don't see that.

12   Q.    If you go to the far right

13   column total pills sold over the course of

14   the period of time?

15   A.    You -- your question flipped on

16   me, just so you know.

17   Q.    Fair enough.  Sorry about that.

18        Do you understand my question

19   now to be referring to total sales of

20   Endocet between the period of time they

21   started selling it until they stopped

22   would be about 4.2 billion Endocets?

23   A.    I think you need to clarify your

24   question, sir.

1    Q.    And, what's confusing about it,

2    or what's tripping us up?

3    A.    Are you saying sales or units,

4    sir?

5    Q.    I'm sorry.  Sales of those

6    units.

7          These are, in fact, the units

8    that have been represented as sold to us.

9    A.    Okay.

10         MR. STERN:  Not dollars, is the

11    point.

12         MR. BUCHANAN:  Fair.

13         MR. STERN:  Right.

14         MR. BUCHANAN:  Fair.

15   BY MR. BUCHANAN:

16    Q.    And I'm -- you sold this volume

17    of pills, sir?

18    A.    This sheet indicates that we've

19    sold these unit -- extended units of these

20    pills.

21    Q.    Fair enough.  Thank you.

22         Yeah, I did not mean to suggest

23    that these are dollars.  There's a legend

24    at the top that I think reflects extended

1    units.  That's what we're talking about

2    with these numbers.

3         A.    Okay.

4         Q.    Okay.  And we're looking at just

5    the Endo numbers in this chart, I'll

6    represent to you, sir.  Okay.

7              MR. STERN:  Objection to the

8         form.

9    BY MR. BUCHANAN:

10        Q.    So, we see roughly 4.2 billion

11   Endocet units, that's pills, over the time

12   that Endo provided us data from '99 to

13   present, right?

14        A.    4.2 billion extended units.

15        Q.    For Percocet we see, as the

16   brand, Endo's brand, we see some 1.6

17   billion extended units, correct?

18        A.    Correct.

19        Q.    All right.  So, those two

20   oxycodone acetaminophen combinations

21   represent almost, what, 6 billion pills

22   sold by Endo for that controlled

23   substance.

24              Is that right?

1      A.      About 5.6, 5.7 billion units,

2   yes.

3      Q.      Yeah, 5.8 even?

4      A.      Okay.

5      Q.      There's another line in there

6   oxycodone APAP, I guess they sold a

7   different formulation of Percocet there,

8   right?  Or another -- another formulation?

9      A.      It's a formulation of oxycodone,

10   yes.

11      Q.      Okay.  And there's some

12   additional sales off to the right.

13   Doesn't look like too much, I guess,

14   right?  Just a million pills, or 845,000?

15          MR. STERN:  Objection to the

16      form.

17      A.      845,000 extended units.

18      Q.      Okay.  And, so, we also see that

19   branded product that you all sold

20   Opana ER --

21          MR. STERN:  Objection.

22      Q.      -- close to 500 million units

23   sold in that product, right?

24          MR. STERN:  Objection to the

1      form.

2      A.    Almost 500 million unit --

3   extended units of Opana ER.

4      Q.    Okay.  And then Morphine, we

5   talked about that on the -- the product

6   chart earlier today, some 1.1 billion

7   units of Morphine, right?

8      A.    1.1 billion extended units, yes.

9      Q.    Okay.  So, look, we don't have

10  to go through each of these line items to

11  get them into the record, but it's some

12  8.2 billion extended units over the period

13  of time that we received data from Endo

14  for, correct?

15     A.    Yes, that's what it says.

16          MR. BUCHANAN:  Okay.  Could I

17     have the chart, please, for Qualitest?

18  BY MR. BUCHANAN:

19     Q.    We looked at that kind of

20  corporate history chart earlier today,

21  sir, and saw that in 2010, Endo acquired

22  either Qualitest, or the assets of

23  Qualitest.

24          Do you recall that?

1    A.    Yes.

2    Q.    Okay.  That was roughly 2010, I
3    believe, when that happened.

4            (Campanelli Exhibit 208,
5            document, was marked for
6            identification, as of this date.)

7    BY MR. BUCHANAN:

8    Q.    I'm going to pass you Exhibit
9    208.

10   A.    Are we done with this document?

11   Q.    For the moment, yes.  You can
12   keep them close, but we don't know when
13   we'll need to refer to them.

14            A similar chart, sir, in Exhibit
15   208 to what we looked at for Endo just a
16   moment ago.

17            As we talked about, Qualitest
18   was in the business of making opioid
19   products, right?

20            MR. STERN:  Objection; lack of
21            foundation.

22   A.    Qualitest manufactured opioids,
23   yes.

24   Q.    Okay.  Manufactured a lot of

1    them, right?

2         A.    It shows 24 billion unit --

3    extended units.

4         Q.    Let's pause on that.

5               24 billion?

6    A.    Yes.

7         Q.    So, if we look at this chart,

8    sir, we see, boy, making a lot of Vicodin,

9    right?

10              MR. STERN:  Object to the form.

11        A.    Could you show me what product

12   you're referring to?

13        Q.    I'm referring to hydrocodone

14   APAP.

15              Do you see that?

16        A.    Yes.

17        Q.    18 billion pills.

18              You see that, sir?

19        A.    I see it.

20        Q.    That's a lot of Vicodin.

21              MR. STERN:  Object to the form.

22        A.    It's -- it's -- it's significant

23   volume.

24        Q.    Market leader in Vicodin?

1                MR. STERN:  Object to the form.

2        A.     That, I don't know.

3        Q.     Okay.  Let's look down to -- and

4    there's other hydrocodone products there,

5    sir, and the jury will obviously have this

6    evidence.  But I -- I would like to call a

7    few things out.

8                If we could, go down to it looks

9    like Qualitest was also making Endocet,

10   correct?

11       A.     Correct.

12       Q.     Do you recall, sir, that after

13   Par -- excuse me.  Qualitest was acquired

14   by Endo, the generic operations of Endo

15   kind of moved into Qualitest operations?

16               MR. STERN:  Object to the form.

17       A.     I'm sorry.  Could you say that

18   one more time?

19       Q.     Yeah.

20               Do you recall, sir, that after

21   Endo acquired Qualitest in 2010, some of

22   the generic portfolio of Endo moved into

23   the operating business of Qualitest?  Do

24   you recall that?

1    A.    I -- I don't know if that

2    happened in 2010.

3    Q.    Okay.

4          MR. BUCHANAN:  Can we scroll,

5    Corey, to just see the years from 2010

6    to -- no, actually, if you could kind

7    of just pull the right one over so we

8    could see 2010.

9    Q.    So, okay.  These are the -- this

10   is product mix.  We see Endocets start to

11   be made by Qualitest in 2011.

12         You see that?

13   A.    I see that.

14   Q.    Okay.  Hundred million pills

15   that year, 358 million the next year, 170

16   million the year after that, and it

17   continues.

18         MR. BUCHANAN:  Could you go to

19   the right, Corey?

20   Q.    For a total of some 880 million

21   Endocets, right?

22   A.    I see that, yes.

23   Q.    And we've also got Qualitest

24   making Percocet, right?

1    A.    Yes.

2    Q.    87 million Percocets made?

3    A.    Yes.  Qualitest is manufacturing

4  on behalf of Endo at this time.

5    Q.    Okay.  So, yeah, after -- after

6  the time of the merger, some of the pills

7  that used to be made or contracted for by

8  Endo are now being made or contracted for

9  by Qualitest, right?

10    A.    Yes.

11         I'm sorry.  You said 2010.  I

12  just think it's more like 2011, but yes.

13    Q.    And that's just a matter of when

14  the operations get formally integrated,

15  right?

16    A.    Seems reasonable.

17    Q.    Okay.  And, so, let's total this

18  up.  So -- actually, before we do that,

19  there's also this other line item for

20  oxycodone APAP.

21         Do you see that?

22    A.    Yes.

23    Q.    Oxycodone APAP, that would be

24  another way of referring to Percocet,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2         A.    Yes.

3         Q.    Okay.  You got Percocet in,

4    essentially, three different buckets at

5    least, right?

6         A.    There's a generic form in here.

7         Q.    And that would be the oxycodone

8    APAP?

9         A.    Correct.

10        Q.    Okay.  And, so, what we see

11   here, sir, is Qualitest, prior to the time

12   of its acquisition and after the time of

13   its acquisition, pushing out a lot of

14   opioid pills, right?

15             MR. STERN:  Object to the form.

16        A.    I see the volume here on the

17   paper.

18        Q.    25 billion, right?

19        A.    25 billion extended units, yes.

20        Q.    And we can agree that's a lot,

21   right?

22        A.    It's a high volume of -- of

23   opioids, or controlled substances.

24        Q.    I mean, that's -- that's enough

Highly Confidential - Subject to Further Confidentiality Review

1   for a hundred count bottle for every adult

2   in the United States, right?

3       A.    This is over a 15-year period.

4       Q.    The answer to my question

5   though, sir, would be yes, that is enough

6   for a hundred count bottle hydrocodone,

7   oxycodone, oxymorphone, collection of

8   opioid pills manufactured by Qualitest for

9   every adult in the United States, correct?

10          MR. STERN:  Objection to the

11      form.

12      A.    I don't -- I don't know the

13  answer to that.

14      Q.    The answer is you just don't

15  know the population of adults in the

16  United States?

17      A.    That's correct.

18      Q.    Okay.  Does it surprise you that

19  Qualitest made that many opioids?

20          MR. STERN:  Object to the form.

21  BY MR. BUCHANAN:

22      Q.    I just want to -- are you -- are

23  you learning this sitting here today, or

24  did you have that awareness before you

1    came in today?

2        A.    I did not have the specific

3    volume, but it's not surprising that

4    Qualitest had historically been known as

5    an opioid producer.  So that -- that --

6    that's -- that's factual.  That's known in

7    the industry.

8        Q.    Let's look at the bottom, if we

9    could, sir.

10            MR. STERN:  I'm sorry, the

11        bottom -- are we still on?

12            MR. BUCHANAN:  We're still on

13        this exhibit.

14            MR. STERN:  208.

15            MR. BUCHANAN:  Thank you.

16        Exhibit 208.

17    BY MR. BUCHANAN:

18        Q.    The screen may or may not be

19    easier.  I think probably your -- you can

20    probably read it just fine if you look on

21    the exhibit itself.

22            But, we see, I mean, Qualitest

23    volume of opioids grew quite dramatically.

24            MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1       form.

2    BY MR. BUCHANAN:

3       Q.    True?

4       A.    The generic versions of what

5    they were producing increased.

6       Q.    And, so, we look at the counts

7    and we go back to 2001.  In fairness, sir,

8    I don't know if that's a full 2001 year's

9    worth of data.  This is everything that we

10   were given.

11            2001 reports 162, 162 million

12   pills.  I'd suggest probably the better

13   reference point would be 2002.

14            Would you agree with me?

15      A.    I would agree with that.

16      Q.    Okay.  Probably didn't multiply

17   it by five time in one year, right?

18      A.    Unlikely.

19      Q.    So, in 2002, we see Qualitest

20   made some 721 million opioid pills, right,

21   or other extended units?

22      A.    Yes, I see that.

23      Q.    2003 it's grown 846 million,

24   right?

1          A.     Yes.

2          Q.     Growing in 2004 984 million,

3    right?

4          A.     Yes.

5          Q.     Growing in 2005 1.2 billion

6    pills, right?

7          A.     Yes.

8          Q.     Had a little dip in 2006 it

9    looks like, right?

10         A.     Agreed.

11         Q.     997 million.  A little flat

12   there in 2007 at 1.03 billion.

13                You see that?

14         A.     I see it.

15         Q.     A billion in 2008.  And then

16   2009 growing again.

17                Right?

18         A.     I see it.

19         Q.     Okay.  1.3 billion pills in

20   2009?

21         A.     Correct.

22         Q.     One year, right?

23         A.     Yes.

24         Q.     1.6 billion in 2010.

Highly Confidential - Subject to Further Confidentiality Review

1          True?

2     A.    Yes.

3     Q.    2.4 billion in 2011, right?

4     A.    Yes.

5     Q.    2011 is the year we saw that CDC

6     report about there being an epidemic,

7     right?

8     A.    Yes.

9     Q.    3.3 billion, still rising, in

10    2012, right?

11    A.    Yes.

12    Q.    2013 we're up to 2.9 billion,

13    correct?

14    A.    Correct.

15    Q.    And then 3.7 billion in 2014,

16    right?

17    A.    Yes.

18    Q.    And then in 2015 it's down to

19    2.5 billion, I see, right?

20    A.    Right.

21          MR. STERN:  Mr. Buchanan, if I

22    may.  Ultimately this exhibit will

23    speak for itself.

24          I'd just like to note that we're

Highly Confidential - Subject to Further Confidentiality Review

```
1          not being entirely precise with these
2          numbers.
3                    MR. BUCHANAN:  I appreciate
4          that.
5     BY MR. BUCHANAN:
6          Q.    And you can agree, sir, you and
7     I have both been doing a little rounding
8     in our dialogue.
9                    Fair?
10         A.    Agreed.
11                   MR. BUCHANAN:  The numbers are
12         on the sheet, and I don't think either
13         side is going to fuss with whatever
14         the data shows is the data.
15                   Correct, counsel?
16                   MR. STERN:  Yes.
17                   MR. BUCHANAN:  And I'd be to
18         happy to get a stipulation from
19         counsel and put the precise numbers on
20         so we don't have any fuss about that,
21         but that's not an issue for today.
22    BY MR. BUCHANAN:
23         Q.    All right.  Sir, let's look at
24    the next one.
```

Highly Confidential - Subject to Further Confidentiality Review

1           All right.  I should indicate in

2    2015, is that the year when Par and

3    Endo/Qualitest came together?

4           A.    Yes.

5           Q.    And there was some realignment

6    of products among the various portfolio

7    companies beginning in 2015?

8           A.    The portfolio were evaluated and

9    we started to synergize products.

10          Q.    Okay.  And would it be fair to

11   say, sir, that some of the loss in volume

12   between 2014 and 2015 is accounted for by

13   the reallocation of products between Endo,

14   Qualitest and Par as part of that merger

15   process?

16          MR. STERN:  Objection; lack of

17      foundation.

18          A.    Could you say that one more time

19   for me, sir?

20          Q.    Sure.

21          Would it be fair to say, sir,

22   that some of the loss in volume between

23   2014 and 2015 as reflected on the sales

24   for Qualitest, in terms of extended units,

1   is accounted for by the reallocation of

2   products between Qualitest and Endo or

3   Par, or don't you know?

4       A.    I don't believe there was a

5   reallocation of products between the

6   portfolios, no.  There was not.

7       Q.    When did that begin?

8       A.    Maybe you can just help me.

9   What do you mean by reallocation?

10      Q.    Certain products were deemed to

11  be Qualitest products versus Par products

12  or vice versa, or Endo or Qualitest

13  products or Par products or vice versa, as

14  part of the integration of the companies

15  that began in 2015.

16          Correct?

17      A.    I just want to make sure that

18  I'm understanding your question.  Is

19  that -- is that your rationale for the

20  decline in -- in volume?

21      Q.    I'm just asking you whether that

22  happened.

23      A.    Fair enough.

24          The portfolios were combined.

Highly Confidential - Subject to Further Confidentiality Review

1    The Par and the -- the Par and the

2    Qualitest portfolios were combined.

3        Q.    Okay.  Well, let's take a look

4    now at the Par sheet.  You can set that

5    one aside.

6            MR. BUCHANAN:  Could I have,

7        please, Exhibit 207?

8            (Campanelli Exhibit 207,

9        document, was marked for

10       identification, as of this date.)

11   BY MR. BUCHANAN:

12       Q.    I saw kind of a smile in

13   recognition when you looked at 207, sir.

14           Do you see that's what happened

15   by looking at the Par data?  That, in

16   fact, some products that were not Par

17   products were now kind of on the Par side

18   of the ledger?

19       A.    Agreed.

20       Q.    Okay.

21           MR. BUCHANAN:  Let's pull up,

22       please, E1809, Corey.

23   BY MR. BUCHANAN:

24       Q.    All right.  We have it on the

1    screen here.  This is a spreadsheet that's

2    been generated by us in response to

3    information provided to us by your

4    company, or at least by counsel for the

5    company.  And on the left-hand side, like

6    the other charts, it lists the various

7    products that had been kind of on Par's

8    ledger over the years as orders shipped or

9    manufactured by the company.

10              Do you recognize those products,

11   sir?  Let's look prior to 2015.  Do you

12   recognize those products for which there

13   is shipment data as products that Par was

14   selling during that period of time?

15        A.    Yes.

16        Q.    Okay.  And, so, we see that the

17   company is selling, just for simplicity,

18   sir, we'll look at the pre-2015 period of

19   time just to get a sense of really what

20   the company was doing, okay.

21              Would that be fair?

22        A.    Yes.

23        Q.    Okay.  So, if we look at 2014,

24   for example, this would be some two, three

Highly Confidential - Subject to Further Confidentiality Review

1    years after the CDC had stated there's an

2    epidemic of prescription dug --

3    prescription drug overdose in this

4    country.

5              Do you see the products that Par

6    was selling that year?

7         A.    Yes.

8         Q.    What products was Par selling?

9         A.    Chlorpheniramine, hydrocodone,

10   which is Tussionex.  It sold the -- the

11   fentanyl patch.  It sold -- I apologize.

12   I went out of order here.  It sold the

13   fentanyl lozenge, again the fentanyl

14   patch.  It sold Morphine extended-release

15   tablets.  It sold an authorized generic

16   version of oxycodone and it sold oxycodone

17   in combination with acetaminophen.

18        Q.    Okay.  And, so, just to drill

19   down on that a little.  I mean, those

20   are -- the names you just read correlate

21   with the pictures we were looking at on

22   that demonstrative earlier today, on that

23   slide?

24        A.    The Par portfolio?

1     Q.    Yes.

2     A.    Correct.

3     Q.    Okay.  I just want to make sure

4  that we fairly characterize the Par

5  portfolio.

6              So, in 2014, sir, Par, for the

7  first year in its history, enters the

8  opioid market with Percocet, right?

9     A.    With the oxycodone APAP generic

10  product you're referring to?

11     Q.    That's what I was referring to.

12  And Corey was kind enough to highlight the

13  actual word I spoke, which is fair.

14     A.    Okay.

15     Q.    But I was looking at the

16  oxycodone APAP, that would be the generic

17  equivalent of Percocet, correct?

18     A.    Correct.

19     Q.    You all sold 270 million

20  Percocets that year?

21     A.    Correct.

22     Q.    One for every person in the

23  United States, or close to it?

24     A.    Approximately.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So about 400 million units that

2  year of opioid-containing products, right?

3    A.    Correct.

4    Q.    And as we look forward, sir, we

5  see some 7.7 billion products before and

6  after the merger with Endo attributable to

7  Par, correct?

8    A.    Yes.  With a decrease in the out

9  years, correct.

10    Q.    I think I said products, but

11  more correctly would have said extended

12  units, pills, dosing units, et cetera.

13        Is that fair?

14    A.    Thank you.  Yes.

15    Q.    Okay.  These products that we're

16  talking about, sir, oxycodone APAP

17  hydrocodone, Morphine, these are products

18  that were called out as in the CDC's note

19  from 2011, as part of the prescription

20  drug epidemic.

21        Fair?

22    A.    That's what the documents refer

23  to, yes.

24    Q.    Okay.  What I'd like to do, sir,

Highly Confidential - Subject to Further Confidentiality Review

1   is just kind of, so we can visualize this

2   a little bit.

3           (Pause.)

4           We're going to have one for you

5   as well.

6           MR. BUCHANAN:  This is going to

7     be Exhibit 210.

8           (Campanelli Exhibit 210,

9     document, was marked for

10    identification, as of this date.)

11  BY MR. BUCHANAN:

12    Q.    All right.  So, I'll represent

13  to you, sir, that what we've done, and you

14  can see the source is listed on the

15  bottom, is we've plotted the -- the sales

16  of pills in pills, not dollars, okay.

17  This is the pill volume shipped by the

18  three current Endo entities, Endo,

19  Qualitest and Par.

20          Do you see that?

21          MR. STERN:  Objection; lack of

22    foundation.

23    A.    Yes.

24    Q.    Okay.  We can see, sir, that

1    in -- the merger, obviously, with

2    Qualitest happens in 2010, correct?

3        A.    Endo and Qualitest occurred in

4    2010, yes.

5        Q.    And the merger with Par occurred

6    in 2015, correct?

7        A.    Correct.

8        Q.    What we've included, sir, so

9    this chart is reflective of the sales of

10   these entities for whatever you've given

11   us data for, is the sales that even

12   preceded those mergers, okay.

13           MR. STERN:  Objection to the

14       form.

15   BY MR. BUCHANAN:

16       Q.    Just so we're communicating,

17   okay?

18       A.    These represent the extended

19   units, correct.

20       Q.    Okay.  So, what we see, sir,

21   over time in the left-hand column is

22   extended units.  There's a legend there,

23   just so we're communicating with each

24   other, and a legend on the bottom that

Highly Confidential - Subject to Further Confidentiality Review

1    says extended units are pills or dosage

2    units, et cetera, okay.

3              Is that the way you report

4    things in terms of shipments in your

5    business, sir?

6         A.    I'm sorry?

7         Q.    Do you report extended units in

8    the pharmaceutical business?

9         A.    Probably units.

10        Q.    Units would be bottles?

11        A.    Correct.

12        Q.    Have you seen the reports that

13   also calculate the extended units?

14        A.    Yes.

15        Q.    Okay.  So it's a fair way to

16   report, if you will, the volume for a

17   product.  Fair?

18        A.    It's my understanding.

19        Q.    Okay.  So, we have here extended

20   units over the years, and we can see that,

21   you know, Endo, not -- we don't have data

22   prior to '99 and maybe not even a full

23   year for '99, but Endo at its early stage

24   is less than a billion pills, half a

1    billion it looks like while it's getting

2    started.  You know, the yellow lines grow

3    and I guess kind of approach a billion in

4    maybe 700, 800 million in 2009.

5         You see that?

6    A.    Yes.

7    Q.    And then after 2010 there's some

8    reallocation of products between Endo and

9    Qualitest in terms of their relative,

10   which company's responsible for that.

11        Do you understand that, sir?

12   A.    In 2010 it appears that

13   there's -- Qualitest is producing generic

14   versions of Endo's products and that's

15   why, I assume, it's increasing from

16   Qualitest.

17   Q.    You see that Endo's attribution

18   declines over time while Qualitest's go

19   up, right?

20   A.    Correct.

21   Q.    And, is that something like what

22   happened with Par and Qualitest in 2015, a

23   reallocation of products between the two

24   companies?

1    A.    That's what appears to be

2    happening, yes.

3    Q.    We see, obviously, the sales for

4    Par in 2014, 2015, and they shift fairly

5    dramatically between Par and Qualitest,

6    right?

7    A.    Yes.

8    Q.    Okay.  So, reorienting us.

9         In 2011, we looked at that CDC

10   note talking about the epidemic

11   prescription drugs and overdoses.

12        We can see that the Endo,

13   Qualitest and Par entities are growing

14   business, right?

15        MR. STERN:  Mr. Buchanan, just

16        for the record, object to this

17        demonstrative to the extent it makes

18        it appear as though certain entities

19        were unified at times when they were

20        not.  The earlier testimony elaborated

21        the corporate history and we'd

22        respectfully submit that this

23        demonstrative is potentially

24        misleading on that point.

1              MR. BUCHANAN:  I believe the

2        entities are defendants, and so I

3        understand your statement, counsel,

4        but I probably disagree with whatever

5        inference you're trying to draw from

6        it.

7              MR. STERN:  I'm not trying to

8        draw an inference.  It's just that in

9        2003, for example, Endo and Qualitest

10        were not the same company.  In fact,

11        they weren't even related at that

12        point.  And the single bar is

13        potentially misleading.

14              MR. BUCHANAN:  There is no fuss

15        on that fact, sir.

16              But where we might have a

17        disagreement is with regard to whether

18        Qualitest is, through a successor of

19        Qualitest, liable for the sales that

20        it made at any point in time.

21              MR. STERN:  That's an issue for

22        another day.

23              MR. BUCHANAN:  That's an issue

24        for another day.

1           I tried to present the chart in

2      a way that reflected the sales

3      attributable to each of them and so we

4      can have accurate testimony.

5           Your clarification is noted, but

6      let's zoom forward to a period where

7      we shouldn't have a dispute, and

8      that's 2011.

9  BY MR. BUCHANAN:

10      Q.    Can we agree, sir --

11           MR. STERN:  Mr. Buchanan, we

12      have the same dispute because Par

13      perches the top the 2011 bar and that

14      was pre-acquisition.

15           MR. BUCHANAN:  We can certainly

16      do this.  Let's forget about the blue

17      tip the top of 2011 and 2012.

18  BY MR. BUCHANAN:

19      Q.    Sir, can we agree that in the

20  year after the CDC announced the

21  prescription drug overdose epidemic that

22  the combined Endo/Qualitest entity grew

23  its sales?

24      A.    Well -- yes.

1     Q.     Thank you.

2            And, sir, when I use the term

3     "sales," I guess as a businessperson,

4     there's been some resistance to my use of

5     the term.  I won't say -- you've been

6     cooperative.  But you're interpreting that

7     as dollars as opposed to pills.

8            What's the right way to

9     communicate when I'm talking about pills

10    with you?

11    A.     Again, it's what you see here.

12    The extended units on the left part -- on

13    the Y part of the -- the Y portion of the

14    chart.

15    Q.     So my chart is sufficiently

16    descriptive in terms of by adding extended

17    units on the side we know what we're

18    talking about?

19    A.     When we talk about extended

20    units, we know we're talking about

21    individual pills.

22    Q.     Fair enough.

23           (Campanelli Exhibit 211,

24           document, was marked for

1            identification, as of this date.)

2    BY MR. BUCHANAN:

3         Q.    Passing you what we've marked as

4    Exhibit 211 to your deposition, sir.

5              Sir, 211 is the same exhibit we

6    just looked at?

7              MR. STERN:  Counsel, I'm sorry

8         to interrupt.

9              The same observation with

10        respect to 211 as 210.

11             MR. BUCHANAN:  Your objection,

12        or observation, is noted.

13   BY MR. BUCHANAN:

14        Q.    Mr. Campanelli, when we look at

15   Exhibit 211, what we've now incorporated

16   is the data from the CDC that reflects the

17   deaths secondary to opioid use in this

18   country.

19             You see that red line?

20        A.    Yes.

21        Q.    Okay.  At any point in time,

22   sir, prior to 2015, had any scientists

23   within your company or any employee within

24   your company brought to you the sales data

1    in extended units and shown that in

2    combination with the deaths secondary to

3    this epidemic?

4         A.    I don't recall that happening.

5         Q.    Prior to sitting here today,

6    sir, has anybody in your company brought

7    to you the juxtaposition of your sales in

8    extended units with the deaths that have

9    been suffered in this country secondary to

10   the opioid epidemic?

11        A.    As I sit here today, I don't

12   recall seeing or hearing from the

13   individuals this type of data.

14             Based upon our -- our strategy

15   moving forward, we're winding down our

16   opioid production.

17        Q.    You say winding down, sir.  I

18   still see hundreds of millions of pills

19   being made, right?

20        A.    There are, but they're

21   significantly less than in 2013, '14, and

22   '15.

23        Q.    And we only have Qualitest

24   through 2015.

1          Is that because Qualitest data

2    would now be in Par, sir?

3    A.    Yes.

4          Again, what's misleading is what

5    you really need to be doing here is

6    looking at the red and the blue bars and

7    understanding that that is generic

8    extended units and the yellow being

9    branded extended units.  That's the way

10   you should be interpreting this data,

11   assuming it's correct.

12   Q.    Okay.  And all I can do, sir, is

13   compile what's been given to us by the

14   company as reflective of its sales, and

15   I'll represent to you we did our best to

16   do that accurately.

17         What I do see, sir, is in 2018,

18   Par made some 660 million opioid extended

19   units, right?

20         MR. STERN:  I'm sorry,

21      counselor.  2018?  I don't have that

22      on my --

23         MR. BUCHANAN:  I'm sorry.  I'm

24      back at the chart, which is 207, the

1    data table, sir.

2         MR. STERN:  Okay.  Sorry.

3    BY MR. BUCHANAN:

4         Q.    See that?

5         A.    Could you just rephrase the

6    question, or repeat the question?

7         Q.    Certainly.  Yeah.

8              You see, sir, in 2018 that Par's

9    still made some 660 million opioid

10   tablets, right, or extended units?

11        A.    Yes, which is a significant

12   decrease from the prior year.

13        Q.    The 272 oxycodone APAPs, right?

14        A.    Yes.

15        Q.    Those would be Percocets, right?

16        A.    Yes.

17        Q.    Some 260 million hydrocodone

18   APAPs, right?

19        A.    Correct.

20        Q.    That would be Vicodin, right?

21        A.    Yes.

22        Q.    Okay.  And then a number of

23   other ones that are reflected on the

24   various schedules and that we saw in the

Highly Confidential - Subject to Further Confidentiality Review

1  pill charts earlier today, correct?

2  A.    And, yes, as you can see a

3  significant reduction over time.

4  Q.    Okay.  Still in the opioid

5  business today?

6  MR. STERN:  Objection to the

7  form.

8  A.    We still sell a small amount

9  of -- of opioids today, yes.

10  Q.    Well, 660 million last year,

11  right, sir?

12  A.    Yes, and declining.

13  Q.    I suppose it depends on how you

14  define small.

15  A.    Again, these medications have a

16  purpose for people in pain.

17  Q.    I suppose it matters on how you

18  define small, right?

19  A.    Yeah.

20  Q.    Okay.  All right.  We spent some

21  time, sir, talking about Percocet today.

22  I would like to talk about that

23  in a little more detail.

24  You didn't have to wait until

1    the DEA --

2            MR. BUCHANAN:  Excuse me.

3        Withdrawn.

4        Q.    You didn't have to wait until

5    the CDC declared an epidemic in 2011 with

6    prescription painkillers to know that

7    there was a real problem with diversion

8    and abuse of Percocet, right, sir?

9            MR. STERN:  Object to the form.

10       A.    I didn't know that specific in,

11   you know, prior to 2015.

12       Q.    There had been a problem with

13   Percocet and Percodan abuse for years,

14   right?

15       A.    There may have been.

16            (Campanelli Exhibit 11, e-mail,

17       was marked for identification, as of

18       this date.)

19   BY MR. BUCHANAN:

20       Q.    You have Exhibit 11 in your

21   binder.  If I could direct you to that,

22   sir.

23            MR. BUCHANAN:  Corey, we're

24       going to start on the first page.

1    Q.    It's an e-mail exchange between

2    some Endo folks.  You'll see a Bates

3    number in the bottom that indicates it was

4    produced to us in this litigation by Endo.

5         I'm going to take us to the

6    second page, 548.2.  It says:  Drugs and

7    chemicals of concern.

8         It's a note from the DEA in or

9    around 2003.

10        Do you see that, sir?

11   A.    Yes, I do.

12   Q.    And at any point today, sir, if

13   you feel the need to look further in a

14   document, feel free.  I'm going to try and

15   orient you as best as I'm able, and maybe

16   you just want to until I do that and you

17   can decide what you need to read.  It's

18   your call.

19   A.    Okay.  Thank you.

20   Q.    Drugs and chemicals of concern

21   action plan to prevent abuse and

22   diversion --

23        MR. BUCHANAN:  Excuse me.

24        Withdrawn.

1    Q.    (Reading) Drugs and chemicals of

2    concern.  Action plan to prevent the

3    diversion and abuse of OxyContin.

4            Do you see that?

5    A.    Yes.

6    Q.    Okay.  Let's go to the dot-3,

7    which is the second page of that DEA

8    alert.  It says:  Oxycodone has been

9    marketed.

10            Do you see that?

11            MR. BUCHANAN:  Scroll down,

12    please, Corey to the bottom.  There

13    you go.

14    A.    Yes.

15    Q.    (Reading)  Oxycodone has been

16    marketed in combination products with

17    aspirin and acetaminophen Percodan and

18    Percocet for many years.

19            Did I read that correct?

20    A.    Yes.

21    Q.    (Reading) Diversion and abuse of

22    these products continue.

23            Right?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    There was diversion and abuse --

2          MR. BUCHANAN:  Well, withdrawn.

3    Q.    Percocet is your trademark,

4    right, sir?

5          MR. STERN:  Objection to the

6    form.

7    A.    Percocet is a trademark of Endo.

8    Q.    Percodan is your trademark?

9          MR. STERN:  Objection to the

10   form.

11   A.    I'm not familiar with the

12   product, but I don't have reason to doubt

13   what you're saying.

14   Q.    Percodan and Percocet abuse and

15   diversion continue, right, sir?

16         MR. STERN:  Objection to the

17   form.

18   A.    I'm aware that is -- there is

19   abuse and misuse of opioid products.

20   Q.    Happening in 2003, according to

21   the DEA, correct?

22   A.    I see it.

23   Q.    Was happening before, according

24   to the DEA, right?

1      A.    Correct.

2      Q.    You didn't have to wait until

3 2003 to know that Percocet is a drug of

4 abuse, right?

5            MR. STERN:  Objection to the

6      form.

7      A.    I'm not sure I understand.

8            Could you say that again,

9 please?

10     Q.    I said you didn't need to wait

11 until 2003, as Endo as a company, to know

12 that Percocet was a drug of abuse, right?

13           MR. STERN:  Objection to the

14     form.

15     A.    Again, I'm seeing an e-mail that

16 it appears to be written by former

17 regulatory and legal individuals at Endo

18 talking about an action plan.

19     Q.    Well, what you're seeing, sir,

20 is an e-mail, and attached to that e-mail

21 is a DEA notice from 2003, correct?

22     A.    I see the notice, yes.

23     Q.    You would certainly hope that

24 your company would pay attention to

Highly Confidential - Subject to Further Confidentiality Review

1    notices from the DEA, right?

2        A.    Which appear to be happening.

3        Q.    Okay.  So, as of 2003, you don't

4    fuss with the fact that the company was on

5    notice of abuse and diversion with

6    Percocet and Percodan, right?

7              MR. STERN:  Objection to the

8        form.

9        A.    Again, I'd have to read this

10   document a little deeper here.  I see what

11   you're referring to in terms of the -- the

12   concern.  But it appears that supply chain

13   and regulatory are interacting about

14   putting together an action plan.

15       Q.    To address what?

16       A.    To prevent the diversion and

17   abuse of OxyContin.

18       Q.    That are continuing, right?

19       A.    Again, as I've said before, I

20   know that there's abuse and misuse of

21   opioid products today.

22       Q.    And what the DEA is telling the

23   company at this point in time is that

24   diversion and abuse of those products,

Highly Confidential - Subject to Further Confidentiality Review

1    Percodan and Percocet is continuing,

2    right?

3         A.    In 2003, they're acknowledging

4    a -- an action plan in how to prevent with

5    respect to -- to opioid abuse.

6         Q.    Okay.  You didn't have to wait

7    until 2003 for the company to know about

8    abuse and diversion of Percocet and

9    Percodan, right, sir?

10             MR. STERN:  Objection to the

11        form; lack of foundation.

12        A.    I don't know what is happening

13   here pre-2003, sir.

14        Q.    Let's look at Exhibit 12.

15             (Campanelli Exhibit 12,

16        document, was marked for

17        identification, as of this date.)

18   BY MR. BUCHANAN:

19        Q.    "The addiction potential of

20   oxycodone Percodan," Edward Bloomquist.

21   It's an article, reports on drugs.

22             You see that, sir?

23        A.    Yes.

24             MR. BUCHANAN:  Can you go to the

1    right column, Corey, number 2?

2    Q.    (Reading) Numerous non-criminal

3    persons without previous history of

4    addiction or of association with elicit

5    narcotics are becoming addicted to the

6    drug and are committing criminal offenses

7    to obtain it.

8         Did I read that correctly, sir?

9    A.    You did.

10   Q.    Okay.  And this is not a report

11   from 2003; is it, sir?

12   A.    No.  It's not.

13   Q.    When is this report from?

14   A.    1963.

15   Q.    A report in the literature from

16   1963 about numerous non-criminal persons

17   without previous histories of addiction or

18   of association with elicit narcotics are

19   becoming addicted to the drug Percodan and

20   are committing criminal offenses to obtain

21   it.

22        You see, that, sir?

23   A.    I see that.

24   Q.    Certainly information you'd want

1    to be mindful of in connection with

2    presenting this product to the public,

3    right?

4            MR. STERN:  Objection to the

5        form; lack of foundation.

6        A.    With what the article's also

7    saying is that the same care should be

8    used when using Percodan as also Morphine.

9        Q.    My question to you, sir, was

10   certainly information, information being

11   that numerous non-criminal persons without

12   previous histories of addiction or

13   associations with elicit narcotics, are

14   becoming addicted to the drug and are

15   committing crimes to get it, that's

16   something a company should be aware of in

17   connection with its marketing and

18   promotion of a product, right?

19       A.    I see that --

20           MR. STERN:  Objection to the

21       form.

22       A.    I see those words, but it also

23   says that the same care should be used

24   when exercising using Percodan as with

1   Morphine.  So, to me it's a general

2   statement.

3          I'd have to go through this

4   entire article in a little bit more

5   detail.

6          But I see your point, but I also

7   see that they're also making the point

8   that care needs to be given.

9   Q.    My question is really just one

10  of how you run a company, sir, and how you

11  market products.

12         As a matter of running a company

13  and marketing products, would you agree,

14  sir, that your company should be aware of

15  the way in which its products are being

16  used, abused, and diverted and incorporate

17  that information into how it markets and

18  promotes its products?

19         MR. STERN:  Objection to the

20    form.

21  A.    So, there's a lot there.  I --

22  I'd have to -- if you could dissect that a

23  little simpler for me, I'd be able to

24  respond.

1    Q.    Can you foresee a situation,

2    sir, where a company shouldn't be seeking

3    information, trying to understand how its

4    product is being abused and diverted and

5    taking every action it can to prevent that

6    risk?

7           MR. STERN:  Objection to the

8         form.

9    A.    Again, my understanding as it to

10   pertains to Endo and/or Qualitest or Par,

11   that there were systems and procedures in

12   place with professionals that have these

13   responsibilities to be able to -- to put

14   those controls in place.

15   Q.    Okay.  So if you're aware that

16   you have a drug that is prone to abuse and

17   diversion, and you're aware that there is

18   a problem that is continuing with regard

19   to that issue in the early 2000s, you

20   certainly wouldn't want to be trying to

21   get people to take higher doses of it,

22   right?

23          MR. STERN:  Objection to the

24        form; lack of foundation.

Highly Confidential - Subject to Further Confidentiality Review

1     A.    I am not a doctor and I don't

2   know why a doctor prescribes a certain

3   type of milligram.  That -- that is --

4   that comes from the doctor and the

5   patient.

6     Q.    And your marketing team, right?

7     A.    I would say that our marketing

8   team would be -- would be communicating

9   the on-labeled indications in the use of

10  product.

11    Q.    Your marketing team and your

12  sales team are communicating with doctors,

13  right?

14        MR. STERN:  Objection to the

15      form; lack of foundation.

16    A.    Our sales teams have

17  interactions with the doctors, correct.

18    Q.    You know that doctors get a lot

19  of information from your sales teams,

20  right?

21    A.    They get information based upon

22  training and education from our sales

23  team, yes.

24    Q.    That's why you have a sales

1    team, right?

2        A.    Correct.

3        Q.    And to grow your sales, right?

4        A.    Growing sales is -- is one goal

5    of a company, yes.

6        Q.    Sales sells, right?

7        A.    I'm not sure I understand that,

8    sir.

9        Q.    The sales group sells?

10       A.    Yes.

11       Q.    The goal of the sales group is

12   to sell more?

13       A.    The goal of the sales group is

14   to sell in compliance with the labeled

15   indication for the intended purpose of a

16   product, any product as well.

17       Q.    The goal of the sales group is

18   to grow sales?

19       A.    Growing sales is a component

20   under the right set of circumstances,

21   which includes the labeled indication.

22       Q.    Okay.  Well, let's talk about

23   that a little bit with regard to Percocet.

24            Could I have -- actually, you

1    have them already.  Could you go, please,

2    to Exhibit 13 in your binder, sir?

3              (Campanelli Exhibit 13, e-mail,

4         was marked for identification, as of

5         this date.)

6    BY MR. BUCHANAN:

7         Q.    Exhibit 13 is exchange

8    between --

9              MR. BUCHANAN:  It's E1876,

10        Corey.

11        Q.    It's an exchange between an

12   individual named David Kerr and a host of

13   folks.

14             Pretty senior guy, right?

15        A.    Senior vice-president, yes.

16        Q.    Senior vice-president commercial

17   business for Endo at that point in time,

18   correct, sir?

19        A.    Yes.

20        Q.    Okay.  And I'd like to direct

21   your attention to dot-387.  It's a

22   presentation.

23             And it may be faster on the

24   screen.  You have my --

 1              MR. STERN:  I'm sorry.  Dot-387.

 2              MR. BUCHANAN:  Dot-387.  There's

 3       a series of presentations in this.

 4              MR. STERN:  I see.

 5       BY MR. BUCHANAN:

 6       Q.    It's a Power Point entitled

 7       "Percocet history time and events in the

 8       news media."

 9              You see that, sir?

10       A.    Yes.

11              What tab am I on?

12              MR. STERN:  38 -- you're Tab 13

13       and then way toward the back -- near

14       Tab 14.  Go all the way -- you're

15       looking for this number.

16              THE WITNESS:  Yeah, I have it.

17       Okay.

18       BY MR. BUCHANAN:

19       Q.    You should see the same thing in

20       your binder that you see on the screen.

21       A.    Okay.

22       Q.    Can you just confirm for me that

23       you do?

24       A.    I do.

1    Q.    Great.

2          Percocet history time and events

3    in the news media.

4          This is June 2006, right?

5    A.    Correct.

6    Q.    Let's at least orient ourselves.

7          We're in 2006 and if we can go

8    to dot-390, few pages down.  First bullet:

9    Percocet is ranked among the top 3

10   opioids, out of 14, to potentially abuse

11   as per OAS.

12         Do you see that, sir?

13   A.    Yes.

14   Q.    Your branded product, a product

15   that the collective entities Par,

16   Qualitest, and Endo sold many, many

17   billions of over the years, was one of the

18   top three opioids to potentially abuse,

19   correct, sir?

20         MR. STERN:  Objection to the

21    form; lack of foundation.

22   A.    According to the source.

23   Q.    Okay.  It says:  OxyContin is

24   the most commonly abused prescription

Highly Confidential - Subject to Further Confidentiality Review

1    opioid analgesic while oxycodone

2    preparations like Percocet are ranked

3    third.

4             Did I read that correctly, sir?

5    A.    Yes.

6    Q.    (Reading) From 2000 to 2002,

7    oxycodone and hydrocodone accounted for

8    approximately 70 percent of all narcotic

9    analgesic drug abuse.

10            Did I read that correctly?

11   A.    Yes.

12   Q.    So, in that three-year period of

13   time, the products that we've talked

14   about, Percocet, OxyContin, Vicodin,

15   accounted for 70 percent of all narcotic

16   analgesic drug abuse, right, sir?

17            MR. STERN:  Objection to the

18        form; lack of foundation.

19   BY MR. BUCHANAN:

20   Q.    You could answer.

21   A.    I don't know the answer to that.

22   I see this.  I -- I -- again, I see it

23   from -- coming from the source that you've

24   put in front of me.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And the source would be a Power

2     Point of the company, correct?

3     A.    Yes.

4     Q.    Prepared in or around June of

5     2006, right?

6     A.    Yes.

7     Q.    Drawing on something from the

8     DEA's National Forensic Laboratory

9     information, correct, sir?

10    A.    Correct.

11    Q.    And we could agree, sir, that we

12    looked at the extended unit charts sales a

13    few minutes ago, tens of billions of

14    oxycodone and hydrocodone preparations

15    sold by quar -- excuse me.  Par, Qualitest

16    and Endo over the years.

17          Correct?

18    A.    Based upon purchase orders from

19    the wholesalers, yes.

20    Q.    Okay.  Let's go to dot-395, sir.

21          Your drug with a brand name

22    Percocet has got street names, right?

23          MR. STERN:  Objection to the

24          form; lack of foundation.

1    A.    I don't know that to be the

2  case.

3    Q.    Well, we see certainly the

4  company in 2006, sir, noting that your

5  drug Percocet and Percodan has got street

6  names, right?

7         MR. STERN:  Objection to the

8    form.

9    A.    According to this Power Point

10  presentation, yes.  I see it.

11    Q.    When something's got a street

12  name, what's that mean to you, sir?

13    A.    That the -- the product could be

14  misused or illegally used.

15    Q.    That it's got some value on the

16  street, right?

17         MR. STERN:  Objection to the

18    form; lack of foundation.

19    A.    I know that it's misused and

20  it's legally used.

21    Q.    And you had some street names

22  for yours, Percs and Percies, right?

23         MR. STERN:  Objection to the

24    form.

1    A.    That's what the Power Point

2    presentation indicates.

3    Q.    Okay.  And oxycodone products,

4    we saw your company's made those over the

5    years, right?

6    A.    Correct.

7    Q.    They had names like hillbilly

8    heroin, right?

9         MR. STERN:  Objection to the

10        form; lack of foundation.

11    A.    That's what the presentation

12    indicates.

13    Q.    And the presentation by Endo --

14    A.    Correct.

15    Q.    -- in terms of its Percocet

16    history in 2006, correct, sir?

17    A.    That's what it says, yes.

18    Q.    Now, this abuse with Percocet,

19    it happened for good reason, right?

20        MR. STERN:  Objection to the

21        form.

22    A.    I'm not sure I understand your

23    question.

24    Q.    There's an explanation for why

1   this was happening.

2          Is that right, sir?

3          MR. STERN:  Objection to the

4   form.

5   A.    I'm not sure.

6   Q.    In the early 2000s, sir, as Endo

7   was getting started, shortly after the JV

8   spun it out in DuPont and Merck, you were

9   pushing Percocet to drive revenue to grow

10  this business into a real business, right?

11         MR. STERN:  Objection to the

12  form.

13  A.    I -- I do not know the answer to

14  that question at all.

15  Q.    Would it surprise you to know,

16  sir, that you were pushing the dose higher

17  and pushing it longer?

18         MR. STERN:  Objection to the

19  form.

20  BY MR. BUCHANAN:

21  Q.    To grow revenue?

22         MR. STERN:  Objection to the

23  form.

24  A.    I don't know the answer to that

1    question.

2         Q.    Nothing you heard before you sat

3    down today?

4         A.    Never heard that before.

5         Q.    Okay.  Let's look at Exhibit 14.

6              (Campanelli Exhibit 14,

7         document, was marked for

8         identification, as of this date.)

9    BY MR. BUCHANAN:

10        Q.    All right.  This is a Power

11   Point from 2001, sir.  Few years after

12   Endo was formed out of DuPont Merck.

13             And to make sure we're clear,

14   Percocet was one of the brands that Endo

15   was formed with, right?

16        A.    Yes.

17        Q.    Okay.  When the company was

18   formed, it took Percocet from the DuPont

19   Merck joint venture, right?

20        A.    My understanding in 1997 when

21   the new company was formed, Percocet came

22   with the new entity.

23        Q.    And Endo started blowing it out,

24   right?

1          MR. STERN:  Objection to the

2     form.

3     A.    My understanding is that Endo

4     started to promote the product in some --

5     some period of time in that -- in that

6     time frame that you're referencing to.

7     Q.    I mean, they came out with new

8     formulations, right?

9          MR. STERN:  Objection to the

10    form; lack of foundation.

11    A.    I don't know that.

12    Q.    I'm going to pass you what we're

13    marking as Exhibit 12, sir, see if this

14    refreshes your recollection.

15          Here you are, sir.

16          (Campanelli Exhibit 212,

17    document, was marked for

18    identification, as of this date.)

19          MR. BUCHANAN:  212 is the

20    demonstrative.

21    BY MR. BUCHANAN:

22    Q.    You see before you a history of

23    Endo and its major drugs, sir?

24    A.    I see it.

1     Q.     Okay.  So, Percocet's approved

2     in the mid '70s, according to this, sir,

3     correct?

4     A.     Yes.

5     Q.     In the late '90s, after Endo is

6     kind of formed out of the Merck DuPont JV,

7     they bring out a bunch of new formulations

8     of Percocet, right?

9           MR. STERN:  Objection to the

10          form; lack of foundation.

11    A.     I see additional strengths.

12    Q.     Two-and-a-half milligrams, 5

13    milligrams, 7-and-a-half milligrams, 10

14    milligrams.  All in 1999, right?

15    A.     I see three additional strengths

16    here, yes.

17    Q.     2001 they bring out some high

18    dose Percocets.

19           You see that?

20    A.     I see the 10 milligram in

21    combination with 327 milligrams of APAP,

22    yes.

23    Q.     When I say "high dose," I mean,

24    they bring out a 10 milligram oxycodone

1    component, right?

2         A.    That component was introduced in

3    1999, but I see it, yes.

4         Q.    Okay.  Well, they bring it out

5    with a lower acetaminophen component,

6    right?

7         A.    Correct.

8         Q.    And, so, Endo, shortly after

9    it's formed, comes out with Percocet in

10   multiple different formulations, right?

11        A.    Yes.

12        Q.    Okay.  Higher strength of

13   oxycodone, right?

14        A.    I see it.

15        Q.    Double the strength of oxycodone

16   in Percocets, right?

17             MR. STERN:  Objection; form,

18        lack of foundation.

19        A.    I see increased strengths.

20        Q.    Right.  Increase going from 5 to

21   10.  Doubling the strength, right?

22        A.    I see a higher dosage.

23        Q.    Okay.  Let's look back now to

24   Exhibit 14, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              This is 2001.  2002 strategy
 2    review.  Talking about the Percocet
 3    business plan and marketing strategy,
 4    right?  You see that?
 5        A.     Okay.
 6        Q.     I'm on dot-7.
 7        A.     Okay.
 8        Q.     And we'll see Percocet key
 9    targets.  Message, second item:  Push dose
10    higher.  Use longer.
11              Right?
12        A.     I see it.
13        Q.     And, look, if you can drive the
14    dose up, you get more money on the higher
15    dosages, right?
16        A.     I don't know how the products
17    were -- I don't know how the products were
18    priced back in 1999.
19        Q.     And if you use it longer, for
20    longer periods of time, that's more pills,
21    right?
22              MR. STERN:  Objection; lack of
23        foundation.
24        A.     I'm sorry.  Could you just
```

1    repeat that?

2        Q.    Yeah.

3            If you're pushing the dose

4    higher and you're using longer, you're

5    going to make more money, right?

6            MR. STERN:  Objection to form;

7        lack of foundation.

8        A.    If the patient has a need at a

9    longer period of duration, presumably,

10   yes, you're going to be making more sales.

11       Q.    Right.

12           Let's go to dot-11, please.

13           You're targeting OxyContin

14   writers, right?

15           MR. STERN:  Objection to the

16       form; lack of foundation.

17   BY MR. BUCHANAN:

18       Q.    Percocet key targets.  Target

19   the OxyContin writer.

20           See that?  Large OxyContin

21   writers.  Top of the page, sir, dot-11?

22       A.    I see it.

23       Q.    Pain specialists and primary

24   care, right?

1    A.    That's who the team's calling

2    on.

3    Q.    Okay.  And your message to them

4    was to start using Percocet in chronic

5    pain patients, right?

6          MR. STERN:  Objection to the

7          form; lack of foundation.

8    A.    So, I don't know what all the

9    facts are going on here in the strategy

10   that's going on, but we -- we do also know

11   is in the early 2000s is that we do have

12   an APAP issue going on.  And I can see,

13   again, that in 1999, they introduce, or

14   Endo introduced a 650 milligram APAP

15   strength and then came out and reduced it.

16   So there may be some connection of safety

17   tied back to acetaminophen.

18   Q.    Okay.  Increase Percocet daily

19   oxycodone dosage from 60 milligrams to 120

20   milligrams.

21         Right?

22   A.    I see that.

23   Q.    Okay.  We talk about oxycodone.

24         Oxycodone has a higher Morphine

Highly Confidential - Subject to Further Confidentiality Review

1    equivalent than hydrocodone, right?

2        A.    It does.

3        Q.    So 120 milligrams, if we use

4    Morphine equivalents, that would be 180

5    milligrams?

6        A.    That's right.  But also, as I

7    can see here, looking at the next bullet,

8    that there is certainly concern with --

9    with acetaminophen.  And hence, it looks

10   like the reason that the company may have

11   reduced the -- the acetaminophen dosages.

12       Q.    Yeah.  And I'm actually focused

13   on the company pushing doses higher.

14             You see that, sir?  And, so, the

15   place where the company is pushing the

16   doses higher is on oxycodone, right?

17             MR. STERN:  Objection; form;

18        lack of foundation.

19       A.    What I see here is an increase

20   in the -- the oxycodone strength and a

21   decrease in the APAP strength.

22       Q.    Right.

23             So the answer to my question

24   would be the dose that's being increased

Highly Confidential - Subject to Further Confidentiality Review

1    is oxycodone, correct?

2          A.    Correct.

3          Q.    Okay.  So it says:  Increases

4    Percocet daily oxycodone dosage from 60 to

5    120.

6                Right?

7          A.    Yes.

8          Q.    Doubles it?

9          A.    It doubles the Morphine and also

10   cuts the acetaminophen in half.

11         Q.    Right.

12               And, so, 120 milligrams of

13   oxycodone, I think you told us earlier,

14   would convert out to 180 milligrams of

15   Morphine equivalent, right?

16         A.    Three-to-one.

17         Q.    On oxycodone?

18               I just want accurate testimony,

19   sir.  I don't want to -- I thought you

20   told us the conversion before was

21   three-to-one on oxymorphone and

22   one-and-a-half-to-one on oxycodone.

23         A.    I apologize.  Correct.

24         Q.    That's fine.  I just want to

1    make sure we're communicating.

2            All right.  So we can fairly

3    understand this, the company was trying to

4    push patients from 60 milligrams as the

5    maximum daily dose to 120 milligrams of

6    maximum daily dose, correct?

7            MR. STERN:  Objection to the

8        form; lack of foundation.

9        A.    I don't know the person that

10   wrote this.  I don't know the intentions

11   of their words.  I certainly see the word

12   "push," but I also see in here a -- a --

13   certainly a concern in improved safety

14   with respect to acetaminophen.  So, I see

15   the words, but these -- I don't know the

16   person that wrote this Power Point

17   presentation, why they chose their words.

18       Q.    Okay.  Let's go to dot-13, sir.

19            MR. BUCHANAN:  And I'll move to

20       strike that.

21            THE WITNESS:  Okay.

22   BY MR. BUCHANAN:

23       Q.    Target pharmacists.  Message.

24            What's the second message for

1    this target audience of Percocet?

2         A.    It says:  Push doses -- push

3    dose higher.  Use longer.

4              And of course above it you can

5    see the efficacy and reduction of APAP.

6         Q.    And if we go to dot-16, sir, we

7    see "Opportunities."  There we go.

8         A.    Okay.

9         Q.    (Reading) Utilize higher doses

10   with new Percocet.

11             Right?

12        A.    Can I study this for a second,

13   sir?

14        Q.    Yes.

15        A.    So, we're on the SWOT?

16        Q.    We're on the SWOT analysis,

17   strength, weaknesses, opportunities,

18   threats.

19             You see that?  We're on the

20   bottom left corner "Opportunities."

21        A.    I see it.

22        Q.    Something you guys do in

23   companies, do these SWOT analyses?

24        A.    Yes.

1    Q.    Okay.  Opportunities.  Utilize

2    higher doses with new Percocet.

3          That was an opportunity, right?

4    A.    As it's listed here, correct.

5    Q.    Also utilize in chronic pain,

6    right?

7    A.    Correct.

8    Q.    'Cause Percocet was an

9    immediate-release product, right?

10   A.    Yes.

11   Q.    And the opportunity here is to

12   start using it, or to utilize chronic

13   pain, to the right?

14         MR. STERN:  Objection to the

15   form; lack of foundation.

16         MR. BUCHANAN:  Withdrawn.

17   BY MR. BUCHANAN:

18   Q.    What's written here as an

19   opportunity is utilize chronic pain,

20   right?

21   A.    That's what it states.

22   Q.    But you also wanted to not just

23   get moderate severe pain, or moderately

24   severe pain.  You also wanted to push the

Highly Confidential - Subject to Further Confidentiality Review

1    market for Percocet to mild pain.

2             Right?

3             MR. STERN:  Objection to the

4        form; lack of foundation.

5             This isn't a 30(b)(6),

6        Mr. Buchanan.

7        A.    I don't know -- I don't know the

8    team, the people that -- that put this

9    presentation together.  I don't know

10   exactly what they're trying to do here.

11       Q.    Okay.  Well, let's look at

12   dot-34.

13            Percocet chronic pain position.

14            Do you see that, sir?

15       A.    Yes.

16       Q.    And it's noting expand usage

17   from moderate, moderately severe into mild

18   and moderate pain, right, sir?

19       A.    I see it.

20       Q.    Okay.  Do you know whether

21   Percocet, sir, was indicated for mild to

22   moderate pain?

23       A.    I don't believe it is.

24       Q.    Okay.  You can set that aside,

Highly Confidential - Subject to Further Confidentiality Review

 1    sir.

 2              I'd like to talk about how the

 3    company set out to do this, to expand the

 4    usage, push the dose.

 5              Can you go, please, to --

 6              MR. BUCHANAN:  What's the tab on

 7       this?

 8              (Pause.)

 9              (Campanelli Exhibit 101,

10       document, was marked for

11       identification, as of this date.)

12    BY MR. BUCHANAN:

13       Q.    I'm passing you what we're

14    marking as Exhibit 101.  This is a Power

15    Point from 2002, an executive committee

16    presentation.

17              You see that, sir?

18       A.    Yes, I do.

19              MR. BUCHANAN:  It's E1870.

20    BY MR. BUCHANAN:

21       Q.    I'd like to just take you to

22    1870.4.  Percocet market development.

23              You see that, sir?

24       A.    Yes.

1    Q.    And you see the growth in this

2    market?

3              MR. STERN:  Objection to the

4         form; lack of foundation.

5    BY MR. BUCHANAN:

6    Q.    See the growth from 1998 to 2001

7    and the forecast for 2002, sir?

8    A.    I do.

9    Q.    1998 479 million, right?

10   Actually, I believe that's extended unit

11   TRX.

12             You see that?

13   A.    Yes.

14   Q.    Okay.  By 2001, it's grown, you

15   have all those new tablets and new

16   strength formulations, to 707, right?

17             MR. STERN:  Objection to the

18        form and lack of foundation.

19   A.    I see an -- I see an increase

20   here, yes.

21   Q.    And you see the growth rate

22   going from 1998 to 1999 grew the market 11

23   percent, right?

24             MR. STERN:  Objection to the

1          form and lack of foundation.

2     BY MR. BUCHANAN:

3          Q.    See that, sir?

4          A.    I see an increase in extended

5     units to eleven percent.

6          Q.    By 11.2 percent, correct?

7          A.    Correct.

8          Q.    Then year-over-year going to

9     2000, you see it grows another 15.9

10    percent, right?

11         A.    Yes.

12         Q.    Going to 2001, you see it grew

13    15 percent at 14.6 percent, right?

14              MR. STERN:  Objection to the

15         form; lack of foundation.

16         A.    I see the growth 14.6 percent in

17    the presentation.

18         Q.    And then in 2001, you're

19    forecasting almost 20 percent growth in

20    2002, correct?

21              MR. STERN:  Objection to the

22         form; lack of foundation.

23    BY MR. BUCHANAN:

24         Q.    And you got some key market

1    drivers and you list promotional efforts

2    on the right, right?

3              MR. STERN:  Objection to "you."

4         Objection to the form.  Objection to

5         the lack of foundation.

6              MR. BUCHANAN:  You can object,

7         counsel.

8         A.    I can see where the company was

9    targeting key market drivers.

10        Q.    Yep.

11             Promotional efforts is one of

12   the items, right?

13             MR. STERN:  That's objection to

14        the word "you."  Not objection to you

15        personally.

16             MR. BUCHANAN:  You may have had

17        both objections, but that's fine.

18   BY MR. BUCHANAN:

19        Q.    Promotional efforts is one of

20   the market drivers, right?

21        A.    Appears to be, yes.

22        Q.    And beneath that it says the

23   average prescription size is increasing,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I see that.

 2          Q.     Okay.  Let's go, please, to

 3     dot-27.

 4                 We see a chart.

 5          A.     Can you just give me a little

 6     time?

 7          Q.     Sure.

 8          A.     I apologize.

 9          Q.     Sure.

10                 Do you have the page?  I want to

11     make sure --

12          A.     I'm good.

13          Q.     Good.  Dot-27.

14          A.     I see it.

15          Q.     Okay.  Percocet with high

16     strength P&L.

17                 You see that?

18          A.     Yes.

19          Q.     That's a business term for

20     profit and loss.

21                 Is that right?

22          A.     Correct.

23          Q.     Okay.  So you got sales on the

24     left, right?
```

1    A.    Correct.

2    Q.    And you got the plan for future

3  years, right?

4    A.    I can see the estimate, yes.

5    Q.    And, so, cost of goods, that's

6  what it costs to make the stuff?

7    A.    Yes.

8    Q.    Okay.  And, so, 10 percent of

9  what you charge for it is what it costs to

10  make it, right?

11    A.    It's looking at something like

12  this has to be an estimate, yes.

13    Q.    Okay.  And you're spending as

14  much on your sales force to go out and

15  push this to doctors that you're spending

16  to make the pills, right?

17         MR. STERN:  Objection to the

18     form; lack of foundation.

19  BY MR. BUCHANAN:

20    Q.    Actually a little more.

21         MR. STERN:  Objection to form;

22     lack of foundation.

23    A.    Again, this looks like an

24  incredibly high level P&L when I see in

1  percents like this.

2      Q.    My question to you, sir, does it

3  reflect the cost of goods to be the same

4  as what you're going to pay your sales

5  force?

6      A.    For the first two -- for the

7  first two years, it appears to be the

8  same.

9      Q.    Okay.  Let's go to dot-11, sir.

10         This notes:  Continued expansion

11  of Percocet into acute and chronic

12  markets.

13         Do you see that second item?

14     A.    I'm sorry.  Could you repeat the

15  question?

16     Q.    Yeah.  The second item says:

17  Continued expansion of Percocet into acute

18  and chronic markets.

19         Do you see that, sir?

20     A.    I see that.

21     Q.    Okay.  Those dollars you spend

22  on sales force and those new strengths and

23  pushing the dose higher and pushing it

24  longer, it worked, right?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  Objection to the

2     form.

3          I'm sorry.  What page are we on?

4     Eleven?

5          MR. BUCHANAN:  I'm not asking a

6     question on that page, but that's

7     where I just was.

8          MR. STERN:  Okay.

9     A.    Could you repeat the question?

10    Q.    Sure.

11         Those dollars that you spent on

12    the sales force and the new strengths and

13    pushing the dose higher and pushing it

14    longer, that worked, right?

15         MR. STERN:  Objection to the

16    form; lack of foundation.

17    A.    Okay.  I would have to see an

18    entire P&L on the entire portfolio to

19    really get a good indication of what's

20    going on here.  I have no idea how this is

21    being allocated.  When it says higher

22    strength, I -- I'd have to see more data

23    than this to be able to really form an

24    opinion.  I'm seeing a super high what

1    looks like to be an allocation with --

2    with two strengths.

3        Q.    Sir, your company, this company

4    Endo, this is the company that Percocet

5    built?

6            MR. STERN:  Objection to the

7        form.

8    BY MR. BUCHANAN:

9        Q.    Right?

10           MR. STERN:  Lack of foundation.

11       A.    Percocet was a product in the

12   Endo portfolio.

13       Q.    It's the company that Percocet

14   built?

15           MR. STERN:  Objection to form;

16       lack of foundation.

17   BY MR. BUCHANAN:

18       Q.    Right?

19       A.    Amongst other products.

20           MR. BUCHANAN:  Could I please

21       have Exhibit 15?

22           (Campanelli Exhibit 15,

23       document, was marked for

24       identification, as of this date.)

1    BY MR. BUCHANAN:

2        Q.    Go to tab 15, please.  Now we're

3    back to your binder, sir.  Tab 15.

4        A.    Sorry.

5        Q.    You can set that one aside.

6              Endo commercial -- Endo

7    Commercial Capabilities Overview from

8    Jeremy Goldberg, managing director of

9    corporate development.

10             You see that, sir?

11       A.    Yes.

12       Q.    I'd like to direct you to page

13   14, dot-14.

14             Could you read the title of the

15   slide for us?

16       A.    It says "The Company that

17   Percocet built."

18       Q.    The company that Percocet built.

19             What is the name of the company,

20   sir, in the bottom right corner of this

21   slide?

22       A.    It is Endo.

23       Q.    The company that Percocet built.

24             Isn't that right, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  Objection to the

2     form; lack of foundation.

3          You can say what the slide says.

4     A.    That's what the slide says.

5          I don't know who Jeremy Goldberg

6   is.  I don't know if this is a corporate

7   position or an individual position.

8     Q.    Okay.  Percodan and Percocet,

9   you recognize those two items.  We've

10   talked about them a little bit.

11          Two big brands of Endo at this

12   point in time, correct, sir?

13     A.    As I said, I'm familiar with

14   Percocet.

15          I am not familiar with Percodan.

16     Q.    Okay.  And if we went down to

17   the patent and trademark office, sir, we'd

18   go in and we could look for these words

19   and they would say they're registered

20   trademarks of your company, correct?

21          MR. STERN:  Objection to the

22     form; lack of foundation.

23     A.    I won't doubt that they are --

24   they're licensed to Endo.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It's got that R with a circle

2    next to it which means it's a registered

3    trademark, right?

4    A.    Yes.

5    Q.    A trademark of Endo, correct?

6    A.    I don't have reason to doubt it.

7    Q.    Then and now, right?

8    A.    I don't have reason to doubt it.

9    Q.    Okay.  Product was first

10   launched by DuPont in 1976, right?

11   A.    Percocet.  Is that what you're

12   referring to?

13   Q.    Percocet, yes.

14   A.    That's what it says.

15   Q.    Okay.  And Endo grew it from 40

16   million dollars to 214 million dollars in

17   2003, right?

18        MR. STERN:  Objection; lack of

19        foundation.

20   A.    That's what the presentation

21   says.

22   Q.    Approximately 77 percent of

23   prescriptions for oxycodone with

24   acetaminophen are written as what, sir?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Percocet, according to IMS.

2    Q.    Percocet, right?

3    A.    That's what it says.

4    Q.    Okay.  Let's go, please, to

5    dot-15.

6          The company that Percocet built

7    also the company that built Percocet,

8    right?

9          MR. STERN:  Objection to the

10         form; lack of foundation.

11   A.    Again, I don't know if this is a

12   corporate message, if this is an

13   individual message.

14         If you flip the page, it says

15   something very similar in terms of what's

16   going on in the future with Lidoderm.

17         There is just a lot of things

18   happening.  It may be an individual making

19   a statement.  I don't know if this is a

20   corporate statement.

21   Q.    Okay.  Well, we know what it

22   says, sir.  The company that built

23   Percocet, right?

24   A.    I'm saying that I see the words.

1    That could be a corporate development

2    individual's interpretation, not a

3    corporate -- a corporate interpretation.

4         Q.    Okay.

5         A.    I can see where it's switching

6    in the future to Lidoderm.

7         Q.    And what we see here, sir, is

8    under the company that built Percocet,

9    really the success, you, your company had,

10   growing it from the late '90s til the end

11   of this chart, is that 2003?

12        A.    That's what it says.

13        Q.    Prior chart said it started at

14   40 million, right?  Prior slide we were on

15   said when you took it over from DuPont it

16   was at 40 million?

17        A.    It said first launched by

18   DuPont.  Then it says grew from 40

19   million.

20        Q.    We see between 1999 at 300

21   million in Percocet sales.  As of the end

22   of 2003, you're over 700 million of

23   Percocet sales, correct?

24        A.    I'm not sure.  This is IMS data,

Highly Confidential - Subject to Further Confidentiality Review

1    sir.  I'm not sure what we're looking at

2    here.

3              We've got to look at that --

4    that white chart.  This is -- I think this

5    is according to IMS data.  This is, I

6    don't believe, is Endo, so.

7         Q.    I see.

8              So, what you're saying, sir, is

9    that this is -- these are maybe

10   prescriptions rather than dollars?

11        A.    No.  I'm not saying that.  I

12   can't see the -- the Y axis very well, and

13   I believe that says IMS in thousands or

14   millions.  So, I don't believe these are

15   representation of actual Endo sales.  If

16   it's IMS, it would be X factory sales.

17        Q.    So, what we're looking at, sir,

18   is we know what we can tell from the chart

19   is that as of 1999, last quarter of 1999,

20   it's roughly 300, if that's TRX is in

21   thousands, right?

22              MR. STERN:  Objection to the

23        form; lack of foundation.

24        A.    Again, I'm not sure what we're

1    looking at here because it's confusing.

2          So, and I see -- I see what you

3    pointed me to in the previous slide at 250

4    million dollars in 2003.  And, again, I

5    need to study this thing very closely.

6    But if I go to 2003 on this bar chart

7    here, it certainly is well beyond 214

8    million dollars.

9          So, are these IMS sales or TRXs?

10   I can't tell by the Y axis.

11      Q.    The legend in the document as

12   produced to us, sir, reflects it what it

13   reflects.  I agree with you it looks like

14   it says something like TRX or RX in

15   thousands.

16      A.    Okay.

17      Q.    Do you agree?

18          MR. STERN:  Are we talking about

19      the thing on the Y axis?

20          MR. BUCHANAN:  On the bottom,

21      yeah.

22   BY MR. BUCHANAN:

23      Q.    Doesn't look like dollars,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm speculating.  It looks like

2  TRX.

3              MR. STERN:  Don't do that.

4              THE WITNESS:  I apologize.  I

5        shouldn't speculate.

6  BY MR. BUCHANAN:

7    Q.    That's fine.

8              And I think we can both agree,

9  sir, that the prior slide had dollars.

10  The one we were looking at, the slide went

11  from 40 to 214 million in 2003, correct?

12    A.    I agree that it went to 214

13  million in 2003.  I don't know what the

14  starting point is.

15    Q.    Fair enough.

16              Then when we look at this slide

17  with the legend clipped, whatever the

18  legend is on the left has roughly doubled

19  between 1999 in terms of its RXs, TRXs,

20  where it was for the first quarter to

21  where it is at the end of 2003, correct,

22  sir?

23    A.    Again, it's not a fair

24  representation.  You're carving one

1    quarter of two -- of 1999 and then you're

2    carving specific quarters in the following

3    years.

4              You have to actually break this

5    thing out, layer it on top.  You've got

6    one quarter of 1999 here, sir.  So add

7    three more quarters in there.  I'm not

8    sure you're doubling.

9         Q.    Okay.  Sir, I have not done

10   anything, sir.  This is the -- this is the

11   deck that was prepared by the Endo folks.

12   The deck that was given to us in the form

13   that it was given to us.

14             What we can agree, sir, is that

15   the data that is reflected on this slide

16   reflects what it reflects, but the title

17   of this slide we can both read and not

18   dispute, right?

19        A.    Agreed.

20        Q.    That says "The company that

21   built Percocet."

22             Correct?

23        A.    It says "The company that built

24   Percocet."

Highly Confidential - Subject to Further Confidentiality Review

 1              And the following slide says
 2    "The company that is building Lidoderm."
 3              So I'm not sure what this person
 4    is doing here.
 5              MR. BUCHANAN:  So, counsel, I
 6        don't know what you want to do
 7        timewise.
 8              MR. STERN:  It's totally up to
 9        you.
10              MR. BUCHANAN:  I'm going to go
11        into a new area.  If we're ready for a
12        break and that's fine for the witness
13        and you, that's fine.
14              MR. STERN:  Let me ask Mr.
15        Campanelli, do you have a preference?
16              THE WITNESS:  Do you want to do
17        a quick break and come back?
18              MR. STERN:  Sure.  A quick break
19        and come back or a lunch break?
20              THE WITNESS:  I'm fine.  I'll
21        do -- let's do a bio break and keep
22        going.
23              MR. BUCHANAN:  Let's do a bio
24        break and do another hour.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  The last five was

2     ten.  We'll try to keep it to that.

3          MR. BUCHANAN:  That's fine.

4          THE VIDEOGRAPHER:  Stand by,

5     please.  Remove your microphones.

6          The time is 12:23 p.m.

7          Off the record.

8          (Recess taken.)

9          THE VIDEOGRAPHER:  We are back

10    on the record.

11         The time is 12:37 p.m.

12    BY MR. BUCHANAN:

13    Q.    Mr. Campanelli, we are back on

14    record.  You're still under oath.

15         Are you ready to proceed?

16    A.    Yes.

17    Q.    Okay, great.

18         We were looking at a

19    presentation a moment ago, Exhibit 15,

20    entitled "Endo commercial capabilities

21    overview."

22         Do you recall that?

23    A.    Yes.

24    Q.    Tab 15 in your binder.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Is that where you want me to go?

2    Q.    If you could real quick, just to

3  keep us oriented.

4    A.    Okay.

5         MR. STERN:  I'm sorry.  I

6    apologize.  Tab 15?

7  BY MR. BUCHANAN:

8    Q.    Okay.  And the way this was

9  produced to us, sir, is with an e-mail and

10  an attachment.

11         MR. BUCHANAN:  What I'd like to

12    do is ask my tech, if you could, to

13    pull up the Bates number for the file

14    so that we can tie it back to the

15    production so there's no dispute.

16         And for the record, the Bates

17    number of the file we were just

18    looking at is

19    ENDO_OPIOID_MDL_01139611.

20  BY MR. BUCHANAN:

21    Q.    Okay.  And, what I'd like to do,

22  sir, because there was some question about

23  who wrote this and -- and the

24  communications around it, is give you, if

1    I could, the e-mail to which it was

2    attached (handing.)

3            (Campanelli Exhibit 102, e-mail,

4       was marked for identification, as of

5       this date.)

6    BY MR. BUCHANAN:

7       Q.    Passing you what we've marked as

8    Exhibit 102 to your deposition.  It's an

9    e-mail thread among Mr. Goldberg.  We saw

10   him noted on the -- on the presentation.

11           You recall that?

12      A.    Yes.

13      Q.    With several folks.  The latest

14   in time e-mail indicates it's from 2005.

15           Correct?

16      A.    Yes.

17      Q.    And it's talking about a Biovail

18   meeting is the attachment and follow-up to

19   yesterday's meeting.  And he's sending it

20   out to his team.

21           You see that?

22      A.    Yes, I see -- I see -- I see his

23   name and who he sent it to.

24      Q.    Okay.  And Mr. Goldberg sends it

1    off to Caroline Manogue, right?

2        A.    Correct.

3        Q.    And then to a Peter Lankau?

4        A.    Right.

5        Q.    Peter Lankau, do you know who he

6    was?

7        A.    Yes.

8        Q.    Who was he?

9        A.    Former CEO.

10       Q.    Okay.  So this presentation that

11   we just were talking about before the

12   break, the company that Percocet built,

13   the company that built Percocet, was had

14   in communication between this person

15   managing director corporate development to

16   I guess the general counsel and also the

17   CEO.

18            Is that right?

19            MR. STERN:  Objection; lack of

20       foundation, unless I'm missing

21       something.

22       A.    So, Caroline Manogue, to my

23   understanding, was general counsel.

24       Q.    Okay.  So, does that help orient

1    you, sir, in terms of the communication

2    that was had around this presentation back

3    in 2005?

4        A.    Again, when you say "orient,"

5    understanding that -- that I see words on

6    paper.  I see Jeremy Goldberg.

7            I don't know any of these

8    people, and I don't know exactly what's

9    going on here.  But Caroline Manogue, at

10   one time, was general counsel.  At one

11   time, Peter Lankau was CEO.

12       Q.    And it was a presentation that

13   was actually used in a meeting with

14   Biovail in 2005, right?

15       A.    Can you help me out.  You're

16   saying Biovail?

17       Q.    Biovail meeting 10/6/2005.

18            You see that as the attachment?

19       A.    I'm sorry, yes.  I see Biovail

20   meeting.  Yes.  I apologize.

21       Q.    And it says:  Team.  This is

22   what we sent to Bobcat as a follow-up to

23   yesterday's meeting.

24            Right?

Highly Confidential - Subject to Further Confidentiality Review

```
1     A.    Yes.

2     Q.    All right.  Now, what I'd like

to do, because there was some debate about

the legend on that page, we were in

dot-15.

6           Remember that chart?

7     A.    Yes.

8     Q.    Where we couldn't really read

the Y axis.  I'm told that if we pull up

the native file, we can actually read it a

little better.

12          Do you see it on your screen

now, sir?

14    A.    Yes.

15    Q.    Okay.  And so that legend on the

Y axis we were trying to understand, what

is it?

18    A.    Total scripts.

19    Q.    Okay.  So total scripts in

thousands?

21    A.    I -- I -- yes.

22    Q.    Okay.  So, total scripts in

thousands.  This is the slide, again, that

was on the printed page dot-15, the
```

Highly Confidential - Subject to Further Confidentiality Review

1    company that Percocet -- the company that

2    built Percocet.

3              Correct?

4        A.    That's right.

5        Q.    Okay.  And what we see here as

6    of late '99, we see total RXs as of then

7    about 300,000, right?

8        A.    What we're seeing is one quarter

9    of prescription data in 1999.

10       Q.    Okay.

11       A.    And then we're seeing four

12   quarters of data of prescription data in

13   two thousand -- 2000 through 2002 and then

14   a partial year in 2003.  So I --

15       Q.    You don't understand these, sir,

16   to be quarterly data?

17             What does the X axis indicate

18   for each of the data points, sir?

19       A.    It says quarter November.

20             I don't know what it -- if

21   it's -- I don't know if it's a moving

22   annual total.  I --

23       Q.    Okay.

24       A.    Because it's unusual the way

1    they're -- okay.

2        Q.    What's reflected in the X axis,

3    sir, is quarterly data points across a

4    four-year period of time, correct?

5        A.    Yeah.  As I look at it now, it

6    must be a moving annual total on a

7    quarterly basis.

8        Q.    So, we have quarterly total as

9    of '99 of 300 total RX.

10           Correct, sir?  Do you see that

11   RX?

12       A.    I see that.

13       Q.    Okay.  And quarterly total as of

14   November '03 of roughly 700,000 total RX,

15   correct?

16       A.    Correct.

17       Q.    Okay.  Well, regardless of the

18   language, sir, the company that Percocet

19   built or the company that built Percocet,

20   there's no debate, as you understand

21   Endo's history, sir, that Endo was very

22   much a pain management company, correct?

23       A.    Endo had a focus on pain.

24       Q.    And at that point in time, sir,

Highly Confidential - Subject to Further Confidentiality Review

1   the company saw great opportunity in the

2   pain market.

3            Fair?

4       A.    It was focused in the pain area.

5       Q.    In fact, the company saw

6   tremendous opportunity in pain more

7   broadly, right?

8            MR. STERN:  Objection to the

9       form; lack of foundation.

10      A.    I -- I don't know what that

11  means.

12      Q.    Well, pain management was a

13  tremendous growth area at that point in

14  time.

15           True?

16           MR. STERN:  I'm sorry.  What

17      year are we in?

18           MR. BUCHANAN:  Early 2000, sir.

19      A.    I'm sorry, counselor.  Are you

20  having me look at this chart again?

21      Q.    I'm not.  You can close the

22  exhibit or actually just flip the tab

23  forward so it doesn't distract you.

24           Fair enough.

1          Pain management was a tremendous

2     growth area in the early 2000s, true?

3          MR. STERN:  Objection; lack of

4       foundation; form.

5     A.     Looking at the documents here on

6     face value, not interacting with the

7     people, it appears as though it was a high

8     focus of Endo.

9     Q.    Okay.  Let's go to E139.  It's

10    Exhibit 16, sir.

11          From time to time, companies

12    like Endo --

13    A.     I apologize.  I don't think I

14    have an exhibit --

15          MS. SCULLION:  New binder.

16          MR. BUCHANAN:  Sorry.  Here you

17      go, sir (handing.)

18          THE WITNESS:  Should I --

19          MR. BUCHANAN:  You can set the

20      prior one aside.

21          MR. STERN:  You know what, I'll

22      take it from you, Paul.  I'm going to

23      take this off for just one second.

24          THE WITNESS:  Okay.

1            What tab would you like me to go

2       to, sir?

3            MR. BUCHANAN:  Probably the

4       first one in that.  It's Tab 16.  Or

5       hopefully it is.

6            MR. STERN:  Bear with me a

7       minute.

8            MR. BUCHANAN:  No worries.

9            (Pause.)

10   BY MR. BUCHANAN:

11       Q.    Do you see Tab 16?

12       A.    Yes.

13       Q.    An Exhibit 16 sticker on that

14   first page?

15       A.    Correct.

16            (Campanelli Exhibit 16,

17       document, was marked for

18       identification, as of this date.)

19   BY MR. BUCHANAN:

20       Q.    Looking at a presentation from

21   Endo Pharmaceuticals to Wachovia

22   Securities Nantucket Equity Conference.

23            Do you see that, sir?

24       A.    Yes.

1     Q.    And public companies, from time

2     to time, will go out and meet with

3     investors or meet with analysts and

4     present about their businesses, correct?

5     A.    Correct.

6     Q.    That's something you do today,

7     correct?

8     A.    Correct.

9     Q.    Something that Endo did then,

10    right?

11    A.    Apparently so, yes.

12    Q.    Okay.  This is from June 2002.

13          I'd like to take you to dot-7.

14    A.    Okay.

15    Q.    And in characterizing the

16    company's business, it reads:  Aggressive

17    pain focus.

18          Did I read that correctly?

19    A.    Correct.

20    Q.    (Reading) Pain management

21    represents a tremendous growth area.

22          You see that?

23    A.    That's what the words say.

24    Q.    (Reading) Growing at a

1  compounded growth rate of greater than 28

2  percent annually.

3          Right?

4     A.    That's what it says.

5     Q.    Okay.  Let's go to dot-11,

6  please.

7          In fact, compounded annual

8  growth rate of 31 percent, right?

9     A.    Between 1998 and 2001, that's

10  what it says.

11     Q.    Okay.  So, from 1998, sales into

12  the pain market were 1.6 billion dollars,

13  right?

14          MR. STERN:  Objection; lack of

15     foundation.

16     A.    I'm sorry.  Could you say it one

17  more time, sir?

18     Q.    Sir, this reflects that sales as

19  of 1998 for narcotic analgesics were 1.6

20  billion, right?

21     A.    According to IMS data, yes.

22     Q.    And now we're talking dollars,

23  right?

24     A.    These are dollars in billions as

1    of 1998, as reported by IMS.

2        Q.    And, you know, some two,

3    three-year period of time, sir, this

4    business segment, it's more than doubled,

5    right?

6            MR. STERN:  Objection; lack of

7        foundation.

8        A.    According to the IMS data, it

9    appears that it's doubled, more than

10   doubled.

11       Q.    Right.

12           And IMS is a data source you're

13   familiar with, right, sir?

14       A.    Yes.

15       Q.    I mean, you buy unlicensed data

16   from IMS all the time to get an

17   understanding of your customers, how

18   you're doing with your customers, et

19   cetera, right?  Your business segments?

20       A.    Okay.  My business segments,

21   yes.

22       Q.    Fair enough.

23           And you do that now at Endo,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Correct.

 2          Q.     You did it when you were at Par,

 3   right?

 4          A.     Correct.

 5          Q.     And you're not at all surprised

 6   to see IMS data reflected in the

 7   presentation from Endo from the early

 8   2000s as a data source they were using

 9   then, right?

10          A.     Correct.

11          Q.     When you were at Par in the

12   early 2000s, you guys were all licensing

13   and using IMS data, right?

14          A.     Correct.

15          Q.     Okay.  All right.  You can set

16   that aside.

17                 To be successful in this growth

18   area, in this new market of pain

19   management, or this growing market of pain

20   management, as a company, Endo needed to

21   move the market towards a change in the

22   treatment of pain?

23                 MR. STERN:  Objection to the

24      form; lack of foundation.
```

```
 1    BY MR. BUCHANAN:

 2         Q.    Right?

 3         A.    I have no idea.  I have no idea

 4    on that.

 5         Q.    Endo had to change the way docs

 6    were treating pain, right?

 7              MR. STERN:  Objection; lack of

 8         foundation; form.

 9         A.    I don't know the answer to that

10    question.

11              MR. BUCHANAN:  Can you put

12         Exhibit 17 on the screen, Corey?  It's

13         a video.  Just put it up on the screen

14         and pause it.

15    BY MR. BUCHANAN:

16         Q.    On the screen, sir, what I've

17    marked as 17 is the full footage of the

18    video.

19              For the record, what we're going

20    to supply, and I'd like the court reporter

21    to transcribe the portions that are

22    played, is an interview conducted with Ms.

23    Carol Ammon.

24              Do you know who she is?
```

```
 1        A.     She was the founder of Endo.

 2        Q.     She was the founder and also the

 3   CEO, right?

 4        A.     Correct.

 5        Q.     Okay.  So, she came out of the

 6   DuPont Merck joint venture in 1997, formed

 7   the company, and then ultimately brought

 8   it public a few years later?

 9        A.     That's my general understanding.

10        Q.     Okay.

11               MR. BUCHANAN:  Could we queue up

12        this particular video at 3:37, Corey?

13               MR. STERN:  And I'm just going

14        to object, Mr. Buchanan, to the

15        playing of an excerpt instead of the

16        full video.

17               MR. BUCHANAN:  If there's some

18        other portion you'd like to play, you

19        have the disk, and my tech would be

20        happy to assist you in doing so, if

21        you'd like.

22               Can we roll?

23               (Video recording played.)

24               "What we really needed to do is
```

 1          drive as much revenue as we could.

 2          And there were several essential

 3          ingredients in that.  One was really

 4          leveraging the customer base, and for

 5          us that's really getting physicians to

 6          be acquainted with our products, but

 7          more importantly it's getting

 8          physicians who are thought leaders

 9          that would not only talk about our

10          products, but would really start to

11          move the whole market towards a change

12          in pain management so we then could

13          take the profitability, we could have

14          cash, and then be able to invest in

15          new products that would go into that

16          changing landscape of pain

17          management."

18               MR. BUCHANAN:  Okay.  Let's

19          pause it there.

20      BY MR. BUCHANAN:

21          Q.    You recognize Ms. Ammon?

22          A.    Not by photo.  By name, yes.

23          Q.    The company's focus, sir, as you

24      heard from Ms. Ammon in these early years,

1    was to get docs who were thought leaders.

2         You heard her say that, right?

3    A.    That's what the -- that small

4    clip indicated.

5    Q.    To move the market, right?

6    A.    That's what was played.

7    Q.    Towards a change in pain

8    management, right?

9    A.    That's what she said, but I

10   don't know if she said something before or

11   after that gave a purpose as to why Endo

12   was looking to do that.

13   Q.    So they could then take the

14   profitability gained by doing that, have

15   cash, invest in new products that would

16   then serve the changed landscape of pain

17   management that the thought leaders helped

18   them change, right?

19   A.    I don't know if that's what she

20   said.

21        She said that they wanted to

22   reinvest in new products.

23        MR. BUCHANAN:  Can we play it

24   again, please?

1            (Video played.)

2            "What we really needed to do is

3       drive as much revenue as we could.

4       And there were several essential

5       ingredients in that.  One was really

6       leveraging the customer base, and for

7       us that's really getting physicians to

8       be acquainted with our products, but

9       more importantly it's getting

10      physicians who are thought leaders

11      that would not only talk about our

12      products, but would really start to

13      move the whole market towards a change

14      in pain management so we then could

15      take the profitability, we could have

16      cash, and then be able to invest in

17      new products that would go into that

18      changing landscape of pain

19      management."

20  BY MR. BUCHANAN:

21      Q.    Change the practice of pain

22  management.  The focus of the CEO of Endo

23  in its formative years.

24            Right?

1          MR. STERN:  Objection to the

2      form; lack of foundation.

3      A.    That's what she said.

4      Q.    Getting KOLs who were physicians

5   to really start to move the whole market

6   towards a change?

7          MR. STERN:  Objection to the

8      form; lack of foundation.

9      A.    Again, I don't know if she said

10  something before or after this video that

11  would have justified the change.

12     Q.    Can we agree, sir, that if a

13  drug company is going to set out to change

14  the landscape of pain management, it

15  better make sure the patients are going to

16  have better outcomes than before?

17         MR. STERN:  Objection to the

18     form; lack of foundation.

19     A.    She may be referring to putting

20  dollars into R&D to make improvements in

21  pain medications.  I don't know.

22     Q.    Okay.  What she said was they

23  were going to get physicians who are

24  thought leaders that would not only talk

1    about their products, but really start to

2    move the whole market towards a change in

3    pain management.

4             That's what you heard her say,

5    right?

6        A.    I heard her say that.

7        Q.    Okay.  Well, if you're going to

8    do that, you better darn well study and

9    make sure your drugs in this changed

10   market are going to bring better outcomes

11   for patients than the old way, right?

12            MR. STERN:  Objection to the

13       form; lack of foundation.

14       A.    Again, you played me a very

15   quick snippet of a video.  I don't know

16   what her intentions were.  I don't know if

17   there's something behind this.  She's

18   talking also about R&D.  I don't know what

19   her intentions are.  She may very well be

20   focused on new and improved medications.

21   I don't know.

22       Q.    Endo's vision in these early

23   years, the early 2000s, the company you're

24   currently CEO of, change the practice of

1    pain management, right?

2              MR. STERN:  Objection to the

3         form; lack of foundation.

4    BY MR. BUCHANAN:

5         Q.    Well, you've heard what she

6    said, right?

7         A.    I heard a very brief snippet of

8    a video.  I don't know what she said

9    before that, and I don't know what she

10   said after that.  I don't know the context

11   of that entire interview.

12        Q.    Let's see if we have some

13   documents that can further elucidate this,

14   sir.

15             Can you go, please, to --

16             MR. STERN:  Are we sticking with

17        the new binder here?

18             MR. BUCHANAN:  I thought we

19        were, but it looks like this is one

20        that's a standalone.

21             MR. STERN:  Okay.

22             (Campanelli Exhibit 103, e-mail,

23        was marked for identification, as of

24        this date.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    And, sir, what number do we have

3    on the bottom?

4        A.    103.

5        Q.    103, sir.

6              You see here an e-mail exchange.

7              MR. BUCHANAN:  Let's see 1256.

8        A.    Correct.

9        Q.    An e-mail exchange between Amy

10   Lohr and a bunch of folks.  It's a

11   business plan and kickoff meeting and

12   there's some presentations that are on

13   there.

14             You see that?

15       A.    Yes.

16       Q.    We see Peter Lankau's

17   presentation, right?

18       A.    Yes.

19       Q.    And I think you told us just a

20   moment ago, sir, he was the CEO?

21       A.    Correct.

22       Q.    And there's a number of

23   attachments here, but you can see from the

24   icons that there's only one Power Point

1    that's attached to this document, right?

2         A.    Yes.

3         Q.    Okay.  And that's Peter Lankau's

4    presentation.

5              True?

6         A.    That's what I would infer.

7         Q.    Okay.  So we saw Ms. Ammon and

8    her statements.  We now have Mr. Lankau's

9    statements.

10             Let's go to dot-6, please.

11             Endo pharmaceutical vision.

12             You see that, sir?

13        A.    Correct.

14        Q.    To drive the practice of pain

15   management.

16             You see that?

17        A.    Yes.

18        Q.    Okay.  And the way you were

19   going to do that, sir, is use a pyramid of

20   influence, right?

21        A.    I don't know what Endo was going

22   to do back then.

23        Q.    You were going to use national

24   advisory boards, pushing down the

1    specialty advisory boards, going to

2    regional outreach and CME programs and

3    grand rounds and fellowship programs and

4    education, all to get your message to

5    doctors every which way you could, right,

6    sir?

7         MR. STERN:  Objection to the

8         form; lack of foundation.

9         A.   I am sorry.  I wasn't there.  I

10   have no idea what Peter Lankau and his

11   team was planning on doing.

12        Q.   Okay.  Let's go back, please, to

13   Exhibit 15.

14             (Campanelli Exhibit 15,

15        document, was marked for

16        identification, as of this date.)

17   BY MR. BUCHANAN:

18        Q.   It's in the prior binder, but

19   I'm just going to pop this one slide up.

20   Maybe you can just work with that.

21             MR. BUCHANAN:  It's dot-36,

22        Corey.

23   BY MR. BUCHANAN:

24        Q.   Clinical development and

1    education.  I'll represent that's what

2    CD&E stands for, sir.  This is from that

3    same Power Point we were looking at that

4    went from Jeremy Goldberg to the CEO and

5    general counsel in 2005.  And talks about

6    their pyramid of influence.

7           You see that?

8    A.    I see possibilities here, yes.

9    Q.    Okay.  You understand this was

10   presented outside the company, right?  It

11   was that Biovail presentation we were

12   looking at a moment ago?

13          MR. STERN:  Objection; lack of

14     foundation.

15   A.    I don't know if it was or not.

16   Q.    Okay.

17          (Reading) CD&E pyramid of

18   influence, a coordinated approach.

19   Generate advocacy among national and

20   regional opinion leaders through advisory

21   boards.

22          You see that?

23   A.    Yes.

24   Q.    Next, establish treatment

1    algorithms in partnership with national

2    societies.

3              You see that?

4    A.    Yes.

5    Q.    Improve awareness among general

6    public via public health announce and

7    third party media relations.

8    A.    I see that.

9    Q.    And then initiate influence

10   mapping in order to identify key

11   influencers, right?

12   A.    I see that.

13   Q.    Okay.  And, so, when we look at

14   that pyramid, and it could be a little

15   challenging to read.

16        MR. BUCHANAN:  I don't know,

17        Corey.  Is it possible for you just to

18        get that triangle a little bigger so

19        we can read the words?

20        MS. JONES-McDONALD:  What page?

21        MR. BUCHANAN:  It's 244.3 -- I'm

22   sorry.  Dot-36.

23             Thank you.  That really helps.

24

1    BY MR. BUCHANAN:

2        Q.    So, we got national advisory

3    boards at the top of the pyramid, right,

4    this influencing -- influence mapping

5    pyramid?

6        A.    Correct.

7        Q.    Underneath that we got the

8    specialty advisory boards, right?

9        A.    Correct.

10       Q.    Then you got regional outreach,

11   right?

12       A.    Correct.

13       Q.    And these are the tentacles that

14   are going out into the community, right?

15       A.    Again, I'm looking at one slide

16   without looking at the entire deck.  I can

17   see it says:  See the possibilities.

18             So it looks like this is

19   something that's being considered.

20       Q.    Okay.  These tentacles include

21   the CME programs, right?

22       A.    I see it.

23       Q.    Grand rounds, right?

24       A.    I see the words.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Fellowship programs, right?

2    A.    Correct.

3    Q.    Pain education, right?

4    A.    Correct.

5    Q.    And grant support, right?

6    A.    I see the words.

7    Q.    Underneath that, broad scale

8  educational initiatives, right?

9    A.    I see that.

10   Q.    Influence mapping to physicians,

11  nurses and patients, right?

12   A.    That's part of the

13  possibilities.

14   Q.    Okay.  CD&E was about using

15  education to sell?

16        MR. STERN:  Objection to the

17    form; lack of foundation.

18  BY MR. BUCHANAN:

19   Q.    Right?

20   A.    That, I don't know.  I don't

21  know the answer to that.

22   Q.    Okay.  You know who Ms.

23  Kitlinski is, right?

24   A.    No, I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    She was the head of CD&E for, I

2    think, 15 years or so, from '98 to 2013?

3    A.    I wouldn't know that.

4    Q.    Okay.

5         (Campanelli Exhibit 104,

6    document, was marked for

7    identification, as of this date.)

8    BY MR. BUCHANAN:

9    Q.    Passing over what we're marking

10   as Exhibit 104, sir.

11        I apologize we're in and out of

12   the binder.

13        MR. BUCHANAN:  Corey, could you

14   pull up 1251, E1251?

15   BY MR. BUCHANAN:

16   Q.    All right.  So, this is a

17   clinical development and education 1999

18   objective.

19        You see that, sir?  It's on the

20   screen as well.  I don't know what's

21   easiest for you.

22   A.    Yes, I see it.

23   Q.    And the clinical development and

24   education group is going to partner with

Highly Confidential - Subject to Further Confidentiality Review

1   sales and marking to identify and

2   capitalize on educational opportunities,

3   right?

4           MR. STERN:  Objection; lack of

5       foundation.

6           MR. BUCHANAN:  It's item 1

7       Financial Performance, Corey.  Second

8       bullet.

9       A.    I see the words.

10      Q.    Okay.  Partner with sales and

11  marketing to identify, prioritize and

12  capitalize on educational opportunities

13  which drive attainment of what, sir?

14      A.    Sales quotas while optimizing

15  resource utilization.

16          MR. STERN:  And to be clear,

17      that was -- you were asking him to

18      read from the document, which he just

19      did.

20  BY MR. BUCHANAN:

21      Q.    Sales quota, correct, sir?

22      A.    Reading from the document, yes.

23      Q.    Next item says:  Work with sales

24  and marketing teams to leverage.

1    Leverage, right?  You see that?

2    A.    I see it.

3    Q.    Okay.  Educational programs for

4    incremental sales, right?

5    A.    That's what the words say.

6    Q.    So, using education to increase

7    sales, right?

8    MR. STERN:  Objection; lack of

9    foundation.  Other than what's on this

10   paper.

11   A.    I see where the -- I see where

12   the clinical group wants to partner with

13   sales and marketing.

14   Q.    To do what, sir, to leverage

15   educational programs?  Do you see those

16   words?

17   A.    It says to leverage educational

18   programs for incremental sales.

19   Q.    Okay.  Incremental sales means

20   what?  More sales?

21   MR. STERN:  Objection; lack of

22   foundation as to what Linda Kitlinski

23   meant.

24   MR. BUCHANAN:  Counsel, I mean,

1      really.  I'm sure things can be

2      frustrating, but I think just

3      "objection to form" would be the

4      appropriate way to handle that.

5          A.    I'm sorry.  Could you repeat the

6      question?

7          Q.    Yes.  Incremental sales means

8      what, sir?  More sales?

9          A.    They're looking --

10              MR. STERN:  Objection to lack of

11      foundation.

12          A.    They're looking for additional

13      sales.

14          Q.    Okay.  All right.  Let's move

15      forward, please.  Passing another one

16      over.

17              (Campanelli Exhibit 105,

18      document, was marked for

19      identification, as of this date.)

20      BY MR. BUCHANAN:

21          Q.    Out of the binder still.  105.

22              Well, let's look at how CD&E,

23      clinical development and education, went

24      about partnering with sales and marketing,

1    okay.

2              This is the CD&E presentation

3    from 2000.  It says -- I guess why don't

4    we start with dot-4.

5              MR. STERN:  I'm sorry.

6         Mr. Buchanan, where do you see this is

7         from 2000?

8              MR. BUCHANAN:  You know, I said

9         that, I understood it to be, but I

10        will -- I will represent to you that

11        the document is dated 1/20/2000, sir.

12        I have that by metadata.  There may be

13        a cover e-mail which we can let you

14        know about.

15             MR. STERN:  Okay.

16             MR. BUCHANAN:  Okay.

17   BY MR. BUCHANAN:

18        Q.    All right.  So, as represented,

19   sir, early 2000.

20             "CD&E the critical connection

21   for success in 2000 and beyond" is the

22   title on the first slide, correct, sir?

23        A.    Yes.

24        Q.    Okay.  Let's go to dot-4.

1          All right.  So, here's how CD&E

2    is characterizing what it does, right?

3          MR. STERN:  Objection; lack of

4      foundation.

5      A.    I'm not sure I understand the

6    question.

7      Q.    Well, you see on the fourth

8    slide, sir, a series of graphics following

9    the overview of CD&E?

10     A.    Yes.

11     Q.    Okay.  Til the field.

12          That's the first picture, right?

13          MR. STERN:  I'm sorry.  Where

14      does it say the overview?  I'm not

15      sure I have the right thing.

16   BY MR. BUCHANAN:

17     Q.    Do you see the first picture,

18   sir?  Til the field?

19          MR. STERN:  Mr. Buchanan, where

20      does it say the overview?

21          MR. BUCHANAN:  I'm trying to

22      move forward, counsel.

23          MR. STERN:  I'm going to object

24      that you're misrepresenting the

Highly Confidential - Subject to Further Confidentiality Review

1    document.

2           MR. BUCHANAN:  I don't think I

3    am, sir, but with due respect, feel

4    free to clarify something.

5  BY MR. BUCHANAN:

6    Q.    Sir, first picture, tilling the

7  field.

8           That's what's happening?

9           MR. STERN:  Objection; lack of

10   foundation.

11   A.    That's what the cartoon appears

12  to be representing.

13   Q.    Second picture, sir, planting

14  seeds?

15   A.    That's what the cartoon shows.

16   Q.    Third picture, water the seeds?

17   A.    Correct.

18   Q.    Fourth picture, reap the fruits

19  of your labor, right?

20          MR. STERN:  Objection to the

21   characterization.  Objection to lack

22   of foundation.

23   A.    I'm seeing plants that have

24  grown.

1    Q.    Right.

2          What you're actually seeing,

3    sir, is a person who has tilled the field

4    and planted seeds, right?

5    A.    Correct.

6    Q.    Watered the seeds, right?

7    A.    Correct.

8    Q.    You see her holding carrots,

9    right?

10   A.    I don't know what that is.

11         MR. BUCHANAN:  All right.

12   Corey, maybe you could help us all

13   out.

14   BY MR. BUCHANAN:

15   Q.    What's that look like to you,

16   sir?

17   A.    My mother's purse.

18         I have no idea what that looks

19   like.

20   Q.    Okay.  Till, plant, water, reap.

21         That's CD&E, right?

22         MR. STERN:  Objection to the

23   characterization.  Objection to the

24   form.  Objection to lack of

1        foundation.

2   BY MR. BUCHANAN:

3        Q.    That's what the pictures

4   reflect, sir?

5              I mean, you're not fussing with

6   the pictures; are you?

7        A.    I'm not fussing with the idea

8   that somebody's planting seeds, watering

9   it and then growing some type of plant.

10       Q.    And holding something in her

11  hand after she's grown it, right?

12       A.    Correct.

13       Q.    Okay.  All right.

14              So, one of the ways CD&E was

15  going to grow this market for pain was to

16  establish pain management as priority with

17  primary care doctors, right?

18              MR. STERN:  Objection to the

19       form; lack of foundation.

20       A.    I -- I don't know what you're

21  referring to or where you're referring.

22       Q.    Let's go to dot-16.

23              2000.  CD&E.  Again, clinical

24  development and education tactics.

1          You see that?

2      A.    I apologize.  You are going a

3  little bit faster than I am right now.

4      Q.    Okay.  And I -- as I said at the

5  beginning, I will generally be referring

6  to what's on the screen.  You are always

7  welcome to review the entire document, and

8  I will pause for you to do so.

9      A.    Thank you.

10     Q.    Okay.

11     A.    Okay.

12     Q.    We are on dot-16 right now.

13     A.    Correct.

14     Q.    CD&E tactics is what it says,

15  right?

16     A.    Yes.

17     Q.    2000?

18     A.    Yeah.  Okay.

19     Q.    First bullet:  Establish pain

20  management as a priority with PCPs and

21  some other specialties, right?

22     A.    I see that.

23     Q.    All right.  PCPs, please tell

24  the jury what that is.

Highly Confidential - Subject to Further Confidentiality Review

1   A.   Primary care physicians.

2   Q.   Doctors that are not pain

3   specialists, right?

4   A.   Correct.

5   Q.   General practitioners might be

6   another way of thinking of PCPs, right?

7   A.   Yes.

8   Q.   Okay.  Let's go to 13.

9        Going to leverage alliances to

10  expand the utilization of the current

11  product line, right?

12       CD&E strategy and tactic, right?

13  A.   That's what the words say.

14  Q.   Okay.  And I'm going to scroll

15  down in that bullet there:  Support/develop

16  initiatives that combat opiophobia.

17       Do you see that?

18       MR. STERN:  What page are we on,

19  counsel?

20       MR. BUCHANAN:  We're on dot-13,

21  sir.

22  A.   I see that.

23  Q.   So, Endo's clinical development

24  and education group in 2000, to help

1    expand utilization of its product line, is

2    going to support and develop initiatives

3    to combat what, sir?

4        A.    Opiophobia.

5        Q.    You know what opiophobia is,

6    right?

7        A.    No, actually, I don't.

8        Q.    You know what phobia is, right?

9        A.    Yes.

10       Q.    What do you think that first

11   half means, sir?

12       A.    Afraid of something.

13       Q.    OPIO?

14       A.    I'm guessing.  I really don't --

15             MR. STERN:  Please don't guess.

16       A.    I don't know if this is a -- if

17   this is a -- if this is a slang or if this

18   is a medical term.  I'm not -- I'm just

19   not familiar with this term.

20       Q.    Sir, we spent some time talking

21   about the CDC's declaration of an epidemic

22   in 2011.

23             Probably not such a bad thing to

24   be fearful and concerned about opioids.

1          Would you agree?

2          MR. STERN:  Objection to the

3      form; lack of foundation.

4      A.    Again, our -- our focuses, these

5  products when prescribed as -- as

6  subsequent to the clinical trial that they

7  are safe and efficacious.

8      Q.    Sir, do you endorse the

9  activities of clinical development and

10  education to combat fears and concerns

11  about opioids?

12          MR. STERN:  Objection; lack of

13      foundation.  Objection to the form.

14      A.    You're talking to me personally

15  or the company, or what period of time?

16      Q.    I'm talking to you personally,

17  sir.

18          You've seen in 2011 there's an

19  epidemic.  We saw charts of 150,000

20  deaths.  We heard about, what, 400,000

21  admits every year for treatment.

22          And my question is do you

23  endorse the activity of your education

24  group to combat concerns of doctors about

Highly Confidential - Subject to Further Confidentiality Review

1    the safety of opioids?

2              MR. STERN:  Objection to the

3         form; lack of foundation.

4         A.    Again, I would never want to do

5    something to change that type of behavior

6    or concern.

7         Q.    It is wise to be seriously

8    concerned about the risks of opioids.

9              Fair, sir?

10             MR. STERN:  Objection to the

11        form; lack of foundation.

12        A.    Again, it is very concerning to

13   me when opioids are -- are used for -- for

14   misuse or abuse.

15             Again, when prescribed and used

16   as its intended purpose, it has helped

17   millions of people in pain.

18        Q.    Certainly not a good idea, sir,

19   to be spending millions of doctors to

20   combat --

21             MR. STERN:  Dollars.

22             MR. BUCHANAN:  Doctors.

23             Excuse me.  Withdrawn.

24        Q.    It's certainly not a good idea,

1    sir, to be spending millions of dollars to

2    combat doctors' concerns about the safety

3    of opioids, right?

4              MR. STERN:  Objection to the

5         form; lack of foundation.

6         A.    Again, you are -- you're

7    pointing in a direction of a Power Point

8    that's many years old.  I don't know if

9    what's -- what's behind this or the words

10   in front of it or after it.

11             When you point to this one

12   particular section, it's concerning.

13        Q.    Let's go to dot-23.

14             One of the items in 2000 the

15   company was developing was a national

16   visiting faculty program, right?

17        A.    I don't know that.

18        Q.    All right.  It said that it was

19   critical to do this to expand the base of

20   prescribers and average numbers of scripts

21   written.

22             Do you see that, sir?

23        A.    Okay.  What this says is

24   unbudgeted tactics.  I don't know if this

Highly Confidential - Subject to Further Confidentiality Review

1   is approved.  I don't know if this is

2   conceptual.  I don't know if this is

3   something the company's planning on doing.

4       Q.    We'll get to that.

5       A.    Okay.

6       Q.    My question to you, sir, is if

7   you'll stay with the -- stay with the

8   point.  It says national visiting faculty

9   program.

10          What's the first bullet say?

11      A.    Critical to expand base of

12  prescribers and average number of scripts

13  written.

14      Q.    Okay.  So, a visiting faculty

15  program was critical to expand the number

16  of prescribers and the number of scripts,

17  right?

18      A.    I don't know if it is critical.

19          I see the use of the word

20  "tactics."

21      Q.    Okay.  Effectiveness of

22  peer-to-peer influence is well-documented.

23          Correct, sir?

24      A.    I see the words.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   Okay.  And, so, one of the ways

2  CD&E went about doing this through its

3  pyramid of influence was by forming its

4  own CME entity, right?

5  A.   I don't know the answer to that.

6  Q.   You all created a captive,

7  right?

8  A.   I don't know that.

9  MR. STERN:  Objection to the

10  form; lack of foundation.

11  BY MR. BUCHANAN:

12  Q.   You've heard of the NIPC;

13  haven't you, sir?

14  A.   I'm not familiar with that.

15  Q.   NIPC was established by Endo in

16  2001, right?

17  A.   I have no idea.

18  Q.   NIPC, sir, stands for the

19  National Initiative For Pain Control,

20  right?

21  A.   As I responded, I didn't know

22  the answer to that question.

23  Q.   Have you heard of it at any

24  point in time?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.

2    Q.    Okay.  Let's look at Exhibit 19,

3  sir.

4          (Campanelli Exhibit 19, e-mail,

5      was marked for identification, as of

6      this date.)

7          MR. STERN:  Wait.  I'm sorry.

8      Book one?  Second book?

9          Sorry.

10 BY MR. BUCHANAN:

11   Q.    Your National Institute of Pain

12 Control established by Endo in 2001 had

13 more than 1.2 million doctor participants

14 in eleven years.

15   A.    Okay.  Let's just back me up a

16 little bit here because I'm not sure what

17 I'm looking at and what you're referring

18 to.

19   Q.    Okay.  Well, that's fair, sir.

20 Let's look at Exhibit 19.

21   A.    Okay.  I'm there.

22   Q.    It's an e-mail exchange.

23         You see that?

24   A.    I see the e-mail.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Okay.  And if you drill down a

 2    little bit, this is a letter response to a

 3    congressional inquiry.

 4               You see that?

 5               MR. STERN:  Can you hold on just

 6         a second, Mr. Buchanan?

 7               MR. BUCHANAN:  Sure.  Whatever

 8         time you need, counsel, and the

 9         witness, of course, to catch up with

10         where we are.

11               I am on --

12               MR. STERN:  I'm not sure I'm

13         looking at the right thing.

14               MR. BUCHANAN:  Okay.  You should

15         be looking at Exhibit 19.

16               MR. STERN:  Right.  This is not

17         a letter response to a congressional

18         investigation.

19               MR. BUCHANAN:  I'm sorry.  Thank

20         you.

21               It's a letter responding to Vice

22         President Biden.  Thank you.

23               MR. STERN:  Then I have the

24         right document.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    You see Exhibit 19, sir?  You're

3    on the same page with us?

4        A.    Yes.

5        Q.    So we go to the second page, you

6    see this is Endo responding to Vice

7    President Biden, correct?  I just want to

8    know whether it's Endo responding.

9        A.    Endo's responding to -- to

10   address misuse and abuse of prescription

11   medications.

12       Q.    Okay.  And Endo describes its

13   involvement with an organization called

14   the National Initiative on Pain Control.

15             You see that?

16       A.    No, I don't.  Can you point me

17   to that?

18       Q.    Sure.  Dot-10.  National

19   Institute on Pain Control, NIPC.

20   Integrated independent educational

21   initiative established and supported by

22   Endo since 2001.  First bullet.

23             MR. BUCHANAN:  And counsel,

24       we're on page dot-10.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  I know.  I'm just

2     trying to figure out the relationship

3     between what goes after the end of the

4     letter and -- between the letter and

5     the end of the document.

6          Is it referred to in the letter

7     somewhere?

8          MR. BUCHANAN:  I believe so, but

9     I -- yes, I believe so.

10          MR. STERN:  Can you bear with me

11     just one second?

12          Okay.  Go ahead.

13     A.    I'm sorry.  You want to ask the

14     question again.

15          MR. STERN:  I found it.

16          MR. BUCHANAN:  Thank you.

17     BY MR. BUCHANAN:

18     Q.    First bullet on dot-10 says,

19     under "National Initiative on Pain

20     Control":  Integrated independent

21     educational initiative established,

22     established and supported by Endo since

23     2001.

24          Right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I see it.

2    Q.    Okay.  Endo formed the NIPC, or

3    established it, in 2001, correct?

4          MR. STERN:  Objection; lack of

5          foundation.

6    A.    That's what the words say.

7    Q.    And gave it some 30 million

8    dollars to go out and spread Endo's

9    message, right?

10         MR. STERN:  Objection; lack of

11         foundation.

12   A.    I don't know the answer to that.

13   Q.    Okay.  Content targeted towards

14   PCPs, NPs, PAs and other HCPs on the front

15   line.

16         You see that?

17   A.    I do see it.

18   Q.    Greater than 1.2 million

19   participants to date.

20         See that, sir?

21   A.    I see the reference to the

22   participants in the webcast.

23   Q.    In your binder, sir, I'm going

24   to move you forward to Exhibit 21.

Highly Confidential - Subject to Further Confidentiality Review

1            (Campanelli Exhibit 21,

2       document, was marked for

3       identification, as of this date.)

4            MR. BUCHANAN:  I'm sorry.  Don't

5       go to 21.  I'm told we have an exhibit

6       snafu.  I'm passing you over, sir,

7       what we've marked as Exhibit

8       Number 21.

9  BY MR. BUCHANAN:

10      Q.    This is a summary of payments by

11  Endo to the NIPC based on this information

12  referenced.

13           Do you see that?

14      A.    I see -- I see a reference that

15  Endo made payments to NIPC over nine or so

16  years.

17      Q.    Some 30 million dollars, right?

18      A.    That's what it says.

19      Q.    Okay.  And, so, Endo, with this

20  entity it established in 2001, was

21  spreading to its 1.2 million member

22  audience of doctors and nurse

23  practitioners and other things certain

24  messages about opioids, right?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  Objection to the

2      form; lack of foundation.

3      A.    I don't know what you mean.

4      Q.    Okay.  Let's go to Exhibit 22.

5          (Campanelli Exhibit 22,

6      document, was marked for

7      identification, as of this date.)

8  BY MR. BUCHANAN:

9      Q.    Should be in the binder.

10          This is the Pain Management

11  Today newsletter from 2001 from the NIPC.

12          You see that?  Volume 1, number

13  1, right?

14      A.    I'm just trying to see where it

15  says NIPC.

16      Q.    I think you can see it in the

17  bottom left corner, sir.  It says National

18  Initiative and Pain Control with that

19  little swirly logo?

20      A.    Okay.

21      Q.    You see it?

22      A.    Yes.

23      Q.    Okay.  And let's go to dot-4

24  they've got this heading as part of their

1    training "Key terms for opioid

2    analgesics."

3              You see that?

4       A.    Yes.

5       Q.    Pseudoaddiction.

6              You see that?

7       A.    Yes.

8       Q.    Familiar with that term, sir?

9       A.    Not really.

10      Q.    Not real addiction,

11   pseudoaddiction, right?

12              MR. STERN:  Objection to the

13       form; lack of foundation.

14      A.    Is that a question?

15      Q.    You agree with me that's what

16   pseudoaddiction is?

17      A.    I don't know what

18   pseudoaddiction is.

19      Q.    Okay.  Well, what they're doing

20   here, sir, is saying:  Pseudoaddiction

21   refers to behaviors that might seem

22   aberrant, but actually indicate inadequate

23   treatment of pain.

24              Right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I see it.

2    Q.    (Reading) The behavior is

3  resolved when the pain medication is

4  increased and appropriate analgesia is

5  obtained.

6          You see that, sir?

7    A.    I see it.

8    Q.    That's not true, right?

9          MR. STERN:  Objection; lack of

10     foundation.

11   A.    I don't know if this is a

12  medical term or a term that is understood

13  in the industry.  I don't know what this

14  is about.

15   Q.    Well, let's see how the NIPC

16  went about combating opiophobia in its

17  later presentation, sir.

18          Let's go to Exhibit 23.

19          (Campanelli Exhibit 23,

20     document, was marked for

21     identification, as of this date.)

22  BY MR. BUCHANAN:

23   Q.    This is 2005 Power Point

24  entitled "Opioid Analgesia: Practical

Highly Confidential - Subject to Further Confidentiality Review

1    treatment of the patient with chronic

2    pain."

3              Do you see that, sir?

4    A.     I see that, yes.

5    Q.     Okay.  Let's go to dot-122.

6           Pseudoaddiction.

7    A.     I'm sorry?

8    Q.     Point 122.  Okay.

9           You see that slide, sir,

10   pseudoaddiction?

11   A.     Yes.

12   Q.     (Reading) Pattern of

13   drug-seeking behavior of patients with

14   pain receiving inadequate pain management

15   that can be mistaken for addiction,

16   concerns about availability,

17   clock-watching, unsanctioned dose

18   escalation.

19              You see those characteristics?

20   A.     Yes.

21   Q.     (Reading) May resolve with

22   re-establishment of adequate analgesia or

23   adjustment of analgesic dose and schedule.

24              You see that, sir?

1    A.    Yes.

2    Q.    It says:  Inadequate pain

3  management can lead to behavioral symptoms

4  that mimic those seen with psychological

5  dependence and can be mistaken for

6  addiction.

7          Did I read that correctly?

8    A.    That's what the words say.

9    Q.    (Reading) In the case of

10  pseudoaddiction, the problem behavior is

11  resolve after sufficient pain relief is

12  established.

13   A.    That's what it says.

14   Q.    There's no sound scientific

15  support for that, sir?

16          MR. STERN:  Objection; lack of

17      foundation, form.

18  BY MR. BUCHANAN:

19   Q.    You know that, right?

20          MR. STERN:  Objection to form;

21      lack of foundation.

22   A.    I don't know that.  I don't know

23  the basis of this definition.

24   Q.    Well, you'd agree, certainly, if

1    you're going to try and quell doctors'

2    concerns about opioids and risks of

3    addictions, you better have some robust

4    data if you're going to do that 'cause

5    that's a big deal, right?

6              MR. STERN:  Objection to the

7         form; lack of foundation; calls for --

8         could call for a legal conclusion.

9    A.    Could you ask the question

10   again, please?

11   Q.    Sure.

12             If you're going to try and quell

13   doctors' concerns about opioids and risks

14   of addiction, you better have some robust

15   studies and data if you're going to do

16   that?

17             MR. STERN:  Objection to the

18        form.

19   BY MR. BUCHANAN:

20   Q.    'Cause addiction is a big deal?

21             MR. STERN:  Objection to the

22        form; lack of foundation; compound

23        question; could call for legal

24        conclusion.

Highly Confidential - Subject to Further Confidentiality Review

1     A.    I don't know if there's data

2   behind this or not.  I can't comment on

3   that.

4     Q.    Okay.  Let's go forward.

5         We can agree, certainly, the

6   NIPC was saying it in 2005 and in 2001,

7   two slides we -- the two pieces we've

8   looked at so far, correct?

9     A.    I see the words on the paper,

10  yes.

11    Q.    And they were doing it in 2009,

12  if you go to Exhibit 24 next in order.

13        (Campanelli Exhibit 24,

14    document, was marked for

15    identification, as of this date.)

16  BY MR. BUCHANAN:

17    Q.    Do you see the 2009

18  presentation, sir?

19    A.    Yes.

20    Q.    Chronic opioid therapy slide

21  deck?

22    A.    I see it.

23    Q.    Understanding risk while

24  maximizing analgesia, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I see it.

2    Q.    And when we talk NIPC, you were

3  the funder for NIPC, period, right?

4           MR. STERN:  Objection to the

5       form; lack of foundation.

6    A.    I saw the document where Endo

7  made payments to the NIPC.

8    Q.    Do you have the knowledge, sir,

9  that there were no other sources of

10 funding for NIPC other than you?

11          MR. STERN:  Objection; lack of

12      foundation.

13   A.    I don't know the answer to that.

14   Q.    Okay.  Well, here in 2009 and

15 let's just move forward to dot-82.  There

16 it is again, sir.  Not real addiction.

17 It's pseudoaddiction.  That's what you're

18 training doctors.

19          MR. STERN:  Object -- I'm sorry,

20      is that a question?

21 BY MR. BUCHANAN:

22   Q.    Correct?

23          MR. STERN:  Objection to the

24      form; lack of foundation.

1    A.    Okay.  Again, I don't know if

2    pseudoaddiction is a medical term, if it's

3    a term understood in the industry, and I

4    don't know if there's data behind the

5    statement.

6         Q.    Okay.  We'll go to 2012.

7              MR. STERN:  Can you give us a

8    tab, or an exhibit?

9              MR. BUCHANAN:  It's exhibit

10    number -- I think I need it.

11             (Pause.)

12             MR. BUCHANAN:  Exhibit 25, next

13    in order.

14             (Campanelli Exhibit 25,

15    document, was marked for

16    identification, as of this date.)

17    BY MR. BUCHANAN:

18        Q.    This will take us to 2012, sir.

19             Another Power Point presentation

20    going to 236.67.  Okay.  Pseudoaddiction.

21    Syndrome relating from undertreatment of

22    pain, et cetera.

23             Similar to the messages we've

24    read in the prior pages, sir, correct?

1          A.     I'm sorry.  Could you say that

2     one more time?

3          Q.     Yeah.  Pseudoaddiction, there's

4     a definition on the page.

5                 You see that?

6          A.     I see it.

7          Q.     Similar to the definition we've

8     been looking at, correct?

9                 MR. STERN:  Objection to the

10          form; lack of foundation.

11         A.     It appears consistent.

12         Q.     Okay.  Well, let's go forward,

13    sir, to Exhibit 40.

14                (Campanelli Exhibit 40,

15          document, was marked for

16          identification, as of this date.)

17    BY MR. BUCHANAN:

18         Q.     Do you have before you

19    Exhibit 40 "Guideline for the use of

20    chronic opioid therapy and chronic

21    non-cancer pain"?

22         A.     Yes.

23         Q.     An Evidence Review?

24         A.     That's what it says.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I'd like to take you,

2    sir, to dot-102.

3          You see key question 32?

4    A.    Yes.

5    Q.    (Reading) The term

6    "pseudoaddiction" has been used to

7    describe a pattern of behaviors in

8    patients with unrelieved pain that

9    mimicked behaviors in patients who were

10   addicted to opioids such as escalating

11   doses, using higher doses than prescribed

12   and increasing demands in exaggeration of

13   symptoms.  In such patients, it is

14   believed that effective treatment of the

15   pain should result in resolution of the

16   behaviors.

17          Do you see that, sir?

18   A.    I see that.

19   Q.    And the results of the search

20   revealed what, sir?  Do you see beneath?

21   A.    I see it.

22          MR. STERN:  Objection.

23   BY MR. BUCHANAN:

24   Q.    There's a question raised and a

Highly Confidential - Subject to Further Confidentiality Review

1    research looked to see where are the

2    studies, right?

3              MR. STERN:  Objection; lack of

4        foundation.

5        A.    I'm not sure what you're asking

6    me to do.

7        Q.    Okay.  Where he see results

8    of -- take a step back.

9              This is an Evidence Review of

10   various issues relating to opioids,

11   correct?

12       A.    That's what it says.

13       Q.    Okay.  There's a question here,

14   a question is noted, right?

15       A.    I see it.

16       Q.    Talks about one of the issues

17   we've just been talking about,

18   pseudoaddiction, correct?

19       A.    Correct.

20       Q.    Then it does a search for

21   systematic reviews and primary studies.

22             Do you see that, sir?

23       A.    I do see that.

24       Q.    (Reading) We identified no

1    systematic reviews or primary studies on

2    accuracy of tools for differentiating

3    drug-related behaviors due to inadequate

4    sympton relief and true aberrant

5    drug-related behaviors.

6              Did I read that correctly, sir?

7         A.    Yes.

8         Q.    And then they put a summary of

9    the evidence.

10             Do you see that, sir?

11        A.    Yes.

12        Q.    (Reading) We identified no

13   relevant studies that met the inclusion

14   criteria.

15             Did I read that correctly, sir?

16        A.    That's what the words say.

17   That's what came out of this report.

18        Q.    Okay.  I mean, Endo knows this

19   firsthand, right?

20             MR. STERN:  Objection; lack of

21        foundation.  Objection to the form.

22   BY MR. BUCHANAN:

23        Q.    That there's no support for

24   pseudoaddiction?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't know what --

2         MR. STERN:  Objection; lack of

3    foundation.

4    A.    I don't know where this document

5    came -- went to or where it -- I mean, is

6    this -- I don't know the origin of this

7    document at Endo.

8         Is this -- if this is even in

9    the Endo system.

10   Q.    Sir, these are the -- it's the

11   2009 Evidence Review on issues with

12   opioids, chronic pain, right?

13   A.    That's what it says.

14   Q.    Okay.  You'd certainly hope your

15   pharmaceutical company had that in its

16   files; wouldn't you?

17        MR. STERN:  Objection; form;

18   lack of foundation.

19   A.    It would be an important

20   document.

21   Q.    Okay.  Well, you know this issue

22   came to a head with folks in New York,

23   right?

24        MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1          form; lack of foundation; time frame;

2          who the folks are.

3                    MR. BUCHANAN:  Okay.

4     BY MR. BUCHANAN:

5          Q.    The attorney general?

6          A.    Presumably, yes.

7          Q.    You all got called on this

8     issue; didn't you?

9                    MR. STERN:  Objection to the

10          form; lack of foundation.

11         A.    I have no idea.

12         Q.    Okay.  Passing you what we've

13    marked as, is that 106 or 105?

14                   MR. BACHMAN:  106.

15                   MR. BUCHANAN:  106.

16                   A copy for you as well, counsel.

17                   (Campanelli Exhibit 106,

18          document, was marked for

19          identification, as of this date.)

20    BY MR. BUCHANAN:

21         Q.    Sir, this is an agreement and

22    assurance of discontinuance you, Endo,

23    agreed to, with the State of New York, the

24    attorney general in particular, correct?

1          MR. STERN:  Objection to the

2      form; lack of foundation.  And

3      objection to the use of this document

4      at all under its own terms.

5      A.    Can I study this document?

6      Q.    Yeah, sure.

7      A.    (Perusing document.)

8            Okay.

9      Q.    You had a chance to review it,

10   sir?

11     A.    Not in detail.

12     Q.    Okay.  This is from, what, 2016?

13           You have the date on the back,

14   sir.

15     A.    I'm going to look at it.

16           March 1st, 2016.

17     Q.    I mean, it's not a document

18   you're unaware of, right?

19     A.    I'm generally aware of -- of

20   this document.

21     Q.    Right.

22           And it's executed by the former

23   CEO, Mr. DeSilva, correct?

24     A.    Correct.

1    Q.    This is a big deal, right?

2          MR. STERN:  Object to the form

3    of the question; lack of foundation.

4    A.    I was made generally aware the

5    situation at that time.

6    Q.    Okay.  And this is around the

7    time after Endo bought Par?

8    A.    Correct.

9    Q.    Okay.  Certainly there's

10   agreements and promises that are made by

11   Endo in terms of how it's going to proceed

12   prospectively after it signed this, right?

13   A.    Again, while I look at this

14   document, it looks like we are required to

15   enhance and maintain systems.

16   Q.    Okay.  Well, let's -- let's look

17   at one of the items that was called to

18   your attention following the

19   investigation.  It's E894.7, paragraph 23.

20   A.    I'm there.

21   Q.    (Reading) Endo also trained its

22   sales representatives to distinguish

23   addiction from pseudoaddiction, a

24   purported condition in which patients

Highly Confidential - Subject to Further Confidentiality Review

1    exhibit drug-seeking behavior which

2    resembles but is not the same as

3    addiction.

4           Do you see that paragraph, sir?

5    A.    Yes.

6    Q.    (Reading) The pseudoaddiction

7    concept has never been empirically

8    validated and, in fact, has been abandoned

9    by some of its proponents.

10          Did I read that correctly, sir?

11   A.    Correct.

12   Q.    And what you all agreed to do,

13   if I can take you to 894.15.

14   A.    I'm sorry.  Which number was

15   that?

16   Q.    If I can take you to dot-10.

17          And what you agreed to do is not

18   say it anymore, right?

19   A.    What it's saying --

20          MR. STERN:  Objection to the

21   form.  Objection to the use of this

22   document.  Objection to foundation.

23   A.    It says --

24   Q.    It's paragraph 41B.

1       Do you see that, sir?

2       A.    What I see is that Endo's going

3   to maintain policies prohibiting written,

4   oral or false, misleading, deceptive and

5   then it goes on to say:  Endo shall not.

6       Q.    Right.

7       So we look at the heading

8   "Truthful statements regarding addiction

9   risk and crush resistance."

10      Do you see that?

11      A.    Yes.

12      Q.    It says, the first sentence that

13   you read, and it says:  In particular,

14   Endo shall not.

15      Right.  Then it's got a list of

16   items?

17      A.    Correct.

18      Q.    The second item there is:  Shall

19   not make statements that most patients who

20   take opioids do not become addicted unless

21   such statements are supported by competent

22   and reliable evidence.

23      Do you see that?

24      A.    Yes.

1    Q.    Okay.  Scroll down to item E:

2    Use the term "pseudoaddiction" in any

3    training or marketing.

4              Do you see that?

5    A.    Yes.

6    Q.    Okay.  And sitting here today,

7    sir, you're not aware of any robust

8    studies that would support a use of that

9    term, right?

10             MR. STERN:  Objection; lack of

11        foundation.

12   A.    Again, it's not something that I

13   would have been part of, as I wasn't at

14   Endo at that time.

15   Q.    Since March of 2016, has Endo

16   used the term "pseudoaddiction" anywhere

17   with regard to its discussions or

18   supported educational programs where that

19   term is used?

20             MR. STERN:  Objection; lack of

21        foundation.

22   A.    I don't know the answer to that,

23   but I can see where we made a commitment

24   not to do so.

1    Q.    And if you made a commitment not

2    to do so, it would be your expectation

3    that the company would not do so, correct?

4    A.    Yes.

5    Q.    Okay.

6              MR. BUCHANAN:  If I can have

7    Exhibit 26, please.

8              THE WITNESS:  Am I going to

9    tab --

10             MR. BUCHANAN:  You are, but I

11   think this is an audio file.

12             (Campanelli Exhibit 26, CD, was

13   marked for identification, as of this

14   date.)

15             MR. BUCHANAN:  Passing over

16   Exhibit 26 for counsel, if they'd like

17   to review the broader program.

18             MR. STERN:  Do you have copies

19   of either the video or the audio?

20             MR. BUCHANAN:  I don't, but

21   you're welcome to use those today.

22   You can take them to make copies.  We

23   can make a stipulation.

24             MR. STERN:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BUCHANAN:  I'm sorry.  Wait.

 2         Do we have additional copies?

 3         So one for the record and one

 4    for counsel.

 5         Okay.  We'll work it out.  We're

 6    not trying to keep that stuff out of

 7    your hands.

 8  BY MR. BUCHANAN:

 9    Q.    All right.  So, we're on Exhibit

10    26.

11         And, so, with the NIPC, you'd

12  given NIPC money, right?

13    A.    I'm sorry?

14              MR. STERN:  Objection; lack of

15    foundation.

16  BY MR. BUCHANAN:

17    Q.    Well, we saw, sir, in the letter

18  back to Vice President Biden, was the

19  company established the NIPC in 2001,

20  right?

21    A.    Correct.

22    Q.    Gave it some 31 million dollars,

23  right?

24    A.    It looks like the company
```

Highly Confidential - Subject to Further Confidentiality Review

1    contributed 31 million dollars over a

2    series of years.

3        Q.    To support educational

4    initiatives, correct?

5        A.    That's what appears to be the

6    intention.

7        Q.    Okay.  And then there would be

8    doctors that would go out and start

9    teaching other doctors your message,

10   right?

11       A.    Okay.  Again, I wasn't here.  I

12   don't know.  I'd have to understand deeper

13   in that document what was going on.

14       Q.    Okay.

15           MR. BUCHANAN:  Could we play --

16       let's pause for a moment.  I'll

17       represent before we play it, this is

18       Bates number KP360,

19       OHIO_MDL_000095691.  It's excerpts of

20       a Dr. Grace Ford, one of the NIPC

21       speakers during one of the speaker

22       programs.

23           MR. STERN:  Objection to the use

24       of just an excerpt.

Highly Confidential - Subject to Further Confidentiality Review

1     What is the date?  That's a good

2     question.

3          MR. BUCHANAN:  I don't have it

4     on my sheet.

5          Can we provide it?

6          I understand it's 2006.  I'll

7     get a formal month and day for you.

8          Could we queue up, please,

9     Corey, I believe it occurs about 17

10    minutes in, 17:45?

11 BY MR. BUCHANAN:

12    Q.    And these are the words of Dr.

13 Grace Ford, an NIPC speaker, supported and

14 funded with your dollars, sir.

15          MR. BUCHANAN:  Can you play it,

16    please, Corey?

17          (Audio recording played.)

18          "Appropriate decision regarding

19    opoid therapy require a comprehensive

20    assessment and comprehensive

21    assessment is required by JAYCO.  And

22    pain is a fifth vital sign.  You to

23    treat patient's pain adequately.  If

24    not, you can and you will be sued."

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BUCHANAN:  Let's pause.

2     BY MR. BUCHANAN:

3          Q.    Your speaker, to an audience of

4     doctors, medical professionals, through

5     the NIPC with your dollars, is telling

6     other dollars that if they don't do this,

7     they will be sued.

8               Did you hear that, sir?

9          MR. STERN:  Objection; lack of

10         foundation.

11         A.    I think you got to repeat your

12    question.

13         Q.    Your speaker, Dr. Grace Ford, to

14    an audience of doctors, medical

15    professionals, other health care

16    providers, through the NIPC with your

17    dollars, is telling other doctors that if

18    they don't do this, they will be sued.

19         MR. STERN:  Objection to the

20         form and lack of foundation.

21    BY MR. BUCHANAN:

22         Q.    Correct?

23         MR. STERN:  Objection to the

24         form and lack of foundation.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I heard the words "you will be

2    sued."

3         This is an 18-minute audio.  You

4    played me about 30 seconds of it.  Explain

5    that a little bit better.

6    Q.    You did hear that, sir?

7    A.    I did hear the words "you will

8    be sued" on an 18-minute audio.

9    Q.    And the record should, so you're

10   aware, and I don't know if you're aware of

11   this, sir, I have a limit on how many

12   hours I get to ask you questions.  I'm

13   sure we're both thankful about that.

14   Which means I am not going to play for you

15   the entire presentations in various audio

16   files.  If there is something worthy that

17   your counsel would like to present to your

18   recollection, I'm sure he will.

19        But, will you agree with me,

20   sir, that what she told, in your sponsored

21   CME, using your dollars to train

22   physicians with the message you endorse,

23   that you will be sued if you don't do

24   this?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STERN:  Objection; lack of
 2         foundation.
 3    A.    Could I hear the audio again?
 4              MR. BUCHANAN:  Sure.
 5              (Audio recording played.)
 6              "Appropriate decision regarding
 7         opoid therapy require a comprehensive
 8         assessment and comprehensive
 9         assessment is required by JAYCO.  And
10         pain is a fifth vital sign.  You to
11         treat patient's pain adequately.  If
12         not, you can and you will be sued."
13    BY MR. BUCHANAN:
14    Q.    You have to treat patients'
15    pain adequately.  If you don't, you can
16    and you will be sued.
17              That's the educational message
18    your 31 million dollars was being used to
19    support.
20              MR. STERN:  Objection to the
21         form and lack of foundation.
22    BY MR. BUCHANAN:
23    Q.    Right, sir?
24    A.    Okay.  I heard the words that
```

1    she spoke.

2            I don't know her basis of that

3    is.

4        Q.    So, one thing you were doing,

5    sir, is you were combating opiophobia,

6    fear and concerns of opioids.  Don't call

7    it addiction, call it pseudoaddiction.

8            That's one technique that was

9    being used for the NIPC, right?

10           MR. STERN:  Objection to the

11       form; lack of foundation.

12       A.    You keep on saying "you."  I

13   just need to make it clear I wasn't there

14   at the time.

15           I'm not entirely sure what she's

16   saying or what's going on.

17       Q.    Okay.

18       A.    At this period of time.

19       Q.    An entity, sir, that you gave 31

20   million dollars to over the years.

21           MR. STERN:  Objection to lack of

22       foundation.  Objection to the form.

23   BY MR. BUCHANAN:

24       Q.    Agreed?

1      A.     You showed me a doctor -- a

2   document which showed that there was the

3   31 million dollar contribution.

4      Q.     Supported them before that

5   presentation by Ms. Ford, right?

6             MR. STERN:  Objection to the

7      form and lack of foundation.

8      A.     I'm uncertain of the -- the

9   timing 'cause I don't know if you're sure

10   of the timing of that audio as well.

11     Q.     Continued to support them until

12   2011, right?

13     A.     That's what the document shows.

14     Q.     And, in fact, you know how these

15   CMEs work, right?

16     A.     I don't know what you mean by

17   that question.

18     Q.     I mean the companies that

19   sponsor often send representatives to

20   monitor the CMEs, right?

21             MR. STERN:  Objection; lack of

22      foundation.

23     A.     It would not be unusual.

24     Q.     Right.  You've got a CD&E group.

1    We looked at Ms. Kitlinski's name a moment

2    ago.

3              MR. STERN:  Objection to the

4       form; lack of foundation.

5    BY MR. BUCHANAN:

6       Q.    And her statements about how

7    CD&E was going to go about doing this,

8    right?

9              MR. STERN:  Objection to the

10      form; lack of foundation.

11      A.    I would need to study that

12   document in greater detail.

13      Q.    Well, let's go to Exhibit 28.

14           (Campanelli Exhibit 28,

15      document, was marked for

16      identification, as of this date.)

17   BY MR. BUCHANAN:

18      Q.    You also got reports back from

19   your organization, the NIPC, so you could

20   make sure your dollars were being

21   well-spent, right?

22             MR. STERN:  Objection to the

23      form; lack of foundation.

24      A.    I would have to study this

1    document.

2         Q.    What you'd get back you'd see

3    was the message you wanted delivered being

4    heard and received, right?

5         A.    Again I would have to study this

6    document to understand what this executive

7    summary is indicating.

8         Q.    Okay.  So, this is a 1282.1,

9    it's Exhibit 28, National Initiative on

10   Pain Control executive summary, right?

11        A.    That's what it says.

12        Q.    This is reporting on a period of

13   time and it's describing really the -- the

14   efforts that were undertaken, the target

15   audiences, et cetera.

16             You see that?

17        A.    You'd have to give me a moment

18   to -- to understand this document.

19        Q.    And you're entitled to that

20   moment, sir.

21        A.    (Perusing document.)

22             The topic's talking about

23   advancing an opioid's analgesia,

24   maximizing benefits while minimizing risk.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And let's go, please, to

2    dot-4.

3    A.    Okay.

4    Q.    And these are the exit

5    interviews of participants and the

6    comments that are provided back following

7    the CME, right?

8         MR. STERN:  Objection; lack of

9         foundation.

10    Q.    You're free to orient yourself

11    to the document, sir.  I understand you

12    didn't attend it.

13    A.    It appears to be feedback from

14    doctors.

15    Q.    Right.

16         And, so, the question put to the

17    attendees is following this activity, the

18    CME activity, what is the most important

19    change you will make in your practice?

20         Do you see that?

21    A.    Yes.

22    Q.    Second bullet says what, sir?

23    A.    More use of opioids.

24    Q.    More use of opioids.

Highly Confidential - Subject to Further Confidentiality Review

1    Fourth bullet says:  Use opioids

2    earlier with my pain patients.

3    Do you see that?

4    A.    It's the fifth bullet, but yes,

5    I see it.

6    Q.    Fifth bullet.  Thank you.

7    Appreciate the clarification, sir.

8    So, use more and use them

9    earlier.

10    2006, that's where we are now,

11    right?

12    MR. STERN:  Objection to the

13    form of the question.

14    A.    Talks about communication, talks

15    about assessment.  Talks about a lot of

16    things here.

17    Q.    You agree, sir, this is the

18    takeaway, most important change you will

19    make in your practice.  These are the

20    bullets we're looking at.

21    Right?

22    A.    There are --

23    MR. STERN:  Objection; lack of

24    foundation.  Except for what's on the

Highly Confidential - Subject to Further Confidentiality Review

1       face of the document.

2       A.    Again, these are -- are -- are

3  quick, short bullets that contain other --

4  other open-ended questions.

5       Q.    Well, we do know, sir, that

6  there was more opioids being used in 2006

7  than there were in 2000, right?

8       A.    The document you showed me

9  showed an increase with respect to Endo.

10      Q.    We know generally, we looked at

11 the CDC charts, more opioids being used,

12 right?

13      A.    That's what the chart showed.

14      Q.    Right.

15            Sales were going up, right?

16      A.    The correlation you're referring

17 to?

18      Q.    Yes.

19      A.    I saw it.

20      Q.    Deaths are going up, right?

21      A.    That's what the document showed.

22      Q.    Treatment admissions are going

23 up, correct?

24      A.    That's what the document showed.

1    Q.    And we see the take-home from

2    your company-sponsored CME program with

3    your captive NIPC organization is more use

4    of opioids, right?

5         MR. STERN:  Objection to the

6    form of the question.

7    BY MR. BUCHANAN:

8    Q.    Do you see that, sir?  Second

9    bullet point.

10   A.    Again you're going to a snapshot

11   here.  I'd like to study this document in

12   more detail to see if there's other things

13   that would be important.

14   Q.    Do you see the bullet I'm

15   referring to, sir?

16   A.    I see two bullets you're

17   referring to.

18   Q.    Sure.  And we know what the CDC

19   ultimately came out and said in 2016,

20   right?

21   A.    Yes.

22   Q.    They said use less?

23        MR. STERN:  Objection.

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2         Q.    Right?

 3               MR. STERN:  Objection; lack of

 4         foundation; mischaracterizes the CDC

 5         guidelines.

 6               MR. BUCHANAN:  I don't think it

 7         does, counsel, but if you want to

 8         object to form, that's fine, or

 9         foundation.

10               MR. STERN:  I am to both.

11               MR. BUCHANAN:  It precisely says

12         what I say.

13         A.    You'd have to show me that

14    document.

15         Q.    You don't have familiarity with

16    the CDC guidelines from 2016, sir?

17         A.    Not off the top of my head, no.

18         Q.    Go slow and go low.

19               Haven't heard that?

20         A.    No, I have not.

21         Q.    Certainly not saying use more

22    opioids.

23               Can we agree to that?

24         A.    If you show me the document, I
```

1    can opine on it.

2        Q.    Can we agree, sir, that just as

3    somebody who hasn't seen the document,

4    you're not hearing a message today in your

5    community of use more opioids?

6        A.    I'm not hearing that in our

7    community.

8        Q.    You're not hearing a message in

9    your community, sir, of use opioids

10   earlier with your pain patients?

11       A.    Okay.  Our understanding is to

12   use opioids responsibly for their intended

13   purposes.  Again, there's tens of

14   thousands, if not millions of patients

15   that require opioids to relieve pain for

16   its intended use.

17       Q.    Start low and go slow.  That's

18   what the CDC's telling people after those

19   big run-up in sales that you all led in

20   the early 2000s, right, sir?

21            MR. STERN:  Objection; lack of

22       foundation.

23       A.    Again, as I stated, I don't know

24   if that's what's in that document.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Let's go to Exhibit 27.

2           (Campanelli Exhibit 27, e-mail,

3     was marked for identification, as of

4     this date.)

5  BY MR. BUCHANAN:

6     Q.    Here is a report out of the

7  CME -- report out of a CME NIPC opioid

8  Cinci program.

9           You're familiar, sir, Cincinnati

10 is in Ohio?

11    A.    No, I'm not familiar with it.

12    Q.    Okay.  I'll represent to you,

13 sir, that Cincinnati is in Ohio.

14          This is a summary of a NIPC

15 opioid Cinci program from 2003.  It's an

16 e-mail exchange with Ms. Kitlinski, the

17 head of CD&E that we talked about, her

18 colleague and junior, Vin Tormo, coming

19 out of this late 2003 NIPC program.

20          You see it?

21    A.    I see it.

22    Q.    I'm going to start towards the

23 back.

24          And you see at the bottom of

1    dot-1 there's a e-mail from Teresa Leigh,

2    and she's reporting on the feedback they

3    got from doctors coming out of the

4    program, right?

5         And I'm actually going to focus

6    on the -- I'm sorry.  Did you answer?

7    A.    No, I did not.

8    Q.    Okay.

9    A.    I don't know the answer to that.

10   I don't know that that's what this says.

11   Q.    It's reporting to colleagues

12   here, Cincinnati district manager Teresa

13   Leigh is telling her colleagues, including

14   Mr. Tormo and Ms. Kitlinski, what happened

15   on Thursday, November 23rd, 2003, right?

16        MR. STERN:  Objection.

17   A.    I'm not seeing those names that

18   you're referring to here.

19   Q.    Do you see Ms. Leigh?  Do you

20   see that on the screen?

21   A.    Yes.

22   Q.    You see Mr. Tormo?

23   A.    Yes.

24   Q.    And you see up the stream Ms.

Highly Confidential - Subject to Further Confidentiality Review

1    Kitlinski?

2        A.    Now you're going to the top of

3    the e-mail?

4        Q.    I'm sorry.  We were going to

5    talk about that.

6        A.    I see her name at the top of the

7    e-mail string.

8        Q.    That was why you couldn't agree

9    with me a moment ago?

10       A.    I didn't see it.

11       Q.    Okay.  Fair enough.

12             Let's go now to November 13,

13   2003, 11:24 p.m., the response from Mr.

14   Tormo:  Thanks for the feedback, Teresa.

15             Again reporting on the NIPC

16   opioid Cinci program.  And then it

17   continues.

18             You see that?

19       A.    You're referring to "Glad that

20   your recommendation"?  Is that where you

21   are?

22       Q.    I'm referring to the middle

23   e-mail, sir, 11:24 p.m.

24       A.    Yeah, I see it.

1    Q.    Okay.

2          (Reading) Thanks for the

3    feedback, Teresa.  Glad that the program

4    went so well.  Three exclamation points.

5          You see that?

6    A.    Yeah.

7    Q.    Okay.

8          (Reading) Glad that your

9    recommendation to have the opoid program

10   in Cincinnati paved the way towards.

11         You see that part of the

12   sentence?

13   A.    Yes, I do.

14   Q.    (Reading) And lessened the fear

15   of appropriately prescribing opioids.

16         Do you see that?

17   A.    Yes.

18   Q.    And that's what you all were

19   trying to do, lessen fear, grow the

20   market, expand usage, right?

21         MR. STERN:  Objection to the

22     form; lack of foundation; selective

23     quotation of the e-mail.

24   A.    I don't know what she's doing

1  here.

2      Q.    Okay.  You understand that

3  phobia is fear, right?

4      A.    As I said, it was a term I was

5  not -- I'm not familiar with this term.

6      Q.    Okay.  You don't understand the

7  reference to fear?

8      A.    I understand fear.

9      Q.    Okay.  And lessening fear,

10  correct?

11      A.    Yes.

12      Q.    And, so, one of the things Mr.

13  Tormo was glad about lessening the fear of

14  appropriately prescribing opioids, right?

15      A.    That's what it says, but it's

16  referring to a program, and I don't know

17  what happened at the program.

18      Q.    Well, we've heard some of the

19  audio from your program, sir, right?  That

20  one was at least trying to induce fear

21  that you would get sued if you didn't

22  prescribe opioids, right?

23      A.    Okay.  That was a -- that was

24  the -- the --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Dr. Ford.

2    A.    That was the 30-second audio

3    clip I listened to?

4    Q.    Yeah.

5          You recall that?

6    A.    I recall that 30-second clip.

7    Q.    Okay.  Be fair to say that was

8    inducing or at least trying to induce fear

9    about what would happen if you don't

10   prescribe, right?

11   A.    I don't know what --

12         MR. STERN:  Objection; lack of

13         foundation.

14   A.    I don't know what she was

15   referring to.

16   Q.    I guess we all heard it and the

17   jury will hear it, and they'll have an

18   opportunity to decide.

19         Fair?

20   A.    Fair.

21         MR. BUCHANAN:  I'm about ready

22         to move into a different topic.  I

23         know there was discussion about having

24         lunch today.  I assume we're still

Highly Confidential - Subject to Further Confidentiality Review

1       going to try to do that.

2            What I would like to do before

3       we take a break, if you guys are

4       amenable to a break, is just mark a

5       couple of things for cleanup here.

6            Can I have the exhibits?

7            (Pause.)

8            MR. BUCHANAN:  Marking for the

9       exhibit the underlying source data for

10      the demonstratives just so they're

11      complete and you all have a record, to

12      the extent there's any desire to sync

13      things up later.

14           Exhibit 14 is E1848.  It's Par

15      sales.

16           MR. STERN:  Wait.  Hold on a

17      minute.

18           MR. BUCHANAN:  I'm going to pass

19      these over to you and you can have

20      them.

21           MR. STERN:  We have an

22      Exhibit 14.

23           MR. BUCHANAN:  No, I said

24      E1840 -- I'm sorry.  Exhibit 214.  I'm

Highly Confidential - Subject to Further Confidentiality Review

1        sorry.

2             Exhibit 214, alternately

3        referenced as E1848, is a summary of

4        Par sales data that was produced by

5        defense counsel to plaintiffs, which

6        underlies some of the charts that we

7        looked at.

8             (Campanelli Exhibit 214,

9        document, was marked for

10       identification, as of this date.)

11            MR. BUCHANAN:  Exhibit 213,

12       alternately marked as E1847, is the

13       underlying data for Qualitest sales

14       that was produced to us.

15            (Campanelli Exhibit 213,

16       document, was marked for

17       identification, as of this date.)

18            MR. BUCHANAN:  Exhibit 209 is

19       the underlying data on a drive of the

20       Endo sales data, the CDC deaths, and

21       early Qualitest data.

22            (Campanelli Exhibit 209, flash

23       drive, was marked for identification,

24       as of this date.)

1          MR. BUCHANAN:  I think that

2     cleans up the exhibits prior to taking

3     lunch.

4          And you're free to peruse those

5     if you need to.

6          At this point, I propose we take

7     a break for lunch, as briefly as you'd

8     like.

9          MR. STERN:  Sure.

10          THE VIDEOGRAPHER:  All right.

11     Stand by.  Microphones.

12          The time is 1:56 p.m.

13          Off the record.

14          (Luncheon recess taken.)

15               -  -  -

16      A F T E R N O O N   S E S S I O N

17               -  -  -

18          THE VIDEOGRAPHER:  We are back

19     on the record.

20          The time is 2:38 p.m.

21     BY MR. BUCHANAN:

22     Q.    Sir, we're back on the record.

23          We spent some time before lunch

24     talking about the NIPC and other matters

Highly Confidential - Subject to Further Confidentiality Review

1    related to CD&E.  We're going to talk

2    about some other organizations the company

3    supported over the years.

4    ████████████████████████████

    ██ ████████████████████████████

    ██ ███████████████████████████

    ██ ██████████████████████

    ██ ████████████████

    ██ ███████████████

    ██     ██     ██

    ██     ██   █████████████

    ██ ███████████

    ██     ██   █████████████

    ██ ██████

15   Q.    Okay.  Is there a -- do you have

16   a relative

17   CCampanelli@Americangeriatrics.org?

18   A.    No.

19   Q.    Okay.  Thank you.

20         Now, moving forward.

21         I'd like to talk to you about

22   the American Pain Foundation.

23         Is that an entity or an

24   organization you've heard of, sir?

1        A.      I'm sorry.  One more time?

2        Q.      The American Pain Foundation?

3        A.      I'm not familiar with it.

4        Q.      You may have heard of it by its

5    acronym, APF?

6        A.      Fair.

7        Q.      Does that seem familiar to you?

8        A.      Yes.

9        Q.      Could we go to Tab 30 in your

10   binder, sir?

11              Tab 30 is a response to an

12   inquiry, I believe, by Senator Grassley

13   put together by counsel for Endo and it's

14   got some attachments to it.  I'm going to

15   focus on the attachments and I'll

16   represent to you, sir, the attachments

17   reflect payments to various entities that

18   were the subject of inquiry by Senator

19   Grassley.

20              Okay?

21       A.      Okay.

22       Q.      If you can get past the body of

23   the letter, you'll seen an addenda, and

24   it's actually at dot-24.

1      So, the American Pain

2  Foundation -- dot-24, sir.

3      A.    Okay.

4      Q.    The American Pain Foundation is

5  another entity that Endo supported over

6  the years.

7      Fair?

8      A.    I see that.

9      Q.    Thousands and thousands and,

10  indeed, hundreds of thousands of dollars

11  in checks written over the years, right?

12      MR. STERN:  Objection; lack of

13      foundation.  Except what's in this

14      document.

15      A.    I -- I see -- I see American

16  Pain Foundation and I see dollars

17  attributed to -- to the APF.

18      Q.    Sir, I take it you don't doubt

19  the -- that the company, in response to a

20  congressional or Senate inquiry, would

21  indeed try and collect accurate and

22  complete information in response to such

23  an inquiry?

24      A.    I would think that to be the

1    case.

2              I just don't know what I'm

3    looking at yet.

4        Q.    Okay.  What we see here are

5    years and precise payments by month of

6    payment, the official organization name

7    and the purpose of the payment.

8              You see that?  I'm on dot-24

9    still.

10       A.    I see it.

11       Q.    You know, '99 shows 20,000; 2000

12   25,000; 2001 $20,000; 2002 $25,000.  And

13   then we see as time goes on they get

14   larger, correct?

15       A.    I see some increases.

16       Q.    Okay.  You can go to page

17   dot-25.

18             And you see over time a little

19   short of 6 million dollars to the American

20   Pain Foundation, right?

21       A.    That's what it says.

22       Q.    Okay.  And one of the things the

23   American Pain Foundation was doing was

24   pulling together patient brochures in

Highly Confidential - Subject to Further Confidentiality Review

1    doctors' offices to give to patients,

2    right?

3           MR. STERN:  Objection to the

4      form of the question.

5      A.    I don't know that.

6      Q.    Okay.  Let's go to Exhibit 31,

7    next in order.

8           (Campanelli Exhibit 31,

9      document, was marked for

10     identification, as of this date.)

11   BY MR. BUCHANAN:

12     Q.    This is a July 31, 2001

13   correspondence with the American Pain

14   Foundation.

15          I'm sorry.  There's an e-mail

16   that is the cover from August of 2001 from

17   Ms. Kitlinski to Ms. Ammon and Skip

18   Ivison.

19          Do you see that?

20     A.    Yes.

21     Q.    That's the cover e-mail?

22     A.    I see it.

23     Q.    Okay.  And Ms. Ammon, again, she

24   was the CEO at that point in time?

1    A.    Yes.

2    Q.    And Skip Ivison, who's he?

3    A.    I don't know.

4    Q.    Okay.  In the body of the e-mail

5    reflects that there's been some

6    interactions with executive director of

7    the APF, or the American Pain Foundation,

8    and asks you to forward along the update.

9          Do you see that?

10   A.    Yes.

11   Q.    Indicates second line of Ms.

12   Kitlinski's e-mail:  He also expressed his

13   appreciation for the support Endo's

14   provided to APF and is forwarding a copy

15   of - I guess that's a tax form - to the

16   company.

17         Do you see that?

18   A.    That's what Kitlinski's

19   indicating.

20   Q.    Okay.  Let's look at 1326.2, or

21   dot-2 for simplicity.

22         This is a memo from the American

23   Pain Foundation.

24         MR. BUCHANAN:  Actually, can you

1        zoom out for a second, Corey?

2        Q.    We see American Pain Foundation

3    to Ms. Kitlinski, cc the CEO and Mr.

4    Ivison from the executive director.

5              Do you see that?

6        A.    Yes.

7        Q.    Okay.  And you see in the body

8    it's he's thanking -- thanking Ms.

9    Kitlinski for coming by, seeing the new

10   offices.  And then he gives a report on

11   what's been happening.

12             Do you see that?

13       A.    Okay.  I see the words, yes.

14       Q.    (Reading) During our meeting, I

15   hope to, 1, update you on our recent

16   activities, growth and future plans.  2,

17   learn more about relevant Endo activities

18   in terms of pain management and working

19   with third party advocacy groups, and then

20   3, discuss your interest in continuing to

21   support our projects.

22             Right?

23       A.    I see it, yes.

24       Q.    Then if we go to the third page,

Highly Confidential - Subject to Further Confidentiality Review

1  we see an overview of recent APF

2  accomplishments, right?

3      A.    I see it.

4      Q.    It says:  With support from

5  Endo.

6            And it outlines some of what we

7  saw in the prior document in terms of

8  funding, $20,000 in 1999 and $25,000 in

9  2000 and many other funders.

10            (Reading) APF has accomplished a

11  lot in the past two years.

12            Do you see that?

13      A.    I see it.

14      Q.    Okay.  Let's go to dot-4.  We

15  see "Patient Education Materials."

16            Do you see that heading, sir?

17      A.    Yes.

18      Q.    It says:  The American Pain

19  Foundation produced the Pain Action Guide.

20            Right?

21      A.    It says produced Pain Action

22  Guide, yes.

23      Q.    (Reading) A patient education

24  pamphlet that has been so popular with

Highly Confidential - Subject to Further Confidentiality Review

1    consumers and health care providers that

2    they're already in their third printing.

3              Right?

4         A.    I see it.

5         Q.    Okay.  Have you seen the

6    pamphlets that the American Pain

7    Foundation put together and was giving out

8    to health care providers and doctors?

9         A.    No, I have not.

10        Q.    Okay.  Let's go to -- let's go

11   to Exhibit 32, which is the next in order.

12             (Campanelli Exhibit 32,

13        document, was marked for

14        identification, as of this date.)

15   BY MR. BUCHANAN:

16        Q.    Do you have Exhibit 32 before

17   you, sir?

18        A.    Yes.

19        Q.    Okay.  Exhibit 32 says:  Reading

20   this could help ease your pain.

21             Right?

22        A.    Yes.

23        Q.    Pain Action Guide, American Pain

24   Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1       A.      That's what it says.

2       Q.      Okay.  We see, if you go to the

3    back, you see that it's, in fact, from

4    2000, right?

5       A.      That's what the copyright says.

6       Q.      Okay.  And this was the

7    organization we saw you were writing

8    checks to, right?

9               MR. STERN:  Objection to the

10         form of the question.

11   BY MR. BUCHANAN:

12      Q.      I'm sorry, you, Endo.

13              At this point in time?

14      A.      I saw the sheet that showed Endo

15   made a contribution over time.

16      Q.      Made a contribution in '99,

17   right?

18      A.      Yes.

19      Q.      Made a contribution in 2000,

20   right?

21      A.      Yes.

22      Q.      And really in all the years up

23   through the time of the schedule that we

24   were looking at, right?

1    A.    The schedule had precise years

2    on it, yes.

3    Q.    Reflecting payments through the

4    years continuously until the time of the

5    schedule, right?

6    A.    Correct.

7    Q.    Okay.  All right.

8          So, this is that patient

9    brochure, the pain action guide, from the

10   American Pain Foundation, correct?

11   A.    That's what it says.

12   Q.    Exhibit 32, let's go to --

13   sorry.  Let's go to dot-8.

14         So, one of the things this

15   foundation you were funding was saying is

16   that -- telling all patients that not all

17   doctors even know how to treat pain.

18         MR. STERN:  Objection to the

19    form and lack of foundation.

20   BY MR. BUCHANAN:

21   Q.    Right?

22   A.    I see the words.

23   Q.    So, this is a patient pamphlet

24   financially supported by Endo, correct?

1          MR. STERN:  Objection to the

2      form; lack of foundation.

3      A.    Again, I saw the document that

4   you showed me.

5      Q.    Okay.  And the patient brochure

6   says:  Not all doctors know how to treat

7   pain.  Your doctor should give the same

8   attention to your pain as to any other

9   health problems.  But many doctors have

10  had little training in pain care.  If your

11  doctor is unable to deal with your pain

12  effectively ask your doctor to consult

13  with a specialist or consider switching

14  doctors.

15          Do you see that, sir?

16     A.    Yes, I see that.

17     Q.    Endo is financially supporting a

18  patient brochure telling patients to

19  doctor shop?

20          MR. STERN:  Objection.

21  BY MR. BUCHANAN:

22     Q.    If their doctor doesn't give

23  them what they want, right?

24          MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1          form of the question and lack of

 2          foundation.

 3     A.    I see those words.

 4          I also see the page before it

 5     where it says:  Finding good pain care and

 6     taking control of your pain can be hard

 7     work.  Learn all you can about pain and

 8     possible treatments.

 9     Q.    Okay.

10          MR. BUCHANAN:  I'll move to

11          strike the non-responsive portion.

12     Q.    But the answer to my question is

13     yes, you see that, right?

14     A.    I see the words.

15     Q.    Okay.  Coaching patients to

16     doctor shop?

17          MR. STERN:  Objection to the

18          form of the question.

19     BY MR. BUCHANAN:

20     Q.    If they don't get what they want

21     from their doctor?

22          MR. STERN:  Objection to the

23          form of the question.

24     A.    It says if your doctor's unable
```

Highly Confidential - Subject to Further Confidentiality Review

1    to deal with your pain effectively.

2        Q.    Ask your doctor to consult with

3    a specialist or consider switching

4    doctors.

5            That's what they wrote, right?

6        A.    That's what it says.

7        Q.    Okay.  Let's look at the next

8    page, dot-9.  It says:  Pain medications

9    rarely cause addiction.

10           Do you see that?

11       A.    I see it.

12       Q.    That's not true?

13           MR. STERN:  Objection; lack of

14       foundation.  Objection to the form.

15       A.    Okay.

16       Q.    Agree?

17       A.    I don't know what the basis of

18   these -- of this brochure is.  I don't

19   know what's behind this.  I don't know why

20   they chose to say this.

21       Q.    It's got you scratching your

22   head though, right?  How the heck were

23   they saying that?

24           MR. STERN:  Object to the form;

1      lack of foundation.

2      A.     As I say, I don't know why they

3   chose the words here.

4      Q.     There is nothing rare about the

5   addiction with the use of pain medication,

6   sir?

7             MR. STERN:  Objection to the

8        form; lack of foundation.

9   BY MR. BUCHANAN:

10     Q.     You agree?

11            MR. STERN:  Objection to the

12       form; lack of foundation.

13     A.     Could you please say that again?

14     Q.     There is nothing rare about

15   addiction with the use of pain medications

16   like opioids, sir.  Agreed?

17            MR. STERN:  Objection to the

18       form; lack of foundation.

19     A.     Again, when used as -- as --

20   under the intended purposes, under the

21   labeled indication, we believe that they

22   are safe and effective.  When they're

23   abused or misused, they could be

24   addictive.

1  Q.   Pain medications rarely cause

2  addiction.  That was in the patient

3  brochure that you, Endo, financially

4  supported?

5         MR. STERN:  Objection to the

6     form.

7  BY MR. BUCHANAN:

8     Q.   Right?

9     A.   It also says:  Unless you have a

10  history of substance abuse, there is

11  little risk of addiction.

12     Q.   Okay.  Where is the study for

13  that, sir?

14     A.   I don't know if there is a study

15  or not.

16     Q.   There certainly should be one if

17  you're going to tell patients that, right?

18         MR. STERN:  Objection to the

19     form; lack of foundation; calls for a

20     legal conclusion.

21     A.   Again, I don't know why the

22  words were chosen to be here.

23     Q.   One of the ways to combat

24  opiophobia is to tell patients addiction

Highly Confidential - Subject to Further Confidentiality Review

1    is rare, right?

2           MR. STERN:  Objection to the

3       form; lack of foundation.

4    BY MR. BUCHANAN:

5       Q.    That will help combat fears,

6    right?

7       A.    I don't know the answer to that.

8       Q.    Okay.  It says:  Morphine and

9    similar pain medications called opioids

10   can be highly effectively for certain

11   conditions.  Unless you have a history of

12   substance abuse, there is little risk of

13   addiction when these medications are

14   properly prescribed by a doctor and taken

15   as directed.

16          Did I read that correctly?

17      A.    Yes.

18      Q.    We looked at the CDC chart,

19   right, from 2011?  You saw that?

20      A.    I saw it.

21      Q.    You saw as more people take

22   these drugs, more people are overdosing

23   and dying, more people are going in for

24   treatment for what, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  Objection to the

2     form of the question.

3  BY MR. BUCHANAN:

4     Q.    Addiction, right?

5     A.    I saw the chart.  I saw the

6  statistics that you showed me.  I saw the

7  sales going up.

8     Q.    That look rare to you?

9          MR. STERN:  Objection to the

10     form; lack of foundation.

11     A.    I don't know the answer to that.

12     Q.    Okay.  Let's go forward in time.

13          Let's go to I think we're in

14  Exhibit 33.

15          (Campanelli Exhibit 33,

16     document, was marked for

17     identification, as of this date.)

18  BY MR. BUCHANAN:

19     Q.    Next in order it looks like.

20          Again, another patient brochure,

21  Pain Action Guide from the American Pain

22  Foundation, right?

23     A.    I see it.

24     Q.    Okay.  We see -- let's see if we

1    have a date on the back.

2              It's 2003, okay.

3              Let's go to dot-3.

4              Just to orient ourselves, sir,

5    in 2003, you all were still supporting the

6    American Pain Foundation, right?

7              MR. STERN:  Objection to the

8        form; lack of foundation.

9        A.    From the document you showed me,

10   it appears that Endo supported.

11       Q.    Okay.  And on this page it says:

12   Know the facts.

13             Right?

14       A.    Yes.

15       Q.    Facts, with an exclamation

16   point, right?

17       A.    Yes.

18       Q.    It's got a few points, then it

19   says, again:  Not all healthcare providers

20   know how to treat your pain.

21             Right?

22       A.    That's what the words say.

23       Q.    (Reading) If your health care

24   provider is unable to treat your pain

1    effectively, ask him or her to refer to a

2    specialist.  You may need to consider

3    changing providers.

4             You see that?

5    A.    I see it.

6    Q.    That is the recommendation in

7    the patient brochure that you all were

8    funding, you all being Endo?

9             MR. STERN:  Objection to the

10        form; lack of foundation.

11   A.    Again, I don't know any

12   underlying information that would have led

13   to that -- that -- that point.

14   Q.    Okay.  Next point says:  Pain

15   medications rarely cause addiction.

16            Do you see that?

17   A.    I see it.

18   Q.    Looks like the one we looked at

19   a few minutes ago, right?

20   A.    It was on the previous deck,

21   yes.

22   Q.    Again, telling patients, telling

23   health care providers combating opiophobia

24   pain medications rarely cause addiction,

1    right?

2            MR. STERN:  Objection to the

3        form of the question; lack of

4        foundation.

5        A.    Again, I don't see the

6    opiophobia here.

7        Q.    No, I -- this was the message

8    the company -- excuse me, the APF was

9    communicating with the company dollars to

10   consumers and health care providers,

11   right?

12           MR. STERN:  Objection to the

13       form of the question; lack of

14       foundation.

15       A.    They're communicating this point

16   as you're referencing.

17       Q.    Okay.

18           (Reading) Pain medications

19   rarely cause addiction.  Morphine and

20   similar pain medications called opioids

21   can be highly effective for certain

22   conditions.  Unless you have a history of

23   substance abuse, there's little risk of

24   addiction.

1          And it continues.

2          You see that?

3     A.    Yes.

4     Q.    That's not true.

5          MR. STERN:  Objection to the

6     form; lack of foundation.

7   BY MR. BUCHANAN:

8     Q.    Right, sir?

9     A.    I don't know the answer to that.

10    Q.    As a person sitting here, sir,

11  in 2019, president of a pharmaceutical

12  company, is it rare to --

13         MR. STERN:  I'm sorry.  I also

14    object because the entire sentence was

15    not read just now.

16         MR. BUCHANAN:  You just

17    interrupted my question, counsel.

18         MR. STERN:  I apologize.

19         MR. BUCHANAN:  There's

20    opportunity for redirect, and I

21    certainly wouldn't objected to a

22    comment before, but now I'm in a

23    question.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    As a person sitting here, sir,

3    in 2019, president of a pharmaceutical

4    company, are you surprised to see the

5    addiction risk of opioid medications

6    described as rare?

7             MR. STERN:  Objection; lack of

8        foundation; mischaracterizes the

9        document; and objection to form.

10       A.    As I sit here today, opioid

11   abuse and misuse is not surprising to see

12   that as addiction.

13            As the products that contain

14   opioids are prescribed for the indication

15   and use with respect to the label and the

16   indication, those drugs help millions of

17   Americans relieve pain.

18       Q.    Sir, within the walls of Endo at

19   this very point in time, the company was

20   aware that the risk of addiction was

21   anything but rare.

22            Right?

23            MR. STERN:  Objection to the

24       form.

1        At this point in time 2003?

2        MR. BUCHANAN:  Yeah, 2003, early

3    2000s.

4        MR. STERN:  Lack of foundation.

5    A.    I have no idea what was going on

6    within the four walls of Endo in 2003.

7    Q.    Okay.  Let's look at 34, next in

8    order.

9        (Campanelli Exhibit 34, e-mail,

10    was marked for identification, as of

11    this date.)

12  BY MR. BUCHANAN:

13  Q.    This is an e-mail from a Matthew

14  Clark to Ms. Kitlinski and others sent on

15  I guess it's March of 2004, attaching an

16  article Nicholson Drugs 2003.

17        Do you see that?

18  A.    I see it.

19  Q.    (Reading) Dear all:  Article

20  mentioned yesterday.

21        Do you see that?

22  A.    I see it.

23  Q.    Okay.  Next page:  Responsible

24  prescribing of opioids for the management

Highly Confidential - Subject to Further Confidentiality Review

1    of chronic pain.

2           I'm sorry.  Dot-2.

3    A.    I see it.

4           MR. BUCHANAN:  Corey, could you

5    go to dot-3, please?

6  BY MR. BUCHANAN:

7    Q.    It states:  Estimates of

8  addiction rates among patients with

9  chronic non-cancer pain range from 3.2 to

10  18.9 percent.

11          Do you see that, sir?

12    A.    I see it.

13    Q.    High side of the range, one in

14  five people?

15    A.    Almost.

16    Q.    Is that rare to you?

17          MR. STERN:  Objection; lack of

18    foundation.

19    A.    Again, I don't know what this is

20  quoting, what statistics are used, what's

21  being reported here.

22    Q.    Is that rare to you?

23    A.    I don't know -- I don't know

24  it -- I don't know how to respond to that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    One in five people addicted

2    chronic use of non-cancer pain opioids, is

3    that rare to you, sir?

4              MR. STERN:  Objection to the

5         form; lack of foundation.

6    A.    I don't know if that includes

7    people that are abusing or misusing or

8    people that are using a drug for its

9    intended purpose.

10   Q.    18.9 percent is not rare, sir.

11             We can agree on that?

12             MR. STERN:  Objection to the

13        form; lack of foundation.

14   A.    I just don't know.

15   Q.    Okay.  Are you familiar with the

16   literature, sir, even as of today saying

17   the rates of addiction are 8 to 12

18   percent?

19             MR. STERN:  Objection to the

20        form; lack of foundation.

21   A.    I'm not familiar with the

22   statistics.

23   Q.    I'd just like to know, sir, if

24   you were aware that the rate of addiction

1    was 8 to 12 percent, would you have

2    endorsed characterizing that risk as rare,

3    sir?

4              MR. STERN:  Objection to the

5         form of the question; lack of

6         foundation.

7         A.    You're asking me to go back in

8    time back in 2003.  I would need to know a

9    lot of information to be able to -- to

10   really respond to that intelligently.

11        Q.    Okay.  Well, there's no debate,

12   sir, we got a lot of addicted people in

13   this country following the last 15 years

14   of messages like we just looked at, right?

15             MR. STERN:  Objection to the

16        form of the question; lack of

17        foundation.

18        A.    I will agree that we have too --

19   too much addiction in this country.  I do

20   not know if it's tied back to this

21   statement.

22        Q.    Let's go to Exhibit 36, please.

23             (Campanelli Exhibit 36,

24        document, was marked for

Highly Confidential - Subject to Further Confidentiality Review

1      identification, as of this date.)

2   BY MR. BUCHANAN:

3      Q.    Because when you use the term

4   "rare," rare actually does have a meaning

5   in the pharmaceutical industry, right?

6            MR. STERN:  Objection to the

7       form of the question.

8      A.    I'd have to look at it on a

9   product-by-product basis.

10     Q.    You've heard of CIOMS, sir?

11     A.    No, I have not.

12     Q.    Okay.  CIOMS is the Council for

13  International Organizations of Medical

14  Science.

15           Are you aware of that?

16     A.    No.

17     Q.    Don't know it by the long name

18  or the acronym?

19     A.    No.

20     Q.    Okay.  Exhibit 36, sir, is a

21  document entitled "Benefit-Risk Balance

22  for Marketed Drugs:  Evaluating safety

23  signals."

24           You see that, sir?

1    A.    Yes.

2    Q.    Reported by the CIOMS Working

3    Group.

4          You see that?

5    A.    I see it.

6    Q.    Geneva 1998?

7    A.    I see it.

8    Q.    Okay.  Quantification of risk.

9          Please go to dot-48.

10         As I said, sir, in your field,

11   the pharmaceutical industry, adverse

12   events are, in fact, characterized by

13   certain terms like "rare" and "common" and

14   "frequent."

15         Right?

16   A.    I -- I don't know the answer to

17   that.

18         MR. BUCHANAN:  Can you please

19   pull it up, Corey?

20   Q.    (Reading) Quantification of

21   risk.  Incidence of the reaction.

22         Okay.

23   A.    I see that.

24   Q.    Okay.  I'm going to the middle

1    of the paragraph it says:  However, risk

2    can often be approximated in terms of

3    magnitudes of 10 as suggested in the CIOMS

4    III report.

5              Do you see that, sir?

6        A.    I see it.

7        Q.    (Reading) Greater than or equal

8    to 1 percent comon or frequent.

9              You see that?

10       A.    I see it.

11       Q.    (Reading) Greater than or equal

12   to 1 per 1,000 but less 1 percent uncommon

13   or infrequent.

14             You see that?

15       A.    I see it.

16       Q.    (Reading) Greater than or equal

17   to 1 per 10,000 but less than 1 per 1,000,

18   that's rare.

19             Right?

20             MR. STERN:  Objection; lack of

21       foundation.

22   BY MR. BUCHANAN:

23       Q.    Did I read that correctly, sir?

24       A.    You read it correctly.

1          Q.     (Reading) Less than 1 per 10,000

2     very rare.

3               Right?

4               MR. STERN:  Objection; lack of

5     foundation.

6               If you're asking what --

7               MR. BUCHANAN:  I'm asking the

8     questions I just asked, counsel.

9          A.     I see the words.

10         Q.     Okay.  Will you agree we looked

11    at the report from with inside the

12    company's walls from 2004, the 3.2 to 18.9

13    percent.

14              Do you recall seeing that just a

15    moment ago with me, sir?

16         A.     I see the estimates that you've

17    put back on the screen.

18         Q.     Yes, okay.

19              Let's now go back to the CIOMS

20    chart.  You tell us where does even the

21    low end of that range, 3.2 percent, where

22    does that fall in these categories for

23    ranking frequency?

24         A.     Can I bring up the other --

1    bring up the other --

2           MR. BUCHANAN:  Can you pull them

3       up side-by-side, Corey, so he's got

4       them both?

5    BY MR. BUCHANAN:

6       Q.    On the left is the CIOMS

7    definition of the various frequencies.  On

8    the right is the publication from within

9    the company's walls of addiction rates.

10          Okay.  So let's use the low end

11   of the rate from the publication of

12   addiction rates of 3.2 percent.

13          What I'll ask you to do, sir, is

14   looking at 3.2 percent, could you tell the

15   jury the frequency of that using the terms

16   that CIOMS says should be used?

17      A.    I don't know on the bottom here

18   what the number of -- of cases it's

19   referring to where it says:  Estimates of

20   the addiction rates among patients with

21   chronic non-cancer range from 3.2 to 18

22   percent.

23      Q.    3.2, sir, where does that fall

24   in the ranges that are provided in CIOMS?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    It would be -- it would be very

2    rare.

3        Q.    3.2?

4        A.    Where am I looking?

5        Q.    3.2 percent would be common or

6    frequent.

7        A.    Where am I looking?

8        Q.    You're looking at the top of

9    your screen, sir.

10            (Reading) Risk can often be

11    approximated in terms of the magnitudes of

12    10 as suggested in the CIOMS II report,

13    colon.

14        A.    I stand corrected.

15            Yes, I see it.  Common or

16    frequent.

17        Q.    Right.

18            Addiction is common.

19            MR. STERN:  Objection to the

20        form.

21    BY MR. BUCHANAN:

22        Q.    Addiction is frequent.

23            MR. STERN:  Objection to the

24        form of the question; lack of

Highly Confidential - Subject to Further Confidentiality Review

1    foundation.

2    BY MR. BUCHANAN:

3       Q.    Those are the terms CIOMS said

4    should be used to characterize the rates

5    we're look at in this publication from

6    2004.

7             Correct, sir?

8             MR. STERN:  Objection to the

9       form.  Objection to lack of

10      foundation.

11      A.    As I said, I don't know what the

12   basis of this 1998 CIOMS document is.  I

13   don't know if it -- if all drugs fall into

14   the same category.  I don't know if this

15   is an FDA term or is this a -- I don't

16   know if this is tied to any special

17   indication of -- of drug.

18      Q.    Okay, sir.  Using the CIOMS

19   definitions, let's just stay with my

20   question.  Using the CIOMS definition, 3.2

21   percent addiction rate is common or

22   frequent, correct?

23            MR. STERN:  Objection to the

24      form; lack of foundation.

1    A.    Using that definition, I see

2    where it says common or frequent, but I

3    don't know if it's comparing apples to

4    apples here.

5    Q.    Okay.  Well, the CIOMS is saying

6    these are the frameworks for frequencies.

7         MR. STERN:  Objection; lack of

8         foundation.  Objection to form.

9    BY MR. BUCHANAN:

10   Q.    You see the CIOMS report, sir?

11   A.    I see the CIOMS report.

12   Q.    Okay.  We could agree, sir, that

13   these brochures might have read a little

14   differently and probably had different

15   impact if, rather than saying pain

16   medications rarely cause addiction, if

17   they said pain medications frequently

18   cause addiction?

19        MR. STERN:  Objection; calls for

20        speculation.  Objection to form; lack

21        of foundation.

22   A.    I don't know the answer to that.

23   I don't know.

24   Q.    We could agree that's a

Highly Confidential - Subject to Further Confidentiality Review

1    different sentence?

2         A.    That would be different.

3         Q.    Right.

4               Could have said pain medications

5    commonly or frequently cause addiction in

6    patients using them, right?

7               MR. STERN:  Objection; form and

8         foundation.

9    BY MR. BUCHANAN:

10        Q.    Right, sir?

11        A.    I don't know if we're comparing

12   apples to apples here, sir.

13        Q.    Okay.  We can agree that that's

14   not what was said in the APF brochures

15   that the company financially supported,

16   correct, sir?

17        A.    That's not what was said.

18        Q.    Thank you.

19              Now I'd like to talk about

20   another group called the American Pain

21   Society.

22              Have you heard of them?

23        A.    I've heard of them.

24        Q.    Another group that you, Endo,

Highly Confidential - Subject to Further Confidentiality Review

1    wrote millions of dollars in checks to,

2    right?

3            MR. STERN:  Objection; form;

4        foundation.

5        A.    Don't know the answer to that.

6        Q.    To get your message out, right?

7            MR. STERN:  Objection; form and

8        foundation.

9        A.    I don't know the answer.

10       Q.    I mean, you paid them

11   four-and-a-half million dollars to get

12   your message out, right?

13           MR. STERN:  Objection to form

14       and foundation.

15   BY MR. BUCHANAN:

16       Q.    You can answer.

17       A.    That was the document you showed

18   me before?

19       Q.    Yeah.  And that's in the

20   document before, just to pull it up for

21   your convenience, sir.

22           MR. BUCHANAN:  Corey, it's

23       287.30.

24       Q.    This is the response to Senator

1    Grassley's inquiry.  It's Exhibit 30.

2              Could you tell the jury, please,

3    what the total is to the American Pain

4    Society, funds from Endo to get your

5    message out, sir?

6        A.    4.468 million dollars.

7        Q.    Okay.  In fact, in dealing with

8    the APS, one of the things you were doing

9    was sponsoring training of residents to

10   try and combat opiophobia, correct?

11             MR. STERN:  What time frame?

12             MR. BUCHANAN:  Early 2000s.

13             MR. STERN:  Objection to form

14        and lack of foundation for early

15        2000s.

16   BY MR. BUCHANAN:

17       Q.    You Endo.

18       A.    I don't know.

19       Q.    Okay.  Tried to provide them

20   with tools that you said will help them

21   look a patient in the eye and figure out

22   whether that patient was going to become

23   addicted.

24             MR. STERN:  Objection to form

Highly Confidential - Subject to Further Confidentiality Review

1        and foundation.

2    BY MR. BUCHANAN:

3        Q.    Do you recall that, sir?

4        A.    No, I don't recall that.

5        Q.    You heard of the SOAPP tool?

6        A.    No, I have not.

7        Q.    Okay.  Company came up with

8    screening tools and used screening tools

9    as part of its training trying to combat

10   opiophobia.

11             Correct, sir?

12             MR. STERN:  Objection to form

13       and foundation.

14       A.    I don't know that answer.

15       Q.    Okay.  Let's go to -- sorry.

16   Trying to move us along.

17             (Pause.)

18       Q.    Exhibit 38, please.

19             (Campanelli Exhibit 38, e-mail,

20       was marked for identification, as of

21       this date.)

22   BY MR. BUCHANAN:

23       Q.    Exhibit 38, sir, is an e-mail

24   attaching a outline of a presentation from

1    the APS:  Fundamentals of pain management.

2    A primer for residents and fellows.

3              Do you see that?

4        A.    You're referring to the

5    syllabus?

6        Q.    I am, yes.

7        A.    I see it.

8        Q.    Okay.  Can we go to dot-5?

9              (Reading) Fundamentals of pain

10   management.  A primer for residents and

11   fellows.

12             Do you see that?

13       A.    I see.

14       Q.    Okay.  And one of the -- let's

15   go to the next slide.

16             MR. BUCHANAN:  I think it's on

17       dot-34, please, Corey.

18       Q.    (Reading) Screener and Opioid

19   Assessment For Patients in Pain.

20             Do you see that?  So-called

21   SOAPP?

22       A.    I see the words.

23       Q.    Yeah.  And this was one of the

24   tools that you were giving out to

1    residents, people who were learning how to

2    practice medicine, how you were training

3    them up on how to combat opiophobia,

4    right?

5             MR. STERN:  Objection; form and

6        foundation.

7        A.    I don't know if this is a draft.

8    It was -- if it was used.  I don't know if

9    this was -- I don't know if this was ever,

10   in fact, used.

11       Q.    Okay.  You do see with me, sir,

12   in dot-34, the Screener and Opioid

13   Assessment For Patients in Pain, SOAPP?

14       A.    I see it.

15       Q.    Okay.  Well, let's look at what

16   the evidence review showed about the

17   effectiveness of these.

18             Let's go to Exhibit 39.

19             (Campanelli Exhibit 39,

20        document, was marked for

21        identification, as of this date.)

22   BY MR. BUCHANAN:

23       Q.    This is something that appears

24   in -- I'm sorry.  Before we get to

1    Exhibit 39, the SOAPP tool is something

2    you all the were using in your marketing,

3    you all were using through your support of

4    various patient groups and pain societies

5    to try and combat opiophobia, correct?

6              MR. STERN:  Objection to form

7         and foundation.

8         A.    I have no idea.

9         Q.    Well, we just looked at it in

10   the APS materials.  We can agree to that.

11        A.    I saw it in the APS materials.

12        Q.    Okay.  Let's look at this

13   Evidence Assessment of the Agency For

14   Healthcare Research and Quality.

15             Do you see that?

16        A.    No, I don't see it.

17        Q.    Okay.  It's at the bottom of the

18   page.  The writing might be small.

19             MR. BUCHANAN:    But maybe we

20        could blow it up a little, Corey, help

21        us all out.

22        A.    I see it.

23        Q.    It's an agency within U.S.

24   Government, sir?

1       A.    I'm not familiar with this

2    agency.

3       Q.    Okay.  This is a 2014 review,

4    sir.  It says:  The effectiveness and risk

5    of long-term opioid treatment of chronic

6    pain.

7            MR. BUCHANAN:  Let's go to key

8        question 4B, dot-90.  Please blow it

9        up for us.

10      Q.    (Reading) In patients with

11   chronic pain, what is the effectiveness of

12   use of risk prediction instruments on

13   outcomes related to overdose, addiction,

14   abuse or misuse?

15           Do you see that question?

16      A.    Yes.

17      Q.    Key point, it's called out on

18   the screen.  What's it say?

19      A.    (Reading) No study evaluated the

20   effectiveness of risk prediction

21   instruments for reducing outcomes related

22   to overdose, addiction, abuse or misuse.

23      Q.    Okay.

24      A.    (Reading) SOE: Insufficient.

1    Q.    Insufficient.

2          No study evaluated the

3    effectiveness of the tools you were

4    training residents and fellows with.

5          MR. STERN:  Objection to form

6      and foundation.

7    BY MR. BUCHANAN:

8    Q.    Right, sir?

9    A.    That's what the words say.

10   Q.    Okay.  Let's go to dot-91.

11   "Detailed synthesis" at the top.

12         (Reading) The APS review

13   identified no studies on the effectiveness

14   of risk prediction instruments in reducing

15   outcomes related to overdose, addiction,

16   abuse, or misuse.  We also did not

17   identify any studies published since the

18   APS review addressing this question.

19         Did I read that correctly, sir?

20   A.    Yes.

21   Q.    You can set those aside, sir.

22         Okay.  Now, in the early 2000s,

23   sir, there were hearings related to opioid

24   abuse, oxycodone, OxyContin in particular,

1    before Congress.

2            Are you aware of that?

3       A.    No, I'm not familiar with that.

4       Q.    Okay.  Just being someone in the

5    industry, I mean you were in the industry,

6    obviously, in the early 2000s, correct?

7       A.    Correct.

8       Q.    Okay.  I guess we can go back

9    to -- go back to Exhibit 11 in one of the

10   earlier binders.  We can also pull it up

11   on the screen for the convenience of

12   everybody.

13           Dot-548.  This is that DEA

14   action plan from 2003.

15           THE WITNESS:  You know, I'm

16      going to take the binder.

17           (Pause.)

18      A.    What tab am I in?

19      Q.    You're in Tab 11 in the first

20   binder.

21           MR. STERN:  Do we have people on

22      the phone?

23           MS. SCULLION:  Sure.

24           MR. STERN:  Have they been

1    identified?

2         MS. SCULLION:  They e-mail in.

3         MR. BUCHANAN:  We can get names

4    at the break.

5         MR. STERN:  I wasn't aware of

6    that.  That answers my question.

7    BY MR. BUCHANAN:

8    Q.    You have it before you again,

9    sir?

10   A.    I do.

11   Q.    I think if you go to the second

12   page you'll see the DEA release:  Drugs of

13   chemical concern.  Action plan to prevent

14   the diversion and abuse of OxyContin.

15        You see that?

16   A.    I see it.

17   Q.    There was also a GAO report in

18   2003.

19        You know that?

20   A.    I see it.

21   Q.    A GAO report.

22        Are you aware of that?

23   A.    I'm not aware of the report.

24   Q.    Okay.  If you go to Exhibit 44

1    in your other binder, if we can keep them

2    both --

3         A.    Sure.

4         Q.    -- reasonably handy.

5              MR. STERN:  Mine only goes up to

6         40.

7              New binder.  New binder, Paul.

8    No, it's not in there.

9              THE WITNESS:  Okay.  44, you

10        said?

11             MR. BUCHANAN:  Exhibit 44.

12             (Campanelli Exhibit 44,

13        document, was marked for

14        identification, as of this date.)

15   BY MR. BUCHANAN:

16        Q.    Do you know what the GAO is,

17   first of all?

18        A.    Government -- government

19   accounting -- accountability --

20   government -- I -- no, I -- general

21   accounting office.  I don't know.

22        Q.    Okay.  You know it's a -- it's

23   an office within the government that

24   periodically conducts investigations and

Highly Confidential - Subject to Further Confidentiality Review

1    reports to Congress and others, correct?

2        A.    Correct.

3        Q.    So, in December of 2003, sir,

4    they issue a report:  Prescription drugs

5    OxyContin abuse and diversion and efforts

6    to address the problem.

7            Do you see that, sir?

8        A.    I see it.

9        Q.    Okay.  And you all, Endo to be

10   clear, decide, at this point in time,

11   after a market that is built on

12   overaggressive promotion, that has

13   embedded within it diversion and abuse,

14   that this is a market you want to be in,

15   right?

16           MR. STERN:  Objection to the

17       form of the question; lack of

18       foundation.

19       A.    Endo is -- is -- is -- is -- is

20   marketing and promoting opioids into --

21   into this category -- into the U.S. at

22   this point in time.

23       Q.    Well, no.  I mean even more

24   specifically, sir.

1              I mean you wanted to start

2      selling OxyContin, generic OxyContin, at

3      this point in time in the end of 2003,

4      after allegations of fraud and

5      manipulative marketing, that's the market

6      you wanted to get into and the product you

7      wanted sell, correct?

8              MR. STERN:  Objection to form

9         and foundation.

10        A.    Endo was looking to get into the

11     market.

12        Q.    Right.  And Endo did get into

13     the market, right?

14        A.    Over time.

15        Q.    It got into the market and made

16     generic oxycodone -- excuse me.  Generic

17     OxyContin, correct, sir?

18             MR. STERN:  Objection to form

19        and foundation for 2004.

20        A.    Endo produced the product.

21        Q.    Let's look.  Can we pull out,

22     please, the Endo sales chart that we had

23     this morning?

24             MR. BUCHANAN:  Corey, maybe just

Highly Confidential - Subject to Further Confidentiality Review

1           for the witness and all of us, we

2           could pull it up on the screen, it's

3           E1811.

4     BY MR. BUCHANAN:

5           Q.    We see oxycodone ER 2005.

6                 Do you see that?

7                 MR. BUCHANAN:  I'm sorry.  Can

8     you blow it up for us, please, Corey?

9     It's kind of hard to see.

10                Maybe just cut it off at 2006.

11                There we go.  Can you see it

12    all?

13                That's good.  Can you scroll a

14    little more over so we can have 2004,

15    2005, 2006?

16                Great.

17          Q.    So, just to reframe this, sir.

18    The DEA issues an alert on OxyContin in

19    2003 about concerns about abuse and

20    diversion, right?

21          A.    I see it.

22          Q.    The GAO issues a report on

23    OxyContin abuse and the concerns how it

24    was marketed and the representations that

Highly Confidential - Subject to Further Confidentiality Review

1    were made and what doctors and patients

2    believe, right?

3         A.    I don't know what's in this

4    document.

5         Q.    Okay.  You can see it in the

6    summary on the left.

7         A.    I see the title.

8         Q.    Okay.  And we see little over a

9    year later, Endo's bringing generic oxy to

10   the market, right?

11             MR. STERN:  Objection; form and

12        foundation.  Other than what's on the

13        face of the document.

14        A.    It eventually enters the market.

15        Q.    Okay.  The eventually is in

16   2005, Endo sells -- brings generic

17   OxyContin to the market, sir, correct?

18             MR. STERN:  Objection; form and

19        foundation.

20        A.    I see the units in 2005.

21        Q.    And you see the units in 2006,

22   right?

23        A.    Correct.

24        Q.    Some 270 million pills in some

Highly Confidential - Subject to Further Confidentiality Review

1    period within those two years, right?

2            MR. STERN:  Objection; form and

3        foundation.

4        A.    Show me where you're looking.

5        Q.    I'm looking oxycodone ER.

6            MR. BUCHANAN:  Corey, could you

7        line them up a little bit, please?

8            THE WITNESS:  You're a little

9        off.

10           MR. BUCHANAN:  Yeah, they're a

11       little staggered, but I think you can

12       tell where.

13       A.    I see it.

14       Q.    So you see for 2005 130 million

15   pills?

16       A.    Yes.

17       Q.    You see for 2006 148 million

18   pills?

19       A.    Yes.

20       Q.    Into this market built on

21   fraudulent representations, marketing

22   problems, and diversion and abuse, right?

23           MR. STERN:  Objection; form and

24       foundation.

1        A.      I see the report that talks

2    about abuse and diversion.  And I see that

3    Endo launched the product in 2005 and had

4    sales as well into 2006 and a little bit

5    in 2007.

6        Q.      Right.  And you know the story a

7    little bit there, sir.  That the company

8    got approval from the FDA, the AB generic,

9    to bring it to the market.  Then there was

10   a litigation that followed with Purdue.

11              Is that right?

12              MR. STERN:  Objection; form and

13        foundation.

14              MS. PARK:  Objection.

15       A.      I'm actually not familiar with

16   that.

17       Q.      You know Purdue litigated with

18   Endo over this.  You don't know that?

19       A.      No.

20       Q.      And shut it down?

21              MR. STERN:  Objection.

22   BY MR. BUCHANAN:

23       Q.      So they could keep the sales for

24   themselves?

1           MR. STERN:  Objection; form and

2       foundation.

3       A.    I didn't know the history.

4       Q.    Okay.  So, 270 million pills by

5   Endo generic oxy in 2005 and 2006.  That's

6   what the data shows, right?

7       A.    I see it.

8       Q.    Okay.  Please look at Exhibit 9,

9   sir.

10          (Campanelli Exhibit 9, document,

11      was marked for identification, as of

12      this date.)

13      A.    Am I keeping this other binder

14  in front of me, or not?

15      Q.    You might need to.  I apologize

16  for that, sir.  It shouldn't happen too

17  often.

18          This is an article and I guess a

19  financial report.  Market Watch.

20          You see that?

21      A.    Yes, I see it.

22          MR. BUCHANAN:  Can you pull it

23      up, please, Corey?  It's E242.

24          And you can take down the

Highly Confidential - Subject to Further Confidentiality Review

1          numbers.

2     Q.    This is from March 24 of 2004.

3           You see that?

4     A.    I see it.

5     Q.    That's three months after the

6    GAO issues their report about all this

7    problem with OxyContin, right?

8           MR. STERN:  Objection; form and

9     foundation.

10   BY MR. BUCHANAN:

11    Q.    Do I have the dates right, sir?

12    A.    Correct.

13          MR. STERN:  Exhibit 9?

14          MR. BUCHANAN:  Exhibit 9.

15          MR. STERN:  It's missing from my

16    book.

17          It's behind Tab 8.  Okay.

18   BY MR. BUCHANAN:

19    Q.    It says:  Endo wins OxyContin

20   generics bid.

21          Right?

22    A.    I see it.

23    Q.    Endo wins?

24    A.    I see the headline.

1     Q.    It says:  Endo OxyContin, which

2     was nicknamed hillbilly heroin after

3     rampant abuse was seen in certain rural

4     areas had U.S. sales of about 1.9 billion

5     in 2003.

6          Right?

7     A.    I see it.

8     Q.    (Reading) We are extremely

9     pleased by the FDA's approval of our

10    oxycodone extended-release product which

11    represents a substantial market

12    opportunity for Endo.

13    A.    I see it.

14    Q.    Do you see that?

15         (Reading) And reinforces our

16    leadership position in pain management,

17    said the CEO Carol Ammon.

18         Right?

19    A.    I see it.

20    Q.    Three months after the GAO

21    reports about all these problems with

22    OxyContin.

23         You agree with that, right?

24    A.    The timing is understood.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    After the DEA reported about the

2    problems of abuse and diversion of

3    OxyContin, as well as your other two

4    products, Percocet and Percodan, right?

5    A.    Yes.

6    Q.    And after Congress held hearings

7    on the way in which OxyContin had been

8    promoted, correct?

9         MR. STERN:  Objection; form and

10        foundation.

11   A.    Yes.

12   Q.    And we saw, sir, later in time

13   as well, that Qualitest also made generic

14   OxyContin, right?

15   A.    Yes.

16   Q.    And Par made generic OxyContin,

17   right?

18   A.    No.

19   Q.    Par sold generic OxyContin?

20   A.    Yes.

21   Q.    Into the market that was built

22   on those representations as described in

23   these reports, right, sir?

24        MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1          form and foundation.

2     A.     Could you repeat the question?

3            MR. BUCHANAN:  Withdrawn.

4     Q.     Opana, that's one you sold for

5     longer than a couple years, right?

6            MR. STERN:  Objection; form and

7          foundation.

8     A.     Opana was sold for a number of

9     years.

10    Q.     Okay.  Opana, real potent,

11    right?

12           MR. STERN:  Objection to form

13         and foundation.

14    BY MR. BUCHANAN:

15    Q.     You can answer.

16    A.     It's a potent opioid.

17    Q.     Three times more potent than

18    Morphine, right?

19    A.     On an MME basis.

20    Q.     Two times more potent than the

21    drug we were just talking about that had

22    all the concerns about addiction and

23    abuse, OxyContin, right?

24           MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1        form.

2        A.    On an MME basis.

3        Q.    You sold a lot of it, right?

4              MR. STERN:  Objection to the

5        form.

6        A.    Sold based on -- on

7   prescriptions.

8        Q.    You ultimately built Opana to be

9   the number 2 drug in this market segment;

10  didn't you, sir?

11             MR. STERN:  Objection to the

12       form.

13  BY MR. BUCHANAN:

14       Q.    You being Endo?

15             MR. STERN:  Objection; form and

16       foundation.

17       A.    What do you mean by number 2?

18       Q.    I mean you weren't in first

19  place, you were in second.

20             MR. STERN:  Objection to form

21       and foundation.

22       A.    I'm not sure what you're

23  referring to.

24             Based on what?

1    Q.    Okay.

2         MR. BUCHANAN:  Could I have

3    Bingo 1, please?  Do you have a copy

4    for counsel?

5  BY MR. BUCHANAN:

6    Q.    Do you know who Demir Bingo is,

7  sir?

8    A.    No.

9    Q.    I'll represent to you, sir, he

10  was the head of the Opana brand.

11        MR. BUCHANAN:  Could we please

12  play Bingo 1, please?

13        (Video played.)

14        "Going to the first bullet point

15  under your description of your time at

16  Endo, you say you successfully

17  launched the Opana brand in 2006

18  building it into a 600 million dollar

19  franchise and becoming the Number Two

20  product in its market segment.  Safe

21  to say that your work on the Opana

22  brand was successful?

23        "It was -- yes, it was

24  successful as far as I was concerned.

1        A relatively small percentage of the

2        overall market.

3            "You did build it up to a 600

4        million dollar franchise, correct?

5            "Yes.

6            "Okay.  And through the

7        marketing promotion efforts, it did

8        become Number Two product in the

9        market segment at least, correct?

10           "Correct."

11  BY MR. BUCHANAN:

12    Q.   Sir, did you have that awareness

13  that, in fact, Opana, from its launch and

14  through the efforts of promotion, dollars

15  you backed behind it with sales revenues

16  and other efforts, rose it to a 600

17  million dollar brand?

18        MR. STERN:  Objection; form and

19        foundation.

20    A.   At what period of time?

21    Q.   At any point during the

22  product's life, sir.

23    A.   As I sit here today?

24    Q.   Yes.

1     A.     I'm aware.

2     Q.     Number 2 in the market segment,

3  according to that, for the product,

4  correct?

5     A.     As I sit here today, I'm aware.

6     Q.     Ultimately had some problems

7  with abuse and diversion with Opana,

8  right?

9          MR. STERN:  Objection to the

10         form and foundation.

11    A.     That, I don't know.

12    Q.     You have no knowledge of that,

13 sir?

14    A.     No, I don't.

15    Q.     I mean, this was a drug that was

16 on the market in its original and its

17 reformulated form at the time you were the

18 CEO, right?

19    A.     CEO of Endo?

20    Q.     Yes.

21    A.     I was the CEO starting in

22 September of 2016.

23    Q.     Yes, sir.

24    A.     No, I did not know.

1      Q.     Would it be surprising to you,

2      sir, that it was abused and diverted and

3      popular in the street?

4             MR. STERN:  At what -- I think

5        we're having a time frame issue here.

6      BY MR. BUCHANAN:

7      Q.     At any point in time.

8      A.     I've learned about the -- I

9      learned about general concerns with some

10     information flow at an advisory committee.

11     Q.     Okay.  And that would be the

12     advisory committee in 2017?

13     A.     Correct.

14     Q.     Okay.  Shortly thereafter, the

15     drug was withdrawn from the market at the

16     FDA request, correct?

17     A.     Correct.  Withdrawn voluntarily,

18     yes.

19     Q.     At the FDA's request, sir?

20     A.     It was voluntarily removed.  The

21     FDA asked us to voluntarily remove it and

22     we complied.

23     Q.     Okay.  The FDA asked you to

24     withdraw it and you did so, correct?

1      A.    They ask -- they requested that

2    we would voluntarily withdraw and we did

3    so.

4      Q.    Okay.  We'll talk about that a

5    little later.

6            But that's not the first time

7    you pulled an oxymorphone product from the

8    market for safety, right?

9            MR. STERN:  Objection to the

10       form and foundation.

11           It's not a 30(b)(6).

12   BY MR. BUCHANAN:

13     Q.    You, sir, Endo.

14           MR. STERN:  He's not Endo.  He's

15       Mr. Campanelli.

16   BY MR. BUCHANAN:

17     Q.    Mr. Campanelli, as CEO of Endo,

18   a company that has been in the business

19   since the 1920s, that has marketed opioids

20   for a real long time, it's not the first

21   time the company had to pull an

22   oxymorphone product from the market?

23           MR. STERN:  Objection; form and

24       foundation.

1    A.    The company started in 1997, and

2  I am unaware if they pulled product in the

3  past.

4    Q.    You didn't know that Endo made

5  Numorphan?

6    A.    No.

7    Q.    You didn't know it pulled it off

8  the market in the '70s because of abuse

9  and diversion?

10    A.    No.

11    Q.    Same active ingredient, sir.

12  Oxymorphone.

13    A.    I'm not --

14    Q.    You were not aware of that?

15    A.    I'm not familiar with the

16  product.

17    Q.    History repeats itself, right?

18         MR. STERN:  Objection; form and

19    foundation.

20    A.    I'm not sure what you mean by

21  that.

22    Q.    I mean it helps to know history

23  so we know how not to let the same thing

24  happen twice, right?

1          MR. STERN:  Objection to form

2     and foundation.

3     A.    You're referring to 1970?

4     Q.    Are you aware, sir, that the

5 company withdrew Numorphan from the market

6 in the '70s?

7     A.    No.

8          MR. BUCHANAN:  Could I take the

9     witness to 45?

10          Do you have it -- do they have

11     the binder with these exhibits?

12          MR. STERN:  Yeah.  We have 45.

13          (Campanelli Exhibit 45,

14     document, was marked for

15     identification, as of this date.)

16 BY MR. BUCHANAN:

17     Q.    Tab 45.  It's a chapter

18 entitled:  Oxymorphone abuse among

19 narcotic addicts.

20          Do you see that, sir?

21          MR. STERN:  Chapter of what,

22     Mr. Buchanan?

23          MR. BUCHANAN:  I'm sure we have

24     the book for you.  Or I can get you

1          the title.

2                    (Pause.)

3                    MR. BUCHANAN:  I'm told it's on

4          page 5.  Is it on your page 5, sir, at

5          the back of the book?

6                    MR. STERN:  The front of book.

7          Or maybe it would be the back.  Looks

8          like the front of the book.

9                    MR. BUCHANAN:  Does that orient

10         you, sir?

11                   MR. STERN:  Yes, it does.  Thank

12         you.

13                   MR. BUCHANAN:  You're welcome.

14     BY MR. BUCHANAN:

15         Q.    This book from 1972 says:

16     Oxymorphone abuse among narcotic addicts.

17                   We're at chapter 35.  Do you see

18     that?  Page 1, dot-1.

19         A.    Where are you?

20         Q.    I'm at dot-1.

21         A.    Okay.

22         Q.    (Reading) Numorphan, registered

23     trademark.

24                   Do you see that?

1    A.    I see it.

2    Q.    (Reading) A narcotic analgesic

3  developed and first marketed by Endo Labs

4  in 1996 has become a drug of abuse among a

5  sizable segment of the narcotic addict

6  population.

7        Do you see that, sir?

8    A.    I think you misspoke.

9    Q.    I'm sorry, did I misread that?

10   A.    Yes.

11   Q.    Okay.

12        (Reading) Numorphan,

13  oxymorphone, a narcotic analgesic

14  developed and first marketed by Endo Labs

15  in 1966 has become a drug of abuse among a

16  sizable segment of the narcotic addict

17  population.

18        Do you see that, sir?

19   A.    I do.

20   Q.    And, did I read it correctly

21  that time?

22   A.    Yes.

23   Q.    Okay.  If you go down to

24  background, sir, you'll see:  On the

1  Street.

2          (Reading) On the street,

3  Numorphan can be identified by its various

4  subculture names.

5          It's got street names, right?

6     A.    That's what it says.

7     Q.    (Reading) Numorphine, Blue

8  Morphine, Blue Morphan, or Blues.

9          Right?

10    A.    That's what it says.

11    Q.    And that was something you were

12  worried about in launching, you being

13  Endo, were worried about in launching

14  Opana.

15          Correct, sir?

16          MR. STERN:  Objection to form

17     and foundation.

18    A.    I have no idea what's going on

19  here in 1966.

20    Q.    No, I'm talking about in 2004,

21  '5, '6, sir when you're getting ready to

22  launch Opana.

23          You're worried about the story

24  of the Blues getting out, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1            MR. STERN:  Objection; no
2       foundation at all.
3   BY MR. BUCHANAN:
4       Q.    You're not aware of that, sir?
5       A.    I am not aware of that.
6       Q.    If you go to Exhibit 46, sir.
7            (Campanelli Exhibit 46,
8       document, was marked for
9       identification, as of this date.)
10  BY MR. BUCHANAN:
11      Q.    This is a document produced in
12  the litigation ENDO_OPIOID_MDL_04137791
13  "Corporate Reputation Management Endo
14  Pharmaceuticals."
15           Do you see that, sir?
16      A.    I see it.
17      Q.    Okay.  Presented by Cohn and
18  Wolfe Healthcare.
19           Moving forward we see:  Endo
20  rough seas ahead.
21           Dot-7.
22           Upcoming milestones.  3218
23  launch.  3202 launch.
24           You know these are code names
```

1    for your --

2              MR. STERN:  This is not an Endo

3         document.

4              MR. BUCHANAN:  Sorry, sir.  It's

5         not a proper objection.

6              MR. STERN:  I object to form and

7         foundation.

8              MR. BUCHANAN:  That's a proper

9         objection, and I'll consider that as

10        to whether to reframe my question.

11   BY MR. BUCHANAN:

12        Q.    3218, you had an OxyContin

13   product you were trying to bring out,

14   right?

15             MR. STERN:  Objection to form

16        and foundation.

17        A.    I don't know what this code

18   number references.

19        Q.    Okay.  And you had your Opana

20   product you were trying to bring to market

21   as well, right?

22             MR. STERN:  Objection to form

23        and foundation as to 2004.

24        A.    This is confusing 'cause I don't

1    know if it's talking about Endo products

2    or other people's products here.

3         Q.    Okay.  Let's see.

4              Move forward to dot-18 "Media

5    Strategies for 3218 Launch."

6              Do you see that?

7              Represent to you, sir, that 3218

8    was the internal working name for the

9    OxyContin product.

10        A.    Which one?

11        Q.    The generic OxyContin product

12   the company brought to market in 2005.

13             It says on dot-18:  Media

14   strategy for 3218 launch: Three options.

15             Do you see that?

16        A.    I see it.

17        Q.    The next page says:  Conduct top

18   tear briefings.  Pros and cons.

19             Do you see that?

20        A.    Yes.

21        Q.    Then as you see, as you go

22   through the next several pages, the last

23   item on each of the cons:  Endo Blues

24   story emerges.

1    Right?

2    Endo Blues story emerges.  Endo

3  Blues story emerges.

4    Over the next three pages,

5  right?

6    A.    I see the words.

7    Q.    Did you know that Endo had

8  products street name Blues, oxymorphone,

9  the very active ingredient that it

10 marketed in 2006 to 2017 that had been

11 withdrawn from the market in the '70s,

12 sir?

13    MR. STERN:  Objection to form

14    and foundation.

15    A.    No, I'm not aware.

16    Q.    Okay.  Opana ER is ultimately

17 approved by the FDA.

18    MR. BUCHANAN:  You can take that

19    down, please, Corey.

20    Q.    Opana ER is ultimately approved

21 by the FDA, correct, sir?

22    A.    Correct.

23    Q.    Brought to the market.  And

24 we've seen the shipping sheets.

1              You can see when you started

2      selling it into the market, right?

3          A.    Yes.

4          Q.    Okay.  And you recognized early

5      on, sir, even before launch, that to bring

6      Opana ER into the market, you had to

7      settle prescribers on the risk of abuse

8      and diversion?

9              MR. STERN:  Objection; form and

10        foundation.

11     BY MR. BUCHANAN:

12         Q.    Right?

13         A.    I don't know that.

14         Q.    Okay.  Let's go forward to --

15     sorry.  Pass it over to you.  I understand

16     it's not in your binders.  It's

17     Exhibit 107.

18             (Campanelli Exhibit 107, e-mail,

19        was marked for identification, as of

20        this date.)

21     BY MR. BUCHANAN:

22         Q.    All right.  We're looking at

23     Exhibit 107, sir.  It's an e-mail among

24     folks and attaching Power Point to subteam

Highly Confidential - Subject to Further Confidentiality Review

```
1    members.

2           Do you see that?  Endo risk

3    management strategy?

4        A.    I see it.

5        Q.    Okay.  It runs through a number

6    of points.

7           I'll try and move quickly here.

8           Talks about the Endo 3202

9    strategy.

10          Do you see that?

11       A.    Yes.

12       Q.    Got to differentiate Endo 3202

13   from OxyContin, right?

14          MR. STERN:  Objection to form

15   and foundation.

16       A.    Again, I'm confused on the

17   numbers.

18       Q.    I'll represent to you, sir, that

19   Endo 3202 is Opana ER in its premarketed

20   name, okay?

21       A.    Okay.

22       Q.    It says:  Create market

23   environment prior to launch that insures

24   rapid uptake in adoption.
```

1          Do you see that?

2     A.    Where are we looking?

3     Q.    I'm sorry.  I didn't give you a

4     page.

5          Dot-13.  "EN3202 strategy."

6     A.    Could you just repeat it for me?

7     Q.    Yes.

8          It says "EN3202 strategy."

9     A.    Okay.

10    Q.    (Reading) Create market

11    environment prior to launch that insures

12    rapid uptake in adoption of EN3202.

13         Right?

14    A.    I see it.

15    Q.    (Reading) Remove barriers, real

16    and perceived, to prescribers.

17         Right?

18    A.    Yes.

19    Q.    Okay.  Let's go to dot-19.  It

20    says:  ROI for EN3202.

21         Do you see that?

22    A.    Yes.

23    Q.    We looked at a lot of acronyms,

24    many of which I think you haven't been

Highly Confidential - Subject to Further Confidentiality Review

1    able to tell us what they actually stood

2    for.

3              You know what ROI is, right?

4    A.    Yes.

5    Q.    What is that?

6    A.    Return on investment.

7    Q.    Okay.

8              (Reading) Return on investment

9    for Opana ER.

10             It says:  Potential sales of

11   Opana ER depend directly on prescribers'

12   comfort level with the risk of abuse and

13   diversion.

14             Right?

15   A.    I see that.

16   Q.    Have to calm concerns among

17   doctors that the risk of abuse and

18   diversion for your drug, right?

19             MR. STERN:  Objection to form

20   and foundation.

21   A.    I'm sorry.  Are you pointing to

22   this presentation?

23   Q.    I'm asking you that question,

24   sir.

1    A.    I'm sorry.  Could you ask it

2    again?

3    Q.    Sure.

4         To have the ROI you wanted,

5    you've got to calm doctors' concerns about

6    the risk of abuse and diversion with your

7    drug, right?

8         MR. STERN:  Objection to form

9      and foundation.

10   A.    Again, I don't know that.  I see

11   the words here on paper.

12   Q.    Okay.  Well, let's talk about

13   really how the company shaped its messages

14   to do just that, okay.

15        MR. BUCHANAN:  You can take that

16      down, Corey.

17   BY MR. BUCHANAN:

18   Q.    Before we do so, let's go to

19   Exhibit 47.  Should be in your binder,

20   sir.

21        (Campanelli Exhibit 47, e-mail,

22      was marked for identification, as of

23      this date.)

24

1    BY MR. BUCHANAN:

2        Q.    It's an e-mail from a Larry

3    Romaine to a group late 2007.  "Opana

4    brand IQ team" is the attachment.

5            You see the attachment it says:

6    Endo sales force report Opana brand IQ

7    successful rep research 12/17/07.

8        A.    Yes.

9        Q.    Are the attachments.

10       A.    I see it.

11       Q.    If you go to the next page, you

12   see "Opana brand IQ team.  Accelerating

13   our growth," is what it says off to the

14   right?

15       A.    I see it.

16       Q.    Okay.  Top in the executive

17   summary of decisions or strategic

18   considerations says:  Pharma reps perceive

19   their challenges in a more negative light

20   and feel that marketing the CII to PCPs in

21   the current market setting is very

22   difficult.  PCPs are afraid of the

23   consequences of writing long-acting

24   opioids.

1          Do you see that?

2     A.     Yes.

3     Q.     Docs are afraid, right?

4          MR. STERN:  Objection; form and

5     foundation.

6     A.     That's what the words say.

7     Q.     It's talking about docs, we're

8     talking about primary care physicians when

9     we see PCPs, right?

10    A.     Correct.

11    Q.     And at the bottom it talks about

12    required resources.

13         Do you see that?

14    A.     I see it.

15    Q.     Okay.  So, one, it talks about

16    access tools to extend the sales call.

17         Two, it says:  Help reduce CII

18    prescribing concerns for PCP targets.

19         Right?

20    A.     I see it.

21    Q.     Okay.  So, the required

22    resources to help reduce CII.

23         That's CSII, that's a controlled

24    substance category?

1    A.    Correct.

2    Q.    CII concerns, that would be

3  concerns about drugs like OxyContin,

4  concerns about drugs like Opana, right?

5  Those are both CII drugs?

6          MR. STERN:  Objection to the

7      form of the question.

8    A.    Hydromorphone and oxymorphone

9  are Schedule II products.

10    Q.    And oxycodone is Schedule II,

11  right?

12    A.    Oxycodone is a CII product.

13    Q.    Right.  So Percocet, OxyContin,

14  Opana, all Schedule II, right?

15    A.    Correct.

16    Q.    So we say:  Help reduce

17  prescribing concerns for PCP targets about

18  drugs like those.

19          Right?

20    A.    That's what it says.

21    Q.    All right.  And then it goes

22  through and it outlines what's been

23  effective in dealing with that, right?

24    A.    Please refer me to a page.

1    Q.    Sure.  Let's go to -- I can't

2    read that number.  I think it's dot-33.

3              MR. STERN:  I'm sorry.  Which

4       exhibit?

5              MR. BUCHANAN:  It's the same

6       exhibit we're in.

7    BY MR. BUCHANAN:

8    Q.    Dot-33.  Should be a little

9    orange 27 in the right corner there 'cause

10   the number's a little concealed.

11             It says:  Promotional sales

12   tools.

13   A.    Show me where you're looking.

14             Okay.

15   Q.    You see that?

16             And it talks about what the reps

17   are doing to combat these concerns that

18   they're getting from prescribers, right?

19             MR. STERN:  Objection; form and

20      foundation.

21   A.    I'm not -- you have to point me

22   to where it says that.

23   Q.    You see dot-27?

24   A.    I see it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You see 27 in the corner?

2    A.    I see it.

3    Q.    It says:  Reps were using the

4    TIMERx-N delivery system to differentiate

5    Opana ER from the competition by its

6    delivery system.

7         Right?

8    A.    I see it.

9    Q.    At this point in time, sir, in

10   terms of extended-release, OxyContin was

11   competition?

12   A.    I don't know the answer to that.

13   Q.    Okay.

14        (Reading) It is also a good

15   discussion point if the physician is

16   afraid of abuse.

17        Right?

18        MR. STERN:  Objection; form and

19   foundation.

20   A.    I see the words.

21   Q.    Right.  Well, the TIMERx

22   delivery system, sir, was never permitted

23   to be characterized as some way of

24   reducing the risk of abuse; was it, sir?

1            MR. STERN:  Objection; form and

2        foundation.  It's not an Endo

3        document.

4            MR. BUCHANAN:  We disagree.

5    BY MR. BUCHANAN:

6        Q.    Please answer the question

7    though, sir.

8        A.    It's certainly not part of the

9    labeled indication.

10        Q.    You certainly wouldn't

11    endorse -- you would not endorse reps

12    saying things like that; would you, sir?

13        A.    Saying what?

14        Q.    Trying to deal with physicians'

15    concerns about abuse by talking about the

16    TIMERx-N delivery system to distinguish it

17    from OxyContin, right?

18        A.    Again, I don't know if -- if

19    this is an Endo document, if there's going

20    to be training and education behind a

21    statement of this nature or why it would

22    be -- if it was to be said or not to be

23    said.

24        Q.    Well, we know the message was

1    heard, right?

2           MR. STERN:  Objection; form and

3      foundation.

4    BY MR. BUCHANAN:

5       Q.    Well, let me ask you, sir.

6           Do you have knowledge about,

7    from your time when you joined Endo, about

8    the way in which Endo evaluates what

9    physicians are hearing from their sales

10   reps?

11      A.    No.

12      Q.    In fact, the company conducts

13   surveys to find out what messages are

14   being retained by doctors concerning the

15   products, right?

16      A.    I don't know what Endo did prior

17   to my employment as CEO.

18      Q.    Okay.  All right.  Let's look at

19   Exhibit 49, sir.

20           (Campanelli Exhibit 49, e-mail,

21      was marked for identification, as of

22      this date.)

23   BY MR. BUCHANAN:

24      Q.    That's an e-mail attaching

1    what's called an "Opana ATU Wave 3 Final

2    Report and Brand IQ Summary."

3              Do you see that?

4         A.    I see it.

5         Q.    There's a report attached.

6    Let's go to the second page.  Again "Opana

7    Brand IQ Team.  Accelerating Our Growth."

8              Do you see that?

9         A.    I see it.

10        Q.    Okay.  And let's go to the

11   dot-7.

12             Here's the Wave 3 final report,

13   right?

14        A.    Okay.

15        Q.    And just to orient you, sir, we

16   get into the document at dot-18 it says:

17   Opana is perceived well.

18             Then it talks about various

19   characteristics.

20             Do you see that?

21        A.    I see it.

22        Q.    And it talks about in the first

23   bullet:  Continues to be perceived as an

24   effective opioid in terms of potency and

1    duration of action.  However, its unique

2    strengths are.

3              And, what's the first unique

4    strength?

5    A.    Low abuse potential.

6    Q.    You know that was never a claim

7    the company was permitted to promote,

8    right?

9    A.    I know it's not in the labeled

10   indication.

11   Q.    It certainly wouldn't be right

12   to be giving that impression to doctors by

13   talking about the TIMERx system or some

14   unique delivery system that you had a low

15   abuse potential, right?

16             MR. STERN:  Objection; calls for

17        legal conclusion.

18   A.    Again, I don't know if this was

19   ever used with the sales reps.

20   Q.    Well, this was certainly the

21   report of what's being perceived about

22   your drug in this period of time, right?

23             MR. STERN:  Objection; form and

24        foundation.

1    BY MR. BUCHANAN:

2        Q.    Endo's drug?

3        A.    Again, I don't know who this is

4    going to, what it's being used for.  I

5    don't know if it's a sales rep document,

6    if it's an internal -- I have no idea

7    who's using this document.

8        Q.    Well, certainly, sir, you don't

9    dispute that Endo had knowledge at this

10   point in time, as reflected in this

11   document, about doctors' perceptions that

12   it had a low abuse potential, right?

13            MR. STERN:  Objection; form and

14       foundation.

15       A.    It's coming for -- it appears to

16   be research data.

17       Q.    With Endo's logo on it in a

18   report to a bunch of Endo folks, right?

19       A.    That's correct.

20       Q.    Okay.

21            It's just not true?

22            MR. STERN:  Objection; form and

23       foundation.

24

1    BY MR. BUCHANAN:

2        Q.    That Endo has a low abuse

3    potential?

4            MR. STERN:  Objection; form and

5        foundation.

6        A.    I -- as I stated, I don't know

7    what the purpose of this document, who

8    used it, what was it based upon.  I --

9    I -- I see the words on the paper, but I

10   don't know where this went or who used it.

11       Q.    Let's go to the next page, sir.

12           Opana's unique strengths in

13   having multiple formulations and low abuse

14   potential are key differentiating factors.

15           Do you see that?

16       A.    Yes.

17       Q.    Okay.  It's being characterized

18   as a unique strength to have a low abuse

19   potential, but it's not even true?

20           MR. STERN:  Objection; form and

21       foundation.

22   BY MR. BUCHANAN:

23       Q.    That's a false statement, sir.

24           MR. STERN:  Objection.

1   BY MR. BUCHANAN:

2       Q.    Isn't it?

3             MR. STERN:  Objection; form and

4       foundation.

5       A.    Again, I see the words on the

6   paper.  I don't know what the intentions

7   or the purpose of this statement is being

8   used here for.

9       Q.    The company could not properly

10  even try to differentiate itself from

11  another product using low abuse potential.

12  There was no data for that; was there,

13  sir?

14            MR. STERN:  Objection; form and

15      foundation; calls for a legal

16      conclusion.

17      A.    I don't know the answer to that.

18      Q.    Let's look at the last bullet:

19  Physicians say the primary factor that

20  leads them to anticipate an increase in

21  use of Opana ER over the next 6 months, is

22  what?

23      A.    Low abuse.

24      Q.    All these doctors, the doctors

1    who are prescribing your drug, have

2    somehow come with the impression that your

3    drug has a unique strength of low abuse

4    potential.

5            You see that in this report,

6    sir, right?

7        A.    I see the words.  I don't know

8    if this is something that has been

9    communicated to doctors.  This is clearly

10   not what reps would have been trained on.

11       Q.    Well, certainly, sir, when the

12   company got this information, what it

13   needed to do was get out there and say

14   "No, you're all wrong.  We do not have a

15   low abuse potential.  Our drug is abused

16   like other drugs.  We have a high abuse

17   potential."

18           That's what you'd want your

19   company to do, right?

20           MR. STERN:  Objection to form.

21   BY MR. BUCHANAN:

22       Q.    Correct this immediately?

23           MR. STERN:  Objection to form

24       and foundation and calls for a legal

1        conclusion.

2        A.    I don't know if they did or did

3    not do that.

4        Q.    It would certainly be concerning

5    if they didn't, we'd agree?

6             MR. STERN:  Objection; form and

7        foundation.

8        A.    Again, I know what the product

9    was labeled and indicated for under the

10   clinical trial that was approved by the

11   FDA.

12       Q.    Well, let's look what marketing

13   recommends, okay.  Let's look how

14   marketing responds to this information.

15   Let's go to dot-22. "Marketing

16   Implications and Recommendations."

17            Marketing is recommending, sir,

18   continue promoting lower abuse potential,

19   right?

20            MR. STERN:  Objection; form and

21       foundation.

22   BY MR. BUCHANAN:

23       Q.    Do you see that at the bottom of

24   the page, sir?

1        A.    I see -- I see the words on the

2   paper.

3        Q.    Right.

4              Continue promoting something

5   that is false.

6              MR. STERN:  Objection to form

7         and foundation and mischaracterizes

8         the document.

9              MR. BUCHANAN:  It does not in

10        any way.

11       A.    Again, my understanding is this

12  would go through a review committee

13  meeting in order to get proper language

14  out to -- to the sales reps in training.

15             I don't know where this went.

16  Marketing is one component of -- of

17  individuals that would have to agree on --

18  on statements.

19       Q.    You saw the CDC report in 2011,

20  right?  Deaths, massive numbers and growth

21  in ten years' time.  And you guys are

22  saying continue promoting low abuse

23  potential?

24             MR. STERN:  Objection.

```
 1    BY MR. BUCHANAN:

 2        Q.    You guys being Endo, sir.  The

 3    company you're the chief executive officer

 4    of.

 5             MR. STERN:  Objection; form and

 6        foundation.

 7             He was not the chief executive

 8        officer at the time of this document.

 9    BY MR. BUCHANAN:

10        Q.    I'm sorry, sir.

11             Does that forgive it?

12             MR. STERN:  Objection.

13        A.    Okay.  So, clearly it -- you

14    know, a lot of people -- everybody feels

15    bad about the abuse and deaths associated

16    with opioids.

17             You're pointing to me to a

18    statement made by marketing which I don't

19    have the ability to know where or how this

20    was used, if it was even used and if it

21    was mark approved or not.  So I don't know

22    how to respond to a bullet with some words

23    on it if it ever even got to the sales

24    reps.
```

```
 1          Q.    Okay.  Well, let's -- let's read

 2     a little more closely then, sir.

 3          A.    Okay.

 4          Q.    "Continue promoting."

 5                Do you see the first two words?

 6          A.    I see "continue promoting."

 7          Q.    (Reading) Continue promoting

 8     Opana's strengths.

 9                And, what is the particular

10     point that should be continually promoted?

11          A.    In potency, dosing.

12          Q.    Low abuse potential?

13          A.    Again, as I stated, I don't know

14     if this was a mark reviewed and approved

15     document, or is it just coming from

16     marketing.  What it says here is marketing

17     implications and recommendations.  I don't

18     know if other people weighed in on this

19     statement.

20          Q.    Okay.  It says in the middle,

21     sir, in the bullet --

22                MR. BUCHANAN:  I'll move to

23          strike the non-responsive portion of

24          your answer, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It says in the middle that:    In

2    order to help overcome these obstacles,

3    it's crucial to encourage uptake by

4    maintaining detailing frequency across all

5    physician specialties.

6         Do you see that?

7    A.    I see the words.

8    Q.    Okay.  Let's break this down a

9    little bit.

10        Detailing.  That's boots on the

11   ground sales reps in doctors' offices,

12   right?

13   A.    Correct.

14   Q.    Okay.  So we've got to maintain

15   the frequency that sales reps are in

16   doctors' offices talking to them, right?

17   That's one component of this?

18   A.    That's a component of the

19   recommendation.

20   Q.    To overcome obstacles, right?

21   A.    That's a recommendation of the

22   marketing team.

23   Q.    And continue promoting.  Let's

24   stop there.

```
 1              If you are continuing something,
 2    you have already been doing it, right,
 3    sir?
 4              MR. STERN:  Objection to form
 5        and foundation.
 6        A.    Again, I see the words on -- on
 7    the slide here.  I don't know if every one
 8    of these things is being done or not.
 9        Q.    Okay.  Continue promoting and it
10    identifies some things.  And then in
11    parens it says:  Particularly, low abuse
12    potential, each of which resonates well
13    with physicians.
14              Did I read that correctly, sir?
15        A.    Yes, you did.
16              MR. BUCHANAN:  I suggest we take
17        a short break.
18              MR. STERN:  Sure.
19              THE VIDEOGRAPHER:  Okay.  The
20        time is 3:59 p.m.
21              Off the record.
22              (Recess taken.)
23              THE VIDEOGRAPHER:  We are back
24        on the record.
```

1              The time is 4:14 p.m.

2     BY MR. BUCHANAN:

3         Q.    Okay.  Sir, we were just looking

4     at this late 2007 Opana ATU W3 review.

5              MR. STERN:  I'm sorry,

6         Mr. Buchanan.  I really apologize.  I

7         left my pad downstairs.  I'll be right

8         back.

9              MR. BUCHANAN:  No worries.

10             THE VIDEOGRAPHER:  The time is

11        4:15 p.m.

12             Off the record.

13             (Recess taken.)

14             THE VIDEOGRAPHER:  We are back

15        on the record.

16             The time is 4:18 p.m.

17    BY MR. BUCHANAN:

18        Q.    Sir, we were just looking at the

19    late 2007 Opana AT W3 review.  I'd like to

20    move us forward now into 2008.

21             Again, a marketing analysis of

22    what docs are retaining and the messaging

23    to doctors.

24             If you'll scroll forward in your

1    binder to Exhibit 50.

2         (Campanelli Exhibit 50,

3    document, was marked for

4    identification, as of this date.)

5    BY MR. BUCHANAN:

6    Q.    It says "Opana ATU W6 Final

7    Report December 2018."

8         Do you see that, sir?

9    A.    I do.

10   Q.    Okay.  Going forward to dot-12,

11   sir.  "Key insights."

12        "On the most important

13   characteristics."

14        Do you see that paragraph, sir,

15   first one?

16   A.    I do.

17   Q.    On the most important

18   characteristics, it talks first about how

19   physicians rate Opana ER significantly

20   lower than all other ER opioids on

21   insurance formulary.

22        Do you see that first part?

23   A.    Yes.

24   Q.    But they rate Opana ER

1    significantly higher than all others on

2    "Does not have a representation for street

3    abuse."

4              Do you see that?

5    A.    I see it.

6    Q.    Okay.

7              (Reading) Therefore, Opana ER's

8    position in doctors' minds around the lack

9    of street value leading to a perception of

10   lower potential for street use.

11             Do you see that?

12   A.    I see that.

13   Q.    And then:  MDs when prescribing

14   increases for Opana ER over the next six

15   months continue to mention low abuse

16   potential.

17             Right?

18   A.    I see it.

19   Q.    (Reading) This aligns with

20   findings in previous waves of the ATU as

21   well as other studies conducted with Opana

22   ER physicians.

23             Did I read that correctly?

24   A.    Yes, I see the words.

1    Q.    Okay.  Let's go, please, to

2    dot-17.

3          Its heading is "Opana ER remains

4    at par with other ER Schedule II opioids

5    on potency."

6          Do you see that?

7    A.    I do.

8    Q.    It has an opportunity to build

9    on one of its most important strengths,

10   low abuse potential.

11         Do you see that, sir?

12   A.    I see it.

13   Q.    Okay.

14         (Reading) Interestingly - second

15   to last bullet - physicians who anticipate

16   an increase in prescribing Opana ER in the

17   next six months say that their estimates

18   are primarily driven by low abuse

19   potential.

20         Right?

21   A.    And efficacy, yes.

22   Q.    And efficacy factors, thank you.

23         All right.  So, this is the end

24   of 2008, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    We go to dot-56 in the document.

3   It says:  Advantages of Opana ER - in the

4   left-hand side - mentioned by five or more

5   physicians.

6            Do you see that?

7      A.    I see it.

8      Q.    Number 1 item there under

9   "Safety and Tolerability":  Fewer side

10  effects.

11           What is that?  Low abuse

12  potential?

13     A.    I see low abuse potential.

14     Q.    All right.  So that's a year

15  after the last one we looked at.

16           Let's go forward to 2010, sir.

17           We are at Exhibit 51 in your

18  binder.

19           (Campanelli Exhibit 51,

20      document, was marked for

21      identification, as of this date.)

22  BY MR. BUCHANAN:

23     Q.    (Reading) Opana ER customer

24  satisfaction sales force effectiveness,

1  awareness and usage.  Research program

2  Wave 2.

3          Do you see that?

4      A.    I do.

5      Q.    Okay.  If we go to it's dot-79.

6  It's kind of hard to see in the red.

7          Top right corner is presenting

8  physician survey information concerning

9  your product Opana ER, correct?

10     A.    I see the words.

11         MR. STERN:  Objection; form and

12     foundation.

13 BY MR. BUCHANAN:

14     Q.    (Reading) Attributes related to

15 increase in prescribing of Opana ER Wave 2.

16         You see that?

17     A.    I see the words, yes.

18     Q.    (Reading) Top mentions mentioned

19 by five or more physicians.

20         First item is what, sir?

21     A.    Low potential for

22 abuse/diversion 37 percent.

23     Q.    Low potential for

24 abuse/diversion.  37 percent of physicians

1    mentioned that as related to increase in

2    prescribing of Opana ER.

3              Right?

4    A.    That's what it says.

5    Q.    Okay.  And we know that is not

6    true, right, sir?

7              MR. STERN:  Objection; form and

8        foundation.

9    A.    Again, I don't know what the

10   purpose of this is being used for.

11   Q.    The company had boots on the

12   ground for years detailing doctors about

13   Opana ER, correct, sir?

14             MR. STERN:  Objection; form and

15       foundation.

16   A.    Endo detailed Opana ER.

17   Q.    It had every opportunity to

18   share the truth about its product with

19   physicians if it wanted to.

20             Fair?

21             MR. STERN:  Objection to form

22       and foundation.

23   A.    I'd have to look through the

24   training documents to see what was trained

1    on or what ultimately was the approved

2    mark program.

3        Q.    And if there was indeed no -- if

4    there was not a low potential for abuse or

5    diversion, sales reps had the ability to

6    tell doctors just that.

7            MR. STERN:  Objection; form and

8        foundation.

9    BY MR. BUCHANAN:

10       Q.    Right?

11       A.    Again, I'd have to go to the

12   mark -- approved mark documents to see

13   what was given in front of the sales reps

14   to speak to doctors about.

15           MR. BUCHANAN:  Can we pull up

16       Romaine 2 for the witness, and a copy

17       for counsel, please?  It's an excerpt

18       of testimony of Larry Romaine.

19       Q.    Do you know who Larry Romaine

20   is, sir?

21       A.    No.

22       Q.    VP of sales, oversaw Opana ER.

23           He wasn't there at any point

24   when you were there, sir?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    No.

2        Q.    Okay.

3              MR. BUCHANAN:  Could you pull up

4        Romaine clip 2?

5              (Video played.)

6              "The ATU studies, these were

7        studies to go out to the providers to

8        see what messages they were retaining

9        with respect to Opana, correct?

10             "It was market research with

11       physicians, yes.

12             "But they were looking to see

13       what messages were retained by those

14       physicians?

15             "Yes.

16             "Okay.  And also to see what the

17       physicians' perceptions were of Opana

18       ER, correct?

19             "Correct.

20             "And if we look again at page

21       E974.13, this report is indicating as

22       of June 2007 that low abuse potential

23       and safety and tolerability were

24       regarded as the main advantage of
```

1    Opana ER, according to this study,

2    correct?

3        "According to this study that

4    I'm looking at now.

5        "Yeah.  And this is a study that

6    Endo would have reviewed when received

7    in June 2007?

8        "Yes.

9        "Okay.  So they would have seen

10   it.  That was what the study was

11   finding was that the perception was

12   that Opana ER had low abuse potential,

13   and that was an advantage with respect

14   to other long-acting opioids, correct?

15       "That's what this data reflects.

16   But to put this in context, that's

17   what physicians were feeding back.  So

18   where they heard that could be

19   anywhere.  It could be talking to

20   other colleagues.  I -- I don't know

21   how to interpret this.

22       "Do you know if anyone went to

23   go find out to see if, Gee, is it

24   possible that physicians are getting

1       an impression of Opana ER as having

2       low abuse potential compared to other

3       long-acting opioids based on messages

4       that the sales reps are delivering?

5       Did anyone ever check that?

6               "I don't recall that."

7   BY MR. BUCHANAN:

8       Q.    Are you aware, at any point in

9   time, sir, where the company ever went out

10  to correct physicians' impression of low

11  abuse potential of Opana ER, sir?

12              MR. STERN:  Objection; form and

13      foundation.

14      A.    Again, I was not at the company

15  at this point in time, so I don't know --

16  I don't know what the company did.

17      Q.    Okay.  Let me -- sir, by 2009,

18  you were well-aware -- you, I'm sorry,

19  Endo, was well-aware that Opana had a

20  second degree issue with abuse.

21              Isn't that true?

22              MR. STERN:  Objection to form

23      and foundation.

24      A.    I don't know the answer to that

Highly Confidential - Subject to Further Confidentiality Review

1    question back in 2009.

2        Q.    All right.  Well, we looked at

3    ATU reports from 2007, 2008 and 2010, sir,

4    and you saw that doctors had that message

5    being retained, right?

6        A.    That's what the document

7    reflects.

8        Q.    In fact, Opana had a high

9    potential for abuse, right?

10            MR. STERN:  Objection to form

11        and foundation.

12        A.    I don't know that.

13        Q.    Okay.  Let's look at Exhibit 52

14    then, sir.

15            (Campanelli Exhibit 52, e-mail,

16        was marked for identification, as of

17        this date.)

18    BY MR. BUCHANAN:

19        Q.    Before you, sir, is Exhibit 52,

20    an e-mail from one Endo person to another

21    Endo person "FYI only."

22            Right?  Do you see that?

23        A.    I see it.

24        Q.    OSAM-O-Gram Opana January 2009.

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that, sir?

2    A.    I do.

3    Q.    And this is from a special --

4    somebody Angela Thomas out of Endo

5    Pharmaceuticals in Dayton, Ohio, right?

6    A.    I see that.

7    Q.    Okay.  She states:  Please don't

8    forward this on.

9    Right?

10   A.    I see it.

11   Q.    Okay.

12   (Reading) I just wanted you to

13   be aware of this report that is being sent

14   out to some doctors?

15   Do you see that?

16   A.    I do.

17   Q.    Okay.  And this OSAM-O-GRAM in

18   Ohio from the Department of Alcohol and

19   Drug Addiction Services reports that your,

20   Endo's, drug Opana has a high potential

21   for abuse, right?

22   A.    Where does it say that, sir?

23   Q.    The title here:  Reports of

24   Opana abuse emerging in several OSAM

1    network areas.

2             Do you see that, sir, as the

3    title?

4        A.    I see the abuse emerging in

5    several OSAM network areas, yes.

6        Q.    (Reading) What is Opana?

7             Bottom left corner.

8        A.    I see it.

9        Q.    Okay.

10            (Reading) Opana's psychoactive

11   ingredient is oxymorphone, a Schedule II

12   semisynthetic pharmaceutical opioid that

13   has high potential for abuse.

14            Do you see that, sir?

15       A.    I see the words, yes.

16       Q.    Do you see the contrast between

17   that sentence and the message that the

18   company was continuing to promote about

19   low potential for abuse?

20            MR. STERN:  Objection; form and

21       foundation.

22       A.    Again, I see -- I see the words

23   coming out of Wright State University, and

24   I do see the difference between what was

1    on the previous presentation.

2        Q.    Right.  Because what's coming

3    out here in January of 2009 is high

4    potential for abuse, right?

5        A.    I'd have to study the document.

6    It's -- it says abuse emerging.

7        Q.    But we see "Opana's psychoactive

8    ingredient is oxymorphone, a Schedule II

9    semisynthetic pharmaceutical opioid that

10   has high potential for abuse."

11           Do you see that, sir?

12       A.    I see the words.

13       Q.    Okay.  And then it goes on and

14   talks about elicit user perspectives on

15   Opana, off to the right.

16           Do you see that?

17       A.    That's the heading.

18       Q.    Okay.

19           (Reading) Users in Athens and

20   Cincinnati indicated that Opana high, that

21   the Opana high was comparable to and even

22   better than that of OxyContin.

23           Do you see that?

24       A.    I see that.  I don't know what

1    this is based upon.

2        Q.    Reports of users in Athens,

3    Cincinnati.  That's what it's based on.

4        A.    I don't know how this

5    information is being gathered.

6        Q.    Okay.

7              (Reading) A white female user

8    from her 20s in Athens reported that her

9    best friend had obtained a tablet

10   illegally and inhaled it intranasally.

11   She commented, And I guess you can get

12   really blown out of it for less than a

13   tablet of OxyContin.

14             Do you see that?

15       A.    I do.

16       Q.    (Reading) Another white female

17   in her mid-20s added, Right.  I guess

18   that's like an Oxy times ten.

19             Right?

20       A.    I see the words.

21       Q.    Okay.  In fact, you do know,

22   sir, maybe not times ten, but you do know

23   that oxymorphone, the active ingredient in

24   Opana, is more potent than the active

1    ingredient in OxyContin, right?

2         A.    I'm aware.

3         Q.    Twice as potent, right?

4               MR. STERN:  Objection; form and

5         foundation.

6         A.    I know it's more potent.

7         Q.    It continues:  The oxymorphone

8    is the best, even better than oxycodone.

9    I can do a whole Oxy 80 and nothing

10   happens, but if I take one of them pills,

11   Opana ER, I get a buzz.  That's how I get

12   energy and to do things around the house.

13              Do you see that, sir?

14        A.    I see the words.

15        Q.    And it reports about abuse and

16   user perceptions regarding the superiority

17   of Opana versus that other drug that had

18   all the problems we talked about earlier,

19   OxyContin, right?

20              MR. STERN:  Objection to form.

21        A.    I'm sorry.  Could you ask

22   that -- could you just ask that again?

23        Q.    Yeah.

24              It's talking about the problems

1  with your drug, your Endo's drug, Opana,

2  relative to that other drug, OxyContin,

3  that we spent some time talking about

4  earlier today, correct?

5      A.    It says "In comparison to other

6  pharmaceutical opioids."  I'm not sure

7  what it means.

8      Q.    Okay.

9            (Reading) Overall, the emerging

10  phenomenon of oxymorphone tablet abuse is

11  consistent with the continuing trend of

12  high levels of pharmaceutical opioid abuse

13  in Ohio and across the nation.

14            Correct?

15      A.    That's what the words say, yes.

16      Q.    And that's certainly not the

17  only report the company got about

18  oxymorphone abuse, right?

19            MR. STERN:  Objection to form

20      and foundation.

21      A.    You've shown me others today.

22      Q.    And that's a bulletin we just

23  looked at in 2009 for Ohio, right?

24      A.    It's -- it's coming from this

Highly Confidential - Subject to Further Confidentiality Review

1    OSAM-O-GRAM from Wright State University.

2         Q.    Let's go forward in your binder,

3    sir, to 54.

4              (Campanelli Exhibit 54,

5         document, was marked for

6         identification, as of this date.)

7         A.    54?

8         Q.    DEA released --

9         A.    I'm sorry, 54?

10        Q.    54, yes, sir.

11             2011 Opana abuse.

12        A.    Where do you have me looking,

13   sir?

14        Q.    Exhibit 54.

15        A.    Okay.  Which?

16        Q.    I'm sorry.  The title says

17   "Opana (oxymorphone) abuse.)

18             Do you see that?

19        A.    I do see it.

20        Q.    Okay.

21             (Reading) It's been reported by

22   several sources of information as the big

23   thing right now.

24             Right?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I see the words.

2       Q.      Okay.

3               (Reading) Details.  Oxymorphone.

4    Opana, Numorphan, Numorphone - gives the

5    longer chemical name - is a powerful

6    semisynthetic opioid analgesic.

7               Right?

8       A.      I see it.

9       Q.      (Reading) In the early 1970s,

10   oxymorphone in the form of Numorphan

11   instant release tablets was one of the

12   most-sought offer and well-regarded

13   opioids of the class of IV drug-using

14   community.

15              Correct?

16      A.      I see it.

17      Q.      (Reading) Popularly known as

18   Blues for their blue coloring, the tablets

19   contained very few insoluble ingredients,

20   making them extremely easy to inject and

21   they were dangerously potent when used

22   intravenously.

23              Right?

24      A.      I see the words.

1    Q.    Does this help inform you, sir,

2    as to the history behind Opana's active

3    ingredient oxymorphone?

4    A.    According to the words on the

5    paper here, I see.

6    Q.    Certainly you would have

7    expected your company, Endo, to be aware

8    of releases by the DEA about the products

9    it was selling, right?

10    A.    And maybe they were.  I'm -- I'm

11    uncertain.

12    Q.    Okay.

13         (Reading) Blues were also

14    considered to be especially euphoric.

15         Do you see that?

16    A.    I do.

17    Q.    (Reading) Better than heroin or

18    Morphine.

19         MR. STERN:  Objection; form and

20         foundation.

21    A.    I see it.

22    Q.    Okay.  It's got a whole

23    paragraph of slang terms for these things:

24    blues, biscuits, blue heaven, new blues,

Highly Confidential - Subject to Further Confidentiality Review

1    octagons, stop signs, pink, pink heaven,

2    business circuits, pink lady, Mrs. O, OM,

3    pink O, the O bomb.

4              Do you see that?

5    A.    I do.

6    Q.    Does that suggest to you, sir,

7    that your drug was being widely abused and

8    diverted in this country?

9              MR. STERN:  Objection to form

10        and foundation.

11   A.    I don't know the answer to that.

12   Q.    No shortage of street names for

13   your oxymorphone product, right, sir?

14             MR. STERN:  Objection to form

15        and foundation.

16   A.    There's several.

17   Q.    Oxymorphone -- I'm sorry, sir.

18   There's a heading called "Abuse" on the

19   next page.  Got some pictures there too.

20             You see that?

21   A.    I see it.

22   Q.    Beneath that:  Oxymorphone has

23   short-lived euphoric effects.  This is one

24   of the crucial elements of a drug that

1    generates a serious narcotic habit rather

2    quickly.

3              Did I read that correctly?

4    A.    Yes.

5    Q.    Oxymorphone has a short-lived,

6    or has short-lived euphoric effects, and

7    the DEA is commenting this is one of the

8    crucial elements of a drug that generates

9    a serious narcotic habit, right?

10   A.    I see it.

11   Q.    Rather quickly?

12   A.    That's what it says.

13   Q.    (Reading) Users will require

14   more doses to maintain a stable level of

15   euphoria.

16             Right?

17   A.    That's what the words say.

18   Q.    Not good.

19             MR. STERN:  Objection; form and

20   foundation.

21   BY MR. BUCHANAN:

22   Q.    Right?

23   A.    It's not a positive statement.

24   Q.    Certainly it would not be

Highly Confidential - Subject to Further Confidentiality Review

1   appropriate to be endorsing and promoting

2   a low abuse potential about a drug about

3   which can generate a serious narcotic

4   habit rather quickly.

5           MR. STERN:  Objection; form and

6       foundation.

7   BY MR. BUCHANAN:

8       Q.    Agreed?

9       A.    Again, I don't know if Endo did

10  or did not do this.

11      Q.    Will you agree, sir, you are not

12  aware of any scientific data for Opana ER

13  or Opana ER formulated that had a low

14  abuse potential, right?

15          MR. STERN:  Objection; form and

16      foundation.

17      A.    I'm unaware.

18      Q.    Okay.

19          MR. BUCHANAN:  Could we play

20      that clip from Mr. Romaine?

21  BY MR. BUCHANAN:

22      Q.    Mr. Romaine, again, is the vice

23  president of sales at this point in time,

24  or during the time the product was being

Highly Confidential - Subject to Further Confidentiality Review

1    marked.

2        A.    Can you remind me the time

3    frame?

4        Q.    Yeah.  This is -- the deposition

5    was recently.

6            MR. STERN:  What's the time

7        frame?

8        A.    Of his marketing.

9        Q.    In the pre-2010 window is when

10   it was in the context of those ATU reports

11   we were looking at, sir.

12            MR. BUCHANAN:  Could you roll

13       the clip?

14            (Video played.)

15            "Endo knew that Opana ER did not

16       have a lower abuse potential than

17       other opioids, correct?

18            "Objection; foundation.

19            "That's in the package insert.

20            "Right.  There's not a lower

21       abuse potential for Opana ER, correct?

22            "Correct.

23            "And there is not a low abuse

24       potential for Opana ER, correct?

1        "Correct."

2   BY MR. BUCHANAN:

3       Q.    Sir, sitting here today, you're

4   not aware of any data that states

5   otherwise; are you?

6       A.    I'm not aware of any.

7       Q.    Okay.  Let's go forward to

8   Exhibit 53.

9            (Campanelli Exhibit 53, e-mail,

10        was marked for identification, as of

11        this date.)

12  BY MR. BUCHANAN:

13      Q.    Moving forward in time, sir,

14  this is 2011.  It's an e-mail thread, and

15  we'll start bottom up, if we could.

16            It's an e-mail from Mr. Tormo.

17  We've seen some correspondence from him

18  earlier already today, e-mails and

19  whatnot.  Mr. Tormo is communicating with

20  others June 27th, 2011.

21      A.    I'm sorry.  We're in Tab 53?

22      Q.    It should be tab 53.  If you go

23  to the second page.

24      A.    I'm sorry.

1      Q.    Dot-2.  564.2.

2      A.    Okay.

3            I can't really see this print on

4      the screen, but go ahead.

5      Q.    Okay.

6            MR. STERN:  Just look at the

7      document.

8  BY MR. BUCHANAN:

9      Q.    If you can read the document, if

10     that works for you, sir.

11           Mr. Tormo writes:  FYI.  One of

12     our therapeutic experts attending the

13     ASIPP, American Society of Interventional

14     Pain Physicians, meeting this past

15     weekend, informed Catherine Jackson,

16     clinical affairs manager pain southeast,

17     that a speaker from the DEA made the

18     same -- made some comments relating to

19     Opana misuse and diversion saying it was

20     the next OxyContin epidemic.

21           Do you see that, sir?

22     A.    I see it.

23     Q.    Did I read that correctly?

24     A.    You did.

1    Q.    Okay.  You certainly expect the

2    company to be heeding those concerns and

3    insuring that physicians were not getting

4    the impression that the drug had a low

5    abuse potential, correct?

6             MR. STERN:  Objection; form and

7         foundation; calls for legal

8         conclusion.

9    A.    Again, I'm not sure what the

10   company did or did not do regarding this

11   statement.

12   Q.    All right.  You can set that

13   aside, sir.

14            I want to spend a few minutes on

15   Qualitest, if we could.

16            It's been a while since we

17   talked about Qualitest today, sir.  We

18   talked about them this morning.

19            That was that business that

20   really their business was opioids, or at

21   least a very significant percentage of

22   their business, right?

23            MR. STERN:  Objection;

24        foundation.

Highly Confidential - Subject to Further Confidentiality Review

1        Time frame?

2    BY MR. BUCHANAN:

3        Q.    Let's talk pre-merger.

4             Certainly prior to 2010, you

5    know, sir, that, what, about half of the

6    business of Qualitest was opioid products?

7             MR. STERN:  Objection;

8        foundation.

9        A.    I never quantified the number of

10   products in that regard.  They had a

11   series of products in their portfolio.

12       Q.    Okay.  Let's go to Exhibit 62.

13            MR. STERN:  You meant

14       pre-acquisition of Qualitest by Endo.

15            MR. BUCHANAN:  That is what I

16       meant.

17   BY MR. BUCHANAN:

18       Q.    I was trying to orient you to

19   2010, sir.

20            That's when Endo acquired

21   Qualitest, correct?

22            MR. STERN:  The assets thereof.

23       A.    I know this in 2010.

24       Q.    Thank you.

1          This is an e-mail, sir, from VP

2     of business development Paul Evans to

3     Jeremy Tatum.

4          Do you know Mr. Tatum, sir?

5     A.     I do know Mr. Tatum.

6     Q.     Okay.  You know his function?

7     A.     Yes.

8     Q.     What was it?

9     A.     When he worked for Par, was

10    supply chain.

11    Q.     Got you.

12         So, this is a presentation as of

13    May 2010.  If you go to the second page.

14    Qualitest Pharmaceuticals.

15         Got some plants down there in

16    Alabama and Charlotte, right?

17    A.     There were, yes.

18    Q.     Okay.  I'd like to direct your

19    attention, please, to dot-4.  It says here

20    it's a leading developer and manufacturer

21    and marketer of prescription generic

22    pharmaceutical products, right?

23    A.     Yes.

24    Q.     If you scroll down it says:

Highly Confidential - Subject to Further Confidentiality Review

1    Focused on controlled substances and

2    developing a broad line of OCs.

3           I think I think the fourth or

4    fifth built.

5           See that?

6    A.    I see it.

7    Q.    Okay.  Controlled substances,

8    that would be products like opioids,

9    right?

10   A.    Correct.

11   Q.    And developing a broad line of

12   OCs, would that be oral contraceptives?

13   A.    That would be.

14   Q.    So as a class of business,

15   controlled substances was a big component

16   of Qualitest's book of business at that

17   point in time, right?

18   A.    It was a focus.

19   Q.    Okay.  And at the time when Endo

20   acquired Qualitest in 2010, it was the

21   fifth largest generics company, right?

22   A.    I believe that's right.

23   Q.    Okay.  You were in the space at

24   that point in time.  Par is probably a

1    competitor of Qualitest, right?

2        A.    Generically speaking, yes, but

3    our portfolios were very different.

4        Q.    I see.  So you were both generic

5    manufacturers, but you had different

6    really product focuses.

7            Would that be fair?

8        A.    Our strategies were very

9    different, but yes.

10       Q.    Okay.  Let's go to the next

11   page.  It tracks the history of the fifth

12   largest U.S. generics company.  You see

13   that?  Goes back to 1983.

14           Did you know that Qualitest was

15   formed as a joint venture with K-mart?

16       A.    I did.

17       Q.    Okay.  It grew ultimately, it I

18   guess it was acquired by a private equity

19   firm in 2007, right?

20       A.    Yes.

21       Q.    And we looked at those charts on

22   pills that were sold, and we saw the

23   company kind of gussied up its production

24   of -- of opioid products in the years

1    after that acquisition.

2            Isn't that right, sir?

3            MR. STERN:  Objection to form

4    and foundation.

5        A.    I'm not sure what gussied up

6    means.

7        Q.    I'm sorry.

8            It gussied itself up and was

9    producing a lot more opioids in the years

10   after that, right?

11           MR. STERN:  Objection; form and

12   foundation.

13       A.    It produced a large volume of

14   opioids.

15       Q.    Okay.  APAX fund.  I guess when

16   they bought the company it was the seventh

17   largest generic company, right?  According

18   to this?

19       A.    People define size by different

20   metrics, but according to them, they were

21   the seventh largest.

22       Q.    And by this time today, which

23   would have been mid-2010, they're listing

24   themselves as the fifth largest, correct?

1    A.    According to this document.

2    Q.    Okay.  Let's go forward and talk

3  about Qualitest's portfolio at the time

4  that Endo, I guess, went shopping for

5  them.

6          Let's go to dot-9.

7          It says:  Diversify portfolio of

8  specialty generics positioned in

9  attractive product categories.

10         Right?

11   A.    I see it.

12   Q.    Okay.  The attractive product

13  categories that are listed, first one

14  listed there on the left is what, sir?

15   A.    Controlled substances.

16   Q.    Okay.  Controlled substances in

17  the eyes of Qualitest was an attractive

18  product category.

19         Fair?

20   A.    That's what it says.

21   Q.    Leading manufacturer of

22  controlled substances in the United

23  States.

24         Right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That's what it says.

2    Q.    43 percent of total revenues in

3  2009, right?

4    A.    That's what it says.

5    Q.    Top 3 products by revenue.

6  Number one and number two are two of those

7  products that the CDC said are the drugs,

8  the prescription drugs that are being

9  used, responsible for the opioid epidemic,

10  right?

11    A.    That's what the reports show

12  that you showed me before.

13    Q.    Okay.  So, 43 percent of

14  Qualitest's revenue in 2009 was selling

15  controlled substances, really these three

16  products, right?

17    A.    That's what the document says.

18    Q.    Okay.  And the plan, the plan,

19  if we go to the next page, sir, is to do

20  more and to continue to grow, right?

21    A.    I'd have to read this.

22    Q.    Well, let's just look at the

23  strategy off to the right, just to orient

24  you.

Highly Confidential - Subject to Further Confidentiality Review

1          I realize it's late in the day

2    at this point.

3          A.    (Perusing document.)

4          MR. BUCHANAN:  Can you also blow

5    up the heading, Corey?

6          Q.    (Reading) Qualitest has a strong

7    presence and broad product line in the

8    controlled substances market.

9          Did I read that correctly, sir?

10         A.    You did.

11         Q.    Okay.  Strategy.  Bullet 1:

12   Continue to expand portfolio and broaden

13   the offerings in this category.

14         Right?

15         A.    Yes.

16         Q.    Offer more, right?

17         A.    It's just hard for me to put a

18   connection of does it mean specifically

19   controlled substances.

20         Q.    Okay.  Well, the category that

21   we're talking about under that heading,

22   sir, do you see "Qualitest is a strong

23   presence and broad product line in the

24   controlled substances market"?  Right?

1    A.    Okay.  I see it.

2    Q.    On the left-hand side it says

3    "Barriers to entry"?

4    A.    I see it.

5    Q.    And it lists some of these

6    barriers to entry you might expect in the

7    controlled substances market.

8          Fair?

9    A.    Yeah, I just needed to catch the

10   flow.

11   Q.    Fair enough.

12         Okay.  And, so, this company,

13   with its focus as a leading manufacturer

14   of opioids and controlled substances, was

15   the company Endo went shopping for in

16   2010, right?

17         MR. STERN:  Objection; form and

18         foundation.

19   A.    Endo acquired Qualitest in 2010.

20   Q.    Okay.  And this was after the

21   FDA had declared a public health crisis

22   secondary to prescription opioid products,

23   right?

24         MR. STERN:  Objection to form

Highly Confidential - Subject to Further Confidentiality Review

1    and foundation.

2        A.    I'm not sure if it conducted a

3    health crisis here.

4        Q.    Well, let me show you, sir,

5    Exhibit 61.

6            (Campanelli Exhibit 61, e-mail,

7        was marked for identification, as of

8        this date.)

9    BY MR. BUCHANAN:

10       Q.    Exhibit 61, sir, is a series of

11   Power Points that were presented to

12   various Endo and other industry folks at

13   an FDA REMS meeting in March of 2009.

14           Do you see the first page?

15       A.    I do.

16       Q.    Okay.  You were in this

17   certainly in the drug space in 2009, sir.

18           Were you in the Par -- was Par

19   in the opioid space at this point in time?

20       A.    I don't believe so.

21       Q.    Okay.  And, so, on dot-8 we see

22   a presentation by Mr. Rappaport.  Excuse

23   me, Dr. Rappaport:  REMS for opioid

24   analgesics.  How did we get here?  Where

1    are we going?

2            Talks about first reports of

3    widespread OxyContin abuse in 2000.

4            Do you see that, sir, bottom of

5    the page?

6        A.    I see it.

7        Q.    Okay.  And then move on to:

8    It's time to take action, on dot-10.

9            Right?  Bottom of the page?

10       A.    I see it.

11       Q.    It says:  Prescription opioids

12   are at the center of a major public health

13   crisis of addiction, misuse, abuse,

14   overdose and death.

15           Right?

16       A.    I see it.

17       Q.    Two years before the CDC

18   declared it a public health epidemic, the

19   FDA declared it a public health crisis,

20   right?

21       A.    I don't know if the FDA -- this

22   is a REMS program.  I'm not sure that this

23   is -- that they declared it a public

24   health crisis.

1    Q.   Well, certainly what the FDA

2    said to manufacturers concerning, at this

3    particular meeting by Dr. Rappaport,

4    prescription opioids are at the center of

5    a major public health crisis.

6         Do you see that?

7    A.   I see that, but I don't know if

8    he's speaking on behalf of the FDA.

9    Q.   Sorry, sir.  You do see that

10   it's an FDA presentation?

11   A.   I do, but it's focused on REMS.

12   Q.   Okay.  At 896.8.

13   A.   I see it.

14   Q.   Could we agree that this is not

15   a presentation, it's just an industry

16   conference, right?

17        MR. STERN:  Objection to the

18   form.

19   A.   It's an industry meeting.

20   Q.   Right.

21        In fact, what the FDA did is

22   they sent a letter out to all industry

23   participants with products that could be

24   subject to REMS and said, Come down to

1    Maryland, we need to talk to you.

2         Right?

3    A.    I don't know if that's what they

4    would have done.

5    Q.    And industry came down and

6    talked, or at least heard from the FDA on

7    this issue?

8         MR. STERN:  Objection to the

9    form and foundation.

10   A.    I see on dot-7 it's an industry

11   meeting to discuss opioid REMS.

12   Q.    Okay.  Let's go to dot-7, sir.

13   A.    Okay.

14   Q.    It says:  Industry meeting to

15   discuss opioid REMS.  FDA.

16        It's in Maryland, right?

17   A.    Yes.

18   Q.    Okay.  It's going to be a

19   welcome by Dr. Jenkins.  Mr. Rappaport is

20   going to present for the FDA.  We've got a

21   regulatory broad from a Dr. Axelrod, or a

22   lawyer, I guess, and proposed elements of

23   the REMS, and then industry was going to

24   get to interact on their questions and

Highly Confidential - Subject to Further Confidentiality Review

1    concerns, right?

2        A.    I see it.

3        Q.    Okay.

4              (Reading) Public health crisis

5    with prescription opioids 2009.

6        A.    Where are you, sir?

7        Q.    I'm on the page we were just at,

8    sir.  It's dot-10, first bullet.

9              MR. BUCHANAN:  I'm sorry.  Down

10       below, Corey.

11       A.    I see it.

12       Q.    Okay.  Public health crisis with

13   prescription opioids as it relates to

14   addiction, misuse, abuse, overdose and

15   death 2009.

16             True, sir?

17       A.    I see it.

18       Q.    And in the face -- and Endo had

19   a controlled substance on the market at

20   that point in time it was at the REMS

21   meeting, right?

22             MR. STERN:  Objection; form and

23       foundation.

24

1    BY MR. BUCHANAN:

2        Q.    Do you know that, sir?

3        A.    I don't know if they

4    participated at the meeting.

5        Q.    You know they got the letter,

6    right?

7              MR. STERN:  Objection; form and

8         foundation.

9              2009.

10   BY MR. BUCHANAN:

11       Q.    Let's go to -- we don't have to

12   make a big issue out of it, but I will

13   represent to you, sir, just to kind of

14   keep the record moving here, that on

15   February 6th, 2009, Dr. Rappaport sent Mr.

16   Barto in regulatory affairs the guidance

17   about this risk evaluation mitigation

18   strategy meeting in March of 2009.

19             Accepting that representation,

20   sir, would you expect the company's

21   regulatory representatives to attend?

22             MR. STERN:  Objection; form and

23        foundation.

24       A.    It would be reasonable to -- to

1    attend.

2        Q.    We could agree, sir, at least

3    with regard to this document.

4            MR. BUCHANAN:  Could you scroll

5        to the bottom of the page so we can

6        see the Bates number, please, Corey?

7        Q.    We could agree that this

8    document, sir, reflects that it's from the

9    files of your company, Endo, correct?

10       A.    Correct.

11       Q.    Okay.  So you don't really

12   dispute, and we saw the cover e-mail, that

13   the company had this presentation by Dr.

14   Rappaport describing this public health

15   crisis in 2009?

16           MR. STERN:  Objection; form and

17       foundation.

18       A.    Where I'm confused is your

19   question I thought originally said did we

20   participate in the meeting.  My response

21   is I don't know if we -- we participated

22   in the meeting.  But I'm not going to

23   dispute that we didn't have at least a

24   copy of the document.  It could have been

Highly Confidential - Subject to Further Confidentiality Review

1    put up on an FDA website.  I don't know.

2         Q.    It certainly was distributed

3    within the company, right?

4              MR. STERN:  Objection; form and

5         foundation.

6    BY MR. BUCHANAN:

7         Q.    Can we go to the first page and

8    answer counsel's concern about whether it

9    was distributed --

10             MR. STERN:  Based on what's in

11        the document as opposed to his

12        personal knowledge, yes, we can go to

13        the first page.

14             MR. BUCHANAN:  Okay.

15   BY MR. BUCHANAN:

16        Q.    You have that, sir?

17        A.    I do.

18        Q.    Okay.  And, so, in the face of a

19   public health crisis about prescription

20   opioids of abuse and death and addiction,

21   Endo went and bought the leading

22   manufacturer of opioids, or a leading

23   manufacturer of opioids, Qualitest, right?

24             MR. STERN:  Objection.

1    BY MR. BUCHANAN:

2        Q.    A year later?

3            MR. STERN:  Objection to form

4        and foundation.

5        A.    In 2010, Endo acquired

6    Qualitest.

7        Q.    Okay.  And if we go to

8    Exhibit 208, it's the chart.  It's E1810A.

9    We can see that --

10       A.    Where am I going, sir?

11       Q.    I'm on the screen, sir, if you

12   can see it.

13       A.    Okay.

14           MR. BUCHANAN:  Could we scroll,

15       please, to -- did we lose the screen?

16           (Pause.)

17           MR. BUCHANAN:  Corey, could you

18       set it up, though, so we can see,

19       please, 2007, '8, '9, '10, '11?

20           Thank you.

21   BY MR. BUCHANAN:

22       Q.    All right.  So, in 2010, a year

23   after we saw the notice from the FDA about

24   this public health crisis with

1    prescription drugs, Endo buys Qualitest,

2    right?

3         A.    Yes.

4         Q.    And we could see as we look back

5    over the years, Qualitest in 2007, after

6    it gets bought by that private equity

7    firm, is making a billion pills a year,

8    right?

9              MR. STERN:  Objection; form and

10        foundation.

11        A.    It appears that Qualitest's

12   volumes are a billion tablets, extended

13   units.

14        Q.    Okay.  And in 2008 it's about

15   the same.

16             Extended units.  Thank you, sir.

17             About the same in 2008, right?

18        A.    Correct.

19        Q.    2009 goes up 30 percent, right?

20        A.    Correct.

21        Q.    2010 probably another 25

22   percent, right?

23        A.    Correct.

24        Q.    And in 2011 getting even more,

1    right?

2        A.    It's increasing.

3        Q.    Okay.  This was an attractive

4    business to Endo.  Opioids in the face of

5    a prescription drug crisis, right?

6              MR. STERN:  Objection; form and

7         foundation.

8        A.    It was a business that Endo was

9    interested in.

10       Q.    Okay.  And acted on.  They

11   bought it.

12       A.    Correct.

13       Q.    Okay.  I'd like to now turn,

14   sir, to Opana reformulated.

15             At the time when you joined the

16   company, Opana reformulated was a product

17   the company was marketing and selling,

18   right?

19       A.    I don't believe it was marketing

20   it.  I think it was selling it.

21       Q.    Okay.  You were making money

22   from it, right?

23       A.    Yes.

24       Q.    And the way this played out,

1   sir, is late 2000s, the patent on Opana ER

2   was getting ready to expire, right?

3       A.    Which formulation are you

4   referring to?

5       Q.    Opana ER, the original

6   formulation that was brought to market in

7   2006.  The patent was getting ready to

8   expire.  Generics were, I guess, looking

9   at it getting ready to enter the space,

10  and the company was trying to extend its

11  exclusivity or secure new exclusivity or

12  claims to keep hold of the market.

13          Right?

14      A.    Endo introduced a new

15  formulation in the -- in -- in the late --

16  in the -- I think around 2011 or so.

17      Q.    And, you've been in the generic

18  space for a while, right?

19      A.    Correct.

20      Q.    Okay.  And, so, what happens

21  often is that when a proprietary product

22  or a patented product gets to the end of

23  its patented life, often generic

24  competitors come in, and once generic

1   competitors come in, sales of the patented

2   product drop dramatically due to

3   substitution rules and other things that

4   effectively take market share away from

5   the brand, right?

6       A.    Generics typically get

7   conversion of the brand market and take

8   the majority of the share.

9       Q.    And that can happen extremely

10  rapidly, right?

11      A.    Yes.

12      Q.    I mean, up to 80 percent within

13  60 days, right?

14      A.    Yes.

15      Q.    Or more?

16      A.    Wouldn't be unusual.

17      Q.    And, so, Endo, aware that its

18  patent was expiring and that generic

19  competitors could be entering into the

20  space in the late 2000s, sought to bring a

21  new formulation to market, right?

22          MR. STERN:  Objection; form and

23      foundation.

24      A.    I don't know specifically the

1   reason Endo chose to bring a formulation

2   to the market.

3       Q.    That's a familiar development

4   cycle to you in this industry, right, sir?

5       A.    You're referring to life cycle

6   management?

7       Q.    Life cycle management where a

8   company, as it anticipates expiration of

9   its patent and entry of new generic

10  competition, will seek to add new claims,

11  change formulations, do things that will

12  allow it to continue its exclusivity

13  through one means or another.

14          Fair?

15      A.    It's not unusual.

16      Q.    Okay.  And, so, it doesn't

17  surprise you that, in fact, Endo looked to

18  a new way of formulating its Opana product

19  to extend its exclusivity, or at least

20  retain its mark share, right?

21      A.    Again, my understanding was Endo

22  was looking for an improved formulation at

23  this period of time.

24      Q.    Okay.  And, so, ultimately Endo

1    did bring reformulated Opana to the market

2    in I think it's early 2012, right?

3         A.    Sounds right.

4         Q.    Okay.  And wrote to the FDA and

5    said old Opana should be withdrawn from

6    the market, right?

7              MR. STERN:  Objection; form and

8         foundation.

9    BY MR. BUCHANAN:

10        Q.    Did you know that?

11        A.    At some point I was aware.

12        Q.    Right.

13             I mean, what -- what Endo did,

14   after it got its product reformulated

15   Opana on to the market, is it told the FDA

16   that it thinks the old product, the risks

17   now outweighed the benefits in that

18   product.

19             MR. STERN:  Objection.

20        Q.    Right?

21             MR. STERN:  Form and foundation.

22        A.    I don't know the answer to that.

23        Q.    It wrote to the FDA and told

24   them that the original formulation should

Highly Confidential - Subject to Further Confidentiality Review

1    be discontinued for safety reasons, right?

2            MR. STERN:  Objection; form and

3        foundation.

4        A.    I'm sorry.  Is there a question

5    there?

6        Q.    There is.

7        A.    I'm sorry.

8        Q.    Are you aware of that?

9        A.    Am I aware?

10       Q.    That Endo wrote to the FDA and

11   said that the original formulation of

12   Opana ER should be withdrawn from the

13   market, discontinued for safety reasons?

14           MR. STERN:  Objection; form and

15       foundation.

16       A.    As I sit here today, I am aware

17   today.

18       Q.    Okay.  Was that something you

19   were aware of prior to the time you

20   started to get ready for your deposition?

21       A.    I -- I know that I was made

22   aware, but I would tell you it was not

23   resonating at the time.

24       Q.    Okay.  When were you made aware?

1    Just while you were at Par and were

2    considering entering the Opana space?

3         A.    No.

4         Q.    Or when you were at Endo after

5    the Par acquisition?

6         A.    I know this was part of the --

7    at some point, this was part of the

8    advisory committee.

9         Q.    Okay.  Let's go to Exhibit 66.

10            (Campanelli Exhibit 66, e-mail,

11        was marked for identification, as of

12        this date.)

13   BY MR. BUCHANAN:

14        Q.    It's an e-mail from Ms. Chapman

15   to the FDA.

16            Ms. Chapman's in regulatory

17   affairs, right?

18        A.    She was.

19        Q.    Director of regulatory affairs?

20        A.    Sounds right.

21        Q.    This is May 2012, about a month

22   or two after Opana has been -- Opana

23   reformulated has been approved by the FDA.

24   And she writes, as noted in the middle

1    paragraph:  While the original formulation

2    of Opana ER was deemed by FDA to be safe

3    and effective when taking according to the

4    prescribing information.  The original

5    formulation was, what?

6        A.    Subject to both intentional and

7    inadvertent abuse and misuse.

8        Q.    So, now that the company has

9    secured a new formulation so that it's

10   going to start marketing and promoting the

11   new formulation, now the company is

12   willing to acknowledge that the

13   formulation it had been selling for the

14   last six years was subject to abuse and

15   misuse.

16            MR. STERN:  Objection; form and

17       foundation.

18   BY MR. BUCHANAN:

19       Q.    Right?

20       A.    The regulatory -- I see the

21   e-mail from the regulatory team making

22   that indication.

23       Q.    You would agree, sir, that that

24   sentence is inconsistent with the term, or

Highly Confidential - Subject to Further Confidentiality Review

1    the statement "there is a low potential

2    for abuse with Opana"?

3              MR. STERN:  Objection; form and

4         foundation.  Time frame.

5    A.    Can you ask that question again?

6    Q.    You would agree, sir, that that

7    statement is inconsistent with the

8    statement that there is a low potential

9    for abuse?

10             MR. STERN:  Objection; form and

11        foundation.

12   A.    They're at odds.

13   Q.    Continued:  Endo believes that

14   the new formulation of Opana, which is

15   designed to be crush resistant, offers a

16   safety advantage over the original

17   formulation and that the original

18   formulation should be discontinued for

19   safety reasons.

20             Correct?

21   A.    I see it.

22   Q.    The product that the company had

23   been selling for the last six years,

24   right?  Had been selling between 2006 and

1    2012, right?

2         A.    Correct.

3         Q.    After the company had now

4    secured the reformulated version and

5    approval of that, it asked the FDA to take

6    the old version off to keep the generics

7    out of the space?

8              MR. STERN:  Objection; form and

9         foundation; mischaracterizes the

10        document.

11        A.    Again, it -- the document is

12   indicating that there was a safety concern

13   on the original formulation.

14        Q.    I mean, you as a person who was

15   in the generic business and has been in

16   the generic business for a long time, you

17   know what's happening here, right?

18             MR. STERN:  Objection; form and

19        foundation.

20        A.    No, I don't know what's

21   happening here.

22        Q.    You know the company has just

23   secured approval for a reformulated

24   version.  Generics are preparing to enter

1    the space.  Generic Opana ER and the

2    company, with Ms. Chapman as the face with

3    the FDA, is trying to get the old NDA

4    discontinued so that the generics can't be

5    AB comparable.

6              Right?

7        A.    I -- my understanding is she is

8    indicating that the old formulation has

9    safety issues and Endo introduced a new

10   formulation which I thought was a better

11   overall formulation.

12       Q.    Well, so, let's talk about the

13   old formulation.

14             The old formulation, I mean, it

15   didn't change between 2006 and 2012,

16   right?

17       A.    You're talking about the TIMERx

18   formulation.

19       Q.    The original formulation, yes.

20       A.    Correct.

21       Q.    So that formulation was good

22   enough to sell by this company for six

23   years, and then as soon as the company got

24   the new formulation approved it was no

1    longer good to sell, right?

2            MR. STERN:  Objection; form and

3        foundation.

4        A.    I don't know if there's

5    something going on here.

6            At the end of the day, I see

7    this e-mail that says Endo's removing it

8    for safety reasons.

9        Q.    Okay.  The company sought claims

10   that --

11           MR. BUCHANAN:  Withdrawn.

12           Could I get a time check?

13           THE VIDEOGRAPHER:  We're at six

14       hours and 19 minutes.

15           MR. BUCHANAN:  I'll withdraw my

16       last question to the extent it was

17       even half-asked.

18           Could we take a short break?

19           MR. STERN:  Sure.

20           THE VIDEOGRAPHER:  The time is

21       5:09 p.m.

22           We're off the record.

23           (Recess taken.)

24           THE VIDEOGRAPHER:  We are back

1       on the record.

2               The time is 5:19 p.m.

3    BY MR. BUCHANAN:

4       Q.    Thank you.  We're back on the

5    record, sir.  You're still under oath.

6               You understand that, correct?

7       A.    Yes.

8       Q.    Okay.  Great.  We're going to

9    push through here and finish up shortly,

10   at least my examination.  The clock will

11   probably ring and end me.

12              So, let's talk about that Opana

13   reformulation product, okay.

14              In 2012, the company brought

15   that to market.  In 2017, the company was

16   asked to withdraw it from the market by

17   the FDA.

18              Correct, sir?

19      A.    Asked to voluntarily withdraw

20   it, yes.

21      Q.    Okay.  And the product is not

22   currently marketed and sold in this

23   country, correct?

24      A.    Correct.

1    Q.    Okay.  And some of the issues

2    that arose with regard to Opana

3    reformulated, well, you had significant

4    oral abuse with the product, right?

5              MR. STERN:  Objection to the

6         form and foundation.

7    A.    I'm unaware if it had oral

8    abuse.

9    Q.    You are aware -- we'll move on

10   to the abuse you are aware of, sir.

11             There was IV abuse, correct?

12   A.    I am aware.

13   Q.    Due to the way in which the

14   product was reformulated, it made it

15   susceptible to being dissolved in liquid

16   and injected for abuse, correct?

17             MR. STERN:  Objection to the

18        form and foundation.

19   A.    I'm not aware of the specific

20   details, but I know it was -- it was tied

21   back to the injectable misuse of the

22   product.

23   Q.    And if we look over the history

24   of the product between 2012 and 2017, some

1    of the consequences of that abuse through

2    injection included HIV transmission,

3    right?

4              MR. STERN:  Objection to form

5         and foundation.

6         A.    Again, I learned about HIV in

7    the 2016, '17 time frame.

8         Q.    It was one of the consequences

9    secondary to the IV -- IV use and misuse

10   and abuse of Opana reformulated, correct?

11        A.    It was an issue.

12        Q.    Hepatitis was another issue that

13   was arising as a result of the IV abuse

14   with Opana reformulated, right?

15             MR. STERN:  Objection to form

16        and foundation.

17        A.    I learned of that, yes, in the

18   2016 time frame.

19        Q.    And a very rare blood disorder,

20   something call TTP, secondary to IV drug

21   abuse due to the way in which the product

22   was formulated and how it was composed

23   once dissolved, correct?

24             MR. STERN:  Objection to form

Highly Confidential - Subject to Further Confidentiality Review

1      and foundation.

2          A.      TTP or TPP?

3          Q.      I'm sorry.  I think I misspoke.

4          A.      Just so I -- I just want to make

5      sure we're all clear.

6                  (Pause.)

7          Q.      TPP.  A rare blood disorder

8      secondary to IV use was something that

9      you're aware of being reported with Opana,

10     correct?

11         A.      With the new formulation.

12                 MR. STERN:  TTP.

13                 MR. BUCHANAN:  I'm sorry.  Are

14         we crossing?  Did I have it right the

15         first time?

16                 MR. STERN:  You had it right.

17                 THE WITNESS:  I apologize.

18                 MR. BUCHANAN:  Okay.  Thank you.

19         You said it with such a firm

20         conviction, sir, that I questioned

21         myself.

22     BY MR. BUCHANAN:

23         Q.      TTP is a rare blood disorder,

24     correct?

1          MR. STERN:  Objection to the

2     form.

3     A.    I have general knowledge of

4     that.

5     Q.    And, in fact, what happened

6     shortly after Opana was brought to market,

7     it didn't take long for the drug to hit

8     the streets and be abused for the IV route

9     of administration, right?

10    A.    You're referring to the new

11    formulation?

12    Q.    I am.  Yes, sir.

13    A.    At what period of time?

14    Q.    2012, '13.

15    A.    I'm not sure what's going on in

16    2012.

17    Q.    Okay.  Do you have the

18    awareness, sir, that -- well, okay.

19    You've identified a number of items that

20    you did become aware of as a result of FDA

21    advisory committees and discussions, I

22    assume internally, about this Opana

23    reformulated product, correct?

24    A.    That's what I'm referring to.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  One of them, I guess the

2    big picture umbrella is IV drug abuse,

3    right?

4    A.   Abuse and misuse, yes.

5    Q.   So, patients were acquiring the

6    pills.  They were dissolving the pills in

7    liquid.  They would then be drawn up

8    through a syringe and injected into

9    bodies.

10   Right?

11   MR. STERN:  Objection; form and

12   foundation.

13   A.   I don't know how specifically

14   they manipulated the product, but they

15   were -- the abuse and the misuse dealt

16   with the IV form.

17   Q.   Okay.  I mean, this is something

18   that the company, Endo, was aware of long

19   before it was launched, right?

20   MR. STERN:  Objection; form and

21   foundation as to long before 2015.

22   A.   I don't know the timing on that.

23   Q.   Did you know, sir, that the

24   company was aware, through its testing

1    with Grunenthal, its partner on the

2    product, that the drug was easily prepped

3    for IV injection?

4        A.    I did not know that.

5        Q.    Let's go to exhibit -- sorry.  I

6    guess Exhibit 70, sir.

7            (Campanelli Exhibit 70,

8        document, was marked for

9        identification, as of this date.)

10   BY MR. BUCHANAN:

11       Q.    You ran testing on -- I guess

12   Grunenthal.

13           Grunenthal was a partner with

14   Endo in the reformulated product, correct?

15       A.    It's my understanding.

16       Q.    So we're on this page

17   "Preparation for IV injection."  We see

18   comparisons being made between TRF, tamper

19   resistant formulation, 5 milligram, tamper

20   resistant formulation 40 milligram.

21           Do you see that?

22       A.    I see it.

23       Q.    And then versus old Opana.  Do

24   you see that?  The third column.

1    A.    I see that.

2    Q.    Okay.  You see in the second row

3  the amount extracted, it talks about the

4  amount relative to the 40 milligrams there

5  for the second column.  You see about 10

6  grams of the 40 milligrams extracted?

7    A.    10 milligrams.

8    Q.    Versus .2 milligrams of the old

9  pill, right?

10    A.    I just want to make sure I get

11  my bearings here.

12        The TRF in the 5 -- in the 40 is

13  referring to what?

14    Q.    The tamper resistant formulation

15  that was being developed and tested by

16  Grunenthal, sir.

17    A.    The new formulation.

18    Q.    Yes, sir.

19    A.    Okay.

20    Q.    You see that about 10 milligrams

21  of the 40 milligrams was drawn up by IV

22  injection with new formulation versus .2

23  milligrams with the old formulation.

24        You see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2            MR. BUCHANAN:  You can take that

3      down, please.

4    BY MR. BUCHANAN:

5      Q.    Let's go now to Exhibit 69.

6            (Campanelli Exhibit 69,

7      document, was marked for

8      identification, as of this date.)

9    BY MR. BUCHANAN:

10     Q.    This is a Q4 face-to-face

11   meeting in Chadds Ford.

12           That was one of the sites for

13   Endo in 2009, correct?

14     A.    Back in 2009, that's what I

15   believe was -- is a site, yes.

16     Q.    Okay.  And we'll go to dot-6.

17           And these are results of a

18   face-to-face meeting with Grunenthal and

19   Endo, right?

20     A.    I have no idea what's happening

21   here in --

22     Q.    Okay.  Sorry.  I'll just give

23   you a moment to orient yourself.

24           You see the logos of both

1    companies on the first page, dot-1?

2         A.    Dot-1?

3         Q.    Yes.

4         A.    Yes.

5         Q.    Grunenthal and Endo noted there.

6         A.    I see it.

7         Q.    Q4 face-to-face meeting Chadds

8    Ford December 7th and 8th, 2009, right?

9         A.    I see it's 2009.

10        Q.    Okay.  And they run through the

11   results of various testing, right?

12             MR. STERN:  Objection; form and

13        foundation.

14   BY MR. BUCHANAN:

15        Q.    Have you seen this before, sir?

16        A.    No, I have not.

17        Q.    Did anybody bring to your

18   attention, sir, that, in fact, Grunenthal

19   had run tests prior to launch that showed

20   that this was susceptible to abuse through

21   injection?

22             MR. STERN:  Objection; form and

23        foundation.

24        A.    I'm not familiar with it.

1    Q.    Okay.  All right.  You can set

2    it aside, sir.

3         I want to shift gears real

4    quick, go back to an earlier point in time

5    prior to reformulated Opana and talk about

6    marketing and promotion of Opana ER prior

7    to the reformulation, okay.

8         MR. STERN:  Are we in our books

9         still?

10        MR. BUCHANAN:  You're not in

11        your book right now.

12   BY MR. BUCHANAN:

13   Q.    Sales representatives, sir.

14        Sales representatives, you had

15   them to detail Opana ER, correct?

16        MR. STERN:  Objection; form and

17        foundation.

18   BY MR. BUCHANAN:

19   Q.    You Endo.

20        MR. STERN:  What time period are

21        we talking about?

22        MR. BUCHANAN:  I'm sorry,

23        counsel.

24

```
1    BY MR. BUCHANAN:

2        Q.    For the original Opana product,

3    the company employed sales representatives

4    that called on physicians.

5            True?

6            MR. STERN:  Objection; form and

7        foundation.

8        A.    My understanding is we had sales

9    reps.

10       Q.    Okay.  And the systems within

11   the company called for sales

12   representatives to at least note the fact

13   that they were calling on doctors in a

14   system, right?

15           MR. STERN:  Objection to the

16       form and foundation.  We have no time

17       frame.

18           MR. BUCHANAN:  I'm referring to

19       this period of time, counsel, for

20       Opana ER.

21           MR. STERN:  Before September

22       2015 or after?

23           MR. BUCHANAN:  Well, Opana ER

24       non-reformulated is certainly going to
```

Highly Confidential - Subject to Further Confidentiality Review

1      be between 2006 and 2012.

2              MR. STERN:  Okay.

3              MR. BUCHANAN:  Let's have that

4      time frame in mind.

5              MR. STERN:  Okay.

6      A.    I wasn't there, so I'm not sure

7   what the company was doing.

8      Q.    Okay.

9              MR. BUCHANAN:  Behind you,

10     counsel, are three boxes.  Each box is

11     a copy of the same exhibit.  What I'd

12     like to do, if you could, just maybe

13     just give the witness one folder.

14             Let me come over and help you.

15             (Pause.)

16             MR. BUCHANAN:  Sir, I'm going to

17     put this to your side.

18             For the record, Exhibit 108 is a

19     series of printouts of the company's

20     sales call detail database.

21             (Campanelli Exhibit 108, box of

22     documents, was marked for

23     identification, as of this date.)

24             THE WITNESS:  I'm sorry.  I

1        didn't hear that.

2              MR. BUCHANAN:  It's a printout

3        from the company's sales call database

4        that's been produced to us in the

5        litigation of the calls on physicians

6        in Ohio.

7              THE WITNESS:  Okay.

8   BY MR. BUCHANAN:

9        Q.    Okay.  Could you just pull up

10  one of the folders from the box, sir?

11       A.    Any one?

12       Q.    Any one.

13             I just want you to orient us,

14  sir, to the content of the sales call log

15  as produced to us.  Can you pull out a

16  page, first page?

17             MR. STERN:  Can I just, for

18       kicks, the one he pulled up is E1873

19       2008 to 2016 full Ohio Opana ER call

20       log ENDO_OPIOID_MDL number 00673566

21       and there's a Post-it note on the

22       front that says number 1. 1-1200.

23             MR. BUCHANAN:  And thank you for

24       that, counsel.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2       Q.    I'll represent to you, sir, that

3    the printouts in the other folders in the

4    box that has been marked as this exhibit

5    contain the remaining pages from that same

6    file.  It is one file that contains all

7    those pages, sir.

8       A.    Okay.

9       Q.    Do you see, sir, fields of

10   information as if a very long spreadsheet?

11          MR. STERN:  I won't keep doing

12      this, Mr. Buchanan, but just this is,

13      Mr. Campanelli is looking at the first

14      one he's looking at is E1783.3.

15          MR. BUCHANAN:  Thank you.  Thank

16      you.

17   BY MR. BUCHANAN:

18      Q.    And, so we can see, sir, as we

19   read across there are a number of fields

20   at the top of the page, correct?

21      A.    Correct.

22      Q.    There is the healthcare

23   provider, or HCP first name, right?

24      A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    HCP last name, correct?

2    A.    Yes.

3    Q.    We see HCP specialty, right?

4    A.    Correct.

5    Q.    An address, right?

6    A.    Correct.

7    Q.    Which you understand to be the

8    address for the health care provider,

9    correct?

10    A.    I would draw that conclusion

11    because of the previous -- yes.  Yeah, the

12    previous HCP and specialty.  I would

13    assume that's the -- the -- the office

14    address.

15    Q.    Okay.  And then there are

16    employee numbers and employee names, rep

17    names that are listed there, right?

18    A.    Yes.

19    Q.    Okay.  Rep first name, rep

20    middle name, rep last name, right?

21    A.    I see it.

22    Q.    And then there's a field number

23    or code, right?

24    A.    I see it.

1    Q.    And then a call date, right?

2    A.    I see it.

3    Q.    And in your parlance and in your

4    industry, sir, you refer to the

5    interaction between a sales representative

6    and its visit on a physician as a sales

7    call, right?

8    A.    Correct.

9    Q.    And note it with a call date,

10   right?

11   A.    Correct.

12   Q.    Okay.  And then there's a field

13   where comments could be added, right?

14   A.    I see it.

15   Q.    I don't see any on the pages I

16   have before me.

17         Do you see any on yours?

18   A.    I do not.

19   Q.    Okay.  Duration, messages, two

20   other columns, right?

21   A.    Correct.

22   Q.    That could be populated but are

23   not populated on mine.

24   A.    Correct.

1    Q.    And then there's listing for the

2    product, right?

3    A.    I see it.

4    Q.    Do you see the product names

5    there?

6    A.    I do.

7    Q.    Do you see Opana ER?

8    A.    I do.

9    Q.    And they appear to be in a date

10   order, right?

11   A.    A date order, you're talking

12   about the call date?

13   Q.    Yes.  That was my understanding

14   from my review, but you're the witness.

15         Do they increase in date?

16   A.    Unless I'm looking at this

17   wrong, it looks like it's all the same

18   date.

19   Q.    It may just be because there's a

20   lot of calls happening on the same date in

21   the State of Ohio.

22   A.    Okay.  So let me just flip

23   through some more pages here.

24         Yes, I could see the date is

Highly Confidential - Subject to Further Confidentiality Review

1    increasing out in time as I get to deeper

2    in the document.

3        Q.    Sir, I won't ask you to do the

4    counting.  It's probably easier to do it

5    on the computer that we used.  I'll

6    represent to you, sir, that I think

7    there's a 131,000 visits with doctors in

8    Ohio on the dates that are -- that we were

9    given data for.

10            Is it consistent with your

11   knowledge, sir, that the company was

12   actively detailing physicians in Ohio and

13   elsewhere on Opana ER?

14            MR. STERN:  Objection; form and

15       foundation.

16       A.    Okay.  Again, I wasn't there.  I

17   don't have personal knowledge.  But I -- I

18   do see these documents in front of me.

19       Q.    The company had a sales force

20   that was charged with detailing Opana ER,

21   right?

22       A.    That's my understanding.

23       Q.    Okay.  And I'll represent to

24   you, sir, there were 131,000 calls on

1    doctors in Ohio on Opana ER, or ER

2    reformulated.

3              Is that a lot to you?

4              MR. STERN:  Objection; form and

5         foundation.

6         A.    What's the period of time?

7         Q.    2008-2016.

8         A.    I -- I would have to see the

9    entire call panel.  I just don't know the

10    answer to that.

11        Q.    20,000 visits a year, is that a

12    lot to you?

13              MR. STERN:  Objection; form and

14         foundation.

15        A.    I just don't know.

16        Q.    Okay.  Well, do you know Dr.

17    Adolf Harper, sir?

18        A.    No, I do not.

19              MR. BUCHANAN:  Could I have

20         Exhibit 110, please?

21              (Campanelli Exhibit 110,

22         document, was marked for

23         identification, as of this date.)

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    Passing you what's been marked

3    as Exhibit 110, sir.

4              What we've done, sir, is try to

5    zoom in a little bit on a physician in

6    Ohio.  Dr. Adolf Harper.

7              Do you recognize the format of

8    110 to be consistent with the field and

9    data you were just reading to us, sir, in

10   terms of its format?

11       A.    It looks consistent.  Appears to

12   be consistent.

13       Q.    I'll represent to you, sir, that

14   what we did was we searched for Dr. Harper

15   to just get the calls on him, okay.

16             And these are sorted in date

17   order, sir.

18             And we see that Dr. Harper was

19   called on 110 times by sales

20   representatives of Endo.

21             Do you see that?

22       A.    Is that what this adds up to?

23       Q.    That is.  I mean, you can

24   probably get a quick sense of it just by

1    turning the pages, but --

2        A.    Okay.

3        Q.    -- without maybe not to that

4    level of precision.

5            But, does that seem about right

6    to you, sir?

7        A.    I'll take your word for it.

8        Q.    Okay.  Promote -- promoting,

9    detailing, visiting with Dr. Harper from

10   2008 on Opana ER all the way up to 2012,

11   right?

12       A.    I see it.

13       Q.    Last visit was in February of

14   2012, right?

15       A.    According to the sheet.

16       Q.    Dr. Harper was indicted for

17   running a pill mill, right?

18           MR. STERN:  Objection; form and

19       foundation.

20       A.    Okay.  I didn't know that.

21       Q.    Dr. Harper had patients in his

22   lobby urinating, getting sick, engaging in

23   aggressive behavior, fighting,

24   administrators signing prescription pads

1    with no visits with patients.

2              MR. STERN:  Objection; form and

3         foundation.

4    BY MR. BUCHANAN:

5         Q.    Are you aware of that, sir?

6         A.    No, I'm not aware.

7         Q.    And your sales reps, your

8    Endo's, sales reps, are going into this

9    office and seeing this --

10             MR. STERN:  Objection; form and

11        foundation.  Time frame.

12        Q.    -- and not reporting it to the

13   company, right?

14             MR. STERN:  Objection; form and

15        foundation.  Time frame.

16        A.    I -- I just don't know.  I was

17   not there.  I don't know what Endo was

18   doing at this point in time.

19        Q.    In fact, he doesn't get taken

20   off the Endo call lists until there's news

21   reports about Dr. Harper?

22             MR. STERN:  Objection; form and

23        foundation.  Time frame.

24

 1    BY MR. BUCHANAN:

 2        Q.    Is that right, sir?

 3        A.    As I said, I was not there.  I

 4    don't know that.

 5        Q.    Passing you, sir, what we're

 6    marking as Exhibit 109.

 7              (Campanelli Exhibit 109, e-mail,

 8        was marked for identification, as of

 9        this date.)

10              MR. BUCHANAN:  I'm told we don't

11        have it on the screen, but how long

12        would it take to pop the Elmo?

13              THE VIDEOGRAPHER:  Seconds.

14              MR. BUCHANAN:  Okay.

15              You can take a look at it first,

16        sir.

17              (Pause.)

18    BY MR. BUCHANAN:

19        Q.    For the video I've got it on the

20    Elmo here, you'll see my little squiggles

21    and notes.

22              This is an interaction between a

23    couple Endo folks.

24              For the record, it's a Bates

1    stamp ENDO_OPIOID_MDL-02816741.  From the

2    spring of 2012.  Prescriber removals.

3            (Reading) Dr. Harper is rather

4    large for Akron and we would like to

5    remove.

6            And it continues.

7            Do you see that, sir?

8    A.    I see it.

9    Q.    Okay.  Let's go to the next

10   page.

11           MR. BUCHANAN:  How do we zoom

12       in, sir?

13           THE VIDEOGRAPHER:  Right here.

14           MR. BUCHANAN:  That's cool.

15       Thank you.

16   BY MR. BUCHANAN:

17   Q.    Zoom in.

18           And, so, what we see here is

19   that notwithstanding that Dr. Harper has

20   been visited some 110 times, including

21   through February, it's not until after

22   there are news reports, local news about

23   his questionable activities that Endo

24   takes action, right?

1          MR. STERN:  Objection; form and

2     foundation.

3  BY MR. BUCHANAN:

4     Q.    I'm sorry.  Can you see that,

5  sir?

6     A.    I can see it, but I don't -- I

7  don't know what Endo was doing or not

8  doing at this point in time.

9     Q.    Okay.  We could agree, sir, that

10  the exhibit we looked at, Exhibit 110,

11  reflects, and I realize I didn't give you

12  time to count them, but roughly a hundred

13  or so, 110 sales calls to Dr. Harper, who

14  by this report is engaging in questionable

15  actions.

16     A.    I see the words.

17     Q.    But it's not until this hits the

18  news and is a public thing in the press

19  that Endo stops calling on him, right?

20          MR. STERN:  Objection; form and

21     foundation.

22  BY MR. BUCHANAN:

23     Q.    That's what this reflects,

24  right?

1    A.    I don't know what this is

2    reflecting.

3           Again, at this point in time,

4    I'm not there.  I don't know what Endo did

5    or did not do.

6    Q.    Okay.  Certainly, sir, if your

7    sales reps were walking through a doctor's

8    office who had patients getting sick,

9    urinating, engaging in aggressive

10   behavior, falling asleep, or with a list

11   of the prescriptions that were willing to

12   fill the doctor's pharmacy, you'd hope the

13   red flags would go off with those sales

14   reps; wouldn't you, sir?

15          MR. STERN:  Objection; form and

16       foundation.

17   A.    As you explain that, obviously

18   that's not a good thing.

19          I just don't know whether or not

20   that really occurred.  If that was -- I

21   don't have the evidence or validation.  I

22   just don't know how to respond to that.

23   Q.    Well, certainly you'd hope your

24   sells reps would report it up the chain,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2              MR. STERN:  Objection; form and

3       foundation.

4         A.    I wasn't there.

5              However, if that was happening,

6    I would hope that -- that that would be

7    something that the reps would report.

8         Q.    Okay.  Sir, I have to -- I have

9    to shift gears a little bit.

10             There's been some changes in the

11   generic industry in the last few years.

12             Fair?

13        A.    I'm not sure what you mean.

14        Q.    The industry has changed in the

15   way buying groups deal with generic

16   manufacturers.

17             True?

18        A.    There's been a consolidation, if

19   that's what you're referring to.

20        Q.    Okay.  There's a few large

21   buying groups, right?

22        A.    Yes.

23        Q.    And, what are their names?

24        A.    Clarus-1, Webad and Red Oak.

1     Q.    How has that impacted Endo's

2 business?

3     A.



Highly Confidential - Subject to Further Confidentiality Review



1  ██████████████████████████████████████████

   ██████████████████████████████████████████

   ██████████████████████████████████████

   ██████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   █████████████████████████████

8      Q.    Okay.  And, so, if you could

9  explain to me, sir, how does that impact

10 or put pressure on the company in terms of

11 its relationships with its customers?

12     A.    ██████████████████████████████

   █████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

16     Q.    Okay.  Has anything changed

17 secondary to that, with regard to your

18 relationships with PBMs?

19     A.    ██████████████████████████████

   ██████████████████████████

   ████  ████████████████████████████

   ████████████████████████████████████

   ██████

   ████  ████

Highly Confidential - Subject to Further Confidentiality Review



1    Q.

4         MR. STERN:  Who?  I'm sorry,

5    Mr. Buchanan.  Who has no interaction?

6         MR. BUCHANAN:  I meant the

7    entity that he's the CEO.

8    A.    Okay.  Let's -- so, let's --

9    maybe we should back up here.  I thought

10   you were talking about generics.

11        Could you ask the question

12   again?

13   Q.    I'm sorry.

14







Highly Confidential - Subject to Further Confidentiality Review



21        Q.    Okay.

22              MR. BUCHANAN:  Can we take a

23        short break?

24              THE WITNESS:  Sure.

```
 1              THE VIDEOGRAPHER:  All right.
 2         The time is 5:49 p.m.
 3              Off the record.
 4              (Recess taken.)
 5              THE VIDEOGRAPHER:  We are back
 6         on the record.
 7              The time is 5:55 p.m.
 8              MR. BUCHANAN:  Mr. Campanelli,
 9         thank you for your time today.  I am
10         advised I'm at the end of my -- my
11         time with you.  At this point, I'm
12         going to pass you to counsel for --
13         for other states and municipalities
14         for their examinations.
15              Thank you again, sir.  I
16         appreciate your time.
17              THE WITNESS:  Thank you.
18              MR. STERN:  Thank you,
19         Mr. Buchanan.
20    EXAMINATION BY
21    MS. HERZFELD:
22         Q.   Good afternoon, Mr. Campanelli.
23    How are you?
24         A.   Good.  How are you?
```

1    Q.    Good.  My name is Tricia

2    Herzfeld, and I'm an attorney for the

3    Tennessee State plaintiffs.  I reserved

4    two hours to question you today, but

5    hopefully I won't need all that time.  I'm

6    sure you're in a hurry to get out of here.

7    A.    I'm here to answer your

8    questions.

9    Q.    Great.  Wonderful.

10    MS. HERZFELD:  Before we get

11    started, I just wanted to lodge the

12    Tennessee State -- state litigations

13    objections in all of the Tennessee

14    State cases about Endo's failure to

15    comply with the MDL protocol and the

16    protocol that has been listed in the

17    Dunaway and Staubus cases.

18    Just to note, we have not

19    received -- we have not received a

20    custodial file for Mr. Campanelli.  We

21    have not received any documents from

22    Mr. Campanelli.

23    So we are very specifically

24    reserving our rights to re-depose Mr.

1      Campanelli in the future because it

2      certainly has hampered our ability to

3      prepare for today.

4              MR. STERN:  Ms. Herzfeld, I'm

5      sorry to interrupt.

6              MS. HERZFELD:  Yes.

7              MR. STERN:  I know that -- I

8      know there are other grounds for your

9      objection other than not producing Mr.

10     Campanelli's custodial files, but we

11     believe we have produced his custodial

12     files.

13             MS. HERZFELD:  No, I

14     double-checked right before I started

15     questioning.  We absolutely don't have

16     it, and we actually sent multiple

17     e-mails requesting it.

18             MR. STERN:  Can I have just a --

19     can we go off the record for a minute?

20             MS. HERZFELD:  Sure.

21             THE VIDEOGRAPHER:  All right.

22     The time is 5:57 p.m.

23             Off the record.

24             (Recess taken.)

1       THE VIDEOGRAPHER:  We are back

2   on the record.

3       The time is 5:59 p.m.

4       MR. STERN:  So, we're trying to

5   move on with this, but it's my

6   understanding that Mr. Campanelli's

7   Endo custodial files were produced 14

8   days ago.  We're going to try to find

9   out to whom they were produced and get

10  you that information as promptly as we

11  can.

12      MS. HERZFELD:  Great.  And just

13  for your information, so, it looks

14  like we received the intent for

15  February 22nd.  The MDL issued its

16  notice of deposition on March 4th.  On

17  March 7th is when we e-mailed in

18  compliance with the protocol

19  requesting all the stuff we were

20  supposed to get.  On March 11th, Mr.

21  Davis wrote back and said that he

22  would write back separately to address

23  the deposition of Mr. Campanelli.  We

24  didn't get any follow-up on that.

1          Then on March 13th, we sent another

2     e-mail requesting that we get Mr.

3     Campanelli's custodial files, various

4     documents, et cetera, et cetera, et

5     cetera.  We didn't hear anything back

6     from that.  We then e-mailed again

7     Friday, March 15th, explaining that we

8     hadn't received the custodial file for

9     Mr. Campanelli or any other of the

10     documents that would be required, and

11     we didn't hear back.

12          So that's our understanding of

13     where we are.

14          MR. STERN:  I understand there

15     are issues with respect to other

16     documents, and those I'm not --

17          MS. HERZFELD:  We'll address

18     that a different day.

19          MR. STERN:  But I am concerned

20     that we -- there may be some

21     miscommunication, and we're going to

22     try to get to the bottom of it.

23          MS. HERZFELD:  Okay, great.

24          I just want to be very clear for

1    the record that I'm taking this

2    deposition without the benefit of Mr.

3    Campanelli's custodial file.  So,

4    given that we're here, we're going to

5    try to get through the questions that

6    we can, but I am very, very

7    specifically reserving my right to

8    re-depose this witness at a later

9    date, obviously subject to, you know,

10   the court in Staubus making a ruling

11   on that.

12         I'm not expecting you to agree,

13   is what I'm telling you.

14         MR. STERN:  No, no, no, I'm -- I

15   need to confer outside for just a

16   minute.

17         MS. HERZFELD:  Sure.

18   Absolutely.

19         THE VIDEOGRAPHER:  Okay.  The

20   time is 6:01 p.m.

21         Off the record.

22         (Recess taken.)

23         THE VIDEOGRAPHER:  All right.

24   We are back on the record.

 1           The time is 6:04 p.m.

 2           MS. HERZFELD:  Okay.  We're back

 3      on the record after a short break

 4      where before we went off the record we

 5      were discussing the lack of custodial

 6      file or any other necessary documents

 7      that we needed for today's deposition.

 8           My understanding is that counsel

 9      for Endo would like to go forward at

10      this point.

11           MR. STERN:  That's correct.

12           MS. HERZFELD:  Okay.  So, we

13      have reserved two hours today and are

14      specifically reserving our right to

15      re-depose this witness at a later

16      date, specifically under the rules of

17      the Tennessee Rules of Civil Procedure

18      which don't have a time limitation for

19      the deposition, and so we're reserving

20      all of our rights under that, plus all

21      of our prior objections for failure to

22      follow the various protocols in this

23      case.

24

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MS. HERZFELD:

2         Q.    Okay.  Mr. Campanelli, like I

3    said before, my name is Tricia Herzfeld.

4    I'm an attorney from the State of

5    Tennessee.

6              How are you doing?

7         A.    Good.  Thank you.  And yourself?

8         Q.    Good.  Good.  Good.  Good so

9    far.

10             Have you heard anything about

11   the Tennessee litigation?

12        A.    No.

13        Q.    Okay.  Are you familiar at all

14   with the Tennessee litigation being

15   different in any way from the litigation

16   in the MDL?

17        A.    No.

18        Q.    Okay.  You talked a little bit

19   before in your deposition about being

20   aware of the opioid problem in this

21   country.

22             Are you aware that the opioid

23   problem is particularly bad in the

24   Appalachian region of the country?
```

Highly Confidential - Subject to Further Confidentiality Review

1               MR. STERN:  Objection; form and

2        foundation.

3        A.    I'm not sure what you mean.

4        Q.    Do you know what the Appalachian

5   region of the United States is?

6        A.    Yes.

7        Q.    And, are you aware that the

8   opioid epidemic has hit the Appalachian

9   region particularly hard?

10               MR. STERN:  Objection to form;

11        foundation.

12        A.    I don't know specifically.

13        Generally I'm aware.

14        Q.    Okay.  And, do you consider

15   Tennessee to be part of Appalachia?

16        A.    Yes.

17        Q.    And you've heard of NAVIPPRO,

18   the National Addiction Vigilance

19   Intervention and Prevention Program.

20        Is that right?

21        A.    I've heard of it.  I'm not

22   specifically knowledgeable what it does.

23        Q.    Okay.  You're aware that Endo

24   helped fund the start of NAVIPPRO?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     No.

2      Q.     NAVIPPRO is one of the ways Endo

3  monitors the abuse and diversion of Opana.

4             You're aware of that?

5      A.     I've seen that in the ADCOM.

6      Q.     Okay.  And Endo has been a

7  member, a paying member of NAVIPPRO.

8             Is that right?

9      A.     I believe that is to be the

10 case.

11     Q.     And Endo receives NAVIPPRO's

12 surveillance reports every quarter.

13            Is that right?

14     A.     I don't know the frequency.

15     Q.     Okay.  But you do know that Endo

16 receives regular NAVIPPRO surveillance

17 reports?

18     A.     I know that we've contracted

19 with NAVIPPRO.

20     Q.     Okay.  And part of that contract

21 is receiving regular surveillance reports

22 of your Opana product?

23     A.     Again, I don't know the

24 frequency.

Highly Confidential - Subject to Further Confidentiality Review

1       We no longer sell Opana.

2       Q.      But in the past, you received

3   surveillance reports of your opioid

4   product Opana.

5       Is that right?

6       A.      What period of time are you

7   referring to?

8       Q.      2012 til the -- til the product

9   went off the market.

10      MR. STERN:  Objection;

11   foundation.

12      A.      So, my -- my awareness of

13   NAVIPPRO stems about two to three months

14   from September 2016 to -- to about

15   December 2016.

16      Q.      Okay.  So, about the time of the

17   three-year NAVIPPRO report?

18      A.      It's the start of when I became

19   the CEO to the time that we stopped

20   selling -- from the time that we

21   stopped -- we eliminated our sales -- our

22   sales force.

23      Q.      Okay.  And you talked about

24   discussions of the NAVIPPRO reports at the

1  ADCOM meeting.

2          Is that right?

3      A.    I've seen some reports in the

4  ADCOM with the NAVIPPRO timeline.

5      Q.    Okay.  And you were aware that

6  Opana ER was abused more in some areas of

7  the country than others through those

8  NAVIPPRO reports.

9          Is that right?

10          MR. STERN:  Objection;

11      foundation.

12      A.    I don't recall specifically the

13  details.  I did see some graphs that

14  showed Tennessee was -- was higher.

15      Q.    Tennessee wasn't just higher.

16  It was extraordinarily higher; was it not?

17          MR. STERN:  Objection to the

18      form.

19      A.    I don't recall.

20      Q.    Okay.  Have you ever heard the

21  term "the Tennessee effect" in response --

22  in -- to describe Opana?

23      A.    No.

24      Q.    Okay.  When numbers were given

1    to the FDA and various other reports were

2    given, did you -- you were aware that

3    Tennessee's numbers were pulled out

4    separately from the rest of the country

5    'cause they were so bad?

6                MR. STERN:  Objection to the

7         form and foundation.

8         A.    What specifically are you

9    referring to?

10        Q.    Tennessee's abuse and diversion

11   rates of Opana.

12        A.    I'm sorry.  Is this referring to

13   the ADCOM or in general?

14        Q.    In general.

15        A.    I did not know.

16        Q.    Okay.  And you knew that there

17   was an Opana injection problem in

18   Tennessee.

19                Is that right?

20        A.    I'm aware of the facts that came

21   out of the ADCOM.

22        Q.    Okay.  And those facts indicated

23   that there was a high injection rate of

24   Opana in Tennessee.

1        Is that right?

2    A.    I don't know specifically

3  Tennessee, but I'm aware that there was an

4  injection issue.

5    Q.    Were there ever any other

6  discussions of Tennessee in the ADCOM or

7  any other meetings that you've attended?

8    A.    I didn't have any specific

9  discussions on Tennessee.

10   Q.    About Tennessee?

11   A.    No.

12       MS. HERZFELD:  Okay.  I'm going

13     to hand you what we will mark as

14     Campanelli 500.  We're going to start

15     the Tennessee exhibits with 500.

16       For those on the phone, it's

17     ENDO-OPIOID_MDL_06183930 through

18     '4083.

19       THE WITNESS:  Okay.

20       (Campanelli Exhibit 500,

21     document, was marked for

22     identification, as of this date.)

23  BY MS. HERZFELD:

24   Q.    Take a look at that for me,

1    please.  I've handed you what is the

2    NAVIPPRO quarterly report that was

3    provided to Endo for the fourth quarter of

4    2012.

5              Do you see that on the front?

6        A.    I do.

7        Q.    Okay.  And if you will turn with

8    me to page 7.

9        A.    Okay.

10       Q.    Okay.  And then it says at the

11   top there Quarter 4 2012 and annual

12   4/1/2012 through 12/31/2012.

13             Is that right?  In the top

14   corner.

15       A.    Yes.

16       Q.    Okay.  And if you'll go down

17   with me to the ASI-MV summary, the first

18   bullet point, could you read that for me,

19   please?

20       A.    (Reading) During the 9 month

21   reporting period, 455 sites located in 31

22   states, including the District of

23   Columbia, contributed to a total of 38,628

24   unique adult assessments.

Highly Confidential - Subject to Further Confidentiality Review

1          You want me to keep reading?

2     Q.    No.  You can stop there.

3          Go to the first bullet point

4  that starts with "past 30 day."

5     A.    You would like me to read that?

6     Q.    Yes, please.

7     A.    (Reading) Past 30-day abuse of

8  reformulated Opana ER was observed in 20

9  of the 31 states that contributed data to

10  the ASI-MV network tracking reformulated

11  Opana ER.

12     Q.    Okay.  Keep going.

13     A.    (Reading) States within the

14  ASI-MV network that contributed to the

15  greatest number of reformulated ER abuses

16  cases included Tennessee, with N equaling

17  119, 58 percent.

18          Keep reading?

19     Q.    No.  That's enough.  You can

20  stop right there.

21          So, this here indicates, this

22  paragraph that you just read, that 58

23  percent of the Opana ER abuse cases were

24  coming from the State of Tennessee,

1    according to this document.

2              Is that right?

3         A.    Again, I wasn't at Endo, but I

4    see the words on the paper.

5         Q.    Okay.  In looking at that, the

6    next highest is North Carolina, and that

7    has 18 -- or, 8.8 percent.

8              You see where I'm at?

9         A.    I see it.

10        Q.    Okay.  So, would you agree with

11   me that 58 percent is significantly higher

12   than 8.8 percent?

13             MR. STERN:  Objection to the

14        form.

15        A.    I don't know the backgrounds of

16   all the calculation here, but certainly 58

17   percent is higher than 8 percent, or 9

18   percent.

19        Q.    Okay.  And so you would agree

20   with me that, according to this document,

21   Tennessee was indicated as a flag for

22   abuse of reformulated Opana ER as early as

23   April of 2012?

24             MR. STERN:  Objection to the

1    form and foundation.

2    A.    Okay.  I don't know what you

3    mean by flag, but clearly Tennessee is N

4    equaling 119 at 58 percent.

5    Q.    And 58 percent is greater than

6    half of the abuse reports, right?  58

7    percent is greater than half?

8    A.    58 percent is greater than 50

9    percent.

10   Q.    Okay.  Great.

11         Okay.  If you'll go to then with

12   me to page 54.  On page 54, if you'll draw

13   your attention to figure 24, please.

14   A.    I'm sorry, figure 24, yes.

15         Can I undo this?  Is that okay?

16   Q.    Yeah, sure.  Yeah.

17         Okay.  Looking at that figure,

18   what does it appear to be measuring?

19         MR. STERN:  Objection; form and

20   foundation.

21   A.    Okay.  I see Tennessee and I see

22   all other ASI-MV states, quarterly

23   percentage of injection of reformulated

24   Opana ER reported by individuals within

1    the ASI-MV network in Tennessee and all

2    other states.

3              So it's a -- looks like it's a

4    comparison between Tennessee and all other

5    states.

6         Q.    Okay.  And looking down at it,

7    Tennessee is the darker of the two,

8    according to this graph.

9              Is that right?

10        A.    I would assume that.  It's a

11   little hard to read, but I assume that's

12   what it is.

13        Q.    Okay.  And when you see Quarter

14   2 for 2012, Quarter 3 for 2012 and Quarter

15   4 for 2012, in all of those, the graph,

16   the darker one for Tennessee, is much

17   higher than the combined number for all

18   other states.

19              Is that right?

20        A.    I could see that it is -- that

21   Tennessee is greater than the other

22   states.

23        Q.    Okay.  So it's safe to say,

24   based on that information and the two

1    pages that we just looked at that, there

2    were certainly reports that Endo had

3    received that there was an Opana ER abuse

4    problem in Tennessee.

5              Is that right?

6              MR. STERN:  Objection; form and

7        foundation as to --

8        A.    Again, I don't -- wasn't there.

9    I don't know who wrote when -- I guess who

10   received this at Endo, but I can see that

11   Tennessee is greater than the other

12   states.

13       Q.    Okay.  And Endo kept shipping

14   Opana ER to Tennessee in 2012.

15             Is that right?

16             MR. STERN:  Objection;

17        foundation.

18       A.    I don't know what you mean by --

19             MR. STERN:  Form.

20             I'm sorry.  Go ahead.

21             THE WITNESS:  I apologize.

22       A.    Can you elaborate what do you

23   mean by Endo kept shipping Tennessee?

24       Q.    Did Endo put any -- any measures

1   in place to prevent Opana from ending up

2   in Tennessee?

3            MR. STERN:  In 2012?

4            MS. HERZFELD:  In 2012.

5            MR. STERN:  Objection; form and

6      foundation.

7       A.    I wasn't there.  I don't know

8   whether or not Endo put any measures in

9   place.

10      Q.    But, to your knowledge, you

11  never heard of Endo putting any measures

12  in place to stop Opana from getting to

13  Tennessee?

14           MR. STERN:  In 2012?

15           MS. HERZFELD:  Ever.

16      A.    As I said, I don't know whether

17  or not Endo -- I wasn't there at this

18  period of time.  I don't know if Endo did

19  or did not put any measures in place.

20      Q.    Okay.  But my point is you

21  haven't heard of that?

22      A.    I haven't heard of it.  I'm

23  unaware of it.

24      Q.    Okay.  Great.

Highly Confidential - Subject to Further Confidentiality Review

1    Okay.  If you'll set that aside,

2    please.

3    A.    Are we done with this document?

4    Q.    Yes.

5    (Campanelli Exhibit 501,

6    document, was marked for

7    identification, as of this date.)

8    BY MS. HERZFELD:

9    Q.    I'm going to hand you what we're

10    marking as Campanelli Exhibit 501.

11    A.    Okay.

12    Q.    For the record, it's

13    EPI_001760592 through '60680.

14    Sir, I've hand you what has --

15    what is titled the NAVIPPRO report for the

16    reporting period of January 1st, 2013

17    through March 31st, 2013, the first

18    quarter of 2013.

19    Do you see where it says that on

20    the first page?

21    A.    I do.

22    Q.    Okay.  If you will take that,

23    please, and flip to page 7.  Okay.  And if

24    you could go down with me to where it says

1    "ASI-MV summary" to that first bullet

2    point, just as we looked at for the 2012

3    report.  It starts with "Past 30 day

4    abuse."

5              Do you see where I'm at?

6        A.    Yes.

7        Q.    Could you read that for me,

8    please?

9        A.    (Reading) Past 30 days abuse of

10   reformulated Opana ER was observed in 14

11   of the 33 states that contributed data to

12   the ASI-MV network tracking reformulated

13   Opana ER.

14       Q.    Keep going.

15       A.    (Reading) Of the total cases of

16   abuse N equals 125 reported during Q1 2013

17   65.6 percent N equals 82 were reported

18   from the State of Tennessee.

19       Q.    You can stop there.

20             Okay.  So, the next, if you read

21   the next sentence, it says that the next

22   highest one, the number of reported

23   instances is 11, where Tennessee is 125.

24             Is that right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I see that.
 2        Q.    Okay.  Now if you will switch
 3   with me to page 39.
 4        A.    Okay.
 5        Q.    Okay.  And if you will start
 6   with the second sentence on page 39 that
 7   starts with "Overall."  It's its third
 8   line down.
 9        A.    (Reading) Overall prescription
10   opioid abuse, as well as abuse of
11   reformulated Opana ER, is higher in
12   Tennessee relative to other states within
13   the ASI-MV network.
14        Q.    Okay.  You can stop there.
15              And then look figure 14 for me,
16   please.  Figure 14 then again shows
17   Tennessee separated from all other states.
18              Is that right?
19        A.    I see that.
20        Q.    And Tennessee is the dark
21   number, or the dark graph in the middle.
22              Is that right?
23        A.    I see it.
24        Q.    And for injection it's higher
```

1    than all other states combined.

2           Is that right?

3    A.    Yes, I see that.

4    Q.    Okay.  And for snorting, it's

5    almost equal.

6           Is that right?

7    A.    About.

8    Q.    Okay.  So, looking at these

9    three things that we just talked about in

10   this third -- in this report for the first

11   quarter of 2013, you would agree with me

12   that Tennessee had an issue with Opana ER

13   abuse; would you not?

14          MR. STERN:  Objection to the

15      form of the question.

16   A.    I don't know if this is showing

17   abuse.

18   Q.    Okay.  What do you think it's

19   showing?

20          MR. STERN:  I instruct the

21      witness not to speculate.

22   BY MS. HERZFELD:

23   Q.    Well, let's go back to page 7.

24          That first bullet point that you

1    read on page 7:  Past 30 days abuse of

2    reformulated Opana ER was observed in 14

3    of the 33 states that contributed data to

4    the ASI-MV network tracking reformulated

5    Opana ER.  Of the total cases of abuse

6    reported during Quarter 1 2013, 65.6

7    percent were reported from the State of

8    Tennessee.

9          Did I read that correctly, sir?

10    A.    You did.

11    Q.    Okay.  And, so, my question was

12    in this document, 2013 first quarter does

13    it show that Tennessee had a problem with

14    abuse of Opana ER?

15          MR. STERN:  Objection to the

16          form of the question.

17    A.    Okay.  Referring back to figure

18    14?

19    Q.    What is your question?

20    A.    Did you want me to refer back to

21    figure 14?

22    Q.    You can refer to figure 14 or

23    you can refer to what we just read in page

24    7.

1    A.    Okay.  On page 7 in the

2  executive summary it states that there is

3  an issue in -- in Tennessee.

4    Q.    Okay.  Thank you, sir.

5         And to your knowledge, Opana

6  continued to ship into Tennessee in 2013.

7         Is that right?

8         MR. STERN:  Objection; form and

9    foundation.

10   A.    I wasn't employed at Endo, so I

11  don't have any knowledge.

12   Q.    But you don't have any knowledge

13  of any efforts that were ever put in place

14  to stop the shipment of Opana into the

15  State of Tennessee.

16         MR. STERN:  Objection; form and

17    foundation.

18   Q.    Is that correct?

19         MS. HERZFELD:  Can I finish my

20    question before you object?

21         MR. STERN:  Sure.

22         MS. HERZFELD:  Thank you.

23   A.    Again, I wasn't employed.  I

24  don't know what Endo did or did not do

1  with respect to the State of Tennessee.

2      Q.    But you never heard of them

3  stopping shipment of Opana into the State

4  of Tennessee during your tenure.

5          Is that right, sir?

6      A.    I never --

7          MR. STERN:  Objection; form and

8      foundation.

9      A.    I never heard of it, as I was

10  not employed.

11      Q.    Okay.  I'm going to hand you

12  what we will mark as Campanelli

13  Exhibit 502.

14          (Campanelli Exhibit 502,

15      document, was marked for

16      identification, as of this date.)

17  BY MS. HERZFELD:

18      Q.    Sir, I've handed you what is the

19  NAVIPPRO report for the second quarter of

20  2014 for Opana.

21          Do you see where it says that?

22      A.    Yes, I see it.

23      Q.    Okay.  If you could turn with me

24  to page 41.

1          For the record, this is

2     ENDO_OPIOID_MDL-01459827 through '59911.

3          Are you on page 41, sir?

4     A.     Yes.

5     Q.     Okay.  Are you looking at figure

6     16?

7     A.     Yes.

8     Q.     Okay.  And figure 16, could you

9     please read what the title is?

10    A.     Figure 16 dis -- the title?

11    Q.     The description of figure 16.

12    A.     Thank you.

13          (Reading) Distribution of routes

14    of administration reported by individuals

15    within the ASI-MV network in Tennessee and

16    other states who indicated past 30 days

17    abuse of reformulated Opana ER with a date

18    of Q -- of the date of April 1st, 2014

19    through June 30th, 2014.

20    Q.     Okay.  And, so, again this chart

21    shows Tennessee separated from all other

22    states.

23          Is that right?

24    A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And in this chart,

2  Tennessee is the lightest number.  Is

3  that -- or, the lightest color.

4           Is that right?

5      A.    It is the lighter shade.

6      Q.    And looking at injection, it's

7  higher than the others in the graph.

8           Is that right?

9      A.    I see that it's -- it is higher

10  than the others.

11      Q.    Okay.  And, so, looking at this,

12  76.7 percent of the injection abuse of

13  Opana is in Tennessee.  In all other

14  states combined is 54.3 percent.

15           Is that right?

16           MR. STERN:  Objection; form and

17       foundation and characterization of the

18       document.

19      A.    Okay.  Could you ask the

20  question again?

21      Q.    Sure.  Looking at see where it

22  says "injection"?

23      A.    Yes.

24      Q.    And there's three bars there,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2        A.    I see it.

3        Q.    And the lightest bar there is

4    Tennessee.

5              Is that right?

6        A.    Correct.

7        Q.    Okay.  And the lightest bar in

8    Tennessee is the highest of the three bars

9    there.

10             Is that correct?

11       A.    That's correct.

12       Q.    And the other things that are

13   being measured here are all ASI-MV states

14   and other states.

15             Is that correct?

16       A.    Correct.

17       Q.    Okay.  And the light bar for

18   Tennessee is higher than all ASI-MV states

19   and all other states.

20             Is that right?

21       A.    That's correct.

22       Q.    Okay.  So, Tennessee's injection

23   abuse rate for Opana was higher than all

24   other states combined?

1          MR. STERN:  Objection; form and

2     foundation.

3     A.    Based upon the heading here,

4  that's what it would imply.

5     Q.    Okay.  Thank you, sir.

6          And despite this, Opana was

7  still being shipped into Tennessee, to

8  your knowledge.

9          Is that right, sir?

10          MR. STERN:  Objection; form and

11     foundation.

12     A.    As I said, I was not at Endo.  I

13  don't have knowledge whether or not Endo

14  shipped into the State of Tennessee at

15  this point in time.

16     Q.    But you don't know that Endo did

17  anything to stop the shipment of Opana

18  into Tennessee.

19          Is that right, sir?

20     A.    As I said, I was not part of

21  Endo.  I do not know what -- what Endo

22  would have done during this time.

23     Q.    Okay.  But during that period of

24  time, you were at Par.

1          Is that right?

2     A.     In 2014?

3     Q.     Yes, sir.

4     A.     Yes.

5     Q.     Okay.  And, so, during your time

6  at Par Pharmaceuticals, you went through

7  that there was a portfolio of opioid,

8  generic opioid drugs that were sold

9  through Par Pharmaceuticals.

10          Is that right?

11    A.     We had a few.

12    Q.     Okay.  And, was there ever, at

13  your time at Par, any direction to make

14  sure that opioid prescriptions were not

15  getting shipped to Tennessee?

16    A.     That's not the way generics

17  are -- are sold.  We sell through

18  wholesalers.

19    Q.     Okay.  And, did you ever have

20  any sort of a discussion with any

21  wholesalers about Hey, there looks like

22  there's an opioid abuse problem in

23  Tennessee.  We want to limit our shipment

24  of Par opioid pharmaceuticals to

1    Tennessee?

2        A.    To the best of my knowledge,

3    that type of conversation would not have

4    occurred.

5              We would have shipped to

6    wholesalers based upon their purchase

7    order requirements.

8        Q.    Okay.  And, did you -- when you

9    were at Par Pharmaceuticals, did you ever

10   hear the term "knowing your customer's

11   customer"?

12       A.    At some point I was aware that

13   term.  I'm not sure what the exact period

14   of time is.

15       Q.    Okay.  And that was during your

16   time at Par Pharmaceuticals.

17             Is that right?

18       A.    I think so.

19       Q.    Okay.  And knowing your

20   customer's customer means not just knowing

21   who your wholesaler is, but also knowing

22   who it is your wholesaler is selling to.

23             Is that right?

24       A.    I think it has to do with

Highly Confidential - Subject to Further Confidentiality Review

1  knowing your wholesaler's direct DC and

2  its subsidiary DCs.

3      Q.   Okay.  And at Par

4  Pharmaceuticals when you were working in

5  the generics, you also knew that as a

6  manufacturer, the DEA required you to at

7  least have some communication with your

8  distributors about abuse and diversion

9  detection.

10          Is that right?

11          MR. STERN:  Objection; form and

12      foundation; calls for a legal

13      conclusion.

14      A.   I don't have an answer to that.

15  I'd be leaving that to the individuals

16  responsible for that at Par.

17      Q.   Okay.  And, so, as part of

18  knowing your customer's customer, did you

19  ever have a discussion with anyone at Par

20  about generic opioids going to Tennessee

21  in any way?

22      A.   I would not have had that

23  conversation.

24      Q.   Okay.  I'm going to hand you

Highly Confidential - Subject to Further Confidentiality Review

1    what we will mark as Campanelli

2    Exhibit 503.

3              (Campanelli Exhibit 503,

4         document, was marked for

5         identification, as of this date.)

6    BY MS. HERZFELD:

7         Q.    I'll submit to you, sir, that

8    this is the second quarter 2015 NAVIPPRO

9    report that was provided to Endo it looks

10   like the -- looks like the Bates numbers

11   are cut off the bottom of my copy.

12   However, I'll submit to you that that's

13   what it is.

14              Do you see that on the front?

15        A.    I'm sorry.  What's your

16   question?

17        Q.    Does it look to you to be the

18   NAVIPPRO report from the second quarter of

19   2015?

20              MR. STERN:  Objection; form and

21        foundation.

22        A.    I see the reporting period

23   starting in April.

24        Q.    Of 2015?

1      A.     Correct.

2      Q.     Okay.  Good.

3             So, if you will then go with me

4      to page 9.

5      A.     Okay.

6      Q.     Okay.  And if you will go to the

7      second bullet point on page 9.

8      A.     Okay.

9      Q.     If you'll start about halfway

10     through that paragraph the one that starts

11     with "Further review."

12            Do you see where I'm at?

13     A.     Yes.

14     Q.     The one that starts with

15     "Demographically."  If you could start at

16     "Further review."

17     A.     (Reading) Further review of

18     route of administration data during Q2

19     2015 indicates that a greater percentage

20     of the past 30 day abusers of reformulated

21     Opana ER in Tennessee reported injections

22     76.9 percent versus past 30 day abusers of

23     products in all states except Tennessee

24     54.3 percent.

1    Q.    Okay.  You can stop there for

2    me, please.

3                Okay.  And if you could go to

4    page 43.  Figure 15.

5                Figure 15 describes the

6    distribution of routes of administration

7    reported by individuals within the ASI-MV

8    network in Tennessee and other states who

9    indicated past 30 days abuse of

10   reformulated Opana ER.

11               Is that correct?

12   A.    Yes.

13   Q.    Okay.  And here Tennessee is

14   also viewed separately from the rest of

15   the country.

16               Is that right?

17               MR. STERN:  Objection to the

18   form; foundation.

19   A.    I see Tennessee is separated

20   out.

21   Q.    Okay.

22               Okay.  So, we've looked at a few

23   of these now, and every time Tennessee is

24   always marked in these reports that Endo

Highly Confidential - Subject to Further Confidentiality Review

1    was receiving as being dramatically

2    different from every other state for IV

3    injection of Opana.

4             Is that right?

5             MR. STERN:  Objection to the

6        form and foundation.

7        A.    I see that Tennessee has a

8    higher rate.

9        Q.    Okay.  And that's consistent

10   throughout all the NAVIPPRO reports that

11   we've looked at 2012 through 2015.

12            Is that correct?

13       A.    That's correct.

14       Q.    Okay.  And then, you joined Endo

15   in 2016.

16            Is that correct?

17       A.    I joined Endo in September 2015.

18       Q.    September 2015?

19       A.    Correct.

20       Q.    Okay.  So you certainly would be

21   familiar then with what was going on at

22   Endo in 2016, yes, sir?

23            MR. STERN:  Objection to the

24        form of the question.

1    A.    2015 I was aware of the generic

2    aspect of what was going on at Endo.

3    Q.    Okay.  But in 2016, you started

4    your current position at Endo.

5        Is that --

6    A.    In September of 2016 I would

7    have become aware.

8    Q.    Okay.  So, I'm going to hand you

9    what we'll mark as Campanelli Exhibit 504.

10    A.    Okay.

11        (Campanelli Exhibit 504,

12        document, was marked for

13        identification, as of this date.)

14    BY MS. HERZFELD:

15    Q.    Okay.  And, so, this NAVIPPRO

16    report is dated the second quarter of

17    2016, April 1st, 2016 through June 30th,

18    2016.

19        Did I read that correctly?

20    A.    Yes.

21    Q.    Okay.  And it was issued

22    8/19/2016.

23        Is that right?

24    A.    That's correct.

1    Q.    Okay.  And that would have been

2    right before you started.

3              Is that right?

4    A.    That would have been before I

5    became the CEO of Endo.

6    Q.    Correct.

7              Okay.  Because you became the

8    CEO of Endo one month later?

9    A.    Correct.

10    Q.    Okay.  So, looking at this

11    report, if you will go with me to page 8.

12              Is that right?

13              Sorry.  If you'll go to page 8

14    for me, please.

15    A.    Okay.

16    Q.    Okay.  And if you could go down

17    for me to the one, two, three, fourth

18    bullet point.

19    A.    Okay.

20    Q.    And read that first sentence for

21    me.

22    A.    (Reading) Further review of

23    route of administration data during Q2

24    2016 indicates that a greater percentage

Highly Confidential - Subject to Further Confidentiality Review

1    of past 30 day abusers of reformulated

2    Opana ER in Tennessee reported injection

3    74.7 percent versus past 30 day abusers of

4    the product in all states except Tennessee

5    42.9 percent.

6         Q.    Okay.  You can stop there for

7    me.

8              Then if you'll go to page 44.

9    Look at figure 30.

10             Okay.  And figure -- are you

11   with me?

12        A.    Yes.

13        Q.    Okay.  And figure 30 is:

14   Distribution of routes of administration

15   reported by individuals within the ASI-MV

16   network in Tennessee and other states who

17   indicated past 30 day abuse of

18   reformulated Opana ER.

19             Did I read that correctly?

20        A.    You did.

21        Q.    Okay.  And Tennessee is

22   separated out from the other states in

23   this chart.

24             Is that correct?

1        A.     Yes, it is.

2        Q.     Okay.  I'm looking at the

3    injection rates here.  According to this

4    chart, Tennessee has the lightest number

5    in this chart, or the lightest color in

6    this chart.

7               Is that correct?

8        A.     Yes.

9        Q.     Okay.  And so, looking at

10   injection, Tennessee again has the highest

11   bar.

12              Is that right?

13       A.     Correct.

14       Q.     Okay.  And looking at snorting,

15   Tennessee has the highest bar.

16              Is that correct?

17       A.     That's correct.

18       Q.     Okay.  And, so, this chart,

19   according to this chart, it would indicate

20   that Tennessee has a higher injection and

21   snorting rate than the rest of the other

22   states?

23       A.     It indicates and clearly a

24   change in snorting.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And that change is that

2   it went up.

3           Is that correct?

4      A.    That's what it appears to be

5   versus the other quarters.

6      Q.    Okay.  Then if you'll switch

7   with me to page 48.

8           I'm sorry.  If you could go to

9   page 45.

10     A.    Okay.

11     Q.    Okay.  And then it says here in

12  the second full paragraph, the one that

13  starts with "Data."

14     A.    Okay.

15     Q.    If you could go to the sentence

16  that starts with "It is important."  If

17  you could read that out loud for me,

18  please, the next two sentences.

19     A.    Okay.

20           (Reading) It is important to

21  note that the number of prescriptions

22  dispensed within a geographic region is

23  related to a product's potential diversion

24  and abuse.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And the next sentence?

2    A.    (Reading) When considering the

3    proportion of prescriptions dispensed for

4    reformulated Opana ER during Q2 2016 per

5    population, the level of prescriptions

6    dispensed for the product in Tennessee

7    147.07 prescriptions per hundred thousand

8    population is among the highest for states

9    within the ASI-MV network.

10   Q.    Okay.  You can stop there.

11         And, Tennessee was also a high

12   state for sales for Opana ER.

13         Is that correct?

14   A.    I don't know the answer to that.

15   Q.    Okay.  If you'll switch with me

16   to page 48.

17   A.    Okay.

18   Q.    Okay.  It's under "Source of

19   Procurement."

20         Do you see that heading?

21   A.    Yes.

22   Q.    Okay.  If you'll go down to

23   "More specifically" and start reading

24   there for me, please.

1    A.    (Reading) More specifically,

2  individuals who reported past 30 day abuse

3  of reformulated Opana ER most frequently

4  obtained the product from a dealer, 59.2

5  percent, followed by a family member or

6  friend, 35 percent, and other source, 14.2

7  percent.

8    Q.    And the next sentence.

9    A.    (Reading) Additionally, five

10 individuals reported they acquired

11 reformulated Opana ER via their own

12 prescription, 4.2 percent, and two via

13 stealing, 1.7 percent.

14    Q.    Okay.  And, so, that shows

15 specifically that 59.2 percent of

16 individuals that were abusing Opana ER got

17 their Opana ER from a dealer, meaning a

18 drug dealer.

19          Is that right, sir?

20    A.    I'm assuming that's what it

21 means.

22    Q.    And only 4.2 percent got them

23 via their own prescriptions.

24          Is that right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     That's what the words say.

2      Q.     Okay.  So if it says only 4.2

3   got their Opana ER from their own

4   prescriptions, everybody else got it

5   illegally.

6             Is that right?

7      A.     I don't know if that's what this

8   says.

9      Q.     Okay.  Well, how can you get

10  Opana if you don't have your own

11  prescription legally?  Do you know?

12     A.     No, I don't know.

13     Q.     Okay.  And, so, legally you know

14  if you have a prescription for Opana you

15  can obtain it that way legally.

16            Is that correct?

17     A.     Okay.  I don't know what the

18  legal meaning of a family member or a

19  friend.  I don't know if that's an illegal

20  term.  So forgive me for that.

21     Q.     Okay.  And that's fine, family

22  member or friend, if you don't know what

23  those mean.

24            But otherwise, a dealer, let's

1    just start with a dealer.  59.2 percent of

2    those drugs had being bought illegally.

3              Is that right?

4              MR. STERN:  Objection; form and

5        foundation.

6        A.    I would agree that a dealer is

7    legal.

8              MR. STERN:  Can you just bear

9        with me one minute, Ms. Herzfeld?

10             Which exhibit are we on?

11             MS. HERZFELD:  Page 48.

12             MR. STERN:  Of which?  Of 504?

13             MS. HERZFELD:  Of 504.

14             MR. STERN:  Sorry.  Go ahead.

15   BY MS. HERZFELD:

16       Q.    So, back to the dealer statistic

17   that we were looking at.

18             That statistic there

19   demonstrates that there is indeed an

20   illegal drug market for Opana ER.

21             Is that right?

22       A.    I wasn't responsible -- I'm not

23   sure what this means.

24       Q.    Okay.  And there was an illegal

1    drug market for Opana ER in Tennessee.

2         Is that right?

3    A.   I don't know if there was or was

4    not.

5    Q.   Okay.  If people are injecting

6    Opana via IV, is that typically what

7    someone does when they get a prescription

8    from their doctor?

9    A.   No.

10   Q.   Okay.  So, you would agree that

11   that is an abuse of the product.

12        Is that right?

13   A.   I would agree that's an abuse

14   and a misuse of Opana.

15   Q.   Okay.  And, so, if you are

16   abusing and misusing Opana by injecting it

17   via IV, you didn't get it, you didn't get

18   your Opana by a doctor via a prescription?

19        MR. STERN:  Objection;

20   foundation.

21   BY MS. HERZFELD:

22   Q.   And you didn't get it from your

23   doctor from prescription.  This indicates

24   here 59.2 percent get it from a dealer,

1    that would indicate people who were

2    injecting it are likely getting it from a

3    dealer.

4            Is that right?

5            MR. STERN:  Objection to the

6        foundation.

7        A.    I see the words "dealer" in this

8    document.  That I agree with.

9        Q.    Okay.  And you know that

10   Tennessee has a high IV injection rate for

11   Opana through all the documents we've just

12   gone through.

13           Is that right?

14       A.    I've seen that.

15       Q.    Okay.  And you would agree with

16   me people who don't -- people who are

17   injecting Opana intravenously are not

18   taking it in a way that would be

19   prescribed by a doctor?

20       A.    I would agree with that.

21       Q.    Okay.  And you would agree with

22   me that if you're injecting Opana

23   intravenously, that's not an approved use

24   for the drug?

1    A.    That is -- that is a -- an abuse

2    and a misuse way to use the drug.

3    Q.    Okay.  And people who abuse and

4    misuse drugs, as we see here

5    statistically, mostly buy them from the

6    street?

7          MR. STERN:  Objection;

8    foundation.

9    BY MS. HERZFELD:

10   Q.    Looking here it says:  Opana ER

11   most frequently obtained the product from

12   a dealer.

13   A.    Okay.  Okay.  You flipped

14   between dealer and street.  So I'm not

15   sure what you want me to respond.

16   Q.    We'll start again.

17         So, here it says, going back to

18   source of procurement on page 48:  More

19   specifically, individuals who reported

20   past 30 day abuse of reformulated Opana ER

21   most frequently obtained the product from

22   a dealer.

23         Did I read that correctly?

24   A.    Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And we know that the

2    highest form of abuse in Tennessee was

3    through intravenous use.

4              Is that correct?

5    A.    That's what the graphs are

6    showing.

7    Q.    Okay.  Very good.

8              Endo wasn't required to sell

9    pills that make it to Tennessee.

10              Is that correct?

11    A.    I'm sorry?

12              MR. STERN:  Objection to the

13    form and foundation.

14    BY MS. HERZFELD:

15    Q.    Endo isn't required to sell

16    Opana pills that make it to Tennessee.

17              Is that right?

18              MR. STERN:  Objection to form

19    and foundation.

20    A.    We don't sell Opana to Tennessee

21    today.

22    Q.    Ever.

23              Were you ever required to make

24    sure that your product made it into

Highly Confidential - Subject to Further Confidentiality Review

1    Tennessee?

2           MR. STERN:  Objection to form

3       and foundation.

4       A.    I don't know the distribution

5    outlet on what Endo did into Tennessee

6    specifically.

7       Q.    Okay.  But you know who was

8    buying the product.

9           Is that right?

10          MR. STERN:  Objection to the

11      form.

12      A.    We know our customer.

13      Q.    Okay.  And, who is your

14   customer?

15      A.    At this particular -- what

16   particular time?

17      Q.    Your customer for Opana from

18   2012 to 2017 when it was pulled from the

19   market.

20      A.    I don't know up until -- I do

21   not know specifically up until the

22   September 2016 time frame what Endo did.

23          When I stepped into the

24   position, to the best of my knowledge, the

Highly Confidential - Subject to Further Confidentiality Review

1    distribution outlet for Opana would go

2    through the wholesalers.

3        Q.    Okay.  But from the wholesalers

4    you knew, via IMS Health data, who it is

5    that was receiving your drugs ultimately.

6            Is that right?

7            MR. STERN:  Objection to the

8        form of the question and foundation.

9        A.    I don't know the specific data

10   that -- that Endo acquired from IMS.

11           I do know that -- that we sell,

12   or sold Opana to wholesalers.

13       Q.    Okay.  And you knew that that

14   Opana was ending up in the state of

15   Tennessee.

16           Is that right?

17       A.    Presumably, of course it would

18   get there.  I don't know how the specific

19   distribution channel would go once it went

20   to a wholesaler.  That would be their

21   responsibility.

22       Q.    Well, sir, you were tracking

23   where your product was going; were you

24   not?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    We were tracking our customer.

2    Q.    You were tracking Opana going

3    into the state of Tennessee; were you not?

4         MR. STERN:  Objection; form and

5         foundation.  Time frame.

6    A.    What time frame?

7    Q.    From the period of time that you

8    started as in your current position.

9    A.    When I started, we almost

10   immediately withdrew the product from the

11   market.

12   Q.    But you didn't actually almost

13   immediately withdraw it from the market.

14        You started, when, September

15   2016.  That's what you said, right?

16   A.    September 23rd, 2016.

17   Q.    And yet the product wasn't

18   actually withdrawn from the market until

19   the following year.

20        Isn't that right?

21   A.    It was withdrawn in -- in -- in

22   June of 2017.

23   Q.    And then the distribution was to

24   end in September 2017.

1        Isn't that correct?

2     A.     Now it's at the wholesaler.

3     Q.     Okay.  So a year after you took

4   over, it took a year before the product

5   was pulled from the market?

6     A.     The agreement with the FDA was

7   there was a voluntarily -- a voluntary

8   withdrawal from the market.  The FDA gave

9   us a period to -- to sell and distribute

10   to wholesalers.  At that point in time,

11   the FDA did not put a limitation, to the

12   best of my knowledge, as to when a

13   wholesaler had to stop selling the

14   product.

15     Q.     But, sir, my question is it was

16   a full year from the time that you started

17   until Opana made it off the market.

18        Is that right?

19        MR. STERN:  Objection to the

20     form of the question.

21     A.     I don't know when the product

22   exited the market.  What I do know is we

23   stopped selling in June -- I believe it

24   was -- I'm sorry.  We stopped selling in

Highly Confidential - Subject to Further Confidentiality Review

1    September of 2017.

2        Q.    Okay.  And you began your

3    employment in September 2016?

4        A.    Correct.

5        Q.    Okay.  Okay.  I'm going to hand

6    you what we will mark as Campanelli

7    Exhibit 505.

8            (Campanelli Exhibit 505, e-mail,

9        was marked for identification, as of

10        this date.)

11    BY MS. HERZFELD:

12        Q.    This is ENDO_OPIOID_MDL-02667006

13    and '7007.

14            Sir, there was a time when Endo

15    considered not shipping Opana to

16    Tennessee.

17            Is that correct?

18            MR. STERN:  Objection;

19        foundation; form.

20        A.    I don't know that.

21        Q.    Okay.  If you'll go ahead and

22    take a look at this e-mail reading from

23    the bottom up.

24        A.    (Perusing document.)

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sir, who is Brian Lortie?

2    A.    Brian Lortie was the president

3    of the branded portion of Endo.

4    Q.    Okay.  And, who is Jason

5    Reckner?

6    A.    I don't know.

7    Q.    Okay.  And here this is an

8    e-mail from Brian Lortie to Jason Reckner

9    dated November 13th, 2014.

10           Is that right?

11    A.    Yes, I see it.

12    Q.    Okay.  And it says:  Jason.

13    Just make sure that you will take the lead

14    on the Tennessee Opana actions from

15    yesterday's review.  Tennessee

16    distribution/RXs in specific area.  What

17    if we closed off distribution there?

18    Impact on sales?  What did Purdue do and

19    how?  (Brian Munroe can provide assistance

20    on this one through his contacts.)

21           Did I read that correctly?

22    A.    Yeah.

23    Q.    Okay.  And, so, does this e-mail

24    indicate that there was a discussion about

Highly Confidential - Subject to Further Confidentiality Review

1  closing off distribution of Opana to

2  Tennessee?

3      A.    That's what the words on the

4  document say.

5      Q.    Okay.  Then Brian responds to

6  Jason Reckner talking about closing off

7  distribution to -- of Opana ER to

8  Tennessee.

9           Is that right?

10     A.    Those are the words.

11     Q.    Okay.  And, so, looking at this,

12  according to this document, it was

13  discussed and considered within Endo that

14  they would stop distributing Opana ER to

15  Tennessee.

16          Is that what this document

17  indicates?

18          MR. STERN:  Objection to form

19     and foundation; document speaks for

20     itself.

21     A.    The words on the document would

22  imply that.

23     Q.    Okay.  And, so, do you know

24  who -- if that decision was ever followed

1  through on?

2      A.    I don't know.

3      Q.    Okay.  Do you know who would

4  have been responsible for making that

5  decision?

6      A.    Ultimately I see Brian Lortie as

7  the president and Rajiv deSilva as the

8  CEO.

9      Q.    Okay.  And since the time that

10  you've been in your current position with

11  Endo, has anyone ever discussed with you

12  on suspending or stopping distribution of

13  Opana ER to Tennessee?

14      A.    I don't recall -- I don't

15  recollect that conversation happening.

16      Q.    Okay.  And, so, there was a

17  conversation that occurred back in 2014

18  about stopping distribution of Opana ER to

19  Tennessee, and to your knowledge, that

20  never occurred.

21          Is that right?

22      A.    I don't know what would have

23  occurred or not.  I see the words on the

24  document that's dated November 2014.

1    Q.    Okay.  And you revisited that

2    decision when you became the CEO of Endo?

3    A.    I don't recall.

4    Q.    You don't recall or you did not?

5    A.    I don't recall if we had that

6    conversation 'cause we knew that we were

7    going to withdraw the product.

8    Q.    Okay.  So, it remained an

9    option, at least for that year while the

10   product was still on the market and you

11   were the CEO, that distribution could have

12   stopped in Tennessee.

13             Is that right?

14             MR. STERN:  Objection to the

15       form of the question.

16   A.    Okay.  I was the CEO in

17   September of 2016.  We had an ADCOM in

18   March, and we made a decision to

19   voluntarily withdraw the market from every

20   component of distribution in -- by

21   September of 2017.

22   Q.    I understand that, sir.

23             But during that period of time,

24   it was possible to stop distribution to

1    Tennessee; was it not?

2              MR. STERN:  Objection to the

3        form of the question.

4        A.    It would -- it would -- it would

5    have been possible.  I don't know if we

6    were distributing specifically into

7    Tennessee at that period of time.

8        Q.    Okay.  But if you were, it was

9    possible to stop.

10             Is that right?

11             MR. STERN:  Objection to the

12       form of the question.

13       A.    At that point in time, I don't

14   know if we were selling into Tennessee or

15   not.

16       Q.    Okay.  Do you know how -- have

17   you ever heard of neonatal abstinence

18   syndrome?

19       A.    No.

20       Q.    Okay.  Have you heard of babies

21   being born dependent on opioids?

22       A.    Yes.

23       Q.    Do you know how many babies were

24   born dependent on opioids in Tennessee

1    during that period of time when you became

2    the CEO before the product was ultimately

3    pulled?

4         A.    No.

5              MR. STERN:  Objection to

6         foundation.

7         A.    I do not know.

8         Q.    Okay.  Do you know how many

9    people overdosed on opioid products in

10   Tennessee during that period of time from

11   the time you became CEO until it was

12   ultimately withdrawn from the market?

13             MR. STERN:  Objection to the

14        form.

15        A.    I don't know, but if it's one,

16   it's one too many.

17        Q.    Okay.  Why was the decision made

18   not to suspend or stop shipping Opana ER

19   to Tennessee?

20             MR. STERN:  Objection;

21        mischaracterizes testimony; form and

22        foundation.

23        A.    What period of time?

24        Q.    Any period of time.

1      A.    I don't know.  I can't answer

2 that question before my -- before my role

3 as CEO.

4      Q.    Okay.  What about during your

5 role as CEO?

6      A.    As I said, we went to the

7 advisory committee meeting in March, and

8 we ultimately made the decision in June to

9 voluntarily withdraw it.  So we withdrew

10 from every state in the United States.

11      Q.    But you didn't do anything

12 specific for Tennessee before that time;

13 did you?

14      A.    I don't recall whether or not we

15 made any decision specific to Tennessee.

16 I don't think I was looking at Tennessee

17 as an isolated state.  We're looking at

18 the entire country at this point in time.

19      Q.    Okay.  But the NAVIPPRO was

20 definitely looking at Tennessee as an

21 isolated state; was it not?

22      MR. STERN:  Objection to the

23 form of the question.

24      A.    The data that you showed me

1   certainly indicated Tennessee was -- was

2   isolated.

3         I'm saying when we made our

4   decision, we were looking at the United

5   States, not just Tennessee.

6     Q.   I see.

7         Okay.  Thank you, sir.  You can

8   set that aside.

9         Sir, do you know if there are

10   any characteristics that place a certain

11   geographic area at greater risk for abuse

12   and diversion of opioids?

13         MR. STERN:  Objection to the

14     form of the question; foundation.

15     A.   I'm not sure I understand your

16   question.

17     Q.   Sure.

18         Do you know, from your knowledge

19   in the opioid industry, if there are

20   certain geographic or demographic

21   characteristics that can make a particular

22   area more susceptible to opioid abuse?

23         MR. STERN:  Objection; form and

24     foundation.

1      A.    No, I do not know.

2      Q.    Okay.  And, you attended the

3  March 2017 ADCOM meeting?

4      A.    I did not.

5      Q.    You did not?

6      A.    No, I did not.

7      Q.    Okay.  Did -- do you know who

8  from Endo did attend?

9      A.    I -- I -- I know several people

10  would have.

11      Q.    Okay.  Did you ever review the

12  materials that were presented at the March

13  2017 ADCOM meeting?

14      A.    I would have received a copy.

15      Q.    Okay.

16           MS. HERZFELD:  I'm going to mark

17      this as Endo Exhibit 50 -- or,

18      Campanelli Exhibit 506.

19           (Campanelli Exhibit 506,

20      document, was marked for

21      identification, as of this date.)

22  BY MS. HERZFELD:

23      Q.    Okay.  Sir, if you'll take a

24  look at this, it's the slide deck from the

1    March 13th, 2007 ADCOM meeting.  If I can

2    draw your attention all the way to the

3    back to the slide that in the corner is

4    marked VR 143 and SR 4.

5            MR. STERN:  Paul, right near the

6        end.

7            THE WITNESS:  I'm getting there.

8            I'm going to switch with you,

9        Jon, 'cause I don't do this as quickly

10       as you are.

11           MS. HERZFELD:  Very good.

12   BY MS. HERZFELD:

13       Q.    So, the one that's marked VR 143

14   in the corner, do you see that?

15       A.    Yes.

16       Q.    Okay.  And the title is

17   "NAVIPPRO distribution of Opana ER abuse

18   cases ASI-MV assessments and number of

19   opioid prescriptions by state."

20           Did I read that correctly?

21       A.    Yes.

22       Q.    Okay.  And, what are the two

23   states that are on this slide?

24       A.    Tennessee and North Carolina.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And if you'll look at the
2  opioid prescriptions for Tennessee, what
3  is the number?
4    A.   19,281,864.
5    Q.   And then if you look down at the
6  bottom Opana ER abuse case percentage
7  total, what percentage does Tennessee hold
8  in that space?
9    A.   74.6 percent.
10   Q.   And North Carolina, conversely,
11  what percentage does it have for Opana ER
12  abuse cases?
13   A.   4.8 percent.
14   Q.   Okay.  And if you'll switch with
15  me then to the next page that's marked
16  SR 4.  If you could read the title for me
17  there.
18   A.   "Why Tennessee experience is an
19  anomaly and not a sentinel occurrence."
20   Q.   Okay.  If you'll read the
21  next -- the first bullet point for me,
22  please.
23   A.   (Reading) IV abuse of nearly all
24  opioids very high for some time without

Highly Confidential - Subject to Further Confidentiality Review

1   appreciable spread.

2        Q.     And the next one?

3        A.     (Reading) Very particular abuse

4   ecology.   Complicated set of factors.

5        Q.     Okay.  And the next one.

6        A.     (Reading) Pockets of increased

7   IV drug use occurring in other locations

8   around the country have not led to Opana

9   singles.

10       Q.     Okay.  And, so, what was meant

11  by very particular abuse ecology?

12       A.     I don't know.

13       Q.     Do you know what the complicated

14  set of factors that made Tennessee stand

15  out so much for Opana ER abuse were?

16       A.     I do not know.

17       Q.     Did you ever have any

18  discussions with anyone on your staff

19  about trying to determine what the

20  particular issues were for Opana abuse in

21  Tennessee?

22       A.     No.

23              At this point in time, I'm about

24  four months on the job.

1    Q.    Okay.  But at four months on the

2    job, Tennessee had already come up as

3    being like Hello, Tennessee.  Right?

4              Every single thing has Tennessee

5    separate.

6              Isn't that right?

7    A.    The documents that you showed me

8    has Tennessee tied back to them, yes.

9    Q.    Okay.  And here in the ADCOM

10   meeting they're talking specifically about

11   Tennessee, yes?

12   A.    Yes.

13   Q.    Okay.  And Tennessee is being

14   raised as a flag at the ADCOM meeting.

15             Is that right?

16   A.    I see Tennessee as being --

17   is -- is -- is being pointed out, yes.

18   Q.    Okay.  But you didn't have any

19   discussions with your staff about the

20   Tennessee Opana abuse problem?

21   A.    Discussions were about Opana in

22   the country, the entire United States.

23   Q.    Okay.  So you didn't have any

24   specific conversations about the Opana

1    abuse problem in Tennessee?

2        A.    Not specific to Tennessee.

3        Q.    Okay.  Great.  You can set that

4    aside for me, please.

5              MS. HERZFELD:  Okay.  And I'm on

6         my last one, for anybody trying to

7         figure out travel plans.

8        Q.    Okay.  I'm going to hand you

9    what we've marked as Campanelli Exhibit

10   507.

11             (Campanelli Exhibit 507, e-mail,

12        was marked for identification, as of

13        this date.)

14   BY MS. HERZFELD:

15       Q.    And for the record, it's

16   ENDO_OPIOID_MDL-01848038.  It's one-page

17   document.

18             Take a look at this for me, sir.

19   I'll give you a moment to review it.

20       A.    (Perusing document.)

21             MR. STERN:  I'm sorry.  What

22        number is this?  506?

23             Paul?

24             MS. HERZFELD:  507.

1          MR. STERN:  507.  Thank you.

2     BY MS. HERZFELD:

3          Q.    Have you had an opportunity to

4     review it, sir?

5          A.    Yes.

6          Q.    Okay.  Is this an e-mail that

7     was sent from you to Tara Chapman dated

8     March 23rd, 2017?

9          A.    Yes.

10         Q.    Okay.  And the e-mail that

11    you're sending from you to Tara Chapman

12    is -- looks like an e-mail from the bottom

13    that has to do with an e-mail Tara had

14    sent to Swati Patwardhan.

15              Did I say that correctly?  I'm

16    sure I didn't.

17         A.    I think you did.

18         Q.    Really?  Great.

19              Okay.  And, who is Swati

20    Patwardhan?

21         A.    I believe she was a project

22    manager at the FDA.

23         Q.    Okay.  And, so, here in the text

24    of this e-mail, if you'll go down with me

1    to where you've got, like, under the

2    bullet points there the sentence that

3    starts with "Additionally."

4             Could you read there for me,

5    please?

6        A.    Where it says "additional

7    components"?

8        Q.    "Additionally as mentioned."

9        A.    (Reading) Additionally as

10   mentioned during our presentation, Endo is

11   also working on an ethnographic study in

12   Tennessee and also commits to continue to

13   follow the RADARS and NAVIPPRO

14   surveillance data.

15       Q.    Okay.  Great.

16            Do you know if that ethnographic

17   study in Tennessee was ever completed?

18       A.    I don't remember.

19       Q.    Okay.  Do you know what the

20   results were?

21       A.    I don't remember.

22       Q.    Okay.  Where would I look to

23   find it, if it existed?

24       A.    Our regulatory affairs would

1    have had it.

2         Q.    Okay.  And, who would I ask?

3         A.    William McIntyre.

4         Q.    Okay.  Did Endo take any steps

5    in --

6              MS. HERZFELD:  I'll withdraw

7         that question.

8         Q.    You don't know the results of

9    any study, ethnographic study, in

10   Tennessee?

11        A.    I don't -- I don't recall.

12   There might be a timing issue whereby we

13   chose to take the -- voluntarily take the

14   product off the market.  So I'm not sure

15   if it was done or completed or whatever

16   happened to it.

17        Q.    Okay.  But in the meantime, to

18   your knowledge, Opana was continuing to be

19   sold into Tennessee until you withdrew it

20   from the market?

21        A.    Again, at this point in time, I

22   don't know if we were specifically selling

23   in to Tennessee.

24              We were selling the product.

1    Q.    Okay.

2    A.    That much I know.

3    Q.    And if the data shows that Opana

4    was being sold into Tennessee, you don't

5    have any reason to dispute that?

6    A.    Agreed.

7    Q.    Okay.  And to this day, Endo

8    continues to sell its generic opioid

9    products through its distributors that can

10   make their way into Tennessee.

11        Is that right?

12   A.    Yes.

13        MS. HERZFELD:  Okay.  I'll just

14   take a five minute break, two minutes,

15   something.

16        MR. STERN:  Sure.

17        THE VIDEOGRAPHER:  All right.

18   The time is 7:00 p.m.

19        Off the record.

20        (Recess taken.)

21        THE VIDEOGRAPHER:  We are back

22   on the record.

23        The time is 7:03 p.m.

24        MS. HERZFELD:  Thank you, Mr.

Highly Confidential - Subject to Further Confidentiality Review

1    Campanelli.  I'm going to suspend the

2    deposition at this time.  I don't have

3    any more questions for you today.  But

4    I'm suspending it based on the fact

5    that we haven't received any of the

6    documents in your custodial file and I

7    would like to have those in order to

8    be able to question you further.

9         So we'll suspend the deposition

10   at this time.

11        MR. STERN:  And, again, it's our

12   understanding that you have received

13   those documents.

14        MS. HERZFELD:  Understood.

15        (Pause.)

16   EXAMINATION BY

17   MR. STERN:

18        Q.    Mr. Campanelli, good evening.

19        A.    Good evening.

20        Q.    When did you start working at

21   Endo?

22        A.    September 2015.

23        Q.    And what was your position then,

24   would you remind us?

```
 1        A.    President of the generics
 2   position.
 3        Q.    And you held that position until
 4   when?
 5        A.    For one year to September 2016.
 6        Q.    When you became what?
 7        A.    President and CEO of Endo.
 8        Q.    Mr. Buchanan showed you about 70
 9   documents, give or take.  The record will
10   speak for itself on that point.
11              But, does that sound about right
12   to you?
13        A.    A number of documents.
14        Q.    Did -- and that included Endo
15   documents.
16              Is that right?
17        A.    Correct.
18        Q.    And by Endo documents I mean
19   e-mails, internal e-mails at Endo.
20              You saw those?
21        A.    Yes.
22        Q.    You saw other documents that had
23   Endo logos on them?
24        A.    Yes.
```

1    Q.    Did any of -- were -- was your

2    name on any of those e-mails?

3    A.    No.

4    Q.    As a "to"?

5    A.    No.

6    Q.    As a "from"?

7    A.    No.

8    Q.    As a "cc"?

9    A.    No.

10    Q.    Anywhere in the body of any of

11    those e-mails?

12    A.    No.

13    Q.    What about the other Endo, what

14    I'm just defining as the Endo documents,

15    documents generated by Endo or with an

16    Endo logo on them, does your name appear

17    on any of those documents?

18    A.    No.

19    Q.    Did you ever receive any of

20    those documents?

21    A.    No.

22    Q.    Are any of the documents, with

23    the possible exception of the AOD, had

24    you, of all the documents that

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Buchanan showed you, had you seen any

2    of them before today?

3        A.    No, I have not.

4        Q.    With the possible exception of

5    the AOD, did any of them bear a date that

6    preceded, came before, September 1st,

7    2015?

8        A.    No.

9        Q.    For the time period before

10   September 1st, 2015, do you have any

11   personal knowledge of any internal

12   communications at Endo?

13       A.    I do not.

14       Q.    For that time period, do you

15   have any personal knowledge of what

16   decisions were made at Endo about opioids?

17       A.    I do not.

18       Q.    Do you have any personal

19   knowledge about why decisions were made at

20   Endo about opioids before September of

21   2015?

22       A.    I do not.

23       Q.    Do you have any personal

24   knowledge about anything that happened at

Highly Confidential - Subject to Further Confidentiality Review

1   Endo before September of 2015?

2       A.    I do not.

3       Q.    So, to the extent that you were

4   answering questions about the documents

5   that you saw, what were those answers

6   based upon?

7       A.    The words on the paper.

8       Q.    Anything else?

9       A.    No.

10          MR. STERN:  I have nothing

11      further.

12          MR. BUCHANAN:  How long?

13          THE VIDEOGRAPHER:  He went for

14      four minutes.

15          MS. JONES-McDONALD:  No, there

16      was time.

17          THE VIDEOGRAPHER:  Three

18      minutes.

19          You want to go off the record?

20          MR. BUCHANAN:  Yeah.

21          THE VIDEOGRAPHER:  All right.

22      The time is 7:07 p.m.

23          Off the record.

24          (Recess taken.)

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  We are back

2     on the record.

3          The time is 7:10 p.m.

4     BY MR. STERN:

5     Q.     Mr. Campanelli, I think between

6     us, my going too fast and everyone's

7     schedule this evening, I think that

8     there's one question and answer that we

9     need to clear up.  I don't think this will

10    be in dispute, but I'm going to ask the

11    question again.

12          With the possible exception of

13    the AOD, were any of the documents -- did

14    any of the documents that Mr. Buchanan

15    showed you bear a date after September

16    1st, 2015?

17    A.     After?  No.

18          MR. STERN:  Okay.  Thank you.

19          THE VIDEOGRAPHER:  Stay on the

20    record or go off?

21          MR. BUCHANAN:  Just one moment.

22    We can go off.

23          THE VIDEOGRAPHER:  Off the

24    record, right?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. SCULLION:  Yes.

2          THE VIDEOGRAPHER:  The time is

3     7:11 p.m.

4          Off the record.

5          (Recess taken.)

6          THE VIDEOGRAPHER:  The time is

7     7:13 p.m.

8          Back on the record.

9   FURTHER EXAMINATION BY

10  MR. BUCHANAN:

11     Q.   Now, sir, you are the president

12  and CEO of Endo, correct?

13     A.   Correct.

14     Q.   Within Endo, operating company

15  Par, correct?

16     A.   I'm sorry?

17     Q.   Within Endo, an operating

18  subsidiary Par, correct?

19     A.   Correct.

20     Q.   Also responsible for that,

21  correct?

22     A.   Yes.

23     Q.   Par has within it the operating

24  assets of Qualitest, correct?

1     A.    Qualitest no longer exists.

2     Q.    Okay.  Those assets are now

3  within the company that is Par, correct,

4  sir?

5     A.    Correct.

6     Q.    Okay.  I'll pass you what we

7  marked as Exhibit 111 to your deposition,

8  sir.

9          (Campanelli Exhibit 111, e-mail,

10         was marked for identification, as of

11         this date.)

12  BY MR. BUCHANAN:

13     Q.    It's an e-mail from yourself to

14  others, an important message from Paul

15  Campanelli, an open letter regarding the

16  opioid crisis.

17          Do you see that, sir?

18     A.    I see it.

19     Q.    Second page:  Since its founding

20  as a family business in 1920, Endo has

21  evolved into a generics and specialty

22  branded pharmaceutical company whose

23  products help millions of patients lead

24  healthier lives.

1              Do you see this letter, sir?

2     A.     Yes.

3     Q.     Do you recall writing it?

4     A.     I participated in it.

5     Q.     Okay.  Certainly you embrace

6  Endo's history in this letter, right, sir?

7     A.     We're embracing the name of Endo

8  in this letter.

9     Q.     You embrace Endo's history and

10 its founding as a family business in 1920,

11 right?

12    A.     We see it, yes.

13    Q.     It's evolution into a generics

14 and specialty branded pharmaceutical

15 company, right?

16    A.     Yes.

17    Q.     Well, you're not skipping the

18 years, are you, sir, between 1997 and 2015

19 when you talk about Endo's history; are

20 you?

21    A.     Could you say that again?

22    Q.     You're not skipping the years

23 between 1997 and 2015 when you got to the

24 company in terms of Endo's history, right,

1   sir?

2           MR. STERN:  Objection; form and

3       foundation.

4       A.    We're speaking about Endo since

5   its 1997 inception.

6       Q.    You would agree with me, sir,

7   that Endo is responsible for its deeds and

8   misdeeds that occurred before you got to

9   the company, right, sir?

10          MR. STERN:  Objection; form;

11      foundation; and calls for a legal

12      conclusion.

13      A.    I don't know the answer to that.

14      Q.    Sir, you're not saying that it's

15  okay to talk about Endo in 1920 and it's

16  okay to talk about Endo from 19 -- I'm

17  sorry, 2015 and '16, but not during the 17

18  years when you built this opioid market?

19          MR. STERN:  Objection; form and

20      foundation.

21  BY MR. BUCHANAN:

22      Q.    Are you, sir?

23          MR. STERN:  Objection; form and

24      foundation.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I wasn't there.  I don't know

2    the answer to your question.

3    Q.    That's right, sir.

4          And we looked at a lot of

5    documents that certainly you'd want to be

6    aware of, wouldn't you, sir, as the chief

7    executive officer of the company?

8          MR. STERN:  Objection; form and

9       foundation.

10   A.    I'm not sure I understand.

11   Q.    Would you want to be aware of,

12   sir, that your detail representatives are

13   calling on pill mills and not reporting

14   that?  Is that something you expect to be

15   aware of?

16         MR. STERN:  Objection to form

17      and foundation.

18   A.    At what period of time?

19   Q.    The period of time we looked at

20   today, sir.

21         Do you recall when Opana ER was

22   being marketed and detailed by sales

23   representatives in Ohio to a pill mill?

24         MR. STERN:  Objection; form and

1       foundation.

2               That was before September 1st,

3       2015.

4    BY MR. BUCHANAN:

5       Q.    Do you recall that, sir?

6       A.    I recall the document you showed

7    me.

8       Q.    You certainly wouldn't endorse

9    the decisions of representatives not to

10   report that activity up the food chain;

11   would you, sir?

12              MR. STERN:  Objection to form

13       and foundation.

14       A.    Again, I don't know the --

15   the -- the reasons why they did or did not

16   do certain things at this period of time.

17       Q.    Whether before or after 2015,

18   sir, you would not endorse false messages

19   about the abuse potential of your drug;

20   would you, sir?

21              MR. STERN:  Objection; form and

22       foundation.

23       A.    Again, I can speak to 2015 and

24   beyond.

Highly Confidential - Subject to Further Confidentiality Review

```
1          I would not endorse it from that

2  period of time.

3     Q.    Whether before or after 2015,

4  sir, you would not endorse using NIPC or

5  using the APF to say that abuse is rare

6  when it is anything but rare, correct,

7  sir?

8          MR. STERN:  Objection to form

9     and foundation.

10    A.    Again, I would endorse it since

11 I've been at Endo.

12    Q.    Making false statements, sir, is

13 a problem regardless of when it happens.

14         Agreed?

15         MR. STERN:  Objection to form

16    and foundation.

17    A.    Proven false statements are a

18 problem.

19    Q.    And whether that happened on

20 your watch, sir, or whether it happened

21 under the watch your predecessor, that's a

22 problem.

23         Right, sir?

24         MR. STERN:  Objection to form
```

 1          and foundation.

 2          A.    False statements that are proven

 3    to be false -- I'm sorry.

 4                Could you say that question

 5    again?

 6          Q.    Whether those false statements

 7    happened on your watch, sir, or whether

 8    they happened on your predecessor's watch,

 9    that's a problem, right?

10                MR. STERN:  Objection to form

11          and foundation.

12          A.    If it's a factual statement,

13    it's a concern.

14                MR. BUCHANAN:  No further

15          questions.

16                THE VIDEOGRAPHER:  Okay.  Off

17          the record.

18                All right.  This marks the end

19          of today's deposition.  The time is

20          7:17 p.m.

21                (Deposition adjourned at

22          approximately 7:17 p.m.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1               A C K N O W L E D G M E N T

2

3     STATE OF              )

4                                :ss

5     COUNTY OF              )

6

7           I, PAUL CAMPANELLI, hereby

8     certify that I have read the transcript of

9     my testimony taken under oath in my

10    deposition of March 21, 2019; that the

11    transcript is a true and complete record

12    of my testimony, and that the answers on

13    the record as given by me are true and

14    correct.

15

16

17           _____

                      PAUL CAMPANELLI

18

19    Signed and subscribed to before me this

20    _____ day of _____, 2019.

21

22    _____

23    Notary Public, State of

24

1                          E R R A T A

2        PAGE / LINE / CHANGE    /    REASON

3        _____

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

1                C E R T I F I C A T E

2    STATE OF NEW YORK

3    COUNTY OF NEW YORK

4

5          I, Marie Foley, RMR, CRR, a

6    Certified Realtime Reporter and Notary

7    Public within and for the State of New

8    York, do hereby certify:

9          THAT PAUL CAMPANELLI, the witness

10   whose deposition is hereinbefore set

11   forth, was duly sworn by me and that such

12   deposition is a true record of the

13   testimony given by the witness.

14         I further certify that I am not

15   related to any of the parties to this

16   action by blood or marriage, and that I am

17   in no way interested in the outcome of

18   this matter.

19         IN WITNESS WHEREOF, I have

20   hereunto set my hand this 24th day of

21   March, 2019.

22

23   _____

                MARIE FOLEY, RMR, CRR

24

Highly Confidential - Subject to Further Confidentiality Review

1                              LAWYER'S NOTES

2        PAGE / LINE

3        _____  _____  _____

4        _____  _____  _____

5        _____  _____  _____

6        _____  _____  _____

7        _____  _____  _____

8        _____  _____  _____

9        _____  _____  _____

10       _____  _____  _____

11       _____  _____  _____

12       _____  _____  _____

13       _____  _____  _____

14       _____  _____  _____

15       _____  _____  _____

16       _____  _____  _____

17       _____  _____  _____

18       _____  _____  _____

19       _____  _____  _____

20       _____  _____  _____

21       _____  _____  _____

22       _____  _____  _____

23       _____  _____  _____

24       _____  _____  _____