```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL        :  MDL No. 2804

     PRESCRIPTION OPIATE     :

 4   LITIGATION              :  Case No. 17-md-2804

                             :

 5   APPLIES TO ALL CASES    :  Hon. Dan A. Polster

                             :

 6                           :

 7

 8                    HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                       - - - -

12                   JANUARY 8, 2019

13                       - - - -

14        VIDEOTAPED DEPOSITION OF GREGORY CARLSON,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Tuesday,

20   January 8, 2019, commencing at 9:06 a.m.

21                       - - - -

22              GOLKOW LITIGATION SERVICES

            877.370.3377 phone | 917.591.5672 fax

23                   deps@golkow.com

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

```
 1          A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3      WAGSTAFF & CARTMELL, LLP
         BY:  TOM ROTTINGHAUS, ESQUIRE
 4       4740 Grand Avenue, Suite 300
         Kansas City, Missouri  64112
 5       816.701.1100
         trottinghaus@wcllp.com
 6
 7  On behalf of Defendant AmerisourceBergen Drug
    Corporation
 8
         (By Phone/Livestream)
 9       REED SMITH LLP
         BY:  SHANA E. RUSSO, ESQUIRE
10       136 Main Street, Suite 250
         Princeton Forrestal Village
11       Princeton, New Jersey  08540
         609.514.5959
12       srusso@reedsmith.com
13
    On behalf of Defendant Cardinal Health, Inc.
14
         PIETRAGALLO GORDON ALFANO BOSICK &
15       RASPANTI, LLP
         BY:  JENNIFER BOURIAT, ESQUIRE
16       One Oxford Centre, 38th Floor
         301 Grant Street
17       Pittsburgh, Pennsylvania  15219
         412.263.2000
18       jhb@pietragallo.com
19
    On behalf of Defendants Endo Pharmaceuticals, Endo
20  Health Solutions and Par Pharmaceuticals
21       (By Phone/Livestream)
         ARNOLD & PORTER KAYE SCHOLER LLP
22       BY:  ERICA I. GUTHRIE, ESQUIRE
         601 Massachusetts Avenue, NW
23       Washington, DC  20001-37453
         202.942.5743
24       erica.guthrie@arnoldporter.com
25
```

---

Page 3

```
 1      A P P E A R A N C E S (Continued)
 2  On behalf of Defendant HBC Service Company
 3      MARCUS & SHAPIRA, LLP
         BY:  JOSHUA KOBRIN, ESQUIRE
 4           ROBERT M. BARNES, ESQUIRE
         One Oxford Centre, 35th Floor
 5       Pittsburgh, Pennsylvania  15219
         412.471.3490
 6       jkobrin@marcus-shapira.com
         rbarnes@marcus-shapira.com
 7
 8  On behalf of Defendant McKesson Corporation
 9      COVINGTON & BURLING, LLP
         BY:  AMBER CHARLES, ESQUIRE
10       One CityCenter
         850 Tenth Street, NW
11       Washington, DC  20001-4956
         202.662.5807
12       acharles@cov.com
13
    On behalf of Defendant Walmart
14
         (By phone/Livestream)
15       JONES DAY, LLP
         BY:  CHRISTOPHER MARKHAM, ESQUIRE
16       100 High Street
         21st Floor
17       Boston, Massachusetts 02110-1781
         617.960.3939
18       cmarkham@jonesday.com
19
    On behalf of Deponent
20
         DICKIE MCCAMEY & CHILCOTE, P.C.
21       BY:  JEFFREY J. WETZEL, ESQUIRE
         Two PPG Place, Suite 400
22       Pittsburgh, Pennsylvania  15222
         412.392.5617
23       jwetzel@dmclaw.com
24  Also present
25       Frank Stanek, legal videographer
```

---

Page 4

```
 1              * I N D E X *
 2  GREGORY CARLSON                    PAGE
 3   EXAMINATION BY MR. ROTTINGHAUS     8, 246, 252
     EXAMINATION BY MR. BARNES          217, 251
 4
 5      * INDEX OF HBC-CARLSON EXHIBITS *
 6  NO.          DESCRIPTION        PAGE
    Exhibit 1  Greg Carlson LinkedIn profile     13
 7
    Exhibit 2  Giant Eagle Retail Operations -    45
 8             Pharmacy Operations org chart
               as of November 13, 2014
 9             HBC_MDL00002216
10  Exhibit 3  CFR Part 1301.74 from DEA website  52
               P1.47 - P1.47.2
11
    Exhibit 4  DEA Dear Registrant 6/12/12,       89
12             6/12/12, 12/27/07, 2/7/07, 9/27/06
               letters
13             ABDCMDL00269683 - 00269694
14  Exhibit 5  Ohio State Board of Pharmacy       101
               Meeting Minutes November 2-4, 2009
15
    Exhibit 6  Ohio State Board of Pharmacy       101
16             Meeting Minutes December 5-7, 2011
17  Exhibit 7  Email chain, 1/30/12, from A.      107
               Zelaski to G. Carlson, et al.,
18             subject: RE: HBC phone number
               HBC_MDL00090001 - 00090004
19
    Exhibit 8  Meeting invitation for 5/24/13,    110
20             from J. Millward to G. Carlson,
               et al., subject: CSMP Questionnaire
21             Complete Response
               HBC_MDL00144314 - 00144322
22
    Exhibit 9  Email, 8/22/13, from S. Voyten to  114
23             J. Millward, et al., subject: FW:
               CVS News Story
24             HBC_MDL00154265 - 00154266
25
```

---

Page 5

```
 1    * INDEX OF HBC-CARLSON EXHIBITS (Continued) *
 2  NO.          DESCRIPTION        PAGE
    Exhibit 10  Email chain, 4/18/14, from M. Bianco  116
 3              to G. Carson, subject: Re: 35 missing
                tote
 4              HBC_MDL00135668 - 00135670
 5  Exhibit 11  Email chain, 4/23/14, from TammySSD   118
                to B. Snider, subject: Re: Missing
 6              HBC Tote
                MCKMDL0059574 - 0059578
 7
    Exhibit 12  Email chain, 8/11/15, from R.         121
 8              Shaheen to G. Carlson, subject: RE:
                Procedural inconsistency
 9              HBC_MDL0063991 - 00063992
10  Exhibit 13  Email chain, 11/25/13, from T.        128
                Roahrig to J. Millward, subject:
11              FW: Daily HBC Suspicious Purchasing
                Report - 11/13/13
12              HBC_MDL00094599 - 0094600
13  Exhibit 14  Email chain, 8/20/15, from G.         134
                Carlson to J. Jenson, et al.,
14              subject: FW: Thrifty White Notes
                HBC_MDL00069566 - 00069571
15
    Exhibit 15  Email chain, 10/23/08, from S.        153
16              Cook to G. Carlson, subject: Giant
                Eagle CSMP Thresholds
17              MCKMDL00628660 - 00628673
18  Exhibit 16  Email chain, 2/23/09, from S. Cook    157
                to D. Gustin, subject: RE: Giant
19              Eagle CSMP Thresholds
                MCKMDL00628614 - 00628616
20
    Exhibit 17  Daily HBC Controls report, 10/31/13   160
21              HBC_MDL00002348
22  Exhibit 18  Email chain, 7/30/13, from 1217       166
                Pharmacy Team Leader to G. Carlson,
23              subject: RE: Oxycodone Threshold
                HBC_MDL000174163
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1    * INDEX OF HBC-CARLSON EXHIBITS (Continued) *
2   NO.        DESCRIPTION                    PAGE
    Exhibit 19  Email chain, 9/19/13, from G.
3        Carlson to A. Lowther, subject: RE:    168
         Controls at HBC
4        HBC_MDL00135579 - 00135580
5   Exhibit 20  Email chain, 9/9/13, from G.     168
         Carlson to K. Remas, subject: RE:
6        Controls at HBC
         HBC_MDL00135022 - 00135024
7
    Exhibit 21  HBC Service Company's Responses to    175
8        Plaintiffs' (First) Set of Combined
         Discovery Requests
9
    Exhibit 22  Email, 1/22/14, from J. Millward to   176
10       G. Carlson, et al., subject: FW:
         Wholesale Distributor Questionnaire,
11       attaching Qualitest Wholesale
         Distributor/Chain Distribution
12       Center Questionnaire
         HBC_MDL00135570 - 00135574
13
    Exhibit 23  Giant Eagle Pharmacy Fiscal Year    187
14       2015 AOP/Business Plan, 6/24/14
         HBC_MDL00034115 - 00034149
15
    Exhibit 24  Giant Eagle Inventory Control -    191
16       Suspicious Order Policies with
         various effective dates
17       HBC_MDL00078638 - 00078639
         HBC_MDL00004386 - 00004387
18       HBC_MDL00045916 - 00078918
         HBC_MDL00051908
19       HBC_MDL00043414
         HBC_MDL00010092 - 00010093
20
21  Exhibit 25  2009-2014 Hydrocodone Dosage Unit   209
         Distribution to Giant Eagle
22       Pharmacies in Cuyahoga County,
         Summit County, and all of Ohio
23       P-HBC-0017
24              - - - -
25

Page 7

PROCEEDINGS

- - - -

MR. ROTTINGHAUS:  We are now on the record.  My name is Frank Stanek.  I'm the videographer for Golkow Litigation Services.  Today's date is January 8, 2019, and the time is 9:06 a.m.

This video deposition is being held in Pittsburgh, Pennsylvania, In Re: National Prescription Opiate Litigation, for the United States District Court, for the Northern District of Ohio, Eastern Division.

The deponent is Greg Carlson.

Will counsel please identify themselves.

MR. ROTTINGHAUS:  Tom Rottinghaus on behalf of plaintiff.

MS. BOURIAT:  Jennifer Bouriat on behalf of Cardinal.

MS. CHARLES:  Amber Charles on behalf of McKesson.

MR. KOBRIN:  Josh Kobrin, Marcus & Shapira, on behalf of HBC Service Company.

MR. WETZEL:  Jeffrey Wetzel for Mr. Carlson personally.

MR. BARNES:  Robert Barnes, Marcus &

Page 8

Shapira, for Mr. Carlson.

MR. ROTTINGHAUS:  Then do we have anybody participating by telephone?

MR. MARKHAM:  Chris Markham on behalf of Walmart.

MS. RUSSO:  Shana Russo on behalf of Amerisource Bergen Drug Corporation, of Reed Smith.

MS. GUTHRIE:  Erica Guthrie of Arnold & Porter on behalf of the Endo and Par defendants.

GREGORY CARLSON,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROTTINGHAUS:

Q.  Good morning, Mr. Carlson.

A.  Good morning.

Q.  My name is Tom Rottinghaus.  We met right before the deposition; correct?

A.  Yes.

Q.  Thank you for coming here today.  You understand you are here to give a deposition in a case involving your involvement, I guess, at Giant Eagle and HBC warehouse between, as I understand it, 2007 and 2016?

Page 9

A.  Yes.

Q.  I'm going to be asking you a series of questions today about your involvement or your capacity in those institutions.  There are going to be several documents we're going to talk about as well.  I've taken the liberty of marking a few documents that we will be talking about that I think you have in front of you.

You understand you've just taken an oath to tell the truth?

A.  Yes.

Q.  And this is the same type of testimony you would give as if you were in a courtroom; correct?

A.  Yes.

Q.  It's my understanding you may not be able to be present at the time of trial, so you understand that this testimony you give today is being videotaped and may be played for a jury at the time of trial if you are not available to be there in person?

A.  Yes.

Q.  It's going to be very important for me to make sure that you and I understand each other today.  If I ask you any questions that you don't

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 understand, I want you to please stop me, let me
2 know you don't understand it, and I'll do my best
3 to rephrase that question. Okay?
4    A.   Okay.
5    Q.   Similarly, it won't be my intention to
6 interrupt you before you finish an answer.
7 However, if I do so unintentionally, please let me
8 know you have not finished your answer. We'll
9 stop. We'll give you a chance to finish your
10 answer. Okay?
11    A.   Okay.
12    Q.   You're doing a great job of audiblizing
13 you answers. One thing I may ask you to do at
14 times is to give an audible answer because
15 sometimes in conversations, we just nod our heads
16 or say "uh-huh" or "huh-uhn," but I may need to
17 ask you to give me a "yes" or "no" answer at
18 times. Okay?
19    A.   Okay.
20    Q.   I don't intend to be rude to you if I do
21 that. It's just that we need to have a clear
22 record. Okay?
23    A.   Okay.
24    Q.   It's my understanding you at this time,
25 point in time, no longer work for the Giant Eagle

Page 11

1 HBC system; is that correct?
2    A.   Correct.
3    Q.   However, you are here with counsel for
4 HBC; is that correct?
5    A.   Correct.
6    Q.   Now, I don't get to find out and I'm not
7 asking you what you have talked with counsel about
8 in preparation for this deposition, but I would
9 like to know or get a general understanding of
10 what you have reviewed irrespective of
11 correspondence from your counsel in preparation
12 for the deposition.
13    For instance, I'm wondering if you've looked
14 at prior emails from your time at the company or
15 any other documents.
16    A.   I have.
17    Q.   Let's kind of break it down. First of
18 all, you've had some time to prepare to give your
19 testimony today; correct?
20    A.   Yes.
21    Q.   And I'm assuming that in preparation for
22 your testimony, you did want to look at some
23 documents that went back to the timeframe in which
24 you were involved at HBC?
25    A.   Yes.

Page 12

1    Q.   And you had a chance to do that?
2    A.   Yes.
3    Q.   I suspect that some of those documents
4 we will be talking about today. It won't be my
5 intention to put anything in front of you that's
6 not, to the best of my understanding, a genuine
7 document that was given to us by the company. But
8 if at any point in time you don't understand what
9 a document is or you need to take a few more
10 minutes to look at it, you let us and we'll give
11 you a chance to do that. Okay?
12    A.   Okay.
13    Q.   Can you give us an approximation as to
14 how much time in terms of hours you have spent
15 getting ready for this testimony today?
16    A.   I would say roughly eight hours.
17    Q.   I don't get to hear what you talked
18 about. But you obviously had a chance to talk to
19 your attorney and meet with your attorney?
20    A.   Uh-huh.
21    Q.   "Yes"?
22    A.   Yes. I met with the attorneys.
23    Q.   And have you also had the opportunity or
24 taken time to try to speak to anyone who is still
25 at Giant Eagle with respect to any questions or

Page 13

1 thoughts you may have had as you got ready for the
2 deposition?
3    A.   I've not spoken with anybody at Giant
4 Eagle about the deposition.
5    Q.   And I know sometimes they're thought of
6 interchangeably, but the same question with
7 respect to anyone who worked at the HBC warehouse,
8 have you spoken to them in preparation for this
9 deposition?
10    A.   Not in preparation for this deposition.
11       (HBC-Carlson Exhibit 1 was marked.)
12 BY MR. ROTTINGHAUS:
13    Q.   Let's take a look for a minute at
14 Exhibit 1, which I have passed out to your counsel
15 as well. I will represent to you that this was
16 not given to me by the company, but I actually
17 went to LinkedIn, a source that a lot of us use
18 these days; right?
19    A.   Correct.
20    Q.   And I typed in your name, and Exhibit 1
21 is a document that came up. The first thing I
22 would like to do is make sure that Exhibit 1 --
23 and, if we could, I might ask if we can split the
24 page so we can get the second page of Exhibit 1 on
25 the screen as well for you. It may be on the

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  screen right in front of you. You can look at the
2  hard copy or any screen you'd like to look at.
3  They should all be the same thing.
4      Take a minute, if you need to, to look at
5  this, but does Exhibit 1 appear to you to be a
6  document that indeed reflects you, Greg Carlson,
7  personally and some of the background you have had
8  in various capacities in your career?
9      A. Yes.
10     Q. Is Exhibit 1, to the best of your
11 knowledge, a document you prepared and then in
12 some way uploaded or submitted to LinkedIn?
13     A. Yes.
14     Q. Tell us a little bit about what LinkedIn
15 is.
16     A. LinkedIn, I guess it would be considered
17 a social media site but more geared towards
18 business, businesspeople and ways to connect with
19 them, find other people at other companies. I
20 just kind of look at it more as a social media
21 source.
22     Q. Some of us probably still refer to
23 documents with our background as résumés. And in
24 some ways, does the LinkedIn social media site
25 allow you to submit your résumé or your past work

Page 15

1  experience?
2      A. Yes. Most people kind of lay their page
3  out as a résumé, which is kind of how mine is laid
4  out.
5      Q. Do you recall how long ago you prepared
6  Exhibit 1?
7      A. Laying it out -- I've been on LinkedIn
8  for, I would say, over five years, probably closer
9  to ten. I'm not sure exactly when. And I've made
10 edits along the way. The most recent formatting
11 was probably -- I added the UPMC position. So it
12 was probably right around that time when I made
13 the most recent adjustment.
14     Q. In looking at the first page of
15 Exhibit 1, under experience for UPMC, I believe it
16 says from March 2017 to the present, and then it
17 says one year, 11 months.
18     So it would appear to reflect at least from
19 the time you last put information in here up to
20 the present day; is that correct?
21     A. Correct.
22     Q. And is it correct that you still do hold
23 the title of director of pharmacy MTM services at
24 UPMC Health Plan?
25     A. Yes.

Page 16

1      Q. Do you work in the Pittsburgh area?
2      A. Yes. I work in downtown Pittsburgh.
3      Q. If we could go to the second page of
4  this document, I'm going to start where it says
5  Director of Pharmacy Sourcing. Actually, forgive
6  me. I'm going to go kind of towards the bottom.
7      First of all, the education section, it
8  appears that you obtained your Pharm.D. degree in
9  1998?
10     A. Yes.
11     Q. And then from 1998 until 2007, tell us
12 what you did.
13     A. So in 1998 -- actually, in '97 I
14 received my bachelor's degree in pharmacy. So I
15 was a pharmacist, went on for another year. So
16 from '97 I worked as a pharmacist for Osco Drug in
17 Chicago, part of the Jewel-Osco chain, as a staff
18 pharmacist.
19     And in 1999 I moved to Pittsburgh. I think
20 the end of March of 1999 moved to Pittsburgh and
21 started working with Giant Eagle at that point in
22 time as a pharmacist in the stores, in a role that
23 they called floater pharmacist where you would
24 work at any store that needed help covering
25 vacation times, maternity leaves, anything like

Page 17

1  that. So I kind of worked all through the south
2  region of Pittsburgh as a pharmacist.
3      Q. To make sure I understand, that would be
4  in the retail Giant Eagle stores if someone came
5  to the pharmacy with a prescription and needed one
6  filled, you would be the person we usually refer
7  to as the pharmacist in the store?
8      A. Correct. And in 2000 I started a role
9  as pharmaceutical care coordinator -- it's more of
10 a clinical role -- out of the stores, office
11 based, corporate office based, and would go out
12 and visit with patients at their store that they
13 shopped at to review their medications.
14     So it was more of a sit-down typically in the
15 cafeteria area of the store, and we would review
16 their medications, looking for any kind of drug
17 interactions, drugs they don't need, making
18 recommendations to the physician based on their
19 profile and educate them on their disease states.
20     So I did that for roughly about a year or so.
21 At that point, there was a position open for
22 manager of pharmacy services, and that role -- I
23 applied for that role, and I got it. It was a
24 promotion. And that role consisted of
25 manufacturer relations, vendor relations,

Page 18

1 wholesaler relationship, and also dealt with
2 marketing and other just tasks at corporate level.
3    Q.  Do you recall what year you took that
4 position?
5    A.  2001.  At some point in 2001 is when I
6 started that role and was in that role until the
7 one that is listed on LinkedIn as district leader,
8 pharmacy district leader.  At the time I was in
9 that role, it was called pharmacy specialist.
10 It's the same thing as the pharmacy district
11 leader today.
12    Q.  When you had the position as pharmacy
13 specialist, which is now known as pharmacy
14 district leader, did you work in the corporate
15 office?
16    A.  It was more on the road based.  So I
17 covered a region.  So I was responsible for
18 anywhere from 25 to 35 stores at any given time.
19 So I was assigned a region and was responsible for
20 all the operations of the pharmacies for those
21 stores.
22    Q.  Did you at any point in time have a
23 region of Ohio as part of your region?
24    A.  No.  I never covered any Ohio stores.
25    Q.  And from 2001 to 2007, you held that

Page 19

1 title?
2    A.  2005 to 2007 I was the pharmacy district
3 leader.  So I was the manager of pharmacy services
4 from 2001 to 2005.
5    Q.  And then on Exhibit 1, where pharmacy
6 district leader is listed from September 2005 to
7 March 2007, there appear to be about five bullet
8 point summaries of what your position entailed.
9    A.  Yes.
10    Q.  Is that correct?  You don't have to go
11 through this in any particular order, but, again,
12 I'm particularly interested in what you were doing
13 in terms of monitoring pharmacy practices at that
14 point in time.
15    A.  Well, we would do inspections of the
16 pharmacies on a regular basis.  We'd come in and
17 we had a checklist, and we would go through that
18 to make sure that the pharmacies were following
19 proper procedure, all their paperwork was in line,
20 the record keeping was in line.
21    We would monitor the stores' sales, their
22 labor spend and look at all of that, and we'd
23 review that with the pharmacy leader at that
24 store.
25    Q.  You mentioned that you would use a

Page 20

1 checklist.  Is that something you prepared or was
2 that something that was prepared at corporate?
3    A.  There was a corporate checklist that you
4 would follow.
5    Q.  This may sound like a silly question,
6 but why does it make sense to have a checklist
7 when you're going to various stores and going
8 through --
9    A.  It just gave you something to, you
10 know -- it created a routine for you to do.
11    Q.  Created a routine for you as the PDL or
12 the pharmacy rep at that time?
13    A.  Yeah, yes.
14    Q.  And also for the pharmacies to
15 understand what the expectations were for them as
16 well?
17    A.  Yes.
18    Q.  And that's typical in most businesses;
19 is that correct?
20    A.  Yes.
21    Q.  And then you, I think, mentioned that
22 you wanted to make sure they were up to date and
23 correctly doing their record keeping.
24    A.  Yes.
25    Q.  In a pharmacy it's important to keep

Page 21

1 accurate records?
2    A.  Yes.
3    Q.  Why is that?
4    A.  Well, certain requirements are in place
5 for state and federal laws.  So I was just
6 checking in on that.
7    Q.  And then you mentioned, I think, that
8 along the checklist, you wanted to check and make
9 sure they were following proper procedures.
10    A.  Yes.  We would look at things like their
11 workflow, how they were set up, were they
12 following what we recommended for the workflow of
13 the store.  We would monitor the lines, how long
14 were the lines.  It could indicate whether or not
15 they were following proper workflow procedures.
16 It was a multitude of things.
17    Q.  Again, we don't need to get into the
18 details of them.  But these workflow procedures
19 you're talking about, I assume those were
20 procedures that were somewhere written in writing
21 to give guidance to your pharmacists?
22    A.  I'm not certain.  I can't remember as
23 far as what was in writing or not back in the 2005
24 timeframe.  I can't really answer that one.
25    Q.  Was it -- and if you can't tell us,

Page 22

1 that's fine. Was it your experience that when you
2 worked with Giant Eagle, there were indeed some
3 policies that the company expected their
4 pharmacists to follow?
5 A. Yes.
6 Q. And some of those policies were actually
7 written in writing to give guidance to the
8 pharmacists?
9 A. Yes.
10 Q. And not only for the pharmacists, but
11 it's your understanding and memory at the time
12 that there were also policies or procedures, if
13 that's what you would prefer to call them, that
14 were in writing that dealt not only with pharmacy
15 services, but other aspects of the company as
16 well?
17 A. Yes. There were many policies in place
18 across the whole organization.
19 Q. That's been consistent with your entire
20 career. You've seen companies that have policies
21 in place; correct?
22 A. Yes.
23 Q. And policies help provide guidance to
24 employees of the company?
25 A. Generally, yes. There's policies. We

Page 23

1 have procedures. We have guidelines. So there's
2 different classifications of what I would kind of
3 consider a policy versus a guideline.
4 Q. Sure. How do you differentiate between
5 a policy and a guideline?
6 A. Policies tend to be more HR driven. You
7 know, they're meant from an HR perspective to be
8 utilized versus guidelines. Within the profession
9 of pharmacy, you provide guidelines to the
10 pharmacists on how we would like them to operate.
11 But there are, you know, professional judgment
12 that will kind of supersede some of that.
13 Q. Because any pharmacist who practices may
14 have gone to school for a long time and learned a
15 lot of information to help them develop expertise
16 as a pharmacist?
17 A. Yes.
18 MR. BARNES: Object to the form to the
19 extent you're asking him to speculate as to any
20 pharmacist.
21 BY MR. ROTTINGHAUS:
22 Q. I don't want you to speculate. We'll
23 focus on what you know. It's your understanding
24 you personally went to school for a long time to
25 earn the degree that you have in pharmacy;

Page 24

1 correct?
2 A. Yes.
3 Q. And it's hard work?
4 A. It wasn't easy.
5 Q. Any pharmacist, as you said I think, is
6 expected to use clinical judgment at times when
7 they practices as a pharmacist.
8 A. Yes.
9 Q. However, I think you also said that
10 there are times where guidelines might be written.
11 They could be procedures. And you correct me if
12 I'm wrong, but guidelines might be written to
13 allow a pharmacist who is using his or her
14 professional judgment to also understand what some
15 basic expectations are for any particular
16 scenario?
17 MR. BARNES: Object to form.
18 THE WITNESS: I would just need more
19 specific on the question.
20 BY MR. ROTTINGHAUS:
21 Q. Well, tell me what type of
22 guidelines you remember being in place for
23 pharmacists between 2005 and 2007.
24 MR. BARNES: Tom, I'd just remind you
25 that HBC didn't distribute any controlled

Page 25

1 substance before November 2009.
2 MR. ROTTINGHAUS: I'm just trying to
3 build a little foundation. I understand the
4 objection.
5 THE WITNESS: I can't recall. I mean,
6 over the years I was with Giant Eagle, I know we
7 had different procedures in place. This year
8 particular, I couldn't tell you what exactly was
9 in place. It's a very difficult question to
10 answer looking back that far.
11 BY MR. ROTTINGHAUS:
12 Q. Now, you just used the term procedures,
13 and I really want to just make sure we're on the
14 same page with what we're talking about.
15 I think you mentioned that you consider
16 policies to typically be HR, which I assume you
17 mean human resources, driven.
18 A. Yes.
19 Q. Then you mentioned procedures and
20 guidelines. Do you differentiate between
21 procedures and guidelines?
22 A. I mean, they're similar. I mean, some
23 documents may call it one thing, one may call it
24 another.
25 Q. In your role as pharmacy district leader

Page 26

1 up through March of 2007, and, again, when we talk
2 about part of your role being monitor of pharmacy
3 practices, in any way did you have responsibility
4 to review any written practices, whether they be
5 called policies, procedures or guidelines, that
6 were in writing for the pharmacists at that point
7 in time?
8     MR. BARNES:  Object to the form.  Lack
9 of relevance.
10     THE WITNESS:  Can you ask the question
11 again?
12 BY MR. ROTTINGHAUS:
13     Q.  Sure.  It may help if I just make sure
14 we know where we're looking.  I'm still looking on
15 Exhibit 1 in your role as pharmacy district leader
16 from September 2005 to March of 2007.
17     A.  Yes.
18     Q.  And I'm looking at the last I'll call it
19 bullet point where it says, "Visit pharmacies
20 within region regularly to monitor pharmacy
21 practices."  I just want to make sure I completely
22 understand.
23     When you talk about monitoring the pharmacy
24 practices, I think you mentioned that you would go
25 over record keeping, that you would have a

Page 27

1 checklist or go through checklists with the
2 pharmacy teams; is that correct?
3     A.  Yeah.  That's a very generic term.  It
4 was just in there basically to say I would
5 oversee -- make sure they're following the process
6 that we want them to, their customer service is up
7 to par, their quality is up to par.  So that
8 encompasses really everything under pharmacy
9 practices.
10     Q.  And during that timeframe, were you also
11 in any way responsible for reviewing written
12 policies, procedures or guidelines that existed
13 for the pharmacies?
14     MR. BARNES:  Same objection.
15     THE WITNESS:  When you say review, do
16 you mean read?  Because, I mean, reading, yes.
17 Formulating at this time, no.
18 BY MR. ROTTINGHAUS:
19     Q.  That's a good point.  It's my
20 understanding you were not responsible all the way
21 up to 2007 for formulating any policies,
22 procedures or guidelines.
23     A.  Correct, in that position.
24     Q.  However, I think what you're saying is
25 you may have at times reviewed certain written

Page 28

1 policies, procedures or guidelines, but sitting
2 here today, you couldn't tell us exactly what you
3 did?
4     A.  No.
5     Q.  And sitting here today, is it fair to
6 say that you can't really even recall what
7 specific policies, procedures or guidelines were
8 in writing up through March of 2007 for Giant
9 Eagle?
10     MR. BARNES:  Same objection.
11     THE WITNESS:  Yeah.  I couldn't tell you
12 specific policies from 2005 or through 2007.
13 BY MR. ROTTINGHAUS:
14     Q.  We're going to jump forward here in just
15 a second to your new position you took in April of
16 2007.
17     Do you feel like we have covered all of the
18 responsibilities and duties you fulfilled for
19 Giant Eagle as a pharmacy district leader from
20 September 2005 through March 2007 just generally?
21     MR. BARNES:  Are you saying in addition
22 to what's written on his LinkedIn profile?
23     MR. ROTTINGHAUS:  Yeah.
24 BY MR. ROTTINGHAUS:
25     Q.  I mean, obviously, we're looking at your

Page 29

1 LinkedIn profile.  I'm not asking for details.  I
2 understand it was several years ago and you
3 probably don't remember every detail of every day,
4 and I certainly don't expect that.
5     A.  Yeah.  I mean, generally speaking, yes,
6 there were other things that would pop up day to
7 day.  If anything happened at the store, it was
8 something I had to deal with.
9     Q.  And correct me if I'm wrong.  I think
10 you said there were maybe, give or take, but
11 around 25 to 35 stores you were responsible for
12 during that timeframe?
13     A.  Yes.
14     Q.  Were they in the greater Pittsburgh
15 area?
16     A.  Most of them were in the southern region
17 of Pittsburgh, and that actually extended down to
18 Morgantown, West Virginia.  But then there were
19 times where I would cover other regions if there
20 was a leave of absence.  I do recall one time I
21 had the Beaver Valley area.  But it was generally
22 around the Pittsburgh market.
23     Q.  It's my understanding that Giant Eagle
24 during the timeframe when you worked there had
25 pharmacies in five different states.

Page 30

1    A.  Yeah, up to five at the time I worked
2  there.
3    Q.  Pennsylvania?
4    A.  Ohio, West Virginia, Maryland and
5  Indiana.
6    Q.  During this timeframe we've been talking
7  about, 2005 to 2007, you were primarily covering
8  stores in Pennsylvania but maybe some stores in
9  West Virginia?
10   A.  Yeah, West Virginia as well.
11   Q.  Any other states?
12   A.  No.
13   Q.  Let's move right above this area to your
14 title of director of pharmacy sourcing from
15 April 2007 to April 2012.  If it's hard to read on
16 that hard copy, again, it's on the screen if
17 that's helpful to you.
18   I see that you have also kind of listed some
19 bullet points that give a general summary for what
20 you did during that timeframe.
21   A.  Yes.
22   Q.  If you can just in your own words
23 describe for us what your position entailed as
24 director of pharmacy sourcing from April of 2007
25 to April of 2012.

Page 31

1    A.  In that role, the primary role was to
2  find cost savings through sourcing.  So it was
3  including anything that the pharmacy would
4  purchase.  It could include supplies such as bags,
5  vials, anything like that, or medications.  So it
6  could be through our wholesaler contract.  There
7  was pricing established within each contract.  So
8  I was involved in those negotiations as well as
9  finding any other ways to save money on any
10 product.
11   Q.  I see that -- first of all, the point
12 you mentioned that you negotiated the wholesaler
13 contract to save $16 million annually, was that as
14 part of a team, or was that just you individually
15 who was involved in that negotiation?
16   A.  There were people involved other than
17 myself.  I was kind of like the point person, but
18 we did have a team working on that.
19   Q.  Do you recall whether that contract
20 entailed, among other things, controlled
21 substances?
22   A.  With the wholesaler we were purchasing
23 controlled substances.  So it would entail that,
24 nothing broken out specifically for that.
25   Q.  We're going to be talking about

Page 32

1  controlled substances at various times obviously
2  today.  Specifically, I'm going to be talking
3  about hydrocodone combination products.  Is that a
4  term that's familiar with you?
5    A.  Yes.
6    Q.  Sometimes they're referred to, I think,
7  as HCPs for short; is that correct?
8    A.  Yeah.  I mean, I never referred to it
9  that way, but I guess you could go there.
10   Q.  I'll try not to use that term.  If I do,
11 feel free to remind me you don't know what I'm
12 talking about.  But I'm probably going to be --
13   A.  HCP meaning hydrocodone combination
14 products?
15   Q.  Yes, or combination products.
16   A.  Combination products.  Okay.
17   Q.  I think it's probably the same thing
18 we're talking about.
19   In April 2007 when you negotiated this
20 wholesaler contract, do you know whether that also
21 entailed hydrocodone combination products?
22   A.  It would have been included in the
23 general pricing structure.
24   Q.  I should have told you.  You probably
25 know this.  At times people may have a concern

Page 33

1  about a question I ask, and it may be well
2  founded, but nobody is trying to interrupt us, but
3  I'll try to let them finish their objection.  If
4  you can, let them try to get their objection in as
5  well.
6    A.  Okay.
7    Q.  I see in the second bullet you state
8  that you at that time at least, it says, opened
9  generic prescription drug warehouse for pharmacy
10 with estimated annual savings of over $20 million
11 by purchasing direct from the manufacturer.
12   I'm assuming, and I could be incorrect, but
13 I'm assuming this is the HBC warehouse.
14   A.  Yes.  That would be the HBC warehouse.
15   Q.  Were you involved in starting that
16 warehouse from the ground up?
17   A.  Yes.
18   Q.  Who else at the company was involved?
19   A.  Well, there were several people
20 involved.  It was kind of a team project to get it
21 up and running.
22   MR. BARNES:  Excuse me.  Tom, for
23 clarification, you mean as a brand new warehouse
24 opening for the first time and doing any business
25 whatsoever or just with respect to

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 pharmaceuticals?
2     MR. ROTTINGHAUS:  That's a good
3 question.  Let's clarify.
4 BY MR. ROTTINGHAUS:
5     Q.  When did HBC warehouse open, not just
6 with respect to controlled substances or
7 pharmaceuticals, but when did that warehouse open
8 up?
9     A.  I don't know the specific dates.  It
10 goes back.  It predates me.  We purchased actually
11 FoxMeyer.  My understanding, it was a FoxMeyer
12 warehouse that McKesson acquired.  And we ran it
13 from there as HBC at that point.  I think that was
14 pre-2000.  I don't have specific dates.
15     So I know HBC had been operating for a while
16 before.  All we did -- when I say open generic
17 warehouses, we isolated a spot within the
18 warehouse, secured it and utilized that.  It was
19 just an add-on to the warehouse.
20     Q.  And when you say secured it, you're
21 talking about putting security controls in place
22 because, among other things, some of the
23 medications that were going to be coming into and
24 out of that warehouse were controlled substances?
25     A.  Not at this time.  When we opened it, it

Page 35

1 was really finding a location that was isolated
2 because even prescription drugs need to be
3 isolated securely, whether it's Amoxicillin or
4 Simvastatin, cholesterol medications.  So it was
5 really just finding a location that had secure
6 walls, doors, that we could have security access
7 to so we knew who was going to go in that specific
8 room.  At the time we opened, that was our
9 thought.
10     Q.  Do you recall when HBC first started
11 distributing hydrocodone combination products?
12     A.  I believe, from recollection, it was
13 2009.  It was towards the end of 2009.  So it was
14 either the end of 2009 or early 2010 after we
15 received our DEA license.
16     Q.  And then it continued to do so until
17 2014 as I understand it.
18     A.  Correct.
19     Q.  So when you were first involved in
20 starting the HBC warehouse, it predated the DEA
21 license to distribute hydrocodone combination
22 products, among other things?
23     A.  Yes.
24     Q.  Let's go to that last bullet under your
25 title of director of pharmacy sourcing from 2007

Page 36

1 to 2012.  It states that you negotiated with brand
2 drug manufacturers to secure funding for
3 pharmacist education, in-store promotions and
4 patient compliance programs.
5     Do you remember what patient compliance
6 programs you were involved in?
7     A.  I'm trying to remember.  It probably
8 didn't happen that much in that timeframe.  That
9 was more we would do medication adherence letters.
10 We call them refill reminder letters.  That was
11 probably more towards the manager pharmacy
12 services role.  That bullet may be a little bit
13 misplaced there as far as that goes.
14     The only compliance programs were we would
15 send letters on behalf of -- the manufacturers
16 would help, you know, fund the cost of the letter
17 going out, but it was mainly for the patients'
18 behalf.  It was typically like maintenance
19 medications, like a cholesterol medication,
20 something like that.
21     Q.  Let's go to that third bullet where it
22 says $20 million -- I'm sorry -- second bullet
23 that talks about an estimated annual savings of
24 over $20 million.
25     Did you in any way have an opportunity to

Page 37

1 somehow calculate that it was close to $20 million
2 in savings, or is that just a complete estimate by
3 you?
4     A.  Well, it's an estimate rounded number.
5 We would -- when we bid out our products, that's
6 what was calculated as the savings number from
7 what we were currently paying to what was offered
8 on the direct price.
9     Q.  Let me ask you this:  Between 2009 and
10 2012, while you were in that position as director
11 of pharmacy sourcing, is it your understanding
12 that, give or take, by having the generic
13 prescription drug warehouse, you were able to help
14 the company save approximately $20 million a year?
15     A.  Yes.  The cost savings was roughly that
16 much.
17     Q.  And in part was that cost savings based
18 on the fact that you were able to have the company
19 purchase medications directly from the
20 manufacturers versus going through distributors?
21     A.  Correct.
22     Q.  Because at least at some point in time,
23 HBC began acting as a distributor of medications?
24     A.  Yes.
25     Q.  And that includes a distributor of

Page 38

1 controlled substances at least as of 2009 or early
2 2010?
3     A.  Yes.
4     Q.  And during that timeframe, it's your
5 understanding, and I think the record will reflect
6 it was later 2009, but from 2009 through the time
7 you finished in 2012 as director of pharmacy
8 sourcing, HBC was indeed distributing hydrocodone
9 combination products?
10     A.  Yes.
11     Q.  So part of the savings would have been
12 based by the move to being a distributor of
13 hydrocodone combination products for the Giant
14 Eagle pharmacies?
15         MR. BARNES:  Object to form.  Asking him
16 to speculate as to what a specific drug would
17 contribute or not contribute to the overall
18 warehouse.
19         THE WITNESS:  I was going to say I don't
20 know how much that drug contributed to the
21 $20 million.  It's just an overall number.
22 BY MR. ROTTINGHAUS:
23     Q.  Sure.  Presumably, there was some
24 savings recognized by distributing hydrocodone
25 combination products versus purchasing them from

Page 39

1 an outside distributor; is that right?
2         MR. BARNES:  Object to form.  Asking him
3 to speculate.
4         THE WITNESS:  I can't answer that
5 specifically.
6 BY MR. ROTTINGHAUS:
7     Q.  What would be the benefit to Giant Eagle
8 or HBC warehouse in being a distributor of any
9 medication if it wasn't recognizing a cost
10 savings?
11     A.  There are other benefits as far as
12 controlling the overall supply chain.  So just
13 making sure that we had sufficient supply at any
14 given time to support the stores no matter what
15 drug it was.  So there was added benefits to
16 warehousing besides the cost savings.
17     Q.  Of course, one of the important things
18 for any company would be the cost savings as well?
19     A.  Sure.
20     Q.  Did you personally go into the HBC
21 warehouse physically on a regular basis between
22 2007 and 2012?
23     A.  I visited I couldn't say regularly.  I
24 couldn't answer specifically, but I definitely
25 would visit from time to time.

Page 40

1     Q.  When you went to work each day, you
2 weren't going into that warehouse every day?
3     A.  No.
4     Q.  Are you able to tell us approximately
5 how many times you visited the HBC warehouse
6 during your entire tenure with the Giant Eagle
7 company?
8         MR. BARNES:  Object to form to the
9 extent it asks for anything prior to 2009.
10         THE WITNESS:  I can't give you a number,
11 an accurate number.  I probably couldn't even
12 estimate it at this point.
13 BY MR. ROTTINGHAUS:
14     Q.  Let's focus between 2009 and 2014.  Do
15 you think you visited the HBC warehouse on at
16 least a yearly basis one time a year?
17     A.  I would say a yearly basis, yes.
18     Q.  What would be the purpose for going
19 physically to the warehouse?
20     A.  Sometimes it was just to meet with the
21 team there to see how things were going, to see if
22 anything needed to be changed.  Anything could
23 have come up as far as do we need additional
24 shelving, do we need new shelving, are we going to
25 try new processes at the warehouse and they wanted

Page 41

1 to either show us or talk to us about it.
2     So it could have been any kind of meeting
3 such as that.
4     Q.  Do you remember any particular
5 individuals who you considered to be a part of the
6 team at HBC warehouse?
7     A.  Yes.  I do recall some folks there that
8 were -- that I would just talk to on a regular
9 basis.  Andy Zalewski was early on one of the team
10 members I would talk to.  I don't remember when he
11 left.  Christy Hart was one of the main people
12 there, too, that I would talk to.  And then Walt
13 Durr and Matt Rogos.  At another point in time,
14 Matt Rogos was another individual.
15     Q.  Do you remember between 2009 and 2014
16 what Walter Durr's title was for HBC?
17     A.  I don't know specifically during that
18 time because I know Walt had moved.  There were
19 some changes in the wholesale or the warehouse
20 level team members where they -- I know Walt got
21 additional responsibilities at one point in time.
22 So I don't remember at that time what Walt's
23 position was.  I'm assuming he was in charge of
24 HBC, but I can't answer that accurately.
25     Q.  What about Mr. Rogos, do you remember

Page 42

1  what he did at HBC?
2      A.  There was a point in time where he came
3  in after Andy left.  Again, timeline-wise, I'm a
4  little fuzzy on when Matt was there.  So he was in
5  charge of the facility at one point in time, the
6  HBC facility.  And then, you know, Christy kind of
7  reported to him.
8      Q.  I understand Giant Eagle was a big
9  company, and it looks like you wore different hats
10  for the company, for lack of a better term, at
11  different points in time.
12      I'm not trying to make you an expert in
13  something you don't feel like you have the
14  expertise to tell us about.  So if I ask you
15  questions about HBC or some aspect of HBC that you
16  don't feel like you're the right person to answer
17  it, I respect that.  Just let us know.
18      A.  Okay.
19      Q.  Having said that, I'm going to ask you
20  some questions to see if you do know.
21      Between 2009 and 2014, do you believe you
22  were the person who overall oversaw operations at
23  HBC?
24      A.  I did not oversee operations at HBC.
25      Q.  At any point in time all the way up to

Page 43

1  2016, do you believe you were the person who
2  oversaw operations at HBC?
3      A.  Not at an operations level, no.
4      Q.  At any level?
5      A.  I was involved with decision making
6  regarding HBC but not from an operational
7  standpoint.
8      Q.  Correct me if I'm wrong, but as I
9  understand it, because you were involved in
10  contracts that were being executed with various
11  vendors or manufacturers, you would have been
12  involved at least indirectly with what HBC had
13  coming into its warehouse and going out of its
14  warehouse?
15      A.  Yes.  As far as product choice, yeah, it
16  would come from me or my team as far as that goes.
17      Q.  But in terms of day-to-day operations,
18  were you the person who someone at HBC would call
19  if they needed supervisory authority to do
20  something?
21      A.  If there was a question regarding
22  something related to the store level, then it
23  could come up through me.
24      Q.  What if it related to HBC as the
25  distributor at that level, were you the person

Page 44

1  someone would contact with a question about, hey,
2  can we distribute this medication to store number
3  whatsoever?
4      A.  There were times where questions would
5  come up about a specific order and it was asked.
6  So they could ask me that question.
7      Q.  I'm trying in my mind to get a better
8  understanding of, for lack of a better term, a
9  chain of command if there was one.  Let me ask you
10  this.  If you can tell me, great.  If you can't,
11  just let me know.
12      Between 2009 and 2012, do you believe there
13  was an individual at Giant Eagle who was in charge
14  and had the ultimate supervisory authority at HBC?
15      A.  Yes.  There was somebody in charge at
16  HBC.
17      Q.  Was it you?
18      A.  From a supervisory perspective?
19      Q.  Yes.
20      A.  No.  I did not do any team member
21  reviews for anybody at HBC.  I wouldn't be
22  involved in disciplining anybody at HBC.  Nobody
23  reported to me from an organizational structure.
24      Q.  You said it better than I asked it.  I
25  appreciate that.

Page 45

1      Who was the individual who would review
2  performance of individuals at HBC?
3      A.  I can't answer that question.  I'm not
4  certain.
5      Q.  With respect to if there was a need to
6  discipline someone at HBC warehouse for any
7  particular reason, do you know who that person
8  would be?
9      A.  It would have gone up through their
10  chain of command at HBC, the org chart at any date
11  in time.  So it would depend on who was in charge
12  of the facility.  Like I said, who was in charge
13  did change a couple times through the years, but I
14  couldn't tell you when or who exactly.  So I think
15  it would have to be -- I don't think I can answer
16  that one for you accurately.
17      Q.  That's fine.  I have to confess to you I
18  don't have an org chart for HBC.  I do have one, I
19  think, for at least as of 2014 for Giant Eagle.
20  And maybe that's the same.
21      (HBC-Carlson Exhibit 2 was marked.)
22  BY MR. ROTTINGHAUS:
23      Q.  That's Exhibit 2, and we'll look at that
24  in a minute, but if you want to look at that to
25  answer any of these questions, you can feel free

Page 46

1 to do so. We'll come back to it though.
2    Were you the individual who oversaw HBC's
3 compliance as a distributor of controlled
4 substances between 2009 and 2014?
5    A.  Well, the compliance did fall under me
6 as far as we did have a team looking at compliance
7 also, but, I mean, ultimately, as far as the -- if
8 you want to refer to an exhibit at all.  But at
9 this point in time, compliance would have fallen
10 under me.
11    Q.  Between 2009 and 2014?
12    A.  This is '14, but yes.
13    Q.  And you can feel free to look at an
14 organizational chart if you need to, but I'm not
15 asking you to go off that.  I'm really wanting to
16 know what Mr. Carlson remembers.  If you need to
17 look at that again, that's fine.
18    So let me make sure I understand because
19 compliance is kind of a general term, isn't it?
20    A.  Right.
21    Q.  What does compliance mean to you?
22    A.  Well, following all the rules and
23 regulations put in place, whether it's federal
24 government laws or state laws.
25    Q.  So as I understand it, whatever state a

Page 47

1 warehouse that distributes medications is in, it
2 has to comply with that state's laws?
3    A.  Correct.
4    Q.  And then as you mentioned, there are
5 also often laws at a federal level or regulations
6 at a federal level that must be followed as well?
7    A.  Yes.
8    Q.  And you probably have some familiarity
9 with what's known as the Controlled Substances
10 Act?
11    A.  Yes.
12    Q.  And is it your understanding that the
13 Controlled Substances Act has some requirements
14 that distributors of controlled substances must
15 follow regardless of what state they're practicing
16 in?
17    A.  Yes.
18    Q.  You probably got some of the basic
19 background about the Controlled Substances Act in
20 pharmacy school.
21    A.  Yes.
22    Q.  And then you probably learned some of
23 that on the job as well?
24    A.  Yes.
25    Q.  Have you individually ever attended any

Page 48

1 conferences that, to the best of your
2 understanding, focused primarily on the duties of
3 a distributor of controlled substances to comply
4 with the Controlled Substances Act?
5    A.  I attended many conferences.  I don't
6 recall a specific one regarding that topic.
7    Q.  When we talk about compliance, are you
8 in part referencing the duty of HBC warehouse to
9 comply with the Controlled Substances Act?
10    A.  Yes.
11    Q.  And you said between 2009 and 2014,
12 compliance for HBC warehouse fell under you?
13    A.  Yes.  It would have fallen under me.
14    Q.  That entire time?
15    A.  Again, different points in time there
16 were different layers.  So there were multiple
17 people I would be I would consider responsible
18 for, but ultimately up until 2014, I was, yes,
19 ultimately responsible for it.
20    Q.  The reason I ask is because, again, it's
21 not a big deal, but just in looking at how you
22 described your duties at least between 2007 and
23 2012 as the director of pharmacy sourcing, I
24 didn't see any reference to overseeing compliance,
25 whether it be at HBC or at Giant Eagle.  That's

Page 49

1 fine.
2    But is it your memory that even between 2007
3 and 2012, you were the person in charge of
4 compliance for HBC warehouse?
5    MR. BARNES:  Object to form.
6    Go ahead.
7    THE WITNESS:  Well, I mean, was it in my
8 description?  No.  Was I responsible?  Yeah.  I
9 was the one involved in making sure that
10 everything was in line, following all the
11 regulations in place.  I was the one that did a
12 lot of the research.  Others helped me with that.
13 But, yeah, I was the one responsible for.
14 BY MR. ROTTINGHAUS:
15    Q.  In terms of primary responsibility,
16 you're saying it was you, but you also had others
17 who assisted you?
18    A.  Yeah.  Responsibilities for something
19 like that roll all the way up to the top, so yes.
20    Q.  Between 2009 and 2014, who did you
21 report to, as you say, rolled up to the top?
22    A.  2009 it would have been Randy Heiser,
23 and up until I think 2013, it may have then been
24 Brett Merrell.  I'm not sure when Randy left and
25 Brett came on board.

Page 50

1    Q.   What were the titles that Randy and
2 Brett each respectively held at the company?
3    A.   Randy was vice-president of pharmacy,
4 and Brett was senior vice-president of pharmacy.
5    Q.   What did you do as the person in charge
6 of compliance at HBC warehouse between 2009 and
7 2014 to make sure that HBC warehouse was indeed
8 complying with all state and federal laws?
9        MR. BARNES:  Object to form.  That's a
10 pretty broad question.
11        THE WITNESS:  Yeah.  What do you mean
12 what did I do?
13 BY MR. ROTTINGHAUS:
14    Q.   I'm wondering what you -- so compliance
15 was one of the responsibilities that you're
16 telling us that you had for HBC warehouse between
17 2009 and 2014 as I understand it; is that right?
18    A.   Right.
19    Q.   You had people working under you --
20    A.   Yes.
21    Q.   -- that were also in charge of
22 compliance on a day-by-day basis?
23    A.   Yes.
24    Q.   Is that right?
25    A.   Certain people had different

Page 51

1 responsibilities that followed compliance, yes.
2    Q.   Let's focus on making sure that HBC
3 warehouse as a distributer of controlled
4 substances was complying with the Controlled
5 Substances Act.  Okay?
6    A.   Right.
7    Q.   Who did you rely on under you to make
8 sure that HBC warehouse was indeed complying with
9 its responsibilities as a distributor pursuant to
10 the Controlled Substances Act?
11        MR. BARNES:  Object to form.  Tom, there
12 are a lot of -- that's a broad question.  What
13 portions of the Controlled Substances Act are you
14 talking about?
15 BY MR. ROTTINGHAUS:
16    Q.   Let's go through that.  You understand
17 that the Controlled Substances Act places various
18 responsibilities on manufacturers, distributors
19 and pharmacies; right?
20    A.   Yes.
21    Q.   And because you've worked in a pharmacy,
22 you understand how some of those responsibilities
23 apply to a pharmacy directly doing retail
24 pharmacy?
25    A.   Right.

Page 52

1    Q.   And then you understand that HBC was a
2 distributor of controlled substances; correct?
3    A.   Yes.
4        (HBC-Carlson Exhibit 3 was marked.)
5 BY MR. ROTTINGHAUS:
6    Q.   I have a hard time with that word.
7 Let's refer for a minute to Exhibit 3, but we're
8 going to come back to Exhibit 1.  Okay?
9    A.   Okay.
10    Q.   Let's look at Exhibit 3, which is
11 general number 010.  So that you know,
12 Mr. Carlson, I'm going to reference sometimes
13 general numbers.  It's really just for the person
14 who's putting all of these up on the screen for
15 us.  Okay?
16        Do you have Exhibit 3 in front of you?
17    A.   Yes.
18    Q.   I think this is a portion, not the
19 entirety, of the Code of Federal Regulations
20 dealing with registration of manufacturers,
21 distributors and dispensers of controlled
22 substances, and the specific section that
23 Exhibit 3 references is a section you've probably
24 heard of or referred to before, Section 1301.74.
25        Are you familiar with this section?

Page 53

1    A.   I'm sure I've read it at some point in
2 time.
3    Q.   Specifically I'd like to direct your
4 attention to subsection (b) of 1301.74.
5        MR. BARNES:  Tom, for the record, I'm
6 going to object to this exhibit as being just one
7 subpart of the security requirement in the Code of
8 Federal Regulations.  Not only have you just taken
9 one part.  You haven't given him the 1301.71 and
10 the other regs of which this is a part of.
11 BY MR. ROTTINGHAUS:
12    Q.   Are you with me?
13    A.   Yes.
14    Q.   I'm going to read subsection (b).  You
15 tell me if I've read it incorrectly.  "The
16 registrant shall design and operate a system to
17 disclose to the registrant suspicious orders of
18 controlled substances.  The registrant shall
19 inform the field division office of the
20 Administration in his area of suspicious orders
21 when discovered by the registrant.  Suspicious
22 orders include orders of unusual size, orders
23 deviating substantially from a normal pattern and
24 orders of unusual frequency."
25        Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1   A.  Yes.
2   Q.  And have you seen this provision or
3 requirement before?
4   A.  Like I said, I've read this before in
5 the past.  So, yes, I have seen it.
6   Q.  And is it your understanding that from
7 2009 to 2014, that HBC warehouse had a duty to
8 comply with this subsection?
9       MR. BARNES:  Object to form.
10      THE WITNESS:  We were following all the
11 laws put in place.
12 BY MR. ROTTINGHAUS:
13  Q.  Including this one?
14  A.  Including this one.
15  Q.  My question for you is:  Who did you
16 rely on at HBC to make sure that this specific
17 provision was being followed?
18      MR. BARNES:  From 2009 to '14?
19      MR. ROTTINGHAUS:  Yes, from 2009 to
20 2014.
21      THE WITNESS:  You can't really say one
22 person.  I mean, this was a system that we had put
23 together that involved everybody.  So we put a
24 process in place to look for anything suspicious.
25 That was found through reporting that we had in

Page 55

1 place, or it could be found through just even
2 someone at the warehouse that saw something
3 suspicious was told, educated and instructed to
4 notify somebody if it ever occurred.
5      So not only were they systematic from a
6 reporting standpoint, but there was also, you
7 know, human elements that were added to it.  So it
8 wasn't one person.  It was everybody was vigilant
9 about looking for this as soon as we opened this
10 part of the warehouse up.  It was a very high
11 priority for us to make sure that nothing got out
12 that was even questionable at all.
13 BY MR. ROTTINGHAUS:
14  Q.  How much time do you believe you were
15 spending on a weekly basis dealing with making
16 sure that HBC warehouse was complying with its
17 responsibilities as a distributor between 2009 and
18 2014?
19      MR. BARNES:  Object to form.
20      THE WITNESS:  I couldn't answer that
21 back to 2009.  I do know that I was hyperfocused
22 on the process.  Any time we started a new
23 process, I was hyperfocused on it until everything
24 was in place and going.  So I closely monitored
25 it.  We encouraged any questions to be asked at

Page 56

1 the time.
2   I don't recall any -- I couldn't tell you a
3 specific example, but I know there were times
4 where the warehouse team would ask us a question,
5 and we would, you know, either validate it or tell
6 them what to do, instruct them.
7 BY MR. ROTTINGHAUS:
8   Q.  When you refer to the warehouse team,
9 are you talking about the people physically at the
10 HBC warehouse?
11  A.  Yes.
12  Q.  Now, Mr. Millward -- you know Joe
13 Millward?
14  A.  Yes.
15  Q.  He has given testimony in this case as
16 well.  Is it your memory that Mr. Millward also
17 worked under you at various points in time between
18 2009 and 2014?
19  A.  Yes.  Closer to 2013 -- it would have
20 been 2014 through '16 actually was when he was
21 specifically under me.
22  Q.  Prior to 2014 -- well, let me ask you
23 this.  We've been provided with what's Exhibit 2,
24 and that is a corporate chart for Giant Eagle as
25 of November 13, 2014.

Page 57

1   On the left-hand side down towards the
2 bottom, it says -- there's a box that says manager
3 compliance -- I'm sorry -- let me go back up --
4 senior manager pharmacy, quality and compliance,
5 Joe Millward.
6   A.  Yes.
7   Q.  And then under Joe, there are three
8 boxes.  The one in the middle states manager of
9 compliance, George Chunderlik.
10  A.  Yes.
11  Q.  Was George Chunderlik also a part of the
12 team that assisted you in making sure that HBC
13 warehouse was complying with all federal
14 regulations under the Controlled Substances Act
15 between 2009 and 2014?
16  A.  Yes.
17  Q.  Do you remember whether George worked in
18 that capacity during the entire time from 2009 to
19 2014?
20  A.  I'm not sure the entire timeframe, so I
21 can't confirm that.  But I know he was one of the
22 team members that was involved in compliance.
23  Q.  Would it be fair to say that
24 Mr. Millward was one of the team members in charge
25 of compliance?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1   A.  Yes.
2   Q.  And would it be fair to say that
3   Mr. Chunderlik was one of the team members in
4   charge of compliance?
5   A.  Yes.
6   Q.  Do you remember any other individuals
7   you looked to and relied upon between 2009 and
8   2014 to assist you in making sure that HBC
9   warehouse was complying with its responsibilities
10  under the Controlled Substances Act?
11      MR. BARNES:  At the warehouse do you
12  mean?
13      MR. ROTTINGHAUS:  Yes, sir.
14      THE WITNESS:  Specifically at the
15  warehouse?
16  BY MR. ROTTINGHAUS:
17  Q.  No, not just physically at the
18  warehouse.  Because as I understand it, there were
19  people physically at the warehouse but people also
20  at Giant Eagle corporate or somewhere else who
21  might have some responsibility for the warehouse;
22  is that right?
23  A.  Yes.  So 2009 -- I would say yes.  Andy
24  Zalewski was one person involved and then Walter
25  even as well were responsible for anything that

Page 59

1   went on at the warehouse.
2   Q.  Now, between 2009 and 2014, were you the
3   individual who was deciding if and, if so, what
4   policies should be placed in writing to guide
5   individuals at HBC warehouse regarding any duties
6   to comply with the Controlled Substances Act?
7   A.  I would have been working in conjunction
8   with the team at HBC to put that together.  Again,
9   since they didn't report directly through my
10  structure, it was more of a team effort.  So I
11  would be the, you know, person doing the research,
12  and then they would assist me in putting any
13  policies together at that level.
14  Q.  And when we refer to a team, what you're
15  saying is there are different individuals working
16  together to try to achieve a common goal or
17  several different common goals; is that right?
18  A.  Yes.  We leveraged our legal team for
19  sure.  Any time we did anything with licensure,
20  there were questions about this.  So I'm certain
21  the legal team was involved as well.
22  Q.  Because you were involved not only in
23  compliance, but also in negotiating contracts and
24  overseeing contracts, you could not devote
25  100 percent of your time to compliance between

Page 60

1   2009 and 2014; is that right?
2       MR. BARNES:  Object to the form.
3   If you know.
4   BY MR. ROTTINGHAUS:
5   Q.  Tell us if you did.
6   A.  A hundred percent of my time was not
7   dedicated to compliance.
8   Q.  It just couldn't be, right, because you
9   were doing other things as well?
10  A.  Any organization has a team in place
11  that's responsible for different components of it.
12  Q.  And in order for the team to function
13  properly, there needs to be good communication
14  between the team members?
15  A.  Correct.
16  Q.  Needs to be trust in the team members?
17  A.  Correct.
18  Q.  And there needs to be in some way a
19  delineated understanding as to who on the team is
20  doing what to achieve any goal; correct?
21  A.  Correct.
22  Q.  My question for you right now is between
23  2009 and 2014, did anyone have a responsibility
24  for deciding if and, if so, what policies,
25  procedures or guidelines should be placed in

Page 61

1   writing to guide HBC warehouse on its duties to
2   comply with the Controlled Substances Act?
3       MR. BARNES:  Object to form.
4       THE WITNESS:  I couldn't tell you who
5   the one person was in charge of policies during
6   that one period of time.
7   BY MR. ROTTINGHAUS:
8   Q.  Was it you?
9   A.  Not policy writing, no.
10  Q.  And when we say policies right now, if
11  you're referring to not policies but procedures, I
12  probably need to know.  I'm kind of using that
13  term to refer to policies or procedures.  Do you
14  understand that?
15  A.  No.  Policy to me is a different --
16  Q.  Understood.  I think you said before
17  that to you, policies dealt more with HR.
18  Procedures or guidelines dealt more with
19  operations; is that right?
20  A.  Right, correct.
21  Q.  So I'm talking about policies or
22  procedures or guidelines.  Between 2009 and 2014,
23  who had responsibility for deciding if and, if so,
24  what policies, procedures or guidelines should be
25  put in writing to guide HBC warehouse on its

Page 62

1 duties to comply with the Controlled Substances
2 Act?
3        MR. BARNES:  Object to form.
4        THE WITNESS:  The procedures that were
5 put in place specifically were handled by HBC team
6 members.  That organizational structure there
7 would put their procedures together.  I didn't
8 write their procedures up.
9     My responsibility was to make sure that
10 whatever they had in place was complying with the
11 regulations.  So I couldn't tell you who was
12 responsible for writing anything down on paper.
13 BY MR. ROTTINGHAUS:
14    Q.  They were part of your team though;
15 right?
16    A.  Well, the HBC folks had their own
17 procedures.  So it was the procedures manual.  I
18 don't know -- I couldn't tell you looking back to
19 2009 what the procedure manual was that they had
20 in place.  In the pharmacy retail level, we had
21 procedures on like training materials.  Here's how
22 you open and close a pharmacy.  They had
23 procedures.
24     I'm sure we had procedures at HBC.  I
25 didn't -- it wasn't my responsibility to write

Page 63

1 their operational procedures.  My responsibility
2 was to ensure that what they did there was
3 compliant with the regulations, with the
4 Controlled Substances Act.
5    Q.  When you say you are sure that they did
6 write procedures, I'm referring right now and I
7 think you are, too, to compliance.
8     But is it your testimony that you're
9 confident that your team would have known what
10 procedures it needed to put in writing between
11 2009 and 2014 to guide the overall team at HBC on
12 how to comply with the Controlled Substances Act?
13        MR. BARNES:  Object to form.
14        THE WITNESS:  I can't recall anything
15 specific around procedures that were written down.
16 I can't remember any kind of -- like I said, I'm
17 certain that we had procedures at HBC.  I couldn't
18 tell you what they were.
19 BY MR. ROTTINGHAUS:
20    Q.  And when you say you're certain you had
21 procedures at HBC, are you talking about
22 procedures that in some ways addressed compliance
23 with the duties of HBC as a distributor of
24 controlled substances?
25    A.  Yes.

Page 64

1    Q.  That's what you would have expected;
2 right?
3    A.  Correct.
4    Q.  You had a good team?  Did you have a
5 good team?
6        MR. BARNES:  Object to form.
7        THE WITNESS:  It's a subjective
8 question.
9 BY MR. ROTTINGHAUS:
10    Q.  Well, can you give me your answer?
11    A.  I liked my team.  I did.
12    Q.  And did you have confidence that your
13 team would take the steps that it needed to take
14 to make sure that HBC warehouse was complying with
15 its duties under the Controlled Substances Act
16 between 2009 and 2014?
17    A.  Absolutely.
18        MR. BARNES:  Tom, we've gone a little
19 bit over an hour.
20     Do you need to take a break?
21        THE WITNESS:  I could take a break.
22        MR. ROTTINGHAUS:  That's fine.
23        THE VIDEOGRAPHER:  Off the record 10:08.
24        (Recess from 10:08 a.m. to 10:32 a.m.)
25        THE VIDEOGRAPHER:  On the record 10:32.

Page 65

1 BY MR. ROTTINGHAUS:
2    Q.  Mr. Carlson, we took a short break and
3 had a bit of technical difficulty.  But are you
4 ready to proceed?
5    A.  Yes.
6    Q.  We were talking before a little bit
7 about the team that you had under you at Giant
8 Eagle and specifically the team you had under you
9 and you relied upon to assist you in making sure
10 that HBC warehouse was in compliance with the
11 regulations and requirements of the Controlled
12 Substances Act between 2009 and 2014.
13     You remember that discussion?
14    A.  Yes.
15    Q.  If you could give me names, I'd like to
16 know who you considered to be a part of that team
17 that you referenced.
18    A.  Well, we had already discussed people on
19 the compliance teams, so George and Joe.  We
20 had -- the team included people at HBC like Andy
21 Zalewski, Walt Durr.  Let's see if there's any
22 other folks.  Just general -- the buying team was
23 involved in the process.  So it was a very
24 all-encompassing process all the way down to the
25 store level.  So even the store level folks had

Page 66

1 responsibilities within the whole HBC process.
2     Q.  If you had a specific question that you
3 need answered, whether HBC had a policy dealing
4 with compliance between 2009 and 2014, is there a
5 specific individual out of those people you've
6 referenced that you would probably contact first?
7         MR. BARNES:  Object to form.  Definition
8 of compliance.
9         THE WITNESS:  Yeah.  If I had a question
10 about procedures at HBC in 2009, it would have
11 been Andy Zalewski that I would have asked the
12 question to.
13 BY MR. ROTTINGHAUS:
14     Q.  What was Andy's title at that point in
15 time?
16     A.  I don't know his exact title, but he
17 came -- he was already part of the HBC warehouse
18 team, management team, and he kind of came over as
19 part of the opening of the pharmacy portion around
20 2007.  And then I don't know the timeframe when
21 Andy left.
22     Q.  Did you hire Andy?
23     A.  I did not.
24     Q.  Did you hire George?
25     A.  No.

Page 67

1     Q.  What about Joe?
2     A.  No.
3     Q.  Joe, Mr. Millward, testified that there
4 was a decision to part ways with Giant Eagle at a
5 point in time.  And forgive me.  I don't remember
6 the specific date.  I believe it was around 2016.
7     I think he mentioned that that mutual
8 decision may have been made along with you; is
9 that correct?
10     A.  Yes.
11     Q.  I don't want to get into specifics of
12 everything from a personal standpoint, but I have
13 one specific question.
14     That is:  Was the decision to part ways made
15 in any way due to a belief or a perception by you
16 that he was not fulfilling his duties as manager
17 of compliance?
18     A.  No, no, not as manager of compliance,
19 senior manager of quality and compliance.
20     Q.  Forgive me.  I keep using the wrong
21 title.
22     Do you remember when he became senior
23 manager, quality and compliance?
24     A.  I don't remember the date.  He was
25 reporting to Anthony Mollica at the time.  Anthony

Page 68

1 hired Joe.  Joe got promoted from a pharmacy
2 district leader to manager of quality, and then he
3 evolved that position into quality and compliance.
4     Q.  And Anthony had the position -- did he
5 have the position of VP of pharmacy operations
6 before you?
7     A.  Yes.
8     Q.  So even when Anthony had the position of
9 VP of pharmacy operation before you took that
10 position, it's your belief and testimony that you
11 were the person in charge of making sure that HBC
12 was complying with the Controlled Substances Act
13 as a distributor between 2009 and 2014?
14     A.  I was the point person to make sure that
15 the whole system was working appropriately
16 including -- I mentioned that it wasn't just an
17 HBC facility situation.  It was the entire closed
18 Giant Eagle self-distribution process.
19     It was greater than just that one portion of
20 it.  So my responsibility was to make sure all the
21 components were working in conjunction with one
22 another.
23     Q.  Correct me if I'm wrong.  I don't mean
24 to misstate your testimony.  But it's my
25 understanding that you believe that if a policy

Page 69

1 needed to be put in place between 2009 and 2014,
2 someone on the team would do so?
3     A.  If a policy needed to be created, we'd
4 review it as a team with legal.  Depending on the
5 question at hand, we would get legal involvement
6 and then implement any kind of policy or
7 procedures, yes.
8     Q.  Let me focus in a little bit more.  If
9 there was a specific question as to whether a
10 policy should be put in place to guide or address
11 how HBC warehouse would comply with the
12 requirements of the Controlled Substances Act
13 between 2009 and 2014, it's my understanding that
14 you're not aware of a particular individual on the
15 compliance side that would be responsible for
16 starting that; is that correct?
17         MR. BARNES:  Object to form.  Are you
18 asking about a written policy or --
19         MR. ROTTINGHAUS:  Written policy.
20         THE WITNESS:  We had a team that would
21 develop -- that developed written policies.
22 BY MR. ROTTINGHAUS:
23     Q.  That's what I'm trying to get at, is who
24 the individuals were on that team that developed
25 the written policies.

Page 70

1    A.   Well, I can't speak -- I can speak to
2  the pharmacy team.  The pharmacy corporate and
3  retail pharmacy teams involved George and Joe from
4  a -- putting together any kind of documentation.
5    Q.   George and Joe?
6    A.   George and Joe.
7    Q.   And to make sure I'm not mistaken, when
8  you say the retail side, you're also talking about
9  HBC warehouse as well?
10    A.   Well, again, the whole -- I viewed it as
11  the whole system.  We had the pharmacies itself.
12  We had corporate.  Then you had -- you know, HBC
13  was a portion of that system.  So it's kind of
14  hard to break out anything involved there.
15    Q.   I think I've got it now, but it sounds
16  as if there was a question or belief that a
17  written policy should be put in place that in any
18  way addressed compliance with the Controlled
19  Substances Act between 2009 and 2014, it's your
20  belief that it would likely be Joe Millward or
21  George Chunderlik that would take the lead in
22  doing so?
23    A.   They would be involved.  I can't say
24  take the lead.  I think you'd probably have to say
25  that I would say that I would take the lead on

Page 71

1  leading the team to craft that.
2    Q.   You mentioned before that you were
3  sometimes involved in doing research about
4  compliance with the Controlled Substances Act; is
5  that right?
6    A.   Yes.  We all kind of took part in
7  ensuring that.
8    Q.   So if there were any provision of the
9  Act that you felt required more guidance to be
10  given to the team, including the HBC team, it
11  would most likely come from you and then you might
12  delegate that to George or Joe or someone else?
13    MR. BARNES:  Object to form.
14    THE WITNESS:  I'd need more specifics.
15  I mean, it's kind of more of an assumption.  I
16  can't answer that specifically.
17  BY MR. ROTTINGHAUS:
18    Q.   I'll try to give you a little more
19  specific example, and we'll go into it a little
20  further later.
21    You understand that there was a suspicious
22  order management policy put in place around 2014
23  in writing?
24    A.   Timeline-wise I'm not sure exactly, but
25  I do believe there was a policy put in place, you

Page 72

1  know, like we mentioned policy versus procedures,
2  yes.
3    Q.   Was that a policy or procedure that you
4  directed someone to create?
5    A.   I cannot recall if I directed it or not.
6    Q.   In fairness to you, I'm not trying to
7  just beat a dead horse about this, but you've told
8  us that you were the person in charge of making
9  sure that HBC was compliant with the Controlled
10  Substances Act between 2009 and 2014; right?
11    A.   Yes.  I was in charge of, involved in,
12  yeah.  It was my responsibility to make sure that
13  we were following all rules and regulations.
14    Q.   And what I'm really just trying to find
15  out is if or when a policy was created, is it your
16  belief and expectation that it would have started
17  with you and you would have directed someone to
18  create the policy or might it have come from
19  somebody else on the team who --
20    MR. BARNES:  Objection.  Asked and
21  answered several times now.
22  BY MR. ROTTINGHAUS:
23    Q.   -- who suggested -- I didn't get my
24  question in, so maybe I'll start back over.
25    Was it your belief that if a policy was felt

Page 73

1  to be needed to guide the HBC warehouse team
2  regarding its compliance with the Controlled
3  Substances Act, that the directive to create such
4  a policy would have come from you or might it have
5  also come from someone else under you on the team?
6    MR. BARNES:  Object to form.
7    THE WITNESS:  I can't state that I was
8  the one responsible for creating every policy or
9  procedure.  Like I said before, it was a team
10  effort.  And if someone identified something that
11  needed to be clarified on paper in writing, then I
12  might not have been the one to initiate that, but
13  probably would have been brought in on the
14  discussion or process.
15  BY MR. ROTTINGHAUS:
16    Q.   Between 2009 and 2014, if there was any
17  information communicated to HBC warehouse by the
18  DEA -- and do you know what I mean by the DEA?
19    A.   Yes.
20    Q.   -- would you expect that such
21  communication regarding compliance with the
22  Controlled Substances Act would in some way be
23  directed to you?
24    A.   Yes, at least 2009 until, you know, I
25  became in this new role.

Page 74

1 Q. When you say this new role --
2 A. I'm sorry. Vice-president of pharmacy
3 operations. And even as senior director of
4 pharmacy in the roles, again, there were layers
5 involved. So other people kind of -- may have
6 gotten a communication that I didn't get at some
7 point in time.
8 So I can't say I received every DEA
9 notification throughout the whole time period, but
10 at the beginning, I do know that I was getting
11 copies of any DEA that went to HBC.
12 Q. At any point in time, did you make it
13 clear to your team that you expected to either
14 have communications from the DEA routed to you or
15 to be at least copied on any communications with
16 the DEA as they related to HBC's compliance with
17 the Controlled Substances Act?
18 A. I don't recall asking specifically. I
19 may have or maybe I assumed it would come my way.
20 Q. You said you liked your team.
21 A. Yes.
22 Q. And when you say you assumed it would
23 come your way, does that mean that you would have
24 expected your team to make sure you were aware of
25 any changes in the law or any requirements that

Page 75

1 HBC needed to follow?
2 A. We had real good communication. So
3 anybody could have received a document from the
4 DEA that related to a change in the rules or regs.
5 It might not have come directly to me, but I would
6 have received a copy of it.
7 Q. Did Mr. Millward physically go to the
8 HBC warehouse as part of his job?
9 A. I believe he did.
10 Q. I mean on a day-to-day basis.
11 A. Not on a day-to-day basis.
12 Q. Did he actually work in the same office
13 as you --
14 A. Yes.
15 Q. -- between 2009 and 2014?
16 A. We were in the same office complex. He
17 was in a different building at one point in time.
18 Q. As I think I told you before,
19 Mr. Millward has given testimony in this case as
20 well. I assume you haven't had a chance to review
21 his testimony.
22 A. No.
23 Q. I've had a chance to review it. And
24 Mr. Millward testified that he was responsible for
25 drafting policies and procedures for HBC warehouse

Page 76

1 as they related to compliance. And I'm
2 paraphrasing his testimony on page 48 and 62.
3 Would you agree with that?
4 MR. BARNES: Object to form.
5 THE WITNESS: Part of his job was to
6 interact with anything regarding compliance.
7 BY MR. ROTTINGHAUS:
8 Q. So it might include drafting policies or
9 procedures?
10 A. He was involved in that. I would say
11 there was not -- when we drafted policies, there
12 was never one person just doing it. He may have
13 drafted it as far as physically typing it on
14 paper, but there was input from the whole team,
15 the whole quality and compliance team.
16 Q. Do you agree that Mr. Millward was
17 responsible for monitoring the company's policies
18 and procedures that were in place to try to
19 prevent Giant Eagle and its employees from
20 breaking any laws or regulations?
21 A. Yes.
22 Q. Now, at some point -- actually, let me
23 back up.
24 Again, when Mr. Millward -- when the decision
25 was made for him to leave the company, it's your

Page 77

1 memory that that did not involve any concerns you
2 had about his job as or his job responsibilities
3 over compliance?
4 A. It was more of a disagreement in the
5 direction we were heading.
6 Q. You talked a little bit before about in
7 your position as pharmacy district leader where
8 you would travel to different pharmacies and
9 review checklists with them and record keeping and
10 various policies; is that right?
11 A. Yes.
12 Q. Let me ask you this: Between 2009 and
13 2014, with respect to any policies that were put
14 in place in writing, there would be a reason for
15 doing so; right?
16 A. From that timeframe are you talking
17 about retail level policies, any kind of policies
18 and procedures?
19 Q. Yeah. I'm really talking more about
20 policies as they relate to HBC warehouse. I'm
21 probably making this question more complicated
22 than it needs to be.
23 Some policies don't exist in writing. People
24 just do things; right?
25 A. Correct.

Page 78

1 Q. Some policies get put into writing; is
2 that right?
3 A. We would define policy as anything that
4 would be in writing.
5 Q. That's how I would kind of understand it
6 as well.
7 A. Yeah. So we had procedures though that
8 were, you know, not -- when I say writing, we had
9 a formal publication process for a policy.
10 Procedure was not -- it was in writing, but not
11 necessarily in a formalized published process.
12 People had it, but it wasn't like -- it was just
13 handled a little differently.
14 Q. If you can't answer these questions
15 because it's outside of your responsibilities,
16 that's fine. But I'm curious.
17 When you had this formal process in place to
18 put policies in writing, I assume there was a
19 process where at first there was discussion about
20 whether a policy was needed?
21 A. Again, I wasn't in charge of the policy
22 writing. So early on, especially in this
23 timeframe, I was only brought in if there was a
24 question regarding HBC. So that would be more a
25 question for Joe Millward as far as, you know, who

Page 79

1 was kind of in charge of that piece of it.
2 Q. In general, if a policy is in writing,
3 it's put in writing in part to facilitate
4 communications among individuals in a company?
5 A. It assists in communication, but we had
6 good communication before that. So it's, more or
7 less, just to formalize things, improve things,
8 process changes, things like that. It's just an
9 overall -- I guess you would call it a
10 clarification process or efficient -- to me it's
11 efficient when you put it into this format.
12 Q. If you put it in writing, it's more
13 efficient that way?
14 A. Well, writing in this format. We had a
15 lot of things in writing. But our policy process
16 was formalized.
17 Q. If there's a formal policy in place, it
18 does facilitate communication among individuals
19 about expectations; is that right?
20 MR. BARNES: Object to the form. Calls
21 for speculation.
22 A. Not --
23 BY MR. ROTTINGHAUS:
24 Q. You don't disagree with that statement?
25 A. Not necessarily.

Page 80

1 Q. So you don't agree that a policy in
2 writing facilitates communication among
3 individuals in a company?
4 A. I can't say every time it would.
5 Q. Would it sometimes?
6 A. Potentially.
7 Q. Might that be one reason to put a policy
8 in writing?
9 MR. BARNES: Object to form.
10 THE WITNESS: I wouldn't say that's the
11 only reason for putting it in writing.
12 BY MR. ROTTINGHAUS:
13 Q. I'm not asking the only reason. Is one
14 reason you can think of to put a policy in writing
15 to make sure that everyone is on the same page in
16 a company regarding expectations?
17 MR. BARNES: Object to form. Calls for
18 speculation.
19 THE WITNESS: I mean, I wouldn't view it
20 that way.
21 BY MR. ROTTINGHAUS:
22 Q. How would you view it? If you decide a
23 policy should be put in writing, why would that be
24 a good idea?
25 A. I think, again, it formalizes things.

Page 81

1 But I don't really, to be honest with you, know.
2 Q. Might a written policy help individuals
3 within a company understand their clearly
4 delineated roles in the company?
5 MR. BARNES: Object to form.
6 THE WITNESS: I would state that it
7 would help others in different departments know
8 what other departments are responsible for, not
9 necessarily -- everybody knew their role back at
10 that time and what they were supposed to be doing.
11 They had procedures in place to do it.
12 Now, there were procedures, like I mentioned,
13 at store level from checking in the order process,
14 dispensing of a prescription was highly -- we
15 monitored very closely. Shipping the product was
16 one piece of it. So we had different components
17 all along the way.
18 So really sometimes a policy is just meant to
19 bring together everything -- all these steps in
20 the system into one document.
21 BY MR. ROTTINGHAUS:
22 Q. Might one reason for a formal written
23 policy in the company be to make sure everyone
24 within the company is complying with the law?
25 MR. BARNES: Object to form.

Page 82

1    THE WITNESS:  Again, for this particular
2  reason, I don't believe that to be the reason.
3  BY MR. ROTTINGHAUS:
4    Q.  When you say I don't believe that to be
5  the reason, my question is just a little bit
6  different I think.  We maybe aren't communicating.
7    Do you agree that a policy might help making
8  sure that individuals within a company are
9  complying with a certain regulation or law?
10    MR. BARNES:  Object to form.  Calls for
11  speculation.
12    THE WITNESS:  Can you state the question
13  again?
14  BY MR. ROTTINGHAUS:
15    Q.  Sure.  If a company puts a policy
16  formally in writing regarding certain obligations
17  of the company to comply with the law, why would
18  the company put it in writing?
19    MR. BARNES:  Object to form.
20    THE WITNESS:  Well, you put it in
21  writing -- just because you put it in writing
22  doesn't mean you didn't have -- policy doesn't
23  mean you didn't have it in writing somewhere else
24  before.  I just don't understand the question.
25

Page 83

1  BY MR. ROTTINGHAUS:
2    Q.  Well, you've talked about policies being
3  written by your team members.  I'm wondering why
4  are policies ever put into written format.
5    A.  It's to have it established in a
6  location that people can find it.
7    Q.  So that they can understand what the
8  company's position is or what their role might be
9  in the company in certain circumstances?
10    A.  A lot of times it's created for
11  longevity of the process.
12    Q.  To help people understand the process,
13  too; is that right?
14    A.  New people.
15    Q.  If somebody comes to the company in a
16  new role, if there's a written policy, it may
17  provide them with guidance on what the expectation
18  is; is that right?
19    MR. BARNES:  Object to form.  This is
20  all calling for speculation.
21    THE WITNESS:  Well, I think we're kind
22  of confusing policy and procedures and
23  formalization.  I'm getting confused with the
24  question.
25

Page 84

1  BY MR. ROTTINGHAUS:
2    Q.  I'm trying to use your definition.  A
3  policy is a formal written document.  That's what
4  I'm talking about, a formal written document.
5    You agree and you have seen policies dealing
6  with HBC that are in writing during the timeframe
7  in which you worked for Giant Eagle; is that
8  right?
9    A.  Specific to HBC by itself, I don't know.
10  There are a lot of policies.
11    Q.  You said the companies, they work
12  together, HBC and Giant Eagle; right?
13    A.  Yes.
14    Q.  If there was a policy put in place
15  between 2009 and 2014 that applied to HBC, might
16  the reason for putting that policy in writing be
17  to assist individuals in the company, new
18  individuals and people who have been there for a
19  while, in understanding how to deal with a
20  particular process?
21    MR. BARNES:  Object to form.
22    THE WITNESS:  I can't answer to the
23  reason that a -- unless you point to one specific
24  policy, I can't answer why that policy was put
25  into place.

Page 85

1  BY MR. ROTTINGHAUS:
2    Q.  Is it ever a good idea to put policies
3  in writing, in your opinion?
4    MR. BARNES:  Same objection.
5    THE WITNESS:  I don't think there's
6  anything wrong with putting a policy in place.
7  BY MR. ROTTINGHAUS:
8    Q.  You think sometimes it's a good idea?
9    MR. BARNES:  Object to form.
10    THE WITNESS:  I think it depends on your
11  organization.  If the organization runs off
12  policies, then that's what they would put
13  together.
14  BY MR. ROTTINGHAUS:
15    Q.  Did HBC run off policies between 2009
16  and 2014?
17    A.  We ran off of procedures.
18    Q.  Some of those procedures were put in
19  writing in the form of a policy; correct?
20    A.  If you could point to one, I can say yes
21  or no.  I don't know.
22    Q.  If you don't know, that's fine.
23    A.  Yeah.  I don't know.
24    Q.  And you don't know sitting here today as
25  the person responsible for making sure the company

Page 86

1  was complying with the Controlled Substances Act
2  between 2009 and 2014 whether HBC had any policies
3  in writing during that timeframe?
4       MR. BARNES:  Object to form.
5       THE WITNESS:  They had procedures in
6  writing.
7  BY MR. ROTTINGHAUS:
8    Q.  Now you're using procedures, not
9  policies.  So I want to make sure I'm not getting
10 confused.
11   A.  It's a definition from a Giant Eagle
12 definition standpoint.  So you can define policies
13 and procedures however you want.  We had
14 procedures documented.
15      When we went to get our DEA license, we had
16 to have procedures documented.  Otherwise, they
17 would not have approved.  The DEA approved our
18 facility to be licensed.  We had to have the
19 required documentation and procedures put together
20 on paper, and we showed them to the DEA officers
21 who came in and inspected the facility prior to
22 using it.  And all of our procedures matched up
23 with the Controlled Substances Act.
24   Q.  And these are in writing?
25   A.  They were in writing.

Page 87

1    Q.  Was there a procedure or a policy in
2  writing for identifying suspicious orders for HBC
3  as of 2009?
4    A.  Our process for following suspicious
5  order monitoring matched what was required within
6  this document.
7    Q.  So is the answer "yes" or "no"?
8    A.  What was the question again?
9    Q.  Was there a policy or procedure in
10 writing addressing suspicious orders for HBC
11 warehouse as of 2009 when it got its license?
12   A.  I can't answer.  I don't know.  I can't
13 recall if that was a specific thing in writing.
14   Q.  And if it was in writing, it would have
15 been something created by someone else under you
16 at that point in time; is that right?
17   A.  Correct.  It probably would have been
18 crafted by somebody else.
19   Q.  Because you've told us you were not the
20 person who drafted policies or procedures in
21 writing addressing the duties of HBC to comply
22 with the Controlled Substances Act between 2009
23 and 2014; correct?
24   A.  I don't recall drafting anything.  Maybe
25 helping with some of the wording.  But honestly,

Page 88

1  going back that far, I can't recall.  Again, it
2  was part of a team working on getting the license.
3    Q.  Now, you told me that you learned a
4  little bit about the Controlled Substances Act
5  when you were in pharmacy school and then you
6  learned some about it on the job as well.
7    A.  Yes.
8    Q.  Then I asked you if you had ever
9  attended a specific conference dealing with the
10 duties of a distributor under the Controlled
11 Substances Act, and I think you told me some
12 conferences may have addressed that, but you don't
13 remember going to a specific conference on that
14 issue; is that right?
15   A.  I don't recall specifically.
16   Q.  Were there any other sources of
17 knowledge that you have gained about the duty of a
18 distributor to comply with the Controlled
19 Substances Act other than pharmacy school, some
20 research you have done on your own and maybe some
21 conferences you have gone to?
22   A.  Utilizing our legal team on obtaining a
23 license, what was needed, what was required.  We
24 also went -- we met with some of our share group
25 partners.  So at Giant Eagle we had some other

Page 89

1  regional chains that we would, you know, discuss
2  ideas with that we didn't compete with.
3       So there was times where we would have
4  discussions with them regarding things like that.
5    Q.  And then another way you may have gained
6  knowledge about the duties of a distributor to
7  comply with the Controlled Substances Act between
8  2009 and 2014 could have been from correspondence
9  or documentation from the DEA or any other
10 regulatory body?
11   A.  Yes.  Actually, our local DEA agent was
12 a very important piece of the communication.  So I
13 spoke with him on the phone and via email
14 correspondence when we were preparing our facility
15 to be inspected.
16      (HBC-Carlson Exhibit 4 was marked.)
17 BY MR. ROTTINGHAUS:
18   Q.  In front of you is a document that's
19 been marked as Exhibit 4.  That's been handed out
20 to counsel as well at the beginning of this
21 deposition.
22      I'll represent to you that Exhibit 4 is a
23 collection of four different letters from the DEA
24 over a timeframe.  Each of the letters, I believe,
25 starts out as Dear Registrant.  And I'll represent

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    to you it's my understanding that these letters
2    were intended by the DEA to be sent to every
3    licensed distributor of controlled substances in
4    the country when those letters were sent.
5        A.  Okay.
6        Q.  Now, I understand that your role in
7    making sure the HBC warehouse was complying with
8    requirements of the Controlled Substances Act
9    started in 2009 and went through 2014.
10       A.  Yes.
11       Q.  I'm going to refer you, first of all, to
12   not the very first letter in this document.
13   You'll see numbers at the very bottom in the
14   right-hand corner.
15       A.  Okay.
16       Q.  And in the bottom right-hand corner I
17   think it's the last or second to last letter, but
18   the document numbers end with the last three
19   digits of 687 through 690.
20       A.  Okay.
21       Q.  Are you with me?
22       A.  Yes.
23       Q.  If we go to the first page, 687, it
24   appears to be a February 7, 2007 letter on DEA
25   letterhead; is that right?

Page 91

1        A.  Yes.
2        Q.  Have you seen this letter before?
3        A.  I've seen it before, yes.
4        Q.  And do you remember whether you ever saw
5    this letter during the timeframe in which you were
6    responsible for compliance at HBC warehouse?
7        A.  I do not recall seeing this during my
8    time.
9        Q.  If you'll flip to the front of that
10   document, there is -- the first letter is June 12,
11   2012.  And that's where the exhibit sticker is
12   first on the document.  This is similarly a letter
13   from the DEA.  Again, I think it was sent -- it's
14   my understanding it was sent to all distributors
15   who were licensed to distribute controlled
16   substances.  And this letter was sent on or about
17   July 12, 2012.
18       Take as much time as you need to, but does
19   this letter appear to be a letter you have seen
20   before as well?
21       A.  I've seen this, but only in preparation
22   for the deposition.
23       Q.  So relatively recently you saw the
24   letter?
25       A.  Yes.

Page 92

1        Q.  Do you know whether you had seen this
2    June 12, 2012 letter marked as Exhibit 4 at any
3    point in time during your tenure with HBC?
4        A.  I cannot recall.
5        Q.  Is this a type of letter that if it was
6    indeed received by HBC warehouse, you would expect
7    it to come to you or at least be routed to you as
8    the person who was in charge of making sure that
9    HBC was complying with the Controlled Substances
10   Act between 2009 and 2014?
11       MR. BARNES:  Object to form.
12       THE WITNESS:  Yes, I would.  The process
13   was if they received anything, they would send a
14   copy to corporate.
15   BY MR. ROTTINGHAUS:
16       Q.  And when you say the process, that's not
17   something necessarily written in writing, but
18   that's just what you would expect your team to do?
19       A.  Yes.
20       Q.  Again, sitting here today, you don't
21   think you ever saw this letter back in 2012; is
22   that right?
23       A.  I may have.  I received a lot of
24   documents, and there's no way for me to remember
25   all of them.

Page 93

1        Q.  If you received a document such as this,
2    a letter from the Drug Enforcement Administration
3    which talks about the duties of distributors of
4    controlled substances, do you think this is a
5    letter you would have asked that somebody keep in
6    a file somewhere for HBC warehouse?
7        A.  I would assume if I received this
8    letter, then we would have put it in the DEA -- we
9    did have a DEA file.
10       Q.  It's not the type of letter you would
11   have just taken, read and then either put in the
12   shredder or the trash?
13       A.  I don't believe I would have done that.
14       Q.  Is this a letter that you as the person
15   who was in charge of a team that was tasked with
16   complying with the Controlled Substances Act would
17   have distributed to some of your team members?
18       A.  Yes.
19       Q.  Why would you do that?
20       A.  Any informational documents would be
21   distributed to the whole team just so they're
22   aware of anything.
23       Q.  How would that typically work?  Would it
24   be scanned and then emailed to your team members?
25       A.  It could be by scan.  It could be by

Page 94

1 copy, physical copies and putting it on each
2 person's desk, or it could a scan in an email.
3    Q.   Mr. Millward was in the same physical
4 location as you at the office?
5    A.   He was in the next building over in
6 2012, I believe.
7    Q.   Is Mr. Millward one of the people you
8 would have wanted to give this letter to?
9    A.   Yes.
10    Q.   And Mr. Chunderlik as well, I assume?
11    A.   Yes.
12    Q.   Anybody else?
13    A.   2012, probably -- probably those folks
14 would be the ones.
15    Q.   Let's look at that first paragraph in
16 this letter.  I'm going to read the second
17 sentence of this letter.  "This letter is to
18 remind controlled substance manufacturers and
19 distributors of their responsibility to inform DEA
20 of suspicious orders in accordance with 21 Code of
21 Federal Regulations."
22    If you received a letter such as that, you
23 would want to make sure you read that letter to
24 make sure you understood what the expectation was
25 by the DEA and the law?

Page 95

1    A.   I would read the letter to look for
2 changes in the law or regulations specifically to
3 see how it would impact our process.
4    Q.   And then you would want to communicate
5 that to your team?
6    A.   If there were any changes to the rules
7 and regs, yes.
8    Q.   I think the first letter in this group
9 of letters marked as Exhibit 4 is dated in 2006.
10 I think after that, there was one in
11 February 2007.
12    A.   Yep.
13    Q.   Then another one in 2007, in December of
14 2007.
15    A.   Correct.
16    Q.   And then 2012.  Here's a question I have
17 for you going all the way back to 2006 when you
18 were a pharmacy district leader.  By that point in
19 time, you were aware that there was a growing
20 concern throughout the country about the abuse and
21 potential for abuse of opioid medications?
22    MR. BARNES:  Object to form.
23    THE WITNESS:  Can you restate the
24 question again?
25

Page 96

1 BY MR. ROTTINGHAUS:
2    Q.   Sure.  As of 2006, you as somebody who
3 had a background in pharmacy and who at that time
4 was a pharmacy district leader were already aware
5 that there was becoming a growing concern about
6 abuse and potential for abuse of opioid
7 medications in the country?
8    MR. BARNES:  Same objection.
9    THE WITNESS:  I can't speak to that
10 timeframe.  As a pharmacist, you're aware of that
11 potential, the potential abuse of those products.
12 That's why they're, you know, regulated the way
13 they are.  So pharmacists do know that.
14 BY MR. ROTTINGHAUS:
15    Q.   All the way back to pharmacy school you
16 already knew that?
17    A.   You know the abusive potentials of
18 opioids.
19    Q.   And then between 2007 and 2014, I assume
20 that you were aware that there was a consensus or
21 a belief that there was a continuing or growing
22 problem with opioid abuse in the country?
23    MR. BARNES:  Object to form.  Calls for
24 speculation.
25    THE WITNESS:  I don't recall specific

Page 97

1 timeframes of when, you know, red flags were being
2 thrown out or not.  So from a timing perspective,
3 I'd have to look back and see.
4 BY MR. ROTTINGHAUS:
5    Q.   Giant Eagle I think we said or you
6 acknowledged they operated retail pharmacies in
7 five states.
8    A.   Yes.
9    Q.   And had over 200 retail pharmacies?
10    A.   Yes.
11    Q.   As a group that size, it was your
12 understanding that there were at least some
13 isolated problems with diversion of controlled
14 substances between 2009 and 2014?
15    MR. BARNES:  Object to form.  Can you
16 state what you mean by diversion?
17 BY MR. ROTTINGHAUS:
18    Q.   Do you know what diversion means?
19    A.   Well, I know it means getting it in the
20 wrong hands.  Can you be more specific on what
21 type of diversion?
22    Q.   Well, diversion can occur in different
23 ways; correct?
24    A.   Yes.
25    Q.   A pharmacist can divert?

Page 98

1    A.   Um-hum.
2    Q.   In other words, a pharmacist, for one,
3  they might have an unfortunate drug addiction
4  where they're diverting or taking medications for
5  their own personal use; correct?
6    A.   Correct.
7    Q.   A pharmacist could divert medications
8  for personal gain, in other words, they might take
9  them theoretically and could sell them to someone
10 else?
11   A.   Correct.
12   Q.   They may have a family member who has
13 some addiction that they're trying to help out and
14 don't know how to do it in the right way, and they
15 may divert pharmacy medications for that reason,
16 too; correct?
17   A.   Yes.
18   Q.   And then also pharmacy medications,
19 specifically controlled substances, could
20 theoretically be stolen from a pharmacy.
21   A.   Correct.
22   Q.   They could be stolen from a warehouse.
23   A.   Correct.
24   Q.   That's why there are different controls
25 or security precautions put in place at the

Page 99

1  warehouse level all the way to the retail pharmacy
2  level, to try to prevent diversion from happening;
3  correct?
4    A.   Correct.
5    Q.   Despite those controls being put in
6  place, you were aware that for one reason or
7  another, there were isolated times where even in
8  the Giant Eagle system, diversion took place?
9    A.   Well, there were times where our system
10 caught those types of situations, yeah,
11 absolutely.
12   Q.   And hopefully caught them before it
13 could progress to something really serious, but
14 there were situations where someone was trying to
15 do something illegally with the controlled
16 substances?
17   A.   Yes.
18   Q.   And the hope would be that your system
19 could catch those 100 percent of the time; right?
20   A.   Correct.
21   Q.   Unfortunately, it doesn't always happen
22 100 percent of the time.
23   A.   Right.
24   Q.   And there were times between 2009 and
25 2014 you were aware that there were problems where

Page 100

1  for one reason or another, people were abusing
2  opioid medications either through or within the
3  Giant Eagle system?
4      MR. BARNES:  Object to form.
5      THE WITNESS:  Well, putting the term
6  abusing as far as products, investigating
7  potential loss of product or theft or something to
8  that matter, yes.  But throwing the words abusing
9  the product in there, you know, obviously it
10 depends on your definition of abuse.
11 BY MR. ROTTINGHAUS:
12   Q.   Diversion was something Giant Eagle was
13 trying to prevent along with every other pharmacy
14 and distributor in the country between 2009 and
15 2014 at some level?
16   A.   It's our responsibility as anybody
17 dispensing prescriptions.
18   Q.   And to some degree, you had knowledge
19 that there were individuals within your community
20 or within the country who had a problem abusing
21 controlled substances including opioid
22 medications?
23   A.   Correct.
24   Q.   That's something that wasn't just unique
25 to Mr. Carlson.  Everybody who worked in

Page 101

1  distribution knew that that could be a problem
2  between 2009 and 2014?
3    A.   Correct.
4    Q.   Let me show you Exhibit 5.  Forgive me.
5  It's a little lengthy.  I'll reference specific
6  pages to you after you have a chance to see it.  I
7  haven't marked it yet.  Forgive me.
8      I put a sticker Exhibit 5 in the bottom
9  right-hand corner.  I'm going to give you another
10 document that we're marking as Exhibit 6.  I'm
11 marking a similar document Exhibit 6.  I'll
12 explain them in just a second for you.
13      (HBC-Carlson Exhibits 5 - 6 were marked.)
14 BY MR. ROTTINGHAUS:
15   Q.   Mr. Carlson, Exhibit 5 is meeting
16 minutes from what I understand to be the Ohio
17 Board of Pharmacy.  And if you would please go to
18 page -- it's going to be a little difficult.  And
19 I apologize.  These aren't individually numbered.
20 I'll be happy to help you.  I'm looking at a
21 page -- it's the 12th page in that stack of
22 documents.
23   A.   What is the top words?
24   Q.   Let me just show you.
25      MR. ROTTINGHAUS:  Mr. Barnes, do you

Page 102

1 mind if I reach over just to show him what I'm
2 looking at?
3          MR. BARNES:  Sure.  Tom, these same
4 exhibits were used in the recent Anthony Mollica
5 deposition, and we had a continuing objection to
6 the use of both of these exhibits, 5 and 6.  They
7 were differently numbered in the Mollica
8 deposition, and there was one addition.
9          But these two and the one other one were
10 objected to as being irrelevant, outside the Case
11 Track 1 jurisdictions.  We confirmed that in the
12 middle of the deposition.
13          So if you'll agree to a continuing objection
14 on that ground, I won't have to keep making the
15 same objection as you question him on Exhibits 5
16 and 6.
17          MR. ROTTINGHAUS:  I agree.
18 BY MR. ROTTINGHAUS:
19     Q.  And we're not going to spend a lot of
20 time on these.  I'm sorry they're so voluminous
21 and laborious to go through.
22          Here's the question I have for you,
23 Mr. Carlson.  Really with respect to Exhibit 5 and
24 Exhibit 6, and this isn't meant to be a critique
25 of Giant Eagle or its pharmacies or anything else,

Page 103

1 but the reality is between 2009 and 2014, there
2 were isolated instances where it was discovered
3 that diversion was taking place with respect to
4 medications that were intended for Giant Eagle
5 pharmacy customers; is that right?
6          MR. BARNES:  I'd like to interject a
7 question.  Do you mean the term diversion to
8 encompass theft?
9          MR. ROTTINGHAUS:  Yes.
10          THE WITNESS:  Specific to this case in
11 particular, I haven't read this case, but just in
12 general, there have been cases of theft that
13 occurred out of pharmacies.
14 BY MR. ROTTINGHAUS:
15     Q.  At the Giant Eagle pharmacies?
16     A.  At Giant Eagle.
17     Q.  With respect to those cases, did you
18 have any involvement between 2009 and 2014 in
19 addressing those isolated cases?
20     A.  2009 to '14 I was not in charge of
21 pharmacy operations, but I would get involved as
22 far as assisting in any investigations of these.
23     Q.  Do you believe it's likely that between
24 2009 and 2014, as you became aware of any isolated
25 instances of theft or diversion of any sort with

Page 104

1 Giant Eagle pharmacies, that you would have tried
2 to reiterate to your compliance team the need to
3 make sure that everyone was vigilant in preventing
4 diversion wherever they could?
5          MR. BARNES:  Object to form.
6          THE WITNESS:  Me in particular, I mean,
7 the message was clear, that we were always
8 vigilant for any of these situations.  And I
9 believe that the systems that Anthony Mollica put
10 in place, in charge of operations, were, you know,
11 top notch as far as what I've seen other retailers
12 do from a security standpoint of the products.
13     I mean, these were -- I just think they did a
14 great job of handling all these investigations.
15 BY MR. ROTTINGHAUS:
16     Q.  What was Anthony Mollica's -- did he
17 have responsibility for compliance?
18     A.  At the time that you mentioned, that
19 timeframe, he was in charge of Joe Millward and
20 George Chunderlik.
21     Q.  2009 to 2014?
22     A.  Correct, until I took on the VP role.
23 So the compliance rolled underneath Anthony.  So I
24 just essentially assumed Anthony's position.
25     Q.  Understood.  So maybe we were

Page 105

1 miscommunicating before, but I thought that you
2 told me that between 2009 and 2014, it was you who
3 was responsible for overseeing compliance with the
4 Controlled Substances Act for HBC warehouse.
5     A.  I mentioned it was kind of a team
6 effort.  So even though they reported to Anthony,
7 Joe and George were a resource of mine as well
8 from a compliance and research standpoint.  So I
9 felt in answering the question that it was my
10 responsibility to make sure that we were following
11 the rules.
12     But it was a team effort, like I mentioned,
13 before where George and Joe were also helping,
14 assisting, even to Anthony's level, too.
15     Q.  Was it your understanding then that
16 Anthony was also overseeing the compliance aspect
17 of HBC warehouse between 2009 and 2014?
18     A.  Indirectly I guess you would say yes,
19 because of his team.  Just because they report to
20 him didn't mean that they only worked within his
21 scope.
22     Q.  If there was a concern identified with
23 compliance between 2009 and 2014, would addressing
24 that concern fall under Anthony during that
25 timeframe or under you?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    A.  It would depend on the situation, I
2  think, as far as where it fell.  If it was a store
3  level versus even a McKesson issue, McKesson fell
4  under me at that time as well.  So if it was
5  compliance with the way McKesson was doing things,
6  I would bring Joe and George in on the
7  conversation, but ultimately, I'd be the one
8  dealing with McKesson to remedy any kind of
9  compliance issue.  That's just an example.  I
10  don't have any specifics.
11    Q.  If there was a concern or question
12  raised as to whether there was an effective
13  suspicious order management system in place at HBC
14  warehouse between 2009 and 2014, would you expect
15  that concern to be run through you or run through
16  Anthony or someone else?
17    A.  The concern would be run through me if
18  somebody had any concerns.
19    Q.  And then you would be the one
20  responsible for addressing any concerns and
21  determining if they had any merit?
22    A.  Yeah.  As a team, I would work with them
23  to see if there were any issues or any problems.
24  At the time we were following the process that was
25  required.  We've always had a system in place

Page 107

1  since the beginning.
2    MR. BARNES:  Are you done with five and
3  six?
4    MR. ROTTINGHAUS:  Yeah.
5    (HBC-Carlson Exhibit 7 was marked.)
6  BY MR. ROTTINGHAUS:
7    Q.  I'm showing you what we've marked as
8  Exhibit 7.  If we could go to the second page of
9  this document, this is what appears, Mr. Carlson,
10  to be a chain of emails that actually began, I
11  believe, on January 24.  You can look at all of it
12  if you would like to familiarize yourself with
13  this email chain.  Let me know when you're
14  prepared.
15    (Witness reviewed the exhibit.)
16  BY MR. ROTTINGHAUS:
17    Q.  On the second page, there's a discussion
18  about missing one bottle of, it says, 186775
19  hydro.
20    A.  Okay.
21    MR. ROTTINGHAUS:  If you would highlight
22  that for a second.
23  BY MR. ROTTINGHAUS:
24    Q.  This appears to be an email from Kris
25  Remas.  Do you know who that person is?

Page 108

1    A.  Yes.  Kris was my pharmacy buyer at the
2  time.
3    Q.  When you say your pharmacy buyer -- the
4  regarding line says HBC phone number.  I'm not
5  sure exactly what that means, but --
6    A.  Yeah, because they were asking for the
7  phone number.  In the very first email, the
8  district leader was asking for the phone number to
9  contact the warehouse to discuss the discrepancy.
10    Q.  Does it appear to you that there was a
11  discrepancy noticed that was coming out of the HBC
12  warehouse?
13    A.  In this email chain, it was referring to
14  a missing bottle.
15    Q.  And Kris Remas is identifying the
16  specific bottle and the amount or the dosage of
17  that bottle?  It's a hydrocodone product?
18    A.  Yes.
19    Q.  If we go to the first page, and I don't
20  mean to skip over all the communication, but I
21  noticed that on the first page at the very bottom,
22  Andy Zalewski states in the last sentence, "As for
23  issuing credit, that is now Greg's decision on how
24  to handle."
25    Do you have any belief that he's referring to

Page 109

1  you at this point in time?
2    A.  Yeah.  That would be me.
3    Q.  And then right above that you send an
4  email out on January 27 at 4:32 p.m.  And in that
5  email you ask if it would be too much trouble to
6  place the control bottles in a bag inside the
7  tote.  Then you say, "Since it is possible to
8  squeeze a bottle through, if they were all bagged
9  together, it would be tough to do that."  You say,
10  "Just a thought as an added deterrent."
11    In this email are you discussing in general
12  terms how to deter any type of theft or diversion
13  of the product?
14    A.  Yes.  I can't remember the exact case
15  back then, but this to me looks like an example of
16  when we, you know, quickly identified an issue and
17  investigated very promptly and looked to find what
18  could have caused it and then adding an additional
19  safeguard in place, which was the bags.
20    In this process here, it looks like the
21  system working very well from an overall team
22  standpoint, like I mentioned before, everybody
23  being involved from the store level all the way to
24  the warehouse where they caught it.
25    Within a couple of days, we already had a

Page 110

1  solution in place to prevent this, if that was
2  even the problem.  It was, hey, there's a
3  potential could somebody squeeze their hand
4  through the tote even though it was sealed.  And
5  then we said if we bag them all together, there
6  would be no way they could pull out a full bag of
7  products.
8      Q.  So again, at least by 2012, there was an
9  awareness that for one unfortunate reason or
10 another, people did sometimes try to steal these
11 medications?
12     A.  Sure.
13     Q.  Again, this was hydrocodone combination
14 product at this point in time?
15     A.  Yes.
16     Q.  And you were aware, I mean personally,
17 and your team was aware of the problem that some
18 people were addicted to hydrocodone combination
19 products and would try to steal them?
20     A.  Yeah.  We looked at it as we were
21 responsible for securing the product from start to
22 finish.  This was an example of when we just made
23 sure we had everything secure.
24     (HBC-Carlson Exhibit 8 was marked.)
25

Page 111

1  BY MR. ROTTINGHAUS:
2      Q.  I'm going to have to ask you to forgive
3  me again because I'm going to reference another
4  document there.  I only want to reference a small
5  portion, but unfortunately it's a large document.
6  In the interest of making sure we're being fair,
7  we've attached the entire document.  So I'm going
8  to show you what's been marked as Exhibit 8.
9      So the first page of Exhibit 8, Mr. Carlson,
10 appears to be some type of meeting organization
11 from Mr. Millward where I believe you and
12 Mr. Chunderlik and Mr. Millward and a couple of
13 other individuals were invited guests.  Maybe it
14 wasn't a conference, but to at least participate
15 in this conference; is that right?
16     A.  Conference call, yeah.
17     Q.  Conference call?
18     A.  Um-hum.
19     Q.  Now, there's an email chain right
20 underneath that notice.  Do you see that on the
21 first page --
22     A.  Yes.
23     Q.  -- where it starts, "Greg, I think you,
24 Dan, George and I..."  Are you with me?
25     A.  Yes.

Page 112

1      Q.  This appears to be an email from
2  Mr. Millward, and it's addressed to you, as I
3  understand it.  Is that your understanding?
4      A.  Yes.
5      Q.  You correct me if I'm wrong in how I
6  read this, but he says, "I think you, Dan, George
7  and I need to get together to review and respond
8  to this request from McKesson.  They have
9  definitely strengthened the information that they
10 require before increasing the controlled drug
11 thresholds."
12     You're familiar with the term "thresholds"?
13     A.  Yes.
14     Q.  So as of May of 2013, does it appear to
15 be Mr. Millward's impression that McKesson,
16 they're increasing or strengthening their
17 controlled drug thresholds?
18     MS. CHARLES:  Object to form.
19     THE WITNESS:  Well, I mean, I don't
20 interpret it as strengthening their thresholds.  I
21 interpret it as changing the information needed to
22 increase the thresholds.
23     Whether or not that's strengthening the
24 information, I don't know.  I don't understand
25 what he means by strengthening the information,

Page 113

1  but it sounds like they just are requesting
2  different information than previously given.
3  BY MR. ROTTINGHAUS:
4      Q.  On the next page, and I think you're
5  with me now, page 2 of this document, it's a
6  May 6, 2013 correspondence to Mr. Millward.
7      A.  Okay.
8      Q.  And I don't want to misstate it, so I'm
9  just going to read the first sentence.  First of
10 all, you'll see it's from someone named Dan
11 Jeffries.
12     A.  Yes.
13     Q.  Do you know Mr. Jeffries?
14     A.  I have met Mr. Jeffries, yes.
15     Q.  Who is he with?
16     A.  He's with McKesson.
17     Q.  The letter states as follows, "Dear
18 Joseph, as we unfortunately are all aware, the
19 abuse of prescription drugs, particularly
20 controlled substances, continues to be a serious
21 problem among millions of Americans."
22     Do you agree with that statement?
23     A.  Yes.
24     Q.  Do you think members of your team at HBC
25 would agree with that statement back in 2013?

Page 114

1    A.  I can't speak for them.
2    Q.  You personally do though?
3    A.  Well, I'm not denying that statement.
4    Q.  I mean, you agree at that point in time,
5 it was a problem?
6    A.  I don't know like as far as numbers of
7 Americans as far as that goes.
8       MR. BARNES:  You're done with this one?
9       MR. ROTTINGHAUS:  Yes.
10      (HBC-Carlson Exhibit 9 was marked.)
11 BY MR. ROTTINGHAUS:
12   Q.  I'm showing you what's been marked as
13 Exhibit 9.  Sir, this is an email dated August 22,
14 2013 from someone named Shawn Voyten.
15   A.  Yes.
16   Q.  Did Shawn work at HBC or at Giant Eagle?
17   A.  Giant Eagle.
18   Q.  What was Shawn's position?
19   A.  At this time, I believe -- I believe he
20 was maybe director of pharmacy technology, but I'm
21 not quite certain on his position.
22   Q.  And you're copied on this email that was
23 sent to Mr. Millward, Mr. Mollica and
24 Mr. Chunderlik?
25   A.  Yes.

Page 115

1    Q.  In the first section or first paragraph
2 of that email, it says, "All."  It says, "Paul
3 Callahan sent the attached article for review."
4 And he says, "Very powerful message from CVS."
5    I don't mean to skip through.  If you want to
6 look at the entire document, feel free, but I'm
7 going to skip down about five paragraphs where it
8 starts with, "Abuse of opioid prescription
9 painkillers..."  Do you see where I am?
10   A.  Yes.
11   Q.  And it states, "Abuse of opioid
12 prescription painkillers like Oxycontin ranks as
13 the number two cause of accidental death in the
14 United States."
15   Back in August of 2013, did you have any
16 understanding that abuse of opioid prescription
17 painkillers was becoming one of the leading causes
18 of death in the United States?
19      MR. BARNES:  Object to form.
20      THE WITNESS:  I can't recall back in
21 2009 or 2013 -- I'm sorry -- what my knowledge was
22 as far as this goes.
23 BY MR. ROTTINGHAUS:
24   Q.  At some point in time, did you become
25 aware that the abuse of opioid prescription

Page 116

1 painkillers has become a problem in the United
2 States?
3    A.  A problem, yes.  I mean, a number, cause
4 of death and things like that I don't know
5 specifically.  A problem, yes.
6       (HBC-Carlson Exhibit 10 was marked.)
7 BY MR. ROTTINGHAUS:
8    Q.  I'm handing you what's been marked as
9 Exhibit 10.  Do you have it in front of you?
10   A.  Yes.
11   Q.  This appears to be an April 18, 2014
12 email, at least as it starts at the top, from Mike
13 Bianco to you; is that right?
14   A.  Yes.
15   Q.  I don't want to rush you through this.
16 This email chain, I think, is two and a half pages
17 long.  I won't highlight anything at this point in
18 time, but I want to see if you agree that the
19 email started out because of concern about a
20 missing tote from the HBC warehouse.
21   A.  Yes.  From store 35 it looks like there
22 was a missing tote.
23   Q.  Then there was a question about possibly
24 having to complete a DEA Form 106, which I
25 understand to be a form that's used to address

Page 117

1 potential theft.
2    A.  Correct.
3    Q.  And then if we go to the first page of
4 this exhibit -- I'm sorry.  You're at the right
5 page.  If we look at that page of the exhibit, you
6 state towards the bottom, he needs to fill out the
7 106, right above.
8    So you were asked whether there's a need
9 follow up.  Then you say HBC does need to fill out
10 the 106, but that can be done on their behalf; is
11 that correct?
12   A.  Yeah, we can.  We being Mike and/or I
13 can fill out the 106.
14   Q.  Again, at least as of 2014, the
15 potential for theft was recognized, and the
16 procedure in place at least was to fill out a form
17 if there was a suspected theft?
18   A.  Yeah.  We followed the controlled
19 substance policy, which is if there's ever a
20 theft, you report it to the DEA.
21   Q.  Do you know how often there were
22 concerns about missing totes or missing
23 hydrocodone combination products coming out of the
24 HBC warehouse between 2009 and 2014?
25   A.  I don't know how many times; very

Page 118

1 infrequent.
2    Q.  Whenever a number would be off or
3 couldn't be reconciled with what the warehouse
4 showed versus what was shipped, that would require
5 some type of investigation to find out where any
6 missing mediation was or if indeed there was
7 missing medication?
8    A.  Yes.  If there's anything missing, we
9 would do an investigation.
10      (HBC-Carlson Exhibit 11 was marked.)
11 BY MR. ROTTINGHAUS:
12    Q.  I'm giving you what's been marked as
13 Exhibit 11.  Again, in the interest of trying to
14 make sure it was complete, we've added several
15 pages here, but I'm going to reference, unless
16 you'd like to look at something else, just the
17 front page of Exhibit 11.
18    At the bottom there's an email from someone
19 named Barbara Simpson to you, Mr. Bianco and some
20 other people; is that right?
21    A.  Yes.
22    Q.  And that email is referencing an
23 April 22, 2014 report of a missing control tote
24 from one of the Giant Eagle stores.
25    A.  Yes.

Page 119

1    Q.  And then there's discussion right above
2 that by someone named Blaine Snider about
3 verifying the totes.
4    A.  Yes.
5    Q.  And then at the top of this email -- and
6 I'm not sure that you are a recipient of this
7 portion.  I am wondering if you remember if you
8 were.  But there's a follow-up email by someone
9 named Tammy to Blaine.
10    A.  Yes.
11    Q.  Are you reading with me?
12    A.  I'm reading, yes.
13    Q.  In the first paragraph of that portion
14 of the email, it starts out, "The long and short
15 of it..." at the top.  Are you with me?
16    A.  Yes.
17    Q.  It states, "The long and short of it is
18 that the Giant Eagle HBC sheets are frequently
19 incorrect and there are times they cannot even be
20 used because they have no totals at all."
21    Did I read that correctly?
22    A.  Yes.
23    Q.  And I want you to take as much time as
24 you need to to read through the entirety of that
25 email.  I'm not going to try to read through all

Page 120

1 of it, but I have a follow-up question when you're
2 ready.
3    A.  Okay.
4    Q.  My question is:  Did anyone make you
5 aware in April of 2014 about any concerns that HBC
6 frequently had incorrect sheets for these
7 shipments?
8       MR. BARNES:  Object to form.  There's no
9 foundation here that he was even part of this
10 communication.
11       THE WITNESS:  Yeah, I don't recall ever
12 reading this from Tammy stating what she's stating
13 is the issue.  Tammy was from the courier company
14 that McKesson uses.  I mean, I can't speak to that
15 because I don't recall ever seeing that issue.
16 BY MR. ROTTINGHAUS:
17    Q.  And that's my question.  Did anybody
18 ever notify you that there was a concern about the
19 sheets being incorrect?
20    A.  Not that specific issue.  We did look to
21 improve processes with them, but, no, not to that
22 specific issue.  I don't recall.
23    Q.  I'm done with that.
24      (HBC-Carlson Exhibit 12 was marked.)
25

Page 121

1 BY MR. ROTTINGHAUS:
2    Q.  I'm showing you what's been marked as
3 Exhibit 12.  Let me know when you're with me.
4 While you're looking, I'll tell you what I believe
5 this is, an August 11, 2015 email chain that
6 started out as an email from someone named Richard
7 Shaheen.
8    A.  Shaheen, yes.
9    Q.  Is Mr. Shaheen with the Giant Eagle
10 system?
11       MR. BARNES:  Wait.  I think I got the
12 wrong one.
13       THE WITNESS:  Yeah, I do, too.
14       MR. ROTTINGHAUS:  I gave you the wrong
15 one.  I apologize.  Why don't I pull this back.
16    I have to get my exhibits organized.  If you
17 want to wait here or take a break, that's fine.
18       MR. BARNES:  How long do you need?  Five
19 minutes?
20       MR. ROTTINGHAUS:  Hopefully one minute
21 or two minutes.
22    For the record, I'm going to withdraw what I
23 marked as Exhibit 12.  I'm going to leave it here,
24 and I'm going to put it on a different document.
25    I'm going to show you now what I intended to

Page 122

1  have marked as Exhibit 12 before.
2     And the internal reference number should be
3  1100.
4        MR. BARNES:  This is a document
5  Bates-stamped HBC_MDL63991?
6        MR. ROTTINGHAUS:  Yes.
7  BY MR. ROTTINGHAUS:
8     Q.  I think we have the correct document I
9  meant to grab before.  This appears to be an email
10 chain that was started by Richard Shaheen on
11 August 11, 2015; is that correct?
12    A.  Yes.
13    Q.  On the first page, if you go to the
14 third from the bottom paragraph, I believe this is
15 part of the email that was sent from Mr. Shaheen
16 to you on August 11; is that correct?  It starts
17 out, "We are operating..."
18    A.  Yes.
19    Q.  Here's what it states.  I'm going to say
20 what he states.  Then I want to ask you what your
21 interpretation is.
22    He says, "We are operating on a two-tier
23 system and holding POD pharmacist accountable for
24 the back counting procedure."
25    He then states, "My concerns are that a

Page 123

1  regulatory agency may find fault with the lack of
2  our consistency or not being proactive in other
3  regions for the same types of losses."
4     Do you remember this concern being raised by
5  Mr. Shaheen to you?
6     A.  I don't recall the specific incident.
7     Q.  He's referencing some oxycodone;
8  correct?
9     A.  Correct.  He's referencing the monthly
10 narcotic audit process and the extra safeguards we
11 put in place.  We followed the federal guidelines,
12 regulations I should call them, regarding auditing
13 our narcotic counts.  We started around this time
14 implementing additional beyond what the
15 regulations require.
16    Q.  What was it that you started around this
17 time to implement?
18    A.  This is where he's talking about back
19 counting.  We're required to do, you know, I think
20 it's -- we had a process to do monthly narcotic
21 audits.  Everything was checked to the pill every
22 month.  We started implementing a new process
23 where we were counting to the pill every
24 prescription we filled.  We would back count to
25 make sure it that matched.

Page 124

1     We started that process in the Pittsburgh
2  market to test it out.  And what I then told Rick
3  is that Darren and Joe were working on this
4  particular project to standardize based on what
5  Rick was discussing.  So it was kind of an extra
6  safeguard that we were using in Pittsburgh that
7  Rick didn't know we were looking into spreading it
8  chain-wide.
9     Q.  Was this an extra safeguard that was put
10 in place sometime in 2015?
11    A.  I can't recall when we rolled out the
12 implementation chain-wide.  But I do recall that
13 conversation.  I have to see when.  But, again, it
14 was in addition to what we were already doing by
15 law.  So I think that's what Rick is referring to.
16    Q.  Looking at all of these documents we've
17 been looking at, would you agree it was clear to
18 you and your team at HBC of the need to exercise
19 vigilance against theft or diversion of controlled
20 substances between 2009 and 2014?
21        MR. BARNES:  Object to form.
22        THE WITNESS:  I think -- I believe it
23 was always our belief to be vigilant from the time
24 I started with Giant Eagle until current, until I
25 left the company.

Page 125

1  BY MR. ROTTINGHAUS:
2     Q.  When talking about -- well, let's back
3  up.  It's your understanding, is it not, that one
4  of the requirements under the Controlled
5  Substances Act between 2009 and 2014 was for a
6  distributor to, in laymen's verses, design a
7  system to assist in detecting orders that might
8  end up being suspicious orders from a distributor?
9        MR. BARNES:  Object to form.
10       THE WITNESS:  Are you asking if I think
11 that the requirement is you had to have a system
12 for suspicious orders?
13 BY MR. ROTTINGHAUS:
14    Q.  Well, I mean, your general knowledge is
15 there had to be a system in place per the
16 Controlled Substances Act; is that right?
17    A.  That you had to have a system to
18 disclose the suspicious orders of controlled
19 substances.
20    Q.  I think you're looking at it.  I should
21 have just gone to that.  I was trying to speed
22 this up.  I shouldn't have done that.  Let's look
23 at Exhibit 3 again, general 10.  Again, I'm going
24 to focus, understanding I'm just looking at a
25 portion of this regulation, on 1301.74(b).  I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  sorry that this type is so small.
2  But what I was really trying to get back to
3  is what I think you agreed before, but just to
4  make sure, it was your understanding that HBC as a
5  distributor between 2009 and 2014 had a duty to
6  design and operate a system to disclose suspicious
7  orders of controlled substances?
8  MR. BARNES: Same objection as before.
9  THE WITNESS: We had a system that
10  followed that regulation.
11  BY MR. ROTTINGHAUS:
12  Q.  And you followed it because that was the
13  regulation; right?
14  A.  Yes.  We designed it to fit the rules
15  that were put in place by the DEA.
16  Q.  Then you saw the letters we looked at
17  from the DEA, and I won't pull those back up
18  unless you want me to, but there were letters
19  where the DEA talked about suspicious orders such
20  as orders of unusual size or orders deviating
21  substantially from a normal pattern or orders of
22  unusual frequency.
23  You remember some of that language as well?
24  A.  Yes.
25  Q.  That was kind of guidance that's

Page 127

1  provided to distributors to understand what might
2  be suspicious orders?
3  MR. BARNES: Object to form.
4  BY MR. ROTTINGHAUS:
5  Q.  Is that right?
6  A.  Yes.
7  Q.  And then as a distributor, one of the
8  things HBC was trying to do was look for red flags
9  that might identify an order that could indeed be
10  a suspicious order or at least an order of
11  interest in its distribution?
12  A.  Are you asking if we had a process in
13  place to detect that?
14  Q.  Yes.
15  A.  Yes.
16  Q.  You've used the word and heard the term
17  red flags before; right?
18  A.  Yes.
19  Q.  Not only HBC, but you were aware that
20  other distributors were also trying to comply with
21  the Controlled Substances Act at the same time?
22  MR. BARNES: Object to the form to the
23  extent the question asks you about other
24  distributors.
25  THE WITNESS: I can't speak to other

Page 128

1  distributors other than what McKesson was doing at
2  the time.
3  (HBC-Carlson Exhibit 13 was marked.)
4  BY MR. ROTTINGHAUS:
5  Q.  Let's look at Exhibit 13 I'll hand you.
6  Exhibit 13 is, again, an email chain I think that
7  started on November 14 you'll see from the second
8  page.  If we go to the second page, the original
9  email was from Kayla Voelker, and the date is
10  indeed November 14, 2013; correct?
11  A.  Yes.
12  Q.  And in this email she's saying that --
13  and I'm assuming she's talking about HBC because
14  the subject line is Daily HBC Suspicious
15  Purchasing Report.
16  A.  Yes.
17  Q.  She says, "We have had two pharmacies
18  exceed the purchasing thresholds for certain
19  controlled products so far this month."
20  It appears to me from this email chain that
21  then there was a response by Mr. Millward on
22  November 14 at 5:43 p.m.; is that correct?
23  A.  Correct.
24  Q.  Again, Mr. Millward would be the person,
25  because he was the senior manager of pharmacy

Page 129

1  quality and compliance, he would be an appropriate
2  person to follow up on this email?
3  A.  Yes.
4  MR. BARNES: Tom, just for the record,
5  to the extent that this is not an opioid or one of
6  the opioids at issue in this case, we object.
7  MR. ROTTINGHAUS: Understood.
8  BY MR. ROTTINGHAUS:
9  Q.  And Mr. Millward is asking two people
10  named Todd and Bobby to check with the two stores
11  listed on an attached spreadsheet, which I don't
12  have, to see if the increase in ordering is
13  legitimate.  Do you see that?
14  A.  Yes.
15  Q.  Then he's also apparently asking them to
16  respond to questions in regard to a request for an
17  increase in narcotic order points.  Do you see
18  that?
19  A.  Yes.
20  Q.  And then he's got some questions listed
21  out.  Do you see those questions?
22  A.  Yes.
23  Q.  Those are questions that are kind of
24  familiar to you?
25  A.  Um-hum.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Q.   You have seen other distributors ask
2  some of those same questions between 2009 and
3  2014?
4    A.   I don't know about other distributors,
5  but they were questions that we put in place.
6    Q.   So at least as of 2013, was it your
7  expectation that those questions would be asked
8  whenever there was an order that was exceeding
9  thresholds?
10   A.   Yes.  At this time, yes.
11       MR. BARNES:  Tom, I note that this
12  relates to Pennsylvania.  So an additional
13  objection it's outside the jurisdiction.
14  BY MR. ROTTINGHAUS:
15   Q.   And Pennsylvania is one of the stores
16  that you would have had responsibility for as
17  well; correct?
18   A.   Pennsylvania, yes.
19   Q.   During this timeframe, is Mr. Millward
20  the person you would expect to typically take the
21  point in asking these questions of any pharmacies
22  if their orders were exceeding thresholds?
23   A.   Yes.  Joe was the point person at this
24  time.
25   Q.   Now, if we go right above to the top of

Page 131

1  that email, we'll see that -- well, forgive me.
2  Let's go the middle.  There's an email from Todd
3  Roahrig.  And he asks for the names of the clinics
4  and numbers so that he could follow up, as I
5  understand it.
6    A.   Yeah.  It looks like he's just
7  inquiring -- it sounds like he may have had a
8  phone conversation with Tony and he's asking for
9  him to send the details of what their phone
10  conversation was.
11   Q.   And then at the top, Todd Roahrig
12  responds to Mr. Millward saying, "Here's at least
13  the four clinics/mds around Bridgeville," and he
14  talks about Tony will continue to do his due
15  diligence on those.
16   A.   Yes.
17   Q.   Would it be your expectation,
18  Mr. Carlson -- and let's back up.  That email was
19  on November 25, 2013.
20   A.   Yes.
21   Q.   Would it be your expectation that any
22  medications that were exceeding thresholds during
23  that timeframe would not be shipped until it was
24  determined that the due diligence was done on
25  those clinics?

Page 132

1    A.   That would be the assumption, yeah.
2    Q.   Do you know whether there was a system
3  in place in 2013 for HBC to actually stop the
4  shipment of any orders that were exceeding
5  thresholds until due diligence was done to make
6  sure that the orders were not indeed suspicious?
7        MR. BARNES:  Tom, do you mean shipment
8  from the warehouse to the pharmacy or from the
9  pharmacy to the patient?
10       MR. ROTTINGHAUS:  Warehouse to the
11  pharmacy.
12       THE WITNESS:  Can you restate the
13  question?
14  BY MR. ROTTINGHAUS:
15   Q.   Do you know whether in 2013, November of
16  2013, there was indeed a system in place that was
17  stopping orders that exceeded thresholds from
18  being shipped to various pharmacies until the due
19  diligence could be done to make sure they were
20  indeed not suspicious orders?
21   A.   I know that there was a process to stop
22  orders.
23   Q.   Was that your expectation?
24   A.   Yes.
25   Q.   It was your expectation that orders not

Page 133

1  be shipped until at least some due diligence was
2  done to make sure the orders were not suspicious?
3    A.   Correct.
4    Q.   At least if they were exceeding
5  thresholds; is that right?
6    A.   These are not really suspicious orders.
7  These are orders of interest I would classify
8  them, even though the email does say suspicious in
9  the wording.  These were just stores that were --
10  became orders of interest until we explored them,
11  investigated them.
12   Q.   And orders of interest may not end up
13  being suspicious orders?
14   A.   Correct.
15   Q.   They could be suspicious orders, end up
16  being suspicious orders after due diligence is
17  done as well; correct?
18   A.   That could occur, yes.
19   Q.   And there were a couple of instances
20  where that did occur; correct?
21   A.   I can't recall specifically.
22   Q.   If we go to -- I hand you what has been
23  marked as Exhibit 15.
24       MR. ROTTINGHAUS:  Were we on 14 just
25  now?

Page 134

1    MR. BARNES: 13.
2    (HBC-Carlson Exhibit 14 was marked.)
3  BY MR. ROTTINGHAUS:
4    Q. I'm going to show you what has been
5  marked as Exhibit 14.
6    MR. ROTTINGHAUS: Internal reference
7  1005.
8  BY MR. ROTTINGHAUS:
9    Q. Are you with me?
10   A. Yes.
11   Q. This, again, is an email chain. At the
12  top of this email, it's dated August 20 from you
13  to a couple of individuals; is that right?
14   A. Yes.
15   Q. And you say, "See the guardrails by
16  Emdeon" -- did I say that right?
17   A. Yes.
18   Q. -- "Emdeon below." When you're
19  referencing guardrails, what are you talking
20  about?
21   A. I honestly do not -- I'm referencing
22  this message from Thrifty White, and they said
23  guardrail. So I'm not familiar. It's an Emdeon
24  product it sounds like, but I don't know the
25  details behind that product.

Page 135

1    Q. If we look below your email, we see an
2  email from Mr. Millward to several individuals
3  with you being copied on it on August 20; is that
4  right?
5    A. Yes.
6    Q. And he's referencing his notes from a
7  Thrifty White visit.
8    A. Yes.
9    Q. And among his notes, he says, "Keep
10  engaged with the DEA through all steps of
11  process."
12   That's something you would expect your team
13  to do anyway; right?
14   A. Yes.
15   Q. Then he says, "Relying on thresholds is
16  not good enough for the DEA."
17   Now, this is as of August 20, 2015 what he's
18  saying there.
19   A. I think we need to look at the context
20  of this conversation, too, because this is going
21  back to preparation for -- I believe preparation
22  for looking at controlled -- doing CII
23  prescriptions. So I don't know if that's why Joe
24  was referring to it in that manner.
25   Q. Because by this timeframe, HBC at least

Page 136

1  was no longer distributing any control III
2  substances including hydrocodone combination
3  products; correct?
4    A. All of the hydrocodones were
5  reclassified as Schedule II at this point in time.
6    Q. And by this point in time, the HBC
7  warehouse was no longer even distributing those
8  medications; correct?
9    A. Not the hydrocodone, no, they were not.
10   Q. However, he saying, "Relying on
11  thresholds is not good enough for the DEA."
12   Is that a statement that as of 2015 would be
13  new to you?
14   MR. BARNES: Object to form.
15   THE WITNESS: That's a quote from
16  Thrifty White, so I don't know if that's her
17  interpretation of the situation or not.
18  BY MR. ROTTINGHAUS:
19   Q. Fair enough. I want to focus on what
20  your belief was at this time. As of August of
21  2015, did you have any knowledge or understanding
22  as to whether relying on thresholds in determining
23  whether an order may be an order of interest or a
24  suspicious order was sufficient for the DEA?
25   MR. BARNES: Object to form.

Page 137

1    THE WITNESS: Can you restate the
2  question?
3  BY MR. ROTTINGHAUS:
4    Q. Sure. Let me back it up. We've been
5  looking at an email from August of '15. But I'm
6  going to kind of focus a little bit off of that
7  date.
8    From 2009 to 2014, at some point in time, did
9  you become aware that relying on thresholds of
10  shipments of hydrocodone combination products from
11  the HBC warehouse was not sufficient to satisfy
12  the duties of a distributor under the Controlled
13  Substances Act?
14   MR. BARNES: Object to form.
15   THE WITNESS: I mean, there's nothing in
16  the regulations, to my knowledge, that
17  specifically say thresholds. I can't answer that
18  question because my thought process wasn't like
19  that. Our system didn't only rely on thresholds
20  anyway. It included other safeguards and
21  measures. So I would say nothing was new to my
22  knowledge of the process.
23  BY MR. ROTTINGHAUS:
24   Q. Let's talk about what your system did
25  use. You said it didn't just rely on thresholds.

Page 138

1 Tell us what your system did rely on to identify
2 any suspicious orders between 2009 and 2014.
3     A.  We have a number of systems, had a
4 number of systems in place at the time.  Some of
5 those are around general reporting and monitoring
6 movement reports on a daily basis.  Some included
7 safeguards where unusual quantities were caught
8 prior to going out.
9     So if anything was a large order, outside of
10 the norm, it was immediately stopped and red flags
11 were thrown out.  Questions were asked as far as
12 the validity of that order, and it wasn't released
13 until it was investigated.
14     The stores had a process to check in the
15 orders bottle by bottle.  They had other
16 safeguards in place around safe dispensing of
17 controlled substances to the patients, looking for
18 other red flags as far as the dispensing process.
19 So those are some of the things.  I can't recall
20 every piece of it.
21     Q.  I wrote down a couple of things that I
22 want to ask you about in follow-up.
23     First of all, are you talking about the
24 timeframe of 2009 to 2014 when you're referencing
25 these different processes in place?

Page 139

1     A.  Yes.  We always had processes in place
2 from the beginning.  It was mainly modifications
3 along the way to the process.
4     Q.  And these processes as you described
5 them, were they put in place in an attempt to make
6 sure that HBC warehouse was complying with its
7 responsibilities as a distributor under the
8 Controlled Substances Act?
9     MR. BARNES:  Object to form.
10     THE WITNESS:  We were always complying
11 with the rules.  We were trying to make our
12 process better, more efficient.  So it wasn't a
13 matter of are we compliant.  It was a matter of is
14 our process working the most efficient way it can.
15 Examples of that is removing some of the manual
16 components to that, automating it with reporting
17 or other systems.
18 BY MR. ROTTINGHAUS:
19     Q.  Were these processes you've just talked
20 about, monitoring movement reports, managing
21 unusual quantities, stopping them, those processes
22 we were just talking about, were they put in place
23 as part of an effort to design and operate a
24 system to disclose orders of controlled substances
25 that might end up being suspicious orders?

Page 140

1     MR. BARNES:  Object to form.
2     THE WITNESS:  My answer would be that
3 they were put in place to meet the requirements of
4 the Act.  So if that's what was in the Act, that's
5 part of the reason why they were put in place.
6 BY MR. ROTTINGHAUS:
7     Q.  When you say the Act, you're talking
8 about the Controlled Substances Act?
9     A.  Controlled Substances Act, yes.
10     Q.  Do you know -- well, first of all, let
11 me ask you this with respect to that.  You said
12 monitoring movement reports?
13     A.  Yes.
14     Q.  In preparing for this deposition, have
15 you seen one of those reports?
16     A.  I mean, I saw them years ago, but I have
17 not seen any movement reports in preparation for
18 this.
19     Q.  Are these the reports that are also
20 called daily control reports?
21     A.  I don't believe those were -- I mean, we
22 had -- basically we had buyer reports, for
23 example.  So they were just reports that were
24 printed out daily.  I might have a stack of them
25 on my desk.  It would show you daily movement,

Page 141

1 weekly movement, monthly movement, things like
2 that.
3     Q.  Were you personally tasked with the
4 responsibility to review the daily movement
5 reports to identify any movements of suspicious
6 quantities of substances, or was there some other
7 place to assist you in that?
8     MR. BARNES:  Object to form.
9     THE WITNESS:  There were other systems.
10 I can't remember which reports that would flag
11 certain things.  The one I was speaking of was
12 just a general second level safeguard where I can
13 see if any movements were out of line from
14 previous history.
15     But there were other reports -- I can't think
16 of the names of those reports -- that were out
17 there that would look at movements of therapeutic
18 categories of drugs specifically.
19 BY MR. ROTTINGHAUS:
20     Q.  So you at this point in time, from 2009
21 to 2014, sometime during that timeframe, you
22 became a senior director of pharmacy?
23     A.  Yes.
24     Q.  And when you became the senior director
25 of pharmacy, were you overseeing all 200 something

Page 142

1 Giant Eagle stores?
2    A.  No, not the stores.  I was overseeing
3 all of corporate functions at that point.  So
4 Anthony Mollica was still in charge of the
5 operations of the stores.  I was responsible for
6 the contract management of any vendors, the
7 managed care side, which is the insurance
8 contracting piece of it kind of rolled up
9 underneath me as well.  So it was more at that
10 level.
11    Q.  And I just want to make sure I
12 understand.  During this timeframe from 2009 to
13 2014, you're telling us that one of the processes
14 in place was you would get a sheet of daily
15 movement of all of your medications, including
16 controlled substances, and you would personally
17 look through that to try to identify any orders
18 that seemed out of the ordinary?
19    A.  We had buyers.
20    Q.  First of all, am I correct in what I
21 said?  If I'm not, just correct me.
22    A.  Oh, no, I mean, I didn't daily look at
23 those reports.  We had buyers in place at that
24 time.  We had a category manager in place at the
25 time.  So they would use that to generate their --

Page 143

1 as part of their reordering process.  So when we
2 reviewed that, they could also see any out of the
3 norm patterns in that process.
4    Q.  And you're saying you're one of the
5 individuals that was reviewing and tasked and
6 responsible for reviewing for any out of the norm
7 patterns?
8    A.  I didn't.  When you mentioned senior
9 director of pharmacy, no, I was not reviewing the
10 reports at that time.
11    Q.  And that would have been between 2005 --
12    A.  Right.
13    Q.  I'm sorry.  2007 and 2012.
14    A.  No senior director of pharmacy.
15    Q.  2012 to 2014.
16    A.  Correct.
17    Q.  You were not doing so?
18    A.  I was not reviewing the daily reports
19 back at that point.
20    Q.  Who was reviewing the daily reports at
21 that time, if anyone?
22    A.  Kris Remas would have been reviewing
23 reports as part of -- again, our daily process was
24 to review the reports.
25    Q.  Now, when those reports would get

Page 144

1 reviewed, those are reports of medications
2 including controlled substances that have left the
3 HBC warehouse and have been shipped to one of the
4 retail pharmacies in the five-state region; is
5 that right?
6    A.  It shows history, and then, yeah, it
7 shows some movement past, you know, I should say
8 after the fact.
9    Q.  During that timeframe, you're looking at
10 reports of medications that have already moved
11 from the HBC warehouse?
12    A.  Right.
13    Q.  So at least with respect to that review,
14 it is not going to catch and do any due diligence
15 on medications, specifically controlled
16 substances, that have not yet left the HBC
17 warehouse?
18    A.  Not that report, no.  That report would
19 not.  Other safeguards would.
20    MR. BARNES:  We've been at it about an
21 hour and a half.  Do you mind if we take a break?
22 Normally we try to go about every hour.
23    MR. ROTTINGHAUS:  Whatever you guys
24 want.
25    THE VIDEOGRAPHER:  Off the record at

Page 145

1 12:07.
2    (Recess from 12:07 p.m. to 1:05 p.m.)
3    THE VIDEOGRAPHER:  On the record 1:05.
4 BY MR. ROTTINGHAUS:
5    Q.  So before we took our break, we were
6 talking about some of the systems you said that
7 you had put in place or had in place at HBC.  We'd
8 been discussing the monitoring of movement
9 reports.
10    Correct me if I'm wrong, but my recollection
11 is that you said those reports would come across
12 your desk at least starting in some timeframe
13 between 2009 and 2014?
14    A.  I was receiving those before, like in
15 2007.
16    Q.  From 2007 all the way through 2014?
17    A.  I stopped receiving those probably
18 somewhere around 2012 probably, around there,
19 maybe a little bit sooner than that.
20    Q.  And I think you told me that when those
21 reports came across your desk, they were showing
22 products that had already shipped from the
23 warehouse to the various pharmacies.
24    A.  Correct.
25    Q.  Then you mentioned that -- and I may

Page 146

1  have to ask you to help me out here, but you said
2  that unusual quantities could be caught, stopped
3  and red flagged and not released until or
4  something like that.
5      Are you talking about at the pharmacy level,
6  or were you talking about at HBC?
7      A.  At HBC if it was a large order.
8      Q.  Tell me how prior to 2014 any large
9  order was caught and stopped before it was
10  shipped.
11      A.  If there was an order that was out of
12  the norm for that product line, the person at the
13  warehouse would flag that as this is not a normal
14  order that I pick.  Since they're picking every
15  day, they know, okay, is it one bottle a day --
16  one bottle per store.  If I get an order come
17  through for 20 bottles, this doesn't match norm.
18  I'm going to question it.  And that's where the --
19  it would stop that order until it was confirmed.
20      Q.  Are those the people that some people
21  called the pickers at the warehouse?
22      A.  That might be what their title was, but
23  they were essentially picking product at the
24  warehouse.
25      Q.  Do you remember who those individuals

Page 147

1  were that you were relying on to identify orders
2  that were out of the ordinary?
3      A.  -- Christy Hart was one of them at the
4  time.
5      Q.  Christy Hart?
6      A.  Christy Hart.  She was kind of the lead
7  person there from the beginning, one of the people
8  that I was in contact with.  I don't know if she
9  was like the lead picker or what her title was.  I
10  know she had gotten promoted along the way.  But
11  she would be kind of the contact person at first.
12      But then the rest of that team and in
13  reference to the products we're discussing, there
14  were only certain individuals that could get
15  within the cage.
16      Q.  Those are the people I want to know.
17  Christy Hart?
18      A.  Yeah.  I don't know the names.  I can't
19  recall the names of the other folks.
20      Q.  But you were confident in those folks to
21  let you know or let someone know, whether it be
22  Mr. Millward, Mr. Chunderlik or you, know if they
23  thought there was an order that was out of the
24  ordinary?
25      A.  Yeah.  They would red flag most likely

Page 148

1  me first.  If I'm not available, they would
2  contact somebody that could get in touch with me.
3      Q.  Do you know what training those
4  individuals underwent, if any, to help them
5  determine what should be considered an order out
6  of the ordinary between 2009 and 2014?
7      A.  I don't know of any specific training
8  classes, so to speak.  It was just, more or less,
9  an experience level.
10      Q.  Do you think training would have been a
11  good idea for those individuals that you were
12  relying on to identify orders that were out of the
13  ordinary, as you say?
14      MR. BARNES:  Object to form.
15      THE WITNESS:  That's part of their
16  ongoing hands-on training.  Again, I didn't put
17  the training for pickers together, so I'm not sure
18  what was covered with them as far as that goes.
19  BY MR. ROTTINGHAUS:
20      Q.  Do you think a written policy would have
21  been a good idea during that timeframe, 2009 to
22  2014, to help those individuals that you were
23  relying on to identify orders that were out of the
24  ordinary before they went out?
25      MR. BARNES:  Object to form.

Page 149

1      THE WITNESS:  Not necessarily.
2  BY MR. ROTTINGHAUS:
3      Q.  So you don't think it would be a good
4  idea?
5      A.  I don't think -- looking back, I don't
6  know if it would be a good idea or a bad idea.  We
7  didn't have any issue with it.  We were very good
8  with the process.  Never had any large orders slip
9  through.  So I think the procedure that we had in
10  place was sufficient.
11      Q.  You say you never had any large orders
12  slip through.  What did you consider to be a large
13  order?
14      A.  It depended on the product.  You
15  couldn't make a determination broadly.  It was
16  what's the normal for this.  That would kind of
17  classify as, you know, whatever the
18  classifications are as far as a large order.
19      Q.  You understood that as early as 2008,
20  some companies, some distributors were using
21  thresholds at least to help them identify some
22  orders that might be out of the ordinary?
23      MR. BARNES:  Object to form.  Lack of
24  relevance.
25      THE WITNESS:  Timeline-wise I'm not

Page 150

1 certain, but I do remember threshold emails coming
2 from McKesson.
3 BY MR. ROTTINGHAUS:
4    Q.   And actually threshold criteria started
5 to get set for HBC as of 2013; is that right?
6    A.   There was a report created, an automated
7 report created at that time.
8    Q.   Whose idea was it to create that report?
9    A.   I'm not sure who came up with the idea,
10 but it was a team that kind of worked on how do we
11 come up with a process to do that.
12    Q.   Why was the team trying to come up with
13 a process to identify thresholds at HBC warehouse?
14    A.   We were trying to enhance and improve
15 our process along the way.
16    Q.   The process of identifying orders that
17 might be in excess of ordinary?
18    A.   It would be targeting not orders
19 specifically.  Thresholds don't catch one order.
20 Thresholds capture patterns of orders.  So one
21 large is not, unless it exceeds the threshold, is
22 not going to be caught by the threshold.
23    Q.   What if it exceeded the threshold, what
24 did you expect to happen?
25    A.   The order would be investigated.

Page 151

1    Q.   How would it be investigated?
2    A.   There would be a number of people that
3 would find out what was going on with that store
4 in particular that would do -- down at the PDL
5 level, district leader level investigating what
6 was going on at that particular store.
7    Q.   So this level started below you where
8 the investigation would start?
9    A.   Below me and the operations department
10 would go and look at what's going on in the store.
11    Q.   That's what I want to understand, is
12 what your system was, who the people were that
13 were eyeing these threshold reports and then
14 reporting to whoever they reported to if there
15 were orders exceeding thresholds and then what due
16 diligence was done.
17    A.   So the overall security efforts of the,
18 you know -- to meet the needs of this particular
19 act or regulation encompassed many different parts
20 of the whole process.  So it would be -- we looked
21 at ourselves as a self distributor.  We had owned
22 the product, and we're basically handing it off to
23 another location within our chain.
24       Unlike a wholesaler, which is selling to a
25 new customer, a different customer, self

Page 152

1 distribution, we knew our customers because they
2 were us.  So we were very familiar with our
3 customers.  We knew exactly what was going on.
4 Each of these prescriptions were dispensed with a
5 valid prescription.  So those were kind of the
6 added security measures that met the needs of the
7 requirement.
8    Q.   Are you able to sit here under oath
9 today and tell us that every one of the
10 prescriptions that HBC warehouse filled were
11 filled with a valid prescription?
12       MR. BARNES:  Object to form.
13       THE WITNESS:  The HBC warehouse filled?
14 BY MR. ROTTINGHAUS:
15    Q.   Yes.
16    A.   You mean the product coming from HBC
17 warehouse?
18    Q.   Yes.
19    A.   I can't state, you know, something like
20 that.
21    Q.   I thought I heard you say that.  I
22 understand that you can't say that.  I'm just
23 wondering -- if you're able to say it, I wonder
24 how.
25    A.   We act under the guise that our process

Page 153

1 is very tight.  Can I state that when there's
2 human beings involved that every prescription was
3 completely valid?  I can't say that.
4       (HBC-Carlson Exhibit 15 was marked.)
5 BY MR. ROTTINGHAUS:
6    Q.   Let's look at some of the -- let's look
7 at the process that existed for HBC and Giant
8 Eagle from 2009 through 2014.  I'm going to refer
9 you to some exhibits again.  The first exhibit I'm
10 showing you is marked Exhibit 15.
11       MR. ROTTINGHAUS:  And it's reference
12 103.
13 BY MR. ROTTINGHAUS:
14    Q.   I know this is a multiple-page exhibit.
15 I'm going to be referring to the first page, but
16 look at whatever you need to look at.  At the
17 bottom third of the first page of Exhibit 15,
18 there's an email from someone seemed Sabrina Cook
19 who appears to be from McKesson.  That email is
20 going to you; correct?
21    A.   Yes.
22    Q.   And she states, "Greg, below are stores
23 that are at least 80 percent or above their
24 thresholds.  Please review and let me know if
25 there's a business reason for an increase."

Page 154

1    She then goes on to say they have seven
2  business days before all thresholds get reset;
3  correct?
4    A.  Correct.
5        MR. BARNES:  Tom, I'm going to interject
6  an objection and ask that you agree it be
7  continuing in that any questions or exhibits
8  related to how McKesson was operating its
9  threshold systems for drugs directed to our
10  pharmacies is not relevant to HBC who is the sued
11  defendant here.  So you're really inquiring about
12  somebody else's threshold system as opposed to
13  HBC's controls.
14        MR. ROTTINGHAUS:  So what's the
15  objection?  Insufficient foundation?
16        MR. BARNES:  Well, it's lack of
17  relevance.
18        MR. ROTTINGHAUS:  Yeah, you can have a
19  continuing objection if that's what you want.
20  BY MR. ROTTINGHAUS:
21    Q.  Then underneath that email from her is a
22  list of several products that appear to be
23  referenced by her as 80 percent or above their
24  thresholds.
25    A.  Yes.

Page 155

1    Q.  Including several hydrocodone products.
2    A.  Yes, and oxycodone and alprazolam.
3    Q.  Several of these were at the time
4  Schedule III or Schedule III substances?
5    A.  Alprazolam was Schedule IV, hydrocodone
6  III, oxycodone was a II.
7    Q.  And these were all going to Giant Eagle
8  stores?
9    A.  Correct.
10    Q.  And then you give her a response on that
11  same day it appears; is that right?
12    A.  Yes.
13    Q.  And you say, "Sabrina, we need to bump,"
14  and then you list several stores, "up by
15  20 percent due to high volume growth.  These are
16  all either new stores or stores running promotions
17  causing increased volume"; correct?
18    A.  Correct.
19    Q.  Now, where at your level or at your
20  team's level is there any documentation that there
21  has been any investigation done with any of these
22  stores to determine why they are ordering higher
23  than normal levels of each of these substances?
24    A.  Where is the documentation?
25    Q.  Yes.

Page 156

1    A.  I'm not sure.
2    Q.  Do you know if there is any
3  documentation?
4    A.  I'm not sure if there's saved
5  documentation, but there would have been a process
6  to obtain the information.
7    Q.  I'm assuming Ms. Cook was probably on
8  east coast time.
9    A.  Yes.
10    Q.  And then you were, I'm assuming, on --
11    A.  No.  She was on Central time.
12    Q.  That's why the time is a little bit --
13    A.  In Texas.
14    Q.  But it does appear that within about one
15  hour of her email you responded; right?
16    A.  Correct.
17    Q.  Do you think you would have had within
18  that hour enough time to call whoever you needed
19  to call on your team to have them investigate each
20  of these different stores to determine why their
21  orders were up during that timeframe?
22    A.  I don't remember what my process was for
23  this case.  But some of these stores may have had
24  the same district leader that I would have reached
25  out to.

Page 157

1    The other thing I would have used is our
2  other reporting system to show prescription growth
3  and volume growth at the time.
4    That's what I was working from was to see
5  just my overall knowledge of our own customers so
6  I know that these particular stores at this time
7  were either new stores, had acquisitions of other
8  pharmacies, it could have been multiple reasons.
9  But I don't have -- I couldn't remember back to
10  2008 to say why store 4078 in particular was up.
11    Q.  And, similarly, you don't have any
12  documentation or ability to tell us if you made
13  any calls or did any inquiry to find out, for
14  example, if store 4078 was prescribing to a number
15  of patients who listed the same address as their
16  residential address or who were seeing the same
17  doctor; is that right?
18        MR. BARNES:  Object to form.  I think it
19  misstates the evidence with respect to who may
20  have or may not have documentation.
21        THE WITNESS:  I don't -- I can't answer
22  that without --
23        (HBC-Carlson Exhibit 16 was marked.)
24  BY MR. ROTTINGHAUS:
25    Q.  Let me show you Exhibit 16.

Page 158

1     MR. ROTTINGHAUS:  Reference number 102.
2  BY MR. ROTTINGHAUS:
3     Q.   Again, this is, I think, a three-page
4  document. I'm going to refer, starting out, to
5  the second of three pages where there's another
6  email to a Sabrina Cook on Monday, February 23 at
7  10:12 a.m.
8     A.   Yes.
9     Q.   So let's go to page 2 of this document.
10  It appears that, once again, she's referencing
11  stores, she says, that have already hit above
12  90 percent of their thresholds, and she says, let
13  me know if there's a business reason for an
14  increase; is that right?
15     A.   Yes.
16     Q.   And she lists a couple of hydrocodone
17  products there?
18     A.   Yes.
19     Q.   And then I don't mean to skip through
20  emails, but in the interest of time, if you don't
21  mind, go to the first page because there's a
22  response from you at the bottom.
23     Are you able to read that?
24     A.   Yes.
25     Q.   And you say -- and I think you're

Page 159

1  responding to Ms. Cook; is that right?
2     A.   Yes.
3     Q.   You say, "Strictly a massive increase in
4  volume due to the new location drawing more
5  customers"; is that correct?
6     A.   That's what that says, yes.
7     Q.   Are you aware of whether you made any
8  calls or did any inquiry or asked your team
9  members to do any inquiry to make sure that there
10  was not any other reason for the increase in
11  volume?
12     A.   I'm not sure what took place back in
13  2009. I see Don Casar copied on that email. I
14  don't know if that was one of his stores at the
15  time or why I would have copied him. But he could
16  have been -- he was a PDL at one point in time.
17     Q.   Are you aware of any inquiry that was
18  done that day to find out what the distance was
19  from that pharmacy to the nearest doctor and how
20  many patients were bringing in prescriptions for
21  hydrocodone products from the same doctor?
22     MS. CHARLES:  Object to form.
23     MR. BARNES:  I'll also object to form.
24  You're getting into dispensing type questions that
25  these emails would not reference.  So under the

Page 160

1  discovery rulings, I think dispensing information
2  is not relevant.
3     MR. ROTTINGHAUS:  That's not what I'm
4  trying to get into.
5  BY MR. ROTTINGHAUS:
6     Q.   Do you know -- what my question is:  Did
7  you make any call to your knowledge or do any
8  inquiry to your knowledge before responding that
9  it was strictly for a massive increase in volume
10  to make sure that there was not any activity
11  taking place that might raise the question of
12  whether some of these orders were suspicious
13  orders?
14     A.   I don't recall what I did in 2009.
15     (HBC-Carlson Exhibit 17 was marked.)
16  BY MR. ROTTINGHAUS:
17     Q.   We talked before about -- I think we
18  talked -- we called them both threshold reports
19  and daily control reports.  I'm going to show you
20  Exhibit 17.
21     MR. ROTTINGHAUS:  The internal reference
22  number on that I think is 1052.
23  BY MR. ROTTINGHAUS:
24     Q.   I will represent to you, sir, that
25  Mr. James Tsipakis gave testimony on behalf of the

Page 161

1  company about one month ago, and he gave us some
2  information about these reports that are at least
3  labeled on the front page of Exhibit 17 as daily
4  HBC controls.
5     A.   Okay.
6     Q.   And it was his testimony that these
7  reports started reporting on a daily basis
8  thresholds that exceeded three times the 12-month
9  average prior to this order date for HBC and that
10  these came out every day.
11     Do you have any memory of seeing any
12  documents like Exhibit 17?
13     MR. BARNES:  I'm going to object to the
14  form to the extent it misstates Mr. Tsipakis'
15  testimony.
16     THE WITNESS:  Can you restate the
17  question? I'm sorry.
18  BY MR. ROTTINGHAUS:
19     Q.   Let me ask you this:  Did you receive
20  these daily reports?
21     A.   I received a lot of reports.  Just
22  looking at it visually, I'm not sure if this is
23  one of them, but, I mean, we had a number of auto
24  generated reports that came out daily.
25     Q.   Did you have any responsibility for

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  monitoring these reports on a daily basis to find
2  out why some of these medications were exceeding
3  thresholds on a daily basis?
4      MR. BARNES: Object to form.
5      THE WITNESS: Did I have any
6  responsibility did you say?
7  BY MR. ROTTINGHAUS:
8      Q. Yes.
9      A. We had some folks that were looking at
10 this.
11     Q. Was it you?
12     A. I received a copy of it. Was it my
13 responsibility to act on it? No.
14     Q. Whose was it?
15     A. I don't know at the time who was looking
16 at these.
17     Q. Were these reports that were instituted
18 for the benefit of your team that was monitoring
19 compliance with the Controlled Substances Act
20 between 2009 and 2014?
21     MR. BARNES: Object to form.
22     THE WITNESS: Can you state that again?
23 BY MR. ROTTINGHAUS:
24     Q. Were these reports prepared at the
25 direction or request of someone on your team that

Page 163

1  was monitoring compliance with the Controlled
2  Substances Act to make sure that HBC warehouse was
3  indeed complying with the Controlled Substances
4  Act?
5      MR. BARNES: Object to form.
6      THE WITNESS: This report was created to
7  enhance the current process. So I'm not sure
8  whose direction it was to create the specific
9  report.
10 BY MR. ROTTINGHAUS:
11     Q. As I understand it, when these reports
12 were generated and sent out, they were giving
13 reports on products that had already been shipped
14 to the Giant Eagle pharmacies. And that's from
15 the testimony of Mr. Tsipakis so that you know.
16     Is that your understanding as well?
17     MR. BARNES: Object to form.
18     THE WITNESS: That this is reporting
19 shipped out quantities?
20 BY MR. ROTTINGHAUS:
21     Q. Yes.
22     A. It appears to be stating shipped out.
23     Q. In fact, it even says total. If you
24 read the abbreviation, it looks like it says total
25 shipped quantity and it gives a number.

Page 164

1      A. Correct.
2      Q. So these reports were coming to you or
3  whoever on your team after these products were
4  shipped out; correct?
5      A. Correct.
6      Q. Which means even if there was an order
7  that exceeded thresholds and raised some question
8  in someone's mind as to whether it might be a
9  suspicious order, that product had already gone
10 out to one of the pharmacies; correct?
11     A. Product would still be within our
12 possession at the store level.
13     Q. Not at the HBC level though; right?
14     A. Correct.
15     Q. If you look at this document a little
16 closer, and assuming this is a daily threshold
17 report, does it appear to you that there were
18 several stores that were receiving hydrocodone
19 combination products in excess of the threshold?
20     A. I'm not sure what that threshold is
21 based off of. So in looking at that, I can tell
22 you that those bottom stores were higher volume
23 stores in general.
24     Q. Tell me which stores they were and what
25 location since you know. Let's start with 8041.

Page 165

1      A. 8041? Where is 8041?
2      Q. I'm sorry. Forgive me. 52.
3      A. 52 is Camp Horne Road.
4      Q. Where is that?
5      A. That's north of Pittsburgh here.
6      MR. BARNES: Can we have a continuing
7  objection to the extent these are outside the Case
8  Track 1 jurisdiction?
9      MR. ROTTINGHAUS: Sure.
10 BY MR. ROTTINGHAUS:
11     Q. How about 6301?
12     A. That's Sarver. So that's one where --
13 that one probably would have been investigated. I
14 don't know.
15     Q. Why would it be investigated?
16     A. That's not, you know, within the range
17 of those other stores.
18     Q. It's a little higher?
19     A. It's a little higher.
20     Q. What you would expect is someone from
21 your team to at least look at that at some point
22 and say let's figure out why we're exceeding
23 thresholds here?
24     A. That would be the process.
25     Q. That's what you would expect of your

Page 166

1 team?
2     A.  Yes.
3         (HBC-Carlson Exhibit 18 was marked.)
4 BY MR. ROTTINGHAUS:
5     Q.  I'm going to show you what's been marked
6 as Exhibit 18.  So if we look at Exhibit 18, it
7 appears to be an email dated July 30, 2013.
8     A.  Yes.
9     Q.  There's an email from one of the
10 pharmacy team leaders.  I'm assuming that means
11 it's on behalf of one of the stores?
12     A.  Yes.
13     Q.  Is it store 1217?
14     A.  Yes.
15     Q.  Where is that located?
16     A.  Ohio somewhere.
17     Q.  And it says, "Hi, Greg.  We have hit our
18 oxycodone threshold yet again!!"  Then it says,
19 "(I can't believe it)."  It then states, "It has
20 caused us to be short this week on a handful of
21 products.  What steps do we need to take to have
22 it increased again?"
23     Then it looks like you responded at
24 approximately 3:48.
25     A.  Yes.

Page 167

1     Q.  And you say, "Please review with
2 your" -- is it pharmacy district leader?
3     A.  Yes.
4     Q.  Do you know who the pharmacy district
5 leader was for that pharmacy?
6     A.  Not at this date I don't.
7     Q.  You say, "They can have it adjusted.  It
8 will reset Thursday."  Is that right?
9     A.  Yeah.  My point there, the context was
10 it's going to reset on Thursday anyways.  If they
11 wanted to review this threshold issue, they could
12 talk to their PDL about it.
13     Q.  Because you're expecting one of the
14 pharmacy district leaders as part of your team to
15 investigate why this threshold might be going so
16 high; is that right?
17     A.  Correct.
18     Q.  It's not something you're doing
19 personally, Mr. Carlson.  You're expecting other
20 members of your team to do that.
21     A.  At this point, we had a process for the
22 PDLs to review it.
23     Q.  And you would have expected your PDL to
24 review that process; correct?
25     A.  If this store felt they needed an

Page 168

1 increase.
2     Q.  Well, the way you read that email, it
3 says, "We have hit our oxycodone threshold yet
4 again!!"
5     Do you have any gut reaction as to whether
6 they were suggesting the threshold -- that the
7 order was in excess of threshold and somebody
8 needed to look?
9         MR. BARNES:  Object to form.
10        THE WITNESS:  I'm not certain based on
11 this, you know, what was going on in this case.
12 It doesn't look like I was the one following up on
13 it, so I don't know what was going on with this
14 store.  This was a McKesson order, not an HBC
15 order, and I'm not sure how McKesson sets their
16 thresholds by store.
17    (HBC-Carlson Exhibits 19 - 20 were marked.)
18 BY MR. ROTTINGHAUS:
19     Q.  I'm going to show you Exhibits 19 and
20 20, and I'm going to ask, if we can, to put these
21 together and I'm going to explain to you why.  I
22 think Exhibit 19 and Exhibit 20 are both part of
23 the same email chain, but they were emails going
24 in different directions without copying everyone,
25 so there were different people on each email.

Page 169

1         MR. ROTTINGHAUS:  So the reference
2 numbers are 1200 and 1162.
3 BY MR. ROTTINGHAUS:
4     Q.  If we go to 1162, the second page -- are
5 you with me on 1162?
6     A.  Yes.
7     Q.  On the second page there's an email from
8 you on Monday, September 9, and that's at
9 11:49 a.m.
10     A.  Yes.
11     Q.  And I think on Exhibit 19, that same
12 email shows up on the front page, but we'll just
13 start here, if we can.  I want you to have a
14 chance to read it.
15     A.  Okay.
16     Q.  Are you with me?
17     A.  Yes.
18     Q.  Your email is to Mike and Allen.  That's
19 Mike Bianco and Allen Lowther; right?
20     A.  Right.
21     Q.  And you say, "I would like to explore
22 our options around sourcing controls other than
23 HBC."  And then you mentioned a couple or a few
24 options you're thinking about; is that right?
25     A.  It appears to be, yes.

Page 170

1    Q.   Then you say to Allen, "Can you reach
2  out to Eric at HEB."
3    Do you know what HEB is?
4    A.   That's a grocery chain out in Texas,
5  down in Texas.
6    Q.   Is it kind of a --
7    A.   It's a large regional chain similar to
8  Giant Eagle.
9    Q.   Kind of a sister type of chain that you
10 think about things the same way?
11   A.   That yes.  And at this time, we were
12 part of the buying group with them.
13   Q.   So you asked him to reach out to Eric at
14 HEB and ask him how they handle suspicious order
15 monitoring to meet federal requirements; is that
16 right?
17   A.   Yes.
18   Q.   So at this point in time, is there in
19 your mind some question as to whether HBC is doing
20 what it needed to do to meet federal requirements
21 with respect to handling suspicious order
22 monitoring?
23   A.   I think at this point, I was just
24 looking again to find ways to enhance our process
25 and make sure that -- I always liked to look at

Page 171

1  what others did.  And if it was something that
2  made sense for us to do, to do it as well.
3    Q.   You ask Kris -- and I'm kind of
4  paraphrasing just in the interest of time.  You
5  say, "If a store hit a threshold on hydrocodone,
6  could we go in and block that store from ordering
7  those products until the month resets?"
8    And then you mention that you'd like to get
9  answers in the next couple of weeks; is that
10 right?
11   A.   Yes.
12   Q.   So at least at that point in time, in
13 September of 2013, you weren't sure exactly what
14 the process was on whether you or HBC could block
15 a store from ordering additional hydrocodone
16 products if they already had hit their threshold?
17   A.   This was just inquiring into additional
18 functionality using technology to kind of block
19 orders.
20   Q.   But does it appear to you from reading
21 these, that at least as of September of 2013, you
22 were not sure as to whether HBC could go in and
23 block a store that had ordered in excess of its
24 threshold on hydrocodone until the next month?
25   MR. BARNES:  Object to form.

Page 172

1    THE WITNESS:  I can't recall why I asked
2  the question or what I was looking at.
3  BY MR. ROTTINGHAUS:
4    Q.   If we go to the first page of
5  Exhibit 20, which is 1162.  And forgive me.  If
6  you need to refresh -- actually, on the second
7  page of Exhibit 20, 1162, at the top, there's
8  email from Kris Remas.
9    A.   Yes.
10   Q.   To Valerie McGregor.
11   A.   Um-hum.
12   Q.   They're both HBC folks?
13   A.   Valerie was more on the IT side of
14 things, yeah.
15   Q.   So Kris asks Val, "Does Biceps or DCOPS
16 have any functionality that would allow us to
17 block a store from order of product in a certain
18 subgroup" and then goes on to mention hydrocodone;
19 correct?
20   A.   Yeah, as an example.
21   Q.   Let's go to the first page of this
22 Exhibit 20.  And we see that Valerie gives a
23 response.  And according to Valerie, there is
24 nothing in the system that would permit an edit
25 like this right now; is that right?

Page 173

1    A.   That's what she states.
2    Q.   And I don't mean to skip over anything.
3  If you think it's important, we'll review the
4  whole thing, but at the bottom of that email, she
5  says, "Sorry.  Right now this would be a manual
6  process.  There is no systematic way to run these
7  reports and authorize or reauthorize stores for
8  items"; is that right?
9    A.   That's what she states, yes.
10   Q.   Was that news to you at the time?
11   A.   I'm assuming, yeah, because we asked the
12 question.
13   Q.   So you actually responded after that
14 because Kris sent the email to you as an FYI;
15 correct?
16   A.   Yes.
17   Q.   And it looks like you're still trying to
18 make sure you understand the process.
19   A.   I think I'm giving her another solution
20 where we would load in RP.  Yeah.  I can't
21 remember what -- RP was a different system, and it
22 must have been another way to kind of do a manual
23 block.
24   Q.   Okay.  Let's go to Exhibit 19, reference
25 No. 1200, on the first page.  I think you're going

Page 174

1 to see where maybe the recipients on this email
2 chain are diverging a little bit because it's the
3 same question.
4    And then Allen Lowther in the middle of that
5 email sends an email to you on September 19
6 saying, "Did you talk to Wingerter about this?"
7 And he says, "Carolyn said they just implemented a
8 new system in the last couple of weeks."
9    Do you know what that system was?
10    A.  I think it's the one where in my
11 response I said -- he said they're still building
12 it and not implementing it, but I think it was
13 some type of -- it might have been a threshold
14 report that they were building.
15    Q.  And, in fact, Mr. Tsipakis on behalf of
16 HBC told us that it was October of 2013 that the
17 daily controls started getting reported.
18    Do you believe most likely this email is
19 referencing the daily controls that were then
20 reported subsequently?
21    MR. BARNES:  Object to form.  Calls for
22 speculation.
23    THE WITNESS:  I don't think -- I don't
24 think this was referring to that report.  I think
25 this was us trying to get information from our

Page 175

1 share group members.
2 BY MR. ROTTINGHAUS:
3    Q.  We talked before a little bit about what
4 Exhibit 3, Section 1301.74, talks about in terms
5 of the duty of a distributor to design and operate
6 a system to disclose to the registrant suspicious
7 orders of controlled substances; right?  We talked
8 about that?
9    A.  Yes, we have.
10    Q.  And you've told us about some of the
11 systems or parameters that you thought you had in
12 place at HBC warehouse; correct?
13    A.  Yes.
14    (HBC-Carlson Exhibit 21 was marked.)
15 BY MR. ROTTINGHAUS:
16    Q.  When we deposed Mr. Tsipakis and sent
17 some written questions to HBC warehouse in this
18 litigation, we asked about the existence of any
19 written suspicious order management policy, and we
20 were given responses, which I'm going to show you,
21 and your attorney can help you in finding it if
22 you need to.  But I'll represent to you the
23 response was that with respect to a written
24 suspicious order management policy, there was one
25 in effect in 2015 that revised a 2014 policy.  And

Page 176

1 we have been provided with that policy, which I'm
2 going to show you in a minute.
3    My question for you right now is:
4 Understanding that the company has told us that
5 the written -- again, written is what I'm
6 emphasizing -- suspicious order management policy
7 in place was dated 2014, sitting here today under
8 oath, are you aware of any written suspicious
9 order management policy that existed prior to 2014
10 for HBC?
11    MR. BARNES:  Object to form.
12    THE WITNESS:  I can't tell you that I
13 know of a specific written policy for suspicious
14 order monitoring.
15 BY MR. ROTTINGHAUS:
16    Q.  And, again, you've told us, and just to
17 make sure I leave here today understanding how it
18 worked, you weren't the one that drafted the
19 policies for compliance at HBC anyway; is that
20 right?
21    A.  I didn't draft the specific policy, no.
22    (HBC-Carlson Exhibit 22 was marked.)
23 BY MR. ROTTINGHAUS:
24    Q.  I'm going to give you Exhibit 22.
25    MR. BARNES:  You don't have questions on

Page 177

1 21?
2    MR. ROTTINGHAUS:  I just had it in case
3 he needed to refer to it.
4 BY MR. ROTTINGHAUS:
5    Q.  Before we get to Exhibit 22, let me just
6 make sure I understand, because this has been a
7 question we've asked of everybody.  Again, if
8 there was -- to your knowledge, there was no
9 written suspicious order management policy prior
10 to 2014 for HBC?
11    A.  To my knowledge, I can't confirm that.
12    Q.  You're saying --
13    A.  I don't know if there was a written -- I
14 don't remember a written policy around suspicious
15 order monitoring specifically.
16    Q.  Prior to 2014?
17    A.  Correct.
18    Q.  Exhibit 22 appears to be an email dated
19 January 22, 2014 from Mr. Millward to you, to
20 Mr. Chunderlik and to Mr. Voyten; is that correct?
21    A.  Yes.
22    Q.  And then Mr. Mollica and Mr. Bianco are
23 also copied on this email?
24    A.  Yes.
25    Q.  The email states, "Shawn and Greg, are

Page 178

1 we reporting PSE (a listed chemical) sales from
2 HBC to the stores monthly?"
3        MR. ROTTINGHAUS: This is reference
4 No. 1132. I'm going to let our exhibit person
5 catch up with us here. We're at the top, the
6 first portion there.
7 BY MR. ROTTINGHAUS:
8    Q. Do you see where I'm reading from,
9 "Shawn and Greg"?
10    A. Yes.
11    Q. And it's on that paper, too.
12    A. Right.
13    Q. So Mr. Millward says, are we reporting
14 PSE sales from HBC to the stores monthly? He then
15 says, "I assume it is through ARCOS to comply with
16 21 U.S.C. Section 830(b). Are the records being
17 retained for two years?" Correct?
18    A. Yes.
19    Q. And then he states, we need to lock down
20 SOM SOP ASAP; correct?
21    A. Yes.
22    Q. What do you interpret SOM to stand for,
23 since this email is coming to you?
24    A. It looks like it would be suspicious
25 order monitoring.

Page 179

1    Q. And then would SOP potentially be
2 suspicious order policy?
3    A. I would think either standard operating
4 procedure or in here it says summary of program.
5    Q. Okay. So he's saying we need to lock
6 down a suspicious order -- you said monitoring --
7 management or monitoring policy or standard
8 operating procedure ASAP?
9    A. That's what he's stating.
10    Q. And, obviously, we know what ASAP means.
11    A. Yeah, right.
12    Q. So is that your understanding, that he's
13 trying to raise the belief that the company, HBC,
14 needs to get a suspicious order management policy
15 in place?
16        MR. BARNES: Object to form.
17        THE WITNESS: I'm not sure because he
18 throws Sudafed into this mix, which is PSE. So I
19 don't know what the context of this questionnaire
20 is referring to, if he's referring to buying
21 Sudafed or some other products.
22 BY MR. ROTTINGHAUS:
23    Q. So you do think SOM stands for
24 suspicious order management?
25    A. Based on the letters that I know, that

Page 180

1 would most likely be the case.
2        MR. BARNES: I would interpose an
3 objection that this is not opioid related.
4 BY MR. ROTTINGHAUS:
5    Q. Did you have any disagreement that you
6 recall with Mr. Millward about whether there was a
7 need to get a suspicious order management or a
8 suspicious order monitoring policy in place ASAP?
9    A. I don't remember a disagreement with
10 Mr. Millward about it.
11    Q. You would have no reason to disagree if
12 that's what he thought, would you?
13        MR. BARNES: Object to form.
14        THE WITNESS: It depends on the context.
15 I'm not sure what he's saying, what he means by
16 this, if he just needs something in writing to
17 provide to Qualitest outside of what we already
18 had in place. I don't -- I can't tell from this
19 email what he actually means here.
20 BY MR. ROTTINGHAUS:
21    Q. What you do know is it's an email that's
22 addressed to you, Mr. Chunderlik and Mr. Voyten?
23    A. Correct.
24    Q. And do you know whether you responded
25 with a question of him as to what he meant?

Page 181

1    A. I don't. Do you have an email of my
2 response?
3    Q. We've asked for emails. And we've got
4 what we've got. I don't believe we have a
5 response to that.
6    A. So I'm not sure how I responded to this,
7 if I even -- I can't even confirm that I saw this.
8    Q. Well, it would have gone into your
9 inbox; right?
10    A. It would have gone into my inbox, yes.
11    Q. Presumably, at some point, you would try
12 to see an email if it comes into your inbox?
13    A. I try to read every single one of them.
14    Q. I know it's hard to catch up sometimes.
15 But at some point, if you had a concern about what
16 he was saying, you would either email him back or
17 talk to him about it; right?
18    A. Correct.
19    Q. You don't remember ever saying to him, I
20 disagree with you that we need to get a suspicious
21 order management policy in place?
22    A. We had conversations over the years
23 about enhancing our processes including suspicious
24 order monitoring. But specific to this particular
25 context, I can't provide any context to this.

Page 182

1    Q.  So you're now four and a half or close
2  to five years into the process of distributing
3  hydrocodone combination products from HBC
4  warehouses to multiple Giant Eagle pharmacies;
5  correct?
6    A.  Correct.
7    Q.  And at least it appears from this email
8  that Mr. Millward is saying we need to lock down a
9  suspicious order management policy.
10      MR. BARNES:  Object to form.  The
11  witness has already stated it relates to Sudafed.
12      MR. ROTTINGHAUS:  That misstates the
13  testimony.  It's just an interjection trying to
14  coach the witness.
15      MR. BARNES:  No, I'm not.  He said it
16  first.
17      THE WITNESS:  I don't -- like I said, I
18  don't know the context of what he's asking with
19  those letters.  I don't even recall this
20  particular email.  So it's hard for me to assume
21  what Joe Millward was saying.
22  BY MR. ROTTINGHAUS:
23    Q.  As someone in charge of the team that
24  was responsible for compliance, however, you would
25  want Joe to look into this issue if he thought it

Page 183

1  was an issue that the company needed to get a
2  suspicious order management policy?
3    A.  When this email took --
4      MR. BARNES:  Object to form.
5      THE WITNESS:  Joe did not report to me
6  at this time.
7  BY MR. ROTTINGHAUS:
8    Q.  Who did he report to?
9    A.  Anthony Mollica, who's on this email.
10    Q.  So are you saying that it would be
11  Anthony that you would expect to follow up with
12  Joe with regard to any concerns or thoughts that
13  Joe was expressing about this?
14    A.  He may have.
15    Q.  And, again, it's your testimony that not
16  only you, but Anthony and you worked together to
17  oversee compliance for the company?
18    A.  Yeah, in different components, yes.
19    Q.  Well, with respect to the component of
20  implementing a suspicious order management policy,
21  whose responsibility was that and who did that
22  fall under?
23    A.  Well, it would -- again, you refer to
24  this particular email.  I can't answer in
25  that directive.

Page 184

1    Q.  That's a different question.
2    A.  Are you asking a different question?
3    Q.  Yeah.  You don't need to look at the
4  email for this question.
5      With respect to the decision to implement a
6  written suspicious order management policy in
7  2014, four and a half or five years after
8  hydrocodone combination products were getting
9  distributed, whose decision was that and whose
10  responsibility was that?
11    A.  I think it was obviously Joe being in
12  charge of compliance felt we should write
13  something down.  I don't know who made the
14  ultimate decision to do so.
15    Q.  Did either you or Mr. Mollica have to
16  approve it if you wanted to implement a suspicious
17  order policy in writing?
18    A.  It would go through our process to
19  create a policy.
20    Q.  And you don't have any memory about that
21  process?
22    A.  Like I had mentioned I think earlier,
23  policies would be put together by a group of
24  people.
25    Q.  Right.

Page 185

1    A.  Including legal, the legal team
2  involvement and things like that.
3    Q.  I'm talking about just the suspicious
4  order management policy that was put into effect
5  at least as of 2015, if not 2014.  Do you know
6  whose responsibility that fell under?
7    A.  In 2014?  What part of 2014?
8    Q.  We'll look.
9    A.  Again, it depends on when Mr. Mollica
10  left the company.
11    Q.  August 1, 2014 under whose
12  responsibility would the implementation of a
13  written suspicious order management policy have
14  been under?
15    A.  In August of 2014?
16    Q.  Yes.
17    A.  Was Mr. Mollica still with the company?
18    Q.  No.
19    A.  Again, I'm not sure who would be
20  responsible for --
21    Q.  Is it possible it would be you?
22    A.  It's possible.
23    Q.  You took over for Mr. Mollica as VP of
24  pharmacy operations, I believe, around March of
25  2014.

Page 186

1    A.  It could be.
2    Q.  So at least if it was between March of
3  2014 and August of 2014 that the implementation of
4  a suspicious order policy was put in place, that
5  would have been under you?
6        MR. BARNES:  Object to form.
7        THE WITNESS:  Again, it wasn't one
8  person that set a policy.  So would it have fallen
9  under me?  Approved by me?  I didn't approve
10  policies.  Policies were approved by committee.
11  BY MR. ROTTINGHAUS:
12    Q.  You didn't draft them either?
13    A.  I didn't draft any particular policy.  I
14  was involved in the process.
15    Q.  And it appears that you weren't
16  spearheading -- from documents I've seen, I don't
17  see anything to indicate that you were personally,
18  Mr. Carlson, spearheading the drafting and
19  implementation of a written suspicious order
20  policy for HBC; is that correct?
21    A.  Can you rephrase the question?
22    Q.  Sure.  From my review of the documents
23  that have been given to us, from the testimony of
24  the witnesses, from your own testimony today, it's
25  my understanding that you, Mr. Carlson, would not

Page 187

1  have been the individual responsible for the
2  creation and implementation of a written
3  suspicious order management policy for HBC in
4  2014.
5        MR. BARNES:  Object to form.
6        THE WITNESS:  Do you mean the one which
7  was actually put into place?
8  BY MR. ROTTINGHAUS:
9    Q.  Yes.
10    A.  Again, I don't know how to answer that
11  question because it wasn't something that I --
12        (HBC-Carlson Exhibit 23 was marked.)
13  BY MR. ROTTINGHAUS:
14    Q.  We'll come back to it.  Let's look at
15  Exhibit 23.  Again, I apologize for the length,
16  but to make sure we encapsulated everything, we've
17  copied the entirety of this document.
18    And so that your counsel knows, I've tabbed
19  with a yellow tab on your copy page 5 of what I
20  understand to be perhaps a PowerPoint.  It appears
21  to be a PowerPoint presentation to me.  I'll show
22  your attorney what I'm looking at.
23        MR. BARNES:  Marked HBC_34119?
24        MR. ROTTINGHAUS:  Yeah.  That's the
25  exact number.  The reference number is 1003.

Page 188

1  BY MR. ROTTINGHAUS:
2    Q.  Let's start at the first page, 001,
3  first.  And then we're going to be referring to
4  001.5 in just a second.
5    So as I understand it, like many companies,
6  Giant Eagle would have a business plan they would
7  put in place and perhaps at some point during the
8  year review what its business plan would be for
9  various operations?
10    A.  Yes.
11    Q.  That's pretty common in business;
12  correct?
13    A.  Correct.
14    Q.  I will represent to you this has been
15  provided by the company as part of the pharmacy
16  business plan for fiscal year 2015.  Okay?
17    And if we look at what I refer to as page 5
18  of the PowerPoint, it's 001.5, right in the middle
19  of that we see a box that says Implement
20  Controlled Substances Ordering System.  Are you
21  with me?
22    A.  Yes.
23    Q.  Now, it appears that at least -- I
24  should back up, in fairness, to say I mentioned
25  2015, but it appears from page 1 of this document

Page 189

1  that the presentation was June 24, 2014.  Do you
2  see that at the bottom?
3    A.  Yes.  Our fiscal year started in July.
4    Q.  So it appears that you would be maybe or
5  somebody would be presenting this on June 24,
6  2014?
7    A.  Yes.
8    Q.  Let's go back to that page 5 where we
9  looked at that box.  One of the initiatives is
10  to -- let's go one above the "implement" where it
11  says "enhance."
12    Here we see one of the target initiatives is
13  to enhance a suspicious order monitoring system at
14  HBC; correct?
15    A.  Correct.
16    Q.  And then it references, I think, the
17  same provision we've been looking at for quite a
18  bit of the day today --
19    A.  Yes.
20    Q.  -- of the Code of Federal Regulations;
21  is that right?
22    A.  Correct.
23    Q.  And then the owner of this is mentioned
24  to be Joe at HBC, and I'm assuming we're talking
25  about Mr. Millward?

Page 190

1    A.  Yes.
2    Q.  And then there's a target date, and what
3  does that say?
4    A.  To be determined.
5    Q.  And so looking at this document, at
6  least as of June 2014, and recalling that we were
7  looking at an email from Mr. Millward talking
8  about needing to lock down an SOM SOP, does that
9  refresh your recollection that there was
10  discussion about getting a written suspicious
11  order management policy in place for HBC in 2014?
12        MR. BARNES:  Object to form.
13        THE WITNESS:  I never denied that we
14  were working on enhancing the suspicious order
15  monitoring system.  So as far as a written policy,
16  I don't recall that part of it.  But enhancing a
17  suspicious order monitoring system was always --
18  had been a discussion ever since we started.
19  BY MR. ROTTINGHAUS:
20    Q.  Do you think creating a written
21  suspicious order policy would be an enhancement to
22  the suspicious order management system?
23    A.  It wouldn't hurt, but a policy doesn't
24  do anything.
25    Q.  It's got to be followed in order --

Page 191

1    A.  Exactly.
2    Q.  -- for it to do something?
3    A.  Right.  A policy is great, but what you
4  do with it is something else.
5    Q.  And hopefully when a policy is created
6  in writing, it's going to be followed by the
7  company; correct?
8    A.  Correct.
9        (HBC-Carlson Exhibit 24 was marked.)
10  BY MR. ROTTINGHAUS:
11    Q.  Let's look at Exhibit 24.
12        MR. ROTTINGHAUS:  Reference number 12.
13  BY MR. ROTTINGHAUS:
14    Q.  So we've been talking about a written
15  suspicious order policy, and I'll represent to you
16  that Exhibit 24 contains several I'll call them
17  iterations of what appear to be a written policy
18  or system for suspicious orders.
19    A.  Okay.
20    Q.  And the first page of this document,
21  Exhibit 24, is, as I understand it, listed as
22  Revision No. 2 with a revision date of April 9,
23  2015.  Are you with me?
24    A.  Yes.
25    Q.  We're going to highlight it up here as

Page 192

1  well.  And for the department, you'll see on the
2  right-hand corner it says Department - HBC Service
3  Company; correct?
4    A.  Yes.
5    Q.  And then to the left we see there's a
6  policy number.  Then we have an effective date,
7  and the effective date says August 1, 2014.
8    A.  Okay.
9    Q.  Now, again, referencing you before to
10  Exhibit 21, we have been provided information by
11  the company that the first written suspicious
12  order policy was indeed this policy.  Okay?
13    A.  Okay.
14    Q.  Do you have any reason to believe there
15  was any other written suspicious order policy
16  prior to August of 2014?
17    A.  Not in this format.  I don't know of any
18  other written documents.  This one came about from
19  our process to get VAWD certification for
20  distribution to the State of Maryland.  As part of
21  VAWD, we had to formalize documents obviously into
22  a format required by VAWD.  I'm not sure if you're
23  familiar with VAWD.
24    Q.  I am.  In fact, VAWD requires certain
25  policies and procedures to be created and

Page 193

1  implemented and followed by any distributor that
2  wants to receive that certification.
3    A.  Correct.
4    Q.  And some states actually require a
5  distributor that distributes controlled substances
6  to that state to be VAWD certified; correct?
7        MR. BARNES:  Object to form.
8        THE WITNESS:  Correct, except the states
9  that we were distributing to at the time didn't
10  require that.
11  BY MR. ROTTINGHAUS:
12    Q.  However, you're saying that one of the
13  states you were distributing to did tell you that
14  at least as of 2015 or 2014, if you want to
15  distribute in our state, you have to be VAWD
16  certified.
17    A.  Correct, because a number of -- a couple
18  of states require VAWD certification.
19    Q.  And prior to -- was it 2014 or 2015 that
20  HBC became VAWD certified?
21    A.  I can't recall.
22    Q.  The effective date is August 1, 2014.
23    A.  We went through a process with the VAWD,
24  and then there was discussions about discontinuing
25  HBC Services facility.

Page 194

1    Q.   Let's look at Exhibit 24 under the
2  policy section.  First of all, let's go under
3  where it says -- forgive me.  Let's go to where it
4  says Purpose or Objective.  Tell me if I'm reading
5  this wrong, but it appears to say that "The
6  purpose of this suspicious order policy is to
7  identify, investigate, record and report
8  suspicious pharmaceutical product orders"; is that
9  correct?
10   A.   Yes.
11   Q.   And that's a good idea, in your opinion;
12 correct?
13   A.   Yes.
14   Q.   And then if we go to the policy section,
15 it states that "Identified individuals from Giant
16 Eagle, pharmacy compliance and HBC team members
17 must review pharmacy customer orders and order
18 trends on a regular and for cause basis to
19 identify suspicious drug orders."
20     Did I read that correctly?
21   A.   Yes.
22   Q.   And that policy makes sense to you; does
23 it not?
24   A.   Yes.
25   Q.   And then it states, "Suspicious orders

Page 195

1  are blocked and reported to the appropriate
2  regulatory authority within the specified
3  timeframe as required."
4      Does it say that?
5    A.   Yes.
6    Q.   And that makes sense to you as well?
7    A.   Yes.
8    Q.   And that's what you would expect of your
9  team?
10   A.   Yes.
11   Q.   And just because this document was put
12 in writing in August of 2014, you expected your
13 team to be following this process prior to August
14 of 2014?
15     MR. BARNES:  Object to form.
16     THE WITNESS:  I would have to review the
17 whole policy to see if anything has changed in our
18 process.  I mean, things do change as time goes
19 on.  So I'd have to, you know -- I'd have to
20 research that a little bit more.
21 BY MR. ROTTINGHAUS:
22   Q.   Under procedures on this same page,
23 there are some bullets that kind of make some
24 statements; correct?
25   A.   Yes.

Page 196

1    Q.   And under the second bullet, there's a
2  description given to what is a suspicious order
3  criteria; is that right?
4    A.   Yes.
5    Q.   And it says, "Suspicious order criteria
6  include, but are not limited to, the following:
7  Purchases over a defined period that exceeded
8  predetermined thresholds."
9      That's one of them; correct?
10   A.   Yes.
11   Q.   Mr. Carlson, at least with respect to
12 the one control report that we looked at, weren't
13 there multiple stores ordering hydrocodone
14 combination products in excess of their
15 thresholds?
16     MR. BARNES:  Object to form.
17     THE WITNESS:  In that report there were
18 some stores that would have been investigated.
19 They weren't at that point considered suspicious
20 orders.
21 BY MR. ROTTINGHAUS:
22   Q.   If an investigation takes place at any
23 of your stores between 2009 and 2014, you expect
24 there to be some written report of the
25 investigation; correct?

Page 197

1    A.   No.
2    Q.   You don't think written documentation of
3  an investigation is required or a good idea for a
4  store?
5      MR. BARNES:  Object to form.
6      THE WITNESS:  We followed whatever the
7  requirement of the DEA was in place.  So there was
8  no record keeping requirements as part of the
9  provision.  So it wasn't something that we had
10 done.
11 BY MR. ROTTINGHAUS:
12   Q.   Do you think it's a good idea for a
13 company like HBC to document what steps it's
14 taking to attempt to comply with the law?
15     MR. BARNES:  Object to form.
16     THE WITNESS:  I haven't really thought
17 about it.  I don't have an opinion on that.
18 BY MR. ROTTINGHAUS:
19   Q.   So between 2009 and 2014, you never gave
20 any thought to whether if there is an
21 investigation taking place for an order that's
22 exceeding a threshold limit, we should document in
23 some way what steps we are taking to make sure
24 that it's not a suspicious order?
25   A.   We had tight controls in place that

Page 198

1 followed the full security measures of this, not
2 just 1301.74, but all of 1301. So this one small
3 subset was not our entire process.
4     So we were very confident and comfortable
5 that we had one of the best systems in place to
6 monitor it.
7     Q. What were the tight controls in place to
8 on a daily basis follow up and make sure that any
9 orders that were deemed to be in excess of
10 thresholds were not suspicious orders before they
11 got shipped? Tell me about that tight process.
12     A. So when you say they were suspicious
13 orders --
14     Q. Nope, I didn't. Let's listen to my
15 question. If I did, I apologize. I didn't mean
16 to.
17     What was this tight process you've just told
18 us about? Well, let me ask it this way: Would
19 you agree that in order for this process to be
20 tight, whenever there was an order that exceeded
21 the threshold limits, someone at HBC needed to
22 take some steps to find out why that order was
23 exceeding threshold limits?
24     MR. BARNES: Object to form. Calls for
25 speculation.

Page 199

1     THE WITNESS: You're asking if someone
2 at HBC had to find out if it was a suspicious
3 order based on thresholds?
4 BY MR. ROTTINGHAUS:
5     Q. Do you believe they should have?
6     MR. BARNES: HBC or Giant Eagle?
7     MR. ROTTINGHAUS: HBC.
8     THE WITNESS: Well, HBC was -- the
9 reporting was all done at corporate level.
10 BY MR. ROTTINGHAUS:
11     Q. Well, wherever, let me ask you this: Do
12 you believe that in order to keep a tight process
13 in place -- I think you used the term we had a
14 tight process.
15     A. Um-hum.
16     Q. In order to maintain a tight process
17 between 2009 and 2014, don't you agree that it
18 would have been a good idea to document what steps
19 were being taken to follow up on any orders that
20 exceeded thresholds for hydrocodone combination
21 products?
22     MR. BARNES: Object to form. Asked and
23 answered.
24     THE WITNESS: I don't think -- I don't
25 see the benefit of documentation.

Page 200

1 BY MR. ROTTINGHAUS:
2     Q. Would one benefit of the documentation
3 be the ability to show any regulatory body that
4 HBC did indeed take steps to maintain a system, to
5 implement, design and operate a system to disclose
6 the presence of suspicious orders?
7     A. When we opened HBC, we received our DEA,
8 we were inspected by the DEA. They came in. They
9 looked at all of our security features related to
10 this Controlled Substances Act, looked at all of
11 our processes.
12     Our security, according to them, fit all
13 requirements, all the needed necessary steps. We
14 were acting upon that. There was nothing in the
15 provision that said we had to keep documentation
16 for any period of time on any investigation.
17     We did our process. If there was any
18 suspicion come up, we investigated it thoroughly,
19 made our decision. And I can't even think of a
20 time where we -- maybe there was a couple, but not
21 that I can recall, an example when there was a
22 suspicious order that we actually defined. I'm
23 not saying it didn't happen, but I can't recall an
24 example.
25     MR. ROTTINGHAUS: Object and move to

Page 201

1 strike as nonresponsive.
2 BY MR. ROTTINGHAUS:
3     Q. I'm going to ask you a question, and if
4 you can tell me "yes" or "no," I would appreciate
5 it. And if you can't, that's fine. Just let me
6 know that you can't. Okay?
7     A. Okay.
8     Q. And then you can explain why you can't.
9 Don't you think it would have been a good
10 idea between 2009 and 2014 for someone at either
11 Giant Eagle or HBC to document any steps that were
12 taken to follow up on any orders that exceeded
13 thresholds and to show what due diligence was done
14 to determine that they were not indeed suspicious
15 orders?
16     MR. BARNES: Objection. Asked and
17 answered I think at least twice.
18 BY MR. ROTTINGHAUS:
19     Q. "Yes" or "no," if you can. If not --
20     A. Do I think it would be a good idea?
21     Q. Yes.
22     A. No.
23     Q. If we look at this policy, Exhibit 24,
24 if we can go to the second page of it -- actually,
25 forgive me. Let's go back to the first page, the

Page 202

1  bottom two bullets. We're still under Procedures.
2  Second from the bottom says, "Identified orders
3  are investigated to determine if the order is
4  suspicious or legitimate"; right?
5       A. Yes.
6       Q. And then the next bullet states,
7  "Legitimate orders are released for processing and
8  delivery to the customer"; correct?
9       A. That's what it states.
10      Q. Now, as you read this Exhibit 24 and
11 those two bullets, does it suggest to you that if
12 an order is identified as one that needs to be
13 investigated in any respect, that order should not
14 be shipped. Instead, it should first be
15 investigated, and then if it's determined to be a
16 legitimate order, it can then be released for
17 processing and delivery?
18      A. That's what this policy states.
19      Q. And, in fact, prior to 2014, there was
20 no such system in place at HBC or Giant Eagle to
21 make sure that orders exceeding thresholds were
22 not shipped until due diligence was done; correct?
23      A. Correct. The product was shipped, and
24 then due diligence was done, but the product was
25 still within Giant Eagle's possession.

Page 203

1       Q. Now, on the second page, first bullet at
2  the top -- we're going to go through all three of
3  these -- it states, "Suspicious orders are blocked
4  and reported to the applicable regulatory
5  authorities within the timeframe specified";
6  correct?
7       A. Yes.
8       Q. And then the next bullet says, "HBC
9  prepares and communicates any history of
10 suspicious orders to the Giant Eagle pharmacy team
11 as requested."
12      A. Yes.
13      Q. And then "HBC retains the records of the
14 investigation and outcome for six years."
15      Did you have any input on the decision that
16 HBC should retain records of any investigation and
17 the outcome for six years?
18      A. My guess would be that came from our
19 legal recommendation.
20      Q. Now, to your knowledge, were records of
21 investigations done between 2009 and 2014 and
22 documented and kept?
23      MR. BARNES: Object to form. Asked and
24 answered.
25      THE WITNESS: No, they weren't.

Page 204

1  BY MR. ROTTINGHAUS:
2       Q. I may have asked a double negative, and
3  I didn't mean to. So in case I confused you, I
4  want to make sure I didn't.
5       To your knowledge, between 2009 and 2014, is
6  it fair to say that HBC did not regularly record
7  any investigation or due diligence that was done
8  with respect to any order that it felt needed to
9  be investigated?
10      MR. BARNES: Object to form. Vague
11 question. What do you mean by record?
12      MR. ROTTINGHAUS: I don't mean to be
13 vague.
14 BY MR. ROTTINGHAUS:
15      Q. Do you know what I mean when I say
16 record or document?
17      A. Retain records.
18      Q. Yeah. You've told me before that not
19 all -- well, let me back up. Let me just ask it
20 this way and see if I can clarify.
21      Would you agree that between 2009 and 2014,
22 on occasions when there was any follow-up on an
23 order that exceeded threshold, you're not aware of
24 any documentation being kept of that?
25      MR. BARNES: Do you mean other than what

Page 205

1  is shown in emails and things of that nature?
2       MR. ROTTINGHAUS: That's just coaching
3  the witness because I don't even know what emails
4  I've shown him in that nature. I'll just ask it
5  again. If it's an objectionable question, tell
6  me. I'll rephrase it. I'm going to ask it again.
7       MR. BARNES: You're welcome to ask
8  again, but you've shown him a series of exhibits.
9  I can look right --
10      MR. ROTTINGHAUS: You'll get a chance to
11 direct examine him and show him all these exhibits
12 you say I've shown him. I'm not meaning to
13 mislead him and I haven't tried to once today. So
14 I apologize if I did.
15      MR. BARNES: I don't know what you mean
16 by records.
17      MR. ROTTINGHAUS: Let me try it again.
18 BY MR. ROTTINGHAUS:
19      Q. Do you know what records are? We've
20 talked about records today and record keeping,
21 haven't we?
22      A. Yes.
23      Q. Let's lay a little foundation.
24 Companies document records every day about
25 different things that go on in the company; right?

Page 206

1   A.  Yes.
2   Q.  Typically that gets done in writing when
3  it's documented; right?
4   A.  Correct.
5   Q.  When recorded, it's either done audibly
6  or in writing?
7   A.  Yeah.  Audibly, I guess, we don't do
8  audible records.  Paper.
9   Q.  Records that were kept at Giant Eagle or
10  HBC were kept in writing to your knowledge;
11  correct?
12   A.  What type of records?
13   Q.  Records that were kept were kept in
14  writing; correct?
15   A.  Yes.
16   Q.  It might be electronically, too?
17   A.  Yes.
18   Q.  Now, according to this policy on
19  Exhibit 24, the bottom bullet says, "HBC retains
20  the records of its investigation and outcome for
21  six years"; correct?
22   A.  That's what this states, yes.
23   Q.  Does this suggest to you that some
24  record is going to be made of any investigation
25  that's done?

Page 207

1   A.  It suggests that as of the writing of
2  this policy, yes.
3   Q.  And, again, we talked before about the
4  daily control reports from 2013 until you stopped
5  getting them that would issue a report for
6  products that exceeded thresholds; right?
7   A.  Yes.
8   Q.  On those days where orders exceeded
9  thresholds for hydrocodone combination products
10  between 2009 and 2014, would you agree with me
11  that you're not aware of any routine documentation
12  or record keeping of any investigation or due
13  diligence that was done to find out why those
14  orders were exceeding thresholds?
15   MR. BARNES:  Object to form.  Misstates
16  the evidence.
17   THE WITNESS:  I don't recall any special
18  file that was created for record keeping.  There
19  are email history of emails going back and forth.
20  Obviously, you've shown me a number of emails
21  today.  So that would be a form of record.
22  BY MR. ROTTINGHAUS:
23   Q.  Are you saying it should have been kept
24  in a record form?
25   A.  I didn't say that.

Page 208

1   Q.  And what I'm asking is:  To your
2  knowledge, every follow-up investigation done, was
3  it kept or recorded?
4   A.  No.  I mean, there was -- a record was
5  not created, stored specifically from each
6  investigation, if that's what you're asking.  So
7  when I think of a record, and I could be wrong
8  with this, I think of a file that says HBC
9  investigations and everything is in this file.
10  I do not -- I cannot say that we had a file
11  that said HBC investigations.
12   Q.  If your team members in compliance were
13  doing investigations to make sure the company was
14  complying with federal regulations, would you
15  expect them to record those investigations?
16   MR. BARNES:  Object to form.
17   THE WITNESS:  Say that again.
18  BY MR. ROTTINGHAUS:
19   Q.  If your team members in compliance,
20  whether it be Mr. Millward, Mr. Chunderlik or
21  someone else, were, in fact, conducting
22  investigations at any point in time to determine
23  whether the store was complying with the
24  Controlled Substances Act, would you have expected
25  them as part of your team to have recorded those

Page 209

1  investigations in writing?
2   MR. BARNES:  Object to form.
3   THE WITNESS:  I can't -- no would be my
4  answer.
5  BY MR. ROTTINGHAUS:
6   Q.  And the reality is that although there
7  were daily threshold reports issued, you said that
8  by the time those reports would come across your
9  desk at least, those products had already left the
10  HBC warehouse to the pharmacies.
11   A.  Yes.
12   (HBC-Carlson Exhibit 25 was marked.)
13  BY MR. ROTTINGHAUS:
14   Q.  And to your knowledge, was there -- let
15  me ask you this.  Let me show you Exhibit 25.  I
16  know your attorney is going to have an objection,
17  so give him a chance to make it.
18  I'll represent to you that the documents in
19  Exhibit 25 were not prepared by HBC or Giant
20  Eagle, just so you know.  Okay?
21   A.  Okay.
22   Q.  But I want to just ask you about a
23  couple of numbers that are referenced here.  First
24  of all, I'm assuming you have not done any
25  research yourself to find out how many dosage

Page 210

1  units of any hydrocodone combination products were
2  shipped to Giant Eagle pharmacies in any county of
3  Ohio between 2009 and 2014.
4      A.  No.  I've not done any research.
5      MR. BARNES:  Let me interpose, as you
6  expected, my objection to this exhibit both in
7  terms of its -- I don't know who prepared this,
8  how it was prepared and what dosage units means.
9      In addition, it exceeds -- it goes beyond the
10  Case Track 1 jurisdiction to include Ohio numbers.
11  So we object to that entire portion of the
12  exhibit.  I've never seen the last page.
13      MR. ROTTINGHAUS:  Is that an objection,
14  that you've never seen the last page?
15      MR. BARNES:  Yeah.  I've seen this in
16  almost identical form, but it looks like a new
17  page has been added.
18      MR. ROTTINGHAUS:  I can guarantee you I
19  didn't prepare it.  So whatever it is it is.
20      MR. BARNES:  Can't slip one past me.
21      MR. ROTTINGHAUS:  Yeah, I can tell.
22      MS. CHARLES:  I'll join on behalf of
23  McKesson.
24  BY MR. ROTTINGHAUS:
25      Q.  Let me ask you this.  I need to ask you

Page 211

1  a few background questions, Mr. Carlson.  Do you
2  know what ARCOS is?
3      A.  Yes.
4      Q.  Were you responsible in any way during
5  your tenure at Giant Eagle for making sure that
6  any data that needed to be reported to ARCOS by
7  HBC from 2009 to 2014 was indeed reported?
8      A.  Yes.
9      Q.  Did you have someone who assisted you in
10  that reporting, or did you directly as the person
11  report that data?
12      A.  I know I did the first few uploads of
13  data.  I had to have IT pull together the report
14  in the format that's required for the ARCOS
15  upload, upload the file to ARCOS.  ARCOS would
16  then either -- if there was any data -- it had to
17  be in a certain format.  If it rejected anything,
18  it would pop back, and we'd have to resolve that
19  with the ARCOS folks.
20      So to start, I was the one uploading the file
21  to the website.  And then I believe that was
22  handed off to somebody else at some point in time.
23      Q.  Is it your understanding that if data is
24  reported directly, one can determine exactly how
25  many dosage units of controlled substances are

Page 212

1  distributed by a distributor to particular
2  jurisdiction?
3      A.  Correct.
4      Q.  And that's through the ARCOS system?
5      A.  Yes.
6      MR. BARNES:  Can you tell me what a
7  dosage unit is?
8      MR. ROTTINGHAUS:  No, I cannot.
9  BY MR. ROTTINGHAUS:
10      Q.  After you stopped personally doing the
11  uploads, who was it at the company that you relied
12  on to do the uploads, if you remember?
13      A.  It was either given to Dan Beiter or
14  Kris Remas to do.
15      Q.  Regardless, HBC attempted to keep track
16  of that transactional data and record it so that
17  it could report the appropriate ARCOS data?
18      A.  Yes.
19      Q.  It's an example of a company trying to
20  document things to make sure it's complying with
21  the law?
22      A.  Yes.
23      Q.  And then either Giant Eagle on behalf of
24  HBC or HBC submitted the ARCOS data to the DEA
25  through an upload?

Page 213

1      A.  Yes.
2      Q.  I'll represent to you that page 1 of
3  Exhibit 25 is a chart again not created by HBC or
4  Giant Eagle that references hydrocodone products.
5      Here's my question for you:  Do you have any
6  personal knowledge as to how many dosage units of
7  hydrocodone combination products were distributed
8  by HBC to any county in Ohio between 2009 and
9  2014?
10      A.  Not specific to any county, no.
11      Q.  We've attempted to document some of the
12  numbers on this first page from HBC Service
13  Company to Cuyahoga County, Ohio.
14      Do you see the column I'm looking at, HBC
15  Service Company?
16      A.  Yes.
17      Q.  I think it's highlighted as well.
18      Are you aware of any suspicious orders that
19  were ever reported for hydrocodone combination
20  products between 2009 and 2014 at HBC?
21      A.  Am I aware of any?
22      Q.  Yes.
23      A.  I cannot recall any.
24      Q.  If this data is correct, there were over
25  10 million dosage units of hydrocodone combination

Page 214

1  products distributed to Cuyahoga County by HBC
2  between 2009 and 2014.
3      A.  I can't validate that.  I mean, if
4  that's what the report says, I certainly can't
5  confirm that.
6      Q.  Does it surprise you that, assuming
7  there were indeed that many dosage units
8  distributed, there wouldn't be one suspicious
9  order ever reported?
10     MR. BARNES:  Object to form.  Misstates
11 the evidence, as you know.
12     MR. ROTTINGHAUS:  I don't know what Tim
13 did.  I don't intend to misstate the evidence.
14     MR. BARNES:  Well, you know there was --
15     MR. ROTTINGHAUS:  Maybe I am misstating.
16 I don't mean to.  You can go ahead and say it.
17     MR. BARNES:  There were a couple of
18 suspicious order reports.
19     MR. ROTTINGHAUS:  Was it for
20 hydrocodone?
21     MR. BARNES:  No.
22     MR. ROTTINGHAUS:  That's what I'm
23 saying, hydrocodone products.  Let me ask it again
24 to make sure I clarify.
25

Page 215

1  BY MR. ROTTINGHAUS:
2      Q.  Assuming these data are correct, does it
3  surprise you that there was never a suspicious
4  order reported by or on behalf of HBC Service
5  Company between 2009 and 2014 for any hydrocodone
6  combination product to Cuyahoga County?
7      MR. BARNES:  Object to form.
8      THE WITNESS:  It doesn't surprise me.
9  You're talking about -- Cuyahoga is a small area.
10 BY MR. ROTTINGHAUS:
11     Q.  That's a lot of units, isn't it?
12     A.  Well, you're talking about tablets now.
13 These aren't bottles.
14     Q.  Pills; right?
15     A.  Right, I mean, but what is the -- in
16 reference to how many did Walgreens, CVS,
17 Rite-Aid -- how many did they do, what was the
18 market share in the area, how many stores did we
19 have in Cuyahoga.  I don't even know off the top
20 of my head how many stores we had in Cuyahoga.
21 There's a lot of factors other than throwing
22 10 million tablets out there.  I just don't know.
23     Q.  Let's look at page 3 of this exhibit.
24 If I'm looking at the correct table, it say Dosage
25 Units to Summit County, Ohio.  Are you with me?

Page 216

1      A.  Yes.
2      Q.  And if the numbers are correct, does it
3  surprise you that there were 8,892,000 dosage
4  units of hydrocodone combination products
5  distributed to Summit County, Ohio between 2009
6  and 2014 without any suspicious orders ever being
7  reported for that product by HBC or on behalf of
8  HBC?
9      MR. BARNES:  Object to form.
10     THE WITNESS:  It doesn't surprise me.
11 We didn't have a whole lot of suspicious orders
12 overall.  I couldn't even remember an example
13 specifically.
14 BY MR. ROTTINGHAUS:
15     Q.  You can't remember an example of ever
16 finding a suspicious order?
17     A.  I mean, I can't give you an example.  I
18 just don't remember.
19     Q.  Are you aware between 2009 and 2014 of
20 any documentation by any of the Giant Eagle
21 pharmacies of a refusal by a pharmacy or a
22 pharmacy team member to sell a hydrocodone
23 combination product to a customer?
24     A.  Do I -- can you state the first part of
25 that question again?

Page 217

1      Q.  Sure.  Are you aware of any logs or any
2  documentation of any Giant Eagle retail pharmacy
3  team member refusing to sell or dispense a
4  hydrocodone combination product to a customer?
5      A.  I don't know of a log that would record
6  that other than maybe sending an email to the
7  district leader to state that they did that.  But
8  not like an official record keeping log, if that's
9  what you're kind of asking for.
10     MR. ROTTINGHAUS:  That's all I have.
11     MR. BARNES:  Then I'll just jump right
12 in.
13     THE VIDEOGRAPHER:  The time is 2:21.
14     (Recess from 2:21 p.m. to 2:27 p.m.)
15     THE VIDEOGRAPHER:  On the record 2:27.
16         EXAMINATION
17 BY MR. BARNES:
18     Q.  Good afternoon, Mr. Carlson.  I have
19 some follow-up questions.
20     You were asked a lot questions today by
21 plaintiffs' counsel about the so-called suspicious
22 order regulation 1301.74(b).
23     A.  Yes.
24     Q.  But you were never shown the 1301.71,
25 which is the security -- I'll tell you it's the

Page 218

1 security requirement regulation.
2     Are you familiar with that regulation?
3     A. I have reviewed it before.
4     Q. That regulation requires applicants and
5 registrants to provide effective controls and
6 procedures to guard against theft and diversion of
7 controlled substances.
8     Does that refresh your recollection?
9     A. Yes.
10     Q. Did Giant Eagle in the entire time that
11 you were there meet this regulation?
12     MR. ROTTINGHAUS: Objection. Form;
13 insufficient foundation.
14     THE WITNESS: Yes.
15 BY MR. BARNES:
16     Q. Did Giant Eagle have controls to guard
17 against theft and diversion?
18     A. Yes.
19     Q. And were those controls at multiple
20 levels of the organization?
21     MR. ROTTINGHAUS: Objection.
22 Foundation.
23     THE WITNESS: Yes.
24 BY MR. BARNES:
25     Q. Were they at the corporate level?

Page 219

1     A. Yes.
2     Q. Were they at the warehouse level?
3     MR. ROTTINGHAUS: Same objection.
4     THE WITNESS: Yes.
5 BY MR. BARNES:
6     Q. And were they at the store level?
7     A. Yes.
8     Q. You're a pharmacist yourself; correct?
9     A. Yes.
10     Q. You have a doctorate degree in pharmacy?
11     A. Yes.
12     Q. And you've served as a pharmacist in not
13 only Giant Eagle pharmacies, but other pharmacies?
14     A. Yes.
15     Q. Do you believe that Giant Eagle
16 pharmacies met the security requirement at the
17 store level?
18     MR. ROTTINGHAUS: Objection.
19 Foundation.
20     THE WITNESS: Yes.
21 BY MR. BARNES:
22     Q. Do you understand that part of the
23 security requirement and whether somebody is in
24 compliance with that security requirement is
25 dependent upon a multitude of factors, including

Page 220

1 things such as the type and form of controlled
2 substances being handled?
3     MR. ROTTINGHAUS: Objection. Leading.
4     THE WITNESS: Do I understand that?
5 Yes.
6 BY MR. BARNES:
7     Q. In terms of the DEA deciding whether
8 Giant Eagle met or HBC met the security
9 requirement, one factor in the security regulation
10 is what are you distributing?
11     A. Yes.
12     Q. And HBC never distributed controlled
13 substance level II; is that correct?
14     A. Correct.
15     Q. Do you also understand the regulation to
16 involve the quantity of controlled substances
17 being handled in terms of whether or not the
18 security requirement was being met? That's
19 something that the DEA would look at?
20     A. Yes.
21     Q. In terms of quantities, I know you just
22 said that HBC never did level IIs, but the level
23 IIIs, IVs and Vs that it did do, was it all IIIs,
24 IVs and Vs or was it just some of the IIIs, IVs
25 and Vs that the pharmacies was distributing?

Page 221

1     A. It was just some IIIs, IVs and Vs.
2     Q. Now, were all of the Giant Eagle
3 pharmacies located inside the Giant Eagle grocery
4 stores?
5     A. Yes.
6     Q. And did the grocery stores themselves
7 have security aspects?
8     MR. ROTTINGHAUS: Objection. Relevance.
9 BY MR. BARNES:
10     Q. Such as cameras.
11     A. Yes. The store had security. The
12 actual pharmacy within the store had its own
13 gates, locking gate, cameras, alarm system, motion
14 sensing alarm systems.
15     Q. Going back to the security requirement,
16 did you also understand that one aspect of whether
17 that security requirement was met was whether or
18 was the nature of the controls by the registrant
19 overall against theft and diversion?
20     MR. ROTTINGHAUS: Objection. Leading.
21     THE WITNESS: Can you restate the
22 question?
23 BY MR. BARNES:
24     Q. Sure. In terms of the overall security
25 requirement, things that the DEA would consider,

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 did you understand that to include an overall
2 evaluation of the adequacy of the controls at the
3 HBC and store levels?
4     A.  Yes.
5     Q.  Do you understand that the regulation
6 that you were shown by plaintiffs' counsel is just
7 one small aspect of the overall security
8 requirement?
9     A.  Correct, yes.
10     Q.  And do you understand that 1301.74
11 requires that HBC operated a system to disclose
12 suspicious orders?
13     A.  Yes.
14     Q.  Did you ever understand it to require
15 any type of formulaic or threshold system?
16     A.  No.
17     Q.  At the warehouse level, I just want to
18 explore what you do understand.  You mentioned
19 cages, things of that nature.
20     Were these control IIIs, IVs, and Vs kept in
21 locked cages?
22     A.  Yes, per the DEA requirements of
23 specifically around the cage.
24     Q.  You said the DEA actually reviewed the
25 HBC security system before it opened and started

Page 223

1 distributing control IIIs, IVs, and Vs?
2     A.  Yes, before they approved our DEA
3 license.
4     Q.  And did they come in from time to time
5 to reaudit and inspect?
6     A.  Yes.
7         MR. ROTTINGHAUS:  Objection.  Leading.
8 BY MR. BARNES:
9     Q.  At any time, did the DEA ever advise HBC
10 that there was anything lacking in their control
11 system?
12         MR. ROTTINGHAUS:  Objection.
13 Foundation.
14         THE WITNESS:  There was nothing pointed
15 out within our security measures that didn't meet
16 the requirements.
17 BY MR. BARNES:
18     Q.  Did Giant Eagle ever distribute to
19 internet pharmacies?
20     A.  No.
21     Q.  By Giant Eagle I'm including HBC.
22     A.  No, we did not.
23     Q.  But you've also told us that you don't
24 really know the details -- you said the pickers
25 were regulated in terms of access to the cages; is

Page 224

1 that right?
2     A.  Yes.
3     Q.  But the detailed procedures of how they
4 actually did their picking and the forms they
5 filled out, that wasn't part of your job?
6     A.  No, it was not.
7     Q.  Were inventories conducted at HBC?
8     A.  Yes.
9     Q.  Regular inventories?
10     A.  Yes.
11     Q.  Was the HBC warehouse overseen by Giant
12 Eagle's internal audit and accounting department?
13         MR. ROTTINGHAUS:  Objection.  Leading.
14         THE WITNESS:  Yes.
15 BY MR. BARNES:
16     Q.  You were asked a lot of questions today
17 about the development of a so-called SOM system in
18 2013 or 2014.  Do you recall that?
19     A.  Yes.
20     Q.  Was that threshold system I'll call it,
21 was that developed because there was any view that
22 the currently existing controls that you describe
23 were viewed as inadequate in any way?
24     A.  No.  They were put together as an
25 enhancement to the current process.

Page 225

1     Q.  And that process, that threshold process
2 began in or about 2013?
3     A.  About per my recollection.
4     Q.  And were enhancements made to that
5 process over time?
6     A.  Yes.
7     Q.  Are you familiar with the CSOS system?
8     A.  Yes.
9     Q.  Is that one of the enhancements?
10     A.  CSOS was a system that just assisted in
11 ordering CII through at the time it was the
12 wholesaler process, but it was -- it helped us --
13 it was an enhancement for ordering CIIs, so from
14 that perspective.
15     Q.  Are you familiar with Supply Logics?
16     A.  Yes.
17     Q.  Was that an enhancement to the threshold
18 system?
19     A.  Yes.
20     Q.  What did Supply Logics allow you to do?
21     A.  Supply Logics had a couple components to
22 it that could allow us to audit and monitor.  So
23 it would -- I can't remember.  I'm trying to
24 visualize what this report looked like, but it
25 would -- it basically would pull out -- allow us

Page 226

1 to evaluate, investigate stores that were -- you
2 know, that stuck out in some fashion.
3     Q.   At the pharmacy level you talked a
4 little bit about some of the controls at that
5 level.
6     I just want to ask you generally.  Were all
7 of the pharmacies staffed by licensed and trained
8 pharmacists?
9     A.   Yes.
10    Q.   Were they staffed by trained
11 technicians?
12    A.   Yes.
13    Q.   Were all of those individuals trained
14 with respect to diversion?
15    A.   There was a component of the training --
16 I don't know specifically, but I know there were
17 some discussions in the training around that.
18    Q.   Were there policies and procedures,
19 written policies and procedures in place at the
20 pharmacy level that assisted the pharmacists and
21 technicians with respect to filling appropriate
22 prescriptions?
23    A.   Yes.
24    Q.   Are you familiar with the DEA pharmacist
25 manual?

Page 227

1     MR. ROTTINGHAUS:  Objection.  Relevance.
2     THE WITNESS:  I may have seen it.  I
3 can't recall.
4 BY MR. BARNES:
5     Q.   Do you recall if that was located at the
6 pharmacies or accessible by the pharmacies?
7     A.   Yeah.  That should have been at each
8 location, I believe.
9     Q.   Did Giant Eagle have controlled
10 substance dispensing guidelines?
11    A.   There were guidelines around controlled
12 substances, yes.
13    Q.   Did it include things like red flags,
14 things to look out for before dispensing and
15 filling a prescription?
16    A.   Yes.
17    MR. ROTTINGHAUS:  Are you talking about
18 at the pharmacy level or HBC level?
19    MR. BARNES:  Pharmacy level.
20 BY MR. BARNES:
21    Q.   Are you familiar with the so-called
22 OARRS system?
23    A.   Yes.
24    Q.   What is that?
25    A.   It's an Ohio system to monitor

Page 228

1 prescription dispensing across the whole state.
2     Q.   Is that something to your knowledge the
3 Giant Eagle pharmacists would access when filling
4 a prescription as necessary?
5     A.   Yes, as required.
6     MR. ROTTINGHAUS:  I didn't want to
7 interrupt.  I'm interposing an objection on
8 relevance grounds.
9 BY MR. BARNES:
10    Q.   Did the pharmacists or do the pharmacies
11 report their transactions to the DEA?  I think you
12 already testified to that concerning the ARCOS
13 system.
14    A.   The ARCOS was one way.  We also reported
15 dispensings through like the OARRS system and all
16 that.  That was done at corporate level, but all
17 that information about the stores came from
18 corporate that was provided.
19    Q.   Did Giant Eagle have written fraud,
20 waste and abuse guidelines and procedures that
21 were at the pharmacies?
22    A.   Yes.
23    Q.   The record keeping at the pharmacies,
24 are you familiar with the term controlled
25 substance boxes that maintain records?

Page 229

1     A.   Yes.
2     Q.   Is that something when you were a PDL
3 you had to make sure every pharmacy complied with?
4     A.   The boxes either came out like right
5 when I was going onto my other position, the
6 physical boxes that you're talking about.  It
7 was -- I didn't physically do that as a PDL.  I
8 think it came out just as I went on to my next
9 position.
10    Q.   But in your next position, did you learn
11 what those were?
12    A.   Yes.
13    Q.   What were they for generally?
14    A.   Just to kind of keep everything in one
15 place around controlled substances.
16    Q.   Would those include DEA forms, records
17 of invoices and transactions on controlled
18 substances?
19    A.   DEA 222 forms, invoices, anything
20 regarding controlled substances.
21    Q.   At the pharmacy level, were the
22 controlled substances handled any differently than
23 any other drug?
24    A.   Were they handled differently?  Yes.
25    Q.   Were they kept in a secure location?

Page 230

1    A.  Any of the Schedule II were kept in a
2  locked location that only the pharmacist had
3  access to.
4    Q.  And who could fill a controlled
5  substance II level prescription at the pharmacies?
6  Could a tech do it, or was it a pharmacist
7  required?
8        MR. ROTTINGHAUS:  Objection.  Relevance.
9        THE WITNESS:  A pharmacist was required
10 to do that process.
11 BY MR. BARNES:
12   Q.  And how were incoming orders of
13 controlled substances handled?  Were there special
14 procedures for those?
15   A.  Yeah.  We had formalized processes or
16 procedures drawn up on how to receive an order,
17 and it even broke out controlled substances and
18 how to handle those orders specifically.
19   Q.  Were those orders checked against
20 invoices and immediately logged into inventory?
21   A.  Yes.
22   Q.  Were there regular and then perpetual
23 inventories of all controlled substances?
24   A.  Yes.  There were Schedule IIIs through
25 Vs were part of our perpetual.  The CIIs were done

Page 231

1  in a manual fashion.  So we're talking 2009 to
2  '14.  It became part of the perpetual throughout
3  that time period.
4    Q.  You mentioned monthly narc audits.  Was
5  that of all controlled substances?
6    A.  Yes.
7    Q.  And were there also annual controlled
8  substance inventories on top of the monthly narc
9  audits?
10       MR. ROTTINGHAUS:  Objection.  Leading.
11       THE WITNESS:  I'm sorry.  Say that
12 again.
13 BY MR. BARNES:
14   Q.  In addition to the monthly narc audits,
15 were there regular annual inventories?
16       MR. ROTTINGHAUS:  Same objection.
17       THE WITNESS:  Yeah.  We were required to
18 do an every two-year inventory.  We actually did
19 ours on an annual basis.
20 BY MR. BARNES:
21   Q.  While controlled substance prescriptions
22 were being filled, were there special accounting
23 procedures employed to maintain control over every
24 pill?
25   A.  Yes.

Page 232

1        MR. ROTTINGHAUS:  Objection.  Leading.
2  BY MR. BARNES:
3    Q.  Did the Ohio -- not only Ohio, but did
4  the state Boards of Pharmacy come into the
5  pharmacies on a random and unannounced basis and
6  perform surprise inspections on a routine basis?
7    A.  Yes.
8    Q.  Were there ever any problems that you
9  can recall involving controlled substances or
10 opioids?
11   A.  Nothing specific to an inspection
12 regarding those products.
13   Q.  And you were a PDL for a while?
14   A.  Yes.
15   Q.  And you had a region where you regularly
16 visited all your stores?
17   A.  Yes.
18   Q.  Were all of the pharmacies supervised by
19 a PDL in some way?
20   A.  Yes.
21   Q.  And did they regularly visit the store
22 and conduct audits from time to time?
23   A.  Yes.
24   Q.  And did that include controlled
25 substance procedures?

Page 233

1    A.  Yes.
2    Q.  Did the PDL supervise training at the
3  pharmacies?
4    A.  Not directly supervise, but ensure that
5  all team members within that unit were trained.
6    Q.  Did the PDLs work with law enforcement
7  and the Board of Pharmacy to deter diversion and
8  prosecute criminals?
9        MR. ROTTINGHAUS:  Objection.  Leading.
10       THE WITNESS:  Yes.
11 BY MR. BARNES:
12   Q.  Did the PDLs exercise red flag awareness
13 training in the pharmacies?
14   A.  Yes.
15   Q.  Would the PDLs have an opportunity to
16 observe while in these pharmacies suspicious
17 activity, such as long lines out the door, things
18 of that nature?
19   A.  Yes.
20   Q.  And I think you said when you were a
21 PDL, you would assist from time to time with
22 threshold increases if the stores needed them;
23 right?
24   A.  When I was a PDL -- that was after I was
25 a PDL when I was actually having the PDLs do the

Page 234

1  investigation.
2  Q.  You were shown some exhibits that you
3  requested McKesson from time to time to increase
4  certain store's thresholds?
5  A.  Yes.
6  Q.  Do you recall that?
7  A.  Yes.
8  Q.  When you would do that, would it be
9  based upon a legitimate business need?
10  MR. ROTTINGHAUS:  Objection.  Leading.
11  THE WITNESS:  Yeah, yes, per the request
12  of McKesson.  They would ask for the business
13  reason, and I would investigate each store level
14  to see what was going on at that store from a
15  business perspective and provide them the
16  information they requested.
17  BY MR. BARNES:
18  Q.  Did you do any follow-up as requested?
19  A.  As requested, yes.
20  Q.  The information that you provided to
21  McKesson with respect to increases, did you
22  believe it to be truthful and accurate and in good
23  faith?
24  A.  Yes.
25  Q.  Did the pharmacies have loss prevention

Page 235

1  coverage?
2  A.  Yes.
3  Q.  With experienced law enforcement
4  investigators?
5  A.  Yes.
6  Q.  Did the investigators spend a lot of
7  time in the pharmacies?
8  A.  Yes.
9  Q.  Did they work with local police and the
10  Boards of Pharmacy and the DEA to prevent
11  diversion?
12  MR. ROTTINGHAUS:  Objection.  Leading.
13  THE WITNESS:  They did, yes.
14  BY MR. BARNES:
15  Q.  Do you recall, did Giant Eagle
16  pharmacists employ techniques to prevent suspected
17  diversion by writing things on prescriptions or
18  notifying each other about potential suspects?
19  A.  Yes.  They would send -- notify local
20  stores of some potential issue that they're
21  seeing, and they would definitely alert the other
22  locations and their PDL.
23  Q.  Do you recall the loss prevention
24  department increasing security cameras in the
25  pharmacies as a safety precaution?

Page 236

1  MR. ROTTINGHAUS:  Objection.  Relevance.
2  THE WITNESS:  Yes.  Over the years, they
3  were doing that.
4  BY MR. BARNES:
5  Q.  You were asked a lot of questions by
6  plaintiffs' counsel concerning what was in writing
7  or not in writing from 2009 to 2014.
8  At any time, to your knowledge, was Giant
9  Eagle ever advised that any policy needed to be
10  put in writing to meet the security requirement?
11  A.  Through my discussions with the DEA,
12  nothing was ever told to me that we were deficient
13  in any way or needed any other documentation.  So
14  no.
15  Q.  You made reference to, I think, a closed
16  system of self distribution.
17  A.  Yes.
18  Q.  Do you remember that?  Could you explain
19  what you meant by that?
20  A.  When we take possession of the product
21  from the manufacturer, we actually own that
22  product all the way to the patient level.  So
23  we're self distributing within -- the product
24  stays within the same company all the way through
25  until it hits the patient, versus a wholesaler

Page 237

1  arrangement where the wholesaler hands it off to
2  the store, and then they kind of lose sight of it
3  at that point.
4  Giant Eagle's system was more closed than the
5  wholesaler arrangement.
6  Q.  To your knowledge, did Giant Eagle at
7  all times know all of its pharmacies and who was
8  running their pharmacies?
9  MR. ROTTINGHAUS:  Objection.  Leading;
10  foundation.
11  THE WITNESS:  Absolutely.
12  BY MR. BARNES:
13  Q.  You mentioned the so-called VAWD
14  certification for the warehouse.  I understood
15  your testimony to be that one of the main or sole
16  emphasis for putting things in writing was to get
17  the VAWD certification?
18  A.  Yes.  There was a requirement of VAWD to
19  have everything in a format.
20  Q.  Prior to the VAWD process, nobody had
21  insisted upon anything being in writing with
22  respect to suspicious order monitoring; is that
23  correct?
24  MR. ROTTINGHAUS:  Objection.  Vague as
25  to anybody or nobody.

Page 238

1    THE WITNESS:  There was nobody that
2  asked us to do any further before that time
3  period.
4  BY MR. BARNES:
5    Q.  Including the DEA?
6    A.  Including the DEA, yes.
7    Q.  You were asked a few questions about
8  incidents of diversion.  I take it in a 200-store
9  plus chain -- how many pharmacists would you have
10 new that size of a chain?
11   A.  Over 700.
12   Q.  From time to time, would a pharmacist or
13 a pharmacy employee be suspected of theft or
14 diversion and be investigated?
15   A.  Yes.
16   Q.  How common of an occurrence was that?
17   A.  I wouldn't call it a common occurrence,
18 but any time it happened, it seemed like the worst
19 thing in the world.  So it kind of drew a
20 spotlight.  So it did happen.  But it wasn't what
21 I would call a common occurrence.
22   Q.  Was it a rare occurrence?
23   A.  I would call it more of a rare
24 occurrence.
25   Q.  Were those reported to the state boards

Page 239

1  or the police as necessary?
2    A.  As required by each particular state we
3  handled it further.
4    Q.  Would Giant Eagle's controls have worked
5  in those instances?
6    MR. ROTTINGHAUS:  Objection.
7  Insufficient foundation; leading.
8    THE WITNESS:  Say that again.
9  BY MR. BARNES:
10   Q.  Would Giant Eagle's internal controls
11 have worked in those instances --
12   A.  Yes.
13   Q.  -- in terms of discovering something is
14 amiss, something is missing?
15   MR. ROTTINGHAUS:  Same objection.
16   THE WITNESS:  Yes.  They were discovered
17 within our current procedures.  That's how they
18 were discovered.
19 BY MR. BARNES:
20   Q.  You were asked a lot of questions about
21 whether or not you shipped or Giant Eagle shipped
22 from the warehouse to its own pharmacies before an
23 order of interest was determined to be
24 nonsuspicious.  Do you recall that?
25   A.  Yes.

Page 240

1    Q.  Was it your understanding that it was
2  okay to ship in those circumstances?
3    MR. ROTTINGHAUS:  Objection.  Leading.
4    THE WITNESS:  Yes.  Since we were a self
5  distributor, the product was still within our
6  supply chain.  So you're saying if they exceeded
7  this number, we would let it go to the store and
8  then we can investigate it and we still had
9  control over that product and could retrieve it at
10 any point in time.
11 BY MR. BARNES:
12   Q.  So it was going from the warehouse shelf
13 to the pharmacy shelf?
14   A.  Yes.
15   Q.  So as that order was being investigated,
16 if there was a problem, could you retrieve that
17 product?
18   A.  Yes.
19   MR. ROTTINGHAUS:  Objection.  Leading.
20 BY MR. BARNES:
21   Q.  One of the controls you mentioned at the
22 warehouse level was the so-called movement
23 reports.  Do you recall that?
24   A.  Yes.
25   Q.  Is that part of the system that you've

Page 241

1  described for us, system of controls that would be
2  able to detect the suspicious order?
3    A.  It was part of the overall system,
4  another one of the reports that we could utilize
5  to flag discrepancies.
6    Q.  You were asked some questions right
7  after lunch about whether you could say with
8  100 percent certainty that 100 percent of every
9  prescription that Giant Eagle ever filled was
10 perfectly valid.  Do you recall those questions?
11   A.  Yes.
12   Q.  How many prescriptions does Giant Eagle
13 fill in any given year, to your recollection?
14   A.  I think it's, I'm going to say, over
15 14 million.  I don't know if that -- I think it's
16 over 20 million.
17   Q.  Over 20 million prescriptions.  You
18 can't say that every one was perfectly legitimate
19 sitting here today?
20   A.  No, I can't.
21   Q.  But can you say that those prescriptions
22 would have been distributed pursuant to Giant
23 Eagle dispensing policies?
24   A.  Yes.
25   Q.  By licensed pharmacists?

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    A.  Yes.
2    Q.  Who were required to exercise their
3 professional judgment when filling the
4 prescription?
5        MR. ROTTINGHAUS:  Objection.  Leading;
6 insufficient foundation.
7        THE WITNESS:  Yes.
8 BY MR. BARNES:
9    Q.  You were asked some questions about
10 Exhibit 15.  Do you remember that exhibit where
11 the question was how can you respond so quickly?
12 Do you remember that?  It was within an hour,
13 Eastern time versus Central Standard Time.
14    A.  Yes.
15    Q.  The questions were, well, how could you
16 determine in that short timeframe whether the
17 prescription was from doctor shopping or invalid
18 in some way; is that right?
19    A.  Correct.
20    Q.  But that prescription would have already
21 been dispensed; correct?
22    A.  Yes.
23    Q.  By a licensed pharmacist?
24    A.  Yes.
25    Q.  So did you have any comfort at that

Page 243

1 level that the prescriptions had gone through red
2 flag analysis before being dispensed?
3    A.  Yes.
4        MR. ROTTINGHAUS:  Objection.  Leading.
5 BY MR. BARNES:
6    Q.  And did you have working knowledge on a
7 day-to-day basis in this time period of store
8 volumes vis-a-vis each other, the type of business
9 they were doing?
10    A.  Yes, absolutely.
11    Q.  So were you able to respond to these
12 requests on a fairly rapid basis?
13    A.  Yes.  I had all the reports at my
14 fingertips.
15    Q.  Prior to Exhibit 24 -- take a look at
16 24.  These were the written policies.  You were
17 asked some questions about prior to the
18 formalization and writing down of these policies.
19 Did Giant Eagle have a system of controls that
20 would detect suspicious orders?
21    A.  Yes.
22    Q.  Were you formalizing these policies in
23 or about 2014 because of any DEA requirement, or
24 was it for some other requirement?
25    A.  This was for formalizing it in this

Page 244

1 format so we could apply for VAWD certification.
2    Q.  I think you've told us to your
3 knowledge -- correct me if I'm wrong -- with
4 respect to following up on any orders of interest,
5 you're not aware of any DEA requirement to keep
6 any file or record at all; is that right?
7    A.  No.  There's nothing stated in the
8 document, Controlled Substances Act that stated
9 that.
10    Q.  Exhibit 25, this is the plaintiff
11 prepared exhibit.  You said this was by pill.  Is
12 that how you read dosage units?
13        MR. ROTTINGHAUS:  Objection.
14 Insufficient foundation.
15        THE WITNESS:  Yes.  I mean, that's my
16 assumption based on the way it's described as
17 dosing unit.
18 BY MR. BARNES:
19    Q.  When you were explaining that, you
20 seemed to hesitate about how you would count the
21 distribution of HCP products.
22        Is there a different way of doing it if you
23 were going to analyze it?
24    A.  Well, a lot of it is which particular
25 product was it.  There's a few different

Page 245

1 hydrocodone-containing products.  So if it's to
2 tablet level, how many units, how many bottles.
3 You really want to look at market share
4 information.  So does Giant Eagle pharmacies as a
5 percent of their business dispense a higher
6 percentage of hydrocodone than other pharmacies,
7 what's the market share of hydrocodone versus
8 other prescriptions.
9    I mean, there's a lot of different things
10 that would go into analyzing what that number
11 really means.
12    Q.  And would you say it's misleading in any
13 way to just count pills and say are you surprised
14 at this number?
15        MR. ROTTINGHAUS:  Objection.  Leading;
16 insufficient foundation.
17        THE WITNESS:  I can't really use this.
18 I wouldn't use this information for any business
19 analysis by itself or any other kind of evaluation
20 without seeing other correlating data regarding
21 other chains and/or pharmacies.
22 BY MR. BARNES:
23    Q.  Assume for the sake of argument, I
24 really don't know, but let's just assume that
25 these number of pills counts is correct.  To whom

Page 246

1 were these pills given to? What happened to these
2 pills?
3     MR. ROTTINGHAUS: Objection.
4 Insufficient foundation.
5     THE WITNESS: I can't answer that.
6 BY MR. BARNES:
7     Q. They would have gone through the
8 pharmacies?
9     A. They would have gone out through valid
10 prescriptions to some patients.
11     Q. And after they were distributed to
12 patients pursuant to valid prescriptions, do you
13 know what happened to them?
14     A. Not at that point.
15     MR. BARNES: I have nothing further.
16         RE-EXAMINATION
17 BY MR. ROTTINGHAUS:
18     Q. I just have a couple follow-up
19 questions, and I'll let you get out of here. Are
20 you okay going?
21     A. Yep.
22     Q. It will just be a few minutes I think.
23 From the time that medications left the HBC
24 warehouse to getting into the pharmacies to the
25 time they were actually dispensed, I want a better

Page 247

1 understanding of how long that process sometimes
2 took and sometimes didn't take.
3     A. Sure.
4     Q. Were there times where a pharmacy was
5 ordering medications that had to be shipped out
6 that day or the next day in order to fulfill
7 prescriptions that needed to be filled in the next
8 couple of days?
9     A. It could have been. It would depend on
10 the particular drug.
11     Q. Here's why I ask. I've gone to the
12 pharmacy needing a prescription of some sort of
13 antibiotic. They say we don't have it, but we'll
14 call our distributer. We'll have it here in the
15 next 24 hours.
16     Were there situations where Giant Eagle
17 pharmacies could contact HBC and say, hey, we need
18 a certain prescription; we need it here within 24
19 hours because we have customers that are waiting
20 on it?
21     A. HBC didn't operate where the store could
22 call. Everything was managed by electronic order
23 points. So it was based on a prescription going
24 out and then the product came back to replace what
25 was dispensed.

Page 248

1     So a lot of it would -- I can't really answer
2 because a lot of it would depend on the movement
3 of that particular product.
4     Q. Is it -- well, let me ask it this way:
5 Do you know whether there were occasions when
6 hydrocodone combination products were ordered and
7 shipped from the HBC warehouse and dispensed by
8 the pharmacy within 48 hours?
9     A. I don't know of specific examples. I
10 mean, I can't -- I can't really answer that one.
11     Q. You probably know what the average time
12 was that medication sat on the shelves in the
13 stores versus sitting in the warehouse; right?
14     A. I used to know that type of information.
15 I'm not going to throw an estimate out.
16     Q. Is it possible that within 10 days of a
17 medication, specifically a controlled substance,
18 being shipped by the HBC warehouse to a pharmacy,
19 that the medication would make its way to the
20 pharmacy and then make its way out of the
21 pharmacy?
22     A. It could if there's a valid prescription
23 requiring that, yes.
24     Q. It didn't have to sit in the pharmacy
25 for three or four days before it got dispensed,

Page 249

1 did it?
2     A. No. We had other -- we did have the
3 ability if we thought there was something that we
4 wanted to look at to tell a store to quarantine
5 that product and hold it off to the side until we
6 investigated.
7     Q. But unless you told them to do that,
8 they wouldn't normally do that, would they?
9     A. Not unless there was some kind of reason
10 to do so.
11     Q. Now, just to make sure I'm correct,
12 there's been a lot of discussions about
13 thresholds, whether they had come from McKesson or
14 thresholds from the HBC system itself. It's my
15 understanding that prior to October of 2013, there
16 were no thresholds generated on a daily basis for
17 anyone at Giant Eagle or HBC to look at; is that
18 correct?
19     MS. CHARLES: Object to form.
20     THE WITNESS: What's the timeframe
21 again?
22 BY MR. ROTTINGHAUS:
23     Q. Let me ask it again. It's my
24 understanding, and correct me if I'm wrong, but
25 it's my understanding that prior to October of

Page 250

1  '13, there was no system in place at HBC to
2  generate a daily threshold report to know what
3  medications might be exceeding the 12-month
4  average of the prior year?
5      A.  Other than the timeframe where you
6  showed the reports auto generated from Kayla
7  Voelker, I believe that's when those reports
8  specifically started coming out.
9      Q.  So prior to October '13, October of
10  2013, there were no daily threshold reports;
11  correct?
12      A.  I don't know the date timeframe, but,
13  yeah, there was a period sometime around that time
14  that we didn't have anything in place.
15      Q.  Between 2009 and 2014, sitting here
16  today, you're not aware of any orders of
17  hydrocodone combination products that were
18  determined to be suspicious orders?
19      A.  I cannot recall any specific ones.
20      Q.  Do you know one way or the other whether
21  there were any?
22      A.  I don't.  I can't confirm that.  I don't
23  want to say one way or another because I just
24  don't know.
25          MR. ROTTINGHAUS:  That's all I have.

Page 251

1          RE-EXAMINATION
2  BY MR. BARNES:
3      Q.  Just one follow-up question.  After the
4  threshold daily report was instituted in or about
5  October of '13, did it reveal anything with
6  respect to the adequacy of the controls that were
7  already in place?
8      A.  Based on --
9          MR. ROTTINGHAUS:  Let me make a quick
10  objection.  Insufficient foundation.
11      But go ahead.
12          THE WITNESS:  Based on the limited
13  number of suspicious orders that were generated
14  afterwards, I would say, no, it didn't really add
15  a whole lot to the process.  But, again, we looked
16  at it as an enhancement to what we had in place,
17  an extra stopgap.
18  BY MR. BARNES:
19      Q.  Did it indicate one way or the other
20  whether the controls in place were adequate?
21      A.  I would evaluate it --
22          MR. ROTTINGHAUS:  Objection.  Leading.
23          THE WITNESS:  I would evaluate it to
24  show that we did have adequate controls in place
25  from the beginning.

Page 252

1  BY MR. BARNES:
2      Q.  Even after you instituted -- you
3  enhanced it with the threshold system?
4      A.  Yes.
5          MR. BARNES:  Nothing further.
6          RE-EXAMINATION (Continued)
7  BY MR. ROTTINGHAUS:
8      Q.  Prior to 2014, was there ever a system
9  in place where anyone at HBC was instructed when
10  they had an order that exceeded thresholds to ask
11  any particular questions of the pharmacy to find
12  out and do a little more due diligence as to why
13  the order was exceeding threshold?
14      A.  When you say threshold, HBC wasn't
15  looking at threshold information.  They would look
16  at unusual orders, being a large size, and that's
17  where they would ask the questions from.
18      Q.  And was there ever at any point in time
19  to your knowledge any documented instruction to
20  anyone at or on behalf of HBC as to what specific
21  questions they should be asking of pharmacies when
22  they have an order that they thought was
23  extraordinarily large?
24      A.  Their process was to notify myself or
25  someone else at corporate to do the investigation

Page 253

1  for them.
2      Q.  And then was it indeed your
3  responsibility at that point to do the
4  investigation?
5      A.  Me, or throughout this timeframe, there
6  may have been others that were responsible for
7  following up.
8      Q.  You or Mr. Millward?
9      A.  It could have been Mr. Millward, yes.
10      Q.  Mr. Chunderlik?
11      A.  Yes.
12      Q.  Our Mr. Bianco?
13      A.  Correct.
14      Q.  Anyone else?
15      A.  Dan Beiter potentially.  I don't know if
16  it ever came up with them.
17          MR. ROTTINGHAUS:  Thank you.
18          MR. BARNES:  Thank you.
19          THE VIDEOGRAPHER:  Off the record 3:04.
20          (Whereupon, at 3:04 p.m., the taking of
21  the instant deposition ceased.)
22
23
24
25

Page 254

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF ALLEGHENY          )   SS:
3            C E R T I F I C A T E
4       I, Ann Medis, Registered Professional
5 Reporter, Certified Livenote Reporter and Notary
6 Public within and for the Commonwealth of
7 Pennsylvania, do hereby certify:
8       That GREGORY CARLSON, the witness whose
9 deposition is hereinbefore set forth, was duly
10 sworn by me and that such deposition is a true
11 record of the testimony given by such witness.
12       I further certify the inspection,
13 reading and signing of said deposition were not
14 waived by counsel for the respective parties and
15 by the witness.
16       I further certify that I am not related
17 to any of the parties to this action by blood or
18 marriage and that I am in no way interested in the
19 outcome of this matter.
20       IN WITNESS WHEREOF, I have hereunto set
21 my hand this 11th day of January, 2019.
22
      _____
23            Notary Public
24
25

Page 255

1 COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
  COUNTY OF ALLEGHENY          ) S H E E T
2
3    I, GREGORY CARLSON, have read the foregoing
  pages of my deposition given on January 8, 2019,
4 and wish to make the following, if any,
  amendments, additions, deletions or corrections:
5
6 Page  Line  Change and reason for change:
7 ____ ____ _____
8 ____ ____ _____
9 ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18
19 In all other respects, the transcript is true and
  correct.
20
21     _____
         GREGORY CARLSON
22
23 _____ day of _____, 2019.
24 _____
       Notary Public
25