```
 1                UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3                        - - -

 4    IN RE:  NATIONAL        )

      PRESCRIPTION OPIATE     )  MDL No. 2804

 5    LITIGATION              )

      _____)  Case No. 1:17-MD-2804

 6                            )

      THIS DOCUMENT RELATES   )

 7    TO ALL CASES            )  Hon. Dan A. Polster

 8                        - - -

 9             Tuesday, October 16, 2018

10       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

11

                          - - -

12

13        Videotaped deposition of Raymond P. Carney,

14    held at the offices of BakerHostetler, 200 Civic

15    Center Drive, Suite 1200, Columbus, Ohio, commencing

16    at 9:09 a.m., on the above date, before Carol A. Kirk,

17    Registered Merit Reporter and Notary Public.

18

19                        - - -

20

21

22

23            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 A P P E A R A N C E S:
 2    On behalf of the Plaintiffs:
 3          MCHUGH FULLER LAW GROUP
                  AMY J. QUEZON, ESQUIRE
 4                amy@mchughfuller.com
                  MICHAEL J. FULLER, JR., ESQUIRE
 5                (via teleconference)
                  mike@mchughfuller.com
 6          97 Elias Whiddon Road
            Hattiesburg, Mississippi  39402
 7          601-261-2220
 8                and
 9          GRAY AND WHITE LAW
            BY:  MARK K. GRAY, ESQUIRE
10                mgray@grayandwhitelaw.com
            713 East Market Street
11          Louisville, Kentucky  40402
            502-805-1800
12                and
13          SIMMONS HANLY CONROY, LLC
            BY:  RICK KROEGER, ESQUIRE
14                rkroeger@simmonsfirm.com
            One Court Street
15          Alton, Illinois  62002
            618-259-2222
16
                  and
17
            LEVIN PAPANTONIO THOMAS MITCHELL
18          RAFFERTY & PROCTOR P.A.
            BY:  ARCHIE C. LAMB, ESQUIRE
19                alamb@levinlaw.com
            316 South Baylen Street, Suite 600
20          Pensacola, Florida  32591
            205-435-7000
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                A P P E A R A N C E S:
 2   On behalf of the Cardinal Health, Inc.:
 3        WILLIAMS & CONNOLLY LLP
          BY:  STEVEN M. PYSER, ESQUIRE
 4             spyser@wc.com
          725 Twelfth Street, N.W.
 5        Washington, DC  20005
          202-434-5899
 6
 7   On behalf of the AmerisourceBergen:
 8        REED SMITH LLP
          BY:  NICHOLAS R. RODRIGUEZ, ESQUIRE
 9             nrodriguez@reedsmith.com
          Three Logan Square
10        1717 Arch Street, Suite 3100
          Philadelphia, Pennsylvania  19103
11        215-241-7947
12
     On behalf of HBC Service Company:
13
          MARCUS & SHAPIRA LLP
14        BY:  DARLENE M. NOWAK, ESQUIRE
               nowak@marcus-shapira.com
15        One Oxford Center, 35th Floor
          301 Grant Street
16        Pittsburgh, Pennsylvania  15219-6401
          412-338-5214
17
18   On behalf of Walmart:
19        JONES DAY
          BY:  CASTEEL E. BORSAY, ESQUIRE
20             cborsay@jonesday.com
          325 John H. McConnell Boulevard, Suite 600
21        Columbus, Ohio  43215-2673
          614-469-3939
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                A P P E A R A N C E S:
 2     On behalf of Prescription Supply, Inc.:
 3            PELINI, CAMPBELL & WILLIAMS LLC
              BY:  ERIC J. WILLIAMS, ESQUIRE
 4                ejwilliams@pelini-law.com
              8040 Cleveland Avenue NW, Suite 400
 5            North Canton, Ohio  44720
              330-305-6400
 6
 7     On behalf of CVS Indiana, LLC and CVS RX Services,
       Inc.:
 8
              ZUCKERMAN SPAEDER LLP
 9            BY:  R. MILES CLARK, ESQUIRE
                  mclark@zuckerman.com
10            1800 M Street NW, Suite 1000
              Washington, DC  20036-5807
11            202-778-1800
12
       On behalf of Johnson & Johnson and
13     Janssen Pharmaceuticals:
14            TUCKER ELLIS LLP
              BY:  GIUSEPPE W. PAPPALARDO, ESQUIRE
15                gwp@tuckerellis.com
              950 Main Avenue, Suite 1100
16            Cleveland, Ohio  44113
              216-592-5000
17
18     On behalf of McKesson:
19            COVINGTON & BURLING, LLP
              BY:  MEGHAN E. MONAGHAN, ESQUIRE
20                mmonaghan@cov.com
              850 Tenth Street, NW
21            Washington, DC  20001
              202-662-5531
22
23
24
```

```
 1                  A P P E A R A N C E S:
 2    On behalf of Endo Pharmaceuticals, Inc., and
      Endo Health Solutions Inc.:
 3
              ARNOLD & PORTER KAYE SCHOLER, LLP
 4            BY:  JOHN D. CELLA, ESQUIRE
                  john.cellaa@arnoldporter.com
 5            601 Massachusetts Avenue, NW
              Washington, DC  20001
 6            202-942-6771
 7
      On behalf of the Allergan Defendants:
 8
              KIRKLAND & ELLIS LLP
 9            BY:  ZACHARY A. CIULLO, ESQUIRE
                  zac.ciullo@kirkland.com
10            (via teleconference)
              300 North LaSalle
11            Chicago, Illinois  60654
              312-862-3429
12
13
14    ALSO PRESENT:
15            Twila Hulett, Levin Papantonio
              Katelyn Adams, Williams & Connolly
16            Darnell Brown, Videographer
              Zachary Hone, Trial Technician
17
18
19                       - - -
20
21
22
23
24
```

```
 1        VIDEOTAPED DEPOSITION OF RAYMOND P. CARNEY

 2                  INDEX TO EXAMINATION

 3   WITNESS                                        PAGE

 4       CROSS-EXAMINATION BY MS. QUEZON:             14

         CROSS-EXAMINATION BY MR. LAMB:              161

 5       REDIRECT EXAMINATION BY MR. PYSER:          212

         RECROSS-EXAMINATION BY MR. LAMB:            224

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1      VIDEOTAPED DEPOSITION OF RAYMOND P. CARNEY
 2                 INDEX TO EXHIBITS
 3   EXHIBIT              DESCRIPTION              PAGE
 4   Cardinal-Carney 1    Code of Federal           19
                          Regulations, Title 21,
 5                        Chapter II, Part 1301
 6   Cardinal-Carney 2    GAO document titled        22
                          "OxyContin Abuse and
 7                        Diversion and Efforts to
                          Address the Problem"
 8
     Cardinal-Carney 3    E-mail to Ms. Baker and    31
 9                        Mr. Reardon from
                          Mr. Mitchell, dated
10                        May 12, 2005, Bates-
                          stamped CAH_MDL_PRIORPROD_
11                        DEA07_00318789
12   Cardinal-Carney 4    E-mail thread ending with  33
                          an e-mail to Mr. Bennett
13                        from Mr. Reardon, dated
                          August 30, 2005, Bates-
14                        stamped CAH_MDL_PRIORPROD_
                          DEA07_02088028 and 2088029
15
     Cardinal-Carney 5    E-mail to Ms. McPherson    36
16                        and others from Mignette
                          Strife, dated 7/27/06,
17                        with attachments, Bates-
                          stamped CAH_MDL_PRIORPROD_
18                        DEA07_00828657 through
                          828674
19
     Cardinal-Carney 6    Document titled "Cardinal  41
20                        Health, Inc. v. Holder,
                          Attachment 48 to
21                        Defendants' Opposition to
                          Plaintiff's Motion for
22                        Preliminary Injunction"
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2     EXHIBIT              DESCRIPTION                 PAGE
 3     Cardinal-Carney 7    E-mail string ending with     46
                            an e-mail to Ms. Cooper
 4                          and others from
                            Mr. Flanagan, dated
 5                          11/17/07, Bates-numbered
                            CAH_MDL_PRIORPROD_DEA07_90
 6                          1772 through 901773
 7     Cardinal-Carney 8    Document titled "DEA          49
                            Suspends Lakeland Branch
 8                          of Drug Company From
                            Distributing Controlled
 9                          Substances"
10     Cardinal-Carney 9    E-mail thread ending with     53
                            an e-mail to Mr. Varelo
11                          from Mr. Kurtz, dated
                            12/5/07, Bates-stamped
12                          CAH_MDL_PRIORPROD_DEA07_00
                            135433 through 135434
13
       Cardinal-Carney 10   Letter to Registrant from     63
14                          Mr. Rannazzisi, dated
                            December 27, 2007
15
       Cardinal-Carney 11   Settlement and Release        69
16                          Agreement and
                            Administrative Memorandum
17                          of Agreement, Bates-
                            stamped CAH_MDL_PRIORPROD_
18                          DEA12_00001571 through
                            1618
19
       Cardinal-Carney 12   Total dosage of oxycodone     79
20                          and hydrocodone shipped by
                            Cardinal Health to
21                          Cuyahoga and Summit
                            Counties and total MME of
22                          oxycodone and hydrocodone
                            shipped by Cardinal Health
23                          to Cuyahoga and Summit
                            Counties
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    EXHIBIT            DESCRIPTION                PAGE
 3    Cardinal-Carney 13  Document titled "Sales -    81
                          Anti-Diversion Alert
 4                        Signals," Bates-stamped
                          CAH_MDL_PRIORPROD_AG_00003
 5                        23 through 325
 6    Cardinal-Carney 14  Document titled "U.S.       86
                          Opioid Prescribing Rate
 7                        Maps"
 8    Cardinal-Carney 15  Document titled "Process    87
                          to Establish SOM Threshold
 9                        Limits," Bates-stamped
                          CAH_MDL_PRIORPROD_AG_00286
10                        94 through 28697
11    Cardinal-Carney 16  Document titled "Cardinal   92
                          Health training -
12                        Welcome," Bates-stamped
                          CAH_MDL2804_00227518
13                        through 227612
14    Cardinal-Carney 17  E-mail thread ending with   98
                          an e-mail to Mr. Mone and
15                        others from Ms. McPherson,
                          dated 1/25/08, Bates-
16                        stamped CAH_MDL_PRIORPROD_
                          DEA07_00943834 through
17                        943836
18    Cardinal-Carney 18  E-mail thread ending with  102
                          an e-mail to Mr. Mone and
19                        others from Ms. McPherson,
                          dated 1/9/08, Bates-
20                        stamped CAH_MDL_PRIORPROD_
                          DEA07_00941054 through
21                        941062
22    Cardinal-Carney 19  Document titled "Sales -   118
                          Early Dialogue," Bates-
23                        stamped CAH_MDL_PRIORPROD_
                          AG_0000341 through 343
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    EXHIBIT              DESCRIPTION                 PAGE
 3    Cardinal-Carney 20   E-mail thread ending with   120
                           an e-mail to GMB-QRA-
 4                         Anti-Diversion from Mr.
                           Forst, dated 9/30/10,
 5                         Bates-stamped CAH_MDL_
                           PRIORPROD_DEA12_00003250
 6                         and 3251
 7    Cardinal-Carney 21   E-mail thread ending with   127
                           an e-mail to Mr. Forst and
 8                         Ms. Swedyk from Ms. Hug,
                           dated 2/15/10, Bates-
 9                         stamped CAH_MDL_PRIORPROD_
                           DEA12_00011836 and 11837
10
      Cardinal-Carney 22   Document titled "SOM         131
11                         Threshold Limit
                           Discussion," Bates-stamped
12                         CAH_MDL2804_00228510
                           through 228512
13
      Cardinal-Carney 23   Government's Prehearing      138
14                         Statement, Bates-stamped
                           CAH_MDL_PRIORPROD_DEA12_00
15                         000001 through 54
16    Cardinal-Carney 24   Document titled "Cardinal    146
                           Health - Lakeland
17                         Thresholds Exceeded,"
                           Bates-stamped CAH_MDL_
18                         PRIORPROD_DEA12_00004353
                           through 4355
19
      Cardinal-Carney 25   Declaration of Ruth A.       148
20                         Carter, Bates-stamped
                           CAH_MDL_PRIORPROD_DEA12_00
21                         004124 through 4165
22    Cardinal-Carney 26   E-mail thread ending with    152
                           an e-mail to Mr. Carney
23                         from Mr. Lanctot, dated
                           1/22/13, with attachment,
24                         Bates-stamped CAH_MDL2804_
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INDEX TO EXHIBITS
 2     EXHIBIT              DESCRIPTION              PAGE
 3     Cardinal-Carney 27   Document titled "Cardinal  158
                            Health Agrees to $44
 4                          Million Settlement for
                            Alleged Violations of
 5                          Controlled Substances Act"
 6     Cardinal-Carney 28   Letter to Messrs. Barrett  163
                            and Kaufmann from the
 7                          Congress of the United
                            States, dated 2/15/18
 8
       Cardinal-Carney 29   Document titled "UPDATE:    168
 9                          Former Mingo Co. Doctor
                            Sentenced to Prison in
10                          Pill Mill Probe"
11     Cardinal-Carney 30   Document titled "Former     170
                            Mingo Pill Mill Office
12                          Manager Sentenced to
                            Prison Time"
13
       Cardinal-Carney 31   Document titled             171
14                          "Suspicious drug order
                            rules never enforced by
15                          state"
16     Cardinal-Carney 32   E-mail thread ending with   203
                            an e-mail to
17                          Messrs. Carney and Lanctot
                            from Mr. Loudermilk, dated
18                          1/2/13, with attachments,
                            Bates-stamped CAH_MDL2804_
19                          00100156 through 100163
20     Cardinal-Carney 33   (Combined with Cardinal-    209
                            Carney Exhibit 32
21
       Cardinal-Carney 34   E-mail thread ending with   224
22                          an e-mail to Mr. Cameron
                            from Mr. Carney, dated
23                          7/18/17, Bates-stamped
                            CAH_MDL2804_00123098 and
24                          123099
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              P R O C E E D I N G S

 3                      - - -

 4          THE VIDEOGRAPHER:  Good morning.

 5      We are now on the record.  My name is

 6      Darnell Brown, and I'm the videographer

 7      with Golkow Litigation Services.

 8          Today's date is October 16, 2018,

 9      and the time is 9:09 a.m.

10          This video deposition is being

11      held in Columbus, Ohio in the matter of

12      National Prescription Opioid litigation

13      in the United States District Court for

14      the Northern District of Ohio.

15          The deponent is Ray Carney.

16          Counsel, please identify

17      yourselves for the stenographic record.

18          MS. QUEZON:  Amy Quezon on behalf

19      of the Plaintiff.

20          MR. GRAY:  Mark Gray on behalf of

21      the Plaintiff.

22          MR. KROEGER:  Rick Kroeger on

23      behalf of the Plaintiff.

24          MR. LAMB:  Archie Lamb on behalf
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          of the Plaintiff.

2               MR. PAPPALARDO:  Giuseppe

3          Pappalardo on behalf of

4          Johnson & Johnson.

5               MR. CELLA:  John Cella on behalf

6          of the Endo and Par Defendants.

7               MS. NOWAK:  Darlene Nowak on

8          behalf of HBC Service Company.

9               MS. BORSAY:  Casteel Borsay on

10         behalf of Walmart.

11              MR. CLARK:  Miles Clark from

12         Zuckerman Spaeder on behalf of the CVS

13         Defendants.

14              MR. WILLIAMS:  Eric Williams on

15         behalf of Prescription Supply, Inc.

16              MR. RODRIGUEZ:  Nicholas Rodriguez

17         on behalf of AmerisourceBergen.

18              MS. MONAGHAN:  Meghan Monaghan on

19         behalf of McKesson.

20              MS. ADAMS:  Katelyn Adams on

21         behalf of Cardinal Health.

22              MR. PYSER:  Steven Pyser,

23         Williams & Connolly, on behalf of

24         Cardinal Health and the witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:  The court

 2          reporter is Carol Kirk who will now

 3          swear in the witness.

 4                    - - -

 5                RAYMOND P. CARNEY

 6   being by me first duly sworn, as hereinafter

 7   certified, deposes and says as follows:

 8                CROSS-EXAMINATION

 9   BY MS. QUEZON:

10          Q.    Can you please state your full

11   name for the record.

12          A.    Raymond Paul Carney.

13          Q.    And, Mr. Carney, how are you

14   currently employed?

15          A.    I am employed at Cardinal Health.

16          Q.    And what do you do there?

17          A.    I am the director of independent

18   retail sales for the Wheeling division of

19   Cardinal.

20          Q.    And how long have you held that

21   position?

22          A.    This position, seven years.

23          Q.    And prior to that, were you

24   working with Cardinal?
```

```
 1          A.    Yes.

 2          Q.    When did you first begin to work

 3   with Cardinal?

 4          A.    In '88, April of '88.

 5          Q.    And have you always been in sales?

 6          A.    No.

 7          Q.    Tell me -- just if you can, give

 8   me sort of a thumbnail sketch of when you first

 9   began and the different positions you've held at

10   Cardinal Health.

11          A.    Sure.  In April of '88, started

12   out with the company as a -- a janitor of sorts,

13   right, helping to clean the totes and things

14   like that just -- I was going to school, so I

15   got a part-time job there as a janitor.

16          Q.    In Wheeling?

17          A.    Yes, in Wheeling, in Elm Grove,

18   yes.

19          Q.    Okay.  How long did you hold that

20   position?

21          A.    Just for a few months.  And then I

22   got hired full time as a delivery driver, and

23   that went from '88 to '90.  And then from '90 to

24   '91, I was a merchandiser.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     What does a merchandiser do?

 2              A.     Someone that goes into an

 3     independent retail pharmacy and sets up the

 4     product that you see on the shelf when you come

 5     into the store.

 6              Q.     Okay.

 7              A.     And then from '91 to 2000, I was a

 8     PBC in the field.

 9              Q.     And that's a pharmacy business

10     consultant?

11              A.     Yes, that's correct.

12              Q.     And that takes us to 2000, did you

13     say?

14              A.     Yes.

15              Q.     All right.

16              A.     And from 2000 to 2010, I was

17     promoted into a sales manager position.

18              Q.     Give me a brief outline of what

19     your duties and responsibilities were as sales

20     manager.

21              A.     Manage the sales team of a group

22     of -- it varied from three to five sales PBCs, a

23     merchandising team, and some -- a position we

24     call the POC position.  It's a pharmacy
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    operations consultant that deals with the

 2    technology in the pharmacy, those value-added

 3    services.

 4          Q.    And then in 2010?

 5          A.    For about a year, I became the

 6    director of pharmacy transition in the East for

 7    Cardinal.

 8          Q.    And tell me, again just briefly,

 9    what your duties and responsibilities were -- as

10    the director of what?

11          A.    Pharmacy transition.

12          Q.    Pharmacy transition?

13          A.    Yes.  That's a position where I

14    would help folks valuate the pharmacy, arrive at

15    a fair market value of their pharmacy, and help

16    them buy and sell independent retail pharmacies.

17          Q.    All right.  And then in 2011?

18          A.    I came back to Wheeling and became

19    the director of sales.

20          Q.    Who is your director supervisor?

21          A.    Chris Lanctot.

22          Q.    And approximately how many people

23    do you oversee?

24          A.    Twenty-two.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Mr. Carney, when, if ever, were

 2    you made aware that controlled substances that

 3    were distributed by your company, by Cardinal,

 4    were being diverted outside of legitimate

 5    channels?

 6              MR. PYSER:  Object to form.

 7         Mischaracterizes evidence.

 8              You can answer.

 9              Q.    You can answer.

10              A.    Okay.  I've never been aware that

11    the medications that we distribute have been

12    diverted outside of there.

13              Q.    So in your time from janitor all

14    the way to director of sales, no one at Cardinal

15    has ever made you aware that specifically

16    opioids were being diverted outside of

17    legitimate channels?

18              A.    No.

19              MR. PYSER:  Object to form.

20              Q.    Well, in your roles, your various

21    roles, at Cardinal, you were aware of your

22    responsibilities under the Controlled Substances

23    Act?

24              A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. QUEZON:  Okay.  And let's look

 2          at it if we can.  And this is 4915.

 3                        - - -

 4        (Cardinal-Carney Exhibit 1 marked.)

 5                        - - -

 6                    THE VIDEOGRAPHER:  The time is now

 7          9:15.  Going off the record.

 8                    (Pause in proceedings.)

 9                    THE VIDEOGRAPHER:  The time is now

10          9:17.  Back on the record.

11   BY MS. QUEZON:

12          Q.    Mr. Carney, what I have handed

13   you -- and it's on the screen as well if

14   that's -- if that's helpful -- is 21 C.F.R.

15   Section 1301.74.

16                    Are you familiar with this

17   particular law?

18                    MR. PYSER:  Object to form.

19          A.    Familiar?  I know -- I know of

20   this.  Yes, I've seen it before.

21          Q.    Okay.  And so let's just go

22   through it very briefly.  The registrant -- and

23   so that's anybody who has a DEA registration

24   number, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2         Q.    And Cardinal would fall into that

3    category, right?

4    A.    Yes.

5         Q.    All right.  So "The registrant

6    shall design and operate a system to disclose to

7    the registrant suspicious orders of controlled

8    substances.  The registrant shall inform the

9    Field Division Office of the Administration" --

10   which is the DEA, correct?

11   A.    Yes.

12        Q.    -- "in his area of suspicious

13   orders when discovered by the registrant.

14   Suspicious orders include orders of unusual

15   size, orders deviating substantially from a

16   normal pattern, and orders of unusual

17   frequency."

18             Now, Mr. Carney, certainly by '91,

19   1991, when you were a pharmacy business

20   consultant, you would have been at least

21   familiar with the system Cardinal had to

22   disclose suspicious orders, correct?

23   A.    I was aware of the system, yes.

24        Q.    Okay.  What was -- was it -- did

Highly Confidential - Subject to Further Confidentiality Review

1    it have a name?

2           A.    I do not recall the name from

3    then.  But I recall that the folks in charge of

4    that area in the compliance department would

5    receive or print out monthly Green Bar reports

6    and report anything as spelled out here to the

7    DEA.

8           Q.    And to your recollection,

9    Mr. Carney, that was on a monthly basis?

10          A.    I believe so, yes.

11          Q.    So not when discovered pursuant to

12   the law but retroactively on a monthly basis?

13                MR. PYSER:  Object to form.

14                Calls for a legal conclusion.

15          Q.    You can answer.

16          A.    I can't say.

17          Q.    Okay.  Now, a few moments ago when

18   I asked you whether or not you had ever been

19   made aware by any source that controlled

20   substances were being diverted outside

21   legitimate channels.  And I believe you told me

22   that you had not been made aware of that; is

23   that right?

24          A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2         Misstates the testimony.

 3         Q.    You can answer.

 4         A.    No.

 5         Q.    Let's make sure that question and

 6    answer is clear.

 7                    Were you made or were you not made

 8    aware that controlled substances were being

 9    diverted outside of legitimate channels?

10                    MR. PYSER:  Objection to form.

11         A.    No.

12                    MS. QUEZON:  Let's go to 1087.

13                    Do you have 1087 for me?

14    BY MS. QUEZON:

15         Q.    I apologize, Mr. Carney.  We're

16    looking for a clean copy of this.

17                    MS. QUEZON:  It will probably be

18             the last folder you check.  It goes to

19             46.  There you go.  Do you have one for

20             counsel?

21                         - - -

22         (Cardinal-Carney Exhibit 2 marked.)

23                         - - -

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. QUEZON:

 2          Q.    Okay.  Mr. Carney, this is a GAO

 3    report, the United States General Accounting

 4    Office, report to Congress or the Congressional

 5    Requesters.  This was done in December of 2003.

 6    And as you can see there, it's entitled

 7    "OxyContin Abuse and Diversion and Efforts to

 8    Address the Problem.

 9                Do you see that?

10          A.    Yes.

11          Q.    Is it your testimony today that

12    back in 2003 when you would have been, I guess,

13    a sales manager managing three to five pharmacy

14    business consultants, that no one from Cardinal

15    brought this to your attention?

16          A.    I don't recall.

17                MS. QUEZON:  Okay.  Let's go, if

18          we can, to the first page of the report,

19          and if we can highlight that second

20          paragraph.

21    BY MS. QUEZON:

22          Q.    And if it's easier on the screen

23    for you to see, it's been brought up and bolded.

24    And it says, "Several factors may have
```

```
 1   contributed to the abuse and diversion of

 2   OxyContin.  The active ingredient in OxyContin

 3   is twice as potent as morphine, which may have

 4   made it an attractive target for misuse."

 5              And then farther on down it says,

 6   "Moreover, the significant increase in

 7   OxyContin's availability in the marketplace may

 8   have increased opportunities to obtain the drug

 9   illicitly in some states."

10              Do you see that?

11              MR. PYSER:  Object to form.  Rule

12         of completion.  Not reading the entire

13         thing.

14         A.    Yes, I see it.

15         Q.    Okay.  So as early as December of

16   2003, the GAO is telling Congress that there is

17   an issue with abuse and diversion of OxyContin,

18   and the increase in its availability in the

19   marketplace is leading to diversion.

20              Were you made aware of that?

21              MR. PYSER:  Object to form.

22         Misstates evidence.  That's explicitly

23         contradictory to what the last sentence

24         in the paragraph says.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    You can answer the question.

 2              A.    I -- I don't recall.

 3              Q.    Was this, to the best of your

 4    recollection, this study, this GAO report

 5    regarding the diversion and abuse of OxyContin,

 6    was this something that you recall discussing

 7    with your pharmacy business consultants back in

 8    2003?

 9              A.    No.

10              Q.    If we can go to page 7, please.

11    And at the top, Mr. Carney, do see where it says

12    P1.1087?

13              A.    Mm-hmm.

14              Q.    So we're going to go to P1.1087.7.

15              A.    Okay.

16              MS. QUEZON:  And if we can bring

17         up that second paragraph, please.

18    BY MS. QUEZON:

19              Q.    And here the report discusses that

20    "In early 2000, media reports began to surface

21    in several states that OxyContin was being

22    abused, that is, used for non-therapeutic

23    purposes or for purposes other than those for

24    which it was prescribed and illegally diverted.
```

Highly Confidential - Subject to Further Confidentiality Review

1    According to FDA and the DEA, the abuse of

2    OxyContin is associated with serious

3    consequences, including addiction, overdose, and

4    death."

5              Do you recall having any

6    discussions with your pharmacy business

7    consultants that you were overseeing in 2000 to

8    2003 regarding the abuse and addiction that was

9    being caused by OxyContin?

10             MR. PYSER:  Object to form.

11        A.    I don't recall.

12        Q.    Let's go to the very next page,

13   Mr. Carney, if we can.

14             At the -- at the top portion of

15   that, the sentence that begins during, "During a

16   December 2001 Congressional hearing, witnesses

17   from DEA and other law enforcement officials

18   from Kentucky, Virginia, and West Virginia

19   described the growing problem of abuse and

20   diversion of OxyContin."

21             Now, Mr. Carney, in your role as

22   sales manager in the Wheeling, West Virginia

23   distribution center, would that include areas in

24   Kentucky, Virginia, and West Virginia?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    It would West Virginia, yes.

 2              Q.    Were you aware that law

 3    enforcement officials from West Virginia and the

 4    DEA had testified in 2001 regarding the abuse

 5    and diversion of OxyContin?

 6              A.    No, I wasn't.

 7              Q.    Let's go to 35, please.

 8                    There under that section,

 9    Mr. Carney, that -- on the side, it says,

10    "OxyContin's wide availability may have

11    increased opportunities for illicit use."

12                    Do you see that?

13              A.    Yes, I do.

14              Q.    Okay.  And that section says, "The

15    large amount of OxyContin available in the

16    marketplace may have increased opportunities for

17    abuse and diversion.  Both DEA and Purdue have

18    stated that an increase in a drug's availability

19    in the marketplace may be a factor that attracts

20    interest by those who abuse and divert drugs."

21                    Do you see that?

22              A.    Yes.

23              Q.    Were you aware back when you

24    served as the sales manager in the Wheeling,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   West Virginia area that at least this report

 2   found a link between the amount of drug

 3   available in the community to the likelihood of

 4   diversion?

 5              MR. PYSER:  Object to form.

 6         Misstates evidence.

 7         A.   I can't say.

 8         Q.   Would you agree with that,

 9   Mr. Carney?  Would you agree that the more drug

10   there is in a particular community, the

11   likelihood of diversion and abuse increases?

12              MR. PYSER:  Object to form.

13         A.   I would agree if they say "It may

14   have."  It may have.

15         Q.   Okay.  Let's go to the next page,

16   if we can.  And you see that graph at the top,

17   that table?

18         A.   Yes.

19         Q.   All right.  Let's just look at it.

20   So were you -- are you aware of when OxyContin

21   actually came out onto the market?

22         A.   No.

23         Q.   All right.  I'll let you know that

24   it is 1996, which you can see from this table
```

Highly Confidential - Subject to Further Confidentiality Review

1    here is when they began tracking the number of

2    prescriptions on through to 2002.

3              Do you see that?

4         A.   Yes.

5         Q.   And in 1996, according to this

6    report, there were 316,786 prescriptions in

7    1996.

8              Do you see that?

9         A.   Yes, I do.

10        Q.   And can you -- can you read for us

11   how many there were by the year 2002?

12        A.   7,234,204.

13        Q.   Now, OxyContin was one of the

14   controlled substances that Cardinal distributed,

15   correct?

16        A.   Yes.

17        Q.   Okay.  So at least by 2003, we

18   know that, as a registrant, Cardinal had the

19   duty under the law to design and operate a

20   suspicious order monitoring system, correct?

21              MR. PYSER:  Object to form.  Calls

22         for legal conclusion.

23        A.   "Duty"?  Could you repeat the

24   question, please?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Sure.  By 2003 -- I'm going to do

 2    my best without having to look over here and

 3    reread it.

 4                    By 2003, we know that Cardinal, as

 5    a registrant, as a DEA registrant, had a duty

 6    under the law to design and operate a suspicious

 7    order monitoring system?

 8                    MR. PYSER:  Same objection.

 9              A.    Yes.

10              Q.    And we also know that, at least

11    according to that GAO report, there is an issue

12    with abuse and diversion of OxyContin which is

13    an opioid that Cardinal distributed?

14              A.    I don't know -- I don't know that.

15    I don't know that.

16              Q.    What part don't you know?

17              A.    That at what time there was an

18    issue.

19              Q.    Okay.  Well, we know that the GAO

20    had reported to Congress that there was an

21    issue, correct?

22              A.    Yes.

23                    MS. QUEZON:  All right.  So let's

24              go to 4631.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. QUEZON:

 2          Q.    It's a new exhibit.  Sorry,

 3    Mr. Carney.

 4          A.    Oh, okay.

 5                      - - -

 6        (Cardinal-Carney Exhibit 3 marked.)

 7                      - - -

 8    BY MS. QUEZON:

 9          Q.    And let me start off by asking

10    you, Mr. Carney, do you know a Mark Mitchell?

11          A.    No, I do not.

12          Q.    Do you know a Steve Reardon?

13          A.    No, I do not.

14          Q.    How about Cassi Baker?

15          A.    Yes, I know Cassi Baker.

16          Q.    How do you know Cassi Baker?

17          A.    I know that she's an employee for

18    Cardinal.  I --

19          Q.    Do you know what she does?  I'm

20    sorry.

21          A.    I believe she worked in our

22    government -- governmental department --

23          Q.    Okay.

24          A.    -- in some capacity.
```

1      Q.    So this is an e-mail written by

2   Mr. Mitchell apparently on May 12th of 2005.  So

3   this is now a couple years past that GAO report

4   that we just looked at.  And the subject line is

5   "Drug Wholesale Advisory Council."

6            Do you know who -- do you know

7   what entity that is?

8        A.    No, I don't.  Can I have a second

9   to read through here?

10       Q.    Absolutely.  Take your time and

11   let me know.

12       A.    Okay.

13       Q.    All right.  So it's really the

14   first paragraph that I'm most concerned with.

15   And it begins, "We (three wholesalers) were

16   asked by Greg Jones if we have specific protocol

17   to monitor possible drug diversion (outside of

18   ARCOS) activity with Internet pharmacies or

19   wholesaler accounts.  Nobody volunteered an

20   answer.  To my knowledge, we do not.  If a

21   distributor or Internet pharmacy customer is

22   properly licensed and a legal entity to purchase

23   from us, we typically do not monitor what they

24   purchase or track who they sell to."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Were you aware, Mr. Carney, in

 2     your role as sales manager in 2005 that, at

 3     least according to Mr. Mitchell, there was not a

 4     monitoring system to track Internet pharmacy or

 5     wholesale distributor orders?

 6          A.    Yep.  Not aware.  I was in the

 7     independent retail sales side of the business.

 8     This Mark Mitchell was on the health system

 9     side, the hospital side, a different class of

10     trade than I deal with.  I was not aware of

11     this, have not seen this e-mail, or know about

12     this conversation.

13               MS. QUEZON:  All right.  Let's go

14          to 4598, please, and this will be

15          Exhibit Number 4.

16                         - - -

17          (Cardinal-Carney Exhibit 4 marked.)

18                         - - -

19     BY MS. QUEZON:

20          Q.    And, Mr. Carney, with these e-mail

21     threads --

22          A.    Yes.

23          Q.    -- they go from the bottom up.

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    So just take your time and let me

 2    know when you're --

 3              A.    Sure.

 4              Q.    -- ready.

 5              A.    Okay.

 6              Q.    All right.  So -- and I apologize.

 7    I forgot your last response as to your knowledge

 8    of Mr. Reardon.

 9                    Do you know who that is?

10              A.    I've heard the name, but I do not

11    know him.

12              Q.    Okay.  At least according to this

13    e-mail, his title is vice president, quality and

14    regulatory affairs.

15                    Do you see that?

16              A.    Yes.

17              Q.    All right.  Now, this is a few

18    months later after Mr. Mitchell's e-mail

19    regarding the Internet pharmacies, and now we're

20    in August of 2005.  And Mr. Reardon writes, "DEA

21    has recently initiated investigations of

22    Internet pharmacies who are purchasing excessive

23    qualities -- quantities -- excuse me -- of

24    controlled substances, primarily phentermine and
```

Highly Confidential - Subject to Further Confidentiality Review

1    hydrocodone and dispensing these controlled

2    substances without a valid prescription, in that

3    there was not a required doctor-patient

4    relationship."

5           He goes on to talk about the

6    ongoing meetings with the DEA and that the DEA

7    had identified Colorado as a particular Internet

8    pharmacy problem.

9           The last sentence there, the last

10   full sentence, says, "As we go forward, we will

11   be developing criteria which will help identify

12   Internet pharmacy customers and monitor Internet

13   pharmacy customer purchasing patterns."

14          Were you aware, sir, that as late

15   as August of -- the end of August of 2005, that

16   there was not a monitoring program for Internet

17   pharmacy purchases?

18          MR. PYSER:  Object to form.

19       Misstates evidence.

20       Q.    You can answer.

21       A.    Yeah, I wasn't aware.

22       Q.    And then at the top, he

23   reiterates, "Once we develop a due diligence and

24   monitoring program, it would become part of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    checklist."
 2              Sir, this is -- let's see.  The
 3    Controlled Substances Act came into law in 1971.
 4    This is 2005.  And as sales manager, you were
 5    not aware that there wasn't a due diligence
 6    monitoring program for the sale of controlled
 7    substances to Internet pharmacies?
 8              MR. PYSER:  Object to form.
 9         A.    I was aware that we had a
10    suspicious order monitoring system in place.
11    But, again, I was involved in independent retail
12    pharmacy in West Virginia, Pennsylvania, and
13    Ohio at the time, and I wasn't made aware or
14    didn't have a line of sight on this.
15              MS. QUEZON:  Okay.  Let's go to
16         4444.  18, yes.  This is Exhibit 5, I
17         believe.
18                   - - -
19         (Cardinal-Carney Exhibit 5 marked.)
20                   - - -
21    BY MS. QUEZON:
22         Q.    You are welcome to read as much as
23    you want.  I can tell you that the area I'm
24    going to be discussing with you is on page 7.
```

```
 1                    Mr. Carney, are you familiar with

 2     regulatory compliance reviews?

 3            A.    No.

 4            Q.    Were you aware that Cardinal

 5     Health would do regulatory compliance reviews of

 6     its distribution centers?

 7            A.    Yes.

 8            Q.    Do you see that this appears to be

 9     a regulatory compliance review that was done in

10     June of 2006 at the Birmingham, Alabama

11     distribution center?

12            A.    Yes, I see that.

13            Q.    Okay.  So now we are a year from

14     Mr. Reardon's e-mail that, at least according to

15     the e-mail, said that there was not a monitoring

16     program for suspicious orders or excessive

17     purchases from Internet pharmacies.  That was in

18     August of 2005.  Now we're in June of 2006.

19     Okay?

20            A.    Yes.

21                  MS. QUEZON:  If we can go to page

22            4 of the document.

23                  MR. PYSER:  Counsel, before we

24            move on on this document, I just want to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              note for the record this is one of the

 2              documents that was part of Cardinal's

 3              clawback.  We haven't had a chance yet

 4              to review this document to determine

 5              whether any of these individuals are

 6              attorneys.  In the event they are and

 7              this is a privileged document --

 8                   MS. QUEZON:  We can address it.

 9                   MR. PYSER:  -- we reserve the

10              right --

11                   MS. QUEZON:  Sure.

12                   MR. PYSER:  -- to claw it back and

13              address it at that time --

14                   MS. QUEZON:  Sure, sure, sure.

15                   MR. PYSER:  -- including

16              potentially striking testimony if it is

17              privileged.

18                   MS. QUEZON:  Understood.  Okay.

19    BY MS. QUEZON:

20         Q.   Okay.  Let's go to page 4 of the

21    document, and you see where it says "Significant

22    Issues:  DEA"?

23         A.   Yes.

24         Q.   The fourth sentence that begins
```

Highly Confidential - Subject to Further Confidentiality Review

1    "There is," do you see that sentence?

2          A.    Yes, I do.

3          Q.    And at least according to this

4    compliance review done in June of 2006, it

5    reads, "There is no system to determine

6    excessive or suspicious ordering by customers of

7    controlled substance products."

8                Do you see that?

9          A.    I do.

10         Q.    We can go to page 7.  And it's the

11   bottom section entitled "Controlled Substance

12   Order Filling."

13         A.    Yes.

14         Q.    And at least according to this

15   compliance review at the Birmingham, Alabama,

16   distribution center, the observation is that

17   "There is no system in place to determine

18   excessive purchasing of controlled substance

19   products."

20               Do you see that?

21         A.    Yes, I do.

22         Q.    Do you see under the Corrective

23   Action, it says what they're going to do,

24   they're going to "Create a system to determine

Highly Confidential - Subject to Further Confidentiality Review

1    excessive purchasing by customers of controlled

2    substance products and report any excessive

3    purchases to the DEA on a monthly basis."

4              Now, at the beginning of your

5    deposition, sir, I believe you told me that the

6    monitoring system that you were familiar with

7    did just that, reported on a monthly basis,

8    correct?

9         A.    Yes.

10        Q.    And then it goes on to say at the

11   bottom of that section, "When a narcotic order

12   appears to be excessive, have a supervisor

13   approve the DEA Form 222."

14             Do you see that?

15        A.    Yes, I do.

16        Q.    Okay.  So, first of all, going

17   back to the Controlled Substances Act, as we

18   read at the beginning, the system that was to be

19   designed and operated was supposed to identify

20   and report suspicious orders when discovered.

21             Do you recall that?

22        A.    Yes.

23        Q.    Not retroactively at the end of

24   the month, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I'm -- I'm not aware of it.

 2              Q.    So, at least according to the

 3     quality compliance review, there is no system in

 4     place.  Now we're going to create one in June of

 5     2006.  But we're only going to report on a

 6     monthly basis, and if it appears to be

 7     excessive, we're going to have a supervisor

 8     approve it, not determine whether it should be

 9     approved.  It says, "Have a supervisor approve

10     it," correct?

11                    MR. PYSER:  Object to form.

12              A.    That's what it says here.

13                    MS. QUEZON:  Let's go to 4050,

14              please.  And you can go to 4050.1 -- or

15              2, I guess.  Sorry.

16                            - - -

17         (Cardinal-Carney Exhibit 6 marked.)

18                            - - -

19     BY MS. QUEZON:

20              Q.    Now, I'm going to apologize ahead

21     of time for the printing of this.  It doesn't

22     come out very clearly, but perhaps the actual

23     copy will be better.  And that's Exhibit 6.

24                    All right.  Now, this letter was
```

1    written, at least according to the date on the

2    top of it, September 27th of 2006.

3                Do you see that?

4          A.    Yes, I do.

5          Q.    All right.  So we were just in

6    June when it was determined that there was not a

7    suspicious order monitoring system, at least at

8    the Birmingham distribution center.  And now in

9    September, this is a letter from the DEA to

10   Cardinal Health, but it went to all the

11   distributors.

12               Are you familiar with this letter?

13         A.    No, I'm not.

14         Q.    In 2006, sir, were you still a

15   sales manager in the Wheeling, West Virginia

16   distribution center?

17         A.    Yes, I was.

18         Q.    And is it your testimony that no

19   one from Cardinal made you aware of this

20   correspondence from the DEA in September of

21   2006?

22         A.    Yes.

23         Q.    All right.  Well, let's go through

24   just a little bit of it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Let's go to .3, 50.3.

 2          A.    Mm-hmm.

 3          Q.    In the center there, sir, where it

 4   says "The DEA regulations require."  Do you see

 5   that section?

 6          A.    Yes, I do.

 7          Q.    All right.  And this is basically

 8   just a restatement of that Controlled Substances

 9   Act that we looked at at the beginning, right,

10   "The registrant shall design and operate a

11   system to disclose to the registrant suspicious

12   orders of controlled substances."

13                    Do you see that?

14          A.    Yes.

15          Q.    Okay.  Down beneath the quotation

16   of the Controlled Substances Act, it says, "It

17   bears emphasis that the foregoing reporting

18   requirement is in addition to and not in lieu of

19   the general requirements under 21 U.S.C. 823(e)

20   that a distributor maintain effective controls

21   against diversion."

22                    Do you see that?

23          A.    Yes, I do.

24          Q.    All right.  And let's go back to
```

```
 1    the first section of the page, .2.

 2                    At the last sentence of the third

 3    paragraph, sir, it says, "This responsibility is

 4    critical, as Congress has expressly declared

 5    that the illegal distribution of controlled

 6    substances has a substantial and detrimental

 7    effect on the health and general welfare of the

 8    American people."

 9                    Do you see that?

10         A.    I do.

11         Q.    All right.  Now, the Controlled

12    Substance Act and the DEA's guidance in this

13    letter makes it clear that this responsibility,

14    the responsibility to design and implement a

15    suspicious order monitoring system, is the

16    responsibility of the registrant, correct?

17         A.    Yes.

18         Q.    It doesn't say you can rely on

19    somebody else --

20                    MR. PYSER:  Object to form.

21         Q.    -- in order to determine whether

22    an order is suspicious?  It says the registrant

23    must design and operate, correct?

24                    MR. PYSER:  Object to form.  Calls
```

1           for legal conclusion.

2           A.    I believe so, yes.

3           Q.    Okay.  And on page 3 -- sorry.

4    Lost my place.  Just a moment, please.  Sorry.

5                 Okay.  Yes.  In the paragraph that

6    begins "in a similar vein" -- it's the second

7    full paragraph before the end of the page.

8                 Do you see that, sir?

9           A.    Yes, I do.

10          Q.    Okay.  "In a similar vein, given

11   the requirement under Section 823(e), that a

12   distributor maintain effective controls against

13   diversion, a distributor may not simply rely on

14   the fact that the person placing the suspicious

15   order is a DEA registrant and turn a blind eye

16   to the suspicious circumstances."

17                Do you see that?

18          A.    I do.

19          Q.    So simply because a pharmacy or an

20   Internet pharmacy or a pill mill has a DEA

21   registration number does not mean that that in

22   and of itself -- the order is not suspicious,

23   correct?

24                MR. PYSER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    You can answer.

 2           A.    Could you repeat the question one

 3    more time?

 4           Q.    I can try.

 5                 Simply because an entity has a DEA

 6    registration number, whether that be a pharmacy,

 7    a pill mill, an Internet pharmacy, that in and

 8    of itself does not -- shipping to them does not

 9    remove the responsibility of monitoring

10    suspicious orders just because they have a

11    registration number, correct?

12           A.    Yes.

13                 MR. PYSER:  Objection to form.

14           A.    Yes, it does not.

15                 MS. QUEZON:  All right.  Okay.

16           Let's go to P1.4771, please.  It's

17           Exhibit 7, I believe.

18

19                       - - -

20        (Cardinal-Carney Exhibit 7 marked.)

21                       - - -

22                 MR. PYSER:  Counsel, for the

23           record, same issue on this document

24           given the Bates numbers and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              potential clawback.

 2                   MS. QUEZON:  Okay.

 3                   MR. PYSER:  I think this one

 4              raises the same issues as the last.  Can

 5              we just get a standing objection --

 6                   MS. QUEZON:  Absolutely.

 7                   MR. PYSER:  -- on these Bates

 8              numbers that are in that range?

 9                   MS. QUEZON:  Absolutely.

10                   MR. PYSER:  Thank you.

11   BY MS. QUEZON:

12         Q.    Are you -- do you know who Peter

13   Flanagan is?

14         A.    No, I do not.

15         Q.    Okay.  So this is an e-mail from

16   Mr. Flanagan to it looks like a number of

17   different list serves within Cardinal, correct?

18         A.    Yes.

19         Q.    And it says, "Subject: Local

20   News."  And if you look at the page attached to

21   the e-mail, you see that in November of 2006, a

22   pharmacy was raided by DEA agents.

23              Do you see that?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And if you'll look over on that

 2    article in the third column or the -- yeah,

 3    third column where it says, "Most of the

 4    medicines were hydrocodone sold as Vicodin and

 5    alprazolam sold as Xanax."

 6                    Do you see that?

 7              A.    I do.

 8              Q.    And then there's a statement there

 9    that says, "My understanding" -- or, "The site

10    appears to be an online pharmacy.  My

11    understanding is they were selling drugs over

12    the Internet."

13                    Do you see that?

14              A.    I do.

15              Q.    Okay.  And the e-mail -- if we can

16    go back to that -- says, "All, FYI, please make

17    sure to share this with your accounts who you

18    know are playing in the gray area."

19                    Do you see that?

20              A.    I do.

21              Q.    So two months after the DEA

22    warning, just because you've got a -- they've

23    got a DEA registration number, that does not

24    fulfill your obligation under the Controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Substances Act.  An article's being passed

 2    around at Cardinal to let the accounts who are

 3    playing in the gray area be aware that the DEA

 4    is cracking down, correct?

 5              MR. PYSER:  Object to form.

 6         A.    I'm not aware of this situation.

 7    Again, I was in West Virginia, Pennsylvania, and

 8    Ohio.  I've not seen this e-mail.  I didn't know

 9    this store, and I've never heard of a gray area.

10              MS. QUEZON:  All right.  Let's go

11         to 4056.  I think this is 8.  Exhibit 8.

12                    - - -

13         (Cardinal-Carney Exhibit 8 marked.)

14                    - - -

15    BY MS. QUEZON:

16         Q.    Mr. Carney, were you aware of in

17    2007 when a number of the distribution centers

18    for Cardinal were suspended, their licenses were

19    suspended?

20         A.    I became aware of it after the

21    fact, yes.

22         Q.    Let's look at, if we can -- and

23    this is a DEA announcement in December of 2007.

24              MR. PYSER:  Counsel, is this a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              document that was produced?  Because it

 2              has a date from March of 2012 but no

 3              Bates numbers on it.

 4                   MS. QUEZON:  I don't know the

 5              answer to that.

 6   BY MS. QUEZON:

 7         Q.   So if we can look at it.  This is

 8   an announcement of the suspension of the

 9   Lakeland distribution center of Cardinal,

10   correct?

11         A.   I believe so, yes.

12         Q.   All right.  And if we can go to

13   the second paragraph there, the last couple

14   sentences -- or the last full sentence.  "In

15   spite of being warned by DEA about the

16   characteristics of rogue Internet pharmacies,

17   this distribution center distributed over

18   8 million dosage units of hydrocodone products

19   between August 2005 and October 2007 to rogue

20   pharmacies."

21              Do you see that?

22         A.   I do see it, yes.

23         Q.   Okay.  So we've gone through some

24   of these documents and at least according to the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    e-mails and the quality compliance review that

 2    was done in Birmingham, there was not a

 3    controlled substance monitoring system in place,

 4    particularly when it came to rogue Internet

 5    pharmacies, correct?

 6              MR. PYSER:  Object to form.

 7         Misstates testimony.

 8         A.    Yeah, I don't know that.  I don't

 9    know that.

10         Q.    Was the Wheeling distribution

11    center distributing to Internet pharmacies?

12         A.    No.

13         Q.    Not ever?

14         A.    Not that I know of, no.

15         Q.    Is it your sworn testimony today

16    that the Wheeling distribution center never

17    distributed any controlled substances to

18    Internet pharmacies?

19         A.    Not that I know of, no.

20         Q.    Okay.  That's different than no.

21    You are not aware of what --

22         A.    I'm not aware of any that fell

23    under my purview.

24              MS. QUEZON:  Okay.  All right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Let's go 4722, please.
 2    BY MS. QUEZON:
 3            Q.    Now, at the same time as -- or
 4    around the same time that Lakeland was
 5    suspended, you were made eventually aware that
 6    other distribution centers' licenses were
 7    suspended as well?
 8            A.    Others -- I became aware of the
 9    Florida -- the Florida issue.
10                  MS. QUEZON:  Can you pull up 4722,
11            please.  Do you have that?  All right.
12            Well, I want to do it, so let's take it
13            down.
14                  What time is it?  Let's take a
15            quick break because I do want to get
16            this one -- I don't think I have a clean
17            copy for you.  So I'm going to make a
18            clean copy of it, and then we can start
19            back up.
20                  MR. PYSER:  Okay.  How many
21            minutes do you need?
22                  MS. QUEZON:  Ten minutes maybe.
23                  THE VIDEOGRAPHER:  The time is now
24            10:02.  Going off the record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Recess taken.)

 2                    THE VIDEOGRAPHER:  Okay.  The time

 3          is now 10:19.  Back on the record.

 4    BY MS. QUEZON:

 5          Q.    All right.  Mr. Carney, I believe

 6    when we took a break, we had just gone over the

 7    fact that the Lakeland distribution center for

 8    Cardinal had been suspended.

 9                    Do you recall that?

10          A.    Yes.

11          Q.    All right.  And were you aware

12    that at the same time, or approximately the same

13    time, that the Lakeland distribution center's

14    registration was suspended, that there were

15    other distribution centers also operated by

16    Cardinal that were suspended?

17          A.    I was not.

18                    MS. QUEZON:  Okay.  Let's look, if

19          we can, at Exhibit Number 9.

20                        - - -

21          (Cardinal-Carney Exhibit 9 marked.)

22                        - - -

23    BY MS. QUEZON:

24          Q.    Are you familiar with the fact
```

Highly Confidential - Subject to Further Confidentiality Review

1    that Cardinal has an Auburn, Washington

2    distribution center?

3           A.    Yes.

4           Q.    Were you aware that in December of

5    2007, the Auburn, Washington distribution center

6    was also suspended from distributing controlled

7    substances?

8           A.    I was not.

9           Q.    Let me know when you have had the

10   opportunity to read through the e-mail.  And

11   I've got just a couple questions for you.

12          A.    Sure.

13                Got it.

14          Q.    All right.  If we can start on the

15   second page, which is going to be the first

16   e-mail.  You see there it says, "Attached is the

17   latest information regarding the DEA issue at

18   our Auburn facility"?

19          A.    Yes.

20          Q.    Do you see that?

21          A.    Yes, I do.

22          Q.    Okay.  "Some additional Q&As have

23   been added, including the fact that customers

24   may place larger orders for controlled

1    substances from Auburn until the suspension goes

2    into effect at noon Pacific time on Monday.

3    However, a limiter will be set at 300 percent of

4    their regular order."

5           Do you see that?

6       A.    Yes, I do.

7       Q.    Okay.  So if I'm reading this

8    correctly, the Auburn distribution center is

9    being suspended because it doesn't have

10   effective controls over controlled substances.

11   And in response, just prior to the suspension,

12   they're going to let their pharmacy customers

13   order 300 percent of their regular orders of

14   controlled substances.  Am I reading that

15   correctly?

16          MR. PYSER:  Object to form.

17        Misstates evidence.

18       A.    I'm not privy to what was going on

19   at that distribution center.  Again, I work out

20   of the West Virginia distribution center and was

21   not aware of any of this going on.

22       Q.    Can we agree that that is

23   reckless, if, in fact, a distribution center is

24   being suspended for not having effective

Highly Confidential - Subject to Further Confidentiality Review

1    controls and the response is to increase the

2    limit of controlled substances by 300 percent?

3              MR. PYSER:  Object to form.

4         Misstates evidence and calls for a legal

5         conclusion.

6         Q.    Do you have an opinion, sir?

7         A.    I can't say whether it's reckless

8    or not.

9         Q.    If we can go to the first page of

10   that e-mail, Mr. Carney.  And I just -- and this

11   is Mr. Kurtz writing.  And this is now obviously

12   December of 2007.  And it begins "Just some

13   thoughts on the Auburn, Washington incident that

14   concern me."

15             Do you see that?

16        A.    Yes, I do.

17        Q.    Okay.  The second full paragraph

18   reads, "The manual process we perform now with

19   the discovery of suspected excessive purchases

20   being left up to the keyer notifying myself, or

21   a picker/double-checker/QC'er questioning an

22   amount being processed seems to leave ample

23   opportunity for failure.  A system-generated

24   flag would be a more complete or thorough method

1   of determining spikes or excessive quantities

2   than what we are currently performing."

3            Do you see that?

4        A.    I do see it.

5        Q.    So apparently in the Auburn,

6   Washington distribution center, they were

7   relying on a picker, double-checker, or QC'er.

8            Can you tell the jury what those

9   terms mean.

10       A.    A picker is a person who picks the

11  order.  A double-checker and a QC'er is someone

12  who scans the order for accuracy.

13       Q.    So they are relying on the picker

14  or the QC'er to make a judgment call about what

15  an excessive order is?

16       A.    I can't speak to what went on in

17  that distribution center.  I only am privy to or

18  can recall what's gone on in our -- our center

19  out of Wheeling.

20       Q.    If we go on to that next

21  paragraph.  It says, "As you know I've

22  investigated many accounts, tracked their

23  ordering history, and reached out for guidance

24  and directions.  But without 'someone' bringing

1    a suspected excessive quantity order to our

2    attention, many, many more could be going out

3    the door under our noses.  I wonder could a

4    similar situation happen in Lakeland and

5    management be questioned 'Why wasn't this

6    discovered?'"

7              Do you see that?

8         A.   I see that, yes.

9         Q.   Okay.  And in December of 2007, I

10   think you mentioned a moment ago that you

11   weren't aware that the Auburn, Washington

12   facility had even been suspended, correct?

13        A.   No.

14        Q.   So no one from Cardinal brought to

15   your attention as the sales manager in Wheeling,

16   West Virginia, that several distribution centers

17   had been suspended because they did not have

18   effective controls regarding controlled

19   substances?

20             MR. PYSER:  Object to form.

21        A.   No.

22        Q.   Is it something you would have

23   wanted to know?

24        A.   I can't say.  I can only speak for

1    what went on in our distribution center and the

2    suspicious order monitoring system we had in

3    place at the time.

4         Q.    At the beginning of the

5    deposition, Mr. Carney, I asked you when, if

6    ever, it had been brought to your attention that

7    opioids specifically were being diverted out of

8    legitimate channels, and you told me that it had

9    never been brought to your attention; is that

10   right?

11        A.    Right, not that I recall.

12        Q.    And for the vast majority of this

13   time period, so let's say from 1996, when

14   OxyContin first came on the market, through to

15   the present, you lived in Wheeling, West

16   Virginia?

17        A.    Yes.

18        Q.    And yet you didn't know that

19   opioids were being diverted outside of

20   legitimate channels?

21        A.    I didn't know -- I -- I don't know

22   of any diverted drugs as it pertains to my sales

23   team or any of the orders that -- that we

24   delivered to independent retail pharmacies that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I serviced were being diverted.

 2         Q.    And my question is just a little

 3    bit different.  My question is, were you ever

 4    made aware from any source that controlled

 5    substances, particularly opioids, were getting

 6    diverted -- whether they were yours or not or

 7    somebody else's, that's not part of the

 8    question.  The question is, were you aware that

 9    opioids were being diverted outside of

10    legitimate channels?

11              MR. PYSER:  Object to form.

12         A.    I became aware of the opioid

13    epidemic.  I remember -- I recall, you know,

14    becoming aware of that sometime in 2008, 2009.

15    So, yes, I was aware through the media that

16    these things were happening, that somehow these

17    pills were getting into the wrong hands or being

18    abused by the wrong folks, yes.

19         Q.    Okay.  But you were not made aware

20    prior to that, so you think maybe around 2008.

21    Here we are right now in 2007 when multiple

22    distribution centers of Cardinal's are being

23    suspended for that very reason, not having

24    effective controls over controlled substances,
```

```
 1   and no one from Cardinal made you aware of that

 2   at the time?

 3                MR. PYSER:  Object to form and

 4          misstates evidence.

 5          Q.    Am I correct?

 6          A.    I can't say how I became aware of

 7   those situations happening in Florida.  I just

 8   know that I knew or found out or heard about

 9   them.

10          Q.    Of the one Lakeland facility?

11          A.    Of the Lakeland facility.

12          Q.    Any of the other distribution

13   centers?

14          A.    No, no.

15          Q.    Okay.  During this period of time,

16   Mr. Carney, 2007 time frame, the end of 2007

17   when these distribution centers were suspended,

18   when their DEA registration was suspended, was

19   Mr. Lanctot your supervisor?

20          A.    No.

21          Q.    Who was your supervisor then?

22          A.    In 2007 I would have been a sales

23   manager, and the person that sat in the position

24   that I hold now was a gentleman named
```

Highly Confidential - Subject to Further Confidentiality Review

1    Stephen Gates.

2        Q.    Okay.  And to the best of your

3    recollection, there wasn't a conference call

4    between your supervisor and the other sales

5    managers or the PBCs, the pharmacy business

6    consultants, regarding the suspensions of these

7    distribution centers?

8        A.    There may have been a

9    conversation.  I may have become aware of it

10   through a conference call, but I can't say for

11   sure.

12       Q.    Okay.  You didn't receive a memo

13   outlining the failures or at least the alleged

14   failures, what DEA said they did wrong, you

15   didn't receive any packets of information as far

16   as, "Hey, the DEA says we messed up and here's

17   how we messed up.  We need to get some

18   corrective action"?

19            MR. PYSER:  Object to form.

20            You can answer.

21       A.    Not that I remember.

22            MS. QUEZON:  Let's go to 4008,

23       please.  And this will be Exhibit 10.

24                 - - -

Highly Confidential - Subject to Further Confidentiality Review

```
 1            (Cardinal-Carney Exhibit 10 marked.)

 2                        -  -  -

 3    BY MS. QUEZON:

 4            Q.    Now, Mr. Carney, a few moments ago

 5    we looked at a correspondence from the DEA that

 6    was sent to Cardinal in 2006.

 7                 Do you remember that?

 8            A.    Yes.

 9            Q.    And I believe your testimony was

10    that it had not been forwarded to you and you

11    had not been provided with that correspondence

12    at least to the best of your recollection?

13            A.    Correct.

14            Q.    Okay.  So, Mr. Carney, as you can

15    see, this now is September of 2007, so

16    approximately a year later.

17            A.    Mine says December 27, 2007.

18            Q.    Yes.  Did I say that wrong?  I'm

19    sorry.  I'll start over.

20                 So I believe the date of this

21    correspondence from the DEA to Cardinal is

22    December 27, 2007, correct?

23            A.    Yes.

24            Q.    All right.  And just so the record
```

```
 1    is clear, the first correspondence from the DEA

 2    was in September of 2006.  So this is

 3    approximately a year later there's another

 4    correspondence going out to the distributors.

 5              Do you see that?

 6         A.   This is a separate letter than the

 7    other one is what you're saying?

 8         Q.   Yes, sir.

 9         A.   Yes, I see that.

10         Q.   Okay.  All right.  And if we can

11    go to the third -- if you'll look at the third

12    paragraph, Mr. Carney, that begins with the

13    sentence, "The regulation also requires."

14              Do you see that?

15         A.   Yes, I do.

16         Q.   Okay.  And it basically states

17    what I think you and I kind of discussed before,

18    "The regulation also requires that the

19    registrant inform the local DEA division office

20    of suspicious orders when discovered by the

21    registrant."

22              Do you see that?

23         A.   I do.

24         Q.   "Filing a monthly report of
```

```
 1    completed transactions, for example, excessive

 2    purchase report or high unit purchases, does not

 3    meet the regulatory requirement to report

 4    suspicious orders."

 5             Do you see that?

 6        A.    Yes, I do.

 7        Q.    Did anyone from Cardinal provide

 8    you with this letter?

 9        A.    Not that I recall.

10        Q.    And I think -- I think we

11    discussed a little while ago that the suspicious

12    monitoring program that you recalled did exactly

13    that, they sent monthly --

14             THE VIDEOGRAPHER:  Counsel on the

15        phone, could you guys put yourself on

16        mute, please.

17        Q.    Sorry for that interruption.

18             I think that the -- what we

19    discussed earlier in your deposition, sir,

20    regarding the suspicious order monitoring

21    program that you recalled did just that, they

22    sent a monthly report of excessive purchases; is

23    that correct?

24             MR. PYSER:  Object to form.
```

```
 1              A.    Yes, initially.  However, the

 2     process did evolve over time and transition as

 3     more technology was brought online.  So I'm not

 4     matching up the timeline exactly here.  It may

 5     have become more frequent as that technology

 6     came online.  I'm not sure when it did.

 7              Q.    Okay.  Well, we know that at least

 8     by December of 2007, the distributors,

 9     specifically Cardinal, is being told "Just

10     telling us that you had excessive orders for the

11     month doesn't cut it," right?

12                    MR. PYSER:  Object to form.

13              A.    I see that, yes.

14              Q.    Okay.

15              A.    This is not the same letter as

16     before --

17              Q.    No, sir.

18              A.    -- where he's reiterating?

19              Q.    No, sir, it's not.

20                    All right.  If we can go to the

21     next page.  And, again, the second paragraph

22     there, it reiterates, "When reporting an order

23     as suspicious, registrants must be clear in

24     their communications with the DEA that the
```

1   registrant is actually characterizing an order

2   as suspicious.  Daily, weekly, or monthly

3   reports submitted by a registrant indicating

4   excessive purchases do not comply with the

5   requirement to report suspicious orders even if

6   the registrant calls such reports suspicious

7   order reports."

8               Do you see that?

9       A.    Yes.

10      Q.    And then just below that, the next

11  paragraph reads, "Lastly, registrants that

12  report" -- "routinely report suspicious orders

13  yet fill them without first determining that

14  order is not being diverted into other than

15  legitimate medical, scientific, and industrial

16  channels may be failing to maintain effective

17  controls against diversion."

18              Do you see that?

19      A.    Yes, I do.

20      Q.    All right.  To the best of your

21  recollection, were the guidelines set out by the

22  DEA in this letter communicated to you in

23  December of 2007?

24      A.    What I recall was that if an order

Highly Confidential - Subject to Further Confidentiality Review

1   was deemed suspicious, that it would be held

2   until -- held and then reviewed and then

3   determine whether it could be released or not.

4          Q.    And when was that system put in

5   place because --

6          A.    I believe right around this

7   timeline; '07, '08.  I can't be sure, but I

8   believe right around this timeline.

9          Q.    All right.  And prior to that time

10  frame, 2000- -- 2007, 2008, do you recall the

11  details of whatever suspicious monitoring

12  program you believe Cardinal had?

13         A.    The details?  Beyond the reporting

14  to the DEA on a monthly basis based on

15  frequency, pattern, size of orders, not beyond

16  those details.

17         Q.    Who was the regulatory person in

18  Wheeling back in 2007?

19         A.    I can't say for sure.  It may have

20  been Paul Exley.  It may have been a gentleman

21  named Ken Cunningham.

22                MS. QUEZON:  All right.  Let's go,

23         if we may, to 4230.

24                       - - -

Highly Confidential - Subject to Further Confidentiality Review

```
 1            (Cardinal-Carney Exhibit 11 marked.)

 2                        - - -

 3    BY MS. QUEZON:

 4            Q.    So my first question, Mr. Carney,

 5    is, have you ever seen this Settlement and

 6    Release Agreement and Administrative Memorandum

 7    of Agreement between the DEA and Cardinal

 8    Health?

 9            A.    Not that I recall.

10            Q.    If you turn to page 41 of that

11    document.

12                  MR. PYSER:  Counsel, which page

13            number are you using?

14                  MS. QUEZON:  I'm sorry.  P1 -- at

15            the top, the 41 at the top.

16                  MR. PYSER:  Thank you.

17                  MS. QUEZON:  Mm-hmm.

18    BY MS. QUEZON:

19            Q.    And I'm really just showing you,

20    for purposes of the date, you see that it was

21    signed on September 30th of 2008?

22            A.    Yes, I do.

23            Q.    All right.  To the best of your

24    recollection, did anyone from Cardinal provide
```

1    this Administrative Memorandum of Agreement to

2    you as the sales manager of the Wheeling, West

3    Virginia distribution center in or around

4    September of 2008?

5           A.    Not that I recall.

6           Q.    If you look at the very first

7    page, Mr. Carney.  And I know that you recalled

8    that there was a -- you recalled hearing

9    something about the Lakeland facility having an

10   issue with the DEA, correct?

11          A.    Yes.

12          Q.    All right.  And we talked about

13   Auburn, and you weren't familiar with that one.

14   But as you see here, there are two other

15   distribution centers that received an Order to

16   Show Cause and Immediate Suspension or an Order

17   to Show Cause at least, which were Auburn,

18   Washington; Lakeland, Florida; Swedesboro, New

19   Jersey; and Stafford, Texas.

20                Do you see that?

21          A.    I do see that.

22          Q.    Were you made aware by anyone from

23   Cardinal that actually four distribution centers

24   had received orders to show cause back in

Highly Confidential - Subject to Further Confidentiality Review

1    November and December of 2007 and January of

2    2008?

3              A.    I was not.

4              Q.    If you go to the next page,

5    Mr. Carney, at the very -- paragraph 7 at the

6    top.  And you see that the "DEA also alleges

7    that Cardinal failed to maintain effective

8    controls against the diversion of controlled

9    substances at its distribution facilities

10   located at the following addresses."  And it's

11   McDonough, Georgia; Valencia, California; and

12   Denver, Colorado.

13             Do you see that?

14             A.    I do.

15             Q.    Were you made aware in the late

16   part of 2007 and the early part of 2008 that

17   seven distribution centers that were operated by

18   Cardinal it was alleged had failed to maintain

19   effective controls against diversion of

20   controlled substances?

21             MR. PYSER:  Object to form.

22             A.    I was not.

23             MS. QUEZON:  Let's go to 4230 --

24             I'm sorry.  4230.16.  16.

```
 1    BY MS. QUEZON:

 2          Q.    And these are the actual Order to

 3    Show Cause and Immediate Suspension of

 4    Registration that were filed by the DEA.  And if

 5    we go -- if we look at paragraph 1 and 2, you

 6    see that this was -- this one is for the Auburn,

 7    Washington facility.  And you see where the DEA

 8    says that they "failed to maintain effective

 9    controls against diversion of a particular

10    controlled substance."

11          Do you see that?

12          A.    Yes.

13          Q.    Okay.  And if we go to the next

14    page, Mr. Carney, under paragraph b at the top.

15    It says, "Despite the substantial guidance

16    provided to Respondent by the DEA regarding

17    identifying rogue pharmacies such as Horen's

18    Drugstore, and despite the public information

19    readily available to Respondent regarding

20    Horen's Drugstore's association with rogue

21    Internet pharmacy websites, Respondent

22    repeatedly supplied Horen's Drugstore with

23    excessive amounts of hydrocodone."

24          Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I do see it.

 2              Q.    Okay.  And to the best of your

 3    recollection, no one from Cardinal brought to

 4    your attention the facts and circumstances

 5    surrounding the Order to Show Cause and

 6    Immediate Suspension of the Auburn, Washington

 7    distribution center; is that correct?

 8              A.    I was not aware.

 9              Q.    If we can go to 4230.20.

10              Now, this is the one as far as

11    Lakeland.  And you do recall hearing something

12    about this one, correct?

13              A.    Yes, I do.

14              Q.    All right.  If we could look at

15    paragraph 2.  Once again, DEA alleges the

16    failure to maintain effective controls against

17    the diversion of a particular controlled

18    substance.  And then it goes on to say, "From

19    August 2005 through October 2007, Respondent

20    distributed over 8 million dosage units of

21    combination hydrocodone products to customers

22    that it knew or should have known were diverting

23    hydrocodone into other than legitimate medical,

24    scientific, and industrial channels."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  If you go to the next page

 2    under -- on 21.  And you'll see in paragraph 3,

 3    that the "pharmacies distributed millions of

 4    dosage units of hydrocodone based on

 5    illegitimate prescriptions originating from

 6    rogue Internet pharmacy websites."

 7                  Do you see that?

 8                  MR. PYSER:  Object to form.

 9          Misstates.

10          A.    I see that, yes.

11          Q.    I understand that you recall being

12    made -- or somehow hearing about the Lakeland

13    distribution center suspension.

14                  Did anyone from Cardinal share

15    with you the specifics as far as why the DEA had

16    suspended their registration number?

17          A.    No.

18          Q.    If we can go to page 4230.25.

19                  This is the Order to Show Cause

20    and Immediate Suspension of Registration for the

21    distribution center located in Swedesboro, New

22    Jersey.  Paragraph 2, again, the failure to

23    maintain effective controls against the

24    diversion of controlled substances.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And then in paragraph 3, "Some Of

 2    respondent's largest purchasers of combination

 3    hydrocodone products were pharmacies engaged in

 4    a scheme to distribute controlled substances

 5    based on purported prescriptions that were

 6    issued for other than a legitimate medical

 7    purpose and by physicians acting outside the

 8    usual course of professional practice.  These

 9    pharmacies distributed millions of dosage units

10    of hydrocodone based on illegitimate

11    prescriptions originating from drug distribution

12    websites."

13                    Do you see that?

14         A.    Yes.

15         Q.    Did anyone from Cardinal share

16    with you the details of why the DEA had

17    suspended the registration of the Swedesboro,

18    New Jersey distribution center?

19                    MR. PYSER:  Object to form.

20         A.    The details of the allegations,

21    no.

22         Q.    Did you even know that Swedesboro

23    had been suspended?

24         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Let's go though 4230.30,

 2    please.

 3                    And this is the Order to Show

 4    Cause issued to the Stafford, Texas distribution

 5    center.

 6                    And in paragraph 2, it indicates,

 7    "Registrant distributed massive amounts of

 8    particular controlled substances to retail

 9    pharmacy customers without maintaining adequate

10    controls to detect and prevent the diversion of

11    controlled substances.  For example, from

12    January 27 through September" -- I'm sorry --

13    "from January 2007 through September 2007,

14    Registrant distributed nearly 21 million dosage

15    units of hydrocodone to its retail pharmacy

16    customers.  Despite distributing such a large

17    quantity of hydrocodone, a highly addictive and

18    widely abused Schedule III controlled substance,

19    Registrant did not have sufficient policies and

20    procedures in place to detect and prevent

21    diversion, did not execute those policies and

22    procedures that were in effect, and failed to

23    provide its employees with the necessary

24    training and resources to detect and prevent
```

Highly Confidential - Subject to Further Confidentiality Review

 1    diversion."

 2                Did anyone from Cardinal make you,

 3    the sales manager of the Wheeling distribution

 4    center, aware of the Order to Show Cause that

 5    had been issued and the facts and circumstances

 6    that led to the Order to Show Cause at the

 7    Stafford, Texas facility?

 8                MR. PYSER:  Object to form.

 9         A.    Not that I recall, no.

10         Q.    Let's go to page 4230.37.

11                This section is entitled "Terms

12    and Conditions."

13                First of all, were you aware that

14    Cardinal agreed and did pay $34 million as a

15    part of the settlement agreement?

16         A.    For these particular things, no.

17    But was I aware that an agreement was reached

18    that we had admitted no guilt?  I believe so,

19    yes.

20         Q.    Were you made aware of what

21    Cardinal agreed to do going forward?  Was this

22    settlement agreement and the terms and

23    conditions provided to you as the sales manager

24    at the Wheeling distribution center as far as

```
 1   what promises were made by Cardinal what they

 2   were going to do going forward?

 3          A.    What we were going to do going

 4   forward from the time that this settlement was

 5   reached?

 6          Q.    Yes, sir.  Any promises that they

 7   made to the government; "Look, hey, you know,

 8   maybe we can do some things better.  Here's what

 9   we're going to do in the future."

10          Did anybody provide you with the

11   terms and conditions or a copy of the settlement

12   agreement so that you were aware of what

13   Cardinal was promising to do in the future?

14          MR. PYSER:  Object to form.

15          A.    I do not recall hearing that we

16   were going to do anything other than what we

17   were already doing.

18          MS. QUEZON:  Let's take a look now

19      at P1.4923.

20          THE WITNESS:  P1 --

21          MS. QUEZON:  I'm sorry.  It's

22      going to be handed to you.

23          THE WITNESS:  Okay.

24                      - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            (Cardinal-Carney Exhibit 12 marked.)

 2                       - - -

 3   BY MS. QUEZON:

 4            Q.    Mr. Carney, what we have now

 5   marked as Exhibit 12 to the deposition is a

 6   composite exhibit that are the total dosage

 7   units of oxycodone and hydrocodone that were

 8   shipped by Cardinal to Cuyahoga County, Ohio,

 9   the total MME of oxycodone and hydrocodone

10   shipped by Cardinal to Cuyahoga, the total

11   dosage units of oxycodone and hydrocodone

12   shipped by Cardinal to Summit County, Ohio, and

13   the total MME of oxycodone and hydrocodone

14   shipped by Cardinal to Summit County, Ohio.  And

15   then there's a combination one.

16            A.    Yes, I see that.

17            Q.    Do you see that?

18            A.    Yes, I do.

19            Q.    Okay.  Now, chronologically what

20   we've gone through -- I think we just looked at

21   the Memorandum of Agreement that was signed in

22   September of 2008.

23                  Do you recall that?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    All right.  So let's look, if we

 2    can, on our charts at the year January 2008 to

 3    January 2009 on our chart.  Do you see -- do you

 4    see those two years?

 5              A.    Yes, I do.

 6              Q.    Okay.  And do you see the

 7    corresponding total dosage units that were

 8    shipped by Cardinal into Cuyahoga during that

 9    year time frame?

10              A.    I believe so, yes.

11              Q.    And it looks like --

12              MR. PYSER:  I'm just going to put

13              on the record an objection to this

14              exhibit since we can't verify the

15              provenance of it or the numbers behind

16              it.

17              MS. QUEZON:  That's fine.

18    BY MS. QUEZON:

19              Q.    If we look at oxycodone for that

20    period of time, it looks like we're somewhere in

21    the 600,000 to 800,000 dosage units during that

22    year period of time.

23              Does that look about right to you?

24              A.    In 2008?
```

```
1            Q.    Yes.

2            A.    Yes.

3            Q.    Yes.  And then if we look at the

4    hydrocodone for that same year, we're somewhere

5    between 800,000 and a million.  Couple of months

6    go over a million, correct?

7            A.    It's not -- it's not where she's

8    pointing at, but over here, yes.

9            Q.    Okay.

10           A.    Or whoever is pointing at that.

11           Q.    Yeah.  It's Zach.

12           A.    We're talking 2008's for both

13   oxycodone and hydrocodone?

14           Q.    Correct.

15           A.    Got it.  Yes.

16               MS. QUEZON:  All right.  Let's go

17           to P1.4052, please.

18                      - - -

19       (Cardinal-Carney Exhibit 13 marked.)

20                      - - -

21   BY MS. QUEZON:

22           Q.    All right.  And just by way of

23   reminder, Mr. Carney, the suspensions of the

24   Cardinal distribution centers in Auburn,
```

```
 1    Stafford, Lakeland, and Swedesboro occurred in

 2    at the end of 2007, beginning of 2008.

 3               Do you remember that?

 4    A.    I believe so, yes.

 5    Q.    And then we looked at the

 6    Memorandum of Agreement that was entered into by

 7    Cardinal and the DEA in September of 2008.

 8               Do you remember that?

 9               MR. PYSER:  Objection.  Asked and

10         answered.

11    A.    Yes.

12    Q.    Okay.  And I'm just giving us some

13    chronological guidelines here.

14               All right.  So now we have a new

15    standard operating procedure for it looks like

16    the sales department, "Anti-diversion Alert

17    Signals."

18               Do you see that?

19    A.    I don't know that I would classify

20    it as new.

21    Q.    I wasn't classifying it that way.

22    The actual document itself classifies it that

23    way.  If you look at the top where it says

24    "Issue Date."  And then right underneath "Issue
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Date," it tells you when it was previously

 2    issued.

 3                    Do you see that?

 4         A.    Yes.

 5         Q.    And you see that, at least

 6    according to the document itself, it says that

 7    it's a new SOP, correct?

 8         A.    That's what it says here.

 9         Q.    Okay.  And if we can go to page 3

10    of the document -- actually, I'm so sorry.  Go

11    back to that first page again.  My bad.

12                    Now, under "4.0 Policy," it says,

13    "The anti-diversion team, within QRA, Supply

14    Chain Integrity, is responsible for the

15    continuous reporting of threshold events

16    identified during the execution of the

17    suspicious order monitoring program."

18                    Do you see that?

19         A.    I do.

20         Q.    All right.  And it says it

21    encompasses two components, "Internal reports

22    that assist in the evaluation of threshold

23    events; and 2) Communication of the threshold

24    events to the sales department."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Is that right?

2          A.    Yes.

3          Q.    And you would be the sales

4    department?

5          A.    Yes.

6          Q.    Okay.  And then underneath that

7    under "Definitions," it talks about held orders.

8                    Do you see that?

9          A.    Yes.

10         Q.    All right.  And I think you

11   mentioned that to me before.  That was your

12   memory of part of the suspicious order

13   monitoring system was the held orders, correct?

14         A.    Yes.  At some point, yes.

15         Q.    Okay.  And we know that at least

16   it's being defined here in what they are calling

17   a new standard operating procedure, issue date

18   of December 22, 2008, correct?

19                   MR. PYSER:  Object to form.

20         A.    Yes.

21                   MS. QUEZON:  All right.  Now let's

22         go to page 3.  Sorry.  And if we can

23         go -- if we can highlight or bring

24         forward the portion of it that starts
```

```
 1          with "More specifically, this report."

 2          A.    I'm sorry.  What page are we on

 3   again?

 4          Q.    Page 3, Mr. Carney.

 5          A.    Page 3.  Okay.  I'm sorry.

 6          Q.    And it's like --

 7          A.    "More specifically" second

 8   paragraph?

 9          Q.    Yes, exactly.  Right there.

10                Okay.  And underneath that

11   paragraph, it lists three bullet points.  So

12   there's a watch list, which is a 5 percent

13   increase, at least $2,500 of controlled

14   substance, list one chemical orders.  A yellow

15   flag, which is a 10 percent increase, at least

16   5,000 of controlled substance, list one chemical

17   orders.  And then a red flag, which is a

18   15 percent increase of a controlled substance,

19   correct?

20          A.    I see that, yes.

21          Q.    In your position as sales manager,

22   were you made aware of these bullet points, the

23   watch list, the yellow flag, and the red flag,

24   and what you were to do in those circumstances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    It was my expectation or our

 2      expectation that even prior to this, if we

 3      noticed any of these types of things, that we

 4      were to report them up through QRA.  But this

 5      became a more -- again, the evolution of our

 6      suspicious order monitoring process.

 7              Q.    So you were familiar with both the

 8      watch list, the yellow flag, and the red flag,

 9      and what your responsibilities were under those

10      circumstances?

11              A.    Yes.

12              MS. QUEZON:  Okay.  Let's go to

13              4971.  Do you have 4971?  If we can go

14              to the second page, I believe.  Yes.

15                           - - -

16      (Cardinal-Carney Exhibit 14 marked.)

17                           - - -

18      BY MS. QUEZON:

19              Q.    All right.  This is from the CDC.

20      And on the second page, Table 1, do you see

21      where it indicates this is the "Total number and

22      rate of opioid prescriptions dispensed in the

23      United States from 2006 until 2017."

24              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I do.

 2              Q.    All right.  And we are now in

 3      the -- let's see.  That standard operating

 4      procedure that we just looked at was established

 5      in December 22nd of 2008, correct?

 6              A.    I don't know that it was

 7      established then.

 8              Q.    That's the date on the standard

 9      operating procedure that we just looked at,

10      right?

11              A.    Yes.

12              Q.    Okay.  So let's look at the total

13      number of prescriptions in 2008 for opioids.

14                    And can you -- can you read into

15      the record according to the CDC what the -- what

16      the total number of prescriptions were for that

17      year.

18              A.    237,860,213.

19                    MS. QUEZON:  All right.  Now,

20              let's go to 4083.

21                            - - -

22          (Cardinal-Carney Exhibit 15 marked.)

23                            - - -

24
```

 1    BY MS. QUEZON:

 2          Q.    Now, this standard operating

 3    procedure is entitled "Process to Establish SOM,

 4    Suspicious Order Monitoring, Threshold Limits."

 5                Do you see that?

 6          A.    Yes, I do.

 7          Q.    Okay.  Now, this one has got a few

 8    issue dates on it.  It looks like originally you

 9    can see 12/22/08.

10                Do you see that with a line

11    through it?

12          A.    Yes.

13          Q.    And then there's another date, it

14    looks like, of January of 2010 and maybe April

15    of 2013.

16                Do you see those?

17          A.    I see January 2010.  And, yes, it

18    looks like -- it's cut off, but it says 02 -- I

19    believe April of 2013, yes.

20          Q.    Okay.  But the earliest issue date

21    we've got is that December 22, 2008, which

22    corresponds to the other SOP that we looked at,

23    correct?  It's the same issue date?

24          A.    Yes.

1        Q.    Okay.  Let's go to the second

2    page, please, and the first paragraph.  So this

3    says, "Extract and format list of customers and

4    historical sales data."

5            Do you see that?

6        A.    Yes.

7        Q.    All right.  So, "Compile all

8    historical sales for all monitored items for all

9    customers over the most recent 12-month period

10    of time.  The 12-month time period should be

11    based on the date the product was shipped."

12            So in order to establish a

13    threshold, we're going to look at the past 12

14    months.  So here we're in December of 2008.

15    We're going to look back to December of 2007.

16    So basically the calendar year of 2008, if we

17    were going to set a threshold on the very day

18    that the SOP was first issued.

19        A.    From December of '07 to December

20    of '08, that would be the 12-month period.

21        Q.    Okay.

22        A.    Yes.

23        Q.    And then if you go to the next

24    page, we're basically going to take the mean of

Highly Confidential - Subject to Further Confidentiality Review

1    the year of sales for that customer, historical

2    sales.  And then under Section 6, we're going to

3    multiply that by 3.

4              Do you see that for hydrocodone,

5    oxycodone, et cetera?

6         A.    In Section 6, each segment by a

7    factor of 3, 5, or 8.

8         Q.    Okay.  So we're taking the monthly

9    average or mean of what the historical ordering

10   data has been, and in order to set their

11   threshold, we're going to multiply their average

12   by 3, correct?

13             MR. PYSER:  Object to form.

14        A.    That's what it says here, but this

15   was all part of the QRA department.  I wasn't

16   involved in the statistical data or the

17   formulas -- creating the formulas for

18   determining.

19        Q.    Were you aware as the sales

20   manager of the Wheeling facility that in order

21   to set a threshold for one of your customers,

22   they were taking the monthly average and

23   figuring out what their historical data

24   reflected as far as what they usually ordered,

```
 1    but in order to set a threshold, we're going to

 2    multiply that number by 3?

 3              MR. PYSER:  Object to form.

 4         A.   I wasn't aware of the particular

 5    math, no.  But I was aware that their thresholds

 6    were based on their usage --

 7         Q.   Times 3?

 8         A.   -- or a percentage of their usage.

 9         Q.   Times 3 --

10              MR. PYSER:  Object to form.

11         Q.   -- according to this?

12         A.   According to what I see now, yes.

13              MS. QUEZON:  Okay.  So let's go to

14         4766, please.  Actually, before we do

15         that, let's just go -- nah.  Let's just

16         go to 4766.

17              MR. GRAY:  You've got a new

18         assistant over here.  Bear with me.

19              MS. QUEZON:  It's pretty big.  It

20         looks like this, Arch (indicating).

21              MR. GRAY:  Sorry.

22              MS. QUEZON:  That's okay.  We've

23         got to mark it.

24              There's only one in here.  I'll
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              give you mine if you want it.

2                        - - -

3         (Cardinal-Carney Exhibit 16 marked.)

4                        - - -

5              MR. PYSER:  Do you have another

6         copy there?

7              MS. QUEZON:  I don't.  I'm so

8         sorry.  I think that's the only one we

9         have.  I can get you one.  Is that all

10        right?

11             MR. PYSER:  Yeah.  We can proceed.

12             MS. QUEZON:  Okay.

13             MR. PYSER:  He might take a minute

14        to look at it.

15             MS. QUEZON:  Yeah.

16    BY MS. QUEZON:

17        Q.   So, Mr. Carney, I know you

18    probably haven't had the opportunity to read

19    through every single page.  But are you familiar

20    with this training?

21        A.   I do recall it, yes.

22        Q.   Do you know whether you actually

23    participated in this training?

24        A.   Yes, I did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So let's go, if we can, to

 2    page 3.  And, basically, the objectives here are

 3    to understand the mission of the DEA and

 4    Cardinal's obligations under the Controlled

 5    Substance Act and accompanying regulations,

 6    understand Cardinal Health's enhanced suspicious

 7    order monitoring program, recall and understand

 8    DEA handling, recordkeeping, reporting

 9    requirements, connect anti-diversion with sales

10    and operations, and understand your

11    responsibility.

12              And as a part of the sales team,

13    you actually went through this training?

14              A.    Yes, I did.

15              Was there a date?

16              Q.    You know, the -- go back to the

17    very first page.  The only date -- and it's at

18    the -- below that --

19              A.    2008?

20              Q.    2008.  Do you see that at the

21    bottom?

22              A.    But that might be just for that

23    PowerPoint.

24              Q.    Yeah.  Well, let me ask you,
```

1    Mr. Carney.  Do you recall when you went through

2    this training?

3              A.    Probably around 2008 --

4              Q.    Okay.

5              A.    -- as I recall, yeah.

6              Q.    I understand.

7                    All right.  If we could go to page

8    8.

9                    All right.  At the top there, you

10   see under the DEA, under "management and

11   structure," it says that there are "400

12   diversion investigators in the world.  Over

13   1 million registrants for them to both service

14   and investigate."

15                   And then it says, "Chokepoint

16   view - all prescription drugs go through

17   wholesale distributors."

18                   Do you see that?

19             A.    I do.

20             Q.    And at the bottom of that page, it

21   says, "Distributors are viewed as a chokepoint

22   for the supply chain.  The agency may not have

23   total visibility to pharmacies but the

24   distributor does."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Do you see that?

 2          A.    I do.

 3          Q.    And do you agree, sir, that the

 4   distributors are the chokepoint for the supply

 5   chain?

 6          A.    The term "chokepoint" -- can you

 7   define that for me?

 8          Q.    I didn't go to the training.

 9                MR. PYSER:  Object to form.

10          Q.    Do you know what is meant by

11   "chokepoint"?

12          A.    Small enough to get your hands

13   around, I guess, something like that.

14          Q.    And I guess it's defined here and

15   says -- I guess the last part of that sentence

16   says, "The agency may not have total visibility

17   but the distributor does."

18                Right?

19          A.    That's what it says, yes.

20          Q.    Now, if you'll turn to the next

21   page.  And we've gone over this a little bit in

22   those -- on the letters that the DEA had sent to

23   Cardinal.  I know that you had not been provided

24   them.  But here in the training you received, it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    basically reiterates, "Reporting suspicious

 2    orders to DEA does not relieve a distributor of

 3    the responsibility to maintain effective

 4    controls to be prevent diversion."  The DEA told

 5    this industry if you report suspicious orders,

 6    yet fill them, you're failing to maintain

 7    effective controls to prevent diversion.  And

 8    then they mention the warning letter that we

 9    went over earlier in the deposition.

10              Do you see that?

11         A.    Yes.

12         Q.    Okay.  At the bottom of this page,

13    it states, "This is how the industry finds

14    itself in the situation it is in today.  We all

15    thought we were doing good enough but we

16    weren't."

17              Do you agree with that statement?

18              MR. PYSER:  Object to form.

19         A.    I don't know that I agree with "we

20    weren't."  I thought that we out of the Wheeling

21    division were, but -- so, no, I don't completely

22    agree with that statement.

23         Q.    Okay.  Now, you were the sales

24    manager at the Wheeling facility during this
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    period of time.

2              Let's go to page 15, please.  And

3    this has to do with the responsibility,

4    recognition, and prevention.

5         A.    Mm-hmm.

6         Q.    And there it says it's everyone's

7    responsibility.  Do you agree with that

8    statement?

9         A.    I do.

10        Q.    Under -- just directly underneath

11   that, it says, "Sales force - you are the boots

12   on the ground and the front line of defense."

13             Do you agree with that statement?

14        A.    The overall training was -- the

15   way I perceived it was in a sense to enlist us

16   in the fight.

17        Q.    And at the bottom of the page,

18   sir, it says, "Sales - eyes and ears."

19             Do you know what that means?

20        A.    Yes.

21        Q.    What does it mean?

22        A.    That we were to look for a certain

23   set of activities that could be perceived as out

24   of the normal, and then report that up through
```

```
 1   QRA.  Not that we hadn't always had that

 2   responsibility, but this was --

 3            Q.    Emphasizing it?

 4            A.    -- emphasizing it.

 5            Q.    Yes, sir.  Okay.

 6                  And to the best of your

 7   recollection, it would have been probably

 8   sometime in 2008 when this training was given?

 9            A.    I believe so, yes.  But I can't be

10   sure.  But I believe so, yes.

11                  MS. QUEZON:  Okay.  Let's go to

12            P1.4118.

13                        - - -

14       (Cardinal-Carney Exhibit 17 marked.)

15                        - - -

16   BY MS. QUEZON:

17            Q.    Now, we've talked a little bit

18   about the setting of thresholds, which

19   understanding that in sales, you weren't the one

20   setting those thresholds.

21            A.    Right.

22            Q.    But if a customer were close to

23   reaching a threshold or going over a threshold,

24   would you then become involved?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    At some point, we became aware of

 2      that in the evolution of the process, yes.

 3              Q.    All right.  And, again, this is an

 4      e-mail, so we work from the back.  And just let

 5      me know when you've had an opportunity to look

 6      over it.

 7              A.    Sure.

 8                    Got it.

 9              Q.    Okay.  All right.  So it looks

10      like if we start from the back, there's an

11      account, Louis & Clark.  It's a pain clinic.

12      And they need oxycodone and OxyContin, and

13      Roxicet, and they keep "coming back limited."

14      What does "limited" mean?

15              A.    I'm not aware of this situation or

16      this particular store.

17              Q.    Are you familiar with limiters?

18              A.    It may mean -- it may be in

19      regards to thresholds.

20              Q.    Okay.  And the next e-mail in the

21      thread from Russell Trammell says, "Andy, the

22      account below is a pain clinic and has a

23      desperate need for these meds.  How can I tell

24      when this account will be able to order these
```

Highly Confidential - Subject to Further Confidentiality Review

1   products again?  Will it be at the end of the

2   month?  Are the limiters in this case working

3   correctly?  I've instructed the account to get

4   the meds from another source (competitor).  Is

5   this the best course of action?  Any help would

6   be greatly appreciated."

7               And then as we continue to go up,

8   it says, "I am assuming this is a Retail

9   Independent class of trade.  We should notify

10  the sales rep of this situation."

11              Is the sales rep what you were

12  doing, or was that -- would that be more like a

13  pharmacy business consultant?

14          A.   It's a pharmacy business

15  consultant.

16          Q.   So you would have been over --

17          A.   Yes.

18          Q.   Okay.  Not in this situation, I

19  understand --

20          A.   Yeah, no.

21          Q.   -- but generally.

22          A.   No.

23          Q.   Okay.  So the next one says,

24  "Steve, this 11-store chain says they will leave

1    us for H.D. Smith if we do not ship to them on

2    Monday."

3              And by that day -- so that's on

4    Friday, January 25th of 2008.  And by Friday,

5    January 25th of 2008 at 11:00 p.m., the

6    threshold change is complete.

7              Do you see that?

8         A.    Yes.

9         Q.    So if I'm reading the e-mail

10   correctly, a threshold was reached, and because

11   that threshold had been reached, they weren't

12   going to send the controlled substances.

13        A.    Yeah.

14        Q.    It was a threat by the pharmacy to

15   go and get their controlled substances filled by

16   H.D. Smith, and within hours of that, the

17   threshold was increased, correct?

18              MR. PYSER:  Object to form.  Calls

19         for speculation.

20        A.    Yeah.  It does look that way, but

21   I can't speculate what happened.  I only know

22   that I wouldn't have followed this.  I don't

23   know -- Steve Lawrence wouldn't have come into

24   the process that I was -- that I understood it

```
 1    was supposed to be reported through QRA, and

 2    that was it.

 3                MS. QUEZON:  Let's go to 4348.

 4                     -  -  -

 5        (Cardinal-Carney Exhibit 18 marked.)

 6                     -  -  -

 7                MR. PYSER:  Counsel, are we at a

 8          good breaking point if we take a --

 9                MS. QUEZON:  Sure.

10                MR. PYSER:  -- five-, ten-minute

11          break?

12                MS. QUEZON:  Do you want to do

13          that now?

14                MR. PYSER:  Yeah.

15                MS. QUEZON:  Absolutely.

16                THE VIDEOGRAPHER:  The time is now

17          11:28.  We're going off the record.

18                (Recess taken.)

19                THE VIDEOGRAPHER:  Okay.  Time is

20          now 11:45.  Back on the record.

21    BY MS. QUEZON:

22          Q.   Okay.  I think when we took a

23    break, we were going to take a look at Exhibit

24    Number 18.  And let me know -- have you had an
```

1   opportunity to review it?

2          A.    Just one second.

3          Q.    Yeah, take your time.

4          A.    I have it.

5          Q.    All right.  So let's start from

6    the back, if we can, page 9.

7          A.    Mm-hmm.

8          Q.    And it starts with an e-mail on

9    January 2nd of 2008 from Marilyn England who,

10   according to her signature line, is a pharmacy

11   business consultant.  So that would be the type

12   of person that works under you as sales manager?

13         A.    As a sales manager, yes.

14         Q.    Now, obviously this is in Seattle.

15   So this would not have been Wheeling, West

16   Virginia.  But she is a pharmacy business

17   consultant apparently in that -- from that

18   distribution center?

19         A.    Yes.

20         Q.    Okay.  So it starts with, "Hi

21   guys, can you help us?  Cost Less Purdy 14261

22   has been ordering OxyContin (brand) in all

23   strengths and we have been zeroing up until

24   today.  Looking at order history, it looks like

Highly Confidential - Subject to Further Confidentiality Review

1    we filled OxyContin on a few different blanks as

2    of today.  Can you check the blank below that

3    was given to the driver and let me know if we

4    can fill this OxyContin for them or what the

5    issue is (may be the limiters)."

6              And, again, there's that word.

7    And I think we agreed that it probably has

8    something to do with the thresholds, right?

9         A.    Mm-hmm.

10        Q.    Yes?

11        A.    Yes.  Sorry.

12        Q.    Sorry.  Uh-huhs and huh-uhs --

13        A.    Sorry.

14        Q.    That's okay.  All right.

15              MR. PYSER:  Object to form.

16        Speculation.

17        Q.    "Don't know what happened up until

18   today but the customer needs this product

19   desperately."

20              All right.  And if we can go to

21   the next page in order, which is 8.  And this

22   one says, "Carolyn, please review this account.

23   They are getting limited on all OxyContins even

24   though we were in a new month" -- "even though

Highly Confidential - Subject to Further Confidentiality Review

1    we are into a new month."

2              This is January 4th of 2008,

3    correct?

4              MR. PYSER:  Object to form.  Calls

5         for speculation about other people's

6         thoughts.

7         A.    Yes.

8         Q.    Okay.  Marilyn responds and says,

9    "Bill, this is an emergent" -- or "emerg

10   situation and looking for your help."  They've

11   received no OxyContin since day one.  "Today

12   Vault is holding three orders with OxyContin and

13   oxycodone for me because limiters are zero.

14   Please can you help and don't know who Carolyn

15   is."

16             All right.  The top of the page,

17   "Carolyn, not sure who to go to on this one but

18   this is an urgent situation and any help or

19   explanation would be greatly appreciated."

20             If we go to the next page in

21   order, page 7.  Carolyn McPherson says, "Bill,

22   this customer had a blocked order which is

23   currently under investigation."

24             Mr. Colley responds back to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Carolyn, "We need to understand what the next

 2    steps are with this account.  When will the

 3    consultant do the site visit and who is the

 4    consultant?  Is it CAH, Cardinal, PBC, pharmacy

 5    business consultant, or Dendrite."

 6              Do you know who Dendrite is?

 7              MR. PYSER:  Object to form.

 8         A.   No, I don't.

 9         Q.   Never heard of them?

10         A.   I have not heard of them.

11         Q.   Okay.  At the top of that page, it

12    says, "I received notification from Dendrite

13    this morning and the account has been added to

14    their list for a site visit."

15              Now, if we go to page 6, the top

16    e-mail from Steve Lawrence.  Who's

17    Steve Lawrence?

18         A.   The SVP.  He's one step above

19    Chris Lanctot.  Chris Lanctot is my VP, and then

20    Chris' boss is Steve Lawrence, the SVP of sales.

21         Q.   Senior vice president of sales?

22         A.   Yes.

23         Q.   Okay.  Gotcha.  Thank you.

24              All right.  So Mr. Lawrence says,
```

1     "Richard and Bill, is this the store that

2     ordered some 20,000 units in the first two days

3     in January?  Can you all look at the orders for

4     this store for January for the products that we

5     are looking at.  If you need help, please work

6     with Todd Cameron on my staff.  If so, we don't

7     need to throw this to regulatory.  We need to

8     understand what those orders for that quantity

9     is all about.  That is WAY above any parameters

10    we would agree to.  That would put a store at

11    the 2 to 3 million units per year."

12              Did I read that correctly?

13         A.    Yes.

14         Q.    Okay.  So on page 5, Mr. Colley --

15    do you know who Richard Colley is?

16         A.    Yes, I do.

17         Q.    Who is Richard Colley, or what --

18    like what's his position?

19         A.    Now, Richard is a director in the

20    LTC class of trade from out West.  At this time

21    he may have been a sales manager out West.

22         Q.    Okay.

23         A.    I'm not really sure.

24         Q.    And "sales manager," meaning the

```
1    same type of role that you play in Wheeling?

2            A.    Yes.

3            Q.    All right.

4            A.    He also could have been the sales

5    director.  I'm not sure what position he held.

6    Either manager or director.  But I believe

7    manager.

8            Q.    All right.  I think, if we look at

9    page 5 underneath his name, it says "retail

10   sales manager" --

11           A.    Yep.

12           Q.    -- so it sounds like you might be

13   correct.

14                 Okay.  "Steve" -- he writes to

15   Mr. Lawrence -- "the reason this store purchased

16   so much was in anticipation of the generic

17   oxycodone going away in the market and the

18   branded items being the only items available.

19   The Costless stores are marked as just that

20   "costless," and the availability of the generic

21   items aid accomplishing that to their

22   customers."

23                 So apparently in anticipation of

24   the generic oxycodone being taken off the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   market, this pharmacy bought 20,000 --

 2           A.    Attempted.

 3                 MR. PYSER:  Object to form.  Calls

 4           for speculation.

 5           Q.    Attempted to purchase 20,000

 6   units, I guess.  Is that what they're called?

 7           A.    That's what it looks like to me.

 8                 MR. PYSER:  Object to form.  Calls

 9           for speculation.

10           Q.    Okay.  So then Mr. Lawrence

11   responds, "This is completely inappropriate.  We

12   cannot assist customers in either forward buying

13   or hoarding of controlled substances.  I don't

14   even know what to tell you.  You caused this

15   customer to get cut off, then why would you send

16   e-mails directly to regulatory asking them to

17   turn this store on and it is an emergency."

18                 So apparently they got the 20,000

19   units and then got shut down, right?

20                 MR. PYSER:  Object to form.

21           Speculation.

22           A.    The way I read it, they didn't.

23   Just the fact that they attempted to place that

24   order is what got them blocked and set to zero
```

Highly Confidential - Subject to Further Confidentiality Review

 1    going forward for that month, which is why they

 2    couldn't get subsequent ones.  But that's the

 3    way I read this.

 4          Q.    Okay.  Let's keep -- let's keep

 5    going through the e-mail chain and see if we

 6    can -- see if you're right.  All right.  Let's

 7    go to page 4 --

 8                MR. PYSER:  Object to form, the

 9          commentary.

10          Q.    -- from Jimmy Neil.

11                Jimmy -- or from Richard Colley to

12    Jimmy Neil.

13                Do you know who Jimmy Neil was?

14          A.    Jimmy would have been the

15    director.  Would have been Richard Colley's

16    director at the time.

17          Q.    "Jimmy, is there anything you can

18    do to have this account surveyed so they can get

19    reinstated.  Last word was they had been sent

20    over to the Dendrite team but no one has

21    contacted the store."

22                Then we go to page 3.  Apparently

23    whoever Don Williams is with Dendrite -- the

24    surveyor is out of the state.

```
 1                    And then the e-mail at the top of

 2      the page that starts "Michael and Tom."

 3      "Michael and Tom, I know this account made a

 4      serious error in attempting to forward buy some

 5      controls in anticipation of the generic moving

 6      back to brand, but we have no reason to believe

 7      it was anything other than attempt to spec buy.

 8      This account is part of a group that purchases

 9      26 million annually.  We have already turned one

10      other Cost Less account off and then back on

11      after a Dendrite survey.  Is there any way per

12      Richard's request to get a Dendrite person in

13      the store this week versus next?  My area would

14      be willing to pick up the T&E expense to get

15      this done."

16                    So apparently, because of the

17      purchase, a site visit is necessary.  Is that

18      something that you're familiar with?

19              A.    Because of the blocked --

20                    MR. PYSER:  Object to form.

21              Speculation.

22              Q.    Go ahead.  You can answer.

23              A.    Yeah, because of the blocked

24      order.  It came up as suspicious.
```

```
 1              Q.    Okay.  And so before it can be

 2    filled or anything can be done, there's supposed

 3    to be a site visit to the store; is that right?

 4              MR. PYSER:  Object to form.

 5         Speculation.

 6              A.    In some cases, yes.  The order

 7    would have been held pending regulatory

 8    investigation.

 9              Q.    Okay.  Let's go to page 2.  Now,

10    this one is from Michael Moné.  Do you know who

11    Michael Moné is?

12              A.    I do.

13              Q.    Who is that?

14              A.    He at a period in time headed up

15    our QRA department.

16              Q.    All right.  "Nick/Eric, can you

17    get me the status of this account vis-a-vis

18    visits by Dendrite, or was it just a limiter

19    issue?  If a limiter, as my recollection" -- "If

20    a limiter, as my recollection is suggesting,

21    have we committed to a sales or QRA visit in one

22    month?"

23              And the response from Nick -- and

24    who is Nicholas Rausch?
```

```
 1            A.    I'm not sure.  It may have been

 2   the Dendrite person.

 3            Q.    Nicholas responds to Michael and

 4   says, "Michael, this is a limiter issue.  Cost

 5   Less Purdy bumped the limit on 1/3/08 for its

 6   purchases of oxycodone.  The pharmacy was

 7   previously visited as part of the 152

 8   hydrocodone review.  It does not appear this

 9   pharmacy was scheduled to be visited again and

10   below are the summaries from your or Gary's.

11   Review.

12                  "Decision.  Account's threshold

13   limit will be increased to 23,000 units of

14   oxycodone per month."

15                  Do you see that?

16            A.    Yes.

17            Q.    So without a visit, apparently,

18   the threshold was simply increased to 23,000

19   units; is that right?

20                  MR. PYSER:  Object to form.

21            Speculation.

22            A.    I don't know -- I think the way I

23   read it is that it was visited before.  And

24   based on that previous visit, these were the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   decisions that were made before this all

 2   happened.

 3          Q.    Sure.  Okay.  So let's back up.

 4                They attempted to buy 20,000

 5   units, and because of that, it was blocked and a

 6   site visit would have been called for, correct?

 7          A.    That's what --

 8                MR. PYSER:  Object to form.

 9          A.    That's what it seems like, yes.

10          Q.    And without any evidence in the

11   e-mail of an actual site visit occurring after

12   the 20,000-unit order, the threshold limit --

13   the decision was to increase the threshold limit

14   to 23,000 units per month, correct?

15                MR. PYSER:  Object to form.

16          A.    Could you repeat the question

17   again, please?

18          Q.    Sure.

19                We know that, at least according

20   to the e-mail, there was an attempted purchase

21   of 20,000 units.  Whether it was filled or not,

22   we don't know.  But because of it, a site visit

23   to the store was necessary, correct?

24                MR. PYSER:  Object to form.
```

```
 1              A.    That's what it sounds like, yes.

 2              Q.    There is no evidence in the

 3    e-mails that that site visit took place;

 4    instead, it is considered a limiter issue and

 5    the account's threshold limit was increased to

 6    23,000 units of oxycodone per month, correct?

 7                    MR. PYSER:  Object to form.

 8              A.    I would be speculating.  It looks

 9    as if they gathered some other information that

10    allowed them to make this decision short of

11    going out there.

12              Q.    And they reclassified it as --

13    from a medium purchaser to a large purchaser.

14                    Do you see that?

15              A.    I do.

16              Q.    And the threshold is increased to

17    23,000 units going forward, correct?  23,000

18    units per month?

19                    MR. PYSER:  Object to form.

20              Q.    This wasn't a one-time thing.

21    It's -- the threshold itself has been increased

22    so that they can purchase up to 23,000 units of

23    oxycodone a month from this point forward; is

24    that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.
 2           A.    Increase to 23 -- I'm not -- I
 3      wouldn't be -- I'm not aware of what it might
 4      have been.  It might have been 18,000 before
 5      they increased it to 23.  It might have been
 6      19,000.  It doesn't say here.  But, yes, it does
 7      say "increased to 23,000 units per month."
 8           Q.    Okay.  Even though everyone
 9      involved in this knows that the reason for the
10      20,000-unit purchase was a spec buy, was to try
11      to get as much as the generic as they could
12      before it went off the market, right?
13           A.    I can't speak to what everyone
14      knows or everyone knew in this situation.
15                    MR. PYSER:  Object to form.
16           Q.    The e-mails make it clear that the
17      Cost Less Purdy store attempted to buy 20,000
18      units of oxycodone generic, correct?
19           A.    Yes.
20           Q.    And that was the reason why it was
21      such a large amount at the beginning of the
22      month, correct?
23                    MR. PYSER:  Object to form.
24           A.    That's why it hit the suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

1    order monitoring system and why it was held and

2    why it required further investigation.

3           Q.    And without doing that

4    investigation, the decision was made to increase

5    the threshold limit to 23,000 going forward?

6                 MR. PYSER:  Object to form.

7           A.    Yet I wouldn't agree with the fact

8    that you say without doing the investigation.

9    The investigation takes on a couple different

10   forms, one of which is to go out and do a site

11   visit.  But it could have been justified through

12   conversation and a collection of data that I

13   don't -- I'm not seeing here.

14          Q.    Okay.  And regardless of what it

15   was, what the threshold was from January 9th,

16   2008 forward, this pharmacy's threshold was

17   increased to 23,000 units a month?

18                MR. PYSER:  Object to form.

19          A.    It looks to me like their -- their

20   threshold going forward was 23,000 units per

21   month, yes.

22                MS. QUEZON:  Let's go to 4522,

23          please.

24                        - - -

```
 1            (Cardinal-Carney Exhibit 19 marked.)

 2                          - - -

 3    BY MS. QUEZON:

 4            Q.    All right.  Mr. Carney, are you

 5    familiar with this standard operating procedure

 6    that is entitled "Sales Early Dialogue"?

 7            A.    I've not seen this document

 8    itself.

 9            Q.    Are you familiar with the concept

10    of early dialogue as it relates to threshold

11    events?

12            A.    Yes.

13            Q.    Tell me what your understanding is

14    of early dialogue as it applies to threshold

15    events.

16            A.    Early dialogue as it applies to

17    threshold events.  As far as I understand, it

18    would be the dialogue between us and the QRA

19    department.  Just communication about certain

20    situations, things going on, Knowing Your

21    Customer types of shared information between us

22    and QRA.

23            Q.    Okay.  Let's go to page 2.  And

24    you see at the bottom where it says "Procedures
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for Reporting"?

 2          A.    Yes.

 3          Q.    All right.  So "Early Dialogue.

 4    If QRA determines that a customer's order is

 5    close to a threshold but is not a threshold

 6    event, the order will be shipped and the

 7    salesperson will be notified.  Notification may

 8    be made directly to the salesperson or to the

 9    customer with a cc to the salesperson."

10              So basically you've set a

11    threshold for a pharmacy or a customer, and as

12    they get close to it, Cardinal's going to let

13    them know, "You guys are getting close to your

14    threshold."  Right?

15              MR. PYSER:  Object to form.

16          A.    That was never my understanding,

17    but that's what it does say right here.

18          Q.    Was it your understanding that the

19    pharmacy -- the customer, being the pharmacy,

20    shouldn't be aware of what their threshold is?

21          A.    The expectations were that we

22    wouldn't coach them or give them specific

23    numbers about where their threshold events could

24    occur.
```

1          Q.     Because then they could either

2     request an increase in threshold and you'd never

3     hit a threshold event, right?

4               MR. PYSER:  Object to form.

5          A.     Yes.

6          Q.     Do you know whether salespeople

7     outside of Wheeling were following this policy

8     and letting their customers know -- the

9     pharmacies, the drugstores know that they were

10    getting close to a threshold so that they could

11    be increased?

12         A.     I can't speak to that.  I don't

13    know.

14         Q.     But your instructions to your

15    salespeople would have been not to inform the

16    drugstores or the pharmacies that they're

17    getting close to a threshold so that they could

18    be increased?

19         A.     That was the expectation, correct.

20              MS. QUEZON:  Okay.  Let's go to

21         4948, please.

22                       - - -

23         (Cardinal-Carney Exhibit 20 marked.)

24                       - - -

```
 1          A.    Okay.

 2          Q.    Okay.  So actually starting on

 3   that first page, the bottom e-mail from

 4   Paul Farley.

 5                Do you know who Paul Farley is?

 6          A.    Yes, I do.

 7          Q.    Who is Mr. Farley?

 8          A.    He was a salesperson in charge of

 9   our national accounts, class of trade.

10          Q.    National accounts, CVS would be

11   one of those?

12          A.    Yes.

13          Q.    All right.  So Mr. Farley sends an

14   e-mail to Mr. Moné who I think we already

15   established was quality and regulatory

16   affairs --

17          A.    Yes.

18          Q.    -- at some point?

19          A.    Yes.

20          Q.    Okay.  And it's in regards to CVS

21   Number 219, Importance:  High.  "Michael, I'll

22   continue to try and reach you by phone but I

23   wanted to recap my conversations with CVS this

24   morning.  I spoke with Brian Whalen at CVS" --
```

```
 1                   Do you know who Brian Whalen is?

 2          A.    I do not.

 3          Q.    -- "a couple times this morning

 4    regarding the store and the other locations you

 5    referenced at NACDS."

 6                   Do you know what that stands for?

 7          A.    National -- it's drug chains.

 8    It's an organization around the -- National

 9    Association of Drug Chain Pharmacies, I believe.

10          Q.    Okay.  "I also reviewed your

11    slides with him.  He tells me that he responded

12    to Cardinal last month on inquiries for these

13    same stores.  At that time CVS experienced an

14    increase in sales of oxycodone due to the DEA

15    closing stores in that area."

16                   Mr. Carney, were you familiar with

17    what was going on in Florida around 2010 and the

18    shutting down of the pill mills that was taking

19    place?

20          A.    Familiar, no.  Aware of through

21    the news, yes.

22          Q.    Okay.  "Again earlier this week,

23    because of our request, he sent another e-mail

24    to LP" --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you know what LP stands for?

 2          A.     I do not.

 3          Q.     -- "asking them to take a fresh

 4    look.  He received a response yesterday that

 5    they have reviewed the store's activities and

 6    they've been closely monitoring store 219 for a

 7    couple of weeks.  None of these stores show

 8    significant growth or shrink issues.

 9    Additionally, CVS has a new attorney working

10    with the DEA.  They acknowledge that Florida has

11    been cracking down on pill mills and that is

12    driving more legitimate traffic to CVS stores.

13                    "Brian will send your slides over

14    to LP for their review and response.  They will

15    not provide the doctor or patient information

16    you requested unless it is requested by the DEA.

17    He was quite adamant about this.  He does not

18    expect Cardinal to interrupt service to CVS

19    stores since they have responded in the manner

20    we originally agreed upon when launching the

21    suspicious order monitoring program.  Any

22    disruption to service will impact patient care

23    and patient care with pain medication is

24    critical as you are aware.  I ask that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    release any pending orders and update Gilberto."

 2              Do you know who Gilberto is?

 3         A.    I believe he may have been a --

 4    I've heard the name before.

 5         Q.    Okay.  And in response, Mr. Moné

 6    says, "Okay to release the CVS held orders for

 7    the weekend."

 8              Correct?

 9         A.    Yes.

10         Q.    Are you aware, Mr. Carney, that

11    when a chain pharmacy was involved, that the

12    common practice was to call corporate of that

13    chain pharmacy and have them look into their own

14    stores?

15         A.    Not aware.

16              MR. PYSER:  Object to form.  Calls

17         for speculation.

18         A.    I'm not aware.  I was in the

19    independent retail sales class of trade, not the

20    national account or chains class of trade.

21         Q.    Okay.  How -- are independents

22    literally just one, or can there be more than

23    one in the retail independents?

24              Does that make sense?
```

```
 1              A.    Could there be multiple store

 2    owners, right?  So, yeah, there can be smaller

 3    groups.  If they -- you know, let's say a

 4    pharmacist owns two -- he or she owns two or

 5    three stores, yes, that -- that can occur, but I

 6    don't call on the chains.  My sales team doesn't

 7    call on the chains.

 8              Q.    Can we agree, Mr. Carney, that it

 9    would be inappropriate if you -- if there were

10    suspicious orders to -- for you to call the

11    pharmacy and have them look into their own

12    suspicious orders and let you know whether or

13    not it was okay?

14              MR. PYSER:  Object to form.  Calls

15         for speculation.  Improper hypothetical.

16              Q.    Would you do that?

17              MR. PYSER:  Object to form.

18              A.    No.  But we would request

19    information from the pharmacy.

20              Q.    And then make your own

21    determination?

22              A.    Our QRA department would, yes.

23              Q.    Okay.  Because, as we discussed

24    before, that's that the non-delegable duty under
```

1    the Controlled Substance Act, where it doesn't

2    say you can rely on somebody else's opinion as

3    to whether or not it's suspicious, you have to

4    have your own suspicious order monitoring

5    system, right?

6                    MR. PYSER:  Object to form.  Legal

7          conclusion.

8          A.    We have to have our own suspicious

9    order monitoring system, yes.

10          Q.    Okay.  So at least according to

11    the e-mail, because they had shut down pill

12    mills, CVS is getting more prescriptions for

13    opioids, and that's a legitimate reason to

14    release held suspicious orders --

15                    MR. PYSER:  Object to form.

16          Q.    -- right?

17          A.    I can't speculate on that.  I do

18    know that when those facilities are closed, that

19    those patients need those FDA-approved

20    medications for their pain.  So they're looking

21    to go anywhere in the area, CVS or anyone else.

22    It's like squeezing a balloon.

23          Q.    Okay.  So is it your testimony

24    that the shutting down of pill mills is a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    legitimate justification for an increase in

 2    opioids to other pharmacies?

 3              MR. PYSER:  Object to form.

 4         Mischaracterizes.

 5         A.    No.

 6              MS. QUEZON:  Let's go to 4323,

 7         please.  This is Exhibit 21 for the

 8         record.

 9                   - - -

10         (Cardinal-Carney Exhibit 21 marked.)

11                   - - -

12    BY MS. QUEZON:

13         Q.    Okay?

14         A.    Mm-hmm.

15         Q.    All right.  So if we go to the

16    second page.  The e-mail is from Jennifer Hug,

17    who is a manager of retail national accounts,

18    healthcare supply chain services.

19              Do you see that?

20         A.    Yes, I do.

21         Q.    All right.  And she is e-mailing a

22    person by the name of Jason Spinard or Spinard

23    and says, "Jason, can you please have your LP

24    department look into the ordering habits of
```

Highly Confidential - Subject to Further Confidentiality Review

1   these two stores below.  We have seen a huge

2   jump in oxycodone purchases from both.  Please

3   see the detail for each store."

4                   And it's CVS 850.  "I spoke to

5   Nick at this pharmacy.  He stated there was a

6   pain clinic down the road which is causing

7   scripts to increase significantly."  And sets

8   forth the increases.

9                   CVS 219.  Spoke to Nick at the

10  pharmacy.  He stated there's an increased number

11  of patients from pain clinics, that they're only

12  filling for local clinics.  Please see examples.

13                  And then Jason responds back.  And

14  do you see Jason's e-mail address next to his

15  name?

16          A.    JasonSpinard@CVS.com.

17          Q.    So he's a CVS employee?

18                  MR. PYSER:  Object to form.

19          Q.    And it says, "Jen, from LP:  Store

20  850 and 219 are okay.  They're comfortable with

21  the levels."

22                  Do you see that?

23          A.    Yes.

24          Q.    And then at the top, Ms. Hug, I

```
 1    guess, forwards the information from CVS' LP

 2    department in reference to the two suspicious

 3    order monitoring events attached, and says,

 4    "Please let me know if you have any additional

 5    concerns."

 6              So what we have here is CVS

 7    investigating CVS and finding that CVS isn't

 8    doing anything wrong, right?

 9              MR. PYSER:  Object to form.

10        A.   That's not the way I interpret it.

11        Q.   Clearly Ms. Hug is asking CVS to

12    look into the activities of two CVS stores,

13    correct?

14              MR. PYSER:  Object to form.

15        A.   This looks as if she's done her

16    due diligence.  She recognizes a spike in their

17    purchases.  And, yes, she's sharing that

18    information with whoever Jason Spinard is to

19    find out if they're aware, if he's aware at that

20    level.

21        Q.   And, again, just so we're clear,

22    in your position, you would not rely on the

23    pharmacy themselves to let you know whether

24    something is suspicious or not, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. PYSER:  Object to form.

 2         A.    I don't know that these rose to

 3   the level of suspicious orders, i.e., they were

 4   orders that were sent in and were looked at,

 5   other than she was doing her due diligence of

 6   just recognizing this and talking about it out

 7   loud, so ...

 8         Q.    Well, I understand.  If we go back

 9   up to that e-mail at the top.  SOM, that was not

10   my term.  That was the term that Ms. Hug used in

11   reference to the two suspicious order monitoring

12   events attached, correct?

13                 MR. PYSER:  Object to form.

14         A.    I can't discern if they're actual

15   suspicious orders that were determined

16   suspicious or if she's just saying that she

17   recognizes it as somewhat suspicious.  I would

18   be speculating.

19         Q.    Okay.  My question is, though, you

20   would not rely on one of your pharmacy customers

21   to tell you that something is not suspicious?

22   You would do your own due diligence and make

23   that determination, correct?

24                 MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Speculation.  Hypothetical.

 2         A.    If I saw something suspicious

 3    going on in the pharmacy or outside the

 4    pharmacy, I might mention to the customer, "Hey,

 5    what's this about?  Are you aware of this?"

 6         Q.    And if the pharmacist says, "Oh,

 7    yeah, we're cool," is that the end of your due

 8    diligence?

 9              MR. PYSER:  Object to form.

10         A.    No, it wouldn't be.

11         Q.    Okay.  Thank you.

12              MS. QUEZON:  All right.  Let's go

13         to 4956, please.

14                    - - -

15         (Cardinal-Carney Exhibit 22 marked.)

16                    - - -

17              MR. PYSER:  Counsel, I'm not

18         asking for one now, but sometime in the

19         next 15 minutes or so when you get a

20         logical stopping point.

21              MS. QUEZON:  For sure.  Let's do

22         this document, and then we'll take a

23         break for lunch if that sounds okay.

24              MR. PYSER:  Good enough.  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. QUEZON:  Okay.

 2   BY MR. PYSER:

 3         Q.   Okay.  First of all, Mr. Carney,

 4   as you've had the opportunity to kind of flip

 5   through it, do you recognize this document?  It

 6   appears to be from 2010, at least according to

 7   the copyright on the front page.

 8         A.   I do not.

 9         Q.   And it may be that this was more

10   for QRA, based upon the agenda.  If you go to

11   the second page of the document, it looks like

12   that they're reviewing historical context and

13   timeline, implementation of threshold limits

14   into the SOM, electronic monitoring, overview of

15   initial methodology used to calculate the

16   threshold limits, et cetera.

17              Do you recall attending a meeting

18   where these different items were discussed, this

19   agenda was discussed?

20         A.   I do not.

21              MS. QUEZON:  Let's go to page 3,

22         if we can.  And if you can blow that up

23         some, it would be very helpful to me.

24         All right.  There we go.  Much better.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Okay.

 2    BY MS. QUEZON:

 3          Q.    So this the -- it's entitled

 4    "Historical Context."  And if we start there,

 5    you see November 1, 2007?

 6          A.    I do.

 7          Q.    Okay.  And if you look at -- just

 8    right below that, December 1, 2007 is the next

 9    date in line, and it says, "Distribution center

10    licenses suspended by DEA."

11                Right?

12          A.    I see that.

13          Q.    Okay.  So then on 12/20 -- oh,

14    much better -- then on 12/20 up at the top, it

15    says, "Implemented AHOP threshold limits for

16    independent segment."

17                What is AHOP?

18          A.    I don't -- I don't know.

19          Q.    Okay.  But it looks as if once the

20    DCs got suspended, we're going to put some

21    thresholds in place, right?

22                MR. PYSER:  Object to form.

23          A.    On this document, yes, that's what

24    that looks like.
```

```
1              Q.    So then on February 19, 2008, so

2    we start with the independent segment, and then

3    it says, "Implemented all threshold limits for

4    independent segment."

5              I guess the AHOP is different than

6    the entire independent segment?

7              MR. PYSER:  Object to form.

8         Q.    Do you know?

9         A.    I don't.

10        Q.    Okay.  Then on July 1, 2008,

11   implemented threshold limits for LTCH -- I don't

12   know -- segment.  I would assume long-term care

13   and hospital?

14        A.    LTC I could say is long-term care.

15   The HI, I do not know.

16        Q.    All right.  And then October 1,

17   2008, began implementation of threshold limits

18   for national chain stores.

19              Do you see that?

20        A.    I do.

21        Q.    Okay.  So we've got the suspension

22   by the DEA in December of 2007, and almost a

23   year later, Cardinal begins implementation of

24   threshold limits for national chain stores.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Do you see that?

 2          A.    That's what that says, yes.

 3          Q.    Okay.  Then I think the next date

 4    in line is December 7, 2008, implemented

 5    threshold limits for hospital segment.  And

 6    January 2009, implemented threshold limits for

 7    all remaining customers.

 8                  MR. PYSER:  Object to form.

 9          Q.    Did we miss one?  We missed one.

10    December 15, 2008, up at the top, implemented

11    threshold limits for remaining chain stores

12    (CVS).

13                  Do you see that?

14          A.    I do.

15          Q.    Okay.  Now, the rest of the dates

16    and information regarding those dates appears to

17    be in regard to advanced analytics.

18                  Do you know what that is?

19          A.    I'd be speculating.

20          Q.    Okay.  Well, let's just go the --

21    to September 30th of 2010 was when the threshold

22    forecast model was to be delivered.

23                  Do you see that?

24          A.    I see that.
```

```
1          Q.    Okay.  Do you know what a

2   threshold forecast model is?

3          A.    I do not.

4          Q.    Do you know whether even by 2010

5   Cardinal was using advanced analytics in their

6   suspicious order monitoring program?

7          A.    Repeat the question, please.

8          Q.    Do you know if by the end of 2010,

9   Cardinal was using advanced analytics in its

10  suspicious order monitoring program?

11         A.    We've always had a program in

12  place that evolved over time, and as new

13  technology came on board, which is probably

14  where we picked up here, that's what they're

15  defining here, maybe to meet those promises that

16  they made.

17         Q.    Back in 2008?

18         A.    Again, I would just be

19  speculating.  But I would say that we always had

20  a system in place.

21         Q.    Right.  I'm asking specifically

22  about advanced analytics.  Do you know whether

23  by the end of 2010, Cardinal was using advanced

24  analytics in its suspicious order monitoring
```

```
 1    system?  And you may -- you may not know.

 2            A.    Yeah, I do not.

 3            Q.    Okay.

 4            A.    I do not know.

 5                  MS. QUEZON:  Okay.  All right.  I

 6            think this is a good time to stop.

 7                  THE VIDEOGRAPHER:  The time is now

 8            12:33.  Going off the record.

 9                        - - -

10          Thereupon, at 12:33 p.m. a luncheon

11            recess was taken until 1:34 p.m.

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        Tuesday Afternoon Session

                         October 16, 2018

 2                         1:34 p.m.

 3                          - - -

 4            THE VIDEOGRAPHER:  Okay.  The time

 5        is now 1:34.  Back on the record.

 6                          - - -

 7        (Cardinal-Carney Exhibit 23 marked.)

 8                          - - -

 9           CROSS-EXAMINATION (CONT'D.)

10   BY MS. QUEZON:

11           Q.    Mr. Carney, I believe when we left

12   off, we had looked at a couple of e-mails

13   regarding some threshold increases and one about

14   the chain pharmacies sort of investigating your

15   own conduct.

16                Do you remember that line of

17   questioning?

18           A.    Yes.

19           Q.    Okay.  If we can, let's go to

20   4085.  And before you even go through and look

21   at the document that we've provided to you,

22   Exhibit 23, let me just ask you, were you aware

23   that the Lakeland distribution center was

24   investigated again by the DEA in approximately
```

1    2012?

2            A.    No, I was not.

3            Q.    Okay.  To the best of your

4    recollection, did anyone from Cardinal provide

5    you with the details of that investigation or

6    the facts and circumstances leading up to the

7    suspension of their ability to distribute

8    controlled substances?

9            A.    No.

10           Q.    All right.  If you can, just take

11   a look -- and the first question is just going

12   to be, did anyone provide you -- as the sales

13   manager for the Wheeling distribution center,

14   provide you with this government's prehearing

15   statement that sets forth the investigation and

16   the facts and circumstances leading up to the

17   suspension of the Lakeland distribution center?

18           A.    I would have been the director in

19   February of 2012, but no.

20           Q.    I apologize.  You are correct.

21               All right.  Well, let's look at a

22   few of the pages of the pretrial statement.  If

23   we can go to page 4.  And at the bottom of the

24   page, the very last sentence on the page "From

```
 1    approximately," it states, "From approximately

 2    February 2009 through June of 2010" -- now,

 3    again, chronologically, let's just get some

 4    guideposts.  If you'll recall, the Memorandum of

 5    Agreement was signed on September of 2008.

 6                 Do you remember looking at that

 7    exhibit a little while ago?

 8         A.    Yes.

 9         Q.    All right.  So four months later.

10    "From February 2009 through June 2010, monthly

11    oxycodone sales to Florida practitioners

12    steadily increased and well surpassed the

13    monthly oxycodone sales in the remaining states.

14                 "In June of 2010, DEA took action

15    on wholesale distributors supplying Florida

16    practitioners at rogue pain clinics.  Once DEA

17    took action on wholesale distributors, monthly

18    oxycodone sales to practitioners in Florida

19    substantially decreased.

20                 "Despite this decrease in monthly

21    oxycodone sales beginning in 2010, Respondent's

22    sales to its top four Florida retail pharmacy

23    customers on average continued to increase."

24                 And I think we kind of looked at
```

1    this issue a little while ago.  With the pill

2    mills being shut down, the pain clinics being

3    shut down, there's an increase in prescriptions

4    to -- the one we looked at was at CVS.

5              Do you remember that?

6              MR. PYSER:  Objection to form.

7         A.   Yes.

8         Q.   So let's go on to page 12 of the

9    document, beginning at that middle paragraph.

10   "DEA has communicated to Cardinal Health that it

11   is required to conduct its own due diligence on

12   its retail pharmacy chain customers."

13             And skipping down to "During the

14   teleconference."

15             "During the teleconference,

16   Mr. Moné stated that Cardinal Health

17   communicates with the loss prevention, LP,

18   individuals of chain pharmacies when an order is

19   approaching or exceeding set thresholds and

20   maintains e-mails of the communications.

21             "DEA Staff Coordinator Mike Arpaio

22   communicated to Mr. Moné that due diligence

23   investigations must be performed on all

24   customers, chain pharmacies included, when it

1    appears that suspicious high-volume orders are

2    requested of controlled substances and

3    questionnaires should be sent to the chains.

4              "Mr. Moné in turn stated that QRA,

5    quality regulatory affairs, is unable to look at

6    chain pharmacy systems in order to identify

7    problem areas when there is not an order of

8    interest or their threshold is not exceeded."

9              Were you aware -- and I understand

10   that you are in independent retail.  But were

11   you aware that it was Cardinal Health's policy

12   to simply communicate a suspicious -- or a

13   suspicious order to the loss prevention of its

14   chain customers?

15             MR. PYSER:  Object to form.

16        A.    I was not.

17        Q.    Let's go to page 16 of the

18   document.  And the section that says,

19   "Exponentially Increasing High-Volume Sales,"

20   about the second full sentence, "DEA

21   concluded" --

22        A.    I see it.

23        Q.    -- "that over a period of

24   approximately three years, from

Highly Confidential - Subject to Further Confidentiality Review

1    November 2008" -- remembering that the

2    Memorandum of Agreement was signed in September

3    of 2008 -- from "November of 2008 to

4    December 2011, Respondent's anti-diversion

5    controls were inadequate to meet their due

6    diligence responsibilities."

7                    And then if we'll go down to the

8    final paragraph of the page.  "Between

9    November 1, 2008, and December 31, 2011,

10   Respondents sold over 12.9 million dosage units

11   of oxycodone to its top four retail pharmacy

12   customers.  From 2008 to 2009, Respondent's

13   oxycodone sales to its top four retail pharmacy

14   customers increased 803 percent.  From 2009 to

15   2010, the oxycodone sales increased 162 percent.

16   Between 2009 and 2011, oxycodone sales to top

17   four retail pharmacies increased 241 percent."

18                   Were you aware of any of those

19   facts?

20                   MR. PYSER:  Object to form.

21          A.    I was not.

22          Q.    All right.  If we can go to

23   page 18, please, under "Inadequate Due

24   Diligence" at the bottom of the page.  And you

Highly Confidential - Subject to Further Confidentiality Review

1    see under small letter A, "Regularly exceeding

2    the distribution thresholds it established for

3    itself."

4              And then on to the next page.

5    "Respondents set monthly thresholds for

6    oxycodone distributions to each of its stores.

7    But from April 2009 to August 2011, Respondent

8    disregarded the oxycodone thresholds for its top

9    four retailers at least 44 times, sometimes by a

10   few thousand pills and sometimes by tens of

11   thousands.  The unexplained disregard for its

12   own threshold suggests that Respondent did not

13   take its own policy seriously.  Based on this

14   evidence, the DEA was unable to conclude that

15   Respondent's stated threshold volumes served as

16   a reliable and consistent constraint against

17   diversion."

18             Did anyone in 2012 make you aware

19   that at least at the distribution center in

20   Florida, they were disregarding their own

21   thresholds?

22        A.    No.

23             MR. PYSER:  Object to form.

24             You can answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    No.

 2            Q.    Would you have liked to have

 3     known?

 4                  MR. PYSER:  Object to form.

 5            A.    Again, my area was in West

 6     Virginia, Pennsylvania, and Ohio, and I wasn't

 7     aware of any of this information.

 8            Q.    And so we're clear, the policies

 9     and procedures of Cardinal apply to all the

10     distribution centers, right?

11            A.    Yes.

12            Q.    Is there any regular communication

13     between the distribution centers regarding

14     safest practices while you have been employed at

15     Cardinal?

16            A.    We are communicated with regularly

17     on what the expectations and policies and

18     procedures are.  I can't speak to how they

19     interpret -- someone else might interpret those

20     policies and procedures or adhere to them.  I

21     can't speak to it.

22                  MS. QUEZON:  Let's look -- and

23            we'll come back to this one.  But let's

24            look at 4633, please.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2          (Cardinal-Carney Exhibit 24 marked.)

 3                         - - -

 4   BY MS. QUEZON:

 5          Q.    Do you know how many suspicious

 6   orders were reported by the Wheeling

 7   distribution center between 2007 and 2012?

 8          A.    Do not.

 9          Q.    Do you know if any were?

10          A.    Yes.  I believe so.  Yes.

11          Q.    Not even a ballpark as to how

12   many?

13          A.    I couldn't speculate.

14          Q.    Mr. Carney, this is just a graph

15   of the number of times thresholds were exceeded

16   from 2009 through to 2011.

17                 Do you see that?

18                 MR. PYSER:  Object to form.

19          A.    I do.

20          Q.    And do you also see the comments

21   in the middle section as far as the reasoning

22   behind the increase in thresholds?

23          A.    I do.

24          Q.    Do you know, as you sit here
```

1    today, how many times the Wheeling, West

2    Virginia distribution center failed to adhere to

3    their own -- to the thresholds that they had set

4    for their customers?

5              MR. PYSER:  Object to form.

6         A.    I do not.

7         Q.    Have you ever been provided by

8    Cardinal with a graph or table, such as the one

9    that has been presented to you today, that would

10   show you, as the sales manager, how many times

11   in Wheeling, West Virginia that the very

12   thresholds that had been set were exceeded or

13   increased?

14             MR. PYSER:  Object to form.

15             Misstates evidence.  Assumes that that

16             has ever happened.

17        A.    I have not.

18        Q.    Okay.  If we can go back to 4085,

19   please, and page 19.

20             Now, do you see, Mr. Carney, under

21   b, "Failing to follow its own Suspicious Order

22   Monitoring policies"?

23        A.    I do.

24        Q.    Okay.  And if you'll recall, this

Highly Confidential - Subject to Further Confidentiality Review

1  is the suspicious order -- I mean -- I'm sorry.

2  One more time.

3           If you'll recall this is the

4  standard operating procedure that we looked at a

5  little while ago that had the watch list, yellow

6  flag, red flag.

7           Do you remember that?

8       A.    I see that, yes.

9       Q.    And it's referenced here where --

10  and we read it together a little while ago that,

11  "Respondent attaches a red flag to a particular

12  customer, which is precipitated by the following

13  two events:  Sales increased by 15 percent (at

14  least 10,000); and 2) at least 20 percent or

15  more in dosage units."

16           Do you see that?

17       A.    I do, yes.

18           MS. QUEZON:  Okay.  If we can now

19       switch off of this exhibit and go to

20       4109.

21               - - -

22       (Cardinal-Carney Exhibit 25 marked.)

23               - - -

24

```
 1   BY MS. QUEZON:

 2        Q.   Mr. Carney, this is a declaration

 3   of one of the witnesses from the DEA who did

 4   some of the investigation into the Lakeland,

 5   Florida distribution center.

 6             Have you ever seen the declaration

 7   of Ruth Carter?

 8        A.   I have not.

 9             MR. PYSER:  Object to form on the

10             preface to that question.

11             MS. QUEZON:  Let's go to page 8 of

12             the document, please.  And if you can

13             pull up the bottom part.

14        A.   I only have three pages.

15        Q.   Oh.  Well, that's not going to

16   work.  Let me hand you mine.  And we'll

17   substitute this for the exhibit.

18        A.   Sure.

19             Okay.  I'm there.

20        Q.   All right.  And on page 8, if you

21   can -- sort of the footnote area, "The following

22   data was taken from Respondent's" -- do you see

23   that?

24        A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. QUEZON:  Can you bring that

 2             part of it up a little bit so we can see

 3             it better?  Yeah, the whole thing, like

 4             that entire section, if you don't mind.

 5             Yeah, there we go.

 6   BY MS. QUEZON:

 7        Q.    All right.  And this basically

 8   says, "The following data was taken from

 9   Respondent's ESOM database, provided in response

10   to the AIW" -- which is a warrant -- "and

11   establishes the following red flag events.  The

12   events are based on monthly accruals of

13   controlled substances."

14             And do you see where four

15   different pharmacies -- these are the top

16   purchasers of controlled substances from the

17   Lakeland distribution center.  And you see a

18   listing of all the red flag events that occurred

19   between -- in the years of 2009 through 2011?

20                    MR. PYSER:  Object to form.

21        A.    I do.

22        Q.    And do you see that as a result of

23   the red flag event, there was supposed to have

24   been a site visit to the pharmacies.
```

```
 1                    Is that your understanding of the

 2   policy at Cardinal?

 3                    MR. PYSER:  Object to form.

 4           A.    Based on what we read before, it

 5   said that a 10 percent increase would.  So, yes.

 6           Q.    Okay.  Again, have you ever been

 7   presented with this type of information, meaning

 8   red flags that were not responded to pursuant to

 9   the Cardinal policies for the Wheeling, West

10   Virginia distribution center?

11                    MR. PYSER:  Object to form.

12           A.    I have not.

13                    MS. QUEZON:  Okay.  Let's go to

14           P1.4655, please.

15   BY MS. QUEZON:

16           Q.    And so we're clear, while we're

17   getting that exhibit ready, you were not told by

18   anyone at Cardinal that the Lakeland

19   distribution center had once again faced a

20   suspension or any of the facts and circumstances

21   that led to that?

22           A.    Not that I recall.

23                    - - -

24           (Cardinal-Carney Exhibit 26 marked.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    - - -

2   BY MS. QUEZON:

3        Q.    Let me know when you have the

4   opportunity to look through the document,

5   please.

6        A.    I've got it.

7        Q.    Okay.  So obviously this is an

8   e-mail with an attachment from Mr. Lanctot to

9   you, correct?

10       A.    Initially from Todd.

11       Q.    Mr. Cameron?

12       A.    Yeah, to -- oh, no.  Yeah.  So it

13  was -- it did come from Chris to me, yes.

14       Q.    Okay.  And do you recall receiving

15  this?

16       A.    Yes, I believe so.

17       Q.    All right.  And the attachment is

18  called "Enhancing the Anti-diversion Program."

19  And is dated January 17th, 2013; is that right?

20       A.    Yes.

21       Q.    I'm sorry.  Go back to that first

22  page, the e-mail.

23              In looking at the section from

24  Mr. Cameron when he sends it initially to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Mr. Lanctot and some other individuals, it

2    states, "It's intended to be internal only even

3    though we know will end up in customer and DEA's

4    hands."

5              Do you have any idea what

6    Mr. Cameron means by this?

7         A.   I do not.

8         Q.   Let's go to the actual attachment,

9    "Enhancing the Anti-diversion Program."  And if

10   we could go to the second page of that.  So it

11   will be page 3 of the exhibit.

12        A.   Yes.

13        Q.   Okay.  Now, this says, "Objective

14   Criteria.  The eight objective criteria that we

15   measure and evaluate to determine whether to set

16   thresholds above the national average are as

17   follows."  And then it lists eight different

18   criteria, and it gives us the national average,

19   and then the 95th percentile.

20              Do you see that?

21        A.   I do.

22        Q.   And would that be the

23   95th percentile of pharmacies across the United

24   States?
```

```
 1            A.    I believe it would, yes.

 2            Q.    All right.  So I'm just trying to

 3    understand the graph -- or the table.

 4                  So the percentage of oxycodone

 5    that is oxycodone 15- and 30-milligram products.

 6    So national average for a pharmacy is

 7    22 percent?

 8            A.    Mm-hmm.

 9            Q.    And --

10            A.    Yes, yes.

11            Q.    And then the 95th percentile is

12    68 percent?

13            A.    Anything above that.

14            Q.    Okay.  Now, the paragraph

15    underneath the table, basically the part that is

16    bolded, "Customers whose objective scores

17    approach or exceed the 95th percentile in one or

18    more of these areas and customers with a high

19    cumulative score for the eight factors will be

20    subject to additional scrutiny and thresholds

21    will be managed accordingly."

22                  Do you know what that means?

23            A.    Yes.

24            Q.    Explain that to me, please.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Each one of these criteria, the

2    customer's purchasing habits were applied here,

3    and they received a score.  And the higher the

4    score, the closer they came to putting us at

5    risk up to a point of a 12 score overall.

6             And if the customer had anything

7    approaching or over a 12 score, they could be

8    marked for a site visit, further information

9    required, that type of thing, taking a deeper

10   look at the customer to make sure that there was

11   nothing going on, that they weren't putting us

12   at risk.

13        Q.    So going back to that number 1,

14   "The percentage of oxycodone that is oxycodone

15   15- and 30-milligram products."  The national

16   average is 22 percent.  So let's say somebody --

17   let's say a pharmacy was at ▉ percent, ▉▉▉▉▉

▉    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ percentile, but well

19   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, that in and of itself

20   would not bring any more scrutiny to the

21   pharmacy?

22        A.    No, it would --

23             MR. PYSER:  Object to form.

24             Go ahead and answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.  No, it would.  They get a
 2    score -- a failing score would be at ██ percent.
 3    But between ██ and ██ would be a corresponding
 4    score that they would be given.  And the higher
 5    the score overall, the closer they were to
 6    failing and putting us at risk.
 7            Q.    Have you seen this objective
 8    criteria applied to pharmacies that you
 9    distribute to?
10            A.    Every one.
11            Q.    I haven't seen it.  That's the
12    reason I'm asking.
13            A.    Yes.
14            Q.    So there -- this objective
15    criteria has been applied to -- to the best of
16    your knowledge, to the pharmacies that Cardinal
17    sells to?
18                  MR. PYSER:  Object to form.
19            A.    At least in my territories, yes.
20    And this was for a time the -- what we probably
21    called the advanced analytics.
22            Q.    And when you say -- the advanced
23    analytics we talked about before --
24            A.    Yes.
```

```
 1          Q.     -- back with that chart?

 2          A.     Yes.

 3          Q.     Okay.  And so now we're in January

 4   of 2013 when we're enhancing the anti-diversion

 5   program to use our advanced analytics?

 6          A.     When it comes to this, probably --

 7   yes, the date, yes.

 8          Q.     Okay.  All right.  And then go to

 9   page 4, please.  Under the section that says,

10   "We will not fill any order for a controlled

11   substance that exceeds a threshold."

12                 Do you see that?

13          A.     I do.

14          Q.     Okay.  "Since our thresholds will

15   be based on objective criteria and data and

16   tailored to each customer, we will not fill any

17   order for a controlled substance that exceeds

18   its threshold.

19                 "When customers approach a

20   threshold early in an accrual cycle, you will

21   receive notice and have an opportunity to

22   interact with both the customer and Quality and

23   Regulatory Affairs' analytics team to better

24   understand the circumstances around the order so
```

```
 1    that we can determine whether the threshold is

 2    appropriately set."

 3             So once again, when a customer is

 4    approaching a threshold, we're going to contact

 5    the customer and let them know you're

 6    approaching a threshold --

 7             MR. PYSER:  Object to form.

 8        Q.    -- right?

 9        A.    At some point, that became part of

10    the practice, yes.  They wouldn't receive this

11    detail information or the analytics behind it.

12        Q.    But they'd know that they were

13    approaching a threshold?  Yes?

14        A.    Yes.

15             MS. QUEZON:  Okay.  All right.

16        And if we can go to 508.

17                     - - -

18        (Cardinal-Carney Exhibit 27 marked.)

19                     - - -

20    BY MS. QUEZON:

21        Q.    Just let me know when you've had

22    the opportunity to look at the document.

23        A.    Okay.  I have it.

24        Q.    All right.  First of all, were you
```

1   aware that Cardinal Health had agreed to a

2   $44 million settlement for alleged violations of

3   the Controlled Substances Act in or around

4   December of 2016?

5          A.    Sometime after that, I did become

6   aware of it, yes.

7          Q.    Were you provided by Cardinal with

8   any of the details of the investigation or what

9   was alleged that Cardinal had done wrong?

10         A.    I was not.

11                MR. PYSER:  I'll caution you in

12          answering not to reveal any

13          communications with counsel.

14                MS. QUEZON:  Of course.

15  BY MS. QUEZON:

16         Q.    And specific to Cardinal, I don't

17  want to know anything that your attorneys may or

18  may not have told you.

19         A.    Right.  I was not by Cardinal.

20         Q.    Okay.  So, again, we looked at the

21  2008 events, the 2012 events.  We've got this

22  settlement.  Throughout each and every one of

23  them, you were never given by Cardinal the

24  details and the facts and circumstances that led

Highly Confidential - Subject to Further Confidentiality Review

```
 1    up to the suspensions or the fines?

 2           A.    I don't recall how I became aware

 3    of --

 4           Q.    Lakeland?

 5           A.    Yes.  It could have been through a

 6    conference call.  The same -- the same with

 7    this.  But nothing official sent to me from ...

 8           Q.    And I'm more concerned about

 9    whether or not the details of what was alleged

10    that Cardinal had done wrong.

11           A.    Yes, I have not.

12           Q.    Okay.  And here on the second page

13    of it, it basically states, "The settlement

14    resolves allegations arising from an

15    investigation in Maryland as well as an

16    administrative proceeding related to conduct in

17    Florida.  According to the settlement

18    agreement" -- which I assume you have not seen.

19    Have you seen the settlement agreement?

20           A.    I have not.

21           Q.    -- "Cardinal admitted that from

22    January 1, 2009, to May 14, 2012, it failed to

23    report suspicious orders to the DEA as required

24    by the Controlled Substances Act.  The
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   settlement also resolves allegations that

 2   Cardinal failed to maintain effective controls

 3   against diversion."

 4              Were you aware that they had

 5   admitted failing to follow the Controlled

 6   Substances Act?

 7              MR. PYSER:  Object to form.

 8        Misstates evidence.

 9        A.    I was not.

10              MS. QUEZON:  Mr. Carney, I don't

11         have any more questions of you.  My

12         co-counsel, Mr. Lamb, is going to take

13         over.  But we may need just a quick five

14         minutes to switch places.  Is that okay?

15              MR. PYSER:  That's fine.

16              MS. QUEZON:  Thanks.

17              THE VIDEOGRAPHER:  The time is now

18         2:07.  Going off the record.

19              (Recess taken.)

20              THE VIDEOGRAPHER:  The time is now

21         2:13.  Back on the record.

22                    - - -

23              CROSS-EXAMINATION

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LAMB:

 2          Q.   Mr. Carney, my name is Archie

 3   Lamb.  I am co-counsel with Ms. Quezon.  I've

 4   got a few questions.  She touched on a very

 5   comprehensive list of the questions we had for

 6   you.  I'm primarily going to focus on West

 7   Virginia.  And this is not going to last a whole

 8   long time.

 9               Are you from West Virginia

10   originally?

11          A.   Yes, I am.

12          Q.   And I know you live in Wheeling

13   you told us.  Is that where your home --

14          A.   Yes, born and --

15          Q.   -- hometown is?

16          A.   Yes.

17          Q.   You were born and raised there?

18          A.   Yes.

19          Q.   How old were you when you went to

20   work at Cardinal in 1988?

21          A.   I would have been 23, 24 years

22   old.

23          Q.   And so it's 30 years --

24          A.   Thirty years.
```

```
 1          Q.    -- of employment?

 2          A.    Yes.

 3          Q.    Would you agree with me that the

 4    opioid epidemic has reached tragic proportions

 5    in the State of West Virginia?

 6          A.    Absolutely.

 7          Q.    And did you see the CEO,

 8    Mr. Barrett, testify in front of Congress a few

 9    months ago?

10          A.    I did.

11          Q.    And have you seen the letter that

12    the -- Mr. Walden and Mr. Pallone sent to

13    Mr. Barrett inquiring as to some questions about

14    the West Virginia and Cardinal's role in the

15    opioid epidemic in West Virginia?

16                Have you seen that letter?

17          A.    I have not.

18                MR. LAMB:  Let's show him

19          Plaintiff's Exhibit 43, P1.43.

20                       - - -

21          (Cardinal-Carney Exhibit 28 marked.)

22                       - - -

23    BY MR. LAMB:

24          Q.    Let's show him Plaintiff's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 43, P1.43.

 2              We'll give you a chance just to

 3    peruse that document.  And let me know when

 4    you're ready --

 5         A.   Sure.

 6         Q.   -- for me to ask a question.

 7         A.   Sure.

 8              MR. PYSER:  And for the record,

 9              it's marked 28 in this deposition?

10              We're using a couple different numbers.

11              I just want to make sure we have the

12              right one.  Is that right?

13              MR. LAMB:  Is it marked 28?  I'm

14              her assistant.

15         A.   Okay.  Sir, I think I have it.

16         Q.   Have you seen that document before

17    I handed it to you today?

18         A.   I have not.

19         Q.   Are you familiar with the

20    statistics cited in that document?

21         A.   Somewhat, yes.

22         Q.   For what period of time -- and I

23    apologize for -- I'm just trying not to rehash

24    anything that Ms. Quezon talked about.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    For what period were you -- what

 2    was your job in the 2000s?  What was your job

 3    title?

 4            A.   From 2010 to date, I was the

 5    director of sales.  But during this time period

 6    of 2000 to 2010, I would have been a sales

 7    manager, but not in West Virginia.

 8            Q.   Where?

 9            A.   In Ohio.

10            Q.   So tell me what areas you would

11    have covered in Ohio.

12            A.   The entire State of Ohio.  The

13    northern panhandle of West Virginia, and

14    southern West Virginia, and a small sliver of

15    western Pennsylvania.

16            Q.   And after 2010?

17            A.   I was the director overseeing

18    all --

19            Q.   Of West Virginia?

20            A.   All of West Virginia, Ohio,

21    Pennsylvania.

22            Q.   Let's go to the first page, second

23    paragraph.  It says, "For example, in 2015, West

24    Virginia had the highest opioid overdose rate in
```

1    the nation."

2              Were you aware of that?

3         A.    Yes, I was.

4         Q.    It goes on to say that in West

5    Virginia, it's caused many social challenges for

6    its residents and devastated its economy.

7              Do you agree with that?

8              MR. PYSER:  Object to form.

9         A.    The challenges, yes.  The economy,

10   not so much.

11        Q.    Have you -- I don't understand.

12   Not so much what?  You don't agree with that?

13        A.    I don't agree that it's been the

14   opioid epidemic that's ruined the economy in

15   West Virginia.

16        Q.    Do you agree that the opioid

17   epidemic has a significant negative impact on

18   the economy in West Virginia?

19             MR. PYSER:  Object to form.  Calls

20        for expert testimony.

21        A.    An impact, yes.  How significant,

22   I wouldn't know, sir.

23        Q.    It says between 2007 and 2012,

24   Cardinal Health, your company, distributed

Highly Confidential - Subject to Further Confidentiality Review

```
1    155 million doses of hydrocodone and 85 million

2    doses of oxycodone.

3              Do you agree with those numbers?

4         A.   Do I agree that those numbers

5    happened?

6         Q.   Are accurate?

7         A.   Yes, sir.

8         Q.   Would you agree with me that in a

9    state of a population of 1.8 million, that is an

10   excessive supply of hydrocodone and oxycodone

11   for that state?

12             MR. PYSER:  Object to form.  Calls

13        for speculation and expert testimony.

14        A.   I would -- I would have no way of

15   knowing what the patients' needs were.

16        Q.   You have no idea?

17        A.   I have no way of knowing what the

18   patients' needs for these medications were.

19             MR. PYSER:  Counsel, please let

20        him finish his answer.

21        Q.   We'll come back to that in a

22   minute.  I want to ask you a couple other

23   questions first.

24             MR. LAMB:  Let's show him P1.4969.
```

```
 1              We'll come back to that in a

 2         minute.  That's all right.  Just take

 3         your time.  You don't have it?  Okay.

 4              Go to 4970.

 5                   - - -

 6    (Cardinal-Carney Exhibit 29 marked.)

 7                   - - -

 8 BY MR. LAMB:

 9         Q.    Again, Mr. Carney, take your time

10 and let me know when you've reviewed the

11 document and are ready to answer questions.

12         A.    Yes, sir.

13              MR. PYSER:  Object to the

14         introduction of the hearsay in this news

15         article.

16         A.    Okay.

17         Q.    Okay.  So do you know or familiar

18 with Dr. Diane Shafer who's referenced in this

19 article?

20         A.    I am not.

21         Q.    And do you know where the -- where

22 Mingo County, West Virginia is?

23         A.    It's in southern West Virginia.

24         Q.    And was it a part of your -- is it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    presently a part of your area --

 2         A.    Yes.

 3         Q.    -- sales area?

 4         A.    Yes, sir.

 5         Q.    Have you -- are you familiar with

 6    any of the matters discussed in here relative to

 7    her misconduct, her going to prison, excessive

 8    supply of opioids to her patients?  Are you

 9    familiar with that?

10               MR. PYSER:  Object to form.

11         A.    No, I'm not.

12               MR. PYSER:  You can answer the

13         question.

14         A.    No, I'm not.

15         Q.    You are aware that during the

16    period of time that you were a sales director in

17    Ohio, and now as a sales manager in Ohio and

18    West Virginia, that there have been pill mills

19    and doctors excessively prescribing drugs in a

20    medically unnecessary way?  You're aware of

21    that, aren't you?

22               MR. PYSER:  Object to form.

23         A.    Yes.

24         Q.    Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LAMB:  Let's look at 4969.

 2                         - - -

 3        (Cardinal-Carney Exhibit 30 marked.)

 4                         - - -

 5   BY MR. LAMB:

 6             Q.    Let me know when you're ready.

 7             A.    Sure.

 8                    MR. PYSER:  Same objections to the

 9             introduction of this exhibit.

10             A.    I have it.

11             Q.    Are you familiar with the

12   prosecution of Ms. Miller who is the office

13   manager or Dr. Ryckman who is the doctor

14   fraudulently filling out prescriptions for

15   medications; benzodiazepines and opioids?

16             A.    I was not.

17             Q.    You're not familiar with any of

18   these people?

19             A.    No, sir.

20             Q.    Were you aware of this prosecution

21   before you read this article?

22             A.    I was not.

23                    MR. LAMB:  Let's go to 571.

24                         - - -
```

```
 1              (Cardinal-Carney Exhibit 31 marked.)

 2                          -  -  -

 3    BY MR. LAMB:

 4              Q.    Is Madison, West Virginia in your

 5    area?

 6              A.    Yes, sir.

 7              Q.    Okay.

 8                    MR. PYSER:  Again, object to the

 9              introduction of this exhibit.

10              A.    I believe I have it now.

11              Q.    You are aware, are you not, that

12    there is a federal obligation under the

13    Controlled Substances Act for Cardinal to report

14    suspicious orders, correct?

15              A.    Yes.

16              Q.    And then there's a state

17    obligation and law under which Cardinal is

18    supposed to [sic] suspicious orders under state

19    law to the pharmacy board as well; isn't that

20    correct?

21                    MR. PYSER:  Object to form.  Legal

22              conclusion.

23              A.    I believe so, yes.

24              Q.    Okay.  And all I'm asking for is
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    your understanding.

2           A.    Yes, sir.

3           Q.    I mean, you're -- you understand

4    that you have obligations related to reporting

5    suspicious orders.  We've established that

6    ad nauseam in Ms. Quezon's questioning.  And one

7    of those is a state requirement, and one of

8    those is a federal requirement, and you know

9    that.

10                MR. PYSER:  Object.

11          Q.    You've known that the whole time

12   you've been a sales director, correct?

13                MR. PYSER:  Object to form.

14          A.    Yes.

15          Q.    Okay.  Now, this says -- this

16   article says that between 2001 and June of 2012,

17   the pharmacy board only received two reports of

18   suspicious orders from Cardinal Healthcare.

19                Does that make sense to you?

20                MR. PYSER:  Object to form.

21          A.    Does it make sense to me?  No.

22          Q.    Explain that to me.

23          A.    Because I -- I'm -- it's -- again,

24   I'm in the -- in the sales portion of it.  So
```

Highly Confidential - Subject to Further Confidentiality Review

1    that would be the QRA's and the compliance

2    department's responsibilities.  And why they

3    didn't do that or if they didn't do that, I -- I

4    couldn't speculate.

5          Q.    Well, your salespeople are

6    integral to the process of collecting

7    information and data.  You're the eyes and ears

8    of the organization relative to pill mills and

9    inappropriate conduct relative to dispensing

10   narcotics; isn't that correct?

11               MR. PYSER:  Object to form.

12         A.    Yes, sir.

13         Q.    And so to that end, does it make

14   sense to you that there would be only two

15   reports in an 11-year period of time by Cardinal

16   Healthcare to the pharmacy board in West

17   Virginia?

18         A.    I only know what we reported in

19   through QRA and what would have been flagged as

20   suspicious orders.  And then that -- the QRA

21   department was to handle it from there.  It's

22   not sales that sends the reports to the --

23         Q.    You would agree --

24         A.    -- state board.

```
1            Q.    I'm sorry.  Were you finished?

2            A.    I am now, yes, sir.

3            Q.    You would agree with me that given

4    the volume of narcotics distributed in West

5    Virginia between 2000 and 2012, there were more

6    than two suspicious orders delivered in West

7    Virginia by Cardinal Healthcare?  You would

8    agree with that, wouldn't you?

9                  MR. PYSER:  Object to form.

10           A.    Yes.

11           Q.    Does it make sense to you that

12   after the Attorney General filed lawsuits

13   against Cardinal, that they began to send

14   suspicious orders at the rate of about 40 per

15   month?  Does that make sense to you?

16                 MR. PYSER:  Object to form.

17           A.    I can't speculate on what makes

18   sense to me, sir.

19           Q.    Okay.  That's fair.

20           A.    I would just -- I would say

21   that --

22           Q.    That's -- that's fair.

23                 You became director of sales of

24   West Virginia and Ohio in 2010; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Counsel, please let

 2            him finish his answers before you ask

 3            the next question.

 4                    MR. LAMB:  I thought he was done.

 5   BY MR. LAMB:

 6            Q.    Let me tell you this:  If I

 7   interrupt you, it's an accident.  And I want to

 8   be sure that you know that.

 9            A.    Sure.

10            Q.    So I apologize if I've stepped on

11   your answer.

12            A.    Sure.

13            Q.    But go ahead.

14            A.    It was January of 2011, yes.

15            Q.    Okay.  But the point I'm trying to

16   make is, the change in the volume of suspicious

17   orders occurred during your time at the helm of

18   the director of sales of West Virginia and Ohio,

19   correct?

20            A.    I'm not aware of that, sir.

21            Q.    Okay.  Are you -- are you telling

22   us that you have no idea when suspicious orders

23   are reported?

24                    MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    That I have no idea when a

 2    suspicious order is reported?  No, I do have an

 3    idea of when we're contacted, that the order has

 4    been held, yes.

 5          Q.    So if it's a suspicious order, the

 6    obligation is to report it and not to ship it

 7    until QRA has approved the shipment, correct?

 8          A.    Correct.

 9          Q.    And your salespeople get paid by

10    volume of product delivered to the pharmacies,

11    correct?

12                MR. PYSER:  Object to form.

13          A.    Not necessarily.  Not -- not

14    entirely, no.

15          Q.    Okay.  Well, let's unpack that a

16    little bit.

17                Do they get paid commission for

18    volume of narcotics sold?

19          A.    They're paid on a base salary and

20    according to a budget set for retention topline

21    sales.

22          Q.    And we've heard a lot about that

23    budget stuff.  But my question is, is their

24    compensation at all based on volume sold?
```

```
 1           A.    Based on the budget, yes.

 2           Q.    What's that mean?

 3           A.    That means that a certain number

 4   is set each year based on the previous year's

 5   sales, and a budget is created off of that, and

 6   you're paid to hit that budget.

 7           Q.    Well, are you paid to hit it, or

 8   are you paid to exceed it?

 9           A.    You're paid to hit it.

10           Q.    But you've got to hit it right on

11   the button, like --

12           A.    If you're under, you're not

13   compensated, but you're paid to hit the budget.

14           Q.    Are you -- are you compensated

15   more if you exceed the budget in volume?

16           A.    Yes, sir.

17           Q.    That's all I'm trying to figure

18   out.

19           A.    Yes.

20           Q.    It's a commission deal, right?

21           A.    A portion --

22           Q.    They get paid on volume.

23                 MR. PYSER:  Counsel, just let him

24           finish.
```

1        A.     A portion of their compensation is

2   paid on the volume that they sell, yes, sir.

3        Q.     And so the more they sell, the

4   more they make?

5        A.     The higher they are -- they come

6   in above the budget, the more that they would

7   make, yes, sir.

8        Q.     All right.  Is that a yes?

9        A.     Yes, sir.

10        Q.     Okay.  Are you familiar with Tug

11   Valley Pharmacy?

12        A.     I've seen it in the news, yes, I

13   have.

14        Q.     Tell me what you've seen about it

15   in the news.

16        A.     That it's a -- it's a pharmacy

17   that was diverting prescription drugs, yes.

18        Q.     And over what period of time was

19   Tug Valley Pharmacy diverting prescription drugs

20   in Mingo County, West Virginia?

21        A.     I'm not exactly sure.  They

22   weren't a customer of ours.

23        Q.     You never delivered any drugs to

24   Tug Valley Pharmacy?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Not that I know of, sir.

 2              Q.    Okay.  How about to Larry's

 3     Drive-In?

 4              A.    It was a customer of ours for a

 5     time.

 6              Q.    That was a pill mill, wasn't it?

 7                    MR. PYSER:  Object to form.

 8              A.    Not that I know --

 9                    MR. PYSER:  You can answer.

10              Q.    Go ahead.

11              A.    Not that I know of, sir.

12              Q.    You don't think Larry's

13     pharmacy -- Larry's Drive-In was a pill mill?

14                    MR. PYSER:  Object to form.

15              A.    I don't have a -- an opinion on

16     whether it was a pill mill or not, no.

17              Q.    Well, as director of sales for

18     Cardinal Healthcare, do you have an opinion on

19     what a pill mill is?

20              A.    What the term "pill mill" refers

21     to?

22              Q.    Yeah.

23              A.    Yes, yes.

24              Q.    What -- give me your definition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    It's kind of a slang term for a

 2   pharmacy that is just rolling out pills.

 3              Q.    And during the period of time from

 4   2000 to 2010 when you were sales manager in

 5   Ohio, did Cardinal Healthcare deliver to pill

 6   mills?

 7              A.    Not that I know of, sir.

 8              Q.    You have no idea --

 9              A.    I have no idea.

10              Q.    -- as you sit here?

11              A.    As I sit here.

12              Q.    Would you agree with me that it

13   would be inappropriate and illegal for Cardinal

14   Healthcare to deliver to a pill mill if they

15   knew it was, indeed, behaving illegally?

16              MR. PYSER:  Object to form.

17              A.    Yes.  If they came up as

18   suspicious order, and they were -- they showed

19   that they were something other than an

20   independent retail pharmacy, yes.

21              Q.    Well, as you say, rolling out

22   pills in excessive quantities is illegal, isn't

23   it?

24              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I can't speak to the legality of

 2      the number of pills.  We deliver FDA-approved

 3      medications to licensed independent pharmacies

 4      that have a patient base in need of those

 5      medications.

 6              Q.    But you have an obligation to

 7      monitor, investigate, and halt shipments that

 8      are suspicious in order or deviate in a pattern?

 9      You have an obligation to assess that and report

10      that and not ship it if you know that those

11      criteria are met?  That's your obligation,

12      right?

13                  MR. PYSER:  Object to form.

14          Compound question.

15              A.    Yes, it is.

16              Q.    It is.  It's too many questions,

17      but I'm just trying to get --

18              A.    Yes, it is, and we've done that.

19              Q.    Okay.

20              A.    I believe we've done that.

21              Q.    You're satisfied that Cardinal

22      Healthcare has never failed in its obligation to

23      report suspicious orders during the period of

24      time you've been involved as a sales manager or
```

1    sales director?

2         A.    I can speak for the Wheeling

3    division and the territories that fell under my

4    purview, and I can say that I'm satisfied that

5    we did the best we could.

6         Q.    In a typical month, how many

7    suspicious orders would you report both in the

8    2000 and 2010 time frame and since you've become

9    sales director?

10        A.    I, myself, wouldn't report any,

11   sir.

12        Q.    How many have been reported on

13   pharmacies under your jurisdiction during that

14   18-year period of time?

15        A.    Not exactly sure.

16        Q.    Give me a judgment as to -- and I

17   don't want you to speculate.  But you have no

18   earthly idea how many suspicious orders on a

19   monthly basis at any time during that period

20   would have been reported on your pharmacies?

21             MR. PYSER:  Object to form.

22             Argumentative.

23        A.    It would be speculation on my

24   part.  I have no idea.

```
 1              Q.    Okay.  And it's argumentative on

 2     my part.  I'm just trying to figure out how

 3     many, in your best judgment, you would report on

 4     a regular basis.

 5                    MR. PYSER:  Object to form.

 6              A.    I don't want to speculate.

 7              Q.    What sort of training did you

 8     receive and what sort of information were you

 9     given after the company paid $34 million in 2008

10     for the Lakeland fiasco?

11                    MR. PYSER:  Object to form.

12              Q.    What did they tell you about it?

13     Did you have meetings about it?  Were you

14     trained on it?  Were you educated about it?  Did

15     they explain to you what had happened?

16              A.    About Lakeland?

17                    MR. PYSER:  Object to form.

18              Q.    Yeah.

19              A.    No, no.

20              Q.    Never talked to you about it?

21              A.    We've had training on preventing

22     prescription drug diversion, but not specific to

23     Lakeland.

24              Q.    Y'all never sat down with anybody
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    in leadership and said, "This is what happened

2    in Lakeland.  We can't do this here"?  That

3    never happened?

4              MR. PYSER:  Object to form.

5         A.   Not to my -- not to my knowledge,

6    no.

7         Q.   Well, you would have been there

8    so ...

9         A.   Yep.  No.

10        Q.   Didn't happen?

11        A.   Didn't happen.

12             MR. PYSER:  Object to form.

13             MR. LAMB:  Let's go to the .6 --

14        1.5716, Zach.  It's the last page.

15   BY MR. LAMB:

16        Q.   Talking about the Larry's Drive-In

17   Pharmacy in Boone County, that's your customer,

18   right?

19        A.    He has been a customer of ours in

20   the past, yes.

21        Q.    And this says that the Attorney

22   General of West Virginia filed a lawsuit

23   claiming that Larry's Drive-In Pharmacy had

24   blindly filled suspicious prescriptions and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    dispensed extraordinary number of pills,

 2    10 million doses in 11 years.

 3                Do you agree with that?

 4                MR. PYSER:  Object to form.

 5         A.    Can you ask me that question

 6    again?

 7         Q.    Yeah.

 8                Do you agree that Larry's Drive-In

 9    Pharmacy dispensed 10 million doses of pain

10    pills in an 11-year period of time?

11         A.    If that's what the numbers say,

12    then, yes, sir.

13         Q.    And why wouldn't that have been a

14    suspicious order reported by Cardinal

15    Healthcare?

16                MR. PYSER:  Object to form.  It's

17            unclear if Cardinal was serving them in

18            this time.

19         Q.    That's all right.  I'm just -- if

20    Cardinal had been supplying that volume of

21    drugs, would you agree with me that that should

22    be reported as a suspicious order?

23                MR. PYSER:  Object to form.  Calls

24            for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    If we would have been supplying --

 2            Q.    Yes.

 3            A.    -- all of those pills in that

 4   time?

 5            Q.    Yes.

 6            A.    I couldn't speculate, sir.  It

 7   would be up to -- or it would be determined upon

 8   his patient base.

 9            Q.    And no matter how many people live

10   there?

11                 MR. PYSER:  Object to form.

12            Q.    I mean, how do you decide what is

13   an excessive volume, a volume that causes one to

14   be suspicious and report under the Controlled

15   Substances Act obligation to do so?

16            A.    Again, I'm in the sales

17   department, so I'm not the expert on this.  It's

18   the QRA department's responsibility to put

19   together those things like those advanced

20   analytics, the frequency, the pattern, and the

21   volume of the purchases.

22            Q.    So you've never been trained in

23   these advanced analytics.  You've never had

24   training relative to what you -- what you see,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   what you observe, what you should report to QRA

 2   to serve as the basis, the factual basis, of

 3   this conclusion that they make?  You've never

 4   had training on that?

 5              MR. PYSER:  Object to form.

 6        A.    Yes, we have had training.

 7        Q.    Okay.  That's what I'm trying to

 8   get to.

 9              At what point and at what level

10   does the volume sold -- like 10 million doses in

11   11 years, there should be some criteria, I would

12   think, that would let you make a decision, an

13   educated decision, on whether that's something

14   you ought to report to QRA or not?

15              MR. PYSER:  Object to form.

16        A.    Again, the decisions on what

17   constituted suspicious orders were determined by

18   the QRA department as the orders came in.

19        Q.    Yeah, but you had to -- you had to

20   tell them what you thought at some point.  Your

21   people had to be trained to report to them --

22              MR. PYSER:  Object to form.

23        Q.    -- right?

24        A.    If we saw something that was out
```

Highly Confidential - Subject to Further Confidentiality Review

1    of the ordinary that we talked about in that

2    training with lines and things like this, yes.

3         Q.    Yeah.  And that's what I'm trying

4    to get at.  At what point does the volume of

5    drugs in a given population rise to the level of

6    something that you ought to delve into and/or

7    report to QRA?

8              MR. PYSER:  Object to form.

9         A.    I guess when it surpasses the

10   number of patients that they have, but.  That's

11   not information that we in the sales department

12   were making determinations on.  That was

13   strictly on the QRA department.

14        Q.    So how do you decide whether to

15   report them to QRA or not?

16        A.    Again, when the volume of the

17   orders exceed the frequency or out of ordinary

18   with the frequency, the pattern, or the size of

19   the drugs, that's picked up as the orders come

20   through the computer.

21        Q.    All right.  Well, let's talk about

22   volume then.

23              MR. LAMB:  Let's go back to

24        Exhibit 43.2.  Family Discount Pharmacy.

```
 1            Roman Numeral I, Zach.  Above that

 2            paragraph, please.

 3    BY MR. LAMB:

 4            Q.    Let me know when you get there,

 5    Mr. Carney.

 6            A.    That's this one here?

 7            Q.    Yes, sir.

 8            A.    Exhibit 28?

 9            Q.    Yes, sir.  Sometimes I'm going to

10    refer to the --

11            A.    The top?

12            Q.    Yes, sir.

13            A.    Gotcha.

14            Q.    But it helps the record if you

15    tell -- if I don't tell you what the yellow

16    number is, it would help the record if you

17    articulate both so we don't get sideways on

18    that.

19                  So let me just read this to save a

20    little bit of time.

21                  Family Discount Pharmacy, was that

22    a customer of yours?

23            A.    It was.

24            Q.    Do you know where Mount
```

Highly Confidential - Subject to Further Confidentiality Review

1    Gay-Shamrock, West Virginia, is?

2           A.    I do.

3           Q.    Is that in southern West Virginia

4    or northern West Virginia?

5           A.    It's in southern West Virginia.

6           Q.    So it wouldn't have been a part of

7    your sales territory in the 2000-2010, but it

8    would be part of your territory now?

9           A.    From '11 until now, yes.

10          Q.    Okay.  Did you at any time between

11   2007 and 2012 -- recognizing that you weren't

12   sales director until '11, '12, but are you

13   familiar with reports of suspicious orders at

14   Family Discount Pharmacy in Mount Gay being

15   reported by Cardinal Healthcare?

16          A.    I can't say for sure.  I know that

17   at some point in 2012, we decided to cut them

18   off.  But I can't say for sure that I'm familiar

19   with --

20          Q.    Sometime in when?

21          A.    The end of 2012.

22          Q.    Did you decide to report them

23   after the DEA started investigating them or

24   before?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    We would have reported them any

2    time that we received a suspicious order.

3          Q.    Did you terminate them after the

4    DEA let you know they were investigating them or

5    before?

6          A.    I don't recall.

7          Q.    You would agree with me that

8    16,591,000 doses over a 10-year period of time

9    of hydrocodone and oxycodone to a population of

10   1,779 would be excessive under any

11   circumstances --

12               MR. PYSER:  Object to form.

13         Q.    -- correct?

14         A.    I don't know that the

15   population -- just as a population of that town

16   was part of his customer base or her customer

17   base.

18         Q.    Okay.

19         A.    It could have been drawing from

20   surrounding areas.

21         Q.    Well, let's say it was 10,000

22   people.  Would 16,590,000 doses be excessive in

23   your opinion?

24         A.    I really can't say, sir.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    But there is some mathematical

2   relationship between population and dosage units

3   sold that ought to weigh into the decision by

4   Cardinal Healthcare whether or not to report

5   suspicious activity?  You agree with that, don't

6   you?

7              MR. PYSER:  Object to form.

8         A.    No, I don't agree with that.

9         Q.    Well, tell me what you disagree

10  with?

11        A.    That we should strictly base that

12  pharmacy's need for these medications on how

13  many folks are in that particular town.

14        Q.    Would you agree with me that it's

15  a relevant factor that ought to be considered?

16        A.    I really can't say, sir.  I don't

17  make those kind of decisions.

18        Q.    Do you agree with me that an

19  excessive supply, given population, enhances the

20  likelihood of illegal diversion?

21              MR. PYSER:  Object to form.

22        A.    I couldn't speculate on that, sir.

23        Q.    You have no opinion one way or the

24  other?

```
 1              A.    I couldn't speculate on it, no.

 2              Q.    So let's go to the next paragraph.

 3   Do you know what ARCOS data is?  That acronym,

 4   ARCOS?

 5              A.    Yes.  It's an automated reporting

 6   system.

 7              Q.    Yeah.  "Over a five-year period,

 8   the ARCOS data showed that Cardinal Healthcare

 9   supplied Family Discount Pharmacy with

10   6.5 million hydrocodone and oxycodone pills."

11                    Do you have any reason to disagree

12   with that?

13              A.    Nope.  No, sir.

14              Q.    And that "3,561 hydrocodone and

15   oxycodone pills were delivered every day to

16   Family Discount Pharmacy."

17                    Is that what that says?

18                    MR. PYSER:  Object to form.

19              A.    If pills were delivered every day,

20   that would be the math.  But I don't know that

21   that many pills were delivered every day.

22              Q.    Well, we do know that 6.5 million

23   pills were delivered over that five-year period

24   of time --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    -- they were just doing an

 3   extrapolation of the numbers to get a daily

 4   average?

 5          A.    Yes, sir.

 6          Q.    Would you agree with me that 731

 7   opioid pills per person is an excessive

 8   amount --

 9                MR. PYSER:  Object to form.

10          Q.    -- of opioids?

11                MR. PYSER:  Object to form.

12          Q.    731 pills per year, is that an

13   excessive amount of opioids per person?

14                MR. PYSER:  Object to form.

15          A.    If that were the customers --

16   well, again, it's based on how many patients had

17   a need for these medications at this pharmacy.

18   They extrapolate here that it would be, you

19   know, just using the population of Mount Gay.

20          Q.    And you think that's an

21   inappropriate way to make these calculations?

22          A.    Yes, sir.  Yes, sir, I do.

23          Q.    So you do not think that's an

24   excessive supply of opioids?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2            Misstates.  Mischaracterizes his

 3            testimony.

 4                    MR. LAMB:  I'm asking him --

 5            A.    Without knowing the number of

 6     patients, no.

 7            Q.    So I assume you have the same

 8     answer if going to the next page, Family

 9     Discount delivered over 1.3 million dosage units

10     each year in 2010 and 2011?  You still don't

11     think that's an excessive supply of drugs for a

12     town of 1,779 people?

13            A.    I have no way of knowing, sir.

14            Q.    Take a look at the table on page

15     43.3.

16                    Would you agree with me that 6.4

17     million pills over a five-year period of time

18     would be excessive supply and create the

19     likelihood of illegal diversion in a town of

20     1,779 people?

21                    MR. PYSER:  Object to form.

22            Q.    Would you agree with that?

23            A.    I would not.

24            Q.    You would not agree with that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.

 2              Q.    It doesn't enhance the likelihood

 3    of illegal diversion in your opinion?

 4              A.    I have no way of knowing.

 5                    MR. PYSER:  Object to form.

 6              Q.    I'm sorry?

 7              A.    I have no way of knowing.

 8              Q.    And you've been with this company

 9    30 years, and you have no way of knowing?

10              A.    Correct.

11                    MR. PYSER:  Object to form.

12                    MR. LAMB:  Too late.

13                    Kidding.  Just kidding.

14                    MR. PYSER:  I'm trying not to step

15         on you.

16    BY MR. LAMB:

17              Q.    Do you know who Hurley -- do you

18    know who Hurley Drug Company is?  Have you -- is

19    that a customer of yours?

20              A.    Yes, sir, they were.

21              Q.    And have they ever been cited by

22    Cardinal Healthcare, to your knowledge --

23              A.    Yes, sir, they have.

24              Q.    -- for -- now, you're stepping on
```

1   me.

2          A.     Sorry.

3          Q.     Let me start again just to make

4   the record clear.

5                 Has Hurley Drug Company ever been

6   cited for suspicious orders by Cardinal

7   Healthcare under Cardinal's obligation under the

8   Controlled Substances Act to report such an

9   order?

10         A.     Yes, they have.

11         Q.     And on how many occasions?

12         A.     I can't tell you how many

13   occasions exactly over time, but I'm aware that

14   they have hit thresholds, yes.

15         Q.     Have you terminated Hurley Drug as

16   a customer?

17         A.     Yes, we have.

18         Q.     Do you know when that would have

19   happened?

20         A.     Years ago.  Not exactly sure.

21         Q.     Would you have terminated them

22   before the DEA began investigating them?

23         A.     If their purchasing habits rise to

24   the level in which they put us at risk for

1   diverting drugs, we would have, yes.

2          Q.    But as you sit here, you don't

3   know whether the DEA notified you that they were

4   investigating them before you terminated them or

5   not?

6          A.    I don't know, but I don't believe

7   so.

8          Q.    Williamson County's population was

9   3,191 people in 2010.  If Cardinal Healthcare

10  provided Hurley Drug with 537,000 doses of

11  hydrocodone and oxycodone, would that in and of

12  itself trigger a suspicious order report based

13  on the criteria that you've been trained to base

14  such decisions on at Cardinal Healthcare?

15         A.    I just -- the population in any

16  given town wasn't part of the criteria.

17         Q.    Would you agree with me that it

18  ought to be included in an analysis at some

19  level?

20         MR. PYSER:  Object to form.

21         A.    I have no opinion on whether or

22  not it should be included.  It's been my

23  experience over the years that pharmacies

24  service patients from outside the town, outside

Highly Confidential - Subject to Further Confidentiality Review

1    their county.

2            Q.    Do you know what the Oxy Express

3    is?

4            A.    No, I do not.

5            Q.    You've never heard of that term?

6            A.    No, I have not.

7            Q.    Twenty years in sales with

8    Cardinal and you've not heard the term "Oxy

9    Express"?

10           A.    No, I have not.

11                 MR. PYSER:  Object to form.  Asked

12           and answered.

13           Q.    Well, the DEA certainly thinks

14   that population is an important criteria when

15   assessing whether or not a pharmacy's behavior

16   violates suspicious order criteria, correct?

17                 MR. PYSER:  Object to form.

18           A.    I don't know that.

19                 MR. LAMB:  43.4, the last

20           paragraph just before the footnotes

21           begin, Zach, "according."

22   BY MR. LAMB:

23           Q.    "According to the U.S. Census

24   data, Williamson's population was 3,191 in 2010.

1    Therefore, the amount of hydrocodone and

2    oxycodone shipped to Hurley Drug Company appears

3    to be potentially excessive when compared to the

4    population in that area."

5              Would you agree with me that at

6    least the authors of this letter to your CEO

7    believe that population is relevant?

8              MR. PYSER:  Object to form.  Calls

9         for speculation.

10        A.    Was that -- that was written by

11   the DEA and not --

12        Q.    That was written by the

13   congressman that sent this letter to

14   Mr. Barrett --

15             MR. PYSER:  Object to form.

16        Q.    -- based on information they

17   attained -- obtained from the DEA.

18             MR. PYSER:  Object to form.

19        A.    So it has been written somewhere

20   by the DEA that --

21        Q.    Here's my question.

22        A.    -- when compared to the

23   population -- was this written by the DEA?

24        Q.    We'll get to a lot of things with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the DEA.

 2                 My question to you is, is that

 3    what that paragraph says?

 4                 MR. PYSER:  Object to form.

 5         A.    Yes.

 6         Q.    Thank you.

 7                 Do you know who Joe Rannazzisi is?

 8         A.    Yes.

 9         Q.    Have you met him?

10         A.    Never.

11         Q.    You haven't?

12         A.    No, I have not.

13         Q.    You've never attended a

14    presentation that DEA made to Cardinal Health

15    about anti-diversion or any of those types of

16    subject matters?

17         A.    Yeah, I have not.

18                 MR. LAMB:  Let me see 4050 and

19           4088.

20                 MS. QUEZON:  They've been marked.

21                 MR. LAMB:  Oh, okay.  That's

22           right.  The two Rannazzisi letters.

23                 MS. QUEZON:  Yes.  They're marked.

24                 Number 6 is the first one, I believe.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. PYSER:  Why don't we take a

2         break while we figure this out since

3         we've been going about an hour.

4              THE VIDEOGRAPHER:  The time is now

5         3:10.  Going off the record.

6              (Recess taken.)

7              THE VIDEOGRAPHER:  Okay.  The time

8         is now 3:28.  Back on the record.

9    BY MR. LAMB:

10        Q.   Mr. Carney, before we went off the

11   record --

12             MR. LAMB:  Did you have both of

13        the -- did you have both of these?

14             MR. PYSER:  You're looking for

15        Exhibit 6 and 10?

16             MR. LAMB:  Yes.  May I look at

17        them to make sure I have the right

18        thing?

19             THE WITNESS:  Sure.

20             MR. LAMB:  Okay.  Yes.

21   BY MR. LAMB:

22        Q.   So Exhibit 6 is a letter dated

23   September 27, '06, and Exhibit 10 is a letter

24   from Mr. Rannazzisi of December 27, 2007.  And
```

Highly Confidential - Subject to Further Confidentiality Review

1    you -- I'm not going to ask you a bunch of

2    questions, but you've looked at those already

3    when Ms. Quezon was talking.

4              I just want to establish a

5    predicate that you know who Mr. Rannazzisi is

6    even though you've never met him.

7         A.    Yes.

8         Q.    That's the point of -- he's the

9    author of those two letters.

10        A.    Yeah.

11        Q.    And, again, we're not going to

12   rehash -- recover that ground.

13             What I do want to go to is Exhibit

14   4658.

15             And let me know when you're ready,

16   Mr. Carney.

17                  - - -

18        (Cardinal-Carney Exhibit 32 marked.)

19                  - - -

20             MR. PYSER:  Counsel, is this the

21        full document with the attachment?

22             MR. LAMB:  It is -- that's a good

23        question.  It's every page that I was

24        given when this document was produced.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Okay.  So it was

 2           produced --

 3                  MR. LAMB:  I had the same

 4           question.  It doesn't seem to -- but I

 5           was hoping he could tell us.  But

 6           they're sequential, as you can see, on

 7           Bates numbers.

 8                  MR. PYSER:  I do.  I was just

 9           wondering if it was cut off, but you can

10           ask.

11                  MR. LAMB:  We did not cut it off.

12           It's everything we had.

13   BY MR. LAMB:

14           Q.   I don't want to interrupt you,

15   Mr. Carney, but can I ask you as you're

16   reviewing, have you seen this before?  Do you

17   remember having seen this previously?

18           A.   I don't remember.

19           Q.   Okay.

20           A.   Okay.

21           Q.   Okay.  So you do not remember

22   having seen this document?

23           A.   I don't recall.

24           Q.   Okay.  But it is a document sent
```

Highly Confidential - Subject to Further Confidentiality Review

1    to you by Mr. James Loudermilk; is that correct?

2           A.    Yes, yes.

3           Q.    And who is Mr. Loudermilk?

4           A.    He's my administrative assistant.

5           Q.    And then Mr. Lanctot is copied

6    here why?

7           A.    He's my boss.

8           Q.    Okay.  And this would have been in

9    2013?

10          A.    Yes.

11          Q.    So you were the sales director of

12   Ohio and West Virginia at the time?

13          A.    Yes, sir.

14          Q.    It seems to cite a Congressional

15   statement made by Joe Rannazzisi of the DEA to a

16   committee headed by Senator Feinstein.  Does

17   that accurately portray what it seems to be?

18          A.    Yes, yes.

19          Q.    And so what is the purpose of

20   Mr. Loudermilk highlighting -- and those are his

21   highlights that came with the original document,

22   not ours -- highlighting portions of the

23   Rannazzisi statement and sharing it with you, as

24   best you can tell reviewing this document?  Why

1    was he sending it to you?

2                    MR. PYSER:  Object to form.

3            A.    I seem to recall that, you know,

4    my concern around the epidemic and trying to

5    collect as much information about how it would

6    be described or how you would define it if

7    talking to customers.  And this may have -- this

8    may have come from a -- a recording that

9    Mr. Rannazzisi did at one point, and I had James

10   print it out so I could send it to Chris.

11           Q.    And, Mr. Carney, you say in the

12   cover e-mail, "Ruff, but the idea is to use

13   these as the TP to explain our position."

14                  I don't want to assume what you

15   meant by that, but tell us what TP stood for.

16           A.    Talking points --

17           Q.    Okay.

18           A.    -- when discussing the epidemic.

19           Q.    Okay.  And so, again, I ask you,

20   what did you do with this information?

21           A.    I shared it with Chris.  I may

22   have shared it with my sales managers to share

23   with our people.

24           Q.    Why?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    To explain the seriousness of the

 2   situation.

 3            Q.    Let's look at the last page.  Is

 4   Region 1 in your area?

 5            A.    Region --

 6            Q.    In your -- in your jurisdiction?

 7   Look at the last page, West Virginia, they have

 8   Region 1.  It talks about that five-county area.

 9   That's in your sales territory in 2013, isn't

10   it?

11            A.    I don't have that.

12            Q.    You don't have the last page?

13            A.    This document here (indicating)?

14            Q.    Well, you should have the --

15            MR. PYSER:  Now, Counsel, that's

16            what I was asking you about before.  We

17            only have three pages.

18            MR. LAMB:  Okay.  I don't know

19            what I don't know.

20            We need a clean copy.

21            I'm sorry.  I didn't understand.

22            I guess that would help.  4658.

23            MR. PYSER:  We have 4658.1, .2,

24            and .3, but nothing beyond that.
```

```
 1                    MR. LAMB:  Well, I've got 8.

 2               Let me -- we will get a clean

 3          copy.  Let's go ahead and mark this so

 4          you guys have the complete copy.  I

 5          apologize.

 6               Well, it wouldn't be a deposition

 7          if there weren't a glitch.

 8                    MR. PYSER:  So just so we are

 9          clear on the record, this getting marked

10          as what exhibit number?

11                    MR. LAMB:  What's the next,

12          Plaintiff's next?

13                    MR. PYSER:  He was just looking at

14          32.

15                    MS. QUEZON:  33.

16                    MR. PYSER:  So this is 33.  And

17          the highlighting and writing on 33 is

18          counsel's writing?

19                    MR. LAMB:  Yes, and that's -- but

20          I wanted him to have the complete

21          document.  We'll give you a clean copy

22          without highlighting at the conclusion

23          of the deposition.

24                    MR. PYSER:  Understood.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2        (Cardinal-Carney Exhibit 33 marked.)

 3                    - - -

 4   BY MR. LAMB:

 5        Q.    So I'll refer you to the last

 6   page.  It might be helpful for you to take a

 7   minute and look at it.

 8        A.    Yes.

 9        Q.    And the question is, is Region 1

10   as depicted in that 4658.8 of Exhibit 33 -- are

11   those counties in your area --

12        A.    Yes.

13        Q.    -- in your jurisdiction?

14        A.    Yes, they are.

15        Q.    And this document is generated --

16   at the top of the page, you can see October of

17   2012, Mr. Carney; is that correct?  The upper

18   left-hand corner?

19        A.    Yes, sir.

20        Q.    At the westvirginia.gov website?

21        A.    Yes, sir.

22        Q.    And read, if you would, please,

23   the writing in the bottom left-hand corner.  It

24   starts with "West Virginia has seen a rise."  If
```

```
 1    you could read those three paragraphs, please.

 2          A.    "West Virginia has seen a rise in

 3    prescription drug overdose deaths of nearly

 4    230 percent since 2001.  In the U.S., nearly

 5    three out of the four prescription drug

 6    overdoses are caused by prescription pain

 7    killers, also called opioids pain killers.

 8                "For the period of '06 to 2010,

 9    prescription drug overdose deaths in Region 1

10    account for 6.9 percent of all overdose deaths

11    in West Virginia.

12                Region 1 ranked 3rd in the state

13    with an overdose death rate of 22.3 per 100,000

14    people compared to West Virginia's rate of 26.2

15    per 100,000 people.  Individual county rates are

16    provided to the right."

17                I have a little more -- a better

18    line of sight on that, why we were putting this

19    together.  We were putting it together for a

20    Generation Rx presentation to --

21          Q.    Right.

22                MR. PYSER:  Counsel, please let

23          him finish.

24                MR. LAMB:  Oh, I'm sorry.
```

```
 1                    MR. PYSER:  Were you done with

 2          your answer?

 3          A.    Yeah, to folks in the community,

 4   to churches and to schoolkids and things like

 5   that.  That's what we were putting together.

 6   That's who the talking points were meant to.  We

 7   were trying to work that out.

 8          Q.    Would you agree with me,

 9   Mr. Carney, that Cardinal in the way they have

10   distributed narcotics, specifically opioids, has

11   contributed significantly to the increase in

12   death rates as a result of opioid overdose in

13   West Virginia?

14          A.    I can't say that, sir.

15          Q.    What do you disagree with about

16   that?

17                    MR. PYSER:  Object to form.

18          A.    That I believe we did our best to

19   have all of the safety nets in place to make

20   sure that those FDA-approved drugs were being

21   delivered to licensed independent retail

22   pharmacies for the need of legitimate patients.

23          Q.    And would you agree with me that

24   if you failed to abide by your obligation to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   monitor, investigate, and halt suspicious

 2   orders, you would have violated your legal duty

 3   under the Controlled Substances Act related to

 4   the distribution of opioids?

 5               MR. PYSER:  Object to form.  Calls

 6          for legal conclusion.

 7          A.    If we failed.

 8               MR. LAMB:  Give me one second.

 9               I don't have any further

10          questions.

11               MR. PYSER:  Let's take five or ten

12          minutes.

13               MR. LAMB:  Okay.

14               THE VIDEOGRAPHER:  The time is now

15          3:41.  Going off the record.

16               (Recess taken.)

17               THE VIDEOGRAPHER:  All right.  The

18          time is now 3:52.  Back on the record.

19                         - - -

20               REDIRECT EXAMINATION

21   BY MR. PYSER:

22          Q.    Mr. Carney, my name is Steven

23   Pyser.  I'm an attorney for Cardinal Health.  I

24   have just a few questions for you today.
```

```
 1                    Can you tell us where you live

 2    today?

 3           A.    I live in Wheeling, West Virginia.

 4           Q.    Is that where you're from

 5    originally?

 6           A.    Yes, it is.

 7           Q.    Have you lived there your whole

 8    life?

 9           A.    Yes, I have.

10           Q.    Do you have a family in Wheeling?

11           A.    I sure do.

12           Q.    And can you tell me just

13    briefly -- your family in Wheeling, who lives

14    there?

15           A.    Sure.  My wife and I.  We've been

16    married for 32 years.  We have three daughters.

17    My mother lives there, and my brothers live

18    there, extended family.

19           Q.    You talked today earlier about

20    your career at Cardinal Health.  Before you came

21    to Cardinal Health -- well, let's start with how

22    old were you when you started at Cardinal

23    Health?

24           A.    Twenty-two.
```

```
 1              Q.     So you were a young man.

 2                     What had you done before you began

 3    work at Cardinal Health?

 4              A.     I was in the Marine Corps.

 5              Q.     What was your job in the Marine

 6    Corps?

 7              A.     I was a military policeman in the

 8    Marine Corps.

 9              Q.     And when you started at Cardinal

10    Health, what location did you begin work at?

11              A.     At the Wheeling DC.

12              Q.     Do you know how long the Wheeling

13    distribution center has been in operation?

14              A.     It's been in operation since 1899

15    [sic].

16              Q.     And today in 2018, approximately

17    how many people are employed at the Wheeling

18    distribution center?

19              A.     Approximately 300.

20              Q.     So going back to the 1980s when

21    you began your job at Cardinal Health, what was

22    your first job?

23              A.     My first job, I was going to

24    school for criminal justice, police science to
```

```
 1    be a state policeman.  My first job was a

 2    janitor in the warehouse.

 3            Q.    Did you eventually change jobs at

 4    Cardinal?

 5            A.    Sure.

 6            Q.    Your first job, was it a part-time

 7    job or a full-time job?

 8            A.    It was part-time for the first few

 9    months, yes.

10            Q.    And when you took on a full-time

11    job at Cardinal, what was that job?

12            A.    It was as a delivery driver.

13            Q.    How long were you a delivery

14    driver?

15            A.    For about a year and a half.

16            Q.    What was your next job?

17            A.    Breaking the vacations on the

18    inside, learning the business, pick, packing,

19    and shipping orders.

20            Q.    For those not familiar with the

21    term, what does it mean to be "breaking

22    vacations"?

23            A.    I would be a delivery driver up

24    until when someone inside was picking the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders.  And then I would be -- they would go on

 2    vacation, and I would move inside and do their

 3    job.

 4            Q.    And you spoke earlier today about

 5    your time as a pharmacy business consultant.  In

 6    what year did you become a pharmacy business

 7    consultant, approximately?

 8            A.    It would be 1991.

 9            Q.    And from 1991 through today, for

10    most of your career, have you either been a

11    pharmacy business consultant yourself or

12    supervised in some capacity pharmacy business

13    consultants?

14            A.    Yes.

15            Q.    In your role as a pharmacy

16    business consultant or as a supervisor of

17    pharmacy business consultants, have you ever

18    attempted to market opioids?

19            A.    No.

20            Q.    Have you ever attempted to

21    generate sales of opioids?

22            A.    No.

23            Q.    In your career at Cardinal Health,

24    have you ever spoken to a doctor?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.

 2              Q.    In your career at Cardinal Health,

 3    have you ever tried to get a doctor to prescribe

 4    a particular medication?

 5              A.    No.

 6              Q.    Earlier today, Plaintiff's counsel

 7    asked you some questions about the Birmingham,

 8    Alabama distribution center and some other

 9    distribution centers.

10                    Do you recall that?

11              A.    Yes.

12              Q.    Do different distribution centers

13    ship to different areas of the country?

14              A.    Yes.

15              Q.    To your knowledge, did the

16    Birmingham, Alabama distribution center ever

17    ship any medications to Ohio?

18              A.    No.

19              Q.    What distribution center covers

20    northern Ohio, particularly Cuyahoga and Summit

21    Counties, the Cleveland and Akron area?

22              A.    It would be the Wheeling

23    distribution center.

24              Q.    To your knowledge, has the DEA
```

```
 1    ever suspended shipments from Cardinal Health

 2    from the Wheeling, West Virginia distribution

 3    center?

 4           A.    No.

 5           Q.    From your perspective, can you

 6    describe Cardinal Health's role in the

 7    healthcare system?

 8           A.    Our country's healthcare

 9    continuum, we are the distributor between -- the

10    middleman between the manufacturer and the

11    retailer.  We distribute FDA-approved

12    medications into licensed independent retail

13    pharmacies.

14           Q.    In your time as a pharmacy

15    business consultant and supervising pharmacy

16    business consultants and in interacting with

17    pharmacies, did you ever know a pharmacy to

18    service patients from outside the town where

19    that pharmacy is located?

20           A.    Yes.

21           Q.    Earlier today you were asked some

22    questions about the QRA anti-diversion team.

23                 Are you familiar with the QRA

24    anti-diversion team?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    In addition to the work of the QRA

 3    anti-diversion team, what are some of the things

 4    that your sales team does to try to prevent

 5    diversion?

 6          A.    We act as the eyes and ears of the

 7    company on the ground to report up any unusual

 8    or out of the ordinary activity that we see or

 9    witness at a pharmacy location.

10          Q.    Is anti-diversion something you

11    emphasize to your team?

12          A.    Yes.

13          Q.    Are the members of your team

14    trained on anti-diversion procedures?

15          A.    Yes.

16          Q.    When -- strike that.

17                In the event that Cardinal Health

18    were to cut off a customer and refuse to ship

19    controlled substances to them because of

20    anti-diversion concerns, would that impact the

21    salary or commission of any Cardinal Health

22    employee?

23                MR. LAMB:  Objection.

24          A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     How does Cardinal Health ensure

 2      that the salary and commission of employees is

 3      not impacted by the decisions of the QRA

 4      anti-diversion team?

 5                     MR. LAMB:  Object to form.

 6              A.     The portion of the budget dollars

 7      that are made up of that particular store's

 8      purchases are removed from the targeted goal

 9      going forward.

10              Q.     What is the impact of that?

11              A.     That the PBC, the sales manager

12      are not impacted by the loss of that business in

13      any way financially.

14              Q.     You were asked some questions

15      earlier today about Hurley Pharmacy and Family

16      Discount Pharmacy.

17              A.     Yes.

18              Q.     For both those pharmacies, to your

19      knowledge, did there come a time when Cardinal

20      Health cut them off and refused to ship

21      controlled substances to them?

22              A.     Yes.

23              Q.     Do you know whether after Cardinal

24      cut these pharmacies off and refused to ship to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them, DEA took any action against those two

 2    pharmacies?

 3              A.    I am not aware.

 4              Q.    You're not aware of any action

 5    taken by DEA?

 6              A.    No, I'm not.

 7              Q.    Do you know whether those

 8    pharmacies still have active DEA licenses and

 9    are free to receive opioids from other

10    distributors?

11              A.    Yes, I believe they do.

12              Q.    All right.  So, to your knowledge,

13    DEA has not deemed it necessary to take any

14    action against those two pharmacies or revoke

15    their pharmacist license?

16              MR. LAMB:  Objection to the form.

17              A.    Not that I know of.

18              Q.    Let me rephrase that question in

19    response to the objection.

20              To your knowledge, has DEA deemed

21    it necessary to take any action against the

22    either Hurley's Pharmacy or Family Discount

23    Pharmacy?

24              A.    Not that I'm aware of.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     I believe you mentioned something

 2      earlier in your testimony about Generation Rx.

 3              A.     Yes.

 4              Q.     What is Generation Rx?

 5              A.     It's a program put together in

 6      conjunction with Ohio State University.  It's a

 7      series of presentations that we put on for

 8      students and their parents warning them of the

 9      dangers of prescription drug abuse and

10      diversion.

11              Q.     Are you personally involved in

12      that programming?

13              A.     I have been, yes.

14              Q.     What is your personal role with

15      respect to Generation Rx?  What have you done?

16              A.     I've done several presentations in

17      local churches, at -- in street fairs, we've set

18      up booths.  And my team has been active in

19      putting on presentations with schoolkids, school

20      children and their parents in all of our

21      territories.

22              Q.     Have you also brought the

23      Generation Rx programming to your own church?

24              A.     Yes, I have.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1             Q.    Does Cardinal encourage its

 2   employees to take part in these anti-diversion

 3   initiatives?

 4             A.    Yes, they do.

 5             Q.    Are there any other anti-diversion

 6   initiatives that you're aware of at Cardinal?

 7             A.    We talked about the Drug Take-Back

 8   days.

 9             Q.    What are those?

10             A.    Those are where we work together

11   with independent retail pharmacies in our

12   territories to put on or to market an

13   opportunity for people in their community,

14   whether they're their patients or not and

15   surrounded communities to have an opportunity to

16   bring back unused drugs from the medicine

17   cabinet to have them properly disposed of.

18             Q.    Mr. Carney, in your experience at

19   Cardinal Health over the last 30 years or so,

20   have you ever seen Cardinal Health ship an order

21   that you believed would be diverted?

22                   MR. LAMB:  Object to the form.

23             A.    No.

24                   MR. PYSER:  No further questions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LAMB:  I've got a couple

 2          things really quick.

 3                     - - -

 4                    RECROSS-EXAMINATION

 5  BY MR. LAMB:

 6          Q.    Let me show you Plaintiff's

 7  Exhibit 1.4875, which is the next --

 8                    MR. LAMB:  What's the exhibit

 9          number?  What's that number?

10                    MS. HULETT:  34.

11                    MR. LAMB:  34.

12                     - - -

13          (Cardinal-Carney Exhibit 34 marked.)

14                     - - -

15  BY MR. LAMB:

16          Q.    Is this an e-mail you sent?

17                    MR. PYSER:  Object to this line of

18          questioning.  Beyond the scope of the

19          examination.

20          A.    Yes.

21          Q.    Read that to us, please, sir.

22          A.    My words?

23          Q.    Yes.

24          A.    "Now I'm starting to think when is
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    enough enough?  Do you have a line of sight on

2    what the total payouts in the various

3    settlements related to the issues might be by

4    now?  1B, 2B?  When will it be enough?"

5         Q.   Is it true that Cardinal

6    Healthcare in fiscal year 2017 generated

7    $129 billion in revenue?

8              MR. PYSER:  Object to form.

9         A.   I believe that's true, yes, sir.

10        Q.   Is it also true that over 150,000

11   people died as a result of opioid-related

12   overdose in 2017?

13             MR. PYSER:  Object to form.  And

14        continuing objection to this line of

15        questioning as beyond the scope.

16        A.   I believe so, yes, sir.

17             MR. LAMB:  That's all I've got.

18             THE VIDEOGRAPHER:  The time is now

19        4:04.  This concludes the deposition.

20        We're going off the record.

21             (Discussion held off the record.)

22             MR. PYSER:  We're going to mark

23        Bates number CAH_MDL2804_00100156 by

24        agreement of counsel as Exhibit 32, and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            that will stand in for both Exhibits 32

 2            and 33 in the transcript.

 3                 MR. LAMB:  That's correct.

 4            (Signature not waived.)

 5                      - - -

 6            Thereupon, at 4:04 p.m., on Tuesday, October

 7   17, 2018, the deposition was concluded.

 8                      - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2   STATE OF OHIO        :

                                  SS:

 3   COUNTY OF FRANKLIN   :

 4

 5          I, RAYMOND P. CARNEY, do hereby certify that

 6   I have read the foregoing transcript of my

 7   cross-examination given on October 16, 2018; that

 8   together with the correction page attached hereto

 9   noting changes in form or substance, if any, it is

10   true and correct.

11                      _____

                        RAYMOND P. CARNEY

12

13          I do hereby certify that the foregoing

14   transcript of the cross-examination of RAYMOND P.

15   CARNEY was submitted to the witness for reading and

16   signing; that after he had stated to the undersigned

17   Notary Public that he had read and examined his

18   cross-examination, he signed the same in my presence

19   on the _____ day of _____, 2018.

20

                        _____

21                      NOTARY PUBLIC - STATE OF OHIO

22   My Commission Expires:

23   _____, _____.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2  STATE OF OHIO      :
                              SS:
 3  COUNTY OF FRANKLIN :
 4           I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named RAYMOND P. CARNEY was by
 6  me first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by him was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by him; that the
 9  deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
             IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Columbus, Ohio
    on this 19th day of October 2018.
15
16
17
18                         _____
                           CAROL A. KIRK, RMR
19                         NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21                  - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2    I, RAYMOND P. CARNEY, have read the transcript

      of my deposition taken on the 19th day of October

 3    2018, or the same has been read to me.  I request that

      the following changes be entered upon the record for

 4    the reasons so indicated.  I have signed the signature

      page and authorize you to attach the same to the

 5    original transcript.

 6    Page  Line  Correction or Change and Reason:

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    Date _____ Signature _____
```