```
 1    UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF OHIO
 2    EASTERN DIVISION
 3  IN RE: NATIONAL            )   MDL No. 2804
    PRESCRIPTION OPIATE        )
 4  LITIGATION                 )   Case No.
                               )   1:17-MD-2804
 5                             )
    THIS DOCUMENT RELATES TO   )   Hon. Dan A. Polster
 6  ALL CASES                  )
                               )
 7
 8
 9                    __ __ __
10            Friday, January 25, 2019
                      __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12             CONFIDENTIALITY REVIEW
                      __ __ __
13
14
15
16       Videotaped Deposition of EUGENE G.
    CAVACINI, held at Winstead PC, 2728 North
17  Harwood, Suite 500, Dallas, Texas, commencing
    at 9:01 a.m., on the above date, before
18  Michael E. Miller, Fellow of the Academy of
    Professional Reporters, Registered Diplomate
19  Reporter, Certified Realtime Reporter and
    Notary Public.
20
21
22
                      __ __ __
23
24          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
25              deps@golkow.com
```

```
 1     A P P E A R A N C E S:
 2        LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY & PROCTOR PA
 3        BY:  BRANDON L. BOGLE, ESQUIRE
                 bbogle@levinlaw.com
 4        316 South Baylen Street
          Suite 600
 5        Pensacola, Florida 32502-5996
          (850) 435-7000
 6        Counsel for MDL Plaintiffs
 7
 8        COVINGTON & BURLING LLP
          BY:  EMILY JOHNSON HENN, ESQUIRE
 9                ehenn@cov.com
          3000 El Camino Real
10        5 Palo Alto Square
          10th Floor
11        Palo Alto, California 94306-2112
          (650) 632-4715
12        Counsel for McKesson Corporation and
          The Witness
13
14        COVINGTON & BURLING LLP
          BY:  MARINA F. DALIA-HUNT, ESQUIRE
15                mdaliahunt@cov.com
          3000 El Camino Real
16        10th Floor
          Palo Alto, California 94306-2112
17        (650) 632-4700
          Counsel for McKesson Corporation and
18        The Witness
19
20        JONES DAY
          BY:  RICHARD M. BRODSKY, ESQUIRE
21                rbrodsky@jonesday.com
          150 West Jefferson Avenue
22        Suite 2100
          Detroit, Michigan 48226
23        (313) 733-3939
          Counsel for Walmart Corporation
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        REED SMITH LLP
          BY:   MARY M. BALASTER, ESQUIRE
 3             mbalaster@reedsmith.com
          811 Main Street
 4        Suite 1700
          Houston, Texas 77002-6110
 5        (713) 469-3842
          Counsel for AmerisourceBergen
 6
 7        BAKER HOSTETLER LLP
          BY:   MATTHEW RALEY, ESQUIRE
 8             mraley@bakerlaw.com
          811 Main Street
 9        Suite 1100
          Houston, Texas 77002
10        (713) 646-1392
          Counsel for Cardinal Health
11
12        MARCUS & SHAPIRA LLP
          BY:   SCOTT D. LIVINGSTON, ESQUIRE
13             livingston@marcus-shapira.com
          One Oxford Center
14        35th Floor
          Pittsburgh, Pennsylvania 15219
15        (412) 471-3490
          Counsel for HBC Services
16
17        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:   KAREN RIGBERG, ESQUIRE
18             (via teleconference)
          777 South Figueroa Street
19        Los Angeles, California 90017-5844
          Counsel for Endo Health Solutions
20        Inc., Endo Pharmaceuticals Inc., Par
          Pharmaceutical, Inc. and Par
21        Pharmaceutical Companies, Inc.
22
23
24
25
```

```
 1    A P P E A R A N C E S:

 2         ALLEGAERT BERGER & VOGEL LLP
           BY:  LAUREN J. PINCUS, ESQUIRE
 3              lpincus@abv.com
                (via teleconference)
 4         111 Broadway
           20th Floor
 5         New York, New York 10006
           (212) 571-0550
 6         Counsel for Rochester Drug
           Cooperative Inc.

 7

 8         COLLINSON DAEHNKE INLOW & GRECO
           BY:  AMANDA E. ROSENTHAL, ESQUIRE
 9              amanda.rosenthal@cdiglaw.com
                (via teleconference)
10         2110 East Flamingo Road
           Suite 305
11         Las Vegas, Nevada 89119
           (702) 979-2132
12         Counsel for C&R Pharmacy

13

14    ALSO PRESENT:

15         SANDRA ZAMORA, ESQUIRE
           McKesson Corporation

16

17    VIDEOGRAPHER/TRIAL TECHNICIAN:

18         RICHARD RIENSTRA,
           Golkow Litigation Services

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2
      APPEARANCES                              2
 3
      PROCEEDINGS                             10
 4
 5

      EXAMINATION OF EUGENE G. CAVACINI:
 6
            BY MR. BOGLE                      12
 7
            BY MS. HENN                      353
 8
            BY MR. BOGLE                     364
 9
10
      CERTIFICATE                           370
11
      ERRATA                                372
12
      ACKNOWLEDGMENT OF DEPONENT            372
13
      LAWYER'S NOTES                        374
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   DEPOSITION EXHIBITS
                    EUGENE G. CAVACINI
 2                    January 25, 2019
 3   MCKESSON-CAVACINI EXHIBITS                   PAGE
 4   Exhibit 1    P1.2131                          15
                  Gene Cavacini Résumé
 5                [No Bates]
 6   Exhibit 2    P1.1464                          46
                  9/27/06 DEA Letter
 7                MCKMDL00478906 -
                  MCKMDL00478909
 8
     Exhibit 3    P1.1704                          68
 9                E-mail(s)
                  MCKMDL00498228 -
10                MCKMDL00498230
11   Exhibit 4    P1.889                           72
                  Settlement and Release
12                Agreement and
                  Administrative Memorandum
13                of Agreement
                  MCKMDL00337001 -
14                MCKMDL00337024
15   Exhibit 5    P1.2141                          88
                  E-mail(s) w/Attachment(s)
16                MCKMDL00543554 -
                  MCKMDL00543561
17
     Exhibit 6    P1.574                          107
18                McKesson Operations Manual
                  MCKMDL00000021 -
19                MCKMDL00000046
20   Exhibit 7    P1.2140                         127
                  E-mail(s) w/Attachment(s)
21                MCKMDL00642352 -
                  MCKMDL00642363
22
     Exhibit 8    P1.2139                         142
23                E-mail(s) w/Attachment(s)
                  MCKMDL00642364 -
24                MCKMDL00642382
25
```

```
 1    MCKESSON-CAVACINI EXHIBITS                    PAGE
 2
      Exhibit 9     P1.1524                          152
 3                  E-mail(s) w/Attachment(s)
                    MCKMDL00484482 -
 4                  MCKMDL00484511
 5    Exhibit 10    P1.1514                          165
                    FY13 Retail Sales Incentive
 6                  Compensation Plan
                    Communication
 7                  MCKMDL00335804 -
                    MCKMDL00335816
 8
      Exhibit 11    P1.1515                          177
 9                  FY14 Retail Sales
                    Compensation Plans
10                  MCKMDL00335830 -
                    MCKMDL00335854
11
      Exhibit 12    P1.2133                          182
12                  E-mail(s)
                    MCKMDL00489792 -
13                  MCKMDL00489793
14    Exhibit 13    P1.2132                          188
                    E-mail(s) w/Attachment(s)
15                  MCKMDL00495641
16    Exhibit 14    P1.2114                          195
                    McKesson OneStop Generics
17                  Newsletter
                    MCKMDL00642308 -
18                  MCKMDL00642313
19    Exhibit 15    P1.1900                          207
                    E-mail(s)
20                  MCKMDL00489869 -
                    MCKMDL00489871
21
      Exhibit 16    P1.1842                          214
22                  E-mail(s)
                    MCKMDL00495740 -
23                  MCKMDL00495741
24
25
```

```
 1     MCKESSON-CAVACINI EXHIBITS               PAGE
 2
       Exhibit 17    P1.1843                    224
 3                   E-mail(s)
                     MCKMDL00492040 -
 4                   MCKMDL00492041
 5     Exhibit 18    P1.1905                    228
                     11/2/18 DOJ Press Release
 6                   [No Bates]
 7     Exhibit 19    P1.1904                    232
                     Indictment, USA v. Martella
 8                   [No Bates]
 9     Exhibit 20    P1.1902                    235
                     McKesson's CSMP Regulatory
10                   Investigative Report
                     MCKMDL00340046 -
11                   MCKMDL00340050
12     Exhibit 21    P1.2137                    239
                     E-mail(s)
13                   MCKMDL00695128 -
                     MCKMDL00695132
14
       Exhibit 22    P1.2060                    253
15                   12/19/18 Energy & Commerce
                     Committee Report
16                   [No Bates]
17     Exhibit 23    McKesson Shipments of      258
                     Opioid Drugs in U.S.,
18                   2006-2014
                     [No Bates]
19
       Exhibit 24    P1.434                     269
20                   5/3/16 Forbes Article
                     [No Bates]
21
       Exhibit 25    P1.1453                    273
22                   3/14/17 The Canton
                     Repository Article
23                   [No Bates]
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    MCKESSON-CAVACINI EXHIBITS                    PAGE
 2

      Exhibit 26   McKesson Shipments of            276
 3                 Opioid Drugs in Ohio,
                   2006-2014
 4                 [No Bates]
 5

      Exhibit 27   P1.851                           288
 6                 Boggs Presentation, State
                   of Prescription Drug Abuse
 7                 MCKMDL00336833 -
                   MCKMDL00336886
 8

      Exhibit 28   P1.44                            294
 9                 2/15/18 Energy & Commerce
                   Committee Letter
10                 [No Bates]
11    Exhibit 29   P1.88                            334
                   Administrative Memorandum
12                 of Agreement
                   MCKMDL00355350 -
13                 MCKMDL00355363
14    Exhibit 30   P1.2136                          366
                   5/31/18 Letter Re: Cavacini
15                 Compensation
                   MCKMDL00695848 -
16                 MCKMDL00695849
17
18
19
20
21
22
23
24
25
```

```
 1                    PROCEEDINGS

 2            (January 25, 2019 at 9:01 a.m.)

 3            THE VIDEOGRAPHER:  We are now

 4      on the record.  Today's date is

 5      January 25th, 2019, and the time is

 6      approximately 9:01 a.m.

 7            This video deposition is being

 8      held in Dallas, Texas in the matter of

 9      In re National Prescription Opiate

10      Litigation, Case No. 1:17-MD-2804.

11            The deponent today is Mr. Gene

12      Cavacini.

13            The court reporter is Mr. Mike

14      Miller.

15            Would counsel like to identify

16      yourselves for the record, starting

17      with counsel on the telephone, please.

18            THE REPORTER:  Counsel on the

19      phone, please identify.

20            MS. PINCUS:  Lauren Pincus from

21      Allegaert Berger & Vogel, on behalf of

22      Rochester Drug Cooperative Inc.

23            MS. RIGBERG:  Karen Rigberg

24      with Arnold & Porter in Los Angeles

25      for the Endo and Par defendants.
```

```
 1              MS. ROSENTHAL:  Amanda

 2      Rosenthal from Collinson Daehnke

 3      Inlow & Greco for C&R Pharmacy.

 4              (Telephone interruption.)

 5              MS. HENN:  Any other counsel on

 6      the phone?

 7              MR. BOGLE:  Brandon Bogle on

 8      behalf of the MDL plaintiffs.

 9              MR. RALEY:  Matt Raley with

10      BakerHostetler on behalf of Cardinal

11      Health.

12              MS. ZAMORA:  Sandra Zamora,

13      McKesson in-house legal.

14              MR. LIVINGSTON:  Scott

15      Livingston on behalf of HBC.

16              MS. BALASTER:  Mary Balaster

17      with Reed Smith on behalf of

18      AmerisourceBergen Drug Corporation.

19              MR. BRODSKY:  Richard Brodsky

20      from Jones Day on behalf of Walmart.

21              MS. DALIA-HUNT:  Marina

22      Dalia-Hunt from Covington for McKesson

23      and the witness.

24              MS. HENN:  Emily Henn from

25      Covington & Burling on behalf of
```

```
 1              McKesson and the witness.

 2                   THE VIDEOGRAPHER:  Would the

 3         court reporter please swear in the

 4         witness.

 5                   (Witness sworn by the

 6         reporter.)

 7              EUGENE G. CAVACINI,

 8             having been duly sworn,

 9             testified as follows:

10                   EXAMINATION

11    BY MR. BOGLE:

12         Q.     Good morning.

13         A.     Good morning.

14         Q.     Can I get your full name,

15    please?

16         A.     Eugene Gregory Cavacini.

17         Q.     And I understand you've been

18    deposed once during your lifetime; is that

19    right?

20         A.     Yes, correct.

21         Q.     And that was about a little

22    less than a year ago.  Does that sound right?

23         A.     I believe it was last May.

24         Q.     Okay.  Just to kind of reorient

25    you to the basics of a deposition, my name is
```

```
 1    Brandon Bogle.  I'm going to be asking you
 2    some questions today.  I'll do my best when
 3    I'm asking you questions to let you finish
 4    your answer before I get to my next question.
 5              I would ask sort of the same
 6    from you, meaning wait until I finish my
 7    question before you answer.  It makes the
 8    record a little clearer and, quite frankly,
 9    it makes sure you understand what I'm asking
10    you.  Is that fair?
11         A.    Yes, thank you.
12         Q.    And if you need a break at any
13    point in time in the deposition, just let me
14    or your counsel know.  We have no problem
15    doing that.  It's not an endurance contest in
16    that regard.  Okay?
17         A.    Thank you.
18         Q.    And the last thing is, if I ask
19    you a question that you don't hear or don't
20    understand, please ask me to repeat or
21    rephrase and I will do my best to do so.
22    Otherwise, I will assume you understand or
23    heard my question.  Is that fair?
24         A.    It is.
25         Q.    Okay.  You are currently
```

```
 1    employed with McKesson; is that right?

 2         A.     Correct.

 3         Q.     Okay.  And you've been there

 4    since 2002; is that right?

 5         A.     Correct.

 6         Q.     Okay.  And I just want to run

 7    through the positions you've held since 2002,

 8    make sure I'm understanding correctly.

 9                I understand that from 2002

10    through 2005 you worked as a sales executive

11    at McKesson.  Does that sound right?

12         A.     It does.  I thought I was in

13    that role a little bit longer, but could be.

14         Q.     Okay.  Let's do this maybe to

15    make it a little smoother.

16                You have a LinkedIn page

17    online; is that correct?

18         A.     I probably do, yes.

19         Q.     Do you recall ever drafting

20    one?

21         A.     Yes.  I don't currently manage

22    it, but --

23         Q.     All right.  Let's take a look

24    at that and I just want to walk through again

25    some of your roles at McKesson over time.
```

```
 1              A.     Yep.

 2              Q.     I'm going to hand you what's

 3      marked as Exhibit 1 to your deposition, which

 4      is also 1.2131.  This is a public document,

 5      so no Bates stamp.

 6                     (McKesson-Cavacini Deposition

 7              Exhibit 1 marked.)

 8      BY MR. BOGLE:

 9              Q.     Okay.  Mr. Cavacini, you see at

10      the top here there's your name; is that

11      right?

12              A.     Correct.

13              Q.     Okay.  Just looking at this,

14      and it's just one page, does this seem to

15      correspond with what you understand to be

16      your LinkedIn page?

17              A.     It does.

18              Q.     Okay.

19              A.     Yes.

20              Q.     Okay.  And so, for example, if

21      we walk through going from bottom to top,

22      it's noted to be a sales executive from

23      January 2002 through November 2005.

24                     Does that seem accurate to you?

25              A.     It does.
```

1     Q.     Okay.  And what were your job

2     functions generally as a sales executive at

3     McKesson?

4     A.     I was a sales executive for our

5     retail independent business, and I described

6     that role as a business development role.  I

7     was tasked with targeting non-McKesson

8     customers and trying to identify if there was

9     a fit for them to become McKesson customers.

10    Q.     So trying to bring in new

11    business; is that fair?

12    A.     Yes.

13    Q.     Okay.  And was there a specific

14    geographic region you focused on during that

15    time period in that job?

16    A.     There was.  I was responsible

17    for the markets serviced by our Delran

18    distribution center, which would have been

19    primarily eastern Pennsylvania, the state of

20    New Jersey, a little bit of Maryland and

21    Delaware, and the boroughs of New York City.

22           During the course of my tenure

23    in that role, I also had some

24    responsibilities for our New Castle markets

25    that would have been western Pennsylvania,

1  pieces of eastern Ohio, the northwest corner

2  of West Virginia.

3       Q.    Okay.  In your responsibility

4  for the New Castle market, did that cover the

5  entire three and a half years that you had

6  that role?

7       A.    No.  I started primarily in the

8  Delran market and then over time expanded

9  into the New Castle market.

10      Q.    So in that, again, sort of

11 three-and-a-half-year time period, do you

12 have a recollection as to how much time you

13 spent sort of trying to get new business in

14 the New Castle market?

15      A.    I would say the primary focus

16 was in the New York City area.  That's where

17 most of our opportunity was.  As far as time,

18 I don't recall when exactly I got

19 responsibility for the New Castle market.  I

20 was living outside of Philadelphia and

21 focusing most of my time in the Delran

22 market.

23      Q.    Okay.  And going back to your

24 LinkedIn page, the next job that's listed

25 there is a district sales manager from

1    November 2005 to March 2009.

2              Does that time frame and that

3    job title sound accurate to you?

4         A.    It does seem accurate, yes.

5         Q.    Okay.  And so as district sales

6    manager, let's start again:  What were your

7    general tasks in that position?

8         A.    I've described that role as a

9    front line sales manager role.  I led a team

10   of retail sales managers whose primary

11   responsibilities were the management of

12   existing McKesson accounts, taking care of

13   our relationship, making sure that we were

14   providing good service and working with those

15   accounts to sell our value proposition and

16   services.

17        Q.    Approximately how many people

18   did you supervise during that time period?

19        A.    It did move from time to time,

20   based on the market needs, and again, my

21   responsibilities, but I would say on average

22   ten, you know, maybe a max of 15.

23        Q.    Okay.  And was there a specific

24   geographic region you covered in that

25   position?

1        A.      It was similar to the sales

2   executive role.  Started with the Delran

3   distribution center, so which would have been

4   that eastern Pennsylvania, New Jersey

5   New York markets.

6               During that tenure, I also had

7   responsibility for the New Castle markets,

8   which came later.

9        Q.      Okay.  You say it came later.

10  Do you recall the specific time period that

11  the New Castle responsibilities came?

12       A.      I don't remember exactly when

13  they expanded the responsibilities to cover

14  New Castle.  There was another sales manager

15  that retired, I believe, and they gave me

16  that territory at that time.

17       Q.      Okay.  What was the sales

18  manager's name that retired?

19       A.      Jim Gavatorta.

20       Q.      Then looking at your LinkedIn

21  page, you're noted to be vice president of

22  sales, March 2009 to January 2012.  So again,

23  does that job title and time period seem

24  accurate to you?

25       A.      It does, yes.

1    Q.    And again, any specific

2    geographic region you have responsibility for

3    with that position?

4    A.    It was the same markets as the

5    district sales manager; had responsibility

6    for the Delran distribution center and the

7    New Castle distribution center.

8    Q.    Okay.  Did you take on any new

9    geographic responsibilities or did it remain

10   those two distribution centers during that

11   roughly three-year period of time?

12   A.    It was those two distribution

13   centers.

14   Q.    Okay.  And can you give me a

15   high-level description of your job

16   responsibilities with that position?

17   A.    I would say it was very similar

18   to the district sales manager role, leading a

19   team of retail sales managers responsible for

20   the maintenance and growth of existing

21   McKesson accounts, very similar job.

22   Q.    Okay.  Did you take on a larger

23   group of people that you supervised with that

24   position versus the district sales manager

25   position?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      No.  We were experiencing some

 2    growth in the New York City market and we had

 3    added people over time.  My recollection is

 4    we had kind of restructured the organization

 5    at that time.  We created a new role called a

 6    general manager role and retitled the

 7    organization.

 8              I ended up hiring a district

 9    sales manager under me to cover the Eastern

10    parts of the market and was given the title

11    of vice president of sales.

12              Q.      Okay.  What was the name of the

13    district sales manager you hired that you

14    referenced there?

15              A.      I'm trying to think.  I

16    remember it being Sam Ha.

17              Q.      And then moving up your

18    LinkedIn page, you're noted to be vice

19    president/general manager from January 2012

20    to March 2015.

21              Again, does that job title and

22    that time period seem accurate to you?

23              A.      It does, yes.

24              Q.      Okay.  And it looks like you

25    moved locations there to Memphis so what
```

1    geographic region were you responsible for

2    with that position?  Was it different?

3         A.     It was, yes.

4         Q.     Okay.

5         A.     My family and I physically

6    moved to a suburb of Memphis and I was

7    responsible for the Memphis DC, the

8    distribution center that serviced the markets

9    of eastern Tennessee, Arkansas, Mississippi,

10   a little bit of Louisiana, a little bit of

11   Missouri.

12              And again, just for

13   clarification, went to that role with simple

14   responsibility for the Memphis DC.  Into my

15   tenure I also assumed responsibility for our

16   Oklahoma City distribution center, which

17   would have serviced the markets of Oklahoma

18   and Texas, a little bit of Kansas.

19        Q.     Do you know when you got -- and

20   a rough time frame is fine -- when you got

21   the responsibilities that were added in

22   Oklahoma City?

23        A.     I think roughly a year into my

24   tenure, so I would say 2013, but...

25        Q.     Okay.  Yeah, an approximation

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is fine.

 2         A.      Thank you.

 3         Q.      All right.  Let's go -- moving

 4    up the LinkedIn page, you're listed next as a

 5    senior vice president - NER, from April 2015

 6    to August 2017.

 7                 Do you see that there?

 8         A.      I do, yes.

 9         Q.      Okay.  Does that position in

10    that time period -- is that accurate --

11         A.      Yes.

12         Q.      -- based on your recollection?

13         A.      Yes.

14         Q.      Okay.  And NER, is that

15    northeast region?

16         A.      It is, yes.

17         Q.      Okay.  And as the senior vice

18    president, again, can you give me a

19    high-level understanding of what you did in

20    that position?

21         A.      I had full operating

22    responsibility for our distribution centers

23    that serviced our northeast region as well as

24    revenue or sales responsibility for our

25    retail independent business and our hospital
```

1    business in those markets.

2        Q.    Okay.  What geographic area did

3    the northeast region cover in that time

4    frame?

5        A.    Approximately Virginia to Maine

6    and west to Ohio, the eastern parts of Ohio.

7    A little bit of North Carolina.

8        Q.    And when you say Virginia to

9    Maine, you're talking south to north,

10    basically straight up the Eastern seaboard?

11        A.    Straight up the Eastern

12    seaboard, south to north, and then west to

13    the eastern parts of Ohio.

14        Q.    Did your territory at that

15    point in time include any portions of West

16    Virginia?

17        A.    It would have.  Our

18    distribution center in Virginia and our

19    distribution -- our New Castle distribution

20    center serviced parts of West Virginia.

21        Q.    Okay.  All right.  Now, moving

22    up to the last position you have noticed --

23    noted here is SVP/COO McKesson, U.S. Pharma.

24    It says August 17th to present.

25            Do you see that?

```
 1           A.     I do.

 2           Q.     Okay.  Now, just so the

 3      acronyms are clear, SVP, would that be senior

 4      vice president?

 5           A.     Senior vice president.

 6           Q.     COO is chief operating officer?

 7           A.     Correct.

 8           Q.     Okay.  For McKesson U.S.

 9      Pharma.  Are you still holding that position?

10           A.     I am, yes.

11           Q.     Okay.  And does that seem

12      accurate as far as the time frame that you

13      took that role over?

14           A.     I do.  There was some overlap

15      with my predecessor.  He left the

16      organization in July, so I assumed.

17           Q.     Who was your predecessor?

18           A.     Frank Starn.

19           Q.     Okay.  So as COO and senior

20      vice president, can you give me again a

21      high-level understanding of what your role is

22      in those positions?

23           A.     Absolutely.  So I'm responsible

24      for our distribution network, our 26 what we

25      refer to as forward DCs that pick, pack and
```

1    ship the orders for our hospital as well as

2    our pharmacy customers.

3              I lead the organizations that

4    provide our customer service and customer

5    care teams as well as our sales

6    effectiveness, and I have sales or revenue

7    responsibility for our retail independent

8    business, our hospital business and our

9    government business.

10        Q.    Okay.  Approximately how many

11   people report to you at McKesson as a COO?

12        A.    I believe approximately 6,000.

13   The majority of those are our hourly

14   associates that work in the distribution

15   centers.

16        Q.    Okay.  And department-wise,

17   which departments at McKesson report up

18   through you?

19        A.    I mean, functions, I've got

20   customer care, sales effectiveness, our

21   contracting teams, our distribution ops teams

22   that lead the distribution center operations,

23   our retail sales teams for independent

24   customers, our hospital sales teams that call

25   on our hospital partners.

```
 1                    I have a few of our -- what I
 2    would call our strategic business units, our
 3    masters, which is a generics business, our
 4    blood and plasma business that services our
 5    hospital channels with specialty products.
 6                    And I have our responsibility
 7    for our packaging business in Memphis,
 8    compliance packaging for manufacturers.
 9         Q.    Okay.  Does the regulatory
10    affairs department or anyone in the
11    regulatory affairs department report up to
12    you as COO?
13         A.    They do not.
14         Q.    Who do they report up to?
15         A.    Currently it would be the
16    president of our business unit.  That would
17    be --
18         Q.    Who is that?
19         A.    Brian Tyler is our interim
20    president.
21         Q.    You said Tyler?
22         A.    Tyler.
23         Q.    Okay.  And as COO, would I
24    understand correctly that you serve on the
25    board of directors as well?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      I do not.

2            Q.      You do not.  Okay.

3                    And as far as the hierarchy at

4    McKesson, approximately how many people are

5    higher up in the organizational structure

6    than the COO position at McKesson,

7    U.S. Pharma-wise?  Let's focus on

8    U.S. Pharma.

9            A.      I don't know.  I've never -- in

10   U.S. Pharma?

11           Q.      Yes, sir.

12           A.      I mean, I report directly to

13   the president of the business unit, so one.

14           Q.      Okay.  And the role as COO of

15   U.S. Pharma is a role of significant

16   responsibility, true?

17           A.      I believe I see a

18   significant -- I take my role as having

19   significant responsibility.  I take it

20   seriously, yeah.

21           Q.      I mean, it's a high-ranking

22   role at the company, true?

23           A.      It's a senior leadership role.

24           Q.      Right.

25                   Now, the McKesson U.S. Pharma
```

1    sales force, from the time that you joined

2    the company to present, what would you

3    approximate is the average size of the U.S.

4    Pharma sales force for McKesson during that

5    time frame?

6         A.    Across both of our segments for

7    retail, independent and health systems, I

8    think the field sales organization is

9    approximately 200 people.

10        Q.    Okay.  When you say field

11   sales, what does that mean?

12        A.    Those that are in the primary

13   selling relationships that hold the title of

14   retail sales manager for independent or

15   account manager for our health systems and

16   hospital business.

17        Q.    Okay.  So those 200, would that

18   also include the district sales managers and

19   the vice presidents positions?

20        A.    No, I think including sales

21   management, probably closer to 250.

22        Q.    Okay.  When you took over the

23   role as COO in 2017, did you have to undergo

24   any sort of specific training for that role?

25        A.    As I mentioned earlier, there

```
 1    was, I would say, an overlap with my

 2    predecessor, where we spent time talking

 3    about the role and responsibilities and how

 4    he spent his time and where he would like to

 5    spend his time and what he thought I should

 6    focus mine on, especially in the short term.

 7         Q.     What were those focus areas he

 8    told you you should focus on?

 9         A.     You know, as I recall back, you

10    know, we spent a significant amount of time

11    talking about our people, the organizational

12    design.  We spent time, you know, talking

13    about certain components of the business,

14    everything from finance to regulatory to

15    audit to compliance.

16               You know, and I think it was

17    helping me get an awareness of what was going

18    to be different as I moved from my previous

19    role into the current role.

20         Q.     Okay.  Did you have any sort of

21    formalized training before taking over as --

22    or as you took over the role of COO?

23         A.     By formalized training --

24         Q.     Right.  Did you have any sort

25    of, you know, sit-down training sessions
```

1    where there's an agenda that's reviewed where

2    you're taught certain aspects of the

3    position?

4        A.    No, I don't remember a

5    classroom or formal training as you describe.

6        Q.    Okay.  Now, when you took over

7    the role as COO, did you undertake any sort

8    of historical analysis to understand how the

9    sales department at U.S. Pharma has worked

10   for the company over time?

11           MS. HENN:  Objection to form.

12       A.    I've been a part of the sales

13   organization for U.S. Pharma in one role or

14   another for the better part of my career.  I

15   think -- I don't remember that being a

16   conversation I had with Frank.

17   BY MR. BOGLE:

18       Q.    Okay.  So if I'm understanding

19   you correctly, it's something you felt like

20   you were already knowledgeable about when you

21   took over the role?

22       A.    I believe I have a pretty good

23   understanding.

24       Q.    Okay.  How about on the

25   operations side, did you undertake any sort

1    of analysis as to how the operations side of

2    the business at U.S. Pharma at McKesson has

3    worked historically prior to you taking over

4    that role?

5                 MS. HENN:  Objection to form.

6         A.    You know, my two prior roles as

7    vice president and general manager and senior

8    vice president had operating responsibilities

9    for distribution centers, so, no, I don't

10   remember specific training or conversations

11   relative to the DC operations.  I believe I

12   had a pretty good understanding.

13   BY MR. BOGLE:

14        Q.    Okay.  And that's -- I'm just

15   trying -- that's fine.  I just want to make

16   sure I understood.

17                 So again, just sort of similar

18   to the sales aspect, you felt when you took

19   over the position of COO in 2017, given your

20   time with the company, you had a good

21   understanding of how the operations side of

22   the company worked; is that true?

23        A.    I think I continue to learn

24   ever day but I believe I have a good

25   understanding.  I competed for the role and

1    was selected, so I believe others had

2    confidence in my understanding as well.

3          Q.     When you say you competed for

4    the role, what do you mean?

5          A.     There was an interview process.

6    I believe probably others had interest in the

7    role and were considered, and I was selected.

8          Q.     Okay.  How did you find out the

9    role was available to be filled?

10         A.     Conversations with leadership

11   at U.S. Pharma.

12         Q.     Okay.  Do you recall who

13   informed you of that initially?

14         A.     It was probably Mark Walchirk.

15   Frank had decided not to come with the

16   company to Dallas and there was going to be

17   an opening.

18         Q.     And you work in the Dallas

19   area; is that true?

20         A.     I do.  I'm officed here in Las

21   Colinas.

22         Q.     So now at your time in the

23   last -- I guess it's almost 18 years at the

24   company, have you developed an understanding

25   as to McKesson's practices as far as

1    distribution of opioids?

2              MS. HENN:  Objection to form.

3         A.    I've been part of U.S. Pharma

4    for 17 years.  I actually believe I just

5    crossed my 17th anniversary with the company.

6    BY MR. BOGLE:

7         Q.    Okay.

8         A.    And, yeah, through my

9    experience and time, I'm familiar with our

10   responsibility and ability to distribute

11   controlled substances.

12        Q.    Okay.  Including opioids?

13        A.    I believe opioids are a

14   controlled substance, yes.

15        Q.    Right.  And during your time at

16   the company, do you feel like you've gained

17   knowledge as to the sales practices of

18   McKesson as it relates to opioids in the last

19   17 years?

20             MS. HENN:  Objection to form.

21        A.    I think I have a good

22   understanding of our sales practices, the

23   responsibilities of our sales teams, what we

24   ask our sales teams to do and how we expect

25   them to perform.

```
 1    BY MR. BOGLE:

 2         Q.     Okay.  Do you agree that there

 3    is an epidemic ongoing, an opioid epidemic

 4    ongoing in this country?

 5         A.     I am acutely aware of the

 6    epidemic as it's been well documented and

 7    described.

 8         Q.     Okay.  When you say acutely

 9    aware, what do you mean by that?

10         A.     I'm very aware.

11         Q.     Okay.  The term "diversion,"

12    have you heard of that term before?

13         A.     I have.

14         Q.     What do you understand that

15    term to mean as it applies to controlled

16    substances?

17         A.     I would say, you know, people

18    acquiring, using, dispensing prescription

19    medications, controlled substances, including

20    opioids, in a way that's not consistent with

21    how they're intended.

22         Q.     Do you agree that diversion of

23    opioids has contributed to the opioid

24    epidemic?

25              MS. HENN:  Objection to form.
```

1        A.     I'm not sure of the connection.

2    BY MR. BOGLE:

3        Q.     Okay.  Is that something you've

4    ever looked at for yourself?

5               MS. HENN:  Objection to form.

6        A.     No, I'm not aware that I've

7    done any specific research on the connection.

8    BY MR. BOGLE:

9        Q.     Okay.  You would agree that

10   protecting the health and safety of the

11   public is the most important role for a

12   pharmaceutical distributor like McKesson,

13   right?

14       A.     I think we have an important

15   responsibility to play in our part of the

16   supply chain, and that we have very clear

17   responsibilities under the Controlled

18   Substances Act and making sure that we uphold

19   those responsibilities is important.

20       Q.     Okay.  And the responsibilities

21   under the Controlled Substances Act

22   specifically, those are important

23   responsibilities.

24              You would agree with that,

25   right?

```
 1          A.      I believe all of our regulatory

 2     responsibilities are important, yes.

 3          Q.      Okay.  To include

 4     responsibilities under the Controlled

 5     Substances Act, true?

 6               MS. HENN:  Objection to form.

 7          A.      All of our responsibilities,

 8     including our responsibilities under the

 9     Controlled Substances Act, we take them very

10     seriously.

11     BY MR. BOGLE:

12          Q.      Okay.  And McKesson, during the

13     17 years you've been with the company, has

14     distributed opioid products, right?

15          A.      We have distributed

16     prescription medications of all kinds,

17     including controlled substances, and yes,

18     including opioids.

19          Q.      Okay.  And you understand that

20     opioids are narcotics?  That's the class of

21     drug they're in, right?

22          A.      I believe I have heard them

23     referred to that way, yes.

24          Q.      And you referenced the

25     Controlled Substances Act a minute ago.  You
```

1    have an understanding that the Controlled

2    Substances Act is, by design, intended to

3    assist in preventing diversion, right?

4              MS. HENN:  Objection to form.

5        A.    I'm -- I have an awareness and

6    an understanding of our responsibilities

7    under the Controlled Substances Act.  I

8    understand our responsibilities to guard

9    against diversion.

10   BY MR. BOGLE:

11       Q.    Okay.  And do you understand

12   why those responsibilities exist as to

13   McKesson, to guard against diversion?  What's

14   the purpose of them?

15             MS. HENN:  Objection to form.

16       A.    I believe I do.  I believe the

17   responsibilities that we have, as well as

18   other partners in the supply chain, are meant

19   to be collaborative and corresponding and

20   build on each other to make sure that there's

21   effective checks and balances from physicians

22   to pharmacies to distributors to

23   manufacturers, to have effective controls

24   that guard against diversion.

25   BY MR. BOGLE:

1    Q.    Okay.  In those checks and

2    balances you referred to, do you have an

3    understanding as to why those would be

4    important to have in place?

5         MS. HENN:  Objection to form.

6    A.    I think because the supply

7    chain is complex and every part of it has a

8    role, and, you know, our responsibility is

9    equally important.

10   BY MR. BOGLE:

11   Q.    Okay.  And you agree that

12   McKesson has a role in attempting to prevent

13   diversion of controlled substances, right?

14   A.    Again, my understanding is to

15   have effective controls to guard against

16   diversion.

17   Q.    Okay.  In your mind, is there a

18   difference between guarding against diversion

19   and attempting to prevent it, and if so,

20   what's the difference?

21   A.    You know, I'm not a lawyer, and

22   the technical differences there, you know,

23   it's always been explained to me that

24   guarding against diversion is our

25   responsibility, and that's how we see it.

1      Q.     Okay.  I'm not asking you as a

2    lawyer.  I'm just asking -- making sure I

3    understand what you understand the

4    responsibilities to be.

5           So do you think there's a

6    distinction in your mind as to guarding

7    against diversion versus attempting to

8    prevent diversion?

9      A.     I guess the distinction for me

10   is that preventing is, you know, very

11   difficult, you know, with the complexity of

12   our supply chain and that we're doing our

13   best to prevent, to guard against, is our

14   responsibility.

15     Q.     And whether it's difficult or

16   not, it's an important thing to -- for

17   McKesson to do its best to accomplish, right?

18     A.     We work incredibly hard at it.

19   That's been my experience.

20     Q.     Okay.  And so because it's an

21   important thing to try to accomplish, right?

22           MS. HENN:  Objection to form.

23     A.     Our responsibilities under the

24   Controlled Substances Act are important, yes.

25   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You mentioned having effective

2   controls against diversion.  What do you

3   understand that to include?  What's

4   encompassed within that?

5         MS. HENN:  Objection to form.

6    A.    I think there are several

7   components that we understand our

8   responsibilities to be, and they range from

9   knowing our customer to having systems in

10  place to identify orders that could

11  potentially deviate in frequency, size or

12  pattern.

13  BY MR. BOGLE:

14   Q.    Okay.  You understand that one

15  of McKesson's responsibilities is to monitor

16  for suspicious controlled substance orders,

17  correct?

18   A.    A part of our program to guard

19  against diversion is that we monitor orders

20  to see if they deviate, like I said, pattern,

21  size, frequency.  That is a component of the

22  program.

23   Q.    And you also understand that

24  there is an obligation of McKesson to report

25  suspicious orders when they are detected,

1    right?

2         A.    Under the Controlled Substances

3    Act, I believe we have a responsibility to

4    report orders that we deem -- I'm sorry.

5         Q.    Yeah.  Were you done?  I'm

6    sorry.

7         A.    Yes.

8         Q.    Okay.  And under the Controlled

9    Substances Act, McKesson also has an

10   obligation to halt the shipment of suspicious

11   orders when they're detected, true?

12             MS. HENN:  Objection to form,

13        lacks foundation.

14        A.    I believe our responsibility is

15   to have effective controls to guard against

16   diversion.

17   BY MR. BOGLE:

18        Q.    Okay.  I think my question was

19   more specific than that.  Let me reask it

20   just to make sure.

21             Under the Controlled Substances

22   Act, McKesson also has an obligation to halt

23   the shipment of suspicious orders when

24   they're detected, true?

25             MS. HENN:  Objection to form,

Highly Confidential - Subject to Further Confidentiality Review

 1              lacks foundation.

 2         A.    I'm not sure.  I think in

 3    our -- our practice is to stop orders that we

 4    deem -- I would like to maybe see the

 5    regulations again -- I don't have them.  To

 6    stop the order?  I'm not sure.

 7              I mean, to identify orders and

 8    to report them, to have effective controls.

 9    BY MR. BOGLE:

10         Q.    Okay.  Well, let me ask you

11    this:  Do you think there's any better way to

12    have effective controls against diversion

13    than stopping the shipment of suspicious

14    orders when they're detected?

15              MS. HENN:  Objection to form.

16         A.    I would respond that the fact

17    that our program does exactly that today,

18    that we -- is an important part of our

19    program.

20    BY MR. BOGLE:

21         Q.    Okay.  That hasn't always been

22    a part of McKesson's program, though, has it?

23              MS. HENN:  Objection to form.

24         A.    No, it hasn't always been a

25    part.  I think the Controlled Substances Act

Highly Confidential - Subject to Further Confidentiality Review

1    has been in place for the better part of

2    30-plus years, so, no, it hasn't always been

3    our practice.

4    BY MR. BOGLE:

5         Q.    Okay.

6         A.    To do it -- and I just want to

7    clarify.

8         Q.    Yeah.

9         A.    To do it as we do today, you

10   know, I'm not 100% aware of what was in

11   place, you know, prior to my joining the

12   company and I'm not as familiar with what

13   processes might have been in place from 2002

14   to roughly 2008.

15        Q.    Okay.  And let me rephrase the

16   question just because I think it's fair.  I'm

17   not asking you what happened before '02.  I

18   don't think that that's something I'm asking

19   you.  So let me rephrase it in case it was

20   unclear.

21             In the time you've been with

22   the company, it has not always been

23   McKesson's practice to halt suspicious orders

24   when they're identified before they are

25   shipped?

```
 1              MS. HENN:  Objection to form,
 2        asked and answered.
 3   BY MR. BOGLE:
 4        Q.    True?
 5        A.    I mean, I couldn't say for
 6   certain.  I mean, we had a regulatory
 7   affairs.  We had a monitoring program.  We
 8   were -- but I'm not sure of all the mechanics
 9   of what might have happened to an order, you
10   know, from -- during the time of my sales
11   executive and most of my district sales
12   manager experience.
13              So I couldn't say for certain
14   if there was a period of time where we did
15   not have this in place in one form or
16   another.
17        Q.    Okay.  What I think you sort of
18   intimated, you believe it's an important part
19   of McKesson's program today, right?
20              MS. HENN:  Objection to form.
21        A.    I think the fact that we have
22   the ability to systemically stop an order
23   that deviates is an important -- from size,
24   pattern, frequency, is an important part of
25   our program today.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOGLE:

2         Q.    Do you have an understanding

3    that while you've been with the company at

4    any point in time that McKesson lacked that

5    ability in some way, shape or form?

6         A.    I don't know.  I think our

7    abilities have improved over time, and we've

8    gotten more sophisticated in the ways we do

9    it, but I don't know that we ever lacked it.

10        Q.    Okay.  I'm going to hand you

11   what I'm marking as Exhibit 2 to your

12   deposition, which is also 1.1464.  Bates

13   number is MCKMDL00478906.

14              And, Mr. Cavacini, I have to

15   read off the numbers.  You don't have to

16   worry about that part, I just have to do it.

17              (McKesson-Cavacini Deposition

18        Exhibit 2 marked.)

19   BY MR. BOGLE:

20        Q.    Okay.  To orient you to

21   Exhibit 2 here, you see at the top is a

22   letter from the U.S. Department of Justice,

23   Drug Enforcement Administration, dated

24   September 27, 2006?

25              Do you see that, top of the

1    first page?

2          A.      September 27th, 2006, yes.

3          Q.      Have you ever seen this letter

4    before?

5          A.      I believe I have, yes.

6          Q.      Do you recall about when you

7    first saw this letter?

8          A.      I can't say for certain when I

9    first saw it.  I do know I've seen it.

10         Q.      Okay.  I want to take a look at

11   a couple of aspects of this letter here.  The

12   first paragraph says:  This letter is being

13   sent to every commercial entity in the United

14   States registered with the Drug Enforcement

15   Administration (DEA) to distribute controlled

16   substances.  The purpose of this letter is to

17   reiterate the responsibilities of controlled

18   substance distributors in view of the

19   prescription drug abuse problem our nation

20   currently faces.

21              Do you see that?

22         A.      I do, yes.

23         Q.      Okay.  And given your 17 years

24   at the company, do you have an understanding

25   at this point in time in 2006 that there was

1    a prescription drug abuse problem in the

2    United States that was ongoing?

3               MS. HENN:  Objection to form.

4        A.    It's hard for me to say exactly

5    what I knew in 2006.  I think my awareness

6    was probably growing and developing at that

7    time, but I can't say exactly what I knew.  I

8    do see that in the next sentence, you know.

9    BY MR. BOGLE:

10       Q.    Okay.  Let me ask it to you

11   this way then.

12             Do you understand as you sit

13   here today that there was a prescription drug

14   abuse problem that our nation was facing in

15   2006?

16             MS. HENN:  Objection to form,

17        asked and answered.

18   BY MR. BOGLE:

19       Q.    Do you have that knowledge

20   today?

21             MS. HENN:  Same objection.

22       A.    I mean, I -- the next sentence

23   of the letter says that the abuse of

24   controlled prescription drugs is a serious

25   and growing healthcare problem in the

1    country; so in 2006, that was the position of

2    the DEA.

3    BY MR. BOGLE:

4        Q.    Okay.  I guess what I'm asking

5    you though is:  As you sit here today, do you

6    have any disagreement that there was a

7    prescription drug abuse problem that dates

8    back to at least 2006?

9            MS. HENN:  Objection to form,

10        asked and answered.

11       A.    I don't know.  And my awareness

12    of it, you know, grew over time, and when it

13    exactly started to take hold is hard for me

14    to say.  We've covered -- its existence today

15    is very well documented.

16    BY MR. BOGLE:

17       Q.    I want to look at the third

18    paragraph on the first page here.  It says:

19    The CSA was designed by Congress to combat

20    diversion by providing for a closed system of

21    drug distribution, in which all legitimate

22    handlers of controlled substances must obtain

23    a DEA registration and, as a condition of

24    maintaining such registration, must take

25    reasonable steps to ensure that their

Highly Confidential - Subject to Further Confidentiality Review

1    registration is not being utilized as a

2    source of diversion.

3              Do you see that?

4        A.    I do.

5        Q.    Okay.  The concept of a closed

6    system of drug distribution, that's a concept

7    you're familiar with as it pertains to

8    controlled substances, right?

9              MS. HENN:  Objection to form.

10       A.    It's a term I've heard before,

11   and I think in an earlier answer of what I

12   was trying to describe with the different

13   members of the supply chain that have equal

14   and corresponding responsibility.

15   BY MR. BOGLE:

16       Q.    And by having a closed system

17   of distribution, that means that not every

18   distributor out there can distribute

19   controlled substances; you have to actually

20   have a registration that's granted by the

21   DEA, right?

22             MS. HENN:  Objection to form,

23        compound.

24       A.    I believe to be a distributor

25   of controlled substances you need to have a

1    registration that's granted by the DEA, and

2    I've referred to that as a privilege that we

3    have.

4    BY MR. BOGLE:

5        Q.     And the next sentence says:

6    Distributors are, of course, one of the key

7    components of the distribution chain.

8               Do you agree with that?

9        A.     I would, yes.

10       Q.     Okay.  It says:  If the closed

11   system is to function properly as Congress

12   envisioned, distributors must be vigilant in

13   deciding whether a prospective customer can

14   be trusted to deliver controlled substances

15   only for lawful purposes.

16              Do you see that sentence?

17       A.     I do.

18       Q.     Do you agree with that?

19              MS. HENN:  Objection to form,

20          calls for speculation.

21       A.     I agree that as I stated

22   earlier, knowing our customers and having an

23   understanding of their business is a

24   responsibility we have and is a core

25   component of the program we have in place

Highly Confidential - Subject to Further Confidentiality Review

1   today.

2       Q.    Okay.  And that responsibility

3   has existed the entire time you've been with

4   the company, right?

5           MS. HENN:  Objection to form.

6       A.    I believe that our

7   responsibilities under the Controlled

8   Substances Act have existed during my entire

9   time with the company.

10  BY MR. BOGLE:

11      Q.    Okay.  The next sentence says:

12  This responsibility is critical as Congress

13  has expressly declared that the illegal

14  distribution of controlled substances has a

15  substantial and detrimental effect on the

16  health and general welfare of the American

17  people.

18          Do you see that?

19      A.    I do see that.

20      Q.    Okay.  If you go to the second

21  page of the letter here, and I'm about

22  three-quarters of the way down the page, the

23  paragraph that starts "Thus, in addition."

24          Do you see where I'm at?

25      A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Okay.
2          A.     Third paragraph up from the
3     bottom.
4          Q.     That's correct, sir.
5                 It says there:  Thus, in
6     addition to reporting all suspicious orders,
7     a distributor has a statutory responsibility
8     to exercise due diligence to avoid filling
9     suspicious orders that might be diverted into
10    other than legitimate medical, scientific,
11    and industrial channels.
12                Do you see that reference?
13         A.     I do.
14         Q.     Okay.  Is that consistent with
15    what your understanding was in 2006 that
16    distributors like McKesson had a statutory
17    responsibility to avoid filling suspicious
18    orders?
19                MS. HENN:  Objection to form,
20         lacks foundation.
21         A.     In my responsibility -- my
22    understanding of our responsibility under the
23    Controlled Substances Act is to have an
24    effective program to guard against diversion.
25    BY MR. BOGLE:
```

1    Q.    Okay.  Does that include

2  avoiding filling suspicious orders once

3  they're detected?

4              MS. HENN:  Objection to form.

5    A.    I think I stated earlier that

6  I'm not clear on how our responsibility to

7  stop or prevent filling is specifically

8  called out in the controlled substance

9  regulations, but to identify orders that

10  deviate, to report those orders, and to have

11  an effective program that guards against

12  diversion is.

13  BY MR. BOGLE:

14    Q.    Okay.  So from this letter in

15  September 27th, 2006, do you think there's

16  anything unclear about the sentence I just

17  read which indicates that distributors should

18  avoid filling suspicious orders that might be

19  diverted into other than legitimate medical,

20  scientific and industrial channels?

21              MS. HENN:  Objection to form.

22    A.    Nothing unclear about the

23  letter.  What is unclear to me is how, if

24  any, this relates to the actual statute, the

25  Controlled Substances Act.

```
 1    BY MR. BOGLE:

 2         Q.     Okay.  The sentence I read

 3    here, though, indicates that at least in 2006

 4    it was DEA's view that that was part of a

 5    statutory responsibility, correct?

 6               MS. HENN:  Objection to form.

 7         A.     I see where in this letter it

 8    states that they believe, in addition to

 9    reporting, the distributor has a statutory

10    responsibility to exercise due diligence.

11    BY MR. BOGLE:

12         Q.     Do you have any independent

13    knowledge as you sit here today that that was

14    not part of McKesson's statutory

15    responsibilities during the entire time

16    you've been with the company?

17               MS. HENN:  Objection to form,

18         calls for a legal conclusion.

19         A.     Could you repeat the question.

20    BY MR. BOGLE:

21         Q.     Sure.

22               Do you have any independent

23    knowledge as you sit here today that the

24    responsibility to avoid filling suspicious

25    orders was not part of McKesson's statutory
```

1    responsibilities for the entire time you've

2    been with the company?

3                MS. HENN:  Objection to form,

4         calls for a legal conclusion.

5         A.    I'm not sure, and I think -- I

6    keep coming back to what my understanding of

7    our responsibilities are, and that's to have

8    an effective program to guard against

9    diversion.

10   BY MR. BOGLE:

11        Q.    Okay.  But to my question as to

12   whether you have any independent knowledge

13   that McKesson lacked the statutory

14   responsibility to avoid filling suspicious

15   orders during the entire time you were with

16   the company, can you speak to that?

17               MS. HENN:  Objection to form,

18        lacks foundation and calls for a legal

19        conclusion.

20        A.    I mean, I'm not a lawyer and I

21   don't know how to answer that.  I'm sorry.

22   BY MR. BOGLE:

23        Q.    Okay.  And I'm not asking you

24   as a lawyer.  I'm asking you as an individual

25   who's acting as the COO of the company and

1    has worked for 17-plus years at McKesson.

2              Is that, as you did your

3    day-to-day job at any point in time, did you

4    understand that to always be your

5    responsibility?

6              MS. HENN:  Objection to form,

7         lacks foundation, calls for a legal

8         conclusion, asked and answered.

9         A.    And I'm unclear if this

10   statement of statutory responsibility is in

11   the regulations today, so -- or if it was in

12   the regulations at that time.  That's where

13   my understanding of the Controlled

14   Substances -- I'm not familiar with that

15   term.

16   BY MR. BOGLE:

17        Q.    Okay.  So I guess going back to

18   my question:  Do you have any independent

19   knowledge as you sit here today that at any

20   point in time you were at the company, that

21   was not McKesson's responsibility?

22             MS. HENN:  Objection, asked and

23        answered, lacks foundation, calls for

24        a legal conclusion.

25        A.    Do I have any...

1              I don't know.

2    BY MR. BOGLE:

3         Q.    Okay.  Let me ask it to you a

4    different way.

5              The concept of being a good

6    corporate citizen, that's something that's

7    important at McKesson, right?

8         A.    I believe we have, you know, a

9    deep commitment to being part of the

10   communities we serve and being good stewards

11   of them.

12        Q.    And as a company aiming to be a

13   good corporate citizen, do you think in that

14   regard that it's important that when the

15   company detects suspicious orders, that they

16   not fill them when it comes to controlled

17   substances like opioids?

18             MS. HENN:  Objection to form.

19        A.    I believe that that capability

20   and that capability as part of our program

21   today is very important to our

22   responsibility.

23   BY MR. BOGLE:

24        Q.    Okay.  And from 2002 to

25   present, can you ever think of a point in

Highly Confidential - Subject to Further Confidentiality Review

1    time when that should not have been important

2    to the company --

3                    MS. HENN:  Objection --

4    BY MR. BOGLE:

5         Q.      -- as a good corporate citizen?

6                    MS. HENN:  Objection to form.

7         A.      As I think back under my

8    experience and my exposure and -- we've

9    always had a commitment to exercise our

10   responsibilities to the best of our abilities

11   and have a program that effectively guarded

12   against diversion, that we took seriously

13   the -- I'm sorry, go ahead.

14   BY MR. BOGLE:

15        Q.      No, no, I want to make sure

16   you're done.

17        A.      The components of that program

18   have evolved over time.

19        Q.      Yeah.  I understand that.  I

20   think I'm not -- and I'm not asking you

21   specifically about the Controlled Substances

22   Act right now.  Let me make that clear.

23                    I'm asking you, as a good

24   corporate citizen, do you think there's any

25   point in time since you've been at McKesson

1    that it should not have been the company's

2    aim to avoid filling suspicious orders of

3    opioids when they were detected by the

4    company?

5                MS. HENN:  Objection to form,

6         calls for speculation.

7         A.    I think -- I mean, I feel like

8    I've responded.  We've always tried to

9    maintain an effective program, a robust

10   program, and I believe we would have used

11   tools at our disposal to do it.  Those have

12   evolved.

13               I'm not clear during that

14   period of time what the mechanics were of

15   every component of the program.  I think

16   there are people that are more informed and

17   educated to better answer that question.

18               I'm not sure it wasn't a

19   component of our program back at that time.

20   I am much more aware that it's different

21   today and how we do it today and how that has

22   evolved.

23   BY MR. BOGLE:

24        Q.    Okay.  Independent of whether

25   it was or wasn't part of your -- part of the

Highly Confidential - Subject to Further Confidentiality Review

1    program, should it have been?

2              MS. HENN:  Objection to the

3         form, asked and answered.

4         A.    Well, it's hard for me to

5    speculate what was even possible, what could

6    have been done and what we knew or what tools

7    or resources we had, you know.

8    BY MR. BOGLE:

9         Q.    Okay.  Well, you understand

10   that McKesson as a distributor of, as you

11   said, many different types of products and

12   items, that you guys have a choice to decide

13   to ship or not ship any sort of product that

14   a company orders, right?

15             MS. HENN:  Objection to form,

16        lacks foundation.

17        A.    I don't -- I don't know that I

18   necessarily agree with the premise of the

19   question, the way the question is structured.

20   BY MR. BOGLE:

21        Q.    Okay.  So do you -- is it your

22   view that McKesson, as it pertains to any

23   product that it sells, lacks the opportunity

24   to deny the customer the product if they

25   think it's not appropriate to give it to

1    them?

2            MS. HENN:  Objection to form,

3        compound, lacks foundation.

4        A.    I think about our

5    responsibility as a distributor to make sure

6    that legitimate medical products, medicines,

7    durable medical equipment, are available to

8    healthcare providers at the time that they

9    need it, and, you know, I don't know that

10   we're in a position to deny access to

11   products that are ordered by pharmacists for

12   their needs pursuant to a prescription.

13            We have some influence and

14   ability of who we do business with.  I mean,

15   I agree with that, but reviewing every order

16   for any product and determining if it's

17   appropriate or needed, I don't know that I

18   would agree that we're in that position.

19       Q.    Okay.  So take this as an

20   example.

21            McKesson is, first of all, a

22   for-profit business, right?

23       A.    We're a publicly traded

24   healthcare compare.

25       Q.    Right.  So you guys, for

Highly Confidential - Subject to Further Confidentiality Review

1   example, are not in the practice of providing

2   pharmacies medications if they told you that

3   there's no way we can ever pay you for any

4   medications that we order, right?

5        A.     I think when I referenced we

6   have some choice of who we do business with,

7   who we open up accounts with, yeah, I mean,

8   reasonable to assume that if an account had

9   no ability or willingness to pay, we probably

10  wouldn't knowingly enter into a business

11  relationship.

12       Q.     And if you already had a

13  relationship with them and they came to you

14  at some point thereafter and said we can't

15  pay you for any product any further going

16  forward, but will you still do business with

17  us, can you think of an instance where

18  McKesson has said, yes, we'll, in perpetuity,

19  do business with you despite the fact you

20  can't pay?

21            MS. HENN:  Objection to form.

22       A.     No.  No, if we were knowing and

23  a customer had expressed their ability to not

24  pay and depending on our contractual

25  relationships with that customer, I mean, I

1    am aware of some that we are obligated to

2    keep shipping even if they don't pay, state

3    governments, for example; as a matter of due

4    practice, if they didn't have the ability to

5    continue to pay us, we probably would not

6    continue to do business with them.

7    BY MR. BOGLE:

8         Q.    Okay.  I want to talk to you --

9    shift gears a little bit and talk to you

10   about the CSMP, and specifically the

11   responsibilities over time of the sales

12   department under the CSMP, okay?

13        A.    Okay.

14        Q.    So first of all, just to sort

15   of orient ourselves, you understand that the

16   Control Substances Monitoring Program, the

17   CSMP, was implemented in 2008, right?

18        A.    I can say for certain that I

19   became first aware of the Controlled

20   Substances Monitoring Program during my time

21   as a district sales manager, so that -- 2008

22   would have been in the time frame, but I

23   can't say for sure exactly it was 2008.

24        Q.    Okay.  All right.

25              Well, I can represent to you

1    that's the first evidence that we have of it

2    being put into place, so if there's any

3    contrary evidence, then we can deal with that

4    later.

5              A.      Okay.

6              Q.      But are you familiar with the

7    Lifestyle Drug Monitoring Program that was in

8    place prior to the CSMP?

9              A.      I'm am familiar with our

10   Lifestyle Drug Monitoring Program.

11             Q.      Okay.  And you understand the

12   purpose of both of these programs from a

13   general perspective was to monitor for

14   suspicious controlled substance orders,

15   right?  As a big picture perspective, that's

16   the purpose of the program, right?

17             A.      I think it was an evolution of

18   our commitment to exercise our

19   responsibilities under the Controlled

20   Substances Act that were part of our program

21   to guard against diversion.

22             Q.      And you say part of your

23   commitment.  The CSMP itself was implemented

24   as part of a 2008 settlement agreement with

25   the DEA, right?

1           MS. HENN:  Objection to form,

2       lacks foundation.

3           A.    I'm not sure of -- the

4    connection or correlation of CSMP came

5    directly out of the settlement.  The timing

6    was around the time of the settlement.

7    BY MR. BOGLE:

8           Q.    So am I understanding correctly

9    that you don't have an understanding, one way

10   or the other, as to whether the CSMP was

11   derived at the insistence of the DEA as part

12   of a 2008 settlement agreement with McKesson?

13          A.    No, I don't know that I know

14   that to be the case.

15          Q.    Okay.  Backing up, you do know

16   there was a settlement agreement entered

17   between McKesson and the DEA regarding

18   violations of the Controlled Substances Act,

19   correct?

20          MS. HENN:  Objection to form,

21       lacks foundation.

22          A.    I'm aware that there were

23   allegations made by the DEA that the company

24   entered into a settlement in 2008.

25   BY MR. BOGLE:

1          Q.      Okay.  Have you seen that

2    agreement?

3          A.      I believe I have, yes.

4          Q.      About when did you see it, do

5    you recall?  Just a year would be fine.

6                  MS. HENN:  Objection to form.

7          A.      I can't say for certain when I

8    first saw it.

9    BY MR. BOGLE:

10         Q.      Okay.  And you do understand,

11   though, that the CSMP was not drafted in

12   response to any change to the Controlled

13   Substances Act, though, right?

14                 MS. HENN:  Objection to form,

15         calls for speculation.

16         A.      I'm not aware that the

17   Controlled Substances Act changed.

18   BY MR. BOGLE:

19         Q.      Okay.  Let's just take a look

20   at something real quick.  I'm going to hand

21   you what I'm marking as Exhibit 3, which is

22   1.704, Bates number is MCKMDL00267635.

23                 MS. HENN:  If this is -- if

24         we're about to start some lengthy

25         questions, we've been going about an

Highly Confidential - Subject to Further Confidentiality Review

1           hour.  Is this a good time for a

2           five-minute break?

3                   MR. BOGLE:  That's fine.  I'll

4           give it to you after the break.

5                   THE VIDEOGRAPHER:  We're off

6           the record at 10:01 a.m.

7                   (Recess taken, 10:01 a.m. to

8           10:10 a.m.)

9                   THE VIDEOGRAPHER:  We are back

10          on the record at 10:10 a.m.

11   BY MR. BOGLE:

12          Q.    Okay.  Mr. Cavacini, I think we

13   left off with me about to hand you an

14   exhibit, so let me go ahead and do that.  I'm

15   going to hand you Exhibit 3, which is 1.704,

16   and that's MCKMDL00267635.

17                  (McKesson-Cavacini Deposition

18          Exhibit 3 marked.)

19   BY MR. BOGLE:

20          Q.    And just to orient you before

21   we get into this document itself, I had asked

22   you whether -- I believe I asked you, at the

23   time the CSMP was implemented, you understand

24   there was no change to the Controlled

25   Substances Act that prompted the CSMP being

```
 1    implemented.

 2              Do you recall that question?

 3              MS. HENN:  Objection to form.

 4       A.    I do recall the question.  I

 5    think I just want to be clear:  I'm not sure

 6    if there was a change or not.  I don't

 7    believe there was.

 8    BY MR. BOGLE:

 9       Q.    Right.  And what's why I'm

10    giving you this.

11       A.    Okay.

12       Q.    I just want to reorient you

13    before we got to the path.

14              You see here's an e-mail with

15    PowerPoint slides attached to it.

16              Do you see that?

17       A.    I do, yes.

18       Q.    Okay.  And see there's -- the

19    e-mail is dated March 7, 2008 from a Cathy

20    Scofield to a group of individuals.

21              Do you see that?

22       A.    I do.

23       Q.    And the first sentence of her

24    e-mail says:  Attached is the CSMP sales

25    training deck we will be presenting to the
```

1    Denver team on Monday.

2                Do you see that?

3        A.      I do, yes.

4        Q.      And do you recall in 2008 you

5    and other members of the sales training force

6    receiving training on the CSMP?

7        A.      I think as I stated earlier, I

8    can absolutely say it was during my time as a

9    district sales manager is when I received,

10   you know, in-depth training on our CSMP.

11   It's hard for me to say exactly when during

12   that period it took place, but I see here

13   that it was being rolled out to the Denver

14   team in March of 2008.

15       Q.      Okay.  And I guess if I'm

16   understanding you correctly, I know you were

17   not on the Denver team, but there would have

18   been similar training presentations done for

19   your team, correct?

20       A.      I do look forward to reviewing

21   the materials.  I would expect there would

22   have been similar trainings for my teams.  I

23   don't know -- I can't say for certain if they

24   were before or after this date.  That's where

25   I'm just not sure.

```
 1              Q.     Okay.  I'm looking at page .6
 2      of the document here.
 3              A.     Page?
 4              Q.     Yeah, sorry the point pages are
 5      I think at the top.  It's easier than
 6      referencing the Bates numbers.  Okay.
 7                     You see a slide there titled
 8      CSMP Overview.  Do you see that?
 9              A.     I do.
10              Q.     And the first bullet point
11      below that says New Controlled Substance
12      Monitoring Program, and then it says below
13      that:  Regulation has not --
14                     And "has not" is bolded, right?
15              A.     It is.
16              Q.     -- changed, but the extent to
17      which we are now required to monitor and
18      provide stronger safeguards to ensure
19      legitimate use of controlled substances has.
20                     And then "has" is bolded as
21      well, right?
22              A.     It is.
23              Q.     Okay.  Now, I had asked you a
24      little bit about the 2008 settlement
25      agreement a minute ago, and I think you said
```

1    at some point in time you recall having

2    reviewed that agreement, right?

3         A.    I have seen the document.

4         Q.    I want to look at a couple of

5    aspects of that with you.  That's going to be

6    Exhibit 4, and it's 1.889.  Bates number is

7    MCKMDL00337001.

8              Mr. Cavacini, there you go.

9              (McKesson-Cavacini Deposition

10         Exhibit 4 marked.)

11   BY MR. BOGLE:

12        Q.    Just to orient you on the first

13   page, if you need to look at anything, let me

14   know, but I just kind of want to orient you

15   to the document first, if you don't mind.

16              The first page says:

17   Settlement and Release Agreement and

18   Administrative Memorandum of Agreement, and

19   in the first paragraph there's a date of

20   May 2nd, 2008.

21              Do you see that there?

22        A.    I do, May 2nd, 2008.

23        Q.    Okay.  Do you recognize this as

24   the settlement agreement you reviewed

25   previously?

```
 1              A.      It looks like the same

 2    document, yes.

 3              Q.      Okay.  And you do understand

 4    from having reviewed this previously that the

 5    settlement that was entered into in May of

 6    2008 between the DEA and McKesson involved

 7    allegations by the DEA of violations of the

 8    Controlled Substances Act, many of which

 9    included opioid distribution, right?

10              MS. HENN:  Objection to form.

11              A.      As I get refamiliarized with

12    the allegations that are documented here,

13    they seem to focus around failing to maintain

14    effective controls and alleges failed to

15    report suspicious orders, controlled

16    substances.

17    BY MR. BOGLE:

18              Q.      Okay.  And the allegations

19    specifically involve, many of them, opioids,

20    right?

21                      For example, if you go to

22    Appendix B of the document, on the second

23    page there, there's a section that talks

24    about covered conduct.  I think it's 13 pages

25    in, it looks like.
```

1        A.      Is there a point number at the

2    top?

3        Q.      It should be, I think, .13.

4        A.      .13?

5        Q.      Yeah.  Do you see where I'm at

6    generally here, the section in the middle of

7    the page titled:  The covered conduct shall

8    mean the following alleged conduct?

9        A.      I do.

10       Q.      Okay.  I'm not going to read

11   all the stuff hereafter, but, for example,

12   there's conduct in the District of Maryland

13   involving the distribution of 3 million

14   dosage units of hydrocodone to

15   NuCare Pharmacy in Baltimore from

16   January 2005 to October 2006 the DEA contends

17   McKesson failed to report as suspicious.

18            Do you see that?

19       A.      I do see that in the document.

20       Q.      Okay.  And hydrocodone is an

21   opioid product, right?

22       A.      I believe.  I'm not 100% sure.

23       Q.      Okay.  You don't know if

24   hydrocodone is an opiate?

25       A.      I can't say for certain.

1      Q.    Okay.  If you look down in

2    letter B, talking about conduct in the Middle

3    District of Florida, there's a reference to,

4    in October 2005, McKesson-Lakeland sold

5    approximately 2.1 million dosage units of

6    hydrocodone to seven pharmacies in the Tampa

7    area, and then it lists the pharmacies, and

8    failed to report these sales as suspicious

9    orders to DEA when discovered.

10              Do you see that?

11      A.    I do see where the document

12    says that, yes.

13      Q.    Okay.  And then it goes on.

14    There's conduct also outlined in Texas,

15    Colorado, Utah and California.

16              Do you see that?

17      A.    Colorado, Utah, California,

18    yes.

19      Q.    Okay.  So we're talking about

20    conduct that occurred in multiple

21    distribution centers, right?  You can see

22    that from the document?

23              MS. HENN:  Objection to form,

24          lacks foundation.

25      A.    I can see where the document

Highly Confidential - Subject to Further Confidentiality Review

1    calls out allegations by the DEA in several

2    of our distribution centers.

3    BY MR. BOGLE:

4         Q.    Right.  For example, the

5    Maryland conduct talks about

6    McKesson-Landover, right?

7         A.    It does yes.

8         Q.    The Florida conduct refers to

9    McKesson-Lakeland, right?

10        A.    It does.

11        Q.    The Texas conduct refers to

12   McKesson-Conroe, right?

13        A.    It does.

14        Q.    The Colorado conduct refers to

15   McKesson-Aurora, right?

16        A.    It does, yes.

17        Q.    The Utah conduct refers to

18   McKesson-Salt Lake City, right?

19        A.    Yes, agreed.

20        Q.    And the California conduct

21   refers to McKesson-West Sacramento, right?

22        A.    Yes, correct.

23        Q.    Those are all different

24   distribution centers that would have existed

25   at McKesson at that point in time, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I believe so, yes.
 2          Q.      Okay.  So when you reviewed
 3   this settlement agreement, when it references
 4   these allegations regarding hydrocodone,
 5   oxycodone, fentanyl, methadone, did you not
 6   have an understanding that those were all
 7   opioid products?
 8               MS. HENN:  Objection to form.
 9          A.      I'm aware that they're all
10   controlled substances.  I don't know that I'm
11   aware that they're all opioids.
12   BY MR. BOGLE:
13          Q.      Okay.  Are you aware of any
14   base chemicals that are in the opiate family?
15          A.      I believe so, yes.
16          Q.      Which ones?
17          A.      Oxycodone.
18          Q.      Okay.  Any others?
19          A.      I believe fentanyl is as well.
20   The question earlier about hydrocodone, I'm
21   just not 100% sure that...
22          Q.      Okay.  So -- and again, I
23   didn't intend to read all the covered conduct
24   here, but you can if you want to to answer my
25   question.
```

1          These allegations that are made

2     here by the DEA in this settlement agreement

3     related to hydrocodone, fentanyl, oxycodone,

4     methadone distribution by various McKesson

5     distribution centers, these are serious

6     allegations, right?

7               MS. HENN:  Objection to form.

8          A.     I would describe them as

9     serious obligations -- allegations, yes.

10    BY MR. BOGLE:

11         Q.     Okay.  And you understand as

12    part of this settlement agreement, McKesson

13    agreed to pay a $13.25 million fine, right?

14              MS. HENN:  Objection to form.

15         A.     I am aware that as a result of

16    the settlement, McKesson did agree and I

17    believe we paid a fine.

18    BY MR. BOGLE:

19         Q.     It's page .5 if that helps.

20         A.     The 13.25, yes, 13.25.

21         Q.     You see that?  Okay.

22              In your experiences at 17 years

23    at McKesson, if there are allegations made of

24    wrongdoing by the company, when the company

25    disagrees with those allegations, do they

```
 1    contest them?
 2              MS. HENN:  Objection to form,
 3         calls for speculation.
 4         A.    I'm not sure in every
 5    circumstance.  I would -- so the question is
 6    if McKesson disagrees with the allegations,
 7    do they contest them?
 8    BY MR. BOGLE:
 9         Q.    Right.  Allegations as serious
10    as the ones we're looking at here related to
11    distribution of various controlled
12    substances, including opioids.
13              MS. HENN:  Objection to form.
14         A.    I'm not sure, but --
15    BY MR. BOGLE:
16         Q.    Okay.
17         A.    I'm not sure.
18         Q.    Okay.  Well, can -- first of
19    all, $13.25 million is a lot of money, right?
20         A.    I think that's relative.  To me
21    that's a lot of money.
22         Q.    Okay.  And do you think for
23    McKesson that's not a lot of money?
24         A.    I don't -- I guess it depends
25    in the context of what it is, you know.  I
```

1    would say generally it's a material sum.

2         Q.    Okay.  And during your 17 years

3    with the company, can you think of an

4    instance where McKesson has paid a fine of

5    $10 million or more for conduct that it

6    disagreed that it actually committed?

7              MS. HENN:  Objection to form.

8         A.    I'm not sure.

9    BY MR. BOGLE:

10        Q.    I'm just asking if you're aware

11   of any circumstance that you could advise our

12   jury about.

13             MS. HENN:  Objection, asked and

14        answered.

15             MR. BOGLE:  You can answer.

16             THE WITNESS:  I'm sorry, could

17        you repeat the question?

18             MR. BOGLE:  Yeah.

19   BY MR. BOGLE:

20        Q.    Are you aware of any

21   circumstance that you could advise our jury

22   about of McKesson disagreeing with

23   allegations of wrongdoing yet paying a fine

24   of more than $10 million, while you've been

25   at the company?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form,
 2         asked and answered.
 3         A.    I'm not sure that I understand
 4    the question, but I think companies settle
 5    disputes through a number of ways, and I'm
 6    not familiar with or was involved in any of
 7    the conversations that led up to this
 8    settlement.
 9    BY MR. BOGLE:
10         Q.    Okay.  Yeah, I'm not talking
11    about other companies.  I'm just talking
12    about McKesson.  I'm not asking you to talk
13    about other companies.
14              I'm just asking you, in the
15    17 years you've been with McKesson, can you
16    think of a single instance where the company
17    has paid a fine exceeding $10 million for
18    conduct it disagreed that it actually was
19    involved in?
20              MS. HENN:  Objection to form,
21         asked and answered, calls for
22         speculation.
23         A.    I'm not sure, but my
24    understanding of this settlement is that we
25    did not admit liability to any of the
```

1    allegations.  The agreement is neither an

2    admission by McKesson of liability of any of

3    the allegations made by the DEA in the orders

4    and investigations, nor a concession by the

5    DEA that its allegations were not well

6    founded.

7              MR. BOGLE:  Move to strike as

8         nonresponsive.

9    BY MR. BOGLE:

10        Q.    My question was simply whether

11   you can think of a single instance in the

12   last 17 years where McKesson has paid a fine

13   exceeding $10 million for something it

14   believed it did not do?

15             MS. HENN:  Objection, calls for

16        speculation, asked and answered

17        numerous times.

18        A.    I'm not sure.  I'm not involved

19   in those discussions.

20   BY MR. BOGLE:

21        Q.    Okay.  When you read this

22   settlement agreement, did you ever reach out

23   to anybody at McKesson and ask whether the

24   company believed or didn't believe it

25   committed the conduct outlined in the

1    settlement agreement?

2              MS. HENN:  I'll just object and

3         instruct the witness that to the

4         extent your question is asking for

5         information and conversations that he

6         may have had with attorneys, that he

7         shouldn't answer; but otherwise, he

8         may.

9              MR. BOGLE:  Yeah, that's fine.

10   BY MR. BOGLE:

11        Q.    So carving out conversations

12   with legal counsel, you ever talk to anybody

13   at McKesson about whether there was a view

14   that the company did or did not do the things

15   outlined in the settlement agreement as it

16   pertained to controlled substances reporting

17   and shipping?

18        A.    I don't recall specific

19   conversations to this settlement, and if -- I

20   don't know that I -- in what period of time?

21        Q.    Anytime after you read it.

22        A.    I'm not sure.  I don't recall

23   those conversations.

24        Q.    Okay.  Meaning you don't recall

25   whether they occurred, right?

1          A.      If I -- again, if I proactively

2     reached out and asked anybody if -- was that

3     the question?

4          Q.      Yeah, so I'll rephrase it for

5     you just so we're clear.

6               We looked at the covered

7     conduct section here, which outlines covered

8     conduct in one, two, three, four, five, six

9     different McKesson distribution centers.

10               My question is simply, after

11     you read that covered conduct in the

12     settlement agreement, when you read it while

13     you were at McKesson, did you ever reach out

14     to anybody and say, did we actually do that?

15     Did we do those things they're alleging we

16     did?

17               MS. HENN:  And I'll make the

18          same objection.

19               MR. BOGLE:  Yeah, except with

20          counsel.  I'm not asking about

21          counsel.

22               MS. HENN:  If I can just make

23          sure to issue the same instruction to

24          the witness about not revealing any

25          conversations you may have had with

1          attorneys.

2          A.      Outside of conversations with

3     attorneys, part of our leadership team,

4     maybe -- I don't recall, no.

5     BY MR. BOGLE:

6          Q.      Okay.  And without revealing

7     the substance of the conversations, did you

8     speak to any attorneys within McKesson about

9     whether the company committed these acts?

10               MS. HENN:  Objection to form,

11          vague as to time.

12          A.      I don't recall asking that

13     question.

14     BY MR. BOGLE:

15          Q.      Okay.  Now, after the CSMP was

16     developed and implemented in 2008, the sales

17     force was tasked with going out in the field

18     and informing customers about the fact that

19     there was a new program coming on board,

20     right?

21          A.      I would say that the sales

22     force was a part of our program and would

23     have been part of communicating that program

24     to customers.

25          Q.      Okay.  And specifically with

Highly Confidential - Subject to Further Confidentiality Review

1    you, one of your roles in 2008 was to take

2    the lead in your geographic area in ensuring

3    that your customers were aware of the CSMP

4    and what it required of them, right?

5             MS. HENN:  Objection to form,

6        compound.

7        A.    Educating customers on their

8    responsibilities under the Controlled

9    Substances Act?

10   BY MR. BOGLE:

11       Q.    No, no, no, under the CSMP,

12   what they would be asked to do.

13       A.    I mean, as I think back on my

14   role as a district sales manager, is to work

15   with my team, make sure that the team

16   understood their responsibilities, our shared

17   responsibilities, and be part of cascading

18   that information and making sure that it was

19   being upheld.

20       Q.    Okay.  So let me just make sure

21   I understand though.

22             When the CSMP would have been

23   implemented in 2008, first of all, you would

24   have had responsibilities with ensuring your

25   team at McKesson understood what its

1    responsibilities were under the CSMP, true?

2        A.    I think my role as a district

3    sales manager was to help educate my team on

4    many of their responsibilities, work with

5    them on training and developing skills, and

6    as part of the CSMP and changes we might have

7    made to the program, would have been helping

8    educate them on it.

9        Q.    Okay.  And you also would have

10    been involved in interactions with customers

11    in your geographic area as to the changes

12    that were being implemented by way of the

13    CSMP, right?

14        MS. HENN:  Objection to form,

15        lacks foundation.

16        THE WITNESS:  Can you repeat

17        the question again?

18        MR. BOGLE:  Sure.

19    BY MR. BOGLE:

20        Q.    You also would have been

21    involved in interactions with customers in

22    your geographic area as to the changes that

23    were being implemented by way of the CSMP,

24    true?

25        A.    I think from time to time.  I

1    mean, I wasn't the primary contact for

2    customers, but would have had interaction

3    with them as well.

4         Q.    Okay.  And part of what was

5    provided to McKesson customers when the CSMP

6    was implemented was sort of a guide for them

7    as to the basics of the program, right?

8              MS. HENN:  Objection to form,

9         lacks foundation.

10        A.    I don't remember a specific

11   guide for customers.

12   BY MR. BOGLE:

13        Q.    Okay. All right.  Let me hand

14   you what I'm marking as Exhibit 5, which is

15   1.2141, and that's MCKMDL00543554.

16             (McKesson-Cavacini Deposition

17        Exhibit 5 marked.)

18   BY MR. BOGLE:

19        Q.    All right, Mr. Cavacini.  I

20   want to orient you to the document first.

21   You see an e-mail on the first page followed

22   by several pages thereafter.

23             You see that?

24        A.    I do.

25        Q.    Okay.  And the e-mail is from a

1    Donald Walker, March 31, 2008, titled

2    Controlled Substances Monitoring Program

3    Review.

4              Do you see that title?

5       A.     I do, yes.

6       Q.     Do you want to look at it for a

7    second?  I just want to make sure you're

8    focused on my question, so if you want to

9    look at it, just let me know.

10      A.     I'm just taking a second to --

11      Q.     Sure.  Just let me know when

12   you're ready to talk about it.

13      A.     Okay.

14      Q.     Okay.  I want to look at the

15   e-mail first.  Mr. Walker says:  Paul -- I

16   think that refers to a Paul Julian.

17              What was Mr. Julian's role at

18   that point in time at McKesson?

19      A.     I can't say for sure what his

20   role was in 2008.  For the most of my career,

21   I knew Paul as our executive vice president

22   and president of our distribution businesses.

23      Q.     Okay.  And he says there:  We

24   are in the process of implementing our new

25   enhanced program to monitor controlled

1    substance sales.  The customer communication

2    centers around a letter from John and Mark

3    which will accompany an information packet

4    mailed to customers which describes the

5    program.  The respective sales teams will

6    then follow up with customers as required.

7              Do you see that?

8         A.    I do.

9         Q.    So in 2008, you would have been

10   responsible for a sales team then that would

11   have followed up with customers as indicated

12   here, right?

13        A.    Yes.

14        Q.    Okay.  And he continues on:  We

15   have begun the process of bringing the

16   systems solution online with the roll-out

17   complete by the end of May.  By design, we

18   intend to get this communication in the hands

19   of our customers before any public

20   announcement is made on the settlement

21   emphasizing that this is an enhancement to

22   existing processes.

23             Do you see that?

24        A.    I do.

25        Q.    Okay.  And then this is a --

1    we're talking about a settlement here.  This

2    is around the same time as the settlement

3    agreement we just reviewed, right?

4              MS. HENN:  Objection to form,

5         asks for speculation.

6         A.    It's around the same time of

7    the settlement we just reviewed, so I can't

8    say for certain if it's referencing the same

9    one.

10   BY MR. BOGLE:

11        Q.    Okay.  Are you aware of any

12   other settlements in or around early 2008

13   other than the one we just looked at,

14   McKesson was involved in?

15        A.    Don't know that I'm aware of

16   any.

17        Q.    Okay.  Then it says:  The

18   attached is the final version of the letter

19   and packet.  This has been reviewed and

20   approved by legal, John and Mark.

21              Do you see that?

22        A.    I do.

23        Q.    Okay.  Then I want to look at

24   the packet here.  So I actually want to start

25   at page .4.

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      As a final step, they were

2    requesting Paul's approval.  Okay.

3            Q.      Are you with me, .4?

4            A.      I am.

5            Q.      Okay.  The middle of the page

6    on .4, see the section titled Program

7    Details?

8            A.      Program Details, yes.

9            Q.      It says there:  All U.S. drug

10   wholesalers have always been required by the

11   DEA to monitor the ordering of controlled

12   substances.  Those regulations have not

13   changed, but the extent to which wholesalers

14   are now required to monitor and enforce the

15   legitimate use of controlled substances has.

16   While we trust and respect our customers'

17   integrity and professionalism, we must

18   cooperate with these mandates from the DEA.

19              Do you see that description?

20           A.      I do see where it says that.

21           Q.      Okay.  And this is similar to

22   what we saw a few minutes ago, that -- the

23   description that the regulations had not

24   changed around the time in 2008, right?

25              MS. HENN:  Objection to form.
```

1        A.    I think the statement states

2    that those regulations have not changed.

3    BY MR. BOGLE:

4        Q.    Okay.  And if you go down

5    towards the bottom of that page, there's some

6    dashes.  I want to look at the next-to-last

7    dash there.

8             It says:  Customers will be

9    alerted in advance of meeting or exceeding

10   their thresholds.

11            Do you see that?

12       A.    I see where it says that.

13       Q.    And so we're clear, as part of

14   the CSMP, there were thresholds for

15   controlled substances, including opioids,

16   that were established for each customer,

17   right?

18            MS. HENN:  Objection to form,

19        lacks foundation.

20       A.    I'm aware that we have

21   thresholds for customers, yes.

22   BY MR. BOGLE:

23       Q.    Right.  And that was part of

24   the CSMP that was implemented in 2008,

25   those -- the introduction of thresholds,

1    right?

2              MS. HENN:  Objection to form,

3         lacks foundation.

4         A.    It is a component of the CSMP,

5    yes.

6    BY MR. BOGLE:

7         Q.    Okay.  And the concept of

8    alerting customers in advance of meeting or

9    exceeding their thresholds, you have

10   knowledge and understanding that that's

11   something that was done as part of the CSMP,

12   right?

13             When a customer was getting

14   close to getting -- meeting their threshold

15   for a controlled substance, they were alerted

16   or advised of that, right?

17        A.    I think for a period of time I

18   am aware that we made some proactive calls to

19   customers as they were approaching their

20   threshold.

21        Q.    Okay.  And then the next -- the

22   dash below that says:  Customers can apply

23   for threshold adjustments if their business

24   is changing or they anticipate needing to

25   place a larger order.

Highly Confidential - Subject to Further Confidentiality Review

1               Do you see that?

2        A.      I do see where the document

3    says that.

4        Q.      And that's describing generally

5    the threshold change request process, that a

6    customer could ask to increase their

7    threshold if they were bumping up against it

8    for a controlled substance, right?

9        A.      I believe it does, yeah.  We

10   had a process in place where customers had a

11   shift in their business or some material

12   change, their needs were changing, they could

13   request an increase to their threshold,

14   called a TCR.

15       Q.      And the concept of the

16   threshold warnings that were provided to

17   customers, that was to ensure that the

18   customers wouldn't get any disruption in

19   their supply of controlled substances, right?

20               MS. HENN:  Objection to form.

21               Go ahead.

22       A.      My understanding was more about

23   patient care, that, you know, taking an

24   action, stopping the shipment of an order,

25   could potentially have an impact to patients.

1    And I think my understanding again was in the

2    spirit of knowing our customer and trying to

3    understand what was happening in their

4    business that was driving them to approach

5    the threshold.

6    BY MR. BOGLE:

7         Q.    The idea under the CSMP, and

8    specifically with the warning process and

9    threshold change request, was to make sure

10   that you had a system in place, but that it

11   still remained business as usual for your

12   customers, right?

13            MS. HENN:  Objection to form,

14        asked and answered.

15        A.    No, I don't agree.

16   BY MR. BOGLE:

17        Q.    Okay.  Well, let's look first

18   at page .5, on the top is a section titled

19   Notification system.

20            Do you see that?

21        A.    I do, yes.

22        Q.    It says:  Your McKesson

23   ordering system conducts real-time monitoring

24   of controlled substance purchases according

25   to DEA base code.

```
 1                    Then it says:  McKesson's CSMP

 2      works with your regular ordering system

 3      processes to deliver communications in plenty

 4      of time for your pharmacy to take corrective

 5      action, helping head off any potential

 6      disruptions in supply.

 7                    Do you see that?

 8           A.    I do.

 9           Q.    That notification system is

10      going back to that threshold warning concept

11      we just talked about, right?

12           A.    I think it was described as an

13      alert.

14           Q.    Right.  A warning or an alert,

15      right?

16           A.    I don't know that the terms are

17      interchangeable.  Making customers aware.

18           Q.    Okay.  And as it's stated here,

19      the purpose of which being to ensure that you

20      could help head off any potential disruptions

21      in supply.

22                    That's what's stated there,

23      right?

24           A.    I do see what's stated there,

25      yes.
```

1    Q.    Okay.  And if we go down to --

2  you see there's like a dark gray box towards

3  the bottom of this page.  Do you see where

4  I'm at?

5    A.    I do.

6    Q.    It says there:  McKesson values

7  you and your business and is committed to

8  working closely with you to ensure that your

9  pharmacy continues to be successful.  This

10  program addresses the DEA's requirements to

11  ensure controlled substances are used in the

12  way they were intended, but it also ensures

13  that you as a McKesson customer can continue

14  with business as usual.

15         You see that?

16    A.    I do see where it says that.

17    Q.    Okay.  And so this is what was

18  being conveyed at least to McKesson customers

19  in 2008, right?

20         MS. HENN:  Objection to form.

21    A.    I can't say for certain.  I

22  don't remember seeing this document in this

23  packet.  We're going back 12 years.  As I

24  kind of read in the cover letter, it was

25  all -- Don was seeking Paul's review and

1    approval.  I'm not sure if he gave it.  I'm

2    not sure if these documents went out in this

3    form.

4    BY MR. BOGLE:

5         Q.    Okay.  Well, we can agree

6    that's what's stated here in what I just

7    read, right, that customers were to be

8    advised that the program addresses DEA's

9    requirements to ensure controlled substances

10   are used in the way they were intended, but

11   it also ensures that you as a McKesson

12   customer can continue with business as usual.

13              That's what the document

14   states, right?

15              MS. HENN:  Objection to form,

16        asked and answered.

17        A.    That is what the document

18   states.

19   BY MR. BOGLE:

20        Q.    Okay.  And there's actually an

21   FAQ section here as well, which is on

22   page .2, so if we can go there.  You see this

23   is titled McKesson Controlled Substances

24   Monitoring Program, FAQs for Pharmacies.

25              Do you see that?

1        A.      I do, yes.

2        Q.      Number 3, there's an FAQ, which

3   I understand is a frequently asked question,

4   right?

5        A.      Also my understanding as well.

6        Q.      Okay.  Number 3 says:  How will

7   this affect my pharmacy business?

8               And there it says:  There

9   should be no significant impact to your

10  business.  The system monitors purchases of

11  your controlled substances and compares them

12  to your thresholds.  We've taken care to

13  set -- we've taken care to set your threshold

14  based on your controlled substance order

15  history, and have put a program in place to

16  give you plenty of notice if you're close to

17  exceeding your threshold for a given product.

18              Do you see that?

19       A.      I do see where it says that.

20       Q.      And again, this was a proposed

21  response to what McKesson viewed as a

22  potentially frequently asked question by a

23  pharmacy customer, right?

24              MS. HENN:  Objection to form,

25          lacks foundation.

1          A.     It's part of the FAQ document,

2     and as I read it, you know, and I think back

3     to our time in this program, we were trying

4     to set the thresholds based on their

5     historical practice.

6               If their business didn't change

7     materially, they should not feel the impact

8     of the thresholds, and if there was changes

9     in their business, we were going to work with

10    them to try and understand what was going on.

11    BY MR. BOGLE:

12         Q.     So we'd already seen a document

13    from the DEA in 2006 that references

14    prescription drug abuse problem.  This is now

15    in 2008.

16               Do you think it should have

17    been business as usual for McKesson customers

18    as it pertained to opioids?

19               MS. HENN:  Objection to form.

20         A.     I think it depends on the

21    customer and their business.  As I think back

22    to my experiences during that time frame, I

23    think we were making many changes to our

24    business, and business as usual isn't how I

25    would describe it.

1  BY MR. BOGLE:

2        Q.     And quite frankly, in 2008, at

3  this point in time McKesson is about to enter

4  into the settlement agreement we just looked

5  at, it, quite frankly, shouldn't be business

6  as usual for McKesson or its customers as it

7  pertains to opioids, should it?

8              MS. HENN:  Objection to form.

9        A.     I think it depends on the

10  customer and the circumstances.  You know,

11  the vast majority of our customers and

12  pharmacies and healthcare providers in

13  general probably didn't see any change.

14  BY MR. BOGLE:

15       Q.     Okay.  And the document we've

16  looked at here, does it anywhere convey that

17  some customers will experience circumstances

18  that are not business as usual?

19             MS. HENN:  Objection to form.

20       A.     When I look at the letter

21  that's also part of the packet dated March

22  31st.

23  BY MR. BOGLE:

24       Q.     Can you show me what page

25  you're on?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      .7.

2          Q.      Okay.  Go ahead.

3          A.      The DEA is requiring that

4    McKesson and wholesalers play an expanded

5    role in monitoring the ordering and

6    distribution -- McKesson has responded by --

7                  MS. HENN:  Let's make sure the

8          court reporter --

9                  MR. BOGLE:  Yeah.  Either read

10         to yourself --

11         A.      I'm reading the second

12   paragraph there.

13                 MS. HENN:  You can read it out

14         loud.  I just want to make sure the

15         court reporter can catch what you're

16         saying.

17         A.      The DEA is requiring that

18   McKesson and all wholesaler distributors play

19   an expanded role in monitoring the order and

20   distribution of substances.  McKesson has

21   responded by implementing a new Controlled

22   Substances Monitoring Program, going to be

23   rolled out in the next 90 days.

24                 The closing sentence that says:

25   Your McKesson representative will be
```

1    following up to provide more details about

2    this new program and answer any questions.

3              You know, I took that there

4    would be changes.

5    BY MR. BOGLE:

6         Q.    This talks about the CSMP,

7    which is the very program we just looked at

8    as indicating would not do anything but

9    ensure that customers operate with business

10   as usual, right?

11             MS. HENN:  Objection to form.

12   BY MR. BOGLE:

13        Q.    The same program, isn't it?

14             MS. HENN:  Mischaracterizes the

15        document.

16        A.    I mean, I do see where that

17   statement was used in the document, but I

18   think the whole creation of this document,

19   having a FAQ for our sales team, trying to

20   prepare our sales, our customers, leads me --

21   and my recollection under that time that

22   there were changes and it was going to be

23   impactful, and we needed to communicate.

24             You know, if it was business as

25   usual, why create this?

```
 1    BY MR. BOGLE:

 2         Q.    Well, why tell customers it was

 3    going to be business as usual if that wasn't

 4    the case?

 5              MS. HENN:  Objection to form,

 6         calls for speculation.

 7         A.    I don't know.  I didn't write

 8    the document.  Again, I don't remember this

 9    document going out in this form.  I can't say

10    if it did or it didn't, if further changes

11    were made.  It's hard for me to say why it

12    was drafted this way.

13    BY MR. BOGLE:

14         Q.    Prior to the implementation of

15    the CSMP in 2008, did you -- actually, strike

16    that.

17              From 2002 to 2007, while you're

18    working as part of the sales force, during

19    that window of time, did you get any training

20    as far as due diligence that you should be

21    conducting as a sales force as it pertained

22    to opioids?

23         A.    I don't recall specific

24    training.  You know, I was aware that we had

25    some responsibilities to help, you know,
```

1    really around the legitimacy of that

2    pharmacy, and I do remember that as my time

3    as a sales executive, when speaking to

4    prospective customers or considering a

5    relationship with prospective customers, one

6    example is we would have to get copies of

7    their board pharmacy license and their DEA

8    license, and those would be turned over to

9    our due diligence and customer onboarding

10   teams.

11           So -- but specific training, I

12   don't recall.

13       Q.    Okay.  So what you recall

14   from '02 to '07 was getting basically the

15   licensures from the pharmacies so that you

16   could pass those on to the group of people

17   that reviewed onboarding?

18       A.    That was one thing that I

19   remember, yes.

20       Q.    Okay.  Anything else that you

21   recall in that time frame due diligence-wise

22   that the sales force was asked to do?

23       A.    Specific to controlled

24   substances, no, but we do have shared

25   principles at McKesson, and those are founded

1    in integrity, accountability and respect.

2    And there was always a responsibility about

3    many of our customers' businesses in many

4    areas that if we were aware of something, to

5    bring it forward, you know.

6          Q.    Do you recall in the 2002 to

7    2007 time frame that you ever personally made

8    anyone aware at McKesson that you had

9    concerns about a customer potentially

10   diverting opioids?

11         A.    No, I can't recall that I did.

12         Q.    I'm going to hand you now what

13   I'm marking as Exhibit 6, which is 1.574, and

14   that's MCKMDL00000021.

15               (McKesson-Cavacini Deposition

16         Exhibit 6 marked.)

17   BY MR. BOGLE:

18         Q.    Okay.  Mr. Cavacini, what I

19   handed you here as Exhibit 6 is a copy of the

20   Controlled Substance Monitoring Program, and

21   if you see at the bottom there's a date of

22   8/24/2011 on it, bottom right, first page.

23               Do you see that?

24         A.    Bottom right, first page.  I

25   do.  It's a copy of a copy, 8/24/2011.

1    Q.    Yeah, the quality isn't the

2    greatest.  That's why I wanted to point that

3    out to you.

4    A.    Thank you.

5    Q.    Okay.  So you're familiar --

6    and we're going to go through a few aspects

7    of this, but before we do, you're familiar

8    with having reviewed copies of the Controlled

9    Substance Monitoring Program over time,

10   right?  You've reviewed them before.

11   A.    I believe I have, yeah.  I

12   mean, I think most of my exposure has been to

13   summaries of the Controlled Substance

14   Monitoring Program, often prepared by our

15   regulatory teams in more of a PowerPoint

16   format, but I have seen the document.

17   Q.    Okay.  And in 2011, August 2011

18   specifically, you would have been part of the

19   McKesson U.S. Pharma sales force, right?

20   A.    I believe I was a vice

21   president of sales at that time, yes.

22   Q.    Right.  Okay.

23         Let's take a look at page .9 of

24   this document.  You see there's a section

25   about a third of the way down the page that

1    says 2.2.2, Level 1 Review - All Remaining

2    Customers.

3              Do you see that section?

4         A.    I do.

5         Q.    Okay.  And Level 1 reviews,

6    first of all, would be triggered once a

7    customer reached their threshold in a given

8    month for a controlled substance, right?

9              MS. HENN:  Objection to form,

10         lacks foundation.

11        A.    I'm not familiar with all of

12   the components of a Level 1 review and that

13   term, but it seems to indicate that it is

14   required for every threshold incursion.

15   BY MR. BOGLE:

16        Q.    Right, that's the first

17   sentence.  It says:  A Level 1 review is

18   required for every threshold incursion.

19              Do you see that?

20        A.    Yeah.

21        Q.    I'm not going to go into great

22   detail on Level 1 reviews.  I want to focus

23   on the sales force side of it.

24              During this time frame, for

25   example, in 2011, the sales force was a

Highly Confidential - Subject to Further Confidentiality Review

1    participant in the Level 1 review process,

2    right?

3           A.     Possibly, but I don't think

4    exclusively or always.

5           Q.     Yeah.  I'm not -- let me make

6    sure my question is clear.

7                  I'm not saying the sales

8    representative was responsible for completing

9    all aspects of Level 1 review.  My question

10   was simply:  The sales representative for a

11   given customer would be a participant in the

12   Level 1 review process, true, under the CSMP?

13          MS. HENN:  Objection, asked and

14       answered.

15          A.     My recollection of the CSMP is

16   that the reviews were typically done by DC

17   management or our regulatory affairs teams.

18   But I guess it's possible they could include

19   sales in some of that or ask for help, if

20   they were unable to complete any part of it.

21   But I don't know that it was contingent upon

22   sales participation in the Level 1 review.

23   BY MR. BOGLE:

24          Q.     Okay.  Let's take a look at an

25   aspect of this here.

1          You see the section that says

2    "How to do" under Level 1 review?

3          A.    I do.

4          Q.    Okay.  And I'm looking at the

5    third bullet point, which is describing an

6    evaluation as part of a Level 1 review.  The

7    third bullet point says:  Contact the

8    appropriate sales representative to determine

9    reasoning behind the sales.

10          Right?  You see that?

11          A.    I do see where it says that,

12    but in the first sentence it says:  DC

13    management or designee will contact the

14    customer upon attempted threshold -- so, you

15    know, my recollection is they might also

16    incorporate the salesperson in that or help

17    in that, but it was -- again, as I think

18    back, it was often done without sales

19    involvement.  It was DC management.

20          Q.    Okay.  So let me make sure I

21    understand then.

22          So while you were -- as part of

23    the McKesson sales force, which really

24    extended all the way until 2017, right?  2002

25    to 2017?

1    A.    I lead large parts of our

2    organization now, but I don't have a

3    full-time selling responsibility.

4    Q.    Right.  Let me rephrase the

5    question because I think we're agreeing with

6    each other.

7         So from 2002 to 2017, to

8    August 2017, you were part of the sales

9    organization at McKesson, right?

10    A.    My responsibilities as

11    senior -- I had operating responsibility, I

12    had responsibilities beyond sales in my

13    senior vice president role, my VP/GM role.

14    They were leaders of salespeople, but I

15    wouldn't consider it part of the sales

16    organization.

17    Q.    Okay.  Let me ask you this:

18    2002 to 2005 as a sales executive, you're

19    part of the sales force at McKesson

20    U.S. Pharma, correct?

21    A.    Correct.

22    Q.    November 2005 to March 2009 as

23    district sales manager, you're part of the

24    McKesson U.S. Pharma sales force, correct?

25    A.    I had selling responsibilities

1    as a district sales manager, correct.

2        Q.    Vice president of sales,

3    March 2009 to January 2012, you're part of

4    the McKesson overall sales force, correct?

5        A.    I had selling responsibility,

6    was part of the sales force.  The number I

7    gave you earlier about 250 people, I'm

8    including vice presidents of sales.

9        Q.    Sure.  And I think what you

10    were referencing here was your time in

11    Memphis when you were vice president and

12    general manager as being less involved in the

13    sales process, true?

14        A.    I would say that's where I

15    began to take on additional responsibilities

16    outside of sales operating responsibility and

17    I would not include that number in the number

18    I gave you earlier for the sales

19    organization.

20        Q.    Okay.

21        A.    But I led salespeople; they

22    reported to me or up through me.

23        Q.    Understood.

24            And then from April 2015 to

25    August 2017 when you were senior vice

1    president in the northeast region, you were

2    overseeing a sales force then too, right?

3         A.     Similar to the general manager.

4    I had broad responsibilities, including

5    overseeing the sales organization.

6         Q.     Right.  So I'm taking a look at

7    from January '02 to August 2017, during that

8    entire time period, do you recall the sales

9    force ever being involved in reviewing

10   customer purchases for due diligence

11   perspective to determine if they were

12   appropriate?

13              MS. HENN:  Objection to form,

14        vague.

15        A.     I remember them working

16   potentially collaboratively with our

17   district -- with our DC management teams and

18   our regulatory affairs teams, but they never

19   had oversight or authority.  They might be a

20   conduit to gather information or make a

21   connection or to provide additional

22   information, but...

23   BY MR. BOGLE:

24        Q.     Because oftentimes the sales

25   representative responsible for a customer

Highly Confidential - Subject to Further Confidentiality Review

1    would be the most knowledgeable about that

2    customer's business, right?

3              MS. HENN:   Objection to form.

4         A.    I think they would have a

5    perspective.

6    BY MR. BOGLE:

7         Q.    Okay.  Because they're the

8    people who frequently actually meet with the

9    customers in person, right?

10        A.    That's one of our expectations,

11   yeah, that they are out meeting with the

12   customers.

13        Q.    Right.  That's how you make

14   sales, right?  You go out and talk to people

15   and you meet with people and you try to close

16   a deal, right?

17        A.    I think our salespeople have

18   broad responsibilities.  We believe that a

19   face-to-face interaction is often a way to

20   help advance some of our joint initiatives,

21   things that we might want to do with our

22   customers, the value of our sales force.

23        Q.    Right.  And that's how you keep

24   customers too, right, is you continue to

25   interact with them over time as a sales force

1    to make sure that you are actively involved

2    in meeting their needs, right?

3         A.    It's a component.  I think we

4    keep customers by providing world-class

5    service and meeting their expectations every

6    day.  We talk about we earn our customers'

7    business every day.

8         Q.    Okay.  And when the CSMP was

9    launched in 2008, part of the responsibility

10   of the sales force when a new customer was

11   brought on board thereafter was to introduce

12   them to the concepts of the CSMP, right?

13              MS. HENN:  Objection to form.

14        A.    You know, I remember our

15   salespeople's responsibility and being part

16   of the program, you know, that started with a

17   customer questionnaire that they might

18   complete with the customer.  The customer

19   filled it out and signed it, but it was often

20   done in conjunction with the sales

21   representative and begin to, you know, make

22   sure that the customer was aware of our

23   program.

24   BY MR. BOGLE:

25        Q.    Okay.  So, for example, we're

1    looking at the 2011 version of the CSMP, if

2    you go to page .11 in the document.  You see

3    middle of the page there's a number 3, New

4    Customer Onboarding Process.

5                   Do you see that?

6         A.      I do.

7         Q.      And under 3.1, it says:

8    Introducing new McKesson customers to

9    Controlled Substance Monitoring.

10                  Do you see that reference?

11        A.      I do.

12        Q.      And under "How to do," it says:

13   During the customer onboarding process, the

14   McKesson sales representative will introduce

15   the CSMP.

16                  Do you see that?

17        A.      I do.

18        Q.      Is that consistent with, from

19   2008 to 2017, what you understand the sales

20   force's role to be as it pertained to

21   onboarding and informing customers of the

22   CSMP?

23        A.      The bullet point below it

24   references the questionnaire, and I think

25   that's where most of my understanding and

1    experience has been with the -- with the

2    RSMs.

3              I think our need to educate

4    customers on the CSMP has evolved over time,

5    and whether we're still using the FAQ and the

6    overview and the communication letter, I

7    can't say for certain.  I mean, these have

8    become -- customers are well aware of the

9    existence of these programs and that

10   wholesalers have.

11        Q.    Okay.  So while -- for example,

12   during around 2011, do you recall that being

13   the practice for your sales force as when

14   they're onboarding a new customer, to advise

15   them of the CSMP, provide the basics of the

16   program to them?

17              MS. HENN:  Objection to form,

18        compound.

19        A.    I don't know exactly what I

20   remember from 2011.

21   BY MR. BOGLE:

22        Q.    Okay.  But we can agree that

23   certainly sales representatives under the

24   CSMP had to have working knowledge of the

25   program, right?

```
 1                MS. HENN:  Objection to form,

 2        vague.

 3        A.     I agree that our sales force

 4   was required to have an understanding of our

 5   program, their responsibilities under it and

 6   be able to participate in the communication

 7   with our customers around it.

 8   BY MR. BOGLE:

 9        Q.     And the responsibilities of

10   sales representatives under the CSMP included

11   looking for suspicious activity with the

12   customer, right?

13        A.     I've been part of conversations

14   and had conversations with salespeople that

15   they are a significant part of our program

16   and are often going to be in a position to

17   observe potential activity that could be

18   suspicious and to bring that forward to

19   members of our regulatory affairs team.

20        Q.     And you expect the sales force

21   to do that, right?  If they see something

22   that's suspicious of potential diversion, you

23   expect them to report that, don't you?

24        A.     If they see -- you know, as I

25   stated earlier going back to 2002, part of
```

1    our shared principle is if they see anything

2    of concern that's unusual relative to CSMP or

3    not, I would expect my team to bring it

4    forward.

5         Q.    And we're going to talk about

6    this a little more in a few minutes, but

7    there have been bonus and incentive plans in

8    place at McKesson for the entire time you

9    were involved in the sales force, and

10   including up to today, right?

11             MS. HENN:  Objection to form.

12        A.    We have a sales incentive plan

13   for our field sales teams.  Different members

14   of the team have been covered by that

15   differently at points in time, but there is a

16   sales incentive plan.

17   BY MR. BOGLE:

18        Q.    Right.  Which components of

19   that are commissions that can be made,

20   portions of that are additional bonuses that

21   can be received, right?

22             MS. HENN:  Objection to form,

23        lacks foundation.

24        A.    There are parts of the

25   incentive plan that are tied to different

1    components.  Some is for products and

2    services; some is for account performance.

3    BY MR. BOGLE:

4         Q.    And the whole concept of these

5    incentive plans is you want to motivate your

6    sales force, right?  That's the whole idea

7    behind the sales incentive plan, right?

8         A.    I've described it that we want

9    to align incentives with the right behaviors

10   that are --

11        Q.    Right.

12        A.    So people are rewarded for

13   performance.

14        Q.    Right.  You want to reward them

15   for doing the right thing, the things that

16   McKesson wants them to do, right?

17        A.    Not everything we want them to

18   do is clearly spelled out in our incentive

19   plans, but key behaviors, initiatives, things

20   that we derive value for us and our customers

21   are often covered, and we compensate them for

22   it.

23        Q.    And things that are important

24   to McKesson for their sales force to do --

25   strike that.

1          The most important things that

2     McKesson wants its sales representatives to

3     do, they compensate them for it, right?  They

4     provide them bonuses or incentives to

5     encourage them to do it.

6               MS. HENN:  Objection to form.

7          A.    I don't agree necessarily, no.

8     BY MR. BOGLE:

9          Q.    Okay.  Can you think of

10    something that -- while you've been at

11    McKesson, that you view as an extremely

12    important concept that is not awarded --

13    rewarded by a bonus, commission or other

14    incentive, that's a top-line goal that you

15    want your sales reps to achieve that you

16    don't compensate them for?

17              MS. HENN:  Objection to form.

18         A.    To operate with integrity.

19    BY MR. BOGLE:

20         Q.    Okay.  So you don't pay your

21    sales force to operate with integrity?

22         A.    Our salespeople are compensated

23    by base salary and incentive plans, but I

24    believe your question was what's specifically

25    called out.  I mean, we have an expectation

1    that people are going to operate with

2    integrity.  That's not called out in the

3    compensation plan.

4         Q.    When you see significant acts

5    of integrity, is that rewarded in any way for

6    your sales force?

7         A.    We have other areas of

8    recognition.  You know, when people go above

9    and beyond, I've personally sent a

10   handwritten note.

11        Q.    Any other way that they're

12   compensated for showing significant

13   integrity?

14        A.    It's a core expectation.  I

15   don't believe we have to provide financial

16   incentive to do that.

17        Q.    Okay.  Well, for example, with

18   the sales incentive plans, the time you've

19   been in the company, 2002 to present, has

20   there ever been an incentive provided to

21   sales -- the sales force to report suspicious

22   activity of customers as it relates to

23   controlled substances?  Has that ever been a

24   component of the plan?

25             MS. HENN:  Objection to form,

1    compound, vague.

2        A.    I'm not aware that it's been a

3    specific segment of our sales incentive

4    plans.  I think it's been a component of some

5    performance documents.

6    BY MR. BOGLE:

7        Q.    What specific incentives would

8    you refer me to that the sales force has been

9    provided for reporting suspicious activity

10   related to controlled substances?

11               MS. HENN:  Objection to form,

12           lacks foundation.

13       A.    I don't know that I -- I think

14   I stated that I'm not aware that there's ever

15   been a specific component of our incentive

16   plan that called out an expectation to report

17   suspicious activity of controlled substances.

18   BY MR. BOGLE:

19       Q.    Okay.  So, for example, let me

20   give you this as an example.

21               Can you -- has there ever been

22   a time where the sales force has been

23   instructed, hey, if you report suspicious

24   activity of a customer related to controlled

25   substances and we confirm that it was

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious, we're going to give you a $500

2    bonus?  Anything like that you can think of?

3          A.      No.

4          Q.      Okay.

5          A.      But I have written a

6    performance document that, under workforce

7    behaviors, adhering to and supporting our

8    regulatory responsibilities is a clear

9    expectation.

10         Q.      When did you draft that?

11         A.      I would say during my period of

12   time as a vice president of sales and a

13   general manager.  I can't say specifically.

14   I'm pretty confident it was a component of

15   mine from time to time, and if it wasn't, I

16   knew clearly the expectation, and I shared

17   that with my team.

18         Q.      And that component you're

19   saying included reporting suspicious activity

20   related to controlled substances?

21         A.      Again, I believe I phrased it

22   as executing our regulatory responsibilities.

23         Q.      Okay.  So going back, because

24   McKesson does provide financial incentives to

25   sales representatives, for example, when they

1    increase profitability for the company,

2    right?

3         A.    You know, our compensation plan

4    today, you know, it's a complex plan.  There

5    are components that could be tied to customer

6    profitability.  I don't think a core

7    component of our plan today is directly tied

8    to profitability.

9              At different periods of time

10   we've had different measurements that were

11   attempting to get at that, but...

12        Q.    Okay.  In -- all right.  We'll

13   look at the plans here in a minute.

14        A.    Okay.

15             MS. HENN:  And we've been going

16        another hour, so this might be a good

17        time for a five-minute break.

18             MR. BOGLE:  That's fine.

19             THE VIDEOGRAPHER:  We're off

20        the record at 11:13 a.m.  This

21        concludes Disc 1.

22             (Recess taken, 11:13 a.m. to

23        11:25 a.m.)

24             THE VIDEOGRAPHER:  We are back

25        on the record, 11:25 a.m., beginning

Highly Confidential - Subject to Further Confidentiality Review

1          of Disc 2.

2     BY MR. BOGLE:

3          Q.      Mr. Cavacini, we had started

4     talking a little bit about sales incentive

5     plans and so I wanted to talk to you about

6     that more specifically.  So I'm going to hand

7     you what I'm marking as Exhibit 7, which is

8     1.2140, and it's Bates number MCKMDL00642352.

9               (McKesson-Cavacini Deposition

10          Exhibit 7 marked.)

11     BY MR. BOGLE:

12          Q.      Okay.  Mr. Cavacini, see here

13     there's an e-mail on the first page titled

14     RSM Compensation Call.

15               Do you see that at the top?

16          A.      I do.

17          Q.      Okay.  And sent from a Brian

18     Ferreira on March 26th, 2006.

19               Do you see that?

20          A.      I do.

21          Q.      I'm not going to go through all

22     the recipients here, but you see that you're

23     in the cc line, correct?

24          A.      Yes, I do.

25          Q.      Okay.  And I want to take a

1    look at some aspects of this PowerPoint

2    that's attached to this, so if we go to

3    page .2, you see there it's titled FY07 Sales

4    Compensation Plan, Retail Sales Managers,

5    dated March 23, 2006.

6            Do you see that?

7    A.     I do.

8    Q.     Okay.  And FY07, would that be

9    fiscal year?

10   A.     Correct.

11   Q.     Okay.  And retail sales

12   manager, that's one of the positions within

13   the McKesson U.S. Pharma sales force at this

14   point in time in 2006, right?

15   A.     Yes.

16   Q.     Okay.  So let's go to the next

17   page, page .3.  It says RSM - Design

18   Principles.  And so would this be the design

19   principles for the incentive plan for retail

20   sales managers for this fiscal year?  Is that

21   what this is summarizing?

22           MS. HENN:  Objection to form,

23       lack foundation.

24   A.     No.  I didn't draft the

25   document, but it seems to indicate that four

Highly Confidential - Subject to Further Confidentiality Review

1    components listed here were some of the

2    principles of the plan.

3    BY MR. BOGLE:

4         Q.    Okay.  Number 1 says:  Focus on

5    generics.

6              Do you see that?

7         A.    I do.

8         Q.    Now, generics are generally the

9    most profitable aspect of the pharmaceutical

10   business at McKesson, right?  The profit

11   margins are greatest?

12             MS. HENN:  Objection to form,

13        vague.

14        A.    My understanding is that

15   generics are an important component of our

16   business and drive significant contribution,

17   yes.

18   BY MR. BOGLE:

19        Q.    Right.  And a significant

20   reason for that is that they have higher

21   profit margins than their branded

22   counterparts for McKesson, right?

23        A.    I mean, they may have higher

24   margins.  They're often less expensive, so my

25   understanding is that adoption of generics is

Highly Confidential - Subject to Further Confidentiality Review

1    good for our customers and potentially good

2    for our business as well.

3         Q.      Okay.  And good for your

4    business because they offer greater

5    profitability options, right?

6         A.      Again, we think about

7    profitability as margin and dollars, and

8    since they're less expensive, not always, but

9    generally, yes, I think the generics are an

10   important part of our business and as

11   indicated by the fact that they were listed

12   here first.

13        Q.      Okay.  Number 2 on this list

14   is:  Emphasize new accounts.

15             Do you see that?

16        A.      I do.

17        Q.      Number 3 is:  Continue emphasis

18   on net sales and customer contribution.

19             Do you see that?

20        A.      I do.

21        Q.      What does customer contribution

22   mean in this context?

23        A.      It's listed on page 7.  My

24   recollection of customer contribution,

25   there's not a lot of detail in this summary

Highly Confidential - Subject to Further Confidentiality Review

 1   document that I can see, but, you know, it

 2   was a factor of how the mix of the customer

 3   between brand and generics, the -- I guess

 4   the discount that we were providing to that

 5   customer was a member of -- measure of

 6   customer profitability.  It was a loose

 7   attempt to get to that.

 8        Q.    Okay.  And going back to

 9   number 3 here on the list:  Continue to

10   emphasize net sales.  So at least as to

11   fiscal year 2007, net sales was a factor in

12   evaluating the sales incentives provided to

13   retail sales managers, right?

14        A.    I'm sorry, I made a mistake and

15   was reading the document as you were talking.

16           The question was customer

17   retention --

18        Q.    No, no, no, I'm sorry.  Let me

19   rephrase it.  I think you're looking at a

20   different point.  So looking at number 3, the

21   emphasis on net sales that's referenced

22   there, so this indicates that for the fiscal

23   year 2007, net sales was a factor being

24   evaluated for sales incentive program

25   purposes, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Seems to indicate that, and

2     also on page .6.

3          Q.      Right.  Right.

4                  And then looking at number 4,

5     it says:  Reward customer retention, which

6     means simply that sales representatives would

7     be rewarded if they were able to keep

8     existing McKesson customers in their

9     territory, right?

10         A.      If customers stayed with us.

11         Q.      Right.  Right.

12                 Then if you go to page .4,

13    there's an RSM - Plan Overview, and it says:

14    Support two strategic priorities.

15                 The first bullet point says:

16    Dominate generics.

17                 Do you see that?

18         A.      I do.

19         Q.      Okay.  And then the second

20    says:  Become #1 in independent market share.

21                 Do you see that?

22         A.      I do.

23         Q.      And independent market share is

24    what's being referred to there as the

25    independent pharmacies, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      It's hard for me to say.

2   Reading this document, I would take it as

3   being independent small chain customers or

4   ISMC segment.

5      Q.      And talking about market share,

6   that's sort of comparing yourself to the

7   other distributors, correct?

8      A.      My understanding of the market

9   share is of the total market what percentage

10  of it you have relative to your competitors.

11     Q.      Right, the distribution market,

12  right, for independent pharmacies.

13     A.      Again, I don't know what Brian

14  was referencing here.  We're primarily a

15  pharmaceutical distributor.  As I've seen our

16  share referenced from time to time it's

17  around our distribution business.

18     Q.      Right.  A couple more points

19  here I want to look at.  So let's go to

20  page .12.

21     A.      .12.

22     Q.      I first want to look at the

23  section that says Dominate Generics.  We

24  talked about that term just a minute ago.  Do

25  you recall talking about that just a moment

Highly Confidential - Subject to Further Confidentiality Review

1    ago with me?

2         A.    It was referenced on the slide.

3         Q.    Right.  And this provides more

4    description on that.  It says:  Over the next

5    several years, we will see many blockbuster

6    branded drugs go off patent, resulting in

7    significant generics launches.  As you know,

8    generics have become a significant profit

9    opportunity providing attractive margins for

10   our customers as well as McKesson.

11   Therefore, dominating generics will be

12   crucial to our success.

13              Do you see that?

14        A.    I do see where that's written.

15        Q.    Okay.  Does that refresh your

16   recollection about profit margins for

17   McKesson being a factor in dominating the

18   generic marketplace?

19              MS. HENN:  Objection to form.

20        A.    I think it aligns with how I

21   answered the question.  They were important

22   for us and important for our customers.  They

23   were...

24   BY MR. BOGLE:

25        Q.    Okay.  And now, for sales

Highly Confidential - Subject to Further Confidentiality Review

```
 1    representatives, how specifically were they

 2    instructed around this time frame to sell

 3    generic products specifically?

 4              MS. HENN:  Objection to form,

 5        calls for speculation.

 6        A.    As I think back to my time in

 7    the field and in these roles, though I never

 8    held the role of RSM, I lead a team of RSMs,

 9    you know, it was about garnering a customer

10    share of their generics, helping them

11    understand that when a branded product went

12    generic, that the generic alternative was

13    available and the potential benefit that that

14    could have for patients and their business,

15    and as a result, ours.

16              And we measure today and have

17    really always talked about, you know, kind of

18    share of wallet in a customer and making sure

19    that we are getting, as their primary

20    distributor, our fair share.

21              And I believe that's how we

22    incent, and if we look at the generics

23    component on .5, we can talk about that in

24    more detail.

25              ///
```

1    BY MR. BOGLE:

2        Q.    Right.  And the generics

3    component specifically was 40% of the

4    variable compensation in this fiscal year,

5    right?  That's what .5 indicates.

6        A.    .5, targeted at 40% or $14,000

7    of variable comp, same as the prior year, and

8    there was a fixed component and a variable

9    component, split equally.

10       Q.    Right.  So basically, what's

11   indicated here on page .5 is between the

12   fixed and variable components, a retail sales

13   manager could earn up to potentially 14,000

14   more dollars in that fiscal year if they met

15   the goals as it pertained to generics, right?

16           MS. HENN:  Objection to form.

17       A.    That's how I would read it,

18   going back 12-plus years, but, yeah, that

19   they had a $14,000 opportunity if they

20   executed against two components of generics

21   performance in their territory.

22   BY MR. BOGLE:

23       Q.    Okay.  Now, at this point in

24   time, in the 2006 time frame, do you have an

25   understanding of what a retail sales manager

1    on average would make in a year, just their

2    base salary?

3         A.    You know, I don't know that

4    it's moved significantly over time, and, you

5    know, base salaries today -- when I was the

6    district sales manager, maybe $50,000.

7         Q.    Okay.  So the potential of a

8    $14,000 addition to that is substantial to a

9    person making $50,000; you would agree to

10   that, right?

11        A.    Again, I think that's all of --

12   all relative.  It would be 20, 25% earnings

13   potential over and above their base salary.

14        Q.    Right.  Okay.  Let's go back to

15   page .12.  There's a couple of other

16   questions on that page.

17             As to the customer retention

18   issue, you see there's a bolded section there

19   that says 100% Customer Retention.

20             Do you see that?

21        A.    I do.

22        Q.    It says:  For the past several

23   years, we've asked you to concentrate on

24   keeping profitable customers and retaining

25   sell-side margins as we focused on the

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Sell-Side Initiative - and you have.

 2                 Do you see that?

 3      A.     I do.

 4      Q.     We talked about earlier whether

 5      McKesson would keep doing business with a

 6      customer that couldn't pay -- couldn't pay

 7      you, and this actually focuses on actually

 8      the goal to keep the profitable customers,

 9      right?

10      A.     I see where the document says

11      that.

12      Q.     Right.  And then the next

13      section down says:  Win New Business.

14                 Do you see that?

15      A.     I do.

16      Q.     It says:  Our goal over the

17      next three years is to become the market

18      leader in the independent segment and our

19      success relies on winning new business.  Each

20      region has developed specific market share

21      goals.  Your sales leadership team will work

22      with you to implement its plans to reach

23      those goals.  I expect each of you to

24      leverage your skills and McKesson's strengths

25      to attract and win new customers.  We will
```

1    provide selling skills training and

2    development at National Sales Conference and

3    beyond to ensure you win in your marketplace.

4              Do you see that?

5         A.    I do.

6         Q.    Okay.  And just going back, for

7    example, on retaining existing customers.  Go

8    to .9.  So if these retail sales managers in

9    the fiscal year of 2007 retained 100% of

10   their customers, then they got a $4,000 bonus

11   for that, right?  That's what this is

12   indicating here?

13        A.    Quarterly payout of $1,000 with

14   an opportunity for exceptions.  All

15   exceptions must be approved by the SVP.

16        Q.    Okay.  But the potential here

17   is, as it says, the opportunity to earn up to

18   $4,000 in fiscal year 2007, right, for

19   retaining 100% of your customers?

20        A.    That was the goal, but, I mean,

21   again, there were exceptions to that.  We

22   might have paid the payout if they did lose a

23   customer anyhow.

24        Q.    This concept of exceptions for

25   not retaining customers, do you recall this

1    going away, though, after 2007, that there

2    were no exceptions?

3          A.    No, I don't remember.  I think

4    we've always been -- tried to be fair and

5    flexible in the way we implement our

6    compensation program, and we still make

7    exceptions today.

8          Q.    Okay.  So you don't recall that

9    policy changing after fiscal year 2007?

10              MS. HENN:  Objection to form,

11          lacks foundation.

12          A.    I'm not aware that the policy

13    changed, and it is not our policy today,

14    so...

15    BY MR. BOGLE:

16          Q.    Okay.  Why is it not the policy

17    today?  Why are there exceptions allowed for

18    this kind of bonus, for retaining customers?

19              MS. HENN:  Objection to form,

20          lacks foundation.

21          A.    Well, I guess to be clear, I'm

22    not aware that there's a retention component

23    of our compensation plan today, but there are

24    other components of our compensation plan

25    that could impact reps' compensation if we

1    were to -- if a customer was to move away

2    from us or discontinue business, and we make

3    reasonable adjustments for those things that

4    are outside of a rep's control, or if a rep

5    participates in a reason that we might

6    discontinue service.  We're not going to

7    penalize them for operating with integrity

8    and doing the right thing.

9    BY MR. BOGLE:

10         Q.    Okay.  And that's important,

11   right?  You don't want to disincentivize a

12   sales representative from reporting

13   potentially suspicious activity, right, of a

14   customer?

15         A.    And I don't believe we do.

16         Q.    Yeah, I'm not saying that you

17   do.  I'm saying that you would agree it's

18   important not to withhold potential bonus

19   payouts for reporting suspicious activity

20   that might result in losing a customer,

21   right?

22         A.    I think it's our practice and

23   that's why we implement it, that we want to

24   make sure that our reps understand that when

25   they perform under the spirit of the plan and

1    under their responsibilities to the company,

2    that they'll have opportunities to be

3    successful.

4         Q.    Okay.  Now, in this description

5    of the fiscal year 2007 incentive plan, do

6    you see any specific compensation laid out

7    for reporting suspicious activity related to

8    controlled substances?

9         A.    I don't in this document, no.

10        Q.    Okay.  I want to hand you next

11   what I'm marking as Exhibit 8, which is

12   1.2139, and that's MCKMDL00642364.

13              There's your copy, sir.

14              (McKesson-Cavacini Deposition

15        Exhibit 8 marked.)

16   BY MR. BOGLE:

17        Q.    Okay.  This is a similar

18   document that we just looked at in the last

19   exhibit.  This is now -- look at the e-mail

20   on the first page, Fiscal Year 2008 RSM

21   Compensation Plan.

22              Do you see that?

23        A.    I do, yes.

24        Q.    And again, from Brian Ferreira,

25   April 19, 2007.  Do you see that date and

1    he's the one who sent it?

2         A.    I do.

3         Q.    Again, I'm not going to read

4    all the names, but one of the cc's on the cc

5    line is you, right?

6         A.    Correct.

7         Q.    Okay.  So let me take a look at

8    this.  If you go to the memo, which is on .2,

9    it says there:  With the start of each new

10   fiscal year, we look ahead to new

11   opportunities to build on the success of the

12   previous year.  In Fiscal Year 2008, we will

13   continue to position ourselves to become #1

14   in the ISMC segment by focusing on our three

15   core initiatives to.

16              ISMC, independent, small/medium

17   chain; is that right?

18        A.    Correct.

19        Q.    And then the three initiatives

20   are -- the first one being:  Win in Generics

21   and drive compliance through our enhanced

22   McKesson OneStop Generics program and new

23   Generics Purchasing Rewards.

24              Do you see that?

25        A.    I do.

1      Q.     The McKesson OneStop Generic

2   program, what is that?  Can you give me a

3   general description of what that program is?

4      A.     I would describe it as our

5   source program for generics, generics that we

6   might have under contract, and offer those to

7   our customers.

8      Q.     So sort of the ordering portal

9   for a customer is the OneStop Generics

10   portal?

11      A.     No, I would refer to the portal

12   as McKesson Connect.

13      Q.     Okay.  The second bullet point

14   says:  Win New Business by providing

15   differentiating value, the industry's best

16   pharmacy franchise, and an unmatched

17   technology offering.

18            You see that there, it's the

19   second initiative?

20      A.     I do.

21      Q.     And the third initiative is:

22   Provide our value every day and maintain 100%

23   Customer Retention.

24            Do you see that?

25      A.     I do.

1    Q.    Okay.  And again, any

2    initiative here that relates to incentives

3    for reporting suspicious controlled substance

4    activity of customers?

5    A.    No, I don't see that called out

6    as a specific component of the plan.

7    Q.    Okay.  If we go to page .3, it

8    outlines the various plan components.

9          Do you see that chart in the

10   middle?

11   A.    I do.

12   Q.    Okay.  And then when you add up

13   all the different components, there's a

14   potential for up to a $35,000 annual

15   incentive to the retail sales managers in

16   fiscal year 2008, right, if they met all

17   those goals?

18   A.    My understanding, that's my

19   recollection.

20   Q.    Okay.  And I want to look next

21   at page .18.  You see here at the top this

22   slide says Customer Retention Bonus, Higher

23   expectation, higher payout.

24          Do you see that?

25   A.    I do.

1    Q.    And then the first bullet point

2    below that says:  Opportunity to earn $1,250

3    each quarter by retaining 100% of accounts.

4            So that's gone up now from

5    4,000 in the previous year to 5,000

6    annualized for fiscal year 2008, right?

7    A.    That's how I would read it.

8    Q.    Okay.

9    A.    1,000 last year, 1250 this

10   year.

11   Q.    Right.  And then the second

12   bullet point says:  No exceptions - any lost

13   account means no payout.

14           Do you see that?

15   A.    I do see where the document

16   says that.

17   Q.    Okay.  So, for example, when I

18   was talking to you earlier about a sales

19   representative reporting suspicious

20   activities related to, for example, opioids

21   with a customer that could result in that

22   customer being lost, that sales

23   representative would receive no payout under

24   this bonus plan for retention, right?

25   A.    That's not my recollection of

1    the practice.  I do see where the document

2    says that and it also references sold to a

3    chain, closed or had credit issues.

4              But my recollection and my

5    experience does not support that.

6        Q.    Okay.  But the plain reading of

7    this document specifically says:  No

8    exceptions - any lost account means no

9    payout.

10             That's what it says, right?

11       A.    That is what it says, but

12   again, doesn't line up with my recollection

13   or my understanding of practice.

14       Q.    Okay.  So is there anything in

15   your view that, from that bullet point I just

16   read, that leaves open the possibility of a

17   sales representative's getting a payout for

18   retention if they lose an account?

19             Does that seem ambiguous in

20   that regard?

21             MS. HENN:  Objection to form.

22       A.    I see very clearly what the

23   document says, but, you know, again, it

24   doesn't line up with my recollection of our

25   practice and isn't our practice today.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOGLE:

2         Q.    So in, for example, the fiscal

3    year 2008, does any example come to mind

4    where a sales representative reported

5    suspicious activity related to opioids or any

6    other controlled substance that resulted in

7    the customer leaving or the business being

8    lost to McKesson and that sales

9    representative still getting their bonus for

10   the retention?

11        A.    I can't recall any specific

12   examples from 2008.

13        Q.    Can you recall any specific

14   examples after 2008 where retention was an

15   aspect of the bonus where that sort of

16   factual circumstance occurred, a sales

17   representative reports suspicious activity,

18   McKesson cuts off that customer or the

19   customer is otherwise lost, and the reward or

20   the bonus for retention is still given to

21   that sales representative?

22        A.    I don't believe that retention

23   as it's articulated here is a component of

24   the comp plan, but there are many components

25   of our comp plan that intertwine with

Highly Confidential - Subject to Further Confidentiality Review

```
1    customers and customer performance, and I

2    think there are numerous examples.  I'm

3    struggling to come up with the name of an

4    account or a specific time where we've made a

5    decision around a customer, that customer has

6    moved away from us or materially changed

7    their purchasing patterns as a result of our

8    decision and we have kept the rep whole,

9    moved that account out of their territory so

10   they wouldn't feel the impact.

11        Q.    But can you think of a specific

12   example where a sales representative reported

13   suspicious activity related to opioids, the

14   customer account was lost for whatever

15   reason, and a retention bonus was still paid

16   in full to that representative, at any point

17   in time?

18             MS. HENN:  Objection to form,

19        asked and answered.

20        A.    I'm not aware of all the years

21   that retention was a part of our compensation

22   plan, and I can't think of a specific

23   example, but I'm aware that it has happened

24   and we've, you know, made every effort to

25   make sure that the rep was not negatively
```

1    impacted for helping us exercise our

2    responsibilities.

3    BY MR. BOGLE:

4         Q.    You're aware of situations

5    where that's happened specifically to a rep

6    reporting suspicious opioid-related activity?

7         A.    No, I don't know that the rep

8    reported it, but because of our program, you

9    know, we made a decision, and there was a

10   change in the customer that would have had a

11   potential impact on the rep, and we've moved

12   that account out of the territory to make

13   sure that the rep was not impacted, whether

14   they were a part of the due diligence process

15   or not.

16        Q.    I'm talking specifically about

17   a situation where a representative says, I'm

18   going to report this conduct because I think

19   it's suspicious, and the customer is lost for

20   whatever reason thereafter, and you're aware

21   that McKesson still paid a retention bonus in

22   full to that representative.

23             MS. HENN:  Objection to form,

24        asked and answered.

25        A.    And again, the retention bonus

Highly Confidential - Subject to Further Confidentiality Review

1    as part of our compensation plan has moved.

2    It's not part of our plan today.  I'm not

3    sure of the exact years when it was in or

4    out, but there are many components of our

5    compensation plan that would be tied to

6    account retention.

7                And whether the rep is involved

8    in the regulatory decision or potentially a

9    credit decision that we made that they didn't

10   control or maybe they did influence, maybe

11   they didn't, we don't penalize them for it.

12   That's the spirit of the -- we want them to

13   be part of our responsibility.

14   BY MR. BOGLE:

15        Q.    Okay.  But under the plain

16   reading of -- on page .18 in Exhibit 8, and

17   saying there are no exceptions, if any lost

18   account -- any lost account means no payout,

19   under the fact pattern I've described, if

20   that account was lost, at least in 2008, that

21   rep wasn't getting his bonus, were they?

22             MS. HENN:  Objection to form,

23        asked and answered, mischaracterizes

24        testimony.

25        A.    I don't know that to be true.

1    I see what the document says, but that's not

2    my recollection of how we behaved.

3    BY MR. BOGLE:

4         Q.    But you don't dispute that

5    that's exactly what the document says,

6    right --

7              MS. HENN:  Objection to form,

8         asked and answered.

9    BY MR. BOGLE:

10        Q.    -- as it was provided to you in

11   April 19th, 2007?

12             MS. HENN:  Same objections.

13        A.    I do see that the document says

14   no exceptions.

15   BY MR. BOGLE:

16        Q.    Okay.  I want to hand you what

17   I'm marking as Exhibit 9 to your deposition,

18   which is 1.1524, and that's MCKMDL00484482:

19   Here you go.

20             (McKesson-Cavacini Deposition

21        Exhibit 9 marked.)

22   BY MR. BOGLE:

23        Q.    And this document,

24   Mr. Cavacini, starts with an e-mail sent by

25   you on April 23, 2010, Subject:  Fiscal Year

Highly Confidential - Subject to Further Confidentiality Review

```
 1    2011 RSM Compensation Plan Review.

 2              Do you see that?

 3    A.      I do, yes.

 4    Q.      So during this time frame in

 5    2010 for the fiscal year 2011, would you have

 6    been responsible for conveying the contents

 7    of this plan to your representatives?

 8    A.      I believe I was the vice

 9    president of sales for the market at that

10    time, which was a similar role that Brian had

11    in the other e-mails we reviewed, and, you

12    know, it appears that I was setting up a

13    conference call to discuss the plan with my

14    team.

15    Q.      Okay.  If we go to page .2

16    here, this is the start of the PowerPoint

17    slide deck.  You see it's titled U.S.

18    Pharmaceutical Fiscal Year 2011 Retail Sales

19    Compensation Plans.

20              Do you see that?

21    A.      FY11, yes.

22    Q.      So would this sales plan

23    encompass more than just the retail sales

24    manager position?

25    A.      As I flip through the document
```

```
 1    and look at the actual compensation plan

 2    that's attached, it appears targeted at

 3    retail sales managers, so I don't believe

 4    anybody else would have been covered by it.

 5         Q.    When it comes to the sales

 6    force, U.S. Pharma-wise at McKesson, is the

 7    largest group of that sales force the retail

 8    sales manager group?

 9         A.    As far as numbers, like --

10         Q.    Sure.  Yeah, exactly.

11         A.    Yeah, I believe they are the

12    largest field sales organization we have,

13    numbers.

14         Q.    Right.

15         A.    The number I gave you earlier,

16    120 of the 200 are probably retail sales

17    managers roughly.

18         Q.    Understood.

19              If we can go to page .6 of this

20    document.  You see here there's a comparison

21    of the 2010 incentive plan to the 2011

22    incentive plan as far as how much was going

23    to be paid and the percentage allocated to

24    different categories.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      That's what it appears to be,
2    yes.
3           Q.      And, for example, in 2010, if
4    all goals were met, annualized, it could be
5    up to $40,000 in potential incentives for the
6    retail sales manager, right?
7           A.      That's what it looks to
8    indicate, yes.
9           Q.      And that number had gone up to
10   $46,100 if all criteria were met in the
11   fiscal year 2011, right?
12          A.      It's a little bit hard to read
13   in the grayout, but the bullet point below
14   says:  Increased annual target to 46,100.
15          Q.      Right.  And we can blow it up
16   on the screen, too, if at any point in time
17   that ever helps you.  But I think you
18   answered the question either way.
19                  So if you look, for example,
20   these components are broken down by
21   percentage for each year.  For example, in
22   2010, the generics portion is 25%.  That went
23   down to 19% in 2011.
24                  Do you see that?
25          A.      I do.
```

1      Q.      The net sales in 2010 was 25%.

2  That went down to 19% in 2011, right?

3      A.      25 to 19, yes.

4      Q.      And core sell margin in 2010

5  was 25%, which went down to 19% in 2011,

6  right?

7      A.      Correct.

8      Q.      And the new accounts went from

9  25% to 24% from 2010 to 2011, right?

10      A.      Yes.

11      Q.      Okay.  And then -- so is --

12  again, is there a specific component outlined

13  here for reporting of suspicious activity

14  being entitled to a specific bonus?

15      A.      No, I don't see that as a

16  called-out part of the comp plan.

17      Q.      And it wasn't -- up until 2013,

18  when you talk about net sales, opioids were

19  included in the net sales calculation for the

20  incentive plan up until 2013 for retail sales

21  managers, right?

22      A.      I'm not sure of the exact date,

23  but I am aware that we did make a change to

24  the plan and excluded, I believe, all

25  controlled substances from the compensation

1    plan.

2         Q.      Okay.

3         A.      I said excluded, right?

4              MS. HENN:  You did.

5              THE WITNESS:  Okay.

6              MR. BOGLE:  You did.

7    BY MR. BOGLE:

8         Q.      So up until the fiscal year

9    2013, from a simple perspective, if opioids

10   counted in the net sales calculation for

11   incentive plans for retail sales managers,

12   the more opioids that were sold to a customer

13   during that time frame, the more potential

14   bonus a retail sales manager could receive

15   under the net sales component, correct?

16        A.      I don't necessarily agree.

17   They were a part of the compensation program,

18   and, yes, you know, the total purchases of

19   the account against a baseline was often the

20   measure for net sales, you know, what the

21   territory did in the prior year and what they

22   do in the post year and the movement up and

23   down above that baseline.

24              You know, so as accounts grew,

25   you know, and as their purchases from us of

1    pharmaceuticals, over-the-counter products,

2    some of which might be controlled substances,

3    you know, I understand that there could be a

4    correlation.

5              But our ability, in my

6    experience, as in those roles, to influence

7    that, you know, never really came into

8    discussion.

9         Q.    When you say to influence that,

10   what is the "that" you're referring to?

11        A.    The amount of any product that

12   was being purchased.

13        Q.    Okay.  So in your experience

14   then, you never saw instances where the sales

15   force encouraged folks in the regulatory

16   department to increase thresholds for opioids

17   to make sure the customer stayed happy.  You

18   never saw that?

19        A.    I think I'm aware of

20   communication from our sales team to the

21   regulatory affairs team that I wouldn't

22   necessarily agree with how it was phrased,

23   but...

24        Q.    Right, because you've seen

25   e-mails phrased along those lines, right,

Highly Confidential - Subject to Further Confidentiality Review

1    where the sales representatives were

2    encouraging the regulatory department to

3    increase thresholds for opioids to keep the

4    customer happy and not to lose their sales,

5    right?

6         A.    I don't know that I remember

7    seeing those specific words, but, yes, I have

8    seen e-mails that might talk about the

9    importance of the customer and, you know,

10   sales rep communicating with our regulatory

11   affairs team that I believe was independent

12   and was fully empowered to make a decision

13   based on their responsibility and view of the

14   account.

15        Q.    But independent of whether you

16   think that they were an independent

17   department, pressure should never be put by

18   the sales department on the regulatory

19   department in its decisions to increase or

20   not increase thresholds for opioids, right?

21             MS. HENN:  Objection to form,

22        lacks foundation.

23        A.    I think by practice, I would

24   prefer that we let our regulatory affairs

25   team make independent judgments based on the

1    information they have and their view of the

2    account.

3    BY MR. BOGLE:

4         Q.    And so going back to my initial

5    question though:  Prior to fiscal year 2013

6    when opioids would have been included in the

7    net sales calculations, as a practical

8    matter, if they're included in the net sales

9    calculation, the more they get sold of any

10   product, including opioids, the more

11   potential bonus a representative can receive,

12   right?

13            MS. HENN:  Objection, asked and

14        answered.

15        A.    Prior to excluding controlled

16   substances, they were part of the net sales,

17   but when I think about, you know, my

18   experience with RSMs and managing a territory

19   and the financial incentive that's tied to

20   it, you know, when we looked at the

21   compensation plan that we just reviewed --

22   BY MR. BOGLE:

23        Q.    Tell me which document you're

24   on, just so we're clear.

25        A.    I was just looking at

1    Exhibit 9.

2              Q.    Okay.

3              A.    The net sales component being

4    an annual incentive of $8,000 spread across

5    75 to 100 accounts in a territory, and again,

6    you know, we were selling distribution

7    services.

8                    I never spoke to customers

9    about my experience, you know, specific

10   products.  They were part of the purchases of

11   that pharmacy.

12             Q.    So in your experience in the

13   sales department, the ability to receive or

14   not receive up to $8,000 for a person making

15   on average 50,000 you don't think made any

16   difference to them?

17                   MS. HENN:  Objection to form.

18             A.    I mean, I can only speak to my

19   experience, and I never felt a conflict under

20   the compensation plan in that one account

21   might contribute a few hundred dollars.  You

22   know, my focus was on the health of my

23   territory and making sure that I could

24   service all of my customers, and had an

25   awareness that, as I stated earlier, our

Highly Confidential - Subject to Further Confidentiality Review

1   license and our ability to distribute

2   controlled substances was a privilege.  I

3   would much rather have one hard conversation

4   with one customer than potentially 75 hard

5   conversations.

6   BY MR. BOGLE:

7       Q.    Okay.  That's you you're

8   speaking of, right?  That's your feeling on

9   it.  As Gene Cavacini, that's how you viewed

10  it, correct?

11      A.    Yeah.  And I believe that's

12  what I tried to instill in my sales team too.

13      Q.    But you're certainly not trying

14  to speak for any of your sales members as to

15  whether they specifically bought into that,

16  right?

17          MS. HENN:  Objection to form.

18      A.    I don't know that it would be

19  possible for me to speak about what others...

20  BY MR. BOGLE:

21      Q.    Right.  In going back to --

22  it's in Exhibit 9, and actually, it's pulled

23  up on the screen, generics was, in 2010, 25%

24  of the incentive plan, 19% in 2011.

25          MS. HENN:  What page is it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     And I'm sorry, I put the
 2    document away again.  It was .6?
 3    BY MR. BOGLE:
 4          Q.     Yes, sir, you're correct about
 5    that.
 6          A.     Okay.
 7          Q.     This is Exhibit 9, .6 is the
 8    page.
 9                 MS. HENN:  Thank you.
10    BY MR. BOGLE:
11          Q.     So you know, for example, in
12    2010, 2011, many of the opioid products
13    available on the market were generics, right?
14          A.     You know, hard for me to say
15    what I knew in FY10, when I came to that
16    awareness.  I am aware that many controlled
17    substances are offered generically.
18          Q.     Okay.  And certainly in 2010
19    and 2011, and we saw years prior, increasing
20    sales of generic products was another way for
21    sales representatives to increase their
22    incentive pay, correct?
23                 MS. HENN:  Objection to form,
24          mischaracterizes the document.
25          A.     Generics is a compensation of
```

1    our sales incentive plan, and weighted

2    equally with net sales and core sales margin

3    in FY11.

4    BY MR. BOGLE:

5         Q.    And the decision to remove

6    opioids from the sales incentive plan was

7    done at a time period where McKesson was

8    being investigated again by the DEA, right?

9         A.    I'm not sure.

10        Q.    Okay.  Are you not aware that

11   in 2012 the DEA renewed investigations into

12   McKesson's activities that pertained to

13   distribution of controlled substances like

14   opioids?

15            MS. HENN:  Objection to form,

16        lacks foundation.

17        A.    I can't say for certain of the

18   timing, no.

19   BY MR. BOGLE:

20        Q.    Okay.  Is it your testimony

21   that such investigations played no role in

22   McKesson's decisions to remove opioids as

23   part of the incentive plans for sales

24   representatives?

25            MS. HENN:  Objection to form,

1        lacks foundation.

2        A.     I'm not aware of any

3    connection.

4    BY MR. BOGLE:

5        Q.     Okay.  So how did this just

6    bubble up then in fiscal year 2013 if not

7    prompted by DEA investigations?

8        A.     I'm not sure of what the

9    motivation was or how we came to the decision

10   to change the compensation plan.

11       Q.     I'm going to hand you what I'm

12   marking as Exhibit 10 to your deposition,

13   which is 1.1514, and that's MCKMDL00335804.

14              (McKesson-Cavacini Deposition

15       Exhibit 10 marked.)

16   BY MR. BOGLE:

17       Q.     Okay.  And what I've handed you

18   here is a Fiscal Year 2013 Retail Sales

19   Incentive Compensation Plan Communication,

20   which is dated April 2012.

21              Do you see that?

22       A.     I do, yes.

23       Q.     And if you go here to page .2,

24   it says:  Fiscal Year '13 RSM Compensation

25   Plan, Guiding Principles & Feedback.

1            Do you see where that reference

2    is made?

3        A.     I do.

4        Q.     Okay.  And below Guiding

5    Principles, the third bullet point says:  Pay

6    for performance.

7            Do you see that?

8        A.     I do.

9        Q.     What performance metrics are

10   being referenced here?

11           MS. HENN:  Objection to form,

12       calls for speculation.

13       A.     I don't know, I didn't write

14   the document.  I mean, I think it's

15   reasonable to assume, and if it correlates

16   with the components of the comp plan that are

17   going to be spelled out, but I can't say for

18   sure.

19   BY MR. BOGLE:

20       Q.     And those components

21   specifically in this year as discussed

22   further down that page are Gx, which is

23   generics, right?

24       A.     I would take Gx to be generics.

25       Q.     Net sales is the second, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.       Correct.
 2          Q.       Third is new accounts, which is
 3     noted to be new business.
 4                   Do you see that?
 5          A.       That's what the document says.
 6          Q.       Those are noted to be the most
 7     important components of the plan in fiscal
 8     year 2013, right?
 9                   MS. HENN:  Objection to form.
10                   THE WITNESS:  I'm sorry.
11                   MS. HENN:  Go ahead.
12          A.       I was going to say it seems to
13     reference feedback they had received on the
14     plan, and it says RSM feedback, is those are
15     the most components -- most important
16     components.  Our sales executives felt
17     something else.  That's how I read it.  I
18     don't...
19     BY MR. BOGLE:
20          Q.       Okay.  So you think that the
21     retail sales managers were wrong as far as
22     what was being compensated?
23          A.       Seems to be their opinion that
24     those were most important, and based on the
25     several other comp plans that we reviewed
```

```
 1    prior, those were largely -- they were

 2    significant components of the comp plan and

 3    continued to be, I believe, into FY13.

 4    Generics, net sales and new accounts are

 5    listed on .5 as parts of the comp plan.

 6         Q.      Right.  And I want to ask you

 7    about another reference here on .12.  This is

 8    Fiscal Year '13 SE Compensation Plan.  Is

 9    that sales executives?

10         A.      I would take that to be sales

11    executives, yes.

12         Q.      And the first bullet point

13    there says:  Maintained, quote/unquote,

14    hunter focus.

15              What does that mean, to be a

16    hunter as a sales executive?

17         A.      I would take -- the sales

18    executive as we described earlier is

19    primarily a business development role.  They

20    are out working with prospective customers to

21    try and find if there's a fit to bring them

22    to McKesson.  That was my responsibilities as

23    a sales executive during the years I had the

24    role.  I was primarily focused on -- on not

25    account management, but more business
```

1    development.

2         Q.    Okay.  So out hunting for new

3    business, right?

4              MS. HENN:  Objection to form.

5         A.    Trying to make connections that

6    could lead to mutually beneficial

7    relationships between us and new customers.

8    BY MR. BOGLE:

9         Q.    So as we discussed in fiscal

10   year 2013 would be when opioids were excluded

11   as part of the compensation incentives, but

12   there was no measure taken at that point in

13   time to incentivize reporting suspicious

14   activities related to opioids, was there?

15   There was no bonus paid for that?

16             MS. HENN:  Objection to form,

17        lacks foundation.

18        A.    As I review the document here,

19   I don't see a specific bonus tied to that,

20   no.

21             MS. HENN:  Counsel, I just note

22        that Exhibit 10 looks like it was

23        printed without the normal

24        confidentiality stamp.  I'm not sure

25        why that would be.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BOGLE:  That was

 2         unintentional if it was.  I'm happy to

 3         have you say it's confidential.

 4              MS. HENN:  I would just ask the

 5         court reporter to note that Exhibit 10

 6         should have a confidential and

 7         potentially highly confidential stamp

 8         on it.

 9              MR. BOGLE:  That's fine.  That

10         was unintentional, I can assure you of

11         that part.

12              MS. HENN:  Understood.

13    BY MR. BOGLE:

14         Q.    When McKesson would cut off a

15    customer for a potential suspicious activity

16    related to opioids, would the general

17    practice be to cut that customer off entirely

18    from purchasing from McKesson anything?

19         A.    When we make a regulatory

20    decision around controlled substances for a

21    customer, not necessarily.  We just might

22    discontinue shipping controlled substances

23    but still maintain a business relationship

24    with that customer in some way.  Oftentimes

25    the customer would move away from us
```

1    entirely.

2          Q.    So when they would move away

3    from you entirely because of the cuts on the

4    controlled substances, would there be any

5    credit given from a net sales perspective to

6    the sales rep for noncontrolled substance

7    sales that were lost for that customer?

8             MS. HENN:  Objection to form,

9       vague.

10         A.    Would there be credit given to

11    the rep for not...

12             The net sales component is

13    typically, in my experience, has been

14    based -- that it's based off the baseline.

15    So if they bought -- the customer, the

16    pharmacy purchased $100 worth of medicines

17    and over-the-counter, and then the next year

18    they bought $102, it's that over target

19    component that would be the -- what the rep

20    would be incented on.

21             So if we made a regulatory

22    decision, you know, you would think purchases

23    are going to decrease over the prior year, so

24    that would be a negative impact of the rep,

25    and that's why it has been my understanding

Highly Confidential - Subject to Further Confidentiality Review

1    of practice to move that account entirely out

2    of the territory, so the baseline comes out.

3    BY MR. BOGLE:

4         Q.     When you say move it out of the

5    territory, what do you mean by that?  I'm not

6    sure I understand what that means.

7         A.     Well, our retail sales managers

8    have a territory, a group of accounts that

9    they are responsible for maintaining and

10   interacting with, and it's that territory

11   that drives their incentive plan and their

12   performance.

13            So if we moved it out so it

14   wasn't attached to that rep anymore, it was

15   an in-house account or held to the side,

16   there wouldn't be the drag on the rep, so

17   there would be no negative implication.

18        Q.     Are you aware of any specific

19   examples when you've been with the company

20   that -- like what you're talking about where

21   a pharmacy's cut off for controlled

22   substances, they decide we're going to go

23   somewhere else because we want to order

24   everything we want to order, and the rep is

25   specifically credited in the way you're

1    talking about?

2              MS. HENN:  Objection to form.

3    BY MR. BOGLE:

4         Q.    Can you name me a customer?

5    I'd like to research this.  Can you name me a

6    customer that that happened with?

7         A.    Yeah, I mean, I don't know that

8    I see them all and it's hard for me to

9    remember the specific customers, but I am

10   aware of the practice and it is our practice,

11   I mean.

12        Q.    Is there an SOP, standard

13   operating procedure, that outlines that

14   practice?

15        A.    I'm not sure.

16        Q.    Okay.  Under the fact pattern

17   you're describing, if the customer is lost

18   altogether and therefore is out of the sales

19   rep's portfolio, they then for the following

20   year, has got to try to find new customers to

21   fill in that gap, correct?

22             MS. HENN:  Objection,

23        mischaracterizing testimony.

24        A.    Not necessarily because, again,

25   the baseline or the starting point would be

1    reset.  So you don't bring the baseline from

2    the prior year into the next year.  Targets

3    are reset every year because customers move

4    in and out for a number of reasons, because

5    territories change in size and scope, our

6    teams change from year to year, so a new

7    baseline is set every year.

8    BY MR. BOGLE:

9         Q.     Can you think of, in the last

10   five years, any specific circumstance, a

11   customer's name where that's happened?

12        A.     Again, I'm struggling to come

13   up with a specific customer name, but I'm

14   aware that it has happened.

15        Q.     Okay.

16        A.     And I've reviewed in aggregate

17   those type of moves.

18        Q.     Okay.  Do you know who would be

19   responsible for making the decisions, let's

20   say in the last five years, as to whether

21   that credit would be given to a sales

22   representative?  Do you know what person has

23   that responsibility?

24             MS. HENN:  Objection to form.

25        Mischaracterizing the testimony.

1      A.     My understanding, that those

2    are approved by our regional vice presidents.

3    BY MR. BOGLE:

4      Q.     Okay.  So the region that

5    would -- Ohio would fit within, who would

6    that be within the last five years?

7      A.     For a period of time it was me

8    and then since to me -- the eastern part of

9    Ohio serviced by New Castle would have fallen

10   into the northeast region, which from the

11   period of 2015 to 2017 was me.  After that it

12   was Chris Smith, who's no longer with the

13   company.  We've since restructured the

14   regions.

15     Q.     Okay.  What guideposts would

16   you use to make those decisions as to whether

17   the sales rep would get such a credit?

18            MS. HENN:  Objection, lacks

19       foundation.

20     A.     I believe it was from my

21   experience fairly standard practice that if

22   that was the circumstances where it was a

23   regulatory decision that drove the shift in

24   the customer's business, we would make the

25   change for the rep.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:

2         Q.    What factors were used to

3    determine if it was a regulatory decision

4    that prompted it if the customer wasn't cut

5    off entirely?

6         A.    Usually it was information

7    presented from the sales team, the rep, their

8    manager, the vice president of sales, the

9    VP/GM that would have been familiar with the

10   circumstances relative to that customer and

11   would have brought the request forward to

12   make the adjustment.

13        Q.    During the time that you had

14   responsibility to make those decisions, do

15   you have any approximations as to how many

16   times you had to make those judgment calls?

17        A.    I don't.  I'd be guessing, you

18   know.

19        Q.    Okay.

20        A.    But from time to time.

21        Q.    Okay.  All right.  I'm going to

22   hand you what I'm marking as Exhibit 11,

23   which is 1.1515, and that's MCKMDL00335830.

24        A.    Thank you.

25             (McKesson-Cavacini Deposition
```

1        Exhibit 11 marked.)

2    BY MR. BOGLE:

3        Q.     What I'm handing you now is the

4    Fiscal Year '14 Retail Sales Compensation

5    Plans dated April 2013.

6             Do you see that?

7        A.     I do, yes.

8        Q.     Okay.  And look at this, couple

9    of components of this with you.

10            If you go to page .6, you see

11   there's a -- I'm sorry -- slide titled FY2014

12   Retail Sales Incentive Plan, and below that

13   it says RSM Net Sales.

14            Do you see that?

15       A.     I do, yes.

16       Q.     And RSM, that's retail sales

17   managers again?

18       A.     That's how I would take it,

19   yes.

20       Q.     Okay.  And it notes here that

21   in the fiscal year 2014 the net sales

22   component was increased up to the 40% mark.

23            Do you see that?

24       A.     I see where it says that.  I

25   don't remember seeing like in the previous

1    document had the year over year -- no, it's

2    on page 5.  No, it's not.  I'm sorry.  No,

3    it's on page 4.

4              Yeah, so net sales was

5    increased from 30 to 40 in the fiscal '14

6    plan.

7         Q.    Right.  And, for example, new

8    accounts was 30% in fiscal year 2014, right?

9         A.    Same as the prior year, 30%.

10        Q.    In fact, there's only three

11   components in 2014 as far as incentive plans.

12   There was the generics at 30%, net sales at

13   40% and new accounts at 30%, right?

14        A.    On page 4 at the bottom it

15   references some solutions.  They're listed as

16   products, additional offering that we could

17   sell that appeared to have variable comp to

18   it.

19        Q.    That's a fair point.

20        A.    Yeah, the core component of the

21   plan appears to add up to 100% on those three

22   components.

23        Q.    Okay.  So again, looking at the

24   2014 fiscal year, there's no -- there's no

25   component, whether it be on the product side

Highly Confidential - Subject to Further Confidentiality Review

1    or the core components, to provide any sort

2    of incentives for reporting suspicious

3    activities related to opioids, right?

4        A.    No, I'm not aware that we

5    specifically called out or provided an

6    incentive for reporting suspicious behavior.

7        Q.    From 2002 to the present time,

8    are you aware of any hotline that has existed

9    for sales representatives to report

10   suspicious opioid-related activity, that's

11   dedicated for that purpose?

12       A.    No, I can't answer that I am.

13   We have a corporate ethics lines, but not

14   aware of something specific for controlled

15   substances.

16       Q.    And the ethics line is

17   generally to get ethical advice, right?

18       A.    No, I think it's to report an

19   issue, but I would understand that if you

20   understood something was not as it should be,

21   there's an anonymous way that you can use the

22   ethics line to report and raise that issue

23   for review.

24       Q.    Is there any standard operating

25   procedure as to when things should be

1    reported to the ethics line?

2         A.    I can't say that I recall an

3    SOP.  It may be in our code of conduct I

4    would like to review, but I'm not aware of a

5    specific document of when to call, but I

6    think the spirit of our program would be that

7    if you see something internally, externally

8    that's inappropriate that you think needs to

9    be looked into that's impacting you or the

10   business or our customers, that line is open

11   and...

12        Q.    Are there any specific bonuses

13   provided to employees that make legitimate

14   reports to the ethics hotline?

15        A.    Not that I'm aware of.

16             MR. BOGLE:  I'm about to shift

17        gears a little bit.  I don't know if

18        it's a decent lunch break time.  I can

19        shift gears if you want.  It doesn't

20        matter.

21             MS. HENN:  Let's go ahead and

22        break for lunch.

23             THE WITNESS:  Whatever you

24        think is best.

25             THE VIDEOGRAPHER:  We're off

```
 1              the record at 12:27 p.m.  This

 2              concludes Disc 2.

 3                   (Recess taken, 12:27 p.m. to

 4              1:04 p.m.)

 5                   THE VIDEOGRAPHER:  We are back

 6              on the record at 1:04 p.m., beginning

 7              of Disc 3.

 8     BY MR. BOGLE:

 9         Q.    Mr. Cavacini, we had stopped

10     before lunch talking about the bonus or sales

11     incentive plans over time.  Do you recall

12     that discussion generally?

13         A.    I do, yes.

14         Q.    Okay.  Now, in addition to

15     motivating sales representatives with those

16     sales incentive plans, you also personally

17     would send e-mails sort of encouraging your

18     sales representatives over time to be as

19     aggressive as possible in their sales tactics

20     to get and keep new customers, right?

21                   MS. HENN:  Objection to form.

22         A.    I think it's reasonable to

23     assume that I would communicate with my team

24     to try and reinforce behaviors and motivate.

25                   ///
```

```
 1    BY MR. BOGLE:

 2         Q.    Okay.  I'm going to hand you

 3    what I'm marking as Exhibit 12 to your

 4    deposition, which is 1.2133.  That's Bates

 5    number MCKMDL00489792.  There you go, sir.

 6              (McKesson-Cavacini Deposition

 7         Exhibit 12 marked.)

 8    BY MR. BOGLE:

 9         Q.    You see here, Mr. Cavacini, you

10    have an e-mail from you dated February 8,

11    2010 to a group of individuals.

12              Do you see that?

13         A.    I do.

14         Q.    This group of individuals,

15    would this generally be the sales force you

16    were supervising at that point in time?

17         A.    Looks to be the team of RSMs,

18    yes.

19         Q.    Okay.  And the subject is Time

20    Magazine on CAH.  CAH being Cardinal Health

21    in this instance, right?

22         A.    That's how I would take it.

23         Q.    For example, if you see on the

24    second page there's an e-mail from a Bill

25    Roehl and the body of that says:  Time
```

```
 1    Magazine article on changes at Cardinal

 2    referred to on today's call.

 3                    Do you see that?

 4         A.     I do.

 5         Q.     And Cardinal Health is one of

 6    your main competitors at McKesson when it

 7    comes to distribution, right?

 8         A.     They're another competitive

 9    distributor.

10         Q.     And a large one at that, right?

11    They're one of your most significant

12    competitors, right?

13         A.     I think they're a significant

14    player in the market, and depending on

15    market, I mean, that relevance might be

16    different in different geographies, but they

17    are a significant player.

18         Q.     Okay.  If you look at this

19    e-mail you sent, you say:  Team, interesting

20    article on CAH.  Looks like they feel they

21    have their house in order and are ready to

22    get back in the fight.

23                    When you say they have their

24    house in order, what are you referring to?

25         A.     I don't know.  The original
```

1    article isn't here.  I don't remember the

2    2010 Time Magazine, or I'd be speculating as

3    to what my thought process was back then.

4         Q.    Okay.  You continue to say:

5    We've already experienced some increased

6    activity in the New Castle market and should

7    expect them to be coming after us in other

8    areas.

9               Do you see that sentence?

10        A.    I do, right after, "Please make

11   sure you are selling value to our customers

12   at every opportunity."

13        Q.    I'm going to get to that.  I'm

14   going one by one.

15              The New Castle market covers

16   portions of Ohio, correct?

17        A.    New Castle would ship eastern

18   Ohio.

19        Q.    Including Summit and Cuyahoga

20   Counties, true?

21              MS. HENN:  Objection to form,

22        lacks foundation.

23        A.    I'm not sure of the specific

24   geographies of Ohio.  I would say, you know,

25   the Cleveland area and suburbs.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. BOGLE:

 2           Q.      Right.

 3           A.      Eastern Ohio.

 4           Q.      Okay.  You continue:  Please

 5      make sure you are selling value to our

 6      customers at every opportunity, and remember,

 7      the best defense is a good offense.  Let's

 8      spend plenty of time in their accounts making

 9      them protect their base before they come

10      after us.

11                   Do you see that?

12           A.      I do.

13           Q.      So what you're encouraging your

14      sales force to do in the last sentence there

15      is to try to target Cardinal Health accounts

16      in the New Castle market, to try to take

17      those accounts from them as a way of having a

18      good offense against Cardinal, right?

19           A.      I would say that the sales team

20      that's copied here covers my entire geography

21      at the time, which would have been Delran and

22      New Castle.  So I was communicating to the

23      entire team.  I do see that -- again, I don't

24      remember the specifics, but apparently in the

25      New Castle market I was articulating that
```

1    we've seen Cardinal be active.  We would

2    expect that they would be active in other

3    parts of our market, and to be active in

4    their accounts too.

5         Q.    Right.  Meaning active in their

6    accounts means try to flip the customer to

7    become a McKesson customer, right?

8              MS. HENN:  Objection to form.

9         A.    Not always.  I mean, I think it

10   was making sure that they were spending their

11   time defending.  That's exactly what I said.

12   BY MR. BOGLE:

13        Q.    When you say let's spend plenty

14   of time in their accounts, who's the "their"

15   you're referring to?

16        A.    That would seem to be that I'm

17   referencing Cardinal.

18        Q.    Right.  So if it's Cardinal's

19   account, how would you be active in their

20   accounts other than trying to flip the

21   customers over to McKesson?

22        A.    But as I read this it seems

23   like I was thinking about occupying

24   Cardinal's time, the best defense is a good

25   offense, let's spend plenty of time in their

1    accounts making them protect their base.

2            If Cardinal is spending their

3    time explaining to their customers why

4    McKesson isn't a good choice, they don't have

5    time to go out and be in my accounts selling

6    their value proposition.

7        Q.    Okay.  And when you gave sort

8    of directives like this, was it your

9    experience that your sales force listened to

10   you?

11       A.    I mean, they were a team of

12   independent contributors.  I think they're --

13   was individual and varied from time to time

14   and maybe not as much as I would have liked,

15   but I do think they took my directions and

16   input seriously.

17       Q.    Okay.  John Kuczynski, that was

18   one of your individuals you supervised on the

19   sales force around this time in 2010, right?

20       A.    John is an RSM in our New

21   Castle markets primarily.

22       Q.    Right.  So during, for example,

23   this e-mail we were looking at is from 2010,

24   and he's listed as one of the recipients,

25   right?

1    A.    Yeah.  I was the vice president

2  of sales and during that period of time had

3  responsibility for the New Castle market and

4  John was copied on the e-mail.

5    Q.    Is he an employee at McKesson

6  that, during your time working with him, you

7  felt listened to your directives and took

8  them to heart?

9    A.    I think John always tried to do

10 his best to represent McKesson and serve his

11 customers in the territory.

12    Q.    All right.  I'm going to hand

13 you now what I'm marking as Exhibit 13, which

14 is 1.2132, and that's MCKMDL00495641.

15         (McKesson-Cavacini Deposition

16         Exhibit 13 marked.)

17 BY MR. BOGLE:

18    Q.    I'm looking at the e-mail on

19 the top of the first page.  It's an e-mail

20 from John Kuczynski, October 13, 2010, to

21 three individuals, one of them being you,

22 right?

23    A.    I was on the cc line of this

24 e-mail.  It was sent to Patrick and I was

25 copied.

1     Q.     What was Patrick's role,

2  Patrick Soos?  Is that how you say that?

3     A.     Correct, Soos.  I believe at

4  this time he was the district sales manager

5  for Buffalo and New Castle.

6     Q.     Okay.  So you would have been

7  Patrick's boss at this point in time?

8     A.     Yes, Patrick reported to me.

9     Q.     If you see here, Mr. Kuczynski

10  says:  I am meeting with Weber's Pharmacy on

11  Friday to propose for $250,000 of CAH

12  business.

13          Again, CAH, that's the

14  terminology you guys frequently used for

15  Cardinal Health, right?

16     A.     Correct.  It's their stock

17  ticker, I believe.

18     Q.     Right.

19          The attached pricing model

20  provides an idea of where I'd like to go with

21  this.  CAH is aggressively trying to keep the

22  business.  ABC is also trying to win the

23  business.

24          That's AmerisourceBergen?

25     A.     Bergen.

1    Q.    Bergen, yeah.  Okay.  Which is

2    another one of your competitors, right?

3    A.    They're another national

4    distributor.

5    Q.    Right.

6          We have one crack at this one

7    due to timing and the age of the owners.  I'm

8    taking a two-edge approach to this, win the

9    business or find a buyer, whichever comes

10   first.  So far it looks like they're

11   postponing selling the store.

12         Do you see that?

13   A.    I do.

14   Q.    Now, the concept of winning the

15   business or trying to find a buyer for a

16   pharmacy, is that something you encourage

17   your sales reps to do?

18   A.    Business development, trying to

19   grow their territory is a component of the

20   sales reps' responsibility.  I'd kind of be

21   speculating on the find a buyer comment.

22   Q.    Well, it says that he has a

23   two-edge approach, one edge being win the

24   business, second edge being find a buyer.

25   And then he references in the next sentence

1    that they're postponing selling the store.

2          So the implication obviously

3    being here that if Mr. Kuczynski can't get

4    their business, he's going to try to find

5    somebody to buy the pharmacy, right?

6          MS. HENN:  Objection to form.

7    A.    I mean, it's hard for me to

8    speculate what John was thinking when he

9    wrote this e-mail.  I mean, we do work with

10   our owners from time to time to help them

11   acquire other independent pharmacies to keep

12   that business independent and part of the

13   community.  If these owners were interested

14   in selling the store, trying to find a

15   McKesson customer that might be interested in

16   buying the store could be a strategy we would

17   have explored.

18   BY MR. BOGLE:

19   Q.    But that strategy as outlined

20   in this e-mail would only be considered if

21   Mr. Kuczynski couldn't win the business,

22   right?

23         MS. HENN:  Objection to form,

24   calls for speculation.

25         ///

1    BY MR. BOGLE:

2         Q.     That's option number two.

3                MS. HENN:  Same objection.

4         A.     It's listed second.  I mean, I

5    read this to do that he's running two paths

6    at the same time, whichever comes first.

7    Not --

8                MS. HENN:  This is --

9                MR. BOGLE:  Go ahead.

10        A.     Whichever come first, so not

11   one after the other; whichever one we could

12   accomplish first is how I read this.

13   BY MR. BOGLE:

14        Q.     So win the business or find a

15   buyer, those are the two options he lists,

16   right, for this pharmacy?

17        A.     He said:  I'm taking a two-edge

18   approach to this, win the business or find a

19   buyer, whichever comes first.

20        Q.     During your time as vice

21   president of sales, did you encourage your

22   sales force to try to find new buyers for

23   pharmacies that wouldn't go to McKesson for

24   their business?

25                MS. HENN:  Objection to form.

1        A.        We have a program that works

2    with McKesson owners that are interested in

3    expanding their ownership and acquiring new

4    stores, and if we were aware of our stores

5    that were potentially for sale, owner was

6    retiring or didn't want to be in the business

7    anymore, we would try to marry them with

8    other McKesson customers who would want to

9    acquire that store, keep the store

10   independent, keep the store part of the

11   community, keep it as a McKesson customer.

12              If a competitor store was going

13   to sell, we would try to find a McKesson

14   buyer that might be interested.

15   BY MR. BOGLE:

16        Q.     Okay.  So if a store like this,

17   for example, that was with Cardinal Health,

18   you find out that they're considering

19   possibly selling, your approach would be to

20   try to find a McKesson-sympathetic buyer to

21   help you flip that business, right?

22              MS. HENN:  Objection to form.

23        A.     I don't know that I agree with

24   how the question was framed.  We would try to

25   find a McKesson-friendly buyer, an existing

Highly Confidential - Subject to Further Confidentiality Review

1  customer that we have a relationship with and

2  introduce them to that opportunity to see if

3  that was a fit and they wanted to acquire the

4  store.

5  BY MR. BOGLE:

6      Q.    When it comes to opioid

7  products that McKesson sells, is it the

8  practice of McKesson to only sell opioid

9  products that are FDA approved?

10      A.    I'm not sure.  We sell 20,000s

11  of -- over 20,000 different products in our

12  distribution centers.  I'm not sure of how we

13  decide what to stock and what not to stock.

14      Q.    Okay.  Let me ask you this.

15  Let me back up.

16          You understand, first of all,

17  that opioids in all forms are only available

18  via prescription, right, in this country at

19  least?

20      A.    I mean, my understanding is

21  that all prescription medications, including

22  controlled substances and opioids, are

23  available by prescription.

24      Q.    Right.  And that all substances

25  that are available only via prescription in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this country have to be FDA approved.

 2              Do you understand that?

 3        A.    That's my general

 4    understanding.

 5        Q.    Okay.  So then I go back to my

 6    earlier question, which is -- and I'll

 7    rephrase it a different way:  Do you ever

 8    recall any periods in time where McKesson was

 9    selling opioid products that were not FDA

10    approved?

11        A.    I'm not aware.

12        Q.    Okay.  Do you understand the

13    purpose behind, when it comes to opioids

14    specifically, only selling those that are FDA

15    approved?

16        A.    My understanding that all

17    medications need to be approved by the FDA

18    before they're commercially available to

19    patients and prescribers, so I think it's to

20    protect the population.

21        Q.    Right.  I'm going to hand you

22    what I'm marking as Exhibit 14, which is

23    1.2114.

24              (McKesson-Cavacini Deposition

25        Exhibit 14 marked.)
```

1    BY MR. BOGLE:

2         Q.    All right.  I'm looking at the

3    e-mail on the top of the first page that says

4    McKesson OneStop Generics Newsletter dated

5    March 1, 2008.

6              Do you see that?

7              MR. RALEY:  Is there a Bates

8         stamp?

9              MR. BOGLE:  Yeah,

10        MCKMDL00642308.  Let me reask my

11        question since I jumped in with the

12        Bates number.

13   BY MR. BOGLE:

14        Q.    You see there, this is a

15   newsletter from March 1st, 2008 titled

16   McKesson OneStop Generics?

17        A.    I do.

18        Q.    Okay.  And these sort of

19   newsletters in this time frame are

20   newsletters you would receive, correct?

21        A.    I remember seeing them from

22   time to time, yeah.  The distribution list

23   isn't here, but I do remember seeing similar

24   communications.

25        Q.    I can represent to you that

1    this was produced to us as coming from your

2    custodial file.  Although there is no list of

3    recipients at all, I can make that

4    representation to you.

5         A.    Wouldn't surprise me.

6         Q.    Okay.  Let's take a look at

7    page .4 in this document.

8               You see about two-thirds of the

9    way down the page, it says Product Notices

10   and Reminders?

11              Do you see that?

12        A.    I do.

13        Q.    Below that it says Regarding

14   Products Containing Hydrocodone, and then it

15   says:  On September 28, 2007, the FDA

16   announced its intention to take enforcement

17   action against companies marketing unapproved

18   prescription drug products containing

19   hydrocodone, a narcotic widely used to treat

20   pain and suppress coughs.  In fact, most of

21   the hydrocodone formulations now marketed to

22   suppress coughs have not been approved.

23              Do you see that?

24        A.    I do see where it says that.

25        Q.    And then skipping a paragraph

Highly Confidential - Subject to Further Confidentiality Review

```
 1      and going to the third paragraph, it says:

 2      Anyone marketing unapproved hydrocodone

 3      products labeled for use in children younger

 4      than 6 years of age were required to end

 5      further manufacturing and distribution of the

 6      products on or before October 31, 2007.

 7                  Do you see that?

 8           A.     I do.

 9           Q.     Then the last sentence in that

10      paragraph says:  Following is a list of

11      products on the McKesson OneStop Generics

12      program that are impacted by this decision.

13                  Do you see that?

14           A.     I do.

15           Q.     And below that is a chart that

16      includes one, two, three, four, five

17      different hydrocodone-containing products

18      that it's noted here in this newsletter would

19      be implicated by this FDA mandate, right?

20           A.     That's what it appears to

21      indicate, yeah.

22           Q.     Okay.

23           A.     I'm following.

24           Q.     And McKesson OneStop Generics,

25      I think we talked about that a little bit
```

1    before, that's the sort of ordering program

2    for generic products at McKesson, right?

3            A.      Just to be clear, it's our

4    source program or our proprietary generics

5    program.  The ordering program that we talked

6    about, how customers interface with us was

7    called McKesson Connect.

8            Q.      You're right, you did make that

9    distinction.

10                   So what's indicated here is

11   that prior to this date, these five

12   hydrocodone-containing products were

13   available on McKesson OneStop Generics,

14   right?

15           A.      Prior to which date, the...

16           Q.      Prior to -- well, it's current

17   as of March 31, 2008.  That's the date listed

18   in the chart for each of them, right?

19           A.      And I think -- yeah,

20   manufacturing such products and must cease

21   future shipments and interstate commerce on

22   or before March 2008.  Following is a list of

23   products.

24           Q.      So did McKesson, around this

25   time in 2008, for example, undergo any

1    analysis or investigation of new products to

2    determine whether they were FDA approved

3    before they sold them?

4         A.    I don't know.

5         Q.    Okay.

6         A.    But -- I guess I'm not clear.

7    Is this on distributors and distribution of

8    the products?  I'm not clear the intent.  It

9    seems to talk to manufacturers, marketing.

10        Q.    Right.  So if they can't market

11   or manufacture because it's not approved, do

12   you think you guys should be able to

13   distribute it?

14        A.    I mean, I'm not sure how

15   product that was in the channel, was with

16   distributors already or potentially in

17   pharmacies already, was impacted by these

18   decisions.  I mean...

19        Q.    Well, if it's never been

20   approved, it's never been approved, right?

21        A.    Well, I don't know if it was --

22   if they were never FDA approved or if there

23   was a change either.  I'm not clear on that

24   from this.

25        Q.    What is indicated from the

Highly Confidential - Subject to Further Confidentiality Review

1    first paragraph, from September 28, 2007, the

2    last sentence is:  In fact, most of the

3    hydrocodone formulations now marketed to

4    suppress coughs have not been approved.

5              Do you see that?

6         A.    I do see where it says that,

7    but I don't know if that -- when that took

8    place or if it's true or not.

9         Q.    Okay.  Do you have any reason

10   to specifically think that it's not true, in

11   fact, these were approved?

12        A.    I don't know either way.

13        Q.    Okay.  We talked a little bit

14   earlier in the deposition about sales

15   representatives and their interaction with

16   the regulatory department in increasing

17   thresholds, so I want to talk about that a

18   little more specifically.

19              So you would agree with me that

20   due diligence assessments under the CSMP

21   should never be driven by a customer's sales

22   volume, profitability or strategic importance

23   to the company, should it?

24              MS. HENN:  Objection to form,

25        compound.

1     A.     I don't know that I can say

2    that those would never be any part of any

3    consideration.  I mean, volume could be, and,

4    I mean, I would probably take issue with the

5    customer profitability.

6    BY MR. BOGLE:

7     Q.     Okay.  Well, let me address the

8    compound objection.  Let me ask it

9    separately.

10           Do you agree that due diligence

11   assessments under the CSMP should never be

12   driven by a customer's sales volume with

13   McKesson?

14    A.     I think I'm having issue with

15   the word "driven."  I would agree that they

16   should not be driven, but sales volume could

17   be a component of the analysis that our

18   regulatory team takes into their due

19   diligence.

20    Q.     But you shouldn't -- there

21   should never be a decision to provide or not

22   provide a customer product just based on how

23   much volume they buy from you, right?

24    A.     I think customers' volume,

25   their purchase history, their patterns, their

Highly Confidential - Subject to Further Confidentiality Review

1     total prescription volume, are all

2     information that our regulatory team might

3     take into consideration.

4          Q.     Okay.  You would agree due

5     diligence assessments under the CSMP should

6     not be driven by profitability of the

7     customer for McKesson, right?

8          A.     I think our regulatory team is

9     probably better equipped to speak of what

10    they might think of, but in the spirit of

11    your question, I'm not aware that it ever

12    was.

13         Q.     Yeah.  I'm just asking whether

14    it should be.

15              MS. HENN:  Asked and answered,

16         objection.

17              Go ahead.

18         A.     I'm not sure that it is, and I

19    think it shouldn't be.

20    BY MR. BOGLE:

21         Q.     Okay.  How about the strategic

22    importance of the customer to McKesson,

23    should that be a factor in due diligence

24    decisions in your view?

25              MS. HENN:  Objection to form.

1      A.     I think strategic importance

2    means different things to different people.

3    I think we should make regulatory decisions

4    based on independent, and I think those --

5    the criteria that influence those decisions

6    for our regulatory teams that are responsible

7    for thresholds are pretty clearly spelled

8    out.

9    BY MR. BOGLE:

10     Q.     And we talked about this a

11   little bit earlier, but the sales department

12   should never attempt to influence regulatory

13   decisions regarding increasing thresholds for

14   customers, right?

15          MS. HENN:  Objection to form.

16     A.     I think the program is most

17   effective when we let our regulatory team

18   make independent decisions.

19   BY MR. BOGLE:

20     Q.     Right.  And that includes not

21   having the sales department weigh in or

22   encourage threshold increases for controlled

23   substances like opioids, right?  That should

24   be strictly a regulatory decision, shouldn't

25   it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.
 2        A.     I think as we covered, having
 3    the sales team weigh in, provide information,
 4    perspective, could be part of the analysis of
 5    our regulatory team, but it isn't --
 6    shouldn't have influence.  The team should
 7    make their independent decision.
 8    BY MR. BOGLE:
 9        Q.     Right.  The sales team should
10    not be trying to dictate an outcome under
11    that circumstance, should they?
12                    MS. HENN:  Objection to form.
13        A.     I would prefer that my sales
14    team provide the information and observations
15    requested.
16    BY MR. BOGLE:
17        Q.     And not try to dictate an
18    outcome, right?
19                    MS. HENN:  Objection, asked and
20         answered.
21        A.     Depends which outcome they're
22    pursuing.  If they have a position on the
23    account that we shouldn't do it, they should
24    influence that outcome.  But to the
25    positive...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:

 2         Q.     I'm sorry, you said to the

 3    positive what?

 4         A.     To influence the team to

 5    increase a threshold, I would prefer that

 6    didn't happen.

 7         Q.     Okay.  And why is that?  Why

 8    would you prefer that didn't happen?

 9         A.     I want my regulatory team to

10    make an independent decision based on the

11    facts and information that they have

12    presented to them.

13         Q.     Okay.  In 2010, Pennsylvania

14    would have been within your sales region,

15    right?

16         A.     Yes.  I mean, the eastern half

17    of Pennsylvania, absolutely during 2010.

18    Yeah, all of 2010, I would have had -- I'm

19    sorry, I would have had responsibility for

20    Pennsylvania, coming out of both New Castle

21    and Delran.

22         Q.     Okay.  And a pharmacy in

23    Pennsylvania named Martella's, are you

24    familiar with them?

25         A.     I am.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  How are you familiar

 2   with them?

 3          A.     I'm aware that they became a

 4   customer of ours -- I'm not sure of the exact

 5   year.  I believe it was during my time as a

 6   vice president of sales.  They were a

 7   customer who came to us from another

 8   distributor, regional distributor in

 9   Pennsylvania.

10          Q.     Okay.  I'm going to hand you

11   what I'm marking as Exhibit 15, which is

12   1.1900.  That's MCKMDL00489869.

13                 (McKesson-Cavacini Deposition

14          Exhibit 15 marked.)

15   BY MR. BOGLE:

16          Q.     There you go, sir.

17          A.     Thank you.

18          Q.     Okay.  I actually want to start

19   on the page .2 in this document.  And there's

20   an e-mail towards the bottom -- or starts in

21   the middle of the page, from SharePoint,

22   October 19, 2010.

23                 Do you see that?

24          A.     I do.

25          Q.     Okay.  And the subject is
```

1    Status of Threshold Change Request for

2    Martella's Pharmacy.

3              Do you see that reference?

4         A.    I do.

5         Q.    If you see on this date,

6    there's a change in several controlled

7    substance thresholds, one of which, at the

8    bottom there, is for oxycodone, changing the

9    number to 12,000 doses.

10             Do you see that?

11        A.    This 4-digit number, oxycodone,

12   change this to the number of doses, 12,000.

13        Q.    Right.  And it's noted in the

14   body of the e-mail that this was approved by

15   Dale Nusser at New Castle Distribution

16   Center, and Michael Oriente.

17             Do you see that?  It's the

18   first paragraph here.

19        A.    I do.  I guess I'm just a

20   little confused because .3 seems to have a

21   signature line, Thank you.  Michael.

22             So I mean, I get where it says

23   it comes from SharePoint, but it also looks

24   to be -- have a signature line from Michael

25   Oriente, the director of regulatory affairs,

1    which is confusing to me.

2         Q.     I can't speak to that part.

3    This is how it was produced.

4         A.     Okay.  Yeah.

5         Q.     But I guess, back to my

6    question though:  Do you see where in the

7    body of the e-mail it's noted that this --

8    these increases, including the one we just

9    talked about for oxycodone, were approved by

10   Dale Nusser and Michael Oriente on

11   October 19, 2010.

12              Do you see that?

13        A.     I see where the e-mail states

14   that they were approved by Dale and Michael

15   Oriente.

16        Q.     Okay.  And then if you go to

17   the e-mail above that, there's an e-mail from

18   Dale Nusser to John Kuczynski where he says:

19   Martella's is ready to go for ordering.

20   Michael approved the TCR with no questions.

21              Do you see that at the top of

22   page 2?

23        A.     I do.

24        Q.     Okay.  And then if you follow

25   it up from there, John Kuczynski writes back

Highly Confidential - Subject to Further Confidentiality Review

1    on October 19, 2010 and says:  What about the

2    overall thresholds?  Is he adjusting

3    everything?

4                To which there's a response

5    from Dale Nusser on October 19th above that

6    where he says:  Michael didn't say.  I will

7    keep a close eye on them.  If they do happen

8    to show up on the 80% report, I will do the

9    TCR immediately (if you don't mind).

10               Do you see that?

11        A.     I do.

12        Q.     And this 80% report, that's

13   those threshold warning reports we talked

14   about earlier, right?

15        A.     I'm not a hundred percent sure

16   what is being referenced here as the 80%

17   report.

18        Q.     Okay.  If you see John

19   Kuczynski's response at the very top back to

20   Dale Nusser, he says:  Waiting for an item to

21   show up at 80% isn't going to work.  They

22   omitted on an item yesterday before the 80%

23   report came out.  We need to adjust their

24   numbers across the board.  Please work with

25   Michael to get this issue revolved.  We can't

1    be in a reactionary mode right now with them.

2              Do you see that?

3         A.    I do see where that's written.

4         Q.    Okay.  And I think we talked

5    about this before.  Mr. Kuczynski at this

6    point in time would have been a sales

7    representative that you supervised, right?

8         A.    He would have been on my team.

9    During periods of time Patrick Soos, we

10   talked about, was the district sales manager

11   in that market, he might have been reporting

12   right to Patrick and Patrick reported to me.

13   But would have been in my organization.

14        Q.    Okay.  Now, this last e-mail we

15   read at the top here, do you think it's

16   appropriate for a sales representative to be

17   instructing somebody at the operations level,

18   Dale Nusser in this example, to tell

19   regulatory they need to be proactively

20   increasing thresholds?

21        A.    I don't agree that that's what

22   it said.  He's asking a member of our

23   operations team to work with a member of our

24   regulatory team so that two-check system, to

25   work with Michael and get it resolved, and

Highly Confidential - Subject to Further Confidentiality Review

1    let's try not to be reactionary.

2        Q.    What he says is:  We need to

3    adjust their numbers across the board.

4            Right?

5        A.    I do see where that's written.

6        Q.    Okay.  He says:  We can't be in

7    a reactionary mode right now with them.

8            Right?

9        A.    That's what he wrote.

10       Q.    Okay.  Is that simply providing

11   an observation of what he's seen at the

12   pharmacy, in your view?

13       A.    I think he's encouraging that

14   we work with our regulatory team to try and

15   get the issue resolved.  I'm not sure what

16   else accompanied this.  I'm not sure the

17   reason for the request.

18       Q.    But I thought we just talked

19   about the fact that in your view, your sales

20   team should not be encouraging increased

21   thresholds for any customers.  That should be

22   strictly a regulatory decision, right?

23       A.    And again, it seems that John

24   understood that as well, that it's going to

25   be Michael Oriente's decision here.

1    Q.    Okay.  So as long as it's

2    Michael Oriente's decision ultimately, you

3    think it's okay for the sales representative

4    to attempt to encourage a specific outcome

5    like this of increasing the thresholds across

6    the board?

7    A.    I see what John wrote.  I'm

8    not -- you know, it's hard for me to

9    speculate eight years ago what the other

10   context was and what John was trying to

11   communicate.

12   Q.    So you didn't know the other

13   context was this company -- this customer was

14   threatening to leave you guys if you didn't

15   increase their thresholds?

16        MS. HENN:  Objection to form,

17        lacks foundation.

18   A.    I don't know that I'm aware.  I

19   don't know where we were in our relationship

20   with Martella's in 2010.

21   BY MR. BOGLE:

22   Q.    Well, do you recall Martella's

23   at any point in time threatening to leave you

24   guys if you didn't increase their controlled

25   substance thresholds the way they wanted you

Highly Confidential - Subject to Further Confidentiality Review

1    to?

2         A.    I remember Martella's being a

3    demanding customer.  Most of my interactions

4    with Martella's was around their pharmacy

5    system that they also bought from us and some

6    of their frustration with that as well.

7         Q.    Okay.  Well, let's take a look

8    at Exhibit 16, which is 1.1842, and that's

9    MCKMDL00495740.

10             (McKesson-Cavacini Deposition

11        Exhibit 16 marked.)

12   BY MR. BOGLE:

13        Q.    So you see here I'm looking at

14   the first page.  In the middle of the page is

15   an e-mail from Jennifer Melvin to a group of

16   individuals on October 21, 2010.

17             Do you see that?

18        A.    I do.

19        Q.    This is actually -- if you go

20   back in your previous exhibit, this is the

21   day after where we left off on the previous

22   exhibit.

23             Do you see that?

24        A.    Yeah, October 19th,

25   October 20th, October 21st.

1    Q.    Okay.  So looking at that

2    middle e-mail from Jennifer Melvin, she says:

3    ServiceFirst has began calling on all of the

4    Northeast Region's CSMP 85-99.99% threshold

5    calls this month.  Evidently, Martella's was

6    called by the sales rep last month and then

7    both ServiceFirst and the sales rep this

8    month and is upset that his thresholds are

9    still not where he feels they should be.

10   Today ServiceFirst called on hydrocodone, the

11   account was at 91.85%, so they also would

12   have received a notice on their invoice.

13   ServiceFirst only makes one call per month to

14   the account.

15        And then it says:  We wanted

16   you to know that the account was very unhappy

17   and threatened to pull his business from

18   McKesson.  Please review and see if there's

19   anything else that may need to be looked at

20   regarding his thresholds.

21        Do you see that?

22   A.    I do.

23   Q.    Okay.  And then the e-mail

24   above that, you're a recipient of, right?

25   A.    Looks like it was sent to me,

1    yes.

2         Q.    Right.  And so just kind of

3    understanding how e-mails work, once you get

4    that one, you get to see all the e-mails in

5    the chain below it, right?

6         A.    I mean, I would -- I -- it

7    appears these two e-mails were linked

8    together, if that's the chain you're

9    referencing.

10        Q.    It is.  Okay.

11             So the next e-mail that I'm

12   looking at at the top of the first page is

13   from John Kuczynski, October 22nd, 2010.

14             And in the second paragraph, he

15   says:  I'm meeting with Martella's in about

16   an hour and I'm going to reassure him that we

17   are addressing the issue.  Please make sure

18   every effort is made to adjust their

19   threshold levels prior to them hitting the

20   85% level to prevent omits of SF or -- or SF

21   from calling them.

22             Do you see that?

23        A.    I do.

24        Q.    Okay.  And the concept of

25   omits, do you understand what that means?

1        A.     I believe I do.

2        Q.     Okay.  And what does that mean?

3        A.     My understanding is that if the

4    threshold is set and the customer exceeded

5    that threshold once they hit it, that we

6    would stop shipping the order, that it would

7    omit.  The customer would not receive the

8    product.

9        Q.     So what Mr. Kuczynski is asking

10   for in this e-mail is that every effort be

11   made to increase their thresholds prior to

12   them hitting the 85% mark in a given month to

13   ensure they don't get their orders blocked,

14   right?

15       A.     I see what John wrote, where he

16   says that please make sure every effort is

17   made to adjust their threshold prior to

18   hitting the 85% level and to prevent omits.

19       Q.     And again, this is in the face

20   of the e-mail below from the day before, the

21   customer saying if he didn't get these

22   thresholds worked out in the way he wants

23   them, he's threatening to leave the company

24   as far as business, right?

25       A.     It appears that's what Jennifer

1    was conveying, that the customer stated that,

2    threatened to pull his business from

3    McKesson.

4         Q.    And this would be an instance,

5    for example, in 2010, if Mr. Kuczynski loses

6    this account, he loses a portion of his

7    potential bonus, right?

8              MS. HENN:  Objection to form,

9         lacks foundation.

10        A.    But I guess what I take from

11   this though is that the decision is

12   independent, and our regulatory decision, you

13   know, would have the information, and that

14   lies with them.

15             What the customer said or what

16   John said, I'm not sure that it had any

17   influence on the regulatory decision that

18   appeared Michael Oriente was going to make.

19             MR. BOGLE:  Move to strike as

20        nonresponsive.

21   BY MR. BOGLE:

22        Q.    My question was simply:  In

23   2010, based on the incentive plans we looked

24   at earlier, if this account was lost the way

25   the customer is threatening for you guys to

1    lose it, that would impact Mr. Kuczynski's

2    bonus, wouldn't it?

3         A.    I would say not necessarily.  I

4    mean, if this account left us because he was

5    exerting pressure on the sales team and

6    potentially the regulatory affairs team to

7    make a decision, we didn't make that decision

8    and the customer left us, I would probably

9    consider moving that out of the rep's

10   territory.  We did the right thing.

11        Q.    Okay.  Even during the time

12   frame where there was stated in the plan we

13   looked at earlier to be no exceptions to the

14   loss of customers bonus, the retention bonus?

15        A.    I understand that's what the

16   document said, but I think, as we discussed,

17   that's not my recollection of the practice.

18        Q.    Okay.  So at any rate, we do

19   see Mr. Kuczynski urging people, including

20   people in the regulatory department, to

21   proactively increase these thresholds before

22   they hit the 85% mark, right?

23        A.    Again, I don't believe that's

24   what John said.  He said we can't be in

25   reactionary mode and to please work with

1    Michael to get the issue resolved.

2         Q.    And he specifically -- the

3    e-mail we're looking at here says:  Please

4    make sure every effort is made to adjust

5    their threshold levels prior to them hitting

6    the 85% level to prevent omits.

7              Right?  That's what he says.

8         A.    Please make sure every effort.

9    If we have the right information, if the

10   program supports it, that's a decision for

11   regulatory to make, make every effort that

12   it's done quickly.  But make the -- make the

13   decision regulatory's going to make.

14        Q.    Okay.  Do you see any -- you

15   added a lot of extra language there that

16   doesn't appear in this e-mail, does it?

17        A.    It says:  Please make sure

18   every effort is made to adjust their

19   threshold levels prior to them hitting the

20   80% level and to prevent omits.

21        Q.    Right.  And if you see in the

22   initial e-mail that I read to you, the two

23   items that are showing up in the chart listed

24   below are both hydrocodone.

25              You see that?

1          A.      Yeah, I think the e-mail

2      referenced that they were -- that

3      ServiceFirst had made a call on hydrocodone.

4      There were two hydrocodone products listed.

5          Q.      Right.  So you think in this

6      instance that Mr. Kuczynski was well within

7      his right to urge the regulatory department

8      to increase these thresholds to prevent

9      omits?

10                 MS. HENN:  Objection to form.

11     BY MR. BOGLE:

12         Q.      That that was well within his

13     right as a sales representative.  Is that

14     your testimony?

15                 MS. HENN:  Objection to form.

16         A.      It's hard to look back eight

17     years ago at the context of the e-mail.  I

18     see exactly what John said, and, you know, my

19     regulatory team I'm confident would make an

20     independent decision based on the information

21     they had.

22     BY MR. BOGLE:

23         Q.      But wouldn't you feel more

24     confident if they weren't having people exert

25     pressure on them to make those decisions in

1    one way or the other?

2              MS. HENN:  Objection to form,

3         lacks foundation.

4         A.    As I read the e-mail, it's

5    every effort is made that put this at the

6    priority, do the analysis, make the decision.

7    I cannot -- it's hard for me to speak for

8    John.  Again, it was written ten years ago.

9    I'm looking at one e-mail, but that's how I

10   take it.

11   BY MR. BOGLE:

12        Q.    My question just was:  Wouldn't

13   you feel more comfortable that the decision

14   from regulatory was an independent one if

15   there weren't people in the sales department

16   exerting pressure on them to make a decision

17   one way?

18             MS. HENN:  Objection, asked and

19        answered.

20        A.    I am comfortable it's an

21   independent one.

22   BY MR. BOGLE:

23        Q.    So it's okay for Mr. Kuczynski

24   in your mind to exert the kind of pressure

25   he's doing in this e-mail?

```
1                    MS. HENN:  Objection to form,

2          lacks foundation.

3          A.    I disagree with how -- with the

4    context you're putting around the e-mail.

5    BY MR. BOGLE:

6          Q.    Okay.  So you don't think he's

7    exerting any undue pressure here in that

8    e-mail; is that your testimony?

9          A.    My testimony is I don't believe

10   it would have influence on the decision.

11         Q.    Okay.  That's not my question.

12               My question is:  Do you or do

13   you not believe he is exerting improper

14   influence here?  I'm not asking whether they

15   listened to him or didn't listen to him.  We

16   can ask somebody else about that.

17               I'm asking you whether, as the

18   guy who was supervising him at the time, you

19   think it was appropriate for him to try to

20   exert that kind of influence in an e-mail?

21               MS. HENN:  Objection to form,

22         lacks foundation.

23         A.    It's hard for me to say.  You

24   know, I -- I probably would have written the

25   e-mail differently.
```

1    BY MR. BOGLE:

2        Q.    Okay.  And this specific -- the

3    thresholds for Martella's, do you have an

4    understanding as to what happened to them in

5    the days following this, for hydrocodone?

6        A.    Back in 2010?

7        Q.    Right.  Do you know what

8    happened after this as far as their

9    hydrocodone thresholds?

10       A.    I'm not aware of what decision

11   was made relative to the hydrocodone

12   thresholds.

13       Q.    Okay.  I'm going to hand you

14   what I'm marking as Exhibit 17, which is

15   1.1843, and that's MCKMDL00492040.

16            (McKesson-Cavacini Deposition

17       Exhibit 17 marked.)

18   BY MR. BOGLE:

19       Q.    If you go to the e-mail on

20   page .2, it's again another one from

21   SharePoint.  We're now three days later,

22   October 25, 2010, and the subject is Status

23   of Threshold Change Request for Martella's

24   Pharmacy.

25            Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.        I do, yes.

2        Q.        Okay.  And you see there, below

3    that there are increases to thresholds that

4    were approved on this date for several items,

5    including for hydrocodone being increased by

6    20%.

7                  Do you see that?

8        A.        I see that hydrocodone and

9    several other products are listed here.

10        Q.        And another one specifically is

11    methadone, it also increased by 20%, right,

12    on this date?

13        A.        Methadone is listed as well.

14        Q.        Both opioid products as you

15    understand it, right?

16        A.        I think as I testified earlier,

17    I'm not 100% sure if hydrocodone and

18    methadone are opioids.  I mean, I'm aware

19    they're controlled substances.

20        Q.        Okay.  And then if you go --

21    I'm now on the first page of the document.

22    There's an e-mail from Blaine Snider on

23    October 26, 2010.  It's the second e-mail

24    from the top.

25                  You see where I'm at?

Highly Confidential – Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     And here he's talking to

 3   Mr. Kuczynski, and he says:  Can you get

 4   Michael -- what Michael requested?  The usage

 5   was incomplete.  I believe Dale said

 6   something.  I upped them to about the highest

 7   I've ever done anyone as per previous

 8   e-mails.  Will you be able to call to

 9   discuss?

10             Do you see that?

11          A.     I do see where Blaine wrote

12   that.

13          Q.     And increasing thresholds, is

14   that something that in 2010 would have been

15   routinely done by the operations side of the

16   company rather than regulatory?

17          A.     I can't say for sure what the

18   process was in 2010.

19          Q.     Did folks in operations like

20   Mr. Snider have the authority to increase

21   thresholds by themselves?

22          A.     I'm not sure.

23          Q.     Okay.

24          A.     And I'm also -- I mean, it says

25   I upped them.
```

1      Q.      Right.

2      A.      Okay.  I'm not exactly sure

3  what that refers to, too.

4      Q.      You don't understand that

5  refers to increasing the thresholds, upping

6  the thresholds?

7      A.      I mean, thresholds isn't listed

8  in the e-mail, so, I mean, it's in the

9  subject line.

10     Q.      Right.

11     A.      And it references again that

12  other SharePoint e-mail that says a request

13  on 10/25 was submitted and approved by

14  Michael Oriente, so I -- I mean, I don't know

15  how Blaine's e-mail relates to the one that

16  started the chain that apparently again came

17  from Michael that referenced the hydrocodone

18  increase.

19     Q.      Now, this customer, Martella's,

20  are you aware that just in the past few

21  months the owner of that pharmacy was

22  indicted for diversion of opioids?

23     A.      I'm not aware of the specific

24  timing of when I became aware, but I am aware

25  that the store is facing action and has some

1    charges against it, yes.

2         Q.    Right.  And you know those

3    charges are specifically related to

4    allegations that they've been, for years,

5    diverting opioids, right?

6         A.    I would like to see a copy of

7    the complaint and allegations against the

8    store.

9         Q.    Okay.

10        A.    I'm not --

11        Q.    Okay.  Let's look at a couple

12   of things on this then.  I'm going to hand

13   you first what I'm marking as Exhibit 18,

14   which is 1.1905.  This is a public document,

15   so no Bates number.

16             (McKesson-Cavacini Deposition

17        Exhibit 18 marked.)

18   BY MR. BOGLE:

19        Q.    There you go, sir.

20        A.    Thank you.

21        Q.    You see here this is a press

22   release from November 2nd, 2018 from the

23   Department of Justice.

24             Do you see that?

25        A.    I do, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And the title is

2  Johnstown Pharmacist Charged in 109-Count

3  Indictment with Illegally Creating Bogus

4  Prescriptions and then Dispensing the Drugs.

5          Do you see that reference?

6    A.    Is that -- I don't.  I'm sorry.

7    Q.    Yeah.  It's the title.  It's

8  sort of the bolded title there.

9    A.    Oh, I'm sorry.

10   Q.    I was just reading the bolded

11  title to you.

12   A.    Oh, bogus prescriptions and

13  then dispensing them.

14   Q.    Yeah.  And so it goes on to

15  say:  A Johnstown, PA pharmacist has been

16  indicted by a federal grand jury in

17  Pittsburgh on charges of dispensing and

18  distributing controlled substances and

19  conspiring to distribute and dispense

20  controlled substances, United States Attorney

21  Scott W. Brady announced today.

22          Then skipping down to the third

23  paragraph, it says:  According to the

24  indictment presented to the court, Martella

25  owned and operated Martella's Pharmacy

Highly Confidential - Subject to Further Confidentiality Review

```
1    located on Franklin Street in Johnstown.

2              That's the same pharmacy we've

3    just been talking about from these 2010

4    e-mails, right?

5         A.    I'm aware that the Martella's

6    that was our customer had locations in

7    Johnstown.  I'm not familiar with the

8    Franklin Street.  I don't know the address of

9    the pharmacy.

10        Q.    Do you have any reason to

11   disagree that this is the same pharmacy we

12   were just talking about in these 2010

13   e-mails?

14        A.    I do not.  I believe it is.

15        Q.    Okay.  The indictment alleges

16   that Martella, a pharmacist, conspired with

17   Dr. Peter James Ridella, who previously

18   pleaded guilty, and an individual named as

19   J.R., to create and submit unlawful

20   prescriptions for oxycodone; oxycodone and

21   acetaminophen, also known as Percocet;

22   oxymorphone, also known as Opana; morphine

23   sulfate, also known as MS Contin; and

24   hydrocodone and acetaminophen, also known as

25   Vicodin, and then unlawfully dispensed those
```

1    controlled substances to other persons.

2              Do you see that?

3    A.    I do.

4    Q.    It says:  The law provides for

5    a maximum per count sentence of 20 years in

6    prison and a fine of a million dollars or

7    both.

8              Do you see that there?

9    A.    I do.

10   Q.    And what was laid out in this

11   indictment covered a large period of time

12   that this -- that Martella's was a customer

13   of McKesson, right?  Are you aware of that?

14             MS. HENN:  Objection, lack of

15        foundation.

16   A.    I don't know that.  I don't

17   know -- I don't see that there's any dates or

18   time periods referenced here in the document

19   in front of me.

20   BY MR. BOGLE:

21   Q.    All right.  I'm going to hand

22   you what I'm marking as Exhibit 19, which is

23   1.1904, and again, this is a nonproduction

24   document so no Bates number.

25             (McKesson-Cavacini Deposition

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Exhibit 19 marked.)

 2   BY MR. BOGLE:

 3        Q.      So what I have for you here is

 4   the actual indictment for Mr. Martella.  You

 5   see this is -- the stamp filed date on this

 6   is October 30, 2018.  Do you see that kind of

 7   in the right-hand side of the page?

 8        A.      10/30/18.

 9        Q.      Yeah.  Either spot says the

10   same thing.

11        A.      Fine.

12        Q.      So getting to the issue of how

13   long this conduct had been ongoing per the

14   indictment, if you can go to the last page of

15   the document, page 10.

16              You see here in the second

17   paragraph it indicates that the illegal

18   dispensing of all the opioid products I just

19   read to you occurred from April 2011 and

20   continued thereafter to in or around

21   June 2016.

22              You see that?

23        A.      I do see where it says from in

24   and around April 11 to June 2016.

25        Q.      And that entire period of time
```

```
 1    Martella's was a customer of McKesson, right?

 2                 MS. HENN:  Objection, lacks

 3          foundation.

 4          A.     I'm not sure.

 5    BY MR. BOGLE:

 6          Q.     Are you aware of, if they

 7    weren't, when the account was closed?

 8          A.     I'm not.

 9          Q.     Okay.  Per the e-mails we just

10    looked at, they clearly were a newly

11    onboarded customer as of 2010, late 2010,

12    right?

13                 MS. HENN:  Objection, lacks

14          foundation.

15          A.     I don't know that that was

16    referenced anywhere in the e-mail, when they

17    started with us or when our relationships

18    with Martella's started.

19    BY MR. BOGLE:

20          Q.     We can go back to them if we

21    need to, but the e-mails that we looked at

22    show that as of late 2010, they're certainly

23    a customer of McKesson's, right?

24          A.     I think it shows that as of

25    2010 we had a relationship with Martella's
```

Highly Confidential - Subject to Further Confidentiality Review

1    Pharmacy.

2         Q.    Right.  And a relationship that

3    included providing them opioid products,

4    right?

5         A.    Based on what I saw here, it

6    appeared we had thresholds set for controlled

7    substances.  I don't know what we shipped

8    them.

9         Q.    Okay.  But we saw, certainly in

10   e-mails we looked at, increasing of

11   thresholds for these two different opioid

12   products, methadone and hydrocodone, right?

13        A.    The e-mail on 10/25 states that

14   a threshold increase had been approved on

15   five products, two of which were hydrocodone

16   and methadone.

17        Q.    So after this e-mail exchanges

18   we went through in October 2010, do you have

19   a specific awareness of McKesson thereafter

20   ceasing selling to Martella's?

21        A.    I'm not aware of our history

22   and relationship with Martella's and how it

23   evolved over time.

24        Q.    Okay.  Just to close this final

25   point then, let me hand you what I'm marking

```
 1    as Exhibit 20, which is 1.1902.

 2              (McKesson-Cavacini Deposition

 3         Exhibit 20 marked.)

 4    BY MR. BOGLE:

 5         Q.     This is MCKMDL00340046.  Sorry.

 6         A.     Thank you.

 7         Q.     Okay.  So I just asked you

 8    about whether, leading up to this indictment,

 9    Martella's was a customer of McKesson.  You

10    see here this is an investigative report

11    dated December 15, 2016.

12              Do you see that?

13         A.     Yeah, I don't know that I've

14    seen this document before, but I do see where

15    it says Regulatory Investigative Report and

16    it's dated December 15th, 2016.

17         Q.     Yeah.  And I'm only showing you

18    this to deal with the issue of whether they

19    were a customer or not.

20         A.     Okay.

21         Q.     In the Details section, it

22    says:  This report is in reference to a DEA

23    administrative subpoena received on

24    December 13, 2016 for all invoicing records

25    for Martella's Pharmacy from January 1, 2015
```

1      through November 30, 2016.

2              And then it lists the address,

3      which is the same address that we just saw on

4      the DOJ press release, right, the Franklin

5      Street address.

6          A.    I don't know what the number

7      was in, but Franklin Street in Johnstown, PA.

8          Q.    So this indicates at least here

9      that the DEA believed they were a McKesson

10     customer at least from 2015 to 2016 or they

11     wouldn't have presumably subpoenaed the

12     records, right?

13             MS. HENN:  Objection to form,

14         calls for speculation.

15         A.    I don't know what the DEA

16     believed.  It clearly states the DA sent us a

17     subpoena for that time.

18     BY MR. BOGLE:

19         Q.    Right.  And the DEA can

20     specifically see, for example, controlled

21     substance sales that you would have made to

22     Martella's during that time frame through

23     ARCOS data, right?

24         A.    I believe we submit our ARCOS

25     data which gives the DEA a view of every sale

1    that we make to every customer.

2        Q.    Right.  Including to Martella's

3    during the time frame referenced here, right?

4        A.    I would assume that Martella's

5    was included in our ARCOS submissions if they

6    were a customer.

7        Q.    Okay.  And we've talked about

8    sales activities from the sales force itself

9    in selling McKesson as a company and the

10   products they offer, but there's another

11   component to sales and marketing at McKesson

12   that includes marketing manufacturers'

13   products to customers, right?  Specific

14   marketing of manufacturers' products to

15   pharmacy customers, right?

16       A.    I mean, I'm aware of programs

17   where we work with manufacturers to provide

18   information and access to our pharmacy

19   customers, deliver messaging.  So if that's

20   marketing, yes.

21       Q.    Yeah.  And you're aware that

22   over the time you've been with the company,

23   there have been various deals struck for

24   opioid products for the sales and marketing

25   arms of McKesson to market for manufacturers'

1    opioid products, right?

2              MS. HENN:  Objection to form.

3         A.     You know, I don't recall, and I

4    don't know that I've been involved in the

5    negotiations of those specific programs and

6    what programs might be involved, what

7    products might be involved in those programs.

8    BY MR. BOGLE:

9         Q.     Yeah.  And we'll get to the

10   specific marketing arrangements.  I just want

11   to just start with the preface that you

12   understand that these sort of marketing

13   agreements have been made for opioid products

14   while you've been at the company, right?

15             MS. HENN:  Objection --

16   BY MR. BOGLE:

17        Q.     You've been privy to that

18   information, haven't you?

19             MS. HENN:  Objection to form,

20        vague and compound.

21        A.     I'm not sure that I could list

22   any of the products that were ever included

23   in any of the campaigns that we did with our

24   pharmacy customers.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:

2         Q.    Okay.  Well, let me just hand

3    you this.  Exhibit 21 which is 1.2137.

4    That's MCKMDL00695128.

5              (McKesson-Cavacini Deposition

6         Exhibit 21 marked.)

7              MS. HENN:  And we're again at

8         an hour, so if you want to take a

9         break.

10             MR. BOGLE:  I'm on a new

11        subject.  That's fine.

12             MS. HENN:  Yeah.

13             THE VIDEOGRAPHER:  Okay.  We're

14        off the record at 2:06 p.m.

15             (Recess taken, 2:06 p.m. to

16        2:15 p.m.)

17             THE VIDEOGRAPHER:  Back on the

18        record at 2:15 p.m.

19   BY MR. BOGLE:

20        Q.    Okay.  Mr. Cavacini, we had

21   left off, as I recall it, starting a

22   discussion about McKesson's activity in

23   marketing opioid products for manufacturers.

24             Do you recall us talking about

25   that generally?
```

```
 1              A.     I remember you asking questions

 2      along that line.

 3              Q.     Right.  Okay.  So I just marked

 4      Exhibit 21, which is 1.2137.  That's

 5      MCKMDL00695128.

 6                     And, Mr. Cavacini, what I've

 7      given you here is a series of e-mails.  We're

 8      going to kind of start in date order, which

 9      means towards the back, so starting at

10      page .3.

11                     At the bottom of this page is

12      an e-mail from the SMS Analytics Group,

13      November 7, 2013, to a Dale Harris and a

14      Meredith Hardee, subject being Campaign

15      3578-AMI-Mallinckrodt Hydrocodone has been

16      released.

17                     Do you see that?

18              A.     I do, yes.

19              Q.     Okay.  And in the body of the

20      e-mail it says:  McKesson OneStop Generics

21      Campaign 3578-AMI-Mallinckrodt Hydrocodone,

22      has been launched.  The campaign will be

23      effective from 11/8/2013 through 11/15/2013.

24                     And then it goes on to describe

25      the campaign.  It says:  Inform ISMC
```

1    customers with purchase history of Watson

2    hydrocodone of the savings on Mallinckrodt

3    hydrocodone.  There were supplier-initiated

4    price increases of 10 to 30% on A/C-slot

5    Watson hydrocodone.

6              What does A/C-slot stand for?

7         A.    I believe it stands for

8    alternate choice.

9         Q.    Okay.  A/C-slot Watson

10   hydrocodone in the last couple of months, on

11   top of an already higher price compared to

12   Mallinckrodt A-slot equivalents.  Combine

13   campaign message with industry news regarding

14   FDA recommendation on high-dosage

15   acetaminophen combination drugs.

16             And then there's a main

17   objectives after that, and there's a couple

18   of bullet points I want to look at.

19             The fourth one says:  Convert

20   Watson sales to Mallinckrodt.  And then it

21   says:  Explain how purchasing generics from

22   McK can increase profitability.

23             Do you see that?

24        A.    I do, in addition to the other

25   bullet points in front and after, but --

1     Q.     Sure.  Sure.

2            Then there's some e-mails that

3     follow this introduction of this company.

4     There's an e-mail from Dale Harris back that

5     says:  Thought you might like to see that

6     we're pushing hydrocodone with our ISM calls

7     again.

8            To which Tom Smith on

9     November 8th, 2013 responds:  This is silly.

10           Do you see that?

11    A.     I do see where Dale and Tom

12    wrote that.

13    Q.     And Tom's e-mail on November 8,

14    2013 actually copies you at that point,

15    right?

16    A.     Appears he did, yes.

17    Q.     Okay.  And your job as of that

18    time frame would have been as vice president,

19    general manager in Memphis, right?

20    A.     Correct.

21    Q.     Okay.  And then you actually

22    respond to his e-mail on page .2 at the

23    bottom.  Do you see that response from

24    November 8, 2013?

25    A.     I see where I forwarded it to

1    Susan.  I don't know that I responded to Tom.

2    I don't see that.

3         Q.    No, what I'm saying is you sent

4    an e-mail to Susan Petrus on November 8, 2013

5    about this same subject.

6              Do you see that?

7         A.    Yes, I'm sorry.  I thought you

8    said where I responded to Tom.  I don't see

9    that.

10        Q.    If I did, that's not what I

11   meant to say, so that's fine.

12        A.    Okay.

13        Q.    In the third sentence there,

14   you say:  I kind of agree with Tom - the

15   timing is less than optimal and our ISMs need

16   to be prepared for some tough customer

17   reaction.  I agree with the concept of this

18   campaign, just question the timing.

19             Do you see that?

20        A.    I do see where I wrote that.

21        Q.    Why in your view is the timing

22   less than optional to do such a campaign

23   for Mallinckrodt hydrocodone?

24        A.    As I think back to this time

25   frame, I believe it was at a time where we

1    had made some changes to our threshold

2    programs, how we were calculating those

3    thresholds and adjustments for certain

4    customers, and, you know, it seems to be that

5    my concern was that the ISMs might be calling

6    on an awareness campaign, making customers

7    aware of a lower-priced alternative.  There

8    were some that were probably feeling

9    frustration because the thresholds had been

10   adjusted.

11        Q.    And the ISMs are the

12   independent pharmacies, is that right,

13   independent, small-mediums?

14        A.    Well, ISMC, right, would be

15   independent small-medium chains, our

16   community pharmacy customers.

17        Q.    Right.  All right.  And then

18   Susan Petrus responds on November 8th, 2013

19   above that.  She says:  My understanding is

20   that we should not be doing any campaigns on

21   controlled substances.  Apparently, our

22   process for preventing this is not fool

23   proof.  We need to understand where the

24   breakdown is and fix it.  Also, pull back on

25   this campaign.

1          Do you see that?

2     A.    I do.  And Josh followed up, it

3     hadn't even started yet and wouldn't start,

4     so...

5     Q.    So on this -- well, first off,

6     Susan Petrus, what was her job role at this

7     time?

8     A.    Susan currently leads, you

9     know, our sales effectiveness and customer

10    care groups.  I believe she had the same role

11    at the time.  I don't believe her

12    responsibilities have changed much in the

13    last five to six years.

14    Q.    Would she be someone overseeing

15    campaigns like this for a manufacturer of

16    products?

17    A.    I think the teams that would

18    have made the calls, our customer care teams,

19    would have been under her responsibility.

20    The actual formation of the campaigns, I

21    don't believe so but can't say for sure.

22    Q.    So at this point in 2013, was

23    there an internal policy not to do

24    promotional campaigns on controlled

25    substances?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I mean, Susan seems to indicate

2    that was her understanding.  It's hard for me

3    to say.

4      Q.      Okay.  Now, so if we go to the

5    first page at the bottom, there's an e-mail

6    from an Allegra Riley back to Susan and

7    others, including you, where it's stated:

8    You are correct that we cannot campaign

9    controlled substances.

10             Do you see that?

11     A.      She's responding to Susan and

12   she states that.

13     Q.      Okay.  And then you actually

14   respond at the top of this e-mail chain again

15   and say:  If we agree that this type of

16   awareness campaign is acceptable (it might

17   be), I just think the timing is not right.

18             Do you see that?

19     A.      I do, and I think Allegra also

20   stated in her e-mail that we didn't view this

21   as a campaign, you know, because she says we

22   are not incenting our customers to purchase

23   more with any type of discount.

24             This was informational as I

25   read it, that in the first e-mail that you

1    read that there was a pricing activity taken

2    by one manufacturer, a price increase, and we

3    were making customers aware that had

4    purchase -- purchase history of these items

5    that there was a lower-priced alternative.

6              And it seems to be the feeling

7    that this type of an awareness campaign is

8    appropriate or was appropriate at the time,

9    and I wasn't -- if I read my e-mail again,

10   not saying one way or the other.  I just

11   thought that the timing relative to the

12   changes in thresholds we had made for

13   customers probably was going to set our

14   customer service team up for some hard

15   conversations.

16        Q.    And the threshold changes

17   you're referring to are in response to the

18   DEA investigation of McKesson that was going

19   on in November 2013, right?

20        A.    I'm not aware of the

21   connection --

22        Q.    Okay.

23        A.    -- one way or the other.

24        Q.    You don't know what prompted

25   those changes in late 2013?

1          A.     No, we were constantly

2    evaluating and evolving our program.

3          Q.     Okay.  But you don't recall any

4    specific changes in late 2013 in response to

5    DEA investigation of McKesson as to its

6    opioid distribution activities?

7          A.     I remember --

8                 MS. HENN:  Objection, asked and

9          answered.

10                Go ahead.

11         A.     I remember changes in 2013.  I

12   mean, I think it was the summer of 2013 as I

13   reflect back on that time frame.  But I'm not

14   aware of any connection or correlation or

15   what the motivation was for those changes.

16   BY MR. BOGLE:

17         Q.     So were you aware that McKesson

18   was being investigated by DEA at this point

19   in time, in November 2013?

20                MS. HENN:  Objection, lacks

21         foundation.

22         A.     You know, I'm not sure at that

23   moment what I was aware of and when I became

24   aware of it.

25                ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:

 2         Q.    And this campaign, this

 3    proposed here that we've gone through, is

 4    certainly intended to have McKesson encourage

 5    customers to at the very least switch to the

 6    Mallinckrodt version over at least the Watson

 7    version of hydrocodone, right?  That's what's

 8    laid out in the first e-mail we read, isn't

 9    it?

10              MS. HENN:  Objection to form.

11         A.    I take it that we were trying

12    to make them aware that there was a

13    lower-priced alternative on an equivalent

14    product, and let them make their decision.

15    It does say convert Watson sales to

16    Mallinckrodt, the lower-priced product.

17    BY MR. BOGLE:

18         Q.    Were you aware that well prior

19    to 2013 the DEA had a longstanding view that

20    promotion of controlled substances should not

21    be done by distributors?

22              MS. HENN:  Objection to form,

23         lacks foundation.

24         A.    I'm not aware of the DEA's

25    position, no.
```

```
1    BY MR. BOGLE:

2         Q.      Okay.   That was never conveyed

3    to you?

4                 MS. HENN:   Same objection.

5         A.      I don't remember specific

6    conversations relative to promotion, but, you

7    know, this one was an awareness campaign, as

8    I think it was described.

9    BY MR. BOGLE:

10        Q.      Does McKesson currently engage

11   in promotional activities for opioid

12   manufacturers?

13        A.      I don't know.

14        Q.      Is that not under your umbrella

15   as COO?  Would the people doing that not

16   report up to you ultimately?

17        A.      No.  Our brand management teams

18   and our marketing teams do not report up

19   through me.

20        Q.      Who do they report up through?

21        A.      Marketing, our U.S. Pharma

22   marketing team reports to Wendy Brauner, and

23   I believe brand and product management

24   currently reports to Chris Dimos.

25        Q.      Can you spell that last name on
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     that one?

2          A.     Dimos, D-I-M-O-S.

3          Q.     Are you familiar with the

4     concept of chargebacks?

5          A.     Generally, yes.  Not an expert.

6          Q.     Okay.  I'm sorry.  Make sure

7     you're finished with your answer.

8                 What is your working

9     understanding of what a chargeback is?

10         A.     That there can be a list price

11    and a contract price for a product, and then

12    the chargeback reconciles the difference

13    between the list price and what is actually

14    paid.

15         Q.     Okay.  Do you have any

16    awareness of the exchange of sales

17    information with McKesson and the

18    manufacturer for whom the product is sold?

19                MS. HENN:  Objection to form,

20         vague.

21                THE WITNESS:  Could you repeat

22         the question.

23                MR. BOGLE:  Yeah.

24    BY MR. BOGLE:

25         Q.     So, for example -- let me back
```

1    up and start from a different spot.

2          A.     Okay.

3          Q.     Are you aware that McKesson

4    enters into agreements with manufacturers for

5    whom they sell their products to provide them

6    information about the people they're selling

7    the products to?

8          A.     I would say I think I have a

9    general understanding that some of our

10   agreements with manufacturers involve some

11   data rights, where we would share purchase

12   history back with the manufacturer.  I'm not

13   sure what exact information is included

14   there, at what level and for what

15   manufacturers.

16         Q.     Okay.  Have you ever been

17   involved in structuring those sort of

18   agreements which would outline the

19   information shared between McKesson and

20   manufacturers along those lines?

21         A.     Personally, no.

22         Q.     Okay.  Do you know who does

23   that at McKesson?

24         A.     I think it happens in several

25   different places for branded products.  It's

1    probably a combination of that team that

2    leads -- reports up to Chris Al- -- I'm

3    sorry, to Chris Dimos.

4         Q.    Okay.

5         A.    And then probably for some

6    branded and generics it could be the teams

7    that report up to Chris Alverson.

8         Q.    Okay.  We had talked a little

9    earlier in general terms about the opioid

10   epidemic, and I wanted to talk more

11   specifically with you about that.

12            Do you have an awareness that

13   more than 350,000 people have died due to

14   opioid overdoses since 1999?

15            MS. HENN:  Objection, lacks

16       foundation.

17       A.    I don't know that I'm familiar

18   with that specific number.

19   BY MR. BOGLE:

20       Q.    Okay.  I'm going to hand you

21   what I'm marking as Exhibit 22, which is

22   1.2060.  This is a public document, so no

23   Bates number.

24            (McKesson-Cavacini Deposition

25       Exhibit 22 marked.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BOGLE:  Sorry.  They tell
 2          me to bring a certain number, so I'm
 3          trying to comply.
 4                    MS. HENN:  You can take that
 5          back to Florida.
 6                    MR. BOGLE:  I'm trying to
 7          comply.
 8    BY MR. BOGLE:
 9          Q.    Okay.  Mr. Cavacini, what I
10    just handed you is titled Red Flags and
11    Warning Signs Ignored:  Opioid Distribution
12    and Enforcement Concerns in West Virginia
13    prepared by the Energy and Commerce
14    Committee, Majority Staff, of the House of
15    Representatives in Congress.
16                    Do you see that?
17          A.    I do.
18          Q.    Okay.  And it's dated
19    December 19, 2018.  Do you see that at the
20    bottom?
21          A.    I do.
22          Q.    Have you seen this report?
23          A.    I don't believe I have, no.
24          Q.    Okay.  Is there any system at
25    McKesson for individuals like yourself,
```

1    high-ranking senior individuals, to receive

2    information related to opioid-related news as

3    it comes out?

4         A.    Not a structured or formal

5    process that I'm aware of, no.

6         Q.    Okay.  I guess what I'm asking

7    is:  Do you guys have any service that you

8    sign up for that flags new articles or

9    publications like this related to opioids

10   that are then sent up to senior management?

11        A.    Not that I'm aware of.

12        Q.    Okay.  Let's go to page .5 of

13   this document.  There's an executive summary

14   here on this page.  The first line says:  The

15   opioid epidemic is the worst drug crisis in

16   America's history.  According to the Centers

17   for Disease Control and Prevention, more than

18   351,000 lives have been lost to opioid

19   overdoses since 1999, with no signs of

20   abating.  Far more people die from the misuse

21   of opioids in the United States each year

22   than from road traffic accidents or violence.

23   Public health officials are alarmed that the

24   opioid problem has helped drive a decline in

25   U.S. life expectancy at a time frame when

1    life expectancy is improving in many places

2    around the world.

3              Do you see that?

4         A.    I do.

5         Q.    Okay.  So let's handle these

6    sort of one by one.  The stat of more than

7    350,000 people having died from drug opioid

8    overdoses since 1999, is that a statistic you

9    were aware of prior to today?

10        A.    I don't know that I could have

11   quoted that number prior to seeing it here.

12        Q.    How about that more people die

13   from opioids every year than traffic

14   accidents or violence, is that something you

15   were familiar with?

16        A.    I don't believe I had heard

17   that statement before.

18        Q.    How about that the opioid

19   epidemic has helped drive a decline in U.S.

20   life expectancy, is that something you were

21   aware of?

22        A.    Again, I don't believe I had

23   heard that stated that way.

24        Q.    Okay.  But you are aware that,

25   for example, since 1999, there has been a

1    consistent increase in opioid deaths in this

2    country, right?

3              MS. HENN:  Objection, lacks

4         foundation.

5         A.    I'm not 100% sure of the exact

6    timeline of the studies I have seen, but I

7    have seen statistics that indicate opioid

8    abuse and deaths are rising.

9    BY MR. BOGLE:

10        Q.    Okay.  And have you taken a

11   look at any of the McKesson sales information

12   of opioids, for example, in the last eight to

13   ten years as to whether that number has been

14   going down, steady, increasing over time?

15        A.    I haven't.

16        Q.    Okay.  Is that information that

17   McKesson collects to look at by anyone that

18   you're aware of?

19              MS. HENN:  Objection to form.

20        A.    I'm not sure.  I haven't seen

21   our sales broken out and categorized that

22   way.

23   BY MR. BOGLE:

24        Q.    Would it surprise you that as

25   the opioid epidemic has increased, progressed

Highly Confidential - Subject to Further Confidentiality Review

1   over the last ten years, that so have

2   McKesson's sales of opioids in the United

3   States?

4       A.    I think over the period of time

5   that I've been with the company, our total

6   sales and revenue has grown pretty

7   significantly, so I'm not aware of specific

8   categories, but, no, I don't know that I

9   would be surprised that our sales of all

10  products, over-the-counter, controlled

11  substances, have grown over the last 10 to

12  15 years of my career.

13      Q.    Okay.  Well, I'm going to hand

14  you what I've marked as Exhibit 23 to your

15  deposition, which is a chart that we've put

16  together -- oops, I think I may have handed

17  you -- did I hand you one of mine with the

18  writing on it?  I did.  Yeah, okay.  If you

19  want that one.

20           (McKesson-Cavacini Deposition

21      Exhibit 23 marked.)

22  BY MR. BOGLE:

23      Q.    So I put together a chart here

24  using the ARCOS data that we have in our

25  possession that charts out McKesson's sale

Highly Confidential - Subject to Further Confidentiality Review

1    and shipments of opioids from 2006 to 2014 in

2    the United States, and that's what I've

3    handed you here, sir.

4              So, for example, if we look at

5    this -- and you see this first of all is

6    conveyed on the left-hand in thousands, these

7    numbers?

8        A.    Okay.

9        Q.    You see that?

10       A.    I do see that.

11       Q.    Okay.  So, for example, it's

12   indicated in 2006 there are two -- there were

13   2 million thousands, which is the equivalent

14   of 2 billion, doses of opioids distributed in

15   the United States by McKesson.  You see that?

16             MS. HENN:  Objection, lacks

17        foundation.

18       A.    I see where the chart says

19   that, yes.

20   BY MR. BOGLE:

21       Q.    Okay.  And if you follow the

22   chart up, for example, there is a steady

23   progression in shipments from 2006 to 2014,

24   isn't there?

25             MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:
2         Q.    It continues to go up, doesn't
3    it?
4                MS. HENN:  Lacks foundation.
5         A.    Not equally.  2014 is higher
6    than the 2006 number on this chart.  The
7    bar's taller.
8    BY MR. BOGLE:
9         Q.    Right.  For example, if you
10   look at eight years later in 2014, there are
11   nearly 3.5 billion dosage units distributed
12   by McKesson in the United States.
13               Do you see that?
14               MS. HENN:  Objection, lacks
15       foundation.
16        A.    It seems to be short of 3.5,
17   but the reference of the bar seems to be
18   close to the axis of 3.5.
19   BY MR. BOGLE:
20        Q.    Okay.  So based on your
21   testimony a minute ago, this doesn't surprise
22   you, though, does it, that the increase --
23   there's been a steady increase in the last
24   eight years from 2 billion to nearly
25   3.5 billion dosage units in the United States
```

Highly Confidential - Subject to Further Confidentiality Review

1    for McKesson as it pertains to opioids.

2    That's not a surprising figure to you, is it?

3                 MS. HENN:  Objection, lacks

4         foundation.

5         A.    No.  I mean, I would have to

6    understand what was happening with our

7    customers and our mix and our total business

8    during this time, but, I mean, if that is

9    roughly a 50% increase, is that -- you know,

10   from two to three, I'm trying to think back.

11                I believe the company has more

12   than doubled during this same horizon in

13   total sales.  So we've acquired new

14   customers.  We've grown share.  So I don't

15   know that this is surprising.

16        Q.    Okay.  So the notion that as

17   the epidemic has worsened and more and more

18   people have died from the opioid epidemic,

19   and that seems to correspond pretty well with

20   increased shipments of opioids by McKesson in

21   the United States, that doesn't concern you

22   at all?

23                MS. HENN:  Objection to form,

24        lacks foundation.

25        A.    I would need more information.

Highly Confidential - Subject to Further Confidentiality Review

1  I don't know that I can make the connection,

2  and I'm trying to think back to big shifts

3  with customers and when we started our

4  relationship with the VA, for example, and

5  how that might have influenced this.

6          On the fact that for periods of

7  time it was relatively flat or maybe even

8  declining.  But the fact that these sales in

9  certain categories are -- of products seem to

10  correlate to our overall growth, I don't know

11  that it's surprising.  I --

12  BY MR. BOGLE:

13      Q.    Well -- go ahead.

14      A.    No.

15      Q.    Has there ever been any

16  discussion that you've been privy to at

17  McKesson of capping the number of opioid

18  shipments made to the customers in this

19  country at a certain level every year?

20          MS. HENN:  Objection to form.

21      A.    That McKesson cap it?

22  BY MR. BOGLE:

23      Q.    Uh-huh.  Right.  That you set a

24  certain quota at which you don't exceed under

25  any circumstances in a given year for

Highly Confidential - Subject to Further Confidentiality Review

```
1    opioids.  Has that ever been discussed?
2         A.     My understanding is that the
3    DEA sets the quota for the number of products
4    that can be manufactured, and they adjust
5    that number each year.  I don't recall that
6    I've ever been part of a conversation in
7    McKesson to set a quota or a cap.
8         Q.     Yeah, so I'm not talking with
9    the DEA; I'm talking about McKesson.  I'm
10   talking about are you aware of any discussion
11   within McKesson of saying, listen, we
12   understand the opioid epidemic is getting
13   worse and worse and worse out there.  One way
14   that we can help that is to ship less
15   opioids, and we're going to set a cap on
16   ourselves to make sure in a given year we
17   don't ship over a certain number.
18              Are you aware of any
19   discussions like that?
20              MS. HENN:  Objection to form.
21        A.     I think about these products,
22   and these are, you know, FDA-approved
23   medications that provide a legitimate medical
24   purpose for patients that are in need, and
25   our job is to fill orders from pharmacies
```

1    that are theoretically pursuant to

2    prescriptions that were written by doctors

3    and presented in a pharmacy.

4              No, I've never been part of a

5    conversation around a cap and would be

6    concerned about the impact of patient care

7    and relationship between a doctor and a

8    patient and a pharmacist and a patient.

9    BY MR. BOGLE:

10        Q.    Do you have any understanding

11   of whether there's even legitimate efficacy

12   as far as pain and pain reduction for

13   opioids?

14              MS. HENN:  Objection.

15   BY MR. BOGLE:

16        Q.    Have you ever seen any efficacy

17   profile of the drug?

18              MS. HENN:  Objection to form,

19        lacks foundation.

20        A.    I'm not a physician or a

21   pharmacist.  Those are decisions that are

22   made between healthcare professionals.

23   BY MR. BOGLE:

24        Q.    Right.  And that's what --

25   you're talking about patient care and making

1  sure patients get what they need.  I'm just

2  asking what you know about the efficacy of

3  the drug -- class of drugs.

4      A.    My understanding is that these

5  are legitimate, legal, approved medications

6  and many patients, you know, benefit from

7  them.

8      Q.    You understand that many

9  patients benefit from them?  Where do you

10  have that knowledge?

11      A.    I lost my father to lung cancer

12  when I was 19 years old and I watched the

13  pain he was in at end of life and how he was

14  treated, and I believe that these products

15  brought him comfort when he was suffering

16  deeply.

17      Q.    Okay.  Any other medical

18  knowledge that you have on the point?

19      A.    No, I said clearly I'm not a

20  physician, I'm not a medical professional.

21      Q.    Okay.  And so the notion that

22  the -- there's been a steady increase of

23  opioid sales in the United States by McKesson

24  from 2006 to 2014, are you aware of any

25  discussions that maybe we want less blood on

1    our hands as far as people dying out there

2    from this epidemic?

3              MS. HENN:  Objection --

4    BY MR. BOGLE:

5         Q.    So maybe we're going to sell

6    less of this stuff?

7              MS. HENN:  Objection to form,

8         lacks foundation.

9    BY MR. BOGLE:

10        Q.    Are you aware of any discussion

11   along those lines?

12             MS. HENN:  Same objections.

13        A.    I'm not aware of any

14   discussions of where we have had discussions

15   around caps or limiting these products and

16   believe that those decisions should be made

17   between a medical professional and a patient.

18   BY MR. BOGLE:

19        Q.    As to how much you ship?

20        A.    As to how much is prescribed

21   and ultimately how much is ordered.

22        Q.    Okay.  But you -- McKesson --

23   when I say you, I don't mean you,

24   Mr. Cavacini.  You, the McKesson Corporation,

25   can make decisions on how much of any product

Highly Confidential - Subject to Further Confidentiality Review

1    they are willing to ship, right?  That's

2    within the company's purview to decide,

3    right?

4                    MS. HENN:  Objection to form,

5         asked and answered.

6         A.    But I think it is a balance

7    between making sure that these products are

8    available to patients who need them when they

9    need them, all the medications that we

10   provide.

11                  You know, we are a distributor

12   and a logistics company that see orders from

13   pharmacies and pharmacists pursuant to

14   prescriptions.  I don't think we should be

15   making clinical decisions.  Under the --

16   BY MR. BOGLE:

17        Q.    Well -- go ahead.  Go ahead.

18   No.

19        A.    Under the Controlled Substances

20   Act, we have a responsibility to make sure

21   that we have an effective program to guard

22   against controls and that we have a system to

23   alert orders that deviate in size, pattern

24   and frequency.

25        Q.    Okay.  And do you dispute that

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson has done a poor job over the last 10

2    to 15 years of ensuring it complies with the

3    Controlled Substances Act in that regard?

4              MS. HENN:  Objection to form,

5         lacks foundation.

6         A.    I don't agree that we've done a

7    poor job.

8    BY MR. BOGLE:

9         Q.    Okay.  Now, you're aware that

10   the state of Ohio specifically has been hit

11   hard by the opioid epidemic, right?

12        A.    I'm aware of reports about the

13   impact on communities all over the country,

14   specifically parts of Ohio and West Virginia

15   and Kentucky and Tennessee where I used to

16   live, yes.

17        Q.    And are you aware that the --

18   Ohio has ranked in the top ten in diversion

19   of opioids over time?

20             MS. HENN:  Objection to form,

21        lacks foundation.

22        A.    I don't believe I'm aware of

23   that statistic.

24   BY MR. BOGLE:

25        Q.    I'm going to hand you what I'm

1    marking as Exhibit 24, which is 1.1434, and

2    that's MCKMDL00403517.

3                    (McKesson-Cavacini Deposition

4            Exhibit 24 marked.)

5                    THE WITNESS:  It's stapled

6            funny.

7                    MR. BOGLE:  Yeah, I don't know

8            why they stapled it that way.  Sorry.

9    BY MR. BOGLE:

10           Q.    If you go to page -- I want to

11   look at this PowerPoint deck that's attached

12   to this e-mail, so if you go to page --

13           A.    If I could just have a quick

14   second.  I just want to read it.

15           Q.    Yeah.  Just let me know when

16   you're ready.

17           A.    Okay.  Thank you.

18                    (Document review.)

19           A.    Okay.

20   BY MR. BOGLE:

21           Q.    Okay.  So, actually, let's

22   start with the e-mail to introduce it first.

23   It's from Krista Peck, June 10, 2014 to a

24   group of individuals, subject being the 2014

25   NSC Regulatory Update to DC Ops.

1        Do you see that?

2        A.      I do.

3        Q.      Okay.  And the first line in

4    the e-mail says:  Attached is the Regulatory

5    presentation to the DC Ops team at National

6    Sales Conference (NSC) in May.

7        Do you see that?

8        A.      I do.

9        Q.      Is that typically a conference

10   that you would attend?

11       A.      Our National Sales Conference,

12   I believe I've made every one.

13       Q.      Okay.  Do you recall this that

14   you've looked at -- I know you haven't looked

15   in grand detail, but at the presentation, do

16   you recall this presentation being made?

17       A.      I don't.  And I believe during

18   this time of '14, was I still in Memphis?  I

19   was a VP/GM, I believe, so I had sales and

20   ops responsibility.  The conference has

21   multiple breakout rooms and meetings going on

22   at the same time.  I can't say for certain if

23   I saw this presentation or participated in

24   this part of the meeting.

25       Q.      Okay.  Well, if you look at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    page .13 in this, in this document, you see

 2    there's a slide that says Current Rx Drug

 3    Diversion Trends.

 4              Do you see that?

 5    A.    I do.

 6    Q.    Okay.  And as of when this

 7    chart was created here, for oxycodone, Ohio

 8    is ranked number five on this list, right?

 9    A.    That's what the chart reflects,

10    yes.

11    Q.    Ohio is number seven for

12    hydrocodone, right?

13              MS. HENN:  Objection to form,

14         lacks foundation.

15    A.    Ohio is listed seventh under

16    hydrocodone.

17    BY MR. BOGLE:

18    Q.    Okay.  And for hydromorphone,

19    number eight, right?

20    A.    Yes.

21    Q.    And for oxymorphone,

22    number seven for Ohio, right?

23    A.    Also appears to be correct.

24    Q.    Okay.  Ohio being, at least as

25    of a few years ago, in the top ten in drug
```

1    diversion for oxycodone, hydrocodone,

2    hydromorphone, oxymorphone, that's something

3    you're aware of?

4                    MS. HENN:  Objection to form,

5            lacks foundation and mischaracterizes

6            the document.

7            A.    I don't believe I had seen this

8    chart before referenced here in this way.

9    BY MR. BOGLE:

10           Q.    Are you aware that in Ohio the

11   epidemic has reached a state where the state

12   of Ohio has had to purchase death trailers

13   for people who have suffered opioid overdoses

14   and deaths?

15           A.    I believe I became aware of

16   that recently.

17           Q.    Okay.  How did you become aware

18   of that?

19           A.    I was shown a document in prep

20   for today.

21           Q.    Okay.  So I'm going to hand you

22   what's marked as Exhibit 25 which is 1.1453,

23   no Bates number because it's a public

24   document.

25           A.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1                    (McKesson-Cavacini Deposition

2          Exhibit 25 marked.)

3     BY MR. BOGLE:

4          Q.     Do you recognize this as the

5     document you've recently seen in preparation

6     for the deposition?

7          A.     Appears to be, yes.

8          Q.     Okay.  And the document's from

9     an article dated March 14, 2017, and it's

10    titled Too Many Bodies in Ohio Morgue, so

11    Coroner Gets Death Trailer.

12                    Do you see that?

13         A.     Appears to be the title of the

14    article.

15         Q.     Okay.  Did you actually read

16    the article in its totality?

17         A.     I believe I became familiar

18    with it.  I don't believe I read every part

19    of the document, no.

20         Q.     Okay.  Well, you see on the

21    first page there's a trailer that says

22    Disaster Response, Ohio Department of Health.

23                    Do you see that on the first

24    page there?

25         A.     There's a picture of a trailer,

Highly Confidential - Subject to Further Confidentiality Review

```
1    yes.
2         Q.    And in the first paragraph in
3    the letter -- or in the article it says:
4    It's mute testimony to the opioid addiction
5    plague that has been ravaging Ohio - a
6    20-foot long air conditioned trailer with
7    room for 18 bodies.
8              Do you see that?
9         A.    I do, yes.
10        Q.    And then on page .4, looking at
11   the fourth sort of paragraph here where it
12   says:  Coroners in the counties of.
13             Do you see that?
14        A.    I do.
15        Q.    It says:  Coroners in the
16   counties of Ashtabula and Cuyahoga (which is
17   where Cleveland is located) have had to
18   deploy the trailers when their morgues became
19   too jammed, he said.
20             The medical examiner in Summit
21   County (where Akron is located) asked the
22   Ohio Health Department to send one over last
23   summer when there was a spike in drug
24   overdoses, the Akron Beacon Journal reported.
25             Do you see that?
```

1        A.      I do.

2        Q.      And then if you look down, the

3    next-to-the-last paragraph on that page says:

4    But the situation in rust belt states like

5    Ohio, where the drug overdose rate in 2015

6    (the most recent federal figures available)

7    was 29.9 per 100,000 people, is especially

8    dire.

9               Do you see that?

10       A.      I do, yes.

11       Q.      So when you read this, did this

12   cause you some concern?

13       A.      How can you not feel concerned

14   and pain when you read about addiction and

15   the consequences of it.

16       Q.      Well, in Ohio, for example --

17   and I showed you the chart for the United

18   States.  Would it surprise you that the sale

19   of opioids in the state of Ohio for McKesson

20   has also consistently increased from 2006 to

21   2014?

22               MS. HENN:  Objection to form,

23          lacks foundation.

24       A.      I'm not familiar with the

25   specific trends in Ohio, but -- remind me of

Highly Confidential - Subject to Further Confidentiality Review

1   the question again, I'm sorry.  I was

2   distracted by the picture.

3   BY MR. BOGLE:

4        Q.    It says -- I said:  Would it

5   surprise you that the sales of opioids in the

6   state of Ohio for McKesson has also

7   consistently increased from 2006 to 2014?

8              MS. HENN:  Same objection.

9        A.    I mean, I'm not sure of our

10  overall business trends in Ohio during that

11  same period of time and what our customer mix

12  and relationship with pharmacies and

13  hospitals in Ohio has been.

14  BY MR. BOGLE:

15       Q.    Okay.

16       A.    I don't know.

17             (McKesson-Cavacini Deposition

18       Exhibit 26 marked.)

19  BY MR. BOGLE:

20       Q.    I'm going to hand you what I'm

21  marking as Exhibit 26, which is another

22  summary chart put together from the ARCOS

23  data from the state of Ohio related to

24  McKesson shipments.  Do you see it's titled

25  McKesson Shipments of Opioid Drugs in Ohio,

Highly Confidential - Subject to Further Confidentiality Review

1    Total Dosage Units 2006 to 2014.

2              Do you see that?

3        A.    I do, yes.

4        Q.    Okay.  You see again these

5    numbers are conveyed in thousands, so, for

6    example, in 2006, it's approximately

7    65-ish million doses to Ohio provided by

8    McKesson.

9              Do you see that?

10             MS. HENN:  Objection to form,

11        lacks foundation.

12        A.    I see where the blue bar that

13   correlates with 2006 is somewhere between 60

14   and 80, yeah.

15   BY MR. BOGLE:

16        Q.    And by the time you get to

17   2014, that number is closer to 110 million.

18             Do you see that?

19        A.    I do see that over the period

20   of time it increased and decreased and

21   leveled off, but from 2014 to 2016 --

22        Q.    2006 you mean?

23        A.    I'm sorry, from 2014 to 2006,

24   yeah, there's an increase and the blue bar

25   correlates with roughly I guess what would be

1    a hundred million on this chart.

2         Q.    Okay.  And so from 65 to

3    100 million approximately from 2006 to 2014

4    for the state of Ohio for McKesson.

5              Do you see that?

6              MS. HENN:  Objection, lacks

7         foundation.

8         A.    That appears to what is

9    represented here?  I have no -- I don't know

10   if this -- where this comes from.  I know you

11   said it comes from the ARCOS data.  I don't

12   know how to verify it or...

13   BY MR. BOGLE:

14        Q.    Okay.  Well, based on our

15   discussion from the United States data, would

16   it surprise you that this sort of increase

17   has occurred in that eight-year period?

18             MS. HENN:  Objection, lacks

19        foundation.

20        A.    I would like to understand how

21   it correlates to our overall business in Ohio

22   and population trends and prescriber

23   activities, our customer base.

24             But assuming that our business

25   in Ohio followed trends of our business

1   across the nation and that we grew over this

2   eight- to ten-year period, this alone isn't

3   surprising to me.

4   BY MR. BOGLE:

5       Q.    Okay.  So you agree it's

6   certainly not an irresponsible business model

7   to grow your business in all aspects outside

8   of opioids given the ongoing epidemic, right?

9           MS. HENN:  Objection to form,

10      vague.

11      A.    I don't know that I understand

12  the question.

13  BY MR. BOGLE:

14      Q.    Do you believe it would be an

15  irresponsible business model for McKesson to

16  seek to grow its business in all areas except

17  for opioids, given the ongoing epidemic?

18          MS. HENN:  Objection to form.

19      A.    I don't -- I don't know that we

20  have influence over what's prescribed and

21  dispensed and decisions that are made by

22  medical practitioners.  The relationships

23  that we have with our customers are around

24  their entire prescription pharmaceutical

25  medical needs.  We don't carve out certain

1     categories of products.

2     BY MR. BOGLE:

3          Q.     Would the concern be that if

4     you did, that business would go down

5     altogether?

6               MS. HENN:  Objection to form.

7          A.     I think our concern is that we

8     have a responsibility to make sure that we

9     provide a secure and safe and accurate and

10    efficient supply chain, so medications that

11    are needed by patients are available to the

12    pharmacies and hospital customers we have

13    when they're needed.

14    BY MR. BOGLE:

15         Q.     Okay.  But my question I think

16    went back to:  Do you think it would be an

17    irresponsible business decision to seek to

18    grow your -- McKesson's business in all areas

19    except for in opioids, given the ongoing

20    epidemic?

21              MS. HENN:  Objection to form,

22         asked and answered, vague.

23         A.     I don't know that we can select

24    and make decisions around which classes of

25    medicine we're going to make available to

1    medical practitioners.

2    BY MR. BOGLE:

3         Q.     Sure, you can.  You can decide

4    not to distribute opioids at all, couldn't

5    you?

6         A.     Yeah, and I guess I would be

7    concerned about the impact that that would

8    have on patients that have a legitimate need

9    as prescribed by their physician for these

10   medicines.

11        Q.     But McKesson is fully capable

12   of making the decision to determine, number

13   one, how many opioids they distribute in a

14   period of time, true?

15             MS. HENN:  Objection to form,

16        asked and answered.

17        A.     I'm trying to think through our

18   relationships with our customers and the

19   agreements that we have with customers and

20   hospitals, and I'm not sure of our

21   obligations under those agreements around

22   what products.

23             We've always provided a breadth

24   of FDA-approved medicines that are required,

25   needed and ordered from our customers.

1     Q.     So is it your understanding

2     that if you did not provide the opioids that

3     your pharmacy customers wanted, that somehow

4     you would be subject to some sort of legal

5     action?

6          MS. HENN:  Objection to form,

7          calls for a legal conclusion.

8     A.     I mean, I think our Controlled

9     Substance Monitoring Program allows us to

10    limit orders that deviate, but as far as

11    calling -- I don't know what hospital would

12    do business with us.  I don't know how I

13    could service the VA and cancer centers and

14    teaching hospitals without being able to

15    provide all of the products that they need

16    and require and prescribe and dispense.

17    BY MR. BOGLE:

18    Q.     So let me ask you this:

19    Looking at the Ohio data, we've talked about

20    the increase there.  As far as an increase in

21    legitimate medical need that would justify

22    this sort of increase, can you point me to a

23    specific change in circumstances in the

24    United States that caused an increase in need

25    for opioids?

1              MS. HENN:  Objection to form.

2       A.    I don't know that I understand

3    the question.  I'm sorry.

4    BY MR. BOGLE:

5       Q.    Right.

6              Is there, in your view, any

7    increase in medical need, legitimate medical

8    need for opioids today versus in 2006?

9              MS. HENN:  Objection to form.

10      A.    I'm not a healthcare provider.

11   I'm not a physician.  I think there are

12   people that are -- I think the demand and

13   this trend, if accurate and if represented

14   correctly, is more a factor of our customers

15   and who we service and, you know, how our

16   share probably moved.

17   BY MR. BOGLE:

18      Q.    Do you have a sense that people

19   in the United States have a greater need for

20   opioids than anybody else in the country --

21   or anybody else in the world?

22              MS. HENN:  Objection to form,

23        calls for speculation.

24      A.    I'm not aware.

25              ///

1    BY MR. BOGLE:

2        Q.    But you do know that almost all

3    the opioids utilized in the world are

4    utilized in the United States though, right?

5            MS. HENN:  Objection, lacks

6        foundation.

7        A.    Again, I don't know the

8    specifics.  I've heard trends around

9    dispensing and prescribing patterns in the

10   U.S. relative to other markets.

11   BY MR. BOGLE:

12       Q.    If we can go back to

13   Exhibit 1.2060.  I don't have the

14   cross-reference number.  It's the big

15   document I gave you the -- that one, the E&C

16   document.

17            MS. HENN:  It's Exhibit 22.

18            MR. BOGLE:  Exhibit 22, okay.

19   BY MR. BOGLE:

20       Q.    All right.  So I'm going to

21   page .22 here in this document.  So this is

22   under section Origins of the Modern Opioid

23   Epidemic.

24            Do you see that?

25       A.    I do.

1    Q.    Okay.  Second paragraph there

2    says:  The dramatic growth in opioid

3    consumption is unique to the United States.

4    In a 2017 technical report, published in

5    accordance with Article 15 of the Single

6    Convention on Narcotic Drugs of 1961, the

7    International Narcotics Control Board wrote,

8    "In 2016, the country with the highest

9    consumption of hydrocodone continued to be

10   the United States, with 33.4 tons, equivalent

11   to 99.1% of total global consumption."  The

12   report also noted "consumption of oxycodone

13   was concentrated in the United States (72.9%

14   of the world total)."

15            Do you see that?

16       A.    I do see where that's stated in

17   the document.

18       Q.    So based on these findings, is

19   it your understanding that only people in the

20   United States need opioids?

21            MS. HENN:  Objection to form.

22       A.    I don't know that I can say

23   with any certainty why these statistics are

24   listed the way they are.

25            ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:

2         Q.    Yeah.  I'm just asking whether

3    it's your understanding that only people in

4    the United States have a legitimate medical

5    need for opioids.

6              MS. HENN:  Objection to form.

7         A.    I think the document says that

8    they're used in other parts of the world, 72%

9    is in the U.S., and why doctors prescribe the

10   way they do here and what happens, I don't --

11   I don't know.

12   BY MR. BOGLE:

13        Q.    It's actually 99% for

14   hydrocodone.  Do you see that?

15        A.    I'm sorry, the 72.9 number is

16   the number that --

17        Q.    Yeah, the prior -- sorry.

18        A.    Prior?

19        Q.    The prior sentence says:  In

20   2016, the country with the highest

21   consumption --

22        A.    I'm sorry, you're correct,

23   99.1%.

24        Q.    So if there is such a

25   significant medical need for hydrocodone, for
```

1    example, in the United States, can you

2    explain why that significant medical need

3    doesn't exist in other developed countries in

4    the world?

5         A.    No.

6              MS. HENN:  Objection to form,

7         calls for speculation.

8    BY MR. BOGLE:

9         Q.    I want to look at one more

10   thing here and then we can take a break.

11             But you don't dispute that

12   McKesson has great power to control the

13   downstream flow of opioids to pharmacy

14   customers around the country, do you?

15        A.    I don't know that I agree.

16        Q.    Okay.  Do you know an

17   individual at McKesson name of Gary Boggs?

18        A.    I do, yes.

19        Q.    Okay.  He's in your regulatory

20   department, right?

21        A.    He is.

22        Q.    He's also a pretty senior level

23   in the regulatory department as well, right?

24             MS. HENN:  Objection to form.

25        A.    I believe he's a vice president

Highly Confidential - Subject to Further Confidentiality Review

1    of the regulatory department and has had

2    different roles, but I would call him a

3    senior member of our regulatory team.

4    BY MR. BOGLE:

5         Q.    Okay.  And I just want to mark

6    for you Exhibit 27 to your deposition, which

7    is 1.851, and that's MCKAGMS0060000880.

8              (McKesson-Cavacini Deposition

9         Exhibit 27 marked.)

10   BY MR. BOGLE:

11        Q.    And Mr. Boggs has a background

12   at the DEA before he came on with your

13   company, right?

14        A.    I believe he does, yes.

15        Q.    If you see, this PowerPoint

16   deck is titled State of Prescription Drug

17   Abuse, Gary Boggs, Olive Branch.

18              Do you see that on the front

19   page?

20        A.    I do.

21        Q.    Okay.  And if you go

22   specifically to page .37, it says here:

23   Distributors Have Great Power on this slide,

24   and the bottom bullet point there says -- or

25   actually says Individually and Collectively.

1    And the bottom bullet point below that says:

2    You control the supply to downstream

3    customers.

4              Do you see that?

5    A.     I see the third bullet point

6    says that, yes.

7    Q.     Okay.  And that's just --

8    that's a statement of fact, right, that

9    McKesson, and, quite frankly, other

10   distributors, control the flow of products,

11   including opioids, to downstream customers,

12   right?

13             MS. HENN:  Objection to form,

14        lacks foundation.

15   A.     I don't know that I would

16   agree.  I see that the document says that.

17   BY MR. BOGLE:

18   Q.     Okay.  You don't agree that

19   McKesson has control of the flow of opioids

20   it provides to its downstream customers?

21   A.     I guess I'm just struggling

22   with the word control.  I think we are part

23   of the supply chain and have a role to play

24   as such.

25   Q.     And part of, quite frankly, a

1   broken supply chain, right?

2       A.      No, I don't agree.

3       Q.      You don't agree with that.

4   Well, let me -- before we go there, if you go

5   in this PowerPoint deck to page .46, there's

6   a slide that's titled What Else Impacts

7   Diversion?

8               Do you see that?

9       A.      I do.

10      Q.      The first bullet point there

11  says Compliance, with seven exclamation

12  points, right?

13      A.      I do.

14      Q.      And the bottom bullet point

15  below that says:  Without sustained sources

16  of supply major diversion schemes wither

17  away.

18              Do you see that?

19      A.      I do see where it says that.

20      Q.      Okay.  Do you have an opinion

21  as to whether that's an accurate statement?

22              MS. HENN:  Objection, calls for

23          speculation.

24      A.      I'm not an expert in diversion

25  and what drives it, how it comes to be.  I do

1    think it's reasonable that if you have bad

2    actors that are intent on diverting, they

3    probably need access to product in order to

4    do it.

5    BY MR. BOGLE:

6           Q.     Right.

7                  And as far as product goes,

8    McKesson supplies, I think the website

9    currently says one out of every three pills

10   filled in the United States, right?

11                MS. HENN:  Objection to form,

12          lacks foundation.

13          A.     I think I've seen statistics,

14   and I have shared with great pride that we

15   are responsible for roughly a third of the

16   nation's medication supply.

17   BY MR. BOGLE:

18          Q.     Right.  So you've seen that

19   statistic before, right?

20          A.     I have.

21                MR. BOGLE:  All right.  We can

22          take a quick break.

23                MS. HENN:  Sure.

24                THE VIDEOGRAPHER:  We're off

25          the record at 3:13 p.m.  This

Highly Confidential - Subject to Further Confidentiality Review

```
 1          concludes Disc 3.

 2                  (Recess taken, 3:13 p.m. to

 3          3:24 p.m.)

 4                  THE VIDEOGRAPHER:  We're back

 5          on the record at 3:24 p.m., beginning

 6          of Disc 4.

 7   BY MR. BOGLE:

 8          Q.     Mr. Cavacini, West Virginia is

 9   another state that's been ravaged by the

10   opioid epidemic, right?

11          A.     I'm aware of the issue in

12   West Virginia.

13          Q.     Okay.  And the issue being that

14   it's been extremely hard hit by the opioid

15   epidemic, right?

16          A.     I've heard it described the

17   same way.

18          Q.     And in 2018, there was actually

19   a congressional investigation into McKesson

20   and other distributors as to their conduct in

21   West Virginia as it related to opioid

22   distribution, right?

23          A.     I believe there was an inquiry

24   and investigation that I'm aware.

25          Q.     Right.  And, for example, the
```

Highly Confidential – Subject to Further Confidentiality Review

1    CEO of McKesson, Mr. Hammergren, actually was

2    called by Congress to testify in a hearing,

3    correct?

4          A.    I am aware of the testimony.

5          Q.    Okay.  Have you read the

6    testimony?

7          A.    I don't believe I've read the

8    whole transcript.  I've seen the testimony on

9    C-SPAN.

10         Q.    Okay.  The whole -- all of his

11   testimony or just portions of it?

12         A.    I believe I've seen the entire

13   testimony at one time, and then I've also

14   seen portions of it.

15         Q.    Okay.  Were you involved in any

16   way in assisting Mr. Hammergren to testify

17   before Congress?

18         A.    No.

19         Q.    Were you involved, for example,

20   in collecting any information for him to

21   testify?

22         A.    No.

23         Q.    I'm going to hand you what I'm

24   marking as Exhibit 28 to your deposition, and

25   that's 1.44, a public document, so no Bates

Highly Confidential - Subject to Further Confidentiality Review

```
 1    numbers.
 2              (McKesson-Cavacini Deposition
 3         Exhibit 28 marked.)
 4    BY MR. BOGLE:
 5         Q.    Okay.  And this is a letter
 6    from the House of -- Congress of the United
 7    States, House of Representatives, Committee
 8    on Energy and Commerce from February 15,
 9    2018.
10              Do you see that?
11         A.    I do.
12         Q.    And the letter is addressed to
13    McKesson's CEO, John Hammergren, right?
14         A.    Agreed.
15         Q.    Okay.  And have you ever seen
16    this letter?
17         A.    I believe I have, yes.
18         Q.    As part of preparation or at
19    some time in your work at McKesson?
20         A.    I believe I saw it during prep.
21         Q.    Okay.  Have you ever seen it as
22    part of your daily job at McKesson?
23         A.    I don't believe so, no.
24         Q.    Okay.  And if you look at the
25    second paragraph here in this letter, it
```

1    says:  As parts of our investigation, the

2    Committee wrote you -- to you on May 8, 2017,

3    regarding your distribution practices

4    generally, and in particular with respect to

5    West Virginia.  As we mentioned in that

6    letter, the opioid epidemic has been

7    particularly devastating to West Virginia.

8    For example, in 2015, West Virginia had the

9    highest opioid overdose death rate in the

10   nation.

11             And then the last sentence in

12   that paragraph says:  Court filings also

13   indicate that between 2007 and 2012, McKesson

14   distributed 46,179,600 doses of hydrocodone

15   and 54,304,980 doses of oxycodone, meaning

16   that McKesson shipped a total of 100,484,580

17   doses to West Virginia during this time

18   period.

19             Do you see that?

20   A.      I do see that.

21   Q.      Are you familiar with those

22   statistics as far as how much hydrocodone and

23   oxycodone McKesson distributed to

24   West Virginia during that five-year time

25   frame?

1        A.     I mean, I see the statistics

2    listed here in the letter and I'm familiar

3    with the numbers now.

4        Q.     Okay.  But prior to your

5    preparation for deposition, had you seen any

6    numbers like that as it pertained to

7    West Virginia and the company's distribution

8    of hydrocodone and oxycodone?

9        A.     I don't recall seeing any

10   statistics.

11       Q.     All right.  Let's go back to

12   Exhibit 22, which is the other congressional

13   publication we were looking at.  All right.

14             Let's start on page .5.  And

15   looking in the second paragraph of the

16   executive summary, the second sentence that

17   starts with "In early 2017."

18             Do you see where I'm at?

19       A.     I believe I do.

20       Q.     It says:  In early 2017, the

21   Committee became interested in allegations of

22   "opioid-dumping," a term to describe

23   inordinate volumes of opioids shipped by

24   wholesale drug distributors to pharmacies

25   located in rural communities, such as those

```
 1    in West Virginia.
 2                 And then in the next paragraph
 3    it says:  In May 2017, the Committee opened a
 4    bipartisan investigation into the
 5    allegations.  From press reports and this
 6    investigation, the Committee learned of
 7    opioid shipments in West Virginia that
 8    shocked the conscience.
 9                 And then there's three bullet
10    points noting some description of the
11    shipments.
12                 Do you see that?
13        A.    I do.
14        Q.    First bullet point says:  Over
15    10 years, 20.8 million opioids were shipped
16    to pharmacies in the town of Williamson, home
17    to approximately 3,000 people.
18                 Do you see that?
19        A.    I do, yes.
20        Q.    You agree with me that just
21    common sense, that's an inordinate amount of
22    opioids for that size town?
23                 MS. HENN:  Objection to form.
24        A.    I don't agree.
25                 ///
```

1    BY MR. BOGLE:

2         Q.    You don't agree?  Okay.

3              The next bullet point says:

4    Another nearly 9 million opioids were

5    distributed in just two years to a single

6    pharmacy in Kermit, West Virginia, population

7    406.

8              Do you see that?

9         A.    I do.

10        Q.    Do you agree that that's an

11   inordinate amount of opioids to be delivered

12   in a two-year period given the size of that

13   city?

14        A.    I don't know.  And it's hard to

15   make determinations of, you know, where --

16   pharmacies' orders and markets and

17   prescribers.  I don't know if it's inordinate

18   as you described or not.

19        Q.    Okay.  You certainly at your

20   time at McKesson have been, from a geographic

21   perspective, had responsibility for portions

22   of West Virginia, right, from a sales

23   perspective?

24        A.    I was never a direct

25   salesperson in West Virginia, but during the

1    period of time that I had responsibility for

2    New Castle, the northwestern part of

3    West Virginia, and during the period of times

4    that I had responsibility for our Virginia

5    DC, other parts of West Virginia.

6            Q.      During your time at McKesson,

7    did you ever develop an understanding of the

8    makeup population-wise of West Virginia?

9            A.      No.

10           Q.      Any concept that it's largely a

11   rural-based state as far as population goes?

12                   MS. HENN:   Objection to form.

13           A.      I never sought out or

14   researched, but generally aware that parts of

15   West Virginia are considered rural.

16   BY MR. BOGLE:

17           Q.      Okay.  The third bullet point

18   going back to this says:  Between 2007 and

19   2012, drug distributors shipped more than

20   780 million hydrocodone and oxycodone pills

21   to West Virginia.

22                   Do you see that?

23           A.      I do.

24           Q.      So you hold the same view on

25   that, that you have no opinion as to whether

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that five-year period of time, that's an

 2    inordinate amount of opioids to this single

 3    state?

 4         A.    I don't know if it is or it

 5    isn't.

 6         Q.    You know McKesson was one of

 7    the companies being investigated by Congress

 8    as part of this proceeding, right?

 9              If you don't know, maybe I can

10    just point you to the spot on here to move

11    things along.

12         A.    Yeah, I believe that to be

13    true.  I'm just trying to make sure I

14    absolutely know it to be true.

15         Q.    Okay.  If you look on page .5,

16    further down, I'm in the last paragraph in

17    the middle, where it says:  The companies

18    whose distribution was reviewed.

19         A.    Okay.

20         Q.    You see it lists several

21    distributors, and McKesson's on that list,

22    right?

23         A.    I mean, you described it as an

24    investigation.  This says it was -- I'm

25    really not trying to be difficult.  I just
```

1    don't know.  I haven't read this whole

2    document.  I don't know if it's described as

3    an investigation, an inquiry.

4              I understand that it says that

5    it was -- we were one of the companies that

6    was reviewed.

7         Q.    Okay.  Well, I think the

8    passage I just read to you a moment ago,

9    Congress describes it itself as an

10   investigation.  For example, if you go back

11   to the third paragraph --

12        A.    Opened a bipartisan

13   investigation into the allegations, and I

14   guess as a result of that, the companies

15   reviewed included McKesson.

16        Q.    Right.  So again, I'm only

17   asking you at this point:  Do you understand,

18   do you see here that McKesson was one of the

19   companies reviewed as part of this

20   investigation, right?

21        A.    It appears to be, yes.

22        Q.    Okay.  Were you not aware of

23   that prior to today, that there was an

24   investigation that had just been completed by

25   Congress last month and published regarding

1    McKesson and other distributors and their

2    conduct in West Virginia?

3            A.      I guess, you know, there's --

4    I'm a little unclear on the letter from

5    earlier 2018, and I believe we referenced the

6    letter that was dated in 2017, if that's all

7    part of the same matter, if the energy

8    commerce -- but to answer your question, I

9    mean, I am aware now that it concluded on

10   December 19th and apparently this report was

11   issued.

12           Q.      Right.  But prior to starting

13   this deposition and me showing you this

14   today, this is something you were unaware of,

15   true?

16           A.      I was aware of the inquiry

17   and -- if these are all related, I'm just not

18   clear on that, sir.

19           Q.      Okay.  But the findings in this

20   report from December 19, 2018 are findings

21   you are unfamiliar with prior to us talking

22   about it today, right?

23           A.      I have not reviewed this

24   document in detail prior to us talking about

25   it today.

```
1              Q.     Okay.  Let's go to page .6

2    here.  The first full paragraph says:  This

3    report presents case studies of opioid

4    distribution to southwestern West Virginia

5    pharmacies over the last decade.  The

6    findings from these individual case studies

7    are not necessarily generalizable of the

8    conduct of the distributors more broadly.

9    However, the case studies - taken together

10   with the sheer number of opioids sent to

11   these small towns - raise sufficient concerns

12   as to whether these companies fulfilled their

13   legal obligations to prevent drug diversion.

14              Do you see that?

15        A.     I do see that.

16        Q.     Did you understand that part of

17   the investigation -- I know you haven't seen

18   this publication, but did you understand that

19   part of this investigation by Congress would

20   include assessing whether distributors like

21   McKesson fulfilled their legal obligations to

22   prevent drug diversion in West Virginia?

23              MS. HENN:  Object to form.

24        A.     I don't know that I was aware

25   what the objectives of the committee's
```

1    investigation was prior to seeing it here.

2    BY MR. BOGLE:

3        Q.    If the committee concluded that

4    there were widespread failures as it

5    pertained to preventing diversion of opioids

6    by McKesson and other distributors, would you

7    disagree with that finding from Congress?

8            MS. HENN:  Objection to form,

9        calls for speculation.

10       A.    I haven't reviewed the whole

11   document.  I'm not sure what the conclusions

12   were.  But I think I would -- if you could

13   repeat the last part of the question again.

14   BY MR. BOGLE:

15       Q.    Right.  If the committee as

16   part of this report concluded that there were

17   widespread failures to prevent diversion of

18   opioids by distributors, including McKesson,

19   would you disagree with those findings?

20           MS. HENN:  Objection, calls for

21       speculation.

22       A.    If those were the conclusions,

23   I would disagree.

24   BY MR. BOGLE:

25       Q.    Okay.  Give me just one second.

1    All right.

2              Let's go to page .26.  You see

3    here it says:  The Opioid Epidemic's Impact

4    in West Virginia.

5              Do you see that?

6    A.     It's the opening sentence, yes.

7    Q.     Yep.  It says there:  The

8    opioid epidemic's impact has been

9    particularly acute in West Virginia,

10   beginning with the influx of OxyContin to the

11   state during the late 1990s.  The sudden

12   influx of prescription opioids, leading to

13   the resulting increases in abuse and

14   addiction, has had profound effects on

15   West Virginia.  Between 1999 and 2004, the

16   number of lives lost to accidental drug

17   overdoses in West Virginia increased 550%,

18   giving West Virginia the highest

19   unintentional drug overdose death rate in the

20   United States at the time.  A study published

21   in the Journal of the American Medical

22   Association in December 2008 found that, in

23   2006, 93% of unintentional overdose deaths

24   attributable to prescription drugs in

25   West Virginia involved opioids.

Highly Confidential - Subject to Further Confidentiality Review

1              And the next paragraph

2    continues:  In 1917, West Virginia continued

3    to have the highest overdose death rate in

4    the country, and a report issued by the

5    West Virginia Department of Health and Human

6    Services found that the number of overdose

7    deaths in the state increased by more than

8    316% between 2001 and 2016, with most

9    overdose deaths involving at least one

10   opioid.

11              You see that?

12       A.    I do.

13       Q.    Those statistics, you're

14   familiar with any of those prior to today?

15              MS. HENN:  Objection to form,

16       lacks foundation.

17       A.    I don't believe I had seen the

18   specific statistics relative to West Virginia

19   as outlined here.

20   BY MR. BOGLE:

21       Q.    Okay.  So this time frame here

22   that's being discussed, and specifically

23   talking about 2006 to 2016, as the deaths are

24   increasing from opioid overdoses in

25   West Virginia, do you have an understanding

Highly Confidential - Subject to Further Confidentiality Review

1    of what was happening as far as the amount of

2    opioids that were being supplied from

3    McKesson to West Virginia?

4         A.    I just want to be clear.  It

5    says from 2001 to -- there's a bunch of dates

6    in the different paragraphs that we read.

7         Q.    Yeah.

8         A.    I thought you said 2006, but

9    2001 to 2016, do I know McKesson shipments?

10        Q.    Yeah.  So anytime during the

11   time frame -- let's do that time frame.  I'll

12   strike the previous question.

13             From 2001 to 2016, do you have

14   any sense as to what was happening with

15   McKesson's shipment of opioids to

16   West Virginia as far as whether they're going

17   up, down or staying the same?

18        A.    I do not, no.

19        Q.    Okay.  Well, if we go to

20   page .242 -- 242.  You see there's two charts

21   here towards the middle of the page?  You see

22   those?

23        A.    I do.

24        Q.    Okay.  The sentence before

25   those charts describes them.  It says:  The

Highly Confidential - Subject to Further Confidentiality Review

1    chart below details the number of suspicious

2    order reports submitted to DEA regarding

3    West Virginia pharmacies as well as the

4    amount of oxycodone and hydrocodone doses

5    shipped to the state each year.

6            Do you see that?

7    A.      I do.

8    Q.      Okay.  And if you look, for

9    example, at the number of doses that McKesson

10   shipped in millions of oxycodone and

11   hydrocodone in 2006, was at 17.07 million

12   doses.

13           Do you see that?

14           MS. HENN:  Objection to form,

15       lacks foundation.

16   A.      I do see where the document

17   says under 2006, 17.07.

18   BY MR. BOGLE:

19   Q.      Okay.  If you go -- and you see

20   there, the numbers here, there's a citation

21   923 at the end of that sentence.

22           Do you see that?

23   A.      I do.

24   Q.      Okay.  If you go down to the

25   bottom of the page, it indicates that this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    shipment data came from McKesson, right?  See

 2    that last sentence under 923?

 3         A.    It says:  McKesson produced

 4    shipment data from 2006 to the end of 2016.

 5         Q.    Right.  Which is -- coincides

 6    with the chart we're looking at here, right,

 7    time period-wise?

 8         A.    It appears to, yes.

 9         Q.    Okay.  And, for example, you go

10    to 2007, there's 25.63 million doses of

11    oxycodone and hydrocodone shipped to

12    West Virginia from McKesson.

13               You see that figure?

14         A.    I do.

15         Q.    And then if we kind of go on

16    through, by the time we get to 2015, we're at

17    40.71 million doses of hydrocodone and

18    oxycodone shipped by McKesson into

19    West Virginia in that year.

20               Do you see that figure?

21         A.    I do.

22         Q.    And in 2016, 36.53 million

23    doses in that year shipped by McKesson.

24               Do you see that?

25         A.    I do.
```

1    Q.    So in looking at these figures,

2  we can agree that looking at 2006-2007 time

3  frame, the numbers substantially increase

4  when compared to 2015 and 2016, right?

5          MS. HENN:  Objection to form,

6      lacks foundation.

7      A.    The numbers here from 2006 to

8  '16 approximately doubled.

9  BY MR. BOGLE:

10     Q.    Right.

11          And so based on your prior

12  testimony, I would assume you attribute that

13  to just more business for McKesson, right?

14     A.    I don't know how to attribute

15  it.

16     Q.    Okay.  Do those numbers concern

17  you at all that in the state of West Virginia

18  that's the amount of pills that were shipped

19  of oxycodone and hydrocodone in 2015 and

20  2016, especially compared to what happened in

21  2006 and 2007?

22          MS. HENN:  Objection to form.

23     A.    Again, without the context

24  relative to our overall business in

25  West Virginia and the customers we served, I

1    don't know that I can answer that.  I mean, I

2    think there's more context needed around --

3    BY MR. BOGLE:

4         Q.    Okay.  Are you aware of any

5    specific medical needs in West Virginia that

6    differed in 2015 and 2016 for opioids as

7    compared to 2007, for example?

8              MS. HENN:  Objection to form,

9         calls for speculation.

10        A.    I'm not a healthcare

11   professional, but, you know, during this

12   period of time, I mean, just as one example,

13   we began servicing the VA.  I don't know the

14   VA's concentration.  You know, I don't -- I

15   don't know if that was a drive or not.

16             There could be a number of

17   things going on here.  I just don't know.

18   BY MR. BOGLE:

19        Q.    And one of those things could

20   be that you guys are just shipping a lot more

21   pills to West Virginia, right, and in

22   circumstances where there was not proper due

23   diligence done around those shipments, right?

24             MS. HENN:  Objection to form.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:

 2         Q.    Can you rule out that

 3    possibility?

 4              MS. HENN:  Lacks foundation.

 5              Go ahead.

 6         A.    I don't agree with the context

 7    of the question.

 8    BY MR. BOGLE:

 9         Q.    Okay.  So you've ruled that out

10    as a possibility, am I understanding you

11    right?

12              MS. HENN:  Objection to form,

13         vague.

14         A.    I believe we have exercised and

15    put great effort into exercising our

16    responsibilities under the Controlled

17    Substances Act.

18    BY MR. BOGLE:

19         Q.    Okay.  Great effort, okay.

20              Let's go to page .106.  In

21    the -- there's the third paragraph there,

22    "The scope of the Committee's review."

23              Do you see that?

24         A.    I do.

25         Q.    It says:  The scope of the
```

```
 1    Committee's review of the distributors'

 2    conduct was limited.  The investigation

 3    focused only on distributors' shipments to

 4    certain areas of West Virginia and individual

 5    pharmacies located in those rural regions.

 6    Accordingly, much of this section is

 7    comprised of the case studies.

 8              While the Committee cannot draw

 9    comprehensive, nationwide conclusions from

10    this review, the findings ares astonishing

11    and concerning.  They also raise questions

12    about the effectiveness of distributors'

13    anti-diversion efforts outside West Virginia,

14    as the same policies were implemented across

15    the country.

16              Do you see that?

17        A.    I do, yes.

18        Q.    And policies being implemented

19    across the country, for example, with

20    McKesson, the CSMP was implemented across the

21    entire country, right, one single policy?

22        A.    I believe we implemented our

23    controlled substance policy nationwide.  I

24    believe there were different policies.

25        Q.    Meaning different policies for
```

1    different regions of the country?

2        A.    No, different policies at

3    different points in time.  The program

4    evolved and different policies for different

5    segments of customers.  You had said there

6    was one policy.  I just wanted to be clear,

7    I'm not sure that there was "one" policy.

8        Q.    Okay.  So to the extent that

9    Congress is questioning McKesson's

10   anti-diversion efforts, both inside

11   West Virginia and across the nation, you

12   would think that those concerns are

13   unfounded?  Am I understanding you right

14   based on your prior testimony?

15           MS. HENN:  Objection to form,

16       calls for speculation.

17       A.    I don't -- I don't know that

18   I'm in a position to speculate on the

19   conclusion that Congress made or wrote in

20   this summary.

21   BY MR. BOGLE:

22       Q.    Do you think Congress has any

23   good reason to be concerned about McKesson's

24   anti-diversion policies while you've been

25   with the company?

Highly Confidential - Subject to Further Confidentiality Review

1           MS. HENN:  Objection, calls for

2       speculation.

3           A.    I think we have a program that

4   we're committed to and have continued to

5   evolve and, I believe, is best in class today

6   and will continue to be supported and vested

7   so it stays that way.

8           MR. BOGLE:  Okay.  Move to

9       strike as nonresponsive.

10  BY MR. BOGLE:

11          Q.    My question was simply:  Do you

12  think Congress has good reason to be

13  concerned about McKesson's anti-diversion

14  policies while you've been with the company?

15          MS. HENN:  Objection to form,

16      asked and answered.

17          A.    I'm not sure.  I think we have

18  a program that we're committed to enforcing

19  and upholding our responsibilities under the

20  Controlled Substances Act.

21  BY MR. BOGLE:

22          Q.    You're speaking as of today,

23  right?

24          A.    As of today, and I believe we

25  always had a program that we thought was

1    structured appropriately to meet our needs

2    and our customers' needs and the needs of the

3    supply chain and exercise our

4    responsibilities to distribute controlled

5    substances.

6         Q.    So if Congress has any concerns

7    about McKesson's anti-diversion policies over

8    time, to my question previously, you would

9    think those were unfounded, right?

10             MS. HENN:  Objection to form,

11        calls for speculation.

12        A.    I don't know that I'm in a

13   position to say what conclusions Congress

14   should or shouldn't make.

15   BY MR. BOGLE:

16        Q.    Okay.  As COO of the company at

17   McKesson, you don't have an opinion, one way

18   or the other, as to whether there should be

19   concerns about McKesson's anti-diversion

20   practices since you've been with the company?

21        A.    I believe we've always worked

22   hard to exercise our responsibility and will

23   continue to do so and have done so.

24        Q.    I wasn't asking how hard you

25   worked.  I'm asking if there's concern -- if

1    you think there's good reason to be concerned

2    about McKesson's anti-diversion practices

3    while you've been with the company.

4                    MS. HENN:  Objection, form,

5          asked and answered.

6    BY MR. BOGLE:

7          Q.    I'm not asking you about

8    effort.  I'm asking you about execution.

9                    MS. HENN:  Same objection.

10         A.    No, I don't believe there's

11   reason to be concerned.

12   BY MR. BOGLE:

13         Q.    Okay.  Let's take a look at one

14   of the pharmacies that was investigated here

15   as far as McKesson.  Let's go to .131.

16   There's a section (i) there, McKesson's

17   Initial Engagement with Family Discount

18   Pharmacy.

19                    Do you see that?

20         A.    I do.

21         Q.    Have you ever heard of Family

22   Discount Pharmacy?

23         A.    I believe I have relating to

24   these letters and the investigation

25   referenced here.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Had you heard of them prior to
2    reading these letters?
3        A.      I don't believe I had.
4        Q.      It says here:  Family Discount
5    Pharmacy in Mount Gay-Shamrock,
6    West Virginia, was McKesson's biggest
7    purchaser of hydrocodone and oxycodone in
8    West Virginia between 2006 and 2017.
9    McKesson supplied Family Discount Pharmacy
10   with more than 5.91 million doses of
11   hydrocodone and oxycodone during six years
12   between 2006 and 2014.  Between 2006 and 2007
13   alone, McKesson provided Family Discount
14   Pharmacy with more than 3.82 million doses of
15   hydrocodone.  As will be described below,
16   McKesson terminated this pharmacy prior to
17   2008 for "compliance reasons" but elected to
18   onboard the customer again two times
19   thereafter.
20              Do you see those references?
21       A.      I do.
22       Q.      Okay.  Let's go to page .136.
23   You see there's a finding at the top here --
24   this is again related to Family Discount
25   Pharmacy -- that says:  McKesson did not

 1   consider its prior relationship with Family

 2   Discount Pharmacy when evaluating the

 3   pharmacy's new customer application in 2010,

 4   with a member of McKesson's regulatory

 5   affairs division at one point stating, "I

 6   cannot see any reason we should be hesitant"

 7   with respect to the pharmacy.

 8              Do you see that?

 9        A.    I do see where that's listed

10   and highlighted in blue.

11        Q.    Okay.  And then what's

12   discussed below that are two e-mails from

13   McKesson sales staff.  So I want to take a

14   look at those and ask you about those

15   e-mails.

16              It says:  The e-mails provided

17   by McKesson suggest that the company viewed

18   itself as being in competition with other

19   distributors to obtain Family Discount's

20   account.  For example, in an e-mail to a

21   McKesson Vice President and General Manager

22   referencing a pricing proposal for Family

23   Discount Pharmacy, a member of McKesson's

24   sales division noted the pharmacy had a,

25   quote/unquote, very aggressive buy plan with

1    Cardinal.  I would approve this based on

2    where we have to be to have an opportunity.

3              Do you see that?

4         A.    I do see that.

5         Q.    Okay.  And if there are

6    concerns about a pharmacy potentially being

7    engaged in diversion, you would agree that a

8    desire to beat out another distributor for

9    their business should not override concerns

10   about that diversion, should it?

11             MS. HENN:  Objection, lacks

12        foundation.

13        A.    I think those are two

14   independent decisions, and our regulatory

15   affairs team would make the decision about

16   the legitimacy of the pharmacy and their

17   ability to support purchases and have

18   effective controls and, you know, the sales

19   team would be concerned with the competitive

20   nature of the dynamics.

21   BY MR. BOGLE:

22        Q.    Right.  The sales team's

23   worried about winning new business and

24   getting bigger bonuses, right?

25             MS. HENN:  Objection to form,

Highly Confidential - Subject to Further Confidentiality Review

1          lacks foundation, calls for

2          speculation.

3          A.     I think the sales team has been

4    focused and should be focused on helping find

5    customers that align with how McKesson sees

6    the market and that we can provide valuable

7    services to and build a long-term successful

8    relationship with.

9               And our regulatory affairs team

10   is responsible with making sure that we make

11   good decisions around the customers that we

12   serve and exercise our responsibility under

13   the Controlled Substances Act.

14   BY MR. BOGLE:

15        Q.     You think Family Discount

16   Pharmacy was a pharmacy that was aligned with

17   McKesson's goals as it pertains to either of

18   those?

19               MS. HENN:  Objection to form,

20        calls for speculation, lacks

21        foundation.

22        A.     I don't know.  I'm not familiar

23   with the account or the history.

24   BY MR. BOGLE:

25        Q.     Okay.  In the text that

Highly Confidential - Subject to Further Confidentiality Review

1    continues below these e-mails, it says:  In

2    another e-mail, a member of McKesson's sales

3    division said that he was sure either

4    H.D. Smith or Cardinal Health would offer to

5    be Family Discount's secondary distributor if

6    McKesson were to, quote/unquote, win Family

7    Discount's business.

8              Do you see that?

9        A.    I do.

10        Q.    Okay.  Is that -- in your mind,

11    should be the goal of the sales staff is to

12    be worried about just winning business at all

13    costs?

14              MS. HENN:  Objection, lacks

15         foundation, mischaracterizes the

16         document.

17        A.     This is one sentence out of an

18    e-mail, and I don't read it that way.  It

19    said that another competitor would also be

20    willing to service this customer in a

21    secondary relationship if we were to win the

22    account.  I don't know what that means.

23    BY MR. BOGLE:

24        Q.    Okay.  Well, getting a new

25    account, certainly in 2010, would have

Highly Confidential - Subject to Further Confidentiality Review

1    resulted in the sales rep winning him or

2    herself, right, as far as a bonus goes,

3    wouldn't it?

4              MS. HENN:  Objection to form,

5         lacks foundation, calls for

6         speculation.

7         A.    Yeah, I mean, as we reviewed

8    earlier, we have a sales incentive plan that

9    rewards retail sales managers for winning new

10   business.  I don't know if this account would

11   have qualified.  I don't...

12   BY MR. BOGLE:

13        Q.    Okay.  Let's go to the next

14   page, .137.  The first full paragraph says:

15   According to documents produced to the

16   Committee, McKesson onboarded Family Discount

17   and set the pharmacy's hydrocodone ordering

18   threshold at 155,000 dosage units a month - a

19   level 31 times more than what McKesson

20   determined warranted supplementary

21   documentation on its new questionnaire --

22   customer questionnaire.

23              Do you see that?

24        A.    I do see where it says that.

25        Q.    Okay.  You've seen enough

Highly Confidential - Subject to Further Confidentiality Review

1   customer onboardings and documentation

2   related thereto to know that a threshold set

3   at 155,000 dosage units a month for

4   hydrocodone is high, very high, right?

5        A.     It states here that -- I don't

6   know how it relates to other pharmacies and

7   if it would be high or not for this specific

8   pharmacy.

9        Q.     Okay.  If we can go to

10  page .140, we're now into 2012, some

11  additional e-mails, again, referring to

12  Family Discount Pharmacy.

13            In the first line under the

14  e-mail it says:  In a separate e-mail, a

15  member of McKesson's sales division

16  characterized the pharmacy as a,

17  quote/unquote, real opportunity and requested

18  that the scheduling of the visit be

19  expedited.  This e-mail is reproduced below.

20            So the visit being a visit

21  to -- you visit customers when you onboard

22  them, right, as a new customer?

23       A.     I'm aware that, you know,

24  customers will be visited often by a member

25  of the regulatory affairs team when coming

1    onboard.

2          Q.      And per the discussion here,

3    the sales member at McKesson asked for that

4    to be expedited as it pertained to Family

5    Discount Pharmacy in 2012, right?

6          A.      Again, I see where it states

7    that, and I see the e-mail where it says:

8    Please expedite, thanks.

9          Q.      All right.  I'm just making

10   sure you're done with your answer.  I didn't

11   want to launch into another question.

12         A.      Yeah, I was.

13         Q.      Okay.  Let's go finally on this

14   point to page .142.  First -- the second

15   paragraph there says:  As noted above, during

16   McKesson's three engagements with Family

17   Discount Pharmacy, it supplied more than

18   5.91 million doses of hydrocodone and

19   oxycodone, making the pharmacy McKesson's

20   biggest customer in West Virginia between

21   2006 and 2017.  Had McKesson maintained

22   robust due diligence files for Family

23   Discount Pharmacy and consulted these files

24   when it was considering the pharmacy's

25   applications in 2010 and 2012, it would have

1    been aware that it terminated the pharmacy

2    for compliance reasons on at least one prior

3    occasion.  In addition, conducting a

4    retrospective review of the due diligence

5    files would have also alerted McKesson to the

6    pharmacy's failure to disclose its previous

7    termination by McKesson on its 2010 and 2012

8    new customer applications, with the pharmacy

9    seemingly providing the company with a

10   misrepresentation on its 2010 application in

11   particular.  Such information may have

12   prompted McKesson to deny Family Discount's

13   applications on multiple occasions.  Instead,

14   McKesson accepted Family Discount as a

15   customer a total of at least three times,

16   only to ultimately restrict its ability to

17   purchase controlled substances again in 2014.

18              Do you see that?

19        A.    I do.

20        Q.    And so when these new customer

21   onboardings would have been done in 2010 and

22   2012, those are both prior to the change in

23   policy within McKesson about sales incentives

24   not including opioid sales, right?

25              MS. HENN:  Objection to form,

Highly Confidential - Subject to Further Confidentiality Review

1          lacks foundation.

2          A.    I believe we've covered the

3    2013 plan where controlled substances were

4    excluded.  2010 and 2012 are before that.

5    BY MR. BOGLE:

6          Q.    All right.  Let's go to

7    page .244.  I want to look at the second full

8    paragraph there on that page, where it says:

9    McKesson did not report suspicious orders for

10   West Virginia customers until 2013.  Since it

11   began doing so, the company submitted upwards

12   of 10,000 suspicious order reports to the

13   DEA.  By not reporting suspicious orders when

14   they were discovered, McKesson failed to meet

15   its responsibilities under the CSA.  In

16   addition, the failure to report suspicious

17   orders deprived the DEA of timely information

18   that could have alerted the agency to

19   potential controlled substance diversion,

20   which the agency could have used to act

21   against registrants that were illegally

22   diverting controlled substances.

23              You see that?

24         A.    I do see that.

25         Q.    Were you aware that McKesson

1  wasn't even reporting suspicious orders in

2  West Virginia until 2013?

3          MS. HENN:  Objection to form,

4      lacks foundation.

5      A.    I'm not aware of whether we

6  were or whether we weren't prior or after

7  2013.

8  BY MR. BOGLE:

9      Q.    Okay.  And the concept of

10  failing to report suspicious orders depriving

11  the DEA of the ability to investigate, you

12  agree with that concept, right?  If you don't

13  report a suspicious order, you don't put the

14  DEA on notice of anything to potentially

15  investigate, right?

16          MS. HENN:  Objection to form,

17      lacks foundation and calls for

18      speculation.

19      A.    I don't know that I agree.  I

20  believe we were reporting our ARCOS data that

21  you referenced earlier that some of your

22  statistics came from, and the DEA would have

23  had access to that as well.

24  BY MR. BOGLE:

25      Q.    Okay.  So you think simply by

1    reporting the transactions that occurred,

2    that was sufficient to meet your obligations

3    under the Controlled Substances Act?

4              MS. HENN:  Objection to form,

5         mischaracterizes the testimony.

6         A.    No, our responsibility under

7    the act I think I've stated, to identify and

8    report suspicious orders.

9    BY MR. BOGLE:

10        Q.    Okay.  And if that wasn't done

11   in West Virginia until 2013, what Congress is

12   saying is accurate, that you didn't meet your

13   obligations under the CSA, right?

14             MS. HENN:  Objection to form,

15        lacks foundation.

16        A.    I don't know if it's accurate

17   or not.  I see what was written here in the

18   document that you read to me.

19   BY MR. BOGLE:

20        Q.    Okay.  But if that's true, if

21   what Congress is saying here is true, that

22   McKesson in West Virginia didn't report

23   suspicious orders until 2013, that up until

24   that time, do you agree or disagree with

25   Congress's other conclusion that that means

Highly Confidential - Subject to Further Confidentiality Review

1    that McKesson failed to meet its

2    responsibilities under the Controlled

3    Substances Act?

4              MS. HENN:  Objection to form,

5         lacks foundation and calls for a legal

6         conclusion.

7         A.    I'm not aware of whether the

8    orders were identified as suspicious or not

9    prior to or after our reporting about those

10   orders.  I think...

11   BY MR. BOGLE:

12        Q.    Yeah.  I think my question is

13   different.

14             I'm asking you if the -- if

15   Congress is correct, that McKesson did not

16   report suspicious orders for West Virginia

17   customers until 2013, would the failure to do

18   so prior to 2013 be a failure to meet its

19   obligations under the Controlled Substances

20   Act?

21             MS. HENN:  Same objections.

22        Objection to form, lacks foundation

23        and calls for a legal conclusion.

24        Also, asked and answered.

25        A.    I'm not a lawyer.  I don't know

1    that I'm in a position to determine how to

2    answer that question.

3    BY MR. BOGLE:

4         Q.    Okay.  I thought we talked

5    about earlier that you understood McKesson's

6    responsibilities as far back to the letter at

7    least in, I think, 2006 we looked at, as

8    including the responsibility to report

9    suspicious orders.  If that was not your

10   testimony, let me know.

11        A.    I don't remember the specific

12   question or the testimony, but our

13   responsibility under the act is to have an

14   effective program that identifies orders that

15   deviate in pattern, size and frequency, and

16   to have an effective program that guards

17   against diversion.  That's my understanding.

18        Q.    Okay.  Which includes reporting

19   suspicious orders when detected, right?

20        A.    I believe we also have a

21   responsibility to report the orders when

22   detected.

23        Q.    Okay.  And the last thing I

24   want to look at here is .321.  And I'm in the

25   third paragraph, the third sentence, where it

```
 1    says, "While distributors' policies."

 2              Do you see that sentence?

 3       A.     I do.

 4       Q.     It says:  While distributors'

 5    policies have evolved over time and were

 6    strengthened in reaction to DEA enforcement

 7    actions, the Committee's investigation

 8    identified a variety of breakdowns dating

 9    back to 2006 through the present day.

10              Do you see that?

11       A.     I do see that.

12       Q.     Okay.  Do you agree or disagree

13    that from 2006 through the present day,

14    McKesson has experienced breakdowns in its

15    due diligence related to opioids?

16              MS. HENN:  Objection to form,

17         lacks foundation.

18       A.     I'm not sure I would

19    characterize them the way you had.  I am

20    aware that we had accepted responsibility for

21    failing to report some orders for some

22    customers during specific periods of time.

23    BY MR. BOGLE:

24       Q.     And that's outlined in the 2017

25    settlement agreement, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      I believe so, yes.

2         Q.      Which have you also read that

3    agreement?

4         A.      I've reviewed parts of the

5    agreement.  I can't say that I've read the

6    entire document.

7         Q.      Okay.  Have you reviewed parts

8    of that agreement as part of your employment

9    at McKesson or in preparation for deposition

10   or both?

11        A.      I remember reviewing it as part

12   of the prep for this discussion today.

13        Q.      Did you ever read the 2017

14   agreement or any parts of it as part of your

15   just day-to-day work at McKesson?

16        A.      I had received summaries of the

17   document --

18              MS. HENN:  I'm just going to

19         object that if you're starting to talk

20         about things you heard from lawyers,

21         you shouldn't do that, but go ahead

22         and if you could repeat the question.

23   BY MR. BOGLE:

24        Q.      Yeah, let me rephrase my

25   question because I don't think I'm asking
```

1     that at all.

2             I'm just asking whether, as

3     part of your day-to-day work at McKesson, you

4     ever personally read any portion off the 2017

5     settlement agreement.  I don't want to know

6     what anybody told you.  I want to know if you

7     read it.

8         A.    I don't -- I can't say that I

9     pulled out the document and read the

10    document, but as part of my role and

11    responsibilities, I had received summaries

12    and our responsibilities under that

13    settlement.

14        Q.    Did you ever ask to see the

15    whole agreement as part of your job

16    responsibilities at McKesson?

17        A.    No, I don't recall that I did.

18        Q.    Okay.  I'm going to mark

19    Exhibit 29 for you, which is 1.88.  Also,

20    it's MCKMDL00355350.

21            (McKesson-Cavacini Deposition

22        Exhibit 29 marked.)

23    BY MR. BOGLE:

24        Q.    All right.  So this is, first

25    of all, the top of the first page states

1    Administrative Memorandum of Agreement.

2              Do you see that?

3    A.      I do, yes.

4    Q.      And if you go to the last page,

5    there are signatures, January 5th, 2017 by

6    Mark Walchirk at McKesson, and then also

7    signatures from members of DEA.

8              Do you see that on the last

9    page?

10   A.      I do, yes.

11   Q.      And Mark Walchirk, as noted

12   here, at that time was president of

13   U.S. Pharma at McKesson, right?

14   A.      Correct.

15   Q.      Okay.  So I want to look at a

16   couple of aspects of this settlement

17   agreement here in 2017.

18              If you go first to page .2.

19   You see there under number 7 it says:  On or

20   about November 14, 2014, McKesson received a

21   letter (dated November 4, 2014) from the DEA

22   Office of Chief Counsel, Diversion Regulatory

23   and Litigation Section, stating that DEA was

24   separately pursuing administrative action

25   against McKesson-Aurora for the conduct

1    outlined in the August 13, 2014 letter.

2            DEA also stated that the

3    allegations regarding McKesson's failure to

4    maintain effective controls against diversion

5    of particular controlled substances -- and it

6    cites to 21 U.S.C. 823(b)(1) -- and failure

7    to design and operate a system to disclose to

8    the registrant suspicious orders of

9    controlled substances -- and it cites to

10   21 CFR 1301.74(b) -- was national in scope,

11   and that DEA was also pursuing administrative

12   investigations of such alleged failures at

13   McKesson -- and it lists multiple

14   distribution centers at McKesson, right?

15       A.    It does, yes.

16       Q.    Okay.  Now, have you ever

17   reviewed any of these letters that are

18   outlined here in this paragraph?

19       A.    I would like to see the letters

20   to make sure I have.  I'm not sure what the

21   November 14, 2014 letter is.

22       Q.    Okay.  Well, let me ask you

23   this:  Do you recall ever seeing any

24   documentation from DEA stating to McKesson

25   that it believed its due diligence failures

Highly Confidential - Subject to Further Confidentiality Review

1    as it pertained to monitoring of controlled

2    substances was national in scope?

3              MS. HENN:  Objection to form,

4         lacks foundation.

5         A.    I don't recall.

6    BY MR. BOGLE:

7         Q.    Okay.  Well, you would agree

8    with me that what's outlined here concerns of

9    the DEA outlined about --

10             MS. HENN:  I think your finger

11        is in the shot.

12             MR. BOGLE:  Oh.  Sorry.

13   BY MR. BOGLE:

14        Q.    You would agree with me that

15   the concerns outlined here about due

16   diligence failures that were national in

17   scope are serious and concerning, though,

18   right?

19        A.    I would take all allegations

20   from the DEA as serious.

21        Q.    Okay.  Including these, right,

22   especially when it talks about national

23   failures, right?

24             MS. HENN:  Objection to form,

25        lacks foundation.

1        A.      I take them seriously.

2    BY MR. BOGLE:

3        Q.      I'm sorry?

4        A.      I take them seriously.

5        Q.      Okay.  Let's go to .3.  You see

6    under number 2, you referenced this a little

7    bit earlier, is the acceptance of

8    responsibility provision.

9                Do you see that?

10       A.      I do.

11       Q.      Okay.  It says there:  On or

12   about September 27, 2006, February 7, 2007,

13   and December 27, 2007, DEA's Deputy Assistant

14   Administrator, Office of Diversion Control,

15   sent letters to every entity in the United

16   States that was registered with DEA to

17   manufacture or distribute controlled

18   substances, including McKesson.

19                And it references the DEA

20   letters.

21                The DEA letters contained,

22   among other things, guidance for the

23   identification and reporting of suspicious

24   orders to DEA -- and it references the CFR.

25                Then it says:  McKesson

1    acknowledges that, at various times during

2    the time period -- during the period from

3    January 1, 2009 up through and including the

4    effective date of this agreement (the Covered

5    Time Period), it did not identify or report

6    to DEA certain orders placed by certain

7    pharmacies which should have been detected by

8    McKesson as suspicious based on the guidance

9    contained in the DEA letters about the

10   requirements set forth in -- and then it

11   lists the CFR and U.S.C.

12            Do you see that?

13        A.    I do.

14        Q.    This is the acceptance of

15   responsibility provision that you were

16   talking to me about a few minutes ago, right?

17        A.    I believe so, yes.

18        Q.    Okay.  And we looked at the

19   execution or effective date of this agreement

20   is in January 2017, right?  You see that on

21   the last page, right?  Do you see that on the

22   last page?

23        A.    Yeah.  It was signed in January

24   of --

25        Q.    Executed.  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1          So the acceptance of

2    responsibility for the failure to identify

3    and report suspicious orders over an

4    eight-year time frame, that's very

5    significant, isn't it?

6               MS. HENN:  Objection to form,

7          mischaracterizing the document, lacks

8          foundation.

9          A.    I don't know, but I think we

10   take our obligations under the Controlled

11   Substances Act and under this memorandum of

12   agreement very seriously.

13   BY MR. BOGLE:

14        Q.    The obligation -- once this

15   agreement was executed, is that what you're

16   referring to?

17        A.    No, I think I said under the

18   Controlled Substances Act.

19        Q.    Okay.  Do you think that this

20   acceptance of responsibility that I just read

21   is consistent with a company who's taken

22   these responsibilities seriously?

23              MS. HENN:  Objection to form,

24        the prior question had misstated the

25        contents of the document.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm not aware of all the

2    specifics that went into reaching this

3    settlement with the DEA, and I think it

4    states clearly that at various times during

5    the period we accepted responsibility because

6    we did not identify or report certain orders

7    placed by certain pharmacies which should

8    have been detected by McKesson.

9    BY MR. BOGLE:

10    Q.    Okay.  And this is now the

11    second settlement agreement we've seen.

12    There's also one in 2008 we looked at earlier

13    today.

14          Do you recall that?

15    A.    I do.

16    Q.    Okay.  And so do you think that

17    the entering into two separate settlement

18    agreements nine years apart for essentially

19    the same exact conduct is consistent with a

20    company that takes their due diligence

21    responsibility seriously?

22          MS. HENN:  Objection to form,

23        lacks foundation, mischaracterizes the

24        settlements.

25    A.    I think we do have and have

Highly Confidential – Subject to Further Confidentiality Review

1    always taken our responsibilities seriously.

2    BY MR. BOGLE:

3         Q.    Okay.  Well, do you dispute

4    that McKesson had a widespread failure to

5    investigate and report suspicious orders from

6    2009 to 2017?

7         A.    I wouldn't agree with that.  I

8    think we acknowledged that for certain

9    pharmacies during a certain period of time.

10        Q.    But a very substantial fine was

11   paid this time around in 2017, right, even

12   for a company like McKesson?

13        A.    I believe we paid a substantial

14   fine.

15        Q.    $150 million, right?

16        A.    That's the number I remember,

17   yes.

18        Q.    Okay.  And I'll ask you kind of

19   like I asked you before:  Can you name for

20   our jury any instance since you've been at

21   the company that McKesson has paid a fine

22   even approaching $150 million for something

23   the company believed it did not do?

24             MS. HENN:  Objection to form,

25        calls for speculation.

1          A.    I wasn't involved in the

2     decision-making leading up to this

3     settlement.  It says here:  In order to avoid

4     the uncertainty and expense of litigation,

5     and in furtherance of the parties' belief

6     that a settlement is in the public interest.

7               MR. BOGLE:  Yeah, move to

8          strike as nonresponsive.

9     BY MR. BOGLE:

10         Q.    I'm just asking, in the time

11    you've been at the company, can you name for

12    us a specific instance where McKesson has

13    paid anything approaching a $150 million fine

14    for something that it didn't do?  I'm just

15    looking for one example.

16              MS. HENN:  Objection to form,

17         calls for speculation.

18         A.    I'm not -- I'm not aware of our

19    teams that come to those decisions.  I'm not

20    part of those teams that come to those

21    decisions or why -- what might influence our

22    decisions to enter into a settlement or not.

23    BY MR. BOGLE:

24         Q.    You think you guys shouldn't

25    have settled in 2017?  You should have fought

1    it?

2        A.    Again, I don't know what

3    discussions took place between the company

4    and the DEA leading up to this settlement.  I

5    believe the company made a decision that he

6    felt was in its best interest and the DEA

7    agreed that it was in the best interest of

8    the public to settle.

9        Q.    So, yeah.  I'm just asking

10   whether at your time at McKesson it was your

11   personal opinion that this should not have

12   been settled the way it was in 2017,

13   especially with this acceptance of

14   responsibility we just read?

15            MS. HENN:  Objection to form.

16       A.    I don't know and I don't have

17   enough information to draw a conclusion.

18   BY MR. BOGLE:

19       Q.    Okay.  On this same page,

20   bottom of .3, carrying over to .4, it lists a

21   total of 12 McKesson distribution centers

22   covered by this agreement as having failed to

23   maintain effective controls against

24   diversion.

25            Do you see that?

```
 1              MS. HENN:  Objection to form,

 2        mischaracterizing the document.

 3        A.    I do see where the 12

 4   pharmacies are listed, and I'm unclear if

 5   this is the allegations against the company.

 6   BY MR. BOGLE:

 7        Q.    You say 12 pharmacies.  These

 8   are all distribution centers.

 9        A.    I'm sorry, 12 distribution

10   centers.  I'm sorry, you are correct, 12

11   distribution centers.

12        Q.    Okay.  Let me look at one last

13   thing here and I think I'm done.  Page .4

14   now.  In letter (c) it says:  McKesson failed

15   to follow the procedures and policies set

16   forth in the McKesson CSMP to detect and

17   disclose suspicious orders of controlled

18   substances.  Among other things, McKesson

19   failed to conduct adequate due diligence of

20   its customers, failed to keep complete and

21   accurate records in the CSMP files maintained

22   for many of its customers, and bypassed

23   suspicious order reporting procedures set

24   forth in the McKesson CSMP.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I do see where it says that.
 2          Q.      Do you think that conduct I
 3     just read in this paragraph here is
 4     consistent with a company that undertook
 5     great efforts to minimize diversion of
 6     opioids?
 7                  MS. HENN:  Objection to form.
 8          Objection to form, lacks foundation.
 9          A.      Again, it's my understanding
10     that these were parts of the allocations made
11     by the DEA, but what we accepted
12     responsibility for was clearly outlined here.
13     BY MR. BOGLE:
14          Q.      Okay.  I'm asking -- this
15     document was ultimately signed by Mark
16     Walchirk, right?
17          A.      It appears to be, yes.
18          Q.      What I just read to you in
19     letter (c), do you believe that that's
20     consistent -- that conduct is consistent with
21     a company who takes great effort in
22     minimizing diversion?
23                  MS. HENN:  Objection to form,
24          lacks foundation.
25          A.      I don't know if that statement
```

Highly Confidential - Subject to Further Confidentiality Review

1    is true or not.  I believe it was an

2    allegation against the company that we agreed

3    and accepted responsibility for something

4    very different.

5    BY MR. BOGLE:

6        Q.    Oh, you think that McKesson

7    accepted responsibility for something very

8    different than what I just read in letter

9    (c)?

10       A.    McKesson accepted

11   responsibility for failing to report certain

12   orders for certain customers.

13       Q.    Yeah.  I'm asking if in letter

14   (c), that you think that's substantially

15   different than what McKesson accepted

16   responsibility for.

17       A.    I'm not a lawyer, but there are

18   components of (c) that aren't listed in the

19   acceptance of responsibility section.

20       Q.    Okay.  So when Mark Walchirk,

21   president of U.S. Pharma, signed this, he's

22   signing something that contained a bunch of

23   allegations that you think are completely

24   unfounded, right?

25       A.    I don't know, but that's not my

1    understanding of what we accepted

2    responsibility for.

3          Q.    Well, I'm asking, though:  Do

4    you think that this agreement should have

5    been signed by anyone at McKesson that

6    contains the language that's read in letter

7    (c)?

8                MS. HENN:  Objection to form.

9          A.    I don't know that I'm in a

10   position to second-guess the decisions of

11   Mark and our teams that decided to enter into

12   this agreement with the DEA.  I think what

13   I'm focused on now is making sure that we

14   meet our obligations under it and continue to

15   exercise our responsibilities appropriately

16   and to the satisfaction of supply chain

17   stakeholders and the DEA.

18   BY MR. BOGLE:

19         Q.    How about satisfaction of the

20   patients who might be impacted by these

21   drugs?

22         A.    I think I have a balanced and

23   shared responsibility to make sure that

24   these -- all medications, prescription and

25   otherwise, are available to patients when

1    they need them so they can pick them up at

2    their pharmacy and use them as prescribed,

3    while maintaining effective controls to

4    prevent them from getting in the hands that

5    have -- of people that might have less than

6    good intentions with them.

7         Q.    But you would agree the most

8    important responsibility that you have as COO

9    of McKesson at this point in time is making

10   sure that what's outlined in the 2008 and

11   2000 [sic] settlement agreements as far as

12   the failures and due diligence of McKesson

13   don't continue within the company, true?

14             MS. HENN:  Objection to form,

15        lacks foundation and mischaracterizes

16        the document.

17        A.    I disagree with the framing of

18   the question.

19   BY MR. BOGLE:

20        Q.    We reviewed both agreements.

21   Do you think that your obligations as it

22   stands today are to make sure that the things

23   like that are outlined in those two

24   agreements don't occur again?

25             MS. HENN:  Same objections,

1          lacks foundation.

2          A.     I think one of my

3     responsibilities, along with our regulatory

4     teams, is to make sure that we continue to

5     evolve our program, respond to changing

6     dynamics and trends in the market and have

7     the most effective program to execute our --

8     execute our responsibilities and guard

9     against diversion.  And we're committing to

10    doing it.

11    BY MR. BOGLE:

12         Q.     To make sure that things like

13    the allegations we read in the 2008 and 2017

14    settlement agreement do not occur again,

15    right?

16              MS. HENN:  Objection, lacks

17         foundation.

18         A.     I don't know that the

19    allegations happened or not, but, yeah, I

20    would like to have the best program that

21    nobody could question so there aren't

22    allegations again.

23    BY MR. BOGLE:

24         Q.     Right.  These were all very

25    serious allegations that all resulted in

1    substantial settlements, right?

2         A.    I believe I take the

3    allegations seriously and they were

4    substantial settlements and we responded

5    appropriately.

6         Q.    You say you responded

7    appropriately.  In the 2017 settlement

8    agreement, it's noted that, in fact, starting

9    in 2009, immediately after the 2008

10   settlement agreement, that you guys didn't

11   react appropriately, right?

12               MS. HENN:  Objection --

13   BY MR. BOGLE:

14        Q.    Can you take away the

15   acceptance of responsibility paragraph as

16   meaning anything other than that?

17               MS. HENN:  Objection to form.

18        A.    I focus on paragraph 2 that

19   says:  McKesson has taken steps to prevent

20   such conduct from occurring in the future,

21   including the measures delineated in the

22   Compliance Addendum.

23   BY MR. BOGLE:

24        Q.    Oh, so after this agreement was

25   entered in 2017, right?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HENN:  Objection to form,

2     mischaracterizing the testimony.

3     A.     I think we have taken steps

4     during our entire time with my time with the

5     company to evolve our program.

6     BY MR. BOGLE:

7     Q.     But the failures and due

8     diligence that McKesson accepted

9     responsibility for began within months after

10    the settlement agreement was executed in

11    2008.  True or not true?

12         MS. HENN:  Objection to form,

13         lacks foundation and mischaracterizes

14         the document.

15    A.     The time period outlined here

16    starts in January 1, 2009.

17         MR. BOGLE:  Okay.  I don't have

18         anything further at this time.

19         MS. HENN:  I think we'll want

20         to go off the record.

21         THE VIDEOGRAPHER:  Okay.  We're

22         off the record at 4:31 p.m.

23         (Recess taken, 4:31 p.m. to

24         4:43 p.m.)

25         THE VIDEOGRAPHER:  We're back

Highly Confidential - Subject to Further Confidentiality Review

1          on the record at 4:43 p.m.

2                    EXAMINATION

3     BY MS. HENN:

4          Q.     Good afternoon, Mr. Cavacini.

5          A.     Good afternoon.

6          Q.     Mr. Cavacini, what's your

7     current title at McKesson?

8          A.     Senior vice president and chief

9     operating officer for our U.S. pharmaceutical

10    business.

11         Q.     And when did you take on the

12    role of senior vice president and chief

13    operating officer?

14         A.     Roughly August of 2017.

15         Q.     Prior to taking on your current

16    role, how long did you work for McKesson?

17         A.     I've been with the company a

18    little over 17 years.  Just celebrated my

19    17th anniversary, I believe.

20         Q.     Let's talk about your

21    background.  First, where did you go to

22    college?

23         A.     I graduated from a small

24    liberal arts school outside of Philadelphia

25    called Ursinus College.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    When did you graduate from

2  Ursinus College?

3    A.    1993.

4    Q.    After graduating from college

5  what was your first job?

6    A.    My first job out of school was

7  selling Yellow Pages advertising.

8    Q.    How long did you work in your

9  job selling Yellow Pages advertising?

10    A.    I believe about three years,

11  maybe a little less.

12    Q.    After you stopped working in

13  the Yellow Pages advertising position, what

14  job did you take after that?

15    A.    I actually went to go work for

16  a customer that I met through my employment

17  at the Yellow Pages that owned a mail order

18  diabetes pharmacy called Advantage Health

19  Services.

20    Q.    How did you come to join

21  McKesson in 2002?

22    A.    Advantage was actually a

23  customer of McKesson at different periods of

24  time.  The company was sold roughly halfway

25  through my tenure to Sun Healthcare.  I

1    stayed for a number of years.  Unfortunately,

2    that company actually went through a Chapter

3    11 bankruptcy and at that point in time I

4    began looking for opportunities.  I was

5    familiar with McKesson and came to McKesson

6    in 2002.

7         Q.    What was your position when you

8    joined McKesson?

9         A.    My first role was a retail

10   sales executive.

11        Q.    What were your responsibilities

12   as a retail sales executive?

13        A.    The primary responsibilities of

14   a retail sale executive were business

15   development, trying to work with non-McKesson

16   customers to understand their needs and see

17   if there was a fit with McKesson.

18        Q.    How did you identify potential

19   customers when you were working as a retail

20   sales executive?

21        A.    I think through a variety of

22   sources, back to that time.  Believe it or

23   not, the Yellow Pages was one of them that we

24   used, but there were also lists of

25   pharmacies.  I remember the Hayes Directory

1    being a list of pharmacies.  A lot of my time

2    was spent in New York City where in that

3    market you can literally just park your car

4    and walk and find pharmacies.

5          Q.    How long did you serve as a

6    retail sales executive at McKesson?

7          A.    I believe about four years.

8          Q.    And your next position I think

9    you testified earlier was as a district sales

10   manager?

11         A.    Correct, a district sales

12   manager for our Delran distribution center.

13         Q.    What were your responsibilities

14   as a district sales manager?

15         A.    I was a frontline sales

16   manager, leading a team of, you know, seven

17   to probably 15 retail sales managers at

18   different periods of time that maintained the

19   relationships that we had with our existing

20   McKesson distribution customers.

21         Q.    And what territory did you

22   cover as a district sales manager?

23         A.    It changed a little bit during

24   my tenure there.  I initially started with

25   just the Delran distribution center, which

1 would have been the eastern half of

2 Pennsylvania, New Jersey, New York City, a

3 little bit of Maryland and Delaware, and was

4 later expanded to our New Castle distribution

5 in addition, which would have been the

6 western half of Pennsylvania, eastern Ohio, a

7 little bit of West Virginia.

8   Q.  What was your next position at

9 McKesson after you served as a retail sales

10 manager?

11   A.  I was promoted to a vice

12 president of sales for the same markets.

13   Q.  And how long did you have that

14 position?

15   A.  A little over three years, I

16 believe.

17   Q.  What was your next position at

18 McKesson?

19   A.  I was promoted again to vice

20 president and general manager for our

21 facility in Memphis, Tennessee, so I had

22 sales and operations responsibility for the

23 markets served by that distribution center.

24 Made a move from New Jersey at the time to

25 Collierville, Tennessee.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what was your next position

2    at McKesson?

3    A.    I believe about three years

4    later had a chance to go back to the

5    northeast region and lead our northeast

6    region operations as the senior vice

7    president for that market.

8    Q.    And that was your position

9    before you assumed your current position; is

10   that correct?

11   A.    Correct, up until August of

12   '17.

13   Q.    Mr. Cavacini, how would you

14   describe your level of familiarity with the

15   sales team's operations at McKesson's

16   U.S. Pharma division?

17   A.    I think I have a pretty deep

18   understanding.  For the better part of my

19   17-year career, I've been part of that team

20   in one fashion or another, as an individual

21   contributor and sales manager and now leader

22   of an organization.

23   Q.    Based on your experience, how

24   would you describe the goal of the sales team

25   at McKesson in relation to prospective

1    customers?

2              MR. BOGLE:  Object to form.

3         A.    I've heard it described and

4    I've described it to my teams that we want to

5    have long-term customers that value the

6    services and solutions we provide.  For the

7    better part of my career, our health system's

8    partners, as well as our retail independent

9    customers, have been under intense pressure,

10   reimbursement pressure.  Clinical therapies

11   have become more complex.  They're constantly

12   being asked to do more.

13             And we talk about the customers

14   choose us not only for the value and the

15   services we provide today, but because we

16   share a common vision for the future of

17   pharmacy.  And I think that is what we're

18   trying to pursue.

19   BY MS. HENN:

20        Q.    And again, based on your

21   experience, how would you describe the goal

22   of the sales team at McKesson in relation to

23   existing customers?

24             MR. BOGLE:  Object to form.

25        A.    I think it's to build mutually

1    beneficial and rewarding relationships.  I

2    spoke earlier about our ICARE shared

3    principle "C," and that is customer centered

4    where we think about our business through our

5    customers' eyes and try to make sure that,

6    where we can, we're aligned around where

7    healthcare is going and how we can perform

8    our part to serve the pharmacies that are our

9    customers as well as the communities they

10   serve and that we live in and work out.

11   BY MS. HENN:

12        Q.    Based on your experience over

13   your 17 years at McKesson, describe the

14   typical relationship between a retail sales

15   manager and a customer.

16             MR. BOGLE:  Object to form.

17        A.    I do think it varies, but my

18   experience has been that more often than not,

19   that that is a deep relationship.  In many of

20   our -- the business relationships that we

21   have with our customers, we are probably

22   their largest vendor and have significant

23   impact on their business and their abilities

24   to perform for their communities.

25             One of the things that I'm most

Highly Confidential - Subject to Further Confidentiality Review

1    proud of, if you walk into one of our

2    distribution centers, not only will you see

3    ICARE, but you will see a slogan that "It's

4    not a package, it's a patient."

5              We hammer home to our

6    associates in the DC, as well as our sales

7    teams, that at the end of every one of our

8    processes is a patient; somebody's mother,

9    child, that's in need and waiting for the

10   medications we provide.  And we take that

11   responsibility very seriously in working with

12   our customers.

13             We've also had customers come

14   into our distribution center to share that

15   same message and the impact that we have on

16   their businesses and their communities.

17   BY MS. HENN:

18        Q.    How does the sales team

19   interact with the regulatory affairs team at

20   McKesson?

21             MR. BOGLE:  Object to form.

22        A.    In a variety of ways.  I mean,

23   I've heard it described and I've described it

24   myself that our sales team is an important

25   part of our Controlled Substance Monitoring

Highly Confidential - Subject to Further Confidentiality Review

1    Program, been described as our first line of

2    defense.  They spend the most time with our

3    customers.

4              And our new customer

5    onboarding, they're working with the customer

6    to complete the questionnaire.  The customer

7    fills out that questionnaire and signs it,

8    hopefully in presence of the sales rep, and

9    the sales rep is making observations about

10   what he sees -- he or she sees and observes

11   relative to what's being represented by the

12   customer on the questionnaire.

13             That's shared with our

14   regulatory affairs team who has the ultimate

15   decision.  I mean, they are supportive and

16   collaborative, but independent.

17   BY MS. HENN:

18        Q.    What, if any, training do

19   sales -- does the sales team receive in the

20   area of controlled substances monitoring?

21             MR. BOGLE:  Object to form as

22        to time.

23        A.    During my career I've been a

24   part of and witnessed, you know, several

25   different sales trainings.  As part of our

Highly Confidential - Subject to Further Confidentiality Review

1    National Sales Conference, on a number of

2    years we've had annual refreshers for our

3    sales teams around the controlled substance

4    monitoring, our responsibilities under it.

5                As part of our new hire

6    orientation, when new associates join the

7    company, they go through a training and

8    onboarding process which includes education

9    and review on our CSMP and their

10   responsibilities.

11   BY MS. HENN:

12        Q.    Could you describe McKesson's

13   culture in the area of controlled substances

14   monitoring compliance?

15                MR. BOGLE:  Object to form.

16        A.    I would say diligent.  We take

17   our responsibilities very seriously.  We have

18   worked and invested significantly to try to

19   develop the best program that we can have to

20   execute our responsibilities.

21                I spoke earlier about the

22   commitment that we have to all our customers

23   and that we communicate to our associates

24   that the license that we have is critical to

25   our business in order to meet the full

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmaceutical needs of the customers we

 2    serve, and I would rather make hard decisions

 3    around individual customers than potentially

 4    risk my relationship with, you know, all the

 5    other ones, including major health systems

 6    and trauma centers and our government and DOD

 7    business.  We try to be as diligent as we

 8    can.

 9              MS. HENN:  I have no further

10        questions.

11              Would you like to go off the

12        record and switch?

13              MR. BOGLE:  Let's go off the

14        record just a second and let me think

15        for like 30 seconds.

16              THE VIDEOGRAPHER:  We're off

17        the record at 4:54 p.m.

18              (Recess taken, 4:54 p.m. to

19        4:55 p.m.)

20              THE VIDEOGRAPHER:  Back on the

21        record at 4:55 p.m.

22                    EXAMINATION

23    BY MR. BOGLE:

24        Q.    Mr. Cavacini, just to follow up

25    on one point here:  You just talked about
```

1    McKesson's culture as it pertains to

2    controlled substance monitoring.  I think one

3    of the things you said was you take it very

4    seriously, right?

5          A.    I believe we do, yeah.

6          Q.    Okay.  And I think throughout

7    the deposition today you've taken the

8    position that you think the company has

9    committed no wrongdoing as it pertains to due

10   diligence with opioids, right?

11               MS. HENN:  Objection to form.

12         A.    I think I acknowledged as part

13   of the settlement that we did accept

14   responsibilities for certain customers and

15   certain orders.

16   BY MR. BOGLE:

17         Q.    Okay.  The fact of the matter

18   is, you've, quite frankly, got more than

19   a million reasons at this point to support

20   this company, right?

21               MS. HENN:  Objection to form,

22         vague.

23         A.    I don't know that I understand

24   the question.

25               ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:
 2         Q.    Okay.  Well, you currently, in
 3    2019, for example, are set to make more than
      ▮ ██████████████████████  total compensation,
 5    right?
 6               MS. HENN:  Objection to form,
 7         lacks foundation.
 8         A.    I don't know that to be true.
 9    BY MR. BOGLE:
10         Q.    Okay.  Does the company provide
11    you with your compensation information going
12    into each fiscal year?
13         A.    It does.
14         Q.    Okay.  Let me hand you what I'm
15    marking as Exhibit 30.  It's 1.2136, and
16    that's MCKMDL00695848.
17               (McKesson-Cavacini Deposition
18         Exhibit 30 marked.)
19    BY MR. BOGLE:
20         Q.    And what we see here is, on the
21    first page, a letter from May 31, 2018
22    referenced to Eugene G. Cavacini.
23               That's you, correct?
24         A.    That's me, yes.
25         Q.    Okay.  And I'll tell you this
```

```
 1    was provided to us by McKesson as part of

 2    your personnel file.

 3               If you go to the second page

 4    here, you see there cash compensation and

 5    long-term compensation listed for you for

 6    2018 actuals and your targets for 2019 fiscal

 7    year.

 8               Do you see that?

 9        A.    I do.

10        Q.    Okay.  And, for example, in

11    2018, your actual -- your total target

12    compensation was ████████  right?

13        A.    That was the target

14    compensation.

15        Q.    All right.  And in the fiscal

16    year 2019, the target compensation is

17    ████████  right?

18        A.    Yes.

19        Q.    And quite simply, that's a lot

20    of money, isn't it?

21               MS. HENN:  Objection to form.

22        A.    I feel grateful for the

23    opportunity I have.

24    BY MR. BOGLE:

25        Q.    Okay.  Because that's very
```

Highly Confidential - Subject to Further Confidentiality Review

 1    generously rewarding you from a compensation

 2    perspective, isn't it?

 3            MS. HENN:  Same objection.

 4      A.      I'm humbled by the opportunity

 5    I have.  I'm grateful for what the company

 6    has given me and hopefully what I've returned

 7    to them.

 8

 9            MR. BOGLE:  Okay.  No further

10        questions.

11            MS. HENN:  Before we go off the

12        record, I would just like to ask that

13        the -- pursuant to the protective

14        order, the transcript and all exhibits

15        be designated highly confidential

16        pending review and designation.

17            And I would also ask that the

18        witness have the opportunity to read

19        and sign.

20            MR. RALEY:  Cardinal will

21        reserve its questions for the time of

22        hearing or trial.

23            THE VIDEOGRAPHER:  Anyone on

24        the phone?  Off the record?

25            MS. HENN:  Thanks.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We're off

 2          the record at 4:59 p.m.  This

 3          concludes Disc 4.

 4                    (Proceedings recessed at

 5          4:59 p.m.)

 6                         --o0o--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   CERTIFICATE
 2              I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    EUGENE G. CAVACINI was duly sworn by me to
      testify to the truth, the whole truth and
 6    nothing but the truth.
 7              I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
                I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      requested by the witness or other party
12    before the conclusion of the deposition.
13              I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21
      Notary Public in and for the
22    State of Texas
      My Commission Expires:  7/9/2020
23
      Dated: January 29, 2019
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the

 6     appropriate space on the errata sheet for any

 7     corrections that are made.

 8              After doing so, please sign the

 9     errata sheet and date it.

10              You are signing same subject to

11     the changes you have noted on the errata

12     sheet, which will be attached to your

13     deposition.

14              It is imperative that you return

15     the original errata sheet to the deposing

16     attorney within thirty (30) days of receipt

17     of the deposition transcript by you.  If you

18     fail to do so, the deposition transcript may

19     be deemed to be accurate and may be used in

20     court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          ERRATA

 2    PAGE   LINE   CHANGE

 3    _____  _____  _____

 4           REASON: _____

 5    _____  _____  _____

 6           REASON: _____

 7    _____  _____  _____

 8           REASON: _____

 9    _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3              I, EUGENE G. CAVACINI, do hereby
       certify that I have read the foregoing pages
4      and that the same is a correct transcription
       of the answers given by me to the questions
5      therein propounded, except for the
       corrections or changes in form or substance,
6      if any, noted in the attached
       Errata Sheet.

7

8

9

10

11      _____
        EUGENE G. CAVACINI                      DATE
12

13

14      Subscribed and sworn to before me this
15      _____ day of _____, 20 _____.
16      My commission expires: _____
17
18      _____
19      Notary Public
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1

                           LAWYER'S NOTES

2

3       PAGE      LINE

4       _____     _____     _____

5       _____     _____     _____

6       _____     _____     _____

7       _____     _____     _____

8       _____     _____     _____

9       _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25