```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION,              )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7

 8                    — — —
 9          Wednesday, January 9, 2019
                      — — —
10

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11            CONFIDENTIALITY REVIEW
                      — — —
12

13

14

15        Videotaped Deposition of GEORGE
      CHAPMAN, held at 4206 South J.B. Hunt Drive,
16    Rogers, Arkansas, commencing at 9:00 a.m., on
      the above date, before Debra A. Dibble,
17    Certified Court Reporter, Registered
      Diplomate Reporter, Certified Realtime
18    Captioner, Certified Realtime Reporter and
      Notary Public.
19

20

21

                      — — —
22

           GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | fax 917.591.5672
              deps@golkow.com
24

25
```

Page 2

```
1   A P P E A R A N C E S:
2   CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
    & AGNELLO
3   BY:  MICHAEL A. INNES, ESQUIRE
        minnes@carellabyrne.com
4       JOHN PETROZZINO
        jpetrozzino@carellabyrne.com
5       ZACHARY BOWER, ESQUIRE
        zbower@carellabyrne.com
6   5 Becker Farm Road
    Roseland, New Jersey 07068-1739
7   (973) 994-1700
    Counsel for Plaintiffs
8
9   JONES DAY
    BY:  JASON VARNADO, ESQUIRE
10      jvarnado@jonesday.com
        SCOTT B. ELMER, ESQUIRE
11      selmer@jonesday.com
    717 Texas
12  Houston, Texas  77002- 2712
    832-239-3939
13  Counsel for Walmart
14
15  MARCUS & SHAPIRA, LLP
    (appearing telephonically)
16  BY:  DARLENE NOWAK, ESQUIRE
        dnowak@marcus-shapira.com
17  301 Grant Street
    35th Floor
18  Pittsburgh, Pennsylvania 15219-6401
    (412) 338-4690
19  Counsel for HBC
20
    WRIGHT, LINDSEY & JENNINGS, LLP
21  BY:  CALEY B. VO, ESQUIRE
        cvo@wlj.com
22  3333 Pinnacle Hills Parkway
    Suite 510
23  Rogers, Arkansas 72758-8498
    (479) 986-0888
24  Counsel for McKesson
25
```

Page 3

```
1   ARNOLD & PORTER KAYE SCHOLER, LLP
    (appearing telephonically)
2   BY:  WREDE SMITH
        wrede.smith@arnoldporter.com
3   601 Massachusetts Avenue, NW
    Washington, DC 20001-3743
4   (202) 942-5000
    Counsel for Endo Health Solutions Inc.;
5   Endo Pharmaceuticals Inc.; Par
    Pharmaceuticals, Inc.; Par
6   Pharmaceutical Companies, Inc. formerly
    known as Par Pharmaceutical Holdings,
7   Inc.
8
9   WILLIAMS & CONNOLLY, LLP
    BY:  EMILY RENSHAW PISTILLI, ESQUIRE
10      epistilli@wc.com
        (appearing telephonically)
11  725 Twelfth Street, N.W.
    Washington, DC 20005
12  (202) 434-5331
    Counsel for Cardinal Health, Inc.
13
    JACKSON KELLY, PLLC
14  BY:  ANDREW N. SCHOCK, ESQUIRE
        anschock@jacksonkelly.com
15  50 South Main Street
    Suite 201
16  Akron, Ohio 44308
    (330) 252-9060
17  Counsel for AmerisourceBergen
18
    ALSO PRESENT:
19
    Jennifer B. Bechet
20  Senior Associate Counsel
    Walmart, Inc.
21
22  THE VIDEOGRAPHER:
23  Chris Ritona
    GOLKOW TECHNOLOGIES, INC.
24
25          — — —
```

Page 4

```
1
2              I N D E X
3   GEORGE CHAPMAN                  PAGE
4   DIRECT EXAMINATION BY MR. INNES     7
5          E X H I B I T S
6   No.       Description       Page
7   Walmart    6-5-13 email from Donna     179
    Chapman 1  Auldridge.  Subj: FW: May
8              405-1.  WMT_MDL_000009437,
               with attachment.
9
10  Walmart    Practice Compliance update   181
    Chapman 2  PowerPoint deck slide.
11             WMT_MDL_000053017 with
               attachment
12  Walmart    Wal-Mart Pharmacy DC 6045    206
    Chapman 3  August Review of the July
13             2010 ordering practices of
               Wal-Mart Pharmacies.
14             WMT_MDL_000046008-46051.
15  Walmart    October 2014 email chain.    215
    Chapman 4  Subj: RE: SOM Deck Review.
16             WMT_MDL_000011128-11129
               with attachment
17
18  Walmart    June 2014 email chain.       283
    Chapman 5  Subj: FW: SOM ask for
19             FYE16.
               WMT_MDL_00004826-47828
20             with attachment.
21
    CERTIFICATE            364
22
    ERRATA                 366
23
    ACKNOWLEDGMENT OF DEPONENT        367
24
    LAWYER'S NOTES         368
25
```

Page 5

```
1          PROCEEDINGS
2   (January 9, 2019 at 9:00 a.m.)
3       THE VIDEOGRAPHER:  We are now
4   on the record.  My name is
5   Chris Ritona.  I am videographer for
6   Golkow Litigation Services.
7       Today's date is January 9,
8   2019, and the time is 9:00 a.m.  This
9   video deposition is being held in
10  Rogers, Arkansas, at Mitchell
11  Williams, 4206 South J.B. Hunt Drive,
12  in the matter of National Prescription
13  Opiate Litigation, MDL No. 2804,
14  Case No. 17-MD-2084, United States
15  District Court, Northern District of
16  Ohio, Eastern Division.
17      The deponent today is
18  George Chapman.
19      Will counsel please identify
20  themselves for the record.
21      THE WITNESS:  Here.
22      Sorry.
23      MR. INNES:  No problem.  Good
24  morning.  This is Michael Innes of
25  Carella Byrne for plaintiffs in the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1   MDL.
2       MR. PETROZZINO:  Good morning.
3   This is John Petrozzino from
4   Carella Byrne for plaintiffs in the
5   MDL.
6       MR. VO:  Caley Vo of Wright
7   Lindsey & Jennings on behalf of
8   McKesson.
9       MS. BECHET:  Jennifer Bechet,
10  Associate General Counsel, Walmart
11  Inc.
12      MR. ELMER:  Scott Elmer from
13  Jones Day on behalf of defendant
14  Walmart.
15      MR. VARNADO:  Jason Varnado
16  from Jones Day on behalf of Walmart
17  and the witness.
18      THE WITNESS:  George Chapman,
19  Senior Director, Walmart.
20      THE VIDEOGRAPHER:  The court
21  reporter today is Debbie Dibble, and
22  she will now please swear in the
23  witness.
24      COURT REPORTER:  Would you get
25  attendance on the phone for me,

Page 7

1   please?
2       THE VIDEOGRAPHER:  Could the
3   attendants on the phone please
4   announce themselves for the record as
5   well?
6       MS. PISTILLI:  This is Emily
7   Pistilli from Williams & Connolly on
8   behalf of Cardinal Health.
9       MR. SMITH:  This is Wrede Smith
10  from Arnold & Porter on behalf of Endo
11  and Par.
12      MR. SCHOCK:  And Andrew Schock
13  from Jackson Kelly on behalf of
14  AmerisourceBergen Drug Corporation.
15      MS. NOWAK:  And Darlene Nowak
16  from Marcus & Shapira on behalf of HBC
17  Services.
18      GEORGE CHAPMAN,
19  having first been duly sworn, was examined
20  and testified as follows:
21      DIRECT EXAMINATION
22  BY MR. INNES:
23      Q.  Good morning, Mr. Chapman.  As
24  I just said, my name is Michael Innes.  I'm
25  with the law firm of Carella Byrne out of

Page 8

1   Roseland, New Jersey, and I represent the
2   plaintiffs in the MDL.  Thank you very much
3   for being here this morning.
4       You understand that you're
5   under oath; is that right?
6       A.  I do.
7       Q.  And you might have to speak up
8   so folks on the phone can hear you today.
9       Have you ever testified under
10  oath before?
11      A.  I'm sorry, will you repeat
12  that?
13      Q.  Have you ever testified under
14  oath before?
15      A.  Yes.
16      Q.  So you understand that even
17  though you're in a law office today, the
18  testimony that you give under oath here is
19  subject to the same penalties of perjury as
20  if you were giving testimony in a court of
21  law?
22      A.  I do.
23      Q.  I'm going to assume that you
24  understand the questions that I ask you
25  unless -- excuse me.  I'm going to -- excuse

Page 9

1   me -- I have a cold here.
2       I'm going to assume that you
3   understand the questions I ask you, and if
4   you don't understand them, let me know; is
5   that fair?
6       A.  Yes.
7       Q.  Is there anything that would
8   prevent you from thinking clearly or
9   testifying truthfully today?
10      A.  No.
11      Q.  What did you do to prepare for
12  today's deposition?
13      A.  I met with our in-house legal
14  and outside.
15      Q.  On how many occasions did you
16  meet with them?
17      A.  Three.
18      Q.  And on those occasions, was
19  it -- were all three occasions with both
20  outside and in-house counsel?
21      A.  Yes.
22      Q.  And who attended from outside
23  counsel?
24      A.  Representatives from Jones Day,
25  and I don't know the names of the other folks

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  that would have attended.
2      Q.   And who were the
3  representatives from Jones Day?
4      A.   Jason, and I'm not sure who
5  else was on the phone.
6      Q.   And were all three meetings on
7  the telephone?
8      A.   First was a telephone call.
9      Q.   And what date did that happen?
10     A.   I don't remember the date.  It
11 was in December.
12     Q.   Beginning of December?
13     A.   I believe it was the end of
14 December, toward the end of December.
15     Q.   And approximately how long was
16 that meeting?
17     A.   Oh, around two hours.
18     Q.   And were -- was anyone from
19 Walmart, other than yourself, present on that
20 phone call?
21     A.   There was Walmart legal on the
22 phone.
23     Q.   Anyone other than Walmart
24 legal -- any other employee from Walmart who
25 is not in the legal division?

Page 11

1      A.   No.
2      Q.   So that's the first call.
3           The second meeting, was that
4  telephone or in person?
5      A.   In person.
6      Q.   And when did that occur?
7      A.   Monday of this week.
8      Q.   And for how many -- how long
9  was that meeting?
10     A.   Five hours.
11     Q.   Okay.  Who attended that
12 meeting?
13     A.   It was myself, Jason, Jennifer,
14 Jones Day -- I'm sorry.  I don't have -- I
15 don't know everybody's name.
16          MR. ELMER:  Scott.
17          THE WITNESS:  Oh, yeah.  Scott.
18          And another Walmart legal.  I
19 can't remember.
20     Q.   (BY MR. INNES)  And the Scott
21 that you're referring to is Scott Elmer, and
22 he's --
23     A.   Yes, Scott.
24     Q.   And he's off camera today --
25     A.   Yes.

Page 12

1      Q.   -- but he's present in the
2  room, just for the record.
3           And the third meeting, when did
4  that occur?
5      A.   Yesterday.
6      Q.   Okay.  And for how long was
7  that?
8      A.   Roughly eight hours.
9      Q.   And who was present at that?
10     A.   The same.
11     Q.   And that was --
12     A.   It was the Monday meeting.
13     Q.   And to be clear, that was an
14 in-person meeting?
15     A.   Yes.
16     Q.   Did you review any documents in
17 preparation for today's testimony?
18     A.   I reviewed documents that have
19 been part of my tenure in this position.
20     Q.   Tenure in which position are
21 you --
22     A.   Senior director.
23     Q.   And what was the tenure of that
24 senior director position?
25          MR. VARNADO:  Objection, form.

Page 13

1          THE WITNESS:  2012 until
2      current.
3      Q.   (BY MR. INNES)  So in
4  preparation for today's testimony -- I just
5  want to make sure I have this correct.  You
6  reviewed documents in your possession during
7  your tenure as senior director, and that
8  began in 2012?
9          MR. VARNADO:  Object to the
10     form.
11          THE WITNESS:  Since 2 -- since
12     I was senior director of practice
13     compliance and regulatory affairs.
14     Q.   (BY MR. INNES)  And you did not
15 review any documents prior -- in any prior
16 positions at Walmart?
17     A.   I believe my evaluation.
18     Q.   Okay.
19          How far back were your -- do
20 your evaluations go?
21     A.   I've been with Walmart for
22 27 years.  So I actually don't remember the
23 date of the first evaluation that we went
24 through.
25     Q.   Okay.  I noticed that you were

Page 14

1  at Walmart for 27 years. We're not going to
2  cover that entire time period, so don't worry
3  about that. We're going to focus on a very
4  particular time period.
5       Did you review any deposition
6  testimony that's been taken in this case? As
7  part of your preparation?
8       A.  No.
9       Q.  Did you read any expert reports
10  that have been -- as part of this case?
11       A.  No.
12       Q.  Did you read any court
13  documents in preparation for today's --
14       A.  No.
15       Q.  Have you read any publications
16  in preparation for today's testimony?
17       A.  No.
18       Q.  Did you review any electronic
19  records such as emails in preparation for
20  today?
21       A.  Yes.
22       Q.  And those emails would have
23  been sometime in the time period of 2012 and
24  forward?
25       A.  Yes.

Page 15

1       Q.  No emails reviewed prior to
2  2012?
3       A.  No.
4       Q.  Did you review any databases in
5  preparation for today's testimony?
6       A.  No.
7       Q.  In preparation for today's
8  testimony, did you do any investigation on
9  your own pertaining to documents that you
10  might have in your possession that might help
11  you with your testimony today?
12       A.  No.
13       Q.  Did you speak -- strike that.
14       Are you familiar with the
15  complaint in this case?
16       A.  Can you repeat that?
17       Q.  Are you familiar with the
18  allegations in the complaint in this case?
19       A.  I have -- I have some
20  knowledge.
21       Q.  Have you reviewed that
22  complaint?
23       A.  I have not.
24       Q.  What is your knowledge of the
25  complaint based on?

Page 16

1       MR. VARNADO:  Objection to
2  form.
3       THE WITNESS:  That it's based
4  off of multistate litigation for
5  opioids.
6       Q.  (BY MR. INNES)  Is that the
7  entire extent of your knowledge?
8       A.  Yes.
9       Q.  In preparation for today, did
10  you speak with any representatives for any of
11  the co-defendants in this case?
12       A.  No.
13       Q.  Did you speak with -- other
14  than the folks that we discussed in those
15  three meetings, did you speak with anyone
16  else in preparation for today's deposition?
17       A.  No.
18       Q.  Have you spoken with anyone
19  else at any time about the allegations in the
20  complaint?
21       A.  No.
22       Q.  You never spoke with any
23  colleagues at Walmart regarding the
24  allegations in the complaint?
25       A.  No.

Page 17

1       Q.  So, Mr. Chapman, you just -- I
2  think you said you've been with Walmart for
3  27 years; is that right?
4       A.  Yes.
5       Q.  So I want to do a brief
6  overview of the positions you held during
7  that time period. I can focus your attention
8  in certain areas, but I would like to go back
9  in time so many years.
10       What positions, if any, did you
11  hold at Walmart between the years 1994 and
12  2004?
13       A.  1994 to 2004, I would have
14  been -- in 1994, I would have been a pharmacy
15  manager for Walmart.
16       Somewhere in 1995, 1996, I
17  would have been promoted to a pharmacy
18  district manager. And which I would have
19  relocated to Dublin, Ohio, to manage several
20  locations in that market.
21       Then by 2000 -- I would have
22  been relocated to -- sometime in probably
23  1999, I would have taken another market
24  director or district manager responsibility
25  in North Carolina.

Page 18

1       Then in 2001, I would have
2 moved to Bentonville, Arkansas, to come into
3 the home office in a support role.
4     Q.   Okay.
5     A.   From 2000 -- probably 2002 or
6 '3, I would have been promoted to a regional
7 manager for Walmart -- had responsibilities
8 for Walmart and Sam's Club pharmacies.
9     Q.   Did you hold the position of
10 senior manager ISD at any point in time?
11     A.   I did.
12     Q.   Okay. What does ISD stand for?
13     A.   It's information systems
14 division.
15     Q.   And what were your -- when did
16 you hold that role?
17     A.   It would have been probably
18 around 2007 -- around that time period to
19 2009.
20     Q.   Can you give me just a brief
21 description of what your responsibilities
22 were in that role?
23     A.   I was responsible for managing
24 one of the pharmacy coding teams that had
25 responsibility for the back-end reporting,

Page 19

1 billing, that occurred in our pharmacies.
2     Q.   What exactly is back-end
3 reporting?
4     A.   It is the -- in the pharmacy
5 fulfillment itself, there's the front-end
6 user interface that people use to fill
7 prescriptions. My team had responsibility
8 for all the things that happened in the
9 background as far as reporting, billing,
10 transmitting of claims.
11     Q.   And when you say "in the front
12 end" -- bear with me. It's an evolving
13 transcript, and I'm reading it now.
14     Just so you know, this screen
15 is -- it's LiveNote. I don't know if you
16 have that in front of you.
17     So when I'm reading this, I am
18 paying attention, but ...
19     So when I'm reading this, I am
20 paying attention to what you're saying. I'm
21 just trying to know exactly what you are
22 saying. I'm not checking my email.
23     A.   Yeah.
24     Q.   So in the fulfillment itself,
25 you said there is the front-end interface

Page 20

1 that people use to fill prescriptions. Who
2 are those people?
3     A.   It would be our --
4     MR. VARNADO: Object to the
5 form.
6     THE WITNESS: It would be our
7 pharmacists and our technicians.
8     Q.   (BY MR. INNES) Okay. I'll
9 take an opportunity. I failed to give one
10 instruction. When I ask a question, if you'd
11 just pause and let your counsel interpose an
12 objection if he wants to. Once he does that,
13 you can answer. It just keeps the transcript
14 clean. I'm probably going to be the largest
15 offender of talking over people today. So
16 I'll try to keep that to a minimum.
17     A.   Okay.
18     Q.   So can you describe for me what
19 exactly the pharmacists are entering into the
20 system on the front end?
21     MR. VARNADO: Object to the
22 form.
23     THE WITNESS: So as a
24 prescription comes in, they follow the
25 process set out within the fulfillment

Page 21

1 system to process the prescription.
2     So it would be the customer's
3 information, allergies, directions
4 from the prescriber, and then after
5 that's been entered, then it flows
6 through the process that is set up.
7     Q.   (BY MR. INNES) For how long is
8 that information retained, at the time period
9 that you were in that role?
10     MR. VARNADO: Object to the
11 form.
12     THE WITNESS: To my knowledge,
13 the information is still available.
14     Q.   (BY MR. INNES) Present day?
15     A.   Yes.
16     Q.   In your role in 2009 -- 2007 to
17 2009 in the ISD department, were you ever
18 involved in applications by the business unit
19 for different services that the ISD
20 department could provide?
21     MR. VARNADO: Object to the
22 form.
23     THE WITNESS: My team had
24 responsibility for the yearly annual
25 controlled substance count, but it was

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 just maintaining the application that
2 our pharmacists used on the night of
3 the inventory count in making sure
4 that the reports bring it correctly.
5 Q. (BY MR. INNES) And the
6 application, what do you mean by
7 "application"?
8 A. It is a computer code that is
9 used to -- a Telxon -- you know, which is a
10 handheld computer unit that is used in our
11 stores, to enter in all the -- on-hand counts
12 of all the controlled substances.
13 Q. And how often were those counts
14 done?
15 A. We did that on a yearly basis.
16 Q. And those counts, do you have
17 any knowledge as to how long records of those
18 counts were or are maintained?
19 A. I'm sorry, I didn't hear you.
20 Q. That was a convoluted question.
21 Let me ask that again.
22 How long did -- you said that
23 on a -- that Walmart engaged in counts on a
24 yearly basis.
25 A. Yes.

Page 23

1 Q. Are records of those counts
2 maintained today?
3 MR. VARNADO: Object to the
4 form.
5 THE WITNESS: There -- I don't
6 know how long those are held, if the
7 ones from back then would still be
8 available. I know they're held
9 according to the regulation.
10 Q. (BY MR. INNES) What regulation
11 is that?
12 A. It would be the DEA
13 requirements, or state requirements.
14 Q. Okay. All right. Let's pull
15 out of the ISD and go back to going through
16 your roles.
17 What role did you take on, if
18 any, at Walmart after 2009?
19 A. In 2009, I came back over to
20 the business side from our information
21 systems division, and became a member of the
22 regulatory affairs group at the -- for health
23 and wellness.
24 Q. What was your title in the
25 regulatory affairs group for health and

Page 24

1 wellness at that time?
2 A. It was director of regulatory
3 affairs.
4 Q. Can you briefly describe your
5 responsibilities in that role at that time?
6 A. I had responsibility as a
7 director for an area of the country which was
8 probably 15 states that we helped support our
9 stores in the practice of pharmacy. And
10 dealt with boards of pharmacies, regulatory
11 changes that would have to be implemented
12 within our processes and procedures.
13 Q. Which 15 states exactly were
14 you in charge of?
15 MR. VARNADO: Object to the
16 form.
17 THE WITNESS: I could not --
18 because that has changed, I can't
19 remember all of the states. But it
20 was -- I can tell you that it was
21 South Carolina, North Carolina,
22 Florida and Georgia, but then I don't
23 remember the other states.
24 Q. (BY MR. INNES) Okay. At any
25 time did you have responsibility for the

Page 25

1 state of Ohio?
2 A. In the role of director?
3 Q. That's right.
4 MR. VARNADO: Object to the
5 form.
6 THE WITNESS: I don't believe
7 that I did.
8 Q. (BY MR. INNES) Okay. Is there
9 something that could refresh your
10 recollection as to that?
11 A. I would have to see an email or
12 an alignment map if I had responsibility for
13 Ohio.
14 Q. What's an alignment map?
15 A. It just shows who has
16 responsibilities for which state.
17 Q. And Walmart maintains alignment
18 maps presently?
19 MR. VARNADO: Object to the
20 form.
21 THE WITNESS: There are
22 alignment maps available. I do not
23 know how far they go back.
24 Q. (BY MR. INNES) And you said an
25 alignment map shows who has responsibilities

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 for which state. At any given point in
2 time -- strike that.
3 I just want to be clear that
4 we're talking about the same point in time.
5 We're now in 2010 time period; is that right?
6 A. That would be 2010.
7 Q. Okay. In 2010, approximately
8 how many other directors of regulatory
9 affairs were at Walmart?
10 A. There would have been a total
11 of four directors, but one of those directors
12 was working on a special project for
13 training.
14 Q. And who was that?
15 A. That would have been Tim Koch.
16 Q. Did that special -- I'm trying
17 to cut to the chase on this.
18 Did that special project for
19 training that Tim Koch was charged with
20 relate in any way to the distribution of
21 opioids?
22 A. No.
23 Q. So you said there was four. I
24 have Tim Koch as one, you, Mr. Chapman as the
25 other. I think if my math is correct,

Page 27

1 there's two more.
2 A. Yes.
3 Q. Who were those folks?
4 A. Debbie Mack and Dadrion Gaston.
5 Q. Your prior testimony is that
6 you were responsible for 15 states. Did the
7 other three directors share the balance of
8 the country?
9 A. Yeah, the two directors would
10 have shared the balance of the country.
11 Q. And the other two directors
12 would be Debbie Mack and Mr. Gaston?
13 A. Debbie Mack and Ms. -- Dadrion,
14 yes.
15 Q. Do you know which states
16 Ms. Mack was responsible for?
17 MR. VARNADO: Object to the
18 form.
19 THE WITNESS: Debbie has
20 typically held responsibility for the
21 western part of the U.S.
22 Q. (BY MR. INNES) And then would
23 Ms. Gaston have responsibility for the
24 Midwest?
25 MR. VARNADO: Object to the

Page 28

1 form.
2 THE WITNESS: Dadrion would
3 have had the Midwest to Northeast.
4 Q. (BY MR. INNES) Would that have
5 included Ohio?
6 MR. VARNADO: Object to the
7 form.
8 THE WITNESS: I don't know.
9 Q. (BY MR. INNES) But the way we
10 could figure that out would potentially be by
11 reviewing an alignment map for that period of
12 time?
13 A. Yes.
14 Q. How long did you hold the role
15 of director of pharmacy regulatory affairs?
16 A. That would have been from when
17 I came back over in 2009 until I believe
18 January of -- January or February of 2012.
19 Q. Okay. You testified that as
20 part of your role as director of regulatory
21 affairs, part of your responsibilities is the
22 practice of pharmacies?
23 MR. VARNADO: Objection, form.
24 THE WITNESS: Yes.
25 Q. (BY MR. INNES) And could you

Page 29

1 explain that a little bit more fully?
2 Exactly what the practice of pharmacy would
3 be?
4 A. It would be around
5 state-specific practice act for our
6 pharmacies.
7 Q. And by "state-specific practice
8 act," what do you mean by that?
9 A. Each state is going to have, in
10 the practice act, different regulations
11 around what prescriptions can be filled.
12 There may be even limitations on how many can
13 be given at any one time, how records are
14 maintained, how counseling needs to be done,
15 if it needs to be done on different
16 medications. Various -- various regulations.
17 Q. Did you -- in that role, did
18 you have any responsibility over compliance
19 with federal regulations?
20 A. Yes.
21 Q. And which regulations were
22 those specifically?
23 MR. VARNADO: Object to form.
24 THE WITNESS: It would be any
25 regulations that pertained to the

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 practice of pharmacy.
2 Q. (BY MR. INNES) Controlled
3 Substances Act would be an example?
4 A. Yes.
5 Q. And to be clear, the
6 responsibilities you just described were the
7 same over your entire tenure as senior
8 director?
9 MR. VARNADO: Objection, form.
10 Q. (BY MR. INNES) I'm sorry, as
11 director of regulatory affairs?
12 A. As director of regulatory
13 affairs, yes.
14 Q. And you said sometime in 2012,
15 you obtained a new title. What title was
16 that?
17 A. I became senior director for --
18 it was either regulatory affairs or the name
19 changed to practice compliance, and I don't
20 remember when that happened.
21 Q. Was this -- did you move to an
22 entirely new division or was this simply a
23 change in title?
24 A. We had someone that used to be
25 the director, and I was promoted into that

Page 31

1 position.
2 Q. Okay. How did your
3 responsibilities change?
4 MR. VARNADO: Object to the
5 form.
6 THE WITNESS: Responsibilities
7 became the oversight and coordination
8 among all of the directors for the
9 overseeing of the states and the
10 practice.
11 Q. (BY MR. INNES) And how many
12 directors did you oversee during that time
13 period?
14 A. It would have been three.
15 Q. Three.
16 So you were promoted out of the
17 director level when there were four, and then
18 did that leave Ms. Mack, Ms. Gaston, and
19 Mr. Koch as the directors?
20 A. It did.
21 Q. Okay.
22 And this is in 2012; is that
23 correct?
24 A. Yes.
25 Q. And how long did you hold that

Page 32

1 title?
2 A. I was senior director for
3 regulatory affairs, as a Senior Director I,
4 until some point it was changed to a
5 different level position. I did basically
6 the same role.
7 Q. Sir, in your role as the senior
8 director, when you were overseeing the
9 directors, what were your responsibilities in
10 that oversight?
11 MR. VARNADO: Object to form.
12 THE WITNESS: I had a
13 responsibility to make sure that our
14 corporate policies were consistent
15 across all of the different director
16 areas.
17 Q. (BY MR. INNES) Which corporate
18 policies specifically?
19 MR. VARNADO: Object to the
20 form.
21 THE WITNESS: We have standard
22 operating procedures or POMs that
23 relate to our standards for our
24 pharmacies that speak to the practice
25 of pharmacy and corporately how we run

Page 33

1 our business.
2 Q. (BY MR. INNES) I'm sorry, can
3 you explain to me what a POM is?
4 A. POM is pharmacy operations
5 manual. And it's typically a policy or a
6 procedure.
7 Q. Were there policies that were
8 specific to controlled substances?
9 MR. VARNADO: Object to the
10 form.
11 THE WITNESS: We do have
12 policies, POMs, that speak directly to
13 different aspects of controlled
14 substances.
15 Q. (BY MR. INNES) Are there any
16 policies that are specific to opioids, that
17 are separate and apart from the Schedule II
18 policies?
19 MR. VARNADO: Object to the
20 form.
21 THE WITNESS: Without having a
22 list, I couldn't tell you all of the
23 different policies and POMs. I would
24 have to see a list of the ones that we
25 have.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   (BY MR. INNES)  Does such a
2  list exist?
3    A.   There is an index of all of our
4  POMs.
5    Q.   And if you were to see that
6  index, you'd be able to tell me which
7  policies pertain to Schedule IIs?
8         MR. VARNADO:  Object to the
9    form.
10        THE WITNESS:  I could tell you
11   which ones have some aspect of an
12   opioid or a controlled substance in
13   it.  It wouldn't be to all of the
14   information within that policy or POM.
15   Q.   (BY MR. INNES)  Does that index
16  of POMs contain historic policies?
17        MR. VARNADO:  Object to the
18   form.
19        THE WITNESS:  I believe that
20   it's available.
21   Q.   (BY MR. INNES)  And then would,
22  for instance, that index of policies, if you
23  were looking at it today, which we can't,
24  because I don't believe we have it, would it
25  tell you that a particular policy was in

Page 35

1  effect today?
2         MR. VARNADO:  Object to the
3    form.
4    Q.   (BY MR. INNES)  Or not in
5  effect today?
6    A.   I believe that there are folks
7  that could tell you which policies were
8  effective at what time.
9    Q.   Who would those folks be?
10   A.   It would have to be someone in
11  our ISD group.
12   Q.   And that's the information
13  services division?
14   A.   Systems division.
15   Q.   Systems division.
16        Why do you say someone in the
17  ISD would be the person to speak with?
18   A.   I would think that there would
19  be some record of that.  I don't know for
20  sure.
21   Q.   So someone in ISD could
22  potentially retrieve that document?  Is that
23  what you mean?
24        MR. VARNADO:  Object to the
25   form.

Page 36

1         THE WITNESS:  I'm not sure,
2    but ...
3    Q.   (BY MR. INNES)  Is ISD tasked
4  with maintaining such an index?
5         Strike that.  Let me ask a
6  slightly different question.
7         Is ISD charged with maintaining
8  the accuracy of that index?
9         MR. VARNADO:  Object to form.
10        THE WITNESS:  I can't speak to
11   that.
12   Q.   (BY MR. INNES)  But it is your
13  testimony that, if you wanted to see that
14  index, you would contact someone in ISD?
15        MR. VARNADO:  Object to the
16   form.
17        THE WITNESS:  To see if there
18   was a database that held that
19   information, that would be where I
20   would start.
21   Q.   (BY MR. INNES)  If you didn't
22  get an answer from ISD, where would you turn
23  next?
24        MR. VARNADO:  Object to the
25   form.

Page 37

1         THE WITNESS:  I don't know who
2    that would be.
3    Q.   (BY MR. INNES)  So from the
4  point in time when you took the senior
5  director compliance role at Level 1, were you
6  promoted to another level at any point in
7  time?
8    A.   The job code changed to a
9  Level 2, and at the same time the -- at the
10  time directors, their job -- their job role
11  changed as well.  It was an up-sourcing of
12  the job role.  So they became senior
13  directors.
14   Q.   So at that point in time,
15  you're Senior Director Level 2?
16   A.   2.
17        MR. VARNADO:  Object to the
18   form.
19   Q.   (BY MR. INNES)  The folks who
20  you were overseeing as directors were now
21  senior directors Level 1s?
22   A.   Yes.
23   Q.   And are those the same folks as
24  before?  Mr. Koch, Ms. Gaston, and --
25   A.   No.  At some point Ms. Gaston

Page 38

1  left our department and went to another
2  department.
3      Q.   Okay.  Was her role backfilled?
4      A.   Yes.
5      Q.   And who took that position?
6      A.   Rick Irby.
7      Q.   Do you know approximately the
8  date that Ms. Gaston left and Mr. Irby took
9  over?
10     A.   I don't know the exact date,
11 but it would probably be 2013, maybe.
12     Q.   And in 2013, you're still
13 overseeing three senior directors?
14     A.   Yes.
15     Q.   And were there any other senior
16 directors added?
17     A.   There were no senior directors
18 added.
19     Q.   Who took on the role of
20 director at that point?
21     A.   I'm sorry, can you repeat that?
22     Q.   Who, if anyone, filled the role
23 of director in that time period?
24     A.   At some point we hired new
25 associates to assist in our department, and

Page 39

1  they became directors.
2      Q.   Do you know -- you say "at some
3  point."  Can you be more specific?
4          MR. VARNADO:  Object to the
5      form.
6          THE WITNESS:  It would have
7      been around the time that the
8      directors moved to senior director
9      role, we would have added additional
10     head count.
11     Q.   (BY MR. INNES)  Do you recall
12 how many of those -- how many of those roles
13 were filled?
14     A.   I'm sorry?
15     Q.   Do you recall how many of those
16 roles were filled at that point?
17         MR. VARNADO:  Object to the
18     form.
19         THE WITNESS:  We would have --
20     have added three directors, one for
21     each senior director.
22     Q.   (BY MR. INNES)  Okay.  And
23 would those directors' responsibilities have
24 included the same geographic breakdown of
25 pharmacy?

Page 40

1          MR. VARNADO:  Object to the
2      form.
3          THE WITNESS:  Those directors
4      would report to those senior directors
5      and have the same area of
6      responsibility that that senior
7      director held.
8      Q.   (BY MR. INNES)  At that point
9  in time, what was the senior directors' role?
10         MR. VARNADO:  Object to the
11     form.
12         THE WITNESS:  At that time they
13     still had responsibility for their
14     individual states and the practices.
15     So the role didn't change a lot in
16     what they were doing, except we
17     expanded some of the assistance that
18     we needed from our new director role.
19     Q.   (BY MR. INNES)  Can you
20 describe what you mean by "assistance that we
21 needed from our new director role"?
22     A.   So as the senior director would
23 be doing the responsibilities for their
24 particular state, they now had a director in
25 that position that could help them carry out

Page 41

1  those responsibilities.
2      Q.   And again, those
3  responsibilities were what?
4          Let me -- I can focus you.
5          What were those
6  responsibilities as they relate to the
7  distribution of opioids?
8          MR. VARNADO:  Object to the
9      form.
10         THE WITNESS:  Those
11     responsibilities would have to deal
12     with anything in the practice of
13     pharmacy.
14     Q.   (BY MR. INNES)  And anything in
15 the practice of pharmacy would include what
16 exactly?
17     A.   Adherence to the state laws,
18 adherence to federal law.  Changes to
19 regulations that may happen within a state.
20         Supporting the stores with
21 questions.  The operational support that's
22 given to our regional managers, market
23 directors.
24     Q.   I want to focus on the
25 adherence to state laws and adherence to

Page 42

1 federal law, as it relates to your position
2 during this time.
3         What was your role as it
4 related to these senior directors and
5 directors vis-à-vis state and federal law
6 compliance regarding opioids at that point in
7 time?
8         MR. VARNADO:  Object to the
9 form.
10        THE WITNESS:  If there were --
11 if there was a change and a particular
12 state may reclassify a drug from
13 non-schedule to a schedule, that
14 individual senior director would have
15 responsibility with a director to make
16 sure all the current processes and
17 everything was followed.  My role was
18 more of an oversight for all of the
19 activities that would happen across
20 all of our stores.
21 Q.    (BY MR. INNES)  What do you
22 mean by "activities"?
23 A.    Any law changes, any changes
24 that we would need to make to policies,
25 procedures, enhancements to systems, to go

Page 43

1 from manual processes to systematic
2 processes.
3 Q.    Is it fair to say that your
4 role was to be aware of federal and state
5 laws as it related to the practice of
6 pharmacy?
7         MR. VARNADO:  Object to the
8 form.
9 Q.    (BY MR. INNES)  Is that a fair
10 statement?
11 A.    Yes.
12 Q.    Is it also a fair statement
13 that it was your -- part of your job to
14 ensure that Walmart's policies and procedures
15 regarding the distribution of Schedule IIs or
16 opioids were compliant with those federal and
17 state laws that you were aware of at that
18 time?
19        MR. VARNADO:  Object to the
20 form.
21        THE WITNESS:  My role was to
22 make sure that each one of our states'
23 practice act was followed in as our
24 pharmacists dispensed controlled
25 substances, along with regular

Page 44

1 medications, legend.
2 Q.    (BY MR. INNES)  I'm sorry.  I
3 didn't get that last word.  Along with other
4 regular medications?
5 A.    Regular medications, which was
6 legend medications; things for diabetes,
7 heart.
8 Q.    Thank you for that.
9         Legend medications is a
10 category of drugs?
11 A.    Yes.  It's non-controlled,
12 prescription required.
13 Q.    Thank you.
14        Was it also your role to make
15 sure that federal law was followed by
16 pharmacists dispensing controlled substances?
17        MR. VARNADO:  Object to the
18 form.
19        THE WITNESS:  It was our
20 responsibility to make sure our
21 policies and procedures were accurate
22 regarding federal and state
23 regulations.
24 Q.    (BY MR. INNES)  How did you go
25 about determining whether your policies and

Page 45

1 procedures were accurate regarding federal
2 and state regulations?
3 A.    As a change in regulation would
4 occur, that regulation would be reviewed, and
5 we would assess what changes needed to be
6 made, if any, in our systems to have our
7 pharmacist comply with the change in the
8 regulation.
9 Q.    You say "we" would assess the
10 changes.  Who do you mean by "we"?
11 A.    It would be -- the group and
12 practice compliance would be the directors
13 and senior directors, and then we would also
14 have legal counsel involved.
15 Q.    Would that be in-house legal
16 counsel?
17 A.    Yes.
18 Q.    Would you engage outside legal
19 counsel as well?
20        MR. VARNADO:  Just object to
21 the form of the question.  And to the
22 extent that it's calling for anything
23 privileged, don't discuss any inside
24 counsel or outside counsel
25 conversations.

Page 46

1    Q.   (BY MR. INNES) And to be
2  clear, my question is not -- I don't want to
3  know about the conversations you actually had
4  at this point.  I just want to know who you
5  engaged during that process.
6         MR. VARNADO:  I'll object to
7     the form as to any specific
8     identification of anyone engaged.
9         You can answer the question if
10    outside counsel was at times engaged.
11        THE WITNESS:  So I don't know
12    when legal would have engaged outside
13    counsel.  That was not our
14    responsibility.
15   Q.   (BY MR. INNES) As you sit here
16 today, do you have any knowledge as to
17 particular law firms that were engaged as
18 part of your determination if Walmart was
19 compliant with federal or state laws?
20        MR. VARNADO:  And I'm going to
21    object to the form of the question and
22    instruct you not to answer as to the
23    identity of any law firms.
24   Q.   (BY MR. INNES) Are you taking
25 your counsel's advice and not answering that

Page 47

1  question?
2    A.   I'm sorry, can you repeat?
3         MR. INNES:  Can you read back
4     the question?
5         (Whereupon, the following
6     testimony was read by the court
7     reporter.)
8         "QUESTION:  Are you taking your
9     counsel's advice and not answering
10    that question?"
11        (End of readback.)
12   Q.   (BY MR. INNES) Do you need the
13 prior question repeated?
14   A.   Yes.
15        MR. INNES:  Can you read back
16    the prior question?
17        (Whereupon, the following
18    testimony was read by the court
19    reporter.)
20        "QUESTION:  As you sit here
21    today, do you have any knowledge as to
22    particular law firms that were engaged
23    as part of your determination if
24    Walmart was compliant with federal or
25    state laws?"

Page 48

1         (End of readback.)
2         MR. VARNADO:  Can you read my
3     admonition to him?
4         Or I can just restate.
5         I'm going to object to the form
6     of the question and instruct you not
7     to answer concerning the identity of
8     particular law firms.
9    Q.   (BY MR. INNES) We'll take this
10 in two steps.
11        Do you understand my question?
12   A.   Yes.
13   Q.   Are you taking your counsel's
14 advice not to answer that question?
15   A.   Yes.
16   Q.   Okay.
17        MR. INNES:  Counsel, can you
18    articulate why exactly you believe
19    that the name of a law firm is
20    privileged?
21        MR. VARNADO:  Well, yes.  First
22    off, it's irrelevant, and second off,
23    it's work product, protected privilege
24    as to the identity of who the company
25    engages to obtain legal advice.

Page 49

1         I think that in and of itself
2     is a privileged item.
3         MR. INNES:  So your first
4     objection is relevancy.
5         MR. VARNADO:  No, I'm objecting
6     on privilege grounds.
7         MR. INNES:  So you're
8     withdrawing your relevancy objection.
9         MR. VARNADO:  I'll allege that
10    as well, but I'll stand on the
11    privilege.
12        MR. INNES:  You're objecting on
13    relevancy, yes or no?
14        MR. VARNADO:  Yes.
15        MR. INNES:  And you're
16    objecting on privilege, yes or no?
17        MR. VARNADO:  Yes.
18        MR. INNES:  We might have to
19    address that at a later date.  I think
20    it -- hopefully the case law is on
21    your side on that one, but we can move
22    on for now.  Or I'll just reserve my
23    right to move -- to compel an answer
24    on that question.
25        MR. VARNADO:  And we'll object

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1   to that.
2       Q.    (BY MR. INNES)  So I want to go
3   back and talk a little bit more about how you
4   would identify a change in a regulation that
5   would occur.  And how that -- the review
6   process for that.
7           Whose responsibility was it to
8   monitor regulations for changes?
9           MR. VARNADO:  Object to the
10  form.
11          THE WITNESS:  As part of the
12      role of the senior director that
13      reported to me, they would monitor any
14      changes in their state on regulations
15      either through Board of Pharmacy
16      meetings, newsletters, through legal
17      research that would come our way from
18      state agencies.  All those would be
19      used.
20      Q.    (BY MR. INNES)  Walmart
21  employees in these directors, senior director
22  roles would attend Board of Pharmacy meetings
23  in their particular states.  Is that your
24  testimony?
25      A.    Can you repeat that?

Page 51

1       Q.    Sure.  Let me rephrase.
2           Is it your testimony that
3   Walmart employees would attend Board of
4   Pharmacy meetings in their particular states?
5           MR. VARNADO:  Object to the
6   form.
7           THE WITNESS:  We would receive
8       newsletters from states as far as the
9       research that would be done.  We would
10      have some associates that may attend
11      at certain points, but not at every
12      board meeting.
13      Q.    (BY MR. INNES)  Did you
14  yourself attend any pharmacy -- state Board
15  of Pharmacy meetings?
16      A.    I have attended some.
17      Q.    Did any of those meetings
18  address opioids?
19          MR. VARNADO:  Object to the
20      form.
21          THE WITNESS:  Not that I can
22      recall.
23      Q.    (BY MR. INNES)  Would there be
24  anything that would refresh your recollection
25  as to whether or not Board of Pharmacy

Page 52

1   meetings that you attended addressed opioids?
2       A.    Not without seeing the board --
3   board minutes.
4       Q.    Does Walmart maintain -- strike
5   that.
6           What do you mean by "board
7   minutes"?
8       A.    It would be the board minutes
9   that were either published in the Board of
10  Pharmacy's newsletters.
11      Q.    During what time period do you
12  recall attending Board of Pharmacy meetings?
13      A.    It would have been in my role
14  as a director of regulatory affairs.  I would
15  have attended a few meetings.
16      Q.    What states would those have
17  been in?
18          Strike that.
19          What states do you recall
20  attending state Board of Pharmacy meetings?
21      A.    North Carolina, South Carolina,
22  and Mississippi.
23      Q.    And as you sit here today, you
24  can't recall whether or not meetings attended
25  in those states addressed opioids?

Page 53

1           MR. VARNADO:  Object to the
2       form.
3       A.    That's correct.
4       Q.    (BY MR. INNES)  If you wanted
5   to go back and look to determine whether or
6   not opioids were discussed at those meetings,
7   you would return to board meeting minutes; is
8   that correct?
9       A.    To my knowledge, that would be
10  the only way I would be able to determine.
11      Q.    Do you yourself maintain
12  records of those board minutes?
13      A.    I do not.
14      Q.    Do you know if Walmart
15  maintains records of those meetings?
16      A.    Not to my knowledge.
17      Q.    Did any of your colleagues at
18  that time, either at the director level,
19  senior director level, attend state Board of
20  Pharmacy meetings?
21          MR. VARNADO:  Object to the
22      form.
23          THE WITNESS:  I don't know
24      which meetings that they would have
25      attended.  It would have been in

Page 54

1  conjunction with a board appearance or
2  request of the board.
3      Q.   (BY MR. INNES) But they would
4  have attended?
5      A.   There were some that they would
6  have attended.
7      Q.   Do you know if any of those
8  meetings that they attended addressed
9  opioids?
10     A.   I do not know.
11     Q.   Would there be a way for you to
12 find that out?
13     A.   I don't know which meetings
14 they would have attended.  I don't have a
15 record of that.
16     Q.   Does Walmart maintain a record
17 of meetings attended by directors or senior
18 directors?
19         MR. VARNADO:  Object to the
20     form.
21         THE WITNESS:  I don't believe
22     that Walmart does.
23     Q.   (BY MR. INNES) If you did
24 attend the meeting, the meetings that you do
25 recall, what did you -- what was your role at

Page 55

1  those meetings?
2      A.   It would have been to listen on
3  a particular subject or to be there to
4  present because of a meeting of pharmacist
5  misfill case, and to be there to support the
6  pharmacist.
7      Q.   What's a pharmacist misfill
8  case?
9      A.   An alleged incident where a
10 pharmacist may have filled a prescription for
11 a patient on a -- for -- for incorrect drug
12 or directions.
13     Q.   Are there any other types of
14 misfill cases other than incorrect drug or
15 directions?
16     A.   There may be, but I can't tell
17 you what those are.
18     Q.   Why can't you tell me what they
19 are?
20         MR. VARNADO:  Object to the
21     form.
22         THE WITNESS:  I don't know what
23     those are.
24     Q.   (BY MR. INNES) And what sort
25 of support would you provide to the

Page 56

1  pharmacist during those misfill cases?
2      A.   It could vary, and just letting
3  them understand the appearance before the
4  board and what to expect.  And just helping
5  him through that situation.
6      Q.   Generally speaking, what should
7  a pharmacist expect at such a meeting?
8      A.   That there would be a review of
9  the alleged information, or what happened in
10 the situation.  And that pharmacist would
11 have to explain what they remember about that
12 situation.
13     Q.   Do you remember the outcomes of
14 any of those meetings?
15         MR. VARNADO:  Object to the
16     form.
17         THE WITNESS:  I don't remember.
18     Q.   (BY MR. INNES) Do you recall
19 if any of those meetings the pharmacist --
20 resulted in the pharmacist being sanctioned
21 or otherwise admonished?
22         MR. VARNADO:  Object to the
23     form.
24         THE WITNESS:  I can remember at
25     least one letter of concern.

Page 57

1      Q.   (BY MR. INNES) Is "letter of
2  concern" a term of art or is that your own
3  language?
4      A.   I'm sorry?
5      Q.   Is "letter of concern" a term
6  of art or is that your own language?
7      A.   I believe that was the -- what
8  they used in North Carolina.
9      Q.   To the best of your
10 recollection, was that letter of concern, did
11 it involve opioids in any way?
12     A.   I don't recall.
13     Q.   Do you recall what it did
14 involve?
15     A.   I believe that it was just a
16 regular legend drug.
17     Q.   And a legend drug is that
18 category of drugs we discussed earlier?
19     A.   It would be any prescription, a
20 required medication other than a controlled
21 substance.
22     Q.   Thank you.
23         In addition to your role in
24 determining whether or not Walmart was
25 compliant with or up-to-date with its

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 compliance with state and federal
2 regulations, did you also have any
3 responsibility in determining whether
4 Walmart's policies and procedures were
5 up-to-date regarding industry standards or
6 industry guidelines?
7         MR. VARNADO: Object to the
8     form.
9         THE WITNESS: We always follow
10     the regulation of the state or federal
11     in our policies and procedures.
12     Q.    (BY MR. INNES) Okay. So that
13 wasn't my question exactly, and I'll try to
14 rephrase it.
15         What industry guidelines, if
16 any, did Walmart -- strike that.
17         In your role as a director or
18 senior director, did you make any efforts to
19 ensure that Walmart was compliant with
20 industry guidelines?
21         MR. VARNADO: Object to the
22     form.
23     Q.    (BY MR. INNES) As they relate
24 to opioids?
25     A.    Walmart doesn't develop

Page 59

1 policies around industry standards.
2     Q.    So is it your testimony you did
3 not look to industry standards or guidelines
4 when reviewing Walmart's policies and
5 procedures?
6         MR. VARNADO: Object to the
7     form.
8         THE WITNESS: We would have
9     looked to see what was happening in
10     the industry, and how we could make
11     enhancements to our policies and
12     procedures, but our policies and
13     procedures were based on regulations.
14     Q.    (BY MR. INNES) What do you
15 mean by "enhancements"?
16     A.    We are always looking for ways
17 to enhance our processes, whether it's an
18 update in Connexus to move from a manual way
19 of collecting a signature log that's required
20 by regulation to possibly making it digital.
21 It could be numerous items that we would do
22 that with.
23     Q.    I'm just going to do one thing
24 for the record. Could you spell Connexus?
25     A.    Connexus. C-O-N-N-E-X-U-S.

Page 60

1     Q.    You didn't know this was going
2 to be a national spelling bee contest.
3         Thank you for that.
4         You are a member of the
5 National Association of Chain Drug Stores; is
6 that right?
7     A.    Yes.
8     Q.    What role, if any, do you
9 currently hold in that organization?
10     A.    I currently hold just a member
11 status with NACDS, to help represent Walmart.
12     Q.    And how do you help represent
13 Walmart at the NACDS?
14     A.    It would be by learning what
15 topics are going on, either within state
16 legislation, federal legislation, billing
17 practices, Medicaid changes. It could be a
18 variety of issues that are discussed.
19         MR. VARNADO: Mike, we've been
20     going about an hour. Is this a good
21     time for a break? Or do you want to
22     keep going?
23         MR. INNES: Let me just ask two
24     more questions, and then actually this
25     is a perfect time for a break.

Page 61

1         We're going to come back to
2 NACDS later today.
3     Q.    (BY MR. INNES) Let me seal
4 off -- if I can just take you through the
5 rest of your roles in a time period, and then
6 that will seal off our chapter and we can
7 keep a clean record.
8         So I think we left off in 2013,
9 where you were the Senior Director I of
10 health and wellness. Is that right?
11     A.    That sounds right.
12     Q.    You held that role through --
13 well, through present day? Is that right?
14     A.    The Senior Director II role,
15 yes, is to present day.
16     Q.    And Senior Director II role --
17 and I know you said this earlier, just
18 refresh me. When did you take on the Senior
19 Director II role?
20     A.    It would be --
21     Q.    Approximately?
22     A.    2013? 2014?
23     Q.    And the difference between
24 Senior Director I and Senior Director II, in
25 terms of levels of responsibilities -- what

Page 62

1 is that difference, if any?
2    A.   It was basically a job
3 leveling, so that we could add in additional
4 support with a director level.
5    Q.   Okay.  Let me see if I
6 understand that.
7         "Job leveling" means basically
8 you added a row at the bottom of the pyramid?
9    A.   Yes.
10    Q.   Okay.  What was the decision --
11 do you know what went into the decision to
12 add that --
13         Strike that.
14         Do you know what went into the
15 decision -- strike that again.
16         What precipitated the leveling
17 that you just described?
18    A.   The move was so that we could
19 bring in additional pharmacist related
20 background into that role, and for that to
21 happen, we had to have it as a director
22 level.
23    Q.   And why did Walmart want to
24 bring additional pharmacist-related
25 background into that role?  And that role

Page 63

1 you're talking about is a director level;
2 correct?
3    A.   Correct.
4    Q.   So why did Walmart want to
5 bring in additional pharmacists-related
6 background at the director level?
7         MR. VARNADO:  Object to form.
8         THE WITNESS:  Just for their
9 experience in the pharmacy industry.
10    Q.   (BY MR. INNES)  And how many of
11 those folks were added?
12    A.   I'm sorry?
13    Q.   How many of those folks were
14 added at that director level at that
15 particular time?
16    A.   It would have been three.
17    Q.   Okay.  Why did Walmart feel a
18 need to pay three additional bodies in that
19 role?
20         MR. VARNADO:  Object to the
21 form.
22         THE WITNESS:  It was so that we
23 could be a more efficient
24 organization.
25    Q.   (BY MR. INNES)  What do you

Page 64

1 mean by "efficient organization"?
2    A.   As times and systems and
3 requirements have changed across the
4 industry, you have to keep up-to-date.  To be
5 able to do that, you have to add additional
6 resources to make sure that you can have
7 someone that's -- better monitoring
8 regulations, changes, updates that need to
9 happen, projects within Walmart.  So there's
10 a lot of demand.
11    Q.   And remind me again.  What
12 time -- what time was this band added?
13    A.   Well, the band existed, but to
14 be able to bring in people, you -- you -- we
15 had to move up a level.  So that's why I went
16 from a I to a II, so that the current
17 directors went from director level to Senior
18 Director I, and then we could bring in
19 pharmacist talent at the director level.
20    Q.   And what year was that?
21    A.   I'm sorry?
22    Q.   What year was that that you
23 brought those folks in?
24    A.   I don't know exactly.  It would
25 be around 2013, 2014.

Page 65

1    Q.   And they were brought in
2 because -- strike that.
3         Was there a particular change
4 in regulation that occurred around that time
5 period that required that leveling?
6         MR. VARNADO:  Object to the
7 form.
8         THE WITNESS:  Not to my
9 knowledge, but as a business unit,
10 they were looking to expand in
11 different opportunity -- business
12 opportunities.
13    Q.   (BY MR. INNES)  What were those
14 business opportunities?
15    A.   Central fill pharmacies,
16 specialty pharmacies.  Different services.
17 Immunizations.
18    Q.   And each of these items that
19 you just listed were new to Walmart?
20    A.   Yes.
21    Q.   And those new areas carried
22 with them particular regulations?
23    A.   Yes.
24    Q.   Specific to those areas?
25    A.   Yes.

Page 66

1    Q.   To the best of your knowledge,
2  were any of those -- how, if at all, did the
3  leveling relate to the distribution of
4  opioids?
5    A.   It was not, to my knowledge.
6          MR. INNES:  All right.  Do you
7    want to take a 10-, 15-minute break?
8          MR. VARNADO:  10 minutes.
9    Thank you.
10         THE VIDEOGRAPHER:  10:08.  We
11   are off the video record.
12         (Recess taken, 10:08 a.m. to
13   10:26 a.m.)
14         THE VIDEOGRAPHER:  10:27.  We
15   are on video record.
16   Q.   (BY MR. INNES)  Okay.
17  Mr. Chapman, welcome back.
18         I want to turn our attention to
19  focus on specific regulations, and in
20  particular the Controlled Substances Act.
21         Walmart's required to provide
22  protective procedures to guard against the
23  theft and diversion of controlled substances;
24  is that right?
25         MR. VARNADO:  Object to the

Page 67

1    form.
2          THE WITNESS:  My experience as
3    a pharmacist is we follow the
4    regulations, federal and state.
5    Q.   (BY MR. INNES)  Thank you for
6  the testimony regarding your role as a
7  pharmacist.  I'd like to bring you forward in
8  time to your role as a senior -- as a
9  director of regulatory affairs and senior
10  director in those roles we just discussed.
11         In those roles, is it your
12  understanding that Walmart's required to
13  provide effective controls and procedures to
14  guard against theft and diversion of
15  controlled substances?  Is that right?
16         MR. VARNADO:  Object to the
17    form.
18         THE WITNESS:  Our pharmacists
19    follow federal and state regulations.
20   Q.   (BY MR. INNES)  Again, I'm not
21  talking about your pharmacist.  I want to
22  know that -- more focus you on the
23  distribution of opioids.
24         Is it your understanding that
25  the controlled -- under the Controlled

Page 68

1  Substances Act, Walmart's required to provide
2  effective controls or procedures to guard
3  against the theft and diversion of controlled
4  substances in its role as a distributor?
5    A.   Our pharmacists follow the
6  regulations of the state.  We have safety and
7  security of our pharmacies, and we follow the
8  regulations with the DEA, federal, state
9  agencies.
10         MR. INNES:  I'll move to strike
11    that answer as non-responsive.
12   Q.   (BY MR. INNES)  Again,
13  Mr. Chapman, I am interested in the
14  pharmacists, but we'll get to that later.
15         I want to focus you in your
16  role at Walmart as a director of regulatory
17  affairs.  Did you have responsibility for
18  policies regarding distribution of opioids?
19         MR. VARNADO:  Object to the
20    form.
21         THE WITNESS:  My area has
22    responsibility for maintaining the
23    policies for our pharmacies along many
24    different areas.
25   Q.   (BY MR. INNES)  Are your

Page 69

1  pharmacists part of the distribution of
2  opiates?
3    A.   Our pharmacists dispense
4  medications written by a prescriber.
5    Q.   Are pharmacists part of the
6  distribution of opioids?
7          MR. VARNADO:  Object to the
8    form.
9          THE WITNESS:  Our pharmacies
10    fill legitimate, medical-purpose
11    prescriptions for individual patients.
12   Q.   (BY MR. INNES)  How do your
13  pharmacies go about filling legitimate,
14  medical-purpose prescriptions for individual
15  patients?
16    A.   We receive a prescription order
17  from a prescriber.  We validate that it's
18  used for a legitimate medical purpose.  That
19  pharmacist then fills and counsels the
20  patient on the proper use of that medication.
21    Q.   Where does your pharmacist --
22  where does a Walmart pharmacist obtain
23  opioids?
24         MR. VARNADO:  Object to the
25    form.

Page 70

1    MR. INNES: I can rephrase
2    that.
3    Q.    (BY MR. INNES) From whom do
4    Walmart pharmacists obtain opioids for
5    purposes of dispensing?
6    A.    Our pharmacies receive
7    prescription medications from our pharmacy
8    warehouses or from our supplier partners.
9    Q.    Okay. And I want to focus us
10   today on opioids.
11         You're aware that the country
12   is in the midst of an opioid epidemic; is
13   that right?
14   A.    I'm sorry, can you repeat that?
15   Q.    Are you aware that the country
16   is in the midst of an opioid epidemic?
17   A.    I am aware that there is a lot
18   of conversation on an opioid crisis at this
19   point, yes.
20   Q.    Do you agree there is an opioid
21   crisis?
22   A.    I agree there is an issue with
23   opioids.
24   Q.    What is that issue?
25   A.    That there is a lot of products

Page 71

1    coming in from outside sources into the U.S.,
2    that there were problems a year ago -- years
3    ago in Florida with prescribers, but that
4    there are also legitimate medical purpose
5    prescriptions that are being filled in
6    pharmacies for our patients.
7    Q.    (BY MR. INNES) Where do your
8    pharmacies receive opioids? From whom do
9    your pharmacies receive opioids?
10   A.    Currently our opioid
11   prescriptions would come from our -- I'll
12   take that back. We used to receive our
13   opioids from our C-II warehouse.
14   Q.    And is that the 6045 warehouse?
15   A.    6045.
16   Q.    For what time period did you
17   receive -- did your pharmacies receive
18   opioids from the 6045 warehouse?
19   A.    I can't speak to the entire
20   timeframe that they received opioids from
21   that warehouse. It used to be from different
22   suppliers through the 222 forms, but up to
23   probably May of last year, they received
24   opioids.
25   Q.    Is it your understanding that

Page 72

1    Walmart ceased the distribution of opioids in
2    May of 2018?
3    A.    Walmart discontinued our 6045
4    warehouse.
5    Q.    As it related to opioids?
6         MR. VARNADO: Object to the
7    form.
8         THE WITNESS: That's where we
9    had our opioids from.
10   Q.    (BY MR. INNES) Is Walmart in
11   the business, currently, of distributing
12   opioids?
13   A.    Walmart does not distribute
14   opioids.
15   Q.    Does Walmart dispense opioids?
16   A.    Walmart fills legitimate
17   medical descriptions for opioids.
18   Q.    You testified earlier that in
19   your role as a -- in each of your roles as a
20   director and senior director of regulatory
21   affairs and compliance, it was your job to
22   make sure that Walmart's policies were
23   up-to-date with then current regulations,
24   both state and federal; is that correct?
25         MR. VARNADO: I don't remember.

Page 73

1         THE WITNESS: Can you repeat
2    that?
3         MR. INNES: Can you read back
4    that question, please?
5         (Whereupon, the following
6    testimony was read by the court
7    reporter.)
8         "QUESTION: You testified
9    earlier that in each of your roles as
10   a director and senior director of
11   regulatory affairs and Compliance, it
12   was your job to make sure that
13   Walmart's policies were up-to-date
14   with then current regulations, both
15   state and federal; is that correct?"
16         (End of readback.)
17         MR. VARNADO: Same objection.
18         THE WITNESS: My role as a
19   senior director was to make sure that
20   we had made appropriate changes to our
21   policies as it related to state and
22   federal law.
23   Q.    (BY MR. INNES) What would
24   precipitate those changes?
25   A.    It would be any change in the

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 regulation.
2 Q. And you made changes to your
3 policies to meet changes in the particular
4 regulation; is that right?
5 A. I'm sorry. And I've got some
6 congestion, so now my ears are ringing, so I
7 apologize.
8 Q. We have competing congestion,
9 so at some point, we're going to have
10 harmonic convergence here.
11 So at -- you made changes to
12 policies to meet changes to a particular
13 regulation; is that right?
14 A. Correct. We would update
15 policies.
16 Q. Are you familiar with the
17 Controlled Substances Act?
18 A. I am.
19 Q. What is the Controlled
20 Substances Act?
21 MR. VARNADO: Object to the
22 form.
23 THE WITNESS: It's regulations
24 that were set forth to protect the
25 public around controlled substances

Page 75

1 and how they were dispensed.
2 Q. (BY MR. INNES) Is Walmart a
3 registrant under the Controlled Substances
4 Act?
5 A. Yes.
6 Q. Currently?
7 A. Yes.
8 Q. To the best of your knowledge,
9 when did Walmart first become a registrant
10 under the Controlled Substances Act?
11 A. That, I don't know.
12 And are you talking about a
13 warehouse? Or are you talking about each one
14 of our locations is a registrant?
15 Q. Sure. I can -- thank you for
16 that. I can focus us.
17 When did Walmart first become a
18 registrant to distribute opioids?
19 A. I do not know.
20 Q. Was Walmart a registrant under
21 the Controlled Substances Act to distribute
22 opioids during any time when you were the
23 senior manager?
24 MR. VARNADO: Object to the
25 form.

Page 76

1 THE WITNESS: As a senior
2 manager?
3 MR. INNES: Correct.
4 THE WITNESS: I don't know.
5 Q. (BY MR. INNES) When did you
6 first become aware that Walmart was a
7 registrant under the Controlled Substances
8 Act for the distribution of opioids?
9 MR. VARNADO: Object to the
10 form.
11 THE WITNESS: It would have
12 been after I assumed the role of
13 senior director.
14 Q. (BY MR. INNES) And that would
15 be approximately when?
16 A. Approximately early 2012.
17 Q. So in early 2012, that was the
18 first time you became aware that Walmart was
19 a registrant for purposes -- under the CSA
20 for purposes of distributing opioids; is that
21 correct?
22 A. Yes.
23 Q. At that time were you aware
24 that the DEA regulations required all
25 distributors to report suspicious orders of

Page 77

1 controlled substances?
2 A. I was not -- I didn't have a
3 full understanding of the regulation.
4 Q. When did your -- at what point
5 in time, if ever, did you have a full
6 understanding of the regulation?
7 A. The reporting of the suspicious
8 order monitoring was conducted and had a
9 responsibility -- it was a different
10 organization within Walmart. I didn't -- I
11 didn't know that full understanding of
12 suspicious order until sometime in probably
13 2015.
14 Q. So 2015 was the first time --
15 was when you had a full understanding of the
16 Controlled Substances Act as it relates to
17 distribution of opioids?
18 A. 2014, 2015.
19 Q. Can you be more specific when
20 you say "2014"? What time period in 2014?
21 A. It would have been probably
22 early 2014.
23 Q. So in early 2014, you were the
24 senior director of health and wellness
25 compliance; is that correct?

Page 78

1   A.   Yes.
2   Q.   When did you first become aware
3 of the Controlled Substances Act as it
4 relates to the distribution of opioids?
5   A.   I don't remember the exact
6 date, but just -- it would be after I became
7 a senior director and before we -- before we
8 took over the responsibility for the
9 suspicious order monitoring.
10   Q.   So you became a senior director
11 of pharmacy regulatory affairs sometime in
12 February of 2012; is that correct?
13   A.   Yes.
14   Q.   When did your division take
15 responsibility for suspicious order
16 monitoring?
17        MR. VARNADO:  Object to the
18   form.
19        THE WITNESS:  I don't know the
20   exact date, but it would be in -- have
21   been after 2014.
22   Q.   (BY MR. INNES)  Okay.  I'm a
23 little confused now.  Let me see if I can
24 clear this up.
25        So I asked you what -- the date

Page 79

1 you first became aware of the Controlled
2 Substances Act as it relates to the
3 distribution of opioids.  And I believe your
4 testimony now is you would have become aware
5 of the CSA sometime after 2014.  Is that
6 correct?
7        MR. VARNADO:  Objection to
8   form.
9        THE WITNESS:  I knew of the
10   CSA, but as it relates to suspicious
11   order monitoring, I didn't become, to
12   my knowledge, aware of a reporting
13   obligation until sometime after -- it
14   would have been 2014 or 2015.  I don't
15   remember the exact date.
16   Q.   (BY MR. INNES)  Okay.
17        Your prior testimony, as I
18 understood it, was you had a full
19 understanding of the Controlled Substances
20 Act in the beginning of 2014; is that
21 correct?
22        MR. VARNADO:  Object to the
23   form.
24        THE WITNESS:  I understood most
25   elements of the Controlled Substances

Page 80

1 Act, but I wasn't -- I wasn't
2 100 percent versed in the Controlled
3 Substances Act.
4   Q.   (BY MR. INNES)  Are you
5 100 percent versed today in the Controlled
6 Substances Act?
7   A.   Not without having the act in
8 front of me.  I wouldn't be able to speak to
9 all of its elements.
10   Q.   Yeah, I'm not asking for you to
11 recite the act verbatim.  I'm more driving at
12 your awareness of the Controlled Substances
13 Act as it applies to distribution of opioids
14 and Walmart's obligations under those
15 regulations.
16        MR. VARNADO:  Object to the
17   form.
18   Q.   (BY MR. INNES)  When did you
19 become fully conversant in those obligations
20 under the CSA?
21   A.   I couldn't give you an exact
22 date.
23   Q.   Can you give me a time --
24   A.   I don't remember that.
25   Q.   I did it to you.  I'm sorry, I

Page 81

1 spoke over the top of you.
2   A.   That's all right.
3   Q.   Can you give me an approximate
4 date?
5   A.   It would probably be 2014,
6 somewhere 2014.  Maybe --
7        Sometime in 2014.
8   Q.   What was practice compliance's
9 involvement, if any, in the suspicious order
10 monitoring as relates to opioids prior to
11 fully taking it over?
12        MR. VARNADO:  Object to form.
13        THE WITNESS:  We would have
14   worked with our logistics partners who
15   had responsibility for SOM reporting
16   to make sure that they were working on
17   policies and procedures.
18   Q.   (BY MR. INNES)  What sort of
19 work would have been done with your logistics
20 partners?
21   A.   It would have been looking at
22 making enhancements to their current process
23 for reporting suspicious order monitoring.
24   Q.   When did you first look at
25 making enhancements to the suspicious order

Page 82

1  monitoring program as it relates to -- strike
2  that.
3       When did you first look into
4  making enhancements to the suspicious order
5  monitoring program?
6       MR. VARNADO: Object to form.
7       THE WITNESS: I don't know when
8  all enhancements were made, but my
9  area would have started getting
10  involved in 2014.
11      Q.   (BY MR. INNES) So prior to
12  2014, was anyone in health and wellness
13  practice compliance involved in the
14  suspicious order monitoring program?
15      A.   No.
16      MR. VARNADO: Object to the
17  form.
18      Give me a chance to object.
19      THE WITNESS: I'm sorry.
20      Can you repeat?
21      MR. INNES: There's no question
22  pending.
23      It's quite warm in here, isn't
24  it?
25      THE WITNESS: I'm sorry?

Page 83

1       MR. INNES: Is it quite warm in
2  here, or is it me?
3       THE WITNESS: No, it's warm.
4       MR. INNES: Scott, do you think
5  we could prop that door open a little
6  bit?
7       MR. ELMER: Sure.
8       MR. INNES: Thanks.
9       If it gets too loud for the
10  videographer or for the court
11  reporter, please let me know. I don't
12  want this to be considered a
13  deposition tactic that I'm making the
14  witness uncomfortable. It's quite
15  warm in here.
16      Q.   (BY MR. INNES) When did you
17  first become aware, if ever, that the DEA's
18  regulations require all distributors that are
19  registrants under the CSA to report
20  suspicious orders of controlled substances?
21      A.   I don't remember an exact date,
22  but it would have been sometime around when
23  we took over responsibility -- or became
24  involved with suspicious order monitoring.
25      Q.   Is that sometime --

Page 84

1       A.   And how the logistics process
2  was performing.
3       Q.   And your prior testimony was
4  that was somewhere around 2014. Do I have
5  that correct?
6       A.   Yes.
7       Q.   When did you first become
8  aware, if ever, of Walmart's obligation to
9  design and operate a system to disclose to
10  Walmart suspicious orders of controlled
11  substances?
12      A.   Again, I don't remember the
13  exact date, but it would be sometime in 2014.
14      Q.   When did you first become
15  aware, if ever, that Walmart was required to
16  inform the field division office of
17  administration in Walmart's area of
18  suspicious orders when discovered by Walmart?
19      MR. VARNADO: Object to the
20  form.
21      THE WITNESS: It would have
22  been after we accepted responsibility
23  for SOM reporting.
24      Q.   (BY MR. INNES) And what was
25  the date of that?

Page 85

1       A.   I don't know the exact date.
2       Q.   Sometime in 2014? Is that --
3       A.   That would have been sometime
4  in 2015, most probably.
5       Q.   When did you first become
6  aware, if ever, that suspicious orders under
7  the CSA include orders of unusual size,
8  orders deviating substantially from a normal
9  pattern, and orders of unusual frequency?
10      MR. VARNADO: Object to the
11  form.
12      THE WITNESS: It would have
13  been sometime in 2014.
14      Q.   (BY MR. INNES) In 2014, as you
15  were beginning to familiarize yourself with
16  the CSA, and as it relates to Walmart's role
17  as a distributor of opioids, was there a
18  reason that you did not educate yourself as
19  to reporting to suspicious -- reporting
20  suspicious orders to the field office?
21      MR. VARNADO: Object to the
22  form.
23      THE WITNESS: That was not in
24  our area of responsibility.
25      Q.   (BY MR. INNES) What was your

Page 86

1 area of responsibility at that point?
2         MR. VARNADO:  Object to the
3     form.
4         THE WITNESS:  I'm sorry, what
5     was that?
6     Q.    (BY MR. INNES)  I'm sorry.
7     What was your area of
8 responsibility at that point?
9     A.    Our area of responsibility was
10 everything within the practice compliance and
11 the practice of pharmacy at our locations,
12 our retail pharmacy settings.
13     Q.    What was your responsibility at
14 that point as it related to the distribution
15 of opioids?
16         MR. VARNADO:  Object to the
17     form.
18         THE WITNESS:  Can you repeat
19     that?
20         MR. INNES:  Sorry, that was
21     fast.  I'm sorry.
22     Q.    (BY MR. INNES)  What was your
23 responsibility at that point as it related to
24 the distribution of opioids?
25         MR. VARNADO:  Object to the

Page 87

1     form.
2         THE WITNESS:  We dispensed
3     opioids in our retail pharmacies.
4     Q.    (BY MR. INNES)  In 2014, was
5 Walmart a distributor of opioids?
6     A.    That was not my area of
7 responsibility.
8     Q.    What responsibility, if any,
9 did you have in 2014 regarding distribution?
10     A.    Someone in our area worked with
11 our logistics partners to make enhancements
12 to their system.
13     Q.    Who was that person?
14     A.    Miranda Johnson.
15     Q.    Okay.  And at that point in
16 time, 2014, you were the senior director of
17 health and wellness compliance?
18     A.    Yes.
19     Q.    And did Ms. Johnson report to
20 you at that point in time?
21     A.    She did not.  She reported to
22 someone else.
23     Q.    Who did she report to at that
24 point?
25     A.    She reported to Tim Koch.

Page 88

1 K-O-C-H.
2     Q.    And at that point in time, was
3 Mr. Koch involved in the -- was Mr. Koch
4 involved in the -- strike that.
5         In 2014, senior director of
6 health and wellness compliance that dealt
7 with Walmart's compliance with the CEA -- CSA
8 as it relates to the distribution of opioids
9 was Tim Koch?
10         MR. VARNADO:  Object to the
11     form.
12         THE WITNESS:  Tim Koch would
13     have been a senior director.  His
14     responsibility would have been for
15     making sure our stores, our pharmacy
16     retail sites had the appropriate
17     practice acts for both federal and
18     state legislation.
19         But we did not have
20     responsibility for logistics.
21     Q.    (BY MR. INNES)  What do you
22 mean -- are you using "logistics" as a
23 synonym for "distribution"?
24     A.    Logistics is our distribution.
25     Q.    Is it your understanding that

Page 89

1 during that point in time, health and
2 wellness compliance had no role in compliance
3 with the CSA as it relates to the
4 distribution of opioids?
5         MR. VARNADO:  Object to form.
6         Go ahead.
7         THE WITNESS:  What time period?
8         MR. INNES:  We're in 2014.
9         THE WITNESS:  2014, that
10     responsibility was with our logistics
11     distribution center folks.
12     Q.    (BY MR. INNES)  Okay.  Practice
13 compliance had no role at all?
14         MR. VARNADO:  Object to form.
15         THE WITNESS:  Practice
16     compliance did not have responsibility
17     for the logistics department and SOM
18     reporting.
19     Q.    (BY MR. INNES)  That's not my
20 question.  I want to know if the practice
21 compliance division had any responsibility
22 regarding the distribution of opioids in
23 2014.
24     A.    No.
25     Q.    When, if ever, did the practice

Page 90

1  compliance division have responsibility
2  relating to the distribution of opioids?
3      A.   The practice compliance
4  department would not have responsibility for
5  distribution.
6      Q.   What role, if any, did the
7  practice compliance division have relating to
8  the diversion or potential diversion of
9  opioids in 2014?
10     MR. VARNADO:  Object to form.
11     THE WITNESS:  Practice
12     compliance had responsibility for
13     theft and diversion within our
14     pharmacies for -- either by
15     pharmacists, technicians, or for
16     forged or altered prescriptions that
17     would be presented at our pharmacies.
18     Q.   (BY MR. INNES)  When, if ever,
19  did -- strike that.
20         Can you describe those
21  responsibilities in detail?
22     A.   I'm sorry, can you --
23     Q.   Can you describe those
24  responsibilities that you had?
25     MR. VARNADO:  Object to the

Page 91

1     form.
2      THE WITNESS:  For the
3     pharmacist, technician, or forged or
4     altered prescriptions.
5      Q.   (BY MR. INNES)  Let me rephrase
6  the question.
7         Your testimony is that practice
8  compliance had responsibility for the theft
9  and diversion within our pharmacies, for
10 either pharmacists, technicians, or forged or
11 altered prescriptions that would be presented
12 to our pharmacists.
13        Is that accurate?
14     THE WITNESS:  Practice
15     compliance had the responsibility for
16     reporting to the DEA or to state
17     regulatory agencies of any theft or
18     diversion within our pharmacies.
19     Reporting.
20     Q.   (BY MR. INNES)  And we're
21 talking in 2014 right now?
22     A.   Yes.
23     Q.   Was that same responsibility
24 with practice compliance before 2014?
25     A.   Yes.

Page 92

1      Q.   What years was that -- let me
2  do it differently.
3          What years, to the best of your
4  knowledge, was practice compliance
5  responsible or involved in the reporting that
6  you just described?
7      A.   Since I came to the regulatory
8  affairs area, it would have been from -- that
9  I know of -- would have been from 2012 on.
10     Q.   But you did come to regulatory
11 affairs prior to 2012; correct?
12     A.   It -- it -- that's correct.
13         So it would -- it would have
14 been in -- when I came over to regulatory
15 affairs, which was 2009.
16     Q.   2009.  Okay.
17         So from 2009 forward, to the
18 best of your knowledge, practice compliance
19 was responsible or involved in reporting a
20 diversion to the DEA and --
21     MR. VARNADO:  Object to the
22     form.
23     Q.   (BY MR. INNES) -- and state
24 agencies?
25     MR. VARNADO:  Sorry.  Object to

Page 93

1  the form.
2      THE WITNESS:  Practice
3     compliance had responsibility if we
4     had diversion in our pharmacies, of
5     reporting that diversion if it was a
6     pharmacist, if it was a technician, or
7     if we had some theft or loss inside
8     our pharmacy due to a robbery would
9     have been our responsibility.
10     Q.   (BY MR. INNES)  What about
11 orders placed by pharmacists to Walmart
12 distribution centers?
13     A.   Can you be more specific?
14     Q.   If an order was -- if an order
15 that met the criteria --
16         Strike that.
17         We'll circle back to this.  I
18 think there's a better -- maybe a better way
19 to get where we need to go.
20         I asked you earlier when you
21 first became aware of a DEA regulation
22 requiring Walmart to identify suspicious
23 orders.  And your testimony is -- was that
24 2015?
25     MR. VARNADO:  Object to form.

Page 94

1 THE WITNESS: That I understood
2 the responsibility for our warehouses
3 to report SOM reporting? Is that what
4 you're asking?
5 Q. (BY MR. INNES) For Walmart.
6 A. Sometime around 2014, I would
7 have been aware of the responsibility for
8 reporting of suspicious order monitoring.
9 Q. Do you consider suspicious
10 order monitoring to be a part of diversion?
11 MR. VARNADO: Object to form.
12 THE WITNESS: My understanding
13 of diversion was within our pharmacies
14 with the pharmacy technician, forged
15 or altered prescription, theft or
16 robbery. Now I understand that
17 diversion is included within what's
18 considered suspicious order
19 monitoring.
20 Q. (BY MR. INNES) And when did
21 that understanding change to your current
22 understanding?
23 A. I can't remember an exact date,
24 but it would be after conversations began
25 around the opioid crisis.

Page 95

1 Q. When did the opioid crisis
2 begin?
3 MR. VARNADO: Object to the
4 form.
5 THE WITNESS: I first became
6 aware of when everyone was using the
7 term around -- "opioid crisis" --
8 probably 2014, 2015.
9 Q. (BY MR. INNES) So is that
10 around the time your understanding changed?
11 A. My understanding of?
12 Q. Diversion.
13 A. I'm sorry?
14 Q. Diversion.
15 A. Yes.
16 Q. End of 2014, beginning of 2015,
17 you came to a different understanding of
18 diversion? Your current understanding of
19 diversion?
20 A. That a suspicious order could
21 be considered as diversion.
22 Q. When did you first become
23 aware, if ever, that Walmart is required to
24 maintain effective controls against
25 diversion?

Page 96

1 A. Can you repeat that? I'm
2 sorry.
3 Q. Certainly.
4 When did you first become
5 aware, if ever, that Walmart has a
6 responsibility to maintain effective controls
7 against diversion?
8 A. Since beginning my role in
9 2009, I would have been aware of our
10 responsibility to prevent diversion as it
11 pertained to forged and altered
12 prescriptions, theft within our pharmacies.
13 That was my understanding.
14 Q. But again, in 2014, late 2014,
15 2015, your understanding of diversion
16 changed?
17 A. That a suspicious order could
18 be considered diversion activity.
19 Q. I just want to make sure I have
20 the record clear here.
21 So your first awareness that
22 Walmart had an obligation to maintain
23 effective controls against diversion was
24 sometime in 2009; is that right?
25 A. I can't speak to when Walmart

Page 97

1 understood their obligation. That wasn't
2 controlled by our department.
3 Q. If I misspoke -- I'm interested
4 in your knowledge. So I can rephrase that
5 question.
6 I see that I do have it wrong
7 in my transcript. Let me rephrase that.
8 It's your testimony that you
9 first became aware of Walmart's obligation to
10 maintain effective controls against diversion
11 sometime in 2009?
12 MR. VARNADO: Object to form.
13 THE WITNESS: Can you repeat
14 that? I'm sorry.
15 Q. (BY MR. INNES) You first
16 became aware of Walmart's obligation to
17 maintain effective controls against diversion
18 sometime in 2009.
19 A. Diversion, as my understanding
20 of it, was 2009 when I joined the regulatory
21 affairs.
22 Q. Again, I'm just asking whether
23 or not you had a particular awareness of that
24 particular piece of the Controlled Substances
25 Act. Divorced from what your understanding

Page 98

of diversion was, I just want to know if you
were aware of that particular obligation
under the CSA. And that would have been in
2009. Do I have that correct?
            MR. VARNADO: Object to form.
            THE WITNESS: The particular
    piece of?
            MR. INNES: Walmart's
    obligation to maintain effective
    controls against diversion.
            THE WITNESS: Are you talking
    about SOM reporting?
    Q.    (BY MR. INNES) Is SOM
reporting part of Walmart's maintenance of
effective controls against diversion?
    A.    My understanding of diversion
at the time in 2009 was what I described
earlier. But then around 2014, we became
more involved with logistics and their
responsibility for reporting SOM.
    Q.    When you became more involved
with the logistics team and their
responsibility for reporting SOM, do you
recall at that time if the logistics team had
a different understanding of diversion than

Page 99

you did in 2014?
            MR. VARNADO: Object to the
    form.
            THE WITNESS: I can't speak to
    their understanding.
    Q.    (BY MR. INNES) Did you ever
have a conversation with anyone in logistics
regarding what diversion was as it relates to
the CSA in 2014?
    A.    I can't recall that
conversation.
    Q.    Was there a conversation?
    A.    I can't recall that there was a
conversation.
    Q.    There may have been a
conversation?
    A.    I'm sorry?
    Q.    There may have been a
conversation?
    A.    I can't recall that.
    Q.    You can't recall whether or not
there was a conversation?
    A.    I don't know if there was any
conversation.
            MR. INNES: For the record, now

Page 100

I'm getting glare off the computer
screen, so we're all on an even
playing field.
            MR. VARNADO: All in it
together now.
            MR. INNES: I just want the
record to be clear now.
            THE WITNESS: The sun is
terrible.
            (Discussion off the record.)
            THE VIDEOGRAPHER: Let's go off
the record for one second, if that's
okay.
            MR. INNES: Sure.
            THE VIDEOGRAPHER: 11:08. We
are off video record.
            (Recess taken, 11:08 a.m. to
11:17 a.m.)
            THE VIDEOGRAPHER: 11:17. We
are on the video record.
    Q.    (BY MR. INNES) Mr. Chapman,
let me continue on this same vein for a
little while.
            When, if ever, did you become
aware of Walmart's responsibility to exercise

Page 101

due diligence to avoid fulfilling suspicious
orders that might be diverted into other than
legitimate medical and scientific or
industrial channels?
            MR. VARNADO: Object to form.
            THE WITNESS: We started
    working with the logistics group under
    a suspicious order monitoring program
    sometime in 2014.
    Q.    (BY MR. INNES) Okay. And I'm
not sure that fully answers my question.
            Is it your testimony that
sometime in 2014, you became a Walmart -- you
became aware of Walmart's statutory
responsibility to exercise due diligence to
avoid filling suspicious orders that might be
diverted into other than legitimate medical
and scientific or industrial channels?
            MR. VARNADO: Object to the
    form.
            THE WITNESS: Can you repeat
    that?
    Q.    (BY MR. INNES) Is it your
testimony that sometime in 2014, you became
aware of Walmart's responsibility to exercise

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 due diligence to avoid filling suspicious
2 orders that might be diverted into other than
3 legitimate medical, scientific, or industrial
4 channels?
5 A.    It would have been sometime in
6 2014 that I understood Walmart's obligation
7 for suspicious order monitoring as it was
8 being carried out by the logistics
9 department.
10 Q.    Again, my question is slightly
11 different.
12        When did you become aware, if
13 ever, of Walmart's responsibility to exercise
14 due diligence to avoid filling suspicious
15 orders?
16        MR. VARNADO:  Object to form.
17        THE WITNESS:  My understanding
18 and involvement around suspicious
19 order monitoring and obligation our
20 warehouses had was sometime in 2014.
21 Q.    (BY MR. INNES)  In 2014, did
22 Walmart perform due diligence on orders from
23 pharmacies?
24 A.    I don't know when Walmart began
25 suspicious order monitoring.

Page 103

1 Q.    In 2014, were you aware that
2 Walmart was obligated to exercise due
3 diligence to avoid suspicious orders?
4        MR. VARNADO:  Object to the
5 form.
6        THE WITNESS:  Sometime in 2014
7 is when I became aware of the -- of
8 the SOM obligations that our warehouse
9 was following.
10 Q.    (BY MR. INNES)  What were the
11 SOM obligations that the warehouse was
12 following in 2014?
13 A.    That if there was a suspicious
14 order, an order that was deemed suspicious,
15 that it could not be shipped and had to be
16 reported.
17 Q.    When, if ever, did you become
18 aware that the failure to exercise due
19 diligence could provide a statutory basis for
20 the revocation or suspension of Walmart's
21 registration as a distributor under the
22 Controlled Substances Act?
23        MR. VARNADO:  Object to form.
24        THE WITNESS:  Again, that would
25 have been sometime in 2014, when I had

Page 104

1 an understanding of the obligations
2 around suspicious order monitoring.
3        MR. INNES:  Scott's going to
4 close the door.  Thanks, Scott.
5 Q.    (BY MR. INNES)  And your
6 understanding of the obligations around
7 suspicious order monitoring in 2014
8 encompassed an awareness of the --
9 encompassed an awareness that the failure to
10 exercise due diligence could result in the
11 revocation of a registrant's license?
12        MR. VARNADO:  Object to the
13 form.
14        THE WITNESS:  I understand that
15 suspicious order monitoring needed to
16 be made on any order that was deemed
17 suspicious.
18 Q.    (BY MR. INNES)  What was your
19 understanding of what that suspicious order
20 monitoring needed to be in 2014?
21 A.    That a report had to be made to
22 the DEA of an identified suspicious order.
23 Q.    Who was responsible for
24 reporting suspicious orders at that time?
25 A.    Our logistics division.

Page 105

1 Q.    What role, if any, did the
2 compliance division have at that point in the
3 reporting of suspicious orders?
4 A.    We didn't have a role in the
5 reporting of the suspicious order monitoring.
6 Q.    What role, if any, did the
7 compliance team have in 2014 for the
8 identification of suspicious orders?
9 A.    We partnered with the logistics
10 team to help make enhancements to their
11 system.
12 Q.    What enhancements were those?
13 A.    Systematic enhancements for
14 identifying suspicious orders.
15 Q.    What sort of systematic
16 enhancements specifically?
17 A.    I can't speak to the exact
18 projects.
19 Q.    Can you describe them
20 generally?
21        MR. VARNADO:  Object to the
22 form.
23        THE WITNESS:  We had -- they
24 had processes to identify suspicious
25 orders, but some of their processes

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    were manual in nature.
2        Q.    (BY MR. INNES)  Were all of
3    their processes manual in nature?
4        A.    At that time, all of their
5    processes were not manual.
6        Q.    Do you recall specific policies
7    that were in place at that time regarding the
8    identification of suspicious orders?
9        A.    Logistics had policies that
10   they followed for reporting suspicious
11   orders.
12       Q.    In your role as a senior
13   director of health and wellness practice
14   compliance in 2014, did you review those
15   policies for reporting suspicious orders?
16       A.    I would have seen their policy.
17       Q.    And would you have reviewed it
18   for compliance with federal and state
19   regulations?
20       A.    I would not have reviewed it to
21   see if it was compliant.
22       Q.    Why would you have not reviewed
23   it to see if it was compliant?
24       A.    Because we didn't have
25   responsibility for the reporting.

Page 107

1        Q.    Sorry, I chuckled because
2    there's a chain saw going on outside.  These
3    things comes in threes, so I don't know
4    what's coming next.  This is the sun, the
5    heat, and the chain saw, and the reflection
6    off that, so four.
7             Who had the responsibility for
8    reviewing logistics policies and procedures
9    regarding suspicious order monitoring in 2014
10   for compliance with federal and state
11   regulations?
12            MR. VARNADO:  Object to form.
13            THE WITNESS:  Logistics would
14       have had responsibility for
15       understanding their obligation for
16       reporting a suspicious order.
17       Q.    (BY MR. INNES)  Who had
18   ultimate responsibility for reviewing the
19   policies and procedures that logistics had in
20   place for compliance with suspicious order
21   reporting?
22       A.    I --
23            MR. VARNADO:  Object to the
24       form.
25            THE WITNESS:  I do not know who

Page 108

1    the specific person was that had to
2    review their policy.
3        Q.    (BY MR. INNES)  Do you know if
4    those policies were reviewed for compliance
5    by anyone?
6        A.    I don't know.
7        Q.    Is it possible that those
8    policies were never reviewed by anyone at
9    Walmart for compliance?
10       A.    I can't speak to that.
11       Q.    Is it possible that those
12   policies were never reviewed by anyone
13   outside of Walmart for compliance?
14       A.    I can't speak to that.
15       Q.    Who could speak to that?
16       A.    I don't know who they had
17   review it.
18       Q.    If you wanted to answer that
19   question for yourself, who would you ask?
20            MR. VARNADO:  Object to form.
21            THE WITNESS:  I would approach
22       our legal department.
23       Q.    (BY MR. INNES)  If someone in
24   logistics wanted to know whether or not your
25   policies were in compliance -- strike that.

Page 109

1             Are there compliance policies?
2        A.    I'm sorry, repeat that?
3        Q.    Are there compliance policies
4    that relate to the distribution of opioids?
5             MR. VARNADO:  Object to the
6        form.
7             THE WITNESS:  Say that again?
8        I'm sorry.
9        Q.    (BY MR. INNES)  Are you having
10   a tough time hearing me or are you not
11   understanding the question?
12       A.    It's hard to hear you, but I
13   didn't understand the question.
14       Q.    Okay.  It's a twofer.
15            If someone at Walmart wanted to
16   know whether -- strike that.  We can return
17   to this later.
18            When did you become aware --
19   when did you first become aware, if ever,
20   that Walmart's required to file reports of
21   distributions of controlled substances to the
22   DEA ARCOS unit?
23       A.    Repeat that last part.
24       Q.    Sure.
25            When did you first become

Page 110

1 aware, if ever, that Walmart is required to
2 file reports of distributions of controlled
3 substances to the DEA ARCOS unit?
4     A.    ARCOS reporting.  I would have
5 heard about ARCOS probably after joining the
6 regulatory affairs department.  A brief
7 understanding.
8     Q.    So is it your testimony in 2009
9 was the first time that you heard about
10 ARCOS?
11     A.    Yes.
12     Q.    My question is more specific
13 than that.  When did you first become aware,
14 if ever, that Walmart is required to file
15 reports of distributions of controlled
16 substances to the DEA ARCOS unit?
17     A.    I would have learned that they
18 had to report to ARCOS sometime after I
19 joined in 2009.
20     Q.    Would it be prior to 2010?
21     A.    It would be after I joined
22 the -- in 2009.
23     Q.    So sometime in the 2009 area?
24     A.    Yeah, after joining I would
25 have heard about ARCOS.

Page 111

1     Q.    Again --
2     A.    I wasn't aware of it before.
3     Q.    So your awareness of ARCOS
4 as -- of ARCOS's existence was in 2009; is
5 that correct?
6     A.    Yes.  That there was something
7 called ARCOS.
8     Q.    When did you first become
9 aware, if ever, that Walmart was required to
10 file reports of distributions of certain
11 controlled substances to the DEA ARCOS unit?
12          MR. VARNADO:  Object to form.
13          THE WITNESS:  Again, it would
14     just be sometime after 2009, when, you
15     know, I heard about ARCOS reporting.
16     Q.    (BY MR. INNES)  Prior to 2010?
17     A.    It would have been in 2009 when
18 I would have heard about ARCOS reporting, as
19 I joined the team.
20     Q.    I know this seems -- it seems
21 nitpicky.  Your testimony was sometime after
22 2009.  So I'm just trying to frame 2009.
23     A.    I think I joined regulatory
24 affairs in November of 2009, so ...
25     Q.    Okay.

Page 112

1     A.    I don't know the exact day, but
2 it would have been after I joined in 2009.
3     Q.    And your awareness of the
4 requirement to file reports with the DEA
5 ARCOS unit would have been sometime in 2009?
6     A.    My awareness that there was a
7 report called ARCOS -- that the warehouse had
8 a report, I knew of.  I didn't understand
9 their obligations.
10     Q.    Is this the first time you're
11 hearing of that obligation?  Today?
12     A.    I know that through ARCOS, they
13 have to report anything that's distributed.
14     Q.    When did you first become aware
15 of that obligation to report?
16          MR. VARNADO:  Object to form.
17          THE WITNESS:  It would have
18     been after I joined regulatory
19     affairs.  So it would have been after
20     November of 2009.
21     Q.    (BY MR. INNES)  And prior --
22 but prior to a specific date?
23     A.    I wouldn't remember that date.
24     Q.    Prior to January 1st, 2010?
25     A.    Again, I don't remember the

Page 113

1 date.
2     Q.    Prior to January 1st, 2011?
3     A.    I do not remember the date.
4     Q.    January 1st, 2012?
5     A.    I don't remember the date.
6     Q.    So your testimony today is you
7 don't remember when you first became aware
8 that Walmart had an obligation to report the
9 distribution of Schedule IIs to ARCOS?
10     A.    That is correct.
11          MR. VARNADO:  Object to the
12     form.
13          THE WITNESS:  Yes.
14     Q.    (BY MR. INNES)  But you had
15 awareness of that obligation prior to today?
16     A.    I understood that their -- I
17 learned of an ARCOS report that our C-II
18 warehouse had to make to the DEA on any
19 distribution they made from that warehouse.
20     Q.    I'll ask my question again.
21          When, if ever, did you become
22 aware of the obligation to make that report?
23     A.    I do not know when I became
24 aware that they had to report through ARCOS.
25     Q.    But you acknowledge that there

Page 114

1 is an obligation to report to ARCOS?
2     A.   I understand that the warehouse
3 has to report all distributions through
4 ARCOS.
5     Q.   Okay.  Thank you.
6         Do you agree that orders of
7 excessive quantities of a limited variety of
8 controlled substances, for example,
9 hydrocodone, while ordering few, if any,
10 other drugs is indicative -- strike that.
11         Are you familiar with the DEA's
12 guidance that registrants that rely on rigid
13 formulas to define whether an order is
14 suspicious may be failing to detect
15 suspicious orders?
16         MR. VARNADO:  Object to the
17    form.
18         THE WITNESS:  Can you repeat
19    that?
20     Q.   (BY MR. INNES)  Are you
21 familiar with the DEA's guidance that
22 registrants that rely on rigid formulas to
23 define whether an order is suspicious may be
24 failing to detect suspicious orders?
25         MR. VARNADO:  Same objection.

Page 115

1         THE WITNESS:  I'm not aware
2    that the DEA has given guidance on
3    formulas for suspicious order
4    monitoring.
5     Q.   (BY MR. INNES)  How are you
6 aware of that guidance?
7     A.   I said I am not aware.
8     Q.   Are you aware of any guidance
9 the DEA has given on suspicious order
10 monitoring?
11     A.   The only information that I
12 have seen is just the very short information
13 in the CFR regarding suspicious order
14 monitoring.
15     Q.   You've never seen a letter from
16 the DEA relating to -- providing guidance on
17 suspicious order monitoring?
18     A.   I have not.
19     Q.   Have you ever discussed DEA's
20 guidance on suspicious order monitoring with
21 anyone?
22         MR. VARNADO:  Object to the
23    form.
24         THE WITNESS:  I have -- we've
25    had discussions in my area after we

Page 116

1 took responsibility for suspicious
2 order monitoring on what the DEA's
3 guidance is in the CFR.
4     Q.   (BY MR. INNES)  And when again
5 did you take responsibility for suspicious
6 order monitoring?
7         MR. VARNADO:  Object to form.
8         THE WITNESS:  It would have
9    been sometime in 2015.
10     Q.   (BY MR. INNES)  What
11 discussions did you have in your area
12 regarding suspicious order monitoring on what
13 the DEA's guidance is in the CFR?
14         MR. VARNADO:  And I just object
15    to the question to the extent it's
16    calling for any privileged
17    communications with in-house or
18    outside counsel.  But otherwise, feel
19    free to answer the question.  Just no
20    discussions with lawyers.
21         THE WITNESS:  The discussions
22    around the CFR, that there was very
23    little direction from the DEA around
24    suspicious order monitoring.
25     Q.   (BY MR. INNES)  What research,

Page 117

1 if any, did you do regarding the DEA's
2 guidance on suspicious order monitoring?
3     A.   I did not do any research on
4 suspicious order monitoring and the
5 requirement, besides reviewing CFR.
6     Q.   So help me understand how you
7 can -- well, strike that.
8         Do you agree that there was
9 very little guidance from the DEA regarding
10 suspicious order monitoring in 2014?
11     A.   I had -- I had not seen any
12 guidance from the DEA around suspicious order
13 monitoring besides what was listed in the
14 CFR.
15     Q.   Did you see any guidance from
16 the DEA regarding diversion?
17         MR. VARNADO:  Object to the
18    form.
19         THE WITNESS:  We had developed
20    red flags around diversion, fraudulent
21    prescription, forged prescriptions,
22    pharmacy diversion by pharmacists or
23    technicians, and developed our red
24    flag awareness and programs based off
25    of DEA decisions, communications.

Page 118

1    Q.    (BY MR. INNES) Your prior
2  testimony was the discussions around the CFR,
3  that there was very little direction from the
4  DEA around suspicious order monitoring; is
5  that accurate?
6    A.    That's accurate.
7    Q.    And you further testified that
8  you did no research into the DEA's guidance
9  on suspicious order monitoring; is that
10  correct?
11        MR. VARNADO: Object to the
12  form.
13        THE WITNESS: I did not do
14  research.
15    Q.    (BY MR. INNES) If you did not
16  do research, how could you tell what the
17  DEA's guidance on suspicious order monitoring
18  was or was not?
19    A.    We followed the direction that
20  was listed with -- in the CFR.
21    Q.    What do you mean by "the
22  direction that was listed in the CFR"?
23    A.    As it speaks to the regulation
24  in the CFR.
25    Q.    And you didn't think to look

Page 119

1  anywhere else other than the CFR?
2        MR. VARNADO: Object to the
3  form.
4        THE WITNESS: We received
5        nothing from the DEA regarding --
6        after we took over the SOM
7        reporting -- around specifics of
8        reporting suspicious order monitoring.
9    Q.    (BY MR. INNES) And prior to
10  you taking over suspicious order monitoring
11  reporting and suspicious order monitoring,
12  that was -- who had that responsibility?
13    A.    Well, logistics had that
14  responsibility.
15    Q.    When you took over from
16  logistics, did you ask logistics personnel
17  for any communications from the DEA regarding
18  suspicious order monitoring?
19        MR. VARNADO: Object to the
20  form.
21        THE WITNESS: I did not ask
22        logistics.
23    Q.    (BY MR. INNES) Did logistics
24  provide you with any communications from the
25  DEA regarding suspicious order monitoring?

Page 120

1    A.    I do not recall.
2    Q.    Would there be something that
3  would help you recall?
4    A.    I'm sorry.
5    Q.    Is there anything that would
6  refresh your recollection as to what you
7  received, if anything, from the logistics
8  team regarding DEA's communications on
9  suspicious order monitoring?
10    A.    I'm not aware of anything that
11  would have been provided.
12    Q.    Is it possible that something
13  was provided to your team?
14        MR. VARNADO: Object to the
15  form.
16        THE WITNESS: I do not know.
17    Q.    (BY MR. INNES) Was there a
18  formal transition from logistics to
19  compliance such that there was a point person
20  on -- in those departments?
21    A.    There was a transition of that
22  responsibility from -- from logistics and
23  their reporting to practice compliance and
24  reporting.
25    Q.    Who managed that transition?

Page 121

1    A.    That transition would have been
2  completed with Miranda Johnson.
3    Q.    At that time, who did
4  Miranda Johnson report to?
5    A.    I believe at that time,
6  Miranda Johnson reported to Tim Koch.
7    Q.    Who did Tim Koch report to?
8    A.    Tim Koch reported to me.
9    Q.    And this is in 2014?
10    A.    This would have been 2015.
11    Q.    So at that point, you're Senior
12  Director II; is that right? With health and
13  wellness practice compliance?
14    A.    Yeah, I believe that's correct.
15    Q.    And then -- and under you at
16  that point there were three directors?
17    A.    Senior Director I.
18    Q.    Senior Director Is. Thank you.
19        And Mr. Koch was one of them.
20        And then how many direct
21  reports did Mr. Koch have?
22    A.    At that time he probably would
23  have had two direct reports.
24    Q.    Miranda Johnson?
25    A.    Miranda Johnson and -- I

Page 122

1 don't -- I don't know -- I don't know the
2 timeline when his director came on board.
3     Q.    When his second director came
4 on board?
5     A.    Right. Miranda was a director
6 and he would have had another director.
7     Q.    Okay. Of the three Senior
8 Director Is that you supervised, was Tim Koch
9 the only senior director that was involved in
10 the distribution of opioids?
11         MR. VARNADO: Object to form.
12         THE WITNESS: Tim Koch was
13     never involved in the distribution of
14     opioids.
15     Q.    (BY MR. INNES) Was Tim Koch
16 involved in the suspicious order monitoring
17 of opioids?
18     A.    Tim Koch would have been --
19         MR. VARNADO: Let him finish
20     his question.
21         THE WITNESS: Tim Koch would
22     have been responsible for the
23     supervision of Miranda Johnson.
24     Q.    (BY MR. INNES) And
25 Miranda Johnson would have been responsible

Page 123

1 for suspicious order monitoring?
2     A.    She would have been involved in
3 the transition and then the responsibility of
4 suspicious order monitoring.
5     Q.    So the responsibility of
6 suspicious order monitoring starts with
7 Miranda Johnson, who reports to Tim Koch, who
8 then reports to you?
9     A.    No, it was in logistics, and
10 had been. And then it transitioned from
11 logistics to Miranda Johnson within practice
12 compliance.
13     Q.    Okay. So thank you for that
14 clarification.
15         In 2015, when practice
16 compliance takes over suspicious order
17 monitoring from logistics, the primary -- the
18 person primarily responsible for that is
19 Miranda Johnson, who reports to Tim Koch, who
20 reports to you.
21     A.    Correct. It would have been
22 Miranda and her team that had responsibility.
23     Q.    Who was on Miranda's team, do
24 you recall?
25     A.    At the time it would have been

Page 124

1 two other -- probably two or three other
2 individuals.
3     Q.    Would their time have been
4 devoted strictly to suspicious order
5 monitoring?
6     A.    They would have had -- they
7 would have had different tasks around
8 controlled substances.
9     Q.    But their -- 100 percent of
10 their time would be directed to controls?
11     A.    Around the controlled substance
12 program.
13     Q.    What was the controlled
14 substance program?
15     A.    So Miranda's role was as
16 director of controlled substances, which
17 includes -- could include several different
18 things around controlled substances.
19     Q.    What exactly did it include?
20     A.    I'm sure I can't name all of
21 them, but it would have included annual
22 inventories of controlled substances. It
23 would have had the SOM reporting
24 responsibility, as well as other
25 responsibilities within that program.

Page 125

1     Q.    The other responsibilities
2 within that program, were you referring to
3 the SOM reporting program?
4     A.    SOM reporting program would be
5 one element of responsibility for controlled
6 substances.
7     Q.    Would you agree with me that
8 one indication of diversion would be the
9 ordering of a limited variety of controlled
10 substances in quantities disproportionate to
11 the quantity of non-controlled medications
12 ordered?
13         MR. VARNADO: Object to the
14     form.
15         THE WITNESS: Can you repeat
16     that?
17     Q.    (BY MR. INNES) Sure. Would
18 you agree with me that the following could be
19 indicative of diversion? Ordering a limited
20 variety of controlled substances quantities
21 disproportionate to the quantity of
22 non-controlled medications?
23     A.    If you could clarify that, it
24 would be helpful.
25     Q.    Sure. So I'm wondering -- so

Page 126

1    in -- my understanding of Walmart's business
2    is that it's vertically integrated, at least
3    during the time when it was distributing
4    opioids.
5            "Vertically integrated" meaning
6    that it would -- it could -- its pharmacies
7    ordered directly from the warehouse.
8        A.    Mm-hmm. (Witness nods.)
9        Q.    Would you agree with me that
10   the following is indicative of diversion?
11           If a pharmacy ordered an
12   excessive quantity of a limited -- ordered
13   excessive quantities of a limited variety of
14   controlled substances while ordering few, if
15   any, other drugs?
16           MR. VARNADO: Object to the
17   form.
18           THE WITNESS: I think it would
19   depend on the service area of that
20   particular pharmacy. If they had a
21   cancer center that they were -- had
22   patients coming from. I mean, you
23   would have to look at the entire mix
24   of controlled, non-controls and what
25   they were getting based on their

Page 127

1    patient population.
2        Q.    (BY MR. INNES) So it would be
3    something that could warrant further
4    investigation; is that correct?
5            MR. VARNADO: Object to the
6    form.
7            THE WITNESS: You would want to
8    understand what your patient base is.
9        Q.    (BY MR. INNES) And Walmart
10   would want to understand what its patient
11   base was --
12           MR. VARNADO: Object to form.
13           MR. INNES: -- in that
14   particular pharmacy and that
15   particular order.
16           THE WITNESS: Our pharmacists
17   would want to understand who their
18   patients are that they're serving and
19   the prescriptions that they are
20   filling are legitimate prescriptions.
21       Q.    (BY MR. INNES) And if the
22   order from a Walmart pharmacy, like I just
23   described, that could be an indicator of
24   diversion; is that correct?
25       A.    You're going to have to explain

Page 128

1    that one. I don't understand.
2        Q.    Sure. I'm focused on the part
3    of -- well, let's see if we can agree to
4    this.
5            A Walmart customer walks into a
6    Walmart pharmacy in Cuyahoga County, Ohio,
7    presents a script for opioids. Right?
8        A.    Mm-hmm.
9        Q.    At a certain point in time, the
10   pharmacy needs to make an order of opioids
11   from the distribution center at Walmart; is
12   that right?
13       A.    Mm-hmm. (Witness nods.)
14       Q.    All right. I want to focus on
15   that piece of the chain. I want to focus on
16   the order that's being placed by the pharmacy
17   to the distribution center for -- to fill
18   that stock of opioids.
19       A.    Okay.
20       Q.    Do you agree that it would be
21   indicative of diversion if a pharmacy ordered
22   an excessive quantity of, say, for instance,
23   oxycodone, while ordering few, if any, other
24   drugs?
25       A.    Again, not necessarily.

Page 129

1            If it was a pharmacy that was
2    servicing MD Anderson or some cancer
3    institute, they may have, from time to time,
4    orders that were higher on a particular drug.
5        Q.    Okay. But it might be an
6    indicator of diversion?
7        A.    I don't know that I can answer
8    that.
9        Q.    And you couldn't answer that
10   because you'd have to do further
11   investigation regarding --
12       A.    You'd have to know the
13   specifics of what was happening in that
14   particular, again, patient pharmacy.
15       Q.    Right.
16           In your training at Walmart, if
17   you were to receive such an order, would you
18   like to investigate that further to otherwise
19   alleviate any concerns of diversion?
20           MR. VARNADO: Object to the
21   form.
22           THE WITNESS: As a pharmacist
23   in one of our stores, I would want to
24   know my customer and know the
25   prescriber that was writing

Page 130

1 prescriptions.
2    Q.    (BY MR. INNES) Would you
3 expect the -- in 2014, when complying -- when
4 practice compliance had taken over for
5 suspicious order monitoring, would you agree
6 that an order such as the one I just
7 described could be an indicator of diversion?
8    A.    If -- once the responsibility
9 moved to practice compliance, if, as defined
10 by the DEA in the CFR that an order fell out
11 of the standards for what might be a
12 suspicious order, you would want to
13 investigate.
14    Q.    I've given you very particular
15 parameters I'm asking about. I want to know
16 whether or not excessive quantities of a
17 limited variety of oxycodone, for example,
18 while ordering few, if any, other drugs would
19 be an indicator requiring further
20 investigation by Walmart?
21    A.    Again, it's going to depend on
22 where that pharmacy is and who they're
23 servicing and what the patient needs are in
24 that particular store.
25    Q.    So it sounds to me like the

Page 131

1 answer to the question is yes, and now you're
2 describing to me what that further
3 investigation would be.
4        MR. VARNADO: Object to the
5    form.
6    Q.    (BY MR. INNES) Do I have that
7 wrong?
8    A.    No. I said it would depend on
9 that location, and how that patient
10 population was being served and what the
11 needs of those patients were.
12    Q.    So that order would come in in
13 the manner I described it, excessive
14 quantities of oxycodone, while ordering few,
15 if any, other drugs, would that set off a red
16 flag at Walmart?
17        MR. VARNADO: Object to the
18    form.
19        THE WITNESS: I don't know how
20    you're -- your explanation of an
21    excessive order.
22    Q.    (BY MR. INNES) You tell me.
23 What would -- when you were in that role in
24 2015 and beyond, what was Walmart's
25 understanding of an excessive order by a

Page 132

1 pharmacy?
2    A.    Again, you may have a pharmacy
3 that's -- that's located in a small hometown
4 that may order very little opioids of a type,
5 but if you tried to compare that location to
6 a location that was by a cancer center or
7 some center of that sort, it would be -- you
8 can't compare apples to apples. You have to
9 understand the patient. You have to
10 understand the market for that order.
11    Q.    So again, I want to bring you
12 away from the front end of the continuum, the
13 pharmacist filling the prescription. And I
14 want to talk about Walmart's role as a
15 distributor, where Walmart is filling orders
16 that are coming from the pharmacy. All
17 right? That's where I want to be with all of
18 my questions today. Okay?
19        Unless I tell you we're doing
20 orders being filled in Cuyahoga Main Street
21 at a particular pharmacy, we're talking about
22 Walmart's role as a distributor because
23 that's how you're sued in this case.
24        Do you understand that?
25    A.    Mm-hmm. (Witness nods.)

Page 133

1    Q.    So in 2014, 2015, when you're
2 in charge of -- or, I'm sorry, when health
3 and wellness compliance takes over the
4 suspicious order monitoring, what you're
5 describing to me now is a need to look at
6 each pharmacy on a pharmacy-by-pharmacy
7 basis, on an order-by-order basis; is that
8 correct?
9        MR. VARNADO: Object to the
10    form.
11        THE WITNESS: Logistics was
12    fulfilling their legal obligation that
13    they had prior to practice compliance
14    taking over that responsibility. When
15    practice compliance took over that
16    responsibility, we would have followed
17    the CFR and the guidance that we had
18    been given to monitor orders as they
19    were being placed to our warehouse and
20    being shipped to stores.
21        MR. INNES: Okay. I'm going to
22    move to strike the first sentence, the
23    beginning of "logistics," ending with
24    "responsibility" as nonresponsive.
25    Q.    (BY MR. INNES) Okay. I want

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 to know if you -- if, in your role as the
2 senior director of health and wellness
3 compliance, you agree that the following
4 circumstances might be indicative of
5 diversion, warranting further investigation.
6      A.   Again, you would have --
7           MR. VARNADO:  Hold on.
8           Let him ask a question.
9           THE WITNESS:  What's that?  I'm
10 sorry.
11          MR. INNES:  Sorry, it wasn't a
12 question yet.  But if you want to say
13 something, go right ahead.
14          THE WITNESS:  No.
15          MR. INNES:  Okay.
16     Q.   (BY MR. INNES)  So in your role
17 as the senior director of health and wellness
18 compliance, I want to know if you agree if
19 the following circumstances are indicative of
20 diversion warranting further investigation of
21 an order from a Walmart pharmacy regarding
22 Schedule II opiates.
23          Ordering a limited variety of
24 oxycodone in quantities disproportionate to
25 the quantity of non-controlled medications.

Page 135

1           MR. VARNADO:  Object to the
2      form.
3      Q.   (BY MR. INNES)  Would that
4 warrant further investigation by Walmart?
5      A.   If an order was placed and it
6 fell outside of the guidelines of the CFR
7 from the DEA around a particular order, then
8 that order would have to be reviewed.
9      Q.   I appreciate that.  But I've
10 given you a very specific set of parameters
11 and data points.  And I want an answer to
12 that specific set of circumstances.
13     A.   That --
14     Q.   Do you want me to repeat those
15 circumstances?
16     A.   That was my understanding of
17 what you asked.  I'm sorry.
18     Q.   It's a yes-or-no question.  We
19 can limit it to that.  Would the following be
20 a circumstance that might warrant -- that
21 might be indicative of diversion and warrant
22 further investigation:
23          Ordering excessive quantities
24 of a limited variety of controlled substances
25 in combination with excessive quantities of

Page 136

1 so-called lifestyle drugs?
2      A.   Can you describe lifestyle
3 drug?
4      Q.   For instance, benzodiazepines.
5      A.   Again, I believe that you have
6 to look at -- you have to look at the store.
7 You have to look at the patient population.
8 You have to look at total volume of a store.
9 If it's a busy store or a slow store or, you
10 know, rural store or urban store.
11     Q.   Would those circumstances cause
12 you to make those inquiries?  Or should --
13 strike that.
14          Would this -- would these
15 circumstances cause Walmart to make those
16 inquiries?
17          MR. VARNADO:  Object to the
18     form.
19     Q.   (BY MR. INNES)  In 2015?
20          MR. VARNADO:  Same objection.
21          THE WITNESS:  If it falls
22 outside of the guidance given in the
23 DEA and the CFR, then that would have
24 to be researched.
25     Q.   (BY MR. INNES)  Do the -- in

Page 137

1 your opinion, do the circumstances I
2 articulated fall outside the guidance given
3 by the DEA in the CFR?
4      A.   Do they fall outside the
5 guidance of the DEA?
6      Q.   Those are your words.  Yes.
7      A.   It depends on, again, what that
8 store and who they're servicing.
9          If looking at that store that
10 order fell out of the guidance of the DEA,
11 then you would have to research it.
12     Q.   Can you imagine a store where
13 it placed excessive quantities of a limited
14 variety of controlled substances in
15 combination with excessive quantities of
16 lifestyle drugs?
17          MR. VARNADO:  Object to the
18     form.
19          THE WITNESS:  You're going to
20     have to explain that.  I'm sorry.
21     Q.   (BY MR. INNES)  Well, it sounds
22 to me in your response that you say that this
23 particular set of circumstances, excessive
24 quantities of a limited variety of controlled
25 substances in combination with excessive

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  quantities of lifestyle drugs, may not be
2  indicative of diversion, depending on what
3  store placed the order. Is that right?
4      A.    Depending on the store and
5  patient population, that may not be a sign of
6  diversion.
7      Q.    And how would -- how would
8  Walmart know that an order of that kind from
9  a particular pharmacy was not indicative of
10 diversion?
11     A.    You would have to call and talk
12 to that store and find out why that order was
13 placed.
14     Q.    Okay. Was it your
15 understanding that members of the compliance
16 team and others involved in suspicious order
17 monitoring would make such a call?
18     A.    Yes.
19     Q.    And would they do that in every
20 instance in which an order of excessive
21 quantities of a limited variety of controlled
22 substances in combination with excessive
23 quantities of lifestyle drugs?
24         MR. VARNADO: Object to the
25     form.

Page 139

1         THE WITNESS: My understanding
2      that all of those would be called.
3      Q.    (BY MR. INNES) And where is
4  your -- what is your understanding of how
5  those calls would be documented, if at all?
6      A.    Those calls would be
7  documented. And my understanding is it would
8  be the Archer system.
9      Q.    And that's in 2015?
10     A.    I'm not sure of the date when
11 all of that was put into Archer.
12     Q.    Are you aware of -- are you
13 aware of any written policies requiring that
14 such investigations be documented in Archer?
15     A.    Am I aware -- can you repeat
16 that?
17     Q.    Sure. Are you aware of any
18 written policies requiring that conversations
19 like we've just discussed were documented in
20 Archer?
21     A.    I'm not aware of a policy that
22 calls for that.
23     Q.    Would the following
24 circumstances warrant a call to a pharmacy:
25 orders of the same controlled substance --

Page 140

1  I'm sorry, strike that.
2         Orders of excessive quantities
3  of a limited variety of controlled
4  substances, for example, hydrocodone, while
5  ordering few, if any, other drugs?
6         MR. VARNADO: Object to the
7      form.
8         THE WITNESS: Again, it's going
9      to depend on that particular store and
10     their prescriptions, and what they
11     have served, and who they have served,
12     and where they are located.
13     Q.    (BY MR. INNES) Are you aware
14 of any policies that articulate the type of
15 investigation or phone calls that we are
16 discussing to pharmacies?
17     A.    There may be a standard
18 operating procedure that's in-house-facing,
19 but I'm not aware of that one, but there is
20 no policy that would be store-facing.
21     Q.    Okay. You're going to have to
22 educate me on this. What does "in-house
23 facing" mean?
24     A.    So maybe an operational
25 standard that here's a guide of what you can

Page 141

1  do. Someone could put together a -- you
2  know, here's your steps you need to do. It
3  could be like a training manual for someone
4  in a particular area.
5      Q.    Okay.
6      A.    I don't know that that exists.
7      Q.    Who would create these in-house
8  facing guides in your health and wellness
9  practice compliance?
10     A.    It's going to depend on the
11 subject matter.
12     Q.    Let's limit the subject matter
13 for purposes of this question to suspicious
14 order monitoring.
15     A.    Then that would probably be
16 developed through the director of controlled
17 substances and that team.
18     Q.    And the director of controlled
19 substances in 2015 was Miranda Johnson?
20     A.    It would have been
21 Miranda Johnson.
22     Q.    And does she hold that role
23 through the present day?
24     A.    She does.
25     Q.    And during that time period

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  from 2015 to present day, Miranda Johnson
2  reported to Tim Koch, and Tim Koch reports to
3  you?
4      A.   No.
5      Q.   Let's break that down.
6          In 2015, Johnson reports to
7  Koch, who reports to you?
8      A.   That would be correct until
9  sometime probably in October of 2015.
10     Q.   Okay.  And what changes in
11 October of 2015?
12     A.   In October of 2015, she would
13 have reported directly to me.
14     Q.   So from October 2015 to present
15 day, Miranda Johnson is reporting directly to
16 you?
17     A.   No.
18     Q.   Okay.
19         MR. INNES:  Can you read
20 back -- I'm sorry.  I just want to
21 make sure I have this correct.
22         Could you please read back
23 142,10 through 142,13?
24         You can correct me if this is
25 wrong.  I just want to make sure we

Page 143

1  have the testimony correct.
2          "QUESTION:  What changes in
3  October of 2015?
4          "ANSWER:  In October of 2015,
5  she would have reported directly to
6  me.
7          "QUESTION:  So from October of
8  2015 to present, Miranda" --
9      Okay.  Fair point.
10         Sometimes you just have to
11 listen.
12     Q.   (BY MR. INNES)  So October of
13 2015, Miranda reports directly to you?
14     A.   Yes.
15     Q.   At what point did she stop
16 reporting directly to you?
17     A.   She stopped reporting to me
18 sometime in 2018.  I don't remember the exact
19 date.  It would have been July or August of
20 2018.
21     Q.   Okay.  And did she report to
22 you between October in 2015 and when
23 Walmart -- for lack of a better term --
24 exited the distribution of opioids?
25     A.   She would have.

Page 144

1      Q.   In 2015 and forward, when
2  health and wellness practice compliance was
3  in charge of suspicious order monitoring, did
4  Walmart consider the percentage of a
5  pharmacy's business dispensing controlled
6  substances?
7          MR. VARNADO:  Object to the
8  form.
9          THE WITNESS:  As part of the
10 SOM process in practice compliance, we
11 would have looked at the percent of
12 controlled substances.
13     Q.   (BY MR. INNES)  Okay.  Let me
14 try to speed this up.  So the same preface to
15 the question.
16         2015 forward, when practice
17 compliance is in charge of suspicious order
18 monitoring, did Walmart consider whether one
19 or more practitioner's writing a
20 disproportionate share of prescriptions for
21 controlled substances being filled by a
22 pharmacy?
23         MR. VARNADO:  Object to form.
24         THE WITNESS:  You're going to
25 have to --

Page 145

1          MR. INNES:  Sure.
2          THE WITNESS:  -- ask me that one
3  again.
4      Q.   (BY MR. INNES)  So as part of
5  Walmart's suspicious order monitoring process
6  2015 and forward, did it consider whether one
7  or more practitioners was writing a
8  disproportionate share of the prescriptions
9  for controlled substances being filled by a
10 particular pharmacy?
11     A.   If an order from a store was
12 determined to be a suspicious order,
13 prescribers who prescribed from that location
14 would have been looked at.
15     Q.   Okay.  Thank you for that.
16         I want to look on the other
17 side of -- before that order is determined to
18 be a suspicious order.  As part of the
19 evaluation that made that determination, did
20 Walmart consider whether or not one or more
21 practitioners was writing a disproportionate
22 share of the prescriptions for the controlled
23 substances being filled at that pharmacy?
24         MR. VARNADO:  Object to the
25 form.

Page 146

THE WITNESS:  It would have been a process that would have been developed from our side.  If we took responsibility for reporting, we would have looked at prescribers, if it was a suspicious order.

Q.    (BY MR. INNES)  But not before the determination that it was a suspicious order?

A.    Are you -- can you ask that -- are you asking if we randomly looked at prescribers?

Q.    No, not random.  I'm wondering if you looked at whether or not a practitioner was writing a disproportionate share of prescriptions of controlled -- for controlled substances being filled by the pharmacy.

MR. VARNADO:  Object to form.

THE WITNESS:  Our indication would have been from a suspicious order monitoring.

Q.    (BY MR. INNES)  Your indication of what would have been from -- --

A.    If there might possibly be a

Page 147

prescriber that was a heavy prescriber in that particular location where the suspicious order was generated.

Q.    Walmart did that in 2015 forward?

A.    It would have been sometime after we took over the suspicion monitoring.

Q.    Do you know of a written policy where that was memorialized?

A.    I don't know of a policy.

Q.    How would you be able to determine if there was such a policy?

MR. VARNADO:  Object to the form.

THE WITNESS:  I don't -- I don't know that there is a policy.

Q.    (BY MR. INNES)  Is it possible there is not such a policy?

A.    I don't know that.

Q.    Would there be any way for you to confirm that?

A.    If someone provided -- again, I don't think it's a policy.  It would be an in-house procedure that someone wrote, but I have not -- I don't know of a policy.

Page 148

Q.    This is the second time, I think, you've testified to this, so I want to investigate this a little further.  The difference between a policy and an in-house procedure.

Can you explain to me, high level, what -- what that distinction actually is?

A.    The distinction, when I say "policy" is a policy is something that is put out for our stores, pharmacies, to follow as a Walmart policy that they have to adhere to.  So you may have operational procedures that a particular unit uses in their day-to-day operations.

Q.    Okay.  So you say a policy is something that is put out for stores and pharmacies.  Are there policies that are put out for the home office?

A.    I don't know that they're called -- I don't know that they're called policies.  They could be called standard operating procedures, or just procedures, or guides.  I don't know what the different areas would be used.

Page 149

Q.    In 2015 and forward, when you -- when health and wellness practice compliance took over suspicious order monitoring, did you review any policies or procedures related to that process?

MR. VARNADO:  Object to the form.

Q.    (BY MR. INNES)  For compliance with state and federal regulation?

MR. VARNADO:  Same objection.

THE WITNESS:  I can't recall.

Q.    (BY MR. INNES)  Is there something that might refresh your recollection about such a review?

A.    If there is a document that shows that I received it.  I'd have to review it.

Q.    You'd have to review that email showing you received it, or if you received the email attaching a policy, you would have reviewed that policy?

A.    If there was something that I received, I would have to review it to refresh my memory that something was developed.

Page 150

1    I do not recall and do not
2 remember.
3    Q.    Did you ever receive a policy
4 or procedure regarding suspicious order
5 monitoring after 2015 that you didn't review?
6    A.    I didn't have responsibility
7 for that organization the whole time.
8    Q.    You didn't have responsibility
9 for the suspicious -- Walmart's suspicious
10 order monitoring organization in 2015
11 forward?
12    A.    Tim Koch had responsibility at
13 some point in 2015, in early 2015, and then
14 in 2018, that moved to someone else.
15    Q.    But during that entire time
16 period, those folks were reporting to you; is
17 that correct?
18    A.    Yes.  The team was reporting to
19 my structure.
20    Q.    And the direct reporting -- the
21 difference in direct reporting would have
22 been Tim Koch and then Miranda Johnson?
23    A.    Correct.
24    Q.    And there was no one else who
25 would be directly reporting to you vis-à-vis

Page 151

1 suspicious order monitoring from 2015
2 forward?
3    A.    After October of 2015, Miranda
4 would have reported directly to me.
5    Q.    Okay.  So Koch and Johnson.
6    A.    Mm-hmm.  (Witness nods.)
7    Q.    Anyone else?
8    A.    I'm sorry, say that again?
9    Q.    Did anyone else report directly
10 to you regarding suspicious order monitoring
11 policies?
12    A.    That would have been it.
13    Q.    Okay.  Thank you.
14    MR. VARNADO:  We've been going
15 about another hour.  Is that right?
16    MR. INNES:  Let's go off the
17 record for one second.
18    THE VIDEOGRAPHER:  12:18.  We
19 are off video record.
20    (Recess taken, 12:18 p.m. to
21 1:04 p.m.)
22    THE VIDEOGRAPHER:  1:04.  We
23 are on the video record.
24    Q.    (BY MR. INNES) Good afternoon,
25 Mr. Chapman.  We're back from lunch.

Page 152

1    I'm going to hand you what's
2 been marked already as Exhibit 1 from
3 Ms. Johnson's deposition.
4    MR. INNES:  Some copies for you
5 folks.
6    MR. VARNADO:  Thank you.
7    And you're just looking at
8 what's under tab 1?
9    MR. INNES:  So, yeah, let me
10 explain what this is.
11    Q.    (BY MR. INNES) We're going to
12 look at the whole thing, I think, over the
13 course of the rest of the afternoon, so we'll
14 just keep this one handy.
15    I'll represent to you that this
16 is Walmart's responses to plaintiffs' first
17 combined discovery request.  It is national
18 retail pharmacy defendants.
19    We have attached as Exhibits 2
20 through 9 the documents that are listed in
21 the chart on page 3 of tab 1.
22    MR. VARNADO:  We have 2 to 8.
23    MR. INNES:  Fair point.  Tab 9
24 is missing, but tab 9 is there.  It's
25 just that you don't have the actual

Page 153

1 tab.
2    Q.    (BY MR. INNES) So it's the
3 penultimate page begins tab 9.
4    MR. VARNADO:  I see.
5 Understood.
6    MR. INNES:  Sorry about that.
7 If you need a Post-It note to make
8 that easier.
9    So, Mr. Chapman, if you want to
10 give that a look.  And when you're
11 done, we can start.
12    What I will say is, again,
13 we're going to be using this
14 throughout the course of the
15 afternoon, so I can direct you to the
16 specific sections I want to look at.
17 I can give you time to review that.
18 And then we can begin the questions,
19 or you can spend some time right now
20 reviewing the entire document.  It's
21 entirely up to you.
22    MR. VARNADO:  Why don't I open
23 it and see what it is.
24    MR. INNES:  I would suggest the
25 first option is probably the most

Page 154

1  efficient.
2      MR. VARNADO:  But your option
3  is?
4      MR. INNES:  I'm going to
5  discuss these in sequence over the
6  balance of my time, essentially.  And
7  I'll address each document for a
8  particular, you know, set of
9  questions.
10      So I can say, I'm going to
11  begin my questions on tab 1 now.
12  Review that and let me know and so on
13  and so forth through tab 9.
14      MR. VARNADO:  Sounds fine.
15      MR. INNES:  Does that make
16  sense?
17      MR. VARNADO:  Mm-hmm.
18  Q.   (BY MR. INNES) So if you're --
19  I'm going to look at tabs 1 and 2 first, so
20  if you want to give a look at those.  And
21  then let me know when you're ready, we can
22  dive in.
23      [Document review.]
24      THE WITNESS:  You said 1 and 2?
25  Q.   (BY MR. INNES) And that's

Page 155

1  correct.
2  A.   Okay.
3  Q.   Good to go?  Okay.  Great.
4      So by way of brief explanation,
5  again, this is Walmart's responses to
6  plaintiffs' -- my discovery.  It provides a
7  narrative response for one section, and it
8  provides documents for another section.
9      So I want to direct your
10  attention to -- back in time, time period '94
11  to 2004, we discussed earlier today where you
12  had various titles.  The -- if you can turn
13  to the fourth page of tab 1.  You'll see a
14  series of forwarded paragraphs.
15  A.   Fourth page of what?
16      MR. VARNADO:  Yeah.  It's one
17  more.
18      THE WITNESS:  Oh.  Okay.
19  Q.   (BY MR. INNES) The first
20  bullet says -- well, let me first begin with
21  the specific discovery request says, "Please
22  produce all of your suspicious order
23  monitoring systems, SOMs, policies and
24  procedures since January 2006, and identify
25  the Bates stamp range for each.  Please

Page 156

1  identify the effective dates each was in
2  force and effect."
3      As part of that response,
4  Walmart again provides documents and
5  narrative statements.
6      And directing your attention to
7  the first bullet point on the fourth page, it
8  says, "From as early as 1994 until 2010,
9  employees in Walmart's pharmacy distribution
10  centers reviewed controlled drugs stock
11  exception reports, followed up on orders by
12  speaking with pharmacists, and escalated
13  issues to market and/or regional leadership
14  as needed to investigate orders and/or
15  resolve concerns."
16      Do you see that?
17  A.   Yes.
18  Q.   During that time period, '94 to
19  2004, which would be encompassed in the '94
20  to 2010 date range provided there.  Is that
21  correct?
22  A.   I'm sorry, repeat that.
23  Q.   The date range provided in the
24  first bullet is '94 to 2010; is that correct?
25  A.   Yes.

Page 157

1  Q.   You testified earlier between
2  the years 1994 and 2004, you held various
3  titles.  Was one of those titles the Walmart
4  pharmacy manager?
5  A.   I was pharmacy manager in 1994.
6  Q.   Okay.
7      And you see here that at the
8  bullet it says, "Pharmacy distribution
9  centers reviewed controlled drugs stock
10  exception reports and followed up on orders
11  by speaking with pharmacists, and escalated
12  issues to market and/or regional leadership
13  to investigate orders or resolve concerns."
14      During your time as a Walmart
15  pharmacy manager, how many times, if ever,
16  did a DC employee follow up on an order for
17  an opioid with you?
18  A.   In my time as a pharmacy
19  manager, I don't ever recall having a
20  conversation with a DC around an order that I
21  would have placed.
22  Q.   Okay.
23      Same question for when you held
24  the role of district manager.  How many
25  times, if ever, did a DC employee follow-up

Page 158

1  on an order for an opioid?
2      A.   I'm sorry, as what position?
3      Q.   District manager.
4      A.   I can't recall any location
5  that I had that would have received a call.
6  I didn't receive a call.
7      Q.   So your testimony is that you
8  did not receive a call?
9      A.   Not as a district manager, from
10  my area of responsibility.
11      Q.   And what was your area of
12  responsibility during that time period?
13      A.   It would have been from 1996 to
14  probably 1998, maybe.  It was a two-year --
15  maybe '95.  It was around a two-year time
16  period.  I was in Dublin, Ohio.  I had
17  Columbus, Ohio, and then south.
18      Q.   This might be difficult, but
19  describe what you mean by your region was
20  Columbus and south.  Was it the latitude of
21  Columbus and down?
22      A.   My area had the locations in
23  Columbus, Ohio, Dublin, Marysville, Ohio.  I
24  went as far east as Zanesville, that
25  particular location, and then I went all the

Page 159

1  way south to New Brunswick -- and I can't
2  remember -- West Union, Ohio.
3      Q.   Okay.  All right.
4           Any locations outside of Ohio
5  during that time period?
6      A.   I did.  The first year I had
7  Maysville, Kentucky.
8      Q.   So anything in addition to
9  Maysville, Kentucky and those locations in
10  Ohio?
11      A.   Not in that time period.
12      Q.   Okay.
13           Any other time period?  Where
14  you were district manager?
15      A.   We relocated and came to
16  Fayetteville, North Carolina.  And I had that
17  area of responsibility probably 1997 -- no.
18  It would have been -- it had to have been
19  '98.  '98 to probably 2001, I had that area
20  of responsibility, which was around the
21  Fayetteville, North Carolina area, and all
22  locations were in North Carolina.
23      Q.   Okay.
24      A.   No, I take that back.  It
25  wasn't.  I haven't thought about this in a

Page 160

1  long time.
2           I had two locations -- three
3  locations in South Carolina.
4      Q.   And do you recall the names of
5  those in South Carolina?
6      A.   Dillon, South Carolina, two
7  locations in Florence, South Carolina, and
8  actually one location in Hartsville,
9  South Carolina.
10      Q.   Any others that you recall?
11      A.   No.
12      Q.   Okay.  And during those times
13  as district managers in those locations, you
14  don't recall ever being contacted by a DC
15  employee to follow up an order for an opioid?
16      A.   Not that I can recall.
17      Q.   Is there anything that could
18  help you refresh that recollection?
19      A.   If I received some type of
20  report maybe, but I don't recall ever
21  receiving a call.
22      Q.   During your time as a district
23  manager, did you receive reports regarding
24  Schedule IIs?
25           MR. VARNADO:  Object to the

Page 161

1      form.
2           THE WITNESS:  We received a --
3      I believe it was the 4 percent report
4      within our mailbag that we would
5      receive that would list any location.
6      Q.   (BY MR. INNES) Can you
7  describe what the 4 percent report was?
8      A.   It was a report that showed any
9  location that -- I believe showed 4 percent
10  of purchases -- it would have been 4 percent
11  of your total purchases based off of
12  controlled versus non-controlled for a
13  particular location.
14      Q.   What time period do you recall
15  receiving those 4 percent reports?
16      A.   I remember getting this in
17  our -- in the company mailbag, so -- and it
18  would have had to have been -- I can
19  definitely remember it being when I was in
20  Fayetteville.
21      Q.   Okay.  And Fayetteville was --
22      A.   Fayetteville, North Carolina.
23      Q.   -- this '98-2001 time period?
24      A.   Yes.
25      Q.   I believe you also testified

Page 162

1 that you were -- you held the title regional
2 manager?
3      A.   Yes.
4      Q.   What time period was that
5 again?
6      A.   It would have been 2000-2002,
7 and then through different areas of
8 responsibility it would have been up until --
9 I moved to ISD in somewhere around 2007.
10      Q.   During your time period in that
11 role, how many times, if ever, did a DC
12 employee follow up on an order for an opioid?
13      A.   I don't remember any specific
14 time that I received a call on a location.
15      Q.   And if you wanted to
16 double-check whether or not that happened,
17 would you be able to do that?
18      A.   If it was a phone call, I don't
19 know how I would double-check that.
20      Q.   Did you maintain notes of phone
21 calls you had with DC employees regarding
22 opioids?
23      A.   I may have made a note, but I
24 don't know that I could find those notes.
25      Q.   But again, sitting here

Page 163

1 today --
2      A.   If I received one.
3      Q.   No.
4      A.   No.
5      Q.   And sitting here today, you
6 can't recall whether or not you did receive
7 one?
8      A.   Right.
9      Q.   Okay.  Can we jump forward in
10 time to 2013.  We're still going to be
11 looking at tabs 1 and 2.
12           I want to direct your attention
13 to -- on the bulleted list, the third,
14 fourth, and fifth bullets.
15           [Document review.]
16           So as it relates to -- I'm
17 sorry.
18      A.   Okay.
19      Q.   As it relates to suspicious
20 order monitoring policies and procedures,
21 these bullet points articulate that "In 2013,
22 Walmart's pharmacy distribution centers
23 reviewed controlled drug exception reports,
24 and internally circulated those reports of
25 all store items above 4 percent for further

Page 164

1 review and follow-up as needed."
2           Is it your understanding that
3 that 4 percent report was the same 4 percent
4 report that we're talking about that you
5 testified to earlier receiving in
6 Fayetteville?
7      A.   To my recollection, it was.
8      Q.   Okay.
9           Do you have any reason to
10 question the accuracy of this statement?
11 "From approximately 2010 to 2015, that
12 4 percent report was used."
13           MR. VARNADO:  Object to the
14 form.
15           THE WITNESS:  I can remember
16 receiving some type of controlled
17 substance drug exception report.  And
18 I referred to it as a 4 percent
19 report.  So that was the number that
20 was on the side when it looked through
21 each individual drug that was ordered.
22      Q.   (BY MR. INNES)  So the
23 distinction that I'm trying to understand
24 here is, in the first bullet, there's a
25 reference to '94 to 2010 of a controlled drug

Page 165

1 exception report.  In the third bullet it
2 states from 2010 to 2015, that controlled
3 drug exception report and reports listing all
4 store items above 4 percent for further
5 review.
6           I'm trying to understand,
7 because it seems to me as this is drafted
8 that the controlled drug exception report is
9 different from the report -- the 4 percent
10 report.
11      A.   And I don't know that that
12 4 percent report that's listed in bullet
13 point 3 is different from the controlled
14 substance.  I don't have that knowledge.  But
15 I know that the controlled drug exception
16 report that I used to receive, the guideline
17 was that 4 percent, and that's what I was
18 looking at as a market district manager.
19           They may have had another
20 report that gave some different details, but
21 I remember it as this controlled drug
22 exception report.
23      Q.   When was the last time you saw
24 a copy of a controlled drug stock exception
25 report?

Page 166

1    A.   I would have to say it was --
2  it had to have been in my -- one of my last
3  regional roles.  So it would have been in
4  2007 and before.
5    Q.   Okay.
6    A.   2000 -- sometime probably 2007
7  and before.
8    Q.   When you saw a controlled drug
9  stock exception report that -- well, did you
10 ever see a controlled drug stock exception
11 report that listed opioids above 4 percent?
12       MR. VARNADO:  Object to the
13    form.
14       THE WITNESS:  Sitting here
15    today, I can't recall.  I can recall
16    getting the report and reviewing the
17    report, but I don't remember any
18    specifics about that report.
19    Q.   (BY MR. INNES)  What would
20 you -- after you reviewed the report -- well,
21 strike that.
22       What was the purpose of your
23 review of that report?
24    A.   To see if I had any locations
25 that would have been outside of the norm for

Page 167

1  ordering a particular controlled substance
2  drug.
3    Q.   And by looking in that report,
4  how were you able to tell if there was
5  something outside of the norm for ordering a
6  particular controlled substance drug?
7    A.   If you had a store that listed
8  high -- higher than other stores that you
9  would think were the similar volume and
10 similar patient profile, area of service,
11 that would make you ask questions.
12    Q.   Was there a -- you said "a
13 store listed higher than other stores."  How
14 much higher than other stores would be a flag
15 for you?
16    A.   At the time, I believe the --
17 it was around that 4 percent.
18    Q.   So was the 4 percent something
19 of a marker for you that called your
20 attention to a particular item?
21    A.   Yes.
22    Q.   And on those reports, did those
23 reports contain this other information that
24 you listed, similar volume, similar patient
25 profile, area of service?  Or was that

Page 168

1  information that you went and sought after
2  reviewing the report?
3    A.   Can you repeat that?  I'm
4  sorry.
5    Q.   Sure.  You've -- I'll take you
6  back in time.  You've reviewed a report.
7  It's listed several, for instance, drugs over
8  4 percent.
9       What other information, if any,
10 was on that report?
11    A.   I believe that report -- I'm
12 not sure, but I believe that report may have
13 had the distribution center that that came
14 out of.  And in most cases, it would have
15 been the same distribution center for that
16 particular geographic area.
17    Q.   Okay.
18       So when you testified earlier
19 that you would also look at similar volumes,
20 similar patient profile, area of service,
21 would that be information that you gathered
22 from other sources?  Sources other than the
23 report?
24    A.   It would be knowledge that you
25 had from knowing your area of responsibility.

Page 169

1  That you knew the store was a small town in
2  Eastern North Carolina, and this other store
3  was in a much bigger town.
4    Q.   Why the 4 percent cutoff?  Why
5  not 3 percent?  Why not 5 percent?
6    A.   I don't have the answer for
7  that question.  I don't know.
8    Q.   Do you know who set that
9  marker?
10    A.   I do not know.
11    Q.   Do you know -- if you wanted to
12 figure that answer out, do you know who you
13 would ask?
14    A.   I would not know who to ask.
15    Q.   Is there any way for you to
16 find out who you might ask to determine who
17 would know about the 4 percent?
18       MR. VARNADO:  Object to the
19    form.
20       THE WITNESS:  Since this was
21    owned by the pharmacy distribution
22    logistics team, I would think it would
23    be through them.
24    Q.   (BY MR. INNES)  I'll take you
25 to the fourth bullet down.

Page 170

1    It says, "In 2013, Walmart
2  implemented order alerts in Reddwerks,
3  Walmart's order fulfillment system, and
4  flagged orders for controlled substances of
5  50 bottles or more, and orders for amounts
6  30 percent or higher than the rolling
7  four-week average for that item."
8    MR. VARNADO:  Just object to
9  the form.  You said in 2013.  It says
10  2011 to 2015.
11    MR. INNES:  I think 2013 would
12  be inclusive of that date range.
13    MR. VARNADO:  Yeah.  I thought
14  you were reading the bullet.
15    MR. INNES:  Fair point.
16  Q.    (BY MR. INNES)  Do you believe
17  that to be an accurate statement as you sit
18  here today?
19  A.    I don't know the specific
20  dates, but I know that Reddwerks would have
21  been implemented before 2015.
22  Q.    And how about for the flagged
23  orders of controlled substances of
24  50 bottles?  Is that something that happened
25  in 2013?

Page 171

1  A.    Again, I don't -- I don't know
2  the specifics on when this started.
3  Q.    Okay.  How about the orders for
4  amounts of 30 percent or higher than a
5  four-week average for that item?
6  A.    I don't know the specific date,
7  but it would have been -- it would have been
8  part of the 50.
9  Q.    I'm sorry, what would have been
10  part of the 50?
11  A.    The 30 percent higher and the
12  four-week average and the 50-bottle, those
13  would have been together.
14  Q.    I'm sorry, so you recognize
15  those as metrics that were used at the same
16  point in time?
17  A.    Yes.
18  Q.    Okay.  But you're just not
19  familiar -- you don't know sitting here today
20  at what point that was?
21  A.    No, I don't know when they
22  started, but it -- I know that both would
23  have been in use before 2015.
24  Q.    All right.  Let's turn to
25  tab 2.

Page 172

1    Are you familiar with this
2  document?
3  A.    Yes, I am.
4  Q.    Okay.
5  A.    I have seen this document.
6  Q.    When was the last time you saw
7  this document?
8  A.    I've seen this document in my
9  review.
10  Q.    In your review of documents in
11  preparation for this ...
12  A.    Yes.
13  Q.    Was it shown to you by counsel?
14  A.    Excuse me?
15  Q.    Was it shown to you by counsel?
16    MR. VARNADO:  Just object to
17  any questions concerning what we
18  discussed or even documents shown
19  during preparation.
20  Q.    (BY MR. INNES)  I think there's
21  still a question pending.  I'm wondering if
22  it was shown to you by your counsel.
23    MR. VARNADO:  You can answer
24  that question.
25    THE WITNESS:  All right.  I

Page 173

1  looked at this -- this document most
2  recently this week.
3    MR. INNES:  Okay.  Thank you.
4  Q.    (BY MR. INNES)  Is it your
5  understanding, based on -- strike that.
6    Is it your understanding that
7  this document was in play in 2013?
8    MR. VARNADO:  Object to the
9  form.
10    THE WITNESS:  I'm aware that
11  this document was in place in the
12  process that practice compliance began
13  to get involved in the control
14  substance monitoring with other
15  logistics partners.  So that would
16  have been at least in 2015.
17  Q.    (BY MR. INNES)  When did you
18  first become familiar with this document?
19  A.    It would have been somewhere
20  around that timeframe of 2015.
21  Q.    Okay.  Do you see at the
22  bottom, it says "Senior AP manager, pharmacy
23  duties"?  And it names --
24  A.    Oh.
25  Q.    Sorry.  And it names a drug

Page 174

1 diversion coordinator for further review?
2     Do you know who the drug
3 diversion coordinator was in 2013?
4     A.   I do not.
5     Q.   Do you want me to repeat that
6 question? Maybe you answered it. Sorry.
7     A.   Yeah.
8     Q.   I couldn't hear you over the
9 sound.
10    Do you know anyone -- the name
11 of anyone who's held the title diversion --
12 drug diversion coordinator at any point in
13 time at Walmart?
14    A.   I'm not sure of the drug -- I
15 mean the job titles of this individual and
16 who that would be.
17    Q.   Okay. It says here -- I'm just
18 going to read the full text. "Upon the
19 receipt of the Excel document indicating
20 those stores and items above the 3.99 percent
21 threshold, the senior AP manager will forward
22 the reports to the appropriate drug diversion
23 coordination manager for further review."
24    The way I read that sentence
25 as the appropriate drug diversion

Page 175

1 coordinator, it suggests to me that there's
2 more than one drug diversion coordinator. Is
3 that correct?
4     MR. VARNADO: Object to the
5     form.
6     THE WITNESS: That's what it
7     seems like in here.
8     Q.   (BY MR. INNES) Do you know
9 that to be the case, that there are more than
10 one -- there was more than one appropriate
11 drug diversion coordinator?
12    Strike that.
13    Do you know it to be the case
14 in 2013, that there was more than one drug
15 diversion coordinator?
16    A.   I don't know that -- if this is
17 based off the logistics or global asset
18 protection, so I don't know who this job code
19 is talking about.
20    Q.   Okay. How would I determine --
21 or how would you determine who this -- who
22 held this position in 2013?
23    A.   That would have to be a
24 question that went to the logistics team that
25 owned the SOM process at that time.

Page 176

1     Q.   You testified earlier that
2 the -- your responsibilities as the director
3 of pharmacy regulatory affairs dealt with --
4 I don't want to put words in your mouth --
5 all things pharmacy essentially; is that
6 right?
7     A.   It's for the practice of the
8 pharmacy in our stores, yes.
9     Q.   Okay. The title of this
10 document is "Pharmacy Manual." Are you
11 familiar with the pharmacy manual?
12    A.   A pharmacy manager is going to
13 be local within each pharmacy.
14    Q.   I'm sorry, I think maybe you
15 misheard me. I'm looking at the top of the
16 page under 214.02. It says "Pharmacy
17 Manual."
18    A.   Oh, okay. Sorry.
19    Q.   No problem.
20    Is the pharmacy manual
21 something that you had authority over or
22 responsibility for as part of the -- your
23 responsibilities as director of pharmacy --
24 excuse me, as senior director of health and
25 wellness compliance?

Page 177

1     MR. VARNADO: Object to the
2     form.
3     THE WITNESS: This is a
4     logistics pharmacy manual, so this
5     would be under their purview.
6     MR. INNES: Okay.
7     Q.   (BY MR. INNES) So logistics
8 pharmacy manuals, at least in 2013, you
9 had -- you did not review for compliance with
10 state or federal regulations; is that
11 correct?
12    A.   That's correct.
13    Q.   Do you recall ever receiving an
14 SD 405-1 report?
15    A.   Can you repeat that?
16    Q.   Do you recall ever receiving an
17 SD 405-1 report?
18    A.   Yes.
19    Q.   When did you receive such a
20 document?
21    A.   I can't tell you the specific
22 date, but I can tell you that I had received
23 those. They were produced after each month,
24 and at some point I received some of these
25 reports.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.    And why would you receive those
2    reports?
3    A.    Just to -- this would have been
4    probably around the time period that we were
5    having conversations with logistics and us
6    taking responsibility for the actual
7    reporting of orders that might be suspicious.
8    Q.    So your receipt of a 405-1 was
9    for purposes of the transition between
10   logistics and compliance?
11   A.    To my recollection, it would be
12   for the transition and then to help educate
13   me as to what they were using.
14   Q.    By "they," you mean logistics?
15   A.    Yes.
16   Q.    Did they educate you as to what
17   they were using?
18   A.    They were -- they explained
19   these reports to me.
20   Q.    And what --
21   A.    I'm sorry.
22   Q.    I didn't mean to cut you off,
23   I'm sorry.
24   A.    No, they sent these reports to
25   show what the report was about, and when it

Page 179

1    was generated.
2    Q.    And what's your understanding
3    of what the report is about?
4    A.    It would be -- and like it's
5    described here in the document, that a
6    particular drug that was over 3.99 percent
7    for a particular store and an item, and the
8    item's name, it would highlight that drug on
9    this Excel document.
10   Q.    Is the 405 report the same as
11   the controlled drug stock exception report?
12   A.    I don't believe that it is.
13   Q.    Is the 405 report a subset of
14   the controlled -- I just want to make sure I
15   get that right -- controlled drug stock
16   exception report?
17   A.    Without seeing the two reports
18   together, I can't answer that.
19        (Walmart-Chapman Deposition
20        Exhibit 1 was marked for
21        identification.)
22   Q.    (BY MR. INNES)  Mr. Chapman,
23   I've just handed you what's been marked
24   Exhibit 1.  It's an email from
25   Donna Auldridge, Greg Beam, Terry Crabb, and

Page 180

1    yourself dated June 5th, 2013, and it
2    attaches a May 405 report.
3        Let me know when you've had a
4    chance to review it.
5        [Document review.]
6    A.    Okay.
7    Q.    Does this -- do you recognize
8    this document?
9    A.    I do.
10   Q.    And what is it?
11   A.    It is copies of their February
12   through May 405 report that they were talking
13   to earlier in this policy.
14   Q.    Now seeing this 405 report, can
15   you -- are you able to tell me whether or not
16   it's different from the controlled drug stock
17   exception report?
18   A.    I can't.  Not having that
19   report, I didn't -- I don't remember the
20   different columns.
21   Q.    Is there anything there on that
22   that's missing from that report that you
23   think you might be able to find on the
24   controlled drug stock exception report?
25        MR. VARNADO:  Object to the

Page 181

1    form.
2        THE WITNESS:  Again, without
3        comparing the two reports, I don't
4        know that I can answer that.
5    Q.    (BY MR. INNES)  If we were able
6    to show you a controlled drug stock exception
7    report, that would be the only way you could
8    tell, that you could determine whether or not
9    it's different from the 405 report?
10   A.    Correct.
11   Q.    Fair enough.
12        (Walmart-Chapman Deposition
13        Exhibit 2 was marked for
14        identification.)
15        [Document review.]
16   Q.    (BY MR. INNES)  Mr. Chapman,
17   it's not a very long document, but I can
18   speed this up and direct you to the two pages
19   that I'd like to discuss with you if it
20   helps.
21   A.    Okay.
22   Q.    If you see at the bottom,
23   there's a number.  I'm looking at pages 4 and
24   5.
25        So again, Mr. Chapman, this is

Page 182

1  Exhibit 2 as produced to us in native format.
2  We have attached here a printout of what
3  appears to be a November 12th, 2013 practice
4  compliance update PowerPoint.
5      A.    Mm-hmm.
6      Q.    Your name is on the front page,
7  George Chapman, H and W practice compliance.
8          Do you recall this
9  presentation?
10     A.    Looking at it, I -- I do recall
11  it. I'm not sure when or what meeting this
12  was presented at, but ...
13     Q.    Do you believe that it was
14  presented on or about November 12th of 2013?
15     A.    Yes.
16     Q.    Who typically would you give
17  presentations such as these to?
18     A.    This may be a -- I don't know
19  for sure, but this may be an oversight
20  committee presentation.
21     Q.    And what is the oversight
22  committee?
23     A.    The oversight committee is a
24  committee within our health and wellness
25  compliance organization that looks at

Page 183

1  compliance issues across the entire business
2  for health and wellness. So it could be
3  building, it could be HIPAA, it could be
4  risk. Controlled substances as an entire
5  group would be included in that. It would be
6  any item that would be something that we
7  would want to look at or give a group an
8  update on.
9      Q.    Is this a presentation that you
10  would give on your own or would there be
11  other presenters presenting from this same
12  slide deck?
13     A.    I don't remember if anyone else
14  presented on this. I would -- it was
15  probably just me.
16     Q.    Okay. Your prior testimony was
17  that health and wellness compliance took over
18  suspicious order monitoring in or about the
19  beginning of 2015, end of 2014; is that
20  right?
21     A.    Yes.
22     Q.    This document is dated
23  November 12th of 2013. So more or less a
24  year before the earliest date by which
25  compliance would have taken over suspicious

Page 184

1  order monitoring according to your testimony;
2  is that right?
3      A.    This is dated on the 13th -- I
4  mean the 12th of 2013. As an organization,
5  we would not have taken over suspicious order
6  monitoring.
7      Q.    In fact, you would have taken
8  over suspicious order monitoring as an
9  organization -- compliance, as an
10  organization, at the end of 2014 and the
11  beginning of 2015; is that right?
12     A.    That's what I recall, yes.
13     Q.    And the topics that you
14  presented on here, on or about November of
15  2013, were hydrocodone combination products
16  and controlled substance risk assessment in a
17  fiscal year '15 strategy. And I'm reading
18  that from the second slide.
19     A.    Mm-hmm. (Witness nods.)
20     Q.    So why exactly were you
21  presenting on controlled substance risk
22  assessment at that point in time?
23     A.    This --
24          MR. VARNADO: Object to the
25  form.

Page 185

1          THE WITNESS: This slide on
2  page 4 is part of another meeting that
3  was held as a compliance meeting. And
4  at the time, someone from logistics
5  would have been reporting on this
6  overall status for the SOM. But it
7  would be included all on this one
8  deck. And I inserted this deck to
9  talk about some of the issues that had
10  been discussed in that Thursday
11  compliance meeting?
12     Q.    (BY MR. INNES) What's the
13  Thursday compliance meeting.
14     A.    Every Thursday -- and I don't
15  know when we began this meeting -- we would
16  come together with the business in compliance
17  and all the different stakeholders -- asset
18  protection, logistics would be involved -- to
19  go over projects that were coming up, or if
20  there was areas that we were trying to make
21  enhancements to, to give updates on those
22  processes, projects, or procedures.
23     Q.    So you testified that this --
24  you inserted this slide into the deck based
25  on issues that had been brought up in a

Page 186

1 Thursday compliance meeting. And then you go
2 on to further testify that you don't know
3 when those Thursday compliance meetings
4 began.
5 So how are you certain that
6 these issues were brought up in a Thursday
7 compliance meeting?
8 MR. VARNADO: Object to the
9 form.
10 THE WITNESS: This is the
11 format from the Thursday compliance
12 meeting.
13 Q. (BY MR. INNES) So Thursday
14 compliance meetings, based on the format of
15 this presentation, started at least as early
16 as November of 2013?
17 A. Yes.
18 Q. So let's go back to the page 4.
19 This is an insert of a slide -- strike that.
20 Did you create this slide?
21 A. I did not create the project
22 status slide.
23 Q. Okay.
24 A. But I used that status update
25 slide within my presentation.

Page 187

1 Q. And what was your
2 understanding -- well, explain to me what the
3 first column -- I'm sorry, the first row, it
4 says, "Suspicious order identification
5 monitoring reporting, SOM. Designed and
6 operate a system to detect suspicious orders
7 and report to the DEA when discovered."
8 Delivery date is TBD and the project status
9 is R, with a red shading.
10 What is the significance of the
11 R with the red shading?
12 A. That this enhancement to the
13 suspicious order monitoring that was
14 occurring was not running on schedule. And
15 this would have been -- to my knowledge,
16 would have been presented in a Thursday
17 meeting by someone from the logistics team
18 that had that responsibility.
19 Q. Can you turn to slide 5? And
20 you'll see there, it's -- I'm interested in
21 the top row. It says "Asset protection
22 audits on potential abuse locations."
23 Did you create this slide?
24 A. I do not recall if I created
25 this slide or if I used this slide from

Page 188

1 another presentation.
2 Q. Do you know the significance of
3 that first line, "Asset protection audits on
4 potential abuse locations"?
5 A. It looks to be a statement of
6 all the controls that we have, operational
7 controls that we have around looking for
8 areas that could be potential abuse.
9 Q. What is meant by "potential
10 abuse"?
11 A. If asset protection was
12 involved in this, I -- it could be areas
13 where we've had pharmacist or technician
14 diversion.
15 Q. Did you see results of those
16 audits at any point in time?
17 A. I don't know if that's
18 referring to the 405 or the 4 percent.
19 Q. Could it be referring to
20 something other than the 405 or the
21 4 percent?
22 A. I don't know.
23 Q. Who would know the answer to
24 that?
25 A. It would have to be asset

Page 189

1 protection.
2 Q. Do you know any names of
3 individuals in asset protection?
4 MR. VARNADO: Object to the
5 form.
6 THE WITNESS: It would be
7 Greg Beam.
8 Q. (BY MR. INNES) Mr. Chapman,
9 I'm going to ask you questions regarding
10 tab 3 of Johnson Exhibit 1. If you'd like to
11 review tab 3 and let me know when you're
12 done.
13 A. I'm sorry, which --
14 MR. VARNADO: Let me help you.
15 THE WITNESS: Oh, sorry. Thank
16 you.
17 [Document review.]
18 Q. (BY MR. INNES) Before I get
19 into that, I want to ask one follow-up
20 question that I missed.
21 In 2013, the policies and
22 procedures that were in place regarding
23 suspicious order monitoring, are you aware of
24 any policy that required Walmart to hold an
25 order before it shipped it -- prior to

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  shipping until it cleared its investigation
2  of that order?
3         MR. VARNADO:  Object to the
4  form.
5         THE WITNESS:  That would be a
6  procedure guide that the logistics
7  team would have had, and I'm not aware
8  of it.
9         Or I can't recall it.
10     Q.   (BY MR. INNES)  Are you saying
11  that that is a policy that would not have
12  been in your purview during that time?
13     A.   Correct.
14     Q.   Are you aware of a policy in
15  logistics that articulated that?
16     A.   I don't know.
17     Q.   Okay.  So let's carry forward
18  to 2014 now.
19         You're a senior director at
20  health and wellness practice compliance.  The
21  same procedure -- the same policies and
22  procedures that were articulated in the
23  written portion of Walmart's response and
24  that we discussed for the year 2013, those
25  have now carried forward to 2014, are still

Page 191

1  in place.
2         Is that a correct
3  understanding?
4         MR. VARNADO:  Object to the
5  form.
6         THE WITNESS:  Which -- I don't
7  know what you're referring to.  Which?
8         MR. INNES:  Sure.
9         So if you look at the written
10  portion of the response at bullets 3,
11  4, and 5.
12         THE WITNESS:  Okay.
13     Q.   (BY MR. INNES)  Is there any --
14     A.   This is what you're talking
15  about?  The bullet?
16     Q.   Yes.
17         And specifically bullets 3, 4,
18  and 5.
19     A.   Okay.
20     Q.   All of those policies are in
21  effect in 2014; is that correct?
22     A.   These are all pharmacy
23  distribution procedures that they would be
24  following, and I know they existed before
25  2015.

Page 192

1     Q.   Thank you for that.  So my
2  question is a little bit more specific.
3         I'm wondering if you have any
4  reason to believe that any of these policies
5  were not in effect in the year 2014?
6     A.   No.
7     Q.   Okay.  Thank you.
8         Again, in tab 2, do you have
9  any reason to believe that this policy was
10  not in effect in 2014?
11     A.   Tab 2, the logistics pharmacy
12  manual, controlled substance?
13     Q.   Yes, sir.  It ends in Bates
14  No. 11106.
15     A.   Yeah, it has a -- it has a date
16  stamp of November 2010 was the last time,
17  according to this document, that it was
18  revised.
19     Q.   Okay.  Does that cause you to
20  question whether or not that was in effect in
21  the year 2014?
22     A.   No.
23     Q.   So again my question is, do you
24  have any reason to believe that this document
25  was not in effect in 2014?

Page 193

1     A.   No.
2     Q.   And I'll direct your attention
3  to tab 3.
4         Do you have any reason to
5  believe that this policy was not in effect in
6  October of 2014?
7     A.   Now, when?
8     Q.   October of 2014.
9     A.   This has a date of
10  September 2014, so that would be -- should be
11  the published date of this document.
12     Q.   But you've had an opportunity
13  to review this document, and in your role as
14  the senior director of health and wellness
15  practice compliance, in --
16     A.   I -- I was copied on this
17  document and had seen this document, and this
18  would have been Miranda's help with the
19  logistics team as they updated their
20  document.  And I don't know if this was a
21  prior version or not, but this was Miranda's
22  working with the logistics team.
23     Q.   Okay.  Let's unpack that a
24  little bit.  You say you were copied on this
25  document.  I don't see your name attached to

Page 194

1  this document. Do you recall this from
2  somewhere else?
3      A.   I have seen this document
4  before, and I have received this as a copy.
5      Q.   When was that?
6      A.   I don't know the exact date.
7  I'd have to -- I'd have to look at my email.
8      Q.   Right. To put a finer point on
9  it, is this one of the documents that you
10 reviewed as part of your preparation for
11 today?
12     A.   I have seen this one, yes, in
13 preparation.
14     Q.   Okay. It's one of the ones
15 that you reviewed in those three meetings; is
16 that correct?
17     A.   Yes.
18     Q.   Based on your knowledge of the
19 Controlled Substances Act and Walmart's
20 requirements vis-à-vis the distribution of
21 opioids in 2014, was it your opinion that
22 this document was in compliance with federal
23 regulations?
24          MR. VARNADO: Object to the
25      form of the question.

Page 195

1          THE WITNESS: Yeah, my
2      understanding of the Controlled
3      Substance Act and responsibility on
4      order monitoring, when this document
5      was produced, that this was in
6      compliance with DEA requirements.
7      Q.   (BY MR. INNES) Is it your
8  understanding that this document, at tab 3,
9  beginning at 111 -- sorry, strike that.
10          Bates No. 11107 replaced the
11 policy that was at tab 2, which is Bates
12 No. 11106?
13     A.   I don't have knowledge that
14 this -- this one under tab 3 replaced the one
15 under tab 2.
16          They don't have the same title.
17     Q.   Mr. Chapman, I'll just direct
18 you to the chart that is on -- at tab 1,
19 page 3.
20     A.   Tab 1, page 3? Or the bullet
21 points?
22     Q.   I'm sorry. Yeah.
23          And you'll see there that it
24 says the approximate effective date of
25 Document 11106, the effective date ends on

Page 196

1  October of 2014.
2          And then you'll see that the
3  next line down that says the policy beginning
4  with Bates 11107 is -- the approximate
5  effective date begins in October of 2014.
6      A.   I see that.
7      Q.   Does that change your
8  understanding that -- at all, that the policy
9  in tab 2 was replaced by the policy in tab 3?
10          MR. VARNADO: Object to the
11      form.
12          THE WITNESS: All I'm aware of
13      is what's here on this paper. I don't
14      have firsthand knowledge that this
15      tab 2 document replaced tab 3.
16     Q.   (BY MR. INNES) Okay. So when
17 you -- when the logistics team rolled SOMs to
18 the compliance team at the end of 2014, what,
19 if anything, did you do to familiarize
20 yourself with the policies that were in place
21 at the time of that transition?
22     A.   We would have -- we would have
23 been involved with logistics in 2014, but
24 again, it didn't do the transition until
25 sometime in 2014, 2015. So I don't know the

Page 197

1  exact date.
2      Q.   Okay. Again, my question is
3  slightly different. I'm wondering, when you
4  were going through that transition period,
5  what did you do, if anything, to familiarize
6  yourself with Walmart's SOM policies that
7  were, at that time, housed in logistics?
8      A.   I would not, in my position,
9  have gone through and reviewed logistics
10 policies when they made changes from one
11 policy to the next.
12     Q.   That would have been
13 Ms. Johnson's responsibility?
14     A.   It would have been logistics'
15 responsibility, but Miranda would have had
16 knowledge of it.
17     Q.   And during the transition --
18     A.   I assume.
19     Q.   And during the transition,
20 would it have been Ms. Johnson tasked with
21 knowing what the policies were that your
22 department was now taking ownership of?
23     A.   She would know the current
24 policy as that transitioned from logistics to
25 practice compliance.

Page 198

1    Q.   And at that point in time, she
2  was reporting directly to you; right?  This
3  is October 2015?
4    A.   October 2015, she would have
5  reported to me.
6    Q.   Mm-hmm.
7         And as your direct report, did
8  you have any oversight over -- as to what
9  Ms. Johnson was doing, or not doing, with
10 respect to the transition of suspicious order
11 monitoring from logistics to compliance?
12        MR. VARNADO:  Object to the
13        form.
14        THE WITNESS:  I would have -- I
15        would have information on the projects
16        she was working on, but I would not be
17        into the great detail of every single
18        item that she was working on.
19    Q.   (BY MR. INNES)  At this point
20 in time, you're well aware of the opioid
21 crisis that is going on in October of 2015;
22 is that right?
23    A.   At this time period, the opioid
24 crisis was a topic of conversation around the
25 U.S.

Page 199

1    Q.   Was it a topic of conversation
2  at Walmart?
3    A.   Yes, we would have been having
4  conversations that this was a national issue.
5    Q.   And now your department is
6  taking the mantle on Walmart's efforts to
7  make sure that the opioid crisis can be
8  abated; is that right?
9         MR. VARNADO:  Object to the
10        form.
11        THE WITNESS:  We would have
12        been responsible for -- in 2015, of
13        taking over the suspicious order
14        monitoring.
15    Q.   (BY MR. INNES)  And the
16 suspicious order monitoring is directed at,
17 in large part, making sure that opioids are
18 not diverted to places where they should not
19 go; is that correct?
20        MR. VARNADO:  Object to the
21        form.
22        THE WITNESS:  Again, we would
23        be looking at records as they're
24        placed to our warehouse and reviewing
25        those orders, if we consider those an

Page 200

1  order of interest or a suspicious
2  order.
3    Q.   (BY MR. INNES)  I'm getting
4  something different than what you were doing
5  and were not doing.  I'd like to know why it
6  seems you were not having more of a hands-on
7  role with Ms. Johnson when she's -- when your
8  department is assuming the mantle of the --
9  of Walmart's efforts to prevent diversion.
10        MR. VARNADO:  Object to the
11        form.
12        THE WITNESS:  My responsibility
13        is much larger than this one singular
14        issue, so I would not be down in all
15        of the details of every single project
16        that she was working on.
17    Q.   (BY MR. INNES)  Was there a
18 reason that -- strike that.
19        Did you -- during the
20 transition did you review Walmart's policies
21 and procedures that were in place to ensure
22 that they were compliant with federal and
23 state regulations?
24        MR. VARNADO:  Object to the
25        form.

Page 201

1        THE WITNESS:  We have an
2        ongoing process to ensure that our
3        policies and procedures stay updated.
4    Q.   (BY MR. INNES)  You didn't feel
5  it necessary for you to take a personal role
6  in that as the director of -- senior director
7  of practice compliance?
8        MR. VARNADO:  Object to the
9        form.
10        THE WITNESS:  I have directors
11        and senior directors that had
12        responsibility for making sure that we
13        were -- we continued to maintain
14        compliance within state level, federal
15        level, on many different areas.
16    Q.   (BY MR. INNES)  So you didn't
17 take a personal role in the review of these
18 policies and procedures as they relate to
19 Walmart's compliance with federal and state
20 regulations?
21    A.   I'm sure I would have reviewed
22 a document and looked at the document and
23 been made aware of the document, but I didn't
24 do -- review work on the document.
25    Q.   Are you a member of the health

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 and wellness advisory panel?
2     A.   Health and wellness advisory
3 panel. Is it the health and wellness
4 compliance advisory panel? What -- what's
5 the full name?
6     Q.   I can direct you to Bates
7 No. 11109. It's the last page of tab 3. In
8 the middle of the page it says "The health
9 and wellness advisory panel."
10     A.   Yeah, that's the -- that's
11 the -- yes.
12     I was not a -- I was a stand-in
13 voting member. I was not a voting member of
14 that -- of that panel.
15     Q.   At what time were you a
16 stand-in voting member of that panel?
17     A.   If my -- if my vice president
18 wasn't in that meeting, then if there was
19 something to be voted on, as it were, then I
20 would participate in that role.
21     Q.   Did you attend advisory panel
22 meetings in a non-voting role?
23     A.   I'm sure I did.
24     Q.   At those advisory panel
25 meetings that you attended, whether they were

Page 203

1 in a voting role or non-voting role, were
2 distribution of opioids discussed?
3     A.   The controlled substance
4 program, opioids would be discussed. SOM
5 reporting would have been discussed, but not
6 distribution.
7     And I'm talking logistics side.
8 Logistics was, I believe, a part of this
9 panel as well.
10     Q.   So the health and wellness
11 advisory panel, to your knowledge, never
12 discussed distribution of opioids, but they
13 did discuss SOM reporting?
14     A.   There would have been
15 discussions around the SOM program.
16     Q.   Were there minutes taken of
17 these meetings?
18     A.   That, I don't know.
19     Q.   Who would know if there was
20 minutes taken of those meetings?
21     A.   That would be our -- health and
22 wellness legal would know.
23     Q.   Who was in charge of taking
24 minutes for these meetings?
25     MR. VARNADO: And let me

Page 204

1 just -- there's a little bit of
2 confusion here. I just want to
3 object. To the extent it's calling
4 for privileged deliberations during
5 the controlled substance advisory
6 panel, I'm going to instruct the
7 witness not to answer about those
8 privileged communications involving
9 meetings that were done at the
10 direction of counsel.
11     If you're talking about some
12 other committee, so be it.
13     Q.   (BY MR. INNES) Are you taking
14 counsel's advice and not answering this
15 question?
16     A.   Yes.
17     Q.   Okay. Who are the members of
18 the health and wellness advisory panel?
19     A.   Without having a document that
20 shows all the members, I could probably only
21 name a few, but ...
22     Q.   Are there any members of
23 Walmart's legal department that are members
24 of the health and wellness advisory panel?
25     A.   Yes.

Page 205

1     Q.   How many members are part of
2 the -- strike that.
3     Are the members of the legal
4 department lawyers?
5     A.   I'm sorry, say that again?
6     Q.   Are the members of the legal
7 department that are members of the health and
8 wellness advisory panel, are those folks
9 lawyers?
10     A.   Those would be Walmart
11 associates.
12     Q.   And a Walmart associate is a
13 lawyer?
14     A.   Yeah. Walmart legal.
15     Q.   Are members of -- are the
16 members of the health and wellness advisory
17 panel that are Walmart in-house lawyers, are
18 they voting members?
19     A.   I don't remember.
20     Q.   Is there anything that would
21 refresh your recollection as to that
22 question?
23     A.   I know we had a document that
24 shows who was voting members.
25     MR. INNES: Counsel, I don't

Page 206

1  know that that document's been
2  produced or not been produced. I
3  don't believe I've seen it, so I'll
4  just ask that you produce the members
5  of the advisory panel.
6      MR. ELMER: We've produced
7  responsive documents.
8      MR. VARNADO: Yeah, we've
9  produced responsive documents that I
10  believe include -- contain that
11  information.
12      Now that we have the blower
13  back, maybe this is a good time for a
14  break. We've been going like an hour
15  and 15.
16      THE VIDEOGRAPHER: 2:24. We
17  are off the video record.
18      (Recess taken, 2:24 p.m. to
19  2:45 p.m.)
20      THE VIDEOGRAPHER: 2:45. We
21  are on the video record.
22      (Walmart-Chapman Deposition
23  Exhibit 3 was marked for
24  identification.)
25  Q.    (BY MR. INNES) There's only

Page 207

1  going to be one question for this. Is
2  this -- do you recognize this to be the CDRSE
3  report?
4      MR. VARNADO: Object to the
5  form.
6  Q.    (BY MR. INNES) Controlled drug
7  stock exception report?
8  A.    This is the 46.011?
9      This?
10  Q.    Yes. Yes. Thank you.
11  A.    Yeah. This is -- this is the
12  report I remember receiving.
13  Q.    And the name of that report is
14  controlled drug stock exception report --
15  A.    Yes.
16  Q.    -- is that correct?
17      Okay. Thank you. That's all I
18  have on that.
19      Okay. If I could direct you to
20  tab 3, the second page. It's Bates ending in
21  11108.
22  A.    Okay.
23  Q.    At the bottom of the page
24  there's a -- a topic called "Suspicious order
25  reporting."

Page 208

1      "It has been determined after
2  evaluation that an order of interest is a
3  suspicious order, the following process will
4  be followed to report the suspicious order to
5  key stakeholders, to Drug Enforcement
6  Administration (the DEA), and necessary state
7  agencies as required by law.
8      "The health and wellness
9  director of controlled substances, (the
10  director), will provide a memo of
11  determination of suspicious orders to the
12  following stakeholders."
13      The first stakeholder listed
14  there is "Walmart Health and Wellness
15  Practice Compliance?"
16      That is your department at that
17  time period; is that right?
18  A.    That's correct.
19  Q.    Do you remember receiving any
20  memos of determination of suspicious orders?
21  A.    Yes, I do.
22  Q.    Do you ever remember receiving
23  any memos of determination of suspicious
24  orders for orders placed to -- or placed by
25  pharmacies in Ohio?

Page 209

1  A.    I do not remember specifically.
2  I would have to review.
3  Q.    About how often did you receive
4  a memo of determination of suspicious order?
5  A.    I can't answer the frequency.
6  Q.    Were they provided on a regular
7  interval basis? Bi-monthly? Or would they
8  come in, you know, as they occurred?
9  A.    They would come in as they
10  occurred, and as they were reviewed.
11  Q.    When you received that, what
12  was your common practice after receiving such
13  a document?
14      MR. VARNADO: Object to the
15  form.
16      THE WITNESS: The -- this says
17  to health and wellness practice
18  compliance, so I would receive a copy
19  of it and review that copy for what
20  had happened at that particular store.
21  Q.    (BY MR. INNES) And after
22  reviewing that memo and what happened at a
23  particular store, did you take any action?
24  A.    There was action taken by the
25  director of controlled substance operations

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  team.
2      Q.    And who was the director of
3  controlled substance operation team?
4      A.    Well, it was the director of
5  controlled substances and our operations
6  team.  Sorry.
7      Q.    Understood.  Thank you.  Thank
8  you for that clarification.
9          Was that action taken at your
10  direction?
11     A.    It was taken as protocol set up
12  by the director of controlled substances.
13     Q.    And where is that protocol
14  memorialized, if at all?
15     A.    There is a document that
16  explains what would be looked at in that
17  process.
18     Q.    And which process is that?
19     A.    The review and the
20  communication that went to operations and the
21  steps that would be taken at local store
22  level.
23     Q.    Are you referring to the
24  remediation plans?
25     A.    Yes.

Page 211

1      Q.    Okay.  I'd like to go to the
2  top of that same page, 11108.
3          It reads, "A store whose order
4  is identified as an order of interest and
5  held beyond the expected shipment date will
6  be notified of the shipment delay as quickly
7  as possible."
8          Is it fair to say that that
9  means a shipment would be held prior to --
10  until an investigation is complete at that
11  point?
12     A.    Can you repeat that?
13     Q.    Sure.  When an order is placed
14  and identified as an order of interest, it
15  goes through an evaluation; is that correct?
16     A.    It goes through the evaluation,
17  yes.
18     Q.    And when it is going through
19  the evaluation, at least as it stands in --
20  beginning in October of 2014, is that order
21  held until the evaluation is complete?
22     A.    Correct.
23     Q.    Okay.  Prior to October of
24  2014, were there any policies in place that
25  held orders prior to the evaluation being

Page 212

1  completed?
2          MR. VARNADO:  Object to form.
3          THE WITNESS:  I don't know that
4  I have the information to answer that.
5      Q.    (BY MR. INNES)  What
6  information would you need to answer that?
7      A.    I don't -- it would have been a
8  logistics process, at that point, until we
9  took this process over.
10         So I don't know about their
11  process that they did at that time.
12     Q.    And again, I'll represent to
13  you that this is Walmart's response to each
14  of the suspicious order monitoring policies
15  and procedures from January 6th -- January 1,
16  2006.  It comes in the form of a narrative,
17  and it comes in the form of a document such
18  as the one we're looking at.
19         Can you tell, from the
20  documents in front of you, any time Walmart
21  articulated a policy to hold orders until an
22  evaluation was completed?
23         MR. VARNADO:  Object to form.
24         THE WITNESS:  It's stated in
25  this policy and this update, but I

Page 213

1  don't know that it exists in a prior
2  policy update or procedure guide for
3  the warehouse.
4      Q.    (BY MR. INNES)  And what's a
5  procedure guide for the warehouse?
6      A.    So I'm using procedure guide
7  like I'm using -- well, they've got this
8  titled as a pharmacy manual.  I'm using
9  procedure guide, or manual, or their standard
10  operating procedure.  To me, they all go
11  together.
12     Q.    When you are saying "their,"
13  who are you referring to?
14     A.    Just within Walmart, within
15  different operating divisions.
16     Q.    Okay.  Are you aware of any
17  policies, other than the ones we've reviewed
18  so far today at tabs 2 and 3, that pre-date 2
19  and 3, that would speak to holding an order
20  prior -- until an investigation is completed?
21         MR. VARNADO:  Object to form.
22         THE WITNESS:  I'm not aware of
23  any policy.
24     Q.    (BY MR. INNES)  In 2014, when
25  you were the senior director of health and

Page 214

1  wellness practice compliance, who did you
2  report to?
3     A.    2014.  I should have reported
4  to -- to Jim -- it would have been
5  Jim Langman.
6     Q.    Prior to 2014, was it -- I'll
7  get -- Sybil?
8     A.    When I was promoted into the
9  position of senior director, it was
10  Sybil Richard.  R-I-C-H-A-R-D.
11     Q.    So what years did you report to
12  Sybil Richard?
13     A.    It would have been from 2012 to
14  probably sometime in 2013.  I don't know the
15  date that she left the company.
16     Q.    And Ms. Richard and
17  Mr. Langman, those are the only two folks
18  that you directly reported to during your
19  role as either director or senior director of
20  health and wellness practice compliance?
21     A.    As a director, I reported to
22  Susanne Hiland.
23        As a senior director, I
24  reported to Sybil Richard, Jim Langman -- oh,
25  currently Garrett Heenan --

Page 215

1        And I cannot remember the last
2  guy.  I'm sorry.  He wasn't there very long.
3        David Barlow.  B-A-R-L-O-W.
4        (Walmart-Chapman Deposition
5     Exhibit 4 was marked for
6     identification.)
7        [Document review.]
8     A.    Okay.
9     Q.    (BY MR. INNES)  Okay,
10  Mr. Chapman, you've had a chance to review
11  the document?
12     A.    Yes.
13     Q.    This is a -- begins on Bates
14  No. 11128.  It's an email from
15  Miranda Johnson to George Chapman, dated
16  October 21st, 2014.  And it attaches a
17  PowerPoint presentation that was produced
18  natively, that we have printed out and
19  included here.
20        At this point in time,
21  Ms. Johnson is reporting directly to you; is
22  that correct?
23     A.    It is around this time, because
24  on the previous original appointment, Tim was
25  involved.  So it was in October of that year.

Page 216

1     Q.    Okay.
2     A.    I don't know the exact cutoff
3  date, but she either reported to me directly
4  at this time or I was asking for an update on
5  strategy.
6        So it's right in this
7  timeframe.
8     Q.    Okay.  And the body of this,
9  attaches -- the attachment is titled SOM
10  strategy.  I'm sorry, the subject is "SOM
11  deck review."  The attachment is
12  somstrategy.pptx, which I will represent to
13  you is a PowerPoint file.  And in the body of
14  the email it says, "For our meeting."  Was
15  this a meeting that -- well, strike that.
16        Did you review this strategy
17  deck?
18     A.    Yes.
19     Q.    And did you attend a meeting
20  where this strategy deck was presented?
21     A.    Yes.
22     Q.    And this is -- was that
23  presentation given on or about October 29th,
24  2014, to the best of your recollection?
25     A.    To the best of my recollection,

Page 217

1  yes.
2     Q.    Slide 2 is titled "Current SOM
3  program."  And it lists several items here.
4        Is it your understanding that
5  the current SOM program at that time, October
6  of 2014, was Reddwerks was to flag over
7  20 bottles of Schedule IIs, over 50 bottles
8  of all other DCs, and 30 percent -- greater
9  than 30 percent increase over a rolling
10  four-week average?
11        MR. VARNADO:  Object to the
12  form.
13        THE WITNESS:  These are the
14  items that the Reddwerks system would
15  highlight.
16        MR. INNES:  Okay.
17     Q.    (BY MR. INNES)  And then, in
18  the second bullet, it says DC cuts orders
19  over 50 bottles down to 50 bottles, Oxy 30
20  down to 20 bottles.
21        Oxy 30 refers to a particular
22  dose of oxycodone; is that correct?
23     A.    Yes.
24     Q.    And where in the policies that
25  were in place at this time is it articulated

Page 218

1 that the DCs were to cut orders over
2 50 bottles down to 50 bottles and
3 Oxy 30 bottles down to 20 bottles?
4 MR. VARNADO: Object to the
5 form.
6 THE WITNESS: There was, or is,
7 a controlled substance tool kit that
8 had -- had this information spelled
9 out.
10 Q. (BY MR. INNES) And the
11 controlled substance tool kit is what
12 exactly?
13 A. It would have what the store is
14 expected to follow and some of the guidelines
15 that were put out there. It wasn't a POM
16 policy, but it was -- it was exactly that.
17 It was a tool kit that, as a company, we had
18 made a decision to have limits on these
19 items.
20 Q. Was that tool kit reduced to
21 writing at any point in time?
22 A. To my knowledge, it's only --
23 it was only available on the wire.
24 Q. And what's the wire?
25 A. The wire is our -- I knew it as

Page 219

1 soon as I said that. The wire is our
2 intranet within the company for -- call it
3 our Google. It has policies, procedures,
4 company information.
5 Q. Okay. So if -- does it
6 function like Google in the sense that it's a
7 search engine for documents at Walmart?
8 A. It does have search capability,
9 yes.
10 MR. INNES: I did not see a
11 so-called tool kit document identified
12 in response to our combined discovery
13 requests.
14 Do you know why that might be?
15 MR. VARNADO: Object to the
16 form.
17 THE WITNESS: I don't know, but
18 typically a tool kit within Walmart is
19 made up of different policies and
20 procedures that are all brought into
21 one home location. So it's kind of a
22 one-stop shop to find something out
23 about X.
24 Q. (BY MR. INNES) And within that
25 tool kit, at least in October of 2014, is it

Page 220

1 your recollection that this -- these DC cut
2 orders would have been articulated in that
3 tool kit?
4 A. Yes. This -- I know that the
5 oxy -- the Oxy 30 to 20 bottles would have
6 been articulated.
7 Or that there was going to be a
8 limit.
9 Q. The third bullet is "Monthly
10 reports," and that again references the
11 3.99 percent. Is that -- is that the
12 controlled drug stock exception report?
13 A. I believe it's referring to
14 the -- I don't know specifically which one
15 this is reporting to, the 3.99, which could
16 be part of what the controlled substance --
17 but it wasn't a controlled substance
18 exception report -- is more of a store-facing
19 report or a market director report. It would
20 be like the 405 report.
21 Q. Okay. Understood.
22 I want you to turn to slide 3.
23 This is titled "Improvement opportunities in
24 the current program."
25 Now, again, this is -- this

Page 221

1 slide deck is being -- was created and being
2 delivered around the transition time; is that
3 right?
4 Toward the end of '14?
5 A. It's when our area of practice
6 compliance would have been working with
7 logistics on their programs and procedures.
8 Q. Who identified the improvement
9 opportunities?
10 A. That would have been the work
11 of Miranda and logistics team.
12 Q. Okay. You'll see the second
13 bullet down there, it says, the current --
14 under the current program, it says, "Flags
15 only identify unusual size."
16 Is it your understanding that
17 "usual size" is a reference to the
18 requirements under the Controlled Substance
19 Act to flag orders of unusual size, or as
20 deviating from the standard pattern and so
21 forth?
22 MR. VARNADO: Object to the
23 form.
24 THE WITNESS: It would be in
25 reference to the unusual size.

Page 222

1 Q. (BY MR. INNES) Okay. So at
2 this point in time, Walmart's current program
3 does one of the three -- flags one of the
4 three unusual characteristics identified by
5 the DEA; is that correct?
6 MR. VARNADO: Object to the
7 form.
8 THE WITNESS: Reddwerks, at
9 this time, systematically was flagging
10 the unusual size within Reddwerks.
11 And there were system enhancements
12 that were identified that were in the
13 process, instead of having separate
14 manual reports, to satisfy the
15 different requirements.
16 Q. (BY MR. INNES) How, at this
17 point in time, was Walmart flagging orders of
18 unusual frequency or orders of unusual
19 pattern?
20 A. They could be using -- I don't
21 know specifically, except that they had the
22 availability of the -- of the report that was
23 around 20 bottles, over-20-bottle report,
24 30 percent over a rolling four-week average
25 report. There was the 405 reports that

Page 223

1 logistics and asset protection, they were
2 utilizing. So they're monthly reports.
3 Q. Let's talk about the monthly
4 reports.
5 (Whereupon, Mr. Zach Bower
6 joins the deposition.)
7 Q. (BY MR. INNES) So is it your
8 testimony that, to identify orders of either
9 unusual pattern, unusual frequency, they
10 could be identified through a monthly report?
11 A. It would be one element that
12 they would be looking for a store of some
13 type of -- some type of change, or somewhere
14 they may need to focus, but it wouldn't be on
15 the individual order.
16 Q. So the monthly report would be
17 a factor that could be looked at in the
18 overall evaluation?
19 A. In the -- their overall
20 evaluation where they may need to spend more
21 time, they would utilize probably the
22 20-count report. There were different
23 reports that logistics and asset protection
24 would have been using.
25 Q. But at this point -- at this,

Page 224

1 we're looking at flagging orders of interest.
2 So we're on the very front end of where an
3 order comes in and needs to be identified as
4 an order of interest; right?
5 A. Say that again?
6 Q. So what we're talking about
7 here is the SOM program and how orders are
8 flagged to be as orders of interest for
9 further review. Right?
10 A. (Witness nods.)
11 MR. VARNADO: Object to the
12 form.
13 Q. (BY MR. INNES) How does a
14 monthly report help Walmart flag a particular
15 order as it comes in?
16 A. I don't know that they were
17 using the monthly report on a daily, everyday
18 order basis, because it wouldn't do them --
19 it wouldn't help them in that. But they
20 would use that with the manual processes with
21 the DC warehouse folks to review orders as
22 they came in.
23 Q. So as orders came in in October
24 of 2014, at least as late as October of 2014,
25 Walmart was using a manual process to

Page 225

1 identify orders of interest?
2 MR. VARNADO: Object to the
3 form.
4 THE WITNESS: They would have
5 been using a manual process for some
6 of the other aspects listed in the
7 CFR.
8 Q. (BY MR. INNES) I'm curious,
9 and I want to -- this is important. In
10 October of 2014, how is Walmart identifying
11 orders of interest that need to be
12 investigated further?
13 A. Again, this was under the
14 responsibility of the logistics department.
15 I don't -- can't sit here and tell you all of
16 the items that they were using.
17 Q. But this is at the point in
18 time where your department is taking the
19 mantle on identifying orders of interest
20 for -- that would involve opioids during the
21 opioid epidemic; isn't that right?
22 MR. VARNADO: Object to form.
23 THE WITNESS: We were working
24 with the logistics partners, and we
25 did not have responsibility for the

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  suspicious order monitoring program at
2  that time.
3      Q.    (BY MR. INNES)  Right.  You did
4  not have responsibility yet, but you were
5  about to take the reins on it; isn't that
6  right?
7      A.    Again, we were working with
8  logistics to help them in their processes,
9  but I don't know that --
10         It was in a transition period,
11  but we had not taken responsibility for this
12  reporting.
13     Q.    (BY MR. INNES)  You testified
14  earlier at this point in time you had a
15  working knowledge of the requirements of the
16  CSA and Walmart's responsibilities to comply
17  with it; isn't that right?
18     A.    Yes, we had a knowledge of the
19  requirement under the CFR.
20     Q.    When you viewed this
21  presentation, did this give you pause that
22  you were not -- that Walmart was not meeting
23  its requirements in the CSA on a program that
24  you were about to take the reins on?
25         MR. VARNADO:  Object to the

Page 227

1  form.
2      THE WITNESS:  That we did not
3  have a systematic process built into
4  Reddwerks?  The answer would be yes.
5      Q.    (BY MR. INNES)  That gave you
6  concern that you didn't have a systematic
7  process built into Reddwerks?
8      A.    We had manual processes, but we
9  didn't have systematic processes.
10     Q.    And did you set about to put
11  the systematic process in place as late as
12  October of '14?
13         MR. VARNADO:  Object to the
14  form.
15         THE WITNESS:  I believe that a
16  project was already underway.
17     Q.    (BY MR. INNES)  That was the
18  Reddwerks enhancements?
19     A.    Yes.
20     Q.    What were those enhancements?
21     A.    I would have to look at -- I
22  would have to look at the project document to
23  tell you everything that was put in there.
24  That was not my area of expertise.
25     Q.    Whose area of expertise was

Page 228

1  that?
2      A.    It would have been with
3  logistics, and it would have been with --
4  Miranda would have been involved.
5      Q.    Miranda, in fact, took over
6  that stalled project at one point, didn't
7  she?
8          MR. VARNADO:  Object to the
9  form.
10         THE WITNESS:  Miranda became
11  heavily involved with her ability to
12  help manage the project end of 2014
13  into 2015.
14     Q.    (BY MR. INNES)  And she was
15  your direct report at that point, right?
16     A.    She would have been a direct
17  report at that time.
18     Q.    Was it -- it made you nervous
19  that you didn't have this particular system
20  in place.  It was delegated to your direct
21  report.  How often did you all meet on the
22  status of the completion of that addition
23  to -- those enhancements to Reddwerks?
24         MR. VARNADO:  Object to form.
25         THE WITNESS:  I can't tell you

Page 229

1  how many times we met on -- when we
2  make enhancements to programs.  And
3  this would be like any other program
4  we would be making enhancements to.
5      Q.    (BY MR. INNES)  Did you meet
6  daily?
7      A.    I can't answer that.
8      Q.    I mean, every moment that went
9  by that this model wasn't in place was a
10  potential for diversion; isn't that right?
11         MR. VARNADO:  Object to the
12  form.
13         THE WITNESS:  We had manual
14  processes in place, along with what we
15  had built into -- systematically into
16  Reddwerks to highlight orders of
17  interest.
18     Q.    (BY MR. INNES)  And if you
19  failed to identify -- if Walmart failed to
20  identify orders of interest, that was a
21  potential for diversion; isn't that right?
22         MR. VARNADO:  Object to the
23  form.
24         THE WITNESS:  An order of
25  interest is not necessarily a

Page 230

1  suspicious order.
2      Q.    (BY MR. INNES)  It's not
3  necessarily one, but you're required to clear
4  it to make sure it isn't a suspicious order;
5  isn't that right?
6      A.    An order of interest, we would
7  look at to clear it or make sure that it was
8  not a suspicious order.
9      Q.    And you can't identify a
10 suspicious order until you identify it as an
11 order of interest; isn't that right?
12     A.    You would have to identify it
13 as an interest of order (sic) first.
14     Q.    So if you don't identify it as
15 an order of interest, it will never be
16 identified as a suspicious order; isn't that
17 right?
18            MR. VARNADO:  Object to the
19     form?
20            THE WITNESS:  We had manual and
21     systematic processes in place to
22     identify orders of interest.
23     Q.    (BY MR. INNES)  And those
24 manual processes made you nervous; right?
25            MR. VARNADO:  Object to the

Page 231

1      form.
2            MR. INNES:  I'll withdraw the
3      question.
4      Q.    (BY MR. INNES)  Can you turn to
5  slide 4, please?  Slide 4 has three -- we'll
6  call cells.  It's strategy overview that
7  articulates a Phase 1 and a Phase 2.
8            Is Phase 1 the -- as I
9  understand it, is the enhancements to
10 Reddwerks; is that right?
11     A.    That would be some of the
12 enhancements to Reddwerks.
13     Q.    And Phase 2 was sourcing a
14 statistical order evaluation model that
15 ultimately was IMS/IQVIA or Buzzeo?
16     A.    Yes.
17     Q.    Why did you not -- why did
18 Walmart not prioritize the implementation of
19 a statistical order evaluation model such as
20 Buzzeo at Phase 1?
21            MR. VARNADO:  Object to the
22     form.
23            THE WITNESS:  There's a process
24     of evaluating who has the best product
25     in the market to do the job that

Page 232

1      you're looking for.  So it was -- it
2      was in process.
3      Q.    (BY MR. INNES)  Was that
4  process expedited?
5            MR. VARNADO:  Object to the
6      form.
7            THE WITNESS:  I can't speak to
8      all of the things that were done on
9      the project.
10     Q.    (BY MR. INNES)  Is there a
11 typical process by which -- strike that.
12            The process for evaluating who
13     has the best product in the market to do the
14     job that you're looking for, how long does
15     that take?
16            MR. VARNADO:  Object to the
17     form.
18            THE WITNESS:  That could depend
19     on many different factors of
20     evaluating someone's product, having
21     that person come in and show you their
22     product.
23            There would be a lot of
24     questions involved in trying to make
25     sure you get to the right product.

Page 233

1      Q.    (BY MR. INNES)  Were you aware
2  that your competitors or folks in your space,
3  CVS, Walgreens, Cardinal, were hit with fines
4  for failing to comply with the requirements
5  in the CSA as it relates to the distribution
6  of opioids?
7            MR. VARNADO:  Object to form.
8            THE WITNESS:  I have seen -- I
9      have seen that those occurred.  So I
10     have knowledge of them.
11     Q.    (BY MR. INNES)  And did you
12 have knowledge of them in October of 2014?
13     A.    I don't know when they were --
14 when they were publicized, when they hit the
15 news, so ...
16     Q.    You were in charge of the
17 suspicious order monitoring -- well, the
18 suspicious order monitoring program at
19 Walmart rolled up to you starting in the
20 beginning of 2015; isn't that right?
21     A.    It would have been -- it would
22 have transitioned between 2014 to 2015.  I
23 don't know when that exact transition took
24 place from the logistics team to practice
25 compliance.

Page 234

1    Q.   Did you have a desire to make
2 sure that Walmart was using whatever was best
3 in class to identify orders of interest at
4 that time period?
5       MR. VARNADO: Object to form.
6       THE WITNESS: As a company, we
7    always want to use the best technology
8    to help service our pharmacies, our
9    locations, our logistics center.
10    Q.  (BY MR. INNES) And if Walmart
11 wasn't doing -- wasn't meeting its
12 requirements under the CSA, that could result
13 in fines and penalties; isn't that right?
14       MR. VARNADO: Object to form.
15       THE WITNESS: Walmart logistics
16    had an obligation to make sure they
17    were following the order monitoring
18    process.
19    Q.  (BY MR. INNES) I'm talking
20 about 2015, and that's when the suspicious
21 order monitoring program is under your
22 charge; right?
23    A.   The reporting of those was
24 under our charge, but our logistics partner
25 still had responsibility within suspicious

Page 235

1 ordering. It's their permit, their
2 registration.
3    Q.   But the SOM --
4    A.   Yes.
5    Q.   -- was being enhanced in your
6 words.
7    A.   Yes.
8    Q.   And the statistical method,
9 Phase 2, Buzzeo, was under your purview;
10 isn't that right?
11       MR. VARNADO: Object to the
12    form.
13       THE WITNESS: After our
14    transition, it was under our
15    controlled substance, and it was
16    getting to that statistical model, and
17    we were using our own data as well
18    with the Reddwerks enhancements in
19    Phase 1.
20    Q.  (BY MR. INNES) And I'm going
21 to go back to that, but at that time,
22 Ms. Johnson was tasked with implementing and
23 shepherding all those enhancements and the
24 implementation of a statistical model; is
25 that correct?

Page 236

1    A.   Yes.
2    Q.   And she reported to you; right?
3    A.   Yes.
4    Q.   And if that was not carried out
5 and Walmart was ultimately hit with a fine by
6 the DEA, it would be on the -- your head;
7 isn't that right?
8       MR. VARNADO: Object to the
9    form.
10       THE WITNESS: It would be as --
11    as -- Walmart as an entity and our
12    logistics.
13    Q.  (BY MR. INNES) So I'm
14 wondering, was there anything that either you
15 or your superior could have done to
16 prioritize the sourcing of the statistical
17 model rather than -- or at that time?
18       MR. VARNADO: Object to the
19    form.
20       THE WITNESS: System
21    enhancements within Reddwerks even in
22    Phase 1 was implementing our own
23    statistical pieces.
24    Q.  (BY MR. INNES) But why do it
25 in a two-phased process? If you were

Page 237

1 confident that the enhancements were bringing
2 you in line with your requirements under the
3 CSA, why, at the same time, dual track a
4 statistical order monitoring system like
5 Buzzeo?
6    A.   In developing programs and
7 software to go within DCs and our pharmacies, it's
8 making connections by outside vendors, it's
9 much more difficult and time-consuming than
10 it is to have within something that you
11 already own and have, which was Reddwerks.
12    Q.   So why even ask Buzzeo to be
13 involved?
14    A.   It would have been identified
15 that Buzzeo was -- was a very good program to
16 be using, and we wanted to use the best, so
17 we wanted to continue to enhance our system
18 to have the best that we could get.
19    Q.   And you didn't have the best
20 you could get when you were using Reddwerks
21 enhancements; right?
22       MR. VARNADO: Object to form.
23    Q.  (BY MR. INNES) Because you
24 weren't using Buzzeo.
25       MR. VARNADO: Same objection.

Page 238

1    THE WITNESS:  Our enhancements
2  that we had, we met all of our
3  obligations under Phase 1 and before
4  with how we were monitoring and when
5  we took responsibility, within the
6  practice compliance area, but we were
7  meeting our obligations for the DEA.
8    Q.    (BY MR. INNES)  Let's go back
9  to the internal data that you were using with
10  Reddwerks.  What was that internal data?
11    A.    It would have been our own
12  ordering data, purchases, calculated standard
13  deviations.
14    Q.    Did you contract with Mu Sigma
15  to do that work?
16    A.    I don't know if it was
17  Mu Sigma.
18    Q.    What do you mean by "standard
19  deviations"?
20    A.    I'm sorry?
21    Q.    What do you mean by "calculated
22  standard deviations"?
23    A.    My understanding, it is limited
24  on the standard deviation, but is looking at
25  over a time period.  If you would have

Page 239

1  deviation of X amount over a time period, you
2  may have a normal ebb and flow of
3  prescription ordering that you would see as a
4  pattern in a pharmacy.
5    Q.    If you'd turn to slide 7.
6    This is titled "Phase 2TBD."
7  "Statistical order evaluation model" is the
8  first cell.  The second bullet in that cell
9  says "Flags for unusual size."
10    According to this presentation,
11  Walmart was already doing that.  And the
12  thing goes on to say "Frequency and
13  substantial deviation from a normal pattern."
14    So in Phase 2, Walmart was
15  going to now add in the two missing legs of
16  the unusual characteristic articulated by
17  the -- in the CSA; is that right?
18    MR. VARNADO:  Object to the
19  form.
20    MR. INNES:  I can ask that
21  again.  Withdraw the question.
22    Q.    (BY MR. INNES)  In the program
23  that was in place in October of 2014, Walmart
24  flagged orders of interest based solely on
25  unusual size; is that correct?

Page 240

1    MR. VARNADO:  Object to the
2  form.
3    THE WITNESS:  Walmart had
4  systematic systems in place that
5  looked at unusual size.  But again,
6  there was manual processes involved in
7  identifying the other areas of
8  concern.
9    Q.    (BY MR. INNES)  And those were
10  done manually.  Is that what you said?
11    A.    Those would have been done
12  manually.
13    Q.    And in Phase 2, Walmart will
14  finally have statistical ability to look at
15  frequency and substantial deviation; is that
16  right?
17    MR. VARNADO:  Object to the
18  form.
19    THE WITNESS:  In Phase 1, you
20  would have had some additional
21  enhancements made to Reddwerks that
22  would have given you systematic
23  visibility instead of manual as well.
24    Q.    (BY MR. INNES)  What were those
25  enhancements that were targeted specifically

Page 241

1  at frequency?
2    (Whereupon, Mr. Petrozzino left
3  the deposition.)
4    THE WITNESS:  Again, it would
5  be the data that was being produced
6  from online purchases and dispenses
7  were being fed into the Reddwerks
8  system.  That was my understanding.
9    Q.    (BY MR. INNES)  How were they
10  fed into the Reddwerks system?
11    A.    I can't speak to the technical
12  side of it.  I know that data was being
13  looked at.  Being utilized.
14    Q.    How the data was being utilized
15  by Reddwerks?
16    A.    Yes.
17    Q.    Are these -- at this point in
18  time, are these thresholds that Walmart is
19  employing?
20    A.    I don't know if they were
21  thresholds.
22    Q.    Which enhancements were
23  addressed as substantial deviation from a
24  normal pattern?
25    A.    That was the information I

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  spoke about earlier, when they were using our
2  own data to figure out standard deviations.
3        MR. INNES:  Can we take a
4  five-minute break?
5        MR. VARNADO:  Sure.
6        THE VIDEOGRAPHER:  3:30.  We
7  are off the video record.
8        (Recess taken, 3:30 p.m. to
9  3:51 p.m.)
10       THE VIDEOGRAPHER:  3:51.  We
11 are on the video record.
12    Q.   (BY MR. INNES)  Okay,
13 Mr. Chapman, we are back.
14       I want to talk about the time
15 period when Walmart -- when the compliance --
16 practice compliance takes full possession of
17 Walmart's suspicious order monitoring
18 program.
19       At that point in time, what is
20 your understanding of what -- of how Walmart
21 was identifying orders of interest for
22 further evaluation in its SOM program?
23    A.   We had some of our system -- we
24 had some flags within our systems, and then
25 we had enhancements that were in the process

Page 243

1  of being added to the system to move those
2  from manual processes to systematic
3  processes.
4     Q.   Okay.  I want to add some
5  precision to this.  What do you mean by
6  "systems"?
7     A.   So at the time, that would have
8  been Reddwerks.
9     Q.   And what were the flags --
10 like -- strike that.
11       We're talking about the period
12 of time, the specific period of time when you
13 take full possession.  Are there multiple
14 systems that are in place for identifying
15 orders of interest?  Or is it just Reddwerks?
16    A.   So Reddwerks would be our place
17 for our system orders that would come up.
18 And then there were other manual processes
19 that were being done by the warehouse
20 personnel to identify the other elements.
21    Q.   Okay.  Let's take those two at
22 that time -- one at a time.
23       Reddwerks -- what were the
24 flags in the Reddwerks system at that time?
25    A.   So I'd have to go back and look

Page 244

1  at the document that we looked at earlier
2  that talked about the different flags within
3  Reddwerks.
4     Q.   Is that the PowerPoint
5  presentation?
6     A.   I think it is.
7     Q.   Okay.  I think that's
8  Exhibit 4.  But I'm not sure.  I think
9  there's two PowerPoint presentations.  I
10 don't know which one you want to see.
11       Perhaps your counsel can hand
12 you a copy of Exhibit 4.
13    A.   I think it's the last one we
14 were looking at.
15    Q.   That would be 4.
16       MR. VARNADO:  Here it is.
17 Exhibit 4.
18       THE WITNESS:  So in this time
19 period, you had the over 20 bottle,
20 which would have been in Reddwerks.
21 You also had reporting that came along
22 with that.  You had the over 50.  And
23 you also had the greater than
24 30 percent rolling week average.
25       And then you had the

Page 245

1  improvements and enhancements that
2  were being put in under the Phase 1 of
3  the SOM program, current SOM program.
4     Q.   (BY MR. INNES)  Were those in
5  place at the time that compliance took
6  ownership of SOMs?  The enhancements?
7     A.   The systematic enhancements
8  were in process but not in place.
9     Q.   And what were the systematic
10 enhancements?
11    A.   I don't know all the systematic
12 enhancements that were listed, but one was
13 our own data where we were calculating that
14 standard deviation.
15    Q.   What was the purpose of using
16 your own data to calculate the standard
17 deviation?
18    A.   To identify within the system
19 the deviation from the norm.
20    Q.   Who was calculating the
21 standard deviation?
22    A.   That would be someone in
23 logistics, along with -- I don't know if it
24 was systems that were pulling the -- pulling
25 the data, running the analytics on it.  And

Page 246

1 then that was being uploaded into Reddwerks.
2     Q.    In response to my question,
3 "What was the purpose of using your own data
4 to calculate the standard deviation?" your
5 response was "To identify the system on the
6 deviation from the norm."
7         What was the norm?
8     A.    What a normal order would be
9 for a store, based on what -- their normal
10 pattern.
11     Q.    How was that determined?
12     A.    It would be looking at the past
13 history of that particular store's order.
14     Q.    How far back did you look at
15 the particular store's orders?
16     A.    I do not know that.
17     Q.    Who would know that?
18     A.    Miranda would probably know
19 that.  That would have been in the transition
20 of Miranda and logistics.
21     Q.    So was it compliance that was
22 determining the norms?
23     A.    No.
24         MR. VARNADO:  Object to form.
25         THE WITNESS:  It would have

Page 247

1     been the data itself that was
2     determining what the norm was.
3     Q.    (BY MR. INNES)  Who was
4 examining the data to determine what the norm
5 was?
6     A.    That would have been logistics,
7 and Miranda would have been involved in that
8 process.  I don't know who else was involved.
9     Q.    Would she be involved at your
10 direction?
11     A.    She would be involved in that
12 in her job responsibilities.
13     Q.    And as her immediate
14 supervisor, you set the metes and bounds of
15 her job responsibilities; right?
16         MR. VARNADO:  Object to form.
17         THE WITNESS:  She would have
18     overall job responsibilities.
19     Q.    (BY MR. INNES)  And it was your
20 job to oversee what Miranda was doing?
21     A.    I would not look at the
22 day-to-day of everything that she was working
23 at.
24     Q.    When compliance took over
25 Walmart's suspicious order monitoring

Page 248

1 program, was it your belief that Walmart was
2 in compliance with the DEA's regulations?
3         MR. VARNADO:  Object to form.
4         THE WITNESS:  We had processes
5     in place systematically, and then
6     manually to do the appropriate
7     monitoring of orders.
8     Q.    (BY MR. INNES)  Okay.  That
9 wasn't my question.  My question is, was
10 Walmart in compliance with the DEA's
11 regulations at the time compliance took over
12 SOMs?
13         MR. VARNADO:  Object to form.
14         THE WITNESS:  Walmart was
15     following the CFR definition and
16     making enhancements to our systematic
17     processes from manual at the time.
18     Q.    (BY MR. INNES)  Again, was
19 Walmart in compliance with the DEA's
20 regulations when practice compliance took
21 over the SOMs, yes or no?
22         MR. VARNADO:  Object to form.
23         THE WITNESS:  Walmart was
24     following the direction of the CFR.
25     Q.    (BY MR. INNES)  And how do you

Page 249

1 know that Walmart was following the direction
2 of the CFR?
3     A.    Because of the review that was
4 being done at the time through logistics and
5 in compliance.
6     Q.    And what review was being done
7 through logistics and compliance?
8     A.    The documents that we've
9 already looked at on explaining how we
10 identify orders of interest or suspicious
11 orders.
12     Q.    Based on the PowerPoint
13 presentations we've viewed, the bullet points
14 in those PowerPoint presentations, you draw
15 the conclusion that Walmart was in compliance
16 with the DEA's regulations at the time?
17         MR. VARNADO:  Object to form.
18         THE WITNESS:  There's
19     logistics, policies, and guidelines
20     that are in place.
21     Q.    (BY MR. INNES)  What policies
22 and guidelines are those?
23     A.    "Looking at the logistics
24 pharmacy manual and evaluating orders of
25 interest and suspicious order."

Page 250

1  Q.   I'm sorry, are you reading from
2  a particular document?
3  A.   That's your tab 3.
4  Q.   Okay.
5      What did you yourself do at
6  that time to draw the conclusion that Walmart
7  was aligned with the CFR?
8      MR. VARNADO:  Object to form.
9      THE WITNESS:  I would be
10 getting regular updates on the SOM
11 process, enhancements that we were
12 making to the system.
13 Q.   (BY MR. INNES)  And who were
14 giving you those regular updates?
15 A.   At the time it would have been
16 a partnership between logistics and Miranda
17 on my team.
18 Q.   And who in logistics?
19 A.   Who -- did you say "who in
20 logistics"?
21      At that point it would have
22 been Kristy Spruell.
23 Q.   So the basis for your
24 conclusion that Walmart was complying with
25 the DEA's regulations, when compliance took

Page 251

1  over SOMs, is based exclusively on reports
2  that you received from Ms. Spruell and
3  Ms. Johnson?
4      MR. VARNADO:  Object to form.
5      THE WITNESS:  It would have
6      been their analysis, and legal would
7      have been involved at some point in
8      the analysis of our requirement under
9      the CFR.
10 Q.   (BY MR. INNES)  Part of your
11 job as a senior director of practice and
12 compliance was to identify gaps in regulatory
13 compliance; is that right?
14      MR. VARNADO:  Object to form.
15      THE WITNESS:  To identify where
16      we needed to make enhancements to
17      current processes.
18 Q.   (BY MR. INNES)  Did you ever
19 read the regulations yourself?
20 A.   I read CFR, which is very short
21 in describing SOM reporting, but yes, I have
22 looked at that.
23 Q.   And that's -- is that the only
24 source material that you looked at to
25 determine whether or not Walmart was

Page 252

1  complying with its obligations under the CSA?
2  A.   That would be the only
3  information that I personally looked at.
4  Q.   Did you endeavor to find other
5  information outside of the CFR?
6      MR. VARNADO:  Object to form.
7      THE WITNESS:  I didn't do
8  individual research on that.
9  Q.   (BY MR. INNES)  Why not?
10     MR. VARNADO:  Object to form.
11     THE WITNESS:  I had a director
12 of controlled substances, along with
13 other business partners and legal that
14 worked on that process.
15 Q.   (BY MR. INNES)  And did you
16 review their work product?
17 A.   I would not have reviewed their
18 work product.
19 Q.   So sitting here today, how can
20 you say with confidence that their work
21 product was complete and accurate?
22     MR. VARNADO:  Object to the
23 form.
24     THE WITNESS:  Based on the
25 information and guidance in the CFR

Page 253

1  about our responsibility and the
2  review that had been done by legal,
3  logistics, and my director of
4  compliance, controlled substance
5  compliance.
6  Q.   (BY MR. INNES)  So your reading
7  of the CFR and the information that you
8  received from Ms. Johnson, Ms. Spruell, legal
9  forms the basis for your opinion that when
10 Walmart -- when you took over the SOMs,
11 Walmart was in compliance with the DEA
12 regulation?
13     MR. VARNADO:  Object to form.
14     THE WITNESS:  That would be
15 correct.
16 Q.   (BY MR. INNES)  Did you ever
17 speak with anyone at the DEA regarding
18 Walmart's compliance with the CSA?
19     MR. VARNADO:  Object to form.
20     THE WITNESS:  Can you --
21 Q.   (BY MR. INNES)  Did you ever
22 speak with anyone at the DEA regarding
23 Walmart's compliance or failure to comply
24 with the CSA?
25     MR. VARNADO:  Same objection.

Page 254

1    THE WITNESS: The compliance
2 with the CFR [sic], are you talking
3 just around SOM reporting?
4    MR. INNES: Correct.
5    THE WITNESS: I did have a
6 conversation with a DEA agent around
7 SOM reporting.
8    Q.   (BY MR. INNES) Let me clarify.
9 I'm not asking just about
10 reporting. I'm asking about the processes
11 that you had in place to meet your
12 requirements under the CSA.
13    A.   The conversation --
14    Q.   Go ahead.
15    A.   The conversation I had with the
16 DEA agent was around SOM reporting.
17    Q.   And when was that?
18    A.   It would have been in 2014, I
19 believe. Late 2014. Sometime in 2014.
20    Q.   And that pre-dates compliance's
21 control of the SOM program?
22    A.   It does.
23    Q.   And it's limited to Walmart's
24 reporting of the results of its SOM program?
25    MR. VARNADO: Object to form.

Page 255

1    THE WITNESS: It was around one
2 particular DC.
3    Q.   (BY MR. INNES) Which DC was
4 that?
5    A.   It was our DC 6028 in
6 Crawfordsville, Indiana.
7    Q.   And what was the nature of the
8 conversation regarding DC 6028?
9    A.   The DEA agent had a question
10 after a standard inspection at that facility
11 around our suspicious oral reporting.
12    And they had concerns around a
13 particular doctor in Indiana.
14    Q.   Did this relate at all to
15 opioids?
16    A.   It was -- yes, it was around
17 opioids.
18    Q.   Which particular product, do
19 you recall?
20    A.   I do not remember.
21    Q.   Was it hydrocodone?
22    A.   I don't remember.
23    Q.   Could it have been fentanyl?
24    MR. VARNADO: Object to the
25 form.

Page 256

1    THE WITNESS: I don't remember.
2    Q.   (BY MR. INNES) Were there any
3 other policies or procedures that you would
4 point to in 2015 regarding Walmart's attempts
5 to comply with its obligations under the CSA
6 other than those found at tabs 4, 5, and 8 as
7 well as those items articulated in bullet
8 points 5 and 6?
9    A.   Okay. 4 --
10    Q.   You can take those one at a
11 time, if you'd like.
12    A.   Okay. Under -- what was the
13 tabs again?
14    Q.   Let's first do the bullet
15 points. I think that makes the most sense.
16    A.   Oh.
17    Q.   I'll direct you to the fifth
18 and sixth bullet.
19    In bullet 5 it says, "During
20 that time period you implemented a hard limit
21 of 20 bottles for shipment of Oxy,
22 30 milligrams -- internally circulated report
23 listing orders for Schedule II substances in
24 more than 20 bottles for further review."
25    It goes on to state at bullet 6

Page 257

1 that "During that time period that Walmart
2 implemented enhancements thresholds in
3 Reddwerks and tiered review process."
4    Anything you would like to add
5 to that?
6    MR. VARNADO: Object to the
7 form.
8    THE WITNESS: I don't have
9 anything to add to that.
10    Q.   (BY MR. INNES) Turning your
11 attention to tab 4.
12    According to Walmart's
13 responses to combined discovery requests,
14 tab 4 was in place beginning in March of
15 2015.
16    I'd like to direct your
17 attention to the second page of that
18 document. It talks about documentation and
19 review. It's three-quarters of the way down
20 on the page.
21    A.   I'm sorry, which tab?
22    Q.   Tab 4. Page 2 of tab 4.
23    A.   Oh, okay.
24    Q.   So now we're in 2015, and the
25 SOM is squarely within compliance.

Page 258

1    Did you review this policy for
2 compliance with the DEA --
3    MR. VARNADO: Object to form.
4    Q.   (BY MR. INNES) -- requirements?
5    A.   This is still the logistics
6 policy, but I would have seen this policy.
7    Q.   And would you have reviewed it
8 to make sure it was in compliance with the
9 DEA's requirements?
10    A.   I would have -- I would have
11 looked at this policy, and it would have been
12 the responsibility of our legal and Miranda
13 to make sure that we were in compliance and
14 maintained our compliance.
15    Q.   On page 2 of this document, it
16 says, "Documentation review. Order of
17 interest evaluation should be documented
18 using the order of interest evaluation form."
19    Is this the only way that
20 orders of interest were documented, using the
21 order of interest evaluation form at that
22 time?
23    A.   According to this document,
24 they used the order of interest evaluation
25 form to make their documentation. Are you

Page 259

1 asking me -- what was the question?
2    Q.   Is there any other way that
3 these orders of interest evaluations were
4 documented?
5    A.   Not to my knowledge.
6    Q.   Turn to tab 8, please.
7    [Document review.]
8    Q.   (BY MR. INNES) Have you
9 reviewed the document?
10    A.   Yes.
11    Q.   So according to Walmart's
12 documents to the combined discovery request,
13 the policy at tab 8 was in place beginning in
14 January of 2015. Did you review this
15 document to ensure compliance with the DEA's
16 regulations regarding suspicious order
17 monitoring?
18    MR. VARNADO: Object to the
19    form.
20    THE WITNESS: This policy would
21    have been our version of the 21402
22    logistics policy as they would marry
23    up between the two divisions, where
24    you had logistics following their
25    21402, but this had its home now

Page 260

1 within the practice compliance area,
2 so I would have looked at this
3 document.
4    Q.   (BY MR. INNES) Okay. Now
5 we're getting somewhere.
6    A.   I'm sorry?
7    Q.   Now we're getting somewhere.
8    So this is a compliance
9 document?
10    A.   This is a practice compliance
11 document.
12    Q.   And you reviewed this document
13 prior to it being implemented?
14    A.   I would have looked at it. It
15 would have still gone through the normal
16 review process.
17    Q.   And what was that normal review
18 process?
19    A.   It would have gone through our
20 legal -- legal team. And Miranda would
21 have -- still in conjunction with working
22 with logistics, because of their
23 responsibility to make sure they were doing
24 their procedures.
25    Q.   Can I turn your attention to

Page 261

1 page 3 of this document to the section
2 entitled "Oversight"?
3    I'm looking at the second
4 bullet down. "The director of pharmacy
5 logistics compliance would periodically
6 review order thresholds and make
7 recommendations for threshold adjustments."
8    Why was this bullet point
9 included in the oversight section?
10    A.   This would be probably part of
11 the remediation plan. When you had a store
12 that had an order that was a suspicious
13 order, you would have both logistics involved
14 plus a director of controlled substances in
15 making those recommendations.
16    Q.   So it's your understanding that
17 a threshold adjustment would be made only in
18 the case of a remediation plan?
19    MR. VARNADO: Object to the
20    form.
21    THE WITNESS: I would -- I
22    believe that this would be part of the
23    remediation plan.
24    Q.   (BY MR. INNES) Would periodic
25 threshold adjustments be made outside of a

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  remediation plan?
2      A.   I can't answer that.
3      Q.   So you're the senior director
4  of health and wellness practice compliance in
5  2015.  This is a practice compliance
6  document.  It's setting the terms for
7  Walmart's suspicious order monitoring
8  process.
9          Are you not fully conversant in
10 those terms?
11         MR. VARNADO:  Object to the
12     form.
13         THE WITNESS:  Can you repeat
14     that?
15     Q.   (BY MR. INNES) This policy
16 resides -- in your language -- resides in
17 compliance.  You were the head of compliance
18 at this point; right?
19     A.   Of practice compliance.
20     Q.   And this is a practice
21 compliance document that we're looking at?
22     A.   It is.
23     Q.   It resides in practice
24 compliance?
25     A.   It does.

Page 263

1      Q.   It's your -- for all intents
2  and purposes, it's your document.
3          MR. VARNADO:  Object to the
4      form.
5          (Telephone interruption.)
6      Q.   (BY MR. INNES)  Do you not
7  understand all the terms that are outlined in
8  this compliance document?
9          MR. VARNADO:  Object to the
10     form.
11         THE WITNESS:  I would have
12     read, reviewed, and understand the
13     outline.  This is very similar to the
14     21402.
15     Q.   (BY MR. INNES) According to
16 Walmart's response to a combined discovery,
17 this document was in effect from January 15th
18 to April of '17.  Is that right?
19     A.   I don't know the -- I know that
20 it was effective on January 2015.
21     Q.   And how do you know that?
22     A.   By the notation on the bottom
23 of the actual POM, or policy, or guide.
24     Q.   Did you receive some reports of
25 order of interest evaluations?

Page 264

1      A.   I did not receive order of
2  interest reports.
3      Q.   Did you attend -- the question
4  is slightly different.  At bullet point 3, it
5  states that "The director will present a
6  summary report of order of interest
7  evaluations to the panel on a periodic
8  basis."
9          Did you receive such a summary
10 report of orders of interest evaluations?
11     A.   It may have been a review of
12 total number of order of interest, but not
13 individual order of interest reports.
14     Q.   To your knowledge, did the
15 director present a summary report of order of
16 interest evaluations to the panel on a
17 periodic basis between January 15th and April
18 of '17?
19     A.   I cannot remember specific
20 dates that she would have presented.
21     Q.   Do you know if she ever
22 presented?
23     A.   There were updates, so I know
24 some were done, but I don't know when or how
25 many.

Page 265

1      Q.   Is there a record of the
2  summary reports?
3          MR. VARNADO:  Again, I just
4      object to the extent this is calling
5      for deliberative process or
6      information for the controlled
7      substance advisory panel on a
8      privilege basis.
9          MR. INNES:  I can read back the
10     question if you need it.
11     Q.   (BY MR. INNES)  Is there a
12 record of these summary reports?
13     A.   It would have been taken by our
14 legal department.
15     Q.   What would have been taken by
16 your legal department?
17     A.   This would have been a part of
18 the panel notes.
19     Q.   So according to this policy,
20 the director, who is defined as the director
21 of controlled substances -- and at that time,
22 that would be Miranda Johnson; right?
23     A.   Yes.
24     Q.   -- will present a summary
25 report of order of interest evaluations.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1      Did you receive copies of
2 Ms. Johnson's summary reports of order of
3 interest evaluations?
4     A.   Not that I can recall.
5     Q.   If you have received copies of
6 Ms. Johnson's summary reports of order
7 evaluations, where would they have been kept?
8      MR. VARNADO: Object to form.
9      THE WITNESS: Anything that I
10   would have received would have been in
11   my email system.
12     Q.   (BY MR. INNES) How long are
13 the files in your email system maintained?
14     A.   I have not deleted any of my
15 files. On a company basis, I don't know how
16 long they keep those files.
17     Q.   So it's your practice, as the
18 senior director of health and wellness
19 practice compliance, to maintain your files
20 in your email folders?
21     A.   It -- yes.
22     Q.   Do you save documents in any
23 other place? Other than email?
24     A.   Everything that I would receive
25 and be responsible for would be within --

Page 267

1 would be communication through email.
2     Q.   Do you save email to a backup
3 folder?
4     A.   I don't know if Walmart does
5 systematically keep it to a backup folder. I
6 keep it in my folders.
7     Q.   And do you use Microsoft
8 Outlook?
9     A.   Yes.
10     Q.   And you just keep it in the
11 Microsoft Outlook application?
12     A.   Yes.
13     Q.   You don't save it to the C
14 drive or to your desktop or anything like
15 that?
16     A.   I don't know how Walmart
17 maintains that on the technology side.
18     Q.   Presentations by Ms. Johnson of
19 summary reports of order of interest
20 evaluations to the panel, notes of those
21 presentations were maintained by who?
22     A.   If there were notes taken in
23 that meeting, it would have been taken by
24 legal counsel.
25     Q.   Did anyone else in those

Page 268

1 meetings take notes that you're aware of?
2     A.   Not -- I wouldn't know that.
3     Q.   Did you take notes?
4     A.   I can't recall any specific
5 time that I would have taken particular ...
6     Q.   Following any of those
7 meetings, did you perhaps send an email to
8 someone who didn't attend, giving them a
9 recap summary?
10      MR. VARNADO: Object to form.
11      THE WITNESS: It would have
12   been confined to that meeting under
13   legal counsel.
14     Q.   (BY MR. INNES) Can you explain
15 that? I'm not really sure I understand that
16 answer.
17      What do you mean by "It would
18 have been confined to that meeting under
19 legal counsel"?
20     A.   I would not have sent an email
21 out around something that was under privilege
22 unless legal counsel was involved.
23     Q.   How many presentations of
24 summary reports of order of interest
25 evaluations did you attend?

Page 269

1      MR. VARNADO: Object to the
2   form.
3      THE WITNESS: Can you ask that
4   again?
5      MR. INNES: Sure.
6     Q.   (BY MR. INNES) The
7 presentations of order of interest
8 evaluations to the panel, how many of those
9 meetings did you attend?
10     A.   Again, I don't know how many
11 times Miranda would have presented on an
12 order of interest.
13     Q.   Do you recall her ever
14 presenting an order of interest evaluation?
15     A.   She may have presented on
16 numbers that were coming in as order of
17 interest, but I don't know how many or when.
18     Q.   Do you recall any details from
19 those presentations?
20     A.   I do not.
21     Q.   Have you ever reviewed notes
22 taken by counsel of those presentations?
23      MR. VARNADO: I'll just object
24   on the grounds of privilege.
25      MR. INNES: What's the basis

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  for that privilege?
2      MR. VARNADO:  That the
3  deliberations and minutes and notes
4  from that panel are privileged, and
5  that's the material you're going to
6  get into.
7      MR. INNES:  I think it's
8  material that we can get into based on
9  the rulings by Judge Polster in this
10 case.
11     MR. ELMER:  We can take that up
12 offline unless you want to have the
13 discussion here.
14 Q.   (BY MR. INNES)  It's your
15 testimony that notes were taken by legal
16 counsel in panel presentation -- in
17 presentations to the panel?
18 A.   To my knowledge.
19 Q.   Have you seen copies of those
20 notes that were taken?
21 A.   I do not recall ever seeing
22 notes taken from legal counsel.
23 Q.   What's the basis for your
24 knowledge that notes were taken by legal
25 counsel?

Page 271

1      MR. VARNADO:  Object to the
2  form of the question.
3      THE WITNESS:  Legal counsel was
4  always present in those meetings.
5  Q.   (BY MR. INNES)  You were always
6  present in those meetings as well; right?
7  A.   No.
8  Q.   You were present at some of
9  them; right?
10 A.   I was present, yes.
11 Q.   When you were present, did you
12 take notes?
13 A.   No.
14     MR. VARNADO:  Object to the
15 form of the question.  Asked and
16 answered.
17     THE WITNESS:  I can't remember
18 if I have taken notes in a specific
19 meeting.
20     MR. INNES:  I'm not trying to
21 get cute here, but the idea that you
22 attend a meeting -- that legal
23 attended a meeting, and because they
24 attended the meeting, their notes
25 exist.  Does the mere fact of

Page 272

1  attending a meeting mean there's going
2  to be notes?
3      MR. VARNADO:  Object to the
4  form.
5      THE WITNESS:  There will be
6  times that, you know, a presentation
7  will be given and we would not take
8  notes.
9  Q.   (BY MR. INNES)  But it's your
10 belief that legal counsel took notes at those
11 panel meetings?
12 A.   Well, legal counsel was always
13 present for this meeting or we didn't have
14 these meetings.
15 Q.   Is there any written record of
16 these meetings having taken place?
17     MR. VARNADO:  Object to the
18 form.
19     THE WITNESS:  Are you asking if
20 there's a record of the meeting
21 occurring in our calendars?  That
22 would exist.
23 Q.   (BY MR. INNES)  Okay.  That's
24 one place it might exist.  Any other places?
25 A.   No.

Page 273

1      I mean, just that the meeting
2  was scheduled.
3  Q.   Are there any writings that
4  would confirm that that scheduled meeting
5  occurred?
6  A.   Not that I'm aware of.
7  Q.   Other than notes taken by
8  counsel?
9      MR. VARNADO:  Object to the
10 form.
11     THE WITNESS:  I'm sorry?
12 Q.   (BY MR. INNES)  Other than
13 notes taken by counsel.  Those would confirm
14 that the meeting actually took place; is that
15 correct?
16 A.   I would think so.
17 Q.   When is the last meeting
18 that -- panel meeting that you attended?
19 A.   I can't recall that.
20 Q.   Do you recall any panel meeting
21 that you attended?
22     MR. VARNADO:  Object to the
23 form.
24     THE WITNESS:  I recall being in
25 attendance at some of those meetings.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q.    (BY MR. INNES) What was
2  discussed in those meetings?
3         MR. VARNADO:  I'm going to
4  object on the grounds that those
5  meetings are privileged.  They're
6  governed by attorney-client privilege
7  and instruct you not to answer.
8    Q.    (BY MR. INNES) I'm sorry, it's
9  formality, but are you taking the advice of
10 counsel and refusing to answer that question?
11   A.    Yes.
12        MR. INNES:  Counsel, I think
13 it's clear in this case that these
14 types of meetings and these types of
15 communications are not covered by
16 privilege.  We can take this up at a
17 later date.  We'll hold the deposition
18 open to discuss that, and if we get a
19 ruling on it or if we reach an
20 agreement, we can come back and ask
21 Mr. Chapman questions about this.
22        We don't have to do that if
23 you're willing to allow him to answer
24 the questions.
25        MR. VARNADO:  We're not going

Page 275

1  to hold the deposition open.  He's --
2  we've made our position clear that
3  these meetings are protected by
4  privilege, and what's discussed there
5  is off limits, and I'm going to
6  instruct him not to answer.
7    Q.    (BY MR. INNES) How long were
8  these meetings generally?
9    A.    Probably an hour.
10   Q.    And who attended these
11 meetings?
12   A.    It would be practice
13 compliance.  Legal.  These would be people
14 that would be invited, so I can't speak to
15 who actually attended at the meeting, but
16 logistics, our operations group.
17   Q.    Were there designated persons
18 from these divisions at Walmart, or was it --
19   A.    They would be designated job
20 titles that would attend these meetings.
21        So someone may switch out a
22 job, and so whoever the senior director of
23 operations, they would be in attendance.
24   Q.    What was the overall purpose of
25 the meetings?

Page 276

1    A.    It would be to review --
2         MR. VARNADO:  I'll just object
3  to that question on the grounds of
4  privilege as well.
5         MR. INNES:  Okay.
6    Q.    (BY MR. INNES) Was there an
7  overall -- what was the overall purpose of
8  the meetings?
9         MR. VARNADO:  Same objection,
10 and instruct you not to answer.
11   Q.    (BY MR. INNES)  Are you going
12 to abide by your counsel's objection and
13 instruction not to answer?
14   A.    Yes.
15   Q.    And just to confirm, we are
16 talking about the controlled substance
17 advisory panel; correct?
18   A.    It -- I believe it was known as
19 the health and wellness advisory panel,
20 but ...
21   Q.    Okay.  So in this particular
22 document -- because I know I've seen
23 references to that panel as well.  In this
24 particular document, if you look at the
25 middle of the second page, which is ending in

Page 277

1  Bates No. 4238, you'll see the heading
2  "Determination"?
3    A.    Yep.
4    Q.    The final sentence of that
5  paragraph says, "Controlled substance
6  advisory panel is shortsighted or abbreviated
7  as panel."
8    A.    Mm-hmm.
9    Q.    Is this the panel where --
10        MR. VARNADO:  Where are we?
11        MR. INNES:  Sorry, Counsel.
12 We're at Bates No. 4238.  It's the
13 second page of tab 8.
14        MR. VARNADO:  Okay.
15        MR. INNES:  Quarter of the way
16 down?  Got it?
17        MR. VARNADO:  Yep.
18   Q.    (BY MR. INNES) Just so the
19 record is clear, is this the panel that you
20 have been referring to?
21   A.    This document -- I believe the
22 name of the advisory panel changed to this,
23 but I'm not sure.
24   Q.    So you're not sure which panel
25 Ms. Johnson was tasked with presenting a

Page 278

1  summary report of the order of interest
2  evaluation to?
3      A.   I believe the same advisory
4  panel was listed in a logistics document, and
5  at that point it was referred to as the
6  health and wellness advisory panel.  I
7  believe the name was changed to this
8  controlled substance advisory panel once it
9  came into the compliance area.
10     Q.   Okay.  So this is an
11 administerial change of name but not a change
12 of overall function of that panel?
13     A.   I believe that's correct.
14     Q.   How would you -- was there
15 anything that would help you clarify that in
16 your mind?
17         MR. VARNADO:  Object to the
18     form.
19         THE WITNESS:  Unless there was
20     something written that said it's
21     actually happening, I believe that to
22     be the case.
23     Q.   (BY MR. INNES)  Did you ever
24 review the director's recommendations to the
25 panel for additional oversight of certain

Page 279

1  pharmacies?
2      A.   Are you referring to bullet
3  No. 2?
4      Q.   In fact, I was reading from
5  bullet No. 4.
6      A.   I'm sorry.  What was the
7  question?
8      Q.   Sure.  Sorry.  If you look at
9  the fourth bullet down, the first full
10 sentence there.  I'm wondering if you ever
11 reviewed recommendations by the director to
12 the panel for additional oversight of certain
13 pharmacies.
14     A.   If a recommendation was made by
15 the controlled substance director and I
16 attended that meeting, I would have heard
17 that recommendation.  I was not a voting
18 member, but I would have heard that
19 recommendation.
20     Q.   You did not review
21 Ms. Johnson's recommendations prior to
22 submission to the panel?
23     A.   Not that I can recall.
24     Q.   Would director's
25 recommendations regarding the need for

Page 280

1  additional oversight of a certain pharmacy be
2  brought to a vote at those meetings?
3      A.   If there was a recommendation,
4  there would be a vote.
5      Q.   And what is your understanding
6  of how a vote would be -- would be carried?
7  Would it be a simple majority or a super
8  majority of those voting members in
9  attendance?
10         MR. VARNADO:  Again, I'll just
11     object to the -- I let you get into it
12     a little bit, but the deliberations
13     and functioning of the panel, I object
14     on a privilege basis.
15     Q.   (BY MR. INNES)  Would you like
16 me to repeat the question?
17     A.   No.
18     Q.   Do you want to respond to my
19 question?
20     A.   On the advice of counsel, I
21 would say no.
22     Q.   I don't think that advice has
23 actually been given.
24         MR. VARNADO:  Well, I'll go
25     ahead and give it, then.

Page 281

1         I'm instructing you not to
2     respond concerning --
3         THE WITNESS:  I heard you say
4     that.  I'm sorry.
5         MR. VARNADO:  -- the
6     deliberative process of the panel, on
7     a privilege basis.
8      Q.   (BY MR. INNES)  How many voting
9  members are there on the panel?
10     A.   I would have to review the
11 document about the panel.
12     Q.   What document about the panel
13 do you need to review?
14     A.   There was a -- there's a --
15 there was a document that was created at the
16 time the panel was put together that listed
17 the voting members of the panel.
18     Q.   What else does that document
19 contain?
20     A.   It basically was the makeup of
21 the panel.
22     Q.   Does it articulate bylaws of
23 the panel?
24     A.   Not that I can recall.
25     Q.   Did it set forth a mission

Page 282

1  statement of the panel?
2      A.    Again, I would have to -- I'd
3  have to review that document.
4      Q.    How long is that document?  How
5  many pages?
6      A.    Again, I'd have to review.
7      Q.    Is it two or three pages or was
8  it the length of a telephone book?
9      A.    It would be a short document.
10     Q.    What sort of items are -- does
11 the panel vote on?
12         MR. VARNADO:  Same objection
13 that I made before.  On the
14 deliberative process of the controlled
15 substances advisory panel, I'm
16 instructing you not to answer on the
17 basis of privilege.
18     Q.    (BY MR. INNES) What's the
19 nature --
20         Sorry.  Are you abiding by your
21 counsel's instruction?
22     A.    Yes.
23     Q.    Can you articulate the
24 deliberative process engaged in by the
25 advisory panel?

Page 283

1         MR. VARNADO:  Same objection
2  and instruction.
3      Q.    (BY MR. INNES) Are you abiding
4  by your counsel's instruction?
5      A.    Yes.
6         MR. INNES:  I've only got one
7  more year of policies to get through,
8  and then I think we're sort of closing
9  down.  So let's take a break now and
10 maybe I can make one final push
11 through policies and procedures.
12         MR. VARNADO:  Okay.
13         MR. ELMER:  Sure.
14         THE VIDEOGRAPHER:  4:42.  We
15 are off video record.
16         (Recess taken, 4:42 p.m. to
17 4:59 p.m.)
18         THE VIDEOGRAPHER:  4:59.  We
19 are on the video record.
20         (Walmart-Chapman Deposition
21 Exhibit 5 was marked for
22 identification.)
23     Q.    (BY MR. INNES) Okay.
24 Mr. Chapman.  We are back.
25         You've been handed what's been

Page 284

1  marked as Exhibit 5, I believe.
2         This is an email chain.
3  Halfway down the page you'll see that this
4  was sent -- you sent an email from -- on
5  June 18th, 2014 to Miranda Johnson saying, "I
6  approve."
7         And that was in response to her
8  email of June 18, 2014 that said, "George,
9  here's the request for SOM for FYE16.  I
10 didn't make any adjustments to the risk
11 grading spreadsheet.  Please let me know if
12 you approve and I'll send it over to Marie
13 and Casey for submission this morning."
14         It attaches a document that was
15 produced in native.  We have attached that --
16 a printout of that to the email.
17         And I'd like to go through that
18 attachment with you.
19     A.    Okay.
20     Q.    The project name -- first of
21 all, what is this portfolio scoring sheet?
22     A.    This was a worksheet that was
23 used when projects were put through to make
24 enhancements or add a new project, it was
25 used to do the scoring to see how everything

Page 285

1  stacks up in the whole portfolio within the
2  whole compliance area of the projects.
3      Q.    And the project name for this
4  is "Suspicious order monitoring."
5         Do you see that at the top of
6  the first page of the attachment?
7      A.    Yes.
8      Q.    And again, the date of this
9  e-mail is June of '14.  June of '14, my
10 understanding from your prior testimony is
11 that the suspicious order monitoring was not
12 part of practice compliance at that point; is
13 that correct?
14     A.    That's correct.
15     Q.    I'm just going to walk through
16 this attachment, pretty much line by line.
17         The first section says
18 "Improved Program Effectiveness."
19         It says, "Improves Governance
20 Program Maturity and asks for -- it provides
21 a score of 3, which corresponds to "yes."  Is
22 that correct?
23     A.    Yes.
24     Q.    You'll see that it says next
25 line down, "Improves our business process for

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  governance," same score, 3, meaning yes.
2       The next line says, "Improves
3  our information usage for governance." A
4  score of 3, meaning yes.
5       Mr. Chapman, you didn't change
6  any of the scores on this score sheet that --
7  after Amanda -- after Miranda sent it to you,
8  did you?
9    A.   No.
10   Q.   And this document was
11 ultimately submitted to Casey and Maria?  Do
12 you see that at the top of the page, on the
13 first page ending in 47826?
14   A.   Yes.
15   Q.   Okay.  "Is this a new or an
16 emerging risk?"  It says "3, existing risk."
17      What do you recall the risk
18 that this particular project was looking to
19 solve for?
20      MR. VARNADO:  Object to the
21 form.
22      THE WITNESS:  This would be
23 part of the enhancements that we
24 wanted to make to the suspicious order
25 monitoring program, and this was

Page 287

1  actually a logistics project that ran
2  through our compliance area.
3       MR. INNES:  Right.  Yeah, I'll
4  move to strike that answer as
5  non-responsive.
6    Q.   (BY MR. INNES)  The question
7  is, what risk is this -- is the -- is this
8  particular project seeking to mitigate?
9       MR. VARNADO:  Object to form.
10      THE WITNESS:  Again, this would
11 be enhancements that we were wanting
12 to make to the suspicious order
13 monitoring, or logistics had asked to
14 be made to the actual systematic
15 reporting of the process.
16      MR. INNES:  Okay.  I'll also
17 move to strike that as nonresponsive.
18      I can do this an easier way.
19   Q.   (BY MR. INNES)  If you'd turn
20 to the last page of this document, there's a
21 chart here.  It says in the middle of the
22 page on the right-hand side, "Risk of not
23 doing project and dependencies.  List the
24 risks for not doing this effort."  And it
25 says, "Risks include potential DEA

Page 288

1  enforcement which can include fines,
2  penalties, license forfeiture as well as
3  failure to secure VAWD accreditation."
4       So that's the risk that this is
5  trying to solve for; isn't that correct?
6       MR. VARNADO:  Object to form.
7       THE WITNESS:  I'm sorry, was
8  that a question?
9    Q.   (BY MR. INNES)  That was a
10 question, yes.
11   A.   And what was that again,
12 please?
13   Q.   The risks that this SOM program
14 is seeking to mitigate are articulated on the
15 last page of this document as "Potential DEA
16 enforcement, which can include fines,
17 penalties and license forfeiture as well as
18 failure to secure VAWD accreditation."
19      Is that right?
20   A.   That is the risks they have
21 listed, yes.
22   Q.   Any other risks that would be
23 associated with not doing this project?
24   A.   They don't have anything else
25 listed.

Page 289

1    Q.   Okay.
2       MR. VARNADO:  Can I make just a
3  quick point that it looks like on the
4  attachments, the name of the
5  PowerPoint is FYU16 SOM-FY16MPR
6  summary.  I don't know that that's the
7  same as this last page that's stapled
8  to Exhibit 5.
9    Q.   (BY MR. INNES)  It's my
10 understanding that the last page of Exhibit 5
11 is part of the native Document 47828, which
12 is a consecutive Bates from 47827, the
13 attaching email.
14      MR. VARNADO:  Okay.  All right.
15 I think we're on the same page.
16      MR. INNES:  We're on the same
17 page?
18      MR. VARNADO:  Yeah.
19      MR. INNES:  Can we go off the
20 record for one second?
21      THE VIDEOGRAPHER:  Stand by.
22 5:06.  We are off the video record.
23      (Recess taken, 5:06 p.m. to
24 5:06 p.m.)
25      THE VIDEOGRAPHER:  5:06.  We

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 are on the video record.
2 Q. (BY MR. INNES) Okay.
3 Mr. Chapman, your testimony was that these
4 were the risks that they articulated, but in
5 fact, the risks they articulated are risks
6 that form the basis for this which you
7 approved of; right?
8 MR. VARNADO: Object to form.
9 THE WITNESS: It would have
10 been for the risks that are listed,
11 but there would be potential DEA
12 enforcement if a manual process was
13 not followed.
14 Q. (BY MR. INNES) So you agree
15 with the statement that these risks were
16 clear and present at the time of this
17 document?
18 MR. VARNADO: Object to form.
19 THE WITNESS: As the risks are
20 listed, yes.
21 Q. (BY MR. INNES) In fact, it was
22 an existing risk at the time of this
23 application; isn't that correct?
24 MR. VARNADO: Object to the
25 form.

Page 291

1 THE WITNESS: It was -- it was
2 an existing risk that we were trying
3 to make enhancements to.
4 I don't know that I understand
5 the question.
6 Q. (BY MR. INNES) And the
7 question on the first page of the attachment
8 halfway down, it says, "The risks being
9 mitigated today by manual, systematic, or a
10 combination of both today regardless if
11 optimal or not."
12 You approved of the entry of 5.
13 And 5 says "No. Emerging risk that has no
14 processes in place today."
15 So that meant no manual, no
16 systematic or no combination of both? Was
17 that an accurate statement at the time?
18 MR. VARNADO: Object to form.
19 THE WITNESS: This is adding
20 systematic enhancements to a process
21 that was already in place for
22 logistics.
23 So I don't know that I
24 understand.
25 Q. (BY MR. INNES) Well, we can go

Page 292

1 back again.
2 The risk, which you agreed to
3 just now.
4 A. Mm-hmm. (Witness nods.)
5 Q. It said, "Failure to do this
6 would include potential DEA enforcement which
7 can include fines, penalties and license
8 forfeiture as well as failure to secure VAWD
9 accreditation"; right?
10 And we go back to the first
11 page, and it says, "Is the risk being
12 mitigated today by manual, systematic or a
13 combination today regardless if optimal or
14 not?" And the response that you approved is
15 "No. Emerging risk has no processes in place
16 today."
17 A. The risk would still exist if
18 we didn't make additional -- if we didn't
19 make enhancements to our system that we had
20 in place. That doesn't take out the fact
21 that we had systems where we had manual
22 processes and systems in place for suspicious
23 order monitoring.
24 Q. Certain -- it's not about the
25 existence or nonexistence of the risk.

Page 293

1 You've already said the risk exists. This
2 question is asking whether or not that risk
3 is currently being mitigated by a manual or
4 systematic or combination of both, to which
5 you respond no, it is not.
6 MR. VARNADO: Object to the
7 form.
8 Q. (BY MR. INNES) Is that
9 accurate?
10 A. This is talking about the
11 specific project that health -- that
12 logistics was asking for. This is not
13 talking about the overall SOM process. This
14 was additional enhancements that were being
15 made to our current process that we had.
16 Q. I don't think that's what the
17 document says, sir. It's quite clear that
18 the risk is defined, which you've agreed to
19 on the last page. And when asked about that
20 risk, whether it was being mitigated, you say
21 no.
22 A. This project relates to Phase 1
23 and Phase 2 that we have covered today in
24 some of the previous documents. That's what
25 this portfolio scoring worksheet was all

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  about.
2      Q.    So is it your testimony that
3  this statement is inaccurate?  That there, in
4  fact, was being mitigated by a manual,
5  systematic, or combination, or both at that
6  point in time?
7      A.    The enhancements they wanted to
8  make to this project were not in place.
9      Q.    This -- it's your testimony
10  that this project relates to Phase 1, which
11  is the Reddwerks enhancements?
12      A.    I don't know that this was
13  related to Phase 1 or if it was the
14  combination of Phase 1 and Phase 2 as a total
15  project.
16      Q.    So again, explain to me how --
17  if that's the case, how the risk -- how the
18  statement that "The risk is not being
19  mitigated by a manual, systematic or
20  combination of both today" is accurate.
21      A.    This question is not talking
22  about our -- the SOM program that was in
23  place at the time.  It's talking about the
24  enhancements that we were wanting to make to
25  the SOM program.

Page 295

1      Q.    It says, "Specific goals of
2  this project are" -- and this is in the last
3  page of the attachment.  "One, to create a
4  stop at store level that would prevent a
5  store from ordering over a certain threshold
6  controlled substances.  And two, aggregate
7  vendor-controlled substance order data with
8  Walmart DC-controlled substance order data
9  for purposes of threshold alerts.  This
10  initiative will allow program enhancements to
11  help Walmart avoid DEA enforcement as a
12  result of non-compliance with 21 CFR
13  1301.74(b)."
14      A.    Mm-hmm.
15      Q.    That risk as defined here as a
16  project goal, and also as the risks of not
17  doing this effort --
18      A.    But this entire initiative
19  was --
20          MR. VARNADO:  Let him ask his
21  question.
22      Q.    (BY MR. INNES)  Feel free.
23      A.    The entire initiative was
24  around the program enhancements.  That's what
25  this is.

Page 296

1      Q.    Right.  And the program
2  enhancements were to mitigate the risk of DEA
3  enforcement.  Isn't that right?
4          MR. VARNADO:  Object to the
5  form.
6          THE WITNESS:  That was what was
7  listed as the risk of not doing this
8  project or enhancement to our current
9  program was -- could include potential
10  DEA enforcement.
11      Q.    (BY MR. INNES)  And you had no
12  process in place today to mitigate that,
13  whether manual, systematic, or a combination
14  of both?
15          MR. VARNADO:  Object to form.
16          THE WITNESS:  Are you asking if
17  we had no SOM process in place?
18      Q.    (BY MR. INNES)  No, these two
19  pieces of the goal.  There is no way to
20  create a stop at a store level to prevent a
21  store from ordering over a certain threshold.
22          That didn't exist at the time,
23  did it?
24      A.    That is a -- that would be a
25  new process at store level, not at warehouse

Page 297

1  level.
2      Q.    It didn't exist, did it?
3      A.    That process of creating a stop
4  at store level did not exist.
5      Q.    Okay.  And the aggregation of
6  vendor-controlled substance order data with
7  Walmart DC-controlled substance order data
8  for purposes of threshold alerts, that didn't
9  exist either, did it?
10      A.    Bringing in data from other
11  vendors into the total Walmart so we had a
12  complete picture of what other folks were
13  sending in, that did not exist.  That was
14  No. 2.
15      Q.    "There is a likelihood that the
16  events or conditions underlying the risks
17  will occur."  And those events or conditions
18  underlying the risks were fines, penalties,
19  loss of accreditation; isn't that correct?
20      A.    I'm sorry, where were you
21  reading this?
22      Q.    I'm on the middle of the first
23  page of the attachment.
24      A.    It was marked as likely.
25      Q.    And you agreed with that;

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 correct?
2     A.    I agreed that the project
3 needed to move forward.
4     Q.    Well, clearly you agreed that
5 the project needed to move forward because
6 you made the application.  Isn't that right?
7     A.    I'm sorry, say that again.
8     Q.    You made the application to
9 move the project forward, so that much is
10 clear.  That isn't asking --
11     A.    This was made by logistics.  We
12 didn't make this.
13     Q.    You approved it.
14     A.    I did approve it, because it
15 came through the overall compliance.  But
16 this was a logistics program.  This program
17 was still under logistics at the time.
18     Q.    Did you have the ability not to
19 approve it?
20     A.    No, I wouldn't not approve it.
21 I don't understand.
22     Q.    What was the purpose of
23 Ms. Johnson asking you whether or not you
24 agreed with it?
25        Strike that.

Page 299

1        What was the purpose of
2 Ms. Johnson asking for your -- forwarding
3 your approval on to Casey and Maria?
4        MR. VARNADO:  Object to form.
5        THE WITNESS:  It would have
6     been just the total overall projects
7     that we were working on.  So she sent
8     that to me.
9     Q.    (BY MR. INNES)  In order for
10 this project to move forward, it needed your
11 approval.  It's that simple, isn't it?
12     A.    I'm sorry, repeat that.
13     Q.    In order for this project to
14 move forward, it needed your approval; isn't
15 that right?
16        MR. VARNADO:  Object to form.
17        THE WITNESS:  I don't know that
18     that's -- I don't know that that would
19     be true.
20     Q.    (BY MR. INNES)  It could move
21 forward without your approval?
22     A.    It could move forward with
23 other people's approval, yes.
24     Q.    But they're asking for your
25 approval?

Page 300

1     A.    She is asking for my approval.
2     Q.    And you gave it?
3     A.    Absolutely.
4     Q.    You say "absolutely."  Why
5 absolutely?
6     A.    Because I would always -- on
7 this type of project, where we're making
8 enhancements to something that's as important
9 as around controlled substances, I would
10 approve that project.
11     Q.    Why are controlled substances
12 so important that you would approve anything?
13        MR. VARNADO:  Object to form.
14        THE WITNESS:  Because we take
15     our responsibility seriously.
16        And if we can enhance our
17     systems, processes, and controls
18     around any project, we would do that.
19     Q.    (BY MR. INNES)  And you don't
20 want to risk enforcement by the DEA; isn't
21 that right?
22        MR. VARNADO:  Object to form.
23        THE WITNESS:  We always want to
24     follow, and we do follow regulations.
25     Q.    (BY MR. INNES)  "For the

Page 301

1 potential financial reputational impact to
2 the company if the events or conditions
3 occur" -- and, again, that would be fines or
4 DEA enforcement, you wrote "Severe."
5        MR. VARNADO:  Object to form.
6     Q.    (BY MR. INNES)  Is that
7 accurate?
8     A.    I'll say that would be
9 accurate.
10     Q.    And you approved the statement
11 that it was severe?
12     A.    I'm sorry.
13     Q.    You approved the scoring of
14 "severe" for that particular question?
15     A.    I would have approved that it
16 would have been severe.
17     Q.    And you did approve that it
18 was -- it would have been severe?
19     A.    Mm-hmm.  (Witness nods.)
20     Q.    Why would it have been severe,
21 in your mind?
22     A.    I don't know the timing of
23 this, but there had already been several
24 actions that DEA had taken against different
25 companies.  So we knew that there could be

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  issues.
2      Q.   You feared you were up next?
3      A.   So we wanted to enhance our
4  system.
5      Q.   Why did you feel that these
6  enhancements were necessary to avoid an
7  action by the DEA?
8          MR. VARNADO:  Object to form.
9          THE WITNESS:  Anytime you are
10     trying to enhance, grow the maturity
11     of your program or a program, that you
12     want to continue to make enhancements
13     to that program.
14     Q.   (BY MR. INNES)  Well, DEA isn't
15  in the business of prosecuting companies that
16  are complying; is that right?
17         MR. VARNADO:  Object to form.
18         THE WITNESS:  The DEA would --
19     and I think has appreciated Walmart
20     for our continued compliance.
21     Q.   (BY MR. INNES)  If you were
22  not -- if you were compliant at the time of
23  this application, what's the need for this
24  application?
25         MR. VARNADO:  Object to form.

Page 303

1          THE WITNESS:  We would always
2      want to improve our programs.
3          Being compliant doesn't mean
4      you stop improving your programs.
5      Q.   (BY MR. INNES)  Well, no.
6  You're saying here, if we don't do this, the
7  risk is severe, and the basis for your
8  statement that the risk is severe were other
9  companies in -- similar companies had been
10  fined by the DEA.
11         MR. VARNADO:  Object to the
12     form.
13         THE WITNESS:  If you had a
14     manual process that's in place today,
15     and you have a failure of that manual
16     process, you would want to make sure
17     that you could do as much as you can
18     to improve your process so that you
19     take out the manual processes that
20     exist in making additional
21     enhancements.
22     Q.   (BY MR. INNES)  If Walmart was
23  compliant at the time of this application,
24  why select severe?
25         There's other options you could

Page 304

1  have chosen: minimal, significant, material.
2  I suppose you could select catastrophic.
3          MR. VARNADO:  Object to form.
4          THE WITNESS:  This was an
5      important program enhancement to be
6      made, and so logistics had selected at
7      this point that it was going to be
8      severe.
9      Q.   (BY MR. INNES)  And you agreed
10  with that?
11     A.   I did agree.
12     Q.   Let's turn to the next page of
13  the attachment.  The top is titled "Mandated
14  or executive decree.  What is the extent of
15  the legal or regulatory requirement?"  You
16  agreed with "3, national."
17         Is that correct?
18     A.   Yes.
19     Q.   The next line down says, "Is
20  the effort related to a settlement agreement
21  with a government agency, court order or
22  consent decree?"
23         You agreed with the statement,
24  "Yes."
25         So which agreement with a

Page 305

1  government agency, court order or consent
2  decree was this related to?
3          MR. VARNADO:  Object to form.
4          THE WITNESS:  To my knowledge,
5      it wasn't related to any, but it could
6      be.
7      Q.   (BY MR. INNES)  That's not the
8  question that's asked.  The question that's
9  asked is, is the effort related to a
10  settlement agreement with a government
11  agency, court order or consent decree.
12         It doesn't ask could it be
13  related to such an agreement with a
14  government agency, court order or consent
15  decree, does it?
16     A.   It would be my interpretation
17  that -- when this was filled out that this
18  could be a government agency or it could lead
19  to a court order or consent decree, not that
20  it currently was.
21     Q.   So you're taking that statement
22  to mean if this wasn't done, it could result
23  in a court order, consent decree, or perhaps
24  a settlement agreement following an
25  enforcement action with a regulatory body?

Page 306

1      MR. VARNADO: Object to form.
2      THE WITNESS: It -- this was a
3  form that was used by the -- it wasn't
4  specific for health and wellness and
5  for compliance. It was for all of
6  compliance. So it was not specific in
7  that -- in that regard.
8      Q.    (BY MR. INNES)  Why not just --
9  I mean, was there a -- at the time was there
10 a settlement agreement with a government
11 agency that precipitated the need for this
12 program?
13     A.    If there was a failure in your
14 SOM reporting process, it would -- it would
15 be related to a settlement agreement of some
16 kind.
17     Q.    Sir, when you submit documents
18 within Walmart, there's an expectation you're
19 going to be truthful and accurate in those
20 documents; isn't that right?
21     A.    Yes.
22     Q.    This question clearly asks, is
23 the effort related to a settlement agreement
24 with a government agency, court order or
25 consent decree. It doesn't ask if it could

Page 307

1  be.
2      So I'm asking, if this is a
3  truthful and accurate statement that you
4  agreed with, yes, it is related to a
5  settlement with a government agency, court
6  order or consent decree, I'd like you to
7  point me to which settlement agreement that
8  is, which court order that is, or which
9  consent decree that is. Can you do that?
10     A.    I cannot say that this goes to
11 a specific settlement agreement.
12     Q.    But yet in June of 2014, you
13 agreed with the statement that it did.
14     A.    I agreed with the project
15 needed to go forward to Casey and Maria.
16     Q.    I think that much we can agree
17 on, because you said that you agreed -- you
18 approved with this application.
19     I'm asking about the details
20 that went into that application. And
21 specifically, is the effort related to a
22 settlement agreement with a government
23 agency, court order or consent decree?
24     Was that an accurate response
25 that you agreed with?

Page 308

1      MR. VARNADO:  Object to form.
2      THE WITNESS:  I agreed with the
3  response that's on this form.
4      MR. INNES:  Okay. So now I'll
5  ask my question again.
6      Q.    (BY MR. INNES)  What settlement
7  agreement with the government agency is this
8  related to?
9      A.    And to my knowledge, this is
10 not related to any, but the possibility that
11 it could be.
12     Q.    Is it related to a court order?
13     A.    It would be the same response,
14 that it was not related to -- to my knowledge
15 it's not related to any specific court order,
16 government agency or a consent decree, but it
17 could be.
18     Q.    And I'll go past the next cell
19 and take you to the -- "Is this effort
20 board-directed or informed?  Must provide
21 executive or board directive."  It says board
22 directive. I'm sorry, it says
23 "Board-informed."  You agreed with that
24 statement?
25     A.    Yes.

Page 309

1      Q.    How did you know that it was
2  board-informed?
3      A.    I would think a project of this
4  sided would be board-informed.
5      Q.    Are projects of this size often
6  approved by -- often required the board to be
7  informed?
8      MR. VARNADO:  Object to the
9  form.
10     THE WITNESS:  The board may be
11 aware of this, and so it would be
12 board-informed.
13     Q.    (BY MR. INNES)  Did you know
14 that the board was informed at the time that
15 you agreed with that statement?
16     A.    Not -- not to my knowledge.
17     Q.    So you agreed with this
18 statement without knowing whether or not it
19 was accurate?
20     MR. VARNADO:  I object to the
21 form.
22     THE WITNESS:  I agreed that we
23 had enhancements that we needed to
24 continue to make to our SOM process in
25 partnership with logistics.

Page 310

1    Q.   (BY MR. INNES) Again, I thank
2  you for that testimony. I'm asking you,
3  though, about this particular piece of
4  information in this particular application.
5         What was the basis for your
6  agreement that the board was informed of this
7  project?
8    A.   And for the logistics associate
9  that filled out this form, they would have
10 knowledge of the board being informed, that
11 the board was directly informed.
12   Q.   Did you speak --
13   A.   I did not fill out this form.
14   Q.   But you agreed with the
15 contents of the form, did you not?
16   A.   I agreed that this project
17 should move forward in support of our
18 logistics department and our SOM process
19 improvements.
20   Q.   Did you speak with the
21 logistics associate who filled out this form?
22   A.   I did not.
23   Q.   Do you know who the logistics
24 associate is who filled out this form?
25   A.   I do not know.

Page 311

1    Q.   Did you know at the time?
2    A.   I don't know who filled this
3  form out.
4    Q.   Is it possible that you knew --
5  at the time that you received this email that
6  you knew who the person was?
7         MR. VARNADO: Object to the
8    form.
9         THE WITNESS: No, I do not
10   know.
11   Q.   (BY MR. INNES) I understand
12 your testimony is you do not know now. I'm
13 wondering if you knew at the time that you
14 received this email.
15        MR. VARNADO: Object to the
16   form.
17        THE WITNESS: No. No, I do not
18   know.
19   Q.   (BY MR. INNES) Did you know?
20   A.   I did not know and I do not
21 know who filled out this form.
22   Q.   Take you to the last page of
23 this document. It says "Security."
24        "Is the effort designed to
25 mitigate physical security risks?" You

Page 312

1  agreed with the response, "Yes." What
2  particular physical security risks are you
3  agreeing that this project would mitigate?
4    A.   It would be related to the SOM
5  process and having additional product in
6  stores that did not belong there.
7    Q.   How would these particular --
8  how would this particular effort -- strike
9  that.
10        What's the risk of having
11 additional product in stores that didn't
12 belong there?
13   A.   Repeat that?
14   Q.   What's the risk associated with
15 having additional product in stores that
16 didn't belong there?
17   A.   Well, you could have in-store
18 diversion. You could have a robbery.
19   Q.   I'll take you to the next
20 question. "Is the effort designed to
21 mitigate health or safety risks?"
22        You agreed with the response,
23 "Yes."
24   A.   Yes.
25   Q.   Which particular health risks

Page 313

1  did this project seek to mitigate?
2    A.   My interpretation of this would
3  be, again, having additional product in
4  stores if it was -- if it was stolen or a
5  robbery took place, that would be a safety
6  risk.
7    Q.   How does additional product get
8  to a store that doesn't need to be in a
9  store?
10        MR. VARNADO: Object to form.
11        THE WITNESS: If you had a
12   suspicious order or an order of
13   interest that went to a store and it
14   should have been stopped, if that were
15   to happen because you didn't make
16   system enhancements and relied on a
17   manual process, that would not be
18   good.
19   Q.   (BY MR. INNES) This was a --
20 were these items designed to identify orders
21 of interest?
22        MR. VARNADO: Object to the
23   form.
24        THE WITNESS: This project was
25   listed in the purpose of No. 1 and

Page 314

1    No. 2.
2    Q.   (BY MR. INNES) So I'm just --
3  you know, I think it's important, I think, to
4  clarify or clean up the answer you gave to
5  the last question. "As I understand
6  Walmart's suspicious order monitoring
7  system."
8        You stated that if you had a
9  suspicious order or an order of interest that
10 went to a store and it should have stopped,
11 if that were to happen because you didn't
12 make the system enhancements and relied on a
13 manual process, that would not be good.
14       How, at that time, could an
15 order of interest or a suspicious order make
16 it to a store?
17       MR. VARNADO: Object to form.
18       THE WITNESS: This was trying
19    to be proactive with their first
20    request from logistics to create a
21    stop at store level before anyone
22    manually or through the system that
23    was in place, to identify an order
24    that might become an order of interest
25    or then become a suspicious order.

Page 315

1    Q.   (BY MR. INNES) Okay. I'm
2  not -- I'm honestly not trying to play "got
3  ya." I'm just trying to square up my
4  understanding of the review process at the
5  time with your testimony now.
6        The way I understand it is an
7  order comes in from a pharmacy. It can be
8  filled, or it's flagged as an order of
9  interest. If it's flagged as an order of
10 interest, it's held until that due diligence
11 process is clear. Is that right?
12   A.   Correct.
13   Q.   Okay.
14       And if the due diligence
15 process does not clear it, it's classified as
16 a suspicious order and reported to the DEA;
17 correct?
18       MR. VARNADO: Object to the
19    form.
20   Q.   (BY MR. INNES) Is that
21 correct?
22   A.   That the order would be held
23 and investigated as an order of interest.
24 That an order would be held and investigated
25 as an order of interest. And then if it was

Page 316

1  determined that that was a suspicious order,
2  then that order would not be sent.
3    Q.   So the only way that an order
4  has been classified as an order of interest,
5  or an order that's been classified as a
6  suspicious order could make it to a store
7  would be if that order was not held. Isn't
8  that right?
9    A.   Repeat that?
10   Q.   So the only -- so once an order
11 of interest is identified by Walmart, it's
12 held. Isn't that right?
13   A.   Yes.
14   Q.   And if it's classified as a
15 suspicious order, it's actually never
16 shipped; is that right?
17   A.   Correct.
18   Q.   So the only way for an order of
19 interest, as such, and a suspicious order, as
20 such, to make it to a Walmart pharmacy would
21 be if the duty to hold that order wasn't
22 followed. Isn't that right?
23       MR. VARNADO: Object to form.
24       THE WITNESS: Well, it's also
25    the second part of that project

Page 317

1    enhancements was to aggregate
2    secondary supplier information into
3    the Walmart DC who was following their
4    SOM obligations so that we had total
5    visibility of what was being ordered
6    by a particular location.
7    Q.   (BY MR. INNES) Okay. We can
8  get into that in a second, but I don't think
9  that answers my question. I'll try to -- as
10 best I can, to make it clear.
11       Is it more accurate to say that
12 an order that otherwise should have been
13 categorized as an order of interest, but
14 wasn't because it wasn't captured by the
15 current -- by the system that was in place,
16 that's bad. Right?
17       MR. VARNADO: Object to the
18    form.
19       THE WITNESS: An order of
20    interest would be reviewed --
21       MR. INNES: Right.
22       THE WITNESS: -- before it's
23    shipped.
24       MR. INNES: Right.
25   Q.   (BY MR. INNES) And can that

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1   order of interest make it to the store shelf
2   before the end of a due diligence?
3       A.   No.  It would be reviewed
4   before it was shipped.
5       Q.   So the only way for an order of
6   interest, as such, to make it to a shelf
7   would be if Walmart failed to hold that order
8   of interest until the due diligence was
9   completed?
10      MR. VARNADO:  Object to form.
11      THE WITNESS:  It would be
12  cleared before it was shipped.  So it
13  would not be considered an order of
14  interest anymore.  It would be
15  considered an appropriate order.
16      Q.   (BY MR. INNES) I'm talking
17  about the time before it gets cleared.
18      A.   It wouldn't be shipped.
19      Q.   "Is the effort designed to
20  mitigate fraudulent activities?"
21      You agree with the response of
22  "Yes."
23      What fraudulent activities did
24  this project seek to mitigate specifically?
25      A.   It would be if you had a

Page 319

1   pharmacist or a technician actually either in
2   step 1 or step 2 that was listed here, that
3   they were placing orders that did not need to
4   go to the store, stopping those from
5   happening before the order could even be
6   transmitted or understanding what was coming
7   from the vendor who was meeting their
8   obligation under SOM and what Walmart was
9   doing under their obligation to SOM.
10      Q.   And without these projects --
11  without this project in place, the risk of
12  that happening was likely; isn't that right?
13      MR. VARNADO:  Object to form.
14      THE WITNESS:  We were meeting
15  our obligation under SOM.  These were
16  enhancements to the current system.
17      Q.   (BY MR. INNES) But you said,
18  in response to what's the likelihood the
19  events or conditions underlying the risk will
20  occur, you said -- agree with the statement
21  that was likely.
22      A.   I don't know -- what page are
23  you referencing.
24      Q.   I'm on the first page of the
25  portfolio scoring worksheet.  And I am about

Page 320

1   halfway down the page.
2       A.   It was listed as "Likely."
3       Q.   (BY MR. INNES) Mr. Chapman, I
4   don't know if you are aware or not, but
5   Walmart has produced your performance
6   evaluation forms in this case.
7       And I have a copy here.
8       In fiscal year 2014, you
9   attended and represented Walmart at the NACDS
10  policy council?  Do you recall doing that?
11      A.   Yes.
12      Q.   And what did your attendance
13  and representation entail?
14      A.   This is 2014?
15      Q.   Yes, sir.
16      A.   I attended, along with another
17  member of Walmart, to be there as a
18  representative for Walmart in discussing in
19  the policy council meeting several different
20  projects or current events of federal
21  legislation, state legislation, billing.  It
22  could be technician training.  It could be
23  technician ratios.  It could be pharmacist
24  ratios.
25      Items that would deal with the

Page 321

1   practice of the pharmacy.
2       Q.   How, if at all, did that
3   meeting involve opioids?
4       MR. VARNADO:  Object to the
5   form.
6       THE WITNESS:  Throughout some
7   of the NACDS meetings I'm sure there
8   would be discussions around DEA,
9   opioids, controlled substances,
10  changes in laws at state level,
11  reclassification of hydrocodone from
12  a -- to a Schedule II, and when those
13  things were going to happen.
14      Q.   (BY MR. INNES) And did you
15  participate in those discussions?
16      A.   I would have participated in
17  many of those discussions.
18      Q.   Do you recall those
19  discussions?
20      A.   Participated in meetings.
21  Mm-hmm.
22      Q.   Do you recall your
23  participation in those meetings?
24      A.   I recall attending the
25  meetings.

Q. Well, you just said you participated in the meetings. I'd like to know, you know, what the level of your participation was.
A. Just having general discussions within the group around if it was billing, if it was Medicaid, if it was technician training.
Q. I want to focus you on discussions that you had, if any, at those meetings, at that meeting, involving opioids.
MR. VARNADO: Object to the form.
THE WITNESS: I can't remember exact discussions on opioids at the -- I mean, we would have many discussions around many different topics.
Q. (BY MR. INNES) Regarding opioids?
A. Regarding many different things within pharmacy, not just opioids. It would be total controlled substance programs. It would be several things. Not just opioids.
Q. I get it. Sir, I'm really trying to focus you just on opioids. I can't

be more clear than that. I want to know your involvement with the NACDS and discussions you had regarding opioids.
A. In 2014 there was probably very little discussion about opioids.
Q. How about in 2015?
A. I would have to look at the agendas to tell you for sure.
Q. Did you take notes when you attended these meetings?
A. I did take notes.
Q. Did you maintain copies of those notes to that?
A. It would be within the Outlook system.
Q. In your emails?
A. Yes.
Q. You said that someone else -- you attended these meetings along with someone else from Walmart. Who was that person?
MR. VARNADO: Object to form.
THE WITNESS: That would be Susanne Hiland.
Q. (BY MR. INNES) And did you and

Ms. Hiland attend -- strike that.
Were there breakout sessions about these meetings?
A. At the policy council meetings, there typically were not breakout sessions. It was one meeting.
Q. And how many attendees other than you and Ms. Hiland?
A. I can't answer to the exact number, but it was a good representation from across the retail industry.
Q. Did you or Ms. Hiland make presentations at these meetings?
A. No.
Q. Did you or Ms. Hiland moderate any panels at these meetings?
A. Susanne -- repeat that question?
Q. Did you or Ms. Hiland moderate any panels at the meetings?
A. We didn't moderate panels, but at one time Susanne was the policy council chair for the NACDS policy council meetings, and she chaired the meeting and followed through the agenda.

Q. Does the NA --
I'm sorry.
A. Go ahead.
Q. Does the NACDS maintain minutes of those meetings?
A. I don't know. I would think so.
Q. What causes you to think so?
A. Well, they would send a recap out.
Q. Was that recap sent to your Outlook account here at Walmart?
A. My email.
Q. Did you receive any other materials while -- from the NACDS meetings?
A. From the meetings we would receive the recap, and you may have a presentation around some subject that was presented.
Q. Do you recall any presentations regarding opioids?
A. There may have been presentations around current enforcement activity that was hitting the news.
Q. Were there presentations around

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  current enforcement activity?
2      A.    I can't say specifically, but I
3  would think that they would be talk -- there
4  would be some conversations around the
5  current activity around the enforcement.
6      Q.    In fiscal year 2014, you
7  attended, represented Walmart as a member of
8  the NACDS controlled substance report group.
9  Was Ms. Hiland also a member of the
10 controlled substance report group?
11     A.    Yes.
12     Q.    And what was the mission of the
13 NACDS controlled substance report group?
14     A.    To learn how we could make
15 additional advancements to our current
16 programs that we had with controlled
17 substances.
18     Q.    What did you learn at those
19 meetings regarding additional advancements to
20 the current programs?
21     A.    I can't specifically say one of
22 the things I learned, but it would have been
23 a place where we would have learned about
24 industry, Buzzeo, IQVIA, those type of
25 industry resources.

Page 327

1      Q.    And who did you learn that
2  from, exactly?
3      A.    I can't specifically say.
4      Q.    Other members of the NACDS?
5      A.    It would have been -- it would
6  have been other members of NACDS.
7      Q.    Did NACDS invite vendors to
8  attend these meetings?
9      A.    I can't -- I can't recall a
10 vendor coming to present around opioids or
11 controlled substances.
12     Q.    At any point in time, did the
13 information that you learned at an NACDS
14 event or through your work with the NACDS,
15 was that implemented as part of Walmart's
16 SOMs?
17         MR. VARNADO:  Object to form.
18         THE WITNESS:  Not specifically
19     that I can recall.
20     Q.    (BY MR. INNES)  Generally?
21     A.    No.  I mean, I can't speak to
22 everything that was covered at the meetings,
23 so I -- you know, it's general knowledge and
24 input.
25     Q.    But if we had copies of the

Page 328

1  emails that you received following those
2  meetings, we'd have a better idea of exactly
3  what happened at those meetings; is that
4  right?
5         MR. VARNADO:  Object to form.
6         THE WITNESS:  What was the
7     question?
8      Q.    (BY MR. INNES)  If we had
9  copies of the emails that you received
10 following those meetings, we'd have a better
11 idea of exactly what happened at those
12 meetings; is that right?
13     A.    Those recaps would have been
14 emailed to me, especially from the policy
15 council.
16     Q.    Did you ever delete those
17 emails?
18     A.    I don't delete.
19     Q.    So those emails should be
20 maintained in your Outlook currently?
21     A.    That would be -- yes.  That
22 would be from a policy, and so I don't have
23 any recollection of receiving something
24 specifically from the -- this controlled
25 substance work group.

Page 329

1      Q.    So theoretically we could walk
2  back to your office right now and pull up
3  those emails?
4         MR. VARNADO:  Object to form.
5         THE WITNESS:  It would be
6     within the email system, if I received
7     it.
8      Q.    (BY MR. INNES)  Have you been
9  asked to collect or otherwise produce those
10 to counsel in this case?
11     A.    I don't know that I've been
12 specifically asked to produce that.
13     Q.    Have you been asked by counsel
14 to produce anything?
15     A.    I know that --
16         MR. VARNADO:  Object to the --
17     any conversations you had with counsel
18     as being privileged and instruct you
19     not to answer about any privileged
20     conversations.
21     Q.    (BY MR. INNES)  Were you
22 interviewed by counsel at any point regarding
23 this case?
24         MR. VARNADO:  Objection, asked
25     and answered.

Page 330

1    THE WITNESS:  I'm sorry, what
2  was that?
3    MR. INNES:  You can answer the
4  question.
5    THE WITNESS:  Yes.
6    Q.    (BY MR. INNES)  Outside of the
7  three meetings we discussed this morning,
8  have you been interviewed by counsel
9  regarding this case?
10   A.    Say that again?
11   Q.    Outside of the three meetings
12 that we discussed this morning, have you
13 spoken to counsel regarding this case?
14   A.    No.  Not regarding this case.
15   Q.    No one's asked you to collect
16 documents?
17   A.    No, I didn't collect documents.
18   Q.    But no one at Walmart asked you
19 to collect documents in connection with this
20 case?
21   A.    No.
22   Q.    You make reference in your
23 annual performance evaluation in 2014 to the
24 diversion analytics work group.
25   Are you familiar with that?

Page 331

1    A.    Yes.
2    Q.    And is diversion analytics work
3  group part of NACDS or is that part of some
4  other organization?
5    A.    Diversion analytics work group
6  was led by our global asset protection team,
7  to work on a tool.
8    Q.    What tool was that?
9    A.    It was called the DAT tool,
10 diversion analytics tool.
11   Q.    Was that DAT developed?
12   A.    It was a long process to try to
13 develop that tool that eventually was not
14 completed.
15   Q.    Why was that -- why was the DAT
16 tool not completed?
17   A.    The -- it was a project by
18 global asset protection that they could not
19 get it to work the way that they wanted it to
20 work, so I don't know what the specifics are
21 and why they couldn't complete it.
22   Q.    How did they want it to work
23 specifically?
24   A.    It was a tool that was designed
25 to look for diversion within our pharmacies

Page 332

1  for pharmacist/technician diversion.
2    Q.    And who specifically worked on
3  that data analytics work group with you?
4    MR. VARNADO:  Object to the
5  form.
6    THE WITNESS:  It was led by
7  the -- again, it was led by the global
8  asset development team, and we were
9  participants in that.
10   Q.    (BY MR. INNES)  And who were
11 the members of the global asset development
12 team that were participants in that?
13   A.    Greg Beam I believe in
14 charge of that group.
15   Q.    And did Greg Beam lead the data
16 analytics work group for the development of
17 the DAT?
18   A.    His area had responsibility for
19 the development of the group.  Not as part of
20 asset protection.  It was one of their
21 projects.
22   Q.    Who else from asset protection
23 was part of that group?
24   A.    I don't know who else was
25 involved at the time.

Page 333

1    Q.    Was anyone outside of global
2  asset protection involved in the group,
3  besides yourself?
4    A.    Miranda Johnson would have been
5  involved.  Legal would have been involved.
6  Jim Langman would have been involved.
7    Q.    Anyone else?
8    A.    I'm sorry, what was that?
9    Q.    Was there anyone else that you
10 wanted to add?
11   A.    Not that I can recall.
12   Q.    Fiscal year of '15, you state
13 that "Much work and efforts were placed
14 around the controlled substance risk
15 assessment."
16   What exactly was the controlled
17 substance risk assessment?
18   MR. VARNADO:  Counsel, when you
19 say that "You state that much work and
20 effort," are you reading from a
21 document?
22   MR. INNES:  Yeah.  I'm reading
23 from his -- what do you call it?  The
24 performance evaluation.
25   MR. VARNADO:  Okay.  That's

Page 334

1 something he stated?
2         MR. INNES:  Yeah.
3         MR. VARNADO:  Do you have a
4 copy you can share with him?
5         MR. INNES:  I can rephrase the
6 question if you'd like.
7     Q.    (BY MR. INNES)  In fiscal year
8 15, did you place much work and effort in and
9 around the controlled substance risk
10 assessment?
11         MR. VARNADO:  Let me just
12     object to the extent that this
13     question calls for privileged
14     discussions surrounding that
15     particular effort that was done at the
16     direction of counsel.
17         And direct you not to reveal
18     any of those communications.
19     Q.    (BY MR. INNES)  I don't believe
20 he's asked you to not answer my question.
21 Is that right?
22         MR. VARNADO:  Rephrase the
23     question, and let's see if he can
24     answer it without revealing any
25     privileged communications or

Page 335

1     deliberations in connection with that
2     effort.
3     Q.    (BY MR. INNES)  What is the
4 controlled substance risk assessment?
5     A.    The controlled substance risk
6 assessment would be looking at our total
7 portfolio of projects and processes and POMs,
8 procedures, policies that deal with any
9 Connexus enhancements that we would have for
10 our total controlled substance program.
11         The work being referenced there
12 was when we had the addition of Miranda to
13 the team as a director of controlled
14 substance.
15     Q.    And the controlled risk
16 assessment, was that an ultimate -- was there
17 a work product produced from that controlled
18 risk assessment?
19         MR. VARNADO:  Object to the
20     form.
21         THE WITNESS:  It's a risk
22     assessment.  I don't -- if that's what
23     you're saying, so ...
24         A work product.
25         MR. INNES:  Yeah, inartfully

Page 336

1 asking whether or not it's an actual
2 document.
3         THE WITNESS:  To my knowledge,
4     it's an actual document.
5     Q.    (BY MR. INNES)  And what were
6 the conclusions of that controlled risk
7 assessment --
8         MR. VARNADO:  And again, I'll
9     just object to the extent that calls
10     for privileged communications or
11     writings in connection with that
12     project, and instruct you not to
13     answer about the writing if that's the
14     case.
15         MR. INNES:  What's the basis
16     for that instruction?
17         MR. VARNADO:  That if it's a --
18     work undertaken at the direction of
19     counsel, that any conclusions thereto
20     would be privileged.
21     Q.    (BY MR. INNES)  Did the
22 controlled risk assessment involve an
23 analysis of Walmart's SOMs?
24     A.    It would not have been part of
25 our responsibility.  That would have been the

Page 337

1 end of 2014 going into 2015.
2     Q.    Earlier you testified about the
3 controlled substance risk assessment, "We
4 were looking at our total portfolio of
5 projects and processes and POMs, procedures,
6 policies that deal with any key" -- I think
7 it's any Connexus "enhancements that we have
8 for our total controlled substance program.
9 The work being referenced there was when we
10 had the addition of Miranda to the team as
11 director of controlled substances."
12         So when Miranda is the director
13 of controlled substances, is she not the one
14 charged with SOMs at that point?
15     A.    No.  This would have been
16 fiscal year ending 2015, I believe is what
17 you said, on the evaluation.  Our fiscal year
18 ends January 31st, for the previous year.
19     Q.    We can take it outside of that,
20 because your testimony is that this was work
21 that you did work with Miranda Johnson with
22 respect to the controlled substance risk
23 assessment when she was added to the team as
24 the director of controlled substances.
25     A.    Yes.

Page 338

1 Q. So the director of controlled
2 substances was charged with maintaining
3 Walmart's SOMs; isn't that correct?
4 A. No, she did not have
5 responsibility for the SOM. We did not have
6 responsibility when this was done.
7 Q. And when was this done?
8 A. The assessment would have been
9 done sometime in 2014.
10 Q. When was the assessment
11 finalized?
12 A. I don't know the exact date.
13 Q. So what was the extent of your
14 involvement in that assessment?
15 A. I would have been involved in
16 the discussion around where different
17 elements of the program were, what
18 enhancements I thought needed to be made. It
19 would have been general conversation in that
20 assessment.
21 Q. Let's unpack that a little bit.
22 What discussions were there
23 regarding the elements of the program?
24 MR. VARNADO: And again, I'd
25 just instruct you not to answer about

Page 339

1 any discussions you would have had
2 with counsel in connection with that
3 effort.
4 MR. INNES: I'll rephrase the
5 question.
6 Q. (BY MR. INNES) You testified
7 that you had discussions around the
8 enhancements that you thought needed to be
9 made. What enhancements did you think needed
10 to be made at the time of that risk
11 assessment?
12 A. I can't specifically remember
13 all or any of the enhancements I would have
14 recommended.
15 Q. So your testimony was that you
16 would have been involved in the discussions
17 regarding what enhancements you thought
18 needed to be made. How -- what's the basis
19 for your statement that you had such
20 conversations?
21 MR. VARNADO: And again, to the
22 extent you -- it's not based on
23 privileged communications, you can
24 answer the question.
25 THE WITNESS: It would be a

Page 340

1 normal process just to look at all the
2 different elements within the
3 controlled substance program. With a
4 new director of controlled substances
5 in place, we would want to do an
6 assessment and have -- you know, hear
7 the things that can be enhanced.
8 Q. (BY MR. INNES) Did that
9 process look at the current SOM program at
10 that time?
11 A. We did not have responsibility
12 for SOMs, so I don't know that that would
13 have been part of the discussion.
14 MR. VARNADO: How much time do
15 we have left?
16 THE VIDEOGRAPHER: 18.
17 MR. VARNADO: Thank you.
18 MR. INNES: Why don't we take
19 five, and I'll run through my notes
20 just to make sure I haven't missed
21 anything.
22 Go off the record.
23 THE VIDEOGRAPHER: 6:02. We
24 are off the video record.
25 (Recess taken, 6:02 p.m. to

Page 341

1 6:28 p.m.)
2 THE VIDEOGRAPHER: 6:28. We
3 are on the video record.
4 Q. (BY MR. INNES) Okay.
5 Mr. Chapman, isn't it true that following the
6 efforts you put into the controlled substance
7 risk assessment, you were able to put in
8 place a director of controlled substances?
9 Isn't that right?
10 A. I don't know the timeframe we
11 completed the controlled substance risk
12 assessment that year. It would have been
13 completed that year.
14 Q. And as a result of that -- part
15 of that risk assessment, you were able to
16 create other positions in addition to the
17 director of controlled substances; isn't that
18 right?
19 For example, you created an
20 analyst position for controlled substances in
21 fiscal year '16; is that right?
22 MR. VARNADO: Object to the
23 form.
24 THE WITNESS: That was when?
25 Q. (BY MR. INNES) In fiscal year

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  '16?
2      A.    Yes.
3      Q.    And you created a -- you
4  performed audit thresholds and benchmarks for
5  internal and external data monitoring; is
6  that right?
7      A.    We would have hired
8  positions -- as we continued to enhance our
9  total controlled substance program, we would
10  have added additional resources.
11      Q.    And out of that controlled risk
12  assessment, which was in fiscal year '15,
13  that coincided with the application that we
14  talked about earlier, which I believe was
15  Exhibit 5, if I'm not mistaken; is that
16  right?
17          MR. VARNADO:  Object to the
18      form.
19          THE WITNESS:  I'm sorry, can
20      you repeat that?
21          MR. INNES:  Sure.
22      Q.    (BY MR. INNES)  The controlled
23  substance risk assessment was contemporaneous
24  with the application made in Exhibit 5 for
25  enhancements to the Reddwerks system; isn't

Page 343

1  that right?
2          MR. VARNADO:  Object to form.
3          THE WITNESS:  The controlled
4      substance risk assessment was around
5      their total controlled substance
6      program.  This product that you're
7      referencing in Exhibit 5 is the
8      logistics program for making
9      enhancements to the suspicious order
10      monitoring program.
11      Q.    (BY MR. INNES)  Yeah, I think
12  the testimony was clear as to what these
13  things are.  I'm just making a point that
14  they're contemporaneous.
15          Do you agree with that?
16      A.    And "contemporaneous" meaning?
17      Q.    Meaning they're done in and
18  around the same time.
19      A.    I don't know that.  I don't
20  know when the risk assessment was completed.
21      Q.    Well, you did work with the
22  controlled substance risk assessment in
23  fiscal year '15; isn't that right?
24      A.    It's fiscal year ending '15 --
25      Q.    Correct?

Page 344

1      A.    -- which would have ended 2014.
2      Q.    And in 2014, which is the date
3  of Exhibit 5, is June 2014.
4      A.    That was for this project.
5      Q.    That was for this project;
6  correct?
7      A.    Yes.
8      Q.    So, in fact, you did a lot of
9  work with the controlled substance risk
10  assessment; isn't that right?
11          MR. VARNADO:  Object to the
12      form.
13          THE WITNESS:  I don't -- a risk
14      assessment is something that we do
15      every so many years.  I don't know
16      when we did the risk assessment this
17      particular year around controlled
18      substances.
19      Q.    (BY MR. INNES)  But you did do
20  it; isn't that right?
21      A.    We did a risk assessment in
22  2014.
23      Q.    And out of that risk
24  assessment, there is an application to
25  enhance -- contemporaneous with that risk

Page 345

1  assessment, there is an application to
2  enhance the system you had in place; isn't
3  that right?
4          MR. VARNADO:  Object to form.
5          THE WITNESS:  This is a project
6      from logistics.  I have no reason to
7      believe that this was part of the risk
8      assessment.
9      Q.    (BY MR. INNES)  It doesn't have
10  to be part of the risk assessment.  My point
11  is that it's contemporaneous.  Isn't that
12  right?
13      A.    I don't know that it occurred
14  at the same time.
15      Q.    They happened in the same year,
16  did they not?  2014?
17          Your work on the controlled
18  substance risk assessment and also your
19  approval of the portfolio scoring worksheet
20  for the enhancements to Reddwerks, would you
21  agree with me that those were both in 2014?
22      A.    This project was submitted
23  sometime -- it looks to be around June of
24  2014.  I do not know when we did the risk
25  assessment for controlled substances.

Page 346

1  Q.   In fact, the risk assessment
2 itself showed problems with Walmart's SOM;
3 isn't that right?
4       MR. VARNADO:  Object to the
5 form.
6       THE WITNESS:  I don't know that
7 SOM was any part of the controlled
8 substance risk assessment.
9  Q.   (BY MR. INNES)  That same year
10 you created the director of controlled
11 substances role; isn't that right?
12 A.   Of 2014.
13 Q.   Correct.
14 A.   Was when the position was
15 created.
16 Q.   Correct.  So you added staff to
17 the Controlled Substance Monitoring Program;
18 correct?
19      MR. VARNADO:  Object to the
20 form.
21      THE WITNESS:  We added a
22 director for controlled substances to
23 address our controlled substance
24 programs within practice compliance,
25 PMP reporting, PSE, numerous projects,

Page 347

1 and policies that we would have.
2  Q.   (BY MR. INNES)  And the end of
3 '14 and beginning of '15 is when compliance
4 took the reins on SOMs; isn't that right?
5 A.   We transitioned from logistics
6 owning the SOM reporting process to practice
7 compliance in 2015.
8  Q.   So in 2014, you yourself
9 acknowledge the risks that were associated
10 without doing the project articulated in
11 Exhibit 5?
12      MR. VARNADO:  Object to the
13 form.
14 Q.   (BY MR. INNES)  You add staff
15 directed to the suspicious order monitoring
16 program.  And this all comes in the same year
17 that you're doing controlled substance risk
18 assessments; isn't that right?
19 A.   This was completed in June of
20 '14.  I approved the approval of this project
21 from logistics for the enhancements they
22 wanted to make to their suspicious order
23 monitoring program.
24 Q.   Is it your testimony that all
25 these three things, four things, are

Page 348

1 unrelated?
2       MR. VARNADO:  Object to the
3 form.
4       THE WITNESS:  I can't speak to
5 that.
6  Q.   (BY MR. INNES)  Don't they show
7 the common denominator, that they're aimed at
8 mitigating the risk of diversion of opioids?
9       MR. VARNADO:  Object to form.
10      THE WITNESS:  The risk
11 assessment was around our total
12 controlled substance program.
13 Q.   (BY MR. INNES)  And your
14 controlled substance program incorporated the
15 distribution or dispensing or handling of
16 Schedule II opioids; isn't that right?
17 A.   It did not in 2014.
18 Q.   Practice compliance had no
19 responsibility over opioids in 2014?
20      MR. VARNADO:  Object to the
21 form.
22      THE WITNESS:  We reported to
23 the DEA on 106s if we had pharmacists,
24 technicians, fraudulent prescriptions,
25 losses of controlled substances in

Page 349

1 transit to our facility.
2  Q.   (BY MR. INNES)  So in 2014,
3 fiscal year '15, you were performing a
4 controlled substance risk assessment, an
5 application is made to the -- to enhance the
6 SOM program, a director of controlled
7 substances is added.  Work begins on looking
8 at a statistical ordered -- statistical
9 monitoring system called Buzzeo.
10      Isn't that right?
11 A.   You're going to have to repeat
12 that.  There was several things there.
13      MR. INNES:  Can you read that
14 question back, please?
15      (Whereupon, the following
16 testimony was read by the court
17 reporter.)
18      "QUESTION:  So in 2014, fiscal
19 year '15, you were performing a
20 controlled substance risk assessment,
21 an application is made to the -- to
22 enhance the SOM program, a director of
23 controlled substances is added.  Work
24 begins on looking at a statistical
25 ordered -- statistical monitoring

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1  system called Buzzeo.
2          Isn't that right?"
3          (End of readback.)
4          MR. VARNADO:  And I think we're
5  at our time limit.  With a question
6  pending, you can answer that.
7          THE WITNESS:  I would have to
8  review the documents when the first
9  conversations from our area started
10 talking about the statistical modeling
11 enhancement that needed to be made.
12 This logistics project that was being
13 asked is specific to two areas that
14 logistics wanted to make around their
15 suspicious order monitoring.
16         Again, in 2014, that
17 responsibility was still with health
18 and wellness logistics, and I do not
19 know when we did the risk assessment
20 for our overall controlled substance
21 program that year of 2014.
22         Miranda Johnson was hired
23 sometime in October 2014, sometime
24 along that time period.
25 Q.     (BY MR. INNES)  And Walmart

Page 351

1  exits the business less than two years later?
2  A.     I'm sorry, what?
3          MR. VARNADO:  I think we're out
4  of time.
5          MR. INNES:  He can answer a few
6  more questions.  It's not a hard
7  cutoff.  And he's asked many times to
8  rephrase the question.  He spent two
9  minutes --
10         MR. VARNADO:  Yeah, no.
11         MR. INNES:  Do you want to let
12 that hang?  Do you want to let that
13 one hang?  That question?
14         MR. VARNADO:  Let it hang.
15         MR. INNES:  Yeah, do you want
16 to leave that one open?
17         MR. VARNADO:  Go ahead and
18 answer the question.  Walmart leaves
19 the business.
20         THE WITNESS:  You're going to
21 have to repeat that.
22 Q.     (BY MR. INNES)  When did
23 Walmart exit the business?
24 A.     When did --
25 Q.     When did Walmart cease the

Page 352

1  distribution of Schedule II opioids?
2  A.     That would have been May of --
3  around May of 2018.
4          MR. INNES:  Thank you.
5          MR. VARNADO:  All right.
6          MR. ELMER:  Cool.
7          MR. VARNADO:  Thank you.
8          THE VIDEOGRAPHER:  6:39 p.m.
9  We're off the video record.  This
10 concludes the video deposition of
11 George Chapman.
12         MR. INNES:  I want to make one
13 statement for the record.
14         You guys don't have any
15 recross; right?
16         MR. VARNADO:  No.
17         MR. INNES:  All right.  So
18 the -- last night, we got a production
19 volume from you.  I think it's
20 Volume 25.
21         On the heels of that came an
22 email from Kelly Bonovich, your
23 colleague, that came just to me.  And
24 that came at, I think, 11:53 p.m.  I
25 don't know if that is some of the time

Page 353

1  difference in my phone, but it seemed
2  like it came about midnight.
3          It purported to attach a
4  custodial file for -- that was
5  relevant to today's deposition.
6  Right?  It was eight pages.
7          I believe the entire volume
8  that was produced was somewhere in
9  the -- the range I can give you is
10 55935 to 57263.
11         Clearly there was custodial
12 production in that file.
13         MR. ELMER:  The volume?
14         MR. INNES:  Yeah, clearly there
15 were custodial documents in Volume 25
16 that pertained to Mr. Chapman's
17 deposition.
18         As I said this morning, we're
19 going to hold the deposition open so
20 we can verify whether or not the eight
21 pages of documents that were provided
22 by Kelly at 11:53 are the only
23 custodial files that are associated
24 with Volume 25.
25         MR. VARNADO:  So we'll just

Page 354

1  object to holding the deposition open.
2  We mentioned this morning we waited
3  30 minutes for you to review the
4  documents. We delayed our start by
5  that time. I feel like that's
6  sufficient time to analyze the eight
7  pages --
8      MR. BOWERS: You just took a
9  break for 30 minutes and we had five
10 minutes left on the record. So I
11 don't think that --
12     MR. INNES: What does that
13 matter?
14     MR. BOWERS: You don't think
15 waiting 30 minutes justifies --
16     MR. INNES: This probably
17 doesn't matter as much as your
18 statement just mattered.
19     MR. VARNADO: Really? Delaying
20 for you --
21     MR. BOWERS: A production at
22 midnight for 2,000 pages doesn't
23 matter? That's absurd.
24     MR. VARNADO: He specifically
25 said he needed 30 minutes to review

Page 355

1  ten pages.
2      MR. INNES: I needed 30 minutes
3  to review the ten pages. Right?
4      MR. VARNADO: Or eight pages,
5  or whatever it is.
6      MR. ELMER: We're discussing
7  the assumption that there's something
8  in the volume --
9      MR. INNES: There's no --
10     MR. ELMER: -- that would be
11 relevant or that is custodial. And I
12 think if that assumption is not
13 correct, then you have no basis to
14 make the statement you're making. Is
15 that a fair restatement of the issue?
16     MR. INNES: No, because I have
17 a basis to make the statement.
18     MR. ELMER: Well, no. The point
19 you're trying to make is there may be
20 materials in that volume that relate
21 to his -- that are from his custodial
22 file.
23     MR. INNES: There very well
24 could be. And here's the additional
25 problem.

Page 356

1      MR. ELMER: But if there
2  aren't.
3      MR. INNES: If there aren't,
4  then we will go to our second issue,
5  which is that we had an opportunity to
6  review them for 30 minutes, which is
7  enough to read those documents, but
8  not enough to digest them in the
9  context of Mr. Chapman's entire
10 custodial file. Okay? So that's our
11 second argument.
12     The other argument I'm making
13 is that a courtesy copy at 11:53 is
14 not a courtesy copy, and it's
15 definitely not a courtesy copy when
16 it's sent to one counsel on a team of
17 at least ten that we normally exchange
18 emails with.
19     I appreciate that it was late
20 at night and maybe Kelly left people
21 off unintentionally, but the fact
22 remains that there is a protocol in
23 place where emails between counsel
24 related to the discovery, there are
25 listservs that are copied and team

Page 357

1  members that are copied, and that
2  wasn't done.
3      So I'm left to wake up this
4  morning and see, with my morning
5  coffee, a production of 2,000
6  documents that I'm left to do I don't
7  know what with because none of my
8  colleagues could cover for me if they
9  were up at that hour. So that's
10 frustrating to begin with.
11     The other issue is the
12 privilege issues. We clearly believe
13 that privilege does not attach to SOM
14 program documents. You can't hide
15 behind the attorney-client privilege
16 regarding SOM. Right? That's a clear
17 order in this case.
18     If you guys want to discuss
19 that further, we can. And we're
20 holding the deposition open to get
21 answers to the questions that you
22 directed your client inappropriately
23 not to answer.
24     MR. VARNADO: Okay.
25     MR. INNES: And that's the

Page 358

1  basis for that.  That's enough.  I'll
2  hear -- I'll take it in writing or
3  I'll take it now.  All right?
4       MR. VARNADO:  So you were not
5  prohibited from inquiring into the SOM
6  program, the policies --
7       MR. INNES:  I know.
8       MR. VARNADO:  -- and
9  procedures.
10      MR. INNES:  That's why I asked
11 the questions.
12      MR. ELMER:  Let him respond.
13      MR. VARNADO:  You were not
14 prohibited in this examination from
15 questioning Mr. Chapman about the SOM
16 programs.
17      MR. INNES:  I was prohibited
18 from getting answers.
19      MR. VARNADO:  He answered your
20 questions.
21      MR. INNES:  He did not.  You
22 directed him not to answer the
23 questions.
24      MR. VARNADO:  Well, when you
25 ask for deliberative process

Page 359

1  specifically --
2       MR. INNES:  We asked multiple
3  questions.  If you want to focus on
4  that one, go ahead.
5       MR. ELMER:  Do you want a
6  response or not?
7       MR. INNES:  I want a cogent
8  response, yeah.
9       MR. ELMER:  Allow me to provide
10 a cogent response.
11      You were able to ask questions
12 about the SOM program.
13      MR. INNES:  Correct.
14      MR. ELMER:  You were not
15 permitted to ask questions about
16 privileged communications or
17 privileged deliberations.  If you want
18 to make a cogent argument that those
19 are not privileged, you can do so and
20 we'll respond in the normal course of
21 this back-and-forth, but we're not --
22      MR. BOWER:  Can I ask this
23 question?  Were those documents that
24 would relate to those issues that he
25 was not allowed to answer also

Page 360

1  withheld?
2       MR. ELMER:  I'm not in a
3  position, Jason is not in a position
4  to do this on the fly.  I'm suggesting
5  that if you want to make your
6  argument, make it.  We'll respond
7  with, you know, our response, and then
8  we'll -- it'll sort itself out.
9       MR. INNES:  Fair.  I think
10 we're cool with that.  I think what
11 Zach was suggesting and what I'm
12 suggesting now is that the purpose of
13 that order was to avoid having to go
14 through that process.
15      MR. ELMER:  I understand.  And
16 I also think that it's not -- it is
17 simply not the case that there is no
18 privilege when we're talking about
19 communications with counsel or
20 deliberations with counsel.
21      MR. INNES:  As a general
22 matter, I hear you.  Not in this case,
23 as it relates to SOMs.  But we can
24 battle it out.
25      MR. ELMER:  No, I understand

Page 361

1  that.  Let's sort that out in writing.
2  I just don't think that now is the
3  time to sort that out because we
4  strongly disagree, and I understand
5  your argument.
6       MR. BOWER:  We disagree with
7  that because we believe that that's a
8  point where counsel wouldn't have to
9  come back, the witness wouldn't have
10 to come back and do all that stuff.
11 And I imagine that will be one of your
12 objections, that we don't have to
13 bring the witness back.  And we would
14 ask that you don't raise that
15 objection, because you are the one who
16 are making that necessary.
17      MR. ELMER:  No.  Point taken.
18 Understood.  Your arguments are made.
19 We're going to respond to whatever you
20 send us.  And I understand that you
21 think that it's something that we can
22 resolve right now, that that would
23 save you the hassle of doing this or
24 we could reopen, or whatever else.
25      The point is that we are not in

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  a position to resolve this issue right
2  now.
3        MR. BOWER:  I don't know why
4  you just don't want to get the truth
5  out there; right?
6        MR. ELMER:  Don't -- don't --
7  don't.
8        MR. BOWER:  Well --
9        MR. ELMER:  You can be --
10  Can we go off the record?  Why
11  do we need your --
12        MR. BOWER:  Because that's what
13  this is about; right?  That's what the
14  Court wanted us to do.
15        MR. ELMER:  All right.  We're
16  done.
17  Can we go off the record?
18  Do you want your soliloquy
19  about --
20        MR. BOWER:  Absolutely.  We
21  just want testimony.
22        MR. ELMER:  Can we go off the
23  record?
24        THE VIDEOGRAPHER:  6:45.  We're
25  off the record.

Page 363

1        (Proceedings recessed at
2  6:46 p.m.)
3              --o0o--
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

1                CERTIFICATE
2        I, DEBRA A. DIBBLE, Registered
Diplomate Reporter, Certified Realtime
3  Reporter, Certified Realtime Captioner,
Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
commencement of the examination, GEORGE
5  CHAPMAN was duly sworn by me to testify to
the truth, the whole truth and nothing but
6  the truth.
7        I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
        I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
12  before the conclusion of the deposition.
13        I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
that I am not financially interested in the
16  action.
17
18
19
20  _____
DEBRA A. DIBBLE, RDR, CRR, CRC
21  NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
22  Certified Court Reporter
23  Dated: 14 January 2019
24
25

Page 365

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8        After doing so, please sign the
9  errata sheet and date it.
10        You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14        It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

| Page 366 |
| --- |

ERRATA

1
2 PAGE  LINE  CHANGE
3 _____
4     REASON: _____
5 _____  _____
6     REASON: _____
7 _____  _____
8     REASON: _____
9 _____  _____
10    REASON: _____
11 _____  _____
12    REASON: _____
13 _____  _____
14    REASON: _____
15 _____  _____
16    REASON: _____
17 _____  _____
18    REASON: _____
19 _____  _____
20    REASON: _____
21 _____  _____
22    REASON: _____
23 _____  _____
24    REASON: _____
25

| Page 368 |
| --- |

LAWYER'S NOTES

1
2
3 PAGE   LINE
4 _____  _____  _____
5 _____  _____  _____
6 _____  _____  _____
7 _____  _____  _____
8 _____  _____  _____
9 _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25

| Page 367 |
| --- |

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4     I, GEORGE CHAPMAN, do hereby
   certify that I have read the foregoing pages
   and that the same is a correct transcription
5  of the answers given by me to the questions
6  therein propounded, except for the
   corrections or changes in form or substance,
7  if any, noted in the attached
   Errata Sheet.
8
9
10
11
12 _____
   GEORGE CHAPMAN               DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 _____
20 Notary Public
21
22
23
24
25