Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
    IN RE:  NATIONAL PRESCRIPTION      Case No. 1:17-MD-2804
 4  OPIATE LITIGATION                  MDL NO. 2804
                                       Hon. Dan A. Polster
 5  APPLIES TO ALL CASES
 6
    _ _ _ _ _ _ _ _ _ _ _ _ _ /
 7
 8        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
 9
        VIDEOTAPED
10  DEPOSITION OF: RICHARD CHAPMAN
11  DATE:          December 18, 2018
12  TIME:          9:37 a.m. to 3:04 p.m.
13
    PLACE:         201 North Franklin Street
14                 Suite 3400
                   Tampa, Florida
15
16  PURSUANT TO:   Notice by counsel for
                   Plaintiffs for purposes of
17                 discovery, use at trial
                   or such other purposes
18                 as are permitted under
                   the Ohio Rules
19                 of Civil Procedure
20  BEFORE:        LISA A. SIMONS-CLARK, RMR, CRR
                   Notary Public, State of
21                 Florida at Large
22
23
24
25
```

se

## Page 2

APPEARANCES:

1 APPEARANCES:
2   MARK P. PIFKO, ESQUIRE
      Baron & Budd, P.C.
3     15910 Ventura Boulevard, Suite 1600
      Encino, California 91436
4     (818) 839-2333
5   - and -
6   WILLIAM G. POWERS, ESQUIRE
      Baron & Budd, P.C.
7     600 New Hampshire Avenue NW
      The Watergate, Suite 10-A
8     Washington, DC 20037
      (202) 333-4562
9       Attorneys for Plaintiffs and PEC
10  ELISA P. McENROE, ESQUIRE
      Morgan Lewis & Bockius, LLP
11    170f Market Street
      Philadelphia, Pennsylvania 19103-2921
12    (215) 963-5917
13  - and -
14  KELLY A. MOORE, ESQUIRE
      JOHN M. MALOY, ESQUIRE
15    Morgan Lewis & Bockius, LLP
      101 Park Avenue
16    New York, New York 10178
      (212) 309-6612
17      Attorneys for Rite Aid and Richard Chapman
18  MICHAEL S. VITALE, ESQUIRE
      BakerHostetler
19    200 South Orange Avenue
      Orlando, Florida 32801
20    (407) 649-4083
        Attorney for Cardinal Health
21
    APPEARANCES VIA TELEPHONE AND STREAM
22
      GRETCHEN M. CALLAS, ESQUIRE
23    Jackson Kelly, PLLC
      500 Lee Street East, Suite 1600
24    Charleston, West Virginia 25301
      (304) 340-1169
25      Attorney for AmerisourceBergen

## Page 3

1   APPEARANCES VIA TELEPHONE AND STREAM
2   DANIEL B. MULLEN, ESQUIRE
      Marcus & Shapira, LLP
3     301 Grant Street
      One Oxford Centre, 35th Floor
4     Pittsburgh, Pennsylvania 15219
      (412) 338-5202
5       Attorney for HBC Service Co.
6   JOANNE CACERES, ESQUIRE
      Jones Day
7     77 West Wacker
      Chicago, Illinois 60601
8     (312) 782-3939
        Attorney for Walmart
9
    ALEJANDRO BARRIENTOS, ESQUIRE
10    Covington & Burling, LLP
      One City Center
11    850 Tenth Street, NW
      Washington, DC 20001
12    (202) 662-6000
        Attorney for McKesson
13
    JOHN D. LOMBARDO, ESQUIRE
14    Arnold & Porter Kaye Scholer, LLP
      777 South Figueroa Street, Suite 4400
15    Los Angeles, California 90017
      (213) 243-4000
16      Attorney for Endo and Par
17  APPEARANCES VIA STREAM:
18    ALEXANDRA K. HUGHES, ESQUIRE
      Blasingame Burch Garrard Ashley, P.C.
19    440 College Avenue, Suite 320
      Athens, Georgia 30601
20    (706) 744-4135
21    NOAH RICH, ESQUIRE
      Baron & Budd, P.C.
22    600 New Hampshire Avenue, NW
      Washington, DC 20037
23    (202) 333-4562
24
25

## Page 4

1
2   STREAMING APPEARANCES, CONTINUED
3     JAY LICHTER, ESQUIRE
      Baron & Budd, P.C.
4     15910 Ventura Boulevard, Suite 1600
      Encino, California 91436
5     (818) 839-2333
6   STERLING CLUFF, ESQUIRE
      Baron & Budd, P.C.
7     15910 Ventura Boulevard, Suite 1600
      Encino, California 91436
8     (813) 839-2333
9   SCOTT SIMMER, ESQUIRE
      Baron & Budd, P.C.
10    600 New Hampshire Avenue NW
      Washington, DC 20037
11    (202) 333-4562
12  EMMA KABOLI
      LITIGATION PARALEGAL
13    Baron & Budd, P.C.
14  GRETCHEN KEARNEY
      LITIGATION PARALEGAL
15    Baron & Budd, P.C.
16
17  ALSO PRESENT:
18    Jeff Fleming, the videographer
      Willow Ashlynn, Trial Tech
19
20            INDEX
21                        PAGE
22  DIRECT EXAMINATION BY MR. PIFKO          7
    CROSS-EXAMINATION BY MS. McENROE       194
    CERTIFICATE OF OATH              197
23  REPORTER'S CERTIFICATE           198
    ERRATA SHEET                 199
24
25

## Page 5

1
2       INDEX, CONTINUED
3     (ATTACHED TO THE TRANSCRIPT)
4   EXHIBITS                MARKED
5   RITE AID CHAPMAN 1 - Rite_Aid_OMDL_0020412       87
6   RITE AID CHAPMAN 2 - Rite_Aid_OMDL_0038075 to 77  113
7   RITE AID CHAPMAN 3 - Rite_Aid_OMDL_0014948 to 51  122
8   RITE AID CHAPMAN 4 - Rite_Aid_OMDL_0024619 to 622  129
9   RITE AID CHAPMAN 5 - Rite_Aid_OMDL_0024623 to 24636 134
10  RITE AID CHAPMAN 6 - Rite_Aid_OMDL_0040183         166
    RITE AID CHAPMAN 7 - Rite_Aid_OMDL_0040184 to 198  166
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

| Page 6 |
|---|
| 1  THE VIDEOGRAPHER: We are now on the record. |
| 2  My name is Jeff Fleming. I'm a videographer for |
| 3  Golkow Litigation Services. Today's date is |
| 4  December 18, 2018. The time is 9:37 a.m. |
| 5  This video deposition is being held in Tampa, |
| 6  Florida, in the matter of National Prescription |
| 7  Opiate Litigation, MDL No. 2084 (sic) for the |
| 8  United States District Court for the Northern |
| 9  District of Ohio, Eastern Division. |
| 10  The deponent is Rick Chapman. Will counsel |
| 11  please identify themselves for the record? |
| 12  MR. PIFKO: Good morning. Mark Pifko on |
| 13  behalf of Plaintiffs and the PEC from the law firm |
| 14  of Baron & Budd. |
| 15  MR. POWERS: Will Powers from Baron & Budd. |
| 16  MS. McENROE: Good morning. Elisa McEnroe |
| 17  from Morgan, Lewis & Bockius on behalf of Rite-Aid |
| 18  and the witness; and together with me I have with |
| 19  my colleague -- me and my colleague Kelly Moore |
| 20  and John Maloy. |
| 21  MR. VITALE: And Michael Vitale with the law |
| 22  firm of BakerHostetler representing Cardinal |
| 23  Health. |
| 24  THE VIDEOGRAPHER: Do we need counsel on the |
| 25  phone, too? |

| Page 7 |
|---|
| 1  MR. PIFKO: Who's at the end? Sorry. Oh, |
| 2  that's -- |
| 3  MS. McENROE: That's my colleague, John Maloy. |
| 4  MR. PIFKO: And anyone on the phone, can you |
| 5  announce yourself, please? |
| 6  MR. BARRIENTOS: Yes. Alejandro Barrientos |
| 7  from Covington & Burling. |
| 8  MS. CACERES: Joanne Caceres from Jones Day |
| 9  representing Walmart. |
| 10  MS. CALLAS: Gretchen Callas from Jackson |
| 11  Kelly for AmerisourceBergen. |
| 12  MR. LOMBARDO: John Lombardo with Arnold & |
| 13  Porter for the Endo and Par defendants. |
| 14  THE VIDEOGRAPHER: The court reporter is Lisa |
| 15  Clark and will now swear in the witness. |
| 16  RICHARD CHAPMAN, |
| 17  the witness herein, being first duly sworn on oath, was |
| 18  examined and deposed as follows: |
| 19  THE WITNESS: I do. |
| 20  DIRECT EXAMINATION |
| 21  BY MR. PIFKO: |
| 22  Q. Good morning, Mr. Chapman. |
| 23  A. Good morning. |
| 24  Q. My name is Mark Pifko. I represent the |
| 25  plaintiffs in this matter. I'm going to be asking you |

| Page 8 |
|---|
| 1  some questions today. |
| 2  A. Okay. |
| 3  Q. Let's start by having you please state and |
| 4  spell your name for the record. |
| 5  A. My formal name is Richard Chapman. |
| 6  R-i-c-h-a-r-d, C-h-a-p-m-a-n, and I normally go by |
| 7  Rick. |
| 8  Q. Okay. And you understand that you are here in |
| 9  connection with a lawsuit concerning opioids; is that |
| 10  correct? |
| 11  A. I do. |
| 12  Q. Okay. You work at Rite-Aid? |
| 13  A. I did. |
| 14  Q. What -- are you retired now? |
| 15  A. I am. |
| 16  Q. All right. Before we get started, I want to |
| 17  go over some ground rules. I'm sure that in preparing |
| 18  for the deposition your counsel went over them, but |
| 19  let's just go over a couple of the high points before |
| 20  we get started so we make sure we're all on the same |
| 21  page here. |
| 22  A. Okay. |
| 23  Q. Okay. So you see we have a court reporter |
| 24  here that's writing everything down that we're saying. |
| 25  As a result of the fact that we're making a written |

| Page 9 |
|---|
| 1  record of the proceedings, we need to be careful about |
| 2  how we say and do certain things that we might normally |
| 3  do in a conversation. |
| 4  So first, we need to make sure that you give |
| 5  an audible response to any question instead of just |
| 6  nodding your head or shrugging your shoulders. |
| 7  Understood? |
| 8  A. I do. I do understand. |
| 9  Q. Okay. And then we need to be careful about |
| 10  saying things like uh-huh or uh-uh, because when you |
| 11  write it down, you can't really tell the difference, |
| 12  even though I can hear the difference; but, when we see |
| 13  the written record, we can't. So if you're trying to |
| 14  say yes or no, just use something that's more clear. |
| 15  A. I understand. |
| 16  Q. Okay. You understand that you've just been |
| 17  sworn in and you're under oath? |
| 18  A. I do. |
| 19  Q. And you understand that means that you could |
| 20  be subject to criminal or civil penalties if you lie or |
| 21  intentionally are misleading today? |
| 22  A. I do. |
| 23  MS. McENROE: Objection to form. |
| 24  THE WITNESS: Oh. |
| 25  MS. McENROE: You may answer. |

Page 10

1    THE WITNESS: I do.
2  BY MR. PIFKO:
3    Q. Okay. And that's a good point to note, that
4  from time to time counsel may -- various counsel in
5  here or on the phone may assert an objection. Unless
6  they instruct you not to answer, I'm still expecting an
7  answer to the question. Okay?
8    A. Okay.
9    Q. And they'll be very clear if they're going to
10  be instructing you not to answer, I'm sure. And then
11  I'm going to be asking you about some events in the
12  past. I'm entitled to your best recollection or
13  estimate of what occurred in the past, but at the same
14  time, I don't want you to guess.
15    So if you have absolutely no memory or ability
16  to say anything, then, you know, you can say that; but,
17  if you can have some sort of memory and you can give
18  your best estimate or recollection, I'm entitled to
19  that. Okay?
20    A. I understand.
21    Q. Okay. And then if I ask you something and you
22  don't understand it, please let me know, and I'll try
23  to use language or rephrase the question in a way that
24  makes it so that you do understand. Okay?
25    A. Okay.

Page 11

1    Q. But if you answer, I'm going to assume that
2  you do understand. Okay?
3    A. Okay.
4    Q. All right. So let's talk about your
5  employment with Rite-Aid. You -- when did you retire
6  from Rite-Aid?
7    A. I retired in July of 2015, and I did go back
8  to work for Rite-Aid for a -- for a temporary
9  assignment in 2016 and retired again or left again in
10  2017.
11    Q. Okay. When did you join Rite-Aid?
12    A. In June of 2007.
13    Q. Let's talk for a second about this temporary
14  employment that you had. What -- do you remember
15  approximately the month when that started?
16    A. November of 2016.
17    Q. And then when did you end in 2017?
18    A. October.
19    Q. What was the nature of that work?
20    A. It was as the -- I'm trying to recall the job
21  title because it was an odd -- it was, like,
22  coordinating director of supply chain or something like
23  that. It was the position that had been held by my
24  former boss as senior VP of supply chain.
25    He had left the company, and they asked me to

Page 12

1  come back temporarily.
2    Q. Did you -- so we're here in Tampa. I assume
3  that's where you live now?
4    A. I live in Madeira Beach, Florida --
5    Q. Okay.
6    A. -- which is in Pinellas County.
7    Q. Okay.
8    A. It's in the Bay Area here.
9    Q. Okay. So did you have to leave this area to
10  take that assignment in 2016 and 2017?
11    A. I maintained a home here and had a temporary
12  housing basically, an apartment, in the -- in the Camp
13  Hill area.
14    Q. Okay. So you were physically located in Camp
15  Hill to perform the duties of that job?
16    A. I was physically located in Camp Hill.
17    Q. And then for your -- the time between June
18  2007 and July 2015, where were you physically located?
19    A. In Camp Hill. Again, we maintained a home
20  here, but I had a home in Camp Hill.
21    Q. What did you do before you joined Rite-Aid?
22    A. I worked for Eckerd Corporation and then for
23  Brooks Eckerd Corporation.
24    Q. What was your tenure at the Eckerd
25  Corporation?

Page 13

1    A. I started at Eckerd Corporation in December
2  1974.
3    Q. And then there was some sort of corporate
4  transaction between Rite-Aid and Eckerd?
5    MS. McENROE: Objection to form. You may
6    answer.
7    THE WITNESS: No, not between Rite-Aid and
8    Eckerd. By the time that transaction took place,
9    Eckerd had been purchased by a company named
10    Brooks. So the corporation was Brooks Eckerd at
11    that time.
12  BY MR. PIFKO:
13    Q. Okay. So do you have a memory of when the
14  transaction between Eckerd and Brooks occurred?
15    A. 2004, I believe. The fall of 2004, I believe.
16    Q. Okay. And then there was a transaction
17  between Rite-Aid and Brooks, correct?
18    A. Correct.
19    Q. And what was the approximate time frame for
20  that?
21    A. It closed in June of 2007. That's when I
22  joined Rite-Aid.
23    Q. Did your job responsibilities change in any
24  way when -- well, what's your understanding of what the
25  nature of the transaction was between Rite-Aid and

Page 14

1 Brooks?
2     MS. McENROE: Objection. Form.
3     THE WITNESS: Rite-Aid purchased Brooks Eckerd
4 Corporation.
5 BY MR. PIFKO:
6   Q.  Okay. So did -- when Rite-Aid purchased
7 Brooks Eckerd Corporation, did your job
8 responsibilities change in any way?
9   A.  Yes.
10   Q.  Okay. We'll -- we'll go through, I guess,
11 from the start of your time with the Eckerd
12 Corporation, the various positions that you held.
13   A.  Okay.
14     MS. McENROE: Objection. Form. Calls for a
15 narrative.
16 BY MR. PIFKO:
17   Q.  So you started at the Eckerd Corporation in
18 December 1974, correct?
19   A.  Correct.
20   Q.  What was your highest level of education at
21 that time?
22   A.  Some college.
23   Q.  Where did you attend college?
24   A.  Carnegie Mellon University.
25   Q.  When did you start going to Carnegie Mellon?

Page 15

1   A.  1973.
2   Q.  And then did you stop attending courses when
3 you started working for the Eckerd Corporation?
4   A.  No. No. I stopped courses at Carnegie Mellon
5 in December of 1973.
6   Q.  Okay. Then about a year later you joined the
7 Eckerd Corporation?
8   A.  Correct.
9   Q.  Did you attend any college courses after you
10 joined the Eckerd Corporation?
11   A.  I did.
12   Q.  Okay. When was that?
13   A.  Oh, various times. Multiple occurrences in,
14 gosh, the late '70s, the early '80s, and then I
15 completed my degree work in the early 2000s.
16   Q.  So you have a degree from where?
17   A.  Eckerd College.
18   Q.  Okay. Is that affiliated with the
19 corporation?
20   A.  No, it is not.
21   Q.  Okay. Just a coincidence?
22   A.  It -- it was Florida Presbyterian College, and
23 it received a significant endowment from Jack Eckerd,
24 who had founded the corporation, the Eckerd
25 Corporation --

Page 16

1   Q.  Okay.
2   A.  -- and so they renamed the college Eckerd
3 College because of the contribution that he had made.
4   Q.  How long did you attend courses there?
5   A.  It was an 18-month, perhaps, period, I would
6 say.
7   Q.  Was that something you did while you were
8 working, or did you have to take time off from work to
9 do that?
10   A.  While I was working.
11   Q.  What was your final degree that you got from
12 Eckerd College?
13   A.  Bachelor of Arts in Business.
14   Q.  And you attended some courses before that as
15 well?
16   A.  I did.
17   Q.  Do you remember where?
18   A.  Valencia Community College in Florida -- in
19 Orlando and St. Pete College in St. Petersburg.
20   Q.  Did you get any degrees or certificates or
21 anything from those universities?
22   A.  I did not.
23   Q.  What was your first position at the Eckerd
24 Corporation?
25   A.  I was temporary Christmas help at the Orlando

Page 17

1 photo lab.
2   Q.  So I assume that was a very short-term
3 position?
4   A.  The temporary part was.
5   Q.  Okay. Then what did you do next?
6   A.  Well, I worked -- continued to work in the
7 photo lab for a couple of years, and then I moved into
8 a distribution center that was also in Orlando.
9   Q.  When did you start working at the distribution
10 center?
11   A.  Late 1976, I believe.
12   Q.  How long did you work there?
13   A.  At that particular distribution center --
14 there was actually three different buildings or
15 distribution centers in Orlando and all in one complex,
16 and I worked among those three until 1980.
17   Q.  Did you have a specific job -- the same job
18 title during that time period?
19   A.  I did not.
20   Q.  All right. Let's go through each of those.
21 When you first started working at the distribution
22 center, what was your job title?
23   A.  I was -- I loaded trucks. My job title was a
24 Material Handler B.
25   Q.  Okay. And how long did you have that

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 position?
2    A.   Several months.  You know, less than a year I
3 would say, but several months.
4    Q.   And then what did you do?
5    A.   I became an order selector in the case goods
6 picking department.
7    Q.   What were your responsibilities as an order
8 selector?
9    A.   We got orders from the stores of the items
10 that they -- that they wanted or needed for
11 replenishment that were sent out in bulk quantities,
12 either in full cases or in very -- you know, the items
13 themselves were bulky.
14         We fulfilled those orders, confirmed that we
15 had picked the items and packed them for delivery to
16 the store.
17    Q.   Did you have any involvement in picking
18 controlled substances at that time?
19    A.   I did not.
20    Q.   And then what was your next position?
21    A.   I was a group leader, which is -- was a -- an
22 hourly lead position in one of the departments in the
23 distribution center.
24    Q.   What were your responsibilities as a group
25 leader?

Page 19

1    A.   To assign work to the associates in that
2 department, to maintain the flow of goods through the
3 distribution center.
4    Q.   Did you have any involvement with controlled
5 substances at that time?
6    A.   I did not.
7    Q.   So then in 1980 you stopped working at the
8 distribution center; is that correct?
9    A.   Correct.
10    Q.   And then where did you go?
11    A.   I moved to the Eckerd corporate office in
12 Largo, Florida.
13    Q.   What title did you take on then?
14    A.   I think the title was distribution systems
15 analyst, if I recall correctly.
16    Q.   What was your -- what were your
17 responsibilities?
18    A.   Eckerd was putting together a team.  They were
19 replacing their information systems that supported
20 accounting, merchandising, the distribution centers,
21 things of that nature; and Eckerd, as a part of that
22 project, put together a user team from each of the
23 functional areas so that -- and the assignment of that
24 user team was to help with testing, design, you know,
25 user -- human interface design and writing manuals and

Page 20

1 things of that nature, and so I was the representative
2 from distribution on that team.
3    Q.   How long did you do that?
4    A.   Until 1982, I believe.
5    Q.   In connection with that work, did you do
6 anything related to controlled substances?
7    A.   Nothing directly related to controlled
8 substances.  I mean, the systems that were being
9 designed ran the warehouses.  So, you know, that
10 ultimately involved controlled substances, but nothing
11 I directly did had anything to do with controlled
12 substances.
13    Q.   And then what was your next position?
14    A.   I was a supervisor in the Clearwater
15 distribution center.
16    Q.   What was your responsibility as a supervisor?
17    A.   You oversaw multiple departments within the
18 distribution center, hired and fired, you know, hired
19 and managed the workforce, made sure there was adequate
20 staffing, and again, maintain the flow of work through
21 the distribution center.
22    Q.   How long did you have that position?
23    A.   For just over a year.
24    Q.   So from approximately 1982 to 1983?
25    A.   Correct.

Page 21

1    Q.   And then what did you do?
2    A.   In 1983 I moved -- went to Hammond, Louisiana,
3 to help open a distribution center there.
4    Q.   How long did you work there?
5    A.   One year.
6    Q.   What types of responsibilities did you have
7 with respect to assisting them in opening that
8 distribution center?
9    A.   I was an operate -- I had been promoted from
10 supervisor to operations manager.  So I was responsible
11 for some of the -- I had multiple supervisors work for
12 me at that point.  So I was responsible for the
13 shipping and receiving departments and the support
14 functions within the distribution center, like the
15 forklift operations and things of that nature.
16    Q.   Did the people under you have responsibility
17 for shipping controlled substances?
18    A.   I was not responsible for the department that
19 selected and packed controlled substances, but the
20 trucks that were loaded did have controlled substances
21 on them.  So the forklift drivers, for instance, that
22 moved product would have moved controlled substances,
23 yes.
24    Q.   Okay.  Where did you go next?
25    A.   I then went to the Atlanta distribution

Page 22

1 center, which is actually in Newnan, Georgia, but we
2 commonly called it the Atlanta distribution center.
3 Q. What was your responsibility there?
4 A. I was also an operations manager, and so I was
5 over multiple departments, kind of similarly to in
6 Hammond, so --
7 Q. Did you have any responsibility for controlled
8 substances there?
9 A. I did have the pharmacy department in the
10 Newnan distribution center report to me as -- at one
11 time during that period of time that I worked for --
12 Q. Okay. What was the period of time that you
13 worked there?
14 A. I was there from 1984 to 1989.
15 Q. So some of the people under you were
16 responsible for picking controlled substances that
17 needed to be shipped to stores and fulfilling those
18 orders?
19     MS. McENROE: Objection to form. You may
20 answer.
21     THE WITNESS: During a portion of that
22 five-year period -- we rotated responsibilities.
23 There were two operations managers, and we kind of
24 changed assignments; but during a portion of that
25 five-year period, yes, I was over the pharmacy

Page 23

1 area, and yes, there were associates within the
2 pharmacy area that were responsible for picking
3 and packing controlled substances to go to the
4 stores.
5 BY MR. PIFKO:
6 Q. Of the time period from 1984 to 1989, what was
7 the portion that you had responsibility for the
8 pharmacy area?
9 A. Probably two of those five years, I would say.
10 Q. Okay. Do you remember which of the -- of that
11 period, which two years?
12 A. It was the latter part of that period, so --
13 Q. So from 1987 to 1989?
14 A. Yes. Around that, I would say.
15 Q. And then where did you go after 1989?
16 A. I returned to the Eckerd corporate office in
17 Largo, Florida.
18 Q. What did you do there?
19 A. I think the job title was manager of
20 distribution systems and planning, if I recall
21 correctly; and the key responsibilities were the
22 budgeting and financial planning for the distribution
23 centers and to act as the liaison for systems
24 development and maintenance in the distribution
25 centers.

Page 24

1 Q. How long did you have that position?
2 A. Well, that direct position I probably had for
3 three years perhaps and then -- probably three years.
4 Q. So in approximately 1992 you moved to another
5 position?
6 A. Well, I -- I was promoted to a director level
7 position. My boss left that position, so I was
8 promoted into his job. So I still had the same
9 responsibilities, but my responsibilities then
10 expanded, so --
11 Q. What was your title then?
12 A. Director of distribution systems and planning,
13 I believe.
14 Q. How long did you have that position?
15 A. I was in that position through -- and it
16 ultimately got changed to be a senior director level
17 position, but I was in that position through the time
18 that Eckerd's was sold to Brooks.
19     So I was at the Eckerd corporate office until
20 that sale, that transaction was complete.
21 Q. So that -- the Brooks and Eckerd transaction
22 occurred in 2004?
23 A. Yes, I believe that's correct.
24 Q. And then you had a change in responsibilities
25 at that time?

Page 25

1 A. Yes. Yes.
2 Q. Okay. So what -- what was your new position
3 in 2004?
4 A. Well, it was -- I think the job title was just
5 changed to senior director of logistics, and I remained
6 part of the Brooks Eckerd corporate office team, I
7 guess; and I had largely the same responsibilities that
8 I had had prior and also -- also had responsibility for
9 some transportation functions.
10 Q. How long did you have that position?
11 A. Until the Rite-Aid/Brooks transaction.
12 Q. That was in 2007?
13 A. Yes.
14 Q. So when Rite-Aid purchased the Brooks Eckerd
15 Corporation, you had a change in job responsibilities?
16 A. I did.
17     MS. McENROE: Objection to form.
18     THE WITNESS: I did.
19 BY MR. PIFKO:
20 Q. Okay. What was your job then?
21 A. I became the general manager of the
22 Philadelphia distribution center.
23 Q. How long did you have that position?
24 A. About 16 months.
25 Q. So to sometime in 2009?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A.   No, in 2008.
2    Q.   Okay.
3    A.   Yeah, it was like from June of 2007 till the
4  end of September of 2008, I think.
5    Q.   Okay.  What were your responsibilities as the
6  general manager for the Philadelphia distribution
7  center?
8    A.   It was overall responsibility for the
9  distribution center.  So, you know, managing it,
10 staffing it, ensuring that we served our store
11 customers in the way that we did, maintaining flow of
12 products, meeting the financial responsibilities,
13 things of that nature.
14   Q.   When you say "meeting the financial
15 responsibilities," what do you mean?
16   A.   Well, I mean, we had a budget that we were --
17 as any company does; and so I was, you know, part of my
18 job was to make plans and to put the budget together
19 and then to achieve those, so --
20   Q.   Were you the top -- as the general manager of
21 a distribution center, were you the top level person at
22 that distribution center?
23   A.   I --
24      MS. McENROE:  Objection to form.
25      THE WITNESS:  I was.

Page 27

1  BY MR. PIFKO:
2    Q.   So did you oversee people who had
3  responsibility for shipping controlled substances to
4  Rite-Aid pharmacies?
5    A.   I did not.
6    Q.   Okay.
7    A.   We did not have controlled substances in the
8  Philadelphia distribution center.
9    Q.   Okay.  What was your next position?
10   A.   I went to the Rite-Aid corporate office.
11   Q.   So that was sometime in 2008?
12   A.   Correct.
13   Q.   What was your job then?
14   A.   The job title was vice president of logistics.
15   Q.   How long did you hold that position?
16   A.   Until I retired in 2015.
17   Q.   Did you move through any iterations, like
18 senior vice president or anything like that or you
19 always stayed vice president?
20      MS. McENROE:  Objection to form.
21      THE WITNESS:  I stayed vice president.
22 BY MR. PIFKO:
23   Q.   What were your job responsibilities as the
24 vice president of logistics?
25   A.   During that time I was responsible for the --

Page 28

1  the -- a huge portion of the responsibility was
2  transportation related.  I was responsible for both
3  inbound and outbound transportation to the stores.
4      I also had responsibility for the financial
5  planning activity, for the safety programs and safety
6  management, system support, and regulatory compliance.
7    Q.   When you say "regulatory compliance," what do
8  you mean by that?
9    A.   I mean there was a member of my team that was
10 the person, the resource, that coordinated with the DCs
11 to make sure that we were in compliance with
12 regulations related to all pharmacy activities,
13 controlled substances, things of that nature.
14     That individual coordinated both -- it was
15 kind of a liaison between the distribution centers and
16 our corporate staff that acted as our subject matter
17 experts for that.
18   Q.   What's the title of that regulatory compliance
19 person?
20   A.   Director of -- it may have been director of
21 compliance.  I don't recall, you know, specifically.
22   Q.   During your tenure from 2008 to 2015, were
23 there multiple people that held that position?
24   A.   There were.
25   Q.   Do you remember any of their names?

Page 29

1    A.   The person in that position when I joined,
2  when I first went to the corporate office, was named
3  Kevin Mitchell.  Subsequent to Kevin leaving, those
4  responsibilities were taken over by Chris Belli, and
5  after Chris left, the responsibilities were taken over
6  by an individual by the name of Kevin Peterson; and, of
7  course, they changed dramatically because Rite-Aid quit
8  carrying pharmaceuticals in the distribution centers.
9    Q.   Do you know who Rite-Aid's primary supplier of
10 controlled substances was?
11      MS. McENROE:  Objection to form.
12      THE WITNESS:  I'm sure if you're talking about
13   in dollar value, it would have been McKesson.  If
14   you're talking about unit volume, I couldn't
15   answer that because, you know, such a large
16   proportion of the pharmacy product are generics,
17   and there's a number of generic manufacturers.
18 BY MR. PIFKO:
19   Q.   At various points in your tenure as vice
20 president of logistics, did Rite-Aid purchase
21 controlled substances directly from certain
22 manufacturers?
23   A.   I don't know the answer to that.
24   Q.   Okay.  So you know that they -- that Rite-Aid
25 purchased controlled substances and other

Page 30

1  pharmaceutical products from McKesson?
2    A.  I do know that we purchased from McKesson,
3  yes.
4    Q.  And then you just testified that you believe
5  that -- you mentioned generics and that maybe there
6  were other suppliers?
7    A.  There are other generic suppliers that we
8  purchased product from besides McKesson.
9    Q.  Okay.  Do you remember the names of any of
10 those?
11   A.  You know, Teva is an example.  I was not
12 involved in the purchasing side at all.  So, you know,
13 our responsibility was more operational and executing
14 it in the distribution center.  So I couldn't tell you,
15 quite honestly, who all of those were.
16   Q.  Okay.  And that's okay.  I was just asking for
17 your best recollection, so --
18   A.  Yeah.
19   Q.  -- if you remembered any of the names, that's
20 all I'm asking.
21   A.  As I said, Teva comes to mind.  You know, I
22 can't remember any of the other ones explicitly --
23 specifically.
24   Q.  Did you ever meet with anybody from Teva?
25   A.  I did not.

Page 31

1    Q.  How about McKesson, did you ever meet with
2  anyone from McKesson?
3    A.  I was in meetings with McKesson about some
4  systems work later in my tenure there, but it wasn't
5  related to controlled substances.  It was about a data
6  exchange basically, but -- but I never met with any of
7  them about purchasing or anything of that nature; but I
8  was -- I attended a meeting that -- that there were
9  McKesson people at.
10   Q.  So you mentioned that, among the
11 responsibilities of the regulatory compliance person
12 who was one of the people who reported to you -- well,
13 first of all, that's correct, that the regulatory
14 compliance person reported to you when you were the
15 vice president of logistics?
16       MS. McENROE:  Objection to form.
17       THE WITNESS:  That's correct.
18 BY MR. PIFKO:
19   Q.  Okay.  And so I believe you testified earlier
20 that among those responsibilities that the regulatory
21 compliance person had was the Controlled Substances
22 Act, correct?
23       MS. McENROE:  Objection to form.
24       THE WITNESS:  What I said was that there --
25   that individual's responsibility was to act as a

Page 32

1    liaison and coordinate activity at the
2    distribution centers and to ensure compliance with
3    all regulations to use as a resource with the
4    folks in the corporate office.
5  BY MR. PIFKO:
6    Q.  Okay.  And what I'm trying to get at is if,
7  when you say all regulations, if you're aware if that
8  included the Controlled Substances Act?
9    A.  I am aware of that, yes.
10   Q.  Have you heard of the Controlled Substances
11 Act before?
12   A.  Yes, I have.
13   Q.  When do you believe was the first time you
14 heard that?
15   A.  Many years ago.  I -- I couldn't -- I'm sure I
16 was working for Eckerd's at the time, so --
17   Q.  Do you have an understanding about what
18 diversion is?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  I do.
21 BY MR. PIFKO:
22   Q.  Can you tell me what your understanding is?
23   A.  Diversion is when product is taken out of the
24 supply chain when it's diverted from its intended
25 target, its intended destination, its intended

Page 33

1  customer, to someone else in the supply chain.
2    Q.  Have you ever heard of the idea that someone
3  is a registrant under the Controlled Substances Act?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  I have.
6  BY MR. PIFKO:
7    Q.  Did you understand, when you were vice
8  president of logistics, that Rite-Aid was a registrant
9  under the Controlled Substances Act?
10   A.  I did.
11   Q.  How did you come to have that understanding?
12   A.  Well, the -- I'm familiar with the need for an
13 individual location to be a registrant, to have a DEA
14 registration number.  So as a part of my knowledge in
15 working in the chain drug industry as long as I did, I
16 know that every store and every distribution center is
17 registered, and it has a DEA registration number.
18   Q.  Have you ever heard of the phrase that a
19 registrant has a duty to maintain effective controls to
20 prevent diversion?
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  I have heard that, yes.
23 BY MR. PIFKO:
24   Q.  When you were VP of logistics, did you
25 understand that locations that -- where Rite-Aid held a

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 registration, that they had duties to maintain
2 effective controls to prevent diversion?
3        MS. McENROE: Objection to form.
4        THE WITNESS: I do understand -- or did
5    understand that, yes.
6 BY MR. PIFKO:
7    Q.   Okay. Are you familiar with the activities
8 that occurred at Rite-Aid locations to carry out that
9 duty --
10        MS. McENROE: Objection.
11 BY MR. PIFKO:
12    Q.   -- to maintain effective controls to prevent
13 diversion?
14        MS. McENROE: Object to form.
15        THE WITNESS: I am familiar with -- with it,
16    yes.
17 BY MR. PIFKO:
18    Q.   What is your understanding of what activities
19 were taken by Rite-Aid during the period when you were
20 VP of logistics in connection with the duty to prevent
21 diversion?
22        MS. McENROE: Object to the form. Calls for a
23    narrative. Can you break that down a little bit
24    more, Mr. Pifko?
25 BY MR. PIFKO:

Page 35

1    Q.   Do you understand the question?
2    A.   I -- I do.
3    Q.   Okay. Can you give me an answer?
4        MS. McENROE: Can you ask something a little
5    bit more specific?
6        MR. PIFKO: Well, I'd like to hear his answer.
7        THE WITNESS: I guess the first thing that I
8    would say is Rite-Aid is a closed system.
9    Rite-Aid shipped only to its own -- our
10    distribution centers only shipped to Rite-Aid
11    stores.
12        So as a part of that, in terms of ensuring
13    there was no diversion, we -- we knew both the
14    from and the -- you know, the origination and the
15    destination of every shipment was a Rite-Aid
16    location; and in terms of the quantity of those
17    orders, there were a variety of controls.
18        The orders were created not by a human. They
19    were system created based on actual sales at a
20    store, actual scripts that were filled and product
21    that was consumed at a store.
22        So there wasn't a -- there wasn't a capability
23    of someone just to place an unusually large order
24    as a human to try to divert product. Pharmacists
25    were able to modify those orders, but there was

Page 36

1    limitations on the pharmacist's ability to modify
2    those orders.
3        So again, there was very tight controls on the
4    orders that were placed that were sent to the
5    distribution centers. Once it arrived at the
6    distribution center, we had kind of a couple of
7    things that were what I would characterize as a
8    kind of a last line of defense or a final step in
9    that.
10        We had a threshold above which no order would
11    be filled, and we also had given the assignment
12    and responsibility of the order fillers in the
13    controlled substance area, because they were
14    familiar with kind of the general flow and size of
15    orders, if they saw something they thought was
16    unusual, they had the authority to stop the order
17    and adjust and/or call the store to confirm
18    whether the order had been, you know, entered
19    correctly or created correctly, regardless of
20    whether it met or exceeded the threshold that I
21    mentioned.
22        So there was multiple components in place to
23    manage that and to ensure that no product was
24    diverted.
25 BY MR. PIFKO:

Page 37

1    Q.   Okay. So let's -- let's break that out a
2 little bit, and then I also want to ask you just before
3 we do that, so you -- you held the -- I asked you to
4 provide that answer in the time period of when you were
5 VP of logistics, and so that was a fairly long time
6 period where you held that position.
7    A.   Yes.
8    Q.   So I want to ask you, was the explanation that
9 you just provided, was that the same process that was
10 used during your entire tenure as VP of logistics?
11    A.   To the best of my knowledge, it was. I wasn't
12 responsible for the store ordering component of it, but
13 I know generally how it worked, but -- so to the best
14 of my knowledge, it was, yes.
15    Q.   Okay. So let's unpack some of the different
16 issues that you talked about. First, you said
17 something about -- you were talking about how -- the
18 way in which orders were placed at the store and how it
19 was based on product that was sold. Can you -- do
20 you --
21    A.   Well, actually -- I'm sorry.
22        MS. McENROE: Let him finish his question.
23        THE WITNESS: I'm sorry. Go ahead.
24 BY MR. PIFKO:
25    Q.   Okay. Well, first of all, I just want to ask

Page 38

1 if you have familiarity with how the orders were placed
2 at a particular store.
3      MS. McENROE: Objection to form.
4      THE WITNESS: Okay. What I was going to say,
5   actually, the first thing I said was that Rite-Aid
6   was a closed system, that we only shipped to our
7   own stores. So certainly that -- there's an
8   inherent level of control there that perhaps other
9   shippers don't have. So that was the first thing
10  that I said.
11      In answer to your question, you're -- you're
12  asking how was the inventory managed at the store,
13  or can you clarify that?
14 BY MR. PIFKO:
15  Q. Yeah. And to be clear, I'm just asking about
16 controlled substances right now.
17  A. Okay. Can you repeat it then, please?
18  Q. Yeah. And then let's also -- let me ask
19 another foundational question. Are you familiar that
20 under Federal law there's a scheduling of controlled
21 substances?
22  A. I am.
23  Q. Okay. And you understand there's Schedule 1
24 through 5?
25  A. I am.

Page 39

1  Q. Okay. And do you have an understanding about
2 what the different levels are in the scheduling?
3      MS. McENROE: Objection to form.
4      THE WITNESS: Yes. I have an understanding
5   in -- and as you, I'm sure, know, Rite-Aid did not
6   ship Schedule 2 substances out of our distribution
7   centers.
8 BY MR. PIFKO:
9  Q. Okay. What's your understanding of the
10 differences in the scheduling? What's the difference
11 between, for example, something that's a Schedule 2
12 versus a Schedule 3?
13      MS. McENROE: Objection to form.
14      THE WITNESS: I -- my general understanding
15   would be, I would expect that it's more
16   susceptible to -- a Schedule 2 is more susceptible
17   to abuse than a Schedule 3, but I don't know that.
18   I'm not a pharmacist, so --
19 BY MR. PIFKO:
20  Q. Okay. And that's -- all I'm asking you today
21 is to give your best ability to answer. So just --
22  A. Okay.
23  Q. I'm not asking you to be an expert in
24 anything. If you know something, you tell me. If you
25 don't -- okay?

Page 40

1  A. Okay.
2  Q. So it's your understanding that a lower
3 numbered scheduled substance is more prone to abuse
4 than a higher number scheduled substance; is that
5 correct?
6      MS. McENROE: Objection to form.
7      THE WITNESS: That would be my impression,
8   yes.
9 BY MR. PIFKO:
10  Q. And then what's the basis for that
11 understanding?
12  A. The degree of control that's required for the
13 varying schedule levels and mandated by the DEA.
14  Q. Have you ever read DEA regulations concerning
15 handling of controlled substances?
16  A. I have.
17  Q. Okay. Have you ever read portions of the
18 Controlled Substances Act?
19  A. I may have. I -- I don't know for sure. I
20 can't say with certainty that I have. I know I have
21 read the CFR, some portions of that, so --
22  Q. What was the context in which you've read the
23 portions of the CFR?
24  A. When we've done work in distribution centers
25 to construct pharmacy areas and ensure that -- it was

Page 41

1 to ensure that the physical security aspects were met
2 properly.
3  Q. When you say "physical security," what do you
4 mean by that?
5  A. That it's kind of as a general statement, the
6 areas where you pick controlled substances have to be
7 contained within a cage, and there's, you know, some
8 specifications about the wire gauge and how big the
9 holes can be in the cage and things of that -- and the
10 fencing and things of that nature, so --
11  Q. So let's go back to the -- the placing of an
12 order.
13  A. Okay.
14  Q. When you were explaining to me the -- that
15 there were some sort of limitations on placing of
16 orders, I'd like you to explain that, your
17 understanding of how an order was placed at a pharmacy
18 for -- you said that Rite-Aid didn't ship -- or it
19 didn't distribute Schedule 2 substances, so let's just
20 talk about Schedule 3 substances.
21  A. Okay.
22      MS. McENROE: Objection to form.
23 BY MR. PIFKO:
24  Q. Let me just ask a better question. So my
25 question to you is, with respect to Schedule 3

Page 42

1 substances, do you understand how an order was placed
2 at a particular pharmacy location at a store to a
3 distribution center?
4     MS. McENROE: Objection to form.
5     THE WITNESS: My understanding is that for all
6 pharmacy products, it was a computerized ordering
7 system. They created an order based on the demand
8 for that item and the on-hand balance in -- in the
9 store; and the demand obviously is a function of
10 the sales or the -- and the use -- in the instance
11 of a pharmaceutical product, of its consumption
12 when filling scripts.
13     So it was a computerized algorithm that took
14 into account the on-hand balance and the rate of
15 sale for that product to calculate an efficient
16 order quantity.
17 BY MR. PIFKO:
18 Q. Okay. So there's a computer system at a
19 particular pharmacy location in the store. Yes?
20 A. Well, there's --
21     MS. McENROE: Objection to form.
22     THE WITNESS: I'm sorry. There's a mainframe
23 that actually -- you know, the computer was not --
24 did not reside at a -- at an individual store,
25 so --

Page 43

1 BY MR. PIFKO:
2 Q. Okay.
3 A. But the store connected to the computer
4 system, yes.
5 Q. Okay. Is there a name for the software that
6 managed the ordering system, do you know?
7 A. I would assume that there is, but I don't know
8 what it is.
9 Q. Okay.
10 A. So --
11 Q. And it's your understanding that the mainframe
12 system was located somewhere centralized?
13 A. Correct.
14 Q. Okay. And was that same system used for all
15 the Rite-Aid stores?
16 A. That is my understanding, yes.
17 Q. Do you know where -- physically where that
18 system was located?
19 A. In Camp Hill, Pennsylvania, so -- or there --
20 in the greater Camp Hill area. Maybe I should, you
21 know, be more precise with that, so --
22 Q. Is there a department or division of the
23 company that was responsible for maintaining that
24 process?
25     MS. McENROE: Objection to form.

Page 44

1     THE WITNESS: There is and was an IT
2 department that was responsible for maintaining
3 both the hardware and the software.
4 BY MR. PIFKO:
5 Q. And then just the IT department, is there any
6 other special name?
7 A. No. No.
8 Q. So under this system, the computer, the
9 mainframe is looking at how much product is moving
10 through the store and seeing the rate at which product
11 is being taken off the shelves and comparing that to
12 the inventory on hand and then automatically putting in
13 an order so that you can ensure that the location has
14 enough product to fulfill the demand; is that correct?
15     MS. McENROE: Objection to form.
16     THE WITNESS: Yes. The goal was to ensure
17 that we satisfied our customers. I mean, it's
18 a -- it's -- you know, you can imagine it's -- the
19 key component of our business is to make sure that
20 we get the medications and the medicines in the
21 hands of our customers, so yes.
22 BY MR. PIFKO:
23 Q. Okay. So an order through that system gets
24 placed by a store to a distribution center, correct?
25 A. Correct.

Page 45

1 Q. And are you familiar with the process by which
2 an order is received at a distribution center?
3     MS. McENROE: Objection to form.
4     THE WITNESS: I am.
5 BY MR. PIFKO:
6 Q. Okay. And I want to be clear. I know you
7 had -- you were a general manager of several
8 distribution centers. I'm just talking about Schedule
9 3 controlled substances right now. Okay?
10 A. Okay.
11 Q. So with respect to a Schedule 3 controlled
12 substance, when an order comes in to a distribution
13 center, how -- how does that happen?
14     MS. McENROE: Objection to form.
15     THE WITNESS: The distribution centers operate
16 on a type of software that's called -- the acronym
17 you will hear is a WMS. It stands for Warehouse
18 Management System; and the warehouse management
19 system is what creates and manages orders, manages
20 receipts of goods in the receiving department, the
21 storage of product, you know, all of the various
22 facets of operating a distribution center.
23     So the order would be transmitted or would
24 move through the portion of the mainframe that
25 created the order into the Warehouse Management

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 System for the particular distribution center
2 that -- that -- that serviced that store; and part
3 of the ware -- as part of the Warehouse Management
4 System, it would be routed to the pharmacy pick
5 area.
6 BY MR. PIFKO:
7 Q. So is it correct that a specific distribution
8 center is responsible for all products at certain
9 specific stores?
10 MS. McENROE: Objection to form.
11 THE WITNESS: No, it is not.
12 BY MR. PIFKO:
13 Q. Okay. So let's explain that. Is it possible,
14 within Rite-Aid systems, for more than one distribution
15 center to send product to a particular store?
16 MS. McENROE: Objection to form.
17 THE WITNESS: It is.
18 BY MR. PIFKO:
19 Q. Are you familiar with the process of how an
20 order is sent to one distribution center or another?
21 A. I am.
22 Q. Okay. What's your understanding of that?
23 A. Rite-Aid kind of categorized products in -- in
24 big picture, and there's kind of three types of
25 products. There were Rx products; there were what were

Page 47

1 called CP products for centralized products, and there
2 were front-end products; and every distribution center
3 stocked the front-end products.
4 A subset of the distribution centers stocked
5 the CP and the pharmacy products. So a store that
6 would -- whose trucks originated at a DC that only
7 stocked front-end products, like the Philadelphia one
8 that I managed, got their CP and pharmacy products from
9 another distribution center.
10 That product was select -- the orders were
11 selected and picked and packed at the other
12 distribution center, sent to the front-end distribution
13 center. So they would have been sent to Philadelphia,
14 and they would have been cross-docked and merged with
15 the product that Philadelphia picked for that store for
16 the load to be completed for delivery to the store.
17 Q. So when you say -- you used the term
18 "cross-docked." So that means -- so for -- let's talk
19 about the, as an example, the Philadelphia location.
20 So there's a truck that's going to go to a particular
21 store that's filled with what you would call front-end
22 product, correct?
23 MS. McENROE: Objection to form. Is there a
24 question there? Yeah.
25 BY MR. PIFKO:

Page 48

1 Q. Some front-end product from that distribution
2 center is placed on the loading dock to be put on a
3 truck to go to a particular store; is that correct?
4 MS. McENROE: Objection to form.
5 THE WITNESS: Product, yes. Product from --
6 is selected by Philadelphia, which would be the
7 front-end product, would be put on the loading
8 dock, yes.
9 BY MR. PIFKO:
10 Q. Okay. And if a store that's fulfilled by the
11 Philadelphia center needs controlled substances and the
12 Philadelphia center doesn't provide that, that comes in
13 on another truck from another distribution center to
14 the Philadelphia distribution center; is that correct?
15 MS. McENROE: Objection to form.
16 THE WITNESS: That is correct.
17 BY MR. PIFKO:
18 Q. Okay. And so that pallet or pallets of goods
19 then is merged in with the other goods from the
20 Philadelphia center; is that correct?
21 MS. McENROE: Objection to form.
22 THE WITNESS: It's not quite that simple.
23 There is a -- in each of the distribution centers
24 there were what are called cross-dock cages that
25 were approved and inspected by the DEA, and the

Page 49

1 DEA approved our procedures around those
2 cross-dock cages.
3 So the product, when it came from the pharmacy
4 distribution center, didn't go to the loading
5 dock. It went to the cross-dock cage, and it was
6 counted and tallied as it went into the cross-dock
7 cage; and then when it came out of the cross-dock
8 cage to go onto the outbound load, it was -- the
9 counts were verified, and so there was a final
10 count of totes that were put on out of the
11 cross-dock cage, you know, onto -- there was a
12 final count that was part of the loading manifest
13 for that final delivery.
14 BY MR. PIFKO:
15 Q. Okay. So when you have a distribution center
16 that doesn't provide its own controlled substances and
17 it has to get them from another distribution center,
18 all the controlled substances that come in are put in a
19 separate area until they're ultimately loaded on a
20 truck?
21 MS. McENROE: Objection to form.
22 THE WITNESS: All of the pharmacy product, all
23 of it is --
24 BY MR. PIFKO:
25 Q. Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    A. -- is in a -- was in a cross-dock cage.
2    Q. Okay.
3    A. Again, it was -- the entire process was
4  approved by the DEA. They gave -- approved the
5  specifications when the cross-dock cages were
6  constructed, inspected, and approved them for use
7  before they were put into use.
8    Q. So when an order is getting put on a truck,
9  there's -- there's some sort of manifest of what's
10 supposed to go into that truck?
11   MS. McENROE: Objection to form.
12   THE WITNESS: There is a -- are you -- are you
13 talking specifically about pharmacy products?
14 BY MR. PIFKO:
15   Q. Well, in general, any products. A truck is
16 going to go to a store. How do you know what to put on
17 that truck?
18   MS. McENROE: Objection to form.
19   THE WITNESS: There are -- for the front-end
20 products, those are packed and palletized by
21 selectors in the front-end distribution center.
22 There was not necessarily a -- it depended on
23 the distribution center because they had different
24 systems at different locations; but there wasn't
25 necessarily, for front-end product, a specific

Page 51

1  tally that said, you know, you're getting 112
2  totes, you know, 68 boxes, things of that nature.
3    The way that operated is everything came
4  through the conveyor system to the shipping
5  department and was controlled -- there was a
6  mechanism to control that you knew when a wave of
7  stores were finished so that you knew you had all
8  the picks for that store and it was complete; but
9  there was not a tally, you know, a count of totes,
10 for example, of front-end product.
11   Now, pharmacy product, there absolutely was.
12 There was a specific count that was signed for
13 when the cross-dock DC, you know, came into the
14 cross-dock DC. The counts were verified. They
15 were verified when they were loaded onto the
16 truck, and they were signed for when they were
17 delivered to the store.
18 BY MR. PIFKO:
19   Q. Okay. And so when someone is loading that
20 onto the truck, there's some sort of indication that
21 you're supposed to go to the pharmacy cage and get
22 products?
23   A. And they know how many totes --
24   MS. McENROE: Objection to form.
25   THE WITNESS: And they know how many totes

Page 52

1  they're supposed to get, correct.
2  BY MR. PIFKO:
3    Q. Okay. So they go and get that, and then as
4  they're loading the truck, they put that in there?
5    A. Correct.
6    Q. Let's back up to the actual pharmacy location
7  again. So we talked about the automated system where
8  you have the computer algorithms that's monitoring
9  demand and product moving out of the store and checking
10 the inventory. Do you recall that discussion?
11   A. I do.
12   MS. McENROE: Objection to form.
13 BY MR. PIFKO:
14   Q. So do you have familiarity with how the
15 inventory is inputted into the -- at the pharmacy is
16 inputted into that computer system?
17   MS. McENROE: Objection to form.
18   THE WITNESS: I -- that wasn't my area of
19 responsibility. I -- I -- my general
20 understanding is that the orders that were shipped
21 were received into the distribution -- into the
22 inventory of the store based on the projected
23 delivery date from the distribution center, but
24 I'm not an expert on that system.
25 BY MR. PIFKO:

Page 53

1    Q. Okay. But what I'm trying to understand is,
2  you said it's an algorithm that's sort of checking the
3  rate of products moving versus what's sitting on the
4  shelf in the pharmacy, correct?
5    A. Correct.
6    Q. And so what I'm trying to understand is, how
7  does the computer know what's sitting on the shelf, if
8  you know that?
9    A. My understanding is that there -- we knew what
10 day a store was -- the delivery would take place for
11 that store. We knew the contents of the pharmacy
12 totes, and we knew how many pharmacy totes that they
13 received -- or that were shipped to them.
14    On the day that the delivery took place to
15 that store, the pharmacy's -- my understanding is that
16 the pharmacy's inventory was updated with the contents
17 of those totes.
18   Q. Okay. So it's essentially automated updating
19 based on the materials that are coming in. The
20 computer knows that 10 items came in, so it just adds
21 10 items to the known inventory; is that correct?
22   MS. McENROE: Objection to form.
23   THE WITNESS: That is my understanding.
24 BY MR. PIFKO:
25   Q. Okay. So then let's talk about how the orders

Page 54

1  came in to the distribution center again.  For -- I
2  asked you and I kind of understood, but I think we can
3  get a clearer record.
4        With respect to Schedule 3 controlled
5  substances, when a specific pharmacy needs to fill
6  their inventory, does that order always get placed to
7  the same distribution center for pharmaceutical
8  products, or can it get bumped around to different
9  distribution centers?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  There is a fixed relationship
12    between a store and its servicing DC or DCs.
13    However, that can change over time; but at any
14    point in time, a store would only receive pharmacy
15    product from one Rite-Aid distribution center.
16  BY MR. PIFKO:
17    Q.  Is it possible that if the distribution center
18  is out of a product that's ordered or low on it, that
19  that order could then be kicked over to another
20  distribution center?
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  It was not.  That was not our
23    process.
24  BY MR. PIFKO:
25    Q.  Okay.  And then I think I asked you this

Page 55

1  before, but do you know the name of the ordering
2  software that was used?
3    A.  In the -- to create the store orders?
4    Q.  Well, the computer system that facilitated the
5  ordering between the stores and the distribution
6  centers.
7    A.  I don't.  I -- no, I don't.
8    Q.  You talked about a warehouse management
9  system.  Do you recall saying that?
10   A.  Yes.
11   Q.  Okay.  Is that just a generic name for a type
12  of software?
13   A.  It is.
14   Q.  Okay.  That's not a specific company or --
15   A.  No.
16   Q.  -- brand or anything like that?
17   A.  No, it is not.
18   Q.  So an order gets placed into a distribution
19  center, and then that -- that distribution center
20  receives that via computer?
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  Correct.
23  BY MR. PIFKO:
24   Q.  And then is the order from a pharmacy, would
25  that contain a whole host of items that they might need

Page 56

1  at any particular time?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  It could.  It would contain all
4    of the items that were part of the order that they
5    were expected to place on that day.
6  BY MR. PIFKO:
7    Q.  So your understanding -- you understand that
8  in connection with the lawsuit, certain documents were
9  collected from Rite-Aid?
10   A.  I do.
11   Q.  Okay.  And some of those included documents
12  from your E-mail.  Do you understand that?
13   A.  I do.
14   Q.  Okay.  So I've looked at some of those
15  documents.  I've seen that some stores were called
16  weekly and some were called biweekly; is that correct?
17   A.  Correct.
18   Q.  Okay.  And that means that a truck would come
19  to them weekly or biweekly; is that correct?
20   A.  Correct.
21   Q.  And so the automated system was set up to fill
22  orders as needed, either weekly or biweekly; is that
23  correct?
24       MS. McENROE:  Objection to form.
25       THE WITNESS:  To the best of my knowledge,

Page 57

1  yes.
2  BY MR. PIFKO:
3    Q.  Okay.  So an order that comes into the
4  distribution center contains all the various items the
5  store might need, either on a weekly or biweekly basis,
6  correct?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  Yes.
9  BY MR. PIFKO:
10   Q.  Okay.  And then there's -- you testified
11  earlier that there's different areas within the
12  distribution center where an order could be filled,
13  correct?
14       MS. McENROE:  Objection to form.
15       THE WITNESS:  Correct.
16  BY MR. PIFKO:
17   Q.  And so one of those areas is pharmacy,
18  correct?
19   A.  Correct.
20   Q.  So when an order comes in from a location, is
21  it somehow then divided into, okay, these people need
22  to look at this portion of the order and these people
23  need to look at this portion of the order?
24       MS. McENROE:  Objection to form.
25       THE WITNESS:  The -- all of the items that the

Page 58

1  distribution center will select for -- would
2  select for a store, would fill for a store, have a
3  defined pick location within the distribution
4  center.
5      So the orders are broken out according to pick
6  locations, and so all of the orders that involve
7  pharmaceutical products would be broken out by the
8  pick locations that were assigned to those
9  pharmaceutical products and sent to the area to
10  pick pharmaceuticals.
11  BY MR. PIFKO:
12  Q.  When you say "sent to the area," does that
13  mean it's loaded onto a computer terminal in that area,
14  or is there a physical piece of paper that gets printed
15  out?  Are you familiar with that process?
16  A.  It's -- we used a system called pick-to-light.
17  So it was a computerized system and -- with a display
18  at each pick location that would tell you the quantity
19  to pick, and so it was sent to the pick-to-light
20  system.
21  Q.  So if you're an employee who's responsible for
22  fulfilling an order, is there a name for that type of
23  employee?
24      MS. McENROE:  Objection to form.
25      THE WITNESS:  It would be an order selector.

Page 59

1  I mean -- yes.
2  BY MR. PIFKO:
3  Q.  Okay.
4  A.  A pharmacy order selector, so --
5  Q.  So a Schedule 3 controlled substance order
6  comes in.  The order selector, they have to go to a
7  computer terminal and determine what orders they're
8  supposed to fill?
9      MS. McENROE:  Objection to form.
10      THE WITNESS:  The orders automatically load
11  into the pick-to -- or are automatically loaded
12  into the pick-to-light system.  So they're queued
13  up for the order selector, and so they would
14  basically just start with the first order that was
15  in the system for them, if that makes sense.
16  BY MR. PIFKO:
17  Q.  Yeah.  And I'm just trying to visualize.  So
18  I'm a worker in the distribution center.  Do I have a
19  handheld terminal, or I go to, like, a desk where
20  there's -- the orders are laid out for me?  How do I
21  know what I'm supposed to do?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  You go to a picking module, and
24  there are, in that picking module -- and by
25  "picking module" I mean a set of shelves that

Page 60

1  contain product.
2      On -- each of those shelves are subdivided
3  into pick locations that I -- as I mentioned
4  earlier that are defined for a specific product.
5  Each of those locations has a light in front of
6  it, an LED display that is intended to be able to
7  display the pick quantity for that skew for the
8  store that you're selecting; and then there's
9  another overall display for the order that you're
10  selecting.
11      So at the beginning of the pick area, you pick
12  up a tote, you'd scan the tote.  It would tell
13  you, okay, now you're on Order 1234567.  It knows
14  that that tote that you're using is associated
15  with that order, and it would light the lights for
16  you to go and pick the individual products.
17  BY MR. PIFKO:
18  Q.  Okay.  And then how -- are you familiar with
19  how the lights relate to quantity?
20  A.  The lights displayed the quantity, so --
21  Q.  Okay.  So --
22  A.  They would display two if you were to pick two
23  bottles.  They would display one if you were to pick
24  one.
25  Q.  Okay.  I thought you said something about

Page 61

1  color, did I mishear you, of the light?
2  A.  I don't recall saying that.
3  Q.  Okay.
4  A.  I said LED.  They were LED lights, yeah.
5  Q.  Okay.  So I'm an order filler.
6  A.  Order selector.
7  Q.  Okay.  I'm an order selector, and I type in
8  I'm going to fill pharmaceutical products for Store
9  12345 into the computer, and then it lights up all the
10  different boxes I need to go to to put into the tote?
11  A.  In effect.  I mean, you scan a tote to start
12  the order.  You go into the area.  An order is queued
13  up in the area that you're working in.  When you scan a
14  tote to start an order, it knows, okay, the order that
15  I have queued up on this display is the order for this
16  tote they're -- this individual is beginning to
17  work in.  So that's kind of the general.
18  Q.  Okay.  And then as I move down the aisle, I
19  see areas that are lit up, and it has a number next to
20  it?
21  A.  Correct.
22  Q.  And then there's a, like, a bin, like you
23  said, and I grab the number of items that are lit up on
24  the light and put it into the tote?
25  A.  Correct.  And then you'd press a button to

Page 62

1 confirm that you picked it, and it puts the -- the
2 display then goes away.
3    Q.  And then when I've completed that, I put the
4 tote somewhere?
5    A.  There's a --
6     MS. McENROE:  Object to form.
7     THE WITNESS:  There's a conveyor system that
8 takes the tote away from the pharmacy area.
9     MS. McENROE:  Mr. Pifko, if we get to a good
10 time to stop for a break, we've been going about
11 an hour.
12     MR. PIFKO:  Yeah.  We can take a break right
13 now.
14     MS. McENROE:  Great.  Thank you.
15     MR. PIFKO:  Thanks.
16     THE VIDEOGRAPHER:  Off the record, 10:40 a.m.
17    (Brief recess was taken.)
18     THE VIDEOGRAPHER:  On the record, 10:53 a.m.
19 BY MR. PIFKO:
20    Q.  I forgot to ask you before we started:  Have
21 you ever been deposed before?
22    A.  I have not.
23    Q.  All right.  What did you do to prepare for
24 this deposition?
25    A.  I had a telephone call with our attorneys last

Page 63

1 Monday and then had some meetings yesterday -- or met
2 with them yesterday.
3    Q.  When was the -- and when you say your
4 attorneys, you mean the woman next to you?
5    A.  Yeah.  I mean John, Kelly, and Elisa, correct.
6    Q.  Okay.  When was the first time that you heard
7 you were going to be deposed in connection with this
8 case?
9    A.  It was a few months ago.  I couldn't tell you
10 the exact date, but it was some -- a few months ago.
11    Q.  I talked to you earlier about documents and
12 the idea that certain documents were collected for the
13 litigation.  Did you do anything to look and see if you
14 had any documents, aside from those that might be
15 maintained at the company?
16    A.  You're asking did I check at home to see if
17 I --
18    Q.  Yes.
19    A.  I do not have any documents at home related to
20 my employment at Rite-Aid.  The only -- let me correct
21 that.  The only documents I have related to my
22 employment at Rite-Aid are related to my retirement.
23 You know, I have things about my 401(k).
24    Q.  Nothing related to the case?
25    A.  But nothing related to the case, no.

Page 64

1    Q.  Okay.  So let's go back to our discussion
2 about the order process.
3    A.  Okay.
4    Q.  Does the -- so this -- we talked about the
5 system where an order is placed with the pharmacy is
6 automated, correct?
7    A.  Correct.
8    Q.  Does the -- I keep forgetting the name of the
9 person -- the order -- I'm going to write it down.
10    A.  Order selector.
11    Q.  Order selector.  Does the order selector have
12 any ability -- ability to deviate from the items that
13 the -- that the automated system is lighting up and
14 telling them to pick?
15    A.  To add additional items?  No.
16    Q.  How about to subtract items?
17    A.  They can -- they can adjust the quantity down
18 for an item.  They can't delete an item from the
19 record; but, if they were unable to pick an item or, as
20 I mentioned earlier, we had controls in place involving
21 thresholds that couldn't be exceeded, if the order
22 quantity that initially came in exceeded that, they had
23 the ability to adjust the quantity down, but they
24 couldn't remove an item from the record, if that's your
25 question.

Page 65

1    Q.  Okay.  Well, let's -- let's talk about the --
2 more details of that.  Okay?
3    A.  Okay.
4    Q.  So if an item -- I think what you just said,
5 if an item, if there's not enough of it in the
6 container when they go to pick it, that might be a
7 reason that they'd have to put less in there?
8    A.  They could adjust an order down if we were out
9 of stock or, for some reason, unable to fill that item,
10 that order, yes.
11    Q.  And then -- but -- okay.  So that isn't really
12 up to them.  It's just if they go to -- it says pick 10
13 items and there's only nine in there, that's all
14 they -- they just pick what they can and then they
15 write in the computer that it was out of stock?
16     MS. McENROE:  Objection to form.
17     THE WITNESS:  If -- if they're unable to
18 fulfill the entire order quantity on the
19 pick-to-light display, the module that is
20 underneath the pick location, there's an ability
21 for them to adjust down.
22     As I mentioned earlier, when they pick, if
23 they pick complete, they indicate they pick
24 complete, confirm it, and the light goes out.  If
25 they pick less than complete, they reduce the

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  quantity and confirm it, and the light goes out.
2  BY MR. PIFKO:
3  Q.  And then you mentioned that there are -- there
4  were order thresholds for controlled substances that
5  couldn't be exceeded, correct?
6  A.  There was an order threshold, yes, a single
7  value, yes.
8  Q.  Okay.  Are you familiar with the thresholds?
9  MS. McENROE:  Objection to form.
10  THE WITNESS:  I -- I am.
11  BY MR. PIFKO:
12  Q.  Did all the stores have the same threshold?
13  MS. McENROE:  Objection to form.
14  THE WITNESS:  It was generally true there was
15  a single threshold.  There were a very small
16  number of stores that, after evaluation and
17  analysis by our government affairs department,
18  were defined as exceptions and could get greater
19  quantities than the threshold; but there was a
20  process that they had to go through.
21  You know, the government affairs department
22  looked at the movement, the location of the store,
23  the movement of the items, the history, that type
24  of thing, and then an exception could be granted;
25  but there was a very, very small number of those

Page 67

1  exceptions.
2  BY MR. PIFKO:
3  Q.  Do you have a time frame on the exceptions?
4  MS. McENROE:  Objection to form.
5  THE WITNESS:  I'm not sure I understand the
6  question.
7  BY MR. PIFKO:
8  Q.  Okay.  So I'm asking, again, we took a break,
9  so I want to be clear about that.  I'm asking -- these
10  questions are about the time period when you were VP of
11  logistics.  Okay?
12  A.  Okay.
13  Q.  So you said that there was a very small number
14  of stores that had a higher threshold, correct?
15  A.  Correct.
16  Q.  Do you know the, roughly, the time periods
17  when those stores moved into a period when they had
18  this higher threshold?
19  MS. McENROE:  Objection to form.
20  THE WITNESS:  I do not.
21  BY MR. PIFKO:
22  Q.  But aside from that small handful, all stores
23  had the same threshold for controlled substances; is
24  that correct?
25  MS. McENROE:  Objection to form.

Page 68

1  THE WITNESS:  That is correct.
2  BY MR. PIFKO:
3  Q.  Let's talk about breaking out the thresholds a
4  little bit.  Do you have an understanding, were there
5  thresholds for different types of products?
6  A.  No.
7  Q.  Okay.  So all Schedule 3s at all stores, other
8  than this handful of stores, all had the same
9  threshold?
10  A.  Correct.
11  Q.  Do you know what the threshold was?
12  A.  I believe it was 5,000 dosage units.  So if it
13  was, you know, a bottle of a hundred, the quantity
14  would be 50.
15  Q.  And do you --
16  A.  I believe that's correct.
17  Q.  Do you have an understanding about how that
18  threshold was established?
19  A.  I do not.  That threshold was in place when I
20  joined Rite-Aid, so I -- I don't know the history of
21  that.  I -- I generally understand there was an
22  analysis done of order volumes and demand; but I -- as
23  I said, it was in place when I joined Rite-Aid, so I
24  don't have the details of how it was established.
25  Q.  And so if an order came in from the automated

Page 69

1  system that exceeded the threshold, the order selector,
2  how would they know that it exceeded the threshold?
3  A.  By what it displayed on the pick-to-light
4  module.
5  Q.  So the pick-to-light module would
6  automatically adjust down the order to meet the
7  threshold?
8  A.  No.  The order selector adjusted the order
9  down.
10  Q.  Okay.  So how did the order -- did the order
11  selector know what the threshold -- where a store was
12  in terms of a threshold and how the order needed to be
13  adjusted down?
14  A.  Well, again, using the example I just gave, if
15  the product was in bottles of a hundred, they would
16  know they couldn't bill more than 50, you know,
17  assuming that the threshold was 5,000, which I believe
18  it was, they couldn't bill more than 50.  So if an
19  order came in for 55, they would adjust it down to 50.
20  Q.  And then I think maybe some of my confusion
21  was, I needed to ask some more questions about the --
22  how the threshold works.  So the threshold, is that --
23  was that a weekly threshold?
24  A.  It was on the order that was received, so it
25  was on that order.  As you mentioned earlier, some

Page 70

1 stores were biweekly stores, so they only got product
2 every other week. So it was on the order.
3   Q. So the threshold was based on the period for
4 which an order would be filled for that store?
5   A. The threshold was per order, correct.
6   Q. And you said all the stores had 5,000?
7   A. That's my understanding, yes.
8   Q. What about for --
9   A. Except the exception stores that we mentioned,
10 so --
11   Q. So for a store that was biweekly, was there a
12 threshold half of 5,000 or their threshold was 5,000 as
13 well?
14   A. The threshold was 5,000 for all stores, to the
15 best of my knowledge, other than the exception stores
16 that went through a process to get an exception granted
17 through our government affairs department.
18   Q. And so that 5,000 was for a specific order,
19 correct?
20   MS. McENROE: Objection to form.
21   THE WITNESS: It was per order for that
22   particular -- in other words, you're looking at
23   the order today. You're not allowed to ship them
24   more than 5,000 units.
25 BY MR. PIFKO:

Page 71

1   Q. And so the order selectors were familiar with
2 that threshold because it was the same for all stores,
3 correct?
4   A. Absolutely. Yes. That's correct.
5   Q. And so if an order came in from an automated
6 system that exceeded that, they would know that when
7 they saw it, and then they would adjust it downward?
8   A. Correct.
9   Q. How would they go and adjust it downward?
10   A. The pick-to-light module that shows the order
11 quantity, there's a mechanism for adjusting the pick
12 down; and so they would adjust it down to whatever
13 quantity it was that they picked, and then they would
14 confirm that.
15   Q. And then they would just adjust it down so
16 that it was within the threshold?
17   A. So that it met the threshold. They would
18 adjust it to the threshold level.
19   Q. So if an order came in for 5,001 dosage units,
20 they would adjust it down to 5,000 dosage units?
21   MS. McENROE: Objection to form.
22   THE WITNESS: That's conceptually correct.
23   You know, the products are shipped in bottles of
24   50 or a hundred or what -- so you would -- I can't
25   imagine a circumstance you'd get an order for

Page 72

1   5,001, but you could get an order -- because the
2   orders were in units, in bottles that we shipped
3   or whatever the shipping container was.
4     So, you know, it wouldn't say 5 -- I guess my
5   point is, it wouldn't say 5,001. It would say 51
6   bottles, and they would know to adjust it to 50.
7 BY MR. PIFKO:
8   Q. Okay. And so they would adjust it down to the
9 next -- the closest you would get to 5,000, based on
10 the particular volume of a bottle?
11   A. Correct. They would adjust it to the
12 threshold that was established based on the quantity
13 that was packed in a bottle for that item, that's
14 correct.
15   Q. And then would they have to enter in some sort
16 of code into the system to note that the adjustment was
17 made for the purpose of lowering to the threshold?
18   A. They did not enter it into the pick-to-light
19 system. There was a -- a tracking mechanism where they
20 recorded that they adjusted it down; and they both kept
21 a file of those, an Excel file of those adjustments,
22 and also later sent those adjustments to the corporate
23 office.
24   Q. Was there also -- well, I guess maybe it's the
25 same file of orders that exceeded the threshold?

Page 73

1   MS. McENROE: Objection to form.
2   THE WITNESS: Orders that exceeded the
3   thresh -- if it exceeded the threshold, it would
4   have been adjusted, and it would have been
5   contained in the file I just described.
6 BY MR. PIFKO:
7   Q. And then where -- was there a name for that
8 file?
9   A. I'm sure there is, but I can't off the top of
10 my -- you know, that's a level of detail significantly
11 below what I was involved with; but I'm sure there was
12 a name for the file, but I couldn't tell you what it
13 was.
14   Q. Was someone -- you said it was -- ultimately
15 could be sent to corporate, correct?
16   A. Correct.
17   Q. But was there someone who, before it got sent
18 to corporate, who would be responsible for looking at
19 orders that were adjusted to threshold?
20   A. It was -- the process was that the picker
21 adjusted it and recorded it; and the manager, the
22 pharmacy manager, would review and confirm, you know,
23 so the pharmacy -- it was looked at by two people.
24 Both the picker and the pharmacy manager looked at the
25 adjustment that was made.

Page 74

1    Q.  Do you have an understanding about the -- what
2  criteria the manager would be looking at when they're
3  looking at the adjustment?  Why are they looking at it?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  The adjustments included both
6  adjustments that we're talking about, both
7  adjustments that simply exceeded the threshold;
8  but you'll recall that earlier I mentioned that
9  another leg of the controls that Rite-Aid had in
10  place was that the order selectors, who were kind
11  of familiar with the norms, that, you know, the
12  normal patterns of ordering, if they saw something
13  that was unusual, they had the wherewithal to kind
14  of raise their hand and stop and either adjust it
15  or call the -- if it was during the day, they'd
16  call the store to confirm the order quantity.
17        Even if it was below the threshold, there was
18  a check that was made for that.  Those were also
19  contained in the same -- in the same list, so in
20  the same file.
21        So the manager was both, you know, confirming
22  that someone had properly recorded the adjustments
23  that were made because of the threshold but also
24  was reviewing what action, if any, was taken for
25  the ones that were adjusted below the threshold.

Page 75

1  BY MR. PIFKO:
2    Q.  At some point you had responsibility for
3  getting the spreadsheets of these threshold
4  exceedances.  Do you recall that?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  That came into the corporate
7    office in my department?
8  BY MR. PIFKO:
9    Q.  Yes.
10    A.  They came -- the adjustments that were made
11  came in to, you know, the regulatory individual that
12  worked for me, yes.
13    Q.  And there was a period when one of those
14  people, maybe they left the company or something, and
15  it was -- those were sent directly to you?
16    A.  There was.  For the -- I think you're actually
17  talking about a subset of those adjustments, the ones
18  that were basically for the ARCOS reportable items.
19  Yes, those were sent to me.
20    Q.  And that's what I'm getting at is, what was
21  your understanding of what was being sent to you at
22  that time?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  Well, again, there's -- there
25    was a file that contained all of the adjustments

Page 76

1    that were made, and then there was a file that
2    contained only the ARCOS reportable items.
3        The file that contains the ARCOS reportable
4    items was made to report the corresponding
5    corrections in the ARCOS file so that when it was
6    created -- when it was sent to the DEA, it
7    reflected the adjustment that was made at the
8    distribution center.
9  BY MR. PIFKO:
10    Q.  And so we're talking about, to be clear, you
11  understand that as a registrant, among the duties
12  Rite-Aid had was to report certain types of products to
13  the ARCOS system; is that correct?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  I do understand that.
16  BY MR. PIFKO:
17    Q.  Okay.  And so when the spreadsheet was sent to
18  you, it was a subset of items that needed to be
19  reported to ARCOS; and, if I'm understanding you
20  correctly, you got that report so that you would make
21  sure the amount being reported into the ARCOS system
22  was the order actually filled, not the order actually
23  placed; is that correct?
24        MS. McENROE:  Objection to form.
25        THE WITNESS:  Well, let me restate it to make

Page 77

1    sure that this is being -- it was -- because you
2    said it was a subset of the ARCOS reportable
3    items.  It was the -- the subset of the ARCOS
4    reportable items that had an adjustment, if that
5    makes sense.
6  BY MR. PIFKO:
7    Q.  Okay.
8    A.  So there was a file of all of the items that
9  were adjusted, many of which were not ARCOS reportable.
10  That was a file.  There was a separate file that was a
11  subset of that first file that was only the ARCOS
12  reportable items.
13        That file was sent to be used to make -- to
14  adjust the quantities in the ARCOS file before it was
15  sent to the DEA.  Does that make sense?
16    Q.  Yes.  So is there an automated system for
17  queuing up the orders that were going to be reported to
18  the ARCOS system?
19        MS. McENROE:  Objection to form.
20        THE WITNESS:  I believe you're asking was
21    there an automated process to create the ARCOS
22    file; is that correct?
23  BY MR. PIFKO:
24    Q.  Yes.
25    A.  Yes.

Page 78

1    Q.  Okay.  So the file would be created, but then
2  if order quantities had been adjusted through the
3  threshold system, someone would have to make sure that
4  they were appropriately reflected in the file that was
5  generated?
6    A.  Yes.  As I recall, the initial file contained
7  the original order quantity, not the quantity that was
8  ultimately shipped.  So again, as I recall, the
9  adjustment had to be made based on the files that were
10  sent by the distribution center.
11    Q.  Okay.  And then backing up, so there's a --
12  there's a file of these controlled substances that --
13  and you said if there's an adjustment downward for
14  threshold, that's put in the file; and then you said
15  that, on occasion, an order selector might decrease the
16  order, and that would have to be put in there as well?
17    MS. McENROE:  Objection to form.
18    THE WITNESS:  Correct.  They may decrease the
19    order, even though it did not exceed the thresh --
20    something that was within the threshold, but they
21    may have followed up with and found that the order
22    needed to be adjusted.
23  BY MR. PIFKO:
24    Q.  Was there -- are there codes in that system to
25  tell you why there's an adjustment being made?

Page 79

1    A.  You're saying in the pick-to-light system?
2    Q.  In the -- in the spreadsheet that's created.
3  You said -- hold on for a second.  So I believe you
4  said you don't remember the name of it; is that
5  correct?
6    A.  That is correct.
7    Q.  Okay.  So we can just call it, for purposes of
8  the deposition, the order adjustment spreadsheet.
9  Okay?
10    A.  Okay.
11    Q.  So in this order adjustment spreadsheet, is
12  there any sort of coding so you know that an order was
13  adjusted for a specific reason?
14    A.  I don't -- I guess I don't recall the file
15  specifically enough to say with certainty; but I would
16  guess there was something that indicated which ones
17  were adjusted because they exceeded the threshold and
18  maybe -- I know that -- I know that if they adjusted it
19  for a reason besides exceeding the threshold, they had
20  to indicate why.  So there was -- there was some
21  narrative or something in there about that.
22    Q.  Okay.  So that could be they made some one-off
23  adjustment after talking to the store, or it also could
24  be because there wasn't sufficient supply in the
25  warehouse?

Page 80

1    MS. McENROE:  Objection to form.
2    THE WITNESS:  It -- it could be either of
3    those.  It -- it would rarely be insufficient
4    supply because the system would not have -- if the
5    system knew we were -- you know, the system knows
6    the distribution center inventory as well.
7    So if the system, the Warehouse Management
8    System, did not show inventory to fulfill an
9    order, it would not have created one for the --
10    for the distribution center.
11    So it was possible that there would be an
12    inventory problem, or perhaps an item got
13    quarantined, for example.  So it showed in
14    inventory, but we shouldn't ship it, and they'd
15    have to adjust for that reason, but that was very
16    uncommon.
17  BY MR. PIFKO:
18    Q.  Are there any other reasons that an order
19  could be adjusted from the size of the order that came
20  in?
21    A.  I'm -- I'm sure there are.  I mean, again,
22  what typically would happen if they -- if they -- it
23  was below the threshold but it looked unusual or, you
24  know, they had any question at all, they would attempt
25  to call the store, and the store could tell them, you

Page 81

1  know, what they really intended to do.  Did they really
2  need that quantity?
3    Maybe they -- so I know, again, there was some
4  comments made about, Here's why I adjusted.  This is
5  what the store told me.  So I couldn't tell you what
6  all of those things were, but those would have been
7  based on conversations with the pharmacist at the
8  store.
9    Q.  And then that was going to be my next
10  question, was, so if there was a conversation with
11  somebody at the store, that would be documented in the
12  spreadsheet?
13    A.  Yes.
14    Q.  Do you -- are you familiar with any training
15  on Controlled Substances Act that order selectors may
16  have received?
17    A.  I'm not -- you know, let me first say that I
18  wasn't -- my area wasn't responsible for the operation
19  of the distribution centers.  So that wasn't directly
20  in my purview.  I know that their -- they were trained
21  on their responsibilities and what they were expected
22  to execute at the distribution center.
23    I don't know whether there was any training
24  that specifically mentioned the Controlled Substances
25  Act.  I know that it told them what we could and

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  couldn't do and did and didn't do to make -- to ensure
2  that we complied with the Controlled Substances Act.
3    Q.  And just -- I think we kind of covered this,
4  but I just want to make sure we're clear.  Are you --
5  having been a former distribution center general
6  manager, are you familiar with the chain of management
7  and -- of employees at the distribution center?
8    A.  You're talking about the reporting structure
9  at the distribution center?
10    Q.  Yeah.
11    A.  Generally, yes.
12    Q.  Okay.  So an order selector, is that an hourly
13  position?
14    A.  Yes.
15    Q.  And is that a daytime position or a nighttime
16  position?
17    A.  There are order selectors -- we run a
18  multi-shift operation at almost all of the distribution
19  centers, so --
20    Q.  Okay.  So they can be both?
21    A.  They can be both.
22    Q.  So there's -- order selecting happens 24 hours
23  a day?
24    A.  It happens throughout the day.  The schedule
25  varies, depending on the specific distribution center.

Page 83

1  There typically is a window during that -- during that
2  24-hour day, there's a window where no order selecting
3  is being done for system maintenance and replenishment,
4  things of that nature; but, as a general statement, it
5  could happen throughout the day.
6    Q.  And who do the order selectors report to?
7    A.  They will generally report to a department
8  manager.  There's a pharmacy department manager.
9  There's also, in each pharmacy department, a DEA
10  coordinator who monitors the activities in the
11  controlled substance cage and all of the things related
12  to DEA, and they would be a resource for those
13  associates as well.
14    Q.  Is there a DEA coordinator on site during all
15  shifts or only during the day?
16    A.  There is not one on site during all shifts.
17  There is a DEA coordinator at the distribution center.
18  That person, as a part of their responsibility, may be
19  asked to work all shifts from time to time.
20    Q.  So that the order selector reports up to
21  the --
22    A.  To a department manager.
23    Q.  -- a department manager; and in the case of
24  controlled substances, is it the pharmacy department?
25    A.  Correct.

Page 84

1    Q.  And who does the pharmacy department manager
2  report to?
3    A.  They would generally report to an operations
4  manager.
5    Q.  And then they report to the general manager?
6    A.  That would be -- typically that would be the
7  case, yes.
8    Q.  Are you familiar -- so we talked about it a
9  little bit earlier.  We talked about the idea of
10  diversion.  Do you recall that?
11    A.  I do.
12    Q.  Okay.  Are you familiar with the idea of
13  suspicious order monitoring and reporting under the
14  Controlled Substances Act?
15      MS. McENROE:  Objection to form.
16      THE WITNESS:  I am.
17  BY MR. PIFKO:
18    Q.  Okay.  Are you aware of whether Rite-Aid had a
19  system in place to report suspicious orders to the DEA?
20    A.  Our process -- again, I've got to walk through
21  the process for creating the orders to ensure that the
22  orders are correct based on demand.  Then they are --
23  they arrive at the distribution center, and they are
24  then adjusted below that threshold and reviewed by the
25  associates as they pick them.

Page 85

1      If, in fact, we saw anything suspicious at
2  that point, our policy was, at the distribution center,
3  to contact the government affairs department, and they
4  would take care of any notification that took place.
5    Q.  Was there any system to report an order that
6  exceeded the threshold to the DEA?
7    A.  "Report an order that exceeded the threshold."
8  We -- are you asking whether we automatically reported
9  all orders that exceeded the threshold to the DEA?
10    Q.  Right.
11    A.  We did not.  The threshold was set -- in many
12  cases, the threshold was set as a level, again, as kind
13  of the last line of defense after the orders were
14  already created through these other systems and if
15  anything reduced it below what that legitimate expected
16  order would be.
17      So I don't believe -- they certainly -- we did
18  not report to the DEA every time we adjusted an order
19  based on a threshold.
20    Q.  Are you familiar with the criteria that were
21  used to decide whether to report an order to the DEA?
22    A.  All -- of my own knowledge, the only thing I
23  know is that they would report anything we were
24  concerned with to the government affairs department and
25  that they would then make the decision to report to the

Page 86

1 DEA.
2 Q. Okay. So let's talk about -- are you familiar
3 with criteria that would have led something to be
4 reported to the government affairs department?
5 A. You know, I -- again, I can't -- I can't say
6 anything specific. That's probably multiple levels
7 below what my, kind of, responsibilities were; but I
8 know that if, in fact, in the judgment of the order
9 selectors, the DEA coordinator, and the pharmacy
10 manager, there was a concern, they would contact the
11 government affairs department, so --
12 Q. Do you know if there were any documented
13 procedures by which order selectors were told what
14 would lead something to be, quote, suspicious to be
15 reported to the government affairs department?
16 A. I know that there were documented procedures
17 that were used to train the order selectors and what
18 they were supposed to do; and again, the order
19 selector, if they had a concern, they would bring it to
20 the attention of their, you know, their department
21 manager and the DEA -- and/or the DEA coordinator who
22 would ultimately make that contact to the government
23 affairs department, so --
24 Q. Do you know the names of any of the people who
25 worked in the government affairs department?

Page 87

1 A. Janet Hart is -- was our primary contact
2 that -- she was our, kind of, subject matter expert
3 that we used as a resource.
4 Q. Anyone else?
5 A. Typically we would -- certainly from my
6 perspective, my involvement, I would go to Janet with
7 any questions or any issues that I had, so --
8 Q. To your recollection, Janet held that position
9 the entire time that you would have had any involvement
10 with anyone in government affairs?
11 A. To the best of my knowledge, yes.
12 Q. There wasn't anyone else that you can recall
13 ever having interacted with from government affairs?
14 A. Well, there were other people I interacted
15 with from government affairs; but, if there was
16 anything that was related to the DEA, I interacted with
17 Janet.
18 Q. Can I get some -- can we go off record for
19 just 2 seconds?
20 THE VIDEOGRAPHER: Off the record, 11:22 a.m.
21 (Brief recess was taken.)
22 THE VIDEOGRAPHER: On the record, 11:23 a.m.
23 (Rite-Aid Chapman Exhibit No. 1 was marked for
24 identification.)
25 BY MR. PIFKO:

Page 88

1 Q. I'm handing you what's marked as Exhibit 1.
2 For the record, Exhibit 1 is a one-page document Bates
3 labeled 0020412 -- sorry -- Rite-Aid underscore --
4 Rite_Aid_OMDL_0020412. Please take a moment to review
5 that, and let me know when you are done.
6 A. Okay.
7 Q. Have you seen this document before?
8 A. I have.
9 Q. When was the last time you saw it?
10 A. Probably yesterday, so --
11 Q. Before yesterday, when was the last time you
12 saw it?
13 A. Probably 2009.
14 Q. And that's the date of the E-mail?
15 A. Correct.
16 Q. Okay.
17 A. Right.
18 Q. It's from someone named Kevin. Do you know
19 which Kevin?
20 A. It's Kevin Mitchell.
21 Q. Okay. And how do you know it's
22 Kevin Mitchell?
23 A. If you look on the original message, it says
24 from d-i-s-k-e-m. That was his E -- Rite-Aid
25 maintained two E-mail systems, and that was the --

Page 89

1 Kevin's ID in the old E-mail system.
2 Q. Let's talk about the E-mail system for a
3 minute. There were -- there was an old system and a
4 new system, or were there simultaneously two systems?
5 A. There were simultaneously two systems. You
6 know, for some period of time there were both, so --
7 Q. Do you have an understanding about why that
8 was?
9 A. Well, they were phasing out the old system.
10 Q. Okay.
11 A. The old system was called SYSM, and it was,
12 you know, it had many limitations. It was a
13 mainframe-based system, but that was -- that was his ID
14 for that.
15 Q. Okay. And so then a new system was
16 instituted, and people got different E-mail addresses?
17 A. When the new system was implemented, you got
18 an E-mail address that, you know, was basically your
19 name, you know, so --
20 Q. So do you recall receiving this E-mail?
21 A. I do.
22 Q. Do you know the conference -- well, in it
23 Kevin is telling you about a conference that he
24 attended. Do you see that?
25 A. I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  Q. Do you know what conference he was attending?
2  A. I believe he's referring to -- we had Kevin
3  and/or DEA coordinators from different distribution
4  centers attend the conferences that were put on by
5  Ron Buzzeo's organization in the time I was at
6  Rite-Aid, and I believe that's the conference he's
7  referring to.
8  Q. And so among other things, he writes to you.
9  At the end he says, Good conference. We have one take
10 away that we need to better address; suspicious order
11 monitoring. Do you see that?
12 A. I do.
13 Q. Okay. Did you have a discussion with him
14 about suspicion order monitoring at that time?
15 A. I'm sure that I did.
16 Q. Do you have an understanding about why he said
17 that the company needed to better address suspicious
18 order monitoring?
19 A. I'm sure it was because that was something
20 that was brought up, to the best of my knowledge, at
21 all of the conferences that Ron Buzzeo put on during
22 this time frame. You know, the conferences were for
23 both drug chains that shipped only to their own stores
24 and also for shippers that shipped to independent
25 retailers and things of that nature.

Page 91

1      So I know that was -- as I recall, that was on
2  the agenda at every one of the conferences that any of
3  our people attended.
4  Q. Have you ever attended one of those
5  conferences?
6  A. I did when I worked for Eckerd's, but, you
7  know, this was prior to me working for Rite-Aid.
8  Probably in the late '90s I attended one.
9  Q. So to your knowledge, Ron Buzzeo was putting
10 these on as far back as the late '90s?
11 A. I believe that's when it was, the late '90s
12 when I attended one, yes.
13 Q. Okay. The one you attended was put on by
14 Ron Buzzeo?
15 A. Yes.
16 Q. And did you -- so Kevin, I believe his name
17 came up earlier. He was the regulatory compliance
18 person, correct?
19 A. Correct. Kevin Mitchell.
20 Q. Okay. Do you recall the time period when he
21 held the regulatory compliance position?
22 A. He was in that position when I came to the
23 corporate office in 2008, and I -- I couldn't tell you
24 exactly when he left. I would say 2011 maybe, but I'm
25 not sure of the exact date. 2010, 2011, so --

Page 92

1  Q. Are you familiar with the reasons why he left?
2  A. I am not.
3  Q. He left the company, or he left to have
4  another position within the company?
5  A. He left the company.
6  Q. Do you know where he went after?
7  A. I do not.
8  Q. So as the logistics manager, I believe you
9  said vice president of logistics, he reported to you?
10 A. Correct.
11 Q. Did you have authority to decide what
12 trainings to send people like him on?
13 A. Not purely and independently. I made
14 recommendations, but our policy was that I would have
15 to get the approval of my boss anytime I sent anyone to
16 conventions, conferences, you know, travel expenses or
17 something any company manages. So I didn't have the
18 independent authority, but I had the authority to
19 recommend.
20 Q. And who was your boss who had that approved --
21 final approval authority?
22 A. Wilson Lester.
23 Q. So did you recommend every year that someone
24 from your department attend one of Ron Buzzeo's
25 conference, conferences?

Page 93

1  A. I -- I recommended multiple times. I mean, I
2  don't know that I can, you know, authoritatively say I
3  recommended it every single year. I don't recall that
4  that specifically, but I know I recommended it multiple
5  times and that folks both from the corporate office and
6  also from the distribution centers, the DEA coordinator
7  position that I mentioned, went.
8  Q. Okay. And so in this E-mail Kevin tells you
9  that you need to better address suspicious order
10 monitoring. Do you recall having a discussion with him
11 at that time about what you could do to better address
12 suspicious order monitoring?
13 A. I -- I can't remember -- recall the specific
14 conversation, but what I typically would have done
15 would be to engage Janet and to ask Kevin to meet with
16 Janet, to talk about our current procedures and what
17 Ron described and, if, after that discussion, there
18 were really any issues that we needed to address that
19 weren't addressed with our existing procedures, to let
20 me know.
21 Q. Do you recall there being any specific gaps or
22 areas that you wanted to improve in the suspicious
23 order monitoring system at this time?
24 A. I do not.
25 Q. Do you recall making any changes to the system

Page 94

1 as a result of this discussion in 2009?
2     A.  I do not recall making any changes.
3     Q.  If there were changes, would you be aware of
4 them?
5     A.  I would expect to be, yes.
6     Q.  Do you recall there being changes to the
7 system at any time during your tenure?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  I do not.  You know, I will say
10    this:  When I joined Rite-Aid, I was quite
11    impressed by the process that they had in place to
12    manage controls when I first became involved with
13    it.  It was, you know, robust, multilevel.
14        So no, I -- I -- to the best of my knowledge,
15    that system that was in place remained in place
16    throughout the remainder of the time that Rite-Aid
17    shipped controlled substances.
18 BY MR. PIFKO:
19    Q.  Do you know if Mr. Mitchell brought any
20 paperwork back from the conference with him?
21    A.  I -- I don't recall that.
22    Q.  Do you --
23    A.  I don't recall.
24    Q.  Do you recall, at any time anyone attended one
25 of Mr. Buzzeo's conferences, them bringing back any

Page 95

1 materials they might have received from the conference?
2     A.  I don't specifically recall that, no.
3     Q.  When you attended one of Mr. Buzzeo's
4 conferences, do you recall receiving any materials?
5     A.  I would assume that I did, but it's -- you
6 know, it's long enough ago that I don't really
7 remember; but typically when you go to a conference,
8 there's some printed material that you get, so --
9     Q.  Do you know if materials from the conference
10 would have been maintained by your department or the
11 regulatory compliance department at any time?
12    A.  Again, I don't know that there were any
13 materials from the -- from the conference.  So I can't
14 answer that.  I -- I don't know what it was and, you
15 know, if there was anything.  So -- so I don't know the
16 answer to that question.
17    Q.  You said that you would have referred Kevin to
18 Janet Hart to have a discussion about any concerns he
19 had?
20    A.  Correct.  With -- with the thought that -- to
21 make sure that we compared whatever Ron described as an
22 issue with our current processes and if, after that,
23 Janet felt like there were any concerns, we would
24 certainly take steps to address them, so --
25    Q.  Do you recall having any discussions with

Page 96

1 Janet Hart about the suspicious order monitoring?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  Pursuant to this?
4 BY MR. PIFKO:
5     Q.  Yes.
6     A.  No.  I do not.  Again, this was one of
7 multiple areas of responsibility that I had.  So I
8 charged Kevin with that responsibility.  Kevin would
9 have had the discussion with Janet.  If there were any
10 issues, Kevin would have brought them back to me.  That
11 would have escalated it, and we would have had further
12 discussion with Janet; but no, I don't remember any
13 discussion with Janet as a result of this.
14    Q.  How about at any time, did you have a
15 discussion with Janet Hart about suspicious order
16 monitoring?
17    A.  Well, later in my tenure at Rite-Aid we looked
18 at automating some of the manual processes that I
19 described, you know, to increase the efficiency for
20 that; and so there was some work that was initiated to
21 potentially kick off a system project, and I did have
22 some conference -- some conversations probably with
23 Janet at that time.
24        Again, they would have been very limited at my
25 level when -- the period I'm talking about, Chris Belli

Page 97

1 was in place, and Chris Belli would have had, you know,
2 any detailed conversations with Janet about it; but I'm
3 sure we had some conversations then when we were
4 talking about automating some of this.
5     Q.  There's a document called a Project
6 Initiation.  Is that a form that you're familiar with?
7     A.  It is.
8     Q.  Okay.  And you recall corresponding with
9 people, including Janet and Chris, about the project
10 initiation?
11    A.  I do.  It's for the project I just
12 mentioned --
13    Q.  Right.
14    A.  -- that it was to automate some of these
15 manual processes that we had in place and to provide
16 some -- you know, the thought process of that project
17 was to take activities -- both to automate what was
18 going on at the distribution centers but also to take
19 activities that were being run by separate processes
20 and our loss prevention perhaps and government affairs
21 area and collect them all into one system.  So yes, I
22 do recall that.
23    Q.  To your knowledge, was that project ever
24 implemented?
25    A.  No, that project was never implemented.

Page 98

1    Q.  Do you know why it was not implemented?
2    A.  Well, ultimately Rite-Aid stopped shipping
3  controlled substances.  So there was work to evaluate
4  the project, to, you know, to scope out the work effort
5  for the project, to get it on the -- in the work queue,
6  you know, any -- I referred to the IT department.
7        All IT departments, I'm sure at every company
8  in America, has a backlog of projects to do.  So
9  there's a work queue that it would have to be entered
10  into, and there was work to kind of get it into that
11  work queue; and, as I recall, that was -- by the time
12  that was underway, it was shortly before we eliminated
13  shipping pharmacy.
14        So there would no longer have been a benefit,
15  truly, of automating a process that was already in
16  place and already sufficed as it stood, even if it was
17  a little less efficient than we liked it to be.
18    Q.  And what do you mean it was less efficient
19  than you would like it to be?
20    A.  Well, some of the manual steps that we -- I
21  talked about the order selectors having to write things
22  down and recording it in an Excel spreadsheet and
23  things of that nature.  The project kind of envisioned
24  that that could all be done online and would be
25  collected in one central database as opposed to being

Page 99

1  on an Excel spreadsheet, things of that nature, so --
2    Q.  Do you recall when the discussions first
3  started about this project?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  I -- I don't recall exactly.
6    I -- no.  My guess would be 2012 or '13; but, you
7    know, I'd have to go back and look at the
8    documents to confirm that, so --
9  BY MR. PIFKO:
10    Q.  Do you recall -- I believe that you were just
11  testifying about the process of implementing the
12  procedure and going through IT.  Do you recall that?
13    A.  Yes.
14    Q.  As one of those processes, you would have a --
15  some test sites where you would implement this program;
16  is that correct?
17    A.  Are you asking as a part of getting the
18  project approved or part of actually developing and
19  implementing the project?
20    Q.  Part of developing and implementing it.
21    A.  If we developed and implemented it, any IT
22  project, we would typically pilot it at, you know, one
23  or -- you know, one or two locations before
24  implementing it at all of the locations.
25    Q.  Do you recall the Liverpool distribution

Page 100

1  center being selected as one of the test sites for that
2  project?
3    A.  I -- I don't recall it.  You know, I don't
4  recall why we selected that, but it doesn't surprise me
5  that we would have selected Liverpool.
6    Q.  Where is the Liverpool distribution center?
7    A.  Near Syracuse, New York.
8    Q.  And do you have an understanding about the
9  geographic regions serviced by the Liverpool
10  distribution center?
11    A.  Generally, and again, as I mentioned earlier,
12  those service locations changed over time; but yeah, as
13  a general statement, I could say yes.
14    Q.  Do you know the states that were included
15  within the service area for the Liverpool distribution
16  center?
17    A.  At various times it would have included
18  obviously New York, some stores probably in
19  New Hampshire, Connecticut, you know, Western
20  Massachusetts, Northern Pennsylvania, probably the edge
21  of Ohio.
22        You know, I'm not -- you know, we -- that was
23  something that was managed based on distribution center
24  capacity; and, as I mentioned, that changed over time
25  as distribution centers closed and as Rite-Aid

Page 101

1  completed the integration of the Eckerd stores and
2  distribution centers.
3        So gosh, I -- you know, to me, at my level,
4  they were store numbers and volumes and transportation
5  needs.  It wasn't -- you know, it wasn't something that
6  I looked at in great detail, so --
7    Q.  Is there a document that tells you which
8  distribution centers served which stores at any given
9  time?
10    A.  There were -- there was a -- in the Rite-Aid
11  database, you know, there was a place where you
12  indicated who -- which distribution centers serviced a
13  store for whatever period of time, and then when you
14  made a change, you made a change in that database.
15        So I'm sure that they could be extracted from
16  that.  Beyond that, there were -- you know, various
17  functional areas kept spreadsheets of, you know,
18  service areas and things of that nature, so --
19    Q.  You mentioned that you wouldn't be surprised
20  that the Liverpool distribution center would be
21  selected as a pilot location for the program, the
22  suspicious order monitoring automation program, what
23  you were just discussing.  Why did you say that?
24    A.  Well, Perryman is -- we only had pharmacy
25  products in four of the distribution centers:

Page 102

1 Tuscaloosa, Woodland on the West Coast, Liverpool, and
2 Perryman. We -- if we were going to pilot something,
3 you know, one of the considerations would be
4 geographical proximity to the corporate office in case,
5 you know, as you went and did some testing and
6 participated and things of that nature.
7     And although the Perryman distribution center
8 is actually closer to the corporate office, we would
9 tend to not pilot something at Perryman because it was
10 so large.
11     Perryman is -- was Rite-Aid's largest
12 distribution center by a significant, you know -- a
13 significant proportion. So, you know, when you're
14 piloting a new system, you probably don't want to go
15 into the biggest location that you have.
16     Q. Are you familiar with the process by which --
17 we talked about how orders get placed by a store to the
18 distribution center. At some point a distribution
19 center runs low on supply. We talked about that a
20 little bit. Are you familiar with the process by which
21 a distribution center orders product?
22     A. Generally, yes. That wasn't in my area of
23 responsibility; and just as a point of clarification,
24 the distribution center did not order product. There
25 was a functional department at the corporate office

Page 103

1 that managed the replenishment of goods into the
2 distribution centers.
3     Q. Do you know if, similar to the way store
4 orders were made, if it was through an automated
5 system?
6     A. It was.
7     Q. Okay. So do you know if it's similar in
8 regards to the distribution center's computer system
9 would be monitoring the demand of items versus the
10 inventory and request to be refilled based on that?
11     A. Yes. In broad strokes, that's correct. It
12 would look at the on-hand balance for an item; it would
13 look at the projected demand for an item. There was an
14 ability to adjust for seasonality.
15     You know, obviously some -- you know, you sell
16 more filler paper in June than you do in -- or June and
17 July as you're going back to school than you do later
18 in the year. So there's an ability to adjust for
19 seasonality.
20     So there was some -- some other controls or
21 adjustments that could be made in that -- in that, and
22 it also took into account lead time and required order
23 sizes. Some items you have to order -- you know, some
24 item you have to order by the pallet. Some items you
25 can order by the case type of thing, so --

Page 104

1     Q. Do you know if that was the same computer
2 system used at the stores?
3     A. No, it was not. There was a -- no, it was
4 not.
5     Q. Do you know -- do you know the name of that
6 system?
7     A. It was -- E3 was the vendor that it was
8 purchased through, so -- and again, I'm not -- that
9 wasn't my area of responsibility. I'm not an expert.
10 I, you know, kind of in general know conceptually how
11 it worked, but we've just about exhausted my knowledge
12 at this point.
13     Q. There was someone at headquarters who was
14 responsible for that?
15     A. There was a replenishment department that was
16 responsible for replenishing both front-end and
17 pharmacy orders into the distribution centers.
18     Q. And so someone in the replenishment department
19 would be more familiar with the process than you?
20     A. Yes.
21     MR. PIFKO: We've been going about another
22     hour, and I think it's around noon, if you guys
23     want to take another break.
24     MS. McENROE: So it's 11:45. We can break now
25     and take a short lunch or if you want to keep

Page 105

1 going for a little while and then break for lunch.
2     MR. VITALE: Yeah, let's break for lunch now.
3     MR. PIFKO: Let's take a short break now.
4     MS. McENROE: So take a short break now and
5     then come back, yeah.
6     THE VIDEOGRAPHER: Off the record at 11:45
7     a.m.
8     (Brief recess was taken.)
9     THE VIDEOGRAPHER: On the record, 11:59 a.m.
10 BY MR. PIFKO:
11     Q. Are you familiar with the audit process with
12 respect to DEA audits in the distribution centers?
13     A. Generally --
14     MS. McENROE: Objection to form.
15     THE WITNESS: Generally, yes.
16 BY MR. PIFKO:
17     Q. Was that something that you had familiarity
18 with when you were general manager of a distribution
19 center?
20     A. If you're asking whether I had involvement
21 with it as a general manager, no, because we didn't
22 have a pharmacy department; but by the time I became a
23 general manager, you know, I had worked -- for Eckerd's
24 for 30 years, so we -- Eckerd had undergone DEA audits,
25 so I was generally familiar with it from that.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.   And when you were VP of logistics, did you
2   have any high-level involvement with audits?
3    A.   With DEA audits?
4    Q.   Yes.
5    A.   Yes.  We were -- again, you know, my area was
6   a resource to the distribution center.  So when the DEA
7   came for an audit, they would let my area know; and, if
8   there were any -- you know, occasionally there were
9   reporting needs or things that they would need to have
10   run and data generated that my department would help
11   coordinate.
12       But yes, we -- we were always aware when there
13   was a DEA audit, and we got feedback at the end of
14   those audits and, you know, we were -- gosh, you know,
15   I was always pleased to see we did very well with those
16   DEA audits.
17    Q.   Do you know if, as part of the audit process,
18   the DEA evaluated the company's suspicious order
19   monitoring efforts?
20    A.   Actually, I know that they did an audit at the
21   Perryman distribution center, and at the conclusion of
22   that, in the exit discussion, they complimented us on
23   our process to manage suspicious orders or excessive
24   orders.  So yes, they did evaluate it as a part of
25   that.

Page 107

1    Q.   Do you know the rough time frame that that
2   occurred?
3    A.   Again, I'd say, you know, 2012, '13.  I -- you
4   know, it's been several years ago now, but I -- I know
5   that we had the audit and that occurred, so --
6    Q.   Do you recall who -- the names of the DEA
7   officers who conducted the audit?
8    A.   No, I wouldn't have been, you know, involved
9   again at that level.  We got -- we got feedback of the
10   results, but I -- I wasn't there when the audit took
11   place, and I wasn't there for the exit interview.  So
12   we got feedback from it, but I didn't participate; and
13   no, I don't know the names of the officers that were
14   involved in that.
15    Q.   During your tenure as VP of logistics, did you
16   ever meet with any DEA agents?
17    A.   I did.  Yes, I did.
18    Q.   Okay.  When was the first such occasion that
19   you met with DEA agents?
20    A.   There was only one occasion, as I recall, and
21   it was very early in my tenure in that position,
22   probably in 2009.  We actually visited the DEA's
23   headquarters in Washington.
24       You know, I described to you the cross-dock
25   process that we had where we had the cross-dock cages

Page 108

1   that were approved by the DEA for us to bring product
2   from a pharmacy DC and merge it with the orders at the
3   front-end DC.
4       We had to get permission from the DEA to
5   extend that process to the Eckerd DCs that were --
6   Rite-Aid already had permission from the DEA to do
7   that.  When the Eckerd acquisition took place and now
8   Rite-Aid owned the Eckerd DCs, you have to get explicit
9   permission at every location.
10       So we had to get permission from them to do
11   the cross-dock process, and so I was part of a group
12   that went to DEA headquarters in Washington and met
13   with them.  So that was the only time that I met with
14   any DEA agents, and that was the subject.
15    Q.   Do you remember the name of the agents that
16   you met with then?
17    A.   I do not.
18    Q.   To your knowledge, while you were at Rite-Aid,
19   was the company ever subject to any enforcement actions
20   by the DEA?
21    A.   Not that I know of.  I -- there's none that I
22   was aware of, so --
23    Q.   Let's talk about theft for a moment.  From
24   time to time would you have issues with theft?
25       MS. McENROE:  Objection to form.

Page 109

1       THE WITNESS:  You're talking about in general?
2   Certainly, there was product stolen from our
3   distribution centers.
4   BY MR. PIFKO:
5    Q.   And specifically with respect to controlled
6   substances.
7    A.   I don't ever remember there being an incident
8   that I was aware of where we had theft of any
9   controlled substances.  You know, the physical security
10   was much greater for those products.
11       The process by which the associates were
12   vetted and allowed to go into the cage and to
13   participate in that activity was higher.  They had a --
14   you know, a background, you know, investigation was
15   done and things of that nature.  So while we -- you
16   know, it would be disingenuous for me to say we never
17   had any front-end product stolen from a DC.
18       I'm -- I'm not aware of any incidents that --
19   certainly I'm not aware of where we had any controlled
20   substances stolen.
21    Q.   Pardon me.  We're having some technical
22   difficulties in locating the document.
23       While he's looking for that, are you familiar
24   with the idea of conducting due diligence on an order
25   that's deemed to be suspicious or potentially

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 suspicious?

2     MS. McENROE: Objection to form.

3     THE WITNESS: I'm not sure exactly what you

4     mean by "due diligence." I know that we have a

5     responsibility as a registrant to take steps to

6     avoid diversion, you know, to ensure diversion

7     doesn't take place, and to also ensure suspicious

8     orders are not filled, and we don't take -- but if

9     you're -- I'm not sure exactly what you're

10     referring to by the phrase "due diligence" with

11     that.

12 BY MR. PIFKO:

13   Q. Are you familiar with the idea that if an

14 order is potentially suspicious, there's a duty to

15 investigate the order to alleviate those suspicions?

16     MS. McENROE: Objection to form.

17     THE WITNESS: Yes.

18 BY MR. PIFKO:

19   Q. To your knowledge, does Rite-Aid have a

20 process to -- when you were VP of logistics, did

21 Rite-Aid have a process to conduct such investigations?

22   A. When -- our responsibility in the distribution

23 centers would have -- would have been, if we identified

24 anything that we felt was a suspicious order, we would

25 have reported it to the government affairs department.

Page 111

1 They would have then worked with the loss prevention

2 department and us, if necessary, to do any

3 investigation.

4     I'm not aware of that ever -- I don't recall

5 that ever occurring. That's what would have taken

6 place.

7   Q. If you -- if there was such an investigation,

8 would you have been involved in it?

9     MS. McENROE: Objection to form.

10     THE WITNESS: Potentially, but not with

11     certainty.

12 BY MR. PIFKO:

13   Q. Is there a name of somebody within the

14 government affairs department who would be responsible

15 for heading up an investigation like that?

16   A. If we had identified something that we felt

17 was suspicious, we -- or potentially suspicious, we

18 would have contacted Janet Hart.

19   Q. Do you know if there would be any

20 documentation of a request for an investigation to

21 occur?

22     MS. McENROE: Objection to form.

23     THE WITNESS: I -- I don't know of that ever

24     taking place.

25 BY MR. PIFKO:

Page 112

1   Q. So you don't believe that there ever was a

2 request to conduct an investigation?

3   A. I -- no, I didn't say that. I said I'm not

4 aware of it ever taking place. I don't know.

5   Q. Okay.

6   A. It did not take place, to the best of my

7 knowledge.

8   Q. If an order was deemed to be potentially

9 suspicious, would that be documented anywhere?

10     MS. McENROE: Objection to form.

11     THE WITNESS: There would have been

12     communication to Janet Hart; and I'm sure, you

13     know, certainly based on the documents that were

14     able to be produced, I'm sure it would have been

15     documented in an E-mail or, you know, some

16     communication, so --

17 BY MR. PIFKO:

18   Q. Do you know if there was any sort of

19 spreadsheet or anything where those communications

20 would have been maintained?

21   A. I'm not aware of any spreadsheet; and again, I

22 don't -- I don't recall it ever taking place.

23   Q. All right. I'm handing you what's been marked

24 as Exhibit 2.

25     (Rite-Aid Chapman Exhibit No. 2 was marked for

Page 113

1 identification.)

2 BY MR. PIFKO:

3   Q. For the record, Exhibit 2 is a multipage

4 E-mail, Bates labeled Rite_Aid_OMDL_0038075 to 77.

5 Take a moment to review that, and let me know when

6 you're done.

7   A. Okay. Okay.

8   Q. All right. So this -- have you seen this

9 before?

10   A. I have.

11   Q. When was the last time you saw this?

12   A. Yesterday.

13   Q. And before seeing it yesterday, when was the

14 last time you saw it?

15   A. 2013.

16   Q. All right. The subject line of this series of

17 E-mails is Suspicious Order Monitoring Project.

18 Actually, it says 5046 - Suspicious Order Monitoring

19 Project. Do you see that?

20   A. I do.

21   Q. What is the Suspicious Order Monitoring

22 Project?

23   A. It was a project that was conceptualized to --

24 from the distribution center's perspective to replace

25 the manual activities that I mentioned to you, whereby

Page 114

1 we used -- we had a threshold and adjusted orders down
2 if they exceeded that threshold and then went through a
3 series of manual steps to record that action and report
4 it back to the corporate office.
5      It also included -- the -- the project that
6 was envisioned would have also included -- you know,
7 there's some reporting and monitoring activities that
8 took place in our loss prevention department that would
9 have been -- that were done as a separate -- you know,
10 in a separate process.
11      So it would have folded all of those processes
12 together so there would have been one place that
13 managed this, all of this activity and the reporting of
14 it; but from our perspective, the key to it was that it
15 was going to automate what was then a manual process.
16   Q.  So at the second -- so beginning on the second
17 page here -- well, there's an E-mail from you to
18 Chris Belli dated June 12th, 2013.  Do you see that?
19   A.  I do.
20   Q.  It says, Chris - Per our conversation, and
21 then you're forwarding something from Marcia.  Do you
22 see that?
23   A.  Yeah.
24   Q.  Who's Marcia, do you know?
25   A.  She was in our IT department, so she was

Page 115

1 assigned the responsibility of creating a project
2 initiation form for this, I believe, so that's --
3   Q.  And that was going to be my next question.
4 There's a template below.  It continues from the second
5 page to the third page.  Do you see that?
6   A.  Correct.
7   Q.  Do you know what that is?
8   A.  That's the -- those are screen prints, I
9 believe, of the system that is used to input the data
10 that then leads to a project initiation request.
11   Q.  Can you tell me generally what a project
12 initiation request is?
13   A.  Well, anytime the -- any of the functional
14 departments, one of the IT department -- in this
15 context, a project initiation request was anytime any
16 of the functional departments wanted the IT department
17 to do something that was not maintenance, that was not
18 fixing a problem, so you're initiating a new project,
19 there was a structured set of wickets that you went
20 through to document what the project was, to quantify
21 both hard and soft benefits from it, and then the IT
22 department would put together their costs for things of
23 that nature.
24      So it was -- it was -- it was all of the --
25 the project initiation form was basically the

Page 116

1 collection of the administrative steps to put together
2 the data that you would use to kick off a project.
3   Q.  Okay.  So information reflected here on page 2
4 of the document -- which is E-mail from Marcia to you
5 and Richard and Karyn.  Do you see that?
6   A.  Yes.
7   Q.  Okay.  Do you know who provided the
8 information in this E-mail?
9   A.  Of my own knowledge, I do not.  I mean, I
10 would guess that she, Marcia, spoke to both Chris and
11 our loss prevention department and Janet Hart would be
12 my expectation, but I -- I didn't -- I never asked
13 Marcia where she got this information, so --
14   Q.  Who's Richard?
15   A.  Rich, Richard Reinsburrow worked for me, and
16 he was responsible for -- he was kind of the systems
17 liaison at the corporate office for the distribution
18 centers.  So whenever there was a system change,
19 maintenance, modification, whatever it might be, Rich
20 was involved in it, you know, in some cases to help
21 with the design, in other cases just administratively.
22 You know, he helped coordinate the different activities
23 of the IT associates, so --
24   Q.  How about Karyn, who is she?
25   A.  Karyn was Marcia's boss.  She was -- I believe

Page 117

1 her -- she was -- I believe her title was director, but
2 she worked in the IT department; and she was kind of
3 the IT director that was assigned to deal with projects
4 involved in supply chain.
5   Q.  So going down here on the page, it says Name,
6 and then the form tells you to specify a name for the
7 IS PMO Default Project Site.  Do you see that?
8   A.  Yes.
9   Q.  Do you know what IS PMO stands for?
10   A.  IS is Information Systems, and PMO is Project
11 Management Office.
12   Q.  Okay.  And so it says here the name is 5046 -
13 Suspicious Order Monitoring and Reporting for
14 controlled substance distribution from the Distribution
15 Center.  Do you see that?
16   A.  I do.
17   Q.  Okay.  Is that an accurate description of the
18 name of the project?
19   A.  Yes.
20   Q.  The number there, is that just every project
21 initiation has some sort of number associated with it?
22   A.  To the best of my knowledge, yes.  It's --
23 it's a control number.
24   Q.  So then it has a description of the product --
25 or of the project.  Do you see that below?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.  I do.
2    Q.  Okay.  Can you read that aloud for the record?
3    A.  Develop effective controls against the
4  diversion of controlled substances and conduct adequate
5  due diligence to ensure that controlled substances
6  distributed from the Distribution Centers are for
7  legitimate business needs.
8        Create a portal application that will use the
9  RX Replenishment and Billing system information to
10  create a reporting platform for suspicious order
11  monitoring.
12        Today blanket thresholds are manually enforced
13  at 5,000 dosage units per individual ndc per week per
14  store regardless of dispensing volume or trends.  A
15  process to systematically control based on store volume
16  must be developed.
17        Allow for DC to add comments and approvals on
18  shipments to stores.  This information needs to be
19  available to show DEA if requested.
20    Q.  Is that an accurate description of the
21  project?
22    A.  Yes.  I -- yes.  I believe you'll find that
23  the description was fine-tuned a little bit as the
24  project moved forward; but big picture, yes, that's an
25  accurate description of it.

Page 119

1    Q.  Are the statements that you just read true and
2  correct as at the time that this was being written?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  They were true and correct from
5    the perspective of that's what this project was
6    being asked to do.  The reason I'm answering that
7    way is because, again, I want to emphasize, from
8    our perspective, this was to replace a manual
9    process that we already had in place.
10        So I wouldn't want there to be a
11    misunderstanding and someone think where it says
12    "develop effective controls," that that implies
13    there were no controls already in place.  It was,
14    this request was to develop a system application
15    that included effective controls, so --
16  BY MR. PIFKO:
17    Q.  It said in the passage you just read, Today
18  blanket thresholds are manually enforced at 5,000
19  dosage units per individual ndc per week per store
20  regardless of dispensing volumes or trends.  Do you see
21  that?
22    A.  I do.
23    Q.  Is that accurate as of the date of the writing
24  on this E-mail?
25    A.  Well, it's largely accurate.  There's a couple

Page 120

1  of exceptions that we've already talked about.  One of
2  them is that there were a few -- a handful of stores
3  that had authorized exceptions to that that were
4  allowed after research and confirmation by our
5  government affairs department; and, as also mentioned
6  earlier, we did have a number of stores that received
7  biweekly deliveries.
8        So this, where this says "per week," it really
9  should probably say "per order."
10    Q.  So let's clarify, too.  For biweekly, that
11  means twice a week?
12    A.  No.  That means every other week.
13    Q.  Okay.
14    A.  In the context where you'll see biweekly --
15  you know, anyplace that you see a reference to biweekly
16  stores from us, it's generally every other week.  We
17  had, I don't know, 1200, maybe more than that, stores
18  that were delivered every other week.
19    Q.  Let's go down to the bottom of this page.  It
20  says Benefits, A brief description -- A brief
21  explanation of the benefit for the project.  Do you see
22  that?
23    A.  I do.
24    Q.  Do you have an understanding about what
25  information is being requested in the Benefit section?

Page 121

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  I don't know that any
3    information is -- do you mean why -- is your
4    question why -- is your
5    question why the form has a section to request
6    benefits?
7  BY MR. PIFKO:
8    Q.  Fair enough.  Bad question.  What -- do you
9  have an understanding about what the form is seeking
10  when you input information into that portion of the
11  form in the Benefit section?
12    A.  If you're -- I think I understand your
13  question, and, if I do, if I understand it correctly,
14  the purpose of that section of the form is for the
15  requester to document what benefit the company will
16  gain or what need is being potentially addressed if the
17  project is completed.
18    Q.  Okay.  And then can you read the language
19  that's in the Benefit section there?
20    A.  Yep.  It says, Compliance with 21 U.S.C. 823
21  and/or C.F.R. 1307.74(b) to detect and report
22  suspicious orders of controlled substances through the
23  Distribution Centers.
24        Maintain tolerance thresholds and order limits
25  to identify suspicious orders in order to prevent
26  diversion of controlled substances through any

Page 122

1 pharmacy.
2 Q. Was that accurate at the time this was
3 written?
4 A. It's accurate to say that that goal was one of
5 the projects of this -- or one of the expectations of
6 this project; but again, I want to make sure, because
7 it's not clearly stated here, that it was not to
8 initiate compliance. It was to automate the manual
9 processes that were already in place, so --
10 Q. Then there's a longer form that goes with this
11 as well, correct?
12 A. Yes.
13 (Rite-Aid Chapman Exhibit No. 3 was marked for
14 identification.)
15 BY MR. PIFKO:
16 Q. I'm handing you what's marked as Exhibit 3.
17 For the record, Exhibit 3 is a document Bates labeled
18 Rite_Aid_OMDL_0014948 through 51. Please take a moment
19 to review that, and let me know when you're done.
20 A. Okay. Okay.
21 Q. Have you seen this before?
22 A. I have.
23 Q. When was the last time you saw this document?
24 A. Yesterday.
25 Q. Prior to yesterday, when was the time before

Page 123

1 that that you saw it?
2 A. 2013.
3 Q. Okay. Can you tell me what this document
4 reflects?
5 A. Well, it's an E-mail string that also had a --
6 it had the Project Initiation form attached to it
7 evidently; but it's an E-mail string that was, you
8 know, originated by Karyn Kunzig, who I mentioned is
9 the -- was the director who was kind of responsible for
10 all of the IT projects that were -- you know, involved
11 supply chain, where she was asking for some additional
12 information and feedback to complete the PI form, the
13 Project Initiation form.
14 So, you know, there was a -- I don't know,
15 there's some back and forth with it about some
16 different components of that, so --
17 Q. One of the components of that is, if you turn
18 to the second page, a discussion of the Benefit
19 section.
20 A. Correct.
21 Q. So if you turn to the second page here,
22 there's an E-mail from Chris dated Monday,
23 September 23rd, 2013, at 8:35 a.m. Do you see that?
24 A. I do.
25 Q. And he says, Karyn, we are not submitting any

Page 124

1 labor benefits. All benefits are related to
2 compliance. Do we need to quantify in any way? Do you
3 see that?
4 A. I do.
5 Q. Do you have an understanding about what's
6 being communicated there?
7 A. Yes. What he's saying -- one of the things
8 that, with any of these projects, if you -- let's say
9 you did a -- not this project but a different IT
10 project that was going to automate picking in some
11 fashion and part of your justification was, by
12 automating picking, we would eliminate 10 pickers.
13 You would say, okay, eliminating 10 pickers is
14 X number of dollars of payroll and payroll taxes,
15 benefits, et cetera, et cetera. You would document
16 that in this form, and then it would be removed from
17 your budget when it was submitted.
18 So what Chris is really saying is that even
19 though this will make the process more efficient in the
20 DCs, we're not really going to eliminate any pickers or
21 anything. So we're not saying there's a payroll
22 reduction that's appropriate from this.
23 Q. So Chris is saying there's not going to be any
24 labor savings as a result of this project?
25 A. He's saying -- he's -- what he's -- the point

Page 125

1 that he's making is, there aren't going to be any
2 documented labor benefits that we would -- that we
3 would expect to be removed from our budget.
4 The process will be made more efficient, but
5 we will not reduce head count because of that, if that
6 makes sense, you know, that this isn't going to result
7 in the elimination of someone's job.
8 Q. Then Janet writes back about 20 minutes later.
9 Do you see that --
10 A. I do.
11 Q. -- above there?
12 And you're one of the recipients of that
13 E-mail. Do you see that?
14 A. I do.
15 Q. Do you recall getting that?
16 A. I do.
17 Q. Can you read what she says here?
18 A. Janet said, Compliance is huge. In the most
19 recently filed but then dismissed lawsuit in McDowell
20 County, West Virginia, the county commissioners filed a
21 suit against Rite-Aid and several independent
22 pharmacies for four counts relating to drug diversion.
23 Much of the discovery documentation in that
24 case was around suspicious orders. Several other
25 counties in West Virginia have filed suit against many

Page 126

1 wholesalers for shipping the products into
2 West Virginia and causing the drug problem.
3      I will put something together for Karyn for
4 tomorrow when she returns.
5      Q.  So when she says she's going to put something
6 together, that's for the Benefit section of the Project
7 Initiation form?
8      MS. McENROE:  Objection to form.
9      THE WITNESS:  Yes.  It would be for the
10      Benefits portion.
11 BY MR. PIFKO:
12      Q.  And so you understand that based on this,
13 there was a connection between some of the allegations
14 in the lawsuits in West Virginia to this project?
15      MS. McENROE:  Objection to form.
16      THE WITNESS:  No.  I'm not sure I would say
17      that there's a connection there.  What I would say
18      is that -- I believe the point that Janet is
19      getting at is, and I -- I'm going to preface this
20      by saying I don't have direct knowledge of this,
21      but I'm sure they had to pull together a lot of
22      documentation, you know, data that, ultimately, it
23      sounds like resulted in this case being dismissed.
24      You'll recall that I mentioned that when this
25      project was initiated, it wasn't just to automate

Page 127

1      what took place in the DC, it was also to create a
2      reporting platform that could be used by the loss
3      prevention department or for the government
4      affairs department to kind of more efficiently do
5      some things that they now had to do in other
6      systems and other processes.
7      So I think -- I think that that's what she's
8      getting at, is that she's saying, you know, in
9      effect, Hey, we had to do a bunch of stuff here,
10      and ultimately this case was dismissed.
11      This project, one of the benefits of this
12      project is we will be able to do that in a more
13      efficient manner and in a simpler, more automated
14      way is what I believe she's getting at.
15      I -- I would not say that I think she's
16      directly associating that -- anything with that
17      suit to this project because it sounded like it
18      was already dismissed, by the way.
19 BY MR. PIFKO:
20      Q.  This same Janet Hart, to be clear for the
21 record, that you've talked about earlier?
22      A.  It is.
23      Q.  Aside from communications with any lawyers,
24 did you have any discussions about the West Virginia
25 lawsuits?

Page 128

1      A.  No.
2      Q.  Did you have any knowledge that these lawsuits
3 had been filed?
4      A.  When they were initiated?
5      Q.  Yeah.
6      A.  No.
7      Q.  Aside from discussions with lawyers, did you,
8 in connection with receiving this E-mail, have any
9 discussions with anyone on your team about the fact
10 that this lawsuit had been filed and any actions the
11 company might take?
12      A.  No.  I don't recall anything -- anything other
13 than what's in this E-mail about these lawsuits.
14      Q.  It also says, the second to last sentence
15 there that you read, Several other counties in
16 West Virginia have filed suit against many wholesalers
17 for shipping the products into West Virginia and
18 causing the drug problem.  Do you see that?
19      A.  I do.
20      Q.  Did you have any understanding that there were
21 lawsuits in West Virginia that were against wholesalers
22 for allegedly causing a drug problem?
23      A.  Beyond what's in this E-mail, I -- I wouldn't
24 have known of anything, you know, unless, you know, if
25 something made the Business Press perhaps; but, as a

Page 129

1      general statement, no, nothing other than what's in
2      this E-mail.
3      Q.  Do you know if, at this time, Rite-Aid had
4      stores in West Virginia where it shipped controlled
5      substances to them?
6      A.  We did have stores in West Virginia, and we
7      did ship controlled substances to them.
8      (Rite-Aid Chapman Exhibit No. 4 was marked for
9      identification.)
10 BY MR. PIFKO:
11      Q.  I'm handing you what's marked as Exhibit 4.
12      A.  Okay.
13      Q.  For the record, Exhibit 4 is a multiple page
14 E-mail Bates labeled Rite_Aid_OMDL_0024619 through 622.
15 Please take a moment to review this, and let me know
16 when you're done.
17      A.  Okay.
18      Q.  Have you seen this before?
19      A.  I have.
20      Q.  When was the last time you saw this?
21      A.  Yesterday.
22      Q.  Prior to yesterday, when was the last time you
23 saw it?
24      A.  2013.
25      Q.  So this is -- a following up on some of the

Page 130

1 discussion that was reflected in Exhibit 3. Do you
2 agree?
3 A. Yes.
4 Q. Some of the same E-mails are below --
5 A. Yes.
6 Q. -- in Exhibit 4?
7 A. Yes.
8 Q. Can you tell me what -- in the top E-mail,
9 it's an E-mail from you to Karyn copying Chris dated
10 October 4th, 2013. Do you see that?
11 A. I do.
12 Q. Okay. Can you tell me what's being reflected
13 there?
14 A. Well, as I mentioned, my area of
15 responsibility spanned multiple things. You know, this
16 was just one set of that, you know, and certainly not
17 to minimize it, but -- so I was not necessarily the
18 designer of the detail of a project like this, but I
19 did have some strong feelings about the structure, the
20 way you'd put the project together.
21     And what I actually tried to reflect in an
22 E-mail a couple -- you know, a couple earlier in this
23 string was, I was requesting -- it was really more of a
24 technical point, that I was requesting that when the IT
25 department developed this, as opposed to writing

Page 131

1 program code that executed all of these decisions, that
2 they would create tables that would be populated and --
3 and the program code would draw on the data in those
4 tables to do the decision-making; and that request was
5 based on my background and history in working with IT
6 departments and working on other projects and the
7 thought process that if we made it table driven, that
8 if later there was reason to add additional reasons or
9 make changes, we wouldn't have to come back to the IT
10 department and request a change from them. We would be
11 able to simply update the table.
12     So that was the point that I was making, and
13 it really wasn't, you know, about the detail of the
14 project itself. It was more the structure of how IT
15 was going to do its work; and so, you know, as you see,
16 you know, Karyn came back to me and asked me, okay, do
17 you -- because I said, you know, we'll want this all to
18 be table driven, and she asked for some examples of the
19 data that we would put in the table.
20     I subsequently asked Chris, because Chris
21 would have been the one that would have been working on
22 this at that level -- and you may notice on E-mail that
23 I sent that there's a difference in font between the
24 top part and the part where it begins saying Approved
25 Order.

Page 132

1     I'm quite sure what happened is I asked Chris,
2 I said, Okay, Chris, you know, give me what you would
3 want for this. What would you expect the values to be?
4 He sent it to me, and I cut and pasted it into this
5 E-mail to respond back to Karyn.
6     So this -- this entire string is really more
7 about the structure and the way the IT department would
8 approach the project as opposed to the details of the
9 project itself.
10 Q. So with respect to the reason codes here, do
11 you see that?
12 A. I do.
13 Q. And the idea is for the reason codes there,
14 that's the point you're saying that you pasted in from
15 Chris?
16 A. It is.
17 Q. Okay. Do you have an understanding about what
18 those reason codes are?
19 A. I can read and understand them. I --
20 candidly, Chris and I didn't have a lot of discussion
21 about it because the entire point of this was to give
22 Karyn some examples so she would know, like, the sizes
23 of the fields and things of that nature.
24     We may very well have ended up with different
25 reason codes than what's here, but she just wanted

Page 133

1 something as an example that she could give a
2 programmer, so --
3 Q. Do you have an understanding about what these
4 reason codes generally were -- reasons for what? What
5 are they trying to reflect?
6     MS. McENROE: Objection to form.
7     THE WITNESS: Well, again, I -- this is more
8     from reading it than -- because I'm confident
9     Chris and I didn't have a discussion about this.
10     I simply asked him, Give some values to Karyn so
11     she can do the design work here.
12     So I can read it and kind of infer what
13     Chris's thought process was. So from that
14     perspective, yes, I can answer that, so --
15 BY MR. PIFKO:
16 Q. What -- at the time, what was your
17 understanding of what these reason codes were?
18 A. These were examples to give to Karyn for her
19 to do the design work. We would later then finalize
20 what the reasons and the reason codes and the verbiage
21 and all that kind of stuff, you know, in consultation
22 with loss prevention and Janet, you know, other people
23 would be involved in it; and we would actually populate
24 the data based on that, but these were really meant to
25 just represent an example of what could be reason codes

Page 134

1 for this table, those tables.
2    Q.  So they're talking about types of orders.
3 Would you agree?  Order Approved, Suspicious Activity,
4 Suspicious Order.  Do you see that?
5    A.  I would agree.
6    Q.  So did you understand that this system was
7 going to have some sort of way that people could
8 document whether, for example, an order was approved
9 or, for example, whether it was suspicious?
10    A.  That was part of the design, yes.
11    Q.  That was going to be something that this
12 project was going to allow you to do?
13    A.  We would have the ability to flag an order
14 using -- or flag an order with various labels, if
15 that's the right term, and suspicious orders certainly
16 would have been one of those if we had ever encountered
17 a suspicious order.
18       (Rite-Aid Chapman Exhibit No. 5 was marked for
19 identification.)
20 BY MR. PIFKO:
21    Q.  I'm handing you what's marked as Exhibit 5.
22    A.  Okay.
23    Q.  For the record, Exhibit 5 is a document
24 entitled Project Initiation Document concerning Project
25 5046, which is Bates labeled Rite_Aid_OMDL_0024623

Page 135

1 through 24636.  So take a moment to review this, and
2 let me know when you're done.
3       MS. McENROE:  And while he's looking at that,
4    just really quick for the record, is this Exhibit
5    5 the attachment to Exhibit 6, do you know?
6       MR. PIFKO:  Yeah.  I was going to discuss that
7    with him, but yes.
8       MS. McENROE:  Okay.  But they were produced
9    that way together?
10       MR. PIFKO:  I believe that's correct.  The
11    Bates labels are consecutive.
12       MS. McENROE:  I'm sorry.  I said Exhibit 6.  I
13    meant Exhibit 4.
14       MR. PIFKO:  Exhibit 4.
15       MS. McENROE:  Yep.
16       MR. PIFKO:  Exhibit 4 ends at 0024622, and
17    Exhibit 5 begins at 24623.
18       MS. McENROE:  Thank you.
19       THE WITNESS:  Okay.
20 BY MR. PIFKO:
21    Q.  Have you seen this document before?
22    A.  I believe so.
23    Q.  Okay.  When was the last time you recall
24 seeing this document?
25    A.  Well, I saw -- the reason I said "I believe

Page 136

1 so" is I saw multiple iterations of this document as it
2 evolved yesterday, and I believe this was one of them,
3 so --
4    Q.  So if we look back at Exhibit 4, if you see on
5 the first page there, if you put Exhibit 4 back in
6 front of you, you're actually -- in the E-mail that you
7 sent on October 4th, 2013, you're actually forwarding
8 an E-mail from Karyn, which is below.  Do you see that?
9    A.  Yes.
10    Q.  Do you agree with that?
11    A.  Yes.
12    Q.  Okay.  And in Karyn's E-mail dated
13 October 2nd, 2013, at the end she says, Attached is the
14 most current PI doc.  Do you see that?
15    A.  I do.
16    Q.  And then -- so that's dated October 2nd, and
17 then do you see at the top of Exhibit 4 there's an
18 attachment, Suspicious Order Monitoring PI docx.  Do
19 you see that?
20    A.  I do.
21    Q.  Okay.  So this is the -- you agree this is
22 the -- it's dated, if you look at the first page,
23 October 2nd, 2013.  Do you see that?
24    A.  I do.
25    Q.  So do you agree that this is the document that

Page 137

1 was attached to that -- to Exhibit 4?
2    A.  Yes, it appears that it would be that
3 document.
4    Q.  Okay.  Can you tell me, we've been talking
5 about this generally, but can you tell me what this
6 Exhibit 5 is?
7    A.  Whenever a project, you know, began to reach
8 the point at where it appeared really something was
9 going to be initiated and this -- this was pulled
10 together -- this would get pulled together to a point
11 where it would begin to be routed for approvals.
12       So that's what this form and this document is
13 for, is to complete the documentation of all the
14 associated -- the key information that an executive
15 would need to decide whether or not they agreed to
16 approve this project or not and then actually would be
17 the form that would ultimately be routed to get it
18 approved, so --
19    Q.  If you look back at the exhibits, I believe
20 it's Exhibit 2 is the first time you started discussing
21 this project back in June 2013.  Do you agree?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  It -- we certainly were
24    discussing it then in June of 2013, yes.
25 BY MR. PIFKO:

Page 138

1    Q.  Okay.  You may have started discussing it
2  earlier?
3    A.  Yeah.  I couldn't tell you whether there were
4  earlier discussions.  I wouldn't recall that, but
5  certainly we were discussing it in June of 2013.
6    Q.  Okay.  And so this is several months later as
7  the project is further developed, and you were getting,
8  like you said, to a process -- the point where you are
9  putting information into this form that will ultimately
10 get circulated for approval?
11   A.  Yeah.  It appears to be about three and a half
12 months later.
13   Q.  Okay.  And so there's people listed on the
14 front here under Approvals.  Do you see that?
15   A.  I do.
16   Q.  Okay.  And this reflects people that would
17 ultimately have to sign off on the project to approve
18 it?
19   A.  For it to move forward, yes.
20   Q.  Okay.  As far as process, if these people sign
21 off, then what happens?
22   A.  It then would get in the IT work queue and
23 would be -- there was a -- there's a -- was a separate
24 process by which all of the projects that were approved
25 through this activity were routed to IT; and, if -- if,

Page 139

1  in fact, the number of those projects exceeded IT's
2  ability to execute right now, they would be scheduled
3  out and/or ultimately could be, I guess, disapproved
4  if, you know, reasons changed that would make it
5  unnecessary to do a project.
6        But -- but this would be -- the completion of
7  this would be the step to say, yes, we, a supply chain,
8  want to initiate this project, and we want it in the IT
9  work queue.
10   Q.  Do you have an understanding of when the
11 expectation was for getting this project implemented --
12   MS. McENROE:  Objection to form.
13 BY MR. PIFKO:
14   Q.  -- as far as the time?
15   A.  There's actually a timeline attached to this.
16 So I would say that the timeline that's attached to
17 this would be, since it was prepared by the IT
18 department, it would be the IT department's expectation
19 of delivery of this project.
20   Q.  Okay.  And to be clear for the record, that's
21 on the page that's labeled 0024630.  Is that what
22 you're looking at?  There's a number on the bottom
23 corner.
24   A.  Yes, that is what I'm looking at.
25   Q.  And so based on reviewing this, what's your

Page 140

1  understanding of when this project was to be
2  implemented?
3    A.  Based on this, it would not be fully completed
4  until December of 2014.
5    Q.  The -- going back to the first page of the
6  document, you mentioned Mr. Lester earlier.  Can you
7  tell me who he is?
8    A.  He was my boss.  He was the senior vice
9  president of supply chain.
10   Q.  Is there anyone higher than him that would
11 have had to approve this project?
12   A.  No one higher than him would have had to
13 approve it for it to go into the IT department work
14 queue.  There ultimately was an approval process of
15 which projects the IT department then initiated, and
16 there was a separate process for that that was called a
17 capital project request because of the cost for doing a
18 project of this sort and a, you know, a different
19 routing form for the approvals for that.
20   Q.  What's your understanding of what the cost for
21 this project was?
22   A.  Well, there's a -- there's a cost estimate in
23 here.  I think it showed -- let's find it.  The IT
24 estimate was $435,600.
25   Q.  And again, for the record, you're looking at

Page 141

1  0024631; is that correct?
2    A.  Correct.
3    Q.  The cost estimate there, would there be
4  ongoing costs as well associated with maintaining a
5  project like this that you're aware of?
6    A.  To the best of my knowledge, no, once it was
7  initiated.  Nothing -- I mean, obviously you have to
8  maintain the computer.  You know, there's some hardware
9  maintenance and things of that nature.  You pay -- you
10 pay licensing fees for databases.
11       So all of that comes with any project; but
12 beyond that, to the best of my knowledge, I would say
13 no.
14   Q.  Let's look at some of the pages in here.  If
15 you'd turn to the page 3 of the document.  Let me know
16 when you're there.
17   A.  Okay.  This is the one that the Bates stamp is
18 24625?
19   Q.  Correct.
20   A.  Okay.
21   Q.  Do you see here Background / Summary of the
22 Project?
23   A.  I do.
24   Q.  Okay.  Can you read that for the record?
25   A.  The purpose of this project is to develop

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 effective controls against the diversion of controlled
2 substances and conduct adequate due diligence to ensure
3 that controlled substances distributed from the
4 Rite-Aid Distribution Centers are for legitimate
5 patient needs.
6 　　　 Rite-Aid must ensure compliance with 21 U.S.C.
7 823 and/or C.F.R. 1307.74(b) to detect and report
8 suspicious orders of controlled substances through the
9 distribution centers.
10 　Q. That's similar to language we saw in Exhibit
11 2, correct?
12 　A. Yes. That is similar to that language.
13 　Q. This is consistent with your understanding of
14 the purpose of the project?
15 　A. It is.
16 　Q. Now let's go back to Exhibit 2.
17 　A. Okay.
18 　Q. I want to ask you, if you look at the first
19 sentence in the Description on Exhibit 2.
20 　A. Yes.
21 　Q. Tell me when you're there.
22 　A. I am. I'm there.
23 　Q. It says, Develop effective controls against
24 the diversion of controlled substances and conduct
25 adequate due diligence to ensure that controlled

Page 143

1 substances distributed from the Distribution Centers
2 are for legitimate business needs. Do you see that?
3 　A. I do.
4 　Q. Okay. And then the document dated
5 October 2nd, 2013, says at the -- it's the same
6 sentence except at the end it says "for legitimate
7 patient needs." Do you see that?
8 　A. I do.
9 　Q. Do you recall a discussion of changing the
10 language from "business needs" to "patient needs"?
11 　A. I don't recall a discussion. I think that
12 there was an E-mail string where there was some
13 communication about that, and I think it was intended
14 to reflect the fact that, you know, as always, our --
15 our goal as a chain pharmacy is to serve our patients
16 and to make sure that we have the medications available
17 to our patients that they need to have, so --
18 　Q. Do you know where the language "legitimate
19 business needs" in the original document in June 2013
20 came from?
21 　A. I do not.
22 　Q. But you recall there being E-mails about
23 changing that from "business needs" to "patient needs"?
24 　A. Yes, I believe there was an E-mail string
25 where that was -- that was discussed to change it to

Page 144

1 "patient needs."
2 　Q. Do you recall being part of any other
3 discussions about that change?
4 　A. I do not.
5 　Q. Let's stay on the same page of Exhibit 5 --
6 　A. Okay.
7 　Q. -- page 3. Let me know when you're there.
8 　A. Okay.
9 　Q. All right. There's a section called Project
10 Scope. Do you see that?
11 　A. I do.
12 　Q. It mentions the Pharmacy Replenishment Order
13 Review application. Do you see that?
14 　A. I do.
15 　Q. Do you know what that is?
16 　A. Again, I'm not an expert on the -- on the
17 systems that created the orders. I believe that
18 that -- what that refers to is, in the pharmacy after
19 the system created the order, there was an application
20 where the order was presented to the pharmacist, and
21 the pharmacist was given the opportunity to, within
22 limitations, was given the opportunity to make
23 modifications to that order.
24 　Q. To your knowledge, is that something that was
25 in place the entire time that you were VP of logistics?

Page 145

1 　A. I believe that it was.
2 　Q. Was that ever removed from the process?
3 　A. Not that I'm aware of.
4 　Q. And that was part of the process when you took
5 the position of VP of logistics?
6 　A. To the best of my knowledge it was.
7 　Q. Let's look down at the Project Scope section,
8 the third paragraph. Tell me when you're there.
9 　A. I'm there.
10 　Q. Okay. Can you read the first sentence for me?
11 　A. Various reporting will be available to
12 identify trends in over orderrides (sic), increased
13 volume of controlled substance ordering, and repeated
14 downward cycle counts.
15 　Q. Do you have an understanding of what that's
16 referring to?
17 　A. I do.
18 　Q. Can you tell me?
19 　A. It -- what it's talking about is -- and I'm
20 confident that there -- the goal in incorporating it in
21 this project was to replace things that were being
22 manually run on an ad hoc basis instead of being
23 contained within a given system, was the overrides were
24 what we described -- talked about earlier where a
25 pharmacist can, you know, update the order and change a

Page 146

1 quantity.
2     The increased volume of controlled substance
3 ordering, we just see if there was a trend where there
4 was a controlled substance ordering; and repeated
5 downward cycle counts, a cycle count refers to doing an
6 inventory verification of your on-hand balance and
7 physically counting what you have on hand and comparing
8 it to what the system shows that you have on hand.
9     So when it talks about repeated downward cycle
10 counts, it's if someone repeatedly changed the, in the
11 store, changed the on-hand balance to a lower number.
12    Q.  So when this talks about repeated downward
13 cycle counts, that's the situation where there's
14 repeated occasions of someone in the store lowering the
15 reported inventory at a particular location in the
16 computer system?
17    A.  That's what I would take this to mean, yes.
18    Q.  And did you understand that that was
19 reflective of any concern?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  I have -- I would have no idea.
22    This, you know -- no, I don't understand -- I do
23    not have any understanding specific to that, and I
24    probably wouldn't because this is talking about
25    management of the pharmacies in the stores that I

Page 147

1    didn't have any responsibilities for and wasn't
2    involved in.
3 BY MR. PIFKO:
4    Q.  Do you have an understanding about why that's
5 something that was being included in the reporting as
6 part of this project?
7    A.  I do.
8    Q.  Okay.  What's your understanding of that?
9    A.  Well, as mentioned earlier, the ordering
10 system takes into account the demand, which is driven
11 by your usage or your consumption of a product, and
12 your on-hand balance.
13        So if someone reduces the on-hand balance, it
14 will result in an increased order from the distribution
15 center.  So that's what this is referring to.
16    Q.  Okay.  And do you have an understanding about
17 why the company wanted to have reporting on that
18 parameter?
19        MS. McENROE:  Objection to form.
20        THE WITNESS:  Again, this isn't my area of
21    responsibility, but I'm -- I'm sure that they
22    would be interested in seeing if the same item was
23    adjusted down, thereby causing a -- an increase in
24    the inventory, in the shipments of that item to a
25    given store.

Page 148

1 BY MR. PIFKO:
2    Q.  You talked about a manual collection of
3 certain data.  Do you know if that -- that data was
4 collected manually prior to this?
5    A.  Of my own knowledge, no.  That wouldn't have
6 been -- this is referring to activities that would have
7 taken place in our loss prevention department.  So I
8 can tell you, you know, generally I'm quite confident
9 that they did a lot of reporting and analysis to ensure
10 that we were in compliance with everything we needed to
11 be in compliance with, but I wasn't involved in it, so
12 I can't speak authoritatively on exactly what they did.
13    Q.  How about identifying trends and order
14 overrides, are you aware of any manual reporting of
15 trends and order overrides that occurred prior to this
16 time?
17    A.  I know that they could and did generate
18 reports of manual overrides, controlled substances and
19 non-controlled substances, you know, other items as
20 well.  So I know that that took place, but again, that
21 wasn't part of my area of responsibility.
22    Q.  Do you know who within the company would have
23 received those reports?
24    A.  I -- I don't.  It would have been -- again,
25 this would have been a function of the loss prevention

Page 149

1 department, and they would have worked with store op --
2 store pharmacy operations in dealing with it, so --
3    Q.  How about increased volume of controlled
4 substances ordering, do you see that?
5    A.  I do.
6    Q.  Do you have an understanding that there was a
7 manual reporting of that type of information prior to
8 this time?
9    A.  I would expect that there was, so --
10    Q.  But you don't know either way?
11    A.  Again, that wasn't my area of responsibility,
12 so --
13    Q.  You've never seen a report concerning
14 increased volume of controlled substances ordering at a
15 particular store?
16    A.  I don't ever remember seeing a report of
17 increased volume of controlled substances ordering from
18 a particular store.
19    Q.  Let's turn to the four -- the fifth page of
20 this document, which is Bates labeled, the same prefix,
21 0024627.
22    A.  Okay.
23    Q.  Tell me when you're there.  Okay.  So this has
24 some similar language we discussed earlier.  If you'd
25 read the first sentence there.  Can you read it for the

Page 150

1 record?

2   A.   Today blanket thresholds are manually enforced
3 at 5,000 dosage units per individual NDC per week per
4 store regardless of dispensing volumes or trends.

5   Q.   As we discussed, that's a true statement as of
6 the date of this report?

7       MS. McENROE:  Objection to form.

8       THE WITNESS:  With the exceptions that we
9    discussed earlier, yes.

10 BY MR. PIFKO:

11   Q.   And then can you read the second sentence?

12   A.   This is a labor intensive process with
13 opportunity for order lines to be missed.

14   Q.   Do you have an understanding about what that's
15 reflecting there?

16   A.   Yes.

17   Q.   Okay.  What is your understanding?

18   A.   It's saying that this was a manual process,
19 that we, as we talked about earlier, that the order
20 selectors had to manually record, and then it would --
21 it was entered into an Excel spreadsheet, so --

22   Q.   And there's a concern that given the labor
23 intensive process, order lines could be missed in the
24 analysis?

25   A.   Well, certainly any manual process is -- is --

Page 151

1 has the potential for error.  So that would be
2 something we would -- we would state as part of this,
3 yes.

4   Q.   Do you recall there being a specific
5 discussion about concerns about order lines being
6 missed in the review here?

7   A.   I do not.  I'm not aware of any instances of
8 an order line being missed; but again, any manual
9 process, it would be inaccurate to not acknowledge that
10 there's a potential for error with that.

11   Q.   Do you know if there was any reason why
12 Rite-Aid couldn't have implemented a system like this
13 earlier?

14       MS. McENROE:  Objection to form.

15       THE WITNESS:  I -- I'm -- I guess I'm trying
16    to think of the right way to answer that.  Any
17    project of this sort requires time to design.  You
18    know, if you want it to be effective, it requires
19    time to design, develop, deploy.

20       So there would have been a time window for
21    this to be done, regardless of when it was
22    initiated.  So I'm not sure if that answers your
23    question or not.

24 BY MR. PIFKO:

25   Q.   Fair enough.  Is there any reason that you can

Page 152

1 think of why this project couldn't have been initiated
2 a few years earlier?

3       MS. McENROE:  Objection to form.

4       THE WITNESS:  I'm not aware of any reason that
5    would have prevented it from being initiated, but
6    I -- I will again point out that we had manual
7    processes in place to accomplish what this project
8    was intended to accomplish at the distribution
9    centers.

10       So in terms of, you know, the urgency of it
11    from the distribution center's perspective, we
12    had -- we had manual processes in place for this.

13 BY MR. PIFKO:

14   Q.   This talks about -- well, the third sentence
15 says, In addition, stores which truly need this
16 quantity must order it from McKesson.  Do you see that?

17   A.   I do.

18   Q.   Do you have an understanding about what that's
19 referring to?

20   A.   It refers to the fact that we had that blanket
21 threshold at 5,000 dosage units; and, if a store's
22 legitimate needs caused it to need, you know, instead
23 of -- if it was a bottle of a hundred and they ordered
24 60 and we cut the order to 50, which is what we would
25 have done and they legitimately needed the 60, were

Page 153

1 unable to service their customer and provide the
2 medication to our customers without getting the
3 additional 10, they could and would have ordered those
4 additional 10 from McKesson.

5   Q.   Would the particular store order that directly
6 from McKesson?

7   A.   Yeah.  To the best of my knowledge, yes.
8 Again, that's an area I'm not an expert in; but yes, I
9 believe there was a mechanism where stores ordered
10 directly through McKesson.

11   Q.   Was there any reporting of orders that were
12 made through McKesson back up to the distribution
13 center?

14       MS. McENROE:  Objection to form.

15       THE WITNESS:  I'm not aware of any orders --
16    any reporting that came back to the distribution
17    center, but there certainly was reporting that
18    came back to the corporate office.

19 BY MR. PIFKO:

20   Q.   Okay.  So it's your understanding that if a
21 store ordered directly from McKesson, that order would
22 have been reported back to headquarters?

23   A.   It's my understanding there was reporting
24 of -- of order volumes to McKesson that came back to
25 the corporate headquarters.

Page 154

1    Q.   What's the basis of that understanding?
2    A.   Because one of the things that we -- we focus
3    on in my line of work was to try to service our
4    customers -- our customers were the stores -- as
5    thoroughly as possible.
6         So, frankly, we didn't like it when orders had
7    to go to McKesson because -- and this is -- you have to
8    realize that orders went to McKesson for non-controlled
9    substances.
10        So if an order had to go to McKesson, it meant
11   that that's something that we didn't satisfy and the
12   store's needs were.  So that's why I know there were
13   reports that came back that went to McKesson.
14   Q.   Do you know if there's a name for those
15   reports?
16   A.   I -- I don't, but I know there was reporting
17   that came back, so --
18   Q.   The next sentence here says, A new Billing
19   application will be developed which will, and then it's
20   got all these bullet points.  Do you see this?
21   A.   I do.
22   Q.   And so it talks about -- the first bullet
23   point says, Provide parameters for both Percent and
24   Quantity in which the order override was greater than
25   the suggested order.  Do you see that?

Page 155

1    A.   I do.
2    Q.   Do you have an understanding about what that's
3    reflecting?
4    A.   I do.
5    Q.   Can you tell me?
6    A.   It's reflecting that when you're doing the
7    mathematical computation, it's not practical to limit
8    that computation to only being a percentage or only
9    being a unit quantity because it -- it's highly
10   impacted by the pack size of an item.
11        You know, if you want one more of an item,
12   let's say, you know, using the example you used
13   earlier, if they wanted one more of an item that's
14   packed 50 and, you know, they wanted to go from -- I'm
15   sorry -- it was packed one and they wanted to go from
16   5,000 to 5,001, well, that's a fraction of a percent
17   increase; but, if it's packed -- let's say it's packed
18   5,000 and they wanted one more, it's a hundred percent
19   increase.
20        So it's really making the point that to --
21   that as a part of the design of this, that we wanted to
22   be able to manage those levels, those variance levels,
23   at both a unit, a shipping unit, and at a percentage
24   basis.
25   Q.   Do you know if data on the percentage basis

Page 156

1    and by unit was being collected manually at this time?
2    A.   I don't know the answer to that.
3    Q.   It says, Separate parameters are required for
4    Weekly and Bi-weekly stores order -- order stores.  Do
5    you see that?
6    A.   I do.
7    Q.   Do you have an understanding about why that
8    would be?
9    A.   I do.  The reason is that obviously a biweekly
10   store, it's -- if -- it's not getting an order for two
11   more weeks.  So the quantity that you would ship to
12   them needs to reflect the lead time of it being two
13   more weeks before they get their order as opposed to
14   the lead time of only one more week that another store
15   would be getting their order.
16        That's why you'd need to -- again, the
17   algorithm would need to take that into account
18   separately.
19   Q.   If you look at the third bullet point down
20   here, it says, Identify all controlled drug order lines
21   which exceed the Percent or Quantity Override control
22   values.  Do you see that?
23   A.   I do.
24   Q.   Do you know what that means?
25   A.   It would -- yes, I do.  It's to take the

Page 157

1    parameters that were mentioned in the prior bullets and
2    do the calculation of what would have -- what it would
3    have projected to be the maximum allowable order and
4    compare it to the order that was actually sent through
5    and anywhere that the order that came through exceeded that
6    amount, so it would appear as an excessive order, that
7    would be flagged.
8    Q.   Do you know if that calculation was being
9    conducted manually at this time or any time prior?
10   A.   The only thing that I'm aware of is, I know
11   that there was -- you know, we talked about the
12   automated ordering process, that the computer generated
13   the order, that the pharmacist could then modify the
14   order.
15        There was a limit on how much the pharmacist
16   could increase the order.  So there was a control in
17   place there.  I don't know what that percentage was,
18   but there was a control in place there.
19   Q.   Okay.  Other than that, you're not aware of
20   any manual process that made this calculation reflected
21   in Bullet Point 3 here?
22   A.   Other than that, I am not.
23   Q.   Let's go to the next page.  It's called
24   Trending Reports is the heading there.
25   A.   Okay.

Page 158

1   Q.  In the interest of being efficient here, we'll
2  see if -- can you -- can you read through these various
3  bullet points here, and what I want to know is if you
4  know if any of these trend parameters were being
5  conducted manually at this time or prior, anytime prior
6  to the date of this document.
7   A.  Again, this was not my area of responsibility.
8  This is something that would have been managed in our
9  loss prevention department. I'm confident that reports
10  of this type were being manually generated. You know,
11  there wasn't a single existing system to create all of
12  this.
13    So I'm confident that reports of many of these
14  types were being generated, but it wouldn't have been
15  anything I would have been involved in, so I don't --
16   Q.  Have you ever seen reports reflecting any of
17  this data that were manually generated?
18   A.  I -- I don't recall ever seeing any, but I --
19  but I wouldn't. Again, it wasn't my area of
20  responsibility, so it isn't anything that I would have
21  needed to see.
22   Q.  In the beginning it says, the need exists to
23  monitor ordering patterns of a store over time. Do you
24  see that?
25   A.  I do.

Page 159

1   Q.  Well, to read the whole sentence, it says, In
2  addition to monitoring orders daily, the need exists to
3  monitor ordering patterns of a store over time. Do you
4  see that?
5   A.  I do.
6   Q.  Do you have an understanding about what that
7  means?
8   A.  I -- I do. I think it means that you need to
9  look at not just this week's orders but the orders, you
10  know, over a period of time, over a period of several
11  weeks when you're doing this type of analysis.
12   Q.  Do you have an understanding about why one
13  needs to do that?
14    MS. McENROE: Objection to form.
15    THE WITNESS: I would be speculating, I guess,
16   because, again, it's not my -- my area of
17   responsibility. It's not my area of expertise,
18   but I would say that I would guess that if you see
19   order quantities that are slowly but steadily
20   increasing, you would want to make sure that we
21   have a slow but steady increase in the number of
22   scripts for that store.
23    So you would want to look at it -- you know,
24   something that might not be caught in terms of the
25   control of the percent increase that the

Page 160

1  pharmacist was limited to, let's say, you would
2  want to be able to say, Okay, I see that this is
3  going up by, you know, 5 percent every week or
4  whatever for the past five weeks, but, Oh, yeah, I
5  see we've got scripts to accomplish that or
6  accommodate that.
7  BY MR. PIFKO:
8   Q.  Did you have an understanding that there was
9  any regulatory requirement that would require one to
10  monitor ordering patterns of a store over time?
11    MS. McENROE: Objection to form.
12    THE WITNESS: I would tell you that my
13   understanding is that our regulatory requirement
14   was to ensure that we prevented diversion and
15   identified suspicious orders, whatever it took to
16   do that.
17  BY MR. PIFKO:
18   Q.  Do you know, with respect to the types of data
19  reflected on page 6 or Bates label 0024628, who would
20  be, if anyone, would be responsible for generating that
21  kind of data?
22   A.  I don't know with certainty. My guess is that
23  it would be Sophia Lai or someone in that area.
24   Q.  Who is Sophia?
25   A.  She was -- she worked in the loss prevention

Page 161

1  department. Asset protection, I guess is the official
2  name of the department. I should --
3   Q.  Okay.
4   A.  I should be more precise.
5   Q.  We'll take a break in a minute. I just want
6  to ask one more series of questions, if you'd go to the
7  next page.
8   A.  Okay.
9   Q.  There's a heading Assumptions. Do you see
10  that?
11   A.  Yes.
12   Q.  I want to direct your attention to a couple of
13  those bullet points there.
14   A.  Okay.
15   Q.  The second bullet point here, can you read
16  that out loud for me?
17   A.  Corporate associates will not force distribute
18  unreasonably large quantities of control drug items
19  using the Merchandise Distribution or Pharmacy
20  Replenishment Trend Adjustment applications.
21   Q.  Do you have an understanding what that means?
22   A.  I do. Occasionally orders would be created
23  that would force quantity out to the store without the
24  store ordering it. Typically, a very common reason for
25  that is it's a brand-new item. So it -- you know,

Page 162

1 there's no history. There's nothing in the store
2 system that will cause an order to be created.
3        So you force out a couple of pieces to every
4 store of a brand-new item, and then as they consume
5 that quantity, the systemic ordering process takes over
6 and begins to replenish it.
7    Q.  Why would it say that an associate could force
8 distribute something?  How was -- so it's saying
9 there's an assumption in the system that corporate
10 associates will not force distribute unreasonably large
11 quantities.
12       So in the system, someone could still override
13 the automated system to put, like you're saying, to put
14 out large volumes of product if they felt it was
15 necessary?
16    A.  There was --
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  Sorry.  There was a process by
19    which folks that are in the, actually, in the
20    replenishment department could force product out
21    to the stores; and I think that this is -- this is
22    the IT department basically saying we're assuming
23    that you won't force out some large quantity that
24    would cause a blip in this new system that
25    we're -- we're developing.

Page 163

1 BY MR. PIFKO:
2    Q.  And the new system wouldn't prevent someone
3 from doing that, and that's why they're assuming that.
4 Agree?
5    A.  To the best of my knowledge, that's correct.
6    Q.  And then I just want to ask about the third
7 bullet point.  It says that -- the assumption that
8 McKesson's systems contain sufficient controls to
9 manage the DSD purchases.  Do you know what a DSD
10 purchase is?
11    A.  The acronym stands for Direct Store Delivery.
12    Q.  And that's what we were talking about earlier?
13    A.  Correct.  Where a store ordered directly from
14 McKesson and was replenished directly from McKesson.
15    Q.  We'll take a break.  The last question here.
16 The first bullet point says that another assumption is,
17 This process assumes that the Distribution Centers will
18 pro-actively contact each store on the Suspicious Order
19 Review screen.  Do you see that?
20    A.  I do.
21    Q.  Do you have an understanding about what that
22 means?
23    A.  I do.  The -- you'll recall we talked about
24 the fact that in the current manual process, that even
25 if an order was below the threshold, if the DC saw

Page 164

1 something that they wondered about, they thought
2 merited further follow-up, they would call the store,
3 and they would record the -- the, you know, result of
4 that conversation in -- and it's in those Excel
5 spreadsheets that we've talked about before.
6        This is saying, it assumes that that same
7 thing will take place, someone at the DC will call the
8 store, follow up on anything that was identified as
9 a -- as -- that was identified on this, quote unquote,
10 suspicious order review screen and would make the
11 appropriate entries onto that screen.
12    Q.  Okay.  Thank you.  With that, we'll take a
13 little break for lunch.
14    A.  Okay.
15       THE VIDEOGRAPHER:  Off the record, 1:24 p.m.
16    (Luncheon recess.)
17       THE VIDEOGRAPHER:  On the record, 2:12 p.m.
18 BY MR. PIFKO:
19    Q.  Welcome back from the lunch break.  Before we
20 took a break, we were looking at Exhibit 5, if you'll
21 recall.
22    A.  Okay.
23    Q.  I want to direct your attention back to page 6
24 of Exhibit 5.  Specifically, the Bates label was 24628.
25 We were talking about data, whether data -- you were

Page 165

1 aware if this type of data was being collected as of
2 this time and prior.  Do you recall that discussion?
3    A.  I do.
4    Q.  And I believe you testified that someone in
5 loss prevention -- or what was the other word you used
6 for that department?
7    A.  Asset protection.
8    Q.  Okay.  -- loss prevention or asset protection
9 would be the one responsible for collecting that type
10 of information.  Is that what you said?
11    A.  Yes.
12    Q.  Have you ever spoken with anybody from asset
13 protection or loss prevention about the data sets that
14 they collect --
15       MS. McENROE:  Objection to form.
16 BY MR. PIFKO:
17    Q.  -- concerning orders?
18    A.  I do not recall any specific conversations
19 about store orders with asset protection about the
20 processes they go through.
21    Q.  And you also testified that you've never seen
22 any reports with that type of data in it, correct?
23    A.  That's correct.
24    Q.  I'm going to hand you two documents at once,
25 but they're basically one document.

Page 166

1    MS. McENROE: Mr. Pifko, are you marking them
2  together or separate?
3    MR. PIFKO: I'll mark them separately.
4  They're not stapled, so --
5    (Rite-Aid Chapman Exhibit Nos. 6 and 7 were
6  marked for identification.)
7  BY MR. PIFKO:
8    Q.  I'm handing you what's marked as Exhibit 6 and
9  Exhibit 7, which was what was attached to Exhibit 6,
10  and I'll read the Bates labels into the record in just
11  a minute. Here's 7. Let the record reflect the
12  witness is reviewing Exhibit 7.
13    For the record, Exhibit 6 is a single page
14  E-mail Bates labeled Rite_Aid_OMDL_0040183, and Exhibit
15  7 is a multiple-page Project Initiation Document for
16  Project 0 -- 5046 Suspicious Order Monitoring, Bates
17  labeled Rite_Aid_OMDL_0040184 through 198. So let me
18  know when you're done reviewing.
19    A.  Okay. Okay.
20    Q.  Have you seen Exhibit 6 and 7 before?
21    A.  I have.
22    Q.  When was the last time you saw them?
23    A.  Well, I saw Exhibit 7 yesterday, I believe.
24  I -- I don't know that I saw this E-mail that it would
25  have been attached to, but obviously I saw both of them

Page 167

1  in 2013 as well.
2    Q.  Okay. And so you see from Exhibit 6 it
3  reflects that Janet is sending Karyn and you Exhibit 7,
4  which she says includes all comments and changes, which
5  her E-mail is dated October 9th, 2013. Do you see
6  that?
7    A.  I do.
8    Q.  Okay. Do you agree that Exhibit 7 is a
9  document reflecting all versions and changes as of that
10  date?
11    A.  Yes.
12    MS. McENROE: Objection to form.
13    THE WITNESS: It appears that it is.
14  BY MR. PIFKO:
15    Q.  If you note, there's some strikeouts and
16  things that are highlighted in Exhibit 7, if you see
17  that.
18    A.  I do.
19    Q.  For example, let's turn to page 3, which is
20  04 -- 0040186. Are you there?
21    A.  I am.
22    Q.  Do you see, for example, that it says, Select
23  reason codes -- about halfway down the page, the second
24  paragraph under Project Scope, it says, Select reason
25  codes will trigger follow up by, and struck out Loss

Page 168

1  Prevention, and it has Government Affairs instead. Do
2  you see that?
3    A.  I do.
4    Q.  Okay. Do you have a recollection of changing
5  the reason code follow up from the Loss Prevention
6  department to the Government Affairs department?
7    MS. McENROE: Objection to form.
8    THE WITNESS: No, I do not, and I didn't make
9    this change, so -- my area wasn't make this
10    change. So no, I don't -- I don't know what
11    precipitated that.
12  BY MR. PIFKO:
13    Q.  Okay. Do you know if there was any -- well,
14  the previous sentence says, Distribution Center
15  personnel will contact the store and enter a reason
16  code for the unusually high order quantity. Do you see
17  that?
18    A.  I do.
19    Q.  Okay. And then it says certain codes would
20  trigger follow up by somebody. Do you see that?
21    A.  I do.
22    Q.  Okay. And so my question is, do you know if,
23  at the time that this document was created or at any
24  time prior, if there was any follow-up by anyone if a
25  distribution center person noticed an unusually high --

Page 169

1  had contacted a store and reported an unusually high
2  order quantity?
3    MS. McENROE: Objection to form.
4    THE WITNESS: I'm not aware of any follow-up
5    that took place as a result of a distribution
6    center associate contacting government affairs or
7    loss prevention about an unusually large order.
8    It might -- may have happened, but I'm not aware
9    of that.
10  BY MR. PIFKO:
11    Q.  If you go to the next page, there's a bullet
12  point with a change there. Do you see that?
13    A.  I do.
14    Q.  It says, Spoke to Dan Miller about this
15  function, he agreed to remove this ability for all RX
16  Legend Drugs. Do you see that?
17    A.  I do.
18    Q.  Do you know who Dan Miller is?
19    A.  I do.
20    Q.  Who is he?
21    A.  He is currently -- well, he -- he's -- to the
22  best of my knowledge, he's still employed by Rite-Aid
23  and is in the government affairs department now. He
24  was, at that point in time, I believe he was in
25  pharmacy operations, but he's a -- he's in the pharmacy

Page 170

1  department, so --
2      Q.  Is there a pharmacy -- you mentioned the idea
3  of pharmacy operations earlier in deposition when we
4  were talking about distribution centers.  Is there a
5  pharmacy operations department or division at the
6  corporate offices?
7          MS. McENROE:  Objection to form.
8          THE WITNESS:  Yes, there are -- there is a
9      form -- a pharmacy operations department, and I
10     may not be using the title that they use for their
11     department, but there is a department that serves
12     that function.
13  BY MR. PIFKO:
14     Q.  Who was the head of that function when you
15  were VP of logistics?
16     A.  Well, Dan -- it may have been Dan.  I can't
17  swear to the exact reporting.  I don't -- you know, I
18  mean, there's multiple levels of pharmacy
19  responsibilities that all report into the senior vice
20  president of pharmacy.  So I -- I believe pharmacy
21  operations would have been Dan Miller at that point,
22  but I'm -- I -- I can't swear to that.
23     Q.  Do you have an understanding of the type of
24  activities that are managed within the pharmacy
25  operations department?

Page 171

1      A.  I'm familiar with at least some of them.
2      Q.  Okay.  Can you tell me the ones that you are
3  familiar with?
4      A.  If there's an activity that involved
5  pharmacists at the store and needed coordination across
6  all divisions, typically the pharmacy operations
7  department would be -- would be the focal point --
8  would be the one that would initiate and manage those
9  changes.
10         So it's to manage, you know, pharmacy
11  activities commonly across all divisions and stores.
12     Q.  If there is discipline against a pharmacist,
13  is that the division or department who would handle it?
14         MS. McENROE:  Objection to form.
15         THE WITNESS:  I don't know the answer to that,
16     in the sense that it wasn't my area of
17     responsibility, but I would expect that it would
18     be handled -- discipline of pharmacists would be
19     handled at the local level where a pharmacist
20     would have reported to a pharmacy district
21     manager, and a pharmacy district manager would
22     have responded -- reported to a pharmacy vice
23     president out in the field is what I would
24     anticipate would be the answer to that question;
25     but again, that isn't something I would have been

Page 172

1      involved in.
2  BY MR. PIFKO:
3      Q.  So that's helpful.  Can you explain the
4  hierarchy of the reporting structure for pharmacists?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  Typically, there was -- and let
7      me preface this by saying there are -- there have
8      been changes that took place, you know, to some
9      degree in the time that I worked for Rite-Aid; but
10     typically, there's a pharmacist -- you know, a
11     pharmacist in charge at a store.
12         That pharmacist or the pharmacy operation
13     reports to a pharmacy district manager.  A -- or a
14     group of pharmacist stores reported to a pharmacy
15     district manager.  A group of pharmacy district
16     managers reported to a pharmacy vice president and
17     then that reported in to the corporate office.
18  BY MR. PIFKO:
19     Q.  And when you say the corporate offices, you
20  mean at Camp Hill?
21     A.  I do mean at Camp Hill.
22     Q.  Let's go to the next page of Exhibit 7.  Do
23  you see there's a bunch of changes that are reflected
24  here as well?
25     A.  I do.

Page 173

1      Q.  Are you familiar with any of these changes?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  I -- I can read them, yes, so --
4      and I understand what they mean.
5  BY MR. PIFKO:
6      Q.  Okay.  Well, let's look at the -- not the
7  first one but changes -- that has and/or but the next
8  one.  It says, Will there also -- well, for the bullet
9  point that says, Provide a Reason Code dropdown to be
10  selected when the Distribution Center Associate
11  contacts the store; and then the comment here is, Will
12  there also be tracking capability to indicate who the
13  Distribution Center Association spoke with?  If not
14  could we add?  Do you see that?
15         MS. McENROE:  Objection to form.  And a quick
16     correction.  It was "associate" not "association."
17         THE WITNESS:  I do see it.
18  BY MR. PIFKO:
19     Q.  Okay.  Do you have an understanding about what
20  that's referring to?
21     A.  I do.  What that's saying is that if there was
22  an order that -- an excessive order or an order that
23  prompted action by the distribution center associate,
24  when they called the store, you would typically want
25  that person to get the name of the person they spoke

Page 174

1  to, and I think this is saying, I want to explicitly
2  have that as a required data element, something that
3  they would be forced to enter so we would always know
4  who they spoke to that they called the store.
5      Q.  Do you know if that information was collected
6  at this time or prior, at any time prior to this time?
7      MS. McENROE:  Objection to form.
8      THE WITNESS:  When they -- when they -- you
9      know, I mentioned that as a part of the control
10     processes that we already had in place, the manual
11     control processes, that they recorded in an Excel
12     spreadsheet anytime they took action on an excess
13     order and -- an order that they -- seemed unusual
14     to them, and they would typically record that they
15     spoke to the pharmacist or something along those
16     lines.
17         They may not have always recorded the
18     pharmacist's name; and again, I'm sure that's what
19     Janet's thought process here is, I'd like to know
20     specifically who the individual is that they spoke
21     to.
22  BY MR. PIFKO:
23      Q.  Why do you think that information would be
24  important?
25      MS. McENROE:  Objection to form.

Page 175

1      THE WITNESS:  Well, I think if there was any
2      further follow-up, they would want to make sure
3      they're speaking to the right person that was
4      involved in the action -- the activity, so --
5  BY MR. PIFKO:
6      Q.  At the bottom, the last change here is --
7  well, question.  It says, Could we also display the
8  USER ID that placed the over ride on the order?  Do you
9  see that?
10     A.  I do.
11     Q.  Do you have an understanding about what that's
12  about?
13     A.  I believe what it's saying is they want to
14  know if the -- if the order had been modified at the
15  store, you know, the suggested order quantity came out
16  of the system at the store and someone at the store
17  overrode that, they would want to know who that person
18  is.  I believe that's what it's saying, but I'm not a
19  hundred percent certain of that.
20     Q.  And why would you want to know who that person
21  is?
22     A.  Well, again, I'm not the one making the
23  request, but I would think that if you wanted to do
24  follow-up on a, you know, series of occurrences, it
25  would be helpful to know the specific person that you

Page 176

1  would need to talk to as opposed to just calling the
2  pharmacy and asking for -- asking for the pharmacist.
3      Q.  Do you know if, at this time or anytime prior,
4  that type of information was collected anywhere?
5      A.  I don't know the answer to that.
6      Q.  Let's go to the next page, the page headed
7  Trending Reports.  There's a comment in the last bullet
8  point.  The last bullet point, the first sentence says,
9  Provide a portal report by Drug Class within a store
10  whose increase in total order quantity for the drug
11  class over X months is above the Percent Increase of
12  Controls threshold when compared to the increase total
13  dispense in total order quantity for the store.
14      Do you see that?
15     A.  I do.
16     Q.  Do you have an understanding about what that
17  means?
18     A.  I would read it to mean that they want to
19  identify stores where, if you took their change in
20  overall pharmacy business and compared to it their
21  change in controlled substance dispensing, that there
22  was a difference between the two.  That's what I would
23  read that to mean.
24     Q.  Do you know if --
25     A.  Or a difference that exceeded a certain

Page 177

1  amount.
2      Q.  Do you know if that type of data was being
3  collected at this time or at any time prior?
4      A.  I -- I would assume that it is something that
5  people were running reports to analyze, but of my own
6  knowledge, no.  Again, that wasn't my area of
7  responsibility, so I can't say of my own knowledge that
8  that was being done.
9      Q.  Okay.  So you don't know.  That's correct?
10     A.  I don't -- I -- I don't know.
11     Q.  It says -- well, the comment is, Will this
12  also have dispensing quantity?  Will a data feed for
13  DSD purchases also be reflected?  Can this be displayed
14  as a roll up code and individual NDC?  Do you see that?
15     A.  I do.
16     Q.  Do you have an understanding about what that's
17  inquiring about?
18     A.  It may be a partial understanding.  Some of it
19  I would be making some assumptions about.  I think --
20  well, when it says, Will it also have dispensing
21  quantity, it's looking for data on actual prescriptions
22  that were filled.
23         When it asks for a data feed for DSD
24  purchases, that's the purchases that would have come
25  from McKesson; and, when it says, Can this be displayed

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  as a roll up code in an individual NDC, this is the
2  part that I'm probably a little less certain of, but I
3  know that there are some particularly generic products
4  that I believe may have more than one NDC for what is
5  effectively the same skew because it's manufactured by
6  someone differently -- different.
7       So they'd want to be able to track at the
8  product level as opposed -- not just at the NDC level
9  but both at the NDC level and at the product level is
10 what I would read that to say, but that's my inference
11 and assumption from what it says.
12      Q.  All right.  So what you're saying is, if
13 there's oxy 30, for example, is a pill but there could
14 be several manufacturers and with different NDC codes,
15 you'd want some ability to say still this many oxy 30s
16 total are being ordered?
17      A.  I would read that to be what this request is;
18 but again, I didn't make it, so that's an assumption on
19 my part.
20      Q.  Do you know if pharmacies track forged
21 prescriptions that are submitted?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  Of my own knowledge, I don't
24 know what the processes are for that.
25 BY MR. PIFKO:

Page 179

1      Q.  Who do you think would know that?
2      A.  Well, certainly our loss prevention and
3  pharmacy operations people would know that.
4      Q.  And to the best of your recollection, that
5  would be Dan, who we mentioned earlier?
6      A.  Well, to the best of my recollection, it would
7  have been.  Dan would have been one of the people that
8  would know that during this time period, yes.
9      Q.  I want to go to the -- a couple pages further
10 to the section of the Benefit Estimate.
11      A.  Okay.
12      Q.  You recall we talked about the benefit
13 language earlier, correct?
14      A.  I do.
15      Q.  And there was some discussion about the
16 lawsuits in West Virginia.  Do you recall that?
17      A.  I do.
18      Q.  This mentions -- in addition to that, it
19 mentions some fines that -- for controlled substances,
20 for shipping suspicious orders.  Do you see that?
21      A.  I do.
22      Q.  Do you understand what that's referring to
23 there?
24      A.  In general terms, yes.  I -- I don't have any,
25 you know, specific knowledge of these cases, but yes.

Page 180

1      Q.  Okay.  So it says here, Walgreens was fined
2  $80 million?
3      A.  Yes.
4      Q.  Cardinal Health, $34 million?
5      A.  Yes.
6      Q.  McKesson, $13 million?
7      A.  Yes.
8      Q.  Do you have an understanding about why there's
9  a reference to fines for controlled substances with
10 respect to distributors in the Benefit Estimate here?
11      A.  I do.  I think the point that's being made is
12 if a company didn't have adequate controls in place --
13 and again, I want to emphasize we already had controls
14 in place and, actually, a robust multilevel but, in
15 some degree, manual set of controls in place; but, if
16 you didn't have adequate controls in place, then there
17 could be issues that resulted in fines.  So I think
18 that's the point that's being made.
19      Q.  And this also notes that licenses were
20 surrendered on two of the occasions.  Do you see that?
21      A.  I do.
22      Q.  And then again, the next paragraph mentions
23 the West Virginia lawsuits.  Do you see that?
24      A.  I do.
25      Q.  Does this, the language about the

Page 181

1  West Virginia lawsuits, refresh your recollection about
2  any other discussion that you may have had about those
3  lawsuits?
4      A.  I don't remember ever having any discussions
5  about those lawsuits.
6      Q.  The next paragraph on page 10, Bates label
7  0040193, the next full paragraph there says, DEA has
8  stated numerous times controlled substance distributors
9  must have a protocol to identify and report suspicious
10 orders based on individual pharmacy volume not generic
11 limits for all registrants.  Do you see that?
12      A.  I do.
13      Q.  Do you have an understanding about what that
14 means and why that's here?
15      MS. McENROE:  Objection to form.
16      THE WITNESS:  I -- I do, and I think,
17  actually, it's pointing out that -- what it's
18  essentially pointing out is that the orders that
19  you process has to be -- have to be based on
20  volume, and that actually works out very well with
21  what Rite-Aid's systems were because, as we've
22  talked about numerous times, the order originated
23  out of the store-ordering system that created the
24  order based on volume.
25      So the Rite-Aid -- you know, I would tell you,

Page 182

1    yes, I understand what it means, and yes, I think
2    Rite-Aid had a process in place to ensure that the
3    orders were based on individual pharmacy volume.
4  BY MR. PIFKO:
5    Q.   Okay. Let's back up for a second. So when
6  you read this sentence, what specifically do you
7  understand it to mean?
8    A.   That the DEA is saying that you need to have
9  processes in place that manage these orders that take
10 into account individual store pharmacy volume.
11   Q.   And what's your understanding of how an
12 individual pharmacy volume is supposed to be taken into
13 account?
14     MS. McENROE:  Objection to form.
15     THE WITNESS:  I think the expectation is that
16   there would be a relationship between the store's
17   volume in shipments -- I'm sorry -- in dispensing
18   of controlled substances with the store's order of
19   controlled substances.
20 BY MR. PIFKO:
21   Q.   And what should that relationship be?
22   A.   Well, there should be a fairly direct
23 relationship if you exclude seasonality and pack size
24 and some of those other things, so --
25   Q.   Is there some way -- so what I'm hearing you

Page 183

1  say is, there should be a connection between how much
2  is ordered and how much is dispensed; is that correct?
3    A.   I am saying that, and I'm also saying that
4  there was in our system. It directly drove the order
5  based on your volume, which -- which is what created
6  what your, you know, shelf stock should be; and then
7  based on what your shelf stock, your actual on-hand
8  balance, the difference between the two is what would
9  have resulted in your order.
10   Q.   Are you aware of a circumstance where an order
11 might not necessarily relate to a volume of product
12 dispensed?
13     MS. McENROE:  Objection to form.
14     THE WITNESS:  Are you asking that as a general
15   statement or about a specific order?
16 BY MR. PIFKO:
17   Q.   Well, first as a general statement.
18   A.   Well, as a general statement, what I would say
19 is there is some seasonality in all of, you know, in
20 all of our businesses. So in some cases there's
21 adjustment to the store order algorithms to increase
22 on-hand balances based on season.
23     So that would have a varying -- another effect
24 on it. You know, again, as I've stated multiple times,
25 I'm not an expert on the store ordering system, so I

Page 184

1  can't tell you with certainty all of the things that
2  are taken into account and the precise calculations
3  that go into that; but that's one example I can -- I
4  can tell you that I know impacted store orders.
5    Q.   Well, I'm just trying to understand how -- you
6  said it's your understanding that this sentence means
7  that there should be a direct connection between how
8  much is ordered and how much is dispensed --
9      MS. McENROE:  Objection.
10 BY MR. PIFKO:
11   Q.   -- and I -- what I'm asking, what I'm trying
12 to get you to explain is, where there could be
13 circumstances where you'd order something that has
14 nothing to do with what's dispensed.
15     MS. McENROE:  Objection to form.
16     THE WITNESS:  Actually, what I think I said
17   was that I felt like this sentence meant is
18   that the DEA expected us to identify suspicious
19   orders based on an individual store's volume.
20     You further asked whether or not there's a
21   correlation between a store's volume and the
22   dispensing, and I think that there should be.
23   Now, do I know all of the factors that would go
24   into that to increase or decrease or influence it?
25   No, I don't. It's not my area of expertise.

Page 185

1  BY MR. PIFKO:
2    Q.   Do you see the last section here? It says,
3  Controlled substance distributors must have a
4  suspicious order monitoring system in place which can
5  be provided and explained to the DEA on any routine
6  inspection visit.
7    A.   I do.
8    Q.   What do you understand that to mean?
9    A.   That you have to have a system in place that
10 is used to monitor and identify any suspicious orders,
11 and you have to be able to explain it to the DEA; and,
12 as I've mentioned, Rite-Aid -- I was impressed from the
13 time I joined Rite-Aid, that they had a robust
14 multilevel system, and I think I've also mentioned that
15 we were even audited by the DEA, and they complimented
16 us on that.
17     So I would tell you that what we had in place
18 certainly met what this sentence says is the
19 requirement.
20   Q.   Do you have an understanding about why this
21 sentence is being used here in connection with it being
22 a benefit of this project?
23     MS. McENROE:  Objection to form.
24     THE WITNESS:  I think that the point is is
25   that, again, we would be replacing some systems

Page 186

1  and processes that were already in place but were
2  more manual or more labor intensive that already
3  met these requirements and had these
4  characteristics, so the system that you then
5  replaced it with would also have to meet these
6  requirements and have these characteristics.
7  BY MR. PIFKO:
8      Q.  Let's go to Appendix A.
9      A.  Okay.
10     Q.  Appendix A spans three pages.
11     A.  Right.
12     Q.  Are you familiar with these data parameters?
13     A.  Yes, generally I am.
14     Q.  How -- how familiar with these data
15 parameters?
16     A.  These are the parameters that -- I think I
17 mentioned earlier that part of my -- part of the way
18 that I got involved in this or, you know, made some
19 comments in the process -- or the progress of this
20 project was in, kind of, the design of the -- how IT
21 would approach the design, a more technical view of it.
22     And I said that my recommendation was that
23 they design this so that there were tables that contain
24 the parameters that drove all the calculations and the
25 reporting and things of that nature as opposed to those

Page 187

1  parameters actually being inserted in program code.
2      That's what these are, is the parameters that
3  were then identified and recommended by a combination
4  of our, you know, government affairs, loss prevention,
5  and supply chain department, so --
6      Q.  Did you have any involvement in designing the
7  actual parameters or selecting the parameters that
8  would be included here?
9      A.  I did not.  That's something Chris would have
10 been involved in on my team; and, you know, to the
11 degree that we would have been involved in it, I mean,
12 largely these things are going to be driven by
13 government affairs and loss prevention, but any input
14 from our group directly would have come from Chris.
15     Q.  Were you part of any discussions, aside from,
16 like you said, putting it in table format, about the
17 designing of these parameters?
18     A.  No.  I don't recall any discussions that I had
19 about the parameters or the detail of, you know,
20 exactly how the calculations would work, other than the
21 structure and kind of the technical approach to the
22 project.  Again, that's something Chris would have been
23 more involved with.
24     Q.  So ultimately this project wasn't implemented
25 because Rite-Aid stopped self-distributing controlled

Page 188

1  substances; is that correct?
2      A.  I would -- I'm not the one that, you know,
3  the -- kind of the sole decision-maker to be able to
4  say why this was or wasn't implemented.  I will say
5  that when you look at the timeline for completion for
6  it, it would not have been finished until we were --
7  had stopped, you know, until the company had planned to
8  stop distributing pharmacy products.
9      So I would -- I would guess that that's the
10 reason that it didn't move any further.
11     Q.  Were you involved in the discussions to stop
12 self-distributing controlled substances?
13     A.  I was not involved in the discussions from the
14 perspective of making the decision.  I was involved in
15 the discussions of what the implications or, kind of,
16 the activities that would be necessary if and when that
17 decision was made and was implemented.
18     Q.  So you wouldn't be familiar with the reasons
19 why that decision was made; is that correct?
20     A.  I was not part of that decision-making
21 process.
22     Q.  Did anyone tell you what the reasons were?
23     A.  Other than -- I'm sure that there was a press
24 release that, when we announced the change and probably
25 a joint press release, I would guess, with us and

Page 189

1  McKesson, and I'm sure there was some public
2  information that was -- that was shared about it, but
3  other than that, no.  Again, it wasn't my area of
4  responsibility.
5      Q.  But then there were -- there were changes that
6  were rolled out after the decision that was made that
7  affected people under your control?
8          MS. McENROE:  Objection to form.
9          THE WITNESS:  I'm not sure what you're
10     referring to.
11 BY MR. PIFKO:
12     Q.  Well, I think based on your answer, you said
13 you weren't part of the discussions about why to do it,
14 but then there were discussions about the fact that it
15 was being done?
16     A.  And what we needed to do to support it, yes.
17     Q.  Right.  And so my question to you is whether
18 you were involved in, as you say, changes to support it
19 or what needed to be done to support it.  My question
20 to you is, if you're familiar with what, if anything,
21 changed at the company as a result of that decision.
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  Well, I'm familiar that -- the
24     big picture that I was involved with would be that
25     we had pharmacy departments at four of the

Page 190

1  distribution centers that had both staff and
2  product.
3       So if you're going to eliminate that function,
4  then you need to deal with the staff, and, you
5  know, are there going to be layoffs, and they
6  going to move to other departments, how is that
7  going to be managed.
8       And also, the product at some point is going
9  to, you know, even if you let that inventory bleed
10  down, that product is going to, at some point,
11  have to be moved to another location, so -- so I
12  was involved in planning and discussions around
13  all of that, so --
14  BY MR. PIFKO:
15  Q.  Aside from personnel changes and -- at the
16  distribution centers and dealing with leftover product,
17  were you involved with any other process changes as a
18  result of the decision to -- not to self-distribute
19  controlled substances?
20  A.  Well, the other thing --
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  The other thing that, you know,
23  more directly impacted my area is, some of the
24  responsibilities of that compliance position now
25  were no longer appropriate or no longer part of

Page 191

1  the supply chain area responsibility, so --
2  BY MR. PIFKO:
3  Q.  Was that position cut back?
4       MS. McENROE:  Objection to form.
5       THE WITNESS:  No.  The -- there was an
6  individual that was responsible for pharmacy
7  returns, that basically anything that would have
8  remained in that regulatory position rolled into
9  the responsibility of the individual who was
10  responsible for pharmacy returns.
11  BY MR. PIFKO:
12  Q.  Okay.  So then you no longer had a person who
13  had that regulatory compliance, just -- that was their
14  sole responsibility, that position was terminated, and
15  you rolled those responsibilities into another person's
16  job title?
17  A.  The --
18       MS. McENROE:  Objection to form.
19       THE WITNESS:  The remaining -- and it
20  probably, frankly, was very, very few, but
21  whatever other responsibilities that related to
22  regulatory compliance in the distribution centers
23  were rolled into the responsibility of the
24  individual that handled pharmacy returns.
25  BY MR. PIFKO:

Page 192

1  Q.  Were you working at the company when that
2  occurred?
3  A.  I was.
4  Q.  Okay.  And so I believe you said Kevin was the
5  last name that you mentioned of having that role.  I
6  forget his last name.
7  A.  Peterson.
8  Q.  Kevin Peterson.  Was he terminated at that
9  time?
10  A.  No.
11  Q.  Okay.
12  A.  No.  He was responsible for pharmacy returns,
13  and so he assumed the responsibility -- these
14  responsibilities as well, so --
15  Q.  Okay.  Was Chris -- did Chris leave the
16  company as a result of that change?
17  A.  No.  Chris left, took another job, so --
18  Q.  So when Chris left, who took his position?
19  A.  Those responsibilities moved to
20  Kevin Peterson, so --
21  Q.  Okay.  Was that -- was Chris's departure at
22  the time when the company stopped self-distributing
23  controlled substances?
24  A.  It was -- I don't remember the exact month and
25  year of Chris's departure, but I think it was in that

Page 193

1  window of time when that was occurring, so --
2  Q.  And it's your testimony that the two had
3  nothing to do with each other?
4  A.  Chris's departure?
5  Q.  Yeah.
6  A.  Oh, Chris's departure, to the best of my
7  knowledge, had nothing to do with that.  He had another
8  job opportunity and he -- I mean, that's -- that's what
9  Chris told me, was he had another job opportunity, yes.
10  Q.  Janet Hart, did her position change in any
11  way, to your knowledge?
12       MS. McENROE:  Objection to form.
13       THE WITNESS:  Not to my knowledge, and I don't
14  know that I would have, you know, known anything,
15  other than she no longer had to act as an advisor
16  to the distribution centers, you know, that
17  component of her responsibility; but no, I'm not
18  aware of anything else.
19  BY MR. PIFKO:
20  Q.  We're going to take a short break.
21       MS. McENROE:  Sure.
22       THE VIDEOGRAPHER:  Off the record, 2:50 p.m.
23       (Brief recess was taken.)
24       THE VIDEOGRAPHER:  On the record, 3:02 p.m.
25       MS. McENROE:  Good afternoon.

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1     MR. PIFKO: This is --
2     MS. McENROE: Go ahead. Sorry.
3     MR. PIFKO: This is Mark from Plaintiffs'
4  counsel. Pending any direct examination, I don't
5  have any further questions.
6          CROSS-EXAMINATION
7  BY MS. McENROE:
8     Q. Good afternoon, Mr. Chapman. My name is
9  Elisa McEnroe. I'm counsel for Rite-Aid and here on
10 your behalf today. Do you understand that?
11    A. I do.
12    Q. Okay. I just have --
13    THE VIDEOGRAPHER: Could you slide to your
14 right?
15    MS. McENROE: Sure. Is that good?
16    THE VIDEOGRAPHER: Thank you.
17 BY MS. McENROE:
18    Q. I just have a few questions for you. If you
19 could look at Exhibit 7.
20    A. Okay.
21    Q. On that exhibit and on a number of other
22 exhibits we've looked at today there's been an
23 individual named Wilson Lester on certain project
24 documents. Do you see that?
25    A. Yes.

Page 195

1     Q. And do you know who that is?
2     A. Wilson was my boss at Rite-Aid.
3     Q. Did you ever discuss this project with him?
4     A. I'm sure that we did, and we had high-level
5  discussions about this project, so --
6     Q. Did you have a sense of the depth of
7  Mr. Lester's knowledge on this project?
8     A. It would have been at an executive level, you
9  know, a very high level of just conceptually knowing
10 what the project was about and not at any detailed
11 level at all, you know. If Chris's -- Chris Belli's
12 knowledge of the project was this much, you know, mine
13 might have been this much, and Wilson's would have been
14 this much because --
15    Q. At -- go ahead.
16    A. Because his -- again, he was -- Wilson was a
17 senior vice president of supply chain, responsible for
18 all the distribution centers for the corporate team,
19 the replenishment function. You know, this was one of
20 many, many responsibilities that he had. So that's no
21 disrespect to Wilson, so --
22    Q. And for the purposes of the record, you were
23 saying this much, this much, and this much. Can you
24 just say that a little bit more and more -- you had
25 your hands bigger and then smaller, then smaller?

Page 196

1     A. Smaller and then very close together for
2  Wilson. Wilson would have very little, so --
3     Q. Counsel for Plaintiffs asked you a
4  hypothetical regarding oxy 30 just a couple minutes
5  ago. Do you remember that?
6     A. I do.
7     Q. Is that an item that Rite-Aid ever
8  distributed?
9     A. No. You know, oxy 30 -- oxy is a C2, and I
10 think we've talked about this before, but Rite-Aid
11 never distributed Class 2 controlled substances.
12    Q. Great. Thank you. I have no further
13 questions.
14    MR. PIFKO: I'm good.
15    MS. McENROE: Thank you for your time today.
16    MR. VITALE: On behalf of Cardinal Health, I
17 don't have any questions.
18    THE VIDEOGRAPHER: Anybody on the phone?
19    MS. McENROE: I don't think so.
20    THE VIDEOGRAPHER: Off the record, 3:04 p.m.
21    (Deposition concluded at 3:04 p.m.)
22
23
24
25

Page 197

1         CERTIFICATE OF OATH
2
3
4  STATE OF FLORIDA
5  COUNTY OF HILLSBOROUGH
6
7
8     I, Lisa A. Simons-Clark, RMR, CRR, Notary
9  Public, State of Florida, certify that RICK CHAPMAN
10 personally appeared before me on the 18th day of
11 December, 2018, and was duly sworn.
12
13    WITNESS my hand and official seal this _____ day of
14 December, 2018.
15
16    _____
17    Lisa A. Simons-Clark, RMR, CRR
18    Notary Public - State of Florida
19    My Commission Expires: 7/1/20
20    Commission No. GG 001980
21
22
23
24
25

Page 198

1           REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF PINELLAS
5
6       I, Lisa A. Simons-Clark, Registered Merit
   Reporter, Certified Realtime Reporter, certify that I
   was authorized to and did stenographically report the
7  deposition of RICHARD CHAPMAN; that a review of the
   transcript was requested; and that the transcript is a
8  true and complete record of my stenographic notes.
9
10      I further certify that I am not a relative,
   employee, attorney, or counsel of any of the parties,
11 nor am I a relative or employee of any of the parties'
   attorney or counsel connected with the action, nor am I
12 financially interested in the action.
13
14      Dated this ____ day of December, 2018.
15
16
        _____
17         Lisa A. Simons-Clark, RMR, CRR
18
19
20
21
22
23
24
25

Page 199

1           ERRATA SHEET
2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3  IN RE:  National Prescription Opiate Litigation
      WITNESS:  RICHARD CHAPMAN
4     DATE OF DEPOSITION:  December 18, 2018
5  PAGE LINE   CHANGE              REASON
6  ___ ___   _____
7  ___ ___   _____
8  ___ ___   _____
9  ___ ___   _____
10 ___ ___   _____
11 ___ ___   _____
12 ___ ___   _____
13 ___ ___   _____
14 ___ ___   _____
15 ___ ___   _____
16 ___ ___   _____
17 ___ ___   _____
18 ___ ___   _____
19 ___ ___   _____
20
   Under penalties of perjury, I declare that I have read
21 the foregoing document and that the facts stated in it
   are true.
22
23
   _____
24 DATE        RICHARD CHAPMAN
25 Reporter:  Lisa A. Simons-Clark, RMR, CRR