1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4                     -  -  -
5   IN RE:  NATIONAL    :  MDL NO. 2804
    PRESCRIPTION OPIATE :
6   LITIGATION          :
    ----------------------------------------
7                       :  CASE NO.
    THIS DOCUMENT       :  1:17-MD-2804
8   RELATES TO ALL CASES:
                        :  Hon. Dan A.
9                       :  Polster
10                    -  -  -
            Friday, January 4, 2019
11                    -  -  -
12  HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW
13
                    -  -  -
14
                Videotaped deposition of
15  DEBRA CHASE, taken pursuant to notice,
    was held at the law offices of Morgan
16  Lewis & Bockius, 1111 Pennsylvania
    Avenue, NW Washington, DC 20004,
17  beginning at 10:17 a.m., on the above
    date, before Amanda Dee Maslynsky-Miller,
18  a Certified Realtime Reporter.
19                    -  -  -
20
21
22
          GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24

**Page 2**

APPEARANCES:

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
    EMMA KABOLL, PARALEGAL
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Wpowers@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN P. LAVELLE, JR., ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com

- and -

BY: JOHN M. MALOY, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6682
John.maloy@morganlewis.com
Representing the Defendant,
Rite Aid Corporation

COVINGTON & BURLING LLP
BY: ALISON DICURCIO, LAW CLERK
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
Adicurcio@cov.com
Representing the Defendant,
McKesson Corporation

**Page 3**

APPEARANCES: (Continued)

VIA TELEPHONE/LIVESTREAM:

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ZENO HOUSTON, ESQUIRE
250 West 55th Street
New York, New York 10019
(212) 836-8000
Zeno.houston@arnoldporter.com
Representing the Defendant,
Endo Pharmaceuticals, Endo Health,
and Par Pharmaceuticals

REED SMITH, LLP
BY: LUKE PORTER, ESQUIRE
101 Second Street
Suite 1800
San Francisco, California 94105
(415) 543-8700
Representing the Defendant,
AmerisourceBergen Corporation

JONES DAY
BY: PATRICK J. BEISELL, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
Pbeisell@jonesday.com
Representing the Defendant,
Walmart

ALSO PRESENT:
Daniel Holmstock, Videographer

**Page 4**

- - -
I N D E X
- - -

Testimony of: DEBRA CHASE

By Mr. Powers                7

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION              PAGE
RiteAid-Chase
Exhibit-1  Rite_Aid_OMDL_0016495-498  40

RiteAid-Chase
Exhibit-2  Rite_Aid_OMDL_0016297-329  85
RiteAid-Chase
Exhibit-3  Rite_Aid_OMDL_0012503-505  104

RiteAid-Chase
Exhibit-4  Rite_Aid_OMDL_0049994-50031 112
RiteAid-Chase
Exhibit-5  Rite_Aid_OMDL_0016955-956  115

RiteAid-Chase
Exhibit-6  Rite_Aid_OMDL_0003641      129
RiteAid-Chase
Exhibit-7  Rite_Aid_OMDL_0014379-452  149

**Page 5**

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
6    1

Question Marked
Page Line    Page Line    Page Line
None

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1           - - -
2           (It is hereby stipulated and
3     agreed by and among counsel that
4     sealing, filing and certification
5     are waived, and that all
6     objections, except as to the form
7     of the question, will be reserved
8     until the time of trial.)
9           - - -
10          VIDEO TECHNICIAN:  We are
11    now on the record.  My name is
12    Daniel Holmstock.  I'm the
13    videographer for Golkow Litigation
14    Services.  Today's date is January
15    4th, 2019.  The time on the video
16    screen is 10:17 a.m.
17          This video deposition is
18    being held at the law offices of
19    Morgan Lewis, at 1111 Pennsylvania
20    Avenue, Northwest, in Washington,
21    D.C. in the matter of In Re
22    National Prescription Opiate
23    Litigation.
24          The case is pending before

Page 7

1     the United States District Court
2     for the Northern District of Ohio,
3     Eastern Division.  The deponent is
4     Debra Chase.  Counsel will be
5     noted on the stenographic record
6     for appearances.  The court
7     reporter is Amanda Miller, who
8     will now administer the oath.
9           - - -
10          DEBRA CHASE, after having
11    been duly sworn, was examined and
12    testified as follows:
13          - - -
14          EXAMINATION
15          - - -
16    BY MR. POWERS:
17    Q.    Good morning, Ms. Chase.
18    A.    Good morning.
19    Q.    My name is Will Powers, and
20    I represent the plaintiffs in this
21    litigation.
22          Before we get going, can you
23    please state your full name and spell it
24    for the record?

Page 8

1     A.    Yes.  Debra Ann Chase.
2     Q.    Can you spell it, please?
3     A.    D-E-B-R-A, A-N-N, C-H-A-S-E.
4     Q.    And we've got a couple of
5     people listening on the phone and in the
6     room, so I'd ask you to just keep your
7     voice up, so everyone can hear.
8           Is that all right?
9     A.    Uh-huh.
10    Q.    And that -- your answer
11    there leads me into one of my further
12    instructions.
13          Because we do have a court
14    reporter taking down the testimony here
15    today, I just ask that all of your
16    answers that you give are verbal answers,
17    a yes or no, something like that, as
18    opposed to nods of the head, uh-huhs,
19    uh-uh, things like that.
20          Is that all right?
21    A.    Okay.
22    Q.    If, for any reason, you
23    don't understand a question I'm asking
24    today or require any sort of

Page 9

1     clarification, explanation of the words
2     I'm using or anything like that, you have
3     to tell me and we'll get that matter
4     resolved before you answer the question.
5           Is that okay?
6     A.    Yes.
7     Q.    So, then, if you answer a
8     question, I'm going to go ahead and
9     assume that you understand it.
10          Is that okay?
11    A.    Yes.
12    Q.    Are you currently suffering
13    from any medical disease or illness that
14    in any way interferes with your ability
15    to answer truthfully and completely my
16    questions here today?
17    A.    No.
18    Q.    Do you understand that the
19    court reporter has sworn you in and
20    you're under oath here just as you would
21    be in a courtroom at trial?
22    A.    Yes.
23    Q.    And because you're under
24    oath, if you lie or provide an

Page 10

1  intentionally misleading answer, you may
2  be subject to criminal or civil
3  penalties.
4         Do you understand that?
5     A.  Yes.
6     Q.  And as we go today, we can
7  take breaks if you need them, but I just
8  ask that if there's a question pending,
9  that you answer the question pending
10 before we take the break.
11        Is that all right?
12    A.  Yes.
13        MR. LAVELLE:  The witness
14    will consult with -- I reserve the
15    right to consult with counsel if
16    there's a privilege issue.
17 BY MR. POWERS:
18    Q.  That gets to my next
19 instruction.
20        Your counsel, from time to
21 time, may object to my questions.  But
22 I'm still entitled to an answer, unless
23 your counsel specifically instructs you
24 not to answer.

Page 11

1         Do you understand that?
2     A.  Yes.
3     Q.  Okay, Ms. Chase, I want to
4  start by going over your educational
5  background.
6         Did you ever complete high
7  school?
8     A.  Yes.
9     Q.  Where did you go to high
10 school?
11    A.  Parkdale High in Riverdale,
12 Maryland.
13    Q.  And when did you graduate?
14    A.  1983.
15    Q.  Do you have any education
16 beyond high school?
17    A.  I have some college.
18    Q.  Where did you do your "some
19 college"?
20    A.  Harford Community College.
21    Q.  And when was that?
22    A.  In between '84, '86 -- 1984,
23 1986.
24    Q.  Did you ever receive a

Page 12

1  degree from college?
2     A.  I did not.
3     Q.  Do you have any other
4  education beyond high school, besides the
5  classes you took at Harford Community
6  College?
7         MR. LAVELLE:  Object to
8     form.
9         THE WITNESS:  Could you
10    repeat that again?
11 BY MR. POWERS:
12    Q.  Any education -- did you
13 have any education beyond high school,
14 besides the -- some community college at
15 Harford Community College?
16        MR. LAVELLE:  Same
17    objection.
18        THE WITNESS:  I've had some
19    other education through the
20    military.
21 BY MR. POWERS:
22    Q.  What is the nature of that
23 education?
24    A.  I'm sorry?

Page 13

1     Q.  What is the nature of that
2  education?
3     A.  It pertained to the job that
4  I had in the military.
5     Q.  Let me back up here.
6         When were you in the
7  military?
8     A.  From 1983 to 1992.
9     Q.  And what branch of the
10 military were you in?
11    A.  I was in the Army.
12    Q.  During that time period when
13 you were in the military, where were you
14 located?
15    A.  Starting from the beginning
16 or --
17    Q.  Sure.
18    A.  I was -- started in the
19 Army.  I went to Fort Jackson for basic
20 training.  And then I went to Fort
21 Benjamin, Harrison, Indiana for my
22 advanced training.
23        And after that, I was
24 stationed at Aberdeen Proving Ground.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 And then I went to Augsburg, Germany, and
2 back to Aberdeen Proving Ground. And my
3 last station was in Kaiserslautern,
4 Germany.
5     Q.   And you mentioned that you
6 got some education while you were in the
7 Army.
8         What was the education you
9 got while you were in the Army?
10    A.   All the education I got was
11 pertaining to the particular job that I
12 had.
13    Q.   What was the particular job
14 you had?
15    A.   It was called personnel
16 information systems.
17    Q.   And what -- can you describe
18 what personnel information systems was?
19    A.   It actually entailed quite a
20 few things. Mainly, like, data entry
21 information.
22    Q.   Then you said you left the
23 military in 1992, right?
24    A.   Correct.

Page 15

1     Q.   Where -- what did you do
2 after you left the military in 1992?
3     A.   So forgive me, that kind of
4 goes back to the education.
5         I did go to school again and
6 took a couple of classes at Harford
7 Community.
8         But then I was employed by
9 Northeast Foods in Baltimore.
10    Q.   And what did you do for
11 Northeast Foods?
12    A.   I was a payroll clerk and
13 data entry clerk.
14    Q.   When did you first start
15 working at Rite Aid?
16    A.   In 1998.
17    Q.   Between '92 and '98, when
18 you first started working at Rite Aid,
19 did you work anywhere else besides
20 Northeast Foods?
21    A.   Not full time. I had
22 part-time jobs.
23    Q.   Was your job with Northeast
24 Foods a full-time job?

Page 16

1     A.   Yes.
2     Q.   What were the part-time jobs
3 you had in addition to your full-time job
4 at Northeast Foods during the time period
5 of '92 to '98?
6     A.   I worked for Rite Aid
7 pharmacy, the store, for a brief period.
8         And what else?
9         I worked for Riley Mortgage
10 Company part time in Columbia, Maryland
11 as well.
12    Q.   The Rite Aid store you
13 worked at part time before 1998, what
14 were you doing at the store?
15    A.   I was a cashier.
16    Q.   Was cashier your only job
17 you had, before joining Rite Aid full
18 time in '98, at Rite Aid?
19    A.   Yes.
20    Q.   When you first started
21 working at Rite Aid in 1998, what was the
22 position that you had?
23    A.   When I first started, I was
24 hired as the order fulfillment partner.

Page 17

1     Q.   And where were you working
2 at that time as an order fulfillment
3 partner?
4     A.   In the Rx area, pharmacy
5 area.
6     Q.   When you say "the Rx area,"
7 are you referring to a physical area or a
8 topic area?
9         MR. LAVELLE: Object to
10 form.
11         THE WITNESS: I'm sorry?
12 BY MR. POWERS:
13    Q.   You said that you worked in
14 the Rx area.
15         Are you talking about a
16 physical area or, like, a topic area?
17    A.   It was --
18         MR. LAVELLE: Object to
19 form.
20         THE WITNESS: It was the
21 department.
22 BY MR. POWERS:
23    Q.   Where were you physically
24 located when you started working at Rite

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 Aid in '98 as an order fulfillment
2 partner?
3     A.   In the Rx department.
4     Q.   But was that in Maryland?
5 Was that --
6     A.   I'm sorry.
7         Yes, in --
8         MR. LAVELLE:  Object to
9 form.
10        Please let the attorney
11 finish his question before you
12 start answering.
13        THE WITNESS:  I'm sorry.
14 Could you repeat that,
15 please?
16 BY MR. POWERS:
17    Q.   Sure.
18        In 1998 when you started
19 working at Rite Aid full time, where,
20 physically, was the office you were
21 working at?
22    A.   That was in Aberdeen --
23 Perryman, Maryland.
24    Q.   And is that the distribution

Page 19

1 center Rite Aid has in Perryman,
2 Maryland?
3     A.   Yes.
4     Q.   What were your job
5 responsibilities as an order fulfillment
6 partner in -- starting in 1998?
7     A.   I started off in the Rx
8 department, and I was responsible for
9 running the A-frames.
10    Q.   What are the A-frames?
11    A.   A-frames was a machine that
12 was set up to dispense -- to dispense the
13 product into the totes for the stores.
14    Q.   How long were you an order
15 fulfillment partner?
16    A.   As long as you're there, you
17 actually are an order fulfillment partner
18 the whole time, so --
19    Q.   Are you still with Rite Aid
20 today?
21    A.   Yes, I am.
22    Q.   So are you still an order
23 fulfillment partner today?
24    A.   My title is considered an

Page 20

1 order fulfillment partner, yes.
2     Q.   When you started in 1998,
3 did you have any other titles besides
4 order fulfillment partner?
5     A.   At that time, no.
6     Q.   So you testified that your
7 first responsibilities were working with
8 the A-frames.
9         Did you ever switch
10 responsibilities or change
11 responsibilities during your -- after you
12 started in 1998 at Rite Aid?
13        MR. LAVELLE:  Object to
14 form.
15        THE WITNESS:  Yes, I did.
16 BY MR. POWERS:
17    Q.   When was that?  When was the
18 first time that happened?
19    A.   Approximately six months to
20 a year, I switched to another position.
21    Q.   So that would have been some
22 time in 1999, probably, then?
23    A.   Approximately.  I'm not
24 exactly sure.

Page 21

1     Q.   And what was the position
2 you switched into?
3     A.   At that time, I was moved
4 into the Rx control cage.
5     Q.   And what is the Rx control
6 cage?
7     A.   The Rx control cage is the
8 area where controlled drugs were held.
9     Q.   And that's also at the
10 Perryman distribution center in Aberdeen?
11    A.   Yes.
12    Q.   Did your title change when
13 you were moved into the Rx control cage?
14    A.   The added title was control
15 cage partner.
16    Q.   And how long were you a
17 control cage partner for?
18    A.   The -- up until currently,
19 now.
20    Q.   And what are the job
21 responsibilities of a control cage
22 partner at the Aberdeen facility?
23    A.   It included several
24 different jobs within that cage, and that

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 consisted of a paperwork person or a
2 picker or a receiver or a replenisher.
3     Q.   Anything else besides a
4 paperwork person, picker, receiver or
5 replenisher?
6     A.   Not as an actual control
7 cage associate, no.
8     Q.   And just so we're clear,
9 when you -- when we talk about the
10 control cage, is that the area within the
11 distribution center that the controlled
12 substances are held?
13     A.   Yes.
14     Q.   So you mentioned four
15 responsibilities of the control cage
16 partner.
17         The first one you mentioned
18 was paperwork person.
19         Can you describe what you
20 mean by that?
21     A.   The paperwork person was
22 responsible for recording the tote
23 numbers and store numbers onto a log for
24 the totes that were picked for the

Page 23

1 stores.
2     Q.   Did the log have a name?
3     A.   Yes, it has a name.  Right
4 now it kind of slips my mind.
5     Q.   Okay.  Any other
6 responsibilities of the paperwork person?
7     A.   After they log the
8 information onto the sheet, then they
9 would palletize the totes after they were
10 strapped and tied, according to that log.
11     Q.   Anything else?
12     A.   And run reports.
13     Q.   What kind of reports did the
14 paperwork control cage partner run?
15     A.   The pick list that listed
16 the -- all the drugs that the store was
17 supposed to get on that paper.
18     Q.   So the pick list was a list
19 of all the drugs that any particular Rite
20 Aid store was supposed to get in a
21 shipment?
22     A.   On that particular order,
23 yes.
24     Q.   On that particular order,

Page 24

1 okay.
2         Any other kind of reports
3 that the paperwork control cage partner
4 ran besides the pick list?
5         MR. LAVELLE:  Object to
6 form.
7         THE WITNESS:  Yes, they did.
8 BY MR. POWERS:
9     Q.   What were those reports?
10     A.   They were -- what did we
11 call them?  Sorry, right now it just kind
12 of slipped my mind, the actual name of
13 it.
14     Q.   Can you describe it?
15     A.   It was a list of the -- all
16 the stores that printed for a wave, what
17 they called a wave.
18     Q.   What is a wave?
19     A.   The wave is set up by
20 transportation, and all the stores that
21 would be picked in that one area -- in
22 that one section, shall I say.
23         I'm sorry, and going back to
24 the other question you asked me, what was

Page 25

1 the name of the -- it was actually called
2 a tote list.  The --
3     Q.   So the wave you're talking
4 about, is that like a wave of shipments
5 that would go out to a particular set of
6 stores, or is that a wave inside the
7 distribution center itself?
8         MR. LAVELLE:  Object to
9 form.
10         THE WITNESS:  I'm sorry,
11 could you ask that again?
12 BY MR. POWERS:
13     Q.   Sure.
14         You described a wave before
15 when you were talking about the pick
16 list.
17         Can you describe what the
18 wave means when you say "wave"?
19         MR. LAVELLE:  Object to
20 form.
21         THE WITNESS:  Each wave had
22 the stores set up the way
23 transportation had them to be
24 picked.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

BY MR. POWERS:
Q.   When -- you're saying "transportation," so does that have to do with the shipping of the orders to the stores?
A.   I'm not quite sure how they set it up.  But each wave had a separate number to it so you knew which tote, so which stores, went together.
Like, if there was a wave 10, you knew not to put a store from wave 20 on that pallet.
Q.   So the waves would have numbers and those numbers would correspond to a particular group of stores that were being shipped to?
A.   Correct.
MR. POWERS:  We need to go off the record for a second.
VIDEO TECHNICIAN:  The time is 10:36 a.m.  We are going off the record.
- - -
(Whereupon, a brief recess

Page 27

was taken.)
- - -
VIDEO TECHNICIAN:  The time is 10:44 a.m.  And we're back on the record.
BY MR. POWERS:
Q.   Before we took the break, Ms. Chase, we were talking about the duties of a control cage partner.
Before I go further into that, were the control cage partners ever called control cage clerks?
A.   That was a different position.
Q.   Okay.  The control cage clerk is a different position than control cage partner?
A.   Yes.
Q.   Okay.  So moving back to control cage partner, you said they also had duties that had to do with being a picker; is that right?
A.   Correct.
Q.   What were the picker duties?

Page 28

A.   They would actually pick the items for the tote, for the stores.
Q.   And I'm not real familiar with the Perryman distribution center, so when you say they "picked the items for the totes," can you describe what that entails?
A.   Yes.  They use a system called Pick to Light.  So you would induct a tote by hitting a button, and you would scan the tote that had a license plate on it.  And then it would assign the tote to a store.
And then you would hit another start button, and it would light up all the items that are supposed to be picked for that tote.
And then after you hit each button, once the tote was complete, then it would send a label to the printer, which then the paperwork person would take over from there.
Q.   So I understand it, the picker goes, gets a tote, scans something

Page 29

on the tote called the license plate, right?
A.   Correct.
Q.   And then they go, physically, to the shelves or the storage areas, right, with the tote that they just scanned; is that correct?
MR. LAVELLE:  Object to form.
THE WITNESS:  No.
BY MR. POWERS:
Q.   Can you correct me, then?
A.   It was on a conveyor.  So you would just -- once you pick up the tote and scanned it, you set it on the conveyor and you just slide it down.
Q.   And when the tote is sliding down the conveyor belts, the items that were supposed to be put in the tote are on shelves or something next to the conveyor belt?
MR. LAVELLE:  Object to form.
THE WITNESS:  I'm sorry,

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    could you repeat that?
2  BY MR. POWERS:
3      Q.   Once the tote is on the
4  conveyor belt, how were the items
5  gathered and put in the tote?
6      A.   It was like an aisle.  So
7  you had a conveyor on your left side and
8  a set of racks on your right side, and
9  that's how the Pick to Light was set up
10 on that side.
11         So you would just pick the
12 item, hit the light to confirm that you
13 picked the item, and then put it in the
14 tote and just continue the tote down the
15 conveyor.
16     Q.   And once all the items have
17 been picked and put in the tote, what
18 happened next?
19     A.   Then that would be pushed
20 off to another -- what they call a static
21 line, and it would go down the line.  And
22 then all the totes would be lined up.
23         And at that point, that's
24 where the paperwork person would take

Page 31

1  over.
2      Q.   You also mentioned receivers
3  as some of the job responsibilities of
4  the control cage partner.
5          What were the receiver
6  responsibilities?
7      A.   In the early part of the
8  time that I started, in '98, the receiver
9  was part of that job.  And at some point,
10 I can't remember when, it became an
11 inbound function.
12         But they would -- the
13 inbound department, or receivers, would
14 bring in items that belonged into the
15 cage.  And you would -- when they brought
16 it into the cage, we had a handheld gun,
17 and we would go through the items, go
18 through each and every box, make sure
19 everything was there according to the
20 packing list, and then you would receive
21 it into the system that were put into the
22 inventory.
23     Q.   Where were the items being
24 received from?

Page 32

1      A.   Do you mean within the
2  building or just --
3      Q.   Like, were they coming from
4  the manufacturers, or somewhere else?
5          Let me back up.
6          Were the items being
7  received from somewhere else besides Rite
8  Aid itself?
9      A.   Yes.
10     Q.   Where?
11     A.   We had different vendors
12 that were shipped to Rite Aid.
13     Q.   And those would include
14 distributors of controlled substances?
15     A.   Yes.
16     Q.   You also mentioned
17 replenisher as a job responsibility of a
18 control cage partner.
19         What were the
20 responsibilities of a replenisher?
21     A.   The replenisher would be
22 responsible for stocking the shelves from
23 the, like, lower storage areas.
24     Q.   And that was internal to the

Page 33

1  Rite Aid distribution center?
2      A.   We had stockers within the
3  control cage.
4      Q.   So where were the lower
5  storage areas located, then?
6      A.   They were right behind the
7  pick racks.
8      Q.   So the replenishers, then,
9  were putting from the storage areas into
10 the pick rack so they could be put into
11 the tote; is that sort of how it worked?
12         MR. LAVELLE:  Object to
13     form.
14         THE WITNESS:  Yes.
15 BY MR. POWERS:
16     Q.   So you said you were a
17 control cage partner from about a year
18 after you started at Rite Aid in '98
19 until currently, right?
20     A.   That -- under that -- was
21 the umbrella title, yes.
22     Q.   What other titles did you
23 have at the Rite Aid distribution center
24 in Perryman?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.   After the control cage
2  associate, I became the -- I did receiver
3  and then also became a control cage
4  clerk.
5    Q.   When were you a control cage
6  associate?
7    A.   The whole time I was there I
8  was considered a control cage associate.
9    Q.   Is control cage associate
10 the same thing as control cage partner,
11 then?
12   A.   Yes.
13   Q.   When did you become a
14 control cage clerk?
15   A.   I can't remember the actual
16 date.
17   Q.   Can you give me an
18 approximate date?
19   A.   I'm not for sure.  I would
20 say within about a year after working
21 there.
22   Q.   So some time before 2000?
23   A.   Yes.
24   Q.   How long were you a control

Page 35

1  cage clerk for?
2    A.   That, I don't remember the
3  exact date either.
4    Q.   Are you still a control cage
5  clerk?
6    A.   I am not.
7    Q.   What is your current
8  position?
9    A.   My current position is a
10 control cage associate.
11   Q.   Did you have any other
12 positions besides control cage associate
13 or control cage clerk?
14   A.   Yes.
15   Q.   What were those positions?
16   A.   After the control cage
17 clerk, I became the DEA coordinator.
18   Q.   Do you know when you became
19 the DEA coordinator?
20   A.   I'm sorry?
21   Q.   When did you become the DEA
22 coordinator?
23   A.   I don't remember the exact
24 dates.  Approximately 2002.

Page 36

1    Q.   Do you know how long you
2  were a DEA coordinator for?
3    A.   Approximately five years.
4    Q.   So you were a DEA
5  coordinator from about 2002 to about
6  2007; is that right?
7    A.   Yes.
8    Q.   And after you stopped being
9  the DEA coordinator, what was your
10 position?
11   A.   I went back to the DEA
12 clerk.
13   Q.   When you say you went back
14 to DEA clerk, were you ever a DEA clerk
15 before?
16   A.   Yes.  I was a DEA clerk
17 before I became a coordinator.
18   Q.   So is control cage clerk the
19 same as DEA clerk?
20   A.   I'm sorry.  Yes, it is.
21   Q.   I'm just trying to get a
22 handle on the different titles.
23   A.   Yes, I apologize.
24       When we say it, it is sort

Page 37

1  of interchangeable.
2    Q.   So after being DEA
3  coordinator, you went back to being a DEA
4  clerk.
5       How long did you remain a
6  DEA clerk after approximately 2007?
7    A.   I can't quite remember.  I
8  believe it was less than a year, because
9  they changed the position -- they kind of
10 got rid of the position as the clerk.
11   Q.   Did you transition to a new
12 position at that point when they got rid
13 of the DEA clerk position?
14   A.   Yes.  Then I became the
15 control cage lead.
16   Q.   And how long were you a
17 control cage lead?
18   A.   Up until currently -- I'm
19 sorry, excuse me, until 2014.
20   Q.   And then after 2014, what
21 was your position?
22   A.   Then I just pretty much
23 became the DEA associate again, or
24 partner.

Page 38

1    Q.   And that -- is that what you
2  referred to earlier as the control cage
3  associate?
4    A.   Correct.
5    Q.   Okay.  I want to go back to
6  the control cage clerk before you became
7  DEA coordinator.
8         What were your job
9  responsibilities in that position?
10    A.   If I remember, most of the
11  responsibilities were to monitor the
12  billing report and different
13  correspondences with other people within
14  the building, and helping out in the
15  control cage with whatever was needed
16  from the other associates, and assisting
17  the DEA clerk with whatever -- I mean, a
18  DEA coordinator with whatever she needed.
19    Q.   Who was the DEA coordinator?
20    A.   At the time --
21         MR. LAVELLE:  Object to
22  form.
23  BY MR. POWERS:
24    Q.   Yeah.  At the time you were

Page 39

1  a control cage clerk, before becoming a
2  DEA coordinator.
3    A.   I'm sorry, if you could just
4  repeat that.
5    Q.   Sure.
6         So you said one of your job
7  responsibilities as a control cage clerk,
8  when you were in that position before you
9  became a DEA coordinator in approximately
10  2002 was to assist the DEA coordinator,
11  right?
12    A.   Correct.
13    Q.   Who was the DEA coordinator
14  you were assisting?
15    A.   That was Marian Wood.
16    Q.   Do you know how long Ms.
17  Wood has been in that position as DEA
18  coordinator?
19         MR. LAVELLE:  Object to
20  form.
21         THE WITNESS:  No.
22  BY MR. POWERS:
23    Q.   Has she been the DEA
24  coordinator at the Aberdeen facility your

Page 40

1  entire time there?
2    A.   No.
3    Q.   When you moved on to the
4  position of DEA coordinator in around
5  2002, what were your job responsibilities
6  there?
7    A.   My main responsibilities
8  were to make sure that the associates in
9  the cage were adhering to different
10  procedures and policies within the cage
11  and to maintain the inventory, and it
12  included correspondence with DEA agents
13  and Board of Pharmacy agents, and other
14  clerical things.
15         - - -
16         (Whereupon, Exhibit
17  RiteAid-Chase Exhibit-1,
18  Rite_Aid_OMDL_0016495-498, was
19  marked for identification.)
20         - - -
21         MR. POWERS:  I'll hand you
22  what I marked as Exhibit-1.  For
23  the record it's Bates stamped
24  Rite_Aid_OMDL_0016495.  And it's

Page 41

1  an e-mail with the included
2  attachments.
3  BY MR. POWERS:
4    Q.   Just take a second and look
5  over the e-mail, and just let me know
6  when you've had a chance to review it.
7         MR. LAVELLE:  Are you using
8  any prefix for the exhibit?  Are
9  you just calling it Exhibit-1?
10         MR. POWERS:  I'll just refer
11  to it as Exhibit-1.
12         MR. LAVELLE:  Okay.
13         MR. POWERS:  I think on the
14  stickers it says Chase as the
15  witness.
16         MR. LAVELLE:  So it's
17  Chase-1.  Thank you.
18  BY MR. POWERS:
19    Q.   I want to direct your
20  attention to the first page of Exhibit-1.
21         It looks like it's an
22  e-mail.  And at the top there, it says,
23  From Debra Chase.
24         That's you, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.   Correct.
2    Q.   And it's sent to a
3    ███████@RiteAid.com.
4         Who is that?
5    A.   At the time, that would have
6 been Kim Brown, and she was the Rx
7 department manager.
8    Q.   And then the e-mail has two
9 attachments, Control Cage Clerk.doc and
10 DEA Coordinator Job Responsibilities.doc.
11        Do you see those?
12   A.   Yes.
13   Q.   And so looking at the second
14 page of Exhibit-1, it looks like this is
15 the job responsibilities for a control
16 cage clerk.
17        Would you agree?
18        MR. LAVELLE:  Object to
19   form.
20        THE WITNESS:  I'm sorry,
21   could you repeat that?
22 BY MR. POWERS:
23   Q.   The document that is the
24 second page of Exhibit-1 looks to be a

Page 43

1 list of job responsibilities for a
2 control cage clerk; is that right?
3        MR. LAVELLE:  Object to
4   form.
5        THE WITNESS:  Yes.
6 BY MR. POWERS:
7    Q.   And I want to direct your
8 attention to Number 7 there.
9         It says, Prepare
10 correspondence to government agencies,
11 when needed, for receiving and inventory
12 shortages discrepancies.
13        Do you see that?
14   A.   Yes.
15   Q.   What correspondence would
16 this refer to?
17   A.   That would be if we had any
18 shortages or -- inventory shortages, we
19 would send a letter of intent to the DEA
20 to let them know that we might possibly
21 file a DEA Form 106 for shortages.
22   Q.   Any other types of
23 correspondence that this refers to, that
24 Number 7 refers to in this document?

Page 44

1    A.   It would just be an e-mail
2 that we would send ahead of time in --
3 yes, just the e-mail to let them know
4 that we might be filing the 106.
5    Q.   And who did you send that to
6 at the DEA?
7    A.   I can't remember her name
8 right now.  At the time, it was a female
9 that we would send it to.
10   Q.   It would be a specific
11 person, though?
12   A.   Yes.  Yes.
13   Q.   I want to direct your
14 attention to Number 9 here on the second
15 page of Exhibit-1.
16        And it says, Check monthly
17 and ARCOS receipts.
18        Do you see that?
19   A.   Yes.
20   Q.   What does that mean?
21   A.   Each month, on the 10th of
22 the month, we would get monthly reports
23 for billing and receiving and ARCOS
24 reports.  And we would check those to the

Page 45

1 billings and receivings that we had done
2 for the previous month.
3    Q.   It looks like ARCOS is all
4 caps.
5         Is that an abbreviation
6 you're familiar with?
7    A.   Yes, it is.
8    Q.   What is ARCOS?
9    A.   I'm familiar with it, but I
10 don't remember what the breakdown of it
11 is.
12   Q.   What is it -- what does the
13 ARCOS information tell you?
14   A.   It pretty much tells me it's
15 an item that is designated as an ARCOS
16 item that is reportable -- let me make
17 sure I say it -- that is reportable --
18 that is watched by the DEA, and it's what
19 they call ARCOS reportable.
20   Q.   And controlled substances
21 would be ARCOS reportable?
22   A.   Not all.
23   Q.   Not all.
24        Which ones would be

Page 46

1 reportable, ARCOS reportable?
2    A.   I don't remember
3 specifically.
4    Q.   Looking at Number 10 now, it
5 says, Trained as backup for DEA
6 coordinator when needed.
7        Do you see that?
8    A.   Yes.
9    Q.   And that Number 11 also
10 says, Trained to support a DEA
11 inspection, if needed.
12        Do you see that?
13    A.   Yes.
14    Q.   How were these trainings
15 referred to in 10 and 11 conducted?
16    A.   I trained with Marian Wood,
17 and she would go through all different
18 situations with me and show me what's
19 needed to back her up in her job in her
20 absence, for her job and the DEA
21 inspections as well.
22    Q.   Was there anything besides
23 the in-person training with Marian Wood?
24    A.   I'm sorry?

Page 47

1    Q.   Was there any other training
2 besides the in-person training with
3 Marian Wood on these two topics?
4    A.   Not that I can remember.
5    Q.   Were there any written
6 materials given to you when these
7 trainings happened?
8    A.   None specific that I can
9 remember.  But we would go over different
10 items that were -- you know, different
11 logs that we had in the office, and she
12 taught me what was what and what needed
13 to be reported, that type of thing.
14    Q.   Besides Marian Wood, do you
15 know if anyone else did these kind of
16 trainings?
17    A.   At times, I do recall Kevin
18 Mitchell would come down from the
19 corporate office.
20    Q.   And the corporate office is
21 where?
22    A.   In Harrisburg, Pa.
23    Q.   And Marian Wood was located
24 in Maryland?

Page 48

1    A.   Yes.
2    Q.   Did she work out of the
3 Perryman distribution center?
4    A.   Yes.
5    Q.   Going to the third page of
6 Exhibit-1.
7        At the top there, it looks
8 like the subject line of this document
9 is, DEA coordinator job responsibilities.
10        Do you see that?
11    A.   Yes.
12    Q.   So this document outlines
13 the job responsibilities for the DEA
14 coordinator position, right?
15    A.   Yes.
16    Q.   I'm going to direct your
17 attention to Number 1 in the list there.
18        And it says, Ensure
19 regulatory compliance with state and
20 federal laws as it relates to pharmacy
21 operations.
22        Do you see that?
23    A.   Yes.
24    Q.   How did you do this?

Page 49

1        MR. LAVELLE:  Object to
2    form.
3        THE WITNESS:  Compliance
4    with state and federal laws as it
5    relates to pharmacy operations, I
6    don't quite remember specifically.
7        I think the information was
8    based on the CFR, the Code of
9    Federal Regulations.
10 BY MR. POWERS:
11    Q.   When you say it was "based
12 on the CFR," you mean where it refers to
13 the state and federal laws, those would
14 be the CFR provisions?
15    A.   I'm sorry, repeat that.
16    Q.   You said the information was
17 based on the CFR.
18        Are those the -- are you
19 saying that the CFR provisions are the
20 state and federal laws that the DEA
21 coordinator here is supposed to ensure
22 regulatory compliance with?
23        MR. LAVELLE:  Object to
24    form.

Page 50

1  THE WITNESS:  I believe --
2  well, for the regulatory
3  compliance, we use the CFR as a
4  guideline is what I'm saying.
5  BY MR. POWERS:
6  Q.  Anything else besides the
7  CFR?
8  A.  Not that I can think of
9  specifically right now.
10  Q.  And this Number 1 here says,
11  Ensure regulatory compliance.
12  How did you ensure the
13  regulatory compliance, as a DEA
14  coordinator?
15  A.  There were different
16  policies and procedures that were put in
17  place that -- to ensure that we were in
18  compliance with that regulatory, based on
19  the CFR.
20  Q.  Moving down to Number 2 in
21  this list, it says, Maintain SOPs for
22  pharmacy department.
23  Do you see that?
24  A.  Yes.

Page 51

1  Q.  Does "SOP" refer to standard
2  operating procedures?
3  A.  Yes.
4  Q.  What does it mean by
5  maintain the SOPs?
6  A.  We have the SOPs in our
7  office.  And when it says "maintain,"
8  it's just make sure that they were
9  updated.
10  Q.  Anything besides making sure
11  they were updated?
12  A.  Other than making sure that
13  the associates had the current SOPs,
14  that's pretty much it.
15  Q.  Number 3 there says, Review
16  and verify information on end-of-month
17  ARCOS reports for accuracy and
18  completion.  Maintain pharmaceutical
19  files and records for state-required time
20  frame.
21  Do you see that?
22  A.  Yes.
23  Q.  Were the end-of-month ARCOS
24  reports only reviewed for accuracy and

Page 52

1  completion?
2  A.  Yes.
3  Q.  And where were those files
4  maintained, the files referred to in
5  Number 3 here on this list?  Where were
6  those files maintained?
7  A.  They were kept in the office
8  of the DEA coordinator.
9  Q.  At the distribution center?
10  A.  Yes.
11  Q.  Were those hardcopy files,
12  or electronic files?
13  A.  Hardcopy.
14  Q.  And it says for the -- it
15  says, Maintain the pharmaceutical files
16  and records for the state-required time
17  frame.
18  Do you know what the
19  state-required time frame was at that
20  time?
21  A.  I don't remember right now.
22  Q.  Do you know what it is now?
23  A.  No.  I don't remember what
24  it is.

Page 53

1  Q.  Moving down to Number 5 in
2  this list in Exhibit-1, it says, Conduct
3  semi-annual internal DEA audits.
4  Do you see that?
5  A.  Yes.
6  Q.  What does that Number 5
7  entry mean there?
8  A.  That means that we actually
9  conducted our own DEA audits based on
10  what the DEA had asked for in the
11  previous times that they had been there.
12  And we would pretty much go through and
13  just go through them again.
14  Q.  So those audits referred to
15  in Bullet Point 5 here, those are
16  internal Rite Aid audits, not having to
17  do with external people from DEA coming
18  in and auditing the facility; is that
19  right?
20  MR. LAVELLE:  Object to
21  form.
22  THE WITNESS:  Yes.
23  BY MR. POWERS:
24  Q.  And the Number 5 there says,

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  Semi-annual.
2        How often was that?
3        A.   Six -- every six months.
4  But not -- it didn't always happen, like,
5  every six months.
6        Q.   There wasn't a set schedule
7  or anything like that?
8        A.   No.
9        Q.   Moving on to the last page
10 of Exhibit-1, and it's Number 9.
11       It says, Ensure the
12 following logbooks are in place.
13       And the first one listed
14 there as letter A is, Excessive order
15 monitoring log.
16       Do you see that?
17       A.   Yes.
18       Q.   Where is the excessive order
19 monitoring log kept?
20       A.   It was kept in the control
21 cage.
22       Q.   And was that a hardcopy log
23 or an electronic log?
24       A.   It was a hardcopy log.

Page 55

1        Q.   Was that hardcopy excessive
2  order monitoring log kept in electronic
3  form anywhere else?
4        A.   I believe that it was -- it
5  was -- let me start over.
6        Marian Wood, when she was
7  DEA coordinator, she would take the log
8  and type it, and then keep it on a form
9  on her computer.
10       Q.   Did you ever take the
11 hardcopy excessive order monitoring log
12 and put it into electronic format
13 yourself?
14       A.   I did not.
15       Q.   Do you know if anyone else
16 besides Marian Wood did that?
17       A.   No.
18       Q.   Did you ever see the
19 electronic version of the excessive order
20 monitoring log that Marian Wood created?
21       A.   Yes.
22       Q.   How did you come to see that
23 electronic version?
24       A.   I just saw it -- recently, I

Page 56

1  just saw a copy of it.
2        Q.   And what does this excessive
3  order monitoring log, whether it be in
4  hardcopy or electronic copy, show?
5        A.   It would show the
6  information that was logged by myself or
7  one of the associates for orders that --
8  excuse me -- that was either shorted down
9  or just logged based on the orders that
10 was picked.
11       Q.   So you personally made
12 entries into this excessive order
13 monitoring log; is that right?
14       A.   Yes.
15       Q.   And when would you put
16 entries into this excessive order
17 monitoring log?
18       A.   Whenever we had an order
19 that, when the picker is picking and if
20 it comes up over what the threshold is,
21 then they would stop and log it in.
22       They would either short the
23 item down or call the store, just to make
24 sure exactly what they needed.  And then

Page 57

1  we would log the information into the
2  book.
3        Q.   Would the picker log the
4  information or would someone else log the
5  information into the excessive order
6  monitoring log?
7        A.   We --
8        MR. LAVELLE:  Object to
9  form.
10       THE WITNESS:  Yes.
11 BY MR. POWERS:
12       Q.   Who would -- sorry, let me
13 ask it this way:  Who would physically
14 put the information into the excessive
15 order monitoring log?
16       A.   Either myself or the picker.
17       Q.   And what information did you
18 put in the excessive order monitoring
19 log?
20       A.   It would have -- start off
21 with the date, the item number, the
22 quantity that the pick asked for, and
23 then the quantity that was actually
24 picked.

Page 58

1    If we called the store, it
2 would have the store, the pharmacy
3 information, as to whether they wanted --
4 what they wanted, if they wanted
5 something different, we would log what
6 they wanted.  And then it would be the
7 person who logged it.  And then myself
8 and/or Marian would sign off on it.
9    Q.   Going back to -- actually,
10 before I move on from the excessive order
11 monitoring log, you said it was a
12 hardcopy that was kept in the cage.
13    I'm assuming that it would
14 have to be recycled, or it would get
15 pretty large after a while, right?  So
16 you would have to -- there wasn't the
17 same excessive order monitoring log the
18 entire period you were at Rite Aid,
19 right?
20    MR. LAVELLE:  Object to
21    form.  Object to form.
22 BY MR. POWERS:
23    Q.   The same physical book was
24 not the same?

Page 59

1    MR. LAVELLE:  Object to
2    form.
3    THE WITNESS:  Can you repeat
4    that for me?
5 BY MR. POWERS:
6    Q.   Sure.
7    So you said the excessive
8 order monitoring logs that you made entry
9 into was a physical document, right?
10    A.   Correct.
11    Q.   It was in some kind of
12 binder or something like that?
13    A.   Yes.
14    Q.   So does that binder just
15 keep growing year after year, or was it
16 ever replaced?
17    MR. LAVELLE:  Object to
18    form.
19    THE WITNESS:  It was -- we
20    kept it yearly.
21 BY MR. POWERS:
22    Q.   So you had a different
23 binder containing the excessive order
24 monitoring log for each year; is that

Page 60

1 right?
2    A.   Correct.
3    Q.   What did you do with the old
4 physical logbook, excessive order
5 monitoring logbook, when you started a
6 new year?
7    A.   We would pull those sheets
8 and put them into a folder.
9    Q.   What folder -- sorry, you
10 can finish your answer.  I'm sorry.  I
11 didn't mean to interrupt you.
12    A.   We would pull the sheets for
13 the previous year and put them in a
14 folder, a dated folder for that year, and
15 keep it in the file drawer.
16    Q.   What was the name of that
17 folder that you put those pages into?
18    A.   Excessive order monitoring
19 log.
20    Q.   And where was that file
21 kept?
22    A.   We had a desk -- within the
23 control cage, there was a separate area
24 that we used as sort of a clerical area,

Page 61

1 and those folders were kept in a desk
2 drawer.
3    Q.   And how far back do those
4 order -- excessive order monitoring log
5 hardcopy files go?
6    MR. LAVELLE:  Object to
7    form.
8    THE WITNESS:  I don't quite
9    remember exactly how long we kept
10    them.
11 BY MR. POWERS:
12    Q.   Sitting here today, do you
13 remember -- I mean, you still work in the
14 distribution center, right?
15    A.   Yes.
16    Q.   Do you know, sitting here
17 today, what the earliest year you have
18 hardcopy files for the excessive order
19 monitoring log?
20    A.   We have this current year,
21 yes.  And last year's.
22    Q.   Anything before that still
23 in hardcopy?
24    A.   Not that I can remember

Page 62

1 right now.
2     Q.   Going back to the last page
3 of Exhibit-1, Number 9, letter C, there's
4 a Red Book log.
5         What is that?
6     A.   The Red Book was a book that
7 we kept in the DEA -- in the office, in
8 the DEA office.  And it was a log for
9 each item.  And any type of adjustments
10 that was done to that item was logged
11 into the book.
12     Q.   Would that -- you said it
13 was a book that included adjustments of
14 items.
15         Would that include
16 adjustments for orders that were cut down
17 to below threshold?
18     A.   Yes.
19     Q.   Where is this Red Book log
20 kept?
21     A.   It was kept in the DEA
22 coordinator's office.
23     Q.   So that would have been
24 Marian Wood's office?

Page 63

1     A.   Yes.
2     Q.   And was that also in
3 hardcopy?
4     A.   Yes.
5     Q.   Did it exist in any
6 electronic format?
7     A.   We kept the log -- we had
8 a -- the format of the sheet that we
9 filled out, we kept that on our computers
10 in a file.
11     Q.   When you say "on our
12 computers," do you mean your personal
13 computer, or was it a Rite Aid computer
14 system?
15         MR. LAVELLE:  Object to
16     form.
17         THE WITNESS:  Can you repeat
18     that for me, please?
19 BY MR. POWERS:
20     Q.   Right.
21         You said you kept it "on our
22 computers."  Did you have your own
23 personal computer you kept it on, or was
24 it more so meaning in the Rite Aid

Page 64

1 system?
2         MR. LAVELLE:  Object to
3     form.
4         THE WITNESS:  We had Rite
5     Aid computers.
6 BY MR. POWERS:
7     Q.   Going down to Number 11 on
8 the last page of Exhibit-1, it says,
9 Ensure all DEA procedures are reviewed
10 and are practiced by each employee who
11 has authorized access into the CD cage.
12         Do you see that?
13     A.   Yes.
14     Q.   What does CD stand for here?
15     A.   Controlled drug.
16     Q.   This item Number 11 says
17 that the job responsibility is to ensure
18 all DEA procedures are reviewed and
19 practiced by each employee.
20         How did the DEA coordinator
21 ensure that all the DEA procedures were
22 followed?
23     A.   Can you be just a little bit
24 more specific?

Page 65

1     Q.   So part of the DEA
2 coordinator's job was to ensure all the
3 DEA procedures were followed by each
4 employee, right?
5         That's what this Number 11
6 says?
7     A.   Okay.  Yes.
8     Q.   How did the DEA coordinator
9 ensure that the DEA procedures were
10 followed by each employee?
11     A.   They had -- we had -- I'm
12 sorry.
13         We have procedures that were
14 written up based on the, I guess it kind
15 of goes back to the CFR again and what it
16 states for certain thirgs that we had to
17 have in place.  So they had procedures
18 that were written up based on that.
19         So we would -- each
20 procedure was -- for the cage, each
21 associate was given those procedures and
22 gone over them, and they had to sign for
23 them and make sure they understood what
24 was expected from them.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q.   Besides getting the copies
2 of the procedures, what else did the DEA
3 coordinator have to do to ensure that
4 they were followed?
5    A.   I mean, other than just
6 making sure that they understood what
7 they were supposed to be doing.  And when
8 they first started, they had a training
9 period.  So they were trained for a
10 certain period of time to make sure that
11 they understood what they were doing.
12   Q.   Were there other trainings
13 besides the initial trainings, or was the
14 initial training the only one?
15       MR. LAVELLE:  Object to
16   form.
17       THE WITNESS:  I'm sorry,
18   could you repeat it, the question?
19 BY MR. POWERS:
20   Q.   Sure.
21       You said that when the
22 employees first started, they had a
23 training period, right?
24   A.   Correct.

Page 67

1    Q.   So besides that initial
2 training period, were the employees ever
3 trained again on DEA procedures?
4    A.   Yes.
5    Q.   How often?
6    A.   I don't quite remember
7 exactly how often.  But they were --
8 procedures were gone over with them
9 periodically.
10   Q.   Was there any set schedule
11 for that?
12   A.   Mainly, if something changed
13 within a procedure, we would make sure
14 everybody had that change and that they
15 understood the change.
16   Q.   So besides when there was a
17 change, were the policies ever
18 periodically gone over, the DEA policies
19 gone over with the employees?
20   A.   At the time that I was the
21 coordinator, I would go in annually and
22 try to do it with them annually, to make
23 sure they understood and everybody was up
24 on the procedures.

Page 68

1    Q.   And how did you do that?
2    A.   I would come in and gather
3 everybody together.  We would physically
4 go over the procedures and read them and
5 have them re-sign them.
6    Q.   And Exhibit-1, this is an
7 e-mail from 2007.
8        Do the job responsibilities
9 of a control cage clerk and DEA
10 coordinator, as reflected in Exhibit-1,
11 match the job responsibilities of a
12 control cage clerk and DEA coordinator
13 currently?
14   A.   We do not have those
15 positions anymore.
16   Q.   What are they called now?
17   A.   Those positions don't exist
18 anymore.
19   Q.   When did they stop existing?
20   A.   Approximately in 2014.
21   Q.   Do you know why they stopped
22 existing in 2014?
23   A.   Yes.
24   Q.   Why is that?

Page 69

1    A.   In 2014, Rite Aid ceased to
2 ship controlled drugs to the stores, and
3 it was turned over to McKesson.
4    Q.   So the descriptions in
5 Exhibit-1, were those the descriptions of
6 the jobs of control cage clerk and DEA
7 coordinator from 2007 to 2014?
8    A.   Say that again, I'm sorry.
9    Q.   Sure.
10       The job descriptions in
11 Exhibit-1 for a control cage clerk and a
12 DEA coordinator, were those the job
13 responsibilities for those two positions
14 from 2007 to 2014?
15   A.   Yes.
16   Q.   Are you familiar with the
17 term "diversion" in the context of
18 controlled substances?
19   A.   Yes.
20   Q.   What does diversion mean, in
21 your own words?
22   A.   In my own words, diversion
23 means something that is taken and used
24 for other than what is the purpose.

Page 70

1    MR. LAVELLE:  Counsel, are
2  you finished with Chase-1?
3    MR. POWERS:  Yes.
4    MR. LAVELLE:  I'll give it
5  to the court reporter.  She needs
6  to keep all the exhibits.
7    Thank you.
8  BY MR. POWERS:
9    Q.   Does Rite Aid have an
10  obligation to prevent diversion?
11    A.   Yes.
12    MR. LAVELLE:  Object to
13  form.
14  BY MR. POWERS:
15    Q.   Why does Rite Aid have an
16  obligation to prevent diversion?
17    MR. LAVELLE:  Object to
18  form.
19    THE WITNESS:  Could you
20  repeat that?  I'm sorry.
21  BY MR. POWERS:
22    Q.   Why does Rite Aid have an
23  obligation to prevent diversion?
24    MR. LAVELLE:  Object to

Page 71

1  form.
2    THE WITNESS:  As a
3  distributor, they would have an
4  obligation to make sure their
5  items aren't going other than
6  where they're supposed to go.
7  BY MR. POWERS:
8    Q.   Any other reason besides by
9  virtue of being a distributor?
10    MR. LAVELLE:  Same
11  objection.
12    THE WITNESS:  Not that I can
13  necessarily think of right now.
14  BY MR. POWERS:
15    Q.   Are you familiar with the
16  concept -- are you familiar with the
17  concept of a suspicious order in the
18  context of controlled substance
19  distribution?
20    A.   Yes.
21    Q.   What does that mean to you?
22    A.   To me, that means that
23  there's an order that we have a question
24  about, that is possibly not what it

Page 72

1  should be.
2    Q.   When you say "we," in an
3  order that we have a question about, do
4  you mean Rite Aid?
5    A.   Yes.  In the context of who
6  was working with me.
7    Q.   And you said that it's an
8  order that is possibly not what it should
9  be.
10    What do you mean by that?
11    A.   As in if we thought
12  something was going to happen to -- other
13  than what was supposed to, other than
14  going to the pharmacist, or if we thought
15  something was happening with it.
16    Q.   We talked a little bit
17  before about sort of how the operations
18  worked at the DC, and I want to just get
19  clarity on a couple of points.
20    The Rite Aid distribution
21  centers only distributes to Rite Aid
22  stores, correct?
23    A.   Yes.
24    Q.   And the Rite Aid

Page 73

1  distribution centers only distributed
2  controlled substances up until 2014,
3  right?
4    A.   Yes.
5    Q.   How often would orders for
6  controlled substances be received at the
7  distribution center?
8    A.   Like --
9    Q.   Like, would an order come in
10  daily?  Weekly?  Every hour?  How did
11  that work?
12    MR. LAVELLE:  Object to
13  form.
14    THE WITNESS:  Oh, I'm sorry.
15    The orders came -- they came
16  through daily.
17  BY MR. POWERS:
18    Q.   And once the orders came
19  through, what happened next?
20    A.   I was not in a position
21  to -- how can I put it?  The way they
22  came through the building, I didn't have
23  access to that.  That wasn't part of my
24  job.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  I didn't see it until it
2  actually came to the control cage and
3  when they downloaded what we called the
4  wave, as I explained earlier.
5      Q.   So you would see a wave come
6  through.
7          And was that electronic on a
8  computer or was it on a hardcopy
9  document?  How would that come through to
10 you?
11         MR. LAVELLE:  Object to
12     form.
13         THE WITNESS:  Could you
14     repeat it for me, please?
15 BY MR. POWERS:
16     Q.   Sure.
17         So you said that you would
18 get the orders through the waves in the
19 control cage, right?
20     A.   Correct.
21     Q.   How would you receive those
22 waves?  Would it be electronic?
23 Hardcopy?  Verbal?  What?
24         MR. LAVELLE:  Object to

Page 75

1     form.
2          THE WITNESS:  Computer,
3      electronic.
4  BY MR. POWERS:
5      Q.   And was there a name for the
6  computer system where you would get the
7  waves?
8      A.   They came down through what
9  we called the IPTI system.
10     Q.   I'm sorry, IP?
11     A.   IPTI.
12     Q.   IPTI.
13     A.   That's the actual computer
14 that it came on.
15     Q.   And then once you saw the
16 orders come through in the wave on the
17 computer, what happened next?
18     A.   Then as the picker, once
19 they saw the wave, they knew they had
20 work, and then that's when they would go
21 to the procedure that I explained earlier
22 about scanning the tote and going from
23 there.
24     Q.   Using the Pick to Light

Page 76

1  system?
2      A.   Using the Pick to Light
3  system, correct.
4      Q.   And then once the picker put
5  all the materials in the tote, what
6  happened after that?
7      A.   Then it would be pushed off
8  onto a static line and the paperwork
9  person would take over from there.
10     Q.   After the paperwork person
11 was done, what happened?
12     A.   Then those totes were
13 palletized.
14     Q.   When you say "palletized,"
15 I'm just not familiar with the verb.
16         It's basically putting it on
17 a big pallet to put on a truck; is that
18 right?
19     A.   Yes.  Based on the wave,
20 like I explained earlier, the totes were
21 palletized according to what wave they
22 were in.  And then they would be sent
23 over to transportation.
24     Q.   And transportation did

Page 77

1  what -- did what with the pallets?
2      A.   They would go into -- we had
3  a -- a control cage over in the
4  transportation area, and they would hold
5  them until they were ready to load them
6  onto trucks.
7      Q.   How often were they loaded
8  onto trucks?
9      A.   I don't work over there, so
10 I don't know specifically.
11     Q.   Do you know if Rite Aid
12 stores that the distribution center was
13 working with got shipments daily?
14 Weekly?  Biweekly?  Do you know the
15 frequency?
16     A.   Not for individual stores.
17 Some stores were daily -- I mean, some
18 stores were possibly three days a week,
19 some stores were one day a week.  So it
20 varied.
21     Q.   And we talked a little bit
22 before, or you mentioned before the
23 concept of a threshold.
24         Can you explain what you

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 mean by that?
2     A.    Yes.  A threshold was the
3 amount of drugs that was -- I'm sorry,
4 the amount of pills that a store could
5 get per item.  And it was set up as 5,000
6 pills per item.
7     Q.    You say the "amount of
8 pills."
9          Could it be in different
10 forms than pills?
11     A.    Yes.  Like a bottle count of
12 100 or 500 or a 50 count.  So it would
13 determine whether they received 10
14 bottles of one or 50 of the other or 10
15 of another.
16     Q.    And when you say it was set
17 up as 5,000 pills per item, what do you
18 mean by "item"?
19     A.    The drug itself, a specific
20 drug.
21     Q.    So, let's say, Oxycodone
22 would be a different item than, say,
23 Tramadol; is that right?
24          MR. LAVELLE:  Object to

Page 79

1     form.
2          THE WITNESS:  We didn't have
3     Oxycodone.
4 BY MR. POWERS:
5     Q.    What is an example of a
6 couple different items of controlled
7 substances that you did have?
8     A.    We did have Tramadol or
9 hydrocodone items.
10     Q.    So if you had a shipment of
11 both hydrocodone and Tramadol, each
12 individual item would have a threshold of
13 5,000?
14          So the hydrocodone would
15 have a threshold of 5,000 and the
16 Tramadol would have a separate threshold
17 of 5,000; is that right?
18          MR. LAVELLE:  Object to
19     form.
20          THE WITNESS:  Yes.
21 BY MR. POWERS:
22     Q.    Would the different
23 formulations of each drug have a
24 different threshold, or, I should rather

Page 80

1 say, have a separate threshold?
2     A.    It was set up across the
3 board that each item, with some
4 exceptions, had the threshold -- I'm
5 sorry, had the threshold of the 5,000
6 pills.
7     Q.    I guess my question is, you
8 could have different dosages of
9 hydrocodone, right?  You can have 50
10 milligrams, 10 milligram formulations of
11 hydrocodone, right?
12     A.    Yes.
13     Q.    So would the 5,000-pill
14 thresholds apply across all formulations,
15 or did each individual formulation have
16 its own 5,000-pill threshold?
17     A.    It wasn't based on the
18 formulation, it was based on the pill
19 count of the bottle.
20     Q.    So if you have a pill
21 count -- let me back up.
22          What are the different
23 formulations of hydrocodone that Rite Aid
24 used to distribute?

Page 81

1     A.    I do not recall all of those
2 specifically.
3     Q.    Okay.  Do you remember
4 examples?
5     A.    I'm sorry, no, I do not.
6     Q.    So let's say the hydrocodone
7 has a formulation of an 8-milligram pill.
8          Is that one of the ones you
9 remember?
10     A.    Once again, I can't recall
11 what exactly --
12     Q.    We don't really need to go
13 through the exact formulations that Rite
14 Aid had or didn't have.
15          What I'm just trying to say
16 is, the hydrocodones would have different
17 milligram dosages in each pill, right?
18     A.    Correct.
19     Q.    Okay.  So for those
20 different dosages, would those dosages
21 have a 5,000-pill limit on each
22 particular dosage, or would all
23 hydrocodone in that particular shipment
24 have to be calculated against the

Page 82

1  5,000-pill limit?
2          MR. LAVELLE:  Object to
3      form.
4          THE WITNESS:  So, once
5      again, it was based on the pill
6      count of the bottle, not the
7      dosage of the pill.
8  BY MR. POWERS:
9      Q.   Would the different
10  formulations of hydrocodone come in
11  different bottles?
12          MR. LAVELLE:  Object to
13      form.
14          THE WITNESS:  I'm not
15      understanding what you're asking.
16  BY MR. POWERS:
17      Q.   So you have -- there's a
18  5,000-pill count threshold, right?
19      A.   Correct.
20      Q.   And when calculating whether
21  or not you're getting to that 5,000-pill
22  count threshold, do all bottles of
23  hydrocodone, regardless of pill count, go
24  to that 5,000, or do the different

Page 83

1  bottles of hydrocodone count differently
2  depending on what's in that bottle?
3          MR. LAVELLE:  Object to
4      form.
5          THE WITNESS:  No.
6  BY MR. POWERS:
7      Q.   Can you explain how it
8  works?
9      A.   It was based on the pill
10  count of the bottle.  If it was 100
11  pills, 100-pill count bottle, they could
12  only get a total of 5,000 pills, whatever
13  that came out to, whether it's 50
14  bottles.  If it was a 500-count, once
15  again, they could only get a total of
16  5,000 pills.
17      Q.   So if you have a bottle of
18  hydrocodone that has 100 pills in it and
19  you have a bottle of hydrocodone that has
20  50 pills in it, do those two pill counts
21  get added up for the threshold, or are
22  they separate thresholds?
23          MR. LAVELLE:  Object to
24      form.

Page 84

1          THE WITNESS:  They are
2      separate.
3  BY MR. POWERS:
4      Q.   So you could have multiple
5  orders of different pill count bottles of
6  hydrocodone -- strike that.  That's a bad
7  question.
8          MR. LAVELLE:  Counsel, we've
9      been going about an hour.  When we
10      get to a convenient spot for a
11      break, I'd like to take one.
12          MR. POWERS:  We can do it
13      right now.  That's fine.
14          VIDEO TECHNICIAN:  The time
15      is 11:43 a.m.  We are going off
16      the record.
17          - - -
18          (Whereupon, a brief recess
19      was taken.)
20          - - -
21          VIDEO TECHNICIAN:  The time
22      is 11:58 a.m.  We are back on the
23      record.
24  BY MR. POWERS:

Page 85

1      Q.   Welcome back, Ms. Chase.
2          MR. POWERS:  I'm going to
3      hand you what has been marked as
4      Exhibit-2.  And the beginning
5      Bates on this exhibit is
6      Rite_Aid_OMDL_0016297.
7          And, once again, it's an
8      e-mail with a bunch of attachments
9      that are also included in this
10      exhibit.  It's somewhat lengthy,
11      the number of exhibits on here.
12      I'm going to tell you to take a
13      look at it, but I'm going to tell
14      you that I'm going to direct your
15      attention to a couple particular
16      pages in the exhibit.  So maybe
17      that will help move things along a
18      little quicker.
19          - - -
20          (Whereupon, Exhibit
21      RiteAid-Chase Exhibit-2,
22      Rite_Aid_OMDL_0016297-329, was
23      marked for identification.)
24          - - -

Page 86

1    THE WITNESS: Okay.
2  BY MR. POWERS:
3    Q.   So the first page of
4  Exhibit-2 looks to be an e-mail from you,
5  correct?
6    A.   Correct.
7    Q.   And it's to a ██████ @Rite
8  Aid.com, right?
9    A.   Yes.
10    Q.   Who is that?
11    A.   At this time, I cannot
12  recall who that is.
13    Q.   And it looks like you're
14  attaching a bunch of procedures to this
15  e-mail you're sending, right?
16    A.   Yes.
17    Oh, I'm sorry, that would be
18  Darla Harkins is her name.
19    Q.   Who is Darla Harkins?
20    A.   I believe she was the
21  assistant Rite Aid manager.
22    Q.   The manager for the
23  distribution center in Perryman?
24    A.   For the Rx department, I'm

Page 87

1  sorry.
2    Q.   And it looks like in this
3  e-mail you're attaching a bunch of
4  procedures, right?
5    A.   Yes.
6    Q.   I'm going to direct your
7  attention to the page that is delineated
8  with a Bates stamp ending in 16305.  It's
9  four or five pages into the document,
10  Exhibit-2.
11    MR. LAVELLE:  The witness
12    has it in front of her.
13  BY MR. POWERS:
14    Q.   And it looks like this
15  particular page is entitled, Controlled
16  Drug Above Average Order Monitoring
17  Program.
18    Do you see that?
19    A.   Yes.
20    Q.   Right below that, it says,
21  in all caps, The person who picks a
22  controlled drug order is responsible for
23  alerting the supervisor on duty of
24  unusually high order quantities.

Page 88

1    Do you see that?
2    A.   Yes.
3    Q.   Who would the supervisor be
4  that's referred to in that sentence?
5    A.   It would refer to either the
6  lead or the DEA coordinator.
7    Q.   When you say "the lead,"
8  what do you mean by that?  Is that the
9  official title?
10    A.   Yes, I'm sorry.  It's the
11  control cage lead.
12    Q.   Control cage lead, okay.
13    What would be considered an
14  unusually high order quantity?
15    A.   As it pertains to this, it
16  would be anything that was considered
17  over the threshold.
18    Q.   Did you personally ever
19  alert a supervisor to an unusually high
20  order?
21    A.   It was reported to myself or
22  whoever the DEA coordinator was at that
23  time.
24    Q.   So you were getting the

Page 89

1  reports, as opposed to making the
2  reports, of unusually high orders?
3    A.   Yes.
4    Q.   Did you ever get a report of
5  an unusually high order?
6    A.   Yes.  I mean -- I'm sorry,
7  when you say "report," basically, I was
8  informed.  Like, someone, they would stop
9  picking and say something like, oh, this
10  is over the threshold, what should we do?
11  Or they would take care of it themselves.
12    Q.   Right.  That's -- yes.
13    A.   Yes.
14    Q.   I think the term it uses
15  here is "alerted."
16    So as control cage lead or
17  DEA coordinator, whatever you were, were
18  you ever alerted of an order of unusually
19  high order quantity?
20    A.   Yes.
21    Q.   What did you do when you got
22  that alert?
23    A.   We would -- two things,
24  depending on the time of the day, or --

Page 90

1  we would either short the item down to
2  what the threshold is or was and/or we
3  would either call the store to verify
4  exactly what they needed and to remind
5  them that they could not get over that
6  certain amount.
7      Q.   How did you make the
8  decision between shorting the order or
9  calling the store?
10     A.   So it all depended on, like
11 I said, the time of the day, if the store
12 was still open or not.  Or if night
13 shift -- night shift, the stores were
14 mostly closed, so they didn't call.
15     Q.   So what would happen if you
16 couldn't call?
17     A.   Then they would
18 automatically short it down to the
19 threshold.
20     Q.   When you -- did you
21 personally make some of those phone calls
22 inquiring about unusually high orders?
23     A.   Yes.
24     Q.   Was there any script or

Page 91

1  particular questions you were supposed to
2  ask?
3          MR. LAVELLE:  Object to
4      form.
5          THE WITNESS:  No.
6  BY MR. POWERS:
7      Q.   What did you ask the
8  pharmacy when you called about an
9  over-threshold order?
10     A.   Typically, the conversation
11 would go -- I would ask for the
12 pharmacist in charge.  And then I would
13 inform them of what the order was, as to
14 what the item was, and tell them,
15 depending on what they were ordering,
16 that they cannot receive that amount and
17 that I can only ship 50, or whatever the
18 threshold was for the item.
19         And then I would ask them if
20 they even needed that amount.  Because
21 some stores would decide they did not
22 need that amount.
23     Q.   Would you ever ask anything
24 else?

Page 92

1      A.   No, sir.
2          I'm sorry, other than their
3  name, so that I can record that into the
4  log.
5      Q.   If the pharmacy that you
6  called said, yes, we want the full amount
7  we ordered, what would happen then?
8      A.   If it was over the
9  threshold, we would inform them we can
10 only send what was -- what the threshold
11 was.
12     Q.   Is that what you refer to as
13 cutting the order?
14     A.   Yes, sir.
15     Q.   So when you got an unusually
16 high order quantity above the thresholds,
17 the order would still be partially
18 shipped at the amount that would be below
19 the threshold; is that right?
20     A.   Yes.
21     Q.   Were there ever any orders
22 that were above threshold that you did
23 not ship any part of?
24     A.   Say that again.  I'm sorry.

Page 93

1      Q.   Were there any orders that
2  were -- that came to the distribution
3  center above the threshold that you did
4  not ship any part of the order?
5      A.   I do recall we had some.  I
6  don't recall specifics, but I have had
7  some.
8      Q.   Do you remember why the
9  orders were not shipped at all?
10     A.   Most of the time, that phone
11 call, the pharmacist would say they
12 didn't understand why they even ordered
13 it, and then they would say we don't need
14 that so you don't have to ship it to us.
15     Q.   Did you ever ask any
16 questions beyond just verifying whether
17 they needed that particular amount?
18         MR. LAVELLE:  Object to
19     form.
20         THE WITNESS:  No.
21 BY MR. POWERS:
22     Q.   Let me be clear.
23         We're talking about when
24 you're calling the pharmacies when they

Page 94

1 place orders above threshold, right?
2          MR. LAVELLE:  Object to
3     form.
4 BY MR. POWERS:
5     Q.   So let me ask it this way --
6     A.   Okay.
7     Q.   -- when you called the
8 pharmacists or the pharmacies about
9 orders that came in that were above the
10 threshold, you did not ask any other
11 questions besides whether or not the
12 pharmacy needed that particular amount,
13 right?
14          MR. LAVELLE:  Object to
15     form.
16          THE WITNESS:  I would only
17     ask them if that order was
18     correct.
19 BY MR. POWERS:
20     Q.   Looking at the page in
21 Exhibit-2 that we've been looking at,
22 ending in Bates 16305, in the second full
23 paragraph there, it says, If the store
24 verifies the quantity is correct, the

Page 95

1 associate notifies them that we cannot
2 send more than 50 units.  This amount is
3 being based on a ███████ average
4 movement test of all controlled drugs.
5          Do you see that?
6     A.   Yes.
7     Q.   What is a ███████ average
8 movement test of controlled drugs?
9     A.   That was a test that was
10 conducted by the Government Affairs
11 Office that determined the movement of a
12 store's items.
13     Q.   Do you know who at the
14 Government Affairs Office was responsible
15 for that?
16     A.   The contact that I had would
17 be Janet Hart.
18     Q.   Before we move on from the
19 calls to the pharmacies, were those calls
20 to the pharmacies, when there was an
21 above-threshold order, were those
22 documented anywhere?
23     A.   Yes.  They were documented
24 in the excessive logbook.

Page 96

1     Q.   Anywhere else?
2     A.   No.
3     Q.   And moving further down, and
4 I guess it's the second -- another
5 paragraph there on the same page we've
6 been looking at in Exhibit-2, it says,
7 the last sentence, In both cases, the
8 associate will make note of the order in
9 the above average order monitoring log.
10          Do you see that?
11     A.   Yes.
12     Q.   Did anyone ever review that
13 above average order monitoring log?
14          MR. LAVELLE:  Object to
15     form.
16          THE WITNESS:  Yes.
17 BY MR. POWERS:
18     Q.   Who?
19     A.   Either myself or Marian.
20     Q.   When did you review it?
21     A.   The same day that it would
22 happen.
23     Q.   Did you ever go back and
24 look at it after you made the entries in

Page 97

1 it?
2     A.   On the day it would happen,
3 I would either look at it at that time,
4 because I would be the one to sign it,
5 myself or Marian, or by the end of the
6 day we would.
7     Q.   Do you know if anyone else
8 ever reviewed that log?
9          MR. LAVELLE:  Object to
10     form.
11          THE WITNESS:  Not that I can
12     think of specifically.
13 BY MR. POWERS:
14     Q.   Going to the next page in
15 Exhibit-2, which is Bates number ending
16 1306, at the top there, it says, With the
17 exceptions of.
18          Do you see that?
19     A.   Yes.
20     Q.   So are these the exceptions
21 to the 5,000-pill thresholds you were
22 talking about before?
23     A.   Yes.
24     Q.   And were all the exceptions

Page 98

1 noted on this document?
2 MR. LAVELLE: Object to
3 form.
4 THE WITNESS: Yes. Yes.
5 BY MR. POWERS:
6 Q. Did the exceptions change
7 over time?
8 A. They changed occasionally,
9 but not -- I don't know -- remember
10 specifically when.
11 Q. So different stores had
12 different exceptions at different times;
13 is that what you're saying?
14 A. Right. There was some
15 different stores, yes.
16 Q. Was this -- were these three
17 pages here in Exhibit-2, Bates 16305
18 through 16307, the extent of the written
19 policy on the above average order
20 monitoring program?
21 MR. LAVELLE: Object to
22 form.
23 THE WITNESS: Could you
24 repeat that? I'm sorry.

Page 99

1 BY MR. POWERS:
2 Q. Sure.
3 So these pages we've been
4 looking at in Exhibit-2, with Bates
5 numbers 16305 through 16307, does that --
6 do those three pages constitute the
7 entirety of the written policy regarding
8 controlled drug above average order
9 monitoring program?
10 A. This is the document that we
11 would use as a training guide for the
12 associates that worked in the cage.
13 Q. Any other training guides?
14 A. For?
15 Q. For the above average order
16 monitoring program?
17 A. Not that --
18 Q. So this would be --
19 A. -- I can think of.
20 Q. I'm sorry.
21 A. I'm sorry.
22 That I can think of for --
23 that we use for the cage for the
24 associates.

Page 100

1 Q. Was there any other training
2 besides this document we've talked about?
3 MR. LAVELLE: Object to
4 form.
5 THE WITNESS: Not that I can
6 recall right now.
7 BY MR. POWERS:
8 Q. I want to direct your
9 attention now to the page in Exhibit-2
10 Bates labeled 16311.
11 MR. LAVELLE: The witness
12 has it in front of her.
13 BY MR. POWERS:
14 Q. And this document is
15 entitled, Drug Diversion Training, right?
16 A. Yes.
17 Q. And it looks like this
18 policy is two pages long, from Page 16311
19 to 16312; is that right?
20 A. Yes.
21 Q. And it looks like this
22 document refers to theft, correct?
23 A. To the diversion of drugs,
24 yes.

Page 101

1 Q. Does drug diversion only
2 involve the theft of controlled
3 substances?
4 MR. LAVELLE: Object to
5 form.
6 THE WITNESS: I'm not sure
7 what you mean with that.
8 BY MR. POWERS:
9 Q. So we talked about the
10 definition of diversion before, right?
11 A. Okay. Uh-huh.
12 Q. Is the only form of
13 diversion theft of controlled substances?
14 MR. LAVELLE: Object to
15 form.
16 THE WITNESS: I mean, I'm
17 sorry, the way I look at
18 diversion, if it was -- if it was
19 a diversion and it was -- then
20 most likely it was theft or lost
21 in transit or something like that.
22 BY MR. POWERS:
23 Q. You say "most likely."
24 Does that mean there's other

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 ways a drug can be diverted?
2    A. Not in the sense of -- in my
3 opinion, in the sense of diversion, it
4 means that it's being used for other than
5 what it was supposed to be used for. So
6 I guess it would only be considered
7 theft.
8    Q. And in this document, it
9 asks that employees report diversion to a
10 supervisor, right?
11    A. Yes.
12    Q. Did you ever personally
13 report any theft to a supervisor, theft
14 of controlled substances to a supervisor?
15    A. No.
16    Q. Did you ever receive any
17 reports of theft of controlled
18 substances?
19    A. Are we specifically talking
20 about the cage, or --
21    Q. Generally speaking.
22    A. At some time, we did have
23 conversations from stores to say that
24 they did not receive their orders, and

Page 103

1 then it would be investigated.
2    Q. Then these policies we just
3 talked about in Exhibit-2, the above
4 average order monitoring and the drug
5 diversion training, they were attached to
6 an e-mail that you can see on the first
7 page of Exhibit-2 in 2007, right?
8    A. I'm sorry, would you repeat
9 that?
10    Q. So the two policies we were
11 just talking about, the above average
12 order monitoring program and the drug
13 diversion training, those two policies
14 were sent by you in 2007, according to
15 the cover e-mail, right?
16    A. Okay. Yes.
17    Q. And those two policies that
18 we just talked about, did those change
19 from 2007 to 2014?
20    A. Not that I can recall.
21    Q. Perhaps with the -- maybe
22 the store exceptions, particular store
23 exceptions, changing, right?
24    A. Yes.

Page 104

1    Q. But other than that, they
2 were almost identical, if not identical?
3    MR. LAVELLE: Object to
4 form.
5    THE WITNESS: Yes.
6    MR. POWERS: You can put
7 aside Exhibit-2.
8    MR. LAVELLE: Let's give
9 this to the court reporter.
10    - - -
11    (Whereupon, Exhibit
12 RiteAid-Chase Exhibit-3,
13 Rite_Aid_OMDL_0012503-505, was
14 marked for identification.)
15    - - -
16    MR. POWERS: I'm going to
17 hand you what's been marked as
18 Exhibit-3. It is another e-mail,
19 and the starting Bates number is
20 Rite_Aid_OMDL_0012503. And the
21 e-mail has an attachment which is
22 included in Exhibit-3.
23    THE WITNESS: Okay.
24 BY MR. POWERS:

Page 105

1    Q. So it looks like this is an
2 e-mail from Marian Wood to you, correct?
3    Do you see at the top there?
4    A. Correct.
5    Q. And it's a 2011 e-mail, and
6 it has an attachment there that's
7 entitled, Maximum
8 Pick.04.2011.revised.doc.
9    Do you see that?
10    A. Yes.
11    Q. And if you turn to the
12 second page of Exhibit-3, it's a page
13 that is entitled, Maximum Pick Allowance.
14    Do you see that?
15    A. Yes.
16    Q. So is this an example of
17 exceptions to the thresholds of
18 controlled substances?
19    A. Yes.
20    Q. And would this be posted as
21 a physical sign in the controlled
22 substance cage?
23    A. Yes.
24    Q. Besides the posting of a

Page 106

1 document like this in Exhibit-3, would
2 there be any other way to tell what
3 stores had exceptions?
4     A.   For -- I'm sorry, for the
5 pickers, or just in general?
6     Q.   We'll start with the
7 pickers, for the pickers.
8     A.   For the pickers, they would
9 know by us alerting them of this form,
10 and then we would post it where they
11 could see it when they're picking.
12     Q.   So the pickers could
13 physically see this form or this page
14 posted somewhere while they were doing
15 their picking?
16     A.   Yes.
17     Q.   How about besides the
18 pickers, was this available -- I say
19 "this," was this list of exceptions
20 available anywhere else besides the
21 physical posting in the control cage
22 area?
23     A.   It was only posted in the
24 cage.  And then myself and Marian had it

Page 107

1 in a hardcopy -- I'm sorry, in our
2 computers in our files.
3     Q.   When you say it was in the
4 computers, what do you mean by that?
5     A.   I'm sorry.  In the Rite Aid
6 computers that we used at work.
7     Q.   How did the pickers know,
8 when fulfilling an order, that the store
9 was one of the exception stores and so
10 they could fill it above the 5,000-pill
11 thresholds?
12     A.   They would have to stop and
13 look up the tote number in the computer,
14 and the tote number would tell them
15 what the store is.
16     Q.   Was there any automated way
17 that the pickers would know that this is
18 an exception store and they could fill it
19 above 5,000?
20     A.   No.
21     Q.   So what if a picker thought
22 that a store was on the exception list
23 and filled an order over 5,000, what
24 would happen then?

Page 108

1     A.   Well, they wouldn't, because
2 they would automatically stop and look it
3 up to begin with.
4     Q.   You say "they would
5 automatically stop and look it up."
6          What makes you say it was
7 automatic?  Was it an automated system
8 that did that, or was it just on the
9 pickers themselves to make sure they look
10 up at the picker list?
11          MR. LAVELLE:  Object to
12     form.
13          THE WITNESS:  The picker
14     would physically stop picking.
15 BY MR. POWERS:
16     Q.   But if a picker wanted to,
17 the picker could put in the tote more
18 than 5,000 if they, just for whatever
19 reason, didn't think to look up and make
20 sure that it was on the exception list?
21     A.   They could.
22     Q.   What safeguards were there,
23 if that happened, that that order would
24 not be shipped out?

Page 109

1     A.   Based on the training, all
2 the pickers knew that they were not
3 supposed to pick over that amount.  So
4 they knew, when something came up over
5 threshold, they would stop the pick and
6 then go look up the store to see what it
7 is.
8     Q.   But if the picker was
9 mistaken that the store was on the
10 threshold -- or, excuse me, on the
11 exceptions list for the thresholds, they
12 could conceivably pick more than the
13 threshold, correct?
14     A.   Correct.
15          And at that time, we had
16 another safeguard, because we had
17 verifiers that verified the totes as
18 well.
19     Q.   What do the verifiers do?
20     A.   Verify the information based
21 on the pick list that's printed out and
22 compare it physically to the tote.
23     Q.   Where did they fall in the
24 chain, in terms of did they verify after

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 the order was picked, before it was
2 shipped? Did they verify it after it was
3 shipped? How did they do that?
4 　　　　MR. LAVELLE: Object to
5 　　form.
6 　　　　THE WITNESS: They verified
7 　　it after the pick.
8 BY MR. POWERS:
9 　　Q.　How did the verifiers know
10 which stores had exceptions?
11 　　A.　They have that same posting.
12 　　Q.　The physical poster on the
13 wall like the one here in Exhibit-3?
14 　　A.　Correct.
15 　　Q.　How would they -- excuse me.
16 　　　　How would the verifiers
17 verify the orders? Was there an
18 electronic system? Was it a paper order
19 system? How did that work?
20 　　A.　Originally, when I first
21 started in the cage, it was a physical
22 check and they would physically check it
23 against the set pick list that I talked
24 about.

Page 111

1 　　　　At some point, which I can't
2 remember the exact date, we did have a
3 system installed where it was a computer
4 system where you scanned the item -- you
5 would scan the tote into the system so
6 the system knew exactly what store you
7 were dealing with, and then you would
8 scan the items. And it would let you
9 know what you had picked into that tote.
10 And at that time, they could catch
11 whether it was an overage or not.
12 　　Q.　And that electronic system,
13 did that reflect the 5,000-pill
14 thresholds?
15 　　A.　Not electronically. But at
16 that time, the store would -- the picker
17 would be able to see the store that
18 they're looking at and they would have,
19 like I said, this posting, near the
20 verifying table, so they could do a
21 double check as well.
22 　　Q.　So the verifier would just
23 have what the order was and it could be
24 an order that was above the threshold,

Page 112

1 right?
2 　　A.　Correct.
3 　　　　And at that time, they would
4 see that it's over and then they would
5 also stop and question it as well.
6 　　　　MR. LAVELLE: Are you
7 　　finished with Exhibit-3?
8 　　　　MR. POWERS: Yes, we're
9 　　finished with that exhibit.
10 　　　　-　-　-
11 　　　　(Whereupon, Exhibit
12 　　RiteAid-Chase Exhibit-4,
13 　　Rite_Aid_OMDL_0049994-50031, was
14 　　marked for identification.)
15 　　　　-　-　-
16 　　　　MR. POWERS: I'm going to
17 hand you what's been marked as
18 Exhibit-4. It's Bates number
19 Rite_Aid_OMDL_0049994.
20 　　　　And it's a somewhat lengthy
21 exhibit. I'm really just going to
22 ask you questions about the first
23 two pages.
24 　　　　THE WITNESS: Okay.

Page 113

1 BY MR. POWERS:
2 　　Q.　So the first two pages,
3 which are Bates numbered ending in 9994
4 and 9995, have you ever seen those two
5 pages before?
6 　　A.　Yes, I have.
7 　　Q.　What do they reflect?
8 　　A.　They have the -- a list of
9 the procedures, the titles of the
10 procedures, and the dates that I signed
11 of updates for those.
12 　　Q.　And it looks like, in the
13 column in the left there, it's the same
14 procedures we were talking about, the
15 above average monitoring and drug
16 diversion, right?
17 　　　　Do you see that?
18 　　A.　Yes.
19 　　Q.　And it looks like you
20 first -- let me back up.
21 　　　　What is the date there --
22 what does the date column there reflect?
23 　　A.　The dates that I signed the
24 signature sheet for the procedure.

Page 114

1    Q.   So you signed a signature
2  sheet for the above average monitoring
3  for the first time in 2001, it looks
4  like?
5    A.   I don't think it was the
6  very first time.  But -- because I see
7  one from 6/27.  But on this document, it
8  shows for 2001, yes.
9    Q.   And then for the row below
10 that, drug diversion, the date there is
11 June 1st, 2001.
12       Do you see that?
13   A.   Yes.
14   Q.   So you verified that you
15 signed the procedure on drug diversion in
16 2001?
17   A.   Yes.
18   Q.   Then if you see in those two
19 rows going across on the first page of, I
20 believe this is Exhibit-4, it looks like
21 there are additional dates.
22       What do those additional
23 dates signify?
24   A.   Those would be dates that I

Page 115

1  re-signed that procedure.
2    Q.   Why did you re-sign the
3  procedure?
4    A.   At this time, I couldn't
5  tell you specifically why.  It could have
6  been a change to the procedure, or it
7  could have just been an annual update.
8        MR. POWERS:  We're done with
9        that one.
10            - - -
11       (Whereupon, Exhibit
12       RiteAid-Chase Exhibit-5,
13       Rite_Aid_OMDL_0016955-956, was
14       marked for identification.)
15            - - -
16       MR. POWERS:  I'm going to
17       hand you what's been marked as
18       Exhibit-5, which is Bates numbered
19       Rite_Aid_OMDL_0016955.
20 BY MR. POWERS:
21   Q.   So on the first page of
22 Exhibit-5, it looks like this is -- the
23 top e-mail is an e-mail to you from Kim
24 Brown, right?

Page 116

1    A.   Correct.
2    Q.   Who is Kim Brown?
3    A.   At the time, Kim Brown would
4  have been the Rx department manager.
5    Q.   And she's forwarding a
6  message; you can see on the bottom of
7  Page 1 of Exhibit-5 that it looks like
8  it's an e-mail from Kevin Mitchell,
9  right?
10   A.   Correct.
11   Q.   And who was Kevin Mitchell?
12   A.   Kevin Mitchell was an
13 associate from -- well, he was a Rite Aid
14 employee, and he was corporate.  And we
15 reported to him -- as a DEA coordinator,
16 we reported to him.
17   Q.   When you say "we," who do
18 you mean?
19   A.   Sorry, all the DEA
20 coordinators for the different
21 distribution centers.
22   Q.   And it looks like Kevin
23 Mitchell is asking for some information
24 and Kimberly Brown is asking you to

Page 117

1  collect it.
2        Is that a fair
3  representation of what's happening here?
4        MR. LAVELLE:  Object to
5        form.
6        THE WITNESS:  Yes.
7  BY MR. POWERS:
8    Q.   Do you recall completing
9  that task that Debra -- excuse me, that
10 Kimberly Brown gave to you?
11   A.   I can't recall specifically.
12 But looking at what he's asking for, we
13 always had it in the cage.
14   Q.   I want to go through what
15 Kevin was asking for here.
16       So going to the first line
17 of Kevin Mitchell's e-mail, it says,
18 First of all, I want to ensure that you
19 have in place an excessive order
20 monitoring process for your respective
21 DC.
22       Do you see that?
23   A.   Yes.
24   Q.   And Kevin Mitchell sends

Page 118

1 this e-mail in 2008, right?
2     A.   Yes.
3     Q.   And the previous exhibit,
4 Exhibit-4, you had been certifying that
5 you looked at excessive order monitoring
6 since 2001, right?
7     A.   Yes.
8     Q.   How come Kevin doesn't know
9 that this is already in place?
10         MR. LAVELLE:  Object to
11     form.
12         THE WITNESS:  I don't know.
13 BY MR. POWERS:
14     Q.   He was the director of
15 regulatory compliance, right?
16         Kevin was the director of
17 regulatory compliance, right?
18     A.   Correct.
19     Q.   Shouldn't he have known
20 about the already-in-place order
21 monitoring, excessive order monitoring,
22 above average order monitoring, whatever
23 you want to call it?
24         MR. LAVELLE:  Object to

Page 119

1     form.
2         THE WITNESS:  Yes.
3 BY MR. POWERS:
4     Q.   Does Kevin Mitchell not know
5 what he's talking about here?
6         MR. LAVELLE:  Object to
7     form.
8         THE WITNESS:  The way I read
9     this, I don't read it as if he's
10     saying he don't know that we have
11     it.  It's that he wants to make
12     sure that we have it.
13 BY MR. POWERS:
14     Q.   Were there any distribution
15 centers that did not have this above
16 average or excessive order monitoring
17 procedures?
18     A.   I can't speak for all the
19 other DCs, but we all pretty much always
20 followed the same procedures.
21     Q.   Going down to the third
22 paragraph that starts, Please identify
23 any and all stores that have attempted to
24 order in excess of these quantities.  I

Page 120

1 need the store number, the item number
2 and description and date of order.  We
3 are going to run reports for those stores
4 on those items in question to check for,
5 quote, need.
6         Do you see that?
7     A.   Yes.
8     Q.   How would you find out
9 information about stores ordering in
10 excess of the quantities?
11     A.   I would have gotten that
12 information off of the excessive order
13 log.
14     Q.   Would Kevin Mitchell have
15 had access to that excessive order log
16 himself?
17         MR. LAVELLE:  Object to
18     form.
19         THE WITNESS:  No.
20 BY MR. POWERS:
21     Q.   So he would need to rely on
22 each individual distribution center to
23 tell him which orders were coming in
24 above the thresholds?

Page 121

1     A.   Yes.
2     Q.   Besides asking each
3 individual distribution center, Kevin
4 Mitchell could not find that information
5 on his own?
6         MR. LAVELLE:  Object to
7     form.
8 BY MR. POWERS:
9     Q.   About which orders were
10 above the thresholds?
11         MR. LAVELLE:  Same
12     objection.
13         THE WITNESS:  Repeat the
14     question for me, please.  I'm
15     sorry.
16 BY MR. POWERS:
17     Q.   Sure.
18         So in order for Kevin
19 Mitchell to figure out which orders were
20 coming in over threshold, he would need
21 to directly contact each distribution
22 center himself to get the distribution
23 center to tell him, correct?
24         MR. LAVELLE:  Object to

Page 122

1 form.
2          THE WITNESS: He could get
3 the information from us. I'm not
4 quite sure if it's something he
5 could have gone to the corporate
6 office and had their IT pull that
7 information.
8 BY MR. POWERS:
9     Q.   But in your personal
10 knowledge, Kevin Mitchell would have to
11 come -- would come to you and the
12 distribution centers to figure out this
13 sort of information about which orders
14 were above the threshold?
15          MR. LAVELLE: Object to
16 form.
17          THE WITNESS: Yes.
18 BY MR. POWERS:
19     Q.   And in that same paragraph I
20 just read, the last sentence reads, We
21 are going to run reports for those stores
22 on those items in question to check for,
23 quote, need.
24          Do you know if those reports

Page 123

1 referred to in that sentence were ever
2 run?
3     A.   No, I don't, because that
4 probably would have been something that
5 he ran from the corporate office.
6     Q.   Do you know what Kevin
7 Mitchell means there when he says "need"
8 in quotes?
9          MR. LAVELLE: Object to
10 form.
11          THE WITNESS: No, not
12 specifically. But -- no.
13 BY MR. POWERS:
14     Q.   And besides in the excessive
15 order log, would the information
16 requested by Kevin Mitchell in this
17 paragraph be reflected anywhere else?
18     A.   Say that again. I'm sorry.
19     Q.   Besides being in the
20 excessive order monitoring log, would the
21 information asked for by Kevin Mitchell
22 here in this paragraph in Exhibit-5
23 starting with, Please identify, would
24 that information be anywhere else?

Page 124

1     A.   In the form that he's asking
2 for, we would have had it in the cage,
3 the excessive order log. But he could
4 have possibly went to systems and asked
5 them to pull the store's orders, and then
6 he could see what they ordered.
7     Q.   But that was not information
8 that was kept in the regular course of
9 business, besides being put into the
10 excessive order monitoring log?
11          MR. LAVELLE: Object to
12 form.
13          THE WITNESS: Correct.
14 BY MR. POWERS:
15     Q.   Moving on to the next
16 paragraph, it reads: Also, some of you
17 have stores that have been given
18 exceptions for certain items. Please
19 provide the store number and item numbers
20 as well. We want to reevaluate the need.
21          Do you see that?
22     A.   Yes.
23     Q.   Who gave the exceptions
24 referred to in there -- referred to in

Page 125

1 this paragraph?
2     A.   From reading this, I take it
3 that they're talking about the exceptions
4 that we had listed on those sheets that
5 we talked about previously, and that
6 would have been through Janet Hart's
7 office.
8     Q.   So we're talking about
9 threshold exceptions here?
10     A.   Exactly.
11     Q.   This list of threshold
12 exceptions, was that only kept at the DC?
13          MR. LAVELLE: Object to
14 form.
15          THE WITNESS: Yes.
16 BY MR. POWERS:
17     Q.   So to the best of your
18 knowledge, Kevin Mitchell did not have a
19 separate list of the exceptions?
20     A.   I could not speak for what
21 he actually kept. Janet Hart would have
22 it as well, because she would be the one
23 we got the information from.
24     Q.   Did you know what the

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 exceptions were at other DCs, threshold
2 exceptions were at the other distribution
3 centers?
4 A. Not specifically right now,
5 but I -- I'm thinking that we all had the
6 same threshold.
7 Q. All had the same threshold
8 or threshold exceptions?
9 A. Threshold exceptions, sorry.
10 Q. And the next paragraph down,
11 it says, We will be reevaluating our
12 current thresholds. Once we run the
13 reports and review, we will send to your
14 DC printer for you to file with your
15 controlled drug paperwork.
16 Do you see that?
17 A. Yes.
18 Q. Do you know if the
19 thresholds were ever reevaluated?
20 A. At the -- yes, they were.
21 Q. When were they reevaluated?
22 A. To my recollection -- I
23 don't remember the exact dates, but they
24 were looked at again right before I

Page 127

1 started in the position as the
2 coordinator.
3 And they were pretty much
4 always the same at the time that I was
5 there.
6 Q. When was the time when you
7 started as coordinator?
8 A. Approximately in 2002,
9 something like that.
10 Q. Did the thresholds ever
11 change from the 5,000-pill count?
12 A. Not at the time that I was
13 there, no.
14 Q. So the threshold may have
15 been reevaluated, but the actual
16 5,000-pill threshold didn't ever change?
17 That number never changed?
18 A. Correct.
19 Q. And the reports and review
20 that it refers to in this last paragraph,
21 did you ever see those?
22 A. No.
23 Q. So it was never sent to the
24 DC printer?

Page 128

1 A. I don't recall what they
2 would have been.
3 Q. When he says "the DC
4 printer," what does that mean?
5 A. The only DC printer that I
6 can think of would be through the
7 computer room.
8 Q. But you never saw any report
9 about reevaluating thresholds or anything
10 like that come through the distribution
11 center?
12 MR. LAVELLE: Object to
13 form.
14 THE WITNESS: Not that I can
15 recall.
16 BY MR. POWERS:
17 Q. And from the top e-mail, it
18 looks like something that these -- these
19 categories of information that were
20 talking about that Kevin is looking for,
21 did you ever put those together, as
22 Kimberly Brown asked you to?
23 A. I can't remember
24 specifically. I can say that I most

Page 129

1 likely did.
2 Q. Okay.
3 MR. LAVELLE: Finished with
4 5?
5 MR. POWERS: Yes, we're
6 done.
7 - - -
8 (Whereupon, Exhibit
9 RiteAid-Chase Exhibit-6,
10 Rite_Aid_OMDL_0003641, was marked
11 for identification.)
12 - - -
13 MR. POWERS: I'm going to
14 hand you what's been marked as
15 Exhibit-6. This is Bates number
16 Rite_Aid_OMDL_0003641.
17 THE WITNESS: Okay.
18 BY MR. POWERS:
19 Q. Have you ever seen this
20 document before in Exhibit-6?
21 A. Yes.
22 Q. When was the last time you
23 saw this document?
24 A. I recall seeing a copy of it

Page 130

1  recently, within the last week.
2      I'm sorry, maybe not this
3  specific one, but one similar to.
4      Q.   A document similar to this?
5      A.   Yes.
6      Q.   And what is this document in
7  Exhibit-6?
8      A.   The controlled drug
9  adjustment record.
10     Q.   What does it reflect?
11     A.   It reflects any type of
12  adjustments that was done to an item
13  systematically.
14     Q.   Is this different than the
15  excessive order monitoring log?
16     A.   Yes.
17     Q.   What is the difference?
18     A.   This would be any type of
19  adjustment that was done to that item
20  within the system, as to whether it was
21  recording a loss to it or an overage or,
22  really, pretty much anything that would
23  have affected the inventory for that
24  item.

Page 131

1      Q.   So it reflects more than
2  just orders that were excessive orders,
3  it reflects any sort of adjustment to the
4  orders that were shipped?
5      A.   Correct.
6      Q.   How often were these --
7  well, let's back up a second.
8      Is it all right if we call
9  Exhibit-6 a controlled drug adjustment
10  record?
11     A.   Yes.
12     Q.   How often were the
13  controlled drug adjustment records
14  generated?
15         MR. LAVELLE:  Object to
16  form.
17         THE WITNESS:  Could you
18  repeat that for me, please?
19  BY MR. POWERS:
20     Q.   Sure.
21     How often were these
22  controlled drug adjustment records
23  generated?
24     A.   Any time any type of

Page 132

1  adjustment was done to an item.
2      Q.   Was it done in realtime or
3  was it done weekly or monthly?
4         MR. LAVELLE:  Object to
5  form.
6         THE WITNESS:  Pretty much
7  the same day anything would happen
8  to it; or, shall I say, any time
9  anything was adjusted, it was
10  recorded.
11  BY MR. POWERS:
12     Q.   So in the left-hand column
13  there, it has a bunch of different dates.
14     Those were the dates that
15  the particular row was added to the
16  controlled drug adjustment record; is
17  that what that means?
18     A.   That would be the date that
19  whatever adjustment was done to the item,
20  yes.
21     Q.   But it looks like those
22  dates only span from December 17th, 2012
23  to December 21st, 2012, right?
24     A.   Yes.

Page 133

1      Q.   How come there is only that
2  date range on this particular sheet?
3      A.   This sheet was done -- this
4  particular sheet was done weekly.
5      Q.   Okay.  So these -- these
6  reports, the controlled drug adjustment
7  records, would be completed weekly with
8  all the orders that were adjusted for
9  that week; is that right?
10     A.   Yes.  This was a weekly
11  report.
12     Q.   So for the next week, there
13  would be a similar controlled drug
14  adjustment record reflecting the same
15  information?
16     A.   For that week ending, yes.
17     Q.   So you would have a whole
18  collection of these controlled drug
19  adjustment records for every single week
20  at the distribution center, right?
21     A.   Correct.
22     Q.   Where were these controlled
23  drug adjustment records kept?
24     A.   They were kept in a logbook

Page 134

1 that was in the DEA coordinator's office.
2     Q.   Were they kept in electronic
3 format anywhere?
4     A.   Yes.  We have the file --
5 had a file within the Rite Aid computers.
6     Q.   So when you added things --
7 let me back up.
8         Were you one of the people
9 who added entries on this controlled drug
10 adjustment record in Exhibit-6?
11     A.   Yes.
12     Q.   Who else would add things to
13 these controlled drug adjustment records?
14     A.   Marian Wood.
15     Q.   Anyone else?
16     A.   No.
17     Q.   Would you add the entries on
18 Exhibit-6 electronically or in hardcopy?
19     A.   It would start off as a
20 hardcopy, written.  And then we would go
21 back in and update it electronically and
22 print it out.
23         So it would be what you're
24 looking at right now.

Page 135

1     Q.   So you had a hardcopy sheet,
2 you would write in on the sheet with the
3 information, then the information would
4 get typed in the -- that same information
5 would be transposed to the computer
6 electronically, and then the electronic
7 copy is the one that is then printed out
8 and we see in Exhibit-6; is that right?
9         MR. LAVELLE:  Object to
10 form.
11         THE WITNESS:  Yes.
12 BY MR. POWERS:
13     Q.   How come you didn't just
14 enter it into the computer in the first
15 instance?
16     A.   Depending on timing, what we
17 were doing throughout that day.  If
18 something was going on and we made an
19 adjustment, so we would write it down so
20 we could have that information written
21 down properly.
22         And then we would -- time,
23 we would go back and create the
24 hardcopy -- the computer-generated copy.

Page 136

1     Q.   And I'll direct your
2 attention to the second row on Exhibit-6,
3 the one for the date -- the first order
4 for the date of 12/20/2012.
5         Do you see the row I'm
6 talking about?
7     A.   Yes.
8     Q.   What does the item number
9 column reflect?
10     A.   The item number that's
11 assigned to that drug.
12     Q.   And how about the next
13 column over to the right, with the
14 heading of QTY, what does that reflect?
15     A.   That is the quantity that
16 was adjusted back into the inventory.
17     Q.   So the numbers in the
18 quantity column reflect what went back
19 into the inventory, as opposed to shipped
20 to the store; is that right?
21     A.   Correct.
22         It would reflect any type of
23 adjustment, whether it would have been an
24 addition or subtraction.  And in this

Page 137

1 instance, it's an addition.
2     Q.   So in this particular line
3 we're talking about, the plus 29 reflects
4 that 29 units were placed back into
5 inventory; is that right?
6     A.   Correct.
7     Q.   How about the next column
8 over, ADJ code?
9         What does that reflect?
10     A.   That is -- that is an
11 adjustment code.  And each action was
12 assigned an adjustment code.  And this
13 one reflected that it was based on an
14 excessive order.
15     Q.   Who assigned the adjustment
16 codes?
17     A.   Those were already in place
18 when I started working there, and I can
19 only assume it was a corporate issue.
20     Q.   But do you know if those
21 are -- adjustment codes are used
22 internally at Rite Aid, or are those DEA
23 adjustment codes?
24     A.   They would be Rite Aid

Page 138

1 codes.
2    Q.   So this looks like there's a
3 code of 087.
4       What does that represent?
5    A.   That code is representing
6 that we put items back into the system
7 based on an excessive order.
8    Q.   How about on the bottom row
9 there, 099, what does that mean?
10    A.   099, that is a receiving
11 code, receiving error code.
12    Q.   Are there any other codes
13 besides 087 and 099?
14    A.   There are.  I just can't
15 remember what they are specifically right
16 now.
17    Q.   Are you familiar with code
18 080?
19    A.   It sounds familiar.  I just
20 don't remember what it is right now.
21    Q.   How about code 007?
22    A.   Yes.
23    Q.   What does that one mean?
24    A.   007 was considered a

Page 139

1 miscellaneous code.
2    Q.   So going back to the row we
3 were talking about, the second row on
4 Exhibit-6, the description column says,
5 C3A hydro/APAP10/325MG100STAB.
6       Do you see that?
7    A.   Yes.
8    Q.   What does the description
9 code -- what does the description column
10 represent?
11    A.   The title of the drug.
12    Q.   And so what does this drug
13 in the second row reflect?
14    A.   Hydrocodone APAP.
15    Q.   Moving over to NDC number
16 column, what is that?
17    A.   That would be the NDC code
18 that's assigned to the drugs.
19    Q.   What does NDC stand for?
20    A.   I can't remember right off.
21 I believe it was the National -- I don't
22 remember exactly.
23    Q.   Is it National Drug Code?
24    A.   National Drug Code, yes.

Page 140

1    Q.   And then looking over to the
2 final column, reason, what is that column
3 supposed to reflect?
4    A.   That code would be a
5 description of why that item was added
6 back into the system.
7    Q.   So for the line -- the row
8 we've been looking at, it says,
9 EXE.ord.store 4239, pills, 79, sent 50,
10 credit 29.
11       Do you see that?
12    A.   Yes.
13    Q.   Does that mean -- do the
14 first three words there mean exceed order
15 of the store, or something along those
16 lines?
17    A.   Excessive order.
18    Q.   Excessive order, okay.
19       So that would be an order
20 that was above the 5,000-pill threshold,
21 right?
22    A.   Yes.
23    Q.   And the rest of the reason
24 there, does that reflect that the order

Page 141

1 was cut from 79 to 50?
2    A.   Yes.
3    Q.   And that means, then, Rite
4 Aid had to credit 29 units because those
5 were not actually being shipped, right?
6    A.   Correct.
7    Q.   And that's the same thing in
8 the other two rows here for hydrocodone
9 products where the orders were on 12/21,
10 right?
11    A.   Yes.
12    Q.   The reason column there,
13 does that reflect all of the information
14 that would have been on the handwritten
15 version of this controlled drug
16 adjustment record?
17    A.   Yes.  That would have --
18 that would have went into the reason code
19 on the excessive logbook.
20    Q.   So there would be no other
21 information that was contained on the
22 handwritten version of this controlled
23 drug adjustment record, other than what's
24 on Exhibit-6, the printout?

Page 142

1    A.   Say that again. I'm sorry.
2    Q.   So you said before that
3 there was a handwritten version of the
4 drug adjustment records that was
5 transcribed into the computer, correct?
6    A.   Correct.
7    Q.   Did the handwritten version
8 contain more information than was input
9 into the computer?
10    A.   No.
11    Q.   Does this drug adjustment
12 record in Exhibit-6 reflect any
13 information about whether the pharmacy
14 was contacted about the order above
15 threshold?
16    A.   That wouldn't have been on
17 here. That would have been logged into
18 the excessive logbook.
19    Q.   So any calls to pharmacies
20 would not have been logged on these drug
21 adjustment records like the one in
22 Exhibit-6?
23    A.   Not on here, no.
24    Q.   With these orders that were

Page 143

1 cut because they exceeded the thresholds,
2 do you know if the individual stores
3 could order directly from McKesson for
4 those -- for those particular products?
5    A.   It is my understanding that
6 the stores could order from McKesson.
7 Specifically, I could not answer that.
8    Q.   Did the distribution center
9 have any way to figure out if an
10 individual store was ordering from
11 McKesson in addition to the shipments
12 from the distribution center?
13    A.   Not that I know of.
14    Q.   Was there any way to track
15 stores that consistently ordered above
16 threshold?
17        MR. LAVELLE: Object to the
18    form of the question.
19        THE WITNESS: We could -- we
20    used our excessive logbook to look
21    and see if, you know, stores
22    consistently --
23 BY MR. POWERS:
24    Q.   But that was not something

Page 144

1 you tracked on any sort of regular basis,
2 was it?
3    A.   No.
4    Q.   So besides going back and
5 physically looking at the excessive order
6 logbook, you would have no way of knowing
7 which stores consistently ordered over
8 threshold?
9    A.   No, I wouldn't have known.
10    Q.   Did you know that in 2013
11 Rite Aid was developing a suspicious
12 order monitoring program?
13    A.   It sounds familiar, but I'm
14 not directly remembering it specifically.
15    Q.   Did you have any involvement
16 in that development?
17    A.   No.
18    Q.   How did you hear about it?
19    A.   It may have been something
20 that was mentioned to me by Marian Wood
21 or maybe Keith -- I'm sorry, Kevin
22 Mitchell.
23        But once again, I don't
24 remember specifically.

Page 145

1    Q.   You never gave any input on
2 how a suspicious order monitoring system
3 should be put in place at Rite Aid?
4    A.   No.
5    Q.   Did you have a suspicious
6 order monitoring program at Rite Aid?
7        MR. LAVELLE: Object to
8    form.
9        THE WITNESS: I'm aware that
10    we had a procedure for suspicious
11    monitoring.
12 BY MR. POWERS:
13    Q.   What was that procedure?
14    A.   Basically, from my
15 recollection, it was if we saw any
16 suspicious orders, then we were to report
17 it to a manager or -- and they would
18 report it -- and, in turn, it would be
19 reported to the DEA.
20    Q.   Was that a written policy?
21    A.   I do recall us having a
22 policy for that.
23    Q.   At all times you worked at
24 Rite Aid?

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A.   I'm sorry?

2    Q.   At all times you worked at

3  Rite Aid?

4    A.   Yes.

5    Q.   You had a written policy

6  that you were supposed to report

7  suspicious orders?

8    A.   Yes.

9    Q.   Did you ever report any

10 suspicious orders yourself?

11   A.   No.

12   Q.   Do you know of anyone who

13 ever reported any suspicious orders?

14   A.   No.

15   Q.   Where would that suspicious

16 order monitoring policy be?

17       Where could I find a copy of

18 it?

19   A.   I believe it is in the DEA

20 regulation book.  I can't remember

21 specifically right now.

22   Q.   Do you know if Rite Aid ever

23 investigated any orders as potentially

24 suspicious during the time that you

Page 147

1  worked at Rite Aid?

2        MR. LAVELLE:  Object to

3    form.

4        THE WITNESS:  No.

5  BY MR. POWERS:

6    Q.   No, you don't know; or, no,

7  they never investigated any orders as

8  potentially suspicious?

9        MR. LAVELLE:  Object to

10   form.

11       THE WITNESS:  None that I'm

12   aware of.

13 BY MR. POWERS:

14   Q.   So you're not aware of any

15 time Rite Aid investigated any order that

16 was potentially suspicious; is that

17 right?

18       MR. LAVELLE:  Object to

19   form.

20       THE WITNESS:  Repeat your

21   question, please.

22 BY MR. POWERS:

23   Q.   You're not aware of any

24 times that Rite Aid investigated

Page 148

1  potentially suspicious orders, right?

2        MR. LAVELLE:  Object to

3    form.

4        THE WITNESS:  No.

5        MR. LAVELLE:  Counsel, it's

6    about five minutes after 1:00.

7        MR. POWERS:  Yes.  I think I

8  may be done, so do you want to

9  take a quick ten-minute break and

10 we may be done for the day.

11       MR. LAVELLE:  That's fine.

12       VIDEO TECHNICIAN:  The time

13 is 1:04 p.m.  We are going off the

14 record.

15         - - -

16       (Whereupon, a brief recess

17 was taken.)

18         - - -

19       VIDEO TECHNICIAN:  The time

20 is 1:17 p.m.  We are back on the

21 record.

22 BY MR. POWERS:

23   Q.   Welcome back, Ms. Chase.

24       I just have a couple of

Page 149

1  follow-up questions, and then I think

2  I'll be done.

3         - - -

4       (Whereupon, Exhibit

5    RiteAid-Chase Exhibit-7,

6    Rite_Aid_OMDL_0014379-452, was

7    marked for identification.)

8         - - -

9       MR. POWERS:  I'm going to

10 hand you what's been marked as

11 Exhibit-7, which is a document

12 with Rite Aid Bates number

13 Rite_Aid_OMDL_0014379.  And, once

14 again, it's another document that

15 has a lot of pages in it.

16 BY MR. POWERS:

17   Q.   I'm going to direct your

18 attention only to one particular page,

19 and that page is the Bates ending in

20 14404.

21       MR. LAVELLE:  The witness

22   has it in front of her.

23 BY MR. POWERS:

24   Q.   Before the break, we were

Page 150

1 talking about a suspicious order
2 monitoring program.
3        Is this page reflected at
4 Bates number 14407 -- 14404 of Exhibit-7
5 the suspicious order monitoring program
6 you were referring to?
7     A.   This is for -- this is for
8 the excessive order monitoring, yes.
9     Q.   So is there a different
10 program you're referring to when you
11 say -- when you were talking about the
12 suspicious order monitoring program?
13     A.   I just recall that this was
14 in here, and it mentioned about
15 suspicious orders.
16     Q.   So is there a different
17 program you were referring to when you
18 referred to a suspicious order monitoring
19 program before?
20        MR. LAVELLE:  Object to the
21     form of the question.
22        THE WITNESS:  No, not at the
23     time.  I was thinking of this.
24 BY MR. POWERS:

Page 151

1     Q.   When you say "this," you
2 mean the page --
3     A.   This form we're looking at.
4     Q.   -- the page in Exhibit-7
5 with the Bates number ending in 14404?
6        MR. LAVELLE:  You need to
7     wait until he's finished asking
8     the question before you answer,
9     otherwise the record is not clear.
10     Can we have the question
11     read back?
12        MR. POWERS:  I can just
13     rephrase it.
14        MR. LAVELLE:  Okay.  Thanks.
15 BY MR. POWERS:
16     Q.   You said you were thinking
17 of this.
18        And I asked, When you say
19 "this," were you referring to the page in
20 Exhibit-7 with the Bates number ending in
21 14404?
22        MR. LAVELLE:  Object to
23     form.
24        THE WITNESS:  Yes.

Page 152

1 BY MR. POWERS:
2     Q.   And on Page 14404 of
3 Exhibit-7, in the paragraph next to
4 Number 3, it says, A review is performed
5 to determine the legitimacy of the order.
6 Appropriate documentation of the review
7 is maintained on file.
8        Were you ever aware of any
9 reviews like the one referred to here
10 being conducted?
11        MR. LAVELLE:  Object to
12     form.
13        THE WITNESS:  Looking at
14     this, in my opinion, the review
15     would be us looking at the order
16     and calling the store to
17     determine --
18 BY MR. POWERS:
19     Q.   Anything else besides -- I'm
20 sorry.  I'm sorry, I jumped in there.
21 You can finish your answer.
22     A.   And to determine if that
23 is -- I'm sorry, specifically what they
24 were supposed to get or what they were to

Page 153

1 get.
2     Q.   So besides calling the
3 store, was anything else done in the
4 review?
5     A.   Not that I can recall right
6 now.
7     Q.   Besides -- let me back up.
8        Did you get a written copy
9 of this suspicious order monitoring
10 guideline reflected in Exhibit-7?
11     A.   It was in the regulatory
12 guideline book that we had in the office.
13     Q.   And that was a hardcopy
14 book?
15     A.   Yes.
16     Q.   Besides the hardcopy book
17 you had in the office, did you ever get
18 any specific training on this particular
19 procedure about excessive order
20 monitoring?
21     A.   Yes.  It was part of the
22 packet that we looked at earlier when it
23 talked about excessive order monitoring.
24     Q.   Besides that other packet we

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 talked about earlier, any other training
2 on how to recognize excessive orders or
3 suspicious orders?
4     A.    Not that I can recall.
5     Q.    You testified in the
6 beginning, when we were talking about
7 your job responsibilities -- sorry, we're
8 done with Exhibit-7.
9          You talked about earlier,
10 when we were talking about your job
11 responsibilities at Rite Aid, that you
12 went from the DEA coordinator in 2007
13 back to being a DEA clerk.
14          Why did that happen?
15     A.    At the time, I was asked to
16 step down from the DEA coordinator
17 position.
18     Q.    Why were you asked to step
19 down from the DEA coordinator position?
20     A.    Because of my lateness to
21 work in the mornings.
22     Q.    Did it have anything to do
23 with your job performance?
24     A.    Nothing at all --

Page 155

1     Q.    Besides the lateness?
2     A.    -- except for -- yeah, at
3 the time, Kim Brown felt that by me
4 punching in late in the morning that she
5 felt that I didn't need to be in that
6 position.
7          MR. POWERS:  That's all I
8 have.
9          MR. LAVELLE:  Any other
10 questions?
11          We have no questions for the
12 witness.  The witness reserves the
13 right to read and sign.
14          VIDEO TECHNICIAN:  The time
15 is 1:23 p.m., January 4th, 2019.
16 Going off the record, completing
17 the videotape deposition.
18              - - -
19          (Whereupon, the deposition
20 concluded at 1:23 p.m.)
21              - - -
22
23
24

Page 156

1          CERTIFICATE
2
3
4          I HEREBY CERTIFY that the
5 witness was duly sworn by me and that the
6 deposition is a true record of the
7 testimony given by the witness.
8
9
10
          Amanda Maslynsky-Miller
11          Certified Realtime Reporter
          Dated:  January 7, 2019
12
13
14
15
16
17          (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Page 157

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4 over carefully and make any necessary
5 corrections.  You should state the reason
6 in the appropriate space on the errata
7 sheet for any corrections that are made.
8          After doing so, please sign
9 the errata sheet and date it.
10          You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14          It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 158

E R R A T A

- - - - - -

PAGE  LINE  CHANGE/REASON

1
2
3
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____

Page 160

LAWYER'S NOTES

PAGE  LINE

1
2
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____

Page 159

ACKNOWLEDGMENT OF DEPONENT

I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 155, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
DEBRA CHASE            DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public