```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL         :   MDL No. 2804

     PRESCRIPTION OPIATE      :

 4   LITIGATION               :   Case No. 17-md-2804

                              :

 5   APPLIES TO ALL CASES     :   Hon. Dan A. Polster

                              :

 6                            :

 7

 8                   HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                       - - - -

12                   JANUARY 16, 2019

13                       - - - -

14       VIDEOTAPED DEPOSITION OF GEORGE CHUNDERLIK,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on

20   Wednesday, January 16, 2019, commencing at 9:04 a.m.

21                       - - - -

22               GOLKOW LITIGATION SERVICES

             877.370.3377 phone | 917.591.5672 fax

23                    deps@golkow.com

24

25
```

| | |
|---|---|
| **Page 2** | **Page 4** |

**Page 2**

```
 1          A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3      WAGSTAFF & CARTMELL, LLP
        BY:  THOMAS ROTTINGHAUS, ESQUIRE
 4      AND  TYLER HUDSON, ESQUIRE
        4740 Grand Avenue, Suite 300
 5      Kansas City, Missouri  64112
        816.701.1100
 6      trottinghaus@wcllp.com
        thudson@wcllp.com
 7
 8  On behalf of Defendant AmerisourceBergen Drug
    Corporation
 9
        (By Phone/Livestream)
10      REED SMITH LLC
        BY:  BRIAN HIMMEL, ESQUIRE
11      Reed Smith Centre
        225 Fifth Avenue
12      Pittsburgh, Pennsylvania 15222
        412.288.3131
13      bhimmel@reedsmith.com
14
15  On behalf of Defendant Cardinal Health, Inc.
16      PIETRAGALLO GORDON ALFANO BOSICK &
        RASPANTI, LLP
17      BY:  JENNIFER BOURIAT, ESQUIRE
        One Oxford Centre, 38th Floor
18      301 Grant Street
        Pittsburgh, Pennsylvania  15219
19      412.263.2000
20      jhb@pietragallo.com
21  On behalf of Defendants Endo Pharmaceuticals, Endo
    Health Solutions and Par Pharmaceuticals
22      (By phone/Livestream)
        ARNOLD & PORTER KAYE SCHOLER LLP
23      BY:  SEAN MCCORMICK, ESQUIRE
        601 Massachusetts Avenue, NW
24      Washington, DC  20001-37453
        202.942.5743
25      sean.mccormick@arnoldporter.com
```

**Page 4**

```
 1              * I N D E X *
 2  GEORGE CHUNDERLIK              PAGE
 3    EXAMINATION BY MR. ROTTINGHAUS        8
      EXAMINATION BY MR. HUDSON    163, 284, 305
 4    EXAMINATION BY MR. KOBRIN      254, 301
 5    * INDEX OF HBC-CHUNDERLIK EXHIBITS *
 6  NO.        DESCRIPTION        PAGE
    Exhibit 1   George Chunderlik LinkedIn profile   11
 7
    Exhibit 2   Giant Eagle Retail Operations -    18
 8              Pharmacy Operations 11/13/14
                org chart
 9              HBC_MDL00002216
10  Exhibit 3   CFR Part 1301.74 from DEA website   85
                P1.47 - P1.47.2
11
    Exhibit 4   DEA Dear Registrant 6/12/12,      78
12              6/12/12, 12/27/07, 2/7/07, 9/27/06
                letters
13              ABDCMDL00269683 - 00269694
14  Exhibit 5   Meeting invitation for 5/24/13,    88
                from J. Millward to G. Carlson,
15              et al., subject: CSMP Questionnaire
                Complete Response
16              HBC_MDL00144314 - 00144322
17  Exhibit 6   Email, 8/22/13, from S. Voyten to   94
                J. Millward, et al., subject: FW:
18              CVS News Story
                HBC_MDL00154265 - 00154266
19
    Exhibit 7   Email, 12/13/13, from J. Millward   96
20              to J. Hurley, et al., subject:
                Compliance Issues HBC Whse, attaching
21              presentations given at DEA Distributor
                Conference
22              HBC_MDL00136141 - 000136213
23  Exhibit 8   Email, 5/1/12, from A. Mollica     109
                to G. Chunderlik, subject: FW:
24              2012 Anda Supply Chain Symposium
                HBC_MDL00064379 - 00064441
25
```

| | |
|---|---|
| **Page 3** | **Page 5** |

**Page 3**

```
 1      A P P E A R A N C E S (Continued)
 2  On behalf of Defendant HBC Service Company
 3      MARCUS & SHAPIRA, LLP
        BY:  JOSHUA A. KOBRIN, ESQUIRE
 4      AND  ROBERT M. BARNES, ESQUIRE
        One Oxford Centre, 35th Floor
 5      Pittsburgh, Pennsylvania  15219
        412.471.3490
 6      jkobrin@marcus-shapira.com
        rbarnes@marcus-shapira.com
 7
 8  On behalf of Defendant McKesson Corporation
 9      COVINGTON & BURLING, LLP
        BY:  RAJ PAUL, ESQUIRE
10      One CityCenter
        850 Tenth Street, NW
11      Washington, DC  20001-4956
        202.662.5807
12      rpaul@cov.com
13
    On behalf of Defendant Walmart
14
        (By phone/Livestream)
15      JONES DAY
        BY:  ALEXANDRA J. WOLTER, ESQUIRE
16      555 South Flower Street
        Fiftieth Floor
17      Los Angeles, California  90071
        213.243.2651
18      awolter@jonesday.com
19
    Also present
20
        Adam Balenciaga, legal videographer
21
22
23
24
25
```

**Page 5**

```
 1  * INDEX OF HBC-CHUNDERLIK EXHIBITS (Continued) *
 2  NO.        DESCRIPTION        PAGE
    Exhibit 9   Email, 1/9/13, from G. Chunderlik   115
 3              to F. Bencivengo, et al., subject:
                Narcotic Audit Application, with
 4              attachments
                HBC_MDL00041837 - 000041850
 5
    Exhibit 10  Email chain, 8/20/15, from G.      119
 6              Carlson to J. Jenson, et al.,
                subject: FW: Thrifty White Notes
 7              HBC_MDL00069566 - 00069571
 8  Exhibit 11  20131030_Daily_HBC_Controls       131
                HBC_MDL00002348
 9
    Exhibit 12  Email chain, 11/25/13, from T.     149
10              Roahrig to J. Millward, subject: FW:
                Daily HBC Suspicious Purchasing
11              Report
                HBC_MDL00094599 - 00094600
12
    Exhibit 13  Email chain, 1/10/14, from T.      157
13              Roahrig to J. Millward, subject: RE:
                Daily HBC Suspicious Purchasing
14              Report - 01/09/14
                HBC_MDL00039223
15
    Exhibit 14  Email, 8/28/15, from J. Millward to 158
16              E. Hart, et al., subject: 30-010 -
                Inventory Control - Suspicious Order
17              Policy FINAL.docx, attaching 30-010 -
                Inventory Control - Suspicious Order
18              Policy FINAL.docx
                HBC_MDL00169475 - 00169477
19
    Exhibit 15  Email chain, 1/15/16, from G.      161
20              Chunderlik to J. Millward, subject:
                FW: Daily HBC Suspicious Purchasing
21              Report - 01/14/16, attaching
                20160114_Daily_HBC_Controls_W7.xlsx
22              HBC_MDL00057182 - 0057186
23
24
25
```

Page 6

1    * INDEX OF HBC-CHUNDERLIK EXHIBITS (Continued) *
2  NO.        DESCRIPTION              PAGE
   Exhibit 16  Email chain, 1/22/14, from J.     163
3     Millward to G. Carlson, et al.,
      subject: FW: Wholesale Distributor
4     Questionnaire, attaching Wholesale
      Distributor Questionnaire
5     HBC_MDL00135570 - 0013557
6  Exhibit 17  HBC Service Company's Responses    172
      to Plaintiffs' (First) Set of
7     Combined Discovery Responses
      P-HBC-0011 - 0011.20
8
   Exhibit 18  Giant Eagle Inventory Control -   174
9     Suspicious Order Policies with
      various effective dates
10    HBC_MDL00078638 - 00078639
      HBC_MDL00078636 - 00078637
11    HBC_MDL00045916 - 00078918
      HBC_MDL00051908
12    HBC_MDL00043414
      HBC_MDL00010092 - 00010093
13
   Exhibit 19  Email, 9/28/15, from R. McClune to  186
14    J. Millward, et al., subject:
      Control Blocking Policy and Procedure
15    HBC_MDL00005466 - 00005467
16 Exhibit 20  Email chain, 4/14/16, from G.      189
      Chunderlik to E. Hart, subject: RE:
17    USL Questionnaire, attaching Controlled
      Substance Handling Questionnaire_
18    Upsher Smith.doc
      HBC_MDL00030064 - 00030069
19
   Exhibit 21  Email, 11/21/16, from P. Raub to   204
20    M. Doerr, et al., subject: RE:
      Suspicious Order Monitoring (SOM)
21    HBC-MDL00046220 - 00046228
22 Exhibit 22  Email, 1/27/17, from G. Chunderlik  228
      to M. Doerr, subject: SOM Process -
23    High Level, attach SOM Policy
      Procedure_v4.doc
24    HBC_MDL00046143 - 00046145
25             - - - -

Page 7

1              P R O C E E D I N G S
2                  - - - -
3         THE VIDEOGRAPHER:  We are now on the
4    record.  My name is Adam Balenciaga for Golkow
5    Litigation Services.  Today's date is January 16,
6    2019, and the time is 9:04 a.m.
7         This video deposition is being held at
8    Marcus & Shapira, LLP, One Oxford Centre, 35th
9    Floor, Pittsburgh, PA 15219, in the matter of
10   National Prescription Opiate Litigation,
11   MDL No. 2804, for the United States District Court
12   for the Northern District of Ohio, Eastern
13   Division.
14        The deponent is George Chunderlik.
15        All counsel will be noted on the stenographic
16   record.  Will all counsel identify themselves.
17        MR. ROTTINGHAUS:  This is Tom
18   Rottinghaus and Ty Hudson on behalf of the
19   plaintiffs.
20        MS. BOURIAT:  Jennifer Bouriat from
21   Pietragallo on behalf of Cardinal.
22        MR. PAUL:  Raj Paul of Covington &
23   Burling on behalf of McKesson.
24        MR. BARNES:  Robert Barnes, Marcus &
25   Shapira, on behalf of HBC Service Company.

Page 8

1         MR. KOBRIN:  Josh Kobrin, also Marcus &
2    Shapira, on behalf of HBC Service Company.
3         MR. ROTTINGHAUS:  Is anyone appearing by
4    telephone?
5         MR. MCCORMICK:  Good morning.  This is
6    Sean McCormick from Arnold & Porter for the Endo
7    and Par defendants.
8         MR. HIMMEL:  This is Brian Himmel from
9    Reed Smith for Amerisource Bergen Drug Company.
10        MR. ROTTINGHAUS:  Anyone else?
11        MS. WOLTER:  This is Alexandra Wolter
12   from Jones Day for Walmart, Inc.
13        THE VIDEOGRAPHER:  The court reporter is
14   Ann Medis and will now swear in the witness.
15          GEORGE CHUNDERLIK,
16     having been first duly sworn, was examined
17          and testified as follows:
18            EXAMINATION
19   BY MR. ROTTINGHAUS:
20     Q.  Sir, my name is Tom Rottinghaus.  I'm
21   here with my colleague, Ty Hudson.  We're going to
22   be asking you some questions today about your
23   involvement primarily in the HBC warehouse for
24   Giant Eagle.  Okay?
25     A.  Okay.

Page 9

1     Q.  Would you please go ahead and introduce
2    yourself for us.
3     A.  Yes.  My name is George Chunderlik.
4     Q.  Mr. Chunderlik, you currently still work
5    for what's known as Giant Eagle?
6     A.  I do, yes.
7     Q.  We're going to be probably sitting here
8    for a few hours today, and our goal is not to
9    harass you in any respect, but we're going to have
10   a lot of documents we're going to be asking you to
11   look at at various points in time.
12        It's going to be very important for us to
13   make sure that we are communicating.  In other
14   words, I want you to make sure you're
15   understanding my questions I ask you today, and
16   certainly I want to make sure I give you an
17   opportunity to completely respond to any questions
18   I ask.
19        So if I interrupt you at any point in time
20   before you're finished, I want you to please stop
21   me and let me know you're not finished so that I
22   can give you an opportunity to finish your answer.
23   Okay?
24     A.  Okay.
25     Q.  You understand that you have just taken

Highly Confidential – Subject to Further Confidentiality Review

Page 10

1 an oath to tell the truth just like the oath you
2 would take if you were in a courtroom when this
3 case goes to trial?
4     A.  Right.
5     Q.  It's my understanding that you may not
6 be available at the time of trial to come testify
7 live, so I assume you also understand that you're
8 being videotaped here today in case you're unable
9 to testify live so that, if necessary, portions of
10 your testimony can be played to the court and jury
11 at the time of trial.
12     A.  I do.
13     Q.  There are going to be times when I
14 probably ask you if you can give me a "yes" or
15 "no" answer to a question.  You may not be able to
16 do that all the time.  That's fine.  If you're
17 able to, I want you to do so.  But if not, just
18 tell me why you can't.  And I'm going to certainly
19 give you a chance to explain.  Okay?
20     A.  Okay.
21     Q.  Now, you're here with counsel today?
22     A.  I am, yes.
23     Q.  We don't get to hear what you and your
24 attorneys talked about.  So my question isn't
25 intended to delve into that issue.  But I'm

Page 11

1 wondering how much time approximately have you
2 spent getting ready for your deposition?
3     A.  Approximately two days, 8-hour, 9-hours
4 days getting prepared.
5     Q.  And then I assume that you've taken an
6 opportunity to at least look at some of the
7 documents that you might get asked about today?
8     A.  I have, yes.
9     (HBC-Chunderlik Exhibit 1 was marked.)
10 BY MR. ROTTINGHAUS:
11     Q.  One of the first things I want to ask
12 you about is your background with the company.  We
13 have marked as Plaintiffs' Exhibit No. 1 a
14 document that I believe is in front of you.  And I
15 will represent to you this is not a document that
16 was provided to us by Giant Eagle or HBC
17 warehouse.  It's a document we pulled off of the
18 internet through a site called LinkedIn, which I'm
19 assuming you are familiar with.
20     A.  I am familiar with LinkedIn, yes.
21     Q.  Those of us here who are old enough
22 probably used to refer to someone's background as
23 their CV or resumé.
24     A.  Correct.
25     Q.  On LinkedIn it's my understanding that

Page 12

1 someone is allowed to basically put their resumé
2 online for individuals to see if they wish to do
3 so.
4     A.  Yes.
5     Q.  And that's what you have done
6 voluntarily?
7     A.  Yes.
8     Q.  It's my understanding from looking at
9 Exhibit 1 that you have been employed by the Giant
10 Eagle or HBC entity for at least, I guess, 11
11 years now.
12     A.  Yes; that's correct.
13     Q.  Under experience on Exhibit 1, it says
14 manager, pharmacy training and compliance.
15     A.  That's correct.
16     Q.  Let's kind of back up to before Giant
17 Eagle.  I see that you went to college and
18 finished with a bachelor of science in pharmacy in
19 approximately 1980.
20     A.  That is correct, yes.
21     Q.  Tell us from 1980 until 2008 what you
22 did.
23     A.  From 1980, starting in 1980, my first
24 job in pharmacy as a pharmacist was with People's
25 Drug in Maryland, Langley Park, Maryland.  For

Page 13

1 People's I managed one store.  I was a staff
2 pharmacist at the first store that I was employed
3 with People's.  Then I moved to a pharmacy
4 management position.
5     I left People's in -- I believe it was
6 February of 1982, and I actually went to work for
7 Giant Eagle as a pharmacist at that point in time.
8 So from 1982 up until 1990, I was a pharmacist
9 working at the store.  I managed three different
10 pharmacies for Giant Eagle during that period of
11 time.
12     In 1990 I did take a position, an
13 office-based position in our pharmacy services
14 area where I started out doing training.  We were
15 putting in a new software program, and I was doing
16 training of pharmacists and pharmacy personnel on
17 that program.
18     And then in 1992 after the rollout was
19 finished, I stayed in the corporate office and was
20 mainly in an administrative position in support in
21 the pharmacy services area, support for managed
22 care, support for our retail pharmacists, did a
23 lot of computer training as we had new pharmacists
24 and new team members come on.  So I was in that
25 position until March of 2003.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1     At that point in time, I did leave Giant
2 Eagle, and I took a job with a consulting firm in
3 Pittsburgh called Pharmacy Healthcare Solutions.
4 It was a company that performed consulting
5 services in the retail pharmacy industry, in the
6 pharmaceutical industry and in the managed care
7 industry.
8     I was with PHSI for approximately five years.
9 And that brought me to my current position with
10 Giant Eagle. I actually left PHSI in June of 2008
11 when I came back to Giant Eagle.
12     At that time I was in a training capacity. I
13 was managing some of our pharmacy trainers that
14 were responsible for training new pharmacy
15 technicians that came on with Giant Eagle at that
16 point. That's where in my LinkedIn profile where
17 manager of pharmacy training came into being. It
18 wasn't really until -- and I really haven't
19 updated my LinkedIn profile with my official title
20 that I have right now as senior manager of
21 pharmacy compliance.
22     Q. What year did you take on the senior
23 manager of pharmacy compliance?
24     A. I actually became the senior manager of
25 pharmacy compliance in -- I believe it was about

Page 15

1 the May or June timeframe of 2016. And that
2 official role was senior manager of pharmacy
3 compliance.
4     Q. I'm going to have some follow-up
5 questions about that general background. Are you
6 finished with your general background?
7     A. Yes, yes.
8     Q. I appreciate it. So it's my
9 understanding you actually worked in the State of
10 Maryland as a staff pharmacist when you first got
11 out of school.
12     A. That's correct.
13     Q. Before I forget, have you ever worked as
14 a pharmacist in the State of Ohio?
15     A. I do not have a license.
16     Q. And I assume you have worked as a staff
17 pharmacist or had a license as a pharmacist in the
18 State of Pennsylvania?
19     A. Yes.
20     Q. Any other states?
21     A. Maryland. I still maintain my Maryland
22 license.
23     Q. Those two states?
24     A. Yes.
25     Q. Let me ask you a couple of questions

Page 16

1 about your position as a consultant between 2003
2 and 2008. I believe you said it was -- the
3 initials are PHSI?
4     A. Yes, PHSI, Pharmacy Healthcare
5 Solutions.
6     Q. Thank you. In that role, did you
7 provide any consulting expertise in the area of
8 compliance?
9     A. No.
10     Q. You probably understand, but we should
11 probably make sure we're communicating when I use
12 the word compliance. I assume you agree that any
13 pharmacist has to comply with certain laws in
14 order to be a pharmacist.
15     A. Yes.
16     MR. KOBRIN: Object to form.
17 BY MR. ROTTINGHAUS:
18     Q. And similarly, HBC warehouse as a
19 distributor between 2009 and 2014 also had an
20 obligation to comply with certain laws and
21 regulations?
22     A. Yes.
23     Q. Between 2009 and 2014, did you have any
24 role in managing compliance for HBC warehouse?
25     A. I didn't manage compliance, but I was

Page 17

1 involved in some compliance activities during that
2 period of time.
3     Q. We'll be talking about some of those,
4 and we'll come back to that then.
5     So would it be fair to say that prior to
6 coming back to Giant Eagle in 2008, you did not
7 have any role in overseeing or managing compliance
8 for any entity or company?
9     A. I did not.
10     Q. Let's talk a little bit about what you
11 have been doing for Giant Eagle and the HBC
12 warehouse since coming back to Giant Eagle in
13 2008. And I appreciate the fact that you had been
14 with them before, but my questions now are going
15 to be focusing on that timeframe, from 2008 until
16 the present. And then I might even limit it a
17 little bit more than that at times. Okay?
18     Can you tell us what year you believe you
19 started to provide some role for HBC warehouse in
20 the realm of compliance?
21     MR. KOBRIN: Object to form.
22     THE WITNESS: My recollection would be
23 somewhere in the latter quarter, calendar quarter
24 of 2012.
25

Page 18

BY MR. ROTTINGHAUS:

Q. And what was it in the latter part of 2012, to the best of your memory, that caused you to take on some role in compliance for HBC warehouse?

A. It was just part of my role with Giant Eagle, because I did have some knowledge of business operations and those types of things.

Q. You certainly had some familiarity with what a pharmacist individually has to do to comply with laws and keep his or her license for being a pharmacist?

A. Yes.

Q. At some point in time in 2012, did you undergo additional training or some type of education to allow you to gain a better understanding of what laws or regulations from a state or federal level that HBC warehouse as a distributor needed to follow?

A. Nothing, no formal education in that area.

(HBC-Chunderlik Exhibit 2 was marked.)

BY MR. ROTTINGHAUS:

Q. Let's look for a minute at what's been marked as Exhibit 2. You'll see we've got little

Page 19

stickers. And I apologize. Some of them are a little hard to see probably, but I think on the bottom right-hand corner, you'll see what we marked as Exhibit 2.

A. Yes.

Q. We've also got it up on the screen for you, I think. Do you see it on the screen?

A. Yes.

Q. I want you to know we're trying to make sure we have the same document on that screen for everyone to see as the same hard copy that's in front of you. And you're welcome to look at either one. Okay?

A. Okay.

Q. There may be times I ask the individual to my right here to highlight certain things on some of the documents really just to help us kind of make sure we're following the same thing. You see your name on this exhibit, I assume.

A. I do, yes.

Q. You probably looked at Exhibit 2 at some point in getting ready of your deposition.

A. I have.

Q. You will see at the top where it says Retail Operations under the Giant Eagle. It says

Page 20

Pharmacy Operations as of November 13, 2014; is that correct?

A. Yes.

Q. You may be able to help me. Do you know whether the titles and the individuals that are listed on Exhibit 2 deal primarily with Giant Eagle or with HBC warehouse, or is it both?

A. It would be both.

Q. Make sure we're communicating. It's my understanding that HBC warehouse is affiliated with Giant Eagle obviously; correct?

A. That's correct.

Q. When you were providing services for your employer in the role of compliance, was it your understanding that part of that role was to make sure that HBC warehouse was indeed complying with state and federal laws?

A. Yes.

Q. Now, we see at the bottom left hand of this document your name, and you're in the middle box; is that right?

A. That's correct.

Q. I'm not exactly sure if I'm reading this correctly, but your title at least as of 2014 was manager of compliance?

Page 21

A. Yes.

Q. And then the box right above yours, it says senior manager of pharmacy, quality and compliance, and it has the name of Mr. Millward.

A. That's correct.

Q. Mr. Millward has also given testimony in this case, so we have a general understanding as to his role in the company as well. I'm not sure I asked him this exactly, so I'm going to ask you.

Was it your understanding that in some capacity Mr. Millward oversaw what you did or was your supervisor, or is that an incorrect statement?

A. That's correct.

Q. So in some way he was someone you would report to or be obligated to report to if necessary?

A. Correct, yes.

Q. And then we've also had the opportunity to take the deposition and obtain testimony from Greg Carlson, who I understand is no longer with the company, but had been with the company back in 2014; is that right?

A. That is correct.

Q. And was Mr. Carlson also someone you

Page 22

1 would report to in your role as compliance?
2     A.  Yes.
3     Q.  Was there anyone else you reported to
4 with respect to your duties in managing compliance
5 for HBC warehouse besides Mr. Millward and
6 Mr. Carlson?
7         MR. KOBRIN:  Object to form.  At this
8 time?
9 BY MR. ROTTINGHAUS:
10     Q.  He makes a good point.  Let me try to
11 narrow this down a little bit.  We're going to be
12 talking specifically at times about a timeframe of
13 2009 to 2014.  And I'll tell you why.  At that
14 point in time, it's our understanding that HBC
15 warehouse was distributing to its 200 or so
16 pharmacies certain hydrocodone combination
17 products.
18     Is that your understanding as well?
19     A.  Yes.
20     Q.  At that time they were Schedule III
21 substances; correct?
22     A.  Yes.
23     Q.  It's my understanding they're now
24 Schedule II; is that right?
25     A.  That's correct.

Page 23

1     Q.  Does the timeframe of 2009 to 2014 sound
2 correct to you when I reference that being the
3 timeframe that HBC warehouse was distributing
4 hydrocodone combination products to the Giant
5 Eagle pharmacies?
6     A.  Repeat that one more time.
7     Q.  Sure.  I mentioned 2009 to 2014 being
8 the timeframe in which HBC warehouse was
9 distributing hydrocodone combination products to
10 the Giant Eagle pharmacies.
11     Do you have any reason to disagree that
12 that's the appropriate timeframe?
13     A.  To my knowledge, in the 2009 timeframe,
14 I didn't really have a lot of interaction at the
15 warehouse.  So I can't attest to that exactly,
16 only from the timeframe that I would be familiar
17 with.
18     Q.  Let's just cover that now.  What
19 timeframe -- and, again, you know you're under
20 oath, I do, and I don't want you to say something
21 that you think is incorrect.  So if you're not
22 sure, you can tell me.
23     But what timeframe do you believe you had
24 some responsibility for overseeing compliance or
25 managing compliance for the HBC warehouse?

Page 24

1         MR. KOBRIN:  Object to form.
2         THE WITNESS:  Starting in the latter
3 part of 2012, at the last quarter of the calendar
4 year, around that timeframe.
5 BY MR. ROTTINGHAUS:
6     Q.  Would it be fair to say that prior to
7 the latter part of 2012, to the best of your
8 memory and your testimony here today, you did not
9 have any role in managing compliance for the HBC
10 warehouse?
11     A.  Prior to the 2012 timeframe?
12     Q.  Yes.
13     A.  That would that be correct.
14     Q.  Do you know who did have that
15 responsibility prior to the latter part of 2012?
16     A.  It would be my belief that some part of
17 it fell to Joe Millward.
18         MR. KOBRIN:  Don't speculate if you
19 don't know.
20 BY MR. ROTTINGHAUS:
21     Q.  Prior to the latter part of 2012, was
22 compliance even a part of your title while you
23 were at Giant Eagle and HBC?
24     A.  No, because I actually started out as
25 the manager of pharmacy training.  When compliance

Page 25

1 came into play was in that part of 2012 and that
2 quarter.
3     Q.  Do you have any memory as to why
4 pharmacy came into play in that latter part of
5 2012?
6     A.  I don't recall exactly, no.
7     Q.  Someone -- well, let me ask you this:
8 Do you remember if you approached the company and
9 said you wanted to have a role in compliance, or
10 was someone at the company asking you to take on a
11 role of compliance?
12         MR. KOBRIN:  Object to form.
13 BY MR. ROTTINGHAUS:
14     Q.  If you remember.
15     A.  It would be more of coming to me.
16     Q.  Do you remember who came to you and
17 asked you to assist with managing compliance for
18 the HBC warehouse in the latter part of 2012?
19     A.  It would have been Anthony Mollica.
20     Q.  Do you remember at that time what
21 Mr. Mollica's title was?
22     A.  At that period of time, I believe he was
23 the vice-president of pharmacy operations.
24     Q.  And that was a position that Mr. Carlson
25 ultimately took over at some point in time as

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  well?
2      A.  That is correct.
3      Q.  Do you remember why Mr. Mollica wanted
4  you to take on the role of manager of compliance
5  in the latter part of 2012?
6      A.  Not specifically.  I had some prior
7  involvement in accreditations for other areas of
8  Giant Eagle, and it seemed like it would be a good
9  fit for me.
10     Q.  What involvement in accreditations did
11 you have prior to the latter part of 2012 for the
12 Giant Eagle system?
13     A.  Part of our -- part of the products that
14 we do distribute from our pharmacies are certain
15 items of durable medical equipment, specifically
16 blood glucose monitors, diabetes test strips,
17 lancets for finger blood draws and things like
18 that.  That falls under the durable medical
19 equipment portion of Medicare.
20     And at that period of time, we had become
21 accredited to be able to handle those types of
22 products to distribute to Medicare Part B
23 patients.  And I was very involved in procuring
24 and helping our company procure that
25 accreditation.

Page 27

1      Q.  So you developed some degree of
2  expertise in that specific area?
3      A.  Yes.
4      Q.  So it seemed like a good fit at least to
5  see if you might be willing to take on a greater
6  role in compliance for the company?
7      A.  Yes.
8      Q.  You understand that as a distributor of
9  hydrocodone combination products or controlled
10 substances between 2009 and 2014, that HBC
11 warehouse had an obligation to comply with the
12 Controlled Substances Act and all of its
13 provisions?
14     A.  Yes.
15     Q.  Did you ever undergo any training or
16 seminars or education either at or prior to the
17 latter part of 2012 to help you better understand
18 what obligations HBC warehouse might have in order
19 to comply with the Controlled Substances Act?
20     A.  Nothing specific.
21     Q.  When you say nothing specific, it causes
22 me as an attorney to want to ask:  Was there
23 anything more general then that you received in
24 terms of training or knowledge?
25     A.  I did a lot of reading.

Page 28

1      Q.  At the office you would try to read up?
2      A.  Correct.
3      Q.  Did the company make available to you
4  any consultants or experts to help you better
5  understand what the obligations would be for HBC
6  warehouse in order to comply with the Controlled
7  Substances Act when you became the manager of
8  compliance in the latter part of 2012?
9      A.  No.
10     Q.  Did you ask for any additional resources
11 or training?
12     A.  I knew that I could rely on other
13 individuals to help me if I had any questions in
14 those areas.
15     Q.  You say you did a lot of reading.  Do
16 you remember what it was you decided you should
17 read in order to better acquaint yourself with the
18 obligations to comply with the Controlled
19 Substances Act in the latter part of 2012?
20     A.  The DEA pharmacists manual.
21     Q.  I'm sorry.  I'm going to stop you, and I
22 don't mean to interrupt, but I lost you when you
23 gave me that abbreviation.
24     A.  The DEA pharmacists manual, and I also
25 reviewed the distributor manual as well.

Page 29

1      Q.  Do you remember who published the
2  distributor manual that you're talking about?
3      A.  It would have been the Drug Enforcement
4  Agency, the DEA.
5      Q.  And is it the best of your memory that
6  you became more interested in acquainting yourself
7  with those obligations when you did agree to take
8  on the role of manager of compliance for the HBC
9  warehouse in the latter part of 2012?
10     A.  Yes.
11     Q.  Because you knew it was important that
12 HBC warehouse comply with the law?
13     A.  Yes.
14     Q.  Do you remember attending any seminars
15 or continuing education classes or any meetings to
16 in any way educate yourself or better acquaint
17 yourself with the obligations of HBC warehouse to
18 comply with the Controlled Substances Act at or
19 near the time you took over as manager of
20 compliance?
21     A.  Not at that point in time.
22     Q.  At at some point in time you did do
23 that?
24     A.  I did.
25     Q.  Do you remember when?

Page 30

1    A.  The early part -- well, the mid 2016
2 timeframe.
3    Q.  Would it be fair to say that prior to
4 the mid 2016 timeframe, you had not gone to any
5 specific conferences or DEA meetings or any
6 educational seminars or something similar to
7 better acquaint yourself or better educate
8 yourself about the obligations of HBC warehouse to
9 comply with the Controlled Substances Act?
10    A.  Repeat the first part.
11    Q.  Sure.  Would it be fair to say that
12 prior to 2016, you had not gone to any
13 conferences, meetings or seminars to better
14 acquaint yourself with the obligations of HBC
15 warehouse to comply with the Controlled Substances
16 Act?
17    A.  Yes.
18      MR. KOBRIN:  Object to form.  Don't say
19 anything with regard to any meetings you may have
20 had or any conferences you may have discussed or
21 anything that might be privileged you had with
22 counsel or anything like that.
23 BY MR. ROTTINGHAUS:
24    Q.  I want you to listen to your attorney
25 certainly, but just to make sure I understand, I

Page 31

1 don't want you to tell me what it entailed.
2    But at any point in time between 2012 and
3 2016 when you took on the role of manager of
4 compliance for HBC warehouse, do you recall
5 meeting with any individuals, whether it be
6 attorneys or consultants, to discuss the
7 obligations of HBC warehouse to comply with the
8 Controlled Substances Act?
9    A.  No.
10    Q.  Looking at Exhibit 2, which again is the
11 chart that we were provided as of November 2014
12 for the Giant Eagle system, looking at that chart,
13 can you think of anyone who actually would maybe
14 fall under you or under your title in the
15 compliance area for HBC warehouse that's not
16 listed on here?
17    A.  During this timeframe?
18    Q.  Yes.
19    A.  No.
20    Q.  Let's broaden that timeframe from 2009
21 to 2014.  And, again, I reference that timeframe
22 because it's our understanding that that is the
23 timeframe when HBC warehouse was distributing
24 hydrocodone combination products to its 200 or so
25 pharmacies.  Okay?

Page 32

1    Between 2009 and 2014, can you think of
2 anyone who would fall, I guess, under you or under
3 your title or under your supervision for HBC
4 warehouse in terms of making sure that HBC was
5 complying with its obligations under state and
6 federal laws?
7    A.  No.
8      MR. KOBRIN:  Object to form.
9 BY MR. ROTTINGHAUS:
10    Q.  The answer is "no"?
11    A.  "No."
12      MR. KOBRIN:  You're asking only somebody
13 under him at HBC?
14 BY MR. ROTTINGHAUS:
15    Q.  In that mid to late -- you did say it
16 was mid to late 2012 when you took on the
17 additional role of manager of compliance?
18    A.  Yes.
19    Q.  When you took on that role, did you also
20 have other roles with the company, whether it be
21 Giant Eagle or HBC warehouse?
22    A.  Yes.
23    Q.  I want to get a better understanding of
24 what else you were doing for the HBC warehouse or
25 Giant Eagle system really from the time you came

Page 33

1 back in 2008 to 2014.  We talked about the fact
2 you got the title of manager of compliance.
3    A.  Yes.
4    Q.  What other titles or hats, for lack of a
5 better word, did you wear during that timeframe?
6      MR. KOBRIN:  Object to form.
7 BY MR. ROTTINGHAUS:
8    Q.  I want to make sure I'm being clear when
9 I say what other hats did you wear.  Do you kind
10 of understand what I mean?  What other obligations
11 did you have for the company?
12    A.  Well, when I came back to Giant Eagle in
13 2008, I started in the pharmacy training
14 department where my responsibilities -- I had
15 supervision over -- we had 14 pharmacy trainers,
16 and there was another pharmacy training manager,
17 and we both had supervisory responsibilities over
18 seven pharmacy trainers.  I had seven, and my
19 colleague had seven.
20    And we were responsible for supervising those
21 individuals in their daily activities in training
22 pharmacy technicians that came to Giant Eagle.  I
23 was actually in that role from 2008 up until --
24 even carrying over I had some of those
25 responsibilities even past the 2012 timeframe.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   Once that 2012 timeframe hit, it sounds
2  as if you were taking on the duties of manager of
3  compliance.
4    A.   Yes.
5    Q.   In addition, you were still doing some
6  of the pharmacy training supervisory
7  responsibilities?
8    A.   Correct, yes.
9    Q.   You said that would be -- you would have
10  responsibility over seven different trainers?
11    A.   Correct.
12    Q.   Who were then, in turn, responsible for
13  training pharmacists around the retail pharmacies?
14    A.   Pharmacy technicians.
15    Q.   Any other job responsibilities you
16  recall having during the timeframe between 2008
17  and all the way up to 2014?
18    A.   Well, I did become more involved as
19  pharmacy -- the manager of pharmacy compliance in
20  that 2012 timeframe.  It kind of overlaps there.
21    Q.   And really from a purely technical job
22  responsibility, it would be fair to say that prior
23  to mid to late 2012, you did not have any
24  responsibility for overseeing -- I'm sorry.
25    Would it be fair to say that prior to that

Page 35

1  mid to late 2012 timeframe, you did not have any
2  technical responsibility for managing compliance
3  for HBC warehouse?
4    A.   That's correct.
5    Q.   When we talk about the pharmacy training
6  and you said the pharmacy technicians were
7  ultimately overseen by the people you were
8  supervising and training; is that right?
9    A.   Repeat.
10    Q.   Let me back up.  Just to make sure --
11  you probably have figured this out.  I'm not a
12  pharmacist.
13    From that 2008 to 2012 timeframe, when you
14  were overseeing and had supervisory responsibility
15  for pharmacy training, ultimately, that's training
16  individuals who were working in the Giant Eagle
17  retail pharmacies; correct?
18    A.   Yes.
19    Q.   This is not training individuals who
20  were working in the HBC warehouse?
21    A.   That is correct.
22    Q.   And I think you told me and I didn't
23  quite catch it, but I think you told me between
24  2008 and 200-- -- up to the present time, you were
25  working -- your office was in the corporate

Page 36

1  headquarters for Giant Eagle.
2    A.   That is correct.
3    Q.   How much time were you spending in the
4  HBC pharmacy, the actual physical location?  I'm
5  sorry.
6    How much time were you spending between 2012
7  and 2016 at the actual HBC warehouse?
8    A.   I made occasional visits to the
9  warehouse.
10    Q.   Help me understand what an occasional
11  visit means.
12    MR. KOBRIN:  Object to form.
13    THE WITNESS:  Maybe once or twice a
14  year.
15  BY MR. ROTTINGHAUS:
16    Q.   How far drive-wise is the HBC warehouse
17  from the Giant Eagle headquarters where you
18  officed?
19    A.   I would say approximately 40 miles.
20    Q.   Let's focus the timeframe a little bit
21  tighter now.  Let's talk about from mid 2012 until
22  October of 2014.
23    Can you say here today with confidence that
24  you had actually visited the HBC warehouse during
25  that timeframe?

Page 37

1    A.   Yes.
2    Q.   Do you know how many times?
3    A.   My recollection would be once or twice.
4    Q.   Between mid 2012 and October of 2014,
5  your best recollection is you visited the HBC
6  warehouse two times?
7    A.   Once or twice.  I can't recall exactly.
8    Q.   Do you remember why you went there on
9  that one or two occasions?
10    A.   On one occasion we were trying to become
11  VAWD accredited for our HBC warehouse and we had
12  to -- had actually two meetings with those folks
13  in preparation for VAWD accreditation.
14    Q.   It's my understanding -- and remind me
15  what VAWD stands for.  I know it's an acronym.
16    A.   Yes.  It's Vendor Accredited Wholesale
17  Distribution.
18    Q.   And it's my understanding from speaking
19  with Mr. Carlson in his deposition that it was not
20  required for HBC warehouse to be VAWD accredited
21  in order to distribute controlled substances to
22  some of the states where it had retail pharmacies.
23    A.   That's correct.
24    Q.   But the State of Maryland, if my memory
25  is correct, at some point in time required VAWD

Page 38

1 accreditation?
2　A.　At some point in time, they did.
3　　MR. HUDSON:　Can you just make sure I
4 get a moment to object to form.
5 BY MR. ROTTINGHAUS:
6　Q.　Regardless of when that took place, is
7 it your best memory that you visited the HBC
8 warehouse whenever Giant Eagle was working on
9 making sure it could continue to distribute
10 medications to the State of Maryland?
11　　MR. KOBRIN:　Object to form.
12 BY MR. ROTTINGHAUS:
13　Q.　I don't want to confuse you.　Let me
14 back up.
15　At some point in time, Maryland required VAWD
16 accreditation?
17　A.　Yes.
18　Q.　That's the best of your memory; right?
19　A.　Best of my memory, yes.
20　Q.　And that's when HBC warehouse decided it
21 wanted to get the VAWD accreditation; correct?
22　A.　Yes.
23　Q.　And that's the timeframe in which you
24 remember visiting the HBC warehouse?
25　A.　Yes.

Page 39

1　Q.　It was some reason you visited in order
2 to assist in making sure the VAWD accreditation
3 process took place?
4　A.　Yes.
5　Q.　Let's talk about VAWD accreditation for
6 just a minute.　It's my understanding that VAWD
7 provides accreditation to distributors if they
8 fulfill certain criteria for VAWD.
9　A.　Correct.
10　Q.　Is one of those criteria that
11 distributors enact certain policies, procedures or
12 protocols to be followed?
13　　MR. KOBRIN:　Object to form.　If you
14 know.
15　　THE WITNESS:　Correct.
16 BY MR. ROTTINGHAUS:
17　Q.　That's one of the things when you were
18 managing compliance, you had to at some point find
19 out.　If we want to become VAWD accredited so that
20 we can continue distributing to the State of
21 Maryland, I need to figure out or have somebody
22 figure out what we need to do to get accredited;
23 correct?
24　A.　Correct.
25　Q.　At some point in time it sounds as if

Page 40

1 you personally tried to make sure you understood
2 what the accreditation criteria were.
3　A.　That is correct.
4　Q.　And indeed you did find out that in
5 order to become accredited, HBC warehouse had to
6 have certain policies and procedures in writing in
7 place?
8　A.　Correct.
9　Q.　Now, at the time you remember visiting
10 HBC warehouse on that one or two occasions between
11 2012 and 2014, is it your memory that you were
12 visiting the warehouse to make sure that certain
13 policies or procedures were being followed?
14　A.　Not at that point in time.
15　Q.　What do you recall going to the
16 warehouse for?
17　A.　It was the initial stages of looking
18 over the requirements to determine even if this
19 was something that we would want to pursue.
20　Q.　Ultimately, you decided it would be
21 worthwhile to do so?
22　A.　At some point we did, yes.
23　Q.　And you did ultimately -- after 2014 you
24 did obtain VAWD accreditation for the HBC
25 warehouse?

Page 41

1　　MR. KOBRIN:　Object to form.
2　　THE WITNESS:　No, we did not.
3 BY MR. ROTTINGHAUS:
4　Q.　You did for the new Giant Eagle
5 distribution center?
6　A.　Yes.
7　Q.　Actually, the HBC warehouse never did
8 obtain VAWD accreditation; is that correct?
9　A.　That's correct.
10　Q.　We'll probably come back to that in a
11 little bit. Let's talk for a minute just about
12 policies and procedures in general.　I think I
13 told you we had the opportunity to ask
14 Mr. Millward some questions.　It was probably a
15 few weeks ago now.　And I've had an opportunity to
16 rereview the testimony he gave under oath when he
17 gave his deposition.
18　It's my understanding that according to
19 Mr. Millward, he was one of the individuals who
20 had responsibility for making sure that policies
21 or procedures would get drafted and ultimately
22 approved for the HBC warehouse.
23　Is that your memory as well?
24　A.　That's correct.
25　Q.　Were you also an individual who along

Page 42

1 with Mr. Millward had responsibility for making
2 sure that certain policies and procedures got
3 drafted for the HBC warehouse?
4      MR. KOBRIN:  Object to form.
5      THE WITNESS:  That's correct.
6 BY MR. ROTTINGHAUS:
7   Q.  Was there anyone else who had
8 responsibility for doing so besides you and
9 Mr. Millward?
10   A.  Not direct responsibility.
11   Q.  When I use the word policies and
12 procedures, I understand or I've been told those
13 can mean different things to different people.  I
14 don't mean to really use them interchangeably, but
15 I'm not trying to be confusing either.
16   Do you in your mind distinguish between a
17 written policy and a written procedure?
18   A.  At times I do.
19   Q.  I want to make sure I understand how you
20 classify a policy and how you classify a procedure
21 so that we can make sure we're communicating well.
22 I'm talking about policies that are in writing and
23 procedures that are in writing.  Okay?
24   Let me ask you this:  What might be a reason
25 to put -- well, first of all, let me ask you:

Page 43

1 What do you or how do you define a policy, a
2 written policy for a company?
3   A.  I look at written policies as being
4 things that have to be followed 100 percent of the
5 time.
6   Q.  Can you give us an example?
7   A.  Just in general, if a policy is written,
8 and I use an example of if the policy says you
9 cannot bring a weapon to work, if you bring a
10 weapon to work, you would be automatically
11 dismissed.
12   Q.  What about a procedure?
13   A.  A procedure could entail there's many
14 different ways to get to the same point.  A
15 procedure in my mind is sometimes a standard
16 operating procedure because there's many different
17 ways that things can be done in certain
18 situations.  I look at a procedure as to be
19 something that can be followed to get to a certain
20 point.
21   Q.  Let me ask you this:  If and when HBC
22 warehouse wanted to draft a policy -- let me ask
23 it this way instead.  Let's back up.
24   Certainly there are certain things that the
25 law required HBC warehouse to do; correct?

Page 44

1   A.  Correct.
2   Q.  If, and I'm saying if, HBC elected to
3 draft a policy to provide guidance to its
4 employees and personnel about following that law,
5 you would indeed call it a policy and not a
6 procedure?
7      MR. KOBRIN:  Object to form.
8      THE WITNESS:  I'm not quite sure.
9 BY MR. ROTTINGHAUS:
10   Q.  Let me ask it a little differently.  If
11 HBC wanted to provide information to its personnel
12 about certain laws that must be complied with as a
13 distributor of controlled substances, would you as
14 the person who had some responsibility for
15 drafting policies and procedures elect to call
16 that a policy or a procedure?
17      MR. KOBRIN:  Object to form.
18      THE WITNESS:  I don't know if there were
19 any hard and fast rules as to how we would
20 determine that.
21 BY MR. ROTTINGHAUS:
22   Q.  Would you agree that if you were
23 providing information to your personnel on how to
24 follow the law, you would expect them to try to
25 follow the law?

Page 45

1   A.  Yes.
2   Q.  And if you elected to put that
3 information down in a written policy, you would
4 expect your personnel to follow the policy?
5   A.  If it was in a written policy.
6   Q.  What might be the benefit of putting
7 information down in writing either in a policy or
8 a procedure for employees of HBC warehouse?
9   A.  To make sure that -- a reason for -- if
10 a certain law or policy is not followed, there's a
11 little bit more of a level of progressive
12 discipline that may take place.
13   Q.  If something -- if a policy is put down
14 in writing or if a procedure is put down in
15 writing, it might facilitate better communication
16 among individuals at the company who are expected
17 to follow the policy or procedure?
18      MR. KOBRIN:  Object to form.  Assumes
19 facts not in evidence.
20      THE WITNESS:  I would suppose so.
21 BY MR. ROTTINGHAUS:
22   Q.  It provides some guidance clearly in
23 writing for individuals on what the company
24 expects; correct?
25   A.  I would suppose, yes.

Page 46

1    Q.  And that's in part why you sometimes
2  decided to draft policies or procedures for
3  individuals at HBC warehouse; isn't that right?
4        MR. KOBRIN:  Object to form.
5        THE WITNESS:  There would be a couple,
6  you know, maybe reasons because of an
7  accreditation.
8  BY MR. ROTTINGHAUS:
9    Q.  Sure.  But you're trying to educate the
10  individuals who work at the company to help them
11  understand what the expectation is; correct?
12    A.  Correct.
13    Q.  Also, it provides hopefully for more
14  consistent application of any guidance that the
15  company wants to provide for its employees if it
16  puts it down in a policy or procedure; correct?
17    A.  I would suppose it does.
18    Q.  Ultimately, it allows the company to
19  operate a little more efficiently if everybody is
20  on the same page and understands what the
21  expectation is in writing in terms of a policy or
22  a procedure?
23        MR. KOBRIN:  Object to form.  Don't
24  speculate about the efficiency of the company.
25        THE WITNESS:  I can't speculate on that.

Page 47

1  BY MR. ROTTINGHAUS:
2    Q.  That's fine.  Certainly by putting or
3  putting in writing a policy or a procedure, to the
4  extent it talks or discusses compliance with the
5  law, it allows the company to make sure that it
6  has clearly communicated to its employees what the
7  law requires of the company; is that right?
8        MR. KOBRIN:  Object to form.
9        THE WITNESS:  I would suppose.
10  BY MR. ROTTINGHAUS:
11    Q.  I mean, you actually have drafted
12  policies or procedures at times that in some way
13  reflect what the law is and what the company
14  expects its employees to do in order to follow the
15  law; correct?
16        MR. KOBRIN:  Object to form.
17        THE WITNESS:  In many cases, if it's
18  part of law, we would expect our employees to be
19  following the law.
20  BY MR. ROTTINGHAUS:
21    Q.  But to the extent it's -- let me back
22  up.  You've drafted policies for your retail
23  pharmacies?
24    A.  Yes.
25    Q.  You drafted procedures for your retail

Page 48

1  pharmacies?
2    A.  Yes.
3    Q.  Did some of those policies and
4  procedures reflect the obligations of those retail
5  pharmacies under the law, whether it be state law
6  or federal law?
7    A.  We write policies for internal use, the
8  way we would want to see things done.  I can't
9  honestly say that we write policies whenever it is
10  part of law.
11    Q.  I think you said it better than I could
12  have.  You said you write policies to reflect the
13  way you want things done; correct?
14    A.  The way the company would want things
15  done.
16    Q.  The way the company would want things
17  done and want its employees to act; is that right?
18    A.  I would say yes.
19    Q.  And by putting them in writing, it
20  clearly communicates that expectation to
21  employees; is that right?
22    A.  As much as possible.
23    Q.  And hopefully allows for a more
24  consistent application of whatever the company
25  wants done?

Page 49

1    A.  I would say yes.
2    Q.  Because if there's a question in
3  somebody's mind, they have a document they can go
4  to and say what is the policy on this; is that
5  right?
6        MR. KOBRIN:  Object to form.
7        THE WITNESS:  Occasionally.
8  BY MR. ROTTINGHAUS:
9    Q.  Versus just going down the hallway and
10  asking somebody what they normally do, they can go
11  to a book or a manual or a policy and say this is
12  what the company expects; is that right?
13        MR. KOBRIN:  Object to form.
14        THE WITNESS:  At times, yes.
15  BY MR. ROTTINGHAUS:
16    Q.  With respect to HBC warehouse's
17  obligations to comply with the Controlled
18  Substances Act, who at the company oversaw that
19  responsibility between 2012 and 2014?
20    A.  They had a warehouse manager at the HBC
21  facility.
22    Q.  Do you remember who the warehouse
23  manager was at that point in time?
24    A.  I believe his name was Walt Durr.
25    Q.  Were there some policies and procedures

Page 50

1 put down in writing between 2012 and 2014 to help
2 Mr. Durr make sure he understood what the
3 company's expectations were for compliance with
4 the Controlled Substances Act?
5     A.  I don't recall if there were or not.
6     Q.  And because we talked about the fact
7 that you and Mr. Millward were the individuals who
8 were in charge of drafting policies and procedures
9 for the company, if there indeed were policies or
10 procedures to provide guidance to Mr. Durr, they
11 would have most likely been drafted by you or
12 Mr. Millward?
13         MR. KOBRIN:  Object to form.
14 Misrepresents the deponent's testimony.
15         THE WITNESS:  I would like to know the
16 timeframe.
17 BY MR. ROTTINGHAUS:
18     Q.  Sure.  I definitely don't intend to
19 misrepresent your testimony, so forgive me if I
20 wasn't clear.  You correct me if I'm wrong, but we
21 talked about the fact that we had an opportunity
22 to hear from Mr. Millward and we had an
23 opportunity to hear from Mr. Carlson.
24     My understanding is -- and you correct me if
25 I'm wrong, but my understanding is between 2009

Page 51

1 and 2014, Mr. Millward had some responsibility for
2 drafting policies and procedures for the HBC
3 warehouse.
4     A.  I'm not quite sure of that timeframe.
5     Q.  What about the mid 2012 to 2014, did you
6 personally have some responsibility as the manager
7 of compliance to draft policies and procedures for
8 the HBC warehouse to the extent they dealt with
9 compliance with the law?
10     A.  What was the timeframe again?
11     Q.  Well, I think you told me you took on
12 the job of manager of compliance in mid to late
13 2012; right?
14     A.  Um-hum.
15     Q.  So my question is:  From the time you
16 took on that title of manager of compliance from
17 mid to late 2012 through 2014, to the extent a
18 policy or procedure was going to be drafted to
19 provide guidance or a written expectation for HBC
20 warehouse as a distributor of controlled
21 substances, would that policy have been drafted by
22 you?
23     A.  I did not draft any policies in the
24 timeframe of 2009 to 2014.
25     Q.  That helps me a little bit to know that.

Page 52

1 And let me make sure I heard you correctly.
2 Between 2009 and 2014, you, Mr. Chunderlik, did
3 not draft any policies or procedures that dealt
4 with compliance with state or federal laws for HBC
5 warehouse?
6     A.  Not that I can recall.
7     Q.  And certainly you wouldn't have done it
8 anyway before mid 2012 because you didn't even
9 have a job title of manager of compliance until
10 mid 2012 at the earliest; correct?
11     A.  That's right.
12     Q.  Now, can you tell us why, if there is a
13 reason, why between 2009 and 2014 you did not
14 draft any policies or procedures for HBC warehouse
15 regarding compliance with state or federal laws?
16         MR. KOBRIN:  Object to form.
17         THE WITNESS:  At that period there may
18 have been policies in place that I was not aware
19 of, because my involvement in HBC didn't take
20 place really until that latter part of 2012.  So I
21 don't have any recollection of anything prior to
22 that timeframe.
23 BY MR. ROTTINGHAUS:
24     Q.  Well, you said that in mid to late 2012
25 when you took on the role agreed -- and you did.

Page 53

1 You voluntarily agreed to take on the role of
2 manager of compliance for HBC warehouse; correct?
3     A.  Not just HBC warehouse.  That was part
4 of.
5     Q.  Let me ask it this way:  You do agree
6 that you voluntarily agreed to assume, at least in
7 part, the duties of manager of compliance for the
8 HBC warehouse in addition to Giant Eagle somewhere
9 in to mid 2012 to later 2012.
10     A.  Yes.
11     Q.  Once you agreed to take on the title
12 manager of compliance for the HBC warehouse in mid
13 to late 2012 all the way through to 2014, at any
14 point in time, did you think it might be a good
15 idea to find out what policies or procedures the
16 company already had, if it had anything, in
17 writing to provide guidance for its employees in
18 abiding by the Controlled Substances Act?
19         MR. KOBRIN:  Object to form.  He wasn't
20 the manager of compliance for the HBC warehouse.
21         THE WITNESS:  Correct.  I was not
22 manager of compliance for the HBC warehouse.
23 BY MR. ROTTINGHAUS:
24     Q.  I appreciate you letting me know that.
25 I haven't had an opportunity to learn everything

Page 54

1 about your background. So this is, in part, a
2 learning experience for me as well.
3     So are you telling us you were not the
4 manager of compliance for HBC warehouse?
5     A. Not specifically for HBC warehouse. I
6 was a manager of compliance for Giant Eagle
7 pharmacy.
8     Q. Is it your understanding that HBC
9 warehouse had a license to distribute Schedule III
10 controlled substances between 2009 and 2014?
11     A. Yes.
12     Q. So when you took on the role or the
13 title of manager of compliance in mid to late
14 2012, did you at any point in time ask anyone
15 whether you were going to have any responsibility
16 for overseeing compliance for the HBC warehouse in
17 addition to Giant Eagle?
18     MR. KOBRIN: Object to form.
19     THE WITNESS: I'm not sure I really
20 understand that question.
21 BY MR. ROTTINGHAUS:
22     Q. Well, Giant Eagle -- it's my
23 understanding that Giant Eagle owned HBC
24 warehouse. Is that your understanding?
25     A. Yes.

Page 55

1     Q. It's my understanding that in mid to
2 late 2012, you took on the title of manager of
3 compliance; correct?
4     A. Um-hum.
5     Q. That's information that was provided to
6 us on Exhibit 2, but it's my understanding that's
7 also your testimony today.
8     A. Yes.
9     Q. Who were you managing compliance for?
10 Were you managing compliance for HBC warehouse?
11     A. It was mostly the retail pharmacies.
12     Q. And there is a difference between the
13 obligations of a retail pharmacy that's actually
14 dispensing medications including controlled
15 substances and the responsibilities of a
16 distributor under the Controlled Substances Act.
17 You understand that; correct?
18     A. Yes.
19     Q. When you took on that job responsibility
20 and agreed to become the manager of compliance in
21 mid to late 2012, was it your understanding that
22 you were also going to be overseeing compliance of
23 the HBC warehouse?
24     A. I didn't oversee compliance. I was part
25 of the compliance team.

Page 56

1     Q. Was it your understanding in mid to late
2 2012 that you would be part of the team that made
3 sure that HBC warehouse was indeed complying with
4 its responsibilities as a distributor of
5 controlled substances?
6     A. Yes.
7     Q. To your knowledge, was anyone else,
8 either senior or under you, also in charge of
9 making sure that HBC warehouse was complying with
10 its obligations under the Controlled Substances
11 Act between 2012 and 2014?
12     A. Joe Millward, the gentleman that I
13 reported to at Giant Eagle.
14     MR. BARNES: Tom, I previously asked
15 that we take a break right around now so I can get
16 on the call.
17     MR. ROTTINGHAUS: That's fine.
18     THE VIDEOGRAPHER: The time is 9:58 a.m.
19 We're going off the video record.
20     (Recess from 9:58 a.m. to 10:17 a.m.)
21     THE VIDEOGRAPHER: The time is
22 10:17 a.m. We're back on the video record.
23 BY MR. ROTTINGHAUS:
24     Q. Mr. Chunderlik, we just took a break at
25 the request of your counsel. And forgive me. I'm

Page 57

1 going to try to pick up where I left off, but I
2 need to refresh myself on couple of things before
3 I do so.
4     It's my understanding that prior to taking on
5 the position of manager of compliance in the
6 latter part of 2012, you had no formal training in
7 the realm of compliance; is that correct?
8     A. No formal training.
9     Q. What you did is you tried to read up to
10 make sure you had an understanding of what the
11 responsibilities were for the pharmacies at Giant
12 Eagle, but also HBC as a distributor of controlled
13 substances to comply with the federal and state
14 laws?
15     MR. KOBRIN: Object to form.
16     THE WITNESS: That was one part of it.
17 I did some reading. I also collaborated and
18 talked to other folks that I thought I needed to
19 talk to. In some cases, it could involve legal
20 counsel at Giant Eagle and my direct supervisor at
21 the time, Joe Millward, or even Greg Carlson, to
22 increase my knowledge of operations of the HBC
23 warehouse.
24 BY MR. ROTTINGHAUS:
25     Q. To the best of your memory, did anyone

Page 58

1 provide you with any written resources published
2 by any organization to assist you in making sure
3 you had an understanding of the responsibilities
4 of HBC as a distributor to comply with the
5 Controlled Substances Act and any other state and
6 federal laws from 2012 onward?
7    A. In talking to some of the individuals
8 and talking to even legal counsel, I was directed
9 towards some information that would help me
10 understand that.
11    MR. KOBRIN: Again, I just want to make
12 sure with regard to conversations you had with
13 legal counsel, you can state generally that you
14 had them, but I don't want you to get into any
15 detail about them. I don't think Tom does either.
16 BY MR. ROTTINGHAUS:
17    Q. What information -- what resources were
18 you directed to? And I'm talking about published
19 resources, whether they be from DEA or from some
20 other organization.
21    What did you look at and try to read to make
22 sure you were fulfilling your responsibilities as
23 manager of compliance for HBC warehouse?
24    A. First of all, I want to make sure. I
25 wasn't just directly the manager of compliance at

Page 59

1 the HBC warehouse. It was one of my areas that
2 fell under me, but I wasn't directly the manager
3 for HBC warehouse alone.
4    Q. I understand you were manager of
5 compliance for Giant Eagle. But my understanding
6 was --
7    A. Giant Eagle pharmacy.
8    Q. Giant Eagle pharmacy. But my
9 understanding, and correct me if I'm wrong, is
10 that you also had the responsibility for managing
11 compliance for HBC warehouse. Am I incorrect?
12    A. In collaboration with my boss, my direct
13 supervisor, Joe Millward, and even Greg Carlson.
14    Q. Besides Mr. Carlson and Mr. Millward,
15 who both have also given us testimony and
16 information about who was overseeing compliance,
17 besides those two individuals and yourself, was
18 there anyone else who to your knowledge was making
19 sure that HBC was complying with its
20 responsibilities as a distributor of controlled
21 substances between 2009 and 2014?
22    MR. KOBRIN: Not somebody who was
23 supervising? I'm just making sure.
24 BY MR. ROTTINGHAUS:
25    Q. Let's back up. I think you know what

Page 60

1 I'm talking about. But if you don't, let me know.
2 I'm trying to find out. You said you had some
3 role in managing compliance for HBC warehouse;
4 correct?
5    A. Yes.
6    Q. I think what you're trying to tell us is
7 you weren't the only one; is that right?
8    A. That would be correct.
9    Q. You're trying to tell us that
10 Mr. Millward also had some responsibility and
11 Mr. Carlson also had some responsibility.
12    A. Yes.
13    Q. Was there anyone else?
14    A. Not direct responsibility.
15    Q. You, Mr. Carlson and Mr. Millward though
16 did have direct responsibility; correct?
17    A. I'm not sure. The definition of direct
18 I'm not quite sure.
19    Q. Well, you used the word.
20    A. I did use the word, yeah. I'm not quite
21 sure though.
22    Q. Well, I mean, you agree somebody had to
23 make sure that HBC warehouse was complying with
24 the law between 2012 and 2014; right?
25    A. I would also say that the warehouse

Page 61

1 manager had a part to make sure that his facility
2 was in compliance with the law as well.
3    Q. That would be Mr. Durr?
4    A. Yes, correct.
5    Q. Did anyone provide Mr. Durr with any
6 written direction on what the expectations were
7 for him to make sure that his facility at HBC
8 warehouse was complying with the law and its
9 duties as a distributor of controlled substances
10 between 2009 and 2014?
11    A. I don't necessarily know that.
12    Q. Did you personally provide him with any
13 written documentation to help him understand what
14 his responsibilities might be?
15    MR. KOBRIN: Object to form.
16    THE WITNESS: There may have been
17 communication, oral communication.
18 BY MR. ROTTINGHAUS:
19    Q. I'm asking for written right now. Did
20 you draft any written policies or procedures to
21 assist Mr. Durr or anyone else at HBC warehouse
22 between 2012 and 2014 to understand their
23 responsibilities as a distributor of controlled
24 substances?
25    MR. KOBRIN: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 Misrepresents prior testimony. He talked about
2 that already.
3     THE WITNESS: I'm not sure that I recall
4 that.
5 BY MR. ROTTINGHAUS:
6     Q. You're not sure you recall ever
7 providing him with any written documentation, is
8 that what you're saying?
9     A. Yes.
10     Q. You certainly don't remember drafting
11 any policies or procedures for Mr. Durr or for
12 anyone else at the HBC warehouse to follow to make
13 sure they were complying with the Controlled
14 Substances Act between 2012 and 2014, do you?
15     A. I don't recall.
16     Q. And, obviously, you would not have done
17 so before 2012 because you didn't have any
18 responsibility for compliance prior to 2012;
19 right?
20     A. That would be correct.
21     Q. So, therefore, between 2009 and 2014,
22 you don't recall ever providing Mr. Durr or anyone
23 else at HBC warehouse with any written policies or
24 procedures to assist them in making sure they were
25 complying with the Controlled Substances Act; is

Page 63

1 that correct?
2     A. I'm not quite sure. I don't recall
3 exactly.
4     Q. You certainly can't point to anything
5 today, can you?
6     MR. KOBRIN: Object to form.
7     THE WITNESS: I am not sure.
8 BY MR. ROTTINGHAUS:
9     Q. Do you believe there was a policy or a
10 procedure you drafted that just hasn't been
11 circulated yet?
12     A. I can't -- I can't -- I don't have
13 any -- I don't have any recall on that.
14     Q. And that's all we can ask you, is to
15 give us your testimony, and you are under oath,
16 but to give us your testimony to the best of your
17 recollection.
18     Just to make sure we clear, you do not recall
19 drafting or having had drafted any policies or
20 procedures to provide guidance to anyone at HBC
21 warehouse as to their responsibilities as a
22 distributor of controlled substances between 2009
23 and 2014; correct?
24     A. What period in 2014 may I ask?
25     Q. Well, we'll ask. October of 2014,

Page 64

1 because it's my understanding that in October of
2 2014, HBC warehouse stopped distributing
3 hydrocodone combination products. Is that your
4 understanding?
5     A. That is correct, yes.
6     Q. So let's back up. Now you know I'm
7 talking about up until October of 2014.
8     Sitting here today, it's fair to say that you
9 do not recall and cannot point to us any document,
10 any policy, any procedure that provided any
11 guidance to anyone at HBC warehouse as to its
12 responsibilities as a distributor of controlled
13 substances between 2009 and 2014?
14     A. That is my recall, yes.
15     Q. Sitting here today, do you think it
16 would have been a good idea to have drafted some
17 policies or procedures or written guidance to
18 individuals at HBC warehouse to make sure they
19 understand or understood their responsibilities as
20 a distributor of controlled substances between
21 2012 and 2014?
22     MR. KOBRIN: Object to form.
23     THE WITNESS: It may or may not. Not in
24 all cases.
25

Page 65

1 BY MR. ROTTINGHAUS:
2     Q. You said it may or may not. Let's talk
3 about how it may. Why may that have helped?
4     A. There are instances where, you know,
5 sometimes things in written form can be
6 misinterpreted and misunderstood, and in those
7 types of cases, I believe that oral communication,
8 being able to ask questions, interpretation and
9 things like that.
10     Q. Of course, if something is in writing,
11 to the extent it's misunderstood, someone who's
12 reading a written document or reading written
13 guidance also has the option to still pick up the
14 phone or walk down the hall or contact anyone in
15 the company and ask them what is meant by that
16 guidance; correct?
17     MR. KOBRIN: Object to form.
18     THE WITNESS: I would agree with that.
19 BY MR. ROTTINGHAUS:
20     Q. You've been a pharmacist since 1980?
21     A. Yes.
22     Q. And in your various capacities as a
23 retail pharmacist and as a trainer, you've run
24 across numerous policies for different companies
25 you've worked for; right?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A.  I would say yes.
2    Q.  And you've run across numerous
3  procedures for companies you've worked for; right?
4    A.  Yes.
5    Q.  There's a reason those are drafted;
6  correct?
7        MR. KOBRIN:  Object to form.
8        THE WITNESS:  I can't -- I can't
9  speculate as to why a company writes a policy or
10  why they don't.
11  BY MR. ROTTINGHAUS:
12    Q.  Well, when you've written them, was
13  there a reason for you to do it?
14    A.  Yes.
15    Q.  In part, it was to make sure that people
16  at the company understood what their obligations
17  were and what the expectations were by the
18  company; correct?
19        MR. KOBRIN:  Object to form.
20        THE WITNESS:  Or if I was asked to write
21  a policy.
22  BY MR. ROTTINGHAUS:
23    Q.  I want to let you finish.  I got the
24  objection, and it will stand.  I'm going to ask it
25  again.

Page 67

1        On those occasions where you drafted a policy
2  or procedure for anyone at HBC warehouse or at
3  Giant Eagle, there was a reason why you did it;
4  correct?
5        MR. KOBRIN:  Object to form.
6        THE WITNESS:  I may have been asked to
7  do that.
8  BY MR. ROTTINGHAUS:
9    Q.  But there was a reason why someone
10  thought it should be drafted and put to writing;
11  correct?
12        MR. KOBRIN:  Object to form.
13        Speculative.
14        THE WITNESS:  I can only speculate that
15  that would be the case.
16  BY MR. ROTTINGHAUS:
17    Q.  Do you have to speculate as to why you
18  would have decided to draft a policy or a
19  procedure, sir, or is there a reason?
20        When you decide it to do, is there a reason
21  why you did it?  You're not trying to waste your
22  time; right?
23    A.  No.  I would just say, you know,
24  basically if the company asked to have a policy
25  written, I would provide and collaborate with

Page 68

1  other folks to write that policy.
2    Q.  And sometimes there have been occasions
3  where you thought it might be a good idea to have
4  a policy or procedure in place, because we're
5  going to look at some of those documents today; is
6  that right?
7        MR. KOBRIN:  Object to form.
8        THE WITNESS:  Without seeing the
9  documents, I'm not really sure.
10  BY MR. ROTTINGHAUS:
11    Q.  Well, would you agree there have been
12  times in your career for Giant Eagle and in that
13  timeframe when you oversaw compliance for HBC
14  warehouse that you thought it would be a good idea
15  to have documentation and written guidance for
16  individuals to make sure they understood what
17  their expectations were?
18    A.  When it was a requirement, yes.
19    Q.  Only when it was a requirement or were
20  there times where you thought it would be a good
21  idea to make sure everyone was on the same page
22  and everyone understood what their obligations
23  were?
24    A.  When we were required to do so, yes.
25    Q.  Only when required to do so.  So the

Page 69

1  only reason a policy or a procedure ever got
2  drafted by you, Mr. Chunderlik, was when you
3  thought there was a requirement that you do so?
4        MR. KOBRIN:  Object to form.
5  BY MR. ROTTINGHAUS:
6    Q.  Is that what you're telling this court
7  and jury?
8    A.  That's my recollection.
9    Q.  At any point in time between 2012 and
10  2014 when you were overseeing or managing
11  compliance for HBC warehouse, did you think it
12  would be a good idea to have policies, procedures
13  or written guidance available for individuals
14  in the warehouse, the pickers, Mr. Durr and his
15  people, to make sure they knew what their
16  obligations were if an order was given for some
17  certain type of controlled substance?
18        MR. KOBRIN:  Object to form.
19        THE WITNESS:  I hear several different
20  questions being asked at the same time.
21  BY MR. ROTTINGHAUS:
22    Q.  Let me clarify.  That's one of my
23  faults.  I sometimes ask very unclear questions.
24        Mr. Durr had a team of people including
25  people that are sometimes referred to as pickers

Page 70

1 in the secure area of the warehouse; correct?
2     A.  I would believe so.
3     Q.  To your knowledge, was there any written
4 guidance for those individuals in the warehouse
5 who were picking orders, picking controlled
6 substances and putting them in to totes to be shipped
7 off to the pharmacies?
8     Was there any written guidance for those
9 people to make sure they understood what the
10 obligations were for HBC warehouse as a
11 distributor of controlled substances?
12     A.  I'm not really sure if there were.
13     Q.  Looking back and understanding that you
14 had responsibility for compliance not only of
15 Giant Eagle, but also HBC warehouse as a manager
16 of compliance, do you think it would have been a
17 good idea to have had written documentation and
18 guidance for those individuals?
19     A.  I'm not sure.
20     Q.  Why do you say you're not sure?
21     A.  As I had talked -- as I alluded to
22 earlier, a lot of times I am most comfortable in
23 communicating orally with folks.  If they have
24 questions or have any type of question that they
25 need to ask me, I would respond orally, pick up

Page 71

1 the phone, talk.
2     Q.  Do you know if Mr. Durr's team, all of
3 the individuals who worked under him in that
4 warehouse at HBC between 2012 and 2014 had that
5 same level of comfort of knowing they could just
6 pick up the phone and talk to you if they had any
7 questions?
8         MR. KOBRIN:  Object to form.
9 Speculative.
10         THE WITNESS:  I don't know that.
11 BY MR. ROTTINGHAUS:
12     Q.  You don't know because you don't even
13 know who all those individuals were in fairness to
14 you; right?
15         MR. KOBRIN:  Object to form.
16         THE WITNESS:  I don't know all the
17 pickers who worked at the HBC warehouse.
18 BY MR. ROTTINGHAUS:
19     Q.  I'm not suggesting you should, but I
20 mean, in fairness, you visited that warehouse, to
21 the best of your memory, once or twice between
22 2012 and 2014; right?
23     A.  Yes.
24     Q.  So personally you didn't get an
25 opportunity to meet everybody who worked in that

Page 72

1 warehouse, did you?
2     A.  Most of my communication was with the
3 warehouse manager.
4     Q.  Understood.  And you didn't get a chance
5 to communicate with all of the team there at the
6 warehouse; correct?
7     A.  Not every single individual.
8     Q.  And certainly you never had an
9 opportunity or you never took the opportunity to
10 communicate with those individuals in writing, in
11 the form of a written guidance via policy,
12 procedure or other document, to make sure they
13 understood what you expected as the manager of
14 compliance, did you?
15         MR. KOBRIN:  Object to form.
16 Misrepresents evidence and testimony.
17         THE WITNESS:  I'm not really sure that I
18 would agree to that.
19 BY MR. ROTTINGHAUS:
20     Q.  Well, let's talk about it.  When between
21 2012 and 2014 did Mr. Chunderlik as manager of
22 compliance take the time to put anything in
23 writing regarding his expectations for individuals
24 at the HBC warehouse to make sure they were
25 complying with their obligations as a distributor

Page 73

1 of controlled substances?
2     A.  I did not.
3     Q.  Do you know if anyone did?
4     A.  I believe there were some procedural
5 documents put together by other individuals before
6 I came into the role.
7     Q.  Before 2012 you think there were
8 procedural documents that were put in writing to
9 provide guidance to individuals at HBC warehouse?
10     A.  I think there may have been.
11     Q.  Do you know what those documents
12 entailed?  Because I'm not sure I've seen them.
13     A.  I'm not really sure.
14     Q.  You certainly don't know if any of those
15 documents involved guidance to individuals at HBC
16 warehouse as to their obligations to comply with
17 the Controlled Substances Act; is that fair to
18 say?
19         MR. KOBRIN:  Object to form.
20         THE WITNESS:  I would agree with that.
21 BY MR. ROTTINGHAUS:
22     Q.  At any point in time after you took over
23 as the manager of compliance in later 2012, did
24 you ask anyone if you could see what policies or
25 procedural documents, I think you referred to them

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 as, existed to make sure they did provide
2 sufficient guidance to individuals at the HBC
3 warehouse regarding their obligations under the
4 Controlled Substances Act?
5        MR. KOBRIN: Object to form.
6        THE WITNESS: I did not personally.
7 BY MR. ROTTINGHAUS:
8    Q. Do you think that would have been a good
9 idea?
10   A. I'm not sure.
11   Q. When you took over as the manager of
12 compliance in 2012, to the best of your memory, no
13 one either above you, below you or at your same
14 level showed you any documents that already
15 existed to provide guidance to HBC warehouse as to
16 its obligations as a distributor under the
17 Controlled Substances Act; is that fair to say?
18   A. There may have been some documents out
19 there that I can't recall exactly what was in
20 those documents.
21   Q. Now, you said before that you didn't
22 want to speculate. Is this a point in time where
23 you might be speculating a little bit as to
24 whether there might have been some documents out
25 there?

Page 75

1    A. I'm not sure.
2    Q. Well, let's ask the question again. And
3 I know your attorney doesn't want you to
4 speculate. And I don't want you to either because
5 you're under oath. I only want you to tell us if
6 you can. Okay? Let me ask the question a little
7 differently. So listen if you can.
8        Would it be fair to say that you don't recall
9 anyone ever providing you with any documents that
10 existed in writing to provide guidance to
11 individuals at the HBC warehouse as to their
12 obligations as a distributor of controlled
13 substances when you took the position as manager
14 of compliance in 2012?
15   A. I would say yes.
16   Q. And it would also be fair to say that
17 you don't remember any time after 2012 and before
18 the end of 2014 that anyone did that; is that
19 correct?
20       MR. KOBRIN: Object to form.
21       THE WITNESS: That would be correct.
22 BY MR. ROTTINGHAUS:
23   Q. That would be correct?
24   A. Yes.
25   Q. Again, I've told you we've had an

Page 76

1 opportunity to speak to some different people in
2 this case including Mr. Millward and Mr. Carlson
3 and others, and we've learned a little bit about
4 how Giant Eagle pharmacies ran.
5        Correct me if I'm wrong, but it's my
6 understanding that at least as of 2014, Giant
7 Eagle had pharmacies in at least five states, if
8 not more.
9    A. That's correct. Maybe four states at
10 that point in time.
11   Q. Ohio was one of them?
12   A. 2014?
13   Q. Yes. Ohio was one of them; right?
14   A. Yes.
15   Q. And Ohio was one of the states where HBC
16 warehouse was indeed distributing controlled
17 substance including hydrocodone combination
18 products between 2009 and 2014; correct?
19   A. Correct.
20   Q. When you took over as manager of
21 compliance for Giant Eagle and HBC warehouse in
22 late 2012, I assume you already had an
23 understanding that there was felt to be a problem
24 with abuse of opioid medications in this country.
25       MR. KOBRIN: Object to form.

Page 77

1        THE WITNESS: I knew that in certain
2 instances there were, yes.
3 BY MR. ROTTINGHAUS:
4    Q. And there had even been some isolated
5 instances where some of the Giant Eagle pharmacies
6 had encountered problems with diversion; correct?
7        MR. KOBRIN: Object to form.
8        THE WITNESS: I don't recall the exact
9 timeframe.
10 BY MR. ROTTINGHAUS:
11   Q. You do recall there had been times where
12 you heard about problems with diversion at some of
13 the Giant Eagle pharmacies?
14       MR. KOBRIN: Object to form.
15       THE WITNESS: I do recall an instance or
16 two.
17 BY MR. ROTTINGHAUS:
18   Q. Is that something you would have been
19 overseeing, the investigation into the diversion
20 in those instances?
21   A. At those points in time, I do not
22 believe so.
23   Q. Is that because it was, to the best of
24 your knowledge, prior to 2012, or was that just
25 not something that fell under your

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 responsibilities as manager of compliance once you
2 took over --
3    A.  Before 2012.
4       MR. KOBRIN:  Object to form.
5 BY MR. ROTTINGHAUS:
6    Q.  Once you took over as manager of
7 compliance in 2012, did your responsibilities also
8 include overseeing investigations where there were
9 any potential concerns about diversion?
10    A.  I would not say -- I would not use the
11 word overseeing.  I would say part of a group that
12 would look into those types of situations.  I did
13 not oversee an investigation.
14    Q.  Let's focus on that timeframe again when
15 you found out that you were being asked to become
16 manager of compliance for Giant Eagle and HBC
17 warehouse.  Okay?
18    You told us before that you did a lot of
19 reading once you found out that you were going to
20 be taking on that role and you willfully took on
21 that role; correct?
22    A.  Yep.
23    Q.  "Yes"?
24    A.  Yes.  Sorry.
25       (HBC-Chunderlik Exhibit 4 was marked.)

Page 79

1 BY MR. ROTTINGHAUS:
2    Q.  I'm going to show you what's been marked
3 as Exhibit 4.
4       MR. ROTTINGHAUS:  Exhibit 4 is, I think,
5 reference number 03, pull that up, the first page.
6 BY MR. ROTTINGHAUS:
7    Q.  Mr. Chunderlik, what you have in front
8 of you and what we have marked as Exhibit 4 is
9 actually a series of four different pieces of
10 correspondence on letterhead from the United
11 States Department of Justice Drug Enforcement
12 Administration.  I will represent to you all the
13 attorneys here are familiar with these letters
14 because they've been discussed at various points
15 in time.
16    Each of these letters start out with Dear
17 Registrant.  That's how they're addressed.  There
18 is one from 2006.  There's one from February of
19 2007.  There's one from December of 2007, and then
20 the one right in front of at the top of the stack
21 is dated June 12th of 2012.
22    Here's my question for you.  When you took
23 over as manager of compliance in late 2012 and
24 started doing some reading, I think you said that
25 one of the things you did is you looked at some

Page 80

1 resources from the DEA.
2    A.  Correct.
3    Q.  And I assume you're not sitting here
4 representing to us you remember specifically what
5 you reviewed; is that right?
6    A.  That is correct.
7    Q.  Looking at Exhibit 4, do you believe you
8 reviewed any of the letters from the DEA that are
9 contained in Exhibit 4 back when you took over as
10 manager of compliance for HBC and Giant Eagle in
11 2012?
12    A.  I do not recall these letters
13 specifically.
14    Q.  Do you remember if you ever saw those
15 letters before you became aware that you were
16 going to need to give testimony in this case?
17    A.  Yes.
18    Q.  Do you remember approximately when you
19 first remember seeing any of these letters that
20 are in Exhibit 4?
21    A.  In these forms, I would say early 2017.
22    Q.  Do you remember what it is that focused
23 your attention on these letters that are
24 encompassed in Exhibit 4 in 2017?
25       MR. KOBRIN:  Let me give you a warning

Page 81

1 about privilege.  I'm not sure what the context
2 was, but if it related to counsel, I'd be weary of
3 sharing information that you shared or were
4 advised by counsel.
5 BY MR. ROTTINGHAUS:
6    Q.  I want to make sure that I -- I don't
7 want to delve into communications with your
8 attorneys.  I maybe misunderstood what you said
9 before.  And maybe I just phrased my question
10 poorly when I asked you if you had ever been aware
11 of these letters before you became aware that you
12 would be a witness giving testimony in this case.
13    What I meant was before you were contacted by
14 any lawyers about this case, had you reviewed any
15 of these letters in Exhibit 4?
16    A.  I recall seeing one of these letters.
17    Q.  Do you remember which one you recall
18 seeing and when you recall seeing it?
19    A.  I believe it was early in the 2017
20 timeframe.
21    Q.  Do you remember what it was in 2017 that
22 caused you to run across one of these letters that
23 are in Exhibit 4?
24    A.  I don't remember a specific instance,
25 but I did have it.  It was presented to me as

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 something that I should take a look at.
2    Q.  Do you remember who presented it to you
3 as something you should take a look at?
4    A.  I do not remember the individual, no.
5    Q.  Was it someone at Giant Eagle?
6    A.  Yes.
7    Q.  In other words, someone at your
8 company --
9    A.  Yes.
10    Q.  -- told you in 2017 that they thought
11 you should be aware of these letters from the DEA?
12    A.  Yes.
13    Q.  And that would still be because you had
14 the title of manager of compliance in 2017?
15      MR. KOBRIN:  Object to form.
16      THE WITNESS:  Yes.
17 BY MR. ROTTINGHAUS:
18    Q.  Do you remember if -- do you remember
19 which letter among those in Exhibit 4 was the
20 letter you saw?
21    A.  I could not say which date was on the
22 letter. I don't recall which date.
23    Q.  Do you recall whether when you saw
24 whichever letter you saw in 2017 that's reflected
25 in Exhibit 4 that it caused you to go back and

Page 83

1 want to see some of the other letters that the DEA
2 had sent out to registrants who were licensed to
3 distribute controlled substances?
4      MR. KOBRIN:  Object to form.  Assumes
5 that he knew about the other letters.
6      THE WITNESS:  Restate that question if
7 you could.
8 BY MR. ROTTINGHAUS:
9    Q.  Do you know whether you became aware of
10 other letters that had been published and sent by
11 the DEA whenever you were directed to the letter
12 you were directed to that's encompassed in
13 Exhibit 4 in 2017?
14      MR. KOBRIN:  Object to form.
15      THE WITNESS:  I didn't know that there
16 were various versions of this particular document.
17 BY MR. ROTTINGHAUS:
18    Q.  So once it was directed to you in 2017
19 by someone at Giant Eagle, you obviously read the
20 letter?
21    A.  Yes.
22    Q.  At that point in time, did you try to
23 digest the contents of that letter and make sure
24 that whatever it stated, Giant Eagle was following
25 the guidelines provided by the DEA?

Page 84

1    A.  Yes.
2    Q.  If you look at the first page of
3 Exhibit 12, as you read this letter on the first
4 page, Exhibit 4, today, Mr. Chunderlik, is it your
5 understanding that this letter is indeed directed
6 to entities that are licensed to distribute
7 controlled substances in the United States?
8    A.  Yes.
9    Q.  And even sitting here today -- first of
10 all, today HBC warehouse is no longer distributing
11 controlled substances as I understand.
12    A.  That's correct.
13    Q.  And, again, back in 2009 is when it
14 stopped distributing hydrocodone combination
15 products?
16      MR. KOBRIN:  Object to form.
17      THE WITNESS:  Repeat that.
18 BY MR. ROTTINGHAUS:
19    Q.  I'm sorry.  I said that wrong.  2014 is
20 when it stopped distributing hydrocodone
21 combination products to the best of your memory?
22    A.  Yes.
23    Q.  This letter on the first page of
24 Exhibit 4, it references some statutory codes
25 including 21 CFR Section 1301.  I think it's in

Page 85

1 the second full paragraph, well, first and second
2 full paragraph.  Do you see that?
3    A.  I do.
4    Q.  At any point in time, do you recall that
5 you personally looked or went to the United States
6 Code of Federal Regulations, specifically
7 Section 1301.74, to better understand what the
8 duties of a distributor of controlled substances
9 might entail between 2012 and 2014?
10    A.  I may have.
11      (HBC-Chunderlik Exhibit 3 was marked.)
12 BY MR. ROTTINGHAUS:
13    Q.  I'm going to show you what's been marked
14 Exhibit 3.  I think it was already in front of
15 you.  I'm going to be focusing on subparagraph
16 (b), which is the second full paragraph there.
17 Are you with me?
18    A.  I am, yes.
19    Q.  It's a little hard to read.  I apologize
20 the text is kind of small.  So we've also put it
21 on the screen if it's easier for you to read
22 there.
23      First of all, I want to read this subsection
24 and make sure I'm reading it correctly.  Okay?
25 According to this subsection, it states, "The

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 registrant shall design and operate a system to
2 disclose to the registrant suspicious orders of
3 controlled substances."
4     Have I read it right so far?
5     A.  Yes.
6     Q.  It then says, "The registrant shall
7 inform the field division office in his area of
8 suspicious orders when discovered by the
9 registrant."  Correct?
10    A.  Yes.
11    Q.  And then it goes on to describe
12 suspicious orders and how they can include orders
13 of unusual size, orders deviating substantially
14 from a normal pattern and orders of unusual
15 frequency; correct?
16    A.  Yes.
17    Q.  Do you remember if you read at any point
18 in time this provision of the Code of Federal
19 Regulations between 2012 and 2014 when you were
20 manager of compliance and, in part, oversaw
21 compliance for HBC warehouse?
22    A.  I do recall that, yes.
23    Q.  In fact, when you told us that you went
24 and did some reading when you first took on the
25 position of manager of compliance, is this section

Page 87

1 of the Code of Federal Regulations one of the
2 sections you went and read, to the best of your
3 memory?
4     A.  I do recall that, yes.
5     Q.  And that's certainly a section of the
6 the Code of Federal Regulations that you believed
7 at the time and still believe that any distributor
8 of controlled substances has an obligation to
9 follow; correct?
10    MR. KOBRIN:  Object to form.
11    THE WITNESS:  It's one of the -- it's a
12 subsection of the entire -- of the entire security
13 procedure, to protect the security integrity of
14 controlled substances.
15 BY MR. ROTTINGHAUS:
16    Q.  When you read this section, specifically
17 where it says, "The registrant shall design and
18 operate a system," did you at any point in 2012 or
19 thereafter ask any of your colleagues whether a
20 system was already in place for HBC warehouse?
21    A.  The timeframe again?
22    Q.  When you took over as manager of
23 compliance in 2012.
24    A.  I don't recall specifically.
25    Q.  Let me ask it again to make sure I asked

Page 88

1 it correctly.  Once you took over as manager of
2 compliance in 2012, is it fair to say that you
3 don't specifically remember asking anyone whether
4 HBC warehouse had already designed and operated a
5 system to disclose suspicious orders?
6     A.  I would say that's correct.
7     Q.  We're going to move on to some -- you
8 can lay down these exhibits that we've had in
9 front of you.  If you need to look at them at any
10 point in time, I want you to feel free to do so.
11 If you need me to direct you back to something,
12 you let me know.  We're going to move on to some
13 other documents right now.
14    (HBC-Chunderlik Exhibit 5 was marked.)
15 BY MR. ROTTINGHAUS:
16    Q.  I want to show you what has been marked
17 as Exhibit 5.  And I'm going to tell you what I've
18 told some of the other witnesses.  Forgive me that
19 some of these documents are pretty lengthy.  And
20 we're not going to go over all of them.  You
21 certainly have a right to look at anything you
22 want to look at.  But there are going to be
23 portions of some of these documents that I want to
24 focus on.
25    I'm not intentionally trying to mislead you

Page 89

1 as to what they say.  So if you want to take the
2 time to look through them, you have the right to
3 do so.  Okay?
4     A.  Sure.
5     Q.  Specifically on Exhibit 5 right now, I'm
6 focusing on the first page.  Okay?
7     A.  Yes.
8     Q.  You'll see at the top -- I'm assuming
9 this might be what we sometimes call a calendar
10 invite because it says Organizer and then it says
11 Joe Millward, does it not, at the top?
12    A.  Yes, it does.
13    Q.  And then if you look down, I think
14 you're going to see your name in the Required
15 section of that document.
16    A.  Yes.
17    Q.  I think it's the third line down.
18    A.  Yes.
19    Q.  Mr. Carlson and you among others;
20 correct?
21    A.  Yes.
22    Q.  And then it looks like there's a
23 conference room where there's going to be some
24 type of meeting or conference.
25    A.  Yes.

Page 90

1  Q.  If you look at the emails, there's an
2  email chain here, and I want to go to the second
3  page of this document now.  Are you with me?
4  A.  Yes.
5  Q.  You'll see at the top of that document
6  it's dated May 6, 2013; correct?
7  A.  That's correct.
8  Q.  And it looks like it's addressed to
9  Mr. Millward.
10  A.  Yes.
11  Q.  I'm going to read to you -- and I think
12  I'll be corrected if I'm wrong.  I think this is
13  from someone at McKesson.  Okay?
14  A.  It looks to be.
15  Q.  I really want to just focus on the first
16  sentence, and then I have a question.  It says,
17  "Dear Joseph, as we unfortunately are all aware,
18  the abuse of prescription drugs, particularly
19  controlled substances, continues to be a serious
20  problem among millions of Americans."
21  Did I read that correctly?
22  A.  You did.
23  Q.  Do you agree with that statement?
24  A.  I don't necessarily know that to be
25  true.  I cannot agree that I know that to be true.

Page 91

1  Q.  Do you have any reason or did you have
2  any reason as of 2013 to voice your opinion that
3  you disagreed with this statement to anyone?
4  A.  I don't think I voiced that opinion, no.
5  Q.  If you go back to the first page of this
6  document -- well, forgive me.  I don't mean to
7  jump around.  I should go back to the second page
8  for one more minute.
9  I believe if you go to the second paragraph
10  of this document on page 2, it's talking about an
11  effort to expand upon due diligence in providing
12  some information that's being requested of the
13  company.
14  A.  Yes.
15  Q.  Now back to page 1.  On the bottom half
16  of this, there's an email from Sabrina Cook to
17  Mr. Millward.  I don't believe you're copied on
18  this portion of the email.  But I just want to ask
19  you if you're familiar with what she's talking
20  about.  Okay?
21  She states, "Dear Joe, our regulatory team
22  has developed a CSMP questionnaire that will need
23  to be completed by all of our existing customers."
24  Do you know what that questionnaire was?
25  MR. KOBRIN:  Object to form.

Page 92

1  THE WITNESS:  I may have some
2  recollection of that.
3  BY MR. ROTTINGHAUS:
4  Q.  Then if you go to the email right above
5  that, it appears to be from Joe to Greg and,
6  again, I think you might be copied on this.  And
7  it says, "Greg, I think that you, Dan, George" --
8  and I'm assuming he's referring to you when he
9  says George.
10  A.  Yes.
11  Q.  -- "and I need to get together to review
12  and respond to this request form."
13  And then he states, "They have definitely
14  strengthened the information that they require
15  before increasing the controlled drug thresholds."
16  MR. KOBRIN:  Object to form.
17  BY MR. ROTTINGHAUS:
18  Q.  Did I read that correctly?
19  A.  Yes.
20  Q.  Does it appear to you at least as of
21  2013 that McKesson was changing the requirements
22  to increase thresholds for certain medications, or
23  do you know?
24  A.  Changing requirements, I'm not
25  necessarily sure that I believe they were changing

Page 93

1  any requirements.
2  Q.  Do you have a memory that as of 2013,
3  there were some companies, particularly
4  distributors, that had some type of threshold
5  system in place to help them determine when an
6  order might exceed what a typical order had been
7  for a controlled substance?
8  MR. KOBRIN:  Object to form.
9  THE WITNESS:  I do have a recollection
10  of that, yes.
11  BY MR. ROTTINGHAUS:
12  Q.  In fact, at some point in time in 2013,
13  it's your understanding that HBC warehouse started
14  recording on a daily basis orders that exceeded
15  thresholds; is that right?
16  A.  Yes.
17  Q.  And that was in October of 2013 that
18  went out as I understand it.
19  A.  I'm not exactly sure of which month in
20  2013, but a general area or a general timeframe
21  would be that.
22  Q.  To help refresh your memory as you got
23  ready for this deposition, did you take a look at
24  any of the daily threshold reports or daily
25  control reports as I think they are sometimes

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 called?
2     A.  I did, yes.
3     Q.  So you know what I'm talking about when
4 I talk about those daily control reports?
5     A.  Yes.
6     Q.  We're going to talk about those in a
7 little more detail in a minute.  Right now I'm
8 going to ask to refer you to a document we have
9 marked as Exhibit 6.
10        (HBC-Chunderlik Exhibit 6 was marked.)
11 BY MR. ROTTINGHAUS:
12    Q.  I'm going to focus on the first page of
13 this document.  Are you with me?
14    A.  Yes, I am.
15    Q.  This is an email from Shawn Voyten.
16    A.  Yes.
17    Q.  And Shawn is with the Giant Eagle -- was
18 with Giant Eagle at the time?
19    A.  At this period of time, yes.
20    Q.  And you were one of the individuals this
21 email was sent to along with Mr. Millward and
22 Mr. Mollica; correct?
23    A.  Correct, yes.
24    Q.  And basically, it looks to me, and take
25 your time to review it if you want to, but it

Page 95

1 looks like he's just referencing a CVS news story;
2 is that right?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  It appears so, yes.
5 BY MR. ROTTINGHAUS:
6     Q.  The second sentence -- let's focus on
7 the second sentence from him.  He sends this email
8 to everyone.  He references first that a gentleman
9 named Paul Callahan sent the article; correct?
10    A.  Yes.
11    Q.  And then he says, "Very powerful message
12 from CVS."  Did I read that correctly?
13    A.  Yes.
14    Q.  Then if we go down five paragraphs,
15 there's a paragraph that starts with "Abuse of
16 opioid..."
17    A.  Yes.
18    Q.  And here, at least according to this
19 article that Mr. Voyten has sent to you, it says,
20 "Abuse of opioid prescription pain painkillers
21 like Oxycontin ranks as the number two cause of
22 accidental death in the United States according to
23 CVS."
24        Is that right?
25    A.  That's what it says, yes.

Page 96

1     Q.  Do you remember whether in 2013 -- and
2 this was the time when you were manager of
3 compliance; correct?
4     A.  Yes.
5     Q.  Do you remember whether you were
6 surprised to find out that abuse of opioid
7 prescription painkillers was one of the leading
8 causes of accidental death in the United States?
9     A.  I can't recall if I was surprised by
10 that or not.
11    Q.  Would it be fair to say that you already
12 were aware that it was a problem in the United
13 States?
14    A.  In general, I knew that it was a
15 problem.
16        (HBC-Chunderlik Exhibit 7 was marked.)
17 BY MR. ROTTINGHAUS:
18    Q.  Let's look at what we've marked as
19 Exhibit 7.  Again, this is another one of those
20 documents that's larger than I wish it was, but
21 we've made copies.  I'm going to give your
22 attorney a chance to give you the original one
23 that we've marked with the exhibit sticker.
24        I'm going to focus you on the first page for
25 a second.  Again, I don't want to rush you if you

Page 97

1 want to look at more of this.  Okay?
2     A.  Okay.
3     Q.  The first page appears to be from
4 Mr. Millward to a couple of gentlemen, and then
5 you're copied.  You're one of two people who are
6 copied or carbon copied on the email; correct?
7     A.  That is correct.
8     Q.  What Mr. Millward appears to be
9 referencing is two presentations that were given
10 at the DEA's -- what this appears to be
11 referencing is a couple of presentations that were
12 given at a recent DEA distributor conference that
13 he and Matt Rogos had attended.
14    A.  Yes.
15    Q.  And this is in 2013?
16    A.  I would believe that to be correct.
17    Q.  Do you remember whether you would have
18 been invited to attend that conference?
19    A.  I do not recall that, that I was invited
20 to go to that conference.
21    Q.  Sitting here today, are you pretty
22 confident you did not go to that conference?
23    A.  I'm confident that I did not go to that
24 conference, yes.
25    Q.  Mr. Millward then references some slides

Page 98

1 that he pulled from the DEA website; is that
2 right?
3     A.  He does reference that, yes.
4     Q.  We're going to go to -- we're going to
5 move into this document a little bit.  I'm not
6 going to bore you with every page, although if you
7 need to look at anything, I want you to feel free
8 to.
9     I'm going to go to in the top right-hand
10 corner what is marked as -- well, actually, I'm
11 going to go to the bottom right-hand corner and
12 I'm going to reference -- I'm going to ask our
13 presentation person how many numbers he needs on
14 this.
15     While he's looking, I will tell you you'll
16 see in the bottom right-hand corner of the actual
17 slides there are numbers.
18     A.  Yes.
19     Q.  I'm at one that says 19.
20     A.  The last two digits?
21     Q.  Maybe your attorney can show you.
22         MR. ROTTINGHAUS:  Do you see what I'm
23 talking about at the bottom?  Maybe not every
24 slide has it.
25         MR. KOBRIN:  Oh, yeah, I know what

Page 99

1 you're talking about.  160 is the last three Bates
2 numbers; is that right?
3         MR. ROTTINGHAUS:  Yes.
4 BY MR. ROTTINGHAUS:
5     Q.  Are you with me on that slide that's
6 number 19?
7     A.  Yes.
8     Q.  I don't think I'm going to be showing
9 you anything you haven't seen before, but I want
10 to just ask you about this.
11     On this slide that it appears Mr. Millward
12 pulled from the DEA's website, it provides some
13 guidance as to what suspicious orders can include;
14 is that right?
15     A.  It does, yes.
16     Q.  And you at least are aware when we're
17 talking about suspicious orders right now, we're
18 talking about suspicious orders of controlled
19 substances?
20     A.  Yes.
21     Q.  And at least according to this slide,
22 suspicious orders can include orders of unusual
23 size; correct?
24     A.  Yes.
25     Q.  Or orders deviating substantially from a

Page 100

1 normal pattern?
2     A.  Yes.
3     Q.  Or orders of unusual frequency?
4     A.  Yes.
5     Q.  That's language you've seen in the Code
6 of Federal Regulations and other documents as well
7 already by that point in time?
8     A.  I have, yes.
9     Q.  So none of this is new to you; right?
10     A.  That's correct.
11     Q.  And then the DEA at the bottom of this
12 says, "These criteria are disjunctive.  They can
13 stand alone or together."  Correct?
14     A.  Yes.
15     Q.  First of all, do you remember seeing
16 this presentation when it was sent to you by
17 Mr. Millward in 2013?
18     A.  I do have a recall of this presentation,
19 yes.
20     Q.  And as the manager of compliance for
21 Giant Eagle and the HBC warehouse, you would want
22 to make sure that if there was any new information
23 in this presentation, you were aware of it;
24 correct?
25     A.  Yes.

Page 101

1     Q.  Do you remember whether at any point in
2 time in late 2013 or early 2014 you asked anyone
3 whether there was any system in place to make sure
4 that the HBC warehouse had guidance on how to
5 detect possible suspicious orders?
6         MR. KOBRIN:  Object to form.
7         THE WITNESS:  I don't recall that
8 specifically.
9 BY MR. ROTTINGHAUS:
10     Q.  I'm sorry.  Did you say you do not?
11     A.  I do not recall that specifically.
12     Q.  Let's focus for a second on the
13 timeframe of 2012 to 2014.  To your knowledge,
14 other than the daily control reports that would
15 report thresholds, and again we're going to look
16 at that in a minute, are you aware of any other
17 documentation that was created by HBC warehouse or
18 on behalf of HBC warehouse by anyone at Giant
19 Eagle concerning any orders that might be of
20 unusual size, orders that deviated substantially
21 from a normal pattern or orders of an unusual
22 frequency?
23         MR. KOBRIN:  Object to form.
24         THE WITNESS:  I'm not aware of any
25 document.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

BY MR. ROTTINGHAUS:

1  Q.  If any such documents were created on a
regular basis, it sounds as if they did not go to
you; is that correct?

5  A.  That's correct.

6  Q.  And since you were indeed the manager of
compliance, is it your belief that if such
documents had been created, they would have gone
to you?

10  MR. KOBRIN:  Object to form.

11  THE WITNESS:  I'm not sure because I was
a part of a compliance team.

13  BY MR. ROTTINGHAUS:

14  Q.  You were the manager; correct?

15  A.  That's correct.

16  Q.  Can you think of anyone else they could
have gone to other than the manager of compliance?

18  A.  The next person I would think of would
be Joe Millward and/or it could have been Greg
Carlson who had some warehouse -- at that time
some warehouse responsibilities.

22  Q.  Can you think of anyone else they would
have gone to?

24  A.  It may have gone to the warehouse
manager.

Page 103

1  Q.  Mr. Durr?

2  A.  Yes.

3  Q.  Can you think of anyone else?

4  A.  If there was a warehouse supervisor, he
may have seen something like that.

6  Q.  If you had been aware, and I'm not
suggesting there were, but if you were aware of
any such documents being prepared whenever someone
was trying to determine if there was an order of
unusual size or an order that deviated
substantially from a normal pattern or an order of
unusual frequency, had you known that such
documentation existed, would you have requested
that it come to you also as manager of compliance?

15  MR. KOBRIN:  Object to form.

16  THE WITNESS:  I'm not necessarily sure
that I would do that.

18  BY MR. ROTTINGHAUS:

19  Q.  Did you have any written guidance for
you as to what your duties really were as manager
of compliance?

22  A.  A job description, yes.

23  Q.  Who prepared that job description?

24  A.  Human resources in conjunction with
myself and Anthony Mollica.

Page 104

1  Q.  Was that document prepared back in 2012?

2  A.  I believe so, yes.

3  Q.  Have you seen that document in getting
ready for your deposition?

5  A.  I did not look at that document in
getting ready for this deposition, no.

7  Q.  Did you ask to see that document?

8  A.  I did not.

9  Q.  Do you know if that document still
exists?

11  A.  It may.

12  Q.  When you say it may, do you know for
sure?

14  A.  I believe so.

15  Q.  When did you last see it?

16  A.  It's been a while.  I can't -- I can't
come up with the exact timeframe.

18  Q.  And you're sure it existed in 2012 when
you became manager of compliance?

20  A.  Yes.

21  Q.  Do you remember what it said?

22  A.  Not specifically.

23  Q.  Did it reference any duty you would have
to oversee compliance by the HBC warehouse?

25  MR. KOBRIN:  Object to form.  Assumes

Page 105

1  facts not in evidence.

2  THE WITNESS:  Not oversee --

3  MR. KOBRIN:  Let me make sure I get my
objection in.

5  He already stated that he didn't specifically
remember what it stated.

7  BY MR. ROTTINGHAUS:

8  Q.  Do you recall whether it provided any
guidance as to what your responsibilities would
be, if any, in overseeing compliance by the HBC
warehouse?

12  MR. KOBRIN:  Object to form.

13  THE WITNESS:  Not specifically that I
can remember exact specific details.

15  BY MR. ROTTINGHAUS:

16  Q.  Do you remember if the HBC warehouse is
even referenced in this document you're talking
about?

19  MR. KOBRIN:  Object to form.

20  THE WITNESS:  I believe it was, yes.

21  BY MR. ROTTINGHAUS:

22  Q.  And how do you believe it was?

23  A.  In reviewing the job description at that
period of time.

25  Q.  So indeed that document said you would

Page 106

1 have responsibility as manager of compliance for
2 the HBC warehouse?
3    A.   As part of a collaborative team.
4    Q.   Did it discuss or did it specifically
5 say as part of --
6    A.   That would be my understanding.  I'm
7 sorry.
8    Q.   Did the document specifically say that
9 you would be part of a collaborative team in
10 overseeing the duties of compliance by HBC
11 warehouse?
12       MR. KOBRIN:  Object to form.
13       THE WITNESS:  I don't know I recall that
14 that was the exact language that was used.
15 BY MR. ROTTINGHAUS:
16    Q.   And, again, you think this document
17 still exists and would -- first of all, you think
18 the document does still exist?
19    A.   I believe it does, yes.
20    Q.   Do you believe it would help refresh
21 your recollection as to what you agreed upon as
22 your duties as manager of compliance if you could
23 see that document again?
24    A.   It may help, yes.
25    Q.   You don't have it with you today, do

Page 107

1 you?
2    A.   I do not.
3    Q.   I'm going to show you a document we have
4 marked as Exhibit 8, I think.  Let me make sure.
5 I may not need this.  Forgive me.  I'm not going
6 to show you that document right now.  I am going
7 to show it to you, but not now.
8       We've already talked about it a little bit,
9 but you're familiar with the term thresholds as
10 that might relate to daily orders of controlled
11 substances?
12    A.   Yes.
13    Q.   And when HBC enacted a daily control
14 report that reported orders exceeding thresholds
15 for certain controlled substances, do you have a
16 memory as to how it calculated the thresholds?
17    A.   I do have a vague memory of it.  I can
18 recall certain aspects of it, of the formula.
19    Q.   The company has provided testimony
20 through someone as a representative of the
21 company, and my understanding from hearing that
22 individual is that the daily threshold reports
23 were calculated by taking three times the 12-month
24 average prior to that day's report and determining
25 whether controlled substances indeed exceeded

Page 108

1 three times the average.
2    A.   I believe that to be correct, yes.
3    Q.   So in order for any controlled substance
4 to show up on those daily threshold reports, the
5 order already had to exceed three times what the
6 average had been over the last year for that
7 substance; is that correct?
8    A.   That would be correct, yes.
9    Q.   Did you have any involvement in deciding
10 upon how that threshold would be calculated?
11    A.   I don't recall.  I might have been in
12 some conversations, but I don't recall specifics
13 about those conversations.
14    Q.   Do you remember whether you were the
15 individual who said they wanted to have a daily
16 control report that showed what drugs were
17 exceeding thresholds?
18       MR. KOBRIN:  Object to form.
19       THE WITNESS:  I don't believe I was -- I
20 requested that form on my own volition.
21 BY MR. ROTTINGHAUS:
22    Q.   Did you at any point in time from 2012
23 through 2014 receive any training or guidance
24 regarding red flags to look for in determining
25 whether orders might indeed be suspicious orders?

Page 109

1    A.   Formal training, I wouldn't say formal
2 training, but just in various articles that I may
3 have read or in collaborating with the other
4 colleagues that I had.
5    Q.   When I say red flags, I know that's kind
6 of a colloquial term, but you understand what I
7 mean when I'm talking about suspicious orders and
8 red flags?
9    A.   Yes.
10    Q.   In other words, things to maybe just be
11 on the lookout for for particular orders of
12 controlled substances.
13    A.   Yes.
14    Q.   And you were aware of that even before
15 2012 before becoming manager of compliance;
16 correct?
17       MR. KOBRIN:  Object to form.
18       THE WITNESS:  As part of the warehouse
19 distribution, maybe not.
20       (HBC-Chunderlik Exhibit 8 was marked.)
21 BY MR. ROTTINGHAUS:
22    Q.   I'm going to show you now what we have
23 marked Exhibit 8.  It's, again, one of those
24 documents I'm going to ask you just a couple of
25 things, but it's fairly large.

Page 110

1    MR. ROTTINGHAUS: I think before we get
2 into this, we're going to go off the record real
3 quick because we have to change the videotape.
4    MR. KOBRIN: Take a break?
5    MR. ROTTINGHAUS: If you guys want to or
6 you want to keep moving for a little bit, I'll get
7 through this.
8    THE VIDEOGRAPHER: The time is
9 11:13 a.m. We're going off the video record.
10    (Recess from 11:13 a.m. to 11:38 a.m.)
11    THE VIDEOGRAPHER: The time is
12 11:38 a.m. We are now back on the video record.
13 BY MR. ROTTINGHAUS:
14    Q. Mr. Chunderlik, right before we took a
15 break, I think I may have referred to a document
16 we have marked as Exhibit No. 8. Do you have that
17 in front of you?
18    A. I do, yes.
19    Q. Let's look at the first page of that
20 document. This appears to be either an email or
21 some type of forward from Anthony Mollica to you
22 on May 1, 2012; is that correct?
23    A. That's correct.
24    Q. And it references the Anda Supply Chain
25 Symposium.

Page 111

1    A. Yes.
2    Q. Do you recall whether you personally had
3 attended the Anda Supply Chain Symposium?
4    A. I did not attend this symposium.
5    Q. Now, in May of 2012, it's my
6 understanding that you had not yet become the
7 manager of compliance; is that correct?
8    A. To the best of my recollection, that is
9 correct, yes.
10    Q. If we could now, let's go to -- there
11 are lengthy numbers in the bottom right-hand
12 corner of each of these documents. I may have
13 referred your attorney to the page I'm going to
14 reference. There's also a number five at the
15 bottom right-hand corner. Do you see that?
16    A. Yes.
17    MR. ROTTINGHAUS: The Bates numbers are
18 4413.
19 BY MR. ROTTINGHAUS:
20    Q. Before I actually ask you any questions
21 about this, do you know whether you ever looked at
22 this document back in May of 2012?
23    A. I have a recollection that I may have
24 reviewed it, yes.
25    Q. So at least as of 2012 when this was

Page 112

1 forwarded to you, you believe you did see some of
2 this document, if not all of it?
3    A. Yes.
4    Q. Let's look at what I had just referred
5 to as this page 5, which appears to be a
6 PowerPoint slide. Does it appear to you as well?
7    A. It does.
8    Q. And I understand this is not a document
9 that was prepared by Giant Eagle or HBC, but this
10 is a document that Mr. Mollica brought back with
11 him from the supply chain symposium; correct?
12    A. I believe so, yes.
13    MR. KOBRIN: Object to form.
14 BY MR. ROTTINGHAUS:
15    Q. That's your understanding?
16    A. That's my understanding.
17    Q. And that's your memory from 2012?
18    A. Yes.
19    Q. Now, at least on this slide it appears
20 to be, again, referencing some of the duties of a
21 distributor of controlled substances; is that
22 right?
23    A. Yes.
24    Q. And it specifically is referencing
25 Section 1301.74(a) and (b) of the Code of Federal

Page 113

1 Regulations.
2    A. Yes.
3    Q. Let's look for a second at subsection
4 (b) of this document. Once again, we're going to
5 see language that you have seen before; correct?
6    A. Yes.
7    Q. And this is, again, restating what the
8 Code of Federal Regulations says, and that is that
9 the registrant shall design and operate a system
10 to disclose to the registrant suspicious orders of
11 controlled substances; correct?
12    A. Correct.
13    Q. And then it goes on.
14    If you'll go to the next page of this, in
15 bold face it says SOM Measurements; correct?
16    A. Yes.
17    Q. Do you believe SO stands for suspicious
18 orders?
19    A. I believe so, yes.
20    Q. Now, as you look at the different topics
21 on this slide, the first thing we see is
22 controlled versus noncontrolled. Then we see cash
23 payment versus third-party payment; correct?
24    A. Yes.
25    Q. Is it your understanding that this slide

Page 114

1 is conveying a belief, for lack of a better term,
2 that a potential red flag might be when
3 individuals are paying for controlled substances
4 with cash?
5 　　　MR. KOBRIN: Object to form.
6 BY MR. ROTTINGHAUS:
7 　　Q. Rather than through insurance.
8 　　　MR. KOBRIN: Object to form.
9 　　　THE WITNESS: I'm not sure what the
10 intent of the person who put this presentation
11 together -- if that was the intent or not.
12 BY MR. ROTTINGHAUS:
13 　　Q. Does that make sense to you, that that
14 could be a red flag when people are paying with
15 cash versus third-party payments?
16 　　A. It could be.
17 　　Q. That's something you were aware of back
18 in 2012; correct?
19 　　A. Yes.
20 　　Q. A potential red flag?
21 　　A. Correct.
22 　　Q. And then it goes on to list other
23 measurements as well; does it not?
24 　　A. It does.
25 　　Q. Now, at any point in 2012 at the time

Page 115

1 you became manager of compliance for Giant Eagle
2 and the HBC warehouse, did you share with
3 individuals at HBC warehouse some of the
4 measurements or some of the factors that should be
5 taken into consideration in determining whether an
6 order might indeed be a suspicious order?
7 　　　MR. KOBRIN: Object to form.
8 　　　THE WITNESS: Restate that question one
9 more time.
10 BY MR. ROTTINGHAUS:
11 　　Q. At any point in time after you took over
12 as manager of compliance in 2012, did you share in
13 writing any potential red flags that anyone at HBC
14 warehouse should be looking for in an effort to
15 determine whether any order could indeed be a
16 suspicious order?
17 　　　MR. KOBRIN: Object to form.
18 　　　THE WITNESS: I am not aware that
19 anything was communicated to the warehouse. But
20 I'm not -- I don't have a recollection that I did
21 any of that.
22 　　　(HBC-Chunderlik Exhibit 9 was marked.)
23 BY MR. ROTTINGHAUS:
24 　　Q. We may come back to this, but we're
25 going to look at another document, Exhibit 9,

Page 116

1 right now. I'll hand that to your attorney. Are
2 you with me?
3 　　A. Yes, I am.
4 　　Q. Exhibit 9 appears to be some type of
5 either email or calendar invite from you; correct?
6 　　A. That is correct.
7 　　Q. To different individuals at Giant Eagle?
8 　　A. Yes.
9 　　Q. And the subject lines says Narcotic
10 Audit Application.
11 　　A. Yes.
12 　　Q. And this is dated January 9, 2013?
13 　　A. That's correct.
14 　　Q. And, again, this is at a point where you
15 are indeed manager of compliance?
16 　　A. Yes.
17 　　Q. And you're referencing some documents
18 for a conference call among participants regarding
19 the narcotic audit application.
20 　　A. That's correct.
21 　　Q. Do you remember this document?
22 　　A. I do.
23 　　Q. Let's look at the second page of this
24 document. At the top it says Store Requirements
25 Summary; correct?

Page 117

1 　　A. Yes.
2 　　Q. Do you remember whether you authored
3 this document?
4 　　A. I did, yes.
5 　　Q. You correct me if I'm wrong, but as I
6 read through this document, it's my understanding
7 that what you are trying to do is communicate in
8 writing some of the requirements of the stores in
9 connection with the narcotic audit application; is
10 that right?
11 　　A. That is correct.
12 　　Q. Why did you want to put this in writing?
13 　　A. Because these are procedures that were
14 new to the store as to the application that we
15 were using, and I wanted to make sure that we had
16 something to follow along during the conference
17 call.
18 　　Q. And would this be something that could
19 that way be communicated in a uniform manner to
20 all of the stores?
21 　　　MR. KOBRIN: Object to form.
22 　　　THE WITNESS: Yes.
23 BY MR. ROTTINGHAUS:
24 　　Q. Again, you wanted it in writing so
25 everybody at every store could see what the

Page 118

1 expectation was; correct?
2     A.  Yes.
3     Q.  And then if there were questions, any
4 individual at any store could pick up the phone
5 and call you; right?
6     A.  They could, yes.
7     Q.  But they would also have something as
8 guidance regarding the expectations in writing?
9     A.  Yes.
10     Q.  And that would be a resource for them;
11 correct?
12     A.  Yes.
13     Q.  And you felt this would be helpful?
14     A.  I thought it would be helpful, yes.
15     Q.  You wouldn't have prepared it if you
16 didn't think it would be helpful?
17     A.  It was a new application, and I wanted
18 to make sure that everybody understood.  The
19 application that we were using was brand new.  I
20 wanted to make sure that they understood various
21 aspects of that program.
22     Q.  And it was easier, in your opinion, to
23 make sure that was put in writing for everyone so
24 that uniformly they would all understand how to
25 use this application; correct?

Page 119

1     A.  This particular application, yes.
2         (HBC-Chunderlik Exhibit 10 was marked.)
3 BY MR. HUDSON:
4     Q.  I've handed to your attorney what we've
5 marked as Exhibit 10.  Now, I believe you told me
6 before that you don't recall between 2012 and 2014
7 providing any written guidance regarding red flags
8 that individuals at HBC warehouse should be
9 looking for with respect to determining when an
10 order indeed is a suspicious order; correct?
11         MR. KOBRIN:  Object to form.
12         THE WITNESS:  Me specifically?
13 BY MR. ROTTINGHAUS:
14     Q.  Yes.
15     A.  Not me specifically, but there may have
16 been other individuals that provided information.
17     Q.  And again, we're talking about in
18 writing right now.  And are you able to tell us
19 under oath that you are aware of anything in
20 writing that was provided to provide guidance
21 regarding red flags to look for at HBC warehouse
22 between 2012 and 2014?
23         MR. KOBRIN:  Object to form.  You're
24 going to remind him he's under oath and
25 everything.  When you say in writing, can you be a

Page 120

1 little more clear as to does that include emails,
2 other memos, or are you only talking about
3 specific official policies?
4         MR. ROTTINGHAUS:  Fair enough.  Let's
5 ask it again.
6 BY MR. ROTTINGHAUS:
7     Q.  I believe you told me before that you do
8 not have any memory of any red flags being
9 provided as guidance in writing to any individuals
10 at HBC warehouse by you between 2012 and 2014; am
11 I correct?
12         MR. KOBRIN:  Object to form.
13         THE WITNESS:  Not by me.
14 BY MR. ROTTINGHAUS:
15     Q.  So what I said is correct?
16     A.  There may be others, but not by me.
17     Q.  And when you say there may be others,
18 are you specifically aware of anything in writing
19 that was provided to individuals at HBC warehouse
20 regarding red flags to look for when determining
21 whether an order might indeed be a suspicious
22 order, or are you just speculating right now?
23         MR. KOBRIN:  Object to form.
24         THE WITNESS:  There are a lot of
25 documents that were in circulation.  I may not

Page 121

1 know the exact -- specifically what was in each of
2 those documents, but there are quite a few
3 documents.  Specifics I can't attest to.
4 BY MR. ROTTINGHAUS:
5     Q.  In fairness to you, I'm only asking what
6 you know.  And I don't expect you to be aware of
7 documents if you haven't seen them before.  But in
8 fairness to me, I'm entitled to find out whether
9 you are specifically aware of anything.  And
10 that's what I'm asking you.  So I'll ask it again.
11     Are you, Mr. Chunderlik, specifically aware
12 of anything in writing being provided to any
13 individuals at HBC warehouse by you or at your
14 direction regarding red flags to look for when
15 attempting to determine whether an order might be
16 a suspicious order between 2012 and 2014?
17     A.  Not by me specifically.
18         MR. KOBRIN:  Object to form.
19         THE WITNESS:  Not by me specifically.
20 BY MR. ROTTINGHAUS:
21     Q.  And you say "not by me specifically."
22 But in all fairness, you're not even sure if there
23 was anything in writing provided by anyone during
24 that timeframe regarding red flags; correct?
25         MR. KOBRIN:  Object to form.  I think he

Page 122

1  said he thought there were things in circulation
2  and in writing during that time period.
3      THE WITNESS:  Specifically, I don't know
4  what was in those particular documents.  But there
5  are a lot of documents in the warehouse from
6  individuals at Giant Eagle.
7  BY MR. HUDSON:
8      Q.  And your attorney can try to tell you
9  what to say all he wants, but the reality is under
10 oath, you can't tell us that you are specifically
11 aware of any; correct?
12     MR. KOBRIN:  I object to that.
13     THE WITNESS:  I cannot tell that.
14 BY MR. ROTTINGHAUS:
15     Q.  So referring to Exhibit 10, to make sure
16 that nobody is confused here, I'm referring to a
17 document that's after 2014.  This is an email
18 dated August 20, 2015.  Okay?
19     A.  Yes.
20     Q.  Now, this is after a point in time when
21 HBC warehouse had stopped distributing any
22 Schedule IIIs including hydrocodone combination
23 products; correct?  Let me back up.  I may have
24 misstated something.
25     This document was created at a point in time

Page 123

1  when HBC warehouse was no longer distributing
2  hydrocodone combination products; correct?
3      A.  That is correct.
4      Q.  Because they stopped doing so in 2014;
5  correct?
6      A.  That is correct, yes.
7      Q.  This is an email from Mr. -- at the top
8  it's from Mr. Carlson, and he sends it to a few
9  individuals, and I don't see your name on there.
10 Correct?
11     A.  That is correct.
12     Q.  You'll see why I'm asking you about this
13 document in just a second.  But what Mr. Carlson
14 says is, "Jill and Cheryl, see the guardrails by
15 Emdeon below"; correct?
16     A.  Yes.
17     Q.  And I'm not going to read the rest of
18 that sentence right now.  Right below that email
19 appears to be an email from Mr. Millward dated the
20 same date.  And on this email you are one of
21 several recipients; correct?
22     A.  Yes.
23     Q.  And this is an email from Mr. Millward,
24 and he's distributing his notes from a recent
25 Thrifty White visit?

Page 124

1      A.  Correct.
2      Q.  Do you remember this email?
3      A.  I have a vague recollection of this
4  email, yes.
5      Q.  And you did indeed receive it at the
6  time; correct?
7      A.  Yes.
8      Q.  If we look at paragraph one, the first
9  thing in the notes in paragraph number one, it
10 states, "Keep engaged with the DEA through all
11 steps in the process."
12     A.  Correct.
13     Q.  And that makes sense to you; right?
14     A.  Yes.
15     Q.  And that's what you would have told
16 anybody asking you how to keep the DEA happy.  You
17 would say "Keep them engaged"; correct?
18     MR. KOBRIN:  Object to form.
19     THE WITNESS:  It would stand -- I would
20 agree to that.
21 BY MR. ROTTINGHAUS:
22     Q.  I mean, you don't disagree with that
23 statement; right?
24     A.  No.  I don't disagree with that.
25     Q.  And then paragraph number two, read for

Page 125

1  me what that first sentence says.
2      A.  "It is critical to have a robust
3  suspicious order monitoring program."
4      Q.  And, again, as of 2015, you had no
5  reason to disagree with that statement either, did
6  you?
7      A.  No.
8      Q.  And then it states, "Relying on
9  thresholds is not good enough for the DEA."
10 Correct?
11     A.  It does say that, yes.
12     Q.  And you agree with that as well; right?
13     A.  Yes.
14     Q.  If you go down a couple of paragraphs,
15 there are some examples of -- it says Examples of
16 Flags; correct?
17     A.  Yes.
18     Q.  As you read this, do you believe that
19 Mr. Millward is probably referencing examples of
20 red flags?
21     A.  I would believe so.
22     Q.  And one of those examples is form of
23 payment, and it states cash versus medical
24 insurance; correct?
25     A.  Correct.

Page 126

1    Q.   And we talked about that before.  And
2  you agree that an example of a red flag for
3  purposes of determining whether an order might be
4  suspicious is what percentage or what share of a
5  pharmacy's clients are paying with cash versus
6  utilizing medical insurance; right?
7        MR. KOBRIN:  Object to form.
8  Misrepresents the evidence.
9  BY MR. ROTTINGHAUS:
10    Q.   I'm asking for your personal experience.
11  In your experience --
12    A.   Could you rephrase your question.
13    Q.   You worked on the retail pharmacy side
14  for a long time; correct?
15    A.   Yes.
16    Q.   And as of 2015, you were aware --
17    A.   In the retail -- I worked in the
18  corporate office from 1990 to the present.  I
19  didn't work necessarily as a dispensing pharmacist
20  at that point in time.
21    Q.   You did at some point work as a
22  dispensing pharmacist.
23    A.   From 1990, from 1980 to 1990.
24    Q.   And after 1990, you were heavily
25  involved in training pharmacy technicians?

Page 127

1    A.   Correct.
2    Q.   And individuals who would be training
3  pharmacists and pharmacy technicians; correct?
4    A.   Yes.
5    Q.   And one thing you were aware of at least
6  as of 2015 was that if a pharmacy has clients
7  coming into the pharmacy and a majority of them
8  are paying with cash versus medical insurance,
9  that could, could be a red flag for a suspicious
10  order; correct?
11    A.   Possible.
12    Q.   So you have no reason to disagree with
13  that being an example of a potential red flag?
14    A.   No.
15    Q.   And then also under that statement of
16  examples is paragraph number two, and it says,
17  "Geographical relationship of the prescriber and
18  patient to the pharmacy"; correct?
19    A.   Correct.
20    Q.   And you tell me if you agree or
21  disagree.  But if a pharmacy has patients driving
22  from hundreds of miles away to refill
23  prescriptions at that pharmacy and the pharmacy is
24  then ordering medications from HBC warehouse, you
25  would want HBC warehouse to at least be cognizant

Page 128

1  of that; correct?
2        MR. KOBRIN:  Object to form.
3        THE WITNESS:  I would agree with that.
4  BY MR. ROTTINGHAUS:
5    Q.   In other words, you've heard of the
6  phrase doctor shopping; correct?
7    A.   I have.
8    Q.   And you're aware of the concept that
9  sometimes individuals who have a problem abusing
10  prescription medications will sometimes try to
11  take medication prescriptions to different
12  pharmacies until they can get them filled;
13  correct?
14    A.   I have, yes.
15    Q.   And you are aware not just in 2015, but
16  in 2009, 2010, 2012 that if a pharmacy had
17  patients driving a long distance just to come to
18  one particular pharmacy to get their medication
19  refilled, that could be a sign of a suspicious
20  order; correct?
21    A.   Could be.
22    Q.   And then paragraph number three
23  discusses combinations of the controls being
24  dispensed.  And you're aware that hydrocodone
25  combination products can be prescribed in

Page 129

1  different amounts; correct?
2    A.   Yes.
3    Q.   Is one of them a 30 milligram?
4    A.   Not 30 milligram, no.
5    Q.   Do you remember the different
6  measurements of hydrocodone in the hydrocodone
7  combination products?
8    A.   Yes.
9    Q.   Some are larger dosages of hydrocodone
10  than others?
11    A.   Yes.
12    Q.   And if a pharmacy is ordering an
13  inordinate number of high dose hydrocodone
14  combination products, in other words, a high dose
15  of the hydrocodone in that medication, that could
16  be also a red flag for a suspicious order;
17  correct?
18        MR. KOBRIN:  Object to form.  Are you
19  talking about the pharmacies ordering from the
20  warehouse?
21        MR. ROTTINGHAUS:  Yes.
22        MR. KOBRIN:  Misrepresents the evidence.
23        THE WITNESS:  Could you restate the
24  question.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 130

BY MR. ROTTINGHAUS:

1  Q.  Let me ask you:  You said you got this
2  email back in 2015.  Where you see paragraph three
3  referencing "combination of controls being
4  dispensed," what do you interpret that to mean?
5  A.  I'm not sure what Joe meant by that.  It
6  would be only speculation on my part, but
7  combination of controls could be more than one
8  control, not necessarily a combination product.
9  Q.  In other words, it could be hydrocodone
10 and another controlled substance?
11 A.  Not necessarily hydrocodone, but there
12 could be other controlled substances, other
13 medication as well.
14 Q.  Did you have any questions about what he
15 was communicating at the time in 2015 when he sent
16 this email to you?
17 A.  Not specifically, no.
18 Q.  Do you remember picking up the phone or
19 walking down to his office and asking him what he
20 was talking about and why he was sending you these
21 notes?
22 A.  Joe and I worked very closely together.
23 And I did not have any reason -- our cubicles were
24 pretty much right next to each other.  So there

Page 131

1  was no reason for me to specifically go to his
2  area to inquire about this.
3  Q.  In part because you already knew what
4  red flags to look for; is that right?
5  A.  I had an idea, yes.
6  Q.  And again, however, that's not something
7  that as of 2014 you had ever communicated to any
8  individuals at the HBC warehouse in writing, to
9  the best of your memory?
10 MR. KOBRIN:  Object to form.  Asked and
11 answered.
12 BY MR. ROTTINGHAUS:
13 Q.  Correct?
14 A.  I have answered that question, yes.
15 Q.  The answer was I'm correct?
16 A.  Yes.
17 (HBC-Chunderlik Exhibit 11 was marked.)
18 BY MR. HUDSON:
19 Q.  I'm going to show you now what's been
20 marked as Exhibit 11.  I want to give you a chance
21 to look at it before I ask you.
22 Do you have Exhibit 11 in front of you, sir?
23 A.  Yes.
24 Q.  This is what I understand to be a daily
25 threshold report.  Is that your understanding as

Page 132

1  well?
2  A.  Yes.
3  Q.  There's been testimony in this case by a
4  representative for the company that these reports
5  started coming out in October of 2013.
6  Do you have any reason to disagree with that?
7  A.  I do not, no.
8  Q.  Do you know whether you were a recipient
9  on a regular basis of these daily threshold
10 reports?
11 A.  Yes.
12 Q.  Did you get them every day?
13 A.  Yes.
14 Q.  Do you know why you were one of the
15 individuals receiving these reports?
16 A.  Because I was part of the compliance
17 team.
18 Q.  Do you know what the expectation was
19 that you, Mr. Chunderlik, would do with these
20 reports when you received them?
21 A.  I would review these reports when they
22 came out every day.
23 Q.  And after you reviewed them, what was
24 the expectation as to what you would do with them?
25 A.  I would review.  If I felt that anything

Page 133

1  could be unusual, I would bring it to somebody's
2  attention.
3  Q.  Well, isn't it fair to say that the fact
4  that each of these medications on Exhibit 11 were
5  indeed exceeding thresholds by three times could
6  in and of itself be unusual?
7  A.  Taken from that one specific aspect, it
8  can be.
9  Q.  So one thing you would want to do when
10 you saw these daily threshold reports is make sure
11 somebody was investigating these to make sure that
12 indeed there was some explanation for why these
13 orders were exceeding thresholds?
14 MR. KOBRIN:  Object to form.
15 THE WITNESS:  Restate that.
16 BY MR. ROTTINGHAUS:
17 Q.  Sure.  You expected someone to be
18 investigating each of these orders that exceeded
19 thresholds to determine why they were indeed
20 exceeding thresholds; correct?
21 MR. KOBRIN:  Object to form.
22 THE WITNESS:  I'm not sure I would
23 expect somebody to be looking at this report and
24 reviewing it.
25

Page 134

BY MR. ROTTINGHAUS:
1  Q.  Do you know who you would expect to be
2  doing it as the manager of compliance?
3  A.  I was one of the persons who was
4  reviewing this report as well as some of the other
5  recipients of, and I don't know who else at the
6  time was seeing these reports as well.
7  Q.  When you indeed did investigate why or
8  whether any order was exceeding a daily threshold
9  for a reason, did you try to document what you
10 were doing to investigate that?
11 A.  No written documentation that I have a
12 recollection of.
13 Q.  Are you able to tell us then what you
14 did on a daily basis with respect to these daily
15 threshold reports?
16 A.  I would review --
17     MR. KOBRIN:  Object to form.
18     THE WITNESS:  I would review each line
19 to look at the store and determine if I felt that
20 anything was unusual or out of line that would
21 require further investigation.
22 BY MR. ROTTINGHAUS:
23 Q.  Do you know whether there was an
24 expectation that any of these controlled

Page 135

substances that were exceeding thresholds on a
1  daily basis would be shipped before someone did
2  due diligence to find out why they were exceeding
3  thresholds?
4  A.  Say that again.
5  Q.  Do you know whether there was an
6  expectation as to whether these medications that
7  were on this daily threshold report would indeed
8  be shipped to the pharmacy before someone did due
9  diligence to determine why they were exceeding the
10 daily threshold?
11     MR. KOBRIN:  Object to form.
12     THE WITNESS:  If something was on the
13 report, it had already been shipped.
14 BY MR. ROTTINGHAUS:
15 Q.  In other words, there was not an
16 opportunity to actually do the due diligence and
17 find out why these medications were exceeding
18 threshold before they had been shipped the way
19 these threshold reports came out?
20 A.  That's correct.
21 Q.  They had already gone to the pharmacy?
22 A.  Yes.
23 Q.  Do you know whether there was an
24 expectation that anyone would be contacting the

Page 136

various pharmacies and telling them do not
1  dispense these medications until we are able to
2  conduct due diligence to find out why this order
3  was exceeding the daily threshold?
4      MR. KOBRIN:  Object to form.
5      THE WITNESS:  Could you repeat that?
6  BY MR. ROTTINGHAUS:
7  Q.  Sure.  Do you know whether there was an
8  expectation that someone, someone on this
9  compliance team you told us about, would be
10 contacting these various pharmacies to find out
11 why their orders were exceeding daily thresholds
12 on a daily basis?
13     MR. KOBRIN:  Object to form.
14     THE WITNESS:  There were some instances
15 when that did occur.
16 BY MR. ROTTINGHAUS:
17 Q.  That's not my question.  My question is:
18 Do you know why there was an expectation that
19 someone on the compliance team would be contacting
20 these various pharmacies whose orders were
21 exceeding thresholds on a daily basis?
22     MR. KOBRIN:  Object to form.
23     THE WITNESS:  I would say that's one of
24 the reasons why we produced this report that that

Page 137

would happen.
1  BY MR. ROTTINGHAUS:
2  Q.  Do you know who was expected to make --
3  I'm sorry.  Let me ask it again.
4  Do you know who was expected to communicate
5  with these various pharmacies to find out why
6  their orders were exceeding daily thresholds?
7  A.  It could be a number of individuals,
8  myself included.
9  Q.  Was there anything put in writing to
10 provide guidance to anyone on this compliance team
11 as to who should be contacting these various
12 pharmacies?
13 A.  We communicated with each other when we
14 did that.  Whether we had anything in writing, I'm
15 not sure that there was a requirement for that.
16 Q.  Are you telling this court and jury that
17 on a daily basis, there was communication among
18 your team as to every one of these orders that
19 were exceeding thresholds?
20     MR. KOBRIN:  Object to form.
21     THE WITNESS:  I would say yes.
22 BY MR. ROTTINGHAUS:
23 Q.  And under oath you're able to tell this
24 court and jury that somebody was contacting each

Page 138

1  of these pharmacies on a daily basis to the extent
2  the pharmacy was exceeding its order or -- excuse
3  me -- its threshold?
4      A.  I did not say contacting the pharmacy.
5  Discussion amongst the compliance group.
6      Q.  I misunderstood you.  I'm sorry.
7      Do you have any memory as to what those
8  discussions would entail among the compliance
9  group?
10     A.  Not specifically.
11     Q.  And this compliance group you're telling
12  us about, who did that entail?  You and who else?
13     A.  Myself, Joe Millward, Greg Carlson on an
14  occasional basis.  I'm not sure who the other
15  folks were on the email.
16         MR. KOBRIN:  Are you talking about on
17  this particular report, Tom, or are you talking
18  about generally?
19         MR. ROTTINGHAUS:  Generally.
20  BY MR. ROTTINGHAUS:
21     Q.  If you don't know, it's okay.  I'm just
22  wondering if you know.
23     A.  I just know -- I don't know.  There were
24  other individuals, but I can't remember exactly
25  which ones were on the report and getting this

Page 139

1  report.
2      Q.  Is it fair to say that looking back,
3  you're not sure that everyone was in communication
4  as to who should be following up on every one of
5  these daily threshold reports every day?
6          MR. KOBRIN:  Object to form.
7  Misrepresents his testimony.
8  BY MR. ROTTINGHAUS:
9      Q.  I don't want to misrepresent your
10 testimony.
11     A.  I'm sorry.  Could you repeat that
12 again.
13     Q.  Sure.  I don't want to misrepresent your
14 testimony.  I just want to see if you can give us
15 an answer.  And if you can't, just tell us.
16     Is it fair to say that sitting here today,
17 you're not sure you can say with certainty that
18 someone was following up on a daily basis with
19 respect to every one of the orders that exceeded
20 threshold?
21         MR. KOBRIN:  Object to form.
22         THE WITNESS:  May not be contacting the
23 store, but reviewing this document.
24 BY MR. ROTTINGHAUS:
25     Q.  Understood that it's getting reviewed.

Page 140

1  And by the time it's getting reviewed, all of
2  these orders that have exceeded their thresholds
3  have already shipped out to the pharmacy; correct?
4      A.  That's correct.
5      Q.  And isn't it fair to say, and you tell
6  me if I'm wrong, but is it fair to say that you
7  cannot tell us with any confidence that on a daily
8  basis, someone was following up with every
9  pharmacy who had an order that exceeded the daily
10 threshold to find out why it was exceeding the
11 daily threshold?
12         MR. KOBRIN:  Object to form.
13         THE WITNESS:  I can't say that every
14 store was called.
15 BY MR. ROTTINGHAUS:
16     Q.  Isn't it fair to say that you really
17 don't know whether there was a good answer for why
18 some of these pharmacies were exceeding their
19 daily thresholds if the pharmacies weren't
20 contacted?
21         MR. KOBRIN:  Object to form.
22         THE WITNESS:  There are many different
23 things that went into why or when a store would be
24 contacted.
25

Page 141

1  BY MR. ROTTINGHAUS:
2      Q.  Tell us what things went into when and
3  why a store would be contacted.
4      A.  Some of the stores aren't here.  Because
5  of the way this report was generated, stores would
6  show up -- they could show up in the middle of a
7  month and be on the report by the end of the
8  month, and maybe they had not had an increase in
9  purchases for that particular situation.  That may
10 be one that I could think of.
11     Q.  Some stores would show up on this daily
12 threshold report within the first ten days of the
13 month, wouldn't they?
14         MR. KOBRIN:  Object to form.
15         THE WITNESS:  They could.
16 BY MR. ROTTINGHAUS:
17     Q.  And you're not able to tell us sitting
18 here today that you're confident that those
19 stores, whenever they showed up on this threshold
20 report, were always contacted to find out why they
21 might be exceeding the daily threshold?
22         MR. KOBRIN:  Object to form.  He's
23 talked about how they did follow-up also.
24         MR. ROTTINGHAUS:  You can coach him all
25 you want, but I just want an answer.

Page 142

1    MR. KOBRIN: I'm not coaching him. You
2 keep asking him the same question and trying to
3 insert your own spin on his answers.
4 BY MR. ROTTINGHAUS:
5    Q.  You can answer it however you want, sir.
6    A.  Repeat the question.
7    Q.  Isn't it fair to say that regardless of
8 when during the month a store showed up on this
9 daily threshold report, that you are not certain
10 that someone contacted that store to do any
11 investigation in an attempt to find out why the
12 store was indeed exceeding the daily threshold?
13   A.  I can't --
14      MR. KOBRIN:  This specific report or all
15 reports?
16      MR. ROTTINGHAUS:  The objections are
17 getting a little excessive now.  They can be to
18 the form.
19 BY MR. ROTTINGHAUS:
20   Q.  But you can answer the question.  I'll
21 ask it again.
22      MR. KOBRIN:  I'm going to get it on the
23 record.  I'm not clear, and this might be my
24 fault.  But that question wasn't clear to me if
25 you meant -- you were pointing to the exhibit

Page 143

1 while you asked it -- if you're referring to this
2 particular exhibit or if you're referring to the
3 entire multiyear period that this report was run.
4 BY MR. ROTTINGHAUS:
5    Q.  Isn't it fair to say, sir, that
6 regardless of when a store showed up on a daily
7 threshold report, from 2013 on, you cannot say
8 with any certainty whether on a daily basis each
9 store was contacted to determine why it was
10 exceeding its daily threshold?
11   A.  I can't say that each store was
12 contacted.
13   Q.  And sitting here today, you really don't
14 know when they were contacted and when they
15 weren't contacted; correct?
16   A.  Not at this point in time.
17   Q.  And you personally never prepared any
18 document to provide guidance for any individuals
19 as to when or why they might want to contact a
20 store if it indeed exceeded the daily threshold;
21 correct?
22      MR. KOBRIN:  Object to form.
23      THE WITNESS:  I did not provide any
24 document.
25

Page 144

1 BY MR. ROTTINGHAUS:
2    Q.  And to your knowledge, no one else did
3 either; correct?
4    A.  I'm not quite sure of that.
5    Q.  From 2012 until 2014, do you have a
6 specific recollection of any investigation that
7 was ever performed by you to determine why a store
8 was indeed exceeding its daily threshold?
9    A.  There may have been instances when
10 during an investigation I would have called a
11 store.
12   Q.  Are you positive you did so, or are you
13 just thinking that could have happened?
14   A.  I'm positive within that timeframe that
15 I would have done it at some point in time.
16   Q.  When you did that, did you take the time
17 to document, whether it be in an email or in a
18 file or in any notes, that you had indeed
19 contacted the store and had been given some
20 reassurance that the order that was exceeding the
21 daily threshold didn't have any characteristics to
22 lead you to conclude that it might be a suspicious
23 order?
24   A.  I don't have anything.  I don't believe
25 I have anything in writing, no.

Page 145

1    Q.  To your knowledge, did anybody at Giant
2 Eagle or HBC keep any logs or notes or
3 documentation of any follow-up when it was done
4 with any store in an effort to determine why the
5 store was exceeding its daily threshold?
6    A.  There were --
7       MR. KOBRIN:  Object to form.
8       THE WITNESS:  There were instances when
9 that was done.
10 BY MR. ROTTINGHAUS:
11   Q.  Was there any guidance to those
12 individuals as to when they should prepare that
13 documentation or when they shouldn't, or do you
14 think it was just done -- it was created when
15 someone did indeed contact the store?
16   A.  Yes.
17   Q.  I asked you a couple of questions.  I
18 didn't mean to confuse you.  So just to make sure
19 we're following each other, is it your belief
20 sitting here today that when a store was contacted
21 and there was some follow-up investigation with a
22 store, it would get documented in some form or
23 another?
24      MR. KOBRIN:  Object to form.
25      THE WITNESS:  I have seen documentation

Page 146

1 of that type, yes.
2 BY MR. ROTTINGHAUS:
3    Q.   And as manager of compliance, that's
4 what you would have expected of the people working
5 under you.
6       MR. KOBRIN:  Object to form.
7       THE WITNESS:  At this point in time,
8 there wasn't anybody working under me.
9 BY MR. ROTTINGHAUS:
10    Q.   As manager of compliance, you would have
11 expected that when someone did indeed contact a
12 store to do some type of follow-up to find out why
13 the store was exceeding its threshold, there would
14 be an email or some form of documentation of that?
15       MR. KOBRIN:  Object to form.
16       THE WITNESS:  Was it my expectation?
17 BY MR. ROTTINGHAUS:
18    Q.   Yes.
19    A.   Just rephrase that question or restate
20 the question.
21    Q.   First let me back up.  You do recall
22 locations where you would see an email from
23 someone between 2012 and 2017 where they
24 documented in an email or some other way that they
25 had followed up with a store about an order; is

Page 147

1 that right?
2    A.   That is correct.
3    Q.   And that's what you would have expected
4 them to do; right?
5       MR. KOBRIN:  Object to form.
6       THE WITNESS:  I'm not sure I would have
7 expected that.
8 BY MR. ROTTINGHAUS:
9    Q.   You talked about multiple individuals on
10 this team for compliance who are getting these
11 daily threshold reports, and in some way, ideally,
12 you would want your team members to be
13 communicating with each other about who was doing
14 what to follow up on those daily threshold
15 reports; correct?
16    A.   We were all in the same area, and it was
17 very easy to have verbal communication between
18 myself and the other individuals that were working
19 on that team.  I didn't necessarily see a need for
20 any written documentation when I was talking to
21 folks or when we were talking amongst ourselves.
22    Q.   Although, on some occasions, you did see
23 written documentation that someone had taken steps
24 to contact a pharmacy to find out why they were
25 exceeding a threshold?

Page 148

1    A.   There may have been instances of that.
2    Q.   You do recall some of those?
3    A.   I do, yes.
4    Q.   And that would make sense that they
5 would be communicating with the team in writing to
6 let them know they had followed up; correct?
7    A.   There may be some other folks that they
8 communicated with that I was part of the email.
9    Q.   And that's what you would expect; right?
10       MR. KOBRIN:  Object to form.  He's
11 already answered.
12       THE WITNESS:  I don't necessarily know
13 if I expect that.
14 BY MR. ROTTINGHAUS:
15    Q.   You're the manager of compliance.
16    A.   I am.
17    Q.   You had certain expectations as to how
18 things would be handled to make sure that HBC
19 warehouse was complying with the Controlled
20 Substances Act; correct?
21       MR. KOBRIN:  Object to form.
22       THE WITNESS:  If I knew somebody was
23 communicating, I wouldn't necessarily need to see
24 it in writing.
25

Page 149

1 BY MR. ROTTINGHAUS:
2    Q.   Understood.  But you did have certain
3 expectations as to how things would be handled to
4 make sure that HBC warehouse was complying with
5 its duties under the Controlled Substances Act;
6 correct?
7       MR. KOBRIN:  Object to form.  Asked and
8 answered.
9       THE WITNESS:  I think I have answered
10 that question.
11 BY MR. ROTTINGHAUS:
12    Q.   Is the answer "yes" or "no"?
13       MR. KOBRIN:  Object to form.
14       THE WITNESS:  In certain situations, I
15 would expect to see some documentation, not
16 necessarily in all situations.
17       (HBC-Chunderlik Exhibit 12 was marked.)
18 BY MR. ROTTINGHAUS:
19    Q.   I'm going to show you what's been marked
20 as Exhibit 12.  Are you with me?
21    A.   I am, yes.
22    Q.   I think Exhibit 12 is a two-page
23 document that's, once again, an email chain.  Does
24 it appear that way to you as well?
25    A.   Yes, it does.

Page 150

1    Q.   If we go to the second page, this email
2  starts on November 14 at 8:50 a.m.; correct?
3    A.   Yes.
4    Q.   And it's from Kayla Voelker?
5    A.   Yes.
6    Q.   It's my understanding that oftentimes
7  Kayla would be the person who would email these
8  daily threshold reports.
9         MR. KOBRIN:  Object to form.
10 BY MR. ROTTINGHAUS:
11   Q.   I may be incorrect.  Do you know?
12   A.   I don't necessarily know if it was
13 Kayla.
14   Q.   At least on this day, it appears that
15 Kayla was emailing the group to let them know that
16 there had been two pharmacies exceeding the
17 purchasing thresholds for certain controlled
18 substances so far that month; is that right?
19   A.   Correct.
20   Q.   This was dated November 14.
21   A.   Yes.
22   Q.   Then if we flip to the first page of
23 this document, I think there's a response by
24 Mr. Millward, and you're copied on the response.
25 His response actually is including a couple of

Page 151

1  individuals named Todd and Bobby.
2    A.   Correct.
3    Q.   And they were with Giant Eagle as well?
4    A.   Yes.
5    Q.   Or did they work at the HBC warehouse?
6    A.   No.  They did not work at the warehouse.
7    Q.   And at least in this case, Mr. Millward
8  is documenting that he is asking them to check
9  with these two stores, and he's referencing an
10 attached spreadsheet which I'm not sure I have,
11 but he's asking them to see if the increase in
12 ordering is legitimate; correct?
13   A.   He is, yes.
14   Q.   And he's proposing some questions that
15 could be asked in conducting that inquiry; right?
16   A.   Yes.
17   Q.   One of the questions -- and he's got, I
18 think, six different questions here.  One of them
19 is:  "Has the store experienced an overall
20 increase in prescription volume compared to the
21 last year, and, if so, what's the percentage
22 increase?"
23        MR. KOBRIN:  Object to form.
24        THE WITNESS:  Yes.
25

Page 152

1  BY MR. ROTTINGHAUS:
2    Q.   Then he suggests asking if the pharmacy
3  has had an acquisition in the last year; correct?
4    A.   I see that, yes.
5    Q.   Then asks:  "Has a new physician
6  practice opened in the geographic location within
7  the last year?"  Correct?
8         MR. KOBRIN:  Object to form.
9         THE WITNESS:  Yes.
10 BY MR. ROTTINGHAUS:
11   Q.   Another question is whether the pharmacy
12 has a patient or multiple patients requiring the
13 same drugs?
14        MR. KOBRIN:  Object to form.
15        THE WITNESS:  Yes, I see that.
16 BY MR. ROTTINGHAUS:
17   Q.   And then he has just a couple of
18 additional factors to consider; correct?
19   A.   Yes.
20   Q.   And these appear to be questions that in
21 your mind would be good questions to ask a
22 pharmacy when determining whether an order they
23 have that is exceeding thresholds has a good
24 reason; correct?
25   A.   Yes.

Page 153

1    Q.   Based on one occasion in November of
2  2013, we see all of these things being put to
3  writing?
4    A.   Yes.
5         MR. KOBRIN:  Object to form.
6  BY MR. ROTTINGHAUS:
7    Q.   You're not sure whether this type of
8  input was given on a daily basis or this type of
9  inquiry was followed with any pharmacies on a
10 daily basis; is that right?
11        MR. KOBRIN:  Object to form.
12        THE WITNESS:  Not to this level.
13 BY MR. ROTTINGHAUS:
14   Q.   Now, as I understand from the testimony
15 of other individuals when medications would ship
16 from HBC pharmacy, they would be going to one of
17 the HBC -- I'm sorry -- one of the Giant Eagle --
18 let me back up.
19        It's my understanding when medications would
20 ship from HBC warehouse, they would be going to
21 one of the 200 or so Giant Eagle pharmacies --
22   A.   That's correct.
23   Q.   -- operating in five different states;
24 correct?
25   A.   Yes.

Page 154

1    Q.   Once a pharmacy receives medications,
2  I'm assuming, and you correct me if I'm wrong,
3  they may dispense those medications the same day,
4  the next day or two weeks later?
5       MR. KOBRIN:  Object to form.
6       THE WITNESS:  That could be possible,
7  yes.
8  BY MR. ROTTINGHAUS:
9    Q.   The idea in general theory is a pharmacy
10 doesn't want to have too much stuff stocked on its
11 shelves at any given point in time so that it can
12 kind of efficiently maintain its inventory; right?
13   A.   I would agree, yes.
14   Q.   So it would not surprise you if some of
15 the Giant Eagle pharmacies that were receiving
16 orders for controlled substances were indeed
17 distributing those -- I'm sorry -- were indeed
18 selling or dispensing those controlled substances
19 within a matter of either hours or days after they
20 received them?
21      MR. KOBRIN:  Object to form.
22      THE WITNESS:  I don't know if I could
23 say with any degree of certainty that that was
24 always the case.
25

Page 155

1  BY MR. ROTTINGHAUS:
2    Q.   My question is a little different.
3       But you would agree in general that once a
4  pharmacy received an order for controlled
5  substances, those controlled substances might
6  leave the shelves and get dispensed within hours
7  of receipt or they may sit there for a few days
8  before they're picked up or dispensed; right?
9    A.   They may, yes.
10   Q.   At least with respect to this inquiry
11 that's being done that started on November 14, if
12 you go to the top of the first page of Exhibit 12,
13 we see an email dated 10 days or 11 days later,
14 November 25; correct?
15   A.   Yes.
16   Q.   And this email is providing some
17 information regarding the pharmacies that
18 Mr. Millward was referencing should be asked some
19 questions; correct?
20   A.   Yes.
21   Q.   And then in that email, it says, "Tony
22 will continue to do his due diligence on those."
23 Is that right?
24   A.   Yes.
25   Q.   So does it appear to you that although

Page 156

1  the daily threshold report was issued and an
2  inquiry was made on November 14 about two
3  pharmacies, even as of November 25, someone had
4  not yet had an opportunity to -- I think I'm
5  mistaken.  Forgive me.  I think I'm being
6  misleading, and I didn't mean to.
7       Part of the inquiry that's being done, and I
8  skipped through an email, was on November 18, Todd
9  Roahrig sent an email asking someone named Tony to
10 give some information regarding the clinics and
11 their names and numbers that might be referring
12 patients to these pharmacies; is that right?
13   A.   That looks to be, yes.
14   Q.   And then on November 25, there's an
15 email providing information regarding those
16 clinics; is that right?
17   A.   Yes.
18   Q.   So at least 11 days after this initial
19 inquiry was raised, it appears that people are
20 still trying to investigate at least which clinics
21 might be prescribing for patients that are coming
22 to these pharmacies?
23      MR. KOBRIN:  Object to form.
24 Misrepresents the evidence.
25      THE WITNESS:  I don't know what would

Page 157

1  have taken place November 18 and November 25.  I
2  don't know that that was the first time that there
3  had been any conversation or any other
4  correspondence.
5       (HBC-Chunderlik Exhibit 13 was marked.)
6  BY MR. ROTTINGHAUS:
7    Q.   I show you what we've marked as
8  Exhibit 13, which is reference number 1001.  This
9  is an email that starts out at the bottom on
10 January 10, 2014; correct?
11   A.   Yes.
12   Q.   This is, again, an email from
13 Ms. Voelker stating that one pharmacy had exceeded
14 the purchasing thresholds so far that month and
15 we're only ten days into the month; correct?
16   A.   Yes.
17   Q.   And then right above that, Mr. Millward
18 provides some input, and you're copied on the
19 email, where he states that store 8 is flagged as
20 having hit their threshold for total hydrocodone
21 products?
22   A.   Yes.
23   Q.   And then he asks if someone can please
24 see if this is an anomaly or if the orders should
25 be considered suspicious; correct?

Page 158

1    A.  Correct.
2    Q.  And then that same day, Mr. Roahrig
3  responds that he had spoken to someone at the
4  pharmacy.
5    A.  That's what that appears to be, yes.
6    Q.  And at least it appears that the inquiry
7  he did was he determined that it was cold and did
8  he say cough -- cough and cold season and this
9  medication is one that's used to treat coughs and
10  colds.
11    A.  Yes.
12    MR. KOBRIN:  Object to form.
13  BY MR. ROTTINGHAUS:
14    Q.  From his email are you able to tell
15  whether he did any additional inquiry?
16    A.  I cannot tell from this email if there
17  was anything additional.
18    (HBC-Chunderlik Exhibit 14 was marked.)
19  BY MR. HUDSON:
20    Q.  Let's look at Exhibit 14.  Are you with
21  me?
22    A.  Yes.
23    Q.  This is an email dated August of 2015;
24  correct?
25    A.  Yes.

Page 159

1    Q.  August 28, 2015.
2    A.  That's correct.
3    Q.  From Mr. Millward where you are copied.
4    A.  Yes.
5    Q.  And here he's talking about a policy
6  that was submitted for VAWD; correct?
7    A.  Correct.
8    Q.  And you told me before that you remember
9  a policy being prepared in order to obtain VAWD
10  certification.
11    A.  Correct.
12    Q.  I'm not sure about the timeframe we were
13  talking about.  But in reviewing this email, does
14  it appear to you that Giant Eagle was trying to
15  obtain VAWD certification for one of its states as
16  of August 2015?
17    A.  Correct.
18    Q.  Here in this email at the bottom, the
19  last two sentences of the first paragraph say,
20  "Team members:  At the distribution center
21  identify unusual pick quantities and escalate the
22  flagged items to the facility supervisor who
23  escalates the issue to the GE pharmacy team."
24    Do you know whether he is referring the GE
25  distribution center or the HBC warehouse?  I

Page 160

1  assume GE.
2    MR. KOBRIN:  Object to form.
3  BY MR. ROTTINGHAUS:
4    Q.  If you don't know, it's okay.
5    A.  I do not know.
6    Q.  We know that HBC warehouse stopped
7  distributing hydrocodone combination products in
8  November of 2014; correct?
9    A.  That's correct.
10    MR. KOBRIN:  You might want to have the
11  deponent read the exhibit over.
12    MR. ROTTINGHAUS:  Absolutely.  I don't
13  have any further questions about this, I don't
14  think.  Actually, I do.
15  BY MR. ROTTINGHAUS:
16    Q.  Take your time.  If you look at the
17  second page of this document, Exhibit 14, it's a
18  suspicious order policy that we're going to be
19  talking about in some more detail in a little bit.
20  On the left-hand column of this policy, it says a
21  created date.  It says August 1 of '14; correct?
22    A.  It does, yes.
23    Q.  Did you create this policy?
24    A.  I created it in collaboration with
25  others.

Page 161

1    Q.  Are you the one that actually typed it
2  out?
3    A.  I'm not sure if I typed this out, but
4  I'm familiar with the policy.
5    Q.  Sitting here, are you pretty confident
6  that you at least had input on this policy?
7    A.  Yes.
8    Q.  And this is the policy that Mr. Millward
9  is referencing when he says "Here is the policy we
10  submitted for VAWD"?
11    A.  Yes.
12    (HBC-Chunderlik Exhibit 15 was marked.)
13  BY MR. HUDSON:
14    Q.  We're going to come back to that policy
15  in a little bit.  I'll show you what's been marked
16  as Exhibit 15.  I'm almost through most of these.
17  Are you with me?
18    A.  Yes.
19    Q.  At the top of this exhibit is an email
20  from you to Mr. Millward.  It's dated January of
21  2016.
22    A.  Correct.
23    Q.  You say, "Hi, Joe.  I noticed that Kris
24  did not have you on this.  These items will be
25  blocked."  Correct?

Page 162

1    A.   Correct.
2    Q.   At this point in time, how were these
3 orders getting, as you say, blocked?
4    A.   There had to be some manual intervention
5 to block those orders.  The warehouse would be
6 notified not to deliver those orders.
7    Q.   Because even as of January of 2016,
8 there was not any type of automated system that
9 would prevent these orders from getting filled and
10 shipped from the warehouse level; is that correct?
11    MR. KOBRIN:  Object to form.
12 BY MR. ROTTINGHAUS:
13    Q.   Or from the distribution center level.
14    A.   That's correct.
15    MR. KOBRIN:  We do have lunch here, so I
16 don't know if you want to wrap up soon.
17    MR. ROTTINGHAUS:  I will.  I'll wrap up
18 in just a minute.
19 BY MR. ROTTINGHAUS:
20    Q.   Then going back to the timeframe of 2012
21 to 2014, it's also fair and correct to say that if
22 an order was going to be blocked from the HBC
23 warehouse, it had to be manually done so by
24 someone contacting the warehouse and telling them
25 not to ship or someone at the warehouse deciding

Page 163

1 not to ship; is that correct?
2    In other words, there was not an automated
3 system to block any orders from the HBC warehouse?
4    A.   That's my recollection; that is correct.
5    MR. ROTTINGHAUS:  This is probably a
6 fine time to stop.
7    THE VIDEOGRAPHER:  The time is
8 12:32 p.m.  We are going off the video record.
9    (Recess from 12:32 p.m. to 1:32 p.m.)
10    THE VIDEOGRAPHER:  The time is 1:32 p.m.
11 We are now back on the video record.
12    EXAMINATION
13 BY MR. HUDSON:
14    Q.   Good afternoon, Mr. Chunderlik.  My name
15 is Ty Hudson.  Mr. Rottinghaus has got to run to
16 the airport, so I'm going to take over.  I have
17 some questions for you.
18    As you recall, before lunch we were talking
19 some about the daily threshold reports.  Do you
20 remember the discussion about those reports?
21    A.   Correct.
22    (HBC-Chunderlik Exhibit 16 was marked.)
23 BY MR. HUDSON:
24    Q.   Now let me hand you what I've marked as
25 Exhibit 16.

Page 164

1    MR. HUDSON:  The internal reference
2 number, just for the record, is P-HBC-1132.
3 BY MR. HUDSON:
4    Q.   And this is a multi-page document with
5 an email and then an attachment of a
6 questionnaire, do you see that, from a
7 manufacturer?
8    A.   Yes.
9    Q.   And from time to time, did manufacturers
10 from whom Giant Eagle was buying drugs ask HBC or
11 Giant Eagle to fill out questionnaires?
12    A.   Yes.
13    Q.   And is this an example of one of those
14 questionnaires?
15    A.   This is an example of one of those
16 questionnaires, yes.
17    Q.   And if we look -- and I believe the
18 exhibit has got a summary page on page 1, and then
19 it looks like it's the same email on page 2 or at
20 least the same questionnaire then on pages 3, 4
21 and 5.  Do you see that?
22    A.   Yes.
23    Q.   So I'm going to focus then on the
24 questions from the manufacturer to you that are on
25 pages 3, 4 and 5.  Okay?

Page 165

1    A.   Yes.
2    Q.   And so on the first page of the
3 questionnaire, this is directed to HBC asking
4 about the corporate headquarters; correct?
5    A.   That's correct.
6    Q.   And then the next section, section two,
7 relates to the registered distribution center.  Do
8 you see that?
9    A.   Yes.
10    Q.   And then the third section talks about
11 prior history of the distribution center; right?
12    A.   Yes.
13    Q.   And then the fourth is business
14 information.
15    A.   That is correct, yes.
16    Q.   And then the fifth is SOM and
17 anti-diversion program; right?
18    A.   Yes.
19    Q.   I want to focus on the fifth section.
20 That's questions 27 through 32.  Do you see those?
21    A.   Yes.
22    Q.   And this is an example of a manufacturer
23 asking HBC whether the company has a suspicious
24 order monitoring program which complies with 21
25 CFR 1301.74(b) for controlled substances; correct?

Page 166

1    A.  Yes.
2    Q.  And then the next question, 28, asks:
3  "Does the company have a suspicious order
4  monitoring program which complies with 21 USC
5  830(b) for listed chemicals?"  Correct?
6    A.  Correct.
7    Q.  And then if we skip down to question 30,
8  it says, "Please provide a copy of your suspicious
9  order monitoring program, SOP or summary of
10  program."
11    Do you see that?
12    A.  Correct, yes.
13    Q.  Have you heard the term SOM sometimes?
14    A.  I have, yes.
15    Q.  And that's suspicious order monitoring?
16    A.  Yes.
17    Q.  And then SOP or summary of program;
18  right?  Do you see that there in the second part
19  of number 30?
20    A.  Yes.
21    Q.  So SOM is an acronym for suspicious
22  order monitoring, and then SOP is an acronym for
23  summary of program; right?
24    A.  That is correct.
25    Q.  And in this particular questionnaire,

Page 167

1  this particular manufacturer is asking HBC to
2  provide a copy of their program to them; right?
3  That's what question 30 is asking?
4    A.  That is correct, yes.
5    Q.  Now, if we go back to the first page of
6  this exhibit, do you see there at the top there's
7  an email from Mr. Millward to yourself,
8  Mr. Carlson, Mr. Voyten and then copies to
9  Mr. Mollica, Mr. Bianco?
10    A.  Yes.
11    Q.  And the subject is:  FW:  Wholesale
12  Distributor Questionnaire.  And then you can see
13  there attachment show that the Wholesale
14  Distributor Questionnaire that we were talking
15  about is the attachment to this email; right?
16    A.  I'm sorry.
17    Q.  Do you see under attachment Wholesale
18  Distributor Questionnaire?
19    A.  Yes, yes, yes.
20    Q.  And that's the questionnaire that we've
21  been talking about that you can see is the
22  Wholesale Distributor Questionnaire; right?
23    A.  Yes.
24    Q.  So now down below in the body of the
25  email, Mr. Millward is asking Mr. Voyten and

Page 168

1  Mr. Carlson -- at the very end of his email, do
2  you see where he says at the end, "We need lock
3  down an SOM SOP ASAP"?
4    A.  Yes.
5    Q.  And does that indicate to you as a
6  recipient of this email that Mr. Millward was
7  indicating to Mr. Voyten, Mr. Carlson, yourself
8  and others copied that HBC needed to lock down a
9  suspicious order monitoring program ASAP?
10    MR. KOBRIN:  Object to form.
11  Misrepresents the document.
12    THE WITNESS:  I don't know what
13  Mr. Millward meant by lock down terminology.  I'm
14  not familiar with that.  I'm not sure what he
15  meant by that.
16  BY MR. HUDSON:
17    Q.  You've never heard the phrase lock down
18  before?
19    MR. KOBRIN:  Object to form.
20    THE WITNESS:  Not used in a context such
21  as this I have not.
22  BY MR. HUDSON:
23    Q.  You agree that in this questionnaire, as
24  we talked about, that the manufacturer was asking
25  for a copy of HBC's SOM; right?

Page 169

1    MR. KOBRIN:  Object to form.
2  BY MR. HUDSON:
3    Q.  In question 30 that we talked about
4  before.
5    A.  A copy of our suspicious order
6  monitoring program or a summary of that program,
7  yes.
8    Q.  Right.  And then in response with the
9  forward of this email, Mr. Millward is then
10  forwarding that email, and in the body of his
11  email, he's saying, "We need lock down an SOM SOP
12  ASAP."  Right?
13    A.  I see that, yes.
14    Q.  Can we agree ASAP means as soon as
15  possible?
16    A.  Yes.
17    Q.  Do you think there's a connection
18  between this manufacturer asking for a copy of
19  HBC's suspicious order monitoring program and
20  Mr. Millward's comments that "We need lock down an
21  SOM SOP ASAP"?
22    MR. KOBRIN:  Object to form.
23  Misrepresents the evidence.
24    THE WITNESS:  Could you state the
25  question.  I'm not sure I fully understand it.

Page 170

BY MR. HUDSON:
1 Q. Sure. Do you think there's a
relationship between the manufacturer asking for a
suspicious order monitoring program from HBC and
Mr. Millward's comments to this group that "We
need lock down an SOM SOP ASAP"?
MR. KOBRIN: Ty, you keep saying that
they want a copy of the program. That's not what
it says. So I object to the misrepresentation of
what question 30 actually says.
THE WITNESS: I'm not sure I understand
what you mean by relation. I'm not sure I
understand what you mean by relation.
BY MR. HUDSON:
Q. I thought we established previously that
in question 30, the drug manufacturer was asking
HBC to provide them with a copy of your suspicious
order monitoring program.
A. Or a summary of the program.
Q. Right, or a summary of the program;
right?
A. Yes.
MR. KOBRIN: I object. That's not what
it says.
MR. HUDSON: That's fine.

Page 171

MR. KOBRIN: It never said suspicious
order monitoring program.
MR. HUDSON: If you want to take a break
to talk to your witness, you're happy to, and then
you can ask him clarifying questions.
MR. KOBRIN: I'm objecting that you've
done it several times.
MR. HUDSON: Then object to form.
MR. KOBRIN: Despite my objections,
you're misrepresenting what is on the page and
you're confusing the witness. So I'm going to
object.
BY MR. HUDSON:
Q. Mr. Chunderlik, do you agree that
question 30 says, "Please provide a copy of your
suspicious order monitoring program, SOP or
summary of program"?
A. I believe that is what it says there,
yes.
Q. And you agree with me that what that
means is that the manufacturer is asking Giant
Eagle or HBC to provide a copy of your suspicious
order monitoring program, SOP or a summary of the
program?
MR. KOBRIN: Object to form.

Page 172

THE WITNESS: I would agree that that's
what they are asking for.
BY MR. HUDSON:
Q. So my question is: That request from
the manufacturer, is there a relationship between
that and Mr. Millward's comment to this group "We
need lock down SOM SOP ASAP"?
A. I can't interpret exactly what he means
by that.
Q. Do you know at the time that this email
was written in January of 2014 whether or not HBC
had any written policies for suspicious order
monitoring?
A. No, I cannot.
(HBC-Chunderlik Exhibit 17 was marked.)
BY MR. HUDSON:
Q. Let me show you then what I've marked as
Exhibit 17, which is the company's answers to some
questions that we asked them about their written
policies and procedures. Okay? You're welcome
to look at the entire document. I'm just going to
focus on question two right now.
A. On the first page?
Q. So question two is on the top right.
It's P-HBC-0011.8. You see question two says,

Page 173

"Please produce each of your suspicious order
monitoring system policies and procedures since
January 1, 2006 and identify the Bates-stamped
range for each."
I'm sorry. I need to give you time to get
there.
A. Could you repeat the page number?
Q. Absolutely. On the top right it's 11.8.
A. 11.8, okay.
Q. Do you see the question there?
A. Yes.
Q. So they're asking for -- the question is
asking for each suspicious order monitoring system
policy or procedure since January 2006.
Do you see that?
A. Yes, I do.
Q. Now, if you turn to the next page, which
is 11.9, there's a number of objections, but when
you get down, do you see the dashes with the Bates
ranges which are some document reference numbers
and then a list of policies and procedures? Do
you see that?
A. Yes.
Q. Do you see as you go down they become
later in date? So the first one is 2015, then

Page 174

1  2016, then 2017 and so forth.
2      A.  Yes.
3          (HBC-Chunderlik Exhibit 18 was marked.)
4  BY MR. HUDSON:
5      Q.  Let me hand you what I've marked as
6  Exhibit 18, and I'll represent to you that
7  Exhibit 18 is a compilation document that we put
8  together that puts all in one place the documents
9  that HBC has identified as written policies or
10 procedures in answer number two.  Okay?
11     A.  Okay.
12     Q.  So if we look at Exhibit 18, and you'll
13 see, again, if you just scan through Exhibit 18 --
14 do you see there that the documents -- the date of
15 the policies get later in time, meaning the first
16 policy earliest in time is first and then as you
17 go back, they become later in time?
18     A.  Yes.  Let me get through the...
19     Q.  Sure.
20     MR. HIMMEL:  I apologize for
21 interrupting.  But remotely, I don't know if I'm
22 the only one, I've lost the live transcription.
23 We still have video, but not the transcription.
24     MR. HUDSON:  Let's go off the record.
25     THE VIDEOGRAPHER:  The time is 1:46 p.m.

Page 175

1  We are going off the video record.
2      (Recess from 1:46 p.m. to 1:50 p.m.)
3      THE VIDEOGRAPHER:  The time is 1:50 p.m.
4  We're back on the video record.
5  BY MR. HUDSON:
6      Q.  Mr. Chunderlik, we're back on
7  Exhibits 17 and 18, 17 being the company's
8  responses to some questions and then 18 being a
9  summary of those documents.
10     A.  Yes.
11     Q.  Have you had a chance to review
12 Exhibit 18?
13     A.  I have looked over the information, yes.
14     Q.  And do you see that the effective date
15 of the policies gets later as you go back, later
16 in time as you go back?
17     A.  Yes.
18     Q.  So can we agree that the first policy
19 identified by Giant Eagle or HBC, the effective
20 date is August 1, 2014?
21     A.  That is what the document says, yes.
22     Q.  And it's got a created date of 8/1/14 as
23 well; correct?
24     A.  Yes.
25     Q.  And does that indicate to you that it

Page 176

1  was created the same day that it became effective?
2      A.  The policy was worked on prior to this
3  in varying -- to varying degrees.  So we had been
4  working on this policy prior to August 1, 2014.
5      Q.  Is that something that you know
6  independent of looking at the document or
7  something you believe to be true by looking at the
8  document?
9      A.  Independent of looking at the document.
10     Q.  Do you have a recollection of working on
11 this particular policy prior to August 1, 2014?
12     A.  Yes, I do.
13     Q.  And who were you working with?
14     A.  It would have been myself and other
15 members of the compliance team, Joe Millward, as
16 well as the gentleman who is listed on this
17 policy, Matt Rogos.  I believe at the time we also
18 had a project manager that was helping us with
19 this as well.
20     Q.  Can we agree that this is the first
21 written policy or procedure created by Giant Eagle
22 or HBC relating to monitoring suspicious orders of
23 controlled substances?
24     MR. KOBRIN:  Object to form.  By this do
25 you mean the 8/1/14 policy or the policy here?

Page 177

1  BY MR. HUDSON:
2      Q.  Do you understand the question?
3      A.  I'm not sure I do.
4      Q.  The policy that we're looking at, the
5  first page of Exhibit 18 --
6      A.  Yes.
7      Q.  -- you testified that you believe there
8  was a version that was created on or around
9  August 1, 2014; right?
10     A.  Yes.
11     Q.  And you recall working on that?
12     A.  Yes.
13     Q.  So that August 1, 2014 policy, can we
14 agree that that was the first written policy or
15 procedure created by Giant Eagle or HBC relating
16 to monitoring suspicious orders of controlled
17 substances?
18     A.  Did you say written policy?
19     Q.  Yes.
20     A.  I am not quite sure.
21     Q.  You agree that that's the first policy
22 that's been identified by the company, correct, if
23 you look back at Exhibit 17 back on page 11.9?
24     A.  Yes.  So this is referring to.  I'm just
25 looking at the numbers here making sure I have

Page 178

1 everything matched up.
2    Q.  Sure.  And the best way to do that is
3 there's a Bates number on it.
4    A.  Correct.
5    Q.  So you can see that ending in 638 and
6 then that matches with the 638.
7    A.  Yes.  On Exhibit 17 it has the long
8 Bates-stamp number, and it says HBC policy
9 effective 4/9/2015 to 2/26/2016, version 2,
10 updating 8/1/14 version of policy.
11    Is that what this is referring to?
12    Q.  Yes.  You're jumping to what was going
13 to be my next question.  Actually, the document --
14 the first page of Exhibit 18, do you see on the
15 top right it says version number and it says 2,
16 and then it says revision date 4/9/2015?
17    A.  Yes.
18    Q.  So what we're looking at, the first page
19 of Exhibit 18, is actually the second version of
20 that written policy; right?
21    A.  Yes.
22    Q.  But you've testified that you believe
23 that there was a first version that was created on
24 August 1, 2014; right?
25    A.  There may have been.

Page 179

1    Q.  And that's something you've testified
2 that you have a recollection of participating in
3 the drafting of; right?
4    A.  Yes.
5    Q.  So do you know why there would not be a
6 copy of version 1, the 8/1/14 version of this
7 written policy or procedure?
8    A.  I do not.
9    Q.  Would it be the practice of Giant Eagle
10 or HBC to maintain written policies once they're
11 created?
12    A.  As much as possible.
13    Q.  Do you know of any reason why a policy
14 would not be retained?
15    A.  I can't think of any, no.
16    Q.  Is it possible that there wasn't a
17 version 1 created on 8/1/2014?
18    A.  I can't be sure of that, no.
19    Q.  I know you can't be sure.  What I'm
20 asking is:  Are you sure one way or the other
21 whether or not there was, in fact, an
22 8/1/14 version of this policy?
23    MR. KOBRIN:  Object to form.  He
24 testified about that already.
25    THE WITNESS:  I'm not sure.

Page 180

1 BY MR. HUDSON:
2    Q.  So you just don't know one way or the
3 other as you sit here today whether or not there
4 is a version 1 of this policy that was created on
5 or around August 1, 2014?
6    A.  As I sit here today, it's 2019.  This is
7 a 2014 document.  I don't have a total recall of
8 that.
9    Q.  Right.  I understand.  Previously though
10 you had testified that to the best of your
11 recollection, you thought you had actually done
12 some work on the August 1, 2014 version of the
13 policy, and that's why I want to make sure the
14 record is clear.
15    Is it possible that, in fact, it was version
16 2 that you were working on in 2015 and not version
17 1 on August 1, 2014?
18    MR. KOBRIN:  Object to form.
19    THE WITNESS:  That could be possible.
20 BY MR. HUDSON:
21    Q.  And again, just so the record is clear,
22 it would be your expectation and belief that based
23 on Giant Eagle's and HBC's practices, that if
24 there was, in fact, an August 1, 2014 version of
25 this policy created, you would expect that the

Page 181

1 company would have retained that and have a copy
2 of it in its files today?
3    MR. KOBRIN:  Object to form.
4    THE WITNESS:  I'm not necessarily sure
5 of that for these documents.
6 BY MR. HUDSON:
7    Q.  As you sit here today, is there any
8 reason you can think of why the company would have
9 created a policy on or around August 1, 2014, but
10 then made a decision not to retain that?
11    A.  Not a conscious decision to do that.
12    Q.  Were the suspicious order policies
13 something that Giant Eagle and HBC take seriously?
14    A.  Yes.
15    Q.  Was it something that in or around 2014
16 and 2015 that Giant Eagle and HBC were focused on
17 making sure that they had effective written
18 policies and procedures in place?
19    A.  We had many policies that we were
20 working on at the same time, not just this policy.
21 My recollection is that, yes, we take policies
22 very seriously.  But I don't have a definite
23 recollection of the series of events that may have
24 taken place for that.
25    Q.  Sure.  I'll represent to you that

Page 182

1  Exhibit 18, to the best of our knowledge, based on
2  the information we've obtained from the company
3  and the other witnesses we've deposed, this
4  version 2 dated April 9, 2015 is the earliest
5  document that I'm aware of that's been identified
6  as a written policy or procedure at Giant Eagle or
7  HBC relating to monitoring suspicious orders of
8  controlled substances.
9      As you sit here today, are you aware of any
10 written policies or procedures that were created
11 prior to the one that we've been looking at that's
12 the first page of Exhibit 18?
13     A.  There were a lot of policies.  I don't
14 recollect this particular policy specifically.
15     Q.  Right.  I understand.  My question
16 though, just so the record is clear and I get your
17 best testimony, do you have any recollection of
18 any other suspicious order monitoring policy or
19 procedure that was created by Giant Eagle or HBC
20 prior to the one that we're looking at, page 1 of
21 Exhibit 18 that's got a revision date of April 9,
22 2015?
23     A.  Not in written form.
24     Q.  So then if we go back to Exhibit 16,
25 which has got an internal reference number of

Page 183

1  1132 --
2      A.  Yes.
3      Q.  -- that was the email that's dated
4  January of 2014?
5      A.  Yes.
6      Q.  Do you think that Mr. Millward in his
7  email to Mr. Carlson, Mr. Voyten and yourself, do
8  you think he was -- do you think he was
9  referencing in that email written policies or
10 procedures relating to suspicious order
11 monitoring?
12     A.  I'm not sure exactly what Joe was
13 referring to, what Joe Millward was referring to
14 by what he is saying in this document.  I didn't
15 write this, so I'm not necessarily sure I know for
16 sure as I sit here today five years later what he
17 meant by this.
18     Q.  Right.  I understand.  Do you have any
19 independent recollection of any of the events that
20 happened in January of 2014 related to this
21 request for an SOM or SOP?
22         MR. KOBRIN:  Object to form.
23         THE WITNESS:  I'm sorry.  Could you
24 restate that one more time.
25

Page 184

1  BY MR. HUDSON:
2      Q.  Sure.  This email with the attachment
3  from Qualitest I believe --
4      A.  Yes.
5      Q.  -- asking for -- question 30 that we've
6  talked about, asking for a copy --
7      A.  Yes.
8      Q.  -- of your suspicious order monitoring
9  program, SOP or summary of program, is there
10 anything else you recall about this request?
11     A.  Not about this request, no.
12     Q.  Did you have any involvement with trying
13 to figure out whether or not the company had the
14 documents that were being requested or, I guess, a
15 copy of your suspicious order monitoring program,
16 SOP or summary of program?
17     A.  Yes.
18     Q.  You were involved with trying to figure
19 out whether the company had a copy of it?
20     A.  Yes.
21     Q.  And did the company have a copy?
22     A.  I'm not quite sure from this timeframe.
23 I'm not really sure if we did have a copy.
24     Q.  Do you know whether or not a copy was
25 provided to Qualitest?

Page 185

1      A.  A copy -- I don't know if it was a
2  formalized policy as on Exhibit 18.  My
3  recollection is that we would have provided a
4  summary of our program versus a written policy as
5  shown in Exhibit 18.
6      Q.  And what is your recollection of -- at
7  this time in January of 2014, what was the system
8  or what was the suspicious order monitoring?  What
9  was happening at that time?
10     A.  At that point in time, as we've seen, we
11 had daily reports based upon stores that may have
12 exceeded the threshold that we had set up, and if
13 stores flagged on those reports, they were
14 followed up on, and that was part of the
15 explanation in this document.
16     Q.  So at this point in time in January of
17 2014, to the best of your recollection, the system
18 that was in place was the daily threshold reports
19 that you've talked about; correct?
20     A.  Correct, yes.
21     Q.  Now, at some point in 2015, did Giant
22 Eagle take steps to open a new distribution
23 facility where Giant Eagle was going to become a
24 distributor of Schedule II controlled substances?
25     A.  Yes.  We began processes.  We began the

Page 186

1 stages of putting that in place.
2      (HBC-Chunderlik Exhibit 19 was marked.)
3 BY MR. HUDSON:
4      Q.  And let me just hand you what I'm
5 marking as Exhibit 19.
6      My question is:  Is this an email relating to
7 that process of opening the new Giant Eagle RX
8 distribution center?
9           MR. HUDSON:  For the record, the
10 internal reference number is 1107.
11          THE WITNESS:  Could you repeat the
12 question about this document again.
13 BY MR. HUDSON:
14      Q.  Sure.  My question was:  Is this
15 document an example of an internal discussion that
16 was occurring involving the compliance team
17 relating to the opening of the new GERX
18 distribution facility?
19      A.  Yes.
20          MR. KOBRIN:  Can we take a moment and
21 read -- have you had a chance to read over the
22 whole thing, George?
23          THE WITNESS:  I'm familiar with this
24 document.
25          MR. KOBRIN:  Just take a minute and read

Page 187

1 it over.
2          THE WITNESS:  Yes.  I believe that was
3 in anticipation of moving towards the new
4 distribution center.
5 BY MR. HUDSON:
6      Q.  And this is an email from Mr. McClune to
7 Mr. Millward, Ms. Boyd, yourself, Mr. Zakin and
8 Mr. Dougherty?
9      A.  Yes.
10      Q.  And who was Mr. McClune?
11      A.  Mr. McClune was at that point in time
12 the head of our -- in charge of pharmaceutical
13 buying.  He didn't do the buying, but he was in
14 charge of it, and he had some responsibility in
15 that area.
16      Q.  And he writes, "Team, based on our call
17 from Friday, here's how I see the current process
18 working in the short term knowing that an overhaul
19 is imminent considering the GERX distribution
20 facility at FFM will be handling CII shortly."
21      And then he goes on and puts four different
22 points underneath that; right?
23      A.  Yes.
24      Q.  And was this a summary of how HBC would
25 handle its process for monitoring and blocking

Page 188

1 controlled substances in the short term?
2          MR. KOBRIN:  Object to form.
3 Misrepresents the exhibit.
4          THE WITNESS:  Be handling the CII,
5 Schedule II controlled substances.
6 BY MR. HUDSON:
7      Q.  He says here, "Based on our call from
8 Friday, here's how I see the current process
9 working in the short term knowing that an overhaul
10 is imminent considering the GERX distribution
11 facility at FFM will be handling CII shortly."
12      Is this Exhibit 19 a plan for the new
13 distribution facility, or was that a short-term
14 plan for the HBC distribution facility until the
15 new facility opened?
16      A.  This would be the short term until the
17 new facility opened is how I interpret this.
18      Q.  Read number one, if you would.
19      A.  "McKesson/Anda blocks the controlled
20 substance order to the store based on their
21 managed thresholds."
22      Q.  Was that something that McKesson or Anda
23 ever did for controlled substance orders to Giant
24 Eagle retail pharmacies for Schedule III
25 controlled substances like hydrocodone or other

Page 189

1 controlled substances?
2      A.  I believe that would have included that
3 as well.
4      Q.  At some point in time, did HBC or Giant
5 Eagle rely on McKesson or Anda to block orders of
6 Schedule IIIs that were going from HBC to the
7 Giant Eagle retail pharmacies?
8      A.  We wouldn't have relied on McKesson to
9 do any of that.  It was coming from our own
10 warehouse.
11      Q.  And I'm just trying to figure out what
12 this document means.  But to me, I thought they
13 were saying in the short term meaning once the new
14 Giant Eagle facility opens for control IIs, since
15 the old HBC facility didn't distribute Schedule II
16 controlled substances, that the new facility was
17 going to.
18      I read this to mean in the short term,
19 McKesson or Anda would be focusing on blocking the
20 Schedule IIs from the new facility.  But I want to
21 make sure that I'm reading it correctly.
22      And if you don't know, you don't know.  I'm
23 trying to get your best testimony.
24      A.  I don't know.
25          (HBC-Chunderlik Exhibit 20 was marked.)

Page 190

BY MR. HUDSON:

Q. Let's go then to the next document, which I've marked as Exhibit 20. You can put that one to the side. I want to go back then to this topic of manufacturers asking for copies of HBC's suspicious order monitoring business practices. Okay?

A. Okay.

Q. And I've marked as Exhibit 20 a document that has an internal number of 2010, and it's an email from yourself to Erin Hart. Do you see that on page 1?

A. Yes.

Q. And then the subject is: USL Questionnaire.

A. Yes.

Q. And then there's an attachment Controlled Substance Handling Questionnaire_Upshur-Smith.doc. Do you see that?

A. Yes.

Q. And then attached to this email is a questionnaire from Upshur-Smith; correct?

A. Yes.

Q. And in your email, you said, "Hi, Erin. Here's the completed questionnaire. I marked no

Page 191

for the question that asked if we would be willing to send a copy of our documented SOM business practice. They may balk at that. Thanks, George."

Do you see that?

A. Yes.

Q. Is this request by Upshur-Smith in April of 2016 similar to the request that we looked at before in Exhibit 16 with the questionnaire from that Qualitest?

A. Not exactly the same, but similar.

Q. Are both companies asking you for your suspicious order monitoring program that would comply with 21 CFR 1301.74(b)?

A. I would say yes.

Q. And at least for the request that we've got from Upshur-Smith in April of 2016, you've indicated that Giant Eagle or HBC is unwilling to provide a copy of that SOM business practice; correct?

A. Yes.

Q. Do you know how many requests from manufacturers there were for a documented SOM business practice or an SOM system?

A. I don't have an exact number, but

Page 192

several. I don't have an exact number though. There was more than one.

Q. And did you decline to provide a documented SOM business practice to each of the manufacturers that requested it to your knowledge?

A. Declining an SOM business practice, I know in several instances we re-sent in the summary, a summary of our business practice, yes.

Q. In this particular one though, they're asking for a copy of the actual business practice or the program or the system, whatever you want to call it. They're asking for a copy of that itself, right, not just a summary?

MR. KOBRIN: Object to form.

THE WITNESS: I could read that as being the documented SOM business practice being a summary.

BY MR. HUDSON:

Q. Let's look at question five. Question five from Upshur-Smith is: "Would you be willing to send a copy of your documented SOM business practice to USL?"

And you've answered: "No."

So does that indicate that at least in April of 2016, Giant Eagle and HBC were unwilling to

Page 193

send a copy of its documented SOM business practice to Upshur-Smith?

A. They gave us an option here, yes or no. I marked no. If they would have asked in a different manner, rather than giving the option, I would have felt more that we should be sending them at least a summary of the business practice.

Q. And in your email to Ms. Hart -- and who was Erin Hart?

A. She worked under Bob McClune. She does the majority of the buying for the warehouse.

Q. In your email to her, you write, "They may be balk at that."

Did manufacturers want to have a copy of distributors' suspicious order monitoring system or policy documents in order to ensure that they had proper systems in place that complied with the federal --

A. Many of them -- many of them --

MR. KOBRIN: Object to form.

THE WITNESS: -- would have requested.

BY MR. HUDSON:

Q. Many of them would request that?

A. Um-hum.

Q. And by providing a copy of your

Page 194

1 suspicious order monitoring business practice to
2 Upshur-Smith, you would have been showing them
3 that you had a robust system in place that
4 complied with the federal framework; correct?
5       MR. KOBRIN: Object to form.
6       THE WITNESS: Yes.
7 BY MR. HUDSON:
8    Q.  And here you've chosen not to do that;
9 right?
10   A.  I was given the option.  If they would
11 have come back, we would have complied with their
12 request.
13   Q.  Were you concerned that manufacturers
14 would look at the suspicious order monitoring
15 business practice document or documents that you
16 had in place at that time and be concerned that
17 they were not fulfilling the obligations under the
18 federal framework?
19       MR. KOBRIN: Object to form.
20       THE WITNESS: I don't believe that to be
21 the case, no.
22 BY MR. HUDSON:
23   Q.  Why then would you not provide a copy of
24 the suspicious order monitoring business practice
25 to a manufacturer who was asking for it?

Page 195

1    A.  There's no reason to share an internal
2 document.
3    Q.  Wouldn't that provide comfort and
4 confidence to Upshur-Smith that Giant Eagle and
5 HBC were fulfilling their obligations to monitor
6 suspicious orders under the Controlled Substances
7 Act?
8    A.  I don't necessarily know that for sure.
9 I don't know what they did with these forms after
10 they received these.
11   Q.  Are you aware of any other reason why
12 manufacturers were asking for this other than to
13 make sure that the distributor who the
14 manufacturer was sending their controlled
15 substances to was, in fact, complying with the
16 Controlled Substances Act?
17   A.  Restate that question again.
18   Q.  In other words, can we agree that the
19 reason why manufacturers were asking for the
20 document on suspicious order monitoring business
21 practices is to make sure that HBC as a
22 distributor was complying with the requirements of
23 the Controlled Substances Act?
24   A.  That could have been one of the ways in
25 which they were doing that.  I'm not exactly -- I

Page 196

1 don't know exactly what the manufacturers that
2 requested were -- how they used these forms or
3 what they did with them once they received them
4 back from us.
5    Q.  If you look at question four from
6 Upshur-Smith.  So question three was: "Is your
7 suspicious order monitoring process automated?"
8       And you answered: "Yes."  Right?
9    A.  Yes.
10   Q.  So actually if we move up, let's just go
11 through each one of these questions.  For
12 suspicious order monitoring, it said, one, "Do you
13 currently have an active and documented SOM
14 process?"
15       And you said: "Yes."  Right?
16   A.  Yes.
17   Q.  And then the second question is: "How
18 long has your documented process existed?"
19       And you said: "18 plus months."  Right?
20   A.  Yes.
21   Q.  So you're representing to Upshur-Smith
22 that it's been for more than 18 months.  So 18
23 months previous to April of 2016, you had a
24 documented process that existed?
25       MR. KOBRIN: Object to form.  The

Page 197

1 document speaks for itself.
2       THE WITNESS: Yes.
3 BY MR. HUDSON:
4    Q.  And if we went back 18 months from 2016,
5 that would be like roughly October of 2014, in
6 that ballpark?
7    A.  I haven't done the calculation, but it
8 could have been in the timeframe of August
9 roughly.  These are -- when they give ranges like
10 this, 18 plus months, it could take us back to
11 before that period of time.
12   Q.  18 or longer; right?  So you're saying
13 at least into October of 2014 and maybe further
14 back you had a documented process; right?
15   A.  Yes.
16   Q.  Then number two was: "Does your current
17 process" -- so this isn't asking about your past
18 process; this is asking about your current
19 process -- "Does your current process include
20 monitoring your individual customers based on the
21 following criteria:  Order quantity, order
22 frequency, order pattern?"
23       And you answered "Yes" to all three; right?
24   A.  Yes.
25   Q.  So you were telling Upshur-Smith that in

Page 198

1 April of 2016, you had a process for monitoring
2 orders of controlled substances that was based on
3 criteria involving order quantity, order frequency
4 and order pattern; correct?
5    A.  Yes.
6    Q.  Then the next question is:  "Is your
7 suspicious order monitoring process automated?"
8 And you said: "Yes."  Right?
9    A.  Yes.
10   Q.  Then number four said:  "Please briefly
11 describe how technology is used in the SOM
12 process."
13   And you said:  "The ordering monitor system
14 uses algorithms to identify controlled substance
15 orders that require investigation before releasing
16 the order for distribution."  Right?
17   A.  Yes.
18   Q.  Describe for me the SOM process that
19 Giant Eagle or HBC had in place in April of 2016
20 that used algorithms.  What was the program?
21   A.  It would have been the program that was
22 used to produce the daily reports that we were
23 getting.
24   Q.  So in your mind, the SQL that Kayla
25 Voelker created in October of 2013?

Page 199

1    A.  Yes.
2    Q.  That was the system that was still in
3 place through April of 2016?
4    A.  Yes.
5    Q.  It is your belief that that system that
6 generated daily threshold reports was an
7 algorithm?
8    A.  I believe it was.  I believe it fits in
9 my definition of an algorithm.
10   Q.  Describe for me how that system monitors
11 order frequency.
12   A.  We could see on that report how often a
13 store ordered a product.
14   Q.  The daily threshold reports are only
15 flagging stores that are going over the thresholds
16 based on the 12-month rolling data; correct?
17   A.  Yes.
18   Q.  So the program that Kayla Voelker set up
19 with the SQL, it was flagging orders of unusual
20 size based on historical ordering patterns and
21 then comparing those to the current orders; right?
22   A.  Yes.
23   Q.  And any order that was three times
24 bigger than the company-wide 12-month rolling
25 average would get flagged on that report as being

Page 200

1 over the daily threshold; correct?
2    A.  On that report, yes.
3    Q.  Right.  But how would that report which
4 is only focused on orders or shipments that are
5 going over a specific threshold, how would those
6 monitor frequency?
7    A.  We had access to other information that
8 we would -- that we could check if we needed to.
9 We could go back and check orders that didn't even
10 show up on the report if we needed to.
11   Q.  But you're telling Upshur-Smith in April
12 of 2016 that you have an automated process for
13 doing that, you agree with that, in answer to
14 questions two and three; right?
15   MR. KOBRIN:  Object to form.
16   THE WITNESS:  Part of the process, the
17 automated portion of it is to flag whenever an
18 order does go over the threshold.  Part of it
19 does.  In my estimation, as I was answering the
20 question, I feel that our ordering system was
21 automated to some extent to help us monitor the
22 orders that were coming from our pharmacies.
23 BY MR. HUDSON:
24   Q.  How about order pattern, how would the
25 daily threshold reports that are flagging only

Page 201

1 orders that are exceeding a threshold, how would
2 those help HBC or Giant Eagle monitor the pattern
3 of orders?
4    MR. KOBRIN:  Object to form.
5    THE WITNESS:  Again, on those reports,
6 you could see a pattern.  You could see once they
7 did trigger on the report, if they came up -- if
8 the quantity of the order was increasing, it could
9 detect a pattern from that information.
10 BY MR. HUDSON:
11   Q.  Those would be flagged because they're
12 an order of unusual size, right, unusual quantity?
13   A.  Flagged on the report.  But if need be,
14 we could go back and look at orders to see how
15 they were progressing because we had access to
16 other information that we could check, not just
17 this report.
18   Q.  Can we agree that in order to check
19 order frequency or order pattern, HBC and Giant
20 Eagle did not have an automated process for doing
21 that.  It would require you to go look at other
22 documents and try to determine the order patterns
23 or order frequencies of the pharmacies?
24   MR. KOBRIN:  Object to form.  Misstates
25 the evidence.

Page 202

1    THE WITNESS:  In that instance, we would
2  have access to that information.  It wouldn't be
3  part of what shows up from an automated algorithm
4  triggering the order.
5  BY MR. HUDSON:
6    Q.  Right.  In other words, the only -- and
7  I think you testified to this.  I just want to
8  make sure the record is clear.  The only automated
9  process that existed at this time in April of 2016
10  were the daily threshold reports that Kayla
11  Voelker was creating where if a store's order
12  exceeded the threshold, it would trigger and pop
13  up on the daily report?
14    MR. KOBRIN:  Object to form.
15    THE WITNESS:  That's correct.
16  BY MR. HUDSON:
17    Q.  Sir, is that why you didn't want to give
18  Upshur-Smith a copy of of your SOM business
19  practice, because they would be able to see that
20  most of it wasn't automated?
21    A.  No, that was not my intent.  No, I would
22  not say that.
23    Q.  But you do agree that if Upshur-Smith
24  went and looked and compared the program to the
25  answers in two and three, they would be able to --

Page 203

1  and they asked for supporting documentation of how
2  the process actually existed, there wouldn't be
3  any automated process for monitoring order
4  frequency or order pattern; correct?
5    MR. KOBRIN:  Object to form.
6    THE WITNESS:  I don't know what their
7  interpretation would be if they went back to see
8  our process.
9  BY MR. HUDSON:
10    Q.  We've already testified previously that
11  the process was these daily monitoring reports
12  that were being created by Kayla Voelker and the
13  SQL that she created, right, where it was flagging
14  pharmacies that were making above certain
15  quantities; right?
16    A.  Yes.
17    Q.  So that particular report would not have
18  the full breadth of orders or shipments that were
19  occurring by any one pharmacy such that you could
20  look at the frequency or the patterns of past
21  orders and compare those to the current orders;
22  right?
23    MR. KOBRIN:  Object to form.
24    THE WITNESS:  I don't really know how
25  Upshur-Smith would have interpreted the document

Page 204

1  or if they would have come back to us to ask
2  additional questions.
3  BY MR. HUDSON:
4    Q.  You do agree you made the conscious
5  decision not to provide them with a copy of your
6  suspicious order monitoring program?
7    A.  I did.
8    Q.  Did the suspicious order monitoring
9  program become more sophisticated later in 2016 at
10  the new Giant Eagle facility?
11    A.  As we progressed from the early stages
12  of the program up until that time, yes.  We're
13  always looking to improve the program where we
14  were able to as we learned more information, as
15  we -- always trying to get better at what we were
16  doing.
17    (HBC-Chunderlik Exhibit 21 was marked.)
18  BY MR. HUDSON:
19    Q.  I'll hand you what I've marked as
20  Exhibit 21.
21    MR. HUDSON:  Exhibit 21, the internal
22  number is 1033.
23    THE WITNESS:  Yes.
24  BY MR. HUDSON:
25    Q.  This is an email and an attachment, and

Page 205

1  the attachment, the title is Project Scope Drug
2  Control Program.
3    A.  Yes.
4    Q.  Then it looks like it's an email from
5  Philip Raub to yourself and others in November of
6  2016.
7    A.  Yes.
8    Q.  And is this a new version of the drug
9  control program or the scope of implementing a new
10  program for monitoring suspicious orders?
11    A.  Yes.
12    Q.  If you turn back to the page 1.4, the
13  internal reference number on the top right, it's
14  .4, and 2.0 says Project Scope Statement.  Do you
15  see that?
16    A.  Yes.
17    Q.  Are you familiar with these?  I'll give
18  you a second to read this, but are you familiar
19  with the statement that's contained here on this
20  page?
21    A.  I do want to take a moment to read this.
22    Q.  Sure.
23    MR. HUDSON:  Let's go off the record.
24  We need to change the tape.
25    THE VIDEOGRAPHER:  The time is 2:33 p.m.

Page 206

1  We are going off the record.
2        (Recess from 2:33 p.m. to 3:17 p.m.)
3        THE VIDEOGRAPHER:  The time is 3:17 p.m.
4  We're now back on the video record.
5  BY MR. HUDSON:
6     Q.  Mr. Chunderlik, we're back looking at
7  Exhibit 21, which is an email from November of
8  2016 that's attaching a project scope drug control
9  program document.  And we were back on the page
10 with the internal number of 1.4.  And that's the
11 project scope statement.
12    I believe you testified that you have
13 reviewed this document.
14    A.  Yes.
15    Q.  Did you review it at the time that it
16 was sent by Mr. Raub?
17    A.  I have a vague recollection of seeing
18 this document in that period of time.
19    Q.  And this is in November of 2016;
20 correct?
21    A.  Yes.
22    Q.  And the new Giant Eagle RX distribution
23 facility, that opened around November -- excuse
24 me -- February of 2016?
25    A.  Correct.

Page 207

1     Q.  Is that right?
2     A.  Yes.
3     Q.  So at this point in time, the new
4  facility has been open about nine months; right?
5     A.  Yes.
6     Q.  And then in the first paragraph is
7  then -- do you see there is a description of the
8  prior drug control program?  I'll give you a
9  chance to read it.
10    A.  Okay.
11    Q.  The first subparagraph is focusing on
12 the history of the drug control program for
13 Schedule II controlled substances; right?
14    A.  Yes.  Sorry.  Say that again.  I just
15 want to make sure.
16    Q.  Sure.  The first paragraph is focusing
17 on the history of the drug control program for
18 Schedule II narcotics?
19    A.  Specific to Schedule IIs?
20    Q.  Correct.
21    A.  Yes.
22    Q.  And there it indicates in the last
23 sentence, "With the completion of the GE CII
24 warehouse came the need for a more robust
25 monitoring program that covers store to patient as

Page 208

1  well as distribution to store transactions."
2     Do you see that?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  I do see that.
5  BY MR. HUDSON:
6     Q.  Do you know what that means, covers
7  store to patient as well as distribution center to
8  store transactions?
9     A.  Yes, I think so.
10    Q.  What does that mean to you?
11    A.  That we would be able to track the
12 controlled substance as it was distributed from
13 our distribution center to the store and also that
14 part of this process would allow us to automate
15 the process of prescriptions going from the store
16 to the patient.
17    Q.  And in the next paragraph, it then says,
18 "DEA regulation CFR 1301.74(b)..."  And that's
19 that provision that we talked about before; right?
20    A.  Yes.
21    Q.  It says, "...specifically requires that
22 a registrant design and operate a system to
23 disclose to the registrant suspicious orders of
24 controlled substances."  Right?
25    A.  Yes.

Page 209

1     Q.  Then it says, "Purposefully vague, the
2  DEA leaves GE, the registrant, to interpret the
3  elements and metrics of a monitoring system."
4  Right?
5     A.  That's what's said here, yes.
6     Q.  Then it says, "It is the belief of the
7  business that" -- do you know what he means by the
8  reference to the business?
9     A.  I don't necessarily know what this
10 person is referring to when they say it's the
11 belief of the business.
12    Q.  Mr. Raub, I guess, is the one who's
13 sending out this email and said scope document
14 attached; right?
15    A.  Right.
16    Q.  He says, "It is the belief of the
17 business that Giant Eagle's suspicious order
18 monitoring is 75 to 85 percent of where it needs
19 to be.  The missing 15 to 25 percent of the
20 necessary functionality needed to bring the Giant
21 Eagle into full complains with CFR 1301.74(b) can
22 be achieved through the following:"
23    Then there's three bullet points; right?  Do
24 you see that?
25    A.  Yes.

Page 210

1    Q.   It says, "Dynamic threshold management."
2  Do you know what that means?
3    A.   I don't necessarily know what the
4  gentleman was referring to by dynamic threshold
5  management.
6    Q.   Do you know Mr. Raub?
7    A.   I do know him.
8    Q.   And what was Mr. Raub's position?
9    A.   At the period of time of this
10 document -- currently he's the -- he is in charge
11 of our pharmacy inventory, but at the time of the
12 document, he was a business analyst for Giant
13 Eagle.
14   Q.   So was it his job in connection with
15 creating this new drug control program document to
16 evaluate the current state of the GE suspicious
17 order monitoring system as it existed?
18   A.   He may have had some part in that.  I
19 don't know if it was his specific job.
20   Q.   Is that what an analyst does, is
21 analyzes different aspects of the business and
22 tries to find ways to improve them?
23   A.   One of the many, yes.
24   Q.   And do you believe that Mr. Raub was
25 competent at his job?

Page 211

1    A.   From the interaction that I've had with
2  Mr. Raub, I believe he does have -- he is
3  competent at his job.
4    Q.   Do you believe that he was informed
5  about what was happening at Giant Eagle?
6        MR. KOBRIN:  Object to form.  No
7  foundation.
8        THE WITNESS:  I'm not necessarily sure
9  that he was at this point in time.
10 BY MR. HUDSON:
11   Q.   Do you think the person creating the
12 drug program policy document didn't understand
13 Giant Eagle's suspicious order monitoring?
14   A.   I think he had some understanding of it.
15   Q.   Do you disagree with his view that Giant
16 Eagle's suspicious order monitoring is 75 to
17 85 percent of where it needs to be?
18   A.   Yes.
19   Q.   Did you believe at this time in November
20 of 2016 that Giant Eagle was at a hundred percent
21 of where it needed to be?
22   A.   I felt that we could always improve.
23 Would I say a hundred percent?  Maybe not to that
24 extent, but we were always looking to improve our
25 system.

Page 212

1    Q.   Did Giant Eagle have dynamic threshold
2  management at this time in November of 2016?
3    A.   I'm not exactly sure what is meant by
4  dynamic threshold management.  We had a threshold
5  management process that we've already discussed.
6  Whether I would term it dynamic, I don't know what
7  is meant by that dynamic part of threshold
8  management.
9    Q.   This is indicating that there needs to
10 be some change to the threshold, the way in which
11 the threshold management is being operated, right,
12 from his point of view at least?
13   A.   Maybe some improvement.
14   Q.   And then the second bullet point is
15 "Re-engineering and formalizing the current
16 investigative process."  Right?
17   A.   That's what he says here, yes.
18   Q.   We've talked about the investigative
19 process earlier in the day.  You and
20 Mr. Rottinghaus did; correct?
21   A.   Yes.
22   Q.   And I believe you testified that there
23 was no formal -- up until this point in 2016,
24 there was no formal process for documenting the
25 investigations as they were concurring; correct?

Page 213

1    A.   We had a process to do the
2  investigations.  Actually, not in all cases
3  documenting.  A lot of the investigation took
4  place through communication with the PDL, the
5  pharmacy district leader, the stores, the
6  warehouse and so on.
7    Q.   But as you sit here today, you can't
8  personally recall a specific investigation that
9  you undertook; correct?
10       MR. KOBRIN:  Object to form.
11       THE WITNESS:  I participated in some
12 investigations.  I'm not sure if you mean if I led
13 an investigation.
14 BY MR. HUDSON:
15   Q.   As you sit here today, do you have a
16 recollection of specific investigations of
17 specific stores that you led?
18   A.   Not necessarily that I led, but I
19 participated in.
20   Q.   That you participated in?
21   A.   Yes.
22   Q.   Which store was it of the 200?
23       MR. KOBRIN:  Object to form.
24       THE WITNESS:  I'm sure I had some
25 involvement in the store number 8 that we've

Page 214

1  already discussed.
2  BY MR. HUDSON:
3      Q.  Other than store number 8, any other
4  investigations you recall?
5      A.  There were some.  I can't remember
6  specific stores.
7      Q.  Do you remember who you talked to at
8  those stores?
9      A.  I would talk to the pharmacy manager.
10     Q.  Do you remember the names of anybody in
11 particular that you talked to between 2009 and
12 2014?
13         MR. KOBRIN:  Object to form.
14         THE WITNESS:  I would have talked to the
15 pharmacy manager.  Whether they've changed from
16 that point in time, I'm not sure, but I don't
17 recall the specific pharmacist that I talked to.
18 When I make a call to the pharmacy, I always ask
19 for the pharmacist in charge or the pharmacy
20 manager.
21 BY MR. HUDSON:
22     Q.  What particular information did you ask
23 for when you made those calls?
24         MR. KOBRIN:  Object to form.
25         THE WITNESS:  I would ask about if there

Page 215

1  is any -- some of the questions that we had on
2  our -- on one of the previous forms that we
3  discussed that had some of those six questions on
4  there.
5  BY MR. HUDSON:
6      Q.  Did you ask the same questions every
7  time, or did they change?
8      A.  They may have change a little bit.
9      Q.  As you sit here today, can you remember
10 any specific questions that you asked any
11 pharmacist at any particular store between 2009
12 and 2014?
13     A.  Some of the things that I was most
14 interested in when I asked were information on
15 pain clinics, if there were any new physicians in
16 the area.
17     Q.  Anything else that you asked?
18     A.  There may have been, but I can't recall
19 specifically.
20     Q.  Did you ever uncover that there were
21 ever pain clinics or new physicians in the area?
22     A.  Yes.
23     Q.  And would that cause you to have a
24 suspicion that there would be a heightened risk
25 for diversion?

Page 216

1      A.  I wouldn't necessarily say a heightened
2  risk.  I knew that there were probably going to be
3  more prescriptions coming from those facilities.
4  We look to fill prescriptions, legitimate
5  prescriptions.  I had no reason to believe that if
6  a physician has written a prescription, that the
7  pharmacy was going to do their due diligence to
8  determine if that was a legitimate prescription or
9  not.
10     Q.  Other than asking the pharmacist whether
11 there were new physicians or pain clinics in the
12 area, anything else that you can recall doing your
13 due diligence to investigate flagged orders?
14         MR. KOBRIN:  Object to form.  Asked and
15 answered.
16         THE WITNESS:  Other than that, there may
17 have been situations where I had asked about
18 specifically what types of prescriptions that they
19 were seeing from the pain clinic or from the
20 physician's offices and if there was any reason
21 why they had a reason -- if there weren't any pain
22 clinics or new offices being opened, what the
23 pharmacy would have thought was a reason for the
24 increase in purchases in prescriptions.
25

Page 217

1  BY MR. HUDSON:
2      Q.  You agree that between October of 2013
3  and October of 2014, when these daily threshold
4  reports were being generated at the same time that
5  HBC was acting as a distributor of hydrocodone
6  combination products, that there were in excess of
7  a hundred flagged shipments that exceeded those
8  thresholds; right?
9          MR. KOBRIN:  Object to form.
10         THE WITNESS:  I knew that there were
11 stores on the report.  I don't know exactly how
12 many.
13 BY MR. HUDSON:
14     Q.  Can you give any ballpark estimate as
15 you sit here today of whether there were five or a
16 hundred?
17     A.  There were more than five.  There may
18 have been a hundred.  I'm not sure exactly.  I
19 don't have the exact numbers or the reports in
20 front of me.
21     Q.  But there's no systematic -- I guess
22 what I'm getting at -- I'm taking the long way to
23 get there, but there was no systematic process up
24 to this point in 2016 of documenting in any
25 formalized way what investigation or phone calls

Page 218

1 were being made by you or Mr. Millward or others
2 who were looking into orders that had been flagged
3 from the daily threshold reports; correct?
4     MR. KOBRIN: Object to form. Asked and
5 answered.
6     THE WITNESS: Could you restate the
7 question.
8     MR. HUDSON: Could you just read it back
9 for us, please.
10     (The record was read back.)
11     MR. KOBRIN: Same objection.
12     THE WITNESS: We investigated. I don't
13 necessarily know if I would say that there was not
14 a systematic way. We did the investigation.
15 Different circumstances could require us to ask
16 different questions.
17     So we took each in each instance individually
18 to determine what we would do to do that
19 investigation.
20 BY MR. HUDSON:
21     Q. And in each one of those instances
22 though, there was no formalized documentation. So
23 as we sit here today, we have no idea what you did
24 in any one of those instances; correct?
25     MR. KOBRIN: Object to form. Asked and

Page 219

1 answered and misrepresents the evidence.
2     THE WITNESS: I would say we've had --
3 we had some of our investigations documented, if
4 that's what you're asking.
5 BY MR. HUDSON:
6     Q. Are you talking about the one or two
7 emails that we looked at today?
8     A. Yes.
9     Q. Anything that you're aware of that's
10 more formalized than the emails that had been
11 attached and produced?
12     A. I don't know that we were required to
13 have anything formal in writing as to what our
14 investigation into those instances were, no
15 regulatory requirement that we needed to do that.
16     Q. We'll let the jury or the judge or
17 whoever decide what was or wasn't required.
18     All I'm asking is: Was there a formalized
19 process for documenting the investigations that
20 occurred? I think what I'm hearing you say is no,
21 there was not, but I want to make sure I get your
22 testimony correct.
23     MR. KOBRIN: Object to form.
24     THE WITNESS: No.
25

Page 220

1 BY MR. HUDSON:
2     Q. In here what Mr. Raub is indicating is
3 that it would be a good idea to reengineer and
4 formalize the current investigative process;
5 correct?
6     A. I would say that, yes.
7     Q. And then the third bullet point of what
8 he's indicating is the implementation of a case
9 management process.
10     Do you know what a case management process
11 means?
12     A. Yes.
13     Q. What is a case management process?
14     A. Having a record of basically what was
15 done to -- the steps taken to investigate a
16 situation.
17     Q. And that wasn't something, as we've
18 talked about, that occurred up till this point in
19 November of 2016; right?
20     A. Correct.
21     Q. Were there aspects of the suspicious
22 order monitoring system at Giant Eagle or HBC that
23 you were aware of that you believe that Mr. Raub
24 wasn't aware of when he wrote this document
25 indicating that he believed that the monitoring in

Page 221

1 November of 2016 was at 75 to 85 percent of where
2 it needs to be?
3     MR. KOBRIN: Object to form.
4     THE WITNESS: There may have been, yes.
5 BY MR. HUDSON:
6     Q. What is it as you sit here today that
7 you believe Mr. Raub was not aware of that you
8 were aware of?
9     A. Well, as I look at this, and I can't
10 make an interpretation, but it seems that there
11 were certain areas that he felt we didn't have
12 that it could be argued or it could be said we did
13 have those, some of that functionality.
14     Q. What is that though?
15     A. We did have controls in place to
16 monitor, and we did have reports. We had various
17 tools that we could use other than just a
18 threshold report to do our analysis with that's
19 not indicated.
20     So there were other tools available to us to
21 do an investigation into a situation where there
22 could be an order that needed to be investigated
23 further.
24     Q. Is there anywhere where I could go to
25 see when Giant Eagle or HBC ever used those other

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 tools in an investigation to confirm that orders
2 that had been flagged as suspicious were, in fact,
3 legitimate?
4     A. I'm not sure.
5     Q. What causes you to be unsure?
6     A. At that point in time, the areas where
7 we weren't having written documentation of an
8 incident, although a tool could have been used in
9 that incident to help us make a determination.
10     Q. Right. I guess what I'm getting at is
11 you've said there were tools that were available
12 that we could use.
13     A. Yes.
14     Q. And I'm asking is there anywhere I could
15 go to see when you actually used those tools and
16 put them to use to determine that an order that
17 had been flagged as being potentially suspicious
18 was, in fact, a legitimate order?
19         MR. KOBRIN: Object to form.
20         THE WITNESS: I'm not sure.
21 BY MR. HUDSON:
22     Q. As you sit here today, between 2009 and
23 2014, how many orders did HBC flag as being
24 potentially suspicious but then were determined to
25 be legitimate?

Page 223

1         MR. KOBRIN: Object to form.
2     Answer if you know. Don't speculate.
3         THE WITNESS: I don't know.
4 BY MR. HUDSON:
5     Q. Do you have any sort of ballpark idea?
6     A. I don't.
7     Q. Before October of 2013 when the daily
8 threshold reports were put in place, are you aware
9 of any single order from HBC to the Giant Eagle
10 retail pharmacies that was flagged as being
11 suspicious that was then investigated and
12 determined to be legitimate?
13     A. In talking to various individuals -- did
14 you say prior to 200- --
15     Q. Prior to October to 2013. So prior to
16 the daily threshold reports being created, are you
17 personally from your firsthand knowledge of being
18 a participant as part of the compliance team aware
19 of any HBC order that was being shipped to Giant
20 Eagle retail pharmacies that was flagged as being
21 suspicious, but then was investigated and
22 determined to be legitimate?
23     A. In conversation with other folks on the
24 team, there would have -- there were instances of
25 that. I can't point to specific orders or

Page 224

1 timeframes exactly as to when that happened, but I
2 do know that there was processes in place for
3 folks at the warehouse, pickers, other
4 individuals, warehouse manager, that if they saw
5 anything that raised a question in their mind,
6 they would bring it to somebody's attention to
7 determine if that item needed to be sent to the
8 pharmacy.
9     Q. And when did those conversations occur
10 where you learned that information?
11     A. In talking to the other team members on
12 our team.
13     Q. Who specifically though were you
14 speaking to?
15     A. I would have spoken to Joe Millward,
16 Greg Carlson at the time, even Walt Durr who was
17 the warehouse manager.
18     Q. When? Like what's the timeframe when
19 you were speaking to them?
20         MR. KOBRIN: If you remember.
21         THE WITNESS: I do not remember. There
22 would have been instances during that timeframe.
23 I don't exactly remember exactly which dates that
24 that would have occurred.
25

Page 225

1 BY MR. HUDSON:
2     Q. Is there anywhere that you're aware of
3 that I could go that would be a log or a record
4 that was kept at HBC that would let us know how
5 many orders had been flagged by the warehouse?
6     A. I don't -- I don't know if there would
7 be any of those types of records.
8     Q. You personally prior to October of 2013
9 were not involved in any investigations where an
10 order was flagged and that you were personally
11 involved in determining that order was legitimate;
12 correct?
13     A. I was part of a team that helped analyze
14 that.
15     Q. How many of those shipments or orders
16 would you say you were involved in that were
17 flagged prior to October of 2013 and investigated
18 and determined to be legitimate?
19     A. Prior to 2013?
20     Q. Prior to October of 2013.
21     A. October of 2013, at least one that I
22 know of.
23     Q. Anything more specific you can say about
24 that particular order?
25     A. My recollection is that it was flagged,

Page 226

1  and we did stop distribution of that order, of
2  subsequent orders, of subsequent orders, not the
3  particular order.
4      Q.  A suspicious order was flagged, and then
5  you were not able to determine it was legitimate
6  or you were able to determine it was legitimate?
7      A.  We stopped shipment to the store because
8  of what we had determined was potential suspicious
9  activity.
10     Q.  Was that buprenorphine?
11     A.  Yes.
12     Q.  Was that in December of 2013?
13     A.  That would be my recollection of that,
14  yes.
15     Q.  So what I'm trying to determine is prior
16  to October of 2013 -- you'd agree with me that in
17  October of 2013 when you started to create the
18  daily threshold reports, there was an increased
19  focus on looking at orders that were exceeding
20  those threshold quantities; correct?
21     A.  I think the threshold report was another
22  tool that we could use.  I don't want to say that
23  we didn't have focus.  It was another tool that we
24  had to help us.
25     Q.  Prior to October of 2013, there was no

Page 227

1  formalized process for identifying orders of
2  unusual size; correct?
3         MR. KOBRIN:  Object to form.
4         THE WITNESS:  No formal process.
5  BY MR. HUDSON:
6      Q.  No criteria that existed at the
7  warehouse where anyone there would be applying
8  some sort of formula or criteria in a systematic
9  way; right?
10        MR. KOBRIN:  Object to form.
11        THE WITNESS:  I wouldn't say a formula,
12  but there were -- if they thought or if they
13  discovered an order that was -- an item was being
14  ordered, the quantity that was being ordered was
15  more than usual or what they knew the store had
16  historically been ordering, they may raise a flag
17  on that.
18  BY MR. HUDSON:
19     Q.  So if a particular picker or the
20  warehouse manager from just their inherent
21  knowledge of working at that warehouse, if a
22  particular order stuck out to them as being of
23  unusual size, then there may have been an
24  identification of that order and then a subsequent
25  investigation?

Page 228

1      A.  That is possible, yes.
2      Q.  But as you sit here today though, you're
3  not aware of how many times that happened?
4      A.  I am not aware of an exact number or how
5  many times that happened, no.
6         (HBC-Chunderlik Exhibit 22 was marked.)
7  BY MR. HUDSON:
8      Q.  Let's switch to a new document.  I'm
9  going to hand you what I've marked as Exhibit 22.
10  And kind of moving forward in time here, so we're
11  up to January of 2017, and this is an email from
12  you to Mark Doerr.
13     A.  Yes.
14     Q.  Who is Mark Doerr?  What was his role, I
15  guess, at this time?
16     A.  At the time he was the senior
17  vice-president of pharmacy at Giant Eagle.
18     Q.  Did you report to him or would you have
19  reported to somebody else who reported to him?
20     A.  At that time in January of 2017, I would
21  have reported to -- we had a vacancy.  So my
22  reporting responsibilities would have been to Mark
23  Doerr.
24     Q.  So you here in January of 2017 were
25  writing to your boss at the time; right?

Page 229

1      A.  Yes.
2      Q.  And you wrote -- then attached to your
3  email is a new policy.  It's entitled Order
4  Monitoring System Policy; right?
5      A.  Yes.
6      Q.  And it has an effective date of
7  2/2/2017 and a created date of 2/2/17; right?
8      A.  Yes.
9      Q.  And then this is version 1 of this
10  particular policy; right?
11     A.  Yes.
12     Q.  And this particular policy, why was this
13  being created?
14     A.  We wanted to take what we already had
15  and were always looking to improve, so we were --
16  we wanted to improve upon what we -- some of those
17  processes that we already had in place to identify
18  suspicious orders.
19     Q.  Was this part of the overhaul that was
20  referenced in those previous emails of the
21  suspicious order monitoring system?
22     A.  Yes.
23     Q.  So this was a policy that was going to
24  be put in place that was going to be connected to
25  a new system for monitoring suspicious orders?

Page 230

1    A.  Yes.
2    Q.  So then let's walk through this document
3 and see what the new system was going to look
4 like.  It says, "The purpose or objective is to
5 monitor, identify and investigate controlled
6 substance order exceeding system limits; then make
7 the determination to allow the order to continue
8 or to hold the order and report it as being
9 suspicious as required by law."  Right?
10    A.  Yes.
11    Q.  So this new system that was going to be
12 implemented at the Giant Eagle distribution
13 facility was now going to give the company the
14 ability to hold the order while the investigation
15 was occurring to figure out whether it was
16 legitimate or not; right?
17    A.  I would say hold subsequent orders once
18 something had been identified.
19    Q.  But you agree that's not the language
20 that's used in this sentence; right?
21    MR. KOBRIN:  Object to form.
22    THE WITNESS:  It doesn't specifically
23 say that.
24 BY MR. HUDSON:
25    Q.  It says, "...then make the determination

Page 231

1 to allow the order to continue or to hold the
2 order and report it as being suspicious as
3 required by law."  Right?
4    A.  Yes.
5    Q.  At least what's written here, can we
6 agree that this new system, what was contemplated
7 is the ability to hold the order that had been
8 flagged?
9    A.  Say that again.
10    Q.  The purpose and objective of this
11 paragraph, is it indicating that the new Giant
12 Eagle system was going to give the company the
13 ability to hold, in other words, stop the shipment
14 of an order until it could be investigated?
15    A.  To hold subsequent orders.
16    Q.  Does Giant Eagle today have a system in
17 place where the suspicious order that's being
18 flagged can be stopped?
19    A.  Yes, it does.
20    MR. KOBRIN:  Object to form.  You mean
21 today or do you mean --
22    MR. HUDSON:  Today, today, like now.
23    THE WITNESS:  Yes.
24 BY MR. HUDSON:
25    Q.  When did that particular system get

Page 232

1 implemented?
2    MR. KOBRIN:  Object to form.  Relevance.
3 This is beyond the discovery period.
4    You can answer.
5    THE WITNESS:  Ask the question.
6 BY MR. HUDSON:
7    Q.  When did Giant Eagle implement a system
8 that allowed it to stop an order that had been
9 flagged pending the investigation and
10 determination of whether it was legitimate?
11    A.  In November of 2018.
12    Q.  November of 2018.
13    MR. KOBRIN:  I just want to clarify, Ty.
14    MR. HUDSON:  You can when you ask him
15 questions.
16    MR. KOBRIN:  Well, I want to clarify
17 with you.
18    MR. HUDSON:  You don't get the right to.
19 That's now how depositions work.  You're not an
20 active participant.
21    MR. KOBRIN:  I'm going to object to
22 that.  It's a misleading question.  And I won't
23 explain to you why it's a misleading question.  We
24 can deal with it later.
25    MR. HUDSON:  That is completely fair.

Page 233

1    MR. KOBRIN:  And I move to strike the
2 testimony as being misled by the prior question.
3 We can talk about it at a break if you want.  But
4 we're going to limit you on redirect to the time
5 that we've taken on redirect.  So if you want to
6 clean something up later, you're not going to have
7 that opportunity.
8 BY MR. HUDSON:
9    Q.  Mr. Chunderlik, here in the next
10 paragraph is a discussion of the scope of the new
11 policy; right?
12    A.  Yes.
13    Q.  It says, "This procedure applies to the
14 Giant Eagle order monitoring system team which
15 consists of members of pharmacy administration,
16 pharmacy operations, pharmacy compliance, pharmacy
17 merchandising, pharmacy technology, Giant Eagle RX
18 distribution center teams and loss prevention."
19 Right?
20    A.  Yes.
21    Q.  Was this policy more comprehensive than
22 previous policies in terms of who was involved in
23 the process?
24    A.  It's written to appear to be, but in all
25 areas whenever we had our previous programs in

Page 234

1  place, any one of these individuals could be
2  involved as well.  It wasn't meant to add any
3  extra individuals.
4      Q.  So the contemplation was that this same
5  group of individuals would have been previously
6  involved in the process?
7      A.  Yes.
8      Q.  In here it says the policy is the order
9  monitoring system team monitors pharmacy orders to
10 prevent possible diversion of controlled
11 substances; right?
12     A.  Yes.
13     Q.  And then the procedure, we've got 14
14 bullet points; correct?
15         MR. KOBRIN:  Object to form.
16         THE WITNESS:  Yes.
17 BY MR. HUDSON:
18     Q.  And the first bullet point is just
19 indicating that controlled substances are supplied
20 to the pharmacies from McKesson, Anda and the new
21 Giant Eagle RX distribution center; right?
22     A.  Yes.
23     Q.  And the second bullet point is Schedule
24 II controlled substances are generated using the
25 controlled substance ordering system.  In

Page 235

1  parentheses it says CSOS.  Right?
2      A.  Yes.
3      Q.  When was the CSOS system implemented, if
4  you know?
5      A.  At the retail location, my recollection
6  is around April of 2015.
7      Q.  Then the next bullet point is the OMS.
8  Is that a reference to the order monitoring
9  system?
10     A.  Yes.
11     Q.  Is that the new system that's going to
12 be implemented --
13     A.  Yes.
14     Q.  -- in conjunction with this policy?
15     A.  Yes.
16     Q.  The OMS uses algorithms to identify
17 controlled substance orders that require
18 investigation and documentation before releasing
19 the order for distribution.
20        Then there's a sub-bullet there.  The OMS
21 algorithm generates limits based on monthly
22 thresholds and ordering characteristics specific
23 to the following.  Then it lists pharmacy
24 location, chemical, generic product indicater,
25 National Drug Code and ordering pattern; correct?

Page 236

1      A.  Yes.
2      Q.  If you could, just compare for me how
3  comprehensive these algorithms are for monitoring
4  orders compared to the previous daily threshold
5  reports that we talked about.
6      A.  I think we modified the algorithm to --
7  we modified the algorithm that we were using to
8  identify any type of suspicious order or any type
9  of order.
10     Q.  So now the monitoring is going to be
11 specific to the actual pharmacy location; right?
12     A.  Yes.
13     Q.  That was not something that -- the daily
14 threshold reports that were implemented in October
15 of 2013, not something they were able to do;
16 right?
17     A.  That's correct.
18     Q.  And then here it also indicates that
19 this monitoring is going to involve not just
20 monthly thresholds, but also ordering
21 characteristics; correct?
22     A.  That's correct.
23     Q.  That's something that the prior daily
24 threshold reports were not able to do; right?
25     A.  Which bullet are you referring to?

Page 237

1      Q.  The clear bullet, the first.
2      A.  I wouldn't necessarily say that our
3  previous system was not able to do some of these
4  things as well.
5      Q.  We've looked at the reports before, but
6  the daily threshold reports that began being
7  generated in October of 2013, those were monthly
8  or those were thresholds of orders based upon
9  monthly rolling data; right?
10     A.  Right, but they were chemical, generic
11 product indicator, National Drug Code as well.  I
12 kind of want to make that distinction there.  We
13 have bullets that look like we've added these
14 types of things, but they were part of the
15 original one as well.
16     Q.  The original one in October of 2013
17 created thresholds based on GPI; right?  The
18 generic product indicator was --
19     A.  At the GPI 10 level.
20     Q.  Right.  And then it was specific that
21 thresholds were company-wide, but not store or
22 location specific; right?
23     A.  Correct.
24     Q.  And then the daily threshold reports,
25 those didn't include -- there was no data that was

Page 238

1  being mined to create algorithms to flag or
2  monitor ordering characteristics, right, or
3  ordering patterns?
4      MR. KOBRIN:  Object to form.
5      THE WITNESS:  We have those reports
6  where we could -- I mean, they do show pattern.
7  They have the potential to show patterns.
8  BY MR. HUDSON:
9      Q.  They show a pattern as it relates to
10 orders, but only the subset of orders that would
11 be exceeding a threshold; right?
12     In other words, the only thing being flagged
13 in the daily threshold reports that were in
14 existence from October of 2013 were orders that
15 were exceeding the threshold; right?
16     MR. KOBRIN:  Object to form.
17     THE WITNESS:  Those are the orders.
18 When a store -- the first time a store went over
19 the threshold, they would flag on the report, and
20 they could have the potential to stay on that
21 report till the end of the month, yes.
22 BY MR. HUDSON:
23     Q.  Right.  But if there wasn't an order
24 going from HBC to a pharmacy that tripped over the
25 threshold, that order would not be on those daily

Page 239

1  threshold reports; correct?
2      A.  It may not show up on there, yes.  It
3  would not show up on there.
4      Q.  So in terms of monitoring or evaluating
5  ordering patterns as a whole, that wasn't
6  something that the daily threshold reports in
7  October of 2013 gave the company the ability to
8  do, was it?
9      MR. KOBRIN:  Object to form.  Vague.
10     THE WITNESS:  I think it had the
11 ability.  If somebody looked at the report, they
12 would be able to see patterns if they had the
13 report.
14 BY MR. HUDSON:
15     Q.  Those patterns would be limited only to
16 the orders that exceeded the threshold because
17 those would be the orders that would be on the
18 reports; is that fair?
19     A.  That's correct, yes.
20     Q.  If we turn to the next page, there's a
21 bullet point at the top about investigations.
22     A.  Yes.
23     Q.  Then it's got they can include, but not
24 limited to, store purchasing patterns, store
25 dispensing patterns, individual prescriptions for

Page 240

1  controlled substances, prescriber histories and
2  patterns, interviews with pharmacy -- with store
3  pharmacists and technicians and interviews with
4  pharmacy district leaders; right?
5      A.  Yes.
6      Q.  Were store dispensing patterns something
7  that there was a systematic process of
8  investigating prior to the implementation of this
9  new system?
10     MR. KOBRIN:  Object to form.  Vague.
11     THE WITNESS:  The way the question is
12 posed, I'm not sure I understand.
13 BY MR. HUDSON:
14     Q.  You've testified today about the
15 investigations that occurred prior to the
16 implementation of this new system; right?
17     A.  Yes.
18     Q.  And then if we look down to the bullet
19 point, the fourth bullet point down, it starts
20 out, "The documentation of the investigation and
21 determination must be retained in readily
22 retrievable form according to the Giant Eagle
23 document retention policy and not less than two
24 years."  Right?
25     A.  Yes.

Page 241

1      Q.  So at this point in January 2017, Giant
2  Eagle as a company is going to begin keeping files
3  of the investigations that were occurring;
4  correct?
5      A.  Correct.
6      Q.  And that wasn't something that occurred
7  previously; right?
8      A.  In some cases it did occur, but not in
9  necessarily all cases.
10     Q.  In fact, Giant Eagle then had an actual
11 database or repository or whatever you want to
12 call it where those investigative files were kept
13 moving forward --
14     A.  Moving forward, yes.
15     Q.  -- after January 2017?
16     A.  Yes, that's correct.
17     Q.  There wasn't a repository or database or
18 some centralized location where investigative
19 files were kept in the past?
20     A.  Correct, yes.
21     Q.  If we go back then to your cover email
22 to this policy document, in the third paragraph
23 you said, "Keeping in mind that this is a draft
24 copy, my intention is a high level description of
25 the SOM process to have available if we are asked

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 to produce during an inspection." Right?
2    A.  Yes.
3    Q.  At this time in January of 2017, this
4 new system was not yet functioning under this
5 policy; right?
6    A.  On February -- excuse me -- January 27
7 it was not.
8    Q.  Why then the idea that you would keep
9 this in the file in case there was an inspection?
10    A.  If, in fact, we were asked to produce a
11 written copy or a document describing our process.
12    Q.  But you had a formal -- I mean, you had
13 a policy document that was previously in effect,
14 right, prior to this one?
15    A.  Yes, yes.
16    Q.  Did you believe that that policy
17 document, the previous version, was problematic if
18 there was an investigation?
19        MR. KOBRIN:  Object to form.
20        THE WITNESS:  I did not think it was
21 problematic, no.
22 BY MR. HUDSON:
23    Q.  Then why not keep it in the file and
24 show then that policy document and the current
25 system that existed if there was an inspection?

Page 243

1    A.  I believe that we would have.  I'm not
2 sure -- I believe that we would have.  If we were
3 asked for that document, we would have.
4    Q.  So you would have the old policy that
5 was in existence and then this new policy in the
6 file to show if there was an investigation?
7        MR. KOBRIN:  Object to form.
8 BY MR. HUDSON:
9    Q.  To show where --
10    A.  To show our process.
11    Q.  To show where the program, in other
12 words, to show where the new program was going
13 into the future?  What would be the purpose of
14 putting this high level description of the new SOM
15 process in the file for an investigation?
16        MR. KOBRIN:  Object to form.
17 BY MR. HUDSON:
18    Q.  I'm not asking the question very well.
19        MR. KOBRIN:  Object to form.  Misleading
20 and vague.
21        THE WITNESS:  It was a new process, so
22 we wanted in case -- if we had an inspection, we
23 wanted to be able to show what our process was and
24 describe, because during an investigation, there
25 could be -- it could be oral or it could be show

Page 244

1 me what processes you have in place.
2 BY MR. HUDSON:
3    Q.  Right.  I guess what I'm getting at,
4 this process though described in this policy, it
5 wasn't yet in place.  In other words, it wasn't
6 occurring at Giant Eagle.  This was just a draft
7 of the policy about a system that was going to be
8 put in place in the future; right?
9        MR. KOBRIN:  Object to form.
10 BY MR. HUDSON:
11    Q.  Did I misunderstand your testimony on
12 that?
13    A.  No.  I believe that's correct.
14    Q.  Would you agree that this new system was
15 more robust than the previous system that was in
16 existence?
17    A.  We were always looking to improve.
18 Whether I would use a word -- a description of
19 robust, it was different and it had some more
20 information that could help us during an
21 investigation.
22    Q.  This would show in an investigation
23 because this would show that Giant Eagle would be
24 able to stop shipments prior to -- in other words,
25 if orders had been flagged, it would show that

Page 245

1 Giant Eagle was going to have the ability to stop
2 shipments while it was investigating?
3    A.  Future shipments.
4    Q.  In your mind, you're saying this is
5 future shipments only?
6    A.  Future shipments, yes.
7    Q.  To you this doesn't indicate that --
8        MR. KOBRIN:  Object to form.
9 BY MR. HUDSON:
10    Q.  -- Giant Eagle is stating that it can
11 stop the order that's being flagged as being
12 suspicious?
13    A.  At this point, no.
14    Q.  With the implementation of this new
15 program, did you believe that Giant Eagle's
16 suspicious order monitoring system was then at a
17 hundred percent in terms of compliance with
18 CFR 1301.74(b)?
19        MR. KOBRIN:  Object to form.
20        THE WITNESS:  We were always looking to
21 improve our system anywhere we could.  This was
22 just another iteration of an improvement to our
23 system that we were hoping -- that we put in
24 place.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 246

BY MR. HUDSON:

Q. As a compliance officer, were there things that you were hoping that Giant Eagle would still be able to add later to help comply with the distributor requirements of 1301.74(b)?

A. Yes. We were always looking to improve, if there were any improvements that we could make.

Q. What were some, one or more improvements that you were hoping that could be made in the future that weren't part of this new policy?

MR. KOBRIN: Object to form.

THE WITNESS: One of the improvements was to have a little bit more of an automated process or a way to stop an order before it was shipped.

BY MR. HUDSON:

Q. Is it your understanding that HBC has reported two orders of controlled substances being suspicious during the time it's been a distributor of controlled substances, meaning from November of 2009 to the present?

A. Yes.

Q. And I think you testified one of those was in December of 2013.

A. Correct.

Page 247

Q. And then the other one was in January of 2016.

A. I believe that to be correct, yes.

Q. Those were both buprenorphine?

A. Yes.

Q. I apologize if I'm mispronouncing that.

A. Pretty close.

Q. Feel free to correct me. There were no suspicious orders of hydrocodone combination products reported to the DEA as suspicious; correct?

A. That's correct.

Q. And as you sit here today, do you believe that from November of 2009 until October of 2014 when HBC acted as a distributor of hydrocodone combination products, that there were, in fact, no suspicious orders that should have been reported to the DEA?

A. I believe because of some of the controls that we had in place at the distribution center, HBC, at our pharmacies, at corporate, with the processes that we were doing, that's correct. We did not believe that we had any suspicious orders.

Q. Would you agree that HBC acted as a

Page 248

distributor for millions of dosage units of hydrocodone products that were distributed to the 200 Giant Eagle retail pharmacies; right?

A. Yes.

MR. KOBRIN: Object to form.

BY MR. HUDSON:

Q. And of those, about 40 of those were in Cuyahoga and Summit County?

MR. KOBRIN: Object to form.

BY MR. HUDSON:

Q. Does that sound right, in the ballpark?

A. In the ballpark, yes.

Q. Is it your view that there were more likely than not orders that were trying to be diverted, in other words, that there were suspicious orders where there were patients or others trying to divert controlled substances, but Giant Eagle or HBC had controls in place to catch those, or do you believe that there just weren't ever any attempts at diversion?

MR. KOBRIN: Object to form.

THE WITNESS: I believe that Giant Eagle had controls in place to catch orders or catch any type of diversion that may have been going on not only at the warehouse, but we had controls at our

Page 249

retail pharmacies as well and at corporate, the corporate level also. So we did have controls to monitor and look for those types of...

BY MR. HUDSON:

Q. I didn't mean to cut you off. Go ahead and finish your answer. I apologize.

A. I just meant we had controls in place to monitor. We had, as I said, controls at all levels, warehouse, retail pharmacy and corporate office.

Q. So let's just go through that then. We've got the corporate level; right?

A. Yes.

Q. We've got controls there?

A. Yes.

Q. Then we've got the warehouse?

A. Correct.

Q. And that's the distributor warehouse; right?

A. Yes.

Q. And that's HBC?

A. Yes.

Q. You've got controls there?

A. Yes.

Q. And then you've got the retail

Page 250

1 pharmacies, and that's the Giant Eagle 200 retail
2 pharmacies; right?
3    A.  Correct.
4    Q.  At the corporate level, how many
5 suspicious orders were caught due to the controls
6 that were in place?
7      MR. KOBRIN:  Object to form.
8      THE WITNESS:  A suspicious order I don't
9 necessarily think -- a suspicious order would have
10 been the buprenorphine situations.
11 BY MR. HUDSON:
12    Q.  What were the corporate controls that
13 you're alluding to?  What were the controls that
14 existed?
15    A.  The fact that we had tools in place to
16 monitor purchases, monitor dispensing.  Of course,
17 we had the reports that we were getting on a daily
18 basis.  We had internal audits that an internal
19 auditing group would do at our pharmacies.  We had
20 PDLs doing audits and going into their pharmacies.
21 They're required on a quarterly basis to do audits
22 on their pharmacies.
23    Q.  Anything specific though to flagging
24 suspicious orders of controlled substances under
25 Section -- in other words, the suspicious order

Page 251

1 monitoring system under Section 1301.47(b)?
2      MR. KOBRIN:  Object to form.  Asked and
3 answered.
4      THE WITNESS:  Pharmacies would -- the
5 pharmacies would where they felt that there was
6 something -- if they had a prescription that
7 was -- didn't quite look to them that it was
8 legitimate, they would always verify and validate
9 prescriptions.
10 BY MR. HUDSON:
11    Q.  At the Giant Eagle retail pharmacies,
12 how many prescriptions were there that were of
13 controlled substances that were attempted to be
14 filled, but the pharmacist refused to fill the
15 prescription because they determined that there
16 was a risk of diversion?
17    A.  I don't have --
18      MR. KOBRIN:  Object to form.  Do you
19 have a time period?
20      Let me make sure I get my objection in.
21      Is there a time period for that, or is that
22 an open-ended question?
23      MR. HUDSON:  It's an open-ended
24 question.
25      THE WITNESS:  I couldn't speculate on

Page 252

1 how many prescriptions that a pharmacist checked
2 or denied because they felt that there was some
3 reason that the prescription was going to be
4 diverted.
5 BY MR. HUDSON:
6    Q.  And I assume there's no log or
7 repository or place where I could go and look and
8 try to figure out within Giant Eagle how many of
9 the pharmacists decided not to fill prescriptions?
10    A.  Not that I know of, no.
11    Q.  So as you sit here today, can you point
12 to any specific instances where Giant Eagle had
13 retail pharmacy controls in place where a
14 pharmacist refused to fill a prescription for a
15 controlled substance because he or she believed it
16 was at risk for diversion?
17    A.  Pharmacists -- we have our controlled
18 drug dispensing guideline that discussed red flag
19 situations to be -- to look out for.  We also had
20 audits in place, but mainly the controlled
21 substance dispensing guideline to help, because we
22 rely on our pharmacists, their professional
23 judgment, as well as relying on the law whenever
24 they need to in determining whether a prescription
25 should be filled or not.

Page 253

1    Q.  Right.  All I'm asking is:  As you sit
2 here today, you don't know how many red flags
3 there were though at Giant Eagle retail
4 pharmacies?
5      MR. KOBRIN:  Object to form.
6      THE WITNESS:  I would not be able to.
7 BY MR. HUDSON:
8    Q.  And you wouldn't know how many times a
9 pharmacist flagged an order but decided not to
10 fill it because it was at risk for diversion?
11    A.  I would have no way.
12      MR. KOBRIN:  Object to form.
13      Give me time to object.
14 BY MR. HUDSON:
15    Q.  So in terms of the retail pharmacy
16 controls, can you say as you sit here today how
17 effective they were in terms of data that would
18 show whether there were or were not prescriptions
19 that were stopped because of the risk of
20 diversion?
21    A.  I don't have any data that I can point
22 to for any specifics on that.
23    Q.  Would that be the same for the corporate
24 level controls, in other words, there's no data
25 that we can point to or look at to try to figure

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  out how effective the corporate controls were in
2  preventing diversion?
3      MR. KOBRIN:  Object to form.  Misstates
4  the evidence.
5      THE WITNESS:  That's correct.
6      MR. HUDSON:  I don't have any further
7  questions.
8      MR. KOBRIN:  Go off the record real
9  quick.
10     THE VIDEOGRAPHER:  The time is 4:15 p.m.
11 We're going off the video record.
12     (Recess from 4:15 p.m. to 4:39 p.m.)
13     THE VIDEOGRAPHER:  The time is 4:39 p.m.
14 We're now back on the video record.
15         EXAMINATION
16 BY MR. KOBRIN:
17     Q.  Mr. Chunderlik, do you remember being
18 asked questions about the so-called suspicious
19 order regulation at Section 1301.74(b) this
20 morning?
21     A.  Yes.
22     Q.  And that is, I believe, Exhibit 3, if
23 you want to look at that.  During any time during
24 your deposition, were you shown the security
25 regulation, which is at 1301.71 of the Code of

Page 255

1  Federal Regulations?
2      A.  No.
3      Q.  Sitting here today, what do you
4  understand the security regulation to be?
5      A.  The security regulation, it's a system
6  of controls to put in place to protect the
7  integrity and the safety of medication and to help
8  prevent diversion into illicit markets.
9      Q.  Do you understand that to be the main
10 requirement that distributors are supposed to meet
11 under the Controlled Substances Act?
12     MR. HUDSON:  Object to the form.
13     THE WITNESS:  That is a section of it
14 and it is -- there are multiple pieces that go
15 along with that.
16 BY MR. KOBRIN:
17     Q.  Is that the overarching requirement to
18 your understanding?
19     A.  Yes, yes.
20     Q.  Did HBC meet that requirement at all
21 times --
22     MR. HUDSON:  Object to the form.
23 BY MR. KOBRIN:
24     Q.  -- that are relevant to this litigation,
25 so starting in 2009 and running all the way to the

Page 256

1  present?
2      A.  Yes.
3      Q.  So in answering yes, are you saying that
4  it met the requirement both before and after it
5  had a suspicious order monitoring threshold,
6  automated system, whatever you want to call it,
7  that it met the requirement before it had that
8  system?
9      A.  Yes.
10     Q.  And did it meet the requirement after it
11 had the system?
12     A.  Yes.
13     Q.  Looking back at 1301.74, it says, "The
14 registrant must design and operate a system to
15 disclose to the registrant suspicious orders of
16 controlled substances."
17     Do you understand that to be the only factor
18 that's taken into consideration for the security
19 requirement?
20     A.  No.  That's a subsection of the entire
21 requirement.
22     Q.  Can you think of any other factors?  For
23 example, is the physical security of the warehouse
24 one of the factors?
25     A.  Yes, it is.

Page 257

1      Q.  Is record keeping one of the factors?
2      A.  Record keeping is one of the factors,
3  yes.
4      Q.  Are controls on the way that the
5  controlled substances are distributed, is that one
6  of the factors?
7      A.  Yes.
8      Q.  Is security at the warehouse one of the
9  factors?
10     A.  Yes.
11     Q.  Is the type of drugs being distributed
12 one of the factors?
13     A.  Yes.
14     Q.  Is to whom the drugs are being
15 distributed to one of the factors?
16     A.  Yes.
17     Q.  Did HBC or was HBC ever a registered
18 distributor of Schedule II controlled substances?
19     A.  No.
20     Q.  Are opioids generally under Schedule II?
21     A.  Generally, yes.
22     Q.  Is there an exception?  Was there ever a
23 time when opioids were not Schedule II or any kind
24 of particular opioid was not a Schedule II?
25     A.  Yes.  Prior to October of 2014,

Page 258

1 hydrocodone and hydrocodone combination products
2 were in Schedule III.
3     Q.   And after October of 2014, what were
4 they reclassified as?
5     A.   All hydrocodone and hydrocodone
6 combination products were rescheduled as Schedule
7 II controlled substances.
8     Q.   Did HBC ever distribute hydrocodone
9 combination products when they were classified as
10 a Schedule II controlled substance?
11     A.   No, they did not.
12     Q.   Did HBC ever distribute any Schedule II
13 controlled substances?
14     A.   No, it did not.
15     Q.   Did HBC take that into account when
16 determining its compliance with the security
17 requirement?
18     A.   Yes.
19     Q.   Did HBC consider the quantity of
20 controlled substances it was handling when it
21 designed its overall security system and
22 determined its compliance with the security
23 requirement?
24     A.   Yes.
25     Q.   Did HBC consider the internal controls

Page 259

1 over the receipt of controlled substances it was
2 handling when it determined it was in compliance
3 with the security requirements?
4     A.   Yes.
5     Q.   Did HBC consider the physical security
6 features of its facility --
7     A.   Yes.
8     Q.   -- when it determined it was in
9 compliance with the security requirements?
10     A.   Yes.
11     Q.   Did HBC get frequent visits from the
12 DEA?
13     A.   They got visits from the DEA, yes.
14     Q.   What was the purpose of those visits?
15     A.   To do reconciliation audits to see if we
16 were also complying with the security requirements
17 that were required as part of the Act and that we
18 had controls in place.
19     Q.   Did the DEA ever tell HBC that they were
20 not meeting the security requirements under the
21 regulations, under the regulation related to the
22 Controlled Substances Act?
23     A.   Not that I know of, no.
24     Q.   With respect to the HBC warehouse that
25 you visited, do you recall whether it had a locked

Page 260

1 cage?
2     A.   Yes, it did.
3     Q.   Was there controlled access to that
4 cage?
5     A.   There was controlled access, yes.
6     Q.   Do you know whether that cage was
7 inspected and approved by the DEA?
8     A.   It was, yes.
9     Q.   Do you know if admittance to that cage
10 was controlled and limited to only certain
11 personnel?
12     A.   Yes.
13     Q.   When you visited HBC warehouse, was it
14 clear that they had taken any steps in order to be
15 compliant with the Controlled Substances Act?
16     A.   Yes.
17     Q.   So the people at the HBC warehouse were
18 aware of the Controlled Substances Act?
19         MR. HUDSON:  Object to the form.
20         THE WITNESS:  Yes.
21 BY MR. KOBRIN:
22     Q.   Do you know whether the people at the
23 warehouse were aware of the Controlled Substances
24 Act?
25     A.   Yes.

Page 261

1     Q.   And they had procedures in place to
2 comply with the Controlled Substances Act;
3 correct?
4         MR. HUDSON:  Object to the form.
5 BY MR. KOBRIN:
6     Q.   Did they have procedures in place to
7 comply with the Controlled Substances Act,
8 Mr. Chunderlik?
9     A.   Yes.
10     Q.   Did you know that they had procedures in
11 place to comply with the Controlled Substances Act
12 when you first took over as compliance manager in
13 2012?
14     A.   Yes.
15     Q.   Opposing counsel asked you several
16 questions about the threshold emails that you
17 received beginning in December 2013.
18         Do you remember that?
19     A.   Yes.
20     Q.   And several times he asked you if you
21 could point to a specific order that popped up on
22 the threshold emails and you could tell him what
23 you did or what anyone did in order to do due
24 diligence on that flagged order.  Do you remember
25 that?

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    A.   Yes.
2    Q.   Is there a way for you to estimate how
3  many of those orders popped up a year that you
4  guys ran down and did due diligence on?  Was it
5  more than ten?
6    A.   Yes.
7    Q.   More than 20?
8    A.   Yes.
9    Q.   Possibly even more than a hundred?
10    A.   Yes.
11    Q.   And you can't remember every one of
12  them, can you?
13    A.   No, I can't.
14    Q.   Did you attempt to memorize all of the
15  due diligence or all of the orders that popped up
16  on those threshold emails for this deposition?
17    A.   No.
18    Q.   You mentioned earlier that you're a
19  pharmacist; correct?
20    A.   That's correct.
21    Q.   What degrees in pharmacy do you have?
22    A.   A bachelor of science of pharmacy.
23    Q.   And have you ever practiced as a
24  pharmacist in a pharmacy store?
25    A.   I have, yes.

Page 263

1    Q.   Are you familiar with dispensing
2  practices?
3    A.   I am, yes.
4    Q.   Are you familiar with the dispensing
5  practices at Giant Eagle pharmacies?
6    A.   Yes.
7    Q.   At the Giant Eagle pharmacy stores, are
8  there internal controls over controlled
9  substances?
10    A.   Yes, there are.
11    Q.   Are there physical controls over
12  controlled substances?
13    A.   Yes.
14    Q.   What kind of physical controls?  Is it
15  safes?
16    A.   Locked cabinets, locked safes primarily.
17    Q.   Is there limited access to those locked
18  cabinets and safes?
19    A.   There are limited access to the narcotic
20  cabinets and the safes.
21    Q.   Does Giant Eagle train pharmacists to
22  keep tight controls over its controlled
23  substances?
24    A.   Yes.
25    Q.   Are those policies and procedures

Page 264

1  monitored by loss prevention?
2    A.   Yes.
3    Q.   Are the pharmacies monitored by loss
4  prevention?
5    A.   Yes.
6    Q.   Are there internal audits of the
7  pharmacies?
8    A.   Yes.
9    Q.   Are the pharmacists and the pharmacy
10  techs trained and supervised?
11    A.   Yes, they are.
12    Q.   In fact, you were involved in the
13  supervision of those pharmacy techs, weren't you?
14    A.   That's correct.
15    Q.   Does Giant Eagle impose policies and
16  procedures on pharmacists and pharmacy techs with
17  respect to the way it dispenses controlled
18  substances?
19        MR. HUDSON:  Object to the form.
20        THE WITNESS:  No, we do not.
21  BY MR. KOBRIN:
22    Q.   You don't impose any policies and
23  procedures about how they dispense prescriptions?
24    A.   We have a controlled drug dispensing
25  guideline that we have communicated out to our

Page 265

1  pharmacists and pharmacy team members.
2    Q.   And do you also have a DEA pharmacist
3  manual that you communicate out to your
4  pharmacists and team members?
5    A.   Yes, we do.
6    Q.   Is that available in every Giant Eagle
7  pharmacy?
8    A.   It is readily available at each Giant
9  Eagle pharmacy.
10    Q.   And you mentioned that Giant Eagle has
11  controlled substance dispensing guidelines.
12    A.   Yes, that's correct.
13    Q.   Does it include red flags, things to
14  watch for in terms of whether a prescription is
15  legitimate or not?
16    A.   That is correct, yes.
17    Q.   Could you look at Exhibit 10.  I'll find
18  it, too.  Earlier today opposing counsel had you
19  looking at the risk assessment red and green flags
20  that are listed under Section 3(b) in the email
21  from Joseph Millward in this exhibit.  Do you see
22  that?
23    A.   Yes, I do.
24    Q.   Are those red flags for the pharmacy or
25  are they for the warehouse?

Page 266

1    A.  They would be for the pharmacy.
2    Q.  They would apply to the manner in which
3  pharmacists are judging potential customers who
4  come in; correct?
5    A.  That's correct.
6    Q.  Is that a kind of pharmacy control that
7  would be listed in the controlled substance
8  dispensing guidelines that are at every Giant
9  Eagle pharmacy?
10    A.  Yes; yes, sir.
11    Q.  To your knowledge, has the DEA ever
12  raised an issue about a pharmacy store's
13  compliance, a Giant Eagle pharmacy store's
14  compliance with the Controlled Substances Act?
15        MR. HUDSON:  Object to the form.
16        THE WITNESS:  No.
17  BY MR. KOBRIN:
18    Q.  We talked a little bit about controls at
19  pharmacies.  Are pharmacists required to
20  immediately update a store's controlled substance
21  inventory when it receives incoming orders?
22        MR. HUDSON:  Objection.  No foundation.
23        THE WITNESS:  The system can do that
24  whenever they receive the order into the pharmacy.
25

Page 267

1  BY MR. KOBRIN:
2    Q.  When a pharmacist fills a controlled
3  substance prescription, is the store inventory
4  immediately updated for outgoing prescriptions?
5    A.  Yes.
6    Q.  At the end of the day, is there a check
7  of remaining balances of the controlled substance
8  at the stores?
9    A.  In controlled substances and Schedule II
10  items, the pharmacy does a perpetual back count of
11  what should be remaining on the shelf after they
12  dispense a prescription.
13    Q.  What does that mean, a perpetual back
14  count?
15    A.  After each time a prescription goes
16  through the filling process, the pharmacist is
17  required to go back and count the remaining
18  inventory that's in the -- for that product and
19  log it into the electronic database within our
20  pharmacy data management system.
21    Q.  Are you familiar with the term monthly
22  narc audit?
23    A.  I am, yes.
24    Q.  What is a monthly narc audit?
25    A.  The monthly narc audit is a program that

Page 268

1  was developed by Giant Eagle to reconcile
2  inventory.  It will show the purchases for a given
3  time period as to when the audit was conducted and
4  show all dispensing.  And at the end of doing that
5  calculation, there is an actual -- there is an
6  expected on-hand count that is shown to the
7  pharmacy.
8        They do the count, and then they update it
9  with the actual count that is remaining in
10  inventory.
11    Q.  Do you also have annual audits of
12  inventories at Giant Eagle pharmacies?
13    A.  We do annual inventory counts at each
14  pharmacy, yes, of all controlled substances.
15    Q.  Can you tell me what a PDL is?
16    A.  PDL is an acronym at Giant Eagle for
17  pharmacy district leader.
18    Q.  What do the PDLs do?
19    A.  The PDLs -- each PDL has roughly 29 to
20  33 stores that they are responsible for business
21  oversight of a particular region.
22    Q.  Do they regularly visit the stores?
23    A.  They do regularly visit the stores, yes.
24    Q.  When the compliance team did due
25  diligence on any orders that flagged or any orders

Page 269

1  that they wanted to investigate further, would the
2  PDLs be a good source of information as to what
3  was going on --
4    A.  The PDL is a very good source of
5  information, yes.
6    Q.  Did you and others at Giant Eagle
7  corporate office utilize the PDLs when doing due
8  diligence at stores and on orders?
9    A.  Yes, sir; yes.
10    Q.  Do PDLs conduct audits or inquiries
11  concerning procedures at the stores?
12    A.  They do.
13    Q.  Do they supervise the training of
14  pharmacists at all?  Are they involved in the
15  supervising and training of pharmacists?
16    A.  They do have a part in supervising the
17  training.  As part of their audit, they would look
18  to see if required training was being conducted by
19  the pharmacist or that team members were doing
20  some computer-based training programs that had
21  been assigned to them.
22    Q.  That would be like continuing education?
23    A.  Possibly, yes.
24    Q.  Do the stores, do the Giant Eagle
25  pharmacy stores work with local law enforcement?

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    A.   Yes, they do.
2    Q.   Do the Giant Eagle pharmacy stores work
3  with local police departments?
4    A.   Yes.
5    Q.   Do the Giant Eagle pharmacy stores work
6  with the Board of Pharmacy inspectors in each
7  state?
8    A.   Yes, they do.
9    Q.   Do the Giant Eagle pharmacy stores and
10  their employees work with DEA agents?
11    A.   They have, yes.
12    Q.   Would you characterize that relationship
13  between the stores and these law enforcement
14  agencies as a cooperative working relationship?
15    A.   Yes, I would, very cooperative.
16    Q.   In working with local law enforcement
17  and the DEA, has Giant Eagle been able to uncover
18  people who are attempting to pass bad scripts?
19    A.   Yes, we have.
20    Q.   Does Giant Eagle have a pharmacy
21  investigator?
22    A.   Yes, we do.
23    Q.   And does he also work with local law
24  enforcement in trying to apprehend people who are
25  passing bad scripts?

Page 271

1    A.   Yes, sir.
2    Q.   Can you think of actually sitting here
3  today -- I'm not asking you to go into detail, but
4  are you sure that Giant Eagle has actually done
5  that?  Have they actually successfully cooperated
6  and worked with law enforcement in order to
7  apprehend the people who are passing bad scripts?
8    A.   Yes, sir.
9    Q.   You can think of actual specific
10  situations where that has occurred?
11    A.   Yes, I can.
12    Q.   Are you familiar with the term or rather
13  the acronym BOLO, B-O-L-O?
14    A.   I am, yes.
15    Q.   What is BOLO?
16    A.   That's an acronym that stands for be on
17  the lookout.
18    Q.   What does that mean?
19    A.   I believe the genesis of it is maybe a
20  law enforcement term to be -- in our situation, it
21  would be to be on the lookout for bad scripts
22  coming into the pharmacy, bad calls being made
23  into the pharmacy, used to alert our pharmacists
24  and our team members that there may be situations
25  where somebody has come into a pharmacy and tried

Page 272

1  to pass a bad script.
2    Quite frequently we send out these types of
3  alerts to neighboring stores or a region of stores
4  just to be on the lookout.  If you see anybody
5  coming in matching a description or coming in with
6  a prescription from something that has been deemed
7  a bad script, we have BOLOs sent out from our loss
8  prevention investigator to be on the lookout for
9  these things.
10    Q.   Has a BOLO at GE pharmacies ever led to
11  the apprehension of someone trying pass a bad
12  script?
13    A.   Yes, it has.
14    Q.   You can think of actual specific
15  situations?
16    A.   Yes.
17    Q.   Opposing counsel asked you earlier today
18  about pharmacists turning people away and refusing
19  to fill their prescriptions.  Do you remember
20  that?
21    A.   I do remember that, yes.
22    Q.   He wanted you to tell him specific
23  situations or the number of people or scripts that
24  have been turned away over a period of five years
25  between X date and X date.  Do you remember that?

Page 273

1    A.   Yes, I do.
2    Q.   Without getting into that level of
3  detail, are you certain that pharmacists at Giant
4  Eagle pharmacies during the period in question,
5  which I think opposing counsel asked you about
6  2009 to 2014, are you certain that they turned
7  away people --
8    A.   Yes.
9    Q.   -- who had scripts that they were not
10  comfortable filling?
11    A.   Yes.
12    Q.   You can think of particular
13  circumstances where that happened?
14    A.   Yes, I can.
15    Q.   Does Giant Eagle support its pharmacists
16  when it turns away people who want to have their
17  scripts filled because the pharmacist is
18  uncomfortable filling the script?
19    A.   It does, yes.
20    Q.   Is that part of its policies and
21  procedures or is that written anywhere that it
22  will support people who do that?
23    A.   It's part of our controlled drug
24  dispensing guideline documents.
25    Q.   You mentioned that that's something that

Page 274

1 you kind of want to tell people in a written
2 format and you kind of supported your pharmacists
3 in the fact that they can turn away prescriptions
4 if they don't feel comfortable filling; right?
5    A.   That's correct.
6    Q.   That's a policy you put in writing or
7 that's a position you put in writing?
8    A.   That is a position that we did put in
9 writing, yes.
10    Q.   Why do you put everything in writing?
11 Opposing counsel asked you a lot today about why
12 there's no policy about every single law or every
13 single thing that you want someone working at the
14 warehouse or someone working at corporate or
15 someone working at the pharmacies.  How come
16 everything isn't written into writing?
17    A.   We don't necessarily take a law and make
18 it into a policy because the law is already
19 written, and we would expect -- our expectation is
20 that all of our pharmacy team members follow the
21 law.
22    Q.   So you don't generally put legal
23 requirements into a policy document?
24    A.   Not necessarily.  We do not.
25    Q.   At the very beginning of the day,

Page 275

1 opposing counsel asked you about meetings,
2 conferences, the documents that you read to kind
3 of educate yourself on compliance with the
4 Controlled Substances Act.  Do you remember that?
5    A.   Yes, I do.
6    Q.   I don't want to get into too much detail
7 here.  But shortly after you took on the position
8 as the manager of compliance, did you have
9 meetings with counsel where you talked about the
10 regulations that were related to Controlled
11 Substances Act?
12    A.   Yes, I did.
13        MR. HUDSON:  Object to the form.
14        MR. KOBRIN:  What's your objection?
15        MR. HUDSON:  What's that?
16        MR. KOBRIN:  What's the objection?
17        MR. HUDSON:  Object to the form and also
18 you're asking questions about meeting the lawyers.
19        MR. KOBRIN:  What's your form objection?
20        MR. HUDSON:  It may open the door to me
21 asking those same questions.
22        MR. KOBRIN:  That's fine.  That's why I
23 said that he doesn't need to get into what he's
24 talking about.
25        What's the form objection?

Page 276

1        MR. HUDSON:  What's that?
2        MR. KOBRIN:  What's the form objection?
3        MR. HUDSON:  It's vague.
4 BY MR. KOBRIN:
5    Q.   Did you have meetings on a regular basis
6 with attorneys related to the Controlled
7 Substances Act and regulations?
8    A.   Yes.
9    Q.   Could you look at Exhibit 8.  Turn to
10 the page in the exhibit marked Bates number 64414.
11 We're going to the pages opposing counsel had you
12 look at.  These were factors, I believe, that
13 opposing counsel had you look at for SOM
14 measurements.
15        One of them is controlled versus
16 noncontrolled; right?
17    A.   That is correct, yes.
18    Q.   Cash payments versus third-party
19 payments?
20    A.   Yes.
21    Q.   Variety of drugs prescribed or
22 dispensed?
23    A.   Yes.
24    Q.   Schedule II versus schedule III through
25 V, do you see that?

Page 277

1    A.   Yes.
2    Q.   Again, we spoke earlier.  Did HBC ever
3 distribute Schedule II?
4    A.   No, they did not.
5    Q.   Did they only distribute Schedule III
6 through V narcotics?
7    A.   Yes.
8    Q.   Would you look at Exhibit 19.  Do you
9 remember opposing counsel asking you about
10 Exhibit 19 earlier today?
11    A.   I do, yes.
12    Q.   Would you tell me the date of
13 Exhibit 19?
14    A.   This would be September 28, 2015.
15    Q.   That's from Robert McClune to you and
16 others; correct?
17    A.   That is correct, yes, sir.
18    Q.   Could you read the line right after the
19 number one in the email?
20    A.   "McKesson/Anda blocks the controlled
21 substance order to the store based on their
22 managed thresholds."
23    Q.   Now, you told opposing counsel that this
24 might have related to Giant Eagle's preparation
25 for the GERX facility.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 Does reading bullet number one there, does
2 reading "McKesson and Anda blocks," does reading
3 that line refresh your memory on what this email
4 is really about?
5 A. This would be ordering our controlled
6 substances from McKesson and Anda, not the Giant
7 Eagle RX distribution center.
8 Q. Could you just scan the content of the
9 email really quickly because I want to ask you
10 kind of general. I want to make sure you've had
11 the opportunity. If you're comfortable with the
12 content of it, that's fine, but I want you to take
13 the chance to really look at it.
14 A. Okay.
15 Q. Now you've taken the time to really look
16 at it in the context of what we just discussed, is
17 there anything in this email about distribution
18 from Giant Eagle's GERX distribution facility?
19 A. No.
20 Q. Is there anything in this email about
21 distribution from Giant Eagle's HBC distribution
22 facility?
23 A. No.
24 Q. Go to Exhibit 22. I want to clarify for
25 the record. You talked a lot about how this

Page 279

1 was -- the policies and procedures that were going
2 into effect that maybe weren't in effect at the
3 time that this was created, and opposing counsel
4 asked you questions about whether -- why you were
5 going to keep this on file. Do you recall that?
6 A. I do.
7 Q. Shortly after the date of the email,
8 January 27, 2017 --
9 A. Yes.
10 Q. -- did Giant Eagle begin to follow the
11 procedures outlined in this suspicious order
12 monitoring policy?
13 A. Yes.
14 Q. And that was in February of 2017 that it
15 began following those policies?
16 A. That is correct.
17 Q. So when you said that it wasn't in
18 effect on the 27th of January, you meant the date
19 of this email; correct?
20 A. Yes, I did.
21 Q. You talked a little bit about always
22 trying to improve and updating the policies. Do
23 you recall that?
24 A. Yes, I do.
25 Q. And that this new document was mainly to

Page 280

1 reflect steps that you were taking to always
2 constantly improve, constantly innovate,
3 constantly trying to make things better even if
4 you were already in compliance.
5 A. That is correct, yes.
6 Q. Do you recall, and I think it's outlined
7 in this document, that at this time in 2017, you
8 began running a threshold system through CSOS?
9 A. That is correct, yes, sir.
10 Q. And what is CSOS?
11 A. CSOS is an electronic controlled
12 substances ordering system used for -- to be able
13 to order Schedule II controlled substances
14 electronically versus using a manual DEA 222 form
15 to do that ordering.
16 Q. So if you're using CSOS, all of your
17 Schedule II controlled substance orders are going
18 through an electronic system?
19 A. That is correct.
20 Q. And it would be all Schedule IIs that
21 would go through CSOS?
22 A. That is correct.
23 Q. So if there were a threshold system that
24 were put on -- that were integrated with CSOS,
25 that threshold system would apply to all Schedule

Page 281

1 II orders?
2 A. That is correct, yes.
3 Q. Would it apply to Schedule II orders
4 going to HBC?
5 A. Yes, it would.
6 Q. But HBC didn't distribute Schedule IIs;
7 correct?
8 A. That is correct. HBC did not distribute
9 Schedule II controlled substances.
10 Q. Would it apply to Schedule II orders
11 going to GERX, Giant Eagle's RX distribution
12 center?
13 A. Yes.
14 Q. Would it apply to Schedule II orders
15 going to McKesson?
16 A. Yes, it would.
17 Q. Would it apply to Schedule II orders
18 going to Anda?
19 A. Yes.
20 Q. When you integrated the threshold system
21 into CSOS in early 2017, do you recall whether
22 that new threshold system was able to stop an
23 order?
24 A. That new threshold system could stop an
25 order, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  Q.  It could stop an order?
2  A.  It could, yes.
3  Q.  Before it left the warehouse?
4  A.  That is correct.
5  Q.  So if an order flagged in the new
6  system, it would stop the order before it left the
7  warehouse?
8  A.  That is correct, yes.
9  Q.  And that system applied to all Schedule
10 II controlled substance orders?
11 A.  Yes.
12 Q.  That were going to a Giant Eagle
13 pharmacy?
14 A.  Yes.
15 Q.  Because earlier you had said that you
16 thought that Giant Eagle wasn't able to stop an
17 order until 2018.  You were mistaken then?
18 A.  I was mistaken, yes.
19 Q.  If an order is flagged in any of these
20 systems, Mr. Chunderlik, does that mean that the
21 order of controlled substances is going to be
22 diverted?
23 A.  No, it does not.
24 Q.  If an order is investigated by people in
25 compliance or people at the warehouse, does that

Page 283

1  mean that the order is going to be diverted?
2  A.  No, it does not.
3  Q.  What does it mean?  What happens to
4  these pills after they're moved from the warehouse
5  to the pharmacy?
6  A.  Whenever they're moved to the pharmacy,
7  they're used to fill prescriptions, legal
8  prescriptions.  Once they leave our warehouse,
9  they go from the shelf at the warehouse to the
10 pharmacy shelf to be dispensed for legitimate
11 prescriptions.
12 Q.  Mr. Chunderlik, was Giant Eagle always
13 in compliance with the Controlled Substances Act
14 and its regulations?
15    MR. HUDSON:  Object to the form.  Calls
16 for a legal conclusion.
17    THE WITNESS:  Yes.
18 BY MR. KOBRIN:
19 Q.  In your opinion, was it in compliance
20 both before and after it had an automated
21 threshold system?
22 A.  Yes, I believe so.
23 Q.  Thank you.
24    RE-EXAMINATION
25

Page 284

1  BY MR. HUDSON:
2  Q.  Mr. Chunderlik, what are all the
3  requirements of the Controlled Substances Act?
4  A.  I can't speak -- I can't rattle off all
5  the various aspects of the Controlled Substances
6  Act, but if I have it in front of me here, I can.
7  Q.  So if you don't know what all the
8  requirements of the Controlled Substances Act are,
9  how can you testify here today to this jury that
10 Giant Eagle or HBC is in compliance with all of
11 the requirements of the Controlled Substances Act?
12    MR. KOBRIN:  Object to form.  If you
13 want to show him the Controlled Substances Act --
14    THE WITNESS:  I could go to the
15 Controlled Substances Act.  I had that.  That was
16 available to me.
17 BY MR. HUDSON:
18 Q.  Well, opposing counsel didn't show
19 you -- HBC's counsel didn't show you the
20 Controlled Substances Act.  He just asked you was
21 HBC at all times in compliance with the Controlled
22 Substances Act; right?
23 A.  Yes.
24 Q.  And you said yes.
25 A.  Yes.

Page 285

1  Q.  So tell me all the ways in which HBC was
2  in compliance with the Controlled Substances Act.
3  A.  Well, we had physical controls in place.
4  All of our controlled substances were in approved,
5  DEA-approved cage under lock and key.  There were
6  controls that limited access to only individuals
7  who should have access to the distribution of
8  those substances.
9  Our facility was under video surveillance 24
10 hours a day.  We had security guards in place
11 during off hours to ensure that there was no entry
12 into the warehouse.  The DEA had been to our
13 warehouse and approved all the security controls
14 that we did have in place at that warehouse.
15 Q.  And those are all -- what you just
16 described are all physical controls; correct?
17 A.  Yes.
18 Q.  Those are aimed at trying to prevent
19 theft of controlled substances; right?
20 A.  I would say yes.
21 Q.  But you agree that there's a completely
22 independent obligation for distributors to monitor
23 suspicious orders; right?
24 A.  I don't necessarily believe that it's
25 independent of the security act, the controlled

Page 286

1 substance security act. I think it's the part of
2 a whole. It's one subsection of that entire
3 section.
4     Q. So in your mind, if HBC had in place the
5 proper physical controls, would that alleviate the
6 need to have a more robust monitoring system for
7 suspicious orders at the distributor level?
8     A. No. I don't believe it would alleviate
9 them from having to have that in place, no.
10     Q. And that's because independent of the
11 physical security requirements, there's a
12 completely separate provision, section (b), that
13 relates to monitoring suspicious orders; right?
14     A. It's part of the Act, yes.
15     Q. And you agree though that that's a
16 separate obligation that HBC must meet; right?
17     A. Yes.
18     Q. And you agree that the first written
19 policy that was aimed at detecting suspicious
20 orders, and we looked at it today, was drafted --
21 well, the version 2 is what we have here today,
22 and that was in April of -- April 9, 2015 is when
23 that first became effective; right?
24     A. Which one would be the exhibit that we
25 would be referring to?

Page 287

1     Q. It's Exhibit 18.
2     A. Yes. This is version 2.
3     Q. And we've established here today that
4 that's the first written policy that HBC had in
5 place that was focused on meeting the requirement
6 under Section 1310.74(b) of monitoring suspicious
7 orders; correct?
8     MR. KOBRIN: Object to form.
9     THE WITNESS: Are we talking April 9,
10 2015?
11 BY MR. HUDSON:
12     Q. Yes.
13     A. I believe there may have been something
14 prior to that timeframe.
15     Q. We agree that there may be a version 1
16 effective August 1 of 2014; right?
17     A. Yes.
18     Q. But you agree that between November of
19 2009 and August 1, 2014, HBC was a distributor of
20 Schedule III controlled substances including
21 hydrocodone combination products, and it did not
22 have a written policy or procedure specifically
23 focused on complying with the requirements of
24 1310.74(b); correct?
25     A. There were procedures in place. In a

Page 288

1 formalized written form, no, that I know of.
2     Q. So you agree that the first written
3 policy that was in place was on August 1, 2014
4 even though HBC had been acting as a distributor
5 of opioids for almost four years?
6     MR. KOBRIN: Object to form.
7     THE WITNESS: To my knowledge.
8 BY MR. HUDSON:
9     Q. And counsel in asking you questions
10 didn't present you with any other written policies
11 that we hadn't looked at; right?
12     A. No.
13     Q. In fact, you've been asked today to
14 testify about other policies at the retail level
15 or the corporate level or other levels of Giant
16 Eagle, but here today when HBC's counsel had an
17 opportunity to depose you, they didn't show you
18 any written policies, correct, any new written
19 policies; right?
20     A. No.
21     Q. So in terms of your testimony, what
22 you're saying is they were there, but there's
23 nothing as you sit here today that you can point
24 to and tie together a specific written policy that
25 existed and then show that that had an impact of

Page 289

1 reducing diversion at Giant Eagle in terms of data
2 or other processes in place where Giant Eagle was
3 trying to track its effectiveness at preventing
4 diversion; is that fair?
5     MR. KOBRIN: Object to form.
6     THE WITNESS: A lot of information
7 there. Can you -- I'm not quite following the
8 question.
9 BY MR. HUDSON:
10     Q. Sure. You were asked questions about
11 policies that exist at the retail level and, for
12 example, things that pharmacists did to try to
13 prevent diversion; right?
14     A. Yes.
15     Q. And you said -- you testified, I think,
16 BOLO was one of the initiatives. I think you said
17 working with the DEA or local law enforcement;
18 right?
19     A. Correct.
20     Q. You said that in your mind, you can
21 actually recall some instances where that led to
22 prescriptions not being filled; right?
23     A. Yes.
24     Q. How many?
25     MR. KOBRIN: Object to form.

Page 290

1    THE WITNESS: I can't put a definite
2 number to it, but it was quite a few.
3 BY MR. HUDSON:
4    Q. Were they in Ohio?
5    A. Yes, they were.
6    Q. Were any in Ohio?
7    A. Yes, they were. I'm sorry.
8    Q. Which stores in Ohio?
9    A. Did you say mainly in Ohio?
10    Q. No. Were some in Ohio?
11    A. Some were in Ohio, yes.
12    Q. And you prepared for eight hours for
13 this deposition; right?
14    A. Yes.
15    Q. In your eight hours of preparation for
16 this deposition, can you tell us about any of the
17 specific instances where there were Giant Eagle
18 initiatives aimed at preventing diversion where
19 you can show that, in fact, prescriptions weren't
20 filled or orders were stopped?
21    MR. KOBRIN: Hold on. You want to know
22 what he did in his eight hours of deposition prep?
23    MR. HUDSON: No.
24    MR. KOBRIN: I mean, you're getting --
25

Page 291

1 BY MR. HUDSON:
2    Q. Do you understand my question, sir?
3    MR. KOBRIN: Ty, I'm just objecting.
4 You're getting close to privileged information.
5 I'd like you to clarify what you want him to tell
6 you here or I'm going to tell him not to answer.
7 BY MR. HUDSON:
8    Q. I'm saying you prepared for the
9 deposition for eight hours; correct?
10    A. I did.
11    Q. And in doing so, you reviewed
12 documentation; right?
13    A. Yes.
14    Q. You thought through the questions that
15 were going to be asked in this deposition; right?
16    A. Yes.
17    Q. My question is: In all the preparation
18 that you did, have you been able to identify any
19 of the specifics where there were Giant Eagle
20 controls in place that actually led to avoiding
21 the diversion of controlled substances?
22    A. I think so, yes.
23    Q. Tell me what these specific instances
24 are.
25    A. Situations where, you know, based upon

Page 292

1 information either through a BOLO or a pharmacist
2 getting what he felt was a bad -- he or she felt
3 was a prescription that was not valid, would have
4 refused to fill it.
5    MR. KOBRIN: Ty, I'm going to interrupt
6 real quick and make an objection. Everything he
7 reviewed and that he looked at, even if he can't
8 recall it now, we have produced to you and you
9 have.
10    So if he did see something, and I don't know
11 exactly what he's speaking about, but if he did
12 see something and there were documents related to
13 these exact incidents that he's talking about, you
14 have them.
15    MR. HUDSON: That's fine. I don't know
16 whether that's an objection.
17    MR. KOBRIN: I don't want you to tell
18 him what documents he looked at yesterday. It's
19 work product.
20    MR. HUDSON: I'm not asking him that.
21    MR. KOBRIN: Well, you're getting very
22 close to asking him that, Ty. You're telling him
23 what incidents are you talking about.
24 BY MR. HUDSON:
25    Q. Mr. Chunderlik, as you sit here today,

Page 293

1 can you tell us the store where diversion was
2 prevented by Giant Eagle controls?
3    MR. KOBRIN: If you can recall.
4    THE WITNESS: I can't recall a specific
5 store.
6 BY MR. HUDSON:
7    Q. Can you remember a year when those
8 efforts led to preventing diversion?
9    A. I could -- for the timeframe that I was
10 part of the compliance team, it could have ranged
11 from 2012 all the way to the present.
12    Q. Anything more specific you can say?
13    A. Not specifically I can't, no.
14    Q. The DEA never specifically told you that
15 you're in -- that Giant Eagle or HBC is in
16 compliance with the suspicious order monitoring
17 requirements of the Controlled Substances Act;
18 correct?
19    MR. KOBRIN: Object to form.
20    THE WITNESS: We were approved as a
21 registrant. The DEA had been into our facility
22 several times to do inspections. And upon
23 inspection, we were never apprized of anything
24 like that.
25

Page 294

BY MR. HUDSON:

Q. Are you aware of any time that the DEA conducted an investigation specifically to determine whether or not HBC was in compliance of the monitoring requirements of the Controlled Substances Act?

A. It never came up in any of the inspections that I know of.

Q. Right. What I'm getting at is we can't say one way or the other the DEA's view specific to HBC's monitoring of suspicious orders of controlled substances. It's just never something that the DEA every evaluated one way or another.

MR. KOBRIN: Object to form. You're asking him to --

BY MR. HUDSON:

Q. Is that fair?

MR. KOBRIN: Object to form. He can't speak to what the DEA was evaluating or what their intent was.

MR. HUDSON: Sure, he can. He interacted with the DEA. He's testified that he did.

MR. KOBRIN: I don't think he's going to testify to what the DEA's intent was when it did

Page 295

specific things with DEA. You can depose the DEA.

BY MR. HUDSON:

Q. You've testified here today that you're aware of DEA inspections; right?

A. Yes.

Q. And you're saying you were personally involved in those?

A. I was not at the facility when those took place.

Q. So you have no -- do you have any knowledge of whether or not the DEA was specifically investigating whether or not HBC was in compliance with the distributor requirements of the Controlled Substances Act?

A. I don't know that that was ever part of their investigation at the HBC facility.

Q. So to your knowledge, you have -- let me ask it this way: You have no knowledge of the DEA ever investigating whether HBC was in compliance with the distributor requirements of the Controlled Substances Act?

A. That's correct.

Q. You were asked about investigations, and you said investigations that occurred and I think it was between 2009 and 2014. I think you said

Page 296

maybe it was 10 or 20 or maybe even greater than a hundred, and I think you said possibly more than a hundred investigations. Does that sound right?

A. In relation to?

Q. Investigations of flagged orders of controlled substances at HBC.

A. Yes.

Q. If you had a system for documenting those investigations, when you were sitting here today, you wouldn't be speculating about whether it's 10 or 20 or greater than a hundred; right?

A. I would say that's correct, yes.

Q. And you agree with me that HBC did start documenting those investigations in 2017?

A. Yes.

Q. I guess technically it would be Giant Eagle started documenting those investigations in 2017; right?

So if I asked you the same question about the number of investigations that occurred in 2017 or 2018 at the Giant Eagle distribution facility, you would point me to the repository that exists, and we'd be able to determine the exact number; right?

A. That's correct.

Q. Now, in terms of pharmacists trying to

Page 297

prevent diversion, is there any specific criteria that you're aware of that the pharmacists were applying to try to figure out whether or not the pharmacies -- the prescriptions that were seeking to be filled were legitimate or not?

A. That was part of our controlled substance dispensing guideline communicated to the pharmacists.

Q. Sure. And was the guideline or the principle at Giant Eagle to give the pharmacists discretion to apply their professional judgement in each situation?

A. That is correct.

Q. So there wasn't any particular criteria that were universally applied by pharmacists across all 200 different stores, is that fair, to your knowledge, if you know?

A. They all had the controlled substances dispensing guideline that had that information in there. They all had access to that.

Q. Right. But in terms of a criteria to apply, there was a deference to the professional judgment of each pharmacist?

A. Each situation could be different and that was -- I would say yes, that's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  Q.  You were asked some questions about why
2  policies were not put in writing, and I think you
3  said if it's law, then it's just not put into a
4  policy; right?
5      MR. KOBRIN:  Object to form.  Misstates
6  the testimony.
7  BY MR. HUDSON:
8  Q.  Did I get that right?  What was your
9  point, I guess, or what was --
10  A.  We don't necessarily take -- we don't
11  necessarily take law to input it into a policy.
12  Q.  Got it.  But you actually did that at
13  HBC; right?  You just didn't do it until August of
14  2013.
15      MR. KOBRIN:  Object to form.
16      THE WITNESS:  We put steps in to comply
17  with the law.
18  BY MR. HUDSON:
19  Q.  Right.  And specific to the suspicious
20  order monitoring, that happened either on
21  August 1, 2014 or April 9, 2015 depending on
22  whether version 1 or version 2 of that policy
23  existed; is that fair?
24  A.  Yes.
25  Q.  But there was nothing that prevented HBC

Page 299

1  from putting a policy like that in place in
2  November of 2009 when it started acting as a
3  distributor of controlled substances, was there?
4  A.  No, there was not.
5  Q.  And the same for documenting
6  investigations, that's something that HBC -- I'm
7  sorry; I keep saying HBC -- Giant Eagle started
8  doing in 2017, right, and created a repository to
9  put those investigations?
10  A.  Yes.
11  Q.  Same.  There's nothing that would have
12  prevented HBC from doing that from 2009 to 2014 at
13  the time that it was acting as a distributor of
14  Schedule III through V controlled substances;
15  right?
16      MR. KOBRIN:  Object to form.
17      THE WITNESS:  Not that I know of.
18  BY MR. HUDSON:
19  Q.  And during the time that HBC acted as a
20  distributor of hydrocodone combination products,
21  so from November of 2009 to October of 2014, there
22  were no shipments of those HCPs that were flagged
23  and stopped from shipping to the Giant Eagle
24  retail pharmacies; correct?  In other words -- let
25  me ask it a different way.  I'll try to make this

Page 300

1  more clear.
2      Between November of 2009 and October of 2014,
3  HBC never stopped the shipment of a hydrocodone
4  combination product that was going from the HBC
5  warehouse to the Giant Eagle retail pharmacies
6  because it believed that it was at risk for
7  diversion?
8      MR. KOBRIN:  Object to form.  Misstates
9  the evidence.
10      THE WITNESS:  I don't believe so, no.
11  BY MR. HUDSON:
12  Q.  Right.  Because even the two orders that
13  got reported to the DEA, those were still shipped;
14  right?
15  A.  Yes, they were.
16  Q.  And so at least for the time period
17  between November of 2009 and October of 2014,
18  there was no mechanism at the HBC warehouse where
19  HBC could stop the shipment of a controlled
20  substance because it was at risk for diversion?
21      MR. KOBRIN:  Object to form.
22  BY MR. HUDSON:
23  Q.  In an automated way.
24  A.  That's correct.
25      MR. HUDSON:  I don't have any further

Page 301

1  questions.
2      RE-EXAMINATION
3  BY MR. KOBRIN:
4  Q.  Do you have the exhibit that relates to
5  the order in 2016 that was reported to the DEA?
6  A.  Do you have a number on that, Josh?
7  Q.  The DEA 2016 packet of documents.  If
8  you look at Exhibit No. 15.  Looking at
9  Exhibit 15, this is about the 2016 order.  If you
10  look at your email on January 15, 2016, although
11  it was an automated block, what are you telling
12  Mr. Remas in your email of January 15, 2016?
13      You might want to look to Joseph Millward's
14  email, the prior email, to get the context.
15  A.  I was communicating to Kris Remas in the
16  procurement department to block orders, any
17  further orders for this item.
18  Q.  It's not just one item, is it?  It's
19  more than one item; right?
20  A.  For these items I should say.
21  Q.  Those are all buprenorphine-containing
22  products?
23  A.  Yes.
24  Q.  And that happened the same day as the
25  order got flagged; is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    A.   That looks to be -- yes; that is
2  correct.
3    Q.   So no more buprenorphine-containing
4  products went to that pharmacy.  And you guys
5  still had control over the
6  buprenorphine-containing products that went to the
7  pharmacy that morning through the Giant Eagle
8  pharmacy; isn't that correct?
9    A.   I'm sorry, Josh.  Can you repeat your
10  question.
11    Q.   The order that went to the Giant Eagle
12  pharmacy that morning, Giant Eagle still had
13  control over that order, the product that went in
14  that order because it went to a Giant Eagle
15  pharmacy?
16    A.   That is correct, yes.  We did have
17  control of that order.
18    Q.   The 2013 suspicious order that was
19  reported to the DEA, did you see the documentation
20  on that today?
21    A.   I don't recall if that was part of the
22  documentation that I reviewed today.
23    Q.   So you didn't actually review any
24  documents showing that that didn't stop the order?
25    A.   Correct.

Page 303

1    Q.   Do you know right now as you sit here
2  today without looking at that document that it
3  didn't stop the order in 2013?  Do you know that?
4    A.   I don't know that.
5    Q.   Thank you.  One moment.
6    Have you read the Controlled Substances Act
7  and its regulations?
8    A.   Yes.
9    Q.   Have you read and analyzed all the
10  policies that we discussed earlier on redirect,
11  all the Giant Eagle policies that we discussed
12  earlier on redirect?
13    A.   Yes.
14    Q.   Are you familiar, very familiar I would
15  say -- are you very familiar with those policies
16  from Giant Eagle?
17    A.   Yes.
18    Q.   Opposing counsel didn't show you any of
19  those policies today?
20    A.   I don't believe so.
21    Q.   He didn't show you any of those other
22  procedures that he asked about today and just
23  asked you about on redirect?  He didn't show you
24  any of those procedures or policies today, did he?
25    A.   I don't believe so.

Page 304

1    Q.   Opposing counsel talked to you about
2  record keeping.
3    A.   Yes.
4    Q.   And if you had logs, you could have
5  counted all the times that you followed up on
6  those flagged orders.
7    A.   Yeah.
8    Q.   But we do have a record of all those
9  flagged orders, don't we?
10    A.   We do.
11    Q.   We have the record in the logs; correct?
12  We looked at some of those logs today.  In fact,
13  opposing counsel showed you the October 2014 log
14  or something like that.
15    A.   We have the log.
16    Q.   We have all those logs going all the way
17  back to the beginning of the monitoring system,
18  don't we?
19    A.   Yes, we do.
20    Q.   So we do have records from that system,
21  don't we?
22    A.   Yes, we do.
23    Q.   Or Giant Eagle does have records from
24  that system, doesn't it?
25    A.   Yes.

Page 305

1    Q.   Thank you, Mr. Chunderlik.
2        RE-EXAMINATION (Continued)
3  BY MR. HUDSON:
4    Q.   Just a couple quick questions.
5    We've got the logs that show the suspicious
6  orders that were exceeding thresholds; right?
7  That's what we have here today.
8    A.   The orders that were exceeding
9  thresholds.
10    Q.   We just don't have any of the documents
11  that show whether or not HBC did or didn't go and
12  investigate each and every one of them; right?
13        MR. KOBRIN:  Object to form.
14        THE WITNESS:  Yes.
15  BY MR. HUDSON:
16    Q.   And then in terms of the orders that
17  were stopped, at most it was two orders of
18  buprenorphine, at most, if they were, in fact,
19  stopped?  There may or may not have been two
20  orders of buprenorphine that were stopped.  Those
21  are individual shipments; right?
22    A.   Individual shipments.
23    Q.   That's out of tens of thousands of
24  shipments of opioids to more than 200 different
25  stores in five different states; right?

Page 306

1      MR. KOBRIN: Object to form.

2      THE WITNESS: Yes.

3      MR. HUDSON: No further questions.

4      THE VIDEOGRAPHER: The time is 5:38 p.m.

5 This concludes this video deposition.

6      (Whereupon, at 5:38 p.m., the taking of

7 the instant deposition ceased.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 307

1 COMMONWEALTH OF PENNSYLVANIA )

2 COUNTY OF ALLEGHENY         ) SS:

3      C E R T I F I C A T E

4      I, Ann Medis, Registered Professional

5 Reporter, Certified Livenote Reporter and Notary

6 Public within and for the Commonwealth of

7 Pennsylvania, do hereby certify:

8      That GEORGE CHUNDERLIK, the witness

9 whose deposition is hereinbefore set forth, was

10 duly sworn by me and that such deposition is a

11 true record of the testimony given by such

12 witness.

13      I further certify the inspection,

14 reading and signing of said deposition were not

15 waived by counsel for the respective parties and

16 by the witness.

17      I further certify that I am not related

18 to any of the parties to this action by blood or

19 marriage and that I am in no way interested in the

20 outcome of this matter.

21      IN WITNESS WHEREOF, I have hereunto set

22 my hand this 21st day of January, 2019.

23

     _____

24         Notary Public

25

Page 308

1 COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
   COUNTY OF ALLEGHENY      ) S H E E T

2

3    I, GEORGE CHUNDERLIK, have read the foregoing
   pages of my deposition given on January 16, 2019,

4 and wish to make the following, if any,
   amendments, additions, deletions or corrections:

5

6 Page Line   Change and reason for change:

7 ____ ____   _____

8 ____ ____   _____

9 ____ ____   _____

10 ____ ____   _____

11 ____ ____   _____

12 ____ ____   _____

13 ____ ____   _____

14 ____ ____   _____

15 ____ ____   _____

16 ____ ____   _____

17 ____ ____   _____

18

19 In all other respects, the transcript is true and
   correct.

20

21      _____

        GEORGE CHUNDERLIK

22

23 _____ day of _____, 2019.

24 _____

        Notary Public

25